# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED DRYWALL :
PRODUCTS LIABILITY LITIGATION

MDL NO. 2047
SECTION : L

JUDGE FALLON
MAG. JUDGE WILKINSON

This Document Relates To:

**STAN BROESDER**

                    Plaintiff,

**v.**

**KNAUF GIPS KG, a German Corporation,
KNAUF PLASTERBOARD (TIANJIN) CO.
LTD., KNAUF PLASTERBOARD (WUHU) CO.
LTD., KNAUF PLASTERBOARD
(DONGGUAN) CO. LTD., Chinese limited
Liability corporations; ROTHCHILT
INTERNATIONAL LTD, a foreign corporation;
USG CORPORATION, SEACOAST SUPPLY;
Supplier Does 1-100; and Builder Does 1-100,**

                    Defendants.

## ORIGINAL COMPLAINT

COMES NOW, Plaintiff Stan Broesder ("Plaintiff") and hereby files this lawsuit against the

following Defendants (the "Defendants"): Knauf Gips KG, Knauf Plasterboard (Tianjin) Co., Ltd., Knauf

Plasterboard (Wuhu) Co., Ltd., Knauf Plasterboard (Dongguan) Co., Ltd. (collectively also referred to

herein as "Knauf"); Rothchilt International Ltd,.; Supplier Does 1-100 (collectively also referred to herein

as "Suppliers"); Installer Does 1-100 (collectively also referred to herein as "Installers"); USG

Corporation; Seacoast Supply; Distributer Does 1-100 (collectively also referred to herein as "Builders").

1



EXHIBIT
A

Except as to facts regarding Plaintiff, all facts contained in this complaint are alleged upon information and belief.

## INTRODUCTION

1.      Defendants' drywall, used in a home in which Plaintiff owns, is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors, and causes corrosion (the "Defect") of refrigerator coils, microwaves, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

2.      This defect is latent and existed in Defendants' drywall at the time of installation regardless of the way the product was installed, maintained, and/or painted. There is no repair that will correct the Defect.

3.      As a result of Defendants' conduct as alleged herein, Plaintiff has suffered personal and economic losses as a result of owning a home containing inherently defective drywall that has caused damage to the home itself and to Other Property.

4.      Plaintiff has incurred or will incur thousands of dollars in damages including, but not limited to: repair/replacement of the defective drywall, repair/replacement of Other Property, possible medical expenses, moving expenses, diminution of value of the home, loss of marketability, permanent structural defects, and loss of potential rental income.

5.      Further, as a result of Defendants' conduct as alleged herein, Plaintiff has suffered harm and/or been exposed to an increased risk of harm and thus has need for injunctive and/or equitable relief in the form of medical monitoring.

6.      Plaintiff therefore brings this action to recover damages on account of owning a home that contains defective, hazardous, or dangerous drywall manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold by Defendants.

## JURISDICTION AND VENUE

7.     This Court has personal jurisdiction over the non-resident Defendants because they were and are engaged in substantial and not isolated activity and transactions within this State. Additionally, Plaintiff's causes of action arise from Defendants, personally or through their agents, causing injury to persons and property within the State of Louisiana arising out of acts or omissions of Defendants and, and the time of the injury, products, materials, or things manufactured, distributed, supplied, installed, marketed, sold, or otherwise provided by Defendants were used and consumed within the State of Louisiana in the ordinary course of commerce, trade, or use.

8.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1332 as the Plaintiff' citizenship is diverse from all known Defendants and the amount in controversy exceeds the sum of $75,000.00 exclusive of interest and costs.

## PARTIES

### Plaintiff

9.     Plaintiff purchased a home in Chalmette, Louisiana from on or about May 2006 that had been completely renovated after Hurricane Katrina.  During the renovation, defective Chinese Drywall was installed in the home.  Overtime, the home began to suffer from a number of problems including, but not limited to, the corrosive effects of the sulfur and/or other compounds in the drywall. As a result of the Defendants' conduct and the defective and dangerous drywall, Plaintiff has suffered injury to personal and real property as further described herein.

10.     Plaintiff bought the home in Chalmette, Lousiana as an investment and/or rental property. As a result of the presence of the Chinese Drywall in the home, Plaintiff is now unable to sell and/or lease the home out of concern to the health of anyone who might live in the home.  As a result of such, Plaintiff has been and will continue to suffer substantial damages and loss of monies.

