# UNITED STATES DISTRICT COURT
# IN AND FOR THE MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

KRISTIN MORGAN CULLITON,
individually and on behalf of all similarly
situated individuals,

CASE NO. 09-cv-00589-JDW-TGW

        Plaintiffs,

v.

TAYLOR MORRISON SERVICES, INC., a
Delaware Corporation, Successor to Morrison
Homes, Inc., a Delaware Corporation d/b/a
Morrison Homes, Knauf Gips KG, a German
Corporation, Gebr Knauf Verwaltungsgesellschaft
KG, a German Corporation, Knauf Plasterboard
Tianjin Co. Ltd., a Chinese Limited Corporation,
Rothchilt International Ltd., a Chinese Limited
Corporation, USG Corporation, a Foreign
Corporation, L&W Supply Corporation, d/b/a
Seacoast Supply, a Foreign Corporation, and
Banner Supply Company, a Florida Corporation,

        Defendants.

_____/

## PLAINTIFF'S MOTION FOR PROTECTIVE ORDER
## PURSUANT TO FED. R. CIV. P. 23(d)

Plaintiff Kristin Morgan Culliton (hereinafter "Plaintiff" or "Ms. Culliton"), by and

through undersigned counsel, hereby moves the Court for a protective order protecting the

interests of putative class members in the instant action, pursuant to Rule 23(d) of the Federal

Rules of Civil Procedure for the reasons set forth in the accompanying Memorandum of Law.

This putative class action arises from the installation of defective drywall in numerous

homes throughout Florida. The drywall contains volatile sulfur compounds and excessive

organic matter. As the sulfur compounds are released into the air, a sulfurous "rotten egg" smell

**Exhibit "A"**

occurs, and exposed metallic surfaces in the home tarnish and corrode, causing the failure of air conditioning systems and adversely impacting other elements in the home. In response to numerous complaints about the problem, Defendant Taylor Morrison has implemented a plan to induce affected homeowners and putative class members to completely release and assign their property damage claims arising from the defective drywall against all potential defendants in exchange for Taylor Morrison's promise to repair their homes. *See* Exhibit 1, Repair and Relocation Agreement Package. In addition, Taylor Morrison is unilaterally providing misleading, conflicting, and inaccurate information to putative class members concerning their rights and the steps Taylor Morrison is promising to take to address the Chinese drywall problem. *See* Exhibit 2, Affidavit.

Accordingly, Plaintiff respectfully requests that the Court enter an order: (1) prohibiting Defendant Taylor Morrison from enforcing the "Limited Release" and "Assignment of Claims" provisions contained within its unilaterally-drafted Repair and Relocation Agreements against unrepresented homeowners; (2) declaring as void the "Limited Release" and "Assignment of Claims" provisions contained in any and all Repair and Relocation Agreements executed by unrepresented homeowners subsequent to the initiation of this action; (3) requiring Taylor Morrison to distribute a Court-approved Notice or Information Sheet to all Taylor Morrison homeowners whose homes have been confirmed as containing Chinese drywall, including those who have previously been sent Repair and Relocation Agreements, disclosing the instant class action and the effect that the homeowners' execution of Defendant's Repair and Relocation Agreement may have on their opportunity to participate in this action; and (4) requiring Taylor Morrison to identify any homes that have been confirmed to contain the defective drywall, and

those homeowners to whom Taylor Morrison has provided a Repair and Relocation Agreement and associated documents.

## MEMORANDUM OF LAW

### I.   BACKGROUND

This class action was brought by Plaintiff Kristin Culliton against Defendant Taylor Morrison and others based on Taylor Morrison's use of defective drywall imported from China (hereinafter "Chinese drywall") in the construction of Ms. Culliton's home located at 15314 Skip Jack Loop, Bradenton, Florida 34202, as well as in the homes of other Florida homeowners whom Ms. Culliton seeks to represent. Plaintiff's First Amended Complaint and Motion for Class Certification were filed concurrently on January 26, 2009 in the Circuit Court of the Twelfth Judicial Circuit in and for Sarasota County, Florida.[1] Defendant subsequently filed its responsive pleading on February 9, 2009.

Despite having full knowledge of the fact that Plaintiff's action was filed on behalf of a class consisting of all Taylor Morrison homeowners in Florida whose homes were constructed with Chinese drywall, Taylor Morrison has been providing putative class members with misleading and often conflicting information about this action, as well as actively seeking to induce homeowners into a complete surrender of all their potential claims in the action. For homeowners whose homes contain the Chinese drywall, Taylor Morrison has been providing a package that is attached hereto as Exhibit 1, and contains: a cover letter to the homeowner; a

---

[1] Subsequent to filing the First Amended Complaint, Plaintiff and Defendant stipulated to the transfer of this action to Manatee County and to the filing of Plaintiff's Second Amended Complaint on March 6, 2009. Defendant L&W Supply Corporation then removed this action to the instant Court on March 30, 2009. (Doc. Entry 1).

Chinese Drywall Fact Sheet; a Master Q & A; a Homeowner Relocation Cover; and a Repair and Relocation Agreement (hereinafter "the Agreement") – all of which were unilaterally drafted by Taylor Morrison.

The Agreement proposes the non-negotiable terms pursuant to which Taylor Morrison will repair homes containing Chinese drywall. In addition to containing unfavorable terms and missing several essential terms, the Agreement completely fails to disclose to homeowners that the instant class action is pending, and that executing Defendant's Agreement could have the effect of opting homeowners out of participating in this action. Plainly, it was Defendant's intent to deny homeowners the opportunity to consult counsel or make an informed and knowing decision concerning whether or not to accept the proposed Agreement, and to take advantage of vulnerable and often desperate homeowners whose homes are uninhabitable and incurring damage from the defective drywall. In other words, Taylor Morrison's goal here is to "pick off" putative class members one-by-one. By failing to reveal the existence and nature of this class action to homeowners and presenting its Agreement in a take-it-or-leave-it manner, Taylor Morrison is seeking to mislead homeowners into believing that acceptance of the Agreement is the only way they can secure any home repairs at Taylor Morrison's expense.

As mentioned above, certain statements and representations in the materials provided to homeowners are misleading, incomplete, and inaccurate, and the proposed Agreement contains terms that are adverse to homeowners and omits some essential terms. For example:

- The Agreement releases or assigns all property damage claims against not only Taylor Morrison, but against every other entity as well, and effectively extinguishes all homeowner property damage claims. ¶¶ 15, 17.

4

- The homeowner must acknowledge that an independent drywall contractor purchased and installed the drywall. Background, Section B.

- The definition of "Residence" leaves it unclear whether Taylor Morrison will repair damage to the landscaping and exterior grounds of the property that occurs during the removal and repair process.

- Taylor Morrison removes and disposes of all the defective drywall. ¶ 2.

- Homeowners are barred from the property unless they give 24-hour notice and are accompanied by a representative of the Builder. ¶ 10.

- Taylor Morrison is under no obligation to begin the process in a timely fashion. The promise to pay relocation expenses is only triggered upon Taylor Morrison providing notice to vacate the home.

- Payment for damage to personal property is limited to $1,500. ¶ 8.

These terms not only threaten to extinguish the rights of affected homeowners; they also could result in the permanent loss of crucial evidence, such as the very drywall that is causing damage to the putative class of affected homeowners.

The other materials Taylor Morrison is providing to homeowners in addition to the Agreement similarly contain inaccurate and conflicting information. The so-called "Fact Sheet" conflicts with the terms of the Agreement in numerous areas, such as the scope of the work to be performed (Fact Sheet: "demolition of the inside of the home down to the studs"); makes incomplete statements regarding the source of the problem with the drywall (Fact Sheet: "naturally occurring sulfur compound," no mention of the levels of excessive organic material); and improperly suggests that the Florida Department of Health has concluded that there is no health risk.

The "Master Q&A" also contains inaccurate and misleading information. Paragraph 11 suggests that homeowners may move out immediately and begin receiving a stipend, but the

Agreement only promises a stipend to homeowners who have received a Notice to Vacate.

Paragraph 12 again implies that the Florida Department of Health has concluded that there is no

health risk, which is not the case.

Finally, the last paragraph of the "Relocation Cover" provided to homeowners induces

homeowners to release and assign all of their property damage claims against any and all entities

by noting that "homeowners do not have the resources to take legal action against those

ultimately responsible for the problem," without any disclosure of this pending action or any of

the other related actions against Taylor Morrison, falsely suggesting to homeowners that Taylor

Morrison's offer is the only option available to address the problems in their homes caused by the

Chinese drywall.

## II.    ARGUMENT

### A.    Defendant Should Be Prohibited from Enforcing the "Limited Release" and "Assignment of Claims" Provisions of the Agreement and the Provisions Should Be Found Void in Any and All Executed Agreements Because Enforcement Would Eliminate Legal Remedies Potentially Available to Putative Class Members of Which They Had No Knowledge.

As recognized by the United States Supreme Court, class actions "serve an important

function in our system of civil justice." *Gulf Oil v. Bernard*, 452 U.S. 89, 99 (1981).  Class

actions, such as this case against Taylor Morrison, provide a means for a class representative to

"vindicat[e] the rights of individuals who otherwise might not consider it worth the candle to

embark on litigation in which the optimum result might be more than consumed by the cost. *Id.*

at 99-100, n. 11 (quoting *Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 328 (1980).  The

class action device, because it disposes of numerous common claims in a single lawsuit, also

presents

6

opportunities for abuse as problems for court and counsel in the management of cases .... Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties.

*Id.* at 100.

Taylor Morrison's requirement under Paragraphs 15 and 17 of the Agreement that homeowners release, assign, and waive their rights to pursue claims against all other responsible parties, including, but not limited to, the Defendants named in this lawsuit, infringes on the Court's duty to protect the interests of potential class members. Rule 23 serves to protect the interests of class members by requiring that class members receive court-approved notice of the proceeding and an opportunity to make an informed decision whether to exclude themselves ("opt out") from the class. Rule 23(b)(3), (c)(2) Fed. R. Civ. P.; *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974). This notice, and the corresponding right to opt out of the class, are supposed to take place *after* class certification, not *before*, under supervision of the court, and not as a result of the unilateral communication of incomplete information from a party. *See* H. Newberg & A. Conte, *Newberg on Class Actions*, §§ 8:2, 8:9 (4th ed. 2002) (emphasis added). Accordingly, in the event that the Court declines to find the Agreements unenforceable, the Court should at least declare that any putative class members who executed such Agreements after the initiation of this class case are not precluded from participating in this class action, should a class be certified.

Pre-certification contacts with class members that result in class members effectively opting out of the class before certification – such as is occurring here through Taylor Morrison's distributing to putative class members Agreements containing releases and assignments of rights

7

– are an abuse which interferes with the Court's authority and ability to effectuate the policies of

Rule 23. "Courts are concerned that such communications may prevent class members from

making informed decisions about exclusion." *Id.* at § 15-19, pp. 15-52.

Courts have not hesitated to restrain parties from communicating with actual or potential

class members when the communications could potentially interfere with the proper conduct of

class litigation, especially in cases where a defendant seeks to encourage class members to opt

out of a class. The Eleventh Circuit case of *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193

(11th Cir. 1985) is instructive. In *Kleiner*, the defendant bank, with the goal of diminishing the

size of the certified class, engaged in an orchestrated campaign to contact putative class members

in order to encourage them to opt out. The court recognized that although it was in the

defendant's interests to diminish the size of the class, "Such conduct reduces the effectiveness of

the 23(b)(3) class action for no reason except to undermine the purposes of the rule." *Id.* at 1202.

The court went on to note that

> A unilateral communications scheme, moreover, is rife with potential for
> coercion. 'If the class and the class opponent are involved in an ongoing business
> relationship, communications from the class opponent to the class may be
> coercive.' This litigation is illustrative. The class consisted of Bank borrowers,
> many of whom were dependent on the Bank for future financing. Bank customers
> affected by the litigation included 'those who anticipated seeking a note
> "rollover," new loans, extensions of lines of credit, or any type of discretionary
> financial indulgence from their loan officers, and who did not have convenient
> access to other credit sources.'

*Id.* (citations omitted).

The circumstances before the Court here are very similar. Homeowners who have agreed

to Taylor Morrison's Agreement likely did so only because they were unaware that a class action

was pending on their behalf, and, accordingly, believed they had no other recourse for correcting

8

the problems in their homes caused by Chinese drywall.  Moreover, as discussed above, the

average homeowner is likely unaware of the multitude of missing and unfavorable terms in

Defendant's proposed Agreement.  Not to mention the fact that the package sent by Taylor

Morrison to homeowners, including the letter and Agreement, improperly contains opinions and

statements of a non-attorney concerning the legal effect of executing the Agreement.

Homeowners may not realize that signing Defendant's Agreement not only releases Taylor

Morrison from related future claims, but also releases *all* manufacturers and distributors involved

in the Chinese drywall supply chain.  Further, it goes without saying that homeowners reviewing

or executing Defendant's Agreement are unaware that signing the Agreement may opt them out

of participating in and benefitting from the instant class action since homeowners have not been

given any notice that this case is currently being litigated on their behalf.

