## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| STEVEN MINAFRI, on behalf of himself and all others similarly situated , On Behalf of the General Public, | : : : | **Case No. 2:09-cv-167** |
| | : | **Judge Algenon L. Marbley** |
| Plaintiff, | : : | |
| vs. | : : | |
| M/I HOMES, INC., KNAUF GIPS KG, KNAUF PLASTERBOARD (TIANJIN) CO, LTD., and DOES 1-100, | : : : : | |
| Defendants. | : : | |

## PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER TO PROTECT THE CLASS AND FAIR CONDUCT OF THIS ACTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(d) REGULATING COMMUNICATIONS WITH MEMBERS OF THE PUTATIVE CLASS

Plaintiff, by and through his counsel, respectfully moves this Honorable Court, pursuant to Fed. R. Civ. P. 23(d)(2) to protect the putative Class Members and the fair conduct of this action from the unauthorized and improper communications to the putative Class Members by Defendant, M/I Homes Inc. ("Defendant"). After the filing of this class action, Defendant notified Plaintiff's Counsel that it intended to send a communication ("Communication") that invited the members of the putative Class to settle and release their claims.

In this Communication, Defendant solicits the settlement of the putative Class Members' claims related to the defective Chinese drywall Defendant installed in their homes. Defendant hopes to settle putative Class Members' claims without fully advising them of the true nature and scope of its drywall's defects, an accurate description of the pendency of this litigation (including the names and/or contact information of the lawyers who brought the case on their behalf), and their rights to participate in this litigation.

Plaintiff's Counsel informed Defendant that the Communication was misleading in many ways. Further, that the Court has not approved this Communication. Plaintiff's Counsel urged Defendant not to send the Communication until the Court had a chance to review, approve, modify or deny the sending of such Communication. Defendant informed Plaintiff's Counsel that it would not wait for the Court to review this Communication. Plaintiff's Counsel informed Defendant that they were going to file a Temporary Restraining Order immediately and that Plaintiff's Counsel had contacted the Court for an emergency hearing.  Defendant indicated that it was going to send the Communication regardless of the Court's ability to review the situation.

Plaintiff, on behalf of himself and other members of the proposed Classes ("Class" or "Class Members"), for the reasons set forth in the accompanying memorandum of law, respectfully requests the Court to approve a preliminary injunction (a) prohibiting Defendant from sending the Communication; (b) ordering Defendant to cease contacting or soliciting (or encouraging others to contact or solicit) putative Class Members in this case about the settlement of their claims or the status of this class action without prior approval from the Court or agreement by Plaintiff's counsel; (c) to turn over the names and addresses of the putative Class Members to Plaintiff's Counsel; and (d) ordering Defendant to identify claims of putative Class Members that were made after the filing of this class action and claims that have been purportedly released by putative Class Members after the filing of this case.

Date:   April 25, 2009                                     Respectfully submitted,


                                                           s/ Jack Landskroner
                                                           Jack Landskroner (0059227)
                                                           Drew Legando (0084209)
                                                           LANDSKRONER GRIECO MADDEN
                                                           1360 West 9th Street, Suite 200
                                                           Cleveland, OH 44113
                                                           216-522-9000
                                                           216-522-9007 (fax)
                                                           jack@lgmlegal.com
                                                           drew@lgmlegal.com

                                                           Charles LaDuca
                                                           William H. Anderson
                                                           CUNEO GILBERT & LaDUCA, LLP
                                                           507 C Street, NE

Washington, DC 20002
202-789-3960
202-789-1813 (fax)
charlesl@cuneolaw.com
wanderson@cuneolaw.com

Robert K. Shelquist
Yvonne M. Flaherty
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Ste. 2200
Minneapolis, MN 55401
612-339-6900

Shawn Raiter
LARSON KING, LLP
2800 Wells Fargo Place
30 E. Seventh Street
Saint Paul, MN 55101
651-312-6518
sraiter@larsonking.com

Michael McShane
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, CA 94105
(415) 568-2555
Fax: (415) 576-1776

Jeremy W. Alters
ALTERS BOLDT BROWN RASH CULMO
4141 NE 2nd Avenue, Ste. 201
Miami, FL 33137
305-571-8550

*Attorneys for Plaintiff Steven Minafri and
the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that *Plaintiff's Motion for a Temporary Restraining Order to Protect the Class and Fair Conduct of this Action Pursuant to Federal Rule of Civil Procedure 23(d) Regulating Communications with Members of the Putative Class* was filed electronically with the U.S. District Court, Northern District of Ohio on April 25, 2009.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the court system.

s/Jack Landskroner
Jack Landskroner (0059227)
LANDSKRONER GRIECO MADDEN
1360 West 9th Street, Suite 200
Cleveland, OH 44113
Telephone: (216) 522-9000
Facsimile: (216) 522-9007
jack@lgmlegal.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| STEVEN MINAFRI, on behalf of himself and all others similarly situated , On Behalf of the General Public, | : : : | **Case No. 2:09-cv-167** |
| | : | **Judge Algenon L. Marbley** |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| M/I HOMES, INC., KNAUF GIPS KG, KNAUF PLASTERBOARD (TIANJIN) CO., LTD., and DOES 1-100, | : : : | |
| | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER TO PROTECT THE CLASS AND FAIR CONDUCT OF THIS ACTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(d) REGULATING COMMUNICATIONS WITH MEMBERS OF THE PUTATIVE CLASS**

Pursuant to Fed.R.Civ.P. 23(d)(2) and 65(b), Plaintiff moves this Honorable Court to protect the putative class (the "Class") and the fair conduct of this action from unauthorized and improper communications to the members of the Class ("Class Members") by Defendant M/I Homes ("Defendant"). This motion is supported by the Declaration of Charles J. LaDuca ("LaDuca Decl."). For the reasons stated below, the Court should enter a temporary restraining order enjoining the communication in its present form, requiring prior Court approval of future communications, and requiring disclosure to Plaintiff's counsel of the identity of all Class Members, as well as identifying those who have filed and/or released claims against Defendant.

**I.      INTRODUCTION**

Counsel for Defendant notified Plaintiff's Counsel, Shawn Raiter and Charles LaDuca, on Thursday, April 23, 2009, that Defendant intends to send a letter which included a legal release and an offer of settlement ("communication") to putative Class Members regarding the defective Chinese-manufactured drywall (the "Chinese Drywall") in the homes built by

Defendant. LaDuca Decl., Exh. 1. Counsel for the Defendant sent a draft of such communication to Mr. Raiter and Mr. LaDuca at approximately 4:00 p.m. on April 23, 2009. *Id.*, ¶ 3.

The next day, counsel for the parties conducted a conference call to discuss concerns Plaintiff had about the proposed communication and release. *Id.*, ¶ 6. During that call, Defendant notified Messrs. Raiter and LaDuca that the communication had been drafted and edited by Suzanne Kay Richards, Esq., of Vorys Sater Seymour & Pease, counsel of record for Defendant, as well as other attorneys for Defendant. *Id.*

After reviewing the communication, Plaintiff's counsel informed Defendant's counsel that the communication was misleading and was an improper communication to the putative class. *Id.*, ¶ 4. Specifically, Plaintiff's counsel informed Defendant's counsel that the communication was misleading for the following reasons:

- o  it failed to advise putative Class Members of the full scope of the problem;

- o  it failed to advise putative Class Members of the health-related issues the defective product may cause;

- o  it failed to provide putative Class Members with a full explanation of the class action lawsuit that was filed or the scope of the release M/I Homes is seeking;

- o  it failed to provide putative Class Members contact information for the lawyers who brought the lawsuit on behalf of the putative Class;

- o  it failed to advise putative Class Members that the communication was drafted by lawyers for M/I Homes – rather it is simply signed by the Area President of M/I Homes;

- o  it failed to advise putative Class Members of the legal ramifications of the release;

- o  it failed to tell the putative Class Members that the communication was not approved by the Court; and

- o  it failed to properly describe or inform the putative Class Members about the Rescission of Agreement.

Plaintiff's counsel also informed Defendant's counsel that they would file a Temporary Restraining Order with this Court and urged Defendant's counsel not to send such

communication until the Court has reviewed the communication. Defense counsel refused and told Plaintiffs' counsel that their client intended to send the communication to its customers regardless of the Plaintiffs' Counsel's concerns, or Plaintiff's intention to seek judicial review of the proposed communication.

As discussed above, this communication is an attempt to mislead consumers into settling their claims without fully advising them of the true nature, scope and harmful effects of the Chinese Drywall, the pendency of the class action litigation, and their right to participate in this litigation. Plaintiff, on behalf of himself and other members of the proposed Class ("Class" or "Class Members"), respectfully requests that the Court enter a preliminary injunction (a) prohibiting Defendants from sending the communication in its present form; (b) ordering Defendant to cease contacting or soliciting (or encouraging others to contact or solicit) putative Class Members in this case about the settlement of their claims or the status of this class action without prior Court approval; (c) directing Defendant to disclose the names and addresses of the putative class members to Plaintiff's Counsel; and (d) ordering Defendant to identify claims of putative Class Members that were made after the filing of this class action and that have been purportedly released by putative Class Members after the filing of this case.

## II.    ARGUMENT

District courts have broad discretionary powers under Fed.R.Civ.P. 23(d) to supervise communications with class members. Rule 23(d), in relevant part, states:

> **Orders in Conduct of Actions.** In the conduct of actions to which this rule applies, the court may make appropriate orders: ... (2) requiring, for the protection of members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors... [and] (5) dealing with similar procedural matters.

Fed.R.Civ.P. 23(d). Many courts have found this regulatory power is adjunct to the authority of the courts themselves. In *Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981), the Supreme Court explained these plenary powers:

> [A] district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties.

*Id.* at 100. *See also Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985); *In re Federal Skywalk Cases*, 97 F.R.D 370, 377 (W.D.Mo. 1983). Rule 23(d) provides this Court broad authority to manage the conduct of class actions at "any step in the action," not only after class certification. *See Hoffman-LaRoche Inc. v. Sperling*, 110 S.Ct. 482, 486 (1989); *Gulf Oil Co.*, 452 U.S. at 101.

Courts have long recognized the potential for abuse that may occur when defendant or its counsel communicates with members of a class or proposed class. *See Gulf Oil Co.*, 452 U.S at 99-100; *In re School Asbestos Litig.*, 842 F.2d 671, 679-80 (3d Cir. 1988); *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 601-02 (2d Cir. 1986); *Kleiner*, 751 at 101-03. Specifically, misleading communications to class members or putative class members regarding the litigation pose a significant threat to the fairness of the proceedings, the fundamental rights of parties, the adequacy of representation and the general administration of justice generally. *In re School Asbestos Litig.*, 842 F.2d at 680; *see also Waldo v. Lakeshore Estates, Inc.*, 433 F.Supp. 783, 790-91 (E.D. La. 1977), appeal dismissed, 579 F.2d 642 (5th Cir. 1978) ("Unapproved communications to class members that misrepresent the status or effect of the pending action also have an obvious potential for confusion and/or adversely affecting the administration of justice."). "Unsupervised unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of one-sided presentation of the facts, without opportunity for rebuttal. The damage from misstatement so could be irreparable." *Kleiner*, 751 F.2d 1203. [1]

Because of the potential for abuse, district courts have "both the duty and the broad authority to… enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil*

---

[1] *See also* D.F. Herr, *Manual for Complex Litig. Fourth*, ¶ 21.33 (2006) ("The judge has ultimate control over communications among the parties, third parties, or their agents and Class Members on the subject matter of the litigation to ensure the integrity of the proceedings and protection of the class…If improper communications occur, curative action might be necessary, such as extending deadlines for opting out, intervening or responding to a proposed settlement, or voiding improperly solicited opt-out and providing new opportunity to opt-out."

*Co.*, 452 U.S. at 100; *In re School Asbestos Litig.*, 842 F.2d at 679-80.  In *Gulf Oil v. Bernard*, the Supreme Court advised courts that any order regulating communications with putative class members should be "based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101.[2]

In seeking an order limiting a defendant's communications with putative class members, a plaintiff must show that a restricting order would guard against the likelihood of serious abuses. *Gulf Oil*, 452 U.S. at 104.  Actual harm need not be shown.  *See Jennifer v. Delaware Solid Waste Authority*, 1999 WL 117762 (D. Del. Feb. 25, 1999).  Showing that the "interests embodied in Rule 23 might be hindered is a sufficient finding upon which to base an order limiting contacts." *See Hampton Hardware, Inc. v. Cotter & Co., Inc.*, 156 F.R.D. 630, 633 (N.D.Tex. 1994).

Following *Gulf Oil*, many courts have confronted the need to supervise inherently coercive communications with absent class members.  That is the issue now before the Court. Where there is a risk of misleading the class or otherwise threatening the fairness of the proceedings, courts frequently impose limitations on such communications, if not enjoining the communications altogether.  *In re Community Bank of Northern Virginia*, 418 F.3d 277 (3d Cir. 2005); *In re School Asbestos Litig.*, 842 F.2d 671 (3d Cir. 1988); *Kleiner v. First National Bank of Atlanta*, 751.2d 1193 (11th Cir. 1985); *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 845 (2d Cir. 1980); *Ralph Oldmobile, Inc. v. General Motors Corp.*, 2001 WL 1035132, *2 (S.D.N.Y. Sept. 7, 2001); *Jennifer v. Delaware Solid Waste Authority*, 1999 WL 117762 (D. Del. Feb. 25, 1999); *Burrell v. Crown Ent. Petroleum, Inc.*, 176 F.R.D. 239, 242-43 (E.D. Tex. 1997); *Georgine v. Amchen Prods., Inc.*, 160 F.R.D. 478 (E.D. Pa. 1995); *Haffer v. Temple University*, 115 F.R.D. 506, 512 (E.D. Pa. 1987); *Tedesco v. Mishkin*, 629 F.Supp. 1484, 1484 (S.D.N.Y. 1986); *Bower v. Bunker Hill Co.*, 689 F.Supp. 1032, 1033-34 (E.D. Wash. 1985); *In re Federal Skywalk Cases*, 97 F.R.D. 370, 377 (W.D. Mo. 1983); *Resnick v. American Dental Ass'n*, 95

---

[2] In *Gulf Oil*, the Court ultimately found invalid an order that imposed a <u>complete</u> ban on all communications concerning the class action between the parties or their counsel and any actual or potential class member not a party without prior approval of a court.  *Gulf Oil*, 452 U.S. at 102-04.

F.R.D. 372, 376-377 (N.D. Ill. 1982); *Zarate v. Younglove*, 86 F.R.D. 80 (C.D. Cal. 1982); *Impervious Point Industries, Inc. v. Ashland Oil*, 508 F.Supp. 720, 722-24 (W.D. Ky.) *appeal dismissed without opinion*, 659 F. 1081 (6th Circ. 1981). .

In *Erhardt*, the court recognized that the district court was responsible for preventing unauthorized notices to class members:

> It is the responsibility of the court to direct the "best notices practicable" to class members, Rule 23(c)(2), and to safeguard them from the unauthorized, misleading communications from the parties or their counsel.  Unapproved notices to class members which are factually or legally incomplete, lack objectivity and neutrality, or contain untruths will surely result in confusion and adversely affect the administration of justice.  To prevent abusive practices in the absence of a local rule, the court should include in its order of notice a provision limiting within constitutional parameters any unauthorized correspondence by parties and their counsel with class members.

*Erhardt*, 629 F.2d at 846.

Of particular concern are communications by defendants with putative class members that are misleading as to a proposed settlement, the status of pending class action, or that induce class members to opt-out or not cooperate with class counsel. *In re School Asbestos Litig.*, 842 F.2d at 682; *In re Community Bank of Northern Virginia*, 418 F.3d at 311-312;  *Georgine*, 160 F.R.D. at 490; *Haffer*,  115 F.R.D. at 512-513; See *Kleiner*, 751 A.2d at 1202; *Ralph Oldsmobile, Inc.*,  2001 WL 1035132 at *4-6; *Jennifer*, 1999 WL 117762 at *2;  *Hampton Hardware*,  156 F.R.D. at 633, *Impervious Paint*, 508 F.Supp. at 721-723.

In this case, the proposed communication to absent members of the class is precisely the sort of misleading communication that courts have routinely modified, or enjoined, in the foregoing cases. As discussed in some detail above, the proposed communication (1) fails to advise putative Class Members of the full scope of the problem, (2) fails to advise putative Class Members of the health-related issues the defective product may cause, (3) fails to provide putative Class Members with a full explanation of the class action lawsuit that was filed or the scope of the release M/I Homes is seeking, (4) fails to provide putative Class Members contact information for the lawyers who brought the lawsuit on behalf of the putative Class, (5) fails to advise putative Class Members that the communication was drafted by lawyers for M/I Homes

(it is simply signed by the Area President of M/I Homes), (6) fails to advise putative Class Members of the legal ramifications of the release, (7) fails to tell the putative Class Members that the communication was not approved by the Court, and (8) fails to properly describe or inform the putative Class Members about the Rescission of Agreement attached to the Communication. The Court should enjoin the communication in its present form, and require Court approval of any future communications to Class Members.

## III.    CONCLUSION

For the reasons stated herein, the Court should enter a temporary restraining order enjoining the communication in its present form, requiring prior Court approval of future communications to Class Members, and requiring disclosure to Plaintiff's counsel of the identity of all Class Members, as well as identifying those who have filed and/or released claims against Defendant.  A proposed temporary restraining order is submitted herewith.

Plaintiff further requests the Court schedule a conference call with all parties to discuss this matter as soon as conveniently possible for the Court.

Date:   April 25, 2009                          Respectfully submitted:

s/ Jack Landskroner
Jack Landskroner (0059227)
Drew Legando (0084209)
LANDSKRONER GRIECO MADDEN
1360 West 9th Street, Suite 200
Cleveland, OH 44113
216-522-9000
216-522-9007 (fax)
jack@lgmlegal.com
drew@lgmlegal.com

Charles LaDuca
William H. Anderson
CUNEO GILBERT & LaDUCA, LLP
507 C Street, NE
Washington, DC 20002
202-789-3960
202-789-1813 (fax)
charlesl@cuneolaw.com
wanderson@cuneolaw.com

Robert K. Shelquist
Yvonne M. Flaherty
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Ave. S., Ste. 2200
Minneapolis, MN 55401
612-339-6900

Shawn Raiter
LARSON KING, LLP
2800 Wells Fargo Place
30 E. Seventh Street
Saint Paul, MN 55101
651-312-6518
sraiter@larsonking.com

Michael McShane
AUDET & PARTNERS, LLP
221 Main Street, Suite 1460
San Francisco, CA  94105
(415) 568-2555
Fax: (415) 576-1776

Jeremy W. Alters
ALTERS BOLDT BROWN RASH CULMO
4141 NE 2nd Avenue, Ste. 201
Miami, FL 33137
305-571-8550

*Attorneys for Plaintiff Steven Minafri and the*
*Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that *Plaintiff's Memorandum of Law in Support of Motion for a Temporary Restraining Order to Protect the Class and Fair Conduct of this Action Pursuant to Federal Rule of Civil Procedure 23(d) Regulating Communications with Members of the Putative Class* was filed electronically with the U.S. District Court, Northern District of Ohio on April 25, 2009.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the court system.

<div style="margin-left: 50%;">
s/Jack Landskroner _____

Jack Landskroner (0059227)

LANDSKRONER GRIECO MADDEN

1360 West 9th Street, Suite 200

Cleveland, OH 44113

Telephone: (216) 522-9000

Facsimile: (216) 522-9007

jack@lgmlegal.com
</div>

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

STEVEN MINAFRI,                          :

  PLAINTIFF,                             :          CASE NO. 2:09-CV-167

        vs.                          :          Columbus, Ohio
                                    April 27, 2009
M/I HOMES, ET AL.,                       :

  DEFENDANTS.                            :

- - -

TRANSCRIPT OF TELEPHONIC CONFERENCE
MOTION FOR TEMPORARY RESTRAINING ORDER

BEFORE THE HONORABLE ALGENON L. MARBLEY,
UNITED STATES DISTRICT JUDGE

- - -

APPEARANCES:

For the Plaintiffs:              Cuneo Gilbert & LaDuca, LLP
                                 By:  CHARLES J. LADUCA, ESQ.
                                      WILLIAM H. ANDERSON, ESQ.
                                      BRENDAN S. THOMPSON, ESQ.
                                 507 C Street, NE
                                 Washington, D.C.  20002

                                 Landskroner Grieco Madden
                                 By:  JACK LANDSKRONER, ESQ.
                                 1360 West 9th Street
                                 Cleveland, Ohio  44113

For the Defendants:              Vorys Sater Seymour & Pease, LLP
                                 By:  SUZANNE K. RICHARDS, ESQ.
                                      MICHAEL R. THOMAS, ESQ.
                                 52 East Gay Street
                                 Columbus, Ohio  43216

APPEARANCES:

For the Defendants:                    Carlton Fields
                                       By:  JARET J. FUENTE
                                       4221 West Boy Scout Boulevard
                                       Suite 1000
                                       Tampa, Florida  33607

                                       -  -  -

```
1                                    MONDAY AFTERNOON SESSION

2                                    APRIL 27, 2009

3                             - - -

4          THE COURT:  Good afternoon.  Would Counsel please

5   identify themselves for the record beginning with counsel for

6   the plaintiffs.

7          MR. LADUCA:  Good afternoon, Your Honor.  May it

8   please the Court, my name is Charles LaDuca.  I'm with William

9   Anderson and Brendan Thompson from the Cuneo, Gilbert and

10  LaDuca firm in Washington D.C.

11         MR. LANDSKRONER:  Jack Landskroner from Landskroner,

12  Grieco, Madden in Cleveland for the plaintiff.

13         THE COURT:  Could you repeat your name and spell it?

14  I have my law clerk Mrs. Mirkin, and my court reporter

15  Mrs. Evans with me, and we didn't hear you quite so clearly.

16         MR. LADUCA:  I'm sorry, Your Honor.  Did you mean for

17  Mr. LaDuca or Mr. Landskroner or both?

18         THE COURT:  Mr. LaDuca, I heard you quite clearly.

19         MR. LANDSKRONER:  With a name like Landskroner,

20  Judge, I'm glad to repeat myself.

21         THE COURT:  My name is Algenon, so I share your pain.

22         MR. LANDSKRONER:  It's Jack Landskroner.  That's

23  L-A-N-D-S-K-R-O-N-E-R from Landskroner Grieco, G-R-I-E-C-O, and

24  Madden, in Cleveland, and we're plaintiff counsel.

25         THE COURT:  Any further counsel for plaintiff?  Any
```

```
 1   additional plaintiffs' counsel?

 2              MR. LADUCA:  No, sir.

 3              THE COURT:  Counsel for the defense.

 4              MS. RICHARDS:  Good afternoon, Your Honor.  This is

 5   Suzanne Richards.  With me in my office is Michael Thomas, and

 6   we're with the Vorys Sater Law Firm here in Columbus.

 7              THE COURT:  All right.

 8              MR. FUENTE:  Good afternoon, Judge.  My name is Jaret

 9   J-A-R-E-T, Fuente, F-U-E-N-T-E.  I'm with the Carlton Fields

10   Law Firm in Tampa, Florida.

11              THE COURT:  Is there anyone else?

12              MS. RICHARDS:  No, Your Honor.  That's all that's on

13   for defendant M/I Homes.

14              THE COURT:  We're convened pursuant to Local Rule

15   65.1 on the motion filed by the plaintiffs for a temporary

16   retraining order.  Before we begin this hearing, I wanted to

17   make it clear that in the usual circumstance, I like to have

18   these 65.1 conferences conducted in person.  But because of the

19   extenuating circumstances that we encountered and because of

20   the immediacy that was urged by the plaintiff, the Court agreed

21   to proceed in this manner.

22              The threshold issue that I want to address, however,

23   is whether I am conflicted out of this case.  I understand that

24   in the declaration - I believe it was the declaration - you

25   indicated that this did not apply to -- in the complaint, I'm
```

1   sorry.  In the complaint, you indicated it did not apply to the

2   judge or the magistrate judge to whom the case was assigned.

3   My dilemma, however - and I wanted to bring this to the

4   attention of all of the parties - is twofold.  First, my home

5   was built by a division of M/I Homes known as Showcase Homes.

6   I don't know whether that division is still in existence, but

7   my home was built, I believe, in 1996.

8          I don't know whether I have the drywall that is

9   implicated in the complaint in my house.  As I went through the

10  complaint, I don't recall a time period being defined that

11  would tell me whether I was a part of the putative class or

12  not.  That's the one issue.

13         The second issue is that I serve on the Board of

14  Trustees -- I'm a trustee on the Board of Trustees of the Ohio

15  State University, and one of my fellow trustees is Robert

16  Schottenstein who is the CEO of M/I Homes.  I have served on

17  that board now for two years.

18         As some of you may or may not know, I don't think

19  that it's any accident any more that once a judge is assigned

20  to a case, most lawyers will examine his or her background just

21  to find out something about the judge.  So counsel for the

22  plaintiff probably have determined that prior to my appointment

23  to the bench, I was a partner at the Vorys Sater Law Firm.

24  Ms. Richards and I were partners in the litigation group and

25  worked on matters together from time to time.

1          Now, we have a local rule on this court that you
2    can't take cases from your former firm for a period of three
3    years.  Well, this is my 12th year on the bench, so that third
4    issue is probably a nonstarter, but I wanted to bring that to
5    the attention of all counsel.

6          The first two issues, however, are of some
7    consequence to me because I have no doubt about my ability to
8    sit and preside over this case in a fair and impartial manner.
9    But I want to, at all costs, avoid the appearance of
10   impropriety.  Since I have the microphone at this point, I
11   would relate a circumstance that befell me a few years ago.  I
12   was presiding over a case -- I also teach at the law school at
13   the Moritz College of Law at Ohio State.  This is before I was
14   a trustee.  One of the parties was suing the university.  I
15   made it clear that I was -- I taught as an adjunct in the law
16   school, that I could still be fair and impartial, but that if
17   either party wished I would be happy to recuse.  I allowed them
18   to submit essentially a blind motion to the clerk's office so
19   that I wouldn't even have to know which party requested that I
20   recuse.  Neither party requested that I recuse, both purported
21   to be quite happy with me presiding over the case.

22         Well, invariably and inevitably in our adversarial
23   system, one party will lose.  As soon as that one party lost,
24   that party complained that I was conflicted out of the case
25   anyway.  So I don't take for granted even the appearance of

1    impropriety any more.

2           So I want to ask Mr. LaDuca, what time period does

3    this class cover?  Or put another way, during what period were

4    the homes of the putative class members built?

5           MR. LADUCA:  Your Honor, I believe the time period

6    that we've been able to ascertain is roughly 2004 through 2007

7    with the possibility that it went back to as far as 2001.

8    Those are rumors going back to 2001.  So I do not believe your

9    issue number one is a concern.

10          THE COURT:  Ms. Richards, I'm not asking you to give

11   me pre-discovery discovery, but do you have any information

12   which would indicate that the drywall in question was being

13   installed in homes prior to that date?

14          MS. RICHARDS:  No, Your Honor, we do not.  I'm not

15   even sure we have information going back to 2001, but certainly

16   not before that.

17          THE COURT:  All right.  Okay.  Then that eliminates

18   that.

19          Now, what about the second issue, Mr. LaDuca?

20          I should add to that second issue the fact that my

21   home was built by M/I Homes, but maybe that's taken care of in

22   the complaint.  But let's deal first with the issue of my

23   serving on the Board of Trustees with Mr. Schottenstein.

24          MR. LADUCA:  Your Honor, this is Mr. LaDuca, and I

25   see no issue or concern with that issue or even with your third

```
 1   issue, sir.
 2             THE COURT:  Mr. Landskroner?
 3             MR. LANDSKRONER:  No, Your Honor.  I'm satisfied if
 4   the Court believes it can be fair and impartial in this case,
 5   then I'm satisfied with that.
 6             THE COURT:  Ms. Richards?
 7             MS. RICHARDS:  Your Honor, we also believe you could
 8   be fair and impartial and don't have any issue with that.
 9             THE COURT:  All right.  Mr. Fuente?
10             MR. FUENTE:  No issues here, Judge.
11             THE COURT:  All right.
12             Mr. LaDuca, are you speaking for the plaintiffs
13   during this conference?
14             MR. LADUCA:  I am, Your Honor, with the possibility
15   of Mr. Landskroner chiming in here or there, sir.
16             THE COURT:  All right.  Please proceed with
17   describing to the Court the immediacy and the irreparability
18   issues that you believe warrant the issuance of a temporary
19   restraining order.
20             MR. LADUCA:  Thank you, Your Honor.  If I may, I'd
21   like to start with just a short explanation of the facts and
22   the genesis of why we filed the motion in the first place.
23             THE COURT:  Sure.
24             MR. LADUCA:  If it's redundant, I apologize but I'll
25   move through it pretty quickly.  I also wanted to start by
```

1    thanking, Your Honor, for fitting us into your busy schedule,

2    for letting us appear by phone, sir.  I hope you know it, but

3    the parties did try to resolve this issue before bothering the

4    Court on such short notice, and we were unable to.

5            Your Honor, we filed our class action lawsuit against

6    M/I Homes and other defendants on March 5th, 2009.  The

7    complaint alleged that certain drywall from China that

8    defendants used to build homes across America is defective and

9    actually toxic.

10           Our class representative, Mr. Minafri, has the

11   product.  He owns an M/I home.  This gentleman had to replace

12   fourteen air conditioners in two years; fourteen have corroded

13   on him.

14           Now, shortly after filing our complaint, we served

15   M/I Homes.  We're still in the process of serving several other

16   defendants.  We have to go through the Hague Treaty and some

17   other international laws to get service effectuated on them.

18   My co-counsel, Shawn Raiter from the Larson King firm, received

19   a call from Sue Richards.  I apologize, maybe he called Sue.

20   I'm not sure which happened first.  But Sue mentioned that they

21   had been retained to defend M/I Homes, and they actually had a

22   short conversation about whether or not it was possible for an

23   early resolution of this case.

24           My co-counsel asked for some more information on the

25   class side and scope and what information they may -- M/I Homes

1   may know.  Ms. Richards said she would get back to him.  Judge,

2   the next thing we know, last Thursday, April 23rd, at some

3   point in the afternoon, we received an e-mail with the

4   communication in question.  The communication also had a legal

5   release and a settlement offer as well.

6        We immediately notified them – when I say "them," Sue

7   Richards – that we had some issues with this communication.

8   Ms. Richards and Mr. Raiter scheduled a conference call for

9   Friday afternoon, April 24th, to discuss our concerns.

10       On that call, sir, we expressed our concerns about

11  the misleading nature of this and the end-around type of

12  approach to this communication.  They told us it was just a

13  letter from the president of the company; it wasn't a legal

14  correspondence; it was just a company writing a letter to their

15  client, which I strongly disagreed with but I guess we'll get

16  there in a minute.

17       We asked them if they would give us just one business

18  day -- this is Friday at 5 p.m. -- one business day to submit

19  some changes and/or to contact the Court for guidance.  We had

20  some real grave concerns about the misleading nature of the

21  correspondence, and we wanted to redline it and kind of work

22  with them a little bit.  They refused that request.  They

23  basically told us that the letter was going out.  So we filed

24  our papers with your court on Saturday.

25       THE COURT:  Am I correct, Mr. LaDuca -- or

1   Ms. Richards, you can answer this.  Am I correct that the

2   letter has not yet gone out?

3          MS. RICHARDS:  Your Honor, that is not correct.  The

4   letter went out on Friday as I advised plaintiffs' counsel on a

5   telephone conference Friday afternoon.  The letter is gone.

6   The communication is gone.

7          THE COURT:  Okay.

8          MR. LADUCA:  Your Honor --

9          MS. RICHARDS:  Your Honor, one point if I may.  I

10  know that I need to let Mr. LaDuca go on, but the communication

11  that is attached to the TRO papers is not the communication

12  that went.  There were some revisions to it.  I sent that

13  revised communication on Friday.  I don't think there's

14  anything advertent by plaintiffs having the wrong one.  I just

15  want to make that clear for the record.  When I get to my turn,

16  I can tell you the few changes that were made but I just want

17  to make sure that everyone has that in mind.

18         THE COURT:  Ms. Richards, when Mr. LaDuca is done,

19  I'm going to give you an opportunity to respond.  As part of

20  your response, I would like you to kind of detail the

21  differences between what has been marked as Exhibit A in the

22  papers and represented as the letter that you sent out and what

23  actually went out.

24         But go ahead, Mr. LaDuca.

25         MR. LADUCA:  Thank you, sir.

1          Well, Your Honor, when I address the communication,

2    sir, I'm referring to the letter, the legal release attached to

3    the letter and the settlement offer and all papers involved,

4    sir.

5          Your Honor, the communication that is attached to my

6    declaration or the changes that Ms. Richards will send you is

7    not fair.  It's not balanced.  It's not neutral.  It's

8    misleading.

9          Judge, the solicitation by defense counsel of

10   releases, of legal releases and individual settlements from a

11   pending class action before the Court has ruled on class

12   certification, constitutes a serious challenge to the authority

13   of the court to have some sort of control over the

14   communication, which is what I was trying to get on Friday.  I

15   wanted to put this before you and see what Your Honor thought.

16          THE COURT:  Well, Mr. LaDuca, before we get too far

17   down this road, I've had an opportunity to do some brief

18   research.  This type of communication is not, per se, improper.

19   If you look at *M.L. Stern Overtime Litigation*, which is from

20   the Southern District of California, a 2008 case, they found

21   that a pre-class certification settlement offer to putative

22   class members was not in and of itself misleading, and they

23   allowed it, I think, with some modifications because it was not

24   misleading and because it was not inherently coercive.

25   Sometimes it is, and sometimes it isn't.

```
 1            We are slightly disadvantaged now because we don't
 2    know whether the issues to which you had an objection were
 3    addressed in the modified version or in the version that
 4    Ms. Richards, in fact, sent.
 5            MR. LADUCA:  I can tell you --
 6            THE COURT:  Go ahead.
 7            MR. LADUCA:  I'm sorry, Your Honor.
 8            THE COURT:  No.  Go ahead.
 9            MR. LADUCA:  Yes, sir.
10            I can tell you that first, Your Honor, there's two
11    questions there.  I would agree with you that the case law is
12    legion about -- the issue is about whether the communication is
13    misleading or coercive.  I would put before you this
14    communication is misleading.  I would be glad to tell you why.
15            Second, Judge, the modified version that Ms. Richards
16    sent out, I've read it -- and it was just an oversight.  I
17    apologize.  We will be glad to furnish it to you right after
18    this call.  My concerns remain, Your Honor.  My concerns and my
19    colleagues' concerns are centered about allowing the putative
20    class to make informed decisions.  Class counsel and this
21    Court -- not putting myself on your level, sir -- but I believe
22    us together we have to make sure that -- we have a
23    responsibility to make sure that putative class members have
24    enough balanced information to make an informed decision.
25            Judge, this is not balanced.  It's not neutral.  It's
```

1 | very misleading. It's misleading for many, many reasons. It's
2 | misleading because it fails to advise the putative class
3 | members of the full scope of the problem. Judge, no one knows
4 | the full scope of the problem yet.
5 |      THE COURT: Mr. LaDuca --
6 |      MR. LADUCA: I have reviewed a lot of these case on
7 | file across the country. We have our experts working overtime
8 | trying to get our arms around the full scope of the problem,
9 | and we may never get there, sir. It's not the right time to --
10 | Judge, I'm sorry?
11 |      THE COURT: What I was going to say is you may
12 | have -- at least with respect to the scope and gravity of the
13 | problem, you said that Ms. Richards or the defendants did not
14 | advise the putative class members as to the full scope of the
15 | problem, and then you advised the Court that no one knows the
16 | full scope of the problem. So the likelihood is that it would
17 | be impossible in this type of communication to address the full
18 | scope of the problem.
19 |      Would it not be sufficient if the communicator
20 | identified the nature of the problem? Because at this point,
21 | you're right. The full scope of the problem is not known. You
22 | may also be right that at this point maybe it's not even
23 | knowable. If the defendants have just been put on notice of
24 | the fact of a problem, that is, by this lawsuit, it could very
25 | well be that they, too, or that the defendant also has not had

1    an opportunity to investigate to the extent that it can

2    articulate the full scope of the problem.

3            MR. LADUCA:   I understand what Your Honor is

4    suggesting, and I would agree that my issue number one that I

5    raised in my memo, that could be addressed by different

6    wording.   I have some proposed -- a different way to address

7    that that would satisfy our concern.   Maybe simply saying we

8    don't know the scope of the problem but here's what we're

9    willing to do.   Your Honor, again, I speak of that without

10   conferring with my colleagues.   Your Honor, I believe that

11   issue can be addressed quite easily with just allowing myself a

12   chance -- could have been addressed by allowing us a chance to

13   play with the wording.

14           The second reason it's misleading, Judge, the

15   communication fails to advise the putative class members of

16   health-related issues that the defective product may cause.   It

17   also -- and I think this is very important, Your Honor -- it

18   fails to provide class members with an explanation of the class

19   action lawsuit or the scope of the release.   It doesn't even

20   provide information -- it doesn't provide the putative class

21   members with information on how to contact a lawyer who brought

22   the lawsuit on their behalf.   It doesn't tell class members

23   that the communication is drafted by lawyers from M/I Homes.

24   It doesn't tell the putative class members this is not a court

25   ordered document.   It doesn't give a full explanation of the

1  legal ramifications of the release.

2          Judge, it doesn't give the whole side of the story.

3  This is very important.  I think this may be the most important

4  thing.  The letter -- after the first page or so, in the second

5  page it talks about a class action lawsuit that's been filed.

6  It says that suit may affect your rights.  However, it doesn't

7  provide the names for the plaintiffs' lawyers so our putative

8  class members we are seeking to represent can contact us for

9  more information.

10         THE COURT:  Let me ask you this, Mr. LaDuca.  I would

11  understand your position certainly if this class had already

12  been certified, then you would be the attorneys for the class.

13  At this point, there are no, quote, class attorneys, quotes

14  closed, because there is no class.  Would you agree?

15         MR. LADUCA:  Well, I would agree that there is no

16  class.  I would not agree that there is no responsibility or

17  ethical obligation for the putative class members.  As a matter

18  of fact, the Supreme Court has addressed this:  *Gulf Oil*;

19  Kleiner v. First National Bank of Atlanta; *In Re School*

20  *Asbestos* out of the Third Circuit; the *Ashland Oil* case out of

21  the Sixth Circuit.  All of those cases were before class

22  certification.  That's what I put before you, Judge, that there

23  is a difference regarding the First Amendment Rights and

24  communications under Rule 23(d), pre-class certification and

25  post-class certification.

1          Judge, I think it's more important and it's more
2    egregious and it's more -- we have more of an obligation to
3    protect the information control before class certification,
4    especially before class certification.  Your Honor, there are
5    lots of Sixth Circuit cases on that point as well.

6          Judge, just from a lay person's standpoint, this
7    letter does not give our names.  I have gone through this
8    battle regarding putting our names on communications before.  I
9    went through this battle in the *CertainTeed* litigation in the
10   Eastern District of Pennsylvania before Judge Louis Pollack.
11   We had a big oral argument.  We briefed it.  We went through
12   it.  It was pre-class certification.  *In Re CertainTeed Shingle*
13   litigation.  It's MDL, No. 187 before the Eastern District of
14   Pennsylvania before Judge Pollack.

15         Judge, we had this exact same issue before Judge
16   Pollack.  It was pre-class certification.  There were putative
17   class members.  Judge Pollack said, I think this is a time
18   where the Court has to guard the information, and we have to
19   help the putative class members before class certification to
20   make an informed decision.

21         Your Honor, this letter, it doesn't give our
22   information.  It doesn't give the contact information for the
23   lawyers.  If a putative class member, a lay person who is not
24   an attorney, gets this letter and they have questions about
25   their legal rights and they have questions about the case that

1  was listed, Judge, they don't have access to the PACER court

2  filing system.

3          I apologize.  My four-year-old brought home a bug or

4  something, so I'm losing my voice.  My whole house is.

5          They don't have access to the PACER court filing

6  system.  They're not going to have the ability to start looking

7  up this case and go through it and they don't have an ECF

8  account.  They're going to call the signatory of the letter,

9  the president of the defendant.

10          Judge, that's not fair.  The president of the

11  defendant is not going to give an unbiased explanation of this

12  lawsuit.  It's not in his interest.  Judge, I put before you

13  it's not even fair to put this person in that situation.  He's

14  not a lawyer.  He can't address arbitration clauses or releases

15  or other, you know, legal ramifications of signing this

16  agreement.  Judge, those are some of the reasons I listed in

17  our memo.

18          I have kind of a test that I use when I draft

19  documents, when I send out notices in class certification.  I

20  call it my mother-in-law test.  I call my 72 year old

21  mother-in-law.  She's in Florida.  I read her sections of these

22  notices.  If she gets it, it passes muster.

23          There is a 52-word sentence in this letter.  I quote,

24  However, should you decide that you do not want to proceed

25  under the terms of the Work Authorization Agreement, you may

1    advise us by executing and delivering the enclosed Rescission

2    of Agreement to us at the address noted above within three

3    business days of your execution of the Work Authorization

4    Agreement.

5             Judge, my mother-in-law was baffled.  And your

6    putative class members and my putative class members are going

7    to be baffled.  It's a 52-word sentence.  This document is

8    misleading.  It's confusing.  It doesn't give all of the

9    information.  I put before you, sir, that just following the

10   Supreme Court *Gulf Oil* case, following the *Kleiner* case,

11   following the *Ashland Oil* case in the Sixth Circuit, sir, these

12   were all pre-class -- or some of these were pre-class

13   certification cases.  That's why I thought it was pretty

14   important especially now that it's gone out.

15            I mean, one fact in the *CertainTeed* litigation,

16   Judge, one important fact in that case was the defendant was

17   already sending out notices -- I'm sorry, releases and

18   opportunities to settle the case outside the class

19   certification, the efforts of the class action, pre-class

20   certification.  That court -- and I'll furnish you with some

21   supplemental authority, but that Court authorized us the

22   opportunity to have a curative notice.  They allowed us to put

23   together one page that the Court approved.  It's a court

24   approved communication, and they allowed us to send this

25   communication to everyone that was involved in that case.

```
1              I would respectfully put before Your Honor that since
2     this has already gone out, this document that I stress is a
3     misleading communication, I put before you we should have that
4     same right, sir.
5              THE COURT:   Thank you, Mr. LaDuca.
6              MR. LADUCA:   Thank you for allowing me to speak, Your
7     Honor.
8              MR. LANDSKRONER:   Judge, Jack Landskroner for the
9     plaintiff.   If I could add one suggestion to what Charles has
10    pointed out.
11             THE COURT:   Yes.
12             MR. LANDSKRONER:   While it's certainly not binding on
13    this court, the Ohio Supreme Court does provide some good
14    guidance on this issue.   That was in the Hamilton v. Ohio
15    Savings Bank, 82 Ohio St.3d 67.   It's a 1998 case.   The Court
16    faced the same situation.   The Court flat out said after the
17    commencement of the class action, the defendant should not be
18    permitted to engage in unilateral or unsupervised
19    communications with potential members of the class concerning
20    the substance of the class action.
21             Then the Court went on to cite a California case,
22    Kleiner v. First National Bank, 751 F2d 1193.   The Court there
23    referenced that "Unsupervised, unilateral communications with
24    the plaintiff class sabotage the goal of informed consent by
25    urging exclusion on the basis of a one-sided presentation of
```

1   the facts, without opportunity for rebuttal.  The damage from

2   misstatements could well be irreparable."

3          The Court went on to say that, "Solicitations scheme

4   relegates the essential supervision of the court to the status

5   of an afterthought."  In that case, the "Subterfuge and

6   subversion constituted an intolerable affront to the authority

7   of the district court to police class member contacts."

8          THE COURT:  In that case, had the defense counsel, as

9   here, contacted plaintiffs' counsel to advise that the letter

10  was going out or that the communication was going out?

11         MR. LANDSKRONER:  I can't answer that, Your Honor.

12  I'm not aware whether that --

13         THE COURT:  I don't believe so.  I don't believe so,

14  but I will confirm that.  We looked at quite a few cases in the

15  few hours that we had today.

16         One other question, Mr. LaDuca or Mr. Landskroner,

17  either of you can answer this.  Is the immediacy element still

18  present in light of the fact that the letter has now gone out?

19         MR. LADUCA:  Yes, Your Honor.  That's why I raise the

20  In Re CertainTeed litigation as an example.  Judge Pollack, in

21  that case, said that since the communication already went out,

22  there was an immediate need for a curative notice.  I would

23  respectfully request an opportunity to present to Your Honor

24  such a curative notice that we could provide to all of the

25  putative class members that received M/I Homes' letter.

```
 1              I think that's one --
 2              THE COURT:  Before --
 3              MR. LADUCA:  -- area of relief I've requested before
 4    Your Honor in my motion.
 5              THE COURT:  Let me elaborate a little bit on my
 6    question.  What I would typically do, let's say a case will
 7    come in; I would grant a TRO; the TRO has only ten days; at the
 8    end of that ten-day period or within the ten-day period, I
 9    would hold a preliminary injunction hearing and give the
10    parties an opportunity to flesh out some of these issues.  I
11    would do the same in this case, hold a PI hearing as soon as
12    possible.
13              But the TRO seeks emergency relief.  It's an
14    extraordinary remedy.  I could see more easily if Ms. Richards
15    had not yet sent the letter, then it would be something that we
16    needed to do today or we needed to do yesterday, so to speak.
17    But since the letter has gone out, we have a window in which to
18    look at whether there is a need for a clarifying notice or some
19    type of remedial notice; if so, we can carefully craft what
20    that notice might be.
21              I'm simply thinking out loud.  That does not mean
22    that I've reached a resolution because I have yet to hear from
23    Ms. Richards.
24              Ms. Richards.
25              MR. LADUCA:  Your Honor, this is Charles LaDuca.  May
```

1   I throw two quick comments on?  I know I had a lot of your

2   time, but may I add one thing to that, sir?

3           THE COURT:  Yes.

4           MR. LADUCA:  Two facts, stepping back from

5   Mr. Landskroner.  You switched subjects to that clarifying

6   notice issue.  Mr. Landskroner brought up the Ohio Supreme

7   Court *Hamilton* case where the plaintiffs' lawyers were not

8   identified or we were unsure if the plaintiffs' lawyers were

9   notified and Your Honor believes they were not.  I would put

10  before Your Honor again the Impervious Paint Industry v.

11  Ashland Oil, 508 F Supp 720; and the Michigan State Podiatry

12  Association v. Blue Cross Blue Shield, which is 1987 U.S.

13  District, Lexis 15-534.

14          Judge, those are both cases where the plaintiffs'

15  lawyers were notified ahead of time and they had the

16  opportunity to go before the Court and say these notices were

17  misleading and unfair.

18          As for the issuing of the clarifying notice, we would

19  agree and follow your guidance and recommendation on how best

20  to handle that, sir.  Thank you.

21          THE COURT:  Ms. Richards.

22          MS. RICHARDS:  Thank you, Your Honor.

23          First, if I may, I will address the Court's question.

24  I think it was to point out the differences in the

25  communication as it actually went out versus what was attached.

1    Does the Court still want me to answer that question?

2              THE COURT:  Yes.

3              MS. RICHARDS:  I can do that.  Okay.  Firstly, Your

4    Honor, in the letter itself, the second page, first full

5    paragraph where it is talking about reminding them that there's

6    a class action that's been filed against M/I by a homeowner who

7    seeks to represent all persons who purchased homes.  The

8    addition there was to give the name of the case, the case

9    number, and the court in which it is pending.

10             THE COURT:  That was on the second page, first

11   paragraph?

12             MS. RICHARDS:  Yes, Your Honor.

13             THE COURT:  That previously begins with "finally"?

14             MS. RICHARDS:  That's correct, Your Honor.  That

15   paragraph, after the sentence -- the sentence was there that

16   said, "As set forth in our previous correspondence, we remind

17   you that M/I Homes was named as a defendant in a class action

18   lawsuit filed by a homeowner who seeks to represent all persons

19   who purchased homes containing the imported drywall."

20             After that sentence, the parenthesis was added to

21   give the name of the case, the case number, and the court in

22   which it's pending.  That was added.

23             Then, in the Work Authorization Agreement, Your

24   Honor, as the Court is aware I assume from reading it, this is

25   a limited release, only property damages.  We didn't catch this

```
 1    until after we sent the first version to the plaintiff, but as
 2    I say, I immediately -- after our telephone conference, when
 3    there was a change, I sent it on to them.
 4              But in the arbitration agreement and in the
 5    assignment paragraph -- so if the Court would look at Roman
 6    Numeral Three, I'm sorry.
 7              THE COURT:  The arbitration agreement on my copy is
 8    Roman Numeral Five on page four.  Has that changed?
 9              MS. RICHARDS:  No, that hasn't changed.  Let me start
10    with that paragraph and I'll go back to paragraph four.  Roman
11    Numeral Five, the arbitration paragraph, the underlying
12    provision -- an underlying provision was put in to make clear
13    that personal injury -- claims for personal injury would not be
14    covered by this arbitration clause.  In other words, because we
15    were saying it's only property damage, you're not releasing any
16    personal injury claim.  We are not including personal injury
17    claims in the arbitration provision.  Okay.
18              THE COURT:  All right.
19              MS. RICHARDS:  Did I make that clear, Your Honor?
20              And then in Roman Numeral Four with regard to the
21    release, Your Honor will see that with regard to the release,
22    we have said that it does not include claims of personal
23    injury, and we said that again with regard to the assignment;
24    that is, we were not assigning any claims for personal injury.
25    So we added those additional -- that additional language in
```

1   both Roman Numeral Four with regard to the assignment issue and

2   in Roman Numeral Five with regard to the arbitration issue.   So

3   each time we added a -- provided it doesn't cover personal

4   injury claims.

5           THE COURT:   All right.

6           MS. RICHARDS:   All right.   Do you have any -- have I

7   made that clear?

8           THE COURT:   No, I don't have any further questions,

9   Ms. Richards, on the variations between what I have before me

10  as part of the filings by the plaintiff and what you actually

11  sent.   I will proceed on your representation that this

12  constitutes the sum and substance of those changes.   Is that

13  right?

14          MS. RICHARDS:   I believe I have done them all.

15          May I just ask Jaret.   Have I fully indicated the

16  changes?

17          MR. FUENTE:   Yes, you have.   The one thing I would

18  point out is that the language in the arbitration clause, I

19  believe, was in and is in a draft that the Court has.   It's

20  similar language.

21          THE COURT:   Yeah.   About midway, the paragraph I have

22  it says, "But does not include any claims for personal injury,

23  if any, against Builder, arising from the Drywall."

24          MR. FUENTE:   So I think what Ms. Richards said is

25  accurate except for that.   The inclusion to the letter and the

1    inclusion to Roman Numeral Four after the assignment are the

2    only changes that were made.  They just happen to be the same

3    subject matter in the arbitration clause.

4              THE COURT:  That's fine.

5              MS. RICHARDS:  It still says in the assignment,

6    "Provided, however, the foregoing assignment shall not include

7    claims for personal injury."

8              That's the only change that was made there.

9              Okay, Your Honor?

10             THE COURT:  All right.  That's fine.

11             MS. RICHARDS:  Now, if I may, I'll now address

12   Mr. LaDuca's points.

13             First of all, Your Honor, I think it doesn't quite

14   fully state the facts, as I understand them, to say that there

15   were initial calls with either Mr. Landskroner or with

16   Mr. Raiter, and then the next thing they knew was last Thursday

17   when we sent them -- the communication goes out.  Actually, at

18   one of the initial calls -- and frankly, the initial call was

19   to get an extension of time to respond to the complaint.  We

20   asked the plaintiffs' counsel what they were interested in on

21   behalf of their named plaintiff or at that time their only

22   client.  We did explain to them that M/I had already done

23   certain things even before this lawsuit was filed, Your Honor.

24   I think that that was a very important point.

25             So before I address the actual communications and why

1   they're not misleading, I'd like the Court to understand that

2   before the lawsuit was filed, communications had been going on

3   back and forth between M/I Homes and customers or homeowners of

4   M/I Homes' buildings.  What had happened, Your Honor, is that

5   there had been some warranty inquiries and warranty claims that

6   had been made to M/I Homes.  Then there was a lot of publicity

7   in Florida about a possible problem with imported drywall.  And

8   based on that, M/I Homes, before the lawsuit was filed, had

9   sent a letter to individuals who had contacted them about the

10  problems or who they understood had problems, and it in fact

11  said, you know, we understood that there had been recent news

12  reports about a possible problem with the drywall; we're

13  sending you this letter because you have reported problems; and

14  what we'd like to do is schedule an inspection of your home to

15  see whether there is a problem and we can determine what it is.

16          That letter lays out —— was sent out before the

17  lawsuit.  They did, in fact, get responses from people who

18  asked M/I Homes to come and inspect their home.

19          Then a second letter was sent because that first

20  letter —— obviously, because it was before the lawsuit, it made

21  no mention of any lawsuit.

22          THE COURT:  Okay.

23          MS. RICHARDS:  Then a letter was sent, a second

24  letter was sent to people that had not reported problems but

25  based on the news reports that this may be a widespread problem

1    because of alleged imported drywall, they sent it to people and

2    said, you know, we're showing that you have not reported any

3    problem but if you want M/I Homes to come and inspect your

4    home, we will do that.

5            As I sit here today, Your Honor, in all

6    forthrightness, I do not know the exact date of that letter.

7    The only thing I do know is that it probably went out somewhere

8    between the first week of March -- so somewhere maybe between

9    3/5, if that's the date they filed, and the third letter went

10   out on April 6th.

11           Then another letter went out because we wanted to

12   tell the people who had reported problems that a lawsuit had

13   been filed since that wasn't in the first letter.  It also

14   wanted to say -- it wanted to tell them your home did, in fact,

15   test positive; we sent you a letter before the lawsuit; you

16   asked us to come and test; we tested and now we're letting you

17   know that your letter tested positive; your inspection revealed

18   there may be corrosion on certain of your components.  It said

19   at this time we're developing the protocol or developing this

20   issue and we'll be contacting you to discuss that.  Then a same

21   type of letter went out to people who had no problem.

22           So what happened here, Your Honor, is the first

23   letter, before the lawsuit, went to people who had indicated

24   they might have a problem.  Then when it became clear from the

25   news reports that maybe this was more widespread than just

1   people who had reported a problem, we also offered to inspect

2   people who hadn't even reported a problem.  So this is going on

3   now.  It started at least before the lawsuit had occurred.

4          Now, I think this is significant, Your Honor, because

5   with all due respect, I believe that on more than one occasion

6   I said orally -- and I believe that there is an e-mail or so

7   which we attached to responses in which I said it in e-mail

8   writing.  But I know I said it orally where I said, look, M/I

9   Homes has been having communications with these homeowners that

10  have been contacting us and, in fact, these people are

11  hammering M/I Homes to have them do something.  We are going --

12  M/I Homes is developing a protocol to try to deal with at least

13  the remedying of the fact that the drywall is still in the

14  home.

15         I believe that was said in one of the early

16  conversations.  I don't want to say whether it was the first or

17  the second, but very early on when we were asking for

18  extensions.  In fact, we told them we were working on

19  something, I believe, and that was, in fact, why we thought we

20  were asking the question of what do you think your person

21  wants.

22         I think we can date all of this for Your Honor

23  because obviously we took an extension of time before the first

24  answer was due.  I had some of those conversations before I

25  would have filed for the extension, the initial extension, so

Case 2:09-md-02047-EEF-MBN   Document 249-2   Filed 09/21/09   Page 44 of 71
31

1   we can piece this together.

2          In additional, even when I sent the communication

3   last week, I specifically said that we needed to go forward

4   because of the customer demand.  I had a conversation - and I

5   know he's not on the phone so I feel bad - with Mr. Raiter.  I

6   specifically had a discussion with Mr. Raiter in which I said,

7   Shawn, we simply cannot wait for the attorneys to dither around

8   about things.  These people are demanding, and we've been

9   communicating with them from way before the lawsuit -- from

10  before the lawsuit and we're going to go forward.

11         I only tell Your Honor that because I think it may be

12  a little bit confusing, if not misleading, to say that this was

13  suddenly sprung on them last week.

14         Now, with regard to the communication itself, Your

15  Honor, I would point out, number one, in the papers that have

16  been filed, they haven't really told you or us if there is

17  anything affirmatively stated that is misleading or it is

18  false.  The one thing that they have told you today is that

19  with regard to the rescission point, that that's 52 words of a

20  sentence.  Now, I'm going to take their word for that, but I

21  don't think that the mere number of words significantly -- I

22  mean, it's said a couple of places.  It clearly does tell them

23  that should you decide -- in the letter, it says, Should you

24  decide that you do not want to proceed under the terms of the

25  Work Authorization Agreement, you may advise us by executing

1    and delivering the enclosed Rescission of Agreement to us at

2    the address above within three business days -- Your Honor, not

3    just three days, three business days -- of your execution of

4    the Work Authorization Agreement.  The wording in the

5    Rescission of Agreement, which I think the Court has in front

6    of it, you will see essentially two sentences.

7            So they've not really told you anything.  They didn't

8    tell us anything else last week.  They asked me to hold it up

9    because I had told them I was sending it on Thursday.  They

10   asked me to hold it up.  I specifically asked is there anything

11   that you believe is inaccurate, any statement that's false or

12   inaccurate or that's misleading.  As Mr. LaDuca mentioned to

13   you, they did say to us you need to put in the names and

14   addresses of us -- our contact information.

15           Now, Your Honor, with regard to that point, as you

16   will see in the Work Authorization Agreement, we do ask them to

17   acknowledge that they have either talked to legal counsel about

18   this proposal or have had the opportunity to do so, and we told

19   them there is a lawsuit.  Now it seems to me, Your Honor, that

20   it is not M/I's obligation, nor perhaps even its right, to tell

21   these people here are the lawyers you should consult.  These

22   people have been dealing with this issue and have been talking

23   with us since before the lawsuit.

24           I might just, as a parenthesis, add in this regard

25   that with regard to my understanding with regard to the homes,

1    the single family homes that are involved, these are homes that

2    sold for between three hundred and four hundred thousand

3    dollars.  As a generalization, these are people that are not

4    unsophisticated.  I don't think that we have to tell them

5    here's the lawyers that you should deal with.

6           Now, a couple things that I think with regard to the

7    communication that was sent.  Number one, Your Honor, there is

8    absolutely no deadline set forth in these papers.  They may

9    take all the time they need and want to decide to accept or not

10   accept the documents.  So there's nothing coercive at all

11   concerning these papers.  Indeed, after giving all that time,

12   as much time as they need or want, they have three business

13   days after they sign it to change their mind and tell us don't

14   proceed.  That's pretty clear, I think, if you look at the

15   letter.  So I think that there -- contrary to some of the

16   cases, there is absolutely no coercion here at all about it.

17          Secondly, one of the points here is while we believe

18   these are fairly sophisticated and certainly not

19   unsophisticated people, I mean, we're talking about a page and

20   a half letter and we're talking about a document that's

21   essentially four-and-a-half pages, five pages.  So we do

22   believe that we have done something and tried -- I think M/I

23   Homes made an effort to try to do it in plain language, with

24   all due respect to Mr. LaDuca's 72 year old mother-in-law.

25          With regard to the point that we should have put more

1    information in, they're not telling you that what's in there
2    was false in any way, shape, or form.  They say, number one,
3    but we didn't tell them the full scope of the problem.  I think
4    Your Honor understands perfectly why that would be not
5    something we would go into.  We understand that they -- for
6    example, they make it clear, look, we think there might be
7    personal health problems, personal injury claims here because
8    of health problems.  While M/I Homes may not believe that, we
9    didn't get into that and for that reason it didn't talk about
10   health issues because it is not asking to do anything with
11   regard to that and not asking those to be released.  It is
12   saying here's what we're willing to do and if we do this -- and
13   by the way, Your Honor, it would probably be -- it's estimated
14   to be ninety to a hundred thousand dollars a home to do what is
15   necessary in this Work Authorization Agreement.
16          There was something else mentioned by Mr. LaDuca
17   about including a full explanation, what they said,
18   quote/unquote, full explanation.  Well, Your Honor, again, it
19   seems to me that that is not something that typically is
20   required of us to do.  What I would submit what the cases
21   uniformly say is you got to tell them that there's a case
22   pending.  In fact, if you will look in some of the cases where
23   the Court has actually entered some kind of limited order, it
24   has said from now on you can continue to communicate but you
25   can't say anything substantive about the lawsuit.  So we didn't

1    What the cases really say is that, number one, these kind of

2    communications, as Your Honor pointed out, are not per se

3    violative of Rule 23.

4            Number two, there has to be a clear record and

5    specific findings that somehow this was false, misleading or

6    coercive.  I don't think they've given you anything that would

7    allow that kind of finding to be made, with all due respect.

8            As for the relational position of the parties that

9    you see in some of the suits, that doesn't exist here.  There

10   is none of the suggestion that they should opt out of the

11   lawsuit or trying to tell them that they shouldn't participate

12   in the lawsuit.  There's nothing of that nature at all.  In

13   fact, Your Honor, we're making it clear that they're not giving

14   up personal injury claims.  So, for example, were they to sign

15   this and were Your Honor to certify the class on all of the

16   claims including the personal injury claims that are in the

17   complaint, these people would still be part of the class.  And

18   there's nothing in these papers or in the release that they

19   would sign, if they wanted them to do all of this work, that

20   would mean that they simply were no longer part of the class

21   action.

22           There's none of that coercion.  There's nothing being

23   said to them that is where certain courts have said, Well, you

24   can't do that; that seems a little like coercion.  We're not in

25   any way, shape or form making any statements that somehow or

1    otherwise indicates to them that they should not be part of the

2    class.  We're simply saying to them, number one, here's what we

3    would be willing to do.

4         I think, Your Honor, the Work Authorization Agreement

5    was trying to spell out in great detail what it is we would do

6    in saying we're going to do extra things, some few additional

7    things.  Then we are also saying we would want a release and

8    assignment of these property damage claims because, Your Honor,

9    I think what is clear - and I think this will be not disputed -

10   M/I Homes is not the installer of the drywall.  It is going to

11   stand behind these homes, but there are independent parties

12   that imported this, distributed this, and then installed it.

13        So what M/I Homes is specifically saying is, look,

14   we -- if we do this work, we are asking you for a release.  If

15   we do this work, we also want you to assign just the property

16   claims so we can go after the people that really imported this

17   drywall and sold it to us.

18        I think, Your Honor, that none of the cases cited --

19   and I would obviously want to expand on this in a written

20   response, but I think none of the cases cited really are

21   supportive of the class that you would find this misleading.

22   And certainly at this point, I'm not sure that a curative

23   letter is necessary.  I would suggest that unless there's a

24   finding that these communications were misleading or coersive,

25   there is really no grounds for a curative letter.  This is an

1   area where so long as a party is not being coersive and

2   misleading, it has the right to communicate.

3           In this case, I think it is even more important here

4   because we are talking about communications that started well

5   before this lawsuit and shouldn't be able to be stopped by

6   simply someone filing the lawsuit, especially if it isn't

7   certified.  I think in that regard, Your Honor, we do have a

8   situation and we're trying to be sensitive to it.

9           M/I Homes hears, as I understand it, on virtually a

10  daily basis from homeowners that they want something done about

11  the drywall.  They want it taken out, and that is a conflict.

12  This is a point that I made on more than one occasion with

13  counsel for plaintiffs.  I'm not saying necessarily with Jack

14  or with Charles, I don't think other than last week, but with

15  Shawn.  I made this point, you know, we're just getting

16  hammered and we need to respond to these people; they have a

17  right to say to us please act promptly, and that's what we're

18  trying to do.

19          So I urge Your Honor to not issue a curative order,

20  certainly not on any emergency basis.  I would generally and

21  very much agree with the Court that we need to have a hearing

22  on this and resolve whether a curative letter would somehow be

23  required.

24          THE COURT:  Thank you, Ms. Richards.

25          MS. RICHARDS:  Thank you, Your Honor, for allowing me

1   that time.

2         MR. LADUCA:   Your Honor, this is Charles DeLuca.   May

3   I just have two minutes to close up?

4         THE COURT:   Certainly.

5         MR. LADUCA:   First and foremost, Ms. Richards just

6   told Your Honor that she said Your Honor said communications of

7   this kind are not violative of Rule 23.   I don't think that's

8   what Your Honor said.   I believe Your Honor said that the form

9   of this communication, the form is not violative of Rule 23.   I

10  would agree with that.   It's the substance we have a problem

11  with, sir.

12        Second, we never had a problem with communications

13  filed before -- I'm sorry, communications sent before the

14  lawsuit was filed.   I don't have an issue with that as long as

15  our client doesn't some day show up with a communication that

16  is grossly misleading, which I'm sure it was not.   These are

17  lawyer-drafted documents.   But the first settlement offers and

18  the first release of legal claims, those came out after the

19  complaint was filed.

20        Second, Ms. Richards added that M/I Homes provided

21  the case name and where the case was filed.   Well, that just

22  holds to my argument that whether you're sophisticated or not,

23  you need to have the name of counsel in the complaint.   When

24  they have questions, they're still going to call the person who

25  wrote the letter, and that's what Judge Pollack stressed in

1   Philadelphia.

2          Your Honor, Ms. Richards points out that they're

3   getting hammered with people calling her -- not her, but her

4   client is getting hammered.  That magnifies the importance of

5   court review and that magnifies the importance of Your Honor

6   having a say in what information is distributed to the putative

7   class members because, sir, I put before you that you do have a

8   responsibility to do that, and I believe that I do as well, to

9   protect that.

10         Things we can take out of the TRO that I filed today:

11  I think there was one question Your Honor presented before

12  Ms. Richards started.  We could prevent future correspondence

13  without court approval because there is a complaint on file.

14  We could have -- I would request that the Court order that M/I

15  Homes provide us with names of all putative class members that

16  they have in their possession, everyone that they're writing

17  these letters to; and allowing me an opportunity to present to

18  Your Honor a clarifying notice.  I'm fine with just sending it

19  and doing this via the briefings.  I just want the opportunity

20  to show you what I believe to be a fair, balanced, neutral,

21  clarifying notice.

22         Sir, the issue that I'm so concerned with is what

23  happens to the putative class members who sign a release before

24  the clarifying notice.  Our lawsuit is seeking more.  The

25  ninety thousand to one hundred thousand, we're seeking other

1  forms of release that may get them more than what they're being

2  offered, and this communication does not say that.

3        So, Your Honor, I respectfully feel that there is a

4  legal communication that's been put out.  It was put out

5  knowing that opposing counsel had grave concerns and knowing

6  that we really wanted the Court's approval on this.  We have no

7  problems with the communications Ms. Richards laid out that

8  went out before the complaint was filed.  Once the complaint

9  was filed, sure, we do have a concern along those lines, sir.

10       We still haven't received the letter that she said

11  she sent out around the same time as she's seeking an extension

12  to respond to the complaint; they didn't notify us.  They did

13  notify us of this one because this one is different, Judge.

14  This correspondence is different than the others.  It offers a

15  settlement and a release, and it offers these important legal

16  releases and important legal information to them without

17  providing all the information.  Our complaint seeks more.

18       THE COURT:  All right.  Thank you, Mr. LaDuca.

19       MR. LADUCA:  Thank you, Your Honor, for your time.

20       MS. RICHARDS:  I'm sorry, Your Honor, there was, I

21  think, one mistake made.  Again, I'm sure it's inadvertent but

22  actually I called Mr. Raiter before the one letter -- before

23  this was going to go out so that I could advise him that it was

24  going out and did he want Mr. Minafri's sent to him.  Actually;

25  Mr. Raiter -- and again, we have all had this happen.  He

1    wasn't able to call me back within five business days.  I told

2    him it had gone out, and I would be glad to send him a copy of

3    that.  As I recall -- and if Shawn tells me I'm wrong on this,

4    I'll certainly bow.  But I believe he told me he didn't need me

5    to send it, they had already seen it.  I just want to point out

6    it is not true to say that this is the first time we were

7    sending something out.  I want to make sure that's --

8              MR. LADUCA:  Your Honor, I have no disagreement with

9    Ms. Richards.  I believe she may have told Shawn about that

10   second communication.  It's just our concern is with this legal

11   release and settlement that happened after the complaint was

12   filed.

13             Thank you for your time.

14             THE COURT:  Okay.  I'm going to take --

15             MR. FUENTE:  May I make one point?

16             THE COURT:  Certainly.

17             MR. FUENTE:  First of all, Judge, I'm not admitted in

18   Ohio and I'm not admitted in your court there, just in the

19   interest of full disclosure.  May I proceed?

20             THE COURT:  I don't think your one point will violate

21   any ethical rules.

22             MR. FUENTE:  The point I want to make, Counsel has

23   referenced an order that Judge Pollack entered in a case called

24   *CertainTeed* that counsel was involved in.  There is a division

25   about that case that I think is important.  First is in that

 1   case, as I understand the facts - I'm pretty familiar with it -

 2   the defendant sent out the correspondence to its customers that

 3   did not disclose the existence of pending litigation.   The

 4   division here is that M/I Homes has disclosed the litigation by

 5   case name, case number, and the court in which the case is

 6   pending.

 7          The defendant agreed to some type of curative notice,

 8   which is not on the table here.  We don't agree with even the

 9   curative notice, if I understand that properly.

10          The Court and parties did not disclose the case name,

11   case number, or court.  They said very generically that a class

12   action has been filed.  We've gone beyond that.  We've

13   disclosed the name, identified the plaintiff and homeowners by

14   community, and by court and case number.  That's a big

15   distinction that makes the *CertainTeed* litigation different

16   from the Minafri case.

17          The issue that M/I Homes is under a lot of pressure,

18   it has a business relationship with its customers.  These folks

19   are relying on M/I Homes to act and to act properly.  The only

20   hurdle right now is counsel for Mr. Minafri.  In an effort to

21   work through that hurdle, we presented this material to

22   Mr. Minafri's lawyers and here we are now.  I think M/I Homes

23   has no choice but to proceed because it has homeowners and had

24   an obligation to respond.  These are folks that want M/I Homes

25   to act, and that's what it's doing.

```
 1            The communication, as Ms. Richards said, is very
 2    straightforward.  It's not misleading.  I just wanted to point
 3    out those points for clarification.
 4            THE COURT:  I understand them, and I understood them
 5    as set forth by Ms. Richards, but I appreciate your
 6    embellishing at least on the distinction between the one case
 7    relied upon by Mr. LaDuca.
 8            It's 4:18.  The Court is going to take about a
 9    ten-minute recess, and then I'm going to come back at
10    approximately 4:30 and give you my decision or tell you what
11    I'm going to decide.  I think that with the information I have,
12    the arguments of counsel, which have been very helpful and
13    cogent, I would be able to give you my decision on the TRO
14    application of the plaintiffs.  So bear with me.  I'm going to
15    put you on mute so that you'll know that I can hear you but you
16    can't hear me.  Thank you.  We'll stand in recess for ten
17    minutes.
18            (Brief recess taken.)
19            THE COURT:  Good afternoon, parties.  I am back on
20    the record.  Is everyone here?  Mr. LaDuca?
21            MR. LADUCA:  Yes, sir.
22            THE COURT:  Mr. Landskroner?
23            MR. LANDSKRONER:  Yes, sir.
24            THE COURT:  Ms. Richards?
25            MS. RICHARDS:  Yes, Your Honor.
```

1          THE COURT:  Mr. Thomas?

2          MR. THOMAS:  Yes, sir.

3          THE COURT:  And Mr. Fuente?

4          MR. FUENTE:  Yes, sir.

5          THE COURT:  The Court has considered the arguments of

6   counsel and taken into consideration the pleadings that have

7   been filed and the authorities cited therein.  As a general

8   proposition, as Counsel are all aware, pre-certification

9   communications to potential class members by both parties

10  generally are permitted and are also considered to constitute

11  constitutionally-protected speech.

12          As such, any limitations on pre-certification

13  communications between parties and potential class members

14  should be based on a clear record and specific findings that

15  reflect a weighing of the need for a limitation and the

16  potential interference with the rights of the parties.

17          In other words, for this type of communication to be

18  curtailed, the record must show that the communication was

19  either leading and/or inherently coercive.  It's within that

20  context and against that background that I view the

21  communication here.

22          I'll note for the record that I do not have the final

23  letter that was sent out.  As an officer of the court, however,

24  I take Ms. Richards at her word, and those of Mr. Fuente, that

25  the changes to the correspondence were communicated to this

1    Court, and so I'm considering that as a part of the factual

2    record.

3            As a threshold matter, I find nothing coercive about

4    the letter.  Certainly, as Ms. Richards correctly pointed out,

5    we don't have some of the relationship issues that were present

6    in some of the other cases where the communication was between

7    an employer and an employee where the employer had the inherent

8    advantage over the employee.

9            There was nothing false that the Court could

10   ascertain in this letter, nor based on the arguments of counsel

11   were any false statements identified.  I find compelling the

12   fact that the putative class members, should they enter into

13   this agreement, would not give up any of their personal injury

14   claims and they can still be members of the class.

15           I am, however, concerned, as Mr. LaDuca points out,

16   about a couple of matters.  The case law is just not clear as

17   to the extent that M/I was under some responsibility in

18   contacting the putative class members to fully elaborate on the

19   nature of the lawsuit.  That is fraught with peril and danger,

20   however, because by the very nature of our adversarial process,

21   the perspective of defense counsel as to the lawsuit may not be

22   in harmony with the perspective of plaintiffs' counsel, and

23   would that undertaking expose the defendant to any additional

24   liability once defense counsel undertakes to offer some

25   explanation of the lawsuit.

1          I find it sufficient, at least at this point, that

2    defense counsel identified the lawsuit, identified the docket

3    number so that a putative class member can certainly find the

4    lawsuit — because it's a public document — get a copy of the

5    complaint, see who the counsel are.  And if that putative class

6    member has questions, certainly they would be able to address a

7    lawyer who represents the plaintiff at this point.

8          I'm not certain, and I didn't find the language to

9    which Mr. LaDuca referred or upon which he was relying when I

10   thought he indicated to the Court that defense counsel would

11   have been under some obligation to provide his name.  I found

12   nothing in *Gulf Oil* that suggested that, nor did I find

13   anything in *M.L. Stern Overtime Litigation*, or any of the other

14   cases that I looked at including Wayne v. Chinese Daily News

15   and Cobell v. Norton.  But, as I said, given the amount of time

16   in which we had to do this research, maybe I overlooked it.  If

17   there is authority on that point, I would invite it.

18          For those reasons, however, the Court finds that

19   there is no immediacy and irreparability, particularly in light

20   of the fact that the letter has already gone out.  Of course,

21   if I find after a preliminary injunction hearing that

22   corrective notices are necessary and warranted, then this Court

23   can order that the same be submitted by appropriate counsel.

24          I am going to recommend that we can have a

25   preliminary injunction hearing on this matter on either

1   May 14th or May 18th.  I want counsel to look at their

2   calendars to determine which of those dates work better.  I

3   will tell you that I would prefer the 18th because the week of

4   the 11th is -- I would be squeezing you in, and I have a

5   suppression hearing that quite possibly will spill over into

6   the 14th.

7           Excuse me just a second.

8           My assistant just told me that there is a possibility

9   that we won't have a courtroom available because Judge Watson

10  is going to be using my courtroom for a two-week trial.  But my

11  recollection is that his trial doesn't begin until Tuesday, May

12  19th.  So I'm still going with the May 18th date.  And for this

13  type of hearing, I can possibly use one of the magistrate

14  judge's courtroom so it's not really an issue for me.

15          Mr. LaDuca, are you available on the 18th?

16          MR. LADUCA:  I will make myself available, sir, on

17  the 18th.

18          THE COURT:  Mr. Landskroner?

19          MR. LANDSKRONER:  Yes, sir, Your Honor, I'm

20  available.  If we can do it later in the afternoon, I have to

21  be before the court -- before Judge Carr in Toledo and it's for

22  a ten o'clock hearing that I imagine we'll be done by 12.  I

23  have to truck it down from Toledo to Columbus, but I'll be

24  there.  Sometime around three would be good, if we can do it.

25          THE COURT:  It will be difficult to begin at three.

1           MR. LANDSKRONER:  Maybe I'll have one of my partners

2   cover the hearing.

3           THE COURT:  That might be a good idea.  I'm not

4   suggesting that prolixity comes to mind in dealing with all

5   counsel on this telephonic status conference, but I'm not

6   ruling that out either.

7           Now, Ms. Richards, I assume that you're available on

8   the 18th.

9           MS. RICHARDS:  Yes, Your Honor, I will do that.  If I

10  may, Your Honor, one point.  First of all, yes, I clearly am

11  available.  It is possible -- and I'd like to at least be able

12  to double check with the client only because if certain

13  witnesses are needed, they are probably all in Florida.  I'm

14  assuming we can get them here.  I'm not saying that, but I just

15  wondered if I could at least check with the client to make sure

16  that there's nothing that would include that.  But I think you

17  can count on, yes, I will be available absolutely, and

18  certainly do everything I could to make sure that clients could

19  get here for that hearing.

20          THE COURT:  All right.

21          Mr. Fuente?

22          MR. FUENTE:  Yes, sir, I'm available.

23          THE COURT:  And Mr. Thomas?  Mr. Thomas?

24          MS. RICHARDS:  I'm sorry, Your Honor.  He said, yes,

25  Your Honor, he was available.

```
 1              THE COURT:  All right.
 2              Mr. LaDuca, do you have any idea of how long you
 3     would expect your case to take, your presentation?
 4              MR. LADUCA:  Your Honor, I can't imagine it would
 5     take more than thirty minutes.  It's just -- but it depends.  I
 6     have to confer with some of my clients and try to get some
 7     witnesses.  But for my presentation, not including putting
 8     witnesses up, half an hour, sir.
 9              THE COURT:  Ms. Richards?
10              MS. RICHARDS:  Again, Your Honor, assuming that we
11     may need witnesses, I'm going to say an hour.  That would
12     include having witnesses, I think.  I'm a little unclear on --
13     I would like to consult with counsel, but I'm assuming that we
14     would put on a witness or so, and that would probably be an
15     hour.
16              THE COURT:  All right.  We can begin, then, at ten
17     for any people who might -- I know that from time to time some
18     witnesses may want to come in in the morning, so I'll give some
19     latitude for a morning flight.  But if you believe that your
20     witnesses will all be in on Sunday, we can begin earlier.  It
21     really doesn't matter to the Court.
22              MS. RICHARDS:  I would think they would be coming in
23     on Sunday, Your Honor, to be very frank with you, because I
24     think it's difficult to fly from Florida to here and get in by
25     ten.  I don't think there are any direct flights any more is
```

```
 1  why I say that.

 2          THE COURT:  I don't know that there are any direct

 3  flights anywhere if you're flying into or out of Columbus;

 4  maybe to Cincinnati but that's a totally different issue.

 5          We'll begin at 9:30 on the 18th.

 6          I will give counsel an opportunity to file pleadings.

 7  I presumed, Mr. LaDuca, that you wanted a temporary restraining

 8  order and then a preliminary injunction.  Is that right?

 9          MR. LADUCA:  That's correct.

10          THE COURT:  I'm going to give the parties -- I'll

11  give you until four o'clock on Monday, May 4th, to file your

12  brief in support of a preliminary injunction, Mr. LaDuca.

13          MR. LADUCA:  Thank you.

14          THE COURT:  No, given our limited time, there will be

15  simultaneous briefing on the 4th, simultaneous replies on the

16  11th.

17          So, Ms. Richards, you'll file your brief in

18  opposition on the 4th.  Mr. LaDuca will file his brief in

19  support on the 4th, and you all will file your responsive

20  pleadings on the 11th.

21          In the interim, if you have questions, you can

22  contact the Court's law clerk, Ms. Sarah Mirkin, at 719-3262.

23          Are there any other issues that we need to take up at

24  this time from the plaintiffs, Mr. LaDuca?  Any issues from the

25  plaintiff?
```

1            MR. LADUCA:  I don't believe so, sir.

2            THE COURT:  Ms. Richards, anything from the defense?

3            MS. RICHARDS:  No, Your Honor.  Thank you.

4            THE COURT:  Thank you very much, everyone.

5            MS. RICHARDS:  Thank you, Your Honor, for your time.

6                              - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2                            CERTIFICATE
 3            I certify that the foregoing is a true and correct
 4   record of proceedings in the above-entitled matter, heard
 5   before the Honorable Algenon L. Marbley, United States District
 6   Judge, sitting at Columbus, Ohio, on April 27, 2009, reported
 7   by me in stenotypy and transcribed by me or under my
 8   supervision.
 9
10
11
12
13
14
15                           s/Shawna J. Evans_____
                             Shawna J. Evans, RPR
16                           Official Federal Court Reporter
17
18
19
20
21
22
23
24
25
```

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN MINAFRI, | : | |
| | : | |
| Plaintiff, | : | **Case No. 2:09-cv-167** |
| | : | |
| | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| M/I HOMES, INC., *et al.*, | : | **Magistrate Judge King** |
| | : | |
| | : | |
| Defendant. | : | |

## ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER

This case involves Plaintiff's claim that Defendants manufactured, sold, and installed

defective drywall that contains sulfur and other organic compounds that are injurious to human

health.  Plaintiff Steven Minafri ("Minafri") has filed this action as a class action, however, the

Court has not yet ruled on the issue of class certification.  Now before the Court is Minafri's

Motion for a Temporary Restraining Order pursuant to Federal Rule of Civil Procedure 23(d).

(Doc. no. 8.)

Minafri asks the Court to enjoin Defendant M/I Homes, Inc. from communicating with

putative class members without obtaining prior approval from the Court or the agreement of

Plaintiff's counsel.  Minafri's Motion centers around an April 24, 2009 letter that M/I Homes

sent to putative class members who owned houses built by M/I Homes.[1]  The Letter offered to

remove the drywall from putative class members houses in exchange for a limited release and

assignment of certain claims against M/I Homes.  Minafri contends that the Letter was

misleading and improper, warranting injunctive relief under Rule 23(d).

---

[1]  Minafri's Motion also asked the Court to enjoin M/I Homes from sending the Letter in its present form, however, the Court learned during the hearing on the Motion that the Letter had already been sent on April 24, 2009.

A preliminary informal conference on Minafri's Motion was held by telephone on Monday, April 27, 2009, pursuant to S.D. Ohio Civ. R. 65.1(a).  In attendance were counsel for Minafri and counsel for M/I Homes.  Upon consideration of Minafri's briefs and exhibits and the arguments of the parties, and for the reasons set forth on the record during the April 27, 2009 hearing, the Court finds that there is no clear record demonstrating misleading information in the Letter or inherently coercive behavior on the part of Defendant M/I Homes.  *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101-02 (1981) (order limiting communications between parties and potential class members must be based on a clear record of particular abuses); *In re M.L. Stern Overtime Litig.*, 250 F.R.D. 492, 500 (S.D. Cal. 2008) (pre-certification communication of settlement offer to putative class members was not misleading or coercive and, thus, not improper).  Accordingly, the Court **DENIES** Minafri's Motion for a Temporary Restraining Order.

The Court further orders that a preliminary injunction hearing shall be held on **Monday, May 18, 2009 at 9:30 a.m.**  The briefing schedule for that hearing, to include only opening and reply briefs, will be as follows:

**May 4, 2009, at 4:00 p.m.**: opening briefs from both parties not to exceed 15 pages in length are due.

**May 11, 2009, at 4:00 p.m.**: reply briefs, not to exceed 5 pages in length are due.

**IT IS SO ORDERED.**

                                          **s/Algenon L. Marbley**
                                     **ALGENON L. MARBLEY**
                                     **United States District Court Judge**

**DATE: April 27, 2009**





Win a FREE year of SunTrust business products.   LEARN MORE   SunTrust
SunTrust Bank, Member FDIC. No purchase or other obligation required to enter.



Things To Do This Weekend

77°
Miami
Thunderstorm
Click for more JustWeather.com Site | Web | As Seen On

Search [GO]

- Home  • News  • Weather  • Entertainment  • Sports  • Lifestyle  • Contests  • Marketplace  • Community  • Seen On

Homepage / Miami News

- Story

Text Size

# Chinese Drywall Trial To Start In Jan.

## Lawsuit Alleges Drywall Is Tainted

POSTED: Thursday, September 3, 2009
UPDATED: 6:10 pm EDT September 3, 2009

**NEW ORLEANS** -- A federal judge presiding over hundreds of lawsuits against Chinese drywall makers and installers said Thursday that he plans to hold the first trial in January for the cases, which claim the imported products emit sulfur, methane and other chemical compounds that have ruined homes and harmed residents' health.

U.S. District Judge Eldon Fallon told attorneys that he expects them to pick six plaintiffs whose cases could be tried in early 2010, with the first trial starting in January.

Kerry Miller, a lead lawyer for companies named as defendants in the suits, said defense attorneys may need more time to prepare for the first batch of bellwether trials. Russ Herman, a lead plaintiffs lawyer, said he supports Fallon's scheduling plan.

"I wish we could begin trials next week. We're ready," Herman said after the hearing.

Fallon said the first batch of trials would be limited to damage claims and wouldn't include plaintiffs who blame Chinese drywall for health problems.

Around 400 plaintiffs and 20 defendants have filled out "profile forms" for the litigation, but Herman estimated that plaintiffs lawyers represent around 6,000 clients with claims.

Knauf Plasterboard Tianjin, a company based in China, is the only drywall manufacturer to have filled out a profile form; most of the companies are home builders. Knauf Tianjin spokeswoman Melisa Mendez Chantres said the company is investigating and trying to resolve homeowners' complaints.

"KPT's primary focus has always been ensuring the health and safety of the end-users of its product," she said in a statement. "It responded immediately to inquiries by builders that raised health concerns and hired highly regarded experts, who determined that there were no health risks to persons in the homes."

Herman said he expects several dozen other Chinese drywall manufacturers to respond to the litigation in coming weeks.

Thirty properties owned by plaintiffs are scheduled to be inspected in the coming days. Fifteen are in Florida, eight are in Louisiana, four are in Mississippi, and one each are in Alabama, North Carolina and Virginia.

Fallon said the protocols for the inspections could be "tweaked" before the next batch of roughly 1,000 inspections.

"You can think you've done the protocol in the proper way, but until you carry it out, until you conduct inspections, you really don't know," he said.

**Previous Stories:**

http://www.justnews.com/news/20709414/detail.html                    9/4/2009

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION

MDL DOCKET: 2047

SECTION: L

JUDGE FALLON
MAG. JUDGE WILKINSON

_____/

## AFFIDAVIT OF S. TODD MERRILL

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

BEFORE ME, the undersigned authority, personally appeared S. TODD
MERRILL, who, being first duly sworn, deposes and states as follows:

1.      I am the General Counsel–East Region of Taylor Morrison Services Inc.
("Taylor Morrison") and Secretary of Taylor Woodrow Communities at Vasari, L.L.C.
("Taylor Woodrow").   In that position, I am a custodian of the business records
pertaining to the projects which are the subject of the pending MDL proceedings against
these two entities.

2.      I am over the age of 18 and have personal knowledge of the matters stated
herein or am otherwise relying on the business records of Taylor Morrison and Taylor
Woodrow.

3.      Taylor Woodrow and Taylor Morrison have negotiated several Repair and
Relocation Agreements with their homeowners.   We always give our homeowners
sufficient time to read and review the Agreements in advance, and retain counsel, if they

Taylor Morrison/MDL-Louisiana/Aff of Todd Merrill

**Exhibit "D"**

choose to do so.  In fact, the Agreements are emailed to the homeowners and no homeowners are asked to sign the Agreements "on the spot".

4.    Taylor Woodrow discovered that some homes in its Vasari project in Bonita Springs, Florida had Chinese Drywall.  The Cassia at Vasari Condominium Association, Inc. ("Association") was represented by counsel.  The Association was represented by one of the more well-known construction law firms in Florida, Becker-Poliakoff.  While there are some differences in the terms of our various Repair and Relocation Agreements, the primary points (such as the limited release, assignment of claims, and new warranty) covered in the Release and Repair Agreement which the Association executed are similar to other agreements that we negotiated with other homeowners.  Some of these other homeowners were represented by counsel and others were not.

5.    In addition to the firm mentioned above, Taylor Morrison or Taylor Woodrow has negotiated, or is still negotiating agreements with affected homeowners represented by the Allen Dell firm in Tampa, Florida, attorney Edwin Mulock in Bradenton, Florida, attorney Asha Dhillon in Los Angeles, California, and the firm of Shapiro Blasi Waserman and Gora, P.A, in Boca Raton, Florida.

6.    Taylor Morrison or Taylor Woodrow have also negotiated either signed agreements or proposals for signed agreements with attorneys who represent MDL Plaintiffs in this action.

7.    The majority of the Taylor Morrison homes where Chinese drywall has been found sold for prices between $300,000-$450,000.

Taylor Morrison/MDL-Louisiana/Aff of Todd Merrill

8.    The majority of the Taylor Woodrow homes where Chinese drywall has been found sold for prices between $540,000-$840,000.

9.    Ever since the May 12, 2009, hearing on Plaintiff's Motion for Protective Order in *Culliton v. Taylor Morrison Services*, the written materials sent by Taylor Morrison and Taylor Woodrow to homeowners related to the repair and relocation agreements contain language that homeowners have the right to consult with an attorney, should they choose to do so.

FURTHER AFFIANT SAYETH NAUGHT.

_____
S. Todd Merrill

SWORN TO AND SUBSCRIBED before me this ____ day of September 2009, by _S. Todd Merrill_, who is personally known to me or who produced _____ as identification and who did take an oath.

_____
NOTARY PUBLIC
Print name:
My commission expires:

Notary Public State of Florida
Elaine A Stullc
My Commission DD627034
Expires 03/26/2011

Taylor Morrison/MDL-Louisiana/Aff of Todd Merrill