UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) | MDL No. 2047<br><br>SECTION: L<br><br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO ALL CASES | | |

**RESPONSE OF THE DEFENDANTS' STEERING COMMITTEE AND
HOMEBUILDERS' STEERING COMMITTEE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY**

The Defendants' Steering Committee (DSC) and Homebuilders' Steering Committee (HSC), by and through undersigned counsel, submit this opposition to Plaintiffs' Motion to Expedite Discovery on behalf of all Defendants.

**INTRODUCTION**

The Court has clearly and repeatedly conveyed to the parties a logical, though ambitious, plan for addressing certain key issues in the initial phase of this case. Pursuant to that plan, the Court has directed the parties to focus on the following three issues: product identification, supply chain, and jurisdiction over foreign defendants. To that end, the Court has already expedited discovery by ordering the parties to submit disclosures in the form of profile forms and by directing that an initial inspection program take place on a very aggressive schedule.

In addition, the Court has directed the parties to review the profile forms and, based on the profile forms and inspections, select ten property-damages-only plaintiffs for purposes of conducting additional discovery and selecting five plaintiffs for "bellwether" trials.

ATL_IMANAGE-6348004.2

The Defendants have been following the Court's instructions.  The PSC, however, is now suggesting that the parties abandon the Court's focused plan by launching into full-scale, massive discovery on virtually all issues.  As will be shown below, the PSC's proposed discovery is anything but "narrowly focused," and it is certainly not limited to the three issues prescribed by the Court.  In particular, much of the discovery seems designed to help the PSC identify potential claimants, not to discover information germane under the Court's phased approach.  If the Court allows the Plaintiffs to conduct discovery now on the issues reflected in their proposed document requests and 30(b)(6) notices, the inevitable result will be to significantly delay the case and divert the parties' efforts away from the issues the Court has directed the parties to address.

The Defendants (DSC and HSC) respectfully submit that the Court should stay the course on its plan for addressing these preliminary issues, keep in place the stay of all discovery other than that directed to the three identified issues, and deny Plaintiffs' motion to expedite discovery.[1]

### I. Plaintiffs' Proposed Discovery Is Unfocused, Overly Broad and Highly Burdensome

Contrary to Plaintiffs' claim that their discovery is "narrowly focused," the proposed document requests and 30(b)(6) notices are the exact opposite.  Instead of concentrating on the three critical issues of product identification, supply chain details, and jurisdiction over foreign

---

[1] The Defendants are, however, willing to agree to expedited discovery on the preliminary issues and have made certain suggestions to the PSC in this regard.  *See* Defendants' proposal in Section IV, below.

entities, Plaintiffs' requests are extremely broad and burdensome because they seek information about:

- **health effects, which the Court has specifically reserved for later phases of the litigation** (See 30(b)(6) Deposition Topic ("30(b)(6) Topic"), No. 19[2] ("Any communications and/or reports of adverse health effects associated with exposure to Chinese drywall."));

- **identification of non-MDL homeowners** (See Request for Production ("RFP"), No. 25 ("All documents evidencing or identifying the communities and street addresses of homes (whether single family or multiple family dwellings) and commercial buildings in which Chinese drywall was used…."); 30(b)(6) Topic, No. 10(b) (same));

- **drywall complaints and claims** (See RFP No. 30 ("All notices, claims, complaints, communications or documents of any kind among and/or between Defendant's employees and/or employees of affiliate companies or consultants, and any property owners, homeowner's associations, co-op or condo boards, property managers, or tenants during the Relevant Time Period, concerning problems with the drywall…."));

- **drywall marketing** (See RFP No. 28 ("All drafts of any promotional and/or marketing materials relating to any drywall product."));

- **drywall design and manufacture** (See Manufacturer RFP No. 16 ("All documents concerning the design, development, manufacturing processes, testing, and inspection of Chinese drywall."); Manufacturer RFP No. 17 ("All documents concerning the compounds used by Defendant in the manufacture of Chinese drywall"); Manufacturer RFP No. 20 ("All documents concerning any changes in the manufacturing, inspection, or testing processes for Chinese drywall during the Relevant Time Period."); Manufacturer RFP No. 21 ("All documents concerning the Quality Assurance Methods utilized by Defendant, including any changes thereto, in its manufacture of Chinese drywall during the Relevant Time Period."); Manufacturer RFP No. 22 ("All documents concerning Process Control, including any changes thereto, during the manufacture of Chinese drywall and any of its component materials during the Relevant Time Period.")); Manufacturer RFP No. 26 ("All documents concerning any testing or inspections of

---

[2] Plaintiffs have made largely similar requests to each group of Defendants (Builder, Installer/Contractor, Importer/Exporter/Broker, Manufacturer, and Distributor/Supplier/Retailer), however, there are some requests that are particular to a group and the numbering of the requests vary. For ease of reference, unless otherwise noted, citations are to the Requests for Production and 30(b)(6) notice to the Builder Defendants. In addition, several of the subject matter areas addressed in this section may well be relevant to the jurisdictional issue, but discovery on this issue has been deferred by the Court until after it rules on Knauf Gyps KG's motion for protective order. See September 8, 2009 Order.

Chinese Drywall to insure compliance with any regulations, specifications, or standards…."));

- **drywall storage** (See RFP No. 35 ("All documents and communications relating to the storage and/or warehousing of Chinese drywall during the Relevant Time Period."); 30(b)(6) Topic No. 10(f)(" the methods, locations, and standards employed in the storage of any and all Chinese drywall…"));

- **communications with government agencies about drywall** (See RFP No. 33 ("All communications between Defendant and any foreign or domestic governmental agency during the Relevant Time Period, including but not limited to the CPSC, EPA, CDC, and APSDR, concerning problems with the drywall…."); RFP No. 34 ("All documents provided to and any communications between Defendant and any foreign or domestic governmental entity, body, department, division, agency, and/or representatives during the Relevant Time Period, concerning problems with the drywall…."); 30(b)(6) Topic No. 16(d) ("Communications with any domestic or foreign governmental bodies, entities, agencies, departments, divisions, or representatives relating to Chinese drywall."));

- f**inancial data** (See 30(b)(6) Topic No. 12 ("Financial data relating to your transactions involving Chinese Drywall…"));

- **communications with trade associations about drywall** (See 30(b)(6) Topic No. 15 ("All communications with trade associations, professional organizations, manufacturing organizations concerning the manufacture, storage, care or use of Chinese drywall."));

- **drywall investigation** (See RFP No. 2 ("All documents generated by, prepared for, reviewed by, received by, or concerning Defendant's Board of Directors, or any committee thereof or authorized thereby, concerning Chinese drywall or of problems with the drywall…."); RFP No. 38 ("All contracts and communications between Defendant and any third-party vendor or consultant relating to any research, inspection, testing, analysis, and remediation of Chinese drywall."); RFP No. 30 ("All notices, claims, complaints, communications or documents of any kind among and/or between Defendant's employees and/or employees of affiliate companies or consultants, and any property owners, homeowner's associations, co-op or condo boards, property managers, or tenants . . . ."); RFP No. 31 ("All communications between Defendant and any manufacturer, importer, exporter, purchasing agent, broker, distributor, and/or retailer of Chinese drywall during [January 1, 2001 to present], concerning problems with the drywall, including any symptoms of the drywall's presence such as smells or odors, air conditioning unit or component replacement, corrosion of metals, electrical and/or plumbing systems or components, and any related health and safety concerns, issues, or claims."); RFP No. 32 ("All communications between Defendant and any other builder and/or contractor using Chinese drywall, or installer of Chinese drywall utilized by Defendant during the Relevant Time Period, concerning problems with the drywall...."));

- **drywall inspection, testing, and analysis** (See RFP No. 36 ("All documents relating to research, inspection, testing, analysis, or remediation done by or on behalf of Defendant relating to the Chinese drywall…."); RFP No. 38 ("All contracts and communications between Defendant and any third-party vendor or consultant relating to any research, inspection, testing, analysis, and remediation of Chinese drywall."); RFP No. 41 ("All documents and communications concerning or referencing in any way any inspection, testing, repair, and/or remediation protocols relating to Chinese drywall."); 30(b)(6) Topic No. 14 ("Any inspections, analyses and/or compliance testing of Chinese drywall…."); Manufacturer RFP No. 18 ("All documents concerning any research or testing on Chinese drywall by Defendant or anyone acting on its behalf, to determine how the components, properties, or effects of such drywall would, could, or might change due to chemical deterioration, exposure to various temperatures, pressure changes, weather conditions, moisture and/or humidity conditions, the passage of time and/or any combination thereof."));

- **drywall repair, including protocols** (See RFP No. 36 ("All documents relating to research, inspection, testing, analysis, or remediation done by or on behalf of Defendant relating to the Chinese drywall…."); RFP No. 38 ("All contracts and communications between Defendant and any third-party vendor or consultant relating to any research, inspection, testing, analysis, and remediation of Chinese drywall."); 30(b)(6) Topic No. 17(a) (same); RFP No. 41 ("All documents and communications concerning or referencing in any way any inspection, testing, repair, and/or remediation protocols relating to Chinese drywall."); 30(b)(6) Topic No. 17(b)("Any protocols, instructions, guidances, manuals, plans, and/or standard operating procedures (SOPs) for such inspections, sampling, analyses, testing, and/or remediations."));

- **drywall standards**  (See 30(b)(6) Topic No. 18 (c) ("Any standards consulted, considered, or relied upon to determine the quality and characteristics of the drywall products subject to such inspections, sampling, analyses, testing, and/or remediations."); RFP No. 15 ("All documents concerning performance specifications and standards for Chinese drywall...."));

- **homeowner notices** (See RFP No. 40 ("All notices to any property owners and/or tenants, that their property and/or other properties contain Chinese drywall."); 30(b)(6) Topic No. 16(c) ("Notices to or from any property owners, managers, condo/co-op boards, and/or homeowner associations relating to the Chinese drywall."));

- **homeowner contracts** (See 30(b)(6) Topic No. 16(b) ("The existence and nature of any contracts or agreements with property owners, managers, condo/co-op boards, and/or homeowner associations relating to Chinese drywall."));

- **insurance coverage** (See RFP No. 13 ("Each and every general liability, comprehensive general liability, advertising liability, errors and omissions, or product liability insurance policy… [from January 1, 2001 to present]); 30(b)(6) Topic No. 19 ("Any policies of

-5-

insurance…"); (RFP No. 13 ("Any charts or schedules of layers of insurance or self-insured retention for any of the respective years of coverage."));

- **insurance claims** (See RFP No. 39 ("All documents and communications between Defendant and any insurer or its representative concerning any claims relating to Chinese drywall."); 30(b)(6) Topic No. 20 ("All claims you have made on any insurance policies…."); and

- **document preservation** (See RFP No. 11 ("Documents sufficient to identify the steps taken by or on behalf of you to preserve documents that are or may be potentially discoverable in this action."); 30(b)(6) Topic No. 6 ("Steps taken by you or on your behalf to preserve data, documents, and ESI that are or may be potentially discoverable in this matter."); RFP No. 10 ("All of Defendant's document retention or document destruction policies and memoranda in effect during the Relevant Time Period."); 30(b)(6) Topic No. 4 ("Any record filing, storage, retention, and/or destruction procedures and/or systems….")).

Not only have Plaintiffs strayed far beyond the three areas prescribed by the Court, their requests are overly broad even for full-blown discovery, as shown by the following requests:

- **documents over a nine-year period without justification** (Plaintiffs define "Relevant Time Period" as January 1, 2001 to Present, when all available information shows that the problem arose in 2005 and was largely over in 2007.);

- **certain categories of documents without any time restriction, and unrelated to Chinese drywall** (See RFP No. 28 ("All drafts of any promotional and/or marketing materials relating to *any drywall product*."));

- **general business documents wholly unrelated to Chinese drywall, including:**

  o Documents sufficient to identify all members of the Board of Directors, all corporate officers, and all persons or entities owning more than 5 % interest for the Defendant and all subsidiaries and affiliates of the Defendant from January 1, 2001 to present (See RFP No. 3);

  o Annual organization charts for every entity that owned more than 5 % interest in Defendant, including any subsidiary or affiliate of Defendant, from January 1, 2001 to present (See RFP No. 3);

-6-

- o All documents concerning any report or analysis of Defendant's financial condition or business prospect of Defendant, including any subsidiary or affiliate of Defendant, from January 1, 2001 to present (See RFP No. 6);

- o All filings made to any state, federal, domestic and/or foreign governmental agencies, departments, divisions, bodies, entities, or representatives from January 1, 2001 to present (See RFP No. 7; 30(b)(6) Topic No. 3);

- o Documents sufficient to identify by state, the name, address, and telephone number for all registered agent(s) for Defendant within the United States (See RFP No. 8);

- o Documents concerning the departmental and corporate standard operating procedures, processes, guidelines, and rules for the conduct of the individuals in groups, departments, and teams of Defendant (See RFP No. 9);

- o All of Defendant's document retention or document destruction policies and memoranda in effect from January 1, 2001 to present (See RFP No. 9; 30(b)(6) Topic No. 4); and

- o Information related to computer programs, software or databases used to create documents and ESI responsive to the requests (See 30(b)(6) Topic No. 5); and

- **documents already provided to Plaintiffs through expedited profile forms** (See RFP No. 13 ("Each and every general liability, comprehensive general liability, advertising liability, errors and omissions, or product liability insurance policy… [from January 1, 2001 to present])")).

If the Defendants are required to respond to the discovery requests propounded by Plaintiffs, significant delay will result. Given the breadth of the discovery, as shown above, it is not physically possible to respond in "seven days," or even in thirty days. To the contrary, extra time will be required. This is wholly inconsistent with the plan outlined by the Court.[3]

---

[3] Defendants also note that several of them have only a single home, or a few homes, involved in this MDL. To require such Defendants to respond to full-scale, extremely costly discovery before the Court and parties get their arms around this case would be premature, unnecessary, and unfair.

## II. The Parties Are Already Expediting Discovery Pursuant to the Court's Plan

During the August 11th Status Conference, the Court outlined the critical initial steps for the parties to undertake in discovery:

> I think this case is going to profit from understanding and getting our hands around as quickly as possible what we're dealing with. We need to know whether or not a particular property has within it Chinese manufactured drywall. And if so, the extent of that drywall… we need to know who manufactured it, we need to know who distributed it, we need to know who installed it, and also we need to know at least visually the nature and extent of the collateral damage.

August 11, 2009 Status Conference Transcript, 4:16-5:1. To accomplish this plan and to have this litigation ready for "bellwether" trials by early 2010, the Court ordered all parties to complete and serve profile forms on an expedited basis. In addition, the Court directed the parties to undertake a Threshold Inspection Program ("TIP").

Pursuant to this directive, the parties first addressed their respective profile forms. For their part, each Defendant has provided or is in the process of providing all information relating to product identification and supply chain for each named MDL plaintiff, in addition to several other categories of information such as corporate entity information, home inspection results, home repairs and insurance information. The Defendants are now analyzing this information in order to (a) link up, to the extent possible, each home with specific brands of Chinese drywall and the chain of supply for each such brand, and (b) identify those areas of product identification and supply chain where there are still gaps in information so that focused follow-up discovery on these issues can be formulated.

Likewise, the PSC has produced not quite 300 profile forms which provide some information, albeit limited and inconsistent, concerning each claimant's home, the alleged damage thereto, and whether he/she seeks personal injury damages. Defendants are now analyzing the information in these plaintiff profile forms in order to (a) select bellwether plaintiffs for second phase discovery and trial, and (b) identify those areas where there are gaps in information about each plaintiff and his/her home so that appropriate follow-up discovery can be framed.

Based on their review so far, Defendants note that there appear to be significant problems and irregularities with Plaintiffs' profile forms. First, the PSC has far fewer claimants and cases in the MDL than previously represented.[4] For example, at the September 3, 2009 status conference, PSC Liaison Counsel represented that there were 635 cases pending in MDL No. 2047, and then was reported in various media outlets to have "estimated that plaintiffs' lawyers represent around 6,000 clients with [drywall] claims."[5] Yet, as of today, the PSC has submitted fewer than 300 profile forms (once the some 59 duplicates are removed and the 45 submitted by homebuilders Mitchell homes, which is not a PSC client or a homeowner, are also removed). Thus, either plaintiffs' counsel do not represent as many clients as they say they do, or they are holding client cases out of the MDL for some purpose. Second, many of the plaintiff

---

[4] In addition, no profile form was timely submitted for three of the homes which the PSC included in the 30-home TIP. These three are Carson and Charlene Fluharty at 1706 Graduate Way in Pensacola; Lula Daniels at 5918 Biler Drive in Pensacola; and Robert Morris at 14123 Stilton Street in Tampa. This problem was finally rectified on September 18 after DSC Liaison Counsel brought this to the attention of the PSC.

[5] *E.g.*, Kunzelman, Michael.. "Judge Eyes January for Trial on Chinese Drywall." *Miami Herald*. September 3, 2009. Available from http://www.miamiherald.com/news/florida/AP/v-print/story/1216209.html.

profile forms are incomplete, unsigned, illegible and/or contain other irregularities. Third, as mentioned above, some 59 profile forms (approximately 20%) appear to be duplicates. Indeed, based on Defendants' review so far, some of the Plaintiff profile forms are actually triplicates. Fourth, different groups of plaintiffs' counsel are using different forms, so the information provided is not uniform or consistent. Fifth, many profile forms relate to homeowners who have individual cases pending in state courts. The Defendants are still trying to make sense of all of this disparate and incomplete information, and will be bringing certain matters in this regard to the PSC's and/or Court's attention as soon as possible in an appropriate fashion. Suffice it to say, the problems with Plaintiffs' profile forms have significantly delayed Defendants in their efforts to carry out the Court's directives.

In addition to the profile forms, the parties are now trying to carry out the Court's expedited TIP. As the Court is aware, this program has encountered problems right out of the box, and the parties are undertaking to craft adjustments to the program in order to make the program work. This, too, has resulted in additional delay and extra work.

Plaintiffs' proposed expedited, full-scale discovery flies directly in the face of the initial goals and initiatives articulated by the Court. The Court has repeatedly indicated that all discovery is to be stayed while the preliminary issues outlined by the Court are addressed. The PSC is apparently now unhappy with this course. Their proposed remedy is not only to discard this approach -- i.e., lift the stay and proceed with full-scale discovery on all issues-- but also to provide the Defendants an impossibly short time to answer their proposed overly broad and

onerous discovery. In short, they want to abandon the Court's plan in favor of discovery by ambush. Plaintiffs' motion should be denied.

### III. Plaintiffs' Discovery Requests Appear To Be An Attempt to Identify New Clients

In part, Plaintiffs' initial discovery efforts appear to be designed to identify potential clients instead of addressing the Court's three threshold issues. Plaintiffs' proposed discovery seeks a list of the communities and street addresses for homes in which defective Chinese drywall has been found. See RFP No. 25. In addition, Plaintiffs ask for "[a]ll notices, claims, communications or documents of any kind among and/or between Defendant's employees … and any property owners…concerning problems with the drywall…." RFP No. 30. Plaintiffs likewise seek the identification of all homes where drywall investigations have been done (RFP Nos. 2, 30, 31, 32); all homes where drywall inspections or testing has been done (RFP Nos. 36, 38, 41; 30(b)(6) Topic No. 41); all homes where drywall repairs have been done (RFP Nos. 36, 38, 41; 30(b)(6) Topic No. 41); all notices to homeowners regarding Chinese drywall (RFP No. 40); and all contracts with homeowners (30(b)(6) Topic No. 16(b)). None of these requests is limited to Plaintiffs in the MDL, but instead seeks information about *any* property owners. Indeed, some of the requests (e.g., RFP No. 30, quoted above) seems to refer to any drywall, not just Chinese or defective drywall. Given the privacy interests of these homeowners and the concerns many have already voiced about identifying their homes as having defective Chinese drywall, these requests are not only premature but also inappropriate given the fact that the vast majority of the homeowners are not in the MDL.

## IV. The Defendants Have Proposed Revised Discovery Requests to Plaintiffs

The Court has instructed the parties to meet and confer about proposed discovery in this case before the discovery is undertaken. As part of that process, Defendants have reviewed Plaintiffs' proposed discovery and have offered a counter-proposal to Plaintiffs.

Specifically, Defendants took one of Plaintiffs' proposed 30(b)(6) notices, deleted all those areas that do not relate to product identification or supply chain, and provided this markup to the PSC.[6] The PSC indicated that they are unwilling to limit themselves to these areas.

As indicated above, Defendants believe the Court should stick with its plan. In the interest of expediting the case, however, Defendants would be willing to expedite discovery on product identification and supply chain, and are ready and willing to discuss with Plaintiffs the details of how to do this. In particular, Defendants believe that the quickest and most efficient way to obtain the existing product identification and supply chain information in their possession is for the Defendants to make written disclosures in these areas on an expedited basis for those homes where sufficient information was provided in the Plaintiff profile forms to do so.

## CONCLUSION

Contrary to Plaintiffs' claim that their proposed expedited discovery is "narrowly focused," the opposite is true. Instead of concentrating on the issues of product identification, supply chain details, and jurisdiction over foreign entities, Plaintiffs' requests consist of full-

---

[6] As mentioned above, discovery relating to the Court's third preliminary issue, personal jurisdiction and foreign defendants, has been deferred until after the Court rules on Knauf Gyp KG's motion for protective order. September 8, 2009 Order.

-12-

scale discovery, unconfined by the Court's prior directives. Accordingly, the DSC and HSC request that the Court deny Plaintiffs' Motion for Expedited Discovery and, instead:

1) require Plaintiffs to limit their discovery requests and deposition topics to the areas of inquiry of product identification and supply chain information;

2) direct the parties to meet and confer as to how best to expedite discovery on product identification and supply chain;

3) address the scope of jurisdictional discovery after ruling on Knauf Gyp KG's motion for protective order; and

4) leave broader discovery until the ten bellwether plaintiffs are selected, as the Court previously outlined.

Respectfully submitted,

By: /s/ Kerry J. Miller
    Kerry J. Miller (#24562)
    FRILOT L.L.C.
    Suite 3700
    1100 Poydras Street
    New Orleans, LA 70163
    Telephone: (504) 599-8000

    LIAISON COUNSEL FOR DSC

By: /s/ Phillip A. Wittmann
    Phillip A. Wittmann (#13625)
    STONE PIGMAN WALTHER
      WITTMANN
    546 Carondelet Street
    New Orleans, LA 70130
    Telephone: (504) 593-0804

    LOCAL CHAIR OF HSC

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing **RESPONSE OF THE DEFENDANTS' STEERING COMMITTEE AND HOMEBUILDERS' STEERING COMMITTEE IN OPPOSITION TO PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY** has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 21st day of September, 2009.

By: /s/ Kerry J. Miller
Kerry J. Miller (#24562)
FRILOT L.L.C
Suite 3700
1100 Poydras Street
New Orleans, LA 70163
Telephone: (504) 599-8000

LIAISON COUNSEL FOR DSC