UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL | ) | MDL NO. 2047 |
|   PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | SECTION: L |
| | ) | |
| | ) | JUDGE FALLON |
| | ) | MAG. JUDGE WILKINSON |
| _____ | ) | |

**THIS DOCUMENT RELATES TO ALL CASES**

**PLAINTIFFS' STEERING COMMITTEE'S JOINT RESPONSE TO
THE DISTRIBUTOR AND MANUFACTURER DEFENDANTS'
MOTION TO DISMISS OR, ALTERNATIVELY, TO STRIKE
PLAINTIFFS' TORT CLAIMS FOR ECONOMIC DAMAGES**

I.   **INTRODUCTION**

The Plaintiffs' Steering Committee ("PSC") was appointed by this Court to represent all

of the plaintiffs in this multidistrict litigation.  The plaintiffs are assembled pursuant to the June

12, 2009 Transfer Order of the Judicial Panel on Multidistrict Litigation to address the

international scandal posed by the importation from China of drywall that emits smelly,

corrosive gases.[1]  The problem posed by Chinese drywall is recognized to be of immense

magnitude as it affects both  health and home, not simply the economic disappointment of

consumers.  Already the United States Consumer Product Safety Commission has opened an

investigation into the dangers posed by Chinese drywall to the thousands of consumers in the

United States whose health and homes are affected.[2]  A similar investigation is underway

---

[1] *See In re Chinese Drywall Products Liability Litigation,* 626 F.Supp.2d 1346, 1347
(J.P.M.L. 2009).

[2] *See Investigation of Imported Drywall Status Update, September 2009*, available at
http://www.cpsc.gov/info/drywall/sep2009status.pdf

through the auspices of the Florida Department of Health[3]

Before these investigations were begun to confront the ravages and damages caused by the imported drywall, plaintiffs around the country were filing lawsuits asserting claims relating to the negligent creation of household products that emit dangerous, corrosive and noxious fumes. Once these cases were lodged in this transferor court, to expedite these proceedings, by order dated September 10, 2009,  this Court permitted the defendants to file a blanket motion addressing the Economic Loss Rule. That legal doctrine is intended to distinguish between claims sounding in tort and those expressing contractual warranty claims when defective products are found to only injure themselves (an inapposite condition here).

Pursuant to that order, the Distributor defendants filed their motion to dismiss or, alternatively, to strike Plaintiffs' tort claims for economic damages for each Plaintiffs' claim subject to Florida law. That motion was followed by the motion of the Manufacturer defendants, Knauf Plasterboard (Tianjin) Co., Ltd.; Knauf Plasterboard (Wuhu) Co., Ltd.; and Knauf Gips KG only in those cases in which the Knauf entities acknowledge service, i.e., *Morris-Chin v Knauf Plasterboard (Tianjin) Co., Ltd*, 09-4119 and *Vickers v. Knauf Gips KG*, 09-4117. Both the *Morris-Chin* and *Vickers* actions present claims under Florida law only, leaving the Knauf entities in the identical position as the Distributor defendants. Nevertheless, the Knauf entities not only  join in the defendants' motion, but also expand that motion's application by addressing the Economic Loss Rule as it applies in other jurisdictions in which they have been named as

---

[3]*See Hazard Assessment of Copper Corrosion and Air-Conditioner Evaporator Coil Failures Possibly Associated with Imported Drywall*, available at http://www.doh.state.fl.us/environment/community/indoor-air/drywall.html ("The Department of Health is currently identifying and assessing potential human health hazards related to the phenomenon of rapid and recurring corrosion of metals inside homes.").

defendants, but not yet served, *i.e.*, Alabama, Louisiana and Mississippi.

The motions attempt to dismiss legal theories in all Florida cases and elsewhere, but pay no heed to the specific factual allegations within the individual complaints that take these actions outside the ambit of the doctrine.  Generally speaking, as the name of this MDL implies, these complaints address product liability claims relating to defective drywall imported from China. The drywall, which was negligently produced, off-gases noxious fumes that ruin not just the drywall but other property in the plaintiffs' homes.  Plaintiffs exposed to these fumes have alleged that they are at increased risk of developing latent diseases and in need of medical monitoring, or, in many cases, that they have already suffered  personal injuries.[4]   Both allegations of injury to other property and personal injury alter the legal landscape as these damages are recognized exceptions to the Economic Loss Rule.

The plaintiffs are not in direct contractual privity with the manufacturer of their drywall or the distributors of their drywall.  They have properly alleged, nevertheless, both tort and warranty claims against these entities.  Because of the safety concerns created by the defective drywall, plaintiffs' tort claims address publicly created duties, not duties that arise solely out of contractual relations.   Further, once plaintiffs establish that they fall within the two exceptions of the doctrine, the contractual limitations imposed by the Economic Loss Rule are relieved and plaintiffs may recover in tort for all consequential damages resulting from the defective product.

As demonstrated below, the dangers presented by the defendants' defective product coupled with Plaintiffs' allegations suffice to afford them both a contract and tort remedy.

---

[4]This Court concluded that "***personal injuries include claims for*** mental anguish and ***medical monitoring***."  *See* Plaintiff Profile Forms (footnoted asterisk qualifying question "Are you claiming personal injuries?")(emphasis added); Pretrial Order No. 11 (adopting Plaintiff Profile Forms and ordering that they be completed).

## II.   **FACTUAL BACKGROUND**

Plaintiffs filed numerous complaints against distributers and manufacturers in Florida, as well as other jurisdictions addressing their claims related to the defective imported drywall. Plaintiffs fit all manner of descriptions and run the gamut:  some are new homeowners, some are persons that purchased drywall to renovate only parts of their homes.  Defendants do not distinguish amongst the plaintiffs' situations, nor do they account for the factual pleadings in these complaints, whose allegations must be taken as true on a motion to dismiss.[5]

By way of example, Janet Morris-Chin and Dajan Green, in their national class action complaint succinctly stated, "the problems caused by defective drywall are numerous, including

---

[5]In *Riverbend Capital, LLC v. Essex Ins. Co.*,  2009 WL 2408385, *2 (E.D.La. Aug. 4, 2009)(Fallon, J.), this Court announced the appropriate standard of review of a motion to dismiss as follows:

> Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that dismissal is appropriate where the pleader fails to state a claim upon which relief may be granted. "The district court may not dismiss a complaint under rule 12(b)(6) 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir.1997) *(quoting Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The complaint must be liberally construed in favor of the plaintiff, "and all facts pleaded in the complaint must be taken as true." *Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir.1986). "In order to avoid dismissal for failure to state a claim, however, a plaintiff must plead specific facts, not mere conclusory allegations ." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir.2000) (*quoting Tuchman v. DSC Commc'ns Corp*., 14 F.3d 1061, 1067 (5th Cir.1994)). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

damage to other property in the home and adverse health effects on the occupants of the home."
*See* Amended Class Action Complaint ¶5, *Morris-Chin v. Knauf Plasterboard Tianjin Co., Ltd.*,
No. 09-20796 (S.D.FLa.).  This couple purchased their home on November 6, 2006.
Unbeknownst to them, their home contained defective Knauf drywall.  Because of Knauf's
drywall, plaintiffs "experienced damage to their home, fixtures attached thereto, and personal
property contained therein and have suffered adverse health effects as a direct result of the toxic
chemicals emanating from the defective drywall."  *Id.*, ¶30.  As a consequence their home is "in
need of costly remediation."  *Id.*

Similar allegations are set forth in parargraphs 1, 4-5 of the Amended Class Action
Complaint in *Vickers v. Knauf Gips KG*, No. 09-cv-20510 (S.D.Fla.)

In *Allen v. Knauf Gips KG*, No. 2:09-CV-54-Ftm-99-DNF (M.D.Fla.), another Florida
class action complaint, the plaintiffs alleged that:

> The drywall manufactured, processed, distributed, delivered,
> supplied, inspected, marketed, and/or sold by Defendants to build
> the homes of Plaintiffs and the Plaintiff Class Members is
> defective and emits levels of sulfur, methane and/or other volatile
> organic chemical compounds that cause corrosion of HVAC coils
> and refrigerator units, certain electrical wiring and plumbing
> components, and other household items, as well as create noxious,
> "rotten egg-like" odors.  Defendants' defective gypsum drywall
> further causes allergic reactions, coughing, sinus and throat
> infection, eye irritation, respiratory problems and other health
> concerns.  Defendants' drywall was inherently defective and not
> suitable for its intended use.

*Allen* Class Action Amended Complaint ¶2.

Likewise, in *Ankney v. Knauf Gips KG*, No. 2:09-CV-166 (M.D.Fla.), the plaintiffs
asserted a Florida class on the grounds that "Defendants' drywall used in the homes of Plaintiff
and the Plaintiff Class Members is inherently defective because it release sulfide gases and other

chemicals that create noxious, dangerous and "rotten egg-like" odors, and results in severe corrosion and other property damage to air-conditioner and refrigerator coils, microwaves, faucets utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("other property")."  *Id.*, Class Action Complaint ¶1.  The *Ankney* complaint further alleges that plaintiff and the class will incur damages such as "repair/replacement of homes, buildings, damage to other property, any materials contaminated or corroded by the drywall, including incidental and consequential damages, as well as stigma damages."  *Id*., ¶4.  Also, the *Ankney* complaint explicitly alleges that plaintiffs "have suffered harm and/or been exposed to an increased risk of harm" and therefore require environmental and medical monitoring.  *Id.*, ¶5.

Similar allegations to these were asserted by plaintiffs In Alabama.  For example, in *Kokoszka v. Knauf Gips KG*, No. 1:09-CV-00371 (S.D.Ala.), the plaintiffs asserted that their drywall emits Hydrogen sulfide ("H2S"), a broad-spectrum poison, meaning that it can poison several different systems in the body, although the nervous system is most affected.  *Id*., Complaint ¶87.  The toxicity of H2S is comparable to hydrogen cyanide.  *Id*., ¶88.  At low levels, H2S can cause eye irritation, sore throat and cough, nausea, shortness of breath, and fluid in the lungs.  *Id.*, ¶89.  They asserted that as a direct result of the corrosive effect of these sulfide gases, they have suffered and continue to suffer damages, including, but not limited to the costs of  inspection, and to remedy, replace and remove the defective drywall.  *Id.*, ¶93.

In Mississippi, for example, Plaintiffs have asserted virtually identical allegations of noxious fumes emanating from their Chinese drywall that corrodes metals, HVAC systems, refrigerators and other property and causes a variety of personal ailments.  *See e.g, Legendre v.*

*Knauf Gips KG*, No. 1:09-CV-654 (S.D.Miss.), Complaint ¶¶2, 22 & 26; *Gagnard v. Knauf Gips KG*, 1:09-CV-647 (S.D.Miss.), Complaint ¶¶2, 18-19, 41.  As a result of the unreasonable risk to the Plaintiffs' homes, as well as to the health of Plaintiffs, defendants were asserted to be liable for all damages and injuries sustained by the Plaintiffs.  *Gagnard* Complaint ¶60.

Likewise, plaintiffs in Louisiana have asserted similar allegations.  For example, in *Mills v. Knauf Gips KG*, No. 3:09-CV-721 (M.D.La.), plaintiffs asserted claims based on negligence and contractual theories, as well as statutory theories under the Louisiana Deceptive and Unfair Trade Practices Act.  *Id.*, Complaint Count XVII.  Plaintiffs seek all damages available to them under the law.

## III.   ARGUMENT

### A.   The Economic Loss Rule Does Not Bar Homeowners from Recovering Damages Arising out of the Legal Duties Imposed Upon Manufacturers and Distributors in Tort.

The Manufacturer and Distributor defendants mistakenly argue that the Economic Loss Rule limits plaintiffs to recover damages solely based on contractual warranty claims or, alternatively, limits recovery of damages caused by the drywall to other property (televisions and stereos but not their homes) and personal injuries.  These defendants misconstrue relevant case law addressing the doctrine and overstate the reach and purpose of the Economic Loss Rule.  As a matter of law, in Florida, and elsewhere, the Plaintiffs theories of recovery in tort are permissible.

#### 1)   The Maritime Origins of the Economic Loss Rule and Later History

The modern roots of the Economic Loss Doctrine germinated in the United States Supreme Court decision of *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S.

858 (1986).  Therein, the high court confronted the commercial claims of several charterers that had contracted for the construction of several vessels with a shipbuilding company.  The shipbuilding company, in turn, subcontracted with Transamerica Delaval to design, manufacture and supervise the installation of turbines that were to become the propulsion units for each vessel.  When components of the turbines failed aboard one of the ships, other vessels that were still under construction were cannibalized for temporary repair parts.  After final repairs to the first vessel were made with newly designed parts, it was later found that the other vessels with the original parts all shared similar turbine damage.  The charterers thereafter brought suit against the turbine manufacturer in tort for the cost of repairing the turbines and for lost income.

The substantive issue presented in *East River Steamship* was "whether a cause of action in tort is stated when a defective product purchased in a commercial transaction malfunctions, injuring only the product itself and causing purely economic loss."  *Id*. at 859.

The Supreme Court recognized that recovery of damages beyond the malfunctioning product are available in "paradigmatic" products liability actions where safety concerns exist not only where life and limb are at peril but also when to protect against property damage.  *Id.* at 866-67.[6]   The Supreme Court then considered whether the facts presented such a paradigmatic

---

[6]For authority, the Supreme Court referenced *Marsh Wood Products Co.  v. Babcock & Wilcox Co.*, 207 Wis. 209, 240 N.W. 392 (Wis. 1932) and *Genessee County Patrons Fire Relief Ass'n v. L. Sonneborn Sons, Inc.*, 263 N.Y. 463, 189 N.E. 551 (N.Y. 1934).  In *Marsh Wood*, the defendant manufactured a boiler tube that ruptured causing injuries to persons and to property.  The Wisconsin Supreme Court ruled that "where the article, if negligently manufactured, will be imminently dangerous to human safety, the liability should extend to property damage in all cases where a causal connection can be established between the defect which constitutes the article a menace and property damage."  *Marsh Wood*, 240 N.W. at 399.  In *Genessee County*, the defendants's waterproofing preparation caused an explosion that destroyed the tank in which it was applied and damaged other property. The defendant contended it should not be liable for the damage to other property.  The New York Court of Appeals rejected this argument: "To hold
(continued...)

claim.  In answering this question in the negative, the Supreme Court focused on the product at issue – the turbine.  The Supreme Court viewed the turbine as an "integrated package" and referred to each turbine as a "single unit."  Although the plaintiffs were purchasers of complete ships, the Supreme Court deliberately narrowed its focus of the injury to the suspect product.  This perception allowed the court to limit the claim to economic losses because "the injury suffered – the failure of the product to function properly – is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain."  *Id* at 868.

Based upon its evaluation of the operative facts, the Supreme Court weighed the competing jurisprudence then existing regarding the availability of claims in tort for injuries solely to the product itself.  The Court compared the restrictive California case of *Seely v. White Motor Co.*, 403 P.2d 145 (Cal. 1965)(warranty law precludes application of tort liability where only economic harm is manifest) against the expansive New Jersey case of *Santor v. A&M Karagheusian, Inc.*, 207 A.2d 305 (N.J. 1965)(duty to make nondefective products encompassed injury to the product itself).   Although the majority of circuit courts sitting in admiralty agreed with the expansive view espoused by *Santor*, the Supreme Court adopted the *Seely* approach.  *East River*, 476 U.S. at 870.  The Court reasoned that products liability claims and contractual claims should be kept "in separate spheres" so as "to maintain a realistic limitation on damages."

---

[6](...continued)
that an owner of a building injured by an explosion and fire caused by the use of the material could recover for his personal injury but could not recover for the damage to his clothing or the destruction of his building would be anomalous."  *Genessee County*, 189 N.E. at 553.   The intent of these cases proves that once an exception to the Economic Loss Rule is met, then damages are recoverable for all foreseeable injuries, including economic injuries.

Id. at 871.[7]

Thus, the Supreme Court held "that a manufacturer in a commercial relationship has no duty under either a negligence or strict-products liability theory to prevent a product from injuring itself." *Id.* at 871. In siding with the contractual limitations, the Supreme Court emphasized the equal bargaining power of the parties and the availability of warranty claims. Id. at 873 ("a commercial situation generally does not involve large disparities in bargaining power."). Specifically, the Supreme Court stated that, "[c]ontract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements." *Id*. At 872-73.

Numerous states that have considered *East River*, have chosen to permit plaintiffs to assert claims in tort against manufacturers and distributors of defective products recognizing that such entities have a duty to act reasonably in the design, manufacture, and sale of products that will become incorporated into residential property. These courts have found that where mass produced products that are integrated into residential properties that cause damage to other parts of the home, those responsible for putting the products into the stream of commerce should be held accountable for the resulting damages caused by their products. For example, in *Jimenez v.Superior Court*, 29 Cal.4th 473, 485 (Cal. 2002), the California Supreme Court recognized that "manufacturer of a defective window installed in a mass-produced home may be held strictly liable in tort for damage that the window's defect causes other parts of the home in which it is installed." Similarly, *Loughridge v. Goodyear Tire & Rubber Co.*, 192 F.Supp.2d 1175, 1183-84

---

[7]Ironically, that the Supreme Court would also lack admiralty jurisdiction for breach of warranty claims, although mentioned in a footnote, is never overtly weighed as a factor in the court's decision to limit such claims to warranty. *Id.* at 872 n. 7.

(D.Colo. 2002), the court ruled that the manufacturer of defective hoses used for radiant floor heating should be subject to claims for strict liability based upon Section 402A(1) of the Restatement (Second) of Torts and also because "the hoses did not become part of the realty for purposes of the inquiry."

The PSC submits that this Court should also be informed by the treatment other courts have afforded product liability cases involving asbestos. Asbestos is a product similar to Chinese drywall in that it threatens health and damages other property. In numerous asbestos cases, the economic loss rule does not present itself as a bar to plaintiffs' tort claims. In the following asbestos cases plaintiffs sought reimbursement for the removal or encapsulation of the asbestos, a building material like CDW incorporated into the building. Asbestos suppliers in these cases argued that the plaintiff suffered only an economic loss, *i.e.*, repair, removal or encapsulation of the defective product. In the unique circumstances of asbestos cases, courts have often held that the economic loss rule does not apply and that the plaintiff may recover in tort for the removal of asbestos. The unique circumstances and reasoning of these courts apply here as well. The courts in the asbestos cases employed the rationale that asbestos contaminates or "harms" "other property" in the building, such as furniture, carpeting and drapes, and that the asbestos currently causes personal injury to the plaintiff and other occupants. *See, e.g., City of Manchester v. National Gypsum Co.,* 637 F. Supp. 646 (D.R.I. 1986) (placement, removal and replacement of asbestos products causing damage to 16 schools and other public buildings); *Town of Hooksett Sch. Dist. v. W.R. Grace & Co.,* 617 F. Supp. 126 (D.N.H., 1984) (plaintiff alleging that asbestos fibers contained in the defendant's product -- insulation -- were released into the school's atmosphere thus contaminating the air, the carpeting, the curtains, other school

furnishings, personnel and occupants); *County of Johnson v. United States Gypsum Co.,* 580 F. Supp. 284 (E.D. Tenn. 1984) (mining, manufacturing and selling of products containing asbestos used in construction of school causing damages); *Kershaw Cty. Bd. of Educ. v. United States Gypsum Co.,* 396 S.E.2d 369, 371 (S.C. 1990) (asbestos in school ceiling tile damaging other property of the plaintiff); *Tioga Public School Dist. #15 v. United States Gypsum,* 984 F.2d 915, 919 (6th Cir. 1993 (ELR not a bar to school district recovering in tort from plaster manufacturer the cost of removing asbestos-containing plaster; risk of devastating injury to those exposed is best distributed to the seller or manufacturer); *Greenville v. W.R. Grace & Co.,* 827 F.2d 975 , 978 (4th Cir. 1987) ("By contrast, the injury that resulted from the installation of Monokote in this case is the contamination of the Greenville City Hall with asbestos fibers, which endanger the lives and health of the building's occupants. In our opinion, this is not the type of risk that is normally allocated between the parties to a contract by agreement, unlike the risk of malfunctioning turbines at issue in East River or the risk of faulty roofing shingles involved in Watermark.").  It is the unique lingering dangers of asbestos, like the ongoing emission of sulfide gasses from Chinese drywall, that provides the exception for defendants' drywall.

Against these facts and circumstances, the defendants seek to impose the Economic Loss Rule upon the plaintiffs who lacked equal bargaining power and had no opportunity to contract

for different warranty rights in Florida, Alabama, Mississippi and Louisiana.[8]   The law of each

jurisdiction is addressed below with the reasons why these motions to dismiss are without merit.

      **B.**     **The Economic Loss Rule Does Not Bar Plaintiffs' Claims Under Florida Law**

          **1.**     **Plaintiffs' Strict Liability Claim is not Barred by the Economic Loss Rule Because Plaintiffs Have Alleged Some Modicum of Physical Injury and Damage Caused to Other Property by Banner's Defective Drywall.**

The "economic loss doctrine" is a judicially created doctrine that was originally adopted

by the Supreme Court of Florida in its seminal opinion of *Florida Power & Light Co. v.*

*Westinghouse Elec. Co.*, 510 So.2d 899 (Fla. 1987).  The economic loss doctrine was recently

fully re-examined in *Indemnity Ins. Co. of North America v. American Aviation, Inc*., 891 So.2d

532, 536 (Fla. 2004) on certified questions from the United States Court of Appeals for the

Eleventh Circuit due to "confusion about the scope of this doctrine."  *See Indemnity Ins. Co. of*

*North America v. American Aviation, Inc*., 344 F.3d 1136 (11th Cir. 2003).  Therein, the plaintiff

owner of an airplane and its insurer sued its mechanic for damages to the airplane that resulted

from the faulty repair of the plane's landing gear.  The claim involved negligent maintenance

---

[8]The court in *In re Asbestos School Litigation,* 1991 WL 155231, *5 (E.D.Pa. Aug. 7, 1991), also recognized that the ability to negotiate contractual warranties presented questions of fact that precluded dispositive rulings:

> Plaintiffs assert facts and claims establishing that they were prevented, by Kaiser Cement and other defendants, from bargaining at arms-length and setting the terms of their agreement with respect to the use and the effects of asbestos-containing materials in construction. Under such a scenario, the availability of tort recovery does not threaten to swallow the economic loss doctrine but instead provides and appropriate avenue for relief in light of the possibility that no arms-length "bargain" ever took place.

and inspection of the plane. The Supreme Court of Florida ruled that the plaintiffs' claims did not involve an action against the manufacturer or distributor for economic losses and therefore the Economic Loss Rule was inapposite.  *Id*. 891 So.2d at 541.  To make that ruling the court found that the Economic Loss  doctrine "bars a negligence action to recover solely economic damages only in circumstances where the parties are either in contractual privity or the defendant is a manufacturer or distributor of a product, and no established exception to the application of the rule applies."  *Id*., 891 So.2d at 534.  The high court examined the two distinct types of claims, *i.e.*, the Contractual Privity Economic Loss Rule and the Products Liability Economic Loss Rule.[9]  As to the Products Liability application, the Court found the doctrine germane only in instances when a defective product does cause damages to the product but causes no personal injury or damage to other property.  *Id*.

In contrast to *Indemnity Ins.*, the defendants focus principally on the much criticized decision of *Casa Clara Condominium Ass'n v. Charley Toppino and Sons, Inc.*, 620 So.2d 1244 (Fla. 1993)(a 4-3 decision, accompanied by a well reasoned dissent).  Therein, the plaintiff homeowner sought to enhance its contractual claims by asserting negligence theories against a builder supplier of defective concrete.  The Supreme Court of Florida found that "[t]he homeowners are seeking purely economic damages – no one has sustained any physical injuries and no property, other than the structures built with [defendant's] concrete, has sustained any damage."  *Id*. at 1246.  With this fact pattern established, the court applied the economic loss

---

[9] Regarding the Contractual Privity Economic Loss Rule, the Florida Supreme Court observed that, "the prohibition against tort actions to recover solely economic damages for those in contractual privity is designed to prevent parties to a contract from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort." *Id.*, *citing Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So.2d 490, 494 (Fla. 3d DCA 1994).

rule, "which prohibits tort recovery when a product damages itself, causing economic loss, but does not cause personal injury or damage to any property other than itself." *Id*. The court further rejected the plaintiff's arguments that characterized their loss into components of the home, as opposed to the home in its entirety. *Id*. at 1247.[10] This identical reasoning was adopted by the court in *Fishman v. Boldt*, 666 So.2d 273 (Fla. 4th D.C.A. 1996). From these and other equal vintage opinions pre-dating *Indemnity Ins*., the defendants contend that damage to other components integrated into a single unit are not considered damage to "other property" under Florida law.[11]

Following *Casa Clara*, the Supreme Court of Florida had another opportunity to revisit the economic loss doctrine in a case where a lessee sued its lessor for damages caused to computers stored in the leased premises during renovations conducted by the lessor. *See Comptech Intern., Inc. v. Milam Commerce Park, Ltd.*, 753 So.2d 1219 (Fla.1999). Therein the Supreme Court criticized the *Casa Clara* opinion and other decisions as presenting "the danger in an unprincipled extension of the rule." *Id*. at 1225. The Court was especially critical of the *Casa Clara* court's expansive interpretation of the term "other property" and suggested that "the

---

[10]The majority held: "Generally, house buyers have little or no interest in how or where the individual components of a house are obtained. They are content to let the builder produce the finished product, *i.e*., a house. These homeowners bought finished products--dwellings--not the individual components of those dwellings. They bargained for the finished products, not their various components. The concrete became an integral part of the finished product and, thus, did not injure "other" property." *Id*.

[11]None of the post-*Indemnity Ins*. cases cited by the Defendants address the Products Liability Economic Loss Rule and are therefore inapposite. *See Curd v. Mosaic Fertilzer, LLC*, 993 So.2d 1078 (Fla. 2d DCA 2008)(fishermen without contractual privity or defective product, claiming economic damages to natural resources (fish), not to any damage to property of the fisherman); *Cessna Aircraft Co. v. Avior Technologies, Inc.*, 990 So.2d 532 (Fla. 3d DCA 2008)(professional negligence claim); and *North Atlantic Marine, Ltd. V. Sealine Int'l, Ltd.*, 2007 WL 5298433 (S.D.Fla. March 29, 2007)(Contractual Privity Economic Loss Rule claim).

15

economic loss rule cannot be used as a barrier to legitimate causes of action." *Id*. at 1225-26.
With this backdrop in place, the court determined that the computers were "other property" and
found the plaintiffs' claim fit within the exception to the economic loss doctrine.

Most recently, in the *Indemnity Ins*. case, the Supreme Court of Florida agreed "that the
economic loss rule should be expressly limited," to two principles.  *Id.* 891 So.2d at 542.  First,
the Supreme Court adverted to the original intent of the doctrine that it should limit recovery
"when the parties have negotiated remedies for nonperformance pursuant to a contract."  *Id*.[12]
Second, the court reaffirmed the original rational of economic loss doctrine expressed in *East
River, Seely* and *Florida Power* with the following caveat: "However, we expressly note that the
"other property" exception to the products liability economic loss rule remains viable."
*Indemnity Ins.,* 891 So.2d at 543.  In so doing, the Court gave no credence to *Casa Clara*.
Instead, it referenced *East River, supra*; *Comptech, supra,* and *Southland Construction, Inc. v.
Richeson Corp*., 642 So.2d 5 (Fla. 5th D.C.A. 1994), the last being a case at odds with *Casa
Clara*'s interpretation of other property.[13]  The *Indemnity Ins*. Court described the facts of

_____

[12]Assuming the intent of the Florida Supreme Court was to return the Economic Loss
Rule to its original rationale, then it most assuredly should not be employed outside the context
of commercial entities, especially to homeowners.  *See, e.g., Mt. Lebanon Pers. Care Home v.
Hoover Universal, Inc.*, 276 F.3d 845, 852 (6th Cir. 2002) (sophisticated business entities have
"the knowledge, skill, and resources to develop and operate" complex commercial ventures
while "most home-buyers do not have the expertise to ensure that the products used in building
the home are defect-free…").

[13]*See also St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.*, 2007 WL 397047
(S.D.Fla. Feb. 1, 2007).  In that case a third- party plaintiff sued third-party defendant for
damage allegedly caused to a ship that sank when maintenance and repair services were
negligently performed on other proximately located property.  The third-party plaintiff
contended that third-party defendant's actions while servicing the air conditioner caused damage
to the entire vessel.  The only product discussed in the parties' express or implied agreement was
the air conditioning system.  In that case, the Court found that the air conditioner was the

(continued...)

*Southland* thus: "concluding that "other structures" not involved in the building project that were damaged by the failure of the retaining wall, *i.e.*, the adjoining pool deck and a different wall, were other property."

In contrast to the facts asserted by the plaintiffs in *Casa Clara* or *Fishman*, the Florida plaintiffs, in line with *Comptech* and *Southland*, have asserted far more extensive damage to other property in the plaintiffs' homes.  The fumes emitted from the defective drywall supplied by the Distributors and Manufacturers corrodes metal not just in the tubing, wiring and receptacles of plaintiffs' homes (which components would fall under the *Casa Clara* rubric but not the *Southland* rubric), but in the air conditioner coils servicing the homes and other property used inside plaintiffs' homes (*e.g.*, refrigerator coils, microwaves, utensils, computers and electronic appliances such as stereo equipment and televisions).  As the plaintiffs have expressly alleged damage to "other property," Defendants can not maintain their restrictive definition regarding component parts.

Defendants' argument attempts to extend the *Casa Clara* component rubric beyond any realistic limitation.  In *Casa Clara*, the court was attempting to create a self-defined defense against the unwarranted extension of contractual damages into the tort realm.  The court sought to prohibit a plaintiff from circumventing the contractual relationship by bringing an action in tort.  But the bounds imposed by the Supreme Court of Florida recognized that a tort remedy must be made available when the supplier of a product breaches the fundamental "duty of

---

[13](...continued)
"product" at issue in the contract and the remainder of the vessel was the "other property."  *Id.* at
*3. Since damage occurred to the "other property," the third-party's negligence claim was not
barred by the economic loss rule and it was entitled to bring a tort action against the third-party
defendant for recovery of the damage suffered to the entire vessel.

reasonable care [which] thereby encourages citizens to avoid causing physical harm to others."
*Casa Clara*, 620 So.2d at 1246.  Because *Casa Clara* contemplated tort claims like those
evident here, Defendants' attempted extension of the *Casa Clara* component rubric is unfounded
(both legally and factually).  *See* discussion *supra* at 11-12.  Indeed, the Supreme Court of
Florida has endorsed less restrictive interpretations of "other property" in cases factually
approaching this case.  *See Indemnity Ins., supra.*

Moreover, plaintiffs have also alleged a physical injury aspect to the damage caused by
the defective drywall.  Plaintiffs have alleged exposure to the sulfide gases emitted by the
defective drywall, which gases are proven hazardous, dangerous or toxic substances.  This
exposure has placed plaintiffs at a significantly increased risk of contracting a serious latent
disease that may be prevented by timely diagnostic surveillance or actual physical injury to
plaintiffs.  These alleged facts, however, must be taken as true.  When viewed in their best light,
these allegations present a clear exception to the *Casa Clara* rubric and under Florida law, once
within the exception, plaintiffs are entitled to all damages, consequential or otherwise,
reasonably necessary to "compensate the plaintiff for loss and return him to the position he
occupied before the injury."  *East River*, 476 U.S. at 873 n.9.

Accordingly, Plaintiffs' Complaints allege facts that place their claims into the exception
to the economic loss doctrine. Defendants' motion to dismiss for failure to state a claim is
without merit and should be denied.

> **2.    Under Florida Law, Plaintiffs' Allegations Addressing the Smelly,
> Corrosive Off-Gassing from Defendants' Drywall State Causes of
> Action for Negligence and The Deceptive and Unfair Trade Practice
> Act that are Independent of the Economic Loss Rule.**

In *Indemnity Ins*., the Florida Supreme Court reaffirmed that other exceptions to the

Products Liability Economic Loss Rule exist. Claims where duties arise independent of any

contractual relation, such as those for professional malpractice, fraudulent inducement, negligent

misrepresentation or freestanding statutory claims are not affected by the Economic Loss Rule.

*Indemnity Ins*., 891 So.2d at 543. *See also Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.,*

693 So.2d 602, 609 (Fla 2d DCA 1997)("In administering the FDUTPA, courts do not have the

right to limit and, in essence, to abrogate, as the trial court did in this case, the expanded

remedies granted to consumers under this legislatively created scheme by allowing the judicially

favored economic loss rule to override a legislative policy pronouncement and to eliminate the

enforcement of those remedies.").

      In *Florida Specialty, Inc. V. H 2 Ology, Inc*., 742 So.2d 523 (Fla. 1ˢᵗ DCA 1999), the

court denied a motion to dismiss based upon the Products Liability Economic Loss Rule.

Therein, the plaintiff claimed damage to leased vehicles based upon the effects of defendant's

corrosive product. The court rejected the defendants' argument based upon the Economic Loss

Rule, as follows:

> Under the facts alleged in the present complaint, the tort, negligent
> discharge of a corrosive substance, is completely independent of
> the contract for lease of three motor vehicles from Nimnicht to
> Florida Specialty. Moreover, appellees and appellants here did not
> have a commercial or contractual relationship that would give rise
> to the type of economic expectations worthy of protection under
> the economic loss rule. *See Florida Power*, 510 So.2d at 901. We
> find no rationale for application of the economic loss rule in this
> case.

*Id*. at 527.

      Thus, it appears that claims for negligent discharge of a corrosive substance is a claim

recognized to give rise to a duty that is independent of the Economic Loss Rule. Plaintiffs in

every action have asserted facts that support this theory, *i.e.,* that the smelly corrosive gases emitted from Defendants' drywall has caused both property damage and personal injury or exposure to dangerous substances.

Accordingly, the Economic Loss Rule can not act as a bar to preclude plaintiffs' claims in these circumstances.

**C.     The Economic Loss Rule Does Not Bar Plaintiffs' Claims Under Alabama Law.**

Alabama recognizes the Economic Loss Rule in common law tort claims involving commercial entities.  In *Vesta Fire Insurance Corp., v. Milam & Company Const., Inc.*, 901 So.2d 84 (Ala. 2004), the Supreme Court of Alabama set forth the doctrine thus: "The economic loss rule prevents tort recovery when a product damages itself, causing economic loss, but does not cause personal injury or damage to any property other than itself." *Id*. at 106-07, *citing, Lloyd Wood Coal Co. V. Clark Equipment Co.*, 543 So.2d 671 (Ala. 1989).   At issue in *Vesta Fire* was the question of whether the electrical work of the defendant caused a fire to a *commercial* building.  Because of spoliation, whether a product was the cause of the fire was indeterminate and the court concluded that judgment for the defendant was not permitted.

In the earlier *Lloyd* case, the plaintiff coal company sued the manufacturer of a front-end loader that malfunctioned, burned and was substantially damaged.  No person was injured or other property damaged.  *Lloyd*, 543 So.2d at 672.  The manufacturer argued that the Economic Loss Rule should apply.  The *Lloyd* court recognized the rule but appears to have limited its application only to disputes between commercial entities with equal bargaining power.  In particular the court noted that the product "was for commercial use, as opposed to consumer use." *Id.*  In addition, the court looked to *East River, supra*, which spoke only in terms of

commercial users.  *Id*. at 673, *quoting East River*, 476 U.S. at 870.  The Alabama Supreme Court

was fixated on the absence of damage to any person or other property and noted, "[o]f course, an

action in tort would have arisen had there been personal injury or damage to property other than

the product itself."  *Id.* at 674.[14]

Following both *Vesta* and *Lloyd*, in another litigation involving only commercial entities,

the Crum Construction Company sued in tort the manufacturer of a roofing system and the

manufacturer's representative claiming that the roof leaked in a building it was constructing.  *See*

*Crum v. Johns Manville, Inc.*, 2009 WL 637260 (Ala.App.Ct. March 13, 2009).  The court

rejected the Economic Loss Rule defense:

> In the present case, the allegations of the amended complaint do
> not foreclose the possibility that the Crum plaintiffs could prove a
> set of facts in support of their claims that would allow them to
> recover damages for injuries to property other than the roofing
> system, especially when it is considered that one of the allegations
> of the amended complaint is that the roofing system leaked. We
> can easily envision evidence indicating that the alleged leaks
> caused damage to other parts of the Crum plaintiffs' building or to
> the personal property contained therein. As such, the
> economic-loss rule does not support dismissal of the wantonness
> claim.

*Id.* at *6.

As the Alabama claimants are not commercial entities, the economic loss defense

presented by the defendants is improper.  Even if the defendants were able to avoid the rulings of

the *Vesta* and *Lloyd*, however, their argument that the integration of the drywall into plaintiffs'

homes makes it impossible to distinguish damage between the home and its components fails

under *Crum*.  The Economic Loss Rule defense is invalid under Alabama law.

---

[14]*Bay Lines, Inc. v. Stoughton Trailers, Inc.*, 838 So.2d 1013 (Ala. 2002), relied upon by
defendants, was also a case involving only commercial entities.

**D.     The Economic Loss Rule Does Not Bar Plaintiffs' Claims**
**        Under Mississippi Law.**

Defendants assert that under Mississippi law Plaintiffs cannot recover for economic

losses caused by their defective drywall.  To support their argument Defendants cite three

Mississippi cases where the plaintiffs suffered only economic losses.  In *Lee v. General Motors*

*Corp.*, 950 F. Supp. 170 (S.D. Miss 1996), the plaintiffs sought solely economic damages for

GM lowering the standards on the roofs of their Blazers. The plaintiffs sustained no personal

injuries and had no accidents. *Id.* at 172.  While the Mississippi Supreme Court had not, and still

has not, addressed this issue, the Southern District of Mississippi made an <u>Erie</u> guess and held

that there is no remedy under negligence and/or strict liability in tort for damages that are solely

economic in nature.  *Id.* at 174.

In *State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 736 So.2d 384 (Miss. Ct. App.

1999), plaintiff's only damages were economic damage to the product itself, there were no

personal injuries or damage to other property.   The economic loss doctrine bars claims under

strict liability and negligence when the only damage is to the product itself.  *Id.* at 387.  The

court noted that Mississippi's products liability statue does not define 'commercial damage to

the product itself,  yet this is presumed to mean damages caused by the product itself that

adversely affects the product's monetary value, the type of recovery that is considered beyond

the scope of the state's product liability law of torts  *Id.* at 388.

In *Progressive Ins. Co. v. Monaco Coach Corp.*, 2006 WL 839520, *2 (S.D. Miss. 2006),

the plaintiff's claim, again, was for economic loss only; the plaintiff did not allege any personal

injury.  The court distinguished claims of individual consumers with physical injuries from

consumers who suffer only economic damages and dismissed Progressive's strict liability and

defect claims "under the economic loss doctrine ***because*** of the absence of any personal injury resulting from the alleged defect." Id at *2 and *5 (emphasis added).

Because Plaintiffs in this case are alleging far more than damage to the product itself (the drywall) and are also alleging present personal injuries related to the sulfide gases emitted from the drywall, their claims do not fall under the exclusion of Mississippi's economic loss doctrine.

### E.    Louisiana Does Not Recognize The Economic Loss Rule.

Tort liability in Louisiana stems from Civil Code Article 2315, which provides for full reparation.[15]  Under the Louisiana Products Liability Act, damages "includes damage to the product itself and economic loss arising from a deficiency in or loss of use of the product" to the extent that such recovery for damage or economic loss is not provided for under the law of Redhibition,[16] which imposes on a "good faith" seller the responsibility to repair, remedy or correct the defect,[17] and imposes upon a manufacturer or "bad faith" seller liability for "the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for preservation of the thing, and also for damages and reasonable attorneys fees."[18]  *See generally, Aucoin v. Southern Quality Homes, LLC,* 984 So.2d 685, 691-693 (La. 2008) (a manufacturer is independently liable to the

---

[15]*See, e.g., Brookshire Bros. Holding v. Total Containment, Inc*., 2007 WL 184600, at *7 (W.D.La. Jan. 18, 2007) (rejecting application of the economic loss rule to Louisiana claims, as "Louisiana provides for full recovery and full reparation for a plaintiff under Louisiana's Civil Code Article 2315"); LA. CIV. CODE ART. 2315 ("Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it").

[16]LA. REV. STAT. 9:2800.53(5).

[17]LA. CIV. CODE ART. 2531.

[18]LA. CIV. CODE ART. 2545.

purchaser for rehibitory defects that existed at the time of delivery to the seller);  *Tucker v. Petroleum Helicopters, Inc.,* 2008-1019 (La. App. 4th Cir. 3/23/2009), 9 So.3d 966, 973 ("this Court does not see where *East River* or any of its progeny preclude recovery in a Louisiana court for a redhibition claim which is a warranty based claim"); *Dawson Farms, LLC v. BASF Corp.*, 2008 WL 5220517, *1-2 (W.D.La. Dec. 12, 2008)('The LPLA was intended to preserve, and not displace claims in redhibition").[19]  Plaintiffs suspect that the comment to the choice-of-law provision relied upon by Defendants reflects a perception of the law in other states, rather than a commentary on the law in Louisiana.  Nevertheless, and in any event, Louisiana does not recognize the economic loss doctrine.  Accordingly, the Economic Loss Rule defense is without merit in Louisiana.

## IV.   CONCLUSION

For the reasons set forth above, the Distributor and Manufacturer's motions to dismiss or, alternatively, to strike plaintiffs' claims for economic damages should be denied.

---

[19]Indeed, facing the same argument,  Judge Englehardt was "unwilling to conclude that plaintiffs have no remedy for economic loss damages in Louisiana."  *In re FEMA Trailer Formaldehyde Products Liability Litigation*, 2008 WL 5217594, *18 (E.D. La. Dec. 12, 2008).

Respectfully submitted,

Dated:  October 21, 2009

s/Leonard A. Davis
Russ M. Herman, Esquire
Leonard A. Davis, Esquire
Stephen J. Herman, Esquire
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin (On the Brief)
Fred S. Longer (On the Brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Victor Manuel Diaz
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
vdiaz@podhurst.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
 Matthews, Martinez, Gonzales,
 Kalbac & Kane
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Bruce William Steckler
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W
Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Jeremy W. Alters
Alters, Boldt, Brown, Rash & Culmo, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@abbrclaw.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 21th day of October, 2009.

/s/ Leonard A. Davis
Leonard A. Davis
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Ave.
New Orleans, LA  70113
PH:  (504) 581-4892
Fax:  (504) 561-6024
ldavis@hhkc.com