# Exhibit D

**HERMAN, HERMAN, KATZ & COTLAR**
L.L.P.
Attorneys at Law

820 O'KEEFE AVENUE, NEW ORLEANS, LOUISIANA 70113-1116
TELEPHONE: (504) 581-4892    FACSIMILE: (504) 561-6024
HTTP://WWW.HHKC.COM

Harry Herman (1914-1987)
Russ M. Herman*
Maury A. Herman*
Morton H. Katz*
Sidney A. Cotlar*
Steven J. Lane
Leonard A. Davis*
James C. Klick†

Stephen J. Herman
Brian D. Katz
Soren E. Gisleson

Joseph E. Cain
Jennifer J. Greene‡
John S. Creevy
Jeremy S. Epstein†
Edmond H. Knoll
Joseph A. Kott, M.D. J.D. (Of Counsel)

Offices in New Orleans and
Covington, Louisiana

* A Professional Law Corporation
† Also Admitted in Texas
‡ Also Admitted in Arkansas

This Firm and its Partners Are Also
Partners in Herman Gerel, LLP (Formerly
Herman, Mathis, Casey, Kitchens & Gerel, LLP)

October 14, 2009

*VIA E-MAIL*

Honorable Eldon E. Fallon
c/o United States District Court
Eastern District of Louisiana
500 Poydras Street
Room C456
New Orleans, LA 70130

RE: *In re: Chinese-Manufactured Drywall Products Liability Litigation*
**MDL 2047**

Dear Judge Fallon:

I am writing on behalf of the Plaintiffs' Steering Committee (PSC) in response to the October 9, 2009 letter submitted by the Defense Steering Committee (DSC) and Homebuilders' Steering Committee (HSC) (collectively herein, "Defendants"). In their letter, Defendants have raised concerns regarding the PSC's proposed preservation order and requests relating to the format in which Defendants should produce relevant materials. As explained below, Defendants' objections are largely illusory and seem intended to delay discovery in this action.

As an initial matter, the PSC reminds the Court that it first served discovery requests on Defendants on September 2, 2009. These included Requests for Production of Documents to Manufacturer Defendants, Builder Defendants, Builder/Supplier/Retailer Defendants, Installer/Contractor Defendants and Importer/Exporter/Broker Defendants. These requests explicitly sought production in native format and also requested a meet and confer with Defendants to address any production issues. No Defendant contacted us. Plaintiffs' subsequent requests to meet and confer on our requests and the format of production were ignored by Defendants. Indeed, Defendants refused to meet with Plaintiffs to discuss our Requests for Production at all until ordered to do so by the Court, at the September 24, 2009 status conference. Even then, some Defendants elected not to participate in the meet and confer that occurred the following day, on September 25, 2009 in Miami. At the meet and confer, virtually all of the participating Defendants agreed to

October 14, 2009
Page 2

provide written responses to the PSC's requests and to commence production by October 9, 2009. Notably, as of the date of this letter, none of the Defendants have provided any response to our requests. Further, Defendants did not provide any objections to the PSC's native format production request until a teleconference on September 30, 2009, nearly 4 weeks after our initial requests were made. Defendants now propose that the format of production needs to be negotiated separately with each party.

In addition, on September 2, 2009, the PSC noticed a number of 30(B)(6) depositions. These included the following Defendants:

1. La Suprema Enterprise, Inc.
2. La Suprema Trading, Inc.
3. Banner Supply Company
4. Black Bear Gypsum Supply, Inc.
5. Independent Builders Supply Association, Inc.
6. Interior/Exterior Building Supply, LP
7. L&W Supply Corporation d/b/a Seacoast Supply
8. Smoky Mountain Supply, Inc. d/b/a Emerald Coast Building Materials
9. Venture Supply, Inc.
10. Porter-Blaine Corp.

Plaintiffs respectfully submit that Defendants' "eleventh-hour" objections are merely transparent attempts to delay document productions and 30(b)(6) depositions, and that such gamesmanship should not be permitted. The Defendants' position that we negotiate document production format on a Defendant by Defendant basis (which likely will total in very many different formats) adds support to Plaintiffs' demand that documents be produced in the native format, as that limits the number of formats the Plaintiffs will have to deal with. With respect to the specific arguments raised in Defendants' October 9, 2009 letter, the PSC responds as follows:

## Production of Electronically-Stored Information (ESI) and Hardcopy Documents

In their letter, while Defendants agree that a uniform protocol for the preservation of hardcopy documents and ESI is warranted, they object to any uniformity in the *production* of documents, arguing that such a protocol would "disregard any given defendant's document management system or sophistication." Def. Ltr. At 2. This objection is a red-herring, in that it blatantly ignores the plain-language of Plaintiffs' request. For example, as stated in the PSC's letter to Your Honor dated October 1, 2009, Plaintiffs' have requested that productions be made in the following format:

October 14, 2009
Page 3

1. For documents that originally existed in hardcopy format and where an individual defendant does not intend to convert them into an electronic format for their own review, we ask they copies of such documents be produced to Plaintiffs;

2. For documents that originally existed in hardcopy format and where an individual defendant has converted, or intends to convert, such documents into an electronic format for their own review, Plaintiffs also wish production in an electronic format;[1] and

3. For documents that originally existed in electronic format, Plaintiffs request production of such material in its native format (e.g., if a document was created and saved as a Word file, a defendant should provide Plaintiffs with a copy of that Word file).

The PSC is only requesting that each individual defendant produce relevant materials in the same format in which they created and stored them in the ordinary course of business, which is consistent with the Federal Rules. Where Defendants have undertaken the conversion of hardcopy documents into an electronic format, we simply ask that they provide copies to Plaintiffs in a standardized format. There is no significant burden to Defendants in having to provide electronic copies of documents that already exist in electronic form, particularly where the PSC has requested such materials in native format. Indeed, the FRCP contemplates production of electronically stored information in an electronic format. FRCP 34(b). Nor is there a burden in having to provide load files for electronic documents to the extent any existing load files are not compatible with Plaintiffs document review systems. This is a typical task performed in every litigation involving the production of electronically stored information. Indeed, most vendors that provide copy services, can also scan hardcopy documents and create OCR and load files for the electronic images.

Notably, Defendants have made no showing that the PSC's format requests fail to account for an "individual defendant's document management system or sophistication." Producing documents in native format clearly avoids any problems in that regard. Presumably, Defendants refer to smaller entities who may not keep documents electronically or who may not have formalized back-up systems. Such defendants merely need to make copies of their documents or alternatively, any hard-drives or storage systems that contain electronic files. Indeed, at the September 25, 2009 meet and confer, many of the smaller entities indicated that they had only a few boxes of documents.

---

[1] Pursuant to that request, Plaintiffs have asked that such productions be made in a standard format typically used in litigations where hardcopy documents have been converted to an electronic format. Thus, we have requested TIFF images of the hard copy documents, complete with load files, as well as objective coding (e.g., Date, Author, Recipient) and OCR files that will enable Plaintiffs to properly organize and search the document productions. Similar productions have been made in other recent MDL litigations, including Vioxx, Propulsid, Gadolinium, and Fosamax.

October 14, 2009
Page 4

During a meet and confer call on September 30, 2009, DSC representatives suggested that some Defendants may only elect to produce documents for inspection. Plaintiffs respectfully suggest that given the large number of parties in this action, such a protocol will be inefficient and will create significant delays at a time where we are only 3 months away from trial.[1] Plaintiffs submit the more prudent course is to require Defendants to produce responsive materials as requested by the PSC, particularly where Defendants did not raise any objections to Plaintiffs' requests until weeks after discovery was served.[2] At a minimum, such an order will insure consistency in the format of production and all parties expectations as to what their respective obligations are. Indeed, in the event a party genuinely believes it is unable to comply with Plaintiffs' format of production requests, it should be prepared to make a good faith showing on an expedited basis to the Court as to why it is unable to do so and why an alternative format is required.

## Investigation Into Preservation

During the September 30, 2009 meet and confer with Defendants, PSC representatives sought assurance that relevant materials have been preserved, as the parties had not yet reached agreement on a preservation protocol relating to hardcopy documents and electronic information. Defendants also argue that they should not have to verify that they have preserved relevant materials in this litigation, arguing that such an inquiry is a "fishing expedition." While it is true that the three defense lawyers participating in the meet and confer could not respond on behalf of parties they do not represent, it is telling that they also refused to respond on behalf of their own clients. FRCP 26(g) requires an attorney to certify that their disclosure is complete. The Defendants' failure to affirm that the proper "litigation hold" procedures have been undertaken is curious. The Sedona Principles, Second Edition, Best Practices Recommendations & Principles for Addressing Electronic Document Production, Section 3, Comment 3.a. states "Early discussion of issues relating to the preservation and production of electronically stored information may help reduce...motions involving the failure to preserve relevant information." By the Defendants' failure to engage in <u>any</u> discussion in this regard is a clear violation of these principles. Thus, to date, the PSC does not know if <u>any</u> Defendant has preserved relevant materials in accordance with PTO 1. Plaintiffs' request is simple. Each Defendant should verify that they have preserved relevant materials. If they are unable to do so, then targeted and expedited discovery is required to avoid further spoliation and the Court should allow such discovery to immediately proceed, in addition to any other discovery.

---

[1] For example, Plaintiffs anticipate that manufacturer productions will need to be reviewed by PSC representatives, as well as multiple defendants. Coordinating several reviews will be far more time consuming than simply producing electronic copies of the files at issue.

[2] Plaintiffs anticipate that some Defendants, having ignored Plaintiffs format of production request, may have collected documents and had them converted to another format. The Federal Rules make clear, that where a responding party ignores such request and fails to provide written objections and a description of its intended production format, it does so at its own peril. *See* Fed. R. Civ. P. 34(b), Notes for the 2006 Amendment.

October 14, 2009
Page 5

### Production of ESI in Native Format

Defendants also object to production of ESI in native format, providing 4 bases for their objections: 1) Native production will create delay; 2) native files are "difficult or impossible" to redact or Bates number; 3) Metadata that accompanies native files lack evidentiary value because it is not relevant; and 4) Production in native format may cost defendant millions of dollars. As explained below, such claims are without merit.

Native production need not create delay, nor are native files difficult or impossible to redact or mark with unique identifiers. Native file production simply requires the copying of electronic files. Such files can be marked with a unique identifier, such as a hash mark, that is far less expensive and time-consuming than Bates numbering, and can be accomplished using commercially available software that is utilized by numerous third-party vendors that specialize in document productions. *See* Tom O'Connor, *Bates Stamps' Days May Be Numbered*, LAW TECHNOLOGY NEWS (May 5, 2008) (detailing how native productions have been made much more efficient and less expensive with recent software applications) (annexed hereto as Exh. A). Similarly, there are techniques available to address redaction of native files where necessary. *See* Press Release, *InterLegis Announces Industry's First Native File Redaction Capability for Web-based Review* (Oct. 29, 2008) (annexed hereto as Exh. B); D. Austin, *Effective Review of Native Files Results in More Efficient and Cost-Effective Discovery*, DIGITAL DISCOVERY & E-EVIDENCE, Vol. 6, No. 11 (Nov. 2006) (noting that files requiring redaction can be converted to electronic images) (annexed hereto as Exh. C).

Although Defendants suggest that the PSC has requested native files only to obtain metadata, such a claim ignores the other important features of native file productions. Indeed, native file review provides greater efficiencies in document review and searchability. *See id.* Those facts are not present in this case. The PSC set forth a requested format for production a long time ago and Defendants ignored the request. Moreover, native files maintain coloring added to a document or spreadsheet, "track changes", formulas and rounding, and documents and spreadsheets, it avoids changes to a document when they are "processed" by the Defendants into TIFF files, as well as numerous other benefits. Further, while Defendants seek to minimize the potential relevance of metadata, it can be of great evidentiary value, providing the PSC with information about how a given document was amended, who made such changes, and when alterations were made. For example, as the Court is aware and is now publicly known, a key piece of evidence in the Vioxx litigation was the revelation by the Editors of the *New England Journal of Medicine* (NEJM) that an important table had been deleted from the submitted manuscript of the VIGOR study article. This was only discovered because the NEJM maintained the manuscript submission in its native format and the deleted table was embedded in the metadata of the electronic file. This important discovery led to the publication of the NEJM's *Expression of Concern*. Indeed, this publication, as well as the

October 14, 2009
Page 6

testimony of the New England Journal of Medicine's editor concerning the deletion of data from the article, was powerful evidence in several Vioxx trials. Several courts have recognized the importance of metadata. Indeed, the provisions addressing preservation of evidence in PTO 1, explicitly require the preservation of metadata. PTO 1, paragraph 14.

Defendants cite a decision by this Court, in *McCord v. State Farm Fire & Cas. Ins. Co.*, 2008 U.S. Dist. LEXIS 36006 (E.D. La., May 2, 2008), as recognition that requiring a native format production will create inherent discovery delays. In *McCord*, however, the Court did not determine that native file production creates production delays, as Defendants suggest. Rather, the Court denied a <u>belated</u> request for native format production, raised for the first time at a discovery hearing just days before the discovery deadline in that case was set to expire. *See id.* Indeed, contrary to Defendants' assertions, numerous Court have recognized the importance of native file productions and ordered such productions. *See Covad Communications Co. v. Revonet, Inc.*, --- F.R.D. ----, 2009 WL 2595257 (D.D.C., Aug. 25, 2009); *FSP Stallion 1, LLC v. Luce*, Slip Copy, 2009 WL 2177107, (D.Nev., July 21, 2009) (ordering native format productions of accounting data and other documents with associated metadata); *Goodbys Creek, LLC v. Arch Ins. Co.*, No. 07-CV-947, 2008 WL 4279693, at *3 (M.D.Fla. Sept. 15, 2008) (requiring production in native format where native format request had been clearly made and responding party ignored request and produced in a TIFF format instead); *White v. Graceland College Center for Professional Development & Lifelong Learning, Inc.*, 586 F.Supp.2d 1250 (D.Kan., 2008) (requiring production of emails and attachments in native format where Defendant produced in PDF format instead).

Finally, Defendants aver, without any showing at all, that production in native format could cost them "many millions of dollars." To the contrary, where parties have reviewed and produced documents in native format, they have reduced electronic discovery costs. *See* Exh. C. Production of documents to the PSC in this MDL in the format requested by Plaintiffs will promote efficiency since one uniform production will occur. Further, Defendants have offered no information as to how native format production compares to their preferred production format. Indeed, to date, no Defendant has provided any information concerning how, if at all, it has collected and prepared documents for production. Defendants should not now be permitted to rest on speculative claims that native format production will be cost-prohibitive.

## Modification of Pretrial Order No. 1

In their letter Defendants seek a narrowing of PTO No. 1's document preservation requirements, which embodies the categories and types of evidence suggested under the Federal Rules. Plaintiffs believe PTO No. 1 fairly protects relevant information from destruction and appropriately requires a meet and confer among the parties should any party have concerns regarding its preservation obligations. Defendants now propose, months after PTO No. 1 was

entered, that the Court relieve them of their obligation to preserve voice mails and metadata. With respect to voicemails, absent individual discovery on each Defendant's computer and communication systems, Plaintiffs are not in a position to determine a given defendant's current or historic ability to preserve voicemail and suggest that an order permitting destruction of voicemails would be premature. The PSC's goal at this time is to have Defendants preserve so that evidence is not lost if it is to be produced. Arguments over what should or should not be produced can occur at a later date, but at this time, evidence should be preserved.

With respect to metadata, Plaintiffs maintain that the significance of metadata is clear and that Defendants are obligated to preserve the metadata for electronic documents, regardless of whether this Court orders the production of files in their native format. Indeed, even where native files are converted into other formats (PDFs or TIFFs with associated text files), select metadata is often produced with such files (author, date of creation, etc.), and therefore should not be destroyed under any circumstances.

In sum, the PSC requests that the Court order Defendants to comply with their discovery obligations, by preserving evidence, enter into a production protocol and immediately providing their written responses to our requests for production and to immediately commence their document productions in the formats requested by Plaintiffs so that depositions can begin.

The PSC will be prepared to address these issues in more detail at the upcoming case management conference.

Sincerely,

LEONARD A. DAVIS

LAD:lmf
Enclosures
cc: Kerry Miller, Esq.
    Hilarie Bass, Esq.
    Russ M. Herman, Esq.
    Arnold Levin, Esq.
    Plaintiffs' Steering Committee




# LEGAL**TECHNOLOGY**



Select '**Print**' in your browser menu to print this document.

Copyright 2009. Incisive Media US Properties, LLC. All rights reserved. Law.com Legal Technology
Page printed from: http://www.law.com/tech

Back to Article

---

**Bates Stamps' Days May Be Numbered**

Tom O'Connor
Law Technology News
May 05, 2008

One of the most challenging problems facing litigation attorneys is how to work with the massive volume of digital documents produced during the discovery phase of a case.

For years, they have relied on a system of scanning and sequentially numbering individual document pages, extracting the text electronically and producing single-page TIFF files as the standard method. But that process is simply not effective when dealing with terabytes of data.

To address the sheer volume, many vendors are advocating a new way of working with electronic documents that can reduce costs as much as 65 percent by eliminating the need for text extraction and imaging in the processing phase.

Beyond immediate cost savings, this approach also provides cheaper native file production, reducing imaging costs for production sets and saving up to 90 percent of the time needed to process documents. How? By not using Bates numbers on every page.

It also may solve a second problem, because it addresses the preference (under recent federal and state rule changes) for using native files in productions, which cannot be Bates numbered.

Currently, to provide Bates numbering, many vendors generate TIFF images from native files and then Bates number those images. But this process complicates native file review and -- at anywhere from eight to 20 cents per TIFF -- adds considerable cost to the process.

Typically, during processing, data is culled, de-duplicated; metadata and text are extracted; and then a TIFF file is created. An unavoidable consequence is that the relationship of the pages to other pages, or attachments, is broken --




and then must be re-created for the review process.

Page-oriented programs handle this by using a load file to tie everything together from the key of a page number. But most new software use a relational database that stores the data about a document in multiple tables. To load single page TIFFs into a relational database involves a substantial amount of additional and duplicative work in the data load process.

A document-based data model, rather than a page-based approach, eliminates the text extraction and image creation steps from the processing stage and cuts the cost of that process in half. Documents become available in the review platform much faster -- as imaging often accounts for as much as 90 percent of the time to process. This enables early case assessment without any processing, by simply dragging and dropping a native file or a PST straight into the application -- which cannot be achieved with the page-based batch process.

Relational databases allow for one-to-many and many-to-many relationships and support advanced features and functions -- as well as compatibility with external engines for tasks such as de-duping and concept searching.

Applications that support these functions -- such as softwarefrom Equivio, Recommind and Vivisimo Inc. -- are all document-based and will not perform in the old page environment.

Programs that use the document model can eliminate batch transfer. This process (See Diagram 1 below) increases data storage due to the need for data replication in the transfer process and is also prone to a high rate of human error. And elimination of the time that inventory (in this case, electronic data) is stationary will eliminate overall cost as well as reduce production time.



DIAGRAM 1: BATCH TRANSFER WORKFLOW

Firms responding to a litigation hold letter can use a tool such as Recommind's Axcelerate to automate first pass review. David Baskin, Recommind's vice president of product management, says this process "improves review accuracy and consistency, which drastically expedites the review process."

"It helps attorneys gain insight into a document collection before review has even begun while insuring that all documents reviewed and the legacy workflow is maintained."

Using the document approach, files can be moved between the first-pass tool and stronger litigation support programs as needs arise, rather than in large batch transfers. This integration creates an easier, faster and more cost-effective e-discovery process. (See Diagram 2 below)



Another example of this is eCapture from IPRO Tech Inc. It helps users load large sets of documents, files and materials rapidly and in a native workflow, eliminating conversion of native files to TIFF images and extracting the text files.

A modern litigation support program must be able to review native documents that are not just paper equivalents, and directly enable review of any file that is in common use in business today. The future belongs to these new technologies, where native files are processed without the need to convert to TIFF and are identified by their unique hash algorithm.

Attorneys and clients who focus on a document-based system will save time and money and can conduct native file review. In today's world of vast quantities of electronic documents, the days of the Bates stamp are numbered.

*Tom O'Connor, a member of the* Law Technology News *Editorial Advisory Board, is the director of the Legal Electronic Document Institute and is based in New Orleans.*

**RELATED LINKS**

Time to Catch the 'Science of Search'

In Search of Better E-Discovery Methods



Solutions Overview
> **Discovery360**
Modules:
+ Visual Analytics
+ DataMapper
+ EDD Processing
+ Advanced Analytics



New Whitepaper

Download

## Press Releases

InterLegis Announces Industry's First Native File Redaction Capabil

*Document review technology eases the redaction process f*

Dallas, TX – October 29, 2008 – Dallas-based InterLegis, Inc. an innovator of Web-based technologies, has introduced the industry's first available native file redacting capability. D discovery culling and review application, now allows users to redact files in their native fo document review process.

The ability to perform native file review has been available for some time, but one disadva been the inability to redact native files, an argument on which even strong proponents of of today's most sophisticated review tools offer only workarounds for redacting native file: cumbersome step of pausing in the middle of a review to convert the native file to a tiff im interrupts the steady flow of the review process and still leaves open the risk of inadverte file.

InterLegis is the first to develop technology that is not simply a workaround, but an actual files in their native formats. Discovery360 users can now redact native files on the fly, witl the middle of the review process.

"As a progressive technology company, InterLegis is committed to developing innovative discovery process," said Kevin Carr, president of InterLegis, Inc. "Our latest advancemen demonstrates our leadership among legal support service providers as we continue to de truly change the way e-discovery is done."

InterLegis has recently gained more attention and accolades within the e-discovery indus solutions the company has introduced in the past year. Discovery360 DataMapper, InterL preview tool, is used to reduce data collections prior to processing for litigation, regulaton offering corporations greater control over their data to reduce risk and substantially reduc addition, the company launched its unique visual analytics capability earlier this year, anc compatible version of Discovery360.

**About InterLegis, Inc.**
Founded in 1998, InterLegis, Inc. has developed cutting-edge document technologies and analysis, similarity matching, automatic categorizations, electronic discovery processing/c digitization, optical character recognition, compression, database indexing, advanced sea enables corporations, law firms and legal service providers to reduce the risk, complexity

Discovery Solutions | About InterLegis | Partners | News & Events | Resources | Join Our Team | C

requests and internal investigations. The company's flagship product, Discovery360™, in provide a 360 degree view of all documents based on all possible document attributes an technologies. These capabilities help legal teams to drive early and accurate case asses: including concept, timeline, and message thread analysis, among others. InterLegis is hea information, visit www.InterLegis.com.

If you are interested in obtaining archived InterLegis press releases, please contact us.

Back to News & Events

Discovery Solutions | About InterLegis | Partners | News & Events | Resources | Conte

© 2009 InterLegis, All Rights Reserved.
Sitemap | Privacy Policy

Published by Pike & Fischer, a BNA Company

# Digital Discovery & e-Evidence

BEST PRACTICES & EVOLVING LAW

http://ddee.pf.com

Reprinted from Vol. 6, No. 11 | November 2006

EXHIBIT C

## TALKING TECH

# Effective Review of Native Files Results in More Efficient and Cost-Effective Discovery

By D. Douglas Austin

The concept of native file review is attractive to many litigators. A large component of electronic discovery costs is "processing", which can add considerable time to the review and production of responsive materials. The ability to avoid paying for expensive conversion to TIFF/PDF formats and to start reviewing the source files right away enables litigators to meet increasingly aggressive production timelines while also reducing costs. However, there are several issues to consider when undertaking a native file review project to ensure a high quality of output while accomplishing these objectives.

### What is Native File Review?

Native files are simply electronic files in their original format as generated by the "native" application. Examples include:

- Microsoft® Office files (such as Word, Excel, PowerPoint)
- Adobe® Acrobat PDF files
- E-mail formats such as Microsoft Exchange/Outlook and Lotus® Notes
- Other word processing file formats, such as Corel WordPerfect
- Graphics files, including TIFF, JPEG and bitmap (BMP) files
- Databases and system files
- Many, many others

Native File Review is review of electronic files in their original (i.e., "native") format (without conversion to a standard format, such as TIFF or PDF first) to determine whether to include them in production.

### Benefits of Native File Review

*Reduce Electronic Discovery Costs:* Typically, only 20 percent of an electronic file collection is relevant to the case. For predominantly e-mail-based collections, the percentage is usually considerably less. Reviewing electronic files before conversion enables you to convert only what's relevant – reducing conversion costs by 80 percent or more.

*Shorten Review and Production Time:* Conversion takes time. Each file must be converted to a standard image format (e.g., TIFF, PDF) for review. The larger the collection of files, the longer they take to "print" to these standard file formats. Native file review enables review to start immediately instead of waiting for conversion. Typically, fewer files require conversion after review and documents are ready for production faster.

*Requirement to Produce Searchable Files is Increasing:* Courts are more frequently requiring that data be produced in an electronic, searchable form. Changes to the Federal Rules (Rules 34 and 45, expected to become effective in December) will require production of electronic information in "reasonably searchable form." While this doesn't necessarily mandate native production, it will likely increase the tendency (and the expectation) of production in this form.

Several courts have already required the defendant to produce native files to opposing counsel. Two examples:

- *In re VeriSign, Inc. Securities Litigation*, 2004 WL 2445243 (N.D. Cal. Mar 2004): The court ordered the defendant to produce Outlook documents in native .PST files and rejected its request to be permitted to produce a TIFF version without metadata.
- *United States v. First Data*, 287 F. Supp. 2d 69 (D.D.C. 2003): The court ordered the parties to produce "electronic documents" "in the native electronic format (or a mutually agreeable format)".

*View Hidden Information When Necessary:* Many electronic files have considerable "metadata" associated

Reprinted with permission from *Digital Discovery & e-Evidence*, Volume 6, Number 11. Copyright © 2006 IOMA, Inc. Published by Pike & Fischer. For more information on *Digital Discovery & e-Evidence*, call Lou Klein at 1-646-424-3885 or email lklein@ioma.com.

with them that is not displayed in an image of the file. Tracked changes and comments are examples of metadata contained within Word® files; underlying formulas is an example of metadata contained within Excel® files. With the expected increase in cases where native files are requested by opposing counsel, the ability to view this information will become more important.

## Production Considerations

*Electronic and Searchable Production Doesn't Necessarily Mean Native Files:* Images can still be produced, with linked searchable text files and appropriate metadata in delimited format to satisfy the "electronic and searchable" requirement if the court doesn't explicitly require production of native files.

*Documenting Integrity of Files and Chain of Custody:* One reason that requesting parties have for specifying native files is that metadata within the files themselves (e.g., create date and/or last modify date) can help confirm the integrity of the file. If you're not producing native files, it is especially important to document the chain of custody from custodians of those files through review and conversion to production (including affidavits where appropriate) to make it clear that files have not been tampered with, intentionally or unintentionally.

*Bottom Line:* Native file review provides several benefits to the production process, including reduced discovery time and expense. However, native file review doesn't necessarily require native file production. In most cases, there is no need to produce the native files themselves unless opposing counsel can demonstrate to the court the need for the files in that format. Production of the images of relevant files with searchable text and appropriate metadata will often satisfy the requirements of opposing counsel as well as the producing party's obligation within the Federal Rules.

## Methods for Conducting Native File Review

There are two primary methods for conducting native file review: 1) using native applications, and 2) using a "universal" viewer. Most discovery management solutions provide one or both of these methods in supporting native file review.

*Native Applications:* Review using native applications is just like it sounds – using the original source application to review the file. This means you would use Word® to review Word® files, Adobe Acrobat® to view PDF files, Outlook® to view Outlook® e-mail messages, etc. An obvious advantage to this review method is that you can see the files exactly as they appear, including hidden information that is shown within the native application. However, review of files becomes considerably more complex since legal staff performing the review may require proficiency in multiple applications. There is also licensing and support of multiple applications to consider — each reviewer will need a copy of each software application that he/she will use to review the files. If the file collection is diverse, this could mean numerous applications to license and use to conduct the review. Finally, if not properly managed, the use of native applications for review could result in unintentional alteration of metadata.

*Universal Viewer:* Review using a universal viewer involves using a standardized viewing product to view several different file types. The advantages to this method are that you only need to license a single product and reviewers need only be proficient in one application. However, because universal viewers provide a "rendering" of the file, the format is often different than it looks within the native application. Those differences can be minor so that a review of content for relevancy is unaffected, or they can be significant, resulting in obscuring or truncation of content within the resulting display. Most universal viewers also don't show much of the hidden information, so inadvertent disclosures could occur when producing native files if comments and tracked changes are missed during review.

*Role of Discovery Management Software in Native File Review:* Management of the review process is a critical part of effectively reviewing native files and the software plays a key role. When coordinating multiple reviewers, effective workflow supervision that provides flexibility in assigning files to reviewers based on a variety of criteria and also provides tracking of review on an individual basis enables each review method's potential to be fully realized. A consistent interface for delivering files for review and recording review tracking information can make the review process more consistent and efficient. Finally, the ability to integrate searches and filtering within the review process can facilitate review considerably. For example, the highlighting of attorney names and other potential privilege terms can enable reviewers to make privilege determinations in a fraction of the time it would take to review each entire file.

*Bottom Line:* There is no panacea for the review of native files. The method you choose can depend on a variety of factors, including diversity of file collection, technical proficiency of review staff, and production format, among others. Producing native files will usually require use of native applications to view hidden information and minimize the risk of inadvertent disclosures. When producing images, a combined approach may be appropriate where a majority of files are reviewed with a universal viewer and most "special needs" files are reviewed using the native application. Effective discovery management software that supports both review methods can facilitate this combined approach, enabling you to maximize the strengths of each review method.

## How to Address Issues Associated with Native File Review

There are several issues to consider when undertaking a native file review project, including:

*Possible Spoliation Claims by Unintentionally Altering Files:* Before beginning any review project, copy

the files using software that manages the process without modifying file dates. Work with the copies during review. Then, convert or produce the original files. This will avoid potential altering of the files during review.

*Efficiency of Review of Native Files:* Review using multiple applications can be slow and cumbersome. Use of a universal viewer can help provide a consistent interface for review. Some discovery-management solutions can manage multiple applications seamlessly, providing a consistent interface for review.

*Support and Use of the Native Applications:* The cost of multiple applications, additional expertise required by reviewers and technical support required to use and support these applications can be extensive. Again, use of a universal viewer can help provide a consistent interface for review. If native applications are used, distribution of files can be managed so that specific file formats are routed to reviewers with particular expertise in the software that supports them. However, if the electronic collection is e-mail based, it may be difficult to manage distribution in that manner.

*Redacting/Annotating Native Files:* Most native file formats don't support an elegant method for redacting and annotating. If you're not producing native files, this can be managed by a "two-phase" review process of 1) reviewing the native files for relevancy then converting ONLY the relevant files to image and 2) redacting/annotating the images for confidential and privileged information during a second pass for privilege review. If you are producing native files, either agree with opposing counsel to convert to image only files requiring redaction, or establish with them an acceptable method for obscuring or overwriting confidential and privileged information within the native files.

*Bates Numbering:* It is difficult to electronically Bates label most native file formats. If you're reviewing but not producing native files, this is not an issue — you can still electronically Bates number the images you produce. If you are producing native files, work with opposing counsel and the court to agree to use content-based algorithms (or other file level numbering scheme) to uniquely identify each file.

*"Special Needs" Files:* There are files that either cannot be easily reviewed natively (e.g., executables, password-protected files) or may require special expertise to review (e.g., Microsoft Access databases, Autocad files). Create a plan for routing special expertise files to those with experience to review them and determine how they will be produced (e.g., produce the native Access files, dump the data to Excel, etc.). Prepare an Exception Log for files that cannot be reviewed or produced (e.g., executable files, virus-infected files, corrupt files, password-protected files).

*Bottom Line:* There will almost always be a small percentage of files that don't get reviewed natively in any case. It may make sense to convert a few "oddball" file types instead of installing the native application on multiple workstations to handle them if the universal viewer does not support those formats.

**Summary.** Despite the exceptions, native file review can still be performed for most of the document collection, providing benefits to the overall process. Conducted efficiently, review of native files can be a significant strategy to combat the high costs and effectively meet urgent deadlines associated with discovery today.

*D. Douglas Austin is a Technical Consultant at IE Discovery, a provider of comprehensive discovery management solutions. He can be reached at daustin@iediscovery.com.*