# Exhibit G



Hilarie Bass
Tel: (305) 579-0745
Fax: (305) 579-0717
bassh@gtlaw.com

October 30, 2009

**VIA E-MAIL TO:**

Ervin Gonzalez, Esq.
Colson Hicks
255 Aragon Avenue, 2nd Floor
Coral Gables, Florida 33134-5008

Re: *In Re: Chinese-Manufactured Drywall Products Liability Litigation,* **MDL 2047**

Dear Ervin:

As you know, this firm represents Lennar Corporation, Lennar Homes, LLC f/k/a Lennar Homes, Inc. and U.S. Home Corporation (collectively, "Lennar") in the referenced litigation. As a follow up to the meet and confer that you had with my partner, Mark Salky, last week, and in light of the Federal Rules of Civil Procedure (the "Rules") relating to electronically stored information ("ESI"), we wanted to set forth Lennar's position with respect to issues surrounding the preservation and production of ESI. Our hope is that this letter will aid in the discovery process, and lead to open and frank communications concerning Lennar's positions on the preservation and production of ESI in an upcoming meet and confer.

Lennar has undertaken numerous steps to preserve ESI that is potentially relevant to the litigation. The following describes the steps that Lennar has taken or intends to take, as well as those it has not taken and does not intend to take, to preserve potentially relevant ESI in connection with these matters. In keeping with the spirit of the Rules and Paragraph 14 of Pretrial Order #1, the purpose of this disclosure is to provide for early and efficient resolution of issues that may arise concerning ESI or Lennar's document preservation and production obligations. We welcome full and frank discussions concerning these matters at the Plaintiff Steering Committee's ("PSC") convenience.

1) For purposes of preserving and searching for ESI, the PSC has defined the relevant time period for Chinese Drywall related issues to be from 2001 to the present. This is the period of time we are relying on for our preservation and production efforts. To the extent that the PSC believes that the proposed period is insufficient, we ask that, in advance of an upcoming meet and confer, the PSC provides us with its proposed start and end dates, along with a brief explanation of the types of documents the PSC would expect to find outside of the defined period.

GREENBERG TRAURIG, P.A. ■ ATTORNEYS AT LAW ■ WWW.GTLAW.COM
1221 Brickell Avenue ■ Miami, FL 33131 ■ Tel 305.579.0500 ■ Fax 305.579.0717

Ervin Gonzalez, Esq.
October 30, 2009
Page 2

2) Based on our understanding of the claims arising out of allegedly defective Chinese manufactured drywall, Lennar has identified approximately 100 current or former employees that may have unique, non-duplicative, non-cumulative potentially relevant data with respect to the issues in these cases (hereinafter, the "Potential Custodians").

3) At various times starting in late 2008 and early 2009, Lennar issued written litigation hold notices and updates of litigation hold notices to Potential Custodians. Lennar intends to continue sending litigation hold updates during the pendency of the Chinese Drywall cases, and intends to inform any new employees that are likely to have custody of potentially relevant data of the litigation hold.

4) Lennar uses Notes as its email system. Lennar's main Notes system operates on an AS/400 in Miami and manages approximately 2,300 mailboxes. While several other Notes installations exist throughout the various Lennar offices, the main Notes systems in Miami includes a briefly delayed replica of mailboxes on every other system.

5) In addition to providing Notes services, the AS/400 provides a web-service interface for Notes that permits Lennar personnel to access their mailbox from a browser.

6) To limit the ultimate size of the Notes system, with some exceptions, emails that are inactive (*e.g.*, have not been sent, received or viewed) within 60 days are purged. Once a mail user is placed on litigation hold, however, this automatic purge is disabled, and all new messages for the user are journaled. At convenient intervals, and primarily for space considerations, the journaled emails are moved from the Notes system to another location where they are retained on litigation hold. Because the journaled emails correspond to users that have received a litigation hold, the journal is duplicative, and the journaled emails can be obtained from another source that is less burdensome, more convenient, or less expensive. Thus, the burden or expense of discovery from these sources outweighs its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C). Moreover, for the same reasons, Lennar deems the email journals as not reasonably accessible because of undue burden or cost. See Fed. R. Civ. P. 26(b)(2)(B). Should the PSC disagree with the designations concerning accessibility or burden set out in this paragraph, we are prepared to discuss that at our upcoming meet and confer. To the extent the PSC believes the email journals require searching, we ask that, in advance of the meet and confer, the PSC provide us with its proposed search protocols, along with a brief explanation of the types of documents the PSC would expect to find outside of the Potential Custodians' mailboxes, but within the journal. Such a disclosure will facilitate this discussion at our meet and confer to discuss this proposal.

7) The AS/400 containing the Notes server and web-services for Notes is backed up on a 60 day rotation. Since as early as March 2008, with a few exceptions, a monthly

Ervin Gonzalez, Esq.
October 30, 2009
Page 3

backup tape set is pulled out of rotation and stored permanently.[1] With respect to mail users that have not separated from Lennar, Lennar generally deems these sources of data as not reasonably accessible because of the undue burden or cost to restore the tapes. See Fed. R. Civ. P. 26(b)(2)(B). With respect to separated users, Lennar deems all but the mailbox on the last monthly backup before the separation as not reasonably accessible because of the undue burden or cost to restore the tapes. See Fed. R. Civ. P. 26(b)(2)(B). Should the PSC disagree with the designations concerning accessibility set out in this paragraph, we are prepared to discuss that at our upcoming meet and confer. To the extent that the PSC believes that additional tapes or mailboxes require searching, we ask that, in advance of the meet and confer, the PSC provide us with its proposed tapes and mailboxes, along with a brief explanation of the types of documents they would expect to find outside of our search, but within theirs. Such a disclosure will facilitate this discussion at our meet and confer to discuss this proposal.

8) Because of the replication of the mailboxes onto the main Notes system in Miami, all the *other* Notes systems are considered to be cumulative. Accordingly, discovery from these sources is unreasonably cumulative or duplicative, and can be obtained from another source that is less burdensome, more convenient, or less expensive. Thus, the burden or expense of discovery from these sources outweighs its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C). Moreover, for the same reasons, Lennar deems these sources of data as not reasonably accessible because of undue burden or cost. See Fed. R. Civ. P. 26(b)(2)(B).

9) According to Lennar's policy, Notes users may create archives on their Home directory (discussed more later), or, in some cases, in a special area of the AS/400 that serves Notes. Where Notes archives are created on the AS/400, it is also backed up with the AS/400 tapes as discussed above, and the designations made concerning those backups apply to these Notes archives as well. It is technologically possible that a user could, against company policy, create a Notes archive on their local PC.[2] Accordingly, Lennar intends to obtain and preserve a copy of any Notes archive that exists on a Potential Custodian's local PC.

10) According to Lennar's policy, PC users are not supposed to store any documents locally on PCs or on removable media; instead, Home directories (discussed below) and General directories (discussed below) are provided for general purpose file storage. It is technologically possible that a user could, against company policy, store files on the drive of a local PC or other removable media. Accordingly, Lennar

---

[1] The tapes that currently exist are from: (1) 2008-03-16; (2) 2008-06-01; (3) 2008-08-03; (4) 2008-10-05; (5) 2008-11-30; (6) 2008-12-31; (7) 2009-01-31; (8) 2009-02-28; (9) 2009-03-31; (10) 2009-04-30; (11) 2009-06-01; (12) 2009-06-30; (13) 2009-07-31; (14) 2009-08-31; and (15) 2009-09-30.

[2] Unless otherwise specified or unless the context so dictates, as used here, PC refers to a company issued desktop or laptop computer.

Ervin Gonzalez, Esq.
October 30, 2009
Page 4

11) Each of the potentially relevant Divisions at Lennar involved in some respect with the Chinese Drywall claims maintain a general purpose file server that includes a Home (H:) drive and a General (G:) drive. The Home drive contains a folder for each user that can be used as the user deems appropriate. Except for administrative or IT purposes, only a user has access to their own Home drive. Substantially all users have access to the folders on the General drive. The Home and General drives are backed up nightly, with a 5 day nightly rotation, a 4 week weekly rotation, and a 2 year monthly rotation. Lennar's policy is to keep month end tapes only for one year, although may have some tapes that are older. Lennar also keeps year end tapes. We are in the process of compiling a list of tape backups in Lennar's possession.

12) Lennar presently has no knowledge of potentially relevant information existing on the Home drive backups that is not also present on the Home drives of the non-separated users. Absent such knowledge, Lennar considers discovery from these sources unreasonably cumulative or duplicative, and such discovery can be obtained from another source that is less burdensome, more convenient, or less expensive. Thus, the burden or expense of discovery from these sources outweighs its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C). Moreover, for the same reasons, Lennar deems these sources of data as not reasonably accessible because of undue burden or cost. See Fed. R. Civ. P. 26(b)(2)(B). With respect to the backups of the Home drive folders for separated users which no longer have Home drive folders on the Home drive, Lennar deems all but the Home folder preserved in the last monthly backup before the separation as not reasonably accessible because of the undue burden or cost to restore the tapes. See Fed. R. Civ. P. 26(b)(2)(B). In addition, the burden or expense of discovery from sources designated not reasonably accessible outweighs its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C). Should the PSC disagree with the designations concerning accessibility or burden set out in this paragraph, we are prepared to discuss that at our upcoming meet and confer. To the extent that the PSC believes that additional tapes or folders require searching, we ask that, in advance of the meet and confer, the PSC provide us with its proposed tapes and mailboxes, along with a brief explanation of the types of documents it would expect to find outside of our parameters, but within its. Such a disclosure will facilitate this discussion at our conference to discuss this proposal.

13) Lennar presently has no knowledge of potentially relevant information existing on the General drive backups that is not also present on the General drives. Absent such knowledge, Lennar considers discovery from these sources unreasonably cumulative or duplicative, and such discovery can be obtained from another source that is less burdensome, more convenient, or less expensive. Thus, the burden or expense of discovery from these sources outweighs its likely benefit. See Fed. R.

Ervin Gonzalez, Esq.
October 30, 2009
Page 5

---

Civ. P. 26(b)(2)(C). Moreover, for the same reasons, Lennar deems these sources of data as not reasonably accessible because of undue burden or cost. See Fed. R. Civ. P. 26(b)(2)(B). Should the PSC disagree with the designations concerning accessibility or burden set out in this paragraph, we are prepared to discuss that at our upcoming meet and confer. To the extent that the PSC believes that additional tapes or folders require searching, we ask that, in advance of our upcoming meet and confer, the PSC provide us with its proposed tapes and mailboxes, along with a brief explanation of the types of documents it would expect to find outside of our parameters, but within its. Such a disclosure will facilitate this discussion at our conference to discuss this proposal.

14) Lennar uses JD Edwards accounting software. In the manner it is configured by Lennar, JD Edwards retains its data, and does not purge or consolidate transactions. The JD Edwards data is backed up regularly in a rotation, with monthly backups being pulled out of rotation and retained for a longer period of time, *e.g.*, 2 years. The backups will continue to be retained in the ordinary course of business until they are scheduled for overwriting. Because Lennar does not purge or consolidate the JD Edwards data, however, all of the data on any JD Edwards backup is also available in the online system. Because the JD Edwards backup data is duplicative, and can be obtained from another source (*i.e.*, the online system) that is less burdensome, more convenient, and less expensive, the burden or expense of discovery from these backups outweighs its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C). Moreover, for the same reasons, Lennar deems these sources of data as not reasonably accessible because of undue burden or cost. See Fed. R. Civ. P. 26(b)(2)(B).

15) Lennar uses BuildPro to interface with its subcontractors. Like JD Edwards, in the manner it is configured by Lennar, the BuildPro data is retained, and the transactions are neither purged nor consolidated. As with JD Edwards, the BuildPro data is backed up regularly in a rotation, with monthly backups being pulled out of rotation and retained for a longer period of time, *e.g.*, 2 years. The backups will continue to be retained in the ordinary course of business until they are scheduled for overwriting. Because Lennar does not purge or consolidate the BuildPro data, however, all of the data on any BuildPro backup is also available in the online system. Because the BuildPro backup data is duplicative, and can be obtained from another source (*i.e.*, the online system) that is less burdensome, more convenient, and less expensive, the burden or expense of discovery from these backups outweighs its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C). Moreover, for the same reasons, Lennar deems these sources of data as not reasonably accessible because of undue burden or cost. See Fed. R. Civ. P. 26(b)(2)(B).

16) Lennar provides remote access to its network via VPN to certain of its laptop users for use in connection with their company-issued laptop computer. No VPN

Ervin Gonzalez, Esq.
October 30, 2009
Page 6

---

connectivity is provided for use on other computers. Any potentially relevant data on a company laptop computer will be dealt with in the manner discussed above.

17) Some of the Potential Custodians have company-issued BlackBerry personal digital assistants ("PDAs"). With respect to email and calendars the PDAs synchronize to the Notes server data automatically. Although capable of such functions, SMS messaging and Blackberry PIN messaging are not used for company business, but rather, if at all, for casual communications such as scheduling lunch. Lennar presently has no knowledge of potentially relevant information existing on the PDAs that is not also present in the Notes environment drives as well. Absent such knowledge, Lennar considers discovery from these sources unreasonably cumulative or duplicative, and such discovery can be obtained from another source that is less burdensome, more convenient, or less expensive. Thus, the burden or expense of discovery from these sources outweighs its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C). Moreover, for the same reasons, Lennar deems these sources of data as not reasonably accessible because of undue burden or cost. See Fed. R. Civ. P. 26(b)(2)(B). Should the PSC disagree with the designations concerning accessibility or burden set out in this paragraph, we are prepared to discuss that at our upcoming meet and confer. To the extent the PSC believes additional tapes or folders require searching, we ask that, in advance of the relevant conference, the PSC provide us with its proposed tapes and mailboxes, along with a brief explanation of the types of documents it would expect to find outside of our parameters, but within theirs. Such a disclosure will facilitate this discussion at our conference to discuss this proposal.

18) Substantially all of the Potential Custodians have cell phones, or use their BlackBerries as cell phones. Cell phones frequently maintain a short term log of calls. Lennar is taking no steps to preserve this data – regardless of whether the phones owned or controlled by Lennar, or otherwise – as such short-term call log data has limited utility and is unlikely to lead to the discovery of admissible evidence. Lennar considers discovery from these sources unreasonably cumulative or duplicative, and such discovery can be obtained from another source that is less burdensome, more convenient, or less expensive. Thus, the burden or expense of discovery from these sources outweighs its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C). Moreover, for the same reasons, Lennar deems these sources of data as not reasonably accessible because of undue burden or cost. See Fed. R. Civ. P. 26(b)(2)(B).

19) Lennar has not provided instant messaging (IM) to its employees, nor is it supported within the company. IM may be installed and occasionally used by Lennar personnel to generate informal, quick and transient conversations. It is not meant to generate business records and the logs of IM conversation are not preserved. If IM is used by Potential Custodians, they would have the ability independently to save IM conversations to the Home or General drives. To the extent that there are

Ervin Gonzalez, Esq.
October 30, 2009
Page 7

Ervin Gonzalez, Esq.
October 30, 2009
Page 7

_____

independently saved conversations that are deemed relevant to this litigation, they will be preserved as discussed above.

20) Lennar has several voice-mail systems that may have handled voicemail for one or more Potential Custodians. The litigation hold applies to voice-mail as well as other forms of electronically stored information. Unless a voice-mail is identified by a Potential Custodian in connection with Lennar's efforts to collect documents, no effort will be made to locate responsive voice-mail. These efforts will not be made because acquisition and production of content from the voice-mail systems or backups would be manual, extremely time-consuming and an expensive process. Accordingly, Lennar designates its voice-mail data and backups as not reasonably accessible because of undue burden or cost. See Fed. R. Civ. P. 26(b)(2)(B). Moreover, the burden or expense of producing discovery from voice-mail or the voice-mail backups outweigh its likely benefit. Fed. R. Civ. P. 26(b)(2)(C). Should the PSC disagree with the designations concerning accessibility or burden set out in this paragraph, we are prepared to discuss that at our upcoming meet and confer. To the extent the PSC believes additional tapes or folders require searching, we ask that, in advance of the meet and confer, the PSC provide us with its proposed tapes and mailboxes, along with a brief explanation of the types of documents it would expect to find outside of our parameters, but within theirs. Such a disclosure will facilitate this discussion at our conference to discuss this proposal.

21) Lennar has a public facing website available at Lennar.com. A copy of the public facing website, and to the extent they exist, records of prior versions of its public facing website, will be preserved.

22) Lennar employs SharePoint Team Rooms and Notes QuickPlace. To the extent that any Potential Custodian identifies a Team Room or a QuickPlace as a potential repository for relevant ESI, it will be preserved.

23) Lennar does not ordinarily preserve or obtain data from employees' personal home computers absent a reason to believe that unique, relevant data will be located on such computers. Lennar has no reason to believe that unique potentially relevant data will be on its employees' personal home computers; however, any business data contained on employees' home computers are subject to the litigation hold.

* * *

Although Lennar has identified approximately 100 Potential Custodians, Lennar is concerned with the cost of electronic discovery. In an effort to streamline the discovery process, and ensure that the costs of the case remain manageable in relation to the what is at issue in the case as a whole, Lennar proposes that 20 of the roughly 100 Potential Custodians are designated as Key Custodians. Lennar proposes that the ESI of the Key Custodians is collected, reviewed and produced on an expedited

Ervin Gonzalez, Esq.
October 30, 2009
Page 8

---

timetable in the ordinary course of this litigation. If and when it becomes apparent to the parties that one or more additional Potential Custodians appear necessary to the matter, the parties can agree to collect and process their ESI as well. If the parties are unable to agree on these additional Potential Custodians, the PSC can ask the Court to enter an order compelling such collection and processing.

To select the Key Custodians from the Potential Custodians, Lennar proposes that it select 10 itself, and the PSC selects the other 10. In support of the PSC's selection, Lennar is prepared to provide the PSC with names, job titles and other selected details of the 100 or so Potential Custodians. Moreover, Lennar would agree to provide the PSC the ability to select fewer than 10 in the first instance, and to reserve additional selections until it has had a chance to review documents from the selected Key Custodians.

Nothing in this proposal is intended to change Lennar's obligation concerning the preservation of ESI for each of the Potential Custodians.

\* \* \*

**Forensic Data**: To the extent not addressed above, Lennar ordinarily does not seek to preserve, review or produce other ESI that may require forensic investigation or analysis (*e.g.*, deleted, fragmented or shadowed data). As you know, the forensic imaging process captures data that often consists of "garbled" and difficult to interpret information. There are significant burdens involved in culling and producing that type of garbled and/or fragmented information, and significant potential to prejudice or confuse matters where partial or "garbled" information – which lacks context – is produced. Thus, even where forensic images exist, Lennar regards the portions of them that are not reflective of active files at the time of imaging as not reasonably accessible because of undue burden or cost, as the value of any otherwise un-produced data is likely to be substantially outweighed by the burden involved in culling and producing from that source. *See* Fed. R. Civ. P. 26(b)(2)(B), (C).

**Continuing Investigation**: Lennar is continuing to investigate whether it has possession, custody or control over ESI beyond that described above that it has reason to believe is potentially relevant to these matters, and is not reasonably accessible because of undue burden or cost. To the extent it identifies such ESI, Lennar will do so with reasonable particularity, as required by Fed. R. Civ. P. 26(b)(2)(B).

**Cost and Burdens**: The burdens placed on Lennar during this litigation, including during discovery, must be proportional to the litigation itself, including the nature of the claims and the amount in controversy. *See* Fed. R. Civ. P. 1, 26(b)(2)(C). Lennar reserves the right to seek shifting or sharing of certain discovery costs, including vendors' and attorneys' fees, under appropriate circumstances. *See* Fed. R. Civ. P.

Ervin Gonzalez, Esq.
October 30, 2009
Page 9

---

26(b)(2)(B), (C). This will depend in part on the agreements we can reach at the upcoming meet and confer.

**Search Terms:** Once we are able to agree on the universe of ESI that is to be collected, we propose agreeing on a set of search terms that will be used to narrow the scope of potentially relevant ESI that needs to be reviewed and, if responsive and not privileged, produced to the PSC. Our proposed set of search terms is attached hereto as Appendix A.

**Form of Production:** Lennar intends to produce discoverable ESI to Plaintiffs in TIFF format. We acknowledge the request from the PSC that Lennar produce its ESI in native format along with meta-data; however, we expect to provide the PSC with Lennar's records in TIFF form. Lennar objects to the production of any ESI in native form, in part because of the inherent burdens associated with document control, review and redaction, and in part because of the expedited timetable for production in this case. Native file production creates numerous problems and issues. For example, as stated in the Sedona Principles, "information produced natively may be difficult or impossible to redact or Bates number[.]" These files will be similarly difficult or impossible to associate with legends concerning confidentiality. In addition, the review of native file production will create a review burden on counsel since, as the Sedona Principles also recognize, the meta-data associated with the native files could contain or reveal privileged, secret or other sensitive information, necessitating its relatively costly review, and thus impacting the speed and cost of production. Moreover, the courts have recognized that such a speedy production militates *against*, not for, production in native form. *See McCord v. State Farm Fire & Cas. Ins. Co.*, 2008 U.S. Dist. LEXIS 36006 (E.D. La. 2008) (denying request for production of native format email due to imminent discovery deadline).

Even if Plaintiffs agree to accept production in TIFF, Lennar is prepared to discuss native production, on a document-by-document basis, in the event that the PSC believe that circumstances so warrant.

**Privilege Issues:** Lennar takes the protections associated with the attorney-client privilege and work product doctrine seriously and zealously guards against waiver of these protections. Lennar thus will not voluntarily enter into any agreements (*e.g.*, "quick peek" agreements) which puts either in jeopardy.

**Privacy and Confidentiality:** Lennar takes the protection of its personal and sensitive information seriously and intends to conduct discovery in this case to comply with any applicable privacy laws, regulations or like obligations and restrictions. Lennar will not produce documents (including ESI) in a manner that displays personal and sensitive consumer or employee information. To the extent documents containing such information are deemed potentially relevant or otherwise discoverable, Lennar will produce documents in a manner that preserves the privacy concerns of Lennar's

Ervin Gonzalez, Esq.
October 30, 2009
Page 10

---

customers and employees, including, where appropriate, redacting documents, providing reports from Lennar's databases that do not include such information, or other appropriate techniques to avoid inappropriate disclosure of such information. To the extent discovery requests in these matters call for data which constitutes Lennar's confidential and proprietary information, Lennar shall only produce such information under the terms of Pretrial Order #16.

\* \* \*

We believe that this letter addresses Lennar's position concerning preservation and production of ESI. We are prepared to discuss these issues with the PSC at your convenience.

Sincerely,

*/s/* Hilarie Bass

cc:  Mark A. Salky, Esq. (via email)
Adam Landa, Esq. (via email)
Lenny Davis, Esq. (via email)


Ervin Gonzalez, Esq.
October 30, 2009
Page 11

## Appendix A - Proposed ESI Search Terms

[named MDL plaintiff] homeowner/occupant names
[named MDL plaintiff] homeowner/occupant affected property address
drywall
"dry wall"
wallboard
"wall board"
gypsum
China
Chinese
sulfur
offgas*
off-gas*
"off gas*"
coil w/3 replac*
coil w/3 fail*
A/C w/3 replac*
A/C w/3 fail*
"air condition*" w/3 replac*
"air condition*" w/3 fail*
black* w/3 copper
black* w/3 wire
black* w/3 wiring
black* w/3 electrical
black* w/3 HVAC
black* w/3 "air condition*"
black* w/3 coil
black* w/3 plumbing
black* w/3 pipe
odor
smell
corrod*
corrosion

*MIA 180,883,936v5 10-30-09*