# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| MICHELLE GERMANO; DENNIS JACKSON; SHARON JACKSON; JASON DUNAWAY; LISA DUNAWAY, individually, and on behalf of all others similarly situated, | Case No. 2:09-cv-00202 |
| Plaintiff, | |
| v. | |
| TAISHAN GYPSUM CO. LTD f/k/a SHANDONG TAIHE DONGXIN COMPANY, LTD; TOBIN TRADING INC.; HARBOR WALK DEVELOPMENT, LLC, and VENTURE SUPPLY CORPORATION and THE PORTER-BLAINE CORP., | |
| Defendants | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO VENTURE SUPPLY, INC. AND PORTER-BLAINE CORPORATION'S MOTION TO DISQUALIFY COUNSEL FOR PLAINTIFFS

## I.    INTRODUCTION

"Kill the messenger" is a common debate stratagem for parties without any meaningful substantive support for their argument. Venture Supply, Inc. (Venture) and the Porter-Blaine Corporation ("PB"), collectively "movants", were, respectively, the supplier and installer of the defective Chinese drywall tainting plaintiffs' residence.[1] Having no purposeful defense to the plaintiffs' claims that it is the movants' defective drywall damaging the plaintiffs' homes, Venture and PB have resorted to distraction and diversion as their latest challenge to plaintiffs' claims

---

[1]*See* Defendants Venture Supply, Inc. and The Porter-Blaine Corp.'s Demurrer and Answer to Plaintiff's Complaint at 16, CL-09-3105 (Va.Cir.Ct. for City of Norfolk, June 1, 2009) ("The present case involves the sale of drywall by Venture to suppliers or the installation of the drywall by Porter-Blaine for a general contractor.").

(and ultimately, the larger class claims) – they now seek to disqualify the plaintiffs' counsel.   In their zeal to kill these messengers, movants confect a supposedly disqualifying conflict of interest, *i.e.*, contending that it is inappropriate under the Virginia Rule of Professional Conduct 1.7 for class counsel to simultaneously represent the plaintiffs individually while pursuing virtually identical claims for other similarly situated home owners in the class actions filed in this Court and in the Eastern District of North Carolina.[2]  The fulcrum upon which Movants' legal stratagem pivots and necessarily depends upon is their evidentially unsupported conclusion that a limited fund is present.

As detailed below, the factual premise for movants' argument is specious.  It is based upon pure conjecture and rank hearsay.  Not a single affidavit, nor other sort of admissible evidence is offered by the movants to sustain their speculative argument regarding the existence of a limited fund.  Further, movants overlook that other defendants, particularly Taishan Gypsum Co., Ltd.  f/k/a Shandong Taihe Dongxin, Ltd. [hereafter "Taishan"], the Chinese manufacturer of the movants' drywall, is present as a party in the federal class actions.  Taishan's assets are neither mentioned, nor accounted for in movants' obtuse definition of the purportedly limited funds available to satisfy any judgment obtained by the as yet uncertified class represented by plaintiffs' counsel.  These inconvenient facts eviscerate the fallacy that a limited fund is present here.

Apart from these factual infirmities, Plaintiffs shall also demonstrate that no ethical conflict is presented under Virginia law and correlative federal pronouncements.  Indeed,

---

[2]How Virginia's Rules of Professional Conduct are imposed extra-jurisdictionally upon counsel practicing before a United States District Court in North Carolina is never explained.

apparently unbeknownst to the movants, on May 10, 1985, the Virginia State Bar Standing

Committee on Legal ethics issued Legal Ethics Opinion No. 692 [hereafter "LEO No. 692"],

which specifically authorizes the simultaneous representation of individual and class plaintiffs.[3]

Since Virginia does not currently provide for class action practice in state courts of the

Commonwealth, looking to the federal body of law addressing the issue of simultaneous

representation of individual and class plaintiffs, reveals no disqualifying conflicts.

For these reasons and those elaborated upon below, the motion to disqualify should be

denied.[4]

## II.  FACTUAL BACKGROUND

Michelle Germano, Dennis Jackson, Sharon Jackson, Jason Dunaway and Lisa Dunaway

filed this class action complaint on May 1, 2009, against Taishan, Harbor Walk LLC (a builder),

Tobin, Venture and PB.  An Amended Complaint was filed on May 26, 2009.  The Germano

plaintiffs asserted several claims sounding in negligence, breach of contract, warranty, unjust

enrichment, nuisance, and medical monitoring, for the damage to their home, other property and

health.

Counsel for the Germano plaintiffs is Richard J. Serpe, a member of the Virginia Bar.

---

[3]LEO No. 692 is attached hereto as Exhibit "A"  If LEO No. 692 was known to movants and deliberately not disclosed to this tribunal, such practice should not be condoned by this court.

[4] This action is the subject of the June 18, 2009 Conditional Transfer Order ("CTO") issued by the Judicial Panel on MultiDistrict Litigation ("JPML").  Movants objected to the issuance of the CTO and sought to vacate the transfer to the coordinated proceedings taking place in *In re Chinese Drywall*, MDL No. 2047 (E.D.La.) before the Honorable Eldon E. Fallon.  The JPML by Order dated August 14, 2009, is scheduled to hear these objections on September 24, 2009 without oral argument. *See* Hearing Session Order, (JPML Aug. 14, 2009) available at http://www.jpml.uscourts.gov/Hearing_Info/HearingOrder9-24-09.pdf.

His co-counsel identified on the complaints are Arnold Levin, Fred S. Longer, Daniel C. Levin,

Levin Fishbein Sedran & Berman; Michael D. Hausfeld, Richard S. Lewis, James J. Pizzirusso,

Faris Gareeb, Hausfeld LLP; Robert Gary, Gary Naegele & Theodo, LLC; and Richard W.

Stimson. Mr. Levin was recently appointed Plaintiffs' Lead Counsel by the Honorable Eldon E.

Fallon in *In re Chinese Drywall Products Liability Litigation*, MDL No. 2047, Pretrial Order No.

8 (E.D.La. July 27, 2009).[5]

On May 8, 2009, the identical plaintiffs' counsel filed a complaint for Tuan and Colleen

Nguyen against a different assemblage of defendants for similar claims associated with Chinese

drywall, *i.e.* Venture, PB and their homebuilder, Curb Appeal Home Builders, Inc. On June 8,

2009, they filed an Amended Complaint to add Tobin Trading Inc., movant's intermediary in the

sale of Chinese drywall from Taishan, as an additional defendant party.

Subsequently, J. Michael Malone, a member of the North Carolina bar, on May 15, 2009,

filed a class action complaint in the United States District Court for the Eastern District of North

Carolina against yet a different assemblage of defendants for different claims associated with

Chinese drywall. *See Hinkley v. Taishan Gypsum Co., Ltd.,* No. 2:09-cv-00202 (E.D.N.C.)

[Exhibit B to movant's papers]. Mr. Malone's co-counsel were Richard J. Serpe, Arnold Levin,

Fred S. Longer, Daniel C. Levin, Levin Fishbein Sedran & Berman; Michael D. Hausfeld,

Richard S. Lewis, James J. Pizzirusso, Faris Gareeb, Hausfeld LLP; Robert Gary, Gary Naegele

& Theodo, LLC; and Richard W. Stimson.

Mr. Serpe on August 10, 2009, on behalf of other individual clients that he represents in

the Virginia Beach area, filed six complaints against Venture, PB and Tobin and other

___

[5]Available at http://www.laed.uscourts.gov/Drywall/Orders/PTO8.pdf.

defendants. *See Baldwin v. Wellington L.L.C.,* No. CL09 -5135 (Norfolk Circuit Ct.); *Sakony v. Wellington L.L.C.,* No. CL09-5127 (Norfolk Circuit Ct.); *Morgan v. Wellington L.L.C.,* No. CL09-5133 (Norfolk Circuit Ct.); *Galgano v. Wellington L.L.C.,* No. CL09-5137 (Norfolk Circuit Ct.); *Heishober v. Wellington L.L.C.,* No. CL09-5168 (Norfolk Circuit Ct.); and *Ward v. Peak Building Corp.,* No. CL09-5167 (Norfolk Circuit Ct.).[6] Within days of these filings, without even waiting for service of process, Venture and PB filed answers, demurrers and identical motions to disqualify.

Each of these motions to disqualify is dependent upon one salient fact – the existence of a limited fund. To support the pretext of a limited fund, movants make several unsupported contentions: 1) Tobin has only $2 million in insurance coverage; 2) Venture only has insurance from Hanover Insurance Co for liability and umbrella coverage with an aggregate limit of $12 million[7]; 3) PB only has insurance from Hanover Insurance Company for liability and umbrella coverage with an aggregate limit of $12 million; 4) extrapolating from the *ad damnum* clause of the Nguyen's complaint, movants assume that each class members' damages in the *Germano* and *Hinkley* actions are also $2 million per home, over $200 million per case, and "approaching half a billion dollars" in the aggregate. *See* Motion to Disqualify at 3.

Notwithstanding these contentions, the lack of evidentiary support for each is manifest.

First, movants begin with the following hearsay statement: "Counsel will represent to the

---

[6]The complaints in these actions were attached as Exhibit C to the Motion to Disqualify.

[7]After filing their baseless motion, Mr. Serpe called Movants' counsel to advise them of several factual inaccuracies regarding movants insurance coverage. Movants' counsel advised that they had not conducted their own insurance coverage analysis (which raised additional questions regarding the propriety of their motion.). Nonetheless, movants insist that a limited fund still exists.

Court that it has been informed that Tobin has $2 million in insurance coverage under a reservation of rights and that Tobin itself has been out of business for some time and has no assets." *See* Motion to Disqualify at 3. No documents, affided to or otherwise, accompany this statement. Plaintiffs have no way to verify the accuracy of this statement by an out of court declarant without resort to deposing movants' counsel, as Tobin has not yet formally responded to plaintiffs' outstanding discovery that was served along with the summons and amended complaint.

Second and third, despite movants' representations in their initial motion, in response to a request for production of insurance policies in *Nguyen*, PB provided a coverage summary, entitled, "Insurance Policies," attached hereto as Exhibit "B". The summary indicates separate, annual policies for PB beginning in 2005-2006, and continuing until 2008-2009. For each of the four year coverage periods, the summary identifies three separate layers of insurance: 1) general liability; 2) excess liability[8]; and 3) an umbrella policy. Upon inspection of the underlying policies, plaintiffs understand from the declaration pages for policy year 2005-2006 (attached as Exhibit "C") that these policies provide the following coverage:

| Porter Blaine policies 2005-2006 | Aggregate limit |
| --- | --- |
| General Liability | $2,000,000 |
| Excess Liability | $10,000,000 |
| Umbrella liability | $10,000,000 |
| Total coverage 2005-2006 | $22,000,000 |

---

[8]The summary states, "excess liability policy cancelled July 15, 2009." Movants' recent supplemental responses to discovery reflect an entirely different coverage period that extends until November, 2009.

A review of these policies also clearly establishes that each policy year constitutes its own separate limit of liability. Under "Section III - Limits of Insurance," in the Commercial General Liability policy, that policy at page 10 provides, "The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period to any remaining period of less 12 months, starting with the beginning of the policy period showed in the Declarations..."[9] Accordingly, PB's insurance coverage for 2005 through 2009 appears to be at least as follows:

| Porter Blaine policies 2005-2009 | Aggregate limit |
|---|---|
| 2005-2006 | $22,000,000 |
| 2006-2007 | $22,000,000 |
| 2007-2008 | $22,000,000 |
| Total coverage 2005-2009 | $88,000,000 |

Venture also obtained insurance coverage for these same time periods. On page 3 of its memorandum to disqualify counsel, Venture takes care to separately report insurance coverage than that obtained by PB. While both defendants are listed on the same declaration pages, a reasonable interpretation of the policies, as amended through endorsements, and for considerable additional premiums paid, both defendants are entitled to separate aggregate limits for these policies. If Venture and PB succeed in this policy construction, they would have available at least $176,000,000 in combined coverage.

On September 16, 2009, in *Nguyen*, movants provided a supplemental response to interrogatories including provision of additional umbrella insurance policies, and confirmation that conception of coverage began in 2004, not 2005 as previously indicated (*see* attached correspondence and supplemental discovery response attached as Exhibit "E"). Movants

---

[9]Commercial General Liability Coverage Form is attached hereto as Exhibit"D".

acknowledged in their correspondence that they are still in the process of confirming dates and types of coverage available. With the addition of the 2004-2005 coverage, and the subsequent umbrella policy from July 7, 2009 to present, the total insurance coverage available to these defendants exceeds $230,000,000.00.

Given the inaccurate portrayal of Movants' insurance coverage, plaintiffs are reluctant to accept their representation based upon unsupported hearsay that Tobin has only $2 million in insurance coverage. Even if correct, there is over $230 million of insurance coverage to pay for damages to plaintiffs and the two classes from just these three defendants. Movants never account for any other assets in their possession (properties, leases, vehicles, cash etc.), leaving the Court to once again speculate as to whether the insurance proceeds constitute and define the limits of funds available.[10] Likewise, movants never account for the non-insurance assets of the other defendant in this action Tobin, or the third party defendant, Taishan.

Finally, movants never address the ability of the other defendants in the class actions to contribute to payment of any judgments that may be obtained. Such contributions would further dispel any notion of the existence of a limited fund (assuming such a notion ever was considered). On this point, the movants agree; they have named as third-party defendants, both Taishan and Tobin, for just such a purpose. *See* Defendants Venture Supply, Inc. And the Porter-Blain Corp.'s Third-Party Claim Against Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin, Co., Ltd and Tobin Trading, Inc. (Va. Cir.Ct. for City of Norfolk, June 1, 2009). Their

---

[10] In *Nguyen*, PB and Venture's Response to Plaintiffs' Second Request for Production of Documents Nos. 2-4, Movants objected and deemed irrelevant matters relating to tax returns, financial statements, and any transfer of assets of corporate funds. Having refused to produce this evidence in discovery, Movants should be estopped from adverting to such evidence for purposes of this motion.

8

purposeful ignorance of Taishan and Tobin (or any of the other defendants) for purposes of the instant motion is disingenuous at best.

Fourth, movants' calculation of the liability exposure generated by the seven individual Virginia state court claims and the *Germano* and *Hinkley* class actions is based on the supposition that at least 100 class members from both class actions have claims equal in value to the Nguyen's $2 million demand. This assertion is purely hypothetical and untethered to any basis in fact. *See* Motion to Disqualify at 2 ("It should be noted that **_IF_** the seven individual state action homeowner's claims are worth $2 million, each, then the 100-plus plaintiffs in this action must have claims worth at least $200 million, and the 100-plus plaintiffs in the *Hinkley* action must have claims worth at least the same amount.")(emphasis added). Movants have no reason to presume that the home values for the absent class members are the same across the board, or across state lines. If they do, they have failed to provide any evidence of same.

Based on the known, undisputed facts, there is at least $230 million in insurance coverage available from just Venture and PB alone for the seven individual claimants and the two classes represented by plaintiffs' counsel. Since other funds are likely to be available from parties other than the two movants, the movants have failed to establish as a matter of fact any limited fund.[11]

---

[11]As discussed in the next section, the evidentiary burden of establishing a limited fund is on the movants. The Motion to Disqualify is unaccompanied by any evidence. Plaintiffs, on the other hand, have come forward with evidence that controverts movants' assertion of the existence of a limited fund. Having failed to meet their initial burden, it would be unfair and inappropriate, if, in their reply, movants attempt to backfill their oversight by attempting to establish a record so late. If such an improper effort by the movants to cover their lapse occurs, Plaintiffs reserve their right to take discovery (if necessary) and submit a sur-reply to address any newly produced information.

### The Virginia State Bar Inquiry

Movants represent that they and counsel for Tobin approached the Virginia State Bar for an informal opinion regarding the ethics of plaintiffs' counsel representing both individuals and a class in Virginia only involving related subject matter against the same defendant where the cost of complying with a judgment in favor of the individual or class may render the defendant financially unable to satisfy the claims of the other.[12]  Although no correspondence supporting these communications has ever been produced, Movants assert that the informal response of the State Bar to both inquiries has been the same: "The lawyer would be in a conflict situation and the conflict situation cannot be cured by consent." *See* Motion to Disqualify at 4.

Whether movants advised the State Bar that the class action was only recently filed and that no motion to certify has been filed, and that no order certifying the class has issued, is not disclosed.  Whether the movants advised that their assumptions regarding a limited fund were mistaken and misleading since their reference to the Bar appears to have been made as to only one defendant when numerous defendants and third-party defendants are appearing in the actions and capable of contributing to any judgment are likewise not disclosed.

When confronted with the movants' presentation of their exaggerated and inaccurate inquiry to the Virginia State Bar, plaintiffs demurred. *See* Motion to Disqualify, Exhibit "E." Although conflicts rendering counsel inadequate to represent a class are ordinarily presented in opposition to motions for class certification, *see, e.g.,* Fed.R.Civ.P. 23(a)(4), movants advance their motion now supposedly based upon the advice of the State Bar.

---

[12]To exaggerate their claim of a limited fund, movants take into consideration the claims of the *Hinkley* class. When they sought an ethical opinion from the State Bar, however, movants omitted any mention of same.

As discussed below, there is no actual conflict justifying disqualification.

## III.   ARGUMENT

### A.   THE VIRGINIA STATE BAR HAS FOUND MULTIPLE REPRESENTATION OF BOTH INDIVIDUAL AND CLASS PLAINTIFFS TO BE PERMISSIBLE

Movants assert that Rule 1:7 of the Virginia Rules of Professional Conduct identifies a

conflict that makes multiple representation of individual and class plaintiffs irreconcilable.

Motion to Disqualify at 6, *citing* Comment 19 [sic., Comment 10]. As *Lazy Oil, supra,* makes

clear, such representation is quite common in class actions. Indeed, contrary to movants'

assertion that there are no Virginia LEO's directly on point, the Virginia State Bar has ruled on

multiple representations in the class context and LEO No. 692 is in accord with *Lazy Oil.*

On May 10, 1985, a Committee Opinion issued on the issue now before the Court. LEO

No. 692 states:

> It is not improper for a firm representing an unincorporated
> association of condominium owners against individual unit owners
> for past due assessments to also represent unit owners individually
> and collectively in a class action suit against a manufacturer for
> defects in the condominium air conditioning system.

*Id.* Thus, the State bar has endorsed representation of plaintiffs both "individually and

collectively in a class action." This reasoning should be dispositive.[13] *See also* District of

Columbia Bar Opinion No. 301 (June 20, 2000)("A lawyer representing the plaintiffs in a class

---

[13]Movants may argue that LEO No. 692 addressed the former Code of Professional
Responsibility, but they ignored that distinction when addressing other LEOs under the older
rules. Regardless, substantial case law exists to support multiple representation in the fashion
undertaken by plaintiffs' counsel.

action lawsuit is not precluded from representing a member of the class who wishes to bring a

tort action involving related subject matter against the same defendant.").[14]

**B.     MOVANTS HAVE A HIGH EVIDENTIARY BURDEN TO
        JUSTIFY DISQUALIFICATION OF OPPOSING COUNSEL**

Motions to disqualify are considered "drastic" measures since they run contrary to the

rights of litigants to freely chose their counsel.  *See Gay v. Luihn Food Systems, Inc.*, 54 Va. Cir.

468, 2001 WL 103883, *2 (Va.Cir.Ct. Feb. 7, 2001), *quoting, Shaffer v. Farm Fresh, Inc.*, 966

F.2d 142, 146 (4th Cir. 1992).  It has been recognized that certain unscrupulous counsel indulge in

the misuse of "disqualification motions for purely strategic purposes." *Tessier v. Plastic Surgery*

*Specialists, Inc.*, 731 F.Supp. 724, 729 (E.D.Va. 1990).  Using motions to disqualify as a

"weapon in the adversarial contest" many such counsel hide under the pretextual "cover of a

dutiful effort to reprove an ethically challenged lawyer," *Gay*, 2001 WL 103833 at *3.  Thus,

"only the naive would discount the possibility of such motivations infecting modern litigation."

*Id.*

"Given the potential for abuse, a litigant seeking to disqualify an opponent's lawyer must

hurdle a 'high standard of proof' to be successful." *Id, quoting, Tessier*, 731 F.Supp. at 729.

Recognizing this heightened burden, courts do not make the ruling to disqualify lightly.  *Lehner*

*Family Business Trust v. United Leasing Corp.*, 71 Va.Cir. 150, 2006 WL 2022209, *2 (City of

Richmond Cir.Ct. June 20, 2006).  Consequently, "imagined scenarios of conflict" can not justify

disqualification. *Gay,* 2001 WL 103883 at *3; *In re Stokes*, 156 B.R. 181, 185 (Bkr.E.D.Va.

---

[14]Opinion No. 301 was attached to the Motion to Disqualify as Exhibit F.

1993). Only actual or likely conflicts are grounds for disqualification. *Id.* Hypothesis based on conjecture will not support granting a motion to disqualify counsel. *Tessier*, 731 F.Supp. at 729.

This enhanced standard of review is especially pertinent to conflicts premised upon assertions of purported limited funds. To demonstrate an actual conflict under a limited fund theory, an objecting party must proffer some evidence that a limited fund, in fact, exists. Courts take the view that mere speculation regarding a defendant's ability to satisfy a judgment at some point in the future is insufficient to give rise to a conflict. *See Sheftelman v. Jones*, 667 F.Supp. 859, 865 (N.D.Ga. 1987)(declining to find a disabling conflict at class certification stage based on potential inability to satisfy competing judgments); *Anderson v. Bank of S., N.A.*, 118 F.R.D. 136, 149 (M.D.Fla. 1987)(finding counsel adequate despite multiple representation against same defendants in four other class actions). *See also Ortiz v. Fibreboard Corporation*, 527 U.S. 815, 842-43 (1999), where the United States Supreme Court observed that "the burden of justification rests on the proponent of any departure from the traditional norm [of a limited fund]."[15]

The court should further be mindful of practical considerations and approach disqualification motions on a case-by-case basis so as to avoid "mechanical and didactic" application of the Rules of Professional Conduct. *Stokes*, 156 B.R. at 185. This is especially the case when attempting to apply the Rules of Professional Conduct in a class action context. As Judge Adams noted in his seminal concurrence in *In re Corn Derivatives Antitrust Litigation*, 758 F.2d 157, 163 (3d Cir. 1984), "courts cannot mechanically transpose to class actions the rule

---

[15]The Supreme Court in *Ortiz* rejected a class settlement of asbestos claimants finding that it was improper to "aggregate unliquidated tort claims on a limited fund rationale," *Ortiz*, 527 U.S. at 843. Here, Movants are attempting to transgress this edict by aggregating unliquidated tort claims to confect their limited fund.

developed in the traditional lawyer-client setting context." Continuing this line of reasoning,

Judge Adams found:

> Class action litigation frequently promotes and protects the legal
> interests of those whose rights might not be protected at all without
> the class action device.   Any approach resembling a per se
> disqualification of an attorney who represents multiple parties in a
> class, or the entire class, when any member disagrees, might well
> undermine the attractiveness and utility of the class action device
> by discouraging multiple representation.

*Id.* at 164.  As a result, the concurrence suggested that a "balancing process" should be

undertaken.

Indeed, following the reasoning of Judge Adams, the court in *Lazy Oil Co. v. Witco*

*Corp.*, 166 F.3d 581 (3d Cir. 1999), permitted class counsel (Levin, Fishbein, Sedran & Berman)

to continue to pursue a class settlement despite the objection of their client, the class

representative plaintiff.  Pertinent to the present motion, the court noted that strict application of

the traditional rules on attorney-client relations provides too much "leverage" to those seeking

disqualification for strategic reasons:

> If, by applying the usual rules on attorney-client relations,
> class counsel could easily be disqualified in these cases, not only
> would the objectors enjoy great "leverage," but many fair and
> reasonable settlements would be undermined by the need to find
> substitute counsel after months or even years of fruitful settlement
> negotiations. "Moreover, the conflict rules do not appear to be
> drafted with class action procedures in mind and may be at odds
> with the policies underlying the class action rules."   Bruce A.
> Green, *Conflicts of Interest in Litigation: The Judicial Role,* 65
> Fordham L.Rev. 71, 127 (1996).

Id. at 589.  The court went on to hold that class counsel were not disqualified from multiple

representation of other individual representative plaintiffs and the class even when their class

representative plaintiff objects to the class settlement, "as long as the interest of the class in continued representation by experienced counsel is not outweighed by the actual prejudice to the objectors of being opposed by their former counsel." *Id.* at 590.

Accepting this high standard of proof, it is plain that movants have failed to satisfy their burden of establishing a limited fund to have plaintiffs' counsel disqualified. To the contrary, as established in the factual statement above, there appears to be approximately $230 million in insurance coverage. Further, the availability of other assets of the movants and other defendants are not addressed by the movants. These funds disprove movants' arguments of the existence of a limited fund.

### C.   COURTS HAVE FOUND THERE TO BE NO DISQUALIFYING CONFLICT WHEN REPRESENTING PLAINTIFFS INDIVIDUALLY AND COLLECTIVELY IN A CLASS ACTION UNLESS IT IS PROVEN THAT A LIMITED FUND, IN FACT, EXISTS

As seen from the above discussion, multiple representation of individuals and class plaintiffs is permissible. Some courts, however, have intimated that a conflict could potentially arise between class and individual representation in instances where a limited fund is proven. *See In re Asbestos School Litigation*, 1986 WL 13882 (E.D. Pa. 1986), where the court held:

> Class plaintiffs' counsel assert that class plaintiffs who choose to remain in the class and plaintiffs who opt-out of the class will benefit if counsel is allowed to represent both types of plaintiffs. At this point in this litigation it does not appear that there is a limited fund for payment of damages. In light of this fact I will allow counsel serving on the Executive Committee to represent plaintiffs who have opted out of the class. In the future, however, if it appears that there is a limited fund, a conflict of interest <u>may</u> be found.

*Id.* at *2 (emphasis added). The court's ruling makes clear that even where a limited fund is proven, the finding of an actual disqualifying conflict remains undetermined and subject to further consideration.

Similarly, in *Sheftelman, supra,* the court refused to find counsel inadequate on the basis of a potential conflict resulting from the risk of a limited fund. *Sheftelman,* 667 F. Supp. at 865. The court reasoned that not only were the conflicts illusory because no evidence existed that defendants could not pay, but also "the potential conflicts are very speculative at this time" because the other class had not yet been certified and neither case had yet obtained a favorable judgment. *Id.* Similarly, in *Anderson, supra,* the court concluded that the potential conflict of counsel's representations of four other classes or proposed classes against the same named defendants did not render counsel inadequate. *Anderson,* 118 F.R.D. at 149. The court found that the "conflict is speculative, since plaintiffs must obtain judgments in both cases and defendants must be unable to satisfy the judgments before an actual conflict arises." *Id.*

Elsewhere, state courts have reached the same results. In *Katlin v. Tremoglie,* 1999 WL 1577980 (Phila.C.P. June 29, 1999), for example, the court rejected the conflict argued by movants absent a limited fund being established by the defendants, as follows:

> Defendants argue that a conflict exists between members of the class and patients who have chosen to sue individually in the coordinated management program. The purported conflict arises because Mark Tanner, a partner at class plaintiff's counsel's firm, is on the plaintiff's steering committee for the coordinated program. Defendants contend a conflict exists because """Katlin and individual plaintiffs represented by the law firm could find themselves fighting each other and the class members for their shares of defendants' assets." (Df.'s Greenspring mem. in opp'n at 70.)

16

The court finds, at this time, that no conflict of interest arises from the same law firm representing both class plaintiffs and plaintiffs involved in the coordinated *In re Tremoglie* program. Defendants did not cite any authority for the proposition that an unacceptable conflict of interest arises if a law firm represents both class and individual plaintiffs. For the contrary proposition, however, plaintiff, cited to <u>*In re Asbestos School Litigation*, 1986 WL 13882 (E.D. Pa. 1986)</u>. The court in *In re Asbestos School Litigation* permitted counsel for the class to represent both class members and plaintiffs who have opted out of the class. The court permitted counsel to represent both class and opt-out plaintiffs because a limited fund for payment of damages had not been established. *Id.* If it was apparent that a limited fund existed, the court observed that it might find a conflict of interest. *Id.*

Here, we find no conflict of interest exists because individuals in the *In re Tremoglie* program are similar to the opt-out plaintiffs in *In re Asbestos School Litigation*, and no evidence has been presented that a limited fund exists. Although we recognize that up to now there has been no class suit for Tremoglie patients to opt out of, plaintiffs in the *In re Tremoglie* program have effectively opted out of this class suit because they cannot both join this class suit and sue individually in the coordinated program. Plaintiffs who do so have impermissibly split their cause of action. See Part III F. However, we believe that the opt-out status of plaintiffs in the coordinated program could change if, after receiving notice of this class suit, they decide to discontinue their individual suits and opt in to this class action. Therefore, we will-albeit prematurely-refer to plaintiffs in the coordinated program as opt-out plaintiffs. Based on that characterization, we will hew to the principal announced in *In re Asbestos School Litigation*. <u>Because defendants have offered no evidence that a limited fund for damages exists, we find that class counsel's dual representation of the class and individual plaintiffs in the coordinated program does not raise an impermissible conflict of interest.</u>

*Id.* (emphasis added)

As demonstrated above, Movants have mistakenly relied upon the limited fund exception as the basis for their motion. Their failure and inability to offer any evidence proving that a limited fund actually exists warrants the denial of their motion.

IV.     **CONCLUSION**

For purely strategic reasons, movants have sought to have plaintiffs' counsel disqualified based on the assertion that a limited fund exists to satisfy the claims of plaintiffs and the classes at issue.  Their motion is unsupported by any evidence.  Even if evidence had been provided, their assertion remains baseless.  Under these circumstances, where the heightened burden of proof rests solely upon the movants, their motion to disqualify counsel should be denied.

Respectfully submitted,

Dated: September 21, 2009                                                /S/

_____

Richard Serpe, Esquire
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
*Counsel for Plaintiffs*

Michael D. Hausfeld, Esquire
Richard S. Lewis, Esquire
James J. Pizzirusso, Esquire
Faris Ghareeb, Esquire
HAUSFELD LLP
1700 K Street, N.W.
Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
*Co-counsel for Plaintiffs*

Arnold Levin, Esquire
Fred S. Longer, Esquire
Daniel Levin, Esquire

18

Arnold Levin, Esquire
Fred S. Longer, Esquire
Daniel Levin, Esquire
Matthew C. Gaughan, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
*Co-counsel for Plaintiffs*

Richard W. Stimson, Esquire
Attorney at Law
920 Waters Reach Court
Alpharetta, Georgia 30022
Phone: 214-914-6128
*Co-counsel for Plaintiffs*

Robert Gary, Esquire
GARY, NAEGELE & THEADO, LLC
446 Broadway
Lorain, OH 44052
Phone: (440) 244-4809
Fax: (440) 244-3462
*Co-counsel for Plaintiffs*

19

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of September, 2009, the foregoing pleading was electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Mark C. Nanavati, Esquire (VA Bar No. 38709)
Kenneth F. Hardt, Esquire (VA Bar No. 23966)
Sinnott, Nuckols & Logan, P.C.
13811 Village Mill Drive
Midlothian, VA  23114-4365
(804) 378-7600
(804) 378-2610 (Facsimile)
mnanavati@snllaw.com
khardt@snllaw.com
*Counsel for Venture Supply, Inc. and The Porter-Blaine Corp.*

John Franklin, III, Esquire (VA Bar No. 13267)
James E. Brydges, Jr., Esquire (VA Bar No. 4420)
Brian N. Casey, Esquire (VA Bar No. 26710)
Taylor & Walker, P.C.
P.O. Box 3490
Norfolk, VA  23514-3490
(757) 625-7300
(757) 625-1504 (Facsimile)
jfranklin@taylorwalkerlaw.com
jbrydges@taylorwalkerlaw.com
bcasey@taylorwalkerlaw.com
*Counsel for Harbor Walk Development, LLC*

Tobin Trading, Inc.
Theodore J. Brenner, Esquire (VSB No. 17815)
Brenner, Evans & Millman
411 E. Franklin Street, Suite 200
Richmond, Virginia 23219
tbrenner@beylaw.com
*Counsel for Tobin Trading, Inc.*

I also hereby certify that on the 21st day of September, 2009, a true and correct copy of the foregoing pleading was served by first-class mail upon:

Taishan Gypsum Co. Ltd. f/k/a
Shandong Taihe Dongxin Co. Ltd.
Dawenkou, Daiyue District
Tai'an City, Shandohng Province
China 271026

By:


  /s/

Richard J. Serpe, Esquire (Va Bar No. 33340)
Law Offices of Richard J. Serpe, P.C.
580 E. Main Street, Suite 310
Norfolk, VA  23510-2322
757-233-0009
757-233-0455 (Facsimile)
rserpe@serpefirm.com
*Counsel for Plaintiffs*

# EXHIBIT A

LEO #692    SIMULTANEOUS REPRESENTATION OF ADVERSE PARTIES IN UNRELATED SUITS


It is not improper for a firm representing an unincorporated association of
condominium owners against individual unit owners for past due assessments to
also represent unit owners individually and collectively in a class action
suit against a manufacturer for defects in the condominium's air conditioning
system.  [See Canons 4 and 5.]
Committee Opinion
May 10, 1985

Index Items
CONFLICT OF INTEREST
CONDOMINIUM UNIT OWNER'S ASSOCIATION

Roderick B. Mathews, Chairman
1200 Mutual Building
Richmond, VA 23219

Robert J. Grey, Jr.
P.O. Box 27491
Richmond, VA 23261

¿ West Morrison
P.O. Box 739
Lynchburg, VA 24505

William F. Roeder, Jr.
3000 University Drive
Fairfax, VA 22030

Diane M. Strickland
P.O. Box 2886
Roanoke, VA 24001

William D. Dolan, III, President

Robert H. Patterson, Jr., President-Elect

N. Samuel Clifton, Executive Director

Michael L. Rigsby, Bar Counsel



# Virginia State Bar

Suite 1622, 700 Building, 700 East Main Street
Richmond, Virginia 23219 • 804-786-2061

STANDING COMMITTEE ON LEGAL ETHICS

May 10, 1985

LEO #692

Raymond J. Diaz, Esquire
Rees, Broome & Diaz, P.C.
Suite 810
8133 Leesburg Pike
Tysons Corner
Vienna, Virginia 22180

Dear Mr. Diaz:

I am writing in response to your letter dated March 21, 1985, seeking an informal advisory opinion from the Standing Committee on Legal Ethics of the Virginia State Bar ("Committee").

Your firm currently represents the unincorporated unit owners' association of a condominium and, among other things, seeks to recover in behalf of the association condominium assessments which are levied by the association to the individual unit owners. Your inquiry is whether you can continue to represent the association against those individual unit owners while simultaneously representing the unit owners individually and collectively in a class action under the Virginia Condominium Act in regard to certain defects including defects in the air conditioning system at the condominiums, the air conditioning system being a portion of the individual units under the condominium documentation.

The Committee has considered your inquiry in light of the provisions of Canon 4 which deals with confidences and secrets and with Canon 5 which deals with the exercise of independent professional judgment in behalf of your client, and we find no basis for disqualification from representation of the unit owners' association by the simultaneous representation of the individual unit owners in litigation under the Virginia Condominium Act involving defects in the condominiums.

Raymond J. Diaz, Esquire
May 10, 1985
Page Two


      Please be advised that this opinion is advisory only
and is based only on the facts you present for our considera-
tion and is not binding on any court or other tribunal.

                             Sincerely,

                             Roderick B. Mathews
                             Chairman

RBM:cf

REES, BROOME & DIAZ, P. C.

COUNSELLORS AT LAW
SUITE 810
8133 LEESBURG PIKE
TYSONS CORNER
VIENNA, VIRGINIA 22180
(703) 790-1911

JOSEPH A. CONDO
JOEL M. BIRKEN*
RAYMOND J. DIAZ*
JONATHAN J. BROOME, JR.*
JAMES M. REES*
JOHN F. BOLAND*
MICHAEL L. O'REILLY
HENRY F. BRANDENSTEIN, JR.*△
MARK A. WINER*
T. PATRICK DULANY*†
ALLISON M. CARNEY
PAUL P. VANGELLOW*

March 21, 1985

*ALSO ADMITTED IN THE DISTRICT OF COLUMBIA
†ALSO ADMITTED IN MARYLAND
△ALSO ADMITTED IN NEW YORK

VSB/LEGAL ETHICS
Received
Staff          *Rigsby*
Committee      *Mathews*
Initial Draft
DISTRICT OF COLUMBIA OFFICE
Chairman's Draft      4/24
Publication Date
Summary & Index

Michael L. Rigsby, Esquire
Virginia State Bar Counsel
Suite 1622, 700 Building
700 East Main Street
Richmond, Virginia 23219

Dear Mike:

This is to solicit the opinion of the Legal Ethics
Committee in the circumstances described below.

This firm represents the unincorporated Unit Owners
Association of a condominium located in Northern Virginia.
Incident to this representation, we regularly make demand for,
sue and collect condominium assessments which are due from
individual unit owners to the Association and which are not
timely paid.

Additionally, we have been in negotiations with the
declarant concerning the statutory warranty claims for common
area defects and for defects in the air conditioning systems at
the condominium. Under the condominium documents, the air
conditioning systems are a portion of the individual units.

At the direction of the Board of Directors, we are now
considering the filing of a class action in the circuit court
under §55-79.53 of the Virginia Condominium Act and under
Virginia common law on behalf of all unit owners against the
declarant concerning the air conditioning systems.

May this firm represent the Unit Owners Association in
future assessment collection cases against individual unit
owners during our representation of the plaintiff class
representatives?

REES, BROOME & DIAZ, P.C.

Michael L. Rigsby, Esquire
March 21, 1985
Page Two


I would be most grateful if you would present this question to the Legal Ethics Committee for me and advise me of their opinion.

With thanks for your assistance in this matter and with best personal regards, I am,

Very truly yours,

REES, BROOME & DIAZ, P.C.

By: _____
Raymond J. Diaz

RJD:mbw
14690

# EXHIBIT B

# Porter-Blaine Corporation

## Insurance Policies

### 2005-2006

| | | |
|---|---|---|
| 1. | General Liability | 11/15/05 - 11/15/06 |
| 2. | Excess Liability | 11/15/05 - 11/15/06 |
| 3. | Umbrella | 11/15/05 - 11/15/06 |

### 2006-2007

| | | |
|---|---|---|
| 4. | General Liability | 11/15/06 - 11/15/07 |
| 5. | Excess Liability | 11/15/06 - 11/15/07 |
| 6. | Umbrella | 11/15/06 - 11/15/07 |

### 2007-2008

| | | |
|---|---|---|
| 7. | General Liability | 11/15/07 - 11/15/08 |
| 8. | Excess Liability | 11/15/07 - 11/15/08 |
| 9. | Umbrella | 11/15/07 - 11/15/08 |

### 2008-2009 (Excess Liability Policy Cancelled July 15, 2008)

| | | |
|---|---|---|
| 10. | General Liability | 11/15/08 - 11/15/09 |
| 11. | Umbrella | 11/15/08 - 11/15/09 |

# EXHIBIT C

CITIZENS INSURANCE COMPANY OF AMERICA, 440 LINCOLN ST., WORCESTER, MA 01605

## COMMERCIAL GENERAL LIABILITY DECLARATION

| POLICY NUMBER | POLICY PERIOD FROM | TO | COVERAGE IS PROVIDED IN THE | | AGENCY CODE |
|---|---|---|---|---|---|
| ZBR 7905525 02 | 11/15/05 | 11/15/06 | CITIZENS INSURANCE CO. OF AMERICA | | 3001551 |

| NAMED INSURED AND ADDRESS | AGENT |
|---|---|
| THE PORTER-BLAINE CORPORATION<br>AND VENTURE SUPPLY INC<br>1140 AZALEA GARDEN ROAD<br>NORFOLK VA            23502 | HILB, ROGAL & HOBBS OF VA,<br>WORLD TRADE CENTER<br>101 W MAIN ST SUITE 3000<br>NORFOLK , VA            23510 |

AUDIT FREQUENCY: ANNUAL

LIMITS OF INSURANCE:

| | |
|---|---|
| GENERAL AGGREGATE LIMIT | $2,000,000 ✓ |
| PRODUCTS - COMPLETED OPERATIONS AGGREGATE LIMIT | $2,000,000 ✓ |
| EACH OCCURRENCE LIMIT | $1,000,000 ✓ |
| FIRE DAMAGE LIMIT, ANY ONE FIRE | $100,000 ✓ |
| PERSONAL AND ADVERTISING INJURY LIMIT | $1,000,000 ✓ |
| MEDICAL EXPENSE LIMIT, ANY ONE PERSON | $5,000 ✓ |

TOTAL ADVANCE COMMERCIAL GENERAL LIABILITY PREMIUM:        $25,448.00

FORMS APPLICABLE TO COMMERCIAL GENERAL LIABILITY:
| | | | | |
|---|---|---|---|---|
| CG 21 47 07/98 | 421-0022 12/90 | CG 00 01 10/01 ✓ | CG 21 33 11/85 *xcl.* | |
| CG 01 79 02/03 *VA changes* | IL 01 38 05/04 *VA* | CG 00 62 12/02 *War* | CG 21 62 09/98 *xcl.* | |
| IL 00 21 11/85 | CG 21 88 05/04 *-Terr.* | CG 21 72 12/02 *-Terr.* | CG 21 67 04/02 *fungi* | |
| CG 04 48 12/03 | CG 04 35 02/02 *-EB* | | 421-0149 09/03 | |

↳ *Broadening end.*
*includes add'l insd*

FORM NO. 421-0001A   2/89                    ISSUED 11/14/2005

AGENCY BILL

231-1096 (1/95)

AGENT COPY                    PAGE      8

## Declarations

# EXCESS LIABILITY POLICY

**POLICY NUMBER:** XTM-000-6924-2113
ITEM 1
**POLICY PERIOD:** FROM 11/15/05 TO 11/15/06
(12:01 A.M. Standard time at the address
of the Named Insured as stated herein)

ITEM 2
**NAMED INSURED AND MAILING ADDRESS:**
THE PORTER-BLAINE CORPORATION, AND AS PER LEAD UMBRELLA ✓
1140 AZALEA GARDEN ROAD
NORFOLK, VA 23502

**FIREMAN'S FUND INSURANCE COMPANIES**

Coverage is provided in the following
company, a stock company.

07   National Surety Corporation

In return for the payment of the premium, and subject to all the terms of this
policy, we agree with you to provide the insurance as stated in this policy.

### LIMITS OF INSURANCE

$10,000,000  Each Occurrence        $10,000,000  Aggregate

### UNDERLYING INSURANCE LIMITS

$10,000,000  Each Occurrence        $10,000,000  Aggregate

### PREMIUM

Basis of premium:   Flat charge   PB 1/1/06

Advance Premium: $13,770 ✓   Annual Minimum Premium:  $13,770
includes Terrorism Risk Insurance Act - Certified Acts Coverage:     $270

### SCHEDULE OF UNDERLYING INSURANCE

This schedule is described within Form No. 178457 2-91 which forms a part of
this policy's declarations.

### SCHEDULE OF ENDORSEMENTS

This schedule is described within Form No. 178250-04-04 which forms a
part of this policy's declarations.

| Date of Issue:<br>11/17/2005 | Countersignature of Authorized Agent:<br>VIRGINIA - DOES NOT APPLY IN VIRGINIA |
|---|---|

This declarations page is issued in conjunction with and forms a part of Policy Form 5303 10-02.

| Und Group<br>C | Branch<br>SSR | Producer Code<br>45 490 002 | Producer<br>HILB, ROGAL & HOBBS CO. VA | | Comm.<br>10.00% |
|---|---|---|---|---|---|
| Audit Frequency<br>0 | | | | Previous Policy No.<br>NEW | |

## EXCELLA -- EXCESS/UMBRELLA POLICY

### PART TWO.. THIS DECLARATIONS PAGE WITH "POLICY PROVISIONS-PART ONE" COMPLETES THE BELOW NUMBERED POLICY

POLICY NUMBER  UHR7917898-01

DECLARATIONS

30-1551
Agent

**Item 1.  Named Insured and Address** (No., Street, Town, County, State)

THE PORTER-BLAINE CORPORATION &
VENTURE SUPPLY INC, PORTER-MARCE,
LLC
1140 AZALEA GARDEN ROAD
NORFOLK, VA  23502

HRH OF VIRGINIA
101 WEST MAIN ST  #3000
WORLD TRADE CENTER
NORFOLK, VA
23510

**Item 2.  Policy Period:** (Month, Day, Year)

From    11/15/2005  To    11/15/2006
12:01 A. M., standard time at the address of the named insured as stated herein.

Form of Business:
- [ ] Individual  [ ] Partnership  [x] Corporation  [ ] Limited Liability Company
- [ ] Organization (Other than Partnership, Joint Venture or Limited Liability Company

Business Description: DRYWALL CONTRACTOR/DEALER

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.  THIS PREMIUM MAY BE SUBJECT TO AUDIT.

**Item 3.  Limit of Liability (Section III)**

Occurrence Limit                   $ 10,000,000
Aggregate Limit                    $ 10,000,000

**Item 4.   Premium Computation**

Estimated Annual
Rate per FLAT
Estimated Annual Premium $ 23,776.00
Annual Minimum Premium $ 23,776.00
Advance Premium $ 23,776.00

**Endorsements:**
SEE  472-0176 ATTACHED

- [ ] PRE PAID -- the total annual premium is due at inception.
- [x] HANOCASH -- the annual premium is payable according to the term of the Hanocash endorsement attached.
- [ ] ACCOUNT BILL    [ ] DIRECT BILL    [ ] Annual    [ ] Semi-Annual    [x] Other 10-PAY

Audit period: Non Auditable Unless Indicated by  [ ] Annual  [ ] Semi-Annual  [ ] Other
If you cancel this policy, we shall receive and retain not less than $ 16,600    as a policy minimum premium.

472-0002  (9-98)

Page 1 of 1

# EXHIBIT D

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

   **(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

   **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

   **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   **(2)** The "bodily injury" or "property damage" occurs during the policy period; and

   **(3)** Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

   **(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

   **(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

   **(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

© ISO Properties, Inc., 2000

**e.** Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

**2. Exclusions**

This insurance does not apply to:

**a. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

**c. Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

**d. Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

**e. Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© ISO Properties, Inc., 2000

CG 00 01 10 01     □

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with, the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

© ISO Properties, Inc., 2000

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

© ISO Properties, Inc., 2000

□

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a side-track agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance ; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

## 2. Exclusions

This insurance does not apply to:

### a. Knowing Violation Of Rights Of Another

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

### b. Material Published With Knowledge Of Falsity

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

### c. Material Published Prior To Policy Period

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

### d. Criminal Acts

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

### e. Contractual Liability

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

### f. Breach Of Contract

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

### g. Quality Or Performance Of Goods – Failure To Conform To Statements

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

### h. Wrong Description Of Prices

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

### i. Infringement Of Copyright, Patent, Trademark Or Trade Secret

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

### j. Insureds In Media And Internet Type Businesses

"Personal and advertising injury" committed by an insured whose business is:

(1) Advertising, broadcasting, publishing or telecasting;

(2) Designing or determining content of websites for others; or

(3) An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

### k. Electronic Chatrooms Or Bulletin Boards

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

© ISO Properties, Inc., 2000   CG 00 01 10 01   □

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

**2. Exclusions**

We will not pay expenses for "bodily injury":

**a. Any Insured**

To any insured, except "volunteer workers".

**b. Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

**c. Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

**d. Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

**e. Athletics Activities**

To a person injured while taking part in athletics.

**f. Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

**g. Coverage A Exclusions**

Excluded under Coverage A.

**h. War**

Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

**b.** Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

**c.** The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

**d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

**e.** All costs taxed against the insured in the "suit".

**f.** Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

**g.** All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

**2.** If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

**a.** The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

**b.** This insurance applies to such liability assumed by the insured;

**c.** The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

**d.** The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

**e.** The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

**f.** The indemnitee:

**(1)** Agrees in writing to:

**(a)** Cooperate with us in the investigation, settlement or defense of the "suit";

**(b)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

**(c)** Notify any other insurer whose coverage is available to the indemnitee; and

**(d)** Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

**(2)** Provides us with written authorization to:

**(a)** Obtain records and other information related to the "suit"; and

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

**a.** We have used up the applicable limit of insurance in the payment of judgments or settlements; or

**b.** The conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

© ISO Properties, Inc., 2000

CG 00 01 10 01

**SECTION II – WHO IS AN INSURED**

1. If you are designated in the Declarations as:

   a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

   (1) "Bodily injury" or "personal and advertising injury":

   (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

   (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

   (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

   (d) Arising out of his or her providing or failing to provide professional health care services.

   (2) "Property damage" to property:

   (a) Owned, occupied or used by,

   (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

   you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

   c. Any person or organization having proper temporary custody of your property if you die, but only:

   (1) With respect to liability arising out of the maintenance or use of that property; and

   (2) Until your legal representative has been appointed.

   d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to:

   a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

   b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision.

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

   a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

   b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

   c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. Insureds;

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

1. **Bankruptcy**

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

© ISO Properties, Inc., 2000

CG 00 01 10 01     □

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

## 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

## 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

b. **Excess Insurance**

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(b) That is Fire Insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I — Coverage A — Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

© ISO Properties, Inc., 2000

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(1)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(2)** The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V – DEFINITIONS

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment".

© ISO Properties, Inc., 2000

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in a. above;

      (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

      (3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

   provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

   a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

   b. You have failed to fulfill the terms of a contract or agreement;

   if such property can be restored to use by:

   a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

   b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

   a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

   b. A sidetrack agreement;

   c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

   d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

   e. An elevator maintenance agreement;

   f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

      Paragraph f. does not include that part of any contract or agreement:

      (1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

      (2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

         (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

         (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

      (3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

© ISO Properties, Inc., 2000

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

   a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

   b. While it is in or on an aircraft, watercraft or "auto"; or

   c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

   but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

   a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

   b. Vehicles maintained for use solely on or next to premises you own or rent;

   c. Vehicles that travel on crawler treads;

   d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

      (1) Power cranes, shovels, loaders, diggers or drills; or

      (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

   e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

      (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

      (2) Cherry pickers and similar devices used to raise or lower workers;

   f. Vehicles not described in a., b., c., or d. above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

      (1) Equipment designed primarily for:

         (a) Snow removal;

         (b) Road maintenance, but not construction or resurfacing; or

         (c) Street cleaning;

      (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

      (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

   f. The use of another's advertising idea in your "advertisement"; or

   g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

  © ISO Properties, Inc., 2000   □

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

    **(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

    **(1)** Work or operations performed by you or on your behalf; and

    **(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes

    **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

    **(2)** The providing of or failure to provide warnings or instructions.

     © ISO Properties, Inc., 2000      CG 00 01 10 01    □

# EXHIBIT "E"

# Sinnott Nuckols & Logan, PC

*ATTORNEYS AT LAW*

(804) 378-7600 Ext. 3311

khardt@snllaw.com

September 16, 2009

Richard J. Serpe, Esquire
LAW OFFICE OF RICHARD J. SERPE, P.C.
Crown Center, Suite 310
580 Main Street
Norfolk, Virginia 23510

RE:     **Tuan Nguyen and Colleen Nguyen v. Venture Supply, Inc., The Porter-
        Blaine Corp., and Curb Appeal Home Builders, Inc.**
        Norfolk Circuit Court; Case No. CL09-3105

Dear Richard:

Enclosed please find Venture and Porter-Blaine's supplemental responses to your client's interrogatories relating to insurance coverage. We recently discovered the existence of the Fireman's excess policies and have been in the process of confirming dates and type of coverage.

Also enclosed please find a copy of the documents we were provided relating to that coverage.

If you have any questions or concerns or need a more formal response, please contact me.

Sincerely,

Kenneth F. Hardt

KFH/jmh
Enclosure



cc:     Theodore L. Brenner, Esquire (w/encl.)
        Sam Porter (w/encl.)
        William D. Makimoto, Regional General Adjuster (w/encl.)
        (03-834333-12)

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF NORFOLK

TUAN NGUYEN and
COLLEEN NGUYEN,

    Plaintiff,

v.           Case No: CL09-3105

VENTURE SUPPLY, INC., et al.

    Defendants.

## DEFENDANT VENTURE SUPPLY, INC.'S SUPPLEMENTAL ANSWER TO PLAINTIFFS' FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

   COMES NOW, the defendant, Venture Supply, Inc. ("Venture"), by counsel, and for its

Supplemental Answer to the Plaintiffs' First Interrogatories and Requests for Production, subject

to previous objections, states the following:


  3. Describe all liability coverage required by you for calendar years 2006 through present.

Include in your description any information concerning denial of coverage or reservation of

rights under each policy.

### SUPPLEMENTAL ANSWER:


  Hanover Insurance Company, Policy Number ZBR 7905525-(00,01,02,03,04); effective
11/15/04 – 11/15/09, liability limits $1,000,000.00/$2,000,000.00.

  Hanover Insurance Company, Policy Number UHR 7917898-(00,01,02,03,04); effective
11/15/04 – 7/2/09, umbrella limits of $10,000,000.00/$10,000,000.00.

  Hanover Insurance Company, Policy Number UHR 7917898 – 04; effective 7/7/09 -
present, umbrella limits of $5,000,000/$5,000,000.

Fireman's Fund Insurance Company, Policy No. XTM-000-6924-2113, effective 11/15/05 – 11/15/06, excess umbrella limits $10,000,000/$10,000,000

Fireman's Fund Insurance Company, Policy No. SHX-000-8854-0364, effective 11/15/06 – 7/15/08, excess umbrella limits $10,000,000/$10,000,000.

Hanover has notified Venture of its reservation of rights, and Fireman's has been recently notified of the claims.

VENTURE SUPPLY, INC.

By: _____
                                    Of Counsel

Mark C. Nanavati, Esquire
Kenneth F. Hardt, Esquire
SINNOTT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 378-7600
(804) 378-2610 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was mailed on this the ____ day of September, 2009 to:

Richard J. Serpe, Esquire
LAW OFFICES OF RICHARD J. SERPE, P.C.
Crown Center, Suite 310
580 East Main Street
Norfolk, Virginia 23510

Curb Appeal Home Builders, Inc.
c/o Emmanuel D. Voces, Registered Agent
5040 Corporate Woods Drive, Suite 120
Virginia Beach, Virginia  23462

Theodore I. Brenner, Esquire
Brenner, Evans & Millman
411 E. Franklin Street, Suite 200
Richmond, Virginia  23219

_____

2

VIRGINIA:

IN THE CIRCUIT COURT FOR THE CITY OF NORFOLK

TUAN NGUYEN and
COLLEEN NGUYEN,

           Plaintiff,

v.                            Case No: CL09-3105

VENTURE SUPPLY, INC., et al.

           Defendants.

## DEFENDANT THE PORTER-BLAINE'S SUPPLEMENTAL ANSWER TO PLAINTIFFS' FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

COMES NOW, the defendant, The Porter-Blaine Corporation ("PB"), by counsel, and for its Supplemental Answer to the Plaintiffs' First Interrogatories and Requests for Production, subject to previous objections, states the following:

3. Describe all liability coverage required by you for calendar years 2006 through present. Include in your description any information concerning denial of coverage or reservation of rights under each policy.

**SUPPLEMENTAL ANSWER:**

Hanover Insurance Company, Policy Number ZBR 7905525-(00,01,02,03,04); effective 11/15/04 – 11/15/09, liability limits $1,000,000.00/$2,000,000.00.

Hanover Insurance Company, Policy Number UHR 7917898-(00,01,02,03,04); effective 11/15/04 – 7/2/09, umbrella limits of $10,000,000.00/$10,000,000.00.

Hanover Insurance Company, Policy Number UHR 7917898 – 04; effective 7/7/09 - present, umbrella limits of $5,000,000/$5,000,000.

Fireman's Fund Insurance Company, Policy No. XTM-000-6924-2113, effective 11/15/05 – 11/15/06, excess umbrella limits $10,000,000/$10,000,000

Fireman's Fund Insurance Company, Policy No. SHX-000-8854-0364, effective 11/15/06 – 7/15/08, excess umbrella limits $10,000,000/$10,000,000.

Hanover has notified PB of its reservation of rights, and Fireman's has been recently notified of the claims.

THE PORTER-BLAINE CORPORATION

By: _____

Of Counsel

Mark C. Nanavati, Esquire
Kenneth F. Hardt, Esquire
SINNOTT, NUCKOLS & LOGAN, P.C.
13811 Village Mill Drive
Midlothian, Virginia 23114
(804) 378-7600
(804) 378-2610 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was mailed on this the 16 day of September, 2009 to:

Richard J. Serpe, Esquire
LAW OFFICES OF RICHARD J. SERPE, P.C.
Crown Center, Suite 310
580 East Main Street
Norfolk, Virginia 23510

Curb Appeal Home Builders, Inc.
c/o Emmanuel D. Voces, Registered Agent
5040 Corporate Woods Drive, Suite 120
Virginia Beach, Virginia  23462

Theodore I. Brenner, Esquire
Brenner, Evans & Millman
411 E. Franklin Street, Suite 200
Richmond, Virginia 23219

_____