# EXHIBIT A

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | : **MDL No. 2047**<br>:<br>: **SECTION:  L**<br>: **JUDGE FALLON**<br>: **MAG. JUDGE WILKINSON**<br>: |
| **THIS DOCUMENT RELATES TO:** | :<br>: |
| **Roberts, et al. v. Knauf GIPS KG, et al.,**<br>**Case No. 09-05870 (E.D.La.)** | :<br>:<br>: |

### AMENDED COMPLAINT--CLASS ACTION

Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this class action on behalf of themselves and all other similarly situated owners and residents of real properties in the United States containing drywall that is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that causes property damage and potential health hazards.  The drywall has been manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendants, Knauf Gips KG ("Knauf Gips"); Knauf Plasterboard (Tianjin) Co., LTD ("Knauf Tianjin"); Knauf Plasterboard (Wuhu) Co. LTD ("Knauf Wuhu"); Knauf Plasterboard (Dongguan) Co. LTD ("Knauf Dongguan") (all Knauf-related entities are collectively referred to herein as "Knauf"); Banner Supply Co. ("Banner Supply"), Rothchilt International Ltd. ("Rothchilt), and present in homes built by Defendant Northstar Holdings at B and A, LLC, ("Northstar"), other developers,  and their subsidiaries, divisions and/or agents, and in support thereof, state as follows:

### INTRODUCTION

1.  Defendants' drywall used in the homes of Plaintiffs and the Plaintiff Class Members is

inherently defective because it emits various sulfide gases and/or other chemicals through

1

"off-gassing" that creates noxious, "rotten egg-like" odors, and causes corrosion ("the Defect") of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

2.   This Defect is latent and existed in Defendants' drywall at the time of installation regardless of the way the product was installed, maintained, and/or painted.  There is no repair that will correct the Defect.

3.   As a result of Defendants' conduct as alleged herein, Plaintiffs and thousands of others Class Members in United States have suffered economic losses by owning homes containing inherently defective drywall that has caused damage to their homes and Other Property.

4.   Plaintiffs and Class Members have incurred or will incur tens of thousands of dollars in damages including, but not limited to: repair/replacement of homes, Other Property, any materials contaminated or corroded by the drywall as a result of "off-gassing," incidental and consequential damages.

5.   Further, as a result of Defendants' conduct as alleged herein, Plaintiffs and thousands of others Class Members in United States have suffered harm and/or been exposed to an increased risk of harm and thus have need for injunctive and/or equitable relief in the form of emergency notice, environmental monitoring, and medical monitoring.

6.   Plaintiffs bring this action on behalf of a Class of all similarly situated owners and residents of residential homes in the United States that contain defective, hazardous, or dangerous drywall manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendants.

## JURISDICTION, PARTIES, AND VENUE

7.  This action is within the original jurisdiction of this Court by virtue of 28 U.S.C. §1332(d)(2) and the Class Action Fairness Act.  Plaintiffs and Defendants are citizens of different states and the amount in controversy of this Class action exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

8.  Should the Court not have original jurisdiction over any claim or claims under CAFA, this Court can exercise supplemental jurisdiction under 28 U.S.C. §1367 over the claims because they are derived from the same nucleus of operative facts such that plaintiffs would ordinarily expect to try them in one proceeding.

9.  Venue in this district satisfies the requirements of 28 U.S.C. §1391(b)(1)-(2)  and (c) because a significant number of the absent class members reside in this jurisdiction and a substantial amount of the events and occurrences giving rise to the claims occurred in this District, or a substantial part of the property that is the subject of this action is situated in this district. Venue is otherwise appropriate in this district consistent with JPML's consolidation of MDL.

## PLAINTIFFS

10. Plaintiffs Dr. Steven Roberts and Jennifer Roberts are citizens of Palm Beach County, Florida, and own a home located at 10013 Cobblestone Creek Drive, Boynton Beach, Florida.

11. Plaintiffs Dr. Steven Roberts and Jennifer Roberts home was built by Northstar using drywall manufactured and supplied by one or more of the Defendants.

12. Plaintiffs Carolyn Santamaria and Daniel Santamaria are citizens of Palm Beach County, Florida, and own a home located at 8765 Cobblestone Preserve Court, Boynton Beach, Florida.

13. Plaintiffs Carolyn Santamaria and Daniel Santamaria home was built by Northstar using drywall manufactured and supplied by one or more of the Defendants.

### DEFENDANTS

### Drywall Manufacturers - Knauf Entities

14. Defendant Knauf Gips is a German corporation doing business in the United States with its principal place of business located at Postfach 10, D-97343 Iphofen, Germany.

15. Knauf Gips is a leading manufacturer of drywall, building materials and systems with approximately 20,000 employees worldwide.

16. Knauf has more than 130 production plants in over 40 countries generating annual sales in excess of $4.8 billion Euros.

17. In 1995, Knauf began manufacturing drywall in China.  In 1997, 2000, and 2001 Knauf established three plasterboard plants located in Wuhu (Anhui province), Tianjin and Dongguan (Guangdong province), respectively.

18. Knauf Gips, together with its agents, subsidiaries, and/or affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) provides building materials and systems to customers in over 50 countries, including the United States.

19. Knauf Gips provided defective drywall to one or more of the Plaintiffs' homes.

20. Knauf Gips improperly manufactured, marketed, and later distributed the subject defective drywall in the United States.  Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of Chinese drywall in the United States.

4

21. Upon information and belief, at all material times hereto, Knauf Gips supervised, operated, trained, and otherwise exercised control and/or had the right to control the operations of Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan, and their agents, apparent agents, and employees.

22. From 1997 through 2001, Knauf Gips established three plasterboard plants located in Wuhu, Tianjin, and Dongguan, China, respectively.

23. The quality of all Knauf Gips' Chinese drywall plants in China is supervised, overseen, and controlled according to the requirements of Knauf Gips' headquarters in Germany.

24. Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan and their employees are the actual and/or apparent agents of Knauf Gips.

25. Upon information and belief, Knauf Gips, together with its agents, subsidiaries and/or affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold and placed within the stream of commerce drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within the United States.

26. Upon information and belief, Knauf Gips by itself and/or through its agents, subsidiaries, and/or affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) has continuously and systematically distributed and sold drywall to numerous purchasers in the United States with the knowledge that its drywall would be and is installed in numerous homes in the United States.

27. As discussed more fully below, Knauf Gips by itself and/or through its agents, subsidiaries and affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold,

directly and indirectly, to certain suppliers, including Defendants Banner Supply and Rothchilt, defective Chinese drywall that was installed in homes being built in the United States, thereby causing substantial damage to Plaintiffs and Class Members in the United States.

28. Knauf Gips, each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) participated in the wrongful acts herein.

29. Knauf Gips, each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) also acted in joint enterprise, joint venture and as each other's agent within the course and scope of said agency.

30. At all times relevant hereto, Defendant Knauf Gips, each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) acted by and through their employees, agents, apparent agents and representatives, who were acting within the course and scope of their employment, agency, apparent agency and representation and in the furtherance of Defendants' interests.

31. Defendant Knauf Gips is the parent corporation of the Knauf Entities (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan).  Knauf Gips individually participated, ratified, approved and directed the improper or illegal acts and omissions described herein.

### Knauf Gips' Chinese Drywall Distribution

32. Upon information and belief, tens of millions of square feet of Defendant Knauf Gips defective drywall was used in the construction of the United States homes between 2004 and the present.

33. Because of a shortage of construction materials from a booming housing market and massive damage in the United States in 2005 caused by Hurricanes Katrina and Wilma, domestic

builders, suppliers, and importers began bringing significant stocks of foreign manufactured drywall into the United States.

34. At least 550 million pounds of Chinese drywall came into the United States from approximately 2004 to 2006 -- enough to construct 60,000 average-size homes.

35. Nearly 60 percent of the Chinese drywall that came into the United States came in through Florida ports.

36. Miami's port received the largest number of shipments of Chinese drywall.  Public records show that more than 100 million pounds of Chinese drywall were off-loaded in Miami.  Other ports with significant Chinese drywall off-loading include Port Everglades (80 million pounds), Tampa, (50 million pounds), as well as Port Manatee, Pensacola, Port Canaveral, and Jacksonville.

37. At least 37 million pounds of Knauf drywall was shipped directly from three sites in China to Florida through Tampa and Port Canaveral.  Knauf Tianjin sent an additional amount (characterized by company officials as "most" of its drywall) into Miami.

38. In March 2006, Knauf Dongguang shipped 11 million pounds of Chinese drywall aboard the cargo ship *Afra*.  This shipment was unloaded in Port Canaveral.

39. In the spring of 2006, the cargo ship *Great Immensity* unloaded one shipment of more than 16 million pounds of Chinese drywall manufactured by Knauf Tianjin -- enough to make approximately 1,700 homes.  The *Great Immensity* unloaded shipments at more than two dozen ports throughout the United States, including seven in Florida.

40. Shipping records show coordination between Knauf's Chinese subsidiaries, such as sharing the same vessel to transport their product to the U.S.  In April 2006, the *Yong An Cheng* took three shipments from Knauf Wuhu and a fourth from Knauf Dongguang to the U.S.  All were

imported by United States Gypsum Corporation, one of the largest manufacturers of domestic drywall in the U.S. market.

41. Knauf Tianjin, one of three Knauf Gips Chinese subsidiaries, admits that it manufactured and imported at least 20% of the imported Chinese drywall that came into the United States.

42. Shipping information indicates that Knauf Tianjin sent at least 38.7 million pounds Chinese drywall to the United States in 2006 and Knauf Wuhu sent at least 28.6 million pounds of Chinese drywall.  Based on U.S. Customs and Census information, these figures would indicate that 78 percent of Chinese drywall imports in 2006 came from these two Knauf plants.

43. Many builders in Florida have admitted using Knauf Chinese drywall in communities throughout Florida.

## Knauf Gips' Subsidiary—Knauf Tianjin

44. Upon information and belief, Defendant, Knauf Tianjin, is an international corporation doing business in the United States.

45. Defendant Knauf Tianjin manufactured and distributed defective drywall that is in one or more of Plaintiffs' homes.

46. Knauf Tianjin improperly manufactured, marketed, and distributed the subject defective drywall in the United States.  Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

## Knauf Gips' Subsidiary—Knauf Wuhu

47. Upon information and belief, Defendant, Knauf Wuhu, is an international corporation doing business in the United States.

48. Defendant Knauf Wuhu manufactured and distributed defective drywall that is in one or more of Plaintiffs' homes.

49. Knauf Wuhu improperly manufactured, marketed, and later distributed the subject defective drywall in the United States.  Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

### Knauf Gips' Subsidiary—Knauf Dongguan

50. Upon information and belief, Defendant, Knauf Dongguan, is an international corporation doing business in the United States.

51. Defendant Knauf Dongguan manufactured and distributed defective drywall that is in one or more of Plaintiffs' homes.

52. Knauf Donngguan improperly manufactured, marketed, and later distributed the subject defective drywall in the United States.  Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

### Defendant Distributors/Suppliers

### Defendant Banner Supply

53. Defendant Banner Supply is a Florida corporation with its principal place of business located in the Southern District of Florida at 7195 N.W. 30th Street, Miami, Miami-Dade County, Florida 33122.

54. Defendant Banner Supply exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the United States.  Directly or indirectly through agents, affiliates or co-conspirators, Defendant Banner Supply's acts or omissions related to defective Drywall have injured Plaintiffs and Class Members as alleged herein.

9

**Defendant Rothchilt**

55. Defendant Rothchilt is a foreign corporation doing business in the United States.

56. Defendant Rothchilt exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the United States. Directly or indirectly through agents, affiliates or co-conspirators, Defendant Rothchilt's acts or omissions related to defective Drywall have injured Plaintiffs and Class Members as alleged herein.

57. Defendant Rothchilt manufactured and distributed defective drywall that is in one or more of Plaintiffs' homes.

58. Rothchilt improperly manufactured, marketed, and later distributed the subject defective drywall in the United States. Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

**Developer/Builder Defendant**

**Northstar**

59. Defendant Northstar is a Florida corporation with its principal place of business located in Palme Beach County, Florida at 14406 Military Trail, Delray Beach.

60. Defendant Northstar installed defective drywall in Plaintiffs' home located in the State of Florida. Defendant Northstar's acts or omissions directly or indirectly through its agents, employees, or affiliates, in the installation of defective drywall have injured Plaintiffs and Class Members as alleged herein.

## GENERAL ALLEGATIONS

**A.    Drywall Background**

61. Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, sheetrock, gyproc, or simply board.

62. A drywall panel is made of a paper liner wrapped around an inner core made primarily from hardened gypsum plaster.

63. Drywall is typically available in 4 ft (1219 mm) wide sheets of various lengths. Newly formed sheets are cut from a belt, the result of a continuous manufacturing process.

64. The most commonly used drywall is one-half-inch thick but can range from one quarter (6.35 mm) to one inch (25.4 mm) thick.

65. The core material of drywall, gypsum, is available in two forms, pure gypsum, which is naturally occurring, and synthetic gypsum, which is manmade.

66. Pure gypsum is a white to transparent mineral, but sometimes impurities color it grey, brown, or pink.

67. Synthetic gypsum is generally manufactured with byproducts of coal-fired powerplants.

68. Coal combustion byproducts ("CCBs" or "CCPs") are the inorganic residues that remain after pulverized coal is burned.

69. The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

70. In order to meet emission standards, many utilities have installed flue-gas-desulfurization (FGD) equipment.  Flue gas desulfurization is a chemical process to remove sulfur oxides from the flue gas at coal-burning powerplants.

71. Various FGD methods have been developed that chemically combine the sulfur gases released in coal combustion by reacting them with a sorbent, such as limestone or lime.

72. As the flue gas comes in contact with the slurry of calcium salts, sulfur dioxide reacts with the calcium to form hydrous calcium sulfate, otherwise known as gypsum.

**B**.     **How Drywall Is Created**

73. In order to form drywall, gypsum must be "calcined," or partially dehydrated by heating.

74. When gypsum is heated, it loses about three quarters of its water and becomes hemihydrate gypsum which is soft and can be easily ground to a powder called hemihydrate gypsum plaster.

75. The gypsum powder is then mixed with water to form a paste or slurry.

76. While the hemihydrate gypsum plaster is in slurry form, it is poured between two paper layers to make drywall.

77. Drywall is formed by sandwiching a core of wet gypsum between two sheets of heavy paper or fiberglass mats. When the core sets and is dried in a large drying chamber, the "sandwich" becomes rigid and strong enough for use as a building material.

78. The paste or slurry is typically mixed with fiber (usually paper and/or fiberglass), plasticizer, foaming agent, potash as an accelerator, starch or other chelate as a retarder, various additives that increase mildew and fire resistance (fiberglass or vermiculite), and water.

79. Drywall may consist of two other materials with sulfur content: alkyl ethoxy sulfates as foaming agents and lignin or napthalene sulfonates as dispersing agents.

## C.    The Defective Drywall Emits Noxious and Corrosive Levels of Sulfur

80. Upon information and belief, Defendants' drywall contained naturally mined gypsum and synthetic gypsum manufactured from CCBs.

81. When gypsum, mined or synthetic, is subjected to certain environmental conditions, the product breaks down into sulfate ions which in turn can be chemically transformed into hydrogen sulfide gas and other sulfide gases.

82. The problem of sulfide emissions from drywall is well-understood in the drywall industry and has been studied for many years.

83. The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.

84. Sulfide emissions from drywall have been a particular problem in landfills and, as such, many landfills refuse to accept drywall or place strict limitations on the amounts and on the ways in which drywall can be disposed. An independent consulting firm, hired by a Miami-based builder, has concluded there is little doubt that the drywall manufactured by Defendants is the cause of the corrosion in many residents' homes.

85. One of the managing principles of the independent testing firm stated that: "We have definitely identified that a combination of sulfide gases are the cause of the corrosion of the coils.  The substances we've found are well known to cause that kind of corrosion."

86. The firm's December 2008 results found three sulfide gases: carbon disulfide, carbonyl sulfide and dimethyl sulfide.

87. Hydrogen sulfide was found in previous testing that the company conducted on the Defendants' drywall: "Our previous studied indicate, however, that carbon disulfide, carbonyl sulfide, and hydrogen sulfide are gases that can be associated with emissions from Chinese drywall."

88. According to a Knauf statement, the company "is doing its own investigation, and believes the problem drywall came from a specific [gypsum] mine, which also supplied other manufacturers."  According to Knauf, the company stopped using the questionable mine in 2006.

89. According to published reports, however, some independent environmental testing firms and building experts have said the source of the drywall problem is waste materials from the scrubbers of coal-fired power plants used to make the drywall in China.

90. Knauf's 2009 statement also noted: "Until last year in Florida, no complaint had been raised and no product had been rejected because of odor or impacts to copper in the nine years of [Knauf Tianjin's] operation." (Emphasis added).

91. Knauf received complaints from builders and contractors about "rotten egg" smells coming from its Chinese-manufactured drywall as far back as 2006.

92. In November 2006, in response to reports of odors associated with its drywall, the company hired the Center for Toxicology and Environmental Health, L.L.C. (CTEH) to conduct an air quality investigation in five homes in Florida.

93. Knauf's 2009 statement also declared: "The sulfur compounds detected in testing in homes have been found at no greater levels than air outside homes or in soil, marshes or the ocean."

94. Knauf's 2006 testing revealed, however, that its product released detectable, above-background levels of various sulfur containing compounds.  In particular, Knauf's testing revealed the presence of iron disulfide from its Chinese Drywall as the likely source of the sulfur smells.  Knauf's testing agency declared: "These data indicate that certain naturally-occurring sulfur-containing *compounds can be emitted from the Knauf Tianjin product at concentrations higher than present in background air*." (emphasis added).

95. One importer acknowledged in published reports that the defective Chinese Drywall was "well known in the industry" by 2007.

96. No member of the Class could have discovered the existence of the defect in the Chinese-manufactured drywall until press reports about the defects were released in December 2008.

**D.**   **The Need for Medical Monitoring for the Health Effects of Sulfur Emitting Drywall**

97. Hydrogen sulfide ("H2S"), one of the chemicals found to have been released from drywall, is considered a broad-spectrum poison, meaning that it can poison several different systems in the body, although the nervous system is most affected.

98. The toxicity of H2S is comparable with that of hydrogen cyanide.  It forms a complex bond with iron in the mitochondrial cytochrome enzymes, thereby blocking oxygen from binding and stopping cellular respiration.

99. Exposure to lower concentrations of sulfides can result in eye irritation, a sore throat and cough, nausea, shortness of breath, and fluid in the lungs.

100.   Long-term, low-level exposure to sulfides has been associated with fatigue, loss of appetite, headaches, irritability, poor memory, and dizziness.  Chronic exposures to low levels of sulfides has also been implicated in increased miscarriage and reproductive health issues.

101.   Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold defective drywall, which was unreasonably dangerous in its normal use in that the drywall caused corrosion and damage to Other Property in Plaintiffs and Class Members' homes and caused allergic reactions, coughing, sinus and throat infection, eye irritation, breathing hazards, other health concerns, and/or significantly increased the risk of contracting a serious latent disease.

102.   As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and the Plaintiff Class Members' homes and bodies have been exposed to Defendants' drywall and the corrosive and harmful effects of the sulfide gases and other chemicals being released from these proven hazardous substances.

15

103.    As a direct and proximate result of Defendants' defective drywall and the corrosive

effects of the sulfide gases and other chemicals being released from these products, the

Plaintiffs and the Class Members have suffered, and continue to suffer damages.  These

damages include, but are not limited to, costs of inspection as well as the costs and expenses

necessary to remedy, replace and remove the defective drywall and Other Property that has

been affected.

104.    As a direct and proximate result of Defendants' defective drywall and the corrosive

effects of the sulfide gases and other chemicals being released from these products, Plaintiffs

and Class Members have been exposed to above-background levels of sulfides and other

harmful chemicals, have been placed at an increased risk of disease, and have need for

injunctive relief in the form of emergency notice, environmental testing and monitoring, and

medical monitoring.

**Conditions Precedent**

105.    All notice required by Chapter 558, Florida Statutes, and conditions precedent to bringing

this action have been met or will have been met or were waived by Defendants.

**CLASS ACTION ALLEGATIONS**

106.    Plaintiffs bring this suit as a class action pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3)

and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and the

following Class (collectively referred to herein as "the Class") comprised of:

**Class Definition**

> All owners and/or residents of real properties in the United States
> containing drywall manufactured, sold, distributed, or supplied by
> Knauf.  All members of the class are seeking compensatory
> damages, injunctive and/or equitable relief for environmental and
> medical monitoring.  Defendant, its officers, directors, subsidiaries,

or any person or other entity related to, affiliated with or employed
by Defendant are excluded from the class definition.

**Subclass "A"**
**Distibutor/Supplier Rothchilt International Ltd. ("Rothchilt")**
**Subclass:**
All owners and/or residents of real properties located in the United
States containing Knauf Chinese drywall that was sold, distributed,
or supplied by Rothchilt.

**Subclass "B"**
**Distributor/Supplier Banner Supply Co. ("Banner Supply")**
**Subclass:**
All owners and/or residents of real properties located in the State
of Florida containing Knauf Chinese drywall that was sold,
distributed, or supplied by Banner Supply.

**Subclass "C"**
**Developer/Builder Northstar Holdings at B and A, LLC
("Northstar") Subclass:**
All owners and/or residents of real properties in the State of
Florida that were built and/or made by Northstar and contain
Knauf Chinese drywall.

107.   It is further averred upon information and belief that heretofore named and unnamed

distributors were responsible for distributing the drywall to the named Plaintiffs and Class

and Subclass members' homes.  However, this information is in the control and possession of

the builder and manufacturing Defendants.  Following discovery, Plaintiffs contemplate that

this information will be made available and the responsible distributors will either be

specifically designated and/or joined in this action as Defendants.

## NUMEROSITY

108.   Upon information and belief, the Defendants' defective drywall was installed in

thousands of homes in the United States; therefore, the Class and Subclasses are sufficiently

numerous so that the joinder of all Class and Subclass members in a single action is

impracticable.

109.    Upon information and belief, there are thousands of putative Class and Subclass members

involved in this case.

## **COMMONALITY**

110.    There are numerous common questions of law and fact that predominate over any

questions affecting only individual members of the Class and Subclasses.  Among these

common questions of law and fact are the following:

      a.      whether Defendants manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall products;

      b.      whether Defendants' drywall contains latent and/or manifest defects in the form of emitting sulfides and other chemicals;

      c.      whether Plaintiffs are entitled to recover compensatory, exemplary, incidental, consequential, and/or other damages as a result of Defendants' unlawful and tortious conduct;

      d.      whether Plaintiffs are entitled to recover injunctive and/or equitable relief as a result of Defendants' unlawful and tortious conduct;

      e.      whether Defendants' conduct in manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling their drywall breached the duty of care owed by Defendants to Plaintiffs;

      f.      whether Defendants are strictly liable for selling a defective product;

      g.      whether Defendants failed to warn Plaintiffs of the dangers and hazards related to the defective drywall;

      h.      whether Builder/Developer Defendants conduct constitutes negligence;

18

i.      whether Builder/Developer Defendants breached warranties;

j.      whether Builder/Developers Defendants breached implied warranties of merchantability;

k.      whether Defendants breached implied warranties of fitness for a particular purpose;

l.      whether Defendants violated the various Consumer Protection Acts;

m.      whether Defendants created a private nuisance;

n.      whether Defendants should create and fund an emergency notice program, environmental monitoring, and/or a medical monitoring program;

o.      whether Defendants should give notice to Plaintiffs, Class Members, and Subclass Members under Fed. R. Civ. P. 23(b) 2 or (d) of the defects in drywall, of the need for necessary home inspection, and of the potential health risks associated with the drywall's defects; and

p.      whether Plaintiffs are entitled to attorney's fees, and if so, in what amount.

## **TYPICALITY**

111.   The legal claims of named Plaintiffs are typical of the legal claims of other members of the Class and Subclasses. Plaintiffs have the same legal interests as other members of the Class and Subclasses.

112.   The named Plaintiffs and each member of the Class and Subclasses have defective drywall in their homes.  Due to the drywall in named Plaintiffs' and Class and Subclass Members' homes, each have suffered damages in the form of economic damages, and the need for injunctive and equitable relief, as set forth herein.

19

113.     Named Plaintiffs and Class and Subclass Members' homes and personal property have sustained the same type of economic damage and potential physical harm due to the defective drywall.  Thus, the legal remedies available to named Plaintiffs and the Class and Subclass Members are the same due to the wrongful conduct of Defendants.  The Plaintiffs' claims satisfy the typicality requirement.

## ADEQUACY OF REPRESENTATION

114.     Named Plaintiffs are adequate representatives of the Class and Subclasses and together with legal counsel will fairly and adequately protect the interests of the Class and Subclasses. Named Plaintiffs have no conflicts with the Class or Subclasses and are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent them.  Named Plaintiffs anticipate no difficulty in the management of this litigation as a class action.  Moreover, the class representative's interests are aligned with the Class and Subclass Members and it is unlikely there will be a divergence of viewpoint.

115.     The undersigned counsel are competent counsel experienced in class action litigation, mass torts, and litigation involving defective and harmful products.  Counsel will fairly and adequately protect the interests of the Class and Subclasses.

## RULE 23(b)(1) REQUIREMENTS

116.     The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual Class and Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class and Subclass members that would establish incompatible standards of conduct for the party opposing the Class and Subclasses; or

adjudications with respect to individual Class and Subclass members that, as a practical matter, would be dispositive of the interests of the other Class and Subclass members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

### RULE 23(b)(2) REQUIREMENTS

117.    The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class and Subclasses, so that final injunctive relief is appropriate respecting the Class and Subclasses as a whole.

### RULE 23(b)(3) REQUIREMENTS

118.    The common questions set forth above predominate over Class and Subclass Members' individual issues.

119.    A class action is superior to other methods of dispute resolution in this case.  The Class and Subclass members have an interest in class adjudication rather than individual adjudication because of the overlapping rights.  It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class and Subclass members would protect their rights on their own without this class action case.  Management of the class will be efficient and far superior to the management of individual lawsuits.

### COUNT I
### NEGLIGENCE
**(Against All Manufacturer Defendants Knauf Gips, Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan)**

120.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

21

121.    Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) marketing, and/or j) selling drywall, including a duty to adequately warn of its failure to do the same.  Defendants' duty includes, but was not limited to the following:

     a.  using reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

     b.  using reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

     c.  using reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

     d.  using reasonable care in the importing of the drywall to prevent it from containing Defects as set forth herein;

     e.  using reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

     f.  using reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

     g.  using reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

     h.  using reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

     i.  using reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

j.   using reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

k.   adequately warning and instructing the Plaintiffs and Class Members of the Defects associated with drywall;

l.   properly manufacturing the drywall to prevent it from containing the Defects as set forth herein;

m.  properly selecting the gypsum that did not contain excessive levels of sulfur;

n.   recalling or otherwise notifying users at the earliest date that it became known that the drywall was dangerous and Defective;

o.   advertising and recommending the use of drywall with sufficient knowledge as to its manufacturing defect and dangerous propensities;

p.   not misrepresenting that the drywall was safe for its intended purpose when, in fact, it was not;

q.   not manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

r.   not exporting and/or importing drywall in a manner which was dangerous to its intended and foreseeable users;

s.   not distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

t.   not concealing information from Plaintiffs and Class Members regarding reports of adverse effects associated with drywall;

u.   not improperly concealing and/or misrepresenting information from the Plaintiffs and Plaintiff Class Members and/or the public, concerning the

23

severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and

v.  otherwise exercising reasonable care in the design, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall to prevent it from containing Defects as set forth herein.

122.    Defendants were negligent and breached their duty to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall, including a duty to adequately warn of its failure to do the same.   Defendants' negligence included, but was not limited to the following:

a.  failing to use reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

b.  failing to use reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein:

c.  failing to use reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

d.  failing to use reasonable care in the importing of the drywall to prevent it from containing Defects as set forth herein;

e.  failing to use reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

f.  failing to use reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

24

g.  failing to use reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

h.  failing to use reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

i.  failing to use reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

j.  failing to use reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

k.  failing to adequately warn and instruct the Plaintiffs and Class Members of the Defects associated with drywall;

l.  failing to properly manufacture the drywall to prevent it from containing the Defects as set forth herein;

m.  failing to properly select the gypsum that did not contain excessive levels of sulfur;

n.  failing to recall or otherwise notify users at the earliest date that it became known that drywall was dangerous and Defective;

o.  advertising and recommending the use of drywall without sufficient knowledge as to its manufacturing Defect and dangerous propensities;

p.  misrepresenting that drywall was safe for its intended purpose when, in fact, it was not;

q.  manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;