UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED DRYWALL
    PRODUCTS LIABILITY LITIGATION

MDL DOCKET: 2047

SECTION: L

JUDGE FALLON
MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO ALL CASES

_____/

## RESPONSE AND OBJECTIONS TO THE PLAINTIFFS' STEERING COMMITTEE'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO TAYLOR MORRISON SERVICES, INC. AND TAYLOR WOODROW COMMUNITIES AT VASARI, LLC.

### GENERAL OBJECTIONS (APPLICABLE TO ALL REQUESTS):

1.    Taylor Morrison Services, Inc., "Taylor Morrison" and Taylor Woodrow Communities at Vasari, LLC., "Taylor Woodrow" object to and will not produce documents falling within the scope of the attorney client or work product privileges.

2.    Taylor Morrison and Taylor Woodrow object to production of ESI, until an appropriate order is entered governing the production of such information. Among other things, this Court must determine which party will pay for the costs of investigation and production of ESI, whether "native format" documents must be produced, whether ESI documents must be recopied for the PSC, and many other issues. These defendants offer to attend a "meet and confer" with the PSC to determine, among other things, appropriate search terms for researching responsive ESI. Much of the ESI documentation is not "readily accessible". Moreover, the request is not specifically tailored to discover relevant information, would be unduly expensive, and is unreasonable as there are only 3-4 current MDL plaintiffs suing these defendants.

Exhibit "A"

3.    Taylor Morrison and Taylor Woodrow object to the scope of the document request to the extent that it seeks documents beginning in 2001, and requests documentation from Defendants geographic regions that have no Chinese Drywall claims.  With one possible exception, there are no pending claims for defective drywall that was delivered to Taylor Morrison or Taylor Woodrow prior to 2005, or for any homes with Chinese drywall that were built by these Defendants prior to 2005.  Moreover, all Chinese Drywall complaints relative to these defendants are limited to homes built in west and southwest Florida (Pasco, Lee, Manatee, Hillsborough, Sarasota, Charlotte, Collier counties).

4.    Taylor Morrison and Taylor Woodrow object to the scope of the document request to the extent that it seeks information relative to homeowners who are not named plaintiffs or who have not filled out profile forms in this MDL case.    These requests seek the premature identification of potential class members.  Moreover, the documentation is not likely to lead to the discovery of admissible evidence relative to the Plaintiffs in this case.

5.    Taylor Morrison and Taylor Woodrow object to and will not produce documents related to financial discovery, since these documents are not likely to lead to the discovery of admissible evidence, until after judgment is entered.

6.    Taylor Morrison and Taylor Woodrow object to and will not produce documents relating to all "subsidiaries or affiliates of defendant".  Taylor Morrison's ownership structure has been previously disclosed in this proceeding.  Taylor Morrison and Taylor Woodrow will produce documents relating to affiliates or subsidiaries that built homes within the State of Florida from 2005 through present, for MDL Plaintiffs or individuals filling out Plaintiff's profile forms.  It is unduly burdensome to request documents from subsidiaries or affiliates that were not building homes within the State of Florida during the relevant time and that are not

parties to this lawsuit. All putative class actions or individual lawsuits against these defendants relate only to homes built in the State of Florida.

**RESPONSES:**

1. Subject to the foregoing general objections, Taylor Morrison and Taylor Woodrow will make available all documents falling within these categories. A number of these documents are filed within the public records and are readily accessible to the Plaintiffs. Nevertheless, these documents will be made available at a mutually convenient time and location.

2. Subject to the foregoing general objections these documents will be made available at a mutually convenient time and location.

3.(a)(b) Subject to the foregoing general objections these documents will be made available.

3.(c) Taylor Morrison and Taylor Woodrow object and will not produce the documents showing financial ownership of the Defendants. The documents requested will not likely lead to the discovery of admissible evidence prior to judgment.

3(d) Taylor Morrison and Taylor Woodrow object and will not produce the documents showing financial ownership of the Defendants. The items requested will not likely lead to the discovery of admissible evidence prior to judgment.

4. None exist. Taylor Morrison and Taylor Woodrow did perform inspections of certain homes after learning of the drywall problem and Taylor Morrison and Taylor Woodrow's internal documents concerning these inspections as to the plaintiffs will be made available. Documents concerning Environ's inspections (assuming that they are even responsive to this request) fall within the scope of the work product privilege.

5.    None exist.

6.    Taylor Morrison and Taylor Woodrow object on the grounds that this request is beyond the scope of proper prejudgment discovery. Taylor Morrison and Taylor Woodrow intend to file a motion for protective order with regard to this request.

7.    Taylor Morrison and Taylor Woodrow object on the grounds that this request is overbroad and impossible to respond to. The PSC has agreed to narrow down this request after a "meet and confer session" with the HSC, since this would theoretically require the production of every building permit request and inspection of every home built during the relative period.

8.    Taylor Morrison and Taylor Woodrow object to producing these documents. These documents are public record and are accessible "online" by the Plaintiffs.

9.    Taylor Morrison and Taylor Woodrow have no such documents, with the exception of inspections of drywall once the problem was discovered.  Guidelines for the inspection protocol have previously been produced.

10.    Such documents will be made available at a mutually convenient time and place.

11.    Defendants object, as any such documents fall under the scope of attorney client privilege.  Counsel for Taylor Morrison and Taylor Woodrow has taken appropriate action to make sure the documents are not destroyed.

12.    The policies have previously been produced.  They are available to be copied again if the Plaintiffs might desire.  Defendants are not sure what the request for "policies of related entities" means.

13.    Such documents will be made available at a mutually convenient time and place.

14.    Defendants object to this request on the grounds that it is overbroad and difficult to understand.  Subject to the objection, such documents will be made available at a mutually

4

convenient time and location, except joint defense agreements between the Defendants.  Joint defense agreements are privileged but will be provided to the Court upon request.

15.   Taylor Morrison and Taylor Woodrow have certain contractual provisions requiring subcontractors to use U.S. drywall (not Chinese drywall).   All subcontracts will be made available at a mutually convenient time and place.  There are no "standards for Chinese drywall" since these Defendants never expected to receive any such drywall.

16.   Taylor Morrison and Taylor Woodrow have no such documents since any such drywall was purchased by subcontractors.

17.   Taylor Morrison and Taylor Woodrow have no such documents.

18.   Taylor Morrison and Taylor Woodrow have no such documents for the time period and geographic area set forth in the general objections, other than subcontracts which show who the subcontractor was for particular subdivisions.  Said subcontracts will be made available at a mutually convenient time and place.  These Defendants have no knowledge as to all of the importers or suppliers from which the subcontractors purchased materials.

19.   Taylor Morrison and Taylor Woodrow have no such documents.

20.   Taylor Morrison and Taylor Woodrow have no such documents.

21.   Subject to the general objections asserted above and documents protective by joint defense agreements, Defendants will make available these documents at a mutually convenient time and place.  These Defendants did not purchase, install, or store Chinese drywall.

22.   Taylor Morrison and Taylor Woodrow will make available such documents at a mutually convenient time and place.  As stated above, these Defendants did not purchase, install or store any such Chinese drywall.

23.     Taylor Morrison and Taylor Woodrow will make available such documents at a mutually convenient time and place.  As stated above these Defendants did not purchase, install or store any such Chinese drywall.

24.     Unknown.  The only state in which Chinese drywall has been confirmed in Taylor Morrison or Taylor Woodrow built homes is Florida.  Therefore, such documents will be made available relative to Florida, which is the only state in which Taylor Morrison has been sued.

25.     Taylor Morrison and Taylor Woodrow object on the grounds that this request is not likely to lead to the discovery of admissible evidence.  Documents that do not relate to MDL Plaintiffs or those who have filled out a Plaintiff's Profile Form are not relevant or likely to lead to admissible evidence in these proceedings.  Moreover, this Court has already denied this relief to the PSC in connection with the PSC's "Motion to Protect Class".

26.     Taylor Morrison and Taylor Woodrow have no such documents.

27.     Taylor Morrison and Taylor Woodrow have no such documents. Defendants have no inventory of Chinese drywall.

28.     Taylor Morrison and Taylor Woodrow have no such documents.

29.     Taylor Morrison and Taylor Woodrow have already produced these documents in connection with the Court's order requesting identification information of Chinese drywall.

30.     Taylor Morrison and Taylor Woodrow object on the grounds that this request is not likely to lead to the discovery of admissible evidence.  Documents that do not relate to MDL Plaintiffs or those who have filled out a Plaintiff's Profile Form are not relevant or likely to lead to admissible evidence in these proceedings.  Moreover, this Court has already denied this relief to the PSC in connection with the PSC's "Motion to Protect Class".  These documents will be

made available with respect to the named Plaintiffs or any person filling out of Plaintiff Profile Form.

31.     Taylor Morrison and Taylor Woodrow will make available such documents at a mutually convenient time and place.

32.     Subject to the joint defense privilege, Taylor Morrison and Taylor Woodrow will made available such documents at a mutually convenient time and place.

33.     Taylor Morrison and Taylor Woodrow will make available such documents at a mutually convenient time and place.

34.     Taylor Morrison and Taylor Woodrow will make available such documents at a mutually convenient time and place.

35.     Taylor Morrison and Taylor Woodrow have no such documents.

36.     Inspection protocols have already been produced, as well as the repair protocol. Documents obtained by the Defendants' consultant fall within the scope of the work product and attorney client privileges and Taylor Morrison and Taylor Woodrow therefore object to the production of these documents. Any documents relating to inspections or repairs of specific residences that are not MDL Plaintiffs or who have not filled out the Plaintiffs Profile Forms are not likely to lead to the discovery of admissible evidence and the Defendants object to such production.

37.     Taylor Morrison and Taylor Woodrow have already produced the documents as they relate to the protocols. Defendants object to the production of repair agreements for non-MDL plaintiffs as they are not relevant or likely to lead to admissible evidence in these proceedings. Moreover, this Court has already denied this relief to the PSC in connection with the PSC's "Motion to Protect Class"

38.     Taylor Morrison and Taylor Woodrow objects to this request to the extent that it calls for documents falling within the work product and attorney client privileges.     These defendants will make available non-privileged documents at a mutually convenient time and location.

39.     Taylor Morrison and Taylor Woodrow will make available such documents at a mutually convenient time and place.   Policies have already been produced.

40.     Taylor Morrison and Taylor Woodrow object on the grounds that this request is not likely to lead to the discovery of admissible evidence.  Documents that do not relate to MDL Plaintiffs or those who have filled out a Plaintiff's Profile Form are not relevant or likely to lead to admissible evidence in these proceedings.  Moreover, this Court has already denied this relief to the PSC in connection with the PSC's "Motion to Protect Class".  These documents will be made available with respect to the named Plaintiffs or any person filling out of Plaintiff Profile Form.

41.     Taylor Morrison and Taylor Woodrow object to this request on the grounds that it is overbroad and impossible to understand.  Subject to this objection, inspection and repair protocols have already been produced.

_____/s/ Neal A. Sivyer_____
Neal A. Sivyer
Florida Bar No. 373745
nsivyer@sbwlegal.com
Stephen E. Walker
swalker@sbwlegal.com
Florida Bar No. 0497851

**SIVYER BARLOW & WATSON, P.A.**
401 E. Jackson Street, Suite 2225
Tampa, Florida 33602
Telephone: (813) 221-4242
Facsimile: (813) 227-8598
*Attorneys for Taylor Morrison Services,*
*Inc., and Taylor Woodrow Communities at*
*Vasari, LLC*

## CERTIFICATE OF SERVICE

I HEREBY certify that on October 13, 2009, the foregoing document is being served on Plaintiffs' Liaison Counsel, Russ M. Herman, Herman, Herman, Katz & Cotlar, LLP, 820 O'Keefe Avenue, Suite 100, New Orleans, LA 70113 and all counsel of record upon all parties by electronically uploading the same to Lexis/Nexis File & Serve in accordance with Pretrial Order No.: 6.

/s/ Neal A. Sivyer
Attorney

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED DRYWALL          MDL DOCKET: 2047
       PRODUCTS LIABILITY LITIGATION

                                             SECTION: L

THIS DOCUMENT RELATES TO                     JUDGE FALLON
ALL CASES                                    MAG. JUDGE WILKINSON

_____/

## AFFIDAVIT

STATE OF FLORIDA
COUNTY OF

      BEFORE ME, the undersigned authority, personally appeared ROBERT W. WITTE, who, being first duly sworn, deposes and states as follows:

      1.    My name is Robert Witte. I am over the age of 18 years old and make this affidavit based on my personal knowledge, except as stated with regard to price quotes herein.

      2.    I am the Vice President and Chief Information Officer for Taylor Morrison Inc.

      3.    I was provided a copy of the PSC's First Request for the Production of Documents and Things, which was directed to Taylor Morrison Services, Inc., and Taylor Woodrow Communities of Vasari, LLC., among other parties.

      4.    I requested that our paralegal provide me with an estimate of the potential company employees that might have had regular communications relative to the Chinese drywall issues that are subject of this lawsuit.

5.      After obtaining an estimated number of 30-35 employees still currently employed by Taylor Morrison who were most involved in Chinese drywall issues, I narrowed the list of servers to the offices in Fort Myers, Tampa, and Bradenton, Florida. The identified employees work in those offices. I did this based upon the sense of urgency to the electronic discovery request and in an attempt to somewhat limit the expense.  I then made an estimate of the amount of expense that would be required for our company to comply with the PSC's document request as it relates to electronic data for those servers.

6.      From a price estimate standpoint I obtained a quote from an outside vendor (Emag Solutions) for the current document request as it relates to electronic data recovery.  This estimate is similar to quotes received for ESI document requests served upon us in other lawsuits, that are described later in this affidavit..  A copy of the estimate is attached hereto as Exhibit "A".

7.      I had previously attempted to estimate the costs for ESI production in this case for various levels of data, as set forth in Exhibit "B".   By way of explanation, if only the current emails and computer files were searched for 35 current employees, the cost to our company would be approximately $5,344.00.   Since we do not have the staff at our company to perform this work, it would have to be "outsourced".  The exact cost would depend upon the number of search terms, since any subsequent searches would require additional time and hourly billing costs.

8.      If we did a search of our email archives for the 30-35 employees identified, it is my estimate that there would be an additional cost of at least $8,300.00, bringing the costs of steps 1 and 2 to over $13,000.00.  If we also archive searched the

individual personal computers of the 30-35 employees still employed by Taylor Morrison that are most likely to be involved, this would be an additional cost of over $22,000.00.

9.    We also regularly create backup tapes of our servers for disaster recovery purposes.  However, the older tapes are not all perfectly labeled, and not all may be recoverable.  If we scanned and restored only the labeled tapes (over 700) the approximate cost would be slightly under $300,000 as set forth in the attached Exhibit "B".  The current quote from Emag Solutions would be approximately 50%, of my estimate, if we used them for the other work stated in this affidavit (i.e. there would be "volume discount").

10.    In addition, there are a number of unknown tapes (over 700). Pictures of the boxes holding most of our "backup tapes" are included in Exhibit "B".  These unknown tapes (which do not have labels or specific dates) could also be scanned, restored and searched.  The approximate cost of scanning and restoring those would be in the neighborhood of an additional $300,000.00.

11.    If the search were broadened to all Taylor Morrison related entities, there are currently approximately 13 million emails online on the company computer system and 2 million documents and we have over 15 servers in use.  These numbers do not include data stored on tapes referenced in paragraphs 9-10 above.  Moreover, some of the documents or computers are password protected, which may require additional time and expense to retrieve.

12.    The search quote from Emag Solutions is $8.00 per gigabyte, which would be a cost of $1.8 million, based upon the estimate that there are 234,000 gigabytes of information on our system.

13.    None of the costs set forth above would include our own employee time, or that of our outside legal counsel for reviewing the identified documents and emails.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Robert W. Witte

SWORN TO AND SUBSCRIBED before me this 4th day of November, 2009, by Robert W. Witte, who is personally known to me or who produced _a driver's license_ as identification and who did take an oath.

_____
NOTARY PUBLIC
Print name: Kimberly A. dela Vega
My commission expires: August 31, 2011

KIMBERLY A. DE LA VEGA
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
August 31, 2011



# Statement of Work: Services Schedule

| | |
|---|---|
| Presented To: | **John Lucas** |
| | **Taylor Morrison** |
| | **151 Southhall Lane, Suite 200** |
| | **Maintland, FL 32751** |
| Presented By: | **Kara Coffee** |
| | **ESI Consultant** |
| | **eMag Solutions, LLC** |
| Presented On: | **October 23, 2009** |
| Class: | **eMag Confidential** |


**eMag**
Solutions

# Letter to the Customer

John Lucas
Taylor Morrison
151 Southhall Lane, Suite 200
Maintland, FL 32751

October 23, 2009

Dear Mr. John Lucas:

eMag Solutions LLC ("eMag") is pleased to present  Taylor Morrison  ("Customer") this Services Schedule ("Schedule") detailing services to be performed on your behalf by eMag. Upon full execution of this Schedule, eMag will provide Customer with the services detailed below.

This letter will memorialize our understanding with respect to the engagement of eMag in this matter, the effective date of which will be considered October 23, 2009 (the "Engagement").

The following sections are included in this Schedule:

- Section 1–Overview (Requirements, Pricing, Assumptions, etc.)
- Section 2–Contacts for Services (Customer and eMag contact information)
- Section 3–Terms and Conditions

Should you have any questions or wish to discuss this document, Kara Coffee can be contacted at 404-995-1685 or by e-mail at kcoffee@emagsolutions.com.

Sincerely,

For:
eMag Solutions LLC

**I hereby agree to the terms of this Schedule,**

**Taylor Morrison**

_____
**By (Signature)**

_____
**Name (Printed)**

_____
**Title**

_____
**Date**

**Note:** Please sign and email a copy to your ESI Consultant or fax a copy to 800-334-8273.

---

© 2006-2009 **eMag Solutions**
Taylor Morrison, eMag Confidential

eMag
Solutions

# SECTION 1–Overview

## Scope of Work

eMag has been retained by the Customer for tape restoration and electronic discovery services on approximately one-thousand- six-hundred and fifty-one (1651) backup tapes (collectively, "Source Media").

The work to be performed by eMag on behalf of Ocean Bank is as follows:

1) eMag shall inventory all Source Media received and complete chain of custody documentation for eMag and Customer records;
2) eMag shall restore data from Customer designated Source Media to make said data available for additional processing;
3) eMag shall filter (Keyword Search and/or Date Filter) all emails of identified custodians based on  search terms to be provided by Customer;
4) After data is processed according to Customer's request, eMag will place resulting data onto NTFS formatted hard drive media for delivery to Customer
5) Upon completion of data restoration and verification that the Source Media are no longer required for the purposes of storing data, eMag will return the media to Customer according to a mutually agreeable delivery schedule and delete all data off of eMag's NAS storage unit as requested by Customer.

## Pricing Information

1) Pricing for this job is currently provided as follows:

   Pricing is subject to change based upon variance between project assumptions and actual parameters of work/actual time required for collection and processing. Any material variance in pricing from this Statement of Work (defined as price increase of 15% greater than current value) will be provided to client in writing as soon as practicable.

**Pricing in this Statement of Work is valid for 30 days from the date this document is received.**

*Timelines/Assumptions used in Developing Price Quote are subject to change based on actual work parameters or actual time required for collection & processing.*

| Service | Cost |
|---|---|
| Restoration of 1651 backup tapes | $190.00 per tape assuming all 1651 tapes |
| Keyword Searching | $8.00 per GB assuming all 1651 tapes are searched |



| Output Media | Cost |
|---|---|
| FTP | No cost |
| DVD | $20.00 per DVD |
| Hard Drive | Invoiced at $0.65 per GB based on the capacity of the drive |

## Turnaround Time

Project to be completed within two (2) months of receipt of the backup tapes (not including the date of receipt).  Data will be delivered on a rolling basis according to a mutually agreeable delivery schedule.

# eMag Project Assumptions

The following assumptions and recommendations were used in the preparation of the processing, delivery, and pricing estimates contained in this document. Any deviation from the assumptions contained herein may impact any or all of the estimates contained herein:

1) eMag shall restore data from Customer designated Source Media to make said data available for additional processing.  All Source Media restoration and processing will be performed at eMag's Atlanta, Georgia facility. The Source Media includes approximately one-thousand- six-hundred and fifty-one (1651) backup tapes. The Source Media includes a combination of LTO1, LTO2, LTO3, DLT and DAT backup tapes;
2) Customer has provided eMag with one keyword, "Chinese Drywall", and will confirm the keyword and/or any additional keywords before the onset of this project;
3) Processing of Source Media will commence only upon execution of this Schedule;
4) The e-mail systems located on the Source Media are Microsoft Exchange and Novell GroupWise;  Customer will provide administrator password if needed to process the e-mail systems;
5) Keyword filtering will take place across all restored data;
6) Once the project is completed and the deliverable is reviewed and approved by Customer, eMag will delete all data off of eMag's NAS storage unit as requested by Customer. If approval takes more than 30 days from completion of the project, storage fees will begin to accrue;
7) Customer may require additional services pertaining to this project from eMag, for which an Addendum to this Schedule may be required;
8)  In circumstances where additional work is required to identify incoming media shipments or input specific client notes, a Media Management fee of $65 per hour will be charged
9) Restoration of data on the Source Media does not guarantee the restoration of 100% of the data that was written to the media. Logical and/or physical errors may prevent complete restoration of the data. eMag will take commercially reasonable efforts to restore as much data as technically possible and will inform the customer of any issue encountered;



10) Data restoration and data recovery are two separate and distinct processes with separate pricing structures. Any Source Media requiring data recovery will be identified to Customer along with a price quote for the recovery effort, provided, however, no such data recovery work shall occur without Customer's prior written consent;

11) Failed backup tape restoration and/or cataloging attempts will be invoiced at 85% of the quoted rate. Partial restorations and/or catalogs due to logical or physical issues with the media will be invoiced at 100% of the quoted rate.

## Processing

Restoration of the Source Media will occur in the sequence deemed most appropriate by eMag as satisfying the requirements contained herein. If Customer requires a specific production sequence to meet time commitments to other Customer or external processes, please inform eMag prior to the commencement of Services so as to minimize the impact to the production processes and to determine the degree to which eMag can accommodate Customer's request.

1) An estimated time of completion will be generated once eMag receives or media or gets confirmation of tape numbers, types, and formats.

2) Services will be performed as quickly as technically feasible, taking into consideration technical limitations beyond eMag and Customer's control;

3) Services to be performed in satisfaction of the requirements contained herein do not include decrypting encrypted documents or email, removal of passwords on password protected files, nor do they include processing or manipulation of abnormal or atypical file types.

## Return Delivery and Storage Billing

1) All Source Media and resultant data will be delivered to the Project Shipping Contact at the address specified by Customer in Exhibit 2 below, within a mutually agreeable timetable.

2) This project quote includes 30 days of data storage within the quoted figure, with storage beginning on the day the media arrives at eMag.  Additional storage will be provided at the rates set forth below, until Client notifies eMag that it no longer desires eMag to store its data:

Storage begins at $300 per month for up to 200GB of data.  For data in excess of 200GB, pricing is as follows:

> From 0-5 TB:  $1.50 per GB per month
> From 5-10 TB: $1.25 per GB per month
> Over 10 TB: $1.00 per GB per month
>
> Tape Storage--$2.50 per Source Media per month

3) Beyond the first 30 days of storage, **it is the customer's responsibility to notify eMag when storage of data/media is no longer desired.  In the absence of such Customer notification, eMag will continue to bill for monthly storage at the same rates.**

4) Beyond the initial storage period, client may opt to cancel storage billing at any time, but storage will be billed at a minimum of a two week prorated period based on the date of cancellation.  Billing for storage will be calculated and invoiced on the 15th day of each month following the initial storage period.



5) Upon cancellation of storage billing, customer must advise eMag whether it wishes to have data/media returned to customer, or destroyed by eMag.

6) Return shipping of data/media will be charged to customer at cost to eMag, or Customer may opt to provide a federal express number under which eMag will ship data/media.



# Section 2

## Contacts for Services

The eMag resource names provided below do not constitute a commitment by eMag for these representatives to be assigned to the project for its duration. While eMag intends to minimize any substitution of resources, doing so may become necessary.

### eMag Contacts

| | | |
|---|---|---|
| Account Management | Kara Coffee | 404-995-1685 |
| Project Management | To Be Announced | 404-995-0000 |
| Executive Management | Brendan Sullivan, President | 404-995-1698 |

### Customer Contacts

### Project Billing Contact

Name: _____

Phone #: _____

Address: _____

_____

_____

E-mail Address: _____

### Project Technical Contact

Name: _____

Phone #: _____

Address: _____

_____

_____

E-mail Address: _____

### Project Shipping Contact

Name: _____

Phone #: _____

Address: _____

_____

_____

E-mail Address: _____

eMag Solutions

*Statement of Work: Services Schedule*

# Section 3

## Terms & Conditions

**PRICING:** All fixed unit prices, exclusive of computer charges, shall not be subject to increase for at least twelve months from today's date. Increases after that time shall require thirty (30) days prior written notice to **Customer.** Following the first twelve months of the Engagement, all time and materials and computer prices are subject to reasonable change at the commencement of each calendar year.

**INVOICING:** eMag shall issue invoices to **Customer** bi-weekly for the performance of authorized services. **Customer** will process invoices within thirty days of receipt. Should any amount on the invoice be disputed, **Customer** agrees to process all undisputed amounts within thirty days of receiving the invoice, while the parties attempt to resolve the contested amounts to our mutual satisfaction. Once resolved, **Customer** agrees to pay the remaining amounts within ten days of resolution.

**CONFIDENTIALITY & NON-DISCLOSURE:** eMag Solutions adheres to strict information and data security policies in accordance with ISO27001 standards. All reports and documents prepared by eMag shall be delivered to, and all communications by eMag shall be with, **Customer** or such persons working with **Customer** as **Customer** shall designate.  All communications between eMag, **Customer**, or others in connection with this Engagement shall be regarded as confidential and made solely for the purpose of assisting counsel in giving legal advice. eMag, and any subcontractor it engages, will take appropriate precautions to protect **Customer's** proprietary information, the work it and its subcontractors create, and any confidential attorney-client communications. eMag will disclose its work product only to **Customer** and to persons working on this Engagement on a need to know basis. eMag's obligation of confidentiality shall not extend to information that: (i) is already known to eMag or its agents at the time the information is received by eMag; (ii) is or becomes known to the public through no fault or action of eMag or its agents; or (iii) is available to eMag from a third party not bound to secrecy by contract or court order.

eMag will not disclose to anyone, without **Customer's** written permission or pursuant to an order of a court of competent jurisdiction, the nature or content of any oral or written communications concerning this Engagement, nor any information gained from the inspection of any data, record, or document submitted to eMag with respect to this Engagement, including information obtained from corporate or publicly available records or documents, and eMag will not permit inspection of any data, papers, or documents concerning this Engagement without **Customer's** prior written permission or an order of a court of competent jurisdiction. The preceding sentence will not be construed to limit eMag's testimony at any administrative hearing.

**PRIOR AGREEMENTS:** This project may be part of a previous order that has been extended, and/or may have a Master Services Agreement associated with it. Unless explicitly stated to the contrary in this Statement of Work, conflicts in requirements and/or terms between this agreement and any previous contract or purchase order shall be governed by the details of the information in this document.

**LEGAL REQUESTS:** eMag will immediately notify **Customer** of the happening of either of the following events: (i) the exhibition or surrender of any documents or records covered in this Engagement, in a manner not expressly authorized, or (ii) a request by anyone to examine, inspect or copy such documents or records covered by this Engagement.

**COURT ORDER:** eMag shall give immediate notice to **Customer** of a court order or subpoena to testify and/or to produce any documents or records arising from this Engagement and shall cooperate fully in any efforts that Customer may undertake with respect to that order or subpoena. Should **Customer** require eMag to oppose disclosure of such information or materials, **Customer** will either retain legal counsel to represent eMag or will indemnify eMag for all costs and expenses, including reasonable attorneys' fees and disbursements, resulting from such action. **Customer** will also pay all hourly fees associated with eMag's efforts to oppose the order or subpoena and/or respond to it at established Market rates.



**WORK PRODUCT:** All work papers, records, or other documents prepared or obtained with respect to this Engagement, **excluding internal notes, modifications to eMag proprietary software to process Customer's data and internal job processing notes,** shall be treated as **Customer's** work product and shall be held by eMag solely for **Customer's** convenience and subject to **Customer's** unqualified right to instruct eMag with respect to possession and control.

Work papers prepared by eMag, or under eMag's direction, in connection with this Engagement belong to **Customer,** and will be turned over to **Customer** at **Customer's** request. eMag will be afforded reasonable access to such work papers in the event that eMag is involved with litigation or administrative proceedings where such access is necessary.

**CONFLICT:** eMag affirms that it has undertaken a limited inquiry of its records to determine conflicts with this Engagement and that no such conflicts have been found. **Customer** acknowledges, however, that the very nature, diversity, magnitude, and volume of eMag and its past and present clients and professional relationships does not allow eMag to be certain that each and every possible relationship or potential conflict has come to its attention. In the event that additional relationships or potential conflicts come to eMag's attention, eMag will promptly notify **Customer. eMag operates as a neutral third-party vendor in all cases, except when retained to act specifically in a consulting capacity.** This Engagement will not preclude eMag's future services for clients adverse to **Customer** on matters that are not substantially related to the matter eMag is handling in connection with this Engagement, so long as these future services do not require eMag to use or disclose information obtained during the course of this Engagement.

**LIMITED LIABILITY:** It is understood and agreed that eMag is an independent contractor. Accordingly, eMag will not assume liability for **Customer's** actual use of the information provided to **Customer as result of services performed under terms of this Engagement,** nor does **Customer** assume liability for eMag's activities in gathering information, which eMag has represented will be done in full compliance with all applicable laws and regulations. **Customer** agrees to hold eMag harmless and indemnify eMag (including its officers, employees, and agents) against all claims, liability, damages, and costs (including reasonable attorneys' fees and disbursements) arising out of this Engagement, except when the same shall arise due to eMag's or its agents' willful misconduct, unlawful activity, or **gross** negligence.

**eMag is not responsible for the data residing on any media provided. It is the responsibility of Customer to ensure that eMag is working on a duplicate version of Customer data. If there is a sole source of media being sent to eMag for processing, Customer must indicate such in writing.**

**Customer warrants to eMag Solutions that it is the owner of, and/or has the right to be in possession of, all Materials furnished to eMag, and that such materials are furnished for a lawful purpose.**

**CHOICE OF LAW:** The laws of the State of Georgia without regard to its conflict of laws principles shall govern this Engagement.

**HEADINGS:** The headings and titles used in this document are purely for convenience purposes, and no legal meaning should be attached to such headings.

**CONSENT TO JURISDICTION AND VENUE:** Customer and eMag agree that any and all disputes concerning the terms, conditions, or operation of this Agreement, whether such dispute arises at law or in equity, shall be decided by the Superior Court of Fulton County, Georgia or United States District Court for the Northern District of Georgia, Atlanta Division, and the parties hereby irrevocably consent to jurisdiction and venue in such courts. If an action is initiated in the Superior Court of Fulton County, Georgia or the United States District Court for the Northern District of Georgia, Atlanta Division, Customer and eMag hereby waive and agree not to assert any defenses of lack of jurisdiction or improper venue or forum *non conveniens*, all such defenses being hereby waived.



# Estimate based on quote from Emag Solutions

## Assumptions

| | |
|---|---|
| Consultant | $50/hour |
| Project Manager | $75/hour |
| Search Terms | ??? |
| Current EE's | 35 |
| Former EE's | 33 |
| Tape Scan | $50 |
| Restore (based on 30 EE's) 1st 25 | $425 |
| Restore (based on 30 EE's) 26 - 100 | $375 |
| Restore (based on 30 EE's) 101 -??? | $340 |
| Tape information based on quote from emag | |
| Taylor Morrison will outsource all work | |

## Online Data Search (35 Current EE's)

| | Time (hrs) | Cost |
|---|---|---|
| E-mail | 40 | $2,000 |
| Files | 50 | $2,500 |
| Project Mgr | 11 | $844 |
| **Total** | **90** | **$5,344** |

## E-mail Archive Search (35 Current and some of the former EE's)

| | Time (hrs) | Cost |
|---|---|---|
| E-mail | 140 | $7,000 |
| Project Mgr | 18 | $1,333 |
| **Total** | **140** | **$8,333** |

## PC's (35 Current EE's)

| | Time (hrs) | Cost |
|---|---|---|
| Files | 380 | $19,000 |
| Project Mgr | 47.5 | $3,563 |
| **Total** | **380** | **$22,563** |

## Options

| | |
|---|---|
| Online (Blue from the IT Landscape) | $5,344 |
| Online + E-mail Archive (Blue from the IT Landscape) | $13,656 |
| Online + E-mail Archive + PC's (Blue from the IT Landscape) | $36,219 |
| Online + E-mail Archive + PC's + Labeled Tapes (Blue from the IT Landscape) | $328,632 |
| Online + E-mail Archive + PC's + Labeled Tapes + Unknown Tapes (Blue, Green, Grey, Red from the IT Landscape) | $623,192 |

## Labeled Tapes (755)

| | Tapes | Cost per Tape | Cost |
|---|---|---|---|
| Scan | 715 | $50 | $35,750 |
| Restore 1st 25 | 25 | $425 | $10,625 |
| Restore 26 - 100 | 75 | $375 | $28,125 |
| Restore 101-??? | 615 | $340 | $209,100 |
| Shipping | | $500 | $500 |
| Search | 140 hours | $5,000 | $7,000 |
| Project Mgr | 18 hours | $1,333 | |
| **Total** | | | **$292,413** |

## Unknown Tapes (754)

| | Tapes | Cost per Tape | Cost |
|---|---|---|---|
| Scan | 754 | $50 | $37,700 |
| Restore 1st 25 | 0 | $425 | $0 |
| Restore 26 - 100 | 0 | $375 | $0 |
| Restore 101-??? | 754 | $340 | $256,360 |
| Shipping | | $500 | $500 |
| Search | | ??? | $0 |
| Project Mgr | | ??? | $0 |
| **Total** | | | **$294,560** |

HAUSFELD LLP

202.540.7200 ph
202.540.7201 fax

1700 K Street, NW
Suite 650
Washington, DC 20006

October 28, 2009

*VIA E-MAIL AND US MAIL*
Neal A. Sivyer
Sivyer Barlow & Watson, P.A.
401 E. Jackson Street
Suite 2225
Tampa, FL 33602

Re:     *Follow-up Meet and Confer of Plaintiffs' Discovery of Taylor Morrison ("TM")*

Dear Neal:

This is a follow-up to our meet and confer of October 26, 2009. We appreciate your time. We believe there are several disagreements on discovery as set forth below. We will seek relief from the Court on these matters. Please call me if there are any questions.

*Objections:*  We understand that you object to any discovery that predates 2005, any discovery as to TM activities outside of Southwest Florida, and any discovery that goes beyond the particular records that pertain to the 4 MDL Plaintiffs who have sued TM, and one additional Florida resident at a TM development who has filed a Plaintiff Profile Form. We will move to strike these scope objections for the reasons set forth below.

*RFP #4*     You did make a rough estimate that in Florida Taylor Morrison has conducted roughly 300 inspections, and written roughly 100 remediation agreements, and that you will claim that Environ's (environmental consulting) work for TM is privileged work product. We contend that this data is relevant to a myriad of relevant issues including but not limited to TM's knowledge of the Chinese Drywall problem generally; the alleged defect in the drywall; whether there are feasible remedies to the Chinese Drywall contamination; as well as testing, inspection and analysis of Chinese Drywall; labeling of the product; notices regarding the Chinese Drywall problem; and communications between TM and co-defendants and insurers; all issues critical to this litigation. Furthermore, we believe that objective data related to Chinese Drywall generated by Environ is discoverable and not attorney work product. At this time we are seeking the objective data itself, not Environ's opinions. Therefore, we will move to compel full responses to RFP #4.

*RFP #7*     We will limit RFP #7 at this time to all filings *related to Chinese Drywall* made to any governmental agency, as described in the request. We will move to compel full responses to this request.

**Exhibit "C"**

*RFP #9*      We understand you have informally produced your inspection protocols and remediation protocols.  We ask that you formally produce these documents by bate stamping them and providing copies.

*RFP #11*      We understand you will deem certain preservation documents created by counsel as privileged.  However, we request you produce TM's corporate document preservation policies.

*RFP #'s 25, 30*
*36, 37, 38, 40*      We understand you have a scope objection to RFP #25, 30, 36, 37, 38, 40.  The Court has made clear that a defendant may not limit itself to individual case-specific responses in an MDL, or under the relevance standards for discovery.  See Transcript of Discovery Conference (10/06/09) at 16(9-18); Minute Entry October 6, 2009; *see also Arinder v. Lee*, 2000 WL 680343, *1-2 (E.D. La 5/23/2000).  All of these requests are *specifically related to Chinese Drywall* and well within the guidelines provided by the Court and cited above.  We will move to compel full responses to these requests.

*Depositions and Document Production*
       We renew our request for a date for 30(b)(6) deposition.  We must obtain the TM documents from you in Concordance and review them prior to the deposition, and we don't have the document production cleared up yet.  I have spoken to Jerry Parker.  He informed me that the Defendants are aware that the Plaintiffs have requested the documents in *Concordance Load Format,* and that TM has not done that.  Please indicate if TM will do that and if so when; or alternatively if TM will not do that.  We propose early December for TM 30(b)(6) witnesses. Please provide an acceptable date.

*ESI*
       As we discussed, please resolve the ESI production issues with Jerry Parker's office.

*Privilege Log*
       TM has not produced a privilege log.  Please indicate the date that will be produced.

       Thank you.

                                        Sincerely,

                                        *Rich Lewis*

                                        Richard S. Lewis

cc:      Jerrold Parker



# Sivyer Barlow & Watson, P.A.

### ATTORNEYS AT LAW

MAHLON H. BARLOW, III

R.J. HAUGHEY, II

EDWARD J. KUCHINSKI

J. CARLTON MITCHELL

MELISSA A. GIVENS

NEAL A. SIVYER

STEPHEN E. WALKER

PAUL D. WATSON

SUNTRUST FINANCIAL CENTRE
401 E. JACKSON STREET
SUITE 2225
TAMPA, FL 33602
(813) 221-4242
FAX: (813) 227-8598
www.sbwlegal.com

OF COUNSEL

GAIL M. ABERCROMBIE

DAVID S. WATSON

SENDER'S EMAIL:
nsivyer@sbwlegal.com

October 26, 2009

Leonard Davis, Esq.
Herman, Herman, Katz & Cotlar, L.L.P
820 O'Keefe Avenue
New Orleans, LA 70113-1116

RE:   *Chinese Manufactured Drywall Products Liability Litigation*
*MDL No.: 2047*
Our File No.: 8211.5

Dear Lenny:

As you are aware, I represent Taylor Morrison and Taylor Woodrow ("Taylor") in these actions. Please consider this as a supplement to the letter dated October 23, 2009 from Mark Salky.

I agree with and share the same frustrations set forth in Mark's letter concerning the PSC's unwillingness to cooperate with regard to the issues of ESI discovery and depositions.

As you correctly stated, when you asked me when Taylor would be available for deposition, I indicated that we could be available in a relatively short time frame, provided that our plaintiffs were also made available for depositions near the same dates. I only have 4 plaintiffs in this MDL case. I think that it would be perfectly fair for 2 of my plaintiffs to be deposed first and the other 2 plaintiffs deposed after my clients. If your rational is that the goal should be to fast track for discovery only cases that will be set for bellwether trials, then either both sets of depositions should be set now, or neither of them. Obviously if one of the Taylor cases is likely to be set as a bellwether trial, then the plaintiff(s) ought to be available for deposition. Alternatively, if my clients' cases are not likely to be set for early trial, then there is no particular rush to take either set of depositions.

With regard to ESI discovery, I share Mr. Salky's concerns, and would point out that the PSC's position that we should simply start producing ESI discovery on a rolling basis is impossible. If we unilaterally select search terms, or search ESI with regard to individual

**Composite Exhibit "D"**

Leonard Davis, Esq.
October 26, 2009
Page 2

employees at Taylor that were most involved in the Chinese drywall issues, we will have to start all over if you do not like the search terms or the employees that we select, and we are forced to expand the searches.   You have offered to share none of the costs either.

Given the fact that we have a grand total of 4 homeowners in these cases (one of whom has asked to withdraw), it is not realistic to ask us to spend hundreds of thousands of dollars on this scope of ESI discovery.   We have produced hard copies of 3000 pages of documents reflecting, among other things, our insurance, all of the plaintiffs' files in these MDL cases, and numerous documents relative to the subcontractors.   There is no evidence that any of the homebuilders knew of the bad drywall before it was installed, that they stored the bad drywall, or that they installed any of the bad drywall.  Spending hundreds of thousands of dollars or more to search millions of emails from an international group of companies makes absolutely no sense.

I did receive a call from Jerry Parker of your office, and we have missed each other.  I am scheduled to confer at 4 pm today with other members of the PSC.  I would also be perfectly willing to talk to Ervin Gonzalez, or other attorneys in his office (who have 3 of the 4 plaintiffs named against my clients).  I have had a great relationship dealing with Ervin. He is a superb lawyer.

In summary, we need to be practical.  Searching millions of emails for a 9 year period without any agreed search terms and with no limit as to the offices or employees whose computers are being searched is absolutely ridiculous.  I do not think that the Judge will be particularly happy with either side if we cannot work out some reasonable parameters on ESI discovery and I hope we can make some progress in our continued talks.

I look forward to speaking with either Jerry on the ESI issues and would be glad to discuss the deposition schedules with any member of the PSC.  I do think that we ought to coordinate a deposition schedule with all parties, since various defendants would likely want to be available for certain depositions which might include that of my clients, Taylor Morrison and Taylor Woodrow.

I look forward to a meaningful level of cooperation from the PSC on these issues.

Sincerely,

Neal A. Sivyer

NAS:kp
cc:    Hilarie Bass-via email
        Kerry Miller-via email
        Ervin Gonzales-via email
        Dorothy Wimberly-via email



# Sivyer Barlow & Watson, P.A.

### ATTORNEYS AT LAW

MAHLON H. BARLOW, III

R.J. HAUGHEY, II

EDWARD J. KUCHINSKI

J. CARLTON MITCHELL

MELISSA A. GIVENS

NEAL A. SIVYER

STEPHEN E. WALKER

PAUL D. WATSON

SUNTRUST FINANCIAL CENTRE
401 E. JACKSON STREET
SUITE 2225
TAMPA, FL 33602
(813) 221-4242
FAX: (813) 227-8598
www.sbwlegal.com

OF COUNSEL

GAIL M. ABERCROMBIE

DAVID S. WATSON

SENDER'S EMAIL:
nsivyer@sbwlegal.com

November 5, 2009

**SENT VIA EMAIL**
Leonard Davis, Esq.
Herman, Herman, Katz & Cotlar, L.L.P
820 O'Keefe Avenue
New Orleans, LA  70113-1116

RE:  *Chinese Manufactured Drywall Products Liability Litigation*
*MDL No.: 2047*
Our File No.: 8211.5

Dear Mr. Davis:

As you are aware, I represent Taylor Morrison Services, Inc., and Taylor Woodrow Communities at Vassari, LLC. (collectively "Taylor"), in this litigation. I have attempted to reach Mr. Parker on several occasions and he has left me a message once. Unfortunately, we have had no success discussing the electronically stored information ("ESI") production issues. Therefore, I thought it best to summarize Taylor's systems, in an attempt to narrow the issues of ESI discovery. As you know, we offered several suggestions at the original "meet and confer" in New Orleans two weeks ago, to narrow the scope of requested electronic discovery, while allowing the PSC to obtain the most likely relevant sources, and hold down the cost and time of production (which we contend should be shared by the parties).

I have had a subsequent "meet and confer" with Richard Lewis concerning the production of hard copy documents and our general objections. However, we did not discuss the electronic issues, since he was not given permission to discuss this. We reached a consensus on some issues relating to the hard copy production, and continue to disagree on others.

Taylor has taken steps to preserve its electronic data in accordance with the Court's Pretrial Order concerning same. We also wanted to summarize for you the electronic systems in place at Taylor, so that you and your electronic experts can more adequately access the volume of data within Taylor's possession.

Leonard Davis, Esq.
November 5, 2009
Page 2

1. Taylor uses Exchange as its e-mail system. Taylor's Exchange system is distributed throughout North America and is comprised of 14 servers.

2. In addition to the traditional Outlook client software, Exchange also provides a web interface for accessing e-mail from an Internet browser.

3. Taylor attempts to limit the size of some user's mailboxes with policies that remove e-mail after 45, 90, or 365 days. Although e-mail is removed from the mailbox, it remains in the e-mail archive for an indefinite period of time.

4. Taylor allows the large majority of the users' mailboxes to grow without limits.

5. In November of 2008, Taylor implemented an e-mail archive system. Since that time all e-mails sent or received have been captured by the archiving software. Taylor does not purge e-mail from the archiving software. Taylor has also imported all mail that was online in the users' mailboxes into the e-mail archive.

6. The Exchange servers hosting e-mail and web services are backed up on a 30 day rotation. Generally one set of backups per month is stored offsite from the Exchange server indefinitely.

7. Taylor provides a network drive or home directory and encourages its use. It is possible for users to store documents on their PC's or on usb drives.

8. Taylor uses Windows servers to provide file storage for its users. There are approximately 14 File servers throughout North America. Although users typically store files on their local server it is possible that data is stored on the company shared drive T or on other division servers.

9. The File servers hosting file services are backed up on a 30 day rotation. Generally one set of backups per month is stored offsite from the Exchange server indefinitely.

10. Taylor uses Newstar accounting and home building software.

11. The servers hosting Newstar services are backed up on a 30 day rotation. Generally one set of backups per month is stored offsite from the Exchange server indefinitely.

12. Taylor uses Build Pro to interface with its subcontractors. Build Pro is outsource to Hyphen Solutions and is not maintained by Taylor Morrison. Build Pro data that is interfaced with Newstar is in the online system and uses the same backup procedures as Newstar.

13. Taylor provides remote access to services via VPN and Citrix. It is possible for a user to install these technologies on their home computer.

Leonard Davis, Esq.
November 5, 2009
Page 3

14. Taylor issues Blackberries, Windows Mobile Devices or iPhones to many users.  Other users will only have a cell phone. Taylor is taking no steps to preserve this data.

15. Taylor provides Instant Messaging for its users via Live Communications Server.  Taylor does not monitor IM usage nor do they record it.

16. Taylor has several voicemail systems.

17. Taylor has a public facing website available at TaylorMorrison.com

18. Taylor uses SharePoint for its intranet.

19. Taylor has a custom CRM tool hosted by DigiScribe.

As we discussed at the original meet and confer, it would be my suggestion that we narrow the electronic searches to the 30 or 35 individuals at Taylor with the most involvement in the Chinese drywall issues.  We would also agree to search their archive emails, as well as their computers and hard drives.

Restoring and doing initial searches of all backup tapes with ESI for all "affiliated companies", as requested by the PSC, would be extraordinarily expensive and time consuming. If we scanned and restored only the "labeled" backup tapes (over 700) the approximate cost would be probably be $200,000- $300,000.  In addition, there are a number of unknown tapes (over 700). The approximate cost of scanning and restoring those would be in the neighborhood of an additional $300,000.00.   This data was originally stored for emergency management purposes.  The foregoing do not even include the additional cost of the actual searches which would also be tremendous, unless the search terms or number of tapes were limited. We currently have approximately 13 million emails on-line alone.  There are also approximately 2 million documents on line, some of which are likely password protected.

Once we are able to agree on the scope of ESI that is to be collected, we propose agreeing on a set of search terms, to narrow the scope of potentially relevant ESI that needs to be reviewed and, if responsive and not privileged, produced to the PSC.  We would suggest initially searching the names and addresses of the named plaintiffs, the names of the subcontractors, suppliers and manufacturers for those homes, as well as evidence preservation and inspection protocols.

Taylor intends to produce discoverable ESI to Plaintiffs in TIFF format.  As Lennar did, we acknowledge the request from the PSC that Taylor produce its ESI in native format along with meta-data; however, we expect to provide the PSC with Taylor's record in TIFF form. Taylor objects to the production of any ESI in native form, in part because of the inherent burdens associated with document control, review and redaction, and in part because of the expedited timetable for production in this case.

Leonard Davis, Esq.
November 5, 2009
Page 4


Native file production creates numerous problems and issues. For example, as stated in the *Sedona Principles* "information produced natively may be difficult or impossible to redact or Bates number [.]" These files will be similarly difficult or impossible to associate with legends concerning confidentiality. In addition, the review of native file production will create a review burden on counsel since, as the *Sedona Principles* also recognize, the meta-data associated with the native files could contain or reveal privileged, secret or other sensitive information, necessitating its relatively costly review, and thus impacting the speed and cost of production. Moreover, the courts have recognized that such a speedy production militates against, not for, production in native form. *See McCord v. State Fire & Cas. Inc. Co.* 2008 U.S. Dis. LEXIS 36006 (E.D. La. 2008) (denying request for production of native format email due to imminent discovery deadline).

Random searches of the approximately 1,500 stored tapes that were originally created for disaster relief purposes would be extraordinarily expensive and time consuming relative to the usefulness of the information obtained. A search of 13 million emails is also unrealistic. It is my understanding that the PSC has refused to agree to the cost of any of the ESI discovery. Taylor is not willing to incur the extraordinary expense in doing this.

By copy of this letter I am suggesting that Ervin Gonzalez (who is the lead attorney with respect to 3 of our 4 Plaintiffs) or Mr. Parker evaluate this data and information with your IT expert. As stated above, we think that none of the above information you seek relates to the UK IT systems. A search of all of our related company computers for an 8-9 year period of time is unrealistic and goes well beyond the "readily accessible electronic information" envisioned in the Federal Rules.

I look forward to your prompt response.

Sincerely,

Neal A. Sivyer

NAS:kp
cc:    Hilarie Bass, Esq.-via email
       Kerry Miller, Esq.-via email
       Ervin Gonzales, Esq.-via email
       Dorothy Wimberly, Esq.-via email
       Jerry Parker, Esq.-via email

**Neal Sivyer**

| | |
|---|---|
| ʔom: | Neal Sivyer |
| Sent: | Thursday, October 29, 2009 5:03 PM |
| To: | 'Richard Lewis' |
| Cc: | Parker, Jerrold S.; Lisa Walker |
| Subject: | RE: Follow-up Meet and Confer of Plaintiffs' Discovery of TM |

Gentlemen,

My paralegal, Lisa has called your technology person about converting the documents to Concordance. As long as you will pay for this, this is not an issue. Please ask him to call Lisa Walker.

As I told Richard, I don't know the number of inspections. I just used 300 for an example. Regardless of the number, we stand by our objection.

As I stated before, we will appear for a deposition on reasonably short notice but I want my plaintiffs available also. Please arrange for Tarzy, Glavin, Culliton, and Niemczura to appear.

Jerry-can you call me Monday at a specific time about ESI? I am in mediation today and tomorrow. Please consider my prior suggestions on search terms, narrowing the scope of time and employees, and sharing the expense.

Neal

**From:** Anna Galloway [mailto:agalloway@hausfeldllp.com] **On Behalf Of** Richard Lewis
**Sent:** Thursday, October 29, 2009 4:39 PM
**To:** Neal Sivyer
**Cc:** Richard Lewis; Parker, Jerrold S.
**Subject:** Follow-up Meet and Confer of Plaintiffs' Discovery of TM

Anna Galloway, Legal Secretary
agalloway@hausfeldllp.com
202.540.7162 ph



1700 K Street, NW, Suite 650, Washington, DC 20006
202.540.7200 main / 202.540.7201 fax / www.hausfeldllp.com

This electronic mail transmission from Hausfeld LLP may contain confidential or privileged information.
If you believe you have received this message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

Exhibit "E"