# EXHIBIT A

Check One [✓]
- [ ] CASH
- [✓] CONV
- [ ] FHA
- [ ] VA
- [ ] OTHER

8/13/2006 11:10:31AM
MIAMI-DADE COUNTY CGC062343

**LENNAR HOMES, INC.**
730 NW 107 AVE, Suite 400
Miami, Florida 33172
(305) 559-1951

**PURCHASE AND SALE AGREEMENT**

Check One [✓]
- [✓] Owner Occupied
- [ ] Second Home
- [ ] Investment

THIS IS A LEGALLY BINDING AGREEMENT, IF NOT FULLY UNDERSTOOD SEEK COMPETENT LEGAL ADVICE. NO WARRANTIES OR REPRESENTATIONS, OTHER THAN THOSE SPECIFIED IN THIS AGREEMENT, ARE EXPRESSED OR IMPLIED. ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF SELLER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS AGREEMENT AND THE DOCUMENT BOOK PROVIDED TO PURCHASER, IF ANY.

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into effective as of the **May 31, 2006** by and between LENNAR HOMES, INC., a Florida corporation ("Seller"), and the purchaser(s) named below ("Purchaser"):

PURCHASER(S):
1. Lorena Garcia
2. Angela M. Garcia
3.
4.

Check Applicable:
1. M[ ] S[✓] W[ ] M[ ] F[✓]
2. M[ ] S[✓] W[ ] M[ ] F[✓]
3. M[ ] S[ ] W[ ] M[ ] F[ ]
4. M[ ] S[ ] W[ ] M[ ] F[ ]

Purchaser Address: 13332 S W 6 Street
City: Miami    State/Country: Florida    Zip: 33184

By providing your telephone and fax numbers and your email address, you hereby consent to receiving telephonic, fax, and email communications, including advertisements, made or sent by or on behalf of Lennar Homes, Inc. and/or its affiliates.
Home Telephone: (305) 223-2853

Social Security Number / Passport Number:
Social Security Number / Passport Number:
Social Security Number / Passport Number:
Social Security Number / Passport Number:

Redacted

Telefax Number:
Email Address: visiongloryinc@yahoo.com
Business Telephone Purchaser: (305) 273-7473
Business Telephone Second Purchaser:

1. **Purchase and Sale.** Purchaser agrees to buy and Seller agrees to sell to Purchaser (on the terms and conditions set forth below)
Model **634051.1736 C / Sorrento** constructed or to be constructed on the following described property:
Lot **02** of Block **06** of Section **Tuscany Village** of **Tuscany Village II** Subdivision, in **Miami-Dade** County (the "County"), Florida.

Elevation: A1    Garage Locations will be determined by Seller
Address: 12964 SW 135 St Miami, Florida 33186

The single family residence, the above-described property, improvements constructed or to be constructed thereon, and all appurtenances thereto are collectively referred to in this Agreement as the "Home" and are located within **Tuscany Village** (the "Community"). The lot on which the Home is located will be referred to in this Agreement as the "Homesite."

2. **Purchase and Payments.** The total purchase price ("Total Purchase Price") for the Home being purchased hereunder, exclusive of any Closing Costs as described in Section 16 and elsewhere herein, will be as follows:

| PURCHASE PRICE | AMOUNT |
|---|---|
| Base Purchase Price | $ 328,190.00 |
|  | $ |
| Homesite Premium | $ |
| Options: SHUTTERS, | $ 8,490.00 |
| UPGRADE CARPET, TILE | $ |
| GRANITE, FULL PATIO | $ |
|  | $ |
|  | $ |
| TOTAL PURCHASE PRICE | $ 336,680.00 |

THIS DWELLING UNIT IS WITHIN A COMMUNITY DEVELOPMENT DISTRICT ("DISTRICT"). THE DISTRICT PLANS TO ISSUE OR HAS ISSUED BONDS THAT WILL HAVE PRINCIPAL AND INTEREST PAYMENTS APPLICABLE TO THIS DWELLING UNIT OVER A PERIOD OF UP TO THIRTY (30) YEARS TO FUND CONSTRUCTION OF INFRASTRUCTURE SERVING THE PROPERTY IN THE ESTIMATED AGGREGATE AMOUNT OF **36,750.00**. THIS DWELLING UNIT SHALL BE ASSESSED AN ESTIMATED ANNUAL CAPITAL ASSESSMENT OF **1,225.00** FOR ITS PROPORTIONATE SHARE OF DEBT SERVICE ON THE BONDS UNTIL SUCH BONDS ARE PAID IN FULL. THESE AMOUNTS ARE DUE OVER THE TERM OF THE BONDS IN ADDITION TO THE PURCHASE PRICE. INITIAL PURCHASER ALSO UNDERSTANDS THAT IF THE ACTUAL ANNUAL CAPITAL ASSESSMENTS ON THE DWELLING UNIT ARE MORE THAN FIVE PERCENT (5%) HIGHER THAN THE ESTIMATED AMOUNT PROVIDED HEREIN, INITIAL PURCHASER SHALL HAVE THE RIGHT TO RESCIND THIS AGREEMENT AT ANY TIME PRIOR TO CLOSING. INITIAL PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT THE ESTIMATED AMOUNT OF CAPITAL ASSESSMENTS DOES NOT INCLUDE ADMINISTRATIVE ASSESSMENTS WHICH SHALL BE LEVIED BY THE DISTRICT FOR OPERATIONS AND INFRASTRUCTURE MAINTENANCE AND MAY VARY FROM YEAR TO YEAR AND FROM TIME TO TIME. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURES IN THIS PROVISION AND THE ATTACHED CDD NOTICE, THE CDD NOTICE SHALL CONTROL.

Purchaser shall make the following payments:

| PAYMENT | DUE DATE | AMOUNT DUE |
|---|---|---|
| Initial Deposit | Upon signing of Agreement | $ 5,000.00 |
| Additional Deposit |  | $ |
|  |  | $ |
| Nonrefundable deposit(s) for options, extras and/or upgrades |  | $ |
| Amount to be financed |  | $ 336,680.00 |
| BALANCE DUE BY CASHIER'S CHECK OR FEDERAL WIRE ONLY (BANK CHECK OR OFFICIAL CHECK WILL NOT BE ACCEPTED) Initial ___ Initial AMG Initial ___ Initial ___ | At Closing (as defined in Section 14 hereof) | $ -5,000.00 |
| TOTAL |  | $ 336,680.00 |

CFT-09/23/05    Purchaser's Initials 

LEN-HF-0005794
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3. **Financing.**

3.1. **Mortgage Loan.** This Agreement is contingent on Purchaser obtaining a loan commitment for a first mortgage loan from an institutional lender in the amount set forth on the first page hereof (with interest, term, and service charges at current market rates at time of Closing for a borrower of Purchaser's credit qualifications) within sixty (60) days of Purchaser's execution of this Agreement. Notwithstanding any provision herein to the contrary, if Purchaser is applying for a loan in excess of eighty percent (80%) of the Total Purchase Price, and the Home is not being acquired as a primary residence, Purchaser agrees to accept a loan equal to eighty percent (80%) of the Total Purchase Price if the institutional lender considering Purchaser's loan application will not approve a loan in excess of eighty percent (80%) of the Total Purchase Price. Unless Purchaser shall have notified Seller otherwise in writing within sixty (60) days of Purchaser's execution of this Agreement, Purchaser shall be conclusively presumed to have obtained the loan commitment or agreed to purchase the Home without mortgage financing. If Purchaser does timely notify Seller within the sixty (60) day period that he/she failed to obtain a loan commitment, Seller may require Purchaser to immediately reapply for a mortgage loan with another lending institution designated by Seller. If Purchaser then fails to obtain a loan commitment within sixty (60) days from Seller's notice to reapply, either Purchaser or Seller shall have the right to terminate this Agreement whereupon the Deposit (as defined in Section 20 herein) shall be returned to Purchaser. Notwithstanding the foregoing, Seller may charge Purchaser a reasonable amount, not to exceed One Hundred Twenty-Five Dollars ($125.00), to cover administrative costs, and thereupon the parties hereto shall be released from all liability hereunder without any further acts by either party.

3.2. **Application.** Purchaser agrees to submit his/her application for a mortgage loan from an institutional lender within ten (10) days of Purchaser's execution of this Agreement. Failure to make timely application shall be deemed a breach of Purchaser's obligations hereunder and Seller shall have all the remedies available under Section 17 hereof without any further acts by Purchaser or Seller. Purchaser understands that any application hereunder must be fully completed in order to obtain the mortgage and will make a good faith attempt to qualify for the mortgage. If Purchaser has a spouse who has not signed this Agreement, Purchaser agrees to have his/her spouse sign the mortgage documents as required by the lender. PURCHASER AGREES TO INCUR NO DEBT SUBSEQUENT TO THE DATE HEREOF WHICH MIGHT JEOPARDIZE APPROVAL OF PURCHASER'S LOAN. IF THE HOME IS BEING PURCHASED BY A CORPORATION, PARTNERSHIP, OR OTHER ORGANIZATION, PURCHASER AGREES (i) TO OBTAIN ANY PERSONAL ENDORSEMENTS OR GUARANTEES REQUIRED BY THE LENDER AND (ii) PROVIDE TO THE LENDER AND/OR THE TITLE INSURER PROMPTLY UPON REQUEST SUCH CERTIFICATES, RESOLUTIONS OR OTHER CORPORATE, PARTNERSHIP OR OTHER ORGANIZATIONAL DOCUMENTS AS MAY BE REQUIRED. Except as herein provided, Purchaser agrees to pay all loan fees and closing costs charged by the lender in connection with the mortgage. Purchaser will pay any prepaid interest due on the mortgage at the time of Closing and any amount the lender may require to be put into escrow toward the payment of property taxes and insurance on the Home. Purchaser will also pay any mortgage insurance premiums (prepaid or otherwise), if required by such lender.

3.3. **Commitment.** Purchaser understands that the rate of interest on the mortgage is established by the lender and not by Seller and that any predictions or representations of present or future interest rate which may have been contained in any advertising or promotion by Seller are not binding. If Purchaser obtains a written mortgage loan commitment or approval from an institutional lender and the mortgage loan commitment or approval is subsequently withdrawn through no fault of the Seller, this Agreement shall remain in full force and effect and Purchaser shall be conclusively presumed to have agreed to purchase the Home without mortgage financing. If Purchaser obtains a loan commitment which contains any special condition which is not ordinarily contained in typical loan commitments for the Community, Seller, in Seller's sole discretion, may treat Purchaser's loan application as having been denied; whereupon, Seller shall have the rights set forth in Section 3.1 hereof.

Purchaser's Initials ___ ___

3.4. **Sale of Other Residence.** Purchaser represents and warrants that this Agreement and the mortgage loan referenced herein are not and will not be subject to or contingent upon Purchaser selling and/or closing on the sale of Purchaser's present residence or other property. Failure to close on the purchase of the Home will constitute a default by Purchaser and the remedies available to Seller for Purchaser's default under this Agreement shall apply.

3.5. **FHA and VA.** Purchaser agrees to proceed with the purchase of the Home after having read Purchaser's rights and privileges, as set forth below, appropriate to the type of loan Purchaser has requested.

3.5.1. **FHA Loans Only.** It is expressly agreed that notwithstanding any other provisions of this Agreement (contract), the Purchaser shall not be obligated to complete the purchase of the Home (property) or to incur any penalty by forfeiture of earnest money deposits or otherwise, unless Purchaser has been given in accordance with Housing and Urban Development ("HUD")/Federal Housing Administration ("FHA") or United States Department of Veterans Affairs ("VA") requirements, a written statement by the Federal Housing Commissioner, Department of Veterans Affairs, or a Direct Endorsement lender setting forth the appraised value of the Home (property) (for mortgage purposes) of not less than $_____ (which statement Seller agrees to deliver to Purchaser promptly after such Appraised Value Statement is made available to Seller). The Purchaser shall have the privilege and option of proceeding with the consummation of this Agreement (the contract) without regard to the amount of the appraised valuation. THE APPRAISED VALUATION IS ARRIVED AT TO DETERMINE THE MAXIMUM MORTGAGE THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT WILL INSURE. HUD DOES NOT WARRANT THE VALUE OR THE CONDITION OF THE PROPERTY. THE PURCHASER SHOULD SATISFY HIMSELF/HERSELF THAT THE PRICE AND CONDITION OF THE PROPERTY ARE ACCEPTABLE. (See signature block for FHA/VA loan below.)

3.5.2. **VA Loans Only.** It is expressly agreed that, notwithstanding any provisions of this Agreement, Purchaser shall not incur any penalty by forfeiture of earnest monies or otherwise be obligated to complete the purchase of the Home, if Purchaser cannot obtain a loan guaranteed by the VA, including without limitation, if the Total Purchase Price exceeds the reasonable value of the Home established by VA or a VA lender pursuant to the Lender Appraisal Processing Program. Purchaser shall, however, have the privilege and option of proceeding with the consummation of this Agreement without regard to the amount of reasonable value established by the VA or the VA lender. (See signature block for FHA/VA loan below.)

AGREE TO PROCEED:  Check ☑ one:  FHA ☐  VA ☐

_____   _____
Purchaser                        Purchaser

3.5.3. **Special Trust Account.** If Purchaser is financing the purchase of the Home with an FHA insured or VA guaranteed loan, the Deposits received from Purchaser prior to Closing shall be placed in a special trust account.

4. **Notice.** Section 501.1375 of the Florida Statutes requires that the following statement be disclosed to purchasers of residential homes:

> THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO TEN PERCENT (10%) OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY BUYER.

**WAIVER:** Purchaser's Initials ___ ___
I/We hereby waive my/our rights under Section 501.1375 of the Florida Statutes to have all deposit funds, up to ten percent (10%) of the Total Purchase Price, deposited in an escrow account.

**NON-WAIVER:** Purchaser's Initials _____
Purchaser is electing to have all deposit funds, up to ten percent (10%) of the Total Purchase Price, deposited in an escrow account. Seller intends to use the deposit funds for construction purposes and has acquired a master surety bond permitting Seller to obtain the immediate release of such deposit funds from the escrow account as provided in Section 501.1375(5) of the Florida Statutes. If Purchaser does not waive the right to have the deposit funds placed in an escrow account, Purchaser may be debited at Closing an amount equal to the premium for the applicable portion of the master surety bond securing such deposit funds.

LEN-HF-0005767
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5. **Credit Information Authorization.** Purchaser authorizes the lender designated in Section 7, and any other lender to whom Purchaser has applied or is in the process of applying for a mortgage loan in connection with this transaction ("**Lender**"), to disclose to Seller the information contained in any loan application, verifications of deposit, income and employment, and credit reports or credit related documentation on Purchaser. Purchaser authorizes Seller to order one or more credit reports from a consumer reporting agency to be used in connection with this transaction. The cost of said report(s) is (are) to be paid by Purchaser. Purchaser authorizes Seller to forward all copies of all or any portion of said report(s) without interpretation to Lender, or to any lender who (at the request of Purchaser) will evaluate a potential extension of credit to Purchaser, in connection with this transaction. Purchaser authorizes the Lender, and any credit bureau or other person or entity utilized or engaged by Lender, to obtain one or more consumer reports regarding Purchaser and to investigate any information, reference, statement, or data, provided to Lender by the Purchaser or by any other person or entity, pertaining to Purchaser's credit and financial status. Purchaser shall indemnify and hold harmless Lender and Seller, and any credit bureau or other person or entity utilized or engaged by Lender or Seller, for any damages or liability arising from an investigation of Purchaser's credit and financial status.

Purchaser's Initials ___ ___

6. **Builder's Fee.** Purchaser acknowledges and agrees that in connection with the purchase of the Home, Purchaser shall pay to Seller a builder's fee, equal to two percent (2%) of the Total Purchase Price (the "**Builder's Fee**"). The Builder's Fee is imposed in connection with all home sales in the Community, regardless of whether the purchaser finances the purchase of the home. The Builder's Fee represents additional compensation to Seller and principally is intended to cover various out-of-pocket and internal costs and expenses associated with development. This fee is due at Closing. The Builder's Fee is separate from any and all Closing Costs. While the Builder's Fee is payable, along with various other fees, costs and amounts at Closing, the Builder's Fee is not a settlement fee associated with any loan that Purchaser may obtain to finance the purchase of the Home.

Purchaser's Initials ___ ___

7. **Title Insurance, Mortgage Loan and Closing Costs.**

7.1. Purchaser has a right to use a title company and a lender chosen by Purchaser in connection with the purchase of the Home. If the (a) purchase of the Home is a cash transaction without financing, and Purchaser elects to use North American Title Company ("**North American**"), a title company affiliated with Seller, or (b) purchase of the Home will be financed, and Purchaser elects to use both North American and Universal American Mortgage Company, LLC, a Florida limited liability company ("**UAMC**"), an affiliate of Seller, or such other lender, if any, as may be named by Seller on the Approved Lender Addendum attached hereto and made a part hereof, then Seller shall pay the following Closing Costs: documentary stamp taxes on the Deed (as hereinafter defined), the premium for an owner's title insurance policy, and the costs to record the Deed. In order to assure that the title work and the loan application process are commenced promptly, Purchaser must select the title company and lender, and advise Seller of the election, either simultaneously with the execution of this Agreement or within ten (10) days of the date of this Agreement. Please check ☑ one of the boxes below and place your initials below the selected text. By initialing on the line provided by the selected text, Purchaser also acknowledges receipt of the Affiliated Business Arrangement Disclosure Statement which discloses the affiliation of Seller with North American and UAMC.

(1) ☒ Purchaser elects to use both North American and UAMC (or such other lender named on the Approved Lender Addendum).

Purchaser's Initials ___ ___

(2) ☐ Purchaser intends to purchase the Home without financing (i.e., will not obtain financing from any lender) but elects to use North American.

Purchaser's Initials ___

(3) ☐ Purchaser elects to use a title company other than North American and/or a lender other than UAMC (or any other lender named on the Approved Lender Addendum).

Purchaser's Initials ___

(4) ☐ Purchaser shall notify Seller within ten (10) days of the date of this Agreement of its election of option (1), (2) or (3) by delivering to Seller the Election Form Amendment attached hereto.

Purchaser's Initials ___

7.2. If Purchaser selects option (1) or (2) in Section 7.1 above, Seller will pay the documentary stamp taxes on the Deed, the premium for an owner's title insurance policy, and the costs to record the Deed only if the election is made within the time period noted above. Regardless of whether Seller pays such costs, Purchaser will pay all other loan and Closing Costs including, without limitation, the title search fee, title exam fee and settlement fee.

8. **Construction Financing.** Seller may borrow construction money from Seller's own lender to construct the Community and/or the improvements on the land comprising the Home. Purchaser acknowledges that any lender advancing construction funds will have a first mortgage on the Home until Closing. At that time, Seller may use all of the Closing proceeds to release the Home from the lien of the construction mortgage. This Agreement and the Deposit hereunder will not give Purchaser any lien or claim against the Home, and Purchaser's rights hereunder shall at all times from the date hereof be subordinate to those of any lender holding a mortgage, whether or not such mortgage secures the advancement of construction funds and even if such mortgage is placed of record and encumbers the Home after the date of this Agreement.

9. **Construction Specifications.**

9.1. **Generally.** The materials, equipment and fixtures included in and to be used in constructing the Home will be substantially the same as or similar in quality to those described in the applicable plans and specifications and in the model (except as to extras, options and/or upgrades), if a model has been constructed. Seller has the absolute right to make modifications to the plans and specifications. Without limiting the generality of the foregoing, Purchaser specifically agrees that minor changes in the dimensions of rooms and patios, entrances and terraces, if applicable, and changes in the locations of windows, doors, walls, partitions, utility lead-ins and outlets (including, but not limited to electrical, cable television and telephone), air-conditioning components, lighting fixtures and electrical panel boxes may be made by Seller. Such changes may also include, but are not limited to, minor changes in the building location, setbacks and facing, the building's external configuration, its structural components, its finishes and the landscaping associated therewith. It is widely observed construction industry practice for pre-construction plans and specifications for any home or building to be changed and adjusted from time to time in order to accommodate on-going, "in the field" construction factors. These changes and adjustments are essential in order to permit all components of the Home to be integrated into a well-functioning and aesthetically pleasing product in an expeditious manner. Based on the foregoing, Purchaser acknowledges that such changes may occur and agrees that it is reasonable and to Purchaser's benefit, to allow Seller the flexibility to make such changes to the Home. Purchaser further understands and acknowledges that many of the Homes to be constructed within the Community require floor plans which are opposite ("flipped") mirror images of the model floor plan and that Seller's agents and/or representatives have fully explained and reviewed this fact with Purchaser and Purchaser fully understands and accepts the floor plan configuration for the Home and improvements to be constructed within the Home. Purchaser further understands and agrees that the following items (which may be seen in models or shown in illustrations) may not be included with the sale of the Home: wall coverings, paint colors, accent light fixtures, wall ornaments, drapes, blinds, bedspreads, furniture, furnishings, wet bars, monitoring systems, certain built-in fixtures, special floor coverings, wood trim, upgraded items and/or any other items of this nature which may be added or deleted from time to time. This list of items (which is not all-inclusive) is provided as an illustration of the type of items built-in or placed upon models or shown in illustrations strictly for purposes of decoration and example only. In addition, notwithstanding anything to the contrary contained in this Agreement, Seller does not guarantee that any particular vehicle will be able to fit into a garage, if any. Buyer should consult the floor plans for their particular home with respect to the size of the garage. By initialing below Purchaser acknowledges having received a features list and a floor plan showing the orientation of the Home.

Purchaser's Initials ___ ___

Purchaser's Initials ___ ___

LEN-HF-0005768
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

9.2. **Variations.** Purchaser further understands and agrees that certain of the finishing items, such as tile, marble, carpet, cabinets, stone, brickwork, wood, paint, stain and mica are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturers from those shown in the model, if any, or in illustrations or brochures or those included in the specifications. Furthermore, if circumstances arise that, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, Seller reserves the right to substitute equipment, materials, appliances, etc., which in Seller's opinion are considered to be of quality substantially similar or equal, or of better quality, subject to their availability. Purchaser also understands that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor, if any. Purchaser further acknowledges and agrees that (i) the plans and specifications of the Home and the Community on file with the applicable governmental authorities may not be identical in detail to Seller's plans and specifications, and (ii) because of the day-to-day nature of the changes described in Section 9.1 and this Section 9.2, the plans and specifications on file with the applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file all changes with such authorities). As a result of the foregoing, Purchaser and Seller both acknowledge and agree that: The Home and the Community may not be constructed in accordance with the plans and specifications on file with the applicable governmental authorities. Without limiting the generality of Section 19 of this Agreement, Seller disclaims any and all express or implied warranties that construction will be accomplished in compliance with such plans and specifications. Seller has not given and Purchaser has not relied on or bargained for any such warranties. In furtherance of the foregoing, in the event of any conflict between the actual construction of the Home and/or the Community, and that which is set forth on the plans and specifications, Purchaser agrees that the actual construction shall prevail and to accept the Home and Community as actually constructed (in lieu of what is set forth on the plans and specifications). Seller will provide Purchaser, when available, with a checklist of color and/or material choices for those items for which Purchaser will have a choice, if any (in Seller's sole discretion). If Purchaser fails to complete and return the color and/or material selections to Seller within a reasonable amount of time as determined by Seller, Purchaser understands that all choices will be made by Seller and Purchaser will have no reason to object to those choices. Colors of all items and materials not included in that checklist will be selected by Seller. Dimensions of your Home may differ from those reflected in brochures, advertisements, artists' renderings and marketing floor plans. Actual dimensions may vary upon completion of the Home.

9.3. **Purchaser Acknowledgments.** Purchaser acknowledges and agrees that Purchaser has not relied upon any statements, verbal or written, published by or under the authority of Seller in advertising and promotional matter, including but not limited to newspaper, radio or television advertisements, but has based the decision to purchase solely upon Purchaser's personal investigation, observation and the disclosure materials and Documents (as defined below) provided herewith. Purchaser further acknowledges that the primary inducement to purchase under this Agreement is the Home.

9.4. **Landscaping.** Purchaser further agrees and understands that trees and landscaping which are located within the Community may be removed during the construction or development process. Seller does not guarantee the location, replacement or survival of any trees and/or landscaping which are left or planted on any portion of the Community. Any loss of trees, shrubs, annuals, or other landscaping shall in no way obligate Seller to replace them.

10. **Completion Date.** Seller is required to complete and does agree that the construction of the Home will be completed within a period of two (2) years from Purchaser's execution of this Agreement. If construction is delayed by events consisting of acts of God, impossibility of performance or frustration of purpose, the date of completion shall be extended by the delay period. It is the express intent of the parties that the parties' rights and obligations under this Agreement be construed in the manner necessary to exempt this Agreement and the sale of the Home from registration under the Interstate Land Sales Full Disclosure Act, and both Purchaser and Seller hereby expressly waive any right or provision of this Agreement that would otherwise preclude any exemption.

11. **Inspection Prior to Closing.**

11.1. PURCHASER SHALL BE GIVEN AN OPPORTUNITY TO EXAMINE THE HOME WITH SELLER'S REPRESENTATIVE PRIOR TO CLOSING OF TITLE ON A DATE AND TIME SCHEDULED BY SELLER. AT THAT TIME, IF ANY ITEMS ARE NOTED, PURCHASER SHALL PRESENT TO SELLER AN INSPECTION STATEMENT SIGNED BY PURCHASER. IF ANY ITEMS NOTED ARE ACTUALLY DEFECTIVE IN WORKMANSHIP OR MATERIALS IN SELLER'S OPINION (IN ACCORDANCE WITH CONSTRUCTION STANDARDS PREVALENT FOR A SIMILAR HOME IN THE COUNTY WHERE THE COMMUNITY IS LOCATED), SELLER WILL BE OBLIGATED TO CORRECT THOSE ITEMS AT SELLER'S COST. A SECOND INSPECTION OF THE HOME WILL BE CONDUCTED PRIOR TO CLOSING AT WHICH TIME THE PURCHASER WILL BE GIVEN AN OPPORTUNITY TO EXAMINE THE HOME WITH SELLER'S REPRESENTATIVE TO ACKNOWLEDGE THAT ITEMS LISTED ON THE INSPECTION STATEMENT PREPARED AFTER THE FIRST INSPECTION HAVE BEEN CORRECTED. ANY REMAINING ITEMS THAT SELLER HAS AGREED TO CORRECT WILL BE CORRECTED BY SELLER AT SELLER'S SOLE COST AND EXPENSE PRIOR TO CLOSING (OR AT SELLER'S OPTION WITHIN A REASONABLE TIME AFTER CLOSING). NO ESCROW OR HOLDBACK OF CLOSING FUNDS SHALL BE PERMITTED. IF A PURCHASER FAILS TO TAKE ADVANTAGE OF ANY PRE-CLOSING INSPECTION ON THE TIME AND DATE SCHEDULED BY SELLER, PURCHASER SHALL BE DEEMED TO HAVE WAIVED THE RIGHT TO INSPECT THE HOME PRIOR TO CLOSING.

11.2. Purchaser acknowledges that all matters pertaining to the initial construction of the Home will be performed by Seller and Seller's representatives. Purchaser acknowledges and agrees that for reasons of safety and to comply with liability and insurance requirements imposed upon Seller, neither Purchaser nor any agent of Purchaser shall, until after the Closing, be permitted to enter upon the Home without Seller's prior written approval. Purchaser agrees not to interfere with or interrupt any workmen at the Home. Any personal inspections shall be made at times designated by Seller and upon written permission of Seller, and shall not be allowed under any condition prior to the formal inspection described above and only with Seller's representative. Purchaser may not order any work on the Home, other than options, upgrades and/or extras that Seller has agreed in writing to provide, until after the Closing. Purchaser recognizes that Seller is under no obligation to agree to provide options, extras and/or upgrades. Without limiting the applicability of this Section to all obligations, representations and covenants of Purchaser hereunder, Purchaser specifically acknowledges that any breach by Purchaser of the terms and conditions contained within this Section shall be deemed to be a "material breach" and shall entitle Seller to declare this Agreement to be in default in accordance with the provisions of Section 17 hereof. Seller's failure to promptly take any action with respect to Purchaser's breach of the terms and conditions contained herein shall not be deemed a waiver of any of Seller's rights or remedies hereunder. Whenever this Agreement shall require the Seller to complete or substantially complete an item of construction, unless provided specifically to the contrary herein, such item shall be deemed complete or substantially complete when so completed, in the sole and unfettered opinion of the Seller. Without limiting Seller's rights contained within Section 9 hereof, should Seller fail to provide any item of construction required to be provided or any option, extra and/or upgrade, Purchaser's sole remedy therefor will be to collect an amount from Seller equal to Seller's cost for such item and for Seller's cost of installation of such item had such item been installed at the appropriate time during construction. Without limiting Seller's rights and Purchaser's obligations contained within this Section and elsewhere in this Agreement, should any defects in workmanship or materials be discovered before or after the Closing, Purchaser agrees that Purchaser's sole remedy therefor is for Seller to repair or replace the defective item at Seller's sole and absolute discretion. To the extent permitted by applicable law, Seller disclaims any liability for incidental or consequential damages that may arise from a defective item.

12. **Damage to Home.** If between the date of this Agreement and the Closing, the Home is damaged by fire, natural disaster, acts of terrorism or other casualty, the following shall apply:

12.1. Risk of loss to the Home by fire, natural disaster, acts of terrorism or other casualty until the Closing is assumed by Seller, but without any obligation by Seller to repair or replace the Home, except that if Seller elects to repair or replace such loss or damage to the Home, this Agreement shall continue in full force and effect and Purchaser shall not have the right to reject title or receive a credit against or abatement in the Total Purchase Price. If Seller elects to repair or replace such loss or damage, Seller shall be entitled to a reasonable period of time within which to complete such repairs or replacement. Any proceeds received from insurance in satisfaction of any claim or action in connection with such loss or damage shall belong entirely to Seller. If such proceeds shall be paid to Purchaser, Purchaser agrees that such funds are the property of Seller and Purchaser shall promptly upon receipt thereof turn the same over to Seller.

12.2. If Seller notifies Purchaser that Seller does not elect to repair or replace any such loss or damage to the Home, then this Agreement shall be deemed terminated and of no further force or effect. Seller shall refund to Purchaser all monies deposited hereunder whereupon the parties shall be released and discharged of all claims and obligations hereunder, except that if Purchaser is then otherwise in default hereunder, Seller shall retain all or a portion of the Deposit and of the deposits for options, extras and/or upgrades as and for liquidated damages as provided in Section 17 hereof.

12.3. Risk of loss to the Home by fire, natural disaster, acts of terrorism or other casualty from and after Closing is assumed by Purchaser. Purchaser should be aware that the Home, however well constructed, may be subject to damage or destruction by naturally occurring events such as hurricanes and sinkholes. While Seller has no knowledge of sinkholes or naturally occurring gases such as radon in the immediate vicinity of the Home, all risks associated with all natural occurrences shall be borne by Purchaser from and after Closing.

MIA\87380.23
FINAL 9/30/05

Page 4 of 11

Purchaser's Initials _____

LEN-HF-0005769
**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

13. **Documents.**

☒ **OPTION ONE FOR USE WHEN THERE IS A COMMUNITY DOCUMENT BOOK** - Purchaser acknowledges receipt of the Document Book for the Community containing important documents regarding the Community. Purchaser should be aware that the Document Book does not include all of the documents affecting the Home and the Community (collectively, the "**Documents**"), however, all of the provisions of each of the Documents are incorporated by reference into this Agreement. The explanations, disclaimers and limitations set forth in the Document Book are hereby incorporated to this Agreement by this reference. Purchaser acknowledges that Seller has the right to amend such Documents as deemed necessary by Seller in its sole and absolute discretion. Purchaser agrees to take title to the Home subject to the Documents, to abide by and be bound by all of the terms and conditions of the Documents, and any amendments thereto. The Disclosure Addendum attached hereto, if any, sets forth additional information respecting lien rights and homeowners' associations restrictions affecting the Home. Notwithstanding any other provision herein to the contrary, in the event that this Agreement is terminated for any reason whatsoever, Purchaser shall return the Document Book to Seller in the same condition originally received (ordinary wear and tear excepted). If the Document Book is not returned upon termination of this Agreement, Seller shall be entitled to deduct seventy-five ($75.00) from any portion of the Deposit to be refunded to Purchaser as a result of the termination, to defray Seller's costs and expenses resulting from the preparation, printing and delivery of the Document Book. Purchaser understands and agrees this Section shall survive the termination of this Agreement.

☐ **OPTION TWO FOR USE WHEN THERE IS NO DOCUMENT BOOK** - Purchaser should be aware that there may be documents of record affecting the Home and the Community (collectively, the "**Documents**"). The Documents are available from the title insurance company that will insure title to the Home.

14. **Closing Date.** Without limiting Section 10 of this Agreement, Purchaser acknowledges and agrees that Seller has the right in its sole discretion to schedule the date, time and place for the closing of the transaction contemplated by this Agreement (the "**Closing**") and that Purchaser shall close on such Closing date. Prior to the Closing, a temporary or permanent certificate of completion or use covering the Home shall be issued by the proper governmental agency. Purchaser will be given at least ten (10) days notice of the Closing date, time and place. Seller is authorized to postpone or advance the date of the Closing at its discretion. Seller must, however, give Purchaser reasonable notice of the new Closing date. Any notice of Closing may be given verbally, by telephone, telegraph, telex, telefax, mail or other means of communication at Seller's option. An affidavit of one of Seller's employees or agents that such notice was given will be conclusive for purposes of proving that notice was given. All notices will be given to Purchaser at the address or by use of the telephone number(s) specified on Page 1 of this Agreement unless Seller has received written notice from Purchaser of any change therein prior to the date notice of Closing is given. The fact that Purchaser fails to receive the notice of Closing because Purchaser has failed to advise Seller of any changes of address or phone number, or because Purchaser has failed to pick up a letter when Purchaser has been advised of an attempted delivery or for any other reason, shall not relieve Purchaser of Purchaser's obligation to close on the scheduled date, unless Seller otherwise agrees in writing to postpone the Closing date. If Seller agrees in writing to reschedule the Closing at Purchaser's request or because Purchaser (if a corporation) has failed to produce all corporate documents requested by Seller, or for any other reason (except for delay required by Seller), Seller may impose a late charge equal to Two Hundred Fifty Dollars ($250.00) per day for every day from the original Closing date through the date that the transaction closes and prorations shall be as of the original Closing date. Purchaser agrees the late charge is appropriate in order to cover Seller's administrative and other expenses resulting from a delay in Closing. Seller is not required to agree to reschedule Closing, but Seller may reschedule Closing in Seller's sole discretion.

15. **Closing.** Title to the Home to be delivered to Purchaser at Closing will be marketable and insurable, subject only to those matters hereinbelow set forth. In connection therewith:

   15.1. Title to the Home shall be subject to the following: (1) zoning, building codes, bulkhead laws, ordinances, regulations, rights or interests vested in the United States of America or the State of Florida; (2) real estate taxes and other taxes for the year of conveyance and subsequent years including taxes or assessments of any special taxing or community development district (including assessments relating to capital improvements and bonds); (3) the general printed exceptions contained in an ALTA Owner's Title Insurance Policy; (4) utility easements, sewer agreements, telephone agreements, cable agreements, telecommunication agreements, monitoring agreements, restrictions and reservations common to any plat affecting the Home; (5) the Documents; (6) any laws and restrictions, covenants, conditions, limitations, reservations, agreements or easements recorded in the Public Records (for example, property use limitations and obligations, easements (right-of-way) and agreements relating to telephone, gas or electric lines, water and sewer lines and drainage, provided they do not prevent use of the Home for single family residential purposes); and (7) acts done or suffered by Purchaser and any mortgage obtained by Purchaser for the purchase of the Home. It is Purchaser's responsibility to review and become familiar with each of the foregoing title matters, some of which are covenants running with the land. If any title defects are discovered by Purchaser after Closing, Purchaser's sole remedy shall be to make a claim to Purchaser's title insurer.

   15.2. Seller is not required to furnish Purchaser with an abstract of title. If desired, Purchaser may obtain the same at Purchaser's expense.

   15.3. Seller shall convey title to Purchaser at Closing by delivery to Purchaser of a Special Warranty Deed (the "**Deed**") describing the Home which shall convey title to Purchaser subject to all matters described in Section 15.1 above. Any such matters omitted from the Deed shall nevertheless be deemed to be included in the Deed. This Section shall expressly survive Closing and the delivery of the Deed. The acceptance of the Deed by Purchaser shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to this Agreement, except those which are herein specifically deemed to survive Closing or which may survive by operation of law (if any).

   15.4. Seller shall provide an affidavit complying with the Foreign Investment in Real Property Tax Act of 1980, as amended, upon the written request of Purchaser.

   15.5. Seller may not own title to the Home or Homesite on the date of execution of this Agreement or at Closing; however, Seller shall obtain title to the Home or Homesite on or before the date of Closing or effect the necessary transfer of title on or before the date when Seller causes title to be transferred to Purchaser.

   15.6. If Seller cannot provide marketable and insurable title as described above, Seller will have a reasonable period of time (at least one hundred and twenty (120) days) from the date of the scheduled Closing to attempt to correct any defects in title; provided, however, Seller shall not be obligated to incur any expense to clear title to the Home. If Seller cannot or elects not to correct the title defects, Seller shall so notify Purchaser within such period, and Purchaser may thereafter elect (by written notice from Purchaser to Seller) one of the following two (2) options: (1) to accept title in the condition offered (with defects) and pay the balance of the Total Purchase Price for the Home (without set off or deduction therefor), thereby waiving any claim with respect to such title defects and Purchaser will not make any claims against Seller because of the title defects; or (2) to terminate this Agreement and receive a full refund of all monies deposited hereunder. If all monies deposited hereunder are refunded, Purchaser agrees to accept it as full payment of Seller's liability hereunder, whereupon this Agreement shall be terminated and Seller shall thereafter be relieved and released of all further liability hereunder. Purchaser shall not thereafter have any rights to make any additional claims against Seller. In the event Purchaser does not notify Seller in writing within five (5) business days from the receipt of Seller's notice (time being strictly of the essence) as to which option Purchaser elects, Purchaser shall be conclusively presumed to have elected option (2) set forth above.

   15.7. Purchaser shall be responsible for any pending and proposed liens, taxes and/or assessments for public improvements. Seller will be responsible for public improvement liens which have been certified as of the date of Closing. At Closing, Purchaser agrees to pay to Seller the balance of the Total Purchase Price and any additional amounts Purchaser owes under this Agreement by cashier's check or by federal wire transfer. Official check, bank check or personal check will not be accepted.

16. **Closing Costs.** PURCHASER UNDERSTANDS AND AGREES THAT IN ADDITION TO THE BALANCE OF THE TOTAL PURCHASE PRICE, PURCHASER SHALL PAY CERTAIN OTHER FEES AND CLOSING COSTS AT CLOSING. IN CONNECTION THEREWITH, WITHOUT LIMITATION, THE ITEMS LISTED BELOW WILL COLLECTIVELY BE REFERRED TO AS "**CLOSING COSTS**." NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, IN THE CASE OF AN FHA/VA OR FANNIE MAE LOAN, PURCHASER SHALL NOT PAY FOR ANY COSTS PROHIBITED BY HUD (FHA), VA OR FANNIE MAE REGULATIONS. The Closing Costs include, without limitation:

   16.1. The premium for a policy of owner's title insurance, the cost of the documentary stamp taxes on the Deed, and the cost to record the Deed except to the extent otherwise provided in Section 7 above. In the case of an FHA insured or VA guaranteed loan, Seller shall pay the documentary stamp taxes on the Deed and Purchaser shall pay all additional costs chargeable to Purchaser under FHA/VA regulations.

LEN-HF-0005770
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

16.2. Customary closing costs of a purchaser, including but not limited to items such as loan fees, loan closing costs and all other related sums, attorneys' fees, escrows for taxes and insurance, recording fees, documentary stamp taxes on the note, intangible taxes, credit reports and PMI insurance, if applicable, charged by Purchaser's lender or otherwise customary for a purchaser at closing.

16.3. Title search updates, title examination fees and any other Closing expenses of Purchaser.

16.4. All additional costs respecting the Home imposed by any governmental authority.

16.5. The cost of any obligations Purchaser incurs not provided for in this Agreement.

16.6. The cost of a survey of the Home.

16.7. Certified governmental liens (liens which can be paid pursuant to written notice), if any, shall be assumed and paid by Seller; pending governmental improvement liens shall be paid and assumed by Purchaser.

16.8. A pro rata share of County interim service fees, if any.

16.9. A pro rata share of waste fees.

16.10. A pro rata share of utility deposits for the Home prepaid by Seller.

16.11. Any other expenses of an owner of the Home provided for or referenced in the Documents.

16.12. Amounts reflected in the Disclosure Addendum, if any, attached hereto and made a part hereof.

16.13. Current expenses of the Home (for example: taxes, special assessments and current monthly assessments to one or more homeowners' associations), will be adjusted between Seller and Purchaser as of the date of Closing. Purchaser shall reimburse Seller for any prepaid expenses of the Home such as utility deposits, insurance premiums, local interim service fees, cable fees, assessments and capital contributions made to one or more homeowners' associations, paid by Seller in advance and/or for the month of Closing.

16.14. If real estate taxes for the year of Closing are assessed in the aggregate on the land comprising the portion of the Community including the Home rather than on a homesite-by-homesite basis, Seller will pay such taxes in full when due, but Purchaser will reimburse Seller at the Closing Purchaser's pro rata share of such taxes from the date of the Closing (if such taxes are then known) or the Home's allocable share (so prorated) of Seller's estimate of those taxes (if such taxes are not then known), subject to readjustment at either the request of Seller or Purchaser within six (6) months from when the actual tax bill is known. If taxes for the year of Closing are assessed on a homesite-by-homesite basis but such taxes are not due on the date of the Closing, Purchaser will be responsible for paying such tax bill in full when due but Seller will reimburse Purchaser at the Closing, Seller's pro rata share of such taxes (if the taxes are then known) or the Seller's estimate of those taxes (if such taxes are not then known) through the date of Closing, subject to readjustment at either the request of Seller or Purchaser within six (6) months from when the actual bill is known. If the Closing takes place after Seller has paid the taxes for the year of the Closing, Purchaser will reimburse Seller at the Closing for Purchaser's pro rata share of those taxes from the date of Closing.

16.15. The cost of any modifications or changes which are incurred by Seller as a result of changes in building codes, governmental rules, regulations or requirements, or the enforcement of any of the same, after the date of this Agreement, shall be paid by Purchaser at the time of Closing.

17. Default.

17.1. Purchaser's Default. Should Purchaser fail to close on the title to the Home as herein provided, or fail to perform or observe any of the Purchaser's obligations hereunder, Seller may, at its option, terminate this Agreement by notice to Purchaser, which termination will be effective upon the giving of such notice. In such event, the portion of the Deposit equal to or less than ten percent (10%) of the Total Purchase Price shall be retained by Seller as liquidated and agreed upon damages for Purchaser's default, and all rights and privileges hereunder shall thereafter terminate. The portion of the Deposit in excess of ten percent (10%) of the Total Purchase Price, if any, shall be returned to Purchaser. Notwithstanding the foregoing, any deposits or payments for options, extras and/or upgrades shall also be retained by Seller as liquidated and agreed upon damages. Seller has removed the Home from the market and has incurred substantial direct and indirect expenses relative to sales, models, advertising and similar items, and Purchaser recognizes that no method could determine the precise damage resulting from Purchaser's default and that such liquidated damages are a fair and reasonable remedy. The termination of this Agreement and the retention of the portion of the Deposit equal to or less than ten percent (10%) of the Total Purchase Price and the retention of deposits or payments for options, extras and/or upgrades, as liquidated and agreed upon damages, shall be the Seller's sole remedy in the event of Purchaser's default, and upon termination of the Agreement, neither party shall have any further obligation to the other. Any damage or loss that occurs to the Home while Purchaser is in default will not affect Seller's right to retain that portion of the Deposit equal to or less than ten percent (10%) of the Total Purchase Price as liquidated damages to the extent provided herein. The provisions of this Section 17.1 shall survive the termination of this Agreement.

17.2. Seller's Default.

17.2.1. Prior to Closing.

17.2.1.1. Notice. Purchaser shall give written notice to Seller following Seller's default under this Agreement as a condition precedent to seeking any remedy against Seller. The written notice shall specify the default in detail. The notice to be given pursuant to this Section shall be delivered to Seller in the same manner noted in Section 32 of this Agreement.

17.2.1.2. Cure Period. Seller shall have a reasonable period of time (not less than thirty (30) days nor more than ninety (90) days) from the date Seller receives the written notice (the "Cure Period") to correct any default or to otherwise respond to Purchaser in the event Seller determines that no default has occurred and/or defect exists.

17.2.1.3. Right to Inspect and Correct. Seller shall have the Cure Period to inspect and correct any alleged default or defect or to otherwise respond to Purchaser in the event Seller determines that no default has occurred and/or defect exists.

17.2.1.4. Expiration of Cure Period. Purchaser agrees that Purchaser shall seek no remedy against Seller prior to the expiration of the Cure Period. Seller shall have the right but not the obligation to take action during the Cure Period and/or respond to any notice received from Purchaser.

17.2.1.5. Remedy. In the event that Seller is unable to cure any default during the Cure Period (except in the event of a title defect as set forth in Section 15 above), Purchaser shall have the right to terminate this Agreement and receive a full refund of the Deposit and a full refund of deposits or payments for options, extras and/or upgrades, and the Purchaser's liquidated damages under this provision shall be the sum equal to that portion of the Deposit equal to or less than ten percent (10%) of the Total Purchase Price; or, in the alternative, Purchaser shall have the right of specific performance. By way of example, if the Deposit is less than ten percent (10%) of the Total Purchase Price, then Purchaser shall receive a refund of the Deposit and a refund of deposits or payments for options, extras and/or upgrades, and liquidated damages under this provision shall be equal to the actual amount of the Deposit. If the Deposit is equal to or more than ten percent (10%) of the Total Purchase Price, then Purchaser shall receive a refund of the actual amount of the Deposit and a refund of deposits or payments for options, extras and/or upgrades, and Purchaser's liquidated damages under this provision shall be equal to ten percent (10%) of the Total Purchase Price. In the event Purchaser rightfully so terminates this Agreement, both parties shall be released from any and all further obligations hereunder. Purchaser and Seller acknowledge that such liquidated damages are a fair and reasonable remedy because it is not possible to determine at this time the actual damages Purchaser might suffer, if any, should Seller default under this Agreement. Notwithstanding anything contained in this Section 17 to the contrary, in the event of Seller's default under Section 10 of this Agreement, the Cure Period shall not apply and Purchaser shall have all remedies available at law and in equity without limitation or restriction.

LEN-HF-0005771
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

17.2.1.6. Survival. The provisions of this Section 17.2 shall survive the termination of this Agreement.

17.2.2. Post-Closing.

17.2.2.1. Notice. Purchaser shall give written notice to Seller of any alleged defect or default with respect to the Home, arising under this Agreement or under law after Closing, as a condition precedent to seeking any remedy against Seller with respect to the Home. The written notice shall specify the defect or default in detail. The notices to be given pursuant to this Section shall be delivered to Seller and Seller's Counsel in the same manner noted in Section 32 of this Agreement. Notices to Seller's Counsel are to be sent to Lennar Homes, Inc., Attention: General Counsel, 700 N.W. 107th Avenue, 4th Floor, Miami, Florida 33172.

17.2.2.2. Right to Inspect and Correct. Seller shall have the Cure Period to inspect and correct any alleged default or defect or to otherwise respond to Purchaser in the event Seller determines that no default has occurred and/or defect exists. The Cure Period shall be extended by any period of time that Purchaser refuses to allow Seller to inspect the Home and/or perform tests as required by Section 17.2.3 hereof.

17.2.2.3. Expiration of Cure Period. Purchaser agrees that Purchaser shall seek no remedy against Seller prior to the expiration of the Cure Period. Without limiting the foregoing, Purchaser shall not bring any litigation against Seller respecting the Home until the expiration of the Cure Period (which shall be deemed to be ninety (90) days from Seller's receipt of Purchaser's written notice unless Seller agrees in writing to any shorter period). Seller shall have the right, but not the obligation, to take action during the Cure Period and/or respond to any notice received from Purchaser.

17.2.2.4. Master Deed Restriction. The provisions of this Section 17.2.2 and Section 17.2.3 shall be covenants running with the land and are referenced in the Master Deed Restrictions recorded or to be recorded in the Public Records of County.

17.2.3. Purchaser's Obligation to Permit Inspection. Purchaser agrees that once Purchaser has given written notice to Seller pursuant to Section 17.2.1.1 or Section 17.2.2.1, whichever is applicable, Purchaser shall be obligated to permit Seller and its agents to perform inspections of the Home and to perform all tests and make all repairs/replacements deemed necessary by Seller to respond to such notice at all reasonable times. Purchaser agrees that any inspection, test and/or repair/replacement scheduled on a business day between 9 a.m. and 5 p.m. shall be deemed scheduled at a reasonable time. The rights reserved in this Section 17.2 include the right of Seller to repair or address, at Seller's sole option and expense, any aspect of the Home deemed defective by Seller during its inspections of the Home.

18. Seller's Use of the Community. As long as Seller and/or the Declarant/Developer under the Documents or its successors or assigns owns any portion of the Community, Seller and/or the Declarant/Developer under the Documents and its agents may maintain sales and leasing offices and models within the Community to assist Seller and/or the Declarant/Developer under the Documents in selling, reselling, and leasing properties in the Community and properties located outside the Community. As long as Seller, or any nominees of Seller and/or the Declarant/Developer under the Documents, owns any land or home in the Community, Seller and/or its nominees and/or the Declarant/Developer under the Documents shall have the right and privilege to maintain general sales offices in and about the Community, including model residences, and to have their employees present on the premises to show homes, use Community facilities and/or property and, without limitation, to do any and all other things necessary or appropriate by them to sell, resell, or lease homes and other properties owned by Seller and/or the Declarant/Developer under the Documents, all without charge or contribution; provided, however, that such activities shall be carried on in such a manner as will not unreasonably interfere with the Purchaser's enjoyment of the Home.

19. Limitation of Warranties.

19.1. Limited Warranty.

19.1.1. Purchaser acknowledges that at the time of execution of this Agreement, Seller has no reason to know of any particular purpose Purchaser has in purchasing the Home and items of personal property located therein other than normal residential use. Purchaser agrees that the only warranties which Seller is providing Purchaser are those set forth in the Limited Warranty for Homes ("Limited Warranty"), a copy of which is attached hereto and incorporated herein. By initialing below, Purchaser acknowledges having received and reviewed the Limited Warranty prior to the execution of this Agreement.

Purchaser's Initials [initials]

19.1.2. SELLER GIVES THE LIMITED WARRANTY EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESSED OR IMPLIED. TO THE MAXIMUM EXTENT LAWFUL, AND EXCEPT FOR THE LIMITED WARRANTY, THE SELLER DISCLAIMS ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS, FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY, INTENDED USE, WORKMANSHIP, OR CONSTRUCTION RESPECTING THE HOME, COMMON PROPERTIES OF THE COMMUNITY, IF ANY, AND ALL FIXTURES OR ITEMS OF PERSONAL PROPERTY SOLD PURSUANT TO THIS AGREEMENT, OR ANY OTHER REAL OR PERSONAL PROPERTY WHATSOEVER CONVEYED IN CONNECTION WITH THE SALE OF THE HOME, OR LOCATED WITHIN THE COMMUNITY WHETHER ARISING FROM THIS AGREEMENT, USAGE, TRADE, IMPOSED BY STATUTE, COURSE OF DEALING, CASE LAW OR OTHERWISE.

19.1.3. THE LIMITED WARRANTY IS THE ONLY EXPRESS WARRANTY GIVEN BY SELLER. SELLER DISCLAIMS ANY LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES.

19.1.4. Normal swelling, expansion and contraction of materials and construction, and any cracks appearing as a result thereof or as a result of settlement of, in or on the Home shall not be deemed to be construction defects. Upon Closing, Seller shall deliver to Purchaser all manufacturers' warranties, if any, covering the consumer products (if any) to be conveyed to Purchaser hereunder, provided, however, SELLER SHALL NOT THEREBY BE DEEMED TO WARRANT ANY SUCH CONSUMER PRODUCT, NOR TO ADOPT ANY LIABILITY FOR ANY SUCH MANUFACTURERS' WARRANTY THEREOF.

19.1.5. Given the climate and humid conditions in South Florida, mold, mildew, spores, fungi and/or other toxins may exist and/or develop within the Home. Purchaser is hereby advised that certain mold, mildew, spores, fungi and/or other toxins may be, or if allowed to remain for a sufficient period may become, toxic and potentially pose a health risk. By Closing, Purchaser shall be deemed to have assumed the risks associated with mold, mildew, spores, fungi and/or other toxins and to have released Seller from any and all claims and liability resulting from same. Without limiting the generality of the foregoing, Seller hereby disclaims any and all express or implied warranties as to design, construction, view, sound and/or odor transmission, furnishing and equipping of the Home, the existence of mold, mildew, spores, fungi and/or other toxins within the Home. Seller has not given and Purchaser has not relied on or bargained for any such warranties.

19.1.6. Purchaser acknowledges and agrees that Seller has made no representations or warranties regarding (i) the economic advantages or disadvantages of purchasing the Home, (ii) any potential increase in the value of the Home above the Purchase Price, or (iii) the purchase of the Home as an investment or for other economic purposes, and Purchaser has and will rely on its own determination of such matters in purchasing the Home.

19.1.7. Purchaser acknowledges and agrees that Seller has made no representations or warranties regarding the existence or quality of any views that will be visible from the Home when completed, and Purchaser understands and agrees that the view from the Home can and will only be determined upon completion of the Home and the Community, and that any views that can be anticipated from models, sketches or other materials

MIA\87380.23
FINAL 9/30/05

Page 7 of 11

Purchaser's Initials [initials]

LEN-HF-0005772
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

attempting to show how the Home and Community will look upon completion may not be relied upon for such purpose, and Purchaser is not purchasing the Home in reliance on the Home having any particular view.

19.2. No Warranties for Third Party Construction.

19.2.1. Seller does not warrant any of the work performed in the Home or on the Homesite by third party contractors, not hired by Seller, after the Closing.

19.2.2. Seller shall not be liable for any defects in the work performed by third party contractors not hired by Seller, nor for any adverse impact to the Home, Homesite or Community caused thereby.

19.2.3. Further, should Purchaser elect to use a third party contractor that is a subcontractor of Seller, Purchaser acknowledges that Seller makes no representations relative to the performance by such third party contractor.

20. Deposits. Any reference to Deposit or Deposits herein shall refer collectively to all amounts deposited with Seller under this Agreement, and under any addendum or amendment hereto, except for any deposits or payments made by Purchaser for options, extras and/or upgrades. Any and all deposits or payments for options, extras, and/or upgrades are non-refundable except (i) in the event of Seller's default, (ii) if the Home is damaged, as described in Section 12, and Seller does not elect to repair or replace the Home and/or (iii) Seller is unable to provide marketable and insurable title, as described in Section 15. All monies deposited under the terms of this Agreement, except for the balance due at Closing, may be made by check drawn on a Florida bank, subject to collection. All payments must be made in United States funds. If the Deposit is held in escrow, it shall be released to Seller upon written notice from Seller to the escrow agent that Purchaser has defaulted under this Agreement, unless Purchaser has commenced arbitration proceedings in accordance with Section 39 of this Agreement within ten (10) days after written notice to Purchaser that Seller has declared a default. Release of the Deposit to Seller shall not affect Purchaser's right to arbitrate.

21. Agreement Not to be Recorded. Purchaser covenants that Purchaser shall not record this Agreement (or any memorandum thereof) in the Public Records of the County. Purchaser agrees, if Purchaser records this Agreement, to pay all of Seller's legal fees, paraprofessional fees and expenses incurred in removing the cloud in title caused by such recordation. Seller's rights under this Section shall be in addition to Seller's remedies for Purchaser's default provided in Section 17 of this Agreement.

22. Transfer or Assignment. Purchaser has no right to assign, sell or transfer Purchaser's interest in this Agreement (whether voluntarily or by operation of law or otherwise) without Seller's prior written consent. If Purchaser is a corporation, other business entity, trustee or nominee, a transfer of any material equity or beneficial or principal interest shall constitute an assignment of this Agreement. If Purchaser attempts to assign this Agreement in violation of this Section 22, Seller can declare Purchaser in default and Seller shall be entitled to all remedies available under Section 17 hereof. Purchaser agrees that Seller may withhold its consent with or without any reason or condition in any manner it chooses (if it gives it at all) and may charge Purchaser a reasonable amount to cover administrative costs incurred in considering whether or not to grant consent. If Seller desires to sell the Community before or during construction, Seller may assign or transfer Seller's interest in this Agreement, in the Deposit and in the non-refundable deposits or payments for options, extras and/or upgrades without Purchaser's consent. If the buyer of the Community assumes Seller's obligations contained in this Agreement, Seller will not be liable to Purchaser for any acts, omissions or defaults by the buyer of the Community.

23. Persons Bound By This Agreement. If Purchaser dies or in any way loses legal control of his/her affairs, this Agreement will bind his/her heirs and legal representatives. If Purchaser has received Seller's permission to assign or transfer this Agreement, then Purchaser's approved assignees shall be bound by the terms of this Agreement. If more than one person signs this Agreement as Purchaser, each such person shall be jointly and severally liable for full performance of all of Purchaser's duties and obligations hereunder.

24. Interpretation and Computation of Time. The use of the masculine gender in this Agreement shall be deemed to refer to the feminine or neuter gender, and the singular shall include the plural, and vice versa, whenever the context so requires. This Agreement reflects the negotiated agreement of the parties, each represented by competent legal counsel, or by parties who chose not to be represented by counsel. Accordingly, this Agreement shall be construed as if both parties jointly prepared it, and no presumption against one party or the other shall govern the interpretation or construction of any of the provisions of this Agreement. Any reference in this Agreement to the time periods of less than six (6) days shall, in the computation thereof, exclude Saturdays, Sundays and legal holidays. Any reference in this Agreement to time periods of six (6) days or more shall, in computation thereof, include Saturdays, Sundays and legal holidays. If the last day of any such period is a Saturday, Sunday or legal holiday, the period shall be extended to 5:00 p.m. on the next full business day.

25. Waiver. Seller's waiver of any of its rights or remedies shall not operate to waive any other of Seller's rights or remedies or to prevent Seller from enforcing the waived right or remedy in another instance.

26. Survival, Incorporation and Severability. All provisions and disclaimers in this Agreement are intended to have effect after the Closing and shall survive the Closing, unless expressly stated otherwise. The explanations and disclaimers set forth in the Documents are incorporated into this Agreement. In the event that any clause or provision of this Agreement shall be void or unenforceable, such clause or provision shall be deemed deleted so that the balance of the Agreement is enforceable.

27. Section Headings. The Section headings in this Agreement are for convenience only and shall not affect the meaning, interpretation or scope of the provisions which follow them.

28. Florida Law. Any disputes that develop under this Agreement or questions regarding the interpretation of this Agreement will be settled according to Florida law to the extent federal law is not applicable.

29. Entire Agreement. PURCHASER CERTIFIES THAT PURCHASER HAS READ EVERY PROVISION OF THIS AGREEMENT AND EACH ADDENDUM ATTACHED HERETO AND THAT THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN PURCHASER AND SELLER. This Agreement is the entire agreement for the sale and purchase of the Home and once it is signed it can only be amended in writing. Prior agreements, representations, understandings, and oral statements not reflected in this Agreement have no effect and are not binding on Seller. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS NOT RELIED ON ANY REPRESENTATIONS, WARRANTIES, NEWSPAPER, RADIO OR TELEVISION ADVERTISEMENTS, WARRANTIES, STATEMENTS, OR ESTIMATES OF ANY NATURE WHATSOEVER, WHETHER WRITTEN OR ORAL, MADE BY SELLER, SALES PERSONS, AGENTS, OFFICERS, EMPLOYEES, CO-OPERATING BROKERS (IF ANY) OR OTHERWISE EXCEPT AS HEREIN SPECIFICALLY REPRESENTED. PURCHASER HAS BASED HIS/HER DECISION TO PURCHASE THE HOME ON PERSONAL INVESTIGATION, OBSERVATION AND THE DOCUMENTS.

30. Inducement. Purchaser acknowledges that the sole inducement to purchase the Home is the Home and not (i) the common facilities comprising part of the Community, if any, or (ii) any expectation that the Home will increase in value.

31. Time of the Essence. Purchaser acknowledges that time is of the essence in connection with this transaction.

32. Notice. Except as provided in Section 14 with respect to notices of the scheduled date of Closing, any notice required or permitted to be given in connection with this Agreement shall be in writing and sent by United States certified mail with return receipt requested, professional overnight courier or telefax (with confirmation and copy by (i) certified mail if Purchaser's address is within the United States or (ii) overnight professional courier if to a Purchaser whose address is outside of the United States) to Purchaser or Seller at the addresses on Page 1 of this Agreement, and additionally to Seller by hand delivery at Seller's sales office. All notices shall only be effective upon receipt or refusal to accept receipt (by failure to accept delivery or otherwise).

33. RADON GAS. This disclosure is required by Section 404.056 of the Florida Statutes. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department.

LEN-HF-0005773
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

34. **Energy Rating.** Pursuant to Section 553.996 of the Florida Statutes, Purchaser may request that Seller cause a State Certified Energy Rater to perform an energy efficiency rating on the Home being purchased. Purchaser hereby releases Seller from any responsibility or liability for the accuracy or level of the rating and Purchaser understands and agrees that this Agreement is not contingent upon Purchaser approving the rating, that the rating is solely for Purchaser's own information and that Purchaser will pay the total cost of the rating. Purchaser hereby acknowledges the receipt of a brochure from The Florida Energy Gauge Program regarding Florida's Building Energy Rating System (the "Energy Rating Brochure").

35. **Insulation Disclosure.** Pursuant to Title 16, Chapter I, Section 460.16 of the Code of Federal Regulations, the Insulation Disclosure Addendum or the Disclosure Addendum containing the required insulation disclosure attached hereto is incorporated herein by reference and made a part hereof.

36. **Selling Agent and Cooperating Broker.** Unless a Cooperating Broker Addendum indicating otherwise is attached hereto, Purchaser represents to Seller that Purchaser has not consulted, dealt or negotiated with a real estate broker, salesperson or agent other than Seller's sales personnel located at Seller's sales office. Purchaser agrees that Seller is not responsible for the payment of a commission to a real estate broker, salesperson or agent other than Seller's sales personnel and Purchaser agrees to indemnify and hold Seller harmless from and against any and all loss and liability, including attorney's and paraprofessional's fees and costs at all levels, resulting from or arising out of any representation or breach of a representation or warranty set forth in this Section 36. Purchaser understands and agrees that this Section shall survive the Closing and the delivery of the Deed.

37. **Counterparts and Telefaxed Signatures.** This Agreement shall be validly executed when signed in counterparts. The effective time of the Agreement is the date and time when the last of the parties to sign executes this Agreement. Signatures may be given via telefax transmission and shall be deemed given as of the date and time of the transmission of this Agreement by telefax to the other party.

38. **Additional Changes.** Purchaser agrees that it may be necessary (at any time and from time to time) after Purchaser executes this Agreement for Seller, and/or the Developer/Declarant under the Documents, to change the terms and provisions of this Agreement and/or the Documents to comply with and conform to the rules and regulations (as same may exist and as same may be promulgated from time to time) of any governmental agency or subdivision. In addition, Seller, and/or the Developer/Declarant under the Documents, shall have the right to amend all Documents for development or other purposes.

39. **ARBITRATION OF DISPUTES.**

   39.1. The parties to this Agreement specifically agree that any dispute (whether contract, warranty, tort, statutory or otherwise), including, but not limited to, (a) any and all controversies, disputes or claims arising under, or related to, this Agreement, the property, or any dealings between the Purchaser and Seller (with the exception of "consumer products" as defined by the Magnuson-Moss Warranty-Federal Trade Commission Act, 15 U.S.C. §2301 et seq., and the regulations promulgated thereunder and with the exception of any dispute arising pursuant to Section 10 of this Agreement); (b) any controversy, dispute or claim arising by virtue of any representations, promises or warranties alleged to have been made by Seller or Seller's representative; and (c) any personal injury or property damage alleged to have been sustained by Purchaser on the Home, Homesite, or in the Community (hereinafter individually referred to as "Dispute" and collectively referred to as "Disputes"), shall first be submitted to mediation and, if not settled during mediation, shall thereafter be submitted to binding arbitration as provided by the Federal Arbitration Act (9 U.S.C. §§1 et seq.) and not by or in a court of law.

   39.2. The mediation shall be filed with and administered by the American Arbitration Association ("AAA") in accordance with the AAA's Supplementary Mediation Procedures for Residential Construction Disputes in effect on the date of the request. If there are no Supplementary Mediation Procedures for Residential Construction Disputes currently in effect, then the AAA's Construction Industry Mediation Rules in effect on the date of such request shall be utilized. Unless mutually waived in writing by the parties, submission to mediation is a condition precedent to either party taking further action with regard to any matter covered hereunder.

   39.3. If the Dispute is not fully resolved by mediation, the Dispute shall be submitted to binding arbitration and administered by the AAA in accordance with the AAA's Supplementary Arbitration Procedures for Residential Construction Disputes in effect on the date of the request. If there are no Supplementary Arbitration Procedures for Residential Construction Disputes currently in effect, then the AAA's Construction Industry Arbitration Rules in effect on the date of such request shall be utilized. Any judgment upon the award rendered by the arbitrator may be entered in and enforced by any court having jurisdiction over such Dispute. Unless the parties otherwise agree, claims in excess of $10,000.00 but less than $500,000.00 shall utilize the Regular Track Procedures of the Construction Industry Arbitration Rules, as modified by the Supplementary Arbitration Procedures for Residential Construction. If the claimed amount exceeds $250,000.00 or includes a demand for punitive damages, the Dispute shall be heard and determined by three arbitrators. Otherwise, unless mutually agreed to by the parties, there shall be one arbitrator. Arbitrators shall have expertise in the area(s) of Dispute, which may include legal expertise if legal issues are involved. All decisions respecting the arbitrability of any Dispute shall be decided by the arbitrator(s). At the request of any party, the award of the arbitrator(s) shall be accompanied by detailed written findings of fact and conclusions of law. Except as may be required by law or for confirmation of an award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties.

   39.4. Purchaser and Seller specifically agree that notwithstanding anything to the contrary, the rights and obligations set forth in this Section 39 shall survive (1) the Closing; (2) the termination of this Agreement by either party; or (3) the default of this Agreement by either party. The waiver or invalidity of any portion of Section 39 shall not affect the validity or enforceability of the remaining portions of this Section 39. Purchaser and Seller further agree (1) that any dispute involving Seller's affiliates, directors, officers, employees and agents shall also be subject to mediation and arbitration as set forth herein, and shall not be pursued in a court of law; (2) that Seller may, at its sole election, include its subcontractors and suppliers, as well as any warranty company and insuror as parties in the mediation and arbitration; and (3) that the mediation and arbitration will be limited to the parties specified herein.

   39.5. Each party shall bear its own costs and expenses, including attorneys' fees and paraprofessional fees, for any mediation and arbitration. Notwithstanding the foregoing, if a party unsuccessfully contests the validity or scope of arbitration in a court of law, the non-contesting party shall be awarded reasonable attorneys' fees, paraprofessional fees and expenses incurred in defending such contest. In addition, if a party fails to abide by the terms of a mediation settlement or arbitration award, the other party shall be awarded reasonable attorneys' fees, paraprofessional fees and expenses incurred in enforcing such settlement or award.

   39.6. Purchaser may obtain additional information concerning the rules of the AAA by visiting its website at www.adr.org or by writing the AAA at 335 Madison Avenue, New York, New York 10017.

   39.7. Seller supports the principals set forth in the Consumer Due Process Protocol developed by the National Consumer Disputes Advisory Committee and agrees to the following:

      39.7.1. Notwithstanding the foregoing requirement for arbitration, Purchaser shall have the option, after mediation, to seek relief in a small claims court for disputes or claims within the scope of the court's jurisdiction in lieu of proceeding to arbitration. This option does not apply to any appeal from a decision by a small claims court.

      39.7.2. **Mediation Fees.** Seller agrees to pay for one (1) day of mediation (mediator fees plus any administrative fees relating to the mediation). Any mediator and associated administrative fees incurred thereafter shall be shared equally by the parties.

      39.7.3. **Arbitration Fees.** The fees for any claim in an amount of $10,000.00 or less shall be apportioned as provided in the Supplementary Rules for Residential Construction Disputes of the AAA or other applicable rules. Unless provided otherwise by the Supplementary Rules for Residential Construction Disputes of the AAA or other applicable rules, for claims that exceed $10,000.00, the filing party shall pay up to the first $750.00 of any initial filing fee to initiate arbitration. Under the following conditions, Seller agrees to pay up to the next $2,000.00 of any initial filing fee: (i) Purchaser has participated in mediation prior to initiating the arbitration; (ii) the parties have mutually agreed to waive mediation; or (iii) Seller is the filing party. The portion of any filing fee not covered above, and any case service fee, management fee or fees of arbitrator(s), shall be shared equally by the parties.

LEN-HF-0005774
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

39.8. Notwithstanding the foregoing, in the event that either Seller or Purchaser seeks injunctive relief from a court because irreparable damage or harm would otherwise be suffered by either party before mediation or arbitration could be conducted, such actions shall not be interpreted to indicate that either party has waived the right to mediate or arbitrate. The right to mediate or arbitrate should also not be considered waived by the filing of a counterclaim by either party once a claim for injunctive relief had been filed with a court.

40. **Other Dispute Resolutions.** Notwithstanding the parties' obligation to submit any Dispute to mediation and arbitration, in the event that a court of competent jurisdiction shall determine or a relevant law shall provide that a particular Dispute is not subject to the mediation or the arbitration provisions of Section 39 hereof (such as disputes arising under Section 10 or Section 19 of this Agreement), then the parties agree to the following provisions:

40.1. **Resolution of Disputes.** EACH PURCHASER ACKNOWLEDGES THAT THIS AGREEMENT IS A SOPHISTICATED LEGAL DOCUMENT. ACCORDINGLY, JUSTICE WILL BEST BE SERVED IF ISSUES REGARDING THIS AGREEMENT ARE HEARD BY A JUDGE IN A COURT PROCEEDING, AND NOT A JURY. EACH PURCHASER AGREES THAT ANY DISPUTE, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE HEARD BY A JUDGE IN A COURT PROCEEDING AND NOT A JURY. SELLER HEREBY SUGGESTS THAT EACH PURCHASER CONTACT AN ATTORNEY IF SUCH PURCHASER DOES NOT UNDERSTAND THE LEGAL CONSEQUENCES OF EXECUTING THIS AGREEMENT.

40.2. **Attorneys' Fees and Costs.** In the event that any litigation is commenced in connection with the enforcement or interpretation of this Agreement, the Home or the application of laws or regulations to any aspect of this transaction, each party shall pay his/her/its own legal expenses and costs.

41. **Venue.** Each Purchaser acknowledges that the Home is located in the County (identified on Page 1 of this Agreement) and Seller has an office in the County. Accordingly, an irrebuttable presumption exists that the only appropriate venue for the resolution of any dispute lies in the County. In addition to the foregoing, each Purchaser and Seller agree that the venue for resolution of any dispute lies in the County.

42. **Pre-Paid Taxes, Fees and Charges.** Unless otherwise provided herein, Purchaser agrees that any taxes, fees or other charges paid by Seller to any governmental authority, utility company, or any other entity which at a later date are refunded in whole or in part, shall be returned to Seller in the event said refund is received by Purchaser. This Section shall survive the Closing and re-sale of the Home.

43. **Reservation of Easement.** For the purpose of completing the construction and servicing of the Home and Community, Seller hereby reserves an easement of ingress and egress for itself and its successors and assigns, and each of their respective agents, employees, materialmen and subcontractors, over, under and upon the Home for a period of sixty (60) days after Closing. Seller shall provide reasonable notice to Purchaser before exercising easement rights granted herein.

44. **Construction Activities.** ALL OWNERS, OCCUPANTS AND USERS OF THE COMMUNITY ARE HEREBY PLACED ON NOTICE THAT (1) SELLER AND/OR ITS AGENTS, CONTRACTORS, SUBCONTRACTORS, LICENSEES AND OTHER DESIGNEES, AND/OR (2) ANY OTHER PARTIES, WILL BE, FROM TIME TO TIME, CONDUCTING BLASTING, EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR IN PROXIMITY TO THE COMMUNITY. BY THE ACCEPTANCE OF THEIR DEED OR OTHER CONVEYANCE OR MORTGAGE, LEASEHOLD, LICENSE OR OTHER INTEREST, AND BY USING ANY PORTION OF THE COMMUNITY, EACH SUCH OWNER, OCCUPANT AND USER AUTOMATICALLY ACKNOWLEDGES, STIPULATES AND AGREES (i) THAT NONE OF THE AFORESAID ACTIVITIES SHALL BE DEEMED NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, HEREUNDER OR AT LAW GENERALLY, (ii) NOT TO ENTER UPON, OR ALLOW THEIR CHILDREN OR OTHER PERSONS UNDER THEIR CONTROL OR DIRECTION TO ENTER UPON (REGARDLESS OF WHETHER SUCH ENTRY IS A TRESPASS OR OTHERWISE ANY PROPERTY WITHIN OR IN PROXIMITY TO THE COMMUNITY WHERE SUCH ACTIVITY IS BEING CONDUCTED (EVEN IF NOT BEING ACTIVELY CONDUCTED AT THE TIME OF ENTRY, SUCH AS AT NIGHT OR OTHERWISE DURING NON-WORKING HOURS), (iii) SELLER AND THE OTHER AFORESAID RELATED PARTIES SHALL NOT BE LIABLE FOR ANY AND ALL LOSSES, DAMAGES (COMPENSATORY, CONSEQUENTIAL, PUNITIVE OR OTHERWISE), INJURIES OR DEATHS ARISING FROM OR RELATING TO THE AFORESAID ACTIVITIES, EXCEPT RESULTING DIRECTLY FROM SELLER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (iv) ANY PURCHASE OR USE OF ANY PORTION OF THE COMMUNITY HAS BEEN AND WILL BE MADE WITH FULL KNOWLEDGE OF THE FOREGOING AND (v) THIS ACKNOWLEDGMENT AND AGREEMENT IS A MATERIAL INDUCEMENT TO SELLER TO SELL, CONVEY, AND/OR ALLOW THE USE OF THE HOME.

45. **Not Binding.** This Agreement shall not be binding on Seller until executed by an authorized agent or officer of Seller.

46. **Attachments.** The following documents are attached to and form a part of this Agreement:

Check (☑) all that apply:

☑ Disclosure Addendum
☑ Insulation Disclosure Addendum
☑ Energy Rating Brochure
☑ Disclosure Summary
☑ Affiliated Business Arrangement Disclosure Statement
☑ Features List
☑ Indoor Environmental Quality Disclosure
☑ Financial Information Disclosure

☐ Election Form Amendment
☐ Cooperating Broker Addendum
☑ District Brochure
☑ Limited Warranty for Homes
☑ CDD Disclosure Statement
☐ Specimen Warranty
☐ _____
☐ _____

47. **FLORIDA HOMEOWNERS' CONSTRUCTION RECOVERY FUND.** Pursuant to Section 489.1425 of the Florida Statutes, Seller provides the following notice. PAYMENT MAY BE AVAILABLE FROM THE FLORIDA HOMEOWNERS' CONSTRUCTION RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS. (850) 487-1395, 1940 N. MONROE ST., SUITE 60, TALLAHASSEE, FLORIDA 32399-2202.

48. **Disclosure Summary.** Prior to execution of this Agreement, Seller provided a Disclosure Summary to Purchaser. Such Disclosure Summary is incorporated herein by reference. PURCHASER SHOULD NOT EXECUTE THIS AGREEMENT UNTIL PURCHASER HAS RECEIVED AND READ THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401, FLORIDA STATUTES. IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO (THE PROSPECTIVE) PURCHASER BEFORE EXECUTING THIS AGREEMENT (CONTRACT FOR SALE), THIS AGREEMENT (CONTRACT) IS VOIDABLE BY PURCHASER (BUYER) BY DELIVERING TO SELLER OR SELLER'S AGENT OR REPRESENTATIVE WRITTEN NOTICE OF THE PURCHASER'S (BUYER'S) INTENTION TO CANCEL WITHIN THREE (3) DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. PURCHASER'S (BUYER'S) RIGHT TO VOID THIS AGREEMENT (CONTRACT) SHALL TERMINATE AT CLOSING.

49. **CHAPTER 558 NOTICE OF CLAIM.** In accordance with Florida law, Seller provides Purchaser with the following notice: CHAPTER 558, FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY (60) DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS AGREEMENT (CONTRACT) A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

LEN-HF-0005775
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

If Purchaser rejects any settlement offer made pursuant to such Florida law by Seller or other contractors, subcontractors, suppliers or design professionals hired by, through or under Seller or its affiliates (collectively, "**Protected Parties**"), and Purchaser elects to proceed with an action against one or more Protected Parties, Purchaser acknowledges that the Dispute must be resolved by mediation or, if not resolved by mediation, by binding arbitration as provided in this Agreement. Further, all other provisions of this Agreement respecting Disputes remain in full force and effect.

50. District. _South Kendall_ Pursuant to Section 190.048 of Florida Statutes, Seller provides the following notice. THE _____ COMMUNITY DEVELOPMENT DISTRICT MAY IMPOSE AND LEVY TAXES OR ASSESSMENTS, OR BOTH TAXES AND ASSESSMENTS, ON THIS PROPERTY. THESE TAXES AND ASSESSMENTS PAY THE CONSTRUCTION, OPERATION, AND MAINTENANCE COSTS OF CERTAIN PUBLIC FACILITIES AND SERVICES OF THE DISTRICT AND ARE SET ANNUALLY BY THE GOVERNING BOARD OF THE DISTRICT. THESE TAXES AND ASSESSMENTS ARE IN ADDITION TO COUNTY AND OTHER LOCAL GOVERNMENTAL TAXES AND ASSESSMENTS AND ALL OTHER TAXES AND ASSESSMENTS PROVIDED FOR BY LAW.

The parties have hereunto affixed their respective hands and seals on the day and year set forth below their respective names.

| (Witness) | (Purchaser) _[signature]_ |
| Print Name: _____ | Print Name: _LORENA GARCIA_ |
| | Date: _____ |
| (Witness) | (Purchaser) _[signature]_ |
| Print Name: _____ | Print Name: _Angela M. Garcia_ |
| | Date: _____ |
| (Witness) | (Purchaser) |
| Print Name: _____ | Print Name: _____ |
| | Date: _____ |
| (Witness) | (Purchaser) |
| Print Name: _____ | Print Name: _____ |
| | Date: _____ |

LENNAR HOMES, INC., a Florida corporation

By: _[signature]_
Name: _____
Title: _____
Date: _8/10/06_

MIA\87380.23
FINAL 9/30/05

Page 11 of 11

LEN-HF-0005776
CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER