## AGREEMENT FOR PURCHASE AND SALE

**THIS AGREEMENT** (hereinafter referred to as "Agreement") made as of the last date of execution hereof ("Effective Date"), by and between:

> SELLER:    Springhill, L.L.C.,
>             a Louisiana Limited Liability Company
>
> ("Seller")
>
> and
>
> BUYER:    Slidell Property Management, LLC
>            a Delaware Limited Liability Company
>
> ("Buyer")

### WITNESSETH:

In consideration of the mutual promises, covenants, terms and conditions herein contained, and intending to be legally bound, Seller and Buyer hereby agree as follows:

1.    **SALE OF PROPERTY.**  Seller hereby agrees to sell and Buyer hereby agrees to purchase the real property and improvements comprising forty (40) residential units and the lots on which the units are situated, located in the Oak Plain, Phase 1 and Oak Plain, Phase 2 subdivisions in St. Tammany Parish, State of Louisiana, as more particularly described on Exhibit A and Exhibit A-1, attached hereto and incorporated herein by this reference (each a "Unit" and, collectively, the "Units"). The foregoing Units, together with all other property to be sold and purchased with such Units in each Conveyance (defined herein), is referred to herein as the "Property," which shall include, without limitation, the following:

(a)    All hereditaments, easements, rights-of-way, drives, alleys, parking areas and appurtenances thereunto belonging, or in any way appertaining to the Property (including, without limitation, all of the right, title and interest, if any, of the Seller in and to any land lying in the bed of any street, road or avenue, open or proposed, in front of or adjoining the Property, to the centerline thereof, and all right, title and interest of the Seller, if any, in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to the Property by reason of change of grade of any street);

(b)    All improvements, shrubbery, plantings, fixtures, heating and air conditioning equipment and facilities, electrical equipment and facilities, and plumbing equipment and facilities, of every kind and nature whatsoever located in or on the Property used or useful in the operation of the Property, including the list of

B:\MM2 719045 v3
2616960-010361 9/8/2006, 4:49:24 PM



**EXHIBIT**

**A**

appliances to be included in each Unit as set forth in Exhibit A-2, attached hereto and made a part hereof;

(c)     Copies, if any, of all original and supplemental surveys, operating manuals, inspection reports, environmental audits, warranties and guarantees covering Property in Seller's possession or control, and permits relating to the operation of the Property; and

(d)     The Warranty (defined below), subject to the terms and conditions hereof.

2.     DELIVERY OF UNITS.

(a)     The parties anticipate that the Units will be conveyed to Buyer in accordance with the terms and conditions herein in two (2) separate closings (the "First Conveyance" and "Second Conveyance," respectively, and each a "Conveyance"), to take place in accordance with the provisions of Paragraph 8 below. The First Conveyance shall consist of the Units denoted as Unit 16A, Unit 16B, Unit 2A, and Unit 23A on Exhibit A-1. A schedule of the Units proposed to be transferred in each Conveyance, the portion of the Purchase Price for said Conveyance, and the estimated closing date for said Conveyance is also set forth in Exhibit A-1. Seller shall deliver the Units in each Conveyance constructed in a good and workmanlike manner, in accordance with the plans and specifications therefor, including but not limited to the specifications set forth in Exhibit B hereto, and in accordance with all applicable laws, rules and regulations, Seller having obtained permits with respect to the Units in each Conveyance, including certificates of occupancy, necessary for Buyer to commence utilization of each such Unit for residential purposes at no additional cost to Buyer (the "Seller's Delivery Requirements"). When Seller's Delivery Requirements have been met with respect to all Units to be included in each Conveyance, Seller will immediately notify Buyer in writing of same, which notice shall be given in accordance with the provisions of Paragraph 14 (the "Seller's Delivery Notice"). Seller hereby provides Buyer the Seller's Delivery Notice for the First Conveyance.

(b)     At Seller's expense, at Closing (defined in Paragraph 8, below), Seller shall provide or cause to be delivered to Buyer a "2-10 Home Buyers Warranty" for each Unit conveyed, in the form attached hereto as Exhibit C (the "2-10 Warranty") and in the amount of the fair market value thereof. In addition, for the period beginning one (1) year after the Closing for each Unit and extending until the earlier of (i) three (3) years after the Closing Date and (ii) the date that Seller no longer owns the Unit, Seller shall provide to Buyer for each Unit warranty protection coverage equivalent to that which is provided to Buyer under the "One Year Workmanship Warranty" of the 2-10 Home Buyers Warranty during the one (1) year period immediately following the Closing Date. The 2-10 Warranty and the warranty protection provided for in the immediately preceding sentence of this Paragraph 2(b) are referred to herein as the "Warranty." For purposes of the 2-10 Warranty, at Closing, Seller shall cause to be certified to Buyer that National Home Insurance Company is the "Warranty Insurer," as defined in the 2-10 Warranty. Seller's obligations under this Paragraph 2(b) shall survive the Closing. In the event of any discrepancy between the provisions of the 2-10 Warranty and the provisions of this Agreement, this Agreement shall control. The parties hereby acknowledge that the

2

warranty protection provided by the Warranty is in addition to, and not in lieu of, those warranties set forth in the New Home Warranty Act, Louisiana Revised Statutes 9:3141-3150 (the "NHWA"), that the NHWA is applicable to Buyer as an "owner," as that term is defined in the NHWA, and that Buyer has not waived any of its rights under the NHWA.

(c)    Seller hereby covenants to meet Seller's Delivery Requirements and provide Seller's Delivery Notice with respect to all of the Units by not later than September 29, 2006, and Seller's failure to do so shall be a default hereunder, giving rise to Buyer's remedies set forth in Paragraph 13(b).

3.    PURCHASE PRICE.

(a)    The purchase price for all Units to be conveyed hereunder (the "Purchase Price") shall be Five Million Six Hundred Thirty Thousand Eight Hundred Fifty-Two and 00/100 Dollars ($5,630,852.00), which shall be payable in accordance with the schedule set forth on Exhibit A-1 for each Unit conveyed to Buyer in accordance with the provisions of Paragraph 3.

(b)    Within five (5) days after complete execution of this Agreement, Buyer shall deposit Two Hundred Fifty Thousand and 00/100 Dollars ($250,000.00) as earnest money ("Earnest Money"), which shall be held by Jones Fussell, L.L.P., as agent for Chicago Title Insurance Company (the "Title Company") in an interest bearing account with all interest earned thereon for the benefit of the Buyer and the Earnest Money and accrued interest shall be applied to the amount due from the Buyer at the Closing of the Second Conveyance as a credit against the Purchase Price. The Earnest Money shall be held by the Title Company in accordance with the terms set forth herein. Any unapplied Earnest Money shall be returned to Buyer.

4.    PAYMENT OF PURCHASE PRICE.  The Purchase Price shall be paid based upon the total number of Units transferred at the Closing of each Conveyance, in accordance with the prices listed on Exhibit A-1.  The parties currently estimate the Purchase Price to be paid as follows:

|      |                                      |                |
| ---- | ------------------------------------ | -------------- |
| (i)  | Cash on closing First Conveyance     | $552,984.00    |
| (ii) | Cash on closing Second Conveyance    | $5,077,868.00  |
|      | TOTAL:                               | $5,630,852.00  |

The Purchase Price is subject to adjustments at Closing as set forth hereinbelow.

5.    REPRESENTATIONS, WARRANTIES AND COVENANTS OF SELLER.  Seller makes the following representations, warranties and covenants each of which (i) shall survive the Closing, (ii) is material and is being relied upon by Buyer, (iii) is true in all respects as of the date hereof and (iv) shall be true in all respects on the Closing Date unless otherwise disclosed to Buyer in writing prior to the Closing Date:

(a)    Seller is a limited liability company, duly organized under the laws of the State of Louisiana.  Seller has the full right and authority to enter into this Agreement and to consummate

3

the sales transaction contemplated herein, and the person executing this Agreement on behalf of Seller has all requisite authority and has been duly authorized to bind Seller. Seller will take such additional action necessary to appropriate, effect and facilitate the consummation of the purchase and sale transaction contemplated herein, including, but not limited to, executing affidavits, certificates, and resolutions as are reasonably required by the Buyer or the Title Company.

(b)     Seller has insurable title to all of Property which will be conveyed by Seller to Buyer on Closing free and clear of any and all liens, encumbrances, restrictions or easements of any kind whatsoever created by, through or under Seller except for those exceptions approved by Buyer during the Inspection Period (the "Permitted Exceptions"), which are subject to Buyer's review and approval during the Inspection Period, as hereinafter defined.

(c)     To Seller's knowledge, there are no disputes concerning location of property lines or corners or any encroachments of any improvement onto or off of the Property.

(d)     The Property has access to a public road, and access to the Property does not rely on any private easements. Seller has no knowledge of any fact or condition which would or could result in the termination or reduction of the current access from the Property to existing roads, or to sewer or other utility services presently serving the Property. All utilities, including, but not limited to, water, gas, sewer, telephone and electricity, are located at the Property in capacities sufficient to serve the Units thereon for Buyer's intended purposes, and such utilities will be available for use by Buyer at Closing. Cable television service is available for connection to the boundary of the Property, and Purchaser may choose to connect same to each Unit at Purchaser's additional expense.

(e)     Seller is not aware of any mineshafts under the Property or of any other latent defects regarding the Property such as sinkholes.

(f)     Seller has and at the Closing will have performed all obligations required to be performed by it and is not, and at time of Closing will not be, in default under any lease, mortgage, security agreement or any other agreement to which Seller is or has been a party with respect to Property.

(g)     To the best of Seller's knowledge, no violations of law, actions, suits or proceedings including condemnation by eminent domain, have been sent, claimed, instituted or threatened against or are affecting Property at law or in equity or before any federal, state or municipal governmental department, commission, board, bureau, agency or instrumentality by any governmental agency applicable to the operation of the Property. To Seller's knowledge, there are no claims, lawsuits or other proceedings pending or threatened regarding or affecting Seller or the ownership, use or possession of the Property or any portion thereof.

(h)     No notices or requests have been received by Seller from any insurance company issuing any policy of insurance covering the Property or from the holder of any mortgage, requesting the performance of any work with respect to Property with which Seller has not fully

4

B JMM2.719046 v2
2619900-010581 9/8/2006, 4:39:24 PM

complied.  Any such notices or requests received prior to the Closing shall be fully complied with by Seller at Seller's expense prior to Closing.

(i)   Seller has received no notice and has no knowledge of any pending improvement liens or special assessments to be made against the Property by any governmental authority or other entity have authority over same.

(j)   Seller shall not restrict the use of all or any part of the Property, nor take, or cause to be taken, any action in conflict with this Agreement at any time between the Effective Date and (i) the Closing or (ii) the earlier termination Buyer's obligations with respect to any of the Units as set forth in this Agreement.  Seller additionally hereby represents and warrants no rights-of-first-refusal, options or similar agreements exist in connection with the Property which would in any way interfere with Buyer's ability to purchase the Property.

(k)   At Closing, no contract of any kind, including, without limitation, employment contracts, real estate leasing and brokerage contracts, and contracts for servicing, operating or managing the Property, will be effective and binding upon the Property or Buyer that cannot be canceled on thirty (30) days notice.

(l)   There are no unpaid bills or claims in connection with the construction of or any repairs to the Property nor shall there be on the date of Closing.  Seller shall satisfy any and all claims for mechanic or materialmen's liens against the Property or any part thereof on or prior to Closing, and shall indemnify and hold harmless and protect the Buyer from any and all loss from such claims.

(m)   The transaction contemplated hereby complies with all federal and state laws including, but not limited to, FIRPTA and ERISA.  Seller is not a "foreign person" as that term is defined in I.R.C. §1445; nor is the sale subject to any tax-withholding requirement.

(n)   All permits and licenses necessary for the operation and occupancy of the Property, including, but not limited to, all building and use permits, have been obtained in final and unconditional forms on all operations to date and shall be maintained through Closing.

(o)   At Closing, Seller shall have paid all fees, commissions, salaries and rendered payment for all other costs and expenses including without limitation, management fees, leasing commissions, service contracts, employment contracts, repairs and such other expenses incurred in the operation of the Property.

(p)   To Seller's actual knowledge, no hazardous substances as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 USC § 9601(14), pollutants or contaminants as defined in CERCLA, 42 USC § 9604(A)(2), or hazardous wastes as defined by the Resources Conservation and Recovery Act ("RCRA"), 42 USC § 6903(5), or other similar applicable federal or state laws and regulations including, but not limited to, asbestos, PCBs, and urea formaldehyde, have been generated, released, stored, or deposited over, beneath, or on the Property or on or in any structures located

5

on the Property from any source whatsoever by Seller, its predecessors in interest in the Property, or any other person.

(q)     The Property has been properly subdivided in accordance with all applicable laws rules and regulations and each Unit currently comprises a separate tax parcel.

(r)     The Property is currently zoned C-2 Highway Commercial (with a conditional use permit for residential duplexes) for Buyer's intended use as residential property.

(s)     The Property is located within flood zone B and the structures on each lot are not located on a wetlands area.

(t)     The Property is not subject to any current use or special assessment which would give rise to a rollback tax or other deferred tax liability.

(u)     The construction of the Units constituting part of the Property began after August 28, 2005. For purposes of this Paragraph 4(u), construction shall be deemed to have begun on the day when site work began on any portion of the Property. No portion of the Property has been offered for lease or rent, or has been offered to be a part of a sale-leaseback or similar arrangement, nor has any party occupied or taken possession of any portion of the Property. No portion of the improvements on the Units or any component thereof has been used for its intended purpose at any location other than at the Property, and the Units have at all times been held by the Seller as inventory with the sole intention of selling the Units and not for use as rental property.

(v)     The elevations of the Units are in compliance with FEMA requirements at the time of commencement of construction.

(w)     All improvements are constructed within the appropriate subdivision lot boundaries.

(x)     Upon request from Buyer or any subsequent owner of any Unit, Seller will make all plans and specifications available to Buyer and any subsequent owner of any Unit; provided, however that such plans and specifications may not be reproduced and shall only be available for review under Seller's reasonable supervision.

6.     CONDITIONS TO AGREEMENT.   Buyer's obligations to purchase the Property or otherwise perform any obligation hereunder shall be conditioned upon the satisfaction of each of the following conditions precedent (individually, a "Condition" and collectively, the "Conditions"):

(a)     The performance by Seller of each and every agreement to be performed by Seller hereunder, and the truth and accuracy, in all material respects, of each representation and warranty made by Seller as of the Closing Date, including but not limited to those set forth in Paragraph 5, above;

6

B 0662 719008 v8
2615900-010561 9/8/2006, 4:49:24 PM

(i)    As-Built Surveys of all Units completed on or before September 6, 2006;
(ii)   Final Subdivision Plat of all of the Units;
(iii)  Existing (if any) Title Insurance Policy covering all of the Units; and
(iv)  Copies of all permits and licenses obtained in connection with the development of the Property.

Seller shall provide As-Built Surveys for those units completed after September 6, 2006 within three (3) days after completion of construction. If Seller is unable to deliver any such documents and as a consequence Buyer's inspections are delayed (e.g., the surveyor or the environmental engineer cannot prepare the survey or a Phase I Environmental Site Assessment ("ESA")) and additional time is required for such inspections, the parties shall cooperate in extending each Inspection Period for the days necessary to complete such inspection reports or survey as the case may be.

8.    TITLE INSURANCE AND SURVEY.

(a)    With respect to the First Conveyance, on or before September 12, 2006 Seller, at Buyer's expense (subject to Paragraph 8(d) below), shall deliver to Buyer a title commitment issued by Title Company, at standard rates, for the issuance of an owner's title policy, ALTA Owner's Policy Form dated 10/17/92 (or such other form as is reasonably required by Buyer's lender upon notice to Seller), in the amount of the Purchase Price for all Units in such Conveyance, and, if applicable, a mortgagee's policy in the amount of any loan, covering title to all Units in such Conveyance showing fee simple title vested in Seller, subject only to taxes for the current tax year (the "Title Commitment"). With respect to the Second Conveyance, Seller, at Buyer's expense, shall deliver the Title Commitment to Buyer within ten (10) days after the Seller's Delivery Notice. Buyer shall give Seller written notice or notices (the "Title Notice") on or before the expiration of the Inspection Period whether any matter in the Title Commitment is not acceptable to Buyer. Seller shall satisfy those requirements applicable to Seller in the Title Commitment and shall use good faith efforts to eliminate or modify all unacceptable matters to the reasonable satisfaction of the Buyer; provided, however, that at Closing, mortgages, judgments and other monetary liens may be satisfied and released out of the net proceeds due Seller. Seller shall not have any obligation to incur any expense in the remediation of the title defects set forth in the Title Notice (except, as aforesaid, in connection with the satisfaction of mortgages, liens or judgments against the Property). In the event that Seller is unwilling or unable, upon the exercise of due diligence, to cure or eliminate those matters objected to within thirty (30) days after receipt of the Title Notice or on or before Closing, whichever is earlier, Buyer may, at its option (i) accept the title subject to the objections raised by the Buyer, in which event said objections shall be deemed waived for all purposes and shall be Permitted Exceptions, but no such waiver shall reduce Buyer's rights by reason of any such agreement, warranty or representation herein, or (ii) terminate its obligations under this Agreement with respect to all Units for which Buyer finds title objectionable. Any exceptions or requirements appearing on any updated Title Commitment which were not reflected in the Title Commitment shall be cured or satisfied by Seller, unless suffered by the Buyer or waived by the Buyer in writing.

8

(b)     As a condition precedent to Closing, Buyer shall obtain, at Buyer's expense (subject to Paragraph 8(e) below), an owner's title insurance policy, ALTA Owner's Policy Form dated 10/17/92, in the full amount of the Purchase Price of all Units in such Conveyance, and a mortgagee's title insurance policy in the amount of any loan, wherein the Title Company shall insure that good, marketable and indefeasible title to the Property subject to such Conveyance is vested in Buyer, subject only to ad valorem taxes for the current year endorsed "not yet due and payable" and the Permitted Exceptions. Seller shall cause the standard exceptions within the policy for mechanic and materialmen's liens and the gap coverage exception to be deleted.

(c)     Buyer may, at Buyer's expense, cause to be prepared, by a duly licensed land surveyor, a current survey of the Property subject to each Conveyance in form and substance acceptable to Buyer. The survey shall be currently dated, shall show the location on the Property of all improvements, fences, evidence of abandoned fences, ponds, creeks, streams, rivers, easements, roads, rights-of-way, location of all utilities serving the Property, and encroachments, and shall contain a legal description of the boundaries of the Property by metes and bounds. The surveyor shall certify to the Buyer and to the Title Company and to Buyer's mortgagee, if any, that the survey is correct, and that there are no visible discrepancies, conflicts, encroachments, overlapping of improvements, fences, evidence of abandoned fences, ponds, creeks, streams, rivers, easements, roads or rights-of-way except as are shown on the survey plat. Any and all matters shown on said survey shall be legibly identified by appropriate volume and page recording references with dates of recording noted. Buyer shall have until the end of the Inspection Period to approve or disapprove the material contained thereon. If Buyer shall disapprove of any survey matter, Buyer may either (i) treat such objection as a title objection as set forth above, or (ii) terminate its obligations under this Agreement with respect to all Units for which Buyer finds title objectionable.

(d)     Those matters not objected to during the Inspection Period, as extended, shall be deemed Permitted Exceptions.

(e)     The parties hereby acknowledge that, in order to facilitate a speedy closing of the First Conveyance, Buyer shall cause the foregoing surveys and an ESA with respect to the First Conveyance to be prepared after the Closing of the First Conveyance and during the Inspection Period for the Second Conveyance. If such surveys or ESA reveal any defect to which Buyer would have had the right to object if Buyer had obtained such surveys and ESA prior to the Closing of the First Conveyance, then Buyer shall provide to Seller written notice of same prior to the end of the Inspection Period for the Second Conveyance, and Seller shall use good faith efforts to assist Buyer in correcting such defect(s). If Buyer and Seller are unable to correct such defect(s) prior to the Closing of the Second Conveyance, the Buyer shall transfer the Units thereby affected back to Seller and apply the Purchase Price paid in connection with such Units to the Purchase Price due at the Closing of the Second Conveyance.

9.   CLOSING.

(a)     Closing Date. The consummation of the transactions contemplated herein (with respect to each Conveyance, the "Closing") shall occur on the dates set forth in Exhibit A-1

9

hereto, or at such earlier time as Buyer may designate (with respect to each Conveyance, the "Closing Date"). Closing shall be held at the offices of Jones Fussell, L.L.P. in Covington, Louisiana.

(b)      Delivery of Documents at Closing.  At the Closing, the Seller shall deliver to the Buyer the following documents and instruments with respect to the Units and the Property which are the subject of such Closing as set forth in Exhibit A:

(i)      A general warranty deed acceptable to the Title Company transferring and conveying unto Buyer the Property, subject only to the Permitted Exceptions, which deed shall be duly executed by Seller and acknowledged;

(ii)     A lien waiver affidavit executed by or on behalf of Seller and dated as of the Closing Date, acknowledging that no bills for labor and/or materials furnished to the Property are due and owing to any parties so that the Title Company shall remove the mechanics' and materialmen's lien exception from the policies being issued;

(iii)    A seller's/owner's affidavit on the Title Company's form so that the Title Company shall remove the standard exceptions and the gap coverage exception from the policies being issued at Closing;

(iv)     The Warranty and all warranties required under Paragraph 2(b);

(v)      Evidence in recordable form, acceptable to Buyer and the Title Company, authorizing the consummation of the sales transaction contemplated hereby and the execution and delivery of the Closing documents on behalf of the Seller;

(vi)     An Assignment (executed by Seller) of all warranties and guaranties from third-parties relating to the Property or any part thereof and held by the Seller;

(vii)    Such other documents as may be reasonably required by the Buyer or the Title Company, including a FIRPTA affidavit and a Commercial Real Estate Broker Lien Affidavit, in customary Louisiana transaction; and

(viii)   A certificate of completion from Seller, certifying that the Units have been constructed in accordance with the plans and specifications for same and with all applicable laws, rules and regulations and are ready for occupancy.

At the Closing, the Buyer shall cause to be delivered to the Seller the net amount due Seller for said Conveyance on Closing and Seller and Buyer shall execute multiple copies of a Closing Statement.

10

B:JMM2.719046 v8
2616900-012561.9/8/2006; 4:49:24 PM

(c)    Prorations and Adjustments.  The following items shall be adjusted and prorated between Seller and Buyer as of the date of closing:

(i)    Ad Valorem Taxes.  All parish, state, municipal, real estate and personal property taxes and any other taxes constituting a lien against the Property for tax year preceding the tax year in which the Closing occurs shall be paid in full by Seller.  All parish, state and municipal, real estate taxes and personal property taxes for the tax year in which the Closing occurs shall be prorated based upon the actual real estate taxes and personal property taxes paid by Seller for the current tax year if available (and if not, the prior tax year) in which the Closing occurs (adjusted by the amount of any reimbursement by any tenants for taxes).  If the actual tax imposed against the Property is less or more than such amount, the tax proration made at Closing shall be readjusted and Seller, or Buyer, as the case may be, shall pay any additional amount owed to the other within ten (10) days after request for same.  For purposes hereof, it shall be assumed that parish taxes are paid in arrears.

(ii)    Utilities.  The amount of all unpaid water and other utility bills with respect to the Property and allocable to the period prior to the Closing Date shall be paid by Seller; provided, however, that the amounts of any utility bills that cannot be ascertained as of the Closing Date shall be based on the latest utility bills received by Seller with further adjustment and payment made after Closing when the utility bills for the period involved have been received, such payment to be made within ten (10) days after ascertainment of the amount of such utility bills.

The foregoing obligations of Buyer and Seller shall survive the Closing.

(d)    Closing Costs.  The costs of the surveys will be paid by Buyer.  Buyer shall pay the costs of the title insurance policy(s).  If a mortgage policy is obtained, the total title insurance for owner's and mortgagee's policies shall be paid by Buyer.  Buyer will pay all costs of recording the deed, including deed tax and any mortgage loan documents.  Each party shall bear the expense of its own attorney.

10.    POSSESSION.  Buyer shall be entitled to full possession of the Property at Closing (per Conveyance), subject to the terms of this Agreement.

11.    OPERATION AND MAINTENANCE OF PROPERTY PENDING CLOSING. Between the date hereof and the Closing Date, Seller shall:

(a)    Keep and maintain Property in good condition and repair, ordinary wear and tear, damage by fire or other casualty, or by acts of God and the elements excepted;

(b)    Notwithstanding anything to the contrary in this Agreement, between the date of this Agreement and the Closing Date, Seller shall not enter into any contract or lease that will be a continuing post-closing obligation affecting the Property without Buyer's prior written consent.

11

B:JMM2 719646 v8
2616500-010561 9/5/2006 4:49:24 PM

12.   REAL ESTATE COMMISSIONS. Each of the parties represents to the other that it has not incurred and will not incur any liability for brokerage fees or agent commissions in connection with this Agreement, and Seller and Buyer each agree to indemnify and hold the other harmless from and against any and all claims or demands with respect to any brokerage fees or agents' commissions or other compensation asserted by any person, firm, or corporation in connection with this Agreement or the transactions contemplated hereby, insofar as any such claim is based upon any conversation or contract with Seller or Buyer, respectively.   The foregoing indemnity shall survive the Closing or any early termination of this Agreement.

13.   RISK OF LOSS.

(a)   The risk of loss or damage to the Property thereon shall remain with the Seller until the Closing Date.  Seller shall deliver possession of the Property in accordance with Seller's Delivery Requirements, except for insured damage by fire or other casualty, acts of God and the elements.

(b)   Seller shall repair or replace any damage caused to the Property prior to Closing by fire or other casualty; provided, however, that the Closing Date shall be extended for such reasonable time as shall allow such restoration and provided further that if the cost of said repair or replacement exceeds Ten Thousand and 00/100 Dollars ($10,000.00) per Unit or if such restoration is not completed by December 8, 2006, Buyer may, upon proper notice, terminate this Agreement, upon which termination, all Earnest Money shall be returned together with interest thereon to Buyer, but without costs or other setoff, and the parties shall be discharged fully from all further obligations under this Agreement.  In the alternative, upon written notice from Buyer, Seller shall deliver to Buyer at Closing the damaged property and an assignment of all its insurance claims relating thereto together with an amount in cash of any deductible amount payable by Seller pursuant to such insurance policy.

14.   DEFAULT.

(a)   In the event all conditions to Buyer's obligation to close have been satisfied, and Buyer fails to close the transactions contemplated herein, except as expressly permitted, Seller may terminate this Agreement, whereupon the Earnest Money deposit shall be forfeited as liquidated damages or Seller may seek specific performance, at its option.   The foregoing remedies shall be Seller's sole remedies in the event of Buyer's failure to close.

(b)   In the event all conditions to Seller's obligation to close have been satisfied, and Seller fails to close the transaction in accordance with its terms, Buyer may, in its sole discretion, either (i) enforce this Agreement and the sale and purchase provided for herein according to its terms by all means available at law or equity, including specific performance, or (ii) terminate this Agreement, whereupon the Earnest Money deposit shall be returned immediately in full to Buyer and Seller shall pay Buyer an amount equal to the Earnest Money representing sole liquidated damages due to Buyer.  The foregoing remedies shall be Buyer's sole remedies in the event of Seller's failure to close.

12

(c)    Should either party employ an attorney to enforce any of the provisions hereof, or to protect its interest in any matter arising under this Agreement, or to specifically enforce this Agreement, the party prevailing shall be entitled to recover from the other party all reasonable costs, charges and expenses, including attorneys' fees, expended in connection therewith, including expenses incurred on appeal.

15.    NOTICES. All notices required to be given hereunder shall be in writing and delivered personally or by certified mail, return receipt requested, or by nationally recognized overnight courier, and addressed as follows:

| | |
|---|---|
| To Seller: | Springhill, L.L.C. (Attn: Adrian and Chris Kornman)<br>2053 Gause Boulevard East<br>Suite 200<br>Slidell, LA 70461 |
| With copy to: | Jeffrey D. Schoen, Esq.<br>Jones Fussell, L.L.P<br>P.O. Box 1810<br>Covington, LA 70434 |
| To Buyer: | Slidell Property Management, LLC<br>c/o Mr. John F. Campbell<br>P.O. Box 8357<br>St. Thomas, USVI 00801 |
| With copy to: | B.G. Minisman, Esq.<br>Baker, Donelson, Bearman, Caldwell & Berkowitz, PC<br>420 North 20th Street<br>Suite 1600<br>Birmingham, AL 35203 |

Each such mailed notice shall be deemed to have been given to, or served upon, the party to which addressed on the date the same is deposited in the United States registered or certified mail, return receipt requested, postage prepaid, properly addressed in the manner above provided or one (1) day after deposit with the national recognized overnight courier. Each such delivered notice or communication shall be deemed to have been given to or served upon the party to whom delivered, upon the delivery thereof in the manner above provided. Any party hereto may change its address for the service of notice hereunder by delivering written notice of said change to the other parties hereunder, in the manner above specified, ten (10) days prior to the effective date of said change.

16.    CAPTIONS. The paragraph headings or captions appearing in this Agreement are for convenience only, are not a part of this Agreement, and are not to be considered in interpreting this Agreement.

13

17.   ENTIRE AGREEMENT, MODIFICATION.  This written Agreement constitutes the entire and complete agreement between the parties hereto and supersedes any prior oral or written agreements between the parties with respect to the Property.  It is expressly agreed that there are no verbal understandings or agreements which in any way change the terms, covenants and conditions herein set forth, and that no modification of this Agreement and no waiver of any of its terms and conditions shall be effective unless made in writing and duly executed by the parties hereto.

18.   BINDING EFFECT.  All covenants, agreements, warranties and provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and permitted assigns.

19.   ASSIGNABILITY.  Buyer reserves the right to transfer and assign this Agreement to any party in which the principals of Buyer are also involved as principals of the assignee.

20.   MUTUAL COOPERATION.  In the event and for so long as either party or a member of such party is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, claim, audit, or demand, including any dispute with any state or federal taxing authority, in connection with (i) any transaction under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Property, the other party will reasonably cooperate with such party or member of such party and such party's or member's counsel in the contest or defense, make reasonably available their personnel, and provide such testimony and access to their books and records as shall be reasonably necessary in connection with the contest or defense, and the contesting or defending party shall reimburse the other party the reasonable fair market value of the time devoted and expenses incurred in providing such assistance.

21.   COUNTERPARTS.  This Agreement may be executed in counterparts (no one (1) of which will need to contain the signatures of more than one (1) party hereto so long as each party hereto executes at least one (1) such counterpart), each of which shall be deemed an original and all of which, when taking together, shall constitute and be one (1) and the same instrument.

22.   CONSTRUCTION, VENUE, AND CHOICE OF LAW.  The parties hereby agree that each has played an equal part in the negotiations and drafting of this Agreement, and in interpreting any provisions hereof, there shall be no construction or interpretation of this Agreement for or against either party based upon who drafted the same.  Further, any and all disputes hereunder shall be exclusively litigated in the applicable state court or the U.S. District Court for the Eastern District of Louisiana, wherein Louisiana law shall be applied as to the choice of law on all issues in said litigation.

23.   TIME OF ESSENCE.  Time is of the essence with respect to all matters contained in this Agreement.

24.   SEVERABILITY.  In the event that any one (1) or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect,

14

B JMM2.719046 v8
2616900-010561 3/08/2006, 4:49:24 PM

such invalidity, illegality or enforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date shown below.

SELLER:

SPRINGHILL, L.L.C.

By: _____
Name: ADRIAN KORNMAN
Its:      Authorized Member
September 8, 2006

BUYER:

SLIDELL PROPERTY MANAGEMENT, LLC

By: _____
Name: JOHN F. CAMPBELL
Its:      Member
September 8, 2006

15

EXHIBIT A

LEGAL DESCRIPTION OF UNITS

### First Conveyance

Lots 2-A, 16-A, 16-B, and 23-A of Oak Plain, Phase I, Section 24, Township 9 South, Range 14 East, St. Tammany Parish, Louisiana as per Subdivision Plat of J.V. Burkes & Associates, Inc., dated 4/05/05 recorded as Clerk of Court Map File No. 3907 of the official records of St. Tammany Parish, Louisiana.

### Second Conveyance

Lots 18-A, 18-B, 19-A, 19-B, 22-A, 22-B, 23-B, 24-A, 24-B, 25-A, 25-B, 26-A, 26-B, 27-A, 27-B, 28-A, 28-B, 29-A, 29-B, 30-A, 30-B, 31-A, 31-B, 32-A, 32-B, 33-A, 33-B, 34-A, 34-B, 35-A, 35-B, 36-A, 36-B, 37-A, 37-B, and 38-A of Oak Plain, Phase 2, Section 24, Township 9 South, Range 14 East, St. Tammany Parish, Louisiana, as per Subdivision Plat of J.V. Burkes & Associates, Inc., dated 9/21/05 recorded as Clerk of Court Map File No. 4086 of the official records of St. Tammany Parish, Louisiana.

B.JMM2.719046 v8
2816900-010561 9/8/2006, 4:49:24 PM.

EXHIBIT A-1

SCHEDULE OF CONVEYANCES
(UNITS, PURCHASE PRICE PER
CONVEYANCE AND LATEST CLOSING DATE)

| Conveyance | Units | Purchase Price | Closing Date |
|---|---|---|---|
| First | Described in Exhibit A | $552,984.00 | September 15, 2006 |
| Second | Described in Exhibit A | $5,077,868.00 | October 31, 2006 |

B JMM2.719045 v8
2616900-010561 9/8/2006; 4:49:24 PM

EXHIBIT A-2

SCHEDULE OF APPLIANCES

GE Hotpoint Dishwasher HDA2000
GE Hotpoint Disposer GFC320
GE Hotpoint Microwave Non Vent 1435W
GE Hotpoint Range Electric Free-Standing Standard Clean RB526

EXHIBIT B

SPECIFICATIONS

(SEE ATTACHED)

# VILLAS AT SPRINGHILL
## SPECIFICATIONS (REVISED 08/22/06)

| Feature | Austin | Cameron | Madison |
|---|---|---|---|
| PLAN-ELEV-EXTERIOR | | | |
| Elevations | A, B, C | A, B, C | A, B, C |
| Ceiling Height 1st | 8 feet | 8 feet | 8 feet |
| Living Area Total | 1501 | 1519 | 1777 |
| Garage Area | 434 | 335 | 396 |
| Porch Area | A=91, B=70, C=57 | A=235, B=111, C=229 | A=24, B=83, C=157 |
| Slab Area | A=2016, B=2005, C=1992 | A=1889, B=1765, C=1883 | A=2197, B=2256, C=2330 |
| Under Beam Area | A=2016, B=2005, C=1992 | A=1889, B=1765, C=1883 | A=2197, B=2256, C=2330 |
| Car Storage | 2-Car Garage | 2-Car Garage | 2-Car Garage |
| Back Porch | None | 6-8 x 10-0 | None |
| Patio Open | 8-0 x 12-0 | None | 8-0 x 12-0 |
| Patio Cov Option | None | None | None |
| Front Door | 6-Panel Fiberglass | 6-Panel Fiberglass | 6-Panel Fiberglass |
| Brick Sides | None | None | None |
| Brick Rear | None | None | None |
| Stucco Fronts | None | None | None |
| Roofing Shingles | 30-Yr Dimensional | 30-Yr Dimensional | 30-Yr Dimensional |
| Vinyl Siding Product | Alside Centerlock | Alside Centerlock | Alside Centerlock |
| Vinyl Siding Profile | 0.44" Dutchlap | 0.44" Dutchlap | 0.44" Dutchlap |
| Soffit/Fascia Material | Vinyl/Aluminum | Vinyl/Aluminum | Vinyl/Aluminum |
| Soffit/Fascia Color | White | White | White |
| Aluminum Columns | AFCO Empire | AFCO Empire | AFCO Empire |
| Shutter Brand | Mid-America | Mid-America | Mid-America |
| DOORS-TRIM | | | |
| Attic Access Garage | 22x54 | 22x54 | 22x54 |
| DRYWALL | | | |
| Drywall Walls | OrangePeel | OrangePeel | OrangePeel |
| Drywall Ceilings | Acoustical (Popcorn) | Acoustical (Popcorn) | Acoustical (Popcorn) |
| Drywall Corner Bead | Square | Square | Square |
| Drywall Garage | Texture Optional | Texture Optional | Texture Optional |
| ELECTRICAL | | | |
| Ceiling Fans | None | None | None |
| ELECTRONICS | | | |
| Structured Wiring | Optional | Optional | Optional |
| Phone Outlets | Kitchen/MBed | Kitchen/MBed | Kitchen/MBed |
| Cable TV Outlets | Family/MBed | Family/MBed | Family/MBed |

## VILLAS AT SPRINGHILL
### SPECIFICATIONS (REVISED 08/22/06)

| Feature | Austin | Cameron | Madison |
|---|---|---|---|
| FIREPLACE | | | |
| Fireplace Standard | None | None | None |
| Fireplace Model | None | None | None |
| Fireplace Design | None | None | None |
| Fireplace Chimney | None | None | None |
| Fireplace Mantel | None | None | None |
| FLOORING | | | |
| Flooring Standard | Vinyl/Carpet | Vinyl/Carpet | Vinyl/Carpet |
| Vinyl Base Grade | Seville | Seville | Seville |
| Carpet Base Grade | Royale 2 | Royale 2 | Royale 2 |
| Flooring Master Lav | Vinyl | Vinyl | Vinyl |
| Flooring Bath2 Lav | Vinyl | Vinyl | Vinyl |
| GLASS-MIRRORS | | | |
| Shower Doors | None | None | None |
| Powder Mirror | None | None | None |
| HVAC | | | |
| AC Brand | Goodman | Goodman | Goodman |
| AC SEER Rating | 10.0 | 10.0 | 10.0 |
| AC Thermostat | | | |
| Central Heater | Electric | Electric | Electric |
| AC 1st Floor | Attic 3.0 Tons | Attic 3.0 Tons | Attic 3.5 Tons |
| Utility Room Drop | None | None | None |
| Master Bath Drop | Yes | Yes | Yes |
| Master Closet Drop | None | None | None |
| Hall Bath Drop | None | None | None |
| Dryer Vent | | | |
| INSULATION | | | |
| Standard Insulation | R13/30 @ SS07 | R13/30 @ SS07 | R13/30 @ SS07 |
| Exterior Walls | R13 Batts | R13 Batts | R13 Batts |
| Attic Walls | R19 Batts | R19 Batts | R19 Batts |
| Subfloor Over Garage | R19 Batts | R19 Batts | R19 Batts |
| Subfloor Over Porches | R19 Batts | R19 Batts | R19 Batts |
| Typical Flat Ceilings | R30 Blown | R30 Blown | R30 Blown |
| Typical Sloped Ceilings | R30 Batts | R30 Batts | R30 Batts |
| Ceilings Decked Above | R19 Batts | R19 Batts | R19 Batts |
| KITCHEN | | | |

## VILLAS AT SPRINGHILL
### SPECIFICATIONS (REVISED 08/22/06)

| Feature | Austin | Cameron | Madison |
|---|---|---|---|
| Standard Cabinets | Seacrest | Seacrest | Seacrest |
| Kitchen Top Material | Formica | Formica | Formica |
| Kitchen Top Edge | Waterfall | Waterfall | Waterfall |
| Kitchen Splash | Formica | Formica | Formica |
| Kitchen Range | HP F-S Coil | HP F-S Coil | HP F-S Coil |
| Kitchen Island | None | None | None |
| Kitchen Wall Cabs | 30 inches | 30 inches | 30 inches |
| Kitchen Furr Down | None | None | None |
| Kitchen Cab Crown | None | None | None |
| LANDSCAPE | | | |
| Centipede Sod | Front/Sides | Front/Sides | Front/Sides |
| Garden Soil | 2 scoops | 2 scoops | 2 scoops |
| Garden 1-Gal Shrub | 8 each | 8 each | 8 each |
| Garden 3-Gal Shrub | 10 each | 10 each | 10 each |
| Garden Pine Straw | 2 bales | 2 bales | 2 bales |
| PAINT | | | |
| Paint Brand | ICI-Dulux-Glidden | ICI-Dulux-Glidden | ICI-Dulux-Glidden |
| Wall/Ceiling Paint | Ultra Hide Latex | Ultra Hide Latex | Ultra Hide Latex |
| Wall/Ceiling Gloss | Interior Flat | Interior Flat | Interior Flat |
| Wall/Ceiling Color | SW1032 City Loft | SW1032 City Loft | SW1032 City Loft |
| Door/Trim Paint | Ultra Hide Latex | Ultra Hide Latex | Ultra Hide Latex |
| Door/Trim Gloss | Interior Semi-Gloss | Interior Semi-Gloss | Interior Semi-Gloss |
| Door/Trim Color | SW1004 Pure White | SW1004 Pure White | SW1004 Pure White |
| Stair Parts Stain | Golden Oak | Golden Oak | Golden Oak |
| Exterior Paint | Dulux Professional | Dulux Professional | Dulux Professional |
| Exterior Gloss | Exterior Gloss | Exterior Gloss | Exterior Gloss |
| Exterior Trim Color | SW1004 Pure White | SW1004 Pure White | SW1004 Pure White |
| Rear Door Color | SW1004 Pure White | SW1004 Pure White | SW1004 Pure White |
| Garage Door Color | White (Factory Finish) | White (Factory Finish) | White (Factory Finish) |
| Front Door Color | Match Shutters | Match Shutters | Match Shutters |
| PLUMBING | | | |
| Kit Faucet | Moen Chateau | Moen Chateau | Moen Chateau |
| Kit Faucet | Single Handle Chrome | Single Handle Chrome | Single Handle Chrome |
| Kit Sink | Sterling PRO33226-3S | Sterling PRO33226-3S | Sterling PRO33226-3S |
| Kit Sink | 2-Bowl 33x22x6 | 2-Bowl 33x22x6 | 2-Bowl 33x22x6 |
| Kit Sink | Satin Stainless Steel | Satin Stainless Steel | Satin Stainless Steel |

## VILLAS AT SPRINGHILL
### SPECIFICATIONS (REVISED 08/22/06)

| Feature | Austin | Cameron | Madison |
|---|---|---|---|
| MB Lav Faucet | Moen Castelby | Moen Castelby | Moen Castelby |
| MB Lav Faucet | 1 @ 4" Mini Spread | 1 @ 4" Mini Spread | 1 @ 4" Mini Spread |
| MB Tub Faucet | Moen Castelby | Moen Castelby | Moen Castelby |
| MB Tub Faucet | Tub/Shower | Tub/Shower | Tub/Shower |
| MB Faucet Finish | Chrome | Chrome | Chrome |
| MB Tub | Aqua Glass 826033A | Aqua Glass 826033A | Aqua Glass 826033A |
| MB Tub | 60x32x78 White Gloss | 60x32x78 White Gloss | 60x32x78 White Gloss |
| MB Toilet | Mansfield or St. Thomas | Mansfield or St. Thomas | Mansfield or St. Thomas |
| MB Toilet | Round w/Seat - White | Round w/Seat - White | Round w/Seat - White |
| B2 Lav Faucet | Moen Castelby | Moen Castelby | Moen Castelby |
| B2 Lav Faucet | 1 @ 4" Mini Spread | 1 @ 4" Mini Spread | 1 @ 4" Mini Spread |
| B2 Tub Faucet | Moen Castelby | Moen Castelby | Moen Castelby |
| B2 Tub Faucet | Tub/Shower | Tub/Shower | Tub/Shower |
| B2 Faucet Finish | Chrome | Chrome | Chrome |
| B2 Tub | Aqua Glass 826033A | Aqua Glass 826033A | Aqua Glass 826033A |
| B2 Tub | 60x32x78 White Gloss | 60x32x78 White Gloss | 60x32x78 White Gloss |
| B2 Toilet | Mansfield or St. Thomas | Mansfield or St. Thomas | Mansfield or St. Thomas |
| B2 Toilet | Round w/Seat - White | Round w/Seat - White | Round w/Seat - White |
| Water Heater | Rheem 50-Gal Electric | Rheem 50-Gal Electric | Rheem 50-Gal Electric |
| Hose Bibs | Standard x 2 | Standard x 2 | Standard x 2 |
| AC Drain Lines | Provided by Plumber | Provided by Plumber | Provided by Plumber |
| Ice Maker Roughin | Provided by Plumber | Provided by Plumber | Provided by Plumber |
| Washer Roughin | Provided by Plumber | Provided by Plumber | Provided by Plumber |
| Tub Wastes/Overflows | Color-Match Faucet | Color-Match Faucet | Color-Match Faucet |
| Shower Strainers | Color-Match Faucet | Color-Match Faucet | Color-Match Faucet |
| SITE | | | |
| Setback Front | 25 feet | 25 feet | 25 feet |
| Setback Rear | 40 feet | 40 feet | 40 feet |
| Setback Sides | 5 feet (Zero party wall) | 5 feet (Zero party wall) | 5 feet (Zero party wall) |
| Setback Corner | 10 feet | 10 feet | 10 feet |
| City Sidewalks | None | None | None |

Springhill Villas 8/25/06

| Lot Number | | Address | CityStateZip | Prod House Type |
|---|---|---|---|---|
| 2 | A | 1089 Clairise Court | Slidell LA 70461 | Cmm B |
| 16 | A | 1100 Clairise Court | Slidell LA 70461 | Cmm B |
| 16 | B | 1096 Clairise Court | Slidell LA 70461 | Cmm B |
| 18 | A | 1084 Clairise Court | Slidell LA 70461 | Cmm A |
| 18 | B | 1080 Clairise Court | Slidell LA 70461 | Cmm A |
| 19 | A | 1076 Clairise Court | Slidell LA 70461 | Cmm A |
| 19 | B | 1072 Clairise Court | Slidell LA 70461 | Cmm A |
| 22 | A | 1052 Clairise Court | Slidell LA 70461 | Cmm B |
| 22 | B | 1048 Clairise Court | Slidell LA 70461 | Cmm B |
| 23 | A | 1044 Clairise Court | Slidell LA 70461 | Aus C |
| 23 | B | 1040 Clairise Court | Slidell LA 70461 | Aus C |
| 24 | A | 1036 Clairise Court | Slidell LA 70461 | Cmm A |
| 24 | B | 1032 Clairise Court | Slidell LA 70461 | Cmm A |
| 25 | A | 1028 Clairise Court | Slidell LA 70461 | Mad B |
| 25 | B | 1024 Clairise Court | Slidell LA 70461 | Mad B |
| 26 | A | 1020 Clairise Court | Slidell LA 70461 | Cmm B |
| 26 | B | 1018 Clairise Court | Slidell LA 70461 | Cmm B |
| 27 | A | 1012 Clairise Court | Slidell LA 70461 | Cmm A |
| 27 | B | 1008 Clairise Court | Slidell LA 70461 | Cmm A |
| 28 | A | 1004 Clairise Court | Slidell LA 70461 | Cmm C |
| 28 | B | 1000 Clairise Court | Slidell LA 70461 | Cmm C |
| 29 | A | 1001 Clairise Court | Slidell LA 70461 | Mad A |
| 29 | B | 1005 Clairise Court | Slidell LA 70461 | Mad A |
| 30 | A | 1009 Clairise Court | Slidell LA 70461 | Aus A |
| 30 | B | 1013 Clairise Court | Slidell LA 70461 | Aus A |
| 31 | A | 1017 Clairise Court | Slidell LA 70461 | Mad C |
| 31 | B | 1021 Clairise Court | Slidell LA 70461 | Mad C |
| 32 | A | 1025 Clairise Court | Slidell LA 70461 | Aus C |
| 32 | B | 1029 Clairise Court | Slidell LA 70461 | Aus C |
| 33 | A | 1033 Clairise Court | Slidell LA 70461 | Mad A |
| 33 | B | 1037 Clairise Court | Slidell LA 70461 | Mad A |
| 34 | A | 1041 Clairise Court | Slidell LA 70461 | Cmm C |
| 34 | B | 1045 Clairise Court | Slidell LA 70461 | Cmm C |
| 35 | A | 1049 Clairise Court | Slidell LA 70461 | Mad B |
| 35 | B | 1053 Clairise Court | Slidell LA 70461 | Mad B |
| 36 | A | 1057 Clairise Court | Slidell LA 70461 | Cmm C |
| 36 | B | 1061 Clairise Court | Slidell LA 70461 | Cmm C |
| 37 | A | 1065 Clairise Court | Slidell LA 70461 | Aus B |
| 37 | B | 1069 Clairise Court | Slidell LA 70461 | Aus B |
| 38 | A | 1073 Clairise Court | Slidell LA 70461 | Cmm B |

EXHIBIT C

2-10 WARRANTY

(SEE ATTACHED)

B JMM2 719246 v8
2616900-910561 9/8/2006; 4:49:24 PM