UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |
|---|---|
| THIS DOCUMENT RELATES TO:<br><br>Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al., Case No. 2:09-cv-6687 (E.D.La.) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
SCOPE AND EXTENT OF REMEDIATON**

I. **INTRODUCTION**

Plaintiffs Michelle Germano, Dennis Jackson, Sharon Jackson, Jason Dunaway and Lisa Dunaway (collectively, "Plaintiffs"), by and through counsel, respectfully file this memorandum of law in support of their position regarding the scope and extent of the remediation of the homes which are the subject of the hearing scheduled to begin on February 19, 2010. As set forth more fully below, Plaintiffs contend that the homes at issue (and, indeed, all homes similarly built with Chinese drywall) require extensive remediation due to the presence of corrosion and corrosive sulfur gases caused by the Chinese drywall. The scope of the proposed necessary remediation is detailed below. Further, even if full remediation is accomplished, the evidence will show that these homes will still suffer a significant post-remediation diminution of value. Lastly, the owners of these homes will not be fully compensated unless they recover damages for all of the injuries suffered due to the corrosive Chinese drywall, including damage to personal property, costs associated with moving and relocation, foreclosure and bankruptcy, increased cost of

1

financing, and loss of income. As this memorandum will demonstrate, all of these damages are recoverable pursuant to the law of the Commonwealth of Virginia.

## II. PROCEDURAL HISTORY

Plaintiffs, on behalf of themselves and all other similarly situated owners and tenants, brought the above-captioned class action against Defendants Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd. ("Taishan"); Tobin Trading Inc.; Venture Supply Inc., Harbor Walk Development, LLC, and The Porter-Blaine Corp. Taishan sold drywall it manufactured in China ("Chinese Drywall" or "CDW") to Venture Supply, which, in turn, sold it to Porter-Blaine, the builder, which built the seven homes at issue here.

Plaintiffs filed their initial complaint in the Eastern District of Virginia on May 1, 2009. Thereafter, on May 26, 2009, Plaintiffs filed their First Amended Complaint. On August 3, 2009, Plaintiffs received notice that service of process of the First Amended Complaint was perfected on Defendant Taishan. Plaintiffs' case was then transferred to the Eastern District of Louisiana on October 13, 2009. Subsequent to transfer, Plaintiffs moved to amend the First Amended Complaint to assert a national class against Taishan. *See* Ex Parte/Consent Motion to Amend/Correct Class Action Complaint by Interlineation, Docket No. 396 (Oct. 30, 2009). Plaintiffs' motion to amend was granted. *See* Order, Docket No. 469 (Nov. 18, 2009).

The Second Amended Class Action Complaint (the "Complaint") asserts claims against Taishan for negligence, negligence per se, breach of express and/or implied warranties, private nuisance, unjust enrichment, violation of the Consumer Protection Acts and for equitable injunctive and medical monitoring. Since Taishan did not respond to the Complaint or enter its appearance in this litigation, Plaintiffs moved for a default judgment. *See* Ex Parte/Consent Motion for Default Judgment, Docket No. 464 (Nov. 18, 2009). The Court preliminarily granted

Plaintiffs' motion for default judgment. *See* Order, Docket No. 487 (Nov. 20, 2009).

On November 25, 2009, this Court issued a scheduling order setting a hearing to address the scope and extent of appropriate remediation. *See* Scheduling Order (Nov. 25. 2009), Docket No. 502. (as amended on Dec. 21, 2009, Docket No. 642, and Jan. 21, 2010, Docket No. 784).

Pursuant to a Consent Order entered on December 2, 2009, the hearing will have no binding effect on the non-parties to the action.[1] The hearing will only have a preclusive effect on those properties which are the subject of the hearing; nonetheless, it is expected that the Court's findings will provide guidance for similarly situated and/or affected properties. *See In re: Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La., Dec. 4, 2009) ("The Court now clarifies that the results of the hearing will only have a preclusive effect on those properties which are the subject of the hearing but, hopefully, the Court's findings will provide some guidance for similarly situated and/or affected properties.").

Interested parties were allowed to (and have) intervened in the proceedings. In accordance with the Court's scheduling order, a motion to intervene in the hearing was filed by William and Deborah Morgan, Preston and Rachael McKellar, Frederick and Vanessa Michaux, J. Jerry and Inez Baldwin, Joseph and Kathy Leach, Robert and Lea Orlando, and Steven and Elizabeth Heischober.[2] *See* Motion to Intervene, Docket No. 548, filed Dec. 3, 2009. Knauf Plasterboard Tianjin Co. Ltd. ("Knauf") also moved to intervene. *See* Motion to Intervene, Docket No. 561, filed Dec. 4, 2009. Both of these motions were granted. Order, Docket No. 642

---

[1] The default proceedings proceeding in Germano "shall have no effect, collateral, direct or otherwise, on Venture, PB or any of the other non-Taishan defendants in the Germano action." *See* Consent Order (Venture Supply, Inc and The Porter-Blaine Corporation's Objection to Apparent Stipulation or Agreement Between DSC and PSC), (Dec. 02, 2009), Docket No. 546. Thus, the hearing will not issue be preclusive as to non-parties (including absent members of the Germano putative class) or the defendants in Germano, other than Taishan.

[2] For purposes of convenience, the Plaintiff-Intervenors will henceforth be referred to as "the Plaintiffs."

(Dec. 21, 2009.)

The Mitchell Company, Inc. ("The Mitchell Company") also moved to intervene in the hearing or, in the alternative, to consolidate hearings on the default judgment against Taishan sought by both the Plaintiffs and by Mitchell. *See* Motion to Intervene, Docket No. 558, filed Dec. 4, 2009. The Court granted Mitchell motion to intervene but denied its request to consolidate. *See* Order, Docket No. 697 (Jan. 5, 2009).[3]

## III.    THE REPRESENTATIVE PROPERTIES

The seven homes owned by the Plaintiffs represent a cross-section of Virginia home construction ranging from modest homes to high-end custom homes. The seven homes also represent a spectrum of CDW usage ranging from construction with all or nearly all CDW (such as the Morgan home), to "mixed" homes containing CDW and domestic drywall (such as the Orlando home), to a single home that has the unique situation of localized CDW use in a single room, *i.e.*, the post-construction addition of a wine cellar (the Leach home).

The seven properties are identified as follows:

(1)    8495 Ashington Way, Williamsburg, Virginia. This property is co-owned by William Morgan and Deborah Morgan. A 2,254 square foot house was built on the property in

---

[3] The Mitchell Company filed a class action complaint against Taishan; Knauf GIPS KG; Knauf Plasterboard Tianjin Co., Ltd.; Interior & Exterior Building Supply, L.P.; and Rightway Drywall, Inc. in the Northern District of Florida on March 6, 2009. That complaint was successfully served on Taishan on July 30, 2009. The Mitchell Company's complaint seeks to recover damages for persons and entities who used Taishan's defective drywall and incurred damages related to repair, replacement, and/or remediation of the defective drywall. After Taishan failed to respond to the Mitchell complaint in a timely fashion, The Mitchell Company moved for default judgment against Taishan on September 2, 2009. That motion for default judgment was granted on October 9, 2009.

On December 24, 2009, The Mitchell Company filed a Motion for Class Certification against Taishan. The PSC and The Mitchell Company have communicated regarding the motion, as well as the default steps and timing issues associated with such motion. The PSC and The Mitchell Company advised the Court of their meet and confers and agreed that at a later date, a briefing schedule and hearing on the class certification motion may be established at a time that is appropriate after the conclusion of the remediation hearing. *See* Minute Entry, Docket No. 595 (Dec. 10, 2009).

2006. The appraised value of the property as of August 31, 2008, was $382,000. The Morgans no longer occupy their home and have found alternative living arrangements.

(2) 1008 Hollymeade Circle, Newport News, Virginia. This property is co-owned by Preston McKellar and Rachael McKellar. A 1,720 foot house was built on the property in 2006. The appraised value of the as of August 31, 2008, was $230,000. The Mckellars no longer occupy their home and have found alternative living arrangements.

(3) 901 Eastfield Lane, Newport News, Virginia. This property is co-owned by J. Frederick Michaux and Vanessa Michaux. A 2,146 square foot house was built on the property in 2007. The appraised value of the property as of August 31, 2008, was $267,500. The Michauxs no longer occupy their home and have found alternative living arrangements.

(4) 4020 Dunbarton Circle, Williamsburg, Virginia. This property is co-owned by Jerry Baldwin and Inez Baldwin. A 2,830 square foot house was built on the property in 2006. The appraised value of the property as of August 31, 2008, was $382,000.

(5) 4043 Dunbarton Circle, Williamsburg, Virginia. This property is co-owned by Joseph Leach and Kathy Leach. A 1,832 square foot house was built on the property in 2007. The appraised value of the property as of August 31, 2008, was $475,000. The Chinese drywall in this house was only used for the construction of a wine room, which was an addition to the original house. The wine room's air circulation system is separate from the remainder of the house.

(6) 4091 Dunbarton Circle, Williamsburg, Virginia. This property is co-owned by Robert Orlando and Lea Orlando. A 2,830 square foot house was built on the property in 2005. The appraised value of the property as of August 31, 2008, was $381,000.00. The Orlandos no longer occupy their home and have found alternative living arrangements.

(7) 214A 80th Street, Virginia Beach, Virginia. This property is co-owned by Steven

Heischober and Elizabeth Heischober. A 2,575 square foot house was built on the property in 2006. The appraised value of the property as of August 31, 2008, was $635,000. The Heischobers no longer occupy their home and have found alternative living arrangements.

## IV.   THE INJURIES

In all the homes, the CDW emits foul-smelling and irritant sulfur gases that corrode metal surfaces and destroy HVAC, electrical, electronic and home safety systems, as well as personal property such as jewelry. These Virginia homes are only three years old; yet, the homeowners have been forced to replace the HVAC coils numerous times, have experienced repeated electric failures, and face the risk of the premature failure of electric systems in their homes. In these homes, a black, loosely adherent type of corrosion has eaten into the metal surfaces forming corrosive deposits and "pits" in the HVAC and electric components.

Laboratory analysis of the corrosion product and the pits have demonstrated that the corrosion product is made up primarily of copper sulfide in the case of HVAC and electrical wire, and silver sulfide in the cases of switches and circuit contact points. Laboratory analysis of the HVAC and electrical components in homes with CDW have been compared to those in otherwise comparable homes without CDW (*i.e.*, control homes) and the differences are stark. In the CDW homes there have been multiple HVAC failures and there exists widespread thick black corrosion, including "pitting" on the HVAC and other copper and silver surfaces, in only three years of use. In the control homes there have not been multiple HVAC failures, nor has the thick black corrosion including "pitting" occurred on HVAC and copper and silver surfaces. The CDW homes consistently contain noxious and irritant odors throughout the year and the control homes do not.

Researchers at Sandia National Laboratories (SNL), a premier engineering research institute of the United States Government, have investigated the CDW damage in Virginia homes

by "harvesting" electrical components and subjecting the components to analysis in the corrosion laboratory. The SNL evaluation has shown the compromised morphology (*i.e.*, structure) of the electrical components in these homes and determined that the environment in these homes is "severely corrosive" - a classification typically reserved for the most corrosive industrial environments.[4]

The corrosive sulfur gases have rendered the home unlivable for most of the plaintiff families, and their resale value, even if the homes are nearly brand new, is most likely zero until the homes are repaired.

There is a consensus among major domestic builders, as well as all the corrosion and building experts on both sides of this case, that the CDW homes must undergo significant repair to reverse and eradicate the corrosive environment that presently exists in these homes.

The Plaintiffs have suffered substantial damages. They have lost the use of their homes and the value of their most important investments. They have suffered severe damages and disruption in their lives.

The first step to making the Plaintiff families whole is to identify and implement a full repair of the damaged homes. Major domestic builders, for a combination of technical and practical reasons, have determined that CDW homes require new HVAC, electrical and plumbing systems as well as total replacement of all drywall in the home. Plaintiffs' experts agree. Only this type of thorough remedy can provide confidence that the homes have been

---

[4] Gill, et al., *Interim Report on the Status of the Analysis of Electrical Components Installed in Homes with Chinese Drywall*, Consumer Product Safety Commission, November 23, 2009, at 11-12 citing Glass, et al., *Interim Report on the Analysis of Corrosion Products on Harvested Electrical Components*, Sandia National Laboratories, November 2009 at 23, 30 [attached hereto as Exhibit "1"].

purged of the corrosive CDW and can restore them to conditions that would exist but for the installation and presence of CDW. Only complete remediation, as opposed to mitigation, can make the Plaintiffs whole and assure that their homes will have a value in the real estate market in future years. Incomplete or patchwork remediation must be rejected.

## V.  THE SCOPE AND EXTENT OF REMEDIATION AND REPAIR

The evidence will show that that CDW is significantly different from domestically manufactured drywall; sulfur compounds off-gassing from CDW causes corrosion and a strong noxious and irritating sulfur odor in the homes in which it has been installed. Expert Report of Dean A. Rutilia, P.E. ("Rutilia Report"), § 6 at 104. The sulfur off-gasses caused corrosion to numerous building components within the Plaintiffs' homes, including, but not limited to, electrical components, such as receptacles (outlets) and switches, plumbing and HVAC components. *Id.* The current corrosion (and future corrosion absent a remediation) creates an increased risk of fire or electrical shock within the homes. *Id.* The potential consequences of this risk mandate replacing the electrical wiring and devices in the homes. *Id.* The risk of corrosion remains even if the drywall is removed. *Id.*

The seven homes and other homes with CDW must be repaired to prevent further damage from sulfur compounds and odors that remain within the homes, including the removal of all drywall, all damaged components and materials, and all materials that provide a reservoir of sulfur compounds and odors. Rutilia Report, § 6 at 104; Expert Report of Ron Wright ("Wright Report") at 24; Expert Report of Ron Bailey ("Bailey Report") at 20-21. The homes are repairable since the CDW has caused no significant damage to wood product framing, steel framing connectors, or concrete foundations and slabs. Rutilia Report, § 6 at 104.

Practical deconstruction and construction requirements necessitate the removal of more

8

than the building components or portions of components that are damaged by CDW. Rutilia Report, § 6 at 104. Many undamaged interior building components require removal to access and inspect for damaged components. *Id.* Thus, the typical repair will require removal and disposal of all drywall, all electrical components, all copper and brass plumbing components and materials, copper low voltage and signal wire, HVAC components and hot water heaters (including the exterior air conditioning compressor/condenser units), HVAC ductwork, fibrous insulation, carpet and padding, kitchen and laundry appliances, and personal electronics and appliances with contact switches and/or printed circuit boards, such as televisions and computers. *Id.*; Bailey Report at 22; Wright Report at 24-25. Since there is no significant damage to wood product framing, steel framing connectors, concrete foundations, and windows and doors, such articles will not need to be replaced. Rutilia Report, § 6 at 105. However, since these items have been exposed to the defective drywall, they will need to be thoroughly cleaned and allowed to off-gas before reconstruction. *Id.* During and at the conclusion of the remediation, it is necessary to perform specialized micro-cleaning to assure long-term success of the remediation. *See* Bailey Report at 22. Further, it is necessary to conduct post-remediation inspection and certification that all CDW has been removed from the house, all irritants and noxious gases have been eliminated, and all corroded HVAC and electrical components have been replaced.

With respect to the Leach home only, localized repair of the wine cellar is satisfactory since it known with certainty that CDW installed in the home is limited to the wine cellar and this room is sufficiently isolated from the rest of the home. Rutilia Report, § 6 at 105. All building components, insulation, flooring and lights within the wine cellar should be removed and replaced. *Id.* The electrical system should be replaced back to the main electrical panel. *Id.* Drywall immediately adjacent to the wine cellar should be removed, inspected, cleaned and replaced. *Id.* Electrical, mechanical and plumbing components within rooms adjacent to the

9

wine cellar should be inspected for damages a repaired where damaged. *See id.*; Bailey Report at 10.

Some items of Plaintiffs' personal property will also need to be replaced. Personal possessions (*e.g.*, jewelry and silverware) and sorbent materials should be cleaned where cleaning fully restores the possessions; otherwise, such items of personal property will need to be replaced. *See* Rutilia Report, § 5.5.4. Appliances and electronics with contact switches and/or printed circuit boards, such as televisions and computers should be replaced. *Id.*

Intervenor Knauf has set forth two alternative repair and remediation suggestions. The first involves leaving all of the corrosive Chinese drywall in place and installing a retrofitted industrial HVAC, dehumidifier, and filter (known as an Environmental Control System or "ECS"). The second involves selective identification of corrosive Chinese drywall and selective removal of corrosive Chinese drywall, while leaving behind the domestic drywall. Neither of these approaches has been utilized by any major builder conducting Chinese drywall repair and remediation. Neither of these approaches has been recognized as efficacious by any governmental or scientific authority, and neither of these approaches have been evaluated, tested, or recommended in the published peer-reviewed literature. Both of these approaches are in fact proposals to do an experiment in the homes of the Plaintiffs to find out for the first time whether they work or not. Furthermore, both of these approaches are partial approaches in that they ignore the existing corrosion on metal surfaces including HVAC equipment (other than the coils), electrical systems including ground wires and other wiring throughout the house, and electronic components in the home such as fire alarms, smoke detectors, switches, and circuit boards. These partial approaches, along with the Knauf suggestion that wires can be "cleaned" of corrosion and corrosive pitting or cut back and respliced are unsafe, impractical, and if done legally with appropriately skilled electricians and engineers, will not significantly reduce the cost

of the repair and remediation.

There is no data whatsoever showing that the ECS can actually work in a home with people living in it. The fact that it requires the homeowner to run the system 24 hours a day, 365 days a year for the remaining lifespan of the home without opening the windows or turning off the system for any other reason, presents blatantly obvious practical difficulties. Furthermore, the suggestion that the homeowner could ever sell the home for a fair price on the open market while disclosing that the home still contains corrosive Chinese drywall cannot be harmonized with the concept of making the Plaintiff whole for the damages he or she has suffered.

Similarly, the selective identification and removal of Chinese drywall approach is based on two tools, a corrosion grading scale and a field XRF gun that have never been used or approved for the purpose of board by board Chinese drywall identification and removal.

In sum, both of the Knauf suggestions for repair and remediation lack any scientifically reliable support to give the homeowner confidence and protection that his or her home will be restored to the function and value it would have had had it not been contaminated by Chinese drywall.

## VI.   DISCUSSION

The properties which are the subject of this hearing are all located in Virginia. The drywall at issue was purchased in Virginia and used for the construction of houses in Virginia. Accordingly, Virginia law controls.

The Second Amended Complaint asserts the following seven claims against Defendant Taishan: (1) Negligence; (2) Negligence Per Se; (3) Breach of Express and/or Implied Warranties; (4) Private Nuisance; (5) Unjust Enrichment; (6) Violation of the Virginia Consumer Protection Act; and (7) Equitable and Injunctive Relief and Medical Monitoring. Because

Plaintiffs obtained a preliminary default against Taishan, they now may proceed under Rule 55 of the Federal Rules of Civil Procedure for entry of a default judgment against Taishan. Upon entry of same, Taishan is deemed to have admitted the well-pleaded facts set forth within the Complaint.[5] Consequently, Taishan is liable to each of the Plaintiffs for damages as allowed by each of these causes of action

Since a sum certain cannot be determined from the pleadings, the Court must conduct a hearing on damages. Fed. R. Civ. P. 55(b)(2). The Plaintiffs will present at the hearing evidence in support of all damages incurred and recoverable under the law of Virginia. The injury they have suffered is primarily an injury to real property.

Because Plaintiffs' interests in their real properties have been injured by Defendant Taishan's negligence, they are entitled to damages.[6] In general, the measure of damages in Virginia for a negligence action is "the amount necessary to compensate the injured party for the damage proximately caused by the tortious conduct." *Lochaven Co. v. Master Pools by Schertle, Inc.*, 233 Va. 537, 591, 357 S.E.2d 534, 537 (Va. 1987). With respect to injury to real property, Virginia allows damages to be measured by diminished value, the cost of repair or a combination of both. "Both rules are merely evidentiary methods for determining that amount which will compensate the owner of his actual pecuniary loss sustained as a result of a negligent wrongful act." *Averett v. Shircliff*, 218 Va. 202, 208, 237 S.E.2d 92, 95 (Va. 1977).

---

[5] By failing to respond to the complaint, the defaulting party admits all well-pleaded facts set forth within the complaint, except those addressed to damages. *See Jackson v. FIE Corp.*, 302 F.3d 515, 525 (5th Cir. 2002) ("After a default judgment, the plaintiff's well-pleaded factual allegations are taken as true, except regarding damages"), *quoting, United States v. Shipco General, Inc.*, 814 F.2d 1011, 1014 (5th Cir.1987).

[6] Plaintiffs' negligence claims are not barred by Virginia's economic loss rule. *See Proto v. The Futura Group, LLC., et al.*, CL09-2455, Hearing Tr., Dec. 7, 2009 (Va. Cir. Ct.) at 68 (overruling demurrer with respect to negligence); *see also In re: Chinese Manufactured Drywall Prod. Liab. Litig.*, MDL 2047 (E.D. La., Jan. 13, 2010) (rejecting the arguments that the economic loss rule barred plaintiffs' tort claims).

The Plaintiffs will introduce evidence of the cost to repair each of the subject properties plus evidence of the diminution of value each property will suffer even with a complete repair and remediation. The scope of remediation was discussed above. However, even if the homes are fully remediated, they will still suffer a diminution in value. Here, the evidence will show that each of the houses at issue will suffer a loss of value even after they are remediated. Expert testimony will establish that when full remediation is performed, these homes will most likely lose 25% of their value as appraised for August 31, 2008. On the other hand, if remediation is not promptly performed, the expert testimony will show that these homes will most likely suffer a 30% loss in their 2008 appraised value (plus the cost of remediation). *See* Expert Report of The Cost-Benefit Group, LLC at 5. These post-remediation losses are recoverable under Virginia law, in addition to recovery of the cost of the remediation itself.

Pursuant to Virginia law, the Plaintiffs can recover both the cost of repair and the loss in value of their property after the repairs are completed. The evidence will show that for each of the properties at issue the damage is not permanent and is in fact repairable. Under these circumstances, the proper measure of damages is the cost of repair, **plus** the amount the property was depreciated because it was damaged. *Lee v. Bell*, 237 Va. 626, 379 S.E.2d 464 (Va. 1989) (cost of repair is proper measure of damages if evidence has been introduced showing repair costs); *Lochaven,* 233 Va. at 538, 357 S.E.2d at 543 (plaintiff entitled to recover all costs necessary to repair damage to embankment and pool deck caused by negligence of pool cleaning company); *Westlake Props. v. Westlake Pointe Prop. Owners Ass'n*, 273 Va. 107, 126, 639 S.E.2d 257, 269 (Va. 2007) (jury was properly instructed that measure of damages was reasonable cost of repairing or replacing the property, whichever is less, plus necessary expenses shown by the evidence to have been incurred by the plaintiff); *Wittman Family Trust v.*

*Renaissance Housing Corp.*, 2000 Va. Cir. LEXIS 523 (Va. Cir., Nov. 30, 2000) (in case involving defective siding material (EIFS), court held that "the measure of compensatory damages is the cost of repair, unless the cost of repair would constitute economic waste."); Virginia Model Jury Instructions, Instruction No. 9.060 (Property Damage: Partial Loss) ("When personal property is partially damaged, the measure of damages is the reasonable cost of repairing the property plus the amount, if any, the property was depreciated because it was damaged, plus the necessary and reasonable expenses shown by the evidence to have been incurred by the plaintiff as a result of the damage to the property.").

In addition to damage to real property, the evidence will also show that the drywall manufactured by Taishan has damaged the Plaintiffs personal property. *See* Expert Report of Legier & Co. ("Legier Report"). The measure of damages for injury to personal property in Virginia is similar to that for real property. Where personal property has been either destroyed or damaged "the general rule for determining the amount of damages for injury to personal property is the fair market value of the property before and immediately after the property was damaged, plus necessary reasonable expenses incurred by the owner in connection with the injury." *Averett*, 218 Va. at 206, 237 S.E.2d at 95 (Va. 1977). As with realty, the exception to the rule is where personal property has been damaged and can be restored by repairs. If the repairs would be less than the diminution in value because of the injury, the amount recoverable is the cost of repairs and the diminution in market value of the injured property after the repairs are made. *Id.*, 218 Va. at 207-208, 237 S.E.2d at 96. Thus, if personal property has been destroyed, the measure of damages is the diminution in market value plus any reasonable and necessary expenses incurred as a result of the injury. However, if the personal property has been damaged but not destroyed, the proper measure of damages is either (1) the diminution in market

14

value plus reasonable and necessary expenses incurred or (2) the reasonable cost of repair plus a reasonable amount for lost value because of the injury, whichever is less.

Finally, the evidence will show that the Plaintiffs have suffered various other harms, including alternative living costs, costs associated with foreclosures and/or bankruptcy, additional amount owed due to mortgage deferral, bankruptcy or inability to refinance, and the loss of income. *See* Legier Report. Under Virginia law, a plaintiff's recovery of damages includes all damages proximately caused by the tortious conduct. *Lochaven*, 233 Va. at 541, 357 S.E.2d at 537 ("The measure of damages in a negligence action is that amount necessary to compensate the injured party for the damages proximately caused by the tortious conduct."); *see also Packett v. Herbert*, 237 Va. 422, 377 S.E.2d 438 (Va. 1989) (damages to real property are not limited to the diminution in value and may include damages for loss in use and other consequential injuries); Restatement (Second) of Torts § 929 (1979) (providing that damages for injury to real property include compensation for loss of use of the property and other consequential injuries in addition to any permanent property damage, whether measured by restoration or market value); *Averett*, 218 Va. at 206, 237 S.E.2d at 95 (citing with approval Section 928 of the Restatement of the Law of Torts, which allows compensation for loss of use); *Seymour v. McDonald*, 24 Va. Cir. 531 (1981) (consequential damages recoverable in addition to damages for injury to real property); 5C Michie's Jurisprudence, Damages, § 32 (2006) (rule encompasses recovery of expenses incidental to irreparable injury); J. Costello, <u>Virginia Remedies</u>, Damages, § 21.04[2][a] (foreseeable consequential damages recoverable). Damages for these consequential injuries are therefore all recoverable under Virginia law.

## VII. CONCLUSION

For all of the foregoing reasons, Plaintiffs submit that Virginia law allows recovery of (1) the cost of the full scope of remediation as outlined herein, (2) the post-remediation diminution of their properties, (3) the cost of repair or replacement of personal property, and (4) all other expenses incurred by the Plaintiffs as a result of the existence of Chinese drywall on their properties.

Respectfully submitted,

Dated: February 12, 2010

/s_____
Russ M. Herman, Esquire
Leonard A. Davis, Esquire
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin (On the Brief)
Fred S. Longer (On the Brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com

*Plaintiffs' Lead Counsel*
*MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445

Victor Manuel Diaz
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
 Matthews, Martinez, Gonzales,
 Kalbac & Kane
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931

Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931

Bruce William Steckler
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-118

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630

Jerold Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

                                      Scott Wm. Weinstein
                                      Morgan & Morgan
                                      12800 University Drive, Suite 600
                                      Ft. Meyers, FL 33907
                                      Phone: (239) 433-6880
                                      Fax: (239) 433-6836
                                      sweinstein@forthepeople.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

| | |
|---|---|
| Richard S. Lewis<br>HAUSFELD LLP<br>1700 K Street, N.W<br>Suite 650<br>Washington, DC 20006<br>Phone: (202) 540-7200<br>Fax: (202) 540-7201 | Jeremy W. Alters<br>Alters, Boldt, Brown, Rash & Culmo, P.A.<br>4141 N.E. 2nd Avenue<br>Suite 201<br>Miami, FL 33137<br>Phone: (305) 571-8550<br>Fax: (305) 571-8559 |
| Daniel K. Bryson<br>Lewis & Roberts<br>3700 Glenwood Avenue, Suite 410<br>Raleigh, NC 27612<br>Phone: (919) 981-0191<br>Fax: (919) 981-0431 | Richard J. Serpe, Esquire<br>Law Offices of Richard J. Serpe<br>Crown Center, Ste. 310<br>580 East Main Street<br>Norfolk, VA 23510-2322 |

## **CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing Plaintiffs Bench Brief for Default Judgment Proceedings has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 12th day of February, 2010.

      /s/_____
Leonard A. Davis, Esquire
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhkc.com
Plaintiffs' Liaison Counsel
MDL 2047

*Co-counsel for Plaintiff*