UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL | : | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | : | |
|  | : | SECTION: L |
|  | : | |
|  | : | JUDGE FALLON |
|  | : | MAG. JUDGE WILKINSON |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

**This Document Relates to *Germano, et al. v. Taishan Gypsum Co. Ltd., et al.*, case no. 09-6687**

**ORDER & REASONS**

Before the Court are *Daubert* motions filed by the Plaintiffs' Steering Committee ("PSC") and Intervenor Knauf Plasterboard Tianjin Co. Ltd. ("Knauf") to exclude specific aspects of expert witness testimony. For the following reasons, IT IS ORDERED that the PSC's Motion to Exclude the Expert Opinions of Roger G. Morse, AIA, and Matthew J. Perricone, Ph.D. (Rec. Doc. No. 832) is GRANTED IN PART with regard to expert testimony on the Environmental Control System ("ECS") and on the X-Ray Fluoroscopy Device's ("XRF") use to detect individual sheets of Chinese drywall, and DENIED IN PART with regard to expert testimony on the XRF's use to detect the general presence of Chinese drywall and the visual corrosion grading scale. IT IS FURTHER ORDERED that Knauf's (1) Motion to Exclude Portions of Expert Report and Testimony of Dean Rutila (Rec. Doc. No. 854), (2) Motion to Exclude Portions of Expert Report and Testimony of Donald Galler (Rec. Doc. No. 851), and (3) Motion to Exclude Portions of Expert Report and Testimony of Dr. J.R. Scully (Rec. Doc. No. 856) are DENIED.

**I.    BACKGROUND**

In the aftermath of Hurricanes Katrina and Rita, rebuilding put a strain on U.S. building

supplies, including drywall.  As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the Gulf Coast and East Coast.  Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances in their homes.  Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall.  Accordingly, these homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall.  Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation.  Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in the U.S. District Court, Eastern District of Louisiana.

The present matter, *Germano, et al. v. Taishan Gypsum Co. Ltd., et al.*, Case no. 09-6687**,** was transferred to this Court after being filed in the United States District Court for the Eastern District of Virginia as a class action on behalf of owners and residents of homes in the Commonwealth of Virginia containing defective Chinese-manufactured drywall that was designed and manufactured by Defendant Taishan Gypsum Co. Ltd. ("Taishan").

Defendant Taishan is a Chinese corporation with its principal place of business located in Shandong Province, China.  In June 2009, summons was issued to Taishan, and on September 23, 2009, it was returned executed.  In short, Taishan has been properly served.  The delay for answering has long passed and yet no answer or responsive pleading has been filed by Taishan.

On November 18, 2009, the Plaintiffs' Steering Committee ("PSC") filed a Motion for Default Judgment as to Taishan.  On November 20, 2009, the Court issued an Order of Preliminary Default.  Subsequently, the Court issued a Scheduling Order for a hearing on default judgment proceedings against Taishan.  The Court declared its intent to use the hearing as a vehicle to consider the scope and extent of the appropriate remediation necessary for properties that are impacted by Chinese drywall.  Some seven properties were selected as being representative of the variety of claimed damages in the MDL.[1]  Parties similarly situated or having a common interest in this matter were given an opportunity to intervene and participate in these proceedings.  One of these intervenors was Knauf Plasterboard Tianjin Co. Ltd. ("Knauf").

Because the issues involved in this default judgment hearing necessitate expert testimony, the Court is required to vet the proposed experts to make a determination as to the sufficiency, reliability, and relevance of the facts and data used and the methodology relied upon by these experts in formulating their opinion.  Accordingly, the Court set a hearing which is often termed a *Daubert* hearing on January 29, 2010, to consider these preliminary matters.  Subsequently, on February 19, 20, and 22, 2010, the Court will convene a final default judgment hearing at which the interested parties will have an opportunity to present evidence in support of their respective positions.  Following that hearing, the Court will make a determination of the nature and scope of remediation for the properties involved with the hope that this will also provide some guidance for other cases similarly situated.

---

[1]Jerry and Inez Baldwin, Steven and Elizabeth Heischober, Joseph and Kathy Leach, Preston and Rachael McKellar, J. Frederick and Vannessa Michaux, William and Deborah Morgan, and Robert and Lea Orlando, all homeowners in Virginia with homes containing Chinese drywall manufactured by Taishan, intervened as plaintiffs to provide a cross-section of properties afflicted with Chinese drywall for the Court to consider in its scope of remediation hearing.

## II.   *DAUBERT* ADMISSIBILITY STANDARD

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrel Dow Pharmaceuticals*, 509 U.S. 579 (1993).  In *Daubert*, the Supreme Court held that trial courts should serve as the gatekeeeper for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant."  *Id*. at 589.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known.  *Id*. at 592-93.  In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony.  *Id*. at 593-95.  These factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community.  *Id*.  Whether some or all these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

In addition to the five factors laid out in *Daubert*, a trial court may consider additional factors in assessing the scientific reliability of expert testimony.  *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999).  Some of these factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate dosage or duration data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3)

whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g.*, *id.* at 313; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 678 (W.D. Tex. 2002).

Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts in issue, meaning that there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. *Moore*, 151 F.3d at 275-76. The focus is not on the result or conclusion, but on the methodology. *Id.* The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the methodology used by the expert was proper. *Id.*

The trial court is the gatekeeper of scientific evidence. *Daubert*, 509 U.S. at 596. It has a special obligation to ensure that any and all expert testimony meets these standards. *Id.* Accordingly, it must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology can be properly applied to the facts in issue. *Id.* at 592-93. In making this assessment, the trial court need not take the expert's word for it. *Joiner*, 522 U.S. at 147. Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to

exclude it.  *Moore*, 151 F.3d at 279.

In satisfying its "gatekeeper" duty, the Court will look at the qualifications of the experts and the methodology used in reaching their opinions and not attempt to determine the accuracy of the conclusion reached by the expert.  The validity or correctness of the conclusions is for the fact finder to determine.

## II.     PRESENT MOTIONS

The PSC and Knauf have filed *Daubert* motions.  The PSC filed a Motion to Exclude portions of the Expert Opinions of Roger G. Morse, AIA, and Matthew J. Perricone, Ph.D. (Rec. Doc. No. 832).  Knauf filed three Daubert Motions: (1) Motion to Exclude Portions of Expert Report and Testimony of Dean Rutila (Rec. Doc. No. 854), (2) Motion to Exclude Portions of Expert Report and Testimony of Donald Galler (Rec. Doc. No. 851), and (3) Motion to Exclude Portions of Expert Report and Testimony of Dr. J.R. Scully (Rec. Doc. No. 856).

The Court has reviewed the reports from the experts at issue and studied the extensive briefs submitted by the parties.  Counsel further presented their respective positions at the *Daubert* hearing on January 29, 2010.  It is now appropriate for the Court to rule on these Motions.  The Court will address each challenged expert in turn, starting first with the PSC's Motion and then proceeding to Knauf's Motions.

### A.     PSC'S MOTION

#### 1.     Roger G. Morse

Roger G. Morse, an architect, was retained by Knauf to testify as an expert.  One of his opinions is that the emission of corrosive and noxious gas from Chinese drywall can be reduced by installing a retrofitted air-conditioning system termed as an Environmental Control System ("ECS") in the affected homes.

The Court has considered the briefs submitted and arguments made by the parties with regard to Mr. Morse and his testimony regarding the ECS.  The ECS technology has not been used in an occupied residential home, nor has its use been endorsed by the government or scientific group.  These are not "red herring" issues as Knauf claims, but rather bear on the fact that the ECS technology is at best experimental and at worst useless.  In fact, Knauf concedes that the ECS's use in a residential setting has not been tested or peer reviewed since it has only been used in five test houses and one occupied house as of the time of the *Daubert* hearing. Additionally, there exists no known error rate for the device.  Finally, there exists no peer review or published literature supporting the use of the device in an occupied, residential home. Accordingly, the Court holds that under the *Daubert* standards for admissibility of expert opinions, testimony from any experts, including Mr. Morse, regarding the use of the ECS is to be excluded, and the PSC's Motion to Exclude that portion of Mr. Morse's testimony is GRANTED consistent with this holding.

### 2.      Matthew J. Perricone, Ph.D.

Matthew J. Perricone, Ph.D., a material sciences analyst, was retained by Knauf to testify as an expert that he has developed a plan to reliably eliminate the need to remove all drywall in a "mixed" (Chinese and domestic) drywall house by selectively identifying corrosive Chinese drywall for removal, while at the same time identifying the non-corrosive domestic drywall and leaving it behind.  Dr. Perricone proposes using two different tools to carry out his plan.  The first is a visual corrosion grading scale which requires pulling all electrical receptacles and switches from the wall, but not detaching such, and grading them on a four point scale.  The second is by utilizing an X-Ray Fluoroscopy Device ("XRF") which is used to examine drywall board to determine whether the strontium content is over a certain level.

The Court has considered the briefs submitted and arguments made by the parties with regard to Dr. Perricone.  With regard to the visual corrosion grading scale testimony, the Court finds that this testimony satisfies *Daubert* standards.  The visual corrosion grading has been adopted by the Consumer Products Safety Commission and the Florida Department of Health in conjunction their own efforts to identify Chinese drywall in properties.  Further, Knauf intends to conduct field training and develop a manual to ensure consistency and precision in the application of the testing.  Accordingly, the Court DENIES the PSC's Motion to Limit or Exclude with regard to any testimony, including that of Dr. Perricone, involving visual corrosion grading scale.

With regard to the use of the XRF technology, the Court finds that this technology may be of significance in testing the general presence of Chinese drywall in a home, but that it is not reliable for selective identification of which individual boards are Chinese drywall and which are not.  This finding is based on data suggesting that the use of the XRF to detect individual sheets of Chinese drywall results in many false readings.  Accordingly, the Court GRANTS the PSC's Motion to Limit or Exclude with regard to all expert testimony, including that of Dr. Perricone, on the use of the XRF to detect individual sheets of Chinese drywall in a home, but DENIES the Motion with regard to expert testimony on the use of the XRF to detect the presence of Chinese drywall in a home generally.

### B.      KNAUF'S MOTIONS

#### 1.      Dean Rutila

Dean Rutila, a civil engineer and senior project manager, was retained by the PSC to testify as an expert witness in metallurgical, electrical, and mechanical engineering related fields using an admitted "multi-disciplinary" approach to opine regarding the cause and scope of

chemical-based, electrical wiring corrosion, and resulting damages in homes with Taishan drywall.

The Court has considered the briefs submitted and arguments made by the parties with regard to Mr. Rutila. The Court finds that Mr. Rutila served as the supervisor of the PSC's team of experts and has been retained to provide a "big picture" opinion as to the total effects of Chinese drywall on the seven homes. In this role, the Court concludes that Mr. Rutila is entitled to rely upon the opinions of other experts under Rule 702 of the Federal Rules of Evidence in rendering his own informed opinion. The Court finds that Knauf's objections can be properly addressed through vigorous cross-examination. Accordingly, Knauf's Motion to Exclude is DENIED.

### 2.      Donald Galler

Donald Galler, an electrical engineer who focuses his practice on analysis of electrical and system failures, was retained by the PSC to testify as an expert witness that silver wiring and contacts in Chinese drywall homes are attacked by airborne sulphur vapors emitted from the drywall, causing corrosion. Mr. Galler examined samples of electrical devices taken from the seven affected homes at issue to reach this opinion.

The Court has considered the briefs submitted and arguments made by the parties with regard to Mr. Galler. The Court notes Mr. Galler is a highly qualified professional who works at the Massachusetts Institute of Technology and has 20 plus years of studying silver contacts. Further, Mr. Galler's examination of samples of silver contacts on switches from the Chinese drywall affected homes satisfy *Daubert* standards for admissibility. He examined at least five samples and determined that these samples exhibited exceptional corrosion, providing objective support to his opinion the extrapolation of this data shows other similar switches will fail.

Accordingly, the Court DENIES Knauf's Motion to Exclude.

### 3.    Dr. J.R. Scully

Dr. J.R. Scully, a corrosion scientist, was retained by the PSC to testify as an expert witness that measurements of corrosion on copper wires directly, as opposed to on copper reactivity coupons, can be used to determine with any predictability the corrosivity of environments and future risk.  Dr. Scully further opines that these measurements also provide evidence of capillary corrosion that would result in the further risk of corrosion.

The Court has considered the briefs submitted and arguments made by the parties with regard to Dr. Scully.  The Court finds that Knauf has failed to raise *Daubert* issues in its Motion, and that its challenges to Dr. Scully's testimony are best addressed by vigorous cross-examination.  Knauf concedes that Dr. Scully is a well educated, well respected, qualified corrosion expert.  Additionally, Dr. Scully's testing methods using copper wires are identical to the testing methods used by Sandia National Laboratories, the U.S. Government's gold standard for testing.  Accordingly, Knauf's Motion to Exclude is DENIED.

## IV.    CONCLUSION

For the foregoing reasons, IT IS ORDERED that the PSC's Motion to Exclude the Expert Opinions of Roger G. Morse, AIA, is and Matthew J. Perricone, Ph.D. (Rec. Doc. No. 832) is GRANTED IN PART with regard to expert testimony on the ECS and on the XRF's use to detect individual sheets of Chinese drywall, and DENIED IN PART with regard to expert testimony on the XRF's use to detect the general presence of Chinese drywall and the visual corrosion grading scale.  IT IS FURTHER ORDERED that Knauf's (1) Motion to Exclude Portions of Expert Report and Testimony of Dean Rutila (Rec. Doc. No. 854), (2) Motion to Exclude Portions of Expert Report and Testimony of Donald Galler (Rec. Doc. No. 851), and

(3) Motion to Exclude Portions of Expert Report and Testimony of Dr. J.R. Scully (Rec. Doc. No. 856) are DENIED.


New Orleans, Louisiana, this 12th day of February 2010.

_____
ELDON E. FALLON
UNITED STATES DISTRICT JUDGE