EXHIBIT "A"



Date Printed: 07/17/08«CURRENTDATE»

| | | | |
|---|---|---|---|
| SELLER: | KB HOME/Shaw Louisiana LLC | SELLER'S AGENT: | Tiffany Easterling«SalesPerson1» |
| SELLER'S ADDRESS: | Suite 301 | SELLER'S BROKER: | KB HOME |
| | 3636 I-10 Service Road South | | |
| | Metairie, LA 70002, Telephone: (504) 218-2600 | | |

| | | | | |
|---|---|---|---|---|
| BUYER: | 1. | Kirk J Meyer«BuyerFirstMILast» | | |
| | 2. | Lori Meyer«CoBuyerFirstLastMl» | | |
| Buyer Address: | 1. | 4840 Hwy. 22 #11-36«BuyerAddress», Mandeville«BuyerCity», LA«BuyerState» 70471«BuyerZip» | | |
| | 2. | 4840 Hwy. 22 #11-36«CoBuyerAddress», Mandeville«CoBuyerCity», LA«COBUYERSTATE» 70471«COBUYERZIP» | | |
| Primary Phone: | 1. | (985) 264-2444«BuyerHome» | Secondary Phone: 1. | «BUYERMOBILE» |
| | 2. | (985) 264-2444«COBUYERHOME» | 2. | «COBUYERMOBILE» |
| Business Phone First Buyer: | | «BuyerWork» | Business Phone Co Buyer: | «CoBuyerWork» |
| Social Security/Passport Numbers | | | | |

**DESCRIPTION OF PROPERTY:**
Lot: 101«Lot»   Phase: 7«Phase»   Unit: «Unit»   Community: Guste Island 4Plex«Community»
Address: 101 White Heron Drive«Address»   City/Town Madisonville«PropCity»   Louisiana   Zip: 70447«PropZip»
Plan: 222.1932«APlan»   Elevation: C«Elevation»
Parish: «CLYCounty»   Land Lot / Block: «CLYLandLot»/ «CLYBlock»   District «CLYDistrict»   Section: «CLYSection»
Plat Book «CLYPlatBook»   Page «CLYPage»

**FINANCING**
Loan Type:   ☐Cash   ☒CONV   ☐FHA   ☐VA
Type of Occupation of Home:   ☐Owner Occupied   ☐Second Home   ☐Investment

**PURCHASE PRICE AND TERMS OF PAYMENT:**

| PURCHASE PRICE | | AMOUNT |
|---|---|---|
| Base Purchase Price | | |
| Lot Premium: | | |
| Options | | |
| Price Adjustment- | | |
| TOTAL PURCHASE PRICE (Subject to change upon completion of options and color selections.) | | |

| | | | |
|---|---|---|---|
| Initial Deposit (Good Faith Deposit) | | Upon signing of Agreement | $1,500.00«EarnestMoneyDeposit» |
| Additional Deposit (with Initial Deposit, the "Deposit") | | Date Due: | $ |
| Options Deposit | | Date Due: | $0.00«OPTIONSMONEYDEPOSIT» |
| Seller's contribution of up to | $0«TOTALBUILDERCONTRIBUTION» | If CKBHL Loan and use Seller's Attorney | | |
| Mortgage to be Applied For (Subject to change upon completion of options and color selections.) (IF BLANK, THIS IS A CASH TRANSACTION) | | Date Due: | $194,750.00«LoanAmount» |
| Balance by Official Bank Check or Federal Bank Wire | | At Closing (*excluding closing costs, pre-paids, insurance) | $ |
| TOTAL | | | $205,000.00«TotalPrice» |

**SIGNIFICANT DATES** (Buyer's failure to satisfy the following deadlines will constitute a default by Buyer):

| | |
|---|---|
| Date of Agreement: | 7/17/2008«OriginalSaleDate» |
| Re-write/Transfer Date: | «ReWriteTransferDate» |
| Estimated Closing Date: | TBD«EstClosingDate» |
| Loan Application Deadline: | 5 days from Buyer's signature or   TBD«LoanApplicDead» |
| Loan Approval Deadline: | 30 days from Buyer's signature or   TBD«LoanApprovDead» |
| Flooring and Options/Upgrades Selection Deadline : | 21 days from Buyer's signature or   TBD«OptionsDead» |
| Studio Appointment Date: | «ShowroomDate» @ «ShowroomTime» |

Date _____   Date _____

Buyer _____   By _____

Buyer _____   Title _____

«REBROKERNAME» / «REREALTORAGENTNAME»   Tiffany Easterling«SalesPerson1»
Buyer's Broker/Agent   Printed Name of Seller's Agent

«REBROKERLICENSE» / «REREALTORLICENSE»
Buyer's Broker/Agent License Number

**PLEASE NOTE:**
1. Absolutely no changes after the Flooring and Options/Upgrades Selection Deadline.
2. Homeowner's Insurance Policy needs to be forwarded to the closing attorney 10 business days prior to the Closing.
3. Final non-conditional loan approval is required prior to Buyer attending the Homeowner Orientation.

louexhibita.doc

Square: __28«Block»__   Lot: __101«Lot»__   Buyer: __Kirk J Meyer«BuyerFirstMILast»__   Date: __7/17/2008«OriginalSaleDate»__



## NEW HOME PURCHASE AGREEMENT

THIS NEW HOME PURCHASE AGREEMENT ("Agreement"), is executed between KB HOME/Shaw Louisiana LLC, a Delaware limited liability company ("Seller"), with an address of 3636 I-10 Service Road South, Suite 301, Metairie, LA 70002, Telephone: (504) 218-2600 and the Buyer(s) defined below ("Buyer"). The terms "Buyer", "Seller", "Buyer's Broker", "Buyer's Agent", "Seller's Agent", "Community", "Purchase Price", "Good Faith Deposit", and "Property" are as shown and defined on Exhibit "A" to this Agreement, which is attached hereto and incorporated herein. The Property being sold is that tract of land identified on Exhibit "A" as the "Building/Unit", which is a part of the Community shown on Exhibit "A", together with all improvements as are located thereon. The full legal description of the Property is the same as described on the most recent Community plat recorded with the Clerk of Court for the Parish in which the Property is located, and is made a part of this Agreement by reference. The date of this Agreement is the date this Agreement is signed by the Buyer.

1.  **Purchase and Sale.** This is an agreement to purchase a new home. Buyer agrees to buy and Seller agrees to sell the Property for the Purchase Price. The closing of such purchase and sale is referred to in this Agreement as the "Closing."

2.  **Purchase Price and Deposits.** The Purchase Price is shown on Exhibit "A" and as may be amended by addendums to this Agreement. Seller acknowledges receipt of the Good Faith Deposit as shown on Exhibit "A" as a good faith deposit to bind this Agreement. The Good Faith Deposit shall be deposited by Seller and later applied toward Buyer's down payment and Closing costs. Deposit or cashing of any Good Faith Deposit check by Seller does not guarantee acceptance of this Agreement by Seller. The Good Faith Deposit is paid to create a contract and is refunded only if: (1) this Agreement is not accepted by Seller, (2) Buyer's mortgage loan application is denied or (3) Seller is in default and does not cure said default within the time period specified in this Agreement. Buyer's Good Faith Deposit and the Purchase Price of the Property may be increased prior to the Closing, pursuant to the terms of any addenda to this Agreement provided by Seller and signed by Buyer concurrently with or after the date of this Agreement for optional and upgrade improvements to the Property. As a result of Seller maintaining the deposits, Seller may receive certain financial benefits such as an array of bank services, accommodations, loans or other business transactions ("Collateral Benefits"). All Collateral Benefits shall accrue to the sole benefit of Seller, and Seller shall have no obligation to account to the Buyer for the value of any such Collateral Benefits. The Good Faith Deposit, together with any other pre-Closing deposits, prepayments for options or other payments delivered by Buyer to Seller as required under this Agreement, are collectively referred to in this Agreement as the "Deposits."

BUYER'S INITIALS: ☐☐

3.  **Brokers.** Buyer covenants and represents to Seller that Buyer has not dealt with any real estate broker or salesperson in connection with this transaction other than the Brokers noted on Exhibits "A" and "C". Buyer agrees to indemnify and hold harmless Seller from any claim whatsoever made by any real estate broker or salesperson for any commission and for the costs and expense of defending any claim for commission, including, without limitation, reasonable attorneys' fees, paraprofessional fees and legal costs, arising out of or related to this transaction, at trial and upon appeal. The provisions of this section will survive the Closing of the purchase and sale of the Property. Seller agrees to pay a commission in the amount as shown on Exhibits "A" and "C" at and only upon Closing, for procurement and participation in the sale as Buyer's Agent.

BUYER'S INITIALS: ☐☐

4.  **Financing.**

    4.1  **Time for Application; Cash Sale.** If this purchase is to be funded by third party financing, then Buyer's obligation to close is contingent upon Buyer's obtaining within the time and in accordance with the provisions set forth below, a commitment from such third party for a loan in an amount and on the terms described on Exhibit "A". Buyer shall submit to Seller's affiliated mortgage company, Countrywide KB Home Loans ("CKBHL"), an application for such financing, including two (2) months of bank statements, one (1) month of pay stubs and two (2) years of W2's (tax returns if self employed) for each Buyer, within five (5) days of the date of this Agreement and shall diligently pursue such application until it is approved or denied. Buyer is NOT REQUIRED TO USE CKBHL as Buyer's mortgage lender and is free to use any lender of Buyer's choosing. Seller reserves the right to reject the mortgage Lender chosen if Seller reasonably believes that such mortgage Lender does not have sufficient financial or other resources to originate, process, underwrite, fund and close the loan by the estimated Closing date. In addition, even if Buyer is paying cash for the Property and does not intend to obtain third party financing, Buyer(s) agree to fully complete and and provide Seller the additional documentation described in the preceding sentence, at the time or purchase. Buyer is NOT REQUIRED TO USE CKBHL, as Buyer's mortgage lender and is free to use any lender of Buyer's choosing. Seller reserves the right to reject the mortgage Lender chosen if Seller reasonably believes that such mortgage Lender does not have sufficient financial or other resources to originate, process, underwrite, fund and close the loan by the estimated Closing date. Buyer acknowledges that there is no obligation on the part of Buyer whatsoever to use the lending services of CKBHL. Buyer may select any lending institution of Buyer's choice for the purpose of securing mortgage financing.

BUYER'S INITIALS: ☐☐

    4.2  **Credit Information Authorization.** Buyer authorizes CKBHL or any other individual or entity to which Buyer submits a mortgage application to obtain financing to purchase the Property (a "Lender"), or any credit bureau or other investigative agency employed by Lender to investigate any reference, statement, or date, provided to Lender by the Buyer or by any other person or entity, pertaining to Buyer's credit and financial responsibility. Buyer will indemnify and hold harmless Lender and any credit bureau or other investigative agency employed by Lender for any damages or liability arising from an investigation of Buyer's credit and financial responsibility.

    4.3  **Credit Release.** By signing this Agreement, Buyer hereby authorizes Lender to disclose to Seller or Seller's representatives any and all information concerning the status of Buyer's loan, including, but not limited to, the appraisal, loan application, loan submittal, conditions to loan approval, written loan approval, written denial of loan approval and reasons therefore, status of loan documents, funding conditions and requirements, verification of deposits, credit, income and employment information concerning Buyer, and Buyer agrees to hold Lender, Seller and Seller's representatives, harmless from any liability arising there from.

    4.4  **Quality of Application.** Buyer understands that the mortgage application must be fully and timely completed (and updated, if required) in good faith and agrees to execute truthfully and promptly furnish all documents necessary to complete the processing of the mortgage application, including but not limited to verification of employment, income and deposits, as well as furnishing all required financial statements, federal income tax returns and credit references. Failure to do so may, at Seller's option, constitute a default under this Agreement and Seller may terminate this Agreement and retain, without further notice or liability to Buyer, Buyer's Deposits. If Buyer has a spouse who has not signed this Agreement, Buyer agrees to have his or her spouse sign the mortgage and any other loan documents that may be required by Lender. **BUYER AGREES TO INCUR NO DEBT AFTER SIGNING THIS AGREEMENT THAT MAY JEOPARDIZE THE APPROVAL OF BUYER'S LOAN.** If a corporation, partnership, or other type of organization is purchasing the Property, then Buyer agrees (1) to obtain any personal endorsements or guarantees required by Lender and (2) provide to Lender and the title insurer, promptly upon request such certificates, resolutions or other corporate, partnership or other organizational documents as may be required. The commission or omission of any act by Buyer calculated to produce a rejection by a prospective Lender shall constitute an act of default under this Agreement including voluntarily changing Buyer's employment status or location.

    4.5  **Closing Costs.** Upon Buyer obtaining financing with CKBHL and closing on the Property, Seller agrees to pay a portion of the Closing costs up to the amount shown on Exhibit "A". In the event Buyer elects to obtain a mortgage from a Lender other than CKBHL, Buyer will be responsible for all Closing costs in connection with this Agreement. In the event Buyer obtains a FHA insured or VA

Square: __28«Block»__     Lot: __101«Lot»__     Buyer: __Kirk J Meyer«BuyerFirstMILast»__     Date: __7/17/2008«OriginalSaleDate»__

guaranteed loan, a portion of such incentive shall be retained by Seller and applied to the payment of any Closing cost Buyer is prohibited from paying by Lender. The terms and conditions of the loan shall not in any way affect the rights or obligations of the parties under this agreement. Buyer acknowledges that Seller makes no representation that the interest rate prevailing at the Closing will be the rate quoted by Lender to the Buyer at the time of loan approval. Buyer acknowledges that the sale and purchase of the Property is not contingent upon Buyer's ability to retain the interest rate quoted at the time of loan approval and that Buyer will be required to pay the interest rate charged by Lender at the Closing. Buyer agrees to make such escrow payments for real property taxes and assessments, homeowners association assessments, mortgage insurance premiums, and fire and other hazard insurance premiums as may be required by Lender. This transaction must be closed by an attorney approved by Seller. Seller will contribute the amount shown on Exhibit "A" towards closing costs to pay for such approved attorney's fees.

**BUYER'S INITIALS:**

4.6   **Commitment.** If Buyer is applying for a loan with CKBHL, Buyer shall obtain a full loan commitment for a first mortgage in the amount determined after the options and color selections have been made at the KB Home Studio no later than **thirty (30) days** after the date (the "Option Determination Date") upon which such amount is finally determined at the KB Home Studio. If Buyer is applying for a loan with a Lender other than CKBHL, Buyer shall have **five (5) days** to provide a pre-approval letter and **thirty (30) days** from the Option Determination Date to provide to Seller a full loan commitment for such loan, failing which Seller may, at its election, require Buyer to apply within **five (5) days** for a loan with CKBHL or another lender of Seller's choosing. If Buyer fails to comply timely with Seller's election, such failure shall constitute a default by Buyer and entitle Seller to cancel this Agreement and retain as liquidated damages all Deposits. Buyer shall not be required to use CKBHL or such other lender selected by Seller as Buyer's mortgage lender but, provided such approval is for a mortgage loan in an amount with the same loan to value ratio set forth on Exhibit "A", and at CKBHL's or such other lender's prevailing interest rate at the time of Closing, Seller shall be entitled to use CKBHL's or such other lender's approval of Buyer's loan application as evidence that Buyer would qualify for a loan with another lender and, therefore, that Buyer's failure to so qualify constitutes a default by Buyer hereunder. If Buyer obtains a loan commitment which contains any special condition which is not ordinarily contained in typical loan commitments for the Community, Seller, in Seller's sole discretion, may treat Buyer's loan application as having been denied; whereupon, Seller shall have the rights set forth in Section 4.7 hereof. Once initially approved, for the purpose of this Agreement, Buyer shall be deemed to have obtained a mortgage commitment regardless of conditions, if any, imposed in any such approval.

4.7   **Failure to Obtain Commitment.** If Seller is notified by Buyer of Buyer's failure to obtain mortgage financing and Buyer is not otherwise in default, Seller may, at its option, require Buyer to immediately reapply for a loan with another institution of Seller's choice, in which case Buyer must be approved within **forty-five (45) days** after the re-application. If Buyer fails to obtain a commitment after re-application, then this Agreement shall be deemed null and void and of no further force and effect, and Buyer's Deposits shall be returned and thereupon the parties hereto will be released from all liability hereunder without any further obligations by either party. If Buyer is unable to obtain mortgage approval because (1) Buyer has failed to comply with the requirements set forth in this Agreement; (2) Lender has withdrawn its mortgage approval after such approval has been previously given by said Lender through no fault of Seller; (3) Buyer's credit is approved but Buyer fails to fulfill the conditions imposed in such approval relating to matters outside of this transaction; or (4) Buyer's spouse fails or refuses to execute the loan documents if necessary, then Buyer shall not be entitled to a return of Deposits. By signing this Agreement, Buyer acknowledges that this Agreement does not constitute either a loan application to, or loan approval or commitment by, any Lender. Buyer shall be solely responsible for obtaining the loan.

4.8   **Buyer's Loan Default.** Buyer shall be in material default of this Agreement as a result of any of the following: (1) any failure by Buyer to timely apply for a loan as provided herein; (2) any voluntary act of Buyer undertaken for the purpose of preventing Lender from approving the loan; (3) any request by Buyer that Lender not approve the loan; (4) a failure by Buyer to furnish all documents and information required by Lender within the time limits specified herein; (5) any material misrepresentation or other default resulting in Lender's disapproval of the loan; and (6) any failure to properly sign all documents and take any and all actions required by Lender to approve or timely fund the loan.

4.9   **Sale of Other Residence.** Except as Buyer and Seller may have expressly agreed to in a separate rider, amendment or addendum to this Agreement, Buyer represents and warrants that this Agreement and the mortgage loan referenced herein are not and will not be subject to or contingent upon Buyer's selling Buyer's present residence or other property. Failure to disclose any such contingency will constitute a default by Buyer and the remedies for default under this Agreement shall apply.

**BUYER'S INITIALS:**

4.10   FHA / VA Loans.

4.10.1   **FHA Appraisal.** It is expressly agreed that, notwithstanding any other provisions of this Agreement, the Buyer shall not be obligated to complete the purchase of the Property described herein or to incur any penalty by forfeiture of Deposits, unless the Buyer has been given, in accordance with HUD/FHA requirements, a written statement by the Federal Housing Commissioner, Veterans Administration, or a Direct Endorsement Lender setting forth the appraised value of the Property of not less than the Purchase Price. The Buyer shall have the privilege and option of proceeding with consummation of the Agreement without regard to the amount of the appraised valuation. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does not warrant the value or the condition of the Property. The Buyer should satisfy himself/herself that the Purchase Price and condition of the Property are acceptable.

4.10.2   **VA Appraisal.** It is expressly agreed that, notwithstanding any other provision of this Agreement, the Buyer shall not incur any penalty by forfeiture of Deposits or otherwise be obligated to complete the purchase of the Property described herein if the Purchase Price or cost exceeds the reasonable value of the Property as established by the Veterans Administration. The Buyer shall, however, have the privilege and option of proceeding with the consummation of this Agreement without regard to the amount of reasonable value established by the Veterans Administration.

4.10.3   **FHA Real Estate Certification.** Buyer and Seller by signing this Agreement hereby certify that the terms and conditions of this Agreement for the sale of the Property described herein are true and correct to the best of our knowledge and belief. No other agreements have been entered into by any of the undersigned other than those disclosed in this Agreement.

> WARNING. SECTION 1010 OF TITLE 18, U.S.C., PROVIDES: "WHOEVER, FOR THE PURPOSE OF OBTAINING A LOAN, SHALL BE OFFERED TO OR ACCEPTED BY THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT FOR INSURANCE, OR FOR THE PURPOSE OF INFLUENCING IN ANY WAY THE ACTION OF SUCH DEPARTMENT, MAKES, PASSES, UTTERS OR PUBLISHES ANY STATEMENT, KNOWING THE SAME TO BE FALSE, SHALL BE FINED NOT MORE THAN $5,000.00 OR IMPRISONED NOT MORE THAN TWO YEARS OR BOTH."

4.10.4   **VA Escrow.** In the event Buyer utilizes VA financing, Buyer shall notify Seller and the Good Faith Deposit shall be placed in a separate escrow account as required by 38 US Code Section 3706, within ten (10) business days of the date Seller is notified Buyer is utilizing VA financing.

4.10.5   **Underwriting Fee.** The loan may be processed under FHA Direct Endorsement Underwriting or VA Automatic Underwriting. In the event such underwriting is utilized, Seller acknowledges that an underwriting fee may be charged to Seller by Lender, in which event Seller agrees to pay the underwriting fee.

Square: _28«Block»_    Lot: _101«Lot»_    Buyer: _Kirk J Meyer«BuyerFirstMILast»_    Date: _7/17/2008«OriginalSaleDate»_

5. **Construction.**

    5.1   **Condition of Home.** If construction of the home has not commenced at the time of execution hereof, Seller shall construct the home in substantial compliance with the plans and specifications for the floor plan and elevation described on Exhibit "A", as they are so amended from time to time by Seller (the "Plans and Specifications"). In the event the home is, at the time of execution hereof, in the course of construction, or substantially completed, such home shall be accepted by Buyer in an "as is" "where is" condition, meaning that Buyer agrees to accept the home with all previously selected options and colors, subject only to completion in accordance with the Plans and Specifications.

    5.2   **Variations.** In keeping with its desire to constantly improve its product and/or to meet code requirements, including but not limited to lot size and shape, Seller may make any changes in the Plans and Specifications that it deems appropriate at any time, as long as those changes do not materially or adversely affect the market value of the Property. In the event of a conflict between Seller's sales materials, advertisements, feature sheets, renderings or brochures, and the Plans and Specifications; the Plans and Specifications shall be binding. Buyer further understands and agrees that certain of the finishing items, including but not limited to tile, marble, carpet, cabinets, stone, brickwork, wood, paint, stain, and mica are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturers from those shown in the model or the KB Home Studio, if any, or in illustrations or brochures or those included in the Plans and Specifications. Furthermore, if circumstances arise that, in Seller's sole opinion, warrant changes of labor, suppliers, manufacturers, brand names or items, Seller reserves the right to substitute equipment, materials, appliances, etc., which in Seller's sole opinion are considered to be of quality substantially similar or equal, or of better quality, subject to their availability.   Buyer also understands that Seller has the right to substitute or change materials or stain colors utilized in wood decor, if any. Buyer acknowledges and understands that the Plans and Specifications on file with applicable governmental authorities may not be identical to Seller's Plans and Specifications because Seller's construction requirements may result in changes (there being no legal requirement to file all changes with such authorities).

    5.3   **Models and Plans.** Before signing this Agreement, Buyer has viewed a certain model home and/or certain plans, drawings, or other renderings depicting examples of the type of home being purchased. The home as built, will be substantially similar to the examples Buyer has viewed, but may differ because of variations in some dimensions or the use of materials different from those viewed by the Buyer. Closing of this sale constitutes unconditional acceptance of the home as built without regard to variations or differences between the home and the model home, drawings, renderings or plans viewed as examples by Buyer. Buyer's refusal to accept the home as built shall constitute a default by Buyer of this Agreement for which Seller may retain all Deposits.

    BUYER'S INITIALS: [  ][  ]

    5.4   **Selections by Buyer.** Buyer agrees to visit the KB Home Studio and finalize all color and option selections within **twenty-one (21) days** of the date of this Agreement. If the KB Home Studio has no available appointments within **twenty-one (21) days**, then Buyer agrees to take the next available appointment. If Buyer fails to complete the color selections within **twenty-one (21) days** from the date of this Agreement or at such later first available appointment (if purchasing a home that is not yet under construction) then Seller may at its option (1) choose all colors and options, or (2) cancel the Agreement and retain all Deposits as liquidated damages. If Buyer is purchasing a home under construction, or previously authorized to start, Buyer understands that all choices and colors have been pre-selected, and Buyer agrees to accept said choices. Once Buyer's selections are finalized at the KB Home Studio and Buyer has executed an Addendum to this Agreement, absolutely no changes or additions may be made, unless requested by Seller due to unavailability of original selections.

6. **Lots.** Each lot is unique in its size, shape and drainage characteristics. Buyer understands and agrees that the size of the lot; the exact location of sidewalks and driveways and the drainage patterns of their lot will differ from the model home plans, drawings or renderings.

7. **Home Location.** The location of the home on the Property is at the sole discretion of Seller. Seller reserves the right to determine the location and configuration of the home upon the lot subject to Community and municipal requirements. In the event that the type of home desired by Buyer will not fit on the lot within Community and municipal requirements, Seller shall so notify Buyer and (1) this Agreement shall be terminated and all Deposits returned to the Buyer and the parties shall be released from all further liability hereunder; or (2) at its option, Buyer may choose another lot and execute a new contract at the current prices for the home on that lot, in which case the Buyer's Deposits shall be transferred to the new lot. If Buyer has not received a loan pre-approval or is currently in default, then this option will not be available to Buyer. Buyer is hereby advised to review the recorded plat for the Property and to be aware of drainage, utility and other easements, if any, shown on that Plat affecting the Property. Buyer shall be responsible for reviewing the survey or plat and determining the boundaries of the Property. Neither Seller, Broker, nor their agents and employees are authorized to make any representation to Buyer about such matters.

8. **Homesite Premiums.** Buyer acknowledges that a part of the Purchase Price may contain an amount for a homesite/lot premium, and agrees that such homesite/lot premium is a reflection of Seller's internal value of the characteristics of this particular homesite. The premium is not based on trees, view, or other conditions that are beyond the control of Seller. It being the agreement of the parties that Seller is not making any representation as to such matters. Buyer agrees that the homesite premium is not refundable for any reason in the future.

9. **Lot Preparation.** Seller reserves the right to remove any trees that Seller deems necessary. Seller expressly makes no promises whatsoever as to the existence or location of any tree on the Property or adjacent to the Property at Closing or thereafter. The elevation of the home may require Seller to fill around trees when establishing the final grade of the lot. Seller does not guarantee the life or growth of any tree and Buyer expressly agrees and understands that construction activity sometimes unavoidably results in the death of trees on or about the construction area.

10. **Landscaping.** "Landscaping" as used in this paragraph shall mean the any of the following items that may be either currently existing or installed by Seller in the Community or on a lot: trees, shrubs, plants, lawns, walkways, retaining walls, decks, fences, ponds, and similar structures. Sod, if any, is installed in accordance with standards, which are established by Seller. If the Community standards call for Landscaping of the rear yard, such Landscaping will extend approximately twenty-five (25) feet from the rear foundation of the home, and such Landscaping will include only the disturbed areas which are graded, planted with grass seed and covered with straw. The Community may contain Landscaping that may be removed during the construction and development process. Seller does not guarantee the location, replacement or survival of any existing Landscaping. Shrubs and trees, if any, are installed (regardless of location) at the sole discretion of Seller. Buyer agrees that Seller is not required to install any Landscaping at times when weather conditions make it inappropriate to do so, in which event Seller agrees to install Landscaping at the appropriate time after the Closing. Buyer grants Seller or Seller's contractors permission to enter upon the Property to install such Landscaping. Seller in Seller's sole discretion shall determine locations and types of Landscaping. Seller is not liable for any Landscaping, or damage or destruction to same. Seller makes no warranty whatsoever as to the type, health, location or amount of Landscaping, which will exist, on the Property after construction.

11. **Adjacent Land Use.** Land adjacent to or surrounding the Community which is not owned by Seller, is not within Seller's control and Seller shall not be liable to Buyer for any use or condition of Property adjacent or surrounding the Community or the lot, whether or not owned by Buyer including but not limited to any commercial, industrial, institutional, multi-family residential or non-residential uses. Seller makes no representation regarding land adjacent to or surrounding the Community.

12. **Completion Date.** Seller is not required to commence construction until Seller receives a mortgage commitment letter in form acceptable to Seller, and Buyer and Seller have executed an Addendum to this Agreement at the KB Home Studio. If such conditions to commencement of home construction are not satisfied within **sixty (60) days** from the date this Agreement is signed by Buyer, then Seller may terminate this Agreement. If the above Property is not already completed, Seller estimates that all specified construction on the Property should be completed within **one hundred eighty (180) days** from the date of commencement of construction (slab pour). Buyer acknowledges and agrees that completion is an estimate and the Seller will not be responsible to Buyer for any expenses resulting from delays in construction of the home, including but not limited to rent, hotels, storage, moving expenses and loss of a tax deduction. Reasonable efforts will be made to complete the home in a timely manner, however, notwithstanding the above Seller will complete the home within **two (2) years** of the date that Buyer executes this Agreement. If construction is delayed

Square: __28«Block»__   Lot: __101«Lot»__   Buyer: __Kirk J Meyer«BuyerFirstMILast»__   Date: __7/17/2008«OriginalSaleDate»__

by events constituting acts of God, Force Majeure, frustration of purpose or impossibility of performance, the date of completion shall be extended by the delay period. It is the express intent of the parties that the parties' rights and obligations under this Agreement be construed in the manner necessary to exempt this Agreement and sale from registration under the Interstate Land Sales Full Disclosure Act, and both Buyer and Seller hereby expressly waive any right or provision of this Agreement that would otherwise preclude any exemption. If the home is not completed within two (2) years of the date that Buyer executes this Agreement, and Buyer is not in default, Buyer's only remedy will be to terminate this Agreement and receive a full refund of all Deposits previously paid.

13. **Entry During Construction.** Buyer will not hire or employ any contractors, subcontractors or any other persons, firms or corporations to do work in or on the Property until after Closing. Buyer acknowledges that Seller and its representatives will handle all matters pertaining to Seller's construction of the home and the Community. Buyer acknowledges that certain common facilities which may ultimately be constructed in the Community may not be constructed at the time of Closing or for an indefinite time thereafter. This transaction is in no way conditioned upon the construction of any such facilities. Buyer agrees not to interfere with or interrupt any workmen at the site of the home or in the Community. Buyer understands and acknowledges that entry to the construction site of the home can be dangerous; that hazards may exist which are not observable, and that Buyer's entry shall be at Buyer's own risk. Buyer hereby waives any and all claims against Seller for injury or loss to person or property arising out of or in connection with such entry by Buyer or Buyer agrees to indemnify and hold Seller harmless from and against any and all loss, damage, costs, claim or expense arising from or in connection with such entry. During construction, because of various insurance requirements for Buyer's safety, neither Buyer nor any agent of Buyer shall enter the construction site without Seller's prior consent, which consent may be arbitrarily withheld, unless accompanied by a KB Home employee. Should Buyer receive Seller's consent to enter the construction site, Buyer and any of Buyer's guests must wear a hard hat at all times while on the construction site. Buyer or Buyer's agents' entry, whether with or without Seller's consent, shall be at Buyer's own risk, and Seller will have no liability in the event of loss or injury to Buyer or Buyer's agents. Any damage to the home during such entry caused by Buyer or Buyer's agents shall be Buyer's sole responsibility, and Seller may charge Buyer for the repair of such damage, in which event Buyer shall promptly pay to Seller the amount so charged.

14. **Inspections Prior to Closing.** Buyer will be given a reasonable opportunity to inspect the home and lot with Seller's representative at four (4) times during construction: (1) Pre-construction Buyer Orientation, (2) Pre-drywall Buyer orientation, (3) Homeowner Orientation (prior to Closing); and (4) Homeowner Acceptance Walk. Buyer understands that Seller will not delay construction of the home if Buyer is unable to attend either the Pre-construction or Pre-drywall meetings. It is the policy of KB Home that the Buyer's home is one hundred percent (100%) complete at the time of Closing. Any exceptions to this policy must be authorized by Seller's Division President and agreed to by the Buyer in writing.

**BUYER'S INITIALS:**

15. **Independent Professional Inspection.** Buyer may have an inspection of the Property by an independent professional inspector (the "Inspector") prior to Closing, only in accordance with the following terms:

   15.1 **Independent Inspector Requirements.** The Inspector must, at the time of the inspection: (1) maintain all business licenses required by law; (2) be a full-time professional inspector or professional engineer; (3) if not a professional engineer, be a member of either the American Society of Home Inspectors, Inc., or the Home Inspectors Association for the state in which the Property is located; and (4) have general liability insurance in an amount of at least One Million Dollars ($1,000,000.00). At the time of the inspection, Purchaser shall provide proof to Seller that the Inspector meets these requirements. All inspectors are required to sign in and sign out at the sales office.

   15.2 **Scheduling of Independent Inspection.** Buyer agrees to schedule an appointment with Seller for the initial inspection at least one (1) week in advance of the inspection. The initial inspection shall take place between the activities titled Rough HVAC Completed and Schd Framing Inspection of the Sellers' Master Schedule. Buyer agrees to schedule an appointment with Seller for the final inspection at least one (1) week in advance of the final inspection. The final inspection shall take place between the activities titled Final Quality Inspection and Community Team Walk Thru of the Sellers' Master Schedule. The inspections shall be done at a reasonable time during normal business hours and without interfering with Seller's activities on the Property. There shall be no invasive testing without Seller's written consent. Seller or its representative may accompany the Inspector, if Seller so desires. Any written report prepared by the Inspector must be delivered to Seller by noon on the first business day following the inspection.

   15.3 **Independent Inspection Objections.** If the Inspector's timely delivered report discloses items which the Inspector believes are defective, and which are unacceptable to Buyer (the "Inspection Objections"), Buyer shall notify Seller, in writing, the items which Buyer finds objectionable by noon on the first business day following the inspection. Seller shall have three (3) business days after receipt of the Inspection Objections to notify Buyer of those items that Seller believes are valid and that it will correct prior to Closing. Seller is not required to correct any item listed on the Inspection Objections; however, if Seller does not agree to correct any item on the Inspection Objections which is a material building code violation, Buyer may terminate this Agreement by written notice to Seller and receive a full refund of the Deposits as Buyer's exclusive remedy.

   15.4 **Independent Inspection Fees.** Buyer agrees to pay all inspection fees, engineering fees, and other expenses of any kind relating to Buyer's inspection of the Property under this Agreement. Upon request, Buyer agrees to furnish proof in affidavit form to Seller, any title insurance company, or any attorney certifying title that all such fees and expenses have been paid in full.

   15.5 **Indemnity Regarding Independent Inspection.** Buyer agrees to indemnify and hold harmless Seller, its employees, contractors and invitees from any and all injuries, losses, liens, claims, judgments, liabilities, costs, expenses or damage (including reasonable attorneys' fees and court costs) sustained by or threatened against Seller arising out of, relating to or based on in any way the inspections by Buyer or its representatives or by Buyer's failure to abide by the provisions of this section.

16. **Damage to Home.** If between the date of this Agreement and the Closing, the home is damaged by fire, natural disaster or other casualty, the following shall apply:

   16.1 **Risk of Loss Until Closing.** Risk of loss to the home by fire or other casualty until the Closing herein provided is assumed by Seller, but without any obligation by Seller to repair or replace same, except that if Seller elects to repair or replace such loss or damage to the improvements, this Agreement shall continue in its full force and effect and Buyer shall not have the right to reject title or receive a credit against or abatement in the Purchase Price. If Seller elects to repair or replace such loss or damage, Seller shall be entitled to a reasonable period of time within which to complete such repairs or replacement. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss or damage shall belong entirely to Seller and if such proceeds shall be paid to Buyer, Buyer agrees that such funds are the property of Seller and Buyer shall promptly upon receipt thereof turn same over to Seller.

   16.2 **Seller's Election.** If Seller notifies Buyer that Seller does not elect to repair or replace any such loss or damage to the home, then this Agreement shall be deemed canceled and of no further force or effect. Upon such termination, Seller shall refund to Buyer all Deposits whereupon the parties shall be released and discharged of all claims and obligations hereunder, except that if Buyer is then otherwise in default hereunder, Seller shall retain all Deposits as and for liquidated damages as provided in this Agreement.

   16.3 **Risk of Loss After Closing.** Buyer assumes the risk of loss to the home by fire, natural disaster or other casualty from and after Closing. Buyer should be aware that the home, however well constructed, may be subject to damage or destruction by naturally occurring events and all risks associated with all natural occurrences shall be borne by Buyer from and after Closing.

17. **Unusual Conditions.** Seller reserves the right to terminate this Agreement and refund all Deposits due to any facts or circumstances becoming known to Seller after the Effective Date hereof that would prohibit Seller from constructing the home selected within normal anticipated construction costs, including, without limitation, geological or physical conditions, strikes, building moratoriums, adverse weather conditions, material shortages, building code changes, or impact fees.

Square: __28«Block»__   Lot: __101«Lot»__   Buyer: __Kirk J Meyer«BuyerFirstMILast»__   Date: __7/17/2008«OriginalSaleDate»__

18. <u>Closing.</u>

    18.1    **Evidence of Title.** Seller warrants that the title to the Property is good, marketable and insurable (subject to the exceptions listed or referred to below). At Closing, Seller will cause a title insurance agent selected by Seller to issue a title commitment to Buyer at Buyer's expense. As required by the Real Estate Settlement Procedures Act of 1974, Buyer acknowledges that Seller has not directly or indirectly required Buyer, as a condition of this sale, to purchase either an owner's or mortgagee's title insurance policy from any particular insurer or agency. Buyer shall have the right to elect to obtain Buyer's own title insurance. If Buyer elects to obtain title insurance from a company other than the title insurance company selected by Seller, Buyer must make such election in writing within fifteen (15) days of the date of this Agreement. If Buyer or Lender requires an abstract of title, said abstract will be at Buyer's expense. If the preparation and delivery of an abstract causes a delay in the Closing date, or if Seller extends the Closing date as an accommodation to Buyer, Buyer will be charged, in addition to any other sums payable pursuant to this Agreement, costs for the delay on a per diem basis in an amount equal to the higher of (a) One Hundred Fifty Dollars (**$150.00**) per day or (b) 0.1% of the base purchase price of the home per day. Seller shall have no obligation to provide Buyer a title search, prior title policy or other title evidence if Buyer elects not to obtain title insurance from the title insurance company selected by Seller, as provided above. The issuance of a title policy by the title insurance company selected by Seller, subject only to those matters as specified herein, shall be conclusive and binding on the parties. Any title policy issued by the title insurance company selected by Seller will not insure title to or any interest in personal property or riparian rights.

    18.2    **Title Policy.** Subsequent to Closing, and unless Buyer has elected otherwise, as set forth herein, the title insurance company selected by Seller will deliver to Buyer an owner's title insurance policy insuring title to the Property in an amount equal to the Purchase Price and otherwise conforming to said commitment, subject to those exceptions customarily contained in an ALTA Owner's Title Insurance Policy, and subject also to the following (collectively, "Permitted Exceptions"): (1) zoning, building codes, bulkhead laws, ordinances, regulations, rights or interests vested in the United States of America, the State of Louisiana; (2) real estate taxes and other taxes for the year of conveyance and subsequent years including taxes, pending and certified county or municipal improvements liens and or assessments of any special taxing district, as set forth in this Agreement or in the Covenants (as hereafter defined in the paragraph below titled "Association Membership; Covenants"); (3) the general printed exceptions contained in an ALTA Owner's Title Insurance Policy; (4) utility easements, sewer agreements, telephone agreements, cable agreements, restrictions and reservations common to the Community; (5) any laws and restrictions, covenants, conditions, limitations, reservations, agreements or easements recorded in the Public Records, including without limitation property use limitations and obligations, easements, rights-of-way and agreements relating to telephone, gas or electric lines, water and sewer lines and drainage, provided they do not prevent use of the home for single family residential purposes; (6) the Covenants; and (7) acts done or suffered by Buyer and any mortgage obtained by Buyer for the purchase of the Property. It is Buyer's responsibility to review and become familiar with each of the foregoing title matters, some of which are covenants running with the land.

    18.3    **Deed.** At Closing, Seller will convey good and marketable title to the Property to Buyer by Act of Sale of Property with Limited Warranty (the "Deed") subject only to (1) zoning ordinances, (2) general utility and other easements of record, (3) subdivision restrictions of record, and (4) such other easements, restrictions and encumbrances specified in this Agreement or which are shown on the subdivision plat on file with the County where the Property is located. Good and marketable title as used in this Agreement shall mean title which a title insurance company, licensed to do business in Louisiana, will insure at its regular rates, subject only to standard exceptions. If Seller is unable to convey good and marketable title in accordance with this Agreement, Seller shall refund Buyer's Deposits, this Agreement shall be terminated, and neither party shall have any further claim against the other by reason of this Agreement. The warranty of title in the Deed shall be limited to a warranty of title for the acts of Seller, but shall be made with full substitution and subrogation to all rights and actions of warranty that Seller may have against prior owners of the Property. No mineral rights will be included in the sale. Seller shall not be required to bring any action or otherwise incur any expense to render the title to the Property marketable. Seller and Buyer agree that all papers necessary to carry out the terms of this Agreement shall be produced, executed, and delivered in the time required to fulfill the terms and conditions of this Agreement.

    18.4    **Vesting.** At Closing, title to the Property shall be conveyed by Seller to Buyer pursuant to the Buyer's prior instructions to the Closing attorney. The manner of taking title to the Property can have significant legal and tax consequences. Buyer is advised to give this matter serious consideration and consult with an attorney or tax consultant for advice.

    18.5    **After-Acquired Title.** Seller may not own title to the Property as of the date of this Agreement; and Seller's obligations under this Agreement are contingent upon Seller obtaining title to the Property prior to the start date of construction of the home.

    18.6    **Title Defects.** If Seller cannot provide a marketable and insurable title as described above, or if Seller cannot convey title due to impossibility, zoning prohibition, mistake, Seller's inability to obtain title to the Property or for any similar reason, then Seller will have a reasonable period of time (not to exceed one hundred twenty [120] days) from the date of the scheduled Closing to attempt to correct any defects in title; provided, however, Seller shall not be obligated to incur any expense to clear title to the Property. If Seller cannot or elects not to correct the title defects, Seller shall so notify Buyer within such period, and Buyer may thereafter elect, by written notice from Buyer to Seller, to: (1) accept title in the condition offered (with defects) and pay the balance of the Purchase Price for the Property (without setoff or deduction therefore), thereby waiving any claim with respect to such defects and Buyer will not make any claims against Seller because of the defects; or (2) cancel this Agreement and receive a full refund of all Deposits; provided, however, if the title defect results from Seller's inability to obtain title to the Property, either Buyer or Seller may terminate this Agreement, in which case Buyer shall receive a full refund of all Deposits. If all Deposits are so refunded, Buyer agrees to accept the refunded Deposits as full payment of Seller's liability hereunder, whereupon this Agreement shall be terminated and Seller shall thereafter be relieved and released of all further liability hereunder. In the event Buyer does not notify Seller in writing within five (5) business days from the receipt of Seller's notice (time being strictly of the essence) as to which option Buyer elects, Buyer shall be conclusively presumed to have elected option (1) set forth above. Buyer shall be responsible for any pending and proposed liens, taxes and/or assessments for public improvements. Seller will be responsible for public improvement liens, which have been certified as of the date of Closing.

    18.7    **Pre-Closing.** Prior to Closing, and <u>upon loan approval and verification of funds</u>, Seller shall conduct with Buyer a "Pre-Closing Homeowner Orientation and Homeowner Acceptance", walk-through (the "Homeowner O&A"). The Homeowner O&A gives the Buyer an opportunity to specify any items that remain to be completed in the home. Buyer acknowledges that Seller will use its best efforts to complete all of the items as specified. Buyer understands that Seller will not close without a fully signed Homeowner O&A. Buyer acknowledges by signing the Homeowner O&A that all items have been completed and accepted and approved by Buyer.

    18.8    **Mineral Reservation.** In the Deed, the parties will include the following mineral reservation "Seller reserves unto itself, it successors and assigns, and excepts from this transfer, all of the oil, gas and other minerals in, under and which may be produced from the property herein conveyed, it being understood, however that Seller, its successors and assigns, shall have the right to produce oil, gas or other minerals in, under and from the property herein conveyed by the use of directional drilling methods only and thus hereby waives surface rights up to a depth of 500 feet below the surface of the property."

19. <u>Closing.</u>

    19.1    **Closing Date and Location.** Buyer acknowledges and agrees that Seller has the right in its sole discretion to schedule the date, time and place for the Closing (the "Closing") and that Buyer shall close on such Closing date. The Closing Date will be set by notice from Seller to Buyer approximately **thirty (30) business days** prior to the anticipated Closing Date. An affidavit of one of Seller's employees or agents that such notice was given will be conclusive for purposes of proving that notice was given. The fact that Buyer fails to receive the notice of Closing because Buyer has failed to advise Seller of any contact information changes, or because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or for any other reason, shall not relieve Buyer of Buyer's obligation to close on the scheduled date, unless Seller otherwise agrees in writing to postpone the Closing date. If Seller agrees in writing to reschedule the Closing at Buyer's request or because Buyer (if a corporation) has failed to produce all corporate documents requested by Seller, or for any other reason (except for delay desired by Seller), Seller may impose a late charge equal to the higher of (a) ONE HUNDRED FIFTY DOLLARS (**$150.00**)

Square:  __28«Block»__   Lot: __101«Lot»__   Buyer: __Kirk J Meyer«BuyerFirstMILast»__   Date: __7/17/2008«OriginalSaleDate»__

per day or (b) 0.1% of the base purchase price of the home per day, for every day that the scheduled Closing is delayed. Buyer agrees the late charge is appropriate in order to cover Seller's administrative and other expenses resulting from a delay in Closing. Seller is not required to agree to reschedule Closing, but Seller may reschedule Closing in Seller's sole discretion. In addition to any other sums payable pursuant to this Agreement, Buyer will pay to Seller an additional charge of ONE HUNDRED DOLLARS ($100.00) for re-preparation of the Closing documents. In the event Buyer requests and Seller agrees that this transaction be closed by mail (Buyer understands that Seller is under no obligation to so agree) then Buyer shall pay to Seller the sum of ONE HUNDRED TWENTY-FIVE DOLLARS ($125.00) to offset the cost of preparing and completing the Closing by mail. Prior to the Closing, a certificate of occupancy covering the home shall be issued by the proper governmental agency.

19.2    **Payment and Clearance of Funds.** At Closing, Buyer agrees to pay the Seller the balance of the Purchase Price and any additional amounts owed under this Agreement in United States Dollars by official bank check or by wire transfer. If Seller does not receive all of the funds, including mortgage proceeds, if any, Buyer is required to pay or have paid to Seller at Closing, or if those funds have not cleared, Buyer will not be entitled to take possession of the Property until all funds have been received and have cleared.

19.3    **Electronic Transfer of Funds at Closing.** Buyer agrees that the funds to close this transaction shall be wired to the Closing attorney's Trust Account sufficiently in advance so that good funds are available at the time of Closing; provided, however, that if Buyer's loan to purchase the Property is financed by CKBHL as lender, then, at the Closing, the loan proceeds payable from CKBHL to Seller may be paid directly by CKBHL to Seller by an electronic transfer of funds, without actual deposit of funds in the Closing attorney's Trust Account (this method of payment is referred to as the "Direct Funding Method"). The procedures of the Direct Funding Method have been reviewed, without objection, by the Veteran's Administration, and the U.S. Department of Housing and Urban Development. The use of the Direct Funding Method will not result in any additional cost or expense to Buyer.

20.    **Possession.** Seller shall grant possession of the Property to Buyer immediately after Closing. In no event shall Buyer, prior to Closing and the payment of the Purchase Price in full: (1) move any household goods or other materials into the home located on the Property; or (2) make any physical changes, alterations or additions, including but not limited to, painting, wallpaper installation, wiring, installation of curtain rods, light fixtures and fans; (3) interfere with the contractors or subcontractors completing the construction of the home located on the Property; or (4) have materials or supplies delivered to the Property or to the job site. All work and materials to be performed or supplied under this Agreement shall be performed or supplied by Seller's independent contractors, employees, agents or suppliers.

21.    **Default.**

21.1    **By Buyer.** If Buyer fails to honor his/her promises or to perform his/her obligations under this Agreement (including making scheduled Deposits), Buyer will be in "Default". If Buyer is still in default five (5) days after Seller sends Buyer notice of such default, Seller may cancel this Agreement. IF, HOWEVER, BUYER'S DEFAULT IS IN FAILING TO CLOSE ON THE SCHEDULED DATE, THEN SELLER MAY CANCEL THIS AGREEMENT WITHOUT GIVING BUYER ANY PRIOR (OR SUBSEQUENT) NOTIFICATION OR OPPORTUNITY TO CLOSE AT A LATER DATE. Upon Buyer's default (and the expiration of any notice period, if applicable), all of Buyer's rights under this Agreement will end, and Seller may resell the Property without any accounting to Buyer. Buyer understands that because Seller has taken the Property off the market for Buyer, and that Seller has spent money on sales, advertising, promotion and construction and has incurred other costs incident to this sale, Buyer's default will damage Seller. As compensation for this damage, in the event Seller cancels this Agreement because of Buyer's default, Buyer authorizes Seller to keep (or if not then paid by Buyer, Buyer will pay to Seller) all Deposits (including, without limitation, those on options, extras, upgrades and the like) Buyer has then made (and which would have been required to have been made had Buyer not defaulted) and all interest which was, or would have been, earned on them, all as liquidated damages and not as penalty. Buyer and Seller agree to the foregoing compensation for damage because there is no other precise method of determining Seller's damages. If Buyer defaults, Buyer promises not to sue for the return of any part of his Deposits. Any damage or loss that occurs to the lot or home while Buyer is in default will not affect Seller's right to liquidated damages.

BUYER'S INITIALS: [    ]

21.2    **By Seller.** If Seller defaults under this Agreement, Buyer will give Seller notice of such default, and if Seller has not cured the default within **sixty (60) days** after such notice is given, Buyer will have such rights as may be available under applicable law. If Seller has commenced to cure the default within such **sixty (60) day period** and is diligently proceeding to complete such cure, Seller shall be granted a reasonable period of time after the expiration of such **sixty (60) day period** to complete such cure. Should Seller fail to provide any item of construction required to be provided by Seller's Plans and Specifications, Buyer's sole remedy against Seller will be to collect liquidated damages from Seller in an amount equal to the greater of (1) Seller's cost for such item and for the installation of such item had such item been installed at the appropriate time during construction, or (2) Seller's specific charge for such item if such item is an extra and Buyer has paid for it in full in advance (and if Buyer has not paid for it in full, then the amount for purposes of this subclause (2) will only be so much of that price as has been paid by Buyer, if any). Buyer and Seller acknowledge and agree that by failing to provide an item of construction the item of construction omitted is therefore not covered by any warranty, such Agreement dealing only with defective items which are actually installed and which are covered by the terms of such Agreement, and, therefore, the remedies set forth in this section shall be the exclusive remedies relating to Seller's failure to provide any item of construction. The provisions of this section will survive the Closing.

22.    **Association Memberships; Covenants.**

22.1    **Covenants.** The Property will be covered by a Declaration of Covenants, Conditions, and Restrictions (the "Covenants"), a copy of which has either been given to Buyer or which will be available for Buyer's inspection in Seller's sales office prior to Closing. Buyer acknowledges that the Covenants will contain restrictions on the use of the Property. Buyer acknowledges that there is a mandatory homeowner association fee in the approximate amount of $_____ per _____, with an initial enrollment fee of $_____ established by the Covenants, which must be paid by Buyer. Buyer understands that Buyer's membership in the association ("Association") will take effect at Closing. At Closing, Buyer agrees to accept all liabilities and obligations of membership in the Association. Buyer acknowledges that the Association is charged with certain responsibilities, including but not limited to assessing and collecting from each member assessment. Said assessments shall be made and collected in accordance with the Covenants and, by the execution of this Agreement, Buyer acknowledges and agrees to pay Buyer's proportionate share of said assessments as they become due. Buyer understands that the Association has a right to place a lien upon the Property pursuant to the Covenants, and Buyer agrees not to raise any defense of homestead and waives any right that Buyer may have to assert a homestead exemption to seizure with respect to the lien or privilege of the Association or to allege the superiority of homestead over the liens created, as they same may be available to Buyer, concerning the enforcement of the liens pursuant to the terms of the Covenants. Buyer further acknowledges and agrees that the Covenants permit amendments to be made to them and that any changes made to them prior to Closing may not necessarily be delivered to Buyer prior to Closing but will be recorded in the public records of the county in which the Property is located. Any amendment to the Covenants will not affect Buyer's obligation to perform any or all of his duties under this Agreement, unless such changes have a serious, measurable and adverse affect on the market value of the lot or home. The provisions of this section of this Agreement will continue to be effective after the Closing.

22.2    **Initial Board.** Buyer acknowledges that nominees of Seller may serve as the initial officers and directors of the Association and are authorized by Buyer to act for and on the behalf of the Association in entering into any and all agreements as are provided for in or contemplated by the Covenants and their exhibits. Buyer also acknowledges the provisions of the Covenants are fair and reasonable.

22.3    **Budgets.** Buyer understands that the budgets for the Association are not guaranteed. All budgets are subject to change at any time and from time to time to reflect actual and projected expenditures. These changes may occur before or after Closing, but will not affect any of Buyer's obligations under this Agreement (except as to resulting changes in Association fees and Closing prorations).

BUYER'S INITIALS: [    ]

Square: 28«Block»   Lot: 101«Lot»   Buyer: Kirk J Meyer«BuyerFirstMILast»   Date: 7/17/2008«Original SaleDate»

23. **Additional Covenants.** (If this Paragraph is not initialed below, it is not a part of this Agreement.)

**Initial If Applicable.** The Property is subject to an additional Declaration of Covenants, Conditions, and Restrictions, a copy of which has either been given to Buyer or which will be available for Buyer's inspection prior to Closing (the "Additional Covenants"). Buyer acknowledges that the Additional Covenants will contain restrictions on the use of the Property. Buyer acknowledges that there is a mandatory homeowner association fee in the approximate amount of $_____ per _____, with an initial enrollment fee of $_____ established by the Additional Covenants, which must be paid by Buyer.

**BUYER'S INITIALS:**

24. **Seller's Use of the Common Areas.** As long as Seller, or any nominees of Seller, owns any lot in the Community, Seller and/or its nominees shall have the right and privilege to maintain general sales and construction offices in and about the Community, including model residences, and to have their employees present on the premises to show homes, use the common areas of the Community and, without limitation, to do any and all other things necessary or appropriate by them to sell, resell, all without charge or contribution including signs and temporary entrance features; provided, however, that such activities shall be carried on in such a manner as will not unreasonably interfere with the Buyer's enjoyment of the Property.

25. **Insulation Disclosure.** Seller has advised Buyer, as required by the applicable rules of the Federal Trade Commission, that the location, type, thickness and R-value of the insulation intended to be installed in the home are as follows: (1) Exterior walls, excluding exterior garage walls, with BATT insulation to a thickness of 3 5/8 inches which will, according to the manufacturer, yield an R-Value of 13; (2) Ceilings below attic areas (areas which are not vaulted) are insulated with BLOWN insulation to a thickness of 13 inches which will, according to the manufacturer, yield an R-Value of 30; (3) Vaulted ceilings with BATT insulation to a thickness of at least 9 inches which will, according to the manufacturer, yield an R-value of 30; (4) Exterior Vault knee-walls with BATT insulation to a thickness of 3 5/8 inches which will, according to the manufacturer, yield an R-Value of 13; (5) Interior Vault knee-walls with BATT insulation to a thickness of 6 inches which will, according to the manufacturer, yield an R-Value of 19; (6) Basement ceilings are insulated with BATT insulation to a thickness of 6 inches which will, according to the manufacturer, yield an R-Value of 19; and (7) Garage ceilings under conditioned space are insulated with BATT insulation to a thickness of at least 9 inches which will, according to the manufacturer, yield an R-Value of 30. Seller shall have the right to substitute insulation, so long as the R-Value is equal to or greater than set forth herein. The manufacturer supplies the information set forth herein to Seller and Seller shall have no liability if the R-Value is in fact different than that indicated.

26. **Additional Changes.** Buyer agrees that it may be necessary (at any time and from time to time) after Buyer executes this Agreement for Seller and the Developer or Declarant under the Covenants to change the terms and provisions of this Agreement and/or the Covenants to comply with and conform to the rules and regulations (as same may exist and as same may be promulgated from time to time) of any governmental agency or the Community.

27. **Limited Warranty.** Seller will provide Buyer with a limited warranty agreement, which consists of Volumes 1 & 2 (individually and collectively the "Warranty") through KB HOME. Seller makes no warranty or guarantee, express or implied, except as specifically set forth in the Warranty. Buyer may obtain a copy of the Warranty from Seller. The Warranty, and to some extent this Agreement, describe Seller's repair and warranty obligations, the procedures for making a warranty claim and the procedures for the settlement of disputes. In the event that a homeowner is unsatisfied with Seller's rejection or handling of a warranty claim, the homeowner and Seller will participate in the negotiation and/or arbitration processes described in detail in the Warranty. Buyer acknowledges that the Warranty provides that certain items installed or incorporated into the home, for example, appliances, may not be covered by the Warranty and instead, may be separately warranted by their manufacturer or installer. Seller shall assign such third party warranties to Buyer at the Closing, however, Seller shall have no other obligation whatsoever under said warranties, and shall not assign any such warranties until such time as Buyer has paid all sums due hereunder.

**BUYER'S INITIALS:**

28. **Limitation of Liability.** EXCEPT FOR THE LIMITED WARRANTY DESCRIBED ABOVE, AND EXCEPT FOR THE TITLE WARRANTIES SPECIFIED IN THIS AGREEMENT, SELLER MAKES NO OTHER WARRANTY OF ANY KIND; SELLER HEREBY DISCLAIMS ALL SUCH OTHER WARRANTIES. SELLER MAKES NO WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EITHER EXPRESSED OR IMPLIED. THE EXCLUSIVE REMEDY FOR ANY DEFECT OF ANY ITEM OR CLAIMED DEFECT IN THE HOME IS BY WRITTEN NOTIFICATION PRIOR TO THE EXPIRATION OF THE WARRANTY PERIOD. SELLER'S OBLIGATION SHALL BE THE CORRECTION OF SUCH DEFECT BY REPAIR OR REPLACEMENT, IN ITS DISCRETION. NO SUCH ACTIONS TAKEN BY SELLER TO REPAIR OR REPLACE A DEFECT SHALL EXTEND THE WARRANTY PERIOD. SELLER SHALL NOT BE LIABLE FOR MONETARY DAMAGES OF ANY KIND, INCLUDING SECONDARY, CONSEQUENTIAL, PUNITIVE, GENERAL, SPECIAL OR INDIRECT DAMAGES.

29. **Construction Activities.** All owners, occupants and users of the Community are hereby placed on notice that Seller, its agents, contractors, subcontractors, licensees and other designees will be, from time to time, conducting excavation, construction and other activities within or in proximity to the Community. By the acceptance of their deed or other conveyance or mortgage, leasehold, license or other interest, and by using any portion of the Community, each such owner, occupant and user automatically acknowledges, stipulates and agrees (1) that none of the aforesaid activities shall be deemed nuisances or noxious or offensive activities, hereunder or at law generally, (2) not to enter upon, or allow their children or other persons under their control or direction to enter upon (regardless of whether such entry is a trespass or otherwise) any property within or in proximity to the Community where such activity is being conducted (even if not being actively conducted at the time of entry, such as at night or otherwise during non-working hours), (3) Seller and the other aforesaid related parties shall not be liable for any losses, damages (compensatory, consequential, punitive or otherwise), injuries or deaths arising from or relating to the aforesaid activities, except resulting directly from Seller's gross negligence or willful misconduct, (4) any purchase or use of any portion of the Community has been and will be made with full knowledge of the foregoing and (5) this acknowledgment and agreement are material inducements to Seller to sell, convey, or allow the use of the Property. This section shall survive the Closing.

30. **Plan Copyright.** It is understood by Buyer that the architectural plan for the proposed home is the property of KB HOME, a Delaware corporation ("KB HOME") and is protected by United States copyright laws. Any modifications to such plan suggested or made by Buyer become the property of KB HOME. Buyer agrees not to infringe on KB HOME's copyrights in any manner, including the construction of a dwelling substantially similar to that, which is the subject of this Agreement. Any violation of the copyright law shall also constitute a breach of this Agreement. This section shall not merge in the deed of conveyance and shall survive Closing.

31. **Water and Sewer.** The Property is served by:
(Initial one) _____ Public Sewer System _____ Private Sewer System _____ Septic Tank
(Initial one) _____ Public Water System _____ Private Water System

32. **Marketing.** Buyer agrees that Seller may use exterior photos of the Property and home in promotional literature and advertising, after Closing and without restriction, for a period of ten (10) years after the Closing Date. Seller shall also have the right to place, from time to time, marketing and directional signs along a five (5) foot section of land adjacent to the road right-of-way on the Property for a period of two (2) years after the Closing Date.

33. **Wood Infestation & Soil Treatment Certification.** At Closing, Seller shall provide Buyer with a current termite treatment certification. If any additional inspections or reports are required by Buyer or Lender, Buyer shall pay all costs for the additional inspections or reports.

| Square: | 28«Block» | Lot: | 101«Lot» | Buyer: | Kirk J Meyer«BuyerFirstMILast» | Date: | 7/17/2008«Original SaleDate» |

34. **Changes and Inquiries.** Buyer agrees to direct all inquiries and questions to Seller's sales associate, who will provide Buyer with a timely response. Changes to this Agreement may only be made by a written amendment signed by Buyer and Seller. NO EMPLOYEE OR ASSOCIATE OF SELLER IS AUTHORIZED TO ACCEPT THIS AGREEMENT WITH ANY CHANGES (EXCEPT TO FILL IN BLANKS OR CHECK BOXES WHERE APPROPRIATE) OR WITH RIDERS, AMENDMENTS OR SPECIAL STIPULATIONS THAT ARE NOT ON SELLER'S APPROVED FORM(S).

35. **Miscellaneous Provisions.**

   35.1 **Waiver.** Seller's waiver of any of its rights or remedies shall not operate to waive any other of Seller's rights or remedies or to prevent Seller from enforcing the waived right or remedy in another instance.

   **Survival, Incorporation and Severability.** The provisions and disclaimers in this Agreement, which are intended to have effect after the Closing, shall survive the Closing. In the event that any clause or provision of this Agreement shall be void or unenforceable, such clause or provision shall be deemed deleted to the minimum extent necessary so that the balance of this Agreement is enforceable.

   **Section Headings.** The section headings in this Agreement are for convenience only and shall not affect the meaning, interpretation or scope of the provisions, which follow them.

   **Governing Law.** Any disputes that develop under this Agreement will be settled according to the state in which the Property is located.

   **Time of the Essence.** Buyer acknowledges that time is of the essence in connection with this transaction and any delay in Buyer's performance under this Agreement will prejudice Seller.

   BUYER'S INITIALS: ☐☐

   **Notice.** Except as otherwise provided for in this Agreement, any notice required or permitted to be given in connection with this Agreement shall be in writing and sent by United States certified mail with return receipt requested, professional overnight courier, facsimile (with confirmation and copy by certified mail if Buyer's address is within the United States or overnight professional courier if to a Buyer whose address is outside of the United States) or telex (with confirmation and copy by certified mail or overnight professional courier if to a Buyer whose address is outside of the United States) to Buyer or Seller at the addresses on Exhibit "A" of this Agreement, and additionally to Seller by hand delivery at Seller's sales office. All notices shall only be effective upon receipt or refusal to accept receipt (by failure to accept delivery or otherwise).

   **Radon Gas.** Seller makes the following disclosure: Radon is a naturally occurring radioactive gas that, when it has accumulated in the building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Louisiana.

   **English Language.** Buyer acknowledges that this Agreement was negotiated in the English language.

   **Assignment.** The rights and interest of Seller in and to this Agreement may be assigned or transferred by Seller to any entity. The rights and interest of Buyer in and to this Agreement may not be assigned or otherwise transferred, voluntarily or by operation of law, by Buyer without the written consent of Seller, which consent may be withheld by Seller at its sole discretion.

   **Joint Obligations.** If Buyer is comprised of more than one person or entity, then each party comprising Buyer shall be jointly and severally responsible for the performance of Buyer's obligations under this Agreement.

   **Cooperation.** Buyer and Seller agree to execute all instruments and documents and to take all actions as may be required herein and by Lender, if any, to consummate the sale and purchase herein contemplated.

   **No Tax Withholding.** Section 1455 of the Internal Revenue Code, provides that a transferee of a United States real property interest must withhold tax if the transferor (i.e., Seller) is a foreign person. In order to inform Buyer that withholding of tax is not required in connection with this transaction, Seller certifies that Seller is exempt from the withholding requirements.

   **Entire Agreement.** Buyer certifies that Buyer has read every provision of this Agreement and each Addendum attached hereto and that this Agreement constitutes the entire agreement between Buyer and Seller. This Agreement is the entire agreement for the sale and purchase of the Property and once it is signed it can only be amended in writing. Prior agreements, representations, understandings, and oral statements not reflected in this Agreement are void and have no effect. Buyer acknowledges that he has not relied on any representations, newspaper, radio or television advertisements, warranties, statements, or estimates of any nature whatsoever, whether written or oral, made by Seller's sales persons, agents, officers, employees, co-operating brokers (if any) or otherwise except as herein specifically represented. Buyer has based his/her decision to purchase the Property on personal investigation, observation and the Covenants.

   THIS IS A LEGALLY BINDING AGREEMENT; BUYER SHOULD SEEK PROFESSIONAL ADVICE.

   BUYER'S INITIALS: ☐☐

36. **Mediation and Arbitration.**

   **Agreement or Property Disputes.** In the event of any dispute related to the Property or this Agreement, the parties shall first mediate their dispute with a third party mediator to be selected by the parties. The costs of arbitration will be shared equally between the parties. In the event the dispute is not settled at mediation, then this Agreement shall be subject to arbitration under the Federal Arbitration Act. Subject to the provisions set forth below, all claims, demands, disputes, controversies and differences that may arise between the parties to this Agreement (including the officers, agents and employees of each party) of whatever nature or kind, including, without limitation, disputes: 1) as to events, representations, or omissions, which predate this Agreement; 2) arising out of this Agreement; and/or 3) relative to the construction contemplated by this Agreement arising prior to the Closing shall be submitted to binding arbitration and such arbitration shall be governed by the provisions of the Federal Arbitration Act 9, U.S.C. Section 1 et. seq. Either party may, within one (1) year after an arbitration award, apply to the U.S. District Court having jurisdiction over the county in which the Property is located to confirm the award. The forwarding of a written demand for arbitration shall toll the running of any applicable statute of limitations for the matter to be arbitrated. This Agreement to arbitrate shall survive Closing, and shall survive cancellation of this Agreement. Arbitration shall be conducted through the American Arbitration Association offices nearest to where the Property is located.

   **Seller Option to Cancel.** Notwithstanding the foregoing, if, for any reason, a bona fide dispute should arise between Buyer and Seller prior to Closing, and if such bona fide dispute cannot be resolved to their mutual satisfaction, then Seller at its sole option may either submit the dispute to binding arbitration or may terminate this Agreement by written notice to Buyer prior to Closing. If Seller terminates this Agreement, Seller shall return to Buyer all Deposits, whether refundable or not.

**Warranty Disputes.** The provisions of this Section shall not apply to any repairs or warranty claims with respect to the Home arising after the construction is completed and the Closing has occurred hereunder and shall expressly NOT control over the dispute resolution provisions in the Warranty for such repairs or warranty claims. Notwithstanding anything to the contrary in this Agreement or any other agreement entered into by Buyer and Seller or other documentation with respect to the Property, any such repairs or warranty claims shall be governed by the Warranty coverage disputes provisions of the Warranty and applicable State and Federal law.

**BUYER'S INITIALS:**

**SELLER'S INITIALS:**

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

| Square: | 28«Block» | Lot: | 101«Lot» | Buyer: | Kirk J Meyer«BuyerFirstMILast» | Date: | 7/17/2008«Original SaleDate» |

37. **Exhibits and Addenda.** The following Exhibits and Addenda are attached and made a part of this Agreement; the provisions set forth on the Exhibits shall, if conflicting with the printed portions of this Agreement, control:

( ) Exhibit "A"
( ) Exhibit "B" Affiliated Business Arrangement Disclosure Statement
( ) Exhibit "C" Buyer's Broker Registration and Commission Agreement
( ) Exhibit "D" Certified Professional Home Builder Addendum
( ) Exhibit "___" _____
( ) Exhibit "___" _____
( ) Exhibit "___" _____
( ) Exhibit "___" _____
( ) Exhibit "___" _____
( ) Exhibit "___" _____

This Agreement shall not be binding upon Seller until accepted by Seller as evidenced by execution by an authorized officer of Seller. Execution by Seller's salesperson or broker does not constitute acceptance by Seller.

IN WITNESS WHEREOF, the undersigned parties have set their hands and seals as of the date indicated:

Buyer:                                                         Seller:

                                                               KB HOME/Shaw Louisiana LLC

_____                              

_____                              

Date _____                                   Date _____

Buyer   Kirk J Meyer«BuyerFirstMILast»                         By _____

Buyer   Lori Meyer«CoBuyerFirstLastMI»                         Title _____

«REBROKERNAME» / «REREALTORAGENTNAME»                          Tiffany Easterling«SalesPerson1»
Buyer's Broker/Agent                                           Printed Name of Seller's Agent

«REBROKERLICENSE» / «REREALTORLICENSE»
Buyer's Broker/Agent License Number


Buyer's offer is accepted upon execution by an authorized representative of Seller, in the space provided below, Only upon such acceptance shall Buyer's offer become a firm and binding contract, subject to the herein stated terms and conditions.

ACCEPTANCE BY SELLER

_____ DATE _____

---

**No Broker**

**Initial If Applicable.** Buyer acknowledges that no broker has represented Buyer or been involved in negotiating this Agreement and that no commission will be paid to a broker claiming by or through Buyer.

BUYER'S INITIALS: ☐☐

Exhibit "B"



## AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE STATEMENT
### Notice

| | | | | |
|---|---|---|---|---|
| Date of Purchase Agreement | 7/17/2008«OriginalSaleDate» | | | |
| Buyer | Kirk J Meyer«BuyerFirstMILast» | Buyer | Lori Meyer«CoBuyerFirstLastMI» | |
| Community | Guste Island 4Plex«Community» | | Sales Person: | Tiffany Easterling«SalesRep» |
| Lot | 101«Lot»  Block 28«Block» | | Arch. Plan | 222.1932«APlan» |
| Address | 101 White Heron Drive«Address» | | Madisonville«PropCity» | LA«PropSt» 70447«PropZip» |

**From:  KB HOME/SHAW LOUISIANA LLC**

This is to give you notice that KB HOME/Shaw Louisiana LLC has a business relationship with KB HOME Title Services Inc., and KB Home Insurance Agency Inc. (collectively referred to herein as the "Affiliated Companies"). Specifically, the Affiliated Companies are directly or indirectly owned by KB HOME. Countrywide KB Home Loans, LLC has an affiliated relationship with the other Affiliated Companies because KB HOME, directly or indirectly owns 100% of the Affiliated Companies and 50% of Countrywide KB Home Loans, LLC. Because of these relationships, this referral may provide Countrywide KB Home Loans, LLC, KB HOME and/or the Affiliated Companies a financial or other benefit.

Set forth below is the estimated charge or range of charges for settlement services listed. You are NOT required to use the listed providers as a condition for settlement of your loan on or the purchase of the subject property. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

**KB HOME Title Services Inc.**
**Title and Settlement Services**             **Charge or Range of Charges**

KB HOME Title Services Inc. is not currently offered in the State of Louisiana.


**KB HOME Insurance Agency Inc.**
**Insurance Products and Services**

KB HOME Insurance Agency Inc. is not currently offered in the State of Louisiana.

**Countrywide KB Home Loans, LLC**
**Home Loans**
Countrywide KB Home Loans, LLC and several of its affiliated companies provide mortgage loans and related services incidental to the making and closing of your home loan. The estimated charges or range of charges for these services are as follows:

| | | |
|---|---|---|
| 801- | Loan Fee | $ Vary depending on loan amount and loan program |
| 803- | Appraisal fee | $ 200-500 |
| 804- | Credit Report Fee | $ 35 |
| 808- | Tax Service Contract | $ 60-120 |
| 809- | Lender Fee | $ 1090 |
| 811- | Flood Certification | $ 26 |

If you select Countrywide KB Home Loans, LLC for a home loan, Countrywide KB Home Loans, LLC may require you to use the services of an affiliated credit reporting agency or real estate appraiser, as a condition of your loan on this property, to represent Countrywide KB Home Loans, LLC's interest in the transaction.

**ACKNOWLEDGMENT**
I/we have read this disclosure form, and understand that KB HOME/Shaw Louisiana LLC and Countrywide KB Home Loans, LLC is/are referring me/us to purchase the above-described settlement services and may receive a financial or other benefit as the result of this referral.

Buyer:

_____
Signature/Date

_____
Signature/Date

Exhibit "C"

**KB HOME**

BUYER'S BROKER REGISTRATION AND COMMISSION AGREEMENT

| | | | | | | |
|---|---|---|---|---|---|---|
| Buyer | Kirk J Meyer«BuyerFirstMILast» | Co-Buyer | Lori Meyer«CoBuyerFirstLastMI» | Seller's Agent: | Tiffany Easterling«SalesRep» | |
| Property | 101 White Heron Drive, Madisonville, LA 70447«COMPLETEPROPADDRESS» | | | Tract/Plat / 7«TractP» | | Lot 101«Lot» |
| Community | Guste Island 4Plex«Community» | | County/State | /LA«PROPSTATE» | Date | 7/17/2008«OriginalSaleDate» |

The following constitutes the entire agreement (the "Agreement") by and between KB HOME/SHAW LOUISIANA LLC ("Seller") and the "Buyer's Broker" listed below regarding a potential referral sales commission described in Paragraph 1 below with respect to the Buyer(s) and the Property described above. No other representations or acknowledgements shall be binding upon either party unless agreed to in writing by both parties. The parties agree as follows:

1. Seller shall pay to Buyer's Broker a commission equal to three percent (3%) of total sales price of the above-referenced home (the "Commission") at the close of escrow provided (i) a contract is signed by Buyer and accepted by Seller within sixty (60) days after the date of this Agreement, and (ii) such close of escrow occurs within two hundred seventy (270) days after the date of this Agreement. No commission shall be paid if a contract is signed more than sixty (60) days after the date of this Agreement unless Buyer's Broker has re-registered the Buyer. This Agreement serves as escrow instructions to govern payment of the Commission to Buyer's Broker.

2. It is an absolute condition for the payment of any Commission that Buyer's Broker accompany and register Buyer at the Community at the time of Buyer's **first** visit as a prospective purchaser to the Community. Buyer's Broker shall not be entitled to any Commission if Buyer has visited the Community without Buyer's Broker prior to the date of this Agreement or if Buyer has previously registered with Seller via any means, including, but not limited to, registering with Seller via Seller's Special TV Offer, Infomercial, houseCALL call center, internet Web site, Homebuyer's Club, write-in/mail-in registrations, or at Seller's communities or divisional or off-site presentations, or elsewhere.

   The registration of the Buyer's Broker shall be established only for the particular Buyer for the Property but shall be established only by: (a) complete execution and acceptance of this Agreement and (b) Buyer's completion of Seller's form registration card at the Community acknowledging the portion of the card which evidences that Buyer's Broker referred Buyer to the Property. Upon request, a copy of the Agreement will be given to Buyer's Broker. Any attempt of Buyer's Broker to effectuate a broker relationship with Seller without Buyer's Broker's actual presence at Buyer's first visit shall be null and void.

3. Buyers of Seller's homes are NOT required to use CKBHL for their financing as a condition for purchase. Buyer may obtain financing from any qualified lending institution. Buyer's Broker has been made aware of this and acknowledges its obligation to inform Buyer thereof.

4. Buyer's Broker acknowledges that it shall not pay, rebate or otherwise transfer all or any portion of its Commission or any referral fee to the Buyer, any relative of Buyer or any member of the Buyer's household under any circumstances.

5. Buyer's Broker represents that it is licensed as a real estate broker or salesperson in the state in which the Property is located. To the extent required by law, Buyer's Broker must provide an executed form of disclosure of its agency relationship with Buyer (executed by Buyer's Broker and Buyer) indicating that Buyer's Broker is the agent of Buyer exclusively prior to Buyer's execution of a sales contract. Buyer's Broker represents and warrants that Buyer's Broker's license number as set forth below accurately represents its current, active sales license number. Buyer's Broker represents that it is currently active in residential real estate as its primary source of employment.

6. Seller's on-site agent shall be primarily responsible for coordinating loan processing, however, Buyer's Broker acknowledges that, if requested by Seller, Buyer's Broker shall be obligated to assist Seller in obtaining documentation or other information from Buyer with respect to its loan approval, loan closing or the title or escrow documentation for the Closing of the transaction. Buyer's Broker's failure to cooperate as required above shall subject Buyer's Broker to Commission forfeiture.

7. In the event that Buyer elects to purchase a property from Seller other than a property in the Community, Seller shall have no obligation to pay Buyer's Broker a commission therewith unless a separate Agreement is established between Seller and Buyer's Broker in writing, using the form hereof and Buyer's Broker meets the obligations set forth therein.

8. Buyer's Broker agrees to indemnify and hold harmless Seller, Seller's parent, subsidiary and affiliate companies and Seller's employees, officers and directors (collectively, the "Affiliates") from and against any and all claims, charges, costs, fees, obligations, damages, liabilities, expenses and attorneys' fees incurred by Seller or the Affiliates by virtue of Buyer's Broker's actions or errors with respect to or in connection with this Agreement or the potential transaction between Seller and Buyer referred herein (the "Sale Transaction").

9. Buyer's Broker has no independent authority to bind Buyer or Seller. Only Seller's form purchase agreement will be used. Buyer's Broker may not advertise any of Seller's homes in any printed form.

10. If a real estate salesperson or broker other than Buyer's Broker attempts to register as Buyer's broker within sixty (60) days after the date hereof, Seller shall only be obligated to pay a single Commission to the Buyer's Broker which first registered Buyer at the Community in which Buyer purchased a home from Seller (assuming a sale contract is signed within such sixty (60) day period and all other criteria of this Agreement have been met).

11. This Agreement is only in effect for the Buyer described above and may be rescinded and terminated in Buyer's sole discretion upon written notice to Seller and Buyer's Broker.

This Agreement is effective upon execution by an authorized officer of Seller. On-site sales representatives are not authorized representatives of Seller for such purposes.

BROKER: Please Print or Type (ALL CHECKS WILL BE ISSUED AS DIRECTED TO BROKER BELOW)

| | | | |
|---|---|---|---|
| Individual | «REREALTORAGENTNAME» | Company Name | «REBROKERCOMPANY» |
| Broker Name | «REBROKERNAME» | Broker License # | «REBROKERLICENSE» |
| Broker Fed Tax ID# | «REBROKERTAXID» | Name for Commission Check | «REBROKERNAME» |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Address for Commission Check | «REBROKERSTREETADDRESS» | City | «REBROKERCITY» | State | «REBROKERSTATE» | Zip | «REBROKERZIP» |

Agreed to by:

_____   _____
KB HOME/SHAW LOUISIANA LLC - Authorized Signature   Date

_____   _____
REFERRAL AGENT OR BROKER - Authorized Signature   Date

Buyer's Broker's representation of Buyer and Buyer's Broker's rights under this Referral Buyer's Broker Commission Agreement are acknowledged by Buyer(s) as of the same date of Buyer's Broker's signature above.

Buyer: _____   Buyer: _____

Exhibit "D"
Certified Professional Home Builder Addendum

 # Certified Professional Home Builder 
## The Housing Institute, Inc.
## New Home Purchase and Sale Agreement Addendum

This addendum is part of the New Home Purchase Agreement ("Agreement") between the undersigned Buyer and KB HOME/Shaw Louisiana LLC ("Seller") dated   7/17/2008«Origina lSaleDate»   relating to real property located at

101 White Heron Drive, Madisonville, LA 70447«COMPLETEPROPADDRESS»

The purpose of this addendum is to clarify the relationship between the Seller, who is a Certified Professional Home Builder, the Buyer(s) and The Housing Institute, Inc. The Housing Institute, Inc. uses its best efforts to determine a builder's qualifications for certification as a Professional Home Builder. The Buyer(s) acknowledges that neither The Housing Institute, Inc. nor any of its affiliated corporations, nor their officers, employees or agents: (1) are parties to the Agreement; (2) shall have liability to the Buyer(s) relating to the real property or home; and (3) have made any warranty or representation, express or implied, to the Buyer(s).

The Certified Professional Home Builder program is administered by The Housing Institute, Inc. and was established to recognize professionalism in the home building industry. The term, Professional, is used to describe the manner in which the Seller conducts business and the process the Seller follows in delivering your new home. While the program recognizes the professionalism of the Seller, The Housing Institute, Inc. has not inspected the real property identified above and it does not and cannot address the specific construction quality of the new home.

To be a Certified Professional Home Builder, the Seller agrees to meet certain criteria regarding experience, education, references, insurance, building performance standards, warranties, building volume and ethics. These criteria are detailed within the Policy and Procedures for the program, which the Buyer(s) is encouraged to review. Certified Professional Home Builders are recertified each year.

Enjoy your new home!


Buyer:   Kirk J Meyer«BuyerFirstMILast»


_____          _____
Signature                                     Date


Buyer:   Lori Meyer«CoBuyerFirstLastMI»


_____          _____
Signature                                     Date


Seller:   KB HOME/SHAW LOUISIANA LLC

By:_____
Name:   Tiffany Easterling«SalesPerson1»         _____
Title: _____            Date