Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | X |  |
| IN RE: | X | MDL No. 2047 |
| CHINESE-MANUFACTURED | X |  |
| DRYWALL PRODUCTS | X | SECTION: L |
| LIABILITY LITIGATION | X |  |
|  | X | JUDGE FALLON |
| This document applies | X |  |
| to all cases | X | MAG. JUDGE WILKINSON |

- - -

THURSDAY, JANUARY 21, 2010
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

- - -

Videotaped deposition of MATTHEW J. PERRICONE, Ph.D., held at the offices of Frilot Partridge, LLC, 3800 Energy Centre, 1100 Poydras Street, New Orleans, Louisiana, commencing at 9:25 a.m., on the above date, before Micheal A. Johnson, Certified Court Reporter, Registered Professional Reporter, Certified Realtime Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.DEPS
deps@golkow.com

EXHIBIT A

Confidential - Pursuant to Protective Order

Page 350

1  vernacular, a common household cleaning
2  technique is what my wife suggests I don't do
3  enough of on the weekends. What do you mean
4  by a common household cleaning technique in
5  the context of removing corrosion from an
6  electrical system in a house?
7       A.   Well, in terms of common
8  techniques, I mean, we're talking about a
9  very basic use of a Scotch-Brite pad and
10 water. Another example would have been the
11 use of Brasso polish or cleaner with a cloth,
12 which is routinely done in terms of cleaning
13 things like the tarnish on silverware. So
14 that also was shown, in the appendix of my
15 report, to be effective.
16      Q.   Let me ask you to look at your
17 Appendix C, page 20. Are you there?
18      A.   Yes, I am.
19      Q.   Let me attach to the deposition
20 a copy of this as Exhibit No. 30.
21           (Whereupon, Deposition Exhibit
22       Perricone-30, Page 20 of Expert Report
23       of Matthew J. Perricone, Ph.D.,
24       Appendix C, Virginia Home Assessment,

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Pursuant to Protective Order

Page 351

1          was marked for identification.)
2          A.     Yes.
3     BY MR. SERPE:
4          Q.     Would you circle in either red
5     or green, it doesn't matter, the alphanumeric
6     CU2 that you see over the spike there on page
7     20.
8          A.     In which figure?  There are
9     multiple CU2.
10         Q.     I gave you my page 20.  Would
11    you mind on that --
12         A.     Is that the top diagram?
13         Q.     Yeah, the top -- top diagram.
14         A.     Okay.
15         Q.     Now, you used an XPS device in
16    order to generate the figure.  What's the
17    figure number, by the way, on that?
18         A.     This is Figure 20.
19         Q.     Figure 20 of Exhibit 30.  You
20    used an XPS device to generate that data?
21         A.     Yes, we did at RJ Lee Group.
22         Q.     And did the RJ Lee Group XPS
23    device tell you in some sort of a readout
24    that the spike there was Cu2P3?

Confidential - Pursuant to Protective Order

Page 352

1    A.    Yes.  These peak locations are
2    compared against the relevant tables and able
3    to identify what the position of these peaks
4    are and how they relate to each individual
5    element.
6    Q.    What relevant table did you
7    compare it to?
8    A.    This is a library of binding
9    energies that would be routinely part of the
10   software that is with the XPS device.
11   Q.    So this was a library that came
12   with your XPS device?
13   A.    Yes.  I believe it is a library
14   of published values of all these different
15   binding energies that uniquely identify these
16   individual elements.  That's a common way
17   that these types of analyses are done.
18   Q.    All right.  So this -- the
19   actual graph that we see there on page 20 in
20   figure -- tell me the number one more time.
21   A.    20's here, 21's here.
22   Q.    20.  Did the -- did the
23   software that plotted this chart actually put
24   the CU2P3 that I had you circle, or did you

Confidential - Pursuant to Protective Order

Page 353

1   go in afterwards and type that information
2   there above the speak -- the peak?
3        A.    This was done at our
4   laboratory.  I -- it's unclear to me whether
5   that was done by the software or had to be
6   done by hand afterwards.
7        Q.    And who would have done that?
8        A.    Likely our -- the laboratory,
9   our laboratory staff who performed the
10  analysis.
11       Q.    And do you know whether they
12  did that based upon software that came with
13  the XPS or a different reference table or how
14  it was that they came up with the -- with the
15  data point?
16       A.    I believe it was in reference
17  to the libraries that they had in comparison
18  to known peak positions for these elements.
19  There's also standards of the various types
20  of phases at issue that were used as
21  references to determine the key positions of
22  the peaks.
23       Q.    And with respect to those
24  references and libraries, it would be within

Confidential - Pursuant to Protective Order

Page 354

1  your ability when you return to your office
2  to get copies of those from the technician
3  that generated this data point and provide
4  them to counsel so that they could give them
5  to us?
6      A.   I would imagine that that would
7  not be an issue.
8      Q.   All right.
9           MR. SERPE:  I'm making that
10      request and -- you know, so that --
11 BY MR. SERPE:
12      Q.   Do you understand what I'm
13 asking for?
14      A.   I do.
15      Q.   All right.
16      A.   Yes.  I didn't realize that
17 that would not be -- you would not be able to
18 look at the data that we provided.
19           MR. SANDERS:  Have you provided
20      that already in the reliance materials
21      or is that something --
22           THE WITNESS:  We provided all
23      this XPS data as the actual files from
24      the computer.  I did not realize that

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Pursuant to Protective Order

Page 355

```
 1            the software that they --
 2                 MR. SERPE:  I'm sorry?
 3                 MR. SANDERS:  Is that because
 4            you -- because the data that they
 5            provided -- we'll get you the
 6            information.
 7                 MR. SERPE:  That's fine.
 8                 MR. SANDERS:  I think we may
 9            have given it to you already.
10                 MR. BRYSON:  Send it to me,
11            Doug.
12       BY MR. SERPE:
13            Q.    Final topic and we're done.  I
14       want to ask about switches and outlets.
15            A.    Okay.
16            Q.    Did you examine any of the
17       switches or receptacles that were provided to
18       determine whether or not there was internal
19       evidence of corrosion?
20            A.    The outlets that were provided
21       were examined by our laboratory for the
22       evidence of tarnishing on the wire surfaces
23       and --
24            Q.    Wire surfaces?
```