Confidential - Subject to Further Confidentiality Review

Page 1

1          IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
2

3      _____  §   MDL NO. 2047
       IN RE:                    §
4      CHINESE-MANUFACTURED      §   SECTION: L
       DRYWALL PRODUCTS          §
5      LIABILITY LITIGATION      §   JUDGE FALLON
       _____  §   MAG. JUDGE WILKINSON
6

7                   – – –

8          FRIDAY, FEBRUARY 12, 2010

9             – CONFIDENTIAL –
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10
               TRIAL TESTIMONY
11
                    – – –
12

13

14          Videotaped deposition of LORI A.

15     STREIT, Ph.D., held at the Windsor Court

16     Hotel, 300 Gravier Street, New Orleans,

17     Louisiana, commencing at 2:47 p.m., on the

18     above date, before Michael E. Miller,

19     Certified Court Reporter, Registered

20     Diplomate Reporter, Certified Realtime

21     Reporter.

22                    – – –

23          GOLKOW TECHNOLOGIES, INC.
         877.370.3377 ph | 917.591.5672 fax
24            deps@golkow.com

U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED  2-22-10
LORETTA G. WHYTE
CLERK

Confidential - Subject to Further Confidentiality Review

Page 2

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2
      MICHELLE GERMANO; DENNIS       §
 3    JACKSON; SHARON JACKSON;       §
      JASON DUNAWAY; LISA DUNAWAY;   §
 4    Individually, and on behalf    §
      of all other similarly         §
 5    situated,                      §
                                     §
 6              Plaintiffs,          §
                                     §
 7    vs.                            §   2:09cv202
                                     §
 8    TAISHAN GYPSUM CO. LTD.        §
      f/k/a SHANDONG TAIHE DONGXIN   §
 9    CO. LTD.; VENTURE SUPPLY,      §
      INC.; HARBOR WALK              §
10    DEVELOPMENT, LLC; and THE      §
      PORTER-BLAINE CORP.,           §
11                                   §
                Defendants.          §
12
13    _____
14
15
16
17
18
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 3

```
 1    A P P E A R A N C E S :

 2        SEEGER WEISS, LLP
          BY:   CHRISTOPHER A. SEEGER, ESQUIRE
 3              cseeger@seegerweiss.com
                JEFFREY S. GRAND, ESQUIRE
 4              jgrand@seegerweiss.com
                SCOTT ALAN GEORGE, ESQUIRE
 5              sgeorge@seegerweiss.com
          One William Street
 6        New York, New York 10004
          (212) 584-0700
 7        Counsel for Plaintiffs

 8

          LEVIN, PAPANTONIO, THOMAS, MITCHELL,
 9        ECHSNER & PROCTOR, PA
          BY:   BEN W. GORDON, JR., ESQUIRE
10              bgordon@levinlaw.com
                BILL CASH, III, ESQUIRE
11              bcash@levinlaw.com
          316 South Baylen Street
12        Pensacola, Florida 32502-5996
          (850) 435-7000
13        Counsel for Plaintiffs

14

          LAMBERT AND NELSON, PLC
15        BY:   HUGH P. LAMBERT, ESQUIRE
                hlambert@lambertandnelson.com
16        701 Magazine Street
          New Orleans, Louisiana 70130-3629
17        (504) 581-1750
          Counsel for Plaintiffs

18

19        BAKER & McKENZIE, LLP
          BY:   DOUGLAS B. SANDERS, ESQUIRE
20              douglas.b.sanders@bakernet.com
          One Prudential Plaza, Suite 3500
21        Chicago, Illinois 60601
          (312) 861-8000
22        Counsel for Knauf Plasterboard
          Tianjin Co., Ltd.
23

24
```

Page 4

```
 1    A P P E A R A N C E S:

 2        SINNOTT, NUCKOLS & LOGAN, PC
          BY:  KENNETH F. HARDT, ESQUIRE
 3            khardt@snllaw.com
              (via teleconference)
 4        13811 Village Mill Drive
          Midlothian, Virginia 23114
 5        (804) 378-7600
          Counsel for Venture Supply, Inc. and
 6        Porter-Blaine Corp.

 7

          THOMPSON, COE, COUSINS & IRONS, LLP
 8        BY:  DIANA M. BROWN, ESQUIRE
              dbrown@thompsoncoe.com
 9            (via teleconference)
          One Riverway
10        Houston, Texas 77056
          (713) 403-8210
11        Counsel for North River Insurance
          Company
12

13    VIDEOGRAPHER:

14        MELISSA BARDWELL,
          Golkow Technologies, Inc.
15

16                    - - -

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    I N D E X
                LORI A. STREIT, Ph.D.
 2                  February 16, 2010

 3

 4    APPEARANCES                           3

 5    PROCEEDINGS                           8

 6

 7    EXAMINATION OF LORI A. STREIT, Ph.D.:

 8         BY MR. SEEGER                    10

 9         BY MR. SANDERS                   92

10         BY MR. SEEGER                   120

11         BY MR. SANDERS                  124

12

13    CERTIFICATE                         128

14    ACKNOWLEDGMENT OF DEPONENT          129

15    ERRATA                              130

16    LAWYER'S NOTES                      131

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

1                        DEPOSITION EXHIBITS
                        LORI A. STREIT, Ph.D.
2                         February 16, 2010

3

4    NUMBER              DESCRIPTION            MARKED

5    Streit-1     3/17/09 Report for Florida      25
                  Department of Health by
6                 Streit

7    Streit-2     Comparison of Methods           31
                  Utilized by Commercial
8                 Laboratories for Analyses
                  of Bulk Drywall Samples,
9                 by Krause, et al.,
                  P2.0099-0001
10
     Streit-3     "Proposed Mechanism for         35
11                the Release of Reduced
                  Sulfur Compounds from
12                Corrosive Imported
                  Drywall," by Gauthier,
13                et al.,
                  P2.0095-0001 -
14                P2.0095-0027

15   Streit-4     "Corrosive Imported             36
                  Wallboard, Investigating
16                Emissions," by DeMott,
                  P2-0093-0001 -
17                P2.0093-0024

18   Streit-5     "Chemical Emissions,            36
                  Including Sulfur
19                Compounds, from Chinese
                  Produced Drywall," by
20                Worthan,
                  P2.0091-0001 -
21                P2.0091-0026

22

23

24

Confidential - Subject to Further Confidentiality Review

1                    DEPOSITION EXHIBITS

2

3       NUMBER              DESCRIPTION           MARKED

4    Streit-6      "Measurement of            37
               Corrosive, Odorous and
5               Potentially Harmful Gases
               from Imported and
6               Domestic Wallboard," by
               Tuday, et al.,
7               P2.0151-0001 -
               P2.0151-0033
8
     Streit-7      "CPSC Summary of           45
9               Contractor's Indoor Air
               Quality Assessment of
10              Homes Containing Chinese
               Drywall," by Saltzman,
11              P1.019-0001 -
               P1.019-0190
12
     Streit-8      12/28/09 Expert Report of  64
13              Lori Streit, Ph.D.,
               P1.2023-0001-
14              P1.2023-0095

15   Streit-9      Draft Interagency Task     50
               Force on Chinese Drywall
16              Executive Summary of
               10/29/09 Release of
17              Initial Chinese Drywall
               Studies,
18              P1.1804-0001 -
               P1.1804-0523
19
     Streit-10     1/16/10 Supplemental       65
20              Expert Report of Lori
               Streit, Ph.D.,
21              P1.2025-0001 -
               P1.2025-0004
22

23

24

Confidential - Subject to Further Confidentiality Review

Page 8

```
1              DEPOSITION EXHIBITS

2

3      NUMBER          DESCRIPTION          MARKED

4   Streit-11    Reliance Date for            82
                 Dr. Lori Streit's
5                Opinions,
                 P1.1849-0001 -
6                P1.1849-0009,
                 P1.1850-0001 -
7                P1.1850-0015 &
                 P1.1851-0001 -
8                P1.1851-0051

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS

 2               (February 16, 2010 at

 3          2:47 p.m.)

 4                    THE VIDEOGRAPHER:  We're now

 5          going on the record.  The date today

 6          is February 16th, 2010.  The time now

 7          is approximately 2:47 p.m.  This is

 8          the videotaped trial deposition of

 9          Dr. Lori Streit taken in reference to

10          the Chinese-Manufactured Drywall

11          Litigation for the U.S. District

12          Court, Eastern District of Louisiana.

13          The deposition is being held in

14          New Orleans, Louisiana today.

15                    My name is Melissa Bardwell,

16          videographer representing Golkow

17          Technologies, and the court reporter

18          is Mike Miller.

19                    Would counsel present please

20          introduce themselves and state their

21          affiliations for the record.

22                    MR. SEEGER:  Chris Seeger on

23          behalf of the Germano plaintiffs.  And

24          I'm here with Scott George and Jeffrey
```

Confidential - Subject to Further Confidentiality Review

1       Grand from my firm, Seeger Weiss.

2               MR. GORDON:   Ben Gordon, Levin

3       Papantonio, for the plaintiffs.

4               MR. CASH:   Bill Cash for the

5       Plaintiffs.

6               MR. LAMBERT:   Hugh Lambert,

7       Lambert & Nelson, for the Plaintiffs.

8               MR. SANDERS:   Doug Sanders on

9       behalf of Intervenor Knauf

10      Plasterboard Tianjin Company.

11              THE VIDEOGRAPHER:   Would the

12      court reporter please swear in the

13      witness.

14          LORI A. STREIT, Ph.D.,

15      having been duly sworn, testified as follows:

16                      EXAMINATION

17      BY MR. SEEGER:

18          Q.      Dr. Streit, this portion of

19      your testimony is going to be used by

20      Judge Fallon in the hearing that we're going

21      to be starting on Friday, just so you know,

22      okay?

23          A.      That's fine.

24          Q.      So I'm going to start off with

Confidential - Subject to Further Confidentiality Review

1    doing your direct, and then Mr. Sanders will

2    have an opportunity to do the

3    cross-examination of you.

4           Let's start with what degrees

5    you have.  Talk to us about your educational

6    background.

7       A.    I have a Bachelor of Science

8    degree in chemistry from Trenton State

9    college, which is now the College of

10   New Jersey; and then I went to Arizona State

11   University in Tempe, Arizona and worked

12   straight through, skipping my master's to get

13   my Ph.D. in four years.

14       Q.    Okay.

15       A.    My Ph.D. is in analytical

16   chemistry, materials analysis.

17       Q.    And when did you get your

18   Ph.D.?

19       A.    1987.

20       Q.    Okay.  In the earlier part of

21   your discovery deposition, I heard you use

22   the term "forensic chemist."  Is that

23   something that you'd go by?

24       A.    People in my field consider

Confidential - Subject to Further Confidentiality Review

1    themselves to be forensic scientists or a

2    forensic investigator, using the term

3    "forensic" not in the sense of that you would

4    see on, you know, the TV shows where you're

5    looking at blood and hair and fingerprints

6    and all those nasty things.

7         Q.    Like on CSI?

8         A.    Yeah.  We use it as a generic

9    term which involves doing an investigation,

10   potentially on site and then back in the

11   laboratory, and you're trying to solve a

12   problem, hence the term "forensics."

13        Q.    Okay.  And before we get a

14   little bit more into that type of your

15   background, have you ever taught chemistry?

16        A.    I have.  I taught at Elmhurst

17   College in Illinois.  I taught general

18   chemistry to returning nursing majors, which

19   was quite fun.

20        Q.    Okay.  How long did you do that

21   for?

22        A.    I only did it for one semester.

23   Working full time and then trying to prep for

24   classes and, you know, put in really all the

Confidential - Subject to Further Confidentiality Review

1    time you need to as a professor is, I think,

2    extremely difficult, and I was finding it to

3    be more difficult than I thought I could

4    handle, so I went back to my full-time

5    analytical job.

6         Q.    Okay.  And let's talk about

7    your full-time analytical job.  Who are you

8    employed by?

9         A.    Currently, I am employed by

10   Unified Engineering, and that is a scientific

11   and engineering consulting firm located in

12   Aurora, Illinois.

13        Q.    Okay.  Are you a principal of

14   that company?

15        A.    I am.  I am currently president

16   of that company.

17        Q.    Okay.  Are there other

18   principals?

19        A.    There are four.

20        Q.    Okay.  How many employees?

21        A.    None.

22        Q.    Okay.  So now I want to get

23   back to sort of how you spend your

24   professional time.  Do you do work on behalf

Confidential - Subject to Further Confidentiality Review

Page 14

1    of companies?  Do you do investigative work?

2        A.    I do.  I would say probably 50

3    to 60% of what I do is what I would call

4    industrial consulting, meaning that companies

5    come to me, homeowners come to me, government

6    agencies, insurance companies, and they have

7    a specific problem which has some chemistry

8    or materials analysis aspect to it that

9    they're asking me to help them with.

10       Q.    Okay.  And what are the names

11   of some of the companies you've been retained

12   by to give opinions in chemistry?

13       A.    You know, I work for a wide

14   gamut.  It could be like, for example, I do a

15   lot of work for First Alert that makes smoke

16   alarms.  Along those lines, I do work for

17   Kidde.  I do work for Coleman.

18              MR. SEEGER:  I'm sorry.

19              THE WITNESS:  That's okay.

20              MR. SEEGER:  Somebody has got

21        music on their phone, and probably the

22        person who's doing it can't hear me,

23        so I'm going to turn the volume down.

24              (Comments off the record.)

Confidential - Subject to Further Confidentiality Review

1    BY MR. SEEGER:

2         Q.     So, I'm sorry.  Let's go back

3    to --

4         A.     That's okay.

5               Anyway, companies I've worked

6    for, you know, again, First Alert, Sunbeam,

7    Coleman.  I do a lot of work for automotive

8    manufacturers, people that make automotive

9    contacts and airbags, things of that nature.

10               I mean, it can be small

11   companies.  It can be large companies.  It

12   can be local companies.  It can be nationally

13   known companies.

14        Q.     In the course of your

15   engagement by some of these companies, have

16   you been asked to look at corrosion-type

17   issues?

18        A.     Very often I look at

19   corrosion-type issues, yes.

20        Q.     And talk to us about some of

21   the engagements you've had with regard to --

22   outside of this litigation, by doing forensic

23   chemistry with regard to corrosion issues.

24        A.     I can think of examples where

Confidential - Subject to Further Confidentiality Review

```
1    I'm looking at the smallest of components on

2    a circuit board, could be wires on a circuit

3    board, capacitors, could be contacts, and

4    going through corrosion on metal components

5    as a result of a fire, and then, you know,

6    all the way up to building supports, cranes,

7    pieces of cars, frames, things of that

8    nature.

9         Q.     Would some of your work be --

10   would it be involved in looking at doing like

11   a failure analysis?

12        A.     I do failure analysis in the

13   sense that, yes, I look at the corrosion

14   deposits.  I try to identify, sometimes, what

15   the corrosion deposits are, as far as what

16   the phases are, what's the impurities that

17   are in the corrosion.

18            I'm often called on to prepare

19   metallurgical samples, and so I'll do

20   cross-sections through the corrosion to see

21   whether the plating is still there to protect

22   it, how large the pits are, you know, whether

23   the corrosion goes actually all the way

24   through the metal, so you have a complete
```

Confidential - Subject to Further Confidentiality Review

1    failure penetration.  Could be a weld.  It

2    could be a fracture.

3              You know, it's hard to

4    characterize them because I get such a

5    variety of things on a daily basis.

6         Q.    And what type of -- in the

7    course of doing that type of work, that

8    forensic chemistry looking at corrosion, what

9    type of tests would you do, would you employ?

10        A.    For me, I typically start, and

11   most of what I do within my laboratory, would

12   be using optical microscopes of different

13   types to look at samples at various

14   magnifications.

15             And then to do elemental

16   analysis and higher-magnification work, I

17   have a scanning electron microscope, which

18   allows me to do a more in-depth study.

19             And then I have a network of

20   colleagues that I work with and laboratories

21   that I work with, and we work back and forth,

22   so that none of us has an over -- a financial

23   burden due to acquisition of equipment.  So

24   if I need an FTIR, I may go to a specific

Confidential - Subject to Further Confidentiality Review

Page 18

1    laboratory and if that person needs an SEM,

2    they come to me.

3            So I use a variety of

4    analytical techniques, and it really depends

5    on what you're looking at.  If you're looking

6    at organic materials, you'll choose an

7    infrared technique, FTIR.  If you're looking

8    at inorganics, you'll choose SEM with an EDS

9    detector.

10           If you're looking at gases, you

11   do gas chromatography.  If you're looking at

12   liquids, you do liquid chromatography and so

13   on.  pH testing.

14           And then there are specialized

15   tests that sometimes I'll recommend that I

16   don't necessarily do on a daily basis, but

17   they're part of my training and education and

18   experience, and so I pick those because I

19   think they are the best tests used for that

20   particular purpose.

21      Q.    One of the tests that you

22   mentioned was SEM.  Just for the judge's

23   convenience, what is an SEM?

24      A.    An SEM is an abbreviation for a

1    scanning electron microscope, and that is

2    something actually often used in the court

3    system as a way to look at metals and

4    inclusions and particles and to get an

5    elemental analysis of what you're doing.

6            It's essentially a larger piece

7    of equipment where you place the sample in a

8    chamber and you pull down a vacuum on it and

9    then you hit the sample with an electron beam

10   and you look at the energy of what's coming

11   off the sample.

12           So each energy represents a

13   specific element, and you'll get a spectrum

14   where you can say, "Okay, this sample

15   contains sulfur, calcium, oxygen," which

16   would be consistent with gypsum, or it has a

17   strontium particle or an elemental sulfur

18   particle, based on the analysis that you do.

19       Q.     Okay.  And is that -- the SEM,

20   is that the type of testing that you did in

21   this litigation in the course of rendering

22   your opinions?

23       A.     It was one of the tests that I

24   did, yes.

Confidential - Subject to Further Confidentiality Review

1          Q.      And just talk to us about some

2     of the other tests you did in this

3     litigation.

4          A.      There's a -- the optical

5     microscopy test that I had talked about where

6     you're using a light microscope, different

7     types of light microscopes, depending on what

8     you're doing, to get an assessment of what's

9     in the sample.

10               In this case, I was looking for

11    elemental sulfur particles, so they have a

12    certain characteristic that you look for.

13    Initially, there were questions about pyrite,

14    and we were looking for those.  Any other

15    inclusions, the cellulose fibers, the fibrous

16    glass, which had been alleged to be in some

17    of these materials, we were looking for those

18    by optical microscopy as well.

19         Q.      And is that a method that you

20    would employ whether you were hired by an

21    insurance company to look at an issue for

22    them as -- you know, is it a new type of

23    test, or is it something you always do?

24         A.      No, who employs me has no

Confidential - Subject to Further Confidentiality Review

```
 1      impact, as far as I'm concerned, on what

 2      tests I choose.  I choose the tests that I

 3      think are appropriate to solve the problem.

 4           Q.      Have you been -- prior to your

 5      work here with regard to Chinese drywall, had

 6      you been engaged by any companies to look at

 7      any type of drywall issues?

 8           A.      Yes, I have in the past.

 9           Q.      Can you tell us a little bit

10      about that?

11           A.      The -- I have done work for

12      drywall companies, but actually, I've done

13      more work for another engineering firm which

14      goes by the name of Packer Engineering, which

15      is a place that I was formerly employed.

16                   And they came to me and said,

17      "We're having some analytical needs that we

18      think you have better expertise to take care

19      of, and so we would like you to help us with

20      this project," and most of it was on domestic

21      drywall.

22           Q.      Okay.  And how long have you

23      been doing this for, you know, acting as a

24      forensic chemist?
```

Confidential - Subject to Further Confidentiality Review

1          A.      Since 1987.

2          Q.      Okay.

3          A.      So 23 years, I guess.

4          Q.      Now, let me talk to you a

5     little bit about Chinese drywall.

6                  Before you were retained by the

7     plaintiffs' committee in this litigation, had

8     you had any experience with Chinese drywall?

9          A.      My experience with Chinese

10    drywall and this particular issue of the

11    odors and corrosive questions actually

12    started with a contact from David Krause from

13    the Florida Department of Health.

14                 David and I have worked

15    together in the past on, actually, many

16    analytical projects; and, in fact, I met

17    David and was working with him while he was

18    still doing his thesis and was somewhat of a

19    mentor figure for him, to guide him through

20    his thesis work.  And then it's just kind of,

21    you know, progressed from there.  It's a

22    back-and-forth colleague relationship.

23         Q.      So David Krause from the

24    Florida Department of Health called you about

1    Chinese drywall.  Tell us what he called you

2    for.

3         A.     He called and he said, "Explain

4    to me" -- the Florida homeowners were

5    experiencing odors coming out of their home

6    and that they suspected that the drywall was

7    potentially a source, and that they were also

8    experiencing corrosion issues, and he knows

9    that I've done work on corrosion.

10                And so he said, "Can I send you

11   some samples?  I'd like you to take a look at

12   them and see if you can see what you see.

13   What are the major differences that are

14   jumping out at you?"

15        Q.     Dr. Streit, just to be clear

16   for the record and for Judge Fallon, he

17   called you.  You did not call him about

18   Chinese drywall, correct?

19        A.     I did not call him.  David

20   called me.

21        Q.     Okay.  Please continue.

22        A.     From there, I did the initial

23   work for him.  I published the report.  As a

24   result of the publication, which, of course,

Page 24

1   now is free rein on the Internet, I began

2   getting calls from homeowners --

3        Q.     Let me back you up a little bit

4   because you went a little fast.

5        A.     I'm sorry.

6        Q.     You talked about publishing a

7   report.  Tell us first what Dr. Krause asked

8   you do, and, you know, we'll go from there.

9   Let's start with that.

10       A.     Okay.  He said, "I'm going to

11  send you samples, and I want you to basically

12  characterize them.  What do you see?  What

13  are the similarities, and what are the

14  differences?  And then, you know, I need you

15  to prepare a report."

16       Q.     And these samples, tell us what

17  the samples were that he sent you, just so

18  we're clear.

19       A.     He sent me four samples.  One

20  of them was marked -- although he has his own

21  identifications, one of them had a Knauf

22  marking; one of them said, "Made in China";

23  one of them was unmarked; and then one of

24  them, I believe, was Grid Marks, which is a

Confidential - Subject to Further Confidentiality Review

1    National Gypsum product.

2         Q.    Okay.  And actually, I saw you

3    reaching for a document.  Were you reaching

4    for your report?

5         A.    I was reaching for the Florida

6    Department of Health report that I issued to

7    them, which are calling Exhibit 2.

8              MR. SEEGER:  Okay.  Let me see

9         if we have a copy of that, and we'll

10        mark it differently.  I'm going to put

11        another sticker on here.  Is that okay

12        with you?

13             MR. SANDERS:  Go ahead.

14             (Whereupon, Deposition Exhibit

15        Streit-1, 3/17/09 Report for Florida

16        Department of Health by Streit, was

17        marked for identification.)

18    BY MR. SEEGER:

19        Q.    All right.  Dr. Streit, what

20    I'm going to mark and show you -- for the

21    record, what I've just marked as Streit

22    Exhibit 1, could you please describe what

23    that is?

24        A.    This is a -- this is a copy of

Confidential - Subject to Further Confidentiality Review

1    the report that I issued to Dr. David Krause

2    of the Florida Department of Health, dated

3    March 17th, 2009.

4         Q.    Okay.  And what does -- what do

5    you have in that report?  What does it show?

6    Does it show testing that you did on behalf

7    of the Florida Department of Health?

8         A.    Yes.  This is a report on the

9    initial study of the four samples that David

10   sent to me and asked me to characterize.

11        Q.    Okay.  And tell us what you

12   found.

13        A.    Basically, what we were finding

14   that stood out in this report -- and I should

15   go back.  I'm sorry.

16             In addition, he did send me a

17   piece of copper tubing that had blackened on

18   the surface.

19        Q.    Okay.

20        A.    So we can start with that.  We

21   took a sample of that off with what's called

22   a tungsten needle.  It's a very fine point,

23   so you can scrape material off.  And we did

24   an SEM/EDS of that material and determined

Confidential - Subject to Further Confidentiality Review

1    that that was rich in sulfur and in copper --

2         Q.    Okay.

3         A.    -- with a just a trace of

4    oxygen.  And so it was pretty clear at that

5    point that because of the lack of oxygen, it

6    would be a sulfide, and it's also black, as

7    opposed to green.

8              But just to confirm, we sent it

9    for XRD, which is an x-ray diffraction

10   technique, and that technique is designed to

11   give you the actual chemical composition; in

12   other words, that it's a sulfide or a sulfate

13   or whatever it happens to be, so --

14        Q.    And XRD, is that a type of test

15   that chemists regularly employ to --

16        A.    For that type of purpose, yes.

17        Q.    Okay.

18        A.    So it's confirmatory of what we

19   actually saw by SEM.

20        Q.    Okay.

21        A.    Then we went on, and with

22   respect to the drywall, we did determine that

23   as a result of the testing, we were seeing

24   differences in the domestic product, which

Confidential - Subject to Further Confidentiality Review

1    was the Grid Marks product, versus the

2    Chinese product.

3              We saw strontium inclusions,

4    which are particles that were in the gypsum

5    of the Chinese products, as opposed to the

6    American products or domestically produced

7    products.

8              And at the time, it appeared to

9    me that they were mixed with sulfur and not

10   so much with the oxygen, so I determined and

11   had assessed at the time that I believed they

12   were strontium sulfide, and that's what I

13   reported.

14             But it was clear that there was

15   a difference in strontium; and actually

16   subsequently to that, we did ICP and

17   confirmed that the strontium levels were

18   higher in the Chinese-made product as opposed

19   to the domestic product.

20        Q.    Okay.  Now, you used the term

21   "ICP."  Again, just for Judge Fallon's

22   benefit, what does that mean?

23        A.    "ICP" stands for inductively

24   coupled plasma.  And it's just a fancy term

Confidential - Subject to Further Confidentiality Review

1      for heating the sample up in a plasma

2      environment and then it emits a signal, which

3      you then detect using a mass spectrometer;

4      and each element has a distinct weight, so

5      it's separated by its mass.

6              Q.      And this test, is this a test

7      that's generally accepted by chemists to be

8      used for that type of purpose?

9              A.      Yes, it's used for the purpose

10     of looking at trace elements, specifically

11     metals --

12             Q.      Okay.

13             A.      -- and various substrates.

14             Q.      Now, Dr. Krause, at some point,

15     had published a poster at a conference.  Are

16     you aware of that?

17             A.      Yes, he did.

18             Q.      Okay.  Could you tell us a

19     little bit about what your experience is with

20     Dr. Krause's poster and the conference that

21     he presented it at?

22                     MR. SANDERS:  Object to the

23             form.

24             A.      The poster that I believe

Confidential - Subject to Further Confidentiality Review

Page 30

1    you're referring to was presented at a

2    technical conference that occurred in

3    November in Tampa, Florida, where scientists

4    were invited to submit an abstract with

5    regard to their work on the Chinese

6    problematic drywall situation; and a panel

7    from the university of Florida then reviewed

8    all of the abstracts and selected the ones

9    that they thought were appropriate to be

10   presented at the conference.

11   BY MR. SEEGER:

12        Q.     Okay.  So wait.  Let me ask you

13   about it.

14             So the posters and

15   presentations that were presented at the

16   conference, were they reviewed -- they were

17   independently reviewed, you're saying?

18        A.     They were independently

19   reviewed by the University of Florida,

20   members of the staff, so professors at the

21   University of Florida.

22        Q.     Would people in your field

23   consider that a peer-review process?

24        A.     To some extent, yes.  I mean,

Confidential - Subject to Further Confidentiality Review

1    they are our peers, obviously.  And there was

2    a review process that went on, and there were

3    some -- my understanding from talking with

4    David is some of them were rejected, and then

5    others were accepted and allowed to present.

6         Q.     And who hosted this conference,

7    do you know?

8         A.     I think there were several, but

9    the main participants were the Department of

10   Florida Health --

11        Q.     Okay.

12        A.     -- the University of Florida,

13   and then I think there may have been a couple

14   other organizations as well.

15              (Whereupon, Deposition Exhibit

16        Streit-2, Comparison of Methods

17        Utilized by Commercial Laboratories

18        for Analyses of Bulk Drywall Samples,

19        by Krause, et al., P2.0099-0001, was

20        marked for identification.)

21   BY MR. SEEGER:

22        Q.     All right.  Dr. Streit, let me

23   show you what I've marked as Exhibit 2,

24   Streit Exhibit 2.  And for the record, I just

Confidential - Subject to Further Confidentiality Review

1      have to put the exhibit number, the actual

2      trial exhibit number.  It's P2.0099.

3              And can you identify for

4      Judge Fallon what this is that we've just

5      marked as Exhibit 2?

6          A.      In my understanding of what

7      this is, is this is David Krause's

8      presentation, poster presentation, at that

9      conference.  And what he had done was he sent

10     samples to three different laboratories, one

11     of which was our laboratory, Unified

12     Engineering, and he asked for a

13     characterization of the drywall.

14              And he was comparing the

15     various methods to see whether everyone that

16     looked at it came up with the identifications

17     that were consistent, whether it was domestic

18     or whether it was a Chinese-made product.

19         Q.      All right.  And at the top, the

20     title of the poster is "Comparison of Methods

21     Utilized by Commercial Laboratories for

22     Analyses of Bulk Drywall Samples."  And then

23     there are the names of some authors under

24     there.

Confidential - Subject to Further Confidentiality Review

1           Other than Dr. Krause, do you

2    recognize the other names?

3        A.     Dr. Salazar, I do know, because

4    I've done work for him.

5        Q.     And who is he?

6        A.     He is a Ph.D. chemist.  He's an

7    independent.  He has an independent

8    consulting group called Salazar Consulting,

9    and he's hired to do just this type of thing,

10   various analytical -- I think he actually

11   does more in an air sampling area as an

12   industrial hygienist kind of person, as

13   opposed to more what we do, which is

14   materials analysis; and that's why he

15   actually sends samples to me when he needs

16   materials analysis work.

17       Q.     Okay.

18       A.     The other gentleman, I do not

19   know.

20       Q.     And, Dr. Streit, do you see the

21   name of your company listed anywhere on this

22   poster?

23       A.     In "Participating

24   Laboratories," we're listed as Laboratory C.

Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  And is the data that you

2    provided to the Florida Department of Health

3    included in this poster?

4          A.     This would have been

5    separate -- a separate study.  It's not this

6    study.

7          Q.     Right.

8          A.     But they were separate samples,

9    so, yes, they are included.  Anything that's

10   included under "Laboratory C" was our work.

11         Q.     Okay.  And have you reviewed

12   any of the presentations, other than

13   Dr. Krause's, that were made at the Tampa

14   conference?

15                By the way, just for the

16   record, when was that conference?  I don't

17   know if you said the date.

18         A.     It was in November of last

19   year.

20         Q.     Of 2009?

21         A.     2009.

22         Q.     Okay.  And had you reviewed any

23   of the other presentations that were made at

24   that conference?

Confidential - Subject to Further Confidentiality Review

Page 35

```
 1        A.      I have.

 2                MR. SEEGER:   Okay.   I'll just

 3        mark a few.

 4                (Whereupon, Deposition Exhibit

 5        Streit-3, "Proposed Mechanism for the

 6        Release of Reduced Sulfur Compounds

 7        from Corrosive Imported Drywall," by

 8        Gauthier, et al., P2.0095-0001 -

 9        P2.0095-0027, was marked for

10        identification.)

11  BY MR. SEEGER:

12        Q.      All right.  Let me start

13  handing these to you.

14                Dr. Streit, what we've marked

15  as Exhibit 3 is a presentation done by a

16  Thomas Gauthier, Ph.D., and the title is

17  "Proposed Mechanism for the Release of

18  Reduced Sulfur Compounds from Corrosive

19  Imported Drywall."  Also, for the record, its

20  trial exhibit number is P2.0093-0001.

21                Now --

22                MR. SANDERS:   Can I get one?

23                MR. SEEGER:   Oh, yeah.   I

24        thought we gave you one.   Sorry about
```

Confidential - Subject to Further Confidentiality Review

Page 36

```
 1            that.   That's everything we're going
 2            to do.
 3                    MR. SANDERS:   Which one are we
 4            on, Gauthier?
 5                    MR. SEEGER:   Yeah.
 6                    (Whereupon, Deposition Exhibit
 7            Streit-4, "Corrosive Imported
 8            Wallboard, Investigating Emissions,"
 9            by DeMott, P2-0093-0001 -
10            P2.0093-0024, was marked for
11            identification.)
12    BY MR. SEEGER:
13            Q.    And let me also -- what I'm
14    handing to you, which has been marked as
15    Streit Exhibit 4, is a presentation by Robert
16    DeMott, who's a PhD, "Corrosive Imported
17    Wallboard, Investigating Emissions."  I'll
18    hand that to you.
19                    (Whereupon, Deposition Exhibit
20            Streit-5, "Chemical Emissions,
21            Including Sulfur Compounds, from
22            Chinese Produced Drywall," by Worthan,
23            P2.0091-0001 - P2.0091-0026, was
24            marked for identification.)
```

Confidential - Subject to Further Confidentiality Review

```
1      BY MR. SEEGER:

2           Q.      Streit Exhibit 5, and the trial

3      exhibit number is P2.0091-0001, is a

4      presentation by Tony Worthan, MPH, "Chemical

5      Emissions Including Sulfur Compounds from

6      Chinese Produced Drywall."

7                  (Whereupon, Deposition Exhibit

8             Streit-6, "Measurement of Corrosive,

9             Odorous and Potentially Harmful Gases

10            from Imported and Domestic Wallboard,"

11            by Tuday, et al., P2.0151-0001 -

12            P2.0151-0033, was marked for

13            identification.)

14     BY MR. SEEGER:

15          Q.      And then Exhibit 6, Streit

16     Exhibit 6, which is trial-stamped

17     P2.0151-0001, is Michael Tuday and others

18     from Columbia Analytical Services.  The title

19     is "Measurement of Corrosive, Odorous and

20     Potentially Harmful Gases from Imported and

21     Domestic Wallboard."

22                 All right.  Do you have all

23     four of those?

24          A.      I do.
```

Confidential - Subject to Further Confidentiality Review

Page 38

1        Q.      Let me just start by asking

2   you, Dr. Streit:  Have you seen these

3   presentations?

4        A.      I have reviewed all of these

5   presentations.

6        Q.      And are these materials that

7   you've relied upon in giving opinions in this

8   case?

9        A.      They are.

10       Q.      Okay.  For now, I'm going to

11  just have you put those aside, but we're

12  going to go back and forth some.

13              Let me ask you this with regard

14  to your experience with Chinese drywall:  How

15  many samples of drywall, Chinese drywall and

16  other drywall, in the context of looking at

17  problems of Chinese drywall, have you looked

18  at since you've been introduced to this by

19  Dr. Krause?

20       A.      Probably five to 600 total.

21       Q.      Okay.  And out of the five to

22  600, do you have any idea of how many of

23  those were identified as Chinese drywall

24  versus domestic drywall?

Confidential - Subject to Further Confidentiality Review

Page 39

```
 1              MR. SANDERS:  Object to
 2        foundation.
 3        A.    I'd have to go through the
 4   list, but I did provide a table; and if I
 5   knew what the source was, I listed that in
 6   the table.  So without sitting here and
 7   counting them up, I really am not sure, but
 8   my estimate would be probably 50 to 70 or so.
 9   BY MR. SEEGER:
10        Q.    Okay.  And these samples have
11   been sent to you from various sources; is
12   that fair to say?
13        A.    I have received homeowners --
14   samples from homeowners, samples from other
15   industrial hygienists, samples from
16   remediation companies, samples from various
17   attorneys, from various government agencies.
18   Basically, I think I've gotten samples from
19   every aspect of people who would be exposed
20   to this problem.
21        Q.    And you mentioned that
22   homeowners have sent you samples.  How would
23   homeowners have found out about you?
24        A.    Once the Florida Department of
```

Confidential - Subject to Further Confidentiality Review

Page 40

1    Health published -- through the Freedom of

2    Information Act, they always publish their

3    data on their website, and it wound up being

4    accessible to anyone.

5           I had received calls and had a

6    talk with the New York Times and LA Times,

7    and so I think through kind of just a general

8    accessible information in the day and age we

9    live in, it was pretty easy for people to

10   find the report.  My name, the phone number

11   is right on the title page, give her a call.

12        Q.     And what types of things would

13   homeowners ask you to do?

14        A.     They were concerned.

15        Q.     About what?

16        A.     You know, "Hey, my home smells.

17   I'm experiencing HVAC failure, coil failure."

18           And I'd talk to them a little

19   bit about that, ask them to, you know, open

20   up an outlet.  "Do you see black on the

21   surface of the wires."

22           And then I would either ask

23   them if they wanted to send a sample to look

24   for strontium in particular, is usually where

Confidential - Subject to Further Confidentiality Review

1    I started.  I had other people that would

2    call and just say, "I want you to do the same

3    testing you did for the Florida Department of

4    Health," and, you know, we'd talk about that

5    and I'd try to narrow it down to try to help

6    them, you know, more specifically.

7              It really just, you know,

8    depends on what their concerns were.

9         Q.    Now, tell us -- before we move

10   into the specific opinions in this case, tell

11   us what the results of your testing for the

12   Florida Department of Health resulted in.

13   What did it show you?  What did you see?

14        A.    I'm seeing differences that I

15   thought were real and should be explored

16   further.

17        Q.    Differences, you mean, between

18   the Chinese drywall --

19        A.    And the domestic product.

20        Q.    Okay.  Continue to talk to us

21   about that.

22        A.    And so at that point, I wound

23   up getting in a discussion and conversation

24   with the EPA, the CPSC, the Department of

Confidential - Subject to Further Confidentiality Review

```
 1      Florida.   There were representatives from the
 2      drywall manufacturers also on the conference
 3      call, and we had a one-and-a-half-to-two-hour
 4      conference call about the findings.  And
 5      where do you go from there, you know?
 6           Q.      Did you present your findings
 7      on that conference call?
 8           A.      I did talk to them about --
 9      they were all familiar with it because they'd
10      already read the report.  They had specific
11      questions, which I answered for them.
12                   And then we started to talk
13      about, you know, what direction should we go
14      in?  They were asking questions about further
15      testing, and so I gave them ideas on, you
16      know, where -- what I thought they should do.
17      And some of them, they've chosen to do and
18      other ones, they didn't; and that's fine.
19                   And they have since formed an
20      interagency task force amongst themselves, so
21      I've kind of gotten, you know, out of that
22      loop, per se.
23           Q.      Have you been involved in any
24      testing that's been used by the CPSC?
```

Confidential - Subject to Further Confidentiality Review

Page 43

```
 1        A.      Yeah, there's -- some of the

 2   testing that I have done, which was actually

 3   done, commissioned by the CPSC, but they

 4   hired a facilitator, if you will; and they

 5   said, "Okay, you know, we want you to

 6   coordinate all the testing from different

 7   laboratories," and so I was sent samples, and

 8   sent results back.

 9        Q.      Dr. Streit, let me ask you

10   this:  So before anybody in this case had

11   sent you any samples related to the Germano

12   homes that we're going to be talking about,

13   what conclusions had you reached about

14   Chinese drywall in connection with the work

15   you were doing for the Florida Department of

16   Health and the CPSC, in your own testing?

17        A.      From my testing, I was seeing

18   sulfur gas emissions, meaning that I was

19   seeing hydrogen sulfide, I was seeing

20   carbonyl sulfide, and I was seeing carbon

21   disulfide in the samples that were sent to

22   me.  So I think that needed to be explored

23   further.

24                And then I was also seeing a
```

Confidential - Subject to Further Confidentiality Review

1     difference in the strontium, which drew up a

2     flag for me, and I was looking further,

3     really, at that.  Those are the two main

4     tests out of the initial report that I was

5     somewhat focusing on.

6          Q.     Okay.

7          A.     And -- I'm sorry.

8          Q.     Go ahead.

9          A.     I should also say the corrosion

10    deposits on the metal.

11         Q.     Okay.

12         A.     I continued to look at

13    corrosion deposits on metals for clients as

14    well.

15         Q.     And so the client -- were these

16    metals being sent to you -- who were they

17    being sent to you by?

18         A.     Sometimes, the manufacturer of

19    the HVAC equipment.  Sometimes, they were

20    sent by investigators that would go out in

21    the field and cut out a piece of the coil or

22    a piece of wiring and send it to me.

23         Q.     And did the CPSC ultimately

24    make available results of testing that they

Confidential - Subject to Further Confidentiality Review

Page 45

1    had done?

2         A.    I think they've done that

3    several times.

4                   (Whereupon, Deposition Exhibit

5              Streit-7, "CPSC Summary of

6              Contractor's Indoor Air Quality

7              Assessment of Homes Containing Chinese

8              Drywall," by Saltzman, P1.019-0001 -

9              P1.019-0190, was marked for

10             identification.)

11   BY MR. SEEGER:

12        Q.    All right.  Dr. Streit, let me

13   show you what we've just marked as Exhibit 7,

14   and it's the trial exhibit number

15   P1.019-0001.

16                   And can you identify what that

17   is for Judge Fallon, please?

18        A.    Yes.  This is the CPSC's

19   report -- or part of the report that was put

20   out on November 23rd of last year.  And it

21   looks like this is the particular report

22   section that deals with the chemical analysis

23   portion, and I have to go through and see.

24                   It doesn't look like the

Confidential - Subject to Further Confidentiality Review

1    corrosion part is in here, so this is more of

2    the chemical sampling part of the report.

3        Q.    And have you reviewed this?

4        A.    I have reviewed it, yes.

5        Q.    And are the findings with

6    regard to Chinese drywall that you found and

7    what's in this report consistent, in your

8    opinion?

9        A.    Yeah, they're consistent.  I

10   tended to find that these strontium levels

11   were a little bit higher than they're saying.

12   Their value apparently goes down to 1200 ppm

13   strontium, and most of what I'm seeing was

14   above 1800 or so, although there are

15   outliers.  I do see some that are below 1200.

16          But from a consistent point of

17   view, I think the important thing is that

18   there's a difference in the strontium levels,

19   being that it's elevated in the Chinese

20   drywall and not elevated in the domestically

21   produced product.

22       Q.    And that difference, is that

23   also -- is your finding of that difference in

24   the strontium levels -- is that consistent

Confidential - Subject to Further Confidentiality Review

Page 47

1    with what you've seen published by the

2    Florida Department of Health as well?

3         A.    Yes.  They were finding the

4    same thing, as were many people who presented

5    at the conference.

6         Q.    And what about -- now going

7    back to the CPSC report that you have in your

8    hand, marked as Exhibit 7, what about with

9    regard to off-gassing?

10        A.    With regard to off-gassing,

11   they're saying that they find hydrogen

12   sulfide, that they measure in the homes by

13   the use of a passive sampler, meaning that

14   they're taking an average over a two-week

15   span, as to opposed a -- they did do grab

16   samples, but apparently they've abandoned

17   that.  They don't even really mention it in

18   their summary.

19             So I think they've diverted to

20   the passive sampling as being something that

21   they think is more representative over a time

22   period.

23        Q.    Let me stop you on that note,

24   just to make it clear.  What is the

Confidential - Subject to Further Confidentiality Review

1    difference between passive sampling and grab

2    sampling?

3         A.    A grab sample is when you take

4    either a syringe or an evacuated can or a

5    pump and you literally grab an air sample,

6    meaning that for a short duration of time,

7    and most of them -- typically, they're using

8    what's called a one-liter Tedlar bag, which

9    is a plastic bag you're filling up, so it's

10   like blowing up a balloon.

11        And what you're doing is you're

12   taking a very small amount of air at an

13   instant in time and sucking it into the bag,

14   and then you analyze what's in the bag.  So

15   that is literally a snapshot in time, if you

16   will.

17        A passive sampler, you're also

18   taking an air sample through a pump, but now

19   what you're doing is you're sending it

20   through some type of chemical agent which is

21   fixing the sample, meaning that if there's

22   hydrogen sulfide or other reactive gases,

23   they react with the medium that you're

24   passing them through, and so they become

Confidential - Subject to Further Confidentiality Review

1    stable, as opposed to potentially

2    deteriorating.

3             So you can leave it for a

4    longer period of time, and then you

5    essentially extract them off of that when you

6    get back to the laboratory.

7             So for these passive samples,

8    they were done for a two-week time period, so

9    it's an average of what's occurred in the

10   home -- spikes, nothing, whatever happened to

11   be -- for a two-week period of time.

12        Q.    Do you have an opinion as to

13   which method is more reliable for testing for

14   off-gassing?

15             MR. SANDERS:   Object to

16        foundation.

17        A.    As far as being more reliable,

18   I think that with respect to the grab

19   samples, obviously it depends on where you

20   take them, whether you're having a release at

21   that point in time, whether you've actually

22   captured what's going on in the house in that

23   30-second period is probably, quite frankly,

24   pretty unlikely.

Confidential - Subject to Further Confidentiality Review

Page 50

```
 1                    The passive sample is a little

 2      bit better in that you're now averaging

 3      whatever's going on in the house over a

 4      two-week period, but that's exactly what it

 5      is; it's an average.  So if you have nothing

 6      occurring in the house for 13 of the 14 days

 7      and then all of a sudden you get a

 8      20-part-per-billion spike, you're not going

 9      to see that because it's all going to average

10      out over time.

11                    (Whereupon, Deposition Exhibit

12             Streit-9, Draft Interagency Task Force

13             on Chinese Drywall Executive Summary

14             of 10/29/09 Release of Initial Chinese

15             Drywall Studies, P1.1804-0001 -

16             P1.1804-0523, was marked for

17             identification.)

18      BY MR. SEEGER:

19             Q.     Okay.  I'm going to hand you

20      what we've just marked as Streit Exhibit 9,

21      which is trial-marked P1.1804-0001.

22                    MR. SEEGER:  And, Doug, I know

23             you have this, but I only have one

24             copy of it -- well, I'm not even
```

Confidential - Subject to Further Confidentiality Review

```
 1              referring to it just yet.  It's the

 2              ten-home study from the Florida

 3              Department of Insurance.  I've got one

 4              copy.  Is that all right?

 5                   MR. SANDERS:  Sure.

 6      BY MR. SEEGER:

 7              Q.    Can you identify for

 8      Judge Fallon what I've just handed you and

 9      marked as Streit Exhibit 9?

10              A.    This is a summary of work that

11      was released by the interagency task force

12      studying the -- the government task force

13      studying the drywall on October 29th of 2009,

14      so it predates the 50-home -- 51-home study.

15                   This one is indoor air testing

16      of ten homes from the Florida and Louisiana

17      area, and then they actually allude to the

18      fact that they're going to be releasing a

19      more comprehensive 50-home study at that

20      time.

21              Q.    Okay.  And is this something

22      you reviewed?

23              A.    I did review it, yes.

24              Q.    And both with regard to Streit
```

Confidential - Subject to Further Confidentiality Review

Page 52

1    Exhibit 8, which is the CPSC study, and

2    Exhibit 9, which is the Florida Department of

3    Health study, have you relied upon both of

4    those in rendering your opinions in this

5    case?

6         A.     Again, this is something that

7    I've looked at, and yes, I have relied upon

8    it.  It's consistent with what I've seen in

9    my own testing.

10              MR. SEEGER:  Hold on.  Just

11         stay on the record, you stay on too.

12         Just take a break for a second.

13              I don't know what to do

14         because, as you people on the phone

15         can hear, somebody is playing music,

16         and if you guys who know it is, call

17         them and tell them to stop because

18         otherwise we're going to have to hang

19         up.  All right.  It stopped.

20              So whoever came back on who has

21         music on hold, would you stop putting

22         us on hold, just mute the phone.  All

23         right.

24    BY MR. SEEGER:

Confidential - Subject to Further Confidentiality Review

Page 53

1      Q.     So you've looked at both of

2   these, and you've relied on these in

3   connection with rendering your opinions in

4   that case; is that fair?

5      A.     I have.

6      Q.     Okay.  Now, I want to just take

7   a step back on the question I asked you

8   before about passive sampling and grab

9   sampling.

10      A.     Yes.

11      Q.     Do you have an opinion as to

12   which one is more reliable?

13           MR. SANDERS:  Object to

14           foundation.

15      A.     I think that from the

16   standpoint of what's more representative in

17   the home, certainly the passive samples are

18   more representative of an overall

19   characterization over a time period.

20           You can take grab samples and

21   you may actually happen to hit a release and

22   so you're going to get some values, and

23   then -- but there are many times when you may

24   not hit a release, and so you wind up getting

Confidential - Subject to Further Confidentiality Review

1    a nondetect; and I'm just not sure that

2    that's representative of truly what's going

3    on in the residence.

4    BY MR. SEEGER:

5        Q.    Okay.  All right.  Let me ask

6    you this, Dr. Streit:  With regard to the

7    Germano homes that are the subject of this

8    hearing that Judge Fallon is presiding over,

9    what were you asked to do by the plaintiffs'

10   lawyers in this case?

11       A.    I was asked to visit the home,

12   and then I was asked to analyze samples that

13   were harvested from the homes and determine

14   if, in fact -- the testing that I would

15   normally run on these samples at that point,

16   whether I was seeing elevated levels of

17   strontium, whether I was seeing strontium

18   inclusions, whether I could analyze the black

19   deposits and determine whether that was

20   copper sulfide or copper oxide, looking at

21   off-gassing to see whether the samplers were

22   going to admit the hydrogen sulfide, carbonyl

23   sulfide and carbon disulfide that we were

24   essentially seeing; and then to also, in

Confidential - Subject to Further Confidentiality Review

1    conjunction with reviewing other materials,

2    draw conclusions, based on my work and review

3    of others.

4         Q.    Okay.  Let me start with your

5    conclusions here.  What did you see with

6    regard to elevated strontium off-gassing and

7    corrosion in the homes you visited in the

8    Germano litigation?

9              MR. SANDERS:  Object to form.

10        A.    With respect to off-gassing,

11   when I walked into the three houses that

12   contained suspected drywall that was produced

13   in China, the homes have a very distinct and

14   noticeable odor.

15             It's -- it was something that

16   in certain areas the home was stronger than

17   in others, and as the day progressed,

18   actually somewhat became a little irritating

19   to my eyes and was causing me to cough a

20   little bit, which subsequently, as I got more

21   fresh air, was better.

22             I then went into what was

23   considered to be a control home, where there

24   was no drywall manufactured from China; and I

Confidential – Subject to Further Confidentiality Review

1    looked at the copper surfaces in that home,

2    the wiring and the bathroom plumbing and so

3    on, and determined that I didn't see any

4    visible sign of corrosion, nor did I perceive

5    an odor in that home.

6    BY MR. SEEGER:

7         Q.    Okay.  So you picked -- so

8    we're on off-gassing right now.  What else --

9    I mean, did you -- those were sort of your

10   visual observations.  What about your testing

11   analysis?

12        A.    Those samples were tested in a

13   humidified environment, just like many of the

14   other samples have done, where you take a

15   piece of the drywall, you take off the paper,

16   and then you place the sample in a humidified

17   environment for a period of time, typically

18   48 hours, and then you measure the gases

19   which come out of that drywall to determine

20   what they are.  Are they hydrogen sulfide?

21   Are they carbonyl sulfide?  Are they carbon

22   disulfide?  Are they another sulfur gas, or

23   are they something else?

24        Q.    And what did you find?

Confidential - Subject to Further Confidentiality Review

1          A.      When the samples are

2    humidified, what we tend to see is carbonyl

3    sulfide and carbon disulfide at elevated

4    levels, because the hydrogen sulfide, as it

5    turns out, is absorbed by the moisture as a

6    result of the way the test is run.

7               And so when we went back and

8    ran those dry, you get a hydrogen sulfide

9    emission, which you miss if you run the

10   samples humidified.  So you see all three

11   gases that will be given off by the Chinese

12   drywall that -- the hydrogen sulfide, we

13   don't see coming out of the domestic product

14   at all.  There are a couple of instances

15   where you may see carbonyl sulfide in

16   domestic product, but it's at pretty low

17   levels.

18        Q.      And as Judge Fallon begins to

19   familiarize himself with the types of tests,

20   what type of tests did you do with regard to

21   off-gassing?

22        A.      This is a GC mass spec test.

23   That stands for gas chromatography, and it's

24   a mass spectrometry detector.

Confidential - Subject to Further Confidentiality Review

1           You can also use what's called

2      an SCD, which is a sulfur chemiluminescence

3      detector.  It's just another way for you to

4      get a signal and is really more specific for

5      sulfur testing.

6           Q.     All right.  Let me ask you

7      this:  With regard to the testing for

8      off-gassing, the method that you used, do you

9      have an opinion as to whether that is a more

10     reliable method for measuring off-gassing

11     than, let's say, certain indoor air quality

12     tests?

13               MR. SANDERS:  Object to

14          foundation.

15          A.     Well, they're ASTM tests that

16     are designed to measure the off-gassing under

17     a controlled set of conditions, so that you

18     are essentially putting a piece of drywall in

19     a container and you are trapping the gases

20     that come out, so you can actually measure

21     them, as opposed to taking air samples in a

22     house, where, quite frankly, it's really

23     hit-or-miss.

24               You know, if you talk to the

Confidential - Subject to Further Confidentiality Review

1    homeowners, sometimes they smell something,

2    sometimes they don't, so when do you take

3    your sample?  Do you wait until the

4    homeowners smell something, or, you know,

5    what do you do?

6            And I think that that was my

7    initial criticism of air sampling, and the

8    reason why I had expressed that opinion to

9    the CPSC and David, that I really didn't

10    think the air sampling was very productive.

11           I really thought it would be

12    better, if you want to find out if the

13    drywall is a problem, you have to control the

14    test better.

15    BY MR. SEEGER:

16        Q.    Now, when you say this is the

17    opinion you gave to David, you're saying this

18    is what you had said to David Krause at the

19    Florida Department of Health, just to be

20    clear?

21        A.    Right.  That is correct.

22        Q.    Let's talk some about what you

23    observed in the Germano homes that have

24    Chinese drywall and the control home there

Confidential - Subject to Further Confidentiality Review

Page 60

1    with regard to corrosion.

2         A.    The Germano homes have

3    corrosion that are pretty widespread.  When

4    you go in the home, if you look at the copper

5    tubing in the bathrooms, the water lines,

6    they're black.

7              If you open up the back of the

8    refrigerator and you look at all of the

9    associated tubing and wiring that's in the

10   back of the refrigerator, that was all back.

11             In one case, the lamp wire

12   going up all the way to the ceiling, you

13   could see that the wires were black

14   underneath; and, in fact, we later analyzed

15   those samples.

16             You saw it when we looked at

17   the alarm systems, and you took the cover off

18   the alarm system.  You could see darkening of

19   the wires on the alarm systems.

20             Then we went up and looked at

21   the air-conditioning coils.  And in the one

22   home, I think it was the McKellar home, the

23   coil had only been in there for two months,

24   and it was black.

Confidential - Subject to Further Confidentiality Review

Page 61

1        Q.      The HVAC coil?

2        A.      The HVAC coil.

3                And then, of course, we'd look

4   at the outlet covers and take the outlet

5   covers off and look at the wires, and they

6   were blackened.  There were picture frames

7   which showed some blackening.

8                If you looked at the

9   chrome-plated fixtures in the bathroom, they

10  were all blackened.  The mirror backing was

11  affected.  It was actually pretty pervasive

12  in the entire house.

13       Q.      Let me ask you this.  All of us

14  have seen, you know, silver tarnish and

15  corrosion on metals.  What is the

16  significance of you seeing black on the

17  metals that you observed in the Germano

18  homes?

19       A.      It's different than what you

20  would consider normal aging or, you know,

21  aging corrosion as a result of being in an

22  oxidizing environment, in the air.

23               What we're seeing are deposits

24  of black material on the surface, actually,

Confidential - Subject to Further Confidentiality Review

1    you know, physical deposits on the surface,

2    so -- and that's the formation of the

3    sulfide, which then was corroding the metal

4    underneath.

5              And visually, it appears

6    different.  It's not a thin discoloration

7    layer.  It's actually a material on the

8    surface that you can scrape and analyze,

9    whereas oxidation, it's very difficult to do

10   that.  You wind up analyzing the entire

11   substrate.

12       Q.    Well, do you have an opinion as

13   to whether this is the kind of corrosion that

14   you can just kind of wipe off the wires?

15       A.    The corrosion, you can't wipe

16   off.  And even the black material, some of it

17   you can wipe off -- you know, we're doing

18   that to collect samples -- but not all of it.

19   And, in fact, some of it is held on quite

20   tightly.  Other material, you can poke at it,

21   and then it will flake off.

22              And then in some places, you

23   can't get it off at all because it's held on

24   by the corrosion pits, if you will.  So, you

Confidential - Subject to Further Confidentiality Review

1    know, you're not going to be able to just

2    wipe it off.

3              MR. SANDERS:   Object to

4         foundation.

5    BY MR. SEEGER:

6         Q.    Well, do you have experience

7    doing -- you know, looking at corrosive

8    metals, metals that have corrosion on them?

9         A.    Very often I look at problems

10   involving corrosion and oxidation of the

11   surface, deposits on the surface.  I look at

12   the extent of corrosion, pitting, whether

13   it's penetrated through the metal, whether

14   it's, quote/unquote, "formicary," so it's

15   tunneling in.

16             It really -- and those samples

17   are something that I get quite frequently

18   because that's a pretty large problem in the

19   world we live in, with exposure to chemicals

20   and thing.

21        Q.    And is that a large part of

22   what you do generally in connection with

23   you -- the work you do for industry, is

24   looking at corrosion and telling your clients

1    in that case the cause or the extent of the

2    corrosion?

3         A.    Sure.  What's in the corrosion

4    deposit, what I believe is causing it, and

5    then sometimes we talk about how to fix the

6    problem.  But typically, they come to me

7    because they need the analysis done.

8         Q.    Okay.  And how much -- you

9    know, how long have you been working on

10   identifying corrosion problems and the extent

11   of corrosion for anybody who's ever hired you

12   to do it?

13        A.    I've been doing that for my

14   entire professional career.

15             MR. SEEGER:  Okay.  Let's mark

16        her report now.

17             (Whereupon, Deposition Exhibit

18        Streit-8, 12/28/09 Expert Report of

19        Lori Streit, Ph.D., P1.2023-0001-

20        P1.2023-0095, was marked for

21        identification.)

22   BY MR. SEEGER:

23        Q.    Dr. Streit, I'd like to mark

24   for you the report that you gave in December

Confidential - Subject to Further Confidentiality Review

1      on behalf of the Germano plaintiffs, and your

2      supplemental report that you did in January.

3      For the record, what I'm marking as Streit-8

4      is Trial Exhibit P1.2023-0001.

5                    And is that a start of your

6      report that I've marked as Streit-8?

7           A.      Without counting up all the

8      pages, it does appear to be a copy of my

9      report.

10                   (Whereupon, Deposition Exhibit

11           Streit-10, 1/16/10 Supplemental Expert

12           Report of Lori Streit, Ph.D.,

13           P1.2025-0001 - P1.2025-0004, was

14           marked for identification.)

15     BY MR. SEEGER:

16          Q.      Okay.  And then I've also

17     marked as Streit-10 -- sorry we went out of

18     order -- your supplemental report.  Would you

19     please take a look and confirm -- ooh, let me

20     just read for the record.  It's Trial

21     Exhibit No. P1.2025-0001?

22                   Is that your supplemental

23     report?

24          A.      Yes, it is.

Confidential - Subject to Further Confidentiality Review

Page 66

```
1          Q.       Okay.  Now, Dr. Streit, take

2     your report from December please, and

3     consistent with what we've been discussing on

4     corrosion, you've included some photographs;

5     is that correct?

6          A.       I have.

7          Q.       And I just wanted to know if we

8     wanted to go through a few of these just

9     to -- and when we're in court with the judge,

10    hopefully we'll be able to put these up in

11    front of him so he can see them.

12                  But I want to start with the

13    photos on page -- actually, if you look at

14    the last four numbers, you see where it's got

15    a P number?

16         A.       Yes, sir.

17         Q.       It's dash 0050, if you can go

18    to that page.

19         A.       Okay.

20         Q.       So assuming that we'll have

21    this page up in front of Judge Fallon, could

22    you please tell the judge what is here?

23         A.       This was the air-conditioning

24    coil that was taken out of the McKellar home
```

Confidential - Subject to Further Confidentiality Review

1    after I had visited that home in November.

2         Q.    Okay.  All four of these photos

3    show that?

4         A.    Yes.  All -- well, no, one,

5    two, three.

6         Q.    Okay.  So the upper left-hand

7    corner --

8         A.    The upper right-hand corner,

9    and the lower left-hand corner.

10        Q.    Okay.  Let's start with the

11   upper left-hand corner, and please tell

12   Judge Fallon what that shows.

13        A.    This is a picture of the end of

14   the A/C coil where the installation date was

15   noted as September 6th of '09.

16        Q.    Okay.

17        A.    And what it's showing is the

18   ends of the copper coils which would normally

19   be a copper color, may not necessarily be

20   shiny, but they're a copper color.  And as

21   you can see, they've been blackened, and they

22   have deposits on them; as well as the upper

23   right-hand one, which is the extension of the

24   copper tube from the end of the

Confidential - Subject to Further Confidentiality Review

Page 68

1    air-conditioning coil.

2         Q.     Now, is the upper right-hand

3    photo a good example of the blackening that

4    you saw?

5         A.     It shows up much better in that

6    photograph than it does in the prior

7    photograph.

8         Q.     Okay.  And then if you could

9    tell us what the lower left-hand photo

10   demonstrates.

11        A.     That's a documentation of the

12   area where I scraped off the black material

13   and then did an SEM/EDS analysis to confirm

14   that, in fact -- or identify that it was

15   copper and sulfur.

16        Q.     Okay.  And what is the

17   significance of finding copper and sulfur on

18   that HVAC coil right there?

19        A.     That it's a copper sulfide, and

20   sulfides form from exposure to sulfide gases.

21        Q.     Okay.  And the sulfide gases

22   that you've identified in your testing are

23   hydrogen sulfide?

24        A.     Not only myself, but the CPSC

Confidential - Subject to Further Confidentiality Review

Page 69

 1    and many others have identified hydrogen

 2    sulfide, carbonyl sulfide and carbon

 3    disulfide.

 4              MR. SEEGER:  Okay.  Why don't

 5         we take a break so we can change the

 6         video.

 7              THE VIDEOGRAPHER:  The time now

 8         is approximately 3:42 p.m.  We're off

 9         the record.

10              (Recess taken, 3:42 p.m. to

11         3:45 p.m.)

12              THE VIDEOGRAPHER:  This begins

13         Tape 2 of the videotaped trial

14         deposition of Dr. Lori Streit.  Time

15         now is approximately 3:46 p.m., and

16         we're back on the record.

17    BY MR. SEEGER:

18         Q.    So we left off when we changed

19    the tape, Dr. Streit, you were saying that

20    the testing that you had done and that you'd

21    seen with the CPSC and the Florida Department

22    of Health showed carbon sulfide, carbonyl

23    sulfide --

24         A.    It shows hydrogen sulfide,

Confidential - Subject to Further Confidentiality Review

Page 70

1    carbonyl sulfide and carbon disulfide.

2        Q.      Got it.

3              Now, what are the significance

4    of these three compounds in your opinion with

5    regard to corrosion in the home?

6              MR. SANDERS:  Object to

7         foundation.

8        A.      They are reduced sulfur gases,

9    meaning that they will corrode metal and they

10   will leave an odor and they will leave --

11   react with the metal in order to form the

12   metal sulfide.

13   BY MR. SEEGER:

14       Q.      Is this new chemistry you've

15   invented, or has this been around?

16       A.      It's been around forever.

17       Q.      Okay.  Now, take a look at the

18   photos on page 0036 of your report.  All

19   right.

20              And, again, assuming we'll have

21   these photos in front of Judge Fallon,

22   starting from the upper left, could you tell

23   us what these show?

24       A.      This is an outlet that was

Confidential - Subject to Further Confidentiality Review

```
 1    taken from the Heischober house.
 2         Q.     Okay.
 3         A.     Hence the initials "SLH."
 4         Q.     Okay.
 5         A.     And the close-up that you see
 6    on the upper right is a digital camera
 7    photograph of the blackened surface of the
 8    ground wire that is attached to the outlet.
 9         Q.     Okay.
10         A.     And then the lower right-hand
11    corner is a 40x microscopic image of the
12    blackened surface of the copper wire.
13         Q.     Let me just correct one thing.
14    You said -- that's the lower left-hand
15    corner.
16         A.     Did I say "right"?
17         Q.     Yeah.
18         A.     I'm sorry, the lower left.
19         Q.     Okay.  Let's just pause on the
20    photo in the lower left-hand corner, just in
21    case we got confused.  What is that a photo
22    of again?
23         A.     That is a photograph taken
24    through an optical microscope at 40x
```

Confidential - Subject to Further Confidentiality Review

1    magnification, so 40-times magnification.

2        Q.    Okay.

3        A.    And that is basically just a

4    close-up of the wire, the ground wire that's

5    shown in the upper photographs. So we're

6    going progressively from an overall shot so

7    you can see where it came from, to a closer

8    macro shot of just the wire, to the actual

9    blackened surface to show you what it looks

10    like.

11        Q.    Okay. Again, just looking at

12    the surface, tell us the significance of this

13    photograph. What does it show?

14        A.    It shows black deposits on the

15    surface of the wire, and when you remove

16    them, they are confirmed to be copper

17    sulfide.

18        Q.    Okay. Is copper sulfide

19    corrosive?

20        A.    Yes.

21        Q.    Could you go to the photos --

22        A.    It is the -- I'm sorry. It is

23    the corrosion by-product of the reaction with

24    a sulfur-reducing gas.

Confidential - Subject to Further Confidentiality Review

1          Q.      Okay.  That's what gets left

2     behind?

3          A.      Yes.  It's the reaction of the

4     corrosion product -- of the corrosion with

5     the metal, and it forms the corrosion

6     product, which is what you see on the

7     surface.

8          Q.      Can you go to page 0077.  Now,

9     one of the things you had mentioned earlier

10    when I asked you about your visual

11    observations is I think you talked about a

12    lamp cord?

13         A.      Yes.  This is a piece of a wire

14    that was going up from the lamp to the

15    ceiling.

16         Q.      Okay.  So tell us again on

17    this, going from, you know, left to right,

18    down, left to right, what you have here.

19         A.      The left is just the

20    documentation of the sample.  It's from the

21    Morgan residence --

22         Q.      Okay.

23         A.      -- Sample 5.  This is the

24    section that I received of the wire.

Confidential - Subject to Further Confidentiality Review

1         Q.      To the right of that, on top?

2         A.      To the right of that on the

3    top.

4                 The lower left, what I did was

5    I took a razor blade, and I sectioned across

6    the sample, so you're looking at a

7    cross-section.  And you can see where some of

8    the strands of the wire in the lower right

9    portion are actually still in, stuck to the

10   polymer.  They didn't come out with the rest

11   of the wire.  And then on the inside surface

12   of the wire that was bound so tightly that

13   you actually got the wire impressions, you

14   see black material.

15                And those black deposits were

16   later identified as copper sulfide, and then

17   the corresponding wires that came out of that

18   wire are shown on the lower right, where you

19   can see some of the black material continues

20   to stick to the surface of the copper.

21        Q.      Now, the ground wire photo we

22   looked at, the ground wire was exposed.  It

23   didn't have any plastic on it or anything,

24   right?

Confidential - Subject to Further Confidentiality Review

1      A.      That is correct.

2      Q.      Okay.  What is the significance

3   of this -- of these photos?

4      A.      This is significant because the

5   corrosive gases have actually penetrated

6   through the plastic.

7      Q.      Okay.  And then if you could

8   also go to page 0083, Dr. Streit, and could

9   you please explain to us the significance of

10  these four photos?

11     A.      It actually starts, I believe,

12  on the bottom left.

13     Q.      Okay.

14     A.      That's the bag that the sample

15  came in.  It's a Morgan house sample; it was

16  a receptacle -- no, I'm sorry.  Is that

17  right?  It wasn't a receptacle end.  That's

18  the sample above.

19            The sample that we're seeing,

20  27B -- no, it is labeled -- excuse me.  Let

21  me go back.

22            It is labeled "Receptacle End"

23  because this portion of the wire was related

24  to a receptacle which was further over on the

Confidential - Subject to Further Confidentiality Review

1    wall, so that was the only way they could

2    describe it.

3        Q.    Just for the record, you didn't

4    harvest these yourself?

5        A.    I did not harvest them.  My

6    understanding was that this was taken from

7    inside the wall but not at the receptacle.

8        Q.    Okay.

9        A.    That it was taken from a bit

10   away, in actually the wall cavity; but it was

11   on a wall that had a receptacle.

12       Q.    Okay.  And who did you get that

13   understanding from about where it was

14   harvested?

15       A.    It was either in a discussion

16   with the people who harvested the sample or

17   with counsel.

18       Q.    Okay.  So tell us, starting

19   with the lower left.  That's the bagging of

20   the sample?

21       A.    Yes.  This actually goes back

22   one more -- one more page.

23       Q.    Okay.  So we're now looking at

24   page 0082.

Confidential - Subject to Further Confidentiality Review

Page 77

```
1        A.      And, again, this is closer to

2   the fixture end of the wire.

3        Q.      Okay.

4        A.      So you can see where I clipped

5   out a piece of the Romex, or it came to me

6   clipped out.

7        Q.      Okay.  Just, again, assuming

8   that Judge Fallon is trying to follow along,

9   tell us what photo you're looking at.

10        A.      I'm sorry.  I'm looking at the

11   upper right-hand photo, which is photo 13.

12        Q.      What does that show?

13        A.      That's the actual piece of the

14   Romex that came out.

15                And then if you look at

16   photo 16, which is in the lower left, those

17   are the three components that are within the

18   Romex.  So if you remove the outer jacket of

19   the Romex, you get a white wire, a black

20   wire, and the ground wire.

21        Q.      Okay.

22        A.      I then stripped out the end of

23   the insulation, so I could look at the metal

24   underneath, and obviously the ground wire was
```

Confidential - Subject to Further Confidentiality Review

1    covered with paper, which is shown in

2    photo 15.   They've got backwards on this

3    scheme of things.

4         Q.     Okay.

5         A.     And then I looked at the

6    surfaces under examination, and --

7         Q.     So now we're back to page 0083?

8         A.     Right.   And the actual wire

9    that -- the only one that actually showed

10   blackening is the ground wire, so you see the

11   wire in photograph 1352, and then you see it

12   up close in photograph 1353.

13        Q.     So 1352 is the upper left, and

14   then the upper right?

15        A.     And then closer up, it's at 40x

16   magnification, you can see the black deposits

17   on the surface which were later confirmed by

18   SEM/EDS to be copper sulfide.

19        Q.     Okay.   Now, did you do any

20   testing of the wire coatings in both the lamp

21   cord and the Romex cord?

22        A.     The testing that I did was to

23   see whether the polymers themselves

24   incorporated sulfur in their structure.   So

Confidential - Subject to Further Confidentiality Review

1    if there was bulk sulfur in the polymer, I

2    was looking for that.

3         Q.    Okay.  And what did you find?

4         A.    I didn't see any sulfur

5    incorporated within the plastic itself to

6    indicate to me that it was a sulfonated

7    polymer, so my conclusion from that is that

8    the sulfur had to come from outside in.

9         Q.    Okay.  So was it your

10   conclusion that it actually permeated through

11   the outer coating?

12        A.    It permeates through and

13   attacks the copper metal underneath.

14        Q.    Okay.  Now, did you do any of

15   this type of testing -- well, let me ask it

16   to you this way.

17              What did you do in the control

18   homes with regard to corrosion?  Did you

19   observe any?

20        A.    In the control home, there were

21   samples of wiring harvested.  I recall a

22   switch specifically and the ground wire; and

23   I did examine that, and I didn't find any

24   black deposits on the surface.

Confidential - Subject to Further Confidentiality Review

1      Q.     Dr. Streit, do you have an

2  opinion as to whether the homes, the Germano

3  homes, that you visited and did testing in

4  with Chinese drywall are a corrosive

5  environment for wires and HVAC coils?

6            MR. SANDERS:  Object to the

7      foundation.

8      A.     I think that it's been clearly

9  shown that sulfur gases come out of the

10 drywall that's incorporated in the Germano

11 homes.  There's sulfide gases.  The deposits

12 on the surface are copper sulfide, which

13 would be the result of interaction with

14 sulfide-containing gases, and, you know,

15 those are clearly corrosion deposits which

16 have been observed on wires and appliances

17 and the A/C, HVAC coils in those homes.

18 BY MR. SEEGER:

19     Q.     Okay.  Is that -- your

20 conclusion there, is that consistent with

21 what you've seen published by the CPSC and

22 the Florida Department of Health?

23     A.     I think, yes, the CPSC, the

24 Florida Department of Health and other

Confidential - Subject to Further Confidentiality Review

Page 81

1      investigators for various agencies or

2      various -- hired by various people, whether

3      it be other environmental firms or, you know,

4      whomever.

5              The data is very consistent,

6      that sulfur gases are being emitted by the

7      Chinese drywall, and the corrosion that's on

8      the surface of the metals is copper sulfide

9      which results from the interaction with those

10     sulfur gases.

11         Q.    And is that finding consistent

12     with the presentation made by Robert DeMott

13     from Environ at the Tampa conference?

14              You have his presentation,

15     Streit Exhibit 4.  If you go to the --

16         A.    I believe it is.  As I'm going

17     through it, he talks about the differences

18     between reduced sulfur gases and other types

19     of oxide which we don't see on these samples.

20     These are caused by reduced sulfur gases as

21     evidenced by my report, the CPSC, you know,

22     his findings and many others.

23         Q.    Is it possible for you to say,

24     sitting here now, which of these sulfur gases

1    is causing the corrosion or if it's a

2    combination of the sulfur gases?

3         A.    I really don't think that

4    anyone knows exactly which one specifically

5    is responsible for the corrosion or whether

6    it's a mixture of all three.

7              I think that at this point

8    everyone is convinced that those are -- the

9    three gases that I've already mentioned are

10   the main players.  But, you know, this is

11   ongoing, and it's still being investigated,

12   and I haven't seen anyone who's come out and

13   given a definitive yes, it's this.  And I'm

14   in that ballpark as well.  We're still

15   looking at the problem to try to isolate, if

16   we can isolate, which one it is, or if it

17   isn't, maybe it is a combination.

18              MR. SEEGER:  You know, let me

19         mark another exhibit just for the next

20         couple of questions we have, the data.

21              (Whereupon, Deposition Exhibit

22         Streit-11, Reliance Date for Dr. Lori

23         Streit's Opinions, P1.1849-0001 -

24         P1.1849-0009, P1.1850-0001 -

Confidential - Subject to Further Confidentiality Review

Page 83

```
 1          P1.1850-0015 & P1.1851-0001 -

 2          P1.1851-0051, was marked for

 3          identification.)

 4    BY MR. SEEGER:

 5          Q.      Okay.  Dr. Streit, we've just

 6    marked for the record as Streit-11.  It has

 7    the trial stamp P1.1849-0001.  And not -- you

 8    don't have to go into specifics, but can you

 9    generally describe what we've just marked as

10    Streit-11?

11          A.      These are samples that were

12    received on January 20th.  They are samples

13    from the Orlando home of pieces of drywall

14    that were subsequently analyzed.

15          Q.      Right.  And I need to make one

16    correction.  For the record, Streit-11

17    consists of several trial exhibits.  The

18    first one is P1.1849-0001 and P1.1850-0001 --

19    I don't know who came up with this numbering

20    system -- and P1.1851-0001.

21               MR. SEEGER:  Doug, here's your

22          copy.

23               MR. SANDERS:  Thank you, sir.

24               MR. SEEGER:  All right.
```

Confidential - Subject to Further Confidentiality Review

1    BY MR. SEEGER:

2         Q.    My next set of questions, and

3    you can feel free to refer to the exhibit we

4    have in front of you, is what did you

5    discover in the Germano homes in regard to

6    the strontium levels?

7         A.    Well, the strontium levels in

8    the Germano homes as evidenced by not only

9    the Exhibit 1849, but also incorporated in

10   other data, show that the Germano samples

11   tend to be pretty high in the strontium.

12   They're in either the upper 2,000s or in the

13   3,000s part per million, milligrams per

14   kilogram of strontium.  So they're on the

15   higher side of what is generally accepted as

16   being the levels in Chinese-produced board.

17        Q.    Okay.  And I want to just step

18   back for one second to some off-gassing

19   questions.

20             Do you have an opinion as to

21   whether the off-gassing accelerates with the

22   increase in heat and humidity?

23        A.    I think that it's been shown

24   that it accelerates and different gases tend

Confidential - Subject to Further Confidentiality Review

Page 85

1    to come out when it's humidified, whereas in

2    a less humidified situation you tend to get

3    more of the hydrogen sulfide.   In the

4    humidity studies, at least in the controlled

5    environments, you tend to get more of the

6    other two because the hydrogen sulfide is

7    readily absorbed by water.

8                So what will happen is the

9    hydrogen sulfide will absorb in the water and

10   form an acidic environment, and that's

11   ultimately what's causing much of the

12   corrosion or related to the corrosion,

13   specifically on the HVAC coils which are

14   moist all the time.   That's why you're

15   getting six failures in three years.   It's

16   because of the accumulation of the sulfide

17   gases dissolved in the water.

18       Q.      Now, let's just pause on that

19   with regard to HVAC coils.

20                Have you seen coil failures in

21   shortened periods of time because of

22   corrosion?

23       A.      I have, yes.

24       Q.      And what is a normal life of,

Confidential - Subject to Further Confidentiality Review

Page 86

1      let's say, an HVAC coil?

2             A.      According to the manufacturers,

3      which many of which are my clients and I've

4      looked at their failed coils as well, we've

5      had that discussion, because I thought it was

6      odd that you'd get that many failures.  I've

7      never seen that kind of failure rate.

8                     And what their technical people

9      have reported to me is that the typical life

10     would be anywhere from 10 to 20 years, you

11     know, 20 being on the extreme side if you

12     were wonderful homeowner and you did all of

13     your maintenance on a regular schedule, which

14     in reality probably doesn't happen very much,

15     and ten years on the other side, where you

16     may have some other factors that are

17     potentially causing a problem like exposure

18     to chemicals, you know, seawaters,

19     fertilizers and things like that --

20             Q.      And what --

21             A.      -- but typically ten years is

22     the shortest.

23             Q.      What have you seen in homes

24     with Chinese drywall?

Confidential - Subject to Further Confidentiality Review

1        A.     You know, many of these homes

2  have multiple failures.  The McKellar home

3  that you were looking at, that

4  air-conditioning coil had only been in for

5  two months, and it was already black.

6            And I think there was one

7  home -- and, excuse me, I don't remember the

8  homeowner's name -- but six coils in three

9  years.  That's outrageous.  That's an

10  unbelievably fast failure rate.

11        Q.     Had you ever seen anything like

12  that?

13        A.     No, I have not.

14        Q.     I want to also ask you --

15  there's some testing results in what we've

16  marked as Streit-11 with regard to a home

17  that -- where the defendants had installed an

18  environmental control system.

19        A.     Okay.

20        Q.     Are you familiar with -- you've

21  heard about that, correct?

22        A.     I have.

23        Q.     And you were sent samples from

24  the home in Port Saint Lucie with an ECS

Confidential - Subject to Further Confidentiality Review

Page 88

1    device; is that correct?

2         A.    Yes, these samples were

3    collected on January 29th, according to the

4    documents.

5         Q.    Okay.  On January 29th.

6               Now, you had those samples

7    tested?

8         A.    I did.

9         Q.    And with regard to off-gassing,

10   what did they show?

11        A.    Those samples show -- I believe

12   they're consistent with everything else.

13   Yeah, Exhibit 1850, they show when tested in

14   a dry encased environment, they show

15   off-gassing of hydrogen sulfide and smaller

16   amounts of the other two; and then when the

17   same tests are run under a moisture

18   environment, they show the other two gases

19   and a diminishment of the hydrogen sulfide.

20        Q.    Okay.  Now, to be fair, the

21   samples were taken out of the ECS environment

22   to do the testing; is that right?

23        A.    Yes, they were.

24        Q.    But what is the significance of

Confidential - Subject to Further Confidentiality Review

1    the off-gassing from your perspective?  What

2    does that still show you?

3              MR. SANDERS:   Object to

4         foundation.

5         A.    What that shows me is that the

6    drywall is still capable, if it's in an

7    environment certainly when the ECS isn't even

8    working, that you're going to get

9    off-gassing; and so if the ECS system for

10   some reason would go down or wasn't

11   functioning, you would have off-gassing of

12   sulfide gases.

13   BY MR. SEEGER:

14        Q.  ·  You had -- in part of your

15   deposition today, earlier today --

16   Mr. Sanders had an opportunity to do a

17   discovery deposition of you, and he asked you

18   some questions regarding mechanism of action.

19   I'd like to ask you and give Mr. Sanders an

20   opportunity to cross-examine you on it, okay?

21        A.    Yes, sir.

22        Q.    You said in your testimony in

23   the discovery deposition that you didn't know

24   the mechanism of action here with regard to

Confidential - Subject to Further Confidentiality Review

Page 90

1    Chinese drywall.  Is that a fair

2    characterization of what you said?

3        A.    I think what I said was that I

4    nor other investigators have pinned down the

5    exact mechanism of what's going on with the

6    drywall.  In other words, we know that

7    there's hydrogen sulfide, carbonyl sulfide,

8    carbon disulfide in the drywall that's being

9    released.  We know that those gases are

10   attacking the metal and forming copper

11   sulfides.  We know that the samples contain

12   elevated levels of elemental sulfur, but to

13   what extent that plays a role is still

14   unclear.

15            So we just don't know if it's

16   one of the gases, if it's an interaction of

17   them.  But we do know that it's worse under

18   hot or humid environments, as shown by the

19   controlled off-gassing.  So it's still

20   ongoing.  People are still working on it,

21   and, you know, we're going as fast as the

22   science will allow.

23       Q.    Now, do you have an opinion to

24   a reasonable degree of scientific certainty

Confidential - Subject to Further Confidentiality Review

1   as to whether that off-gassing causing the

2   corrosion is coming from Chinese drywall?

3        A.    Well, I don't think there's any

4   doubt that the drywall is releasing corrosive

5   gases and those gases are attacking the metal

6   and forming corrosion products.  That's very

7   clear.

8             MR. SEEGER:  Let me see if I

9        have anything else.

10  BY MR. SEEGER:

11       Q.    Dr. Streit, the opinions that

12  you've expressed here in this examination, do

13  you hold them to a reasonable degree of

14  scientific certainty?

15       A.    I do.

16       Q.    All of the opinions you've

17  expressed in this case?

18       A.    Yes, sir.

19            MR. SEEGER:  Okay.  So that's

20       all I have for you for now, and I'll

21       maybe, perhaps, redirect after

22       Mr. Sanders.  You need a break?

23            MR. SANDERS:  Give me like

24       15 minutes, 10 minutes?

Confidential - Subject to Further Confidentiality Review

Page 92

```
 1              MR. SEEGER:  Sure.

 2              THE VIDEOGRAPHER:  The time now

 3       is approximately 4:08 p.m.  We are now

 4       off the record.

 5              (Recess taken, 4:08 p.m. to

 6       4:19 p.m.)

 7              THE VIDEOGRAPHER:  The time now

 8       is approximately 4:19 p.m.  We are

 9       back on the record.

10                   EXAMINATION

11    BY MR. SANDERS:

12       Q.     Good afternoon, Dr. Streit.

13    Doug Sanders representing Intervenor Knauf

14    Plasterboard Tianjin --

15       A.     Good afternoon.

16       Q.     -- as we officially met earlier

17    today.

18              You described the forensic, I

19    guess, investigative approach that you take

20    when you assess these types of problems

21    earlier, and is that based primarily on your

22    education and your experience?

23       A.     It's based on my education.

24    It's based on my experience.  It's based on
```

Confidential - Subject to Further Confidentiality Review

1    the scientific method that's taught to every

2    science student in university.

3         Q.    But there's no specific EPA or

4    other standard that's sort of sets out how

5    you go about tackling a problem like this?

6         A.    I think that would be very

7    difficult because every problem that you

8    encounter has its own variations.

9         Q.    And there's no peer-reviewed

10   literature that you're relying on when you

11   sort of set out your approach to say these

12   are the things I need to do to sort of

13   develop my investigation?

14        A.    You know, other than the fact

15   that you do the basic scientific method, you

16   perform hypothesis, you test your hypothesis,

17   and, you know, you go on to give yourself a

18   result.

19        Q.    And the techniques or the

20   certain investigation or testing that you do

21   would vary from situation to situation,

22   right?

23        A.    They will.

24        Q.    And it depends on the problem

Confidential - Subject to Further Confidentiality Review

1    that you're tackling at that certain time?

2        A.      Certainly.  If you're looking

3    at metals, you use one technique.  If you're

4    looking at organic materials, you may use

5    another.

6        Q.      The first work I think you did

7    with respect to Chinese drywall was at the

8    request of the Florida Department of Health,

9    correct?

10       A.      That is correct.

11       Q.      And you published a report as a

12   result of that work?

13       A.      I did.

14       Q.      You sampled, I think, four

15   samples of drywall in that report?

16       A.      There were four samples that

17   were sent to me and a piece of metal that was

18   blackened.

19       Q.      And in that report, you

20   indicated that strontium sulfide was present

21   in Chinese drywall, correct?

22       A.      That was my initial assessment,

23   yes.

24       Q.      And that was the report that

Confidential - Subject to Further Confidentiality Review

Page 95

```
 1      was published in March 2009?

 2           A.      That's correct.

 3           Q.      Since --

 4           A.      Is that -- is it March?

 5           Q.      If you want to look at

 6      Streit --

 7           A.      Let me just double-check and

 8      make sure it's March.

 9           Q.      Streit-1.

10           A.      I don't want to...

11           Q.      It's right here.

12           A.      Yes, March 17th, that's

13      correct.

14           Q.      Sitting here today, do you

15      believe that there's enough certainty in

16      order to determine whether or not strontium

17      sulfide is actually in Chinese drywall?

18           A.      I think at this point, it's not

19      crystal clear whether that's the case or not,

20      and I think that there is ongoing work to try

21      to answer that question.

22           Q.      But that work hasn't been

23      completed yet?

24           A.      Not to my knowledge, no.
```

Confidential - Subject to Further Confidentiality Review

Page 96

1      Q.      And you -- in that earlier

2   report, have you gone and corrected that

3   report in any way or indicated that

4   strontium -- you're not sure whether

5   strontium sulfide was present in the drywall?

6      A.      I have not formally issued

7   another report.  We have had discussions, you

8   know, with Dr. Krause and with others and, as

9   you can see, things have progressed.  As time

10  goes on, we learn things.  We don't

11  necessarily issue more reports as we go

12  along.

13     Q.      You also conducted some

14  analyses of actual volatile organic sulfur

15  compounds that were being emitted -- or

16  trying to determine if any were being emitted

17  from the board, right?

18     A.      In that particular study?

19     Q.      Yes.

20     A.      Yes, sir.

21     Q.      And you chose two products

22  to -- or you and FDOH chose two products to

23  test, one domestic and one Chinese?

24     A.      That's what we did, yes.

Confidential - Subject to Further Confidentiality Review

Page 97

1        Q.      And in those reports, the

2    domestic board emitted higher levels of

3    hydrogen sulfide than the Chinese board?

4        A.      At that point in time, that is

5    correct, yes.

6        Q.      And I think you -- in the

7    report you indicate that you thought that

8    might be because of some cross-contamination

9    issues?

10       A.      I think it's fairly clear that

11   the samples were exposed to each other for an

12   extended period of time during shipment.

13       Q.      And you knew that you would be

14   sampling for volatile organic chemicals

15   before you conducted the analysis, correct?

16       A.      I did.

17       Q.      And you went ahead and did that

18   anyways?

19       A.      I did.

20       Q.      And you haven't done any

21   testing yourself to determine whether or not

22   Chinese drywall can cross-contaminate

23   domestic drywall?

24       A.      I have not done those specific

Confidential - Subject to Further Confidentiality Review

1    tests.  I have seen the results of those

2    tests by others.

3         Q.    You described in some of the

4    samples that you've seen that you've taken

5    from homes that there's -- the copper sulfide

6    is at times a powder or sort of a flake?

7         A.    It can be a powdery substance

8    or it can be adhered as more of a flake-type

9    material, different from what I would

10   characterize as atmospheric corrosion, where

11   you get a thin layer of oxide on the surface.

12        Q.    And you've even indicated on

13   some occasions -- I think you were looking at

14   a picture of an HVAC coil -- where you were

15   able to scrape off some of that coating at

16   least?

17        A.    Yes, you can.  Some of it is

18   removable.

19        Q.    And that when you do that, you

20   do see copper metal underneath?

21        A.    You can scrape down into the

22   metal, yes.

23        Q.    You haven't done any analysis

24   of cleaning or wiping some of the corrosion

Confidential - Subject to Further Confidentiality Review

1     off and then assessing whether any remains?

2          A.     I don't think all of it can be

3     removed that way.  In fact, if you wipe it

4     and you look on the one sample -- I think

5     it's an SLH sample where they wiped it.  I

6     have that sample, and there's still some

7     black on the surface.  It's not completely

8     removable by wiping.

9          Q.     So are you telling me that you

10    have done some analysis where you've wiped

11    down wires and you've wiped down other copper

12    surfaces and then assessed whether or not

13    there's still corrosion products on there?

14         A.     I'm telling you that the one

15    sample which is in the report, SLH-23 or 26,

16    is what they could remove by wiping; but the

17    photographs I think indicate that there's

18    still material underneath.  It's not

19    completely removable by wiping.

20         Q.     And have you conducted any kind

21    of extensive testing or analyses to figure

22    out whether or not it's possible to wipe it

23    off?

24         A.     I haven't gone any further than

Confidential - Subject to Further Confidentiality Review

1    that, simply because I didn't think that was

2    an issue.  I mean, it's not completely

3    removable that way.  There were areas where I

4    had to scrape pretty hard to get it off.

5            Q.      You talked about corrosion in

6    HVAC coils in particular, and corrosion in

7    HVAC coils happens quite a bit around the

8    country, correct?

9            A.      There are numerous situations

10   where there are corrosions of coils, yes.

11           Q.      And one of those is when it's

12   explored -- when they're exposed to

13   chlorides, not sulfides?

14           A.      Yes, chloride is a fairly

15   common contaminant.

16           Q.      In coastal regions or areas

17   where you're exposed to other sort of salts

18   like maybe snow removal or other salts?

19           A.      Particularly close to the roads

20   in the cities and things, yeah, you can have

21   that problem.

22           Q.      And the environment in which an

23   HVAC is operated in, that's a unique

24   environment as compared to some of the other

Confidential – Subject to Further Confidentiality Review

```
 1    copper, like copper wiring, for example, in a

 2    house?

 3         A.    It's a unique environment in

 4    the sense that it's moist most of the time,

 5    yes.

 6         Q.    So it has condensed water on it

 7    most of the time?

 8         A.    When it's functioning, yes.

 9         Q.    And that contributes to the

10    corrosion?

11         A.    I believe it does.

12         Q.    You've sampled Taishan board in

13    this case, and also you've sampled drywall

14    manufactured by other Chinese companies in

15    your experience, correct?

16         A.    Yes, I have.

17         Q.    One of the primary differences

18    you indicated with respect to U.S. and

19    domestic drywall is strontium, correct?

20         A.    You mean "Chinese and

21    domestic"?

22         Q.    I'm sorry.

23         A.    Yeah, with respect to the

24    difference between Chinese and domestic, we
```

Confidential - Subject to Further Confidentiality Review

```
 1    do see differences in the levels of

 2    strontium, that is correct.

 3         Q.    And Taishan, I guess, you

 4    indicated was generally higher, but as a

 5    general matter, they're both elevated

 6    throughout Chinese drywall?

 7         A.    Most Chinese drywall is

 8    elevated, and my experience has been on

 9    average 1800-part-per-million strontium or

10    higher.

11         Q.    And the -- that's, I think, one

12    of the consistent things amongst Chinese

13    drywall.

14               Is there any other

15    difference -- or is there any difference

16    between Taishan and other Chinese drywall

17    that you've seen?

18         A.    I have seen differences in the

19    magnesium level, but that seems to be unique

20    to that particular product.  I don't see

21    elevated levels in other Chinese product of

22    magnesium.

23         Q.    And other than the magnesium,

24    were there any other differences or notable
```

Confidential - Subject to Further Confidentiality Review

1    distinctions between the Taishan board and

2    other Chinese drywall?

3         A.    No.   It emits the same sulfur

4    gases that the other ones do.   I don't recall

5    seeing anything different.

6         Q.    One of the other primary

7    indicators of Chinese drywall, I think,

8    you've said is elemental sulfur?

9         A.    Yes.

10        Q.    And you don't believe that

11   elemental sulfur is a cause of the corrosion

12   that's happening in the copper, right?

13        A.    I can't say it is or it isn't.

14   I have not checked that.   There are those

15   that believe that it may be an actor.   I just

16   don't know at this point.

17        Q.    The way that elemental sulfur

18   is measured in the tests that you employ,

19   that's a particular test that's done by

20   Columbia Analytical Services?

21        A.    It's done by -- I think many

22   laboratories advertise that they do it.   I

23   chose to use Columbia Analytical.

24        Q.    And is there a specific method

Confidential - Subject to Further Confidentiality Review

1    that Columbia Analytical uses to analyze

2    sulfur, elemental sulfur?

3        A.    Yes, it's an extraction GC mass

4    spec technique.

5        Q.    What's the name of that method?

6        A.    It's EPA-8270, I believe.

7        Q.    And has CAS made some

8    modifications to the method?

9        A.    They're using toluene as the

10   extraction solvent rather than methylene

11   chloride, because elemental sulfur is much

12   more appreciably soluble in toluene than

13   methylene chloride.

14       Q.    And have you seen a written

15   draft of that method that they're using?

16       A.    Well, I have a copy of the

17   8270C method that's the standard EPA method.

18   As to their modification, I don't know if

19   I've seen the specific standard.

20       Q.    So other than the toluene,

21   you're not sure whether there are other

22   modifications that they've made?

23       A.    I was told by Michael Tuday

24   that that was the modification that they

Confidential - Subject to Further Confidentiality Review

1    made.

2        Q.    And just to confirm for me -- I

3    think you've said this -- you don't have an

4    opinion with a reasonable degree of

5    scientific certainty as to the exact

6    mechanism or the exact chemical source that's

7    causing the corrosion, correct?

8            MR. SEEGER:  Objection, form.

9        A.    I think that within a

10   reasonable degree of scientific certainty, it

11   is very clear that the sulfide gases that are

12   coming out of the drywall are causing sulfide

13   corrosion on the metals.

14           As to the:  Is it all hydrogen

15   sulfide that's causing the problem?  Is it a

16   mixture of carbonyl sulfide and hydrogen

17   sulfide?  Is it the degradation of carbonyl

18   sulfide into hydrogen sulfide that -- the

19   exact mechanism, nobody knows; at least at

20   this point nobody has proffered that.

21           But I think it's pretty clear

22   and everyone agrees that the sulfur gases

23   coming out of the drywall are causing the

24   smell and the corrosion in the homes.

Confidential - Subject to Further Confidentiality Review

1    BY MR. SANDERS:

2         Q.      You -- again, back to the HVAC

3    systems.  You in your report did some

4    sampling for acetate and formate, I think,

5    directed at determining whether they were

6    impacting the HVAC systems in particular,

7    correct?

8         A.      Yes.

9         Q.      And in conducting that

10   analysis, there's nothing that you've done

11   that supports an opinion that there's any

12   formicary corrosion going on?

13        A.      I have not seen any evidence of

14   formicary corrosion that I've reviewed.

15        Q.      And is that true with respect

16   to not only the HVAC systems but also other

17   copper components in houses?

18        A.      Well, typically it's the HVAC

19   systems that exhibit formicary corrosion.

20               And, again, you know, I -- the

21   corrosion area is a little out of what --

22   with respect to that mechanism, what I was

23   asked to do; but I have looked at the CPSC

24   work and others, and I don't see anyone

Confidential - Subject to Further Confidentiality Review

1    coming out and saying, you know, formicary

2    corrosion is the mechanism of corrosion here.

3         Q.    We discussed I think the --

4    never mind.  Excuse me.  Strike that.

5              You in your supplemental report

6    which is I think --

7              MR. SANDERS:  I can't remember

8         what exhibit you guys marked that as.

9         Do you remember, Chris?  Streit-10, is

10        that right?

11             MR. SEEGER:  Yes.

12             THE WITNESS:  10, yes.

13   BY MR. SANDERS:

14        Q.    You discussed with Mr. Seeger

15   an opinion that hydrogen sulfide is absorbed

16   at higher humidities and therefore not

17   measured as much as compared to lower

18   humidities, correct?

19        A.    Yes.

20        Q.    And that's based on -- at least

21   in part based on this supplemental testing

22   that you did at high and low humidities

23   aboard?

24        A.    It's based on the testing, and

Confidential - Subject to Further Confidentiality Review

Page 108

1    it's based on general knowledge of hydrogen

2    sulfide gas reactions.

3        Q.    And in this sampling here that

4    you did, the dry samples or the samples where

5    there wasn't any humidity, those went on for

6    a duration of six days, correct?

7        A.    According to the report, they

8    were done for six days, yes.

9        Q.    And the humidity samples, those

10   went on for 48 hours?

11       A.    That's correct.

12       Q.    And 48 hours is the usual

13   standard under which you measure -- or which

14   a lot -- I guess a lot of the standards sort

15   of say that you do the tests, correct?

16       A.    That's what most people do

17   their samples at, 48 hours, yes.

18       Q.    And you don't know why the dry

19   samples here were done for six days?

20       A.    You know, I don't know and -- I

21   don't know why they were done for six days.

22       Q.    There's not a particular

23   standard or method that calls for six-day

24   samples when you're doing chamber tests like

Confidential - Subject to Further Confidentiality Review

1      this?

2            A.      No.   I guess I'm not sure why

3      it was done for that length of time.

4            Q.      And the chamber testing that

5      you've referred to here, it's an indicator,

6      obviously -- or you've testified it's an

7      indicator of what's being emitted from the

8      drywall, correct?

9            A.      It's an indication of what can

10     be emitted under those testing conditions,

11     yes.

12           Q.      So, for example, Mr. Seeger

13     asked you about drywall that was removed from

14     an ECS home in Port Saint Lucie.   That

15     obviously was removed outside of the

16     conditions of that home, correct?

17           A.      Yes.

18           Q.      And then it was put into a

19     chamber and tested under the conditions

20     imposed by that method there, correct?

21           A.      That is correct.

22           Q.      And it also isn't a reflection

23     of the amounts or concentrations that you'd

24     actually find in a living space based on the

Confidential - Subject to Further Confidentiality Review

Page 110

1      drywall in the house?

2           A.      To my knowledge, there is no

3      correlation between the chamber testing and

4      air samples.

5           Q.      You had an opportunity to visit

6      some of the homes in Virginia that contained

7      Taishan drywall?

8           A.      I did.

9           Q.      And you indicated that when you

10     were in the houses, you smelled odors?

11          A.      Yes.

12          Q.      And it varied from room to

13     room, potentially depending on where you were

14     in the house?

15          A.      It depends location to

16     location, yes.

17          Q.      You didn't visit during that

18     trip the Orlando house?

19          A.      No.  Ultimately what happened

20     is many of those homes were done the day

21     before, and we got stuck in a huge rainstorm

22     and got diverted to Washington, so I couldn't

23     get there until the next morning.

24          Q.      But you didn't have an

Confidential - Subject to Further Confidentiality Review

1       opportunity to visit the Orlando house?

2           A.      That's right, we didn't.

3           Q.      Nor the Baldwin house?

4           A.      No.  We went to three houses

5       that had drywall in them that are listed in

6       my report and then one control house.

7           Q.      Okay.  If you go to -- you

8       were describing for the judge in your -- in

9       Streit-8, which is your December 2008 -- I'm

10      sorry, December 28th, 2009, report.

11          A.      Okay.

12          Q.      And you were referencing the

13      wiring on page 0063.

14          A.      Yes.

15          Q.      The corrosion you noted there

16      was on the ground wire only, correct?

17          A.      No, I'm just giving you an

18      example of the corrosion, and it happened to

19      be most evident on the ground wire.

20          Q.      Did you look at the wire around

21      the contact where the other wires, the

22      neutral and line wires, make contact with the

23      receptacle?

24          A.      Yes.

Confidential - Subject to Further Confidentiality Review

1    Q.    And there's corrosion or

2  tarnishing on the sections that are exposed

3  to the outside of the atmosphere, right?

4    A.    I believe that's true.

5    Q.    Have you ever undone one of

6  the --

7        MR. SANDERS:  Do you want to

8      take a break for a second?

9        THE WITNESS:  No, I'm okay.  Go

10     ahead.

11  BY MR. SANDERS:

12    Q.    Have you ever undone one of the

13  screws and looked at whether or not there's

14  shiny copper where the connection is actually

15  made?

16    A.    Yes.

17    Q.    And is there?

18    A.    There is.

19    Q.    Have you ever -- just like the

20  exhibit there on the upper left, have you

21  ever stripped down a wire from a receptacle

22  or a switch and seen that the copper is

23  shiny?

24    A.    I have not done that on --

Confidential - Subject to Further Confidentiality Review

1    there's only one sample I did that on, and

2    that was the Romex sample that we talked

3    about in my direct.

4         Q.    Let's go to that right now.  I

5    believe that's page 82 of this same exhibit?

6              MR. SEEGER:  I think it's 82

7         and 83.

8              MR. SANDERS:  Right.  Starts on

9         82.

10        A.    Yes.

11   BY MR. SANDERS:

12        Q.    And the indication of this

13   sample is that it was from the fixture end of

14   the Romex cable?

15        A.    Yeah, I think what they were

16   trying to do was give you an indication that

17   this wire was closer to the fixture and the

18   other one was closer to the other side.  But

19   my understanding is it wasn't actually at the

20   fixture end.

21        Q.    And the segment, is this -- in

22   the second picture in the upper right-hand

23   corner, is that the section or the segment

24   that you received in your sampling?

Confidential - Subject to Further Confidentiality Review

1     A.     It is.

2          Q.     Do you know why there's the

3     bare copper wire sticking out of it like

4     that, on the right side of that segment?

5          A.     No, I have no idea.  That's how

6     I received it.

7          Q.     Okay.  And the lower left

8     corner, are those the sections of the

9     insulated wire on either side of ground that

10    you stripped down?

11         A.     Yeah.  In fact, if you look

12    at -- they're backwards, and I apologize for

13    that.  It should be mounted opposite.  But

14    figure -- the lower right-hand corner is

15    photograph 15, and that's after taking the

16    outer white Romex off, so that's how they

17    were inside of the Romex sheathing.

18              And then the photograph on the

19    lower left corner, which is 16, shows the

20    areas that I stripped off the white and black

21    polymer coating.

22         Q.     Right.

23              And, you know, it's hard to

24    tell, obviously, from the picture, but is

Confidential - Subject to Further Confidentiality Review

1    there no corrosion on those areas underneath?

2          A.     I did not see any visible sign

3    of corrosion, even microscopically, on those

4    samples.

5          Q.     The other sample you talked

6    about with Mr. Seeger was a lamp cord, and

7    that's on page 77 of Exhibit 8?

8          A.     Yes.

9          Q.     And that's sort of a -- what it

10   looks like to me is a multi-stranded copper

11   wire sort of bundled in a clear plastic cord;

12   is that right?

13         A.     It's a multi-strand that then

14   is encased in the polymer.

15         Q.     And that polymer, that clear

16   polymer, that's -- I know you're not a

17   polymer expert, but that's different than the

18   polymer that we just referenced around this

19   sort of live and neutral wire, correct?

20         A.     You know, I haven't analyzed

21   it, but I think that that's probably true.

22         Q.     And when you looked at it and

23   you did your cross-section and looked at

24   these wires, as you got closer to the center,

Confidential - Subject to Further Confidentiality Review

1    away from the plastic, the tarnishing or

2    corrosion lessened, correct?

3         A.    It was slightly, yes -- excuse

4    me.  It was slightly less, yes.

5         Q.    And with respect to all the

6    wires and the copper -- I guess the wires and

7    other electrical components, you haven't done

8    any cross-sections of those?

9         A.    I have not.

10        Q.    And you haven't measured any

11   film thickness with respect to those?

12        A.    No.

13        Q.    You also discussed some of the

14   air sampling results from Florida Department

15   of Health and CPSC.  Both those agencies,

16   when they initially set out to do their

17   investigations in houses, they started with

18   grab samples and took grab samples, correct?

19        A.    Both agencies did grab samples

20   and did passive samples, but their report,

21   they basically abandoned the grab samples and

22   report the passive data.

23        Q.    And in the passive data that

24   was collected -- or all the data that was

Confidential - Subject to Further Confidentiality Review

1    collected, the CPSC found a slightly higher

2    level of hydrogen sulfide in complaint

3    homes -- what they called complaint homes

4    than they did noncomplaint homes; is that

5    correct?

6         A.    That is correct.

7         Q.    Was that about .6 to .4, or

8    something in that average, ppb?

9         A.    I think those are the

10   statistics that they report.

11        Q.    And do you know where the

12   dosimeters and other things were in the

13   houses in those reports?

14        A.    I think the report says they

15   were in a bedroom -- I think a master

16   bedroom, a bedroom and the living area,

17   something along those lines.

18        Q.    So they were spread throughout

19   the homes, or attempted to be spread

20   throughout the houses?

21        A.    I believe that's correct.

22        Q.    Does the CPSC report that you

23   reference -- does it note any distinction

24   between carbonyl sulfide in the complaint

Confidential - Subject to Further Confidentiality Review

1   homes versus the noncomplaint homes?

2        A.      I don't think they found any

3   statistical difference, so they don't go into

4   it any further than that.

5        Q.      I believe it's a group exhibit

6   marked as Streit-9.

7        A.      Yes.

8        Q.      Is that 9?

9        A.      This is --

10       Q.      I'm sorry.  What's the one that

11  says "Reliance Data for Dr. Lori Streit"?

12       A.      That's 11.

13       Q.      That's 11.  Sorry.

14       A.      That's all right.

15       Q.      Referencing Streit-11, one of

16  the -- I think the second sort of compiled

17  section indicates that there are samples of

18  drywall taken from the ECS house in Port

19  Saint Lucie?

20       A.      Yes, sir.

21       Q.      And the -- you actually did ICP

22  analysis for strontium in those -- in that

23  house?

24       A.      We did.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     And are those reported on

 2    page 13 and 14 of that -- 1850-0013 and

 3    1850-0014?

 4          A.     Yes.

 5          Q.     So the strontium in that house,

 6    levels were over 3,000?

 7          A.     They were.

 8                 MR. SANDERS:  That's it.

 9                 MR. SEEGER:  That's all you

10          have?  I just have a couple points.

11                 THE VIDEOGRAPHER:  I have ten

12          minutes on this tape.

13                 MR. SEEGER:  You want to change

14          the tape?  Go ahead and change it.

15                 THE VIDEOGRAPHER:  The time now

16          is approximately 4:46 p.m., and we are

17          now off the record.

18                 (Pause.)

19                 THE VIDEOGRAPHER:  This begins

20          Tape 3 of the videotaped trial

21          deposition of Dr. Lori Streit.  Time

22          now is approximately 4:48 p.m., and

23          we're back on the record.

24                 MR. SEEGER:  I just have a
```

Confidential - Subject to Further Confidentiality Review

1          couple follow-up questions,

2          Dr. Streit.

3                      EXAMINATION

4     BY MR. SEEGER:

5          Q.     Can you take out the exhibit --

6     I forgot the number -- for the 51-home study

7     done by CPSC?

8                  MR. GEORGE:   7.

9     BY MR. SEEGER:

10         Q.     7, I believe it is.

11         A.     Okay.

12         Q.     You were asked some questions

13    by Mr. Sanders about air testing versus

14    passive sampling of the drywall gases.  Do

15    you recall that?

16         A.     You mean grab samples versus

17    passive samples?  They're both air testing.

18         Q.     Yeah.  Okay.  Grab samples

19    versus passive testing.

20         A.     Yes.

21         Q.     And I believe that you had

22    testified in response that, in fact, that the

23    CPSC actually dropped grab sampling in its

24    final conclusions about how to go about doing

Confidential - Subject to Further Confidentiality Review

1    the testing?

2         A.       That's what it appears they

3    have done.

4         Q.       And I just want to refer you to

5    some language in the -- the pages aren't

6    numbered in the beginning.  It's the fifth

7    page at the end of their summary in the

8    beginning.

9               MR. SANDERS:  Is there a P

10        number on it?

11              MR. SEEGER:  You know what?  On

12        mine, no.  On hers, yes.  I'll tell

13        you when she gets to it.  Right there.

14              THE WITNESS:  Okay.

15              MR. SEEGER:  What's the P

16        number?

17              THE WITNESS:  It's

18        P1.1019-0005.

19   BY MR. SEEGER:

20        Q.       And I just want to ask you if

21   this is what you're more or less referring to

22   in this report and your answer to

23   Mr. Sanders.  It's the last couple sentences

24   of that last paragraph.  Starts off, "While

Confidential - Subject to Further Confidentiality Review

Page 122

1  further investigation is needed."  Do you see

2  that?

3      A.    Yes, I do.

4      Q.    "The findings of the study

5  suggested a tiered approach using a

6  combination of self-reporting of specific

7  home and symptom characteristics and,

8  potentially, some of the following methods

9  would be reasonable and appropriate:  A

10  visual inspection of ground wiring using

11  XRF/FTIR, deployment of metal coupons to

12  measure corrosion and passive monitors to

13  measure specific gases."

14          Did I read that correctly?

15      A.    You did.

16      Q.    Is that part of what you were

17  referring to?

18      A.    Yes.

19      Q.    There's no mention in that of

20  using grab samples, correct?

21      A.    No, and it doesn't appear in

22  their data either.  They pretty much

23  abandoned it.

24      Q.    The techniques that you used in

Confidential - Subject to Further Confidentiality Review

1    investigating Chinese drywall, are they

2    pretty much the same techniques used by the

3    CPSC?

4         A.    For the most part, yes.

5         Q.    The discussion that you had

6    with Mr. Sanders about strontium sulfide, is

7    that different from strontium?

8         A.    Strontium is an element.

9    Strontium sulfide is a compound that

10   incorporates that element that's chemically

11   bonded to sulfur.

12        Q.    Okay.  And there's no dispute

13   as to whether the Chinese drywall, in your

14   mind at least, contained strontium, correct?

15        A.    Oh, absolutely.

16        Q.    And you think there's any doubt

17   in the CPSC or the Florida Department of

18   Health?

19        A.    I don't think anybody has any

20   doubt.

21        Q.    Mr. Sanders asked you questions

22   about other causes of corroding HVAC coils.

23   Do you recall that?

24        A.    I remember his line of

1    questioning, yes.

2         Q.    Other causes, you know, being

3    close to the sea, chlorine, things like that.

4    Did you take that all into account when you

5    were looking at HVAC coils that were

6    purportedly damaged by off-gassing from

7    Chinese drywall?

8         A.    Yes.  They have very different

9    characteristics.  I mean, they have different

10   chemical agents that are involved, or they

11   exhibit different corrosion mechanisms.

12              MR. SEEGER:  That might be all

13        I have.  Let me just take a look.

14              (Pause.)

15              MR. SEEGER:  That's all I have.

16        Thanks.  Thank you very much,

17        Dr. Streit.

18              MR. SANDERS:  One more

19        question.

20                   EXAMINATION

21   BY MR. SANDERS:

22        Q.    Mr. Seeger just read you that

23   last paragraph on page 0005; and this is the

24   CPSC's sort of conclusions in their report

Confidential - Subject to Further Confidentiality Review

1      dated November 23rd, 2009, correct?

2          A.      That's correct.

3          Q.      And he said that, "While

4      further investigation is needed, the findings

5      of the study suggest that a tiered approach

6      using a combination of self-reporting of

7      specific home and symptom characteristics

8      and, potentially, some of the following

9      methods would be reasonable and appropriate:

10     A visual inspection of ground wiring, use of

11     XRF/FTIR, deployment of metal coupons to

12     measure corrosion and passive monitors to

13     measure specific gases."

14             Do you think all those

15     components are a reasonable way to conduct an

16     investigation of Chinese drywall houses?

17         A.      I think that if you're doing

18     XRF in the lab, it's useful; but I think it's

19     been pretty clearly shown that XRF in the

20     field is a problem.

21         Q.      But the other items, the visual

22     inspection, the deployment of metal coupons,

23     passive monitors and then some level of XRF

24     sampling, those are all reasonable ways to

Confidential - Subject to Further Confidentiality Review

1    investigate houses?

2              MR. SEEGER:  Objection,

3         mischaracterizes her testimony.

4         A.    I think you can use them.  I

5    think that -- you know, I have a problem with

6    the passive monitor simply because I don't

7    think it captures or displays the peaks that

8    can occur from symptomatic or episodic

9    releases, and so I prefer to use a controlled

10   environment where I'm looking for the

11   release, potential release, of the gases.

12   BY MR. SANDERS:

13        Q.    Have you suggested any other

14   way to measure the sort of peaks and the

15   actual kind of realtime measurements in

16   houses?

17        A.    Quite frankly, I think the best

18   way to do it is to set up a GS mass spec in

19   the house.

20        Q.    Just let it run?

21        A.    Just let it run.

22              THE VIDEOGRAPHER:  That's all?

23   Okay.

24              The time now is approximately

Confidential - Subject to Further Confidentiality Review

1         4:53 p.m.   Today's trial deposition of

2         Dr. Lori Streit, consisting of three

3         tapes, is now concluded.

4                   (Proceedings concluded at

5         4:53 p.m.)

6                  - - - - - - -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 128

```
 1                    CERTIFICATE

 2

 3            I, MICHAEL E. MILLER, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter and Notary Public, do hereby certify
      that prior to the commencement of the
 5    examination, LORI A. STREIT, Ph.D. was duly
      sworn by me to testify to the truth, the
 6    whole truth and nothing but the truth.

 7            I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
              I DO FURTHER CERTIFY that I am
11    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
12    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
13    that I am not financially interested in the
      action.
14

15

16    _____

17    MICHAEL E. MILLER,
      NCRA Registered Diplomate Reporter
      NCRA Certified Realtime Reporter
18    Certified LiveNote Reporter
      LA Certified Court Reporter #27009
19
      Dated: February 17, 2010
20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4              I, LORI A. STREIT, Ph.D., do
        hereby certify that I have read the foregoing
 5      pages and that the same is a correct
        transcription of the answers given by me to
 6      the questions therein propounded, except for
        the corrections or changes in form or
 7      substance, if any, noted in the attached
        Errata Sheet.
 8

 9

10

11

12      _____
        LORI A. STREIT, Ph.D.              DATE
13

14

15      Subscribed and sworn to before me this

16      _____ day of _____, 20 _____.

17      My commission expires: _____

18

19      Notary Public

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                    – – – – ·· – –
                           ERRATA
2                    – – – – ·· ··

3      PAGE   LINE      CHANGE

4      _____  _____     _____

5      REASON:         _____

6      _____  _____     _____

7      REASON:         _____

8      _____  _____     _____

9      REASON:         _____

10     _____  _____     _____

11     REASON:         _____

12     _____  _____     _____

13     REASON:         _____

14     _____  _____     _____

15     REASON:         _____

16     _____  _____     _____

17     REASON:         _____

18     _____  _____     _____

19     REASON:         _____

20     _____  _____     _____

21     REASON:         _____

22     _____  _____     _____

23     REASON:         _____

24
```

Confidential - Subject to Further Confidentiality Review

1                          - - - - - - -
                          LAWYER'S NOTES
2                          - - - - - - -

3        PAGE    LINE

4        _____   _____    _____

5        _____   _____    _____

6        _____   _____    _____

7        _____   _____    _____

8        _____   _____    _____

9        _____   _____    _____

10       _____   _____    _____

11       _____   _____    _____

12       _____   _____    _____

13       _____   _____    _____

14       _____   _____    _____

15       _____   _____    _____

16       _____   _____    _____

17       _____   _____    _____

18       _____   _____    _____

19       _____   _____    _____

20       _____   _____    _____

21       _____   _____    _____

22       _____   _____    _____

23       _____   _____    _____

24       _____   _____    _____