Confidential - Subject to Further Confidentiality Review

1        IN THE UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF LOUISIANA
2

3    _____    §   MDL NO. 2047
     IN RE:                 §
4    CHINESE-MANUFACTURED   §   SECTION: L
     DRYWALL PRODUCTS       §
5    LIABILITY LITIGATION   §   JUDGE FALLON
                            §   MAG. JUDGE WILKINSON
6    _____    §

7              FRIDAY, FEBRUARY 12, 2010

8                     - - -

9                 - CONFIDENTIAL -
       SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
            TRIAL PRESERVATION TESTIMONY
11

12            Videotaped deposition of JACK

13   CARAVANOS, Ph.D., held at the offices of

14   Gainsburgh, Benjamin, David, Meunier &

15   Warshauer, LLC, 1100 Poydras Street, Suite

16   2800, New Orleans, Louisiana, commencing at

17   1:42 p.m. on the above date, before Susan

18   Perry Miller, Certified Court Reporter,

19   Registered Diplomate Reporter, Certified

20   Realtime Reporter, Certified Broadcast

21   Captioner, NCRA Realtime Systems

22   Administrator.

23           GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph † 917.591.5672 fax
24              deps@golkow.com

**U. S. DISTRICT COURT**
EASTERN DISTRICT OF LOUISIANA
FILED   2-22-10
LORETTA G. WHYTE
CLERK

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
 2

     MICHELLE GERMANO; DENNIS       §
 3   JACKSON; SHARON JACKSON;       §
     JASON DUNAWAY; LISA DUNAWAY;   §
 4   Individually, and on behalf    §
     of all other similarly         §
 5   situated,                      §
                                    §
 6           Plaintiffs,            §
                                    §
 7   vs.                            §   2:09cv202
                                    §
 8   TAISHAN GYPSUM CO. LTD.        §
     f/k/a SHANDONG TAIHE DONGXIN   §
 9   CO. LTD.; VENTURE SUPPLY,      §
     INC.; HARBOR WALK              §
10   DEVELOPMENT, LLC; and THE      §
     PORTER-BLAINE CORP.,           §
11                                  §
             Defendants.            §
12

13   ─────────────────────────────────────────

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S :

 2       LAW OFFICES OF RICHARD J. SERPE, PC
         BY: RICHARD J. SERPE, ESQUIRE
 3           rserpe@serpefirm.com
         580 East Main Street
 4       Suite 310
         Norfolk, Virginia 23510
 5       (757) 233-0009
         Counsel for Plaintiffs
 6
         HAUSFELD, LLP
 7       BY: RICHARD S. LEWIS, ESQUIRE
             rlewis@hausfeldllp.com
 8       1700 K Street, NW
         Suite 650
 9       Washington, DC 20006
         (202) 540-7200
10       Counsel for Plaintiffs

11       BAKER & McKENZIE, LLP
         BY: DONALD J. HAYDEN, ESQUIRE
12           donald.j.hayden@bakernet.com
         Mellon Financial Center
13       1111 Brickell Avenue, Suite 1700
         Miami, Florida 33131
14       (305) 789-8900
         Counsel for Knauf Plasterboard
15       Tianjin Co., Ltd.

16       ALSO PRESENT:

17       STEPHANIE WILKINS
         Baron & Budd, PC
18
         STEPHANIE S. ROJO, ESQUIRE
19       Thompson, Coe, Cousins & Irons, LLP
         (Via Teleconference)
20
         MONICA C. SEGURA, ESQUIRE
21       Rumberger, Kirk & Caldwell
         (Via Teleconference)
22
         ELIZABETH J. FERRY, ESQUIRE
23       Fowler White Burnett, PA
         (Via Teleconference)
24                        - - -
```

1                          INDEX

2                 VIDEOTAPED DEPOSITION OF

3           JACK CARAVANOS, Ph.D., February 12, 2010

4                                        Page

5    APPEARANCES                            3

6

7     EXAMINATION OF JACK CARAVANOS, Ph.D.:

8

     BY MR. SERPE:                          8
9
     BY MR. HAYDEN:                         81
10
     BY MR. SERPE:                          158
11

12   CERTIFICATE                            161

13   ACKNOWLEDGMENT OF DEPONENT             162

14   ERRATA                                 163

15   LAWYER'S NOTES                         164

16

17    Index of Videotapes

18   Tape 1                                 7

19   Tape 2                                 46

20   Tape 3                                 92

21   Tape 4                                 144

22

23

24

1                    EXHIBIT INDEX

2                    Description              Page

3   P1.2041   Curriculum Vitae        —   12

4   P1.019    U.S. CPSC Staff         —   47
              Summary of
5             Contractor's Indoor
              Air Quality
6             Assessment of Homes
              Containing Chinese
7             Drywall

8   P1.2046   Case Definition         —   48
              (12-18-09) for
9             Drywall Associated
              Corrosion in
10            Residences

11  P1.2045   Interim Guidance —      —   52
              Identification of
12            Homes with Corrosion
              from Problem Drywall,
13            by the CPSC and
              Department of Housing
14            and Urban Development

15  P1.2044   Method 6200, Field      —   56
              Portable X-Ray
16            Fluorescence
              Spectrometry for the
17            Determination of
              Elemental
18            Concentrations in
              Soil and Sediment
19
    P1.1809   U.S. Department of      —   66
20            Housing and Urban
              Development
21            Guidelines for the
              Evaluation and
22            Control of Lead-Based
              Paint Hazards in
23            Housing

24

Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | P1.1810 | Performance Characteristic Sheets [P1.1810-001 ~ P1.1810-0048] | – 73 |
| 3 | Caravanos-1 | Affidavit of Tracey Dodd | – 91 |
| 5 | Caravanos-2 | Decision, Amorgianos v. National Railroad Passenger Corporation d/b/a Amtrak, 137 F.Supp. 2d 147 | – 112 |
| 8 | Caravanos-3 | "A Nonparametric Method for Estimating the 5th and 95th Percentile Curves of Variable-Time XRF Readings Based on Monotone Regression," October 24, 2000 | – 144 |

Confidential - Subject to Further Confidentiality Review

1           THE VIDEOGRAPHER:  We are now

2      going on the record.  The date today

3      is February 12, 2010.  The time now is

4      approximately 1:42 p.m.

5           This is the videotaped trial

6      deposition of Mr. Jack Caravanos,

7      taken in reference to the

8      Chinese-manufactured drywall

9      litigation taken for the U.S. District

10     Court, Eastern District of Louisiana.

11     The deposition is being held in

12     New Orleans, Louisiana, today.

13          My name is Melissa Bardwell,

14     videographer representing Golkow

15     Technologies, and the court reporter

16     today is Susan Miller.

17          Would counsel present please

18     introduce themselves and state their

19     affiliations for the record.

20          MR. SERPE:  Richard Serpe,

21     Richard Lewis, and Stephanie Wilkins

22     for the Germano plaintiffs.

23          MR. HAYDEN:  Don Hayden on

24     behalf of Knauf Plasterboard Tianjin.

Confidential - Subject to Further Confidentiality Review

```
 1              THE REPORTER:  Those on the
 2       phone, please, anybody want to
 3       announce?
 4              MS. SEGURA:  Monica Segura from
 5       Rumberger representing Florida Styles,
 6       just observing.  Thank you.
 7              THE REPORTER:  Anyone else?
 8              MS. ROJO:  Stephanie Rojo for
 9       North River Insurance Company, and I'm
10       also just observing.
11              THE REPORTER:  Anyone else?
12              (No response.)
13              (Witness sworn by the
14       reporter.)
15              JACK CARAVANOS, Ph.D.,
16   Having taken an oath to tell the truth, the
17   whole truth, and nothing but the truth, was
18   examined and testified as follows:
19                    EXAMINATION
20   BY MR. SERPE:
21       Q.     Would you state your full name
22   for the record?
23       A.     Jack Caravanos.
24       Q.     And, Dr. Caravanos, would you
```

Confidential - Subject to Further Confidentiality Review

1    tell Judge Fallon briefly about your

2    educational background and training?

3         A.    Yes.   I have a bachelor's

4    degree, a Bachelor's of Science in

5    environmental health from City University in

6    New York.   Following that, I pursued my

7    master's degree at the Polytechnic University

8    in New York.   The title there was

9    environmental health engineering.

10             After that I decided to pursue

11   public health, expanding my studies in

12   environmental health, and I earned a

13   doctorate in public health, environmental

14   health sciences, in 1984.

15        Q.    And where did you obtain your

16   doctorate in public health from in 1984?

17        A.    Columbia University School of

18   Public Health.

19        Q.    Dr. Caravanos, do you hold any

20   academic appointments at the current time?

21        A.    Yes.   I'm a tenured associate

22   professor at the Hunter College, City

23   University of New York.   I am also director

24   of the environmental and occupational health

Confidential - Subject to Further Confidentiality Review

1    sciences track, essentially the department

2    chair of a two-degree program, graduate

3    program in environmental and industrial

4    hygiene.

5         Q.    And what percentage of your

6    time is engaged in academic or teaching

7    activities?

8         A.    Approximately 50% of my time is

9    spent in academic education, followed by

10   administration and research.

11        Q.    You mentioned one of the areas

12   of teaching as industrial hygiene.  Would you

13   tell me about that program?

14        A.    Yes.  Hunter College, the

15   program I direct is an ABET accredited,

16   A-B-E-T, accredited industrial hygiene

17   program, and that means we produce

18   individuals that go on for certification.

19   Industrial hygiene is defined as the

20   identification, evaluation and control of

21   chemical, biological and physical agents.

22        Q.    Where did your industrial

23   hygiene program at Hunter obtain its funding?

24        A.    We are, for the past

Confidential - Subject to Further Confidentiality Review

1    23-some-odd years, we have been funded by the

2    Centers for Disease Control, NIOSH.  We

3    receive funding for graduate students and

4    support them for industrial hygiene

5    education.

6         Q.      Are you a Certified Industrial

7    Hygienist?

8         A.      I am a Certified Industrial

9    Hygienist.

10        Q.      Would you explain to the Court

11   how you achieve that certification?

12        A.      Yes.  CIH, Certified Industrial

13   Hygienist, is the highest level in our field.

14   It requires a set of coursework in industrial

15   hygiene and chemistry, biology, followed by

16   experience; and once you meet those two

17   requirements, as with many board

18   certifications, there's comprehensive exam, a

19   two-day exam, and I've been board-certified

20   for years.

21        Q.      Dr. Caravanos, have you

22   published in the peer-review literature?

23        A.      Yes, I have.

24        Q.      And approximately how many

Confidential - Subject to Further Confidentiality Review

1     articles have you published?

2          A.     I believe the number is

3     somewhere in the order of eight, eight to 10

4     articles.

5          Q.     And are those articles

6     contained in your curriculum vitae?

7          A.     Yes, they are.

8               MR. SERPE:  I'd like to offer,

9          file and introduce into evidence

10         Plaintiff's Exhibit 1.2041, which is

11         Dr. Caravanos's curriculum vitae.

12              MR. HAYDEN:  No objection.

13    BY MR. SERPE:

14         Q.     Dr. Caravanos, does this

15    curriculum vitae reflect the articles which

16    you have published?

17         A.     Yes, it does.

18         Q.     Do some of those articles

19    pertain to an instrument referred to by the

20    initials X-R-F?

21         A.     Yes, it does.

22         Q.     What do the initials X-R-F

23    stand for?

24         A.     XRF is the acronym for X-ray

Confidential - Subject to Further Confidentiality Review

1 fluorescence, and it's an instrument.

2     Q.    And what does the X-ray

3 fluorescence or XRF instrument do?  What is

4 its purpose?

5     A.    XRF is an analytical detection

6 method whereby when you irradiate or hit a

7 surface with energy, it reflects a specific

8 energy back.  A simple analogy would be a

9 fluorescent toy that is shown up against

10 light reflecting a green glow.  In the use of

11 environmental science and chemistry, XRF has

12 been fine-tuned where it's releasing either

13 radioactive gamma ray or X radiation,

14 bombarding a surface.  Electrons in the

15 receiving matrix are excited and reflect a

16 subsequent specific X-ray for that material.

17           So it's used primarily in our

18 business of environmental science and

19 industrial hygiene and in chemistry fields as

20 a metals detector.

21     Q.    And you've published literature

22 on the use of XRF and detecting metals?

23     A.    Yes, I have.

24     Q.    Do you teach courses with

Confidential - Subject to Further Confidentiality Review

1    respect to the use of XRF?

2         A.    I do.  I teach two types of

3    courses, academic courses at the graduate

4    level, as well as continuing education

5    courses.

6         Q.    Where do you teach those?

7         A.    The academic courses are done

8    within the Hunter College School of Health

9    Sciences in our department, and that is part

10   of a Master's of Science degree and a

11   Master's of Public Health degree.  We have

12   laboratory courses where it's presented

13   there.

14              In the world of continuing

15   education, I've been associated and have an

16   appointment at the University of Medicine and

17   Dentistry of New Jersey in Piscataway,

18   New Jersey, where I coordinate many

19   environmental assessment courses, namely in

20   this particular case, lead inspector/risk

21   assessor course.

22        Q.    And who is it that certifies

23   the lead risk assessor course?

24        A.    This course is approved by the

Confidential - Subject to Further Confidentiality Review

```
 1    U.S. EPA.  It must be approved by the

 2    curriculum and the content.  It is a U.S. EPA

 3    approved course, and in New Jersey, that

 4    course must also be approved by the

 5    New Jersey Department of Health and Human

 6    Services.

 7         Q.     Somebody that gets through the

 8    course, what does that entitle them to do?

 9    What's the meaning of being through that

10    certified course?

11         A.     In the early '90s, there were

12    several regulations that required lead-based

13    paint inspection, and in order to insure the

14    quality of the inspections, the consistency,

15    a program was put in so that these inspectors

16    must be trained properly in the use of that

17    instrument as well as the safe use and the

18    identification of that.  So these are

19    individuals that want to either work in

20    private industry in consulting firms or, very

21    often, the municipal agencies departments of

22    health in the proper use of this instrument.

23         Q.     How does that relate to getting

24    a licensure with respect to lead paint
```

Confidential - Subject to Further Confidentiality Review

1    inspections?

2         A.     These individuals in

3    New Jersey, after they complete the required

4    course, are issued a certificate, but in

5    New Jersey they actually have to proceed to

6    go get a licensed -- they have to take a

7    state exam in this field and provide proof of

8    some experience and qualifications and then

9    become a licensed New Jersey lead

10   inspector/risk assessor.

11        Q.     Have you obtained that license?

12        A.     Yes, I have.

13        Q.     Do you own an XRF?

14        A.     I own it in relationship to our

15   department.  Our department, environmental

16   and occupational health sciences at Hunter

17   College, is an owner of that instrument.  My

18   name is on the license.

19        Q.     Would you explain to the Court

20   whether the XRF technology is deployed only

21   in a laboratory or whether it also has use as

22   a field instrument?

23        A.     Well, there are two types of

24   XRF applications.  The initial instruments

Confidential - Subject to Further Confidentiality Review

```
 1     were benchtop models stabilized with proper

 2     sample preparation.  Following that, given

 3     the nature of this technology, technology has

 4     been downsized so now we have an array of

 5     field portable XRF instruments.

 6                    MR. SERPE:  In connection with

 7          the witness' testimony, I would tender

 8          Dr. Caravanos as an expert in the use

 9          of XRF methodology.

10                    MR. HAYDEN:  No objection.

11     BY MR. SERPE:

12          Q.     Dr. Caravanos, you agreed to

13     serve to provide expert witness testimony in

14     this Chinese drywall matter, did you not?

15          A.     I did.

16          Q.     What did you understand your

17     mission to be at the time that you were

18     retained as an expert witness?

19          A.     Well, specifically the use of

20     field portable XRF instrumentation for the

21     selective determination of Chinese wallboard

22     on a board-by-board basis.

23          Q.     And in order to prepare

24     opinions with respect to the field portable
```

Confidential - Subject to Further Confidentiality Review

Page 18

```
 1    XRF instrumentation for selective

 2    identification of Chinese wallboard, did you

 3    review regulatory documents that had been

 4    published concerning that topic?

 5          A.     Yes, I have.

 6          Q.     And was one of the documents

 7    that you reviewed and subsequently relied on

 8    a publication by the Consumer Products Safety

 9    Commission which was entitled "Draft Final

10    Report, CPSC Drywall and Interior

11    Environmental Quality Assessment," and dated

12    November the 18th, 2009, for which we've

13    marked for identification purposes as

14    Exhibit No. P1.019?

15          A.     Yes, I have.

16          Q.     And did you find that this

17    document was useful in your mission of

18    analyzing the appropriateness of portable XRF

19    for the selective identification of Chinese

20    drywall?

21          A.     Yes.  I found this essential

22    for reviewing the use of portable XRFs in

23    determining Chinese wallboard.

24          Q.     Dr. Caravanos, in preparation
```

Confidential - Subject to Further Confidentiality Review

1    for today's deposition, at your direction,

2    did we prepare PowerPoint slides that

3    illustrated some of the most important

4    passages of Exhibit P1.019 that would assist

5    you in your testimony?

6        A.    Yes.  Given the importance of

7    this document, I did ask you to highlight

8    certain sections.

9        Q.    And let me put up on to the

10   screen in the courtroom but hand you a manual

11   copy, since we're obviously not in the

12   courtroom, of the first PowerPoint slide, and

13   ask you if you can explain to the Court why

14   you isolated this particular section of the

15   CPSC's report as important.

16       A.    Well, the first citation I

17   had -- I have here that was quite important

18   for me is understanding that this was a

19   comparison of two groups of homes.

20            We had homes that were -- 51

21   homes were chosen and they were divided into

22   homes where there were complaints and homes

23   that did not have complaints.  So this is

24   studying 51 homes as groups, two groups,

Confidential - Subject to Further Confidentiality Review

```
 1    essentially.  Again, two groups.

 2         Q.     And what was important to you

 3    about groups, and was groups in distinction

 4    for you of any other concept?

 5         A.     Well, yeah.  It was not a

 6    home-by-home comparison.  It was essentially

 7    looking at characteristics within these two

 8    groups of complaint versus non-complaint.

 9              And I could read that section

10    if it's appropriate.

11         Q.     I believe it's up on the

12    Court's screen, but let's go ahead and read

13    that sentence anyhow.

14         A.     Yes.  It is on page P1.091-23

15    and it's in the introduction:  "The study

16    design was not intended to compare homes

17    individually but rather to compare two groups

18    of homes, complaint versus non-complaint,

19    under exposure conditions that would be

20    considered typical under normal occupancy."

21         Q.     Dr. Caravanos, how did that

22    statement which you've highlighted relate to

23    your mission with respect to analyzing the

24    use of a portable XRF for selective
```

Confidential - Subject to Further Confidentiality Review

1    identification?

2        A.     Well, this was not a

3    board-by-board, a section -- a room-by-room

4    comparison, it was looking at two groups.  So

5    again, they were not focusing on identifying

6    homes where different parts of a home had

7    Chinese drywall and other parts did not.

8    This was, again, comparing two large groups.

9        Q.    What's the next passage from

10   the Consumer Products Safety Commission which

11   you had us prepare a PowerPoint slide for?

12       A.    Yes.  The next section is on

13   page P1.019-0119.  It's Section 6.2.2, and

14   this was very important.  The title of this

15   is critical.  This is really -- this is a

16   large document.  There's a lot of information

17   in it.  But from my scope of work, for what I

18   was asked to look at, this is essentially

19   critical and it's entitled "The Valuation of

20   Portable XRF as a Field Screening Tool for

21   Source Identification."

22       Q.    And parsing that sentence,

23   portable as an adjective for XRF, was that

24   describing the field instrument that you

Confidential - Subject to Further Confidentiality Review

Page 22

1      discussed earlier?

2          A.      Yes.   These are the hand-held

3      field instruments that measure --

4      historically have been used to measure lead

5      and this is in the context of a screening

6      tool for those homes.

7          Q.      And what is the significance of

8      describing a tool as a screening tool?

9          A.      Well, it's one of the methods.

10     In screening, very often in public health,

11     environmental sciences, we are looking at

12     ways of filtering down the persons at risk.

13     So whether -- this being used generically as

14     a tool, an instrument, but there are many

15     tools that can be used in public health.

16                 In this case, the tool happens

17     to be an instrument.

18         Q.      What was significant to you

19     about this introductory paragraph of 6.2.2?

20         A.      Yes.   The next important

21     section of this that I found very, very

22     significant was, and I quote, "Portable XRF

23     has been suggested as a useful tool for field

24     identification of imported drywall using

Confidential – Subject to Further Confidentiality Review

1    elevated strontium concentrations as a

2    marker."

3              So this, as the document speaks

4    for itself, XRF has been considered for its

5    applicability in assessing imported drywall.

6         Q.    Did that paragraph also speak

7    to the implications of using it as a field

8    tool?

9         A.    Yes.  In the second and the

10    third sentence following, it states,

11    "However, XRF analysis in the field can be

12    significantly impacted by various surface

13    materials.  When drywall is measured in situ,

14    the paint and any other of the myriad surface

15    coatings that could be applied to walls have

16    a muting effect on the strontium

17    concentrations because the strontium is

18    located at depth."

19              So if I may, the first sentence

20    says it's been suggested as a useful tool,

21    and then the second sentence I read warns of

22    caution in that it underestimates the muting

23    effect on the strontium concentrations

24    because of the location of the gypsum within

Confidential - Subject to Further Confidentiality Review

1    depth of the material.

2         Q.     What muting influences has CPSC

3    suggested to you in this section?

4         A.     Well, consistently in this

5    document it's a negative bias, which means it

6    underestimates -- "it" being portable XRF --

7    underestimates strontium concentrations, and

8    that is quite expected in our field, having

9    experience in this, because when you shoot a

10   wall -- that's what they call taking a

11   reading.  When you shoot a wall, you must go

12   through many layers.  And unlike paint, where

13   you're assessing the top layer, this you must

14   go through maybe several layers of paint,

15   primer, paper, joint compound, maybe more

16   paper, all the way into the gypsum.  So

17   there's a lot of potential bias and material

18   substrate interferences that can affect the

19   reading.

20        Q.     Doctor, let's flip to the next

21   section which you identified.

22        A.     Uh-huh.  Yes, and that would be

23   page P1.019-121.

24        Q.     Bear with me for a second, I

```
 1     think I have gotten my papers out of order.
 2          A.     It begins with, "However, there
 3     is no."  It's page 107.
 4                 MR. SERPE:  Can we go off the
 5          record for a second, please?
 6                 THE VIDEOGRAPHER:  The time now
 7          is approximately 2:01 p.m., and we are
 8          now off the record.
 9                 (Recess taken, 2:01 p.m. to
10          2:03 p.m.)
11                 THE VIDEOGRAPHER:  The time now
12          is approximately 2:03 p.m., and we are
13          back on the record.
14     BY MR. SERPE:
15          Q.     Dr. Caravanos, I've gotten my
16     papers reshuffled and in right order and I
17     believe I'd asked you what the next reference
18     was that you had us prepare a PowerPoint
19     slide for regarding -- on the Consumer
20     Products' November indoor environmental
21     quality document.
22          A.     Yes.  And that is, again, on
23     page 121 of the marked document, page 107 of
24     the original, and the section that is very
```

Confidential - Subject to Further Confidentiality Review

Page 26

```
1    significant here was, "However, there is no

2    clear strontium concentration measured

3    through the paint that could be reliably used

4    to differentiate drywall with true elevated

5    strontium.  Example, many false negatives.

6    The false negatives likely occur on locations

7    in the home that have drywall with thick

8    layers of paint and/or plaster."

9         Q.    Dr. Caravanos, please explain

10   to the Court what the phrase "no clear

11   strontium concentration measured through the

12   paint," what does that mean in terms of the

13   field use of an XRF for selective drywall?

14        A.    Right.  There is no numerical

15   number that is -- that can exclude -- there's

16   no numerical number for strontium that can be

17   used as an exclusionary concept for Chinese

18   drywall.

19        Q.    And what do you mean, "as an

20   exclusionary concept"?  In other words, to

21   say that it wasn't Chinese drywall?

22        A.    That's right.  What we have is

23   a number of false -- a very high percentage

24   of false negatives, where that the instrument
```

Confidential - Subject to Further Confidentiality Review

Page 27

```
 1    says the material is not -- using a certain

 2    numerical standard, the instrument says the

 3    material is not Chinese drywall using a

 4    certain strontium value when indeed, when

 5    sent to a laboratory, that ends up being

 6    positive, so it's a false negative, meaning

 7    the instrument is falsely recording a

 8    negative result.

 9         Q.    And what does CPSC suggest in

10    this section is the source of the false

11    negatives of those false reports?

12         A.    Yes.  In the second sentence,

13    "The false negatives likely occur on

14    locations in the home that have drywall with

15    thick layers of paint and/or plaster," so

16    it's the paint, the paper, the coating on the

17    gypsum that is likely interfering with the

18    reading.

19         Q.    With the reading of the field

20    instrument?

21         A.    Yes, with the reading of the

22    field instrument.

23         Q.    Dr. Caravanos, what's the term

24    "reliably used" mean to you as an industrial
```

Confidential - Subject to Further Confidentiality Review

1    hygienist and environmental scientist?

2        A.    Well, for me that means one

3    that can be relied on, one that is

4    confirmatory, one that scientific decisions

5    are based on.  It's not a more likely than

6    not.  It's a high standard of quality.

7        Q.    Dr. Caravanos, I'd like you to

8    explain this concept of false negatives on

9    using a field device by reference to the

10   figure that was provided by the Consumer

11   Products Safety Commission on page

12   P1.019-0121, the page 107 of the original

13   document.  And to illustrate that point, I'd

14   like to hand you -- we'll put this up on the

15   podium -- I'm sorry, on the easel in a

16   minute.

17            Let me hand you a page from

18   CPSC and ask you if you can identify it.

19       A.    Yes.  This is Figure 6.3 on the

20   reference page.  This is a very, very

21   significant, important chart for me.

22            Would you like me to go ahead

23   and --

24       Q.    Please, explain.

Confidential - Subject to Further Confidentiality Review

1        A.        Well, this is -- do I need to

2    show it to the -- why don't we just leave it

3    right there.

4        Q.        Perhaps we'll put it up first,

5    yeah.

6        A.        And what we have here is the

7    plotting of two strontium numbers, strontium

8    in parts per million as measured by field

9    data, and we should put the phrase here

10   "XRF," so this measurement -- yeah, let's put

11   that on there.  So this, just to make it

12   straightforward, is XRF.  And this lab, which

13   is several different methods but we could put

14   here inductively coupled plasma and the key

15   word there is lab, so XRF versus lab.

16              So what we have here is for the

17   51 homes that were assessed in the CPS study

18   throughout several states, what we have is

19   side by side -- and it says it right here,

20   "Comparison of strontium concentrations of

21   co-located samples."  Co-located means you

22   take a reading here and right next to it you

23   take a chunk, a bulk sample, and send it for

24   labs.

Confidential - Subject to Further Confidentiality Review

1              So to pick a point here, this

2    point right here, these two points say that

3    an XRF gave us a reading of -- that's about

4    3500, maybe 3400; and the lab gave us a

5    reading of 1500.  Looking at another value,

6    let's say up here, this is an example of the

7    lab giving us a reading -- the XRF reading,

8    an instantaneous reading of 1200 or maybe

9    1500 but the actual lab result was 5,000.  So

10   these are all the data points from those 51

11   studies -- homes.

12       Q.     Dr. Caravanos, in the previous

13   slide, you selected a phrase, "regarding

14   strontium concentration that could be

15   reliably used to differentiate drywall."

16              In that regard, are you aware

17   that 1200-part-per-million strontium was

18   selected by Dr. Perricone in this case as a

19   reliable value from which strontium could be

20   used to differentiate drywall?

21       A.     Yes, I am.  Yes, I was.

22       Q.     And at this point, I'd like you

23   to put the board down here and bracket for

24   us, if you will, these 1200 strontium ranges.

Confidential - Subject to Further Confidentiality Review

1          A.      Okay.  I'm going to estimate

2     this.  This would be half --

3               MR. HAYDEN:  I'm going to

4          object to the testimony because this

5          has to do with Florida homes, not with

6          the Virginia homes.

7          A.      Okay.

8     BY MR. SERPE:

9          Q.      Okay.  So you've drawn two

10    lines on Exhibit P1.019-121.  What lines are

11    now added to this document?

12         A.      Okay.  Looking at the

13    ordinate -- the X ordinate field data, I

14    estimated to the best of my ability 1200.

15    This is 1,000, this is 2,000, 1500 would be

16    about here, so I drew a line, a vertical line

17    going up on the 1200 ordinate.

18               Similarly, I estimated the 1200

19    point on the lab data strontium, and I drew a

20    horizontal.

21         Q.      So let's start with the field

22    data line that was drawn here.  What does

23    this line divide?

24         A.      Okay.  This line -- this line

Confidential - Subject to Further Confidentiality Review

Page 32

1    over here says that if we use 1200, right,

2    that's the 1200 number that is in Perricone,

3    that an XRF value on the left side of this

4    line, all these points would be negative.

5    All the points at the right would be

6    positive.

7         Q.     What do you mean by negative

8    and positive?

9         A.     Meaning as per the definition,

10   1200, it would be negative Chinese wallboard,

11   negative for strontium as a surrogate for

12   Chinese wallboard.  Likewise --

13        Q.     Go ahead.

14        A.     Likewise, on the right side of

15   this, like these readings here, all say it's

16   positive according to the XRF.

17        Q.     So this line is how the field

18   XRF would divide boards into domestic versus

19   Chinese?

20        A.     Yes.  Yes.

21        Q.     What about the other axis?

22        A.     This axis uses the same value

23   of 1200, but as the lab data.  And what this

24   shows is anything above this line is

Confidential - Subject to Further Confidentiality Review

```
 1    positive, and this is confirmatory positive,

 2    whereas this field data XRF is more of a

 3    screening, this is the ultimate way to

 4    measure strontium is in a lab.  So anything

 5    above here is positive using this value.

 6    Anything below is negative.

 7          Q.     Would you write your word here,

 8    "confirmation," above ICP?

 9          A.     Yes.  This is the absolute --

10    (witness complied.)

11          Q.     And would you write "screening"

12    above XRF, or below.

13          A.     (Witness complied.)

14          Q.     So, Dr. Caravanos, there are

15    some areas on this chart now where the field

16    screening tool disagrees with the

17    confirmatory laboratory data.  Isn't there?

18                MR. HAYDEN:  Objection to form.

19          A.     Yes.  Everything to the left of

20    this line is, according to the XRF screening

21    instrument, negative.  And everything to --

22    above this line is indeed positive for

23    strontium at the 1200 level indicative to

24    Chinese wallboard.  So all these points here,
```

Confidential - Subject to Further Confidentiality Review

1    and if I may just sort of block it out, all

2    these points are false negatives.

3    BY MR. SERPE:

4         Q.     Because I'm a little concerned

5    about the brightness of this marker, if I

6    can -- if you'll indulge me by doing a little

7    bit heavier highlighting in that region so we

8    can pick it up on the video.

9         A.     Let's see.  Well, let's see.

10   Should we just paint it up?

11        Q.     Yes, please.

12        A.     So everything in this box, all

13   these data points, are false negatives.

14   We'll put that back.

15        Q.     Dr. Caravanos, what's the

16   importance of having this many false

17   negatives on the CPSC's Figure 6.3?

18        A.     Well, just comparing the mass,

19   the mass of dots in this blocked-out section

20   to the entire section, my estimate would be

21   40 to 50% of all the points have false

22   negatives, meaning we made a mistake.

23        Q.     And what mistake was made?

24        A.     If we were using the XRF

Confidential - Subject to Further Confidentiality Review

1    screening instrument to definitively say that

2    there was -- this was Chinese wallboard, it

3    was wrong.  And this is immediately

4    scientifically unacceptable, this high rate

5    of false negatives.

6          Q.     So in this region, what did the

7    screening tool tell us the board was;

8    domestic or U.S.?

9          A.     You really don't know.

10               MR. HAYDEN:  Objection,

11         speculation.

12   BY MR. SERPE:

13         Q.     I'm sorry.  In this region,

14   below 1200 ppm, using that standard, what did

15   the field instrument tell us was the -- the

16   board was positive or negative?

17         A.     The field instrument here told

18   us it was negative when indeed it was

19   positive, so it is Chinese wallboard.  So

20   using the instrument here shows that we're

21   making a lot of mistakes.

22         Q.     And are they so many mistakes

23   that you would consider this to be an

24   unreliable tool for assessing or

Confidential - Subject to Further Confidentiality Review

1    differentiating drywall?

2         A.    Yes.  The field portable XRF,

3    as you can see here, is not an acceptable

4    determinant of strontium in wallboard.  This

5    rate of false positive is unacceptable.

6         Q.    Rate of --

7         A.    I'm sorry, this rate of false

8    negatives is unacceptable.  As a matter of

9    fact, it's interesting to see that the XRF

10   got readings here of zero, right?  So this

11   right here would be an XRF reading of zero.

12   You shoot the wall, zero strontium, when in

13   reality, every point -- this point is, I

14   don't know, 100, 200, 600, 2200 -- so it's

15   amazing that in some cases the instrument

16   reported zero when in reality the laboratory

17   result was very high.

18        Q.    Doctor, if I heard my learned

19   colleague's objection clearly, I think he

20   suggested to the Court that these values were

21   only from Florida.

22              Was it your understanding that

23   the data that was reported in the 51-home

24   study was only the State of Florida?

Confidential - Subject to Further Confidentiality Review

 1          A.      It's my understanding that this

 2    data comes from Florida homes.  It comes from

 3    several states, including Florida, including

 4    Virginia and Mississippi and Alabama.  So

 5    this 51 study was a sample of many homes

 6    throughout.

 7          Q.      Dr. Caravanos, have you seen

 8    specifically data on co-located samples from

 9    Virginia showing false negatives?

10          A.      Yes, I have.

11          Q.      Doctor, finally, from CPSC, I'd

12    like you to tell us about the final slide

13    that we prepared with respect to the

14    conclusions that were drawn by the CPSC with

15    respect to the use of the field or portable

16    XRF for -- as a screening tool.

17          A.      Yes.  And the reason I

18    highlighted this, it refers to in essence the

19    unit of study being the house and not board

20    by board.  And if I may read this section, on

21    page P1.0119-022, the last sentence

22    abstracted, "The house as a whole can be

23    reasonably well characterized using the

24    percent XRF samples with strontium greater

Confidential - Subject to Further Confidentiality Review

1    than 600."

2              And again, the unit there is

3    not board by board, the house as a whole.

4        Q.    Doctor, in the CPSC referring

5    to a well characterization or a

6    characterization that could be done well on

7    that whole home, they've picked a value of

8    600, did they not?

9        A.    Yes, they do.

10       Q.    Did they suggest that that was

11   a value that was restricted to a single

12   state?

13       A.    No, they have not.

14       Q.    Did they suggest that it was

15   regional, Florida and Gulf Coast, as opposed

16   to a single standard for the United States?

17       A.    No, they've not, and my

18   understanding, this is the Consumer Products

19   Safety Commission, a governmental agency, and

20   they do not proceed to individually set

21   different standards for different states.

22   This is the federal government and it applies

23   universally.

24       Q.    Dr. Caravanos, in addition to

Confidential - Subject to Further Confidentiality Review

1    your review of the Consumer Products Safety

2    Commission governmental guidance, did you

3    also review the guidance that was provided by

4    the State of Florida?

5         A.     Yes, I did.

6         Q.     And I'd like to hand you what's

7    been previously marked for identification as

8    P1.2046 and ask you if you can identify it.

9         A.     Yes, this is the Florida case

10    definition document that I also used to form

11    my opinion in my report.

12         Q.     And with respect to -- well,

13    first, when was that Florida definition?

14    What was the date on that?

15         A.     The document is dated

16    December 18th, 2009.

17         Q.     Did we prepare a PowerPoint

18    slide at your direction to assist your

19    testimony?

20         A.     Yes, you did.

21         Q.     What was significant to you

22    about the Florida state definition with

23    respect to your mission; that is, the field

24    portable XRF as an identification tool?

Confidential - Subject to Further Confidentiality Review

1      A.      Right.   In the first paragraph

2    defining sort of the scope of this document

3    it says in sentence number 2, "The sole

4    purpose of this case definition is to help

5    identify homes that are affected by corrosion

6    associated with drywall emissions."

7              And again, the focus there was

8    that this is for homes, not a room-by-room or

9    a board-by-board or an inch-by-inch

10    assessment.

11      Q.    What else was significant to

12    you from this introductory paragraph for the

13    Florida definition in December?

14      A.      Yeah.   Perhaps one of the most

15    significant statements in this document

16    complementing other documents and research is

17    the sentence, "Criteria to demonstrate that a

18    home is not affected by corrosion drywall

19    emissions may require a different approach

20    and inspection criteria that are not

21    described in this document."

22      Q.      And -- go ahead, I'm sorry.

23      A.      And again, this gets to the

24    point that this is not used as an

Confidential - Subject to Further Confidentiality Review

1    exclusionary concept, more of identifying --

2    screening homes and identifying suspect homes

3    and confirming suspect homes.  So again, the

4    last sentence, "May require a different

5    approach and inspection criteria that are not

6    in this document."

7         Q.    Dr. Caravanos, in the research

8    that you've done as part of your mission in

9    this case, have you found a single written

10   document that does describe a system whereby

11   an investigator could selectively identify

12   drywall that is capable of corrosive drywall

13   emissions and differentiate it from domestic

14   drywall?

15        A.    No, I have not.  In all the

16   documents provided, the CPSC, my own

17   literature research, I've not.

18        Q.    Doctor, looking to the

19   Florida's definition of a case where a house

20   has corrosive drywall, what did you find

21   important in their criteria and their

22   analysis of criteria with respect to the use

23   of XRF, and particularly portable XRF?

24        A.    Yes.  There are three criteria

Confidential – Subject to Further Confidentiality Review

```
 1      presented in this, one for homeowners, one

 2      for supporting indicators, and the last,

 3      confirmatory evidence, criteria number 3

 4      under trained professionals.

 5                 And I read here that criteria

 6      number 3 is labeled "Confirmatory evidence of

 7      drywall associated corrosion," and that one

 8      or more of these has to be satisfied for you

 9      to say confirmatory, definitively,

10      scientifically, that this is indeed Chinese

11      drywall."

12                 And when you look at the three

13      options labeled 1, 2, 3, elemental sulfur can

14      be measured using a certain technique,

15      laboratory analysis of head space gases or

16      literally putting a qualitative analysis of a

17      suspect drywall, the corrosion test is

18      required.

19                 So what's interesting in this

20      is XRF portable, field portable XRF is not

21      mentioned at all as a confirmatory tool.

22          Q.     For that matter, is laboratory

23      XRF mentioned as a confirmatory tool for

24      Chinese drywall?
```

Confidential - Subject to Further Confidentiality Review

1      A.      It is not, and most notably,

2   strontium is not even measured.  So at the

3   confirmatory evidence, they are saying --

4   measuring strontium is not acceptable,

5   that -- to measure certain sulfur compounds,

6   off-gassing, or corrosion.

7              MR. HAYDEN:  I'm sorry, Doctor,

8        what are you referring to?

9      A.      The Florida guideline.  So

10  there's no XRF and there's no mention of

11  field portable XRF and no mention of

12  strontium.

13  BY MR. SERPE:

14     Q.      Dr. Caravanos, we held up a

15  moment ago this diagram where we talked about

16  the field screening tool versus a laboratory

17  confirmation, so at least with respect to the

18  State of Florida and using a confirmatory

19  laboratory, is it then your testimony that

20  Florida has excluded the use of XRF in a

21  confirmatory manner?

22              MR. HAYDEN:  Objection,

23        speculative.  Solely speculative.

24        Lack of foundation.

Confidential - Subject to Further Confidentiality Review

Page 44

1     BY MR. SERPE:

2          Q.     Dr. Caravanos, does Florida

3     mention XRF as a confirmatory tool for

4     strontium?

5               MR. HAYDEN:  Objection, lack of

6          foundation.  Objection, form.

7     BY MR. SERPE:

8          Q.     Dr. Caravanos, have you read

9     thoroughly Plaintiff 1.2046?

10         A.     I have.

11         Q.     And on the basis of your

12    review, do you see that the State of Florida

13    in terms of its criteria 3, confirmatory

14    evidence, provides any suggestion that XRF

15    can be used in a confirmatory manner?

16         A.     No, not at all under criteria

17    3, confirmatory evidence.  XRF is not

18    mentioned at all as a confirmatory tool, nor

19    is the mention of strontium.

20         Q.     Thank you.

21         A.     So this is not applicable.

22         Q.     Finally, Doctor, with respect

23    to review of regulatory materials concerning

24    the use of portable XRF, did you review the

Confidential - Subject to Further Confidentiality Review

Page 45

1     Consumer Products Safety Commission recent

2     statement providing interim guidance which we

3     have marked for identification as P1.2045?

4          A.    Yes, I have seen this, yes.

5               MR. SERPE:  With apologies to

6          my learned counsel, from a

7          housekeeping standpoint, I have

8          neglected to offer, file and introduce

9          into evidence the Consumer Products

10         Safety Commission 51-home study or the

11         Florida definition, December 18th,

12         2009.

13              Are there any objections to

14         those documents being received in

15         evidence?

16              MR. HAYDEN:  I don't think

17         under this witness they'll be

18         introduced.  But I don't think we're

19         going to have an objection overall, I

20         don't think, for purposes of the

21         record.

22              MR. SERPE:  No specific

23         objection, though, for --

24              MR. HAYDEN:  This witness

Confidential - Subject to Further Confidentiality Review

Page 46

```
 1        hasn't established the basis for

 2        getting it into evidence.

 3               MR. SERPE:  We'll agree to

 4        disagree about that.  But I guess

 5        there's no additional objection which

 6        you can share with me that we might

 7        then have an ability, then, to cure.

 8               MR. HAYDEN:  Do you mind going

 9        off the record for a second?

10               MR. SERPE:  Sure, that's fine.

11               THE VIDEOGRAPHER:  The time now

12        is approximately 2:28 p.m., and we are

13        now off the record.

14               (Recess taken, 2:28 p.m. to

15        2:31 p.m.)

16               THE VIDEOGRAPHER:  This begins

17        Tape 2 of the trial deposition of

18        Mr. Jack Caravanos.  Time now is

19        approximately 2:31 p.m., and we are

20        back on the record.

21   BY MR. SERPE:

22        Q.    Dr. Caravanos, a couple of

23   housekeeping matters before we turn to this

24   next document.  With respect to the Consumer
```

Confidential - Subject to Further Confidentiality Review

Page 47

1    Product Safety Commission document which we

2    previously identified as P1.019, do you

3    consider this publication of an agency of the

4    United States government as an authoritative

5    document?

6         A.    Yes, I do.

7         Q.    And is it the kind of document

8    that's typically relied on by people in

9    industrial hygiene and environmental

10   sciences?

11        A.    It is absolutely, yes.

12        Q.    And is it something that you

13   relied on and would normally rely on in the

14   course of your profession?

15        A.    Yes, it is.

16             MR. SERPE:  In conjunction with

17        the witness' testimony, I'd offer,

18        file and introduce into evidence

19        P1.019, subject to counsel's

20        objections.

21   BY MR. SERPE:

22        Q.    Dr. Caravanos, the same group

23   of questions with respect to a published

24   state definition from December the 28th of

Confidential - Subject to Further Confidentiality Review

Page 48

1    2010 [sic], is it within the purview of your

2    expertise as an industrial hygienist and

3    environmental scientist to review state

4    regulatory definitions with respect to

5    environmental hazards?

6         A.    Yes, that is within my purview.

7         Q.    And do you find that the

8    Florida statement is the sort of

9    authoritative statement from a state upon

10   which you rely?

11        A.    Yes, I do.

12             MR. SERPE:   In connection with

13        the witness' testimony, I would offer,

14        file and introduce into evidence

15        Plaintiffs Exhibit P.2046.

16             MR. HAYDEN:   No objection.

17   BY MR. SERPE:

18        Q.    Dr. Caravanos, my learned

19   adversary has alerted me to the issue with

20   respect to these individual blue dots here,

21   are you able to tell, for example, this dot

22   here, whether that came from Florida or

23   Louisiana or Virginia?

24        A.    No.   That's not possible.

Confidential - Subject to Further Confidentiality Review

Page 49

1        Q.      And with respect to the data

2    points that are here, could you tell as to

3    any percentage of them which state that they

4    came from?

5        A.      No, there's no indication from

6    this representation the source of the

7    individual data points with regard to states.

8        Q.      And the Consumer Products

9    Safety Commission characterized this rate of

10   false negatives as many false negatives, did

11   it not?

12       A.      Yes, it did.

13       Q.      And did the Consumer Products

14   Safety Commission indicate that the many

15   false negatives that they describe were a

16   phenomenon that rendered the field XRF

17   unreliable for an individual state or did

18   they say it generally with respect to the use

19   of the technology?

20           MR. SERPE:   Objection to form,

21       it mischaracterizes the testimony --

22       or mischaracterizes the report.

23       A.      Yes, they're referring to in

24   general all states.

Confidential - Subject to Further Confidentiality Review

```
 1      BY MR. SERPE:

 2          Q.      Doctor, turning your attention

 3      to what we've marked as Exhibit P1.2045, have

 4      you had a chance to review the interim

 5      guidance recently provided by the Consumer

 6      Products Safety Commission in connection with

 7      the Department of Housing and Urban

 8      Development or HUD?

 9          A.      Yes, I have.

10          Q.      And at your direction, did I

11      produce a PowerPoint slide with respect to

12      this document?

13          A.      Yes, you have.

14          Q.      What was it that was important

15      to you about this document that we have

16      isolated and highlighted with respect to this

17      PowerPoint slide?

18          A.      Yes.   This document dated

19      January 28th shows a two-step -- and let me

20      just read the title, "Interim Guidance,

21      Identification of Homes with Corrosion From

22      Problem Drywall."   And by CPSC and HUD.   And

23      under step 2, step 1 being a threshold

24      determination, a two-point threshold
```

Confidential - Subject to Further Confidentiality Review

Page 51

1       determination, under step 2, corroborating

2       evidence, which I read as confirmatory, one

3       of the options that is used to determine is

4       it indeed Chinese drywall is item C, and I

5       quote, "Strontium levels in samples of

6       drywall core found in the home, i.e.,

7       excluding the exterior paper surfaces,

8       exceeding 1200 ppm."

9           Q.     And what's the significance to

10      you of the word "core" in that sentence?

11          A.     Yes, in environmental sampling,

12      industrial hygiene, this word "core" is

13      referred to as a bulk sample, and we've seen

14      it in lead paint testing and asbestos

15      testing.

16              So when I read "strontium

17      levels in samples of drywall core" and then

18      followed by "specifically excluding paper," I

19      read this as a laboratory flame AAS or ICP

20      analysis.  But essentially this is a

21      laboratory determination.

22              MR. HAYDEN:  Objection, move to

23          strike, speculation.

24      BY MR. SERPE:

Confidential - Subject to Further Confidentiality Review

Page 52

1          Q.      Dr. Caravanos, do you have

2     expertise with respect to reviewing

3     guidelines from CPSC and HUD with respect to

4     the existence of environmental hazards?

5          A.      Yes, I have.

6          Q.      And have you reviewed

7     Plaintiffs' Exhibit P1.2045?

8          A.      Yes, I have.

9          Q.      And do you find that the

10    terminology and the analysis which is

11    contained in there is germane and central to

12    your experience and training as a certified

13    industrial hygienist and environmental

14    scientist?

15         A.      Yes.

16              MR. SERPE:   In connection with

17         the witness' testimony, I would offer,

18         file and introduce into evidence

19         P1.2045.

20              MR. HAYDEN:   That's the

21         interim --

22              MR. SERPE:   Interim,

23         January 28th, 2010.

24              MR. HAYDEN:   No objection.

Confidential - Subject to Further Confidentiality Review

Page 53

1    BY MR. SERPE:

2        Q.    Doctor, did you review this

3    Section 2, corroborating evidence, for

4    references to the use of field XRF as

5    corroborating evidence?

6        A.    Yes, I have.

7        Q.    And what evidence do you find

8    of the Consumer Products Safety Commission or

9    HUD suggesting that an XRF can be used as an

10   instrument for the selective identification,

11   the portable XRF for the selective

12   identification of Chinese drywall?

13       A.    Yes.  And in this document, I

14   read nowhere the mention of XRF as a --

15   portable XRF as a determinant of Chinese

16   drywall.

17       Q.    Dr. Caravanos, in the title of

18   this guidance document, there's the word

19   "homes."  What was the significance to you of

20   the word "homes" in the title of the

21   document?

22            MR. HAYDEN:  Objection,

23       relevance.

24       A.    This identification of homes,

Page 54

```
 1    the unit of study, the problem is wallboard
 2    in homes and generating these gases, so this
 3    is not intended to be a surface-by-surface, a
 4    board-by-board, inch-by-inch determination.
 5    The home is defined as a -- in this case,
 6    problem Chinese wallboard home or not.
 7              So again, this is -- the unit
 8    of study here is homes and not a
 9    board-by-board.
10    BY MR. SERPE:
11        Q.    So, Dr. Caravanos, with respect
12    to your review of all of these regulatory
13    documents, what conclusions did you draw with
14    respect to the appropriateness of portable or
15    hand-held XRF as a tool for the selective
16    identification and removal of Chinese
17    drywall?
18        A.    It's my opinion that the use of
19    a field portable XRF for the determination
20    of -- selective determination of strontium is
21    not scientific, does not meet the scientific
22    rigor such that it determines it as a
23    confirmatory home.
24        Q.    So, Doctor, in distinction, as
```

Confidential - Subject to Further Confidentiality Review

Page 55

1    a screening tool, what conclusions did you

2    reach with respect to portable XRF?

3         A.     I do think, and it's also in

4    line with Florida and CPSC guidelines, that

5    as a screening tool for homes, there is some

6    value in using an XRF instrument and using

7    strontium as a marker.

8              However, when it comes down to

9    answering the question yes or no

10   definitively, is this home, this is not a

11   technology that is scientific and definitive.

12        Q.     And, Doctor, what distinction

13   do you draw between the use of portable XRF

14   with respect to the home versus portable XRF

15   with respect to individual boards?

16        A.     The use of XRF to sample an

17   entire home for a screening again has

18   applicability, but to determine board by

19   board in a home, I think given the number of

20   false negatives that we've seen presented in

21   these documents, as well as the difficulty

22   and the fact that these boards are not easily

23   identified, I think this is not an acceptable

24   determinant.

Confidential - Subject to Further Confidentiality Review

Page 56

```
 1              MR. SERPE:  I'd like to go off

 2        the record for a second.

 3              THE VIDEOGRAPHER:  The time now

 4        is approximately 2:41 p.m., and we are

 5        now off the record.

 6              (Recess taken, 2:41 p.m. to

 7        2:55 p.m.)

 8              THE VIDEOGRAPHER:  The time now

 9        is approximately 2:55 p.m., and we are

10        back on the record.

11   BY MR. SERPE:

12        Q.    Dr. Caravanos, as part of your

13   preparation for your testimony in this case,

14   were you made aware of the suggestion that

15   the United States Environmental Protection

16   Agency had promulgated a methodology, a

17   laboratory methodology with respect to

18   strontium and XRF?

19        A.    Yes, I am.

20        Q.    Let me hand you what I've

21   marked as Exhibit 2044 for identification

22   purposes and ask you if you can identify this

23   as that EPA document.

24        A.    Yes.  This is Method 6200,
```

Confidential - Subject to Further Confidentiality Review

```
 1      "Field Portable X-Ray Fluorescent Spectometry

 2      with a Determination of Elemental

 3      Concentrations in Soil and Sediment."

 4           Q.      That's a mouthful, but let's

 5      parse that out.  Would you explain to us what

 6      the scope, as you understand it, of this

 7      particular laboratory method is?

 8           A.      This is an EPA method, it's

 9      generally a guidance document, but we

10      consider it something of a regulation, that

11      says for a field portable X-ray fluorescence

12      instrument, how is it to be used in analysis

13      of metals in soil and sediment, river

14      sediment.

15           Q.      So the media that is going to

16      be evaluated is soil or dirt?

17           A.      Yes.  This is not a bulk

18      sample, this is not insulation, this is not

19      wood, this is not air or water.  This is soil

20      and sediment.

21           Q.      And what of significance did

22      you determine from your review of Exhibit

23      P1.2044?

24           A.      Well, in reviewing this, it is
```

Confidential - Subject to Further Confidentiality Review

1     a method for using XRF, portable XRF for

2     these metals, and strontium is one of the

3     metals listed.  But on page 2 of the document

4     under Section 1.2, it clearly says, and I

5     quote, "This method is a screening method to

6     be used with confirmatory analysis using

7     other techniques," example given, Flame

8     Atomic Absorption Spectroscopy, Graphite

9     Furnace Atomic Absorption Spectrometry,

10    Inductively Coupled Plasma and Atomic

11    Emission Spectroscopy.

12         Q.     So by using those abbreviations

13    and getting some alphabet soup, FLAA, GFAA,

14    and ICP, AES, those are laboratory

15    techniques?

16         A.     Yeah, these are all elaborate

17    benchtop instruments, large benchtop

18    instruments that are used in a laboratory and

19    typical of all heavy metals analysis.  So

20    essentially that paragraph says, while the

21    XRF can be used for a screening purpose,

22    coming out with any confirmatory conclusive

23    values, it must be followed up with a

24    laboratory analysis similar to the methods

Confidential - Subject to Further Confidentiality Review

Page 59

1    I've been talking about all day.

2        Q.      And this is in the context of

3    using a portable XRF to analyze soil?

4        A.      Yes.  And on top of that, this

5    is only for soil and sediment and not for

6    building materials and other materials.  So

7    you need to proceed with caution when you

8    start applying these methods to other

9    matrices, and it sort of warns you on that.

10       Q.      Dr. Caravanos, if you would

11   turn to the flow chart that is tabbed at the

12   very back of the report and explain what, if

13   any, of significance you learned from the

14   EPA's flow chart which is attached to their

15   guidance document.

16       A.      Yes.  Field portable X-ray

17   fluorescence, the data coming off these

18   machines is greatly improved when you are

19   preparing the sample.  So this flow chart

20   starts with collecting some material and it

21   goes into type of analysis mode, in situ

22   meaning it's -- in nature.  It clearly says,

23   "Remove debris from the soil surface and

24   level the surface.  If necessary, tap the

Confidential - Subject to Further Confidentiality Review

Page 60

1       soil to increase density and compactness."

2               So this is taking soil and

3       earlier on in the document it mentions about

4       a moisture bias, but taking soil that has a

5       moderate amount of moisture, sieving it out,

6       putting it in a capsule, compacting it and

7       then shooting it, so this is not for placing

8       directly on a field or a playground and

9       taking a reading.  It does require sample

10      preparation.

11          Q.    So on the flow chart where you

12      have "intrusive," is that where the flow

13      chart is describing this sample preparation

14      that you're talking about?

15          A.    On the left, it describes a

16      sample preparation I just spoke of.  On the

17      right, under "Types of Analysis Mode,

18      Intrusive," it says, "Collect a sample from a

19      4-by-4 inch square of soil, homogenize it,

20      dry it and thoroughly mix it," and then this

21      is a more definitive, more confirmatory XRF

22      analysis.

23              So there are two, whether you

24      do it in the field, but in situ means if you

Confidential - Subject to Further Confidentiality Review

Page 61

1    were to use the field portable XRF in a home

2    to do soil, you would still have to do some

3    preparations, let's say in the backyard.

4         Q.    And what do they mean by

5    "removing debris from soil surfaces"?

6         A.    Well, there are biases, so what

7    you want to look at is the concentration of

8    these metals in the soil, so you don't want

9    to shoot, you don't want to irradiate, you

10   don't want to measure what's in rocks and

11   sticks and grass, so essentially you're

12   taking some soil, sieving out the large

13   interferences and just looking at the soil

14   matrix.

15        Q.    From your perspective as an

16   industrial hygienist and environmental

17   scientist, is it your opinion that the EPA's

18   Method 6200 for portable XRF measurements of

19   soil provides a reliable methodology from

20   which drywall could be characterized

21   selectively as Chinese versus domestic?

22        A.    No.   This method, Method 6200,

23   as presented, is not a reliable determinant

24   of Chinese drywall.

Confidential - Subject to Further Confidentiality Review

Page 62

1       Q.    Dr. Caravanos, during our

2   discussions of your qualifications, we

3   discussed the portable XRF technology with

4   respect to lead-based paint, and I'd like to

5   ask you a few follow-up questions concerning

6   that.

7          For starters, is portable XRF

8   used when it comes to characterizing

9   lead-based paint in the field?

10      A.    Yes.

11      Q.    Do you teach a course in that?

12      A.    I have.  I do.

13      Q.    Dr. Caravanos, you know,

14   cutting right to the ultimate question, why

15   can't we just use the same instrument that we

16   use for paint for field characterization and

17   also use it for characterizing Chinese

18   drywall?

19          MR. HAYDEN:  Objection, form.

20      A.    Well, the procedures that have

21   brought us today to using the XRF for lead

22   paint, the portable XRF for the lead paint,

23   are extensive.  These instruments, this

24   technology was thoroughly studied and

Confidential - Subject to Further Confidentiality Review

1    evaluated by EPA requirements and after many

2    years of studying these machines, some were

3    ruled unacceptable.  We have a plethora of

4    scientific data, quality control that ensures

5    that this instrument for this application,

6    portable XRF for lead-based paint films, is

7    reliable and is confirmatory and definitive.

8              For that to happen for

9    strontium in Chinese wallboard, we would have

10   to go back and pick out these instruments and

11   run them through the same battery of tests

12   with all the interferences, all the different

13   types of materials, all the different types

14   of instruments, and it's a many-year

15   scientific process.  We tell students over

16   and over that you can't just pick up an

17   instrument and use it in a new application,

18   that we have to go back to the approved

19   methods of analysis; otherwise the data has

20   no integrity.

21   BY MR. SERPE:

22        Q.    Dr. Caravanos, we've used the

23   word "matrix" a couple of times in the

24   deposition today.  Is that a term of art in

Confidential - Subject to Further Confidentiality Review

Page 64

```
 1    the fields of industrial hygiene and

 2    environmental science?

 3         A.    Yes.  It is a term of art.

 4    It's used when we're referring to lead-based

 5    paint substrates and a matrix is essentially

 6    a material that is, in the case of lead-based

 7    paint, a material that is painted on.  So

 8    wood, sheetrock, glass, plastic are the

 9    substrates and the matrices.  But instead of

10    saying we're testing soil, we test water, we

11    test plastic, we talk about the matrix that

12    we're testing.

13         Q.    So how does the proposed use of

14    a portable XRF to selectively identify

15    drywall matrix differ from the established

16    use of portable XRF for characterizing lead

17    paint matrix?

18               MR. HAYDEN:  Objection, form.

19         A.    Yes.  The lead paint matrix,

20    the lead paint is a film that's on the

21    surface.  It's a rather thin film, so that

22    the signal bounce-back from the instrument is

23    strong and repeatable.  In the case of

24    using -- we've seen this even in lead where
```

Confidential - Subject to Further Confidentiality Review

1    you may have lead on the other side of the

2    wall, where you really can't measure it.  So

3    you may have a lead paint film on the other

4    side of the wall.

5             In the case of Chinese drywall,

6    we have a situation where the signal has to

7    go through many layers to get to the matrix

8    that's being tested, the drywall, and that's

9    why they're not really comparable.  It's a

10   totally different matrix, totally different

11   material that we're testing.

12   BY MR. SERPE:

13       Q.    · Dr. Caravanos, has the United

14   States Department of Housing and Urban

15   Development discussed the use of hand-held

16   portable XRF for analyzing lead-based paint?

17       A.    Yes, they have.

18       Q.    I'd like to hand you what's

19   been marked for identification purposes as

20   P1.1809 and ask you if you can identify it.

21       A.    Yes.  This is the latest

22   Chapter 7 of the HUD guidelines for the

23   evaluation and control of lead-based paint

24   hazards in housing called "Lead-Based Paint

Confidential - Subject to Further Confidentiality Review

1     Inspections."

2          Q.     And is this a document that you

3     teach as part of your academic positions?

4          A.     Absolutely.  This is a critical

5     document.

6          Q.     And is this an authoritative

7     document that is typically relied on in the

8     field of industrial hygiene and environmental

9     science?

10         A.     Yes, it is an authoritative

11    document.

12                MR. SERPE:  In connection with

13           the witness' testimony, I would offer,

14           file and introduce into evidence

15           P1.1809.

16                MR. HAYDEN:  No objection.

17    BY MR. SERPE:

18         Q.     Dr. Caravanos, I would like to

19    ask you if you have identified for us some

20    particularly important sections of the

21    Chapter 7 from the HUD guidelines.

22         A.     Yes.

23         Q.     And can you tell us what the

24    scope of these guidelines is in terms of what

Confidential - Subject to Further Confidentiality Review

1    level of inspection were being provided

2    guidance for?

3         A.    Yes.  This is a very important

4    document because we want to ensure that

5    anybody doing a lead-based paint inspection

6    has -- understands the principles and is

7    doing it consistently and maintaining a high

8    quality of quality control and quality

9    assurance.

10              So the point of this is to

11   clearly lay out what is a lead-based paint

12   inspection and what happens throughout all

13   these steps.  Yes.  And the first page that I

14   have marked, step-by-step summary, gives you

15   sort of an introduction to the entire

16   document.  It's a three- or four-page

17   document that lays out the rest.

18        Q.    Dr. Caravanos, is this method

19   able to provide guidance down to a

20   surface-by-surface basis with respect to the

21   determination of whether paint contains lead?

22        A.    Yes.  In the second paragraph

23   of this, if I may read, "The U.S. Department

24   of Housing and Urban Development" --

Confidential - Subject to Further Confidentiality Review

1           MR. HAYDEN:  I'm sorry, what

2       page --

3           MR. SERPE:  Page 004 of the

4       branded exhibit, 7-iii of the

5       original.

6           MR. HAYDEN:  Thank you.

7       A.    "U.S. HUD and EPA define an

8   inspection as a surface-by-surface

9   investigation to determine the presence of

10  lead-based paint," and it gives a reference

11  here.

12  BY MR. SERPE:

13      Q.    Dr. Caravanos, does the United

14  States government and HUD give us a gold

15  standard, what it is that we would compare as

16  we're analyzing the samples to determine

17  whether something would be characterized as

18  positive or negative?

19          MR. HAYDEN:  Objection, form.

20      A.    As far as a laboratory --

21  BY MR. SERPE:

22      Q.    What value, yes.

23      A.    Value.  The numerical, there

24  are two values.  Given the history of lead

Confidential - Subject to Further Confidentiality Review

Page 69

1      and the way it's analyzed, two values have

2      been determined.  Prior to this it was a

3      percent by weight value which was done in a

4      laboratory, a bulk sample, and that is in

5      item 3, you could see the last sentence in

6      number 3, "For purposes of this HUD/EPA

7      lead-based paint disclosure rule, 1 milligram

8      per square millimeter," which is an XRF

9      value, "or .5% by weight are standards that

10     must be used."

11              So it's a dual standard, you

12     can either use XRF of a certain type of

13     machine that's been approved or a laboratory

14     analysis.

15     Q.      This paragraph, though, sets a

16     specific regulatory definition of lead-based

17     paint?

18     A.      It absolutely does.

19     Q.      And it makes that definition

20     mandatory without any discretion with respect

21     to whether paint will or won't be

22     characterized as lead-based paint?

23     A.      Right.  This clearly says that

24     any paint film that has more than 1 milligram

Confidential - Subject to Further Confidentiality Review

1    per square centimeter is defined as

2    lead-based paint.  Or if you use an

3    analytical, the other analytical method, a

4    half a percent by weight.  So these are fixed

5    numerical standards just like OSHA standards,

6    just like other regulatory limits that we

7    have that define lead-based paint.

8         Q.    Dr. Caravanos, in contrast, are

9    you aware of any published regulatory

10   standards which suggest what the threshold

11   strontium value must be before a board could

12   be characterized appropriately and

13   differentiated Chinese versus domestic?

14        A.    I am not aware of any such

15   value.

16        Q.    Doctor, this HUD guidance talks

17   about the necessity of obtaining Performance

18   Characteristic Sheets or PCS.  What is a PCS?

19        A.    PCS is the form, the evaluation

20   document that follows the investigation of a

21   particular XRF instrument.  So what happens

22   is the manufacturer has an instrument, they

23   want it to be -- they want to be able to

24   advertise it saying this can be used for lead

Confidential - Subject to Further Confidentiality Review

Page 71

1    paint inspections.  This document is a review

2    of that instrument and a governmental

3    blessing that it can be used under the

4    conditions set forth in that PCS.  So this is

5    essentially the approval document for

6    portable XRFs for lead-based paint, for HUD

7    inspections.

8         Q.     Has HUD approved XRFs

9    specifically to be used in a portable or

10   field context for lead-based paint?

11        A.     Yes.

12        Q.     Has HUD approved XRF

13   specifically for the use of determining

14   whether a board is Chinese or not?

15        A.     They have not.

16        Q.     Has the Consumer Products

17   Safety Commission or any other regulatory

18   agency approved XRF specifically for the

19   field use of determining whether a board is

20   Chinese or not?

21        A.     Absolutely not.

22               MR. SERPE:  18, please.

23   BY MR. SERPE:

24        Q.     Dr. Caravanos, I'd like to hand

Confidential - Subject to Further Confidentiality Review

1      you what's been marked for identification

2      purposes as P1.1810 and ask you without

3      flipping through all of the pages if you can

4      generally identify that document for us.

5          A.    Yes.  This appears to be the

6      Performance Characteristic Sheets that were

7      referred to earlier of several different

8      manufacturers.

9          Q.    And as we flip through the

10     first one, there is discussion of evaluation

11     data with respect to this instrument on

12     page 1810-02?

13         A.    Uh-huh, yes.

14         Q.    And some additional

15     computational values on 03, am I reading that

16     correctly?

17         A.    There are, yes.

18         Q.    And then a discussion with

19     respect to evaluating the quality of XRF

20     testing for lead-based paint, does that begin

21     on page 3 and continue through page 4?

22         A.    Yes.  It begins on the bottom

23     of page 3 and does continue.

24         Q.    Would you characterize that as

Confidential - Subject to Further Confidentiality Review

```
1     a rigorous scientific analysis of the

2     reliability of XRF for lead-based paint

3     determinations?

4          A.      Absolutely.  This is a thorough

5     analysis of the machine and whether it meets

6     the standard.

7          Q.      Doctor, in preparation for your

8     testimony today, have you found any reference

9     to any sort of a rigorous or even

10    non-rigorous evaluation of the quality of

11    results obtained in using field XRF for the

12    selective identification of Chinese drywall?

13         A.      I have not.

14              MR. SERPE:  In connection with

15         the witness' testimony, I would offer,

16         file and introduce into evidence

17         Plaintiff Exhibit 1.1810.

18              MR. HAYDEN:  Since I don't have

19         them, what is that?

20              MR. SERPE:  This one.  I took

21         the back page off as we talked about

22         earlier.

23              MR. HAYDEN:  Oh.  No objection.

24    BY MR. SERPE:
```

Confidential - Subject to Further Confidentiality Review

Page 74

1      Q.    Dr. Caravanos, is there

2  references to the rate of false negatives

3  achieved when using XRF for the determination

4  of lead-based paint in the field?

5      A.    Yes, there are.

6      Q.    And what is the range of values

7  obtained on these Performance Characteristic

8  Sheets with respect to false negatives in

9  lead-based paint?

10     A.    The false negative rate that

11  I've seen in this document is 1.9%.

12     Q.    And would you consider that to

13  be an acceptable rate of false negatives?

14     A.    Yes.  That essentially is 98%

15  sure, meaning 2%, 1.9% of the time you'll

16  make a false negative claim.

17     Q.    Dr. Caravanos, have you seen a

18  precise calculation of the false negative

19  rate for using portable XRF with respect to

20  characterizing individual boards for Chinese

21  drywall?

22     A.    No, I have not seen that.

23     Q.    From a qualitative standpoint,

24  though, was the 40 to 50% estimate of blue

Confidential - Subject to Further Confidentiality Review

Page 75

```
 1     dots on page 107, which in the record is

 2     P.19-121, would that be a qualitative

 3     estimate of the false negative rate at least

 4     as reported by the CPSC?

 5          A.     Right.  I would say more than

 6     qualitative.

 7               MR. HAYDEN:  Objection,

 8          mischaracterizes the statement.

 9               Go ahead, Doctor.

10          A.     It's a semi-quantitative

11     estimate.  I think the data is there.  What

12     we need to do is count up the points, so it's

13     not as qualitative as it appears.

14               But looking at the number of

15     points compared to the total population, it

16     is a very high false negative rate.

17     BY MR. SERPE:

18          Q.     Doctor, going back to the HUD

19     Chapter 7, if we can pick up there on

20     1809-4 --

21               MR. HAYDEN:  Can you give me

22          the real page?

23               MR. SERPE:  It's 7-iii.

24          A.     Okay.  Yes.
```

Confidential - Subject to Further Confidentiality Review

1    BY MR. SERPE:

2        Q.    And with respect to these

3    Performance Characteristic Sheets, it

4    indicates that these documents will give you

5    specific ranges where the XRF results are

6    positive or negative or inconclusive, as well

7    as calibration checks and other important

8    information.

9            Is that a fair recap of

10   additional information that's available in

11   Exhibit 1810?

12       A.    Yes.   That's what I was

13   referring to on the proper use.   It's not

14   just a -- the document just doesn't sort of

15   bless these instruments for this application,

16   but when read carefully, it literally tells

17   you if you're using this instrument, this is

18   the data interpretation and it can be either

19   true positive, inconclusive, or a true

20   negative.

21           So all these have different

22   positive, inconclusive and negative ranges.

23       Q.    Dr. Caravanos, in contrast, are

24   you aware of a single published Performance

Confidential – Subject to Further Confidentiality Review

1    Characteristic Sheet for an XRF and Chinese

2    drywall which gives any range for an XRF

3    result as being positive, negative or

4    inconclusive?

5         A.    I am not aware of such a

6    document.

7         Q.    Doctor, flipping to the next

8    page of Chapter 7 of HUD, is there guidance

9    given to people conducting portable

10   evaluations for lead-based paint with respect

11   to inconclusive findings?

12        A.    Yes.

13        Q.    And what is that guidance?

14        A.    Well, on number 13 at the

15   bottom it refers to non-conclusive readings,

16   and if I may quote, "In single-family housing

17   inspections, all inconclusive readings must

18   be confirmed in the laboratory unless the

19   client wishes to assume that all inconclusive

20   results are positive."

21             That sort of goes back to a

22   precautionary principle, but what this says

23   is you can't stay with an inconclusive with

24   an XRF reading.  You must resolve it and the

Confidential - Subject to Further Confidentiality Review

1    definitive test is a laboratory analysis.

2          Q.     Dr. Caravanos, in contrast, is

3    there any guidance with respect to --

4    published guidance with respect to when an

5    investigator using a field XRF instrument

6    would know that a sample was inconclusive,

7    thereby mandating laboratory testing for

8    Chinese drywall?

9          A.     There's no guidance for that

10   instrument under that application.

11         Q.     Finally, Doctor, flipping over

12   to page 7-3 of the Chapter 7 of the HUD

13   document, it talks about inspection methods

14   for lead-based paint, and there's a

15   characterization which you've previously

16   highlighted.  What's important about how HUD

17   is highlighting the characterization of the

18   usefulness of XRF for lead-based paint

19   determinations?

20         A.     Right.  And this sentence gets

21   to the issue of destructive testing.

22               MR. HAYDEN:  What sentence?

23               THE WITNESS:  Oh, I'm sorry,

24         item E under "Most common inspection

Confidential - Subject to Further Confidentiality Review

```
 1              method," the first sentence where it

 2              states, "Portable XRF lead-based paint

 3              analyzers are the most common primary

 4              analytical method for inspections in

 5              housing because of their demonstrated

 6              abilities to determine if lead-based

 7              paint is present on many surfaces. "

 8      BY MR. SERPE:

 9              Q.    Dr. Caravanos --

10              MR. HAYDEN:  I'm sorry, I'm

11      sorry.  I'm still lost on what page --

12              MR. SERPE:  7-3.

13              MR. HAYDEN:  All right.  Now

14      we're on.

15              MR. SERPE:  Are we on the

16      proverbial same page, Don?

17              MR. HAYDEN:  I've got it.

18      BY MR. SERPE:

19              Q.    Dr. Caravanos, would you agree

20      with the characterization that portable XRF

21      now has a demonstrated ability to determine

22      lead-based paint?

23              A.    Oh, absolutely, through the

24      PSC -- PCS process.
```

Confidential - Subject to Further Confidentiality Review

Page 80

1      Q.      In contrast, Dr. Caravanos, is

2    there any regulatory record with respect to

3    the demonstrated ability of portable XRF to

4    determine on a surface-by-surface basis the

5    presence of Chinese drywall?

6              MR. SERPE:  Objection, lack of

7         foundation.

8      A.      Not to my knowledge, no.

9    BY MR. SERPE:

10     Q.      And that's based upon all of

11   your investigation, research, training and

12   experience?

13     A.      That is correct.

14     Q.      And all of your review of the

15   regulatory publications from the Consumer

16   Products Safety Commission, HUD, and State of

17   Florida?

18     A.      Yes, that is correct.

19             MR. HAYDEN:  Objection,

20        mischaracterizes his testimony.

21             (Sotto voce discussion.)

22             MR. SERPE:  I apologize.  I

23        left my last exhibit in the library.

24        I've got to take a short break.

Confidential - Subject to Further Confidentiality Review

Page 81

```
 1              THE VIDEOGRAPHER:  Time now is
 2       approximately 3:23 p.m., and we are
 3       now off the record.
 4              (Recess taken, 3:23 p.m. to
 5       3:29 p.m.)
 6              THE VIDEOGRAPHER:  The time now
 7       is approximately 3:29 p.m., and we are
 8       back on the record.
 9              MR. SERPE:  Dr. Caravanos, I
10       don't have any more questions for you
11       at this time.  I would appreciate it
12       if you would answer counsel's
13       questions.
14              THE WITNESS:  Yes.
15                 EXAMINATION
16   BY MR. HAYDEN:
17       Q.    Dr. Caravanos, my name is Don
18   Hayden.  I have a couple of questions.  I
19   just want to clarify what -- to see if we can
20   narrow the focus of why you're here today.
21       A.    Yes.
22       Q.    You're not a chemist, correct?
23       A.    I have training in chemistry.
24       Q.    But you're not a licensed
```

Confidential - Subject to Further Confidentiality Review

Page 82

```
 1    chemist, are you?

 2         A.    I don't think there's a

 3    licensed chemist title, but there are

 4    certifications in chemistry, but I am not a

 5    certified chemist.

 6         Q.    Okay.  You're not a

 7    toxicologist?

 8         A.    I am not a toxicologist.

 9         Q.    You're not a biochemist?

10         A.    I have training in these

11    fields, but I wouldn't classify myself as a

12    biochemist.

13         Q.    Okay.  You are a licensed

14    industrial engineer.  Is that correct?

15    Industrial hygienist?

16         A.    Yes, certified industrial

17    hygienist.

18         Q.    Okay.  And although your

19    certification is as an industrial hygienist,

20    you're not offering opinions today in this

21    case with regard to industrial hygiene, are

22    you?

23         A.    Well, I am, because industrial

24    hygiene is defined as identification of
```

Confidential - Subject to Further Confidentiality Review

1    hazards, evaluation of hazards and control of

2    hazards.  Hazards being chemical, biological

3    and physical.  So in assessing material,

4    whether it's strontium, lead, asbestos,

5    copper, the assessment process is part of

6    industrial hygiene, that second -- that

7    second bullet evaluation.

8          Q.    Okay.  And earlier during your

9    discovery deposition, I went through what I

10   believed your criticisms -- your opinions

11   were, correct?  Do you recall that?

12                MR. SERPE:  Object to the form.

13         A.    I'm sorry, can you refresh my

14   memory?

15   BY MR. HAYDEN:

16         Q.    Okay.  Do you recall me going

17   through the opinions that you offered --

18   strike that.

19                Do you intend to offer any

20   opinions on health issues today?

21         A.    I do not.

22         Q.    Sir, I think you'd testified

23   that you have appeared for deposition in the

24   last four years approximately three times?

Confidential – Subject to Further Confidentiality Review

Page 84

1       A.      That's my recollection, yes.

2       Q.      Okay.  And in all three

3    occasions, those involved appearing on behalf

4    of the plaintiff, correct?

5       A.      That is correct.

6       Q.      Okay.  And prior to that time,

7    you testified more often.  Isn't that right?

8       A.      I did, yes.

9       Q.      Okay.  And besides your

10   professor -- the position you hold as a

11   professor, you also hold a position as a sole

12   proprietor of a consulting company, correct?

13      A.      Yes.  I do consulting and I

14   just use my name as the -- I don't have a

15   company, a registered company.  It's under

16   sole proprietor.  Self-employed, I'm sorry.

17      Q.      And under that consulting

18   company, you've conducted numerous lead-based

19   paint inspections and risk assessments,

20   correct?

21      A.      Yes, I have.

22      Q.      Okay.  And you've also provided

23   expert testimony in lead poisoning and

24   poisoning involving other chemicals and

Confidential - Subject to Further Confidentiality Review

1    compounds?

2         A.      I have in the past, yes.

3         Q.      Okay.

4         A.      The assessment of those, not

5    poisoning per se but the assessment of

6    airborne levels or exposure.  So that's the

7    scope of my testimony there.

8         Q.      Okay.  And I believe your

9    testimony was that in the last year, your

10   consulting has been -- 15% of your time has

11   been involved in consulting, correct?

12        A.      Of my income, yes.

13        Q.      Okay, of your income.

14               And prior to you being more

15   involved in administration at Hunter College,

16   25% of your income came from consulting,

17   correct?

18        A.      Well, it's a variable number,

19   and it does vary sometimes dramatically over

20   the years.  But I would say an average for

21   the years prior to that would be around

22   there.

23        Q.      Okay.  Actually, back in the

24   1990s, you were very active in testifying in

Confidential - Subject to Further Confidentiality Review

Page 86

```
 1     lead paint litigation, correct?
 2               MR. SERPE:   Object to the form.
 3         A.    I was more -- yes.  I was
 4     more -- had more cases, lead inspection and
 5     data review cases in that period, late '90s.
 6     BY MR. HAYDEN:
 7         Q.    Okay.  And immediately before
 8     taking on the administrative role recently in
 9     the last year at Hunter College, you
10     estimated about 25% of your business was in
11     the consulting area, your income.
12         A.    I'm not sure that was one year.
13     It's -- well, yeah, thereabouts.  Again, it's
14     very variable.  I could show you my tax
15     records.  The numbers vary.  And again,
16     that's professional consulting as opposed to
17     my position at UMD-NJ, which is another
18     source.
19         Q.    Okay.  And 80% of that
20     consulting work is in the area of litigation,
21     correct?
22         A.    Yes, the majority, yes.
23     Approximately.
24         Q.    And 75% of that work is on
```

Confidential - Subject to Further Confidentiality Review

Page 87

```
 1    behalf of the plaintiffs, correct?

 2         A.    Approximately, yes.

 3         Q.    And in the area of lead-based

 4    paint investigations, 90% or more of the

 5    representations involve representations for

 6    the plaintiff, correct?

 7         A.    Over the past 10 years, that

 8    would be about right, yes.

 9         Q.    And in your assessments of --

10    for lead-based paint in a home, you have used

11    XRF guns, correct?

12         A.    Well, most of my assessment

13    when it's a litigation-based case or elevated

14    blood lead poisoning, given that I am not a

15    licensed contractor, most of my role is to

16    secure the services of an inspection -- you

17    know, a registered lead risk assessment

18    inspection company that has one of these

19    commercial machines and does that.  So

20    working with counsel, I would recommend a

21    contractor to go in, do this assessment and I

22    would do the data interpretation.

23         Q.    Okay.  Did you make that

24    recommendation to counsel in this case?
```

Confidential - Subject to Further Confidentiality Review

Page 88

```
 1        A.     No.  No, I didn't.  I didn't
 2   generate any -- we didn't generate any -- I
 3   didn't supervise any investigation.  I
 4   reviewed data.
 5        Q.     Okay.  Hydrogen sulfide, is
 6   that a volatile organic compound?
 7               MR. SERPE:  Object to the form.
 8        A.     No, it is not.  VOC, volatile
 9   organic chemical, generally refers to a
10   hydrocarbon -- first of all, it's a liquid
11   that evaporates, so it is a volatile
12   compound, but it is not typically in the
13   definition of VOCs.
14   BY MR. HAYDEN:
15        Q.     Okay.  And strontium, that's
16   not a volatile organic compound, is it?
17        A.     No, it is not.
18        Q.     It's a heavy metal, correct?
19        A.     There are different forms, and
20   there's radioactive forms, but yeah, it's
21   classified as a metal.
22        Q.     The strontium that's involved
23   with this Chinese drywall, that's not
24   radioactive, correct?
```

Confidential - Subject to Further Confidentiality Review

Page 89

1      A.      It's not radioactive.

2      Q.      Actually, there was a finding

3    early on by the CPSC that there was not any

4    concerns with regard to radioactivity here,

5    correct?

6      A.      I am not aware of that.  I

7    would have to investigate that further to

8    agree.

9      Q.      Now, in your discussion of the

10   use of an XRF gun, you assume that the XRF

11   gun would be the exclusive tool that would be

12   used for the evaluation of Chinese drywall in

13   a home, don't you?

14          MR. SERPE:  Object to the form

15          and mischaracterization.

16     A.      Well, that was the scope of the

17   task is to evaluate the field portable XRFs.

18   I am not sure if you're saying if there's

19   another instrument --

20   BY MR. HAYDEN:

21     Q.      No, what I'm asking is, could

22   the XRF be used with other survey techniques

23   to provide a reliable protocol for testing a

24   home for Chinese drywall?

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. SERPE:  Object to the form,
 2          mischaracterization and beyond the
 3          scope.
 4          A.      To my knowledge of the
 5  documents I've reviewed, that is not part of
 6  the process, meaning XRF is not used to
 7  confirm a Chinese drywall material.
 8  BY MR. HAYDEN:
 9          Q.      Did you -- you didn't read the
10  deposition of Matthew Perricone, did you?
11          A.      No, I didn't.
12          Q.      You didn't read the deposition
13  of Roger Morse, did you?
14          A.      I did not.
15          Q.      You indicated that you read the
16  affidavit of Tracey Dodd, correct?
17          A.      I did.
18          Q.      In Ms. Dodd's affidavit, didn't
19  she indicate that the XRF device was being
20  used as one piece of a protocol that her
21  company had put together to evaluate a home
22  for Chinese drywall?
23                    MR. SERPE:  Objection,
24          foundation.
```

Confidential - Subject to Further Confidentiality Review

Page 91

```
1           A.     Well, first of all, we need to

2      separate whether it's screening and whether

3      it's confirmatory, but I would have to look

4      at the Dodd document for me to -- I don't

5      have it in front of me, so before I presume

6      what she said, let's read what she said.

7                  MR. HAYDEN:  Give me one

8           second.

9                  MR. SERPE:  I feel better, Don.

10                 MR. HAYDEN:  Just when you

11          think you have it all in order...

12                 Can we go off the record a

13          second?

14                 MR. SERPE:  Yes.

15                 THE VIDEOGRAPHER:  The time now

16          is approximately 3:41 p.m., and we're

17          now off the record.

18                 (Recess taken, 3:41 p.m. to

19          3:43 p.m.)

20                 (Whereupon, Deposition Exhibit

21          Caravanos-1, Affidavit of Tracey Dodd,

22          was marked for identification and/or

23          introduced.)

24                 THE VIDEOGRAPHER:  This is the
```

Confidential - Subject to Further Confidentiality Review

1          beginning of Tape No. 3 of the

2          videotaped deposition of Mr. Jack

3          Caravanos.   Time now is approximately

4          3:43 p.m., and we are back on the

5          record.

6     BY MR. HAYDEN:

7          Q.     Sir, I'm showing you what's

8     been marked as Caravanos Exhibit No. 1 for

9     identification.

10          A.     Yes, I have it.

11          Q.     Okay.  Have you seen that

12     document before?

13          A.     Yes, I have.

14          Q.     And that was filed in response

15     to a motion to strike your testimony, I

16     believe.

17               MR. SERPE:  Before you answer,

18          Doctor, let me just say that what we

19          have here -- and we're going to begin

20          a series of questions; I'll make a

21          continuing objection so I don't have

22          to interfere with your flow after

23          this.

24               But we've got a hearsay

Confidential - Subject to Further Confidentiality Review

1    statement that contains opinion.  The

2    opinions are from a non-disclosed

3    expert, that it's prejudicially in

4    connection with a discussion of a

5    motion to strike which is completely

6    extraneous to the fact-finding process

7    here, and we're going to move for this

8    portion of the deposition containing

9    hearsay opinion of a non-disclosed

10    expert to be excised and struck from

11    the deposition record.

12              So I've got a continuing

13    objection to hearsay opinion,

14    foundation, prejudice.

15  BY MR. HAYDEN:

16       Q.    Okay.  This is a document you

17  reviewed, correct?

18       A.    I looked at this, yes.

19       Q.    Okay.  Does this indicate to

20  you, this affidavit, that Ms. Dodd in her

21  protocol intended to use the XRF as the

22  exclusive tool for determining Chinese

23  drywall in a Chinese drywall home?

24       A.    I don't think she lays out a

Confidential - Subject to Further Confidentiality Review

1    protocol in this.  I don't see a set of

2    procedures to be followed, an inspection

3    protocol or an assessment protocol.

4         Q.    Okay.  If in fact the XRF

5    device was only used where there was

6    instances in a home where there was no

7    evidence of impact by the Chinese drywall,

8    would your opinions change in any way?

9         A.    It was -- I'm a little

10   confused.  Can you repeat that?  I believe

11   the answer is no, it would not be, no.

12        Q.    Okay.  I'll try and make it a

13   little bit more specific for you.  We talked

14   about the Florida definition of -- the

15   Florida definition of the indicators for

16   Chinese drywall.  Do you recall that?

17        A.    Right.  The screening

18   confirmatory.

19        Q.    And I believe that was an

20   exhibit.  Yeah, do you have that?

21        A.    I do have it in front of me.

22        Q.    Okay.  And that exhibit

23   indicates certain -- a case definition for

24   drywall associated corrosion in residences.

Confidential - Subject to Further Confidentiality Review

1    Do you see that?

2         A.     Well, it sets -- there are

3    three levels, sentinel criteria where it's

4    suspect, supporting, then confirmatory, so

5    there are three categories.

6         Q.     Okay.  And do you see that

7    there are -- in criteria 1, under 2, it says,

8    "Observed corrosion of air conditioner,

9    evaporator coil exemplified by black

10   corrosion on copper tubing components,"

11   correct?

12        A.     Yes.  It's approximately what

13   you said, yes.

14        Q.     Okay.  And number 3 is,

15   "Observed metal corrosion indicated by

16   blackening of one or more of the following:

17   Copper wires, ground wires and electrical

18   conductors."

19              Do you see that?

20        A.     Yes, and several more.  I see

21   that.

22        Q.     Okay.  If in fact part of the

23   protocol would be a visual observation of the

24   switches and receptacles of the home to

Confidential - Subject to Further Confidentiality Review

1      determine if there was evidence of blackening

2      or tarnishing of the copper wires, ground

3      wires and electrical connectors in the home

4      in the first phase of a survey, and only if

5      there was clean, shiny copper would the XRF

6      gun be used, would that change your opinions

7      in any way about the reliability of using the

8      XRF gun in this instance?

9                  MR. SERPE:  Object to the form.

10            Compound nature and incomplete

11            hypothetical.

12                  Subject to the objection,

13            Dr. Caravanos, please attempt to

14            answer the question.

15      A.      Yeah.  There's a lot to that

16      question.  I'm not, you know, fully sure what

17      the question is.

18                  This is a set of three possible

19      criteria.  If all three are met, the home is

20      defined as a possible -- it clearly states a

21      possible case.  XRF is not there, so I'm not

22      quite sure what you're referring to.

23      BY MR. HAYDEN:

24      Q.      I'm referring to the first

Confidential - Subject to Further Confidentiality Review

Page 97

```
1    phase of the protocol that Ms. Dodd puts in

2    place and Mr. Perricone and -- or

3    Dr. Perricone and Mr. Morse have suggested,

4    which if you would have read their

5    depositions you would have understood, which

6    indicates that there's a visual observation

7    of the electrical switches and receptacles.

8              MR. SERPE:  Object to the form.

9    BY MR. HAYDEN:

10        Q.     Before we use the XRF gun.

11             MR. SERPE:  Object to the form,

12        argumentative.

13        A.     Yeah.  And again, that was not

14   within the scope of my assignment is to look

15   at visual assessment, copper corrosion.

16   That's not my area of expertise.

17   BY MR. HAYDEN:

18        Q.     So all you're doing is assuming

19   that all we're looking at in determining

20   Chinese drywall piece by piece in a home is

21   an XRF gun.  Is that right?

22             MR. SERPE:  Objection,

23        mischaracterization.

24        A.     I'm looking at the usefulness
```

Confidential - Subject to Further Confidentiality Review

Page 98

1    of the field portable XRF to determine

2    strontium levels with enough scientific

3    certainty to definitively say yes or no, it

4    is Chinese wallboard.  So that's the narrow

5    focus of what I've been asked to do.

6    BY MR. HAYDEN:

7         Q.    Okay.  There was a great

8    discussion about false negatives with the

9    Consumer Products Safety Commission data,

10   correct?

11        A.    Thank you, yes.

12        Q.    And in that discussion, that

13   assumes that there would be no first phase of

14   a survey of a house where you would determine

15   whether there was blackening at the switches

16   and receptacles of a wall to determine

17   whether the wall should be removed.

18             MR. SERPE:  Objection,

19        mischaracterization.

20        A.    Again, I don't think that would

21   really matter, you know, because the number

22   of false positives is unacceptably high --

23   false negatives is unacceptably high, so that

24   you would not really even use the XRF because

Confidential - Subject to Further Confidentiality Review

Page 99

1    of that.  If you want to use it as a

2    screening, I think, you know, it seems to

3    have some role in it, though it's not defined

4    by any protocol that I've read and the

5    Perricone documents or CPSC or ASTM.

6    BY MR. HAYDEN:

7         Q.    Are you aware of the fact that

8    there is data that shows that the impacts

9    from the sulfur emissions from the drywall

10   are localized for copper wires outside of the

11   aqueous situations in the HVAC system?

12              MR. SERPE:  Object to the form.

13        A.    Again, I did not study that.  I

14   can't render an opinion.  Whether that's

15   correct or incorrect, I have not looked at it

16   at all.

17   BY MR. HAYDEN:

18        Q.    Okay.  Let's assume that that

19   is the case.  That --

20        A.    I'm not a corrosion chemist.  I

21   really -- I did not study the migration of

22   carbon disulfide through the pores of the

23   sheetrock and the walls, so this is not

24   really something I can even talk about

Confidential - Subject to Further Confidentiality Review

1    casually.

2         Q.    So then you really can't

3    provide an opinion on the overall protocol

4    that has been suggested by Knauf Plasterboard

5    Tianjin and its consultants with regard to

6    the selective remediation of a home?

7              MR. SERPE:   Object to the form.

8         A.    I've not seen a protocol by

9    these people.  Perricone doesn't say

10   anything, Goad doesn't describe a protocol --

11   and by protocol, I'm assuming we're talking

12   about a step-by-step procedure like the

13   lead-based paint, instructions on how do we

14   precisely resolve this question.  I've not

15   seen it.

16   BY MR. HAYDEN:

17        Q.    In the lead-based paint

18   situation, there is a protocol that's set

19   forth, correct?

20        A.    Yes.  Yes.

21        Q.    And you're happy -- you believe

22   that that is sufficient to reduce the false

23   negatives that you would find in an

24   evaluation of a home for a lead-based paint,

Confidential - Subject to Further Confidentiality Review

1       correct?

2                   MR. SERPE:   Objection.

3           Mischaracterization.

4           A.      Yeah, it's actually the other

5   way around.   The protocol was established to

6   ensure there are a minimal amount of mistakes

7   and false negatives.

8   BY MR. HAYDEN:

9           Q.      And that's set forth in the

10  document that -- the HUD document that was

11  referenced by Mr. Serpe that I think you have

12  in front of you.

13          A.      Yes.   The HUD guidelines as

14  well as the PCS forms.

15          Q.      And those were put in place in

16  1987?

17          A.      The HUD guidelines were

18  temporary, they were guidance -- I'm sorry,

19  they were interim for many years, and then

20  this was finalized in 1997, so it goes a

21  little before that.

22          Q.      And actually I believe your

23  testimony is you were using XRF for lead

24  paint assessment as early as 1985?

Confidential - Subject to Further Confidentiality Review

1     A.     No, late '80s.  Late '80s,

2     yeah.

3           Q.     Okay.  So you were using it in

4     the late '80s before the final protocol had

5     been put in place in 1997, correct?

6                 MR. SERPE:  Object to the form.

7           A.     Well, let's just clarify using

8     it.  I teach this method for the students

9     because they will graduate and go out in the

10    field and maybe recommend using this, so I

11    myself have not used one of these instruments

12    in 1988.  Later on, when the instruments were

13    approved with the PCS process, that's when we

14    purchased a Niton, one of the instruments

15    that is approved.

16                And from that point on, we used

17    it.  But just so the record's straight, I am

18    not an environmental consultant where I go in

19    and test homes.  All my use was within the

20    research realm and teaching students how to

21    use it.

22    BY MR. HAYDEN:

23          Q.     Okay.  And actually, you didn't

24    go into the Virginia homes here, did you?

Confidential - Subject to Further Confidentiality Review

1     A.     I did not visit the Virginia

2   homes.

3     Q.     And you didn't do any testing

4   of the XRF in the Virginia homes with the

5   device that you now have, the Niton device

6   that you now have in your possession,

7   correct?

8     A.     That was not part of the scope

9   of my work.

10     Q.     Okay.  And no one from the

11   PSC -- no expert for the PSC went into the

12   Virginia homes, as far as you know, and did

13   any testing with XRF to determine whether or

14   not there were false negatives found

15   following the Morse-Perricone protocol?

16            MR. SERPE:  Objection,

17        foundation.

18     A.     There was no -- there was no

19   outside authority, in this case the people

20   responsible for producing the PCS forms that

21   went in and did that.

22   BY MR. HAYDEN:

23     Q.     Okay.  You were first retained

24   in this matter sometime in the late fall,

Confidential - Subject to Further Confidentiality Review

1    correct?

2        A.    Yes.

3        Q.    Probably November or December?

4        A.    Late November or early

5    December.

6        Q.    Okay.  And you spoke with

7    Mr. Serpe.

8        A.    Yes, I did.

9        Q.    And then after that, you

10   reviewed the CPSC report and the guidance

11   from the Florida Department of Health that I

12   think have been identified as exhibits today.

13       A.    Yes.  After our initial

14   consultation, I was sent a number of

15   documents and DVDs and film clips and

16   proceeded to review those, and of course do

17   my own background research.

18       Q.    Okay.  But you provided your

19   report to Mr. Serpe on January 14th of this

20   year, correct?

21       A.    Yes, that's the date of the

22   report.

23       Q.    Okay.  And attached to your

24   report is a report of another gentleman, Zed

Confidential - Subject to Further Confidentiality Review

Page 105

```
 1    Hejzlar.  Is that right?

 2          A.      That's close enough.  Zed

 3    Hejzlar.

 4          Q.      And Mr. Hejzlar sent a letter

 5    to Mr. Serpe on that same date, January 14th,

 6    2010, correct?

 7          A.      Yes, it is dated the same date.

 8          Q.      Okay.  And that date was the

 9    first time you saw that letter, correct?

10          A.      Yes.  I was finishing up my

11    report, assembling my report and I got a call

12    saying, "I have this Dr. Hejzlar who has

13    written a report on this, a few pages.  I'd

14    like to send it to you."

15                  And he sent it over and I was

16    able to integrate it in there, which didn't

17    substantially -- didn't change any findings,

18    merely confirmed my own findings.

19          Q.      And a large part of your

20    opinion today related to a discussion of the

21    report by the U.S. Consumer Products Safety

22    Commission that was issued on or about

23    November 23rd, 2009.

24          A.      Yes.  Let me get to that.  Yes.
```

Confidential - Subject to Further Confidentiality Review

1    We did discuss that earlier.

2         Q.    And counsel referenced you to

3    particular sections of that very lengthy

4    report, I believe it's 190 pages?

5         A.    I think you are right, it's

6    about 190, but these were sections I'd asked

7    counsel to -- if somehow we could magnify and

8    highlight to make my point.

9         Q.    In our earlier questioning, you

10   indicated that you only reviewed sections --

11   pages 1 through 61 and pages 105 to 108 of

12   this 190-page document, correct?

13              MR. SERPE:   Objection,

14        mischaracterization.

15        A.    Yes.   This is a complicated

16   document that deals with many

17   characterizations between complaint homes and

18   non-complaint homes, and I of course needed

19   to read the background, study design, and

20   then go to the section that dealt with the

21   XRF and so forth.

22   BY MR. HAYDEN:

23        Q.    So you never read the whole

24   document, did you?

Confidential - Subject to Further Confidentiality Review

1       A.      Large sections on corrosion and

2   gases but that was not pertinent to my

3   evaluations.

4       Q.      There were additional sections

5   with regard to strontium prior to page 105,

6   but you didn't think those were necessary to

7   be reviewed?

8               MR. SERPE:  Object to the form

9       and foundation.

10      A.      If you could direct me to

11  those...

12  BY MR. HAYDEN:

13      Q.      Sir, this isn't the first time

14  that you didn't read the entire document for

15  a representation in a federal court matter,

16  correct?

17              MR. SERPE:  Object to the form.

18      A.      Well, let's just go back.  I

19  read the document -- I would have to say I

20  read what I needed from this document.  Did I

21  read every single word in the section on

22  corrosion?  No, because it was a waste of

23  time and money, and I generally don't work

24  that way.  I read the sections that I needed

Confidential - Subject to Further Confidentiality Review

Page 108

```
 1    to formulate my opinion, and with regard to,

 2    I think, your other question, we very often

 3    when we do literature reviews look at

 4    abstracts and then decide from the abstracts

 5    which are papers we want to read in depth

 6    versus which ones we can just skim through or

 7    not use at all.

 8    BY MR. HAYDEN:

 9         Q.    Okay.  Actually, in the case

10    of Amorgianos, A-M-O-R-G-I-A-N-O-S, vs.

11    National Railroad Passenger Corporation, you

12    were barred as an expert because you read

13    abstracts rather than reading the entire

14    articles, correct?

15              MR. SERPE:  Object to the form.

16         A.    Well, that's a little news to

17    me because this case that you're referring

18    to, my understanding of what happened in that

19    case -- and I'm not a lawyer and it's rather

20    complicated -- was regarding what they

21    claimed to be an inappropriate or incomplete

22    assessment.

23    BY MR. HAYDEN:

24         Q.    All right.  Well, you were
```

Confidential - Subject to Further Confidentiality Review

1    hired as an expert for the plaintiffs to

2    testify about concentrations of xylene,

3    which -- what is xylene?

4         A.      Xylene is a VOC.  It's a liquid

5    that turns into a gas, very odorous.

6         Q.      And it's used in paint?

7         A.      It's used as a solvent in

8    paint, it's also used in airplane glues, in

9    nail polish.

10        Q.      In that case, the claim was

11   that the plaintiff was exposed to the xylene

12   and the chemical caused the plaintiff injury,

13   correct?

14             MR. SERPE:  Before you answer,

15        Dr. Caravanos, let me add an objection

16        that this extraneous cross-examination

17        was thoroughly vetted as part of the

18        Court's consideration of a Daubert

19        hearing which will be conducted prior

20        to the commencement of the hearing.

21        Assuming the Court's entertaining this

22        testimony whatsoever, it's already

23        rejected these arguments.  I think

24        that your use of reading hearsay

Confidential - Subject to Further Confidentiality Review

Page 110

```
 1              documents, even though they're court

 2              opinions, is out of line, and we're

 3              going to ask for this extraneous

 4              portion of the deposition be struck

 5              from the record.

 6    BY MR. HAYDEN:

 7         Q.     In that case, the judge found

 8    that your testimony was unreliable.  Do you

 9    recall that?

10         A.     Well, I don't think that was

11    the sentence.  Again, I've read the abstracts

12    or the documents on that.  Specifically, it

13    was a mis- -- in my assessment of what

14    happened, a misunderstanding of the data

15    analysis that I had provided.

16         Q.     Okay.  The judge said that your

17    opinions were based upon disturbingly cursory

18    research and speculation, right?

19              MR. SERPE:  Object to the form.

20              We've got hearsay here, if you want to

21              call the judge and establish this,

22              Don, that's fine, but you've asked the

23              witness for his recollection, he's

24              given it to you.  At this point,
```

Confidential - Subject to Further Confidentiality Review

```
 1          you're being argumentative, I'd ask

 2          you to desist.

 3               Subject to that objection,

 4          Dr. Caravanos, if you can answer the

 5          counsel's question, please go ahead.

 6          A.    I'm sorry, can you repeat the

 7   question?

 8   BY MR. HAYDEN:

 9          Q.    The judge called -- found that

10   your opinions on causation were based on

11   disturbingly cursory research and

12   speculation, correct?

13          A.    Well, again, I can't -- I don't

14   have a ruling in front of me, but the

15   estimations -- you know, let's just -- if you

16   want to talk about this, I was asked to

17   estimate the toluene and xylene levels in a

18   closed containment following a lead-based

19   paint operation.

20               The containment was left in

21   place.  They were spray-painting very high

22   levels of xylene-containing paints, so I was

23   asked to predict what would the airborne

24   levels be.  And I went through my
```

Confidential - Subject to Further Confidentiality Review

1    mathematical modeling and produced a rather

2    complicated set of numbers and assumptions,

3    humidities; but at trial, that did not all

4    come out.

5            MR. HAYDEN:  Okay.  Actually,

6        Why don't we mark that.

7            (Whereupon, Deposition Exhibit

8        Caravanos-2, Decision, Amorgianos

9        v. National Railroad Passenger

10       Corporation d/b/a Amtrak, 137

11       F.Supp. 2d 147, was marked for

12       identification and/or introduced.)

13           THE REPORTER:  Caravanos

14       Exhibit No. 2 has been marked.

15           MR. SERPE:  Move to strike

16       Exhibit 1 from the record.

17           MR. HAYDEN:  2.

18           MR. SERPE:  Yeah, we'll get to

19       2.

20   BY MR. HAYDEN:

21       Q.    Sir, I'm showing you what's

22   been marked as Exhibit 2.  In that opinion,

23   did the judge not indicate that your opinion

24   was unreliable?

Confidential – Subject to Further Confidentiality Review

1           MR. SERPE:  Object to the form.

2      The document will speak for itself.

3      Counsel, you're giving an expert

4      witness a legal document and trying to

5      cross-examination him from a published

6      opinion?

7           I think this is way out of

8      line.  We're going to ask for it to be

9      struck.  I'm going to ask you to move

10     on, or we'll request that the Court

11     not only strike this but assess costs

12     for an inappropriate use of a

13     published decision for

14     cross-examination.

15     A.     I must say, the document speaks

16 for itself.

17 BY MR. HAYDEN:

18     Q.     Okay.  You didn't use the

19 methodology that you had advised the court

20 you were intending to use in this case, did

21 you?

22           MR. SERPE:  Same objections.

23     A.     I did.  I did use the

24 methodology.  I defend that the practice of

Confidential - Subject to Further Confidentiality Review

1    assessing those values of toluene and xylene

2    were appropriate; it just never came out in

3    the case.

4    BY MR. HAYDEN:

5         Q.    And do you know if the barring

6    of your testimony was affirmed on appeal?

7         A.    These are legal terms.  I

8    don't -- I'm not -- I don't know how to

9    answer that.  Affirmed on appeal, I'm not

10   quite sure what that means.

11        Q.    Sir, with regard to the XRF,

12   we've seen reference to the use of XRF by the

13   EPA, CPSC, acceptance by HUD for the XRF to

14   be used in lead-based paint investigations.

15        A.    Yes, all of these are within

16   lead-based paint --

17             MR. SERPE:  I'm sorry, I didn't

18        get a chance to object to the

19        vagueness of the question.  With

20        respect to the use of XRF, I'm not

21        sure what you're talking about,

22        Counsel, appreciate if you would --

23        let me just object.  That's a vague

24        question.

Confidential - Subject to Further Confidentiality Review

1    BY MR. HAYDEN:

2         Q.    Okay.   What's your

3    understanding of XRF?   I thought we got an

4    understanding of what XRF was early on in

5    this deposition, but I'm happy to get another

6    definition.   What's your definition of XRF?

7         A.    XRF is X-ray fluorescence.

8         Q.    Okay.   And X-ray fluorescence

9    is something that you use in --

10              MR. SERPE:   Object.   I'm sorry,

11         I didn't mean to cut you off.

12   BY MR. HAYDEN:

13        Q.    X-ray fluorescence is something

14   that has been used in the investigation of

15   lead-based paint.

16              MR. SERPE:   Objection, vague.

17        A.    Field portable XRF.

18   BY MR. HAYDEN:

19        Q.    Field portable XRF, correct.

20        A.    Right.

21        Q.    And we also talked about the

22   use of field portable XRF to evaluate

23   strontium in soil samples, correct?

24        A.    Yes.   Yes, we talked about

Confidential - Subject to Further Confidentiality Review

1    that.

2        Q.     And we actually have an exhibit

3    that I -- that was introduced by opposing

4    counsel that talks about it being an

5    acceptable use for identifying strontium in

6    soil samples, correct?

7        A.     It's an acceptable screening

8    tool, not a confirmatory, for strontium in

9    soil and sediment.

10       Q.     Okay.  Would you agree that XRF

11   could be an acceptable screening tool in a

12   Chinese drywall home?

13       A.     I think that would require more

14   study, but I think it has potential to get

15   there.  I think it needs to be -- the

16   protocol and the science needs to be improved

17   and studied, but I think for a screening

18   tool, that is possible.

19       Q.     Are you aware of the fact

20   that -- strike that.

21              Do you know a Ron Bailey?

22       A.     No, sir, I don't.

23       Q.     Do you know a Mr. Bailey that

24   is an expert for the plaintiffs in this

Confidential - Subject to Further Confidentiality Review

```
 1     matter?

 2            A.       No, sir.  B-A-I-L-E-Y?

 3            Q.       Yeah.

 4            A.       No.

 5            Q.       Okay.  Would you be surprised

 6     if he uses XRF in the inspection of Chinese

 7     drywalls?

 8                     MR. SERPE:  Object to the form.

 9     BY MR. HAYDEN:

10            Q.       Drywall homes?

11            A.       I don't have an opinion whether

12     I'll be surprised or not.  It's -- you know,

13     I don't care.

14            Q.       You would agree, would you not,

15     that XRF is an approved analytical method for

16     strontium that the EPA has published a method

17     for its use in soil samples in SW-846,

18     Method 6200?

19                     MR. SERPE:  Objection.  Asked

20            and answered.

21            A.       Again, I answered that by

22     clarifying that as a screening tool.  It is

23     being used under that method, is recommended

24     under that method.
```

Confidential - Subject to Further Confidentiality Review

1    BY MR. HAYDEN:

2       Q.    Okay.  And let's go to the

3    Consumer Products Safety Commission report.

4       A.    Okay.

5       Q.    Would you agree that from the

6    Consumer Products Safety Commission report

7    that's been identified as an exhibit here

8    that the CPSC used field XRF for its testing

9    of homes for strontium?

10       MR. SERPE:  Object to the form.

11       A.    As part of the study, they

12    incorporated field XRF.

13    BY MR. HAYDEN:

14       Q.    That's right.

15       A.    It was a study.

16       Q.    And CPSC acknowledged that XRF

17    analysis for the evaluation of different

18    drywall types is an appropriate tool to

19    identify different samples utilized in

20    conjunction with other methods of surveying a

21    home, correct?

22       MR. SERPE:  Object to the form.

23       Counsel, are you reading from the

24       document?

Confidential - Subject to Further Confidentiality Review

```
 1        A.     Yes.

 2               MR. SERPE:   Yeah.

 3    BY MR. HAYDEN:

 4        Q.     I'd like you to go, sir, to the

 5    particular pages that your counsel referenced

 6    you to.

 7        A.     I'm sorry, I asked the counsel

 8    to reference these.

 9        Q.     Okay.  Now, if we could go

10    first to page 105.

11        A.     Yes, I'm there.

12        Q.     Okay.  And the first paragraph,

13    the last sentence reads, "When drywall is

14    measured in situ, the paint and any other of

15    the myriad surface coatings that could be

16    applied to walls have a muting effect on the

17    strontium concentrations because the

18    strontium is located at depth."

19               Do you see that?

20        A.     I do see it.

21        Q.     Okay.  Would you agree that if

22    the paint or paper or other surface coatings

23    were removed and you could put the XRF gun on

24    the core of the drywall, that you would be
```

Confidential - Subject to Further Confidentiality Review

1    able to get a better reading?

2        A.    I think, yes, I would agree to

3    that.  The muting would be reduced.

4        Q.    Okay.

5        A.    Not eliminated, but reduced.

6        Q.    Okay.  And there are means to

7    remove the paint and other surface coatings

8    from the wall of a home to get to the core

9    using a portable XRF, correct?

10        MR. SERPE:  Object to the form.

11        A.    Yes.  It's a destructive

12    testing, but you can peel away the paint and

13    paper and just expose the gypsum.

14    BY MR. HAYDEN:

15        Q.    Okay.  And when you say

16    destructive testing, one example could be you

17    could take the faceplate off of a switch and

18    that would expose the core of the drywall,

19    correct?

20        A.    I couldn't do that because you

21    really do need a certain flat area, so it

22    would be hard -- if you took the faceplate

23    off, you would still have to proceed to --

24    are you talking about shooting it at an

Confidential - Subject to Further Confidentiality Review

1    angle, or if you shoot the front of it, you

2    still have to peel away the paper and get to

3    the gypsum.

4         Q.    But you could peel away at the

5    paper behind the faceplate and still there

6    would be no aesthetic damage to the wall,

7    correct?

8              MR. SERPE:  Object to the form,

9         speculative.

10        A.    Yeah, I've installed

11   faceplates, it's a challenge to do it so that

12   you don't damage the rest of the wall.  But

13   that would be a more -- sort of a

14   non-cosmetic damage to the wall surface.

15   BY MR. HAYDEN:

16        Q.    Especially if the first phase

17   of your survey was to open the switches and

18   receptacles of the room, correct?

19             MR. SERPE:  Objection,

20        argumentative.

21        A.    We're not -- I can't go into

22   the first part of a survey and looking at

23   copper wires.  That's, again, not --

24   BY MR. HAYDEN:

Confidential - Subject to Further Confidentiality Review

Page 122

1          Q.     That's right.   That's right.

2     You're only looking at the XRF as the

3     exclusive tool for determining Chinese

4     drywall.

5          A.     No, not the exclusive.   I'm

6     looking at the role of the XRF for purposes

7     of identifying Chinese drywall, not the

8     exclusive.   I'm looking at field portable

9     machines, I've looked at ICP and other

10    methods, but I'm not looking at the protocol

11    for determining copper wire corrosion.

12         Q.     Okay.   What other methods are

13    you considering as part of the determination

14    that's being made for a partial board

15    removal?

16              MR. SERPE:   Objection, beyond

17         the scope of this expert,

18         argumentative, asked and answered.

19         A.     Yes.   There's a field portable.

20    There's also a stationary XRF where you can

21    take material compacted into a capsule and

22    test it that way.   So there's, you know, the

23    ICP.

24              So in researching this issue

Confidential - Subject to Further Confidentiality Review

1    and coming to my conclusions, I needed to

2    study, well, what is the proper analytical

3    method for strontium, so that's what I'm

4    getting at.

5    BY MR. HAYDEN:

6        Q.    Okay.  Well, you mentioned ICP.

7    That was a method that you indicated should

8    have been -- should be used to measure

9    strontium.  Is that correct?

10        A.    It's one of the benchtop

11    laboratory methods that is used, Flame.

12        Q.    But it's a laboratory method,

13    correct?

14        A.    It's a laboratory method.

15        Q.    And as you sit here today,

16    nowhere in the CPSC report do they talk about

17    the use of the ICP method to test the

18    strontium, do they?

19        A.    They refer to it in the 6.3

20    figure that this is laboratory testing, and

21    I'm assuming that given who did this report,

22    they're using EPA methods, so I think there's

23    a strong assumption that the laboratory

24    methods they're talking about are ICP, Flame,

Confidential - Subject to Further Confidentiality Review

1    or another spectroscopy.

2        Q.    Because this is lab data, you

3    assume that it's ICP?

4        A.    I ab- -- no, no, I assume it's

5    either flame AAS, Graphite Furnace AAS, any

6    emission spectroscopy, or ICP.

7        Q.    Well, you mention that the

8    drywall could also have been brought to the

9    lab and used the same hand-held device in the

10   lab, correct?

11            (Brief interruption.)

12       A.    I'm sorry, I got distracted,

13   can you go back?

14   BY MR. HAYDEN:

15       Q.    Okay.  I'm sorry.

16            Where -- there's nothing here

17   to indicate that as you marked on the

18   exhibit, ICP, there's nothing to indicate

19   that the lab data is based on ICP testing or

20   the other testing that you suggested, is

21   there?

22       A.    I think it's absolutely

23   definitive that when they say lab testing,

24   they are using approved EPA benchtop

Confidential - Subject to Further Confidentiality Review

Page 125

1    laboratory instrumentation.  ICP.

2         Q.    They're very detailed

3    throughout this 190-page report.  Why don't

4    they say that here?

5         A.    I can't explain why they didn't

6    say it, but there is really no other

7    laboratory confirmation testing.  You know,

8    when you say "laboratory," there's no other

9    approved -- and again, the key here is that

10   this is CPSC doing a very important piece of

11   work and they're going to send it to an

12   accredited lab using specialized approved

13   methods for that.

14        Q.    What accredited laboratory did

15   they send this to?

16        A.    I don't have the appendices.  I

17   don't have the access to the raw data on

18   this.

19        Q.    Isn't an apples-to-apples

20   comparison that would have been appropriate

21   by the CPSC and probably was followed by the

22   CPSC that they used a field data testing

23   using the same equipment as they used in the

24   lab?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     Oh, no.  No.  Again, lab data,

 2    this is -- it's my absolute conviction that

 3    lab data refers to a benchtop piece of

 4    equipment that's approved for that method, an

 5    accredited method at an accredited lab, and

 6    that's not a benchtop XRF.

 7          Q.     Oh, a benchtop XRF is not

 8    accepted?

 9          A.     Benchtop, according to the

10    method I reviewed, it's not.  It's ICP,

11    flame AAS.  There's about four instruments.

12          Q.     What method did you review?

13          A.     The -- let's just go to my

14    report.  Do I have it here?  Well, I don't

15    guess I have it.

16               MR. SERPE:  Dr. Caravanos, I

17          realize the hour is late, but with a

18          190-page document, please take any

19          time that you need to answer counsel's

20          question.  I'm sure he wouldn't object

21          to that.

22               (Sotto voce discussion.)

23          A.     No, I'm sorry.  I mentioned the

24    methods, the analytical instruments, but I do
```

Confidential - Subject to Further Confidentiality Review

```
 1    not have the EPA method, the approved EPA

 2    method for strontium -- confirmatory

 3    strontium.  The equipment in that method --

 4    well, I don't want to guess, I believe

 5    it's --

 6    BY MR. HAYDEN:

 7         Q.    Sir, that's not my question.

 8    You don't have anything in your report to

 9    support your position that the only methods

10    for quantifying and confirming strontium are

11    FAAS and ICP?

12              MR. HAYDEN:  But you're quite

13         right, Dr. Caravanos.  Don't

14         speculate.  He doesn't want you to

15         guess on this answer.

16         A.    I did not reference that.  I

17    looked up that method, I read it.  It's not

18    referenced in the document.

19    BY MR. HAYDEN:

20         Q.    And that's not the -- that's

21    not the method that was used by the CPSC when

22    they went into the Chinese drywall homes,

23    correct?

24         A.    I don't agree.  It's my
```

Confidential - Subject to Further Confidentiality Review

1   understanding, it's my interpretation of that

2   phrase that when they say laboratory methods,

3   it's an accredited lab using approved

4   methods.

5        Q.    If we could go to the next

6   page, back to page 105 of the CPSC report.

7        A.    Okay, one second.  Yes, I'm

8   there.

9        Q.    The second paragraph was not

10  referenced by either you or your counsel.  Is

11  there a reason for that?

12            MR. LEWIS:  What page, Don?

13            MR. SERPE:  105.

14       A.    Well, these are the paragraphs

15  that I marked and as for display are critical

16  ones for the point I'm making, and for my

17  conclusions.  So the entire section, those

18  entire five, six pages, are valuable.  If you

19  give me a minute, I could read it and answer

20  the question.

21            MR. SERPE:  Please take your

22       time, Doctor.

23            (Witness reviews document(s).)

24       A.    Yes.  So the question?

Confidential - Subject to Further Confidentiality Review

1    BY MR. HAYDEN:

2        Q.    Yes.  Could you read the last

3    two sentences into the record?

4        A.    The last sentence?

5        Q.    Last two sentences.

6        A.    Last two sentences.

7    "Therefore, in-situ measurements of strontium

8    via XRF were able to be used to identify

9    where domestic and imported drywall were

10   located in an otherwise uniformly painted

11   wall.  However, as discussed below, there are

12   significant limitations on using this

13   technique as an absolute indicator."

14       Q.    So would it be fair to say that

15   XRF is not an absolute indicator but it is a

16   screening tool that can differentiate between

17   two pieces of board that are otherwise

18   uniformly painted?

19            MR. SERPE:  Object to the form.

20       A.    I believe we went over this

21   before, but I do agree that the role of XRF,

22   portable XRF, has a screening purpose, and I

23   think there's a potential for further use.  I

24   think given its limitations right now on

Confidential - Subject to Further Confidentiality Review

```
 1     interferences, it's not anything more than a
 2     screening tool, but it does -- it's -- for
 3     screening homes, I think there is potential.
 4     BY MR. HAYDEN:
 5          Q.     Okay.  And we talked about one
 6     way to eliminate some of the interference
 7     through the other materials by getting behind
 8     a faceplate, correct?
 9               MR. SERPE:  Object to the form,
10          mischaracterization.
11          A.     In a qualitative manner.  This
12     has to be assessed by CPSC, because just
13     peeling off paper and joint compound may not
14     get you that much better.  It may not get you
15     to the equivalent laboratory values.
16     BY MR. HAYDEN:
17          Q.     Okay.  You could also shoot
18     into the side of the drywall, correct?
19               MR. SERPE:  Object to the form.
20          A.     I've used this -- I've used the
21     Innov-X instrument.  It is a hard thing to
22     do, to shoot right in there.  The footprint
23     of the detector is large, so it depends on
24     the thickness.  It would be a tricky thing to
```

Confidential - Subject to Further Confidentiality Review

Page 131

1    hold it up to a thin, 3/8-inch piece of

2    sheetrock.  If you move it at all --

3    BY MR. HAYDEN:

4        Q.    But it's something that could

5    be done?

6        A.    Anything could be done, but

7    will the data be meaningful?  Hard to say.

8        Q.    Well, it would be more

9    meaningful than the data with the paint and

10   the other substances that are causing the

11   false negatives, correct?

12            MR. SERPE:  Objection.  Calls

13       for speculation.

14       A.    The interferences would be

15   reduced.

16   BY MR. HAYDEN:

17       Q.    Okay.  And it would allow you

18   to get to the core of the drywall, correct?

19   The core materials of the drywall sheet.

20       A.    What would allow you to?

21       Q.    Shooting into the side of the

22   drywall.

23       A.    Well, you would have to peel

24   that off, and as we all know, when you peel

Confidential - Subject to Further Confidentiality Review

1    that off, the gypsum does crumble a lot, so

2    it would have to be a nice clean slice and

3    you'd have to be very careful holding it

4    there and the data you would get there would

5    be slightly better than shooting through

6    paper and sheetrock -- paper and joint

7    compound.

8          Q.    Okay.  Another method that you

9    could use would be to punch a plug into the

10   wall where you would be removing the paint,

11   paper and other materials other than the

12   drywall, without putting holes in the wall?

13               MR. SERPE:  Objection to the

14          form.

15         A.    I don't understand the protocol

16   here, so what would you do with the plug?

17   BY MR. HAYDEN:

18         Q.    You just -- you'd cut out the

19   paint and the whatever other paper material

20   or other materials that might be interfering

21   with the XRF.

22         A.    Yeah.  I mean, these are all

23   good, interesting ideas and worthy of further

24   research, but until an authoritative

Confidential - Subject to Further Confidentiality Review

1    government agency or an association with

2    authority like ASTM comes out with data that

3    i think it cannot be used in much more than a

4    screening role.  I don't want to say, "Well

5    suppose you take it and compress it and mix

6    it with water and do this, we'd get better

7    and better data."  You've got to go through

8    that rigorous scientific review, because this

9    is just too important.

10         Q.    Okay.  You're aware of the fact

11   that in your report you make some reference

12   to there being some false negatives in the

13   Virginia home XRF testing.  Do you recall

14   that?

15         A.    Yes.  There's one sample,

16   BLO-13, I believe in the Orlando house, where

17   there's proof of a false negative.

18         Q.    Okay.  And actually following

19   the protocol that was in place by Ms. Dodd,

20   as she indicated in her affidavit, that

21   board --

22         A.    I'm sorry.  I'm sorry to

23   interrupt.

24         Q.    That board would have been

Confidential - Subject to Further Confidentiality Review

Page 134

1     removed because the visual observation of the

2     switch next to it showed blackening.

3                 MR. SERPE:  Objection, opinion

4         and hearsay.

5         A.     Well, you keep going back to

6     the protocol in Ms. Dodd's report, and again,

7     I don't see a protocol there.  You know, so,

8     sort of striking that, that was a case where

9     they shot, I believe, defense consultants

10    shot the wall with the XRF, portable XRF, and

11    got levels in the 600, 700 range, and then

12    bulk samples were taken showing that it

13    really is much higher, I believe 2,000 to

14    3,000 parts per million.

15                So according to Perrone's

16    1200 ppm limit, that would not have been

17    Chinese wallboard when in reality it was.

18                MR. LEWIS:  It's Perricone.

19                THE WITNESS:  Perricone.

20    BY MR. HAYDEN:

21        Q.     You realize that the

22    calibration number that he had said of 1200

23    parts per million was set only for the

24    Virginia homes, correct?

Confidential - Subject to Further Confidentiality Review

1          MR. SERPE:  Object to the form,

2      mischaracterization, foundation.

3      A.     It's my understanding that 1200

4  was the number he was using for these homes.

5  BY MR. HAYDEN:

6      Q.     Okay.  Did you understand how

7  that number was determined?

8      A.     That was -- I'd have to go back

9  and read the literature on that.  I believe

10  CPSC uses the 1200 number.  As far as the

11  original origin of that number, I don't know.

12      Q.     Okay.  Let's go to the CPSC

13  interim guidelines, interim guidance, which I

14  believe is attached as an exhibit.

15      A.     Okay.  This is it.

16      Q.     Okay.  And it indicates

17  different steps that should be followed in

18  identifying homes with problem drywall.  Do

19  you see that?

20      A.     Well, threshold inspection,

21  corroborating evidence, yes.  So two,

22  two-step process.

23      Q.     The threshold inspection would

24  be to open up wires or receptacles and

Confidential - Subject to Further Confidentiality Review

1   switches to see if there's some blackening at

2   those connectors, correct?

3       A.      Well, again, the document

4   speaks for itself, and I can read bullet A

5   and bullet B and tell you what it says.  But

6   it doesn't say what to do.  It says, "Visual

7   inspection must show, A, blackening of copper

8   electrical wires and, B, the installation of

9   new drywall between a certain time period."

10              So it doesn't say you should

11  take off a plate and do X, Y and Z.

12      Q.      But that would be a means of

13  visually observing to see if there is

14  blackening of the electrical wiring, correct?

15              MR. SERPE:  Object to the form.

16      A.      Well, again, we're going into

17  that area where I didn't look at the

18  methodology for doing a corrosion assessment

19  in a home, so this is their specialty.  If

20  you're looking at corrosion inside of an

21  electrical outlet, it seems plausible you

22  would take a plate off.

23  BY MR. HAYDEN:

24      Q.      In the corroborating evidence,

Confidential - Subject to Further Confidentiality Review

1    it mentions strontium levels in samples of

2    drywall core found in home excluding the

3    exterior paper surfaces exceeding 1200 parts

4    per million.  That's the same 1200 parts per

5    million that was used by the CPSC when they

6    did their XRF testing in the homes back

7    before the November 23rd report, correct?

8              MR. SERPE:  Object to the form

9         and mischaracterization, vague.

10    A.    Yes.

11  BY MR. HAYDEN:

12    Q.    So wouldn't that assume --

13  wouldn't it be fair to assume that the CPSC

14  is still using XRF at those levels but

15  looking at the drywall core in the homes in

16  determining whether or not there is Chinese

17  drywall in the board?

18              MR. SERPE:  Objection, vague.

19    A.    Yes.  The CPSC document talks

20  about two methods.  We went over that with

21  the chart, the laboratory and the XRF.  So

22  this, I think you can't say with certainty

23  that this is referring to XRF.

24              And my previous statement on

Confidential - Subject to Further Confidentiality Review

```
 1      that was as I read this, my experience in

 2      environmental sampling, whether it's asbestos

 3      or lead or other materials, when they say a

 4      core sample, that's a bulk sample.

 5                   We put it in a little bag, we

 6      send it to the laboratory, and the laboratory

 7      is instructed not to analyze the paper.

 8      BY MR. HAYDEN:

 9           Q.    Well, counsel got to ask you if

10      there was any reference to XRF in this

11      document, correct?  And you didn't see any,

12      right?

13                   MR. SERPE:   Objection,

14           argumentative.

15           A.    I believe that's what I said,

16      yes.

17      BY MR. HAYDEN:

18           Q.    Yeah.  And I'm going to ask you

19      the same:  Is there any reference to ICP or

20      FAAS in this document?

21           A.    No, there's not.

22           Q.    Okay.  So those are assumptions

23      that you're making.

24           A.    Well, they're professional
```

Confidential - Subject to Further Confidentiality Review

1    judgments.  You know, having done this work

2    and sampled many materials, when we say core

3    samples, excluding paper surfaces, I think

4    the vast majority of analytical chemists

5    would deduce that that's a laboratory

6    procedure.

7         Q.    Okay.  And you're not -- but

8    you're an industrial hygienist, correct?

9         A.    Well, that's my nominal --

10   that's my title.  My professional title.  But

11   I have training in chemistry, analytical

12   chemistry and analytical instruments, so...

13   we own a flame absorption spectrophotometer

14   and we teach students how to use it, so I

15   have a knowledge of analytical equipment.

16              (Sotto voce discussion.)

17   BY MR. HAYDEN:

18        Q.    Sir, you seem to believe that

19   the protocol that should be followed here

20   should be more in accord with asbestosis or

21   with lead paint rather than another type of a

22   situation.

23              MR. SERPE:  Objection, beyond

24         the scope and mischaracterization.

Confidential - Subject to Further Confidentiality Review

1          A.     Right.   The intent of the

2     section talking about asbestos inspection and

3     lead paint is just to describe that there's a

4     long process in history in coming up with

5     inspection protocols.   These are complicated,

6     very important protocols and the asbestos

7     inspection, the AHERA rule of 19 -- of the

8     recent years, 1987, as well as the lead paint

9     rule, had very long scientific history in

10    getting to those inspection protocols.

11              So this -- for example, the HUD

12    guidelines, this was not written overnight

13    and took many, many years to polish out and

14    get into a protocol, a true inspection plan.

15    So that needs to get -- that needs to happen

16    for using XRF in Chinese wallboard.

17    BY MR. HAYDEN:

18         Q.     Okay.

19         A.     That was the intent of that.

20         Q.     There is no evidence that

21    Chinese drywall is like asbestos, correct?

22              MR. SERPE:   Object to the form.

23         A.     It's outside the scope.   We

24    could talk about it at some other time, but

Confidential - Subject to Further Confidentiality Review

1   this gets into the hazards of Chinese

2   wallboard which I'm not here -- that's not

3   what I was asked to do.

4   BY MR. HAYDEN:

5        Q.     Well, you did make the

6   statement in your report that when in doubt,

7   you have to assume that the material contains

8   the hazard.  Do you recall making that

9   statement?

10        A.     That's a precautionary

11   principle that's often done in public health

12   when, in the absence of definitive data, to

13   err on the side of safety.

14        Q.     Okay.  Unlike asbestos where

15   there were long-term health effects, there's

16   no evidence of long-term health effects with

17   these low levels of sulfur emissions that may

18   be emitted by Chinese drywall, correct?

19             MR. SERPE:  Objection.  Beyond

20        the scope, in violation of an

21        agreement we have with respect to the

22        scope of this trial, in violation of a

23        court order with respect to the

24        appropriate scope of this trial, out

Confidential - Subject to Further Confidentiality Review

```
 1        of bounds.  Counsel, you're -- I

 2        consider you to be violating the

 3        spirit of our agreement and the

 4        Court's order by asking health-related

 5        predicate questions.  That's not what

 6        this trial is about, and we're going

 7        to -- I'll ask you to desist from

 8        asking those questions.  If you're

 9        going to press on with health-related

10        questions at this hour, I'm going to

11        call the Court and get guidance.

12        These questions are out of bounds.

13              MR. HAYDEN:  At this hour, I

14        mean, I haven't been at

15        cross-examination as long as you were

16        on direct.

17              MR. SERPE:  I'm sorry, what I

18        mean is at this hour in terms of

19        catching the Court at 5:00 o'clock on

20        a Friday afternoon.

21   BY MR. HAYDEN:

22        Q.    With regard to -- also just to

23   follow up one more question in that regard,

24   with regard to the lead paint situation,
```

Confidential - Subject to Further Confidentiality Review

1    that's not -- unlike the lead paint situation

2    where there were long-term health effects to

3    children, there's no evidence as we sit here

4    today that you're aware of that would require

5    that you would follow the same protocol that

6    you'd follow in a lead paint situation.

7              MR. SERPE:  Object to the form.

8         A.    Yes.  Again, I have not done a

9    health risk assessment on Chinese wallboard.

10   That's not part of the scope of my task.  But

11   it is a -- it appears to be a hazard --

12   appears to be a hazard and that if we're

13   going to proceed to inspect for this

14   material, procedures have to be -- excuse

15   me -- procedures have to be designed and

16   methods have to be set so that's done

17   accurately and scientifically.

18              MR. HAYDEN:  Can we take a

19         two-minute break?

20              THE VIDEOGRAPHER:  The time now

21         is approximately 4:40 p.m., and we are

22         now off the record.

23              (Recess taken, 4:40 p.m. to

24         4:49 p.m.)

Confidential - Subject to Further Confidentiality Review

```
 1                    (Whereupon, Deposition Exhibit

 2             Caravanos-3, "A Nonparametric Method

 3             for Estimating the 5th and 95th

 4             Percentile Curves of Variable-Time XRF

 5             Readings Based on Monotone

 6             Regression," October 24, 2000, was

 7             marked for identification and/or

 8             introduced.)

 9                    THE VIDEOGRAPHER:  This begins

10             Tape 4 of the videotaped deposition of

11             Mr. Jack Caravanos.  Time now is

12             approximately 4:49 p.m. and we're back

13             on the record.

14    BY MR. HAYDEN:

15             Q.    Sir, I'm showing you what's

16    been marked as Exhibit 3.  Have you seen it?

17             A.    Yes, I have it.

18             Q.    Okay.  And this discusses a

19    method of estimating the 5th and 95th

20    percentile curves of variable-time XRF

21    readings based on monotone regression.  Do

22    you see that?

23             A.    Yes, I do.

24             Q.    And that's something you relied
```

Confidential - Subject to Further Confidentiality Review

1    upon?

2         A.    I did not rely on this.  I

3    mean, I looked at this, I tried to make sense

4    of this and see its applicability, but in and

5    of itself, it wasn't crucial in my judgment.

6         Q.    What was the purpose for

7    looking at it?

8         A.    Well, just understanding the

9    statistical ranges and the type of

10   variability in XRF readings; are they

11   uniform, a normal distribution, are they

12   parametric, and when they say 5th or 95th

13   percentile, how does that affect the

14   inconclusive range.

15        Q.    Okay.  In the situation where

16   you would find in a home that you would have

17   two types of drywall, domestic -- a domestic

18   brand and a Chinese brand, and you tested the

19   two types of drywall with an XRF gun after

20   removing the paint and surface layers --

21        A.    Okay.

22        Q.    -- and the two -- the results

23   from the XRF showed two very distinct

24   groupings of test results similar to what's

Confidential - Subject to Further Confidentiality Review

1    being discussed in this document, would you

2    agree that you would be able to establish a

3    reliable XRF screening device in a Chinese

4    drywall home?

5              MR. SERPE:   Object to the form

6         and lack of adequate specificity and

7         compound nature of this hypothetical.

8         Subject to my objection, Doctor, if

9         you can give the best answer you're

10        capable of.

11        A.    Well, this is in terms of the

12   lead -- field portable lead XRF units, and

13   for these readings, as part of the PCS,

14   Performance Characteristic Sheet, evaluation,

15   there's an elaborate statistical test,

16   that -- is this machine-reproducible.  That's

17   what this sort of describes, whether it's

18   parametric or non-parametric.

19              And if and when this machine

20   ever does get evaluated for strontium

21   analysis in wallboard, either in situ or

22   prepared sample, it would have to go through

23   that same rigorous test.

24              So there are error bars when

Confidential - Subject to Further Confidentiality Review

1    you take a reading, plus or minus, and the

2    video I've seen will call out a number, plus

3    or minus a range, and it's that range that

4    we're talking about.  And when you come out

5    with standards for instruments, you know, you

6    assume a certain variability, and that

7    variability, that's what we want to keep

8    really narrow.

9    BY MR. HAYDEN:

10        Q.    Okay.  Now, you mentioned a

11   1.9% false negative rate with the lead -- in

12   the situation with the lead with the

13   standards that are in place for testing for

14   lead paint.

15        A.    Yes.  One of the PCS forms for

16   one of the instruments quotes a --

17        Q.    CPSC?

18        A.    No, no, the performance PCS,

19   Performance Characteristic Sheets -- there

20   are a lot of initials today.

21            In one of those instrument

22   performance reports, it quotes false negative

23   rates and that's one of -- I just sort of

24   picked out 1.9.

Confidential - Subject to Further Confidentiality Review

1          Q.      And that would be

2     satisfactory -- a satisfactory false negative

3     rate if you were doing a Chinese drywall

4     testing?

5          A.      Well, that's a good question,

6     because there are two points here.  One is a

7     scientific sort of issue.  What is the number

8     and then what are we going to accept.  So 1.9

9     for this scenario was considered acceptable.

10    So the first thing to do is determine what is

11    the false negative rate and then decide, "Are

12    we willing to take that risk," and it could

13    change, and whether it's a cancer drug,

14    whether it's an instrument or whether it's a

15    hazard.  So there's a two-step process.

16         Q.      In your mind, what is an

17    appropriate false -- the maximum false

18    negatives that would be appropriate?

19         A.      Well, it's a tough one.  If

20    we're talking about a carcinogen, we don't

21    want to make mistakes.  If we're talking

22    about something that is not a serious public

23    health hazard or is a nuisance, we're willing

24    to accept some more mistakes, so it really

Confidential - Subject to Further Confidentiality Review

1    depends on the agent, yeah.

2              If I may say, as low as

3    possible.

4        Q.    Okay.  If we're talking about a

5    nuisance or a situation where one

6    component -- emissions from one component are

7    causing damage to another component in a

8    home, what would be the amount that you would

9    demand?

10             MR. SERPE:  Object to the form,

11        foundation.

12        A.    Again, in most values, in most

13   scientific equipment and testing, we look for

14   99% certainty, so that's why one -- near

15   upwards of 1, 2% is what's very commonly

16   accepted.

17   BY MR. HAYDEN:

18        Q.    And could the reliability of

19   the XRF device as a screening tool --

20        A.    For homes.

21        Q.    -- for a home, be -- you know,

22   for board in a home be improved by putting in

23   place a survey that would also check for the

24   impacts as identified in the Florida

Confidential - Subject to Further Confidentiality Review

1      Department of Health in the various parts of

2      the home?

3              A.      I lost that question.

4              Q.      Okay.

5              A.      That's complicated.

6              Q.      I don't know how much you know

7      about Chinese drywall, but there are claims

8      that there is corrosion in the HVAC systems.

9              A.      Yes.

10             Q.      You're aware of that, right?

11             A.      I'm aware of that.

12             Q.      And that the corrosion in the

13     HVAC system is due to the air running through

14     the HVAC system from throughout the house,

15     correct?

16                     MR. SERPE:   Objection, beyond

17             the scope.

18     BY MR. HAYDEN:

19             Q.      If you know.

20             A.      Well, obviously air is going

21     through an air conditioning system.  How it

22     permeates the walls, how it moves through

23     wall cavities is not something I really

24     investigated, so I really, you know, don't

Confidential - Subject to Further Confidentiality Review

Page 151

1    exactly -- can't tell you what's a primary

2    route for the gases into the electrical

3    outlets.  Is it through the wall cavity,

4    through the outside, this is not my

5    specialty.

6         Q.    Let's assume for purposes of my

7    question that you can localize the tarnishing

8    of the electrical switches and receptacles

9    caused by Chinese drywall.  And when I say

10   localized, that only the receptacles near the

11   Chinese drywall will be impacted.

12        A.    Okay.  So hypothetical, there

13   is a wall and there's an outlet and in that

14   outlet is corroded copper wiring?

15        Q.    No.  You're making that

16   assumption for me.  The --

17        A.    I'm trying to understand.  I'm

18   sorry.

19        Q.    Okay.  And the next step in my

20   question is, you would open up a switch or

21   receptacle and find a clean, shiny copper

22   connection.

23        A.    Right.  Again, you know, we've

24   gone over this.  I'm sorry, I am not

Confidential - Subject to Further Confidentiality Review

1    proposing a protocol, especially not a

2    protocol going into an area where I'm not a

3    specialist in.  So looking for corroded

4    wires, I'm as good as the next guy.  I really

5    can't adequately identify those, and I

6    wouldn't even submit that I can.

7           Q.    Okay.  But let's assume that

8    the XRF gun is only used where you find

9    clean, shiny connections on a wall.

10          A.    Okay.

11          Q.    And in walls where there are

12   blackened receptacles and switches, the wall

13   is removed during the remediation process.

14   Would you agree that there would be far less,

15   if any, false negatives in that protocol?

16                MR. SERPE:  Object to the form.

17          Beyond the scope.

18          A.    I cannot comment on the

19   relationship between Chinese drywall and the

20   context of corrosive gases and the

21   relationship to and the proximity of outlets.

22                You know, I can -- from what I

23   have testified, it's really the false

24   negatives, distance from it, used on any

Confidential - Subject to Further Confidentiality Review

1   drywall will have a range of false negatives

2   for strontium, you know.

3   BY MR. HAYDEN:

4        Q.    I'm asking you to make all

5   these assumptions that the damage to the

6   outlet is due to localized Chinese drywall.

7        A.    Okay.

8        Q.    Okay?  So bear with me.

9        A.    All right.

10        Q.    You're assuming that if there

11   is damage at a receptacle on a wall that it's

12   due to Chinese drywall being on that wall.

13   Okay?

14        A.    Okay.  That's the -- that's

15   your hypothetical?

16        Q.    Yeah.

17        A.    Okay.

18        Q.    And if the XRF gun was only

19   used to test if you found a receptacle that

20   had clean, shiny switches and connections,

21   would you agree that there would be fewer

22   false negatives in determining what drywall

23   to remove?

24             MR. SERPE:  Before you answer,

Confidential - Subject to Further Confidentiality Review

1          Dr. Caravanos, I'd like to note for

2          the record that this has been asked

3          and answered three times.  The witness

4          has said that it's beyond his area of

5          expertise, he's not offering an

6          opinion in the area.  This is now

7          excessive and wasteful, and we would

8          appreciate if Counsel would move on to

9          an area that the witness was actually

10         proffered for.  Subject to the

11         objections, Dr. Caravanos, if you have

12         a new answer to this question or if

13         you can just repeat your previous

14         answers, just please attempt to answer

15         counsel's question.

16              MR. HAYDEN:  Thanks for the

17         speaking objection.

18              MR. SERPE:  I didn't comment at

19         all on the substance.  I'm just

20         pointing out that's the third time

21         he's told you he doesn't have an

22         answer on that hypothetical.

23         A.     So the -- let's understand

24    this.  The strontium in wallboard, those

Confidential - Subject to Further Confidentiality Review

1    molecules, when tested with a field portable

2    XRF, will not respond definitively.  They

3    will not -- there will be some bias, negative

4    bias.  When there's a little strontium, like

5    10 parts per million, or whether there's

6    10,000 parts per million, that proportion of

7    interference is going to be the same because

8    it's an electrical signal that's being

9    buffeted by all the interference.  It doesn't

10    matter sort of where you test it or even if

11    it's American drywall, it's going to have a

12    negative bias.  It's going to have a reduced

13    signal.

14    BY MR. HAYDEN:

15        Q.    Okay.  It's really hard to

16    cross-examine you, sir, when you don't

17    really -- you don't know the Morse/Perricone

18    protocol, do you?

19            MR. SERPE:  Objection to

20        counsel's acknowledgment of his

21        inability to cross-examine the

22        witness.

23            The fact that the witness does

24        or doesn't have a particular reliance

Confidential - Subject to Further Confidentiality Review

1    material is extraneous, and we object

2    to the form, argumentative, and the

3    abusive nature of the question.

4         MR. LEWIS:  It's not a

5    question.

6         MR. SERPE:  It's not a

7    question, it's a statement.  But in

8    any event...

9    BY MR. HAYDEN:

10        Q.    Sir, your assumption is that we

11   are going in and testing each board in the

12   house with the XRF gun, correct?

13        MR. SERPE:  Object to the form,

14        mischaracterization.

15        A.    Again, what I was asked to look

16   at is not what you're doing, is that this

17   instrument testing strontium in wallboard,

18   the field portable instrument, and is it

19   giving you sufficient data, confirmatory

20   sufficient adequate data.  That's really --

21   that's really it.

22   BY MR. HAYDEN:

23        Q.    And you came to your

24   conclusions without doing any of your own

Confidential - Subject to Further Confidentiality Review

1      independent testing, correct?  And without

2      viewing the homes, correct?

3          A.      The scope of how I work is to

4      review documents --

5          Q.      I just want answers to my

6      questions.

7          A.      I'm reviewing reports.  If they

8      wanted to hire me to do a study, I could do

9      that.

10          Q.      Okay.  So you review the CPSC

11      report, you review the Florida Department of

12      Health report, you review the interim

13      guidance that was given by the CPSC, and

14      based on that, you have come to some

15      conclusions, correct?

16          A.      And the other 16 documents that

17      I looked at and my background and my years of

18      experience and training.

19          Q.      Okay.  You have never

20      investigated a Chinese drywall home before,

21      correct?

22              MR. SERPE:  Object to the form.

23          A.      I have not visited these homes.

24      BY MR. HAYDEN:

Confidential - Subject to Further Confidentiality Review

1        Q.      Okay.  You have never

2    investigated a Chinese drywall home.

3        A.      I've never investigated a

4    Chinese drywall home.

5        Q.      Okay.  And you have never used

6    XRF to determine strontium in drywall

7    previously?

8        A.      I have used that instrument but

9    never in that application.

10            MR. HAYDEN:  Thank you.  That's

11        all I have.

12            FURTHER EXAMINATION

13    BY MR. SERPE:

14        Q.      Dr. Caravanos, there was some

15    discussion from Counsel, some questions about

16    the usefulness of field XRF as a screening

17    tool, and I'd like to ask you to be very

18    specific and please advise Judge Fallon as to

19    what scope is it a potentially useful

20    screening tool, a portable XRF, when it comes

21    to Chinese drywall?

22        A.      Yes.  When I use the phrase

23    "screening tool," I'm referring to screening

24    of homes, and this is a home-by-home

Confidential - Subject to Further Confidentiality Review

1    assessment and not necessarily a

2    board-by-board assessment.   The unit is

3    homes.

4         Q.     When it comes to board by

5    board, what role, if any, does a portable XRF

6    have in confirming, confirmatory testing

7    whether a board is Chinese drywall or not?

8         A.     According to the research I've

9    done, it's my professional opinion that at

10   present, given the state of the science and

11   the CPSC documents and the Florida guidance,

12   that there is no role for a board-by-board

13   identification using portable XRF.

14        Q.     And that it's an unreliable

15   instrument for that application?

16        A.     Yes.  As I said earlier, that

17   the rate of false positives, the

18   non-specificity, the poor correlation of

19   false negatives, the poor specificity makes

20   it at this point inconclusive and, again,

21   non-confirmatory.

22             MR. SERPE:  Thank you.  That's

23        all the questions I have.

24             THE VIDEOGRAPHER:  Time now is

Confidential - Subject to Further Confidentiality Review

1    approximately 5:06 p.m.  Today's trial

2    deposition of Mr. Jack Caravanos,

3    consisting of four tapes, is now

4    concluded.

5           (Conclusion of video record.)

6           MR. SERPE:  By stipulation of

7    counsel, the oversize exhibit, which

8    has been identified as P1.019-121, is

9    going to be maintained in the

10   possession of the Plaintiffs Steering

11   Committee and brought to court for

12   trial on the 19th.

13          MR. HAYDEN:  Okay.

14          THE REPORTER:  Thank you.

15          (Proceedings concluded at

16   5:07 p.m.)

17          - - - - - - - - - -

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

1                          CERTIFICATE

2

3              I, SUSAN PERRY MILLER, Certified
   Shorthand Reporter (TX), Certified Court
4  Reporter (LA), Certified LiveNote™ Reporter,
   NCRA Certified Realtime Reporter, NCRA
5  Registered Diplomate Reporter, do hereby
   certify that prior to the commencement of the
6  examination, JACK CARAVANOS, Ph.D. was duly
   sworn by me to testify to the truth, the
7  whole truth and nothing but the truth.

8              I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
9  testimony as taken stenographically by and
   before me at the time, place and on the date
10 hereinbefore set forth, to the best of my
   ability.
11
              I DO FURTHER CERTIFY that I am
12 neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
13 action, and that I am neither a relative nor
   employee of such attorney or counsel, and
14 that I am not financially interested in the
   action.

15

16

17         _____
           SUSAN PERRY MILLER
18         NCRA Registered Diplomate Reporter
           NCRA Certified Realtime Reporter
19         NCRA Certified Broadcast Captioner
           NCRA Realtime Systems Administrator
20         Certified LiveNote™ Reporter

21

22         Dated:  16th day of February, 2010

23

24

Confidential - Subject to Further Confidentiality Review

1          ACKNOWLEDGMENT OF DEPONENT

2

3

4          I, _____, do
hereby certify that I have read the foregoing
5    pages and that the same is a correct
transcription of the answers given by me to
6    the questions therein propounded, except for
the corrections or changes in form or
7    substance, if any, noted in the attached
Errata Sheet.

8

9

10

11

12    _____
JACK CARAVANOS, Ph.D.              DATE
13

14

15    Subscribed and sworn to before me this

16    _____ day of _____, 20 _____.

17    My commission expires: _____

18

19    Notary Public

20

21

22

23

24

```
1                    –   –   –   –   –   –
                              ERRATA
2                    –   –   –   –   –   –

3        PAGE    LINE    CHANGE

4        _____   _____   _____

5        REASON: _____

6        _____   _____   _____

7        REASON: _____

8        _____   _____   _____

9        REASON: _____

10       _____   _____   _____

11       REASON: _____

12       _____   _____   _____

13       REASON: _____

14       _____   _____   _____

15       REASON: _____

16       _____   _____   _____

17       REASON: _____

18       _____   _____   _____

19       REASON: _____

20       _____   _____   _____

21       REASON: _____

22       _____   _____   _____

23       REASON: _____

24       _____   _____   _____
```

Confidential - Subject to Further Confidentiality Review

1

LAWYER'S NOTES

2

3      PAGE     LINE

4      _____    _____    _____

5      _____    _____    _____

6      _____    _____    _____

7      _____    _____    _____

8      _____    _____    _____

9                        _____

10     _____    _____    _____

11     _____    _____    _____

12     _____    _____    _____

13     _____    _____    _____

14     _____    _____    _____

15     _____    _____    _____

16     _____    _____    _____

17     _____    _____    _____

18     _____    _____    _____

19     _____    _____    _____

20     _____    _____    _____

21     _____    _____    _____

22     _____    _____    _____

23     _____    _____    _____

24     _____    _____    _____