1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

3    _____   §   MDL NO. 2047
                           §
IN RE:                     §
4    CHINESE-MANUFACTURED   §   SECTION: L
     DRYWALL PRODUCTS       §
5    LIABILITY LITIGATION   §   JUDGE FALLON
                            §   MAG. JUDGE WILKINSON
6    _____    §

7             TUESDAY, FEBRUARY 2, 2010

8                - CONFIDENTIAL -

9    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

10           TRIAL PRESERVATION TESTIMONY

12                   - - -

13           Videotaped deposition of KENNETH M.

14   ACKS, held at the offices of Gainsburgh,

15   Benjamin, David, Meunier & Warshauer, LLC,

16   2800 Energy Centre, 1100 Poydras Street, New

17   Orleans, Louisiana, commencing at 9:49 a.m.,

18   on the above date, before Michael E. Miller,

19   Certified Court Reporter, Registered

20   Diplomate Reporter and Certified Realtime

21   Reporter.

22                   - - -

23           GOLKOW TECHNOLOGIES, INC.
       877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com

U. S. DISTRICT COURT   Page 1
EASTERN DISTRICT OF LOUISIANA
FILED   2 - 22 - 10
LORETTA G. WHYTE
        CLERK

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
2

3    MICHELLE GERMANO; DENNIS        §
     JACKSON; SHARON JACKSON;        §
     JASON DUNAWAY; LISA DUNAWAY;    §
4    Individually, and on behalf     §
     of all other similarly          §
5    situated,                       §
                                     §
6           Plaintiffs,              §
                                     §
7    vs.                             §    2:09cv202
                                     §
8    TAISHAN GYPSUM CO. LTD.         §
     f/k/a SHANDONG TAIHE DONGXIN    §
9    CO. LTD.; VENTURE SUPPLY,       §
     INC.; HARBOR WALK               §
10   DEVELOPMENT, LLC; and THE       §
     PORTER-BLAINE CORP.,            §
11                                   §
            Defendants.              §
12

13   _____

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S :

 2        GAINSBURGH, BENJAMIN, DAVID,
          MEUNIER & WARSHAUER, LLC
 3        BY:  IRVING J. WARSHAUER, ESQUIRE
               iwarshauer@gainsben.com
 4        2800 Energy Centre
          1100 Poydras Street
 5        New Orleans, Louisiana 70163-2800
          (504) 522-2304
 6        Counsel for Plaintiffs

 7

          MORGAN & MORGAN, PA
 8        BY:  FRANK M. PETOSA, ESQUIRE
               fpetosa@forthepeople.com
 9        6824 Griffin Road
          Suite 3
10        Davie, Florida 33314
          (877) 667-4265
11        Counsel for Plaintiffs

12

          FRILOT, LLC
13        BY:  KYLE A. SPAULDING, ESQUIRE
               kspaulding@frilot.com
14        3700 Energy Centre
          1100 Poydras Street
15        New Orleans, Louisiana 70163
          (504) 599-8000
16        Counsel for Knauf Plasterboard
          Tianjin Co., Ltd.
17

18        SHARON B. KYLE, APLC
          BY:  STEVEN K. SCHILLING, ESQUIRE
19        4960 Bluebonnet Road
          Baton Rouge, Louisiana 70809-3088
20        (225) 293-8400
          Counsel for Mayeaux Construction
21        Company, Inc.

22

23

24
```

Confidential - Subject to Further Confidentiality Review

Page 4

```
 1    A P P E A R A N C E S:

 2        FOWLER WHITE BURNETT, PA
          BY:   ELIZABETH J. FERRY, ESQUIRE
 3            eferry@fowler-white.com
              (via teleconference)
 4        Espirito Santo Plaza
          1395 Brickell Avenue, 14th Floor
 5        Miami, Florida 33131
          (305) 789-9200
 6        Counsel for Black Bear Gypsum
          Supply, Inc. and Smoky Mountain
 7        Materials, Inc.

 8

          SINNOTT, NUCKOLS & LOGAN, PC
 9        BY:   MARK C. NANAVATI, ESQUIRE
              mnanavati@snllaw.com
10            (via teleconference)
          13811 Village Mill Drive
11        Midlothian, Virginia 23114
          (804) 378-7600
12        Counsel for Venture Supply, Inc. and
          Porter-Blaine Corp.
13

14    ALSO PRESENT:

15        RAY TURCOTTE, ESQUIRE
          Baron & Budd, PC
16        (via teleconference)

17

18    VIDEOGRAPHER:

19        MELISSA BARDWELL,
          Golkow Technologies, Inc.
20

21                  - - -

22

23

24
```

Confidential - Subject to Further Confidentiality Review

Page 5

```
 1                       I N D E X
                       KENNETH M. ACKS
 2                     January 2, 2010

 3

 4    APPEARANCES                            3

 5    PROCEEDINGS                            9

 6

 7    EXAMINATION OF KENNETH M. ACKS:

 8          BY MR. WARSHAUER                10

 9

10    CERTIFICATE                          116

11    ACKNOWLEDGMENT OF DEPONENT           117

12    ERRATA                               118

13    LAWYER'S NOTES                       119

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

Page 6

```
 1                  DEPOSITION EXHIBITS
                    KENNETH M. ACKS
 2                  January 2, 2010

 3

 4   NUMBER              DESCRIPTION              MARKED

 5   Germano-Acks-1      Area Map of Seven          34
                         Subject Homes,
 6                       P3.0551-0001

 7   Germano-Acks-2A     Neighborhood Map -         35
                         Williamsburg,
 8                       P3.0552-0001

 9   Germano-Acks-2B     Neighborhood Map -         36
                         Newport News,
10                       P3.0553-0001

11   Germano-Acks-2C     Neighborhood Map -         37
                         214A 80th Street,
12                       Virginia Beach,
                         P3.0554-0001
13
     Germano-Acks-3      Color Photographs of       37
14                       Seven Subject Homes,
                         P3-0555-0001 -
15                       P3.0555-0004

16   Germano-Acks-4A     Belote Appraisal of        43
                         4020 Dunbarton Circle,
17                       P3.0556-0001 -
                         P3.0556-0014
18
     Germano-Acks-4B     Belote Appraisal of        44
19                       4043 Dunbarton Circle,
                         P3.0557-0001 -
20                       P3.0557-0014

21   Germano-Acks-4C     Belote Appraisal of        44
                         4091 Dunbarton Circle,
22                       P3.0558-0001 -
                         P3.0558-0014
23

24
```

Confidential - Subject to Further Confidentiality Review

1                    DEPOSITION EXHIBITS

2

3      NUMBER              DESCRIPTION          MARKED

4   Germano-Acks-4D    Belote Appraisal of       45
                       8495 Ashington Way,
5                      P3.0559-0001 -
                       P3.0559-0014
6
    Germano-Acks-4E    Belote Appraisal of       45
7                      1008 Hollymeade
                       Circle,
8                      P3.0560-0001 -
                       P3.0560-0013
9
    Germano-Acks-4F    Belote Appraisal of       45
10                     901 Eastfield Lane,
                       P3.0561-0001 -
11                     P3.0561-0013

12  Germano-Acks-4G    Belote Appraisal of       46
                       214A 80th Street,
13                     P3.0562-0001 -
                       P3.0562-0013
14
    Germano-Acks-5     Matrix of Properties,     46
15                     Assessed Value and
                       Appraised Value,
16                     P3.0563-0001

17  Germano-Acks-6     Matrix of Sales           87
                       Comparisons and Case
18                     Study Approaches,
                       P3.0564-0001
19
    Germano-Acks-7     Appendix O-S:             72
20                     Contingent valuation
                       Survey (Revised),
21                     P3.0565-0001 -
                       P3.0565-0007
22

23

24

Confidential - Subject to Further Confidentiality Review

Page 8

1              DEPOSITION EXHIBITS

2

3    NUMBER              DESCRIPTION         MARKED

4    Germano-Acks-8      Results of Contingent    75
                         Valuation Survey,
5                        P3.0566-0001 -
                         P3.0566-0015
6
     Germano-Acks-8A     Summary Table of         77
7                        Results of Contingent
                         Valuation Survey,
8                        P3.0598-0001

9    Germano-Acks-9      Table Summarizing        90
                         Results of Contingent
10                       Valuation Studies
                         Utilized,
11                       P3.0567-0001

12   Germano-Acks-10     Matrix of Five          103
                         Valuation
13                       Methodologies,
                         P3.0568-0001
14
     Germano-Acks-11     Matrix of Properties    106
15                       and Diminution of
                         Value,
16                       P3.0569-0001

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                  PROCEEDINGS

 2              (February 2, 2010 at 9:49 a.m.)

 3              THE VIDEOGRAPHER:  We're now

 4      going on the record.  Today's date is

 5      February 2nd, 2010.  Time now is

 6      approximately 9:49 a.m.  This is the

 7      videotaped deposition of Mr. Kenneth

 8      Acks taken in reference to the

 9      Chinese-Manufactured Drywall

10      Litigation.

11              My name is Melissa Bardwell,

12      videographer.  The court reporter

13      today is Mike Miller.  The deposition

14      today is being held in New Orleans,

15      Louisiana.

16              Would counsel present please

17      introduce themselves and state their

18      affiliations for the record.

19              MR. WARSHAUER:  Irving

20      Warshauer on behalf of the Plaintiff

21      Steering Committee.

22              MR. PETOSA:  Frank Petosa on

23      behalf of the Plaintiff Steering

24      Committee.
```

```
1              MR. SPAULDING:  Kyle Spaulding

2          on behalf of Knauf Plasterboard

3          Tianjin Company, Ltd.

4              MR. SCHILLING:  Steven

5          Shilling, Law Firm of Sharon B.

6          Kyle, APLC, representing Mayeaux

7          Construction Company, Inc.

8              KENNETH M. ACKS,

9    having been duly sworn, testified as follows:

10                 EXAMINATION

11   BY MR. WARSHAUER:

12       Q.    Will you please give us your

13   full name for the record?

14       A.    Kenneth Michael Acks.

15       Q.    And what is your business

16   address, Mr. Acks?

17       A.    304 Park Avenue South,

18   New York, New York, 10010, 11th floor.

19       Q.    Okay.  At this time, Mr. Acks,

20   I'm going to ask you questions about your

21   qualifications to tender you to the Court as

22   an expert in estimating economic impacts of

23   environmental hazards upon real estate.

24              Would you please relate to the
```

Confidential - Subject to Further Confidentiality Review

1    Court your educational background, please?

2         A.      Right.   I have a B.A. in

3    economics and history from the University of

4    Chicago, an M.B.A. in finance from the

5    New York University Stern Graduate School of

6    Business Administration.   I was ABD for a

7    Ph.D. in economics from New York University.

8    That means I took all the courses, didn't

9    finish my thesis.

10              I've also taken several

11   appraisal courses through the Appraisal

12   Institute, New York University and Baruch

13   College.

14        Q.      When did you get your M.B.A. in

15   finance from NYU?

16        A.      1988.

17        Q.      Okay.   At this time, what is

18   your employment?

19        A.      I'm the founder and president

20   of the Cost-Benefit Group, which specialize

21   in measuring the economic and financial

22   impacts of environmental hazards in real

23   estate development projects.   We also do a

24   variety of real estate valuation work and

Confidential - Subject to Further Confidentiality Review

1    economic consulting too.

2        Q.     Okay. And how long has that

3    company been in existence?

4        A.     Since 2001, but it's the

5    successor to -- or 2002. It's the successor

6    to Damage Valuation Associates, which did

7    this same work since 1989.

8        Q.     Okay. Would you please

9    describe to the Court the type of work

10   that -- in which you've been involved during

11   the time that you worked first for Damage

12   Valuation Associates and then the

13   Cost-Benefit Group?

14       A.     Right. As I say, a variety of

15   work relating to measuring the economic and

16   financial impacts of environmental hazards in

17   real estate development projects, straight

18   real estate appraisals of uncontaminated

19   property valuation, and also economic

20   studies.

21         Some of the -- some of the

22   projects have involved -- we've worked for

23   the Environmental Protection Agency, where we

24   helped them create a database of valuation

Confidential - Subject to Further Confidentiality Review

Page 13

```
 1    studies to facilitate the analysis by leading
 2    researchers so they can -- they can have a
 3    quick access to studies pertaining to how
 4    environmental factors affect valuation of
 5    different elements, different things that
 6    might go into a cost-benefit analysis.
 7                 We've also been extensively
 8    involved with litigation or just property
 9    owners or various entities that have an
10    interest in looking at how environmental
11    contamination affects property values.  Some
12    of that work is relevant for a cost-benefit
13    analysis.
14                 We've worked for the EPA to
15    help them figure out what to do with
16    Superfund properties that they've had.
17                 We've worked with state
18    agencies and -- looking to acquire properties
19    that have been contaminated.  And we've been
20    involved with litigation disputes similar to
21    this one, where one party is affected --
22    party has property where they're affected by
23    environmental contamination and they're
24    involved with some lawsuits.
```

Confidential - Subject to Further Confidentiality Review

1          We've also worked with banks in

2    terms of financing potentially contaminated

3    properties to look at -- to see if it affects

4    their -- the value of the property.

5          Q.    Would you give the Court an

6    idea of some of the locations where you and

7    your work at Cost-Benefit Group has estimated

8    impacts upon property values of

9    contamination?

10          A.    Sure.  We've worked in several

11    properties in New York, including Brockport,

12    New York; Great Neck, New York; East

13    Fishkill, New York; Hopewell Junction,

14    New York; Lido Beach, New York; Lindenhurst;

15    and New Hyde Park, New York.

16          In New Jersey, we've worked in

17    Alloway, Jersey City and Red Bank.  In

18    Alabama, we did some consulting on a project

19    in Montgomery.  We also did -- were involved

20    with fly ash contamination in Pine, Indiana;

21    and also 91 high-value homes in Jacksonville,

22    Maryland.

23          We've also -- and in terms of

24    commercial properties, we've worked in

Confidential - Subject to Further Confidentiality Review

```
 1    Bedford, Commack, Fishkill, Plainview,

 2    Ronkonkoma, Sag Harbor and Valley Stream,

 3    New York; Jersey City and Ridgewood,

 4    New Jersey; and East Stroudsburg and

 5    Nesquehoning, Pennsylvania.

 6               And some of our work also

 7    wasn't location-specific; like the EPA work

 8    wasn't really location-specific.

 9         Q.     And by whom have you been

10    commissioned to do this work?  Just some

11    examples of the entities or governmental

12    agencies.

13         A.     Right.  As I mentioned the EPA,

14    various state agencies, some of the work and

15    some of the -- we've worked for the FDIC,

16    JPMorgan Chase, Citibank, HSBC, Commerce

17    Bank, the Bank of Montreal, GMAC, Xerox, U.S.

18    Department of Housing and Urban Development,

19    the FDIC, Chinese American Bank, National

20    Amusements, Grubb & Ellis, Landauer Realty,

21    The Related Companies, New York State Housing

22    Finance Agency, New York City Department of

23    Housing Preservation and Development, Nassau

24    and Suffolk Counties, Jersey City, Federated
```

Confidential - Subject to Further Confidentiality Review

1    Department Stores, Sheraton Hotels and Nassau

2    University Medical Center.

3        Q.    Okay.  And for the most part,

4    these were projects to estimate or determine

5    the impacts upon property values of

6    contamination?

7        A.    Yes.  Some of the clients

8    listed, though, were not -- the work was just

9    valuation, which didn't involve a lot

10   contamination.

11       Q.    Okay.  Now, I believe you were

12   involved in creating an environmental

13   valuation and cost-benefit website?

14       A.    Yes.

15       Q.    Would you briefly explain to

16   the Court what that website involves?

17       A.    Basically, like my work for the

18   EPA -- incidentally, that work for the EPA

19   was actually a joint project with Environment

20   Canada and European -- European environmental

21   agencies to create the database, but --

22              And similar to the work on the

23   database, it's a website that's designed to

24   help researchers, government policymakers and

Confidential - Subject to Further Confidentiality Review

1    even citizen activists or business people to

2    figure out if -- when environmental

3    contamination occurs, how much it can affect

4    the value of something.  And this website

5    deals more broadly than just property issues.

6             It also deals with how a stock

7    of a company might be affected by

8    environmental issues.  It also deals with how

9    cost and benefits are measured, so the

10   dollars and cents of global warming.

11            And, also, we try to cover

12   every study that's done in terms of how

13   contamination of real estate affects property

14   value.  We tend to focus a little bit more on

15   that than some of the other issues.

16       Q.    Okay.  Now, I believe you were

17   editor and publisher of Environmental

18   Valuation and Cost-Benefit News?

19       A.    Yes.  That website really is

20   the current presence of Environmental

21   Valuation and Cost-Benefit News.  That

22   Environmental Valuation and Cost-Benefit News

23   started as a news -- a hard-copy newsletter,

24   but then with the growth of the Internet, we

Confidential - Subject to Further Confidentiality Review

1    moved it to the Internet, essentially.

2              And it's -- so it's been around

3    since 1994 -- 1994-1995, when it started out

4    as a hard copy.  And I believe in 2003, it

5    moved to the Internet.

6         Q.    Can you give the Court, please,

7    some examples of the types of contamination

8    that have occurred -- environmental

9    contamination that have occurred where you

10   were called in to estimate how that impacted

11   property value?

12        A.    Sure.  A wide variety, as I

13   said.  There was the fly ash contamination in

14   the town of Pines, Indiana.  We also did a

15   recent case in Odenton, Maryland, which

16   involved fly ash contamination of a property.

17             Much of our work has involved

18   leaky fuel tanks, either on a property itself

19   or on a neighboring gasoline station, where

20   the property came into groundwater or

21   affected a neighboring property in some way.

22             And we also dealt with -- in

23   Brockport, there was a 3M chemical -- a 3M

24   plant which dealt with a wide variety of

Page 19

```
1    chemicals, and it also got into the

2    groundwater.

3              And all these groundwater cases

4    involve -- also involve instances where there

5    was risk in terms of the individual homes

6    themselves that -- because the vapors from

7    the groundwater and the oil can seep into a

8    house itself and affect a property.

9              And, let's see.  We've dealt

10   with just some industrial sites that had a

11   wide variety of chromium contamination and

12   heavy metals.  We did properties near a lead

13   smelter in Pennsylvania.  So just -- I'm not

14   sure if that's totally comprehensive, but

15   we've really dealt with all sorts of

16   different chemicals.

17        Q.    Before you started with Damage

18   Valuation Associates, which then became the

19   Cost-Benefit Group, what type of work did you

20   do?

21        A.    Right.  Coming out of college,

22   I worked for the Federal Reserve Bank of

23   New York, where I was in the international

24   research department, where I gained some more
```

Confidential - Subject to Further Confidentiality Review

Page 20

1    experience with economic techniques, and some

2    of which I'm still using today in these

3    valuations.

4              After that, I started doing

5    consulting, not as Damage Valuation

6    Associates, but just individual consulting at

7    times.  And my first real environmental case

8    was in 1982 as a consultant for a firm called

9    Union Associates on Long Island, which

10   specialized in looking at the economic and

11   financial impacts of nuclear power plants.

12             And back in 1982, we looked at

13   the impacts of the potential construction of

14   the Shoreham Nuclear Plant, and we conducted

15   various studies of how nuclear power plants

16   affect property values.

17             And it's basically a lot of the

18   same techniques I'm using today I was using

19   back in 1982, in terms of seeing how a

20   nuclear power plant can affect neighboring

21   property values.  And we used in that study a

22   contingent valuation survey, which I used in

23   this case; and we also used hedonic

24   regressions of properties -- properties.

Confidential - Subject to Further Confidentiality Review

1    Okay.

2                 So -- and then I worked, in

3    addition, at the New York City Housing

4    Preservation and Development, where we worked

5    on loans to rehabilitate housing.  And

6    transitional neighborhoods, I feel, had a big

7    impact on helping these communities turn

8    around when New York was in a lot of trouble.

9                 And then I also did work at

10   Southmark, a real estate firm; and part of my

11   work in the Housing Preservation and

12   Development involved environmental reviews.

13        Q.     Okay.  Would you please review

14   with the Court some of the publications that

15   you've been involved in and also some of the

16   speaking engagements that you've had.

17        A.     Sure.  My most recent speaking

18   engagement was at the Society for

19   Cost-Benefit Analysis, which involves leading

20   academics and government professionals

21   involved with cost-benefit analyses, and also

22   attaching costs and benefits and values to

23   different -- different phenomena which are

24   hard to measure and hard to quantify in cost

Confidential - Subject to Further Confidentiality Review

1    and benefits.

2                And that was in

3    Washington, D.C., where I presented a paper

4    entitled -- it was "The Costs and Benefits of

5    Real Estate Development," where I discussed

6    development projects, where I discussed many

7    of the issues which I'm using in this -- for

8    this report.

9                Prior to that, I was asked to

10   speak before The Environmental Auditing

11   Roundtable on the economic impact of

12   environmental liabilities on real estate

13   values.  That was on March 3rd, 2009.

14                Before that, I spoke -- I

15   chaired a session and spoke and presented a

16   paper at the Society for Cost -- for

17   Benefit-Cost Analysis, and the paper was

18   entitled "The Costs and Benefits of a Green

19   Mixed-Use Brownfield Redevelopment."  And

20   part of that project involved similar

21   techniques that I'm using in this report.

22                I also did work extensively,

23   which involved a publication of a report and

24   several presentations at seminars, at

Confidential - Subject to Further Confidentiality Review

1    Columbia University and before the United

2    States Society of Ecological Economics on

3    costs and benefits of green roofs.

4              And, once again, green roofs

5    have various benefits and costs, and one --

6    some of the benefits are energy saving,

7    reduced stormwater runoff and improved air

8    quality and improved esthetic benefits.

9              And, once again, in order to

10   quantify those benefits, I used similar

11   techniques to the techniques I'm using now.

12   So I made presentations there.

13              I also spoke before the

14   Carnegie Council on Ethics and International

15   Affairs in New York, May 1988, on

16   environmental values.

17              My publications, which, once

18   again, use similar techniques was -- one was

19   "Tools for Resolving Community Opposition to

20   Public Projects" and -- to public projects,

21   and that, once again, spoke for the need to

22   quantify costs and benefits and values and

23   value diminution from different projects.

24              And then I did a paper,

Confidential - Subject to Further Confidentiality Review

 1     "Shooting in the Dark - How Computer Software

 2     Can Improve the Quality of Government

 3     Policies."

 4          Q.     Okay.   With what professional

 5     associations or entities are you affiliated?

 6          A.     Right.   The American Economic

 7     Association, that Society of Benefit-Cost

 8     Analysis, the Association of Environmental

 9     and Resource Economists, the New York

10     Association of Business Economists.

11          Q.     And you're a fellow in the

12     World Innovation Foundation?

13          A.     Yes.   That's an international

14     think tank consisting of 2000 individuals,

15     including 60 Nobel Prize winners, which

16     provide advice regarding scientific,

17     technological, engineering and economics

18     matters to various governments and

19     corporations.

20          Q.     Okay.   Now, in the past five

21     years, have you been involved in cases in

22     which you've given depositions and/or trial

23     testimony?

24          A.     Yes.

Confidential - Subject to Further Confidentiality Review

Page 25

1        Q.      Would you please review with

2    the Court those cases?

3        A.      Sure.  In Jacksonville,

4    Maryland, there was an Exxon gas station that

5    leaked fuel oil and it was seeping towards

6    neighboring homes, and I was involved with an

7    extensive trial.  The trial lasted from

8    October through March.

9               There were 91 homeowners that

10   were affected by this process, and I was

11   deposed four times and gave testimony on

12   December 30th and December 31st, 2008.

13       Q.      And you were qualified in that

14   case by the Court in what --

15       A.      Correct.

16       Q.      What was your expertise?

17       A.      Oh.  Measuring the impacts on

18   property values of environmental damage.

19       Q.      Okay.  And the Court accepted

20   you as an expert in that field?

21       A.      Yes.

22       Q.      Okay.  Now, what about the

23   other case, another environmental

24   contamination or exposure effects case?

Confidential - Subject to Further Confidentiality Review

Page 26

```
 1        A.      Right.   This was in Hopewell

 2   Junction, New York, where it also involved a

 3   leak of gasoline -- from a gasoline station.

 4   It leaked into the groundwater, and it was --

 5   it had registered contaminants in this home,

 6   including -- they had wellwater, so it got

 7   into their well.  And, also, there was

 8   measured -- measured vapors in their house

 9   from the gasoline spill.

10        Q.      Did you testify in court in

11   that case?

12        A.      Correct.  Yes.

13        Q.      And were you tendered as an

14   expert in the same field, determining the

15   economic impact of the environmental

16   contamination on real estate value?

17        A.      Yes, I was.

18        Q.      And did the Court accept you as

19   an expert in that field?

20        A.      Yes.

21        Q.      So for how long have you been

22   involved in cases in which you did this type

23   of analysis that you're doing in this case

24   and did in those cases?
```

Confidential - Subject to Further Confidentiality Review

1        A.        Right.   1982, the Shoreham

2    Nuclear Power Plant case, which involved

3    litigation, as well as other nonlitigation

4    elements.   So since 1982, I would say.

5        Q.        In the two cases that you just

6    discussed with the Court in which you gave

7    trial testimony, did you use similar

8    methodologies in those cases as you're using

9    in this particular case?

10       A.        Yes.

11       Q.        Okay.   Do you know whether or

12   not any party challenged you under the

13   Daubert case?

14       A.        I was challenged, yes.

15       Q.        And did the Court uphold

16   that -- in which of the cases?

17       A.        Definitely in terms of the

18   Exxon case.   And I know in -- I don't know if

19   it was an official Daubert challenge, but

20   there was a challenge in the Hopewell

21   Junction case.

22       Q.        And did the -- were these

23   challenges upheld by the Court?

24       A.        No.

Confidential - Subject to Further Confidentiality Review

Page 28

 1              MR. WARSHAUER:  Okay.  At this

 2         time, I tender Mr. Acks as an expert

 3         in the field of estimating economic

 4         impacts of environmental hazards upon

 5         real estate.

 6              MR. SPAULDING:  I have nothing.

 7    BY MR. WARSHAUER:

 8         Q.    Mr. Acks, when did you begin

 9    your work on this particular multi-district

10    litigation case?

11         A.    Sometime in late November,

12    2009.

13         Q.    And do you recall by whom you

14    were contacted?

15         A.    Yes.  Richard Lewis of the

16    Plaintiff Steering Committee and Hausfeld.

17         Q.    And in general terms, what were

18    you asked to do?

19         A.    I was asked to look at various

20    economic impacts of this property -- of the

21    Chinese drywall contamination and, in

22    particular, property value impacts.

23         Q.    And was it specifically for

24    seven properties located in Williamsburg,

Confidential - Subject to Further Confidentiality Review

1    Newport News and Virginia Beach, Virginia?

2         A.    Yes.  Four in Williamsburg, two

3    in Newport News and one in Virginia Beach.

4         Q.    Okay.  What materials or

5    information were provided to you at the

6    outset on which you relied?

7         A.    Right.  I received

8    interrogatories from the plaintiffs, and I

9    received environmental reports from Rutila.

10   I received the -- let's see -- news -- I

11   looked at newspaper articles, some of which

12   were provided to me, some of which I gathered

13   myself.

14              I interviewed the plaintiffs,

15   and I -- let's see.  I -- and I looked at,

16   you know, various other relevant journal

17   articles and additional materials.

18        Q.    Were there any facts that you

19   accepted at the outset?

20        A.    Yes.  I took the engineering

21   reports to be credible, by credible

22   engineers.  The plaintiffs' testimony, I

23   listened to, and I took this to be a good

24   signal of perceptions in the marketplace and

Confidential - Subject to Further Confidentiality Review

1    perception of what they were -- what they

2    were experiencing.

3                I didn't detect any plan to

4    sort of exaggerate what they were going

5    through.

6         Q.    Did you accept the fact that

7    there was Chinese drywall in these seven

8    homes?

9         A.    Yes.

10        Q.    Okay.  Now, your investigation

11   to estimate the value of property damages

12   arising from the contaminated drywall

13   consisted of what?  Would you relate that to

14   the Court?

15        A.    Right.  Basically, the first

16   step in evaluating contaminated properties in

17   general is to try to get a handle on what the

18   value would be as uncontaminated.  And while

19   1 would be capable of appraising the

20   properties as uncontaminated, I felt it was

21   important to hire a local real estate

22   appraiser that had serious familiarity with

23   the local market.

24                And so we hired David Belote.

Confidential - Subject to Further Confidentiality Review

```
 1    He's an SRA, as well as a Certified

 2    Residential Appraiser, in New York, so he

 3    valued the properties as uncontaminated.  I

 4    reviewed the appraisals and other information

 5    to determine whether his analyses made sense.

 6         Q.     What does that mean, "SRA"?

 7         A.     Society of Real Estate

 8    Analysis -- Real Estate Appraisal.  Sorry.

 9    Society of Real Estate Appraisers --

10    Residential Appraisers.

11              The -- I also reviewed the

12    documents which you had previously asked me

13    about.  I analyzed local economic,

14    demographic and real estate market conditions

15    because all these are important.

16              As I show later in the

17    literature in terms of appraising or valuing

18    contaminated properties, it's important to

19    understand what's going on in the local

20    economic and real estate markets.  For

21    instance, contamination tends to have a

22    higher impact in higher-income neighborhoods

23    and higher-education neighborhoods, so it's

24    important to understand what's going on in
```

Confidential - Subject to Further Confidentiality Review

1    the locality.

2                And as I mentioned, I reviewed

3    newspaper stories regarding the

4    contamination.  There's some serious

5    contamination which doesn't have a major

6    impact on property values or values in

7    general because it's people just don't think

8    about it.  And there's other contamination,

9    which is not --

10               (Telephone interruption.)

11       A.      There's other contamination

12   which might not be so severe, which attracts

13   a lot of attention, and so it can have a

14   major impact on people, because perception of

15   environmental damage is important.  And in

16   order to investigate perception, you have to

17   look at the newspaper articles and other

18   information.

19               I personally inspected the

20   subject homes to see -- to get a feel for

21   what was going on there beyond what the

22   plaintiffs were just saying.

23               I also -- then I reviewed the

24   academic and appraisal -- economics and

Confidential - Subject to Further Confidentiality Review

1   appraisal literature to -- pertaining to the

2   value of contamination, which I do

3   continuously anyway, but, you know, I try to

4   keep up to date in terms of any new

5   techniques or new empirical evidence

6   regarding valuation of contamination.

7           Then I examined sales of

8   contaminated comparable properties and

9   uncontaminated properties before and after

10  contamination.  Then I estimated the property

11  value changes based on prior studies and

12  other techniques.

13  BY MR. WARSHAUER:

14      Q.     And is that pretty much the

15  standing operating procedure that you follow

16  when you make these analyses of --

17      A.     No, no.

18      Q.     -- how contamination affects

19  properties?

20      A.     Yeah, not only me.  The most

21  reputable, respectable people in the field,

22  that's what they would do.

23      Q.     Okay.  Now, let's talk about

24  these seven properties.  You said four of

Confidential - Subject to Further Confidentiality Review

Page 34

1    them were in Williamsburg, two in Newport

2    News and one in Virginia Beach, Virginia?

3           A.      Correct.

4                   (Whereupon, Deposition Exhibit

5           Germano-Acks-1, Area Map of Seven

6           Subject Homes, P3.0551-0001, was

7           marked for identification.)

8    BY MR. WARSHAUER:

9           Q.      Okay.  And I believe you have

10   an area map of the area that has been marked

11   as trial Exhibit No. P3.0551.  And is it

12   important for you to get an understanding of

13   the area where the properties are located?

14          A.      Yes.  As I mentioned, there's

15   certain factors you should be looking into.

16   As I say, more highly educated areas and more

17   areas with higher incomes, the impact of

18   contamination tends to be shown to be

19   empirically greater, all else being equal,

20   even than in other types of areas.

21                  So I investigated the three

22   areas of this --

23          Q.      Would you show the Court

24   which --

Confidential - Subject to Further Confidentiality Review

Page 35

1          A.      Right.   The four Williamsburg

2     homes are in this area.   This is

3     Williamsburg.   They're very close to each

4     other, within -- well within a quarter mile.

5     The two -- the two Newport News homes were --

6     and this was a relatively new -- all

7     relatively new town -- relatively new

8     development in Williamsburg.

9               These two townhomes were in a

10    relatively new development also, in Newport

11    News.   They were also well within a quarter

12    mile of each other.   Then Virginia Beach, the

13    property was right near the Atlantic Ocean,

14    down there.

15         Q.     Okay.   Did you also get

16    neighborhood maps of the three areas?

17         A.      Yes.

18               (Whereupon, Deposition Exhibit

19         Germano-Acks-2A, Neighborhood Map -

20         Williamsburg, P3.0552-0001, was marked

21         for identification.)

22    BY MR. WARSHAUER:

23         Q.     Okay.   The first one of

24    Williamsburg, that's marked as trial

Confidential - Subject to Further Confidentiality Review

Page 36

1    Exhibit P3.0552.

2             Why do you also look at the

3    actual neighborhoods where these homes are

4    located?

5         A.    Once again, to look at the

6    economic and demographic information

7    pertaining to the neighborhood that they --

8    to see whether -- you know, the education and

9    income levels, also -- education and income

10   levels.

11            (Whereupon, Deposition Exhibit

12       Germano-Acks-2B, Neighborhood Map -

13       Newport News, P3.0553-0001, was marked

14       for identification.)

15   BY MR. WARSHAUER:

16        Q.    Okay.  And also, let's just

17   quickly, if you would, identify the

18   neighborhood map for Newport News, which is

19   Exhibit P3.0553.

20        A.    One other factor in terms of

21   the economic and demographic impacts is I

22   also look at the age structure of potential

23   buyers.  If there are families with young

24   kids that are an important part of the

Confidential - Subject to Further Confidentiality Review

Page 37

```
 1    market, that also tends to have a greater

 2    impact on environmental damages.

 3                    (Whereupon, Deposition Exhibit

 4            Germano-Acks-2C, Neighborhood Map -

 5            214A 80th Street, Virginia Beach,

 6            P3.0554-0001, was marked for

 7            identification.)

 8    BY MR. WARSHAUER:

 9        Q.    And then the last neighborhood

10    map, is that of Virginia Beach, which is

11    Exhibit P3.0554?  So that's the Virginia

12    Beach area?

13        A.    Yes.

14        Q.    And I think there was just one

15    sort of beach home at that location?

16        A.    Yeah.

17        Q.    All right.  Now, did you also

18    take photographs of the seven properties?

19        A.    Yes.

20        Q.    Okay.  If you would --

21        A.    This is just a small sample of

22    some of the pictures I took.

23                    (Whereupon, Deposition Exhibit

24            Germano-Acks-3, Color Photographs of
```

Confidential - Subject to Further Confidentiality Review

1          Seven Subject Homes, P3-0555-0001 –

2          P3.0555-0004, was marked for

3          identification.)

4     BY MR. WARSHAUER:

5          Q.     Okay.  Just for the record,

6     these photos are identified as

7     Exhibit P3.0555, and they're Bates-numbered

8     0001 through 0004?

9          A.     Right.

10         Q.     Just again, if you would, just

11    show the Court, briefly, the home and then

12    the address.

13         A.     Yeah.  These are two of the

14    Williamsburg homes.

15         Q.     And what are the addresses, the

16    one on top?

17         A.     I'm sorry.  4020 Dunbarton

18    Circle and 4043 Dunbarton Circle.

19         Q.     Okay.

20         A.     And this is 4091 Dunbarton

21    Circle, 8495 Ashington Way, which also is

22    very close to these other homes.

23         Q.     Okay.  And then these are the

24    two in Newport News?

Confidential - Subject to Further Confidentiality Review

Page 39

```
1        A.      1008 Hollymeade Circle, Newport
2    News; 901 Eastfield Lane, Newport News.
3        Q.      And then the home in Virginia
4    Beach, Virginia?
5        A.      214A 80th Street, Virginia
6    Beach.
7                MR. WARSHAUER:  Okay.  At this
8            time, we'd offer, file and introduce
9            into evidence the area map,
10           Exhibit P3.0551; the three
11           neighborhood maps, Exhibits P3.0552,
12           0553 and 0554; and the photographs of
13           the seven properties, Exhibit P3.0555.
14   BY MR. WARSHAUER:
15       Q.      Okay.  Mr. Acks, you said that
16   you inspected these seven properties?
17       A.      Yes.
18       Q.      Do you recall approximately
19   when that was?
20       A.      It was around December 15th.  I
21   think it might have been December 15th, 2009.
22       Q.      And what was the purpose of the
23   inspection?
24       A.      Well, to get a feel for what
```

Confidential - Subject to Further Confidentiality Review

1    was really happening.  I couldn't just take

2    the plaintiffs' statements, you know, and

3    other reports as given.  I wanted to see for

4    myself.

5              Also, once again, to get a feel

6    for the neighborhood, to get a feel for what

7    type of impacts this contamination was having

8    on people's lives.  I just wanted to see if

9    the -- what they were talking about was

10   credible too, personally; and just see --

11   also see different real estate offerings in

12   the neighborhood, what was going on.

13        Q.    Okay.  Did you later get

14   additional information about these seven

15   homes, such as assessed values?

16        A.    Yes.

17        Q.    Okay.  I believe you obtained

18   the assessed values for these seven homes

19   from 2007 to 2009?

20        A.    Yes.

21        Q.    And how did you obtain that

22   information?

23        A.    That's publicly available on

24   the Internet.

Confidential - Subject to Further Confidentiality Review

Page 41

1       Q.      And what was the purpose of

2    that?

3       A.      Well, as I say, we commissioned

4    David Belote to look at the appraised -- to

5    do appraisal -- appraised values, and I also

6    wanted to look to see if they -- one,

7    verification was to look at assessed values

8    to see if his appraisals made sense, also to

9    just get a feel for the tax burden resulting

10   from these properties and just...

11      Q.      Now, I believe you asked

12   Mr. Belote, the appraiser, to do the -- to

13   valuate the appraised values of these seven

14   homes as of August 31, 2008?

15      A.      Correct.

16      Q.      Why as of that date?

17      A.      Right.  Obviously, I wanted to

18   get a solid baseline where there was no

19   question in terms of Chinese value -- Chinese

20   drywall contamination, and the -- that

21   information only became publicly available,

22   in terms of newspaper articles, in

23   December 2008.  So I don't think any of these

24   appraised values could be affected by the

Confidential - Subject to Further Confidentiality Review

Page 42

1    Chinese drywall.

2              Also, I wanted to -- you know,

3    we're all well aware of all the craziness

4    that's happened in the financial markets, the

5    great recession, subprime crisis, whatever

6    you want to call it, so I wanted to abstract

7    from some of the really damaging occurrences

8    that happened after the fall of Lehman

9    Brothers.

10             I know there was some signs

11   of -- serious signs of weaknesses, but things

12   really got out of hand around the fall of

13   Lehman Brothers.

14        Q.    Do you -- would you briefly

15   explain to the Court the appraisal process

16   that Mr. Belote used?

17        A.    Right.  Basically, he used the

18   sales -- first of all, he inspected the

19   homes, characterized them, measured them, and

20   then he basically relied upon the sales

21   comparison approach, which looks at -- finds

22   comparable homes to the subjects and

23   adjusts -- and finds sales of comparable

24   homes, and then adjusts the sales for various

Confidential - Subject to Further Confidentiality Review

 1   differences in terms of square footage of

 2   land, square footage of building, number of

 3   bedrooms, bathrooms and other amenities that

 4   could affect the sale price.

 5             But as part of the residential

 6   appraisal process in the form, they do look

 7   at two other approaches, the income approach

 8   and the cost approach.  Typically for

 9   existing residential homes, they're not

10   relied upon, but residential appraisal -- the

11   forms do require them to look at those two

12   approaches too.

13        Q.    So the approach that Mr. Belote

14   used to appraise these seven properties is a

15   standard approach for appraising

16   single-family homes?

17        A.    Yes, nine out of ten existing

18   family homes.

19             (Whereupon, Deposition Exhibit

20        Germano-Acks-4A, Belote Appraisal of

21        4020 Dunbarton Circle, P3.0556-0001 -

22        P3.0556-0014, was marked for

23        identification.)

24   BY MR. WARSHAUER:

Confidential - Subject to Further Confidentiality Review

1        Q.      All right.  I'm going to show

2    you the appraisals that Mr. Belote did for

3    the seven properties.  The first one is

4    marked as Exhibit P3.0556, and is that the

5    appraisal for 4020 Dunbarton Circle?

6        A.      Yes.

7               (Whereupon, Deposition Exhibit

8           Germano-Acks-4B, Belote Appraisal of

9           4043 Dunbarton Circle, P3.0557-0001 –

10          P3.0557-0014, was marked for

11          identification.)

12   BY MR. WARSHAUER:

13       Q.      Okay.  And then the second one,

14   Exhibit P3.0557, that's the appraisal for

15   4043 Dunbarton Circle?

16       A.      Correct.

17              (Whereupon, Deposition Exhibit

18          Germano-Acks-4C, Belote Appraisal of

19          4091 Dunbarton Circle, P3.0558-0001 –

20          P3.0558-0014, was marked for

21          identification.)

22   BY MR. WARSHAUER:

23       Q.      The third one, P3.0558, that's

24   the appraisal for 4091 Dunbarton Circle?

Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2              (Whereupon, Deposition Exhibit

3              Germano-Acks-4D, Belote Appraisal of

4              8495 Ashington Way, P3.0559-0001 –

5              P3.0559-0014, was marked for

6              identification.)

7      BY MR. WARSHAUER:

8          Q.      The next one, P3.0559, that's

9      the appraisal for 8495 Ashington Way in

10     Williamsburg; is that correct?

11         A.      Yes.

12             (Whereupon, Deposition Exhibit

13             Germano-Acks-4E, Belote Appraisal of

14             1008 Hollymeade Circle, P3.0560-0001 –

15             P3.0560-0013, was marked for

16             identification.)

17     BY MR. WARSHAUER:

18         Q.      The next one, Exhibit P3.0560,

19     that's the appraisal for 1008 Hollymeade

20     Circle in Newport News?

21         A.      Yes.

22             (Whereupon, Deposition Exhibit

23             Germano-Acks-4F, Belote Appraisal of

24             901 Eastfield Lane, P3.0561-0001 –

Confidential - Subject to Further Confidentiality Review

Page 46

1          P3.0561-0013, was marked for

2          identification.)

3    BY MR. WARSHAUER:

4          Q.    The next one, P3.0561, that's

5    the appraisal for 901 Eastfield Lane in

6    Newport News?

7          A.    Yes.

8                (Whereupon, Deposition Exhibit

9          Germano-Acks-4G, Belote Appraisal of

10          214A 80th Street, P3.0562-0001 -

11          P3.0562-0013, was marked for

12          identification.)

13    BY MR. WARSHAUER:

14          Q.    And the last one, P3.0562,

15    that's the appraisal for 214A 80th Street in

16    Virginia Beach, Virginia?

17          A.    Correct.

18                MR. WARSHAUER:  Okay.  At this

19          time, I'd offer, file and introduce

20          into evidence the seven appraisals

21          that I just identified with Mr. Acks.

22                THE WITNESS:  Correct.

23                (Whereupon, Deposition Exhibit

24          Germano-Acks-5, Matrix of Properties,

Confidential - Subject to Further Confidentiality Review

1          Assessed Value and Appraised Value,

2          P3.0563-0001, was marked for

3          identification.)

4     BY MR. WARSHAUER:

5          Q.     Okay.  Now, Mr. Acks, I believe

6     you prepared a table that sets out the

7     description of the seven properties, the

8     assessed values and the appraised values as

9     of August 31, 2008.  This has been marked for

10    identification purposes as Exhibit P3.0563.

11         Would you quickly review with

12    the Court the information, the most important

13    information in this table?

14         A.     Sure.

15         Q.     Give the address and then the

16    assessed value and the appraised value.

17         A.     Okay.  The address

18    4020 Dunbarton Circle had an assessed value

19    of 364,300; an appraised value of 382,000.

20         4043 Dunbarton Circle had an

21    assessed value of 479,700; an appraised value

22    of 475,000.

23         4091 Dunbarton Circle had an

24    assessed value of 364,900; appraised value,

Confidential - Subject to Further Confidentiality Review

Page 48

1    381,000.

2             3495 Ashington Way, an assessed

3    value of 419,200; appraised value, 382,000.

4             1008 Hollymeade Circle,

5    assessed value of 224,000; appraised value of

6    230,000.

7             901 Eastfield Lane, assessed

8    value, 264,300; appraised value, 267,500.

9             Last one, 214A 80th Street,

10   Virginia Beach, 540,800 assessed value;

11   635,000 appraised value.

12        Q.    Was there any significance to

13   the information below that on the average

14   total, or was that just some calculations

15   that you made?

16        A.    No, I don't think so.  Just the

17   four -- the four Williamsburg homes tended to

18   have similar home values and appraised --

19   assessed and appraised values.

20             The two townhouses in Newport

21   News tended to have similar assessed and

22   appraised values.  And then the Virginia

23   Beach home was a higher-valued residence

24   because of location by the beach.

Confidential - Subject to Further Confidentiality Review

Page 49

1      Q.      Okay.  Now, you testified that

2   you interviewed the owners or plaintiffs --

3   the owners of these seven properties?

4      A.      Not all seven, but many of

5   them, yes.

6      Q.      Okay.  And what was the

7   significant information that you obtained

8   from these interviews and from reviewing the

9   answers to interrogatories that you said you

10  were provided?

11     A.      Right.  It clearly disrupted

12  their lives, significantly, in a variety of

13  ways.

14     Q.      And did it, in your opinion,

15  disrupt their lives such that it would

16  ultimately impact their property values?

17     A.      Yes.  And it also -- it was

18  consistent with the newspaper reports in

19  terms of perceptions in the marketplace,

20  where a buyer would hear about and see, see

21  with their own eyes, and which are -- you

22  know, which a homeowner would even be

23  worried, in terms of selling this property,

24  what they could get sued about.

Confidential - Subject to Further Confidentiality Review

Page 50

```
 1        Q.     Okay.  What -- did you obtain
 2   information that some of these folks that
 3   actually moved out of their homes?
 4        A.     Yes.
 5        Q.     And did others just use parts
 6   of their homes?
 7        A.     Yes.  Yes.  It was clear that
 8   there were curtains and, clearly, parts of
 9   the home that had not been used.
10        Q.     Okay.  Any other information
11   that you determined to be important, insofar
12   as your analysis in this case, that you
13   obtained from interviewing the plaintiffs or
14   in reviewing their answers to
15   interrogatories?
16        A.     Well, there was clearly a fear
17   and a perception regarding the degree to
18   which that their lives and health could be
19   affected by this property.
20               I'm not making any judgment in
21   terms of whether this actually impacted
22   health; but it was clearly a perception, both
23   in the newspaper articles and amongst the
24   plaintiffs, that there was -- there were
```

Confidential - Subject to Further Confidentiality Review

1    impacts.

2         Q.    Okay.  Now, using a combination

3    of methodologies and information, did you

4    reach conclusions with respect to how the

5    property values of these seven homes were

6    impacted as a result of the contaminated

7    drywall?

8         A.    Yes.  It's standard approach in

9    the appraisal practice and economic practice

10    to use a combination of approaches to

11    evaluate environmental issues.

12         Q.    Okay.

13         A.    For example, as I mentioned --

14    oh.

15         Q.    Okay.  And did you ultimately

16    prepare two reports in this case, a first

17    report dated December 30th, 2009, and then a

18    supplemental report dated January 18th, 2010?

19         A.    Yes.

20         Q.    Okay.  And what was -- what did

21    you supplement --

22              (Telephonic interruption.)

23              THE WITNESS:  I'm sorry, can

24       you --

Confidential - Subject to Further Confidentiality Review

Page 52

1            MR. WARSHAUER:   Yeah.

2    BY MR. WARSHAUER:

3        Q.    The question was:  What did you

4    supplement in the later report?

5        A.    Right.  Most of the -- the

6    supplement had some economic and demographic

7    information, but the most important part was

8    the results of a contingent valuation survey.

9        Q.    Okay.  Now, what were the

10   opinions and valuations that you ultimately

11   reached in this case with respect to these

12   homes, first assuming that there was full

13   remediation of the contamination as attempted

14   with costs not borne by the property owners?

15       A.    Right.  It was -- if the

16   property -- it was a range of 10 to 40% with

17   the most likely estimate of 25%.

18       Q.    And that's diminution in value

19   because of the contaminated Chinese drywall?

20       A.    Correct.

21       Q.    Okay.  And if there was no

22   remediation, what was your opinion and

23   ultimate conclusion with respect to the

24   diminution in property values?

Confidential - Subject to Further Confidentiality Review

Page 53

1          A.      It would be -- the range went

2     higher, from 10% to 50%, with an average of

3     30%, plus the costs of remediation.

4          Q.      Okay.  Now, when you talk about

5     "no remediation," can you explain what you

6     meant by that?

7          A.      Right.  Well, one thing, the --

8     this was clearly where no other -- we're

9     looking at a potential buyer coming into a

10    house, coming into a house that had Chinese

11    drywall.

12              Now, the first case, in terms

13    of a house to be remediated, was where there

14    were -- the house had not been remediated,

15    but there were promises to be -- or an

16    expectation that there would be remediation.

17    The unremediated would be the property where

18    a buyer had no expectation of anyone else

19    remediating the property.

20         Q.      Okay.  Thank you.

21              Now, let's talk about your

22    methodologies and techniques that you used in

23    this case to arrive at your opinions and

24    conclusions.

Confidential - Subject to Further Confidentiality Review

1              You used, in effect,

2    environmental damage valuation?

3         A.    Yes.

4         Q.    And, again, briefly explain to

5    the Court what that involves and sort of the

6    history of that technique and how it evolved.

7         A.    Right.  Basically, after World

8    War II -- you know, immediately after, there

9    was very little consciousness of

10   environmental issues on real estate.  But

11   obviously with the publication of Rachel

12   Carson, the Environmental Movement, that

13   filtered into the economics profession.

14             And the first very formal

15   statistical analysis of the effects of

16   environmental contamination was a 1967

17   article by Ridker & Henning, where they

18   evaluated the effects of air pollution on --

19   in St. Louis through a formal hedonic

20   regression model, which I'll describe later.

21             And then there were many, many

22   different types of analyses done afterwards

23   involving different types of techniques.

24             In terms of the appraisal

1    literature, that happened a bit later.

2    The -- you know, particularly with Love --

3    following Love Canal, that started spurring

4    interest in the effects of environmental

5    contamination on real estate; and then there

6    was the passage of CERCLA, or the Superfund

7    law, shortly thereafter.

8                    And the first publication that

9    people point to is by Joseph Campanella in

10   1984; and there have been many, many

11   publications thereafter.  But the bottom line

12   is that the economics profession has been

13   formally analyzing these facts for more than

14   40 years, and the appraisal profession, for

15   25 years.

16        Q.     Okay.  And what are some of the

17   factors that impact contamination on the

18   market values?

19        A.     Right.  Basically, an analyst

20   has to look at the type and intensity of

21   contamination.  You know, if there's just a

22   little -- if you drop a thermometer and

23   it's -- okay.

24                    The second is the type of

Confidential - Subject to Further Confidentiality Review

1  property:  commercial, industrial,

2  residential.

3           Third is the extent to which

4  contamination interferes with the current use

5  or most probable future use during and after

6  contamination.

7           Four is site topographical

8  conditions and characteristics.

9           Fifth is geographic location.

10           Sixth is status of site

11  investigation, environmental assessment and

12  the extent of information about the location

13  of the contamination on-site.

14           Seven is the source of the

15  contamination, on-site, off-site.

16           The eighth is the applicable

17  regulatory review process and the degree to

18  which additional remediation is mandated by

19  law or regulation.

20           Ninth is the stage of cleanup

21  or remediation plan, approval.

22           Tenth is appropriate past,

23  present or future cleanup of monitoring

24  methods and cost.

Confidential - Subject to Further Confidentiality Review

1          Eleventh, the availability and

2    strength of available environmental

3    indemnities.

4          Twelfth is the availability and

5    cost of environmental insurance policies and

6    programs, either public or private.

7          Thirteenth, the availability of

8    mortgage financing for properties undergoing

9    similar types of investigation, remediation

10   and ongoing environmental monitoring.

11         Fourteenth is perceptions of

12   the public and knowledgeable buyers in the

13   property's marketplace.

14     Q.     So that's the factors that you

15   consider as part of your methodology and

16   analysis?

17     A.     Yes.  And, also, there are a

18   few factors which impact even when a property

19   is clean.  There could be -- could be effects

20   beyond -- property value effects beyond just

21   cleaning the property, and that's -- that's

22   that a property can have additional

23   contamination that was formally hidden,

24   additional -- there could be additional site

Confidential - Subject to Further Confidentiality Review

Page 58

1    investigation reports.

2                    Even if a buyer five years now

3    of a drywall home, there's still -- a buyer

4    might still need to hire a consulting firm to

5    look to make sure that it's totally been

6    remediated.  So that's a cost that's not

7    there for a noncontaminated home, and that

8    could be there five years later because it

9    shows up on a record.

10                    There's additional potential

11   remediation costs and additional

12   environmental monitoring costs, additional

13   legal or administrative costs associated with

14   ownership of the property.

15                    Anytime a buyer has -- buys a

16   property that was once contaminated, they're

17   incurring a potential additional risk that

18   they could get sued, and that's costly.  They

19   have to hire lawyers, consultants.  They

20   don't have to, but it's a potential cost and

21   risk.

22                    There's potentially adverse

23   changes in regulations concerning required

24   levels of investigation.  That's happened all

Confidential - Subject to Further Confidentiality Review

1    the time.  Let's say the CPSC can put a

2    report out tomorrow saying certain things

3    about the required levels of remediation.

4              Five years from now, the CPSC

5    could say, different administration, "No, we

6    were wrong.  We were too lenient."  This is

7    something that a potential home buyer has to

8    worry about.

9              Potential higher vacancies or

10   lower rents due to tenant concerns.  If

11   someone wants to rent the place, they have,

12   you know, a potential -- it's going to --

13   could be harder to rent.

14             Potential inability to obtain

15   mortgage financing.  Banks tend to shy away

16   from similar problems, especially these days,

17   where they're worried about risk profiles.

18   You know, they're going -- it's going to be

19   that much harder to get a mortgage.  It's

20   going to be that much costlier for a buyer or

21   seller.

22             There also could be potential

23   third-party claims.  Well, this is something

24   generally environmental -- it's very --

Confidential - Subject to Further Confidentiality Review

1    probably unlikely that, you know, a

2    neighboring property owner would sue based on

3    this.

4              Potential delays in ability to

5    resell the property or potential inability to

6    resell the property in the future.

7         Q.    Okay.  Thank you.

8              Based upon the available

9    methods and data, you actually selected five

10   methodologies or types of data to estimate

11   the diminution in value of the seven

12   properties arising from contaminated drywall?

13        A.    Correct.

14        Q.    Okay.  And would you please

15   relate to the Court what those five

16   methodologies were?

17        A.    Okay.  The first is the sales

18   comparison approach, which is very similar to

19   the one we discussed that typical residential

20   appraisers use.

21              The second is the approach --

22   contingent -- I might have a little different

23   order from my report --

24        Q.    It doesn't matter.

Confidential - Subject to Further Confidentiality Review

Page 61

1       A.      The second is a contingent

2    valuation of survey approach, where you

3    survey potential market participants to look

4    at how they would perceive the effects of

5    contamination and how it would affect the

6    price.

7            And there's very extensive

8    literature on this contingent valuation,

9    about how surveys have to be applied to the

10   properties.

11      Q.      And you do it in the

12   metropolitan statistical area, where the

13   homes are located?

14      A.      Yes.

15      Q.      Okay.

16      A.      And the third technique is

17   called -- I used, is benefits transfer.

18   That's where you use information from prior

19   studies to estimate contamination.

20            I felt in this case, it was

21   particularly useful to do this because

22   they -- due to the recency of the Chinese

23   drywall impacts, and also the fact that

24   this -- of the subprime -- the great

Confidential - Subject to Further Confidentiality Review

1    recession, the subprime crisis makes analysis

2    of recent phenomenon relatively difficult.

3                The fourth method was a survey

4    of experts.  That's been used by -- in

5    economics literature and appraisal literature

6    elsewhere.  You don't just survey everyone.

7    You find out what the experts think is a

8    diminution in value.

9                The fifth method is something

10   that I personally devised.  I admit it hasn't

11   been peer-reviewed, but I call it the

12   discounted sellout approach.

13       Q.    And we'll get into that in more

14   detail later on.

15       A.    Okay.  Yeah.

16       Q.    Have your analyses and

17   valuation in this area been prepared in

18   conformity with any applicable standards and

19   regulatory provisions?

20       A.    To the extent possible, I tried

21   to conform to USPAP, Uniform Standards of

22   Professional Appraisal Practice; FIRREA;

23   and --

24       Q.    What's FIRREA?

1       A.      Financial Institution

2   Regulatory --

3       Q.      Reform, Recovery & Enforcement

4   Act?

5       A.      Yeah.

6               And there are also certain

7   state mandates, and the Appraisal Institute

8   puts out guidance.

9       Q.      Okay.  Now, Mr. Acks, you

10  testified that you actually used a

11  combination of these methods and approaches.

12  Why did you do that, and would you explain

13  what you meant by that?

14      A.      Correct.  Basically, when

15  you're dealing with complicated phenomena

16  that there -- it can be difficult, you know,

17  to use a single method.  And, as I mentioned,

18  it's standard in appraisal practice to look

19  at three methods.

20              A commercial appraisal that

21  looks at one would be laughed at by most

22  banks, so you use a combination of

23  approaches:  the income, sales and cost

24  approaches, generally.

Confidential - Subject to Further Confidentiality Review

1          There's also a tradition in

2    economics where they try -- where they try to

3    verify data, verify the contingent valuation

4    and hedonic regression approaches by

5    combining the different results, seeing how

6    long they compare.

7          And, in general, there are

8    difficulties in applying all these methods,

9    especially considering how recent the

10   phenomena was, where, you know, as I

11   mentioned, it only became public knowledge in

12   December 2008, so you don't have a broad base

13   of information for sales comparisons or

14   hedonic regressions.

15       Q.     Okay.  Now, has a combination

16   of approaches or methods been advocated by

17   leaders in the field of appraisal of

18   contaminated property?

19       A.     Absolutely.  Roby Simons and

20   Mundy have published articles where they

21   advocated and applied the combination of

22   methods.

23          MR. WARSHAUER:  Okay.  Now

24       we're going to discuss each of the

Confidential - Subject to Further Confidentiality Review

Page 65

1      five methodologies that you used to

2      estimate diminution in value of the

3      seven properties arising from

4      contaminated drywall, but I think the

5      videographer said we need to take a

6      short break so she can change tapes.

7            THE VIDEOGRAPHER:   Time now is

8      approximately 10:43 a.m., and we are

9      now off the record.

10            (Recess taken, 10:43 a.m. to

11      10:52 a.m.)

12            THE VIDEOGRAPHER:   This begins

13      Tape 2 of the videotaped deposition of

14      Mr. Kenneth Acks.   Time now is

15      approximately 10:52 a.m., and we're

16      back on the record.

17   BY MR. WARSHAUER:

18      Q.    Okay.   Mr. Acks, before we took

19   the break, we were going to begin discussing

20   each of the five methodologies that you used

21   to determine diminution in value of these

22   seven properties from the contaminated

23   drywall.

24            The first one I think you

Confidential - Subject to Further Confidentiality Review

1    mentioned was sales comparison of homes

2    contaminated with Chinese drywall.  Would you

3    discuss with the Court what that approach is?

4         A.     Right.  Basically, as I said,

5    it's very similar to what a residential

6    appraiser would do, where they find the

7    subject home and look at comparable homes and

8    then adjust for the differences -- look at

9    sales of comparable homes and adjust for the

10   differences in sale price.

11          They might take off $10,000 of

12   a sale price if the comparable had a larger

13   lot size, and they make it comparable to

14   that.

15          So instead of just adjusting

16   for those factors with the sales comparison

17   approach, an environmental appraiser would

18   adjust for differences in the environmental

19   impacts from an environmentally contaminated

20   sale.

21        Q.    Okay.  And is that a reliable

22   approach?

23        A.    Yes.

24        Q.    Okay.  And has that methodology

Confidential - Subject to Further Confidentiality Review

1    or technique, sales comparison, been subject

2    to peer-review and/or publication or

3    peer-reviewed literature?

4          A.      Yes.

5          Q.      And has the methodology of

6    using sales comparison approach in this type

7    of analysis been accepted by others in your

8    field of expertise?

9          A.      Yes.

10         Q.      Okay.  What conclusions did you

11   reach after using this sales comparison

12   approach?

13         A.      Basically, that -- I estimated

14   a range for properties that were slated to be

15   remediated of 10 to 50%, with the most likely

16   value of 25%, and also for unremediated

17   properties, a range of from 40% to 75%, with

18   a most likely value of 60%.

19              MR. WARSHAUER:  Okay.  Let me

20         just take care of some housekeeping.

21         I believe you referred earlier to the

22         table in which you had the description

23         of the properties, the appraised

24         values and so forth, P3.0563.

Confidential - Subject to Further Confidentiality Review

1          At this time, I'll offer, file

2      and introduce into evidence that table

3      that's been so marked.

4  BY MR. WARSHAUER:

5      Q.    Now, getting back to your

6  methodologies.  So using the sales comparison

7  approach for remediated or to be remediated,

8  it was a 10% to 50% diminution in value of

9  those contaminated homes with a most likely

10  value of 25%?

11      A.    Correct.

12      Q.    And for unremediated, 40% to

13  75%, with a most likely 60% diminution in

14  value?

15      A.    Correct.

16      Q.    Okay.  The second methodology

17  that you used in this case is the contingent

18  valuation survey?

19      A.    Correct.

20      Q.    Okay.  And that was fielded in

21  the Virginia Beach, Norfolk, Newport News,

22  Virginia, North Carolina metropolitan

23  statistical area?

24      A.    Correct.

Confidential - Subject to Further Confidentiality Review

1       Q.      Okay.  Who actually did the

2   survey?

3       A.      It was a firm called IPC, which

4   is a professional survey firm, and which I've

5   worked with in the past.

6       Q.      Okay.  And would you explain to

7   the Court what the survey involved?

8       A.      Right.

9       Q.      Like how many people were

10  surveyed and so forth.

11      A.      Right.  We surveyed 100 people.

12  First, we got various economic and

13  demographic information from them, first

14  and -- before the key questions and after the

15  key questions, we got the age, the gender of

16  the respondent.

17              We also tested for things like

18  attitudes, in terms of whether they were

19  members of an environmental organization, and

20  you don't want to field a survey where you

21  get half the people are rabid

22  environmentalists.  It wouldn't produce valid

23  results.  So we wanted to make sure that it

24  was a broadly representative sample.

Confidential - Subject to Further Confidentiality Review

1        Q.      Okay.  And is the purpose of

2    the survey to assess the attitudes and values

3    attached to homes with contaminated drywall?

4        A.      Yes.

5        Q.      Okay.  Now, has that

6    methodology, using a contingent valuation

7    survey, been tested?

8        A.      Yes.

9        Q.      And has that methodology been

10   subject to peer-review and/or publication or

11   peer-reviewed literature?

12       A.      Yes, at least a hundred times,

13   if not many more.

14       Q.      And has been approved?

15       A.      Yes.

16       Q.      It's been approved as a

17   reliable process?

18       A.      Yes.  Also, government agencies

19   use it very frequently, in terms of assessing

20   the impact or the value -- environmental

21   values, where there are no markets.  Say, for

22   the value of the spotted owl or something,

23   there's no market, as we have in this case.

24   We have some market, but...

1        Q.      Okay.  And the government, as I

2   understand it, has actually commissioned

3   panels to evaluate this method?

4        A.      Yes.  Both NOAA, the National

5   Oceanic & Atmospheric Administration, and the

6   EPA, Environmental Protection Agency, have

7   commissioned panels to study use of

8   contingent valuation, and these -- and

9   generally, it was considered an acceptable

10  method with -- as long as you took

11  appropriate precautions.

12       Q.      And is there a known or

13  acceptable rate of error for this

14  methodology?

15       A.      Typically, you look at 5%, but

16  occasionally, you can get meaningful results

17  up to 10%; but in some cases, some analysts

18  try to get it down to 1%.

19       Q.      And this methodology of using

20  contingent valuation surveys and this type of

21  analysis to determine how environmental

22  contamination affects property values is

23  accepted by others in your field of

24  expertise?

Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      Okay.

3      A.      Not everyone, but many people.

4              (Whereupon, Deposition Exhibit

5      Germano-Acks-7, Appendix O-S:

6      Contingent valuation Survey {Revised},

7      P3.0565-0001 - P3.0565-0007, was

8      marked for identification.)

9  BY MR. WARSHAUER:

10     Q.      Okay.  Now, let's look at the

11 contingent valuation survey.  It's been

12 marked as Exhibit P3.0565, and I think it's

13 Bates-stamped 0001 through 0007.

14             Is that the survey that was

15 actually used in this case?

16     A.      Correct.  Yes.  This is the

17 survey.

18             MR. WARSHAUER:  At this time, I

19     offer, file and introduce into

20     evidence Exhibit P3.0565.

21 BY MR. WARSHAUER:

22     Q.      Now, did you actually revise

23 this survey from the one that was originally

24 prepared?

1      A.     Yes.   Yes.   We wanted to make

2    sure that a case was presented that -- we

3    wanted to -- if there was any possibility of

4    a respondent to bid on a contaminated home,

5    we wanted to try to expedite such a bid.  So

6    we really bent over backwards to try to get

7    people to bid on contaminated homes.

8             One of the things we did was we

9    offered people various discounts for

10   obtaining a contaminated home.  And one thing

11   we mentioned to them was that if you get a 5%

12   discount on a $100,000 home, you'd have

13   $5,000 to buy a new car, to provide various

14   benefits of different kinds, so we tried to

15   get people to feel there was a real value to

16   obtaining a discount.

17             We also presented the case of a

18   home where it would be remediated -- where it

19   would be remediated by other parties first,

20   as opposed to an unremediated home.  We told

21   them, "Let's say this home was going to be

22   remediated," so we presented that case first

23   in order to get them to bid on a contaminated

24   home.

Confidential - Subject to Further Confidentiality Review

1            Then we also, you know,

2    deemphasized -- you know, we said that none

3    of the health effects were proven, so we

4    really tried to get them to bid in various

5    ways.

6          Q.     Did you do -- make every effort

7    to lower the probability of any bias --

8          A.     Yes.

9          Q.     -- in the survey?

10         A.     Yes.

11         Q.     And you had input in the

12   preparation of the survey?

13         A.     Well, I had ultimate

14   responsibility for the survey.  Actually, it

15   was based on something where I vetted it with

16   Ph.D. economists, and it's based on, also, a

17   peer-reviewed study that appeared in a

18   journal.  So it was not, you know, based on

19   more than just my input.

20         Q.     Okay.  Now, you formulated the

21   results of the contingent valuation survey?

22         A.     Well, I got the results from

23   IPC, and I tabulated them.

24                (Whereupon, Deposition Exhibit

 1          Germano-Acks-8, Results of Contingent

 2          Valuation Survey, P3.0566-0001 -

 3          P3.0566-0015, was marked for

 4          identification.)

 5   BY MR. WARSHAUER:

 6          Q.      Okay.  And let me show you what

 7   has been marked as Exhibit P3.0566.  It's

 8   Bates-numbered 0001 through 0015.  And is

 9   this your tabulation of the results of the

10   contingent valuation survey?

11          A.      Yes.

12                  MR. WARSHAUER:  Okay.  At this

13          time, I will offer, file and introduce

14          into evidence P3.0566.

15   BY MR. WARSHAUER:

16          Q.      Would you please discuss with

17   the Court the key results of the survey?

18          A.      Sure.  Basically, as I said, we

19   offered them the opportunity to pay less for

20   a house with contaminated drywall, and we --

21   for a 5% reduction, only 2% of the

22   respondents would accept it.  And then even

23   if the property was only partially

24   contaminated, only 3% would accept it.  Even

Confidential - Subject to Further Confidentiality Review

Page 76

1    if we said it was going to be fully

2    remediated, only 3% would accept a 5%

3    discount.

4              Now -- and in terms of a 10%,

5    we only got 1% more for no remediation

6    scheduled and 3% with full remediation --

7    more for full remediation scheduled by

8    others.

9              Now, skipping some of these

10   details to get to sort of a bottom line,

11   when -- in terms of people that would either

12   never -- would never buy a contaminated home,

13   that was 28% said that they would never buy a

14   contaminated -- a Chinese

15   drywall-contaminated home under any

16   circumstances with no mediation scheduled.

17        Q.     Just for the record,

18   Mr. Acks -- I'm sorry to interrupt you --

19   you're referring to the table that you

20   prepared in which you tabulated the

21   results --

22        A.     Yes.

23        Q.     -- that's marked as Exhibit

24   P3.0598?

Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2                (Whereupon, Deposition Exhibit

3        Germano-Acks-8A, Summary Table of

4        Results of Contingent Valuation

5        Survey, P3.0598-0001, was marked for

6        identification.)

7    BY MR. WARSHAUER:

8        Q.      Okay.  If you would, please

9    continue.

10       A.      Okay.  So as I -- I had gone

11   through the top three results and -- these

12   three results, and now I skip -- skip down to

13   here.  And this is in terms of a person would

14   never buy a Chinese drywall home under any

15   circumstances, no matter how much of a

16   discount they were offered, 28%, if there was

17   no remediation scheduled, 29% if there was

18   partial remediation, and 24% if there was a

19   full remediation.

20               So you're taking away a

21   substantial part of the market, even for

22   people -- even if the home was scheduled to

23   be fully remediated, you're taking away a big

24   part of the market of people that just don't

1    want to deal with this problem.  Especially

2    today in this market, where there's so much

3    housing inventory and so many choices, people

4    just don't want -- these people would never

5    deal with it.

6              But now, these -- the number of

7    people that would not even accept a 75%

8    reduction, and you have to add these two

9    numbers to get at the total number of people

10   that wouldn't really accept the -- that would

11   be -- so 75% wouldn't even accept a 75%

12   reduction.  This is really getting a steal on

13   the home in a lot of ways.

14             And 74%, even if it was just

15   partially contaminated, the partial

16   contamination situation we presented to them

17   was just two homes, representing 15% of the

18   home.  They just didn't want to deal with it.

19             And then 66% still would not

20   accept a 75% reduction, even if the

21   remediation was to be covered by other

22   people.

23             And now, these are more --

24   other summary statistics, just in terms of

Confidential - Subject to Further Confidentiality Review

```
 1    the average -- average demanded by the buyer

 2    was 77%, 69% and 70%.  So the average, very

 3    big discounts would be demanded for a home of

 4    this kind, even if it was to be fully

 5    remediated.

 6              The average eliminated for

 7    nonbuyers, if you take away just people

 8    that -- if you say, "Well, these people that

 9    wouldn't even answer the question, they're

10    not reasonable, we'll kick them out," still

11    68 -- the average remediation -- reduction

12    demanded was 68%, 56% and 61%.  Even with

13    full remediation, people just didn't -- you

14    know, the average demanded was this amount.

15              Then if you kick out just

16    people that were willing to make a bid -- if

17    you just limit it to people that were willing

18    to make a bid, the average reduction was 32%,

19    26%, 27%.  And this is actually much closer

20    to the number I concluded to be very

21    conservative.

22        Q.      Right.  I was going to ask

23    you --

24        A.      Yeah.
```

Confidential - Subject to Further Confidentiality Review

1          Q.      -- what conclusions did you

2    derive from the results of this contingent

3    valuation survey insofar as the diminution of

4    property values for the contaminated drywall?

5          A.      Right.   From the contingent

6    valuation, I lowered the worst case.   I said

7    the range was 40 to 60%, with a most likely

8    value of 50%, well below the average reported

9    here.   And for unremediated, I said it was

10   likely to be 65 to 85, with a most likely

11   value of 75%.

12               But in terms of -- it's

13   important to remember that my final estimate

14   of value, which incorporated the other

15   approaches, it's much closer to this result,

16   much lower, very conservative, relative to

17   what the contingent valuation survey said.

18   So I took -- took it very conservatively.

19        Q.      And, again, you didn't just

20   rely on this survey or the --

21        A.      Absolutely --

22        Q.      -- sales comparison --

23        A.      Absolutely not.

24        Q.      -- methodology?

Confidential - Subject to Further Confidentiality Review

1       A.      Right.

2       Q.      You used a combination of all

3   five?

4       A.      Yes.

5               MR. WARSHAUER:  Okay.  All

6       right.  Let's talk about your third

7       process.  But before we do that, let

8       me offer, file and introduce into

9       evidence the table of results, which

10      is marked P3.0598, if I haven't

11      already done that.  Okay.

12  BY MR. WARSHAUER:

13      Q.      Let's talk about the inferences

14  from your getting information from experts,

15  as you say.

16      A.      Right.  And, as I mentioned,

17  that's an accepted method, in terms of

18  valuation, by both appraisers and economists.

19  It's felt that just asking the general public

20  will be a biased sample, that you really want

21  to get experts that deal with it daily.

22              In fact, Greenberg and Hughes,

23  in 1985, published an article where they

24  specifically interviewed assessors, which has

Confidential - Subject to Further Confidentiality Review

1     been widely quoted in the literature; and

2     there are other -- many other instances where

3     surveys are limited to experts.

4              And in this case, I didn't have

5     the time and resources to do a full survey of

6     assessors, but we -- I did survey newspaper

7     articles and found six instances where

8     assessors lowered property values of

9     generally around 50% of the value of the

10    improvement.

11         Q.    Let me ask you:  Has this

12    process or methodology been subject to

13    peer-review and/or publication, peer-reviewed

14    literature?

15         A.    The general process has, yes.

16         Q.    Okay.  And has it been accepted

17    by others in your field of expertise?

18         A.    Yes.

19         Q.    Okay.  Now, if you would

20    continue.

21         A.    Right.  And several assessors

22    in areas that have been hit hard by

23    contaminated drywall, including some of the

24    local municipalities, had lowered assessments

Confidential - Subject to Further Confidentiality Review

1    significantly.

2              Generally, what the assessors

3    seemed to be doing was taking 50% off of the

4    improved value, and this is in spite of most

5    places having incredibly severe fiscal

6    distress right now due to the financial

7    crisis.

8              And a lot of the assessors that

9    lowered the assessed values did it in areas

10   that were doubly hit hard because these areas

11   tended to be where a lot of new homes were

12   built, so they were hit -- some of the worst

13   areas hit by the financial crisis, plus they

14   had a lot of contaminated-drywall homes.

15             So there really -- you know, it

16   says a lot to me that assessors who are

17   usually conservative and don't really want to

18   lower their tax base, were giving these

19   reductions.

20        Q.    Okay.  What conclusions did you

21   reach after using this process that you just

22   explained to the Court?

23        A.    Right.  The assessor, I had --

24   I felt that they would probably not grant any

Confidential - Subject to Further Confidentiality Review

1    reductions after a home was remediated.  We

2    don't have any evidence regarding that, what

3    would happen, so we really can only talk

4    about unremediated homes.

5            And what I said, that it's

6    likely that they would grant a reduction --

7    they were granting reductions of between

8    25 and -- one assessor, I was told, gave a

9    99% reduction of the improvement, and a most

10   likely value of 35%.

11           And these numbers are lower

12   than the 50% because the assessors generally

13   have granted only for the value of the

14   improvements, whereas I'm speaking in these

15   numbers to the value of the property as a

16   whole, which includes the land, where

17   assessors hadn't granted reductions, to my

18   knowledge.

19       Q.    Okay.  Now, Mr. Acks, the

20   fourth approach or methodology you used, as I

21   understand it, was benefits transfer of

22   results from studies using sales comparison

23   case studies, contingent valuation studies

24   and hedonic regression studies; is that

Case 2:09-md-02047-EEF-MBN   Document 1267   Filed 02/22/10   Page 85 of 119
Confidential - Subject to Further Confidentiality Review

Page 85

1    correct?

2          A.      Right.

3          Q.      Would you explain to the Court

4    what benefits transfer of results from

5    studies entails?

6          A.      Sure.  Well, these -- to do

7    these studies, contingent valuation and

8    hedonic regressions, can be expensive and

9    time-consuming, and sometimes they're not

10   even possible in terms of hedonic -- in this

11   case, it would not have been possible to do a

12   hedonic regression because the phenomenon is

13   so recent that you don't have a big enough

14   sample of contaminated homes to get anything

15   statistically significant of homes that sold

16   with Chinese drywall.

17               So for those three reasons,

18   this method called benefits transfer was

19   devised by economists; and that's, basically,

20   you take results from existing previous

21   studies, generally peer-reviewed, or

22   sometimes it's called a grey literature,

23   which hasn't been subject to that review, and

24   you transfer these results onto the -- into

Confidential - Subject to Further Confidentiality Review

1    the contamination that's of interest.

2                And it's been -- you know,

3    there have been EPA workshops where they've

4    evaluated this method, and it's been

5    extensively written about in the

6    peer-reviewed literature.

7        Q.    Okay.  So this methodology or

8    technique of using benefits transfer results

9    from studies has been tested and has been

10   subject to peer-review and publication --

11       A.    Right.

12       Q.    -- peer-reviewed literature?

13       A.    It's also very akin to the

14   meta-analysis literature, which is appearing

15   a lot regarding health issues, where, you

16   know, people can get confused with all

17   results of studies regarding proper health

18   things to do.

19                So what researchers do, they

20   combine the results of different studies.

21   Like there have been 10, 15 studies of the

22   effect of exercise on heart function, so

23   meta-analysis, they would combine the results

24   of studies and look into what the result

Confidential - Subject to Further Confidentiality Review

```
 1    would be.
 2                    (Whereupon, Deposition Exhibit
 3            Germano-Acks-6, Matrix of Sales
 4            Comparisons and Case Study Approaches,
 5            P3.0564-0001, was marked for
 6            identification.)
 7    BY MR. WARSHAUER:
 8         Q.     Okay.  Well, let's look
 9    first -- you said you used benefits transfer
10    from sales comparison studies --
11         A.     Right.
12         Q.     -- case studies.  If you would,
13    look at Exhibit P3.0564.  And I believe this
14    is a table that you prepared that lists the
15    various studies that you use in this
16    analysis?
17         A.     Correct.
18         Q.     Would you briefly review that
19    with the Court, please?
20         A.     There was a study by Page and
21    Rabinowitz in 1993, which reported on, I
22    think, five residential properties in
23    Wisconsin; two commercial properties in
24    Wisconsin; one, you know, commercial property
```

Confidential - Subject to Further Confidentiality Review

1   in California; and three near Pittsburgh,

2   Pennsylvania.   And they found ranges of

3   estimated diminution on the case study

4   approach from 10% to 50%.

5          Patchin looked at a variety of

6   properties in the Midwest, 1994.   He found

7   the range of 21 to 69%, and his sample was

8   even for industrial properties, which should

9   be less affected by contamination because

10  they -- you know, people don't have to live

11  there, so there's a lower standard of

12  cleanup.

13         Bell found the range, in 1998,

14  of 0% to 51%.

15         And Simons, Bowen and

16  Sementelli looked at properties in Ohio in

17  1999.   They found a range of 28 to 42% for

18  leaking fuel tanks.   And this was more just

19  proximity, rather than actual contamination.

20      Q.      Which we have in this case?

21      A.      Yeah.

22         Howland found an average of

23  about 75% in industrial vacant land in

24  Baltimore; once again, should be less

Confidential - Subject to Further Confidentiality Review

1    affected by contamination.

2          Jackson found 0%.

3          Closser used a case study of a

4    fuel oil spill in New Jersey, 2001

5    publication, 6% to 28%.

6          Simons used -- looked at PCB

7    contamination in Alabama, 2002, found an

8    average of 60%.

9          Robinson, Lucas & Raspberry

10    found methane gas infiltrating into people's

11    homes internally, and he estimate -- they

12    estimated a range of 13 to 48%, and a -- they

13    estimated a most likely value -- really

14    should be a most likely value in this case,

15    rather than average -- of 15%.

16          They also estimated residual

17    stigma, even after the problem was solved, of

18    10%.

19       Q.    Okay.  Based on that analysis,

20    what conclusion did you reach from the

21    benefits transfer of the comparable sales

22    study?

23       A.    Right.  I estimated a range of

24    10 to 50%, with a most likely value of 25%,

Confidential - Subject to Further Confidentiality Review

Page 90

1    which is a relatively conservative look at

2    these studies.  You know, some of the

3    problems were more severe.

4          Q.    And that was -- you reached

5    that -- that diminution in value for homes

6    remediated or to be remediated?

7          A.    Yeah.

8                MR. WARSHAUER:  Okay.  At this

9          time, I'd offer, file and introduce

10         into evidence Exhibit P3.0564, that

11         table.  Okay.

12   BY MR. WARSHAUER:

13         Q.    The second type of studies that

14   you used, the benefit transfer analysis, were

15   contingent valuation studies; is that

16   correct?

17         A.    Yes.

18                (Whereupon, Deposition Exhibit

19         Germano-Acks-9, Table Summarizing

20         Results of Contingent Valuation

21         Studies Utilized, P3.0567-0001, was

22         marked for identification.)

23   BY MR. WARSHAUER:

24         Q.    And, again, would you discuss

Confidential - Subject to Further Confidentiality Review

1    with the Court the studies that were involved

2    in that analysis.  And I believe you prepared

3    a table of those studies that's been marked

4    as Exhibit P3.0567; is that correct?

5         A.     Yes.

6                This first study is a class --

7         Q.     If you would, before you get

8    into the actual results, discuss with the

9    Court what you meant by "contingent valuation

10   study."

11        A.     Right.  Once again, it's a

12   survey approach that is designed to elicit

13   how people value -- value various

14   environmental amenities or disamenities.

15        Q.     These were studies utilizing

16   that type of --

17        A.     Yes.  And these are all

18   peer-reviewed and -- peer-reviewed.

19        Q.     Okay.  Would you -- okay.  Now,

20   if you would, review the studies.

21        A.     Right.  Smith and Desvouges was

22   sort of regarded as a classic study regarding

23   a contaminated waterway, how it would affect

24   property values.  They came up with 19%.

Confidential - Subject to Further Confidentiality Review

1          Green and Hughes was previously

2     mentioned.  It's a survey of assessors, came

3     up with a reduction of 5.9%.

4          Swartzmann -- and the Green and

5     Hughes, you know, these are conservative

6     assessors who are likely to not want their

7     property values diminished, not want their

8     tax base diminished.

9          Swartzmann is 1985.  He

10    considered it was proximity to hazardous

11    waste sites.

12        Q.    In California?

13        A.    I'm sorry, there was an error

14    in that that I discovered.  It was actually

15    in central Illinois.

16        Q.    Okay.

17        A.    I put it with a different

18    study.

19          McLelland looked at properties

20    throughout the U.S., came up with a

21    diminution of 3.5%.  But this also pertains

22    to just the use value that other people have.

23    It doesn't really pertain to the property

24    owners that are individually affected for

Confidential - Subject to Further Confidentiality Review

1    their own property.

2              This is how you would feel if

3    there's a contaminated property in another

4    part of the country, because you -- none of

5    us really like contamination.

6              Mundy was a smelter near -- an

7    ASARCO smelter in Washington State.

8         Q.    1998?

9         A.    1998.  It actually should read

10   "Mundy and McQueen."  And that diminution was

11   significantly greater than 10%.  I just put

12   the conservative number from that study.

13              Jenkins-Smith, Silva, Berrens

14   and Bohara, they dealt with properties -- it

15   was -- this was a -- also a smelter, but more

16   a smelter in -- for soil contamination.  This

17   was really regarding proximity to this

18   smelter, and they found a reduction of 31%

19   through the contingent valuation.

20              And Simons looked at PCB

21   contamination with a survey, 53%, with a

22   range of 20% to 83%.  This was in Alabama.

23   It was a lower-income area, and more severe

24   contamination, so the two sort of balance --

1    the difference is balancing each other out

2    when you transfer the results.

3                  Berrens, Bohara, Jenkins and

4    Smith were in Texas.  They came up with a

5    range of 16 to 21%.  Also proximate

6    contamination, not properties that were

7    actually contaminated.  They were near a

8    concrete plant.

9                  Last study, which I place most

10   emphasis on, is Simons and Winsom-Geideman.

11   They went through six states:  Pennsylvania,

12   Kentucky, Ohio and -- I have a listing.

13   Let's see. -- Ohio, Alabama, South Carolina,

14   Texas, Illinois.

15        Q.      That's a 2005 study?

16        A.      Yes.  And they came with the

17   most likely estimate of 31%, range of 25% to

18   33%.  I placed greatest emphasis on this one

19   because it had the biggest sample.  This was

20   several different surveys with a relatively

21   large sample, and they -- but --

22        Q.      What was the contamination?

23        A.      That was leaking storage tanks,

24   which could get into homes, but it's also

Confidential - Subject to Further Confidentiality Review

1  more dealing with proximity, so it should be

2  adjusted upward relative to this case.

3       Q.     Because of the contamination

4  being in the homes themselves; is that right?

5       A.     Yes.

6       Q.     Okay.  Now, just so the record

7  is clear, you have change in values in that

8  chart.  Sometimes you have minus before

9  them --

10       A.     Yeah.

11       Q.     -- but all of them refer to

12  diminution in value?

13       A.     Yeah, these are all diminution,

14  so they all should be negatives.

15       Q.     Okay.  Based upon your review

16  of these studies, what conclusions did you

17  reach from these studies as it applies to

18  this case insofar as diminution of property

19  values from the contaminated drywall?

20       A.     Right.  A range of 10 to 60%,

21  with a most likely value of 35%.  And, once

22  again, my ultimate conclusion was lower than

23  this estimate because, you know, I was being

24  conservative.

Confidential - Subject to Further Confidentiality Review

Page 96

1          MR. WARSHAUER:  Okay.  At this

2     time, we offer, file and introduce

3     into evidence the table that you were

4     just referring to, which is

5     Exhibit P3.0567.  Okay.

6  BY MR. WARSHAUER:

7     Q.     The third area that you use in

8  the benefits transfer analysis, the third

9  type of study, hedonic regressions, would you

10 briefly explain to the Court what that

11 entails?

12    A.     Right.  That's basically a

13 statistical sampling of a large variety of

14 property sales.  And it's similar, if you go

15 on to the Internet at HomeGain or many

16 different sites, Domania, if you look at the

17 value of your home, you're wondering, "How

18 could they come up with a value when they

19 know so little about -- just from plugging in

20 my address?"

21          What they do is they run either

22 a hedonic regression model or something akin

23 to it using artificial intelligence, where

24 they take a broad sample of home values and

Confidential - Subject to Further Confidentiality Review

1    characteristics of homes, say square footage

2    of land, square footage of building, number

3    of bedrooms, they determine how the land in

4    particular areas and building area and number

5    of homes, number of rooms, number of

6    bathrooms, tends to be statistically related

7    to homes.

8            So they attach values to the

9    land area and building area through that way

10   and estimate a home value.

11        Q.     Has that methodology or

12   technique, hedonic regression, been tested?

13        A.     Yes.

14        Q.     And has it been subject to

15   peer-review and peer-reviewed literature and

16   publication?

17        A.     Many times, yes.

18        Q.     Is there a known or acceptable

19   rate of error for that methodology?

20        A.     Yes.  Similar to the contingent

21   valuation, you shoot for 5%.  Some people

22   demand 1%, but 10% is often used to make

23   inferences in many cases.

24        Q.     And is this technique generally

Confidential - Subject to Further Confidentiality Review

Page 98

1    accepted by others in your field of

2    expertise?

3         A.    Yes.

4         Q.    Okay.  What conclusions did you

5    reach from using this particular methodology,

6    benefits transfer from the hedonic

7    regression?

8         A.    Right.  I concluded the range

9    was between 10 and 30%, with a most likely

10   value of 15%.

11              And as opposed to a contingent

12   valuation study, which often tends to

13   overstate the case for effective

14   contamination, hedonic valuation, I feel,

15   understates the case, and comparable sales

16   generally understate the case because many

17   environmental contaminated properties never

18   sell, so a hedonic regression or a comparable

19   sales approach would not pick these up.

20              Second of all, the homes that

21   do sell, when you drill down into them, you

22   find out the buyer is either uninformed or

23   unusual, so you -- they tend to understate

24   the value for informed buyers.

Confidential - Subject to Further Confidentiality Review

1          Third of all, the hedonic

2     regressions generally look at proximity to

3     contamination, rather than actual

4     contamination, so for those reasons, a

5     hedonic is -- gives you a low-ball estimate

6     for the diminution.

7          Q.     Okay.   And all of the estimates

8     for diminution in values from the -- these

9     three types of studies apply to remediated or

10    to-be-remediated properties?

11         A.     Yes.

12         Q.     Okay.   The fifth approach you

13    use is the one you said that you, in effect,

14    devised that hasn't yet been peer-reviewed --

15         A.     Yeah.

16         Q.     -- the discounted sellout

17    approach.

18         A.     Yes.

19         Q.     Would you briefly explain to

20    the Court what that involves and why you used

21    it in this case along with the other types of

22    approaches.

23         A.     Right.   It's based on a

24    collection of peer-reviewed methods, but, in

Confidential - Subject to Further Confidentiality Review

1    and of itself, it hasn't been peer-reviewed.

2    And basically that's because it's designed to

3    take into account the changes in property

4    value through time.

5              When a property is first

6    discovered to be contaminated, there's no

7    remediation planned, there's little knowledge

8    in -- little knowledge about it.  The effects

9    tend to be more severe.

10              But as a property is

11    remediated, the diminution tends to drop, and

12    although there tends to be -- even the

13    property fully remediated tends to have a

14    diminished value, it's certainly much lower

15    than before the diminution.

16              And a lot of these other

17    approaches are very static.  They don't take

18    into account changes through time, so this

19    method is designed to take into account these

20    changes through time.

21              And what it does, it

22    effectively assigns an effective rental value

23    to each point in time that a home could be

24    sold, and looks and takes a discounted value

Confidential - Subject to Further Confidentiality Review

1    of the changes over time.

2            And, as I say, looking at

3    discounted value -- discounted values is an

4    accepted methodology, but I haven't had it

5    peer-reviewed and tested.

6        Q.     Okay.  And you obviously didn't

7    rely just on that approach in this case?

8        A.     No, I placed very little

9    emphasis.  It was more a check to see how the

10   effects over time could play out into it, and

11   it's -- I came up with a most likely result

12   of 39%.

13       Q.     Diminution in value of homes

14   remediated or to be remediated?

15       A.     Right.

16              Another thing, it also could

17   take into account the diminished -- the

18   suffering of the homeowners in the time when

19   they were in the home, so the diminution

20   during that period is greater.  So some of

21   these methods don't take into account the

22   particular suffering that these people went

23   through.

24       Q.     Okay.  So, again, Mr. Acks, you

Confidential - Subject to Further Confidentiality Review

1    used a broad approach using a combination of

2    these methods to arrive at your conclusions

3    in this case?

4         A.      Absolutely, yes.

5         Q.      And is that also recognized in

6    the economics profession, using

7    combination --

8         A.      Yes.  I've seen many studies

9    which combine a hedonic regression and a

10   contingent valuation study or other methods.

11   There were other methods that we use that

12   just weren't applicable in this case.

13        Q.      There was a part of your report

14   that referred to highest and best use

15   assumption?

16        A.      Right.

17        Q.      Would you explain to the Court

18   what that involves and why it's applicable in

19   this analysis, in this case?

20        A.      Right.  It's not super relevant

21   in this case because they -- all the

22   properties were clearly residential, as-is,

23   and could be and only likely to be used for

24   residential purposes.

Confidential - Subject to Further Confidentiality Review

1           But if you have a piece of

2    vacant land, it's -- typically, you have to

3    figure out what's the best use, given zoning,

4    given market potential, what it can be used

5    for if it's on a busy street, maybe retail is

6    highest and best use.

7           And it's part of -- I mentioned

8    I tried to keep in conformity with USPAP and

9    other regulations.  And part of USPAP is you

10   should look at highest and best use; but in

11   this case, it really was a no-brainer.

12       Q.    Okay.  And, again, you

13   investigated the economics and demographies

14   in the areas where the seven homes were

15   located --

16       A.    Correct.

17       Q.    -- and information in specific

18   cities?

19       A.    Yeah.

20       Q.    Okay.  And I think you

21   discussed your review of the newspaper

22   articles.  Okay.

23           (Whereupon, Deposition Exhibit

24       Germano-Acks-10, Matrix of Five

Confidential - Subject to Further Confidentiality Review

1          Valuation Methodologies, P3.0568-0001,

2          was marked for identification.)

3    BY MR. WARSHAUER:

4          Q.     Mr. Acks, your conclusions

5    based on the five methodologies and data that

6    you use utilize in this case, I believe you

7    prepared a table setting forth your opinions

8    that's been marked for identification

9    purposes as Exhibit P3.0568.

10              Would you review for the Court,

11   please, the conclusions that you reached

12   using these different methods and approaches

13   for the impact of the contamination on the

14   values of these properties?

15         A.     Right.  You just want me to go

16   to the bottom or just --

17         Q.     Just, again, if you would

18   review the...

19         A.     Okay.  Now, once again, I've

20   mentioned all these conclusions in the past,

21   perhaps, with the exception of the bottom

22   one.

23              But the sale of contaminated

24   Chinese drywall properties, the range for

Confidential - Subject to Further Confidentiality Review

1    remediated or to be remediated appeared to

2    indicate 10% to 50%, with a most likely value

3    of 25%.  Unremediated, 40 to 75%, with a most

4    likely value of 60%.

5              And typically -- okay.  And the

6    contingent valuation approach, the range is

7    40 to 60%, with a most likely value of 50%.

8         Q.     That was the survey?

9         A.     The survey, yeah.

10             And unremediated is higher, 65

11   to 85, with a most likely value of 75.

12             The assessors' opinions

13   indicated 25 to 99, with a most likely value

14   of 35%.

15             The comparable sales approach,

16   10% to 50%; most likely, 25%.  And this is --

17   I'm sorry, this is all under benefits

18   transfer.

19             Contingent valuation, 10% to

20   60%; most likely, 35%.

21             Hedonic valuation, 10% to 30%;

22   most likely, 15%.

23             And discounted sellout, 39%.

24        Q.     And so the ultimate conclusions

Confidential - Subject to Further Confidentiality Review

1    you reach with respect to using a combination

2    of all these methodologies and approaches was

3    what?

4         A.      Right.  A range of 10% to 40%

5    for remediated or to be, with a most likely

6    value of 25%.

7         Q.      Diminution?

8         A.      Yes.

9                 And unremediated, 10 to 60%;

10   most likely, 30%.

11        Q.      Okay.  Now, you actually

12   prepared a table looking at the diminution in

13   property values of the actual seven

14   properties; is that correct?

15        A.      Yes.

16                MR. WARSHAUER:  Okay.  Before

17                we go into those, I offer, file and

18                introduce into evidence

19                Exhibit P3.0568, your table setting

20                out your conclusions using the

21                different methodologies.

22                (Whereupon, Deposition Exhibit

23                Germano-Acks-11, Matrix of Properties

24                and Diminution of Value, P3.0569-0001,

Confidential - Subject to Further Confidentiality Review

1          was marked for identification.)

2     BY MR. WARSHAUER:

3          Q.      This table is identified as

4     P3.0569.

5          A.      Okay.  Now, in this table, I

6     individualized the estimates, because there

7     were some differences in the property.

8               As I mentioned, the average

9     diminution expected was 25%, but -- I'll go

10    through all of them individually, but it's

11    significant that the Leach home only had

12    partial contamination in one room, and it was

13    relatively contained.  So that estimate was

14    10%, well below my average estimate of 25%.

15              The --

16         Q.      The first home, at

17    4020 Dunbarton Circle in Williamsburg, the

18    Baldwin home?

19         A.      Right.  That was sort of the --

20    fit in with the average diminution of 25%.

21    25%, so the diminished value was -- the

22    diminution was 95,500.

23         Q.      The appraised value was

24    382,000 --

Confidential - Subject to Further Confidentiality Review

1       A.      Yeah.

2       Q.      -- and you came up with a

3   diminution of 25%, for a diminution of

4   $95,500?

5       A.      Right.

6       Q.      Okay.  Now, the next home.

7   That's the Leach home, located at

8   4043 Dunbarton Circle?

9       A.      Right.  This is the home with

10  the one room that was contaminated, so the

11  diminution is expected to be smaller, but

12  definitely not zero.

13              We lowered the diminution to

14  10%, or 47,500 of the value.

15              4081 -- the next two homes,

16  once again, fall into pretty much the

17  average --

18      Q.      Actually 4091 Dunbarton Circle?

19      A.      4091 Dunbarton Circle and 8495

20  Ashington Way, they're very similar homes

21  with similar appraised values, similar

22  characteristics, so they fall in with this

23  average estimate of 25% or 95,250, 95,500.

24              Now, the next two homes, the

Confidential - Subject to Further Confidentiality Review

```
 1   estimated diminution is slightly lower

 2   because they were in a lower-valued area,

 3   lower-income area.  And, as I mentioned, the

 4   contamination tends to be lower in

 5   lower-income areas.  So the diminution was

 6   lowered to 20% from the average of 25%.

 7              On the other hand -- well, I'll

 8   go -- the first home was 1008 Hollymeade

 9   Circle.  Appraised value, 230,000;

10   diminution, 20%; diminution, 46,000.

11              901 Eastfield Lane, also in

12   Newport News, a townhouse.  267,500,

13   appraised value; 20% diminution; and

14   53,500 -- that translated into 53,500.

15              Now, the Virginia Beach home,

16   on the other hand, was a higher-valued home.

17   And, as I mentioned, upper-income people tend

18   to have more opportunities to search for

19   different homes, so the diminution is

20   greater.  People have to offer a greater

21   discount.  Estimated change:  30%, 190,500.

22        Q.    Okay.  Why is there less effect

23   in the lower-income areas?

24        A.    Because it's an empirical
```

Confidential - Subject to Further Confidentiality Review

1   relationship, and people tend to have fewer

2   choices in terms of jobs.  It's more

3   difficult for them to change jobs or commute

4   to a different location.

5            Also, just empirically, you

6   know, education -- educated people just tend

7   to think more about the contamination, for

8   various reasons; and it's an empirical

9   relationship, which I found to be very

10  consistent.  So I think it's important to

11  utilize it.

12           MR. WARSHAUER:  Okay.  All

13       right.  So at this time, I'll offer,

14       file and introduce into evidence that

15       table with the diminished values for

16       each of the seven homes, which is

17       marked P3.0569.

18  BY MR. WARSHAUER:

19       Q.    Now, this diminution estimate

20  is contingent upon various factors.  I think

21  you set that out in your report?

22       A.    Yes.

23       Q.    Would you please go over those,

24  please?

Confidential - Subject to Further Confidentiality Review

1      A.      Okay.   Now, the diminution for

2    homes slated to be remediated is contingent

3    upon responsible parties or governments

4    assuming responsibility for the cleanup; upon

5    cleanup occurring between March 1st, 2010,

6    and February 28th, 2011; upon investigation,

7    remediation and registered changes in

8    contaminants proceeding at an expected pace;

9    upon there being no significant discoveries

10   of additional contamination; upon stable or

11   increasing house prices in the immediate

12   area; upon no additional information

13   regarding health and other impacts that

14   significantly conflicts with the current

15   state of accepted wisdom in the marketplace;

16   upon limited additional news coverage of the

17   contamination.

18              And in my experience, all of

19   these -- if any of these factors are

20   violated, it could change the likely

21   diminution from an environmental event, like

22   most of these things would result -- if they

23   were violated, would result in an upward

24   estimate.

Confidential - Subject to Further Confidentiality Review

1     Q.      Greater diminution?

2     A.      Yeah.

3     Q.      And are these contingencies

4  pretty standard in the type of analysis that

5  you're doing in this case?

6     A.      Yes.  I mentioned the journal

7  article in the past which talks about things

8  that you have to look at.

9     Q.      Okay.  Now, finally, you

10 estimated the diminution in the property

11 values of these seven homes as of

12 December 15, 2009 --

13    A.      Right.

14    Q.      -- assuming that these

15 contingencies are not met and that the

16 responsible parties or governments do not

17 assume liability for the cleanup or it's

18 not -- doesn't proceed in a timely fashion;

19 is that correct?

20    A.      Yes.

21    Q.      And what conclusions did you

22 reach with respect to these homes?

23    A.      Right.  The 4020 Dunbarton

24 Circle was estimated to be 30%.  Most of

Confidential - Subject to Further Confidentiality Review

1   these represent 5% increases from the

2   previous estimate plus remediation costs.

3          30% for 4020 Dunbarton.   10%,

4   same for -- same number as previously for

5   Leach.   That didn't go up 5%.   That's

6   4043 Dunbarton.

7          4091 Dunbarton Circle, the

8   estimated diminution was 30%.

9          8495 Ashington, the estimated

10  diminution was 30%.

11         1008 Hollymeade and 901

12  Eastfield, the estimated diminution was 25%.

13         And 214A 80th Street in

14  Virginia Beach, the estimated diminution was

15  35%.

16     Q.    Okay.  All of these diminutions

17  in values in the homes that met the

18  contingencies and those that -- where you

19  analyzed it if they don't, were as of

20  December 15th, 2009; is that correct?

21     A.    Correct.

22         MR. WARSHAUER:  At this time, I

23     don't have any further questions, and

24     we tender the witness.

Confidential - Subject to Further Confidentiality Review

1            MR. SPAULDING:  Okay.

2      Mr. Acks, I don't have any actual

3      questions for you at this time,

4      although, as we said earlier, KPT

5      intervened in this action solely to

6      determine the proper scope of the

7      remediation of the seven Virginia

8      homes.

9            And KPT reserves its rights to

10      depose Mr. Acks in the future as

11      necessary as to either of the reports

12      he's authored, if the issues raised in

13      the reports are litigated in the

14      future.

15            MR. WARSHAUER:  Okay.  It's

16      plaintiffs' position that his

17      testimony and the opinions and

18      conclusions reached by Mr. Acks and to

19      which he testified during this

20      deposition are within the scope of

21      this upcoming hearing/trial, and were

22      appropriately produced in connection

23      with this matter.

24            THE VIDEOGRAPHER:  Is that it?

Confidential - Subject to Further Confidentiality Review

1              MR. SCHILLING:  Steven Shilling

2       for Mayeaux Construction Company.   I

3       was merely here to observe, and I'm

4       waiving no rights.  We've not

5       intervened in the Virginia litigation

6       in any way, so any deposition that you

7       may offer -- any testimony you may

8       offer in the future, we reserve our

9       right to depose you.

10             THE VIDEOGRAPHER:  The time now

11      is approximately 11:41 a.m.  Today's

12      deposition of Mr. Kenneth Acks,

13      consisting of two tapes, is now

14      concluded.

15             (Proceedings concluded at

16      11:42 a.m.)

17                 - - - - - - -

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE

 2

 3            I, MICHAEL E. MILLER, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter and Notary Public, do hereby certify
      that prior to the commencement of the
 5    examination, KENNETH M. ACKS was duly sworn
      by me to testify to the truth, the whole
 6    truth and nothing but the truth.

 7            I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
              I DO FURTHER CERTIFY that I am
11    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
12    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
13    that I am not financially interested in the
      action.
14

15

16            _____
      MICHAEL E. MILLER,
17    NCRA Registered Diplomate Reporter
      NCRA Certified Realtime Reporter
18    Certified LiveNote Reporter
      LA Certified Court Reporter #27009
19
      Dated: February 4, 2010
20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

Page 117

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4              I, KENNETH M. ACKS, do hereby
        certify that I have read the foregoing pages
 5      and that the same is a correct transcription
        of the answers given by me to the questions
 6      therein propounded, except for the
        corrections or changes in form or substance,
 7      if any, noted in the attached
        Errata Sheet.
 8

 9

10

11

12      _____
        KENNETH M. ACKS            DATE
13

14

15      Subscribed and sworn to before me this

16      _____ day of _____, 20 _____.

17      My commission expires: _____

18

19      Notary Public

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              - - - - - - -
                    ERRATA
 2              - - -- - - -

 3   PAGE   LINE     CHANGE

 4   ____   ____     _____

 5   REASON:         _____

 6   ____   ____     _____

 7   REASON:         _____

 8   ____   ____     _____

 9   REASON:         _____

10   ____   ____     _____

11   REASON:         _____

12   ____   ____     _____

13   REASON:         _____

14   ____   ____     _____

15   REASON:         _____

16   ____   ____     _____

17   REASON:         _____

18   ____   ____     _____

19   REASON:         _____

20   ____   ____     _____

21   REASON:         _____

22   ____   ____     _____

23   REASON:         _____

24
```

Confidential - Subject to Further Confidentiality Review

1

2

- - - - - - -

LAWYER'S NOTES

- - - - - - -

3    PAGE    LINE

4    ____    ____    _____

5    ____    ____    _____

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   ____    ____    _____

22   ____    ____    _____

23   ____    ____    _____

24   ____    ____    _____