Confidential - Subject to Further Confidentiality Review

Page 1

1              UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
2

U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED   2-22-10
LORETTA G. WHYTE
        CLERK

3    _____  §  MDL NO. 2047
     IN RE:                §
4    CHINESE-MANUFACTURED  §  SECTION: L
     DRYWALL PRODUCTS      §
5    LIABILITY LITIGATION  §  JUDGE FALLON
     _____  §  MAG. JUDGE WILKINSON
6

7                    — — —

8            THURSDAY, FEBRUARY 4, 2010

9                — CONFIDENTIAL —
        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
10
             TRIAL PRESERVATION TESTIMONY
11
                     — — —
12

13           Videotaped deposition of J.C.

14   TUTHILL, CPA, held at the offices of

15   Gainsburgh, Benjamin, David, Meunier &

16   Warshauer, LLC, 2800 Energy Centre, 1100

17   Poydras Street, New Orleans, Louisiana,

18   commencing at 10:00 a.m., on the above date,

19   before Michael E. Miller, Certified Court

20   Reporter, Registered Diplomate Reporter,

21   Certified Realtime Reporter.

22                   — — —

23          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
24            deps@golkow.com

Confidential - Subject to Further Confidentiality Review

Page 2

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF VIRGINIA
 2

    MICHELLE GERMANO; DENNIS        §
 3  JACKSON; SHARON JACKSON;        §
    JASON DUNAWAY; LISA DUNAWAY;    §
 4  Individually, and on behalf     §
    of all other similarly          §
 5  situated,                       §
                                    §
 6            Plaintiffs,           §
                                    §
 7  vs.                             §   2:09cv202
                                    §
 8  TAISHAN GYPSUM CO. LTD.         §
    f/k/a SHANDONG TAIHE DONGXIN    §
 9  CO. LTD.; VENTURE SUPPLY,       §
    INC.; HARBOR WALK               §
10  DEVELOPMENT, LLC; and THE       §
    PORTER-BLAINE CORP.,            §
11                                  §
              Defendants.           §
12

13  _____

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S :

 2         GAINSBURGH, BENJAMIN, DAVID,
           MEUNIER & WARSHAUER, LLC
 3         BY:   GERALD E. MEUNIER, ESQUIRE
                 gmeunier@gainsben.com
 4         2800 Energy Centre
           1100 Poydras Street
 5         New Orleans, Louisiana 70163-2800
           (504) 522-2304
 6         Counsel for Plaintiffs

 7

           BARRIOS, KINGSDORF & CASTEIX, LLP
 8         BY:   DAWN M. BARRIOS, ESQUIRE
                 dbarrios@bkc-law.com
 9         701 Poydras Street
           Suite 3650
10         New Orleans, Louisiana 70139-3650
           (504) 524-3300
11         Counsel for Plaintiffs

12

           FRILOT, LLC
13         BY:   PAUL C. THIBODEAUX, ESQUIRE
                 pthibodeaux@frilot.com
14         3700 Energy Centre
           1100 Poydras Street
15         New Orleans, Louisiana 70163
           (504) 599-8000
16         Counsel for Knauf Plasterboard
           Tianjin Co., Ltd.

17

18         CUNNINGHAM BOUNDS, LLC
           BY:   R. EDWIN LAMBERTH, ESQUIRE
19               rel@cunninghambounds.com
                 (via teleconference)
20         1601 Dauphin Street
           Mobile, Alabama 36604
21         (251) 471-6191
           Counsel for The Mitchell Company, Inc.

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:

 2        FOWLER WHITE BURNETT, PA
          BY:  RICHARD P. MORRIS, ESQUIRE
 3             rmorris@fowler-white.com
               (via teleconference)
 4        Espirito Santo Plaza
          1395 Brickell Avenue, 14th Floor
 5        Miami, Florida 33131
          (305) 789-9200
 6        Counsel for Black Bear Gypsum
          Supply, Inc. and Smoky Mountain
 7        Materials, Inc.

 8
          FULMER, LeROY, ALBEE, BAUMANN &
 9        GLASS, PLC
          BY:  ROBERT M. OLDERSHAW, ESQUIRE
10             roldershaw@fulmerleroy.com
               (via teleconference)
11        2866 East Oakland Park Boulevard
          Fort Lauderdale, Florida 33306
12        (954) 707-4430
          Counsel for Independent Builders
13        Supply Association

14

15    VIDEOGRAPHER:

16        WILLIAM GEIGERT,
          Golkow Technologies, Inc.
17

18                      -- -- --

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

1                          I N D E X
                      J.C. TUTHILL, CPA
2                       February 4, 2010

3

4      APPEARANCES                              3

5      PROCEEDINGS                             17

6

7      EXAMINATION OF J.C. TUTHILL, CPA:

8           BY MR. MEUNIER                     18

9

10     CERTIFICATE                            120

11     ACKNOWLEDGMENT OF DEPONENT             121

12     ERRATA                                 122

13     LAWYER'S NOTES                         123

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                     DEPOSITION EXHIBITS
                        J.C. TUTHILL, CPA
 2                       February 4, 2010

 3

 4     NUMBER                    DESCRIPTION          PAGE

 5     P3.0599-0001       Notice of Deposition         18

 6     P3.0550-0001 -     12/20/09 Expert Report       26
       P3.0550-0066       of Legier & Company
 7
       P3.0548-0001 -     1/18/10 Supplemental         27
 8     P3.0548-0016       Expert Report of
                          Legier & Company
 9
       P3.0549-0001 -     1/20/10 Supplemental         28
10     P3.0549-0003       Expert Report of
                          Legier & Company, re:
11                        Orlando Plaintiffs

12     P3.0622-0001 -     2/3/10 Revised               30
       P3.0622-0015       Supplemental Report of
13                        Legier & Company

14     P3.0620-0001       1/20/10 Tuthill Letter       39
                          to Barrios, re:
15                        Documents Reviewed

16     P3.0621-0001       1/29/10 Tuthill Letter       40
                          to Barrios, re:
17                        Conversation with
                          Morgan's CPA
18
       P3.0237-0001,      Reliance Material:           52
19     P3.0232-0001 -     Alternative Living
       P3.0232-0005,      Costs, re: Heischober
20     P3.0236-0001 -
       P3.0236-0005,
21     P3.0231-0001,
       P3.0571-0001,
22     P3.0239-0001,
       P3.0238-0001
23

24
```

Confidential - Subject to Further Confidentiality Review

Page 7

```
 1                  DEPOSITION EXHIBITS

 2

 3      NUMBER              DESCRIPTION         PAGE

 4   P3.0267-0001,     Reliance Material:        53
     P3.0271-0001,     Repair Costs,
 5   P3.0273-0001,     re: Heischober
     P3.0274-0001,
 6   P3.0275-0001,
     P3.0266-0001,
 7   P3.0268-0001,
     P3.0269-0001,
 8   P3.0270-0001 -
     P3.0270-0002,
 9   P3.0272-0001 -
     P3.0272-0002,
10   P3.0276-0001,
     P3.0277-0001 -
11   P3.0277-0002,
     P3.0265-0001,
12   P3.0264-0001,
     P3.0263-0001 -
13   P3.0263-0004,
     P3.0262-0001,
14   P3.0261-0001 -
     P3.0261-0003,
15   P3.0234-0001,
     P3.0233-0001,
16   P3.0235-0001 -
     P3.0235-0002,
17   P3.0279-0001,
     P3.0280-0001
18
     P3.0260-0001 -    Reliance Material:        53
19   P3.0260-0003,     Mortgage/Inability to
     P3.0257-0001 -    Refinance Costs,
20   P3.0257-0008,     re: Heischober
     P3.0258-0001,
21   P3.0246-0001,
     P3.0244-0001,
22   P3.0245-0002 -
     P3.0245-0004
23

24
```

Confidential - Subject to Further Confidentiality Review

1               DEPOSITION EXHIBITS

2

3       NUMBER              DESCRIPTION          PAGE

4    P3.0536-0001,    Reliance Material:         54
     P3.0252-0001,    Payment of Household
5    P3.0250-0001,    Expenses,
     P3.0251-0001,    re: Heischober
6    P3.0248-0001,
     P3.0534-0001,
7    P3.0535-0001 -
     P3.0535-0002,
8    P3.0249-0001

9    P3.0305-0001,    Reliance Material:         64
     P3.0306-0001,    Repair Costs, re: Leach
10   P3.0308-0001

11   P3.0304-0001 -   Reliance Material:         65
     P3.0304-0002,    Mortgage/Inability to
12   P3.0537-0001,    Refinance Costs,
     P3.0294-0001,    re: Leach
13   P3.0299-0001,
     P3.0303-0001 -
14   P3.0303-0002,
     P3.0302-0001,
15   P3.0296-0001

16   P3.0290-0001,    Reliance Material:         66
     P3.0288-0001 -   Payment of Household
17   P3.0288-0003,    Expenses, re: Leach
     P3.0291-0001 -
18   P3.0291-0002,
     P3.0608-0001 -
19   P3.0608-0002,
     P3.0292-0001,
20   P3.0289-0001,
     P3.0293-0001

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS

 2

 3       NUMBER              DESCRIPTION            PAGE

 4     P3.0186-0001 -    Reliance Material:          69
       P3.0186-0002,     Alternative Living
 5     P3.0218-0001,     Costs, re: Baldwin
       P3.0187-0001 -
 6     P3.0187-0002,
       P3.0188-0001,
 7     P3.0185-0001

 8     P3.0207-0001,     Reliance Material:          69
       P3.0211-0001,     Repair Costs,
 9     P3.0208-0001,     re: Baldwin
       P3.0209-0001,
10     P3.0210-0001,
       P3.0206-0001,
11     P3.0204-0001,
       P3.0205-0001,
12     P3.0214-0001,
       P3.0213-0001,
13     P3.0190-0001 -
       P3.0190-0002,
14     P3.0212-0001,
       P3.0215-0001,
15     P3.0223-0001,
       P3.0222-0001,
16     P3.0221-0001,
       P3.0220-0001,
17     P3.0219-0001

18     P3.0203-0001 -    Reliance Material:          70
       P3.0203-0003,     Mortgage/Inability to
19     P3.0201-0001,     Refinance Costs,
       P3.0202-0001 -    re: Baldwin
20     P3.0202-0006

21     P3.0201-0002,     Reliance Material:          70
       P3.0602-0001 -    Payment of Household
22     P3.0602-0002,     Expenses, re: Baldwin
       P3.0601-0001,
23     P3.0603-0001

24
```

Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION EXHIBITS

 2

 3      NUMBER            DESCRIPTION           PAGE

 4   P3.0320-0001,     Reliance Material:        81
     P3.0323-0001,     Alternative Living
 5   P3.0322-0001,     Costs, re: McKellar
     P3.0325-0001,
 6   P3.0326-0001 -
     P3.0326-0003,
 7   .P3.0318-0001,
     P3.0326-0004 -
 8   P3.0326-0005,
     P3.0333-0001 -
 9   P3.0333-0006,
     P3.0315-0001,
10   P3.0330-0001,
     P3.0540-0001,
11   P3.0614-0001,
     P3.0314-0001,
12   P3.0331-0001,
     P3.0327-0001,
13   P3.0329-0001,
     P3.0319-0001
14   P3.0324-0001,
     P3.0321-0001,
15   P3.0332-0001 -
     P3.0332-0003,
16   P3.0351-0001,
     P3.0348-0001,
17   P3.0328-0001,
     P3.0538-0001,
18   P3.0615-0001,
     P3.0334-0001,
19   P3.0317-0001 -
     P3.0317-0002,
20   P3.0316-0001,
     P3.0313-0001

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS

 2

 3       NUMBER               DESCRIPTION          PAGE
 4    P3.0392-0001,      Reliance Material:         83
      P3.0379-0001,      Repair Costs,
 5    P3.0389-0001,      re: McKellar
      P3.0380-0001,
 6    P3.0385-0001,
      P3.0387-0001,
 7    P3.0388-0001,
      P3.0390-0001,
 8    P3.0391-0001,
      P3.0381-0001,
 9    P3.0382-0001,
      P3.0383-0001,
10    P3.0386-0001,
      P3.0613-0001,
11    P3.0372-0001,
      P3.0378-0001,
12    P3.0369-0001,
      P3.0375-0001,
13    P3.0370-0001,
      P3.0376-0001,
14    P3.0371-0001,
      P3.0377-0001,
15    P3.0368-0001,
      P3.0373-0001,
16    P3.0374-0001,
      P3.0367-0001,
17    P3.0394-0001,
      P3.0393-0001,
18    P3.0397-0001

19    P3.0363-0001,      Reliance Material:         83
      P3.0366-0001 -     Mortgage/Inability to
20    P3.0366-0002,      Refinance Costs,
      P3.0343-0001 -     re: McKellar
21    P3.0343-0004,
      P3.0611-0001,
22    P3.0612-0001,
      P3.0610-0001 -
23    P3.0610-0002

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS

 2

 3        NUMBER              DESCRIPTION        PAGE

 4    P3.0344-0001,     Reliance Material:        84
      P3.0350-0001,     Payment of Household
 5    P3.0346-0001,     Expenses, re: McKellar
      P3.0353-0001 -
 6    P3.0353-0002,
      P3.0347-0001,
 7    P3.0354-0002,
      P3.0349-0001,
 8    P3.0356-0001,
      P3.0355-0001 -
 9    P3.0355-0002,
      P3.0354-0001,
10    P3.0352-0001,
      P3.0539-0001,
11    P3.0342-0001,
      P3.0341-0001 -
12    P3.0341-0010,
      P3.0616-0001 -
13    P3.0616-0003

14    P3.0449-0001 -    Reliance Material:        90
      P3.0449-0021,     Alternative Living
15    P3.0451-0001 -    Costs, re: Michaux
      P3.0451-0002,
16    P3.0445-0001,
      P3.0453-0001 -
17    P3.0453-0002,
      P3.0446-0001,
18    P3.0447-0001,
      P3.0455-0002,
19    P3.0448-0001,
      P3.0450-0001 -
20    P3.0450-0010,
      P3.0452-0001,
21    P3.0445-0001

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
1                    DEPOSITION EXHIBITS

2


3        NUMBER              DESCRIPTION          PAGE

4     P3.0484-0001,      Reliance Material:        91
      P3.0481-0001,      Repair Costs,
5     P3.0482-0001,      re: Michaux
      P3.0483-0001,
6     P3.0486-0001,
      P3.0487-0001,
7     P3.0485-0001,
      P3.0480-0001,
8     P3.0479-0001,
      P3.0478-0001 -
9     P3.0478-0002,
      P3.0476-0001,
10    P3.0474-0001 -
      P3.0474-0002
11
      P3.0473-0001 -     Reliance Material:        92
12    P3.0473-0002,      Mortgage/Inability to
      P3.0457-0001,      Refinance Costs,
13    P3.0458-0001,      re: McKellar
      P3.0469-0001,
14    P3.0470-0001,
      P3.0471-0001,
15    P3.0456-0001 -
      P3.0456-0003,
16    P3.0467-0001 -
      P3.0467-0002,
17    P3.0468-0001,
      P3.0472-0001
18
      P3.0455-0001,      Reliance Material:        92
19    P3.0461-0001 -     Payment of Household
      P3.0461-0005,      Expenses, re: Michaux
20    P3.0463-0001,
      P3.0460-0001,
21    P3.0459-0001

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS

 2

 3      NUMBER              DESCRIPTION          PAGE

 4   P3.0407-0001 -   Reliance Material:        105
     P3.0407-0014,    Alternative Living
 5   P3.0405-0001,    Costs, re: Morgan
     P3.0404-0001 -
 6   P3.0404-0003,
     P3.0402-0001 -
 7   P3.0402-0002,
     P3.0406-0001
 8
     P3.0433-0001,    Reliance Material:        105
 9   P3.0434-0001,    Repair Costs,
     P3.0435-0001,    re: Morgan
10   P3.0436-0001,
     P3.0437-0001,
11   P3.0618-0001,
     P3.0438-0001,
12   P3.0431-0001,
     P3.0430-0001,
13   P3.0431-0002,
     P3.0440-0001,
14   P3.0403-0001

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | | DEPOSITION EXHIBITS | |
| 2 | | | |
| 3 | NUMBER | DESCRIPTION | PAGE |
| 4 | P3.0421-0001 - | Reliance Material: | 109 |
| | P3.0421-0003, | Bankruptcy and | |
| 5 | P3.0418-0001 - | Foreclosure-Related | |
| | P3.0418-0002, | Expenses, re: Morgan | |
| 6 | P3.0408-0001 - | | |
| | P3.0408-0016, | | |
| 7 | P3.0409-0001, | | |
| | P3.0422-0001 - | | |
| 8 | P3.0422-0002, | | |
| | P3.0427-0001, | | |
| 9 | P3.0424-0001 - | | |
| | P3.0424-0002, | | |
| 10 | P3.0423-0001 - | | |
| | P3.0423-0004, | | |
| 11 | P3.0425-0001, | | |
| | P3.0429-0001, | | |
| 12 | P3.0619-0001 - | | |
| | P3.0619-0009, | | |
| 13 | P3.0428-0001, | | |
| | P3.0412-0001, | | |
| 14 | P3.0410-0001, | | |
| | P3.0411-0001, | | |
| 15 | P3.0400-0001 | | |
| 16 | P3.0503-0001, | Reliance Material: | 117 |
| | P3.0506-0001 - | Alternative Living | |
| 17 | P3.0506-0005, | Costs, re: Orlando | |
| | P3.0502-0001, | | |
| 18 | P3.0505-0001 - | | |
| | P3.0505-0002, | | |
| 19 | P3.0504-0001 - | | |
| | P3.0504-0002 | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

Page 16

```
 1                    DEPOSITION EXHIBITS

 2

 3      NUMBER             DESCRIPTION          PAGE

 4   P3.0525-0001,    Reliance Material:        118
     P3.0523-0001,    Repair Costs,
 5   P3.0528-0001,    re: Orlando
     P3.0527-0001 -
 6   P3.0527-0002,
     P3.0529-0001,
 7   P3.0532-0001,
     P3.0530-0001,
 8   P3.0526-0001 -
     P3.0526-0003
 9
     P3.0522-0001,    Reliance Material:        118
10   P3.0604-0001,    Mortgage/Inability to
     P3.0605-0001,    Refinance Costs,
11   P3.0517-0001,    re: Orlando
     P3.0511-0001,
12   P3.0607-0001,
     P3.0509-0001 -
13   P3.0509-0006,
     P3.0512-0001,
14   P3.0521-0001 -
     P3.0521-0002
15   P3.0516-0001 -
     P3.0516-0007,
16   P3.0513-0001 -
     P3.0513-0002
17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS

 2              (February 4, 2010 at

 3         10:00 a.m.)

 4              THE VIDEOGRAPHER:  We're now on

 5         the record.  My name is Bill Geigert.

 6         I'm a videographer for Golkow

 7         Technologies.  Today's date is

 8         February 4th, 2010, and the time is

 9         10:00 a.m.

10              This video deposition is being

11         held in New Orleans, Louisiana in the

12         matter of Chinese-Manufactured Drywall

13         Products Liability Litigation for the

14         U.S. District Court, Eastern District

15         of Louisiana.  The deponent is

16         J.C. Tuthill.

17              Counsel, please identify

18         yourselves.

19              MR. MEUNIER:  Jerry Meunier for

20         the plaintiff intervenors in Germano.

21              MS. BARRIOS:  Dawn Barrios for

22         the plaintiff intervenors in Germano.

23              MR. THIBODEAUX:  Paul

24         Thibodeaux for Knauf Plasterboard
```

Confidential - Subject to Further Confidentiality Review

```
 1        Tianjin Company, Ltd.
 2             THE VIDEOGRAPHER:  The court
 3        reporter is Mike Miller, and he will
 4        now swear in the witness.
 5             J.C. TUTHILL, CPA,
 6   having been duly sworn, testified as follows:
 7                  EXAMINATION
 8   BY MR. MEUNIER:
 9        Q.     Good morning.  Would you state
10   your name and address for the record, please.
11        A.     Yes.  J.C. Tuthill, 1100 Porter
12   Street, 34th floor, New Orleans, Louisiana,
13   70163.
14        Q.     And, Ms. Tuthill, are you
15   appearing today to provide testimony in the
16   Chinese drywall litigation as it relates to
17   the case of Germano versus Taishan Gypsum?
18        A.     Yes, I am.
19             MR. MEUNIER:  I would like to
20        attach to the transcript and offer as
21        Trial Exhibit P3.0599-0001 through
22        0004 the notice of the trial
23        perpetuation deposition of
24        Ms. Tuthill.
```

Confidential - Subject to Further Confidentiality Review

```
 1    BY MR. MEUNIER:

 2         Q.      What is your occupation?

 3         A.      I'm a Certified Public

 4    Accountant.

 5         Q.      By whom are you employed?

 6         A.      Legier & Company.

 7         Q.      What is the business of

 8    Legier & Company?

 9         A.      We're a consulting firm, and we

10    do a wide variety of consulting services.

11         Q.      What position do you hold with

12    Legier & Company?

13         A.      I'm a director in the firm.

14         Q.      And how long have you been with

15    Legier & Company?

16         A.      This will be my 20th year with

17    Legier & Company.

18         Q.      By whom were you employed prior

19    to that?

20         A.      Arthur Andersen, in their audit

21    group.

22         Q.      You received your college

23    degree at the University of South Alabama; is

24    that true?
```

Confidential - Subject to Further Confidentiality Review

 1        A.        That is correct.

 2        Q.        You graduated magna cum laude?

 3        A.        Yes.

 4        Q.        And what was your degree?

 5        A.        It was in accounting,

 6   Bachelor's of Science in accounting.

 7        Q.        What additional -- or what

 8   professional certifications do you hold?

 9        A.        Subsequent to graduation, I

10   passed the CPA exam, Certified Public

11   Accountant; and I have also earned other

12   designations:  the Certified Fraud Examiner,

13   the Certified in Financial Forensics, and

14   also a Certified Forensic Accountant.

15        Q.        Let me go through those briefly

16   with you.  Your CPA was obtained when?

17        A.        I believe in 1988.

18        Q.        And you also hold a CFA?

19        A.        CrFA, that's a Certified

20   Forensic Accountant.

21        Q.        And when did you obtain that

22   certification?

23        A.        In 2002.

24        Q.        And could you just briefly

Confidential - Subject to Further Confidentiality Review

Page 21

1    explain what activities you are trained and

2    qualified to undertake as a CrFA?

3         A.       A forensic accountant is an

4    accountant who applies the skills involved in

5    accounting, auditing, investigation, in

6    matters that are either in dispute,

7    litigation or other investigations.

8         Q.       Does it involve the performance

9    of calculations, as well as financial

10   analysis?

11        A.       Yes, it does.

12        Q.       You also hold a CFF?

13        A.       Yes.

14        Q.       And that is a --

15        A.       That's Certified in Financial

16   Forensics.   That's a designation by the

17   American Institute of Certified Public

18   Accountants, the AICPA.

19        Q.       How does that differ from the

20   CrFA?

21        A.       It's just -- it's the same

22   principles are involved, accounting,

23   auditing, in connection with disputes,

24   matters in courts of law; but it's just by a

Confidential - Subject to Further Confidentiality Review

Page 22

```
1    different professional organization.
2         Q.      Which organization is that?
3         A.      The AICPA.
4         Q.      When did you obtain your CFF?
5         A.      That was in 2008.
6         Q.      And then finally, you hold a
7    CFE?
8         A.      Yes.
9         Q.      And what is that?
10        A.      That's a Certified Fraud
11   Examiner's designation, and that is put forth
12   by another group, the Association of
13   Certified Fraud Examiners.
14               That is more involved with
15   fraud investigations; but it also combines
16   areas of investigation, law, financial
17   aspects and interrogation; more on the fraud
18   side.
19        Q.      All right.  So the activities
20   there focus on verifying certain numbers and
21   making sure that they're documented and
22   correct?
23        A.      Performing an investigation,
24   verifying, interviewing, yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1        Q.      When did you obtain your CFE?
 2        A.      That was in 2009.
 3        Q.      What is the American Board of
 4   Forensic Accounting?
 5        A.      The -- that's a diplomatic
 6   status that's associated with the American
 7   College of Forensic Examiners.
 8        Q.      All right.  And you are a
 9   diplomate of that organization?
10        A.      Yes.
11        Q.      Since when?  What date?
12        A.      1998.
13        Q.      Ms. Tuthill, have you
14   previously provided in legal proceedings
15   expert testimony in the field of forensic
16   accounting and financial analysis?
17        A.      Yes, I have.
18        Q.      Have you done so in both state
19   and federal court?
20        A.      Yes, I have.
21        Q.      Have you so testified in the
22   Eastern District of Louisiana, the federal
23   court here in New Orleans?
24        A.      Yes, I have.
```

Confidential - Subject to Further Confidentiality Review

Page 24

```
1         Q.      Have you previously been
2    retained to provide litigation support
3    services and expert testimony in your field
4    to the Frilot law firm of Mr. Thibodeaux
5    here, local counsel for Knauf?
6         A.      Yes, I have.
7         Q.      Have you also done so for the
8    firm of Stone Pigman, one of whose partners
9    is liaison counsel for the builders in this
10   Chinese drywall litigation?
11        A.      Yes, I have.
12        Q.      In your prior work as an
13   expert, have you been called on to analyze
14   and evaluate aspects of economic loss
15   recoverable in a legal proceeding?
16        A.      Yes, many times.
17               MR. MEUNIER:  At this time, I
18          will tender Ms. Tuthill as an expert
19          in the field of financial accounting
20          and financial analysis.
21   BY MR. MEUNIER:
22        Q.      Ms. Tuthill, you were retained
23   in this case on behalf of seven Virginia
24   homeowners intervening as plaintiffs in the
```

Confidential - Subject to Further Confidentiality Review

Page 25

```
 1     Germano litigation; is that true?
 2         A.     Yes.
 3         Q.     When were you first approached
 4     about serving as an expert in this matter?
 5         A.     I believe it was November of
 6     2009.
 7         Q.     And by whom were you
 8     approached?
 9         A.     Ms. Dawn Barrios.
10         Q.     She is one of counsel
11     representing these homeowners?
12         A.     Yes.
13         Q.     What, in general terms, were
14     you asked to do?
15         A.     I was asked to study and
16     analyze documents and information and
17     evaluate the damages in seven or eight
18     different areas that were set forth by
19     counsel.
20         Q.     And have you written a series
21     of expert reports reflecting your conclusions
22     and opinions?
23         A.     Yes, I have.
24         Q.     I want to show you this
```

Confidential - Subject to Further Confidentiality Review

Page 26

1    document and ask if it is the original expert

2    report that you rendered with regard to all

3    seven Virginia homeowners.

4         A.    Yes, this is the December 30th,

5    2009, report.

6         Q.    And your curriculum vitae is

7    attached to that report?

8         A.    It is.  Correct.

9         Q.    Is the CV attached to that

10   report current and accurate in all respects?

11        A.    Yes.  I don't believe it's been

12   updated since the issuance of this report.

13   Yes.

14             MR. MEUNIER:  Then I will

15        mark -- attach and mark as Trial

16        Exhibit P3.0550-0001 through 0066 the

17        original report and attachments dated

18        December 30, 2009.

19   BY MR. MEUNIER:

20        Q.    Now, since the original report,

21   have you prepared and rendered supplemental

22   reports?

23        A.    Yes.  As we got additional

24   information throughout this matter, we issued

Confidential - Subject to Further Confidentiality Review

```
 1    supplemental reports to include that

 2    information.

 3          Q.    I'll show you this document and

 4    ask if it is the first supplemental report

 5    you prepared after the original report was

 6    rendered.

 7          A.    Yes, that is correct.

 8          Q.    And that supplemental report is

 9    dated when?

10          A.    January 18th, 2010.

11          Q.    Does it pertain to all seven

12    homeowners?

13          A.    Yes, it does.

14          Q.    Does it both restate some of

15    the original calculations and change and

16    revise some, based on new information?

17          A.    Yes.

18                MR. MEUNIER:  I'll mark and

19          attach as Trial Exhibit P3.0548-0001

20          through 0016 the supplemental report

21          of January 18, 2010.

22    BY MR. MEUNIER:

23          Q.    Did you next render a

24    supplemental report pertaining only to the
```

Confidential - Subject to Further Confidentiality Review

Page 28

1    Orlando plaintiffs; that is, Robert and Lisa

2    Orlando?

3         A.    Yes.

4         Q.    And why did you do so?

5         A.    There was additional

6    information that was received relative to

7    these particular plaintiffs.

8         Q.    And what is the date of that

9    supplemental report?

10        A.    January 20th, 2010.

11        Q.    Can you identify what I've

12   given you as that supplemental report?

13        A.    Yes.

14             MR. MEUNIER:  I'll then mark

15        and attach as Trial

16        Exhibit P3.0549-0001 through 0003 the

17        January 20, 2010, supplemental report

18        dealing with the Orlando plaintiffs.

19   BY MR. MEUNIER:

20        Q.    And you have issued one final

21   supplemental report in this matter, true?

22        A.    Yes.

23        Q.    And I'll hand you that and ask

24   if you can identify that report and give us

Confidential - Subject to Further Confidentiality Review

1      the date of that one.

2            A.      February 3rd, 2010.

3            Q.      And that deals with all seven

4      Germano plaintiffs -- all seven Virginia

5      homeowners, rather?

6            A.      Yes, it does; but I see,

7      actually, the Baldwins are missing out of

8      this copy.

9            Q.      We'll correct that and give you

10     a better copy.

11           A.      Or, excuse me, they're just out

12     of order.

13           Q.      They're out of order?

14           A.      But they are in here.

15           Q.      Okay.  They're in there.

16                   So that supplemental report

17     appears to be complete in all respects?

18           A.      Yes.

19           Q.      And this supplemental report,

20     dealing with all seven, and, again, setting

21     forth both original calculations but also

22     others revised as new information had been

23     received, would be the statement of your

24     current opinions and conclusions with respect

Confidential - Subject to Further Confidentiality Review

1    to these seven plaintiff families, correct?

2         A.    Yes, that's my current opinions

3    based on all the information provided to

4    date.

5              MR. MEUNIER:  I will attach and

6         mark as Trial Exhibit P3.0622-0001

7         through 0015 the February 3rd, 2010,

8         supplemental report of Ms. Tuthill.

9    BY MR. MEUNIER:

10        Q.    Ms. Tuthill, did you organize

11   your analysis and calculation according to

12   certain categories of property and economic

13   loss?

14        A.    Yes, there were eight

15   categories of loss.

16        Q.    You did not independently

17   determine these categories.  Rather, they

18   were given to you by counsel; is that true?

19        A.    Yes, they were provided by

20   counsel.

21        Q.    So you were asked to make

22   calculations within categories which counsel

23   advised you were the elements of recoverable

24   damages in this case?

Confidential - Subject to Further Confidentiality Review

Page 31

1        A.      Under Virginia law, yes.

2        Q.      Without getting into specifics

3   at this time, Ms. Tuthill, could you please

4   explain and describe to the Court what each

5   of the general categories encompasses in

6   terms of the property and economic loss that

7   you've looked at.

8        A.      Certainly.  The "Cost of

9   Remediation" is the first area.   That

10   involves the cost associated with remediating

11   the drywall homes.

12              The next category is

13   "Alternative Living Costs"; and that would

14   include such things -- once the family has to

15   move out of the drywall home during the term

16   of the remediation, that would involve rent

17   or utilities, any costs associated with their

18   relocation to an alternative location.

19              The third category is "Personal

20   Property Loss," determined by fair market

21   value.

22              The fourth category would be

23   "Repair Costs," any repair costs associated

24   with electronics, computers, air-conditioning

Confidential - Subject to Further Confidentiality Review

1    units; really, any type of appliances.  There

2    were many different repair costs.  That

3    category also would include any dry-cleaning

4    costs that were necessary to remove the odors

5    associated with the drywall.

6              The fifth category is the

7    "Post-Remediation Diminished Value" of the

8    home as a result of the Chinese drywall.

9              The sixth category would be

10   "Costs Associated with Foreclosure and/or

11   Bankruptcy."  That really only applied to one

12   plaintiff, but there were losses in

13   connection therewith.

14             The seventh area involved

15   amounts that were calculated as losses either

16   due to a mortgage deferral that was incurred

17   by the plaintiffs, or their inability to

18   refinance.

19             The final category included any

20   loss of income.  If the homeowners had to

21   take time off to meet repairmen and have

22   repairs done, they would lose time at work.

23   There were others, some payment of other

24   expenses.

Confidential - Subject to Further Confidentiality Review

Page 33

1                 And also in connection with

2    that category, we actually gave credit if

3    there was any reduction in property taxes

4    that they experienced as a result of the

5    values decreasing with their home by the tax

6    assessors.

7         Q.     Now, for some of these

8    categories, for example, "Cost of

9    Remediation" or "Diminished Property Value

10   Post Remediation," is it true that you simply

11   placed in your report numbers, figures, that

12   you had been given by other plaintiff

13   experts?

14        A.     That is correct.  In three

15   cases, the -- we used information from other

16   experts.  That would be the cost of

17   remediation, the personal property loss

18   determined by fair market value, and also the

19   post-remediation diminished value.  Those

20   were the three areas where we did rely on

21   other experts and the reports they have

22   issued in this matter.

23        Q.     With respect to the categories

24   where you did your own analysis based upon

Confidential - Subject to Further Confidentiality Review

1    the information you had, did you also have

2    certain subcategories; for example, in the

3    category of "Alternative Living Expenses"?

4         A.    Yes.   We broke the losses out

5    into amounts that have been incurred prior to

6    the trial date as opposed to amounts that are

7    to be incurred as one-time amounts in the

8    future beyond the trial date, and a third

9    category would be monthly, recurring amounts

10   that are going to be determined based on the

11   time period that is involved in the

12   remediation of these homes.

13        Q.    All right.  So just so we're

14   clear about that, for "Alternative Living

15   Expenses," the three subcategories are,

16   first, past -- that is, already incurred --

17   living expenses?

18        A.    Prior to the date of the trial.

19        Q.    The second would be future,

20   nonrecurrent living expenses; that is,

21   one-time expense incurments that would incur

22   in the future?

23        A.    That is correct.

24        Q.    And the third subcategory would

Confidential - Subject to Further Confidentiality Review

Page 35

1   be future, recurrent living expenses, such as

2   rent, that you have calculated on a monthly

3   basis?

4         A.      Yes.

5         Q.      To apply to some future loss

6   period, namely when the family is out of the

7   house?

8         A.      That is correct.

9         Q.      In the category of "Repair

10  Costs," did you also have subcategories?

11        A.      Yes.  Again, those would be

12  costs that were either incurred prior to

13  trial or will be incurred subsequent to the

14  trial, but it would be a one-time amount as

15  opposed to any recurring amount.

16        Q.      So for "Repair Costs," we

17  subcategorize into past repair costs and then

18  future, nonrecurring repair costs?

19        A.      Yes.

20        Q.      And finally, in the category of

21  "Loss of income" and incurred expenses, did

22  you subcategorize that as well?

23        A.      Yes.  By the -- it would be a

24  past loss or a future nonrecurring loss, or

Confidential - Subject to Further Confidentiality Review

Page 36

1    in one case, particularly the Leaches, it is

2    a future monthly expense.

3         Q.     All right.  And is the reason

4    you have -- in some cases, have a subcategory

5    for future recurring costs that are simply

6    stated on a monthly basis, because at this

7    point it's not known how long the loss period

8    will be or, for that matter, when it will

9    commence?

10        A.     That's exactly correct, yes.

11        Q.     So we don't know when the loss

12   period commences or when it ends.  It has to

13   do with when the home is through remediation?

14        A.     Yes, when the remediation is

15   complete.

16        Q.     And so in those cases, the only

17   way you can express your calculation of loss

18   is on a monthly basis, to then be applied to

19   that loss period, however long it may be?

20        A.     Correct, based on the facts and

21   circumstances to be presented in the case,

22   yes.

23        Q.     And just to be clear, not every

24   category of loss that you've looked at is

Confidential - Subject to Further Confidentiality Review

Page 37

1    applicable to every plaintiff family; is that

2    correct?

3          A.    No, that's correct.

4          Q.    And we'll see as we go through

5    that that's true.  Some have all categories;

6    some have just a few of the categories?

7          A.    Yes.

8          Q.    Can you generally describe for

9    the Court the documents and materials and

10   information that you relied on in proceeding

11   to conduct your analysis?

12         A.    Certainly.  There were many

13   documents produced in connection with this

14   matter through discovery.  We looked at the

15   complaints.  We looked at interrogatories.

16   We looked at the plaintiff profile forms.

17               There were certain exhibits

18   that were produced in connection with the

19   plaintiffs' purchase of their home or any of

20   these alternative living costs; and those

21   included documents, invoices, receipts,

22   checks, rental agreements, leases, insurance

23   quotes, forbearance agreements.  It was a

24   wide variety of documentation that was

Confidential - Subject to Further Confidentiality Review

Page 38

1    produced.

2              In addition to that, we

3    conducted interviews with all the plaintiffs,

4    and we looked at other information that is in

5    the public domain that -- research such as

6    Consumer Price Index information, housing

7    price information, tax tables, interest rate

8    data.

9              And we also -- as I mentioned

10   previously, we relied upon some of the other

11   experts' report.  That would be Acks,

12   Mr. Acks; Mr. Wright; and Mr. Maloney.  And

13   in some cases, I had conversations with

14   Mr. Acks and, also, I had conversations with

15   Mr. Morgan's CPA.

16              I believe that encompasses the

17   documents and information we provided.  We

18   actually set forth a letter that documents

19   all the Bates numbers that we used and so

20   forth.

21       Q.    All right.  You were asked to

22   send correspondence to counsel, Ms. Barrios,

23   which specified all of the material you

24   relied on for your analysis, true?

Confidential - Subject to Further Confidentiality Review

Page 39

1        A.      Yes.

2        Q.      And I want to show you first a

3    letter of January 20, 2010, and ask you if

4    that's a letter you wrote to Ms. Barrios for

5    that purpose.

6        A.      Yes, it is.  It was just to

7    more specifically describe the documents and

8    information that we set forth on page 2 of

9    our expert report as it relates to Bates

10   number or other information that we relied

11   upon.

12       Q.      When you say "2 of your expert

13   report," you're referring to the original

14   expert report?

15       A.      Yes, of December 30th, 2009.

16              MR. MEUNIER:  I will mark and

17       offer as Trial Exhibit P3.0620-0001

18       the January 20, 2010, letter to

19       Ms. Barrios from the witness.

20   BY MR. MEUNIER:

21       Q.      I'll show you another letter

22   and ask if that is a follow-up letter you

23   wrote to Ms. Barrios for the purpose of

24   identifying reliance material.

Confidential - Subject to Further Confidentiality Review

Page 40

1          A.     Yes, this was to refer

2    specifically to the conversation I had with

3    Mr. Morgan's CPA, as well as with Mr. Acks,

4    another expert in this matter.

5               MR. MEUNIER:  I'll mark and

6          attach as Trial Exhibit P3.0621-0001

7          the January 29, 2010, letter from

8          Ms. Tuthill to Ms. Barrios.

9    BY MR. MEUNIER:

10         Q.     For every past loss item, did

11   you insist on seeing an actual invoice or

12   document to support that loss?

13         A.     Yes.  We wanted to have

14   documentation for our files.  We didn't want

15   to just rely on representations, verbally or

16   otherwise.  We wanted a source document that

17   we could rely to in support of amounts that

18   we would put into our calculations.

19         Q.     And I think you've indicated

20   you also interviewed the plaintiff -- members

21   of the plaintiff families, as necessary?

22         A.     I spoke with all the

23   plaintiffs, correct, by telephone.

24         Q.     Did you have discussions with

Confidential - Subject to Further Confidentiality Review

1    other plaintiff experts, in addition to

2    referring to their expert reports?

3         A.    Yes.

4         Q.    And you mentioned one follow-up

5    letter on talking to a CPA for the Morgan

6    family.  Was that the individual who prepared

7    the tax returns for that family?

8         A.    Yes, and we were relying on the

9    tax returns in some of our calculations, and

10   we spoke with the CPA who prepared them.

11        Q.    Is that methodology, of both

12   relying on documents and conducting those

13   interviews and even reliance on other

14   experts, all consistent with the methodology

15   you've used in your field as an expert?

16        A.    Yes.  We've done that all the

17   time.

18        Q.    And is it considered standard

19   methodology in the field of forensic

20   accounting and financial analysis?

21        A.    Yes, it's part of the

22   investigation and studying analysis of

23   documents.

24        Q.    And in the actual calculations

Confidential - Subject to Further Confidentiality Review

Page 42

```
 1    that you've done to arrive at figures, have
 2    you used principles which are peer-reviewed
 3    and appear in publications in the field?
 4         A.    Yes, absolutely.
 5         Q.    Do they have acceptable and
 6    established margins or standards for error?
 7         A.    Typically in certain areas,
 8    they do.
 9         Q.    Have you relied on accounting
10    principles that have established margins or
11    standards for error?
12         A.    Accounting principles, a lot of
13    times, will use -- they may not call it
14    errors; they may call it estimates.  And
15    that's frequently in accounting what we rely
16    upon, are estimates to be used.
17         Q.    And are these accepted in the
18    field?
19         A.    Yes.
20         Q.    Do they appear in peer-reviewed
21    publications?
22         A.    Yes.
23         Q.    Before we get to the specific
24    amounts, I want to go back and clarify one
```

Confidential - Subject to Further Confidentiality Review

1    thing about the future monthly loss

2    calculations that you did.

3              You told us that you did that

4    in many cases because the loss period had not

5    even commenced, much less finished, and so we

6    had to establish what would be a monthly loss

7    to apply to that future period.

8              But it is true in some cases

9    that these families have already started to

10   incur those recurrent monthly expenses?

11        A.    Yes, that is correct; and in

12   which case it would be under the other

13   categories of amounts incurred prior to the

14   trial as opposed to amounts incurred post

15   trial.

16        Q.    So, in some cases, your monthly

17   loss total can be applied to a past loss

18   period --

19        A.    Yes.

20        Q.    -- that's already happened, but

21   that same total we carry forward for some

22   future loss period that we can't, at this

23   point, know when it will end?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 44

1    Q.    Okay.  Why don't we start

2  referring now, Ms. Tuthill, to the specific

3  amounts for the families, and we'll proceed

4  one family at a time.  And I'll begin -- let

5  me ask you this:  Would the best way to do

6  this be to base it on the last supplemental

7  report that you rendered February 3rd, 2010?

8    A.    Yes.  That has all the latest,

9  current information based on all the

10  documents and information provided.

11   Q.    Referring, then, as you need

12  to, to that report and to any reliance

13  materials, let's first look at the Heischober

14  family, which is Exhibit 1.

15   A.    Actually, Baldwin was first in

16  mine, but we can start at Heischober.  That's

17  fine.  Or we can cover Baldwin.

18   Q.    Okay.  And I'm looking at

19  Exhibit 1, which begins at P3.0622-0002; and

20  that is an itemization of the losses for the

21  Heischobers, Steven and Elizabeth Heischober,

22  correct?

23   A.    Yes.

24   Q.    And it's actually a two-page

Confidential – Subject to Further Confidentiality Review

Page 45

1    exhibit?

2          A.     Yes.

3          Q.     For "Cost of Remediation," you

4    have $279,228 for that family.  And we

5    understand that you simply took that number

6    in reliance on plaintiffs' expert, Ronald

7    Wright?

8          A.     Yes, that's correct.

9          Q.     For "Alternative Living Costs,"

10   we have three subcategories:  "Amount

11   incurred prior to trial," "Amount to be

12   incurred after trial," and then "Monthly

13   amount"?

14         A.     Yes.

15         Q.     And tell me what the figures

16   are for the Heischober family in those

17   categories.

18         A.     The total for the amount

19   incurred prior to trial is $7,896.84.  The

20   total for the amount to be incurred

21   subsequent to the trial, or post-trial, is

22   $3,110; and then the future monthly amount

23   that will be applicable to the time period

24   beyond the trial through the term of the

Confidential - Subject to Further Confidentiality Review

Page 46

```
 1   completion of the remediation would be

 2   $1,822.50.

 3        Q.     For the Heischobers, has that

 4   monthly "Alternative Living Cost" amount been

 5   incurred to date, or have they not yet

 6   incurred it?

 7        A.     They have moved out, so they

 8   have incurred costs associated with

 9   alternative living, yes.

10        Q.     All right.  And the monthly

11   total includes things like rental and rental

12   insurance and utilities, correct?

13        A.     Yes.

14        Q.     You then have an item for

15   personal property loss of $12,004, based on

16   the report of David Maloney.  Can you just

17   tell us what that is?

18        A.     Yes.  That is another expert in

19   this matter that issued a report in

20   connection with the personal property and the

21   fair market value of that property.

22        Q.     So, again, you've just relied

23   on Mr. Maloney for that number?

24        A.     Yes.  He's another expert in
```

Confidential - Subject to Further Confidentiality Review

Page 47

1      this matter.

2           Q.      Now, under "Repair Costs," we

3      have two subcategories indicated:  "Amount

4      prior to trial," and then, "Amount to be

5      incurred post-trial," correct?

6           A.      Yes.

7           Q.      And what are those totals?

8           A.      The amount incurred prior to

9      the trial is $15,943.03, and the amount to be

10     incurred post-trial would be $1,371.63.

11          Q.      And, again, for all the past

12     repair costs, you have relied on actual

13     documents, invoices, et cetera?

14          A.      Correct.

15          Q.      Looking at page 2 of the

16     Heischober exhibit for your supplemental

17     report, you have a figure for

18     "Post-remediation diminished value,"

19     $190,500, which you have taken from the

20     analysis of plaintiffs' expert, Kenneth Acks,

21     true?

22          A.      Yes, that is correct.

23          Q.      There are no costs associated

24     with foreclosure or bankruptcy in the case of

Confidential - Subject to Further Confidentiality Review

Page 48

1    the Heischobers?

2        A.      Not in connection with those

3    plaintiffs, no.

4        Q.      But you do have "Additional

5    Amounts Owed Due to Mortgage Deferral or

6    Inability to Refinance."  That figure is

7    $19,656.48.

8                Explain to the Court how you

9    calculated that figure.

10       A.      Yes.  The Heischobers, as a

11   result of having to move out of their home,

12   have gotten a deferral of their mortgage

13   payments; and what that means is, they don't

14   have to pay their mortgage.  However, the

15   payments that they're not making are going to

16   be capitalized at the end of the term of the

17   forbearance, and they're going to incur

18   additional costs associated with that

19   forbearance.

20       Q.      So the mortgage company is

21   deferring collection of monthly mortgage

22   payments but not waiving that --

23       A.      That is correct.

24       Q.      So when the Heischobers are

Confidential - Subject to Further Confidentiality Review

1   able to move back into their home after the

2   remediation of their home, they will have

3   additional expenses because of the mortgage

4   deferral?

5        A.    Yes.  And this amount was

6   calculated in order to put them back in the

7   place as if the mortgage deferral did not

8   occur.

9        Q.    And, again, why will they be

10  worse off financially, having gone through

11  this mortgage deferral period, once they move

12  back into their home after remediation?

13       A.    Because the interest that has

14  accrued on their balance of their mortgage is

15  just going to be capitalized at the end of

16  the forbearance period, which means they

17  would be paying additional interest

18  throughout the remainder of their term of

19  their loan.

20       Q.    All right.  You have a number

21  in parentheses under the category of "Loss of

22  Income," et cetera, and it deals with

23  reduction in property tax assessments.

24            Explain that to the Court.

Confidential - Subject to Further Confidentiality Review

1      A.      Yes, this is actually a credit

2   that we have taken that would reduce the

3   other amounts of a loss.   It's actually an

4   offset.

5            And in this case, the

6   Heischobers have gotten a reduction in the

7   assessment of their property values, and,

8   therefore, their property taxes have

9   decreased, and, therefore, we have taken that

10   reduction in the property tax amount as a

11   credit against their losses.   It actually

12   reduces their losses.

13      Q.      Is the reduction in their

14   property tax obligation based upon a lowering

15   of the assessment of the value of the home?

16      A.      Yes, by the county assessor's

17   office.

18      Q.      Is it your understanding that's

19   due to the fact that they have Chinese

20   drywall in their home?

21      A.      Yes.

22      Q.      So what, then, in the case of

23   the Heischober family, is your conclusion as

24   to the total amount of property damage or

Confidential - Subject to Further Confidentiality Review

Page 51

```
 1    economic loss they have incurred associated

 2    with Chinese drywall?

 3         A.     The total amount for the

 4    Heischobers is $526,924.27.

 5         Q.     And in addition, you have a

 6    monthly loss amount going forward for them?

 7         A.     Yes.

 8         Q.     And what is that amount?

 9         A.     That's $1,822.50.

10         Q.     We've already established that

11    you proceeded with your analysis based on

12    backup documents and reliance material.  Let

13    me just ask you to identify, in the case of

14    the Heischobers, this material as your

15    reliance for "Alternative Living Expense"

16    calculations in that case.

17         A.     Yes.

18              MR. MEUNIER:  I will attach and

19         offer as Trial Exhibit P3.0237-0001

20         through -- strike that.  I'll have to

21         mark them a different way.

22              I'm going to offer the

23         following trial exhibits as the

24         "Alternative Living Cost" reliance
```

Confidential - Subject to Further Confidentiality Review

Page 52

```
 1          material in the case of the Heischober

 2          plaintiffs:  P3.0237-0001,

 3          P3.0232-0001 through 0005,

 4          P3.0236-0001 through 0005,

 5          P3.0231-0001, P3.0571-0001,

 6          P3.0239-0001 and P3.0238-0001.

 7  BY MR. MEUNIER:

 8          Q.     Let me next show you these

 9  documents and ask if they are the reliance

10  material supporting your analysis for the

11  amount of repair costs incurred by the

12  Heischobers.

13          A.     Yes, they are.

14          MR. MEUNIER:  I'll attach and

15          offer as trial exhibits P3.0267-0001,

16          P3.0271-0001, P3.0273-0001,

17          P3.0274-0001, P3.0275-0001,

18          P3.0266-0001, P3.0268-0001,

19          P3.0269-0001, P3.0270-0001 through

20          0002, P3.0272-0001 through 0002,

21          P3.0276-0001, P3.0277-0001 and 0002,

22          P3.0265-0001, P3.0264-0001,

23          P3.0263-0001 through 0004,

24          P3.0262-0001, P3.0261-0001 through
```

Confidential - Subject to Further Confidentiality Review

Page 53

1       0003, P3.0234-0001, P3.0233-0001,

2       P3.0235-0001 and 0002, P3.0279-0001

3       and P3.0280-0001.

4   BY MR. MEUNIER:

5       Q.      I now show you some reliance

6   material and ask you if this is material

7   which supported your calculations of the

8   additional amounts owed to the Heischober

9   family because of mortgage deferral or

10  inability to refinance.

11      A.      Yes.

12          MR. MEUNIER:   In connection

13      with the witness' testimony, I will

14      offer and mark the following as trial

15      exhibits in that category:

16      P3.0260-0001 through 0003,

17      P3.0257-0001 through 0008,

18      P3.0258-0001, P3.0246-0001,

19      P3.0244-0001 and P3.0245-0002 through

20      0004.

21  BY MR. MEUNIER:

22      Q.      And finally, I show you

23  documents and ask if you can identify these

24  as the reliance material you used to

Confidential - Subject to Further Confidentiality Review

Page 54

1    calculate the loss of income, payment of

2    expenses, household expenses, net of expense

3    reductions, in the case of Joseph -- I'm

4    sorry, in the case of the Heischobers.

5         A.    Yes.

6              MR. MEUNIER:  In connection

7         with the testimony of the witness, I

8         will attach and offer as Trial

9         Exhibits P3.0536-0001, P3.0252-0001,

10        P3.0250-0001, P3.0251-0001,

11        P3.0248-0001, P3.0534-0001,

12        P3.0535-0001 and 2, P3.0249-0001.

13   BY MR. MEUNIER:

14        Q.    Let's next turn, Ms. Tuthill,

15   to exhibit -- the exhibit dealing with the

16   Leach family, attached to your last

17   supplemental report.

18              MR. MEUNIER:  And before we

19        proceed with that, would it be helpful

20        to take a break?

21              THE WITNESS:  Yes.  Thank you.

22              MR. MEUNIER:  Okay.  Off the

23        record, please.

24              THE VIDEOGRAPHER:  Going off

Confidential - Subject to Further Confidentiality Review

Page 55

1         the record at 10:42 a.m.

2              (Recess taken, 10:42 a.m. to

3         10:54 a.m.)

4              THE VIDEOGRAPHER:   Stand by.

5         We're back on the record.   The time is

6         10:54 a.m.

7    BY MR. MEUNIER:

8         Q.     Ms. Tuthill, before we move on

9    to the next plaintiff family, have you made

10   some hand-edits, if you will, of your

11   February 3rd, 2010, supplemental report,

12   which we've marked as a trial exhibit?

13        A.     Yes.   We were just going over

14   the Heischober exhibit; and in connection

15   with the repair cost for the home

16   environmental inspection post-remediation,

17   it's reflected in the first column, "Amount

18   Incurred Prior to Trial."   It actually should

19   be in the second column, "Amount to be

20   Incurred Post-Trial."

21             So, therefore, the amount that

22   I previously read into the record for repair

23   costs, the amount incurred prior to trial

24   actually should be 3,443.03, and the amount

Confidential - Subject to Further Confidentiality Review

Page 56

```
 1     to be incurred post-trial for repair costs
 2     should be 13,871.63.
 3          Q.     And for the record, that's on
 4     Trial Exhibit P3.0622-0002.  The $12,500
 5     figure, which you're now clarifying is an
 6     amount to be incurred post-trial, although a
 7     nonrecurring item --
 8          A.     That's correct.
 9          Q.     -- is the amount that you
10     understand is expended for the technical
11     inspection and certification of the home
12     after it's been remediated?
13          A.     Right.  In connection with some
14     environmental requirements, yes.
15          Q.     So it's a one-time payment, but
16     it's not yet incurred because it incurs after
17     remediation?
18          A.     That is correct.  But that does
19     not change the total.  The total for the
20     Heischobers is still $526,924.27.
21          Q.     Correct.  All right.
22                 Let's go to the next plaintiff
23     family, and that would be the Leach family;
24     Joseph and Cathy Leach.
```

Confidential - Subject to Further Confidentiality Review

Page 57

1          In the category for "Cost of

2    Remediation," you have $14,957.  And we

3    understand that you took that figure from

4    another expert, namely, Mr. Wright, with

5    respect to what it would cost the Leaches for

6    remediation of the wine cellar where drywall

7    exists, Chinese drywall exists?

8          A.    Yes, that's the remediation in

9    connection with that room.

10          Q.    The next item under "Personal

11    Property Loss," you have, "Amount Incurred

12    Prior to Trial: $5,564."  That comes from

13    the plaintiff expert, David Maloney?

14          A.    Yes.

15          Q.    And deals with what?

16          A.    The fair market value of the

17    personal property of the Leaches.

18          Q.    And then under "Repair Costs,"

19    we have two subcategories:  "Amounts prior

20    trial," and "Amount to be incurred after

21    trial."  Please tell us what those subtotals

22    are.

23          A.    Yes.  The amount incurred prior

24    to trial is $249.12, and the amount to be

Case 2:09-md-02047-EEF-MBN   Document 1269   Filed 02/22/10   Page 58 of 123
Confidential - Subject to Further Confidentiality Review

Page 58

1    incurred post-trial is $12,950.

2         Q.    For "Post-Remediation,

3    Diminished Value," which is the next

4    category, you have $47,500, which is taken

5    from the plaintiff expert, Kenneth Acks?

6         A.    Yes.

7         Q.    And then under "Amounts owed

8    due to mortgage deferral or inability to

9    refinance," you have a total of $76,583.96.

10   Please tell the judge how you calculated that

11   total.

12        A.    Again, this was the cost

13   associated with the Leaches' inability to

14   refinance.

15              When they initially purchased

16   their home, they had an interest rate that

17   was about 6 or 7%, and the idea was within a

18   year, they were going to refinance that home

19   and -- when the rates were lower, and they

20   were not going to have -- the reason the rate

21   was higher, there was some additional -- they

22   bumped up the rate instead of paying PMI, but

23   with their loan broker, they were working and

24   saying, "Okay.  In the next year, you can

Confidential - Subject to Further Confidentiality Review

Page 59

1    refinance that, and then that way, there

2    won't be PMI or the higher rate."

3              However, at that time, when

4    they went to refinance, is when the -- they

5    knew that they had the Chinese drywall, and

6    obviously that the bank was not going to let

7    them refinance; and there's documentation

8    from their mortgage brokers that says that

9    they're not going to allow them to refinance

10   as a result of the existence of the Chinese

11   drywall in the home.

12             So this is the cost -- had they

13   been able to refinance, they would have

14   incurred lower costs in the future, and this

15   is the losses associated with that.

16        Q.    And you say in your reliance

17   material you actually have a document, a

18   letter from the mortgage company, confirming

19   that the Leaches could not refinance

20   specifically because of the presence of

21   Chinese drywall in their wine cellar?

22        A.    Yes, that's correct.

23        Q.    And so you did a calculation of

24   the additional amount of interest that the

Confidential - Subject to Further Confidentiality Review

Page 60

1    Leach family now will incur post-trial --

2         A.     Correct.

3         Q.     -- because of that development?

4         A.     Yes.

5         Q.     The final subcategory you have

6    for the Leach family is under "Loss of

7    Income," "Payment of expenses, household

8    expenses," and you have that broken down into

9    amounts prior to trial, and then a monthly

10   amount going forward?

11        A.     Yes.  The amount incurred prior

12   to the trial is $8,945.10, and the monthly

13   recurring amount is $1,635.29.

14        Q.     With respect to the amount

15   incurred prior to trial, you have entries

16   here for "Additional child or dependent care

17   expenses previously provided by father," and

18   "Additional grocery supplies previously

19   provided by father," "Lawn care provided by

20   father."

21               Who do you understand -- who do

22   you mean to refer to when you refer to

23   "father" in those cases?

24        A.     That is Mrs. Leach's father.

Confidential - Subject to Further Confidentiality Review

1    He lived with the family until approximately

2    August of '09.  And he was living in the area

3    of the home that was close to the Chinese

4    drywall and developed certain health issues

5    where he was forced to move out of the home.

6              The reason he was living there,

7    he was actually living there with his wife

8    while Mrs. Leach's husband was away at work.

9    He has a governmental job, and he's away for

10   years at a time in connection with being sent

11   overseas.

12             And so the father and

13   stepmother moved into the home to help care

14   for the children while Mrs. Leach worked.

15   And the father took care of the lawn care.

16   He bought groceries.  The father and the

17   stepmother picked the kids up from school.

18   They took care of the kids when they were not

19   in school.

20             So those are the costs that she

21   has incurred after the father moved out.  As

22   I mentioned, he moved out in August of '09,

23   so these would be the costs from

24   September '09 through the trial in

Confidential - Subject to Further Confidentiality Review

Page 62

1    February 2010.

2        Q.      And in your analysis, you've --

3    and investigation, you verified that the

4    moving-out of the father was related to the

5    Chinese drywall?

6        A.      It was related to issues he

7    developed. He's now in Florida, and it's my

8    understanding his health issues have

9    resolved, but he's not able to move back into

10   the drywall home.

11       Q.      And the figures that you have

12   here which reflect family expenses for things

13   that the father previously did gratis, have

14   you documented those amounts with reliance

15   material?

16       A.      Yes.

17       Q.      So groceries, lawn care, et

18   cetera, that the family is now paying for

19   that previously they received free of charge

20   through the family, you've got documents to

21   support that?

22       A.      Yes.  And actually, we're

23   conservative in our calculations, because we

24   did not include -- for example, her father's

Confidential - Subject to Further Confidentiality Review

```
 1    wife performed a lot of the cooking and the

 2    cleaning and so forth that Mrs. Leach now has

 3    to do.  We did not include costs for those

 4    type of household services.

 5              We just included the daycare

 6    cost for sending the children to get daycare

 7    as opposed to having her father and his wife

 8    take care of them, as well as the groceries

 9    that he was buying on a monthly basis.

10        Q.    And the monthly amount

11    subtotals, then, refer to those same items

12    going forward?

13        A.    Correct.

14        Q.    They've already incurred those

15    monthly amounts to date, and you've got those

16    under the category of "Amount prior to

17    trial"?

18        A.    Prior to trial.

19        Q.    But then we have a monthly

20    amount going forward after trial?

21        A.    Yes.

22        Q.    And that loss period is

23    dependent on when the Chinese drywall is

24    remediated?
```

Confidential - Subject to Further Confidentiality Review

1        A.        The remediation, yes.

2        Q.        What, then, are the -- what are

3    your conclusions with respect to the total

4    property damage and economic loss incurred by

5    the Leach family?

6        A.        For the Leach family, the total

7    amount, either prior and post-trial, is

8    $166,749.18, and the monthly amount to be

9    incurred through the time of the remediation

10   is $1,635.29.

11       Q.        Let me now show you some

12   documents which relate to the Leach family.

13   First, I show you material and ask you if

14   this is supportive of your estimation of

15   repair costs incurred by the Leaches.

16       A.        Yes.

17                 MR. MEUNIER:  In connection

18            with the testimony of the witness, I

19            will offer and mark as Trial Exhibit

20            P3.0305-0001, P3.0306-0001 and

21            P3.0308-0001.

22   BY MR. MEUNIER:

23       Q.        I show you this set of

24   documents and ask if this is the reliance

Confidential - Subject to Further Confidentiality Review

Page 65

1    material for your calculation of additional

2    amounts owed by the Leach family due to

3    mortgage deferral or their inability to

4    refinance.

5        A.    Yes.

6              MR. MEUNIER:  In connection

7        with the testimony, I will offer and

8        mark as Trial Exhibit P3.0304-0001 and

9        2, P3.0537-0001, P3.0294-0001,

10       P3.0299-0001, P3.0303-0001 and 2,

11       P3.0302-0001 and P3.0296-0001.

12   BY MR. MEUNIER:

13       Q.    I ask you next, Ms. Tuthill, to

14   identify as reliance material these documents

15   in connection with your calculation of the

16   loss of income, payment of household

17   expenses, et cetera, relative to the Leach

18   family.

19       A.    Yes.

20             MR. MEUNIER:  In connection

21       with the witness' testimony, I will

22       mark and offer as Trial Exhibits

23       P3.0290-0001, P3.0288-0002 and 3 --

24       I'm sorry, make that 0001, 2 and 3,

Confidential - Subject to Further Confidentiality Review

```
 1          P3.0291-0001 and 2, P3.0608-0001 and

 2          2, P3.0292-0001, P3.0289-0001 and

 3          P3.0293-0001.

 4     BY MR. MEUNIER:

 5          Q.    I'd next like to talk about the

 6     Baldwins, Jerry and Inez Baldwin, and refer

 7     you to your calculations in the supplemental

 8     report at P3.0622-0006 and 7.

 9               Again, in the first category of

10     "Cost of Remediation," you've taken the

11     figure of $245,962.50 from the analysis of

12     Mr. Wright, the plaintiffs' expert?

13          A.    That is correct.

14          Q.    For additional -- I'm sorry,

15     "Alternative Living Expenses," what are your

16     calculations with respect to the Baldwin

17     family?

18          A.    There have been no amounts

19     incurred prior to trial for alternative

20     living costs.  The amount to be incurred

21     post-trial is $7,895.43, and the monthly

22     amount to be incurred post-trial and into the

23     future through the remediation is $4,844.98.

24          Q.    For "Personal Property Loss,"
```

Confidential - Subject to Further Confidentiality Review

1    you have entered a figure of $2,075 based

2    upon the report of plaintiffs' expert David

3    Maloney; is that true?

4         A.    Yes.

5         Q.    What are your calculations and

6    subtotals for repair costs in the case of the

7    Baldwin family?

8         A.    Repair costs, the amounts

9    incurred prior to the trial are $3,332.30,

10   and the amount to be incurred post-trial,

11   $14,437.50.

12        Q.    For "Post-Remediation,

13   Diminished Value," you have entered the total

14   of $95,500.  That's based on the analysis of

15   plaintiffs' expert Kenneth Acks?

16        A.    Yes, that's correct.

17        Q.    And then the final entry for

18   the Baldwins is in the category of

19   "Additional Amounts Owed Due to Mortgage

20   Deferral or Inability to Refinance," and you

21   have the total of $27,159.  Please tell the

22   judge how you calculated that.

23        A.    Very similar to the Leach

24   calculation.  Again, we looked at the costs

Confidential - Subject to Further Confidentiality Review

Page 68

1   that they are going to actually incur as

2   opposed to the cost that they would have

3   incurred, but for the presence of the Chinese

4   drywall because they are unable to refinance

5   their home.

6       Q.      So what are the -- what are

7   your conclusions with respect to the total

8   property damage and economic loss of Jerry

9   and Inez Baldwin associated with Chinese

10  drywall?

11      A.      For the Baldwins, the past

12  amount and to be incurred post-trial is

13  $396,361.73, and the future monthly amount is

14  $4,844.98.

15      Q.      I'd like to next document your

16  reliance material to support these

17  calculations for the Baldwin family.  First,

18  I'll ask you if you can identify these

19  documents as the reliance material supporting

20  your calculations of alternative living costs

21  for the Baldwins.

22      A.      Yes.

23          MR. MEUNIER:   In connection

24      with the witness' testimony, I will

Confidential - Subject to Further Confidentiality Review

Page 69

```
 1            offer and mark the material as Trial

 2            Exhibit P3.0186-0001 and 2,

 3            P3.0218-0001, P3.0187-0001 and 2,

 4            P3.0188-0001 and P3.0185-0001.

 5   BY MR. MEUNIER:

 6        Q.     Can you next identify these

 7   documents as your reliance material for the

 8   "Repair Cost" calculations in the case of the

 9   Baldwin family?

10        A.     Yes.

11            MR. MEUNIER:   In connection

12            with that testimony, I will offer and

13            mark as trial exhibits the material as

14            follows:  P3.0207-0001, P3.0211-0001,

15            P3.0208-0001, P3.0209-0001,

16            P3.0210-0001, P3.0206-0001,

17            P3.0204-0001, P3.0205-0001,

18            P3.0214-0001, P3.0213-0001,

19            P3.0190-0001 and 2, P3.0212-0001,

20            P3.0215-0001, P3.0223-0001,

21            P3.0222-0001, P3.0221-0001,

22            P3.0220-0001 and P3.0219-0001.

23   BY MR. MEUNIER:

24        Q.     Can you next identify as your
```

Confidential - Subject to Further Confidentiality Review

Page 70

```
 1    reliance material for the calculation of the

 2    additional amounts owed to the Baldwin family

 3    due to mortgage deferral or inability to

 4    finance, these documents?

 5         A.    Yes.

 6              MR. MEUNIER:  In connection

 7         with that testimony, I will offer and

 8         mark as Trial Exhibits P3.0203-0001

 9         through 3, P3.0201-0001, P3.0202-0001

10         through 6.

11    BY MR. MEUNIER:

12         Q.    Finally, I show you these

13    materials and ask if you can identify them as

14    supportive of your analysis of the loss of

15    income, payment of expenses, household

16    expenses net of expense reductions in the

17    case of the Baldwin family.

18         A.    Yes.

19              MR. MEUNIER:  In connection

20         with the witness' testimony, I will

21         offer and mark as Trial Exhibits

22         P3.0201-0002, P3.0602-0001 and 2,

23         P3.0601-0001, and P3.0603-0001.

24    BY MR. MEUNIER:
```

```
 1        Q.      The Baldwins still live in

 2   their residence, despite the Chinese drywall;

 3   is that true?

 4        A.      That is true.

 5        Q.      Were they offered a mortgage

 6   deferral, if they chose to move out?

 7        A.      Were they offered one?

 8        Q.      Yes, offered and refused.

 9        A.      I believe that they did not

10   want to obtain a mortgage deferral because

11   they were afraid of the impact on their

12   credit.

13        Q.      And you've actually done

14   calculations for other families which would

15   indicate that there is, indeed, an economic

16   price to be paid, if you accept a mortgage

17   deferral?

18        A.      Depending on the circumstances

19   of the case, that certainly could be true,

20   yes.

21        Q.      So in the case of the Baldwins,

22   they were -- your understanding is that they

23   were offered a mortgage deferral but refused

24   it because of the cost associated with it in
```

Confidential - Subject to Further Confidentiality Review

Page 72

```
 1    the long run?

 2         A.     Yes.

 3         Q.     Let's next go to the -- let's

 4    see -- the McKellar family, Ms. Tuthill.

 5    That portion of your supplemental report

 6    addressing the McKellar family is at --

 7    starts at P3.0622-0008.  Do you see that?

 8         A.     Yes.

 9         Q.     And in the case of the McKellar

10    family, the cost of remediation that you

11    entered is, again, based on Mr. Wright's

12    figure, which is $186,797, correct?

13         A.     That is correct.

14         Q.     For alternative living costs in

15    the case of the McKellars, you have three

16    subcategories:  "Amount prior to trial,"

17    "Amount to be incurred after trial,

18    nonrecurrent," and then a monthly amount that

19    is recurrent?

20         A.     Yes.

21         Q.     Tell us what those subtotals

22    are, please.

23         A.     The amount incurred prior to

24    the trial is $5,653.70.  The amount to be
```

Confidential - Subject to Further Confidentiality Review

Page 73

1   incurred post-trial is $13,969.51.

2           In terms of the monthly amounts

3   that are going to be recurring, there are

4   actually two of those because the McKellars

5   are currently in a very small apartment, and

6   they're going to be there from March through

7   June.

8           So for the months of March

9   through June 2010, the monthly amounts would

10  be $1,211.13; then from July 2010 forward,

11  they have secured an alternative location

12  that's a little bit larger.  I believe she

13  just had a baby and they're really cramped in

14  the apartment, but they were able to find an

15  alternative location starting July 2010.

16  That amount would be $2,029.43 per month.

17      Q.      Now, when you are calculating a

18  future loss in a case with the understanding

19  that the compensation occurs today, do you

20  routinely consider a discount to present

21  value?

22      A.      Yes, typically, you do.

23      Q.      And explain to the Court what

24  that normally entails.

Confidential - Subject to Further Confidentiality Review

1          A.        Based -- a dollar earned

2     today -- a dollar received today is not going

3     to be the same as a dollar earned one, two,

4     three, five years down the road.  So you have

5     to consider a discount factor and bring --

6     for example, if you're going to get $100 in

7     the future, that's worth less today than it

8     is in the future.

9                So there's a present value

10    formula and calculation that's standardly

11    used in the practice, where you can actually

12    discount the future amount back to a present

13    value of today's dollars.

14         Q.      You're taking into account,

15    aren't you, both the effects of inflation

16    going forward and the ability of an

17    individual to invest money and get a return

18    starting now?

19         A.      Well, that's why I have not

20    used present value in this calculation.  All

21    of these future amounts are really in the

22    very foreseeable near future, maybe in the

23    next year or 18 months; and we did not grow

24    those amounts into the future.  We assumed

Confidential - Subject to Further Confidentiality Review

1    today's dollars.

2              So, actually, if a cost of

3    something today is $100, in a year or two

4    from now, it could be slightly more.  And

5    then if you discount that back at a present

6    value factor, you're back at the same amount,

7    and it's an offsetting calculation.

8         Q.    So your decision in this case

9    not to discount future loss figures to

10   present value is based on the assumption that

11   the future loss in this case will be over a

12   period that ends in the next year or so?

13        A.    Correct, and any interest

14   rates, they're very low right now, based on

15   what's going on in the economy.  So if you're

16   going to get money today and be able to

17   invest it, you're not going to be able to get

18   a very high rate of return, and it's pretty

19   much offset by any inflation factor that's

20   out there.

21        Q.    Right.  So we're not estimating

22   future loss over a lifetime, as you would in

23   certain earnings cases?

24        A.    No, no, no.  A very short

Confidential – Subject to Further Confidentiality Review

Page 76

1    period of time in this case.

2        Q.    On the assumption that the

3    remediation takes place within the next year

4    or so?

5        A.    Correct.

6        Q.    And does an expert such as you,

7    when you're looking at a future loss period

8    going forward only a year or so, then look to

9    the last year or so to get some idea of what

10   the market is going to do in terms of an

11   ability to invest and get a return on

12   investment?

13       A.    Yes.

14       Q.    And having looked at the last

15   year or so, your prediction is that we're

16   really talking about a wash between the

17   ability to earn on an investment today,

18   offset by inflation?

19       A.    Correct.

20       Q.    In the case of the McKellars,

21   who are the next family to talk about, and

22   this begins in your supplemental report at

23   P3.0622-0008, the next category that I think

24   we have to talk about is "Repair Costs."  And

Confidential - Subject to Further Confidentiality Review

Page 77

1    you have those broken down here?

2        A.    I believe the next category

3    would be the "Personal Property Loss." I'm

4    not sure we covered that.

5        Q.    Oh, I see. I'm sorry. There

6    is a personal property loss. That figure is

7    3,585, based on what you received from

8    plaintiffs' expert, David Maloney, about

9    personal property?

10        A.    That is correct, yes.

11        Q.    The next category, "Repair

12    Costs," you've broken down into "Amounts

13    incurred prior to trial," and then, "Amounts

14    to be incurred post-trial"?

15        A.    Yes. The amount incurred prior

16    to trial is $170.41, and the amount to be

17    incurred post-trial is $13,827.94.

18        Q.    The next category for the

19    McKellar family is the "Post-Remediation

20    Diminished Value" amount of 46,000. And we

21    understand that's something you took from

22    Kenneth Acks' analysis?

23        A.    Yes.

24        Q.    Then under "Additional Amounts

Confidential - Subject to Further Confidentiality Review

1   Owed Due to Mortgage Deferral," you have

2   $10,914.48.  Explain, briefly, how that

3   analysis applied to the McKellars.

4        A.      The McKellars, they are under a

5   mortgage deferral at this time, so, again,

6   that amount, even though they're not paying

7   it, it's going to be recapitalized at the end

8   of the term of the forbearance that they've

9   received; and, therefore, what we've done is

10  calculate the additional cost associated with

11  that forbearance.

12       Q.      So they're in a period where

13  they're not paying their mortgage, by

14  agreement with the mortgage company?

15       A.      Yes.

16       Q.      But when they reach the moment

17  when they have to resume mortgage payments,

18  this is the financial loss to them based on

19  the additional interest they'll owe?

20       A.      Yes.

21       Q.      And then finally, you have

22  entries for "Loss of Income, Payment of

23  Expenses," et cetera.  What are those in the

24  case of the McKellar family?

1        A.        The amount incurred prior to
2     trial is $1,336.60, and the amount to be
3     incurred post-trial is actually a credit of
4     $1,339.80.
5        Q.        So in that case, you've entered
6     as a loss vacation and sick days taken by
7     Mr. McKellar?
8        A.        Yes, to meet the repairman.
9     There were a couple of different repairs that
10    he had to meet the serviceman there.
11       Q.        And how did you understand that
12    was associated with Chinese drywall?
13       A.        They were electronic
14    components, and I believe a fireplace and
15    another appliance; and they were out several
16    times because it kept having problems, and he
17    kept repeating having to meet the service
18    provider.
19       Q.        But in this case, in this
20    category, that past loss is actually offset
21    by what you've entered as a post-trial credit
22    due to the fact that he'll owe less property
23    tax on the home because of a lowered
24    assessment?

Page 80

1    A.    Yes.  In this case, it is an

2 offset, pretty much.

3    Q.    So what are the totals, then,

4 for the property damage and economic loss

5 you've calculated in the case of Preston and

6 Rachel McKellar?

7    A.    The amount incurred prior to

8 trial and the amount incurred post-trial is

9 $280,914.84; and the monthly amounts, again

10 as I explained earlier, are broken into two

11 different time periods.  The monthly amount,

12 March through June of 2010, is $1,211.13; and

13 the amount from July 2010 forward would be

14 $2,029.43.

15    Q.    I'd like to now go through the

16 reliance material for your analysis of the

17 McKellar family loss.  I'll begin by asking

18 you if you can identify these as the

19 documents you supported -- that supported

20 your analysis for their alternative living

21 expenses.

22    A.    Yes.

23    Q.    Would you like to read the

24 numbers this time?

Confidential – Subject to Further Confidentiality Review

Page 81

1          A.       No.   If I can have more water.

2                   MR. MEUNIER:   In connection

3          with the witness' testimony, I will

4          now offer and attach the following as

5          trial exhibits for the reliance

6          material dealing with alternative

7          living costs:  P3.0320-0001,

8          P3.0323-0001, P3.0322-0001,

9          P3.0325-0001, P3.0326-0001 through 3,

10         P3.0318-0001, P3.0326-0004 and 5,

11         P3.0333-0001 through 6, P3.0315-0001,

12         P3.0330-0001, P3.0540-0001,

13         P3.0614-0001, P3.0314-0001,

14         P3.0331-0001, P3.0327-0001,

15         P3.0329-0001, P3.0324-0001,

16         P3.0321-0001, P3.0332-0001 through 3,

17         P3.0351-0001, P3.0348-0001,

18         P3.0328-0001, P3.0538-0001,

19         P3.0615-0001, P3.0334-0001,

20         P3.0317-0001 and 2, P3.0316-0001 and

21         P3.0313-0001.  And one that I missed

22         is P3.0319-0001.

23    BY MR. MEUNIER:

24         Q.    I next show you documents and

Confidential - Subject to Further Confidentiality Review

Page 82

1    ask if you can identify them as supporting

2    your analysis of the repair costs incurred by

3    the McKellar family.

4         A.     Yes.  And that reminded me it

5    was the AC unit, in addition to a fireplace,

6    that was having all the electronic problems.

7         Q.     All right.  So that was past --

8    in the category of "Past Repair Costs"?

9         A.     Yes.

10        Q.     There are documents showing a

11   need to replace the AC --

12        A.     Various service calls for the

13   AC unit.

14              MR. MEUNIER:  All right.  In

15              connection with the witness'

16              testimony, I will offer and mark as

17              trial exhibits the following documents

18              relative to the repair cost estimate

19              for the McKellars:  P3.0392-0001,

20              P3.0379-0001, P3.0389-0001,

21              P3.0380-0001, P3.0385-0001,

22              P3.0387-0001, P3.0388-0001,

23              P3.0390-0001, P3.0391-0001,

24              P3.0381-0001, P3.0382-0001,

Confidential - Subject to Further Confidentiality Review

Page 83

```
 1          P3.0383-0001, P3.0386-0001,

 2          P3.0613-0001, P3.0372-0001,

 3          P3.0378-0001, P3.0369-0001,

 4          P3.0375-0001, P3.0370-0001,

 5          P3.0376-0001, P3.0371-0001,

 6          P3.0377-0001, P3.0368-0001,

 7          P3.0373-0001, P3.0374-0001,

 8          P3.0367-0001, P3.0394-0001,

 9          P3.0393-0001 and P3.0397-0001.

10   BY MR. MEUNIER:

11          Q.    I next show you, Ms. Tuthill,

12   these documents, and ask you to identify them

13   as your reliance material for the additional

14   amounts owed to the McKellars due to mortgage

15   deferral or inability to refinance.

16          A.    Yes.

17                MR. MEUNIER:  In connection

18          with the testimony of the witness, I

19          will offer as Trial Exhibits

20          P3.0363-0001, P3.0366-0001 and 2,

21          P3.0343-0001 and 2 -- I'm sorry, 0001,

22          2, 3 and 4, P3.0611-0001, P3.0612-0001

23          and P3.0610-0001 and 2.

24   BY MR. MEUNIER:
```

Confidential - Subject to Further Confidentiality Review

Page 84

1      Q.      And finally, I show you these

2   documents and ask you if these are your

3   reliance materials supportive of your

4   analysis of the loss of income, payment of

5   expenses and household expenses net of

6   expense reductions in the case of the

7   McKellars.

8          A.      Yes.

9              MR. MEUNIER:   In connection

10          with the testimony of the witness, I

11          will offer as Trial Exhibits

12          P3.0344-0001, P3.0350-0001,

13          P3.0346-0001, P3.0353-0001 and 2,

14          P3.0347-0001, P3.0354-0002,

15          P3.0349-0001, P3.0356-0001,

16          P3.0355-0001 and 2, P3.0354-0001,

17          P3.0352-0001, P3.0539-0001,

18          P3.0342-0001, P3.0341-0001 through

19          0010, P3.0616-0001 through 3.

20   BY MR. MEUNIER:

21      Q.      I'd next refer you,

22   Ms. Tuthill, to your calculations regarding

23   Jay Fredrick and Vanessa Michaux, which are

24   set forth beginning in your supplemental --

Confidential - Subject to Further Confidentiality Review

1    your last supplemental report at

2    P3.0622-0010.

3              In the category of "Cost of

4    Remediation," you entered $188,409, based

5    upon the opinion of plaintiffs' expert,

6    Ronald Wright?

7         A.    That's correct.

8         Q.    For "Alternative Living

9    Expenses," what are the subtotals for the

10   different categories in the case of the

11   Michauxes?

12        A.    The amount incurred prior to

13   trial is $10,385.56, and the amount to be

14   incurred post-trial is $191.14.  Then the

15   monthly amount is $2,397.90.

16        Q.    That's a monthly loss they are

17   already incurring and will continue to incur

18   going forward?

19        A.    Yes.

20        Q.    The end date being uncertain at

21   this time?

22        A.    Until the remediation is

23   complete, yes.

24        Q.    But, again, it's a foreseeable

Confidential - Subject to Further Confidentiality Review

Page 86

1    duration of loss; therefore, you don't

2    discount the present value, but based on

3    recent history, consider inflation and

4    investment return to be an offset?

5         A.    Yes.

6         Q.    In the category of "Personal

7    Property Loss," you entered a figure of

8    $7,620, based on the opinion of plaintiffs'

9    expert, David Maloney?

10        A.    Yes.

11        Q.    What are the subtotals for the

12   categories under "Repair Costs" in the case

13   of Fredrick and Vanessa Michaux?

14        A.    The repair costs incurred prior

15   to trial are $269.38, and the amount to be

16   incurred post-trial are $14,337.35.

17        Q.    And, again, we've indicated

18   that you made a hand-edit on the typewritten

19   version of your supplemental report, which is

20   in evidence, simply by moving the $12,500

21   figure into an amount to be incurred

22   post-trial?

23        A.    Yes, that environmental

24   inspection will occur post-remediation.

Confidential - Subject to Further Confidentiality Review

1      Q.      The subtotals you just gave

2   reflect that change?

3      A.      That is correct, yes.

4      Q.      Okay.  In "Diminished Value,

5   Post-Remediation," you entered $53,500 for

6   the Michauxes.  That's based upon the

7   analysis and opinion of plaintiffs' expert

8   Kenneth Acks, correct?

9      A.      Yes.  Yes.

10     Q.      In the category of "Additional

11  Amounts Owed Due to Mortgage Deferral or

12  Inability to Refinance," explain to the judge

13  how you arrived at the figure of $11,701.08

14  in the case of the Michauxes.

15     A.      Again, this is the additional

16  cost associated with the mortgage deferral of

17  the Michauxes, comparing the actual cost to

18  their but-for cost, had they never entered

19  the deferral.

20     Q.      They have accepted the mortgage

21  deferral agreement?

22     A.      Yes.

23     Q.      And, therefore, they are not

24  paying mortgage notes now, but on returning

Confidential - Subject to Further Confidentiality Review

Page 88

1    to this home, they will be expected to pay

2    additional interest under the new schedule?

3          A.     Yes.

4          Q.     In the category of "Lost

5    Income, Payment of Expenses," et cetera, you

6    have both an amount incurred prior to trial

7    and then a credit post-trial.  Explain that,

8    please.

9          A.     Yes.  The amount incurred prior

10   to trial is $251.39.  That is additional

11   interest on a line of credit that the

12   Michauxes took out in order to pay their

13   rent, so they will be -- they've incurred

14   that additional interest cost already at the

15   date of the trial.

16             And the amount to be incurred

17   post-trial is $1,677.50, which is a credit,

18   again because they're going to receive a

19   reduction in their property tax assessment;

20   and that's what that figure relates to.

21         Q.     When you credit these

22   plaintiffs because they're going to owe less

23   property tax, you're basing that on actual

24   documents reflecting a lowering of their --

Confidential - Subject to Further Confidentiality Review

1    A.    Assessed value.

2    Q.    -- assessed value?

3    A.    Yes.

4    Q.    And your understanding of what

5    that translates to in terms of property tax

6    owed?

7    A.    Correct, based on research from

8    the county tax assessor's office that's all

9    publicly available online.

10    Q.    So in those cases, your

11    calculation of the total loss being presented

12    here is actually lowered by acknowledging the

13    fact that these plaintiff families in

14    Virginia, at least in some cases, are going

15    to owe less property tax?

16    A.    Yes.   That had to be considered

17    in the calculations.

18    Q.    So what are the final totals of

19    loss in the case of Fredrick and Vanessa

20    Michaux, according to your analysis?

21    A.    The amount incurred prior to

22    trial and the amount incurred post-trial is

23    $284,987.40, and the monthly amount to be

24    incurred is $2,397.90.

Confidential - Subject to Further Confidentiality Review

1      Q.     I show you these documents and

2   ask if they are the supporting documents for

3   your determination of the alternative living

4   expense loss in the case of the Michauxes.

5      A.     Yes.

6             MR. MEUNIER:   In connection

7         with the testimony of the witness, I

8         will offer and mark as Trial Exhibits

9         P3.0449-0001 through 0021,

10        P3.0451-0001 and 2, P3.0445-0001,

11        P3.0453-0001 and 2, P3.0446-0001,

12        P3.0447-0001, P3.0455-0001,

13        P3.0448-0001, P3.0450-0001 through

14        0010, P3.0452-0001 and P3.0445-0001.

15             I want to correct a

16        misstatement.  When I said

17        P3.0455-0001, it should be 0002.  I

18        appreciate my co-counsel being so

19        diligent in listening to this record.

20   BY MR. MEUNIER:

21      Q.     Let me show you these documents

22   and ask if they are the reliance materials

23   for your analysis and conclusions of the

24   repair costs in the case of the Michaux

Confidential - Subject to Further Confidentiality Review

Page 91

```
 1    family.

 2         A.     Yes.

 3                MR. MEUNIER:   In connection

 4         with the witness' testimony, I will

 5         offer as Trial Exhibits P3.0484-0001,

 6         P3.0481-0001, P3.0482-0001,

 7         P3.0483-0001, P3.0486-0001,

 8         P3.0487-0001, P3.0485-0001,

 9         P3.0480-0001, P3.0479-0001,

10         P3.0478-0001 and 2, P3.0476-0001 and

11         P3.0474-0001 and 2.

12    BY MR. MEUNIER:

13         Q.     I next ask if you can identify

14    these materials as the documents supporting

15    your calculation of additional amounts owed

16    in the case of the Michaux family due to

17    mortgage deferral.

18         A.     Yes.

19                MR. MEUNIER:   In connection

20         with the witness' testimony, I will

21         offer as Trial Exhibits P3.0473-0001

22         and 2, P3.047-0001, P3.0458-0001,

23         P3.0469-0001, P3.0470-0001,

24         P3.0471-0001, P3.0456-0001 through 3,
```

Confidential - Subject to Further Confidentiality Review

Page 92

```
1          P3.0467-0001 and 2, P3.0468-0001 and

2          P3.0472-0001.

3               Let me also include in that

4          last category a document I overlooked,

5          which is P3.0457-0001.

6   BY MR. MEUNIER:

7          Q.     Finally, let me show you these

8   documents and ask if they are the reliance

9   materials for your analysis of the loss of

10  income, payment of expenses, household

11  expenses net of expenses in the case of the

12  Michauxes.

13         A.     Yes.

14              MR. MEUNIER:  In connection

15         with the witness' testimony, I will

16         offer as Trial Exhibits P3.0455-0001,

17         P3.0461-0001 through 0005,

18         P3.0463-0001, P3.0460-0001 and

19         P3.0459-0001.

20  BY MR. MEUNIER:

21         Q.     Let's next consider the

22  calculations for the Morgan family, that's

23  William and Deborah Morgan, set forth in your

24  last supplemental report starting at
```

Confidential - Subject to Further Confidentiality Review

1    P3.0622-0012.

2             "Cost of Remediation" here is

3    entered as $221,167, based upon the opinion

4    of plaintiffs' expert Ronald Wright, correct?

5        A.     Yes.

6        Q.     Under "Alternative Living

7    Costs," it appears you have entered figures

8    only under the subcategory of "Amount

9    incurred prior to trial"?

10        A.     That is correct.

11        Q.     And why is that, in the case of

12    the Morgans?

13        A.     They have moved out, but they

14    are going through the bankruptcy issue, and

15    they don't -- we're not recognizing as

16    monthly cost the amount associated with their

17    rent, as they're no longer paying their

18    mortgage.  So we didn't count that.

19        Q.     So they've moved out.  They are

20    paying rent?

21        A.     Yes.

22        Q.     But they're no longer paying a

23    mortgage now?

24        A.     Correct.

Confidential - Subject to Further Confidentiality Review

Page 94

```
1          Q.      And so in this case, you did
2      not feel it appropriate to calculate any
3      ongoing monthly alternative living expense
4      based on rent?
5          A.      Correct.  And it's not tied to
6      the remediation at this point, as far as
7      moving back in after the remediation is done.
8          Q.      And why is that?
9          A.      It's in connection with the
10     bankruptcy and the issues going on with that.
11         Q.      All right.  So in this case,
12     the only subcategory of loss under
13     "Alternative Living Costs" is the amount this
14     family has incurred prior to trial?
15         A.      Correct, and that's --
16         Q.      Already incurred?
17         A.      Yes.
18         Q.      And what is that subtotal?
19         A.      That total is $3,912.23.
20         Q.      Under the category of "Personal
21     Property Loss," you've entered the figure of
22     $886, and that is based on the opinion of the
23     plaintiffs' expert, David Maloney?
24         A.      Yes.
```

Confidential - Subject to Further Confidentiality Review

Page 95

1       Q.      Under "Repair Costs," what is

2   the -- what are the subtotals involved and

3   the amounts there?

4       A.      The amount incurred prior to

5   trial is $1,376.29, and the amount to be

6   incurred post-trial is $12,500.

7       Q.      That's that technical

8   environmental inspection charge of 12,500

9   that they will incur once remediation has

10  taken place?

11      A.      Yes.

12      Q.      For "Post-Remediation,

13  Diminished Value," you've entered the figure

14  of $95,500, which is based upon the opinion

15  of plaintiffs' expert Kenneth Acks, true?

16      A.      Yes.

17      Q.      And in the case of the Morgans,

18  what are your calculations dealing with the

19  costs associated with foreclosure and/or

20  bankruptcy?

21      A.      There's two different areas

22  there:  The amount incurred prior to the

23  trial, which is $15,724, and the amount to be

24  incurred post-trial is $104,356.

Confidential - Subject to Further Confidentiality Review

Page 96

```
1         Q.     Tell me, first, why you

2   associate these bankruptcy costs with Chinese

3   drywall.

4         A.     But for the fact that the

5   Morgans had to move out of their home as a

6   result of the drywall and they had to get an

7   apartment, but they could not afford both the

8   apartment and the mortgage, their only

9   alternative was go into bankruptcy.

10        Q.     And you've investigated that in

11  a way to make you comfortable drawing that

12  conclusion?

13        A.     Yes.  We've got the reliance

14  documents for this information as well.

15        Q.     And there may be testimony at

16  trial from the Morgans on this.

17               So the bankruptcy that is

18  associated with Chinese drywall resulted,

19  first, in a past loss of 15,724; and what

20  specifically does that figure relate to?

21        A.     That includes attorneys' fees

22  and trustee fees associated with the

23  bankruptcy itself.  And that's outlined in

24  the bankruptcy filings.
```

Confidential - Subject to Further Confidentiality Review

Page 97

```
 1        Q.      And what -- under which chapter

 2    of the bankruptcy law are they proceeding?

 3    Is it a Chapter --

 4        A.      I believe it's a 13, but I can

 5    confirm that.

 6        Q.      13?

 7                (Witness reviews document.)

 8        A.      Yes.

 9    BY MR. MEUNIER:

10        Q.      And what is Chapter 13

11    bankruptcy relief, just in --

12        A.      There is a plan for repayment,

13    so some of the amounts will be repaid at

14    certain amounts.  They've, I guess,

15    negotiated with the various debtors

16    involved -- or creditors involved.

17        Q.      So under the bankruptcy relief

18    they seek, they won't be able to discharge

19    all their indebtedness.  They'll organize

20    certain payments in the future?

21        A.      Correct.

22        Q.      Now, under the category of an

23    amount to be incurred post-trial associated

24    with bankruptcy, you have the figure of
```

Confidential - Subject to Further Confidentiality Review

1    $104,356.  Please tell Judge Fallon how you

2    arrived at that total.

3         A.    Yes.   There are many factors

4    that are associated with the Morgans moving

5    out and going into the bankruptcy.  And as a

6    result of the change in cash flow, they no

7    longer have the mortgage interest deduction

8    on their federal tax return or their state

9    tax return, for that matter, nor do they have

10   the deduction for real estate taxes.

11              So they have lost the

12   deductions that they're able to claim on

13   their taxes, and as a result of that, their

14   income taxes have actually increased.

15              Now, they don't have those

16   deductions, but they're also not paying those

17   costs, so you have to take that into account;

18   but you also have to take into account that

19   they're now paying rent.

20              So it's the dynamics of all

21   those different forces and the economic

22   circumstances associated with that.

23              And what we've done is a very

24   detailed calculation that sets forth all the

Confidential - Subject to Further Confidentiality Review

1   inflows and outflows associated with the loss

2   of the deductions and the payment of the

3   rent.

4           And we've gone out for a period

5   of seven years because in connection with the

6   filing of this bankruptcy, Mr. Morgan is not

7   going to be able to get -- purchase another

8   home.  He's not going to be able to get

9   financing for at least a seven-year period.

10  So we've looked at that discrete period.

11          Certainly, we could go on much

12  further in the future because once you've

13  entered a bankruptcy, there are a lot of

14  costs associated with it.  But in order to

15  quantify, as best we could with some

16  certainty here, we've set forth a period of

17  seven years and captured all of the cash

18  inflows and outflows and the net effect of

19  all that.

20          And in this case, we did

21  discount it back to a present value, because

22  we are going out seven years, which is much

23  further than any of the other future losses.

24  So we have discounted those amounts back.

1    And the net effect of all of the inflows and

2    outflows is a net loss to the Morgans of

3    $104,356.

4        Q.    So the loss period that is

5    associated with this amount is seven years?

6        A.    That we have calculated at this

7    time, yes.

8        Q.    And you do that based upon the

9    law you know to be to the effect that when

10   you declare bankruptcy, your ability to

11   obtain credit is impaired for that period of

12   time?

13       A.    Correct.

14       Q.    And because it is a seven-year

15   period, as opposed to the future loss period

16   of the expected remediation we talked about

17   earlier of one to two years, that's a long

18   enough period for you, as an expert, to say,

19   "We're going to discount this to present

20   value"?

21       A.    Yes.

22       Q.    And so what discount to present

23   value percent or figure did you use?

24       A.    We actually relied upon

Confidential - Subject to Further Confidentiality Review

1    treasuries for a seven-year period, because

2    as far out into the future you're going,

3    that's the term that we used.  There are

4    rates of return on various treasury amounts,

5    treasury securities of the U.S. Government,

6    and there's one for seven years; and that's

7    the one we utilized.

8         Q.    And what is that?

9         A.    I believe it's 3.32%.

10        Q.    That's the discount to arrive

11   at a present value?

12        A.    Correct.

13        Q.    So by giving Mr. Morgan the

14   money today, you're assuming his ability to

15   invest at a return of 3. --

16        A.    In treasuries, yes.

17        Q.    -- percent or so in safe

18   investments, treasuries, over the seven-year

19   period?

20        A.    Yes.

21        Q.    Now, what is the Bates-number

22   series for the documents where you say you've

23   set forth the calculation to get to this

24   total using all the different variables of

Confidential - Subject to Further Confidentiality Review

Page 102

1    mortgage he's not paying, rent he is,

2    increased tax liability because of a loss of

3    the mortgage interest deduction, et cetera?

4         A.    I believe those are in the

5    reliance documents of the Bates numbers that

6    you will be reading out shortly.

7              Now, we have our separate

8    calculations, which are not -- are not

9    Bates-numbered.  It's an Excel schedule that

10   we prepared, but that's not Bates-numbered.

11        Q.    Well, I just want to be able to

12   refer, though, now to where the calculations

13   are set forth in the reliance materials.

14   Just give me the starting Bates number, if

15   you have it, for that calculation.

16        A.    Well, they're grouped with the

17   costs associated -- as we're doing with all

18   these other documents.  It's not a Bates

19   range.  It's a stack.

20        Q.    All right.  We'll get to that

21   when I do my thing on numbers.  All right.

22              So the loss that you calculate

23   in the case of William and Deborah Morgan to

24   be associated with their bankruptcy, which

Confidential - Subject to Further Confidentiality Review

1    you find, through your investigation, to be

2    associated with Chinese drywall, comes to

3    what?  What are the totals?

4         A.    The amount incurred prior to

5    trial is $15,724, and to be incurred

6    post-trial is $104,356.

7         Q.    You have on your itemization of

8    loss for the Morgans what appears to be a

9    footnote dropped from the calculation in this

10   category?

11        A.    That's for the bankruptcy costs

12   that we discussed, which are the attorneys'

13   fees and trustee fees, yes.

14        Q.    So you broke down the past loss

15   figure of 15,724 to show how it is itemized

16   to bankruptcy costs, attorneys' fees,

17   et cetera?

18        A.    Yes.

19        Q.    What, then, is your conclusion

20   as to the total property damage economic loss

21   incurred by William and Deborah Morgan in

22   connection with the Chinese drywall

23   litigation?

24        A.    The total is $455,421.52.

Confidential - Subject to Further Confidentiality Review

1          MR. MEUNIER:  I'm told we're

2      close to the end of the tape, so

3      before I begin the process of putting

4      into the record the reliance

5      materials, why don't we take a break

6      at this point.

7          THE VIDEOGRAPHER:  Going off

8      the record at 12:04 p.m.  This is the

9      end of Tape 1.

10         (Recess taken, 12:04 p.m. to

11     12:17 p.m.)

12         THE VIDEOGRAPHER:  We're back

13     on the record.  The time is 12:17 p.m.

14     This is the start of Tape 2.

15 BY MR. MEUNIER:

16     Q.    Ms. Tuthill, I show you these

17 documents and ask if you can identify them as

18 the materials which supported your

19 conclusions regarding the alternative living

20 costs incurred by William and Deborah Morgan.

21     A.    Yes.

22         MR. MEUNIER:  In connection

23     with the witness' testimony, I will

24     offer as Trial Exhibits P3.0407-0001

Confidential - Subject to Further Confidentiality Review

Page 105

```
1        through 14, P3.0405-0001, P3.0404-0001

2        through 3, P3.0402-0001 and 2 and

3        P3.0406-0001.

4   BY MR. MEUNIER:

5        Q.    I show you this material and

6   ask you if it's the material in support of

7   your analysis of the repair costs incurred by

8   the Morgan family.

9        A.    Yes.

10             MR. MEUNIER:   In connection

11       with the witness' testimony, I will

12       offer as Trial Exhibits P3.0433-0001,

13       P3.0434-0001, P3.0435-0001,

14       P3.0436-0001, P3.0437-0001,

15       P3.0618-0001, P3.0438-0001,

16       P3.0431-0001, P3.0430-0001,

17       P3.0431-0002, P3.0440-0001 and

18       P3.0403-0001.

19  BY MR. MEUNIER:

20       Q.    Ms. Tuthill, I show you these

21  documents and ask you to identify them as the

22  materials you used to arrive at your

23  calculations regarding the foreclosure and

24  bankruptcy costs incurred by the Morgans.
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.      I believe there may be

 2   additional documents that go with that.  It's

 3   all under the main heading, "Costs Associated

 4   with Foreclosure and/or Bankruptcy."

 5          Q.      Are there reliance materials

 6   not in that stack I've given you, that you

 7   know of?

 8          A.      Yes.

 9                  What's in that remaining stack

10   right here?

11          Q.      Let me show you this material,

12   which we've labeled as "Reliance material for

13   additional amounts owed due to mortgage

14   deferral and inability to refinance."

15          A.      But for the Morgans, that was

16   zero.  The only category was "Costs

17   Associated with Foreclosure and/or

18   Bankruptcy," and I believe those documents

19   should be part of this.

20          Q.      I see.  All right.  Why don't

21   you look at those and verify that.

22          A.      Yes, these are the additional

23   documents.

24          Q.      Okay.
```

Confidential - Subject to Further Confidentiality Review

Page 107

1      A.      And I believe these are some

2  full copies of documents that may not relate

3  to the mortgage deferral -- to the costs

4  associated with bankruptcy and foreclosure.

5      Q.      Why don't you try to remove

6  those particular documents from that material

7  before we enter it.

8              One of the things in there is a

9  PPF that you needed in order to determine the

10 daughter's birth date?

11     A.      Yes.  Yes.  That's the -- this

12 is the additional information that I did rely

13 upon.  This may be additional pages of the

14 PPF, and then there are some other documents

15 behind it that I don't believe I used.

16     Q.      That you did not rely on?

17 Well, let's remove those and be sure that

18 we're only going to identify now --

19     A.      Those and these.

20     Q.      Put those with those, please.

21             And so is that material now in

22 front of you all of the reliance material

23 that you used in order to determine the

24 bankruptcy-related costs incurred by the

Confidential - Subject to Further Confidentiality Review

1    Morgans?

2         A.    Correct.

3         Q.    And we had talked earlier about

4    that calculation of the future or post-trial

5    amount of $104,356 involving different

6    variables, tax rates, no mortgage payments,

7    yet rent payments.

8              Is it possible for you, before

9    I enter all of this, just to identify for the

10   judge the particular pages that reflect your

11   calculations to arrive at that figure?

12        A.    We relied upon all the

13   documents in this stack for that calculation.

14   We pulled out information in each of these

15   documents in connection with our calculation.

16        Q.    All right.  So there's no

17   single place where you actually set forth a

18   mathematical calculation that leads to the

19   figure?

20        A.    In my binder, yes, I do have

21   that.

22        Q.    All right.

23        A.    But it's not a Bates-numbered

24   document.  It's an internal work paper that

Confidential - Subject to Further Confidentiality Review

1    I've just prepared.

2                MR. MEUNIER:  All right.  All

3         right.  Well, let me, then, in

4         connection with the witness'

5         testimony, offer the following as

6         trial exhibits, and these are the

7         reliance materials supportive of the

8         conclusions as to the bankruptcy and

9         foreclosure-related expenses and costs

10        incurred by the Morgans:  P3.0421-0001

11        through 3, P3.0418-0001 and 2,

12        P3.0408-0001 through 0016,

13        P3.0409-0001, P3.0422-0001 and 2,

14        P3.0427-0001, P3.0424-0001 and 2,

15        P3.0423-0001 through 4, P3.0425-0001,

16        P3.0429-0001, P3.0619-0001 through 9,

17        P3.0428-0001, P3.0412-0001,

18        P3.0410-0001, P3.0411-0001 and

19        P3.0400-0001.

20   MR. MEUNIER:

21        Q.    I believe the final family to

22   discuss with you today, Ms. Tuthill, is the

23   Orlando family, which is Robert and Lisa

24   Orlando.  And I'll refer you to the section

Confidential - Subject to Further Confidentiality Review

Page 110

1    of your last supplemental report beginning at

2    page marked P3.0622-0014.

3              For the amount of the cost of

4    remediation, you've entered the figure of

5    $235,078.50, which you have taken in reliance

6    on the opinion of plaintiffs' expert Ronald

7    Wright, correct?

8         A.    Yes, that is correct.

9         Q.    What are your calculations with

10   regard to alternative living costs in the

11   case of Robert and Lisa Orlando?

12        A.    The amount incurred prior to

13   trial is $10,491.23, and the amount to be

14   incurred post-trial is $6,165.  The monthly

15   recurring amount is $2,368.92.

16        Q.    They have moved out of their

17   residence, which had Chinese drywall?

18        A.    In the month of February.

19        Q.    And so they have a certain

20   amount of past moving costs that you've

21   entered here in that column under "Amount

22   incurred prior to trial"?

23        A.    Correct.

24        Q.    Under the "Amount to be

Confidential - Subject to Further Confidentiality Review

1    incurred post-trial," which you've earlier

2    explained is a nonrecurrent figure, which

3    will occur after the trial, you have a figure

4    of 5,865 related to moving in the case of the

5    Orlandos.  What does that refer to?

6         A.      That would be for them to move

7    back into their drywall home upon the

8    completion of the remediation.

9         Q.      They already have an estimate

10   or a bid --

11        A.      Yes.

12        Q.      -- for that?

13               And that's in your reliance

14   materials?

15        A.      Correct.

16        Q.      Their monthly loss figure for

17   alternative living expenses is being incurred

18   presently?

19        A.      Yes, just this month, it

20   started.

21        Q.      The amount that's been incurred

22   in that category up until now is under the

23   column "Amount incurred post-trial" because

24   it's calculable, but they have a monthly

Confidential - Subject to Further Confidentiality Review

1    amount going forward?

2         A.    A monthly amount going

3    forward --

4         Q.    Which is --

5         A.    Beyond the trial date.

6         Q.    Beyond the trial date?

7         A.    Which would be March 2010 and

8    forward.

9         Q.    Okay.  And you've given us that

10   subtotal?

11        A.    Yes.

12        Q.    Under the category of "Personal

13   Property Loss," you've entered $2,375, which

14   is taken from plaintiffs' expert David

15   Maloney?

16        A.    Yes.

17        Q.    Under the category of "Repair

18   Costs," what are the calculations for the

19   Orlandos?

20        A.    In the amount incurred prior to

21   trial, the amount is $947.39, and the amount

22   to be incurred post-trial is $13,478.70.

23        Q.    And by a hand-edit on the

24   report, which we've entered into evidence,

Confidential - Subject to Further Confidentiality Review

```
 1    you moved the $12,500 figure from an amount

 2    incurred prior to trial to an amount to be

 3    incurred post-trial?

 4         A.      Yes.   That will be performed

 5    after the remediation.

 6         Q.      That's the inspection charge.

 7         A.      The environmental inspection,

 8    yes.

 9         Q.      Under the category of

10    "Post-Remediation Diminished Value," you've

11    entered $95,250.  You've taken that from the

12    opinion of the plaintiffs' expert, Kenneth

13    Acks; is that true?

14         A.      That is correct, yes.

15         Q.      And then the final category of

16    loss is "Amount Owed Due to Mortgage

17    Deferral"; and in this case, what is that

18    total?

19         A.      $11,094.60.

20         Q.      And you have it here as an

21    amount to be incurred post-trial?

22         A.      Correct.

23         Q.      Why is that?

24         A.      That is for a 12-month period
```

Confidential - Subject to Further Confidentiality Review

Page 114

```
 1    of mortgage deferral that occurs subsequent

 2    to the trial date.

 3         Q.     In all the cases where you are

 4    calculating that additional cost to the

 5    plaintiff because of a mortgage deferral

 6    agreement with the lender, are you assuming a

 7    uniform period for the duration of the

 8    mortgage deferral?

 9         A.     I am assuming a 12-month

10    period, although in most circumstances -- all

11    the plaintiffs have only gotten a six-month

12    deferral at this time.  The banks have

13    indicated that they may extend to a 12-month

14    period.

15              And since it's more than likely

16    that the remediation is not going to have

17    been completed within that time frame of six

18    months, we estimated a period of 12 months, a

19    one-year period, conservatively.  It could be

20    longer.  But at this time, we've estimated

21    12 months.

22         Q.     Of course, if it's longer than

23    12 months, the ultimate cost to the plaintiff

24    is increased?
```

Confidential - Subject to Further Confidentiality Review

1     A.     Correct.

2     Q.     You've assumed 12 months on the

3 basis of an understanding that when the

4 Chinese drywall remediation has occurred, the

5 plaintiff is able to return to their home

6 and, again, starts paying mortgage notes?

7     A.     Yes.

8     Q.     So even if your reliance

9 materials reflect a letter or a document

10 telling a plaintiff homeowner that the

11 lender's, at this point, willing to engage in

12 a six-month deferral, you're assuming a

13 renewal for another six months in those

14 cases?

15     A.     Yes, that is correct.

16     Q.     Okay.  What, then, are the

17 total amounts you conclude to have been

18 incurred as a loss by Robert and Lisa Orlando

19 in connection with this case?

20     A.     The amount incurred prior to

21 trial and to be incurred post-trial is

22 $374,880.42, and the monthly recurring amount

23 is $2,368.92.

24     Q.     There's one other scenario I

Confidential - Subject to Further Confidentiality Review

Page 116

1    wanted to reference in connection with the

2    mortgage deferral.  We understand you were

3    assuming a 12-month deferral period.

4               Have you considered what the

5    impact on a plaintiff family would be if, at

6    the end of the 12-month period, the lender

7    says, "No more mortgage deferral.  That's

8    over," and the home is not yet remediated and

9    inhabitable by the plaintiff?  Have you

10   considered that scenario?

11       A.    I'm sure there could be

12   additional consequences of the bank, if

13   they're not able to meet their mortgage

14   payments, and, you know, the cost could be

15   even in excess of what we're including.

16       Q.    Well, in that scenario, would

17   the plaintiff, then, in some cases, face the

18   possibility of paying both the mortgage note

19   and rental?

20       A.    Absolutely.  And if they're not

21   able to meet -- that was my point.  If

22   they're not able to meet that -- both of

23   those payments, they could enter into any

24   other foreclosure action or something like

```
 1    that, if they're not able to meet both of

 2    those obligations.

 3         Q.    And that was the situation with

 4    the Morgans, for example?

 5         A.    Correct.

 6         Q.    Let me now refer to the

 7    reliance materials supporting your

 8    conclusions for the Orlando family and ask

 9    you, first, to identify these documents and

10    tell me if they relate to the alternative

11    living cost analysis in that case.

12         A.    Yes.

13              MR. MEUNIER:   In connection

14         with the witness' testimony, I will

15         offer into evidence the following as

16         trial exhibits:  P3.0503-0001,

17         P3.0506-0001 through 5, P3.0502-0001,

18         P3.0505-0001 and 2, P3.0504-0001 and

19         2.

20    BY MR. MEUNIER:

21         Q.    I show you these documents and

22    ask if they are the reliance materials for

23    your calculations of repair costs in the case

24    of the Orlando family.
```

Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2                MR. MEUNIER:   In connection

3        with the witness' testimony, I will

4        offer as Trial Exhibits P3.0525-0001,

5        P3.0523-0001, P3.0528-0001,

6        P3.0527-0001 and 2, P3.0529-0001,

7        P3.0532-0001, P3.0530-0001 and

8        P3.0526-0001 through 3.

9    BY MR. MEUNIER:

10       Q.      I show you these documents,

11   Ms. Tuthill, and ask if they are the reliance

12   materials in support of your conclusions

13   regarding the mortgage deferral loss incurred

14   by the Orlandos in this case.

15       A.      Yes.

16                MR. MEUNIER:   In connection

17       with the witness' testimony, I will

18       offer as Trial Exhibits P3.0522-0001,

19       P3.0604-0001, P3.0605-0001,

20       P3.0517-0001, P3.0511-0001,

21       P3.0607-0001, P3.0509-0001 through 6,

22       P3.0512-0001, P3.0521-0001 and 2,

23       P3.0516-0001 through 7 and

24       P3.0513-0001 and 2.

Confidential - Subject to Further Confidentiality Review

Page 119

1              Thank you, Ms. Tuthill.  I have

2        no further questions.  I'll tender the

3        witness.

4              MR. THIBODEAUX:  We have no

5        questions at this time.

6              THE VIDEOGRAPHER:  That

7        concludes this videotaped deposition.

8        The time is 12:40 p.m.

9              (Proceedings concluded at

10        12:40 p.m.)

11              -  -  -  -  -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

1                        CERTIFICATE

2

3          I, MICHAEL E. MILLER, Registered
Diplomate Reporter, Certified Realtime
4    Reporter and Notary Public, do hereby certify
that prior to the commencement of the
5    examination, J.C. TUTHILL, CPA was duly sworn
by me to testify to the truth, the whole
6    truth and nothing but the truth.

7          I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
8    testimony as taken stenographically by and
before me at the time, place and on the date
9    hereinbefore set forth, to the best of my
ability.

10

11          I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
12    action, and that I am neither a relative nor
employee of such attorney or counsel, and
13    that I am not financially interested in the
action.

14

15

16          _____

17    MICHAEL E. MILLER,
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
18    Certified LiveNote Reporter
LA Certified Court Reporter #27009

19
Dated: February 8, 2010

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4           I, J.C. TUTHILL, CPA, do hereby
    certify that I have read the foregoing pages
 5  and that the same is a correct transcription
    of the answers given by me to the questions
 6  therein propounded, except for the
    corrections or changes in form or substance,
 7  if any, noted in the attached
    Errata Sheet.
 8

 9

10

11

12  _____
    J.C. TUTHILL, CPA              DATE
13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1      — — ... — — — —
                        ERRATA
 2      — — — — — ...

 3     PAGE   LINE      CHANGE

 4     — —   ———        ————————————————————————————

 5     REASON:          ————————————————————————————

 6     ———   ———        ————————————————————————————

 7     REASON:          ————————————————————————————

 8     — —   ———        ————————————————————————————

 9     REASON:          ————————————————————————————

10     ———   ———        ————————————————————————————

11     REASON:          ————————————————————————————

12     ———   — —        ————————————————————————————

13     REASON:          ————————————————————————————

14     ———   ———        ————————————————————————————

15     REASON:          ————————————————————————————

16     ———   ———        ————————————————————————————

17     REASON:          ————————————————————————————

18     ———   ———        ————————————————————————————

19     REASON:          ————————————————————————————

20     ———   ———        ————————————————————————————

21     REASON:          ————————————————————————————

22     ———   ———        ————————————————————————————

23     REASON:          ————————————————————————————

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    - - - - - -
                      LAWYER'S NOTES
 2                    - - - - - -

 3     PAGE    LINE

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____
```