Confidential - Subject to Further Confidentiality Review

Page 1

```
 1          UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF LOUISIANA
 2

 3    _____  §   MDL NO. 2047
      IN RE:                   §
 4    CHINESE-MANUFACTURED     §   SECTION: L
      DRYWALL PRODUCTS         §
 5    LIABILITY LITIGATION     §   JUDGE FALLON
      _____  §   MAG. JUDGE WILKINSON
 6

 7                   – – –

 8          FRIDAY, FEBRUARY 5, 2010

 9
                  – CONFIDENTIAL –
10    SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

11                   – – –

12

13          Videotaped deposition of WILLIAM

14    BROOM ALEXANDER 'SANDY' SHARP, Ph.D., held

15    at the offices of Frilot Partridge, LLC,

16    3800 Energy Centre, 1100 Poydras Street,

17    New Orleans, Louisiana, commencing at

18    8:54 a.m., on the above date, before Micheal

19    A. Johnson, Certified Court Reporter,

20    Registered Professional Reporter, Certified

21    Realtime Reporter.

22                   – – –

23          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
24              deps@golkow.com
```

U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED    2·22-10
LORETTA G. WHYTE
     CLERK

Confidential - Subject to Further Confidentiality Review

Page 2

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
2

     MICHELLE GERMANO; DENNIS          §
3    JACKSON; SHARON JACKSON;          §
     JASON DUNAWAY; LISA DUNAWAY;      §
4    Individually, and on behalf       §
     of all other similarly            §
5    situated,                         §
                                       §
6              Plaintiffs,             §
                                       §
7    vs.                               §   2:09cv202
                                       §
8    TAISHAN GYPSUM CO. LTD.           §
     f/k/a SHANDONG TAIHE DONGXIN      §
9    CO. LTD.; VENTURE SUPPLY,         §
     INC.; HARBOR WALK                 §
10   DEVELOPMENT, LLC; and THE         §
     PORTER-BLAINE CORP.,              §
11                                     §
               Defendants.             §
12
     _____

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S :

 2         LAW OFFICES OF RICHARD J. SERPE, P.C.
           BY:  RICHARD J. SERPE, ESQUIRE
 3              rserpe@serpefirm.com
           580 East Main Street
 4         Suite 310
           Norfolk, Virginia 23510-2322
 5         (757) 233-0009
           Counsel for Plaintiffs
 6

           HAUSFELD, LLP
 7         BY:  RICHARD S. LEWIS, ESQUIRE
                rlewis@hausfeldllp.com
 8         1700 K Street, N.W.
           Washington, DC 20006
 9         (202) 540-7201
           Counsel for Plaintiffs
10

11         LEWIS & ROBERTS, PLLC
           BY:  DANIEL K. BRYSON
12              dkb@lewis-roberts.com
           3700 Glenwood Avenue
13         Suite 410
           Raleigh, North Carolina 27612
14         (919) 981-0191
           Counsel for Plaintiffs
15

16         LAMBERT & NELSON, PLC
           BY:  HUGH P. LAMBERT, ESQUIRE
17              law@lambertandnelson.com
           701 Magazine Street
18         New Orleans,Louisiana70130
           (504) 581-1750
19         Counsel for Plaintiffs

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1    A P P E A R A N C E S:

 2         BAKER & McKENZIE, LLP
           BY:  ERIN MCCLOSKEY MAUS, ESQUIRE
 3              erin.m.maus@bakernet.com
                DOUGLAS B. SANDERS, ESQUIRE
 4              douglas.b.sanders@bakernet.com
           One Prudential Plaza
 5         Suite 3500
           Chicago, Illinois 60601
 6         (312) 861-8202
           Counsel for Knauf Plasterboard
 7         Tianjin Co., Ltd.

 8
           FOWLER WHITE BURNETT, P.A.
 9         BY:  GEORGE M. KOONCE, ESQUIRE
                gmk@fowler-white.com
10              (via teleconference)
           Espirito Santo Plaza
11         1395 Brickell Avenue, 14th Floor
           Miami, Florida 33131
12         (305) 789-9256
           Counsel for Black Bear Gypsum Inc. and
13         Smoky Mountain Materials, Inc.

14
           FULMER, LeROY, ALBEE, BAUMANN &
15         GLASS, PLC
           BY:  KEVIN J. McALLISTER, ESQUIRE
16              kmcallister@fulmerleroy.com
                (via teleconference)
17         2866 East Oakland Park Boulevard
           Fort Lauderdale, Florida 33306
18         (954) 707-4430
           Counsel for Independent Builders
19         Supply Association

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

Page 5

```
 1    A P P E A R A N C E S:

 2          THOMPSON, COE, COUSINS & IRONS, LLP
            BY:  STEVEN T. POSTON, II, ESQUIRE
 3               sposton@thompsoncoe.com
                 (via teleconference)
 4          One Riverway, Suite 1600
            Houston, Texas 77056
 5          (713) 403-8214
            Counsel for North River Insurance
 6

 7    VIDEOGRAPHER:

 8          MELISSA BARDWELL,
            Golkow Technologies, Inc.
 9                     - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

1            I N D E X
             SANDY SHARP, Ph.D.
2              February 5, 2010

3

4   APPEARANCES                              3

5   PROCEEDINGS                             11

6

7   EXAMINATION OF
    WILLIAM BROOM ALEXANDER 'SANDY' SHARP, Ph.D.:
8

9        BY MR. SERPE                        12

10

11  CERTIFICATE                            344

12  ACKNOWLEDGMENT OF DEPONENT             345

13  ERRATA                                 346

14  LAWYER'S NOTES                         347

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                  DEPOSITION EXHIBITS
      WILLIAM BROOM ALEXANDER 'SANDY' SHARP, Ph.D.
 2                   February 5, 2010

 3

 4   NUMBER            DESCRIPTION            MARKED

 5   Sharp-1    "Corrosion prevention in        14
                electrical control rooms,"
 6              by Sharp, et al.

 7   Sharp-2    "Corrosion Prevention in        16
                Electrical Control Rooms,"
 8              by Sharp, et al.

 9   Sharp-3    10/1/09 and 10/19/09, MWV       67
                Letters to Goad
10

     Sharp-4    12/30/09 Expert Report of       75
11              Sandy Sharp, Ph.D.,
                P1.029-0001 - P1.029-0019
12

     Sharp-5    MTI Publication No. 38          79
13              "Atmospheric Corrosion of
                Control Equipment," by
14              Abbott, P1.179-0001 -
                P1.179-0068
15

     Sharp-6    ISA Standard                   106
16              ISA-S71.04-1985,
                "Environment Conditions
17              for Process Measurement
                and Control Systems:
18              Airborne Contaminants,"
                P1.090-0001 - P1.090-0022
19

     Sharp-7    Color Photograph              109
20

     Sharp-8    Color Photograph              110
21

     Sharp-9    "New tools for the rapid      120
22              assessment and reduction
                of safety risks in newly
23              acquired mill equipment,"
                by Sharp, et al.

24
```

Confidential - Subject to Further Confidentiality Review

1                  DEPOSITION EXHIBITS

2

3      NUMBER            DESCRIPTION          MARKED

4    Sharp-10    Appendix A to 12/09              129
                 Perricone Expert Report,
5                P1.024-0014 - P1.024-0048

6    Sharp-11    01/10 Perricone                  139
                 Supplemental Expert Report
7

     Sharp-12    12/09 Perricone Expert           148
8                Report

9    Sharp-13    11/23/09 Draft, "Interim         167
                 Report on the Status of
10               the Analysis of Electrical
                 Components Installed in
11               Homes with Chinese
                 Drywall," by Gill & Trotta
12
     Sharp-14    Color Photograph - Morgan        173
13               Wire Corrosion

14   Sharp-15    Color Photograph - Wire          174
                 Corrosion Detail
15
     Sharp-16    Color Photograph - Wire          175
16               corrosion detail

17   Sharp-17    Table 1, Summary of              176
                 Tarnish Thickness and Pit
18               Depth Measurements

19   Sharp-18    1/14/10 Supplement No. 1         180
                 to Assessment of Copper
20               Materials From Residences
                 Containing Chinese Drywall
21               Products, by Krantz & Ely

22   Sharp-19    "Indoor Atmospheres," by         197
                 Sinclair
23

24

Confidential - Subject to Further Confidentiality Review

1              DEPOSITION EXHIBITS

2

3      NUMBER           DESCRIPTION          MARKED

4    Sharp-20    Expert Rebuttal Report of      212
                 Dr. Sharp,
5                P1.121-0001 - P1.121-0003

6    Sharp-21    Color Photograph -             248
                 Enlargement of Krantz
7                Measurement

8    Sharp-22    Color Photograph -             249
                 Enlargement of Krantz
9                Measurement

10   Sharp-23    Color Photograph -             249
                 Enlargement of Krantz
11               Measurement

12   Sharp-24    Color Photograph -             249
                 Enlargement of Krantz
13               Measurement

14   Sharp-25    Color Photograph -             249
                 Enlargement of Krantz
15               Measurement

16   Sharp-26    "Corrosion of Electrical       266
                 Conductors in Pulp and
17               Paper Industrial
                 Applications," by
18               Chudnovsky

19   Sharp-27    1/5/10 Data Matrix,            281
                 International Centre for
20               Diffraction Data

21   Sharp-28    Physical Constants of          283
                 Inorganic Compounds
22

23

24

Confidential - Subject to Further Confidentiality Review

Page 10

```
 1                 DEPOSITION EXHIBITS

 2

 3      NUMBER           DESCRIPTION        MARKED

 4   Sharp-29   Science Magazine Article,      326
                "Carbonyl Sulfide:
 5              Potential Agent of
                Atmospheric Sulfur
 6              Corrosion,"

 7   Sharp-30   "The Corrosion of Copper       333
                by Atmospheric Sulphurous
 8              Gases," by Graedel,
                et al.,
 9              P2.0076-0001 -
                P2.0076-0011
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

Page 11

```
1                    PROCEEDINGS
2             (February 5, 2010 at 8:54 a.m.)
3             THE VIDEOGRAPHER:  We are now
4      going on the record.  The date today
5      is February 5th, 2010.  Time now is
6      approximately 8:54 a.m.
7             This is the videotaped
8      deposition of Dr. William Broom
9      Alexander "Sandy" Sharp taken in
10     reference to the Chinese-Manufactured
11     Drywall Litigation for the
12     U.S. District Court, Eastern District
13     of Louisiana.  The deposition is being
14     held in New Orleans, Louisiana.
15            My name is Melissa Bardwell,
16     videographer, representing Golkow
17     Technologies, and the court reporter
18     today is Micheal Johnson.
19            Would counsel present please
20     introduce themselves and state their
21     affiliations for the record.
22            MS. MAUS:  Erin Maus on behalf
23     of Knauf Plasterboard Tianjin.
24            MR. LEWIS:  Richard Lewis for
```

Confidential - Subject to Further Confidentiality Review

```
 1              the Steering Committee.
 2                   MR. SERPE:   Richard Serpe for
 3         the Germano Plaintiffs and the PSC.
 4                   MR. BRYSON:   Dan Bryson for the
 5         Germano Plaintiffs and the PSC.
 6                   THE VIDEOGRAPHER:   Would the
 7         court reporter please swear in the
 8         witness.
 9    WILLIAM BROOM ALEXANDER 'SANDY' SHARP, Ph.D.
10    having been duly sworn, testified as follows:
11                   EXAMINATION
12      BY MR. SERPE:
13         Q.    Good morning, Dr. Sharp.  I'm
14    Richard Serpe.  I'm going to be asking you
15    questions today in connection with your
16    expert reports in the Chinese drywall matter
17    here in New Orleans.  Have you given a
18    deposition before?
19         A.    Once before.
20         Q.    Have you ever appeared in trial
21    before?
22         A.    I have not.
23         Q.    How long ago was your one
24    deposition that you --
```

Confidential - Subject to Further Confidentiality Review

1          A.      It was early in 2009.

2          Q.      And what case was that in?

3          A.      This was a case between the

4     International Paper Company and a contractor

5     who had done some work at a paper mill.

6          Q.      Let me remind you that your

7     testimony today is no different than that in

8     a courtroom.  You understand you are under

9     oath today?

10         A.      I understand.

11         Q.      And it's important to me that

12    you understand my questions today.  Will you

13    stop me if you don't understand one of my

14    questions?

15         A.      I will try to stop you.

16         Q.      I'm happy to rephrase a

17    question or start over again if you find it

18    confusing in any way.  Would that be fair if

19    you stopped me for that?

20         A.      Thank you, yes.

21         Q.      If you don't stop me, I'm going

22    to assume that you understand my questions

23    today.

24         A.      Yes.

Confidential - Subject to Further Confidentiality Review

1          Q.        You're doing beautifully so

2     far, but just as a touchstone, the court

3     reporter does much better when only one of us

4     is talking at a time as it's very difficult,

5     I guess, for him to have two people speaking

6     at the same time on a linear transcript.   So

7     let's both endeavor not to talk over each

8     other today.

9          A.        Yes.

10         Q.        And verbal answers such as a

11    yes or a no are much easier for him to get

12    down than a nod of the head or an uh-huh or

13    huh-uh as you can imagine those would be

14    difficult things to type out with precision,

15    although I'm sure Mike could do it if put to

16    the test.

17              I would like to hand you Sharp

18    Deposition Exhibit No. 1.

19              (Whereupon, Deposition Exhibit

20         Sharp-1, "Corrosion prevention in

21         electrical control rooms," by Sharp,

22         et al., was marked for

23         identification.)

24    BY MR. SERPE:

Confidential - Subject to Further Confidentiality Review

1      Q.      This is your 1989 paper on

2  Corrosion Prevention in Electrical Control

3  Rooms.

4      A.      It is.

5      Q.      Tell me about the journal it

6  was published in.

7      A.      It was published in the journal

8  of the Technical Association of the Pulp and

9  Paper Industry.

10     Q.      Is that a peer-reviewed

11 journal?

12     A.      Yes, it is.  In fact, this

13 publication was peer reviewed twice.  It was

14 peer reviewed when it was submitted to a

15 previous conference; and then after being

16 peer reviewed at that conference, it was then

17 peer reviewed again before being included and

18 published in this journal.

19     Q.      And, in fact, it's been

20 published a third time now, hasn't it, in

21 2008?

22     A.      In two --

23     Q.      A reprint of this has come out

24 in 2008?

Confidential - Subject to Further Confidentiality Review

Page 16

```
1          A.      I'm not aware of what you're

2     referring to.

3          Q.      I may be able to lay hands on

4     it, but I don't know if I can promise.   Let

5     me hand you Exhibit No. 2, Sharp Exhibit

6     No. 2.

7               (Whereupon, Deposition Exhibit

8          Sharp-2, "Corrosion Prevention in

9          Electrical Control Rooms," by Sharp,

10         et al., was marked for

11         identification.)

12    BY MR. SERPE:

13         Q.      Do you recall now that your

14    Corrosion Prevention in Electrical Control

15    Rooms was reprinted in July of 2008?

16         A.      It's my understanding that this

17    is simply reprinted from the journal I have

18    described and published on the website of the

19    MWV Specialty Chemicals.

20         Q.      So initially presented, then

21    published in the TAPPI Journal and then more

22    recently published through the Internet of

23    the -- through the Engineering Bulletin for

24    MeadWestvaco?
```

Confidential - Subject to Further Confidentiality Review

1          A.       Correct.

2          Q.       Dr. Sharp, hydrogen sulfide is

3     a corrosive gas?

4          A.       Hydrogen sulfide can produce

5     corrosion or tarnishing on some materials at

6     some concentrations at some humidities at

7     some temperatures, yes.

8          Q.       So in Exhibit No. 1, in the

9     first column, third paragraph down where you

10    talk about concentrations of corrosive gases,

11    you include hydrogen sulfide as a corrosive

12    gas, do you not?

13         A.       Yes.  That was one of the

14    corrosive gases that I'm referring to in

15    previous studies, yes.

16         Q.       And sulphur dioxide is another

17    corrosive gas that you are referring to?

18         A.       Yes.

19         Q.       Is carbonyl sulfide a corrosive

20    gas?

21         A.       Carbonyl sulfide is much less

22    corrosive at equivalent concentrations than

23    hydrogen sulfide.

24         Q.       And this paper is describing

Confidential - Subject to Further Confidentiality Review

1    environmental conditions in paper and pulp

2    mills, control rooms?

3        A.    The particular study that is

4    reported here was conducted throughout a

5    large plant which was a pulp and paper mill,

6    yes.

7        Q.    And you have significant

8    experience in environmental monitoring of

9    pulp and paper mills, do you not?

10       A.    I have significant experience

11   in environmental monitoring, some of which

12   was in pulp and paper mills and some was not.

13       Q.    And on the basis of that

14   portion of your experience that was for pulp

15   and paper mills, wouldn't it be a fair

16   statement that carbonyl sulfide was not a

17   common gas which was encountered?

18       A.    Carbonyl sulfide is not

19   frequently encountered in pulp and paper

20   mills, but many other reduced sulphur species

21   are.

22       Q.    Carbonyl sulfide is, in fact,

23   almost never encountered in pulp and paper

24   mills.

Confidential - Subject to Further Confidentiality Review

Page 19

```
 1        A.      It -- it's not encountered at
 2   significant concentrations.
 3        Q.      The paragraph that I read from
 4   a minute ago in Exhibit No. 1 talked about
 5   concentrations in the 10-part-per-billion
 6   range, did it not?
 7        A.      It does, yes.
 8        Q.      So we're talking that you have
 9   not encountered carbonyl sulfide in paper and
10   pulp mills in the 1- to 10-part-per-billion
11   range, have you?
12        A.      I do not recollect specific
13   case histories where it was -- carbonyl
14   sulfide was present to that concentration,
15   but I was involved in very many studies and I
16   can't be sure that there was -- there was
17   not.
18        Q.      So broadening your experience
19   base from paper and pulp mills to your full
20   experience in industrial settings, you have
21   never studied the corrosive impact of
22   carbonyl sulfide on control equipment in any
23   setting, have you?
24        A.      I have not made, myself,
```

Confidential - Subject to Further Confidentiality Review

1   studies of the corrosion caused by carbonyl

2   sulfide, although I read in the literature

3   that it is about four orders of magnitude

4   less corrosive than hydrogen sulfide.

5        Q.    So your knowledge of the

6   corrosive properties of carbonyl sulfide is

7   based upon your literature review and not on

8   any real-world experience?

9        A.    If there were carbonyl sulfide

10  in locations that were being protected by

11  atmospheric filtration, the carbonyl sulfide

12  would have been removed.  I -- I'm aware of

13  tests to show that.

14       Q.    When you say "if there were

15  carbonyl sulfide in locations," that would

16  have to be a purely hypothetical matter for

17  you because you never measured discernible

18  concentrations of carbonyl sulfide in any of

19  the industrial settings for which you

20  conducted environmental monitoring.

21       A.    I cannot recall ever being in a

22  situation where the task required individual

23  monitoring of specific reduced sulphur gases.

24       Q.    In your experience you clearly

Confidential - Subject to Further Confidentiality Review

1    monitored the specific concentrations of

2    hydrogen sulfide in industrial environments,

3    didn't you?

4          A.     That's correct, because it is

5    the primary corrosive.

6          Q.     In your industrial experience,

7    you specifically measured the concentrations

8    of sulfur dioxide in industrial environments,

9    didn't you?

10         A.     Yes.

11         Q.     In your industrial experience,

12   you never monitored the specific

13   concentrations of carbonyl sulfide, have you?

14         A.     I never thought it necessary.

15         Q.     In the paragraph I was pointing

16   to, you mentioned the total concentrations of

17   corrosive gases where you included the sum of

18   three different specifically identified

19   corrosive gases, did you not?

20         A.     That's correct.

21         Q.     Corrosive gases have an

22   additive effect.

23         A.     Particular combinations of

24   corrosive gases do have additive effects,

Confidential - Subject to Further Confidentiality Review

1    yes.

2         Q.    Particular combinations of

3    corrosive gases can have synergistic effects.

4         A.    Yes, particular

5    concentrations -- particular combinations can

6    have synergistic effects.

7         Q.    You have never conducted

8    investigation with respect to the additive

9    effect of carbonyl sulfide in corrosive

10   environments, have you?

11        A.    Not myself.

12        Q.    You have never conducted

13   investigation with respect to the synergistic

14   effect of carbonyl sulfide in corrosive

15   environments, have you?

16        A.    No, because I have relied on

17   literature -- evidence that carbonyl sulfide

18   has a very low corrosivity compared to

19   hydrogen sulfide.

20        Q.    Small quantities of corrosive

21   gases can cause intermittent failures in

22   electrical equipment, can't they?

23        A.    Small quantities of certain

24   gases under certain humidities after certain

Confidential - Subject to Further Confidentiality Review

Page 23

1    lengths of time can cause intermittent

2    failures, yes.

3         Q.      In fact, you reported in your

4    1989 paper that extremely small quantities of

5    corrosive gases can cause intermittent

6    failures in electrical equipment, didn't you?

7         A.      What part of the paper are you

8    referring to?

9         Q.      First sentence.

10        A.      That's true.

11        Q.      And you reported that extremely

12   small quantities of corrosive gases can cause

13   permanent failure in electrical equipment.

14        A.      The paper explains in detail

15   what those quantities are.

16        Q.      The paper supplies quantitative

17   numbers for what those concentrations are, do

18   they not?

19        A.      The paper gives recommendations

20   about the general concentrations of corrosive

21   gases that should be achieved to eliminate

22   failures, and then quantitates that in terms

23   of copper reactivity coupons.

24        Q.      And that's a quantitative type

Confidential - Subject to Further Confidentiality Review

Page 24

1       of analysis that this paper goes through,

2       does it not?

3              A.      Yes.

4              Q.      And you make a qualitative

5       statement with respect to what those

6       concentrations mean in the first sentence of

7       this paper, don't you?

8              A.      I say that "extremely small

9       quantities can cause intermittent or

10      permanent failures," meaning extremely --

11      meaning in the part-per-billion range.

12             Q.      The sorts of failures that

13      we're talking about in electrical equipment

14      can occur by the corrosion or breakage of

15      fine wires in the electrical equipment, can't

16      they?

17             A.      That is true.

18             Q.      Corrosion failures can also

19      occur when resistive corrosion products build

20      up between circuit breaker contacts, can't

21      they?

22             A.      Yes.   The buildup of resistive

23      corrosion product between circuit breaker

24      contacts can, but does not always, lead to

Confidential - Subject to Further Confidentiality Review.

Page 25

1    failure.

2         Q.    A contact is a connection point

3    in a circuit breaker.

4         A.    That's true.  Well, that is one

5    type of contact.  There are many others.

6         Q.    Some circuit breakers have

7    contacts that serve as connection points,

8    don't they?

9         A.    I wouldn't really describe them

10   as connection points, but, yes, circuit

11   breakers open and close to allow the flow of

12   electricity.

13        Q.    And the place where a circuit

14   breaker opens and closes and the two pieces

15   occlude are the circuit breaker contacts; is

16   that correct?

17        A.    Yes.

18        Q.    Contacts and circuit breakers

19   are typically silver?

20        A.    It depends which particular

21   type of contact breaker you're talking about,

22   but some of them are silver, that is correct.

23        Q.    And silver, like copper, is

24   subject to corrosion products building up on

Confidential - Subject to Further Confidentiality Review

Page 26

1    them?

2         A.      Silver tarnishes in reduced

3    sulphur atmospheres.

4         Q.      And when it tarnishes,

5    corrosion products can form between circuit

6    breaker contacts.

7         A.      While the contacts are in --

8    are touching, there is very limited access of

9    gases to the contact surfaces.  While they're

10   open, there is access to the contact surfaces

11   and there could be tarnishing.

12        Q.      And when that happens,

13   corrosion products between circuit breaker

14   contacts lead to failure.

15             MS. MAUS:  Objection, form.

16        A.      The accumulation of resistive

17   corrosion products does not itself cause a

18   failure.  The action of a contact breaker,

19   the -- the pressure of the contact and wiping

20   forces are designed to overcome effects of

21   tarnishing on that contact.

22   BY MR. SERPE:

23        Q.      The accumulation of resistive

24   corrosion products does not itself cause

Confidential - Subject to Further Confidentiality Review

1     failure?  Is that your testimony today?

2        A.     I have said that the corrosion

3     failures of electrical equipment usually

4     occur by the complete consumption of breakage

5     of fine wires or by the accumulation of

6     resistive corrosion products between circuit

7     breaker contacts.  That is to say, if it

8     fails by the failure of the circuit breaker

9     contact, it fails by the accumulation of

10     tarnished products in those circuit breaker

11     contacts.  I did not say that the tarnishing

12     itself will produce -- because there is

13     tarnishing it will produce a failure.

14        Q.     It fails by the accumulation of

15     tarnished products in those circuit breaker

16     contacts --

17        A.     If it fails, yes.

18        Q.     If it fails.  And the tarnished

19     products that you said just a minute ago you

20     referred to in your paper as resistive

21     corrosion product, did you not?

22        A.     I did.

23        Q.     And "resistive" is a term of

24     art, isn't it?

Confidential - Subject to Further Confidentiality Review

Page 28

1      A.      A term of art?

2      Q.      Resistive is a technical term.

3      A.      Correct.

4      Q.      It has to do with property of

5  electrical wire or of an electrical system,

6  resistance?

7      A.      Yes, specifically it deals with

8  the properties of a contact.

9      Q.      And resistive describes a

10  process by which the accumulation of the

11  corrosion product is increasing the

12  resistance across that contact.

13      A.      At a certain contact pressure,

14  the resistance will increase with the

15  thickness of the tarnish film.  But as I

16  said, contacts are designed to handle those

17  kinds of problems by the pressure they exert

18  and by wiping forces.

19      Q.      But at some point they fail.

20      A.      At some point some of them

21  fail.

22      Q.      Electronic microcircuits most

23  frequently fail at mating connectors where

24  thin resistive layers of corrosion products

Confidential - Subject to Further Confidentiality Review

1    spread across noble metal contact surfaces;

2    is that true?

3         A.    Yes.  First of all, let me just

4    say that the language that I typically use

5    separates electrical equipment and electronic

6    equipment, meaning by electrical equipment,

7    wires and switches and outlets that work on

8    normal household voltages, and by electronic

9    equipment, I mean microcircuits which

10   typically work at lower currents and are

11   small, contained devices like little

12   computers.

13              Now, could I -- could you

14   please repeat your question.

15        Q.    Electronic microcircuits most

16   frequently fail at mating connectors where

17   thin resistive layers of corrosion products

18   spread across noble metal contact surfaces.

19   True statement?

20        A.    That is true.

21        Q.    So when we're looking at these

22   microcircuits, even a thin resistive layer

23   will frequently lead to failure.

24        A.    Although it is very unlikely

Confidential - Subject to Further Confidentiality Review

Page 30

1      for such a layer to form because of the

2      difficulty of gases entering the space

3      between mating connectors, if -- if a

4      resistive film forms between mating

5      connectors, it can lead to failure.  It

6      doesn't always.  Because even mating

7      connectors typically contact on mountaintops

8      rather than flat surface to flat surface.

9      And therefore there is often enough mating

10     contact surface remaining to make the contact

11     even though there may be tarnishing on the

12     surface.

13          Q.      If the contact gets made, it

14     wouldn't fail.

15               MS. MAUS:  Objection, form.

16          A.      The -- the contact needs to be

17     maintained for the equipment to function.

18     BY MR. SERPE:

19          Q.      But it doesn't always.  And

20     when it fails, it most frequently fails

21     because of the buildup of a thin resistive

22     layer across a mating contact.

23               MS. MAUS:  Objection, form.

24          A.      Contacts are generally the most

Confidential - Subject to Further Confidentiality Review

Page 31

1    vulnerable part of electronic equipment to

2    atmospheric tarnishing.

3    BY MR. SERPE:

4         Q.    Your paper discusses condensed

5    electrolytes allowing leakage currents to

6    flow between adjacent conductors.  What's a

7    "condensed electrolyte"?

8         A.    If electronics are operating in

9    an environment where there are dust --

10   specific types of dust particles, this

11   situation can arise.  Let me explain.

12              Electronic equipment frequently

13   involves adjacent conductors.  If a dust

14   particle blows into somehow the electronic

15   equipment and lies between two adjacent

16   connectors and if that dust particle is what

17   chemicals call hygroscopic, that is to say it

18   attracts water, it can dissolve in the

19   wetness that it attracts.  That then can

20   produce what I'm calling here a condensed

21   electrolyte.  And that can -- and if then

22   also there is a difference in electric

23   potential between the adjacent connectors,

24   you have something like a little battery

Confidential - Subject to Further Confidentiality Review

1    which will act between the connectors to

2    corrode one and to plate on the other and

3    that can lead to electrical -- electronic

4    equipment failures.  That's what I'm trying

5    to describe here.

6         Q.    So just the amount of moisture

7    that can be hygroscopically obtained by a

8    dust particle is enough to begin a process of

9    allowing the formation of corrosion?

10        A.    That's not what I said.  I said

11   that if the particle were hygroscopic, there

12   are rather few chemicals that are -- but

13   let's say you had a particle of magnesium

14   chloride that had somehow not been filtered

15   out of the air in this particular situation,

16   that is a very hygroscopic compound.  By

17   contrast I could say that the compounds

18   involved in wallboard, for example, are not

19   hygroscopic in that fashion.

20             But as I said before, if -- I

21   was writing for completeness here and I

22   wanted to note that this is a failure

23   mechanism.  If you have dust particles and if

24   they're hygroscopic and if the humidity is

Confidential - Subject to Further Confidentiality Review

Page 33

1      such that they can attract water, then

2      there's a potential for failure.

3          Q.      You mentioned the compounds

4      that are involved in wallboard.  Do you

5      consider yourself an expert with respect to

6      the compounds that are in wallboard?

7          A.      No.  But I have looked up

8      the -- the hygroscopic nature of the calcium

9      sulfate and so forth.

10          Q.      Calcium sulfate and so forth?

11          A.      Yes.

12          Q.      What else besides calcium

13      sulfate did you look up?

14          A.      That was -- that was the -- my

15      primary concern because I saw -- I was

16      looking through a list of hygroscopic

17      compounds, and so I studied the -- I was

18      looking to see if there could be hygroscopic

19      compounds in wallboard and concluded that

20      there were not.

21          Q.      Well, how did you know what

22      other compounds besides calcium sulfate were

23      in wallboard?

24          A.      I was looking for major dust

Confidential - Subject to Further Confidentiality Review

Page 34

1    constituents and I thought that calcium

2    sulfate would be the major dust constituent.

3           Q.     So the only one you looked at

4    was calcium sulfate or looked for was calcium

5    sulfate.

6           A.     In this particular table, yes.

7           Q.     Which particular table was

8    this?

9           A.     I don't recall.  It was in I

10   believe Dr. Scully's -- one of the --

11   Dr. Scully had referred to this type of

12   mechanism and he quoted a -- a publication

13   that had a table of the hygroscopic tendency

14   of different dust compounds.

15          Q.     Have you seen a comparison of

16   domestic drywall and the compounds that are

17   found in it to Chinese drywall and compounds

18   that are newly found and never seen in

19   domestic board?

20          A.     I have read depositions to that

21   effect, but I am not an expert in the

22   composition of Chinese drywall.

23          Q.     And since you're not an expert

24   in the composition of Chinese drywall, you

Confidential - Subject to Further Confidentiality Review

```
 1     don't know whether there is or isn't

 2     hygroscopic compounds present in it.

 3              MS. MAUS:  Objection, form;

 4         mischaracterizes his testimony.

 5         A.    I have looked at what I

 6     considered the major constituent of Chinese

 7     wallboard to see if it were particularly

 8     hygroscopic and found that it was not.

 9     That's the extent of my investigation.

10     BY MR. SERPE:

11         Q.    Which major constituents of

12     Chinese wallboard have you looked at?

13         A.    I -- I told you before, I -- it

14     was calcium sulfate.

15         Q.    Just one.

16         A.    Yes.

17         Q.    Do you have an opinion in this

18     case as to how significant the concentration

19     of a component would have to be in a

20     wallboard before it would be capable of

21     producing sufficient dust loading, assuming

22     it's hygroscopic, to be a risk for the

23     development of corrosion failures?

24         A.    That would depend on the
```

Confidential - Subject to Further Confidentiality Review

1     filtration in the air system, but I don't

2     have a general opinion of the type you're

3     seeking.

4          Q.     Dr. Sharp, we've been talking

5     about thin layers of corrosion product.   And

6     I guess that -- I want to turn to a

7     discussion of how thick the corrosion product

8     is on a given surface so I'm going to change

9     gears now to a new topic.

10               When electronic equipment is

11    exposed to corrosive gases, corrosion can

12    build up on the surfaces?

13         A.     It can build up on bare

14    surfaces of certain metals, yes.

15         Q.     And if I use the word

16    "corrosion product," you'll know what I'm

17    speaking about.

18         A.     You're referring to tarnish

19    films, yes.

20         Q.     Tarnish films.   Corrosion

21    products are tarnish films.   And they can get

22    thicker over time, can they not?

23         A.     Yes, they can.

24         Q.     And the thickness can be

Confidential - Subject to Further Confidentiality Review

Page 37

1    measured.

2          A.      The thickness can be measured.

3          Q.      And you placed copper coupons

4    in homes in Florida and Louisiana for the

5    purpose of measuring thickness of corrosion

6    product that built up on copper coupons, did

7    you not?

8          A.      No, sir.  I placed copper

9    reactivity coupons in those homes to

10   characterize the environments with regard to

11   their tendency to cause failure.

12         Q.      And the process of

13   characterizing an environment with regard to

14   its tendency to cause failure involves

15   placing copper reactivity coupons in the

16   environment.

17         A.      Correct.

18         Q.      Waiting some period of time

19   during which the coupons are exposed to the

20   ambient in the room.

21         A.      Correct.

22         Q.      Bringing the reactivity coupons

23   back to a test facility.

24         A.      That's correct.

Confidential - Subject to Further Confidentiality Review

Page 38

1        Q.      And then some measurement is

2    made of the corrosion product which has

3    accumulated on the reactivity coupon so that

4    approximations can be made with respect to

5    the thickness of the corrosion that built up

6    on the reactivity coupons.

7        A.      The measurement of the

8    thickness of the tarnish film that built up

9    is used as a measure of the initial

10   tarnishing rate, and it's that initial

11   tarnishing rate that is found to be a very

12   useful measure of the likelihood of future

13   failure.

14       Q.      And finding a measurement of

15   very little or no thickness of the tarnish

16   film would be a very useful measure that it

17   would be unlikely for future failures of

18   electronic equipment, wouldn't it?

19       A.      A measure of less than

20   487 angstroms in 30 days would indicate that

21   there is no likelihood of failure of

22   electronic equipment.  And I should emphasize

23   that that means of any type of electronic

24   equipment, whether it's made of copper or

Confidential - Subject to Further Confidentiality Review

1      cobalt or silver or iron or whatever because

2      this study that we referred to a minute ago

3      looked at all types of failures.  And the

4      reactivity coupon data gave an indication of

5      the likelihood of any type of failure.

6           Q.      Measuring thicknesses and

7      initial tarnishing rates is a very useful

8      tool for predicting the likelihood of future

9      failure.

10          A.      The national standards are

11     based on that principle; the national

12     standards for classifying environments with

13     regard to corrosivity towards electronic

14     equipment.

15          Q.      In addition to national

16     standards, there are standards which you have

17     published, have you not?

18          A.      I'm not sure what you're

19     referring to with regard to the word

20     "standards."

21          Q.      I was just trying to use your

22     phrase, the national standards are based on

23     that principle.

24          A.      Yes.  Oh, the national standard

Confidential - Subject to Further Confidentiality Review

Page 40

1    I would refer to in that instance would be

2    the ISA 71.04 standard for classifying

3    environments in which electronic equipment is

4    placed.  The same standards are used in the

5    International Electrotechnical Commission

6    standards, which is a worldwide standard, and

7    they and the ISO standards for classifying

8    environments all rely on reactivity coupon

9    measurements.

10         Q.     So my earlier question was, in

11   addition to these national and international

12   standards, Dr. Sharp also has standards that

13   he sets for when he expects to see electrical

14   and electronic failures.

15         A.     Yes.  In this -- in the work

16   that is here in Exhibit 1, I found

17   corrosion -- tarnishing rates equivalent to

18   487 angstroms were the least corrosive

19   environments that could produce failures in

20   electronic equipment and the tarnishing rates

21   equivalent to 1434 angstroms in 30 days were

22   the least corrosive environments that

23   produced corrosion -- produced failure,

24   excuse me, in electrical equipment.

Confidential - Subject to Further Confidentiality Review

Page 41

1        Q.     So over the course of your

2    entire career you have used both national and

3    international standards as well as data that

4    you've published to compare tarnish films

5    that have built up on equipment to the

6    standards to see whether or not we're going

7    to predict failure.

8        A.     I have primarily used my own

9    work; but I have referred to other standards,

10   for example, when I have been teaching about

11   these matters.

12       Q.     We're going to go through the

13   standards and the quantitative analysis in

14   some detail today, but let me just make sure

15   I've got the understanding of how thicknesses

16   are used generally.

17             If a reactivity coupon was

18   placed into an environment and afterwards

19   there was no detectable corrosion product on

20   the surface, we would conclude that there

21   wasn't a corrosive environment and therefore

22   no likelihood of any failure from corrosion.

23   Would that be a fair statement?

24       A.     If the test were properly

Confidential - Subject to Further Confidentiality Review

Page 42

```
 1      conducted and the facts were as you have

 2      said, I would say there is no likelihood of

 3      failures.

 4           Q.      If the coupons show some amount

 5      of corrosion product that's been built up,

 6      the laboratory will carefully analyze it and

 7      report the data in quantitative terms as to a

 8      thickness and a corrosion rate that was

 9      experienced by that coupon in the

10      environment.

11           A.      That is correct.

12           Q.      Then an expert such as yourself

13      could look at that data and compare it to a

14      standard and make a prediction whether or not

15      we would expect to see electrical or

16      electronic failures based upon what we saw on

17      the coupon.

18           A.      Using the data in this paper,

19      yes.

20           Q.      As thicknesses increases and

21      the initial tarnishing rates increase, at

22      some point you get into an area where as an

23      expert you would expect that there would be

24      intermittencies where that equipment would
```

Confidential - Subject to Further Confidentiality Review

1    begin to work sometimes and not work other

2    times, correct?

3         A.    That's what the data say, yes.

4         Q.    And the data also says that at

5    some point as the thickness of the corrosion

6    product builds up, you'll get into an area

7    where you're going to expect a failure of

8    electrical systems.

9         A.    That is correct.

10         Q.    And you'll get into an area

11    where you would expect a failure of

12    electronic systems given an adequate

13    thickness and initial tarnishing rate.

14         A.    If the rates were very high

15    above the numbers that I have talked about, I

16    would expect there to be failures in the

17    future.

18         Q.    Based upon your experience of

19    measuring thicknesses, you wrote the article

20    that's been marked as Sharp Exhibit No. 1 and

21    you published information on where you would

22    expect to see problems in electronic

23    equipment, didn't you?

24         A.    That is correct.

Confidential - Subject to Further Confidentiality Review

1        Q.      I would like you to look at

2    page 144 on that first column.

3        A.      Yes.

4        Q.      Just above the bold heading

5    "Reduction of atmospheric corrosivity."  And

6    let me first get you to read the last

7    sentence of that paragraph to me out loud if

8    you will, sir.

9        A.      "A guideline of 0.1 micrometers

10   per year was chosen as a practical maximum

11   corrosivity to safeguard electronic

12   equipment."

13       Q.      So this was a guideline which

14   you published as a practical maximum for

15   corrosivity to safeguard electronic

16   equipment, wasn't it?

17       A.      We wanted to set -- let me

18   first of all explain the context.  The

19   context was that I had responsibility for

20   corrosion protection of my company's

21   electronic equipment which was extremely

22   important to the functioning of the company's

23   operation.  Having obtained these data, I

24   wanted to set goals for allowable corrosivity

Confidential - Subject to Further Confidentiality Review

1    such that I would achieve the targets that I

2    wanted to achieve, which I have explained

3    before as the 478- and 1434-angstrom limits

4    for electrical and electronic equipment.   And

5    therefore I set what is a conservative goal

6    so as to achieve that target.   And that goal

7    has been retained over 25 years as a

8    conservative goal to achieve that target in

9    about 10,000 installations.

10         Q.      You speak of responsibility,

11   extremely important to protect functioning of

12   equipment.

13         A.      Yes.

14         Q.      Would you agree with me, sir,

15   that a smoke detector in a house is a piece

16   of electronic equipment?

17         A.      Some smoke detectors certainly

18   have electronic circuitry in them, yes.

19         Q.      Fair statement that as we

20   approach the question of the corrosive

21   environment in homes, that we've got a heavy

22   responsibility to protect the electronic

23   equipment in a smoke detector in a home, that

24   would be no different than the responsibility

Confidential - Subject to Further Confidentiality Review

1    that would be placed upon a plant engineer

2    for factory equipment.

3         A.     In principle I agree with you

4    and I have to state that I am not an expert

5    in the design of smoke detectors, but I have

6    heard that they must meet design requirements

7    to withstand more corrosive environments than

8    normal electronic equipment.

9         Q.     But you don't consider yourself

10   an expert on that?

11        A.     I'm not an expert in the design

12   and fabrication of -- of smoke detectors, no.

13        Q.     And you're not suggesting, are

14   you, that the standard that we should hold

15   the corrosion specialists in this case to

16   should be lower in a domestic setting than

17   what the heavy responsibility is in the

18   industrial setting, are you?

19             MS. MAUS:  Objection, form.

20        A.     I -- it is important that a

21   smoke detector function.

22   BY MR. SERPE:

23        Q.     Are you suggesting that the

24   standard of care with respect to protecting

Confidential - Subject to Further Confidentiality Review

1    electronic equipment in a factory should be

2    higher than the standard of care with respect

3    to protecting electronic equipment in the

4    home?

5         A.    No, I am not.  The -- my -- the

6    adjectives that I used to describe the

7    importance of protecting the equipment in the

8    factory were simply because that was the

9    business of the company and many people's

10   livelihood depended on it.

11        Q.    And you would use the same

12   adjectives for protecting the equipment in

13   homes because people's lives depend on it?

14        A.    For smoke detectors, I would.

15        Q.    So you would agree that a

16   guideline of 1 micrometer per year would be a

17   good practical maximum corrosivity to

18   safeguard electronic equipment in the home.

19        A.    That was the goal that we set

20   to achieve the targets that I had described.

21        Q.    And you would set the same goal

22   in the home.

23        A.    I have not set the same goal in

24   the home -- let me think about that question.

Confidential - Subject to Further Confidentiality Review

Page 48

```
 1      It would depend on what purpose you're

 2      referring to this goal.  What would be the

 3      purpose of this goal?

 4                  What I want to achieve in a

 5      home is no failures; therefore, what I need

 6      to achieve is the environment which produces

 7      no failures.  If I could -- if I have

 8      achieved the -- the environment that produces

 9      no failures, I have achieved my task.

10           Q.     Dr. Sharp, your practical

11      maximum corrosivity guideline to safeguard

12      electronic equipment in a factory is

13      .1-micron per year, isn't it?

14           A.     That's the goal, to achieve the

15      target.  And that goal could be used in a

16      home to achieve the target.  The important

17      thing is achieving the target.

18           Q.     Is achieving a target different

19      than a practical maximum corrosivity

20      guideline?

21           A.     In my view it is.  The target

22      is -- is what I have -- it's what I have to

23      do, but it's not me doing it.  This is going

24      to be -- these -- the systems that I was
```

Confidential - Subject to Further Confidentiality Review

Page 49

```
 1      involved with were deployed in a myriad of

 2      applications and therefore I set this

 3      conservative goal so that I -- to -- so that

 4      I would know that the target would be

 5      achieved.

 6              Q.      And when you set the

 7      conservative goal so that you know that the

 8      target will be achieved in the home, you're

 9      setting the same practical maximum

10      corrosivity guideline of .1-micron per year,

11      aren't you?

12              A.      I have not set that.  I have

13      used the -- the target as the direct

14      criteria.

15              Q.      So you're setting a different

16      practical maximum corrosivity guideline for

17      the home than you did for the factory, aren't

18      you?

19              A.      I don't believe so.  I'm trying

20      to avoid failures.  And I know what I have to

21      achieve to avoid failures, both in a factory

22      and in a home and in a hospital, in a museum,

23      wherever.  I have to achieve this

24      487-angstrom or less copper reactivity.  And
```

Confidential - Subject to Further Confidentiality Review

Page 50

1    I've achieved that, I have eliminated

2    failures.

3         Q.    Dr. Sharp, would you show me in

4    Exhibit No. 1 where you tell us the

5    487-angstrom direct measurement that you just

6    referred to.

7         A.    Yes.   The .17 -- if you look at

8    table 1, the third line in that table --

9    excuse me, the second line in that table,

10   "greater than .17 micrometers per year

11   intermittencies."   That .17 micrometers per

12   year translates into 487 angstroms using the

13   conventional parabolic interpretation

14   recommended by the Instrument Society of

15   America.

16        Q.    So in order for me to get to a

17   487-angstrom guideline, I have to run a data

18   point in your report of .17 micrometers per

19   year through a parabolic equation?

20        A.    You'd simply have to look at

21   the square root of the time ratios.   It's not

22   a complicated calculation.

23        Q.    Perhaps not for you, but the

24   square root of the time ratios is something

Confidential - Subject to Further Confidentiality Review

Page 51

1    I'm struggling with.  Tell me -- tell me what

2    we're doing here to .17 to get it to

3    487 microns.

4         A.    The ISA standard for avoiding

5    failures in electronics states how to do this

6    in its Appendix C.  It shows the equation

7    that relates the thickness of the film at

8    different times to the duration of exposure

9    of the coupons.

10        Q.    Where the duration of the

11   exposure of the coupons is an important

12   issue, isn't it?

13        A.    In what sense?

14        Q.    Well, you've got to look to the

15   thickness of the film that's built out --

16   built up over a given duration of exposure?

17        A.    Yes.

18        Q.    And then you've got to apply a

19   formula that assumes a particular type of

20   growth, in this instance parabolic as opposed

21   to, what, linear growth rates?

22        A.    That's what ISA says.  And this

23   type of extrapolation and interpolation is

24   routine for people working in this field.

Confidential - Subject to Further Confidentiality Review

Page 52

```
 1              MR. SERPE:  Dr. Sharp, I would
 2         like to take a short break here this
 3         morning.
 4              THE WITNESS:  Sure.
 5              THE VIDEOGRAPHER:  Time now is
 6         approximately 9:50 a.m., and we are
 7         now off the record.
 8              (Recess taken, 9:50 a.m. to
 9         10:01 a.m.)
10              THE VIDEOGRAPHER:  This begins
11         Tape 2 of the videotaped deposition of
12         Dr. Sandy Sharp.  Time now is
13         approximately 10:01 a.m., and we are
14         back on the record.
15    BY MR. SERPE:
16         Q.    Dr. Sharp, with respect to the
17    article which you authored in 1989 which
18    we've marked as Sharp No. 1, at that point in
19    time you were the group leader -- or a group
20    leader at Westvaco Corporation, were you not?
21         A.    That is correct.
22         Q.    And what were the
23    responsibilities of a group leader at
24    Westvaco Corporation?
```

Confidential - Subject to Further Confidentiality Review

1           A.      I was responsible for the

2      corrosion group in that corporation.  I

3      had -- there were a number of Ph.D.s who

4      reported to me.  And as a group we were

5      responsible for corrosion control within the

6      corporation.  We had chemists and

7      metallurgists, chemical engineers doing

8      research and solving problems in corrosion

9      and materials.

10          Q.      And as the group leader of the

11     corrosion group, you oversaw the development

12     and refinement of the proprietary procedures

13     for copper metal reactivity coupons for

14     Westvaco.

15          A.      That is correct.

16          Q.      And as the group leader of the

17     corrosion group, you oversaw the development

18     and refinement of the proprietary laboratory

19     procedures for analyzing the corrosion

20     product that had been built up on the

21     reactivity coupons as they were returned to

22     the laboratory.

23          A.      That is also correct.

24          Q.      And these proprietary

Confidential - Subject to Further Confidentiality Review

Page 54

```
 1    processes, both for the development of the

 2    reactivity coupons and their analysis, was a

 3    significant part of your life's work,

 4    developing and improving that technology.

 5         A.    That -- that's true.

 6         Q.    A technology that's been

 7    deployed in tens of thousands of locations

 8    around the world.

 9         A.    I understand it's about 10,000

10    of the systems which the company that I was

11    associated with has deployed.

12         Q.    Over what's going on now

13    30 years of development.

14         A.    Nearly 30 years, yes.  And

15    there are many other systems produced by

16    other companies, 20,000 by a single other

17    company, yes.

18         Q.    And you believe that Westvaco's

19    system, now through the name MeadWestvaco, is

20    the premier system for reactivity coupons,

21    deployment and measurement in the world.

22              MS. MAUS:  Objection,

23         foundation.

24         A.    I don't believe I said that.  I
```

Confidential - Subject to Further Confidentiality Review

1    think it -- it is a good system.  We needed

2    to develop our own coupon monitoring

3    capability in-house because we were not able

4    to purchase it in a satisfactory fashion from

5    independent laboratories, so we had the

6    capability in-house and we developed that

7    capability and have maintained it over the

8    years to produce reactive and reproducible

9    copper reactivity coupons and to analyze them

10   carefully.

11   BY MR. SERPE:

12       Q.    And the Westvaco or now

13   MeadWestvaco researchers that analyze

14   reactivity coupons do so very carefully, do

15   they not?

16       A.    The same person has been

17   responsible for that analysis for more than

18   25 years.

19       Q.    Who is that?

20       A.    Her name is Donna Smith.

21       Q.    And Donna Smith is a very

22   precise woman.

23       A.    That's my experience.

24       Q.    And she's a very diligent

Confidential - Subject to Further Confidentiality Review

Page 56

1        woman.

2               A.      Yes.

3               Q.      And she doesn't throw around

4        data or reference values that she doesn't

5        have an extremely high confidence level in?

6               A.      The equipment that she uses is

7        automated.   She conducts the tests and then

8        the data are interpreted by -- according to

9        the standards that we have described.

10              Q.      And the automated system has

11       been improved and refined over the last

12       25 years?

13              A.      Yes, it has.

14              Q.      And you find it to be a highly

15       reliable and precise system.

16              A.      I do.

17              Q.      Dr. Sharp, in coming up with

18       the guidelines and direct measurement levels

19       which you reported in your 1989 paper, which

20       has been marked as Sharp Exhibit No. 1, you

21       collected information regarding equipment in

22       80-some-odd control rooms, did you not?

23              A.      That is correct.

24              Q.      And as you collected the data,

Confidential - Subject to Further Confidentiality Review

Page 57

1    you made careful notes as to the type of

2    failures that had been encountered in some

3    number, perhaps 20, of the control rooms in

4    that factory.

5              MS. MAUS:  Objection,

6         foundation.

7         A.    We sought failure data and then

8    correlated -- or looked for correspondence

9    between the failure data and the tarnish film

10   thickness.

11   BY MR. SERPE:

12        Q.    So you would need data

13   concerning failures in order to do that.

14        A.    Correct.

15        Q.    You'd have to look at the

16   equipment that had actually failed.

17        A.    We looked at the electrical

18   maintenance records.

19        Q.    So you had to look at records

20   of electrical maintenance to determine where

21   equipment had failed.

22        A.    That is correct.

23        Q.    And you also had to look at the

24   reactivity coupons that had been deployed

Confidential - Subject to Further Confidentiality Review

Page 58

1    into the environments within the control room

2    where those equipments had failed.

3         A.      That is correct.

4         Q.      And then you had to attempt to

5    analyze that data in an effort to draw

6    conclusions with respect to how corrosive an

7    environment has to be before you would expect

8    to see a failure.

9         A.      That's the methodology used in

10   this study, yes.

11        Q.      And you kept very careful

12   records with respect to the development of

13   your analysis to reach these conclusions,

14   didn't you?

15        A.      We kept the analytical data

16   showing the thickness of the tarnish films.

17   We needed that to find the cutoff below which

18   failures would not occur.

19        Q.      And you kept copies of the

20   maintenance records on the electrical

21   equipment to make sure you knew which room

22   had had a failure of which piece of

23   equipment.

24        A.      We brought all that information

Confidential - Subject to Further Confidentiality Review

Page 59

1    together in writing the -- this paper.

2         Q.     And where is all of the written

3    documentation concerning the development of

4    this set of standards?

5         A.     Our policy in Westvaco

6    Corporation at that time was to keep detailed

7    records up to the point that a project was

8    documented, then to maintain them for about a

9    year afterwards in case there were questions

10   that arose directly from the publication, and

11   then beyond that the records were not

12   normally kept.

13        Q.     So in other words, at this

14   point in time there are no surviving records

15   with respect to the calculations that were

16   made that resulted in the paper that we're

17   looking at as Sharp No. 1.

18        A.     These are not calculations.

19   These are records of the tarnish film

20   thickness and records of the failures that

21   had occurred in the same environment.

22        Q.     So if I wanted to see the

23   tarnish film thicknesses or wanted to see the

24   reported data on rate of corrosion that were

Confidential - Subject to Further Confidentiality Review

1    associated with these failures to actually

2    look at powered laboratory data, those --

3    those records wouldn't exist anymore?

4         A.    I don't have those records.  I

5    don't work for that company anymore.  I would

6    not expect them to have been retained.

7         Q.    So for example, I would have no

8    way of getting my hands on the actual records

9    to see whether or not between the time that

10   the information came out from the Westvaco

11   computer system and the analyst, this woman

12   that we talked about, whether or not those

13   numbers had been subject to any recalculation

14   based upon assumptions or presumptions about

15   the environment prior to being reported in

16   the paper.

17        A.    I don't know as I -- I already

18   said, I don't know whether those data exists

19   in their original laboratory form, but the --

20   the results of those tests are tabulated in

21   table 1.

22        Q.    So whatever the Westvaco

23   technical department that generated the

24   thicknesses reported, you simply took that

Confidential - Subject to Further Confidentiality Review

1    number off of their reported data and

2    tabulated it, placed it onto the table that

3    we're looking at in Sharp No. 1?

4         A.    It says that the atmospheric

5    corrosivity was measured during a 90-day

6    period.  So that was converted from a 90-day

7    period to an equivalent micrometers per year

8    using the same formula that I described to

9    you before.  Because at that point we were

10   using micrometers per year as a standard

11   reporting function in the same way that

12   nowadays we're using angstroms per 30 days as

13   a standard reporting function.

14        Q.    Well, let's walk through this

15   sequentially because I think it will help

16   illustrate my question.

17              First, you place coupons in the

18   control rooms.

19        A.    Yes.

20        Q.    Second, at this point, 90 days

21   goes by and the coupons are removed.

22        A.    Yes.

23        Q.    Third, they're sent to the

24   technicians at Westvaco who calculate the

Confidential - Subject to Further Confidentiality Review

Page 62

1    thicknesses of the corrosion product on the

2    coupons.

3        A.      Who measure it, yes.

4        Q.      Measure it.  My question is,

5    when that has happened, did anybody

6    recalculate the numbers off of what the

7    Westvaco technicians had come up with before

8    it was tabulated into this paper?

9        A.      Somebody converted angstroms in

10   90 days to micrometers per year.

11       Q.      Using what formula?

12       A.      The parabolic extrapolation

13   that I referred to you -- you to before.

14       Q.      That was the only recalculation

15   that was done?

16       A.      That's correct.

17       Q.      There was no adjustments made,

18   for example, assuming that there was a

19   different density of a corrosion product and

20   therefore that the numbers had to be adjusted

21   on the basis of the wrong density of the

22   corrosion product?

23       A.      These are reported as total

24   thickness of the corrosion product.

1          Q.      I understand how they're

2     reported.  My question is did anything happen

3     to the numbers after they came out of the

4     computer system with the technician at

5     Westvaco before they got tabulated other than

6     changing them to the parabolic curve?  Any

7     other calculation changes that were made?

8          A.      I don't think so.

9          Q.      But you're not sure and we

10     can't check because you don't have the data.

11          A.      Well, there would be -- there

12     would have been no reason to do anything

13     except change the -- recalculate the total

14     thickness from a 90-day total thickness to a

15     365-day total thickness.

16          Q.      There would have been no reason

17     to have done anything other than change the

18     calculation from 90-day to 365-day for total

19     thickness.

20          A.      Correct.

21          Q.      There would have been no reason

22     to have subtracted out an oxide layer in

23     order to have gotten a number before putting

24     it onto the table in the report?

Confidential - Subject to Further Confidentiality Review

Page 64

1          A.      No, there would not.  We

2     subtracted oxide thicknesses in other work

3     for other reasons.

4          Q.      But not in this case?

5          A.      Not in this case.

6          Q.      There would have been no reason

7     to have recalculated the thicknesses --

8     strike that.  Let me ask a question I think

9     you just told me the answer to and I didn't

10    absorb it.

11              Back in the 1989 time frame,

12    did they use this stripping voltaic method

13    for calculating the thicknesses on the

14    reactivity coupons?

15         A.      That is correct.  And I'm

16    not -- just to clarify something that I said,

17    I could not swear that it was Donna Smith

18    that did this particular analysis.  The

19    techniques were developed in my laboratory.

20    And at some point in this general time frame,

21    the analysis function was transferred to the

22    location where Ms. Smith works.  So it could

23    have been her analysis or it could have been

24    analysis in my laboratory, but it would, in

Confidential - Subject to Further Confidentiality Review

Page 65

1    both cases, have been stripping voltammetry

2    as the standard method, the method

3    recommended in the ISA standard.

4        Q.    And stripping voltammetry --

5        A.    Correct.

6        Q.    -- requires a calculation based

7    upon the thickness -- I'm sorry, the density

8    of the corrosion product that was the -- on

9    the reactivity coupon.

10       A.    Yes, that's part of the

11   calculation.  If you count the number of

12   electrons required to reduce the corrosion

13   product and one-gram equivalent -- one

14   faraday of electrons, that's six times 10 to

15   the power of 23rd, reduces one-gram

16   equivalent and you have to know the -- the

17   nature of the product and its density and so

18   forth.  Yes, that's all part of the

19   calculation which is now enshrined in the

20   computer program that helps Donna Smith to do

21   the analysis.

22       Q.    And we've enshrined it because

23   it's important.

24       A.    You have to do the calculation

Confidential - Subject to Further Confidentiality Review

1    correctly to get the correct answer.

2        Q.    And the enshrined calculation

3    now allows for correct answers.

4        A.    Yes.

5        Q.    In 1989 -- remember, we're --

6    we're talking about the time period where the

7    coupons come out, they go to the technical

8    people, the technical people do the stripping

9    voltammetry, the results are reported out by

10   the technicians who conducted that process on

11   some sort of a laboratory form saying here

12   are the thicknesses that we achieved based

13   upon the system that we've been developing.

14   At that point in time, did anybody say, oh,

15   let's redo these numbers based upon a

16   different assumed density of the material

17   before they were published in Sharp Exhibit

18   No. 1?

19       A.    No.

20       Q.    But the working papers,

21   including the laboratory data forms that came

22   out of the analysis of the coupons from these

23   86 rooms as well as the calculations that

24   resulted in the selection of the 487-angstrom

Confidential - Subject to Further Confidentiality Review

Page 67

```
 1    thickness, are not accessible to you in any

 2    format at this time.

 3         A.      They're not accessible to me.

 4         Q.      Same goes for the maintenance

 5    and failure records from these control rooms,

 6    those are no longer accessible to you either.

 7         A.      They are not accessible to me

 8    either.

 9               (Whereupon, Deposition Exhibit

10         Sharp-3, 10/1/09 and 10/19/09, MWV

11         Letters to Goad, was marked for

12         identification.)

13    BY MR. SERPE:

14         Q.      Let me hand you what I'm going

15    to mark as Exhibit No. 3.  Dr. Sharp,

16    Exhibit 3 is data reported by MeadWestvaco

17    with respect to reactivity coupons, is it

18    not?

19         A.      Yes, it is.

20         Q.      If I refer to MeadWestvaco as

21    W -- I'm sorry, MWV during the deposition

22    today, will you know what I'm speaking of?

23         A.      I believe that is the company's

24    official name now, although it is not often
```

Confidential - Subject to Further Confidentiality Review

Page 68

```
1     used.

2          Q.     I find myself saying "WMV"

3     instead of "MWV."  It's a tongue twister

4     sometimes.  I don't know if you have the same

5     problem.

6                 Exhibit No. 3 represents

7     calculations conducted by MWV; is that

8     correct?

9          A.     Yes, it does.

10         Q.     Performed by the technicians

11    and the computer systems at MWV.

12         A.     Correct.

13         Q.     Using the enshrined

14    calculations that ensure accuracy.

15         A.     Yes.

16         Q.     I would like you to flip to the

17    third page of this exhibit which appears to

18    be an October 19th, 2009, letter from MWV.

19    Do you see that?

20         A.     I do.

21         Q.     And I would like to focus for a

22    minute on the three lines of data at the

23    bottom of that page.  Coupons number 4355,

24    4370 and 4396.  You see where I'm referring
```

Confidential - Subject to Further Confidentiality Review

Page 69

1      to?

2          A.      I do.

3          Q.      Reactivity coupons were placed

4      in a home in 9329 Scarborough in Florida,

5      weren't they?

6          A.      Yes.

7          Q.      And they were placed in a

8      bedroom in that home.

9          A.      Yes.

10         Q.      Placed in an interior wall of a

11     bedroom of a home in Florida.

12         A.      They were.

13         Q.      And they were left there for

14     30 days between September 9th of last year

15     and October 9th of last year, were they not?

16         A.      They were.

17         Q.      And they were sent to MWV so

18     that the technicians and computer equipment

19     could calculate the thickness of the

20     corrosion product that built up on those

21     reactivity coupons.

22         A.      Yes.

23         Q.      The results are reported on

24     this page of Exhibit 3.  And I want to look

Confidential - Subject to Further Confidentiality Review

1    first to the column that's labeled "microns

2    per year." Do you see the column I'm

3    referring to?

4           A.     I do.

5           Q.     With respect to the first

6    coupon, that being coupon No. 4355 which was

7    placed in the bedroom wall, the

8    micron-per-year result is .76 microns per

9    year, is it not?

10          A.     It is.

11          Q.     Which is 7.6 times higher than

12   the practical maximum corrosivity guideline

13   which you reported in your paper, Sharp

14   Exhibit No. 1.

15          A.     That is correct.

16          Q.     The coupon also has a thickness

17   reported in angstroms for that 30-day time

18   period, correct?

19          A.     Yes.

20          Q.     And the thickness is reported

21   as 2179 angstroms, does it not?

22          A.     It does.

23          Q.     Which is somewhere along the

24   order of magnitude of five times higher than

Confidential - Subject to Further Confidentiality Review

Page 71

```
 1    your limit for expecting the intermittency --

 2    intermittent failures of electronic

 3    equipment?

 4         A.     It is.

 5         Q.     The environment in this Florida

 6    home, according to the standards in your 1989

 7    paper, is a corrosive environment?

 8         A.     I would predict from my 1979

 9    data that this environment would cause

10    failures in electronic equipment at some

11    point in the future.

12         Q.     And because the corrosive

13    environment in this home is going to lead to

14    failures in electronic equipment, you believe

15    something needs to be done about this

16    environment.

17         A.     Without doing something, then I

18    would predict that there will be failures of

19    electronic equipment at some point in the

20    future.

21         Q.     And you consider failures of

22    electronic equipment in the home unacceptable

23    just like you consider failures of electronic

24    equipment in a factory unacceptable, do you
```

Confidential - Subject to Further Confidentiality Review

Page 72

1    not?

2         A.     We don't want failures to occur

3    because of corrosion, that's my job.

4         Q.     So something has to be done

5    about homes with Chinese drywall to prevent

6    failures of equipment.

7         A.     To prevent failures that are

8    caused by atmospheric tarnishing, because

9    there are other reasons that electronics

10   fail.  New equipment tends to have a higher

11   failure rate and then older equipment tends

12   to have a higher failure rate.  But what

13   we're talking about here is failures due to

14   corrosion and we have a parameter that will

15   indicate its likelihood.  And that parameter,

16   if applied to these data, indicates that

17   there is a likelihood of failure of

18   electronic equipment at some point in the

19   future if this environment is maintained.

20        Q.     And since we're talking about

21   failures due to corrosion and the likelihood

22   of the failure of electronic equipment, you

23   believe something needs to be done to correct

24   the environment in houses with Chinese

Confidential - Subject to Further Confidentiality Review

Page 73

1    drywall.

2          A.      I said that if the environment

3    is not changed in those houses, we will have

4    failures of electronic equipment at some

5    point in the future.

6          Q.      Which is unacceptable.

7          A.      We don't want to have failures

8    of electronic equipment, yes.

9          Q.      And since we don't want to have

10   failures of electronic equipment, the

11   environments are unacceptable.

12         A.      They need to be changed to

13   eliminate the conditions that cause corrosion

14   failures of electronic equipment.  I could

15   say -- I could emphasize not of electrical

16   equipment, but we're -- in this instance

17   we're talking specifically about electronic

18   equipment.

19         Q.      Well, let's talk about

20   electronic equipment.

21         A.      Yes.  Okay.

22         Q.      Your standard as you told me

23   earlier was 1434 angstroms.

24         A.      That's correct.

Confidential - Subject to Further Confidentiality Review

Page 74

1        Q.        In the walls of this bedroom in

2    Florida, the angstrom thicknesses were

3    2179 angstroms, were they not?

4        A.        That is correct.

5        Q.        That's higher than your limit

6    of 1434 angstroms for electrical failures,

7    isn't it?

8        A.        It is a little higher.

9        Q.        So you're predicting that at

10   some point in time we're going to have

11   electrical failures in homes with Chinese

12   drywall if something isn't done about the

13   environment.

14       A.        At some point in the future.

15       Q.        And that's unacceptable.

16       A.        To avoid those kinds of

17   problems, we need to change the environment.

18       Q.        Let's address this "at some

19   point in the future." Do you have an opinion

20   as to what the expected life of a home is?

21       A.        I would say approximately

22   similar to the expected life of a factory.

23       Q.        And what's that?

24       A.        Maybe 50, 100 years.

Confidential - Subject to Further Confidentiality Review

Page 75

1        Q.      So if we want to protect the

2   electrical equipment in a house for 50 to

3   100 years, you're going to have to do

4   something about the Chinese drywall in these

5   houses, aren't you?

6        A.      As I said already, the -- these

7   environments need to be changed to avoid the

8   possibility of future failures.

9        Q.      In fact, your own data

10  indicates that you expect to see electrical

11  failures at contacts and wires in as short as

12  three years at a 1434-angstrom thickness,

13  aren't you?

14       A.      Those were rheostats in

15  electrical circuits, yes.

16       Q.      And three years is obviously

17  significantly shorter than an expected normal

18  use or lifetime for an electrical system in a

19  house.

20       A.      That is correct.

21              (Whereupon, Deposition Exhibit

22          Sharp-4, 12/30/09 Expert Report of

23          Sandy Sharp, Ph.D., P1.029-0001 -

24          P1.029-0019, was marked for

Confidential - Subject to Further Confidentiality Review

1              (identification.)

2     BY MR. SERPE:

3          Q.     Dr. Sharp, let me hand you

4     Exhibit No. 4, which is your report of

5     December 30th, 2009, is it not?

6          A.     Appears to be.

7          Q.     And I would like you to look at

8     the -- page 5 of that report.

9          A.     Yes.

10         Q.     At the very top, paragraph

11    No. 8.  Would you read it out loud for me,

12    please.

13         A.     "The highest atmospheric

14    corrosivities measured inside homes

15    containing KPT drywall were below the 1434

16    30-day threshold required to eliminate

17    conditions that reduce the life of electrical

18    equipment."

19         Q.     That was a mistake, wasn't it?

20              MS. MAUS:   Objection,

21         argumentative.

22         A.     That is not consistent with the

23    measurement on coupon 04355.

24    BY MR. SERPE:

Confidential - Subject to Further Confidentiality Review

1          Q.      So you made a mistake.

2          A.      Apparently I did.

3          Q.      And you made a mistake on

4    coupon 4370.

5          A.      Apparently so.

6          Q.      And you made a mistake on

7    coupon 4396.

8          A.      Apparently so.

9          Q.      In fact, on every sample of an

10   electrical wire in a house that had Chinese

11   drywall but no ECS running, every one of them

12   was over the 1434-angstrom limit, weren't

13   they?

14         A.      Which data are you referring

15   to?

16         Q.      These three data points.

17         A.      With these -- yes, I've already

18   answered that.

19         Q.      We've been having a series of

20   questions about standards as were described

21   in your report, Exhibit No. 4, and in the

22   article as Exhibit No. 1, Sharp Exhibit

23   No. 1.  I'd like to turn now to other

24   national standards and ask you some questions

Confidential - Subject to Further Confidentiality Review

```
 1    about those.

 2         A.      Very well.

 3         Q.      Do you recognize Battelle as a

 4    national standard?

 5         A.      Battelle -- Battelle's

 6    classification is used by some electronic

 7    equipment manufacturers as an in-house

 8    guideline.  The national standard recognized

 9    by the American National Standards Institute

10    is the ISA standard.

11         Q.      And we're going to talk about

12    ISA.  But I'd like to ask you with respect to

13    the "some" who use Battelle as a guideline,

14    that would include Dr. Abbott, wouldn't it?

15         A.      Dr. Abbott has run the Battelle

16    program for many years.

17         Q.      And you recognize Dr. Abbott as

18    a leading authority in the field of

19    corrosion, do you not?

20         A.      I should say Mr. Abbott.  But,

21    yes, within the field of atmospheric

22    corrosion of electronics, he is a major

23    figure.

24         Q.      In fact --
```

Confidential - Subject to Further Confidentiality Review

1        A.      He has done some other

2    corrosion work, but -- concerning military

3    installations, but his primary work has been

4    in the atmospheric corrosion of electronic

5    equipment.

6                    (Whereupon, Deposition Exhibit

7            Sharp-5, MTI Publication No. 38

8            "Atmospheric Corrosion of Control

9            Equipment," by Abbott, P1.179-0001 -

10           P1.179-0068, was marked for

11           identification.)

12   BY MR. SERPE:

13       Q.      Let me hand you Exhibit No. 5.

14   You have in front of you Exhibit No. 5.  You

15   recognize that as the MTI publication

16   Atmospheric Corrosion of Control Equipment?

17       A.      I do.

18       Q.      And if you look back to your

19   report December 30th, which I believe is

20   Exhibit 4, you see that under book references

21   this, in fact, was the second book that you

22   referred to as reliance material in this

23   case.

24       A.      That is true.

Confidential – Subject to Further Confidentiality Review

1      Q.      And in this book, Mr. Abbott

2   discusses the appropriate use of the Battelle

3   classification system, does he not?

4      A.      He does.

5      Q.      And if you'd flip to page 76 --

6   I'm sorry, 75, he sets forth the definitions

7   of the various classes of corrosive

8   environments according to the Battelle Labs,

9   does he not?

10      A.      Yes.   His preamble is that this

11   is the proper way to classify environments

12   and then he gives his particular

13   classification.

14      Q.      And he describes four classes

15   of corrosive environments, does he not?

16      A.      He does.

17      Q.      And one of the classes of

18   environments is Class III.   You see that on

19   page 76?

20      A.      I do.

21      Q.      In which he refers to a

22   moderately severe environment as one in which

23   copper reaction rates result in thicknesses

24   of 1,000 to 3,000 angstroms.   You see that?

Confidential - Subject to Further Confidentiality Review

Page 81

1        A.      In one year, I do.

2        Q.      So when we return to Exhibit

3    No. 3 and the results tabulated at the bottom

4    of the page regarding the Florida home --

5              MR. SERPE:   Richard, the

6         witness needs to turn to October 19th,

7         the third page.

8    BY MR. SERPE:

9        Q.      Third page of Exhibit 3.

10   Again, looking at the Florida home that's at

11   the bottom of the page, Dr. Sharp.

12       A.      Yes.

13       Q.      We're seeing copper reaction

14   rates resulting in films that exceed 1,000 to

15   3,000 angstroms for one year, are we not?

16       A.      In this particular home.   There

17   are other homes with Chinese drywall where

18   the corrosion classification is much lower.

19   But in this particular home what you've said

20   is true.

21       Q.      So in this particular home with

22   Chinese drywall, we've got a Class III,

23   moderately severe environment, do we not?

24       A.      We do.

Confidential - Subject to Further Confidentiality Review

Page 82

1        Q.       One that would be predictive of

2    failure of electrical and electronic

3    equipment in this home.

4        A.       If the environment at the time

5    of the monitoring were maintained, yes.

6        Q.       Battelle Labs has recapped in

7    page 75 of Abbott, also include a Class II of

8    corrosion.  You see that?

9        A.       Yes.

10       Q.       Which includes film thicknesses

11   which can get as thick as 300 angstroms at

12   all times or 1,000 angstroms in one year?

13       A.       That is true.  That's how he

14   classifies it.

15       Q.       And he also contains a

16   qualitative description of what you would

17   expect to see in a Class II corrosive

18   environment, does he not?

19       A.       Yes, he does.

20       Q.       Where copper begins to react?

21       A.       And the porous gold plating

22   starts to exhibit pore corrosion and creep --

23   not creep.  He says begins in Class III, I

24   believe.  Yes.

Confidential - Subject to Further Confidentiality Review

Page 83

```
 1          Q.      He also refers, down below the

 2    thickness language, to Class II conditions

 3    referred to as worst-case office conditions.

 4          A.      That is his term, because he

 5    says it's misleading.

 6          Q.      All right.  Then if we go to

 7    note 1 on page 76, doctor -- I'm sorry,

 8    Mr. Abbott concludes that ISA's definition of

 9    a G1 environment is indistinguishable to the

10    Class I and Class II of Battelle.  You would

11    agree with that, wouldn't you?

12          A.      It -- they are -- they are both

13    based on the same 30-day tarnishing amount of

14    300-angstroms total thickness, yes.

15          Q.      So both the ISA and Battelle

16    Labs use the same 30-day tarnishing amount of

17    300 angstroms to classify their environments.

18          A.      There is a point at which

19    their -- their classification coincides, yes;

20    Battelle Class I and Class II coincide with

21    ISA G1.

22          Q.      And at that coincidental with a

23    convergence for Battelle and ISA, Mr. Abbott

24    believes that you would expect to see
```

Confidential - Subject to Further Confidentiality Review

```
 1    electronic failures developing.
 2         A.    I don't understand the
 3    question.
 4         Q.    Just a minute.  Let me see if I
 5    can get a reference page that will make it a
 6    clearer question.
 7              Dr. Sharp, if you'll flip to
 8    the Abbott paper, page 9 --
 9         A.    Yes.
10         Q.    -- just above critical
11    variables.  And rather than burden the court
12    reporter with a reading of the entire
13    paragraph, would you read that paragraph to
14    yourself that begins "according to figure 2."
15         A.    I will.
16              (Witness reviews document.)
17         A.    Yes, I've read it.
18    BY MR. SERPE:
19         Q.    Doctor -- I'm sorry, Mr. Abbott
20    describes a boundary in this paragraph, does
21    he not?
22         A.    Yes, he gives a qualitative
23    description of a boundary.
24         Q.    And then he provides reference
```

Confidential - Subject to Further Confidentiality Review

Page 85

1    for this boundary to both Battelle and ISA.

2         A.       Without giving any data to show

3    that failures occur.

4         Q.       But the boundary he describes

5    is one beyond which he believed that failures

6    will occur, according to Mr. Abbott.

7         A.       No, he says, "Beyond the

8    transition, environmental corrosion plays an

9    increasingly important role in determining

10   reliability."  That doesn't say that failure

11   will occur.  He's saying that you can have

12   failures, internal failures, when the

13   atmospheric corrosivity is substantially

14   lower for other reasons.  And he's saying at

15   this particular transition, atmospheric --

16   external atmospheric factors start to have an

17   effect.

18        Q.       Dr. Sharp, will you flip to

19   page 25.

20        A.       Yes.

21        Q.       Do you see the figure 2 that

22   Mr. Abbott was referring to?

23        A.       Yes.

24        Q.       And do you see the Battelle

Confidential - Subject to Further Confidentiality Review

Page 86

1    classifications noted, Class I, Class II,

2    Class III?

3         A.    I see, yes, at the very bottom,

4    yes.

5         Q.    And then he plots where he

6    expects to see failure rates increasing --

7    were first occurring and then increasing with

8    this figure, does he not?

9         A.    It's difficult to follow, but

10   let me -- let me try to understand this.

11   He's written -- he's written designations for

12   the classes without apparently separating

13   them along the bottom of this figure.  And

14   then he is -- I'm really not sure what this

15   figure is saying.

16        Q.    Do you have personal

17   correspondence with Mr. Abbott?

18        A.    I talk to him from time to

19   time, yes.  We're both involved in the same

20   field.

21        Q.    Have you ever talked to him on

22   whether or not he expects that there are

23   failures that are going to occur in

24   electrical or electronic equipment as you

Confidential - Subject to Further Confidentiality Review

Page 87

1    approach Battelle Classification No. 2?

2          A.    I have not discussed that

3    specifically with him.  Mr. Abbott tends to

4    make general statements.  And it's because of

5    the lack of specific data that I performed

6    the study that we published in 1989, to see

7    when failures actually would occur.

8          Q.    So your data published in 1989

9    suggests a different outcome than what is

10   reported as -- on pages 9 and 25 of Abbott

11   where failures are expected to begin to occur

12   below 300 angstroms of thickness.

13               MS. MAUS:  Objection, form.

14         A.    I don't believe Abbott said

15   that failures would occur below 300 angstroms

16   of thickness, as you've said.

17   BY MR. SERPE:

18         Q.    Where do you believe Abbott

19   says failures will occur?

20         A.    Abbott says on page 9 that,

21   "Beyond the transition, environmental

22   corrosion will play an increasingly important

23   role in determining reliability."  The ISA

24   standard has a similar comment to say that

Confidential - Subject to Further Confidentiality Review

Page 88

1    environmental effects may -- may play a role

2    in equipment reliability.  And it's because

3    of this -- these -- this general statement

4    not backed up by specific data that we did

5    the experiment to find out when failures do

6    occur.

7        Q.    Dr. Sharp, what was the mission

8    of Battelle Labs in developing these

9    classifications?

10       A.    It was part of the work --

11   these classifications were described as part

12   of a large project with multiple sponsors who

13   were mostly electronic equipment

14   manufacturers.  I am not entirely sure of the

15   specific motivation, but I believe that part

16   of it was that when these vendors would sell

17   equipment and then subsequently maintain that

18   equipment, they wanted to know how likely

19   that equipment was to fail because of

20   environmental factors so that they could bid

21   appropriately for the maintenance contracts.

22   And therefore the system developed by Abbott

23   before there was the ISA standard provided

24   some indication of the likelihood or

Confidential - Subject to Further Confidentiality Review

Page 89

1    possibility of failure.

2            Now, in private conversations

3    with Abbott, I have -- I understand that --

4    well, no, let me take that back.  He -- no,

5    strike that.

6        Q.      You did investigation and

7    experiments to find out when failures do

8    occur, did you not?

9        A.      I did.

10       Q.      Battelle did experiments to

11   find out when failures would occur, didn't

12   they?

13       A.      You're referring to the graph

14   on page 25.  Are these experimental data?  I

15   don't know.

16       Q.      No, I'm not asking about 25 on

17   Abbott.  I'm asking you about Battelle,

18   Battelle's investigation like yours.

19       A.      Which investigation was this?

20       Q.      That resulted in the

21   development of the Battelle classification

22   system.

23       A.      As far as I am aware, the

24   Battelle classification system was not based

Confidential - Subject to Further Confidentiality Review

1      on failures.  My recollection, in

2      conversations with Abbott, was that he

3      started off by monitoring in hundreds of

4      different locations where electronics was

5      operated, from factories to offices to

6      air-traffic control, and he found that they

7      grouped themselves into distinct types and he

8      used those distinct types as the basis of his

9      classification.

10          Q.      And he developed a

11     classification of the types of environments,

12     not as some hypothetical exercise but to

13     actually have a system by which he could

14     predict failure.

15          A.      He predicts that at a certain

16     cutoff, the likelihood of external corrosion

17     limiting the life of electronics starts to

18     increase.  That's what he says in this

19     monograph.

20          Q.      And in this monograph he says

21     that the cutoff where the likelihood of

22     external corrosion limits the life of

23     electronics starts to increase at

24     300 angstroms after 30 days.

Confidential - Subject to Further Confidentiality Review

Page 91

1         A.       That's what he says.

2         Q.       Now, your -- you referred

3    earlier to ISA as a recognized international

4    standard.

5         A.       National standard.  The

6    international version of it is called the

7    International Electrotechnical Commission

8    standard.

9         Q.       And, in fact, ISA based their

10   classification system on the same data that

11   Battelle developed.

12        A.       ISA had input from a number of

13   laboratories, including IBM and Bell

14   Laboratories in particular who had been doing

15   related work.  Battelle was not represented

16   on the ISA committee that developed the ISA

17   standard.

18        Q.       So ISA did not base their

19   definition on Battelle data?

20        A.       Mr. Abbott thinks that the ISA

21   data -- ISA standard was founded on his data.

22        Q.       And he's mistaken?

23        A.       I didn't sit in on all the

24   committee meetings.  I'm not able to comment

Confidential - Subject to Further Confidentiality Review

Page 92

1    on that.

2        Q.      Did you sit in on any of the

3    committee meetings?

4        A.      Some of my staff sat in on some

5    of the meetings.

6        Q.      But you didn't?

7        A.      I did not.

8            MR. SERPE:  We're running out

9        of tape, and by the time we start on a

10       new topic I can't do it in four

11       minutes.  So we're going to take a

12       break.

13           THE VIDEOGRAPHER:  Time now is

14       approximately 10:57 a.m., and we are

15       now off the record.

16           (Recess taken, 10:57 a.m. to

17       11:10 a.m.)

18           THE VIDEOGRAPHER:  This begins

19       Tape 3 of the videotaped deposition of

20       Dr. Sandy Sharp.  Time now is

21       approximately 11:10 a.m., and we are

22       back on the record.

23   BY MR. SERPE:

24       Q.      Dr. Sharp, let's take another

Confidential - Subject to Further Confidentiality Review

1      look at Exhibit No. 3.

2           A.    Yes.

3           Q.    And let's flip to the very

4      first page, October 1st letter.

5           A.    Yes.

6           Q.    And I noticed in the preamble

7      paragraph above the data that they referred

8      to the placement of the coupons as just

9      14 days.  You see where I'm reading from?

10          A.    Yes.

11          Q.    And you would agree, wouldn't

12     you, that 14 days is an extraordinarily short

13     time period for the placement of a reactivity

14     coupon?

15          A.    It's unusually short.  In this

16     particular instance, the placement was short

17     because of a desire to obtain data quickly

18     and that these -- my recollection is that at

19     the same time 30-day coupons were deployed.

20          Q.    And the unusually short time

21     period of 14 days calls into question their

22     reliability, does it not?

23          A.    It -- the reason to have a

24     standard monitoring period is to monitor for

Confidential - Subject to Further Confidentiality Review

Page 94

1    long enough to encounter normal variations in

2    the environment that you're trying to

3    classify.

4         Q.    Because things change over

5    time.

6         A.    Sometimes they do.

7         Q.    Temperature and humidity, as

8    just two examples.

9         A.    Well, without -- without an

10   air-conditioning system, temperature and

11   humidity could change, yes.

12        Q.    And in light of your experience

13   on the normal variations in environments, you

14   have established a standard monitoring

15   period.

16        A.    I recommended a standard

17   monitoring period while I worked at Westvaco.

18        Q.    And the standard monitoring

19   period that you recommended while you worked

20   at Westvaco was 90 days.

21        A.    That is correct.

22        Q.    You never recommended a 14-day

23   monitoring period for reactivity coupons

24   while you were at Westvaco.

Confidential - Subject to Further Confidentiality Review

Page 95

1          A.      Not as a standard practice.

2     Although we probably did measurements on such

3     a short time period and in particular

4     instances.

5          Q.      But in such a short time

6     period, you would have grave concerns about

7     the reliability of the data because of normal

8     variations in the environment.

9                  MS. MAUS:   Objection, form.

10         A.      I wouldn't say I would have

11    grave concerns.   I would say I would have

12    some concern.

13    BY MR. SERPE:

14         Q.      And if you had 30-day data for

15    the same time period in the same room

16    available, you believe the 30-day period

17    would trump the 14-day period -- data

18    generated for the same room.

19         A.      In general I would prefer to

20    see longer monitoring periods simply because

21    of the reasons that I described, that they

22    encompass variations that may occur in the

23    environment.

24         Q.      And in those situations where

Confidential - Subject to Further Confidentiality Review

1    you had both 14- and 30-day data available to

2    you from the same environment and there were

3    discrepancies between the two data, you would

4    defer to the 30-day data as a more accurate

5    representation of the environment.

6         A.      You would learn different

7    things from different -- from the different

8    data.  You would learn from the 14-day what

9    was going on in the first 14 days, and then

10   from the 30-day you would learn what was

11   going on in the accumulated 30-day period.

12        Q.      But that's not something you

13   spoke to with the development of a 90-day

14   standard deployment length period, is it?

15   You weren't pulling some of those out at

16   14 days and 30 days to learn different things

17   from the earlier coupons; you were deploying

18   for 90 days to characterize the environment

19   in a reliably long time period.

20        A.      We're compare -- we're

21   describing two different situations.  In this

22   document that is in front of me here, we are

23   looking at short-term data obtained to find

24   some information quickly.  In the case of the

Confidential - Subject to Further Confidentiality Review

Page 97

```
 1    90-day monitoring period that I have
 2    described, that is for a different period.
 3    That is to determine whether additional
 4    protection is required in a -- in an air
 5    space or whether protection is being given in
 6    an air space.  And there were a number of
 7    factors to consider, including the effort
 8    required to deploy repeated, let's say, three
 9    30-day coupons instead of one 90-day coupon
10    and factors like that.  Given all those
11    factors, I chose 90 days a norm for our
12    company's activities.
13          Q.     And your company's activities
14    include comparing thicknesses obtained over a
15    90-day period to the 487-angstrom standard
16    for 30 days.
17          A.     That is correct.  And since --
18    and in the intervening decades, subsequent to
19    the publication of the ISA standard, 30-day
20    monitoring has become much more commonplace.
21          Q.     And you have experience with
22    30-day data since it's become more
23    commonplace.
24          A.     That is true.
```

Confidential - Subject to Further Confidentiality Review

1      Q.    So that you've had the ability

2  to look to see whether over the 30-day time

3  period, as you were able to demonstrate over

4  a 90-day time period, the 487-angstrom

5  guideline for electronic failure would also

6  hold true.

7      A.    I'm afraid I don't understand

8  the question.

9      Q.    Well, your work historically

10  was based upon 90-day coupon deployment, yes?

11      A.    Yes.

12      Q.    From 90-day deployment data,

13  you generated a 487-angstrom standard which

14  just happens to be based upon a 30-day time

15  period.

16      A.    Yes.  It's calculated on a

17  30-day basis, yes.

18      Q.    Now you're telling me that it

19  became more common to use 30-day deployment

20  time periods.

21      A.    Yes.

22      Q.    And you have experience looking

23  at 30-day deployment coupons.

24      A.    Yes.

Confidential - Subject to Further Confidentiality Review

1       Q.     And you have a confidence level

2   that your 487-angstrom thickness for

3   intermittent electronic failures holds true

4   for thicknesses obtained on 30-day deployment

5   as you had done for yourself on 90-day

6   deployments.

7       A.     That's correct.  By using the

8   nationally accepted parabolic formula for

9   interpolating or extrapolating.

10       Q.     Not just based upon a formula,

11   based upon your association of real-world

12   failures or the absence of real-world

13   failures in the same environments that the

14   coupons were deployed.

15       A.     That is what I described in the

16   1989 paper, yes.

17       Q.     You have no such experience

18   with respect to a 14-day deployment.

19       A.     I can take the 14-day data and

20   extrapolate them to 30 days just the same as

21   I can take the one-year data and interpolate

22   it to 30 days.

23       Q.     But what you miss that you've

24   got for both 90 and 30 days is the

Confidential - Subject to Further Confidentiality Review

1    association of your extrapolation to

2    real-world failures.  You've never done that

3    with respect to 14 days.

4         A.    I don't understand what the

5    challenge is to interpolating and

6    extrapolating by the formula given in

7    Appendix C of the ISA standard.

8         Q.    Can you extrapolate back to

9    one-day deployment?

10        A.    I would not extrapolate back to

11   a one-day deployment.

12        Q.    Why not?

13        A.    Because the coupon as deployed

14   has a certain thickness of copper oxide on

15   it.  The difference in between the

16   as-deployed coupon on day zero and the

17   one-day retrieved coupon would be small and

18   difficult to measure with precision.

19        Q.    So how many days does it have

20   to be there before you say, aha, we've

21   crossed the threshold now that I can

22   extrapolate back to a 2-day deployment, a

23   3-day deployment?  How many days would you

24   have to have before you would say now we can

Confidential - Subject to Further Confidentiality Review

1    still do our parabolic equation and

2    extrapolate from it?

3         A.     The ISA standard suggests a

4    30-day deployment and notes that it may be

5    appropriate to use longer or shorter

6    deployments in more mild or more severe

7    environments.

8         Q.     If it's a more severe

9    environment, okay to go shorter.

10        A.     That's what the standard says.

11        Q.     In a mild environment, not okay

12   to go shorter.

13        A.     It doesn't say it in those

14   terms.  It says that it -- that the 30-day

15   monitoring period is the standard.  And that

16   longer or shorter deployment -- I'm not

17   positive about the wording to swear to it.

18   But the sense of it is that it's -- that

19   longer or shorter deployments may be used in

20   milder or more severe environments.

21        Q.     Dr. Sharp, fill this room with

22   your peers.  Would you argue to them that

23   that in a mild environment 14 days is an

24   adequately long time period to get an

Confidential - Subject to Further Confidentiality Review

1    accurate assessment of the corrosivity of a

2    mild environment?

3         A.    I have already said it and I'm

4    on the record as saying that I'd prefer a

5    longer deployment.

6         Q.    Than what happened here?

7         A.    I wanted data quickly.

8         Q.    And you got that data.  But now

9    that you have the 30-day data, you're

10   discounting the original 14-day data as an

11   unreliably short time period.

12        A.    I didn't say that.  But if I

13   had 30-day data, that would be more

14   appropriate to relate to the ISA

15   classification.

16        Q.    Let's look at the data on

17   page 1 of Exhibit 3.  And let's look at the

18   bottom three lines again, interior bedroom

19   wall.  And you see the address 9329, or a

20   partial address.  I think my colleagues that

21   pay attention to these details will verify

22   for me it's the same house represented on the

23   fourth page that we were talking about

24   earlier.

Confidential - Subject to Further Confidentiality Review

1              MR. SERPE:   Third page.

2   BY MR. SERPE:

3      Q.    I'm sorry, the third page.   In

4   fact, the coupon numbers are the same, 43 --

5   no, they're not, but they're very close, 4353

6   compared to 4355.   I've mucked up that

7   question.   Let me strike it and start all

8   over.

9            Would you look with me on

10  page 1 at coupon 4353.

11     A.    Yes.

12     Q.    And on a description it's got a

13  9329 MWV 8.   You see that?

14     A.    Yes.

15     Q.    If you, just for comparison

16  sake, flip to the third page and look at

17  coupon 4355, it's got the identical

18  identifier for 23 -- I'm sorry, 9329 MWV 8.

19     A.    Yes.

20     Q.    As far as we can tell, same

21  house, same wall.

22     A.    Yes.

23     Q.    Now, on coupon -- going to

24  page 1 -- 4353, when I follow it over to the

Confidential - Subject to Further Confidentiality Review

1    thickness that was achieved in 14 days, I see

2    809 angstroms, do I not?

3         A.    You do.

4         Q.    If I was assuming a linear

5    growth rate, I would double that to

6    1618 angstroms over 30 days, wouldn't I?

7         A.    That would be inappropriate.

8         Q.    Why?

9         A.    Because the ISA standard says

10   that for G1 environments, the parabolic

11   extrapolation is -- is appropriate.

12        Q.    Are you able, with the

13   assistance of a calculator, to give us the

14   parabolic result for converting the 14-day

15   number of 809 angstroms to a 30-day

16   equivalent?

17        A.    Its 30-day equivalent would be

18   of the order of 1200 angstroms.

19        Q.    Could you do the math if we

20   gave you a sheet of paper and a calculator?

21        A.    I probably could.

22        Q.    First have to see if we have a

23   calculator.  Dr. Sharp, perhaps you'll

24   indulge me that during the lunch break, if we

Confidential - Subject to Further Confidentiality Review

Page 105

1    can find a calculator, we'll either do it at

2    the end of the lunch break or perhaps just

3    after we start the deposition.

4          A.     Very good.

5          Q.     But moving on to the final

6    entry on page 1, 4371 for the -- another

7    coupon that was removed after 14 days from

8    this home, we have an angstrom thickness of

9    979, do we not?

10         A.     We do.

11         Q.     And based upon your

12   dead-reckoning of converting that to a 30-day

13   time period, that would exceed the 1434

14   threshold for electrical failures, would it

15   not?

16         A.     It would be close, yes.

17         Q.     And when we look to the

18   protective maximum guideline of .1-micron per

19   year, we once again see that all three wires

20   evaluated by MWV exceeded the .1-micron

21   safety threshold.

22         A.     Yeah, these are not wires.

23   These are copper reactivity coupons.

24         Q.     But the amounts of corrosion

Confidential - Subject to Further Confidentiality Review

1    product that built up on the reactivity

2    coupons exceeded a .1 safety threshold.

3        A.    Yes.  The monitoring was done

4    at the same time as the other coupons that we

5    have seen here, I think.

6        Q.    Dr. Sharp, you assumed a

7    parabolic curve based upon the assumption of

8    a G1 environment, did you not?

9        A.    I said the G1 environment is

10   extrapolated with a parabolic curve.

11       Q.    What curve or formula do you

12   use to extrapolate a G2 environment?

13       A.    G2 and G3 -- I'll need a copy

14   of the ISA standard.

15            MR. SERPE:  Let's mark this

16        Exhibit 6.

17            (Whereupon, Deposition Exhibit

18        Sharp-6, ISA Standard ISA-S71.04-1985,

19        "Environment Conditions for Process

20        Measurement and Control Systems:

21        Airborne Contaminants," P1.090-0001 -

22        P1.090-0022, was marked for

23        identification.)

24   BY MR. SERPE:

Confidential - Subject to Further Confidentiality Review

Page 107

```
 1          Q.      And I believe page 19 would be
 2     the --
 3          A.      I know my way around it.  Thank
 4     you.  I have two copies.
 5               MR. SERPE:  That's one for
 6          counsel.
 7               THE WITNESS:  Oh, beg your
 8          pardon.
 9               MR. SERPE:  Thank you.
10          A.      Yes, for G2, the parabolic
11     extrapolation is called for; and for G3 and
12     GX, a linear extrapolation is called for.
13     BY MR. SERPE:
14          Q.      Dr. Sharp, the -- I would like
15     to fast-forward to a question that may be
16     able to save us some time.  I'm assuming that
17     you've read the Sandia National Laboratories'
18     report that was issued with respect to their
19     investigation of Chinese drywall and
20     electrical equipment?
21          A.      The Gill and Trotta report?
22          Q.      Yes.
23          A.      Yes.
24          Q.      And you're aware that they
```

Confidential - Subject to Further Confidentiality Review

1  classified the environment as a G3 or higher

2  environment?

3          A.    I -- I read that, yes.

4          Q.    And assuming that they were

5  accurate in that respect, it would be a

6  linear equation that would have to be applied

7  to the growth rate rather than a parabolic

8  equation, wouldn't it?

9          A.    If they were correct in that

10  assumption, that would be correct; but I am

11  very doubtful about the assumptions that led

12  them to that conclusion.

13          Q.    We're going to talk about those

14  assumptions later.

15          A.    Good.

16          Q.    But if we assume that

17  Battelle -- that Sandia was correct, that

18  we're dealing with a G3 environment here, the

19  appropriate conversion would require the use

20  of a linear model as opposed to a parabolic

21  model?

22          A.    If that assumption is correct,

23  then we should use a linear extrapolation.

24          Q.    And a linear extrapolation

Confidential - Subject to Further Confidentiality Review

1    would generate significantly greater

2    thicknesses than a parabolic over time.

3         A.    That is correct.

4               (Whereupon, Deposition Exhibit

5         Sharp-7, Color Photograph, was marked

6         for identification.)

7    BY MR. SERPE:

8         Q.    Let me hand you what we're

9    marking for identification purposes as

10   Exhibit No. 7 and ask you whether or not you

11   have observed corrosion product on electrical

12   wires similar to what we're seeing in

13   Exhibit 7 in Chinese drywall houses which you

14   have personally investigated?

15        A.    I have personally investigated

16   homes with -- houses with Chinese drywall and

17   I have seen blackened ground wires.  And this

18   appears to be a blackened ground wire.

19        Q.    And if we look at the hot wire

20   under the white jacket, you can also see

21   evidence of corrosion on the exposed copper

22   wire under the contact point there, can't

23   you?

24        A.    You can't see under the contact

Confidential - Subject to Further Confidentiality Review

1  point and contact points are typically

2  screened from atmospheric gases, but on the

3  exposed surface of the copper you can see a

4  black tarnish film.

5             (Whereupon, Deposition Exhibit

6        Sharp-8, Color Photograph, was marked

7        for identification.)

8  BY MR. SERPE:

9        Q.    Let me hand you Exhibit No. 8.

10  In Exhibit No. 8 we see a direct photograph

11  of both the hot and neutral wires connected

12  to a switch with evidence of corrosion on the

13  exposed portion of the hot and neutral wire,

14  do we not?

15        A.    We see some tarnishing.  It

16  looks fairly light on the center wire there.

17        Q.    And it looks heavier on the

18  wire at the extreme edge of the page, does it

19  not?

20        A.    This apparent ground wire,

21  looks a little heavier on the ground wire.

22  But it's hard to say by -- by visual

23  observation.  As you know, you can't tell how

24  thick a film is by looking at it.

Confidential - Subject to Further Confidentiality Review

1          Q.      It's hard to say by visual

2     observation how heavy a corrosion film is on

3     a wire.

4          A.      That's true.   That's why we use

5     careful analytical methods to determine the

6     thickness of tarnish films on reactivity

7     coupons.

8          Q.      We use careful analytic methods

9     because visual observation is far less

10    reliable.

11         A.      It's insufficient to determine

12    the thickness of the film, yes.

13         Q.      It's also insufficient to

14    qualitatively analyze the amount of corrosion

15    that has been done to a wire.

16         A.      One can get a general

17    qualitative sense of is it corroded, is it

18    tarnished, is it not tarnished by looking at

19    it, but that's not sufficient for an

20    atmospheric classification.

21         Q.      When you looked at Exhibit

22    No. 8 a moment ago, you referred to the

23    tarnish on the central wire as light, did you

24    not?

Confidential - Subject to Further Confidentiality Review

Page 112

1       A.      I said it was lighter than the

2    first one.

3       Q.      Let me read back the question

4    and answer to you and see if this doesn't

5    refresh your recollection as to what you

6    said.  Question, "Let me hand you Exhibit

7    No. 8.  In Exhibit 8 we see a direct

8    photograph of both the hot and neutral wires

9    connected to a switch with evidence of

10   corrosion on the exposed portion of the hot

11   and neutral wires, do we not?"  Answer, "We

12   see some tarnishing.  It looks fairly light

13   in the center wire there."

14               Did I read that -- is that your

15   recollection as to your testimony?

16      A.      That's what I said, yes.

17   Fairly light.

18      Q.      So your qualitative description

19   of the center wire of Exhibit 8 is fairly

20   light?

21      A.      That's what I said, yes.

22      Q.      And you compared to the wire at

23   the -- that is seen to be fastened to the

24   extreme end of the photograph as darker than

Confidential - Subject to Further Confidentiality Review

Page 113

1    the center wire -- I'm sorry, as lighter than

2    the center wire?

3         A.    My intent was to compare it

4    with Exhibit 7 where the tarnish film

5    appeared darker.

6         Q.    So have you seen the Sproles'

7    classification system for grading the

8    corrosion on wires?

9         A.    I've seen the results of that

10   classification.

11        Q.    Have you seen his published

12   standard on which is which, how to use a 1, 2

13   and 3?

14        A.    I've seen the descriptions of

15   those.

16        Q.    Have you seen photographs that

17   go with it to help provide a guide?

18        A.    I can't swear to that.

19        Q.    And would you say that the wire

20   that's in the center of 8 would obtain a

21   different grade than the wire that's

22   visualized on Exhibit 7?

23        A.    I have not been involved in

24   grading wires because that is a qualitative