Confidential - Subject to Further Confidentiality Review

1    assessment.  I have been involved in

2    quantitative assessments of atmospheres by

3    reactivity coupons.

4         Q.    Would you consider yourself

5    unqualified to qualitatively characterize

6    these wires?

7         A.    I have not been trained in the

8    classification system that Dr. Sproles used.

9         Q.    How would one go about getting

10   trained in -- in that system?  You've seen

11   portions of it.  Do you have a sense of how

12   that happens or how that works?

13        A.    I would imagine that one would

14   be trained by looking at a number of samples

15   and hearing from an expert how they're to be

16   classified and understanding the use of

17   classification standards.  And I did not go

18   through that training.

19        Q.    To your knowledge, no one has

20   gone through that training at all.  I mean,

21   Dr. Sproles has developed it, but he hasn't

22   trained anyone, to your knowledge?

23        A.    I don't know whether he has or

24   whether he has not.  When I was present at

Confidential - Subject to Further Confidentiality Review

1    the inspections, Dr. Sproles was making those

2    evaluations.

3         Q.    You were present at the

4    inspections.  There were other experts there

5    at the inspections, were there not?

6         A.    There were.

7         Q.    And you've had conversations

8    with Dr. Perricone and Dr. Goad -- or

9    Mr. Goad over the last several months,

10   haven't you?

11        A.    I have.

12        Q.    And you've had meetings in

13   conference rooms at Baker & McKenzie

14   regarding this case, have you not?

15        A.    I don't recall meeting in

16   Baker & McKenzie offices, no.  But I have had

17   meetings with those individuals that you

18   described, Dr. Goad and Dr. Perricone and

19   Dr. Sproles, yes.

20        Q.    And in all of your meetings and

21   your telephone conversations and your e-mails

22   and your field visits with all of the experts

23   and technical people that are working as

24   experts for Knauf in this case, to your

Confidential - Subject to Further Confidentiality Review

Page 116

1    knowledge nobody knows how to grade a wire

2    under the Sproles system other than Sproles?

3         A.    I don't know if that's true or

4    not.  What I know is that Sproles has done

5    all the grading.

6         Q.    To your knowledge nobody

7    besides Sproles could do it today.

8         A.    To my knowledge sitting here,

9    I'm not aware of anybody else who's trained

10   to do that.

11        Q.    Looking at Exhibit 7, would it

12   be a fair statement that when corrosion

13   becomes visible to the naked eye on the order

14   of what we see on the grounding wire here in

15   Exhibit 7, that we're talking about

16   thicknesses in the hundreds of angstroms?

17        A.    That is probably true.

18        Q.    So that field investigation,

19   including looking carefully at the electrical

20   equipment, is an important tool available to

21   the investigator who is looking for the

22   propensity of an environment to cause

23   failure.

24        A.    It is one tool.  But you have

Confidential - Subject to Further Confidentiality Review

1      to be very careful in making a leap from what

2      you see on wires to what is likely to happen

3      that might cause a failure.  There are very

4      many differences in the situation of an

5      exposed piece of copper that happens to be

6      there than in the type of equipment that will

7      be failed -- that could fail.

8              Q.      And in order to be very

9      careful, one step that an investigator could

10     take would be to take the electrical

11     equipment out of the environment and conduct

12     scientific investigation on it.

13             A.      That would show whether the

14     equipment had failed or not.  That's a

15     possible avenue.  But as I said, there are

16     many differences between the corrosion or

17     tarnishing of copper that is set in an

18     environment and the reactivity coupons that

19     are accepted as the standard for classifying

20     the environment.

21             Q.      Dr. Sharp, we've spent a

22     significant portion of the morning talking

23     about reactivity coupons and how one uses

24     them to assess the corrosive properties of a

Confidential - Subject to Further Confidentiality Review

1    given environment, haven't we?

2         A.    We have.

3         Q.    And granting you the

4    appropriate use of reactivity coupons, my

5    question centers on isn't there also an

6    appropriate investigation which can be

7    conducted where you're looking at the

8    equipment that was actually deployed in the

9    field to look for whether or not it failed

10   and if possible the pathway or mechanism by

11   which it failed?

12        A.    If there were failures, then it

13   would be very important to establish the

14   mechanism and one can certainly look at

15   pieces of copper that are in the environment

16   to see what happened on those pieces of

17   copper.  But as I've said, there is not a

18   correlation between pieces of copper in the

19   environment and failures unless you go down

20   to the root of reactivity coupons which are

21   very carefully characterized and with which

22   the relationships have been found.

23        Q.    And in the absence of a

24   correlation, are you suggesting that it's

Confidential - Subject to Further Confidentiality Review

1    inappropriate to investigate the actual

2    copper surfaces that were in the environment?

3        A.    I'm not suggesting it's

4    inappropriate.  Data's always interesting.

5    But just let me take some examples.  Wires

6    are drawn.  They have cold work.  They often

7    have lubricants on the surface from the

8    drawing process.  That can alter their

9    tarnishing behavior.  On the other hand,

10   electronics typically run warm.  So they

11   typically run with a lower dew point.  As the

12   temperature rises, there's less corrosion.

13   Also, contacts in electronic equipment, which

14   I've said are the most vulnerable part,

15   frequently have corrosion inhibitors added

16   which tend to exclude the atmosphere.  Also,

17   contacts which are the vulnerable part are

18   pushed together and exclude air.  So -- and

19   also the classification coupon method

20   averages the tarnishing over the whole coupon

21   surface.  Therefore, a single measurement of

22   a particular corrosion thickness, let's say,

23   on a piece of wire cannot be taken as -- to

24   classify that environment according to the

Confidential - Subject to Further Confidentiality Review

Page 120

1    classification coupons, the reactivity

2    coupons.

3                    (Whereupon, Deposition Exhibit

4            Sharp-9, "New tools for the rapid

5            assessment and reduction of safety

6            risks in newly acquired mill

7            equipment," by Sharp, et al., was

8            marked for identification.)

9    BY MR. SERPE:

10           Q.    I would like to hand you

11   Exhibit No. 7 -- I'm sorry, 9.  This is your

12   paper recently published?

13           A.    Correct.

14           Q.    "New tools for rapid assessment

15   and reduction of safety risks in newly

16   acquired mill equipment."  Did I read that

17   correctly?

18           A.    You did.

19           Q.    And in this paper, you describe

20   an investigation which you conducted with

21   respect to tank failures, do you not?

22           A.    Yes.  Well, it wasn't really --

23   it was -- it was the development of

24   procedures to avoid tank failures.

Confidential - Subject to Further Confidentiality Review

1          Q.      And one of the things that you

2    did as part of your investigation in this

3    case was conduct inspection of the actual

4    tanks, didn't you?

5          A.      Yes.

6          Q.      And part of that was a simple

7    external visual inspection or looking at the

8    tanks, correct?

9          A.      Yes.

10         Q.      On page --

11         A.      I wanted to know if they were

12   leaking.  I beg your pardon.

13         Q.      On page 13 -- I'm sorry.  I

14   didn't mean to speak over you.  In the middle

15   paragraph, you discuss, as I think you just

16   mentioned, the difficulty of predicting by

17   external inspections where leaks are likely

18   to occur.

19         A.      Correct.  I -- I made the point

20   that lack of penetration in tank wall wells

21   cannot be seen by an external visual

22   inspection.

23         Q.      Because the thickness

24   measurements might not coincide with the

Confidential - Subject to Further Confidentiality Review

1    thinnest location; is that correct?

2         A.    That is correct.

3         Q.    Where we would have a concept

4    of the weakest link there, wouldn't we?

5         A.    Yes.  Because the tank is under

6    pressure, it has to hold mechanical stress.

7         Q.    So you go on to say that,

8    "Internal visual inspection is the most

9    reliable way to find locally thinned areas."

10   Is that correct?

11        A.    Yes.  This is a situation where

12   the tank wall plates are butted together and

13   there's a gap between them that is filled by

14   weld metal.  And if that weld metal has been

15   corroded on the inside of the tank -- you

16   can't see it from the outside of the tank --

17   but if you go to the inside of the tank, you

18   can see whether the weld metal is present

19   between the tank plates.

20        Q.    And because of that, internal

21   visual inspection is the most reliable way to

22   find locally thinned areas.

23        A.    That is correct.

24        Q.    And locally thinned areas would

Confidential - Subject to Further Confidentiality Review

1    represent the weakest link, wouldn't they?

2         A.    In a pressurized vessel like a

3    tank, they would.

4         Q.    Or in a pressurized vessel like

5    an HVAC coil.

6         A.    Yes.  In any pressurized

7    equipment.  Any equipment that has to survive

8    mechanical stress.

9         Q.    Now, one way to do inspections

10   of items is to conduct a cross section, is it

11   not?

12        A.    Cross sections can be

13   conducted.

14        Q.    And when a wire, for example,

15   is cross-sectioned, you can see across the

16   cross-sectional area of the wire, can you

17   not?

18        A.    You can.

19        Q.    And it's possible, using

20   accepted investigative techniques, to measure

21   the thicknesses of the corrosion product on

22   an actual wire from an actual environment, is

23   it not?

24        A.    At the point of the cross

Confidential - Subject to Further Confidentiality Review

Page 124

1    section, you can measure the thickness of the

2    corrosion product or tarnish film.

3         Q.    You can also measure the

4    thickness -- I'm sorry, the depth of any pits

5    that are observed on the wire, can you not?

6         A.    You can.

7         Q.    At that point of cross section?

8         A.    That is true.

9         Q.    And in looking for the weakest

10   link in a wire, one would have to look to the

11   thinnest location, wouldn't you?

12        A.    If the wire were subject to

13   mechanical stress, then it would be likely to

14   fail at its thinnest location.

15        Q.    In addition to investigating

16   the thickness of corrosion and the depth of

17   pits, it's possible to look at the morphology

18   of a wire, is it not?

19        A.    It is.

20        Q.    And in certain types of

21   corrosion, the morphology of a wire can

22   change, can't it?

23        A.    If you mean can there be

24   irregular surface features from the corrosion

Confidential - Subject to Further Confidentiality Review

1       process, I would say yes.

2              Q.       And in certain types of

3       corrosion, a wire can undergo a spongiform

4       change to the internal -- not surface, but

5       the internal portion of the wire, can it not?

6              A.       I have seen a photograph of a

7       spongiform structure on a wire.

8              Q.       And since you've seen it with

9       your own eyes, you believe that in certain

10      types of corrosion a wire can undergo

11      spongiform change.

12             A.       I don't know the history of

13      that -- of the wire that showed that

14      spongiform corrosion in the Gill and Trotta

15      report I believe it was, but they documented

16      that type of structure.

17             Q.       Now, the history of the wire

18      would be important, would it not?

19             A.       Because maybe there was

20      something corrosive on the surface at that

21      point in addition to the atmosphere.  That's

22      why I mentioned history.

23             Q.       Now, let me ask you to assume

24      that that wire came out of a Virginia home in

Confidential - Subject to Further Confidentiality Review

Page 126

```
 1     the same sort of climactic conditions which

 2     you described in your report.  Are you with

 3     me so far on the assumption?

 4          A.     Yes, we assume that the Gill

 5     and Trotta wire with the spongiform structure

 6     came from a Virginia home, yes.

 7          Q.     And that the wire was installed

 8     at approximately the same time, within a

 9     month or two of when the wires were installed

10     in the seven homes that were the subject of

11     this litigation and your expert report.

12          A.     On a hypothetical basis, let's

13     assume that.

14          Q.     And let's finally assume that

15     there were no discernible, significant

16     environmental variances between the Virginia

17     home that this wire was in and the Virginia

18     homes that were the subject of your expert

19     report.  Final aspect.

20          A.     That is a big leap because my

21     own monitoring in the Virginia homes showed

22     that they met a G1 environment.  But I -- I

23     can accept it as a hypothetical postulate if

24     you wish.
```

Confidential - Subject to Further Confidentiality Review

1         Q.      Now, if we accepted all of

2    these pieces, then you would conclude that

3    wires in the other seven homes would

4    experience the same sort of spongiform

5    changes that were described in the Sandia

6    report.

7         A.      I'm trying to remember all the

8    hypothetical conditions here.  If all the

9    homes were the same and if one showed that

10   type of corrosion and there was not some

11   particular local corrosive situation on the

12   wire, then the other homes would show the

13   same feature.

14        Q.      Let me cut to the chase.

15   Freedom of Information Act, that wire did

16   come out of a Virginia home.  Now, tell me

17   what these unique conditions of the Virginia

18   home would be that that wire came out of that

19   would make it nonrepresentative of the other

20   houses in Virginia.

21        A.      Well, simply our data that show

22   that the -- when we monitored the

23   classification of the environment in one of

24   the homes under -- in this case, we found

Confidential - Subject to Further Confidentiality Review

Page 128

1    that the environment was very mild.

2         Q.      Based upon your 14- and 30-day

3    coupons.

4         A.      They were 30-day coupons.

5         Q.      Okay.  Dr. Sharp, you've never

6    seen the results of the Virginia home coupon

7    analysis, have you?

8         A.      I have seen 30-day coupon

9    results.  They're, I believe, in

10   Dr. Perricone's supplemental report.

11        Q.      I'll represent to you, sir,

12   that the only data in Dr. Perricone's report

13   are for Florida and Louisiana.  There is no

14   Virginia data in that report.  I can get you

15   a copy if you'd like to verify it.

16        A.      The Florida and Louisiana data

17   are in his expert report.  It's my

18   recollection that the Virginia data are in

19   the supplemental report.

20        Q.      So you recall having seen the

21   Virginia data in connection with the

22   supplemental report of Dr. Perricone?

23        A.      That's my recollection.

24               MR. SERPE:  A minute.  It's

Confidential - Subject to Further Confidentiality Review

```
 1          five before the hour.  We're going to
 2          lay hands on this report during the
 3          lunch break and resume at 1:00.  Would
 4          that be okay?
 5                  THE WITNESS:  It will.
 6                  MR. SERPE:  Thank you, Doctor.
 7                  THE VIDEOGRAPHER:  Time now is
 8          approximately 11:58 a.m., and we are
 9          now off the record.
10                  (Recess taken, 11:58 a.m. to
11          1:16 p.m.)
12                  (Whereupon, Deposition Exhibit
13          Sharp-10, Appendix A to 12/09
14          Perricone Expert Report, P1.024-0014 -
15          P1.024-0048, was marked for
16          identification.)
17                  THE VIDEOGRAPHER:  This begins
18          Tape 4 of the videotaped deposition of
19          Dr. Sandy Sharp.  Time now is
20          approximately 1:16 p.m. and we're back
21          on the record.
22     BY MR. SERPE:
23          Q.    Dr. Sharp, as we continue this
24     afternoon, were there any portions of this
```

Confidential - Subject to Further Confidentiality Review

Page 130

1    morning's testimony that on reflection during

2    the break that you said to yourself, gee,

3    that might have been inaccurate or I need to

4    amend or do you feel that your testimony was

5    a fair statement of your opinions in this

6    matter as we've gone so far today?

7         A.    I have not recalled anything

8    that I would amend.

9         Q.    I would like you to look at

10   what I've marked as Exhibit No. 10, which I

11   believe is Appendix A to the expert report

12   for Dr. Perricone.

13        A.    Yes.

14        Q.    And if you'll flip to page 10

15   with me, you'll see a reporting of coupon

16   thicknesses with respect to coupons that were

17   collected as of October 9th, 2009.  Do you

18   see the table we're referring to?

19        A.    Yes, I do.

20        Q.    And do you recognize at the

21   bottom of that chart the 9329 positive

22   control data as being the same 9329 as we had

23   talked about earlier as part of Exhibit

24   No. 3?

Confidential - Subject to Further Confidentiality Review

Page 131

1          A.     Yes.

2          Q.     And you'll notice that the

3    angstrom thickness as reported by

4    Dr. Perricone on page 10 of Exhibit 10

5    reports angstrom thicknesses that are

6    different than the angstrom thicknesses that

7    were reported by MWV, doesn't he?

8          A.     Yes.

9          Q.     And the MWV thicknesses, for

10   example, on coupon 4355, which you can find

11   on page 3, W -- I'm sorry MWV reported the

12   angstrom thickness as 2179 angstroms after

13   30 days?

14         A.     Yes.

15         Q.     Yet Dr. Perricone finds that

16   the same coupon 4355 after 30 days was only

17   1453 angstroms.  Did I read that correctly?

18         A.     Yes, he has calculated the

19   thickness of the sulfide portion of the film.

20         Q.     In fact, he has recalculated

21   because those thicknesses had already been

22   calculated once, hadn't they?

23         A.     The total thickness was

24   calculated in the MWV report.

Confidential - Subject to Further Confidentiality Review

Page 132

1      Q.      Calculated by the enshrined

2  calculations at MWV.

3      A.      That is correct.

4      Q.      And the enshrined calculations

5  that were enshrined for accuracy reported the

6  thicknesses on coupon 4355 as 2179 angstroms,

7  did it not?

8      A.      It did.

9      Q.      Yet Dr. Perricone recalculates

10  the enshrined calculations and reduces them

11  down to 1453 angstroms, doesn't he?

12      A.      That was the sulfide portion of

13  the film.

14      Q.      And in order to do so, he

15  subtracts out 55 angstroms from the total

16  thickness, does he not?

17      A.      He does.

18      Q.      And in the proprietary reactive

19  coupon system which was developed

20  painstakingly by MWV over the years, they do

21  no such 55-angstrom deduction.

22           MS. MAUS:  Objection, form.

23      A.      No.  The MWV data shows the

24  total film thickness which includes the oxide

Confidential - Subject to Further Confidentiality Review

Page 133

1     as well as the sulfide.  Dr. Perricone's

2     calculation seeks to calculate the sulfide

3     thickness so that he can compare it to his

4     sulfide data obtained from the ESCA

5     instrument.

6     BY MR. SERPE:

7          Q.     So whatever numbers that

8     Dr. Perricone has come up here would not have

9     any resemblance of thicknesses that could be

10    compared to the standards that were developed

11    by Battelle or ISA, would they?

12         A.     My particular interest would be

13    to compare them to the standards that lead --

14    that discern the failure probability and the

15    appropriate numbers to use for that would be

16    the total film thickness as reported by

17    MeadWestvaco.

18         Q.     Total thicknesses reported by

19    MeadWestvaco would be the appropriate ones to

20    look at, not recalculated ones if you wanted

21    to predict failures.

22         A.     For predicting failures at --

23    you're correct, you would use the total

24    thickness.

Confidential - Subject to Further Confidentiality Review

Page 134

```
 1          Q.     So let's turn to your report,
 2   which we've marked as Exhibit No. 4.  And I'd
 3   like to focus you on paragraph No. 7 on
 4   page 4.  Are you with me, sir?
 5          A.     Yes, I am.
 6          Q.     And since it's short, would you
 7   humor me by reading paragraph No. 7 from
 8   page 4 into the record.
 9          A.     I'd be glad to.  "Because
10   tarnishing rates increase with relative
11   humidity and temperature, the high and
12   variable levels of humidity found in coastal
13   regions of the United States will tend to
14   accelerate the tarnishing of copper surfaces
15   in trace concentrations of reduced sulphur
16   gases emitted by drywall."
17          Q.     When humidity goes up in
18   coastal areas, the rate of accumulation of
19   corrosion on copper surfaces increases,
20   doesn't it?
21          A.     Yes, higher humidity produces
22   on copper higher rates of corrosion.
23          Q.     And variations in humidity --
24   variable levels of humidity also
```

Confidential - Subject to Further Confidentiality Review

Page 135

1    independently influence the rate of

2    corrosion?

3         A.    If the humidity varied rapidly,

4    that can lead to increases in tarnishing

5    rate.

6         Q.    And, in fact, you're aware that

7    in coastal areas even diurnal cycles can

8    result in significant swings in humidity?

9         A.    In outdoor environments, that's

10   true.

11        Q.    And to the extent that people

12   have their windows open during a pleasant

13   time of the fall or spring, that would be the

14   same as the ambient, wouldn't it, inside a

15   home?

16        A.    There would be some air

17   exchange.

18        Q.    Conversely -- I'm sorry, before

19   I get to converse.  High temperatures,

20   particularly in coastal regions of the United

21   States, tend to accelerate the accumulation

22   of corrosion.

23        A.    Other things being equal, high

24   temperatures accelerate corrosion processes,

Confidential - Subject to Further Confidentiality Review

Page 136

1    but in a closed air space increasing the

2    temperature reduces the relative humidity.

3    And in the second paper of my own that I

4    cited, that situation is explained in detail.

5    And the conclusion is that in a closed air

6    space raising the temperature in fact reduces

7    the corrosion rate because the effect of

8    reduced relative humidity is greater than the

9    effective increased temperature.

10        Q.     So there is an interplay

11   between humidity and temperature in the real

12   world and that interplay can itself have an

13   impact on the rates of corrosion

14   accumulation.

15        A.     Yes.  In general -- and if

16   equipment is allowed to warm itself, its

17   tarnishing rate goes down.

18        Q.     I'm not talking about

19   equipment, Dr. Sharp.  I'm asking you about

20   your paragraph 7 where you're talking about

21   the variable levels of humidity and

22   temperature found in coastal regions in the

23   United States.  You understand that's what

24   the questions were about?

Page 137

1      A.     Yes.   And I was answering it

2   with regard to tarnishing rates which I

3   thought was the focus of your question.

4      Q.     It is.   In fact, your sentence

5   says, "Because tarnishing rates increase with

6   relative humidity and temperature in the high

7   and variable levels of humidity found in

8   coastal regions of the United States will

9   tend to accelerate the tarnishing of copper

10  surfaces in trace concentrations of reduced

11  sulphur gases emitted by drywall."  First, I

12  read that accurately, didn't I?

13     A.     You did.

14     Q.     And temperature and humidity in

15  coastal regions will tend to accelerate the

16  tarnishing of copper, won't they?

17     A.     Each independently will, yes.

18  At constant relative humidity higher

19  temperature will increase the rate.  At

20  constant temperature higher relative humidity

21  will increase the rate.  But in a closed air

22  space, as in a house, if you raise the

23  temperature, you reduce the relative humidity

24  and the effect is to reduce the tarnishing

Confidential - Subject to Further Confidentiality Review

Page 138

1    rate.

2         Q.     And when you reduce the

3    temperature, you increase the relative

4    humidity.

5         A.     That is correct.

6         Q.     Which tends to increase the

7    tarnishing rate.

8         A.     That is correct.  That's why

9    dehumidification is important.

10         Q.     But you specifically point to

11    high levels of temperature and variable

12    levels of humidity as a particular confluence

13    of factors which you associate with increased

14    rates of tarnishing, do you not?

15         A.     Yes.

16         Q.     You don't have Virginia coupon

17    data for a time period representing a

18    seasonal high temperature and variable

19    humidity point in time, do you?

20         A.     We only had access to the homes

21    very recently and we tested as soon as we had

22    access.

23         Q.     And you -- you tested in

24    December to January is when it was made

Confidential - Subject to Further Confidentiality Review

1     accessible to you.

2          A.     That is correct.

3          Q.     And the reports of that

4     assessment are in the Perricone -- one of my

5     colleagues will help me out --

6               MR. SERPE:   Supplemental

7          report?

8               MR. LEWIS:   Correct.

9               MR. SERPE:   Which I will mark

10         as Sharp Exhibit 11.

11              (Whereupon, Deposition Exhibit

12         Sharp-11, 01/10 Perricone Supplemental

13         Expert Report, was marked for

14         identification.)

15    BY MR. SERPE:

16         Q.     If we flip to page 16, we see

17    the data that was collected from the Orlando

18    house over a 30-day time period.

19         A.     Yes, we do.

20         Q.     Between December 8th and

21    January 8th.

22         A.     Yes.

23         Q.     And at the far end of that we

24    have two columns, one for as reported in

Confidential - Subject to Further Confidentiality Review

Page 140

1    angstroms.   Am I reading that correctly?

2           A.       Yes, you are.

3           Q.       And the other for the stripping

4    voltammetry total film basis in angstroms.

5    This was the recalculation that we talked

6    about that Dr. Perricone did for some purpose

7    but -- which one would not use for failure

8    prediction.

9           A.       That is correct.

10          Q.       And the as reported, at least

11   as tabulated by Dr. Perricone here, looks at

12   values that are somewhere north of

13   150 angstroms.   Wouldn't that be a fair

14   statement?

15          A.       I see 107 -- sorry, 137 to 213.

16          Q.       And I'm sure someone would be

17   able to calculate a mean, medium and mode,

18   et cetera here, but as you glance at it from

19   dead-reckoning, we're -- we're looking at

20   something in the, what, upper 100s, perhaps

21   as high as 200 angstroms based upon the data

22   that's reported here?

23              MS. MAUS:   Objection, form.

24          A.       The data are what they are.

Confidential – Subject to Further Confidentiality Review

Page 141

1        BY MR. SERPE:

2               Q.      Right.

3               A.      Yes.

4               Q.      So on a test that would be --

5        would it be fair to use a winter season here,

6        December to January, for Virginia?

7               A.      We wanted to learn how this --

8        these -- the atmosphere in the Virginia homes

9        in question should be classified.  We tested

10       as soon as we were able and we found that

11       during the period of the test they would be

12       classified as a nonfailure of electronics,

13       nonfailure of electrical equipment ISA G1

14       environment.

15              Q.      All right.  So let's -- let's

16       slow down there and say -- when you say "we

17       determined," did you get a copy of the MWV

18       data for these coupons?

19              A.      I don't remember.  There was a

20       lot of correspondence.

21              Q.      So you may have or you may not

22       have at that point, right?

23              A.      That's correct.

24              Q.      And you don't know, for

Confidential - Subject to Further Confidentiality Review

1    example, whether microns per year were

2    actually reported by MWV as part of their

3    original data?

4         A.    MWV normally reports microns

5    per year in their standard reporting form.

6         Q.    But we don't have that, at

7    least as far as it was captured by

8    Dr. Perricone here?

9         A.    Apparently not.

10        Q.    So you couldn't say, for

11   example, how close or perhaps how far did we

12   exceed the .1 maximum protective guideline

13   from your 1989 paper?

14        A.    No, we -- we did not exceed the

15   487 angstroms in 30-day limit for failure of

16   electronics.

17        Q.    In December to January of -- in

18   this one Virginia house.

19        A.    That is correct.

20        Q.    But you don't know where we are

21   in terms of the microns per year because you

22   don't have that data available to you.

23        A.    We have not monitored for one

24   year.

Confidential - Subject to Further Confidentiality Review

Page 143

1          Q.     You don't have the conversion

2     as is normally reported by MWV to a one-year

3     micron -- a micron per year rate, do you?

4          A.     Not on this paper, no.

5                 MR. SERPE:  All right.  So,

6          Erin, if the data exists, which would

7          be an equivalent to Exhibit 3, you

8          know, without prejudice to our ability

9          to say we've been asking for it for

10         weeks and haven't gotten it, we would

11         like to make a renewed request for the

12         MWV raw data that resulted in table 2,

13         page 16 of the supplemental report of

14         Dr. Perricone.

15                MS. MAUS:  Noted.

16    BY MR. SERPE:

17         Q.     So, Dr. Perricone, you don't

18    expect to see any significant differences --

19                MR. LEWIS:  Dr. Sharp.

20                MR. SERPE:  Did I say

21         "Perricone"?  I had two cookies

22         instead of one.  I think I'm having a

23         sugar -- lower blood sugar, so I

24         apologize.

Confidential - Subject to Further Confidentiality Review

Page 144

1    BY MR. SERPE:

2         Q.    Dr. Sharp, you don't expect to

3    see any significance in the environments as

4    classified between Florida homes and Virginia

5    homes, do you?

6         A.    In what sense?

7         Q.    In terms of their

8    classifications as corrosive or noncorrosive

9    environments.

10        A.    I would classify them according

11   to the reactivity coupon data.

12        Q.    So would you suggest that a

13   Virginia home could have one classification

14   in the winter and a different classification

15   in the summer?

16        A.    That is possible.  I don't know

17   whether to suggest it because that would be

18   speculative.

19        Q.    So let's talk about data you

20   actually have.  You've got Florida data from

21   the month of September to October, don't you?

22        A.    I believe we were looking at

23   that in the Appendix A.

24        Q.    Exhibit 3.

Confidential - Subject to Further Confidentiality Review

Page 145

```
1          A.      Yes.

2          Q.      And the Florida data for

3    September to October predicted a, what, G3

4    environment if -- if we worked off the

5    angstrom thickness of between 1,000 and

6    3,000.  We established that before lunch,

7    didn't we?

8          A.      Yes.

9          Q.      So you have no reason to

10   believe that the G3 data as observed in a

11   Florida home wouldn't be the same data

12   observed in a Virginia home over a time

13   period that had similar temperature and

14   humidity conditions.

15         A.      I don't think the climate is --

16   I'm not a climatic expert, but I don't think

17   the climate is the same in Virginia and

18   Florida.  So I'm not sure that I could

19   compare those two.  It is certainly

20   appropriate to -- as I said this morning, to

21   monitor in extended periods where it's

22   possible to do that.  That tells you what the

23   classification is.

24         Q.      Let's talk about the Florida
```

Confidential - Subject to Further Confidentiality Review

1    data for a minute.

2           A.    Yes.

3           Q.    You corrected me a minute ago

4    and said, wait, this is a closed environment.

5    You're inside the house.  And I said, oh,

6    what if the windows are open, and you said,

7    oh, there might be some air exchanged.  Do

8    you remember that a minute ago?

9           A.    Yes, I do.

10          Q.    So are you telling me that

11   Florida houses with the doors closed and the

12   air conditioning on are substantially

13   different than Virginia houses with the doors

14   closed and the air conditioning on, such that

15   you'd predict a whole different corrosive

16   environment?

17          A.    You'd have to compare homes --

18   to -- to answer that question, you'd have to

19   find homes that you could compare that had

20   similar Chinese wallboard in similar

21   locations and then make the -- make the

22   measurement.

23          Q.    Let's talk about both of those

24   halves, similar drywall, similar locations.

Confidential - Subject to Further Confidentiality Review

Page 147

1   Okay?

2        A.      Yes.

3        Q.      First, similar drywall.  It's

4   your opinion, is it not, that there's no

5   discernible differences between drywall

6   anywhere in the United States, Chinese

7   drywall; it's all basically the same stuff.

8                MS. MAUS:  Objection, form;

9        foundation.

10       A.      I know that Chinese drywall

11  emits hydrogen sulfide which has a tendency

12  to cause corrosion problems, but I can't say

13  whether all Chinese wallboard is the same

14  from a corrosion point of view.

15               MR. LEWIS:  His report -- can I

16       see Exhibit 10, please?

17               THE WITNESS:  Exhibit 10.  You

18       can.

19               MR. LEWIS:  I'm sorry.  Thank

20       you.

21               THE WITNESS:  All right.

22               MR. SERPE:  Can I go now?

23               MR. LEWIS:  Yes.

24               MR. SERPE:  Are you sure?

Confidential - Subject to Further Confidentiality Review

1          MR. LEWIS:  Yeah.

2          MR. SERPE:  All right.

3          MR. LEWIS:  Can I get one more?

4     Do you have a marked-up one for me?

5          MR. SERPE:  I do.

6          MR. LEWIS:  All right.  Go.

7          MR. SERPE:  Sorry for the

8     administrative hiccup.

9          (Whereupon, Deposition Exhibit

10    Sharp-12, 12/09 Perricone Expert

11    Report, was marked for

12    identification.)

13 BY MR. SERPE:

14    Q.    Let me hand you Exhibit No. 12.

15 And I'll ask you to flip to page -- first, do

16 you recognize this as the report of

17 Dr. Perricone of December 2009?

18    A.    Yes, I do.

19    Q.    And you've had this report.  In

20 fact, you cited it as part of your reliance

21 materials in this case, did you not?

22    A.    I cited it, yes, that I had

23 read it.

24    Q.    And he reports a section under

Confidential - Subject to Further Confidentiality Review

Page 149

1      4.7, page 8 of that report.  Do you see that?

2          A.     Yes.

3          Q.     And would you read the caption

4      heading for paragraph 4.7.

5          A.     "The chemical and physical

6      properties of Chinese drywall in Virginia

7      houses are not substantially different in the

8      chemical and physical properties of other

9      Chinese drywall except for higher amounts of

10     elemental sulphur."

11         Q.     So Virginia has no discernible

12     chemical or physical properties except it's

13     got more elemental sulphur than Florida.

14     Isn't that how you're reading that?

15         A.     This was a report of tests of

16     samples of wallboard which were analyzed in

17     Perricone's laboratory.

18         Q.     And on the basis of

19     Dr. Perricone's data as is listed in his

20     report, as well as his voluminous appendices

21     which you've also reviewed, you recognize

22     that Dr. Perricone is a thorough

23     investigator, don't you?

24         A.     I believe he is, yes.

Confidential - Subject to Further Confidentiality Review

Page 150

1        Q.      And you have found his results

2    to be accurate, aren't they?

3        A.      I have found his results to be

4    reliable, yes.

5        Q.      And in Dr. Perricone's thorough

6    and accurate and reliable assessment, the

7    chemical and physical properties of Virginia

8    Chinese drywall is not substantially

9    different than Chinese drywall found in other

10   parts of the country.

11       A.      Yes.

12       Q.      So the first part of the

13   equation that you pointed to, we'd have to

14   assume that the drywall was the same,

15   Dr. Perricone is answering for us, that the

16   drywall is not substantially different

17   between Virginia and Florida.  Would that be

18   a fair statement?

19       A.      That would be a fair statement.

20       Q.      So let's go to the second part

21   of the equation.  You were in Virginia on the

22   days that these houses were investigated on

23   or about December the 8th of 2009, were you

24   not?

Confidential - Subject to Further Confidentiality Review

1       A.      I was.

2       Q.      And you were part of the

3    process that decided where to deploy the

4    coupons, weren't you?

5       A.      I was, yes.

6       Q.      You were also part of the

7    process that decided where to deploy the

8    coupons in the Florida home, weren't you?

9       A.      Yes, I was.

10       Q.      So you had every opportunity to

11    compare an apple to an apple and, in fact,

12    you did attempt to pick similar locations in

13    those houses, didn't you?

14       A.      Yes.  I was involved in the

15    deployment of coupons in the 9320 and 9315

16    homes, but not to my recollection the 3929

17    home.  But the principle is correct, that I

18    was involved in -- in saying where the

19    coupons should be placed.

20       Q.      And as far as you can tell, the

21    coupons were put into the Orlando home and in

22    substantially similar conditions as were

23    placed in the Florida homes.

24       A.      The Orlando house was occupied

Confidential - Subject to Further Confidentiality Review

Page 152

1    and, therefore, we were careful to place the

2    coupons where they would not disturb or be

3    disturbed by the occupants.  We had more

4    freedom, for example, in the Florida homes to

5    hang coupons right next to the wall and --

6    we -- we just had more freedom because the

7    houses were not occupied.

8          Q.     So in what way were the

9    locations in the Orlando house different such

10   that you would not be able to rely on the

11   Florida data as representative of the

12   conditions in Virginia?

13         A.     Differences that I would

14   look -- that I want to investigate were, for

15   example, the proportion of Chinese wallboard

16   and all the wallboard in the house, the

17   location of Chinese wallboard in the rooms

18   that were being monitored.

19         Q.     Now, you understood that part

20   of the analysis that was happening in

21   Virginia that day was an effort to attempt to

22   locate selectively on a board-by-board basis

23   where the Chinese drywall was in those homes.

24         A.     I do.

Confidential - Subject to Further Confidentiality Review

1      Q.    Using a combination of the

2  visualization of corrosion on the wires,

3  correct?

4      A.    Correct.

5      Q.    As well as a handheld device to

6  attempt to measure strontium in the board

7  content.  Do you recall that?

8      A.    I do.

9      Q.    And on the basis of that

10  investigation, Dr. Perricone and Mr. Morse

11  believe that they have now isolated the exact

12  locations of the Chinese drywall in those

13  houses, have they not?

14      A.    They have found both of those

15  methods to be useful tools in determining

16  where Chinese wallboard is located.

17      Q.    They both have indicated their

18  opinion that it could be used for the

19  selective identification on a board-by-board

20  basis, haven't they?

21      MS. MAUS:  Objection, form.

22      A.    I would have to check their --

23  the specific words that they said in

24  testimony.

Confidential - Subject to Further Confidentiality Review

Page 154

1    BY MR. SERPE:

2         Q.      So that's not what your

3    understanding was from your visiting with

4    them, your call -- your issuing reports at

5    the same time, your relying on the reports,

6    you didn't understand what they were doing

7    was developing a system by which an

8    individual board could be characterized as

9    Chinese drywall or not?

10        A.      I knew that was their goal.

11        Q.      And do you know that they

12   claimed to have achieved it?

13               MS. MAUS:  Objection, form.

14        A.      The claim -- to answer that

15   question I would like to look at their

16   statements.

17   BY MR. SERPE:

18        Q.      Well, you've got right there in

19   front of you as the last exhibit

20   Dr. Perricone's report.

21        A.      Yes, he says in 4.9, "Handheld

22   XRF technology can be used to identify

23   drywall with elevated strontium levels which

24   generally correspond to the amount of copper

Confidential - Subject to Further Confidentiality Review

Page 155

1    discoloration to outlets and switches in

2    Virginia houses."

3         Q.    So at the time that you

4    selected the locations for the deployment of

5    the coupons in the Orlando house, you had

6    information as to where was the Chinese

7    drywall in that house, didn't you?

8         A.    My recollection is that the

9    coupons were placed in the Orlando house

10   after I was there.  I talked in general terms

11   about when -- where they might be deployed so

12   as not to hinder the occupants, but I don't

13   think that I was specifically involved in --

14   in placing them.

15        Q.    So you're aware, are you not,

16   from having reviewed all of the expert

17   reports that you cite as reliance in your

18   materials, that based upon delivery records

19   as well as the inspections by Drs. Morse and

20   Perricone, that three of the Virginia houses

21   were classified as 100% Chinese drywall?  Do

22   you recall that?

23        A.    I remember that the Heischober

24   house was very largely Chinese wallboard.

Confidential - Subject to Further Confidentiality Review

Page 156

1          Q.      Mr. Morgan's house as well; do

2     you recall that?

3          A.      Yes.  And that some were -- it

4     appeared from the -- the visual observation

5     data that the Chinese wallboard might be

6     scattered within the homes --

7          Q.      And, in fact --

8          A.      -- or on particular floors.

9          Q.      And, in fact, you're aware that

10    the Orlando house was one of the scattered

11    houses where it was a mixture of domestic and

12    Chinese drywall that was scattered around

13    that home.

14         A.      More on one floor than another

15    as I recall.

16         Q.      But both floors had some degree

17    of the -- of the Chinese drywall

18    interspersed.

19         A.      Yes.

20         Q.      Dr. Sharp, if the goal was to

21    classify a Virginia home's corrosive

22    environment, why wouldn't you have picked a

23    house that was 100% Chinese drywall so that

24    you'd get a fair assessment of the corrosive

Confidential - Subject to Further Confidentiality Review

1    environments and not run the risk that you

2    put your coupons in a room with no Chinese

3    drywall?

4         A.    I think we wanted to pick one

5    house and there were a number of factors

6    including occupancy being important and being

7    representative.  And although the data are

8    now available showing the final results of

9    the inspection, classification and the XRF

10    classification, they were not -- those data

11    were not finally ready at the time the house

12    was chosen.

13         Q.    And, in fact, they weren't

14    finally ready at the time of December 8th

15    while the field investigation was going on or

16    December 9th when the coupons were placed,

17    correct?

18         A.    I think that's true.

19         Q.    They weren't available until

20    somebody tabulated it and put the results

21    together in the appendices to the Perricone

22    report.

23         A.    Yes.

24         Q.    So in retrospect to the extent

Confidential - Subject to Further Confidentiality Review

Page 158

1    that the Morgan house, which was also

2    unoccupied and is alleged by the Morse and

3    Perricone evaluation system to be 100%

4    Chinese drywall, was available for coupon

5    placement in any location that was wanted,

6    you would agree that Morgan would have been a

7    better test home if we wanted to know the

8    corrosive environment for a Virginia house?

9        A.      From where I sit at this point,

10   if we wanted to find a worst-case situation,

11   to look at a worst case, occupied or

12   nonoccupied, that would be a better choice.

13       Q.      And, of course, looking for the

14   weakest link, as you talked about in the new

15   tools paper which we attached to your

16   deposition as Exhibit No. 9, looking for the

17   weakest link in a worst-case scenario is the

18   very stuff of failure analysis, isn't it?

19       A.      It is the stuff of failure

20   analysis.  It -- in classification we found

21   that the classifications actually varied

22   considerably from location to location, from

23   house to house based on the visual

24   inspection.

Confidential - Subject to Further Confidentiality Review

1      Q.      So if the point here was to

2   look at the seven houses that were set up as

3   a representative cross section, you wouldn't

4   suggest that the appropriate house to deploy

5   coupons in would be the house with the least

6   amount of Chinese drywall for characterizing

7   the -- fairly the cross-sectional analysis,

8   would you?

9      A.      I was never aware of an intent

10  to choose a least corrosive house.  We were

11  particularly interested to choose a house

12  that was occupied because we had not

13  previously monitored in a house that was

14  occupied.

15     Q.      Are you aware of an effort to

16  select a house that was only modestly or

17  partially filled with Chinese drywall to use

18  as a location for coupon deployment?

19     A.      My recollection is that the

20  primary factor was that of house occupancy.

21     Q.      Now, one of the downsides of

22  selecting a house with house occupancy is the

23  inability to open up the wall to deploy

24  coupons into the wall space, correct?

Confidential - Subject to Further Confidentiality Review

Page 160

1          A.        There were samples removed from

2     the Orlando house, but, yes, we obviously did

3     not want to spoil that house unnecessarily.

4          Q.        And to your recollection or

5     knowledge, were the samples that were taken

6     from Exhibit 3 on the third page, 4355, 4370

7     and 4396, were those from the interior wall

8     space or mounted on the outside of the wall?

9     Where were those?

10         A.        Interior wall refers to whether

11    it's a wall inside the house or a wall in the

12    house envelope.

13         Q.        Understood.

14         A.        And so these were coupons hung

15    adjacent to an interior wall.

16         Q.        Now, look at the first page

17    where it describes it as bedroom free

18    interior wall face.  Aren't you reading face

19    to be the exterior of the wall?

20         A.        No, the face is simply the

21    surface of the wall.

22         Q.        So with the deletion of the

23    word "face" from page 3, are you now reading

24    that to be interior to the wall cavity?

Confidential - Subject to Further Confidentiality Review

Page 161

1          A.      The description is not

2   sufficient for me to make that determination.

3          Q.      So I'm sure we can verify that

4   at some point, but if the point becomes,

5   Dr. Sharp, if we want to know what the

6   corrosive propensity is of the space between

7   the walls where the wires are --

8          A.      Yes.

9          Q.      -- you would need to deploy a

10  coupon into that space in order, under your

11  system, to be able to judge what the level of

12  corrosive environment was there?

13         A.      Yes.

14         Q.      And that was not done in

15  Virginia?

16         A.      That was not done in Virginia.

17  That was done elsewhere.

18         Q.      So one last series of questions

19  on the two factors that we set up that might

20  explain the difference between Virginia and

21  Florida.  We've already ruled out the first

22  one.

23                 With respect to the second one,

24  we were discussing the potential differences

Confidential - Subject to Further Confidentiality Review

Page 162

1      of the amount of Chinese drywall that was in

2      the houses as one particular influencing

3      factor.  And I'd like to go through just a

4      couple of different scenarios on that.

5                  In one scenario, the data

6      that's reported on page 3 of Exhibit 3 is

7      from a house that's complete Chinese drywall,

8      is it not?  That Florida house might be all

9      Chinese drywall?

10         A.     I think there was a lot of

11     Chinese drywall in 9329.

12         Q.     So that the -- the data here

13     would represent the approximation of the

14     environment in an area that was approximate

15     to actual Chinese drywall, would it not?

16         A.     That's correct.

17         Q.     Now, one of the potential

18     differences between Virginia house, Orlando

19     and Florida is that for all you know the

20     coupons in the Orlando house were deployed in

21     rooms that had no Chinese drywall approximate

22     to them?

23         A.     I would have to go back to the

24     records of XRF and a visualization to -- to

Confidential - Subject to Further Confidentiality Review

Page 163

1    look at that because the location of the

2    coupons is presented in Perricone's report.

3        Q.    Well, a second thing that could

4    be happening is the total loading of Chinese

5    drywall around the home could have been

6    higher in Florida than compared to Orlando.

7    Would that be a fair statement?

8        A.    That's a possibility.

9        Q.    What other factors, besides the

10   amount of Chinese drywall in a home, would be

11   important to understand or take into account

12   before looking at the Florida data on page 3

13   of Exhibit 3 and then attempting to draw

14   conclusions about the nature of the

15   environment of Chinese drywall houses

16   anywhere in the United States?

17       A.    I think temperature and

18   humidity are the first factors that I

19   would -- that I would consider.

20       Q.    Inside the house, in the

21   ambient of the room?

22       A.    Yes.

23       Q.    And so to the extent that a

24   homeowner in Virginia in July had the

Confidential - Subject to Further Confidentiality Review

1    identical temperature and humidity levels as

2    were happening in this Florida home in

3    September, then we would be holding those two

4    things equal, wouldn't we?

5            MS. MAUS:  Objection, form.

6       A.    If the houses had the same

7    construction -- and I believe the

8    construction was different, but if they had

9    the same construction, if they had the same

10   amount of Chinese drywall, they had the same

11   temperature and the same humidity -- relative

12   humidity, I would expect the corrosivity

13   classification to be the same.

14   BY MR. SERPE:

15      Q.    So if we assume those items

16   that you just ticked off, then the Florida

17   data predicting electrical failures would

18   hold true for predicting electrical failures

19   under similar temperature and humidity

20   conditions in Virginia.

21      A.    If those assumptions could be

22   held.

23      Q.    And you have -- in terms of

24   measurements of homes, Chinese drywall homes,

Confidential - Subject to Further Confidentiality Review

Page 165

```
 1     with -- by the use of reactivity coupons,

 2     really the only data that we have available

 3     to us is September in Florida, same time

 4     period for Louisiana and then this new

 5     Virginia data that was reported December to

 6     January, correct?

 7          A.     Yes.

 8          Q.     So --

 9          A.     After this time we focused our

10     efforts on monitoring the conditions produced

11     by the ECS.

12          Q.     There are no reactivity coupons

13     available to look at for Virginia that would

14     have represented a June, July, August,

15     September time frame, are there?

16          A.     We have not had that

17     opportunity.

18          Q.     But we do have copper

19     components that have been in those houses for

20     three full years that are available to look

21     at, don't we?

22          A.     We do.

23          Q.     And you are aware that copper

24     wires from houses, like Bill Morgan's, have
```

Page 166

1     been removed from those homes and

2     investigated, are you not?

3          A.     Yes.

4          Q.     And the investigation of wires

5     has included the cross sectioning of wires?

6          A.     Yes, it has.

7          Q.     And it's included by some

8     investigators measuring the thickness of the

9     corrosion product on the actual copper

10    components that were in the house.

11         A.     That has been done.  But as I

12    pointed out at length this morning, that

13    cannot be taken as an indicator of the

14    thickness that will be produced on a copper

15    reactivity coupon.

16         Q.     You feel it would be

17    irresponsible for an investigator to measure

18    the thickness on an actual copper component

19    and use it to apply to the ISA or Battelle

20    scales?

21         A.     It would be completely

22    inappropriate for the reasons I described

23    this morning.  There are many factors which

24    make it a different situation on a piece of

Confidential - Subject to Further Confidentiality Review

1    copper wire than on a reactivity coupon.

2                    (Whereupon, Deposition Exhibit

3            Sharp-13, 11/23/09 Draft, "Interim

4            Report on the Status of the Analysis

5            of Electrical Components Installed in

6            Homes with Chinese Drywall," by Gill &

7            Trotta, was marked for

8            identification.)

9    BY MR. SERPE:

10          Q.    Let's look at what I've marked

11   as Exhibit No. 13.  Do you recognize this as

12   the Sandia report as I've been referring to

13   it?

14          A.    Yes, I do.

15          Q.    You've been calling it the Gill

16   and Trotta?

17          A.    Those are the authors.

18          Q.    And you recognize Gill and

19   Trotta as being from the United States

20   Consumer Product Safety Commission?

21          A.    Yes.

22          Q.    And this report, which has been

23   marked for -- as Exhibit 13, contains data

24   that was generated by the scientific staff of

Confidential - Subject to Further Confidentiality Review

Page 168

1      the Sandia National Laboratories, does it

2      not?

3              A.      It does.

4              Q.      The Sandia National

5      Laboratories is an arm of the United States

6      government?

7              A.      Yes, it's part of the

8      Department of Energy.

9              Q.      It is a laboratory widely

10     recognized as being one of the finest in the

11     United States.  Wouldn't you agree with that?

12             A.      It's one good corrosion

13     laboratory.  The government has other good

14     corrosion laboratories at Oak Ridge and

15     Los Alamos and Lawrence Livermore.

16             Q.      So you would put Sandia in the

17     group of the premier laboratories in the

18     United States, wouldn't you?

19             A.      In corrosion in general, yes.

20     I'm not sure about their experience in

21     atmospheric corrosion.  But I have run into

22     them in a number of occasions in corrosion

23     research and they -- they're very capable.

24             Q.      You wouldn't suggest that they

Confidential - Subject to Further Confidentiality Review

```
 1    lack expertise in atmospheric corrosion,

 2    would you?

 3         A.    I simply said I'm not aware of

 4    their expertise in atmospheric corrosion.

 5         Q.    If you flip to page 6 and

 6    you'll see on the -- above the table for

 7    page 6 a description of the process whereby

 8    electrical components were actually harvested

 9    from homes with Chinese drywall, do you not?

10         A.    I do.

11         Q.    And then these samples were

12    taken to the laboratory and investigated

13    microscopically, weren't they?

14         A.    They say that they're -- due to

15    time constraints, only two morphologies were

16    analyzed from one wire in time for this

17    report.  So a single wire was examined for

18    this report.

19         Q.    Do you see on page 9, final

20    full paragraph?

21         A.    Yes.

22         Q.    "Examination of wires attached

23    to the six receptacles revealed similar

24    morphologies for forms of copper corrosion
```

Confidential - Subject to Further Confidentiality Review

1      products."

2              A.      Yes.

3              Q.      So they did examine the wires

4      microscopically.  But in terms of a specific

5      type of test, the TIB testing, that was done

6      on two morphologies for a single wire.  Is

7      that your understanding?

8              A.      Yes.  They looked at wires from

9      six receptacles and made a detailed study of

10     one wire.

11             Q.      All right.  So at page 10 we're

12     looking at a picture of the detailed study of

13     one wire, are we not?

14             A.      Yes.

15             Q.      And if you flip to page 23 of

16     the attachment, they spend time

17     characterizing the morphology, do they not?

18             A.      They did.

19             Q.      Then if you go back to page 23

20     in that first paragraph, there's a sentence

21     that begins -- about eight lines down that

22     begins, "The images."

23             A.      Yes.

24             Q.      Do you see that?

Confidential - Subject to Further Confidentiality Review

1      A.     Yes.

2      Q.     Could you read that sentence

3  into the record for me, please, and the next

4  sentence.

5      A.     "The images clearly show a

6  twenty" -- let me start again.

7            "The images clearly show a

8  20-micron thick sulfide with a

9  cauliflower-like morphology.  The thickness

10  exceeds that expected for a Class II

11  corrosion environment and suggests that the

12  actual environment is likely Class III or

13  higher."

14      Q.     Are you suggesting that the

15  investigators for Sandia National

16  Laboratories acted irresponsibly by

17  publishing this data?

18      A.     I'm not suggesting that they

19  acted irresponsibly by publishing data.  It's

20  never irresponsible to -- to take tests and

21  make measurements.  However, it seems that

22  they have overlooked a key aspect of the

23  copper reactivity coupon classification

24  system which is that you average the

Confidential - Subject to Further Confidentiality Review

Page 172

1    thickness of the corrosion product.  By

2    taking a single measurement and assuming that

3    that is the average tarnish film thickness

4    over a copper reactivity coupon, that

5    involves several leaps of faith.

6           Q.     How thick in angstroms is

7    20 microns?

8           A.     20 microns is 20,000 angstroms.

9           Q.     Are you sure?

10          A.     Well, let's see.  .1-microns is

11   1,000 angstroms.  1 micron is

12   10,000 angstroms.  10,000 times 20 is

13   200,000 angstroms.

14          Q.     The investigators from Sandia

15   are pointing to a corrosion product on this

16   wire that's 200,000-angstroms thick, aren't

17   they?

18          A.     They are.

19          Q.     And you're saying that from

20   that we can't conclude that the corrosive

21   environment that was here would have -- if it

22   was evened out or whatever these leaps of

23   faith are that you referred to, that we

24   wouldn't have had a mere 487 angstroms on

Confidential - Subject to Further Confidentiality Review

Page 173

1     your scale or 1,000 angstroms for a Class II

2     or a Class III ISA?

3          A.     I'm saying that that is not how

4     you classify environments.  Now, if -- if I

5     were to say hypothetically that I was to

6     average this out over a certain area, maybe

7     it would be more than 487 angstroms.  I don't

8     know.  Also I don't know where this

9     particular thick part -- thick tarnish

10    occurred, whether it occurred because of some

11    particular feature, some -- some deposit on

12    the copper, I don't know.  20 microns is a

13    very thick film, though.

14         Q.     Let's talk about a very

15    specific feature and location in a home and

16    thickness.  That's just one additional

17    example of yours.

18         A.     Yes.

19                (Whereupon, Deposition Exhibit

20         Sharp-14, Color Photograph - Morgan

21         Wire Corrosion, was marked for

22         identification.)

23    BY MR. SERPE:

24         Q.     Let me hand you a photograph

Confidential - Subject to Further Confidentiality Review

1    that I'll mark for identification as

2    Exhibit 14.  And I'll ask you to assume that

3    it's a photograph of the lamp that -- from

4    which a sample was collected and ultimately

5    reported as BDM-5.  I'll try and backfill

6    that later.  But just assume that that's the

7    picture of the subject while still in the

8    field.  Okay.

9               (Whereupon, Deposition Exhibit

10         Sharp-15, Color Photograph - Wire

11         Corrosion Detail, was marked for

12         identification.)

13   BY MR. SERPE:

14        Q.    Let me now hand you Exhibit

15   No. 15.

16             MR. SERPE:  Sorry.  I'm going

17        to be throwing them all, though.

18   BY MR. SERPE:

19        Q.    And you'll that see we enlarged

20   the area that was circled with the red box on

21   14.  And in 15 you can see more clearly the

22   presence of an electrical wire which is

23   supplying this fixture in the breakfast area

24   of Mr. Morgan's house.  Are you -- are you

Confidential - Subject to Further Confidentiality Review

Page 175

1     seeing generally the area that I'm referring

2     to in these photographs?

3            A.     I see it.  I see it.

4                   (Whereupon, Deposition Exhibit

5            Sharp-16, Color Photograph - Wire

6            corrosion detail, was marked for

7            identification.)

8     BY MR. SERPE:

9            Q.     Let me hand you Exhibit No. 16

10    and ask you to describe what you see in

11    Exhibit 16.

12                  MS. MAUS:  This comes from the

13           same lamp?

14                  MR. SERPE:  Yes.

15           A.     I can't tell if I'm looking at

16    the top of the lamp or the part against the

17    ceiling.

18    BY MR. SERPE:

19           Q.     16, top of the lamp.

20           A.     Top of the lamp.  Thank you.

21    So what I see is I see the electrical power

22    cord which is yellowish in color and I see a

23    ground wire which is copper-colored.  And

24    towards the top of the electrical wire, I see

Confidential - Subject to Further Confidentiality Review

Page 176

1    a grayish, brownish color, I suppose.

2         Q.    Interior to the yellow jacket

3    of the wire?

4         A.    It's hard to say whether it's

5    the jacket or the interior.

6         Q.    Okay.  Then looking back at 15,

7    then, you can see quite clearly, can't you,

8    that it's interior to the wire where you

9    observe the blackening of the wire, do you

10   not?

11        A.    Are you asking me if I see

12   blackening of the wire in 15?

13        Q.    Yes, through the sheathing.

14        A.    It could be.  It's hard to say.

15   It's certainly not as copper-colored as the

16   ground connection is.

17                (Whereupon, Deposition Exhibit

18        Sharp-17, Table 1, Summary of Tarnish

19        Thickness and Pit Depth Measurements,

20        was marked for identification.)

21   BY MR. SERPE:

22        Q.    Let me hand you Exhibit 17.

23              MR. SERPE:  What happened to

24        the other two?

Confidential - Subject to Further Confidentiality Review

Page 177

1    BY MR. SERPE:

2         Q.    And we've prehighlighted where

3    I was going to direct you to, so perhaps it

4    will save a minute.

5         A.    Thank you.  Okay.

6         Q.    And I'd like you to look at

7    BDM-5 which we'll demonstrate for you later

8    but I'll ask you to assume it's the same wire

9    from the cable on the light fixture in the

10   kitchen, first floor under the insulation.

11   Do you see where I'm reading from?

12        A.    Yes.

13        Q.    And do you see the thickness in

14   microns reported there six inches away from

15   the fixture?

16        A.    Six inches from the fixture,

17   yes.

18        Q.    And you're seeing a 10.2-micron

19   thickness on the wire at least as is reported

20   in table on Exhibit 17?

21        A.    Where does this document come

22   from?

23        Q.    This is Dr. Krantz'

24   supplemental report.

Confidential - Subject to Further Confidentiality Review

Page 178

1    A.    Thank you.  Okay.

2          MR. SERPE:  I think we're out

3    of tape and we'll take a short break

4    just to allow for the change of tape.

5          THE VIDEOGRAPHER:  Time now is

6    approximately 2:15.  We are now off

7    the record.

8          (Recess taken, 2:15 p.m. to

9    2:26 p.m.)

10         THE VIDEOGRAPHER:  This is the

11   beginning of Tape 5 of the videotaped

12   deposition of Dr. Sandy Sharp.  Time

13   now is approximately 2:26 p.m., and we

14   are back on the record.

15   BY MR. SERPE:

16     Q.    Dr. Sharp, right before the

17   break we were talking about a specific wire

18   that was visualized -- or that I asked you to

19   assume was visualized in Exhibits 14, 15 and

20   16.  Do you recall?

21     A.    Yes.

22     Q.    And the -- I'd like to continue

23   to ask you to assume that the sample that

24   we're referring to here is BDM-5, okay,

Confidential - Subject to Further Confidentiality Review

Page 179

1    subject to being tied up later.

2           A.     Yes.

3           Q.     With your counsel's permission,

4    I'd like to show you a page from Dr. Krantz'

5    report, the original report from

6    December 30th, 2009, that I have on the

7    laptop; I do not have on the printed copy.

8    We can supplement the record later.  I just

9    want to ask you if this looks familiar to

10   you.

11          A.     Yes, I have read Mr. Krantz'

12   report and this is evidently from his report.

13   Thank you.

14          Q.     Does looking at the pages of

15   the Krantz report refresh your recollection

16   that one of the wires that was sectioned

17   pulled the insulation jacket back from the

18   wire to look at the corrosion product that

19   was underneath the insulation jacket?

20          A.     I remember the analysis of a

21   multistrand wire.

22          Q.     And indeed it's a multistrand

23   wire that is at least pictured here on the

24   Krantz Report BDM-5 that I showed you a

Confidential - Subject to Further Confidentiality Review

1    minute ago.

2          A.      Yes.

3          Q.      And then let me turn to the

4    Exhibit 17 which was in front of you a minute

5    ago.

6          A.      Yes.

7          Q.      And let's take another look at

8    the tarnish thickness of 10.2 microns.  At

9    least as reported by Dr. Krantz, this would

10   inform you of a 10.2-micron thickness of a

11   multistrand wire -- the corrosion product on

12   a multistrand wire six inches away from the

13   light fixture under insulation, wouldn't it?

14         A.      He -- he measured that as the

15   maximum thickness at -- at that location,

16   yes.

17         Q.      So when we're talking about

18   the -- measuring of a thickness -- well,

19   there it is.  He's got it.  I'm going to hand

20   you my only copy of Exhibit No. 18 and

21   we'll --

22                 (Whereupon, Deposition Exhibit

23         Sharp-18, 1/14/10 Supplement No. 1 to

24         Assessment of Copper Materials From

Confidential - Subject to Further Confidentiality Review

1          Residences Containing Chinese Drywall

2          Products, by Krantz & Ely, was marked

3          for identification.)

4               MR. SERPE:  Erin, we're going

5          to look at page 16.

6               MS. MAUS:  This is what, the

7          Krantz supplemental?

8               MR. SERPE:  Yes.

9     A.     Yes, Mr. Krantz and Dr. Ely.

10    BY MR. SERPE:

11         Q.     And you'll see that on this

12    multistrand wire in addition to measuring

13    thicknesses he's measured a pit, has he not?

14         A.     Yes.

15         Q.     And the pit depth as he

16    measured it is what depth in microns, sir?

17         A.     On -- in this figure, he

18    measured it as 41.7 microns.

19         Q.     And do you take exception -- do

20    you have any reason to doubt the accuracy of

21    the measurements of the pit depths as

22    reported by Krantz' reports, either original

23    or supplemental?

24         A.     No, I'm familiar with

Confidential - Subject to Further Confidentiality Review

Page 182

1    Mr. Krantz and Dr. Ely and I think they're

2    reliable workers.

3         Q.    So in Exhibit 17 tabulated

4    results, as well as the photographic

5    representations there in Exhibit 18, you're

6    presented with data concerning one particular

7    wire that was in Bill Morgan's house, are you

8    not?

9         A.    Yes, one particular cord.

10        Q.    A cord that was not proximate

11   to a wall with Chinese drywall.  You have no

12   reason to believe that that cord was closer

13   than, what, a couple of feet away from a

14   wall?

15        A.    I'm not able to -- well, let's

16   see.  Here's a picture.  It's hard to say,

17   but may -- maybe three feet.  It's hard to

18   say --

19        Q.    Hard to say from the picture?

20        A.    -- looking at Exhibit 14, yes.

21   A few feet, yes.

22        Q.    But we're not talking about the

23   difference of inches that was described in

24   your report from the front of an electrical

Confidential - Subject to Further Confidentiality Review

Page 183

1    box to the back where you have noticed a

2    reduction in the amount of corrosion product

3    that's visible even over that short distance,

4    are we?

5        A.    I have noticed that difference

6    and here we are further from the wall than

7    from the front to the back of the box, yes.

8        Q.    And we're, at least according

9    to the data as presented by Dr. Krantz,

10   looking at corrosion product that accumulated

11   through the insulation jacket of a wire.

12       A.    Yes.  He measured the maximum

13   corrosion product thickness and the

14   corresponding maximum pit depth, yes.

15       Q.    And in angstroms, the thickness

16   he measured would have been 100,000-angstroms

17   thick of corrosion product on this wire

18   underneath the insulation jacket.

19       A.    At the maximum, yes.

20       Q.    But for which you're once again

21   claiming it would be irresponsible to draw a

22   conclusion as having violated a 487-angstrom

23   prediction of electrical --

24       A.    Electronic.

Confidential - Subject to Further Confidentiality Review

Page 184

1          Q.      -- electronic failure.

2                  MS. MAUS:  Objection, form;

3          mischaracterizes his testimony.

4          A.      This wire appears to have

5     served in a corrosive environment.  I would

6     expect that the classification of that

7     environment would indicate that it were a G3

8     or GX environment, but I don't have data to

9     show that.

10    BY MR. SERPE:

11         Q.      I admire your -- your frankness

12    in that answer.  Thank you, Dr. Sharp.

13         A.      That environment could possibly

14    have been aggravated by chemicals within the

15    insulating coat layer.  Again, we can't

16    speculate on that because of lack of data.

17    But certainly it's a very substantial amount

18    of tarnishing that has occurred.

19         Q.      Do you consider yourself an

20    expert in the various wires which are

21    deployed in a house for various functions

22    which require current to be carried?

23         A.      No, I'm not an electrical

24    engineer.  I know that various types of wires

Confidential - Subject to Further Confidentiality Review

Page 185

```
 1      are used.  Some of -- and they have different
 2      insulating coatings and so forth.  And I -- I
 3      have read studies of the effects of volatile
 4      materials from insulating coatings on wire on
 5      corrosion and so forth.
 6           Q.    In the factories that your
 7      career was spent investigating, was an effort
 8      made to restrict the type of electrical wires
 9      in terms of their grade and their gauge that
10      were utilized so that their longevity could
11      be better understood?
12           A.    My primary work was to protect
13      what was there.  What was there had been put
14      there according to electrical codes and
15      standards, but I did not recommend the use of
16      different electrical materials because of
17      corrosion issues.
18           Q.    But the electrical materials
19      that were there were by and large, in your
20      opinion, fairly robust electrical wires and
21      did not include, for example, the sorts of
22      lamp cords that are pictured here in BDM-5?
23                MS. MAUS:  Objection, form.
24           A.    I did not see this type of lamp
```

Confidential - Subject to Further Confidentiality Review

Page 186

1    cord in -- I can't say in any industrial

2    location, but this would not be common in

3    industrial locations.

4    BY MR. SERPE:

5        Q.    What about like a thermostat

6    control wire?  Do you see those in industrial

7    applications?

8        A.    There are thermostats in

9    industrial locations, yes.

10       Q.    And the control wires that are

11   used domestically that have a various bundle

12   of smaller wires that themselves are

13   insulated, same wire that gets used in the

14   industrial setting?

15       A.    I don't know.  I don't know

16   whether different equipment will be used

17   because it was an industrial setting.  I'm

18   just not able to answer that question.

19       Q.    How about speaker wire for

20   entertainment systems in the walls in the

21   living room?  Do you use that in the

22   industrial setting?

23       A.    I've seen speaker wire in

24   industrial settings, yes.  Workers like to

Confidential - Subject to Further Confidentiality Review

1    have music in control rooms.

2         Q.    And do you design domestic --

3    I'm sorry, have you measured failures of

4    speaker wires to determine whether or not

5    speaker wires can sustain various levels of

6    corrosive environment?

7         A.    I have made no studies of

8    speaker wires.  But I am aware that

9    multistranded wires are more vulnerable to

10   atmospheric corrosion than single-stranded,

11   larger diameter wires.

12        Q.    Are you aware that in many

13   homes that were built in the 2006-era, that

14   modern entertainment systems were built into

15   the living rooms or family rooms of those

16   homes?

17        A.    That's possible.  I've made no

18   study of that.

19        Q.    Have you been to a friend's

20   house that's got a surround sound system

21   where the wires are not draped around the

22   walls?

23        A.    I think all my friends have

24   theirs draped around the wall.

Confidential - Subject to Further Confidentiality Review

Page 188

1       Q.      So all your friends have houses

2    that were built prior to 2006?

3       A.      No, I don't have a friend with

4    a house built after 2006.  I'm sorry.

5       Q.      So let me just ask you to

6    assume, because I think you can hold this

7    hypothetical --

8       A.      Yes.

9       Q.      -- that we're taking a

10   multistrand speaker wire --

11      A.      Yes.

12      Q.      -- and we're directing it from

13   a centralized control system in one area of a

14   living room --

15      A.      Yes.

16      Q.      -- and then you're running

17   to -- one, two, three, four, five -- six

18   different speakers around the room in various

19   locations where you have a matrix of speaker

20   wire running around the walls.

21      A.      Yes.

22      Q.      You with me so far?

23      A.      Yes.

24      Q.      Let me ask you also to assume

Confidential - Subject to Further Confidentiality Review

Page 189

1    that those walls are all interior walls where

2    there's Chinese drywall on one side and

3    Chinese drywall on the other side and we've

4    got an environment that that wire is encased

5    in that's influenced by Chinese drywall.  Are

6    you with me so far?

7         A.    Yes, I am.

8         Q.    You would have no difficulty

9    predicting on the basis of the evidence

10   you've seen in your experience with

11   multistrand wires that those entertainment

12   systems are likely to fail if something

13   doesn't get done to protect them?

14        A.    What I said was that they would

15   be more vulnerable to failure than single,

16   large diameter wire systems.  And I also said

17   that I had not made a study of their

18   failures.  So I -- I do not know at which,

19   let's say, ISA category they -- they would

20   fail in what time.

21        Q.    If Bill Morgan's lamp cord were

22   representative of the speaker wires in a

23   modern home, if you held that true, you'd

24   expect these entertainment systems to be

Confidential - Subject to Further Confidentiality Review

Page 190

```
 1    failing well short of the life expectancy of

 2    the house, wouldn't you?

 3         A.      If given that hypothetical

 4    situation, I would.  However, I -- let me

 5    check.  Your hypothetical assumes that these

 6    cords were in the space between the two

 7    drywalls in an interior wall?

 8         Q.      That's right.  Chinese drywall

 9    sandwich.

10         A.      Then let me add to my answer

11    the comment that we have in -- studied

12    interior wall -- we have made reactivity

13    coupon measurements in wall spaces.  And I

14    made a study to look at the difference

15    between in the wall and next to the wall.

16    And I found that there was no significant

17    difference between in the wall and next to

18    the wall.

19         Q.      And at least in terms of next

20    to the wall for a Florida house as reported

21    on Exhibit 3, we do have a G3 environment

22    from which you would expect electrical

23    failures.

24         A.      Given those three data points
```

Page 191

1    that you're referring to, those would

2    correspond to, yes, higher environment, more

3    corrosive environment.

4         Q.    A corrosive environment

5    predictive of electrical and electronic

6    failures.

7         A.    Yes.

8         Q.    We spoke earlier about the fact

9    that the Battelle standards had not only a

10    quantitative standard but also a qualitative

11    standard, did we not?

12        A.    Yes.  I'm not sure if we said

13    it, but they do.

14        Q.    And if you look at page 11 of

15    Exhibit 13 --

16        A.    Okay.  Yes.

17        Q.    -- and it's set forth on

18    page 11, at the bottom of page 11, the

19    qualitative descriptions that you'd expect to

20    see with various Battelle classes of

21    corrosive environments, does it not?

22        A.    Yes, it does.

23        Q.    And we have qualitative

24    information available to us with respect to

Confidential - Subject to Further Confidentiality Review

Page 192

1    the observation of corrosion product on wires

2    in, say for example, Bill Morgan's house, do

3    we not?  We do, in fact, have significant

4    visible corrosion on the Virginia homes, the

5    wires that you've seen?

6            A.      That's true in many locations.

7            Q.      In many locations.

8            A.      There are -- there are

9    locations where there's no corrosion; there's

10   locations where there's some corrosion.

11   There's locations where there's more.

12           Q.      In the locations where there is

13   corrosion observed --

14           A.      Yes.

15           Q.      -- the corrosion product has

16   been subjected to laboratory analysis to

17   determine whether the copper contains

18   corrosion product which contains both oxides

19   and chlorides, have we not?

20           A.      We have analyzed those

21   corrosion products by ESCA.

22           Q.      And, in fact, the Virginia

23   homes with wires that show visible corrosion,

24   we have seen unprotected copper having

Confidential - Subject to Further Confidentiality Review

Page 193

1    corrosion products that contain both oxides

2    and chlorides, don't we?

3        A.      Very small amounts of

4    chlorides.

5        Q.      We've also determined that

6    Virginia homes that have corrosion product on

7    unprotected copper wires have corrosion

8    product which is rich in sulfides and oxides,

9    do we not?

10       A.      We have.

11       Q.      And, in fact, when we look at

12   the composition of the corrosion product on

13   Virginia wires, we see that the corrosion

14   product is primarily a sulfide film with some

15   oxides.  Wouldn't that be a fair statement?

16       A.      That would be true.

17       Q.      On Battelle's qualitative

18   scale, without getting into measurement

19   thicknesses and extrapolating from a uniform

20   thickness as we discussed earlier but simply

21   using the qualitative criteria from Battelle,

22   we would draw the conclusion that Virginia

23   homes are suffering from a Class IV corrosive

24   environment, would we not?

Confidential - Subject to Further Confidentiality Review

Page 194

1         A.       If we were to only take that --

2    that approach, we would classify it in that

3    way.  But that is really misuse of Abbott's

4    data.  Because Abbott says very clearly that

5    you should classify environments by putting

6    coupons into them by carefully characterized

7    and carefully analyzed coupons, not just by

8    looking at the composition of the film.

9    What -- what we have done here is we have

10   taken the film composition out of context and

11   overruled the -- the preferred method

12   proposed by Battelle.

13        Q.       Sandia National Laboratories on

14   behalf of the United States government's

15   Consumer Product Safety Commission took the

16   qualitative criteria from Battelle and

17   applied them to their observations and

18   analysis of real-world receptacles and wires

19   that were harvested from homes with Chinese

20   drywall, didn't they?

21        A.       Yes, they did.

22        Q.       And from that they concluded

23   that Chinese drywall homes have a Class III

24   or higher corrosive environment, did they

1    not?

2         A.    That was their conclusion.

3         Q.    And you consider that to have

4    been a misinformed conclusion?

5         A.    All they had was some thickness

6    data and some composition data.  So all they

7    could do was do their best to interpret the

8    atmospheric classification in terms of what

9    they had.  But that is not the recommended

10   method.  The recommended method is to use

11   characterized coupons and then you can

12   compare the data against everybody else's

13   data.

14        Q.    And since they didn't use the

15   recommended method, you consider the work

16   done by the Sandia National Laboratories on

17   behalf of the United States government as

18   misinformed, don't you?

19        A.    I consider that their

20   conclusions are not well based.

21        Q.    You consider that their

22   conclusions are not reliable, don't you?

23        A.    That they have made -- I

24   consider that they have made a leap of faith

Confidential - Subject to Further Confidentiality Review

1    going straight -- taking one part of the

2    Battelle classification and assuming that it

3    applies.  Now, maybe they're right and maybe

4    they're wrong, but that's not the way you do

5    it.  And they should know that the way you

6    classify environments is by reactivity

7    coupons.

8         Q.    So in your view, Sandia's

9    decision to look at real-world wires and

10   receptacles and measure them constituted a

11   leap of faith and they should have used

12   coupons instead.

13            MS. MAUS:  Objection, asked and

14        answered.

15        A.    Sandia did look at wires and

16   receptacles and switches and found no

17   significant degradation and made no

18   recommendation that anything needed to be

19   replaced.  What I'm saying is that their

20   conclusion about the Battelle classification

21   is not established in the way that Battelle

22   says that classification should be

23   established.

24   BY MR. SERPE:

Confidential - Subject to Further Confidentiality Review

1        Q.      And because of that, you

2    believe Sandia made a leap of faith, your

3    words --

4        A.      Yes.

5        Q.      -- in arriving at their

6    conclusions based upon real-world data.

7                MS. MAUS:  Objection, asked and

8            answered.

9    BY MR. SERPE:

10       Q.      Is that a fair statement?

11       A.      That's a fair statement.

12               (Whereupon, Deposition Exhibit

13           Sharp-19, "Indoor Atmospheres," by

14           Sinclair, was marked for

15           identification.)

16   BY MR. SERPE:

17       Q.      Let me hand you Exhibit No. 19.

18               Bear with me for a second.

19   Before we get to Exhibit 19, let's just go

20   for one more minute back to Sandia 13, right

21   on that same page we were on, page 11.

22       A.      Just one moment.  Yes.

23       Q.      And you'll see that right in

24   the section that we were discussing with the

Confidential - Subject to Further Confidentiality Review

Page 198

```
1    classes of the qualitative description of the

2    Battelle classes, there's a reference made to

3    a textbook of "Corrosion Tests and Standards,

4    Application and Interpretation, Edition 2."

5    That's a book you have in your library, isn't

6    it?

7         A.    Yes.  I think I have Edition 1,

8    but it's Bob Baboian's book, yes.

9         Q.    Bob Baboian?

10        A.    Baboian.

11        Q.    B-A-B-O-I-A-N.  Am I reading

12   that correctly so the court reporter can type

13   that later?

14        A.    You are.

15        Q.    I would like to then focus your

16   attention on Exhibit 19, which is Chapter 29

17   from that book, discussing indoor atmospheres

18   by J.D. Sinclair.  Do you know J.D. Sinclair?

19        A.    He had a distinguished career

20   at Bell Laboratories in indoor corrosion.  I

21   think he was -- he led that group for some

22   time.  He's -- he's an able researcher in

23   indoor corrosion.

24        Q.    A reliable guy, wouldn't you
```

Confidential - Subject to Further Confidentiality Review

Page 199

1    agree?

2         A.     I would say he's an able

3    researcher, yes.

4         Q.     Let's look at what -- is it

5    Dr. Sinclair or Mr. Sinclair, do you know?

6         A.     I would be almost certain that

7    it's doctor.

8         Q.     Dr. Sinclair.  Let's look at

9    what Dr. Sinclair said regarding metal coupon

10   exposures beginning on page 359.  You see

11   where it begins there at the bottom of 359?

12        A.     I do.

13        Q.     In fact, he is talking about

14   how one relates laboratory exposures to field

15   results by using metal coupon tests, does he

16   not?

17        A.     He does.

18        Q.     And then we flip to page 360

19   and Dr. Sinclair describes the process

20   whereby coupons are used and there's got to

21   be an effort to, what, validate corrosion

22   testing of the actual metals that are

23   undergoing as an indication of what's going

24   to happen to field equipment, does he not?

Confidential - Subject to Further Confidentiality Review

Page 200

1          A.      That's what he says.

2          Q.      And would you read for me the

3   sentence that begins, "This leap of faith,"

4   that's there at the top of example -- on page

5   360, column 1.

6          A.      "This leap of faith is usually

7   necessitated by resource limitations."

8          Q.      And the leap of faith that

9   Dr. Sinclair is talking about is the reliance

10  on metal coupons, isn't he?

11         A.      I -- I'm not sure.  That wasn't

12  the way I read it.  What I read was --

13         Q.      Please take a minute to read it

14  again --

15         A.      Yes, uh-huh.

16         Q.      -- and let's see if we can

17  understand each other.

18         A.      What he says is that the

19  results of coupon -- he says, his opinion,

20  "The results are only appropriate for

21  validating the corrosion testing of the

22  metals undergoing tests, but they're

23  frequently used as an indication of test

24  validity for all types of materials."

Confidential – Subject to Further Confidentiality Review

Page 201

1          Q.      But because resources are

2    limited, it's a leap of faith to rely on this

3    data.

4          A.      For --

5                  MS. MAUS:  Objection, form.

6          A.      Yes.  He's -- in -- his opinion

7    is that -- that it's a leap of faith to only

8    test with a single metal.

9    BY MR. SERPE:

10         Q.      A single metal such as copper?

11         A.      He doesn't state that, but

12   that's possible.

13                 MR. SERPE:  A moment.  All

14         right.  I apologize for the

15         interruption.

16   BY MR. SERPE:

17         Q.      We were speaking a minute ago

18   about various types of wires that are in a

19   house having different properties, different

20   types of insulation jackets, multistrand

21   versus single strand.  Those were a couple of

22   the differences, weren't they?

23         A.      Yes.

24         Q.      And then there are different

Confidential - Subject to Further Confidentiality Review

1    cross-sectional areas of the wires, aren't

2    there?

3         A.    There are.

4         Q.    And some wire have very fine

5    connection points, don't they?

6         A.    Typically higher current wires

7    have higher cross sections, yes.

8         Q.    And lower current wires have

9    lower cross sections.

10        A.    Yes.

11        Q.    And they're accordingly more

12   vulnerable to a corrosive atmosphere.

13        A.    That's true.

14        Q.    So for example the fine wires

15   that are used to connect a thermostat to the

16   air-handler unit which drives the air handler

17   are lower current, finer wire, are they not?

18        A.    I'm not aware of the fineness

19   of wires used in that particular application.

20        Q.    So you couldn't offer an

21   opinion whether or not a house with Chinese

22   drywall would or would not be vulnerable to a

23   failure of the electrical wiring systems that

24   are used for air-conditioning systems?

Confidential - Subject to Further Confidentiality Review

1    A.  I do know that air-conditioning

2 systems are frequently used in the kinds of

3 environments where I have -- where the

4 systems that I have been involved with have

5 been used for protection.  But I can't answer

6 your specific question about the nature of

7 wires used in particular control boxes.

8    Q.  Well, I'm not asking about

9 control boxes.  I'm asking about these

10 homeowners' houses, the wires that connect

11 the thermostat to the air-handler units.  You

12 don't know what kind of wires those are, do

13 you?

14    A.  I -- I do not.

15    Q.  So you don't know whether or

16 not the Chinese drywall environments as is

17 described by the testing here would or would

18 not be capable of causing a failure of the

19 wires used for the air-conditioning system?

20    A.  I would -- I would evaluate

21 that by the criteria that I have described

22 before for electronic equipment knowing that

23 electronic equipment is -- is vulnerable and

24 if the same type of wiring is used in this

Confidential - Subject to Further Confidentiality Review

Page 204

1    connection that you describe, then I could

2    evaluate it by that criterion.  If it's more

3    appropriate to evaluate it on an electrical

4    standard, I would evaluate it on an

5    electrical standard.  And I do recall having

6    gone into the back of my own thermostat and

7    found a connector that presumably at its

8    other end went to the air conditioner.

9         Q.     In your 25-plus years of

10   experience evaluating corrosive environments

11   in the industrial setting, how frequently did

12   you harvest wires from an industrial setting

13   and subject them to microscopic analysis?

14        A.     Very rarely.

15        Q.     In fact, you can never recall

16   having sectioned a wire and measured the

17   thickness of a corrosion product on a wire at

18   all during your 25-year career?

19        A.     No, I think we did that at the

20   beginning when we first -- I first got

21   involved with this type of corrosion because

22   of air-conditioner failures in a pulp and

23   paper mill which led to studies of electrical

24   and electronic equipment in control rooms.

Confidential - Subject to Further Confidentiality Review

Page 205

1    At that time we made cross sections of wires

2    and studied them.  As the technology

3    developed, our emphasis was on achieving

4    protection, achieving protection standards.

5    Because when we did that, there were no

6    failures.

7         Q.    Do you recall what the original

8    question was?

9         A.    Could you repeat it?

10        Q.    You can't recall having

11   sectioned a wire and measured the thickness

12   of a corrosion product on a wire at all

13   during your 25-year career.

14        A.    To -- to my best recollection,

15   I have sectioned wires and measured -- and

16   measured corrosion product thickness at the

17   time I just described in my previous long

18   answer.

19        Q.    And did you also measure pit

20   depths during your career?

21        A.    I've measured pit depths on

22   many occasions.  But in terms of indoor

23   corrosion, I can't swear that I did.

24        Q.    And you would believe that a

Confidential – Subject to Further Confidentiality Review

Page 206

```
 1    pit on the order of 15 to 20 microns would be
 2    a significant feature of a piece of equipment
 3    in an electrical control room, wouldn't you?
 4         A.    It would depend on how thick
 5    the wire was.
 6         Q.    How about the 47-micron pit on
 7    the lamp cord BDM-5?
 8         A.    Well, we need to ask how thick
 9    the wire was.
10         Q.    Well, I think you see a
11    representation of that on page 16.
12         A.    This is -- say it's 5,
13    6 centimeters divided by 80.  Just looking at
14    it, it would appear that these might be 10%
15    of the diameter of the wire.
16         Q.    Would you consider that
17    significant?
18         A.    That's significant, but it --
19    it -- whether -- 10% loss of cross section --
20    it -- no, let me back up.
21              These pits may be 10% of the
22    damage of the wire.  The wire depends on its
23    cross section for carrying current.  I don't
24    think that it's a failure condition to
```

Confidential - Subject to Further Confidentiality Review

1    have -- to lose the amount of metal indicated

2    in this picture, in this photograph.

3         Q.    In addition to the

4    cross-sectional area of a wire, another

5    important attribute of a wire is its ability

6    to conduct electricity.  Isn't that a fair

7    statement?

8         A.    Yes, absolutely.

9         Q.    And the -- to the extent that

10   the morphology of a wire has changed from a

11   standard copper matrix to a spongiform

12   matrix, that would be a significant change in

13   its current carrying capability, wouldn't you

14   agree?

15        A.    The copper metal carries the

16   lion's share of the current.

17        Q.    So to the extent you punch

18   holes in it through a spongiform process,

19   you're going to decrease its current carrying

20   capability?

21        A.    That is true.  There will be

22   some probably measurable decrease in current

23   carrying capability if you took a single wire

24   that allows a substantial cross section

Confidential - Subject to Further Confidentiality Review

Page 208

1    because of pitting.

2         Q.     So in your 25-year career, do

3    you ever recall having analyzed the

4    morphology of a wire that was exposed to a

5    corrosive environment to determine if

6    spongiform changes had occurred in the wire?

7         A.     I -- I did not encounter that

8    situation.

9         Q.     The particular instrument that

10   Sandia used to generate figure 1 on page 10

11   of its report -- are you familiar with the

12   FIB electron microscope?

13        A.     My understanding is that it's a

14   way of milling into a surface.  It provides a

15   way of milling into a surface.

16        Q.     And, in fact, it mills or cuts

17   away a surface using the particular

18   technology in an FIB?

19        A.     Yes.

20        Q.     Which provides for a very

21   highly precision cut to cross section into

22   the wire.  Is that a fair statement?

23        A.     It's -- yes.  Otherwise we

24   would make a cross section and mount it and

Confidential - Subject to Further Confidentiality Review

1    make it -- but this provides a shortcut to

2    making that cross section.

3         Q.    A very clean and accurate

4    shortcut for the cross section, wouldn't you

5    agree?

6         A.    Yes, I would agree.

7         Q.    And at least in terms of

8    laboratory technique, would it be a fair

9    statement that figure 1 on page 10 was a

10   fairly elegant result in terms of being able

11   to demonstrate the morphology of the copper

12   in the vicinity of that pit?

13             MS. MAUS:  Objection, form.

14        A.    It demonstrates the morphology

15   of that pit in that wire which was the only

16   wire they looked at, yes.

17   BY MR. SERPE:

18        Q.    A pit such as we're seeing in

19   figure 1, page 10 of the Sandia report would

20   not be one that could be resolved by merely

21   wiping away a tarnish film on the top of the

22   wire, would it?

23        A.    A loss in cross section of the

24   wire would remain.

Confidential - Subject to Further Confidentiality Review

Page 210

1          Q.       And some corrosion product

2     would remain in the pit and the spongiform

3     changes, wouldn't it?

4          A.       It would.

5          Q.       Giving rise to the ability of a

6     self-sustaining corrosion reaction in the pit

7     on that wire.

8          A.       For it to be a self-sustaining

9     reaction, there has to be water in the pit

10    and I don't see an indication from this

11    report that there is water in the pit.

12         Q.       Water could include the

13    hygroscopic water from dust as we described

14    earlier, could it not?

15         A.       I don't see how dust could get

16    into -- into this.  It looks pretty compact

17    surface.

18         Q.       You don't know how dust could

19    get onto an electrical contact of a switch?

20         A.       I said -- I beg your pardon.  I

21    said into, not onto.  I was trying to -- I

22    thought your question was as to whether dust

23    could bring water into this spongiform

24    texture.  And I said I didn't know how dust

Confidential - Subject to Further Confidentiality Review

1      could get there and therefore bring water

2      into it.

3           Q.     If there were dust overlaying

4      the corrosion product that was on that wire

5      and the dust included hygroscopic material,

6      there would be no reason why you couldn't,

7      through capillary action, have water brought

8      to that surface?

9           A.     Those are two fairly major

10     assumptions, and I don't think capillary

11     action would be involved.  Capillary action

12     in atmospheric corrosion is usually

13     restricted to the holes that we call holidays

14     in gold plate.

15          Q.     Did you need moisture to

16     generate the pitting and spongiform changes

17     that we've seen so far?

18          A.     This I would -- I would imagine

19     occurred at a humidity less than the dew

20     point, in which case there would not be

21     visible water there.

22          Q.     So whatever the aqueous

23     conditions that were required for pitting

24     must be present in the vicinity of where that

Confidential - Subject to Further Confidentiality Review

Page 212

1    wire is for us to have developed the very

2    changes that you see visible to you.

3         A.    Well, what happened here was we

4    grew a large corrosion nodule in figure 1,

5    and there is a corresponding loss of metal,

6    which you are referring to as a pit,

7    underneath it.  The metal came from the

8    substrate and that substrate is therefore

9    compromised right directly underneath the --

10   the nodule.

11             (Whereupon, Deposition Exhibit

12        Sharp-20, Expert Rebuttal Report of

13        Dr. Sharp, P1.121-0001 - P1.121-0003,

14        was marked for identification.)

15   BY MR. SERPE:

16        Q.    I would like to hand you

17   Exhibit 20.  You recognize Exhibit 20 as your

18   rebuttal report in this case, do you not?

19        A.    I do.

20        Q.    I would like to point your

21   attention to the tail-end of the first

22   numbered paragraph beginning with the word

23   "because."  Do you see that sentence there?

24        A.    I see it.

Confidential - Subject to Further Confidentiality Review

1          Q.      Would you read that out loud

2     into the record, please.

3          A.      "Because there is no evidence

4     of self-sustaining reactions, for example

5     pitting, on copper wires, installing the

6     environmental control system or removing the

7     source of corrosive gases is able to make the

8     environment less reactive than that

9     associated with the failure of electrical and

10    electronic equipment."

11         Q.      In this sentence you posited

12    that it was the absence of evidence of a

13    self-sustaining reaction which indicated the

14    reliability of ECS or drywall removal to

15    protect electrical and electronic equipment

16    from failure, didn't you?

17         A.      I did because I know that this

18    kind of system can remove these kind of gases

19    to levels -- to concentrations at which

20    failures do not occur.

21         Q.      When -- and failures won't

22    occur, but it assumes the absence of a

23    self-sustaining reaction on copper wires.

24    That was the predicate for your sentence, was

Confidential - Subject to Further Confidentiality Review

1    it not?

2         A.     That's right.  I was really

3    responding to some implications by Dr. Scully

4    that corrosion would continue because of the

5    presence of copper sulfide.  And I am not

6    convinced that corrosion will continue

7    because of the presence of copper sulfide

8    when the humidity is controlled.  That was

9    why I wrote this No. 1 paragraph.

10        Q.     You discussed self-sustaining

11   reactions in paragraph 1.

12        A.     Yes.

13        Q.     You gave an example of a

14   self-sustaining reaction in paragraph 1.

15        A.     Yes.

16        Q.     The example of a

17   self-sustaining reaction that you gave was

18   pitting.

19        A.     Yes.

20        Q.     Pitting is a self-sustaining

21   reaction.

22        A.     That's true.

23        Q.     There is pitting on the wires

24   in the Virginia homes.

Confidential - Subject to Further Confidentiality Review

1          A.      No.   I -- I state here pitting,

2     as that term is normally used, refers to

3     localized corrosion produced by an

4     auto-catalytic reaction.   And that can occur

5     where the environment in the pit is different

6     and the corrosion that is occurring because

7     of that environment being different makes an

8     environment that is corrosive and it keeps --

9     keeping itself corrosive, and that, I don't

10    believe, is what is happening in atmospheric

11    tarnishing.

12               In atmospheric tarnishing, you

13    can get localized tarnishing which, in the

14    first instance, occurs because of clusters of

15    water molecules.   But then as you get

16    localized tarnishing above the original

17    surface, you get localized consumption below

18    that.   And although you may wish to call that

19    pitting, I wanted to distinguish it from a

20    self-sustaining reaction in an aqueous

21    solution which has been widely studied and is

22    what pitting is usually referred to.

23         Q.      So there's no pitting on

24    Virginia wires?

Confidential - Subject to Further Confidentiality Review

Page 216

1        A.      You could describe the consumed

2    metal beneath a lump, let's say, of tarnish

3    as a pit.  And certainly in the

4    air-conditioning system where there is

5    condensation of water on the air-conditioner

6    coil, we see pitting; but in these tarnished

7    wires, I don't want to use the same word

8    "pitting" in the sense of a self-sustaining

9    reaction because I don't believe it's a

10   self-sustaining reaction.

11       Q.      So what you're telling me now

12   is that you'd like to rewrite the sentence to

13   say, no evidence of a self-sustaining

14   reaction; e.g., pitting plus, pitting with

15   some sort of water reaction going on.  Is

16   that what you want to do is change the

17   premise for --

18       A.      No, sir.

19       Q.      -- for what is a

20   self-sustaining reaction?

21              MS. MAUS:  Objection,

22          mischaracterizes his testimony.

23       A.      No.  If you look about the

24   eighth line down, I say, "Pitting as that

Confidential - Subject to Further Confidentiality Review

Page 217

1    term is normally used refers to a localized

2    corrosion produced by an auto-catalytic

3    reaction."  I don't need to change it because

4    I've said what I mean by pitting.

5    BY MR. SERPE:

6         Q.      Sandia called the observations

7    of the wires, the depressions in the wires

8    pits, did it not?

9         A.      Let me look.  They used a term

10   micro cavities on page 9 of Exhibit 13.

11        Q.      Look at page 36, please.  Do

12   you see the summary and conclusions drawn by

13   Sandia National Laboratories, section 4?

14        A.      Yes.

15        Q.      And would you look about

16   halfway through that paragraph, beginning

17   with the words "SEM analysis of."

18        A.      Yes.

19        Q.      Would you read that -- the next

20   several sentences for me, please.

21        A.      The sentence starting "the

22   pits"?

23        Q.      No, "SEM analysis of."

24        A.      Okay.  "SEM analyses of FIB

Confidential - Subject to Further Confidentiality Review

Page 218

1    cross-sectioned ground wires also show that

2    there is localized corrosion of the base

3    copper that produces pits containing a

4    spongy-looking material.  The pits observed

5    to date are up to 20 microns in depth."

6         Q.      Thank you.  So Sandia is

7    referring to these wires in describing pits

8    of the wires, are they not?

9         A.      They are describing what they

10   call pits.

11        Q.      And are you saying that's an

12   abnormal use of the word?

13        A.      I am saying that within the

14   corrosion community, the word "pit" or

15   "pitting" typically refers to self-sustaining

16   reactions.  And I wanted to clarify my

17   opinion that I did not believe there were

18   self-sustaining reactions, and that's why I

19   made this clarification in point 1.

20        Q.      In the corrosion community, the

21   word "pit" typically refers to

22   self-sustaining reactions.

23        A.      That's my opinion.

24        Q.      Sandia uses the word "pit," do

Confidential - Subject to Further Confidentiality Review

1      they not?

2            A.      Yes.

3            Q.      To corrode --

4            A.      Excuse me.  Go ahead.

5            Q.      In the corrosion community,

6      that would typically be understood to mean

7      Sandia believes it's a self-sustaining

8      reaction.  That's how you read it, isn't it?

9            A.      It mis -- Dr. Scully was using

10     it to describe self-sustaining reactions.  My

11     ex -- my rebuttal here refers to the

12     plaintiffs' expert reports that I had

13     reviewed, and then I comment on this.  This

14     was not a comment on the Sandia report.

15           Q.      I understand.  The Sandia

16     report, though, does use the word "pit" --

17           A.      It does.

18           Q.      -- a word commonly understood

19     in the corrosion community to mean

20     self-sustaining reaction, correct?

21           A.      That's what I said, yes.

22           Q.      So to the corrosion community,

23     Sandia's use of the word "pit" when

24     describing wires from Chinese drywall homes

Confidential - Subject to Further Confidentiality Review

Page 220

1    necessarily implies that Sandia believes we

2    have self-sustaining reactions here.  Is that

3    a fair statement?

4            A.        That's a fair statement.

5            Q.        And Dr. Scully obviously has

6    said that.  That was in his original expert

7    report.

8            A.        That's true.

9            Q.        Can you tell me anyone else in

10   the corrosion community that you referred to

11   that shares your opinion that the pits

12   observed on these wires are not

13   self-sustaining reactions?

14           A.        My evidence for the fact that

15   they are not self-sustaining reactions is

16   that if you have electrical or electronic

17   equipment that is in a condition that would

18   promote failure and if you then change the

19   environment so that the environment is no

20   longer corrosive, it's within our failure

21   parameter, that failures stop.  And that

22   could not occur if there were self-sustaining

23   reactions that were continuing on and on.

24           Q.        Do you recall the question?

Confidential - Subject to Further Confidentiality Review

Page 221

1          A.     Yes.

2          Q.     Who else in the corrosion

3   community shares your opinion that the pits

4   observed on these wires are not

5   self-sustaining?

6          A.     I have not made any survey of

7   the corrosion community on this matter.

8          Q.     And your opinion is at odds

9   with the Sandia National Laboratory?

10         A.     It is.  If the Sandia National

11  Laboratories intended to say that it was

12  self-sustaining.

13         Q.     And indeed that's how you read

14  it.

15         A.     That's how I read Dr. Scully's

16  report.

17         Q.     And how you read Sandia.  You

18  just told me that a minute ago.

19         A.     I think it is not a

20  self-sustaining reaction -- if it were a

21  self-sustaining reaction, the -- all the

22  remediation that has been done, which is

23  approximately 30,000 installations, would not

24  work.  It would not protect the existing

Confidential - Subject to Further Confidentiality Review

Page 222

1    equipment.

2        Q.    Dr. Sharp, how many wires from

3    Virginia homes did you evaluate in the

4    laboratory?

5        A.    I did not make laboratory

6    examinations of wires myself.

7        Q.    Do you have access to a

8    laboratory?

9        A.    Everyone has access to

10   laboratories.

11       Q.    Do -- do you have ownership

12   interest in any laboratory?

13       A.    I do not.

14       Q.    Do you have keys to the door

15   for any laboratories?

16       A.    No, I do not.

17       Q.    Do you have a laboratory that

18   you've gone to on a regular basis where you

19   have utilized equipment for investigative

20   purposes?

21       A.    There are laboratories that I

22   have used as part of my business to do

23   corrosion studies, yes.

24       Q.    And how frequently does that

Confidential - Subject to Further Confidentiality Review

1    happen, say, on an annual basis?

2         A.    In this last year I was

3    involved with one major study with another

4    laboratory.

5         Q.    Did it involve Chinese drywall?

6         A.    No, it did not.

7         Q.    Have you ever been in a

8    laboratory building where a piece of Chinese

9    drywall was being evaluated?

10        A.    I have visited the RJ Lee

11   Laboratories and seen evaluations in progress

12   of Chinese drywall, and the kinds of

13   evaluations of components that were made by

14   RJ Lee were the kinds of evaluations that I

15   would have myself conducted had I been tasked

16   with that.

17        Q.    Did you -- were there

18   microscopes there at RJ Lee?

19        A.    There were.

20        Q.    Did you look through a

21   microscope at any electrical surfaces?

22        A.    No, I trusted Dr. Perricone.  I

23   looked at his micrographs and I looked at his

24   equipment and left it at that.

Confidential - Subject to Further Confidentiality Review

Page 224

1              MR. SERPE:   We have to change

2       the tape.   Let's take perhaps a

3       two-minute break.

4              THE VIDEOGRAPHER:   Time now is

5       approximately 3:23 p.m., and we are

6       now off the record.

7              (Recess taken, 3:23 p.m. to

8       3:35 p.m.)

9              THE VIDEOGRAPHER:   This is the

10      beginning of Tape 6 of the videotaped

11      deposition of Dr. Sandy Sharp.   Time

12      now is approximately 3:35 p.m., and we

13      are back on the record.

14  BY MR. SERPE:

15      Q.     I would like to return to

16  Exhibit 19, the Sinclair chapter from the

17  Corrosion Test and Standards textbook.

18      A.     Yes.

19      Q.     And get you to flip to

20  page 359.  And there's a sentence that begins

21  at the second column, just after the mark for

22  13, where it begins "above a critical level."

23      A.     Yes.

24      Q.     Would you read the next two

Confidential - Subject to Further Confidentiality Review

Page 225

1    sentences into the record, please.

2        A.    "Above a critical level of

3    relative humidity, the test specimen will

4    absorb a sufficient amount of moisture to

5    produce a sharply lower resistance between

6    conductors.  The fraction of time of lowered

7    resistance is commonly referred to as the

8    time of wetness."

9        Q.    I'm sorry.  And one additional

10    sentence there.

11        A.    "It is one useful measure of

12    the corrosivity of an environment."

13        Q.    So as I understand it, there's

14    a critical level of relative humidity that

15    can influence the corrosivity of an

16    environment?

17        A.    I'm surprised to see this here.

18    There was a theory in that regard many years

19    ago which was largely disproved.  So I would

20    like to read the context of this paragraph.

21        Q.    Please take your time.

22        A.    Thank you.

23        (Witness reviews document.)

24        A.    I've read the paragraph.