Samuel G. Porter

U. S. DISTRICT COURT  Page 1
EASTERN DISTRICT OF LOUISIANA
FILED   2·22-10
LORETTA G. WHYTE
CLERK

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

3    ─────────────────────── §
     IN RE:                    §
4    CHINESE-MANUFACTURED      §   MDL NO. 2047
     DRYWALL PRODUCTS          §
5    LIABILITY LITIGATION      §   SECTION: L
                               §
6    ───────────────────────   §   JUDGE FALLON
     This document applies     §
7    to all cases              §   MAG. JUDGE WILKINSON
                               §
8    ─────────────────────────

9          WEDNESDAY, DECEMBER 16, 2009

10                 – – –

11

12          Videotaped deposition of SAMUEL G.

13   PORTER, AS 30(B)(6) REPRESENTATIVE OF VENTURE

14   SUPPLY, INC. and PORTER-BLAINE CORP., held at

15   the offices of McKenry, Dancigers, Dawson &

16   Lake, PC, 192 Ballard Court, Suite 400,

17   Virginia Beach, Virginia, commencing at

18   9:21 a.m., on the above date, before

19   Michael E. Miller, Certified Court Reporter,

20   Registered Diplomate Reporter, Certified

21   Realtime Reporter.

22                 – – –

23          GOLKOW TECHNOLOGIES, INC.
        877.370.3377 ph | 917.591.5672 fax
24             deps@golkow.com

Samuel G. Porter

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2
    MICHELLE GERMANO; DENNIS          §
 3  JACKSON; SHARON JACKSON;          §
    JASON DUNAWAY; LISA DUNAWAY;      §
 4  Individually, and on behalf       §
    of all other similarly            §
 5  situated,                         §
                                      §
 6          Plaintiffs,               §
                                      §
 7  vs.                               §   2:09cv202
                                      §
 8  TAISHAN GYPSUM CO. LTD.           §
    f/k/a SHANDONG TAIHE DONGXIN      §
 9  CO. LTD.; VENTURE SUPPLY,         §
    INC.; HARBOR WALK                 §
10  DEVELOPMENT, LLC; and THE         §
    PORTER-BLAINE CORP.,              §
11                                    §
            Defendants.               §
12
13  _____
14
15
16
17
18
19
20
21
22
23
24
```

Samuel G. Porter

```
 1    A P P E A R A N C E S :

 2         HERMAN, HERMAN, KATZ & COTLAR, LLP
           BY:  RUSS M. HERMAN, ESQUIRE
 3              rherman@hhkc.com
           820 O'Keefe Avenue
 4         New Orleans, Louisiana 70113
           (504) 581-4892
 5         Counsel for Plaintiffs

 6

           LEVIN, FISHBEIN, SEDRAN & BERMAN
 7         BY:  FREDERICK S. LONGER, ESQUIRE
                flonger@lfsblaw.com
 8         510 Walnut Street
           Suite 500
 9         Philadelphia, Pennsylvania 19106
           (215) 592-1500
10         Counsel for Plaintiffs

11

           LEVIN, PAPANTONIO, THOMAS, MITCHELL,
12         ECHSNER & PROCTOR, PA
           BY:  BEN W. GORDON, JR., ESQUIRE
13              bgordon@levinlaw.com
                (via teleconference)
14         316 South Baylen Street
           Pensacola, Florida 32502-5996
15         (850) 435-7000
           Counsel for Plaintiffs

16

17         SINNOTT, NUCKOLS & LOGAN, PC
           BY:  KENNETH F. HARDT, ESQUIRE
18              khardt@snllaw.com
           13811 Village Mill Drive
19         Midlothian, Virginia 23114
           (804) 378-7600
20         Counsel for Venture Supply, Inc. and
           Porter-Blaine Corp.

21

22

23

24
```

Samuel G. Porter

```
 1    A P P E A R A N C E S:

 2        BRENNER, EVANS & MILLMAN, PC
          BY:   THEODORE I. BRENNER, ESQUIRE
 3              tbrenner@beylaw.com
          411 East Franklin Street
 4        Suite 200
          Richmond, Virginia 23218-0470
 5        (804) 644-1300
          Counsel for Tobin Trading, Inc.

 6

 7        TAYLOR & WALKER, PC
          BY:   DANNIELLE C. HALL-MCIVOR, ESQUIRE
 8              dhall-mcivor@taylorwalkerlaw.com
          555 Main Street
 9        Suite 1300
          Norfolk, Virginia 23510
10        (757) 625-7300
          Counsel for Harbor Walk Development

11

12        ADORNO & YOSS
          BY:   RACHEL M. COE, ESQUIRE
13              rcoe@adorno.com
                (via teleconference)
14              KRISTEN LAKE CARDOSO, ESQUIRE
                kcardoso@adorno.com
15              (via teleconference)
          888 S.E. 3rd Avenue
16        Suite 500
          Ft. Lauderdale, Florida 33316
17        (954) 523-5885
          Counsel for Banner Supply Co.

18

19        FOWLER WHITE BURNETT, PA
          BY:   ELIZABETH J. FERRY, ESQUIRE
20              eferry@fowler-white.com
                (via teleconference)
21        Espirito Santo Plaza
          1395 Brickell Avenue, 14th Floor
22        Miami, Florida 33131
          (305) 789-9200
23        Counsel for Black Bear Gypsum, Inc.
          and Smoky Mountain Materials, Inc.

24
```

Samuel G. Porter

```
 1   A P P E A R A N C E S:

 2       BAKER & McKENZIE, LLP
         BY:  DOUGLAS B. SANDERS, ESQUIRE
 3            douglas.b.sanders@bakernet.com
              (via teleconference)
 4       One Prudential Plaza, Suite 3500
         130 East Randolph Drive
 5       Chicago, Illinois 60601
         (312) 861-8000
 6       Counsel for Knauf Plasterboard
         (Tianjin) Co., Ltd.
 7

 8       HUNTON & WILLIAMS, LLP
         BY:  A. TODD BROWN, ESQUIRE
 9            tbrown@hunton.com
              (via teleconference)
10       Bank of America Plaza
         101 South Tryon Street, Suite 3500
11       Charlotte, North Carolina 28280
         (704) 378-4700
12       Counsel for Stock Building Supply, LLC
         (Gross v. Knauf matter only)
13

14       GALLOWAY, JOHNSON, TOMPKINS,
         BURR & SMITH, PLC
15       BY:  LAMBERT J. HASSINGER, JR., ESQUIRE
              jhassinger@gjtbs.com
16            (via teleconference)
         One Shell Square
17       701 Poydras Street, 40th Floor
         New Orleans, Louisiana 70139
18       (504) 525-6802
         Counsel for Interior Exterior
19       Building Supply

20

21

22

23

24
```

Samuel G. Porter

1    A P P E A R A N C E S:

2    ALSO PRESENT:

3        KIRA A. LIGATO,
         McKenry, Dancigers, Dawson & Lake, PC
4
         JEFFREY S. VALLIERE, ESQUIRE
5        Allen & Gooch
         (via teleconference)
6

7    VIDEOGRAPHER:

8        MICHAEL KAUFFMANN,
         Golkow Technologies, Inc.
9

10                   - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Samuel G. Porter

1                        I N D E X
                    SAMUEL G. PORTER
2                    December 16, 2009

3

4    APPEARANCES                                3

5    PROCEEDINGS                               17

6

7    EXAMINATION OF SAMUEL G. PORTER:

8         BY MR. HERMAN                         19

9

10   CERTIFICATE                              257

11   ACKNOWLEDGMENT OF DEPONENT               258

12   ERRATA                                   259

13   LAWYER'S NOTES                           260

14

15

16

17

18

19

20

21

22

23

24

Samuel G. Porter

```
1                    DEPOSITION EXHIBITS
                       SAMUEL G. PORTER
2                      December 16, 2009

3

4    NUMBER             DESCRIPTION            MARKED

5    PSC-VPB-1     Amended Notice of              20
                   30(b)(6) Deposition of
6                  Venture Supply, Inc.

7    PSC-VPB-2     Amended Notice of              20
                   30(b)(6) Deposition of
8                  Porter-Blaine Corp.

9    PSC-VPB-81    11/16/05 Perry E-mail to       62
                   Clem, Subject: Labeling
10                 Tape and Back of Board,
                   V002541
11
     PSC-VPB-83    11/17/05 Waddell E-mail        65
12                 to Perry, Subject: Edge
                   Binding Label Tape,
13                 V002527

14   PSC-VPB-84    11/24/05 Perry E-mail to       66
                   Zhang, Subject: Ocean
15                 Freight to Norfolk, VA,
                   USA,
16                 V002507

17   PSC-VPB-87    12/5/05 Perry E-mail to        67
                   Porter, Subject: Air
18                 freight of sample,
                   V002452
19
     PSC-VPB-88    Photographs, Dragon Brand      71
20                 Gypsum Board,
                   V002078 - V002082
21
     PSC-VPB-133   Photographs, Venture           73
22                 Supply, Inc. Wallboard

23   PSC-VPB-91    Photographs of Wallboard       74
                   from Morgan Property
24
```

Page 9

```
1              DEPOSITION EXHIBITS

2

3      NUMBER           DESCRIPTION        MARKED

4   PSC-VPB-92    Photographs of Wallboard    76
                  from Orlando Property
5
    PSC-VPB-93    Photographs of Wallboard    76
6                 from Baldwin Property

7   PSC-VPB-94    Photographs of Wallboard    77
                  from Heischober Property
8
    PSC-VPB-95    Photographs of Wallboard    78
9                 from Leach Property

10  PSC-VPB-96    Photographs of Wallboard    78
                  from McKellar Property
11
    PSC-VPB-97    Photographs of Wallboard    79
12                from Michaux Property

13  PSC-VPB-3     E-mail Chain Ending         81
                  11/14/05 Perry E-mail to
14                Richardelli,
                  Subject: Gypsum
15                drywall/bank information,
                  V002574 - V002580
16
    PSC-VPB-4     E-mail Chain Ending         83
17                11/15/05 Waddell E-mail
                  to Edney,
18                Subject: Amended Letter
                  of Credit and Wiring
19                Instructions,
                  V000393
20
    PSC-VPB-5     11/26/05 Perry E-mail to    86
21                Porter, Subject: L/C
                  Changes,
22                V001801 - V001802

23

24
```

Samuel G. Porter

Page 10

```
1               DEPOSITION EXHIBITS
2
3      NUMBER            DESCRIPTION        MARKED
4    PSC-VPB-10     5/4/06 Perry E-mail to      96
                    Porter, Subject: Progress
5                   report, 5-4-06,
                    V001535 - V001536
6
     PSC-VPB-11     5/24/06 Porter Letter to   100
7                   Shandong Taihe Dongxin,
                    V001442 - V001443
8
     PSC-VPB-9      5/24/06 Woods E-mail to    101
9                   Woods & Porter,
                    Subject: Fax,
10                  w/Handwritten
                    Interlineations,
11                  V001438
12   PSC-VPB-6      11/26/05 Perry E-mail to   104
                    Woods, Subject: Latest
13                  Snafu,
                    V002495 - V002496
14
     PSC-VPB-13     E-mail Chain Ending        107
15                  2/3/06 Woods E-mail to
                    Porter, Subject: Plywood
16                  Pallet,
                    V001682 - V001687
17
     PSC-VPB-14     E-mail Chain Ending        111
18                  11/10/05 Woodard E-mail
                    to Richardelli,
19                  Subject: Venture Supply,
                    Inc - Ocean Cargo
20                  Coverage,
                    V002625
21
     PSC-VPB-17     4/6/06 Woods E-mail to     117
22                  Porter,
                    Subject: Conversation
23                  with Phil Sat morn,
                    V001608 - V001612
24
```

Samuel G. Porter

| | NUMBER | DESCRIPTION | MARKED |
|---|---|---|---|

1                 DEPOSITION EXHIBITS

2

3      NUMBER           DESCRIPTION        MARKED

4   PSC-VPB-18     2/15/06 Woods E-mail to    122
                        Porter, Subject: Look
5                         this over,
                        V001273

6

    PSC-VPB-21     12/14/05 Woods E-mail to   125
7                         Porter, Subject: Send
                        Phil an e-mail,
8                         V002373 - V002392

9   PSC-VPB-22     E-mail Chain Ending      127
                        12/14/05 Perry E-mail to
10                        Clem, Subject: Frank Peng
                        letter from Venture,
11                        V002358 - V002361

12   PSC-VPB-24     12/19/05 Perry          132
                        Handwritten Fax to
13                        Porter,
                        V001854
14

    PSC-VPB-25     Venture Supply, Inc.      133
15                         Corporate Certification,
                        V001834
16

    PSC-VPB-27     2/4/06 Woods E-mail to     134
17                         Porter, Subject: China
                        fax,
18                        V001681

19   PSC-VPB-28     3/9/06 Woods E-mail to     137
                        Porter, Subject: Woody
20                        here,
                        V002799 - V002800
21

22

23

24

Samuel G. Porter

1                    DEPOSITION EXHIBITS

2

3        NUMBER            DESCRIPTION          MARKED

4    PSC-VPB-31      BCC Certificates of          164
                     Quality Management System
5                    Certification for
                     Shandong Taihe Dongxi
6                    Stock Co., Ltd., et al.,
                     w/Attachments,
7                    V028247 - V028300

8    PSC-VPB-32      11/10/05 Richardelli Fax     176
                     to Perry, re:
9                    Translation,
                     V001879 - V001890
10
     PSC-VPB-36      11/9/05 Perry Handwritten    179
11                   Fax to Porter,
                     Subject: Drywall,
12                   V001256

13   PSC-VPB-39      11/9/05 Bender E-mail to     181
                     Richardelli,
14                   Subject: Letter of credit
                     application, w/Attached
15                   Application,
                     V001811- V001818
16
     PSC-VPB-46      11/14/05 Perry E-mail to     183
17                   Porter, Subject: China
                     Drywall,
18                   V002592

19   PSC-VPB-49      E-mail Chain Ending          184
                     11/15/05 Waddell E-mail
20                   to Edney,
                     Subject: Amended Letter
21                   of Credit and Wiring
                     Instructions,
22                   V000393 - V000394

23

24

Samuel G. Porter

```
1                    DEPOSITION EXHIBITS

2

3       NUMBER            DESCRIPTION         MARKED

4    PSC-VPB-50     11/18/05 RBC Centura Fax    186
                    to Richardelli,
5                   w/Handwritten
                    Interlineations,
6                   V001805

7    PSC-VPB-57     E-mail Chain Ending         192
                    11/29/05 Perry E-mail to
8                   Waddell, Subject: Packing
                    photoes,
9                   V002477 - V002479

10   PSC-VPB-54     11/26/05 Perry E-mail to    195
                    Porter, Subject: L/C
11                  changes,
                    V002491
12
     PSC-VPB-52     E-mail Chain Ending         197
13                  11/23/05 Perry E-mail to
                    Porter, Subject: Contract
14                  and L/C,
                    V002514 - V002515
15
     PSC-VPB-135    Venture Supply Services     200
16                  Webpage

17   PSC-VPB-66     Letter of Understanding     203
                    Between Tobin Trading and
18                  Venture Supply,
                    V001554
19
     PSC-VPB-67     Letter of Understanding     204
20                  Between Tobin Trading and
                    Venture Supply,
21                  w/Handwritten
                    Interlineations,
22                  V001902

23

24
```

Samuel G. Porter

1            DEPOSITION EXHIBITS

2

3      NUMBER          DESCRIPTION          MARKED

4    PSC-VPB-68    Executed Letter of          204
                  Understanding Between
5                 Tobin Trading and Venture
                  Supply, w/Handwritten
6                 Interlineations,
                  TOB00058
7
     PSC-VPB-69    12/1/05 Porter Memo To      207
8                 Whom It May Concern,
                  TOB00057
9
     PSC-VPB-71    Venture Supply Checks to    208
10                Perry,
                  V000044 - V000046
11
     PSC-VPB-72    10/13/06 Stein Fax to       209
12                Perry w/Attached Schedule
                  of Payments and Wires for
13                Commissions,
                  TOB00045 - TOB00046
14
     PSC-VPB-73    Schedule of Payments and    212
15                Wires for Commissions,
                  V000032
16
     PSC-VPB-99    12/2/05 Porter Fax to       214
17                Towler/Edney,
                  Subject: FINAL FINAL
18                FINAL Amendments to
                  Letter of Credit!!!,
19                V000382 - V000391

20   PSC-VPB-100   12/17/05 Perry E-mail to    215
                  Porter,
21                Subject: Finalizing 1st
                  shipment at factory,
22                V002346 - V002347

23   PSC-VPB-101   12/19/05 Perry              216
                  Handwritten Fax to
24                Porter, w/Attachments,

Samuel G. Porter

1
                    DEPOSITION EXHIBITS
2
3
     NUMBER              DESCRIPTION           MARKED
4
     PSC-VPB-102     12/13/05 Shandong Taihc      217
5                    Dongxin Invoice and
                     Packing List to Venture
6                    Supply,
                     V001864 - V001865
7
     PSC-VPB-102A    12/2/05 Clem Fax to          218
8                    Porter,
                     V001866 - V001868
9
     PSC-VPB-111     Discharge Schedule for       219
10                   SK Shipping,
                     V001368 - V001369
11
     PSC-VPB-103     12/13/05 Shandong Taihe      222
12                   Dongxin Packing List and
                     Bill of Lading to Venture
13                   Supply,
                     V000320 - V000323
14
     PSC-VPB-104     12/16/05 Contract Between    223
15                   Shandong Taihe Dongxin
                     and Venture Supply,
16                   V001861 - V001863
17   PSC-VPB-105     11/17/05 Contract Between    225
                     Shandong Taihe Dongxin
18                   and Venture Supply,
                     V002531 - V002532
19
     PSC-VPB-106     1/23/06 RBC Centura Fax      226
20                   to Porter,
                     V000315 - V000316
21
     PSC-VPB-107     2/3/06 Schools E-mail to     227
22                   Ford, et al.,
                     Subject: GLYKOFILOUSSA
23                   pre-discharge meeting,
                     V001370
24

Samuel G. Porter

Page 16

| | NUMBER | DESCRIPTION | MARKED |
|---|---|---|---|
| 1 | | DEPOSITION EXHIBITS | |
| 2 | | | |
| 3 | NUMBER | DESCRIPTION | MARKED |
| 4 | PSC-VPB-108 | 2/4/06 & 2/5/06 Shandong | 229 |
| 5 | | Taihe Dongxin Commercial Invoices to Venture | |
| 6 | | Supply, V001409 - V001411 | |
| 7 | PSC-VPB-114 | E-mail Chain Ending 2/19/06 Woods E-mail to | 231 |
| 8 | | Porter, Subject: LOC sample, w/Handwritten | |
| 9 | | Interlineations, V002820 - V002821 | |
| 10 | | | |
| | PSC-VPB-115 | 3/8/06 Perry E-mail to | 235 |
| 11 | | Lei, Subject: Shipping for gypsum board, | |
| 12 | | V002803 - V002804 | |
| 13 | PSC-VPB-116 | E-mail Chain Ending 3/31/06 Woods E-mail to | 236 |
| 14 | | Porter, Subject: TT for Expences, | |
| 15 | | V001663 - V001664 | |
| 16 | PSC-VPB-117 | Porter Handwritten Note, "Boat Board 2nd ship, May | 239 |
| 17 | | 15 Load to Norfolk," V001407 | |
| 18 | | | |
| | PSC-VPB-118 | Porter Handwritten Note, | 241 |
| 19 | | "China Board Deal II," V001644 | |
| 20 | | | |
| | PSC-VPB-119 | 4/10/06 RBC Centura Fax | 242 |
| 21 | | to Towler, V001596 | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Samuel G. Porter

Page 17

```
 1                DEPOSITION EXHIBITS

 2

 3        NUMBER           DESCRIPTION         MARKED

 4    PSC-VPB-120    4/10/06 Edney Fax Cover      243
                     Sheet to Stein,
 5                   Subject: Venture L/C
                     Modification,
 6                   V001597

 7    PSC-VPB-121    4/10/06 Edney Fax to         244
                     Stein, Subject: Venture
 8                   L/C Modification,
                     w/Attachment,
 9                   V000719 - V000727

10    PSC-VPB-127    E-mail Chain Ending          248
                     6/2/06 Perry E-mail to
11                   Paras, Subject: Break
                     bulk from China,
12                   V001416

13    PSC-VPB-123    E-mail Chain Ending          249
                     5/9/06 Richardelli E-mail
14                   to Porter,
                     Subject: Weight of
15                   pallet,
                     V001510 - V001512
16

17

18

19

20

21

22

23

24
```

Samuel G. Porter

Page 18

```
1                   PROCEEDINGS
2              (December 16, 2009 at
3         9:21 a.m.)
4              THE VIDEOGRAPHER:  Stand by.
5         We are now on the record.  My name is
6         Michael Kauffmann.  I'm the
7         videographer for Golkow Technologies.
8         Today's date is December 16th, 2009.
9         The time is 9:21 a.m.
10             This video deposition is being
11        held in Virginia Beach, Virginia in
12        regards to Chinese drywall litigation
13        for the U.S. District Court, Eastern
14        District of Louisiana.  The deponent
15        is Samuel Porter, as a representative
16        of Venture Supply, Incorporated.
17             Counsel, please identify
18        yourselves for the record.
19             MR. HERMAN:  My name is Russ
20        Herman in MDL 2047, appearing before
21        Judge Fallon in the Eastern District
22        of Louisiana.  I represent all
23        plaintiffs, including those styled as
24        the Germano Plaintiffs.
```

Samuel G. Porter

Page 19

```
 1              MR. HARDT:  Yes.  My name is
 2         Ken Hardt.  I represent Venture
 3         Supply.
 4              MR. BRENNER:  My name is Ted
 5         Brenner, I represent Tobin
 6         Trading, Inc.
 7              THE VIDEOGRAPHER:  The court
 8         reporter is Mike Miller.  And he will
 9         now swear in the witness.
10              SAMUEL G. PORTER,
11    having been duly sworn, testified as follows:
12              EXAMINATION
13    BY MR. HERMAN:
14         Q.    Sir, we've been introduced.  My
15    name is Russ Herman.  I'll be asking you
16    questions.  If you don't understand my
17    question, stop me, and I'll try to ask a
18    question that's intelligible.
19              In the event that Mr. Hardt or
20    Mr. Brenner pose an objection, let your
21    attorney, Mr. Hardt, make the objection for
22    the record and, if necessary, instruct you.
23    Fair enough?
24         A.    Yes, sir.
```

Samuel G. Porter

1                    (Whereupon, Deposition Exhibit

2            PSC-VPB-1, Amended Notice of 30(b)(6)

3            Deposition of Venture Supply, Inc.,

4            was marked for identification.)

5    BY MR. HERMAN:

6            Q.      I am going to, during the

7    deposition, identify all exhibit numbers as

8    PSC-VPB, and then with a numeral.  Some may

9    come out of order, but I'm going to introduce

10   now the amended notice of oral and videotaped

11   deposition for Venture Supply, Inc.  It's

12   Exhibit No. 1.  And I'm going to hand counsel

13   a copy.  And I have a couple of extra copies.

14                    (Whereupon, Deposition Exhibit

15           PSC-VPB-2, Amended Notice of 30(b)(6)

16           Deposition of Porter-Blaine Corp., was

17           marked for identification.)

18   BY MR. HERMAN:

19           Q.      And I'm going to identify for

20   the record as No. 2 -- and I want to

21   reiterate that every one of these exhibit

22   numbers also is characterized as PSC-VPB.

23   And PSC-VPB-2 is the amended notice to

24   Porter-Blaine.  And I hand to counsel a copy.

Samuel G. Porter

1          MR. HERMAN:  I have to ask a

2     question of counsel, so please don't

3     answer this question.

4          Mr. Samuel G. Porter, or Sam

5     Porter, has been named as the

6     corporate representative for both

7     depositions, for Venture Supply and

8     Porter-Blaine.

9          Counsel, it's entirely up to

10    you.  I had intended that the

11    questions that I ask seriatim and the

12    exhibits apply to both, but if you

13    want me to repeat a Porter-Blaine

14    deposition when we're through with

15    Venture, I will.  So --

16         MR. HARDT:  Can we discuss this

17    off the record?

18         MR. HERMAN:  Sure.  Absolutely.

19         MR. HARDT:  All right.  Let's

20    go off the record.

21         THE VIDEOGRAPHER:  We're going

22    off the record at 9:25 a.m.

23         (Short recess taken.)

24         THE VIDEOGRAPHER:  We are back

Samuel G. Porter

Page 22

```
 1        on the record at 9:25 a.m.
 2               MR. HERMAN:  And if, I think,
 3        Mr. Hardt, I state this correctly,
 4        Mr. Brenner, this will be the
 5        deposition of both Venture and
 6        Porter-Blaine.
 7               And if a particular question
 8        applies only to Venture or to
 9        Porter-Blaine, I will introduce the
10        question and direct the witness'
11        intention specifically to one or the
12        other.  Otherwise, the questions apply
13        to both.
14               MR. HARDT:  And that's fine.
15        That's fine.
16               MR. BRENNER:  If I may just
17        make a comment earlier Mr. Hardt and I
18        discussed, Tobin is going to reserve
19        its right to depose Venture or
20        Porter-Blaine in the future.  We're
21        not going to be asking questions
22        today.
23               MR. HERMAN:  That's fine.
24     BY MR. HERMAN:
```

Samuel G. Porter

Page 23

1          Q.     Mr. Porter, I'm going to refer

2    to you as "Mr. Porter" during the deposition.

3    Some of the documents refer to you as "Sam";

4    and if there's a particular document that

5    refers to you as "Sam," I'll let you know.

6                 The documents also that we're

7    going to be looking at have "V" numbers, in

8    other words, Bates numbers that begin with

9    "V" that have been produced by Venture or

10   Porter-Blaine; and when I refer to an

11   exhibit, I'm also going to refer to a Bates

12   number, if the exhibit has a Bates number.

13                I'm going to show you and your

14   lawyer, at the same time, any exhibit

15   specifically that I direct your attention to.

16   Fair enough?

17         A.     Yes.

18         Q.     And I mean no offense

19   whatsoever, but it's a standard question for

20   me in every deposition:  You have no

21   medication or medical problem presently that

22   would prevent you from giving answers in this

23   deposition; is that correct?

24         A.     I'm on medication.

Samuel G. Porter

Page 24

```
 1        Q.       What medication are you on?

 2        A.       I'm on Prozac, Toprol,

 3   Lamictal, Vistaril, Prevacid, Inderal, Valium

 4   and Percocet.  And I think there's --

 5        Q.       Well, you have an excellent

 6   memory for the pharmacies that you're on.

 7        A.       Yes, sir.

 8        Q.       If you have a problem during

 9   the deposition, just let us know.

10        A.       Okay.  I do have to take

11   certain medications --

12        Q.       Whenever you have to take them,

13   you just let us know, and we'll recess, and

14   that's fine.

15        A.       Thank you, sir.

16        Q.       You live in Norfolk or Virginia

17   Beach?  Where do you live?

18        A.       Virginia Beach.

19        Q.       Okay.  And how long were you in

20   the building supply business purchasing or

21   distributing drywall?

22        A.       Approximately 15 years.

23        Q.       And had you, before you began

24   importing what I'll call Taishan gypsum
```

Samuel G. Porter

Page 25

```
 1    drywall -- had you ever imported any drywall
 2    before that time from China?
 3         A.     No.
 4              MR. HARDT:  Can I -- and can I
 5         just interject here?  You can call it
 6         Taishan if you want, and I know that
 7         the allegation is that Taishan is the
 8         subsidiary or the successor
 9         corporation to Shandong, but for the
10         record, we don't have any evidence of
11         that.  But you can refer to them as
12         Taishan, if you'd like to.
13              MR. HERMAN:  I do have evidence
14         of it, and I'll be happy to share it
15         with you.  But from now on -- Taishan
16         Gypsum Company originally was Shandong
17         Taihe, T-A-I-H-E, Dongxin,
18         D-O-N-G-X-I-N, Company, Ltd., and it
19         changed its name on September 10th,
20         2007, to Taishan Gypsum Company after
21         BNBM bought a 65% equity share.
22              So I'm going to use "Taishan"
23         or "Shandong" interchangeably.
24    BY MR. HERMAN:
```

Samuel G. Porter

Page 26

1          Q.     At any rate, before you

2    imported --

3          A.     I have a quick question.  I

4    usually refer to as "import" or "domestic

5    board," so --

6          Q.     Okay.  That's fair enough.

7          A.     That's easiest for me.

8          Q.     Okay.  We'll make it easy for

9    you.  Let's first establish that the terms

10   "drywall" and "plaster board" and

11   "sheetrock" --

12         A.     Yes, sir.

13         Q.     -- really are interchangeable

14   for purposes of this deposition.

15         A.     (Nods head.)

16         Q.     Fair enough?

17         A.     Yes.

18         Q.     All right.  Now, had you

19   imported any Chinese drywall or board before

20   the year 2005-2006?

21         A.     I brought in a small amount

22   in -- I think it was 1999, but not very much.

23         Q.     In 1999, did you bring in

24   Knauf, K-N-A-U-F, plaster board made in

Samuel G. Porter

1    China?

2         A.     I think it was made in Germany

3    or Greece.   I'm not exactly sure.

4         Q.     You think --

5         A.     It was not China, no.

6         Q.     It was not Chinese?

7         A.     Yeah, I know it wasn't Chinese.

8         Q.     At that time, did any employees

9    or contractees of either Porter-Blaine or

10   Venture complain about that board?

11        A.     Not to my recollection, no.

12        Q.     Maybe this will refresh your

13   memory, that some of the installers got

14   rashes and complained about a smell?

15        A.     In 1999?

16        Q.     From the Knauf import.

17        A.     No.

18        Q.     Okay.   Now, other than that

19   import in 1999, you had not imported board at

20   all?

21        A.     No.

22        Q.     And the first board you

23   imported was either -- we'll call it Shandong

24   or Taishan drywall, correct?

Samuel G. Porter

1      A.      Correct.

2      Q.      And you began those

3  negotiations through Tobin sometime in late

4  2005, correct?

5      A.      I think it was more towards the

6  middle of '05.

7      Q.      Okay.  And the first delivery

8  to you -- that is, to Venture -- was in 2006,

9  correct?

10      A.      Yes, sir.

11      Q.      How many shipments did you get,

12  all in all, from Taishan or Shandong of

13  board?

14      A.      We got 100,000 sheets on one

15  shipment and then a partial of 59,000 sheets

16  after that.  And that was it.

17      Q.      The second shipment that you

18  referred to, the 59,000 sheets, was that to

19  have been 100,000 sheets, including some

20  replacement board?

21      A.      Yes, sir.

22      Q.      Now, had you ever experienced

23  with domestic board -- that's USA board --

24  before you began importing Chinese drywall,

Samuel G. Porter

1    any complaint of sulfur off-gassing or sulfur

2    compounds from U.S. board?

3         A.    Not that I'm aware of, no.

4         Q.    Corrosion of electrical systems

5    or HVAC systems or plumbing systems?

6         A.    Not that I'm aware of, no.

7         Q.    Health problems caused by U.S.

8    board?

9         A.    Not that I -- no, not that I'm

10   aware of.

11        Q.    So your first contact with any

12   property or health potential damages was when

13   Taishan or Shandong drywall was imported into

14   the U.S. by Venture Supply, correct?

15             MR. HARDT:  Object to the form.

16        But you can answer the question.

17        A.    I didn't have any complaints

18   until the end of '08, beginning of '09.

19   BY MR. HERMAN:

20        Q.    Yes, sir.  But the only

21   complaints that you had was related to

22   drywall that was delivered to you that was

23   purchased in China from Shandong Taishan,

24   correct?

Samuel G. Porter

Page 30

1        A.      Not at the time of delivery --

2        Q.      Yes, sir.

3        A.      -- or --

4        Q.      I apologize.  I shouldn't

5    interrupt.  I'm not asking you if you had

6    complaints at the time of delivery.

7                What I'm asking you is:  Are

8    the only complaints you've ever had as to

9    property or injury related to the Taishan

10   Shandong product that was delivered to you in

11   2006?

12               MR. HARDT:  Object to the form.

13        You can answer.  You can answer.

14        A.      According to the lawsuits and

15   information that I've received, yes.

16   BY MR. HERMAN:

17        Q.      You had received information

18   from two homeowners and from Drago at some

19   point, right, Drago Builders, correct?

20               MR. HARDT:  Dragos, I think,

21        is --

22               MR. HERMAN:  D-R-A-G-O-S?

23               MR. HARDT:  A-S?

24        A.      If I'm not mistaken, the

Samuel G. Porter

Page 31

1    complaints started about the same time with

2    the two homeowners and Dragos.

3    BY MR. HERMAN:

4         Q.    Okay.  Now, you had been

5    ordering -- before you dealt at all with

6    Taishan Shandong, at a one point you had been

7    ordering 150 truckloads, more or less, of

8    drywall from domestic manufacturers in the

9    U.S., correct?

10        A.    Different sources, yes.

11        Q.    And they had cut back to

12   approximately 60 truckloads by 2005, correct?

13        A.    Yes, sir.

14        Q.    And so you made an agreement

15   with Tobin to find some other sources,

16   correct?

17        A.    That's correct.

18        Q.    And the source that he found

19   that eventually was bought by you and

20   delivered to you was Taishan gypsum or

21   Shandong drywall, correct?

22             MR. HARDT:  Again, object to

23        the form.  You can answer the

24        question.

Samuel G. Porter

1      A.     Yes, whatever the name of the

2  company is, or was.

3  BY MR. HERMAN:

4      Q.     So was your motive for engaging

5  Tobin and eventually purchasing Chinese

6  drywall to replenish the stock that had

7  been -- that you weren't getting anymore

8  domestically?

9      A.     Yes, sir.

10     Q.     You had -- would you discuss

11  with me or share with me some of the problems

12  that you had regarding Taishan.

13          MR. HARDT:  Object to the form.

14      You can answer the question.

15      A.     A lot of the problems were

16  delays in -- from production.  They would

17  continually put the production back.  They

18  would delay and delay and delay, and then

19  when it came time to charter a ship, I guess

20  you would refer to it as, there was delays in

21  getting a ship to transport it; and at the

22  same time, the shipping rates kept

23  increasing, the more -- the longer that it

24  went on.

Samuel G. Porter

Page 33

1   BY MR. HERMAN:

2          Q.     You had requested, I believe,

3   that the first shipment of 100,000 sheets

4   from Taishan be delivered to Norfolk,

5   correct?

6                 MR. HARDT:  Object to the form.

7          You can answer the question.

8          A.     Yes, sir.

9   BY MR. HERMAN:

10         Q.     And was it delivered to

11  Norfolk?

12                MR. HARDT:  Object to the form.

13         You can answer the question.

14         A.     It was --  originally, it was

15  destined for Lamberts Point.  What had

16  happened was when the ship got into the bay,

17  the draft of the ship was too deep to

18  actually fit into Lamberts Point.

19                So what happened was the

20  shipping company had to make arrangements for

21  the ship to go to Newport News -- I think it

22  was Newport News' terminals to unload a

23  portion of the material so that the ship

24  would rise up and fit into Lamberts Point,

Samuel G. Porter

1    where the rest of it was unloaded.

2    BY MR. HERMAN:

3         Q.    Now, with -- was it the first

4    or the second shipment that made port and

5    discharged drywall in New Orleans?

6         A.    I never had any distributed in

7    New Orleans.

8         Q.    In Mobile?

9         A.    A ship never went to Mobile.

10        Q.    Did Tobin or Mr. Donald Woods

11   ever advise you that Taishan had shipped

12   product to New Orleans?  Do you recall that?

13        A.    I recall that there were ships

14   going that way, but they had nothing to do

15   with our transactions or purchases with

16   Venture Supply.

17        Q.    Yes, sir.  That's -- my

18   question is:  Do you recall receiving an

19   e-mail from either Mr. Woods or Tobin that

20   Taishan had also shipped drywall to

21   New Orleans, Louisiana?

22        A.    Yes.

23        Q.    Now, I'd like to ask you a

24   couple of questions about 2005-2006.

Samuel G. Porter

1      A.     Yes, sir.

2      Q.     At that time, you were

3  president of Venture Supply, Inc., correct?

4      A.     Yes, sir.

5      Q.     Who else owned -- and how much

6  of Venture Supply, Inc. did you own,

7  approximately?

8      A.     I'm not exactly sure of the

9  dates but at a certain time, and the

10  corporate documents can show, that I had sold

11  10% of Venture -- I owned 100% originally,

12  and then I had sold 10% to Marty Abrisz, and

13  another 10% to a Kurt Riffey.

14      Q.     All right.  Marty Abrisz and

15  Kurt Riffey were vice presidents, were they

16  not?

17      A.     Yes, sir.

18      Q.     Where do they live now, what

19  city?

20      A.     I believe they both live in

21  Chesapeake.

22      Q.     Now, who is Donald Woods, also

23  called "Woody"?

24      A.     Don Woods is an associate, a

Samuel G. Porter

Page 36

```
 1    friend, that when I first got in the drywall
 2    business, I met him approximately 30 years
 3    ago.  And over the years, he's done work for
 4    my company, I've done work for him, and
 5    somehow he is -- I don't know what his
 6    relationship is with Tobin, as far as
 7    business.
 8        Q.    Are you aware that Mr. Woods
 9    indicated that he represent- -- that he owned
10    12% of Venture Supply?
11        A.    I wasn't aware of that, no.
12        Q.    Are you aware as to whether he
13    represented that he owned 12% interest in
14    Porter-Blaine?
15        A.    I was not aware of that.
16        Q.    How much of Porter-Blaine do
17    you own?
18        A.    Originally, I owned 100%.  And
19    at the same time I sold the Venture stock, I
20    sold 49% of Venture to a Richard Osborne.
21        Q.    You sold 49% of Venture --
22              MR. HARDT:  No.
23    BY MR. HERMAN:
24        Q.    -- to Mr. --
```

Samuel G. Porter

```
 1          A.      Porter-Blaine.

 2          Q.      Oh.  I'm sorry.  Okay.

 3                  So you sold 49% of

 4   Porter-Blaine to Richard Osborne, and you

 5   owned 51%?

 6          A.      Yes, sir.  And I'm not exactly

 7   sure of exactly when that occurred, but both

 8   of the stock sales were at the same time.

 9          Q.      Do you know Joe Burt?

10          A.      Yes, sir.

11          Q.      Who's Joe Burt?

12          A.      Joe originally started in the

13   warehouse, worked his way up to supervisor,

14   and then became a -- basically, a general

15   superintendent for Porter-Blaine.

16          Q.      Okay.  When you say he worked

17   in the "warehouse," did he work in Venture

18   Supply's warehouse or Porter-Blaine's

19   warehouse?

20          A.      Venture Supply's.

21          Q.      And this 88,000-square-foot

22   warehouse, was that owned or leased by

23   Venture Supply?

24          A.      Part of it was, yes, and part
```

Page 38

1     of it by Porter-Blaine.

2         Q.     So Porter-Blaine and Venture

3     had separate leases for that warehouse?

4         A.     Yes, sir.

5         Q.     And who did you lease from?

6         A.     The company is called

7     Porter-Marcel.

8         Q.     And am I correct that Venture

9     Supply, Inc. was an importer/distributor, and

10    that Porter-Blaine would get drywall from

11    Venture and contract for the installation of

12    that drywall?

13        A.     It was basically set up as

14    Venture Supply was sales, distribution

15    facility, open to the public or contractors.

16    Porter-Blaine was an established company well

17    before I got into distribution, so

18    Porter-Blaine had its own employees, it had

19    its own contracts and did its own work.  But

20    it was a customer of ours.

21        Q.     Now, let's get back to Taishan

22    Shandong drywall.

23        A.     Uh-huh.

24        Q.     Did you -- that is, Venture

Samuel G. Porter

1   Supply -- sell drywall to contractors?

2        A.     Yes, sir.

3        Q.     Did you sell Taishan Shandong

4   drywall to American Eastern?

5        A.     Basically, Porter-Blaine did

6   the work for American Eastern and

7   Porter-Blaine bought the board from Venture

8   Supply, so American Eastern didn't directly

9   buy the board.

10       Q.     So Porter-Blaine purchased

11  Shandong Taishan drywall from Venture Supply

12  and did work in terms of a subcontractor from

13  American Eastern?

14       A.     Could you say that again?  I'm

15  sorry, I lost it.

16       Q.     Sure.

17              Venture Supply had the Taishan

18  drywall?

19       A.     Yes, sir.

20       Q.     It sells it to Porter-Blaine?

21       A.     Uh-huh.

22       Q.     Porter-Blaine then becomes a

23  subcontractor of American Eastern --

24       A.     Yes, sir.

Samuel G. Porter

Page 40

```
 1        Q.       -- correct?

 2        A.       That's correct.

 3        Q.       Now, did Venture Supply sell

 4   Taishan drywall to Peak Builders, P-E-A-K?

 5        A.       It was basically the same type

 6   of transaction.

 7        Q.       Venture Supply sells Taishan

 8   drywall to Porter-Blaine, and Porter-Blaine

 9   then becomes a subcontractor of Peak

10   Builders?

11        A.       Yes, sir.

12        Q.       What about Atlantic Homes?  Did

13   Venture Supply sell directly to American

14   homes Taishan drywall?

15             MR. HARDT:  You meant Atlantic

16        Homes?  You said "American homes."

17        You meant Atlantic Homes.  You said

18        "American homes" in your question.

19             MR. HERMAN:  I'm sorry.  Thank

20        you.  I appreciate it.  Let me restate

21        it.

22   BY MR. HERMAN:

23        Q.       Did Venture Supply sell Taishan

24   drywall directly to Atlantic Homes, or did it
```

Samuel G. Porter

1   sell to Porter-Blaine and Porter-Blaine then

2   subcontracted Atlantic -- from Atlantic

3   Homes?

4        A.     Venture sold to Porter-Blaine.

5   Porter-Blaine subcontracted from Atlantic

6   Homes.

7        Q.     Now, did Porter-Blaine then

8   subcontract its work to installers?

9        A.     A portion of it.

10        Q.     So a portion of the Taishan

11   Shandong drywall was subcontracted by

12   Porter-Blaine to certain installers, correct?

13        A.     Yes, sir.

14             MR. HERMAN:  Okay.  Let's take

15        a recess.

16             THE VIDEOGRAPHER:  We're going

17        off the record.  The time is 9:48 a.m.

18             (Recess taken, 9:48 a.m. to

19        9:58 a.m.)

20             THE VIDEOGRAPHER:  Please stand

21        by.  We're back on the record at

22        9:58 a.m.

23   BY MR. HERMAN:

24        Q.     What is Legacy Properties?

Samuel G. Porter

```
 1         A.      It's a company my ex-wife owns,

 2   building houses.

 3         Q.      Your ex-wife's name is Kim?

 4         A.      Yes.

 5         Q.      When were you divorced?

 6         A.      December 10th of this year.

 7         Q.      And what did Legacy Properties

 8   do?

 9         A.      She would build houses.  Build

10   homes.

11         Q.      Tidewater Insulators?  Did you

12   own Tidewater Insulators?

13         A.      I owned a third of the company,

14   yes.

15         Q.      Who else owned?

16         A.      Randall Bullard and Jeff Beals.

17         Q.      And who ran that company?

18         A.      It was kind of a group.  Randy

19   would run the office.  Jeff was in charge of

20   sales, and then I was pretty much overall

21   management.

22         Q.      And was Tidewater Insulators in

23   business in 2005 and 2006?

24         A.      Yes, sir.
```

Samuel G. Porter

1      Q.      And Legacy Properties, was it

2  in business in 2005 and 2006?

3      A.      Yes, sir.

4      Q.      Are either of those entities in

5  business today?

6      A.      Tidewater Insulators was sold

7  to a company called IBP, which is Installed

8  Building Products, out of Ohio; and Kim still

9  owns Legacy Properties group.

10     Q.      When was Tidewater sold?

11     A.      I believe it was in the

12 beginning of '07, 2007.  I'm not exactly

13 sure.

14     Q.      Did you and Kim Porter have a

15 property settlement?

16     A.      Yes, sir.

17     Q.      And was that in connection with

18 your divorce?

19     A.      Yes, sir.

20     Q.      And would that property

21 settlement indicate the ownership in Legacy

22 Properties and Tidewater Insulators?

23          MR. HARDT:  Mr. Herman, we're

24       getting a little bit far afield from

Samuel G. Porter

Page 44

```
 1            the notice of deposition in this.

 2            This is the deposition of Venture and

 3            Porter-Blaine.

 4                  MR. HERMAN:  Well, I think the

 5            ownership of these related properties

 6            is important, and I'll connect it --

 7            I'll abandon this questioning for

 8            right now, and I'll connect it through

 9            documents later.

10   BY MR. HERMAN:

11        Q.     Are you familiar with Drake?

12        A.     Yes, sir.

13        Q.     Tell us about Drake.

14        A.     Drake is a -- it's basically

15   called a buy group, where different

16   contractors apply to become members.  There's

17   a criteria that you have to meet.  And what

18   they do is they pool their resources, as far

19   as manufacturers, to negotiate rebates,

20   quantities, what they call preferred vendors.

21                  And I believe it's a

22   separate -- it's a corporation.  They were in

23   California.  I don't know if they are -- I'd

24   heard that the office had moved to
```

Samuel G. Porter

Page 45

```
 1    North Carolina, so I'm not sure.
 2          Q.      Did either Venture or
 3    Porter-Blaine become related to Drake in any
 4    business way?
 5          A.      Venture was a member of The
 6    Drake Group.
 7          Q.      Venture was a member of The
 8    Drake Group.
 9                  Now, The Drake Group, before
10    you purchased the Taishan Shandong drywall,
11    gave you or gave Venture information about
12    the drywall market, did it not?
13          A.      Yes, sir.
14          Q.      What information did it give
15    you?
16          A.      They would meet quarterly in
17    different locations around the country, and
18    the manufacturer representatives would be
19    there, anywhere from local salesmen to the
20    president of the company, and they would
21    project if there was going to be a shortage
22    or an abundance, possibly price increases,
23    and they would negotiate rebates on product
24    lines.
```

Samuel G. Porter

Page 46

```
1        Q.     Now, you received an advisory

2   from Drake, before you purchased the Taishan

3   Shandong drywall, that there was going to be

4   a shortage of domestic drywall and as a

5   result, retail prices of drywall were going

6   to increase, correct?

7        A.     Yes, sir.

8        Q.     And that was one of the reasons

9   that you had decided to go outside the U.S.

10  and purchase foreign drywall, correct?

11             MR. HARDT:   Object to the form.

12       You can answer.

13       A.     Yes, I believe that their

14  projection was that the market was going to

15  require 37 billion board-feet and the

16  domestic manufacturers could only produce

17  34 billion board-feet, based on full

18  production less maintenance time, so

19  everybody knew that the shortage was coming.

20  BY MR. HERMAN:

21       Q.     And was it your idea that if

22  you could purchase Taishan Shandong drywall,

23  that you could import it at a price point

24  that would allow you a profit on resale in
```

Samuel G. Porter

1    the United States?

2         A.     Originally I thought that there

3    would be a profit, but there was a lot of

4    hidden expenses with the importation.

5         Q.     Even with those expenses, your

6    price point, including all those expenses,

7    was, what, 11.5 per sheet?

8         A.     It was much more than that.

9         Q.     What was it per sheet?

10        A.     I don't exactly know.

11        Q.     Did you, for either

12   Porter-Blaine or Venture Supply, send Joe

13   Burt, the field superintendent, to the

14   locations in which installers were installing

15   Taishan drywall to collect payments in cash?

16              MR. HARDT:  Object to form.

17        A.     There was some cash -- I mean,

18   there was a lot of cash transactions that we

19   would deal with.

20   BY MR. HERMAN:

21        Q.     How many cash transactions

22   would you estimate that Porter-Blaine had

23   with its various installers?

24        A.     With the installers?

Samuel G. Porter

1        Q.      Installers, contractors.

2        A.      I don't quite understand.

3               MR. HARDT:  You mean his

4        subcontractors, is that what you're

5        talking about, or the general

6        contractors?

7               MR. HERMAN:  All right.  Let's

8        break it down.

9   BY MR. HERMAN:

10       Q.      Who did you have cash

11   transactions with on Taishan -- on entities

12   or individuals that were using Taishan

13   Shandong drywall?

14       A.      I'm not exactly sure, because

15   we would take cash, credit and payment terms,

16   joint checks; various methods of payment.

17       Q.      Can you estimate it?

18       A.      No, I cannot.

19       Q.      But it is true that Joe Burt,

20   for Porter-Blaine, would go to the jobsites

21   where Taishan drywall was being installed and

22   collect cash, correct?

23               MR. HARDT:  Object to the form.

24        You can answer.

Page 49

1    BY MR. HERMAN:

2         Q.    Isn't that true?

3         A.    He would collect cash.  He

4    would pick up checks.  He would do various

5    transactions.

6         Q.    And who handled the books for

7    Porter-Blaine on these cash transactions?

8         A.    It was a variety.  Whoever in

9    the office was making the deposits.

10        Q.    Well, who kept the books?

11        A.    The office had different --

12   segregated different types of duties.  There

13   was different accounting.  Marc Stein would

14   do the overall accounting.  Leslie and Cathy

15   would do collection calls and go to the bank

16   or do credit card transactions.

17              Same thing with Venture.  It

18   would be Lori or Terry or Marty or different

19   people.  It's hard to say.

20        Q.    All right.  Let's talk about

21   your controller.  That's Mr. Stein, is that

22   right?  Marc Stein?

23        A.    That's correct.

24        Q.    Was he controller for Venture?

Samuel G. Porter

1          A.     Yes.

2          Q.     Was he controller for

3     Porter-Blaine?

4          A.     Yes.

5          Q.     And who paid him his salary?

6          A.     I believe Venture did, but

7     there was a lot of interoffice transactions

8     for various accounts that were used by both

9     corporations.

10         Q.     Who was Leslie Waddell?

11         A.     She was pretty much an

12    assistant to Mark and myself.

13         Q.     For both Venture and

14    Porter-Blaine?

15         A.     Yes.

16         Q.     Do you recall who Jessica

17    Richardelli was?

18         A.     She was a human resource girl.

19         Q.     For whom?

20         A.     Both companies.

21         Q.     Venture and Porter-Blaine?

22         A.     Yes, sir.

23         Q.     Now, these folks, Leslie, who

24    was she paid by?  Was she paid by Venture or

1    Porter-Blaine?

2         A.    I think it was Porter-Blaine.

3         Q.    And Jessica, who was she paid

4    for -- who was she paid by?

5         A.    I believe it was Porter-Blaine.

6         Q.    Don Woods, also known as

7    "Woody"?

8         A.    Uh-huh.

9         Q.    Let me explore with you:  When

10   did you first meet him?

11        A.    1980.

12        Q.    And in 2005 and 2006, he

13   appears on hundreds of e-mails, doesn't he,

14   with Tobin and with Frank Peng, P-E-N-G, and

15   with -- and Porter-Blaine; isn't that

16   correct?

17             MR. HARDT:  Object to the form.

18        You can answer.

19   BY MR. HERMAN:

20        Q.    Isn't that correct?

21        A.    Yes, sir.

22        Q.    And you know that because many

23   of those e-mails either referred to you or

24   were transmitted to you by Mr. Woods; isn't

Samuel G. Porter

Page 52

```
 1    that correct?
 2         A.     Yes.
 3         Q.     And how was Mr. Woods being
 4    compensated?
 5         A.     I believe he had an arrangement
 6    with Tobin.
 7         Q.     He had no payments at all from
 8    Venture?
 9         A.     He had received some advances
10    to, I guess -- for Tobin, so he could send
11    the money to Phil or whatever he would do
12    with it.
13         Q.     Phil, you refer to Phil Perry,
14    who was the principal of Tobin?
15         A.     Yes, sir.
16         Q.     Are you saying that Venture
17    sent money to Donald Woods, and that Donald
18    Woods then sent money to Tobin?
19         A.     At times, yes.
20         Q.     Venture -- is it your testimony
21    that Venture and Porter-Blaine paid nothing
22    to Donald Woods for his services?
23         A.     Porter-Blaine did not, no.
24         Q.     Did --
```

Samuel G. Porter

1        A.        Venture did.

2        Q.        And when Venture paid Donald

3    Woods for his services, was that by check?

4        A.        Yes.

5        Q.        And how much did you pay Donald

6    Woods for this?

7        A.        I don't recall the exact

8    amount.

9        Q.        You were the big boss in this,

10   so to speak.  You gave directions, correct?

11       A.        Yes, sir.

12       Q.        And that was throughout these

13   transactions, correct; that is, with Taishan,

14   correct?

15       A.        Uh...

16       Q.        Donald Woods and Tobin acted at

17   your direction and for Venture, correct?

18       A.        Yes.

19       Q.        Okay.  Now, there was a request

20   by Frank Peng, who was the plant manager of

21   the plant where Taishan was manufacturing

22   drywall which you bought?

23       A.        Yes, sir.

24       Q.        There was a controversy with

1    Frank Peng when he asked that Venture remove

2    from its line of credit or letter of credit

3    the designation that the Taishan drywall was

4    to be delivered after ASTM tests, correct?

5          A.      Yes.

6          Q.      How many tests?

7                MR. HARDT:  Object to the form.

8          A.      How many tests?

9    BY MR. HERMAN:

10         Q.      How many tests did you

11    understand originally were going to be

12    performed on the Taishan drywall according to

13    American standard tests?

14         A.      That was -- there was one, but

15    from what I understand, what the problem

16    Frank and them had was, American standard

17    testing, they have their Chinese testing,

18    which is a CCC or some other type of test

19    that's similar to it.

20         Q.      Did Mr. Frank Peng of Taishan

21    say that he really didn't understand the

22    American standards for testing drywall?  He

23    did say that --

24         A.      Yes.

Samuel G. Porter

Page 55

```
 1        Q.      -- didn't he?

 2        A.      In the e-mail, yes.

 3        Q.      Yeah.

 4              MR. HARDT:  I think it's Frank

 5        Clem.  Are you sure it's Frank Peng?

 6              MR. HERMAN:  Well, the e-mails

 7        say "Frank Peng."

 8              MR. HARDT:  I thought it was

 9        Clem.

10              MR. HERMAN:  And in many

11        translations, it comes out "Frank

12        Clem."  They are --

13              MR. HARDT:  Just for

14        clarification, I think Mr. Peng was

15        the translator.

16              MR. HERMAN:  Well, may be.

17              MR. HARDT:  Okay.

18              MR. HERMAN:  May be.  But the

19        e-mails all say "Frank Peng."

20              MR. HARDT:  Right.  And I --

21        but just for your clarification, I

22        think Mr. Peng was the translator.

23   BY MR. HERMAN:

24        Q.      Now, eventually, you -- what
```

Samuel G. Porter

1    you did is you told Don Woods and Phillip

2    Perry, "Look, get that drywall here.  I'm

3    going to agree to take out the American

4    standard testing out of the letter of

5    credit" --

6              MR. HARDT:  Object to the form.

7         You can answer.

8    BY MR. HERMAN:

9         Q.     -- correct?

10        A.     Yes, because apparently that

11   had nothing to do with the financial

12   transactions with the bank.

13        Q.     All right.  Now, where did you

14   send the Taishan drywall to be tested?

15        A.     I didn't send it anywhere.

16        Q.     So when the Taishan Shandong

17   drywall that you purchased was delivered to

18   Venture, it had not been tested by you,

19   correct?

20        A.     That's correct.

21        Q.     And it had not been tested by

22   any American standard test at that point?

23             MR. HARDT:  Object to the form.

24        You can answer.

Samuel G. Porter

1    BY MR. HERMAN:

2         Q.    Is that correct?

3         A.    I had test results that I had

4    received.  I don't know if Frank had did the

5    testing or if one of his other customers had

6    done the testing.

7         ·Q.    In other words, you received

8    testing from Taishan Shandong that Taishan

9    Shandong had done on drywall in China,

10   correct?

11        A.    Yes, sir.

12        Q.    But you received no drywall in

13   which American standard testing had been

14   done, correct?

15             MR. HARDT:  Object to the form.

16        That's not what he testified to.

17   BY MR. HERMAN:

18        Q.    Am I correct?

19        A.    I don't -- could you rephrase

20   the question?

21        Q.    Sure.

22             Do you know of any American

23   company that tested drywall in China in

24   accord with American standard testing?

Samuel G. Porter

1      A.      I do not, but I received

2    documentation that the tests were done.

3      Q.      From China?

4      A.      Yes, sir.

5      Q.      Nothing in the United States?

6      A.      No.

7      Q.      And Porter-Blaine did not do

8    any testing on that drywall, correct?

9      A.      That's correct.

10      Q.      So the drywall that Venture got

11    from Taishan Shandong and sold to

12    Porter-Blaine, which was then either sold by

13    Porter-Blaine to be installed in homes or

14    properties in Virginia or in which

15    Porter-Blaine itself installed for homes in

16    Virginia, was not tested in the United States

17    of America; is that correct?

18              MR. HARDT:  Object to the form.

19      You can answer.

20      A.      Not that I'm aware of.

21    BY MR. HERMAN:

22      Q.      All right.  Now --

23      A.      I've never had American -- or

24    domestic board tested, either, from Venture

Page 59

1    Supply.

2         Q.    Okay.  Now, when you

3    received -- were aware at the time that you

4    received the Taishan Shandong drywall from

5    China, that other Chinese products had been

6    found either defective or harmful to American

7    consumers?

8         A.    I really hadn't paid attention

9    to it, no.

10        Q.    Okay.  Now, you got certain

11   tests from China, correct?

12        A.    Yes, sir.

13        Q.    They were not completely

14   translated, were they?

15        A.    They were -- no, but I had

16   taken them to Old Dominion University in the

17   linguistics department and had them

18   translated by somebody there.

19        Q.    They were not translated

20   completely, were they?

21        A.    No.

22        Q.    So the testing that the Chinese

23   at Shandong Taishan sent you test results of

24   were not completely translated into English,

Samuel G. Porter

1    were they?

2                    MR. HARDT:   Object to the form.

3    BY MR. HERMAN:

4         Q.    Am I correct?

5         A.    That's correct.

6                    MR. HERMAN:   Would you show me,

7         please, the Frank file?

8    BY MR. HERMAN:

9         Q.    You had directed that the

10   drywall which you purchased from Taishan

11   Shandong be labeled with the name "Venture

12   Supply, Inc.," correct?

13        A.    On the end tabs, yes.

14        Q.    On the end tabs; and also a

15   phone number, correct?

16        A.    Yes, sir.

17        Q.    And at one point, the phone

18   number was incorrect, had to be changed

19   because it was stamped incorrectly?

20        A.    I don't recall that, but it's

21   very possible.

22        Q.    All right.  Now, the end tape

23   would be if you laid a sheet of sheetrock

24   flat -- the end tape would be around the

Samuel G. Porter

Page 61

1   edges?

2        A.       It's just on the ends of the

3   board.

4        Q.       Right.

5        A.       The covers.

6        Q.       What size board did you

7   purchase from Taishan Shandong, do you

8   recall?

9        A.       4x12 by half-inch, 4-foot by

10   12-foot by half-inch thickness.

11        Q.       Weren't those boards also

12   stamped or labeled with the name "Venture

13   Supply, Inc."?

14        A.       On the back, yes.

15        Q.       On the back of each board?

16        A.       Uh-huh.

17        Q.       So you not only had on the

18   Taishan Shandong sheetrock or drywall

19   "Venture Supply, Inc." around the edge,

20   correct?

21        A.       Yes, I had it -- it was just

22   the -- if this is a piece of 4-foot by

23   12-foot half-inch thick, it was only on the

24   ends tabs where the boards come two per

Samuel G. Porter

1    bundle.

2         Q.    Thank you.  I didn't appreciate

3    that, and I appreciate your help.

4              In other words, on the 4-foot

5    side --

6         A.    Yes.

7         Q.    -- there was a tape on the end

8    of it that said "Venture Supply, Inc.,"

9    correct?

10        A.    Yes, sir.  Yes, sir.

11        Q.    And on the back of the board,

12   there was also a stamp that said "Venture

13   Supply, Inc.," correct?

14        A.    Yes, sir.

15        Q.    Now, I'm going to show you an

16   e-mail marked PSC-VPB-81.  It has a Bates

17   stamp of V002541.

18             MR. HARDT:  Thank you.

19             MR. HERMAN:  It's Exhibit 81.

20             (Whereupon, Deposition Exhibit

21        PSC-VPB-81, 11/16/05 Perry E-mail to

22        Clem, Subject: Labeling Tape and Back

23        of Board, V002541, was marked for

24        identification.)

1              MR. HARDT:  You said this is

2        81?

3              MR. HERMAN:  81.

4              MR. HARDT:  Okay.

5    BY MR. HERMAN:

6        Q.    Are these the type of -- is

7    this the type of labeling which you had

8    requested?

9        A.    Yes.

10       Q.    And just so we can move through

11   the deposition, the "V" numbers in the right

12   are Bates numbers.  They were produced from

13   your business records at either Venture

14   Supply or Porter-Blaine.

15             MR. HARDT:  We'll stipulate

16        that the "V" numbers were Bates

17        numbers we put on documents produced

18        to you-all.

19             MR. HERMAN:  Yes.  And I'm just

20        going to ask one question, and if

21        there's an objection, fine.  We'll

22        just do it every time.

23   BY MR. HERMAN:

24       Q.    Are the documents which have

1    "V" numbers, Bates numbers, "V" Bates

2    numbers, produced in the ordinary course of

3    business as business records of either

4    Venture Supply or Porter-Blaine?

5         A.    I don't know that I can answer

6    for every single document.

7         Q.    Okay.  With respect to

8    Exhibit 81 from Mr. Perry at Tobin, dated

9    November 16th, 2005, to Clem, PW --

10             Clem, PW, did you understand

11    that to be Frank, the manager at Shandong

12    Taishan?

13        A.    Yes.

14        Q.    And Leslie Waddell was your

15    employee?

16        A.    Yes.

17        Q.    You recognize this is as a

18    business record of Venture Supply, Inc.?

19        A.    Yes.

20        Q.    And for the record, would

21    you -- I'm going to read it in.  Just make

22    sure I'm reading it correctly.

23             It says, "4-foot by 12-foot by

24    one-half inch gypsum board distributed by

Samuel G. Porter

Page 65

1    Venture Supply, Inc., 757-855-5433,

2    venturesupply.com," one word.  And then on

3    the back of the board, "Venture Supply, Inc.,

4    MFG Shandong, Taihe, T-A-I-H-E, Dongxin,

5    D-O-N-G-X-I-N, Company, Ltd. China," correct?

6         A.    Yes.

7               (Whereupon, Deposition Exhibit

8         PSC-VPB-83, 11/17/05 Waddell E-mail to

9         Perry, Subject: Edge Binding Label

10        Tape, V002527, was marked for

11        identification.)

12   BY MR. HERMAN:

13        Q.    And here's Ms. Waddell.

14   Exhibit 83, is that a business record of your

15   company?  It's Bates number V2527.

16             MR. HARDT:  Which did you say,

17        83?

18             MR. HERMAN:  Yes.

19             MR. HARDT:  Because these

20        aren't marked.

21   BY MR. HERMAN:

22        Q.    It indicates that originally

23   the wrong phone number was indicated, and

24   that Ms. Waddell requested the proper phone

Samuel G. Porter

1   number for Venture Supply, Inc. be used,

2   correct?

3          A.     Yes.

4                 (Whereupon, Deposition Exhibit

5          PSC-VPB-84, 11/24/05 Perry E-mail to

6          Zhang, Subject: Ocean Freight to

7          Norfolk, VA, USA, V002507, was marked

8          for identification.)

9   BY MR. HERMAN:

10         Q.     Now, I'm going to show you

11  Exhibit 84.  It has a Bates number of V2507.

12  That's Exhibit 84.

13                MR. HARDT:  Thank you.

14  BY MR. HERMAN:

15         Q.     Dated 11/24/05 from Phillip W.

16  Perry to Z-H-A-N-G-H-W, with a carbon copy to

17  Clem.

18                And I'm going to direct your

19  attention to these words, "Please provide a

20  list of the ports of call in the Gulf of

21  Mexico and along the East Coast of the USA.

22  We anticipate having cargo on later shipments

23  for delivery at these ports."  And, of

24  course, that's to Mr. Zhang, who was to

Samuel G. Porter

1    arrange shipping from Mr. Perry of Tobin.

2              Now, my question is:  Do you

3    recall ever delivering any Shandong Taishan

4    drywall to any ports in the Gulf of Mexico?

5         A.    No.

6         Q.    Even the packing in China and

7    the specification of wooden pallets was

8    directed by you, correct?

9         A.    Yes.

10        Q.    Now, one of the problems you

11   had was that Taishan Shandong couldn't even

12   determine how to get the air-freight shipping

13   done, correct?

14             MR. HARDT:  Object to the form.

15        A.    Air freight?

16   BY MR. HERMAN:

17        Q.    Yeah.

18        A.    I don't know how you would

19   air-freight drywall.

20             (Whereupon, Deposition Exhibit

21             PSC-VPB-87, 12/5/05 Perry E-mail to

22             Porter, Subject: Air freight of

23             sample, V002452, was marked for

24             identification.)

1    BY MR. HERMAN:

2        Q.    Well, I'll show you Exhibit 87,

3    and this is V2452.

4            MR. HARDT:   Thank you.

5    BY MR. HERMAN:

6        Q.    Now, I want to say for the

7    record that the one I've given you has my

8    yellow markings on it.  That's a yellow

9    marking that I put on myself.

10           And this is dated December 5th,

11   2005, subject is "Air Freight of Sample,"

12   Phillip W. Perry to Porter-Blaine, carbon

13   copy D. Woods.  That would have been Don

14   Woods, correct?

15       A.    Yes.

16       Q.    Did Porter-Blaine have a

17   different e-mail address than Venture

18   Supply, Inc. in December of '05?

19       A.    I believe so.  This is my

20   e-mail address, porterblaine1.

21       Q.    Is this e-mail address for

22   Porter-Blaine1@aol.com, the same e-mail for

23   both Venture Supply, Inc. and Porter-Blaine?

24           MR. HARDT:   Object to the form.

Samuel G. Porter

```
 1         He said it's his.  It's his e-mail

 2         address.

 3    BY MR. HERMAN:

 4         Q.     Are you saying that's your

 5    personal e-mail address?

 6         A.     Uh-huh.

 7         Q.     Okay.  So on all of the

 8    documents that have Porter-Blaine, one word,

 9    and it will be P-O-R-T-E-R-B-L-A-I-N-E,

10    numeral 1, @aol.com, that is your personal

11    e-mail address, correct?

12         A.     Yes.

13         Q.     And so this actually was sent

14    to you, and it says, "The guys at Taihe,

15    T-A-I-H-E, Gypsum seem to be at a loss as to

16    how to get the air-freight shipping done,

17    much less how to pack it," correct?

18         A.     Yes.

19         Q.     And what he was talking about

20    here was sending you some samples?

21              MR. HARDT:  Object to the form.

22         The document speaks for itself.  You

23         can answer.

24         A.     Yes.
```

Samuel G. Porter

Page 70

1    BY MR. HERMAN:

2        Q.    And so as of December 5th,

3    2005, you understood that the folks at

4    Shandong really were not aware of how

5    air-freight shipping could be done, correct?

6            MR. HARDT:  Object to the form.

7        The document speaks for itself.  You

8        can answer the question.

9        A.    I guess, yes.  I assume.

10   BY MR. HERMAN:

11       Q.    That's what it says.  I mean,

12   that's what Phil Perry sent to you, right?

13           MR. HARDT:  That's what Phil

14       Perry is saying.  I mean, the document

15       speaks for itself.

16       A.    Yeah.  Now, as far as the

17   e-mail, I just wanted you to know that I am

18   not computer literate at all, so this is my

19   e-mail address, but I would have different

20   people in the office print the e-mails

21   because I don't know how to download.  I

22   don't know anything.  I'm not a computer guy.

23   BY MR. HERMAN:

24       Q.    You're not?

Samuel G. Porter

1        A.      Right.

2        Q.      Mr. Porter --

3        A.      Yes, sir.

4        Q.      -- shake hands with another

5   dinosaur, will you?

6        A.      Nice to meet you.

7                MR. HARDT:  Another one over

8        here.

9   BY MR. HERMAN:

10       Q.      I understand.

11       A.      Okay.

12       Q.      It was e-mailed to you,

13   somebody would print it down, bring it to

14   you, you'd read it?

15       A.      Yes, sir.

16               (Whereupon, Deposition Exhibit

17       PSC-VPB-88, Photographs, Dragon Brand

18       Gypsum Board, V002078 - V002082, was

19       marked for identification.)

20   BY MR. HERMAN:

21       Q.      Okay.

22       A.      Yeah.

23       Q.      I'm going to show you

24   Exhibit 88.  This is Bates numbers V2078,

Samuel G. Porter

1    2079, 2080, 2082.  And I'll hand counsel a

2    copy.

3              MR. HARDT:  Did you skip '1?

4    BY MR. HERMAN:

5         Q.    This is going to be 88.  2078,

6    2079, 2080 --

7              MR. HARDT:  Right.  It does

8         have 81 in here.

9    BY MR. HERMAN:

10        Q.    -- and 2081 and 2082.

11             This is Deposition Exhibit 88.

12   Would you take a look at this?

13        A.    Uh-huh.

14        Q.    Did you ever get any samples or

15   receive any Dragon brand gypsum board?

16        A.    I never received the board.  I

17   may have received the samples.  I'm not sure.

18   But I never purchased any.

19        Q.    You never purchased any Dragon

20   brand gypsum board?

21        A.    That's correct.

22             MR. HERMAN:  Okay.  You want to

23        give me the Germano file, please,

24        Fred?  Thank you.  What's the next

Samuel G. Porter

```
1        number we have, Fred?

2                (Conference out of the hearing

3        of the reporter.)

4                (Whereupon, Deposition Exhibit

5        PSC-VPB-133, Photographs, Venture

6        Supply, Inc. Wallboard, was marked for

7        identification.)

8                MR. HERMAN:  I'm going to mark

9        this -- this is going to be marked

10       PSC-VPB-133, and it has -- it's two

11       sheets, and it has no Bates number.

12               MR. HARDT:  Thank you.

13  BY MR. HERMAN:

14       Q.    I'd like you to look at this

15  Exhibit 133.  It's two pages --

16               MR. HARDT:  It's actually

17       three, I think, isn't it?

18               MR. LONGER:  Three sheets.

19               MR. HARDT:  Yeah.

20  BY MR. HERMAN:

21       Q.    I'm sorry, it's three sheets.

22  The first sheet says "Venture Supply, Inc.

23  M-F-G, T-A," looks like a J, "H-E," correct?

24       A.    Uh-huh.
```

Samuel G. Porter

1        Q.      Second sheet says "Venture

2    Supply, Inc.," and the third sheet says

3    "P-L-Y, Inc. M-F-G, T-A-I-H-E, China"?

4        A.      That's correct.

5        Q.      Okay.  Can you identify 133 as

6    photographs of the drywall which was shipped

7    to you by Shandong Taishan?

8              MR. HARDT:  Object to the form.

9        You said "shipped to you."

10   BY MR. HERMAN:

11       Q.      Shipped to Venture Supply?

12             MR. HARDT:  By somebody.

13             MR. HERMAN:  I'll repeat the

14       question.

15   BY MR. HERMAN:

16       Q.      Exhibit 133, does Exhibit 133

17   fairly represent the plasterboard which was

18   shipped to Venture Supply from Taishan

19   Shandong?

20       A.      Yes.

21             MR. HERMAN:  Thank you.

22             (Whereupon, Deposition Exhibit

23       PSC-VPB-91, Photographs of Wallboard

24       from Morgan Property, was marked for

Samuel G. Porter

1          identification.)

2    BY MR. HERMAN:

3          Q.     I'm going to show you

4    Exhibit 91.   Exhibit 91 consists of three

5    pages of photographs.   It does not have Bates

6    numbers.   And as an officer of the court, I

7    indicate to you that this came from the

8    Morgan property.

9               Can you identify this drywall

10   as the drywall that was shipped to you --

11   that is, to Venture Supply, Inc. -- by

12   Taishan?

13         A.     The first two are.   The

14   second -- I mean, the first two pages are.

15   The third one looks like it says "National

16   Gypsum."

17         Q.     Okey-doke.

18              MR. HARDT:   Which exhibit was

19        this, Mr. Herman?

20              MR. HERMAN:   This is Exhibit --

21              MR. HARDT:   91?

22              MR. HERMAN:   -- 91.

23              MR. HARDT:   Thank you.

24              (Whereupon, Deposition Exhibit

Samuel G. Porter

1          PSC-VPB-92, Photographs of Wallboard

2          from Orlando Property, was marked for

3          identification.)

4     BY MR. HERMAN:

5          Q.     I'm going to show you

6     Exhibit 92 from the Orlando property.   The

7     builder was American Eastern.   It consists of

8     three pages.

9               And I'll ask you if on the --

10    looking at this, if you can identify the

11    drywall, particularly as it is on the third

12    page, drywall which Venture received from

13    Taishan Shandong?

14         A.     The first two pages, I really

15    can't identify.   The third one, yes.   The

16    second page looks like there's no markings on

17    it at all.

18               (Whereupon, Deposition Exhibit

19         PSC-VPB-93, Photographs of Wallboard

20         from Baldwin Property, was marked for

21         identification.)

22    BY MR. HERMAN:

23         Q.     Okay.   I'll show you Exhibit 93

24    from -- the builder is American Eastern, and

Samuel G. Porter

```
1    it is from the Baldwin property.

2              MR. HARDT:   Thank you.

3    BY MR. HERMAN:

4         Q.     And ask you if you can identify

5    this as any drywall shipped to Venture by

6    Taishan.   Three pages.

7         A.     No, this was not.

8         Q.     Okay.

9         A.     This is, I believe, National

10   Gypsum.

11             (Whereupon, Deposition Exhibit

12        PSC-VPB-94, Photographs of Wallboard

13        from Heischober Property, was marked

14        for identification.)

15   BY MR. HERMAN:

16        Q.     Okay.   I'm going to show you

17   the Heischober, from the Heischober property.

18   The builder was Peak Builders.   Exhibit 94.

19             MR. HARDT:   I'll hand counsel a

20        copy.

21   BY MR. HERMAN:

22        Q.     Ask if you can identify this as

23   drywall shipped by Taishan to Venture Supply.

24        A.     Yes.
```

Samuel G. Porter

1          (Whereupon, Deposition Exhibit

2          PSC-VPB-95, Photographs of Wallboard

3          from Leach Property, was marked for

4          identification.)

5    BY MR. HERMAN:

6          Q.    I'm going to show you

7    Exhibit 95 from the Leach property; the

8    builder, American Eastern; four pages.  And

9    I'll ask you if you can identify that as

10   drywall shipped from Taishan Shandong to

11   Venture.

12               MR. HARDT:  Actually, it's five

13          pages, but that's okay.

14               MR. HERMAN:  Five pages.

15               MR. HARDT:  Yeah.

16   A.    Yes.

17               (Whereupon, Deposition Exhibit

18          PSC-VPB-96, Photographs of Wallboard

19          from McKellar Property, was marked for

20          identification.)

21   BY MR. HERMAN:

22          Q.    I'm going to show you a

23   three-page document, Exhibit 96 --

24               MR. HARDT:  Thank you.

Samuel G. Porter

1      BY MR. HERMAN:

2          Q.     -- from the McKellar property.

3      The builder was Atlantic Homes.  And I'll ask

4      you if you can identify that as drywall

5      shipped by Shandong Taishan to Venture

6      Supply.

7                    MR. HARDT:  Object to the form.

8          A.     Yes.

9                    (Whereupon, Deposition Exhibit

10          PSC-VPB-97, Photographs of Wallboard

11          from Michaux Property, was marked for

12          identification.)

13     BY MR. HERMAN:

14         Q.     I'll show you Exhibit 97 from

15     the Michaux property, M-I-C-H-A-U-X.  Ask you

16     if you can identify this as drywall

17     shipped -- I'm sorry, it was -- Atlantic

18     Homes was the builder -- if that was drywall

19     shipped from Taishan Shandong to Venture

20     Supply, Inc.

21                   MR. HARDT:  Again, object to

22          the form.  It's the use of the word

23          "shipped."

24         A.     The first page shows "National

Samuel G. Porter

Page 80

1    Gypsum"; the second one, I cannot identify;

2    and the third one is the import board.

3    BY MR. HERMAN:

4         Q.    Is what?

5         A.    Import board.  I'm sorry,

6    Shandong.

7         Q.    Shandong?

8         A.    Yes.

9         Q.    So just so we can -- the first

10   shows -- the first page of 97 shows "National

11   Gypsum"?

12        A.    Yes.

13        Q.    The second page is -- you can't

14   read it, correct?

15        A.    That's correct.

16        Q.    And the third page is Shandong

17   Taishan?

18        A.    Yes.

19        Q.    The first thing I'd like to

20   clear up is:  Someone named Susan was

21   attempting to get involved in this shipment.

22   Do you recall that?

23        A.    I recall a little bit of it.

24        Q.    But whoever Susan was or is,

Samuel G. Porter

Page 81

```
1    she was not involved in this transaction --

2         A.      That's correct.

3         Q.      -- is that correct?

4                 (Whereupon, Deposition Exhibit

5         PSC-VPB-3, E-mail Chain Ending

6         11/14/05 Perry E-mail to Richardelli,

7         Subject: Gypsum drywall/bank

8         information, V002574 - V002580, was

9         marked for identification.)

10   BY MR. HERMAN:

11        Q.      I'm going to show you an

12   e-mail.  The Bates number V2574, Exhibit 3.

13   It also has attached to it Exhibit -- 2575,

14   2576, 2577, 2578, 2579, 2580.  Would you look

15   at Exhibit 3.  And I'll hand counsel a copy.

16                MR. HARDT:  Thank you.

17                MR. HERMAN:  And I want to

18        indicate for the record, the

19        underlining is mine.

20   BY MR. HERMAN:

21        Q.      The question I have really

22   relates to Jessica Richardelli, and would you

23   explain what her job was and who employed

24   her?  And that's R-I-C-H-A-R-D-E-L-L-I.
```

Samuel G. Porter

1          A.      I think it was Venture Supply.

2     I'm not exactly sure.

3          Q.      What exactly did she do?

4          A.      She was what we called a human

5     resource.  She would --

6          Q.      Hire folks?

7          A.      She would screen them, she

8     would take care of applications, update drug

9     testing and deal with the 401(k)s, any kind

10    of personnel issue; things like that.

11         Q.      Now, with respect to the

12    transaction or the purchase of the Taishan

13    drywall by Venture, she also handled some

14    banking information?

15         A.      I don't recall her -- she may

16    have done some transactions that I had asked

17    her to do through e-mails, but as far as any

18    of the actual banking, no.

19         Q.      Her name appears on

20    transmissions regarding the letters of

21    credit.  Would that -- she would have been

22    acting at your direction --

23         A.      Yes, sir.

24         Q.      -- with regard to the letters

Samuel G. Porter

Page 83

1    of credit?

2         A.    Yes, sir.

3         Q.    And if we look at the first

4    page of the exhibit, we see that Frank Clem,

5    C-L-E-M, is the chief of the foreign trade

6    department for Shandong Taihe Dongxin

7    Company, correct?

8         A.    Yes.

9         Q.    And is this who you understood

10   was in charge of the manufacture, sale,

11   negotiation for the purchase of the Shandong

12   Taishan drywall by Venture Supply, Inc.?

13        A.    Yes.

14              (Whereupon, Deposition Exhibit

15        PSC-VPB-4, E-mail Chain Ending

16        11/15/05 Waddell E-mail to Edney,

17        Subject: Amended Letter of Credit and

18        Wiring Instructions, V000393, was

19        marked for identification.)

20   BY MR. HERMAN:

21        Q.    Now, I'm going to show you

22   Exhibit 4.  It's V0393.

23              MR. HARDT:  Thank you.

24   BY MR. HERMAN:

Samuel G. Porter

```
 1        Q.     This is -- the portion I'd like

 2   you to look at is -- it says from Leslie

 3   Waddell, November 15th, 2005, at 8:30 a.m. to

 4   Vernon Towler.  Vernon Towler was a banker?

 5        A.     Yes, with RBC.

 6        Q.     And the subject was the amended

 7   letter of credit and wiring instructions,

 8   correct?

 9        A.     Yes.

10        Q.     Would you read, beginning with

11   "Per Sam," for the record, aloud?

12        A.     "Per Sam, please amend the

13   letter of credit to delete the ASTM

14   requirement.  We already have the test

15   results here.  The 30% deposit is to be wired

16   out of Venture Supply's operating account,"

17   number...

18        Q.     And it gives the number?

19        A.     Yes.

20        Q.     What test results did you have?

21        A.     I believe it was the ones that

22   I had received from Shandong.

23        Q.     Are you aware that the tests

24   that they ran were run in -- many of them in
```

Samuel G. Porter

Page 85

1    2004, before they had even begun to

2    manufacture the drywall which Venture

3    Supply, Inc. purchased?

4        A.    I had seen a lot of different

5    dates on different certifications,

6    documentations, so I really don't...

7        Q.    Well, when you saw that, did

8    you question how drywall manufactured in

9    December 2005 and November 2005 could have

10   been tested in 2004?

11            MR. HARDT:  Object to the form.

12       You can answer.

13       A.    No, because I know, for

14   example, a lot of like UL standards are from

15   years prior that are still used after the

16   tests have been conducted and the UL listings

17   have been done.

18   BY MR. HERMAN:

19       Q.    I'm not asking you about a

20   standard that continues.  I'm asking about:

21   Did it occur to you that drywall from

22   Shandong was tested in 2004, but the drywall

23   which you were getting was not tested in

24   2005; that is, the manufactured drywall that

Samuel G. Porter

Page 86

1    was shipped by Venture Supply and purchased

2    from Taishan?

3              MR. HARDT:  Object to the form.

4         You can answer.

5         A.    I thought the test was relevant

6    to the board.

7              MR. HERMAN:  Okay.

8              (Whereupon, Deposition Exhibit

9         PSC-VPB-5, 11/26/05 Perry E-mail to

10        Porter, Subject: L/C Changes,

11        V001801 - V001802, was marked for

12        identification.)

13   BY MR. HERMAN:

14        Q.    I'm going to show you

15   Exhibit 5.  It's V1801.

16             MR. HARDT:  Thank you.  This is

17        5?

18             MR. HERMAN:  It's two pages.

19             MR. HARDT:  Actually, it's a

20        bunch -- oh, you gave me an extra one.

21   BY MR. HERMAN:

22        Q.    If you look at the second page,

23   I'm going to direct your attention to part of

24   the second page.  This is dated

Samuel G. Porter

1    November 26th, 2005, from Phillip Perry to

2    Porter-Blaine -- that would be you, correct?

3         A.    Yes.

4         Q.    And to D. Woods.

5               See if I'm reading this

6    correctly, or maybe you'll read it for me.

7               Would you read beginning

8    with -- beginning the third paragraph that

9    says, "A bit"?

10        A.    "A bit of information about

11   Frank.  He said that he is just about

12   18 months out of college, and I do not think

13   that he has had a real grasp on how to

14   conduct this business with us.  I believe

15   that his boss has been on him for not

16   following the rules set by the financial

17   department of his company.

18               "The problem is that we have

19   had to suffer as a result of his lack of

20   attention to detail (checking account for

21   cash versus L/C deposits and getting Venture

22   Supply to sign contract agreement).

23               "I have told him that all

24   matters like this have to be okayed by each

Samuel G. Porter

Page 88

1    party to any future purchases at the

2    beginning, and not as he discovers the

3    problem, God willing."

4        Q.     That's signed by Phillip Perry,

5    correct?

6        A.     Yes.

7        Q.     So you knew as of November 2005

8    that Shandong or Taishan's person in charge

9    of the drywall you were purchasing had only

10   been out of school 18 months, and really

11   didn't understand how business was conducted,

12   correct?

13             MR. HARDT:  Object to the form.

14        He knows what's in the document.  The

15        document speaks for itself.

16   BY MR. HERMAN:

17        Q.     I'm asking your understanding.

18   You understood that, didn't you?

19             MR. HARDT:  He understood that

20        Phillip was telling him that?  Is that

21        the question?

22   BY MR. HERMAN:

23        Q.     You understood as of

24   November 2005 that Taishan's individual in

Samuel G. Porter

Page 89

1    charge of the shipment you were going to

2    purchase of Taishan drywall had only been out

3    of school 18 months, and he did not

4    understand the way to conduct business?

5              MR. HARDT:  Object to the form.

6    BY MR. HERMAN:

7         Q.    Was that your understanding?

8              MR. HARDT:  No, object to the

9         form.  He knows what Phillip Perry is

10        telling him.  It's Phillip Perry

11        telling him.

12             MR. HERMAN:  I'm not asking him

13        about Mr. Perry.  I'm asking him for

14        his understanding.

15   BY MR. HERMAN:

16        Q.    Did you have any question in

17   your mind as to whether Frank of Taishan was

18   competent enough to handle this shipment and

19   this purchase?

20        A.    I don't know.  I never met the

21   man, and I don't know -- I couldn't tell you

22   if he was 20 years old or 50 years old, as

23   far as being out of college.

24        Q.    And you -- and what about of

Samuel G. Porter

Page 90

1   his ability to do the business part of this

2   transaction?

3        A.    I never went to college, so I

4   don't...

5        Q.    Well, yes, sir.  But did you

6   question his ability to do this transaction?

7        A.    There was a lot of questions

8   that I had with the way that they were doing,

9   just in overall, with the delays.

10       Q.    Okay.

11       A.    Did I answer the question?

12       Q.    I wouldn't criticize you for

13  not answering.  Let me put it this way --

14             MR. HARDT:  You're fine.

15  BY MR. HERMAN:

16       Q.    -- you gave an answer.

17             All I want to know is:  Did you

18  follow up with Tobin and ask any more

19  questions about this fellow's background --

20  that is, Frank's background, his experience,

21  whether he had made other shipments,

22  et cetera?

23       A.    No.

24             MR. HERMAN:  Okay.  Thank you

Samuel G. Porter

1        very much.  Let's take a break.

2                MR. HARDT:  Okay.

3                THE VIDEOGRAPHER:  We're going

4        off the record at 10:58 a.m.  This is

5        the end of Tape No. 1.

6                (Recess taken, 10:58 a.m. to

7        11:10 a.m.)

8                THE VIDEOGRAPHER:  Stand by.

9        We are back on the record at

10        11:10 a.m.  This is the beginning of

11        Tape No. 2.

12   BY MR. HERMAN:

13        Q.     Where does Don Woods live now?

14        A.     I believe Norfolk, Virginia.

15        Q.     Have you seen him in the last

16   year or two?

17        A.     I haven't seen him in several

18   months.

19        Q.     Okay.  Any idea where in

20   Norfolk he lives?

21        A.     No, sir.

22        Q.     Okay.  What about Marc Stein,

23   where does he live?

24        A.     He lives in Virginia Beach.

Samuel G. Porter

```
 1         Q.      When's the last time you saw

 2    him?

 3         A.      Probably six weeks.

 4         Q.      Does he do work for you, still?

 5         A.      He did a little bit at the end,

 6    but no, not anymore.

 7         Q.      And your former wife, Kim

 8    Porter, where does she live?

 9         A.      Virginia Beach.

10         Q.      And Leslie Waddell, where does

11    she live?

12         A.      I'm not exactly sure.  I think

13    it's Virginia Beach.

14         Q.      Richard Osborne, where does he

15    live?

16         A.      Chesapeake.

17         Q.      Jessica Richardelli, where does

18    she live?

19         A.      I think she lives in Virginia

20    Beach, but I haven't talked to her in a

21    really long time, so I don't know.

22         Q.      Who is Tim Oldfield?

23         A.      I think I only met him once,

24    but he is an investor in a real estate deal
```

1    that I was involved in.

2          Q.      What was the name of that deal?

3          A.      The Spectrum at Willoughby.

4          Q.      What was the name of his

5    company?

6          A.      I'm not exactly sure.  I think

7    he owns a pawn shop, and he does other

8    things.  I don't know his past, whatever it

9    is.

10         Q.      The Spectrum at Willoughby

11   receive any Taishan drywall in connection

12   with any construction?

13         A.      No.  The project never got

14   built.

15         Q.      Okay.  Phillip Perry, where

16   does he live now, do you know?

17         A.      I thought he lived in Virginia

18   Beach, but I heard he moved to Dubai.

19         Q.      Who did you hear that from?

20         A.      I heard it from Don Woods.  And

21   1 saw Phil probably -- I want to -- it might

22   have been about eight weeks ago.  I was at

23   the old warehouse, and he came in and he told

24   me he was moving.

Samuel G. Porter

```
 1          Q.      You still lease the warehouse?

 2    Venture Supply still lease the warehouse?

 3          A.      No.   The leases have been

 4    terminated.

 5          Q.      Do you have any ownership in

 6    the warehouse structure itself?

 7          A.      Yes.

 8          Q.      Who owns the warehouse?

 9          A.      A company called Porter-Marcel.

10          Q.      And who are the principals in

11    Porter-Marcel?

12          A.      Just me.

13          Q.      You own 100%?

14          A.      Yes, sir.

15          Q.      Where -- do you have any

16    permanent employees, or regular employees at

17    the warehouse?

18          A.      No.

19          Q.      Where does Joe Burt live?

20          A.      Virginia Beach.

21          Q.      When's the last time you saw

22    him?

23          A.      About a week ago.

24          Q.      Does he do any work for you or
```

Samuel G. Porter

Page 95

1    any business in which you have an interest?

2          A.    No.

3          Q.    Mr. Abrisz, the former vice

4    president of Venture, where does he live?

5          A.    Chesapeake.

6          Q.    And Mr. Riffey, a former vice

7    president?

8          A.    He also lives in Chesapeake.

9          Q.    To the best of your

10   recollection, did Tobin attempt to purchase

11   drywall in Thailand?

12         A.    I believe so, yes.

13         Q.    Was he able to do so?

14         A.    No.

15         Q.    Did he attempt to purchase

16   drywall from Knauf in Greece?

17         A.    Yes.

18         Q.    And that was unsuccessful?

19         A.    That's correct.

20         Q.    Did he advise you that Knauf in

21   Greece was holding off in shipping drywall

22   because they felt that their -- that the

23   market was going to improve even more to

24   benefit the manufacturers?

Page 96

```
 1        A.      From what I understood, they

 2   were what I call oversold, which means they

 3   had sold more than they could produce.

 4                (Whereupon, Deposition Exhibit

 5        PSC-VPB-10, 5/4/06 Perry E-mail to

 6        Porter, Subject: Progress report,

 7        5-4-06, V001535 - V001536, was marked

 8        for identification.)

 9   BY MR. HERMAN:

10        Q.      I'm going to show you

11   Exhibit 10.  It is Bates number V1535.

12                MR. HERMAN:  I'll hand a copy

13        to counsel.

14                MR. HARDT:  Thank you.

15                MR. HERMAN:  And I'll indicate

16        for the record that the highlighting

17        is my own.

18   BY MR. HERMAN:

19        Q.      I'd like you to take a look at

20   this.  It's a progress report, May 4th, 2006,

21   from Phillip Perry to Porter-Blaine with a

22   copy to Donald Woods.

23        A.      Okay.

24        Q.      Okay.  Is it your understanding
```

Samuel G. Porter

Page 97

```
 1    that Taishan also uses the trade name Taihe,

 2    T-A-I-H-E?

 3         A.     Yes.

 4         Q.     I'd like you to look at this

 5    exhibit --

 6               MR. HERMAN:  You've got to put

 7         the number on them for me, Fred.

 8               MR. HARDT:  It's on there.

 9         It's 10.

10    BY MR. HERMAN:

11         Q.     I'd like you to look at

12    Exhibit 10, now that you've read it.  And you

13    were aware at that time, through this e-mail

14    and others, that Taishan had not actually

15    produced the drywall that you had requested

16    timely; is that correct?

17         A.     Yes.

18         Q.     And as a matter of fact, you

19    had missed a shipment?

20         A.     Yes, sir.

21         Q.     Did you also understand that

22    Taishan had sold some of the drywall you

23    had -- that is, Venture -- had contracted for

24    to somebody else?
```

Samuel G. Porter

1      A.     Yes.

2      Q.     And I'd like you to read

3  aloud -- you see the paragraph that begins,

4  "I wanted," "I wanted to get references"?

5      A.     Yes, sir.

6      Q.     And this is Phil Perry

7  communicating with you.  Would you read that

8  paragraph aloud for the record?

9      A.     "I wanted to get references and

10 information about Frank's current container

11 packing and condition of the container cargo

12 upon arrival in the U.S.  Frank was not

13 forthcoming with the information.  I got down

14 to where I have the Chinese phone numbers of

15 two agents that ship board in containers from

16 Taihe."

17     Q.     Would you read the next

18 paragraph?

19     A.     "One container ship was

20 discharged in Miami, and I will try to find

21 out the name of the receiving company today.

22 I spoke to a Ms. Huang, and she said that her

23 containers will arrive in NOLA in a week.

24 Would not give any customer's name, but will

Samuel G. Porter

Page 99

1   provide ship, dock, addresses and dates as

2   soon as she has it. Then it is up to us to

3   contact the cargo owner for permission to see

4   inside the containers. She said that Taihe

5   charged her for repacking and put -- and

6   repacking to put her cargo into the

7   containers."

8         Q.    Now, the communication you got,

9   did you understand that there was a container

10  of Shandong Taishan discharged in Miami and

11  another in New Orleans, Louisiana?

12              MR. HARDT:  Object to the form.

13        The document speaks for itself. But

14        you can answer.

15        A.    If that's what "NOLA" is. I'm

16  not --

17  BY MR. HERMAN:

18        Q.    If "NOLA" is New Orleans,

19  Louisiana, that's what happened here?

20        A.    Yes, sir.

21        Q.    Did you ever find out, or did

22  Tobin ever find out who the recipients of

23  this Taishan drywall were in Miami and NOLA?

24        A.    I don't believe so. And if he

Samuel G. Porter

```
 1    did, I don't think he told me.  But I don't

 2    believe he did, no.

 3                MR. HERMAN:  Thank you.

 4                (Whereupon, Deposition Exhibit

 5         PSC-VPB-11, 5/24/06 Porter Letter to

 6         Shandong Taihe Dongxin, V001442 -

 7         V001443, was marked for

 8         identification.)

 9    BY MR. HERMAN:

10        Q.    I'm going to show you Exhibit

11    No. 11.  It is Bates V1442, 1443 --

12                MR. HARDT:  Thank you, sir.

13    BY MR. HERMAN:

14        Q.    -- dated May 24th, 2006, to

15    Shandong Taihe Dongxin Company.  It is on

16    Venture Supply, Inc. stationery and signed by

17    you, correct?

18        A.    Yes, sir.

19        Q.    All right.  You state that --

20    in the letter, that Shandong caused Venture a

21    loss of 200,000 boards in sales and $900,000

22    in profit because they made board for someone

23    else and stopped making it for you.

24                Do you recall that?
```

Samuel G. Porter

1     A.     Uh-huh.  Yes.

2     Q.     How did you compute your lost

3  profit?

4     A.     Really, I just threw some

5  numbers out there.  I wasn't being accurate

6  with them.  I just wanted to make them aware,

7  you know, that they were costing me money.

8     Q.     For every 100,000 sheets of

9  drywall you ordered, your profit, at least

10  according to this letter, would have been

11  $450,000, correct?

12        MR. HARDT:  Object to the form.

13     A.     Yes.  That was with the

14  original numbers that I had.

15        (Whereupon, Deposition Exhibit

16        PSC-VPB-9, 5/24/06 Woods E-mail to

17        Woods & Porter, Subject: Fax,

18        w/Handwritten Interlineations,

19        V001438, was marked for

20        identification.)

21  BY MR. HERMAN:

22     Q.     Now, I'm going to show you

23  Exhibit 9, and you may hold on -- you may

24  want to hold on to the last exhibit.

Samuel G. Porter

1                     Exhibit 9 is Bates V1438, dated

2     May 24th, '06, from Don Woods to Don Woods.

3     And is this the rough draft of the letter or

4     the substance of the letter which you sent

5     regarding the 900,000 in profit?

6          A.     Give me a moment to read it,

7     please.

8          Q.     Absolutely.

9                 (Witness reviews document.)

10         A.     Okay.  I've read it.

11    BY MR. HERMAN:

12         Q.     Who wrote that "900,000 in

13    profit" on Exhibit 9?

14         A.     That's my handwriting.

15         Q.     Thank you.  If you'll just put

16    those in the tray.

17         A.     Uh-huh.

18         Q.     Thank you.

19                Let me ask you another

20    question, if I might, about Exhibit 9 and

21    Exhibit 11.  Does that refer to the second

22    shipment you were to receive?

23         A.     No.  That was based on gross

24    profit at the time of just the hundred --

Samuel G. Porter

1    of -- well, of the amount of board that I

2    could have sold.  We were turning customers

3    away at that point.

4         Q.    Yeah.

5              Do you see where it says you've

6    only -- you see the 53,000 figure that

7    applies --

8         A.    Oh, I'm sorry.  Yes, this is

9    the second shipment.

10        Q.    This is the second shipment?

11        A.    Yes.

12        Q.    Exhibits 9 and 11 relate to the

13   second shipment?

14        A.    Yes.

15        Q.    And the second shipment, they

16   were supposed to manufacture and sell you

17   100,000 sheets, but this indicates they had

18   only manufactured 53,000 to date?

19        A.    That's correct.

20        Q.    And what you're saying is,

21   "Look, you delayed the first shipment of

22   100,000.  Now you've delayed the second

23   shipment of 100,000, and as a result, I've

24   lost 900,000 in profit"?

Samuel G. Porter

1          A.      Yes.

2                  MR. HARDT:  I mean, the

3          document says what it says.  I object

4          to the form of that question.

5    BY MR. HERMAN:

6          Q.      Would it be fair to say that

7    you were quite angry about the delays that

8    had been caused?

9          A.      Yes, sir.

10         Q.      Would it be fair to say that

11   you were -- directed some very strong

12   language at Mr. Woods and Tobin regarding the

13   delay?

14         A.      I'm sure I did at times, yes.

15                 (Whereupon, Deposition Exhibit

16         PSC-VPB-6, 11/26/05 Perry E-mail to

17         Woods, Subject: Latest Snafu,

18         V002495 - V002496, was marked for

19         identification.)

20   BY MR. HERMAN:

21         Q.      All right.  I'm not going to

22   ask you to read this document into the

23   record, but I am going to ask you if V2495,

24   Exhibit 6, dated November 26th, 2005,

Page 105

1    reflects your anger with the delays that were

2    being caused.

3              And I'm going to direct your

4    attention to the second page of Exhibit 6,

5    which is Bates number 2496.  Would you read

6    the bottom?

7              MR. HARDT:  To himself?  You

8         didn't want him to read it out?

9              MR. HERMAN:  Yes, to himself.

10             MR. HARDT:  Okay.  Well, this

11        is from Phillip Perry.

12             MR. HERMAN:  Yes.

13             MR. HARDT:  Okay.

14             MR. HERMAN:  It's from Don

15        Woods to Phillip Perry.

16             MR. HARDT:  It's from Phillip

17        Perry to Don Woods, at least that's

18        what it says at the front.

19             MR. HERMAN:  Read at the bottom

20        of the second page, Counsel.

21             MR. HARDT:  Okay.  That's the

22        first e-mail.

23             (Witness reviews document.)

24             THE WITNESS:  Okay.  I read it.

Samuel G. Porter

1    BY MR. HERMAN:

2         Q.     What I want to ask you:  Is

3    there some indication that Frank, the manager

4    in Taishan, hung up the phone while you were

5    trying to speak with him?  Do you recall

6    that?

7         A.     Yes.

8         Q.     Tell me about what was going on

9    then, and this is in November 25th, 2005.

10   What was going on?  What did you want to talk

11   to him about, and what were his responses to

12   you?

13        A.     Well, basically, I'd done

14   everything that they had wanted as far as the

15   deposit, paying for different items and

16   letters of credit and setting up -- you know,

17   they've got the shipper set up, but he

18   wouldn't produce the board.

19               And from what I understand from

20   Phil and what I understood the situation was

21   is, he was producing board, but he was

22   selling it -- I believe he was selling it to

23   the highest bidder, is what it boiled down

24   to.

Samuel G. Porter

```
 1                 So if he produced board for me
 2     and somebody came in and says, "I'll give you
 3     more money," they would get the material.
 4         Q.     Did you express that to Frank,
 5     the Shandong representative, when you talked
 6     to him on the phone?
 7         A.     Yes, I did.
 8         Q.     His reaction was to hang up on
 9     you?
10         A.     Yes.
11                (Whereupon, Deposition Exhibit
12         PSC-VPB-13, E-mail Chain Ending 2/3/06
13         Woods E-mail to Porter,
14         Subject: Plywood Pallet, V001682 -
15         V001687, was marked for
16         identification.)
17     BY MR. HERMAN:
18         Q.     All right.  I'm going to show
19     you Exhibit 13, Bates numbers 1682 through
20     1687.  And the yellow markings or the
21     highlighting is mine.  It's dated --
22     Exhibit 13 is dated February 3rd, 2006, from
23     Woods to you, and then there's an earlier
24     e-mail from -- it's transmitting -- strike
```

Samuel G. Porter

1     that.

2              Exhibit 13 is a communication

3     from Tobin to Woods and then a transmittal to

4     you on February 3rd, 2006.  Would you take a

5     look at that?  And I particularly would like

6     to direct your attention to page 1685.

7              And 1684, Bates 1684, is a

8     February 3rd, 2006, and it's from Peng to Don

9     Woods.  And I'd like to clarify for the

10    record:  P-E-N-G mail to C-L-E-M-P-W, looks

11    like a symbol, and then 123@163.com.

12         A.    Okay.

13         Q.    Peng was the interpreter?

14         A.    I'm not sure who -- I thought

15    he was Frank's boss or -- and he may have

16    been an interpreter.  I'm not sure.

17         Q.    So he might have been Frank

18    Clem's boss or interpreter?

19         A.    Yes.

20         Q.    Okay.  And this is from Peng to

21    Don Woods on February 3rd, 2006.  And I'd

22    like you to look at page 1685 of this

23    Exhibit 13, and the line, "Remember the

24    gypsum sales will be hot by the time you

Samuel G. Porter

Page 109

1.   return, and he will need you on the marketing

2   thing soon as possible.

3         "In fact, he has a short list

4   already for you to see and maybe contact.

5   When he gets back from Atlanta, he may have

6   more, and then you will really have to get

7   busy on it.  Lots of this can be phone and

8   internet contacts to start.  Okay.  If you

9   are back, maybe we can have lunch.

10  No Chinese food, I promise.  Do the pallet

11  thing ASAP, Phil.  Okay.  See you, Woody."

12        Do you recall what this

13  reference is to "gypsum sales will be hot by

14  the time you return"?

15        MR. HARDT:  Object to the form.

16     You can answer.

17     A.     Well, the board allocation was

18  getting worse.  And when I was in Atlanta,

19  that was for a Drake meeting, and there were

20  a lot of members that were looking for board.

21        And I told them I had a boat --

22  a partial ship of board coming, and they were

23  interested in it.  You know, what -- how it

24  would go on and so on and so forth.  And they

Samuel G. Porter

1    said that, you know, to get in contact with

2    them, you know, once I had got the board and

3    how everything worked out.

4    BY MR. HERMAN:

5         Q.    And this is in February 2006.

6    Had you received a shipment by then, any

7    shipment?

8              MR. HARDT:  This is

9         February 3rd.

10        A.    Not February 3rd.

11   BY MR. HERMAN:

12        Q.    I'm sorry, February 3rd, 2006,

13   okay?

14        A.    No.  No, we hadn't received the

15   shipment.

16        Q.    You hadn't received the first

17   shipment by then, had you?

18        A.    Correct.

19        Q.    Okay.  And so you had been at

20   a -- what I'll call a trade meeting --

21        A.    Yes.

22        Q.    -- dealing with drywall, and

23   you had heard other folks wanted drywall, and

24   you were telling them that you expected this

Samuel G. Porter

1    first shipment, but it hadn't arrived yet?

2         A.    Correct.

3         Q.    And you felt that because of

4    that, the drywall sales were going to heat

5    up, because there was all this demand for

6    drywall, but there was not supply within the

7    U.S.?

8         A.    Correct.

9              (Whereupon, Deposition Exhibit

10             PSC-VPB-14, E-mail Chain Ending

11             11/10/05 Woodard E-mail to

12             Richardelli, Subject: Venture Supply,

13             Inc - Ocean Cargo Coverage, V002625,

14             was marked for identification.}

15   BY MR. HERMAN:

16        Q.    I'm going to show you

17   Exhibit 14, which is Bates number V2625.

18             MR. HARDT:   I'll be happy to

19        pass these back that way, if you want.

20   BY MR. HERMAN:

21        Q.    What was or who was Hilb, Rogal

22   & Hobbs?  This is an e-mail dated

23   November 10th, 2005.

24        A.    That's my insurance agent.

Samuel G. Porter

1      Q.     And how much -- did either

2  Venture or Porter-Blaine take out additional

3  insurance in connection with the Taishan

4  drywall?

5            MR. HARDT:  Object to the form.

6        What kind of insurance are you talking

7        about?

8            MR. HERMAN:  Any insurance.

9      A.     We had to have cargo insurance

10  for the shipper.  But I always have had a lot

11  of insurance, so, I mean, that's --

12  BY MR. HERMAN:

13      Q.     How much general insurance did

14  you have insuring you against any casualty

15  or -- at the time that the purchase from

16  Taishan was made?

17            MR. HARDT:  I don't mean to be

18        rude, but, again, object to the form.

19        Casualty could be workers' comp.  It

20        could be a bunch of things.

21            MR. HERMAN:  Sure could.

22            MR. HARDT:  Yeah.

23      A.     I had had whatever insurance I

24  had in place --

Samuel G. Porter

1    BY MR. HERMAN:

2         Q.    Did you --

3         A.    -- prior to.

4         Q.    Did you increase it?

5         A.    No.

6         Q.    Did you require, or did

7    Porter-Blaine require installers to have

8    their own liability coverage?

9         A.    Yes.

10        Q.    And did you require, or did

11   Porter-Blaine require any contractors to have

12   liability insurance?

13        A.    Yes.

14        Q.    And so liability -- before

15   Porter-Blaine -- well, strike that.

16             Before Venture would sell to a

17   contractor, you made sure that a contractor

18   would have sufficient liability insurance?

19        A.    I got that --

20             MR. HARDT:  Object to the form.

21             MR. HERMAN:  I gotcha.

22             MR. HARDT:  Yeah, you said

23   "Porter-Blaine."

24        A.    I got that wrong.

Samuel G. Porter

1    BY MR. HERMAN:

2         Q.    Okay.  What is it?

3         A.    Venture wouldn't require any

4    insurance from the customer.  Porter-Blaine

5    required insurance for subcontractors because

6    that's what our workmen's comp carrier had

7    wanted.

8         Q.    Okay.

9         A.    They didn't want us using any

10   uninsured sub, which I agree with.

11        Q.    Now, in addition to workers'

12   comp, did Porter-Blaine require installers to

13   have liability insurance?

14        A.    Yes.

15        Q.    And so the installers of

16   Taishan drywall that installed Taishan

17   drywall would have had liability insurance in

18   connection with that transaction with

19   Porter-Blaine?

20        A.    They would have had insurance

21   no matter what type of board they were

22   hanging.

23        Q.    Because Porter-Blaine required

24   it?

Samuel G. Porter

1          A.     Yes.

2          Q.     And was there an earlier court

3    case in 1999 dealing with whether installers

4    were employees of Porter-Blaine or whether

5    the installers were independent contractors?

6          A.     Yes.

7          Q.     What was determined?

8          A.     To be honest with you, I really

9    can't recall because it was a while ago.  I

10   remember there was two different definitions,

11   the IRS's definition of an independent

12   contractor and the Virginia Employment

13   Commission's definition of an employee

14   subcontractor.

15              So what I'd done was I got

16   with -- I don't remember what happened with

17   the case, but I got with my insurance carrier

18   and we had decided that just to define, to

19   make sure that I was covered for -- let's say

20   somebody, an installer would go in and a

21   drive a nail -- hang a piece of board, drive

22   a nail into a pipe and it would leak and it

23   would flood somebody's house or whatever,

24   there was insurance for that.

Samuel G. Porter

1          Q.     Yeah, Porter-Blaine would have

2     insurance for that, which was purchased by

3     the installer.

4          A.     Right.

5          Q.     And that's why Porter-Blaine

6     required its installers and subcontractors to

7     have insurance on each job, correct?

8                 MR. HARDT:   Object to the form.

9          You can answer.

10         A.     The -- yeah.  What happened is

11    our experience mod had gone very high, which

12    is a rating for workmen's comp, and the loss

13    prevention people at United Contractors,

14    which is my workmen's comp people, set up a

15    loss prevention program for me.

16                And one of the things that they

17    highly suggested was that all the

18    subcontractors have their own insurance for

19    whatever may occur, so that -- all my

20    employees and other people, the rate was so

21    high, I could bring the rate down and stay

22    competitive.

23    BY MR. HERMAN:

24         Q.     So if one of Porter-Blaine's

Samuel G. Porter

1    subcontractors or installers hung the Taishan

2    sheetrock improperly, Porter-Blaine would be

3    covered by the subcontractor's insurance?

4         A.    I guess if they would hang --

5    well, really, any of the products.

6         Q.    Insulation, anything --

7         A.    Yes.

8         Q.    -- that either your

9    subcontractor or your installer performed in

10   connection with Porter-Blaine, you would be

11   covered by their insurance?

12        A.    Yes.  Or if they were injured.

13        Q.    I'm sorry?

14        A.    If they were injured on the

15   job.

16        Q.    Or if they were injured.  So it

17   was both comp insurance and liability

18   insurance, correct?

19        A.    Yes.  Yes.

20             (Whereupon, Deposition Exhibit

21        PSC-VPB-17, 4/6/06 Woods E-mail to

22        Porter, Subject: Conversation with

23        Phil Sat morn, V001608 - V001612, was

24        marked for identification.)

Samuel G. Porter

```
 1    BY MR. HERMAN:

 2         Q.    I'm going to show you

 3    Exhibit 17, and this is V1608 through 1612,

 4    okay?

 5         A.    Uh-huh.

 6         Q.    Now, this is a conversation

 7    with Phil April 8th, 2006, from Don Woods to

 8    you; and it repeats the conversation.  Do you

 9    recall receiving that?

10              (Witness reviews document.)

11              MR. HARDT:  Can I get another

12         copy of that, Mr. Herman?

13              MR. LONGER:  Here you go.

14              MR. HARDT:  That's okay.  I was

15         just going to pass it back.  Can I get

16         another copy of that, pass back to

17         counsel?

18              MR. HERMAN:  Sure.  Anybody

19         else need one?

20              MR. HARDT:  I think we're good.

21         Thank you.

22              (Witness reviews document.)

23              MR. HERMAN:  Okay.  The witness

24         has read Exhibit 17, which is Bates
```

Samuel G. Porter

1          number V1608 through 1612.

2    BY MR. HERMAN:

3          Q.     First of all, sir, I'm not

4    going to embarrass you by asking you to read

5    this aloud, this document aloud, for the

6    deposition and the camera.  It has a number

7    of four-letter words in it, and I do have

8    something that I do need to ask you about,

9    okay?

10         A.     Okay.

11         Q.     If you would -- let's look at

12   this.  This is sent to you by Donald Woods,

13   correct?

14         A.     Uh-huh.

15         Q.     And it's about a conversation

16   he's had with Phil, that's Tobin, regarding

17   difficulties in getting this shipment to you,

18   correct?

19         A.     Yes.

20         Q.     Did you reply to this?

21         A.     I don't think so.

22         Q.     All right.  I'd like you to

23   look at page V1611 of Exhibit 17.  And if

24   you'd look, with your counsel's permission,

Samuel G. Porter

Page 120

1    I'm going to hand you, so that we don't get

2    into some of these curse words or whatever

3    you want to call them -- I've underlined what

4    I'd like you to read for the record on V1611.

5    And, if you would, read who's saying what.

6              MR. HARDT:  At least what this

7         document says who's saying what?

8         A.      You want me to read --

9    BY MR. HERMAN:

10        Q.      Yes, just the underline.

11        A.      -- this?  Okay.

12              "I want to try any Gulf port

13   idea first.  I may get a contract, and so far

14   both ends have been working on me."

15              Phil says, "I will do the trip

16   back to Tai'an again.  Feel like a fool

17   having to go there just to talk to that

18   bastard."

19              D. Woods says, "As I said, tell

20   them you have many customers in several areas

21   and you need board, whatever you can promise.

22   Promise them anything you need to.  I don't

23   give a -- blank -- about how many lies you

24   have to tell or what you promise them.

Samuel G. Porter

1          "You can just disappear from

2     there when this board is on the seas.  Sign a

3     dozen ships, if that's what it takes.  We

4     need just one.  I don't care about the --

5     blank -- anyway.  And I don't care if it

6     looks -- if you look like a fool.  Go there

7     and get the -- blanking -- ship filled."

8          Q.     Okay.  Now, that indicates --

9     well, does that indicate -- did that indicate

10    to you, at times -- at the time, that there

11    was some desperation that Tobin and Woods

12    were feeling about getting this Taishan

13    drywall to Venture?

14          A.     Yes.

15          Q.     And you did not, after you

16    received this conversation, send an e-mail

17    back saying, "Look, don't tell them any

18    lies"?

19               MR. HARDT:  Object to the form.

20         You can answer.

21               THE WITNESS:  I'm sorry, could

22         you repeat that?

23    BY MR. HERMAN:

24          Q.     Did you send an e-mail back to

1    either Woods or Tobin saying, "Look, don't

2    tell them any lies"?

3          A.    Not that I'm aware of.

4          Q.    You had an insurance agent or

5    broker by the name of Marshall?

6          A.    Uh-huh.

7          Q.    And some of this drywall came

8    in damaged; is that right?

9          A.    Yes.

10               (Whereupon, Deposition Exhibit

11         PSC-VPB-18, 2/15/06 Woods E-mail to

12         Porter, Subject: Look this over,

13         V001273, was marked for

14         identification.)

15   BY MR. HERMAN:

16         Q.    I'm going to show you V1273 --

17   I'm sorry.  I'm going to show you Exhibit 18,

18   which is Bates number V1273.

19               MR. HARDT:  Thank you.

20   BY MR. HERMAN:

21         Q.    This is February 15th, 2006,

22   from Woods to yourself, correct?

23         A.    Yes.  Okay.

24         Q.    What kind of damage did you

Samuel G. Porter

1    have?

2         A.        There was some damage from the

3    voyage where the material had shifted in the

4    hull of the ship, and then there was damage

5    when the longshoremen unloaded the material

6    from the hull of the ship to the dock.

7         Q.        And that was the first

8    shipment, correct?

9         A.        Yes.

10        Q.        And how many -- how many sheets

11   of Taishan drywall were damaged?

12        A.        I'm not sure of the exact

13   amount.  I know that I had went through

14   Marshall, the insurance company, to make a

15   claim on the damaged material, but I -- some

16   of the damaged material wasn't damaged as bad

17   as others, so I really didn't put a claim in

18   for every piece that was chipped or damaged

19   or --

20        Q.        Was any of the damaged drywall

21   sold to Porter-Blaine?

22        A.        I'm sure it was, yes.

23        Q.        And was any of the damaged

24   drywall sold by Venture Supply to any builder

Samuel G. Porter

Page 124

1    or contractor?

2         A.    I don't think so, no.

3         Q.    Could you give me -- who at the

4    insurance agency would be the best person

5    that would know about this?

6              MR. HARDT:  About what?  The

7         claim?

8              MR. HERMAN:  About the damage

9         to the Taishan drywall.

10        A.    I think his name was Chuck.

11   It's Chuck Marshall Insurance, but I don't

12   think he's the actual Chuck of Chuck

13   Marshall.  I believe the documents are

14   somewhere.

15   BY MR. HERMAN:

16        Q.    Do you recall the amount that

17   you were paid?

18        A.    It was a small fraction.  I

19   believe it was about 31, $32,000.

20        Q.    And that total shipment was in

21   the range of 350,000 to $400,000; is that

22   right?

23        A.    No, it was more in the million

24   to 1.1 million.

Samuel G. Porter

1     Q.    The total first shipment --

2     A.    Yes.

3     Q.    -- was in the range of

4 1.1 million?

5     A.    Yes.

6     Q.    And you collected about 35,000

7 in damage?

8     A.    Yeah.  I was pretty desperate

9 for the material.

10     Q.    Okay.  It was what?

11     A.    I said I was, I'm sorry,

12 desperate for the material.

13     Q.    Okay.  Did you ever authorize

14 or recollect authorizing Donald Woods to

15 represent both Venture and Tobin in

16 connection with your purchase -- with

17 Venture's purchase of Taishan drywall?

18     A.    I don't recall.  I'm not sure.

19     (Whereupon, Deposition Exhibit

20     PSC-VPB-21, 12/14/05 Woods E-mail to

21     Porter, Subject: Send Phil an e-mail,

22     V002373 - V002392, was marked for

23     identification.)

24 BY MR. HERMAN:

1          Q.     Let me ask you to look at

2    Exhibit 21, Bates numbers V2373 -- and I'm

3    going to read off all of the numbers:   V2373

4    through V2383 and V2390 through 2392.   It's

5    Exhibit 21.

6               MR. HARDT:   Thank you.

7          A.     You want me to read the whole

8    thing?

9    BY MR. HERMAN:

10         Q.     No, I'm just going to ask you

11   to -- it's dated December 14th, 2006.   And if

12   you'd look at the last page of this exhibit,

13   it says -- this is a draft letter.   It says,

14   "Respectfully yours, Donald Woods,

15   Venture/Tobin.   Written with the request of

16   Sam Porter, Venture Supply, Inc., Senior

17   Principal."

18               And I'd like you to go back to

19   exhibit -- 2390, page 2390 of Exhibit 21.   On

20   December 13th, 2005, this was sent from

21   Phillip Perry of Tobin to you.   "Sam, here is

22   a letter from Don.   Do you want it sent?   Has

23   many good points."   And then it's from Don

24   Woods to Don Woods, subject, "Frank Peng,"

Samuel G. Porter

1    P-E-N-G, "What is happening?"

2              And would you look at this,

3    just to refresh your memory, and tell me

4    whether this letter was ever sent, to the

5    best of your recollection.

6              (Whereupon, Deposition Exhibit

7         PSC-VPB-22, E-mail Chain Ending

8         12/14/05 Perry E-mail to Clem,

9         Subject: Frank Peng letter from

10        Venture, V002358 - V002361, was marked

11        for identification.)

12   BY MR. HERMAN:

13        Q.    And I'm going to give you, so

14   you have a complete document, a four-page

15   letter, Exhibit 22, which is V2358 through

16   2361; and I think that may help you.

17             MR. HARDT:  Which exhibit is

18        the second one?

19             MR. LONGER:  22.

20             MR. HARDT:  Thank you.

21             THE WITNESS:  Okay.  What --

22   BY MR. HERMAN:

23        Q.    Well, the question is:  You got

24   several drafts of the letter to send Frank

Samuel G. Porter

1    Peng.  And does Document 22, Exhibit 22,

2    refresh your recollection that eventually a

3    letter was sent to Mr. Peng in substance

4    pretty similar to Exhibit 21?

5         A.    Okay.

6         Q.    And you can take your time.  I

7    just didn't want you to have to read it out

8    of context.

9              (Witness reviews document.)

10             MR. HARDT:  I'm sorry, what's

11        your question?  Was it Exhibit 22 was

12        sent?

13             MR. HERMAN:  I want to know if

14        this letter was sent with his

15        approval.

16             MR. HARDT:  Oh.  Was 22 sent

17        with your approval.  That's the

18        question, I guess.

19             (Witness reviews document.)

20             THE WITNESS:  Okay.

21   BY MR. HERMAN:

22        Q.    Was Exhibit 22, the letter

23   identified, particularly, as V2390 through

24   2392, sent to Frank Peng at Taishan with your

1    approval?

2         A.    Yes.

3              MR. HARDT:  You mean this

4         Exhibit 22, right?  That's what he

5         just read.

6              MR. HERMAN:  Yes.  Yes.

7              MR. HARDT:  But when you said

8         "2390," you were referring back to an

9         earlier...

10             MR. HERMAN:  No.  No.

11        Exhibit 22 --

12             MR. HARDT:  Which is this.

13             MR. HERMAN:  Oh.  It's in both.

14             MR. HARDT:  Okay.  But the

15        question was Exhibit 22.  Because

16        that's what he just finished reading.

17             MR. HERMAN:  Right.  Let me

18        start over, and I apologize to you.

19             MR. HARDT:  Yeah.

20   BY MR. HERMAN:

21        Q.    Exhibit 22 was sent to Frank

22   Clem or Frank Peng at Taishan with your

23   approval, correct?

24        A.    Yes.

1      Q.     Okay.  Now, before that

2    correspondence, at some point you had asked

3    Tobin to try to get you an exclusive

4    distributorship in the USA, correct?

5      A.     There were negotiations about

6    it.

7      Q.     Okay.  My question was:  Had

8    you -- isn't it true that you asked Tobin to

9    try to get you an exclusive distributorship

10   of Taishan drywall in the U.S.?

11     A.     I asked him, but I knew it

12   would never happen.

13     Q.     As a matter of fact, in

14   Exhibit 22, they wanted you to agree to

15   purchase 300,000 sheets of drywall a month in

16   order to get an exclusive distributorship,

17   correct?

18     A.     Correct.

19     Q.     And you said no, correct?

20     A.     Yes.

21     Q.     Now, do you know how your --

22   strike that.

23           Do you know how the Taishan

24   drywall that was shipped to the U.S. and sold

Samuel G. Porter

1    by Taishan to Venture Supply was

2    manufactured?

3              MR. HARDT:  Object to the form.

4         The "shipping," you keep using that

5         term, "shipping."  That's why I object

6         to those questions.

7              MR. HERMAN:  That's okay.  Can

8         you can answer my question?

9              THE WITNESS:  Up to the --

10        could you go from the manufacturing --

11             MR. HERMAN:  Yeah.

12   BY MR. HERMAN:

13        Q.    Taishan manufactured drywall

14   which Venture Supply purchased, correct?

15        A.    Yes.

16        Q.    How was it manufactured, what

17   process?

18        A.    I believe it was manufactured

19   from raw gypsum in the same way that the U.S.

20   producers produce board.  I think there's

21   only one way to produce board.

22        Q.    You are not aware that Taishan

23   had several patents on different ways to

24   manufacture plasterboard?

Samuel G. Porter

1      A.      No.

2      Q.      And you never inquired as to

3  the actual manufacturing process that was

4  used by Taishan on the drywall which they

5  manufactured and sold to Venture Supply,

6  correct?

7      A.      Correct.

8              (Whereupon, Deposition Exhibit

9      PSC-VPB-24, 12/19/05 Perry Handwritten

10     Fax to Porter, V001854, was marked for

11     identification.)

12  BY MR. HERMAN:

13     Q.      I'm going to show you

14  Exhibit 24.  The Bates number is V1854.  It's

15  a handwritten note dated December 19th, 2005,

16  attention Sam Porter, from Phillip Perry of

17  Tobin.

18     A.      Yes.

19     Q.      According to this, the general

20  manager of Taihe asked that Mr. Porter sign

21  above Mr. Perry's name on the contract, and

22  that thereafter, Mr. Perry could sign what

23  was -- whatever was required.  And you

24  authorized that, did you not?

Samuel G. Porter

Page 133

```
 1        A.      I believe so, yeah.
 2                (Whereupon, Deposition Exhibit
 3        PSC-VPB-25, Venture Supply, Inc.
 4        Corporate Certification, V001834, was
 5        marked for identification.)
 6  BY MR. HERMAN:
 7        Q.      I'm going to show you
 8  Exhibit 25, which is Bates number V1834.
 9                MR. HARDT:  Which exhibit is
10        it?
11                THE REPORTER:  25.
12                MR. HARDT:  25?  Thank you.
13                MR. HERMAN:  I'm sorry, it's
14        Exhibit 25.
15                MR. HARDT:  Yeah.
16                MR. HERMAN:  Bates number
17        V1834.
18  BY MR. HERMAN:
19        Q.      This indicates a corporate
20  certification for Venture Supply, Inc. as of
21  January 9th, 2006, correct?
22        A.      I'm sorry, I was reading.
23        Q.      This certifies Venture
24  Supply, Inc. is organized under the state of
```

Samuel G. Porter

Page 134

1    Virginia and that you are president -- that

2    is, you, Mr. Samuel G. Porter was president,

3    and you had a resolution of the board of

4    directors on January 3rd.

5              And Kim Porter's signature is

6    dated on this certification January 9th, '06,

7    correct?

8         A.    Yes.

9         Q.    And you were required -- were

10   you required to have a certification in

11   connection with the purchase of drywall by

12   Venture Supply from Taishan?

13        A.    We had to have certain

14   documents for Rogers & Brown.

15        Q.    Who is Rogers & Brown?

16        A.    I believe that was the

17   insurance that worked with Chuck Marshall.

18        Q.    On the cargo insurance?

19        A.    On the cargo insurance.

20              (Whereupon, Deposition Exhibit

21        PSC-VPB-27, 2/4/06 Woods E-mail to

22        Porter, Subject: China fax, V001681,

23        was marked for identification.)

24   BY MR. HERMAN:

Samuel G. Porter

1        Q.      Okay.  Now, I'm going to show

2   you Exhibit 27, which is Bates number V1681.

3   Look at Exhibit 27.  It's a fax from Donald

4   Woods to you dated February 4th, 2006.

5        A.      Okay.

6        Q.      What is -- it says here, "Okay,

7   Sam.  Frank faxed corrected copies of the

8   items needed for the second round of The

9   Three Stooges game.  Will drop" -- looks like

10  "the" -- "to the office on Monday."

11          Could you explain what this is

12  and what's it about and what The Three

13  Stooges game is?

14          MR. HARDT:  Object to the form.

15     You can answer.

16     A.      I don't know.  But I believe it

17  was referring to The Three Stooges as Frank,

18  Phil and Peng, I think is -- I'm not sure.  I

19  would have to see what the next e-mail was.

20  BY MR. HERMAN:

21     Q.      I don't have that, but I guess

22  Mr. Woods can explain it.  There were a

23  number of people involved.  There was Frank

24  Peng or Frank --

Samuel G. Porter

Page 136

```
1                    MR. HARDT:   Clem.

2    BY MR. HERMAN:

3         Q.     -- Clem or Mr. Woods or

4    yourself or Phillip?

5         A.     (Nods head.)

6         Q.     So the reason I'm asking this

7    question isn't to -- is to put a context on

8    the second round, the second order.

9         A.     Yes.

10        Q.     Okay.  And "The Three Stooges

11   game," was that -- had you seen this

12   expression or used this expression before in

13   connection with the second order from

14   Taishan?

15        A.     No.

16               MR. HARDT:   Object to the form.

17        I don't know that that's what this is

18        about.

19   BY MR. HERMAN:

20        Q.     Had you ever heard that before,

21   "The Three Stooges game," or The Three

22   Stooges come up in connection with the first

23   order from Taishan?

24        A.     I don't know.  If I gave an
```

Samuel G. Porter

Page 137

1    answer, I would be assuming.

2         Q.    No, you don't have to assume.

3         A.    Okay.

4         Q.    To your recollection, no?

5         A.    No.

6               (Whereupon, Deposition Exhibit

7               PSC-VPB-28, 3/9/06 Woods E-mail to

8               Porter, Subject: Woody here, V002799 –

9               V002800, was marked for

10              identification.)

11   BY MR. HERMAN:

12        Q.    Okay.  Okay.  I'm going to show

13   you Exhibit 28, Bates number 2799, and the

14   second page is Bates number 2800.  It's dated

15   March 9th, 2006, from Don Woods to yourself.

16   It begins, "Hey, Sam."  Would you take a look

17   just at the first paragraph for me?

18              MR. HARDT:   28?

19              MR. HERMAN:   It's Exhibit 28,

20         Bates numbers V2799 and 2800.

21              (Witness reviews document.)

22   BY MR. HERMAN:

23        Q.    Just read that first sentence

24   aloud, would you?

Samuel G. Porter

1        A.        "Look, just was on with Phil

2    earlier, and we chatted about your tentative

3    plans.  Should you decide to send the board

4    to Tampa, we will need to know the pier depth

5    there and the port name.  Please ask Ray the

6    name of the terminal and if he will get the

7    info we need.  There are other paperworks

8    that he will get done for you."

9        Q.        Yes, sir.

10            Did you send Taishan drywall to

11   Tampa?

12       A.        Not by boat.

13       Q.        Well, did you send it to Tampa

14   by any means?

15       A.        Some by truck, yes.

16       Q.        All right.  What other cities

17   did you ship Taishan drywall to outside of

18   Virginia?

19            MR. HARDT:  Did he ship, that's

20       the question?

21            MR. HERMAN:  Yes.

22            MR. HARDT:  Okay.

23   BY MR. HERMAN:

24       Q.        Transported, sold...

Samuel G. Porter

1              MR. HARDT:  Well, see, those

2         are different questions.

3              MR. HERMAN:  All right.  Well,

4         I'll break them down, Counsel.

5    BY MR. HERMAN:

6         Q.    Did you sell any -- what are

7    the cities that your Taishan drywall -- that

8    is, Venture Supply's Taishan drywall, ended

9    up in?

10        A.    That, I don't -- I know what

11   states I had shipped to and which

12   distributors.

13        Q.    Right.

14        A.    Where it went from there, I

15   don't know.

16        Q.    Which states did you ship to,

17   and which distributors?

18        A.    Um...

19        Q.    You can take your time.

20        A.    I know there was New York,

21   Georgia and Florida.

22        Q.    And what distributors in

23   Florida?

24        A.    I had sent a few loads to

Samuel G. Porter

```
 1    Banner Supply.  I think it was maybe ten
 2    truckloads.
 3         Q.    And in Georgia, who did you
 4    send Taishan drywall to?
 5              MR. HARDT:  Well, object to the
 6         form.  He sold it to somebody in
 7         Georgia.
 8              MR. HERMAN:  Sold, shipped,
 9         send.
10         A.    I think it was Building
11    Materials Warehouse.
12    BY MR. HERMAN:
13         Q.    And do you recall approximately
14    how much of Taishan drywall you sent there?
15              MR. HARDT:  Object to the form.
16         A.    Somewhere -- somewhere between,
17    I think, 30 and 40,000 sheets.  I may be
18    mistaken, though.
19    BY MR. HERMAN:
20         Q.    Okay.  In Tampa, who did you
21    ship or sell Taishan drywall to?
22         A.    Banner Supply.  The manager
23    there used to be a sales rep for a building
24    supply company here when I -- before I became
```

Samuel G. Porter

Page 141

1    a distributor.  His name is Ray Johnson.

2         Q.     Okay.  Do you recall how much

3    you sent him?

4              MR. HARDT:  Object to the form.

5         A.     I think it was ten truckloads

6    of 450 per truck, so 4500 sheets.

7    BY MR. HERMAN:

8         Q.     Now, did you send or sell or

9    ship Taishan drywall to any distributor in

10   Florida other than Tampa?

11        A.     No.

12        Q.     Do you recall the distributor

13   in New York that you shipped or sold Taishan

14   drywall to?

15        A.     I think it was Inter-County

16   Building Supply.  Yeah, Inter-County or

17   Inter-Country.  I'm not sure.

18        Q.     Where in New York were they

19   located, do you recall?

20        A.     I actually don't.

21        Q.     Do you recall how much you

22   shipped or sold to New York?

23        A.     I want to say about 8,000,

24   maybe 9,000 sheets.

Samuel G. Porter

1          MR. HARDT:  This is in the

2      documents that we produced to you,

3      Mr. Herman.  You know these.

4          THE WITNESS:  Yeah, I --

5          MR. HERMAN:  Okay.  I'm just --

6   BY MR. HERMAN:

7      Q.    You know, whatever you recall

8   is fine.

9      A.    Yeah.  I'm just going by

10  memory, but I know we kept the records.

11         MR. LONGER:  Was it "Inner" or

12      "Inter"?

13         MR. HARDT:  I think it's

14      "Inter."

15         THE WITNESS:  "Inter," I think,

16      yeah.

17  BY MR. HERMAN:

18      Q.    Now, the shipment of Taishan

19  drywall to Banner in Tampa, was that a sale?

20      A.    Yes.

21      Q.    And were the shipments to

22  Georgia and New York sales?

23         MR. HARDT:  Well, object to the

24      form.  Again, he didn't ship those.

1    BY MR. HERMAN:

2        Q.    The Venture Supply Taishan

3    drywall, was it sold to a distributor in

4    Georgia?

5        A.    Yes.

6        Q.    And the Venture Supply Taishan

7    drywall, was it sold to a distributor in

8    New York?

9        A.    Yes.

10       Q.    Do you recall any other sales

11   of Taishan drywall from Venture Supply to any

12   distributor, firm or corporation in any state

13   other than Georgia, Florida or New York?

14           MR. HARDT:  Again, these are

15       all in the sales documents that you

16       have, so --

17       A.    No.  I don't know if -- the

18   Georgia sales may have -- were on the Alabama

19   line.  I don't know if -- Alabama may be

20   included in there.  I can't recall.  But I

21   know that the sales documents --

22   BY MR. HERMAN:

23       Q.    Do you recall what city in

24   Georgia Venture Supply Taishan drywall was

Samuel G. Porter

Page 144

1    sold to a distributor?

2         A.     I think it was Atlanta.

3         Q.     Atlanta?

4         A.     I believe.  I'm not --

5                MR. HARDT:  It's in the

6         documents.

7         A.     That may have just been their

8    corporate headquarters.  I'm not sure.

9                MR. HERMAN:  Okay.  It's 12:30

10        or whatever time the court reporter

11        has.  12:30, more or less.  We'll

12        break for lunch?

13               MR. HARDT:  Sounds good.

14               MR. HERMAN:  And is 1:30 okay

15        to resume?

16               MR. HARDT:  Yep.  If it's

17        12:30, 1:30's fine.

18               MR. HERMAN:  Okay.

19               THE VIDEOGRAPHER:  We're off

20        the record at 12:32 p.m.  This is the

21        end of Tape No. 2.

22               (Recess taken, 12:32 p.m. to

23        1:36 p.m.)

24               THE VIDEOGRAPHER:  We are back

Samuel G. Porter

1           on the record at 1:36 p.m.  This is

2           the beginning of Tape No. 3.

3    BY MR. HERMAN:

4           Q.     At the time Venture Supply

5    received the first shipment of Taishan

6    drywall in Norfolk -- and it went to your

7    warehouse in Norfolk, correct?

8           A.     Yes.

9           Q.     And at that time, did you have

10   drywall from other manufacturers, domestic

11   manufacturers, in your warehouse?

12          A.     Not much.  What would come in

13   would go out that day.

14          Q.     Had you been receiving, in the

15   last quarter of 2005 and throughout 2006, any

16   drywall from National Gypsum?

17          A.     Yes.

18          Q.     From Georgia Pacific?

19          A.     No.

20          Q.     From U.S. Gypsum?

21          A.     A very little bit, yes.

22          Q.     Do you know if any of the

23   National Gypsum or U.S. Gypsum was

24   Chinese-manufactured drywall that had been

Samuel G. Porter

1    rebranded?

2         A.    I don't know.

3         Q.    Did you brand the National

4    Gypsum with Venture Supply, Inc.?

5         A.    No.

6         Q.    So there were no stamps or end

7    tapes that would show "Venture Supply" with

8    regard to the National Gypsum you have in

9    your warehouse?

10        A.    That's correct.

11        Q.    Is that -- and with regard to

12   U.S. Gypsum, did you rebrand or stamp that

13   drywall with "Venture Supply"?

14        A.    No.

15        Q.    So in 2005-2006, whatever

16   drywall from National Gypsum or U.S. Gypsum

17   that you had purchased and had in your

18   warehouse, none of that would have had --

19   been identified as "Venture Supply" in any

20   way, correct?

21        A.    That's correct.

22        Q.    Now, do you have records which

23   indicate in 2005 and 2006 Venture Supply's

24   purchase of drywall from U.S. manufacturers?

Samuel G. Porter

Page 147

1        A.     Yes.

2        Q.     And how would those records be

3    kept?

4        A.     They would be confirmed.  They

5    made copies of a lot of them, and then some

6    of them are going to storage, but they would

7    be in probably an invoice form, and then in a

8    statement at the end of the month.

9        Q.     And we could also determine to

10   whom Venture Supply sold that drywall,

11   correct?

12       A.     Yes.

13       Q.     Did Venture Supply or

14   Porter-Blaine provide any Chinese Taishan

15   drywall to Lowe's?

16       A.     No.

17       Q.     Did Porter-Blaine or Venture

18   Supply supply any Taishan drywall to Home

19   Depot?

20       A.     No.

21       Q.     Other than National Gypsum,

22   Georgia Pacific and U.S. Gypsum, did you

23   purchase gypsum drywall from any other U.S.

24   manufacturers in 2005-2006?

Samuel G. Porter

1         A.      I think Temple was a brand I

2    was buying, which was not large quantities.

3    I could only get a certain amount.  And

4    American Gypsum.

5         Q.      Where was Temple located?

6         A.      I'm not exactly sure, but I

7    know it was a very long truck from the

8    plant -- or from their distribution place to

9    my warehouse.  That's why I wouldn't get very

10   much.

11        Q.      And American, is it American

12   Gypsum?

13        A.      Yes.

14        Q.      And where are they located?

15        A.      I think it's South Carolina, I

16   believe.

17        Q.      Now, did you ever mix on a

18   pallet Chinese drywall -- that is, Taishan

19   drywall -- with drywall manufactured by other

20   manufacturers?

21        A.      Yes.

22        Q.      So that you might have a pallet

23   that had Taishan drywall and National Gypsum

24   on it, for example?

Samuel G. Porter

1        A.      Yes.

2        Q.      And did the prices vary in your

3    sales of Taishan drywall with your sales of

4    National Gypsum when they were stored on the

5    same pallet?

6        A.      Most of our pricing was in

7    levels, A level, B level, C level, according

8    to the customer volume and credit amounts and

9    frequencies and so on.  So the prices were

10   pretty much the same.

11       Q.      So the prices of -- the price

12   of a sheet of National gypsum and a price on

13   a sheet of Taishan gypsum would be relatively

14   the same, but according to A, B, C, D, which

15   would be how much drywall was ordered by a

16   particular buyer and how frequently they

17   bought?

18       A.      Yes.

19       Q.      Now, with regard to Temple and

20   American, Temple gypsum and American Gypsum,

21   did you brand it with "Venture Supply, Inc."

22   in any way?

23       A.      No.

24       Q.      To your knowledge, did

Samuel G. Porter

1    Porter-Blaine, in the last quarter of 2005

2    and in 2006, install with its subcontractors

3    or installers Taishan drywall in the same

4    building as National gypsum?

5        A.      Not at the end of 2005, but in

6    the latter part of the first quarter of 2006.

7    In March of 2006.

8        Q.      Okay.  And what brought that

9    about?

10       A.      That's when the shipment

11   actually came here.

12       Q.      From -- the shipment came from

13   China to your warehouse?

14       A.      Yes.

15       Q.      Let me ask you some background

16   questions.  Where were you born, sir?

17       A.      Miami, Florida.

18       Q.      And how long have you been in

19   Virginia?

20       A.      32, 33 years.

21       Q.      As an adult, what occupation

22   did you first have?  Let's go back.

23               Did you graduate from high

24   school, sir?

Samuel G. Porter

```
 1       A.    Yes.

 2       Q.    And about when was that?

 3       A.    1982.

 4       Q.    And did you thereafter go into

 5  the military service?

 6       A.    No, sir.

 7       Q.    Have you ever served in the

 8  military?

 9       A.    No.

10       Q.    All right.  After high school,

11  what course of endeavor did you pursue?

12             MR. HARDT:  I mean, Mr. Herman,

13        this isn't Sam's deposition.  This is

14        the deposition of Venture and

15        Porter-Blaine.  I'll allow some

16        background questions, but let's not go

17        too much into his background.

18             MR. HERMAN:  I'm entitled to

19        know if the CEO of Porter-Blaine and

20        the CEO of Venture -- what the

21        background is.

22             MR. HARDT:  That's not in your

23        notice of deposition, but go ahead.

24        But let's not go far from this.
```

1          A.       I graduated in 1982 from Green

2    Run High School, but I actually attended

3    Virginia Beach Vocational Technical Education

4    Center, which is a trade school, in '81

5    and '82.

6                  And during that time, I was

7    doing drywall for a company, a local company

8    called L&W, not the big L&W Supply that's

9    associated with U.S. Gypsum, and worked with

10   them for a few years.  And then I started

11   Porter-Blaine, I believe, in about 1985.

12   BY MR. HERMAN:

13         Q.       Did Porter-Blaine originate

14   before Venture Supply?

15         A.       Yes.

16         Q.       So you began Porter-Blaine, and

17   tell me a little bit about the first years'

18   experience with Porter-Blaine.

19         A.       Basically, worked out of a

20   12x12 storage unit, had my tools on, would go

21   out and do patch work, repair, insurance

22   restoration, homeowners, new construction.

23         Q.       And how long --

24         A.       Really down and dirty.

```
 1        Q.      And how long was it from that
 2   point that you organized Venture Supply?
 3        A.      About ten years.
 4        Q.      As I understand your testimony,
 5   Porter-Blaine would have been in existence
 6   ten years before Venture Supply --
 7        A.      Yes.
 8        Q.      -- started.
 9                You had investors originally in
10   Porter-Blaine?
11        A.      No.
12        Q.      It was all yours?
13        A.      I had a partner named Blaine.
14   Him and I basically started the company and
15   named it Porter-Blaine.  I had bought him out
16   because he had wanted to do other things, but
17   I kept the name just for simplicity with
18   creditors, customers.
19        Q.      At the time you initiated
20   Venture Supply, were you 100% owner of
21   Porter-Blaine?
22        A.      Yes.
23        Q.      Okay.  And Venture Supply was
24   originated in about what year?
```

1        A.      '95.   1995.   Excuse me, '96, I

2    think it was.

3        Q.      And did you have investors in

4    Venture Supply when you started out?

5        A.      No.

6        Q.      And did Venture Supply, from

7    the time you originated Venture Supply until

8    the time that you purchased the Chinese

9    drywall, operate in more or less the same

10   way?  By that, I mean were you purchasing

11   sheetrock and other building supplies from

12   various manufacturers and distributing them?

13       A.      When Porter-Blaine was

14   originally started, until Venture Supply was

15   started, I would buy from other distributors;

16   and then when I started Venture Supply, I

17   actually began the distribution company to

18   buy from manufacturers and distribute.

19       Q.      In other words, you had been

20   buying from distributors before that?

21       A.      Yes.

22       Q.      Now you wanted to buy directly

23   from the manufacturers, and you did so

24   through Venture Supply?

Samuel G. Porter

1        A.      Yes.

2        Q.      When did -- is Venture Supply

3   in existence today?

4        A.      It's still a corporation.  It's

5   not active.

6        Q.      When did it cease to become

7   active?

8        A.      I think it was June 30th of

9   2009.

10        Q.      And is Porter-Blaine in

11   existence today?

12        A.      The corporation is, but there's

13   no business dealings.

14        Q.      When did it cease to become

15   active?

16        A.      June 30th, this year.

17        Q.      Are you, at the present time,

18   still engaged in any business related to

19   drywall?

20        A.      No.  The only thing I'm doing

21   is collecting some receivables.  I'm trying

22   to pay off the bank note that I have left

23   from -- or the bank from Venture and

24   Porter-Blaine, and dealing with this

Samuel G. Porter

Page 156

1    litigation a lot.

2         Q.    Okay.  Before you signed the

3    agreement with Taishan for the Chinese

4    drywall, what investigation did you do, if

5    any, of Shandong or Taishan?

6         A.    I looked up the website.  I was

7    going to do a Dun & Bradstreet report, which

8    is a credit report, but I don't know if it

9    was too expensive.  We were -- we had the

10   service of Dun & Bradstreet credit, but I

11   don't know -- I think it was a little more

12   expensive internationally.

13              Phil, when he was over there,

14   he was, you know, seeing, you know, what kind

15   of operation they had, you know.  They were

16   making board out of a decent-sized facility,

17   had a big warehouse.

18              I may have had the bank --

19   before I did the letter of credit, they may

20   have checked into the bank that the funds

21   were going to go to.

22        Q.    Were you aware of Shang

23   plasterboard, S-H-A-N-G, manufactured by

24   Taishan?

Samuel G. Porter

1     A.     No.

2     Q.     Were you aware of T-A-I, new

3  word, S-H-A-N, plasterboard, manufactured by

4  Taishan?

5     A.     Sounds familiar.

6     Q.     What do you recall about that?

7     A.     I think I had received some

8  literature on it, prepackaged information

9  about their company and so on and so forth.

10    Q.     In Chinese or in English?

11    A.     It was in English.

12    Q.     And who did you receive that

13 from?

14    A.     I believe Phil sent that over

15 when he was in China.

16    Q.     Do you know the difference

17 between the Shang and the Tai Shan

18 trademarks?

19    A.     No.

20    Q.     What trademarks do you recall

21 seeing on the plasterboard you purchased from

22 Taishan?

23    A.     I don't remember seeing a

24 trademark on the material.

Samuel G. Porter

1       Q.      Did you ever see the word

2   "T-A-I-H-E" imprinted on the plasterboard?

3       A.      Yes.

4       Q.      Did you ever see a symbol such

5   as a red circle with a white teepee or

6   inverted "V"?

7       A.      No.

8       Q.      Did you ever hear, or were you

9   acquainted with Wu, W-U, X-I-N-G

10  plasterboard, manufactured by Taishan?

11      A.      No.

12      Q.      Are you familiar with the

13  Taishan series plasterboard slogans, quote,

14  "Advanced technology, strict quality control,

15  all-around service, good reputation and can

16  provide consumer great comfortable feeling

17  about lower payment"?

18      A.      Yes.

19      Q.      And where did you get that

20  from?  Was that some sales material you got

21  from them?

22      A.      Yes.  I believe it was another

23  prepackaged-type information from the

24  company.

Samuel G. Porter

Page 159

```
1        Q.     And that -- did you rely on

2    that representation of advanced technology,

3    strict quality control, good reputation?

4        A.     Yes.

5        Q.     Providing consumers great

6    comfort?  Did you rely on that?

7        A.     Yes.

8        Q.     Do you know how many mines

9    Taishan had, gypsum mines, in China?

10       A.     I'm not exactly sure, but the

11   number eight comes into my head.  I thought

12   there was maybe eight mines.

13       Q.     Did you know what percentage of

14   Chinese drywall was produced by Taishan?

15       A.     I believe the literature I saw

16   was about 55%, if I remember correctly.  They

17   said they were the largest in the country.

18       Q.     Did they provide you, or did

19   you know anything about FGD gypsum as a

20   product of Taishan?

21       A.     No.  Unless that's an

22   abbreviation, I don't know anything about it.

23       Q.     What about phosphogypsum,

24   P-H-O-S-P-H-O-G-Y-P-S-U-M?
```

Samuel G. Porter

1      A.      I'm not familiar with it.

2      Q.      Do you know whether the product

3   which you purchased from Taishan was a

4   natural product or a synthetic product or

5   whether it was a combination?

6      A.      I believe it was natural-mined,

7   according to what Phil had told me when he

8   was at the plant.

9      Q.      Did he visit the mines?

10     A.      Yes.  I believe the plant was

11   right at the mine, is what he -- my

12   understanding.

13     Q.      That there was a mine at

14   Tai'an, T-A-I, apostrophe, A-N, and the plant

15   was right next door?

16     A.      Yes.

17     Q.      That's what Phil told you?

18     A.      Yes.

19     Q.      Have you ever done any

20   business -- strike that.

21             In 2005-2006, did you do any

22   business with Marathon Construction

23   Materials, Inc.?

24     A.      No.

Samuel G. Porter

Page 161

```
 1        Q.    Oriental Trading Company?

 2        A.    No.

 3        Q.    TOV Trading, Inc.?

 4        A.    No.

 5        Q.    Elite Supply Corporation?

 6        A.    No.

 7        Q.    Stone Pride International

 8   Corp.?

 9        A.    No.

10        Q.    Ever-Rich USA, Inc.?

11        A.    No.

12        Q.    Are you aware that the Taihe,

13   T-A-I-H-E, plant did not carry out its first

14   internal inspection of quality management and

15   environment management until the year 2007?

16        A.    No, I was not aware of that.

17        Q.    May I ask you one more question

18   about Knauf.  Did either -- did Venture

19   Supply, Inc. receive any drywall from Knauf

20   in the year 2002?

21        A.    No.

22        Q.    Did Porter-Blaine purchase or

23   use any Knauf plasterboard in the year 2002?

24        A.    No.
```

Samuel G. Porter

1          MR. HERMAN:   Hand me the

2     standards file.

3   BY MR. HERMAN:

4        Q.     The standard that was removed

5   at the Chinese manufacturer's request from

6   the letter of credit had to do with

7   fire-retardant or fire-resistant, didn't it?

8        A.     I didn't order any

9   fire-resistant board, so I don't...

10        Q.     So the board that you bought

11   from the -- from Taishan that you sold to

12   Porter-Blaine that was installed in various

13   buildings in Virginia was neither

14   fire-retardant nor fire-resistant; is that

15   correct?

16        A.     Well, the 5/8ths board is what

17   I understand is fire-rated.  They offered

18   that for sale, but I didn't buy any of it.  I

19   just used 1/2" regular, which I don't know

20   exactly what the rating, if there is one on

21   that, is.

22        Q.     I'll ask you the question:  To

23   your knowledge, as you sit here today, the

24   Taishan plasterboard, which you purchased and

1    which Porter-Blaine then received from

2    Venture Supply and then was installed in

3    various properties and homes in Virginia, was

4    not fire-resistant and was not

5    fire-retardant?

6            MR. HARDT:  Object to the form.

7    BY MR. HERMAN:

8        Q.    Is that correct, to your

9    knowledge?

10           MR. HARDT:  You can answer.

11       Object to the form.

12       A.    I believe it is, according to

13   some of the testing information that I have.

14   BY MR. HERMAN:

15       Q.    The testing information which

16   you have is Chinese, correct?

17       A.    I thought I'd submitted -- I

18   thought we had given some that had the

19   American fire rating on the board.

20       Q.    Let's go back now, because I

21   want to be very careful about this.

22       A.    Uh-huh.

23       Q.    Did you ever send the Taishan

24   board purchased by Venture Supply to any

Samuel G. Porter

1    laboratory in the United States to have

2    tested by American standards?

3         A.    No.

4         Q.    Did you -- why, originally, did

5    your letter of credit specify American

6    standard material?

7         A.    I don't recall.

8         Q.    But you do recall you removed

9    it because the Chinese that manufactured the

10   drywall wanted it removed, correct?

11        A.    Yes.

12              (Whereupon, Deposition Exhibit

13        PSC-VPB-31, BCC Certificates of

14        Quality Management System

15        Certification for Shandong Taihe

16        Dongxi Stock Co., Ltd., et al.,

17        w/Attachments, V028247 - V028300, was

18        marked for identification.)

19   BY MR. HERMAN:

20        Q.    I'm going to show you

21   Exhibit 31, Bates number V28247 through

22   V28300, titled "Certificate of Quality

23   Management, Systems Certification, Beijing

24   New Century Certification," issue date,

Samuel G. Porter

1    1/18/1999; reissue date, 7/8/2005, valid

2    until 7/7/2008.

3              I'll ask you to turn to

4    page V28251 and V28252.  Did you ever have

5    the Chinese information interpreted for you

6    that does not appear in English?

7         A.    Yes.

8         Q.    And can you tell me who

9    interpreted this for you?

10        A.    It was Old Dominion University

11   in the linguistics department.  The name of

12   the person is somewhere in the files that Ken

13   and them have.

14        Q.    I want you to look carefully at

15   this.  Is this the way this came to you, with

16   the English from Taihe Group?

17        A.    Yes.

18        Q.    In other words, this wasn't

19   done by Old Dominion.  This is the way it

20   came to you?

21        A.    Yes.

22        Q.    Okay.  So you didn't have this

23   interpreted at all?

24              MR. HARDT:  Object to the form.

1    BY MR. HERMAN:

2         Q.    This came -- this came from

3    Taihe in English?

4         A.    Yeah, I had it checked.

5         Q.    Oh.  You had it checked?

6         A.    (Nods head.)

7         Q.    Okay.  Let's turn, then, if you

8    would, to page 28292, 28293, 28294, 28295 and

9    28296.  Whose handwriting is on 28292?

10        A.    That's from Old Dominion.

11        Q.    Do you know what the National

12   Center is?

13        A.    No.

14        Q.    Do you know that that's the

15   National Center in China?

16        A.    I assumed that's where it was.

17        Q.    All right.  Look at 28293.  Do

18   you see 1, 2, 3, 4, 5, 6 at the top in

19   Chinese?

20        A.    Yes.

21        Q.    Did you have that interpreted?

22        A.    Yes.

23        Q.    Where's the interpretation of

24   it?

Samuel G. Porter

1      A.      I don't know.

2      Q.      Turn to page 28294.

3      A.      Uh-huh.

4      Q.      See the Chinese writing at the

5  top?

6      A.      Yes.

7      Q.      Where's the interpretation of

8  that?

9      A.      I don't see it.

10     Q.      Do you see the lines of Chinese

11  writing in the fifth, sixth, seventh and

12  eighth line?

13     A.      Yes.

14     Q.      Where's the interpretation in

15  the sixth, seventh, eighth line?

16     A.      I don't know.

17     Q.      Now, go to 28295.

18     A.      Uh-huh.

19     Q.      Do you see that it says the

20  date produced the sample is October 7th,

21  2004?

22     A.      Uh-huh.

23     Q.      You see the date samples were

24  chosen was 10/10/2004?

Samuel G. Porter

Page 168

1        A.        Yes.

2        Q.        That the National Center

3    received the samples on December 28th, 2004?

4        A.        Right.

5        Q.        And that it was tested on

6    January 6th and January 7th, 2005?

7        A.        Yes.

8        Q.        This couldn't have been a test

9    on your sheetrock.

10              MR. HARDT:  Object to the form,

11        argumentative.

12   BY MR. HERMAN:

13       Q.        Your sheetrock wasn't even

14   produced until November-December of 2005;

15   isn't that correct?

16              MR. HARDT:  Object to the form.

17       A.        That's correct, but if I'm

18   under the understanding about testing of

19   building products, they don't -- a test isn't

20   done on each individual run or date.  It's

21   done in either an assembly or in a product

22   year, and then that's good for so many years.

23   BY MR. HERMAN:

24       Q.        See if you can answer this

Samuel G. Porter

1    question, okay?

2            There were 100,000 sheets of

3    Taishan drywall that Venture Supply

4    purchased --

5        A.    Yes.

6        Q.    -- that was manufactured in

7    November and December and January, November

8    and December 2005 and January 2006; is that

9    correct?

10        A.    Yes.

11        Q.    None of those sheets were

12    tested; is that correct?

13        A.    According to this, no.

14        Q.    I'm correct, that none of those

15    sheets was tested, correct?  I'm correct?

16    Let me repeat it again.

17            The 100,000 sheets of drywall

18    which you purchased from Taishan in November

19    and December of 2005 were manufactured and

20    were delivered to you in 2006, correct?

21        A.    Yes.

22        Q.    According to this, none of

23    those sheets was tested?

24            MR. HARDT:   Those particular

Golkow Technologies, Inc. - 1.877.370.DEPS

Samuel G. Porter

1        sheets, that's what he's asking.

2    BY MR. HERMAN:

3        Q.      Is that correct?

4        A.      Those particular sheets, yes.

5        Q.      Now, you don't have a

6    comparison, even, as to the manufacturing

7    process in 2004 as distinguished from late

8    2005, do you?

9        A.      The only thing I have would be,

10   for example, domestic board.  When National

11   Gypsum sends out their information, they send

12   out their testing information from whenever

13   they did the test, and that is good for a

14   year, two years, five years, ten years,

15   however long that is.  That's how I thought

16   that this was done.

17       Q.      So you assumed that the Taishan

18   gypsum which you bought was going to be

19   tested in the same way, according to the same

20   standards, as National gypsum?

21              MR. HARDT:  Objection.  You can

22       answer.

23              MR. HERMAN:  Well, wait a

24       minute.  You have to look at me and

Samuel G. Porter

1          answer my question.

2                    MR. HARDT:   Yeah.   No, I just

3          objected to form.   You can answer the

4          question.

5                    MR. HERMAN:   Well, object.   But

6          you need to answer my question, sir.

7          A.        Well, what I don't -- and I'd

8     like you to rephrase the question.

9     BY MR. HERMAN:

10         Q.        I'll be happy to do that.

11         A.        Because you have these test

12    results here that are prior to the production

13    of the board that I had bought.

14                   I was under the understanding

15    when a manufacturer produced a product, these

16    specifications or these -- this information

17    was good for future production, as far as the

18    information.   It was -- it's a repetitive

19    process.   They don't test -- I don't think

20    they test every sheet or every batch or every

21    run.   I don't know, but --

22         Q.        But it would have been tested

23    according to the ASTM, your 100,000 sheets,

24    if your letter of credit had left that

1    language in, instead of you taking it out

2    because the Chinese wanted it out --

3              MR. HARDT:  Object to the form.

4    BY MR. HERMAN:

5         Q.    -- isn't that true?

6         A.    I don't know who would have

7    done the tests.

8         Q.    Of course, you don't know

9    whether the test done in 2004 was natural

10   gypsum or whether it was not 100% natural

11   gypsum, do you?

12        A.    I don't know that --

13             MR. HARDT:  Object to form.

14        A.    -- on Taishan, and I don't know

15   it on the domestic board either.

16   BY MR. HERMAN:

17        Q.    And you don't know whether the

18   100,000 sheets of drywall from Taishan was

19   100% natural gypsum or was one of the other

20   processes that they were using in 2005-2006.

21             MR. HARDT:  Object to the form.

22        That assumes they were using other

23        processes.

24             MR. HERMAN:  No, it's not the

Samuel G. Porter

1        same question.  If you want to object

2        to the form --

3              MR. HARDT:  No, I said that's

4        assumes that they're using other

5        processes.  That's what your question

6        assumed.

7              MR. HERMAN:  Yes, it does.

8              MR. HARDT:  Okay.

9              MR. HERMAN:  Well, I'm an

10        officer of the court, and I think I'm

11        entitled to ask the question.  It's

12        not a trick question.

13              MR. HARDT:  I just objected to

14        the form.  You can answer the

15        question, if you can.

16              MR. HERMAN:  Well, good.

17   BY MR. HERMAN:

18        Q.    You don't know what process

19   Taishan was using to manufacture the drywall

20   that you paid for?

21        A.    Phil was the ears and the eyes

22   over there, and he had told me that it was

23   natural gypsum.

24        Q.    Have you produced a single

Samuel G. Porter

Page 174

1    document that shows that Phil conveyed to you

2    that your drywall that you bought from

3    Taishan was 100% natural gypsum?

4              MR. HARDT:  Object to the form

5         of that question too.  But you can

6         answer it, to the best of your

7         knowledge.

8         A.    I might.  I don't know.

9    BY MR. HERMAN:

10        Q.    And you weren't aware that

11   Taihe started to add FGD gypsum to its

12   manufacturing of plasterboard before you

13   purchased the plasterboard from Taishan?

14        A.    I don't know what FDG gypsum

15   is.  Is that an abbreviation?

16        Q.    Yes, sir, for a manufacturing

17   process that was employed by Taishan in

18   manufacturing plasterboard.

19              And I don't mind you asking the

20   question, even though I'm supposed to be

21   asking.  I don't want to take unfair

22   advantage of you.

23        A.    I just want to make sure that I

24   was clear in my answer.

Samuel G. Porter

Page 175

```
 1        Q.     Yeah.   That's okay.  I want you
 2    to be clear.
 3              MR. HARDT:  Is this the same
 4        one?
 5              MR. HERMAN:  Yeah, I didn't
 6        know that you had a copy.
 7              MR. HARDT:  Oh.  Oh.
 8              MR. HERMAN:  It may be an extra
 9        one.
10              MR. HARDT:  No, no.  You're
11        looking at something different, I
12        think, than what we got.  You just
13        handed out these copies.  I see.  We
14        don't need it.
15              MR. HERMAN:  Yes.
16              MR. HARDT:  Those are the same
17        things he just handed out.
18              These are just extras of those
19        things.  That's why I was confused.
20              MR. LONGER:  That's what I
21        thought.
22    BY MR. HERMAN:
23        Q.     Now, were you ever told by, or
24    did you ever learn from Taishan that the --
```

Samuel G. Porter

1    strike that.

2                Were you aware that the drywall

3    you purchased from Taishan had phosphogypsum,

4    fiberglass and modified corn starch?

5        A.      No.

6                MR. HARDT:  Object to the form.

7                (Whereupon, Deposition Exhibit

8            PSC-VPB-32, 11/10/05 Richardelli Fax

9            to Perry, re: Translation, V001879 —

10           V001890, was marked for

11           identification.)

12   BY MR. HERMAN:

13       Q.      I'm going to show you

14   Exhibit 32, which is Bates numbers 1879,

15   1880, 1881, 1882, 1883, 1884, 1885, 1886,

16   1887, 1888 and 1889 and 1890, from Phil

17   Perry, dated November 10th, '05; 14 pages,

18   including cover that says "Translation."

19               MR. HARDT:  Here's an extra

20           one.

21   BY MR. HERMAN:

22       Q.      Those are the test results --

23               That is Exhibit 32, is it?

24       A.      Uh-huh.

Samuel G. Porter

1    Q.    -- that you relied on?

2    A.    Yes.

3    Q.    And they were sent to you by

4  Phil Perry of Tobin, correct?

5    A.    Yes.

6    Q.    And he was the same Phil Perry

7  that you recall telling you that all of the

8  plasterboard that you got from Taishan was

9  natural gypsum, correct?

10    A.    Yes.

11    Q.    Am I correct?

12    A.    Yes.

13    Q.    Turn to page 1880.  Above the

14  two photographs, do you see any

15  interpretation in English?

16    A.    There's just before and after.

17    Q.    Yes.  Do you see the four lines

18  of Chinese characters above that?

19    A.    Yes.

20    Q.    Is it interpreted anywhere?

21  You see any interpretation of those four

22  lines?

23          MR. HARDT:  On the document?

24          MR. HERMAN:  Yes, on the

Samuel G. Porter

1          document.

2          A.     There's one that says

3     "Company," "Address," "CEO," "Company ZIP

4     Code," "Phone" and "Fax."

5     BY MR. HERMAN:

6          Q.     All right.  Now, you see the

7     next four lines in Chinese?

8          A.     Yes.

9          Q.     Do you see any interpretation

10    of those lines?

11         A.     No.

12                MR. HARDT:  Objection.

13    BY MR. HERMAN:

14         Q.     I submit to you that they are,

15    "Product Description:  This material consists

16    of natural gypsum, phosphogypsum, fiberglass,

17    modified corn starch, et cetera.  (The above

18    information is provided by the inspected

19    entity)."

20                So if by -- you know, if this

21    interpretation of this test report is

22    correct, Mr. Perry was wrong when he said to

23    you that your product that you purchased from

24    Taishan was all natural gypsum?

Page 179

1            MR. HARDT:  Object to the form.

2        A.     According to this, yes.

3  BY MR. HERMAN:

4        Q.     And no one, not you, not some

5  university, not China, ever interpreted those

6  four lines of the product description,

7  correct?

8        A.     Correct.

9               (Whereupon, Deposition Exhibit

10              PSC-VPB-36, 11/9/05 Perry Handwritten

11              Fax to Porter, Subject: Drywall,

12              V001256, was marked for

13              identification.)

14  BY MR. HERMAN:

15       Q.     I'm going to show you

16  Exhibit 36, which is V1256.  It says 11 --

17  it's dated 11 -- looks like

18  November 7th, '05, or November 9th, '05,

19  correct?

20       A.     Yes.

21       Q.     The subject is "Drywall."  It

22  is handwritten, correct?

23       A.     Yes.

24       Q.     Would you read it from where it

Samuel G. Porter

Page 180

```
 1    says "Sam," read it for the record?

 2          A.     "I enclose samples of the

 3    drywall and some information provided by the

 4    manufacturer.  There should be a certified

 5    translator in Norfolk.  If not, you can

 6    contact the language department at ODU for

 7    assistance.  Best regards, Phil Perry, Tobin

 8    Trading."

 9          Q.     Okay.  So in November of '05,

10    Perry sends you samples, correct?

11          A.     Yes.

12          Q.     What happened to those samples?

13          A.     I had them in the office for a

14    while, and I don't know if I've given them to

15    Ken or not.

16          Q.     To your attorney?

17          A.     Yes.

18          Q.     I can't inquire about that.

19                 But between the time that those

20    samples came to you in November-December 2005

21    and the time you gave the samples, or may

22    have given the samples to your attorney, you

23    never had them tested?

24          A.     No.
```

Samuel G. Porter

1          Q.      I'm correct, you never had them

2     tested?

3          A.      Correct, I never had them

4     tested.

5          Q.      And was the information that

6     was sent you also this standard certification

7     that you never had fully translated?

8          A.      Yes.  But I didn't -- I don't

9     understand Chinese, so I didn't know if four

10    lines equaled one word or what, so that's --

11    I just -- I thought it was translated

12    completely.

13                 (Whereupon, Deposition Exhibit

14          PSC-VPB-39, 11/9/05 Bender E-mail to

15          Richardelli, Subject: Letter of credit

16          application, w/Attached Application,

17          V001811- V001818, was marked for

18          identification.)

19    BY MR. HERMAN:

20          Q.      I'm going to show you

21    Exhibit 39, Bates numbers V1811 through 1818.

22    If you would look at page 1811 -- strike

23    that.

24                 Kenneth Bender was from the

Samuel G. Porter

1    RBC Centura Bank?

2         A.     Yes.

3         Q.     And that was your bank,

4    correct?

5         A.     Yes.

6         Q.     And on November 9th, 2005, he

7    sent to Jessica Richardelli -- Jessica worked

8    for Venture; is that correct?

9         A.     Yes.

10        Q.     -- for you to review, a letter

11   of credit for the purchase of 120,000 sheets

12   of drywall from Taishan, correct?

13        A.     Yes.

14        Q.     And if you look at the last box

15   with an x, the original form of letter of

16   credit said, quote, "meet all applicable USA

17   ASTM rating and fire rating standards."

18               Do you see that?

19        A.     Yes.

20        Q.     And that was the language which

21   you omitted from the final letter of credit,

22   at Taishan's request, correct?

23        A.     Yes.

24               (Whereupon, Deposition Exhibit

Samuel G. Porter

1          PSC-VPB-46, 11/14/05 Perry E-mail to

2          Porter, Subject: China Drywall,

3          V002592, was marked for

4          identification.)

5     BY MR. HERMAN:

6          Q.     Let me show you Exhibit 46.  It

7     bears Bates numbers V2592.  It's dated

8     November 14th, 2005, from Phillip W. Perry of

9     Tobin to yourself, correct, sir?

10         A.     Yes.

11         Q.     Whose handwriting is on here?

12         A.     That's mine.

13         Q.     Do you see, speaking about

14    Frank -- why don't you read the first

15    paragraph for the record, please.

16         A.     "The translation of the

17    documents is being done by Frank Clem.  Clear

18    original will be provided with translation."

19         Q.     Okay.  So the Chinese were

20    going to translate their own documents for

21    you?

22         A.     Yes.

23         Q.     Now, read the second paragraph.

24         A.     "ASTM ratings.  They are not

1    clear on requirements of the fire rating.

2    Frank has asked if you can remove

3    requirements from the L/C or give him a pass

4    by using the Chinese fire rating he has

5    provided.  Do you need fire rating for

6    1/2" drywall?  He also asked if you could get

7    the ASTM fire ratings test done in the USA."

8         Q.     Okay.  And your answer, as I

9    see it, is, one, you were going to give him a

10   pass on the fire rating, that it was your

11   opinion that you didn't need fire rating for

12   1/2" drywall, but you could get the test done

13   in the U.S.; is that correct?

14        A.     That's what this says, yes.

15        Q.     But you never had the test

16   done, correct?

17        A.     No.

18        Q.     Correct?

19        A.     Yeah, that's correct.

20               (Whereupon, Deposition Exhibit

21        PSC-VPB-49, E-mail Chain Ending

22        11/15/05 Waddell E-mail to Edney,

23        Subject: Amended Letter of Credit and

24        Wiring Instructions, V000393 -

Samuel G. Porter

1            V000394, was marked for

2            identification.)

3     BY MR. HERMAN:

4            Q.      And if my memory is correct, I

5     may have already covered Exhibit 49, Bates

6     number 393, 394, earlier, but just in an

7     abundance of caution, I'm going to have you

8     look at 49.

9                    In this e-mail of

10    November 15th, 2005, you agreed -- this is

11    actually the e-mail agreeing to delete the

12    ASTM requirement, correct?

13                 MR. HARDT:  And you did cover

14           this one.

15                 THE WITNESS:  Yeah, it looks

16           familiar.

17                 MR. HERMAN:  It may have been

18           in the documents twice, or I may have

19           inadvertently put it in twice, but...

20                 THE REPORTER:  It was

21           Exhibit 4.

22                 MR. HARDT:  It was Exhibit 4,

23           originally.

24                 (Whereupon, Deposition Exhibit

PSC-VPB-50, 11/18/05 RBC Centura Fax to Richardelli, w/Handwritten Interlineations, V001805, was marked for identification.)

BY MR. HERMAN:

Q. Again, I'm going to show you Exhibit 50. Exhibit 50 is Bates number 1805. And you'll see somebody boxed these words, "meet all applicable USA fire rating standards," and then it says, next to it in handwriting "remove."

A. That's my handwriting.

Q. So you can identify this is your handwriting --

A. Yes.

Q. -- and your instruction to remove the ratings?

A. Yes, sir.

Q. By the way, are you aware of any fire hazard caused by Taishan drywall to corroded electrical wiring in the homes in which Taishan drywall was used in Virginia?

A. No.

Q. Are you aware of fire hazards

Samuel G. Porter

1    caused by corroded electrical wires in

2    construction?

3         A.    Could you repeat that?  I lost

4    you there for a second.

5         Q.    Yeah.

6         A.    I'm sorry.

7         Q.    You've had -- you had

8    considerable business in terms of purchasing

9    and distributing various building materials,

10   correct?

11        A.    Yes, sir.

12        Q.    In the course of your business,

13   have you ever had occasion to understand that

14   corroded electrical wiring in a home can

15   cause fire, a fire hazard?

16             MR. HARDT:  Object to the form

17        of the question as so broad, using the

18        term "corroded electrical wiring."  In

19        addition, it's beyond the scope of

20        the notice --

21             MR. HERMAN:  Is that an

22        objection to form?

23             MR. HARDT:  It's also an

24        objection to the extent that that

Samuel G. Porter

1          exceeds the notice of the deposition

2          of this witness.

3     BY MR. HERMAN:

4          Q.    Have you, in the course of your

5     15 years plus in distributing building

6     materials, become aware that corroded

7     electrical wiring is a cause of fire hazard?

8               MR. HARDT:  Same objections.

9          You can answer, you know, if you can

10         understand the question.

11         A.    I don't know much about

12    electrical work.  I know we have done jobs

13    where we would go in and -- we call them fire

14    jobs or water/flood jobs, things like that.

15    And I would hear the term "electrical fire"

16    or the term "water damage" or the term

17    "stovetop fire," things like that.  But as

18    far as electrical, I don't know.  That's not

19    my expertise.

20    BY MR. HERMAN:

21         Q.    Okay.  Fair enough.

22              Do you know whether the Taishan

23    drywall which you -- which Venture Supply

24    purchased was in conformity with the building

Samuel G. Porter

1    codes in Norfolk?

2         A.    I believe it was until Norfolk

3    banned the sale and distribution of it.

4         Q.    What about Virginia Beach?

5         A.    Same thing.  I believe it was

6    in compliance until it was banned.

7         Q.    Was there ever a finding that

8    it was not in compliance?

9         A.    Not that I'm aware of.

10        Q.    You mentioned earlier the

11   Spectrum at Willoughby Point you were an

12   investor in?

13        A.    Yes.

14        Q.    And at the time that that

15   project's financing failed, there were

16   already models up; isn't that true, model

17   houses?

18        A.    No.  There was an old warehouse

19   on the site that they had built a mock model

20   of the units.

21        Q.    And that mock model contained

22   Taishan drywall, did it not?

23        A.    No, I didn't even stock the

24   metal studs or the drywall on that.

Samuel G. Porter

```
 1                 (Conference out of the hearing

 2         of the reporter.)

 3                 THE WITNESS:  Can I use the

 4         bathroom?

 5                 MR. HERMAN:  Sure.  You want to

 6         take a break?

 7                 THE WITNESS:  That sounds good.

 8         Sounds good.

 9                 MR. HARDT:  Let's do it.

10                 THE VIDEOGRAPHER:  Off the

11         record at 2:49 p.m.  This marks the

12         end of Tape No. 3.

13                 (Recess taken, 2:49 p.m. to

14         3:04 p.m.)

15                 THE VIDEOGRAPHER:  Stand by.

16         We're back on the record at 3:04 p.m.

17         This is the beginning of Tape No. 4.

18    BY MR. HERMAN:

19         Q.    Do you know how many standards

20    there are, provided by American standards

21    testing, ASTM, for the testing of drywall?

22         A.    No, I don't.

23         Q.    Do you know what they require?

24         A.    I know there's different
```

Samuel G. Porter

1    requirements for different structures and

2    different sizes of buildings and so on and so

3    forth.

4         Q.    Well, let's just talk about

5    drywall.

6         A.    Okay.

7         Q.    How many -- do you know what

8    the requirements are for the testing of

9    drywall, how many requirements there are?

10              MR. HARDT:  I think that's what

11         he was answering, Mr. Herman.

12   BY MR. HERMAN:

13        Q.    Well, I didn't understand your

14   answer, and it's probably my problem.

15              For the type and dimension --

16   strike that.

17              For the dimensions of drywall

18   which you purchased through Venture Supply

19   from Taishan, how many requirements does

20   American standards require for testing?  How

21   many different standards have to be complied

22   with?

23        A.    I'm not sure I know.  I brought

24   in one size and one thickness, and I'm not

1      sure if there's a certain amount of tests

2      just for that one size and one thickness or

3      if there's multiple tests for thicker boards,

4      thinner boards, longer, shorter.  I'm not

5      aware of that.

6                  (Whereupon, Deposition Exhibit

7             PSC-VPB-57, E-mail Chain Ending

8             11/29/05 Perry E-mail to Waddell,

9             Subject: Packing photoes, V002477 -

10            V002479, was marked for

11            identification.)

12     BY MR. HERMAN:

13            Q.     I'm going to show you

14     Exhibit 57.  It's Bates-stamped V2477, 2478.

15     If you go to the second page, 2478, dated

16     November 29th, 2005, and listed there is

17     Field Item 46A, Item 4, from the letter of

18     credit, specifying what Frank, for Taishan,

19     wanted eliminated from the letter of credit.

20     Do you see that?

21            A.     Yes.

22            Q.     Then go to the prior page,

23     2478, and you see an e-mail of November 23rd,

24     2005, from Phillip W. Perry of Tobin to Frank

Samuel G. Porter

```
 1    at Taishan.   Do you see that at the bottom?

 2         A.     Yes.   I see "Peng."

 3         Q.     Well, Frank -- where it says --

 4         A.     I'm sorry, yes.

 5         Q.     It says, "Frank, will I be

 6    allowed access to the factory to perform the

 7    inspection if 40 item" -- strike that.

 8                "Will I be allowed access to

 9    the factory to perform the inspection if,

10    quote, '46A, Item 4,' end quote, is removed

11    from the L/C, question mark."

12                Do you see that?

13         A.     Yes.

14         Q.     Do you have a recollection that

15    they wouldn't even let Tobin in to inspect

16    the drywall you purchased unless you removed

17    that language about standards and testing

18    from the letter of credit?

19                MR. HARDT:   Object to the form.

20         That's not what that says.   But you

21         can answer.

22         A.     I thought he had made multiple

23    trips to the plant and had seen the

24    production and the production line, even
```

Samuel G. Porter

1    before this was an issue.

2    BY MR. HERMAN:

3         Q.    Well, that's why I'm asking you

4    the question, because I don't understand why

5    he would be e-mailing Taishan saying, "Hey,

6    if we get this standards language out of the

7    letter of credit, can I come in and make an

8    inspection?"

9         A.    I was under the impression that

10   he was -- he had been to the plant multiple

11   times and he had watched production and that

12   he was watching and just checking for

13   thickness and so on and so forth.

14              This sounds like he hadn't been

15   to the plant prior to this, but I don't --

16              MR. HARDT:  If you read the

17        two --

18        A.    -- I don't understand.

19              MR. HARDT:  I apologize, but if

20        you read the two pages you were just

21        reading, 2478 and 2477, what they want

22        removed -- or what they suggested

23        being removed is inspection

24        certificate from Tobin Trading, Inc.

Samuel G. Porter

1      stating that they've inspected the

2      goods, 120,000 sheets of gypsum board

3      in seller's factory, and they meet the

4      buyer's specifications and meet all

5      applicable USA fire ratings,

6      et cetera.

7          If you read Phillip Perry's

8      e-mail, he's saying, "Well, if you

9      take that out, does that mean I can't

10     go in and inspect the 120,000 sheets?"

11     That's what it says.

12         MR. HERMAN:  Well, I don't

13     think that's what it says, but if you

14     say that's what it says, that's what

15     you say it says.

16         MR. HARDT:  Okay.  The document

17     speaks for itself.

18         (Whereupon, Deposition Exhibit

19     PSC-VPB-54, 11/26/05 Perry E-mail to

20     Porter, Subject: L/C changes, V002491,

21     was marked for identification.)

22  BY MR. HERMAN:

23     Q.    I'm going to show you

24  Exhibit 54, Bates-stamped V2491.  This is

Samuel G. Porter

```
 1   dated November 26th, 2005, and it's from

 2   Perry to yourself, Tobin to Venture, correct?

 3        A.    Yes.

 4        Q.    And it's dated after

 5   Exhibit 57, which was the last exhibit, which

 6   was November 23rd.  Do you see where it says,

 7   "Item 46A, Item 4, delete in its entirety"?

 8        A.    In the top up here?

 9        Q.    Right here, sir.

10        A.    Oh, I'm sorry.

11        Q.    "46A, Item 4, delete in its

12   entirety"?

13        A.    Yes, sir.

14        Q.    And that is the same 46A,

15   Item 4, which your counsel read at

16   page V2478, Exhibit 57 --

17              MR. HARDT:  Object to the form.

18   BY MR. HERMAN:

19        Q.    -- correct?  46A, Item 4?

20        A.    Yes.

21        Q.    Okay.  Thank you.

22              MR. HARDT:  I was just looking

23        at what exhibit it is.

24              THE WITNESS:  This is the
```

Samuel G. Porter

1          recent one.

2                    MR. HARDT:   54?   Okay.

3    BY MR. HERMAN:

4          Q.     Okay.   Now let's see if we can

5    further clarify this issue of 46A, Item 4,

6    the letter of credit being eliminated; that

7    is, the one that required American standards.

8          A.     Okay.

9                    (Whereupon, Deposition Exhibit

10           PSC-VPB-52, E-mail Chain Ending

11           11/23/05 Perry E-mail to Porter,

12           Subject: Contract and L/C, V002514 –

13           V002515, was marked for

14           identification.)

15   BY MR. HERMAN:

16         Q.     I'm going to show you

17   Exhibit 52, Bates-stamped 2514, 2515.   That's

18   Exhibit 52.   This is dated November 23rd,

19   2005.   It's, again, from Phillip Perry of

20   Tobin to yourself of Venture Supply.

21                   Do you see where he says that

22   Frank says that Phillip can inspect the

23   board, but he doesn't want any of the -- all

24   of the requirements of 46A Item 4?

Samuel G. Porter

1      A.      Yes.

2          Q.      And actually, Mr. Perry was

3   seeing board that was produced for other

4   customers, not for you, when he made those

5   inspections.  Do you see that?

6      A.      Yeah, I'm a little confused.

7   The previous e-mail was on the 26th.

8          Q.      Right.  Not the previous

9   e-mail, the previous exhibit.

10     A.      Exhibit, I'm sorry.  Because

11  here it says, "Will I be allowed access to

12  the factory to perform the inspection if 46A

13  Item 4 is removed from the L/C?"

14         Q.      Right.

15     A.      That's on November 29th.

16         Q.      What's that date?

17     A.      It's in Chinese.  I can't --

18  Wednesday the 23rd.

19         Q.      Correct, the 23rd?

20     A.      And then this is the 23rd.

21         Q.      That's right.  And they're at

22  different times, aren't they?

23     A.      Yes, sir.

24         Q.      Okay.  Now, let's get back to

Samuel G. Porter

```
 1    Exhibit 52.
 2         A.    Okay.
 3         Q.    And Phillip says he's seen
 4    board produced for others?
 5         A.    Uh-huh.
 6         Q.    It's clean and without
 7    imperfections on pallets of drywall, and the
 8    pallet packaging is plastic wrap, okay?
 9         A.    Yes.
10         Q.    He goes on to say -- why don't
11    you read the next paragraph for the record.
12         A.    "As far as the fire rating go,
13    he claims to meet the requirements stated in
14    the papers sent to you from the Chinese lab.
15    I'm not qualified to say what the fire rating
16    is, except that the board is 1/2" thick and
17    paper-coated.  One side has finish paper, and
18    the other side has common back paper."
19         Q.    So you understood at that time
20    that the requirements for American standard
21    testing was eliminated from the letter of
22    credit, that Perry had seen some board
23    produced for other folks, but Perry wasn't
24    qualified to say what the fire rating was,
```

Samuel G. Porter

1    correct?

2         A.      That's correct.

3         Q.      And the papers that were sent

4    to you from the Chinese lab, they weren't

5    fully interpreted, correct?

6                 MR. HARDT:  Object to the form.

7    BY MR. HERMAN:

8         Q.      Isn't that correct?

9         A.      Yeah.

10                (Whereupon, Deposition Exhibit

11        PSC-VPB-135, Venture Supply Services

12        Webpage, was marked for

13        identification.)

14   BY MR. HERMAN:

15        Q.      I'm going to show you

16   Exhibit 135.  It has no Bates number.  It's

17   two pages, and there's some scratch-out on

18   it.  I don't know where that came from, but

19   I'm only going to ask you about the printed

20   material.

21                Do you recognize Exhibit 135?

22        A.      Yes.

23        Q.      Was this a material on your

24   website?  Did you have a website?

Samuel G. Porter

1        A.      Yes.

2        Q.      And did this come from your

3    website?

4        A.      Yes.

5        Q.      And it says you specialize in

6    plaster and drywall board and supplies?

7        A.      Yes.

8        Q.      And "locally owned and operated

9    since 1992"?

10       A.      Yes.  Well, I don't know if

11   that date is correct.

12       Q.      No, you said '95, but I accept

13   what you've said, okay?  I'm not trying to

14   contradict you.

15       A.      Okay.

16       Q.      What I'm trying to get to is

17   that you specialized in drywall, and then

18   "with over 100 years of combined experience

19   in our business."  What combined business was

20   there?

21       A.      Combined experience, which

22   would be me, my staff.  So if I had 25 -- I

23   mean, the way I looked at it was, if

24   there's --

Samuel G. Porter

Page 202

1        Q.      If I had four lawyers and they

2    worked 25 years apiece, I had 100 years of

3    experience?

4        A.      Yes, sir.

5        Q.      So that's what this 100 years'

6    experience represents?

7        A.      Yes.

8        Q.      You add up the experience of

9    your employees, and it's more than 100 years?

10       A.      Yes.

11       Q.      All right.  Now, looking at

12   Exhibit 135, why is National Gypsum, Georgia

13   Pacific, Johns Manville -- why are they

14   listed there?

15       A.      They were preferred -- well,

16   really, they were some of our better

17   manufacturers that would support us as far as

18   availability and price, and we just had a

19   much better relationship with them at the

20   time.

21       Q.      Oh.  So this is like if you

22   need a reference, you could call National

23   Gypsum or Georgia Pacific or Johns Manville?

24       A.      Yes.

```
 1       Q.     Okay.  Go to the second page.
 2  This slogan on the second page, would you
 3  read it for the record?
 4       A.     "We guarantee you will be one
 5  of our thousands of satisfied customers."
 6       Q.     Now, that Venture Supply
 7  slogan, quote, "We guarantee you will be one
 8  of our thousands of satisfied customers," end
 9  quote, is that something that you came up
10  with?
11       A.     Yes.
12            MR. LONGER:  Where are you
13       going next?
14            MR. HERMAN:  Where am I going
15       to go next?
16            MR. LONGER:  Yes.
17            MR. HERMAN:  I'll let you know.
18            MR. LONGER:  Left or right?
19            MR. HERMAN:  You never know.
20       You never know.  Okay.  Give me the
21       Tobin materials.
22            (Whereupon, Deposition Exhibit
23       PSC-VPB-66, Letter of Understanding
24       Between Tobin Trading and Venture
```

Samuel G. Porter

Page 204

```
1          Supply, V001554, was marked for

2          identification.)

3                   (Whereupon, Deposition Exhibit

4          PSC-VPB-67, Letter of Understanding

5          Between Tobin Trading and Venture

6          Supply, w/Handwritten Interlineations,

7          V001902, was marked for

8          identification.)

9   BY MR. HERMAN:

10         Q.     I'm going to show you two

11  exhibits together so you can compare.  The

12  first is Exhibit 66, Bates number V1554; and

13  the next is Exhibit 67, Bates number V1902.

14  And I'll hand a copy of each to your counsel

15  and copies of each for counsel present,

16  including counsel for Tobin.

17                 MR. HARDT:  I'll just pass them

18         around.

19                 MR. HERMAN:  Exhibit 66 has no

20         handwriting on it.  Exhibit 67 has

21         handwriting on it.

22                 (Whereupon, Deposition Exhibit

23         PSC-VPB-68, Executed Letter of

24         Understanding Between Tobin Trading
```

Samuel G. Porter

Page 205

1          and Venture Supply, w/Handwritten

2          Interlineations, TOB00058, was marked

3          for identification.)

4    BY MR. HERMAN:

5          Q.    Oh.  I'm going to hand you

6    Exhibit 68, which has a Tobin Bates stamp,

7    TOB58.

8               MR. HERMAN:  And if you would

9          hand this to counsel for Tobin.

10              MR. HARDT:  Didn't have an

11         extra copy of that one.

12   BY MR. HERMAN:

13         Q.    Now, the last exhibit I gave

14   you was 58, correct?

15              MR. HARDT:  That's what you

16         wrote on it, 58.

17              THE WITNESS:  68.

18              MR. HERMAN:  I'm sorry.  Let me

19         start over again for the record, just

20         so the record is clear, if you'll hand

21         those three to me.

22              Exhibit 66 is Bates number

23         V1554.  It's a letter of understanding

24         between Tobin and Venture.  It has no

Samuel G. Porter

Page 206

```
 1          writing on it.  It is just a printed

 2          agreement.

 3                 Exhibit 67 is Bates number

 4          V1902, and it has handwriting on it

 5          which has an addition to the agreement

 6          in handwriting pointing to a

 7          paragraph.

 8                 And Tobin -- TOB Bates 58,

 9          Exhibit 68, is the final agreement.

10   BY MR. HERMAN:

11          Q.    And I direct your attention to

12   Exhibit 68.  Is that the signed agreement you

13   entered with Tobin; that is, Venture Supply

14   entered with Tobin?

15          A.    Yes.

16          Q.    And included in that final

17   agreement was language which you suggested in

18   Exhibit 67, correct?

19          A.    It was more negotiated between

20   Phil and I, so it was mutual.

21                 MR. HARDT:  That language is

22          also in 66, you know.

23                 MR. HERMAN:  I'm sorry?

24                 MR. HARDT:  That language is
```

Samuel G. Porter

```
1          also -- it looks like 67 is the first

2          one, then 66 and 68.  I'm sorry.

3    BY MR. HERMAN:

4          Q.     Okay.  Whose handwriting is on

5    67?

6          A.     That's mine.

7          Q.     Okay.

8          A.     It's pretty bad.

9          Q.     It got in the agreement.

10         A.     That's...

11         Q.     And so on November 8th, 2005,

12   for Venture Supply you signed, and Phillip

13   Perry signed for Tobin, correct?

14         A.     Yes.

15         Q.     Do you know if Don Woods, whose

16   nickname is Woody, participated in the

17   compensation paid Tobin under this agreement?

18         A.     I don't know.  Like I stated

19   before, I know I had written Don Woods a few

20   checks.

21                (Whereupon, Deposition Exhibit

22         PSC-VPB-69, 12/1/05 Porter Memo To

23         Whom It May Concern, TOB00057, was

24         marked for identification.)
```

Samuel G. Porter

```
 1   BY MR. HERMAN:

 2        Q.    I'm going to show you

 3   Exhibit 69, which is TOB, Bates number TOB57.

 4              MR. HERMAN:  Excuse me.  This

 5        is Exhibit 69, is it not?

 6              MR. HARDT:  If the last one is

 7        68.

 8              THE WITNESS:  That's what I

 9        have.

10              MR. HERMAN:  Yeah.

11   BY MR. HERMAN:

12        Q.    Now, Exhibit 69 is

13   December 1st, 2005, correct?

14        A.    Yes.

15        Q.    And you appointed Phillip W.

16   Perry of Tobin Trading, Inc. as your agent

17   with authority to sign contracts up to

18   450,000 per contract, correct?

19        A.    Yes.

20              (Whereupon, Deposition Exhibit

21        PSC-VPB-71, Venture Supply Checks to

22        Perry, V000044 – V000046, was marked

23        for identification.)

24   BY MR. HERMAN:
```

Samuel G. Porter

Page 209

1          Q.     Let me show you Exhibit 71,

2   Bates numbers V44, V45, V46.  Now, I

3   represent to you that these documents in

4   Exhibit 71 were produced by Venture Supply,

5   and it is not the complete documents that

6   were produced.  It's only examples.

7                And this shows a draft

8   number 13686, RBC sent tour are a Bank,

9   Venture Supply, Inc. pay $42,948.00 to

10  Phillip Perry, April 19th, 2006.

11               Does this represent -- do these

12  checks represent commissions or remuneration

13  paid Mr. Perry in connection with the

14  transaction of the purchase of Chinese

15  drywall by Venture Supply?

16         A.     Yes.

17               (Whereupon, Deposition Exhibit

18         PSC-VPB-72, 10/13/06 Stein Fax to

19         Perry w/Attached Schedule of Payments

20         and Wires for Commissions, TOB00045 -

21         TOB00046, was marked for

22         identification.)

23  BY MR. HERMAN:

24         Q.     I'm going to show you

Samuel G. Porter

1    Exhibit 72.  It's two pages.  The first is

2    TOB45.  The second is TOB46.  Those are Bates

3    numbers.  And I'm going to show you

4    Exhibit 72, and I hand your counsel a copy of

5    Exhibit 72.

6              The second page lists 131,764

7    payments to Tobin, correct?

8         A.    Yes.

9         Q.    And there are actually three

10   checks within this 131,768 that look like

11   they go to "apply Woodson," "China, apply

12   Woodson AR"?

13        A.    Uh-huh.

14        Q.    What is that?  What does that

15   mean?

16        A.    "AR" is accounts receivable.

17        Q.    Who would "Woodson" be?

18              MR. HARDT:  Well, the payee is

19        Donald Woodson.

20   BY MR. HERMAN:

21        Q.    Is that Donald Woodson?

22              MR. HARDT:  He's the payee.

23        A.    That's what it says.

24   BY MR. HERMAN:

Samuel G. Porter

1       Q.      All right.  And is this -- are

2   these three checks for $6,750 payable Donald

3   Woodson on September 15th, 2006,

4   reimbursements, or are they monies earned?

5       A.      I'm not exactly sure if they

6   were reimbursement or if they were wire

7   transfers that were going to Phil for

8   expenses.

9               I mean, our original agreement

10  called for the $0.75 per board, but in the

11  process, it took so long, I ended up having

12  to reimburse him for a lot more time and

13  expenses and travel and so on and so forth.

14      Q.      Okay.

15      A.      So I don't know exactly what

16  these go to, but I'm -- if I'm not mistaken,

17  they would be in the overall accounting of

18  where the funds -- or what they were for.

19              Like, for example, it says Kurt

20  Riffey for a wire transfer.  I had to get

21  Phil money so he could travel, and he needed

22  advances and things like that.  I believe

23  that's what all this is.

24      Q.      Okay.  I understand, then, in

Samuel G. Porter

1    Exhibit 72 is an accounting of checks or

2    drafts or wire transfers paid in connection

3    with your purchase of Chinese drywall.  As to

4    the specific individual check, some are

5    commission, some may be reimbursements of

6    expenses?

7         A.    Correct.

8               (Whereupon, Deposition Exhibit

9         PSC-VPB-73, Schedule of Payments and

10        Wires for Commissions, V000032, was

11        marked for identification.)

12   BY MR. HERMAN:

13        Q.    I'm going to show you

14   Exhibit 73.  It has a Bates number of

15   Venture, or V32.  Bates number V32.

16              MR. HARDT:  What exhibit is

17        this?

18              THE WITNESS:  I have 73.

19              MR. HARDT:  73?  Okay.

20   BY MR. HERMAN:

21        Q.    Exhibit 73 is Bates number V32.

22   And this, again, is a schedule of payments

23   and wires for commissions, but it has

24   handwriting on it next to payments to Donald

Samuel G. Porter

1    Woodson of $6,750, and it's -- whose

2    handwriting is that?

3         A.    It's not mine.  I'm...

4         Q.    It says the contract was with

5    him, "1099 to Woody."  Any idea whose

6    handwriting that is?

7         A.    I'd be guessing, but it looks

8    as if it's Marc Stein's.

9         Q.    Marc Stein was the controller

10    for Venture Supply?

11         A.    Yes.

12         Q.    So it may be that the checks to

13    Donald Woodson in the amount of $6,750, or

14    the wire transfers, there are three of them,

15    was to pay him -- that is, Woodson -- and

16    that if that were true, he would get a 1099?

17         A.    Yes.

18              MR. HARDT:  Object to the form.

19              MR. HERMAN:  Let's go off the

20         record for just a minute.

21              THE VIDEOGRAPHER:  Off the

22         record at 3:41 p.m.

23              (Recess taken, 3:41 p.m. to

24         4:02 p.m.)

Samuel G. Porter

1          THE VIDEOGRAPHER:  Back on the

2     record at 4:02 p.m.

3          (Whereupon, Deposition Exhibit

4     PSC-VPB-99, 12/2/05 Porter Fax to

5     Towler/Edney, Subject: FINAL FINAL

6     FINAL Amendments to Letter of

7     Credit!!!, V000382 - V000391, was

8     marked for identification.)

9  BY MR. HERMAN:

10      Q.    I'm going to show you

11 Exhibit 99, Bates numbers V382 to 391, and

12 ask you if these are documents, business

13 documents of Venture Supply, kept in the

14 regular and ordinary course of your business.

15      A.    Yes.

16      Q.    Do they relate to the

17 transaction by which Venture Supply purchased

18 drywall from Taishan?

19      A.    Yes.

20      Q.    And among these documents are

21 information regarding the letter of credit,

22 the contract for 100,000 sheets of drywall,

23 and notes in connection with that exhibit,

24 correct?

Samuel G. Porter

Page 215

```
 1        A.     Yes.
 2               MR. HARDT:   Documents speak for
 3        themselves.
 4               (Whereupon, Deposition Exhibit
 5        PSC-VPB-100, 12/17/05 Perry E-mail to
 6        Porter, Subject: Finalizing 1st
 7        shipment at factory, V002346 -
 8        V002347, was marked for
 9        identification.)
10   BY MR. HERMAN:
11        Q.     I'm going to show you
12   Exhibit 100, Bates numbers 2346, 2347, if
13   you'll take a look at that.  Dated
14   December 17th, 2005, addressed to you,
15   correct?
16        A.     Yes.
17        Q.     Is this document kept in the
18   regular and ordinary course of business of
19   Venture Supply?
20        A.     Yes.
21        Q.     Does it relate to purchase
22   orders for the next 100,000 gypsum boards
23   from Taishan and relate to a letter of
24   credit?
```

Samuel G. Porter

1       A.      Yes.

2               (Whereupon, Deposition Exhibit

3       PSC-VPB-101, 12/19/05 Perry

4       Handwritten Fax to Porter,

5       w/Attachments, V001854 - V001858, was

6       marked for identification.)

7    BY MR. HERMAN:

8       Q.      Exhibit 101 is Bates number

9    V1854, 1854 through 1858.

10              These documents were kept by

11   you in the regular course of business -- in

12   the regular course of business of Venture

13   Supply, and include written authorization for

14   Phillip Perry, requested by the general

15   manager of Taihe; the SK Shipping

16   Company, Ltd. bill of lading of 2,000 pallets

17   to Venture Supply, Inc.; your approval of the

18   signature of Phillip Perry on future

19   documents; and looks like a duplicate copy of

20   SK's bill of lading?

21      A.      Yes.

22      Q.      And these are documents kept in

23   the regular and ordinary course of business

24   by Venture Supply; is that correct?

Samuel G. Porter

1       A.      Yes, sir.

2       Q.      And they all relate directly to

3  the transaction by which Venture Supply

4  purchased gypsum drywall from Taishan,

5  correct?

6       A.      Yes.

7             (Whereupon, Deposition Exhibit

8             PSC-VPB-102, 12/13/05 Shandong Taihe

9             Dongxin Invoice and Packing List to

10            Venture Supply, V001864 - V001865, was

11            marked for identification.)

12  BY MR. HERMAN:

13       Q.      I'll show you Exhibit 102.  I'm

14  going to show you Exhibit 102.  It bears

15  Bates stamps V1864, 65, 66 and 67 -- strike

16  that.

17             I'm going to show you

18  Exhibit 102.  It has Bates numbers V1864 and

19  1865.

20             MR. HARDT:  Just the first two

21            sheets?  Thanks.

22  BY MR. HERMAN:

23       Q.      It's a commercial invoice dated

24  December 13th, 2005, for 100,000 sheets of

1    drywall in connection with Venture Supply's

2    purchase from Taishan; is that correct?

3         A.    Yes.

4         Q.    Kept by you in the ordinary

5    course of business and in connection with the

6    transaction with Taishan, correct?

7         A.    That's correct.

8                (Whereupon, Deposition Exhibit

9         PSC-VPB-102A, 12/2/05 Clem Fax to

10        Porter, V001866 - V001868, was marked

11        for identification.)

12   BY MR. HERMAN:

13        Q.    Okay.  I show you Exhibit --

14              MR. HARDT:  103, I think.

15   BY MR. HERMAN:

16        Q.    -- 102A.  It's two pages

17   bearing Bates numbers V1866, 1867, consisting

18   of the final amendments to the letter of

19   credit in connection with your purchase of a

20   hundred sheets of drywall from Taishan.

21              MR. HARDT:  Objection.  The

22        document speaks for itself.

23        A.    Yes.

24   BY MR. HERMAN:

1       Q.     The document is kept in the

2    usual and ordinary course of the business of

3    Venture Supply, Inc. in connection with the

4    transaction of the purchase from Taishan of

5    Chinese drywall?

6       A.     Yes.

7              THE WITNESS:  Is that right?

8              MR. HARDT:  Do you want a

9         sticker on it, or do you just --

10             MR. HERMAN:  Yeah.  Put a

11        sticker on this one.

12             MR. LONGER:  I'll create one.

13             MR. HARDT:  It's 102A.  Yeah.

14             (Whereupon, Deposition Exhibit

15        PSC-VPB-111, Discharge Schedule for

16        SK Shipping, V001368 - V001369, was

17        marked for identification.)

18   BY MR. HERMAN:

19       Q.     I'm going to show you

20   Exhibit VP -- I'm sorry.  I'm going to show

21   you Exhibit 111, Bates number V1368, V1369.

22   We'll take our time with this exhibit.

23             SK Shipping was a shipping

24   company that Tobin contacted in connection

Samuel G. Porter

Page 220

```
 1    with cargo vessels available to transport
 2    various cargos to the United States; is that
 3    correct?
 4         A.    Yes.
 5         Q.    If you look in the second
 6    column, it says M/V G-L-Y-K-O-F-I-L-O --
 7    strike that -- G-Y-K-O-F-I-L-O-U-S-S-A,
 8    GLYKOFILOUSSA, and it says that that cargo
 9    was going to be plywood, steel and gypsum
10    board.  Do you see that?
11         A.    Yes.
12         Q.    Actually, that was the vessel
13    upon which your plywood was shipped, correct?
14         A.    Drywall.
15         Q.    I'm sorry, your drywall.
16               MR. HERMAN:  I'm very tired.
17               THE WITNESS:  I understand.
18               MR. HARDT:  That's okay.
19               THE WITNESS:  I kind of wish it
20         was plywood, but yes.
21               MR. HERMAN:  And I'll ask it
22         again.
23    BY MR. HERMAN:
24         Q.    On Exhibit 111, it indicates
```

Samuel G. Porter

1    that the GLYKOFILOUSSA was the vessel that

2    was contracted to ship your gypsum board that

3    Venture purchased from Taishan, correct?

4         A.    That's correct.

5         Q.    And it shows that it would make

6    port in Norfolk, if you turn to the second

7    page --

8              (Telephonic interruption.)

9              MR. HARDT:  Does that mean

10        nobody's listening?

11             MR. HERMAN:  Hello?

12             COUNSEL ON PHONE:  We're here.

13        We just haven't talked.

14             MR. HERMAN:  Oh.  Okay.

15             MR. HARDT:  They were going to

16        cut you off.  We should have just let

17        them.

18   BY MR. HERMAN:

19        Q.    I'm at the second page of

20   Exhibit 111, Bates number V1369.  And the

21   GLYKOFILOUSSA was the -- the M/V, motor

22   vessel, that transported the gypsum board

23   that you purchased from Taishan in China to

24   Norfolk, Virginia, and it was scheduled to

Samuel G. Porter

1    arrive on February 10th to 13th; is that

2    correct?

3         A.    Yes.

4         Q.    That would have been 2006?

5         A.    Yes.

6         Q.    Is this the first shipment?

7         A.    Yes.

8         Q.    And this is a document kept in

9    the regular and ordinary course of your

10   business, correct?

11        A.    Yes.

12             (Whereupon, Deposition Exhibit

13        PSC-VPB-103, 12/13/05 Shandong Taihe

14        Dongxin Packing List and Bill of

15        Lading to Venture Supply, V000320 -

16        V000323, was marked for

17        identification.)

18   BY MR. HERMAN:

19        Q.    I'm going to show you

20   Exhibit 103, and I hand a copy to your

21   counsel and other attorneys present.

22   Identify it as Bates numbers V320, 321, 322,

23   323, and it says "Packing List, Original,"

24   dated December 13th, 2005.

Samuel G. Porter

```
 1        A.     Yes.

 2        Q.     And this was in connection with

 3   the packing of 100,000 sheets of drywall from

 4   Taishan on 2,000 pallets, and it also

 5   attaches the original bill of lading,

 6   correct?

 7        A.     Yes.

 8               MR. HARDT:  The document speaks

 9        for itself.

10   BY MR. HERMAN:

11        Q.     A copy of the original bill of

12   lading.

13               And this is a record kept in

14   the ordinary course of your business at

15   Venture Supply and relates directly to the

16   packaging and shipping of Chinese drywall

17   from Taishan to Venture Supply, correct?

18        A.     That's correct.

19               (Whereupon, Deposition Exhibit

20        PSC-VPB-104, 12/16/05 Contract Between

21        Shandong Taihe Dongxin and Venture

22        Supply, V001861 - V001863, was marked

23        for identification.)

24   BY MR. HERMAN:
```

Samuel G. Porter

1        Q.        I show you Exhibit 104.  All

2    right.  Exhibit 104 is a contract dated the

3    16th of December, 2005 in Taihe, China.  The

4    seller is Shandong Taihe Dongxin, and the

5    buyer is Venture Supply, Inc.  It's

6    identified with Bates number V1861, 1862 and

7    1863.

8                  And was this for the first

9    purchase of drywall from Taishan or for the

10   second, if you recall?

11       A.        I believe it was going to be

12   for the second one.

13       Q.        Okay.

14       A.        But it was just a preliminary.

15       Q.        It was a preliminary contract?

16       A.        Yes.

17       Q.        And at the bottom of this

18   exhibit is your signature, and under it, it

19   says "President, Samuel G. Porter," correct?

20       A.        Yes.

21       Q.        And this is a document kept in

22   the ordinary course of your business in

23   connection with the purchase of Chinese

24   drywall from Taishan in China, correct?

Samuel G. Porter

```
 1        A.     Yes.
 2               (Whereupon, Deposition Exhibit
 3        PSC-VPB-105, 11/17/05 Contract Between
 4        Shandong Taihe Dongxin and Venture
 5        Supply, V002531 - V002532, was marked
 6        for identification.)
 7   BY MR. HERMAN:
 8        Q.     I'm going to show you another
 9   contract, Exhibit 105, Bates numbers V2531
10   through 2532.  This is a contract dated
11   November 17th, 2005, from Tai'an, China.  The
12   seller is Shandong Taihe Dongxin Supply, Ltd.
13   to the buyer, Venture Supply, Inc.?
14        A.     That's correct.
15        Q.     And this contract was a
16   contract in connection with the first
17   purchase; is that correct?
18        A.     Yeah, but it was a preliminary
19   for the first shipment.
20        Q.     It was preliminary for the
21   first shipment.  And one of the ways we know
22   that is originally there was a quantity of
23   120,000 sheets of drywall, which became
24   100,000 sheets, actually --
```

Samuel G. Porter

1          A.      That's correct.

2          Q.      -- correct?

3                  And this is kept by you in the

4     ordinary course of business in connection

5     with Venture Supply's purchase of Chinese

6     drywall from Taishan, correct?

7          A.      Yes.

8                  (Whereupon, Deposition Exhibit

9          PSC-VPB-106, 1/23/06 RBC Centura Fax

10         to Porter, V000315 - V000316, was

11         marked for identification.)

12    BY MR. HERMAN:

13         Q.      I'm going to show you

14    Exhibit 106, Bates number V315, 316.

15    Exhibit 106 is dated January 23rd, 2006, and

16    it says "Ventura Supply, Inc."; that's a

17    clerical error.  Carbon copy Vernon Towler at

18    RBCC, and it's from RBC Centura.

19                 That's a bank, correct?

20         A.      Yes.

21         Q.      And Monika Kaldre, K-A-L-D-R-E,

22    is the authorized person from the bank to

23    execute this letter of credit in the amount

24    of USD $229,120, correct?

Samuel G. Porter

1           MR. HARDT:  Object to the form.

2      A.    Yes.

3 BY MR. HERMAN:

4      Q.    And the -- attached to it is a

5 commercial invoice of December 13th, 2005,

6 for 100,000 sheets of Chinese drywall in

7 connection with your purchase from Taishan

8 for Venture Supply, correct?

9      A.    That's correct.

10      Q.    And these documents in

11 Exhibit 106 were kept in the ordinary course

12 of business of Venture Supply and form part

13 of the original transaction with Taishan,

14 correct?

15      A.    Yep, that's correct.

16           (Whereupon, Deposition Exhibit

17      PSC-VPB-107, 2/3/06 Schools E-mail to

18      Ford, et al., Subject: GLYKOFILOUSSA

19      pre-discharge meeting, V001370, was

20      marked for identification.)

21 BY MR. HERMAN:

22      Q.    I show you Exhibit 107,

23 identified as V1370.  V1370 is the Bates

24 number.  There you are, Mr. Porter.

Samuel G. Porter

Page 228

```
 1        A.      Thank you.

 2        Q.      You had mentioned earlier John

 3   Schools or Schools, S-C-H-O-O-L-S.  You

 4   hadn't mentioned him by name, but you had

 5   mentioned Lamberts Point Docks, Inc.,

 6   correct?

 7        A.      Yes.

 8        Q.      And originally, the drywall was

 9   to have been unloaded off the ship that was

10   carrying the drywall from China to Norfolk at

11   Lamberts Point Docks, correct?

12        A.      Yes.

13        Q.      And you explained that the

14   draft of the ship as loaded -- that the port

15   itself wasn't deep enough to accommodate the

16   ship, correct?

17        A.      That's correct.

18        Q.      And if we look at this, the

19   ship is confirmed as the GLYKOFILOUSSA

20   G-L-Y-K-O-F-I-L-L-O-U-S-A, and I believe it's

21   missing an "A" in the spelling, but it is the

22   same ship that we looked at before in the

23   prior document.

24        A.      Yes.
```

Samuel G. Porter

1          Q.      And this was a document that

2     you kept in the ordinary course of your

3     business and was related to the actual

4     shipment and discharge of the Chinese drywall

5     which Venture Supply had purchased from

6     Taishan, correct?

7          A.      That's correct, yes.

8          Q.      And it refers to reviewing the

9     sheetrock operation?

10         A.      That's correct.

11                 MR. HARDT:   Objection, the

12             document speaks for itself.

13                 (Whereupon, Deposition Exhibit

14             PSC-VPB-108, 2/4/06 & 2/5/06 Shandong

15             Taihe Dongxin Commercial Invoices to

16             Venture Supply, V001409 - V001411, was

17             marked for identification.)

18    BY MR. HERMAN:

19         Q.      I'm going to show you

20    Exhibit 108, which consists of Bates numbers

21    V1409 through 1411, titled "Shandong Taihe

22    Dongxin Company, Ltd., Commercial Invoice,

23    4 February, 2006," 100,000 sheets of gypsum

24    board.

1          MR. HARDT:  Can I see a copy?

2      Thanks.

3  BY MR. HERMAN:

4      Q.      Now, the first page of the

5  exhibit at Bates 1409 relates to gypsum

6  board, and it shows the total price or total

7  value; then it shows the deposit, which you

8  had advanced; and it shows the remaining

9  amount due, correct?

10     A.      That's correct.

11     Q.      And if we turn to the second

12 page, these are the plywood pallets for the

13 gypsum board and the cost, correct?

14     A.      That's correct.

15     Q.      And the third page is a fax to

16 you of these documents, correct?

17     A.      Yes.

18     Q.      As I understand it, originally

19 Taishan wanted to ship the gypsum board on

20 gypsum pallets, but you specified plywood

21 pallets?

22     A.      That's correct.

23     Q.      And this exhibit is -- was made

24 and kept in the ordinary course of your

Samuel G. Porter

Page 231

1    business and directly relates to the shipment

2    of Taishan drywall to Venture Supply,

3    correct?

4          A.     That's correct.

5                 MR. HERMAN:  For the record,

6          Exhibit 108 also has elsewhere been

7          produced under Bates numbers V250, 251

8          and 252.

9                 (Whereupon, Deposition Exhibit

10         PSC-VPB-114, E-mail Chain Ending

11         2/19/06 Woods E-mail to Porter,

12         Subject: LOC sample, w/Handwritten

13         Interlineations, V002820 - V002821,

14         was marked for identification.)

15   BY MR. HERMAN:

16         Q.     I'm going to show you

17   Exhibit 114, consisting of Bates numbers

18   V2820, 2821.  This is dated February 19th,

19   2006.

20         A.     Yes.

21         Q.     And this relates directly to

22   the letter of credit in connection with the

23   purchase from Taishan by Venture Supply of

24   Chinese drywall, correct?

Samuel G. Porter

1        A.      Yes.

2        Q.      And in handwriting -- whose

3   handwriting is this, do you know?

4        A.      That's mine.

5        Q.      It looks like you paid for 1500

6   pallets, but you only needed 1,064; is that

7   correct?

8        A.      Yes.

9        Q.      It also makes reference, in

10  your handwriting, to Lamberts Point Dock,

11  correct?

12       A.      Yes.

13       Q.      And turn to the second page,

14  V2821.  It says here from Frank -- that would

15  be the Chinese employee of Taishan, correct?

16       A.      Yes.

17       Q.      And he says, "By the way, we

18  have got the test report which was done

19  according to ASTM C-1396 and C-36."

20               Do you see that?

21       A.      Yes.

22       Q.      But the report that you got

23  actually was in Chinese, correct?

24               MR. HARDT:  Not the ASTM

Samuel G. Porter

Page 233

1          report.

2          A.      I thought it was in both.

3     BY MR. HERMAN:

4          Q.      Well, can you show me where

5     that is, because that --

6                  MR. HARDT:  We have produced

7          that with our second supplemental

8          submission and the profile forms on

9          Venture Supply.  The ASTM documents

10         were produced there.

11                 MR. HERMAN:  We haven't seen

12         those.

13                 MR. HARDT:  We -- we filed a

14         second supplement.

15                 MR. HERMAN:  In English?

16                 MR. HARDT:  We filed a second

17         supplemental submission form for

18         Venture Supply, and we attached the

19         ASTM documents that this is referring

20         to.

21                 MR. HERMAN:  In English?

22                 MR. HARDT:  I believe so.  But

23         I produced them a while back.  We sent

24         it off as soon as we found it.  And we

Samuel G. Porter

1          also produced it in Nguyen, I think.

2     BY MR. HERMAN:

3          Q.     Who did these tests?

4          A.     I'm not sure.

5                 THE WITNESS:   I think that was

6          the package that I got, the DHL

7          package that I sent to you.

8                 MR. HARDT:  Right.  Right.  And

9          that's when we produced it.

10                THE WITNESS:   I had got it from

11         Phil Perry.

12                MR. HARDT:  He got it like

13         February 9th, before the shipment came

14         in.  That's the date on it.

15                MR. HERMAN:   That's not my

16         question.

17    BY MR. HERMAN:

18         Q.     Who actually did the testing?

19    Frank?

20         A.     That, I don't know.  It may be

21    in the document.  But at this point, I don't

22    know.

23         Q.     Okay.  This document was

24    received by you in the ordinary course of

Samuel G. Porter

1    your business?

2           A.     Yes, sir.

3           Q.     And it relates to the purchase

4    of Chinese drywall manufactured by Taishan

5    and purchased by Venture Supply, correct?

6           A.     Yes.

7                  (Whereupon, Deposition Exhibit

8           PSC-VPB-115, 3/8/06 Perry E-mail to

9           Lei, Subject: Shipping for gypsum

10          board, V002803 - V002804, was marked

11          for identification.)

12   BY MR. HERMAN:

13          Q.     I am going to show you

14   Exhibit 115, which is V2803 and 2804.  This

15   is dated March 8th, 2006; is that correct?

16          A.     Yes, sir.

17          Q.     And it is from Mr. Perry of

18   Tobin to you at Venture Supply?

19          A.     Yeah.

20          Q.     And it relates directly to --

21                 MR. HARDT:  Well, object.  The

22          document speaks for itself.  It's to

23          waterfront Beijing, but it's cc'd to

24          Porter-Blaine.

Samuel G. Porter

1    BY MR. HERMAN:

2         Q.    Yes, it shows a carbon copy to

3    you at Venture Supply --

4         A.    Uh-huh.  Right.

5         Q.    -- is that correct?

6         A.    Yes.

7         Q.    And it relates to the actual

8    shipping of the drywall which you purchased

9    from -- which Venture Supply purchased from

10   Taishan and requiring a delivery to Lamberts

11   Point Docks in Norfolk, Virginia, correct?

12        A.    Yes, I think this was just an

13   inquiry about shipping.

14        Q.    And is this a document kept in

15   the regular and ordinary course of your

16   business?

17        A.    Yes.

18        Q.    And it relates directly to your

19   purchase of Chinese drywall from Taishan --

20        A.    Yes.

21        Q.    -- for Venture Supply, correct?

22        A.    Yes.

23              (Whereupon, Deposition Exhibit

24        PSC-VPB-116, E-mail Chain Ending

Samuel G. Porter

1           3/31/06 Woods E-mail to Porter,

2           Subject: TT for Expences, V001663 -

3           V001664, was marked for

4           identification.}

5    BY MR. HERMAN:

6           Q.     I'm going to show you

7    Exhibit 116.  Exhibit 116 is Bates

8    number 1663, 1664, and I'm going to hand a

9    copy of that exhibit to counsel.

10                Now, on March 31st, 2006, Don

11   Woods sends an e-mail to Porter-Blaine, which

12   is you, correct?

13          A.     Yes.

14          Q.     And a copy to Jessica

15   Richardelli and Leslie Waddell.  And they

16   were employees that sometimes worked for

17   Venture Supply and sometimes for

18   Porter-Blaine --

19          A.     That's correct.

20          Q.     -- correct?

21                And I had asked you before, and

22   I just want to clarify it.  It says on

23   page 1663, quote, "Okay, Sam.  Here's the

24   bill for the plywood and the pallets for the

Samuel G. Porter

1    second 100,000 pieces destined for Mobile.

2    Expect, also, a TT invoice for slings for the

3    Mobile shipment."

4              And how did the Mobile shipment

5    ever enter into this Chinese drywall that was

6    purchased from Taishan?

7         A.    Well, this -- if I'm not

8    mistaken, this was a ship that we were going

9    to get the material on.  It was -- the

10   material hadn't all been produced.  This was

11   going to be for the second shipment that

12   ended up coming through Camden, not through

13   Mobile.  So this basically had fallen

14   through.

15        Q.    So there was nothing sent to

16   Mobile from Taishan in connection with a

17   purchase by Venture Supply, correct?

18        A.    Yes, that's correct.  That's

19   correct.

20        Q.    And this is a document kept in

21   the ordinary course of your business and

22   relates to an event of drywall that was never

23   delivered to Mobile?

24        A.    That's correct.

Samuel G. Porter

1              (Whereupon, Deposition Exhibit

2         PSC-VPB-117, Porter Handwritten Note,

3         "Boat Board 2nd ship, May 15 Load to

4         Norfolk," V001407, was marked for

5         identification.)

6    BY MR. HERMAN:

7         Q.     I'm going to show you

8    Exhibit 1407 -- strike that.

9              I'm going to show you

10   Exhibit 117, and it is Bates-numbered V1407.

11   Do you know whose handwriting this is?

12        A.     It's mine.

13        Q.     And this is in connection with

14   the second shipment?

15        A.     Yes.

16        Q.     It's dated -- would you read it

17   for me at the top?  I think it says "May"

18   something?

19        A.     "May 15th, load to Norfolk."

20        Q.     All right.  Now, the second

21   shipment, the total cost, was that to be

22   one million -- $1,114,354, $1,114,354.

23        A.     That was the basic cost.  There

24   would have been some additional cost with

Samuel G. Porter

1    that.

2         Q.    And I see a total cost per

3    board of $11.75?

4         A.    Yes.

5         Q.    And was this based upon 100,000

6    sheets of drywall or based upon the 53,000 or

7    so sheets of drywall that you actually

8    received?

9         A.    This was based on the 100,000

10   sheets; but when I did the calculations based

11   on the 56 or 59,000 that was produced, the

12   cost was the same, because it was

13   proportional.

14        Q.    Okay.  Now -- so it cost you

15   for the second shipment -- that is, cost

16   Venture Supply, about $11.75 per board,

17   correct?

18        A.    Yeah.  There was -- it was a

19   little bit more than that, though, I'm sure,

20   but yes.

21        Q.    Approximately in that range?

22        A.    Yeah.

23        Q.    And what was it sold for?

24        A.    Anywhere from $12 to 13.50, $14

1    at the most.

2         Q.    Anywhere from 12 to $14?

3         A.    (Nods head.)

4         Q.    Per board?

5         A.    Yes, depending on the price

6    levels we had talked about earlier.

7         Q.    Now, I'll show you -- and this

8    is a document that you actually prepared

9    yourself in the ordinary course of your

10   business, correct?

11        A.    Yes.

12              (Whereupon, Deposition Exhibit

13        PSC-VPB-118, Porter Handwritten Note,

14        "China Board Deal II," V001644, was

15        marked for identification.)

16   BY MR. HERMAN:

17        Q.    Okay.  I'm going to show you

18   Exhibit 118.  At the top, it says "China

19   Board Deal II."

20              MR. BRENNER:  What's the Bates

21        number?

22              MR. HARDT:  It's V1644.

23   BY MR. HERMAN:

24        Q.    Exhibit 118 is marked Bates

Samuel G. Porter

1    number V1644.  Do you know whose handwriting

2    this is?

3         A.    That's mine.

4         Q.    And this, again, was a

5    computation by you of the total price less

6    the deposits on the China board sold to

7    Venture Supply.  That's the second shipment?

8         A.    Yeah, I believe this was my

9    original starting, and then I redid the

10   calculations according to some additional

11   charges.

12        Q.    Okay.  So Exhibit 118 was done

13   before Exhibit 117?

14        A.    Yes.

15        Q.    And, as I understand it, the

16   letter of credit was going to expire,

17   correct?

18        A.    Yes.

19        Q.    And you gave some specific

20   directions to your bank to have that letter

21   of credit shown to have expired?

22        A.    Yes.

23             (Whereupon, Deposition Exhibit

24        PSC-VPB-119, 4/10/06 RBC Centura Fax

Samuel G. Porter

1                to Towler, V001596, was marked for

2                identification.)

3    BY MR. HERMAN:

4         Q.     I'm going to show you

5    Exhibit 119, which is Bates-numbered V1596,

6    and it's a fax.  And it's stamped at the

7    back -- on the top, rather, "April 10th,

8    2006, Centura Lending," and "April 4th, 2006,

9    Centura."  Tell us what this is.

10               (Whereupon, Deposition Exhibit

11               PSC-VPB-120, 4/10/06 Edney Fax Cover

12               Sheet to Stein, Subject: Venture L/C

13               Modification, V001597, was marked for

14               identification.)

15   BY MR. HERMAN:

16        Q.     And I'm going to also show you

17   in connection with that Exhibit 120, which is

18   stamped, Bates-stamped V1597, which may help

19   explain what the document is.

20        A.     It's a modification to the

21   letter of credit.

22        Q.     Okay.  Those documents are kept

23   in the regular and ordinary course of your

24   business, and were in purchase of Venture

Samuel G. Porter

```
 1   Supply --

 2          A.     Yes.

 3          Q.     -- drywall from Taishan?

 4          A.     Yes.

 5                 (Whereupon, Deposition Exhibit

 6          PSC-VPB-121, 4/10/06 Edney Fax to

 7          Stein, Subject: Venture L/C

 8          Modification, w/Attachment, V000719 -

 9          V000727, was marked for

10          identification.)

11   BY MR. HERMAN:

12          Q.     Now, as you can see, some of

13   these documents have been produced a couple

14   of times with a couple of different numbers,

15   so I'm going to show you Exhibit 121, which

16   is V719, 720, 721, 722, 723, 724, 725, 726

17   and 727, and I'll ask you if Exhibit 121 is

18   the information on the second purchase of

19   drywall and the letter of credit.

20                 You'll have to look at each one

21   of those pages in order to answer the

22   question.  I'll repeat the question after

23   you've had a chance to look at it.

24                 (Witness reviews document.)
```

Samuel G. Porter

1    BY MR. HERMAN:

2         Q.    If I might, it may help you if

3    you look at page 723 through page 727 and see

4    if that is not the letter of credit issued on

5    March 16th, 2006, and signed by you for

6    Venture Supply.

7         A.    Yes.  But the exhibit you gave

8    me, 120, is different.

9         Q.    Okay.  Would you explain that?

10   In other words, we're looking at -- I handed

11   you Exhibit 121, which begins with Bates

12   number 719.  Previously, I gave you

13   Exhibit 119, and that's Bates number V1596;

14   and then Exhibit 120 was V1597.

15        A.    Yeah, it looks like the amounts

16   of the transfer are different on 119 and 121.

17   That's --

18        Q.    Okay.

19        A.    -- what I see.

20        Q.    And can you explain the

21   difference?

22        A.    I believe one is the deposit,

23   the 30% down; and I believe the other one was

24   the difference once the contract was amended

Samuel G. Porter

1    from 100,000 sheets down to 59 -- 50,000.

2         Q.    Okay.  Let's start with

3    Exhibit 119.  What does Exhibit 119 show?

4              MR. HARDT:  Which is 119 and

5         120, right?  Because 120 is the fax

6         cover sheet?

7              MR. HERMAN:  Yes.

8              MR. HARDT:  Right.

9         A.    It looks like a wire transfer.

10   119 looks like a wire transfer for the amount

11   of $193,768.80.

12   BY MR. HERMAN:

13        Q.    And from whom was the wire

14   transfer, and to whom?

15        A.    It was transferred to -- it

16   looks to me like Agricultural Bank of China.

17        Q.    Was that the bank that Taishan

18   was using?

19        A.    Yes, Shandong.

20        Q.    Now, look at the other one for

21   the amount.

22        A.    Okay.  The amount here is -- it

23   looks to me like $253,490.

24        Q.    Okay.  If you took the amount

Samuel G. Porter

1    in Exhibit 119 and the amount in Exhibit 121,

2    would that equal the total purchase by

3    Venture Supply of drywall from Taishan?

4              MR. HARDT:  Object to the form.

5    BY MR. HERMAN:

6         Q.    Second, second purchase?

7              MR. HARDT:  The purchase or the

8         letter of credits?

9              MR. HERMAN:  (Nods head.)

10        A.    Okay.  You got --

11   BY MR. HERMAN:

12        Q.    If you can't answer, it's okay.

13        A.    Well, it's confusing.

14        Q.    Yes, it is confusing, and I

15   agree with you, and that's why I was asking

16   the questions.

17        A.    Okay.  Let me see if I have

18   this correctly.  Exhibit 121 is the letter of

19   credit that was done for the second shipment

20   of board from Taishan, and Exhibit 119 and

21   120 was the actual wire confirmation.

22        Q.    I believe that's correct.

23        A.    Okay.

24        Q.    That's what it looks like to

Samuel G. Porter

1    me.

2         A.    Okay.   That's what I see.

3         Q.    Okay.   Thank you very much for

4    helping with that.

5              And these were documents

6    maintained by Venture Supply, Inc. in the

7    regular course of their business and in

8    connection with the purchase of drywall from

9    Taishan, correct?

10        A.    Yes, sir.

11             (Telephonic interruption.)

12             (Whereupon, Deposition Exhibit

13        PSC-VPB-127, E-mail Chain Ending

14        6/2/06 Perry E-mail to Paras,

15        Subject: Break bulk from China,

16        V001416, was marked for

17        identification.)

18   BY MR. HERMAN:

19        Q.    I'm going to show you

20   Exhibit V -- strike that.

21             I'm going to show you

22   Exhibit 127, Bates number V1416.  It's from

23   Phillip Perry to Chris, P-A-R-A-S, at

24   ThePenrodCompany.com with a copy to you,

Samuel G. Porter

1    correct?

2         A.    Yes.

3         Q.    Who or what is the Penrod

4    Company?

5         A.    The Penrod Company is a large

6    importer of wood.  I believe they're all

7    around the country.  I met Chris through an

8    associate, and Chris brings a lot of ships

9    in.  And he helped with getting the second

10   shipment to the port in New Jersey with his

11   shipment.

12              And Chris is -- I think he's

13   one of the owners of the Penrod Company.

14        Q.    Okay.  So this Exhibit 127 is

15   in connection with the second shipment, which

16   went to the port in New Jersey?

17        A.    That's correct.

18        Q.    And this document was kept in

19   the ordinary course of business, correct?

20        A.    Yes.

21              (Whereupon, Deposition Exhibit

22        PSC-VPB-123, E-mail Chain Ending

23        5/9/06 Richardelli E-mail to Porter,

24        Subject: Weight of pallet, V001510 -

Samuel G. Porter

```
 1          V001512, was marked for

 2          identification.)

 3   BY MR. HERMAN:

 4          Q.     I'm going to show you

 5   Exhibit 123.  I'll say that the yellow marks

 6   on it are my own.  It's identified --

 7   Exhibit 123 is further identified with the

 8   Bates numbers V1510 and 1511.  I'll hand your

 9   counsel a copy.

10               MR. HARDT:  Thank you.

11               MR. HERMAN:  You're welcome.

12   BY MR. HERMAN:

13          Q.     It's -- actually, the exhibit

14   is 1510, 1511 and 1512.  It's three pages

15   dated May 9, 2006, and it was forwarded to

16   you for Venture Supply from Ms. Richardelli

17   at Porter-Blaine.  And the e-mail forwarded

18   to you was from Phillip Perry to

19   Ms. Richardelli with a copy to Ms. Waddell.

20          A.     Okay.  That's correct.

21          Q.     Now, this document was in the

22   regular and ordinary course of your business,

23   correct?

24          A.     Yes.
```

Samuel G. Porter

Page 251

1          Q.      And it related to various

2    issues in connection with the shipping of

3    Chinese drywall to the United States,

4    correct?

5                  MR. HARDT:  Objection, document

6          speaks for itself.

7          A.      Yes.

8    BY MR. HERMAN:

9          Q.      You know whether COSCO,

10   C-O-S-C-O, is a company, a shipping company

11   owned by the Chinese government?

12         A.      That, I don't know.

13         Q.      According to this document,

14   there was a buyer from The Phoenix Company

15   out of Georgia.  Is this the company you

16   shipped to in Georgia?

17                 MR. HARDT:  Objection.

18         A.      No.

19   BY MR. HERMAN:

20         Q.      Or sold to?

21         A.      No.

22         Q.      Have you had any business with

23   The Phoenix Company?

24         A.      No.

Samuel G. Porter

1        Q.       And it makes reference to a

2   buyer by the name of Wendy Wong, W-O-N-G.   Do

3   you know who Wendy Wong is?

4        A.       No.

5        Q.       I'm going to read you a

6   sentence from this.   Quote, "She said that

7   they had three full-time Chinese industrial

8   engineers at the Taihe factory to assist in

9   the production of the board.

10              "From what I saw, they just sit

11   in the office drinking tea unless she visits

12   the factory.   She then does the QA work

13   herself and berates them and Frank for not

14   performing.

15              "They stand there looking down

16   and I imagine wishing the quote, 'American,'

17   end quote, Chinese woman would go away so

18   that they can get back to their normal

19   routine of doing as little as possible, which

20   makes the factory manager happy and willing

21   to provide them a place to drink tea and play

22   board games."

23              Did you read this when it came

24   in?

Samuel G. Porter

1        A.       I probably read it and wasn't

2    surprised that that's what they were doing.

3        Q.       Why weren't you surprised?

4        A.       I guess when the boss is away,

5    the mice will play.  I mean, that -- I don't

6    even know who she is or who their people are,

7    her industrial engineers.

8        Q.       The next sentence says, "The

9    Phoenix Company has had over 20,000 CBM of

10   gypsum board in storage at the Quingdao,

11   Q-U-I-N-G-D-A-O, port warehouse for about

12   three months, and more being made.  They have

13   other goods in storage at another port.

14            "Another outfit, the Deyon,

15   D-E-Y-O-N, Company has 26,000 CBM of gypsum

16   board sitting outside in the Quingdao port

17   and exposed to the weather."

18            Further down it says that,

19   quote, "Our gypsum board is being held in the

20   factory warehouse in the dry environment, and

21   the size of our order of 100,000 pieces is

22   only 6,000 CBM by comparison.  There's gypsum

23   board from other companies here and at other

24   ports.  They are all in the same fix as us,

Samuel G. Porter

Page 254

1    or worse.

2              "The Phoenix purchasing agent

3    is very nervous and has shipped some board by

4    container in desperation.  They are now

5    trying to charter a boat, and I was asked

6    this evening if we would like to share that

7    boat.  The only questions are if there will

8    be space for our cargo and if the ship will

9    go to Norfolk.

10             "The Phoenix board is to be

11   delivered to NOLA.  I should know by tomorrow

12   what they intend to do."

13             Did I read that correctly?

14        A.    Yes.

15        Q.    Did you ever talk to either

16   Phil Perry or Don Woodson -- Don Woods about

17   other Taishan or Chinese drywall being

18   delivered to NOLA?

19        A.    Not for Venture Supply, no.

20        Q.    No, I -- aside from Venture

21   Supply, you've got this e-mail.  Did you make

22   any inquiry as to, perhaps, sharing space

23   with Phoenix on a vessel that would deliver

24   Taishan gypsum drywall to New Orleans, or

Samuel G. Porter

Page 255

1    NOLA, and also then deliver your drywall to

2    Norfolk?

3         A.    Yeah, that's what Phil was

4    trying to do.  He was trying to get space on

5    a ship, no matter where it was, and try to

6    get it from -- let's say he could -- for

7    example, if he could have made a deal with

8    the shipper here, the board would have went

9    into New Orleans, then we probably would have

10   trucked it or railed it to Norfolk, just like

11   we did in the second shipment that went to

12   New Jersey and we had to rail it this way,

13   because that was the only ship that I could

14   get.

15        Q.    And this was an e-mail in the

16   regular and ordinary course of your business

17   and related directly to the purchase by

18   Venture Supply of drywall from Taishan and

19   the ability to get it shipped to Venture

20   Supply, correct?

21        A.    That's correct.

22              (Interruption off the record.)

23              MR. HARDT:  Can we go off the

24        record for a second?

Samuel G. Porter

1              MR. HERMAN:  Sure.

2              THE VIDEOGRAPHER:  Off the

3        record at 5:03 p.m.

4              (Discussion off the record.)

5              THE VIDEOGRAPHER:  Please stand

6        by.  Back on the record at 5:05 p.m.

7              MR. HERMAN:  By agreement of

8        counsel present, we're going to recess

9        at 10 after 5:00 Eastern Standard Time

10       and resume in the morning at 9:00 a.m.

11       Eastern Standard Time and hopefully be

12       in a position to conclude by

13       1:00 o'clock p.m. Thursday at Eastern

14       Standard Time.

15             MR. HARDT:  That's fine.

16             THE VIDEOGRAPHER:  Off the

17       record at 5:06 p.m.  This is the end

18       of Tape No. 4.

19             (Deposition recessed at 5:06 p.m.)

20               - - - - - - -

21

22

23

24

Samuel G. Porter

Page 257

1                        CERTIFICATE

2

3            I, MICHAEL E. MILLER, Certified
    Court Reporter, Registered Diplomate Reporter
4   and Certified Realtime Reporter, do hereby
    certify that prior to the commencement of the
5   examination, SAMUEL G. PORTER was duly sworn
    by me to testify to the truth, the whole
6   truth and nothing but the truth.

7            I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
8   testimony as taken stenographically by and
    before me at the time, place and on the date
9   hereinbefore set forth, to the best of my
    ability.

10

11           I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.

14

15

16        _____
    MICHAEL E. MILLER,
17  NCRA Registered Diplomate Reporter
    NCRA Certified Realtime Reporter
18  Certified LiveNote Reporter
    LA Certified Court Reporter #27009
19
    Dated: December 21, 2009
20

21

22

23

24

Samuel G. Porter

1                  ACKNOWLEDGMENT OF DEPONENT

2

3

4              I, SAMUEL G. PORTER, do hereby
     certify that I have read the foregoing pages
5    and that the same is a correct transcription
     of the answers given by me to the questions
6    therein propounded, except for the
     corrections or changes in form or substance,
7    if any, noted in the attached
     Errata Sheet.

8

9

10

11

12    _____

      SAMUEL G. PORTER              DATE
13

14

15    Subscribed and sworn to before me this

16    _____ day of _____, 20 _____.

17    My commission expires: _____

18

19    Notary Public

20

21

22

23

24

Samuel G. Porter

```
 1                        ‥‥  ‥  ‥  ‥  ‥  ─
                            ERRATA
 2                       ─  ─  ─  ─  ─  ·  ─

 3    PAGE   LINE        CHANGE

 4    _____  _____       _____

 5    REASON:            _____

 6    _____  _____     _____

 7    REASON:            _____

 8    _____  _____       _____

 9    REASON:            _____

10    _____  _____       _____

11    REASON:            _____

12    _____  _____       _____

13    REASON:            _____

14    _____  _____   _____

15    REASON:            _____

16    _____  _____     _____

17    REASON:            _____

18    _____  _____       _____

19    REASON:            _____

20    _____  _____       _____

21    REASON:            _____

22    _____  _____       _____

23    REASON:            _____

24
```

Samuel G. Porter

```
 1                    - - - - - -
                    LAWYER'S NOTES
 2                    - - - .. - - ..

 3      PAGE    LINE

 4      ____    ____    _____

 5      ____    ____    _____

 6      ____    ____    _____

 7      ____    ____    _____

 8      ____    ____    _____

 9      ____    ____    _____

10      ____    ____    _____

11      ____    ____    _____

12      ____    ____    _____

13      ____    ____    _____

14      ____    ____    _____

15      ____    ____    _____

16      ____    ____    _____

17      ____    ____    _____

18      ____    ____    _____

19      ____    ____    _____

20      ____    ____    _____

21      ____    ____    _____

22      ____    ____    _____

23      ____    ____    _____

24      ____    ____    _____
```