Samuel G. Porter

261

U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED   2-22-10
LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                        §
CHINESE-MANUFACTURED          §   MDL NO. 2047
DRYWALL PRODUCTS              §
LIABILITY LITIGATION          §   SECTION: L
                              §
                              §   JUDGE FALLON
This document applies         §
to all cases                  §   MAG. JUDGE WILKINSON
                              §

THURSDAY, DECEMBER 17, 2009

- - -

Videotaped deposition of SAMUEL G.

PORTER, AS 30(B)(6) REPRESENTATIVE OF VENTURE

SUPPLY, INC. and PORTER-BLAINE CORP.,

VOLUME 2, held at the offices of McKenry,

Dancigers, Dawson & Lake, PC, 192 Ballard

Court, Suite 400, Virginia Beach, Virginia,

commencing at 9:03 a.m., on the above date,

before Michael E. Miller, Certified Court

Reporter, Registered Diplomate Reporter,

Certified Realtime Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Samuel G. Porter

262

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2

 3    MICHELLE GERMANO; DENNIS        §
      JACKSON; SHARON JACKSON;        §
      JASON DUNAWAY; LISA DUNAWAY;    §
 4    Individually, and on behalf     §
      of all other similarly         §
 5    situated,                      §
                                     §
 6              Plaintiffs,          §
                                     §
 7    vs.                            §    2:09cv202
                                     §
 8    TAISHAN GYPSUM CO. LTD.        §
      f/k/a SHANDONG TAIHE DONGXIN   §
 9    CO. LTD.; VENTURE SUPPLY,      §
      INC.; HARBOR WALK              §
10    DEVELOPMENT, LLC; and THE      §
      PORTER-BLAINE CORP.,           §
11                                   §
                Defendants.          §
12

13    _____

14

15

16

17

18

19

20

21

22

23

24
```

Samuel G. Porter

263

1   A P P E A R A N C E S :

2       HERMAN, HERMAN, KATZ & COTLAR, LLP
        BY:  RUSS M. HERMAN, ESQUIRE
3            rherman@hhkc.com
        820 O'Keefe Avenue
4       New Orleans, Louisiana 70113
        (504) 581-4892
5       Counsel for Plaintiffs

6

        LEVIN, FISHBEIN, SEDRAN & BERMAN
7       BY:  FREDERICK S. LONGER, ESQUIRE
             flonger@lfsblaw.com
8       510 Walnut Street
        Suite 500
9       Philadelphia, Pennsylvania 19106
        (215) 592-1500
10      Counsel for Plaintiffs

11

        LEVIN, PAPANTONIO, THOMAS, MITCHELL,
12      ECHSNER & PROCTOR, PA
        BY:  BEN W. GORDON, JR., ESQUIRE
13           bgordon@levinlaw.com
             (via teleconference)
14      316 South Baylen Street
        Pensacola, Florida 32502-5996
15      (850) 435-7000
        Counsel for Plaintiffs

16

17      SINNOTT, NUCKOLS & LOGAN, PC
        BY:  KENNETH F. HARDT, ESQUIRE
18           khardt@snllaw.com
        13811 Village Mill Drive
19      Midlothian, Virginia 23114
        (804) 378-7600
20      Counsel for Venture Supply, Inc. and
        Porter-Blaine Corp.

21

22

23

24

Samuel G. Porter

264

1     A P P E A R A N C E S:

2         BRENNER, EVANS & MILLMAN, PC
          BY:   THEODORE I. BRENNER, ESQUIRE
3               tbrenner@beylaw.com
          411 East Franklin Street
4         Suite 200
          Richmond, Virginia 23218-0470
5         (804) 644-1300
          Counsel for Tobin Trading, Inc.
6

7         TAYLOR & WALKER, PC
          BY:   DANNIELLE C. HALL-MCIVOR, ESQUIRE
8               dhall-mcivor@taylorwalkerlaw.com
          555 Main Street
9         Suite 1300
          Norfolk, Virginia 23510
10        (757) 625-7300
          Counsel for Harbor Walk Development
11

12        ADORNO & YOSS
          BY:   KRISTAN LAKE CARDOSO, ESQUIRE
13              kcardoso@adorno.com
                (via teleconference)
14        888 S.E. 3rd Avenue
          Suite 500
15        Ft. Lauderdale, Florida 33316
          (954) 523-5885
16        Counsel for Banner Supply Co.

17

          FOWLER WHITE BURNETT, PA
18        BY:   ELIZABETH J. FERRY, ESQUIRE
                eferry@fowler-white.com
19              (via teleconference)
          Espirito Santo Plaza
20        1395 Brickell Avenue, 14th Floor
          Miami, Florida 33131
21        (305) 789-9200
          Counsel for Black Bear Gypsum, Inc.
22        and Smoky Mountain Materials, Inc.

23

24

Samuel G. Porter

265

1    A P P E A R A N C E S:

2        BAKER & McKENZIE, LLP
         BY:  DOUGLAS B. SANDERS, ESQUIRE
3             douglas.b.sanders@bakernet.com
              (via teleconference)
4        One Prudential Plaza, Suite 3500
         130 East Randolph Drive
5        Chicago, Illinois 60601
         (312) 861-8000
6        Counsel for Knauf Plasterboard
         (Tianjin) Co., Ltd.

7

8        HUNTON & WILLIAMS, LLP
         BY:  A. TODD BROWN, ESQUIRE
9             tbrown@hunton.com
              (via teleconference)
10       Bank of America Plaza
         101 South Tryon Street, Suite 3500
11       Charlotte, North Carolina 28280
         (704) 378-4700
12       Counsel for Stock Building Supply, LLC
         (Gross v. Knauf matter only)

13

14       GALLOWAY, JOHNSON, TOMPKINS,
         BURR & SMITH, PLC
15       BY:  LAMBERT J. HASSINGER, JR., ESQUIRE
              jhassinger@gjtbs.com
16            (via teleconference)
         One Shell Square
17       701 Poydras Street, 40th Floor
         New Orleans, Louisiana 70139
18       (504) 525-6802
         Counsel for Interior Exterior
19       Building Supply

20

21

22

23

24

Samuel G. Porter

266

1   A P P E A R A N C E S:

2   ALSO PRESENT:

3       KIRA A. LIGATO,
        McKenry, Dancigers, Dawson & Lake, PC

4
        JEFFREY S. VALLIERE, ESQUIRE
5       Allen & Gooch
        (via teleconference)

6

7   VIDEOGRAPHER:

8       MICHAEL KAUFFMANN,
        Golkow Technologies, Inc.

9

10                      - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Samuel G. Porter

267

I N D E X
SAMUEL G. PORTER - VOLUME 2
December 17, 2009

APPEARANCES                                      263

PROCEEDINGS                                      272


EXAMINATION OF SAMUEL G. PORTER:

        BY MR. HERMAN                            273


CERTIFICATE                                      394

ACKNOWLEDGMENT OF DEPONENT                       395

ERRATA                                           396

LAWYER'S NOTES                                   397

Samuel G. Porter

268

DEPOSITION EXHIBITS
SAMUEL G. PORTER - VOLUME 2
December 17, 2009

| NUMBER | DESCRIPTION | MARKED |
|--------|-------------|--------|
| PSC-VPB-129 | 6/18/06 Shandong Taihe Dongxin Packing List and Bill of Lading to Venture Supply, V00655 - V000677 | 273 |
| PSC-VPB-130 | Article, "Norfolk company took in up to 3 orders of Chinese drywall," | 276 |
| PSC-VPB-131 | E-mail Chain Ending 7/20/06 Porter E-mail to Stein, Subject: Freight to Norfolk, V0000630 | 277 |
| PSC-VPB-132 | File on Curb Appeal, 1100 Micheal Wood, V028523 - V028557 | 279 |
| PSC-VPB-125 | 5/23/06 Shandong Taihe Dongxin Fax to Porter/Perry, Subject: Gypsum Board, V001431 - V001432 | 294 |
| PSC-VPB-126 | 5/25/06 Perry E-mail to Porter, Subject: Shipment contract, V001453 - V001456 | 296 |
| PSC-VPB-161 | Venture Supply's Supplemental Defendant Profile Form | 299 |
| PSC-VPB-164 | Valuation Documents of 1145 Princess Anne Road | 305 |

Samuel G. Porter

269

1                    DEPOSITION EXHIBITS

2

3        NUMBER          DESCRIPTION        MARKED

4     PSC-VPB-163     Article, "Norfolk-based    307
                      supplier says it
5                     distributed Chinese
                      drywall,"
6
      PSC-VPB-162     7/1/03 Gypsum Today        326
7                     Industry News

8     PSC-VPB-148     E-mail Chain Ending        328
                      10/30/09 Nanavati E-mail
9                     to Serpe,
                      Subject: Exhibit 1,
10                    w/Attachment,
                      PSC-Sinnott-0002 -
11                    PSC-Sinnott-0021

12    PSC-VPB-165A    Subcontractor Backup       329
                      Documentation,
13                    EV000743 - EV001745

14    PSC-VPB-165B    Subcontractor Backup       330
                      Documentation,
15                    EV001746 - EV002656

16    PSC-VPB-165C    Subcontractor Backup       330
                      Documentation,
17                    EV002657 - EV003095

18    PSC-VPB-165D    Backup Documentation to    330
                      Exhibit PSC-VPB-148,
19                    EV000001 - EV000742
                      [To Be Supplemented By
20                    Counsel - Not Attached]

21    PSC-VPB-156     11/24/05 Rugg E-mail to    334
                      Schneider, Subject: The
22                    Drake Group - Market
                      Update,
23                    V001934

24

Samuel G. Porter

270

DEPOSITION EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|--------|-------------|--------|
| PSC-VPB-155 | 11/10/05 Perry E-mail to Clem, Subject: Distributorship, V002608 - V002609 | 345 |
| PSC-VPB-74 | 12/27/05 Li E-mail to Remont, Subject: Gypsum wallboard market in China, INT/EXT02156 | 347 |
| PSC-VPB-75 | Dun & Bradstreet Business Report for Shandong Taihe Dongxin, Co., Ltd., Lucheng Branch, V000368 - V000369 | 350 |
| PSC-VPB-76 | China Explorer Catalog Listing for Shandong Taihe Dongxin, Co., Ltd., V000372 - V000373 | 351 |
| PSC-VPB-77 | China Supplies Products & Services Directory Listing for Shandong Taihe Dongxin Stock Co., V000376 - V000379 | 352 |
| PSC-VPB-78 | Plasterboard page from Shandong Taihe Dongxin, Co., Ltd. Website, V002024 - V002025 | 354 |
| PSC-VPB-139 | Complaints to Venture, V028893 - V028877 [not consecutive] | 358 |
| PSC-VPB-166 | Porter-Blaine Corp./Venture Supply Insurance Policy, V000762 - V000796 | 372 |

Samuel G. Porter

271

1                          DEPOSITION EXHIBITS

2

3           NUMBER              DESCRIPTION            MARKED

4      PSC-VPB-167        Porter-Blaine              372
                          Corp./Venture Supply
5                         Insurance Policy,
                          V000798 - V000829
6
       PSC-VPB-168        Porter-Blaine              373
7                         Corp./Venture Supply
                          Insurance Policy,
8                         V000830 - V000882

9      PSC-VPB-169        Porter-Blaine              373
                          Corp./Venture Supply
10                        Insurance Policy,
                          V000883 - V000932
11

12     PSC-VPB-170        Porter-Blaine              373
                          Corp./Venture Supply
13                        Insurance Policy,
                          V000933 - V000940
14
       PSC-VPB-171        Porter-Blaine              373
15                        Corp./Venture Supply
                          Insurance Policy,
16                        V000941 - V000997

17     PSC-VPB-172        Porter-Blaine              373
                          Corp./Venture Supply
18                        Insurance Policy,
                          V000998 - V001053
19
       PSC-VPB-173        Porter-Blaine              374
20                        Corp./Venture Supply
                          Insurance Policy,
21                        V001054 - V001088

22     PSC-VPB-174        Porter-Blaine              374
                          Corp./Venture Supply
23                        Insurance Policy,
                          V001089 - V001141
24

Samuel G. Porter

272

```
 1              DEPOSITION EXHIBITS

 2

 3       NUMBER          DESCRIPTION        MARKED

 4    PSC-VPB-175     Porter-Blaine           374
                      Corp./Venture Supply
 5                    Insurance Policy,
                      V001142 - V001203
 6
         PSC-VPB-176     Porter-Blaine           374
 7                    Corp./Venture Supply
                      Insurance Policy,
 8                    V001204 - V001254

 9    PSC-VPB-151     Venture Supply, Inc.     381
                      Financial Report,
10                    December 31, 2005 and
                      March 31, 2005,
11                    V000601 - V000621

12    PSC-VPB-153     2009 Annual Report of   383
                      Venture Supply, Inc.,
13                    PSC-VPB-00500

14    PSC-VPB-154     Financial Backup        386
                      Documents,
15                    V000558 - V000619

16

17

18

19

20

21

22

23

24
```

Samuel G. Porter

273

```
 1                    PROCEEDINGS
 2                 (December 17, 2009 at
 3            9:03 a.m.)
 4                 THE VIDEOGRAPHER:  Please stand
 5            by.  We are on the record.  The time
 6            is 9:03 a.m.  This is the beginning of
 7            Tape No. 5.
 8                 SAMUEL G. PORTER,
 9       having been duly sworn, testified as follows:
10                    EXAMINATION
11       BY MR. HERMAN:
12            Q.    I didn't ask yesterday, but I
13       should ask:  Do you wish to read and sign
14       your deposition?
15                 MR. HARDT:  Yes.
16                 (Whereupon, Deposition Exhibit
17            PSC-VPB-129, 6/18/06 Shandong Taihe
18            Dongxin Packing List and Bill of
19            Lading to Venture Supply, V00655 -
20            V000677, was marked for
21            identification.)
22       BY MR. HERMAN:
23            Q.    You have before you
24       Exhibit 129, Bates numbers V655, 656, 657,
```

Samuel G. Porter

1    658, 659, 660, 661, 662, 663, 664, and a

2    second Bates number, 665, 666, 667, 668 and

3    677.

4              First of all, these are records

5    that were kept in the regular course of

6    business by Venture Supply?

7         A.    Yes, sir.

8         Q.    And these records reflect

9    your -- Venture's purchase of Chinese drywall

10   from Taishan in China, correct?

11        A.    Yes.

12        Q.    Now --

13             MR. HARDT:  Mr. Herman, I'm

14        sorry.  I didn't have two 665s, and it

15        jumps -- the last one jumps from 668

16        to 677.

17             MR. HERMAN:  Excuse me, which

18        one don't you have?

19             MR. HARDT:  You said you have

20        two 665s?

21             MR. HERMAN:  I have 665.

22             MR. HARDT:  Oh.  I thought you

23        said you had two 665s.

24             MR. HERMAN:  No.

Samuel G. Porter

275

1              MR. HARDT:  Oh.

2              MR. HERMAN:  I probably did,

3          but if I did --

4              MR. HARDT:  Okay.  And then at

5          the end, it jumps from 668 to 677; is

6          that right?

7              MR. HERMAN:  That's correct.

8              MR. HARDT:  Okay.  I'm sorry.

9    BY MR. HERMAN:

10         Q.     You've reviewed these records,

11    sir?

12         A.     Yes.

13         Q.     And these were your business

14    records, and they were in connection with

15    Venture Supply's purchase from Taishan of

16    53,912 sheets of Chinese drywall, correct?

17         A.     That's correct.

18         Q.     Would this -- is this what has

19    been termed the "second shipment"?

20         A.     Yes.

21         Q.     And there was no third

22    shipment, correct?

23         A.     That's correct.

24              (Whereupon, Deposition Exhibit

Samuel G. Porter

276

1       PSC-VPB-130, Article, "Norfolk company

2       took in up to 3 orders of Chinese

3       drywall," was marked for

4       identification.)

5  BY MR. HERMAN:

6       Q.    I'm going to show you a news

7  report, and we often see news reports that

8  may not be quite accurate.  It's Exhibit 130,

9  and it has no Bates number on it.  And I'm

10  going to hand it to your counsel and the

11  other attorneys that are seated around the

12  table.

13       And Mark Nanavati,

14  N-A-N-A-V-A-T-I, is one of the attorneys that

15  is representing Venture and Porter-Blaine?

16       A.    Yes.

17       Q.    You see in the third paragraph,

18  it says, "Venture initially said it imported

19  approximately 100,000 sheets of drywall in

20  December 2005, but Mark Nanavati, an attorney

21  for the company, said in an e-mail that

22  Venture accepted two additional shipments in

23  early 2006."

24       And this is just an error in

Samuel G. Porter

1   reporting?

2          A.      That's correct.

3          Q.      There were not three shipments?

4          A.      No, there wasn't.

5                  MR. HARDT:   And I will

6          stipulate that the reporter

7          misinterpreted Mr. Nanavati.

8                  MR. HERMAN:   I'm sure that

9          happened.

10                 MR. HARDT:   Yeah.

11                 MR. HERMAN:   I just want to

12         clear it up so that as we go forward,

13         there isn't any concern regarding how

14         many shipments there were.

15                 MR. HARDT:   Which exhibit was

16         that, Sam?

17                 THE WITNESS:   130.

18                 MR. HARDT:   Okay.  Thank you.

19                 (Whereupon, Deposition Exhibit

20         PSC-VPB-131, E-mail Chain Ending

21         7/20/06 Porter E-mail to Stein,

22         Subject: Freight to Norfolk, V0000630,

23         was marked for identification.)

24   BY MR. HERMAN:

Samuel G. Porter

278

1    Q.    I'm going to show you an

2  exhibit, 131, Bates-numbered V630, and it's a

3  series of e-mails in July 2006, if you'd take

4  a look at that.  This is the first page of

5  two, and it's Exhibit, as I said, 131.

6            Yesterday you indicated you

7  had a -- the second shipment was shipped to

8  Camden, New Jersey, correct?

9    A.    Yes.

10    Q.    And as a result, the Norfolk

11  Southern rail system had to transport that

12  drywall to your warehouse in Norfolk; is that

13  correct?

14    A.    It went from Camden, New Jersey

15  to Lamberts Point.  That's where the rail was

16  actually unloaded.

17    Q.    Right.

18    A.    And then to my warehouse.

19    Q.    And this Exhibit 131 is

20  confirmatory of the testimony that you gave,

21  correct?

22    A.    Yes, sir.

23    Q.    And it is a business record in

24  the ordinary course of your business,

Samuel G. Porter

279

1    correct?

2         A.    Yes.

3         Q.    Now, do you know what "Curb

4    Appeal" is, the term?

5         A.    I believe a customer for

6    Porter-Blaine.

7                   (Whereupon, Deposition Exhibit

8              PSC-VPB-132, File on Curb Appeal, 1100

9              Micheal Wood, V028523 - V028557, was

10             marked for identification.)

11   BY MR. HERMAN:

12        Q.    And I'm going to show you

13   Exhibit 132, and it's a rather large exhibit.

14   It goes from Bates number 28523 through

15   exhibit -- V28553, and attached to it are a

16   first and second floor plan, which are V28555

17   and V28556, and the last page is blank,

18   V28557.

19                   Would you look through this,

20   and I just have one or two questions about

21   this.

22                   MR. HARDT:   Which exhibit are

23        we marking this as?

24                   MR. HERMAN:   This is --

Samuel G. Porter

1          MR. LONGER:  132.

2          MR. HARDT:  132?  Thank you.

3          MR. HERMAN:  It's 132?

4          MR. LONGER:  Yes.

5          (Witness reviews document.)

6     BY MR. HERMAN:

7          Q.    I understand that Curb Appeal

8     was actually Curb Appeal Homebuilders?

9          A.    I believe that's correct, yes.

10         Q.    And if you'd just turn for a

11    minute to page 28540.

12         A.    Okay.

13         Q.    This looks like an invoice.  It

14    says "Bill to Porter-Blaine, Remit to Venture

15    Supply, Ship to 1100 Michael Wood," okay?

16         A.    Uh-huh.

17         Q.    Is 1100 Michael Wood actually a

18    location of a piece of property or the

19    address of the Curb Appeal contractor or

20    builder?

21         A.    I believe this is the address

22    of the house that Curb Appeal was building.

23    Some of the records we use might have a lot

24    number, they may have an address, so on and

Samuel G. Porter

281

1    so forth.  This looks like the actual address

2    where the structure was being built.

3         Q.    All right.  And we can call

4    this for reference the Michael Wood

5    structure, "the 1100 Michael Wood structure

6    job"?

7         A.    Yes, sir.

8         Q.    And this invoice shows that, am

9    I correct, there were 190 sheets of drywall

10   ordered, 190 sheets of drywall shipped.  The

11   drywall was 1212DWGB drywall, Gold Bond,

12   one-half inch, 4x12, correct?

13        A.    Yes.

14        Q.    What was the 1212DWGB drywall

15   Gold Bond?

16        A.    That's -- the code in the

17   computer is 12 -- it's -- the item number

18   described, it's half-inch 12-foot drywall.

19   "GB" stands for Gold Bond, so -- and then it

20   gives another description, half-inch, 4-foot

21   by 12-foot.

22        Q.    All right.  Was the 1212DWGB

23   Taishan-manufactured drywall?

24        A.    No, that was Gold Bond.

Samuel G. Porter

282

1      Q.     And Gold Bond was another

2   manufacturer?

3      A.     Yes.  It's referred to, I

4   think, as National Gypsum also.

5      Q.     All right.  Let's go down to

6   the second line.  It says "77, quantity

7   ordered of sheets of drywall, 77 sheets

8   shipped, 1212DWVS drywall, Venture Supply,

9   one-half inch, 4x12."

10             Was this Taishan drywall?

11      A.     Yes.

12      Q.     Okay.  So that on every invoice

13   and billing, either from Venture Supply or

14   Porter-Blaine, was the designation "1212DWVS"

15   used to signify a Taishan-manufactured

16   drywall?

17      A.     Yes, sir.

18      Q.     And do I understand, at least

19   from this invoice, that Venture Supply

20   shipped directly to 1100 Michael Wood and

21   billed Porter-Blaine for the shipment?

22      A.     Yes, sir.

23      Q.     And then Porter-Blaine was to

24   remit $4,623.71 to Venture Supply --

Samuel G. Porter

1       A.      Yes.

2       Q.      -- correct?

3               How did Porter-Blaine collect

4       the $4,623.71 for the 1100 Michael Wood

5       building to send to Venture Supply?

6       A.      Well, Porter-Blaine -- if you

7       go back into the number V028527, that's an

8       invoice from Porter-Blaine to Curb Appeal,

9       which was for the total job at 1100 Michael

10      Wood.  So Porter-Blaine would bill, for

11      example, on this one, Curb Appeal, and then

12      pay Venture Supply for the invoice, 28540,

13      that you're referring to.

14      Q.      I'm looking at 28527.  It says

15      "One drywall complete; current billing,

16      $18,000"?

17      A.      Yes.

18      Q.      So this would have been an

19      ongoing billing?

20      A.      According to this invoice, it's

21      the complete job.  If it might have been a

22      partial, it would state, you know, "partial

23      billing" or whatever the amount.

24      Q.      I see.

Samuel G. Porter

284

1          So it's "one drywall complete"

2    means the complete billing for drywall, and

3    how does that match up -- well -- and if we

4    took each one of the invoices in this exhibit

5    and added them up for drywall, presumably

6    they would add up to $18,000, correct?

7        A.    Well, the proposal and the

8    contract from Porter-Blaine to Curb Appeal is

9    28528.  What we would do is we would submit a

10   price to the builder with options, and then

11   they would pick which options they would

12   want, which would determine the combined

13   total price.

14        Q.    I see.

15          And if you would look at

16   page 28535?

17        A.    Yes, sir.

18        Q.    These billings are for

19   different materials that were also provided

20   in addition to drywall; for instance, D

21   nails, drywall tape, easy-sand, masking tape?

22        A.    Yes, sir.

23          MR. HARDT:  I object to the

24      form.  They're not billing.  It says

Samuel G. Porter

285

1            "cost entries."

2                    MR. HERMAN:  I'm sorry?

3                    MR. HARDT:  At the top, it says

4            "cost entries by job."  You said

5            "billings," I think, in your question.

6    BY MR. HERMAN:

7            Q.    Well, what is "cost entries by

8    job"?  It says "Porter-Blaine Corporation" --

9            A.    Okay.

10           Q.    -- "cost entries by job."

11           A.    I'm sorry.

12                    Porter-Blaine would keep

13   records on the job costs of exactly -- of

14   everything -- we'd set a budget, and then all

15   the billings and whatever was used or paid

16   for on the job would go to this cost entry by

17   job, and it would give a total of the cost of

18   doing the job.

19           Q.    Okay.  All right.  Let's look

20   at 28535.

21           A.    Okay.

22           Q.    At the top, it says,

23   "Porter-Blaine Corporation, cost entries by

24   job," correct?

Samuel G. Porter

286

1       A.      Yes.

2       Q.      And the first line says "Units,

3    112; amount, $138.77," correct?

4       A.      Yes.

5       Q.      Was 138.77 billed to the

6    builder, or was that the -- Porter-Blaine's

7    cost?

8       A.      Everything was billed to

9    Porter-Blaine, whether it was material or

10   labor or landfill fees or anything that had

11   to do with the job, and then this was

12   combined -- this bill was combined for the

13   contract amount, which was submitted to the

14   builder for payment.

15      Q.      All right.  So $138.77 would

16   have been included in the amount that was

17   billed to the builder?

18      A.      Yes.

19      Q.      Okay.  Now, Colleen Nguyen,

20   N-G-U-Y-E-N, pronounced "win," she and her

21   husband owned 1100 Michael Wood Drive; is

22   that correct?

23           MR. HARDT:  Object to the form.

24      A.      From my understanding, yes.

Samuel G. Porter

287

1    BY MR. HERMAN:

2         Q.      And if you look at 28524, on

3    April 7th, 2009, "Mrs. Nguyen would like

4    something in writing stating the number of

5    sheets in her home."

6              Did you understand why she

7    wanted that?

8         A.      When the media came out with

9    the Chinese drywall story, I was inundated

10   with inquiries about if the material was used

11   on the job or whose job or which job.

12             So what I had everybody do was

13   everybody in the office would take messages,

14   and I would return -- like, for example, I

15   would call Ms. Nguyen and try to find out

16   exactly how much of my Chinese board was used

17   in her structure.

18             And these are just notes about

19   when she had called, when I had returned her

20   call and information like that.

21        Q.      Now, do you have any -- your

22   recollection is you returned these calls,

23   correct?

24        A.      Yes.

Samuel G. Porter

288

1      Q.    You don't have any written

2  documents or anything showing, or notes, that

3  you returned the calls, do you?

4           If you do, if you'd point them

5  out to me, I'd appreciate it.

6      A.    I don't see them in this

7  exhibit, but I believe that they are

8  somewhere in what was given to my attorneys.

9      Q.    Where did you get the documents

10  from that you were giving your attorneys?

11      A.    Like you say, the records from

12  the normal course of --

13      Q.    Business?

14      A.    -- business.

15      Q.    And where did you keep them?

16      A.    The active records were kept in

17  the office; and any jobs that were closed out

18  or any records that needed to be stored for a

19  period of time were stored behind the office

20  in the storage room.

21      Q.    The office was located in a

22  warehouse?

23      A.    No -- well, yes, the office was

24  part of the warehouse.  It had the office and

Samuel G. Porter

289

1   then the warehouse, and the office was

2   basically for staff and employees and

3   customers.

4       Q.    And what -- did you have any

5   formal, written notice or written direction

6   to destroy records over a period of time?

7       A.    No, sir.

8       Q.    So all the records that were

9   stored in the office are either still stored

10  there, or they're with your attorney?

11      A.    That's correct.

12      Q.    Look at, if you would, 28544.

13  It says "Porter-Blaine Corporation" --

14      A.    Yes, sir.

15      Q.    -- "Independent Subcontractor

16  Application for Payment"?

17      A.    Uh-huh.

18      Q.    The subcontractor is listed as

19  Lorenzo Garcia.  The date is

20  October 19th, '06.  Would that be the date

21  that work was performed or that -- or is it

22  the date that Porter-Blaine would have gotten

23  the request?

24      A.    That's the date we would have

Samuel G. Porter

290

1     got the request for payment.

2          Q.     And there are two different

3     jobs listed:  One, Seaside Design in the

4     Little Neck Road subdivision and the other,

5     Curb Appeal at Michael Wood --

6          A.     That's correct.

7          Q.     -- correct?

8          A.     That's correct.

9          Q.     And what -- it looks like at

10    Little Neck Road, "Count, 293."  Is that

11    293...

12         A.     It's 293 pieces.

13         Q.     Oh.  It's 293 pieces?

14         A.     Right.

15         Q.     Not hours?

16         A.     Right.

17         Q.     Okay.  And "pieces" means

18    wallboard?

19         A.     Yes, sir.

20         Q.     And the rate, is that $6 an

21    hour?  Is that what that is?

22         A.     It's $6 per piece.

23         Q.     $6 per piece.

24                So Lorenzo Garcia was paid by

Samuel G. Porter

1    the piece, $6 per piece of wallboard or

2    sheetrock erected.

3              And exactly what would the

4    subcontractor do?

5         A.    They would -- for example,

6    Lorenzo Garcia, the code here is "H," which

7    means he's a hanger.  He actually would hang

8    board.  He would have his own crew,

9    employees, staff, whatever.  He would

10   actually install the material.  He would cut

11   it and screw it off, nail it off, et cetera,

12   basically, install the board into whichever

13   unit he was working in.

14        Q.    Now, "F," does that mean float?

15        A.    Some people call it float.

16   We -- I use the term "finish."

17        Q.    All right.  Would you, just for

18   the record, tell us what "floating" or

19   "finishing" is.

20        A.    Once the board hangers would

21   install the board in a unit, the trash would

22   be removed, and the finisher would come in

23   and would apply joint compound to the seams;

24   and that's what we refer to as the tape coat,

Samuel G. Porter

292

1      the first coat.

2                  The second coat, we referred to

3      as the bed coat; and then the third coat is

4      the skim coat, which is the final coat to

5      bring everything up to a nice, smooth finish.

6            Q.      Is tape used at all?

7            A.      Yes.

8            Q.      What kind of -- in the process

9      you just described, what is the taping

10     process?  Is that the first?

11           A.      That's the first coat.

12           Q.      Okay.  And the second coat is

13     not tape, is it?

14           A.      No, the tape is -- would have

15     already been applied.  So, basically, you're

16     just layering mud or a compound to cover the

17     tape.

18           Q.      And the third is a finishing

19     compound?

20           A.      It's either a different

21     compound or the same.

22           Q.      Same?

23           A.      Yeah.  And it would be another

24     additional...

Samuel G. Porter

293

1       Q.      All right.  Now, Lorenzo
2   Garcia -- did Porter-Blaine Corporation
3   subcontract painters as well?
4       A.      No.
5       Q.      All you did was hang, float and
6   finish the sheetrock?
7       A.      We would also do texture work,
8   so there was different textures that
9   people --
10      Q.      If somebody ordered a special
11  texture, you'd apply the texture?
12      A.      Yes, sir.
13      Q.      And when I say "you," I mean
14  Porter-Blaine, through its subcontractors?
15      A.      Yeah.
16      Q.      And if we go to other pages, we
17  see that there was a John Randall, was a
18  Porter-Blaine subcontractor, for example, at
19  Michael Wood; and Scott Hodgson,
20  H-O-D-G-S-O-N, was a subcontractor of
21  Porter-Blaine Corp. on this job; and Absolute
22  Drywall is listed as a subcontractor of
23  Porter-Blaine?
24      A.      Yes.  Yes.  Sorry.

Samuel G. Porter

1    Q.    And then we get to a series of

2  accounting sheets at V28550.  And this,

3  again, lists the different types of materials

4  that were provided in addition to drywall on

5  the 1100 Michael Wood job by Porter-Blaine?

6    A.    Yes.

7    Q.    Is this accounting typical of

8  the way that Porter-Blaine accounted on the

9  jobs?

10    A.    Yes, sir.

11    Q.    And is the Porter-Blaine Corp.

12  Independent Subcontractor Application for

13  Payment the typical type of form that was

14  used on these jobs?

15    A.    That's what Porter-Blaine used,

16  yes.

17    Q.    And when I say "on these jobs,"

18  I mean on jobs in the year 2005-2006.

19    A.    Yes, sir.

20          (Whereupon, Deposition Exhibit

21       PSC-VPB-125, 5/23/06 Shandong Taihe

22       Dongxin Fax to Porter/Perry,

23       Subject: Gypsum Board, V001431 -

24       V001432, was marked for

Samuel G. Porter

1          identification.}

2     BY MR. HERMAN:

3          Q.     I'm going to show you

4     Exhibit 125, Bates number V1431, 1432.

5                MR. HARDT:  Thank you.

6     BY MR. HERMAN:

7          Q.     It's dated May 23rd, 2006, from

8     Shandong Taihe Dongxin Company, Ltd.  And if

9     you take a look at this, does this

10    communication from Shandong Taishan indicate

11    that they were complaining that the delay in

12    shipping the wallboard which you had

13    purchased from Taishan had cost Taishan

14    $200,000 USD?

15                MR. HARDT:  Object to the form.

16          The document speaks for itself.  You

17          can answer.

18          A.     That's what it says.

19    BY MR. HERMAN:

20          Q.     And so this was a complaint by

21    them that the shipping delays had caused them

22    to suffer some damage.  And it's addressed to

23    you, and it's addressed to Mr. Perry,

24    correct?

Samuel G. Porter

296

1           MR. HARDT:  Same objection.

2      A.    Yes.

3  BY MR. HERMAN:

4      Q.    Do you recall receiving this in

5  the regular course of business?

6      A.    Yes.

7      Q.    Did you reply to it?

8      A.    It's possible.  I read the

9  document, and I didn't believe it, so...

10     Q.    Does this relate to the second

11  shipment or the first shipment?

12     A.    Second shipment.

13     Q.    And this communication from

14  Taishan talks about 100,000 sheets of gypsum

15  board, but they actually delivered less than

16  60,000; is that correct?

17     A.    That's correct.

18           (Whereupon, Deposition Exhibit

19           PSC-VPB-126, 5/25/06 Perry E-mail to

20           Porter, Subject: Shipment contract,

21           V001453 - V001456, was marked for

22           identification.)

23  BY MR. HERMAN:

24     Q.    Let me show you Exhibit 126,

Samuel G. Porter

297

1    dated May 25th, 2006, from Phillip Perry to

2    yourself with a copy to Mr. Woods.  And

3    Exhibit 126 has Bates numbers 1453 through

4    1456.  Would you take a look at this?

5              (Witness reviews document.)

6    BY MR. HERMAN:

7         Q.    Does this indicate that as of

8    May 25th, 2006, you -- that is, Venture

9    Supply, was still waiting for the final

10   shipping information to ship the Venture

11   Supply purchases of drywall from Taishan to

12   the United States?

13             MR. HARDT:  Again, object to

14        the form.  The document speaks for

15        itself.  But you can answer.

16        A.    That's right.

17   BY MR. HERMAN:

18        Q.    And if you would tell me, since

19   I didn't hear this document speak to me, who

20   is Justin?

21        A.    I believe it's somebody that

22   Phil was talking to about the shipping

23   arrangements.

24        Q.    And if you would turn to the

Samuel G. Porter

298

1    last two pages of this talking document, what

2    vessel --

3                MR. HARDT:  Well, just for the

4          record --

5    BY MR. HERMAN:

6          Q.    -- is depicted in this

7    document?

8                MR. HARDT:  Just for the

9          record, I'm not so sure that 1455 and

10         56 actually go with this, 1453 and 54;

11         but that's just for the record.

12               MR. HERMAN:  Okay.  We can

13         accept that.  It may not.  It was

14         produced in sequence, so that's one of

15         the reasons I'm asking questions --

16               MR. HARDT:  Sure.

17               MR. HERMAN:  -- because the

18         vessel itself is not identified.

19         A.    I don't know which vessel it

20    is.

21    BY MR. HERMAN:

22         Q.    Okay.  This document was

23    received by you in the ordinary course of the

24    business of Venture Supply?

Samuel G. Porter

299

1          A.     Yes.

2          Q.     And it relates to the shipment

3    of drywall from China to the United States,

4    correct?

5          A.     Yes.

6                 MR. HARDT:  Well, at least 53

7          and 54, right?  Because he said he

8          doesn't know what 55 and 56 is.  Is

9          that acceptable with you?

10                MR. HERMAN:  Let's let me state

11         for the record that 1455 and 1456,

12         which are attached to Exhibit 126,

13         have not been identified by the

14         witness.

15                MR. HARDT:  Thank you.

16                MR. HERMAN:  You're welcome.

17                (Whereupon, Deposition Exhibit

18         PSC-VPB-161, Venture Supply's

19         Supplemental Defendant Profile Form,

20         was marked for identification.)

21   BY MR. HARDT:

22         Q.     I'm going to show you

23   Exhibit 161.  It has no Bates numbers, so I'm

24   going to identify it.  The first page says

Samuel G. Porter

300

1    "Venture Supply Supplemental Defendant

2    Profile Form."  It's dated with a fax at the

3    top, which was faxed to me last night at

4    7:41.

5           This first page says

6    "Supplement" -- the second page says

7    "Supplement to Exporter, Importer or Broker

8    Defendant Profile Form Filed on Behalf of

9    Venture Supply, Inc."

10          The next page purports to have

11    the signature of Samuel Porter,

12    November 6th, '09.

13          The next page says "Venture

14    Supply's testing reports attached to

15    Supplemental Defendant Profile Form."

16          The next page says at the top

17    some Chinese figures and underneath, "Test

18    Report."  At the bottom is dated

19    February 16th, 2006, from the quality

20    supervision and inspection center of national

21    building materials industry for decorating

22    and finishing building materials.

23          The next page says "Test

24    Report," and at the bottom has three

Samuel G. Porter

1    signatures:  "Approver," "Checker," "Drawer."

2                 The next page says "Test

3    Report," and at the bottom has three

4    signatures:  "Approver," "Checker," "Drawer."

5                 The next page has, in Chinese

6    and then interpreted, "Attention," six

7    paragraphs.

8                 The next page says "Test

9    Report," February 16th, 2006, with three

10   signatures:  "Approver," "Checker," "Drawer."

11                The next page says "Attention,"

12   with six paragraphs.

13                The next page says "Test

14   Report," "Approver," "Checker," "Drawer,"

15   with some signatures.

16                The document is in Chinese and

17   with English -- with what appears to be

18   English interpretation of the Chinese.

19                Yesterday we had some

20   discussion, and it was indicated that Venture

21   Supply had supplemented, as required by a

22   court order, its production of test reports.

23                MR. HARDT:  Well, what we did

24        is we filed a Venture Supply profile

Samuel G. Porter

1.         form, and one of the questions related

2         to testing.  And the original testing

3         results that we forwarded with the

4         profile form, which was done by us,

5         not by Mr. Porter, in response to

6         Judge Fallon's order, was the CBM, the

7         original testing documents you asked

8         some questions about yesterday.

9            When we got this, we filed a

10        supplemental profile form to

11        supplement that testing question.

12           MR. HERMAN:  And, perhaps,

13        Counsel, we can stipulate that

14        Exhibit 161 is the supplemental test

15        reports to which you referred

16        yesterday.

17           MR. HARDT:  It appears to be.

18        Exactly.  And I -- it's signed by Sam

19        on 11/6/09, but I -- and I'm not sure

20        of the actual date we sent it in, but

21        it would have been shortly thereafter.

22  BY MR. HERMAN:

23        Q.   Now, my question -- I'll hand

24  you this report.

Samuel G. Porter

303

1              MR. HERMAN:  I need this copy.

2     BY MR. HERMAN:

3         Q.    I'll hand you Exhibit 161 as

4     it's been described for the record.  And look

5     at the third page.  Is that your signature

6     where it says "Certification"?

7         A.    Yes, sir.

8         Q.    And these -- you are certifying

9     these answers, correct?

10        A.    Yes.

11        Q.    All right.  Now, I'd like you

12    to turn to the first page where I've marked

13    in yellow.  You see I've marked a page in --

14    with a yellow marker?  You can see it's

15    shaded?

16             MR. HARDT:  Which Bates number?

17             MR. HERMAN:  It is --

18             MR. HARDT:  Oh.  It's not

19         Bates-stamped.  I'm sorry.  Oh, I see

20         it.  This one?

21             MR. HERMAN:  That's it.

22    BY MR. HERMAN:

23        Q.    Do you see it says on that

24    line, "ASTM C-3697 test item overall (except

Samuel G. Porter

1      flame spread index)"?  Do you see that?

2              A.      Yes.

3              Q.      Do you understand that the

4      flame spread index is a test relating to fire

5      resistance or fire retardant?

6              A.      Yes.

7              Q.      And you see that was not

8      tested --

9                      MR. HARDT:  Object to the form.

10     BY MR. HERMAN:

11             Q.      -- on this particular report?

12             A.      Yes.

13             Q.      All right.  I'd like you to

14     turn to the next test report.  Do you see

15     item 7, "Flame Spread Index"?

16             A.      Yes.

17             Q.      Do you see where it says "Test

18     Value," it's completely blank?

19             A.      Yes.

20             Q.      I'd like you to go two more

21     pages.  Do you see, again, it says, "ASTM

22     C-1396/C-1396-4, test item overall (except

23     flame spread index)"?

24             A.      Yes.

Samuel G. Porter

305

1       Q.     That wasn't tested, correct?

2           MR. HARDT:  Object to the form.

3  BY MR. HERMAN:

4       Q.     Correct?

5       A.     Yeah.

6       Q.     And then if you go to the last

7  page of the test reports, under item 7, it

8  says "Flame Spread Index," no test, correct?

9           MR. HARDT:  Object to the form.

10      A.     Correct.

11          THE WITNESS:  Can we take a

12  break?

13          MR. HERMAN:  Sure.

14          MR. HARDT:  Off the record.

15          THE VIDEOGRAPHER:  Off the

16  record at 9:48 a.m.

17          (Recess taken, 9:48 a.m. to

18  9:59 a.m.)

19          THE VIDEOGRAPHER:  Please stand

20  by.  We're back on the record at

21  9:59 a.m.

22          (Whereupon, Deposition Exhibit

23  PSC-VPB-164, Valuation Documents of

24  1145 Princess Anne Road, was marked

Samuel G. Porter

306

1            for identification.)

2    BY MR. HERMAN:

3        Q.    Yes, sir.  I'd like you to look

4    at Exhibit 164.  It's titled -- it not

5    Bates-stamped.  There are three pages.  The

6    first is titled "Improvements, 1145 Princess

7    Anne Road, Virginia Beach."

8                The second page is value

9    history of the same property.  The third page

10   says "Dwelling," and the fourth page is a

11   floor plan of sorts.  And it all applies to

12   1145 Princess Anne Road, Virginia Beach.

13               Was this a residence that you

14   were building?

15       A.    My wife built it, my ex-wife.

16       Q.    Your ex-wife?

17       A.    Yes.

18       Q.    And in what year did the

19   construction begin?

20       A.    I think 2005.

21       Q.    Was any of the Taishan drywall

22   used in the home that your wife was building?

23       A.    No.

24               MR. HARDT:  It was constructed

Samuel G. Porter

307

1          in 2005.

2     BY MR. HERMAN:

3          Q.     Now, were you and your wife

4     married in 2005?

5          A.     Yes.

6          Q.     So you and your wife were

7     married at the time this home was being

8     built, correct?

9          A.     Yes, but it was still her

10    house.

11         Q.     Okay.  Did you live there?

12         A.     Yeah.

13                (Whereupon, Deposition Exhibit

14         PSC-VPB-163, Article, "Norfolk-based

15         supplier says it distributed Chinese

16         drywall," was marked for

17         identification.)

18    BY MR. HERMAN:

19         Q.     Okay.  Would you look at 163,

20    please.

21         A.     Okay.

22         Q.     You see that this is a news

23    report published on hamptonroads.com?  Do you

24    see that?

Samuel G. Porter

1            MR. HARDT:  The document speaks

2       for itself.  Object to the form.  Go

3       ahead and answer.

4       A.    Yes.

5  BY MR. HERMAN:

6       Q.    Do you see that, sir?

7       A.    Yes.

8       Q.    Have you read this before?

9       A.    Yes.

10      Q.    And you're familiar with it?

11      A.    Yes.

12      Q.    Okay.  I'd like you to look at

13  statement that says, "A Norfolk-based

14  construction supplier said Thursday that it

15  imported 2,000 pallets of China-made drywall,

16  enough to build at least 240 homes, and sold

17  pieces locally between March 2006 and

18  December 2008."

19            Did you report that?

20      A.    I believe that was from my

21  attorneys.

22      Q.    And the second sentence says,

23  "Such wallboard has been the focus of

24  complaints in several states by people who

Samuel G. Porter

309

1   say it emits a corrosive gas that damages

2   household electrical systems and causes

3   respiratory illness."

4              Did I read that correctly?

5      A.    Yes.

6              MR. HARDT:  That's what it

7        says.  Object to the form.

8   BY MR. HERMAN:

9      Q.    "It appears to have been used

10  in at least two developments in Virginia

11  Beach and Chesapeake.  A Virginia Beach

12  developer is inspecting 60 homes suspected of

13  containing the defective drywall."

14             Do you know what developer that

15  refers to?

16     A.    I believe that was Dragos.

17     Q.    And Dragos subsequently, after

18  this, made a -- at some point, a demand on

19  Venture Supply and some insurers, correct?

20             MR. HARDT:  I think it was

21       Venture and Porter-Blaine.

22     A.    I believe Ken is correct.

23  BY MR. HERMAN:

24     Q.    Okay.  So at some point after

Samuel G. Porter

310

1    this article was published, Dragos, which was

2    a builder/contractor, made a demand on

3    Venture Supply and Porter-Blaine and their

4    insurers in connection with Taishan drywall

5    that had been utilized in certain buildings

6    they had constructed?

7              MR. HARDT:  It might have been

8         before this.

9         A.    Yes.  Yeah.

10             MR. HARDT:  I think we provided

11        that demand to you.  I don't know what

12        date it is.  That's the only reason I

13        said that.

14   BY MR. HERMAN:

15        Q.    It also goes on to say that,

16   "An attorney for Venture Supply, Inc., the

17   Norfolk business that imported the Chinese

18   drywall, said the company could not determine

19   how many homes contained the wallboard."

20             Why was that?

21             MR. HARDT:  Object to the form.

22   BY MR. HERMAN:

23        Q.    Why couldn't you determine

24   that?

Samuel G. Porter

311

1           MR. HARDT:  Object to the form.

2      That's not what it says.  It says an

3      attorney said that.

4  BY MR. HERMAN:

5      Q.    Well, why don't you read that

6  sentence that says, "an attorney," beginning

7  with the words "an attorney."

8           MR. HARDT:  You just read it.

9      Object to the form.

10  BY MR. HERMAN:

11      Q.    Would you read it for the

12  record.

13      A.    "An attorney for Venture

14  Supply, Inc., the Norfolk-based business that

15  imported the Chinese drywall, said the

16  company could not determine how many homes

17  contained the wallboard."

18      Q.    Has Venture Supply or

19  Porter-Blaine ever determined how many homes

20  had Taishan wallboard?

21      A.    We have the records of where

22  the board was sold to.

23      Q.    And have you made any sort of

24  listing of where the wallboards were sold to

Samuel G. Porter

312

1   and the homes in which they were used, or the

2   buildings?

3        A.     We made a list of who the

4   material was sold to.  Now, as far as if

5   Porter-Blaine used it in, say, these 60 homes

6   that Dragos inspected, then that would be on

7   that list.

8              If we had sold material to

9   another builder or distributor, I wouldn't

10  know exactly where the material would have

11  been installed.  We have records of who

12  purchased it.

13             THE WITNESS:  Am I clear?

14       Okay.

15  BY MR. HERMAN:

16       Q.     Would you read -- well, let me

17  see if I can get through this.

18             "Venture's owner, Sam Porter,

19  did not return several calls for comment.

20  For the past few weeks, Venture has been

21  going over its records and lining up a team

22  of specialists to determine how to take care

23  of complaints from the drywall, Nanavati

24  said."

Samuel G. Porter

313

1          Nanavati was your lawyer,

2     correct?

3          A.     Yes.

4          Q.     What specialist has Venture

5     lined up to determine how to take care of the

6     complaints?

7               MR. HARDT:  Now, that's the

8          subject of No. 18.  We filed an

9          objection to that.  We're dealing with

10          consulting experts, and we're not

11          going to go that route.  We told you

12          beforehand we're not going to go into

13          consulting experts.

14     BY MR. HERMAN:

15          Q.     Are there any writings that

16     show what specialists Venture Supply or

17     Porter-Blaine either retained or interviewed

18     in this problem?

19               MR. HARDT:  Same objection.

20          We're not going to go into that.  We

21          told you we weren't going to go into

22          consulting experts.

23               MR. HERMAN:  Okay.  We'll bring

24          a rule in connection with that, and a

Samuel G. Porter

314

1       motion.  I'm going to give you an

2       opportunity before I file that motion,

3       as a professional courtesy, to prepare

4       and furnish us with a privilege log.

5               MR. HARDT:  That's fine.  But

6       we provided that objection, I believe,

7       quite some time ago.  I don't know how

8       long ago --

9               MR. HERMAN:  I believe --

10              MR. HARDT:  -- but at some

11      point in time after you served your

12      notice and we filed an objection and

13      we didn't hear from anybody.

14              MR. HERMAN:  I think the

15      Court's order requires the provision

16      of a privilege log.  I'm asking you to

17      please provide us a privilege log, and

18      if we get a privilege log, there won't

19      be any need to file a sanction motion.

20              MR. HARDT:  And that's fine.

21      We can talk about this off the record.

22      But I also understand that there's

23      negotiations between the PSC and the

24      DSC over the extent of the privilege

Samuel G. Porter

1          log, whether you need a privilege log

2          that deals with after attorneys have

3          been retained, up to the current date,

4          you know, for everything, which would

5          include all of your communications

6          with all of your clients after you

7          filed suit.

8                So -- and my understanding is

9          the scope of that privilege log is

10         being negotiated between the PSC and

11         the DSC, but we'll talk about it off

12         the record.  I'll be happy to confer

13         with you.

14    BY MR. HERMAN:

15         Q.     The next sentence or paragraph

16    says, "One of the people confirming the

17    presence of the Chinese drywall on Thursday

18    lives in a Norfolk condominium complex,

19    Harbor Walk, a 240-unit community built in

20    2006 by Wermers, W-E-R-M-E-R-S, Development.

21                "The company sold the

22    development to Florida-based Henin Group,

23    H-E-N-I-N, which said it is in discussions

24    with Venture to determine whether defective

Samuel G. Porter

1     drywall was used."

2                    Has Venture determined whether

3     Taishan drywall was used in the condominium

4     complex Harbor Walk?

5          A.     Yeah, I just want to clarify a

6     little bit.  The 240-unit is what I believe

7     the entire project is supposed to be.  I

8     don't know exactly how many units of that

9     were built.

10                   Porter-Blaine contracted only a

11    portion of the units in the project, but we

12    have determined where the board was used in

13    the units that Porter-Blaine had done.

14         Q.     And Taishan Chinese drywall was

15    used in the units that Porter-Blaine did?

16         A.     In some of them, yes.

17         Q.     Now, have you had communication

18    with the Henin Group regarding any

19    inspections of those properties or testing of

20    those properties?

21         A.     I had had some communications

22    with -- I don't know if he was the project

23    manager or what.  I believe his name was

24    Doug.  I had some conversations with him, and

Samuel G. Porter

317

1    we were going through getting the attorneys

2    involved and getting this process started.

3              And then from what I

4    understand, he had just packed up and moved

5    out in the middle of the night, and I think

6    the Henin Group had abandoned the project.

7    That's my understanding.

8         Q.      "Michelle Germano said she

9    began to smell sulfur throughout her home

10   just months after purchasing her Harbor Walk

11   condo in June 2006."

12             Did Ms. Germano call either

13   Venture Supply or Porter-Blaine?

14             MR. HARDT:   Object to the form.

15        A.      I don't recall.  She may have

16   called once the media frenzy started, but I

17   don't recall her calling or talking to her

18   prior to -- at this time.  And I can't

19   remember if I talked to her or if her counsel

20   had called.  I'm not exactly sure.

21   BY MR. HERMAN:

22        Q.      It goes on to say, "In the past

23   two years, she said her air-conditioning unit

24   has gone out four times, and several other

Samuel G. Porter

318

1    appliances have failed.  Germano, a nurse who

2    works from home, said she has suffered from

3    respiratory problems and daily headaches.

4    She is in the process of finding a place to

5    rent until her home can be restored."

6              Do you recall whether you or an

7    employee of Venture Supply or Porter-Blaine

8    or an employee or subcontractor of

9    Porter-Blaine inspected the Germano home

10   after the complaints were either received by

11   you or published?

12             MR. HARDT:  Object to the form.

13        But you can answer.

14        A.    No.

15   BY MR. HERMAN:

16        Q.    "Venture said that residents

17   whose homes were built before March 2006 do

18   not have the drywall."

19             You made that statement?

20        A.    Yes.

21        Q.    Who did you make that statement

22   to?

23        A.    I can't remember if it was to

24   Ken or to the reporter.  At this point, I had

Samuel G. Porter

1      limited contact with the reporter because he
2      just couldn't seem to get the facts straight.
3           Q.     All right.
4           A.     So -- and I'm -- come to find
5      out --
6                  MR. HARDT:  Well, if it's
7           communications that you had with us,
8           don't answer, okay?
9                  THE WITNESS:  I think it might
10          have been.
11                 MR. HARDT:  Well, then, don't
12          answer.
13     BY MR. HERMAN:
14          Q.     That's what we call
15     attorney-client privilege.  And if I ask a
16     question that might call for you to say what
17     an attorney told you or what you told an
18     attorney, don't tell me that.
19                 You can tell me you talked to
20     an attorney, but you can't tell me what the
21     attorney said or what you said to the
22     attorney.  Fair enough?
23                 MR. HARDT:  I appreciate that.
24          A.     Okay.

Samuel G. Porter

320

BY MR. HERMAN:

Q.    And we have what we call a very
fair rule in cases that's called clawback, so
if you inadvertently say something that your
lawyer told you or you told your lawyer, we
can take care of it so that it doesn't appear
published in this record, okay?

A.    Thank you.

MR. HARDT:  And I appreciate
it.  We'll take care of that on that.
Thank you.

MR. HERMAN:  All right.

BY MR. HERMAN:

Q.    Reading on in Exhibit 163, "The
company advised residents to look for
Venture's name stamped on the back of the
wallboard which could sometimes be seen in
the attic."

That was your, Venture's,
advice, Porter-Blaine's advice?

MR. HARDT:  And just for the
record, because of the statement that
you just said, probably most of this,
because it says that they didn't talk

Samuel G. Porter

321

1          to Venture because Venture didn't call

2          them back, so most of this is going to

3          be from communications either with the

4          press statement from the --

5                MR. HERMAN:  Right.  I can only

6          ask the question and we can take care

7          of it, if it's privileged.

8                MR. HARDT:  Okay.  Don't answer

9          if it's privileged information.

10    BY MR. HERMAN:

11          Q.     Did Venture or Porter-Blaine

12    ever tell anyone that they could look for

13    Venture's name stamped on the back of the

14    wallboard, it could be found by looking in

15    the attic?

16          A.     Yes.

17          Q.     And the only -- is it true that

18    the only wallboard which Venture imported or

19    purchased and which Porter-Blaine used that

20    had Venture's name stamped on the back was

21    Taishan wallboard?

22          A.     That's correct.

23          Q.     So that if I went into my attic

24    and I saw "Venture Supply" on the back of the

Samuel G. Porter

322

1   wallboard or on the edge, on an edging that

2   you described, I would know that that's

3   Taishan wallboard?

4       A.     That's correct.

5       Q.     Then it says, "The Dragos

6   companies has acknowledged that Chinese

7   drywall from Venture may have been used in

8   some homes in the Hampshires at Greenbriar in

9   Chesapeake and Cromwell Park in Virginia

10   Beach."

11             Are these subdivisions?

12       A.     Yes.

13       Q.     And Dragos was not only a

14   builder. Was it a developer in these

15   subdivisions, do you know?

16       A.     Yes.

17       Q.     Did you or any of your

18   employees or Porter-Blaine or any of its

19   employees make inspections of the Dragos

20   homes?

21       A.     Only during construction, not

22   after --

23       Q.     Not after the complaints came

24   in?

Samuel G. Porter

323

1      A.    -- complaints, yes.

2      Q.    I'm reading farther down on the

3  same page, and it says, "Colleen Nguyen,"

4  spelled N-G-U-Y-E-N, "lives in a five-bedroom

5  Virginia Beach home off Little Neck Road.

6  Venture told her that her home contained the

7  wallboard.  She said the home was built by a

8  company called Curb Appeal

9  Homebuilders, Inc., Virginia Beach records

10  show."

11         In your discussions with

12  Ms. Nguyen, did you indicate to her that her

13  home contained Taishan wallboard?

14      A.    Yes.

15      Q.    And have you been interviewed

16  by any government agencies in either city,

17  state or county in Virginia, or any agency of

18  the federal government?

19      A.    I don't know if it's -- if you

20  would call it "interviewed," but I have

21  talked to the Consumer Product Safety

22  Commission, who would come by, and I have

23  given samples to, along with -- I think the

24  guy was from Maryland, along with him.  I

Samuel G. Porter

324

1    believe it was a representative from the EPA.

2                    I have given samples to the

3    City of Chesapeake.  And then there have been

4    a lot of samples that have been given to my

5    attorneys for different people, and I'm not

6    exactly sure.

7        Q.    You don't have to -- don't

8    discuss what -- anything further about the

9    samples that went to your attorneys.

10                   But with regard to the other

11   samples that you gave what I'll call some

12   government agency or representatives of

13   either local, state or federal governments,

14   where did those samples come from?

15       A.    The warehouse at 1140 Azalea

16   Garden Road.  Venture's warehouse.

17       Q.    And at some point, you

18   destroyed the Taishan wallboard that was

19   left.  I'm not speaking about the samples you

20   just described.

21                   MR. HARDT:  Object to form.

22             Other than what he kept, too, because

23             he kept some sheets that you-all got

24             some.

Samuel G. Porter

325

1    BY MR. HERMAN:

2        Q.      Other than samples which were

3    requested and which were given of the Taishan

4    wallboard, you destroyed the remaining

5    inventory that you had?

6        A.      Well, what had happened was

7    with the media and the -- I guess you would

8    call the stigma of me being a Chinese drywall

9    distributor, I had a lot of material in my

10   warehouse, and the City of Norfolk had banned

11   the sale, distribution or use of the

12   material.

13            So at that point, it became

14   really useless to take up space.  So what I

15   had done is I had set aside approximately --

16   I think it was 60 sheets, maybe a hundred, of

17   each -- what I figured was each shipment, the

18   first shipment and the second shipment.  Put

19   that aside.

20            And then the rest I had taken

21   to a landfill so that the people in the area,

22   my customers and everybody, would realize

23   that I'm not distributing it, and I could

24   hopefully retain my business and go about

Samuel G. Porter

1    selling drywall.

2         Q.     Do you still maintain any of

3    the Taishan drywall in any location other

4    than with your attorneys?

5         A.     I have -- it was, like I said,

6    either a hundred or 60 sheets at Azalea

7    Garden Road, and there's still -- I want to

8    say a minimum of 30 to 40 sheets still there.

9              MR. HARDT:  And for the record,

10         that was what was requested by the

11         CSPC.  Not the number, but that

12         certain samples be retained.

13   BY MR. HERMAN:

14        Q.     I'm going to ask, and you can

15   consult with your attorney, that you please

16   preserve and maintain whatever Taishan

17   drywall you have left.

18              MR. HARDT:  We have, in

19         accordance with what the direction of

20         the CPSC has been.

21              (Whereupon, Deposition Exhibit

22         PSC-VPB-162, 7/1/03 Gypsum Today

23         Industry News, was marked for

24         identification.)

Samuel G. Porter

327

1     BY MR. HERMAN:

2          Q.     You have before you another

3     exhibit.  Is that Exhibit 162?

4          A.     Yes, sir.

5          Q.     May I see that one second?

6          A.     (Witness complies.)

7          Q.     Thank you, sir.

8                 It's Exhibit 162.  It doesn't

9     have a Bates stamp on it.  It's titled

10    "Gypsum Today."  Would you take a look at

11    that.

12         A.     Uh-huh.  Okay.

13         Q.     We had some discussion

14    yesterday about The Drake Group, LLC, and

15    this is an announcement that Venture Supply

16    joined The Drake Group, and it's dated

17    July 1st, 2003.

18                Do you ever recall seeing this

19    before?

20         A.     Yes.

21         Q.     And Gypsum Today is a trade

22    magazine or publication?

23         A.     I think Gypsum Today is a

24    website for the Drake members.  I don't know

Samuel G. Porter

328

1    if the average customer or somebody can

2    access it.  I'm not sure.

3          Q.     But once you joined, Venture

4    Supply had access to it, correct?

5          A.     Yes.

6          Q.     And this is a copy of the

7    announcement that you originally recall

8    receiving or reading?

9          A.     Yes.

10                (Whereupon, Deposition Exhibit

11          PSC-VPB-148, E-mail Chain Ending

12          10/30/09 Nanavati E-mail to Serpe,

13          Subject: Exhibit 1, w/Attachment,

14          PSC-Sinnott-0002 - PSC-Sinnott-0021,

15          was marked for identification.)

16   BY MR. HERMAN:

17         Q.     I'm going to show you

18   Exhibit 149 [sic], and I'd like you to take a

19   look at it with your counsel during our

20   break.  We'll break now.  That way, we won't

21   waste a lot of time with it.

22                MR. HARDT:  Okay.

23   BY MR. HERMAN:

24         Q.     My questions are going to be

Samuel G. Porter

329

1   whether this is a document produced in the

2   ordinary course of business, what is it, what

3   does it show and, if you can tell us, where

4   the remainder items on the spreadsheet could

5   be located.

6                   MR. HARDT:  What -- can I ask

7          what remainder -- are we on the

8          record?

9                   THE REPORTER:  Yes.

10                  MR. HARDT:  Okay.  We'll talk

11         about it off the record.

12                  MR. HERMAN:  Yeah.  And I'll

13         give it to you.  It's Exhibit 148.

14         I'll distribute it now.

15                  MR. HARDT:  Can we go off?

16                  THE VIDEOGRAPHER:  Go off the

17         record?  Off the record at 1:13 a.m.

18         This is the end of Tape -- excuse me.

19                  Off the record at 10:27 a.m.

20         This is the end of Tape No. 5.

21                  (Whereupon, Deposition Exhibit

22         PSC-VPB-165A, Subcontractor Backup

23         Documentation, EV000743 - EV001745,

24         was marked for identification.)

Samuel G. Porter

330

1        (Whereupon, Deposition Exhibit

2      PSC-VPB-165B, Subcontractor Backup

3      Documentation, EV001746 - EV002656,

4      was marked for identification.)

5        (Whereupon, Deposition Exhibit

6      PSC-VPB-165C, Subcontractor Backup

7      Documentation, EV002657 - EV003095,

8      was marked for identification.)

9        (Whereupon, Deposition Exhibit

10     PSC-VPB-165D, Backup Documentation to

11     Exhibit PSC-VPB-148, EV000001 -

12     EV000742 [To Be Supplemented By

13     Counsel - Not Attached], was marked

14     for identification.)

15       (Recess taken, 10:27 a.m. to

16     10:51 a.m.)

17       THE VIDEOGRAPHER: Please stand

18     by. Back on the record at 10:51 a.m.

19     This is the beginning of Tape No. 6.

20       MR. HARDT: All right. This is

21     Ken Hardt. I'm counsel for Venture

22     Supply and Porter-Blaine. We've

23     reached a stipulation about certain

24     exhibits, and I just want to explain

Samuel G. Porter

331

1    those and also the Bates numbers.

2          What's been marked PCS-VPB-148

3    is a list of sales documents that is

4    attached to our original Venture

5    Supply's importer distributor profile

6    form.

7          And then we produced to the PSC

8    Bates numbers EV001 through 742, which

9    we will mark as an exhibit to this

10   deposition as 165D, as in "dog." That

11   is what we produced as backup

12   documentation for Exhibit 148, the

13   sales information.  It contains

14   invoices and those types of documents.

15         Then we also produced the

16   following, which we have marked as

17   exhibits:  Bates numbers EV743 through

18   1745, which is in binder marked

19   Exhibit 165A; and then EV1746 through

20   2656, which is marked as Exhibit 165B;

21   and then Bates numbers EV2657 through

22   3095, which we've marked as

23   Exhibits 165C.

24         What's in Exhibits 165A, B and

Samuel G. Porter

332

1        C are the backup documentation

2        relating to subcontractors that was

3        requested by the PSC.  And we're going

4        to supplement the record with EV001

5        through 742, which will be

6        Exhibit 165D.

7             MR. HERMAN:  And, as I

8        understand it, these are produced by

9        both Venture and Porter-Blaine as

10       records in the ordinary course of

11       business?

12            MR. HARDT:  Yes, they are.

13            MR. HERMAN:  And from those

14       documents, it can be ascertained which

15       subcontractors or installers of

16       Porter-Blaine or -- and/or Venture

17       utilized Taishan drywall on particular

18       properties.

19            MR. HARDT:  Well, what you're

20       going to have to do is -- what we

21       produced to you is project files, just

22       like you have the Nguyen project file

23       which was marked as an exhibit to this

24       deposition, for all of the plaintiffs

Samuel G. Porter

333

1    that you-all have identified that you

2    represent; I think it's 52 or 53.  So

3    we produced all those project files.

4        And what we did is went back

5    through those project files,

6    identified the subcontractors in those

7    particular project files, and went

8    back and got the subcontractor backup

9    information for those persons.

10        So the documents that are in

11    165A through C wouldn't tell you

12    anything about what drywall is used.

13    It would just be:  This is who this

14    subcontractor is, and this is an

15    insurance certificate, et cetera.

16        But if you look in the project

17    files that were produced, like the

18    Nguyen project file that we produced

19    to you, and Mr. Porter identified the

20    Venture Supply on the invoice as being

21    Taishan drywall -- if you looked at

22    the subcontractors in that project

23    file, those would be subcontractors

24    that had worked on that project, okay?

Samuel G. Porter

334

 1          MR. HERMAN:  Thank you.

 2          MR. HARDT:  Uh-huh.

 3          (Whereupon, Deposition Exhibit

 4     PSC-VPB-156, 11/24/05 Rugg E-mail to

 5     Schneider, Subject: The Drake Group -

 6     Market Update, V001934, was marked for

 7     identification.)

 8  BY MR. HERMAN:

 9     Q.     Exhibit 156 is Bates

10  number 1934, V1934.  I've underlined -- the

11  underlining on that particular copy is mine,

12  but I'll provide a clean copy of Exhibit 156.

13          Your previous testimony, you

14  identified The Drake Group as a trade group

15  that you joined in approximately 2003.  This

16  document is dated November 14th, 2005, from

17  The Drake Group and is a market update.

18          And it indicates, in part,

19  quote, "We fully expect the industry to

20  continue to make reasonable returns on their

21  investment and would feel fairly comfortable

22  forecasting an industry average net wallboard

23  price in the '08 forward time period of

24  approximately $130 to $135/MSF, with a

Samuel G. Porter

1    narrower fluctuation," and in parentheses it

2    gives a narrower fluctuation.  And it's

3    initiated by Rob Rugg, R-U-G-G, Executive

4    Director, The Drake Group, LLC, and it has an

5    office number and a cell number.  And it's

6    marked confidential.

7              Did you receive this in the

8    ordinary course of business?

9         A.    Yes.

10        Q.    And did you have any

11   conversation or other communication, either

12   oral or in writing, with Mr. Rugg or any

13   member of The Drake Group about the

14   importation of other than Chinese drywall?

15             MR. HARDT:  Object to the form.

16        I don't know what the question is.

17             THE WITNESS:  I don't

18        understand.

19             MR. HERMAN:  Okay.

20   BY MR. HERMAN:

21        Q.    Did you have any conversation

22   with anybody at Drake about importing Chinese

23   drywall?

24        A.    Yes.

Samuel G. Porter

336

1     Q.    Who did you talk to?

2     A.    The Drake Group would have

3 quarterly meetings in different areas of the

4 country, and I can't -- I'd have -- I can't

5 remember exactly where it was. I think we

6 might have been in California at a particular

7 meeting when this was -- this memo was

8 released.

9     But everybody -- what would

10 happen at these meetings is the members would

11 meet with manufacturers' representatives,

12 vice presidents, so on and so forth, and the

13 group would try to say, "Okay. We need more

14 material," or, "We need different" -- you

15 know, new vendors and so on and so forth.

16     And the subject of import board

17 had come up because of the capacity shortage

18 of American-made board. I had talked to a

19 few of the members -- I can't exactly

20 remember who -- about bringing in board from

21 overseas.

22     And at this time, I would have

23 made mention to them that I had Phil -- or I

24 had a guy over in China looking for material,

Samuel G. Porter

337

1   and there were some other people in the group

2   that said that they were also looking for

3   other ways to get board.

4        Q.     Do you recall, in the last

5   quarter of 2005 and in 2006, speaking

6   directly or writing or communicating with any

7   employee of The Drake Group regarding the

8   import of foreign-made drywall?

9        A.     I may have talked to Rob Rugg

10  about it on the phone.

11       Q.     When is the last time that you

12  believe you may have talked to someone with

13  The Drake Group?

14              MR. HARDT:  About anything?  Is

15       that --

16              MR. HERMAN:  Yes.

17              MR. HARDT:  Okay.

18       A.     Rob had resigned -- I found out

19  Rob had resigned, and I got a call from the

20  new executive director.  I think his name is

21  Don.  I'm not exactly sure.  But I really

22  haven't had much dealing with The Drake Group

23  this year.  I believe it was the first

24  quarter of this year when I talked to Don, if

Samuel G. Porter

1     that's his name.

2              He had called me and said he

3     was the new director and that they were, I

4     think, in North Carolina now and had moved

5     from California, and that if he got a chance,

6     he was going to try to go around the country

7     meeting the members.  And that's, I think,

8     the last correspondence I had with anybody.

9     BY MR. HERMAN:

10         Q.     Were there any other

11    publications, other than the one we looked

12    at, of trade magazines, trade publications

13    that you looked at regularly or subscribed

14    to?

15         A.     There were other -- I would get

16    magazines from other trade associations that

17    we were members of; mostly magazines, things

18    like that.  Sometimes I would look at them.

19    Sometimes I wouldn't.

20              The Drake -- the thing that was

21    Gypsum Today, the announcement --

22         Q.     Yes.

23         A.     -- one of the girls in my

24    office, every Monday, would print the member

Samuel G. Porter

339

1    update, is what it was called.  So every

2    Monday I would get the printed copy of

3    whatever they had for that week.  And it

4    would be any -- different topics, as far as

5    new members to, you know, prediction on

6    housing starts, et cetera, et cetera.

7         Q.    What other trade associations

8    did you belong to?

9         A.    I was a member of the Tidewater

10   Builders Association; the Peninsula

11   Homebuilders Association; the American

12   Ceilings & Walls Industry, I believe it was,

13   AWCI; I believe the Better Business Bureau.

14              There were some like

15   advertising we would do.  Like, for example,

16   there's a thing called the Blue Book, which

17   advertises in certain states, you know, like

18   Virginia -- their district here is Virginia,

19   Maryland, North Carolina.  If we would

20   advertise with them, we would be joined with

21   some kind of group.  So there was a variety

22   of groups that I was involved with, or

23   members of.

24         Q.    Mr. Porter, did you advertise,

Samuel G. Porter

1    either in the print media or radio or TV or

2    any other media, the importation of this

3    Taishan drywall?

4         A.    No, sir.

5         Q.    Did you advertise in any way

6    that you would have drywall available in

7    2006, without reference to Taishan or China?

8         A.    We -- part of the Builders and

9    Contractors Exchange, that's another one,

10   it's a weekly booklet that comes out that has

11   a list of all the jobs in the area coming up

12   for bid, the general contractors, the

13   members.

14              We had a continued ad running

15   over the years just for drywall supplies, so

16   it would have Venture Supply.  I think we did

17   a half-page ad, and we just listed drywall,

18   not Taishan.

19         Q.    What sort of organization is

20   Tidewater, and where is it located?

21         A.    The Tidewater Builders

22   Association?

23         Q.    Yeah.

24         A.    Tidewater Builders Association

1    is a local builders group, and they have a

2    board of directors.  They have the president,

3    the vice president, so on and so forth.

4              They promote things like the

5    Home-a-Rama event, where it's showcase of

6    homes; and they're part of the National

7    Association of Homebuilders, which if you

8    join, say, the Tidewater Builders

9    Association, you join the National

10   Association of Homebuilders.  So I'm also --

11   I would be a member of that, also, and I

12   believe they're in Chesapeake.

13        Q.    And Peninsula?

14        A.    The Peninsula Homebuilders, I

15   don't -- I don't think for the last year or

16   so I had much dealing with them.  But they're

17   similar to the Tidewater Builders

18   Association.  And along with the -- if you

19   joined the Peninsula Homebuilders

20   Association, you join the National

21   Association of Homebuilders.

22        Q.    AWCI, where were they located

23   and what did they do, if you recall?

24              MR. HARDT:  ACWI or whatever it

Samuel G. Porter

342

1          is?   The American Ceiling thing, is

2          that what you're asking?

3          A.      Yeah, American Ceiling and

4     Walls Industry --

5     BY MR. HERMAN:

6          Q.      ACW, I guess?

7          A.      Yeah, something like that.

8               I'm not sure where they were

9     located, but I believe they're a national

10    company that advertises mostly for

11    manufacturers.

12               You would get a booklet, and it

13    would have, you know, different products,

14    like National Gypsum or Georgia Pacific or so

15    on and so forth; and they would have new

16    products that were being introduced to the

17    market and articles and things.

18               But it was mostly just, I

19    think, once-a-month publication.

20         Q.      Did they have any information

21    about Chinese drywall?

22         A.      They may have.  I don't recall

23    seeing any.

24         Q.      And did you ever attend any

Samuel G. Porter

343

1    meetings or conventions of the National

2    Association of Homebuilders?

3         A.     Not -- the only -- I would

4    attend the Tidewater Builders Association.

5         Q.     I see.

6         A.     And then some of the presidents

7    of the National Association of Homebuilders

8    would be sworn in in this area.  I would go

9    to those meetings.

10        Q.     Did you ever hold any offices

11   in any of these associations?

12        A.     No.

13        Q.     When you went to the Drake

14   meetings, did anybody ever discuss Knauf with

15   you, K-N-A-U-F?

16        A.     I had heard that there were

17   some people that may have been buying Knauf.

18   I had heard the -- about Knauf.  I had met

19   Mr. Knauf in Florida at an AWCI meeting.  He

20   was there just kind of roaming around.  We

21   would buy insulation from him at time to time

22   over the years.

23        Q.     Which Knauf was that, do you

24   remember?

Samuel G. Porter

344

1      A.      I think it was Alphonse.

2  Alphonse?  I really couldn't pronounce it.

3      Q.      And where was his -- where was

4  Knauf's insulation business location, do you

5  recall?

6      A.      We mostly bought the insulation

7  through distributors, a company like Moore

8  Products.  We -- I never bought directly from

9  Knauf.

10     Q.      But you actually did talk to

11  Mr. Knauf at this AWCI convention?

12     A.      I talked to him for maybe a

13  minute, because when we were a large

14  purchaser of insulation, every Christmas his

15  company would send a bottle of wine, and I

16  just asked, "Mr. Knauf, what happened to the

17  wine?"

18             And he said, "The family drank

19  it all."

20             So that was pretty much the

21  extent of our conversation.

22     Q.      Well, do you recall whether he

23  had a little exhibit there of Knauf products?

24     A.      I believe they did.

Samuel G. Porter

345

1       Q.     In your dealings with Frank

2  Peng or Frank Chen or the Chinese

3  representatives of Taishan, did they ever

4  initiate any phone calls to you?

5       A.     After we had started trying to

6  buy material?

7       Q.     Yes, sir.

8       A.     They -- I think they had called

9  me once or twice when Phil was with them.  I

10  believe it was regarding problems, but I

11  really didn't have much phone conversation

12  with them.

13       Q.     I'm not so much interested in

14  the conversation as to whether they actually

15  made calls from China to you in the U.S.

16       A.     I believe they did, yes.

17       (Whereupon, Deposition Exhibit

18       PSC-VPB-155, 11/10/05 Perry E-mail to

19       Clem, Subject: Distributorship,

20       V002608 - V002609, was marked for

21       identification.)

22  BY MR. HERMAN:

23       Q.     Yesterday we talked a little

24  bit about an attempt to become an exclusive

Samuel G. Porter

346

1    distributor for Taishan drywall, and that

2    fell through.  I'm going to show you

3    Exhibit 155, which is Bates-numbered V2608,

4    2609.

5              MR. HARDT:  And I'll just

6         object to the preface to the question,

7         because I don't think that's what we

8         talked about yesterday.

9              MR. HERMAN:  Oh.  Okay.

10             MR. HARDT:  But the record will

11        reflect it.

12             MR. HERMAN:  Maybe I'm in

13        error, so we'll talk about it now.

14             MR. HARDT:  The record will

15        reflect it.

16   BY MR. HERMAN:

17        Q.    There was an attempt to become

18   an exclusive distributor of Taishan drywall

19   by Venture Supply, correct?

20        A.    Yes.

21        Q.    And this Exhibit 155 is

22   evidence of that attempt, correct?

23        A.    Yes.

24        Q.    And as I recall your testimony,

Samuel G. Porter

347

1   correct me if I'm wrong, they wanted you to

2   purchase 300,000 sheets a month?

3        A.      That's what I recall from

4   yesterday, yes, sir.

5        Q.      And this idea of becoming an

6   exclusive distributor fell through at that

7   point, correct?

8        A.      Very quickly, yes.

9               (Whereupon, Deposition Exhibit

10              PSC-VPB-74, 12/27/05 Li E-mail to

11              Remont, Subject: Gypsum wallboard

12              market in China, INT/EXT02156, was

13              marked for identification.)

14  BY MR. HERMAN:

15       Q.      I'm going to show you

16  Exhibit 74.  And it has some underlining on

17  it, and I have -- I did not make the

18  underlining.  This is the way I received the

19  document.  It's INTERIOR/EXTERIOR02156.  I

20  show you Exhibit 74.

21              It's dated December 27th, 2005,

22  and that's around the same time that you were

23  trying to get your first shipment of drywall

24  to the United States, correct?

Samuel G. Porter

348

1          A.     Yes.

2          Q.     Chinese drywall?

3          A.     Yes.

4          Q.     And the title is "Gypsum

5    Wallboard Market in China," to Rudy Remont.

6    Do you know who Rudy Remont is?

7          A.     No, I don't.

8          Q.     Do you know who William S.

9    App, Jr. is?

10         A.     No, I don't.

11         Q.     Did you -- do you know who

12   Victor W-E-I is?

13         A.     No.

14         Q.     Okay.  You see that the first

15   paragraph relates to Beijing new building

16   material company and 1-1/2 million pieces of

17   Chinese wallboard ordered to Miami in 2006.

18   Do you see that?

19         A.     Yes, sir.

20         Q.     But the second paragraph deals

21   with Shandong Tai He Tongxing, Ltd. Company

22   factory in Tai'an of Shandon Province, and

23   it's a division of BNBMCL.

24              MR. HARDT:  Just for the

Samuel G. Porter

1       record, I'm going to object to any

2       questions on this.  It doesn't look

3       like it's to or from Mr. Porter.  It

4       doesn't look like it's a business

5       record of his.  But I'm --

6           MR. HERMAN:  Okay.  Well,

7       you're going to object.

8           MR. HARDT:  Yeah.

9           MR. HERMAN:  And he can't

10      identify --

11  BY MR. HERMAN:

12       Q.    You can't identify anything on

13  here as relating to your purchase of 100,000

14  sheets of drywall?

15       A.    That's correct.

16           MR. HERMAN:  Okay.  We'll put

17       it in the record only because it's

18       been talked about, and indicate the

19       witness cannot identify it.

20           MR. HARDT:  That's fine.

21           MR. HERMAN:  And it has no

22       relationship, according to the

23       witness, to any purchase that he made.

24           MR. HARDT:  He doesn't know.

Samuel G. Porter

350

1          (Whereupon, Deposition Exhibit

2      PSC-VPB-75, Dun & Bradstreet Business

3      Report for Shandong Taihe Dongxin,

4      Co., Ltd., Lucheng Branch, V000368 -

5      V000369, was marked for

6      identification.)

7   BY MR. HERMAN:

8      Q.     I'm going to show you

9   Exhibit 75, which is V368, and second page is

10  V369.  It's dated January 17th, 2006, at the

11  bottom.  And is this part of the research

12  that you did on Shandong Taihe?

13     A.     Yes, sir.

14     Q.     Did you attempt to get any of

15  the Shandong Taihe or Taishan Gypsum

16  electronic site material, website material,

17  from China?

18     A.     This was, I think, an inquiry.

19  We were part of Dun & Bradstreet Business,

20  which is a credit agency.

21     Q.     Right.

22     A.     In order to get this, we would

23  have had to go to Dun & Bradstreet

24  International.  This was part of what -- a

Samuel G. Porter

351

1    background check we wanted to do.

2         Q.      Yes, sir.  But did you ever

3    access -- or have anyone access the actual

4    websites of Shandong Taihe or Taishan Gypsum?

5         A.      I think I -- I believe I did at

6    one time.

7         Q.      And did you get the material in

8    Chinese and have it interpreted?

9         A.      No.  The website, I think, was

10   in English, if I'm not mistaken.

11        Q.      Did you ever access the website

12   in Chinese?

13        A.      No.

14               (Whereupon, Deposition Exhibit

15        PSC-VPB-76, China Explorer Catalog

16        Listing for Shandong Taihe

17        Dongxin, Co., Ltd., V000372 - V000373,

18        was marked for identification.)

19   BY MR. HERMAN:

20        Q.      I'm going to show you Exhibit

21   No. 76, and this is Bates number V372, 373.

22   It's dated, also, January 17th, 2006, and it

23   appears to be from the "China Explorer

24   catalog, Shandong Taihe Dongxin, contact

Samuel G. Porter

352

1    Mr. Steven Smith."

2            Did you contact Mr. Steven

3    Smith of Shandong Taihe for information about

4    the company?

5        A.    No.  I believe this is what I

6    had accessed the website and had somebody in

7    the office print out.  I think this was what

8    was on the website.

9        Q.    Okay.  In other words,

10   Exhibit 76 was the website you accessed of

11   Shandong Taihe?

12       A.    Yes.

13           MR. HARDT:  I object to the

14       form.  The website's at the bottom.

15   BY MR. HERMAN:

16       Q.    And on this material on the

17   first page, it says, "Contact Mr. Smith,

18   Steven," and it gives some phone numbers and

19   fax numbers.

20           Did you ever attempt to contact

21   Mr. Steven Smith?

22       A.    No, sir.

23           (Whereupon, Deposition Exhibit

24       PSC-VPB-77, China Supplies Products &

Samuel G. Porter

353

1          Services Directory Listing for

2          Shandong Taihe Dongxin Stock Co.,

3          V000376 - V000379, was marked for

4          identification.)

5     BY MR. HERMAN:

6          Q.     And I'm going to show you

7     another document, Exhibit 77, numbered V376,

8     377, also dated January 17th, 2006, titled

9     "China Supplies, Shandong Taihe Dongxin Stock

10    Company," and ask you if this is also

11    information which you accessed for Venture

12    Supply or Porter-Blaine on January 17th,

13    2006.

14               And that's Exhibit 77; is that

15    correct, sir?

16         A.     Yes, sir.

17         Q.     As a result of -- do you recall

18    accessing this article?  And I see it's

19    actually -- I misidentified it, and I

20    apologize.

21               For the record, it's

22    Exhibit 77; and it's four pages, V376 through

23    V379.

24         A.     Yes, this is something that I

Samuel G. Porter

354

1   pulled up on the website and had printed.

2         Q.      And I see that it says

3   "Shandong Taihe Dongxin Stock Company, Ltd.,"

4   and then it has the name of a manager,

5   J-A-I-P-O, second name, Y-A-N-G, with a phone

6   number.  Did you attempt to contact Mr. Yang?

7         A.      No.

8               (Whereupon, Deposition Exhibit

9         PSC-VPB-78, Plasterboard page from

10        Shandong Taihe Dongxin, Co., Ltd.

11        Website, V002024 - V002025, was marked

12        for identification.)

13  BY MR. HERMAN:

14        Q.      I'm going to show you Exhibit

15  No. 78 dated January 17th, 2006, Bates

16  numbers 2024, 2025.

17              MR. HARDT:  Thank you.

18  BY MR. HERMAN:

19        Q.      It's also dated January 17th,

20  2006.  Was this an additional research that

21  you were doing on January 17th, 2006,

22  regarding Taihe and Shandong Taihe Dongxin

23  Company, Ltd.?

24        A.      Yes.

Samuel G. Porter

355

1    Q.    I asked you yesterday about the

2   Taihe trademark, a dark background with what

3   looks like an inverted "V" or white teepee.

4          In any of the plasterboard that

5   you -- or wallboard you received from

6   Taishan, did it have the Taihe name with this

7   particular trademark?

8    A.    I think it had the name, but it

9   didn't have the little mark.

10   Q.    All right.  And if we look at

11   exhibit -- 2024, it says "Contact Person,

12   Frank Peng," P-E-N-G.

13   A.    Yes.

14   Q.    And this was the very

15   individual that had been communicating with

16   Tobin and with Venture Supply throughout the

17   purchase by Venture Supply of Taishan

18   drywall, correct?

19   A.    That's correct.

20   Q.    Did you attempt to reach Frank

21   Peng on or about January 17th by telephone?

22   A.    Not that I'm aware of, but I

23   think Phil had already been in contact with

24   him, according to that date.

Samuel G. Porter

356

```
1          Q.      You were already negotiating?
2          A.      Yes.
3          Q.      And as a matter of fact, Taihe
4     Group had its own website, correct?
5          A.      Yes.
6          Q.      Did you download or have
7     anybody research TaiheGroup.com to see what
8     they had on their website?
9          A.      Yeah, I remember looking at the
10    website.  I don't think anything was ever
11    printed, unless I --
12         Q.      Wasn't it in Chinese?
13         A.      I thought it was in American
14    and Chinese.
15         Q.      Both?
16         A.      Yes, sir.
17         Q.      Now, with regard to
18    Exhibits 76, 77, 78, on January 17th, 2006,
19    you were doing some research, but you were
20    already having trouble with Frank Peng and
21    Taishan, weren't you?
22         A.      Yes, sir.
23         Q.      And so is that the reason you
24    decided to do the research?
```

Samuel G. Porter

357

1     A.    I wanted to do the research, I

2   believe, for several reasons.  One was to

3   find out if there was a -- somebody in -- I

4   guess you would call upper management, or if

5   there was a chain of command to deal with

6   because of all the problems we had had, and

7   also to see if there was another source for

8   board, since Phil was already over in China.

9     Q.    Well, you were having trouble.

10  You did the research.  There was some contact

11  peoples -- excuse me, contact persons, for

12  example, a Mr. Smith and a Mr. Yang, that you

13  could have called on the phone and talked to,

14  correct?

15     A.    Yes.

16     Q.    But you didn't communicate with

17  them, correct?

18     A.    No.

19     Q.    I am correct?

20     A.    Oh.  Yes, you're correct.

21     Q.    Okay.  I appreciate it.  We

22  lawyers, sometimes we ask a question, and you

23  answer it correctly, but the answer you give

24  doesn't -- when you read it, it doesn't --

Samuel G. Porter

1     you know, it doesn't really jive.

2          A.     I understand.

3          Q.     So sometimes because of my

4     problems, I have to ask the question twice.

5     I appreciate you answering.

6          A.     Not a problem.

7               (Whereupon, Deposition Exhibit

8          PSC-VPB-139, Complaints to Venture,

9          V028893 - V028877 [not consecutive],

10         was marked for identification.)

11    BY MR. HERMAN:

12         Q.     I've got a file here that I've

13    marked "Complaints to Venture," and it's

14    PSC-139.  This is Exhibit 139, and I'm going

15    to read off the Bates numbers.  It's going to

16    take a little while to do that, but it will

17    save us a lot of time down the road.  So if

18    everyone will bear with me.

19               MR. HARDT:  Maybe we can save

20         some time, if you want to go off the

21         record on this.

22               MR. HERMAN:  Yeah, sure.

23               MR. HARDT:  Okay.

24               THE VIDEOGRAPHER:  Off the

Samuel G. Porter

359

1    record at 11:28 a.m.

2             (Recess taken, 11:28 a.m. to

3    11:31 a.m.)

4             THE VIDEOGRAPHER:  Please stand

5    by.  We're back on the record at

6    11:31 a.m.

7             MR. HARDT:  Yeah.  This is Ken

8    Hardt again, counsel for Venture and

9    Porter-Blaine.

10            What has been marked as

11   Exhibit 139 are documents we produced

12   in response to requests for production

13   in the state court matter of Colleen

14   Nguyen vs. Venture Supply, Inc. in

15   response to requests for production of

16   documents relating to complaints --

17   any documents relating to complaints

18   from the Nguyens and an unidentified

19   document relating to a complaint from

20   the Dragos Management Group.

21            And they are Bates numbers

22   V28893 through V28877.  And they also

23   include the project file of the

24   Nguyens, which I believe we talked

1          about and was marked as another

2          exhibit to this deposition before.

3 BY MR. HERMAN:

4          Q.     I'm going to ask you a few

5 questions about Exhibit 139.

6             MR. HERMAN:   And for the

7          record, I want to, again, indicate

8          that all the exhibit labels are

9          labeled PSC-VPB, followed by a number

10          to indicate that they are related to

11          the depositions that were taken

12          yesterday on December 16th and

13          proceeding today on December 17th, so

14          that in the event that they are used

15          in other depositions, they will be --

16          may be numbered differently on the

17          same exhibit.   And in the event

18          they're used at trial, they can also

19          be labeled with a trial exhibit.

20             MR. HARDT:   That's fine.

21 BY MR. HERMAN:

22          Q.     If we look at 28893, this is

23 directed to you from your insurer, correct?

24          A.     Yes.

Samuel G. Porter

361

```
 1        Q.     And it's directed to you as
 2   president of both Porter-Blaine and Venture
 3   Supply, correct?
 4        A.     Yes, sir.
 5        Q.     And this letter is 18 pages
 6   long.  And if you'll go to page 17 of the
 7   document, which is Bates number 28910, you'll
 8   see it's signed by William D. Makimoto,
 9   M-A-K-I-M-O-T-O, Regional General Adjuster,
10   Hanover Insurance Group, Inc., Citizens
11   Insurance Company of America.
12             Now, I'm not asking you about
13   anything that your attorney said to you or
14   you said to an attorney.  I would like to
15   know if you have discussed insurance coverage
16   for Venture Supply or Porter-Blaine with
17   Mr. Makimoto.
18        A.     Yes.  I talked to him a couple
19   times on the phone, and I've received some
20   e-mails from him.
21        Q.     Where are the e-mails you
22   received from him?
23             MR. HARDT:  They may be part of
24        the privilege log.  I don't know.
```

Samuel G. Porter

362

1          They may be after litigation had

2          ensued.  I don't know.

3     BY MR. HERMAN:

4          Q.     Okay.  Irrespective of whether

5     they may be part of an attorney-client

6     privilege log, where are the e-mails he sent

7     you?  Do you know where they are?

8          A.     They would be with the files

9     that I have set aside that have been copied

10    by Bizport and submitted to --

11         Q.     Okay.  You have certain files

12    that you've had copied and delivered to your

13    attorneys?

14         A.     Yes.

15         Q.     Regarding lawsuits --

16         A.     Yes, sir.

17         Q.     -- about Venture Supply,

18    Porter-Blaine and Taishan drywall?

19         A.     Yes.

20         Q.     Okay.  And you have a set of

21    those files yourself?

22         A.     Yes.

23         Q.     I'll ask you to maintain them.

24         A.     Yes, sir.

Samuel G. Porter

1      Q.      Okay.  Now, has Mr. Makimoto or

2   anyone that you know of from Hanover made any

3   inspections of the drywall at your warehouse,

4   the Taishan drywall?

5              MR. HARDT:  To the extent that

6          that relates to consulting expert

7          information, that's covered by our

8          similar objection beforehand --

9   BY MR. HERMAN:

10     Q.      Have insurance adjusters from

11  Hanover or Citizens been to your warehouse?

12     A.      I think somebody had come by

13  one time before I closed the businesses down.

14  I'm not exactly sure who it was.

15              I know Michael Falvey, on the

16  second page, with HRH, he would always come

17  by the office every so often, since he was my

18  sales rep.  He had been to the office, but I

19  don't -- I'm sure he didn't take any samples.

20     Q.      Have you gotten any -- is

21  Wolcott, Rivers & Gates a law firm?

22     A.      Yes, sir.

23     Q.      And are they representing you

24  in any of the lawsuits?

Samuel G. Porter

364

1          MR. HARDT:  They're his

2     personal counsel.

3          MR. HERMAN:  What?

4          MR. HARDT:  They're his

5     personal counsel.

6          MR. HERMAN:  Yeah, I'm asking.

7          MR. HARDT:  Yeah.

8  BY MR. HERMAN:

9      Q.     Are they representing you in

10  connection with the lawsuits?

11     A.     No.  They just do my general

12  business matters.

13     Q.     Hanover was providing attorneys

14  with respect to the lawsuits; is that

15  correct?

16     A.     Yes, sir.

17          MR. HARDT:  But Mr. Dorans

18     oversees it as personal counsel for

19     Venture Supply and Porter-Blaine.

20  BY MR. HERMAN:

21     Q.     Let's look at the next page.

22  Mr. Wayne Dean, AIC Claims Agent?

23     A.     Yeah.

24     Q.     Do you know what AIC is?

Samuel G. Porter

365

1          A.      No, I don't.

2          Q.      Has he made an inspection of

3    the warehouse, do you know?

4          A.      He may have been the one that

5    came by and looked at the warehouse.  I know

6    I've talked to him.  I can't remember if I

7    met him, because at the time I was meeting so

8    many different people, I --

9          Q.      Did he send any e-mails to you,

10   do you know?

11         A.      Yes.

12         Q.      Okay.  Any e-mails that were

13   sent to you by Mr. Makimoto, Mr. Wayne Dean

14   or Mr. Michael Falvey, would you please

15   preserve those?

16         A.      Yes.

17                 And I believe Barry Dorans is

18   copied on everything, my legal -- my lawyer.

19                 MR. HERMAN:  Okay.

20                 MR. HARDT:  Well, that's not --

21                 MR. HERMAN:  Well, the lawyers

22         will sort that out with --

23                 THE WITNESS:  Did I do the

24         lawyer thing again?

Samuel G. Porter

1          MR. HARDT:  Just --

2          MR. HERMAN:  -- between

3     themselves or with the help of

4     Judge Fallon.

5   BY MR. HERMAN:

6     Q.    But I'm just asking you to

7   please -- do you have e-mails, and will you

8   preserve them?

9     A.    Yes, I'm saving everything that

10  I have today.

11         THE WITNESS:  Sorry about that.

12    Sorry.

13  BY MR. HERMAN:

14    Q.    Then pages 28524 through

15  pages -- or up to page 28557, those are Bates

16  numbers, that relates to the Nguyen, the

17  N-G-U-Y-E-N claim, that we spoke about

18  earlier, correct?

19    A.    Yes.

20         MR. HARDT:  And I think the

21    file actually starts the page before,

22    which is 28523, which is a copy of the

23    front of the file.

24         MR. HERMAN:  Okay.  So let me

Samuel G. Porter

1          correct that.

2                    MR. HARDT:  You see this 28...

3     BY MR. HERMAN:

4          Q.     28523 through 28556 --

5                    MR. HARDT:  7, actually.

6     BY MR. HERMAN:

7          Q.     -- relates to the claim of the

8     Nguyen family regarding 1100 Michael Wood,

9     the location of that property, correct?

10         A.     Yes.

11         Q.     And on the first page -- that

12    is, 28523 -- 9/18/06, you see some

13    handwriting?

14         A.     I passed by it.  Yes, sir.

15    Yes.

16         Q.     Whose handwriting is that, sir?

17         A.     That -- if you look at the

18    date, it says 9/18/06.  That's actually "KL,"

19    Kathy Lenhart, one of my office personnel.

20    Yes.

21         Q.     And did you ever negotiate with

22    Ms. Nguyen for her loss, either for Venture

23    or Porter-Blaine?

24                   MR. HARDT:  Object to the form.

Samuel G. Porter

368

1        This is '06.  "Christian wants to

2        negotiate" --

3        A.      If I'm not mistaken, this is --

4    this is before the job had ever started.

5    This is what would have been an estimate.

6    Christian, I think, is with Curb Appeal, and

7    what he wanted to negotiate with was the

8    price of the original job, not -- this

9    isn't --

10   BY MR. HERMAN:

11       Q.      This doesn't relate to any

12   claimed damages by the Nguyen family to their

13   property or their person?

14       A.      That's correct.

15       Q.      Okay.  Now, let's look at

16   what's marked 28557.  It's a typewritten

17   page, "Drywall Claim, April 7, '09, Person

18   Reporting Claim, Tuan and Colleen Nguyen."

19           Do you see that?

20       A.      Yes.

21       Q.      Was this typing by either an

22   employee of Venture Supply or an employee of

23   Porter-Blaine?

24           MR. HARDT:  This is generated

Samuel G. Porter

369

1        by us.

2                    MR. HERMAN:  I'm sorry?

3                    MR. HARDT:  This is generated

4        by us.

5    BY MR. HERMAN:

6        Q.      This is generated by --

7                    MR. HARDT:  My firm.

8    BY MR. HERMAN:

9        Q.      -- the attorneys, so...

10                   Were you aware -- you were

11   aware, at least by April 7th, 2009, that

12   there was a problem with the Nguyen property,

13   because by then you had already retained

14   counsel, correct?

15                   MR. HARDT:  Object to the form.

16       Alleged problem.

17   BY MR. HERMAN:

18       Q.      When was the earliest time that

19   you knew that there -- that Taishan wallboard

20   which you had purchased was causing problems?

21                   MR. HARDT:  Object to the form.

22       Are you asking when he was first

23       notified that there was a claim that

24       it was causing problems?

Samuel G. Porter

1          MR. HERMAN:  All right.  Let me

2      rephrase the question.  Thank you.

3          MR. HARDT:  Thank you.

4  BY MR. HERMAN:

5      Q.     When were you first advised by

6  either a builder or a subcontractor or a

7  property owner that Taishan drywall was

8  causing either property or personal injury

9  problems?

10     A.     That would have been in January

11  of '09, when I first started talking to

12  Dragos about a homeowner at the -- not the

13  Hampshires -- yeah, the Hampshires.

14     Q.     The Hampshires was a

15  development?

16     A.     Yes.  One of the Dragos

17  developments we had already gone over.

18     Q.     Now, the first letter that you

19  got from Hanover begins at V28893, and it's

20  dated March 3rd, 2009.  And it relates to

21  builder Dragos Management Corporation, et al.

22  projects, the Hampshires at Greenbriar in

23  Chesapeake, Virginia, and Cromwell Park at

24  Salem, Virginia Beach, Virginia, correct?

Samuel G. Porter

371

1      A.      Yes.

2      Q.      Now, if we turn to V28874

3   through 28877, there's another letter from

4   Kaufman & Canoles, C-A-N-O-L-E-S, to Mr. Bill

5   Makimoto of Hanover Insurance Company, and

6   it's signed by Kristan B. Burch at

7   page 28877.

8           Are you familiar with this

9   letter?

10      A.      Yes.

11      Q.      And at that time, the letter --

12   this letter was copied to your attorney,

13   Mr. Dorans, correct?

14      A.      Yes.

15      Q.      And in it, Dragos indicates, or

16   Kristan B. Burch, the lawyer with Kaufman &

17   Canoles, indicates that Dragos is going to go

18   ahead and remediate the property -- affected

19   properties?

20           MR. HARDT:  The document speaks

21      for itself.

22   BY MR. HERMAN:

23      Q.      Has Porter-Blaine or Venture

24   contributed any sums to the remediation

Samuel G. Porter

372

```
1    effort of the Dragos properties affected by
2    Taishan drywall?
3         A.    No.
4         Q.    Has any insurer of either
5    Porter-Blaine or Venture, to your knowledge,
6    contributed any sums to Dragos for the
7    remediation of homes affected by Taishan
8    drywall?
9         A.    Not that I'm aware of.
10              MR. HERMAN:  That's all I have
11         on this document.  Thank you.
12              Let's go off the record for a
13         minute, please.
14              MR. HARDT:  Thank you.
15              (Whereupon, Deposition Exhibit
16         PSC-VPB-166, Porter-Blaine
17         Corp./Venture Supply Insurance Policy,
18         V000762 - V000796, was marked for
19         identification.)
20              (Whereupon, Deposition Exhibit
21         PSC-VPB-167, Porter-Blaine
22         Corp./Venture Supply Insurance Policy,
23         V000798 - V000829, was marked for
24         identification.)
```

Samuel G. Porter

373

1            (Whereupon, Deposition Exhibit

2       PSC-VPB-168, Porter-Blaine

3       Corp./Venture Supply Insurance Policy,

4       V000830 - V000882, was marked for

5       identification.)

6            (Whereupon, Deposition Exhibit

7       PSC-VPB-169, Porter-Blaine

8       Corp./Venture Supply Insurance Policy,

9       V000883 - V000932, was marked for

10      identification.)

11           (Whereupon, Deposition Exhibit

12      PSC-VPB-170, Porter-Blaine

13      Corp./Venture Supply Insurance Policy,

14      V000933 - V000940, was marked for

15      identification.)

16           (Whereupon, Deposition Exhibit

17      PSC-VPB-171, Porter-Blaine

18      Corp./Venture Supply Insurance Policy,

19      V000941 - V000997, was marked for

20      identification.)

21           (Whereupon, Deposition Exhibit

22      PSC-VPB-172, Porter-Blaine

23      Corp./Venture Supply Insurance Policy,

24      V000998 - V001053, was marked for

Samuel G. Porter

374

1 identification.)

2    (Whereupon, Deposition Exhibit

3 PSC-VPB-173, Porter-Blaine

4 Corp./Venture Supply Insurance Policy,

5 V001054 - V001088, was marked for

6 identification.)

7    (Whereupon, Deposition Exhibit

8 PSC-VPB-174, Porter-Blaine

9 Corp./Venture Supply Insurance Policy,

10 V001089 - V001141, was marked for

11 identification.)

12    (Whereupon, Deposition Exhibit

13 PSC-VPB-175, Porter-Blaine

14 Corp./Venture Supply Insurance Policy,

15 V001142 - V001203, was marked for

16 identification.)

17    (Whereupon, Deposition Exhibit

18 PSC-VPB-176, Porter-Blaine

19 Corp./Venture Supply Insurance Policy,

20 V001204 - V001254, was marked for

21 identification.)

22    THE VIDEOGRAPHER:  Off the

23 record at 11:49 a.m.

24    (Recess taken, 11:49 a.m. to

Samuel G. Porter

1       12:05 p.m.)

2               THE VIDEOGRAPHER:  Please stand

3       by.  Back on the record at 12:05 p.m.

4               MR. HARDT:  Yes, this is Ken

5       Hardt again.  I represent Venture and

6       Porter-Blaine.

7               What has been marked PSC-VPB

8       Exhibits 166 through 176 appear to be

9       the insurance policies we provided in

10      response to document requests.

11              I think they were probably in

12      the Nguyen case, but I'm not sure, but

13      they were in response to plaintiffs'

14      document requests, and that the PSC

15      has requested we get certified copies,

16      and we'll be glad to do that.

17              MR. HERMAN:  And we'll make

18      them part of the record such as they

19      are and at the time we get certified

20      records -- certified copies, we'll

21      meet and confer.  And at that time, we

22      may substitute the certified copies

23      for those that are in the record.

24              MR. HARDT:  I don't have a

Samuel G. Porter

376

1          problem with that.  That's fine.

2     BY MR. HERMAN:

3          Q.     I want to go back to

4     Exhibit 117.  Exhibit 117 is 1407.  It's

5     not -- it was -- yesterday you testified

6     about it, and it had to do with the

7     calculation of costs with respect to the

8     second shipment of Chinese wallboard from

9     Taishan purchased by Venture Supply, or to be

10    purchased.

11         A.     Yes, sir.

12         Q.     It's dated May 15th, and if I'm

13    correct, it is in your handwriting.

14         A.     That's correct.

15         Q.     The columns of various sums,

16    were these projections or actual cost

17    estimates based upon information you had

18    received from various vendors or shippers

19    with regard to, for example, plywood pallets,

20    freight, et cetera?

21         A.     It's a little bit of both.

22    It's mostly cost projections that I -- like,

23    for example, the pallet, $11,272, that's what

24    I had gotten a quote from for the pallets.

Samuel G. Porter

377

1  The freight, for example, was an approximate

2  because I didn't know who was going to be the

3  shipper.

4          So these are just my notes to

5  get an approximate cost because the cost

6  continually would go up over time.

7      Q.    How did the $500,000 figure in

8  your cost projection or estimate -- what was

9  that for?

10          MR. HARDT:  550?  I think you

11      have it.

12          MR. HERMAN:  550.  Thank you.

13  BY MR. HERMAN:

14      Q.    In Exhibit 117, it says

15  "Freight, $557,000."

16      A.    When I first started looking at

17  the shipping rates, they go by cubic meter.

18  And as time went on, the -- if I remember

19  correctly, for example, my original

20  calculations were at $65 per cubic meter.

21          This calculation, I believe,

22  was at $98 per cubic meter because the longer

23  it went, the higher the ship costs went; and

24  the shipping, it seemed to be whoever paid

Samuel G. Porter

1    the most, got the first.

2            And that number was based on --

3    I think we had an earlier document that I had

4    used that approximate figure from one of the

5    shippers that quoted.

6        Q.     Did the actual freight cost, by

7    the time the delivery took place, cost more

8    than 550,000 or less?

9        A.     With the -- the freight, as far

10   as the boat charge and the rail, it ended up

11   costing more than 550,000.

12       Q.     Okay.  Thank you.

13       A.     Uh-huh.

14       Q.     Now, at some point -- if I

15   could have this back.  Thank you.

16            At some point, you had an

17   auction, correct?

18       A.     Yes, sir.

19       Q.     About when was that?

20       A.     It was July 26th.

21       Q.     Of 2009, this year?

22       A.     2009, yes.

23       Q.     And among the equipment that

24   you auctioned off were computers, correct?

Samuel G. Porter

1       A.      Yes, sir.

2       Q.      Those computers belonged to

3   either Venture or Porter-Blaine or both?

4       A.      Either/or.  They were --

5       Q.      Some were Porter-Blaine, and

6   some were Venture?

7       A.      Yes, sir.

8       Q.      Now, what happened to the hard

9   drives related to the computers that you

10  auctioned off?

11      A.      From what I understand is

12  the -- all the information went to the main

13  server, which -- we had a computer room, and

14  all the information went through the server,

15  whether it was accounting or inventory or so

16  on and so forth.

17          So all that information that

18  went to the server, I would use offsite

19  storage companies, like DMSI, Timberline and

20  so on, different things like that.  All that

21  information would either be on the hard

22  drive -- on the main server or by one of

23  these offsite service providers.

24          So I -- whatever information

Samuel G. Porter

380

1    was on the computers that we auctioned, the

2    individual computers, according to my staff

3    and everybody, that everything had already

4    been transferred to the main server, those

5    computers have been auctioned off to

6    different individuals.

7         Q.    So all of the information that

8    would have been on those computers has been

9    maintained in some way --

10             MR. HARDT:  Well, if I could

11        say --

12   BY MR. HERMAN:

13        Q.    -- is that correct?

14             MR. HARDT:  If I could say, we

15        didn't produce and talk about DMSI.

16        We talked to you about using somebody

17        else.

18             MR. HERMAN:  I understand that,

19        and --

20             MR. HARDT:  You're just asking

21        about his knowledge, and he's not the

22        one that's talking.

23   BY MR. HERMAN:

24        Q.    That's all I'm asking about,

Samuel G. Porter

1    is:  To your knowledge, all of the

2    information that was on those computers has

3    been maintained?

4           A.     Yes, sir.

5           Q.     And I'll ask you to continue to

6    maintain it.

7           A.     Yes, sir.

8                  (Whereupon, Deposition Exhibit

9           PSC-VPB-151, Venture Supply, Inc.

10          Financial Report, December 31, 2005

11          and March 31, 2005, V000601 - V000621,

12          was marked for identification.)

13   BY MR. HERMAN:

14          Q.     Now, I'd like you to look at

15   Exhibit 151, which is Bates numbers V601

16   through 621, V621.  And I believe page V602

17   of Exhibit 151 has -- states it's a Venture

18   Supply, Inc. financial report compiled

19   December 31st, 2005, through March 31st,

20   2005; is that correct?

21          A.     Yes, that's correct.

22          Q.     Now, does Venture Supply have

23   financial reports for all periods after

24   March 31st, 2005?

Samuel G. Porter

382

1          A.      Yes, sir.

2          Q.      And where are they maintained?

3          A.      Those documents are in a

4      storage unit in Virginia Beach, separate from

5      the other information that I'm retaining.

6      And the firm -- my accounting firm, Wall,

7      Einhorn & Chernitzer that prepared all my

8      financial documents, they also have copies of

9      all this.

10                 So I have hard copies and

11     everything -- I think I've been with them for

12     almost 15 years.  They should have

13     everything.

14         Q.      And with regard to

15     Porter-Blaine, does Porter-Blaine have

16     financial reports?

17         A.      Yes.

18         Q.      And are they maintained by the

19     same Certified Public Accountants?

20         A.      Yes, sir.

21         Q.      And you have hard copies of

22     those?

23         A.      Yes.

24         Q.      And I'll ask you to maintain

Samuel G. Porter

383

1      those --

2              A.      Yes, sir.

3              Q.      -- both for Venture and for

4      Porter-Blaine.

5                      (Whereupon, Deposition Exhibit

6              PSC-VPB-153, 2009 Annual Report of

7              Venture Supply, Inc., PSC-VPB-00500,

8              was marked for identification.)

9      BY MR. HERMAN:

10             Q.      I'm going to show you

11     Exhibit 153.  It says "2009 Annual Report,

12     Commonwealth of Virginia State Corporation

13     Commission, for Venture Supply, Inc."?

14             A.      Yes.

15             Q.      And do you recognize your

16     signature on this?

17             A.      Yes, sir.

18             Q.      And if you turn to the second

19     page, this is PSC-VPB Bates 0050 and 00501.

20     If you turn to the second page of

21     Exhibit 153, it gives the names of offices of

22     Venture Supply for the year -- well, as of

23     October 12th, 2009; is that correct?

24                     MR. HARDT:  The document says

Samuel G. Porter

1          what it says.

2     BY MR. HERMAN:

3          Q.     Look at the first page.  Your

4     signature --

5          A.     Yes, sir.  Yes, sir.

6          Q.     -- is October 12th, 2009, and

7     it says at the top, "2009 Annual Report."

8          A.     Yes.

9          Q.     Now, since filing this

10    report -- second page says 11/30/09.

11    November 30th, 2009, is a due date.  That

12    would be the date this report was due?

13         A.     (Nods head.)

14         Q.     Have there been changes in the

15    officers of Venture Supply, Inc.?

16         A.     Not yet, no.

17         Q.     All right.  Did Porter-Blaine

18    also register with the Commonwealth of

19    Virginia?

20         A.     Yes, sir.

21         Q.     Have you maintained copies of

22    the annual reports of Porter-Blaine and

23    Venture Supply for the years 2005 through

24    2009?

Samuel G. Porter

1          A.      Yes, sir, but I'm not sure if

2    Porter-Blaine has been up for renewal yet, if

3    it's the same date.  When it does, I'm going

4    to renew it.

5          Q.      And you have the past annual

6    reports for both Porter-Blaine and Venture

7    Supply?

8          A.      I have them in the records, and

9    my agent also has the originals.

10         Q.      Your registered agent is

11   Richard E. Biemiller, B-I-E-M-I-L-L-E-R, and

12   he's one of your attorneys?

13         A.      That's correct.

14         Q.      Has there been a change in the

15   officers of Porter-Blaine in the last year?

16         A.      No, sir.

17         Q.      Has there been a change in

18   ownership of Venture Supply since 2005?

19         A.      I had sold shares of -- well, I

20   don't know.  I can't remember exactly what

21   year it was.  It might have been 2005.  Marty

22   Abrisz and Kurt Riffey had purchased 10% each

23   of the shares of the corporation.  The exact

24   date, I'm not sure.

Samuel G. Porter

386

1      Q.      Since that time, have there

2   been any other changes in the ownership of

3   Venture Supply?

4      A.      No, sir.

5      Q.      All right.  Since 2005, has

6   Porter-Blaine had any change in who the

7   officers are?

8      A.      Same situation.  Richard

9   Osborne had bought 49% of Porter-Blaine.  I'm

10  not exactly -- I think it was in 2005, but

11  there hasn't been any changes since then.

12     Q.      And you remained as president

13  of Porter-Blaine and Venture from 2005

14  through today?

15     A.      Yes, sir.

16             (Whereupon, Deposition Exhibit

17        PSC-VPB-154, Financial Backup

18        Documents, V000558 - V000619, was

19        marked for identification.)

20  BY MR. HERMAN:

21     Q.      I'd like you to look at

22  Exhibit 154, and this is V558 through V619.

23  And if you'd just look through this, I just

24  have one or two questions of you after

Samuel G. Porter

387

1    you've...

2              (Witness reviews document.)

3         A.    Okay.

4    BY MR. HERMAN:

5         Q.    Now, within Exhibit 154, there

6    are also financial statements previously

7    identified, but there are a number of

8    materials, particularly from stevedores and

9    railroad companies, either requesting

10   information or freight information, invoices,

11   et cetera.

12             Are the documents contained in

13   154 representative of various aspects of

14   costs and materials related to the freight of

15   Taishan Chinese drywall, which was purchased

16   by Venture from Taishan?

17        A.    Yes.

18             MR. HERMAN:  Okay.  As I

19        understand it, Venture Supply and

20        Porter-Blaine are going to produce a

21        representative, a 30(b)(6)

22        representative, with regard to ESI and

23        computer-related information.

24             MR. HARDT:  With respect to the

Samuel G. Porter

1    notice of deposition that you-all sent

2    us, yes.  That's, what, it was 4, 5

3    and 6, I believe is what it was.  Yes,

4    sir.

5            MR. HERMAN:  Correct.

6  BY MR. HERMAN:

7       Q.    I just have a couple more

8  questions to clarify your general knowledge,

9  not specific knowledge.

10           The offsite depositories where

11  you sent computer information, where are they

12  located?

13      A.    I believe DMSI is in Omaha,

14  Nebraska; and I'm not sure where the other

15  one would be.

16      Q.    What's the name of the other

17  one?

18      A.    Timberline.

19      Q.    Timberline?

20      A.    Timberline is what the software

21  is called.

22      Q.    And who knows most about your

23  computer information, where it's stored,

24  who's preserving it?  Who would know?

Samuel G. Porter

389

1          MR. HARDT:  We're working on

2      that.  I mean, we're going to provide

3      somebody.

4          MR. HERMAN:  No, I understand

5      you're going to provide somebody to

6      answer.

7          MR. HARDT:  Okay.

8  BY MR. HERMAN:

9      Q.    What I want to know is:  From a

10  Porter-Blaine/Venture president, CEO --

11      A.    Right.

12      Q.    -- in your organizations, who

13  would know most about that?

14      A.    Probably my -- who was my

15  controller.  His name is Marc Stein.  He was

16  basically head accountant, so on and so

17  forth.  He would know which companies we

18  dealt with, and he would bring me, say, for

19  example, DMSI -- you know, when we first

20  started, he said, "Okay.  The DMSI is due for

21  the storage of information.  We need to go

22  through '09," and so on and so forth.

23          So I think he would be the most

24  knowledgeable.

Samuel G. Porter

390

1       Q.      Okay.  So, as far as you know,

2    he would be the most knowledgeable as to

3    where your ESI information is stored and who

4    has it and who's preserving it?

5       A.      Yes.

6               And we also had a computer

7    company in Richmond.  I can't remember the

8    name, if it was CSI or somebody like that.

9    They were -- they would also work with the

10   computer at our office and the firms offsite,

11   but that information would be in the records.

12      Q.      Is Mr. Stein still employed by

13   either Porter-Blaine or Venture Supply?

14      A.      No, sir.

15      Q.      Do you know who employs him

16   today?

17      A.      I'm not exactly sure who

18   employs him.  I know he lives in Virginia

19   Beach, and he had sent me an e-mail with

20   where he's working.  And I remember -- I

21   recall the address being on Viking Drive,

22   just because I've done a lot of work over

23   there over the years.  So somewhere on Viking

24   Drive in Virginia Beach.

Samuel G. Porter

391

1          Q.     Do you know where Mr. Stein

2     lives?

3          A.     Kempsville section of Virginia

4     Beach.

5                 MR. HERMAN:  All right.  I

6          thank you for answering my questions.

7          Let me talk with Fred off the record

8          for a minute.

9                 MR. HARDT:  Okay.

10                THE VIDEOGRAPHER:  Off the

11         record at 12:26 p.m.

12                (Recess taken, 12:26 p.m. to

13         12:28 p.m.)

14                THE VIDEOGRAPHER:  Please stand

15         by.  We're back on the record at

16         12:28 p.m.

17                MR. HERMAN:  This concludes

18         plaintiff's PSC's questioning of

19         Mr. Samuel Porter, president of

20         Venture Supply, Inc. and

21         Porter-Blaine, appearing in a 30(b)(6)

22         deposition as the corporate

23         representative.

24                Subject to the production of a

Samuel G. Porter

392

1  corporate representative to answer ESI

2  and related computer questions or any

3  future production of documents,

4  plaintiffs have no further questions

5  of Mr. Porter.

6      We thank him for his

7  attendance, and we tender the witness

8  to Mitchell Homes, Tobin and Dragos,

9  should they have questions at this

10 point.

11     MR. HARDT:  To Mitchell Homes,

12 Tobin and Dragos, Tobin has reserved

13 their rights.  To the extent you're

14 tendering him to someone who's not a

15 party to Germano, I think we need to

16 discuss that off the record.  If

17 somebody can ask questions, is that

18 what you're indicating?

19     MR. HERMAN:  Yes.

20     MR. HARDT:  Okay.  Is somebody

21 on the phone intending to ask

22 questions?

23     COUNSEL ON PHONE:  I'm not.

24     MR. HERMAN:  Well, hearing

Samuel G. Porter

393

1    nothing -- I'm sorry.  Hearing only

2    one response, and that respondent is

3    not going to ask questions, and

4    hearing no further responses, the

5    deposition is concluded.  And we thank

6    all counsel for their courtesy and

7    Mr. Porter in appearing.

8         MR. HARDT:  Thank you,

9    Mr. Herman.

10        MR. BRENNER:  And just for the

11   record, Tobin is not an intervenor in

12   the pending action or hearing on

13   February the -- whatever there is.

14   There's been a prior order entered as

15   far as non-Taishan defendants, and

16   we're under that.

17        MR. HARDT:  All right.  Thank

18   you.

19        THE VIDEOGRAPHER:  Off the

20   record at 12:30 p.m.  This is the end

21   of Tape No. 6 and the deposition.

22        (Deposition concluded at 12:30 p.m.)

23        - - - - - - -

24

Samuel G. Porter

394

1                            CERTIFICATE

2

3              I, MICHAEL E. MILLER, Certified
   Court Reporter, Registered Diplomate
4  Reporter, Certified Realtime Reporter, do
   hereby certify that prior to the commencement
5  of the examination, SAMUEL G. PORTER was duly
   sworn by me to testify to the truth, the
6  whole truth and nothing but the truth.

7              I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
8  testimony as taken stenographically by and
   before me at the time, place and on the date
9  hereinbefore set forth, to the best of my
   ability.
10
               I DO FURTHER CERTIFY that I am
11 neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
12 action, and that I am neither a relative nor
   employee of such attorney or counsel, and
13 that I am not financially interested in the
   action.

14

15

16 _____
   MICHAEL E. MILLER,
17 NCRA Registered Diplomate Reporter
   NCRA Certified Realtime Reporter
18 Certified LiveNote Reporter
   LA Certified Court Reporter #27009
19
   Dated: December 21, 2009
20

21

22

23

24

Samuel G. Porter

1          ACKNOWLEDGMENT OF DEPONENT

2

3

4          I, SAMUEL G. PORTER, do hereby
certify that I have read the foregoing pages
5   and that the same is a correct transcription
of the answers given by me to the questions
6   therein propounded, except for the
corrections or changes in form or substance,
7   if any, noted in the attached
Errata Sheet.

8

9

10

11

12   _____
SAMUEL G. PORTER          DATE
13

14

15   Subscribed and sworn to before me this

16   _____ day of _____, 20 ____.

17   My commission expires: _____

18

19   Notary Public

20

21

22

23

24

Samuel G. Porter

396

```
1                          - - - - - - -
                               ERRATA
2                          - - - - - - -

3      PAGE   LINE        CHANGE

4      _____  _____       _____

5      REASON:            _____

6      _____  _____       _____

7      REASON:            _____

8      _____  _____       _____

9      REASON:            _____

10     _____  _____       _____

11     REASON:            _____

12     _____  _____       _____

13     REASON:            _____

14     _____  _____       _____

15     REASON:            _____

16     _____  _____       _____

17     REASON:            _____

18     _____  _____       _____

19     REASON:            _____

20     _____  _____       _____

21     REASON:            _____

22     _____  _____       _____

23     REASON:            _____

24
```

Samuel G. Porter

397

- - - - - - -
**LAWYER'S NOTES**
- - - - - - -

PAGE    LINE

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24