# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "Agreement") is made and entered into by and between:

**CENTERLINE HOMES AT B AND A, LLC** (herein after referred to as "Seller"),

whose mailing address is: 825 Coral Ridge Drive, Coral Springs, Florida 33071; and

Name: *Chad Randi , Krzysztof Olszewski*

Address: *2208 Ridgewood Circle*

City: *Royal Palm Beach*   ST: *FL*   Zip: *33411*

Home Ph: *561- 333 3782*   Work Phone: *954 - 854 25 79*

Email Address: *Consulkris@aol.com* (herein after referred to as "Purchaser").

1. DESCRIPTION OF RESIDENCE: **Model:** Victoria   **Lot:** 43   **Garage Orientation:** Right

**Development:** Cobblestone Creek   **Address:** 8680 Cobblestone Point Circle, Boynton Beach, FL 33437

2. PURCHASE TERMS: The Seller and Purchaser hereby agree that the Seller shall sell and the Purchaser shall buy the Residence upon the terms and conditions herein after set forth.

3. DATE OF CLOSING: Seller estimates that the date of closing shall be approximately _____ *April 2006* _____

4. PURCHASE PRICE: The total purchase price (the Purchase Price) for the Residence exclusive of any closing costs shall be as follows:

| | |
|---|---|
| BASE HOME PRICE: | *575,900* |
| LOT PRICE: | *0* |
| Total Purchase Price at execution of the Agreement | *575,900* |

Purchaser agrees to make the following Deposit payments to Seller:

| Payment | Due Date | | Amount Due |
|---|---|---|---|
| Initial Deposit | At contract execution | *5000 + 23,795 =* | *28,795* |
| Additional Deposit | April 3, 2005 | | *28,795* |
| Other Deposits | Due on 5/3/05 unless 90% mortgage commitment received from Centerpoint Financial | Total of Other Deposits | *28,795* |

Mortgage amount or Cash due at closing of title ("Closing") subject to prorations and adjustments set forth in this Agreement which amounts due can be amended by execution of other agreements:                                     *489,515*

All of the foregoing pre-closing payments are collectively called the "Deposits". Deposits may be made in cash or by check. The balance payable at Closing must be paid by local cashier's check or by wire transfer of US funds to an account designated by Seller.

5. METHOD OF FINANCING: Purchaser hereby elects the following method of financing:

[ X ] Mortgage       [ ] Cash

[ X ] Seller designated Lender:   Centerpointe Financial, In

Centerline Homes and Centerpointe Financial are considered an affiliated business arrangement and as such Centerline Homes may derive financial benefit from its Homebuyers financing their home through Centerpointe Financial. You are not required to use Centerpointe Financial as a condition of doing business with Centerline Homes.

[ ] Non-Seller designated Lender   Purchaser hereby elects to choose its own lender, in which event this transaction shall
OR                be considered a cash transaction and not contingent upon Purchaser obtaining mortgage approval as set forth in paragraph 13.

6. DESCRIPTION OF RESIDENCE:

6.1 The Residence has been, or will be, completed in substantial compliance with the plans and specifications (the "Plans") filed with the Building Department in and for Palm Beach County, Florida. However, the Seller shall not be liable for any failure of the Residence to be constructed in strict compliance with the Plans. Seller shall have the right to make modifications to the Plans so long as those modifications do not, in Seller's opinion, significantly impair the value of the Residence. Purchaser understands and agrees that it is a widely observed construction industry practice for pre-construction plans for any home to be changed and adjusted from time to time in order to accommodate ongoing in the field construction factors, and that these changes and adjustments are essential in order to permit all components of the Residence to be integrated into a well-functioning and aesthetically pleasing home. Without limiting Seller's general right to make such changes, Purchaser understands and agrees that changes in the dimensions of rooms, patios and balconies, if any, and in the location of windows, doors, walls, partitions, utility, television and telephone lead-ins and outlets, air conditioning components, lighting fixtures, electrical panel boxes and in the general layout of the Residence and the position of the Residence on the Lot may be made by Seller. Purchaser further understands and agrees that certain items such as the following which may be seen in the Model, or in illustrations thereof, are not included with the sale of the Residence: wall coverings, paint colors, accent light fixtures, wall paneling, bedspreads, furniture, decorator accessories, lamps, mirrors, graphics, pictures, plants, wall-hung shelves, sconces, wet bars, intercoms, kitchen accessories, linens, window shades, window treatments, verticals, upgraded carpets and tile, decorative walks and patios and their treatments, barbecues, planters, lanais, screening, select landscaping, terrain treatments, fireplaces, outside lighting and certain built-in fixtures and other upgraded items. This listing of items, which is not intended to be all-inclusive, is provided as an illustration of the type of items which may be built in or placed upon the Residence, or shown in illustrations therefore, strictly for the purpose of decoration and example only. Items such as these will not be included in the Residence unless specifically provided for in the list of items on the Color/Option Addendum or Change Form. Purchaser acknowledges and understands that certain of these items may not even be available for placement in the Residence or upon the Lot. The Purchaser agrees to close upon the purchase of the Residence if the construction of the Residence is in substantial conformity with the Plans. In the event the Residence, as of the date of this Agreement, has not been substantially completed, then Seller agrees to substantially construct the Residence in accordance with the Plans; however, because the Residence contains many structural elements, materials, and equipment, shortages in materials or supplies or substantial increases in the costs of same may occur which, in the discretion of the Seller, may require substitution of materials or supplies. In the event of substitution, Seller agrees, wherever reasonably possible, to use materials or supplies of equal or better quality, but in no event shall any materials or supplies be of lesser quality than the quality required by the applicable building codes.

/18/2005                Page 1                _____ Seller _____ Purchaser _____ Purchaser

6.2 The Residence shall be decorated in accordance with the selections made by the Purchaser on the Color/Option Addendum Form to be executed by the Purchaser and Seller, from color selections presented by the Seller. The failure of the Purchaser to make selections within thirty (30) days from date of Seller acceptance of this Agreement, shall result in the Seller making such selections as it deems appropriate. In the event that Seller makes such decorative selections, then the Purchaser agrees to close this transaction with such selections as have been made by Seller. In connection with the quality and colors of any tile, marble, cabinets, mica, appliances, carpeting, paver or other items, and in connection with the texture of finish materials, Purchaser recognizes that the quality, color and texture of the samples do not always run true and, therefore, Seller shall not be responsible or liable for variations thereof. In the event that the Purchaser orders extras on the Color/Option Addendum Form, then Purchaser shall pay Seller for the total charges from the Color/Option, Flooring, Pool Options, Screen Enclosure and Other forms in advance, as a condition precedent to the ordering thereof. If said extras become not readily available, then Seller shall return Purchaser's payment thereof and this transaction shall proceed as if the selection had not been made. Any payment for said extras by Purchaser shall be considered as an additional Deposit placed by Purchaser.

6.3 Purchaser acknowledges and agrees that any changes made after the Color/Option Addendum Form completion shall be at Seller's sole and absolute discretion . If Seller shall permit any change then Purchaser will complete and execute a Color/Options Addendum CHANGE Form and Purchaser shall pay for net charges due including a $300 change order service fee for each item. Any payment for said extras by Purchaser shall be considered as an additional Deposit placed by Purchaser.

6.4 Purchaser understands and agrees that Seller shall have complete discretion in finishing details, including but not limited to the exterior of the Residence, landscaping of the Lot and all other amenities upon the Lot and within the Development. Purchaser understands and agrees that trees and landscaping which are located on portions of the Lot and the Development may be removed to permit construction.

6.5 Prior to Closing, Purchaser shall not place any personal property, furniture or fixtures in the Residence, or enter into the Residence or upon the Lot or interfere with the progress of construction of the Residence or with workmen upon the Lot and will not cause or procure such entry or interference by others. Seller shall not be liable in any manner for any personal injury or damage to property which results from Purchaser's breach of this Paragraph 6.5 and Purchaser agrees to indemnify and hold Seller harmless in connection therewith.

6.6 Energy Rating. Pursuant to Section 553.996 of the Florida Statutes, Purchaser may request that Seller cause a State Certified Energy Rater to perform an energy efficiency rating on the Residence being purchased. Purchaser hereby releases Seller from any responsibility or liability for the accuracy or level of the rating and Purchaser understands and agrees that this Agreement is not contingent upon Purchaser approving the rating, that the rating is solely for Purchaser's own information and that Purchaser will pay the total cost of the rating. Purchaser hereby acknowledges the receipt of a brochure from The Florida Energy Gauge Program regarding the Florida Energy Efficiency Rating System (the "Energy Rating Brochure").

6.7 The foregoing provisions of this Section 6 of this Agreement are applicable only if construction of the Residence is not substantially completed, as of the date of this Agreement; however, if the Residence is substantially completed, then Purchaser hereby acknowledges having inspected and approved the Residence and shall purchase the Residence in its "as is" condition, except as otherwise expressly agreed upon between Seller and Purchaser in a written addendum to this Agreement.

6.8 Ceramic Tile. In the event Purchaser selects the ceramic tile option, Purchaser acknowledges the following Seller disclosure: ceramic tile is generally laid directly onto the foundation of the home, which foundation is composed of reinforced concrete. Concrete naturally shrinks as it receives its final setting at which time minor cracks will sometimes appear on its surface regardless of how solid the ground. These cracks do not affect the strength of the structure in any way; however, these settlement cracks in the foundation may result in hairline fractures on the tile surface when tile has been installed. Since these cracks are a result of conditions beyond Seller's control, Seller does not assume responsibility for such repairs. Purchaser shall receive a few replacement tiles at the time of closing in the event any hairline cracks do appear. Following the closing, it will be Purchaser's responsibility to replace any cracked tiles. Purchaser further agrees that Seller shall not be responsible in the event the selected tile has been discontinued or if replacement tiles cannot be located. In addition, since grout will "cure", the grout that Purchaser selects may not exactly match the samples shown. Seller shall not be responsible for any slight color variations in tile or grout from the samples presented.

## 7. CLOSING

7.1 When the Residence is substantially complete, Seller shall, on no less than five (5) days notice, give Purchaser notice of the date, time and place for Closing (the "Specified Closing Date"). The issuance of a temporary or permanent Certificate of Occupancy by the Building Department of Palm Beach County, Florida or by any other governmental authority authorized to issue Certificates of Occupancy shall conclusively evidence that the Residence has been substantially completed. Seller, in its sole discretion, shall have the right to change the Specified Closing Date by written notice to the Purchaser.

7.2 In the event that Purchaser does not close on the Specified Closing Date, the Purchaser shall be deemed to be in default hereunder. If Purchaser does thereafter close, Purchaser agrees that all prorations shall be as of the Specified Closing Date. In addition, Purchaser shall pay to the Seller, in cash at closing, a sum equal to eighteen (18%) percent per annum on the outstanding balance of the purchase price from the Specified Closing Date to the date of actual closing.

7.3 Seller is required to complete and does agree that the construction of the Residence will be completed within a period of two (2) years. If construction is delayed by events consisting of acts of God, impossibility of performance or frustration of purpose, the date of completion shall be extended by the delay period. It is the express intent of the parties that the parties' rights and obligations under this Agreement be construed in the manner necessary to exempt this Agreement and the sale of the Residence from registration under the Interstate Land Sales Full Disclosure Act, and both Purchaser and Seller hereby expressly waive any right or provision of this Agreement that would otherwise preclude any exemption.

7.4 In the event Purchaser's Closing takes place out of the area ("Mail Away Closing") and Purchaser does not have an opportunity to inspect the home prior to Closing, the parties may agree to conduct a walk through inspection of the Residence subsequent to Closing.

8. TITLE: It is understood and agreed that the title to the Residence which the Purchaser will acquire pursuant to this Agreement shall be good and marketable, subject only to: conditions, limitations, reservations, covenants, easements and restrictions of record; taxes for the year of closing which are not then due and payable and the standard exceptions contained in an A.L.T.A. Owner's Policy of Title Insurance; provided, however that none of the foregoing shall prevent the use of the Residence for the purpose of a residential dwelling.

## 9. HOMEOWNERS' ASSOCIATION DISCLOSURE SUMMARY:

9.1 AS A PURCHASER OF PROPERTY IN THIS COMMUNITY, PURCHASER WILL BE OBLIGATED TO BE A MEMBER OF A HOMEOWNERS' ASSOCIATION.

9.2 THERE HAVE BEEN OR WILL BE RECORDED RESTRICTIVE COVENANTS GOVERNING THE USE AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.

9.3 PURCHASER WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE ASSOCIATION. ALL ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.

9.4 PURCHASER'S FAILURE TO PAY SPECIAL ASSESSMENTS OR ASSESSMENTS LEVIED BY A MANDATORY HOMEOWNERS' ASSOCIATION COULD RESULT IN A LIEN ON PURCHASER'S PROPERTY.

9.5 THERE IS NOT AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNER'S ASSOCIATION.

9.6 THE RESTRICTIVE COVENANTS CAN BE AMENDED WITHOUT THE APPROVAL OF THE ASSOCIATION MEMBERSHIP.

9.7 THE STATEMENTS CONTAINED IN THIS DISCLOSURE PARAGRAPH ARE ONLY SUMMARY IN NATURE, AND A PROSPECTIVE PURCHASER SHOULD REFER TO THE COVENANTS AND THE ASSOCIATION GOVERNING DOCUMENTS BEFORE PURCHASING PROPERTY.

9.8 THESE DOCUMENTS ARE MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD OFFICE IN THE COUNTY WHERE THE PROPERTY IS LOCATED.

9.9 Intentionally left blank.

9.10 Upon delivery of deed and possession of the Residence Purchaser shall become a member of a Homeowner's Association ("Association"), a not-for-profit corporation, organized and existing under the laws of the State of Florida; or such other Association as is applicable to said property. By execution of this Agreement Purchaser acknowledges and agrees to be bound by the terms and conditions of the Declaration of Covenants and Restrictions and Certificate of Incorporation and by-laws of said Association and promulgated rules and regulations of the Association, if any, which covenants and agreements on Purchaser part shall specifically survive closing, copies of which are available for Purchaser's review in Seller's office. Purchaser warrants and agrees to abide by all terms thereof which are hereinafter referred to as "Homeowner's Documents".

9.11 Purchaser acknowledges that said Association is charged with certain responsibilities, including but not limited to maintaining the common area and certain common landscaping and is further charged with responsibility for assessing and collecting assessment charges to defray the cost of said responsibilities from each member of the Association. Said assessment shall be made and collected in accordance with the Homeowner's Documents. By the execution of this Agreement Purchaser acknowledges and agrees to pay Purchaser's proportionate share of said assessments as they become due and if Purchaser shall default in the payment of such assessments, the Association will have lien rights against the Residence in accordance with the Homeowner's Documents. Purchaser understands, acknowledges and agrees that Seller shall have the sole right to modify or amend the Declaration, as well as the Articles of Incorporation, by-laws and the promulgated rules and regulations of the Association, as well as any and all other documents pertaining to the Development as Seller shall deem appropriate. Purchaser understands and agrees the Association may enter into a management agreement which may be executed either with Seller, as manager, or with an independent management company. Purchaser further acknowledges that Seller's officers or employees may act as directors and officers of the Association, and, of necessity, may act on behalf of the Association in dealings and transactions with

_____ Seller   _____ Purchaser   _____ Purchaser

Seller. Purchaser hereby waives any and all objections to such dealings and transactions, and hereby ratifies, approves and confirms the same. It is agreed and understood that this provision shall survive the closing.

<u>10. EXPENSES OF CLOSING:</u>

10.1  Purchaser shall pay the following expenses at Closing, in addition to the amount due to Seller set forth in Paragraph 4 plus the amounts from any Color/Option Addendum Form and Color/Option Addendum CHANGE Form set forth in Paragraph 6.2 and 6.3 of this Agreement.

10.1(a)  Any and all closing costs as may be required or charged by any mortgage lender providing Purchaser with mortgage financing, including but not limited to any amounts for principal, interest, taxes, hazard insurance, private mortgage insurance, mortgage title insurance, mortgage title endorsements and mortgagee Florida form 9 endorsements, abstracting charges, required by such mortgage lender to be paid, prepaid or escrowed and survey charges whether or not required by lender.

10.1(b)  Pending liens for public improvements not certified as complete as of the Effective Date of this Agreement.

10.1(c)  Purchaser acknowledges and agrees that in connection with the purchase of the Residence, Purchaser shall pay to Seller a builder's fee equal to one and six-tenths percents (1.6%) of the Total Purchase Price (the "Builder's Fee"). The Builder's Fee is not for settlement services and is separate from any and all fees imposed by a lender and Closing Costs imposed in connection with the purchase of the Residence. The Builder's Fee represents additional compensation to Seller and principally is intended to cover various out-of-pocket and internal costs and expenses associated with development.

10.1(d)  Real property taxes and any other assessments on the Residence, including but not limited to Association dues and/or assessments, if any, due and payable to the Homeowners' Association, shall be prorated from the date as determined in Paragraph 7.1 of this Agreement. Seller shall be responsible for that portion of the real property taxes and assessments levied from January 1 of the year of Closing through and until the day prior to the date of which Closing is scheduled. Purchaser shall be responsible for that portion of the real property taxes and assessments levied from and after the date of which Closing is scheduled through December 31 of the year of Closing, and Seller shall accordingly credit Purchaser at Closing for Seller's prorata obligation for real property taxes and assessments. If the then current annual real property tax bill is not available at Closing, or if Seller anticipates that the current annual real property taxes for the Residence will be assessed on a parcel of land which includes the Residence, the annual real property taxes shall be estimated based upon the real property taxes and assessments actually levied for the prior year on the Residence or the real property taxes and assessments actually levied on a parcel of land of which the Residence was a part. If real property taxes and assessments for the year prior to Closing were estimated because a real property tax bill for the Residence was unavailable at the time of Closing, real property taxes and assessments shall thereafter be prorated upon delivery by Purchaser to Seller of the actual real property tax bill for the year of Closing, and reimbursement shall be made accordingly.

10.1 (e)  A contribution to the working capital of the Homeowner's Association shall equal three (3) months prorated annual assessments on the Residence.

10.1 (f)  Any and all utility connection fees and deposits necessary in order to obtain electrical, gas, water or other utility services to the Residence, public service fees and/or interim service fees, whether or not the same have already been advanced by Seller.

10.1 (g)  any late closing charges provided for elsewhere in this Agreement.

10.1 (h)  Purchaser has a right to use a title company and lender chosen by Purchaser in connection with the purchase of the Residence. If the (a) purchase of the Residence is a cash transaction without mortgage financing, and Purchaser elects to use a Seller-designated title company (the "Seller's Title Company"), or (b) purchase of the Residence will be financed, and Purchaser elects to use both the Seller's Title Company and the Seller Designated Lender, the Seller shall pay the following Closing Costs: documentary stamp taxes on the Deed (as hereinafter defined), the premium for an owner's title insurance policy, and costs to record the Deed. In order to ensure that the title work and the loan application process are commenced promptly, Purchaser must select the title company and lender, and advise Seller of the election, either simultaneously with the execution of this Agreement or within thirty (30) days of the date of this Agreement. Please check one of the choices below and place your initials below the selected text.

(1) ___ Purchaser elects to use both the Seller's Title Company and the Seller Designated Lender.

Purchaser's Initials _____  _____

(2) ___ Purchaser intends to purchase the Residence without mortgage financing but elects to use Seller's Title Company.

Purchaser's Initials _____  _____

(3) ___ Purchase elects to use a title company other than Seller's Title Company and/or a lender other than the Seller Designated Lender.

Purchaser's Initials _____  _____

(4) ___ Purchaser shall notify Seller in writing within thirty (30) days of the date of this Agreement of its election of the above options. In the event Purchaser does not notify Seller of its election within this timeframe, Purchaser shall be deemed to be in default hereunder.

Purchaser's Initials _____  _____

If Purchaser selects option (1) or (2) above and the Seller's Title Company and the Seller Designated Lender are used for the Closing, Seller will pay the documentary stamp taxes on the Deed, the premium for an owner's title insurance policy, and the costs to record the Deed only if the election is made within the time period noted above. In this case, at Closing, or upon Purchaser's request to receive within five (5) days of Closing, Seller shall deliver to Purchaser a title insurance commitment issued by a Florida licensed title insurer, agreeing to issue Purchaser, upon recording of the deed, an Owner's Title Insurance Policy (ALTA form B) in the amount of the total purchase price, insuring Purchaser's title to the Residence, subject to the matters set forth in this Agreement, the standard printed exceptions contained in the title insurance policy and real property taxes on the Residence for the current year and all subsequent years. If Purchaser does not select option (1) or (2) above or does not use the Seller's Title Company and/or the Seller Designated Lender for the Closing or if the election is not made within the time period noted above, Purchaser will pay the documentary stamp taxes on the Deed, the premium for an owner's title insurance policy, and the costs to record the Deed. Regardless of whether Seller pays such costs detailed in this paragraph, Purchaser will pay all other loan and Closing Costs including, without limitation, the title search fee, title exam fee and settlement fee.

11.  ABSTRACT OF TITLE: Seller does not provide abstracts of title for Residence in the Development. Should Purchaser desire an abstract of title, then the obtaining of said abstract of title shall be the Purchaser's sole responsibility and expense.

<u>12. WARRANTIES:</u>

12.1  Limitation of Warranties.

12.1.1. Purchaser acknowledges that at the time of execution of this Agreement, Seller has no reason to know of any particular purpose Purchaser has in purchasing the Residence and items of personal property located therein other than normal residential use. Purchaser agrees that the only warranties which Seller is providing Purchaser are those set forth in the Centerline Homes Limited Warranty ("Limited Warranty") and those set forth in the third party warranty which will be provided by Seller to Purchaser at the time of closing ("Third Party Warranty"), incorporated herein by reference. Purchaser acknowledges having received and reviewed the specimen of the Limited Warranty. A copy of the Third Party Warranty Specimen Booklet is available for examination at Seller's offices. Purchaser understands that the Third Party Warranty is not issued until closing, and may be subject to change between the date of this Agreement and the date of closing, and that such changes are not within the control of Seller, but are subject to changes in the program offered by the company which provides the Third Party Warranty. Validation of the Third Party Warranty is not guaranteed, but is conditioned on the satisfactory completion of all required inspections, upon Seller's compliance with all the administrator's enrollment procedures, and upon Seller remaining a member in good standing of the warranty program. Purchaser acknowledges having received and reviewed the specimen of the Supplement to the Third Party Warranty Booklet.

12.1.2. DURING THE TIME THAT THE LIMITED WARRANTY AND THE THIRD PARTY WARRANTY REMAIN IN EFFECT, ANY IMPLIED WARRANTIES AVAILABLE TO YOU UNDER FEDERAL OR STATE LAW WITH RESPECT TO THE CENTRAL AIR CONDITIONING AND HEATING SYSTEMS SHALL REMAIN AVAILABLE TO YOU. WITH RESPECT TO ALL OTHER COMPONENTS OF THE RESIDENCE, SELLER GIVES THE LIMITED WARRANTY AND THIRD PARTY WARRANTY EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESSED OR IMPLIED. TO THE MAXIMUM EXTENT LAWFUL, AND WITH THE EXCEPTION OF IMPLIED WARRANTIES AVAILABLE TO PURCHASER FOR A LIMITED AMOUNT OF TIME IN ACCORDANCE WITH THE MAGNUSON-MOSS WARRANTY FEDERAL TRADE COMMISSION IMPROVEMENT ACT (15 U.S.C. 2301, ET. SEQ.), SELLER DISCLAIMS ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS, FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY, INTENDED USE, WORKMANSHIP, OR CONSTRUCTION, RESPECTING THE HOME, COMMON AREAS, OF THE COMMUNITY, IF ANY, AND ALL FIXTURES OR ITEMS OF PERSONAL PROPERTY SOLD PURSUANT TO THIS AGREEMENT, OR ANY OTHER REAL OR PERSONAL PROPERTY WHATSOEVER CONVEYED IN CONNECTION WITH THE SALE OF THE RESIDENCE, OR LOCATED WITHIN THE COMMUNITY WHETHER ARISING FROM THIS AGREEMENT, USAGE, TRADE, IMPOSED BY STATUTE, COURSE OF DEALING, CASE LAW OR OTHERWISE.

12.1.3. SOME STATES DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU. THE LIMITED WARRANTY IS THE ONLY EXPRESS WARRANTY GIVEN BY SELLER. SELLER DISCLAIMS ANY LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES. SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU. THE LIMITED WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY ALSO HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

12.1.4. Normal swelling, expansion and contraction of materials and construction, and any cracks appearing as a result thereof or as a result of settlement, are not on the

_____ Seller    _____ Purchaser    _____ Purchaser

RESIDENCE shall not be deemed to be construction defects. Upon Closing, Seller shall deliver to Purchaser all manufacturers' warranties, if any, covering the consumer products (if any) to be conveyed to Purchaser hereunder, provided, however, SELLER SHALL NOT THEREBY BE DEEMED TO WARRANT ANY SUCH CONSUMER PRODUCT, NOR TO ADOPT ANY LIABILITY FOR ANY SUCH MANUFACTURERS' WARRANTY THEREOF. The terms of this Section shall survive the Closing of this transaction.

12.2.  No Warranties for Third Party Construction.

12.2.1.  Seller does not warrant any of the work performed in the Residence or on the Lot by third party contractors, not hired by Seller, prior to or after the Closing.

12.2.2.  Seller shall not be liable for any defects in the work performed by third party contractors not hired by Seller, nor for any adverse impact to the Residence, Lot or Development caused thereby.

12.2.3.  Further, should Purchaser elect to use a third party contractor that is a subcontractor of Seller, Purchaser acknowledges that Seller makes no representations relative to the performance by such third party contractor.

12.3.  This Section shall survive the Closing.

<u>13. MORTGAGE CONTINGENCIES:</u>

13.1  If Purchaser has elected in section 5 of this Agreement to finance the purchase of the Residence with a mortgage from the Seller Designated Lender, then this Mortgage Contingency section of the Agreement shall apply.  Purchaser agrees that it shall fully and timely comply with Purchaser's obligations, and the terms and conditions of this Mortgage Contingency section of the Agreement.  Purchaser hereby expressly authorizes Seller to independently investigate and make any and all inquiries into Purchaser's financial condition as Seller shall deem necessary or appropriate, including but not limited to requests for information from credit reporting agencies and any mortgage lender to which Purchaser has made an application for a mortgage loan.  Purchaser agrees that Seller is under no duty to make such inquiries. Seller's failure to make any such inquiries shall not relieve Purchaser of any obligation under this Agreement, nor shall it affect the time periods provided in this Mortgage Contingency section.

13.2  Within five (5) days after the date of Purchaser's execution of this Agreement, Purchaser shall fully complete a mortgage application with, and give all information in relation to the mortgage application to the Seller Designated Lender.

13.2(a)  Purchaser understands that Purchaser must make a full, complete and truthful application with the Seller Designated Lender.

13.2(b)  The mortgage loan Purchaser applies for will be in the amount set forth in the Purchase Price section of this Agreement (the "Mortgage Amount"), and will provide for an interest rate, repayment terms, and other terms and conditions as of the date the loan is closed.  Purchaser understands that any mortgage terms disclosed to Purchaser prior to the Closing such as interest rates, payment amounts or other terms of mortgage financing, are merely informational and are subject to change at the Closing.

13.2(c)  Purchaser may, at Purchaser's option, and at Purchaser's expense, file an additional application for a mortgage loan in the Mortgage Amount with any other party of Purchaser's choosing.

13.3  Purchaser shall have thirty (30) days after the date of Purchaser's execution of this Agreement, within which to obtain mortgage approval.  Purchaser will notify Seller within two (2) business days after Purchaser is notified of an approval or disapproval of Purchaser's application, but in no event shall Purchaser notify Seller later than the expiration of the thirty (30) day period.

13.4  In the event Purchaser obtains mortgage approval within the thirty (30) day period, this Mortgage Contingency is satisfied, and Purchaser shall be obligated to purchase the Residence under the terms and conditions of the Agreement.

13.4(a)  If Purchaser is approved for a mortgage loan having a principal amount less than the Mortgage Amount, Purchaser shall accept the mortgage loan and pay any corresponding increase in the cash to close required at Closing unless Purchaser notifies Seller that Purchaser will not accept the lesser mortgage loan within two (2) days after Purchaser is notified of such approval, or in no event later than the expiration of the thirty (30) day period.  In the event Purchase does not notify Seller that it will not accept the mortgage loan approval for a lesser principal amount, Purchaser's application shall be deemed to have been accepted.

13.4(b)  If Purchaser is approved for a mortgage loan subject to any conditions or contingencies, Purchaser shall accept the mortgage loan with such conditions or contingencies, unless Purchaser notifies Seller that Purchaser will not accept the mortgage loan with the conditions or contingencies within two (2) days after Purchaser is notified of such approval, or in no event later than the expiration of the thirty (30) day period.  Any such approval, not rejected by Purchaser as provided herein, shall still be deemed mortgage approval for purposes of this Agreement, and Purchaser will be required to satisfy any such conditions or contingencies as required by the mortgage lender and prior to Closing.  If Purchaser is unable to satisfy such conditions or contingencies for any reason whatsoever, regardless of whether the conditions or contingencies are within Purchaser's domain or control, Purchaser will not be able to terminate this Agreement and the Agreement shall be deemed a cash sale.  In such event, Purchaser shall be required to close on its purchase of the Residence without any contingency for a mortgage.

13.5  If Purchaser's application is rejected, or if Purchaser does not get mortgage approval within the thirty (30) day period, or if Purchaser timely rejects any mortgage approval as provided in sections 13.4(a) or (b), Seller, at its discretion, may elect one of the following:  (i) give or provide a mortgage loan to Purchaser at the Closing on the prevailing rates and terms of the Seller Designated Lender;  (ii) grant Purchaser an additional thirty (30) days within which to reapply for a new mortgage loan with any lender, in which event the provisions of this Mortgage Contingency shall apply to the additional thirty (30) day time period. Any such Agreement by Seller to grant an additional thirty (30) days must be in writing, and signed by Seller; or  (iii)  terminate this Agreement, in which event all Deposits which Purchaser paid shall be returned to Purchaser, and thereafter Purchaser and Seller will be relieved of any liabilities or obligations under this Agreement.

13.6  In the event Purchaser fails to notify Seller within the thirty (30) day period that Purchaser has been unable to obtain mortgage approval, or Purchaser's application for a mortgage has been rejected, then this Mortgage Contingency shall no longer apply and this Agreement shall be deemed a cash sale.  In such event, Purchaser shall be required to close on its purchase of the Residence without any contingency for a mortgage.  Notwithstanding the fact that the mortgage contingency may fail as provided in this section, Purchaser is still obligated to provide Seller with any mortgage approval obtained thereafter if Purchaser intends to finance the purchase of the Residence with a mortgage.

13.7  If Purchaser is unable to obtain a mortgage approval because Purchaser failed to pay any application fee or charge, or because Purchaser failed to timely and completely apply for a mortgage loan and provide all documents and information required by the Seller Designated Lender or other lender in connection with Purchaser's application, or because any information on Purchaser's application is untrue or cannot be verified, or because of a change in Purchaser's financial status after Purchaser's mortgage approval is given, or if any lender withdraws Purchaser's approval after such approval is given, then in any such event Purchaser will not be entitled to terminate this Agreement and the Agreement will be deemed a cash sale.  In such event, Purchaser shall be required to close on its purchase of the Residence without any contingency for a mortgage.

14.  DEFAULT, REMEDIES, AND DISPUTE RESOLUTION

14.1  Default by Purchaser.  If the Purchaser shall fail to promptly perform any of the obligations required of the Purchaser hereunder within the time allowed therefore, the Purchaser shall be considered in Default and then the Agreement may, at the option of Seller, be deemed terminated and all of Purchaser's Deposits and all agreed upon Deposits made hereunder shall be deemed and considered as liquidated and agreed damages and all obligations and duties of the parties hereto shall thereupon terminate. It is specifically recognized by the Purchaser that the Residence and its appurtenances are a part of a large development, that a Default on the part of the Purchaser would have serious adverse financial effects upon the Seller as a result of the Seller's incurring expenses relative to sales, advertising expenses, fees, attorneys' fees, etc., and that it would be extremely difficult, if not impossible, to determine the actual damages incurred by the Seller by reason of the Purchaser's default.  Therefore, the foregoing provisions with regard to damages is an attempt by the parties to liquidate the same and is not construed or considered as a forfeiture or penalty.  Purchaser and Seller agree that such damages shall be capped at a sum equal to 15% of the purchase price of the Residence as set forth in this Agreement, and any addenda thereto, even where Purchaser's deposits may exceed this amount, and any excess deposits over this amount shall be returned to Purchaser.  Upon the retention of said liquidated sum by Seller, both parties shall be released from any and all further obligations hereunder.  If Seller declares this Agreement terminated because of Purchaser's default, Seller may resell the Residence without any account to or recourse by Purchaser.

14.2.  Limitations on Damages Against Seller.  In the event Purchaser has any claims against Seller for breach of this Agreement, or with respect to the purchase / sale transaction contemplated herein, or with respect to any claim, demand or cause of action arising out of the construction or delivery of the Residence, Purchaser and Seller agree that to the extent Purchaser may be entitled to recover damages against Seller, Purchaser's damages shall also be capped at a sum equal to 15% of the purchase price as set forth in this Agreement, and any addenda thereto.  Notwithstanding anything in this Section to the contrary, in the event of Seller's default under Section 7.3, or in the event of a claim available under Federal Law with respect to consumer products as defined in the Magnuson-Moss Warranty Federal Trade Commission Improvement Act (15 U.S.C. 2301, et. seq.) this cap on damages shall not apply and Purchaser shall have all remedies at law and in equity without limitation or restriction. In addition, should any Third Party Warranty provided by Seller provide for damages in excess of the limitations set forth herein, then the provisions of such Third Party Warranty shall control with respect to claims made under such Third Party Warranty.

14.3 Dispute Resolution.  In the event that any claim, dispute, or controversy arises under the terms of this Agreement, or with respect to the purchase / sale transaction contemplated herein, or with respect to any claim, demand or cause of action arising out of the construction or delivery of the Residence, Purchaser and Seller agree that any such matter shall be resolved through binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  Any demand for

Seller _____  Purchaser _____  Purchaser

arbitration under this section shall be filed in writing with the other party to this Agreement and with the American Arbitration Association and shall be made within a reasonable time after the dispute has arisen. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof. Except by written consent of the person or entity sought to be joined, no arbitration arising out of or relating to this Agreement, or with respect to the purchase / sale transaction contemplated herein, or with respect to any claim, demand or cause of action arising out of the construction or delivery of the Residence, shall include, by consolidation, joinder, or in any other manner, any person or entity not a party to this Agreement. The agreement to arbitrate between Purchaser and Seller shall be specifically enforceable under applicable law in any court having jurisdiction thereof. This agreement to arbitrate may only be waived if agreed to in writing by both Purchaser and Seller. Both Purchaser and Seller understand and agree that by submitting any such claim, dispute, or controversy to arbitration, they are specifically waiving any right, which they may have otherwise, to seek a resolution of any such matter in court. By their agreement to arbitrate, Purchaser and Seller hereby waive their respective rights to a trial by jury in any action or proceeding, and that neither has made any representation or inducement to obtain this waiver, and that each acknowledge this waiver as a material inducement to enter into this Agreement. Notwithstanding anything in this Section to the contrary, in the event of Seller's default under Section 7.3, or in the event of a claim available under Federal Law with respect to consumer products as defined in the Magnusson-Moss Warranty Federal Trade Commission Improvement Act (15 U.S.C. 2301, et. seq.), this arbitration provision shall not apply, and Purchaser shall be entitled to pursue all remedies at law and in equity in any court of appropriate jurisdiction.

14.4  Purchaser and Seller agree that even in the event they agree to waive mandatory arbitration in writing, that each waive their respective rights to a trial by jury in any other action or proceeding in any court having jurisdiction over such matter.

14.5  The provisions of this Section shall survive the Closing.

15.  NON-ASSIGNMENT:  This Agreement may not be assigned by the Purchaser without the prior written consent of the Seller, which consent may be withheld at the sole and absolute discretion of Seller. The fact that the Seller refuses to give its consent to an assignment shall not give rise to any claim for any damages against Seller. This Agreement shall not be recorded in the Office of the Clerk of any Court of the State of Florida and any recording of same by the Purchaser shall be considered a breach of this Agreement.

16.  OTHER AGREEMENTS:  This Agreement supersedes any and all previous understandings and agreements between the parties hereto, and it is mutually understood and agreed that this Agreement represents the entire agreement between the parties hereto, and no representations or inducements prior hereto, which are not included and embodied in this Agreement, shall be of any force and effect. Any addendum's attached hereto shall constitute a part of this Agreement and are incorporated herein by reference. This Agreement may only be amended and /or modified by an instrument in writing signed by the parties hereto.

17.  NOTICES:  Whenever a notice is required to be sent, the same shall be delivered by hand delivery or certified mail return receipt requested, addressed to the parties at the addresses set forth in this Agreement. All notices shall be deemed and considered given upon hand delivery or upon receipt or failure or refusal to accept receipt as may be applicable.

18.  SEVERABILITY OF PROVISIONS:  Should any part, clause, provision or condition of this Agreement be held to be void, invalid or inoperative, the parties agree that such invalidity shall not affect any other part, clause, provision or condition hereof, but that the remainder of this Agreement shall be effective as though such void part, clause, provisions conditions had not been contained herein. This Agreement has been executed in the State of Florida and shall be governed by and construed under the laws of the State of Florida, without giving effect to the principles of conflicts of law.

19.  Construction Industries Recovery Fund.  Pursuant to Section 489.1425 of the Florida Statutes, Seller provides the following notice.  PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE LICENSED CONTRACTOR.  FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT 1940 NORTH MONROE STREET, TALLAHASSEE, FL 32399-1039.

20.  MISCELLANEOUS:

20.1  Purchaser acknowledges that Purchaser acquires no right, title, interest or lien rights in the Residence prior to the conveyance of the title to the Residence and Purchaser agrees not to file a Lis Pendens or claim of lien concerning any dispute with Seller relative to the subject matter of this Agreement. All of Purchaser's rights under this Agreement are and shall be subordinate to the rights of any lender now or hereafter holding a mortgage encumbering the Residence.

20.2  In the event of any litigation between Purchaser and Seller concerning this Agreement, or the subject matter of this Agreement, each party shall bear its own attorney's fees and costs. Venue for any lawsuits between Purchaser and Seller shall be in Palm Beach County, Florida.

20.3  Paragraph headings used in this Agreement or in any document referred to in this Agreement are for convenience of reference only and are not to affect the construction of, or be taken into consideration in interpreting, the terms and conditions or provisions of this Agreement.

20.4  Whenever used in this Agreement or in any of the documents referred to in this Agreement, the singular shall include the plural and the plural shall include the singular, and the use of any gender, male, female or neuter, shall include all genders, as appropriate.

20.5  This Agreement may be executed simultaneously in any number of counterparts, each of which counterparts together shall constitute one and the same agreement between Purchaser and Seller.

20.6  No waiver of any provision of this Agreement shall be effective unless such waiver is in writing and signed by a duly authorized representative of the party deemed to have so waived and the same shall be effective for the period and on the conditions and for the specific instances and  purpose specified in such writing.

20.7  Purchaser understands, acknowledges and agrees that if after Closing, it shall appear that there is an error in any document executed prior to, at or subsequent to Closing in connection with construction of or pertaining to Closing this transaction, including, where applicable, any mortgage loan closing documents or other documents, or that there is an error in any closing statement, arithmetic or otherwise, Purchaser agrees to execute any and all further documents at Seller's request, or at the request of the mortgage lender, where applicable and additionally to pay any amount required in order to correct any error which shall give rise to an adjustment in any amounts required to be paid in connection with Closing this transaction. This paragraph shall survive Closing.

20.8  Purchaser shall not be entitled to possession of the Residence until Purchaser shall have inspected the Residence immediately prior to closing in the company of an authorized representative of the Seller for the purpose of specifying Purchaser's complaints concerning the physical condition of the Residence. The fact that there may be items to be corrected or completed shall not delay or postpone the Closing if a Certificate of Occupancy (temporary, partial or permanent) has been issued for the Residence. Any defect, or alleged defect, not so specified on the inspection sheet at that time shall be deemed to have occurred after said date of inspection, while the Residence was in the possession of the Purchaser. Purchaser's and Seller's representatives shall sign said inspection sheet. Failure of Purchaser to make inspection when requested shall not delay the Closing and shall be deemed a waiver of Purchaser's right to inspection and correction of deficiencies.

20.9  Purchaser represents and warrants to Seller that except for the broker registered with the Seller, if any, who has executed a Broker Registration form provided by Seller, the Purchaser has not consulted, dealt or negotiated in any manner concerning the purchase of the Residence from the Seller with any real estate broker, salesperson or agent, other than through the Seller's sales offices and agrees to indemnify and hold harmless Seller from and against any and all loss and liability including reasonable attorneys' fees, resulting from the or arising out of any claim against the Seller by any real estate broker, salesperson or agent claiming to have dealt with or through the Purchaser in connection with the transaction contemplated by this Agreement.

26.10  RIDERS TO PURCHASE AND SALE AGREEMENT.  The following additional documents (marked with an "X") are attached hereto, and contain certain disclosures and additional provisions which are part of this Agreement and incorporated herein by reference.

    _X__ Standard Home Specifications
    _X__ Limited Warranty
    _X__ Mold Addendum
    _X__ No Investor Policy

26.11  SELLER HEREBY DISCLOSES THE EXISTENCE OF AGRICULTURAL PRODUCTION RELATED USES IN THE VICINITY OF THE RESIDENCE, INCLUDING THE GROWING AND/OR PACKING OF AGRICULTURAL PRODUCTS.

20.12  Purchaser understands that Seller, and its affiliates, agents, contractors, or subcontractors, will be conducting construction and related activities within and around the Residence and the community in which the Residence is located. Purchaser understands that as a result of this construction, the Residence and the community in which it is located may not be suitable or safe for access by Purchaser, or for Purchaser's family, friends or agents, until such time as Seller has delivered the Residence to Purchaser for occupancy. Purchaser understands and agrees that the construction site is inherently dangerous, and that it will cause interference with the progress of construction if Purchaser, Purchaser's family or friends, or Purchaser's agents are present at the Residence during the course of construction. Accordingly, Purchaser agrees to notify Seller at all times when Purchaser desires to visit the Residence for any purpose, and to make arrangements with Seller for a representative of Seller to escort Purchaser in and around the Residence. This notice and escort notwithstanding, Purchaser hereby waives its entire claim for recovery, assumes all risk, and agrees to defend, protect, indemnify and hold harmless Seller, and Seller's affiliates and agents, from any and all damage, injury, death, claims, losses, liabilities, judgments, costs,

2/4/2005                                   Page 5                            Seller _____ Purchaser _____ Purchaser

demands, causes of action, and expenses (including, without limitation, reasonable attorneys' fees, costs and disbursements) arising from the presence of Purchaser, or Purchaser's family, friends, or agents, at the Residence at any time prior to Seller's delivery of possession of the Residence to Purchaser.

20.13  Purchaser agrees that Purchaser will not place a for-sale or for-rent sign on the Lot until after the Closing and Seller has completed 100 percent of the sales and closed on said sales in the Development.  Purchaser further agrees that Purchaser will not solicit traffic directly or indirectly away from Seller's sales center and will not list the Residence in the multiple listing service and/or advertise in local newspapers until after the Closing.  This provision shall survive the Closing.

20.14  RADON GAS:  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in the State of Florida.  Additional information regarding radon and radon testing may be obtained from your county public health department.

20.15  The provisions of this Agreement shall not be binding upon the Seller unless and until this Agreement is countersigned by an appropriate officer of the Seller.

20.16  Persons Bound By This Agreement.  If Purchaser dies or in any way loses legal control of his affairs, this Agreement will bind his heirs and legal representatives.  If Purchaser has received Seller's permission to assign or transfer this Agreement, then Purchaser's approved assignees shall be bound by the terms of this Agreement.  If more than one person signs this Agreement as Purchaser, each such person shall be jointly and severally liable for full performance of all of Purchaser's duties and obligations hereunder.

20.17  NOTICE REGARDING ACTIONS FOR CONSTRUCTION DEFECTS

20.17.1  In accordance with Florida law, Seller provides Purchaser with the following notice:  FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME.  SIXTY DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS.  YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS.  THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW, AND FAILURE TO FOLLOW THEM MAY AFFECT YOUR ABILITY TO FILE A LAWSUIT.

20.17.2  IF PURCHASER REJECTS ANY SETTLEMENT OFFER MADE PURSUANT TO SUCH FLORIDA LAW BY SELLER OR OTHER CONTRACTORS, SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS HIRED BY, THROUGH OR UNDER SELLER OR ITS AFFILIATES (COLLECTIVELY, "PROTECTED PARTIES"), AND PURCHASER ELECTS TO PROCEED WITH AN ACTION AGAINST ONE OR MORE PROTECTED PARTIES, PURCHASER ACKNOWLEDGES THAT THE DISPUTE MUST BE RESOLVED BY BINDING ARBITRATION AS PROVIDED IN THE AGREEMENT, EXCEPT TO THE EXTENT EXPRESSLY PROVIDED OTHERWISE IN THE AGREEMENT. FURTHER, ALL OTHER PROVISIONS OF THE AGREEMENT RESPECTING DISPUTES REMAIN IN FULL FORCE AND EFFECT.

20.18  PURCHASER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT TIME IS OF THE ESSENCE WITH REGARD TO ANY AND ALL OF PURCHASER'S PERFORMANCE OBLIGATIONS UNDER THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO PURCHASER'S OBLIGATION TO CLOSE THIS TRANSACTION. PURCHASER UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT ANY FAILURE BY PURCHASER TO PERFORM AT THOSE TIMES AS STATED IN THIS AGREEMENT SHALL CONSTITUTE A DEFAULT BY PURCHASER UNDER THIS AGREEMENT, WHEREUPON THE PROVISIONS OF SECTION 14 OF THIS AGREEMENT SHALL APPLY, TIME BEING OF THE ESSENCE TO ALL OF THE PROVISIONS OF THIS AGREEMENT.

20.19  PURCHASER UNDERSTANDS THAT ORAL REPRESENTATIONS CANNOT BE RELIED UPON BY PURCHASER AS CORRECTLY STATING ANY OF SELLER'S REPRESENTATIONS.  FOR CORRECT REPRESENTATIONS, PURCHASER SHALL ONLY MAKE REFERENCE TO THIS AGREEMENT AND THE DOCUMENTS FURNISHED TO PURCHASER BY SELLER.

AGREED AND APPROVED BY SELLER:

CENTERLINE HOMES AT B AND A, LLC

825 Coral Ridge Drive, Coral Springs, Florida  33071

By: _____

Date: _____

FEB 2 8 2005

PURCHASER: _____

By: X _____

Date: 02/27/05

By: X _Chad Lianow_

Date: 2/27/05

THE PURCHASER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10% OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT.  THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE PURCHASER.  THE SELLER, IN THE EVENT FUNDS ARE DEPOSITED IN AN INTEREST-BEARING ESCROW ACCOUNT, SHALL BE ENTITLED TO ANY INTEREST ACCRUED ON THE ACCOUNT, PAYABLE AT CLOSING.  SELLER MAY BORROW MONEY IN AN AMOUNT EQUAL TO THE FUNDS HELD IN ESCROW FOR CONSTRUCTION PURPOSES ONLY, IN WHICH CASE ANY INTEREST WHICH THE SELLER PAYS ON SUCH LOAN FOR A PERIOD NOT TO EXCEED 12 MONTHS SHALL BE PAID BY THE PURCHASER AT THE TIME OF CLOSING.  HOWEVER, IN THIS CASE THE PURCHASER WILL BE CREDITED FOR ANY INTEREST ACCRUED ON THE ESCROWED FUNDS.

I (WE) DO HEREBY ELECT TO WAIVE THE RIGHT TO DEPOSIT, INTO ESCROW, UP TO TEN (10%) PERCENT OF THE PURCHASE PRICE.

PURCHASER: X _____

DATE: 02/27/05

PURCHASER: X _Chad Lianow_

DATE: 2/27/05



## COBBLESTONE
### ·CREEK·

## Introductory Selection Checklist

Buyer: _Chad Prandi, Krzysztof Olschewski_

Model: _Victoria_

Lot: _43_

☐ Elevation: (choose one)   Grande (included)   or   Premiere(circled)  $ _9,795_

Note: Two of the same home elevations cannot be situated side-by-side in Cobblestone Creek

| Model | Premiere Elevation | 3-Car Garage Option |
|-------|--------------------|--------------------|
| Marquette | $6,995 | |
| Farmington | $8,795 | $14,995 |
| Victoria | $9,795 | |
| Sherbrook | $6,595 | |
| Westfield | $7,795 | |

☑ Buyer is considering Swimming Pool Option:     No   (Yes)  (circle one)

☑ Buyer is considering Loggia Extension Option:   No   (Yes)  (circle one)

☑ Buyer is considering Balcony Option:            No   (Yes)  (circle one)

☐ Garage Orientation:                     Left   (Right)  (circle one)

Flipped?  ($750 option)   (No)   Yes   (circle one)

Any dollar amounts will be transferred to the Color & Options Addendum form at time of
option selections; they are not charged to your Sales Contract.

_[signature]_ _____       _Chad Prandi_ _____
Purchaser                                Purchaser

_02/27/05_ _____          _02/24/05_ _____
Date                                     Date

_[signature]_ _____
Seller
Centerline Homes at B and A, LLC

_FEB 2 8 2005_ _____
Date

*Attach original form to Purchase and Sales Agreement*

Rev. 2/21/05

# Cobblestone Creek

## Addendum A

THIS IS AN ADDENDUM TO THAT CERTAIN PURCHASE AND SALE AGREEMENT DATED _____ (AGREEMENT), BY AND BETWEEN (SELLER) AND (PURCHASER) FOR LOT _____ IN Cobblestone Creek.

1. DISCLOSURES. PURCHASER HEREBY ACKNOWLEDGES BEING NOTIFIED BY SELLER OF THE FOLLOWING ADDITIONAL COSTS AND EXPENSES (IF APPLICABLE) WHICH ARE NOT PART OF THE PURCHASE PRICE, AND PURCHASER AGREES TO PAY THESE ENUMERATED COSTS AND EXPENSES (IF APPLICABLE) AT THE CLOSING OF THE PURCHASE OF THE RESIDENCE DESCRIBED IN THE AGREEMENT.

   1.6% BUILDER FEE

   | | |
   |---|---|
   | INTERIM SERVICE FEE/SOLID WASTE FEE | $300.00 |
   | WATER METER FEE | $825.00 |
   | ELECTRIC METER HOOKUP FEE | $345.00 |
   | SURVEY | $375.00 |

2. MORTGAGE CLOSING COST DISCLOSURE: PURCHASER HEREBY ACKNOWLEDGES BEING NOTIFIED BY SELLER THAT THERE ARE ADDITIONAL COSTS AND EXPENSES WHICH ARE NOT PART OF THE PURCHASE PRICE FOR THE ABOVE DESCRIBED RESIDENCE AND RELATE TO OBTAINING A MORTGAGE LOAN ON THE RESIDENCE. PURCHASER IS ADVISED BY SELLER TO OBTAIN A GOOD FAITH ESTIMATE OF THE COSTS ASSOCIATED WITH A MORTGAGE LOAN FROM A MORTGAGE LENDER.

PURCHASER

X _____

Date   01/27/05

X   Chad Keando

Date   2/27/05

AGREED AND APPROVED BY SELLER:

CENTERLINE HOMES AT B AND A, LLC

By _____

Date _____

FEB 2 8 2005



## COBBLESTONE
### ·C R E E K·

### NO INVESTOR RIDER
### TO PURCHASE AND SALE AGREEMENT

Date_____/_____/_____

RE:         Lot #_____, Address_____

1.   Seller desires to promote a stable, residential community consisting of purchasers who intend to own and occupy their Property (the "Residence" or "Residences"). Accordingly, Seller seeks to discourage investor speculation in its communities by prohibiting purchasers from assigning contracts or "flipping" purchase contracts, short-term resale of Residences, and the purchase of Residences for rental income.

2.   This "no investor" policy ("Policy") is expressly stated in this rider. This policy shall also be placed as a restriction on the deed delivered to Purchaser at the time the Residence is transferred to Purchaser. **This Policy and this rider survive the closing of this transaction.**

3.   Purchaser acknowledges that only one Residence will be sold to each Purchaser **This Contract is not assignable or transferable.** All Residences shall be owned and occupied by the original Purchaser(s) for a minimum of one (1) year from the Closing ("Minimum Holding Period").

4.   Purchaser expressly represents and warrants to Seller as follows, with full knowledge that Seller is entering into this Agreement with Purchaser in reliance on the truth of same:

a.         Purchaser is purchasing the Residence in order to make it *either* **Purchaser's primary residence** or a **secondary residence in Florida for Purchaser's use**.

b.         Purchaser is not purchasing the Residence for speculation or immediate resale purposes.

c.         Purchaser has not entered into and will not, during the Minimum Holding Period, enter into, directly or indirectly (through friends, relatives, entities owned or controlled by Purchaser or otherwise) or caused to be entered into for or on behalf of Purchaser another reservation or Purchase Agreement for a Residence from Seller or from a company affiliated with Seller at another community.

d.         Prior to the closing and throughout the Minimum Holding Period, Purchaser will not market, list or advertise (or cause to be marketed, listed or advertised) the Residence for sale or lease with any broker, multiple listing service or otherwise.

5.   Any attempt to violate the provisions of this "No Investor Rider" shall constitute a material breach of the Purchase and Sale Agreement, in which event Seller has the right, at Seller's sole discretion to either:

a.         Terminate this Agreement and retain all deposits and other monies paid by Purchaser pursuant to this Agreement; or

b.         Require Purchaser to pay to Seller at the closing on any prohibited resale of the Residence, in addition to all other sums due, an amount equal to one hundred percent (100%) of the Gain, which is defined as the difference between the gross price of the Residence as purchased by Purchaser from Seller and the gross sales price of the Residence subsequently sold or otherwise transferred by Purchaser to a third party, exclusive of any real estate commissions, customary closing costs, or other expenses incidental to either purchase and sale; or

c.         If Purchaser breaches the restriction on renting or leasing, Purchaser shall forfeit and pay to Seller all rental income received for the Residence, and Seller shall be entitled, among other remedies, to retain all rental income received by Purchaser.

Initials_____

1

6.  The no investor restrictions provided in this section shall not be applicable to those Residences in the community which are designated by Seller as "model homes." Seller may sell model homes and an OWNER of a model home may lease the Residence back to the Seller for the purpose of the continued use of the Residence as a model home. In addition, the Seller can sell, lease, or transfer any model home to any person or entity for the purpose of owning, managing, or using the Residence for the purpose of a model home, and the no investor restrictions shall have no application to such Residence. This exception is to the no investor restriction is necessary in order for the Seller to be able to construct and use model homes for the development, marketing and sale of Residences in the community.

7.  Notwithstanding the foregoing, an original Purchaser may be allowed to sell the Residence under the following circumstances:

a.   A documented job transfer of the original Purchaser to a location which would make commuting from the Residence an undue hardship; or

b.   Death of the original Purchaser or the Purchaser's spouse; or

c.   Transfer by gift, devise or inheritance to a spouse or child; or

d.   Transfer by operation of law to a surviving joint tenant; or

e.   Transfer to a spouse pursuant to the terms of a final judgment of dissolution of marriage or court-approved property settlement agreement; or

f.   Transfer pursuant to a distributive deed by a grantor into a revocable trust, in which the grantor has not less than the right to reside in the Residence during the grantor's lifetime; or

g.   Transfer by an Purchaser to the Purchaser and the Purchaser's spouse, as tenants by the entirety, or transfer by operation of law to a surviving tenant by the entirety; or

h.   Other documented reason acceptable by Seller in Seller's sole and unbridled judgment.

8.  Purchaser acknowledges that the Declaration of Restrictions and Covenants for the Community contains the following provisions and expressly agrees to same:

*"NO INVESTOR RESTRICTIONS.* Each DECLARANT has adopted in its purchaser contracts and/or incorporated into its deeds of conveyance certain restrictions regarding resale and leases of RESIDENCES within COBBLESTONE CREEK. Reference should be made by OWNERS to their purchase agreements and/or deeds of conveyance for the specific details of this restriction."

9.  PURCHASER ACKNOWLEDGES, BY EXECUTING THIS RIDER, THAT THIS RIDER AND THE DECLARATION PROVISIONS ABOVE CONSTITUTE A RESTRICTION ON PURCHASER'S ABILITY TO ALIENATE (CONVEY OR LEASE) THE RESIDENCE, AND FURTHER ACKNOWLEDGES THAT THIS RESTRICTION IS IN THE BEST INTEREST OF THE COMMUNITY AND ITS RESIDENTS AND IS NOT AN UNREASONABLE RESTRICTION ON THE ALIENATION OF PROPERTY.

10. Any violation of this "no investor" policy shall not defeat or render invalid the lien of any first mortgage made in good faith and for value by Purchaser. The covenants and provisions of this policy shall be inferior and subordinate to any such first mortgage recorded concurrently with the deed conveying the Residence to Purchaser.

11. Seller has the right to amend, terminate and reinstate the Policy in its sole discretion at any time.

[THIS SPACE INTENTIONALLY LEFT BLANK WITH SIGNATURES ON THE FOLLOWING PAGE]

Initials

2

IN WITNESS WHEREOF, the parties have hereunder set their hands and seals the day and year first above written.

PURCHASER:

_____

_____

DATE EXECUTED BY PURCHASER:

2/27_____ , 200 5

SELLER:

_____

**STEPHEN MARGOLIS**

By: _____

As Its Authorized Representative

DATE EXECUTED BY SELLER:

FEB 2 8 2005_____ , 200___

3

**Cobblestone Creek**
**Standard Specifications**

| | |
|---|---|
| **Exterior Features:** | S style cement tile roof. |
| **Foundation:** | Reinforced concrete with monolithic slab. |
| | Vapor barrier and termite soil treatment certification. |
| **Structure:** | Concrete block with reinforced concrete columns and concrete second floor. |
| **Trusses:** | Wood engineered roof system. |
| | Overhang is one foot, sheathing is 5/8" inch plywood and fascia is 2" x 8". |
| **Interlocking Pavers:** | |
| **Driveway:** | Olde Towne brick pavers in color-coordinated packages. |
| **Pool Deck and Patio:** | Olde Towne brick pavers-same color as driveway. |
| **Sidewalks:** | Reinforced concrete. |
| **Millwork:** | |
| **Entry Door:** | Eight-foot raised-panel steel door(s) per plan. |
| **Interior Doors:** | Eight-foot colonial-style swing doors. |
| | Eight-foot colonial-style pocket doors per plan. |
| | Eight-foot bi-fold wood louvered door for air handler closets per plan. |
| | Eight-foot mirrored bi-fold door on one master bedroom closet. |
| | Eight-foot colonial-style bi-fold doors on one master bedroom closet and all secondary bedroom closets. |
| **Baseboards:** | Colonial-style five and one-quarter inch. |
| **Casing:** | Colonial-style three and one-quarter inch. |
| **Closet Shelving:** | Vinyl covered wire, one row in each bedroom closet. |
| | Vinyl covered wire, five rows in linen closets and pantry per plan. |
| **Stair Railing:** | Top-mounted square picket per plan. |
| **Finish Hardware and Garage Doors:** | |
| **Front Door:** | Schlage "Barcelona" split-finish antique brass/polished brass handle set. |
| **Interior Doors:** | Schlage "LaSalle" polished brass lever handles. |
| **Accessories:** | One chrome towel bar and one chrome toilet paper holder per bathroom. |
| **Double Garage Door:** | One 16' x 8' steel reinforced raised-panel vented door with automatic garage door opener and two remotes. |
| **Single Garage Door:** | One 8'x 8' steel reinforced raised-panel vented door with pre-wire for garage door opener per plan. |
| **Glass:** | |
| **Fixed Glass:** | White aluminum frame per plan. |
| **Operable Windows:** | White aluminum frame windows with screens. |
| **Impact Glass:** | White aluminum frame impact glass on second floor windows (per plan) |
| **Shower Enclosures:** | Chrome enclosure with clear glass in master shower and secondary bath shower stalls per plan. |
| **Medicine Cabinets:** | Rectangular with beveled edges in master and secondary baths vanity areas per plan. |
| **Mirrors:** | Full length of vanity area and 42" in height in all baths. |
| | Powder baths receive an octagonal-shaped beveled-edge decorative mirror. |
| **Drywall:** | 1/2" drywall on interior walls; 5/8" drywall on ceilings per plan. |
| | Moisture resistant cementitious board in showers and bathtub areas up to 4 ft. |
| **Walls:** | Knockdown texture throughout home except bathrooms. |
| **Ceilings:** | Knockdown texture. |
| **Corners:** | Choice of rounded or square in living areas; square in other areas. |
| **Exterior Stucco:** | Textured on walls and soffits.  Smooth on bands and accents. |
| **Cabinets:** | |
| **Kitchen:** | European-style panelled matte foil doors and boxes with 42" upper cabinets, adjustable shelves and choice of colors and knobs. |
| **Master Bath:** | European-style panelled matte foil doors and boxes raised to 36" high in choice of colors and knobs. |
| **Secondary Baths:** | European-style panelled matte foil doors and boxes raised to 36" high in choice of colors and knobs. |
| **Laundry Room:** | White melamine 30" upper cabinets per plan. |

Initial

Initial

**Cobblestone Creek**
**Standard Specifications**

**Kitchen**
Countertops:        Granite with ¼" edge in choice of category A colors with a 5" backsplash.

**Paint:**
Millwork:          Two coats of white semi-gloss paint on doors, baseboards, and casings.
Interior:          Two coats of white flat latex interior wall paint on walls and ceilings throughout.
Exterior:          Two coats of 100% acrylic flat latex exterior wall paint.
Fascia:            Two coats of latex exterior house paint.
Remarks:           All millwork, sliding glass doors, windows, cabinets, shower enclosures, cultured marble and
                   exterior frames to be caulked.

**Flooring:**
Master Bath:       12" x 12" matte finish ceramic tile on floor and 8" x 10" glossy finish ceramic tile on shower
                   walls to 7' above floor in choice of white or bone.
Secondary Baths:   6" x 6" matte finish ceramic tile on floors and 6" x 6" glossy finish ceramic tile on shower
                   walls to 7' above floor in choice of white or bone.
Main Floor:        18" x 18" standard ceramic tile in foyer, kitchen, breakfast area, laundry room, family room,
                   living room, dining room and powder room per plan.
                   Standard 100% nylon stain control carpet with foam padding in all non-tiled areas.
Window Sills:      Grey and white marble.
Bath Thresholds:   Grey and white marble.
Bath Accessories:  Each bathroom to receive one ceramic soap dish at tub or shower per plan.

**Appliances*:**
Refrigerator:      Whirlpool® 25 cubic ft side-by-side with ice and water dispenser in the door.
Dishwasher:        Whirlpool® with 4 cycles and 7 option combination with "clean touch" control.
Oven:              Whirlpool® 27" single convection built-in.
Cook top:          Whirlpool® 30" built-in cook top.
Microwave:         Whirlpool® 1.5 cubic foot capacity microwave oven with hood.
Washer:            Whirlpool® extra large capacity with 7 cycles.
Dryer:             Whirlpool® extra large capacity dryer.

        Appliance model numbers may vary due to manufacturer changes.  Installed appliances will always be
        equal to or better than those specified above.

**Cultured Marble:**
Master Bath:       Cultured marble tub with skirt and 4" backsplash.
                   Bullnose edge cultured marble countertops in choice of colors with integrated oval bowls and
                   4" backsplash.
Secondary Baths:   Square edge cultured marble countertops in choice of colors with integrated oval bowls and 4"
                   backsplash.

**Plumbing Fixtures:**
Master Bath:       Elongated two-piece water closet with one and one half gallon tank.
                   Two Moen® "Monticello" Double lever chrome lavatory faucets with 8" spread.
                   Moen® "Monticello" single lever chrome shower valve with matching shower head.
                   Moen® "Monticello" Double lever chrome Roman tub faucet with 8" spread.
Secondary Baths:   Elongated two-piece water closet with one and one half gallon tank.
(per plan)         Moen® "Chateau" single lever chrome lavatory faucet with 4" spread.
                   Enameled steel five foot bathtub with Moen® "Chateau" single lever chrome tub valve with
                   matching shower head or shower valve for shower stalls per plan.
Powder Bath:       Elongated two-piece water closet with one and one half gallon tank.
(per plan)         Moen® "Chateau" single lever chrome lavatory faucet with 4" spread.
                   Pedestal sink per plan.
Kitchen Sink:      Americast 50/50 over-mount white sink.
                   Moen® "One Touch" white pull out faucet.
Other:             One 1/3 hp garbage disposal.
                   One washing machine box in wall for plumbing pipes.
                   One free-standing laundry tub.
                   Two exterior hose bibs located per plan.
                   Quick recovery water heater per plan.

Initial _____

Initial _____

**Cobblestone Creek**
**Standard Specifications**

**Electrical:**

| | |
|---|---|
| Service Panels: | 200 Amp Per plan. |
| Switches: | White rocker style switches and white standard receptacles. |
| Hi Hats: | Entry, foyer, kitchen and hallways per plan. |
| Dining Room and Breakfast Nook: | Pre-wired for hanging fixtures. |
| Back Patio: | Globe light(s) per plan. |
| Baths: | Theatrical strip lighting above mirrors. |
| Interior Garage, Master Closet, Laundry Room and Walk In Closets: | Fluorescent lighting. |
| Exterior: | Two coach lights per plan. |
| Ceiling Fan Outlets: | All bedrooms, family room and den per plan. |
| Cable TV Outlets: | All bedrooms, family room, den and loft per plan. |
| Telephone Outlets: | All bedrooms, kitchen, den and loft per plan. |
| Attic Lighting: | Bulb plate and pull switch at each entry point. |
| Exterior GFIs: | One pair each in front, rear and side. |

**Insulation:**

Pursuant to Section 460.16 of the Code of Federal Regulations, the following insulation information is being provided to Purchaser. The following types, thick-nesses and R-values are provided in the homes being constructed in Cobblestone Creek:

FOR THE ROOF:     Type of Insulation: Fiberglass Blown In
                  Thickness of Insulation: 10"
                  R-Value: 30

FOR THE EXTERIOR MASONRY WALLS/CONCRETE WALLS:
                  Type of Insulation: Foil
                  R-Value: 4.2

INTERIOR STUD WALLS OR STUD WALLS BETWEEN GARAGE AND A/C AREA IF ANY:
                  Type of Insulation: Fiberglass Batt
                  Thickness of Insulation: 3.5"
                  R-Value: 11

FOR THE VAULTED CEILINGS, IF ANY:
                  Type of Insulation: Fiberglass Blown In
                  Thickness of Insulation: 10"
                  R-Value: 30

Seller shall have the right to substitute insulation, so long as the R-Value is equal to or greater than that set forth herein. Because the information set forth herein is supplied to Seller by the manufacturer, Seller shall have no liability if the R-value is in fact different than that indicated.

| | |
|---|---|
| Alarm System: | One control panel and telephone connection kit with battery backup. Keypad at the front entry door. Interior siren and contacts for all movable openings except overhead garage doors. |
| Landscaping: | Per approved plans with fully sodded home site. |
| Sprinklers: | Individual lot irrigation system on an automatic timer with full coverage. |
| Storm Shutters: | Steel trackless panels for all first floor windows, fixed glass, glass block and glass doors. Includes diagram, instructional video and bolts. |
| Gutters: | Front and rear of home (per plan). |
| Air Conditioning: | High efficiency equipment, tonnage varies by model. |

The above listed specifications represent standard items that are included in the base purchase price of the home. All features listed are per plan and are subject to change without notice. In the event of a change, Seller agrees, wherever reasonably possible, to use materials or supplies of equal or better quality; but in no event shall any materials or supplies be of lesser quality than the quality required by the applicable building codes.

AGREED AND APPROVED BY SELLER:          PURCHASER:
By Centerline Homes at B & A, LLC

By: _____

Date: _____ 2-28-05 _____          Date: ___ 2/28/05 ___

*Rev 2/17/05*

## MOLD AND MILDEW ADDENDUM

Molds and mildews develop from spores, which are in the air all around you (Purchaser and/or Buyer). As soon as spores settle in an area with the right conditions for growth, they establish colonies, which are often visible to the naked eye. These colonies are a source of more spores, can cause unsightly stains, and may release low levels of toxic chemicals called *mycotoxins* into the air. · When excessive moisture or water accumulates indoors, mold growth can and will occur, particularly if the moisture problem is not promptly addressed. For information on health issues resulting from mold and mildew in your home, please contact the National Institutes of Health and/or your primary health care physician.

### DISCLAIMER:

THE HOME YOU ARE PURCHASING CONTAINS MATERIALS WHICH CONTAIN OR ARE AFFECTED BY MOLD, MILDEW, FUNGUS, SPORES AND CHEMICALS WHICH MAY CAUSE ALLERGIC OR OTHER BODILY REACTIONS. YOU SHOULD CONSULT YOUR PHYSICIAN TO DETERMINE WHICH MOLD, MILDEW, FUNGUS, SPORES OR CHEMICALS MAY ADVERSELY AFFECT YOU OR MEMBERS OF YOUR FAMILY. THE CONSTRUCTION PRODUCTS USED IN BUILDING YOUR HOME CONTAIN, AMONG OTHERS, SOME OF THE FOLLOWING CHEMICALS:

WATER FORMALDEHYDE (found in carpeting and pressed wood products)
ARSENIC (found in treated wood products)
FIBERGLASS (found in insulation products)
PETROLEUM AND PETROLEUM PRODUCTS (found in vinyl and plastic products)
METHYELENE CHLORIDE (found in paint thinners)

This Addendum is not intended to provide an exhaustive explanation of mold, its causes or effects. This Addendum is not intended to provide an exhaustive explanation of how mold growth may be controlled or eliminated. The information above is intended solely to provide a brief disclosure about the possible existence of mold, a limited description of possible effects, and limited tips for controlling and eliminating mold.

WHAT PURCHASER CAN DO: Purchaser can take positive steps to reduce or eliminate the occurrence of mold and mildew growth in the Residence, and thereby minimize any possible adverse effects that may be caused by mold and mildew. These steps include, without limitation, the following:

Before bringing items into the Home, check for signs of mold or mildew. Potted plants (roots and soil), furnishings, or stored clothing and bedding material, as well as many other household goods, could already contain mold or mildew growth.

Regular vacuuming and cleaning will help reduce mold and mildew levels. Mild bleach solutions and most tile cleaners are effective in eliminating or preventing mold and mildew growth.

Keep the humidity in the home low. Vent clothes dryers to the outdoors. Ventilate kitchens and bathrooms by opening the windows, by using exhaust fans, or by running the air conditioning to remove excess moisture in the air, and to facilitate evaporation of water from wet surfaces.

Promptly clean up spills, condensation and other sources of moisture. Thoroughly dry any wet surfaces or material. Do not let water pool or stand in the home. Promptly replace any materials that cannot be thoroughly dried, such as drywall or insulation.

Inspect for leaks on a regular basis. Look for discoloration or wet spots. Repair any leaks promptly. Inspect condensation pans (refrigerators and air conditioners) for mold and mildew growth. Take notice of musty odors, and any visible signs of mold or mildew.

Should mold or mildew develop, thoroughly clean the affected area with a mild solution of bleach. First, test to see if the affected material or surface is color safe. Porous materials, such as fabric, upholstery or carpet should be discarded. Should the mold or mildew growth be severe, call on the services of a qualified professional cleaner.

WAIVER: Whether Purchaser experiences mold or mildew growth depends largely on how Purchaser manages and maintains the Home. Seller's responsibility must be limited to things that Seller can control. As explained in the Limited Warranty for Homes, provided by separate instrument, Seller shall not be responsible for any damages caused by mold or mildew. Further, Seller (i) disclaims any liability for incidental or consequential damages including, without limitation, the inability to possess the Residence, inconvenience, moving costs, hotel costs, storage costs, loss of time, lost wages, lost opportunities, personal injury, and (ii) to the extent provided in the Limited Warranty, disclaims any and all implied warranties.

LEAKS, WET FLOORING AND MOISTURE WILL CONTRIBUTE TO THE GROWTH OF MOLD, MILDEW, FUNGUS OR SPORES. PURCHASER UNDERSTANDS AND AGREES THAT SELLER IS NOT RESPONSIBLE, AND HEREBY DISCLAIMS ANY RESPONSIBILITY FOR ANY ILLNESS OR ALLERGIC REACTIONS WHICH THE PURCHASER MAY EXPERIENCE AS A RESULT OF MOLD, MILDEW,

1

Seller Initials: _____        Purchaser Initials: _____        Purchaser Initials: _____

3/10/03

FUNGUS OR SPORES.  IT IS THE PURCHASER'S RESPONSIBILITY TO KEEP THE HOME CLEAN, DRY, WELL-VENTILATED AND FREE OF CONTAMINATION.  ELECTRONIC AIR FILTERS WHICH MAY ASSIST IN EFFECTIVE AIR FILTRATION ARE AVAILABLE AT ADDITIONAL COST.

THIS MOLD AND MILDEW ADDENDUM IS EXECUTED AS OF THE SAME DATE AS THE PURCHASE AND SALE AGREEMENT BETWEEN THE PARTIES HERETO, AND IS HEREBY INCORPORATED INTO AND IS A PART OF SUCH AGREEMENT.

The undersigned acknowledges receipt of this Mold and Mildew Addendum.  The undersigned has carefully read and reviewed its terms, and the undersigned agrees to its provisions.

**PURCHASER/BUYER:**

By: _____

Print Name:_____

Date: _____

**PURCHASER/BUYER:**

By: _____

Print Name: _____

Date:_____2/27/05_____

**SELLER:**

By: _____

Print Name: ___Stephen Margolis___

Date:_____FEB 2 8 2005_____

Mandatory Addendum
2/4/05

# Centerline Homes
# Limited Warranty

Purchaser: _____
(herein referred to as "**Purchaser**")

Legal description and/or Address: _____
_____
(herein referred to as the "**Residence**")

This **LIMITED WARRANTY** is given by _____
(herein referred to as "**Centerline Homes**") to the above named Purchaser(s), as the owner of the Residence.  This Limited Warranty runs only in favor of Purchaser and is non-transferable.  Any obligation under this Limited Warranty terminates if the Residence is resold or shall cease to be occupied by Purchaser.

## PART I

1.     **When does the warranty term begin and end?** The terms of this Limited Warranty are effective for a period of one (1) year beginning on the earlier of the date that legal ownership of the Residence is transferred from Centerline Homes to Purchaser or the date on which Purchaser takes possession of the Residence.

2.     **What are Centerline Homes' obligations under this Limited Warranty?** Centerline Homes' obligations under this Limited Warranty shall be to either repair or at Centerline Homes' option replace defective items covered by this Limited Warranty.  Centerline Homes shall supply both labor and materials free of charge for the repair or replacement of defective items covered by this Limited Warranty.    Materials and replacement components supplied by Centerline Homes under the terms of this Limited  Warranty shall be of a kind equal in quality to the original material or component. Any steps taken by Centerline Homes to correct malfunctions covered by this Limited Warranty shall not act to extend the duration of this Limited Warranty.  The method of repair of certain specific items will be as set forth in Part II of this Limited Warranty.

3.     **What items are covered by this Limited Warranty?**  Centerline Homes warrants that the Residence will be free from substantial construction defects and from defects in materials and workmanship as specifically defined and described in Part II of this Limited Warranty.  For a list of the items covered and to what extent coverage is available, please refer to Part II, Section 2 of this Limited Warranty.

4.     **Limitations.**  DURING THE TIME THAT THIS LIMITED WARRANTY REMAINS IN EFFECT, ANY IMPLIED WARRANTIES AVAILABLE TO PURCHASER UNDER FEDERAL LAW OR STATE LAW WITH RESPECT TO THE CENTRAL AIR CONDITIONING AND HEATING SYSTEMS SHALL REMAIN AVAILABLE TO PURCHASER. WITH RESPECT TO ALL OTHER COMPONENTS OF THE RESIDENCE, CENTERLINE HOMES GIVES THIS LIMITED WARRANTY EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESSED OR IMPLIED. WITH THE EXCEPTION OF IMPLIED WARRANTIES AVAILABLE TO PURCHASER FOR A LIMITED AMOUNT OF TIME IN ACCORDANCE WITH THE THE MAGNUSON-MOSS WARRANTY FEDERAL TRADE COMMISSION IMPROVEMENT ACT (15 U.S.C. 2301, ET SEQ.) TO THE MAXIMUM EXTENT LAWFUL, CENTERLINE HOMES DISCLAIMS ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS, FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY, INTENDED USE, WORKMANSHIP, OR CONSTRUCTION RESPECTING THE RESIDENCE, COMMON AREAS OF THE COMMUNITY, IF ANY, AND ALL FIXTURES OR ITEMS OF PERSONAL PROPERTY SOLD PURSUANT TO THE PURCHASE AND SALE AGREEMENT, OR ANY OTHER REAL OR PERSONAL PROPERTY WHATSOEVER CONVEYED IN CONNECTION WITH THE SALE OF THE RESIDENCE, OR LOCATED WITHIN THE COMMUNITY WHETHER ARISING FROM THE PURCHASE AND SALE AGREEMENT, USAGE, TRADE, IMPOSED BY STATUTE, COURSE OF DEALING, CASE LAW OR OTHERWISE.

1

Seller Initials: _____          Purchaser Initials: _____          Purchaser Initials: _____

3/10/03

SOME STATES DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU (PURCHASER).

5. **What items are excluded from this Limited Warranty?** Centerline Homes does not assume responsibility for and excludes from this Limited Warranty any and all items not specifically included in this Limited Warranty, including, but not limited to:

5.1 Damage to land and other real property that is not part of the Residence, or any property that was not included in the purchase price stated on the Purchase and Sale Agreement;

5.2 Loss or damage of landscaping (including sodding, seeding, shrubs, trees, and plantings);

5.3 Loss or damage which arises while the Residence is being used primarily for nonresidential purposes;

5.4 Changes in the level of underground water table which were not reasonably foreseeable at the time of construction of the Residence;

5.5 Any condition which has not resulted in actual physical damage to the Residence;

5.6 Any loss or damage that is caused or made worse by any of the following causes, whether acting alone or in sequence or concurrence with any other cause or causes whatsoever:

5.6.1 Negligence, improper maintenance, defective material or work supplied by, or improper operation by, anyone other than Centerline Homes or its employees, agents or subcontractors, including failure to comply with the warranty requirements of manufacturers of Appliances, Equipment and Fixtures (as defined in Section 6 hereof);

5.6.2 Purchaser's failure to give prompt and proper notice to Centerline Homes of any defect or claim under this Limited Warranty;

5.6.3 Change of the grading of the ground that does not comply with accepted grading practices, or failure to maintain the original grade, or any damage resulting from improper landscaping installed by anyone other than Centerline Homes or failure to maintain a proper grade around the Residence to permit adequate drainage of ground water away from the Residence;

5.6.4 Riot or civil commotion, war, vandalism, hurricane, tornado or other windstorm, fire, explosion, acts of terrorism, hail, snow, ice storm, lightning, falling trees or other objects, aircraft, vehicles, mudslide, avalanche, earthquake, or volcanic eruption;

5.6.5 Abuse of the Residence, or any part thereof, beyond the reasonable capacity of such part for such use;

5.6.6 Microorganisms, fungus, decay, wet rot, dry rot, soft rot, rotting of any kind, mold, mildew, vermin, termites, insects, rodents, birds, wild or domestic animals, plants, corrosion, rust, radon, radiation, formaldehyde, asbestos, any solid, liquid or gaseous pollutant, contaminant, toxin, irritant or carcinogenic substance, whether organic or inorganic, and electromagnetic field or emission, including any claim of health risk or uninhabitability based on any of the foregoing;

5.6.7 Purchaser's failure to minimize or mitigate any defect, condition, loss or damage as soon as practicable.

5.7 Appliances, Equipment and Fixtures;

5.8 Any loss or damage caused by buried debris, underground springs, sinkholes, mineshafts or other anomalies which were not reasonably foreseeable in a building site;

Seller Initials: _____   2   Purchaser Initials: _____   Purchaser Initials: _____
3/10/03

5.9    Any damage Purchaser knew about prior to the effective date of this Limited Warranty;

5.10    Any request for warranty performance submitted to Centerline Homes after an unreasonable delay or later than thirty (30) days after the expiration of the term of this Limited Warranty;

5.11    Loss caused, in whole or in part, by any peril or occurrence for which compensation is provided by state legislation or public funds;

5.12    Any loss or damage to the extent the loss or damage is covered by any insurance, whether primary, excess, pro-rata or contingent;

5.13    Diminished market value of the Residence;

5.14    Costs of shelter, transportation, food, moving, storage, or other incidental expenses related to relocation during repair, or any other costs due to loss of use, inconvenience, or annoyance. Any and all consequential loss or damage, including without limitation, any damage to property by this Limited Warranty, any damage to personal property, any damage to property which Purchaser does not own, any bodily damage or personal injury of any kind, including physical or mental pain and suffering and emotional distress, and any medical or hospital expenses, or lost profits caused by, in connection with, or as a result of any defect in the Residence or component thereof, whether such item is warranted or not;

**Centerline Homes disclaims any liability for incidental or consequential damages.  Some states do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you (Purchaser).**

5.15    Normal wear and tear;

5.16    Damage resulting from any stoppage of the plumbing system caused by Purchaser;

5.17    Shrinkage or cracking due to drying of the Residence after construction within the tolerances specified in the General Guidelines and Performance Standards described in Part II of this Limited Warranty;

5.18    Dampness or condensation within the Residence which is not directly attributable to defective insulation or other failure to meet the performance standards contained in Part II of this Limited Warranty;

5.19    Glass in windows and doors is not warranted against breakage;

5.20    Notwithstanding any provision of this Limited Warranty to the contrary, Centerline Homes does not assume responsibility for damage due to defects which are the result of characteristics of material commonly used, so long as the material used are those prescribed by applicable Building Code regulations or, if the applicable Building Code does not prescribe a standard, so long as the materials conform to accepted industry practice (or standards); nor is Centerline Homes liable for any loss or injury caused by the element; or by expansion or contraction of materials;

5.21    Defective design or material supplied by Purchaser installed under Purchaser's direction;

5.22    Certain additional exclusions relevant to particular items are set forth in the General Guidelines and Performance Standards in Part II of this Limited Warranty.

**Unless you receive some other written warranty from Centerline Homes, this Limited Warranty is the only express warranty given by Centerline Homes.**

Seller Initials: _____        Purchaser Initials: _____        Purchaser Initials: _____

3

3/10/03

6. **How are manufacturers' warranties affected?** If available and if applicable, Centerline Homes hereby assigns and passes through to Purchaser the manufacturers' warranties for all appliances, equipment and fixtures, such as air conditioning and heating compressor units, air handlers, air conditioning or heating equipment thermostats, attic fans, boilers, burglar alarms, carbon monoxide detectors, ceiling fans, central vacuum systems, chimes, dishwashers, dryers, electric meters, electronic air cleaners, exhaust fans, fire alarms, fire protection sprinkler systems, freezers, furnaces, garage door openers, garbage disposals, gas meters, gas or electric grills, heat exchangers, heat pumps, humidifiers, instant hot water systems, intercoms, oil tanks, outside lights or motion lights, range hoods, ranges, refrigerators, sewage pumps, smoke detectors, solar collectors, space heaters, sump pumps, thermostats, trash compactors, ventilating fans, washing machines, water heaters, water pumps, water purification systems, water softeners, whirlpool baths, whole-house fans, and any similar items if included in the purchase of the Residence (the "**Appliances, Equipment and Fixtures**"). The Appliances, Equipment and Fixtures are excluded from this Limited Warranty and are covered by manufacturers' warranties to the extent provided in those warranties, if any. Centerline Homes gives no warranties with respect to Appliances, Equipment and Fixtures nor does it cover system defects that are caused by failure of any such Appliances, Equipment and Fixtures.

7. **What procedures have to be followed to obtain performance of warranty obligations?**

7.1    For any malfunction or other problem with your Appliances, Equipment and Fixtures, please refer to your owner's operation and maintenance booklet. For any other malfunction or problem, or if no manufacturers operation and maintenance booklet has been provided, please refer to this Limited Warranty (including Part II) to determine whether the problem is covered by this Limited Warranty.

7.2    In an effort to expedite any warranty service regarding the Residence, we have established the following procedures for making a warranty claim:

7.2.1    All warranty claims should be submitted to the Customer Care Department.

7.2.2    **Emergency service** such as a total electric failure, a total plumbing stoppage or a severe plumbing leak may be called into the Customer Care Department at **(954) 344-8040**. Office hours are Monday through Friday from **9:00 a.m. to 5:00 p.m.** Emergency after-hours telephone numbers for air conditioning, electrical and plumbing problems will be provided to you at closing.

7.2.3    All other requests for service should be submitted **in writing** on an **original Service Request Form** to the Customer Care Department. Please obtain the original Service Request Form from the Customer Care Department. All requests will be handled as quickly as possible.

7.2.4    A Customer Care Representative will use diligent efforts to attempt to be in contact with Purchaser after receiving Purchaser's request for service, subject to matters outside of the control of Centerline Homes. An on-site inspection of the items requested for service may be necessary. Should an inspection be required, Centerline Homes will contact Purchaser for an appointment or permission to enter the Residence.

8. **Emergency Conditions.** As provided above, the only exception to a written service request would be those which fall into the emergency category. An emergency condition is one which if not immediately repaired may cause danger to the Residence or its occupants. In the event of such emergency condition, Purchaser must contact the Customer Care Department as provided above to receive authorization to make any emergency repairs. If the Customer Care Department is not available for emergency authorization, Purchaser must make minimal repairs until authorization for more extensive repairs has been approved, and Purchaser must take action so that further damage can be mitigated. Any unauthorized repairs will not be reimbursed unless these procedures are specifically followed.

Seller Initials: _____          4          Purchaser Initials: _____          Purchaser Initials: _____

3/10/03

9.   **Purchaser Must Provide Centerline Homes with Reasonable Notice of Defect or Claim and Access to the Residence.** Purchaser is obligated under this Limited Warranty to provide Centerline Homes with reasonable notice of any defect or claim under this Limited Warranty as provided above. Purchaser's failure to provide such notice may result in the exclusion of coverage for an item for which coverage may have applied. In addition, Purchaser is obligated to allow Centerline Homes access to the Residence for the purpose of inspecting the claimed defect or problem for the purpose of assessing whether the claimed defect or problem is covered by this Limited Warranty, and if so covered, for the purpose of determining the most cost-effective, necessary, and effective means of solving the defect or problem. Purchaser's failure to provide Centerline Homes such access in a prompt and reasonable time frame shall result in the exclusion of coverage for an item for which coverage may have applied, except for authorized emergency repairs.

10.   **Work Performed by Centerline Homes for Items Not Covered by this Limited Warranty.** In the event Centerline Homes undertakes work to remedy or repair any item for which you have failed to comply with the notice, access, and other obligations under this Limited Warranty, or for any item which is not covered under this Limited Warranty, such action by Centerline Homes shall not be deemed a waiver of any provision or exclusion of this Limited Warranty, and shall not be deemed to relieve Purchaser of the notice, access, and other obligations of this Limited Warranty, and shall not be deemed to extend coverage under this Limited Warranty to any matters not covered herein.

**This Limited Warranty gives you (Purchaser) specific legal rights, and you (Purchaser) may also have other rights which vary from state to state.**

# PART II

## GENERAL GUIDELINES AND PERFORMANCE STANDARDS

1.   **Substantial Construction Defects.** A substantial construction defect covered by this Limited Warranty is limited to actual damage to the load bearing elements of the Residence which substantially affects the use of the Residence for its intended purpose, including, but not limited to, supporting beams, load bearing partitions, structural floor systems, ceiling and floor joists, foundations, footings, and roof rafters. Load bearing items consist of the framing members and structural elements that transmit the dead and live loads to the ground. Any matters covered by this Limited Warranty relating to the load bearing items must represent an actual structural failure of some part of the load bearing system of the Residence.

A substantial effect on the use of the Residence for its intended purpose is not demonstrated by an effect upon the market value of the Residence, nor does minor damage to any load bearing portions of the Residence constitute a defect within the provisions of this Limited Warranty. Examples of non-bearing elements of the Residence are roof shingles, drywall and plaster, exterior siding, brick or stone veneer, subfloor and flooring, wall tile or other wall coverings, electrical, heating, plumbing, appliances, equipment or finishes.

2.   **Minimum Performance for Warranted Items.** Failure to comply with the following performance standards constitutes a breach of this Limited Warranty by Centerline Homes. The structural, mechanical, plumbing, and electrical systems shall comply with the applicable building codes. Conclusive evidence of compliance shall be the issuance of a certificate of occupancy for the Residence by the appropriate governmental building authorities.

2.1   **Electrical Systems.** Switches, receptacles and lighting will operate for their intended purposes.

2.2   **Plumbing.** Plumbing systems including sewers, fixtures and drains should operate as intended according to manufacturing standards. Leakage caused by defective washers is not covered by this Limited Warranty. Clogs or stoppage resulting from Purchaser's negligence is not covered by this Limited Warranty.

2.3   **Painting.** Natural finishes on interior woodwork, exterior paint or stain should not peel or substantially deteriorate; however, fading is normal and the degree is dependent on the climatic conditions. If paint or stain is defective, Centerline Homes will

5

Seller Initials: _____     Purchaser Initials: _____     Purchaser Initials: _____

3/10/03

properly prepare and refinish affected areas matching color as close as possible. Interior paint shall be applied in a manner sufficient to visually cover walls, ceiling and trim surfaces when applied.

2.4    **Ceramic Tiles.** In the event that Centerline Homes installs ceramic tile in the Residence, the following disclosure applies to Purchaser:  Ceramic tile is generally laid directly onto the foundation of the Residence, which foundation is composed of reinforced concrete. Concrete naturally shrinks as it receives its final setting at which time minor cracks will sometimes appear on its surface regardless of how solid the ground is. These cracks do not affect the strength of the structure in any way; however, these settlement cracks in the foundation may result in hairline fractures on the ceramic tile surface.  Since these cracks are a result of conditions beyond Centerline Homes' control, Centerline Homes does not assume responsibility for such repairs. Purchaser shall receive a few replacement tiles at the time of closing for use in the event any hairline cracks do appear on the ceramic tile.  Following the closing, it will be Purchaser's responsibility to replace any cracked tiles.  Purchaser further agrees that Centerline Homes shall not be responsible in the event the selected ceramic tile has been discontinued or if replacement tiles cannot be located. In addition, since grout will "curd", the grout that Purchaser selects may not exactly match the samples shown. Centerline Homes shall not be responsible for any slight color variations in tile or grout from the samples presented.

2.5    **Plaster and Gypsum Wallboard.** Cracks in the plaster of 1/8 inch or more in width are covered by this Limited Warranty. Cracks of less than 1/8 inch in width are not covered by this Limited Warranty.  Slight imperfections such as nail pops, seal lines and cracks not exceeding 1/8 inch in width are common in gypsum wallboard installations and are considered acceptable. <u>Centerline Homes will repair cracks exceeding 1/8 inch in width only one time only during the term of the Limited Warranty.</u>

2.6    **Weather Stripping.** Some air infiltration is normally noticeable around doors and windows, especially during high wind and in high wind areas. Centerline Homes will adjust or correct poorly fitted doors, windows or poorly fitted weather-stripping.

2.7    **Resilient Flooring.** Depression or ridges in resilient flooring in excess of 1/8 inch in width are covered by this Limited Warranty and will be repaired. Centerline Homes shall repair resilient flooring which lifts, bubbles or becomes unglued at seams or has shrinkage gaps in excess of 1/16 of an inch in width. Where dissimilar flooring materials abut one another the gap required to be repaired by Centerline Homes must be in excess of 1/8 of an inch. Centerline Homes shall not be responsible for discontinued patterns or color variations in floor covering.

2.8    **Doors and Windows.** Interior and exterior doors shall not warp in excess of National Woodwork Manufacturers' Standards (1/4 inch measured diagonally from corner to corner). Exterior doors will warp to some degree due to temperature differentials on the inside and outside surfaces. If Purchaser fails to maintain constant temperature controls in the interior of the Residence, between 68 and 78 degrees, the interior warpage will not be covered by this Limited Warranty. Centerline Homes will correct or replace and refinish defective doors to match existing doors as nearly as possible during the term of the warranty. Garage doors, metal, wood and plastic windows and sliding glass and spring doors are covered by this Limited Warranty and should function as intended without jamming. Garage doors shall be installed as recommended by the manufacturer, and some entrance of the elements (sand, wind and water) can be expected under normal conditions. Glass in windows and doors is not warranted against breakage.

2.9    **Shingles and Roofing.** Roofs and exterior walls shall be free from leakage during the period of this Limited Warranty.  Dampness of walls or roofing is often common to new construction and dampness shall not be considered leakage within the terms of this Limited Warranty.

2.10    **Wood and Plastic Finishes.** Floors shall not squeak excessively nor be uneven to an extent of more than 1/4 inch out of level within any 32" measurement and floor slope within any room of the Residence shall not exceed 1/240th of the room width. Joints in molding or joints between molding shall not result in cracks exceeding 1/8 of an inch in width. Joints between exterior trim elements of the Residence including siding shall not result in open cracks in excess of 3/8 inch and shall function to exclude normal rain and wind.

6

Seller Initials: _____    Purchaser Initials: _____    Purchaser Initials: _____

3/10/03

2.11   **Interior Residence Masonry.**   Non-structural cracks in masonry in excess of 1/8 inch and cracks which exceed 1/8 inch in width in mortar joints of masonry construction shall be covered by this Limited Warranty.   Centerline Homes shall only be obligated to repair such cracks as surface patching.

2.12   **Concrete.**   Cracks in slab or foundation walls in excess of 1/8 inch in width shall be covered by this Limited Warranty.   Cracks in garage slabs in excess of 1/4 inch or 1/4 inch in vertical displacement shall be covered by this Limited Warranty.   Cracks in stoops or steps in excess of 1/4 inch and setting of steps in excess of ½ inch in relationship to the Residence structure shall be covered by this Limited Warranty.   Disintegration of concrete surface of flatwork so as to expose the aggregate under normal conditions of weathering and use shall be covered by this Limited Warranty.   Excessive powdering or chalking of concrete surface (specifically excluding surface dust) shall be covered by this Limited Warranty.   Standing water on flatwork in excess of 36 hours after normal rain shall be covered by this Limited Warranty.

2.13   **Grade and Site Work.**   Centerline Homes warrants that standing water shall not remain on the Residence site in excess of 48 dry hours after normal rainfall and/or sprinkler use except in swales which may drain as long as 72 hours after normal rainfall.   The foregoing time periods are subject to extension in extraordinary events such as hurricanes, tropical storms and failures of nearby drainage systems.   The owner of the Residence is responsible for maintaining the grade of swales as originally established by Centerline Homes. Centerline Homes warrants that usual - as opposed to catastrophic (e.g., because of a hurricane) - settling of ground around utility trenches or other field areas will not exceed 6 inches and settling back fill around foundation will not substantially interfere with water drainage away from the Residence. Centerline Homes shall not be responsible nor bear any liability for the effect of any repairs performed under warranty by Centerline Homes upon landscaping, grass, shrubs, or any plantings placed on the property by the Purchaser.

2.14   **Heating and Cooling.**   The heating, ventilating and air conditioning systems have been designed in accordance with the exterior conditions listed in paragraph 302.1(b) of the State of Florida Model Engineering Efficiency Code for building construction, and shall be capable of maintaining space condition of 72 degrees for heating 78 degrees for cooling.   In the case of outside temperatures exceeding 95 degrees Fahrenheit, a differential of 15 degrees Fahrenheit from the outside temperature will be maintained.   This temperature shall be measured at the unit return before dilution with outdoor air.   As used in this section, "heating, ventilating and air conditioning systems" do not include the air conditioning or heating compressor units, air handlers, or thermostats, which equipment is manufactured by others and which is specifically excluded from this Limited Warranty.

2.15   **Stucco.**   Cracks are not unusual in exterior stucco wall surfaces. Cracks greater than 1/8 inch in width shall be repaired.   <u>Centerline Homes will repair cracks exceeding 1/8 inch in width one time only during the term of the Limited Warranty.</u>

2.16   **Condensation.**   Windows will collect condensation on interior surfaces when extreme temperature difference and high humidity levels are present.   Condensation is usually the result of climatic humidity conditions created by the homeowner within the Residence.   Unless directly attributed to faulty installation, window condensation is a result of conditions beyond Centerline Homes' control and no corrective action will be taken.

2.17   **Outdoor Installations.**   Driveways, sidewalks, fences and sprinkler systems should function for their intended purposes, subject to normal cracking and wearing and, in the case of sprinkler systems, damage to sprinkler heads caused by lawn maintenance equipment.

2.18   **Pool.** Pools shall be free from defects in material and workmanship and perform satisfactorily during the term of this Limited Warranty.   The plaster finish (marcite) is warranted against chipping, cracking or peeling for ninety (90) days from the date of closing or marcite installation, whichever is longest.   Crazing (as defined below) is considered normal and is not covered by this Limited Warranty.   Pools are not warranted against any staining and/or discoloration.   "<u>Crazing</u>" shall mean cracks that do not go all the way through (not open cracks) that are caused by normal drying that occurs in all cement products.   Crazing appears in a spider webbing pattern or checking type pattern.   As the plaster cures under water, the Crazing cracks will reseal themselves.   In a pastel colored pool the Crazing cracks are typically more pronounced.

7

Seller Initials: _____        Purchaser Initials: _____        Purchaser Initials: _____

3/10/03



## *HOMEOWNER ASSOCIATION DOCUMENTS*
## *ACKNOWLEDGEMENT*

The COBBLESTONE CREEK Homeowners' Association (HOA) documents describe important information regarding the community. Therefore, please read the documents as soon as possible.

If you have any questions, please contact your sales representative. COBBLESTONE CREEK HOA documents.

_____          _____
PURCHASER'S SIGNATURE                  LOT NUMBER

_____
PURCHASER'S PRINTED NAME



## LEGAL NAME AFFIDAVIT

We, the undersigned, are providing the following information relating to the purchase of Lot ___ Block ___ and the manner in which all closing documents including mortgage and warranty deed are to be prepared.

It is understood that if vesting information is changed after documents have been prepared, additional charges may be incurred.

All documents will be prepared exactly as indicated below.  Please be sure all information is correct and complete.

PLEASE PRINT OR TYPE ALL INFORMATION EXCEPT SIGNATURES

**BORROWER**
Full legal name, including middle initial, if used:

*Chad Prandi , 1*

Marital Status (Married or Single): _____

Relationship to Co-Borrower (Husband/Wife/Father/Sister/Etc.): *Partner.*

Prefix or Suffix (Jr., Sr., Etc.): _____

**CO-BORROWER**
Full legal name, including middle initial, if used:

*Krzysztof Olschewski*

Marital Status (Married or Single): _____

Relationship to Co-Borrower (Husband/Wife/Father/Sister/Etc.): *Partner*

Prefix or Suffix (Jr., Sr., Etc.): _____

Deed to be held in Trust?  (circle one):  ☐ YES ~~☒~~ NO
Is this home going to be your primary residence?:  ☒ YES ☐ NO

PURCHASER:

_Chad Prandi_
Borrower Signature

_(signature)_
Co-Borrower Signature

Date:_____

1/18/03

# SPECIMEN

## SUPPLEMENT TO THE BOOKLET FROM
## HOME BUYERS WARRANTY CORPORATION VI

| PURCHASER | | | | | |
|---|---|---|---|---|---|
| LOT | | PHASE | | SUBDIVISION | |
| COMMUNITY | | | CLOSING DATE | | |
| ADDRESS | | | | | |

_____ ("**Seller**") hopes you will be happy in your new Residence, and we are pleased to present you with the limited warranty from the Home Buyers Warranty Corporation VI (the "Third Party Warranty"). The terms of the Third Party Warranty are explained in detail in the booklet titled "HBW VI Asset Protection Program, Workmanship/Systems and Structural Limited Warranty Coverage – HBW VI APP 307)" as updated in June of 2002 (the "**Booklet**") prepared by HBW VI. This Supplement to the Booklet (this "**Supplement**") does not restrict or override the provisions of the Booklet in any way and is intended to supplement several provisions in the Booklet to facilitate your review of the Third Party Warranty. This Supplement only applies to the Third Party Warranty, which terms are specifically explained in the Booklet. Unless otherwise defined herein, all initially capitalized terms used herein shall have the meanings set forth in the Booklet.

A.    **Limitations.** DURING THE TIME THAT THE THIRD PARTY WARRANTY REMAINS IN EFFECT, ANY IMPLIED WARRANTIES AVAILABLE TO YOU UNDER FEDERAL LAW WITH RESPECT TO CONSUMER PRODUCTS, AS DEFINED IN THE MAGNUSON-MOSS WARRANTY FEDERAL TRADE COMMISSION IMPROVEMENT ACT (15 U.S.C. 2301, ET SEQ.) (THE "**ACT**"), SHALL REMAIN AVAILABLE TO YOU.   WITH RESPECT TO ALL OTHER COMPONENTS OF YOUR RESIDENCE,  SELLER GIVES THE THIRD PARTY WARRANTY AND THE CENTERLINE HOMES LIMITED WARRANTY (DELIVERED TO YOU SEPARATELY) EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, EXPRESSED OR IMPLIED. WITH THE EXCEPTION OF IMPLIED WARRANTIES AVAILABLE TO YOU FOR A LIMITED AMOUNT OF TIME IN ACCORDANCE WITH THE ACT, TO THE MAXIMUM EXTENT LAWFUL, SELLER DISCLAIMS ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS, FITNESS FOR A PARTICULAR PURPOSE, HABITABILITY, INTENDED USE, WORKMANSHIP, OR CONSTRUCTION RESPECTING THE RESIDENCE, COMMON AREAS OF THE COMMUNITY, IF ANY, AND ALL FIXTURES OR ITEMS OF PERSONAL PROPERTY SOLD PURSUANT TO THE PURCHASE AND SALE AGREEMENT, OR ANY OTHER REAL OR PERSONAL PROPERTY WHATSOEVER CONVEYED IN CONNECTION WITH THE SALE OF THE RESIDENCE, OR LOCATED WITHIN THE COMMUNITY WHETHER ARISING FROM THE PURCHASE AND SALE AGREEMENT, USAGE, TRADE, IMPOSED BY STATUTE, COURSE OF DEALING, CASE LAW OR OTHERWISE.  SELLER DISCLAIMS ANY LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES.

SOME STATES DO NOT ALLOW LIMITATIONS ON HOW LONG AN IMPLIED WARRANTY LASTS, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.  SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION OR EXCLUSION MAY NOT APPLY TO YOU.

B.    **When does the warranty term commence?  How long does coverage last?  What is covered by the Third Party Warranty?** The warranty term commences from your closing date, first title transfer or the date you or anyone else first occupied the Residence if that was before closing.  For FHA/VA homes, the warranty term commences the date of closing.  The warranty against certain significant defects in materials and workmanship runs for a one (1) year period.  The warranty against certain significant defects in the electrical, plumbing and mechanical systems runs for a two (2) year period.  See Section I and II of the Booklet for specific information.



# SPECIMEN

C.      **What does Seller and/or HBW VI agree to do?**  Seller or HBW VI shall repair, replace or pay the reasonable cost of repair of an item covered under the Third Party Warranty.  The design, method and manner of such repair shall be within the sole discretion of Seller, if Seller pays for the repair, or of HBW VI, if HBW VI pays for the repair.  See Section VII of the Booklet for specific information.

D.      **What procedures must I follow in order to obtain performance of the obligations stated in the Booklet?**  Please see Section III of the Booklet for reporting defects covered under the Builder's (Seller's) One Year Workmanship or Two Year Systems Warranty, whichever is applicable.  Please see Section V of the Booklet for specific instructions for reporting defects covered under your Structural Warranty, if applicable.  If your Residence is a condominium unit, please see Section VI of the Booklet for reporting requirements.

E.      **What do I do if I believe that the obligations in the Booklet have not been satisfied?**  Please see Section VII of the Booklet for the procedure to follow to resolve any and all claims, disputes and controversies by or between you, the Seller, HBW VI, or any combination of the foregoing.  The arbitration procedures described in the Booklet are not required before bringing suit under the Act, if applicable.

F.      **What is not covered?**  The list of items not covered by the Third Party Warranty are explained in detail in Section VIII of the Booklet.

G.      **How are manufacturers' warranties affected?**  For an explanation on how manufacturers' warranties are affected, please see Section 6 of Part I of Centerline Homes Limited Warranty.

H.      **Is this warranty transferable?**  Yes, all of your rights and obligations under the Third Party Warranty shall fully transfer to each successor in title to the Residence, including any mortgagee in possession, for the remainder of the warranty term and any such transfer shall in no way affect or reduce the coverage under the Limited Warranty for its unexpired term.  See Section VII of the Booklet for more information.

By signing this Supplement you acknowledge the receipt of the Booklet and accept the terms of the Third Party Warranty and this Supplement.

**The Third Party Warranty and the Centerline Homes Limited Warranty are the only express warranties given to purchaser.  The Third Party Warranty gives you specific legal rights, and you may also have other rights which vary from state to state.**



Purchaser's Initials

**Centerpointe Financial, Inc.**
**Real Estate and Settlement Procedures Act**
**Disclosure Form**

### Affiliated Business Arrangement:

Centerpointe Financial has a business arrangement with Centerline Homes, Inc. to originate and process mortgage loans for the purchasers of Centerline Homes, Inc. Common Ownership exists between Centerpointe Financial and Centerline Homes, Inc. which may result in financial benefit to these owners. You are not required to use the services of Centerpointe Financial in order to do business with Centerline Homes, Inc.

By signing below, I hereby acknowledge that I have received a Centerpointe Financial presentation package and understand the nature of the affiliated business relationship.

Purchaser     Date 02/27/05

Purchaser     Date 02/27/05

You're already familiar with the miles-per-gallon stickers on new automobiles, and the yellow EnergyGuide labels on home appliances. Shoppers use this information to figure out how much that car or appliance is really going to cost them. This information gives the buyer a good estimate of what it will cost to operate that car or use that appliance, over and above the purchase price. A car or product that is cheaper to buy can often be more expensive to operate, so this information can help you make the best purchase decision.

## Here's how the Florida EnergyGauge program works.

After the rating, you'll get an easy-to-read Rating Guide has a scale that allows you to compare the specific home you're looking at with the most efficient and the least-efficient homes of the same size with the same number of bedrooms available in your part of the state today. And in addition to this overall estimate of energy use and comparisons, you get a detailed breakdown on the energy costs of the home's air-conditioning, space heating, water heating, refrigeration, clothes dryer, cooking costs, lighting, pool pumping and other miscellaneous equipment.

One of the keys to the success of this program is the uniformity of ratings, made possible by the use of the EnergyGauge® software developed by the Florida Solar Energy Center. It has been specially designed to let Raters input the key data on the home and obtain accurate information for comparison purposes. A unique optimization feature even lets Raters determine what energy-efficiency

features can be added to the home to maximize cost-savings and comfort-improvement.

So how can a home energy rating help you reduce your energy use and save money?

That's easy. While the design and construction of your home and the efficiency of its significant portion of its energy use: occupant life-style will still have a big effect on exactly how much energy you use. This is because your preferences and personal habits - the level at which you set the thermostat, whether or not you turn of lights and fans when leaving a room, how much natural ventilation you use, and other factors - all will affect your home's actual monthly energy use.

The Ratings program in Florida closely parallels national activities.

The U.S. Department of Energy has been working to set national standards for home Energy Rating Systems, and Florida's system surpasses these standards. The Florida Building Energy Rating Guide provides a HERS score for the home. This national score enables homes to qualify for national mortgage financing options requiring a HERS score. This score is computed in accordance with proposed national guidelines, considering the heating, cooling, and hot water energy uses. HERS awards stars to the rating.

Tell your Realtor or builder that you want to get the home rated before you buy it.

They can give you the names of Raters in your area. Additional information on the program is available from the Energy Gauge Program Office at 321-638-1492, or visit our website at www.fsec.ucf.edu.

## Who does Energy Rating?

It is important to note that only State Certified Raters are allowed to perform ratings.These Raters have undergone rigorous training programs and have passed the required challenge exams. They are also required to undergo continuing education classes and further exams to keep their certifications current. An on-going quality control program also watches over their ratings and their work. All their Ratings are submitted to a central Registry that checks them for accuracy and compiles generic building data.

## Energy Ratings in Florida

The Florida Building Energy-efficiency Rating Act (Florida Statute 553.900) was passed by the State Legislature in 1993 and amended in 1994. It established a voluntary statewide energy-efficiency rating system for homes. The Rating System has been adopted by FCA Rule 9J-60.



The Florida Energy Gauge
The Florida Energy Gauge Program
Florida's Building Energy Rating System
1679 Clearlake Road
Cocoa, Florida 32922-5703
321-638-1492
Fax: 321-638-1010
E-Mail: EnGauge@fsec.ucf.edu
Website: www.fsec.ucf.edu

FSEC-EN-1

F1-C4

---

## Thinking About
## Buying a Home?



## Get An
## EnergyGauge® Rating!

### Consider the Benefits:

• More Home for Less Money
• Improved Mortgage Options
• Enhanced Indoor Comfort
• Superior Energy-Efficiency
• More Environmental Sustainability
• Tested Quality Construction
• Greater Resale Value

Initials



Congratulations on your decision to purchase a home.

As you know, there are a lot of factors to consider before signing on the dotted line. By now, you've probably checked out the location of the home you like the best. You know how much the seller wants, how many bedrooms there are, and whether your children will fit, where you'll park your car and lots of other important things.

But wait, there's still one more important thing you really ought to do.

You wouldn't buy a car without asking how many miles-per-gallon it gets, would you? So why would you even think of buying a house without knowing how much the power bills will be? That's why now is the perfect time to get an EnergyGauge® rating on the house.

Since 1994, there has been a voluntary statewide energy-efficiency rating system for homes in Florida, and prospective home owners just like you all around the state are getting their homes rated before they make their purchase. There are several very important reasons why.

◆ Energy ratings give homebuyers a market-place yardstick that measures the benefits of energy-efficiency improvements. You get detailed estimates of how much your energy use will cost.

◆ Energy ratings give you clear and specific information that lets you compare similar homes on their energy use. Two

homes might look similar, but one may be efficient and comfortable and the other an energy-guzzler with a very uncomfortable interior.

◆ Maybe most important of all, the national Home Energy Rating System (HERS) score on the energy rating can qualify you for a number of special mortgage programs that offer lower interest rates, lower closing costs, and other benefits. More and more lenders are coming into Florida with money-saving packages for buyers of energy-efficient homes.

Before buying your next home, hire a Certified Energy Rater to do a rating.

Your builder or Realtor can help you find a Certified Rater in your area. After the rating, you'll get an easy-to-understand Energy Guide that estimates how much it will cost to pay for energy used in that home, and will allow you to look at a number of separate areas of energy use throughout the house.

For many years, buyers have had home inspectors look over a home before making their purchase. This is a great way to find out about potential house problems before you make your purchase. Smart homebuyers around the country are now also asking for a home energy rating to look specifically at the energy efficiency. Because energy costs can often equal house payments, the relatively small cost of a home energy rating can easily be offset by many years of lower energy payments.

---

DCA Form 6 Energy...

## FLORIDA
## BUILDING ENERGY RATING GUIDE

Projected Rating Based on Improvements
Field Performance Test Required for Rating Confirmation

| Best | 18 MBtu | 30 MBtu | 109 MBtu | Worst |
| --- | --- | --- | --- | --- |
| $381 | ▲ | $735 | | $2228 |

As compared with 1800 square foot 3 bedroom home without gas points

This Improved Home Qualifies for an Energy Efficient Mortgage (EEM)

HERS Score
Reference 80
★★★★☆   Improved 80   ★★★★★

Initials