**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * * | MDL No. 2047 <br><br> SECTION: L |
| * * * * * * * * * * * | * * | JUDGE FALLON |
| This Document Relates to: | * * | MAG. JUDGE WILKINSON |
| *Hernandez v. Knauf,* Case No. 09-6050 (E.D.La.) | * * * | |
| * * * * * * * * * * * | * | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO PRECLUDE SPECIFIC ASPECTS OF THE TESTIMONY OF KNAUF'S EXPERTS ON THE IMPACT OF CORROSION ON THE SCOPE OF REMEDIATION**

**I.   INTRODUCTION**

Defendant Knauf has identified four experts (three reports)[1] which address the impact of the corrosion in the Hernandez home on the scope of the needed Chinese Drywall ("CDW") remediation. These four experts cross-reference and rely on each other to express their opinions, so this *Daubert* motion is directed at all four experts' opinions on the corrosion/scope of remediation issue. Specifically, several of the basis of the four experts' opinions do not meet the scientific reliability standard of *Daubert*. The Plaintiffs respectfully request that these aspects of the Knauf experts' opinions, be excluded from the *Hernandez* trial. The discovery depositions of these four experts have not yet occurred, so the PSC reserves the right to supplement this Memorandum after the depositions occur.

---

[1] Knauf Expert Reports of Canzoneri, Beyler, and Perricone/Lee.

1

## II.     BACKGROUND

Knauf's experts originally gave expert opinions that it was not necessary to remove the corrosive CDW from the homes, rather they opined that one should employ an Environmental Control System ("ECS") to mitigate the damage caused by the CDW, but leave the CDW in place in the home.  That opinion was precluded under *Daubert* standards.  Order and Reasons (2/17/10)**.**

Now, the Knauf experts admit that the corrosive CDW cannot be left behind in the home and that it must be removed.  In this particular case, *Hernandez*, the Knauf experts admit that all the drywall (CDW and domestic) must be removed.  Sproles Report (3/2/10) at p. 9.  However, the Knauf experts' current opinion is that most of the metal components in the home that are corroded with copper sulfide and silver sulfide can be left behind in the partial remediation proposal that they recommend.  Specifically, by way of example, the Knauf experts opine that copper sulfide residues on ground wires (no matter how thick) and corrosion pits on ground wires (no matter how deep) can be left behind.  Further examples of what can be left in place under the partial remediation recommendation of the Knauf experts include corrosive silver sulfide deposits on circuit boards such as in a thermostat, and corrosive copper sulfide deposits on pipes hidden in the wall such as an HVAC "line set."

Similar to their proposals on ECS, these Knauf partial remediation proposals to leave in place corroded components have not been employed and are not being employed by major Florida builders doing CDW remediation, such as Beazer Homes and Lennar Homes.  Knauf does not identify or put forth any real world remediation data where the approach of leaving corrosion in place in the home has been tried.  Also, similar to their proposal on ECS, the proposal to leave corroded components behind has not been endorsed by a governmental or

scientific institution studying the CDW problem. So, there is no long term data from CDW homes to support the efficiency or efficacy of the approach of leaving corroded components in place in the homes. Like the Knauf ECS remediation proposal, leaving behind corroded components is an experiment to be carried out in the Plaintiff homeowner's home, in this case Mr. & Mrs. Hernandez's home, for which a group of yet unidentified experts must monitor the home for decades to ascertain the results of the experiment.

The Knauf experts render the opinion that the following corroded components can stay in place in the home as part of the partial remedy they recommend:

- Corroded copper ground wires
- Corroded copper low voltage wire
- Corroded appliances
- Corroded consumer electronics
- Corroded silver circuit boards
- Corroded copper pipes (other than HVAC coils)$^2$

Beyler Report at p. 4, 8; Canzoneri Report at p. 2-3; Carruba Report at Ex. A; Perricone/Lee Report at p. 11-12.

## III.   LEGAL ANALYSIS

The PSC has provided briefing on the basic principles of the legal standards under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), in its prior briefing in *Germano*. (Docket #832). That discussion is incorporated herein by reference. Additional *Daubert* principles relevant to the particular Knauf expert opinions at issue in this motion will be cited herein.

---

[2] Knauf experts do recommend removal and replacement of corroded HVAC coils, and "switches, outlets, and safety devices …" for several reasons including "impracticality, cost-effectiveness to repair, clean or store and salvage," Carruba Report at Ex. A.

3

## IV.  ARGUMENT

The PSC challenges the admissibility of the Knauf experts' opinion to leave behind corroded components in the home as part of its partial remedy, for the following reasons:

### A. Building Code Requirements that do not Allow Corrosive Residues and that Require Six Inches of Slack at a Receptacle or Outlet Are not "Discretionary."

Knauf experts have provided the opinion that building codes are "discretionary." Canzoneri Report at p. 2, 3; Beyler Report at p. 8.  Specifically, they argue that the International Residential Code for One and Two Family Dwellings is discretionary when it comes to the requirement in the section on "Integrity of electrical equipment," that states that "there shall not be any damaged parts … such as parts that are broken; bent; cut; *deteriorated by corrosion*, chemical action or overheating."  They also argue that the Louisiana Code six inch rule on free conductors is discretionary.  Canzoneri Report at p. 2; Beyler Report at p. 7.  Neither of these experts cite the plain text of Code to support their position that the Code does not mean what it says, or any other authority to support this opinion.  Under basic *Daubert* principles, such an opinion lacks any indicia of reliability and should be excluded.  Experts testifying as to remediation of corrosive agents in residential dwellings may not reasonably ignore applicable, governing building codes.  For them to suggest that said codes are merely "discretionary" is not only unreasonable but also contrary to the purpose underlying building code requirements and certainly unreliable under the law.  Engineering, structural, electrical, plumbing and other comparable building experts refer to and rely on building codes every day as part of their professional responsibilities and experience.  *See*, *e.g.*, *Kilgore v. Carson Pirie Holdings, Inc.*, 2006 WL 3253490, *5 (6th Cir. Nov. 8, 2006) (exclusion of expert testimony not an abuse of discretion where expert opined on the dangers of using a stationary escalator as a stairway and

the steps an owner should take to avoid those dangers, but there was "nothing in the building code or any other applicable requirements that mandated such steps."); *Consult Urban Renewal Devel. Corp. v. T.R. Arnold & Assoc., Inc.*, 2009 WL 1969083, *4 (D.N.J. July 1, 2009) (noting "that the construction industry is both a highly technical field and is accompanied by many attendant dangers, [and] there is a strong public interest at stake, which is indeed the very purpose behind … building codes."); *In re Genetically Modified Rice Litig.*, 666 F.Supp.2d 1004, 1022-23 (E.D. Mo. Oct. 9, 2009) (noting that "if a building code says a stair riser must be six inches tall, that is a precise directive that a builder can follow, and if someone is injured because the riser is taller or shorter, negligence *per se* could apply."); *Miller v. Astucci U.S. Ltd.*, 2007 WL 102092, *9 (S.D.N.Y. Jan. 16, 2007) ("The purpose of applying for a building permit is to enable ... authorities to make a determination of whether the proposed building complies with relevant zoning ordinances and building codes."); *Wasco v. T Corp.*, 2008 WL 53707, *4 (D.D.C. Jan. 3, 2008) (finding that expert's proposed "option is neither safe nor consistent with the building code").

### B. "Cleaning" Copper Ground Wires and Other Electrical Components with a Damp Cloth or "Scotch-Brite" is not a Recognized Method to Repair Corroded Wires or Corroded Electrical Contacts.

In support of its recommendation to "clean" corroded electrical components as one element of its recommended partial remedy, the Knauf experts infer authority from a section of the building code that does not use the word "corrosion."  Knauf expert Canzoneri cites the following authority to support his recommendation to clean corrosion off of ground wires:

> Section 4408.17 addresses the cleaning of ground wires:
> "Nonconductive coatings, such as paint, lacquer and enamel, on equipment to be grounded shall be removed from the thread and other contact surfaces to assure electrical continuity …"

5

Canzoneri at p. 3.

This cited section does not even mention the word "corrosion." Mr. Canzoneri does not explain why corrosion – a process that is defined as an "electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the material and its properties," CDW-0105-0001 (ASTM G-15), can be likened to "paint." Corrosion as documented in the Hernandez home is a process by which the wire itself is eaten away by the sulfur and "pits" form, measuring as deep as 38 microns or 380,000 Angstroms. CDW-6-0004 (CTL/Krantz Report). How that corrosion process can be likened to "paint" under the principles of corrosion science is not explained by Mr. Canzoneri. Neither Mr. Canzoneri, nor any other Knauf expert, cites any other authority to support the notion that corrosion on and in the copper and silver components[3] of electrical equipment can be cleaned. Canzoneri Report at p. 3, Beyler Report at p. 4, Carruba Report at Ex. A.

An expert's reliance on government data or publications is not, in and of itself, sufficient. The methodology used by the expert to arrive at his or her opinion must still be reliable and the opinion must be relevant to the facts of the case. As stated in the Advisory Committee Notes to FRE 702: "The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The … expert must explain how the conclusion is so grounded." Advisory Committee Notes to FRE 702 (2000). *See also Daubert v. Merrell Dow*, 43 F.3d 1311, 1319 (9th Cir. 1995) (after remand) (holding that the expert must "explain the methodology ... followed to reach [his or her] conclusions"); *Claar*

---

[3] Knauf experts do *not* claim the thick silver sulfide corrosive deposits on contacts in circuit boards of appliances, consumer electronics, or thermostats can even be cleaned by the damp cloth or Scotch-Brite method as they do for wire; yet they leave such items out of their partial remedy. The shortened life span of such items due to corrosion is explained by Don Galler. Galler Report at CDW-24-0053, 54.

6

*v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) ("[T]he district court repeatedly ordered the experts to explain the reasoning and methods underlying their conclusions.... [Because the experts'] affidavits are devoid of any such explanation ... the district court could not make the findings required by Rule 702[.]"); *United States v. Rincon*, 28 F.3d 921, 924 (9th Cir. 1994) (explaining that the methods used by the expert must be described "in sufficient detail" such that the district court can determine if they are reliable). Under basic *Daubert* principles, such an opinion lacks evidence of use by other major builders, or any other indicia of reliability; and therefore should be excluded.

### C. The CPSC Did Not Find the Wires in CDW Homes to be Safe; Rather Their Investigation is Ongoing.

Knauf experts infer from the CPSC/Sandia Report that wires in CDW homes are safe. Perricone/Lee Report at CDW-169-0013; Beyler Report at p. 2-3. That is not what the report says and Knauf's experts should be precluded from testifying otherwise.

On the question of removal of basic NM wire in CDW homes, the CPSC concluded that CDW homes had a severely corrosive environment on the Battelle scale (Classification III or IV) and that "Electrical equipment that is intended to operate in such [corrosive] environments needs to be designed in such a way, through choice of materials and overall device construction to reduce the impact of the corrosive gases." CDW-0065-0012 (CPSC Report); Sandia Report, 060 at p. 30, 36. It is beyond dispute that regular NB cable used in a residential setting is not specifically designed to withstand corrosive attack.[4]   LT-0229-0005 (Comizolli, 1992)

---

[4] It is also beyond dispute that low voltage wire in the Hernandez and other homes such as the "multi-strand wires encased in flexible sheathing" in lamp chords or light fixtures are corroded and have experienced pitting under the sheathing at levels above 10 microns. CDW-6-0004 (CTL/Krantz Report). Perricone and Lee concede that the sheathing does not protect these kind of wires, CDW-169-0016 (Perricone/Lee Report), yet Knauf experts inexplicably ignore corroded and pitted low voltage wire in their recommended partial remediation plan. Their opinion is to leave it behind.

7

("Properly designed electronic circuits function satisfactorily in Severity Level G-3 environments, but equipment designed without environmental concerns in mind or using materials susceptible to degradation are clearly at risk."). Furthermore on the question of fire and electrical shock risk, CPSC is undertaking a two part investigation which includes "accelerated corrosion testing of new components in an effort to understand long-term exposure implications." CDW-0065-0003. That testing has *not* been done yet, and isn't expected until the summer of 2010. CDW-0065-0004. Similarly, CPSC commissioned NIST to evaluate the risk of "intermittent failures that can impact life safety," and NIST has *not* completed this investigation. CDW-0050-0024-27.

As to Sandia National Labs, the scope of their work did not cover fire and shock risk. CDW-0060 at p. 4, 11.

In short, the CPSC investigation into the safety of wires, fire risk and electric shock risk is ongoing. Thus, any opinion expressed by Knauf experts that the CPSC or Sandia have *concluded* that wires in CDW homes is unfounded, and under basic *Daubert* principles should not be allowed. Under *Daubert*, false assumptions or "guesstimates" along the way will preclude admissibility of expert testimony. *See Coffey v. Dowley Mfg.*, 89 Fed.Appx. 927, 931 (6th Cir. 2003) ("The lack of grounds for these estimates, especially when viewed in light of [the expert's] complete failure to test his predictions, casts doubt on his results."); *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009) (district court found expert's conclusion to be "unreliable because she had based it on a false assumption"); *Seaman v. Seacor Marine, LLC*, 326 Fed.Appx. 721, 726, 2009 WL 1158799, **3 (5th Cir. Apr. 30, 2009) (assumptions of expert "rendered her causation opinion mere guesswork").

### D.  The Knauf Experts Ignore the Battelle Corrosivity Classifications and Failure Standards as well as the Decades of Data Upon Which it is Based.

The field of corrosion science recognizes environmental corrosivity classifications and the data sets they are based on, (i.e., Battelle or ISA 71.04), as a foundational tool to evaluate the risk of failure of electrical equipment in a corrosive environment.  LT-0195-0001 at p. 9, 13 (Abbott, MTI #38).  Both Sandia National Laboratories and Knauf's original corrosion expert Dr. Sandy Sharp *have found that CDW homes present a severely corrosive environment*, (Sandia National Laboratories, 062 at p. 23, 30, 36; Deposition of Dr. Sharp (Germano Transcript (2/24/10) Vol.II at p. 39(15)-42(14), and Dr. Sharp has testified that electrical failures will occur in these CDW homes based on his own corrosion thickness data.  *Id.*  The corrosion literature recognizes that *mere presence of thick copper sulfide films* (qualitative criteria) and the corrosion thickness over .1 micron per year (quantitative criteria) are highly predictive of electrical failures in these CDW homes.  LT-0245-0003 (Sinclair text); LT-0195 at p. 9, 21, 27, 75, 76; Sandia National Laboratories 060 at p. 23, 30, 36; Deposition of Brad Krantz (3/5/10) at p. 46-47, 50-52, 69-73, 152-154.  *Daubert* case law recognizes an expert may not ignore accepted, bedrock principles, such as the corrosivity classifications and failure standards, to arrive at his or her conclusions.  Such avoidance renders the opinion unreliable.  Here, the Knauf experts' opinions on corrosivity and remediation ignore such bedrock principles, thus their opinion that there is no risk of failure should be excluded.  *See Cochran v. Brinkmann Corp.*, 2009 WL 4823858, *8 (N.D. Ga. Dec. 9, 2009) (finding that "the accepted methodology, characterizing the practice of an expert in the field of engineering, [for example,] simply does not involve guesswork or even conjecture; rather, accepted methodology more often involves some inquiry into industry

9

standards, practices, or publications and results in conclusions based upon concrete data, testing, measurements, or calculations.").

### E. The Knauf Expert's Contact Resistance Tests Don't Comply with Recognized Standards for such Tests and are Unreliable.

One of the other purported basis for the Knauf experts' opinion that wire in CDW homes is safe is the "resistance" tests they have done. Contact resistance is the single most important factor in influencing electrical failures. LT-0202 (Chudnovsky p. 934). Chudnovsky reports that electrical properties begin to deteriorate at 200 Angstroms of corrosion product thickness and Abbott reports failures begin near 300 Angstroms for 30 day exposure or 1000 Angstroms for a year of exposure. LT-0202 (Chudnovsky, p. 934); LT-95-013 (Abbott, MTI) at p. 9, 21-25. In this case, CTL/ Krantz Lab reports Angstrom thicknesses on wires in the Hernandez home that are several orders of magnitude above these standards, CDW-6-0004, (CTL/Krantz), Deposition of Brad Krantz (3/5/10) at p. 46-47, 50-52, 69-73, 152-154, and Galler noted that silver sulfide thicknesses were well in excess of these standards. Galler Report at CDW-24-0053, 54.

The resistance testing done by Knauf experts relies in part on copper coupons in chamber studies instead of the real world parts from the Hernandez home. The corrosion product thickness on these coupons understate the actual actual thicknesses of the components in the Hernandez home by as much as a factor of 10 or more and thus understate the expected contact resistance. *Compare* Perricone/Lee Report at Appendix C, D, CDW-169-0365, 0381, *to* CTL/Krantz Report, CDW-6-0004. Given the necessary relationship between contact resistance and failure, the fundamentally flawed Knauf coupon/chamber resistance testing is an unreliable basis for an opinion on contact resistance in the home.

In addition, the method of resistance testing employed by the Knauf experts does not comply with ASTM standards for such tests. ASTM B 539-02 (Standard Test Methods for Measuring Resistance of Electrical Connections (Static Contacts)) states that "Two wire measurements of resistance are not suitable because connections to the sample will contribute part of the measured resistance, and these may be large, unknown, and variable." CDW-0103-0001 (ASTM 539-02). ("The resistance measuring procedures in these test methods are four-terminal techniques."). The methodology of resistance testing employed by Perricone and Lee is an Ohm meter which carries out a two wire measurement procedure, CDW-169-0371, and thus does not meet the standard. For all the reasons above, these tests are unreliable and should be excluded. *Daubert*, 509 U.S. at 592-94; *see also Meadows v. Anchor Longwall and Rebuild, Inc.*, 306 Fed.Appx. 781, 788, 2009 WL 74399, \*\*7 (3rd Cir. Jan. 13, 2009) (observing that evidence of industry practice is useful in evaluating reliability in cases where technical issues like engineering arise), *citing Pineda v. Ford Motor Co.*, 520 F.3d 237, 248 (3rd Cir. 2008); *Kolokowski v. Crown Equipment Corp.*, 2009 WL 2857957, \*9 (D.N.J. Aug. 27, 2009) (holding that "industry standard counsels against the admission of [the expert's] testimony because no walkie rider trucks use a longer handle - or even a telescoping handle - like the one he suggests.").

### F. Knauf Experts' Opine that a Thin Copper Oxide Film is the Same as the Copper Sulfide Film on Wires in CDW Homes is Demonstrably Incorrect.

Knauf expert Beyler concludes that copper oxide films are the same as copper sulfide films, and further implies that copper sulfide films are benign. Beyler Report at p. 3. This conclusion unsupported by all of the data from Sandia, Plaintiff experts, and Defendant experts in this case, flies in the face of the fundamental criteria for Battelle corrosivity classifications.

Those criteria indicate that a benign environment is characterized by a thin copper oxide film that is uniform and will not exceed 300 Angstroms. The criteria also indicate that a severe industrial corrosive environment is characterized by a thick copper sulfide film (>4000 Angstroms (more than 10x the copper oxide film)) as well as creep and pore corrosion. LT-0228-0012 (Sinclair text); LT-195 (Abbott, MTI) at p. 21, 76. The Sandia report showed that in CDW homes the copper sulfide films were 10-20 microns thick (300-600x thicker than the copper oxide films), and they showed pitting, cauliflower morphology, nodules, spongeform, and cracking. 060, Sandia Report at p. 23, 36; *see also* LT-0205-0015, 0016 (Tran 2003). To equate the relatively harmless thin benign copper oxide film to the greater by (several orders of magnitude) copper sulfide film with nodules, cauliflower morphology, pitting, and cracking as Knauf expert Beyler does is a conclusion so inconsistent with all the available data in this case, and the Battelle qualitative corrosivity standards, that it should be deemed unreliable and excluded. *Kumho Tire Co. v. Carmichael*, 526 U.S. at 157 ("district courts must 'scrutinize' whether the 'principles and methods employed by an expert have been properly applied to the facts of the case.'") (citation omitted); *General Electric Co., v. Joiner*, 522 U.S. at 146 ("too great an analytical gap between the data and the opinion proffered.").

> **G. It is Well Recognized that there must be Water Present in an Absorbed Film for Copper Corrosion, Particularly Pitting Corrosion, to Occur; yet Knauf Experts Deny such Water Exists in CDW Homes Anywhere other than on the HVAC Coils**.

Knauf experts reject Dr. Scully's, Brad Krantz', and Don Galler's opinion that microscopic water exists and is available in CDW homes to facilitate pitting corrosion. Perricone Report at CDW-169-0016 thru 1018. They reject this opinion and argue that such pitting only can occur if the copper is under water or "submerged." Under the Knauf expert

12

criticism and view of corrosion, pitting corrosion can *only* occur on HVAC coils where visible condensation exists in an "unique" aggressive environment. Perricone Report at CDW-169-0011, 12. However, Sandia data, data from the Hernandez home and data from other CDW homes shows the existence of large pits (10-20 microns depth) in copper surfaces *other* than the HVAC coils including low voltage wires, high voltage wires, and "line set" copper pipes. CDW-6-0004; CTL/Krantz Supplemental Report (2/16/10); Sandia 060 at p. 36. Under the Knauf experts' view, these documented corrosion pits could not occur unless the wires and line sets were "under water" or showed "visible water" on their surfaces. This opinion of the Knauf experts is totally inconsistent with the data in this case including that from Sandia and CTL Labs, thus the opinion is both unsupportable and does not "fit" this case under *Daubert* standards. The Knauf expert's visible water opinion should be excluded for these reasons. *See Joiner*, 522 U.S. at 146 ("too great an analytical gap between the data and the opinion proffered."); *Moore*, 151 F.3d at 276 (court "must evaluate whether there is an adequate 'fit' between the data and the opinion proffered.").

For all the reasons state above, Plaintiffs request that the above-identified aspects of the Knauf experts' opinions on corrosion and the scope of remediation be excluded under *Daubert* standards.

13

Dated:  March 8, 2010

Respectfully submitted,


/s/ Russ M. Herman_____
Russ M. Herman, Esquire
Leonard A. Davis, Esquire
Stephen J. Herman, Esquire
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*


Arnold Levin
Fred S. Longer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

**PLAINTIFFS' STEERING COMMITTEE**

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Jerrold Seth Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Bruce William Steckler
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Victor Manuel Diaz
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
vdiaz@podhurst.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
 Matthews, Martinez, Gonzales,
 Kalbac & Kane
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis (On the Brief)
HAUSFELD LLP
1700 K Street, N.W Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeldllp.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Jeremy W. Alters
Alters, Boldt, Brown, Rash & Culmo, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@abbrclaw.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

## CERTIFICATE OF SERVICE

        I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 8th day of March, 2010.

        s/ Leonard A. Davis_____
        Leonard A. Davis, Esquire
        Herman, Herman, Katz & Cotlar, LLP
        820 O'Keefe Avenue
        New Orleans, Louisiana 70113
        Phone: (504) 581-4892
        Fax: (504) 561-6024
        Ldavis@hhkc.com