IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * * * * * * * * | MDL Docket No. 2047<br><br>SECTION L<br><br>JUDGE FALLON<br><br>MAG. JUDGE WILKINSON |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**THIS DOCUMENT RELATES TO:** *Hernandez v. Knauf Plasterboard (Tianjin) Co. Ltd. et al.,* Case No. 09-6050 (E.D. La.)

## KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF KENNETH ACKS

## I.      INTRODUCTION.

Defendant Knauf Plasterboard (Tianjin) Co. Ltd. ("KPT") submits this memorandum of law in support of its motion to exclude the report and testimony of Kenneth Acks. The PSC offers the opinions of Kenneth Acks ("Acks") regarding the alleged impact of Chinese drywall on the value of the Hernandez house.[1] Acks opines that his "preliminary estimate of diminution in property value" arising from the presence of Chinese drywall in the Hernandez house, as of March 19, 2009, would likely range from 10% to 40% with a most likely value of approximately 25%. (*See* Acks Report at P4.0010-0005, attached as Exhibit A). To reach this conclusion, Acks claims to engage

---

[1] The deposition of Acks in the *Hernandez* trial has not commenced. KPT will supplement this memorandum with citations and additional argument to the Acks deposition transcript, as necessary.

in an appraisal of the Hernandez property. (*Id.* at P4.0010-0010.) The core of Acks' conclusion is the value of "stigma damages" and their impact on appraising the property, which he improperly calculated by melding together five methods that he claims are advocated by leaders in the field of appraisal of contaminated properties. (*Id.* at P4.0010-0012.)

Acks' appraisal opinions should be excluded under *Daubert* for three fundamental reasons: (1) Acks is not a licensed appraiser in Louisiana, or any other state, and as such, he is not qualified to provide an opinion that appraises the value of the Hernandez property; (2) even if this Court determines that Acks is qualified to give such an appraisal opinion, Acks' report and testimony is unreliable because only the first of the five methods utilized by Acks to determine the impact of Chinese drywall on the appraised value of the Hernandez property has been professionally accepted by the appraisal profession; and (3) his primary means for calculating stigma value—contingent valuation—is not only unaccepted by the appraisal profession, but it also generates hypothetical, speculative, and inaccurate estimates of damages.

Each of these deficiencies is more fully addressed in the Appraisal Review Report prepared by Mr. Richard Roddewig of Clarion Associates, Inc. (*See* Appraisal Review Report, R. Roddewig, attached as Exhibit B.) The Appraisal Review Report, a generally accepted method of reviewing Appraisal Reports, was prepared by Roddewig pursuant to the Uniform Standards of Professional Appraisal Practice ("USPAP") published by The Appraisal Standards Board of The Appraisal Foundation, and the Supplemental Standards of Professional Practice of the Appraisal Institute. (*See* Ex. B at 2.) The Appraisal Review Report examines in great detail the accuracy, reliability, and appropriateness of

the information and methodology used, and damages conclusions reached, in the Acks report.  (*Id.*)  This analysis is directly relevant to the reliability of the report under *Daubert*, and although the extensive review conducted by Clarion Associates is not replicated in its entirely in this motion, it is fully incorporated herein.

## II.    APPLICABLE LAW.

Pursuant to Fed. R. Evid. 702, an expert must be qualified by knowledge, skill, experience, training, or education to provide scientific, technical or other specialized knowledge in a trial.  Fed. R. Evid. 702.  If an expert is sufficiently qualified, this Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid" before admitting expert testimony under FRD 702.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993); *Seaman v. Seacor Marine, L.L.C.*, 326 Fed. Appx. 721, 724 (5th Cir. 2009) ("charge[s] trial judges with the responsibility of acting as gatekeepers to exclude unreliable testimony").  As this Court noted in *Germano*, "scientific testimony is reliable only if 'the reasoning or methodology underlying the testimony is scientifically valid,' meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known." *Germano, et al. v. Taishan Gypsum Co. Ltd., et al.*, No. 09-6687, Order & Reasons of 02/17/10, at 4 (E.D. La. 2010) (citing *Daubert* at 592-93). In determining scientific reliability of expert testimony, this Court may consider whether the expert's theory: (1) is generally accepted; (2) is capable of, or has been tested; (3) has a known or potential rate of error; and (4) has been subjected to peer review. *Id.* (citing *Daubert*, 509 U.S. at 593-95).

As this Court further noted in *Germano*, the party seeking to introduce the expert

testimony bears the burden of proving by a preponderance of the evidence "*that the methodology used by the expert was proper.*" *Id.* at 5 (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998) (emphasis added). In assessing the reasoning or methodology underlying the scientific expert's testimony, this Court "need not take the expert's word for it." *Id.* at 5 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997). Rather, "when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it." *Id.* at 5-6 (citing *Moore*, 151 F.3d at 279). The Fifth Circuit has confirmed that "non-scientific" testimony, such as real property valuations, are subject to the strictures of *Daubert*. *Hidden Oaks v. The City of Austin*, 138 F. 3d 1036 (5th Cir. 1998); *Hebbler v. Turner*, 2004 U.S. Dist. LEXIS 3258 (E.D. La. March 1, 2004) (Despite *Daubert* being a "flexible test...enabling trial courts to succeed as "gatekeepers" in both scientific and non-scientific expert determinations," court excluded property valuation expert under *Daubert* because of unreliable methodology.)

As set forth more fully herein, Acks' opinions fail the strictures of *Daubert* and should be excluded.

## III.   ARGUMENT.

### A.   Acks Is Not Licensed In Louisiana To Conduct A Real Property Appraisal.

The Acks report is an appraisal for which either a permanent or temporary Louisiana appraisal license is required. (Ex. B at 9-10.) Acks repeatedly describes his work as an "appraisal." (*See, e.g.,* Ex. A at P4.0010-0005.) Acks states that in reaching his opinions, he employed various methods and techniques derived from the appraisal industry, including the typical appraisal methods of "Cost, Sales and Income

Approaches." (*See id.* at P4.0010-0057.)   Acks does appear to limit his appraisal methodologies to the "Sales Comparison Approach" because it is the only methodology "directly relevant to this appraisal, though elements of the Cost and Income Approach were utilized in estimating value diminution." (*Id.* at P4.0010-0011.) Acks states that the final step in his "appraisal process" is to reconcile all of the approaches considered. (*Id.*)

Indeed, Acks claims that his report was prepared in conformity with applicable provision of the Code of Professional Ethics and Conduct of the Appraisal Institute, the Uniform Standards of Professional Appraisal Practice ("USPAP") as established by the Appraisal Foundation, and the appraisal requirements established by the State of Louisiana.   (*See id.* at P4.0010-0005 and 0054) ("This report has been made in conformity with, and is subject to the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute where applicable."). Because the Hernandez property is located in Louisiana, Acks also states that his report was prepared in conformity with the appraisal requirements established by the State of Louisiana. (*Id.*)

An "appraisal" in Louisiana is "an analysis, opinion or conclusion relating to the nature, quality, value or utility of specified interests in, or aspects of, identified real estate, for or in expectation of compensation." *See* Louisiana Real Estate Appraisers Law ("LREAL") § 3392. (*See also* Ex. B at 9.) An "appraisal assignment" in Louisiana is "an engagement for which an appraiser is employed or retained to act, or would be perceived by third parties or the public as acting, as a disinterested third party in rendering an unbiased analysis, opinion, or conclusion relating to the nature, quality, value, or utility of specified interests in, or aspects of, identified real estate." (*Id.*) Finally, an "appraisal

report" in Louisiana is defined as "any communication, written or oral, of an analysis, opinion, or conclusion relating to the nature, quality, value, or utility of specified interests in, or aspects of, identified real estate." (*Id.*) The USPAP defines "valuation services" as "services pertaining to aspects of property value" and pertain to all aspects of property value and include services performed by both appraisers and by others. (USPAP, 2008-2009 ed., Definitions, page U-1, lines 33-34, attached as Exhibit C.)

The purpose of the Acks report, to value the Hernandez property and estimate the effects of the presence of Chinese drywall on property value, falls squarely within the definition of an "appraisal" under the LREPL, or a "valuation" under the USPAP. (*See* Ex. A at P4.001-0002) ("The subject of this valuation is a single family home located at the above captioned address in Mandeville, Louisiana. This property reportedly contains contaminated drywall. The purpose of this report is to estimate the effects of the presence of the contaminated drywall upon property value.") Acks' reliance on a real property appraisal from a Louisiana appraiser dated March 2009 does not change the fact that his work was to appraise the Hernandez property, taking into account what Acks believes is a stigma value. By doing so, Acks is engaging in an appraisal of the Hernandez property without a license, as is required under Louisiana law. This Court should therefore reject Acks' valuation opinion as violative of Louisiana law. *See Hidden Oaks*, 138 F.3d at 1050; *Tennessee Dept. of Transportation v. Wheeler*, No. M1999-00088, Tenn. App. LEXIS 727, at *6-10 (Tenn. App. Ct. 2002) (citing Tennessee's requirement that only licensed appraisers can provide real estate valuations and finding that "the trial court erred by permitting [the expert witness at issue] to give an expert opinion regarding the value of the...farm...because [he] was no longer a licensed

real estate broker when he testified").

Even if the Louisiana statute is not dispositive of the qualification question, Acks lacks the requisite qualifications under FRE 702, making his opinions unreliable. As his curriculum vitae indicates, Acks is not a licensed appraiser in any state, and has not obtained any designation from the Appraisal Institute, the leading, national governing body for appraisers. (*See* Ex. A at P4.0010, 0049-0052.) Without such qualifications, Acks should not be considered an expert with appropriate knowledge, skill, experience, training or education to testify to an appraisal of the Hernandez property. As set forth more fully below, Acks' methodologies in determining stigma impact of Chinese drywall on the Hernandez property, particularly his contingent valuation methodology, are not generally accepted and provide inaccurate results. Coupled with these unreliable methodologies, Acks' lack of qualifications and accreditation further support the unreliability of his opinions such that they should be barred under FRE 702. *See Hidden Oaks*, 138 F. 3d at 1050; *James River Ins. Co. v. Rapid Funding, LLC*, 2009 U.S. Dist. LEXIS 14199, * 29-34 (D. Co. February 24, 2009) (lack of appraisal credentials persuades the court to find expert's experience is not enough to overcome problems with reliability of property depreciation calculation.)

**B.    Acks' Methodologies In Valuing Diminution In Property Arising From The Presence Of Chinese Drywall Are Either Not Accepted Methods By The Appraisal Profession Or Are Applied Improperly.**

Acks claims to use five methods to determine the impact of Chinese drywall on the Hernandez property:

- A sales comparison of homes with Chinese drywall;
- Contingent valuation;
- A methodology described as "inference based upon local tax assessor's actions";

- A methodology described as "benefits transfer" of results from other studies that used sales comparisons, contingent valuation, and hedonic regressions; and
- A so-called "discounted seller approach."

Only the first of these five methods, as defined and utilized by Acks in reaching his opinions, has been professionally accepted by the appraisal profession (although it was improperly applied by Acks). (*See* Ex. B at 18-19.) As Roddewig more fully explains, Acks fails to account for the recognized methods of appraising contaminated properties, (*see* Ex. B at 17-18), and relies on a combination of methodologies advocated by individuals—Robert Simons and Bill Mundy—whose qualifications in appraising properties has been judicially questioned. (*See* Ex. A at P4.0010-0012; Ex. B at p. 19); *see also LaBauve v. Olin Corp.*, 231 F.R.D. 632, 678 at n.99 (S.D. Ala. 2005) (excluding Simons' testimony where Simons asserted "in conclusory form, with no underlying analysis, that common, formulaic methods can compute diminution in property values for all proposed class members is so flawed as to be inadmissible as a matter of law"); *North Star Alaska Housing Corp. v. United States*, 76 Fed. Cl. 158, 215 (Fed. Cl. 2007) (rejecting Mundy's property valuation estimates and finding those estimates to be "riddled with flaws -- so many, in fact, as to render his findings worthless.") Because four of the five methodologies employed by Acks—both independently and in combination—are not acceptable appraisal methodologies, and one of which is Acks' report and testimony should be excluded as unreliable under FRE 702.

      **1.    The sales comparison approach, while an accepted method for evaluating environmental property impacts, is improperly applied by Acks.**

Acks describes his sales comparison approach as an investigation into "Market Activity In Chinese Manufactured Drywall Contaminated Homes." (*See* Ex. A at

P4.0010-0030.)  Despite this description, Acks' work is not an actual sales comparison approach, but is merely a reiteration by Acks of what he has heard from others in the market.  (Ex. B at 26.)  He does not independently collect, analyze, or compare actual home sales transactions to the Hernandez property.  (*Id.* at 26-27)  Rather, he relied on interviews conducted with two brokers/sales agents in the Parkland area of Broward County, Florida and an interview with a Virginia Beach, Virginia broker.  (*Id.*)  As set forth in the Appraisal Review Report, the data obtained from these two interviews are not evidence of actual market value.  (*Id.*)  Assessing actual market value as it relates to the property in question is critical to the reliability of the results.  (*Id.* at 17, 26-29.)  Failure to assess such market value undermines the reliability of the results.

> 2. **Acks' contingent valuation methodology is unreliable because it is not generally accepted in the field, as shown by the sole U.S. government report on the subject as well as recent appraisal literature, or supported by peer literature.**

The contingent valuation methodology, which Acks applies in this case, is "not generally accepted" or supported by peer reviewed literature and his opinion thus fails the reliability requirement set forth in *Daubert*.  (*Id.* at 30-44.)  In the wake of the Exxon Valdez oil spill, the National Oceanic and Atmospheric Administration ("NOAA") Panel – through the U.S. Department of Commerce – issued a report that evaluated whether the contingent valuation methodology could provide reliable estimates in assessing the diminution in value of natural resources affected by oil discharges.  (*See Report of the NOAA Panel on Contingent Valuation* [hereinafter "NOAA Panel Report"], Appendix I, 58 Fed. Reg. 4601 (Jan. 15, 1993), attached as Exhibit D.)  The Panel, comprised of a blue-ribbon panel of economists, found that contingent valuation methodology suffers from "an upward bias" because "hypothetical markets tend to overstate willingness to pay

for private as well as public goods." (*See* Ex. D at 4610.)  The Panel thus concluded that

continent valuation analysis is only reliable enough to be a "*starting point* of a judicial

process of damage assessment." (*Id.*) (emphasis added) (noting that "the phrase 'starting

point' is meant to emphasize that the Panel does not suggest that contingent valuation

estimates can be taken as automatically defining the range of compensable damages").

Neither the Department of Commerce nor any other federal government body has issued

a report since that has questioned the NOAA Panel's findings.

Appraisal literature from the leading peer-reviewed journals confirms that the

NOAA Panel's findings were correct.  In his 2006 article published in the most highly

recognized peer reviewed journal in the appraisal industry, *The Appraisal Journal*,

entitled "Contingent Valuation: Not An Appropriate Valuation Tool," Albert Wilson

explains that the "contingent valuation technique was not designed for, nor it is

applicable to, the valuation of goods for which there is a market." *The Appraisal Journal*

53, 60 (2006), attached as Exhibit E.  Wilson adds that any endorsement that there may

be of the contingent valuation method arises exclusively in the "public and quasi-public

goods" arena. *See* Ex. D at 54.  *See also* Richard T. Carson, Nicholas E. Flores, &

Norman F. Meade, "Contingent Valuation: Controversies and Evidence, *Envtl. &

Resource Econ.* 173, 180 (2001) ("rather than representing the 'best' case scenario for

seeing how contingent valuation works as is often claimed, the private goods case is one

that should ... and does ... perform poorly"), attached as Exhibit F.

In a separate article published through *Real Estate Issues*, Wilson explains other

reasons why the contingent valuation method is unreliable:

> [M]ost hypothetical market surveys consider only the buyer's side of the
> relationship; that is, how much the buyer wants the seller to take off the purchase

> price. Surveys rarely examine the seller's side and collect little or no information about whether a discount would receive serious consideration, let alone acceptance.

"Real Property Damages and Rubber Rulers," *Real Estate Issues* 25, 28 (2006), attached as Exhibit G. Wilson further mentions that contingent valuation surveys often give "no evidence of testing to ensure the survey would provide a comprehensive understanding of respondents' answers." (Ex. G at 29.) Contingent valuation surveys also often fail to include questions "to determine if respondents were provided unbiased and well-considered answers." (*Id.*) Therefore, concludes Wilson: "hypothetical market surveys are no better than rubber rulers—measurement devices that analysts can stretch knowingly or unknowingly to achieve a desired result while maintaining the superficial appearance of scientific validity. These methods are not scientifically valid or reliable." (*Id.* at 30.)

Members of the appraisal community who have not been as critical of contingent valuation methodology still point to its unreliability as a property appraisal tool. *The Appraisal Journal* published a 2003 article by Thomas Jackson, entitled, "Methods and Techniques for Contaminated Property Valuation," which explained that contingent valuation methodology at best can be used to "supplement a sales-based analysis." *Appraisal Journal* 311, 318 (2003), attached as Exhibit H. Jackson emphasizes that contingent valuation methodology "cannot stand alone as an appropriate or credible valuation method" as "appraisers must focus on *observable* market data." (Ex. H at 320.)[2]

---

[2] Moreover, the *Dictionary of Real Estate Appraisal*'s Third and Fourth Additions as well as the *Appraisal of Real Estate*'s the 11th and 12th Editions omit any mention whatsoever of contingent valuation methodology. The USPAP also omit contingent valuation methodology. Finally, the Appraisal Institute's 2008 seminar entitled: "Appraising Environmentally Contaminated Properties: Understanding and

Acks' opinion, which relies explicitly on contingent valuation methodology, suffers from all of the flaws mentioned by the NOAA and the relevant appraisal community literature. In Acks own report, he explains the hypothetical nature of his contingent valuation approach:

> [Contingent valuation methodology] attempts to estimate values by asking individuals, in survey or experimental settings, to reveal their personal valuations of increments or decrements in unpriced goods by using *hypothetical, contingent markets*."

(*See* Ex. A at P4.0010-0033) (emphasis added.)

Acks also concedes that the entire scope of contingent valuation survey data was "collected over 3 days between December 28, 2009 and December 30, 2009" during which time only "10 useable responses were collected through telephone interviews." (*Id.* at P4.0010-0036.)  Acks also relies on a similarly faulty survey conducted by GCR & Associates in Louisiana that Acks claims confirms the contingent valuation survey conducted by Acks. (*Id.* at P4.0010-0033.)  The critical questions assessing the discount needed to buy or rent a remediated house was answered by only 40 and 18 people, respectively.  These samples, at best, provide directional data, and are not representative or may not be projected to the general population in Louisiana such that they are reliable to assess impact, if any, to the Hernandez property.

Acks' and the GCR contingent valuation approach mirrors the precise problem that the NOAA Panel and the appraisal literature caution against: it draws from un-observable market data and reaches a hypothetical conclusion that fails to account for upward bias.  For example, the questions presented in Acks' contingent valuation survey

---

Evaluating Stigma," relegates contingent valuation methodology to the status of a "non-traditional method."

ask the interviewee whether s/he would purchase a given home under hypothetical conditions that include "odors resembling rotten eggs; respiratory tract infections; increased asthma attacks, coughing dizziness, fatigue, headaches" and other physical symptoms allegedly associated with the houses at issue. Acks' questions also state that "the links to these effects have been widely reported" to be associated with the houses. (*See id.* at P4.0010-0034-0035.) The GCR survey linked Chinese drywall with health and property damage, without controlling for any bias that such questions imposed. (*See* Rigamer Expert Report, P4.0001-0010 (Question 5: "There has been a lot of discussion in recent news reports and publication on Chinese drywall in homes and possible links between Chinese drywall and problems associated with corrosion of wiring and electrical equipment and reports of associated illness in some residents. Knowing the potential link between Chinese drywall and these issues, would you buy a home where Chinese drywall had been installed.")

Not only do Acks' questions and the GCR survey inappropriately invoke human health concerns, his questions also reveal an overwhelming bias against purchasing the properties at issue. Contrary to the specific guidelines set forth in the NOAA Panel Report, the questions do not allow for adequate time lapse from the accident, do not check for understanding and acceptance from the interviewees, and do not deflect what the NOAA Panel call the "warm-glow" effect in which the interviewees give their answers without consideration of the full transaction costs involved. (*See* Ex. D at 4613.) Nor does Acks even acknowledge the possibility of bias in his report, which is especially alarming given that he drew his conclusions from a mere *ten* responses. (*See* Ex. A at P4.0010.0035.)

Finally, Acks' contingent valuation methodology oversimplifies the complexity of private real estate transactions and ignores the individualized considerations in purchasing residential real estate. Acks fails to explain why his contingent valuation methodology is reliable as applied to the Louisiana houses at issue here where it is well-established that such methodology should only be used in the arena of public or quasi-public goods, not private real estate. Because the NOAA and the appraisal community have cautioned and stressed in peer reviewed articles that the contingent methodology is not a generally accepted appraisal approach, especially with respect to private market goods such as real estate, causes the Acks report to be unreliable.

>   **3.   Acks' reliance on tax assessors' actions is unreliable because reliance on such actions is not generally accepted in the field.**

Acks looks to the actions of tax assessors in Florida, Virginia, and allegedly, Louisiana, concerning their valuation of properties with Chinese drywall.  According to Acks, these actions are indicative of the reduction in value to be attributed to homes with Chinese drywall. (*See* Acks Report at P4.0010-0038.)  Acks admits, however, that "[w]e did not have sufficient time to produce a formal survey of assessors." (*See id.* at P4.0010-0037.)  Despite this, Acks claims the "actions of the assessor clearly indicate a minimum estimate regarding the opinions of these experts of the effect upon property values." (*Id.*)

Acks reliance on such opinion fails to establish how he reviewed and assured the reasonableness of the determinations of the local assessors, which is a burden he carries under the USPAP. (Ex. B at 45-46.)  Also, the data reported appears to assess the value of homes with Chinese drywall that have not been remediated, and there is nothing in the Acks report that deals with how local tax assessors will handle the valuation of a

remediated house.  (Ex. B at 49-50)  While some assessors appear to have unilaterally reduced assessed values on unremediated homes with Chinese drywall, others have not. The actions of a handful of assessors in unremediated homes are not attributable to all homes with Chinese drywall.  (Ex. A at 50); *see also* Standard on the Valuation of Properties Affected by Environmental Contamination by IAAO in 2001 (requiring property-by-property rather than mass appraisal techniques), attached as Exhibit I.

Finally, the peer reviewed literature cited by Acks as supporting reliance on tax assessors also undermines the reliability of such data.  (*See* Ex A. at 47-48) (Greenberg & Hughes article in The Appraisal Journal and the Leon, Vazquez-Polo and Gonzalez article in Environmental and Resource Method both challenge the reliability of tax assessor's judgments on property values).  Because Acks cannot assure the reliability and reasonableness of tax assessors; assessments for unremediated homes in states other than Louisiana, the reliability of Acks opinions is in question.

### 4.    Acks' benefits transfer valuation method is unreliable because reliance on such actions is not generally accepted in the field and he conducts no underlying assessment of its veracity.

Acks defines "benefit transfer" as "the practice of adapting available economic value estimates of a quality or quantity change for some environmental resource to evaluate a proposed change in some other "similar" resource."  (*See* Ex. A at P4.0010-0039.)  Acks relies on three approaches to complete the "benefit transfer": sales comparison and case study approaches, hedonic regressions and contingent valuation.  As set forth more fully in the Appraisal Review Report, each of these approaches is improperly applied by Acks.  (*See* Ex. A at 53-62.)  Acks appears to interpret the "benefit transfer" practice as a review of published literature, and not any collection of direct

analysis of market data. (*See* Ex. A at P4.0010-0039.) Acks does no independent assessment of relevant data or any market research. Rather, his conclusions as they relate to these three approaches are all based on articles published, without any analysis of how those articles justifiably support a conclusion that property values are subject to diminution of value or that the values have declined.

The sales comparison and case study approach relies on ten published articles conducted by someone other than Acks. (*See* Ex. B at 54-55.) Acks collected no market information, does not identify any units of comparison, and makes no qualitative or quantitative adjustments to the sale prices of particular comparable sales. (*Id.*)

Hedonic regression analysis, which is used in real estate valuation, is improperly conducted by Acks. This type of analysis requires a calculation of select variables to determine the value associated with certain characteristics of property. The complete analysis supporting Acks' hedonic regression conclusion appears in a mere two lines of his report. (*See* Ex. A at P4.0010-0040.) In these two lines, Acks cites "Appendix P" (which in the *Hernandez* report is left blank), which, from his *Germano* report, lists roughly 300 articles that serve as the sole basis for his summary conclusion that "property values have declined 15%." (*Id.*) As Roddewig points out in the Appraisal Review Report, there is absolutely no discussion of any of these articles, the data contained in these articles, or how any such data were analyzed or weighed to reach the blunt conclusion that property values have declined 15%. (*See* Ex. B at 59-60.) There is no assessment of whether these articles address Louisiana properties or even properties with similar conditions such that hedonic regression analysis is permissible. A review of the list of articles cited by Acks suggest that none of those articles actually involve Louisiana

properties.   While it is presumed that Acks intends for that conclusion to apply specifically to the Hernandez property in Louisiana, there is nothing in Appendix P or his report that establishes that Acks performed any independent testing on Louisiana properties, or any properties anywhere.   Hedonic regression analysis is an economic regression analysis of actual data, and is not simply an amorphous, undefined analysis of articles.   One of the criteria of *Daubert* is that the method or analysis conducted by the expert be replicable.   In his two line "analysis", Acks outlines no such methodology or analysis, making replication impossible.

Finally, the review of nine articles concerning contingent valuations is subject to the same challenges as identified above.   Contingent valuation is not a generally accepted appraisal method.   (*See* Ex. B at 60.)   Acks also admits that continent valuation produces not only hypothetical damages, but that it is also subject to other biases, making the results unreliable.   (*See* Ex. A at P4.0010-0041) ("The Contingent Valuation studies account for hypothetical damages and are subject to other biases.")

Because Acks' opinions are not grounded in any actual market data, and because there is no analysis of how review of published literature is applicable to actual Louisiana property values and market conditions, the Acks' benefit transfer analysis as applied to the Hernandez property is unreliable.

### 5. Acks' discounted sellout approach is not subject to peer review and is not a generally accepted appraisal method.

Because the benefit transfer methodologies employed by Acks are "flawed," by Acks' own admission, Acks employed a discounted sellout approach that "takes into consideration account contamination, stigma and value changes over time as properties are remediated." (*See* Ex. A at P4.0010-0041.)   As set forth more fully in the Appraisal

Rebuttal Report, Acks reviews data related to single-family homes, which is not the type of property applicable to discounted sellout approaches. (*See* Ex. B at 61.)  In addition, Acks' various "assumptions" about home price appreciation rates, length of time for cleanup and remediation efforts, and difficulties and probabilities of selling a house at various points in time are not supported by any market data or analysis.  He also provides no data or analysis to support an ongoing stigma following house remediation for a period of nine years. (*Id.*)

Like contingent sales analysis and other appraisal methods, a discounted sellout analysis should be based on actual market data.  (*Id.*) (citing Statement on Appraisal Standards No. 2 (SMT-2) and USPAP 2008-2009 Edition, P. U-79, Lines 2507-2512.)  The reliance on unsupported and unproven assumptions renders any of the conclusions unreliable.

**C.     Acks' Primary Means For Calculating Stigma Value—Contingent Valuation—is Not Only Unaccepted by the Appraisal Profession, But It Also Generates Hypothetical, Speculative and Inaccurate Estimates of Damage That Cannot Accurately Predict Market Outcomes.**

In addition to not being a reliable methodology acceptable in the appraisal industry, contingent valuation cannot accurately predict market outcomes and is therefore an unreliable measure of stigma damages for the Hernandez property.

The *Daubert* Court noted that a significant factor in determining whether a scientific expert's methodology is reliable is whether it "can be (and has been) tested." 509 U.S. at 593.  By his own admission, Acks' contingent valuation methodology is entirely hypothetical and speculative; and as such, his methodology has a high potential rate of error which militates against admissibility under *Daubert*. 509 U.S. at 593-95.

Acks describes in his own words that his continent valuation methodology applies

to "*experimental* settings...to reveal their personal valuations of increments or decrements in unpriced goods by using *hypothetical, contingent markets.*"  *See* Acks Report at P4.0010-0033 (emphasis added). By presenting his interviewees with various "what if" hypothetical scenarios, Acks does not focus on what Thomas Jackson in *The Appraisal Journal* called "observable market data." *See The Appraisal Journal,* Jackson at 321.  Richard Carson, a preeminent researcher and proponent of the contingent valuation methodology for valuing public and quasi-public goods, echoes this in noting: "the term '*contingent*' valuation is apt and one should never forget that it is only the plan to provide the good that can [be] valued, not the good in the abstract." (Ex. F at 180.)

Carson then sets forth, in a separate article, the unique problem of the hypothetical approach for private goods: "[B]ecause of the manner in which they are provided, private goods differ fundamentally from public goods with respect to incentives for truthful preference revelation both in actual and survey contexts [and therefore] drawing inferences about private goods [from the contingent valuation methodology] is problematic."  Richard Carson et al., "Contingent Valuation and Revealed Preference Methodologies: Comparing the Estimates for Quasi-Public Goods," *Land Econ.* 80, 81 n.6 (Feb. 1996), attached as Exhibit J.

The ultimate test for whether the contingent valuation methodology is reliable is therefore whether the hypothetical market outcomes that it predicts actually came to fruition.   Those tests have indeed been performed on the continent valuation methodology which Acks uses here, and the results reveal that the contingent valuation methodology does not accurately and reliably predict actual market value for real estate. *See* Richard Roddewig & James Frey, "Testing the Reliability of Contingent Valuation in

the Real Estate Marketplace," *The Appraisal Journal*, 267, 268, 271-79 (2006), attached as Exhibit K.   Specifically, Richard Roddewig and James Frey conducted follow-up studies on the reliability of contingent valuation methodology in four marketplace situations where it was employed to predict damages: North Tacoma, Washington; Corpus Christi, Texas, Crystal Springs, Mississippi; and Columbus, Mississippi. *Id.* at 267, 270-71.   Roddewig and Frey found that in "each of the four situations, the marketplace subsequently failed to perform according to the prediction from the survey-based methodology." In each of these cases the real estate experts relied on contingent valuation methodology to predict substantial decreases in residential properties as a result of the contamination; yet across the board, "*the predicted decrease in prices failed to occur.*" (Ex. K at 271) (emphasis added).

Since the tests show that Acks' contingent valuation methodology, which is hypothetical by its nature, cannot reliably predict real estate market value, this Court should exclude Acks' report and testimony accordingly.

## IV.   CONCLUSION

For the foregoing reasons, and for the reasons more fully set forth in the Appraisal Review Report from R. Roddewig, this Court should find that Acks is not qualified to provide a real estate appraisal, that four of the five appraisal methodologies applied to the Hernandez property are not generally accepted appraisal methodologies, and that the continent valuation analysis, which is the primary method for determining stigma value, is not only hypothetical, but also unsupported by actual market data.   As such, Acks' opinions in their entirety fail to satisfy the reliability requirement of Rule 702 and *Daubert* and should be excluded.

Respectfully submitted,

BY: /s/ Douglas B. Sanders
KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No. 0097136)
**BAKER & MCKENZIE LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL  33131
Telephone:    (305) 789-8966
Facsimile:    (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS
(IL Bar No. 6256621)
RICHARD M. FRANKLIN
(IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL  60601
Telephone:    (312) 861-8075
Facsimile:    (312) 698-2375
Email: douglas.b.sanders@bakernet.com