THIS FORM HAS BEEN APPROVED BY THE FLORIDA ASSOCIATION OF REALTORS® AND THE FLORIDA BAR

## CONTRACT FOR SALE AND PURCHASE

PARTIES: __Tuscan-Harvey Estate Homes, Inc._____ ("Seller"),
of _____902 Clint Moore Road, Suite 120, Boca Raton, Florida 33487_____ (Phone) _561.994.1177_, and
_____William H. Wachter III and Jill M. Pflieger_____ ("Buyer"),
of _____184 Eagle Drive, Jupiter, Florida 33477_____ (Phone) _561.352.9769 or 858.354.7663_
hereby agree that Seller shall sell and Buyer shall buy the following described real property and personal property (collectively "Property") pursuant to the terms and conditions of this Contract for Sale and Purchase and any riders and addenda ("Contract").

I. DESCRIPTION:
(a) Legal description of the Real Property located in __Palm Beach__ County, Florida: See Exhibit A attached hereto known as Lot 20 of L'Hermitage in Frenchman's Reserve, in the city of Palm Beach Gardens, Florida. The real property shall include a completed residential home pursuant to the Features and Specifications attached hereto as Exhibit B
(b) Street address, city, zip, of the Property is: __651 Hermitage Circle, Palm Beach Gardens, Florida__
(c) Personal Property: equity golf membership (with equity/initiation fee waived) at Frenchman's Reserve Country Club, all improvements to the Real Property and appliances as set forth in Exhibit B, and warranties as set forth herein.

II. PURCHASE PRICE: ................................................................................................................................. $ 2,530,000.00
PAYMENT:
(a) Deposit held in escrow by __Cross Country Title__ (Escrow Agent) in the amount of .................. $ 100,000.00
(b) Additional escrow deposit to be made to Escrow Agent within __5__ days after Effective Date (see Paragraph III) in the amount of .................. $ 153,000.00
(c) Subject to AND assumption of existing mortgage in good standing in favor of _____
having an approximate present principal balance of .................................................................. $ N/A
(d) New mortgage financing with a Lender (see Paragraph IV) in the amount of ................................ $ N/A
(e) Purchase money mortgage and note to Seller (see rider for terms) in the amount of ..................... $ N/A
(f) Other ............................................................................................................................................ $ N/A
Balance to close by U.S. cash, wire transfer or locally drawn cashier's or official bank check(s), subject to adjustments or proration .................. $ 2,277,000.00

III. TIME FOR ACCEPTANCE OF OFFER; EFFECTIVE DATE; FACSIMILE: If this offer is not executed by and delivered to all parties OR FACT OF EXECUTION communicated in writing between the parties on or before __5:00 PM on August 13, 2007__, the deposit(s) will, at Buyer's option, be returned and this offer withdrawn. For purposes of delivery or notice of execution, parties include Buyer and Seller or each of the respective brokers or attorneys. The date of Contract ("Effective Date") will be the date when the last one of the Buyer and Seller has signed this offer. A facsimile copy of this Contract and any signatures hereon shall be considered for all purposes as originals.

IV. FINANCING:
X (a) This is a cash transaction with no contingencies for financing.
☐ (b) This Contract is conditioned on Buyer obtaining a written loan commitment within ____ days after Effective Date for (CHECK ONE ONLY)): ☐ a fixed; ☐ an adjustable; or ☐ a fixed or adjustable rate loan in the principal amount of $ _____ at an initial interest rate not to exceed ____%, discount and origination fees not to exceed ____% of principal amount, and for a term of ____ years. Buyer will make application within ____ days (5 days if left blank) after Effective Date and use reasonable diligence to obtain a loan commitment and, thereafter, to satisfy terms and conditions of the commitment and close the loan. Buyer shall pay all loan expenses. If Buyer fails to obtain a commitment or fails to waive Buyer's rights under this subparagraph within the time for obtaining a commitment or, after diligent effort, fails to meet the terms and conditions of the commitment by the closing date, then either party thereafter, by written notice to the other, may cancel this Contract and Buyer shall be refunded the deposit(s); or
☐ (c) The existing mortgage described in Paragraph II(c), above, has ☐ a variable interest rate; or ☐ a fixed interest rate of ____ % per annum. At time of title transfer some fixed interest rates are subject to increase. If increased, the rate shall not exceed ____ % per annum. Seller shall furnish a statement from each mortgagee stating the principal balance, method of payment, interest rate and status of mortgage or authorize Buyer or Closing Agent to obtain the same. If Buyer has agreed to assume a mortgage which requires approval of Buyer by the mortgagee for assumption, then Buyer shall promptly obtain the necessary application and diligently complete and return it to the mortgagee. Any mortgage charge(s) not to exceed $ _____ (1% of amount assumed if left blank), shall be paid by Buyer. If Buyer is not accepted by mortgagee or the requirements for assumption are not in accordance with the terms of this Contract or mortgagee makes a charge in excess of the stated amount, Seller or Buyer may rescind this Contract by written notice to the other party unless either elects to pay the increase in interest rate or excess mortgagee charges.

V. TITLE EVIDENCE: At least __20__ days before closing date, (CHECK ONLY ONE) X Seller shall, at Seller's Buyer's expense (which shall equal the promulgated rate for title insurance less reissue credit, if any is available), deliver to Buyer or Buyer's attorney, or ☐ Buyer shall at Buyer's expense obtain (CHECK ONLY ONE) ☐ abstract of title; or X a title insurance commitment (with legible copies of instruments listed as exceptions attached thereto), proposing to insure Buyer for the Purchase Price plus the cost of any improvements, together with any available endorsements that Buyer may request and, after closing, an owner's policy of title insurance.

VI. CLOSING DATE: This transaction shall be closed and the closing documents delivered on __(SEE ADDENDUM A)__, unless modified by other provisions of this Contract.

VII. RESTRICTIONS; EASEMENTS; LIMITATIONS: Buyer shall take title subject to: comprehensive land use plans, zoning, restrictions, prohibitions and other requirements imposed by governmental authority; restrictions and matters appearing on the plat or otherwise common to the subdivision; outstanding oil, gas and mineral rights of record without right of entry; public utility easements of record (easements are to be located contiguous to real property lines and not more than 10 feet in width as to the rear or front lines and 7 ½ feet in width as to the side lines, unless otherwise stated herein); taxes for year of closing and subsequent years; assumed mortgages and purchase money mortgages, if any (if additional items, see addendum); provided, that there exists at closing no violation of the foregoing and none prevent use of the Property for __residential__ purpose(s).

VIII. OCCUPANCY: Seller warrants that there are no parties in occupancy other than Seller; but if Property is intended to be rented or occupied beyond closing, the fact and terms thereof and the tenant(s) or occupants shall be disclosed pursuant to Standard F. Seller shall deliver occupancy of Property to Buyer at time of closing unless otherwise stated herein. If occupancy is to be delivered before closing, Buyer assumes all risks of loss to Property from date of occupancy, shall be responsible and liable for maintenance from that date, and shall be deemed to have accepted Property in its existing condition as of time of taking occupancy unless otherwise stated herein.

IX. TYPEWRITTEN OR HANDWRITTEN PROVISIONS: Typewritten or handwritten provisions, riders and addenda shall control all printed provisions of this Contract in conflict with them.

X. RIDERS: (CHECK those riders which are applicable AND are attached to this Contract):
☐ COMPREHENSIVE RIDER          ☐ HOMEOWNERS' ASSOCIATION       ☐ COASTAL CONSTRUCTION CONTROL LINE
X CONDOMINIUM                  ☐ "AS IS" RIDER                 ☐ INSULATION
☐ VA/FHA                       ☐ LEAD-BASED PAINT              X ADDENDUMS  A, B, C and D and EXHIBITS A, B, C and D

XI. ASSIGNABILITY: (CHECK ONLY ONE): Buyer X may assign and thereby be released from any further liability under this Contract; ☐ may assign but not be released from liability under this Contract; or ☐ may not assign this Contract.

XII. DISCLOSURES:
(a) Radon is a naturally occurring radioactive gas that when accumulated in a building in sufficient quantities may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding Radon or Radon testing may be obtained from your County Public Health unit.
(b) Buyer acknowledges receipt of the Florida Building Energy-Efficiency Rating System Brochure.
(c) If the real property includes pre-1978 residential housing then a lead-based paint rider is mandatory.
(d) If Seller is a "foreign person" as defined by the Foreign Investment in Real Property Tax Act, the parties shall comply with that Act.
(e) If Buyer will be obligated to be a member of a homeowners' association, BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THE HOMEOWNERS' ASSOCIATION ADDENDUM C – DEVELOPER DISCLOSURE regarding the homeowners associations.

XIII. MAXIMUM REPAIR COSTS: Seller shall not be responsible for the payments in excess of:
(a) $ __N/A_____ for treatment and repair under Standard D (if blank, then 2% of the Purchase Price).
(b) $ __N/A_____ for repair and replacement under Standard N (if blank, then 3% of the Purchase Price).

XIV. SPECIAL CLAUSES; ADDENDA: If additional terms are to be provided, attach addendum and CHECK HERE X.

XV. STANDARDS FOR REAL ESTATE TRANSACTIONS: Standards A through W on the reverse side or attached are incorporated as a part of this Contract.

**THIS IS INTENDED TO BE A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, SEEK THE ADVICE OF AN ATTORNEY PRIOR TO SIGNING.**
THIS FORM HAS BEEN APPROVED BY THE FLORIDA ASSOCIATION OF REALTORS AND THE FLORIDA BAR.
Approval does not constitute an opinion that any of the terms and conditions in this Contract should be accepted by the parties in a particular transaction. Terms and conditions should be negotiated based upon the respective interests, objectives and bargaining positions of all interested persons.
COPYRIGHT 1998 BY THE FLORIDA BAR AND THE FLORIDA ASSOCIATION OF REALTORS

(Buyer)                                         (Seller)

William H. Wachter III and Jill M. Pflieger    Tuscan-Harvey Estate Homes, Inc.

_[signature]_  8/10/07                          _[signature]_
William H. Wachter III    (Date)                By: David Harvey, President    (Date)
_[signature]_  8-10-07
Jill M. Pflieger    (Date)

Deposit under Paragraph II(a) received; IF OTHER THAN CASH, THEN SUBJECT TO CLEARANCE.
Cross Country Title
By: _____ (Escrow Agent)

BROKER'S FEE: The brokers named below, including listing and cooperating brokers, are the only brokers entitled to compensation in connection with this Contract:
Name: __N/A_____                Waterfront Properties/Jacki Ojakian (see Addendum A)
Cooperating Brokers, if any                      Listing Broker

FAR/BAR-5a    Revised 8/98    RIDERS CAN BE OBTAINED FROM THE FLORIDA ASSOCIATION OF REALTORS® OR THE FLORIDA BAR

EXHIBIT "B"

Case 2:09-md-02047-EEF-MBN   Document 2094-3   Filed 03/26/10   Page 2 of 9

accurate synopsis of the instruments affecting title to the real property recorded in the public records of the county wherein the real property is located through Effective Date. Seller shall commence with the earliest public records, or such later date as may be customary in the county. Upon closing of this Contract, the abstract shall become the property of Buyer, subject to the right of retention thereof by first mortgagee until fully paid. (2) A title insurance commitment issued by a Florida licensed title insurer agreeing to issue Buyer, upon recording of the deed to Buyer, an owner's policy of title insurance in the amount of the purchase price, insuring Buyer's title to the real property, subject only to liens, encumbrances, exceptions or qualification set forth in this Contract and those which shall be discharged by Seller at or before closing. Seller shall convey marketable title subject only to liens, encumbrances, exceptions or qualifications set forth in Contract. Marketable title shall be determined according to applicable Title Standards adopted by authority of The Florida Bar and in accordance with law. Buyer shall have 30 days, if abstract, or 5 days, if title commitment, from date of receiving evidence of title to examine it. If title is found defective, Buyer shall, within 3 days thereafter, notify Seller in writing specifying the defect(s). If the defect(s) render title unmarketable, Seller will have 30 days from receipt of notice to remove the defects, failing which Buyer shall, within five (5) days after expiration of the thirty (30) day period, deliver written notice to Seller either: (1) extending the time for a reasonable period not to exceed 120 days within which Seller shall use diligent effort to remove the defects; or (2) requesting a refund of deposit(s) paid which shall be immediately returned to Buyer. If Buyer fails to so notify Seller, Buyer shall be deemed to have accepted the title as it then is. Seller shall, if title is found unmarketable, use diligent effort to correct defect(s) within the time provided therefor. If Seller is unable to timely correct the defects, Buyer shall either waive the defects or receive a refund of deposit(s), thereby releasing Buyer and Seller from all further obligation under this Contract. If evidence of title is delivered to Buyer less than 5 days prior to closing, Buyer may extend closing date so that Buyer shall have up to 5 days from date of receipt of evidence of title to examine same in accordance with this Standard.

B. PURCHASE MONEY MORTGAGE; SECURITY AGREEMENT TO SELLER: A purchase money mortgage and mortgage note to Seller shall provide for a 30-day grace period in the event of default if a first mortgage and a 15-day grace period if a second or lesser mortgage; shall provide for right of prepayment in whole or in part without penalty; shall permit acceleration in event of transfer of the real property; shall require all prior liens and encumbrances to be kept in good standing and forbid modifications of or future advances under prior mortgage(s); shall require Buyer to maintain policies of insurance containing a standard mortgagee clause covering all improvements located on the real property against fire and all perils included within the term "extended coverage endorsements" and such other risks and perils as Seller may reasonably require, in an amount equal to their highest insurable value; and the mortgage, note and security agreement shall be otherwise in form and content required by Seller; but Seller may only require clauses and coverage customarily found in mortgages, mortgage notes and security agreements generally utilized by savings and loan institutions or state or national banks located in the county wherein the real property is located. All personal property and leases being conveyed or assigned will, at Seller's option, be subject to the lien of a security agreement evidenced by recorded financing statements. If a balloon mortgage, the final payment will exceed the periodic payments thereon.

C. SURVEY: Buyer, at Buyer's expense, within time allowed to deliver evidence of title and to examine same, may have the real property surveyed and certified by a registered Florida surveyor. If the survey discloses encroachments on the real property or that improvements located thereon encroach on setback lines, easements, lands of others or violate any restrictions, Contract covenants or applicable governmental regulation, the same shall constitute a title defect.

D. TERMITES/WOOD DESTROYING ORGANISMS: Buyer, at Buyer's expense, within time allowed to deliver evidence of title, may have the Property inspected by a Florida Certified Pest Control Operator ("Operator") to determine if there is any visible active termite infestation or visible damage from termite infestation, excluding fences. If either or both are found, Buyer shall have 4 days from date of written notice thereof within which to have cost of treatment, if required, estimated by the Operator and all damage inspected and estimated by a licensed builder or general contractor. Seller shall pay valid costs of treatment and repair of all damage up to the amount provided in Paragraph XIII(a). If estimated costs exceed that amount, Buyer shall have the option of canceling this Contract within 5 days after receipt of contractor's repair estimate by giving written notice to Seller or Buyer may elect to proceed with the transaction and receive a credit at closing on the amount provided in Paragraph XIII(a). "Termites" shall be deemed to include all wood destroying organisms required to be reported under the Florida Pest Control Act, as amended.

E. INGRESS AND EGRESS: Seller warrants and represents that there is ingress and egress to the real property sufficient for its intended use as described in Paragraph VII hereof, title to which is in accordance with Standard A.

F. LEASES: Seller shall, not less than 15 days before closing, furnish to Buyer copies of all written leases and estoppel letters from each tenant specifying the nature and duration of the tenant's occupancy, rental rates, advanced rent and security deposits paid by tenant. If Seller is unable to obtain such letter from each tenant, the same information shall be furnished by Seller to Buyer within that time period in the form of a Seller's affidavit, and Buyer may thereafter contact tenants to confirm such information. Seller shall, at closing, deliver and assign all original leases to Buyer.

G. LIENS: Seller shall furnish to Buyer at time of closing: an a Florida Statutory Final Contractor's Lien affidavit attesting to the absence, unless otherwise provided for herein, of any financing statement, claims of lien or potential lienors known to Seller, and further attesting that there have been no improvements or repairs to the real property for 90 days immediately preceding date of closing. If the real property has been improved or repaired within that time, Seller shall deliver releases or waivers of construction liens executed by all general contractors, subcontractors, suppliers and materialmen in addition to Seller's lien affidavit setting forth the names of all such general contractors, subcontractors, suppliers and materialmen, further affirming that all charges for improvements or repairs which could serve as a basis for a construction lien or a claim for damages have been paid or will be paid at closing of this Contract.

H. PLACE OF CLOSING: Closing shall be conducted as a mail-away closing held in the county wherein the real property is located at the office of the attorney or other closing agent ("Closing Agent") designated by Buyer.

I. TIME: In computing time periods of less than six (6) days, Saturdays, Sundays and state or national legal holidays shall be excluded. Any time periods provided for herein which shall end on a Saturday, Sunday or a legal holiday shall extend to 5:00 p.m. of the next business day. Time is of the essence in this Contract.

J. DOCUMENTS FOR CLOSING: Seller shall furnish the statutory warranty deed, bill of sale, construction lien affidavit, owner's-possession affidavit, assignments of leases, tenant and mortgagee estoppel letters and corrective instruments. Buyer shall furnish closing statement, mortgage, mortgage note, security agreement and financing statements. See Addendum A.

K. EXPENSES: Documentary stamps on the deed and recording of corrective instruments shall be paid by Seller. Documentary stamps and intangible tax on the purchase money mortgage and any mortgage assumed, mortgagee title insurance commitment with related fees, and recording of purchase money mortgage to Seller, deed and financing statements shall be paid by the Buyer. Unless otherwise provided by law or rider to this Contract, charges for the following related title services, namely title or abstract charge, title examination, and settlement and closing fee, shall be paid by the party responsible for furnishing the title evidence in accordance with Paragraph V. See Addendum A.

L. PRORATIONS; CREDITS: Taxes, assessments, rent, interest, insurance and other expenses of the Property shall be prorated through day before closing. Buyer shall have the option of taking over existing policies of insurance, if assumable, in which event premiums shall be prorated. Cash at closing shall be increased or decreased as may be required by prorations to be made through day prior to closing or occupancy if occupancy occurs before closing. Advance rent and security deposits will be credited to Buyer. Escrow deposits held by mortgagee will be credited to Seller. Taxes shall be prorated based on the current year's tax with due allowance made for maximum allowable discount, homestead and other exemptions. If closing occurs at a date when the current year's millage is not fixed and current year's assessment is available, taxes will be prorated based upon such assessment and prior year's millage. If current year's assessment is not available, then taxes will be prorated on the prior year's tax. If there are completed improvements on the real property by January 1st of year of closing, which improvements were not in existence on January 1st of prior year, then taxes shall be prorated based upon the prior year's millage and at an equitable assessment to be agreed upon between the parties, failing which, request shall be made to the County Property Appraiser for an informal assessment taking into account available exemptions. A tax proration based on an estimate shall, at request of either party, be readjusted upon receipt of tax bill on condition that a statement to that effect is signed at closing.

M. SPECIAL ASSESSMENT LIENS: Certified, confirmed and ratified special assessment liens as of date of closing (not as of Effective Date) are to be paid by Seller. Pending liens as of date of closing shall be assumed by Buyer. If the improvement has been substantially completed as of Effective Date, any pending lien shall be considered certified, confirmed or ratified and Seller shall, at closing, be charged an amount equal to the last estimate or assessment for the improvement by the public body.

N. INSPECTION, REPAIR AND MAINTENANCE: Seller warrants that the ceiling, roof (including the fascia and soffits) and exterior and interior walls, foundation, seawalls (or equivalent) and dockage do not have any Visible Evidence of leaks, water damage or structural damage and that the septic tank, pool, all appliances, mechanical items, heating, cooling, electrical, plumbing systems and machinery are in Working Condition. The foregoing warranty shall be limited to the items specified unless otherwise provided in an addendum. See Addendum A for warranty of Seller to Buyer. Buyer may, at Buyer's expense, have inspections made of those items within 20 days after the Effective Date, by a firm or individual specializing in home inspections and holding an occupational license for such purpose (if required) or by an appropriately licensed Florida contractor, and Buyer shall, prior to Buyer's occupancy but not more than 20 days after Effective Date, report in writing to Seller such items that do not meet the above standards as to defects. Unless Buyer timely reports such defects, Buyer shall be deemed to have waived Seller's warranties as to defects not reported. If repairs or replacements are required to comply with this Standard, Seller shall cause them to be made and shall pay up to the amount provided in Paragraph XIII(b). Seller is not required to make repairs or replacements of a Cosmetic Condition unless caused by a defect Seller is responsible to repair or replace. If the cost for such repair or replacement exceeds the amount provided in Paragraph XIII(b), Buyer or Seller may elect to pay such excess, failing which either party may cancel this Contract. If Seller is unable to correct the defects prior to closing, the cost thereof shall be paid into escrow at closing. Seller shall, upon reasonable notice, provide utilities service and access to the Property for inspections, including a walk-through prior to closing, to confirm that all items of personal property are on the real property and, subject to the foregoing, that all required repairs and replacements have been made and that the Property, including, but not limited to, lawn, shrubbery and pool, if any, has been maintained in the condition existing as of Effective Date, ordinary wear and tear excepted. For purposes of this Contract: (a) "Working Condition" means operating in the manner in which the item was designed to operate; (b) "Cosmetic Condition" means aesthetic imperfections that do not affect the working condition of the item, including, but not limited to: pitted marcite; missing or torn screens; fogged windows; tears, worn spots, or discoloration of floor coverings, wallpaper, or window treatment; nail holes, scratches, dents, scrapes, chips or caulking in ceilings, walls, flooring, fixtures, or mirrors; and minor cracks in floors, tiles, windows, driveways, sidewalks, or pool decks; and (c) cracked roof tiles, curling or worn shingles, or limited roof life shall not be considered defects Seller must repair or replace, so long as there is no evidence of actual leaks or leakage or structural damage, but missing tiles will be Seller's responsibility to replace or repair.

O. RISK OF LOSS: If the Property is damaged by fire or other casualty before closing and cost of restoration does not exceed 3% of the assessed valuation of the Property so damaged, cost of restoration shall be an obligation of the Seller and closing shall proceed pursuant to the terms of this Contract with restoration costs escrowed at closing. If the cost of restoration exceeds 3% of the assessed valuation of the Property so damaged, Buyer shall have the option of either taking Property as is, together with either the 3% or any insurance proceeds payable by virtue of such loss or damage, or of canceling this Contract and receiving return of the deposit(s).

P. PROCEEDS OF SALE; CLOSING PROCEDURE: The deed shall be recorded upon clearance of funds. If an abstract of title has been furnished, evidence of title shall be continued at Buyer's expense to show title in Buyer, without any encumbrances or change which would render Seller's title unmarketable from the date of the last evidence. All closing proceeds shall be held in escrow by Seller's attorney or other mutually acceptable escrow agent for a period of not more than 5 days after closing date. If Seller's title is rendered unmarketable, through no fault of Buyer, Buyer shall, within the 5-day period, notify Seller in writing of the defect and Seller shall have 30 days from date of receipt of such notification to cure the defect. If Seller fails to timely cure the defect, all deposit(s) and closing funds shall, upon written demand by Buyer and within 5 days after demand, be returned to Buyer and, simultaneously with such repayment, Buyer shall return the personal property, vacate the real property and reconvey the Property to Seller by special warranty deed and bill of sale. If Buyer fails to make timely demand for refund, Buyer shall take title as is, waiving all rights against Seller as to any intervening defect except as may be available to Buyer by virtue of warranties contained in the deed or bill of sale. If a portion of the purchase price is to be derived from institutional financing or refinancing, requirements of the lending institution as to place, time of day and procedures for closing, and for disbursement of mortgage proceeds shall control over contrary provision in this Contract. Seller shall have the right to require from the lending institution a written commitment that it will not withhold disbursement of mortgage proceeds as a result of any title defect attributable to Buyer-mortgagor. The escrow and closing procedure required by this Standard shall be waived if title agent insures adverse matters pursuant to Section 627.7841, F.S., as amended.

Q. ESCROW: Any escrow agent ("Agent") receiving funds or equivalent is authorized and agrees by acceptance of them to deposit them promptly, hold same in escrow and, subject to clearance, disburse them in accordance with terms and conditions of this Contract. Failure of funds to clear shall not excuse Buyer's performance. If in doubt as to Agent's duties or liabilities under the provisions of this Contract, Agent may, at Agent's option, continue to hold the subject matter of the escrow until the parties hereto agree to its disbursement or until a judgment of a court of competent jurisdiction shall determine the rights of the parties, or Agent may deposit same with the clerk of the circuit court having jurisdiction of the dispute. Upon notifying all parties concerned of such action, all liability on the part of Agent shall fully terminate, except to the extent of accounting for any items previously delivered out of escrow. If a licensed real estate broker, Agent will comply with provisions of Chapter 475, F.S., as amended. Any suit between Buyer and Seller wherein Agent is made a party because of acting as Agent hereunder, or in any suit wherein Agent interpleads the subject matter of the escrow, Agent shall recover reasonable attorney's fees and costs incurred with these amounts to be paid from and out of the escrowed funds or equivalent and charged and awarded as court costs in favor of the prevailing party. The Agent shall not be liable to any party or person for misdelivery to Buyer or Seller of items subject to the escrow, unless such misdelivery is due to willful breach of the provisions of this Contract or gross negligence of Agent. R. ATTORNEY'S FEES; COSTS: In any litigation, including breach, enforcement or interpretation, arising out of this Contract, the prevailing party in such litigation, which, for purposes of this Standard, shall include Seller, Buyer and any brokers acting in agency or nonagency relationships authorized by Chapter 475, F.S., as amended, shall be entitled to recover from the non-prevailing party reasonable attorney's fees, costs and expenses. This provision shall survive any termination of this Contract.

S. FAILURE OF PERFORMANCE: If Buyer fails to perform this Contract within the time specified, including payment of all deposits, the deposit(s) actually paid by Buyer and deposits(s) agreed to be paid, may shall, as Seller's sole remedy, be recovered and retained by and for the account of Seller as agreed upon liquidated damages, consideration for the execution of this Contract and in full settlement of any claims; whereupon, Buyer and Seller shall be relieved of all obligations under this Contract, Seller shall have no right to proceed in equity to enforce Seller's rights under this Contract in the event Buyer fails to perform this Contract or otherwise breaches the same, or Seller, at Seller's option, may proceed in equity to enforce Seller's rights under this Contract. If for any reason other than failure of Seller to make Seller's title marketable after diligent effort, Seller fails, neglects or refuses to perform this Contract, Buyer may seek specific performance or elect to receive the return of Buyer's deposit(s) without thereby waiving any action for damages resulting from Seller's breach.

T. CONTRACT NOT RECORDABLE; PERSONS BOUND; NOTICE: Neither this Contract nor any notice of it shall be recorded in any public records. This Contract shall bind and inure to the benefit of the parties and their successors in interest. Whenever the context permits, singular shall include plural and one gender shall include all. Notice given by or to the attorney for any party shall be as effective as if given by or to that party. U. CONVEYANCE: Seller shall convey title to the real property by statutory warranty, trustee's, personal representative's or guardian's deed, as appropriate to the status of Seller, subject only to matters contained in Paragraph VII and those otherwise accepted by Buyer. Personal Property shall, at the request of the Buyer, be transferred by an absolute bill of sale with warranty of title, subject only to such matters as may be otherwise provided for herein. V. OTHER AGREEMENTS: No prior or present agreements or representations shall be binding upon Buyer or Seller unless included in this Contract. No modification or change in this Contract shall be valid or binding upon the parties unless in writing and executed by the party or parties intended to be bound by it. W. WARRANTY: Seller warrants that there are no facts known to Seller materially affecting the value of the Property which are not readily observable by Buyer or which have not been disclosed to Buyer. Buyer (_____) (_____) and Seller (_____) (_____) acknowledge receipt of a copy of this page.

**ADDENDUM A ("ADDENDUM") TO CONTRACT FOR SALE AND PURCHASE
(THE "CONTRACT") BY AND BETWEEN
TUSCAN-HARVEY ESTATE HOMES, INC., AS SELLER ("SELLER") AND
WILLIAM H. WACHTER III AND JILL M. PFLIEGER,
AS BUYER ("BUYER")**

1.      All capitalized terms used but not defined herein shall have the meanings assigned to the same in the Contract. In the event of a conflict between the terms of the Contract and this Addendum, the terms of this Addendum shall prevail.

2.      As of the Effective Date, a residence is currently being constructed by Seller on the Property. At Closing, the Property shall include: (a) a luxury residence and certain residential improvements substantially completed in accordance with the drawings, plans and specifications prepared by Brenner Architectural Group, LLC, Seller's architect, project number 25302, for Lot 20, Frenchman's Reserve, Palm Beach County, Florida, which are incorporated herein by this reference, subject to minor changes and variations due to adjustments in the field; (b) the features, specifications, appliances and fixtures described on Exhibit B attached hereto and made a part hereof; and (c) the irrigation and landscaping which currently exists on the Property as of the Effective Date of this Contract. At Closing, the Property shall include a complete construction of a luxury residence with all appliances and fixtures. At Closing, Seller shall provide title to the Property free and clear of all liens, claims, security interests and encumbrances. Either prior to, or after Closing, should any subcontractor, supplier or other person make, record, file or maintain any action on or respecting a claim of mechanic's lien, stop-notice, equitable lien or a lis pendens, related to the Property, Seller agrees to immediately, and at Seller's own expense, procure, furnish and record appropriate statutory release bonds which will extinguish or expunge the same. This paragraph shall survive the Closing of this transaction.

3.      Seller represents and warrants to Buyer that: (i) Seller has good, indefeasible, marketable and insurable title to the Property subject only to the matters set forth in the Contract, and that at the Closing, there shall be no mechanics' liens, contractors' claims, unpaid bills for material or labor pertaining to the Property, nor any other liens which might adversely affect Seller's title to the Property, except for current ad valorem real estate taxes; (ii) by the Closing, Seller shall have completed the construction of the residence substantially in conformance with the plans and specifications submitted to, and approved by, Palm Beach Gardens and the County of Palm Beach, subject to minor changes and variations due to adjustments in the field; (iii) Seller has exclusive possession of the Property, and there are no leases, licenses, or other occupancy agreements affecting the Property and no other entity or person has any claim to possession of the Property; and (iv) other than this Contract and construction agreements to complete construction of the residence which shall terminate at Closing, there are no oral or written contracts or agreements affecting the Property or Seller's interest therein.

4.      Seller represents and warrants to Buyer that the Purchase Price includes an equity golf membership (i.e., the equity fees are evidenced to be documented as waived) at Frenchman's Reserve Country Club ("Membership"). Seller shall cooperate with Buyer, at Buyer's request, if Buyer needs assistance to obtain prior to Closing, all documents evidencing that the Membership is in effect as of the Closing Date ("Membership Documents"). The activation and existence of Buyer's Membership and the delivery to Buyer of the Membership Documents shall be a condition precedent to Buyer's obligation to close this transaction.

5.      Seller hereby guarantees and warrants to Buyer and any successor owner of the Property that the Property shall be free from defects, and Seller shall promptly remedy any defects in workmanship and materials, for a period of one (1) year from the Closing Date, provided, however, that landscaping shall be guaranteed and warranted for only six (6) months from the Closing Date with the stipulation that during such period, Buyer must properly irrigate such landscaping. Seller hereby guarantees and warrants to Buyer that all improvements to the Property shall be completed in accordance with all applicable laws, rules and regulations of all local, state and federal governmental authorities having jurisdiction over the Property and the associations governing the Property. Seller hereby further guarantees and warrants that for one (1) year following the Closing Date, Seller will make good, and if necessary will replace, at its own cost and expense all defects in such material and workmanship. Seller warrants to Buyer that all materials and equipment incorporated into the Property shall be of good quality and new, and that the

1

irrevocable and Seller shall not contest the validity or in any attempt to revoke or withdraw from this guaranty for any cause whatsoever. Seller agrees to make an inspection of defects upon Buyer's request, and to correct all defects in workmanship and Contract and the Closing.

6. Prior to Closing, Seller shall remove all waste, debris, tools, construction equipment and surplus materials, and shall have the residence professionally cleaned (interior and exterior), including windows.

7. Buyer and Seller represent and warrant to each other that neither has dealt or negotiated in any manner with any real estate broker, salesperson or agent concerning the purchase of the Property ("Broker") other than Seller's broker, Jacki Ojakian, with Waterfront Properties, to be paid solely by Seller pursuant to a separate agreement with Seller ("Seller's Broker"). Seller shall be solely responsible to pay commissions and/or fees due to Seller's Broker. If a claim for brokerage in connection with this transaction is made by any Broker claiming to have dealt through or on behalf of one of the parties hereto (the "Indemnitor"), said Indemnitor shall indemnify, defend and hold the other party hereunder, and such other parties' officers, directors, agents and representatives (collectively, the "Indemnitees") harmless from all liabilities, damages, claims, costs, fees and expenses whatsoever (including reasonable attorney's fees and court costs) with respect to said claim for brokerage. The provisions of this paragraph shall survive the Closing.

8. Within ten (10) days prior to Closing, Seller shall provide Buyer with the following closing documents, which shall be in form and substance reasonably acceptable to Buyer and Buyer's title insurer, and which shall be executed by Seller at Closing: (a) Special Warranty Deed in recordable form; (b) an assignment of all manufacturers warranties; (c) Bill of Sale; (d) a No-lien, FIRPTA, GAP and Exclusive Possession Affidavit, (e) closing statement (f) a Statutory Final Contractor's Affidavit evidencing a lien free completion of the construction of the Property; and (g) any other instruments as may be reasonably required by Buyer's lender, or the title insurer or to effect the transaction contemplated by this Contract. Notwithstanding anything in the Contract to the contrary, Seller agrees that Seller shall be obligated to satisfy on or before Closing all mortgage liens, mechanic's liens, liquidated liens and judgments upon the Property.

9. Prior to Closing, Seller shall schedule and attend a "walk-through" of the Property to document items that need repair or replacement prior to Closing ("Punchlist Items"). Seller shall make good faith efforts to correct all Punchlist Items prior to Closing. On the day of, or the day prior to, Closing, Seller and Buyer shall attend a second "walk-though" of the Property to determine whether all Punchlist Items have been corrected. If they have not all been corrected, then Closing shall not occur unless the aggregate value of such Punchlist Items are less than $5,000.00. Seller agrees to correct all Punchlist Items existing at the Closing within thirty (30) days of the Closing Date. This paragraph shall survive the Closing.

10. Subject to the final sentence of this paragraph, the Closing shall take place via an escrow, mail-away closing on a date ("Closing Date") which is five (5) business days following the occurrence of all of the following and Buyer's receipt of written notice from Seller certifying that all of the following has occurred:
    (a) the Property has received a certificate of occupancy from the applicable governmental authority;
    (b) Seller has scheduled, and Buyer has attended a "walk-through" of the Property and mutually determined that the value of Punchlist Items is less than $5,000.00;
    (c) the Property has been completed in accordance with this Contract and the Features and Specifications attached hereto as Exhibit B, including completion of the pool and installation of all pavers;
    (d) the as-built survey has been completed and delivered to Buyer;
    (e) Seller has delivered a statutory Final Contractor's Payment Affidavit stating that all subcontractors, materialmen and laborers have been paid in full and evidencing that there is no unpaid amounts due, claims or liens against the Property;
    (f) Seller has confirmed Buyer's ownership interest in the Membership and has delivered the Membership Documents to Buyer; and
    (g) Seller has performed all the obligations of Seller under this Contract.

Notwithstanding the foregoing, due to Buyer being out of the country between October 10th and October 22nd, 2007 ("Blackout Period"), in the event the Closing Date, as determined above, would fall on a day within the Blackout Period, then the Closing Date shall automatically be extended to October 22, 2007.

11. Buyer's closing costs shall be limited to the following: a prorated portion of the current property taxes; the cost to record the deed; the documentary stamp taxes on the deed of conveyance; intangible taxes and documentary stamp taxes on Buyer's note and mortgage; the premium of the owner's title insurance policy at the promulgated rate for title insurance less reissue credit, if any is available, a simultaneous policy for Buyer's lender at a cost of $25, and any endorsements requested by Buyer or Buyer's lender at the promulgated rate (Seller representing that Seller's title company issuing such policies shall not charge any loan closing or other closing related fees to Buyer other than a $425 loan closing fee and the recording costs of such loan documents); a prorated portion of the master community association and village association assessments paid to Seller; a working capital contribution to the master community association and village association equal to three (3) months assessments per association paid directly to the associations; $375.00 for an as-built survey delivered to Buyer prior to Closing; and any monthly dues due in advance to the Frenchman's Reserve Country Club relating to the Membership. In no event shall Buyer be responsible to pay any construction financing costs of Seller. Costs of corrective instruments relating to title shall be borne by Seller.

12. At Closing, Seller shall deliver all items and documents pertaining to the Property currently in Seller's possession including, without limitation, appliance manuals and warranties, all keys, remote controls, key cards and other access devices for the residence and the association.

13. This Contract shall be governed by Florida law, and venue for any action shall be in Palm Beach County, Florida. If any provisions of this Contract shall for any reason be invalid or unenforceable, the remainder of this Contract shall not be affected thereby, but shall be enforced to the greatest extent permitted by law. This Contract may be executed in multiple counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Facsimile signatures shall be deemed originals. Except as otherwise set forth herein, the Contract is unmodified and in full force and effect.

**SELLER:**

TUSCAN-HARVEY ESTATE HOMES, INC.

By: _____
David Harvey, President

Date: _____

**BUYER:**

_____
WILLIAM H. WACHTER III

Date: 8/10/07

_____
JILL M. PFLIEGER

Date: 8-10-07

FTL 328271.2

3

**ENDORSEMENT TO AGREEMENT OF SALE**

ADDENDUM B

## EQUITY MEMBERSHIP- GOLF

**ENDORSEMENT TO AGREEMENT OF SALE** (the "Agreement") dated _____ between Tuscan-Harvey Estate Homes, Inc. ("**Seller**") and William H. Wachter III and Jill M Pflieger ("**Buyer**") of Lot ____20____ in the community known as Frenchman's Reserve Country Club (**the "Club"**).

**NOTWITHSTANDING** anything contained in the Agreement to the contrary, Buyer and Seller further agree as follows:

FULL MEMBERSHIP included. Within ten (10) days after the date Buyer executes the Agreement, Buyer shall submit a completed application for **Equity Membership - GOLF** to the Frenchman's Reserve Country Club. Buyer shall diligently complete the Club application process in good faith. Buyer acknowledges that Seller is a separate and distinct entity from the Club and accordingly Seller cannot guarantee that Buyer will be accepted for membership in the Club. In the event that Buyer is accepted for membership by the Club, Buyer shall become an Equity Member- Full of the Club at Closing. In the event Buyer is rejected from membership by the Club, the ~~Agreement~~ CONTRACT shall be terminated and Buyer shall receive a full refund of any purchase money deposits paid by Buyer, in which case neither Buyer nor Seller shall have any further duties, rights, remedies or recourse hereunder or under THE CONTRACT, the Club documents, at law or in equity. In that event, Buyer shall release and hold Seller harmless of any claims, liabilities, or causes of action (known or unknown) related to Buyer's rejection from the Club.

**THIS ENDORSEMENT** is intended to be incorporated into and made a part of the ~~Agreement~~ CONTRACT and all other terms and conditions contained in the ~~Agreement~~ CONTRACT, unless expressly modified herein, remain in full force and effect.

**IN WITNESS WHEREOF,** the parties hereto, intending to be legally bound hereby, have hereunto set their hands and seals the day and year written.

BUYER: /s/ WHW                  DATE: 8/10/07

BUYER: /s/ Jill Pflieger        DATE: 8/10/07

SELLER: _____         DATE: _____

C:\WpDocs\Mizner-Tuscan.Agm

# ADDENDUM C
# DEVELOPER DISCLOSURE

**THIS AGREEMENT OF SALE** made the _____ day of _____, 2007 between Tuscan-Harvey Estate Homes, Inc., a Florida Corporation ("Seller") and William H. Wachter III and Jill M Pflieger ("Buyer").

**A.   DISCLOSURE SUMMARY FOR FRENCHMAN'S RESERVE COUNTRY CLUB**

1. As a purchaser of property in this community, you will be obligated to be a member a homeowners' associations.

2. There have been or will be recorded restrictive covenants governing the use and occupancy of properties in this community(s)

3. You will be obligated to pay assessments to each association, which assessments are subject to periodic change.

4. Your failure to pay these assessments could result in a lien on your property.

5. The Restrictive covenants can be amended without the approval of each association's membership

6. There is not an obligation to pay rent or land use fees for recreational or other commonly used facilities as an obligation of membership in the homeowners' association. ~~However, there is an obligation to be at least a social member of Frenchman's Reserve County Club, with an initiation fee of $15,000.00, and current annual dues of $2,200.00.~~ SEE ADDENDUM A AND B. CURRENT ANNUAL DUES FOR FULL MEMBERSHIP ARE $9,900.

7. The statements contained in this disclosure form are only summary in nature, and, as a prospective purchaser, you should refer to the covenants and the association's governing documents.

8. These documents are matters of public record and can be obtained from the record office in the county where the property is located.

**B.   FRENCHMAN'S RESERVE CHARGES AND ASSOCIATION ASSESSMENTS**

1. Buyer agrees that Buyer shall be responsible to pay Frenchman's Reserve community fees and charges described below, all assessments and charges levied from time to time by the Board of Directors of all applicable association and otherwise abide by all restrictive covenants and association documents. At closing, Buyer shall pay the following amounts to Frenchman's Reserve Master Property Owners Association, Inc. (the "Association"): Amount due at closing $ _____, plus current quarter period

2. Buyer agrees that Buyer shall be responsible to pay the Frenchman's Reserve Country Club, Inc. ~~membership contribution,~~ dues, fees and charges described below or in the membership Plan Documents as defined below.

**C.   GENERAL DISCLOSURES**

1. **Energy Efficiency.** Buyer acknowledges receipt of the Energy Efficiency Information brochures required by Section 553.996, Florida Statutes, at or prior to Buyer's execution of this Agreement.

2. **Associations; Receipts of Community Documents.** Upon taking title to the Premises, Buyer shall automatically become a member of the homeowner's associations described in the Community Documents (defined below). Buyer understands Buyer's memberships will take effect at closing. At that time, Buyer agrees to accept all liabilities and obligations of such memberships.

Buyer acknowledges receipt from Seller, prior to Buyer signing this Agreement, of copies of the following documents (the "Community Documents").

   a. Declaration of Restrictions and Covenants for Frenchman's Reserve
   b. Articles of Incorporation and Bylaws of the Associations

   c. Operating Budget for the Association (which may be in their estimated form).

Buyer acknowledges and agrees that the Community Documents permit the Seller to make amendments to them and that any changes it makes to them prior to closing (i) will not necessarily be delivered to Buyer (however such amendments will be a part of the Public Records of Palm Beach County once recorded), and (ii) will not affect Buyer's obligations to perform any and all of the duties under this Agreement, unless such changes have a material and adverse effect upon the market value of the Premises.

Buyer understands the budgets for the Associations are not guaranteed. All budgets are subject to change at any time and from time to time to reflect actual and projected expenditures. These changes may occur before or after closing but will not affect any of Buyer's obligations under this Agreement (except as to resulting changes in closing prorations and charges). Buyer recognizes and agrees that Buyer's assessments may include expenses attributable to Common Areas, which are not yet complete or useable by Buyer.

PAGE 1 OF 3

3. **Use of the Remaining Property.** As long as Seller or other builders own property in the Community, Seller or such other builders may keep a sales center, offices and model homes in the Community (including on the Common Properties). Such persons' sales people may show homes, erect advertising signs and do whatever else is necessary and helpful for sales, leasing or management.

In addition to the foregoing, Seller and other builders and their affiliates, contractors, subcontractors, licensees and designees may conduct such blasting, construction, excavation, repair and other activities in or around the Community as are deemed necessary or appropriate in the sole discretion of the party conducting such activities. Without limiting the generality of the foregoing, and as a material inducement to Seller to enter into this Agreement, Buyer acknowledges and agrees SELLER AND/OR OTHER PARTIES DESCRIBED ABOVE WILL BE CONDUCTING EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR AROUND THE COMMUNITY, BOTH BEFORE AND AFTER BUYER CLOSES UNDER THIS AGREEMENT. Buyer recognizes their rights to do so and will not (i) deem any of these activities to be nuisances or noxious or offensive activities, (ii) enter, or allow any others under Buyer's control to enter any areas where such activities are being conducted (even when they have temporarily ceased, such as during non-working hours), and (iii) hold Seller liable or sue Seller for any damage, injury or death arising from or connected with any of the activities described above.

The provisions of this Paragraph will not limit the generality or effect of any similar provisions in any of the Community Documents and will continue to be effective after (survive) Closing.

4. **Frenchman's Reserve Country Club, Inc.** Buyer understands and agrees that only members and invitees of Frenchman's Reserve Country Club, Inc. may use the recreational facilities of Frenchman's Reserve Country Club, Inc. (The "Club"). Buyer further understands and agrees that Buyer shall apply for membership in accordance with the terms and conditions of the Membership Plan, as the same may be amended from time to time. Buyer further understands and agrees that any information provided to Buyer by Seller regarding membership in and/or utilization of the Club by Buyer is done only as a matter of convenience to Buyer and that Seller has not and does not warrant or represent to Buyer the type of membership which is available to Buyer. ~~Notwithstanding the foregoing, Seller hereby discloses to Buyer that all purchasers of residential units in the Community will be required to purchase at least a social membership in the Club and Buyer hereby agrees to purchase the social membership in the Club at the Closing contemplated herein.~~ SEE ADDENDUM A AND B. /MW/

Further, Buyer acknowledges that by purchasing or paying for the Lot, or by acquiring membership in the Associations, Buyer and any subsequent purchaser from Buyer does not acquire any vested right or easement, prescriptive or otherwise, to use or to continue to use the Club or the facilities owned by the Seller of the Community at this time or any time, unless application for membership is made and accepted as set forth above.

By acquisition of title to the Premises, Buyer acknowledges and agrees that the Club Property is owned and operated by the Club and that each owner of a Lot within the Community is required to own a membership in the Club. Privileges to use the Club Property shall be subject to the terms and conditions of the Plan for the Offering of Memberships for the Club, as the same may be amended from time to time (the "Membership Plan Documents"). Acquisition of a membership in the Club requires the payment of a membership purchase price called a Membership Contribution, and membership dues, fees, and charges. These shall determine these amounts and/or the Club as set forth in the Membership Plan Documents for the Club. Notwithstanding the fact that the Club Property is open space or recreation area for purpose of Palm Beach County Zoning Ordinances and Regulations, each Buyer within the Community by acquisition to title to a Lot releases and discharges forever the Seller, the Club, the Master Association, all Neighborhood Association, and their partners, officers, directors, employees, agents and affiliates from (i) any claim that the Club Property is or must be owned and/or operated by the Master Association, all Neighborhood Associations, of the owners, and/or (ii) any claim that the owners of Lots within the Community are entitled to use the Club Property by virtue of their ownership of a Lot within the Community without acquiring a membership in the Club, paying the applicable Membership Contribution and dues, fees, and charges established by the Club from time to time and complying with the terms and conditions of the Membership Plan Documents for the club.

Buyer hereby indemnifies, defends and holds harmless the Seller, Club, all Associations and their respective partners, employees, agents, directors, officers and affiliates, and their successors and assigns, against and in respect of, and to reimburse the Seller, Club, all Associations, and their respective partners, employees, agents, directors, officers and affiliates on demand for any and all claims, demands, losses, costs, expenses, obligations, liabilities, damages, recoveries and deficiencies, including, but not limited to interest, penalties, attorney and paralegal fees and disbursements (even if incident to any appeals) that the Seller, Club, all Associations and their respective partners, employees, agents, directors, officers and affiliates shall incur or suffer, which arise out of, result from or relate to any claim that because the Club Property is deemed to be open space or a recreation area for the purposes of Palm Beach County Zoning Ordinances and Regulations, the Club Property must be owned and/or operated by the Master Association, or the owners of Lots within the Community and/or that such owners may use the Club Property without acquiring a membership in the Club pursuant to the Club's Membership Plan Documents and paying the Membership Contribution, and dues, fees and charges established by the Club from time to time.

5. **Return of Community Documents.** If this Agreement is canceled for any reason, Buyer will return to Seller all of the Community Documents Seller has delivered to Buyer in the same condition Buyer received them, reasonable wear and tear excepted. If Buyer fails to return them, Buyer will pay Seller $50.00 (which may be withheld from Buyer's deposits if Buyer is then entitled to a refund) to defray Seller's costs of preparation, pirating and delivery.

6. **Lakes.** Buyer acknowledges that Palm Beach County, South Florida Water Management District and/or Lake Worth Drainage District may control all lakes (and other bodies of water), wetlands and littoral areas within the Community (singularly referred to as a "Lake Area" and collectively referred to as the "Lake Areas"). Buyer acknowledges that all Lake Areas are designed as water management areas and are not designed as aesthetic features. Due to fluctuations in ground water elevations from time to time, the water levels in the Lake Areas will rise and fall. Buyer further understands and acknowledges that the Seller may have no control over such water levels or the plant growth in the littoral areas. Therefore, Buyer agrees to release Seller from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including attorney's fees and costs and applicable fees and costs arising from or relating in any manner to the Lake Areas including, without limitation, the permitting, construction and maintenance thereof. Buyer shall not alter, modify, expand or fill any Lake Area without the prior written approval of the local permitting authority, Seller, the U.S. Army Corps of Engineers, and such other local, state and federal authorities as may have relevant jurisdiction over such matter.

7. **Adjacent Right-of-Ways, Easements and Facilities.** Alternate A-1-A (State Road 811) is located westerly and adjacent to the Community. This thoroughfare roadway is currently planned to be widened to six (6) lanes. The Florida East Coast Railway right-of-way (with current railway operation and grade crossing at Hood Road) is located westerly and adjacent to Alternate A-1-A. The Seacoast Utility Authority Hood Road Water Treatment Facility and water tower are located westerly and adjacent to the Florida East Coast Railway. The easterly extension of Hood Road as a planned public roadway will be located along the northerly edge of the Community and will extend to Flamingo Road and Prosperity Farms Road. The Cabana Colony Canal, located southerly and adjacent to the Community, is a publicly dedicated drainage canal. This dedicated right-of-way is currently planned to be expanded from 80 ft. to 120 ft. in width. The golf maintenance area will be located at the Southwest corner of the Community and will have direct access from Alternate A-1-A at the point northerly and adjacent to the Cabana Colony Canal. The Frenchman's Forest Preserve Natural Area ("Frenchman's Forest"), located easterly and adjacent to a portion of the Community, is owned by Palm Beach County. Adjoining Lot owners may not access Frenchman's Forest. Palm Beach County employees and agents may access Frenchman's Forest from time to time along its common boundary with the Community. A public service area will house a satellite and rescue facility, is planned to be located at the Northeast corner of Alternate A-1-A and Hood Road.

8. **Land Use Approvals.** Buyer acknowledges and agrees that the Community is subject to all terms, and conditions of the development approvals now or hereafter in existence, related to Ordinance 4, 2001 of the City of Palm Beach Gardens, which can be obtained from the Palm Beach County Planning, Zoning and Building Department, and the terms and conditions of all approvals and permits issued by all applicable governmental entities. Buyer acknowledges that Seller may modify all such approvals at its sole discretion.

9. **Plats.** Buyer hereby confirms that Buyer has carefully reviewed a copy of all plats applicable to the Lot which include: All water, electric, cable television, telephone, storm sewer and sanitary sewer easements and all other easements shown thereon.

10. **Inspections.** Buyer hereby confirms that Buyer has inspected the Lot referenced above and acknowledges and accepts any and all street lighting, transformers, cable television and telephone locations on said Lot.

_____   8/10/07
Buyer                       Date

_____   8007
Buyer                       Date

_____   _____
Seller (David B. Harvey, President)   Date