<pre>
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3     ************************************************************

 4     IN RE:  CHINESE MANUFACTURED DRYWALL      MDL-2047
              PRODUCTS LIABILITY LITIGATION     Section "L"
 5                                              New Orleans, Louisiana
                                                Monday, February 22, 2010
 6

 7     ************************************************************
       THIS DOCUMENT RELATES TO:
 8
       Michelle Germano, et al
 9
               versus
10
       Taishan Gypsum Co., Ltd., f/k/a
11     Shandong Taihe Dongxin Co., Ltd.,
       et al
12
       Case No. 09-CV-6687
13
       ************************************************************
14

15                    VOLUME II - MORNING SESSION
                 TRANSCRIPT OF DEFAULT HEARING PROCEEDINGS
16             HEARD BEFORE THE HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE
17

18
       APPEARANCES:
19
       FOR THE PLAINTIFF:            HERMAN, HERMAN, KATZ & COTLAR
20                                   BY:  RUSS M. HERMAN, ESQ.
                                          STEPHEN J. HERMAN, ESQ.
21                                   820 O'Keefe Avenue
                                     New Orleans, LA 70113
22

23                                   SEEGER WEISS
                                     BY:  CHRISTOPHER A. SEEGER, ESQ.
24                                   One William Street
                                     New York, NY 10004
25
</pre>

```
 1   APPEARANCES CONTINUED:

 2                                    LAW OFFICES OF RICHARD J. SERPE
                                      BY:  RICHARD J. SERPE, ESQ.
 3                                    Crown Center, Suite 310
                                      580 East Main Street
 4                                    Norfolk, VA 23510-2322

 5
                                      GAINSBURGH, BENJAMIN, DAVID,
 6                                    MEUNIER & WARSHAUER
                                      BY:  GERALD E. MEUNIER, ESQ.
 7                                    2800 Energy Centre
                                      1100 Poydras Street
 8                                    New Orleans, LA 70163-2800

 9
                                      LEWIS & ROBERTS, PLLC
10                                    BY:  DANIEL K. BRYSON, ESQ.
                                      3700 Glenwood Avenue, Suite 410
11                                    Raleigh, NC 27612

12
                                      HAUSFELD
13                                    BY:  RICHARD S. LEWIS, ESQ.
                                      1700 K Street, NW Suite 650
14                                    Washington, D.C. 20006

15
     FOR MITCHELL COMPANY, INC.:      CUNNINGHAM BOUNDS, LLC
16                                    BY:  STEVEN L. NICHOLAS, ESQ.
                                      1601 Dauphin St.
17                                    Mobile, AL 36604

18
     FOR KNAUF PLASTERBOARD
19   TIANJIN CO., LTD.:               BAKER & MCKENZIE, LLP
                                      BY:  DONALD HAYDEN, ESQ.
20                                    Mellon Financial Center
                                      1111 Brickell Avenue, Suite 1700
21                                    Miami, FL 33131

22
     Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
23                                    500 Poydras Street, Room HB-406
                                      New Orleans, Louisiana 70130
24                                    (504) 589-7776

25      Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

DAILY COPY

1                   P R O C E E D I N G S

2              (MONDAY, FEBRUARY 22, 2010)

3                     (MORNING SESSION)

4

5      (OPEN COURT.)

6              THE COURT:  Be seated, please.  Good morning, ladies and

7      gentlemen.  Call the case, please.

8              THE DEPUTY CLERK:  MDL-2047, *in re:  Chinese drywall*.

9              THE COURT:  We're here for the second day of a hearing.

10     You may begin, let's call your witness.

11             MR. ECUYER:  Good morning, your honor.  Before we begin,

12     Michael Ecuyer on behalf of these Virginia plaintiffs and the PSC,

13     we have a little matter of housekeeping.

14             THE COURT:  All right.

15             MR. ECUYER:  Your Honor, we would move to strike exhibits

16     that were inadvertently placed into our exhibit list, specifically,

17     Exhibits P1.2045, P1.2046, P1.2047, P1.2048 and P3.0631 and

18     P3.0632.

19             THE COURT:  Okay.  Let that be done.

20             MR. ECUYER:  And, your Honor, we would offer, file and

21     introduce the following exhibits into the record, designated

22     P1.2054, P1.2057, 2058, 2059, 2060, P1.2062, P3.0626, and P4.0003,

23     P4.0007 and P4.008, your Honor.

24             THE COURT:  Okay.  Let those be admitted into the record.

25             MR. ECUYER:  Thank you.

4

```
 1              THE COURT:  Thank you.

 2              MR. SERPE:  Good morning, your Honor, Richard Serpe for

 3    the PSC and the Germano plaintiffs.  We would call Vannessa Michaux

 4    to the stand.

 5              THE COURT:  Come forward, please, ma'am.

 6              THE DEPUTY CLERK:  Please step into the witness box.

 7        (WHEREUPON, VANNESSA MICHAUX, WAS SWORN IN AND TESTIFIED AS

 8        FOLLOWS:)

 9                        DIRECT EXAMINATION

10    BY MR. SERPE:

11    Q.  Would you state your full name for the record, please.

12    A.  Vannessa Michaux.

13    Q.  What's your current address?

14    A.  My current address?

15    Q.  Yes.

16    A.  341 James Baldwin Street, Newport News.

17    Q.  And do you own another home that has Chinese drywall?

18    A.  Yes, sir.

19    Q.  What's the address of that home?

20    A.  901 Eastfield Lane, and that's Newport News as well.

21    Q.  Vannessa Michaux, is your husband Fred here?

22    A.  Yes, he is in the courtroom.

23              MR. SERPE:  If Fred will stand up.  Good morning, Fred.

24              THE COURT:  Thank you.

25    BY MR. SERPE:
```

1   Q.   When did you purchase the house on Eastfield Lane?

2   A.   November 1st of 2007.

3   Q.   And does the purchase price 267,500 look accurate to you?

4   A.   Yes, sir.

5   Q.   45, we don't see the column heading here, but is it your

6   understanding that the delivery records from Venture Supply show

7   that 45 boards of 4-foot by 12-foot of Chinese drywall were

8   delivered to your home on Eastfield Lane?

9   A.   Yes.

10  Q.   Next slide, please, sir.  Is this a picture of your home?

11  A.   Yes, it is.

12  Q.   Would you describe the layout to the court, please?

13  A.   Yes, it's a three-story, 2,200 square foot townhome.  Do you

14  want more details than that?

15  Q.   Please.

16  A.   On the first floor is my husband's office, which is like a

17  large living room area.  There's A half bath, a laundry room and a

18  garage, two-car garage.  The second floor is the main living space

19  with a living room, half bath, dining room and then a great room,

20  kitchen, TV room connected.  The third floor is three bedrooms and

21  two full baths, the master bath, two individual bedrooms, and then

22  another full bath in the hall.

23  Q.   Is this a walkout porch that you guys --

24  A.   Yes, that's a balcony off the front living room.

25  Q.   And what do you look out at when you're out on that balcony?

```
 1    A.  You look into a ravine and then into the rest of the
 2    neighborhood, like a water ravine.
 3    Q.  This is the Same neighborhood that Mr. McKellar lives at?
 4    A.  Yes, Hollymeade.
 5    Q.  Just remind us, how many families live in that subdivision?
 6    A.  I believe there are 67 townhome units.
 7    Q.  And what's your understanding of how many of those townhomes
 8    have Chinese drywall, approximately?
 9    A.  Approximately 37, I think; 36 or 37 is what the last count that
10    I remember.
11    Q.  Has that had a major impact, obviously, on your community?
12    A.  Yes, yes.  Many of those homeowners have moved out, so it's
13    slowly over the last few months, since we found out in September
14    it's becoming vacant or maybe half filled, half occupied.
15    Q.  Next shot, please.  Who are we looking at here?
16    A.  Those are my precious children.  Derrick is nine years old,
17    Ethan is seven, and Claire is five.
18    Q.  And this is your other kid over here (INDICATING)?
19    A.  Yeah.
20    Q.  What does Fred do for a living?
21    A.  Yes.  He is a pastor, we pastor the City Life Church in Newport
22    News, we just celebrated four years.  We moved to Newport News when
23    we bought the home two years ago.
24    Q.  Does City Life Church have a church building at this point?
25    A.  No, actually we rent for our corporate meetings and then during
```

1    the week we have a lot of other types of meetings, small group,

2    leadership team meetings, and that happens in our home.

3    Q.  So was one of the reasons you bought the home that we just

4    looked at the need to have church meetings in the home?

5    A.  Yeah.  A couple of the things that we loved about the townhome

6    were the fact that it was new construction, but then the fact that

7    my husband would be officing from home and people could come.

8    Because of the kind of work that we do, we do marriage counselling,

9    we often meet with people in crisis, and they were able to enter

10   our home and have some sense of privacy because the office was on

11   the ground floor.  They didn't have to interact with the whole

12   family, so it was an ideal situation.

13         We also had just a fabulous floor plan on the second

14   floor to host meetings with 20 or 25 people and the space was

15   conducive to that, which we do probably twice a week.

16   Q.  Are you guys also home schooling the children in the house?

17   A.  Yes, uh-huh.  My children are in kindergarten, second and

18   fourth grade this year.

19   Q.  So the family life, the church life and the school life were

20   all there within that same building?

21   A.  Yes, that is definitely true of our home.  It wasn't just a

22   place that we come home to, but certainly really the hub of our

23   life happens there, both vocationally, and then for my children,

24   they don't leave the home during the day to be educated, we educate

25   them at home.

1    Q.  Vannessa, I would like you to focus on one aspect of having a

2    Chinese drywall house and that's the smell.

3    A.  Yes.

4    Q.  Would you tell the court about your dealing with the smell, how

5    it had manifested itself in your daily life?

6    A.  Sure.  When we moved into the home, since we never owned a new

7    construction, we just assumed that the distinct odor was from

8    the -- was from new construction, the fibers in the carpet, the

9    glue, the paint.  And really noticed it when we would come home

10   from vacations, when the home was, you know, closed up for a number

11   of days.  Again, we just never connected it with something being

12   wrong but just something that we would hope that would fade as time

13   passed.

14           And it actually continued to get stronger.  And one of

15   the things that we realized at the end of the summer when we went

16   to the very first informational meeting was that we had this

17   pervasive smell.  And really confirmed when we vacated the home,

18   which we did within two days of finding out that our home was built

19   with toxic drywall, because of our children.

20           But anyway, that smell has lingered and it's in my

21   children's home school books, it's in our clothing, it's in our

22   linens, and in some cases we've, you know, obviously had to get rid

23   of items because we can't get rid of the smell.

24   Q.  That was a mouthful.  Let me break down a couple of pieces

25   there.

1    A.  Yes, absolutely.

2    Q.  When did you move out of the house?

3    A.  We moved out, I believe it was September 5th of this year.

4    Q.  So we're going on six months --

5    A.  Yes.

6    Q.  -- since you've been moved out?

7    A.  Yes.

8    Q.  Is it your testimony to the court that that smell of the

9    Chinese drywall is still lingering in clothes and books and other

10   items that you guys have possession of?

11   A.  Absolutely.  And we've had to prioritize which items to

12   replace, obviously for financial reasons.  So some items like

13   mattresses that my children sleep on for ten hours a day, we, you

14   know, doesn't matter, we just got new ones.  And then other items

15   we've had to choose to still keep because we can't afford to

16   replace them right now.

17   Q.  Another thing you mentioned was the decision to move out in two

18   days.  Tell the court how that decision was made and why it was

19   done with such dispatch.

20   A.  Yes.  We were suspicious over the summer with the failure of

21   our air conditioner, we had only lived in our home for 19 months at

22   the time, and so we went to an informational meeting.  Mr. Serpe

23   conducted that meeting with our neighbors, and we came home and we

24   knew that we had many of the indicators; so that night we turned

25   off the power to our home and at midnight with flashlights when the

```
 1   kids were in bed and we pulled all of the wires and we saw that all
 2   of our copper ground wires were black, just like you had indicated
 3   would be a sign.
 4         We had already experienced the air conditioning failure
 5   with the evaporator coil, and we had already experienced many small
 6   electronic failures, which, of course, we had not linked with our
 7   home, we just thought they were electronic failures that were
 8   random.  And then we began to realize that there were some health
 9   things going on with our children, so it was for that reason,
10   really the health of our children that within just a couple of
11   days, like two or three days, we secured a small apartment and
12   immediately moved out of our home.
13   Q.  Did you get mortgage deferral from your bank?
14   A.  We did, starting in January.  So September through January we
15   were paying for our mortgage and the rent on this apartment that we
16   moved into.
17   Q.  Did that cause a hardship for your family?
18   A.  Yeah, absolutely.
19   Q.  And the deferral that you now have from the mortgage company,
20   is it accruing interest and building interest up that will have to
21   be paid off at the end, back end?
22   A.  Yes, that's exactly right.  So we have a pause on payment but
23   the interest is continuing to accrue, and I believe our mortgage
24   schedule will be reassessed at the end and we will have that tagged
25   on.
```

1    Q.  And you worked with an accountant and Ms. Barrios to look at

2    some of those numbers.  Do you believe that the increased interest

3    expense of interest bearing up is going to be a hardship on your

4    family as well?

5    A.  Yes.  Because at this point, to survive these last five months

6    we have, you know, in trying to save our credit, which to that

7    point was stellar, we've had to go through emergency savings, we've

8    had to cash in stock, we've had to do what any family would do to

9    try to keep our credit the way that it is now.

10           Of course the bank will only commit to us for 90 days at

11   a time, so at this point it's in good faith that the bank will keep

12   working with us.  We have no guarantee from them, and it may be

13   that we still have to walk away from our home or something much

14   worse.  We've met with a bankruptcy attorney and we're just

15   believing that this trial is going to be part of us being able to

16   keep our credit and be able to, you know, restore some of the

17   things that have been lost to us.

18   Q.  And in the way of trying to save money and keep your resources

19   together, tell the court how you were able to move out of the

20   Chinese drywall house into the smaller rental.

21   A.  Yeah.  When we found out, it was obviously very alarming.  For

22   me as a mom it was very emotional.  The home that, you know, we

23   thought we would spend the next many years in, which represented so

24   much.  It didn't look different, I think that was one of the

25   challenges, Richard, for us psychologically was, it's not as if a

1   fire had ripped through our home and it looked damaged, it looked

2   beautiful, yet we realized it was aggravating us with our health,

3   my son's eczema, his allergies -- and I know that we're not going

4   to go far down the health ramp -- but those were the reasons and my

5   husband's chronic and growing pain in his back.  And so for us, we

6   decided we had to get out.

7          We actually had a vacation, a family vacation scheduled.

8   And so our church was amazing.  They found out about it, and while

9   we were gone, I put sticky notes on furniture that would fit into

10  our apartment because it was much smaller than our home, and while

11  we were gone to Florida, they actually came in and took the

12  furniture with sticky notes and moved it into our apartment so that

13  when we returned from vacation, our family didn't have to sleep

14  there anymore.

15  Q.  So the house on Eastfield was now vacant?

16  A.  Yes.

17  Q.  Over the next couple of months, one expert after another after

18  another, both people that were hired by the Plaintiff Steering

19  Committee, as well as Knauf came into your home?

20  A.  Yes.

21  Q.  And took samples of all kinds of things?

22  A.  Yes, it looks fabulous right now.  We've got Sharpie all over

23  the walls and holes in the ceiling.

24  Q.  And some of those results have been shared with you.  Have you

25  come to find that there's Chinese drywall located on the first

```
1   floor of your house?

2   A.  Yes, there is.

3   Q.  Is there Chinese drywall on the second floor of your house?

4   A.  Yes, there is.

5   Q.  And is there Chinese drywall on the third floor of your house?

6   A.  Yes, all three.

7   Q.  And, but you were the lowest number of sheets at 45 sheets,

8   would it be your request to this court that some partial repair be

9   done of just 45 sheets or what is it that your request would be

10  when it comes to the remediational repair of your home?

11  A.  Yes.  Your Honor, we are asking that our home would be restored

12  to the condition in which we bought it.  We think that that's

13  what's equitable, that's what would be fair.  It certainly would

14  help us to recover the $40,000 down payment that it took us ten

15  years to accrue; and at this point the home is of no value to us,

16  and we would like it to be restored to what we thought we were

17  buying when we signed on the dotted line on November 1st of 2007.

18  Q.  Vannessa, did you work carefully with appraisers and

19  accountants, Ms. Barrios, to come up with a summary of your

20  damages, both in terms of repairing your home as well as these

21  other expenses that you have incurred?

22  A.  Yes, we did.

23  Q.  And you've had a chance to review this?

24  A.  Yes.

25  Q.  And you believe it's a fair and accurate statement of the
```

 1   economic losses that you sustained in this case?

 2   A.  Yes, we do.

 3         MR. SERPE:  Your Honor, we have already provided this to

 4   the record and introduced it as P3.0622, and the page number is

 5   0010.

 6         No further questions, your Honor, thank you.

 7         THE COURT:  Thank you, very much.

 8         THE WITNESS:  Thank you.

 9         THE COURT:  Call your next witness, please.

10         MR. SEEGER:  Your Honor, we're going to go to television

11   at this point, we have A 54-minute video of an expert that's been

12   deposed in the litigation, Dr. Lori Streit, S-T-R-E-I-T.  Thank

13   you.

14      (WHEREUPON, THE VIDEO DEPOSITION WAS PLAYED AS FOLLOWS:)

15

16   18         Q.    Dr. Streit, this portion of

17   19    your testimony is going to be used by

18   20    Judge Fallon in the hearing that we're going

19   21    to be starting on Friday, just so you know,

20   22    okay?

21

22

23

24   5     you have.  Talk to us about your educational

25   6     background.

7        A.     I have a Bachelor of Science

8   degree in chemistry from Trenton State

9   college, which is now the College of

10   New Jersey; and then I went to Arizona State

11   University in Tempe, Arizona and worked

12   straight through, skipping my master's to get

13   my Ph.D. in four years.

14        Q.     Okay.

15        A.     My Ph.D. is in analytical

16   chemistry, materials analysis.

17        Q.     And when did you get your

18   Ph.D.?

19        A.     1987.

20        Q.     Okay.  In the earlier part of

21   your discovery deposition, I heard you use

22   the term "forensic chemist."  Is that

23   something that you'd go by?

24        A.     People in my field consider


1   themselves to be forensic scientists or a

2   forensic investigator, using the term

3   "forensic" not in the sense of that you would

4   see on, you know, the TV shows where you're

5   looking at blood and hair and fingerprints

6   and all those nasty things.

1   7        Q.     Like on CSI?

2   8        A.     Yeah.  We use it as a generic

3   9    term which involves doing an investigation,

4   10   potentially on site and then back in the

5   11   laboratory, and you're trying to solve a

6   12   problem, hence the term "forensics."

7

8

9

10   6        Q.     Okay.  And let's talk about

11   7    your full-time analytical job.  Who are you

12   8    employed by?

13   9        A.     Currently, I am employed by

14   10   Unified Engineering, and that is a scientific

15   11   and engineering consulting firm located in

16   12   Aurora, Illinois.

17   13       Q.     Okay.  Are you a principal of

18   14   that company?

19   15       A.     I am.  I am currently president

20   16   of that company.

21

22

23

24   24   professional time.  Do you do work on behalf

25

```
 1     1      of companies?  Do you do investigative work?
 2     2              A.    I do.  I would say probably 50
 3     3      to 60% of what I do is what I would call
 4     4      industrial consulting, meaning that companies
 5     5      come to me, homeowners come to me, government
 6     6      agencies, insurance companies, and they have
 7     7      a specific problem which has some chemistry
 8     8      or materials analysis aspect to it that
 9     9      they're asking me to help them with.
10    10              Q.    Okay.  And what are the names
11    11      of some of the companies you've been retained
12    12      by to give opinions in chemistry?
13    13              A.    You know, I work for a wide
14    14      gamut.  It could be like, for example, I do a
15    15      lot of work for First Alert that makes smoke
16    16      alarms.  Along those lines, I do work for
17    17      Kidde.  I do work for Coleman.
18
19
20
21     5              Anyway, companies I've worked
22     6      for, you know, again, First Alert, Sunbeam,
23     7      Coleman.  I do a lot of work for automotive
24     8      manufacturers, people that make automotive
25     9      contacts and airbags, things of that nature.
```

10                I mean, it can be small

11      companies.  It can be large companies.  It

12      can be local companies.  It can be nationally

13      known companies.

14           Q.    In the course of your

15      engagement by some of these companies, have

16      you been asked to look at corrosion-type

17      issues?

18           A.    Very often I look at

19      corrosion-type issues, yes.

20           Q.    And talk to us about some of

21      the engagements you've had with regard to --

22      outside of this litigation, by doing forensic

23      chemistry with regard to corrosion issues.

24           A.    I can think of examples where


1       I'm looking at the smallest of components on

2       a circuit board, could be wires on a circuit

3       board, capacitors, could be contacts, and

4       going through corrosion on metal components

5       as a result of a fire, and then, you know,

6       all the way up to building supports, cranes,

7       pieces of cars, frames, things of that

8       nature.

9            Q.    Would some of your work be --

10      would it be involved in looking at doing like
11      a failure analysis?
12              A.      I do failure analysis in the
13      sense that, yes, I look at the corrosion
14      deposits.  I try to identify, sometimes, what
15      the corrosion deposits are, as far as what
16      the phases are, what's the impurities that
17      are in the corrosion.
18                      I'm often called on to prepare
19      metallurgical samples, and so I'll do
20      cross-sections through the corrosion to see
21      whether the plating is still there to protect
22      it, how large the pits are, you know, whether
23      the corrosion goes actually all the way
24      through the metal, so you have a complete

1       failure penetration.  Could be a weld.  It
2       could be a fracture.

6               Q.      And what type of -- in the
7       course of doing that type of work, that
8       forensic chemistry looking at corrosion, what
9       type of tests would you do, would you employ?

10        A.     For me, I typically start, and

11    most of what I do within my laboratory, would

12    be using optical microscopes of different

13    types to look at samples at various

14    magnifications.

15              And then to do elemental

16    analysis and higher-magnification work, I

17    have a scanning electron microscope, which

18    allows me to do a more in-depth study.

19              And then I have a network of

20    colleagues that I work with and laboratories

21    that I work with, and we work back and forth,

22    so that none of us has an over -- a financial

23    burden due to acquisition of equipment.  So

3               So I use a variety of

4     analytical techniques, and it really depends

5     on what you're looking at.  If you're looking

6     at organic materials, you'll choose an

7     infrared technique.  If you're looking

8     at inorganics, you'll choose SEM with an EDS

9     detector.

10              If you're looking at gases, you

11    do gas chromatography.  If you're looking at

12    liquids, you do liquid chromatography and so

13    on.  PH testing.

14              And then there are specialized

15    tests that sometimes I'll recommend that I

16    don't necessarily do on a daily basis, but

17    they're part of my training and education and

18    experience, and so I pick those because I

19    think they are the best tests used for that

20    particular purpose.

21        Q.    One of the tests that you

22    mentioned was SEM.  Just for the judge's

23    convenience, what is an SEM?

24        A.    An SEM is an abbreviation for a

1    scanning electron microscope, and that is

2    something actually often used in the court

3    system as a way to look at metals and

4    inclusions and particles and to get an

5    elemental analysis of what you're doing.

6              It's essentially a larger piece

7    of equipment where you place the sample in a

8    chamber and you pull down a vacuum on it and

9    then you hit the sample with an electron beam

10   and you look at the energy of what's coming

11          off the sample.

12                    So each energy represents a

13          specific element, and you'll get a spectrum

14          where you can say, "Okay, this sample

15          contains sulfur, calcium, oxygen," which

16          would be consistent with gypsum, or it has a

17          strontium particle or an elemental sulfur

18          particle, based on the analysis that you do.

19          Q.      Okay.  And is that -- the SEM,

20          is that the type of testing that you did in

21          this litigation in the course of rendering

22          your opinions?

23          A.      It was one of the tests that I

24          did, yes.


1           Q.      And just talk to us about some

2           of the other tests you did in this

3           litigation.

4           A.      There's a -- the optical

5           microscopy test that I had talked about where

6           you're using a light microscope, different

7           types of light microscopes, depending on what

8           you're doing, to get an assessment of what's

9           in the sample.

10                    In this case, I was looking for

11    elemental sulfur particles, so they have a

12    certain characteristic that you look for.

19         Q.    And is that a method that you

20    would employ whether you were hired by an

21    insurance company to look at an issue for

22    them as -- you know, is it a new type of

23    test, or is it something you always do?

24         A.    No, who employs me has no

1     impact, as far as I'm concerned, on what

2     tests I choose.  I choose the tests that I

3     think are appropriate to solve the problem.

4          Q.    Have you been -- prior to your

5     work here with regard to Chinese drywall, had

6     you been engaged by any companies to look at

7     any type of drywall issues?

8          A.    Yes, I have in the past.

9          Q.    Can you tell us a little bit

10    about that?

11         A.    The -- I have done work for

12    drywall companies, but actually, I've done

13    more work for another engineering firm which

14    goes by the name of Packer Engineering, which

15    is a place that I was formerly employed.

16              And they came to me and said,

17    "We're having some analytical needs that we

18    think you have better expertise to take care

19    of, and so we would like you to help us with

20    this project," and most of it was on domestic

21    drywall.

22        Q.    Okay.  And how long have you

23    been doing this for, you know, acting as a

24    forensic chemist?

1         A.    Since 1987.

2         Q.    Okay.

3         A.    So 23 years, I guess.

6               Before you were retained by the

7    plaintiffs' committee in this litigation, had

8    you had any experience with Chinese drywall?

9         A.    My experience with Chinese

10   drywall and this particular issue of the

11   odors and corrosive questions actually

12   started with a contact from David Krause from

13     the Florida Department of Health.

14              David and I have worked

15     together in the past on, actually, many

16     analytical projects; and, in fact, I met

17     David and was working with him while he was

18     still doing his thesis and was somewhat of a

19     mentor figure for him, to guide him through

20     his thesis work.  And then it's just kind of,

21     you know, progressed from there.  It's a

22     back-and-forth colleague relationship.

23        Q.    So David Krause from the

24     Florida Department of Health called you about

1     Chinese drywall.  Tell us what he called you

2     for.

3        A.     He called and he said, "Explain

4     to me" -- the Florida homeowners were

5     experiencing odors coming out of their home

6     and that they suspected that the drywall was

7     potentially a source, and that they were also

8     experiencing corrosion issues, and he knows

9     that I've done work on corrosion.

10              And so he said, "Can I send you

11     some samples?  I'd like you to take a look at

12     them and see if you can see what you see.

```
 1    13    What are the major differences that are
 2    14    jumping out at you?"
 3
 4
 5
 6    19         A.    He sent me four samples.  One
 7    20    of them was marked -- although he has his own
 8    21    identifications, one of them had a Knauf
 9    22    marking; one of them said, "Made in China";
10    23    one of them was unmarked; and then one of
11    24    them, I believe, was Grid Marks, which is a
12
13     1    National Gypsum product.
14
15
16
17    19         Q.    All right.  Dr. Streit, what
18    20    I'm going to mark and show you -- for the
19    21    record, what I've just marked as Streit
20    22    Exhibit 1, could you please describe what
21    23    that is?
22    24         A.    This is a -- this is a copy of
23
24     1    the report that I issued to Dr. David Krause
25     2    of the Florida Department of Health, dated
```

1    3    March 17th, 2009.

2    4          Q.     Okay.  And what does -- what do

3    5    you have in that report?  What does it show?

4    6    Does it show testing that you did on behalf

5    7    of the Florida Department of Health?

6    8          A.     Yes.  This is a report on the

7    9    initial study of the four samples that David

8   10    sent to me and asked me to characterize.

9   11          Q.     Okay.  And tell us what you

10  12    found.

11  13          A.     Basically, what we were finding

12  14    that stood out in this report -- and I should

13  15    go back.  I'm sorry.

14  16                 In addition, he did send me a

15  17    piece of copper tubing that had blackened on

16  18    the surface.

17  19          Q.     Okay.

18  20          A.     So we can start with that.  We

19  21    took a sample of that off with what's called

20  22    a tungsten needle.  It's a very fine point,

21  23    so you can scrape material off.  And we did

22  24    an SEM/EDS of that material and determined

23

24   1    that that was rich in sulfur and in copper --

25   2          Q.     Okay.

3          A.      -- with a just a trace of

4    oxygen.  And so it was pretty clear at that

5    point that because of the lack of oxygen, it

6    would be a sulfide, and it's also black, as

7    opposed to green.

8               But just to confirm, we sent it

9    for, which is an x-ray diffraction

10   technique, and that technique is designed to

11   give you the actual chemical composition; in

12   other words, that it's a sulfide or a sulfate

13   or whatever it happens to be, so --

14        Q.      And XRD, is that a type of test

15   that chemists regularly employ to --

16        A.      For that type of purpose, yes.

17        Q.      Okay.

18        A.      So it's confirmatory of what we

19   actually saw by SEM.

20        Q.      Okay.

21        A.      Then we went on, and with

22   respect to the drywall, we did determine that

23   as a result of the testing, we were seeing

24   differences in the domestic product, which

1    was the Grid Marks product, versus the

2    Chinese product.

```
 1    3              We saw strontium inclusions,
 2    4    which are particles that were in the gypsum
 3    5    of the Chinese products, as opposed to the
 4    6    American products or domestically produced
 5    7    products.
 6
 7
 8
 9   14              But it was clear that there was
10   15    a difference in strontium; and actually
11   16    subsequently to that, we did ICP and
12   17    confirmed that the strontium levels were
13   18    higher in the Chinese-made product as opposed
14   19    to the domestic product.
15   20         Q.    Okay.  Now, you used the term
16   21    "ICP."  Again, just for Judge Fallon's
17   22    benefit, what does that mean?
18   23         A.    "ICP" stands for inductively
19   24    coupled plasma.  And it's just a fancy term
20
21    1    for heating the sample up in a plasma
22    2    environment and then it emits a signal, which
23    3    you then detect using a mass spectrometer;
24    4    and each element has a distinct weight, so
25    5    it's separated by its mass.
```

6          Q.     And this test, is this a test
7     that's generally accepted by chemists to be
8     used for that type of purpose?
9          A.     Yes, it's used for the purpose
10     of looking at trace elements, specifically
11     metals --
12          Q.     Okay.
13          A.     -- and various substrates.
14          Q.     Now, Dr. Krause, at some point,
15     had published a poster at a conference.  Are
16     you aware of that?
17          A.     Yes, he did.

24          A.     The poster that I believe

1     you're referring to was presented at a
2     technical conference that occurred in
3     November in Tampa, Florida, where scientists
4     were invited to submit an abstract with
5     regard to their work on the Chinese
6     problematic drywall situation; and a panel
7     from the university of Florida then reviewed
8     all of the abstracts and selected the ones

9      that they thought were appropriate to be

10     presented at the conference.

14                So the posters and

15     presentations that were presented at the

16     conference, were they reviewed -- they were

17     independently reviewed, you're saying?

18         A.    They were independently

19     reviewed by the University of Florida,

20     members of the staff, so professors at the

21     University of Florida.

22         Q.    Would people in your field

23     consider that a peer-review process?

24         A.    To some extent, yes.  I mean,

1      they are our peers, obviously.  And there was

2      a review process that went on, and there were

3      some -- my understanding from talking with

4      David is some of them were rejected, and then

5      others were accepted and allowed to present.

22          Q.    All right.  Dr. Streit, let me

23    show you what I've marked as Exhibit 2,

24    Streit Exhibit 2.  And for the record, I just

1    have to put the exhibit number, the actual

2    trial exhibit number.  It's --

3                And can you identify for

4    Judge Fallon what this is that we've just

5    marked as Exhibit 2?

6          A.    In my understanding of what

7    this is, is this is David Krause's

8    presentation, poster presentation, at that

9    conference.  And what he had done was he sent

10    samples to three different laboratories, one

11    of which was our laboratory, Unified

12    Engineering, and he asked for a

13    characterization of the drywall.

14                And he was comparing the

15    various methods to see whether everyone that

16    looked at it came up with the identifications

17    that were consistent, whether it was domestic

18    or whether it was a Chinese-made product.

```
 1   20          Q.     And, Dr. Streit, do you see the
 2   21   name of your company listed anywhere on this
 3   22   poster?
 4   23          A.     In "Participating
 5   24   Laboratories," we're listed as Laboratory C.
 6
 7
 8
 9   11          Q.     Okay.  And have you reviewed
10   12   any of the presentations, other than
11   13   Dr. Krause's, that were made at the Tampa
12   14   conference?
13   15                 By the way, just for the
14   16   record, when was that conference?  I don't
15   17   know if you said the date.
16   18          A.     It was in November of last
17   19   year.
18   20          Q.     Of 2009?
19   21          A.     2009.
20   22          Q.     Okay.  And had you reviewed any
21   23   of the other presentations that were made at
22   24   that conference?
23
24    1          A.     I have.
25    2                 MR. SEEGER:  Okay.  I'll just
```

```
 1    3          mark a few.

 2

 3

 4

 5   12          Q.    All right.  Let me start

 6   13    handing these to you.

 7   14              Dr. Streit, what we've marked

 8   15    as Exhibit 3 is a presentation done by a

 9   16    Thomas Gauthier, Ph.D., and the title is

10   17    "Proposed Mechanism for the Release of

11   18    Reduced Sulfur Compounds from Corrosive

12   19    Imported Drywall."  Also, for the record, its

13   20    trial exhibit number is.

14

15

16

17   13          Q.    And let me also -- what I'm

18   14    handing to you, which has been marked as

19   15    Streit Exhibit 4, is a presentation by Robert

20   16    DeMott, who's a PhD, "Corrosive Imported

21   17    Wallboard, Investigating Emissions."  I'll

22   18    hand that to you.

23

24

25
```

1    2        Q.    Streit Exhibit 5, and the trial

2    3    exhibit number is P2.0091-0001, is a

3    4    presentation by Tony Worthan, MPH, "Chemical

4    5    Emissions Including Sulfur Compounds from

5    6    Chinese Produced Drywall."

6

7

8

9    15       Q.    And then Exhibit 6, Streit

10   16   Exhibit 6, which is trial-stamped

11   17   , is Michael Tuday and others

12   18   from Columbia Analytical Services.  The title

13   19   is "Measurement of Corrosive, Odorous and

14   20   Potentially Harmful Gases from Imported and

15   21   Domestic Wallboard."

16   22            All right.  Do you have all

17   23   four of those?

18   24       A.    I do.

19

20   1        Q.    Let me just start by asking

21   2    you, Dr. Streit:  Have you seen these

22   3    presentations?

23   4        A.    I have reviewed all of these

24   5    presentations.

25   6        Q.    And are these materials that

```
 1   7   you've relied upon in giving opinions in this

 2   8   case?

 3   9           A.     They are.

 4

 5

 6

 7  13                 Let me ask you this with regard

 8  14   to your experience with Chinese drywall:  How

 9  15   many samples of drywall, Chinese drywall and

10  16   other drywall, in the context of looking at

11  17   problems of Chinese drywall, have you looked

12  18   at since you've been introduced to this by

13  19   Dr. Krause?

14  20           A.     Probably five to 600 total.

15  21           Q.     Okay.  And out of the five to

16  22   600, do you have any idea of how many of

17  23   those were identified as Chinese drywall

18  24   versus domestic drywall?

19

20

21

22   3           A.     I'd have to go through the

23   4   list, but I did provide a table; and if I

24   5   knew what the source was, I listed that in

25   6   the table.  So without sitting here and
```

7    counting them up, I really am not sure, but

8    my estimate would be probably 50 to 70 or so.

9    BY MR. SEEGER:

10         Q.    Okay.  And these samples have

11    been sent to you from various sources; is

12    that fair to say?

13         A.    I have received homeowners --

14    samples from homeowners, samples from other

15    industrial hygienists, samples from

16    remediation companies, samples from various

17    attorneys, from various government agencies.

18    Basically, I think I've gotten samples from

19    every aspect of people who would be exposed

20    to this problem.

9          Q.    Now, tell us -- before we move

10    into the specific opinions in this case, tell

11    us what the results of your testing for the

12    Florida Department of Health resulted in.

13    What did it show you?  What did you see?

14         A.    I'm seeing differences that I

15    thought were real and should be explored

16    further.

17        Q.      Differences, you mean, between

18    the Chinese drywall --

19        A.      And the domestic product.

22        A.      And so at that point, I wound

23    up getting in a discussion and conversation

24    with the EPA, the CPSC, the Department of

1    Florida.  There were representatives from the

2    drywall manufacturers also on the conference

3    call, and we had a one-and-a-half-to-two-hour

4    conference call about the findings.  And

5    where do you go from there, you know?

6        Q.      Did you present your findings

7    on that conference call?

8        A.      I did talk to them about --

9    they were all familiar with it because they'd

10    already read the report.  They had specific

11    questions, which I answered for them.

12              And then we started to talk

13    about, you know, what direction should we go

14    in?  They were asking questions about further

15    testing, and so I gave them ideas on, you

16     know, where -- what I thought they should do.

23          Q.     Have you been involved in any

24     testing that's been used by the CPSC?

1          A.     Yeah, there's -- some of the

2     testing that I have done, which was actually

3     done, commissioned by the CPSC, but they

4     hired a facilitator, if you will; and they

5     said, "Okay, you know, we want you to

6     coordinate all the testing from different

7     laboratories," and so I was sent samples, and

8     sent results back.

9          Q.     Dr. Streit, let me ask you

10     this:  So before anybody in this case had

11     sent you any samples related to the Germano

12     homes that we're going to be talking about,

13     what conclusions had you reached about

14     Chinese drywall in connection with the work

15     you were doing for the Florida Department of

16     Health and the CPSC, in your own testing?

17          A.     From my testing, I was seeing

18     sulfur gas emissions, meaning that I was

19    seeing hydrogen sulfide, I was seeing

20    carbonyl sulfide, and I was seeing carbon

21    disulfide in the samples that were sent to

22    me.  So I think that needed to be explored

23    further.

24              And then I was also seeing a

1    difference in the strontium, which drew up a

2    flag for me, and I was looking further,

3    really, at that.  Those are the two main

4    tests out of the initial report that I was

5    somewhat focusing on.

12       A.    I continued to look at

13    corrosion deposits on metals for clients as

14    well.

15       Q.    And so the client -- were these

16    metals being sent to you -- who were they

17    being sent to you by?

18       A.    Sometimes, the manufacturer of

19    the HVAC equipment.  Sometimes, they were

20    sent by investigators that would go out in

21    the field and cut out a piece of the coil or

22    a piece of wiring and send it to me.

23         Q.    And did the CPSC ultimately

24    make available results of testing that they

1    had done?

2         A.    I think they've done that

3    several times.

12         Q.    All right.  Dr. Streit, let me

13    show you what we've just marked as Exhibit 7,

14    and it's the trial exhibit number

15    P1.019-0001.

16              And can you identify what that

17    is for Judge Fallon, please?

18         A.    Yes.  This is the CPSC's

19    report -- or part of the report that was put

20    out on November 23rd of last year.  And it

21    looks like this is the particular report

22    section that deals with the chemical analysis

23    portion, and I have to go through and see.

24              It doesn't look like the

1    corrosion part is in here, so this is more of

the chemical sampling part of the report.

       Q.     And have you reviewed this?

       A.     I have reviewed it, yes.

       Q.     And are the findings with regard to Chinese drywall that you found and what's in this report consistent, in your opinion?

       A.     Yeah, they're consistent.  I tended to find that these strontium levels were a little bit higher than they're saying. Their value apparently goes down to 1200 ppm strontium, and most of what I'm seeing was above 1800 or so, although there are outliers.  I do see some that are below 1200.

                  But from a consistent point of view, I think the important thing is that there's a difference in the strontium levels, being that it's elevated in the Chinese drywall and not elevated in the domestically produced product.

       Q.     And that difference, is that also -- is your finding of that difference in the strontium levels -- is that consistent

with what you've seen published by the

1   2      Florida Department of Health as well?

2   3           A.      Yes.   They were finding the

3   4      same thing, as were many people who presented

4   5      at the conference.

5   6           Q.      And what about -- now going

6   7      back to the CPSC report that you have in your

7   8      hand, marked as Exhibit 7, what about with

8   9      regard to off-gassing?

9   10          A.       With regard to off-gassing,

10  11     they're saying that they find hydrogen

11  12     sulfide, that they measure in the homes by

12  13     the use of a passive sampler, meaning that

13  14     they're taking an average over a two-week

14  15     span, as to opposed a -- they did do grab

15  16     samples, but apparently they've abandoned

16  17     that.   They don't even really mention it in

17  18     their summary.

18

19

20

21  19          Q.      Okay.   I'm going to hand you

22  20     what we've just marked as Streit Exhibit 9,

23  21     which is trial-marked P1.1804-0001.

24

25

7          Q.    Can you identify for

8    Judge Fallon what I've just handed you and

9    marked as Streit Exhibit 9?

10         A.    This is a summary of work that

11   was released by the interagency task force

12   studying the -- the government task force

13   studying the drywall on October 29th of 2009,

14   so it predates the 50-home -- 51-home study.

15              This one is indoor air testing

16   of ten homes from the Florida and Louisiana

17   area, and then they actually allude to the

18   fact that they're going to be releasing a

19   more comprehensive 50-home study at that

20   time.

21         Q.    Okay.  And is this something

22   you reviewed?

23         A.    I did review it, yes.

24         Q.    And both with regard to Streit

1    Exhibit 8, which is the CPSC study, and

2    Exhibit 9, which is the Florida Department of

3    Health study, have you relied upon both of

4    those in rendering your opinions in this

5    case?

6         A.      Again, this is something that

7     I've looked at, and yes, I have relied upon

8     it.  It's consistent with what I've seen in

9     my own testing.

1         Q.      So you've looked at both of

2     these, and you've relied on these in

3     connection with rendering your opinions in

4     that case; is that fair?

5         A.      I have.

6     you this, Dr. Streit:  With regard to the

7     Germano homes that are the subject of this

8     hearing that Judge Fallon is presiding over,

9     what were you asked to do by the plaintiffs'

10    lawyers in this case?

11        A.      I was asked to visit the home,

12    and then I was asked to analyze samples that

13    were harvested from the homes and determine

14    if, in fact -- the testing that I would

15    normally run on these samples at that point,

16  whether I was seeing elevated levels of

17  strontium, whether I was seeing strontium

18  inclusions, whether I could analyze the black

19  deposits and determine whether that was

20  copper sulfide or copper oxide, looking at

21  off-gassing to see whether the samplers were

22  going to admit the hydrogen sulfide, carbonyl

23  sulfide and carbon disulfide that we were

24  essentially seeing; and then to also, in

1   conjunction with reviewing other materials,

2   draw conclusions, based on my work and review

3   of others.

4        Q.    Okay.  Let me start with your

5   conclusions here.  What did you see with

6   regard to elevated strontium off-gassing and

7   corrosion in the homes you visited in the

8   Germano litigation?

10       A.    With respect to off-gassing,

11  when I walked into the three houses that

12  contained suspected drywall that was produced

13  in China, the homes have a very distinct and

14    noticeable odor.

15              It's -- it was something that

16    in certain areas the home was stronger than

17    in others, and as the day progressed,

18    actually somewhat became a little irritating

19    to my eyes and was causing me to cough a

20    little bit, which subsequently, as I got more

21    fresh air, was better.

22              I then went into what was

23    considered to be a control home, where there

24    was no drywall manufactured from China; and I

1    looked at the copper surfaces in that home,

2    the wiring and the bathroom plumbing and so

3    on, and determined that I didn't see any

4    visible sign of corrosion, nor did I perceive

5    an odor in that home.

9    I mean, did you -- those were sort of your

10    visual observations.  What about your testing

11    analysis?

12         A.    Those samples were tested in a

13    humidified environment, just like many of the

14   other samples have done, where you take a

15   piece of the drywall, you take off the paper,

16   and then you place the sample in a humidified

17   environment for a period of time, typically

18   48 hours, and then you measure the gases

19   which come out of that drywall to determine

20   what they are.  Are they hydrogen sulfide?

21   Are they carbonyl sulfide?  Are they carbon

22   disulfide?  Are they another sulfur gas, or

23   are they something else?

24          Q.     And what did you find?


 1          A.     When the samples are

 2   humidified, what we tend to see is carbonyl

 3   sulfide and carbon disulfide at elevated

 4   levels, because the hydrogen sulfide, as it

 5   turns out, is absorbed by the moisture as a

 6   result of the way the test is run.

 7                 And so when we went back and

 8   ran those dry, you get a hydrogen sulfide

 9   emission, which you miss if you run the

10   samples humidified.  So you see all three

11   gases that will be given off by the Chinese

12   drywall that -- the hydrogen sulfide, we

13   don't see coming out of the domestic product

1   14   at all.  There are a couple of instances

2   15   where you may see carbonyl sulfide in

3   16   domestic product, but it's at pretty low

4   17   levels.

5

6

7

8   20   what type of tests did you do with regard to

9   21   off-gassing?

10  22          A.     This is a GC mass spec test.

11  23   That stands for gas chromatography, and it's

12  24   a mass spectrometry detector.

13

14

15

16  6           Q.     All right.  Let me ask you

17  7    this:  With regard to the testing for

18  8    off-gassing, the method that you used, do you

19  9    have an opinion as to whether that is a more

20  10   reliable method for measuring off-gassing

21  11   than, let's say, certain indoor air quality

22  12   tests?

23

24

25

15          A.      Well, they're ASTM tests that

16     are designed to measure the off-gassing under

17     a controlled set of conditions, so that you

18     are essentially putting a piece of drywall in

19     a container and you are trapping the gases

20     that come out, so you can actually measure

21     them, as opposed to taking air samples in a

22     house, where, quite frankly, it's really

23     hit-or-miss.

24             You know, if you talk to the


1     homeowners, sometimes they smell something,

2     sometimes they don't, so when do you take

3     your sample?  Do you wait until the

4     homeowners smell something, or, you know,

5     what do you do?

6             And I think that that was my

7     initial criticism of air sampling, and the

8     reason why I had expressed that opinion to

9     the CPSC and David, that I really didn't

10     think the air sampling was very productive.

11             I really thought it would be

12     better, if you want to find out if the

13     drywall is a problem, you have to control the

14     test better.

15   BY MR. SEEGER:

16        Q.    Now, when you say this is the

17   opinion you gave to David, you're saying this

18   is what you had said to David Krause at the

19   Florida Department of Health, just to be

20   clear?

21        A.    Right.  That is correct.

22        Q.    Let's talk some about what you

23   observed in the Germano homes that have

24   Chinese drywall and the control home there

1   with regard to corrosion.

2        A.    The Germano homes have

3   corrosion that are pretty widespread.  When

4   you go in the home, if you look at the copper

5   tubing in the bathrooms, the water lines,

6   they're black.

7             If you open up the back of the

8   refrigerator and you look at all of the

9   associated tubing and wiring that's in the

10   back of the refrigerator, that was all back.

11             In one case, the lamp wire

12   going up all the way to the ceiling, you

13   could see that the wires were black

14   underneath; and, in fact, we later analyzed

15    those samples.

16              You saw it when we looked at

17    the alarm systems, and you took the cover off

18    the alarm system.  You could see darkening of

19    the wires on the alarm systems.

20              Then we went up and looked at

21    the air-conditioning coils.  And in the one

22    home, I think it was the McKellar home, the

23    coil had only been in there for two months,

24    and it was black.


1         Q.    The HVAC coil?

2         A.    The HVAC coil.

3              And then, of course, we'd look

4    at the outlet covers and take the outlet

5    covers off and look at the wires, and they

6    were blackened.  There were picture frames

7    which showed some blackening.

8              If you looked at the

9    chrome-plated fixtures in the bathroom, they

10   were all blackened.  The mirror backing was

11   affected.  It was actually pretty pervasive

12   in the entire house.

15    corrosion on metals.  What is the

16    significance of you seeing black on the

17    metals that you observed in the Germano

18    homes?

19         A.    It's different than what you

20    would consider normal aging or, you know,

21    aging corrosion as a result of being in an

22    oxidizing environment, in the air.

23              What we're seeing are deposits

24    of black material on the surface, actually,


1    you know, physical deposits on the surface,

2    so -- and that's the formation of the

3    sulfide, which then was corroding the metal

4    underneath.

5              And visually, it appears

6    different.  It's not a thin discoloration

7    layer.  It's actually a material on the

8    surface that you can scrape and analyze,

9    whereas oxidation, it's very difficult to do

10    that.  You wind up analyzing the entire

11    substrate.

12         Q.    Well, do you have an opinion as

13    to whether this is the kind of corrosion that

14   you can just kind of wipe off the wires?

15        A.    The corrosion, you can't wipe

16   off.  And even the black material, some of it

17   you can wipe off -- you know, we're doing

18   that to collect samples -- but not all of it.

19   And, in fact, some of it is held on quite

20   tightly.  Other material, you can poke at it,

21   and then it will flake off.

22             And then in some places, you

23   can't get it off at all because it's held on

24   by the corrosion pits, if you will.  So, you

1    know, you're not going to be able to just

2    wipe it off.

6         Q.    Well, do you have experience

7    doing -- you know, looking at corrosive

8    metals, metals that have corrosion on them?

9         A.    Very often I look at problems

10   involving corrosion and oxidation of the

11   surface, deposits on the surface.  I look at

12   the extent of corrosion, pitting, whether

13   it's penetrated through the metal, whether

14    it's, quote/unquote, "formicary," so it's

15    tunneling in.

16              It really -- and those samples

17    are something that I get quite frequently

18    because that's a pretty large problem in the

19    world we live in, with exposure to chemicals

20    and thing.

21         Q.    And is that a large part of

22    what you do generally in connection with

23    you -- the work you do for industry, is

24    looking at corrosion and telling your clients


1    in that case the cause or the extent of the

2    corrosion?

3         A.    Sure.  What's in the corrosion

4    deposit, what I believe is causing it, and

5    then sometimes we talk about how to fix the

6    problem.  But typically, they come to me

7    because they need the analysis done.




9    know, how long have you been working on

10    identifying corrosion problems and the extent

11    of corrosion for anybody who's ever hired you

```
 1    12    to do it?
 2    13         A.    I've been doing that for my
 3    14    entire professional career.
 4
 5
 6
 7    23         Q.    Dr. Streit, I'd like to mark
 8    24    for you the report that you gave in December
 9
10     1    on behalf of the Germano plaintiffs, and your
11     2    supplemental report that you did in January.
12     3    For the record, what I'm marking as Streit-8
13     4    is Trial Exhibit P1.2023-0001.
14     5              And is that a start of your
15     6    report that I've marked as Streit-8?
16     7         A.    Without counting up all the
17     8    pages, it does appear to be a copy of my
18     9    report.
19
20
21
22    16         Q.    Okay.  And then I've also
23    17    marked as Streit-10 -- sorry we went out of
24    18    order -- your supplemental report.  Would you
25    19    please take a look and confirm -- ooh, let me
```

20    just read for the record.  It's Trial

21    Exhibit No. P1.2025-0001?

22                  Is that your supplemental

23    report?

24            A.    Yes, it is.


1            Q.    Okay.  Now, Dr. Streit, take

2     your report from December please, and

3     consistent with what we've been discussing on

4     corrosion, you've included some photographs;

5     is that correct?

6            A.    I have.




12                  But I want to start with the

13    photos on page -- actually, if you look at

14    the last four numbers, you see where it's got

15    a P number?

16            A.    Yes, sir.

17            Q.    It's dash 0050, if you can go

18    to that page.

19            A.    Okay.

20            Q.    So assuming that we'll have

21    this page up in front of Judge Fallon, could

22   you please tell the judge what is here?

23        A.    This was the air-conditioning

24   coil that was taken out of the McKellar home

1   after I had visited that home in November.

2        Q.    Okay.  All four of these photos

3   show that?

4        A.    Yes.  All -- well, no, one,

5   two, three.

10        Q.    Okay.  Let's start with the

11   upper left-hand corner, and please tell

12   Judge Fallon what that shows.

13        A.    This is a picture of the end of

14   the A/C coil where the installation date was

15   noted as September 6th of '09.

16        Q.    Okay.

17        A.    And what it's showing is the

18   ends of the copper coils which would normally

19   be a copper color, may not necessarily be

20   shiny, but they're a copper color.  And as

21   you can see, they've been blackened, and they

22   have deposits on them; as well as the upper

23    right-hand one, which is the extension of the

24    copper tube from the end of the


1     air-conditioning coil.

2          Q.     Now, is the upper right-hand

3     photo a good example of the blackening that

4     you saw?

5          A.     It shows up much better in that

6     photograph than it does in the prior

7     photograph.

8          Q.     Okay.  And then if you could

9     tell us what the lower left-hand photo

10    demonstrates.

11         A.     That's a documentation of the

12    area where I scraped off the black material

13    and then did an SEM/EDS analysis to confirm

14    that, in fact -- or identify that it was

15    copper and sulfur.

16         Q.     Okay.  And what is the

17    significance of finding copper and sulfur on

18    that HVAC coil right there?

19         A.     That it's a copper sulfide, and

20    sulfides form from exposure to sulfide gases.

21         Q.     Okay.  And the sulfide gases

22    that you've identified in your testing are

1  23   hydrogen sulfide?

2  24          A.      Not only myself, but the CPSC

3

4  1    and many others have identified hydrogen

5  2    sulfide, carbonyl sulfide and carbon

6  3    disulfide.

7

8

9

10  3             Now, what are the significance

11  4    of these three compounds in your opinion with

12  5    regard to corrosion in the home?

13

14

15

16  8          A.      They are reduced sulfur gases,

17  9    meaning that they will corrode metal and they

18  10   will leave an odor and they will leave --

19  11   react with the metal in order to form the

20  12   metal sulfide.

21  13   BY MR. SEEGER:

22  14          Q.      Is this new chemistry you've

23  15   invented, or has this been around?

24  16          A.      It's been around forever.

25  17          Q.      Okay.  Now, take a look at the

1    18    photos on page 0036 of your report.  All

2

3

4

5    22    starting from the upper left, could you tell

6    23    us what these show?

7    24              A.      This is an outlet that was

8

9    1     taken from the Heischober house.

10   2               Q.      Okay.

11   3               A.      Hence the initials "SLH."

12   4               Q.      Okay.

13   5               A.      And the close-up that you see

14   6     on the upper right is a digital camera

15   7     photograph of the blackened surface of the

16   8     ground wire that is attached to the outlet.

17   9               Q.      Okay.

18   10              A.      And then the lower right-hand

19   11    corner is a 40x microscopic image of the

20   12    blackened surface of the copper wire.

21   13              Q.      Let me just correct one thing.

22   14    You said -- that's the lower left-hand

23   15    corner.

24   16              A.      Did I say "right"?

25   17              Q.      Yeah.

```
 1    18            A.     I'm sorry, the lower left.

 2

 3

 4

 5     3            A.     And that is basically just a

 6     4    close-up of the wire, the ground wire that's

 7     5    shown in the upper photographs.  So we're

 8     6    going progressively from an overall shot so

 9     7    you can see where it came from, to a closer

10     8    macro shot of just the wire, to the actual

11     9    blackened surface to show you what it looks

12    10    like.

13    11            Q.     Okay.  Again, just looking at

14    12    the surface, tell us the significance of this

15    13    photograph.  What does it show?

16    14            A.     It shows black deposits on the

17    15    surface of the wire, and when you remove

18    16    them, they are confirmed to be copper

19    17    sulfide.

20    18            Q.     Okay.  Is copper sulfide

21    19    corrosive?

22

23

24

25    22            A.     It is the -- I'm sorry.  It is
```

23    the corrosion by-product of the reaction with

24    a sulfur-reducing gas.


1         Q.    Okay.  That's what gets left

2    behind?

3         A.    Yes.  It's the reaction of the

4    corrosion product -- of the corrosion with

5    the metal, and it forms the corrosion

6    product, which is what you see on the

7    surface.

8         Q.    Can you go to page 0077.  Now,

9    one of the things you had mentioned earlier

10    when I asked you about your visual

11    observations is I think you talked about a

12    lamp cord?

13         A.    Yes.  This is a piece of a wire

14    that was going up from the lamp to the

15    ceiling.

16         Q.    Okay.  So tell us again on

17    this, going from, you know, left to right,

18    down, left to right, what you have here.

19         A.    The left is just the

20    documentation of the sample.  It's from the

21    Morgan residence --

22         Q.    Okay.

23          A.       -- Sample 5.  This is the

24     section that I received of the wire.


1          Q.       To the right of that, on top?

2          A.       To the right of that on the

3     top.

4                    The lower left, what I did was

5     I took a razor blade, and I sectioned across

6     the sample, so you're looking at a

7     cross-section.  And you can see where some of

8     the strands of the wire in the lower right

9     portion are actually still in, stuck to the

10    polymer.  They didn't come out with the rest

11    of the wire.  And then on the inside surface

12    of the wire that was bound so tightly that

13    you actually got the wire impressions, you

14    see black material.

15                   And those black deposits were

16    later identified as copper sulfide, and then

17    the corresponding wires that came out of that

18    wire are shown on the lower right, where you

19    can see some of the black material continues

20    to stick to the surface of the copper.

21         Q.       Now, the ground wire photo we

22    looked at, the ground wire was exposed.  It

| | | |
|---|---|---|
| 1 | 23 | didn't have any plastic on it or anything, |
| 2 | 24 | right? |
| 3 | | |
| 4 | 1 | A.    That is correct. |
| 5 | 2 | Q.    Okay.  What is the significance |
| 6 | 3 | of this -- of these photos? |
| 7 | 4 | A.    This is significant because the |
| 8 | 5 | corrosive gases have actually penetrated |
| 9 | 6 | through the plastic. |
| 10 | 7 | Q.    Okay.  And then if you could |
| 11 | 8 | also go to page 0083, Dr. Streit, and could |
| 12 | 9 | you please explain to us the significance of |
| 13 | 10 | these four photos? |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | 22 | It is labeled "Receptacle End" |
| 18 | 23 | because this portion of the wire was related |
| 19 | 24 | to a receptacle which was further over on the |
| 20 | | |
| 21 | 1 | wall, so that was the only way they could |
| 22 | 2 | describe it. |
| 23 | 3 | Q.    Just for the record, you didn't |
| 24 | 4 | harvest these yourself? |
| 25 | 5 | A.    I did not harvest them.  My |

```
1    6    understanding was that this was taken from
2    7    inside the wall but not at the receptacle.
3
4
5
6    7         Q.    Okay.  Just, again, assuming
7    8    that Judge Fallon is trying to follow along,
8    9    tell us what photo you're looking at.
9   10         A.    I'm sorry.  I'm looking at the
10  11    upper right-hand photo, which is photo 13.
11  12         Q.    What does that show?
12  13         A.    That's the actual piece of the
13  14    Romex that came out.
14  15              And then if you look at
15  16    photo 16, which is in the lower left, those
16  17    are the three components that are within the
17  18    Romex.  So if you remove the outer jacket of
18  19    the Romex, you get a white wire, a black
19  20    wire, and the ground wire.
20  21         Q.    Okay.
21  22         A.    I then stripped out the end of
22  23    the insulation, so I could look at the metal
23  24    underneath, and obviously the ground wire was
24
25   1    covered with paper, which is shown in
```

2047-EEF-MBN    Document 2190    Filed 03/30/10    Page 67 of 126

1    2    photo 15.  They've got backwards on this

2    3    scheme of things.

3    4         Q.    Okay.

4    5         A.    And then I looked at the

5    6    surfaces under examination, and --

6    7         Q.    So now we're back to page 0083?

7    8         A.    Right.  And the actual wire

8    9    that -- the only one that actually showed

9    10   blackening is the ground wire, so you see the

10   11   wire in photograph 1352, and then you see it

11   12   up close in photograph 1353.

12   13        Q.    So 1352 is the upper left, and

13   14   then the upper right?

14   15        A.    And then closer up, it's at 40x

15   16   magnification, you can see the black deposits

16   17   on the surface which were later confirmed by

17   18   SEM/EDS to be copper sulfide.

18   19        Q.    Okay.  Now, did you do any

19   20   testing of the wire coatings in both the lamp

20   21   cord and the Romex cord?

21   22        A.    The testing that I did was to

22   23   see whether the polymers themselves

23   24   incorporated sulfur in their structure.  So

24

25   1    if there was bulk sulfur in the polymer, I

1    2    was looking for that.

2    3         Q.    Okay.  And what did you find?

3    4         A.    I didn't see any sulfur

4    5    incorporated within the plastic itself to

5    6    indicate to me that it was a sulfonated

6    7    polymer, so my conclusion from that is that

7    8    the sulfur had to come from outside in.

8    9         Q.    Okay.  So was it your

9   10    conclusion that it actually permeated through

10  11    the outer coating?

11  12         A.    It permeates through and

12  13    attacks the copper metal underneath.

13  14         Q.    Okay.  Now, did you do any of

14  15    this type of testing -- well, let me ask it

15  16    to you this way.

16  17              What did you do in the control

17  18    homes with regard to corrosion?  Did you

18  19    observe any?

19  20         A.    In the control home, there were

20  21    samples of wiring harvested.  I recall a

21  22    switch specifically and the ground wire; and

22  23    I did examine that, and I didn't find any

23  24    black deposits on the surface.

24

25   1         Q.    Dr. Streit, do you have an

1   2   opinion as to whether the homes, the Germano

2   3   homes, that you visited and did testing in

3   4   with Chinese drywall are a corrosive

4   5   environment for wires and HVAC coils?

5

6

7

8   8   A.   I think that it's been clearly

9   9   shown that sulfur gases come out of the

10  10  drywall that's incorporated in the Germano

11  11  homes.  There's sulfide gases.  The deposits

12  12  on the surface are copper sulfide, which

13  13  would be the result of interaction with

14  14  sulfide-containing gases, and, you know,

15  15  those are clearly corrosion deposits which

16  16  have been observed on wires and appliances

17  17  and the A/C, HVAC coils in those homes.

18  18  BY MR. SEEGER:

19  19  Q.   Okay.  Is that -- your

20  20  conclusion there, is that consistent with

21  21  what you've seen published by the CPSC and

22  22  the Florida Department of Health?

23  23  A.   I think, yes, the CPSC, the

24  24  Florida Department of Health and other

25

1    investigators for various agencies or

2    various -- hired by various people, whether

3    it be other environmental firms or, you know,

4    whomever.

5              The data is very consistent,

6    that sulfur gases are being emitted by the

7    Chinese drywall, and the corrosion that's on

8    the surface of the metals is copper sulfide

9    which results from the interaction with those

10   sulfur gases.

11        Q.    And is that finding consistent

12   with the presentation made by Robert DeMott

13   from Environ at the Tampa conference?

16        A.    I believe it is.  As I'm going

17   through it, he talks about the differences

18   between reduced sulfur gases and other types

19   of oxide which we don't see on these samples.

20   These are caused by reduced sulfur gases as

21   evidenced by my report, the CPSC, you know,

22   his findings and many others.

23        Q.    Is it possible for you to say,

24   sitting here now, which of these sulfur gases

1

1     is causing the corrosion or if it's a

2     combination of the sulfur gases?

3             A.    I really don't think that

4     anyone knows exactly which one specifically

5     is responsible for the corrosion or whether

6     it's a mixture of all three.

7                  I think that at this point

8     everyone is convinced that those are -- the

9     three gases that I've already mentioned are

10    the main players.  But, you know, this is

11    ongoing, and it's still being investigated,

12    and I haven't seen anyone who's come out and

13    given a definitive yes, it's this.  And I'm

14    in that ballpark as well.  We're still

15    looking at the problem to try to isolate, if

16    we can isolate, which one it is, or if it

17    isn't, maybe it is a combination.

18                  MR. SEEGER:  You know, let me

19        mark another exhibit just for the next

20        couple of questions we have, the data.

5             Q.    Okay.  Dr. Streit, we've just

6    marked for the record as Streit-11.  It has

7    the trial stamp P1.1849-0001.  And not -- you

8    don't have to go into specifics, but can you

9    generally describe what we've just marked as

10   Streit-11?

11       A.    These are samples that were

12   received on January 20th.  They are samples

13   from the Orlando home of pieces of drywall

14   that were subsequently analyzed.

15       Q.    Right.  And I need to make one

16   correction.  For the record, Streit-11

17   consists of several trial exhibits.  The

18   first one is P1.1849-0001 and P1.1850-0001 --

20   system -- and P1.1851-0001.

4    have in front of you, is what did you

5    discover in the Germano homes in regard to

6    the strontium levels?

7       A.    Well, the strontium levels in

8    the Germano homes as evidenced by not only

9       the Exhibit 1849, but also incorporated in

10      other data, show that the Germano samples

11      tend to be pretty high in the strontium.

12      They're in either the upper 2,000s or in the

13      3,000s part per million, milligrams per

14      kilogram of strontium.  So they're on the

15      higher side of what is generally accepted as

16      being the levels in Chinese-produced board.

20              Do you have an opinion as to

21      whether the off-gassing accelerates with the

22      increase in heat and humidity?

23      A.    I think that it's been shown

24      that it accelerates and different gases tend

1       to come out when it's humidified, whereas in

2       a less humidified situation you tend to get

3       more of the hydrogen sulfide.  In the

4       humidity studies, at least in the controlled

5       environments, you tend to get more of the

6       other two because the hydrogen sulfide is

7       readily absorbed by water.

8               So what will happen is the

9       hydrogen sulfide will absorb in the water and

10      form an acidic environment, and that's

11      ultimately what's causing much of the

12      corrosion or related to the corrosion,

13      specifically on the HVAC coils which are

14      moist all the time.  That's why you're

15      getting six failures in three years.  It's

16      because of the accumulation of the sulfide

17      gases dissolved in the water.

18           Q.    Now, let's just pause on that

19      with regard to HVAC coils.

20                Have you seen coil failures in

21      shortened periods of time because of

22      corrosion?

23           A.    I have, yes.

24           Q.    And what is a normal life of,

1       let's say, an HVAC coil?

2            A.    According to the manufacturers,

3       which many of which are my clients and I've

4       looked at their failed coils as well, we've

5       had that discussion, because I thought it was

6       odd that you'd get that many failures.  I've

7       never seen that kind of failure rate.

8                 And what their technical people

9    have reported to me is that the typical life

10   would be anywhere from 10 to 20 years, you

11   know, 20 being on the extreme side if you

12   were wonderful homeowner and you did all of

13   your maintenance on a regular schedule, which

14   in reality probably doesn't happen very much,

15   and ten years on the other side, where you

16   may have some other factors that are

17   potentially causing a problem like exposure

18   to chemicals, you know, seawaters,

19   fertilizers and things like that --

20        Q.    And what --

21        A.    -- but typically ten years is

22   the shortest.

23        Q.    What have you seen in homes

24   with Chinese drywall?

1         A.    You know, many of these homes

2    have multiple failures.  The McKellar home

3    that you were looking at, that

4    air-conditioning coil had only been in for

5    two months, and it was already black.

6               And I think there was one

7    home -- and, excuse me, I don't remember the

8    homeowner's name -- but six coils in three

```
1    9    years.  That's outrageous.  That's an

2    10   unbelievably fast failure rate.

3    11          Q.    Had you ever seen anything like

4    12   that?

5    13          A.    No, I have not.

6

7

8

9    23          Q.    Now, do you have an opinion to

10   24   a reasonable degree of scientific certainty

11

12   1    as to whether that off-gassing causing the

13   2    corrosion is coming from Chinese drywall?

14   3          A.    Well, I don't think there's any

15   4    doubt that the drywall is releasing corrosive

16   5    gases and those gases are attacking the metal

17   6    and forming corrosion products.  That's very

18   7    clear.

19

20

21

22   11          Q.    Dr. Streit, the opinions that

23   12   you've expressed here in this examination, do

24   13   you hold them to a reasonable degree of

25   14   scientific certainty?
```

15          A.      I do.

16          Q.      All of the opinions you've

17     expressed in this case?

18          A.      Yes, sir.

     (WHEREUPON, THE VIDEO DEPOSITION WAS CONCLUDED.)


          MR. ECUYER:  The only housekeeping, I didn't want to

interrupt the video, but we would like to offer Dr. Streit,

obviously, an expert in chemistry and metal failure analysis.

          THE COURT:  Yes, okay.  The court will accept her, and we

will take a 15-minute break at this time.

          THE DEPUTY CLERK:  Everyone rise.

     (WHEREUPON, A RECESS WAS TAKEN.)

          THE COURT:  Be seated, please.  Call your next witness.

          MR. ECUYER:  Your Honor, just one bit of housekeeping

again --

          MR. SEEGER:  I'm sorry, I misspoke.  When I offered

Dr. Streit as a chemistry, I said metals, I should have said

materials failure analysis expert, just for the record.  Thank you.

          MR. ECUYER:  Your Honor, one matter.  In reviewing our

list, we would also like to strike previously-admitted Exhibits

P1.1889 and P1.1890, and in my EXCITEMENT this morning I misspoke.

The one we added this morning was P3.0636, your Honor, not 26.

Thank you.

          THE DEPUTY CLERK:  P3 what?

```
 1              MR. ECUYER:  0636.

 2              THE DEPUTY CLERK:  So, Judge, you're striking those first

 3  two and then admitting?

 4              MR. SERPE:  Yes.

 5              THE COURT:  Let's call your next witness, please.

 6              MR. SERPE:  Your Honor, we call Liz Heischober.

 7              THE DEPUTY CLERK:  Please raise your right hand.

 8        (WHEREUPON, ELIZABETH HEISCHOBER, WAS SWORN IN AND TESTIFIED

 9        AS FOLLOWS:)

10              THE DEPUTY CLERK:  Please be seated, and would you state

11  your name for the record.

12              THE WITNESS:  Yes.  My name is Elizabeth Heischober.

13              THE DEPUTY CLERK:  Would you spell the last name.

14              THE WITNESS:  Yes, H-E-I-S-C-H-O-B-E-R.

15              THE DEPUTY CLERK:  Thank you.

16                          DIRECT EXAMINATION

17  BY MR. SERPE:

18  Q.  Good morning, Liz.

19  A.  Good morning.

20  Q.  Are you ready?

21  A.  Yes.

22  Q.  Let's start with the summary slide that we've been doing with

23  the other families.  And you're the third line down?

24  A.  Correct.

25  Q.  Would you verify for the court what your, the address of the
```

1   Chinese drywall home is?

2   A.  The address is 214A 80th Street, Virginia Beach, Virginia.

3   Q.  And when did you and Steve buy the house on 80th Street?

4   A.  We closed and moved into it on November the 10th, 2006.

5   Q.  And it's your understanding that your home was built with just

6   about 200 sheets of Chinese drywall, 4-foot by 12-foot?

7   A.  Yes, 198.

8   Q.  Can we see a picture of the Heischober's house, Scott.

9        Is this the home that you and Steve live in?

10  A.  Yes, this is our home with the Chinese drywall.  And this home

11  is a duplex, so there's a common wall in the back of it, and

12  adjoining it is another home exactly like it in the back, which

13  also has Chinese drywall.

14  Q.  Liz, we'll talk about the neighbor as part of the duplex a

15  little later.

16       And I can't recall if you were here when I did the Google

17  map thing where you were able to see your house's proximity, were

18  you here for that?

19  A.  Right, yes.

20  Q.  Would you share with the court where your house is nestled

21  between and what kind of quality of life that meant for you and

22  Steve.

23  A.  I will.  I've lived in Virginia Beach for 35 years and I've

24  always lived in this neighborhood, and it's a neighborhood that is

25  close to the beach, we're a block and a half from the Atlantic

1   Ocean, and just to the west of us is a state park, which we have an

2   entrance to on our street, on 80th Street, where we can go hiking

3   and for long walks, take the dogs to run free, and the same on the

4   beach as well.  It's within biking distance to restaurants,

5   festivals and things that they have down at the beach in the

6   summertime.  It's just a really great community to live in.

7   Q.  And is that your rag top over here in the corner?

8   A.  Yes.

9   Q.  The license plate of that car is Sandy Paws; is that RIGHT?

10  A.  Yes, that's correct.

11  Q.  And is that Steve's car or is that --

12  A.  That's my car.  Steve's car has our first dog that we ever

13  owned, his name Shobey (PHONETIC) is on that car.

14  Q.  You guys are big animal people, are they part of the --

15  A.  Yes.  We are big dog lovers, we have always had dogs since

16  we've been married.  We are on our fourth and fifth dogs now.

17  Q.  Can I see the picture of Steve -- is this Steve Heischober

18  here?

19  A.  Yes, this is my husband and our daughter Allison, she is a

20  senior at James Madison University.

21  Q.  And so she is out of the house now and it's you and Steve

22  living in the house?

23  A.  Yes, she is -- we are currently not living in the house, we

24  moved out on August the 28th, about six weeks after we found out

25  that we had the Chinese drywall.  And fortunately, I feel, when we

1   moved into the house, she was away at school and she has been

2   pretty much away at school for the whole time, except for summer

3   vacations and holidays.

4         But I will say for the short time that she has been

5   there, she has experienced some of the physical symptoms that have

6   been associated with Chinese drywall.  She's had rashes and

7   respiratory issues.

8   Q.  Tell the court about the, how you and Steve built the house and

9   what your view was about how long you would be living in it.

10   A.  We built this house when you -- when we had our house on the

11   market, we had lived there for 20 years and we were -- we were

12   looking at making a substantial, you know, amount of money on the

13   sale of our house and we were looking for something that was

14   something we could retire in, that we would not have to, in our

15   later years, move out and go to a retirement home because that's

16   not something that either one of us wanted to do.

17         So for about a year we searched for a home that would be

18   in the same neighborhood but that would have a first-floor bedroom

19   or an elevator, and we found this home, which had both, it had two

20   first-floor bedrooms and an elevator, it's three levels, and it was

21   just the perfect setup for us.  It had very little yard work, it

22   was close to all of the things that we loved, and it was going to

23   suit us well into our later years.

24   Q.  And then you started experiencing problems, which included

25   significant problems with your air conditioning system?

1    A.  Right.  We moved in in November and closed -- of 2006, and the

2    following year, I want to say it was like about ten months later,

3    it was in June we had to have the transformer replaced.  And then

4    after that it was the, we had problems with both coils.

5            We have two units in our home, upstairs and downstairs,

6    and we had problems with both of those and then we had to have a

7    coil replaced.  And in all, we have replaced seven coils in this

8    home in less than three years.

9    Q.  And we went through the paperwork before the court this morning

10   with respect to all of the seven coils that you've replaced in your

11   house?

12   A.  Yes.

13           MR. SERPE:  Your Honor, we've previously marked them and

14   introduced them to the record, they begin at P3.0267-001, a summary

15   of the air conditioner failures for not only the Heischobers, but

16   also the other plaintiffs, will be presented in evidence by

17   Mr. Rutila when he testifies later today.

18   BY MR. SERPE:

19   Q.  Liz, how frequently were these evaporator coils going out, and

20   when did you figure out that maybe Chinese drywall was playing a

21   role?

22   A.  The first one was at about probably nine or ten months, and

23   then it just seemed like it was one thing after another.  It was a

24   coil, then my computer monitor went, then the hard drive crashed.

25   In the spring of the next year, we had to have our TV taken out and

1    all of the electrical panels replaced.  We had a switch in our

2    master bedroom closet that went.

3          And then the coils became more frequent.  One of the last

4    coils, the sixth coil that we had put in in August right after we

5    found out that we had the Chinese drywall, was black in two months.

6    And the seventh coil I think went in December, we were not living

7    there but we did not replace it, we just put it on emergency heat.

8    Q.  And that was the SLH 27 or the coil that Dr. Scully testified

9    having been delivered --

10   A.  Yes.

11   Q.  -- to Charlottesville?

12   A.  Yes.

13   Q.  I want to focus on another one of your plug-in appliances, a

14   clothes dryer.  Is this a picture of your dryer?

15   A.  Yes.

16   Q.  And the dryer's not in your house anymore?

17   A.  No, it isn't.

18   Q.  Where did it head off to?

19   A.  I think maybe it went to MIT, I am not sure where it went, I

20   know it went out to be tested.

21   Q.  Up there by one of those guys in the Massachusetts, Boston

22   area?

23   A.  Yeah, right, scientists.

24   Q.  And you understand that it's been taken apart and you're not

25   going to be seeing the dryer anymore?

1    A.   Correct.

2    Q.   Was that dryer giving you any trouble in any way before you

3    gave the thing up?

4    A.   Whenever I dried clothes, they came out smelling like Chinese

5    drywall.

6    Q.   And you understand now that that clothes dryer has been sent

7    off for testing, and the results came back that there was corrosion

8    on the inside of that dryer?

9    A.   Yes, I understand that.

10   Q.   And part of the damages that you're seeking are for replacement

11   of appliances such as your clothes dryer in this case?

12   A.   Yes, we are seeking for all of our appliances to be replaced.

13   Q.   Liz, you mentioned early that your home is a duplex, what

14   additional concerns do you have with respect to repairing your home

15   in light of the fact that both the front half of the duplex and the

16   back half of the duplex have Chinese drywall?

17   A.   One of my biggest concerns is that in remediation I am very

18   uncomfortable with remediating our side and then the other side not

19   being remediated, because we have this common wall between us and

20   sometimes the common wall can be made of stacked drywall, and if we

21   remediate our side and then he doesn't remediate his until later

22   down the road, we have all of that dust and debris that could come

23   through, and I am just really uncomfortable with investing that

24   much money into it.

25            I mean, when we bought our home, we put $345,000 down on

```
 1    it, that is huge investment for us.  Our home, that was, you know,
 2    that's our dream home and we put a major investment into it, and I
 3    just can't -- I am really uncomfortable doing this remediation
 4    unless his is done at the same time.
 5    Q.  You guys are out of the house now since?
 6    A.  We moved out August 28th.
 7    Q.  And no plans, obviously, to move back in?
 8    A.  No.  I will not move back in there.
 9    Q.  Did you look into the possibility of getting it repaired, talk
10    to contractors about that?
11    A.  Yes.  When we first found out, we were like adamant that we,
12    because we're kind of like take-charge people, and so we wanted to
13    get it fixed.  We wanted to get out there, get estimates, we did
14    all of that.  And the amounts were kind of staggering, and we went
15    to the bank to borrow the money, and the amount that we were going
16    to need to borrow was more than the percentage that they allow you
17    to borrow, you know, in the overall figures for borrowing money,
18    you can only borrow I think 80 percent of the value of your home, I
19    am not sure on that amount, but it's something like that and we
20    were way over that.
21            So we couldn't do that, but we wanted to fix it.  So we
22    went out and got estimates and tried to do everything.  And then we
23    also felt like we needed to wait until a protocol was set.  We did
24    not want to do, rush into it and do something wrong and not
25    correctly do it.  So we wanted to wait until some more findings
```

1    were set.

2    Q.  Let's talk about the value of your home.  You mentioned

3    mortgage and the ratio of the value of the home.  The city of

4    Virginia Beach does assessments of the value of the homes in the

5    neighborhood, do they not?

6    A.  Yes.

7    Q.  Tell the court what value the city of Virginia Beach places

8    upon your home at this point.

9    A.  Right now our home is assessed at $100.  The physical structure

10   is $100.  The land still has the same value but, in essence, right

11   now it's worth nothing to us.

12   Q.  And how much did you pay for this house?

13   A.  $795,000.

14   Q.  And you put 360 --

15   A.  $345,000.

16   Q.  $345,000 down on it.  It's assessed at 100?

17   A.  Right.

18   Q.  Liz, did you work, as the other plaintiffs did, with Dawn

19   Barrios and accountant Tuthill to get an accurate assessment of the

20   damages, both what would be necessary to repair your home, as well

21   as for the additional damages to your goods and financial burden

22   that Chinese drywall has placed upon your house?

23   A.  Yes, I did.

24   Q.  And you've had an opportunity to review the summary that was

25   previously prepared?

1   A.  Yes, I did.

2   Q.  And it's accurate and complete as far as you can tell?

3   A.  Yes.

4         MR. SERPE:  Your Honor, in connection with the witness's

5   testimony, as with the other witnesses, we would direct the court's

6   attention to a previously-admitted exhibit, P3.0622, beginning at

7   page two.  I don't have any further questions.

8         THE COURT:  Thank you.

9         THE WITNESS:  Can I just say one thing?  I just want to

10  say, I have worked hard my whole life since I was 15 years old, and

11  I do not want to be faced with bankruptcy or foreclosure.  And so I

12  am really hoping that we get some kind of positive outcome from

13  this because this is terrible what's happened to all of these

14  families.

15        MR. SERPE:  Thank you, Liz.

16  BY MR. SERPE:

17  Q.  And I'm glad you point that out.  Is there anything else that

18  I --

19  A.  No, that's all.  Thank you, your Honor.

20        THE COURT:  Thank you.

21        Call your next witness.

22        MR. BRYSON:  Good morning, your Honor, Dan Bryson on

23  behalf of the plaintiffs and the PSC.  In the interest of time, we

24  would like to briefly describe and orient the court to the

25  testimony of a very important witness, Jonathan Barnett.  The trial

1    preservation transcript will be submitted as part of the record,

2    your Honor, and it's not lengthy.  We also have a highlighted

3    version of this transcript we would like to present to the court.

4    Again, the witness is Dr. Jonathan Barnett.

5         Dr. Barnett, if I could have the slide, please.  Your

6    Honor, Dr. Barnett is a fire safety engineer, he works at Simpson

7    Gumpertz & Heger, today as the head of their fire safety department

8    in Massachusetts.  His engineering job is to protect people from

9    fires.  He was a professor in fire protection engineering for 28

10   years at Worcester Polytechnical Institute in Massachusetts.  He

11   has taught masters and Ph.D. students fire safety, he has taught

12   them how to investigate fires of electrical origin, he also

13   testified that he has taught applicable building codes for many,

14   many years.  Due to his expertise in fire safety, he was called to

15   testify before Congress on the role of fire following 9/11.

16        Your Honor, so we would like to tender Jonathan Barnett

17   as an expert in fire safety and applicable codes.  And his resumé

18   is in the transcript along with the attached exhibits.

19        THE COURT:  I have reviewed his resumé and the court will

20   accept him as such.

21        MR. BRYSON:  Your honor, just briefly again, to orient

22   the court to his testimony.  He testifies at pages 19 and 20 that

23   the building code IS for life safety and it sets a minimum level of

24   safety, it is prescripted, it is not discretionary.  He testified

25   starting at page 43 that if the code is violated, the violation

1    must be remedied completely.

2          He also testifies that the building code was violated in

3    several respects.  In particular, the electrical code does not

4    allow corrosive residues.  You will hear more about this from

5    witness Ron Wright, who will testify live later today, your Honor.

6          Dr. Barnett also testified about ASTM B-3, which is

7    incorporated by the code, and it states that copper wire, and I

8    quote, "shall be free of all imperfections."  Not some, but all.

9          With life safety, he testified, you don't take a chance

10   that wiring may be okay.  Dr. Barnett reviewed the expert reports

11   in this matter, he examined numerous samples, over 44 samples from

12   these homes, your Honor, and he believes that the corrosion will

13   increase resistance at loose connections.  It is undisputed by

14   consensus fire safety data, and he cites to the report in his

15   deposition, that loose connections at switches, receptacles or

16   other devices are a fire risk.  And that loose connections do

17   happen in residential construction.  The increased resistance from

18   the corrosion increases heat, which increases the fire risk.  He

19   cites the various peer-reviewed literature within his deposition,

20   which discusses the problem at pages 44, 49 and 50, he talks about

21   a number of papers in this regard.

22         He cites to NFPA 921, the Guide for Fire and Explosion

23   Investigations, he cites to Glowing Connections article; he cites

24   to corrosion of electrical conductors and pulp and paper industrial

25   applications, which describes the problem with increased resistance

1    from corrosion, and he also cites to the Abbott paper, which has

2    been discussed already in these proceedings.

3            I would like to point out a quote from his deposition,

4    your Honor, page 59, lines 1 through 7, in which Dr. Barnett

5    testified. "This phenomena is still fairly new. The houses are

6    fairly new. Will we start to have fires five, ten, twenty years

7    down the line? I'm afraid so. And in that case people will die.

8    Well, that's why I'm sitting here today. I'm worried about this

9    problem." Again, this is the man who testified before Congress

10   after 9/11.

11           I would also like to read to the court a quote at the

12   conclusion of his deposition, on PAGE 129, and I asked the question

13   during the trial preservation deposition, "And have you observed

14   sulfide film thicknesses on numerous actual parts in these houses,

15   wiring and receptacles? Yes, I have. And what is the concern that

16   you have? That we have sulfide films that exist in a few samples

17   out of thousands that must be out there, and I am worried that we

18   have some loose connections where these films exist, and we are

19   more likely than not going to have an unwarranted fire if the

20   situation is allowed to continue."

21           My question, "And you have that opinion within a

22   reasonable degree of engineering certainty? A. Yes, I do." And it

23   was like no further questions.

24           Thank you, your Honor. We hope that you will review this

25   transcript in its entirety.

```
 1              THE COURT:  Okay.  I have it and I will do so.

 2              Call your next witness.

 3              MR. LEWIS:  Thank you, your Honor.  Rich Lewis for the

 4   PSC, and the plaintiff'S call Dean Rutila.

 5              THE DEPUTY CLERK:  Please raise your right hand.

 6         (WHEREUPON, DEAN RUTILA, WAS SWORN IN AND TESTIFIED AS

 7         FOLLOWS:)

 8              THE DEPUTY CLERK:  Please be seated.  And would you state

 9   your name for the record.

10              THE WITNESS:  Dean A. RUTILA.

11              MR. SERPE:  Your Honor, a moment for a technical hiccup.

12              THE COURT:  How do you spell your last name?

13              THE WITNESS:  R-U-T-I-L-A.

14              MR. LEWIS:  Your honor, may I proceed?

15              THE COURT:  Yes.

16              MR. Lewis:  Thank you, your Honor.

17                             DIRECT EXAMINATION

18   BY MR. LEWIS:

19   Q.  Good morning, Mr. Rutila.

20   A.  Good morning.

21   Q.  Can you state your name for the record and your business

22   address?

23   A.  Dean A. Rutila, 243 Seyon Street, Waltham, Massachusetts.

24   Q.  And is that the address for your place of employment?

25   A.  That is.
```

1   Q.  And what is the name of that company?

2   A.  Simpson Gumpertz & Heger.

3   Q.  And very briefly, can you explain to the court what that

4   company does and the scope of their work?

5   A.  We are a nationwide multidisciplinary firm of engineers and

6   scientists.  We work on buildings and structures of all types,

7   above ground, buried, et cetera, solving problems, designing them,

8   helping in their construction and maintenance.

9   Q.  Thank you.  Can you explain to the court your own educational

10  training and your licensure?

11  A.  Yes.  I have, as you can read, a bachelor of science in civil

12  engineering from the University of Michigan, 1978, and a master's

13  in science and civil engineering in 1979.  I first was licensed as

14  a professional engineer in 1982.  I am currently licensed in 22

15  states, they're listed there.  It's worth noting that all 22 states

16  require a few key elements:  First, practice in our competence,

17  areas of competency, and that our primary responsibility is to the

18  safety and welfare of the public.

19  Q.  Thank you.  Can you explain to the court briefly your

20  employment history?

21  A.  Yes.  I actually go back to my childhood because I grew up on a

22  contractor's knee.  I've been involved with construction since I

23  was eight, ten years old, and have been involved ever since, well

24  over 40 years now.  I paid for my own college working in the

25  engineering and construction industry, both in general residential

1    construction, construction of a large power plant, land surveying,

2    drafting, construction inspection.

3            Since graduating in '78, I've worked eight years with a

4    Michigan structural engineering firm, I was a group leader and

5    design of new buildings and investigation of failures.  Worked on a

6    major project, licensed nuclear power plant in the Detroit area.

7            Since 1987 I joined Simpson Gumpertz & Heger.  We're a

8    400-person firm, I am a senior principal, senior principal is one

9    of the primary owners of the firm, and I am on the board of

10   directors overseeing the operations of the firm.

11   Q.  Can you explain your present responsibilities at Simpson

12   Gumpertz & Heger and any present teaching responsibilities that you

13   have?

14   A.  As a senior principal, I am responsible for projects.  I am

15   responsible both to the shareholders of the firm, folks like

16   myself; I am responsible to the public, both for their proper

17   execution technically as well as a business.

18           As a professional engineer, I am responsible to code

19   officials and the public for the designs that I create and the

20   solutions and investigations that I perform.  One of the duties of

21   a professional engineer, particularly with a job like mine, is to

22   teach back to the profession.  Once we discover things, we don't

23   hold them as trade secrets, my discoveries I teach back to the

24   public.  And I lecture annually at Harvard University, as well as

25   the University of Wisconsin, and am routinely invited by

1   engineering firms, construction firms, architectural firms and

2   manufacturers to teach them what I have learned as part of my

3   practice.

4   Q.  Mr. Rutila, we've talked about this concept of

5   multidisciplinary problem or a multidisciplinary team.  By

6   referring to some of the work that you've done in the past, can you

7   explain that concept as it relates to your work as an engineer?

8   A.  Yes.  As a building investigator, very seldom is it one skill

9   set, and very seldom is there one person with all of the knowledge

10  and experience.  And I list here a dozen or so on two slides of

11  projects, I'll just pick off the first one, this is the National

12  Audiovisual Conservation Center owned by the Library of Congress in

13  Virginia.  And they had a catastrophic failure during construction

14  of a buried roof structure, and that investigation required looking

15  at the concrete, so I had concrete scientists; it required looking

16  at the geotechnical, the soil; required looking at the polymers and

17  the plastics; there was a viscoelastic behavior to the failure,

18  required a polymer chemist; and those are the kinds of things that

19  I had to bring into that investigation to solve that problem for

20  them.

21          Each of these has its own multidisciplinary

22  characteristic.  I'll pick off one more on this.  The First Church

23  of Christ, scientist, Mary Baker Eddy Library in Boston, I

24  discovered that the building was built in the '30s with seaweed as

25  insulation, and just evaluating seaweed as an insulation material

1    requires not the skill set of any one person, we really had to look

2    at a material that we can't even find in the literature.  And

3    that's the sort of thing that you have to do as a multidisciplinary

4    building investigator.

5            There's a few more on the other page.  I guess I should

6    say on the residential home part that I skipped over there, I've

7    been the responsible engineer for the design and repair of

8    thousands of residential homes, not a few hundred but thousands of

9    people's homes, that I have designed repairs for.

10           MR. LEWIS:  Your Honor, with your permission, I'd like to

11   use the acronym SGH for the engineering firm that Mr. Rutila is at,

12   Simpson Gumpertz & Heger.

13           THE COURT:  Fine.

14   BY MR. LEWIS:

15   Q.  Did Simpson Gumpertz & Heger determine that their Chinese

16   drywall investigation required multidisciplinary resources?

17   A.  Yes, it did.  As soon as I became involved, the phone call from

18   Mr. Bryson, that's how it immediately became apparent that this had

19   to involve many different skill sets, chemistry, material science,

20   metallurgy, fire engineering, that's why I brought Mr. Barnett in,

21   et cetera.  It was very obvious that we needed many skills.

22           MR. LEWIS:  Your Honor, I ask that Mr. Rutila be accepted

23   as an expert in multidisciplinary investigation of building and

24   construction problems.

25           THE COURT:  The court will accept him in that field.

DAILY COPY

1         MR. LEWIS:  Thank you, your Honor.

2    BY MR. LEWIS:

3    Q.  Mr. Rutila, what was your assignment in this case, and please

4    refer to the slide that you prepared for us that will assist your

5    testimony?

6    A.  Fine.  First and foremost, to inspect the seven Virginia homes

7    and two control homes in nearby neighborhoods, control homes being

8    homes that had no evidence of Chinese drywall, evaluate the damage

9    to the building components in those homes caused by the corrosive

10   sulfur gases, collect samples of building components for analysis

11   in our laboratories and analysis of laboratories of others, and

12   then utilize our multidisciplinary expertise that we brought

13   together and the attorneys brought together, including metallurgy,

14   material science, thermal dynamics, the study of moisture and heat

15   flow, failure analysis, life safety, chemistry, engineering and

16   construction principles, to develop repair protocols.

17   Q.  Mr. Rutila, about how many professional engineers assisted you

18   from SGH in this work?

19   A.  At least a dozen within our firm of professional engineers of

20   all different skill sets.

21   Q.  In terms of analyzing samples from the seven homes and the two

22   control homes, can you give us a rough estimate of how many were

23   evaluated at the SGH laboratory?

24   A.  We evaluated nearly 300, I believe it was 283 is the number of

25   samples, some of which we evaluated initially and then passed on to

1    other consultants.  But well over 200 samples.

2    Q.  Mr. Rutila, was part of the SGH investigation to make field

3    visits to Florida to observe and interview representatives from

4    Beazer Homes and Lennar Homes in terms of what kind of work they

5    were doing on remediating Chinese drywall homes?

6    A.  Yes, that was a task that we took on when it became an option,

7    very critical task that we took on.

8    Q.  And did you send engineers from SGH to do that work and report

9    back to you?

10   A.  Yes, I did.  I sent Peter Nelson, who is another senior

11   principal, and another licensed engineer, Scott Tomlinson, to do

12   that work in December of 2009.

13   Q.  The court has heard significant testimony from Beazer Homes but

14   not from Lennar, so I would like to focus the next set of questions

15   on what you learned from the visit to the Lennar remediation.

16   A.  Okay.

17   Q.  Can you give the court an idea of the scope of your visit in

18   terms of interviews or observations; what was involved in your work

19   in Florida?

20   A.  Yes.  The Lennar folks were very accommodating, arranging for

21   us to spend some time with senior executive, as well as line

22   supervisors of the work.  We went to three properties, one property

23   that they had identified scientifically as having Chinese drywall

24   and had yet not started to repair it.  So it was, the people had

25   moved out, they knew it was Chinese drywall, it was on their list

1    to fix, they hadn't started.

2            Another home that we visited was a home that had been

3    completely repaired by their protocol, which I'll get to in a

4    minute.  That home was ready for move-in, they were just going

5    through the final inspection process with the homeowners before

6    they moved back in.

7            And the third home was one where they were in the process

8    of remediating it, they had removed all of the Chinese drywall,

9    they removed all of the drywall, they removed all of the electrical

10   wiring, they removed all of the HVAC equipment, they had removed

11   all copper plumbing components and were in the process of putting

12   it back together again at that point in time.

13   Q.  So as a general matter, was what you just described the scope

14   of remediation that you learned Lennar was using across the

15   spectrum of their homes in Florida?

16   A.  That's correct.  That was the -- that was just a very broad

17   summary of their scope.  But removing all of the drywall, removing

18   all of the electrical system, both low voltage and distribution

19   system, removing all of the mechanical HVAC systems, including the

20   outside compressor, and then removing all copper plumbing

21   components.

22   Q.  Let's just stop at that outside compressor for a moment.  Can

23   you explain to the court what Lennar indicated was the reason to

24   remove the outside compressor?

25   A.  They, unlike Beazer, had found that their outside compressors

1    were failing due to short cycling, that's where the compressor has

2    to work extra hard and repeatedly because of the failures of the

3    inside evaporator coil units.  So they found that their units were

4    failing, and they made the decision that they had to replace the

5    outside compressor component as well.

6    Q.  Going back to the broad scope of the Lennar remediation

7    approach, including replacement of all drywall, wire and HVAC, were

8    you able to discuss with Lennar the rationale for their scope of

9    remediation?

10   A.  Yes.  They were doing it, really, as a construction business

11   decision.  They knew they had to get the Chinese drywall out, they

12   knew that many components were damaged, and it was just the

13   practical way of eliminating the cause of the problem, eliminating

14   the damaged elements and then putting the house back together.

15   Really a practical business decision.

16   Q.  And can you characterize for the court or compare for the court

17   the general scope of the Lennar remedy compared to the PSC remedy

18   that's being recommended in your report and in the expert reports

19   of other plaintiff witnesses?

20   A.  We, of course, knew what Lennar and Beazer were doing when we

21   developed our recommendations in the PSC.  And for practical

22   purposes, they are the same.

23            THE COURT:  Is there any difference between Beazer and

24   Lennar?

25            THE WITNESS:  There are subtle differences.  Lennar, for

1    example, chooses to try to salvage hardwood floors, and they told

2    us sometimes they succeed and sometimes they don't.  They choose to

3    try to salvage more of the cabinetry in the kitchen, sometimes they

4    succeed and sometimes they don't.  So they faced, really, all of

5    the same decisions we heard about from Beazer and have adopted

6    slight variations in their approach and are facing the challenges

7    that, you know, Beazer predicted they would, in a manner of

8    speaking.

9    BY MR. LEWIS:

10   Q.  Mr. Rutila, have you summarized your observations, interviews

11   with Lennar and your observation as to their remediation protocol

12   in your expert report in this case?

13   A.  Yes.  In our December 2009 report, it is summarized therein.

14        MR. LEWIS:  Your Honor, for the record, the summary of

15   the Lennar work is in Mr. Rutila's December report at P1.2016-0103

16   through page 0108.

17   BY MR. LEWIS:

18   Q.  Mr. Rutila, have you had a chance to develop a teaching tool in

19   terms of animation to help explain your expert opinions in court

20   today?

21   A.  Yes.  We worked with the attorneys and the animators to develop

22   segments that you'll see today.

23        MR. LEWIS:  Your Honor, with the court's permission, we

24   have abbreviated and cut segments of this rather than show the

25   whole thing, and we'll use this throughout this witness's

1    testimony.  Thank you.

2    BY MR. LEWIS:

3    Q.  I'd like to start with the Morgan home, and if you can explain

4    to the court your approach to a home inspection as you walk in the

5    front door.

6    A.  Very good.  As you'll see in just a few seconds, the animation

7    acts as if you were walking in the home and, presumably, you walk

8    in and it's actually, the first thing I did in every home that I

9    went into -- it looks like we're rebooting -- the first thing I did

10   in every home I visited was to pause inside the front door, close

11   the door and just form an impression of the home, and that's what I

12   did, more or less as you see in the animation, walk in and close

13   it, immediately the impression was one of a sulfur odor,

14   immediately reflecting, to me it was like a burnt smell, you can

15   stop it there.

16         To me it was like a burnt match smell, that's how I

17   reacted to it.  And then as I spent some time in the home, it

18   started to irritate, for me personally, my tongue, but others it

19   irritated in different ways.

20   Q.  And at this point in the animation we've seen the movement of

21   white, a white cloud and arrows, can you explain to the court what

22   we are attempting to depict with that part of the animation?

23   A.  Yes.  The atmosphere in the home is colorless, just like the

24   atmosphere in this room, and so you can't see the gases that are

25   creating the odor and that create the corrosive atmosphere, so the

1    animation endeavors to depict that with the cloud-like illustration

2    there.

3            What's important in the illustration is, it's moving,

4    it's moving because of the ventilation system, it moves because of

5    differences in heat.  Warm air rises, as we all understand that

6    adage, and it's nonuniform because the house is not in a uniform

7    static condition.  That's what we're attempting to illustrate here.

8    And, of course, this particular illustration shows it being

9    returned or drawn back into a louver, which will recycle the air

10   from the house back to the air-handling unit, where it'll be

11   conditioned once more and then redistributed.

12   Q.  How is the movement of air or the movement of gases in a house

13   relevant to the subject of damage from corrosion?

14   A.  It's very important because, as we look at damage in the house,

15   it is not uniform.  Even in one particular house, such as this one,

16   the Morgan residence, as you look at the corrosion, the film

17   thickness varies from receptacle to receptacle, and the tests in

18   the laboratory all demonstrate that.

19           And this has been demonstrated by the Consumer Product

20   Safety Commission work on the 51 homes study, where their coupons

21   showed something in the neighborhood of three to 400 angstroms of

22   corrosion in the 30-day period away from registerers and something

23   in the 12, 1,400 range of angstroms in 30 days near registers.

24           So they showed in their study, as we find in our

25   observations, that it's a nonuniform corrosion simply because the

1   conditions of the house are nonuniform, as we talk later about

2   moisture and temperature and air flows.

3   Q.  You talked about the movement of gases and the effect that that

4   has on corrosion.  What is the relevance of moisture, you just

5   mentioned that?

6   A.  Moisture is critical to the corrosion, and as we've heard from

7   Dr. Streit just a few minutes ago, it's even critical to which

8   gases are formed.  But the moisture is not uniform in the house,

9   for lots of different reasons.  First off, because of the human

10  behavior, do you take a shower, do you cook, do you run the

11  upstairs colder, the downstairs warmer?  Also because of the

12  nonuniform nature of air and filtration, outside air in Virginia in

13  the summertime is above the dew point of the inside air, and so as

14  the outside air leaks in and contacts certain cold surfaces, then

15  you form moisture.  So the moisture is critical to the corrosion

16  and it's critical to its distribution throughout the homes.

17  Q.  Now, Mr. Rutila, when you're referring to moisture, are we

18  talking about steam or puddles or pooled water on the floor?  Is it

19  always visible moisture?

20  A.  No, it's probably seldom visible moisture.  The places where it

21  would be visible is when you condense on a cold water pipe in a

22  bathroom or on a line set returning from an evaporator coil, those

23  will be cold pipes and the moisture will condense and be visibly,

24  visible water droplets on those.

25          But for the most part, it's just moisture, such as in

1   this room, that when it reaches a cold enough surface and there are

2   many cold enough surfaces, microscopic droplets of water form on

3   those surfaces.  And that's really the critical corrosion for the

4   things like copper wire and computers and circuit boards.

5   Q.  And have you prepared some photographs to demonstrate where

6   these conditions can occur in a home?

7   A.  Yes, we have.

8   Q.  All right.  Let's go through those one at a time.  Maybe you

9   can orient the court as to where we are here.

10  A.  This is the Morgan garage and the air handler in the Morgan

11  garage.  Before we move on, I want to point out, the line set is a

12  little bit difficult to see but it leaves the air handler, this is

13  the line set that we talk about right here (INDICATING).  It's

14  bringing the coolant to and from the outside condenser unit.

15  Q.  What is a line set made out of?

16  A.  It's copper tube.  As you heard, it cannot have any joints in

17  it, it has to be a continuous run between the devices to carry that

18  coolant.  And then on the top we have, we've got an evaporator coil

19  and a -- evaporator coil in this region, and we have a fan and

20  control unit up in the top region.  So that's just a basic

21  description of an air handler in the Morgan house.

22  Q.  All right.  Next slide, please.

23          And can you explain the relevance of this to the question

24  of moisture and corrosion?

25  A.  This is a crawl space.  I crawled in under these homes, and

1    it's a critical part of the investigation to understand how this

2    crawl space interacts with the homes.  This air in the crawl space

3    is atmospheric outside air, and as such, the entire perimeter of

4    the building is surrounded by atmospheric air, unlike homes in some

5    places; in New England we have basements, in Florida they're built

6    slab on ground typically.  These homes were built with crawl spaces

7    in the one neighborhood.

8             So this is atmospheric air, this is a line set returning

9    from the second floor air handler down through the crawl space

10   under the house.  And the line set under here is not corroded

11   because it's exposed to atmospheric conditions, not to sulfur gas

12   conditions.  But it continues down underneath the home and then

13   goes up through the first floor, through the second floor into the

14   attic of the home, where it reaches the air handler, and it's

15   corroded in-between those.  And that's the, when we were listening

16   to testimony about line set that has to be replaced, that's the

17   sort of line set that we have in mind.

18   Q.  Next slide, please.

19            And how is this relevant to the question of corrosion?

20   A.  This is a breakfast area, I would call it, of the Morgan home.

21   There used to be a hanging light from the ceiling here, which we'll

22   get to.  But what's important is that this is a diffuser that

23   supplies air to this space, and that air in the summertime is going

24   to be in the 50- to 55-degree range and the outside air dew point

25   is going to be in the 60-degree range.  So any outside air that

1    comes in contact with the surface cooled by that diffuser is going

2    to condense.

3              And so those are electrical receptacles right there.  So

4    if that diffuser blows air on that receptacle, which it will, then

5    in summertime, if there's any air leakage from the outside to that

6    receptacle, which is very commonplace, then you will get

7    condensation on those wires.  It will be microscopic, it won't make

8    a puddle or anything like that, but it will cause that corrosion.

9    And then the same thing when we get to the light fixture up there,

10   we will see the results of that same moisture on that light

11   fixture.  Excuse me.

12   Q.  Next slide, please.

13   A.  This is a second-floor bedroom in the house.  In this instance,

14   the diffuser is up at the ceiling because you'll remember that the

15   air handler is up in the attic of that home.  So this is blowing

16   air down.  Now, the receptacles aren't as close to it, but what

17   will happen is, the cool air will blow on the wall and that creates

18   moisture or microscopic condensation on the drywall from that same

19   outside air.

20             So we can expect moisture here, and we know that moisture

21   and temperature create the conditions that cause the off-gassing.

22   And if there's any furniture located in front of these devices, and

23   the air blows behind that furniture, you will get condensation even

24   at devices like this.  And this is the sort of thing that is a very

25   common source of condensation in residential-type dwellings that we

1    see.

2    Q.  Next slide.

3    A.  This is a slide to orient a little bit more about the HVAC

4    system, has less to do with the condensation other than the fact

5    that this is where air is drawn back into the second floor air

6    handler and then brought, you know, brought into the air handler,

7    brought to the air handler, where it's cooled down, and then it's

8    redistributed into the spaces as that 50- TO 55-degree air.

9             And then it's worth noting when we later on talk about

10   thermostats and devices, that's a location where thermostat devices

11   for the second floor were located.  They had been removed at the

12   time I took this photograph.

13            MR. LEWIS:  Your Honor, for the record, the exhibit

14   numbers for the photographs having to do with condensation that Mr.

15   Rutila has reviewed are P1.1848-007, 008, 012, 031 and 032.

16            And also for the record, the CPSC 51 home study

17   observation that Mr. Rutila made is at that report at P1.0019.0129.

18            THE DEPUTY CLERK:  These have been admitted already?

19            MR. LEWIS:  Yes, they have, I'm sorry, they've all been

20   admitted.

21            Can we advance in the animation to the kitchen sink.

22            THE WITNESS:  Okay.  The animation is as if we're looking

23   underneath the kitchen sink, that was directly to the left of the

24   breakfast area that we saw just a few moments ago.  What we're

25   looking at here are plastic domestic water supply lines, the white

1    are plastic lines, how they were done in this particular house.

2             This is the hot water, it's distributed up through the

3    top here to the sink and down through the bottom through this

4    device, which I'll get to in a moment, to the dishwasher, and then

5    that's a cold waterline.

6             And what we see are copper elements in that.  Even though

7    it's plastic distribution piping, there are copper elements as

8    connectors.  This is a surge device so you don't get that water

9    hammer banging that you get often in old homes, and these are

10   copper and that's what we're seeing here.

11   BY MR. LEWIS:

12   Q.  Mr. Rutila, were you able to evaluate copper plumbing

13   components from these homes in the SGH laboratories?

14   A.  Yes, we did.  And we included several photographs in our

15   reports of these.

16   Q.  I would like to turn to those from your report at P1.2016.0421,

17   22 and 24, and ask you to explain the relevance of this evaluation

18   to the court.

19   A.  Good.  Before we zoom in, this is a shower assembly, hot water,

20   cold water come in and then get pushed out through the top to the

21   showerhead.  And this is another one of those copper surge devices

22   so you don't get the water hammer banging in your plumbing.  And

23   this is a copper assembly that we look at, and I think we can see

24   it here, this corrosion and the solder that we'll look at in a few

25   moments, there's problems.  But what we found when we look at this

1    is, we find pitting corrosion and copper sulfide on these copper

2    devices.

3           I think we can go to the next page now.  You might want

4    to zoom in on the top one or two images.  This is a sink assembly,

5    shop assembled with brazes, which we'll look at a braze in a

6    minute, and this is a pit on such an assembly.  And this is the

7    type of corrosion that is of concern to us.

8           We can go to the next page.  This is a braze and what we

9    found in examination is there's a deep pit at that braze, and that

10   braze is rich in silver and the corrosion went deep into that

11   silver, and I don't remember if we have the next page or not, but

12   if we do it will be worth looking at.

13   Q.  I think we do.

14   A.  Yeah.  Zoom in on this bottom image, if you could.  Thank you.

15          This is an electron microscope image of that deep pit,

16   and you're looking down into that deep canyon, and that's the type

17   of pit that we found in that silver braze on that particular

18   device.  And these, of course, are the type of findings that lead

19   us to the conclusion and that have led others to the conclusion

20   that these copper assemblies have to be removed from the homes.

21   Q.  I would like to move away from the copper pipes in the kitchen

22   to the HVAC system.  And there's been a lot of discussion of coils,

23   and if you could explain to the court, is coils the only concern

24   when you and your engineering group look at HVAC in Chinese drywall

25   homes?

1    A.  No, it wasn't.  It was important to understand the coils, but

2    it was also important to understand the rest of the assembly,

3    because the coils are right below the image here, and if the only

4    thing damaged was the coils, then it would be reasonable to replace

5    the coils and not replace all of this other equipment.

6         What we're looking at here is part of an assembly,

7    really, an integrated assembly.  This is a fan, draws the air from

8    the homes up through the cooling coils and then pushes it back out

9    after it's been cooled to the assembly.  You'll notice the

10   extensive copper wiring in the assembly.  Right where I am pointing

11   with the green arrow is a circuit board, printed circuit board, and

12   a critical device for the control and operation (INDICATING).

13        And then up at the top, you heard Mr. Galler talk about a

14   controller, and that's a controller.  It has, as you learned, it's

15   essentially a higher voltage switch than we have of a light switch

16   that's operated with relays.  And those are key elements, the

17   wiring, the coils, the circuit board, and the line set, as I

18   pointed out earlier, is off here to the side, all of these are key

19   elements.  And this wiring, of course, some of this wiring is

20   control wiring that goes back through the house, through the

21   corrosive atmosphere to the thermostat, which is another element.

22   Q.  All right.  I would like to go through these components of the

23   integrated HVAC system and focus on each one in some detail, if we

24   could have the next slide.

25        Let's start with the coils.  Can you explain to the court

1    whether the multidisciplinary team in this case, in this case

2    corrosion testing labs, was able to do an actual failure analysis

3    of an HVAC coil?

4    A.   Right.   This particular coil was removed, pressure tested, a

5    leak was, a leak location was identified through that pressure

6    testing and then sectioned, and in the section, we find that there

7    is a corrosion pathway right through that silver braze, that is the

8    cause of that particular leak failure on that particular assembly.

9    Q.   And just for the record, that's P1.2001-0057.

10   A.   That's right.   And you can see there.   That's the leak path

11   that was found during the pressure testing of the assembly.

12   Q.   And in your investigation of the seven Virginia homes, were you

13   able to evaluate reports of failed coils in all of the homes?

14   A.   That's right.   We have summarized the fact that all of the

15   seven homes have coil failures, have reported coil failures, and

16   the two control homes have no coil failures.

17   Q.   Could we have the next slide, please.

18              MR. LEWIS:   And, your Honor, for the record, P3.0625,

19   Federal Rules of Evidence 1006 summary, is on the screen.

20   BY MR. LEWIS:

21   Q.   Is this the summary that you're referring to?

22   A.   Yes.   This is the summary of the reports of the failures from

23   the homeowners of the seven Virginia homes.   There's a second page,

24   I don't know if you have it, but a second page with the control

25   homes.   Exactly.   With no similar reported failure.

1   Q.  And in terms of the control homes, were those homes of a

2   similar nature, similar age of construction, similar neighborhoods,

3   to the homes where you studied and documented the failed coils?

4   A.  Yes.  The one at 254 Loch Haven is in the same neighborhood as

5   the Morgan home and the Leach home and several other homes in

6   Williamsburg.  Built at the same time, reportedly by the same

7   builder.  Just without the Chinese drywall.

8           And the Sullivan home, the second home, is literally

9   across the street, it is right across the street from the McKellar

10  home that, and we heard Mr. McKellar testify on Friday.

11  Q.  Looking in more detail at the other components in the coil.

12          THE DEPUTY CLERK:  I don't have these admitted.

13          MR. LEWIS:  I'm sorry, your Honor?

14          THE DEPUTY CLERK:  I don't have these admitted.

15          MR. LEWIS:  All right.  We will correct that after this

16  witness testifies and provide that exhibit to you.

17          THE DEPUTY CLERK:  Are you moving it in?

18          MR. LEWIS:  Yes, we are.

19          MR. SERPE:  May it please the court, I believe 635

20  Mr. Ecuyer is advised me that --

21          THE DEPUTY CLERK:  He said this was 25?

22          MR. SERPE:  We had an earlier version of 625.  We put the

23  wrong version into power point, the exhibit number is P3.635.

24          THE DEPUTY clerk:  What is the correct number of this

25  one?

1          MR. SERPE:  The correct number is P3.0635.

2          THE DEPUTY CLERK:  So it's all ready in?

3          MR. SERPE:  It's in.

4          MR. LEWIS:  Thank you, your Honor.

5          THE COURT:  All right.  Thank you.

6    BY MR. LEWIS:

7    Q.  I want to move to the specific components that you reviewed in

8    general for the court and look at the analysis that's been done.

9    You talked about an air-handling contactor switch at sample No. SGH

10   31.  And if you could explain what a contactor switch is, what it

11   does, and what observations were made in terms of corrosion.

12   A.  I'm happy to.  I actually have the switch with me, your Honor,

13   if it would help to see the device.  I'll step down and grab the

14   box.

15         MR. LEWIS:  Your Honor, for the record, we will ask that

16   that be labeled as Exhibit P1.2063, and during the next break I

17   will put a sticker on that.

18         THE DEPUTY CLERK:  Judge, are we taking this or a photo

19   at the end?

20         THE COURT:  Eventually we will have to have a photo so

21   that we can deal with it by the record.

22         MR. LEWIS:  Your Honor, may we supplement the record with

23   a photo?  Thank You.

24         THE COURT:  Yes.

25         THE WITNESS:  I thought it would be useful to bring this

1  device because it's a name that we're not familiar with.  It looks

2  a lot like a circuit breaker, it's been disassembled, and there are

3  plungers at the top that push on these switches.  And if I hand it

4  to you, you will be able to see, looking down in this location,

5  these same switches, and that's what we refer to as a contactor.

6  It's a name for a switch.

7  BY MR. LEWIS:

8  Q.  In looking at the big screen, did your investigation with

9  Mr. Galler identify corrosion on those switches?

10  A.  That's correct.

11  Q.  All right.  I want to move to the next part of the integrated

12  HVAC system, the circuit board.  And can you explain to the court

13  what is the function here and what findings have been made in terms

14  of corrosion?

15  A.  Yes.  I lost my pointer, excuse me.  This is a resister on a

16  circuit board from the Morgan house, and this has silver -- excuse

17  me, copper sulfide corrosion deposit on a resister, and that's just

18  one example on this particular circuit board.  I actually brought

19  that circuit board as well, because it's, again, the size and shape

20  of it is obscure sometimes.  The actual resister is this tiny thing

21  right here (INDICATING).  That's the actual resister.  And then you

22  can look at the top end as it's facing away and you can see the

23  same corrosion on that wire up at the top of it.

24       The corrosion product in the photograph has been knocked

25  off as part of our investigation, taken off for, as part of the

1    analysis.  But that same circuit board also had a, also has a

2    relay, this is a relay, which is another name for a switch, and it,

3    too, has silver corrosion, just not shown in that particular

4    photograph.  So the particular circuit board from the Morgan house

5    has corrosion on both silver and copper components.

6              MR. LEWIS:  Your Honor, we would like to mark that device

7    as P1.2064 with the court's permission.

8              THE COURT:  All right.

9    BY MR. LEWIS:

10   Q.  Mr. Rutila, I want to talk about the wires and the thermostat

11   for the HVAC and if you were able to obtain laboratory information

12   about the condition of those wires, if we could click ahead to

13   the --

14   A.  That's obviously a connection point for wires, that is a wire

15   from a thermostat and in the laboratory determined that that is

16   copper sulfide.

17   Q.  If we could highlight BDM 16.  This is a sample from the Krantz

18   report.  And could you discuss the relevance of this finding to the

19   integrated HVAC system?

20   A.  Right.  This is the corrosion thickness on the wire near the

21   fixture.  It was clamped in and then a few inches away, 10.2

22   micrometers of corrosion product.  And we note that the standard of

23   one -- excuse me -- point one micrometer per year or .3 micrometers

24   in three years is instructive in terms of predicting failures.  And

25   this particular table is Dr. Scully's table, where he used this to

1    predict the failure of devices.  And clearly, this thermostat wire

2    is in excess of that prediction for failure.

3    Q.  All right.  And BDM, do you recognize that as the Morgan

4    household?

5    A.  That's right.  That's the second floor thermostat, I pointed

6    out the location where it had been removed from.  That's the second

7    floor thermostat from the Morgan household.

8    Q.  The next slide on the line set, please.

9           The last component, second to the last to this integrated

10   HVAC system I want to talk about is the line set and ask you to

11   explain what findings have been made in regards to corrosion on the

12   line set.

13   A.  It would be instructive to zoom in on this top left photograph.

14   Because although it's upside down, the important number is the

15   corrosion product thickness of 14.9 micrometers.  That's the

16   corrosion on the line set and it's, again, demonstrating to us the

17   corrosive environment.  Now, the line sets as Mr. Smith testified

18   and as we know, are typically wet because they're cold surfaces and

19   condensation occurs on them.  So this shows that that copper line

20   set was in a corrosive environment and well in excess of the .3

21   micrometers that might have been predicted in some, for some

22   materials.

23   Q.  And the last component of the HVAC that I would like to ask you

24   to explain to the court in terms of how it has operated in Chinese

25   drywall homes is the outdoor compressor.

1    A.  Well, this is an image of an outside compressor unit, and we

2    see the line set coming into the unit and exiting the unit.  And

3    the -- one of the copper tubes is uninsulated because it's warm and

4    the other one is insulated because it is cold.  And the gases cycle

5    through the compressor, compressed cooled somewhat and then pushed

6    back to the inside garage or attic air handler.

7             And this is the device that Lennar, we find, is

8    replacing, because they are learning that these units are as if

9    they are 20 years old, in their words.  They're replacing them

10   because of the short cycling that occurs when the inside air

11   handler fails.

12   Q.  Thank you.  Can we go back to the animation to the outlet

13   segment.

14   A.  This is in the first floor of the Morgan house, not far from

15   the front door.  You can stop it there.  This is an electrical

16   receptacle, we also might call it an outlet.

17            It is worth noting a few elements here.  This particular

18   receptacle has a black or hot coming in and then a black going out,

19   so this is bringing power to the receptacle and then taking power

20   to and another device, likely another receptacle.  And then the

21   same thing, the white wires, the continuity wires, are doing the

22   same thing, one is coming in with the hot and one is taking the

23   power back to another device.

24            And then the ground, the bare ground, and we can see how

25   and we illustrate here the fact that you've got to stuff that six

1    inches of wire in there.

2         And then the gases.  Could you back that up, I should

3    have been pointing out what that was doing.  That's too far, I'm

4    sorry.  When we get the animation there, we can see that it is

5    illustrating as if the gas is going into the receptacle.  But the

6    gas is actually in the cavity, in the space.  And depending on air

7    flow pressures, sometimes it'll be coming in, sometimes it'll be

8    coming in through the cable leads, sometimes it'll be coming

9    in-between the box and the drywall and the cover plate.

10         So it all depends on how the space happens to be

11    pressurized at the precise moment you're imaging it in an

12    animation, but the air flow, we can be sure, comes in from

13    different ways at different times as the building pressure changes.

14         Now, if you run the animation, we will see the corrosion

15    develop.  But we should look at this particular cable right here

16    (INDICATING).  As it corrodes, we imagine that that cable is not as

17    well seated as the one below.  You can see how the cable below is,

18    the head of the screw is, covers much more of the copper than the

19    head of this screw.  This is the type of situation that Dr. Barnett

20    is concerned about, where this corrosion interferes with the

21    continuity of this.

22         Now, this is a white wire, and it's more likely to be a

23    problem if it's a black or hot wire.  But if we've got a hot wire

24    that has this type of corrosion and this imperfection, and these

25    imperfections happen which is why we do things like have ground

1    wires, these imperfections happen, and this sort of imperfection

2    the corrosion added is what leads to the risk of the run-away

3    heating, fire and/or shock.  So, but that's what needed to be

4    pointed out there, both the gas is in the cavity coming from both

5    ways and in the corrosion on a conductor.

6    Q.  And you talked about a ground wire in your discussion.  Can you

7    explain to the court what a ground wire is and what your

8    investigation showed in terms of corrosion on ground wires?

9    A.  Primary purpose of the ground wire is to protect us from

10   electrical shock.  If the hot wire comes disconnected or otherwise

11   forms a short, that ground wire will conduct that current back to

12   the -- or if the white forms a short, the ground wire will conduct

13   that current back to the breaker, that breaker will sense the

14   overload and stop the current.

15            So the ground wire is critical for safety.  If we don't

16   have a ground wire and we get certain shorts, then the power will

17   be there ready for someone like myself to touch the receptacle and

18   then get a shock.  And that shock can be fatal, and that's really

19   the primary purpose of a ground wire is to protect us from that

20   electrical shock.

21   Q.  And what is the relevance to your analysis of corrosion when it

22   is seen or observed on a ground wire?

23   A.  Well, the concern and the risk with the ground wire corrosion

24   is that it creates an increased risk that the ground wire will not

25   function as intended.  And so that when we need a ground to protect

1    us from a shock, we'll have too much resistance there, and either

2    the ground wire with too much resistance will increase the heating

3    and create a greater risk of fire or will fail to protect us from

4    that electrical shock.

5    Q.  Mr. Rutila, in the Virginia homes that you inspected, did you

6    determine if the ground wire was covered by a sheathing or plastic?

7    A.  Inside the receptacles, this is an accurate representation,

8    inside the receptacles it is not covered and this is normal for

9    type NM cable; outside the receptacle we can see at the top of the

10   image where the PVC jacket of the cable enters the box and then

11   gets stripped away.  So it's covered outside the box with that PVC

12   outer jacket.  Inside the receptacle it's not covered.

13   Q.  And did you bring an example of that type of jacket that you

14   could explain to the court today?

15   A.  I did.  I brought two, we don't need both of them, but I just

16   wanted to explain that some are yellow and some are white.  And the

17   color doesn't matter.  The yellow is a particular type of plastic

18   that is more slippery and easier for the workers to pull through

19   the studs.  The more common wire -- it's tangled now -- the more

20   common wire is this, this happens to be a Romex brand.  Romex is

21   like Kleenex, it's a name brand.  This one happens to carry that

22   name brand.

23        And it carries in it, as we've seen from photographs, a

24   white conductor, a black conductor and a copper ground that is

25   covered with paper but not the plastic inside.  And then this outer

1  PVC jacket.  And we can see reading it, it tells us the important

2  information, this particular is a 14 gauge ground, 14 gauge wire

3  with ground, and it's a type NM cable, and that's all embossed into

4  it.  If you please.

5            THE COURT:  Thank you.

6            MR. LEWIS:  Your Honor, I ask that we can mark that as

7  P1.2065.

8            THE COURT:  All right.  But this is a demonstrative, it's

9  not going to be part of the record.

10           MR. LEWIS:  All right.  Thank you.

11           THE COURT:  Okay.

12 BY MR. LEWIS:

13 Q.  Mr. Rutila, in the SGH laboratory, were you able to look under

14 that Romex cable and determine if there was corrosion under the

15 jacket on the ground wire?

16 A.  Yes.  A sample from the Morgan house in-between two

17 receptacles, the receptacles about ten feet apart or so,

18 in-between, a section of the cable was removed and the outer PVC

19 jacket stripped away and the copper ground wire underneath that

20 showed the corrosion, the copper sulfide corrosion.

21 Q.  I would like to talk about the other kind of wires, other than

22 the Romex that you were able to evaluate in the home.

23           MR. LEWIS:  Your Honor, with the court's permission, I

24 would like to hand the Baldwin lamp to the witness and ask him to

25 explain other kinds of wire.

```
 1              THE COURT:  Okay.

 2              MR. LEWIS:  Thank you.

 3              THE COURT:  Counsel, we have to stop at 12 o'clock, so

 4   let's get to a point where you're comfortable.

 5              MR. LEWIS:  All right.  Thank you, your Honor.  Your

 6   Honor, may I ask Mr. Baldwin at this point to identify this is his

 7   lamp, this lamp which is subject to his testimony this afternoon

 8   will be confirmed.

 9              THE COURT:  All right.

10              MR. LEWIS:  Mr. Baldwin, is this a lamp from your home?

11              MR. BALDWIN:  It is.

12              MR. LEWIS:  And where was it located in the home?

13              MR. BALDWIN:  First floor room that we call our office.

14              MR. LEWIS:  Thank you.

15   BY MR. LEWIS:

16   Q.  Mr. Rutila, in terms of an evaluation of corrosion on wires,

17   can you explain to the court using this demonstrative what

18   questions you would ask when presented with this and how you would

19   evaluate it in the laboratory?

20   A.  Yes.  Nothing unusual about the lamp in general, but from our

21   experience with these homes, quickly go to and look at this cable.

22   And we can see the wire has a black appearance underneath the

23   plastic jacket, it's a translucent, semi-transparent jacket.  And

24   we can also see that the wire has striping on it.  So it has a

25   strong appearance of corrosion.
```

1        In and of itself, that's not proof of corrosion but it

2   has the appearance.  The other thing that we do is, looking in the

3   bottom, we can see that the wire inside the ceramic base has no

4   apparent corrosion on it.

5        THE COURT:  Let me see.

6        THE WITNESS:  SO you can see both the striping -- so that

7   examination visually creates a strong hypothesis that this is

8   corrosion, knowing that it's from a house with Chinese drywall,

9   where we've seen and verified other copper sulfide corrosion, it

10  would be, the next thing would be to take it to our laboratory or

11  take it to a laboratory if someone else were to do it, section the

12  wire, look at the corrosion product, both in terms of the thickness

13  of corrosion product, and also then confirm that the corrosion

14  product is copper sulfide, that's what we would do.

15  BY MR. LEWIS:

16  Q.  Thank you.

17       The court has seen an explanation of the lamp in the

18  Baldwin home, in the Morgan home, BDM-5, which is on the screen.

19  Is this a similar type of wire to the wire that you've just handed

20  and explained to the judge what the issues are?

21  A.  Yes.  It's a very similar wire, plastic jacket that's somewhat

22  transparent with a multiple strand, two-conductor cable.  And we've

23  seen the corrosion on that has been verified, this one hasn't yet

24  been taken apart.

25  Q.  Mr. Rutila, you mentioned that the NM cable was a type of wire,

1   I believe under the Romex, that you observed in these homes, is

2   that type of wire adequate for an industrial corrosive environment?

3   A.  Type NM is not adequate for a corrosive environment.  Now, I

4   want to clarify a bit of your question, though.  This entire

5   assembly is type NM wire.  It's not the copper underneath or

6   anything else, it's the entire assembly.  The corrosive environment

7   wire has a plastic jacket, which is intended to provide greater

8   corrosion resistance.  So it's the entire assembly is the type NM

9   cable.

10  Q.  And is that assembly adequate for severe industrial environment

11  in terms of a corrosion classification?

12  A.  Type NM cable is not appropriate for a corrosive environment,

13  in this instance, an environment that would be classified as a

14  severe corrosive industrial environment.  Those are obviously

15  homes.

16  Q.  And when you say it's not adequate for that environment, based

17  on what in terms of, is it a code section, is it an industry

18  standard, how do you evaluate that?

19  A.  Sure.  The building code is very clear that type NM cable is

20  not suited for a corrosive environment.  And these are corrosive

21  environments, and that is the, that's why it's not suitable.  It is

22  subject to the damage that we see, and as such, all of the years of

23  experience that we have with electrical wiring in single-family

24  homes doesn't take into account what happens with improper cable in

25  a corrosive environment in a residential home.  We have no

1   experience with that.  That's why it's not suitable.

2   Q.  In terms of your evaluation of the ground wires and the

3   lamp-type wires, did you look at the question of whether these

4   corrosive materials on the wires could be cleaned and these, this

5   electrical equipment could be back -- I'm sorry.  And this

6   electrical equipment could be put back into service after cleaning?

7   A.  Well, it certainly in theory can be cleaned.  The method of

8   cleaning hasn't been established by myself or anyone else.  But

9   clearly, the surface corrosion deposit can be removed.  The real

10  problems with cleaning, though, are cleaning out the pits, we don't

11  know how to do that, I'm convinced that technologically we could

12  figure out a way, and then dealing with the fact that the cable

13  itself is damaged.  And that part, we can't undo that damage, and

14  that's the part that, it doesn't matter if you can clean it

15  superficially, you still have the stuff in the pits which we don't

16  know how to clean yet and don't know if there's a practical method.

17  And we have the damage, which is not tolerable.

18  Q.  In terms of the corrosive residues that Dr. Barnett testified,

19  is there any code section that gives guidance that corrosive

20  residues on wire in homes can be cleaned and put back into service

21  in homes?

22  A.  No.  Such an operation is simply not contemplated by the code.

23  The code simply would require it to be replaced.

24       MR. LEWIS:  Your Honor, this would be a good time to

25  break.

```
1          THE COURT:  Okay.  We'll break here and come back at
2    1:45.  The court will stand in recess until 1:45.
3          THE DEPUTY CLERK:  Everyone rise.
4       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)
5
6                    *  *  *  *  *  *
7
8                    REPORTER'S CERTIFICATE
9
10     I, Karen A. Ibos, CCR, Official Court Reporter, United States
11   District Court, Eastern District of Louisiana, do hereby certify
12   that the foregoing is a true and correct transcript, to the best of
13   my ability and understanding, from the record of the proceedings in
14   the above-entitled and numbered matter.
15
16
17                    _____
18                    Karen A. Ibos, CCR, RPR, CRR
19                    Official Court Reporter
20
21
22
23
24
25
```

DAILY COPY