1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

IN RE:  CHINESE MANUFACTURED DRYWALL      *
5          PRODUCTS LIABILITY LITIGATION    *
                                            *
6                                           *
**THIS DOCUMENT RELATES TO:**               *   MDL No. 2047
7                                           *
Michelle Germano, *et al*                   *   Section L
8                                           *
        versus                              *   New Orleans, Louisiana
9                                           *
Taishan Gypsum Co., Ltd., f/k/a             *   February 22, 2010
10   Shandong Taihe Dongxin Co., Ltd.,      *
*et al*                                      *
11                                          *
Case No. 09-CV-6687                         *
12                                          *
*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

13

14

15          VOLUME II - AFTERNOON SESSION
              PROCEEDINGS BEFORE THE
              HONORABLE ELDON E. FALLON
16          UNITED STATES DISTRICT JUDGE

17

18   <u>APPEARANCES</u>:

19

For Plaintiffs and          Herman, Herman, Katz & Cotlar, LLP
20   Intervenors:            BY:  RUSS M. HERMAN, ESQ.
                                  STEPHEN J. HERMAN, ESQ.
21                           820 O'Keefe Avenue
                             New Orleans, Louisiana 70113
22

23   For Plaintiffs and      Gainsburgh Benjamin David
     Intervenors:               Meunier & Warshauer
24                           BY:  GERALD E. MEUNIER, ESQ.
                                  MICHAEL J. ECUYER, ESQ.
25                           1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163

1    <u>APPEARANCES</u>:

2

3    For Plaintiffs and          Law Offices of Richard J. Serpe, PC
     Intervenors:                BY:  RICHARD J. SERPE, ESQ.
                                 580 East Main Street, Suite 310
4                                Norfolk, Virginia 23510

5

6    For Plaintiffs and          Seeger Weiss
     Intervenors:                BY:  CHRISTOPHER A. SEEGER, ESQ.
                                 One William Street
7                                New York, New York 10004

8

9    For Plaintiffs and          Lewis & Roberts, PLLC
     Intervenors:                BY:  DANIEL K. BRYSON, ESQ.
                                 3700 Glenwood Avenue, Suite 410
10                               Raleigh, North Carolina 27612

11   For Plaintiffs and          Hausfeld, LLP
     Intervenors:                BY:  RICHARD S. LEWIS, ESQ.
12                               1700 K Street N.W., Suite 650
                                 Washington, DC 20006

13

14   For Mitchell Company,       Cunningham Bounds, LLC
     Inc.:                       BY:  STEVEN L. NICHOLAS, ESQ.
15                               1601 Dauphin Street
                                 Mobile, Alabama 36604

16

17   For Knauf Plasterboard      Baker & McKenzie, LLP
     Tianjin Co., Ltd.:          BY:  DONALD HAYDEN, ESQ.
18                               1111 Brickell Avenue, Suite 1700
                                 Miami, Florida 33131

19

20   Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, Room HB-406
21                               New Orleans, Louisiana 70130
                                 (504) 589-7778

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

DAILY COPY

1                          I N D E X

2                                                    PAGE

3

4    Dean Rutila
          Direct Examination                          4

5

6    Jerry Baldwin
          Direct Examination                          31

7

8    Sandy Sharp (Deposition Excerpt)                 39

9    Cathy Leach
          Direct Examination                          43

10

11   Joseph Leach
          Direct Examination                          43

12

13   Lisa Orlando
          Direct Examination                          53

14

15   Ronald Wright
          Voir Dire                                   62

16        Direct Examination                          65

17

18

19

20

21

22

23

24

25

                          DAILY COPY

1                     **AFTERNOON SESSION**

2                     **(February 22, 2010)**

3          **THE DEPUTY CLERK:**  Everyone rise.

4          **THE COURT:**  Be seated, please.

5             You're still under oath, sir.  You may proceed,

6 Counsel.

7             (WHEREUPON **Dean Rutila**, having been duly sworn,

8 testified as follows.)

9                   **DIRECT EXAMINATION**

10 **BY MR. LEWIS:**

11 **Q.**  Good afternoon, Mr. Rutila.

12 **A.**  Good afternoon.

13 **Q.**  Mr. Rutila, this morning I asked you if the wire with a

14 corrosive residue could be cleaned.  Do you recall that

15 question?

16 **A.**  I do.

17 **Q.**  Counsel has asked me to ask you to further explain your

18 answer.  I didn't follow up.  Could you explain your answer to

19 that question, please.

20 **A.**  The wire in the home, there's no practical way to clean it

21 in the home, and that's really the answer I should have given.

22 I did not say it as clearly as that.

23 **Q.**  Thank you.  I would like to proceed with P1.1841.001.

24 Mr. Rutila, in your work in this case, did you consider

25 government documents relating to the Chinese drywall problem

1   such as the State of Florida health department case definition

2   for drywall-associated corrosion in residences?

3   **A.**   Yes, we did.

4   **Q.**   Did you review the criteria that are set forth in that

5   document?

6   **A.**   Yes.

7   **Q.**   Can you review briefly for the Court the nature of the

8   criteria and the nature of the use of the criteria.

9   **A.**   There's two criteria.  On really a screening criteria,

10   Florida calls it sentinel indicators as a screening device.

11   Then there's also the criteria for scientific proof.  We, of

12   course, considered both of them in our work.

13   **Q.**   When you applied those criteria to the seven homes in

14   Virginia that you were able to inspect and do laboratory work

15   on samples from, what conclusion did you reach?

16   **A.**   That the seven homes meet the criteria by the Florida

17   definition for having Chinese drywall problems.

18   **Q.**   What is the unit of study or the unit of analysis that the

19   Florida case definition is directed to?

20        Let me try that again.  Is the purpose of the Florida

21   case definition to make a determination about a house, a group

22   of houses, a room in the house?  What is the unit of

23   determination?

24   **A.**   I see.  The Florida criteria is intended to define whether

25   a home has Chinese drywall problems.  That's the unit.  The

DAILY COPY

 1   unit is a home, a building.

 2              THE COURT:  Is it one sheet or more than one sheet?

 3              THE WITNESS:  The case definition does not

 4   distinguish.  It is a "yes" or "no," you have problems in this

 5   home due to Chinese drywall or you do not.

 6   BY MR. LEWIS:

 7   Q.   Did you also review the recent Consumer Product Safety

 8   Commission criteria for making these types of judgments?

 9   A.   I did.

10              MR. LEWIS:  Could we have that slide, please.

11   BY MR. LEWIS:

12   Q.   Now, the Consumer Product Safety Commission -- if we can

13   blow up the top half -- published a document called "The

14   Interim Guidance identification of Homes with Corrosion from

15   Problem Drywall."  Have you had a chance to review that?

16   A.   I have.

17   Q.   Can you explain to the Court what this is.

18   A.   Similar to the Florida document, it is a document intended

19   to provide guidance for identifying when there is problems in a

20   home, particularly corrosion problems, as a result of drywall.

21              It really has two steps:  First off, an indicator

22   that you likely have problems, and that includes some visual;

23   and then scientific evidence for demonstrating that it is

24   there.  They use the word *threshold* and *corroborating*.

25   Q.   Were you able to apply these criteria from the CPSC

DAILY COPY

1  interim guidance document to the data on the seven homes in

2  Virginia; and if so, what did you conclude?

3  **A.**   Yes.  They have six criteria that they call corroborating

4  evidence in step 2, and four of them have to be met.  The homes

5  in Virginia meet all six of them.

6  **Q.**   All right.  I would like to focus on the threshold

7  inspection criteria for the CPSC.  Does the CPSC consider

8  visual inspection, not inspection with a microscope but visual

9  inspection, of corrosion on wires in their interim guidance

10  protocol?

11  **A.**   Yes.  Only in the threshold stage, not in the second

12  stage.  In the first stage of the threshold stage, they

13  considered visual inspection.

14  **Q.**   So when the CPSC looks at confirmatory or corroborating

15  evidence, do they say anything about visual inspection with the

16  naked eye of a corroded wire?

17  **A.**   No.  It's a laboratory confirmation.

18  **Q.**   Going back to that description of the visual inspection

19  for a threshold criteria, is there anywhere in the CPSC

20  guidance where the CPSC indicates it would be appropriate to

21  use that threshold visual look at a wire for the purpose of

22  deciding what boards in the home are Chinese drywall on a

23  board-by-board basis?

24  **A.**   No.  That's completely outside of the scope of the intent

25  of the document.  The document is intended to identify a home

1    with the problem.

2    **Q.**    All right.  If we can go back to the Florida document, I

3    really have a similar question.  The Florida document does

4    mention in their screening criteria the use of -- we need to go

5    back -- a visual look, without a microscope, at corrosion on a

6    wire in their first criteria, No. 3.  Do you see that?

7    **A.**    I do.  They call that sentinel indicators.

8    **Q.**    They do talk about looking at a wire or an HVAC and seeing

9    corrosion; correct?

10   **A.**    That's correct.

11   **Q.**    Now, is there anything in the Florida case definition that

12   says that that tool, using the naked eye to look at a wire, is

13   a tool that can be used for the purpose of selectively

14   identifying Chinese drywall on a board-by-board basis?

15   **A.**    No.  It's not the intent of the document.  The document is

16   intended to identify a home with a problem, and it couldn't

17   work that way.

18        **THE COURT:**  Well, isn't the purpose of it, though, to

19   identify the effects of drywall and not the presence of

20   drywall?  I mean, isn't that what you're looking for with

21   inspection?  I mean, you're looking for the effects of drywall,

22   aren't you?

23        **THE WITNESS:**  That's correct.  You're looking for

24   confirmatory evidence that there is a problem induced by the

25   drywall.

1  BY MR. LEWIS:

2  Q.    Mr. Rutila, have you prepared a slide to summarize your

3  opinions about the potential use of a visual corrosion grading

4  scale for the purpose of selectively identifying Chinese

5  drywall boards?

6  A.    Yes, I have.  It's six opinions that you just put up.

7  Q.    Can you, as succinctly as possible, review those for the

8  Court, please.

9  A.    First off, the CPSC and FDOH intend it as a screening tool

10  for the house, not for a board-by-board determination.  There

11  is no government or peer-reviewed method endorsed for a

12  board-by-board method of the criteria or any criteria.

13          A visual identification would assume incorrectly that

14  there are only local effects of the corrosive gases, and that's

15  not the case.  The gases are dispersive.  They don't just

16  affect locally to a board.

17          There's no available receptacle hole in so many of

18  the walls.  We think of closets we saw, ceilings, or just many

19  boards up near the ceiling.  They don't have receptacles that

20  would allow you to use a local method even if one existed.

21          It's impractical to determine where the boards are

22  without taking the house apart.  Fundamentally, you can't

23  guarantee, as a designer or as a builder, that you have removed

24  the problem by a board-by-board method.  The same thing is true

25  of a representation to a building code official that you have,

1    in fact, remedied the problem, and you can't do it by that

2    method.

3    **Q.**   Mr. Rutila, in your investigation and review of documents

4    in this case, other than the seven homes that you inspected in

5    Virginia and the two control homes, have you had occasion to

6    review other data about homes with Taishan drywall in Virginia?

7    **A.**   Yes.  There are approximately 60 homes, including the

8    seven represented here today, that we have reviewed documents

9    relative to.

10   **Q.**   Have you reviewed a summary of the information from

11   inspection of those homes in terms of putting it forward in a

12   summary slide?

13   **A.**   Yes.  Yes, I have.

14          **MR. LEWIS:**  Can I have that demonstrative, please.

15   If you could just blow up the top of it.

16   **BY MR. LEWIS:**

17   **Q.**   If you could explain to the Court the nature of the

18   information that you have summarized here and what it tells you

19   about these other Virginia homes that have Chinese drywall.

20   **A.**   This is a list of 60 homes:  Seven of whom are represented

21   here in person today, three other homes that we have visited,

22   and then the balance.

23          This is a screening having been done by the PSC and

24   their scientists to first go through a step-by-step process

25   getting to the point of being able to confirm that these homes

1    have Chinese drywall.  Because of the way it's cut and pasted

2    here, it's a little difficult to follow, but it starts with an

3    inspector noting just odor; taking photographic evidence of the

4    AC coil, photographic evidence of electrical corrosion; then a

5    laboratory confirmation of the corrosion, laboratory

6    confirmation both on the HVAC coil and the electrical;

7    laboratory confirmation that the drywall has elevated

8    strontium -- that's not a field test, that's a laboratory

9    test -- record confirmation that the Venture Taishan drywall

10   was delivered, the number of sheets from those records; and

11   then the aging test results is an off-gassing study of putting

12   a sample of metal in a container with the drywall and

13   confirming that the corrosion exists, that corrosion is caused

14   by that.

15          So all of those things have been for these 60 homes.

16   Most of the testing has been done.  You can see some of them

17   still say "pending," but it demonstrates that -- in addition to

18   the seven homes of the homeowners here today, this is a list of

19   60 total in the Virginia area with a similar problem.

20   Q.   I would like to look at the evaluation that SGH did of

21   appliances and consumer electronics in their work in this case,

22   and I have put up Appendix 1 from your December 30 report.

23   Could you explain to the Court what kind of evaluation SGH did

24   of appliances, consumer electronics, and the issue of corrosion

25   damage.

1    **A.**    Yes.  The slide presented shows a list of, again, what the

2    homeowners reported in terms of what failed.  It's difficult to

3    read from where anybody sits, but a microwave oven, a

4    refrigerator, a computer, clothes dryer, television, more

5    computers, dehumidifiers, failed devices in these homes.

6              These devices we did not examine, but we did collect

7    other devices from these homeowners and did examine them,

8    dozens and dozens of devices.  We took apart computers,

9    hairdryers, coffee makers, virtually any kind of appliance you

10   would imagine -- the dryer that we heard about earlier today --

11   and examined them and identified the same corrosion and the

12   same silver sulfide or copper sulfide corrosion on these

13   devices.

14   **Q.**    Did you present the results from that investigation in

15   your supplemental report of January 18, Appendix 3?

16   **A.**    That's correct.  That's correct.  That is information

17   presented therein.

18   **Q.**    Thank you.  I would like to look at one example of that

19   analysis, and that would be certain parts of the refrigerator

20   in the McKellar home compared to the control home across the

21   street, the Sullivan home, and ask you to explain that

22   evaluation to the Court.

23   **A.**    Okay.  The images you see are general.  If we just go down

24   to the bottom, we can get right to the bottom of it.  These are

25   images of components taken out of the refrigerator, and you can

1    see the corrosion in that image, particularly near that braise

2    where there is a great deal of corrosion on it, as well as at

3    the arrow there where there's copper sulfide corrosion.  So

4    this is the kind of condition that we found in the laboratory.

5            The next page shows, before the laboratory analysis,

6    more general views of the McKellar one right in the middle, if

7    we can go there.  This is before it's disassembled.  Again, you

8    can see the black silver sulfide on the copper tubes as part of

9    the refrigerator.

10           Now, if you illustrate both the bottom two images at

11   the same time, this is a comparison with the refrigerator from

12   McKellar before it was disassembled, and you can see the same

13   image.

14           Then directly below it is the Sullivan refrigerator,

15   exact same make and model, right across the street, built about

16   the same time and occupied about the same time, and the

17   difference between the copper tubing on the two refrigerators

18   is remarkable.  We stood in more or less the same spot relative

19   to the device and took the two photographs, and the one is what

20   you would expect:  Nice, bright, shiny copper in the Sullivan

21   house across the street; and then the corroded copper at the

22   McKellar house.

23           **THE COURT:**  Let me ask you.  In your inspections in

24   the houses where you have the drywall, as opposed to the houses

25   without the drywall, are the only effects the effects on copper

DAILY COPY

1   and silver?  I mean, I'm not talking about the smell or the

2   odor.  Copper and silver.

3           **THE WITNESS:**  It's a great question.  In general, the

4   answer is yes.  Besides the odor, you know, we looked at wood

5   because sulfur gases are known to deteriorate wood.  We looked

6   at the studs.  We looked at galvanized steel.  We looked at the

7   nails and the screws that are used to hold the building

8   together.  We looked at the plywood.  We looked at all these

9   elements.  We looked at the concrete foundation.  Because if

10  those things were damaged by the sulfur gases, then the houses

11  would be unrepairable.  It was a critical question, and the

12  things that we found damaged are the copper-bearing elements

13  and the silver.

14  **BY MR. LEWIS:**

15  **Q.**   Can we click to the --

16  **A.**   The next page, please.

17  **Q.**   -- final slide on the comparison.

18  **A.**   Right, just the bottom two images on that one.

19          Another area of the same two devices, again photo 7

20  and photo 8, top and bottom, comparing the McKellar

21  refrigerator and the Sullivan refrigerator.  Again,

22  night-and-day stark differences for two devices in otherwise

23  nearly identical homes, nearly identical construction, nearly

24  identical time.

25          These are just examples.  Most of the other things in

1    the appendix referred to a few minutes ago are electrical

2    examples, but this is pretty remarkable.

3          THE COURT:  Just following up on what you said about

4    the copper and the silver, your concern about those two metals

5    is that you're finding corrosive effects on it, and you're

6    attributing that to silver sulfide and copper sulfide?

7          THE WITNESS:  The silver sulfide and copper sulfide

8    are the corrosion product.  You attribute the damage to the

9    sulfur gases, exactly, and that's what's causing those

10   deposits.

11   BY MR. LEWIS:

12   Q.   Mr. Rutila, was there any evaluation, in your lab or in

13   other labs among the multidisciplinary team, of sorbent

14   materials or of PVC piping that you had a chance to review from

15   Chinese drywall houses?

16   A.   Yes, we did.  PVC plumbing is a common one.  The PVC wire

17   is another one.  So we did some work, and others did as well.

18   Q.   Did you determine if the sulfur gases had any effect on

19   those materials?

20   A.   The only one that we found an effect on is the copper

21   electrical wiring, where there was enough penetration through

22   the PVC to actually corrode the ground wire, but that was the

23   only effect.

24         THE COURT:  The PVC will not inhibit it, but it will

25   not deteriorate as a result of exposure?

1      **THE WITNESS:**  The PVC electrical wire is permeable

2   enough.  It hasn't been proven one way or another whether PVC

3   drainpipe would allow it to pass or not, but there's been no

4   ill effects associated with it.

5   **BY MR. LEWIS:**

6   **Q.**   In the analysis, was it determined that the sulfur gases

7   can penetrate the PVC material and, when that material is

8   covering a wire, reach the wire and cause corrosion?

9   **A.**   That's correct.  That's exactly my point.

10  **Q.**   I'd like to turn to this concept of a mixed home.  You

11  have used that word in explaining some of the problems to us.

12  If you could explain that concept to the Court, please.

13  **A.**   Many homes have a mixture of Chinese and domestic drywall.

14  Some of the homes, the mixture is very defined to the garage as

15  being domestic and the rest of the house being Chinese.

16      Some homes, it's not so clear; homes have a mixture

17  throughout them, either primarily on one floor or primarily on

18  another floor, with occasionally intermittent pieces.  Those

19  have been a challenge for us to understand those and understand

20  the damage in those homes.

21  **Q.**   I would like to ask you, using as an example the Baldwin

22  home, to let -- to ask you to evaluate the kinds of information

23  available to you to determine whether or not a home is a mixed

24  home; and, if so, if there's any way to understand where the

25  Chinese drywall is in the home.

1            I would like to start with P1.2028-0047, 0048, two

2    pages.  If we could highlight the relevant section of this, if

3    you can explain to the Court the information in this record

4    that bears on the question of a mixed home.

5    **A.**   Very well.  This is the delivery record from Venture, and

6    it tells us quite a few things.  What's been highlighted is the

7    record that 77 pieces of 1/2-inch, 4-foot-by-12-foot Chinese

8    drywall was delivered, according to this record, to the Baldwin

9    home.  The sheet right above that, where it says, "Drywall:

10   Gold Bond," that's domestic drywall.

11           So, in that instance, the record shows 151 of

12   domestic and 77 of the Chinese, and then the record goes on

13   with other pieces of drywall as well.

14           **THE COURT:**  Did you test the domestic?

15           **THE WITNESS:**  Yes, sir.

16           **THE COURT:**  And you tested the Chinese drywall?

17           **THE WITNESS:**  Yes, sir.

18           **THE COURT:**  What's the component in each of them?

19   Are you having gypsum in both of them?

20           **THE WITNESS:**  Yes, both of them are gypsum.

21               The significant difference that we see is that

22   the Venture drywall has a fairly significant percentage of a

23   very fine limestone sand in it, almost dust-like sand.  That

24   sand, when we look at it -- and this is all presented in our

25   December report.  When you look at that sand, you find that

1    there's elemental sulfur, just little pieces -- again, the dust
2    is small, but elemental sulfur in that limestone sand.  That's
3    what we see in our laboratory.
4                     Then what we also get from other investigators
5    is that they find chemically that there is this sulfur in the
6    drywall.  The two observations, the chemistry and the
7    microscopic observation, correspond with each other; they make
8    sense.
9                     **THE COURT:**  Do you have any sulfur in the domestic?
10                    **THE WITNESS:**  Well, gypsum is, of course, composed
11   with a lot of chemically bound sulfur, but we don't find that
12   same either chemically -- the chemical research finds none of
13   that elemental sulfur in it that's not bound with the calcium.
14   Then, microscopically, we don't find that sand, and any sand
15   that we do have doesn't have the elemental sulfur.
16                    So that's what we see as the significant
17   difference, and that's, I think, why the CPSC and others use
18   the test for elemental sulfur as one of the important criteria.
19   **BY MR. LEWIS:**
20   **Q.**   Mr. Rutila, as part of the multidisciplinary team, did you
21   have occasion to meet with and review data with Dr. Lori
22   Streit, one of the chemists in the case?
23   **A.**   Yes, I did.  We didn't meet face-to-face.  We met over the
24   telephone many times.
25   **Q.**   All right.  Are you familiar with her data where she

1    showed off-gassing in the Chinese drywall and was able to

2    compare it -- off-gassing of hydrogen sulfide, carbonyl

3    sulfide, and was able to compare it with non-Chinese drywall?

4    **A.**   Yes.  We also reviewed that data and refer to it in our

5    December reports.

6    **Q.**   Now, in terms of this installation record, can we go to

7    the second page and look at the information in this record

8    relevant to where in the house this record indicates the

9    Chinese drywall is used.

10   **A.**   Right.  This record you have illuminated with the yellow

11   indicates that the 77 boards are put on the first floor, the 77

12   Chinese drywall are on the first floor; and that the second

13   floor has 86 boards of domestic, the Gold Bond.  The "GB"

14   stands for the domestic drywall.

15           That's what the record shows here.  What this is is a

16   stocking record so that when the delivery man brings out the

17   truck, he or she might know that the drywall is supposed to go

18   to different places.  That's what this is.

19   **Q.**   Now, based on your evaluation of these homes, were you

20   able to determine if this kind of a delivery record is a

21   reliable tool for the purpose of knowing specifically where in

22   the home the Chinese drywall is used?

23   **A.**   No, it's not a reliable tool.  It seems to be useful in

24   determining whether there is a mix of boards, but it's not

25   reliable in terms of determining where the corrosion will

1    occur.  We haven't had the luxury of taking a home and taking

2    every piece out to know that -- you know, what kind of errors

3    there are in this, but what we do know is that we find errors

4    and that we find corrosion even where there is no Chinese

5    drywall listed on the records.

6    **Q.**    So in this particular home, the Baldwin home, where the

7    installation record indicates no Chinese drywall on the second

8    floor, were you able to evaluate that second floor, for

9    example, for effects of corrosion?

10   **A.**    Yes, we did.  We did evaluate it.  The attic air handler

11   that services the second floor is severely corroded.  We found

12   corrosion in light switches on the second floor.

13          We did look at the drywall.  We did not find a

14   Chinese board on the second floor, but we didn't examine every

15   board either.

16          **MR. LEWIS:**  Can we enlarge the HVAC system from the

17   second-floor attic of the Baldwin home.

18   **BY MR. LEWIS:**

19   **Q.**    This is from the Perricone report, this particular

20   photograph.  What does this show?

21   **A.**    Yes, I have reviewed that report, and this shows the coil

22   on the second floor.  This is the coil.  It's just two

23   different images of the same coil that is severely corroded.

24   These are copper tubes that are severely corroded in the coil.

25          This air comes from the recirculation of air from the

1   second floor up into this unit, where it's cooled and then

2   pushed back in.  This copper sulfide corrosion demonstrates

3   that there are sulfur gases getting to this unit.

4   **Q.**   You talked about light switches.  I would like to start

5   out with a diagram of the second floor and ask you to orient

6   the Court.  Explain to the Court what this is and how this can

7   be used in evaluating certain electrical equipment from the

8   second floor.

9   **A.**   This is a second-floor plan.  We have overlaid on the

10  second floor the HVAC unit and ductwork.  That's what these

11  various lines that I am highlighting there are, and we will see

12  a little bit more about that in an animation perhaps.

13          There's the stairway down to the first floor.  Then I

14  identify two switches:  JIB23, which is at the top of the

15  stairs; and JIB24, which is in this room that has a water

16  closet and a bathtub.  That small room has a switch.  In those

17  two, we found corrosion on the light switches.

18  **Q.**   All right.  If we could go to the next slide in terms of

19  the sample.  If you could just explain to the Court what we are

20  looking at.

21  **A.**   This is JIB24 from the light switch in that small room, in

22  the bathroom.  I think that's Andrew's hand, if I'm not

23  mistaken, my staff's hand.  He has taken this out, cut the

24  wires, and bagged the sample to bring it back to our

25  laboratory.

1  **Q.**    What floor is the sample JIB24 taken from?

2  **A.**    That's from the second floor in that bathroom.

3  **Q.**    Second floor of the Baldwin home?

4  **A.**    Of the Baldwin home, that's correct.

5  **Q.**    We have the laboratory microphotograph on the next slide.

6  If you can explain that to the Court, please.

7  **A.**    Sure.  This is the contact arm from that light switch.

8  This is the -- one arm is fixed and the other one is movable.

9            This is silver sulfide that has corrosion deposits

10 that have coated the silver that is supposed to be the

11 electrical contact in that switch.  So when you throw the

12 switch, the electricity is supposed to pass through that.  Now

13 the silver sulfide is there, and that is the type of corrosion

14 that is of great concern in terms of creating additional

15 resistance and heating.

16 **Q.**    Have you brought that switch and a switch from a control

17 home with you to explain your opinions today?

18 **A.**    I did.

19            **MR. LEWIS:**  Your Honor, with your permission, it's

20 quite tiny what Mr. Rutila needs to show you.  Can he reach

21 over and point out the features of this sample that are

22 important?

23            **THE COURT:**  Sure.

24            **THE WITNESS:**  So I have just disassembled this and

25 taken the cover off and the rocker switch, and this is what's

1    exposed.  This is the fixed part of the arm.  Then this is the

2    part that moves with the switch.  This is what's in the

3    photograph.  I call your attention to the discoloration.  That

4    should be -- look like a piece of silver.  Instead, it looks

5    like black.

6              Then, by comparison, I brought another switch

7    from the Sullivan home, the so-called control home.  This is a

8    three-way switch, so it has some extra hardware, but you will

9    see that it has, again, the same sort of fixed device -- I've

10   got to take this piece off first -- and then the moving arm.

11   You can see that is what the silver looks like uncorroded.

12   Then, by comparison, it's fairly easy to see side by side the

13   difference between a corroded silver contact and a noncorroded

14   silver contact.

15   **BY MR. LEWIS:**

16   **Q.**   Mr. Rutila, what do you learn from an evaluation of the

17   HVAC on the second floor and the silver switch which is

18   depicted in the photograph from the second floor of the Baldwin

19   home?

20   **A.**   That there are sufficient sulfur gases from Chinese

21   drywall on the second floor to cause corrosion and that the

22   problems that need to be repaired exist there; that is,

23   corroded electrical components, corroded HVAC.  So the line

24   set, for example, from that unit and the wire are corroded in

25   there and need to be remediated.

1    **Q.**   I would like to ask you to explain to the Judge the data

2    we obtained from the defense -- I'm sorry, from intervenor

3    Knauf regarding the use of a color scale on grading corrosion

4    on the second floor of the Baldwin home, and that would be

5    P1.2003-3686.

6    **A.**   This is a floor plan of the second floor of the Baldwin

7    house, very similar to what we showed, and they have -- if you

8    zoom in -- let me give you a good point.  That's a good slot.

9    Thank you.

10            If you zoom in, you can see, using their scheme, that

11   1 is a lesser level of corrosion and 2 is a greater level of

12   corrosion.  So they have gone through and identified -- I would

13   have to see the rest of the document to remember what their

14   scale is, but they have identified on the second floor -- so 1

15   is no visible tarnishing and 2 is sporadic visible tarnishing.

16   So their record shows there is corrosion occurring on the

17   second floor of the Baldwin house.  That's what we can see from

18   this.

19   **Q.**   All right.  I would like to ask you to show a short part

20   of the animation on the Baldwin second floor and ask you to

21   integrate for the Court the HVAC information, the silver switch

22   information, and the color-grading information as it relates to

23   understanding what is happening on the second floor of the

24   Baldwin home as you think about it in terms of repair.

25   **A.**   Very good.  We know that sulfur gases are getting drawn up

1    into the air handler through this return air vent.  Whether

2    they come from the second floor or the first floor, at this

3    point we don't know with any certainty.  What we do know is the

4    gases are there.  The HVAC unit proves that.

5           The gases come up through these return air vents, and

6    then I don't know if it's not running or not, but then they

7    get -- there they go.  The gases get drawn by the fan into the

8    cooling coils and then pushed back out into the rooms.  So any

9    gases get redistributed throughout the house, into the spaces

10   with the, for example, electrical switches.

11          That's what we see from that, and that's what leads

12   us to conclude that, whether there is Chinese drywall on the

13   second floor of Baldwin or not, we have the damage that still

14   requires the removal of the wallboard, the wiring, and the HVAC

15   equipment on that second floor.

16   **Q.**   Mr. Rutila, would you consider excluding the second floor

17   from the repair that you would recommend for the Chinese

18   drywall problems in the Baldwin home?

19   **A.**   No, sir.  That would be completely irresponsible.

20   **Q.**   I want to return briefly to the utility of the delivery

21   records and ask you to look at a different set of records in a

22   different home, and that would be the Nguyen home --

23          **MR. LEWIS:**  Also a Virginia plaintiff but,

24   Your Honor, not one of the seven before the Court.  There was a

25   particular point of information that Mr. Rutila could rely on

DAILY COPY

1    this record to demonstrate the utility of the delivery record.
2    **BY MR. LEWIS:**
3    **Q.**   First, if you could quickly review what this delivery
4    record tells us about the Nguyen home in Virginia.
5    **A.**   It's very similar to the Baldwin; coincidentally, the same
6    77 number.  Drywall:  Venture Supply boards.  So those are
7    Chinese boards.  They say "4-by-2," but they should be 4-by-12.
8    That must just be a typo.  So 77 Chinese drywall boards are
9    shown on this record as being delivered.
10          The second page is where, as we know, the stocking
11   information is.  That's right, the stocking information right
12   there.  It shows the 77 boards for stocking purposes were to go
13   on the first floor.  The second floor, all 140 boards were to
14   be not the Venture Supply boards.  That's what the "VS" stands
15   for right there.
16          So that was what they intended based on this record.
17   That's what this record shows us.
18   **Q.**   That's a similar type of record that you reviewed in the
19   Baldwin case; correct?
20   **A.**   Very much so.
21   **Q.**   Were you able to instruct your engineering staff to look
22   at the second floor of this home and determine if they could
23   obtain any information about the presence of Chinese drywall on
24   the second floor?
25   **A.**   Yes.  Andrew Jeffrey, an engineer on my staff, went to the

1   home and did, in fact, remove drywall and did, in fact, find

2   Chinese drywall on the second floor in that closet.

3   Q.   What was the first way that you were able to determine

4   that the wallboard on the second floor in the closet was, in

5   fact, Chinese?

6   A.   By cutting it and removing it.

7   Q.   If we could blow up what you can see when you removed that

8   board.

9   A.   Venture Supply.  That's what we found in that closet when

10  Andrew had that drywall cut and removed.

11  Q.   This is in the Nguyen home where the installation record

12  indicated no Chinese drywall on the second floor; is that

13  correct?

14  A.   It's not an installation record.  It's a delivery stocking

15  record, and it just plain is wrong.

16  Q.   Were you able to send the sample of the Venture board off

17  to Dr. Streit for analysis to determine if she could gain

18  information about whether it was Chinese and whether it was

19  off-gassing corrosive sulfur gases?

20  A.   Yes, we did.  And she did, in fact, test that board.

21  Q.   Did she report her results to you?

22  A.   Yes, she did.  She found this elemental sulfur and the

23  off-gassing corrosion.

24  Q.   I would like to ask you a final question regarding your

25  opinions in this case and ask you to summarize your conclusions

1  based on the SGH investigation of Chinese drywall in the

2  Virginia homes.

3  **A.**   I put them on this slide.  The Chinese drywall houses have

4  offensive odor and a corrosive environment.  The Chinese

5  drywall houses have excessive corrosion of copper and silver

6  components.  The corrosion is unacceptable from the perspective

7  of life safety and the building code, the mechanical failure of

8  HVAC equipment, and from electrical failure of devices, of

9  consumer devices as well as electrical distribution system.

10  Significant repair and remediation is required.  For practical

11  and scientific reasons, the repair requires the replacement of

12  all drywall, electrical equipment, and all copper and silver

13  components in the houses.

14  **Q.**   Mr. Rutila, I would like to focus on your fifth conclusion

15  and ask you to specifically relate that to what you learned

16  from your experience with interviewing and making observations

17  at the Lennar remediations?

18  **A.**   That's exactly what Lennar is doing at the homes that they

19  were repairing that we visited and that they told us they are

20  doing.

21  **Q.**   In terms of your testimony today and all of the opinions

22  you have expressed, have you expressed those opinions to a

23  reasonable degree of scientific certainty within your field of

24  expertise?

25  **A.**   Yes, I have.

1       **MR. LEWIS:**  Thank you, Mr. Rutila.

2               Your Honor, any further questions?

3       **THE COURT:**  You mentioned the presence of strontium,

4   high levels of strontium, in the Chinese drywall.  What effect

5   does that have?

6       **THE WITNESS:**  We don't believe that it is anything

7   other than a mining or manufacturing artifact; that is, the

8   sources of materials that are used in manufacturing the Chinese

9   drywall leave that as an artifact, that it's not actually the

10  cause of the problem.  That's what all the research that I have

11  read indicates to us today.  It's a useful fingerprint, if you

12  will, put on by a manufacturing process, but it is not the

13  cause of the sulfur off-gassing or the corrosion in the homes.

14      **THE COURT:**  Do you have any opinion as to whether the

15  sulfur was in the gypsum as it was mined, or did it deteriorate

16  in transit or deteriorate after installation or what?

17      **THE WITNESS:**  It's my opinion that it was introduced

18  in the raw materials as in the manufacturing process.  Without

19  knowing anything about the mining process and what that raw

20  material stream is, I can't have any further opinion than that.

21      **THE COURT:**  Is it in the gypsum or is it in the paper

22  covering?

23      **THE WITNESS:**  It's within the gypsum matrix.  It's

24  not related to the paper.  It's within that matrix of the

25  gypsum body.  That's where the sulfur is contained.

DAILY COPY

1          **MR. LEWIS:**  I'm sorry, Your Honor.  If I could ask
2    one more question.  Thank you.
3    **BY MR. LEWIS:**
4    **Q.**   I failed to ask you if, in comparing the remedy that you
5    are recommending to Lennar, you have compared the
6    recommendations as to the entire HVAC system and electronics in
7    the home?
8    **A.**   Yes, I have.  In terms of the HVAC, they are replacing the
9    entire assembly, including the outside compressor, all the
10   ductwork, all the line sets, all the wiring.
11          In terms of electrical, they are removing all the
12   electrical wiring, all the switches, low-voltage wiring, in
13   precisely the same way.
14          **MR. LEWIS:**  Thank you, Mr. Rutila.  No further
15   questions.
16          **THE COURT:**  Why would they have to replace the
17   outside compressor if it's not in the environment?
18          **THE WITNESS:**  When the inside air handler
19   malfunctions, the outside compressor tries to work.  It doesn't
20   know that the inside unit is malfunctioning, so it works
21   harder.  It essentially wears itself out trying to compress a
22   weakened gas in making the assembly work.  That's really why.
23   It wears itself out because of the failure on the inside.
24          **MR. LEWIS:**  Anything further?
25          Thank you very much, Mr. Rutila.  Thank you,

1  Your Honor.

2           **MR. SERPE:**  Plaintiff would call Jerry Baldwin.

3           (WHEREUPON **Jerry Baldwin**, having been duly sworn,

4  testified as follows.)

5           **THE DEPUTY CLERK:**  Please state your full name and

6  correct spelling for the record.

7           **THE WITNESS:**  My name is Jerry Baldwin,

8  B-A-L-D-W-I-N.

9                    **DIRECT EXAMINATION**

10 BY MR. SERPE:

11 **Q.**   Good morning.  Good afternoon, Mr. Baldwin.

12 **A.**   Good afternoon, Mr. Serpe.

13 **Q.**   Would you tell the Court the address of the home that you

14 live in that has Chinese drywall.

15 **A.**   Sure.  My wife and I live at 4020 Dunbarton Circle in

16 Williamsburg, Virginia.

17 **Q.**   It's a single-family home.  Is that an accurate

18 representation of when you moved in and what your approximate

19 purchase price of your home was?

20 **A.**   That's correct, that's accurate.

21           **MR. SERPE:**  Can we see a picture of the Baldwin's

22 home, please, Scott.

23 BY MR. SERPE:

24 **Q.**   Mr. Baldwin, is this a fair picture of your home?

25 **A.**   Yes, sir, that's our home.

                         DAILY COPY

1  **Q.**   Mr. Baldwin, you just heard Mr. Rutila describing the

2  problems with the second floor of your house with corrosion.

3  He didn't spend a great deal of time about the first floor.

4  Would you share with the Court what kind of problems you have

5  run into on the first floor that has the Chinese drywall.

6  **A.**   Sure.  We are on our third set of air-conditioner coils

7  that are in the air handler that's in the garage.  We have had

8  a microwave fail.  We have had our refrigerator fail.  We have

9  had the thermostat fail.  We are on our third computer.  We

10 moved in in late November of 2006.

11 **Q.**   You-guys are still in the house at this point?

12 **A.**   We are still in the house primarily because we can't

13 afford to move out and continue to pay our mortgage and also to

14 pay rent if we were to move out.

15 **Q.**   Jerry, tell the Court the circumstances under which you

16 and Inez bought this house.

17 **A.**   In 2006, we were living in Lawrenceville, Georgia.  It's a

18 suburb of Atlanta.  I accepted a position from my employer to

19 work on a special project in Newport News, Virginia.

20        At the time, my mother-in-law lived with us.  When

21 Inez and I came to the peninsular to look for a home, we had a

22 concern about my mom-in-law living with us.  To try to make it

23 convenient for her and easy for her to live with us, we found

24 this home that has a full bathroom on the first floor and what

25 could have been a full bedroom attached to that full downstairs

1    bathroom.

2              So, gee, what a great find.  Mom-in-law can live with

3    us, and it will -- you know, Inez and I can have upstairs; she

4    can have downstairs.  It will be hassle-free.

5              Unfortunately, we signed the contract for the home in

6    August.  We moved in in November.  In October, my mother-in-law

7    passed away.

8    Q.    So at the time you bought this house, tell the Court what

9    kind of down payment you-all invested in this property.

10   A.    We had in excess of $12,000 in nonrefundable upgrade

11   money.  Using 20/20 hindsight, I would gladly trade that

12   $12,000 today for the problems that we have.

13   Q.    What kind of a down payment on the house?

14   A.    $100,000.  For us to be able to afford the mortgage -- we

15   were totally upside down, moving from Georgia to Williamsburg,

16   on our home.  For us to afford the mortgage, we put $100,000

17   down.

18   Q.    Jerry, you talked about these computers that went out.

19   Where were most of those pieces of equipment located?

20   A.    They were in our downstairs, first floor, what would have

21   been my mother-in-law's bedroom.  It's now called -- we now

22   call it our office, and we have a couple of desks in there.

23   It's where we kept our -- that lamp was in that room, and

24   that's where we kept our computers.

25   Q.    So the lamp that Mr. Rutila talked about, could you

1   identify it for us.  Just for the record, would you identify

2   that as --

3   A.   That's the lamp that was in the downstairs, first-floor

4   office.

5   Q.   You understand you're not going to be seeing this lamp

6   anymore?

7   A.   I told Inez I think we've seen the last of that lamp.

8   Q.   Among all of the people that came into the house to take

9   samples, you're aware that they came in and did various

10  sampling in that office room, are you not?

11  A.   Yes, sir.

12  Q.   And that, one, it was reported that the ceiling in that

13  room was domestic drywall, according to the various techniques

14  that Knauf's experts had employed?

15  A.   That's what our understanding was, yes.

16  Q.   At some point did people from Mr. Rutila's firm come back

17  into that office room?

18  A.   Yes, they did.

19  Q.   What did they do in there?

20  A.   They drilled core samples in three corners of the room.

21  Q.   It's your understanding that those results have come back?

22  A.   Yes, sir.

23  Q.   And that the ceiling that was predicted to have been U.S.

24  drywall was, in fact, Venture Supply Chinese drywall?

25  A.   That's correct.

1   **Q.**    And was releasing corrosive gases?

2   **A.**    Yes, sir.

3   **Q.**    The computers, when they went out, did you lose any data?

4   **A.**    Yeah.  We lost a lot of -- you know, shame on us, we

5   didn't back up enough, but we lost a lot of personal

6   photography.  Inez kept her recipe file on there.  We lost

7   that.  We lost a lot of documents we stored on the computer,

8   and they were irretrievable.

9   **Q.**    Jerry, some discussion today about the second floor of the

10  house.  We just asked about the first floor.  Would you and

11  Inez be comfortable with a repair plan that would leave the

12  second floor of your house as is, intact?

13  **A.**    We absolutely believe the Chinese drywall has affected the

14  second floor of our home.  We had dozens of people through our

15  house inspecting it.  Every one that looked at the air handler

16  on the second floor told us the same thing:  These coils are

17  black and they're ready to go.  We would ask the Court to fully

18  remediate our home.

19  **Q.**    Jerry, when it comes time for the remediation to take

20  place, you and Inez will have to be out of the house for some

21  period of time.  Is that going to work a hardship on you?

22  **A.**    That's going to be a hardship.

23  **Q.**    Did you look into getting a mortgage deferral on your

24  house?

25  **A.**    Through Senator Mark Warner's office, Senator Mark Warner

of Virginia, we provided his office with our mortgage lender information.  I was contacted by my mortgage company and offered forbearance.  They called me up at work one day -- unbeknownst to me, called me up at work and offered me something called forbearance.

I said, "Huh?  You know, I don't know what that is. Could you please explain that to me."

"Well, what that means is that we will suspend your mortgage payments for a period of three months.  In that time, you can take that money that you don't have to pay your mortgage with and you can fix your house."

I said, "Well, gee, I'm not sure you really understand the problem that I have with my house.  It's certainly going to take more than the $6,000 that would be represented by three months of mortgage payments.  What happens with my interest?"

"Well, your interest continues to accrue, as well, and then that interest is due at the end of that three months. But we might look again at the end of three months and extend that forbearance period for you."

I said, "Gee, I'm not really sure I understand how that works to my advantage if you're going to continue to accrue my interest and I'm going to have to ultimately pay that back."  I said, "At this point in time, thank you, but no thank you."

**Q.**   So you took a pass on the mortgage forbearance.  Had you previously made an effort to look into a refinance on the house?

**A.**   Yeah, we were hoping to -- as I'm sure the Court knows, interest rates were very, very low.  When we bought in 2006, our rate was 5-7/8, which at the time was a pretty good rate. Rates were -- refi's were below 4 percent.  We thought, "Gee, this is a great opportunity."  Once you fall below 1 percent under your current rate, it probably makes sense to refi it, of course, knowing fully well that no one was going to come and lend us money on a house with Chinese drywall in it, so it became impossible to refinance.

**Q.**   Jerry, what were you and Inez's plans for the future, how many more years of work and where did you see your lives taking you?

**A.**   Well, we love living in Williamsburg.  I'll be 60 years old.  As a lot of Baby Boomers know, at 66 Social Security takes a little bump, so I had planned to work for six more years.

We had hoped that this home would represent a major portion of our retirement.  We have $100,000 in the house today that's virtually worthless.  If the bank were to come -- if we were to walk away from the home and the bank came after us for the $265,000 that we still owe on the balance of the mortgage, it would take away virtually all of our savings and everything

1   that we have spent 40 years working towards.

2   **Q.**   So as the plaintiffs that are closest to representing

3   people nearing retirement, what's the impact on your outlook on

4   retirement from having had a Chinese-drywall house?

5   **A.**   Well, you know, a retirement that looked six years away

6   now looks a lot farther away.

7   **Q.**   You worked with the accountants and Ms. Barrios, you

8   verified that these are accurate, and you're requesting that

9   the Court award the damages both for the repair and the other

10  economic losses reflected in Exhibit P3.0622; is that accurate,

11  sir?

12  **A.**   That's accurate.  I would just further say that I -- you

13  know, I worry about Inez and I staying in this house.  I worry

14  about my wife's health.  I worry about my health.  I worry

15  about the health of my grandchildren when they come to visit

16  us.  Our son is 33 years old.  He doesn't live with us.  If I

17  were like some of these other folks with children, we would

18  have been out of there a long time ago.

19           Maybe we are just of a generation that believes in

20  trying to do the right thing, which is that you pay your bills,

21  you pay your mortgage.  You know, for 40 years, Inez and I --

22  in August we'll be married 40 years, and we never missed a

23  mortgage payment.  This is an extremely difficult decision that

24  we are faced with making, and I'm also worried about the

25  financial implication that that could have on our lives.

1          **MR. SERPE:**  No further questions.

2          **THE COURT:**  Thank you, sir.

3          **MR. SERPE:**  Your Honor, because of the extraordinary

4    importance of the electrical wiring question and the prediction

5    of failures in the homes, we would like to introduce the entire

6    deposition transcript of the defense expert that most spoke to

7    electrical wires and the propensity for them to fail.  We have

8    prepared a very short excerpt of that deposition.  With the

9    Court's indulgence, we would like to play a short excerpt of

10   the deposition to highlight the importance of electrical system

11   and electrical system failures.  This from Mr. Sandy Sharp, who

12   is a defense expert that was retained by Knauf in this matter.

13          (WHEREUPON the following excerpt from the deposition

14   of **Sandy Sharp** was read out loud.)

15          "Question:  So something has to be done about homes

16      with Chinese drywall to prevent failures of equipment.

17          "Answer:  To prevent failures that are caused by

18      atmospheric tarnishing, because there are other reasons

19      that electronics fail.  New equipment tends to have a

20      higher failure rate and then older equipment tends to have

21      a higher failure rate.  But what we're talking about here

22      is failures due to corrosion and we have a parameter that

23      will indicate its likelihood.  And that parameter, if

24      applied to these data, indicates that there is a

25      likelihood of failure of electronic equipment at some

1    point in the future if this environment is maintained.

2         "Question:  And since we're talking about failures

3    due to corrosion and the likelihood of the failure of

4    electronic equipment, you believe something needs to be

5    done to correct the environment in houses with Chinese

6    drywall.

7         "Answer:  I said that if the environment is not

8    changed in those houses, we will have failures of

9    electronic equipment at some point in the future.

10         "Question:  Which is unacceptable.

11         "Answer:  We don't want to have failures of

12    electronic equipment, yes.

13         "Question:  And since we don't want to have failures

14    of electronic equipment, the environments are

15    unacceptable.

16         "Answer:  They need to be changed to eliminate the

17    conditions that cause corrosion failures of electronic

18    equipment.  I could say -- I could emphasize not of

19    electrical equipment, but we're -- in this instance we're

20    talking specifically about electronic equipment.

21         "Question:  Well, let's talk about electronic

22    equipment.

23         "Answer:  Yes.  Okay.

24         "Question:  Your standard as you told me earlier was

25    1434 angstroms.

1        "Answer:  That's correct.

2        "Question:  In the walls of this bedroom in Florida,

3    the angstrom thicknesses were 2179 angstroms, were they

4    not?

5        "Answer:  That is correct.

6        "Question:  That's higher than your limit of 1434

7    angstroms for electrical failures, isn't it?

8        "Answer:  It is a little higher.

9        "Question:  So you're predicting that at some point

10    in time we're going to have electrical failures in homes

11    with Chinese drywall if something isn't done about the

12    environment.

13        "Answer:  At some point in the future.

14        "Question:  And that's unacceptable.

15        "Answer:  To avoid those kinds of problems, we need

16    to change the environment.

17        "Question:  Let's address this 'at some point in the

18    future.'  Do you have an opinion as to what the expected

19    life of a home is?

20        "Answer:  I would say approximately similar to the

21    expected life of a factory.

22        "Question:  And what's that?

23        "Answer:  Maybe 50, 100 years.

24        "Question:  So if we want to protect the electrical

25    equipment in a house for 50 to 100 years, you're going to

1    have to do something about the Chinese drywall in these
2    houses, aren't you?
3        "Answer:  As I said already, these environments need
4    to be changed to avoid the possibility of future failures.
5        "Question:  In fact, your own data indicates that you
6    expect to see electrical failures at contacts and wires in
7    as short as three years at a 1434-angstrom thickness,
8    aren't you?
9        "Answer:  Those were rheostats in electrical
10   circuits, yes.
11       "Question:  And three years is obviously
12   significantly shorter than an expected normal use or
13   lifetime for an electrical system in a house.
14       "Answer:  That is correct."
15       **MR. SERPE:**  Your Honor, we will provide a copy of
16   Mr. Sharp's deposition to the Court marked as Exhibit P1.2066.
17       **THE COURT:**  We'll make it a part of the transcript.
18   The depositions are part of the transcripts.
19       **MR. SERPE:**  Your Honor, the plaintiff would call
20   Cathy Leach.
21       (WHEREUPON **Cathy Leach**, having been duly sworn,
22   testified as follows.)
23       **THE DEPUTY CLERK:**  Please state your full name and
24   correct spelling for the record.
25       **THE WITNESS:**  Cathy Leach.

1                        **DIRECT EXAMINATION**

2   **BY MR. SERPE:**

3   **Q.**   Are you nervous?

4   **A.**   I'm just upset.

5   **Q.**   Take a deep breath.  We are going to get you a glass of

6   water too.

7            **MR. SERPE:**  Your Honor, would it be possible to

8   switch plaintiffs?

9            **THE COURT:**  Yes, let's do that.

10           (WHEREUPON **Joseph Leach**, having been duly sworn,

11  testified as follows.)

12           **THE DEPUTY CLERK:**  Please state your full name and

13  correct spelling for the record.

14           **THE WITNESS:**  Joseph Leach.

15                       **DIRECT EXAMINATION**

16  **BY MR. SERPE:**

17  **Q.**   You're not Cathy Leach.  Joe, tell the Court what you do

18  for a living.

19  **A.**   I work for the Department of Defense.

20  **Q.**   What do you do for the Department of Defense?

21  **A.**   Military officer.

22  **Q.**   Within the guidelines that you're permitted to, can you

23  give us a little bit of an idea what you do as a military

24  officer for the Department of Defense.

25  **A.**   I work on special operations projects.

1   **Q.**   This is your wife Cathy, who we met very briefly?

2   **A.**   Yes, sir.  She just wanted to get up and say hi to

3   everybody.

4   **Q.**   Let's take a look at the chart.  We see you and Cathy

5   here.  You're a single-family home in Williamsburg.  Is that

6   4043 Dunbarton Circle?

7   **A.**   That's correct.

8   **Q.**   When did you-guys acquire that house?

9   **A.**   July of 2008, sir.

10  **Q.**   What was the purchase price?

11  **A.**   Around $475,000, sir.

12  **Q.**   We have got you down here.  We talked about how the

13  Michauxes only had 45 boards of Chinese drywall, but we have

14  got you down here with an approximate number of only eight

15  sheets of Chinese drywall.  Is that your understanding as to

16  approximately how much drywall has been found in your house?

17  **A.**   Yes, sir.

18  **Q.**   Can we see a picture of the home, please.  Who is this out

19  front here?

20  **A.**   That's Murphy.

21  **Q.**   Would you explain to the Court what the general layout of

22  your house is.

23  **A.**   It's a ranch with a full basement, equal size of the

24  upstairs, and then there's a bonus room above the garage.  The

25  main level is three bedrooms, the dining room, the kitchen,

DAILY COPY

1   living room.  Then the basement has my office, an entertainment

2   room, and another full master suite.

3   **Q.**   It's kind of hard to tell here, but the property drops off

4   very quickly in the back?

5   **A.**   Yes, sir.  It's on a hill.

6   **Q.**   So the lower level of the house, actually across the whole

7   back of the house, has glass, and there's a lot of light that

8   comes in, not so much of a basement as a second story?

9   **A.**   Yeah.  It's basically like a two-level.  The basement is

10  fully redone.

11  **Q.**   You live at the house currently with your wife, Cathy.

12  Who else lives at the house there with you?

13  **A.**   Murphy, and then my kids:  Joseph and Sarah.

14  **Q.**   Can we see your kids who are living there?  There's

15  Joseph.  Before we move off of Joseph, was he having a

16  particular problem with a lot of nosebleeds?

17  **A.**   Yeah.  My in-laws were living with us down in the full

18  suite in the basement for a while.  Obviously, he is very close

19  to his grandparents, and he would always go downstairs.  That's

20  where we found the eight sheets of drywall, specifically in one

21  area downstairs.

22          Every time he would go downstairs, we would notice he

23  was getting nosebleeds, so we forbade him from going

24  downstairs -- like an unscientific test -- for two weeks, and

25  then he stopped.  And then he snuck down the stairs again one

1   day, and they immediately started again.

2   **Q.**   So there's been some conversation loosely thrown around

3   about the wine cellar house.  Let's get this right out.  Is

4   there a bottle of wine in the wine cellar at this point?

5   **A.**   No.

6   **Q.**   Have you ever had a bottle of wine in the wine cellar?

7   **A.**   No.

8   **Q.**   No racks on the walls?  I'm sorry we don't have a picture.

9           So describe what the physical layout of this room is

10  like.

11  **A.**   Basically, it was a room that was added onto by the person

12  we bought the house from as a means to maximize space.  So,

13  basically, like, the front porch, where the foundation would

14  usually be a solid wall, they have cut into it, and they

15  finished off the underpart of the porch.

16  **Q.**   So how big a room are we talking about that they kind of

17  cut in and finished it?

18  **A.**   10-by-10 probably.

19  **Q.**   So you weren't the original owner of this house; somebody

20  else had built this house.  Is that right?

21  **A.**   Yes, sir.

22  **Q.**   To the best of your understanding, this wine room was the

23  area -- or the room that was going to be a wine room is the

24  area where the Chinese drywall ended up?

25  **A.**   Yes.  And there's a small little bar area in the back.

1   The previous owners had intended it, I think, for a wine room,

2   but they obviously drank more wine than I do.

3   Q.   All right.  In addition to Joe, can we see Joe's sister.

4   Who is this little girl?

5   A.   That's Sarah.

6   Q.   So are Sarah and Joe going down the staircase at all into

7   the second floor of your house at this point?

8   A.   No.  Once we realized the problem, and especially with

9   Joseph's nosebleeds, we stopped going down there.  The in-laws

10  moved away from the house.  Then I just basically abandoned my

11  office and bought another computer and we just stay upstairs.

12  Q.   So where were the in-laws staying?

13  A.   Downstairs there's a master bedroom and bath, so they were

14  just staying down there.

15  Q.   So Cathy's dad's name is?

16  A.   Walter Young.

17  Q.   Walter and then --

18  A.   Sharon.

19  Q.   They were downstairs actually living on that first floor

20  of that house?

21  A.   Yes, sir.

22  Q.   So they are not there anymore?

23  A.   No, sir.  They moved back to Florida.

24  Q.   What led to them deciding to move out of the house?

25  A.   Well, when we found Chinese drywall, they decided to move

1    away.  Cathy's father, Walter, was having respiratory issues.

2    It just exacerbated some of the problems he was always having,

3    so they decided to move back to Florida.

4    **Q.**   So they moved out.  At that point, you shut off the first

5    floor of the house?

6    **A.**   Yeah.  I mean, the door, there's no physical -- there's a

7    door that prevents -- as you're going down the stairs.  We just

8    keep that shut.

9    **Q.**   Approximately how much of your house did you lose access

10   to when you kept that door closed and abandoned your office,

11   the playroom, etc.?  What percentage of the house is now lost

12   to you?

13   **A.**   I think the downstairs is about 2,400 square feet or so.

14   **Q.**   When Walter, your father-in-law, moved out, did that have

15   an impact on the fabric of your family's life, the day-to-day

16   activities around the house?

17   **A.**   Oh, yeah.  Of course, just the nature of my job, I'm gone

18   a lot, and so Cathy is with -- her parents, you know, help her

19   a lot with things, especially through, you know, when I go

20   away.  So with them leaving, it kind of jolted her world a

21   little bit.

22   **Q.**   Cathy works outside the home as well as inside the home;

23   right?

24   **A.**   That's correct.

25   **Q.**   So what's her day job?

1   **A.**   She works for an insurance company in Richmond.

2   **Q.**   So was losing her dad and step-mom a major impact in terms

3   of childcare and things like that for your family?

4   **A.**   Yeah.  Especially it was kind of -- it was kind of abrupt

5   too.  I mean, once we found out, her parents left pretty

6   quickly.  We stopped using the downstairs.  Then I was

7   immediately going away, and they had -- she had to, you know,

8   rush to get the day care and things set up for the kids,

9   before- and after-school care and things like that.

10  **Q.**   So, Joe, would it be a fair statement, with only eight

11  sheets of Chinese drywall, that this problem has done a fair

12  job of turning your family's life upside down?

13  **A.**   Yes, that's a fair assessment, sir.

14  **Q.**   Joe, did you have an idea early that there might be a

15  quick path just to take these sheets down and be done with this

16  problem, maybe try and get a contractor to do the work?

17  **A.**   Yeah.  I talked to the builder and tried to work out --

18  you know, I mean, we didn't know the extent of the other

19  problems.  We just wanted to remediate it ourself and then try

20  to work something out with the builder and have it done

21  quickly.

22  **Q.**   That didn't happen?

23  **A.**   No, sir.

24  **Q.**   It's still there?

25  **A.**   Yes, sir.

**Q.**    Now, your understanding that as part of the repair that's
been suggested for your house that they are talking about
running new electrical wires from that room all the way back to
the electrical panel?

**A.**    Yes, sir.

**Q.**    And that the repair work, even for your house with just
eight sheets, is still a very extensive project that's being
done?

**A.**    Unfortunately, that's correct.

**Q.**    Joe, did you try and get a refi on this house?

**A.**    We did, sir.  And as previously stated, I think it was
Senator Warner's letter to all the people affected mortgage
companies for forbearance.  We didn't take the forbearance
because we were still staying there.  Because they were aware
of it, when we went to refinance when the rates dropped about
2 percent in our case, they wouldn't let us because we had
Chinese drywall.

**Q.**    So without the ability to refi and with the Chinese
drywall in your house, do you have concerns about, being in
special operations, having to be transferred and having
difficulty selling this house or moving this house?

**A.**    Yes, sir.  Just the refinance was about $600 a month that
changed, we could have got.  And then I have already lost a
couple of opportunities where -- jobs that I couldn't take
because it would force me to move, and we would have to sell

1   the house quickly.  Obviously, we couldn't do that.

2   Q.   So having the Chinese-drywall house has had a dramatic

3   impact on your ability to earn a living for your family as

4   well?

5   A.   Life-altering.

6   Q.   Joe, the Exhibit P3.0622, page 4, is a recap of the cost

7   of repairing your home as well as the other damages that your

8   family has sustained.  You and Cathy have worked carefully with

9   the accountant and reviewed this carefully and are asking the

10  Court to award damages in the amount reflected by this exhibit?

11  A.   Yes, sir.

12  Q.   Joe, does it smell bad in that room?

13  A.   It will knock you down if you open the door.

14  Q.   There's a door that you can close the room off, I guess,

15  where they were planning on keeping it cool or whatever.  With

16  that door closed, there's no HVAC vents in there, etc., so the

17  air doesn't circulate when that door is closed; is that a fair

18  recap?

19  A.   That's correct.

20  Q.   So you obviously keep it closed?

21  A.   Right.  The previous owners kept a dehumidifier going the

22  whole time and they would keep it open more.  But like I said,

23  the dehumidifier went out, and we just keep it closed and don't

24  even -- we don't go downstairs at all anymore, but the room

25  stays shut off.

1   **Q.**   Importantly, there's no return air or register that

2   circulates air from this room into the house, generally, is

3   there?

4   **A.**   No, not unless the door is open.

5   **Q.**   You're keeping the door closed?

6   **A.**   Yes, sir.

7   **Q.**   When you open it, describe the smell for the Court.

8   **A.**   Oh, it's pungent.  I don't know.  It's like a swamp gas.

9   That's kind of what we thought.  That's what initially drove us

10  to inspecting it.  We thought it was some kind of water damage,

11  some kind of sewer-type smell.  So now we just, obviously, keep

12  the door shut.  But if you do open the door, the smell lasts.

13  You know, it stays down there for a while.

14          **MR. SERPE:**  Joe, I appreciate you substituting for

15  Cathy here.  Thank you very much.

16              No further questions, Your Honor.  Thank you.

17          **THE COURT:**  You're excused, sir.  Thank you.

18          **MR. SERPE:**  Your Honor, we call Lisa Orlando.

19          (WHEREUPON **Lisa Orlando**, having been duly sworn,

20  testified as follows.)

21          **THE DEPUTY CLERK:**  Please state your full name and

22  correct spelling for the record.

23          **THE WITNESS:**  My name is Lisa Marie Orlando.

24

25

1                    **DIRECT EXAMINATION**

2    **BY MR. SERPE:**

3    **Q.**   Good afternoon, Lisa.

4    **A.**   Good afternoon, Richard.

5    **Q.**   Let's do the last line on the chart.  Last but not least,

6    you-guys are on 4091 Dunbarton Circle?

7    **A.**   Yes, we were.

8    **Q.**   That's a single-family home in Williamsburg.

9    **A.**   Uh-huh.

10   **Q.**   You-guys moved in in June of last year?

11   **A.**   Yes, sir.

12   **Q.**   Is that a fair recap of your purchase price, $369,500?

13   **A.**   Yes, sir.

14   **Q.**   From this chart, Lisa, we see 163 4-foot-by-12-foot boards

15   of Venture Supply drywall having been, according to the

16   records, delivered to your home?

17   **A.**   Yes.

18   **Q.**   The home that it was delivered to, we've got a picture of.

19   Is this a fair picture of your house?

20   **A.**   Yes.

21   **Q.**   Lisa, the date of June 9 of last year, that's just last

22   year.  That's much later than any of the other dates that are

23   here.  Would you explain to the Court the circumstances that

24   led to you-guys moving into a house with Chinese drywall in

25   June of last year.

**A.**   Certainly.  My husband accepted a new job with a new

company.  We promised the kids it would be a fun, good move,

and we moved from New York State, Upstate New York.

**Q.**   Do we have a picture of the kids?  Who do we have here?

**A.**   On the far right is Ryan and on the far left is Nathan.

They are twins.  They are going to be 18 in a week.

           In the red shirt is Mason, and he is 13.

           And, of course, the cement of our family, Bob.

**Q.**   Bob.  So the move from New York down here, was that a

major move for the family, the boys, and for you?

**A.**   Major.  The boys missed out on their senior year with all

their friends.

**Q.**   Were you-guys looking forward to moving specifically into

this house?  Was that something you were looking forward to?

**A.**   Yes, we were.

**Q.**   Tell us a little bit about that.  What was it about this

house that was going to be fun for the boys?

**A.**   Well, the yard itself, and we were planning to put in an

inground pool as soon as we closed.

**Q.**   You closed?

**A.**   Yes.

**Q.**   And then you put in an inground pool?

**A.**   $50,000 of an inground pool, yes.

**Q.**   The landscaping was no sooner done on your new home and

your new $50,000 pool and you found out you had Chinese drywall

1  in your house?

2  **A.**   Yes.  Yes, sir.

3  **Q.**   Well, tell the Court what that experience was like for you

4  and your family.

5  **A.**   Well, we were in the house about four weeks, and we got a

6  letter from the builder saying that we could have possibly 172

7  sheets of drywall, Chinese drywall.

8          At first glance at the letter, not really knowing

9  what that meant -- had no idea -- we did a little research.

10  And we received a visitor at our door about a week after we got

11  the letter, who actually was Bill Morgan, and he had noticed

12  that all of the windows in the house were opened a crack and it

13  was 90 degrees outside.  He came and introduced himself and

14  asked, "Why are the windows open when it's so hot?"  And I told

15  him, and that's how we got going.

16  **Q.**   Have you-guys as a neighborhood, particularly the families

17  of Chinese drywall, gotten to know each other pretty well over

18  the last six months?

19  **A.**   Yes.  Yes, sir.

20  **Q.**   Tell the Court what kind of a down payment that you and

21  Bob put down for this house.

22  **A.**   We put $150,000 down, everything that we had, all the

23  equity, besides for the pool, that we had in our house.

24  Everything.

25  **Q.**   Just a hair under half of the purchase price of the house

1    you put down in cash on this place?

2    **A.**    Correct.

3    **Q.**    The pool was on top of that?

4    **A.**    Yes.

5    **Q.**    It was a $200,000 investment, the biggest investment, bar

6    none, that your family had ever made?

7    **A.**    Yes, sir.

8    **Q.**    Does your house smell?

9    **A.**    Yeah, it did.

10   **Q.**    What does it smell like to you?

11   **A.**    Right now, what it smells like to me is --

12   **Q.**    Well, let's start at the beginning.  What was it that you

13   noticed and what did you do about it?

14   **A.**    When we were looking at the house, it had a smell to it,

15   and we thought that the smell was because they had two young

16   children in diapers.  We thought it was just diaper/baby smell.

17   We thought that, after we moved in, we would have all the

18   carpets cleaned and it would go away.  We did that and it

19   hasn't gone away.  It's gotten progressively worse.

20           It smells to me like firecrackers when you -- after

21   you -- like, little firecrackers when they pop, that burnt kind

22   of smell.

23   **Q.**    The water heater went bad on you?

24   **A.**    I'm sorry?

25   **Q.**    You had a hot-water heater that went out?

1   A.   Yes, sir.

2   Q.   Two sets of evaporator coils on your air conditioner?

3   A.   From our understanding, yes, from the previous owner, in

4   three years, they went out two times.

5         We had a problem with our HVAC unit this summer, and

6   we had a man come in and look at it.  He showed us the pits

7   that were in the coils and couldn't believe that it was only a

8   year old.  He thought it was much, much older by the condition

9   of it.

10  Q.   Lisa, how long did you and Bob and the boys stay in the

11  house, after you moved in June 9, before you had moved out?

12  A.   Give me a second here.  About seven months.

13  Q.   How hard of a decision was it for you to abandon your

14  house and move out?

15  A.   Well, that wasn't hard.  We would have left right away if

16  we could have.  You know, my thing is, if it's putting pits in

17  metal, what's it doing to my babies?  But we had to be smart

18  about it and figure out how we could, you know, do this and not

19  kill our credit.

20  Q.   So did you make, like, changes on sleeping arrangements

21  and things to try to work around this?

22  A.   Oh, absolutely.

23  Q.   Tell the Court about that.

24  A.   There seemed to be more Chinese drywall upstairs than

25  downstairs, so we brought mattresses downstairs and placed them

1   in the study, in the master bedroom that was downstairs, and we

2   put a -- I put a curtain across the top of the stairs to try to

3   keep the air and gases and the smell upstairs.

4   **Q.**   So where did people end up sleeping at this point?

5   **A.**   On a mattress on the floor in the study, and then the rest

6   of us in the master suite downstairs.

7           My son, Nathan, is really all bent out of shape.  He

8   is, you know, 17 and a senior, and his parents are sleeping

9   with him, and he's in a new town.  So he's not too happy with

10  us.

11  **Q.**   Lisa, what's the impact for you and Bob and the boys now

12  of being out of the house?  Give the Court an idea how upside

13  down your life has been turned by this.

14  **A.**   We are having to start all over again.  Our rent is higher

15  than our mortgage.  We are just really happy to be out of the

16  house and, hopefully, detoxifying.

17  **Q.**   Lisa, Jerry Baldwin talked about the Knauf people saying

18  that the ceiling was fine in his office.  Did you guys go

19  through a similar experience where, in the bedroom and in the

20  living room and the opposite corner of the house, that with all

21  of the tests and etc. that they did, their report indicated

22  that there was no Chinese drywall in the ceilings of those two

23  rooms?

24  **A.**   Correct.

25  **Q.**   Jerry and Inez are still living there, so we just cut the

1    core samples and sent them to the laboratory.  Would you tell
2    the Court what you-guys were gracious enough to allow us to do
3    in the two rooms that were supposedly U.S. drywall ceilings.
4    **A.**    The entire ceilings are cut out.
5    **Q.**    We cut the entire ceilings down?
6    **A.**    Yes.
7    **Q.**    What labels were on the back of those boards?
8    **A.**    Venture Supply.
9    **Q.**    Chinese drywall?
10   **A.**    Chinese drywall.  Taishan.
11   **Q.**    Lisa, is it your and Bob's request that your house receive
12   the stripped-to-the-studs -- complete drywall, complete
13   mechanical, complete electrical -- described by the Court today
14   and by those gentlemen from Beazer yesterday?
15   **A.**    Yes, please.  Please.
16   **Q.**    Lisa, I'm going to hold up the summary exhibit.  Yours is
17   numbered P3.0622, page 14.  You worked with the appraisers.
18   You worked with the accountant.  You worked with Mr. Barrios.
19   You made sure that this was an accurate statement of your
20   repair expenses as well as the other damages that you and Bob
21   had occurred.  Is that a fair statement so far?
22   **A.**    Yes, sir.
23   **Q.**    Is this the amount of damages for your financial losses
24   that you are asking the Court to award?
25   **A.**    Yes, sir.

1        **MR. SERPE:**  Your Honor, this is already admitted of

2   that record, P3.0622-0014.  Thank you very much.  No further

3   questions.

4        **THE COURT:**  Thank you very much.  We will stop here

5   and come back at 3:45.  Court will stand in recess.

6        **THE DEPUTY CLERK:**  Everyone rise.

7        (WHEREUPON the Court took a brief recess.)

8        **THE DEPUTY CLERK:  Everyone rise.**

9        **THE COURT:**  Be seated.  Let me mention that I told

10  the plaintiffs' committee that it was brought to my attention

11  that someone reported that a recording of my voice was played

12  on the radio this morning or yesterday.  That poses a little

13  problem that I ask cooperation on.

14        I've allowed everybody to bring in laptops and

15  personal equipment, but if that becomes a problem, then I'm

16  going to have to restrict that use also.  The reason is that

17  what I say is on the record, so I'm not concerned about that,

18  but we have a rule in federal court, as well as the

19  Fifth Circuit, of course, that we don't broadcast proceedings.

20        We're not there yet.  We may be there in the

21  future, but we're not there yet.  We don't have television or

22  radio, instantaneous presentation of proceedings.  For that

23  reason, I'd ask that if anybody has done it, please cease from

24  doing it in the future.

25        What were you saying?

1          **MR. ECUYER:**  If I may, Your Honor, Michael Ecuyer.

2     Your Honor, at this time, we'd like to enter into the record

3     several witnesses by way of deposition, some of whom who have

4     been referred to throughout the proceedings thus far.

5               Briefly, we would like to offer J.C. Tuthill,

6     CPA, an expert in accounting, who quantified the plaintiffs'

7     economic damages.  Next, we have physical engineer Edward Lyon,

8     Your Honor.  Next, we have Dr. Jack Caravanos, who discussed

9     XRF and its use.  Next, we have Dr. Jonathan Barnett, a fire

10    safety expert, who you heard excerpts referenced earlier today.

11    Next, we have Kenneth Acks, who addresses the valuation

12    concerns with regard to the specific Virginia seven properties.

13               Dr. Lori Streit.  Your Honor, you heard

14    reference to Dr. Streit, who was tendered earlier as an expert.

15    Then we also have the deposition of Samuel Porter as a

16    representative for Venture Supply and Porter-Blaine.  That is a

17    two-volume deposition, Your Honor.  Finally, just a moment ago,

18    you heard reference to KPT's expert, William Broom Alexander,

19    also known as Sandy Sharp, Dr. Sandy Sharp.  We have that

20    deposition.

21          **THE COURT:**  I'll make that part of the record.

22               Just for the litigants who may not be familiar

23    with this proceeding, witnesses can be called either live in

24    court or they can be deposed, and their deposition is admitted

25    in lieu of their live testimony.  Both are acceptable.

 1           In this particular case, during the course of

 2    the proceeding, there was an adverse proceeding going on;

 3    namely, they had the plaintiffs and on the other side were

 4    intervenors, who had some common interests.  So they all

 5    appeared at the testimony.  The witnesses were sworn and

 6    questions were asked and transcripts were made of these

 7    depositions.

 8           It's both economical, as well as efficient, to

 9    oftentimes introduce the depositions in lieu of having the

10    witnesses incur expenses, travel expenses and otherwise.

11    That's what counsel has done now.  He's introduced that

12    testimony by way of depositions.  So I'll make it a part of the

13    transcript, and it will be just as if those witnesses were

14    called in person.

15           You may proceed, Counsel.

16           **MR. MEUNIER:**  May it please the Court.  The

17    plaintiffs call Ronald Wright.

18           (WHEREUPON **Ronald Wright**, having been duly sworn,

19    testified as follows.)

20           **THE DEPUTY CLERK:**  Please state your full name and

21    correct spelling for the record.

22           **THE WITNESS:**  Ronald E. Wright, W-R-I-G-H-T.

23                              **VOIR DIRE**

24    BY MR. MEUNIER:

25    **Q.**   Good afternoon, Mr. Wright.  What is your address, sir?

1   A.    It's 2512 Independence Boulevard, Wilmington,
2   North Carolina.
3   Q.    What is your occupation?
4   A.    Professional engineer with construction consultant.
5   Q.    By whom are you employed?
6   A.    R.V. Buric Construction Consultants.
7   Q.    What is the nature of Buric's business?
8   A.    We perform a variety of different construction --
9   consultant for both delay claims and for CPM scheduling, but
10  primarily what I do is for building diagnostics.
11  Q.    What percentage of Buric's work deals with residential
12  structures and residential construction?
13  A.    I would say about 30 percent of the work would be towards
14  residential-type structures.
15  Q.    What is your title with Buric?
16  A.    Chief operating officer.
17  Q.    What's the extent of your formal education, Mr. Wright?
18  A.    I have a bachelor's of science in civil engineering and a
19  master's in business administration.
20  Q.    How many years of experience do you have in the
21  construction industry?
22  A.    Over 30 years.
23  Q.    In how many states have you performed project or
24  consultant work as a civil engineer?
25  A.    More than 30 different states.

1  **Q.**   Did you work in the New Orleans area after Hurricane
2  Katrina?
3  **A.**   Yes.
4  **Q.**   What did you do here?
5  **A.**   Primarily with some of the different insurance claims that
6  were being submitted, we did evaluations of buildings and
7  structures for the types of damages that had occurred.
8  **Q.**   You did that on behalf of insurers?
9  **A.**   That's correct.
10  **Q.**   Are you professionally licensed and registered as a civil
11  engineer in the state of Virginia?
12  **A.**   Yes.
13  **Q.**   In what other states are you registered?
14  **A.**   In North Carolina, South Carolina, Ohio, Maryland, and
15  New Jersey.
16  **Q.**   What is the American Society of Testing and Materials or
17  ASTM?
18  **A.**   They're a body of professionals from either consulting,
19  manufacturers, any kind of design professionals that come
20  together and make consensus for standards and guides on how to
21  use materials, how to test materials.
22  **Q.**   Are you a member of ASTM?
23  **A.**   Yes.
24  **Q.**   Are you a member of the American Society of Civil
25  Engineers?

1   **A.**   Yes.

2   **Q.**   Over the course of your career, have you been retained

3   previously as an expert in legal proceedings?

4   **A.**   Yes.

5   **Q.**   Estimate for the Court the number of occasions on which

6   you have been accepted and allowed to testify in court as an

7   expert in civil engineering.

8   **A.**   I believe 27 times.

9   **Q.**   Does your expertise include opinions as to the application

10   of building code provisions and requirements?

11   **A.**   Yes.

12   **Q.**   Does your expertise encompass opinions as to the required

13   scope and cost of property damage repair and remediation?

14   **A.**   Yes.

15          **MR. MEUNIER:**   Your Honor, at this time, I would

16   tender Mr. Wright as an expert in civil engineering.

17          **THE COURT:**   The Court will accept him as such.

18                    **DIRECT EXAMINATION**

19   **BY MR. MEUNIER:**

20   **Q.**   When and by whom were you first contacted to serve as an

21   expert in this case?

22   **A.**   By Dan Bryson on behalf of the plaintiffs' steering

23   committee.

24   **Q.**   When was that?

25   **A.**   That was in early November of 2009.

1    **Q.**    What were you asked to do?

2    **A.**    I was asked to evaluate building code issues that may

3    apply to Chinese drywall, the use of that in homes, and also to

4    look at and help establish or evaluate what the scope of repair

5    would be, and then from that what kind of costs would be for

6    that repair.

7    **Q.**    So you are prepared to offer opinions as to both the scope

8    and cost of the required remediation for these seven Virginia

9    homes?

10   **A.**    That's correct.

11   **Q.**    Did you visit and inspect the Virginia properties?

12   **A.**    Yes.

13   **Q.**    Did you prepare diagrams and sketches of those properties?

14   **A.**    For some of those.   Some were done in conjunction with

15   others at that time.

16   **Q.**    Did you interview owners?

17   **A.**    Yes.

18   **Q.**    Have you reviewed the data and analysis of other experts

19   retained by the plaintiffs in this case?

20   **A.**    Yes.

21   **Q.**    You've also been present in court both today and on Friday

22   to hear the testimony offered?

23   **A.**    Yes.

24   **Q.**    You specifically listened to the scientific testimony from

25   Dean Rutila, Lori Streit by video, John Scully last week, etc.?

1   **A.**    That's correct.

2   **Q.**    As well as Mr. Galler?

3   **A.**    Yes.  Yes.

4   **Q.**    What basic principles, Mr. Wright, did you apply in your

5   engineering assessment of the proper scope of property damage

6   remediation in this case?

7   **A.**    It was to go through and -- basically, I've developed the

8   slide that's shown for three different principles:

9           The first is to determine the causes and the sources

10  of the damages.  You have to find out what's going wrong or

11  causing the problems to address it.

12          After you've done that, then you also define what

13  components have been damaged by that.

14          Once you have those first two items, then you have to

15  find out the scope or define the scope that would address both

16  those items and restore it to the prior condition before any of

17  the damages or the causes and sources have begun.

18  **Q.**    Now, are these basic principles generally recognized in

19  your field?

20  **A.**    Yes.

21  **Q.**    Are they also discussed in the peer-reviewed literature?

22  **A.**    Yes, they are.

23  **Q.**    For example, can you cite the Court to a peer-reviewed

24  article that supports the idea that the removal of the sources

25  of damage is important to restore a property to its prior

1    condition?

2    **A.**   Yes.  I had seen an article that Christopher Muller had

3    written that dealt especially with corrosive gases and the way

4    to address those.

5    **Q.**   The title of this article is, in particular, "Control of

6    Corrosive Gases to Avoid Electrical Equipment Failure."

7    Correct?

8    **A.**   That's correct.

9    **Q.**   Tell the Court what this particular provision in

10   Mr. Muller's article tells us about the importance of removing

11   the source of contamination.

12   **A.**   First and foremost, the article says that the source

13   control should be the first strategy examined.  In other words,

14   get rid of the source so that there's no further damages.

15   **Q.**   What, in addition, does it tell us?

16   **A.**   It says, to do that, you have to remove those sources of

17   contaminants to prevent them from becoming a problem in the

18   first place.

19            **MR. MEUNIER:**  Your Honor, since this is a learned

20   treatise, it is not offered into evidence, but it has been

21   identified as P2.0239.  The witness has read an excerpt, but we

22   make the full article available to the Court as you need.

23            **THE COURT:**  Under 804(18), it's not admissible into

24   evidence, but it is able to be read, portions of it.  The

25   witness has done so.

1  BY MR. MEUNIER:

2  **Q.**   Now, in applying these principles that you mentioned to

3  determine the scope of remediation, are you informed by

4  science, by practicality, or by both?

5  **A.**   By both.  You have to have both to really evaluate what

6  all needs to be repaired because some issues are going to be

7  governed by what the science is telling you that you have to do

8  to address the issue.  Then once you get past that, there's so

9  many constructability issues that are going to be required to

10  be done so you can even accomplish the repair work.

11  **Q.**   For a given step in the remediation, does the weight given

12  science and the weight given practicality differ or vary

13  depending on the specific component of the remediation

14  protocol?

15  **A.**   Well, the science part you have to address, so that would

16  definitely have a very high weight.  But in terms of trying to

17  evaluate what you're going to do for the repair, they're of

18  equal need because you have to have both to be able to have a

19  finite scope of repair.

20  **Q.**   Have you prepared, at our request, Mr. Wright, a written

21  statement or summary for the scope of remediation which you

22  feel is necessary and appropriate in this case?

23  **A.**   Yes, I have.

24  **Q.**   This has been marked as P1.2058.  I'd like you to go down

25  this list, beginning with the first, and tell us, first of all,

1  what "R&R" stands for.

2  **A.**   That stands for remove and replace.

3  **Q.**   Why is it, in your view, necessary to remove and replace

4  drywall on walls and ceilings?

5  **A.**   One particular reason, of course, would be the science

6  base that you have, the Chinese drywall.  So to remove the

7  source that we were talking about earlier, that would have to

8  be done to address that issue.

9  **Q.**   Are you referring to all of the drywall in a home where

10  some Chinese drywall has been confirmed as being present?

11  **A.**   Yes.

12  **Q.**   Why do you remove all of the drywall even though there's

13  only some Chinese drywall?

14  **A.**   Well, the practicality side of it comes into -- on the

15  construction side of it that you have to remove all of it

16  because it's a much more cost-effective way, and it would also

17  make sure that you're catching all Chinese drywall.

18          **THE COURT:**  Theoretically, you could test each sheet

19  with an electron microscope and determine whether or not it's

20  Chinese drywall, but what you're saying is it's not practical

21  to do that?

22          **THE WITNESS:**  That's correct, with the cost you'd

23  have for doing that testing of each and every sheet, and then

24  there's also some examples we're going to show where -- trying

25  to even determine where sheets are to be able to decide that it

1    is one to test.

2    **BY MR. MEUNIER:**

3    **Q.**   You accompanied us on our visit to Fort Myers and Tampa,

4    Florida to view the Beazer homes; correct?

5    **A.**   That's correct.

6    **Q.**   You were present in court when we played the video of that

7    Beazer home room or area where installed drywall is taped in?

8    **A.**   That's correct.

9    **Q.**   Did you actually, at that same Beazer home where that

10   video was taken, do a sketch and count of how many different

11   drywall pieces were in a different area?

12   **A.**   Yes.

13            **MR. MEUNIER:**   Let's go to that next slide, Scott.

14   **BY MR. MEUNIER:**

15   **Q.**   As we can see at the bottom, this refers to the Beazer

16   home in Fort Myers, Florida; correct?

17   **A.**   Yes.

18   **Q.**   What does this sketch of yours tell us about this

19   particular area, which is the master bedroom ceiling layout?

20   **A.**   In the video that had been shown with one of the Beazer

21   witnesses, he had counted the drywall on the walls.  This is of

22   that same room, but it's showing the ceiling and the number of

23   pieces that would have been involved in just applying the

24   drywall to that ceiling.

25            Even though it's 4-by-12 sheets, they have a lot of

1  different joints they have to introduce, so there's a lot of
2  pieces that are used.  That particular ceiling had 11 pieces by
3  itself.
4  Q.   So in order just to look at the ceiling in this one room,
5  if we wanted to make sure we were identifying Chinese drywall
6  on a piece-by-piece basis, you'd have that many different
7  pieces to account for?
8  A.   That's correct.  You'd have to define each one of those to
9  be able to even know they're located there.
10 Q.   That would be a time-consuming process?
11 A.   Yes.  I'm not aware of any foolproof way to actually
12 establish what the perimeter is for each one of those.
13 Q.   Let's go to the next slide.  This is a closet, just a
14 closet in that same home?
15 A.   That's correct.
16 Q.   In the closet alone, how many total pieces of drywall did
17 you count?
18 A.   There were 11 pieces between what was on the walls and
19 what was on the ceiling.  So, again, you would have to define
20 each and every one of those pieces.
21 Q.   Drywall comes in a certain size; we've established
22 4-by-12.
23 A.   That's correct.
24 Q.   But in the construction business, you know that it is cut
25 up into different pieces to be installed.

1   A.   Yes.

2   Q.   Is it scattered through a home in that process?

3   A.   Yes.  What happens is a lot of times they'll have a full

4   sheet, but they don't need it on one particular area, so

5   they'll cut off an end of it.  They'll save that piece to be

6   able to use it in other areas where maybe smaller pieces could

7   be used.

8   Q.   Let's go to the final sketch you made of the Beazer home.

9   This is the entry area of that home?

10   A.   Yes.  There was a small hallway, and it was only about a

11   3-foot-by-6-foot hall.  But within that, between the ceiling

12   and all the door openings and the configuration, there were 14

13   pieces just in that one small area.

14   Q.   Mr. Wright, is the practical mission of trying to identify

15   separate pieces of drywall once they've been installed and

16   painted in complicated by the fact that you cannot see the

17   seams once it's behind the painted wall?

18   A.   That's correct.  They would disappear with the finishing

19   work, and then especially once a wall finish, the paint or --

20   Q.   We have a couple of photographs I'd like you to discuss

21   with the Court briefly.  Is this a photograph showing you

22   removing a section of drywall?

23   A.   Yes.

24   Q.   From one of the Beazer homes in Florida?

25   A.   That's correct.

1    **Q.**   What are you attempting to demonstrate here?

2    **A.**   This is just even in the walls that there may be a

3    4-foot-by-12 piece that starts from the top.  Usually, they

4    work from the ceiling down.  So you would have a 4-foot-by-12.

5    Then they would put a small piece, which is what this is

6    showing, about a 16-inch-wide horizontal strip, because the

7    ceiling was 9-foot-4 height.  So they had to put in this strip

8    to be able to then have the bottom 4-foot continue the rest of

9    the wall.

10   **Q.**   Of course, before you removed and creased it, these seam

11   lines would not be visible?

12   **A.**   That's correct.  With the finished wall, you didn't even

13   notice where that may appear on the wall.

14           **MR. MEUNIER:**  Let's look at the next slide, Scott.

15   **BY MR. MEUNIER:**

16   **Q.**   You've now turned that piece over.

17   **A.**   Yes.

18   **Q.**   What do we learn here about this particular piece?

19   **A.**   It told us the size of it, and I believe it does say

20   "Taishan" on it.

21   **Q.**   It's a 4-by-12 piece.  The seams are shown in this photo,

22   top and bottom?

23   **A.**   That's correct.  It shows that middle piece that they

24   actually introduced into the wall.

25   **Q.**   Now, let's go back to your scope of remediation and look

1   at the next component on it.

2         **THE WITNESS:**  One further thing on the drywall

3   aspect.  You had asked, Your Honor, about the fact if you could

4   find a piece.  But if you did the operation of trying to do

5   just an individual piece, the cost of being able to remove that

6   is about five times more costly than if you did that wall.

7         **THE COURT:**  That's the way the practicality would

8   also come into play?

9         **THE WITNESS:**  Definitely.

10  **BY MR. MEUNIER:**

11  **Q.**   Back to the scope of remediation, which is P1.2058.  The

12  second step or the second element is the removal and

13  replacement of electrical wiring, low-voltage wiring, devices,

14  fixtures, controls, sensors, and main panel components;

15  correct?

16  **A.**   Yes.

17  **Q.**   Tell the Court why that's consistent with the principles

18  you followed and whether both science and practicality inform

19  that recommendation.

20  **A.**   That is based heavily on the science side, what's been

21  said today and on Friday, with the corrosion that's occurred,

22  that the only option's to take that out.  That's further

23  supported by the electrical code that would have been in place

24  for the homes that were constructed in Virginia.  And then

25  there's also a significant part of it on a practicality side.

1   That's even if you were to try to address just a spot repair at
2   where the wiring terminated into a device box.
3   Q.    In regard to this element of your protocol, Mr. Wright,
4   have you looked at provisions in the building code?
5   A.    Yes.
6   Q.    What is the International Residential Code?
7   A.    The State of Virginia adopts the Virginia Uniform
8   Statewide Building Code, which in turn brings in the
9   International Residential Code.  That now has become the code
10  used across the United States in virtually all states for
11  residential application.  So within the residential code,
12  there's specific sections that deal with all types of things
13  for construction, but it has electrical as a part of that code
14  also.
15  Q.    Let's look at the first section of that code, and this is
16  section E3304.6.  Tell the Court:  What is it about this
17  provision that you think is relevant to your recommendation for
18  the removal of all electrical wiring, etc., in the homes?
19  A.    Through that section, it talks about basically all parts
20  of the electrical system, that it shall not be damaged.  If you
21  go right in that area, it says:  Shall not be damaged or
22  contaminated by foreign materials such as paint, plaster,
23  cleaners, abrasives and corrosive residues.  So it tells you
24  specifically you cannot use wiring that's been damaged by any
25  of those components.

1  **Q.**   It also tells us that the wiring in a home cannot be
2  deteriorated by corrosion; correct?
3  **A.**   That's correct.  It shall not be used if there's any
4  damaged parts that are adversely affected, the safe operation
5  or mechanical strength of equipment, such as parts that are
6  broken, bent, cut, deteriorated by corrosion, chemical action,
7  or overheating.
8  **Q.**   So in these seven Virginia homes, Mr. Wright, where
9  defective Chinese drywall has been found, would this provision
10  of the housing code, this electrical provision, require the
11  removal of any wiring terminal or wiring surface that had
12  corrosive residue?
13  **A.**   Yes.
14  **Q.**   Have you seen in this case actual physical evidence of
15  corrosive residue not just on exposed wire endings but also on
16  wire surfaces that were covered with insulation or even behind
17  walls?
18  **A.**   Yes.
19  **Q.**   Were you present at the beginning of the case when
20  Mr. Serpe showed the photograph of a lamp cord from which a
21  lamp was suspended in one of the Virginia homes?
22  **A.**   Yes.  I was present when that was discovered.
23  **Q.**   Did you actually look at that lamp cord at the time it was
24  inspected and photographed?
25  **A.**   Yes, I did.

1    **Q.**   What did you find?

2    **A.**   I saw that the wiring from the ceiling down to the fixture

3    itself, all the exposed wiring inside of the plastic covering,

4    had become discolored and black.

5    **Q.**   Were you also in court today when the lamp of

6    Mr. Baldwin's house was discussed that's sitting over here on

7    the table?

8    **A.**   Yes.

9    **Q.**   Have you looked at that lamp?

10   **A.**   Yes, I have.

11   **Q.**   What's significant about what you found?

12   **A.**   It matches identically to the way in which that lamp at

13   the Morgan residence was, that it has the black interior of

14   that plastic cover.

15   **Q.**   Were you here when Mr. Smith showed Judge Fallon the

16   sample light switch, three-switch box, from one of the Beazer

17   homes?

18   **A.**   Yes.

19            **MR. MEUNIER:**   Your Honor, may I approach?

20            **THE COURT:**   Yes.

21   **BY MR. MEUNIER:**

22   **Q.**   This is Exhibit P1.1891.  Would you look at that,

23   Mr. Wright, and tell us whether you agree with Jerry Smith's

24   testimony that there is visible corrosion on the ground wire

25   coming from that box, which would have been under insulation

1  and behind the wall of that home.

2  **A.**   Yes.  The location of that would have been in the wall

3  cavity, not in the box itself, and it was behind the Romex

4  sheathing that was on that.

5  **Q.**   So the significance of this is that, in the case at hand,

6  you know there's evidence of actual corrosion on covered wiring

7  behind the wall?

8  **A.**   That's correct.

9  **Q.**   Why is that important to support your proposal that all

10  wiring, per the code requirements, in these homes should be

11  removed?

12  **A.**   Well, to get to it, you would have to get the drywall out

13  of the place, but it would mean that you would have to

14  definitely take care of this because that means any of the

15  wiring that may be in the cavity of the wall could have this

16  type of damage on it.

17  **Q.**   We've talked in this case about junction boxes and

18  receptacles.  Could you give the Court just a good working

19  definition of *junction box* and *receptacle*.

20  **A.**   A junction box is a place where you would have the wiring

21  come into and do a splice.  A receptacle is a device that

22  actually could go into a box, then you wire it, and it becomes

23  fixed into that box to be able to plug in and out of.  Much

24  like a light switch; that's a device that goes into a box so

25  that you can have the wiring behind that device.  So a junction

1   box is basically an open box, but you can have the wiring

2   within it for a splice.  It could be where the devices go to.

3   **Q.**   We've heard reference in this case to the requirement of

4   6 inches of slack inside of a box.

5   **A.**   Yes.

6   **Q.**   That is actually a requirement of the building code?

7   **A.**   That's correct.

8           MR. MEUNIER:  If we can look at the next slide,

9   please, Scott.

10  **BY MR. MEUNIER:**

11  **Q.**   I want to look at code provision E3306.10.3.  Is this the

12  requirement that there be a minimum length of 6 inches of free

13  conductor at every outlet, junction, or switch point?

14  **A.**   Yes.

15  **Q.**   What is meant by "free conductor"?  Explain that to the

16  Court.

17  **A.**   What they mean by "free conductor," this box here means

18  that you would have to have -- where this cable enters into the

19  box, you'd have to have 6 inches extend past that point, once

20  it enters into the box, of unobstructed length of wiring so

21  that you can then hook your device up to that length of wiring.

22  **Q.**   This provision of the code actually said this required

23  length of 6 inches shall be measured from the point in the box

24  where the conductor emerges from its raceway or cable sheath --

25  meaning the back of the box where the wall is?

1   A.   That's correct, where then it would become -- 6 inches

2   from that point it comes into that box.

3   Q.   So if you wanted to cut away visibly corroded wiring

4   inside a box and splice new wire onto the ending, would this

5   code requirement mean you'd first have to pull at least

6   6 inches of free wire out from behind the box to be available

7   before you did any splicing?

8   A.   That would be what you would try to do.  But with the way

9   construction is, you would never be able to get an additional

10  6 inches, once you've cut it off, back to where that box --

11  where it enters the box, if you're cutting back to that point,

12  what I understand you're saying is if you could then pull that

13  wiring back through to get another 6 inches.  That's what you

14  would be needing by this code, but there would never be

15  6 inches you'd have available to be able to pull into that box.

16  Q.   Why not?

17  A.   With the way an electrician does the wiring, he runs it to

18  that box and it's stapled to the framing inside of the wall

19  cavity.  It runs all the way back to the panel box.  There's no

20  slack provided in that because, one, for the cost, but it's

21  also -- it would get in the way of trying to perform your

22  activity of wiring that box up.

23  Q.   We have prepared a couple of mockups here, Mr. Wright.

24  A.   Yes.

25  Q.   Would it help you to further explain at this point to the

1    Judge if you could step down and use these mockups?

2    **A.**   I think it would.

3    **Q.**   Okay.

4    **A.**   This would be an example of the 6 inches coming in the

5    box, that you would have that length coming out to the actual

6    device.  In this case, it's a light switch.  So you'd actually

7    have the switch, and each one of the wires within the Romex has

8    to have 6 inches out.  The purpose of that is so you can see

9    how you can pull it out and actually do the wiring onto that

10   switch and to make sure you have enough length so you can do

11   that during the actual operation of putting this in.

12                  **THE COURT:**  Can you splice into that 6 inches?

13                  **THE WITNESS:**  You cannot splice onto this 6 inches --

14   well, you've got the 6 inches.  That would be what you need.

15   If you cut this back at the edge, you no longer have the

16   6 inches.  So you can't just put 6 inches onto that wiring

17   because that's not -- the code contemplates you can't have

18   another set of wiring inside of this box.  It's only for this

19   device.

20                  So if we can show the backside of this, it

21   actually shows how the wiring would typically be done.  In this

22   switch, you'd have wiring that's coming from the panel box --

23   this would be coming down the wall, and you have staples that

24   would go to it.  They run the wiring into the box.  At that

25   point is where you have the 6 inches, once it goes into this

1   box.  On a switch -- this is an example of a switch that runs

2   an outlet box like -- houses are required to have that, one in

3   every room.  You would have this wire go to the device, which

4   would be the switch.  Then it comes back from the switch and it

5   goes down the wall.  So now you've got this wiring that has to

6   come over to this junction box, which has the receptacle in it

7   over here.

8                    This is an example of the others.  This is a

9   switch for a light itself.  So you've got the power line coming

10  into it, then the line that comes back out up to the ceiling

11  over to the light fixture in the ceiling itself.

12                   These are examples of what they call

13  daisy-chained receptacles.  You've got a wire that's running

14  through the wall, and it basically connects a series of

15  outlets, receptacles, together.  It comes into this receptacle.

16  It comes back out.  It goes across.

17                   In this case, it's going to another receptacle

18  here, just to show an example of how you would have two

19  connected to the same wiring.  So this would be examples of --

20  basically, this is a 4-foot-by-4-foot, but it would be

21  representative of what may be on a wall 12-foot long and 8-foot

22  high.

23  **BY MR. MEUNIER:**

24  **Q.**   So, Mr. Wright, just to finish this point, what kind of

25  chain reaction, as a practical construction matter, is set off

1   once you go down the path of not removing all wiring but

2   clipping off what's in the box and trying to create the

3   6 inches of slack in the box required by code?

4   **A.**   What happens in the case of this switch that we were

5   looking at first, if you clip the wiring here, then to maintain

6   this switch location, you have to extend the wiring.  Well, by

7   code, the only way to do that is you put in a junction box and

8   actually do that splice inside of that box, and then come back

9   where you have 6 inches for the line coming into the junction

10  box, 6 inches for the line going out of it down to this new

11  switch, then 6 inches inside the switch box.

12          We've got another example wall of how it would look

13  with that kind of condition.

14          **THE COURT:**  How about the junction boxes; do they

15  need to be replaced, in your opinion?

16          **THE WITNESS:**  The box itself would not have to be

17  replaced, no.  It's a plastic.  I don't believe it would have

18  an issue as far as leaving that in place.

19          **THE COURT:**  What about the insides of the box?

20          **THE WITNESS:**  Everything in there would need to go

21  because it's wiring and then it's a switch or receptacle, which

22  have all found corrosion on those.

23          This is the exact same layout as that wall was.

24  All of these blank cover plates are locations where a splice

25  has been done, and that's because of the fact that the

1    6 inches, now not being available for this switch to stay

2    there, you have to put in one to run wiring into this, with

3    6-inch from the power line coming in, another 6-inch for the

4    one that's going out to the switch, 6 inches in for the switch,

5    6 inches off that switch, down to another junction box, to go

6    over to the outlet that was controlled by this switch.

7                    So this would be how your wall would look on the

8    front face now because you'd have to have access to every

9    junction box.  You can't cover it over with the drywall.  So

10   you'd have to have these cover plates in place to be able to

11   get in where that splice would be.

12   **BY MR. MEUNIER:**

13   **Q.**   Is the multiplication of cover plates on a wall, which

14   wasn't there before, consistent with the principle of restoring

15   a home to its condition prior to Chinese drywall?

16   **A.**   No.  It would be very aesthetically unpleasing.  In

17   addition to that, each of these now creates a new hotspot where

18   the wiring itself, you created with just that splice on that

19   circuit so many more points.  Here you've got one, two, three,

20   four -- five on just that circuit, where before it was just two

21   points.

22                    So you've got a lot more resistance that's built up

23   on each of these areas, where you have more opportunity that

24   fire could occur through that, and it doesn't trigger circuit

25   breakers to go if -- in these boxes where you have the wiring

1   with just a splice, those most likely would not trigger a short

2   that would trip a breaker.  It would heat up and you'd have

3   more chance for a fire.

4   Q.   So there are new potential points for electrical failure?

5   A.   That's correct.

6   Q.   There's an increase of fire risk?

7   A.   Yes.

8   Q.   So in addition to the aesthetics, the owner is not being

9   restored on the basis of risk and function?

10  A.   That's correct.  It would definitely increase risks of

11  problems with the electrical system.

12          This just shows in terms of how many more boxes would

13  be needing to be installed.  From a constructability issue,

14  too, the cost of having to add all of these new junction boxes,

15  with the wiring inside of those, that would take about a half

16  hour each.  So by the time you would go through the process of

17  all these additional junction boxes, it's going to exceed the

18  cost of just taking the wiring out back to the panel and

19  putting in a new line.

20          Part of the problem with having that approach, also,

21  you definitely have the safety issue with all these increased

22  junction boxes, but you've got the cost of the time factor of

23  having to go back and put all of these in compared to what it

24  would take time-wise to do just one run.

25  Q.   When you're doing electrical work in a home, on a

1 percentage basis, what portion generally falls under material

2 cost and what portion falls under labor cost for electrical

3 work?

4 **A.**   It would probably be about 25 percent on the material,

5 75 percent on the labor.

6 **Q.**   So if I'm removing all the wiring, that's obviously

7 removing more material, but the tradeoff on labor is what if

8 I'm going to remove all versus do this multiple-splicing

9 junction box approach?

10 **A.**   You would increase the labor dramatically.

11 **Q.**   You'd increase the cost?

12 **A.**   And it would increase costs, that's correct.

13 **Q.**   Let's go back to your scope of work document, which is

14 2058.  We'll move quickly.  Your third element is to remove and

15 replace air-handler units, compressor units, and ductwork.

16 **A.**   Yes.

17 **Q.**   Again, why is that consistent with the principles you

18 follow, and how is that supported both by science and

19 practicality?

20 **A.**   The science side, as far as what's been discussed, with

21 all the corrosion that's been occurring to the coils, the

22 electronic components within those, that would all be

23 definitely on the science side.

24         Somewhat to the science side, also, on the compressor

25 units, one thing I know Mr. Rutila had discussed dealt with the

1   fact of the overuse of the compressor with the fact the
2   coils -- with any leakage, it's going to make it have short
3   cycling and burn it out quicker.
4            Another issue is that a number of the homes have been
5   built in a time period where the refrigerant that was used
6   within the HVAC system is no longer allowed to be used, and
7   there would be a mismatch between the compressor unit and the
8   air-handler units, that you would not be able to just replace
9   the air handler without having to also change out the
10  compressor because you would not have a matched system that
11  would work.
12  **Q.**   Why remove the ductwork?
13  **A.**   The ductwork would be one that's more practicality.  It
14  would have a science side, in fact, if there's dust within it
15  and it would absorb the sulfur smell.  So you would have
16  off-gassing that could occur over time.
17           But the constructability side is that as you take the
18  drywall down, most of the ductwork's going to be coming with
19  it.  You would have it dangling down out of the ceiling.  It
20  would be in the way of the repair efforts that would be going
21  on.  It's a very cheap cost to actually take that duct out, and
22  it would be more costly to try to salvage it as compared to
23  just throw it away.
24  **Q.**   Next you say we remove and replace appliances.  Which
25  appliances are you referring to there, Mr. Wright?

**A.** Those would be appliances that would be typical for a contractor including in their pricing, which would be the major appliances like all kitchen appliances:  A microwave, oven, the dishwasher, refrigerator.  Then you would have your washer and dryer.  Those would be the major components that I'm discussing in this.  Contractors, generally, they won't include any of the costs for the personal items that a homeowner may have like a TV or a radio, those types of things.

**Q.** Your scope is referring to builder-supplied or contractor-supplied appliances?

**A.** That's correct.

**Q.** Washer, dryer, dishwasher, refrigerator, microwave, hot-water heater, oven, stove?

**A.** Yes, the hot-water heater also.

**Q.** Things like televisions, computers, what is your position, if any, with respect to the need to replace those electronic equipment?

**A.** Based on what has been found through science testing of those components with the electronic circuit boards, wiring within those, those would need to be replaced also.

**Q.** In fairness -- and we'll get to your numbers -- in your cost estimate, you have not provided for the cost of things like televisions and computers?

**A.** That's correct.  It would only be towards what a contractor would supply.

1   **Q.**   Item 5 is to remove and replace plumbing lines and
2   fixtures.   Now, are you dealing here only with metal surface
3   lines and fixtures or also PVC?
4   **A.**   Also PVC.  This, again, has both components of the science
5   side and also the practicality side.  The science side, a lot
6   of the plumbing would have copper or brass parts to them:
7   Faucets, shower mixing boxes.  All of those would have things
8   that would be attacked, again, by the corrosive sulfur.  So you
9   would have to remove those for that component.
10          But a fair share also comes from the constructability
11  side.  To get the drywall out and access to get the drywall
12  out, you'd have to remove everything in front of it.  So
13  toilets would be in the way.  The sinks would be in the way.
14  So all of that plumbing would have to come out to be able to
15  get those items off the wall.
16  **Q.**   PVC, though, is not metal.  Is there a practical
17  construction-related reason why you're removing all of that?
18  **A.**   Again, that would be on the constructability side.  It's
19  one where you'd have most of the PVC comes into areas where
20  you're going to have to get it out of the way to do the drywall
21  removal.  To get it out of the way means you basically cut it
22  back to the floor line.  By doing that, then you have access to
23  get the drywall both out and back on as you do your new work.
24  **Q.**   Would it be cost efficient or construction smart to try to
25  save pieces of PVC, store them, and bring them back later?

1   **A.**    No.   Again, the material cost would be very, very small

2   compared to the labor part, especially if you're trying to do

3   the labor as a salvage operation versus being able to demo it

4   and come back in with just a plumber doing the original

5   installation.

6   **Q.**    Your sixth item is to remove and replace building

7   components to access items above.   Is PVC one of those that you

8   just mentioned, or are there other components here?

9   **A.**    That would be somewhat the same line of thinking, but the

10  building components would be more like cabinetry:   Your wall

11  cabinets, your base cabinets, your vanities in your bathrooms,

12  anything that's been basically mounted to the wall or over the

13  drywall.   So all of your trim around windows, doors, when you

14  get to the floor line, your wall base, if they have crown

15  molding, all of those things would have to come off to be able

16  to get the drywall off.

17  **Q.**    You're aware that Beazer -- and Mr. Phillips testified

18  about this -- actually at first thought they could salvage and

19  store and save cabinets?

20  **A.**    Yes.

21  **Q.**    When you started out in your analysis, were you thinking

22  the same thing?

23  **A.**    Yes.   Actually, we had looked at -- and when we get to

24  cost later, we had done an alternate to even evaluate on a cost

25  side which made more sense:   To salvage or to leave or

1    basically demo it out and put all new in.

2            At that point in time when I had authored my report

3    initially, I had thought it would be something you could

4    salvage.  But in discussions with the contractors we were

5    working with for costs, with Beazer, discussions found that the

6    practicality side of it, it really would be most costly to go

7    forward with trying to salvage the cabinets.

8    Q.   The seventh item is to remove and replace flooring

9    materials but protect hard tile.  Explain that to the Court.

10   A.   The flooring materials -- almost all the carpeting, vinyl,

11   wood flooring -- all of those are very easy to damage, and they

12   also would become very easy to have the dust from the drywall

13   removal operation get impregnated into or cause scratching or

14   damaging to it as you do the removal of the drywall.  So to

15   take care of that, it would be best just to take those out and

16   completely replace those.

17           The quarry tile or hard tile is something that it

18   won't absorb the dust; it is pretty resistant to any kind of

19   damage from working on the surface of it, so those were items

20   that we believed you could salvage that and just use it again

21   in the new repair.

22   Q.   You next recommend the removal and replacement of all

23   ceiling and wall insulation material?

24   A.   Yes.

25   Q.   Why is that, sir?

DAILY COPY

1   **A.**   That's one primarily on constructability; that as you

2   remove the drywall, the insulation in the walls is definitely

3   going to get dust all throughout it.  It also is one that when

4   you have that insulation, it gets compressed.  I believe

5   someone from Beazer had already mentioned that.  It's going to

6   lose it's R-value because you no longer have the full depth of

7   that insulation.  So all of those factors makes the wall

8   insulation one.

9        The ceiling insulation is one where you take the

10   drywall off the ceiling, it's going to already come out because

11   it's going to be just laid on the drywall, so you're going to

12   lose that insulation through that process.

13   **Q.**   You next call for the disposal of demolished items,

14   cleaning, HEPA-vacuum and wet-wipe clean all surfaces.  The

15   disposal, we saw a film during the Beazer demolition, is the

16   cost of a dumpster to take away the material, etc.?

17   **A.**   Yes.  Basically, it's to put it into something that you

18   can then haul off to dispose of properly.  So then after you've

19   got everything removed from all the items above, you have to go

20   back in and clean out the rest of the dust and debris that's

21   been left through that process.

22        So you have a rough cleaning, which would be

23   basically broom or shovel out all the particles you can.  Then

24   you would put the HEPA vacuum so that you can suck up all the

25   rest and not make dust go back throughout the building.  And

1   then the wet-wipe actually will then finish off making sure you

2   get dust particles that are touching other surfaces and the

3   HEPA vacuum can't even suck it off of those.

4   **Q.**   What is a HEPA vacuum?

5   **A.**   It basically has a spatial filtration in it that will

6   capture very small particles.  So by having that vacuum, you

7   don't make the dust go back throughout the whole building.

8   **Q.**   You heard Mr. Phillips and Mr. Smith at Beazer talk about

9   pressure-washing as a component of the cleanup phase; true?

10  **A.**   Yes.

11  **Q.**   Pressure-washing the wood, studs, etc.?

12  **A.**   That's correct.

13  **Q.**   You don't call for that in your remediation?

14  **A.**   No.  Primarily, with the concern -- in the Florida homes

15  that Beazer's remediating, there's a lot of concrete-block

16  walls and steel-stud framing, so the water's not going to get

17  absorbed into that.  It will be something that they can vacuum

18  back out.

19          I like the approach, and I think it probably is a

20  much more thorough cleaning and would like to do that.  But

21  with all the wood that's involved in the homes, especially in

22  the Virginia homes, that would be something where you'd have a

23  lot of water that could get absorbed into all the different

24  crevices and places that the wood framing would have.  I think

25  it would be something that would be a tradeoff to use the wet

1   wipe only because then you can control how much moisture might

2   be introduced into the wood as compared to using the,

3   basically, wet-vacuum approach that Beazer was.

4   **Q.**   Your final step is to restore the residence to its

5   original finish level.  What does that mean?

6   **A.**   That basically would be that once you're putting

7   everything back, then you would do the final painting.  You

8   would have the carpeting.  You would do everything so that it

9   restores that house back to the state it should have been from

10  the original time it was purchased.

11  **Q.**   Is your scope of repair and remediation generally

12  consistent with that of the Beazer approach?

13  **A.**   Yes.  The only issue that I would say is different was the

14  wet-vacuuming.  And then what I heard was they did not do the

15  compressor for the HVAC because of it already being on the new

16  refrigerant, so there was not going to be a mismatch on terms

17  of just doing the interior HVAC components.

18  **Q.**   Just for the record, if we could look at the Beazer

19  remediation scope one moment.  This is P1.1888.  You've

20  reviewed this, Mr. Wright?

21  **A.**   Yes, I have.

22  **Q.**   Except for the difference perhaps on pressure-washing, you

23  essentially agree with the Beazer scope of remediation?

24  **A.**   That's correct.

25  **Q.**   What do you estimate to be the total length of time on

1    average it would take to complete your proposed scope of
2    remediation for these Virginia properties?
3    **A.**   It would depend on the size of the home.  But in general,
4    I'd say it'd be in the four- to six-month range.  A smaller
5    home could be four months.  The larger or more detailed it is,
6    it could take up to six months.
7    **Q.**   Let's go back to 2058.  So you think a four- to six-month
8    period, but that would not apply to one of the homes; correct?
9    **A.**   That's correct.
10   **Q.**   That would be the Leach property?
11   **A.**   Yes.
12   **Q.**   In fairness, which of the components of your remediation
13   would not be applicable to that add-on room that's being
14   remediated in the case of Mr. and Mrs. Leach?
15   **A.**   What I recall, there were no appliances, no HVAC directly
16   within that room, and so 3 and 4 would not be, 5 would not be,
17   and there were no flooring materials, so 7 would not be.
18   **Q.**   So for six of the seven properties, you're recommending
19   steps 1 through 10 on your statement of scope; and in the case
20   of Mr. and Mrs. Leach, you would exclude items 3, 4, 5, and 7?
21   **A.**   That's correct.  I believe in 3 there was mention of a
22   dehumidifier.  It was priced out within the repair scope, and
23   that was included as part of what would be considered an HVAC
24   system even though it's just a dehumidifier.
25   **Q.**   Now, I believe you were here when there was testimony

1    about the role of Environ, the environmental specialist with

2    the Beazer company?

3    A.    Yes.

4    Q.    You heard testimony that at the end of that remediation by

5    Beazer, Environ will come in and sign off technically and

6    environmentally on the fullness and completeness of the work?

7    A.    That's correct.

8    Q.    Have you provided for that additional cost in your scope

9    or your assessment?

10   A.    No, I have not.  That would be something -- there are

11   going to be inspections by local code people, albeit that may

12   not be something that would go to the detail of this type of

13   repair to say that they really checked out and warranted that

14   all evidence of Chinese drywall is gone.

15   Q.    You would understand how, at the end of this, an owner

16   would want some certification that the Chinese drywall problem

17   has been fully taken care of?

18   A.    That's correct.

19   Q.    You're suggesting it could be done by government officials

20   locally who would be inspectors and perform that on the

21   taxpayer basis?

22   A.    Yes.  They would have inspections.  I don't know that it

23   would necessarily give a free clearance, but it would say that

24   it's returned back to being habitable.

25   Q.    The alternative to that would be to actually pay for

1   something like a technical specialist to come in and sign off

2   on the Chinese drywall work that's been done?

3   **A.**   That's correct.

4   **Q.**   Which is what Beazer is calling for?

5   **A.**   Yes.  That was one thing, in discussions with Beazer, I

6   found out that they did have that, where they included that

7   final step of having a clearance testing done to make sure that

8   it was free of Chinese drywall or any effects from Chinese

9   drywall.

10          **MR. MEUNIER:**  I believe, for the record, Your Honor,

11  we've added that in J.C. Tuthill's analysis as a $12,500 cost

12  per unit based on the Beazer testimony.  It's not included in

13  the numbers we're about to review with Mr. Wright.

14  **BY MR. MEUNIER:**

15  **Q.**   So let's talk about the costs associated with your

16  recommended scope of remediation.  I want to begin first,

17  Mr. Wright, by having you explain to the Judge what the basic

18  steps are that are followed to develop a cost estimate for work

19  such as this.

20  **A.**   Okay.  Basically, I had a four-step approach.  The slide

21  shows what those four are.  It's basically we developed -- what

22  we just went through was the basic scope of remediation work

23  that's necessary.  That's a very, very summary description.

24  Now you would have to define what each of those steps means,

25  which is a thorough, detailed explanation in terms of a

1    spreadsheet or an estimate sheet, where you put out every line

2    item of work that has to be done to accomplish that work.  So

3    that's what detail the scope of remediation work would involve.

4              Then from that, you would go into doing your quantity

5    takeoffs.  That's basically, in a given room, how much square

6    footage of drywall is there on the walls, how much is on the

7    ceiling.  You would take the measurements and actually

8    determine how much is in each room, each location of everything

9    in the house.

10             Once you've got those quantity takeoffs, now you have

11   to apply your unit pricing.  You're establishing now, okay,

12   what is the cost to do that specific task that you're doing.

13   And at the end of that, then you summarize and you have some

14   finalizing with markups of overhead, profit, general

15   conditions, what's it going to take to do that job now that you

16   know what your scope is.

17   Q.   Are these steps well established and generally recognized

18   by professionals in your field?

19   A.   Yes.

20   Q.   Are they found in the peer-reviewed literature?

21   A.   Yes, they are.

22   Q.   Let's talk about that detailed scope step that you

23   mentioned.  We've seen your summary statement, but we're

24   talking about something in much greater detail in order to put

25   numbers on this; true?

1  A.    That's true.

2  Q.    Attached to your report -- and this is in evidence as

3  P1.2027 -- you actually created a format to demonstrate the

4  kind of detail that contractors would have to have to follow

5  this scope of work?

6  A.    That's correct.  The scope of work -- we could have given

7  them the summary that we just went through, but in doing that

8  it would not have given them enough direction, what you're

9  really wanting them to accomplish.  This form was provided to

10  the contractors that we did utilize to get bids for the repair

11  to the seven homes.  This basically gave them a footprint or a

12  blueprint of:  Okay.  What is it we're supposed to provide in

13  this bid we're going to give to you?  So it went through and it

14  listed out the types of items that were needed to be addressed.

15  Q.    For example, here we see that you have to detail the

16  drywall that's being installed in ceilings, behind walls, both

17  wet and ceramic walls; true?

18  A.    That's correct.

19  Q.    You have to actually have something in this column under

20  "Unit."  What does "SF" and "EA" mean?

21  A.    The "SF" would stand for square feet because that's how

22  you typically price drywall is by the square foot.  Dining

23  room, it says a premium.  So you'd have one dining room, and

24  you may have an upgrade cost for that.

25          So the "EA" stands for each, meaning you have that to

DAILY COPY

1    be able to take care of it.  There's other kind of little unit

2    abbreviations that you would use such as square yards for

3    carpeting, lineal feet, those types of unit costs.

4    **Q.**    Then the contractor who's submitting the bids can actually

5    enter numbers in this column on the cost?

6    **A.**    That's correct.

7    **Q.**    That would be the unit cost entry?

8    **A.**    Yes.  You would have your quantity times your unit cost

9    will give you your final cost.

10   **Q.**    Now, you actually submitted this proposed scope of work to

11   two Virginia builders?

12   **A.**    That's correct.

13   **Q.**    Two companies in Virginia?

14   **A.**    Yes.

15   **Q.**    Did you find that this detail that you had formatted in

16   your report was sufficient and detailed for their purposes?

17   **A.**    No.  This basically gave them enough information to go

18   forward in developing their full estimate, but this is an

19   example of what one of the contractors had as their tabulation

20   on a room-by-room basis just for the drywall work.

21          So what we're looking at here is, the first part of

22   it at the top, you see "gypsum drywall work."  So as you go

23   down, it has a summary for how much gypsum there is on the

24   ceilings, how much gypsum there is in the partitions, which

25   would be walls.  And then you would have how much taping and

1   finishing work there would be to finish that actual action of

2   putting the drywall compound and tape on all the joints that

3   you have within the drywall.  So you would get -- those numbers

4   that are there are actually being developed below what's been

5   highlighted.  From "gypsum ceiling takeoff," that's a

6   room-by-room of how much drywall each ceiling within the house

7   has.

8   Q.   Let's go to the next page just to show how this sheet ends

9   from this particular contractor.

10  A.   This page deals completely with just the amount of drywall

11  that's on each wall in each room throughout the house.  It

12  would tell you in the garage that you have 86.2 -- I'm sorry,

13  853.28 square feet of drywall on the walls in the garage.

14  Q.   Even with this much detail, the builder needs to figure

15  the cost of something, you then have got subcontractors who

16  have their own numbers to insert in the process; true?

17  A.   That's correct.  In this particular case, the contractor

18  had developed how many square feet there were.  They had gone

19  in, done physical measurements of each room in each of the

20  seven homes.  They provided that square footage to a

21  subcontractor for them to price out and give them back a quote

22  of how much it would be to do that particular work item.

23        In this case, on the drywall, the exhibit shown now,

24  this was the subcontractor that that general contractor had

25  provided that information to.  He received back how much that

1   subcontractor said he would do that drywall work for.

2   **Q.**   Let's talk about the bids that you received.  Which were

3   the two Virginia companies selected to submit independent bids

4   in this case?

5   **A.**   The two names were V.B. Homes and then Virtexco,

6   V-I-R-T-E-X-C-O.

7   **Q.**   What was it about V.B. Homes and Virtexco that you thought

8   made them appropriate choices to independently submit bids?

9   **A.**   V.B. Homes is what I would term a smaller local contractor

10  that has done remodeling and has done some new-home

11  construction, but they do quite a bit of this type of work,

12  where they would come into a house, do repairs, basically on a

13  scope, and put the house back to a new condition.  They've been

14  well established within the Virginia Beach area.  They are a

15  quality contractor.  They've been there for 20 years.  They

16  have a good reputation and are going to be there to make sure

17  there's personal attention done to the house.  That would be

18  the type of people you would want for this kind of repair work

19  so that you make sure they're going to perform the work.

20          Virtexco is a larger contractor that does more

21  multifamily-type construction, or commercial and industrial.

22  They perform work on condominiums or townhouse complexes much

23  like the McKellar or Michaux residences are located in.  We

24  wanted to get a pricing from them, also, for the fact of that.

25  They did price all seven homes out for us, but they are much

1    larger, again, a very quality contractor that's been well
2    established and is going to be there to make sure -- their
3    reputation's on the line.  They're going to do the work
4    correctly.
5    **Q.**   Let's make this clear.  In the bidding process, V.B. Homes
6    and Virtexco were working separately and apart?
7    **A.**   That's correct.
8    **Q.**   They followed the four steps that you mentioned of the
9    detailing of the scope of work, the quantity takeoffs, the unit
10   pricing, then the finalization of markups?  They followed those
11   four steps?
12   **A.**   That's correct.
13   **Q.**   Independent of one another?
14   **A.**   Yes.  Each of them bid independently and followed the
15   steps in developing their own independent bids.
16   **Q.**   They had to go visit these homes?
17   **A.**   Yes.  Each of them visited all seven homes.
18   **Q.**   They did it separate and apart from one another, not
19   conversing with one another or communicating in any way?
20   **A.**   That's correct.
21   **Q.**   I want to next show you a spreadsheet which you prepared.
22   There's a lot of information on here.  We're not going to go
23   through all of it, but I want you to explain to the Court the
24   format.  We have V.B. Homes and we have Virtexco with entries
25   under each; true?

**A.**    That's correct.

**Q.**    Under each, we have the seven plaintiff families:  Morgan, Baldwin, Orlando, Leach, Michaux, McKellar, Heischober.  It's repeated again under Virtexco?

**A.**    Yes.

**Q.**    What do these columns reflect?

**A.**    I developed the spreadsheet basically to summarize the cost that each contractor provided in each of what I would term the 16-division breakdown.  You have standards that have been established in construction where divisions are basically the breakdowns.

So division 9, within that you'd have for gypsum, there's also painting, those different things that are individually line-itemed out, and the contractors provided pricing that way.  So I did it just to see how, comparison-wise, they were doing against what each of them put in for pricing on each home.

This spreadsheet was to do that summary, to be able to see for V.B. Homes, for the Morgan residence, what did they have for cost for each of these 16 divisional items' breakdown. I did the same for Virtexco.  This basically give me a quick summary sheet to be able to see all the numbers that way.

**Q.**    Now, you have at the left-hand bottom of this certain alternatives, 1 through 5.  Tell the Court what those are.

**A.**    During the course of determining what the scope would be,

1   I was trying to explore -- and this was primarily more on the
2   constructability side of it -- if we were to try to do the
3   salvaging of the existing wiring, where -- basically the
4   examples we just went through with the mockup walls, going from
5   the one that showed the original to the new with all the
6   junction boxes, what the cost would be if a contractor
7   attempted to do that.  That's regardless of the fact that I
8   don't believe, with the code and all the other things, that
9   would allow that, but what was the cost for that.
10            Alternate 2 was to salvage the existing carpeting to
11   see if we could actually do that and what the cost would be to
12   try and salvage the carpeting.
13            Number 3 was if we were trying to take the HVAC ducts
14   down, clean them, and then put them back up for reuse.
15   Q.   Let me just stop you there.  You got totals from both the
16   smaller company, V.B. Homes, and the larger company, Virtexco,
17   to accomplish these alternative work?
18   A.   Yes.  Each of them priced out every one of the alternates.
19   Q.   Your conclusion was, with respect to both builders'
20   numbers on alternatives 1 through 3, that they should not be
21   included?
22   A.   That's correct.
23   Q.   Why is that?
24   A.   The cost for that was -- the cost differential for trying
25   to do that was so little compared to the problems of what you

1    may have for future problems on the electrical, what you might

2    have with the carpeting, it just made no economical sense to

3    really try to use those alternates.

4    Q.    What about alternatives 4 and 5?

5    A.    Alternatives 4 and 5 were, once again -- the replaced

6    cabinetry was to see about -- in the original bid, we had it

7    for taking the cabinetry down, carefully taking it out of the

8    house, storing it in a conditioned space, being able to then

9    see whether we could -- I'm sorry.  That one was one where we

10   had it to take it out.  I'm mixing myself up.

11          The original bid was to take it out altogether and

12   then put it back in.  You would store it, carefully take it

13   out, bring it back in.

14          Alternate 4 was, instead of doing that, you just take

15   it out, get rid of it, and put new cabinetry in.  When we did

16   the pricing on that, we saw that the cabinetry cost may be high

17   enough that we should try to go ahead and salvage and do that

18   action, where we just take it out, store it, put it back in

19   place.

20          But as we further discussed with the contractors that

21   we had the bids from, and also once we talked to Beazer and

22   they had tried that process, and the cost it would be to really

23   store it in a climate-controlled environment, the care that was

24   taken to do that, it was actually costing more.  Even though

25   what we had in our original alternate here appeared that it

1   would be a cost savings, it ended up it would be better

2   economically just to replace it.

3   **Q.**   How about the wood flooring, alternate 5?

4   **A.**   The wood flooring, basically the same.  The original bid

5   was to keep the wood flooring in place in the house and protect

6   it.  But it became apparent that there was also the concern

7   because we would have a four-month time period where there

8   would be no conditioning of the air in that space and because

9   of the -- whether warm temperatures, cold temperatures,

10  humidity, that there would be a problem with the floor becoming

11  damaged during that time period.

12          And also the fact of trying to protect it, whether

13  you could actually keep the drywall dust out from being in

14  there and ground into the surface, or that when you tried to

15  remove the drywall you're not going to disturb the whole,

16  entire perimeter edge because the wood would be tight up

17  against the drywall and the wood base would be over that, that

18  you would tear it up already in doing that.

19  **Q.**   So in your final table on the numbers from these two

20  builders, you brought up the costs of alternatives 4 and 5 into

21  the main body of the table?

22  **A.**   Yes.

23  **Q.**   Then we have a revised table, which includes those numbers

24  for the alternatives on cabinets and wood floors.  This, then,

25  P1.2060, represents the V.B. Homes and Virtexco numbers for the

DAILY COPY

1    scope of remediation you think is appropriate for each of these

2    homes?

3    **A.**    That's correct.  These would be, now, the adjusted numbers

4    with -- not including the -- including alternate 4 and 5 into

5    the body of these numbers.

6    **Q.**    Now, across the top there's an entry for the square

7    footage of each home; true?

8    **A.**    Yes.

9    **Q.**    For V.B. Homes, it's 3,079 for Morgan, 2,922 for Baldwin,

10   etc.

11   **A.**    That's correct.

12   **Q.**    When we look over to the entries for Virtexco, some seem

13   to match.  For example, the Morgan and Baldwin numbers match.

14   Orlando, though, is shown to be 3,485 as opposed to 3,005 with

15   V.B. Homes.  Can you explain why two different builders

16   measuring the same property could come up with some variance in

17   square footage?

18   **A.**    I would say it's not unusual at all to have variances like

19   that because who measures it, it could depend on how they went

20   about measuring the house.  Some people, they may not measure

21   all the way to the wall and forget to add in for the cabinetry

22   that's in the way.  They may try to run through from room to

23   room with the longer dimension, where somebody maybe went wall

24   to wall within a room.  It would result in some square-foot

25   differences between them.

1          I would be more shocked when they're exact because

2     that's pretty difficult on a large house, but they did have

3     quite a few numbers that were exact and some that were very

4     close in the total dimensions that they ended up with.

5     Q.   Now, when you totaled up the costs -- and this is at the

6     bottom of the chart -- you have a line here for the total

7     direct costs, and then below that an addition for overhead and

8     profit.

9     A.   Yes.

10    Q.   Explain that.

11    A.   The total direct cost would be if the contractor just

12    hired the people and, in essence, didn't have to do anything

13    else on the project.  That's what the cost would be to do that

14    work.  But that contractor's in business, so he has to have

15    overhead, which would be his home office, where he's got rent

16    for his office space.  He's got staff there like a bookkeeper,

17    the president, anybody else that may work in the office,

18    project manager that oversees several projects.  Those are all

19    home-office costs that he has to pay, but he's got to recover

20    that some way from the projects.

21          A large contractor has more projects to divvy that

22    out among, so he may have a smaller percentage of recovery

23    needed to cover those home-office costs, where a small

24    contractor may have very few projects ongoing, so he's having

25    to recover more of those costs.  He would have a smaller amount

1  of costs in total, but he still would have to get it from a

2  smaller subset of projects.

3         That home-office overhead is generally done by a

4  markup, where that contractor knows on an annual basis how much

5  is his total cost for having the office, the people in the

6  office, all of those types of costs, and then knowing, okay,

7  I've got to assign each project 10 percent, 15 percent, or

8  20 percent to cover those costs.  That's what he would do to

9  figure out a home-office amount.

10        Then after that he's got profit, which basically he

11 wants to make money.  So he's got money that he can give out in

12 bonuses to people, for his own self, capital things that he

13 wants to have funds that he develops to be able to do things in

14 the future.  That's his profit margin.  Again, he applies a

15 percentage of what he knows he wants to try to achieve for the

16 long term.

17 **Q.**   So, for the record, Mr. Wright, let's go back to the

18 larger view.  The V.B. Homes bid for the remediation of the

19 Morgan home was $254,135?

20 **A.**   Yes.

21 **Q.**   The Virtexco bid for the Morgan home was $210,846?

22 **A.**   That's correct.

23 **Q.**   We don't need to read each number, but that's how the

24 Judge will see which company bid was total for each home.

25 There was a difference between the two?

1  **A.**   That's correct.

2  **Q.**   Tell us whether you saw, between the independent bids of

3  V.B. Homes and Virtexco, a surprising difference.

4  **A.**   I would say not a surprising difference.  It would be

5  something I would anticipate, again, primarily with the

6  different structure each of those contractors had, where one

7  was a larger, regional-type contractor, he would have lower

8  costs.  He would have somewhat buying power that the small sub

9  would not have, so he could have lower costs on different

10 items, where the smaller contractor would have higher costs on

11 those same things and definitely would have a higher overhead

12 and profit margin that he would need to put to the project.

13 **Q.**   So the numbers were compatible?

14 **A.**   But overall I'd say they were compatible.  As I looked

15 especially line item by line item in comparison of the two,

16 there were very minor differences between what I would expect

17 for the contractors to provide.

18 **Q.**   Did you perform a cross-check of these contractor cost

19 estimates using an outside reference source?

20 **A.**   Yes.

21 **Q.**   Which source did you use?

22 **A.**   I used RSMeans.

23 **Q.**   This is an RSMeans book?

24 **A.**   Yes, that is.

25 **Q.**   Tell the Court what RSMeans is.

1  **A.**   It's a large organization that compiles costs and labor

2  information by getting information from contractors, from

3  vendors, from subcontractors, compiles all that information and

4  puts it into a manual that then you would have unit costs to be

5  able to figure out and apply to what you may come up to a

6  quantity.  It basically is an organization that every year they

7  go through that process of getting new information of what the

8  current costs are so that you can keep up-to-date.

9          It's something that -- when I first began in

10  construction, I worked as a design engineer for a large

11  manufacturing company.  In their design and engineering group,

12  we did cost estimates for what repairs would be to different

13  structures.  So we used RSMeans for pricing out at that time,

14  so I've used it for well over almost 30 years now.

15  **Q.**   Let's look at a brief overview of RSMeans.  It's a

16  national publication for construction costs data?

17  **A.**   Yes.

18  **Q.**   It's utilized by contractors, design and construction

19  professionals?

20  **A.**   Yes.

21  **Q.**   On a national basis?

22  **A.**   Yes.  People use it because they know that the pricing and

23  the labor is all current so that it can be giving you very

24  accurate data up to the time.

25  **Q.**   In fact, do you know it was used as a reference by one of

1    the Knauf experts in this case?

2    **A.**    Yes.

3    **Q.**    Which one?

4    **A.**    It was used by Morse.

5    **Q.**    Roger Morse?

6    **A.**    Yes.

7    **Q.**    It provides a description of common construction cost

8    items?

9    **A.**    Yes.

10   **Q.**    It defines the process to develop construction estimates?

11   **A.**    It goes through and defines actually the same four steps

12   that I talked about earlier as to how to go about doing an

13   estimate.

14   **Q.**    Actually provides unit rates and square-foot costs for

15   labor, materials, and equipment?

16   **A.**    Yes.

17   **Q.**    Doesn't that vary from one community or location to

18   another?

19   **A.**    Yes, it does.

20   **Q.**    How does the RSMeans source account for that variation?

21   **A.**    They basically -- in their process of gathering all the

22   data, they see and track how much difference there may be in

23   materials purchased in one region of the country compared to

24   another, and so they develop that into what they call city or

25   location cost factors.  Number 7 on the list is basically that

1   item.  They actually have tables in the back of the book -- if

2   you want to show the back of that book, it actually has those

3   in the very back of it as to all the different types of

4   indexes.

5            **THE COURT:**  So you either subtract or you add?

6            **THE WITNESS:**  Yes.  It's got a factor.  You multiply

7   it times your number to get it to that region.

8   **BY MR. MEUNIER:**

9   **Q.**   For example, do you remember the percentages for Norfolk?

10  **A.**   Yeah.  For Norfolk, it was 87.2 percent.

11           What Means has for their original data is collective

12  average of 30 major cities across the United States, so that's

13  100 percent.  On the regional factors, they tell you what

14  percent to adjust.  So 87.2 percent would mean that Norfolk's

15  going to be at 87.2 percent of what the Means number is.

16  **Q.**   How about Fort Myers; did you look that up?

17  **A.**   Fort Myers was 87 percent.

18  **Q.**   So Fort Myers and Norfolk ends up being --

19  **A.**   Basically the same.

20  **Q.**   Yeah.  We didn't talk about unit time trackers for labor,

21  but that, too, is provided in RSMeans and adjusted for

22  location?

23  **A.**   Yes.  They go through and actually develop how much time a

24  crew should take to do each individual type of item like

25  hanging drywall or doing the electrical work.  The half hour

1    that I mentioned earlier, I confirmed it in RSMeans.  That does

2    tell you in there it takes .55 hours to wire up one device,

3    which would be the half hour.

4    **Q.**   So how did you use RSMeans to cross-check the V.B. Homes

5    and Virtexco bids in this case?

6    **A.**   I did some spot checks of the different line items.  Where

7    I had the 16-divisional breakdown, I had gone through, I had

8    looked at the gypsum, and just went to RSMeans, based on the

9    square footages that were put in, say, Virtexco had for their

10   square footage of drywall to see what I would get for a number

11   with RSMeans.

12            I did that for multiple things just to spot-check

13   what their costs were compared to what RSMeans had to make sure

14   I didn't see anything that was really out far, that was not

15   close to what would be the normal.

16   **Q.**   So both independent bidding contractors were in line with

17   unit costs with RSMeans?

18   **A.**   Yes.

19   **Q.**   Did you also cross-check for overhead and profit?

20   **A.**   Yes.  RSMeans has what the typical ranges that contractors

21   would use for their overhead and profit.  The very bottom of

22   this page is directly out of the RSMeans and it shows -- again,

23   they do it to tell you on different size projects.  The item

24   where it says 100,000 to 500,000 --

25   **Q.**   Which is what the range we're talking about for these

1  cases?

2  **A.**   That's correct.  These are in that range.  So it says that

3  the overhead and profit in general should be at a 25 percent.

4  **Q.**   Was that in the range of what V.B. Homes and Virtexco

5  submitted?

6  **A.**   Yes.  I think V.B. Homes used 28 percent, and Virtexco

7  used 21 percent.

8  **Q.**   With the smaller company, with the higher profit, you just

9  get more attention?  Is that essentially the difference?

10  **A.**   They would have more individual attention.  The larger

11  company, it's not like they don't show up on the project, but

12  they have multiple things going, so they're not quite as

13  personal attention as what a smaller contractor would do.

14  **Q.**   Did we ask you, Mr. Wright, to prepare a summary chart

15  that set forth the remediation estimate averages for each of

16  these seven homes?

17  **A.**   Yes.

18  **Q.**   You are taking the two numbers -- one from V.B. Homes, one

19  from Virtexco -- for each property, and you're simply adding

20  those and dividing by two?

21  **A.**   That's correct.

22  **Q.**   The average, if you took those two, in the case of

23  Mr. Morgan's property is $232,491 for this work?

24  **A.**   That's correct.

25  **Q.**   For the Baldwin property, it's $257,730?

1    A.    Yes.

2    Q.    For the Orlando property, $249,140?

3    A.    Yes.

4    Q.    For the Leach add-on room, it's $14,957?

5    A.    That's correct.

6    Q.    For the Michaux property, $198,142?

7    A.    Yep.

8    Q.    For the McKellar home, $194,720?

9    A.    That's correct.

10   Q.    Finally, for the Heischober home, it's $312,755?

11   A.    Yes.

12   Q.    So pretermitting the question whether a given homeowner

13   wants to ask Judge Fallon to remediate from the V.B. Homes

14   number or Virtexco's number, choosing between the two, these at

15   least are the averages of those two numbers in each case?

16   A.    That's correct.

17   Q.    You've entered the square footage of each of the seven

18   homes, again taking the average between the measurements of the

19   two bidders because there is in some cases a discrepancy?

20   A.    Yes.  I took the two different ones and just added them,

21   divided by two.

22   Q.    Then in the final column, on the right, you have dollar

23   per square foot.  Tell us what that sets forth.

24   A.    In the case of Morgan, it would be the $232,491 divided by

25   the square feet of 3,079 to get it basically in a square foot

1  of plan area, the amount of area by floor total that's in that

2  house.

3  **Q.**    Each of the properties, I would say, has a different

4  amount per square foot for the needed remediation?

5  **A.**    That's correct.

6  **Q.**    Can you just briefly comment on why different homes -- and

7  these are proposed as representative of a spread of homes, but

8  why different homes would have this variability on a

9  per-square-foot basis when you talk about the same scope of

10  remediation.

11  **A.**    Some of that deals with the fact that in some homes

12  there's a larger amount of cabinetry or wall tile.  In the case

13  of the Baldwin residence, there was a significant amount more

14  of some cabinets and also in the wall tile that was used in

15  bathrooms and in other areas.  So that drove that price up

16  higher.

17          The Leach residence, with it being one small room,

18  you have a lot more costs for small square footage.  So it's

19  just the economies of scale on that particular one.

20          The Michaux and McKellar, those two are higher

21  because of the smaller square footage.  You basically have

22  quite a bit of the same work you have in a larger-square-foot

23  residence.  So you have all of the cabinets going out, you have

24  all the flooring, all the drywall.  All of those costs aren't

25  spread out over a bigger floor plan area, so that drives their

1    costs up.  Usually the smaller you go, it could make the

2    square-foot price higher.

3            Then on the Heischober, they have an elevator, and

4    they had the only one with real wood flooring.  So those,

5    again, would help drive that cost up, plus there were

6    significant more amounts of cabinetry within their house as

7    compared to the others.  So the individual characteristics of

8    those homes helped create some of the variations that we see in

9    the square-foot price.

10   Q.   If we look at the homes as a profile of representative

11   homes, the overall cost for the remediation you recommend is

12   $208,562.  For a square-foot average of 2,414 square feet, your

13   cost-per-square-foot average is $86.41; correct?

14   A.   That's correct.

15   Q.   I want to recall you to the testimony of Mr. Ray Phillips.

16   You were here for that testimony?

17   A.   Yes.

18   Q.   You heard him tell the Judge that the Beazer cost -- it's

19   a moving target, but at present it's roughly $50 a square foot

20   at the upper end for remediation that's essentially consistent

21   with yours?

22   A.   That's correct.

23   Q.   You were here when Mr. Phillips, then, was asked to

24   convert that builder cost into an owner cost, putting in

25   overhead and things that the builder doesn't factor in?

1    A.    That's correct.

2    Q.    His owner cost relationship figure was $72 a square foot,

3    more or less?

4    A.    Yes.

5    Q.    Can you explain why Mr. Phillips would have $72 in his

6    analysis for the owner and why the average here is $86.41?

7    A.    Yes.

8    Q.    Could you do that.

9    A.    Because once Mr. Phillips said that, I was curious to

10   figure out how there was a difference, so I went back to look

11   at the different items that he had included as his way of going

12   from the $50 to the $72.  I believe there are some other

13   additional items that would not be included within what

14   Beazer's costs were that would be incurred by someone having an

15   individual contractor come to do that work as compared to

16   somebody doing it like Beazer is, where it's a house they had

17   already constructed and came back basically at no cost to try

18   to adjust or change that house back to not having Chinese

19   drywall.

20   Q.    Why don't you step through those calculations quickly with

21   the Court.

22   A.    What I had found was -- I know Mr. Phillips had said about

23   a 10-percent minimum for the concessions that they would have

24   ability to get from vendors and subcontractors as to their not

25   being individual, small contractors getting those costs.

1   Beazer would have buying power basically is what it comes down

2   to.

3           I adjusted that just to go to a 15 percent, believing

4   that V.B. Homes could be as high as 20 percent that they would

5   lose, in essence, of that buying power capability.  Virtexco

6   possibly could be 10 percent, but I would think they would be a

7   little higher, too, because they're not of the same scale like

8   Beazer.  So I went from doing a 10-percent minimum Mr. Phillips

9   suggested to 15 percent, and that made an additional $7.50 to

10  the $50 starting point.

11          Then I looked at the HVAC.  He had said $2 a square

12  foot.  I would agree that would probably be the same because

13  they did not have to do anything with their exterior compressor

14  unit since they already had the refrigerant that was being

15  required.  So I said that would probably be about the same in

16  costs.

17          Then one element that I believe would not be included

18  is supervision.  Beazer has -- such as Jerry Smith, he's

19  involved looking after could be upwards of ten homes at one

20  time, where he's splitting his time across all of those,

21  whereas V.B. Homes would be more specific to one home only.

22          Again, Virtexco could possibly have more than that,

23  but they would have dedicated personnel directly to a home.  So

24  I said there would be some cost that they would have to provide

25  for supervision, overseeing a job in the field, and that was

1    $7.95 a square foot for that supervision for a four-month

2    duration.

3              The overhead and profit, using the same markups that

4    Mr. Phillips gave of the 10 percent for overhead, 15 percent

5    for the profit, or 25 percent, adding those numbers together,

6    that overhead and profit would be an additional $6.74 with the

7    previous amounts I gave.  The 15 percent for profit would be

8    $11.13.  When I added those together, it came to $85.32 a

9    square foot.

10             So I believe what they would be starting with, the

11   $50, in applying it to the situation that V.B. Homes or

12   Virtexco would be doing this repair work in the field, theirs

13   would, again, be in the $85- to $86-per-square-foot range.

14   Q.   So the way you look at the Beazer testimony about their

15   cost per square foot and the conversion to owner cost, it

16   really comes out to be consistent with $86.41, the average you

17   came to?

18   A.   That's correct.

19   Q.   Again, I want to make clear, your numbers here for

20   remediation do not include the $12,500 cost per home that we

21   heard is being spent by Beazer to have Environ come in at the

22   end and sign off on Chinese drywall remediation; true?

23   A.   That's correct.

24   Q.   Although we've talked about local inspectors and

25   government officials doing that as an alternative, do you

1    believe that, in terms of restoring these owners to the proper

2    value of their homes for future sale purposes, it would be

3    essential to get someone who's versed in Chinese drywall, who

4    can sign off that that Chinese drywall remediation has

5    occurred?

6    A.    Absolutely.  I would definitely get a letter of clearance

7    from somebody that would sign off as a professional.

8    Q.    I'm talking not just about some inspector in Virginia, but

9    someone specializing in Chinese drywall?

10   A.    That's correct.

11   Q.    So, Mr. Wright, in summary, having decided on the

12   appropriate scope of remediation, having received bids

13   independently from two builders which you regard as compatible,

14   having cross-checked those numbers using RSMeans, is it your

15   expert testimony and opinion that these averages set forth on

16   this document for the total cost of remediation are fair and

17   reasonable for each of these seven plaintiff owners?

18   A.    Yes.

19   Q.    Is it your opinion that this overall average cost of

20   $86.41 a square foot also is a fair and reasonable average

21   looking at these as representative homes in Virginia?

22   A.    Yes.

23            MR. MEUNIER:  Your Honor, I have no further

24   questions.

25                    It turns out I do.  Sorry.


                              DAILY COPY

1    BY MR. MEUNIER:

2    **Q.**   Are those opinions held by you to a reasonable degree of

3    scientific certainty?

4    **A.**   Yes.

5    **Q.**   Do you agree that the $12,500 charge that Beazer includes

6    in its costs for the Environ certification of the remediation

7    at the end is a reasonable amount for that service?

8    **A.**   Yes.

9              **MR. MEUNIER:**  I'm being told I'm now done, Judge.

10   Thank you.

11             **THE COURT:**  Thank you very much.

12                  Any more witnesses?

13             **MR. MEUNIER:**  Your Honor, that concludes the

14   plaintiffs' presentation of evidence in this hearing.  We

15   certainly appreciate the Court's indulgence and time that

16   you've given us here.  We intend to submit to Your Honor at the

17   end of this week proposed findings of fact and conclusions of

18   law.

19             **THE COURT:**  I'll mark it submitted.  I'm going to

20   have some work to do with regard to reading the depositions

21   that have been submitted today.  I've made the appropriate

22   notes for the testimony that I have heard over the last several

23   days, and I will be drafting my findings of fact and

24   conclusions of law as fast as I reasonably can.  Court will

25   stand in recess.

1          **THE DEPUTY CLERK:**  Everyone rise.

2          **MR. HERMAN:**  Excuse me, Your Honor, may I confer?  I

3    think we may need to put something else on the record.

4               Thank you, Your Honor.

5          (WHEREUPON the Court was in recess.)

6                          * * *

7                       <u>**CERTIFICATE**</u>

8          I, Toni Doyle Tusa, CCR, FCRR, Official Court

9    Reporter for the United States District Court, Eastern District

10   of Louisiana, do hereby certify that the foregoing is a true

11   and correct transcript, to the best of my ability and

12   understanding, from the record of the proceedings in the

13   above-entitled and numbered matter.

14

15

16                              <u>s/ Toni Doyle Tusa</u>
                                Toni Doyle Tusa, CCR, FCRR
17                              Official Court Reporter

18

19

20

21

22

23

24

25