### Manufacturer Defendants – Knauf Entities

11.     Defendants Knauf Gips is a German corporation doing business in the State of Louisiana with its principal place of business located at Postfach 10, D-97343 Iphofen, Germany. Knauf Gips is a leading manufacturer of building materials and systems. Knauf Gips, together with its affiliates,

3

including Knauf Tianjin, provides building materials and systems to customers in over 50 countries, including the United States. Upon information and belief, at all material times hereto, Knauf Gips supervised, operated, trained and otherwise exercised control and/or had the right to control the operations of Knauf Tianjin, and its agents, apparent agents, and employees.

12.     Among other things, in 1995, Knauf Gips introduced its advanced production techniques and technology into China. From 1997 through 2001, Knauf Gips invested in China and established three plasterboard plants which are located in Wuhu, Tianjin and Dongguan. The product quality of all Knauf Gips' plants in China, including Knauf Tianjin, are strictly controlled according to the requirements of Knauf Gips' headquarters in Germany. Moreover, Knauf Gips' sales and technical support teams support Knauf Gips' businesses throughout the world, including Knauf Tianjin in China. Knauf Tianjin and its employees are the actual and/or apparent agents in Knauf Gips.

13.     Upon information and belief, Knauf Gips, together with its affiliates and/or actual or apparent agents, including Knauf Tianjin, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within the State of Louisiana. Upon information and belief, Knauf Gips and/or Knauf Tianjin has continuously and systematically distributed and sold drywall to numerous purchasers in the State of Louisiana and their drywall is installed in numerous homes in Louisiana. Knauf Gips and/or Knauf Tianjin manufactured and sold directly or indirectly to certain suppliers in the State of Louisiana, including USG Corporation d/b/a Seacoast, Rothchilt and Supplier/Installer/Distributor/Builder Does 1-100, defective gypsum drywall that was later installed into homes, thereby causing substantial damage. Moreover, Knauf Gips and/or Knauf Tianjin purposefully availed themselves of the jurisdiction of this Court by selling and shipping substantial quantities of drywall into the State of Louisiana.

14.     Knauf Gips is a leading manufacturer of drywall, building materials and systems with approximately 20,000 employees worldwide.

4

15.     Knauf has more than 130 production plants in over 40 countries generating annual sales in excess of $4.8 billion Euros.

16.     In 1995, Knauf began manufacturing drywall in China. In 1997, 2000, and 2001, Knauf established three plasterboard plants located in Wuhu (Anhui province), Tianjin and Dongguan (Guangdong province), respectively.

17.     Knauf Gips, together with its agents, subsidiaries, and/or affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) provides building materials and systems to customers in over 50 countries, including the United States, and more particularly, the State of Louisiana.

18.     Knauf Gips provided defective drywall that was installed in home which Plaintiff owns.

19.     Knauf Gips improperly manufactured, marketed, and later distributed the subject defective drywall in the United States. Knauf Gips also failed to provide adequate warnings regarding the hazardous and defective nature of Chinese drywall in the United States.

20.     Upon information and belief, at all material times hereto, Knauf Gips supervised, operated, trained, and otherwise exercised control and/or had the right to control the operations of Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan, and their agents, apparent agents, and employees.

21.     From 1997 through 2001, Knauf Gips established three plasterboard plants located in Wuhu, Tianjin, and Dongguan, China, respectively.

22.     The quality of all Knauf Gips' Chinese drywall plants in China is supervised, overseen, and controlled according to the requirements of Knauf Gips' headquarters in Germany.

23.     Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan and their employees are the actual and/or apparent agents of Knauf Gips.

24.     Upon information and belief, Knauf Gips, together with its agents, subsidiaries and/or affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold and placed within the stream of commerce drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within the State of Louisiana.

25.     Upon information and belief, Knauf Gips by itself and/or through its agents, subsidiaries and/or affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) has continuously and systematically distributed and sold drywall to numerous purchasers in the State of Louisiana with the knowledge that its drywall would be and is installed in numerous homes in Louisiana.

26.     As discussed more fully below, Knauf Gips by itself and/or through its agents, subsidiaries, and affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan     ) manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold, directly and indirectly, to certain suppliers in the State of Louisiana, including Defendants USG Corporation d/b/a Seacoast, Rothchilt and Supplier/Installer/Distributor/Builder Does 1-100, defective Chinese drywall that was installed in homes being built in Louisiana, thereby causing substantial damage to Plaintiff and other residents of Louisiana.

27.     Knauf Gips, each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) participated in the wrongful acts herein.

28.     Knauf Gips, each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) also acted in joint enterprise, joint venture and as each other's agent within the course and scope of said agency.

29.     At all times relevant hereto, Defendant Knauf Gips, each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) acted by and through their employees, agents, apparent agents and representatives, who were acting within the course and scope of their employment, agency, apparent agency and representation and in furtherance of Defendants' interests.

30.     Defendant Knauf Gips is the parent corporation of the Knauf Entities (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan). Knauf Gips individually participated, ratified, approved and directed the improper or illegal acts and omissions described herein.

**Knauf Gips' Chinese Drywall Distribution**

31.     Because of a shortage of construction materials from a booming housing market and massive damage in the United States caused by Hurricane Katrina and other disasters, domestic

builders, suppliers, and importers began bringing significant stocks of foreign manufactured drywall into Louisiana and the United States.

32.     At least 550 million pounds of Chinese drywall came into the United States from approximately 2004 to 2006 – enough to construct 60,000 average-size homes.

33.     Louisiana's port received a large number of shipments of Chinese drywall.

34.     In the spring of 2006, the cargo ship *Great Immensity* unloaded one shipment of more than 16 million pounds of Chinese drywall manufactured by Knauf Tianjin – enough to make approximately 1,700 homes. The *Great Immensity* unloaded shipments at more than two dozen ports throughout the United States.

35.     Shipping records show coordination between Knauf's Chinese subsidiaries, such as sharing the same vessel to transport their product to the United States. In April 2006, the *Young An Cheng* took three shipments from Knauf Wuhu and a fourth from Knauf Dongguan to the United States. All were imported by United States market.

36.     Knauf Tianjin, one of three Knauf Gips Chinese subsidiaries, has manufactured and imported at least 20% of the imported Chinese drywall that came into the United States.

37.     Shipping information indicates that Knauf Tianjin sent at least 38.7 million pounds Chinese drywall to the United States in 2006 and Knauf Wuhu sent at least 28.6 million pounds of Chinese drywall. Based on United States Customs and Census information, these figures would indicate that 78 percent of Chinese drywall imports in 2006 came from these two Knauf plants.

38.     Many builders and contractors working in Louisiana have submitted using Knauf Chinese drywall in communities throughout Louisiana.

**Knauf Gips' Subsidiary-Knauf Tianjin**

39.     Upon information and belief, Defendant, Knauf Tianjin, is an international corporation organized under the laws of China doing business in the State of Louisiana with its principal place of business located at North Yinhe Bridge, East Jingjin Road, RC-300400, Tianjin, China.

40.     Defendant Knauf Tianjin manufactured and distributed defective drywall that is in the Plaintiff's home.

41.     Knauf Tianjin improperly manufactured, marketed, and distributed the subject defective drywall in the United States. Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

**Knauf Gips' Subsidiary-Knauf Wuhu**

42.     Upon information and belief, Defendant, Knauf Wuhu, is an international corporation organized under the laws of China doing business in the State of Louisiana with its principal place of business located at No. 2 Gang Wan road, RC-241009, Wuhu Anhui, China.

43.     Defendant Knauf Wuhu manufactured and distributed defective drywall that is in the home that Plaintiff owns.

44.     Knauf Wuhu improperly manufactured, marketed, and later distributed the subject defective drywall in the United States. Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

**Knauf Gips Subsidiary-Knauf Dongguan**

45.     Upon information and belief, Defendant, Knauf Dongguan, is an international corporation organized under the laws of China doing business in the State of Louisiana with its principal place of business located at No.2 Xinsha Development Zone, RC-523147, Guangdong, China.

46.     Defendant Knauf Dongguan manufactured and distributed defective drywall that is in the home that Plaintiff owns.

47.     Knauf Dongguan improperly manufactured, marketed, and later distributed the subject defective drywall in the United States. Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

**Defendant USG Corporation**

48.     Defendant USG Corporation is a Delaware corporation with its principal place of business located at 550 W. Adams Street, Chicago, Illinois 60661, and at all times material, was authorized to and conducted business in the State of Louisiana. Defendant USG, together with its various affiliates, including Defendant Seacoast, is the nation's largest distributor of drywall and related building products.

49.     Defendant Seacoast is a Delaware corporation with its principal place of business located at 550 W. Adams Street, Chicago, Illinois 60661, and at all times material, was authorized to and conducted business in the State of Louisiana. Defendant Seacoast has numerous supply centers in the State of Louisiana. Defendant Seacoast is a subsidiary of Defendant USG.

**Defendant Rothchilt**

50.     Defendant Rothchilt is a foreign corporation doing business in the State of Louisiana with its principal place of business located at N-510 Chia Hsin Bld., Annex 96 Chung Shan N. Rd. Sec. 2, Taipei, Taiwan R.O.C.

51.     Defendant Rothchilt exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the state of Louisiana. Directly or indirectly through agents, affiliates or co-conspirators, Defendant Rothchilt's acts or omissions related to defective Drywall have injured the Plaintiff as alleged herein.

52.     Defendant Rothchilt manufactured and distributed defective drywall that is in the home that Plaintiff owns.

53.     Rothchilt improperly manufactured, marketed, and later distributed the subject drywall in the United States. Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

**Defendant Supplier/Installer/Distributor/Builder Does 1-100**

54.     The identities of Supplier/Installer/Distributor/Builder Does 1-100 are unknown to Plaintiff at this time. Supplier/Installer/Distributor/Builder Does 1-100 are builders, installers, and suppliers of defective drywall that the Plaintiff has not yet identified. When discovered the identities

of these individuals and/or entities, Plaintiff will amend to specifically name the Defendants referred to as Supplier/Installer/Distributer/Builder Does 1-100.

## GENERAL ALLEGATIONS

### A.  Drywall Background

55.     Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, sheetrock, gyproc, or simply board.

56.     A drywall panel is made of a paper liner wrapped around an inner core made primarily from hardened gypsum plaster.

57.     Drywall is typically available in 4 ft (1219 mm) wide sheets of various lengths. Newly formed sheets are cut from a belt, the result of a continuous manufacturing process.

58.     The most commonly used drywall is one-half-inch thick but can range from one quarter (6.35 mm) to one inch (25.4 mm) thick.

59.     The core material of drywall, gypsum, is available in two forms, pure gypsum, which is naturally occurring, and synthetic gypsum, which is manmade.

60.     Pure gypsum is a white to transparent mineral, but sometimes impurities color it grey, brown, or pink.

61.     Synthetic gypsum is generally manufactured with byproducts of coal-fired powerplants.

62.     Coal combustion byproducts ("CCBs" or "CCPs") are the inorganic residues that remain after pulverized coal is burned.

63.     The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

64.     In order to meet emission standards, many utilities have installed flue-gas-desulfurization (FGD) equipment. Flue gas desulfurization is a chemical process to remove sulfur oxides from the flue gas at coal-burning powerplants.

65. Various FGD methods have been developed that chemically combine the sulfur gases released in coal combustion by reacting them with a sorbent, such as limestone of lime.

66. As the flue gas comes in contact with the slurry of calcium salts, sulfur dioxide reacts with the calcium to form hydrous calcium sulfate, otherwise known as gypsum.

**B.  How Drywall Is Created**

67. In order to form drywall, gypsum must be "calcined," or partially dehydrated by heating.

68. When gypsum is heated, it loses about three quarters of its water and becomes hemihydrates gypsum which is soft and can be easily ground to a powder called hemihydrates gypsum plaster.

69. The gypsum powder is then mixed with water to form a paste or slurry.

70. While the hemihydrates gypsum plaster is in slurry form, it is poured between two paper layers to make drywall.

71. Drywall is formed by sandwiching a core of wet gypsum between two sheets of heavy paper or fiberglass mats. When the core sets and is dried in a large drying chamber, the "sandwich" becomes rigid and strong enough for use as a building material.

72. The paste or slurry is typically mixed with fiber (usually paper and/or fiberglass), plasticizer, foaming agent, potash as an accelerator, starch or other chelate as a retarder, various additives that increase mildew and fire resistance (fiberglass or vermiculite), and water.

73. Drywall may consist of two other materials with sulfur content: alkyl ethoxy sulfates as foaming agents and lignin or naphthalene sulfonates as dispersing agents.

**C. The Defective Drywall Emits Noxious and Corrosive Levels of Sulfur**

74. Upon information and belief, Defendants' drywall contained naturally mined gypsum and synthetic gypsum manufactured from CCBs.

75. When gypsum, mined or synthetic, is subjected to certain environmental conditions, the product breaks down into sulfate ions which in turn can be chemically transformed into hydrogen sulfide gas and other sulfide gases.

76.     The problem of sulfide emissions from drywall is well-understood in the drywall industry and has been studied for many years.

77.     The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.

78.     Sulfide emissions from drywall have been a particular problem in landfills and, as such, many landfills refuse to accept drywall or place strict limitations on the amounts and on the ways in which drywall can be disposed.

79.     According to a Knauf statement, the company "believes the problem drywall came from a specific [gypsum] mine, which also supplied other manufacturers." According to Knauf, the company stopped using the questionable mine in 2006.

80.     According to published reports, however, some independent environmental testing firms and building experts have said the source of the drywall problem is waste materials from the scrubbers of coal-fired power plants used to make the drywall in China.

81.     Knauf received complaints from builders and contractors about "rotten egg" smells coming from its Chinese-manufactured drywall as far back as 2006.

82.     Recently, a 2009 Knauf statement declared: "The sulfur compounds detected in testing in homes have been found at no greater levels than air outside homes or in soil, marshes or the ocean.

83.     Knauf's 2006 testing revealed, however, that its product released detectable, above-background levels of various sulfur containing compounds. In particular, Knauf's testing revealed the presence of iron disulfide from its Chinese Drywall as the likely source of the sulfur smells. Knauf's testing agency declared: "These data indicate that certain naturally-occurring sulfur-containing compounds can be emitted from the Knauf Tianjin product at concentrations higher than present in background air."

84.     One importer acknowledged in published reports that the defective Chinese Drywall was "well known in the industry" by 2007.

85.     Plaintiff could not have discovered the existence of the defect in the Chinese-manufactured drywall until press reports about the defects were released in December 2008.

**D. The Need for Medical Monitoring for the Health Effects of Sulfur Emitting Drywall**

86.      Hydrogen sulfide ("H2S"), one of the chemicals found to have been released from drywall, is considered a broad-spectrum poison, meaning that it can poison several different systems in the body, although the nervous system is most affected.

87.      The toxicity of H2S is comparable with that of hydrogen cyanide. It forms a complex bond with iron in the mitochondrial cytochrome enzymes, thereby blocking oxygen from binding and stopping cellular respiration.

88.      Exposure to lower concentrations of sulfides can result in eye irritation, a sore throat and cough, nausea, shortness of breath, and fluid in the lungs,

89.      Long-term, low-level exposure to sulfides has been associated with fatigue, loss of appetite, headaches, irritability, poor memory, and dizziness. Chronic exposure to low levels of sulfides has also been implicated in increased miscarriage and reproductive health issues.

90.      Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold defective drywall, which was unreasonably dangerous in its normal use in that the drywall caused corrosion and damage to Other Property in the home that Plaintiff owns and has the potential to cause allergic reactions, coughing, sinus and throat infection, eye irritation, breathing hazards, other health concerns, and/or significantly increased the risk of contracting a serious latent disease.

91.      As a direct and proximate result of Defendants' actions and omissions, Plaintiff and his Other Property have been exposed to Defendants' drywall and the corrosive and harmful effects of the sulfide gases and other chemicals being released from these proven hazardous substances.

92.      As a direct and proximate result of Defendants' defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, Plaintiff has suffered, and continues to suffer damages.

93.      As a direct and proximate result of Defendants' defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, Plaintiff has been

exposed to above-ground levels of sulfides and other harmful chemicals, have been placed at an increased risk of disease, and have need for injunctive relief in the form of emergency medical monitoring.

## FRAUDULENT CONCEALMENT

94.     The running of any statute of limitations has been equitably tolled because of the Defendants' fraudulent concealment. By failing to disclose a known defect to the Plaintiff and his representatives, and misrepresenting the nature of their product as safe for its intended use, actively concealed from Plaintiff the true risks associated with the drywall in the home that they occupied.

95.     Plaintiff could not have reasonably known or have learned of the manufacturing defect alleged herein and that those risks were a direct and proximate result of Defendants' acts and omissions.

96.     In addition, Defendants are stopped from relying on any statute of limitations because of their fraudulent concealment of the defective nature of their drywall. Defendants were under a duty to disclose the true information about their product and they failed in that duty to the Plaintiff.

97.     Plaintiff had no knowledge that Defendants were engaged in the wrongdoing alleged herein due to the acts of fraudulent concealment alleged herein.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Negligence – Against All Defendants)

98.     Plaintiff adopts and restates the preceding paragraphs as if fully set forth herein.

99.     Defendants owed a duty to the Plaintiff to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) installation, j) marketing, and/or k) selling drywall, including a duty to adequately warn of its failure to do the same. Defendants' duties include, but are not limited to the following:

    a.     using reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

b.    using reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

c.    using reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

d.    using reasonable care in the importing of the drywall to prevent it from containing Defects as set forth herein;

e.    using reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

f.    using reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

g.    using reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

h.    using reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

i.    using reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

j.    using reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

k.    using reasonable care in the installation of the drywall to prevent it from containing Defects as set forth herein;

l.    adequately warning and instructing Plaintiff of the Defects associated with drywall;

m.    properly  manufacturing the drywall to prevent it from containing the Defects as set forth herein;

n.    properly selecting the gypsum that did not contain excessive levels of sulfur;

o.    recalling or otherwise notifying users at the earliest date that it became known that the drywall was dangerous and Defective;

p.  advertising and recommending the use of drywall with sufficient knowledge as to its manufacturing defect and dangerous propensities;

q.  not misrepresenting that the drywall was safe for its intended purpose when, in fact, it was not;

r.  not manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

s.  not exporting and/or importing drywall in a manner which was dangerous to its intended and foreseeable users;

t.  not distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

u.  not concealing information from Plaintiff regarding reports of adverse effects associated with drywall;

v.  not properly concealing and/or misrepresenting information from the Plaintiff and/or public, concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and

w.  otherwise exercising reasonable care in the design, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall to prevent it from containing Defects as set forth herein.

100.  Defendants were negligent and breached their duty to exercise reasonable care in the design, manufacture, export, import, distribution, delivery, supply, inspection, installation, market, and/or sale of drywall, including a duty to adequately warn of its failure to do the same. Defendants' negligence included, but was not limited to the following:

a.  failing to use reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

b.  failing to use reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

17

c.  failing to use reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

d.  failing to use reasonable care in the importing of the drywall to prevent it from containing Defects as set forth herein;

e.  failing to use reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

f.  failing to use reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

g.  failing to use reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

h.  failing to use reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

i.  failing to use reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

j.  failing to use reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

k.  failing to use reasonable care in the installation of the drywall to prevent it from containing Defects as set forth herein;

l.  failing to adequately warn and instruct the Plaintiff of the Defects associated with drywall;

m.  failing to properly manufacture the drywall to prevent it from containing the Defects as set forth herein;

n.  failing to properly select the gypsum that did not contain excessive levels of sulfur;

o.  failing to recall or otherwise notify users at the earliest date that it became known that drywall was dangerous and Defective;

p.    advertising and recommending the use of drywall without sufficient knowledge as to its manufacturing Defect and dangerous propensities;

q.    misrepresenting that drywall was safe for its intended purpose when, in fact, it was not;

r.    manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

s.    exporting and/or importing drywall in a manner which was dangerous to its intended and foreseeable users;

t.    distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

u.    concealing information from Plaintiff regarding reports of adverse effects associated with drywall;

v.    improperly concealing and/or misrepresenting information from the Plaintiff and/or the public, concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and

w.    failing to otherwise exercising reasonable care in the design, manufacture, export, import, distribution, delivery, supply, inspection, market, installation and/or sale of drywall to prevent it from containing Defects as set forth herein.

101.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiff has incurred personal, economic and other damages and is entitled to recover monetary damages for: the repair/replacement of the contaminated drywall, replacement of Other Property and the repair and/or replacement of any materials contaminated or corroded by the drywall.

102.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiff has incurred or will incur incidental and consequential damages for loss of rental income, diminution of value of the home, moving costs, remediation costs, and other related expenses.

103.    Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

## SECOND CAUSE OF ACTION
### (Negligence Per Se – Against all Defendants)

104.    Plaintiff adopts and restates the preceding paragraphs as if fully set forth herein.

105.    Defendants breached their duties to Plaintiff by failing to exercise reasonable care in manufacturing, inspecting, distributing, selling and installing the drywall.

106.    Defendants likewise breached their duties to Plaintiff by failing to warn Plaintiff about the defective nature of the drywall, which both malfunctioned and generated untoward side-effects. Defendants, through the exercise of reasonable care, knew or should have known the nature of the drywall and the adverse effects that it could have on the health of the homes it was used to build and the individuals within them.

107.    Given the range defects of the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause both economic and physical damage to Plaintiff and members of the public.

108.    Economic damages include replacement and mediation to Other Property and medical expenses incurred as a result of exposure to Defendants' drywall.

109.    Defendants' drywall was the proximate cause of both economic and physical damage brought upon Plaintiff.

110.    Due to Defendants' negligence, Plaintiff has and will continue to suffer economic and physical damages.

111.    Although Defendants knew or should have known about the defects of their drywall product, Defendants nevertheless continued to manufacture the product and sell it to members of the public.

## THIRD CAUSE OF ACTION
### (Breach of Louisiana Products Liability Act (La. R.S. 9:2800.51 *et seq.*) – Against All Defendants)

112.    Plaintiff adopts and restates the preceding paragraphs as if fully set forth herein.

113.    Plaintiff's claims for damages were directly and proximately caused by Defendants' violation of the Louisiana Products Liability Act. As a consequence of Defendants violating the Act, Defendants are liable to Plaintiff for all damages caused by the unreasonable characteristics of the product they manufactured and distributed.

114.    Defendants' products described herein are unreasonably dangerous in construction or composition as provided in La.R.S. 9:2800.55, are unreasonably dangerous in design as provided in La.R.S. 9:2800.56, and are unreasonably dangerous because of inadequate warnings as provided by La.R.S. 9:2800.57.

## FOURTH CAUSE OF ACTION
### (Breach of Express Warranty (La. R.S. 9:2800.58) – Against All Defendants)

115.    Plaintiff adopts and restates the preceding paragraphs as if fully set forth herein.

116.    Defendants expressly warranted that the drywall they manufactured, distributed, and/or installed was safe, efficacious, well tested and of high quality.

117.    By manufacturing, distributing, selling, and/or installing a defective, unsafe, and poorly manufactured drywall product, Defendants have breached their express warranty, in violation of La. R.S. 9:2800.58.

118.    Defendants knew or should have known that their warranties were specious.

119.    Plaintiff and/or his representatives relied on these express warranties to their detriment.

120.    As a direct result of this breach of expressed warranty, physical and economic damages have been, and continue to be, incurred by the Plaintiff.

## FIFTH CAUSE OF ACTION
### (Breach of Implied Warranty – Against All Defendants)

121.    Plaintiff adopts and restates the preceding paragraphs as if fully set forth herein.

122.    When Defendants manufactured, distributed, sold, and/or installed their drywall in home that Plaintiff owns, Defendants implicitly warranted that the product was safe, efficacious, well tested and of high quality. Plaintiff was the non-exclusive, but intended beneficiary of these warranties.

123.    By manufacturing, distributing, selling, and/or installing a defective, unsafe, and poorly manufactured drywall product, Defendants have breached their implied warranties.

124.    These implied warranties were relied on by Plaintiff and the purchasers of the drywall, because it is understood that Defendants have knowledge as to the quality, safety, and efficacy of the drywall they manufacture, distribute, sell, and/or install.

125.    As a direct result of this breach of implied warranty, physical and economic damages have been, and continue to be, incurred by Plaintiff.

## SIXTH CAUSE OF ACTION
### (Fraudulent Concealment – Against All Defendants)

126.    Plaintiff adopts and restates the preceding paragraphs as if fully set forth herein.

127.    Defendants knew or should have known that Defendants' drywall was defective, unsafe and poorly manufactured.

128.    Defendants fraudulently concealed that Defendants' drywall was defective, unsafe, and poorly manufactured.

129.    Defendants knew or should have known that their drywall would cause corrosion of, among other things, electrical wiring, air conditioner coils, plumbing and other personal property throughout the effected homes.

130.    Defendants fraudulently concealed that their drywall caused damage to, among other things, electrical wiring, air conditioner coils, plumbing and other personal property throughout the effected homes.

131.    Defendants fraudulently concealed that they had received and/or otherwise learned of complaints regarding their drywall product.

22

132.   Defendants' above-mentioned concealments of key facts regarding the Defendants' drywall resulted in physical and economic damages that have been, and continue to be, incurred by the Plaintiff.

133.   As a result of the Defendants' fraudulent concealments regarding their drywall product, physical and economic damages have been, and continue to be, incurred by Plaintiff.

## SEVENTH CAUSE OF ACTION
### (Fraudulent Misrepresentation – Against All Defendants)

134.   Plaintiff adopts and restates the preceding paragraphs as if fully set forth herein.

135.   Defendants fraudulently alleged to the public that the Defendants' drywall was safe, efficacious, well tested and of high quality.

136.   Defendants knew the above-mentioned representations made to members of the public were specious and fraudulent. These representations were made recklessly and with the intent of defrauding members of the public.

137.   Defendants' drywall was installed in the home that Plaintiff occupied in reliance of the veracity of the above-mentioned fraudulent representations.

138.   As a result of Defendants' fraudulent representations regarding their drywall product, physical and economic damages have been, and continue to be, incurred by Plaintiff.

## EIGHTH CAUSE OF ACTION
### (Negligent Misrepresentation – Against All Defendants)

139.   Plaintiff adopts and restates the preceding paragraphs as if fully set forth herein.

140.   As discussed herein, Defendants fundamentally misrepresented material facts regarding the characteristics of the drywall and omitted other material facts that should have been disclosed to Plaintiff and the public.

141.   In disseminating information regarding the drywall, Defendants negligently caused statements to be made, which they knew or should have known were inaccurate and untrue.

142.   As a direct consequence of the Defendants' negligent misrepresentations and omission of material facts regarding the defective drywall, Plaintiff will be irreparably harmed and otherwise

23

damaged in an amount which cannot presently be calculated.

## NINTH CAUSE OF ACTION
### (Unjust Enrichment – Against All Defendants)

143.   Plaintiff adopts and restates the preceding paragraphs as if fully set forth herein.

144.   Each Defendant individually and collectively profited from the sale of the defective drywall to the owner of the home which Plaintiff occupied, receiving payment themselves or through an agent. Defendants received payment for the defective drywall and have retained those sums to the detriment of the Plaintiff.

145.   Defendants' receipt and retention of the profits gained by sale of the defective drywall used in the home that Plaintiff occupied is unjust and inequitable.

146.   As a direct and proximate result of Defendants' conduct complained of herein Plaintiff has sustained substantial damages.

147.   Defendants knew or should have known of the damages their defective drywall would cause as described herein.

## TENTH CAUSE OF ACTION
### (Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law (L.SA-R.S. 51:1401) – Against All Defendants)

148.   Plaintiff adopts and restates the preceding paragraphs as if fully set forth herein.

149.   This is an action for relief under section L.SA-R.S. 51:1401, *et seq.* (Louisiana Unfair Trade Practices and Consumer Protection Law)

150.   The Louisiana Unfair Trade Practices and Consumer Protection Law prohibits unfair or deceptive methods, acts or practices in the conduct of trade or commerce.

151.   The Defendants acts and omissions as well as their failure to use reasonable care in this matter as alleged in this Complaint equals unfair and deceptive methods, acts or practices.

152.   The unconscionable, illegal, unfair and deceptive acts and practices of Defendants violate the provisions of Louisiana Unfair Trade Practices and Consumer Protection Law. As a result,

Plaintiff had suffered actual damage for which they are entitled to relief. Plaintiff is also entitled under the Law to recover reasonable attorneys' fees.

153.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiff has incurred economic damages and are entitled to recover monetary damages.

154.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiff has incurred or will incur incidental and consequential damages.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury as to all issues so triable as a matter of right.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Honorable Court grant the following relief:

1.    A judgment finding Defendants liable jointly, severally and in solido to Plaintiff and requiring that Defendants pay compensation to Plaintiff to the full extent permitted by the law, together with pre-judgment and post-judgment interest;

2.    An order requiring medical monitoring;

3.    Costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and reasonable attorneys' fees; and

4.    Such other relief as the Court may deem just and appropriate.

Respectfully submitted,

**REICH & BINSTOCK, LLP**

Dennis C. Reich
Texas State Bar No. 16739600
Jordan M. Torry
Texas State Bar No. 24058152
4265 San Felipe, Suite 1000
Houston, Texas 77027
Telephone:  713.622.7271
Facsimile:  713.623.8724

CHRISTOPHER A. SEEGER
**SEEGER WEISS LLP**
One William Street
New York, New York 10004
Telephone: 212-584-0700

Frank J. D'Amico
**LAW OFFICES OF FRANK D'AMICO, JR.**
622 Baronne Street
New Orleans, LA 70113
Phone:  504-525-9561
Fax:  504-525-1073

*ATTORNEYS FOR PLAINTIFF*