     Notably, other federal courts have addressed similar scenarios where defendants' pre-

certification communications with class members failed to disclose the existence of a related

pending class case.  *Pollar v. Judson Steel Corp.*, 1984 U.S. Dist. Lexis 19765 (N.D. Cal. Feb. 3,

1984).  The *Pollar* court responded by limiting the defendants' communications with class

members.  "After finding that improper pre-certification communications caused confusion

concerning potential class members' rights, the court ... prohibited the defendants from further

communication with any class member on issues related to the litigation, ordered the defendants

to turn over to class counsel all written communications from potential class members and

ordered the defendants to pay for corrective notice... [T]he defendants in *Pollar* caused confusion

concerning potential members' rights by running advertisements in newspapers regarding an

affirmative action program for women, without disclosing the existence of the class action

litigation." *Gerlach v. Wells Fargo & Co.*, No. C 05-0585 CW, 2006 WL 824652, at *6 (N.D.

Cal. March 28, 2006).

Numerous other federal cases are consistent with *Kleiner*. *See, e.g. Erhardt v. Prudential*

*Group, Inc.*, 629 F.2d 843 (2d Cir. 1980) (defendant enjoined from further communication with

class after sending letters to class members warning them that they might be liable for costs if

they remained in class and urging them not to participate); *In re School Asbestos Litig.*, 842 F.2d

671 (3d Cir. 1988) (attempts to influence class member participation characterized as "blatant

misconduct"); *Haffer v. Temple University*, 115 F.R.D. 506 (E.D. Pa. 1987) (order prohibiting

improper communications was required where defendant and its counsel held *ex parte* meetings

with class members and tried to dissuade them from meeting with class counsel).

"The fact that the class has yet to be certified does not prevent the Court from issuing a

protective order limiting communications with putative class members to protect the integrity of

the litigation." *Ojeda-Sanchez v. Bland Farms*, No. 608CV096, 2009 WL 577602, at *7 (S.D.

Ga. March 4, 2009) (citing *Jenifer v. Delaware Solid Waste Authority*, No. Civ. A. 980279

MMS, Civ. A. 980565 MMS, 1999 WL 117762 (D.Del. Feb. 25, 2009)). "The solicitation of

exclusions from a pending class action by a defendant before the court has determined that the

case may proceed as a class action constitutes a serious challenge to the authority of the court to

have some control over communications with class members." *Newberg on Class Actions*, §

15.19, pp. 15-52. The reasons why pre-certification solicitation of opt outs is impermissible were

aptly summed up as follows:

> The defendant's argument that the failure to determine the propriety of
> maintaining this action as a class action makes the notice provisions of rule 23(c)
> inapplicable, is not material to the scope of the court's power under rule 23(d) to

deal with abuses ... It would be a strange rule, indeed, where a court would be powerless to deal with what it considered abuses because the litigation has not reached a certain stage. To adopt such a rule would be little more than inviting counsel to engage in a race to complete questionable practices before the court acquires the power to prevent such abuses. For the purpose of preventing and correcting abuses, once an action is filed as a class action it should be so presumed even prior to a formal determination that it is a class action.

*Weight Watchers of Philadelphia v. Weight Watchers Int'l*, 53 F.R.D. 647 (E.D.N.Y. 1971);

*modified by Weight Watchers of Philadelphia v. Weight Watchers Int'l*, 55 F.R.D. 50 (E.D.N.Y.

1971). Here, Taylor Morrison is clearly engaging in a "race to complete questionable practices"

in a misguided effort to deprive putative class members of their claims against Taylor Morrison

and every other potentially liable party prior to class certification. In a comparable situation,

where plaintiffs submitted evidence establishing that defendants communicated directly with

class members, the court held that defendants' communications with class members were

inherently coercive, even if the coercion was unintentional. *Ojeda-Sanchez*, 2009 WL 577602, at

*7. "Should these types of communications continue, they would threaten the ability of plaintiffs

and potential plaintiffs to assert their rights through this litigation." *Id.*

Again, other federal courts have similarly ruled when confronted with the issue of pre-

certification contacts. *See, e.g. Hampton Hardware, Inc. v. Cotter, Inc.*, 156 F.R.D. 630, 634

(N.D. Tex. 1994) (where defendant sent letters to potential class members discussing lawsuit and

discouraging participation, potential class members required protection from "making decisions

based upon one-sided information from an interested party..."); *Burrell v. Crown Petroleum, Inc.*,

176 F.R.D. 239, 243 (E.D. Tex. 1993) ("the effect of a defendant attempting to influence

potential [class members] not to join an embryonic class action would be just as damaging to the

purposes of Rule 23 as a defendant that influences members of an already certified class to opt

11

out"); *Impervious Paint Industries, Inc. v. Ashland Oil Co.*, 508 F.Supp. 720, 722-23 (W.D. Ky.

1981) ("During the time between the institution of a class action and the close of the opt out

period, ... [i]t is essential that the class members' decision to participate or withdraw be made on

the basis of independent analysis of its own self interest. It is the responsibility of the Court as a

neutral arbiter ... to insure this type of free and unfettered decision.")

In light of Taylor Morrison's campaign to diminish the class, the Court should take

remedial action. Assuming the Court does not declare Defendant's Agreement unenforceable,

the Court should enter an order declaring that any putative class members who signed

Defendant's Agreement are still permitted to participate in this litigation, since homeowners had

no knowledge of this action and, therefore, did not make an informed decision when executing

the Agreements.

    **B.**    **Taylor Morrison Should Be Required to Provide Certain Court-Approved**
        **Disclosures to Putative Class Members and Identify Those Putative Class**
        **Members It Has Communicated With Concerning the Chinese Drywall Issue.**

In all correspondence and communications between Taylor Morrison and homeowners,

Taylor Morrison should be required to include meaningful and comprehensive disclosures

concerning the instant class action and what effect a homeowner's execution of the Agreement

has upon the homeowner's ability to potentially participate in this action. In addition, Taylor

Morrison should be required to provide these disclosures to homeowners with whom it has

previously communicated and/or already executed Agreements. These disclosures can be

distributed in the form of a Court-approved notice or an information sheet. As stated by the

*Kleiner* court, "it is critical that the class receive accurate and impartial information regarding the

status, purposes, and effects of the class action. *Kleiner*, 751 F.2d at 1202. The disclosures to

homeowners should include:

- The nature of the lawsuit and the allegations against Taylor Morrison and other corporate defendants;

- The nature of the equitable and legal relief sought;

- That if a class is certified, the Court will provide Notice to class members informing them of their rights and options; and

- The names, addresses, and phone numbers of Plaintiff's counsel who can be contacted for information about the lawsuit.

Fundamental fairness dictates that a putative class member should have the benefit of full

and complete information when faced with the decision whether to waive his or her right to

participate in the class action. Further, because Taylor Morrison should be required to identify

those homeowners whom it has identified as having the Chinese drywall and those to whom it

has provided the Repair and Relocation Agreement and associated documents.

## III.    CONCLUSION

Taylor Morrison is engaging in an improper course of conduct designed to rush

vulnerable, unrepresented homeowners into signing away potential rights in exchange for vague

and uncertain promises by Taylor Morrison. The release and assignment of claims provisions

included in Defendant's Repair and Relocation Agreement are unenforceable and void because,

unbeknownst to homeowners, these provisions have the effect of opting them out of the instant

class action without even receiving notice of this pending lawsuit or the advice of legal counsel.

Defendant should be prohibited from enforcing these provisions of its Agreement against

homeowners who executed a "Repair Agreement" subsequent to the initiation of this action,

13

since homeowners were given no notice of the instant class action pending on their behalf, and therefore, the decision to execute the Agreements was not an informed and knowing decision. Permitting Taylor Morrison to enforce said Agreements would improperly allow Defendant to interfere with this Court's inherent authority under Rule 23, Fed. R. Civ. P.  Further, Defendant should be required to make disclosures concerning the instant action to all Taylor Morrison homeowners, including those who previously executed Agreements.

Respectfully submitted,

               s/ Christopher Casper

Christopher Casper
FBN: 048320
Jonathan B. Cohen
FBN: 0027620
JAMES, HOYER, NEWCOMER, SMILJANICH
   & YANCHUNIS, P.A.
4830 W. Kennedy Blvd., Suite 550
Tampa, Florida  33609
Telephone: (813) 286-4100
Facsimile: (813) 286-4174
ccasper@jameshoyer.com

Darren R. Inverso
NORTON, HAMMERSLEY, LOPEZ & SKOKOS, P.A.
1819 Main Street, Suite 610
Sarasota, Florida  34236
Telephone: (941) 954-4691

Tod N. Aronovitz
ARONOVITZ LAW
777 Brickell Ave., Suite 850
Miami, Florida 33131
Telephone: (305) 372- 2772

**Attorneys for Plaintiff Kristin Morgan Culliton**

14

## LOCAL RULE 3.01(g) CERTIFICATE

Plaintiff's counsel has conferred with counsel for Defendant Taylor Morrison Services, Inc., and opposing counsel does not consent to the relief sought in this Motion.

s/ Christopher Casper
Christopher Casper

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of April, 2009, I electronically caused the foregoing to be filed with the Clerk of the Court using the CM/ECF electronic filing system, which will automatically send copies to all counsel of record in the case.

The foregoing was sent via First Class U.S. Mail, postage prepaid, to the following:

Neal A. Sivyer, Esq.
Stephen Everett Walker, Esq.
Sivyer, Barlow & Watson, P.A.
401 E. Jackson St., Suite 2225
Tampa, Florida 33602

Attorneys for Defendant Taylor Morrison Services, Inc.

Knauf Gips KG
Ridham Dock, Kemsley
Sittingbourne, Kent
ME 9 8SR
UK

Knauf Plasterboard
North Yinhe Bridge, East Jingjin Rd.
Beichen District
Tianjin, China 300400 P.R.C.

Rothchilt International Ltd.
N-510 Chiu Hsn Bld.
Annex 96 Chung Shan N. Rd. Sec. 2
Taipei, Taiwan R.O.C.

                                        s/ Christopher Casper
                                        Christopher Casper

TAYLOR MORRISON
OF FLORIDA, INC.

**West Florida Division**

501 North Cattlemen Road
Suite 100
Sarasota, FL 34232

p. (941)371-3008
f. (941)379-5248

taylormorrison.com

Jennifer Kahler
15306 Skip Jack Loop
Bradenton, Fl 34202

Dear Jennifer,

Our inspection of your home and subsequent testing has confirmed that apparently
defective Chinese drywall was installed in your home when it was built in 2006. As we
may have told you, we did not know that the manufacturers and subcontractors supplied
and installed the imported drywall when the homes were built. Nevertheless, Taylor
Morrison is taking responsibility for repairing our homes that contain defective Chinese
drywall. We deeply regret any disruption or inconvenience this may cause you and your
family.

We continue to evaluate less intrusive solutions but, at the moment, we believe
replacement of the drywall is the best permanent solution. Taylor Morrison will pay for
the temporary relocation of your family while we make the necessary repairs to replace
the drywall in your home. The repairs will involve demolition of the inside of the home
down to the studs. We will thoroughly clean the home interior, replace all drywall and
damaged items, and essentially rebuild the inside of your home. Once the repairs are
completed, you will be provided with an additional year of warranty for the repaired
items that you received when you first purchased your home.

Taylor Morrison intends to repair homes with drywall problems as soon as possible. We
estimate it will take three to five weeks to work through certain permitting requirements
before we can commence construction. You have the option of remaining in your home
until construction work begins or you may go ahead and move out. We will provide you
with a list of possible relocation options. Taylor Morrison will pay displaced
homeowners a fixed monthly stipend for temporary housing and provide reimbursement
for moving and storage costs. Ultimately you will be free to choose your temporary
housing solution. Construction work will take 30 to 90 days, so we estimate that you
could be in temporary housing between 60 and 160 days.

We would like you to know what to expect in the coming weeks. Once you agree to have
the drywall removed from your home, Taylor Morrison will arrange pre-repair meetings
with you and walkthroughs of your home. A complete room by room inspection of the
home will be made to determine what will be required to return the home to the condition
it was in prior to the repairs. This inspection will have visual documentation, either video

Taylor
Woodrow
Communities

taylor
morrison
Homes Inspired by You

TAYLOR MORRISON
OF FLORIDA, INC.

**West Florida Division**

501 North Cattlemen Road
Suite 100
Sarasota, FL 34232

p. (941)371-3008
f. (941)379-5248

taylormorrison.com

or photographic, so that there is no confusion about what will be included in the rebuild of the home. Special attention will be given to any homeowner upgrades done since original occupancy of the home. We will use this inspection to determine what materials need to be ordered and will document, in writing, the types of light fixtures, plumbing fixtures, appliances, cabinets, tile, wood flooring, carpet etc. that will be needed to restore the home. If we find that substitutions will have to be made because original materials or items are no longer available, we will ask you to re-select those items.

We at Taylor Morrison have built our reputation over the years by standing by our homeowners and we will continue to do so. In fact, while this issue affects most homebuilders in Florida, to our knowledge Taylor Morrison is one of a very few homebuilders with a dedicated team in place to address the concerns of our homeowners

Again, we deeply regret this situation and are committed to doing the right thing for our affected homeowners. Rick Wilmeth will be contacting you. If you have questions in the meantime, please call him at 941-554-2862.

Taylor
Woodrow
Communities



# CHINESE DRYWALL FACT SHEET
## TAYLOR MORRISON

We have learned that defective drywall manufactured in China was installed in homes constructed by dozens of homebuilders throughout Florida, including a number of homes built by Taylor Morrison[1].

Some of this Chinese drywall emits a naturally occurring sulfur compound that can corrode and ultimately lead to the failure of heating, ventilation and air conditioning (HVAC) coils and other copper elements in the home. It can also produce a sulfur odor in the home similar to a burned match or rotten eggs.

The affected Taylor Morrison homes so far are confined to Lee and Manatee Counties. The number of homes we have identified that were constructed with apparently defective drywall manufactured in China represents a very small percentage of the thousands of homes that Taylor Morrison built in Florida during the past decade.

The defective drywall was installed by subcontractors without our knowledge or direction. Nevertheless, we at Taylor Morrison are doing everything we can to:

- Protect the health and safety of our homeowners,
- Identify any additional homes that may have been built with defective Chinese drywall;
- Repair any homes where it is discovered.

The raw material used to make all drywall is gypsum rock (dihydrous calcium sulfate). Sulfur is a naturally occurring substance contained in every sheet of gypsum drywall. We have been informed that the gypsum contained in the defective drywall comes from a particular mine in China that appeared to have unusually high levels of sulfur.

Taylor Morrison did not manufacture, import or purchase drywall direct from China. Normally a builder such as Taylor Morrison does not directly purchase components such as drywall. Standard practice in the industry is for builders to hire licensed subcontractors to install drywall and those subcontractors typically purchase drywall from local distributors and manufacturers, who are required to meet certain specifications.

The vast majority of homebuilders, including Taylor Morrison, received the defective drywall through a chain of suppliers and installers without any awareness that the product had been manufactured in China.

Like our homeowners, Taylor Morrison is a victim of the manufacturers and suppliers that provided defective drywall from China. We intend to take all necessary actions to hold the manufacturers and suppliers responsible for their defective products.

---

[1] For purposes of this Fact Sheet, the term "Taylor Morrison" shall refer to Morrison Homes, Inc. (n/k/a Taylor Morrison Services, Inc.), Taylor Woodrow, Inc. (n/k/a Taylor Morrison, Inc.) and any subsidiaries thereof.

We recently established a special team of experts to address homeowner concerns and to carry out a comprehensive drywall repair program.

Taylor Morrison retained ENVIRON International Corporation ("ENVIRON"), a leading global environmental firm, to conduct isolated sampling in our homes.

The environmental scientists and toxicologists at ENVIRON have assured us that tests to date confirm that the levels of sulfur compounds inside homes built with defective Chinese drywall is far below even the most stringent government health and safety standards.

The government standards used for evaluating air quality conditions specifically consider long-term (known as chronic) exposures. ENVIRON's investigation evaluated the testing results in comparison to those applicable for daily exposures over a period of years. ENVIRON determined that the levels in the homes, thus far, did not reach standards for chronic exposures, and that there is no indication daily exposure to the recorded levels of sulfur compounds in homes with defective Chinese drywall would result in any adverse health outcomes.

The Florida State Department of Health agrees that available data has not identified levels of corrosive gasses that exceed those recognized as posing a risk to health.

While there have been isolated instances of homeowners complaining about sore throats or itchy eyes, ENVIRON has been unable to connect these symptoms with the affected drywall. These symptoms may be caused by a number of other, unrelated factors.

Government scientists and health experts, working together with ENVIRON, continue to closely study the situation.

In cases where defective Chinese drywall is confirmed, Taylor Morrison will pay for the temporary relocation of affected families while we make the necessary repairs to replace the drywall in the home.

We continue to evaluate less intrusive solutions but, at the moment, we believe replacement of the drywall is the best permanent solution.

The repairs will involve demolition of the inside of the home down to the studs. We will thoroughly clean the home interior, replace all drywall and damaged items, and essentially rebuild the inside of the home. Once the repairs are completed, homeowners will be provided with an additional year of warranty for the repaired items.

Taylor Morrison has identified substandard drywall manufactured by Knauf Plasterboard Tianjin Co. Ltd. of China. There are reports that other home builders have also identified substandard drywall manufactured by Taishan Gypsum Co. LTD.

Dozens of other homebuilders are affected as well. Taylor Morrison, however, is committed to taking care of our homeowners and to our knowledge we are one of the very few builders that are proactively trying to identify affected homes and permanently resolve the problem.

## REPAIR AND RELOCATION AGREEMENT

THIS REPAIR AND RELOCATION AGREEMENT ("Agreement") is made and entered into as of the Effective Date by and between the undersigned Builder and Homeowner(s).

### Background

A.     Homeowner is the owner of a residence sold and/or constructed by Builder located at the address set forth below Homeowner's signature ("Residence");

B.     Subsequent to the original closing on the Residence, the parties discovered that the independent drywall contractors retained by Builder to install drywall in the Residence ("Drywall Contractors") installed defective drywall ("Defective Drywall") obtained from one or more suppliers, distributors, and/or manufacturers, which Defective Drywall has damaged other property within the Residence ("Other Property"); and

C.     Builder has agreed to remove the Defective Drywall and repair damage caused thereby in accordance with the terms and conditions set forth herein.

### Terms

IN CONSIDERATION of the mutual covenants of the parties contained herein, Builder and Homeowner agree as follows:

1.     Scope of Repair.  Builder agrees, at its sole expense, to perform the following repair work (collectively, the "Repair(s)"):
   a) Remove and replace all drywall in the Residence, including the Defective Drywall.
   b) Repair or replace other building materials Builder originally installed in the Residence that are affected by the Defective Drywall, including HVAC systems, plumbing components, and electrical components.
   c) Finish and paint all newly installed drywall.
   d) Repair or replace, as necessary, all materials in the Residence affected by the Repair process, which may include, but is not limited to, flooring, wall coverings, tile, cabinets, countertops, sinks, toilets, bathtubs, shower enclosures, appliances, mirrors, lighting and plumbing fixtures, and wood trim and moldings.
   e) Remove and dispose of all construction debris and clean the interior of the Residence.

2.     Removal of Defective Drywall.  Builder shall be solely responsible for the disposal of all Defective Drywall removed from the Residence, which disposal shall be in accordance with all applicable governmental laws and regulations.

3.     Replacement Selections.  Homeowner understands that some of the original materials, fixtures and equipment installed when the Residence was first constructed must be replaced as part of the Repair process or may be affected by the Repair process and thus need replacement.  Accordingly, prior to entering into this Agreement Homeowner met with Builder's

representative and selected replacements for those items that will be replaced, as well as those items that may be affected by the Repairs process and need replacement (collectively, the "Replacement Selections"). A copy of the Homeowner's Replacement Selections is attached hereto and incorporated herein by reference. If the Homeowner's Replacement Selections are discontinued or should materials be affected by the Repair process for which Homeowner has not made Replacement Selections, Builder shall give Homeowner fourteen (14) days to make Replacement Selections from the comparable products and materials Builder has available. If Homeowner fails to make the foregoing Replacement Selections within the fourteen (14) day period, Builder shall have the right to make the Replacement Selections in Builder's sole discretion which shall be final and binding on Homeowner. Homeowner shall not be entitled to any Per Diem (as defined below) for the period of any delay in the completion of the Repairs caused by Homeowner's failure to timely make Replacement Selections. Homeowner understands that while Builder intends to match replacement materials and equipment as closely as possible with the original items installed with the original construction, some items may be discontinued or have color variations. Given the accelerated schedule for the Repairs, all Replacement Selections are final and may not be changed except with the prior consent of · Builder, which consent Builder may withhold or grant in its sole discretion.

4. 'New Warranty for Repairs. Builder will perform the work in a workmanlike manner. Builder warrants for a period of one year following substantial completion of the Repairs that all materials and workmanship related to the Repairs shall be free and clear of defects and deficiencies. For purposes of this Agreement, "substantial completion" shall be defined as closing out of the applicable governmental building permit for the Repairs. If a defect occurs in the Repairs, excluding defects caused by a lack of Homeowner maintenance, Builder, at is option, shall repair, replace, or pay the reasonable cost of repairing or replacing the defective item. Notwithstanding the foregoing, appliances, fixtures and equipment installed in connection with the Repairs shall be governed solely by the manufacturer's warranty for such items which Builder hereby assigns to Homeowner. Except with respect to foregoing warranty with respect to the Repairs, all other terms and conditions of the Homeowner's original warranty in connection with the original sale of the Residence shall remain in full force and affect.

·5. Per Diem Reimbursement for Relocation Expenses. 'Homeowner and Builder understand that Homeowner will be required to relocate for the period of time during which Builder makes the Repairs pursuant to this Agreement. Builder will give Homeowner no less than three (3) weeks prior notice ("Vacation Notice") to vacate the Residence before commencing Repairs. Except as otherwise provided in this Agreement, commencing on the later of (i) the day Homeowner vacates and surrenders the Residence to Builder, or (ii) fourteen (14) days following Homeowner's receipt of the Vacation Notice ("Per Diem Commencement Date"), and continuing until five (5) days following substantial completion of the Repairs (the "Repair Period"), Builder agrees to pay Homeowner One Hundred Seventeen Dollars ($117.00) per day (the "Per Diem") in settlement of any and all expenses and damages which Homeowner suffers as a result of having to vacate the Residence. On the Per Diem Commencement Date Builder shall advance to Homeowner sixty (60) days of Per Diem ("Advanced Per Diem"). If the Repairs are not substantially complete prior the expiration of the foregoing sixty (60) day period, Builder will continue to advance the Per Diem in thirty (30) day increments. Builder shall notify Homeowner of the anticipated substantial completion date no less than thirty (30) days prior to substantial completion. In the event Homeowner or its agents interfere, directly or indirectly,

with Builder's performance of the Repairs, Builder shall have be relieved of the obligation to perform any further the Repairs and shall be under no further obligation to pay the Per Diem. Interference shall include, but not be limited to, Homeowner or its agents instructing Builder to cease the Repairs, Homeowner or its agents restricting Builder's access to the Residence, or Homeowner otherwise breaching this Agreement.

6.     Utilities, Taxes, and Maintenance.  Except as otherwise provided below, during the period of the Repairs Homeowner shall remain responsible for paying all ad valorem taxes, community development district assessments, special assessments, utilities, maintenance expenses, and homeowner's and/or condominium association fees in the same manner as though Homeowner occupied the Residence. Notwithstanding the foregoing, Builder shall reimburse Homeowner for all power, water, wastewater, and trash expenses for the Residence incurred during the Repair Period.  To the extent separately contracted for by Homeowner, Builder shall also reimburse homeowner for any yard or pool maintenance expenses for the Residence incurred curing the Repair Period.  Builder shall reimburse Homeowner for the foregoing within thirty (30) days following Builder's receipt of evidence of Homeowner's payment of the same. To the extent not separately contracted for by Homeowner, Builder shall be responsible, at its sole cost and expense, for maintaining the yard and any pool during the Repair Period.

7.     Moving and Storage Expense Reimbursement.  Subject to the reimbursement limits set forth below, Builder shall reimburse Homeowner for documented third-party moving and storage expenses associated with Homeowner moving and storage of Homeowner's furnishings and belongings from and to the Residence during the Repair Period ("Moving and Storage Reimbursement").  If the Residence is one-story, the maximum Moving and Storage Reimbursement is $6,000.  If the Residence is two-stories or located on the second floor or higher, the maximum Moving and Storage Reimbursement is $9,000.  Builder shall pay the Moving and Storage Reimbursement within thirty (30) days following Builder's receipt of evidence of Homeowner's payment of the same.

8.     Personal Property Repair/Replacement Contribution.  In consideration for the terms of this Agreement and the release provided herein, within thirty (30) days following the Effective Date Builder shall pay Homeowner $1,500.00 which Homeowner may use to repair and/or replace any personal property that Homeowner believes may have been affected by the Defective Drywall.

9.     Pre-Drywall and Final Homeowner Orientations.  Prior to installing the replacement drywall, Builder shall provide Homeowner the opportunity to conduct a pre-drywall orientation of the Residence. Builder shall give the Homeowner no less than five (5) days prior notice of the pre-drywall orientation. If Homeowner fails to conduct the pre-drywall orientation within the specified time period, Builder may proceed with completing the Repairs. When the Repairs are substantially complete, Builder shall also give the Homeowner a final orientation of the Residence.

10.     Access.  Once Homeowner vacates the Residence and until the Repairs are complete, Builder shall have sole and exclusive access to the Residence in order to perform the Repairs and shall be in complete control of who shall be entitled to enter and work on the Residence during that time.  Homeowner further understands that for safety, insurance and

3

permitting purposes, it shall enter the Residence only upon at least 24 hour prior notification to Builder and must be accompanied by a Builder representative.

11.    Supervision of Repairs. Builder shall supervise and direct the Repairs. Builder shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Repairs. Builder shall be responsible for the acts and omissions of its employees, subcontractors and their agents' employees in the performance of the Repairs.

12.    Permits, Fees, Licenses and Inspections. Builder shall secure and pay for any and all required building permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Repairs. Homeowner shall sign all documents required by the governmental authorities for the issuance of the applicable building permits for the Repairs, including notices of commencement.

13.    Prevention of Further Damage. To the extent reasonably possible, Builder and its subcontractors will use appropriate precautions to minimize further damage to the Residence during the performance of the Repairs and will indemnify Homeowner against any such damages that are caused.

14.    Subcontractors. Builder will be responsible to pay any and all subcontractors performing Repairs, and will indemnify Homeowner and bond off any liens that are filed by any said subcontractors. Builder will use only licensed subcontractors for any and all trades that require subcontracts to be used.

15.    Limited Release of Property Damage Claims and Assignment of Claims. Except for the indemnities and warranties otherwise provided in this Agreement, Homeowner hereby releases Builder and its parent and subsidiary corporations, employees, agents, officers, directors and shareholders from any and all claims, demands, actions and causes of action relating to or arising from the Defective Drywall and the Repairs being done pursuant to the terms of this Agreement, including claims for damages to Other Property within the Residence, except for personal injury claims which are more specifically excluded in the next paragraph herein. Except as otherwise set forth herein, this release shall also not release any claims under the original warranty given in connection with the original sale of the Residence, provided, however, that the foregoing shall not be deemed to reinstate any such warranties that have already expired.

16.    No Release of Personal Injury Claims. Notwithstanding the preceding paragraph, Homeowner is not releasing any and all potential personal injury claims that it may have relative to the Defective Drywall installed by the Drywall Contractors, or the Repairs. By way of example, in the event that Homeowner somehow becomes ill as a result of the original Defective Drywall installation, it is not releasing its claims to personal injury damages resulting from the installation of such Defective Drywall.

17.    Assignment of Claims. It is understood by the parties that Builder may seek reimbursement from third parties for the costs of the Repairs and the expenses paid hereunder, including from the Drywall Contractors and the suppliers, distributors, and/or manufacturers of the Defective Drywall (collectively, the "Responsible Parties"). Homeowner desires to assist

Builder in the recovery of the foregoing costs and expenses. Accordingly, Homeowner hereby assigns to Builder all of its present and future rights, title, interest, claims and demands against any individual or entity, including, but not limited to, The Responsible Parties, arising from, related to, or connected with property damages in any manner related to the Defective Drywall and Other Property (the "Assigned Claims"). The Assigned Claims shall expressly exclude any personal injury damages or claims arising from the Defective Drywall. Homeowner warrants that it has not previously assigned, settled, compromised or released the Assigned Claims and covenants upon request from Builder to provide Builder with documents, records and other information in Homeowner's possession related to the Assigned Claims and in the meantime shall not destroy or otherwise dispose of the same. Homeowner understands that Builder shall hereafter have the exclusive right to bring any action of claim for property damages related to the Defective Drywall and Other Property. If requested by Builder, Homeowner shall, at Builder's cost, assist Builder in its recovery efforts and shall execute such further documents as may be necessary to evidence the foregoing assignment. Consistent with the foregoing, Homeowner understands that Builder may retain samples of the Defective Drywall removed from the Residence, which shall thereafter be the Builder's sole property.

    18.    <u>Confidential Terms</u>. Homeowner agrees to keep all payment and reimbursement terms provided in this Agreement confidential and shall not discuss or disclose the same to any third parties, other than Homeowner's accountants and lawyer, unless otherwise required by law.

    19.    <u>Entire Agreement</u>. Except as specifically provided herein, this Agreement represents the entire integrated agreement between the parties and supersedes all prior agreements, understandings and representations, oral or written. Homeowner acknowledges that they have read this entire Agreement and fully understand the provisions hereof and are executing the same freely and of their own accord. According, the parties agree that this Agreement shall be construed equally against Builder and Homeowner regardless of who may have originally drafted the same.

    20.    <u>Owner</u>. Homeowner represents and warrants that Homeowner is the sole owner of the Residence and has the authority to enter into this Agreement.

    21.    <u>Modification of Agreement</u>. The terms of this Agreement may only be modified through a written agreement signed by both parties herein.

    22.    <u>Attorneys' Fees and Expert Fees</u>. Each party hereby agrees to be responsible for its own attorneys' fees and expert fees incurred through the Effective Date.

    23.    <u>Effective Date</u>. For purposes of this Agreement, "Effective Date" shall mean the date that this Agreement is last executed by the Builder or Homeowner as indicated by the date below their respective signatures.

SIGNATURES APPEAR ON THE FOLLOWING PAGE

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the Effective Date._____

**BUILDER**
Taylor Woodrow Communities at Vasari, LLC


By:_____
Print name:_____
Title:_____
Date:_____


**HOMEOWNER**

By:_____
Print name:_____
Title:_____
Date:_____

Residence Address:

_____
_____
_____

**ADDITIONAL HOMEOWNER, IF ANY**

By:_____
Print name:_____
Title:_____
Date:_____

ATTACH REPLACEMENT SELECTIONS SHEET

## TAYLOR MORRISON
## HOMEOWNER RELOCATION COVER

As we have told you, in cases such as yours, where defective Chinese drywall is confirmed, Taylor Morrison will pay for the temporary relocation of your family while we make the necessary repairs to replace the drywall in the home.  This package contains information regarding the relocation and repair process and what Taylor Morrison will be providing to you.

### Monthly Stipend

Taylor Morrison will pay displaced homeowners a fixed monthly stipend for temporary housing and provide reimbursement for moving and storage costs.  We will provide you with two month's temporary housing costs up front after work has been authorized. Ultimately you will be free to choose your temporary housing solution.  Construction work will take 30 to 90 days, so we estimate that you could be in temporary housing between 60 and 160 days.

### Temporary Housing Options

Below is a list of possible relocation options.

**Sarasota Residence Inn**
Jennifer Ostrander
941-358-0618
Preferred rate for Taylor Morrison Homeowners

**Ft Myers Residence Inn**
Monica Postigo
859-913-1434
Preferred rate for Taylor Morrison Homeowners

**ATB Furnished Housing**
Ann Moore
1-866-633-3331
www.atbfh.com

**Steve Frey**
**Oasis Corporate Housing**
3225 S. MacDill Ave.
Suite 129
Tampa, Fl.  33629
1-800-578-0256 -- OFFICE
(813) 416-0294 -- CELL
smf@oasiscorporatehousing.com

1

## Moving Companies

We have contacted moving and storage companies and have estimates of from $3,500 to $9,000 for packing, moving out, storage and moving back in. Prices are calculated on weight and will vary from home to home.

We recommend you contact one of these companies to get an estimate for their services. We will pay your moving and storage costs based on these estimates.

### Sarasota Mover Information:

**Spirit Movers**
Tony is the contact
941-748-3969
http://www.spiritmovers.com/

**Sarasota North American Van Lines**
Rick Westervelt
888-642-5007

### Bonita Springs Mover Information

**Peluso Movers**
Ed Turner
800-741-6683

**Greabel Relocation Services**
Karen Toth
800-373-8241 Ext 1120
954-379-1120 - Direct Line

### Fort Myers Mover Information:

**Ray the Mover**
Jeff Smith
239-643-4100
www.raythemover.com

**Alliance Moving Inc.**
Mike Dent
239-455-8276

## Relocation and Repair Schedule

You have the option of remaining in your home until construction work begins or you may go ahead and move out. We estimate it will take three to five weeks to work through certain permitting requirements before we can commence construction. Your Repair Schedule will be provided prior to the commencement of construction.

### Explanation of Repair Agreement

This package includes a waiver for you to sign that will indemnify Taylor Morrison from any further damages, with regards to property damage only.  This is a limited release and assignment of claims that will also allow the company to pursue legal damages from the manufacturers and suppliers responsible for their defective products. We realize that homeowners do not have the resources to take legal action against those ultimately responsible for the problem, but we intend to take all necessary actions to hold the manufacturers and suppliers responsible for their defective products.  In the meantime, we are committed to making the necessary repairs to your home with no guarantee that we will be able to recover damages from the responsible parties.  The agreement does not cover health issues that may arise in the future.

## MASTER Q & A
## TAYLOR MORRISON

**1. Morrison Homes built my home.  Who is Taylor Morrison?**
In July of 2007, the parent company of Morrison Homes, Inc., George Wimpey, plc merged with Taylor Woodrow, plc to form Taylor Wimpey, plc, becoming one of the largest homebuilders in the world.  Taylor Woodrow, plc was the parent company of Taylor Woodrow, Inc., which constructed homes in the United States through various subsidiary companies.  As part of an internal corporate restructuring in January of 2008, Morrison Homes, Inc. changed its name to Taylor Morrison Services, Inc. and Taylor Woodrow, Inc. changed its name to Taylor Morrison, Inc.

**2. Taylor Woodrow built my home.  Who is Taylor Morrison?**
In July of 2007, the parent company of Taylor Woodrow, Inc., Taylor Woodrow, plc merged with George Wimpey, plc to form Taylor Wimpey, plc, becoming one of the largest homebuilders in the world.  George Wimpey, plc was the parent company of Morrison Homes, Inc., which constructed homes in the United States directly or through various subsidiary companies.  Taylor Woodrow, Inc. constructed homes in the United States through various subsidiary companies.  As part of an internal corporate restructuring in January of 2008, Taylor Woodrow, Inc. changed its name to Taylor Morrison, Inc.

**3. How many Taylor Morrison homes were built with Chinese drywall?**
So far, Taylor Morrison[*] has identified around a dozen homes that were constructed with defective drywall manufactured in China. This represents a very small percentage of the thousands of homes that Taylor Morrison built in Florida during the past decade. The defective drywall was installed by subcontractors without our knowledge or direction.

Even so, we at Taylor Morrison are doing everything we can to:
- Protect the health and safety of our homeowners;
- Identify any additional homes that may have been built with defective Chinese drywall, and:
- Repair any homes where it is discovered.

**4. Where are the affected homes located?**
The affected Taylor Morrison homes so far are confined to Lee and Manatee Counties.

**5. When did Taylor Morrison first become aware of the problem?**
While Taylor Morrison received less than a handful of odor complaints in 2006 and 2007 that were suspected to be the result of drywall, we were not aware of the related corrosive affects with some Chinese drywall until the recent news reports published this year.

---

[1*] For purposes of this Q&A, the term "Taylor Morrison" shall refer to Morrison Homes, Inc. (n/k/a Taylor Morrison Services, Inc.), Taylor Woodrow, Inc. (n/k/a Taylor Morrison, Inc.) and any subsidiaries thereof.



Investigations determined that, in many cases, the problem was caused by the defective drywall, which emits a naturally occurring sulfur compound that can corrode and cause the failure of HVAC coils and other copper elements in the home.

All drywall contains sulfur, but extensive testing revealed that some sheets of drywall imported from China contained elevated levels of sulfur compounds that can corrode copper elements in the home.

**6. How do I tell if I have defective Chinese Drywall in my home?**
Some affected homes emit a sulfur odor that smells like a burned match or rotten eggs. Other symptoms include blackening and corrosion of air conditioning coils that leads to system failure. Copper pipes under the kitchen sink and copper wiring also show signs of blackening. If your home shows any of these symptoms, or if you simply have a concern, please contact us at 866-477-1272 and we will send a team of experts to conduct an inspection of your home as soon as possible.

**7. How did drywall manufactured in China end up in Florida homes?**
In 2005 and 2006, damage repairs from Hurricanes Katrina and Wilma put additional pressure on top of already high drywall demand for new home construction. As a result of the shortages, suppliers and manufacturers of drywall turned to offshore sources. One such source was China, where it is now suspected that one mine providing the gypsum rock for drywall production had a higher than normal sulfur content.

**8. Did Taylor Morrison purchase the drywall from manufacturers in China?**
No. Taylor Morrison did not manufacture, import or purchase drywall direct from China. Normally a builder such as Taylor Morrison does not directly purchase components such as drywall. Standard practice in the industry is for builders to hire licensed subcontractors to install drywall and those subcontractors typically purchase drywall from local distributors and manufacturers, who are required to meet certain specifications. The vast majority of homebuilders, including Taylor Morrison, received the defective drywall through a chain of suppliers and installers without any awareness that the product had been manufactured in China.

**9. Who manufactured the defective drywall?**
Taylor Morrison has identified substandard drywall manufactured by Knauf Plasterboard Tianjin Co. Ltd. of China. There are reports that other home builders have also identified substandard drywall manufactured by Taishan Gypsum Co. LTD.

**10. What is Taylor Morrison doing to fix the Chinese drywall problem?**
In cases where Chinese drywall and corrosive effects are confirmed, Taylor Morrison will pay for temporary relocation of affected families, while making the necessary repairs to replace defective Chinese drywall. The repairs involve demolition of the inside of the home, quite literally to the studs. We thoroughly clean the home interior, replace the defective drywall and damaged items, and otherwise return the home to its original

condition. Once the repairs are completed, it will be like moving into a brand new home. Homeowners will be provided with an additional year of warranty for the repaired items. We are also working closely with our experts to try to find other, less disruptive ways to resolve the problem.

**11. How long do I need to wait for my home to be repaired?**
Taylor Morrison wants to repair homes with Chinese drywall problems as soon as possible. Before commencing repairs, we estimate that we will need three to five weeks to work through certain requirements under statues and for the permitting process to take place. Construction work will take 30 to 90 days. So, we estimate that homeowners will be in temporary housing between 60 and 160 days. They will have the choice of remaining in their home until construction begins or they may move out immediately if they so wish. Taylor Morrison will pay displaced homeowners a monthly stipend for temporary housing and provide reimbursement for moving and storage costs.

**12. Does the Chinese drywall pose an unusual health hazard of any kind?**
No. We have hired ENVIRON International Corporation, one of the world's leading environmental firms to investigate the drywall issue and to conduct scientific testing. They assure us that only trace amounts of sulfur were emitted by the Chinese drywall and this poses no health or safety risks to our homeowners and their families. The environmental scientists and toxicologists at ENVIRON also assure us that the detected levels of sulfur compounds were far below government health and safety standards for chronic exposure to sensitive people.

ENVIRON scientists met with representatives from the U.S. Center for Disease Control, the EPA, the Florida State Department of Health and county health officials to discuss air sampling results for all sulfur compounds detected in homes believed to have been built with imported drywall.

The Florida State Department of Health agrees that available data has not identified levels of corrosive gasses that exceed those recognized as posing a risk to health. After studying the findings, other government scientists also determined that, to date there is no indication that the levels of sulfur compounds would result in any adverse health outcomes.

**13. Some people living with Chinese drywall say they have physical symptoms such as irritated eyes, sore throats, headaches. If there are no health concerns, why are people having physical reactions to Chinese drywall?**
While there have been isolated instances of homeowners complaining about sore throats or itchy eyes, ENVIRON has been unable to connect these symptoms with the affected drywall. These symptoms may be caused by a number of other, unrelated factors.

Government scientists and health experts, working together with ENVIRON, continue to closely study the situation.

**14. Why does this particular drywall from China affect HVAC coils and other materials?**

The raw material in drywall is gypsum rock (dihydrous calcium sulfate) and sulfur is a naturally occurring substance in every gypsum drywall sheet that is made. We have been told that the gypsum contained in the defective drywall comes from a particular mine in China that apparently had unusually high levels of sulfur.

**15. How it is possible that small amounts of sulfur compounds emitted in the air from defective Chinese drywall can corrode copper substances, but not harm homeowners?**

The interaction of sulfur compounds with copper metals has certain corrosive effects that do not take place when interacting with the human body. Similar chemical reactions of this type that pose no health risks are common. Cars exposed to the salt air at the beach often rust and corrode, but it is perfectly safe for people to visit and live there.

**16. Is the Chinese drywall only a Taylor Morrison problem?**

No. Dozens of other homebuilders are affected as well. Taylor Morrison, however, is committed to taking care of our homeowners and to our knowledge we are one of the very few builders that are proactively trying to identify affected homes and permanently resolve the problem.

4

## AFFIDAVIT

STATE OF FLORIDA
COUNTY OF MANATEE

BEFORE ME, the undersigned authority, personally appeared Jennifer Rzewnicki who, being first duly sworn, deposes and says:

1.     I am a natural person over the age of 18 years and am otherwise competent to testify to the information contained herein.

2.     I am the original owner of the residence located at 15332 Skip Jack Loop, Bradenton, Florida.   By way of background, I have a college degree and am a licensed Professional Engineer (P.E.).

3.     Morrison Homes which is now known as Taylor Morrison or Taylor Morrison Services, Inc. built my house pursuant to a contract signed by me.

4.     On March 31, 2009 an inspection was held at my home by a Taylor Morrison employee named Chris Clark.   The purpose of the inspection was to determine whether or not my home contains defective Chinese drywall.

5.     At the inspection it was confirmed that my home does contain the defective Chinese drywall.   My home has a sulfur, musty-like smell, my electrical wiring, copper plumbing and HVAC coils are corroded and are black.

6.     Subsequent to the inspection on March 31, 2009 Taylor Morrison, through its employees, sent me various documents.   The document packages includes: 1) a Chinese Drywall Fact Sheet; 2) a Repair and Relocation Agreement; 3) a Taylor Morrison Homeowner Relocation Cover; and 4) a Master Q & A sheet.

7.     While reading each of these documents I found them to be confusing, inconsistent, presumptuous and incomplete.  For example, in one instance there is a representation that my home will be demolished down to the wood studs.  However, in the proposed Repair and Relocation Agreement it states that my home's drywall will be replaced and all other components of my home will either be repaired or replaced.  In another instance, one document makes representations that various Government agencies, including the State of Florida, are working with Taylor Morrison's expert, Environ.  This section goes onto state that the State of Florida findings and agencies agree with Environ and its determination that there are no health related risks associated with the defective Chinese Drywall.  Based upon my reading of various reports, this statement is untrue and misleading.

8.     The aforementioned documents are also inconsistent and confusing as they relate to my discussions with Chris Clark at the time of my home inspection.  At that time, Mr. Clark stated that I would receive a daily stipend for relocation expenses from the date that I actually vacated the house.  To the contrary, the Repair and Relocation Agreement states that I will only receive the daily stipend upon Taylor Morrison proving me a notice to vacate.

9.     On April 8, 2009, in an attempt to clarify the documents, I spoke to Rick Wilmeth, Vice President of Construction with Taylor Morrison.  During that conversation Mr. Wilmeth told me that the components inside my air handler would be replaced but the housing of the air handler would not be replaced, the copper from the air handler to the outside would be replaced, and other systems would be replaced or repaired depending on their findings.  Mr. Wilmeth also stated to me that Taylor Morrison had not actually attempted to demolish a home yet, had not removed any systems yet and have not specifically defined a protocol.  Apparently this process is being done at some time in the future using a Taylor Morrison Spec home.  I also

questioned Mr. Wilmeth as to Taylor Morrison's findings regarding what affect, if any; the byproducts of the Chinese drywall have on my nails and straps as they relate to my wood studs and roof trusses. In response, Mr. Wilmeth simply stated that sulfur does not corrode galvanized nails. This statement was confusing to me since I am unaware what type of nails and straps my home has and Taylor Morrison has not performed any destructive testing on my home.

**FURTHER AFFIANT SAYETH NOT.**

_Jennifer Rzewnicki_
(Jennifer Rzewnicki)

   **SWORN TO AND SUBSCRIBED** before me by Jennifer Rzewnicki, who is personally known to me, this _10th_ day of April, 2009.

My Commission expires:

_Nancy ER Simmers_
Signature of Notary Public

Nancy E. R. Simmers
Commission # DD417466
Expires April 11, 2009
Bonded Troy Fain - Insurance, Inc. 800-385-7018

{8819-1 00383558.DOC;1 4\10\2009}

1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3                Case No. 8:09-cv-598-T-27TGW

 4                       May 12, 2009
                         Tampa, Florida
 5

 6     KRISTIN MORGAN CULLITON, individually
       and on behalf of all similarly situated
 7     individuals,

 8              Plaintiffs,

 9     vs.

10     TAYLOR MORRISON SERVICES, INC., et al.,

11              Defendants.

12     _____/

13

14

15          TRANSCRIPT OF DIGITALLY RECORDED HEARING RE:
            MOTION FOR PROTECTIVE ORDER (Document 10)
16          BEFORE THE HONORABLE THOMAS G. WILSON,
                 UNITED STATES MAGISTRATE JUDGE
17

18     Appearances of Counsel:

19          For the Plaintiffs:

20              Mr. Christopher Craig Casper
                Mr. Darren Robert Inverso
21              Mr. John Allen Yanchunis
                Mr. Jonathan Betten Cohen
22
            For the Defendants:
23
                Mr. Mark Anthony Romance
24              Mr. Neal Allen Sivyer

25     Transcribed by:   Dennis Miracle, Official Reporter
```

*Dennis Miracle, Official Reporter (352) 622-7212*

5/18/09

2

PROCEEDINGS

1
2     THE COURT:  This is a proceeding in Case Number
3  8:09-CV-589-T-27TGW, Kristin Morgan Culliton versus Taylor
4  Morrison.
5        Would counsel identify themselves for the record
6  and indicate who they represent?
7        MR. CASPER:  On behalf of plaintiff, Chris
8  Casper.
9        MR. INVERSO:  On behalf of plaintiff, Darren
10  Inverso.
11        MR. SIVYER:  Your Honor, in behalf of Taylor
12  Morrison Services, Neal Sivyer.
13        MR. ROMANCE:  Good afternoon.  Mark Romance also
14  on behalf of Taylor.
15        THE COURT:  All right.  The plaintiff has filed a
16  motion for protective order, and you may proceed.
17        MR. CASPER:  Thank you, Your Honor.  May it please
18  the Court.  I'm Chris Casper from James, Hoyer, Newcomer
19  Smiljanich & Yanchunis.  Here with me is John Yanchunis and
20  Jonathan Cohen from our firm.
21        Also with me is our co-counsel, Darren Inverso,
22  from the Norton, Hammersley firm in Sarasota.  We're here
23  on our motion for protective order.
24        As the Court, I'm sure, is aware, this case
25  concerns defective drywall that was used in the building of

1  homes throughout the state of Florida.  It mainly appears

2  in the southern half of the state.  We're here today

3  specifically as to one of the defendants in the case,

4  Taylor Morrison.

5       We filed this motion because we learned that

6  Taylor Morrison was contacting homeowners whose homes were

7  built during the time period where the drywall was being

8  used.  The reasons we filed the motion are not because we

9  are trying to prevent Taylor Morrison from inspecting homes

10  when they are contacted -- or when people request an

11  inspection because of their concerns.  We didn't file the

12  motion because we want to stop Taylor Morrison from

13  conducting repairs of homes that are found to have the

14  drywall.  This isn't --

15       THE COURT:  -- (indiscernible) -- how you go about

16  doing that.  They can't contact them.

17       MR. CASPER:  Well, we don't even ask that they not

18  be allowed to contact them.  What we are asking the Court

19  is that, if there are going to be contacts made, that

20  certain disclosures are made, that certain information is

21  provided to homeowners so they can make an informed

22  decision about this agreement.  There's --

23       THE COURT:  So you're not asking that they stop

24  contacting them?

25       MR. CASPER:  That's correct.  We want contacts,

4

1   however, to be governed --

2          THE COURT:  Because that isn't what I got out of

3   the -- out of your motion.

4          MR. CASPER:  Well, in our prayer for relief we

5   don't say they should be prevented from dealing with

6   homeowners, especially homeowners who have concerns about

7   the drywall in their home, and contact them and request an

8   inspection.  We don't ask that they be barred from doing

9   inspections or making repairs either.  The problem

10  arises --

11         THE COURT:  What do you want?

12         MR. CASPER:  What we are asking is if Taylor

13  Morrison is going to be contacting people concerning the

14  specific problem, that certain disclosures are made,

15  specifically that they disclose the fact that there are

16  pending class actions that could potentially involve these

17  homeowners as class members; that class members be informed

18  that they may contact class counsel or their own attorney

19  if they have any concerns --

20         THE COURT:  Which class counsel?

21         MR. CASPER:  We filed a motion, I believe, about a

22  week and a half ago requesting that we be appointed interim

23  class counsel.  We believe that that is related to this,

24  obviously, because if we are successful in being appointed

25  class counsel, we would ask that the disclosure simply

5

1   inform people of that fact and how to contact us.

2        THE COURT:  Well, other class counsel have

3   objected.

4        MR. CASPER:  And they're going to come in --

5        THE COURT:  They don't want you to be class

6   counsel; they want to be class counsel.

7        MR. CASPER:  Well, presumably they can --

8        THE COURT:  So who should the defendants then tell

9   them to contact?

10       MR. CASPER:  Well, I think those issues are going

11  to be heard on that motion.  Two other putative class

12  counsel have moved to intervene for the purposes of being

13  heard on that motion, and presumably those motions will be

14  addressed.  And perhaps a hearing will be held, and the

15  Court can make a decision.  But this is the type of case

16  where there should be interim class counsel for the very

17  reasons set forth not only in this motion but in our

18  interim class counsel motion.

19       If I may approach the Court, I have just a

20  one-page excerpt of some language from the package that

21  they've -- that Taylor Morrison has provided to homeowners.

22       THE COURT:  I've read it.  You can show me what

23  you're talking about.

24       MR. CASPER:  Okay.

25       THE COURT:  I've read all that stuff.  I've read

6

1   all this stuff that's been filed, including their stuff,

2   and I didn't find it misleading.

3          MR. CASPER:  Well, Your Honor, I'll turn your

4   attention to the paragraph quoted at the top of that page

5   that's contained in the cover letter they're providing

6   along with the proposed repair agreement.

7          Now, in that language quoted there at the top of

8   the page, it discusses the release and assignment; and the

9   release and assignment are two of what we see of the

10  biggest problems with this agreement.  The agreement not --

11         THE COURT:  Why do you care about the assignment?

12         MR. CASPER:  Pardon me, Your Honor?

13         THE COURT:  Why do you care about the assignment?

14         MR. CASPER:  Because if -- say a homeowner signs

15  that agreement.  They've not only released their claims

16  against Taylor Morrison; they've assigned claims against

17  any other potentially liable party to Taylor Morrison.

18         THE COURT:  The people who made the drywall.

19         MR. CASPER:  The people who made the drywall?

20         THE COURT:  They want to go -- they're -- I mean,

21  that's so obvious.  They're doing all this work; they want

22  to recover from the people that caused the problem to start

23  with.

24         MR. CASPER:  Well, I believe that the --

25         THE COURT:  So why shouldn't they be permitted to

1  do that?

2      MR. CASPER:  Because it -- what the effect of

3  signing that would potentially do is exclude these putative

4  class members from participation in this action even if

5  there's additional recovery against these other

6  defendants.  They'll be stuck with whatever is in that

7  Taylor Morrison agreement.

8      And as we've set forth in the agreement and as my

9  co-counsel is prepared to address here, there's serious

10  shortcomings with that agreement.

11      THE COURT:  What?  Did you say somebody else is

12  going to talk to me?

13      MR. CASPER:  I wanted my co-counsel to be able to

14  address some of the specific shortcomings in the proposed

15  repair agreement.

16      THE COURT:  Under the Local Rules one guy gets to

17  talk.

18      MR. CASPER:  I'll address those myself then,

19  Your Honor.

20      THE COURT:  Okay.

21      MR. CASPER:  With the -- turning back to that

22  paragraph in the relocation cover, it states that "this is

23  an assignment of claims that will also allow the company to

24  pursue legal damages from the manufacturers and suppliers

25  responsible for the defective products.  We realize that

8

1  homeowners do not have the resources to take legal action
2  against those ultimately responsible for the problem, but
3  we intend to take all necessary actions to hold the
4  manufacturers and suppliers responsible for the defective
5  products."
6          There's two serious problems with this language.
7  First of all, the description of the assignment, I believe,
8  is misleading to a lay person because it suggests that
9  Taylor Morrison is going to pursue those claims on behalf
10 of the homeowners.  I don't think a lay person reading this
11 is going to understand that this is going to completely
12 extinguish any claims they have against anyone.
13         THE COURT:  It says, "This will allow the company
14 to pursue legal damages."
15         MR. CASPER:  It does, but it doesn't say on whose
16 behalf.
17         THE COURT:  Here's, sort of, the problem:  You're
18 trying to create some ambiguity I didn't see in this stuff.
19         MR. CASPER:  Further, the --
20         THE COURT:  It says -- it says the company will
21 pursue it.
22         MR. CASPER:  Your Honor, it also says that --
23         THE COURT:  "We intend," it says, the company, "to
24 take all necessary actions to hold the manufacturers and
25 suppliers responsible."

1    MR. CASPER:  None of which -- none of which will

2    ultimately benefit the person assigning the claims.

3        THE COURT:  Right.

4        MR. CASPER:  I don't think a lay person

5    understands that.  What's wrong with fuller disclosure so

6    people know that they're signing away everything if they

7    agree to this?

8        THE COURT:  All right.

9        MR. CASPER:  Further, the statement that "we

10   realize homeowners do not have the resources to take legal

11   actions against those ultimately responsible" is

12   discouraging people from even seeking legal representation

13   and is a misleading statement in light of the fact there

14   are pending class actions seeking to assert claims on

15   behalf of these people related to the defective drywall.

16       Right now those cases are pending without

17   requiring these people to pay anything or to commit any of

18   their resources towards the prosecution of these cases.  It

19   suggests that this is their only option, sign the agreement

20   and that's it.  That's simply not accurate.

21       THE COURT:  It says if you want to -- if you want

22   your house fixed, we'll fix it for you, but this is part of

23   the bargain.  That's what it says to me.  If you don't want

24   your house fixed, go see a lawyer.

25       MR. CASPER:  Well, it doesn't say that.  It says

10

1   you probably can't afford a lawyer, so assign your claims

2   to us.

3           THE COURT:  Whoever gets this is going to know

4   whether they can afford a lawyer or they can't afford a

5   lawyer.

6           MR. CASPER:  They're not going to --

7           THE COURT:  I'm suspecting that this issue -- I

8   don't imagine it's scattered houses, one in this

9   neighborhood and some a number of blocks away.  They are

10  probably all close together.  These people are talking

11  about this problem over and over and over.

12          I mean, that's -- that's -- I had a house in

13  Virginia, and they put in some sewer pipe going to the

14  house.  And it was -- (indiscernible) -- and it sort of --

15  the thing would break, and you would have to have it

16  repaired.  Everybody in the subdivision knew it was coming,

17  and I'm suspecting these people know, hey, this is what the

18  deal is.  Some of them are saying, I'm going to have the

19  company do it; others are saying, I'm going to go see a

20  lawyer.

21          MR. CASPER:  Well --

22          THE COURT:  And others are probably saying they're

23  going to talk to you.

24          MR. CASPER:  Well, there's an important -- that

25  third option, why not disclose it?  Why not give them the

1  full information that --
2          THE COURT:  Because the other problem is, you're
3  not the only class counsel.
4          MR. CASPER:  We could disclose that there are
5  several pending class actions.  They should be disclosed.
6  If -- if the -- if the protective order would require them
7  to disclose that there are several cases and list them -- I
8  believe there's three that Taylor Morrison has been named
9  in in the state of Florida -- that should be disclosed,
10  because that's an important factor that homeowners should
11  know about when they are looking at these agreements.
12          These agreements provide that Taylor Morrison is
13  going to conduct repairs.  But as we set forth in our
14  motion, there's serious shortcomings in that.  They don't
15  ever promise to fix the problem.  They say, We're going to
16  remove affected drywall and any affected elements in the
17  home.  Well, that doesn't necessarily cure the problem.
18          The additional problem is --
19          THE COURT:  Well, what's left?
20          MR. CASPER:  This -- what is happening with the --
21  with the compounds being emitted by the drywall is it
22  causes damage to appliances in the house.  It causes damage
23  to A/C units.  Televisions have failed, because it causes
24  corrosion of metal components, which could potentially
25  damage all sorts of items in the house.

1            The agreement limits the amount of money for that
2    damage.   It is not specific as to what exactly Taylor
3    Morrison is going to do.

4            The information they provide with the agreement
5    contradicts it in several places.

6            THE COURT:   So you're saying at this point stop
7    doing this stuff until all this is clarified, and the
8    information they have, really, now is much broader so they
9    have more to digest than they do now.

10           MR. CASPER:   Well, what we're saying is --

11           THE COURT:   What I'm gathering also is their
12   houses stink.

13           MR. CASPER:   They do.

14           THE COURT:   If it's a rotten egg smell, that's
15   sort of hard to live with.   And I don't know if you're
16   suggesting, as you may have been, that there's some health
17   problem with that.   If that's the case, then there's even
18   more reason to proceed with these things.

19           MR. CASPER:   We're not asking it to stop.   We're
20   just asking that, if they're going to be doing this, that
21   certain disclosures are made and that people are aware of
22   what they are doing if they sign one of these agreements.

23           That's not the case now.   There's contradictory
24   information within the packet itself.   At one point they
25   say, "We're going to rip the house down to the studs."   The

1    agreement doesn't say they'll do that.

2         At another point they talk about "We'll pay you

3    relocation expenses."

4         THE COURT:  It does mention studs in there.

5         MR. CASPER:  Pardon me?

6         THE COURT:  The disclosures mention the studs --

7         MR. CASPER:  But the agreement --

8         THE COURT:  -- going down to the studs, don't

9    they?  Isn't that what it says?

10        MR. CASPER:  In the agreement itself they do not

11   promise to tear it down to the studs.  They promise to

12   replace affected drywall and other damaged components.

13        That's contradictory to what it says in the

14   materials provided with it that say "We're going to rip it

15   down to the studs."

16        There's other instances where the agreement

17   contradicts other representations made within the same

18   relocation package.  The agreement provides that Taylor

19   Morrison is going to take away all the defective drywall

20   and that the homeowner can't even come to the premises

21   without giving 24 hours' notice.  If a homeowner may have

22   additional claims or even wants to pursue a personal injury

23   claim, which is not released by the Taylor Morrison

24   release, they're going to need that defective drywall.  But

25   if they sign that agreement and Taylor Morrison comes in

14

1  and rips out all the drywall --

2         THE COURT:  Are you saying Taylor Morrison won't

3  let them take a pile of junk?

4         MR. CASPER:  I think a lot of them may not realize

5  that they should be preserving any of that.  A lawyer would

6  tell them that.  But if they are not represented, they

7  probably wouldn't think of that.

8         The fact that the homes are -- many of them --

9  uninhabitable or at least very unpleasant to inhabit, at a

10  minimum, is that it goes to the coercive nature of this

11  offer.  These people are in a desperate situation.

12  They'll -- if somebody comes in and says "We'll fix the

13  house," a lot of them are going to jump on that without

14  understanding the full ramifications of what exactly

15  they're agreeing to and what they're giving up in exchange

16  for it.

17         These houses are under warranty.  Taylor Morrison

18  is supposed to be fixing these problems anyway, but they

19  are not just doing that; they are going in and saying,

20  "Well, we'll fix it, but you have to give up your legal

21  rights not just against us but against everybody else.  We

22  will warrant the repair work for an additional year."  But

23  it's unclear that, if there's a dispute over whether they

24  have actually fixed the problem, whether the homeowner will

25  have any recourse, because the agreement leaves that

1   largely in Taylor Morrison's discretion.  People who sign
2   these could find themselves in a lot of trouble down the
3   line and unable to find any other recourse as a result of
4   having signed these agreements.
5           THE COURT:  What recourse do they need?
6           MR. CASPER:  Well, recourse against the other
7   defendants.  These -- every one of these class actions
8   names manufacturers and suppliers, and there may
9   ultimately --
10          THE COURT:  If their house is fixed, why do they
11   need recourse against somebody else?
12          MR. CASPER:  Under the agreement there's no
13   assurance that the house is going to be fixed.  There's
14   certainly no assurance that it will be --
15          THE COURT:  But there's still a warranty, then.
16   Then they can go back on the warranty.
17          MR. CASPER:  The warranty -- they will have --
18   they are required to sign a release as part of this.  And
19   the release says -- for some reason it says "We're
20   releasing you for work done," even though they haven't
21   started the repair work yet.  So that Taylor Morrison, I'm
22   sure, would contend down the line releases any other
23   warranty claims that were not made at the time this new
24   agreement was signed.
25          The new agreement only warrants the repair work

16

1    that is done.  So a homeowner who believes that they

2    haven't complied with the terms of the agreement is

3    potentially stuck with -- Taylor Morrison says, "Well,

4    we're done.  We did what we said we were going to do under

5    the agreement.  You've released your claims based on the

6    original construction.  You've assigned all your claims

7    against other people to us.  You are out of luck."  And

8    that's a situation homeowners could potentially run into.

9         If they are going to do that, they should be given

10   fuller disclosures, as was done in the WeightWatchers case

11   we cited, the Ojeda Sanchez case we cited.  Neither one of

12   those judges said, "You can't contact these people."  They

13   just set certain limits on it and required certain

14   disclosures.

15        In the WeightWatchers case the judge said, "You

16   can negotiate with these franchisee class members and try

17   and settle their claims if they have an attorney

18   present" --

19        THE COURT:  Well, suppose they just add, okay,

20   here's a list of pending class actions, and you may wish to

21   contact them instead of having your house fixed.  Is that

22   okay?

23        MR. CASPER:  I would also think it would be good

24   in there, or "contact your own attorney."  I mean, I'm not

25   just saying they should be pointed only towards us, but

1   they should understand that this document -- they should

2   consult with somebody who can advise them on it before they

3   sign it.

4         Further --

5         THE COURT:  So what should it say?  "You may wish

6   to talk with a lawyer" or "you should see a lawyer"?

7         MR. CASPER:  I think either one would probably be

8   acceptable.  I think "should see" would probably be better.

9         THE COURT:  Well, then if they -- the people will

10  be incurring some expense that they may not need to incur.

11        MR. CASPER:  Well, if they talk to us, they won't

12  be incurring any expense -- if they talk to us.

13        THE COURT:  Yeah, but I can assure you, you're not

14  going to be singled out that everybody should be talking to

15  you guys.

16        MR. CASPER:  I understand.

17        THE COURT:  Because this sort of looks like what's

18  driving this motion, is you want people to come to you.

19        MR. CASPER:  Your Honor, we don't want people who

20  we have a duty at this stage of the case to look out for

21  their best interests to be misled --

22        THE COURT:  At this point you represent one

23  person.

24        MR. CASPER:  We still have duties to the putative

25  class members.  We can't just freeze them out or ignore

1  their concerns.  When you file a class action, you

2  undertake certain duties on behalf of the unnamed class

3  members, and one of those is to see that they're not misled

4  or exploited into waiving all their rights relative to this

5  claim without having been given full disclosure about

6  what's going on and what their options are.  That's the

7  issue and this is -- could be very detrimental to class

8  members who sign on to these agreements.

9         The idea of going out and inspecting and repairing

10  the houses is not necessarily a bad one.  We're not saying

11  they shouldn't be doing that.  But what is the problem with

12  making sure the people make --

13         THE COURT:  It's a good one.  If the house is

14  no -- stinks and it's causing corrosion, the sooner the

15  better.

16         MR. CASPER:  And under the warranty Taylor

17  Morrison should be doing that, but why should they have to

18  require to do warranty work?

19         THE COURT:  What do you say about the Florida

20  statute that they cite, which suggests that, first, anybody

21  who has got a complaint has to send them a complaint and

22  then they have an obligation to fix it?

23         MR. CASPER:  They have -- they have an obligation

24  to make an offer to fix it or a monetary offer.

25         THE COURT:  Or settle it.

1          MR. CASPER:  Right.  Now, when you take that --

2          THE COURT:  It doesn't say anything about they

3 need to contact a lawyer.

4          MR. CASPER:  Well, when there's already a case

5 pending --

6          THE COURT:  The Florida statute -- I mean, that's,

7 sort of, a remarkable thing.  The Florida statute, sort of,

8 directs how to proceed in this case.

9          MR. CASPER:  But that doesn't take into account

10 the fact that there's already a case pending that could

11 potentially resolve the claims of these people.  They

12 should at least be aware of that.

13          THE COURT:  Let me ask this.  I'm just sort of

14 curious.  Is there going to be any contention -- maybe

15 this -- you're the wrong guy to ask -- is there going to be

16 any contention that the class members can only include

17 those people who have complied with that chapter?

18          MR. CASPER:  That's probably going to be an issue

19 that comes up at some point.  Probably at the class

20 certification stage, I would expect, but I certainly expect

21 to hear something about that from them at the appropriate

22 time, yes.

23          THE COURT:  So it, sort of, looks like it almost

24 isn't the standard class situation.  It looks, sort of,

25 like a Fair Labor Standards Act kind of situation where

20

1  somebody has to do something to be included.

2        MR. CASPER:  Well, that's --

3        THE COURT:  So the people have to make their

4  complaint with some specificity, although at this point I

5  imagine they don't have to be particularly specific.  You

6  know, the drywall stinks and it's wrecking our house.  But

7  there's -- there's that requirement in the law which, sort

8  of, puts a different twist on this than the typical class

9  action.

10        MR. CASPER:  And, conversely, this puts a twist on

11 the typical construction 558 case because usually that's

12 just a dispute individualized between the homeowner and the

13 builder about the construction.

14        THE COURT:  At this point that's what this is.

15        MR. CASPER:  Well, it -- the fact that there

16 are --

17        THE COURT:  The plaintiff has a claim -- I'm

18 assuming she gave notice.

19        MR. CASPER:  She did, and she purported to give

20 notice on behalf of herself and the putative class.

21        THE COURT:  All right.

22        MR. CASPER:  The cases we've cited, Rule 23, are

23 clear that the Court does have an interest and, in fact,

24 has a duty even to class members before a class is

25 certified, and this is the type of situation where Court

1  intervention is necessary.

2  THE COURT:  Well, they point out most of your

3  cases you cited had to do with post-certification.

4  MR. CASPER:  Ojeda Sanchez is pre-certification.

5  It's actually an FLSA case, as the Court mentioned, and the

6  Court analyzed it --

7  THE COURT:  That's a different -- that's a

8  different situation.  That's not a true class; that's an

9  opt-in situation.

10  MR. CASPER:  That -- and the protections in this

11  situation for unnamed class members are supposed to be even

12  greater, because they are going to be members of that class

13  if it's certified unless they have opted out.

14  In FLSA at least the argument can be made that,

15  hey, these people we're contacting have to make a decision

16  themselves anyway, so why not let us run out and try and

17  tell them not to participate before the judge even allows

18  the notice to go out.

19  In Ojeda Sanchez the Court didn't permit that

20  because the defendant had sent people out to try and get

21  potential FLSA plaintiffs to sign something basically

22  saying they wouldn't participate.

23  The WeightWatchers case we cited involving the

24  franchisees was pre-certification, and the Court put

25  certain limits and disclosures that had to be made to

1   franchisees if the defendant wanted to negotiate settlement
2   agreements with them.  Those are business owners.  They are
3   sophisticated business owners, and the Court said, as long
4   as they have counsel there -- and plaintiffs' counsel was
5   informed ahead of time and is allowed to even attend
6   negotiation sessions to confer with the franchisee seeking
7   to settle his claim, then the Court permitted it.
8          Here, we have individual homeowners in a desperate
9   situation because their homes are largely uninhabitable or
10  certainly unpleasant.  They don't know that there's people
11  out there attempting, at least, to try and assert claims on
12  their behalf.  They are presented with an agreement that
13  purports to provide certain repairs to the house, provide
14  some money for relocation.
15         In the situation they're in, many of them are
16  going to feel pressured to sign that simply because they're
17  desperate.  That's why they should, before making that
18  decision, be given information so they can make an informed
19  decision.
20         As it stands now, we have Taylor Morrison, with an
21  agreement drafted by counsel, including materials
22  suggesting that people don't need a lawyer and it's going
23  to take great legal resources to hire a lawyer, suggesting
24  that assigning your claims --
25             THE COURT:  What's the price range of these

23

1   houses?

2        MR. CASPER:  They're -- our plaintiff's was bought

3   for, I think, about $370,000.  That was back when prices

4   were higher.  But the homes we've seen largely in

5   subdivisions, I'd say they're in the three fifty, four

6   fifty range, but --

7        THE COURT:  People who have $300,000 homes can't

8   figure out they need to see a lawyer?

9        MR. CASPER:  Why not tell them?  What's the

10  problem with disclosing it?  What's the problem with more

11  information?

12       THE COURT:  Well, because the problem is, who do

13  you tell?  Because you came in here looking like they were

14  to tell about you and nobody else.  That's what the motion

15  indicated -- just tell about you.  Well, that ain't going

16  to happen.

17       MR. CASPER:  We wouldn't object to disclosing

18  the -- the -- I believe it's three pending cases in Florida

19  where Taylor Morrison is the defendant.

20       THE COURT:  All right.

21       MR. SIVYER:  Good afternoon, Your Honor.  Neal

22  Sivyer.

23       There are a couple of statements that Mr. Casper

24  made during argument that I have to take issue with.  The

25  first is the argument that perhaps these folks won't know

1  that they might want to get a lawyer, and this has
2  discouraged getting lawyers.  Your Honor, this is like an
3  ABA convention.  We've got at least six different law firms
4  all purporting to represent the plaintiffs in this case.
5  There's more lawyers in this case than I've ever seen in my
6  life.
7          So if the idea is we're discouraging lawyers,
8  we've done a pretty lousy job of it because, as you say,
9  everybody in these specific subdivisions that are affected
10 knows everything about it, I'm sure talked to all their
11 neighbors, and those who wanted to have gotten lawyers.
12          Interestingly enough --
13          THE COURT:  But what -- do you have any objection
14 to putting in some statement in your -- not necessarily
15 your -- your release but your facts sheet that there are
16 these class actions -- purported putative class actions at
17 this point, right?
18          MR. SIVYER:  Yes, Your Honor.
19          THE COURT:  Is any of them class certified yet?
20          MR. SIVYER:  There are no -- no -- no -- no even
21 hearings, let alone class certified.
22          THE COURT:  Okay.  And that -- or that you might
23 want to contact your own lawyer --
24          MR. SIVYER:  Right.
25          THE COURT:  -- or some other lawyer, do you have

1   any problem doing that?

2          MR. SIVYER:  Yes.  I wouldn't mind having

3   something in there "you may want to contact a lawyer," but

4   naming these specific lawyers -- every week we get another

5   law firm purportedly representing the class.  I don't know

6   who's going to represent the class.  I don't even know what

7   we'd say about it.  Not to mention, what happens if another

8   law firm purports to represent the class a week from now,

9   which could easily happen?  Do we have to amend the notice

10  and add another law firm?  And then what do we say?  Do we

11  say go to this -- how do we list them in order?  What do we

12  say about the case?

13         Your Honor, nobody has had any trouble finding law

14  firms.  And, interestingly enough, Irvin Gonzalez's firm,

15  the Colson and Hicks firm, which is in the lead counsel

16  position in the Southern District where these lawyers want

17  to have the case transferred to, that law firm, as we've

18  said in the affidavit, has asked that we do repairs and

19  inspections right away.  And we filed an affidavit with the

20  list and the letters from that law firm.

21         So if they go to the Southern District and picked

22  up the phone and call that firm first, those lawyers are

23  going to say, presumably, "Let's get these things fixed.

24  Let's sign the agreement."  If they go to this law firm

25  first and pick up the phone, they're going to say, "Don't

26

1  sign that agreement."

2      I mean, these are $400,000 houses.  These folks

3  are intelligent enough to make an informed decision about

4  whether they want to hire a lawyer; if they do hire a

5  lawyer, who they should hire and what the conditions ought

6  to be.

7      The other statement I want to take issue with with

8  Mr. Casper is --

9      THE COURT:  Let me just --

10     MR. SIVYER:  Yes, Your Honor.

11     THE COURT:  -- pursue that one.  So -- and that --

12  Mr. Gonzalez, I think, has filed an objection to --

13     MR. SIVYER:  He did, Your Honor.

14     THE COURT:  -- the -- actually --

15     MR. SIVYER:  To the motion.

16     THE COURT:  -- it was filed --

17     MR. SIVYER:  Yeah.

18     THE COURT:  It was styled as --

19     MR. SIVYER:  Yeah.  Yeah.

20     THE COURT:  -- an objection to the motion.

21     MR. SIVYER:  Right.

22     THE COURT:  But when you look at it --

23     MR. SIVYER:  Right.

24     THE COURT:  -- I didn't see anything in there

25  arguing against it.

1      MR. SIVYER:  Right.  Well, he says it -- he wants

2  it denied for the time being --

3      THE COURT:  Yeah.

4      MR. SIVYER:  -- anyway, yeah.

5      THE COURT:  Well -- but -- but -- so there's been

6  contact with him -- between your firm --

7      MR. SIVYER:  Yes, Your Honor.

8      THE COURT:  -- and him?

9      MR. SIVYER:  Yes, Your Honor.

10      THE COURT:  And his position is, do repairs?

11      MR. SIVYER:  Sign the release in a slightly

12  modified form, do the repairs, let's go.

13      THE COURT:  What's the modification?

14      MR. SIVYER:  I can't recall all of them.  They are

15  very minor modifications, Your Honor.  I could file it, if

16  I have his permission, but they are very minor

17  modifications to the repair agreement.  And, you know, I

18  would want his permission to file it.

19      THE COURT:  Is there anything in there on the

20  fact -- has the facts sheet been --

21      MR. SIVYER:  It hasn't been modified at all.

22      THE COURT:  Okay.  And so he didn't insist

23  anything about talking to a lawyer?

24      MR. SIVYER:  No.  And, Your Honor, the -- the

25  agreement itself, as the Court pointed out, specifically is

1  fulfilling our obligations under Chapter 558.  Remember,

2  this case shouldn't even be filed until Chapter 558 is

3  satisfied.  So all these other putative class members have

4  to go through the requirements before they can even file

5  suit.  The whole idea --

6          THE COURT:  Well, I was going to get -- you were

7  the one to ask rather than the plaintiff.  So are you going

8  to make some contention -- an objection in class

9  certification that nobody should be a class member if they

10 didn't comply with this chapter?

11         MR. SIVYER:  Absolutely, because we want to fix

12 the houses.

13         THE COURT:  Okay.

14         MR. SIVYER:  That's our goal.  If they have a

15 personal injury claim and there's some horrible health

16 problem, it's excepted.  That's an exception.

17         THE COURT:  And I understand that.

18         MR. SIVYER:  Right.

19         THE COURT:  But in terms of who could be a member

20 of the class, you're going to require every class member --

21 you're going to demand -- and whether it's agreed to or not

22 is something else.

23         MR. SIVYER:  Yes, sir.

24         THE COURT:  -- but you're going to demand that

25 every class member have -- given the notification?

29

1          MR. SIVYER:   Yes, Your Honor.   And I think it
2   envisions this type of case, because the statute gives a
3   different time period for 50 or more units.   So I think it
4   actually envisions cases just like this when it talks about
5   the repairs.
6          And, you know, the WeightWatchers case, in
7   situations like that -- the Ojeda case involved a situation
8   where somebody sent down to Mexico a representative from
9   the company and solicited a statement under threat that
10  these Mexican workers wouldn't get a job that they didn't
11  want to be part of this case.   That's a little different
12  than a $400,000 property owner, many of whom are
13  represented already by lawyers and have a warranty, and the
14  original warranty --
15          THE COURT:   Many or some?
16          MR. SIVYER:   All of them have a warranty.
17          THE COURT:   No.   No.   The lawyer.
18          MR. SIVYER:   Oh.
19          THE COURT:   You said many of them have a lawyer.
20  What I got out of that --
21          MR. SIVYER:   Right.
22          THE COURT:   -- affidavit -- one of the --
23          MR. SIVYER:   Right.
24          THE COURT:   -- affidavits -- was a few of -- some
25  people have a lawyer.

1    MR. SIVYER:  A number of them have an --

2  (indiscernible) -- I don't have an exact --

3    THE COURT:  All right.

4    MR. SIVYER:  -- number.  I know that Mr. Gonzalez

5  has written to us for probably about eight of them.  We've

6  gotten a handful of other lawyers that have written that

7  are completely unconnected.  Obviously we've gotten the one

8  from Mr. Casper's firm.

9    But the vast majority of the lawyers that have

10  written us 558 notices are not affiliated with Mr. Casper

11  or Mr. Inverso's firm.  And they're doing everything they

12  can, as you can see in our materials, to find these folks

13  themselves.  They have got web sites.  They're talking to

14  the newspaper, trying to sign people up.

15    If they really want clients -- and I'm speaking of

16  plaintiff's counsel -- they're doing everything they can to

17  sign them up themselves.

18    For us to send a notice identifying people to them

19  is not required or even appropriate.  They're doing a very

20  good job themselves of doing anything that's required along

21  those lines, Your Honor.

22    And, importantly, the original warranty isn't

23  being released either.  If you look at Paragraph 15 --

24    THE COURT:  That's what I thought.

25    MR. SIVYER:  Right.

1      THE COURT:  You can go ahead and point it out to

2  me, but that --

3      MR. SIVYER:  Yeah.  Paragraph 15 --

4      THE COURT:  Yeah.

5      MR. SIVYER:  -- has an exception for the original

6  warranty as well as obviously a new warranty be given

7  earlier in the provision.  No personal injury release, no

8  release of the original warranty, and a new warranty

9  given.

10      Is it perfect?  I don't know.  But we're making a

11  good-faith attempt to fix these houses to -- to enter into

12  a fair agreement.  And if folks want representation, fine.

13  We've modified some of the agreements at the request of

14  their lawyers.  And, you know, we're doing the best job we

15  can to get people's homes fixed.  That's really our job and

16  our goal.

17      I'm sorry if that doesn't result in a great big

18  attorneys' fee in this case, but that's really what we're

19  trying to do.  Thank you, Your Honor.

20      THE COURT:  All right.  You want to respond?

21      MR. CASPER:  Your Honor, I would ask just to

22  address some of the attorneys -- (indiscernible) -- we make

23  an exception to the Local Rule and let Mr. Inverso address

24  the Court?

25      THE COURT:  No.  No.  That's what the rule is:

32

1   One lawyer speaks at a time.

2            Do you have anything to say in response to what he

3   just said?

4            MR. CASPER:   Your Honor, I -- just briefly.   There

5   are a lot of homeowners out there who are not represented.

6   That much is clear.

7            THE COURT:   What's the -- well, maybe, maybe not.

8   Okay.   Guess what?   Just because you're a homeowner --

9   okay.   When my sewer collapsed and I had to get somebody to

10  come and fix it, I didn't go run to a lawyer.   We called

11  the guy who was in the neighborhood who was fixing these

12  things.   They came and fixed it.

13           So everything doesn't have to turn into a

14  lawsuit.   And if they're going to come in and fix the

15  thing, why shouldn't I let this happen without a lawyer

16  intervening?   Lawyers aren't something magical that they

17  can just -- okay, everything goes away and your TV set gets

18  better so --

19           MR. CASPER:   Well, Your Honor, one side has

20  lawyers.   A lot of people on the other side don't.   That's

21  not a fair situation.

22           THE COURT:   Well, why?   Why?   Because they want

23  their house fixed.   If their house gets fixed, then what --

24  why would they need a lawyer?

25           MR. CASPER:   The way the agreements are written,

33

1   there's no assurance the house is going to be fixed and put

2   in the condition it would have been absent the defective

3   drywall that was installed.  The agreement says they'll put

4   it back --

5           THE COURT:  Well, then you have the warranty, the

6   old one as well as the new one.

7           MR. CASPER:  The release releases any claims

8   related to the defective Chinese drywall, right in

9   Paragraph 15.

10           THE COURT:  Well, of course.  They are taking up

11   that old drywall and putting in new drywall; then you get a

12   year warranty.

13           MR. CASPER:  But if they don't correct the other

14   damage that -- under the agreement it's arguable whether

15   they're even obligated to do, and the homeowner is

16   dissatisfied with the work, they've already released their

17   claims as to the drywall, then the warranty they've gotten

18   in this agreement applies to the repair work.  They've

19   already released their claims related to the problems

20   associated with the defective drywall.

21           THE COURT:  Now, what about the fact that

22   Mr. Gonzalez who -- he wants to represent everybody.  He

23   says, "Go ahead and fix this stuff, and we don't need it.

24   You're -- (indiscernible) -- anything in there about a

25   lawyer."

34

1    MR. CASPER:  What was filed, I saw --

2    THE COURT:  He's in the same position as you are.

3    MR. CASPER:  What --

4    THE COURT:  And as a matter of fact, he's there

5    objecting to you being interim counsel and the style of the

6    motion was objecting to your motion.

7    MR. CASPER:  The interim class counsel motion,

8    yes.

9    THE COURT:  Well -- but there -- but also the

10   style of it objected to this motion for protective order.

11   But if you look at it, there's nothing in there that talks

12   about it.

13   MR. CASPER:  And nothing --

14   THE COURT:  But he, at least in the style, is

15   objecting to this motion.  And so he's in the same position

16   you are.  He's not saying these people need lawyers.

17   MR. CASPER:  Well, the people he's asking for

18   inspections on behalf of -- and all I've seen that he has

19   asked for is inspections, I've not seen anything where

20   Mr. Gonzalez requested Taylor Morrison to initiate

21   repairs.  That may be the case, but I haven't seen it.

22   I believe all I've seen is where he requested some

23   inspections be done.  He represents those people, is my

24   understanding.  They're not unrepresented.  He represents

25   them.

1        The relief we're asking for wouldn't affect -- he
2   can still go to Taylor Morrison and do whatever he wants.
3        THE COURT:  But he's taking a different position
4   than you are.
5        MR. CASPER:  He can do whatever he wants on behalf
6   of his clients, but he has clients that are represented by
7   him.  It's not his clients we're worried about.
8        THE COURT:  But he would have the same obligation
9   that you feel you have to the putative class, and he isn't
10  asking for some statement in there about lawyers or to stop
11  the repair work or anything like that.
12       MR. CASPER:  He can explain, I presume, if there's
13  a hearing on the interim class counsel motion why he has
14  taken that position.  I can't explain why he would, if he
15  has.  I don't even know that he has, Your Honor.  I've just
16  seen that he's asked for some inspections.  We don't oppose
17  inspections.  We've allowed them to inspect our client's
18  house.
19       The other deficiencies in the agreement I just
20  want to address.  It limits property damage to other
21  property to $1,500.  We're talking about some homes where
22  that number is going to be greatly exceeded because we're
23  talking expensive appliances, TV's, air conditioning
24  units.  Air conditioning units are the first thing to show
25  damage in these houses.  Those are expensive.  You don't

1   replace a unit --

2           THE COURT:  Do you have an objection?

3           MR. SIVYER:  I just wanted to clarify one thing,

4   but I would be glad to wait because I think he's misspoken.

5           THE COURT:  You're going on -- you're not

6   responding to what he said.  You're going on to make a new

7   argument, so I have a problem with that.

8           MR. CASPER:  Okay.  Well, with respect to

9   Mr. Gonzalez, I'll just say I know he's requested

10  inspections.  I don't know anything beyond that.

11          THE COURT:  Okay.

12          MR. CASPER:  With respect to these people having

13  lawyers or not, we don't know how many of them have lawyers

14  or not.  They do.  They don't know the exact number today.

15  We don't know how many people they've contacted, how many

16  people have signed this, how many of those people have

17  lawyers.

18          It's simply -- the whole point of Rule 23 is to

19  allow a great number of people's rights to be protected,

20  people who may not even know they have a claim or be aware

21  that somebody is asserting that claim on their behalf, and

22  avoid a situation like this where one side represented by a

23  lawyer could go in, negotiate settlements with

24  unrepresented persons, settlements which, if enforced, will

25  mean that these people will have been opted out of a

1   putative class action, having no notice that the class

2   exists or that the case is pending, contrary completely to

3   the spirit --

4         THE COURT:  And their house is fixed and they're

5   back in their house and they've moved on with their lives.

6         MR. CASPER:  Well, they haven't gotten

7   compensation for their personal property, and it's doubtful

8   under this agreement that the houses will be fixed as they

9   should be.  And why should they have to sign away all of

10   this to get warranty work done?  Where is that in Chapter

11   558?  When to get somebody to honor a warranty do you have

12   to agree to release all your claims against other people?

13         THE COURT:  Why do you need a lawyer to get a

14   warranty honored?

15         MR. CASPER:  Well, because they're not just

16   honoring the warranty.  They're saying, "Well, we'll honor

17   the warranty if you release your claims against us and

18   assign all your claims against everyone else and take" --

19         THE COURT:  Well -- but he just said -- and that's

20   my recollection.  You don't -- you don't -- they're not

21   releasing any other warranty matters.

22         MR. CASPER:  Well, if there's a completely

23   unrelated problem under the warranty, I agree; that

24   wouldn't be released.  The problem is, the release is going

25   to cover anything related to the defective Chinese drywall.

38

1        THE COURT:  But there's a new year warranty.

2        MR. CASPER:  On the repair work, not on problems

3   caused by the defective Chinese drywall.  They're going to

4   argue, I'm sure, if it comes up, that only covers -- "that

5   only warrants the stuff we replaced," if a problem arises

6   with that.  It doesn't cover other problems that the

7   drywall caused.  You release those -- "we did what we said

8   we're going to do under the agreement.  If you still think

9   you have problems in your house caused by the drywall, you

10  don't think we fixed it, you don't think we restored your

11  home to the condition it was in, too bad."

12       That's the situation that a lot of people are

13  going to be left in because they were not fully informed;

14  there was not full disclosure.  Many of them were not

15  represented.

16       It's quite a leap to assume, especially after

17  reading the agreement, that everybody is going to be

18  perfectly happy with the house as repaired and it's going

19  to be a fair deal that they've released everything --

20       THE COURT:  There's going to be some people who

21  are going to try to take advantage of it, because some

22  people -- and try to get as much out of it as they can.

23  There are going to be some people who are just happy to get

24  on with their lives.  And there will be some of them that

25  will say, "This was a real aggravation, and I'm glad it's

1   behind us." There's going to be a whole lot of people, and
2   they all will have different reactions.
3           MR. CASPER: Yeah, let them make that reaction
4   based on complete information. Some people may look at
5   that and say, "Well, I don't want to wait and see what
6   happens with the class action. I'm going to take the
7   deal. I don't think it's a hundred percent but, hey, I'll
8   take it." Some people are going to do that. But they
9   should at least make that decision knowingly and with full
10  information.
11          I would urge the Court to review our memo and just
12  compare --
13          THE COURT: I've already read it.
14          MR. CASPER: -- the terms of the agreement to the
15  representations in the associated documents.
16          THE COURT: I've read all this stuff. I didn't
17  find it particularly misleading.
18          The only thing I find that's -- that has some
19  persuasiveness is some statement to contact a lawyer,
20  period, not you guys, not the other guys, not anybody, but
21  a statement in their facts that there should be some --
22  that you may wish to contact a lawyer before you sign this
23  document.
24          MR. CASPER: But, Your Honor, why not clearer
25  language on the assignment and release issue as well? I

1  don't think it's clear to a lot of people in reading this

2  that this means you're done; this is all you're going to

3  get.

4       THE COURT:  No.  That's why you contact a lawyer.

5  I don't think there's anything misleading about that, so

6  I'm not going to say, yeah, you ought to change that.  If

7  I'm reading that, I understand what it means.  If you don't

8  want to do that, okay, then fine.  Then you don't accept

9  their deal.  You get a lawyer; you bring your own

10 lawsuit -- not necessarily yours but their own lawsuit, and

11 they can ask for a class.  So I'm not changing that one

12 because I don't see anything wrong with that one.

13      And I don't see anything wrong with the other

14 stuff.  I didn't find this a misleading statement at all.

15 It may be that some lawyers can find some ambiguities in it

16 to try to create a -- something misleading about it.  But a

17 real honest-to-goodness person that's reading it trying to

18 get the gist of it, they're not going to be misled by

19 this.  They may want to decide, "I don't want to take the

20 deal" for whatever reason after talking with a lawyer.

21 Okay.  Fine.  So that's all I see in this thing.

22      MR. CASPER:  Fair enough, Your Honor.

23      THE COURT:  All right.  So I'm granting the motion

24 only to the extent that the facts sheet -- I'm not sure

25 that's what you call it, but it's something like --

```
 1              MR. CASPER:  It is what -- that's what --

 2              THE COURT:  Okay.

 3              -- shall include some statement that you -- this

 4    is a significant matter, and you may wish to consult a

 5    lawyer before deciding to sign this form -- the form.

 6              MR. CASPER:  Fair enough.  Fine.  Could we

 7    respectfully suggest that the order say it's otherwise

 8    denied and that way --

 9              THE COURT:  Well, yeah.

10              MR. CASPER:  Okay.  Great.

11              THE COURT:  But what I'm -- what I'm going to do

12    is this:  that you submit something, because the

13    off-the-top-of-my-head language isn't --

14              MR. CASPER:  Right.

15              THE COURT:  -- necessarily what ought to go in

16    there.  So you prepare something along those lines.

17              MR. CASPER:  Yes, Your Honor.

18              THE COURT:  You may wish -- I don't think it ought

19    to -- you should because they may end up spending money

20    they don't need to.  "You may wish to consult" -- "this is

21    a significant matter that involves legal rights, and you

22    may wish to consult a lawyer before signing the form."

23              MR. CASPER:  Fair enough.

24              THE COURT:  And so do this:  You prepare some

25    language along that -- show it to them.  If you don't like
```

42

1  it, you can send in your version.  But it isn't going to be
2  much more than that.
3            MR. CASPER:  Fair enough, Your Honor.
4            THE COURT:  So I will grant the motion to that
5  extent, that the fact sheet shall include something along
6  those lines.  And if there's a disagreement, then I'll put
7  in the language myself that I think is right.
8            MR. CASPER:  All right.  Otherwise --
9            THE COURT:  Otherwise, it will be denied.
10            MR. CASPER:  Thank you, Your Honor.
11            THE COURT:  All right.  Court will be in recess.
12            (Thereupon, the proceedings in this case for this
13  date were concluded at this time.)
14
15
16
17
18
19                    C E R T I F I C A T E
20        I, Dennis Miracle, Official Court Reporter, do
     hereby certify that the foregoing proceedings were
21  transcribed by me from a digital record that was produced
     by the United States District Court for the Middle District
22  of Florida, Tampa Division, and is a true and accurate
     record of said proceedings to the best of my ability, **based
23  on the quality of the recording.**
24      s/Dennis Miracle                    May 15, 2009
     _____        _____
25      Dennis Miracle                        Date

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISTIN MORGAN CULLITON,

      Plaintiff,

v.                                CASE No. 8:09-CV-589-T-27TGW

TAYLOR MORRISON SERVICES,
INC., et al.,

      Defendants.

_____

## O R D E R

THIS CAUSE came on to be heard upon the Plaintiff's Motion for Protective Order (Doc. 10) and the defendant's response thereto (Doc. 19). Based upon the reasons set forth at the hearing, the motion will be granted to the extent that the Taylor Morrison's fact sheet shall include language regarding the homeowners' right to an attorney. The parties subsequently filed a notice of agreed language (Doc. 47).

It is, therefore, upon consideration

ORDERED:

That the Plaintiff's Motion for Protective Order (Doc. 10) be, and the same is hereby, **GRANTED** to the extent that the fact sheet sent by Taylor Morrison to homeowners shall include the following language: "The

Repair and Relocation Agreement is a legally binding contract, which may

affect your legal rights.  You have the right to consult with an attorney should

you choose to do so, prior to executing the Agreement."

DONE and ORDERED at Tampa, Florida, this ____ day of May,

2009.

_____
THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE