**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO:<br><br>Hernandez, et al. v. Knauf Gips, KG, et al.,<br>Case No. 2:09-cv-6050 (E.D.La.) | |

**THE PLAINTIFFS' PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

I.   THE PARTIES STIPULATED THAT KNAUF PLASTERBOARD TIANJIN CO.,
     LTD. DRYWALL WAS DEFECTIVE AND KPT IS LIABLE FOR DAMAGES ............. 1

II.  PLAINTIFFS' HOME IS SEVERELY DAMAGED BY CORROSIVE KPT
     DRYWALL AND REQUIRES A FULL REMEDIATION FOR PLAINTIFFS TO
     BE MADE WHOLE. ........................................................................................................... 2

III. THE ELECTRICAL SYSTEM IN THE PLAINTIFFS' HOME HAS BEEN
     DAMAGED AND SHOULD BE REPLACED. ................................................................. 3

   A.   The Wires are Damaged and Should be Replaced ........................................... 3

      i.   The Corroded Wires Cannot Be Cleaned To Restore Them to the Pre-Corrosion
           Condition ................................................................................................. 14

      ii.  The Corroded Wires Violate Applicable Building Codes ............................................. 15

   B.   The Switches, Outlets, Light Fixtures, Thermostats, and Electronics with a Circuit
        Board Have Been Damaged and Must be Replaced. ..................................... 18

IV.  THE PLUMBING AND HVAC SYSTEMS ARE DAMAGED AND SHOULD BE
     REPLACED. ...................................................................................................................... 22

V.   PRACTICALITY, EFFICACY, AND COST-EFFECTIVENESS NECESSITATE A
     COMPREHENSIVE REMOVAL AND REPLACEMENT OF THE DRYWALL,
     AND THE ELECTRIC, HVAC, AND PLUMBING SYSTEMS. ..................................... 24

   A.   A Comprehensive Clean-up Protocol is Necessary to Assure the Efficacy of the
        CDW Remediation .................................................................................................... 25

   B.   Plaintiffs' Remediation Cost Estimates are Based on Standardized Cost
        Methodologies and are Reliable and Reasonable ........................................... 26

   C.   Major U.S. Builders, Such as Beazer Homes, Have Successfully Remediated
        CDW Homes Utilizing the Same Scope of Work that Plaintiffs Seek to Obtain .......... 28

   D.   KPT's Experts Failed to Present Accurate and Substantiated Cost Data and a Cost
        Effective Remediation Plan ..................................................................................... 30

   E.   Plaintiffs Cannot be Made Whole if Damaged and Corroded Components are Left
        In Place In the Home Instead of Being Removed. ......................................... 31

VI.  PLAINTIFFS HAVE INCURRED SIGNIFICANT ECONOMIC DAMAGES
     CAUSED BY CORROSIVE CDW IN ADDITION TO THE COST OF
     REMEDIATION. ............................................................................................................... 33

VII. CONCLUSIONS OF LAW ............................................................................................. 44

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Burroughs Corp.*, 359 So.2d 607, 610-611 (La. 1978)............................................. 46

*Alpha Alpha v. Southland Aviation*, 697 So.2d 1364, 1372 (La. App. 3rd Cir. 1997) ................. 45

*Aucoin v. Southern Quality Homes*, 984 So.2d 685, 693 (La. 2008)....................................... 43, 47

*Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505-506 (5th Cir. 1994) ................................... 46

*Capitol City Leasing Corp. v. Hill*, 404 So.2d 935, 939 (La. 1981)....................................... 46, 47

*Coleman v. Victor*, 326 So.2d 344, 347 (La. 1976) ....................................................... 44

*Freeport Sulphur Co. v. S.S. Hermosa*, 526 F.2d 300 (5th Cir. 1976) ......................................... 46

*Guillory v. Jim Tatman's Mobile Homes, Inc.,* 490 So.2d 1185 (La. App. 3rd Cir. 1986) .......... 46

*Holloway v. Gulf Motors, Inc.*, 588 So.2d 1322 (La. App. 2nd Cir. 1991) .................................. 46

*Magee v. Brown*, 859 So.2d 720, 723 (La. App. 4th Cir. 2003) .................................................... 46

*Mossy Motors, Inc. v. Sewerage and Water Board of New Orleans*, 753 So.2d 269, 277
  (La. App. 4th Cir. 1999) ............................................................................................................ 44

*Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Serv. Co.*,
  618 So.2d 874, 880 (La. 1993) ................................................................................................. 45

*St. Martin v. Mobil Exploration and Production*, 1997 WL 587758 (E.D.La. Sept. 19, 1997) ... 45

*Summarell v. Ross*, 660 So.2d 112, 116-117 (La. App. 2nd Cir. 1995) ....................................... 45

*Walton Construction Company v. G.M. Horne*, 984 So.2d 827, 838 (La. App. 1st Cir. 2008).... 44

**Statutes**

FED. RULE CIV. PRO. 54(d)(2). ...................................................................................................... 47

LA. CIV. CODE ART 2524 ............................................................................................................... 44

LA. CIV. CODE ART 2545 ........................................................................................................ 43, 47

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
|---|---|
| THIS DOCUMENT RELATES TO: Hernandez, et al. v. Knauf Gips, KG, et al., Case No. 2:09-cv-6050 (E.D.La.) | |

**THE PLAINTIFFS' PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Based on the testimony heard and evidence presented at the Trial held on March 15, 16, 17, 18, and 19, 2010, and considering both the record of this matter and applicable legal authority, the Plaintiffs respectfully request that this Court enter the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52:

**FINDINGS OF FACT**

**I.   THE PARTIES STIPULATED THAT KNAUF PLASTERBOARD TIANJIN CO., LTD. DRYWALL WAS DEFECTIVE AND KPT IS LIABLE FOR DAMAGES.**

1.      Knauf Plasterboard Tianjin Co., Ltd. (KPT or Knauf) has stipulated that its drywall (CDW) in the Hernandez home is Knauf Chinese Manufactured Drywall and is not fit for its intended use because it emits corrosive sulfur gases and creates odor in the home.  Joint Stipulation dated February 24, 2010, Document 1438, at ¶¶ 9-11.

2.      The parties agreed to the critical liability issues before the Court, notably: (i) that Defendant Knauf Plasterboad (Tianjin) Co., Ltd., is both the "manufacturer" and the "seller" of drywall which was purchased by Mr. and Mrs. Hernandez and is present in their home; (ii) that said Knauf drywall emits an odor and off-gases sulfur compounds, which both constitutes a

1

redhibitory vice and renders the drywall unfit for its intended use and purpose; (iii) that while damages are not claimed by Plaintiffs under the Louisiana Products Liability Act, neither will the exclusivity provisions of the LPLA operate to preclude any damages claimed in the Amended and Restated Complaint; and (iv) that Defendant KPT does not assert comparative fault, contribution, or any other reduction in the legal responsibility of KPT on account of the alleged fault of any other person or entity.  Joint Stipulation dated February 24, 2010, Document 1438, at ¶¶ 3, 5, 7, 9, and 10.

## II.  PLAINTIFFS' HOME IS SEVERELY DAMAGED BY CORROSIVE KPT DRYWALL AND REQUIRES A FULL REMEDIATION FOR PLAINTIFFS TO BE MADE WHOLE.

3.      The Hernandez family owns the home at 68034 Marion Street, Mandeville, which is the subject of this lawsuit.  Trial Tr. (3/16/10) at p. 283(2–5) (T. Hernandez).

4.      The Hernandez home is damaged by its exposure to corrosive gases from KPT drywall.  Trial Tr. (3/15/10) at pp. 24–98 (Rutila).

5.      Damage to the home includes corrosion of the HVAC, electrical, and plumbing systems.  Trial Tr. (3/15/10) at pp. 24–98 (Rutila).

6.      Corrosion caused by KPT drywall was documented throughout the Hernandez home, from picture frames, door knobs, and all copper, bronze, and silver that could be inspected.  Trial Tr. (3/15/10) at p. 62(16) – 63(7), 64(17) – 66(18) (Rutila).

7.      Plaintiffs seek a scope of remediation that includes removal of all drywall, the electrical system, the plumbing and HVAC systems, and other components of the home based both on the scientific evidence of damage and life safety risk, as well as the practical considerations of an efficacious and cost-effective remediation.

2

8.    Major U.S. builders who are remediating CDW homes employ this same scope of remediation.  Trial Tr. (3/15/10) at pp. 98–196 (Phillips).

9.    KPT has conceded that all drywall in the home, all insulation, all flexible ductwork, all electrical switches and receptacles, all molding, and all countertops must be removed and replaced as part of proper remediation.  Joint Stipulation dated March 12, 2010, Document 1728, at ¶ 4.

### III. THE ELECTRICAL SYSTEM IN THE PLAINTIFFS' HOME HAS BEEN DAMAGED AND SHOULD BE REPLACED.

10.    The electrical system in the Plaintiffs' home has been damaged by the corrosive sulfur gases emitted by Knauf's drywall.  Trial Tr. (3/16/10), at p. 282(8-11) (Krantz).

### A.    The Wires are Damaged and Should be Replaced

11.    The electrical system includes the high voltage wires, called Romex or NM cabling, that connect to the switches and receptacles throughout the house.   Trial Tr. (3/15/10), at p. 139(14-20) (Phillips).

12.    The Romex or NM cabling consists of three wires (hot, neutral and ground). The hot and neutral wires are in a plastic insulation and all three wires are encased in a plastic sheathing.  Trial Tr. (3/15/10), at pp. 139(23) – 140(1-8) (Phillips).  During installation of switches and receptacles, the plastic insulation is stripped away on the tips of the hot and neutral wires, which, along with the bare copper ground wires, then are attached to connection points on the switches and receptacles. Trial Tr. (3/15/10), at p. 144(2-8) (Phillips). The Romex or NM cabling runs from the switches and receptacles through the walls to the circuit breaker box, where it connects to various circuit breakers.

3

13.     The electrical system also includes low voltage wires which also run through the walls and attach to telephone receptacles, doorbells, HVAC thermostats, and alarm systems. Trial Tr. (3/15/10), p. 139(17-20) (Philips).

14.     The corrosive gases emitted from KPT's drywall has damaged the high and low voltage wires by causing them to corrode. Streit Preservation Deposition, at pp. 60(2-24), 61(3-12); Trial Tr. (3/15/10), at p. 243(15-17).

15.     "Corrosion" is defined by ASTM G15-04 as "the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the materials and its properties." H. Ex. 134-0002 (ASTM G15-04, Standard Terminology Relating to Corrosion and Corrosion Testing); Trial Tr. (3/15/10), at p. 206(20-25) (Krantz).

16.     There are numerous examples of a visual black corrosion film on the electrical wires in Plaintiffs' home.  Trial Tr. (3/15/10), at p. 221(22-25) (Krantz); *see also* H. Ex. 597-0015; Trial Tr. (3/15/10) at p. 225(15-18) (Krantz).

17.     The corrosion film on the wires is copper sulfide.  Trial Tr. (3/15/10), at p. 211(5-6) (Krantz).

18.     Copper sulfide corrosion is particularly aggressive in humid and moist environments.  Trial Tr. (3/19/10), at p. 896(6-7) (Perricone).

19.     Plaintiffs' corrosion expert Brad Krantz, with Corrosion Testing Laboratories ("CTL"), made cross-sections of wires from Plaintiffs' home and measured the corrosion thicknesses on these sections pursuant to commonly-accepted methodology.    Trial Tr. (3/15/10), at pp. 207(25) – 208(1-7) (Krantz).

4

20.     The cross-sectioning method used by Mr. Krantz allowed analysis along the entire length of the wire to identify pits and corrosion film, as opposed to the method of cutting the wire in half for cross-sectional analysis at a random point.  Trial Tr. (3/19/10), at pp. 889(23) – 891(13) (Perricone).

21.     The corrosion thicknesses of the cross-sectioned wires from Plaintiffs' home were measured in places to be in excess of twenty (20) microns.  H. Ex. 590-0001 (Summary of Thickness and Pit Depth Measurements Made on Samples from Hernandez Home and a Control Home); Trial Tr. (3/15/10), at p. 222(10-12) (Krantz); Trial Tr. (3/17/10), at p. 583(8-17) (Lee).

22.     The cross-sectioned wires from Plaintiffs' home also showed numerous pits. These pits were also often in excess of twenty (20) microns deep.  H. Ex. 590-0001 (Summary of Thickness and Pit Depth Measurements Made on Samples from Hernandez Home and a Control Home); Trial Tr. (3/15/10), at p. 222(2-9) (Krantz).

23.     Pitting is defined as by ASTM G15-04 as "corrosion of a metal surface, confined to a point or small area, that takes the form of cavities."  H. Ex. 134-0004 (ASTM G15-04); Trial Tr. (3/15/10), at p. 207(17-20) (Krantz)

24.     ASTM G4-01 provides in section 18.3 that "pitting can occur on unshielded metal surface[s] and can lead to failure of equipment displaying a low general corrosion rate."  H. Ex. 0128-0008.

25.     In addition, Plaintiffs' expert Mr. Krantz performed a number of tests on ground wiring which indicated significant damage and corrosion thicknesses and pits on the tips, middle, and ends of ground wires in other Chinese Manufactured Drywall ("CDW") houses. The tip is where the ground wire attaches to the switch or receptacle, and the end is where the ground wire

5

emerges from a receptacle box or switch box. H. Ex. 598- 0001 to 0014; Trial Tr. (3/15/10), at pp. 231(6-19), 232(13-20) (Krantz).

26.     The insulation jackets on electrical wires do not adequately protect them from corrosive attack from sulfur gases.  Reactive sulfur gases permeate the sheathing and corrode the "protected" wires.  H. Ex. 592-0001.  Trial Tr. (3/15/10), at p. 226(18-20) (Krantz); *see also* H. Ex. 594-0001 and 0002 (example of corrosion under sheathing of low voltage wiring in another house).  H. Ex. 575-0001, 577-0001, and 580-0001.  Trial Tr. (3/15/10), at p. 51(1-8) (Rutila).

27.     The low voltage wiring in Plaintiffs' home demonstrated copper sulfide corrosion well underneath the sheathing.  H. Ex. 592-0001.  Mr. Krantz testified that observation of copper wire surface underneath the insulation confirmed "that corrosion was present all along underneath the insulation."  Trial Tr. (3/15/10), at p. 226(18-20) (Krantz); *see also* H. Ex. 594-0001 and 0002 (example of corrosion under sheathing of low voltage wiring in another house).

28.     The high voltage wiring in Plaintiffs' home demonstrated copper sulfide corrosion well underneath the sheathing.  H. Ex. 575-0001, 577-0001, and 580-0001.  Trial Tr. (3/15/10), at p. 51(1-8) (Rutila).

29.     Lamp and/or light cords in Plaintiffs' home and in other CDW houses demonstrate corrosion underneath the plastic sheathing.  H. Ex. 651; Trial Tr. (3/15/10), at pp. 63(24-25) – 64(1-7) (Rutila); Trial Tr. (3/16/10), at p. 511(22-25) (Hernandez); *see also* H. Ex. 595-0001 and 0002 (BDM 5- showing kitchen light cord corrosion).

6

30.     The ground wire in a home without CDW (i.e., a "control" home) shows shiny copper wires, no corrosion thicknesses or pits. H. Ex. 597-0029, 0030, and 0031 (Control house without CDW); Trial Tr. pp. 227(2) – 228(5) (Krantz).

31.     The wiring in Plaintiffs' home demonstrates corrosion indicative of the most severe corrosive environment and is predictive of failure pursuant to applicable standards.  Trial Tr. (3/15/10), at pp. 212(18-22), 228(13-14) (Krantz).

32.     The corrosive attack from CDW occurs even on insulated wires within the walls of the home and well up from the ends of insulation at electrical switches and outlets.  Trial Tr. (3/15/10), at pp. 50(24) – 52(14) (Rutila); Streit Preservation Deposition, at pp. 75(2) – 79(13).

33.     The corrosive attack also occurs on lamp cords which are in the center of a room away from drywall sources.  Trial Tr. (3/15/10), at pp. 63(22) – 64(7) (Rutila); Streit, at pp. 73(13) – 75(6).

34.     "Predictive of failure" means that the electrical component is predicted to fail in the future, well before the end of the component's anticipated useful life.  Trial Tr. (3/15/10), at p. 213(6-12) (Krantz).

35.     The Battelle Classification System for the corrosivity of environments has four Classifications of corrosivity, ranging from least to most corrosive. The Battelle Classification System is a recognized and applicable standard for predicting future failures pursuant to corrosion. For copper, Battelle assigns the following definitions to these four classes:

| | |
|---|---|
| Class I | No significant corrosion observed. |
| Class II | Corrosion product on unprotected copper contains oxide and chloride. |
| Class III | Corrosion product on unprotected copper is rich in sulfide and oxide. |
| Class IV | Corrosion product on copper is primarily a sulfide film with some oxide. |

7

H. Ex. 59-0012 (Interim Report on the Status of the Analysis of Electrical Components Installed in Homes with Chinese Drywall Gill & Trotta, CPSC, Nov. 2009, hereinafter "Gill & Trotta CPSC Report"); Trial Tr. (3/15/10), at p. 211(1-6) (Krantz).

36.    In addition, Class III and Class IV environments include "pore and creep corrosion." LT 0228-0012 (Sinclair article in Baboian, *Corrosion tests and standards: application in interpretation, Edition 2,* (ASTM International, Pennsylvania, 2005), at p. 360 as cited by H. Ex. 59-0012 (Gill & Trotta CPSC Report) in footnote 1.)

37.    The Battelle Classification System for Corrosive Environments establishes qualitative and quantitative criteria to be used to classify environments. This evaluates corrosion according to both the type of corrosion product (qualitative) and the thicknesses of the corrosion product (quantitative). LT 0195-0017, 0026, 0065, 0066 (Abbott 1993, MTI #38); LT 0228-0012 (Sinclair text).

38.    The wires that were removed from the Plaintiffs' home were shown by generally-accepted laboratory analytical techniques to have a corrosion product that is primarily copper sulfide and/or rich in sulfide. H. Ex. 597-0017-0026 (Krantz SEM/EDS analysis on wiring samples from Hernandez home showing copper sulfide). Trial Tr. (3/15/10) at p. 222(14-17, 23-25), p. 224(2-8) (Krantz).

39.    The wires that were removed from the Plaintiffs' home also demonstrated pore corrosion and creep corrosion. H. Ex. 597-0006 (CTL/Krantz Report); Trial Tr. (3/15/10), at p. 224 (2-25) – p. 225(1-4) (Krantz).

40.    Based solely on these *qualitative* Battelle corrosivity criteria, Plaintiffs' home is classified as a severe corrosive environment under Battelle Classification III and IV, which is

predictive of future failure of the electrical system. H. Ex. 591-0001; Trial Tr. (3/15/10), at p. 228(9-14) (Krantz); Trial Tr. (3/17/10), at pp. 582(18) – 583(1) (Lee).

     41.     The Gill & Trotta CPSC report indicates that "Sandia National Laboratories (SNL) staff suggests that copper wiring is the most susceptible electrical component to the effects of the corrosive gases." H. Ex. 059-0010 and H. Ex. 060-0001 (Interim Report of the Analysis of Corrosion Products on Harvested Electrical Components, Sandia Glass, S. Jill, et al., Nov. 2009, hereinafter "Sandia Report").

     42.     The Gill & Trotta CPSC report and the SNL also established that wires taken from Chinese Drywall (CDW) Virginia, Florida, and Louisiana homes demonstrated a corrosion product rich in copper sulfide, pore corrosion and creep corrosion. The Gill & Trotta CPSC report provides that "SNL staff believe the Battelle corrosive environments that the electrical wiring has been exposed to could be as severe as either Class III or Class IV." H. Ex. 059-0013 and H. Ex. 060-0023.

     43.     The Battelle Corrosivity Classifications also have quantitative criteria for the levels of corrosive environments. The qualitative criteria are based on corrosion product thickness measurements, measured in microns. The Battelle qualitative thickness criteria are 0.1 to 0.3 microns at one year for a Class III environment, and greater than .3 micron at one year for a Class IV environment. (LT 0195-0066; Abbott, MTI #38, 1993). These thicknesses can be extrapolated to .3 microns for a Class III environment after three years of exposure to the corrosive environment. Trial Tr. (3/15/10), at p. 212(1-4) (Krantz).

     44.     The wires that were removed from the Plaintiffs' home demonstrated corrosion product thicknesses many multiples above the severe corrosivity environment standard of .3

9

microns, adjusted to a three-year thickness (Plaintiff has resided in the home approximately three years). Trial Tr. (3/15/10), at p. 212(8-14) (Krantz); Trial Tr. (3/16/10), at p. 286(3) (Hernandez).

45.     The measured corrosion thicknesses on the wires from Plaintiffs' home meet the Battelle Classification III or IV quantitative criteria for a severely corrosive environment based on the measured corrosion thicknesses. Trial Tr. (3/15/10), at p. 212(18-22) (Krantz).

46.     Corrosion product thickness measurements on wires from Plaintiffs' home that meet the quantitative criteria for Battelle Corrosive Classification III or IV were also documented by measurements on wires from other CDW homes by the SNL.  H. Ex. 59-0011, 0013 (Gill & Trotta CPSC Report); H. Ex. 60-0023, 0024, 0036 (Sandia Report).

47.     In particular, Figure 1 of the Gill & Trotta CPSC Report shows a ground wire with a twenty (20) micron corrosion film and an approximately ten (10) micron pit. This damage to the wire demonstrated by this figure, although the SEM magnification utilizes more sophisticated techniques than that utilized by Mr. Krantz at CTL, is very similar to the damage to the ground wires analyzed from Plaintiffs' home. H. Ex. 059-0011; H. Ex. 590-0001; Trial Tr. (3/15/10), at pp. 219(2) – 220(11) (Krantz).

48.     Thus, Plaintiffs' home demonstrates a Battelle classification for corrosivity which is a "severe" environment, whether one applies the qualitative or the quantitative Battelle corrosivity criteria to corroded wires taken from this home.  Trial Tr. (3/15/10), at p. 243(6-10) (Krantz).

10

49.     The application of Battelle and other corrosive environment criteria to real world components is demonstrated by the Chinese Drywall Investigation performed by SNL and documented in the Sandia Report.  H. Ex. 60-0023, 30 (Sandia Report).

50.     The application of Battelle and other corrosive environment criteria to real world components is demonstrated by the expert opinion of Plaintiffs' corrosion expert, Mr. Brad Krantz.  Trial Tr. (3/15/10), at p. 275(2) (Krantz).

51.     Mr. Krantz testified that the best analysis of corroded components is the actual item rather than a copper coupon, and that failure analysis involves investigation of the weakest link, e.g., the thickest corrosion and deepest pits.  Trial Tr. (3/16/10), at pp. 274(25) – 275(17).

52.     The components at issue in this case, taken from Plaintiffs' home and analyzed in the laboratory, do exceed the recognized .1 micron failure threshold standard for the first year of exposure by many multiples.  H. Ex. 591-0001; Trial Tr. (3/15/10), at p. 228(9-14) (Krantz).  Thus, electrical failures are predicted by Mr. Krantz.  Trial Tr. (3/15/10), at p. 212(18-22) (Krantz).

53.     As set forth in the peer- reviewed literature, consensus standards, and the opinions of several experts in the field, the use of real world components under real world exposure conditions and durations of exposure provide more comprehensive and accurate information than the use of copper reactivity coupons, particularly if the coupons are deployed for short periods (such as less than one year).  H. Ex. 129-0001 (ASTM G50 (2003) (Standard Practice for Conducting Atmospheric Corrosion Tests on Metals) recommend exposures over one year to account for seasonal variation and other variables), LT 0236-0001 (Perkins, Corrosion Manual),

11

LT 0205-0009 (Tran 2003), CDW 0054-0001, 0002 (Literature Regarding Corrosion Assessment of Real Components), Trial Tr. (3/16/10), at pp. 274(25) – 275(7), 277(5-23) (Krantz).

54.     The copper coupons deployed by Defendant's expert, RJ Lee in Plaintiffs' home are of no utility because they were exposed to the environment for an inadequate duration and during a cool temperature time period (February) that is not conducive to the formation of copper sulfide corrosion. See DX0001-0191 (Defendant Coupon data for Hernandez house).  Trial Tr. (3/19/10), at pp. 895(18) – 896(1) (Perricone).

55.     Defendant's own data demonstrate that coupon deployment in hotter months does lead to corrosion thicknesses that will result in failures, under the very standard Defendant asserts as applicable. Trial Tr. (3/19/10), at p. 896(8-25) (Perricone). *See* DX0001-0384 (App. D, Perricone Report).

56.     Defendant relies on ISA-S71.04-1985, entitled "Environmental Conditions for Process Measurement and Control Systems: Airborne Contaminants," as the applicable standard. This standard predicts failures of electrical equipment if the corrosion thickness on a copper coupon *exceeds* 300 Angstroms (10,000 Angstroms equals 1 micron) within 30 days. As can be seen from Defendant's coupon data from hotter months, this standard is violated in numerous instances. H. Ex. 62-0014 (ISA-S71.04-1985); Trial Tr. (3/19/10), at p. 829(11-13) (Perricone).

57.     However, ISA-S71.04-1985 does not even apply unless the measurements were taken in conditions where the relative humidity is less than 50%. H.62-0014. Trial Tr. (3/19/10), at p. 895(6-12) (Perricone).  FRE 1006 Summary of Property Failure Data in the Hernandez Home (H. Ex. 558).

12

58.     Plaintiffs have reported many premature failures of major appliances and consumer electronics in their home during their first three years of use of the home.  Trial Tr. (3/16/10), at p. 289(1-25) (Hernandez); FRE 1006 Summary of Property Failure Data in the Hernandez Home (H. Ex. 558).

59.     Laboratory analysis of these copper and silver components from Plaintiffs' home has identified Knauf's drywall as the cause of severe corrosion deposits at the operative connections in the appliances and in consumer electronics.  Trial Tr. (3/16/10), at p.309 (6-22) (Galler).

60.     Mechanical, electrical, and electronic failures in the Hernandez home have been shown to have occurred prematurely, and are predicted to continue to do so, due to the severe corrosive environment created by Chinese drywall in the home.  Trial Tr. (3/16/10), at pp. 329(8-17), 331(22) - 332(8) (Galler); Trial Tr. (3/17/10), at p. 568(20-25) (Lee).

61.     Such failures threaten key safety devices, such as circuit breakers, which have been corroded.  Trial Tr. (3/16/10), at pp. 321(4) – 326(2), 329(18) – 330(11) (Galler).

62.     Defendant's experts claim that the electric systems in the Hernandez home are not compromised, but did not test the actual capacity of the corroded wires to carry current.  Trial Tr. (3/19/10), at p. 907(9-12) (Perricone).

63.     In failure analysis, where the concern is the "weakest link" because the goal is to prevent failures and protect against life safety issues connected to failures (i.e., corrosion increases resistance which increase heat and generates a fire risk), the focus must be on the most vulnerable components.  For example, in failure analysis of a copper tube, it is important not only to consider average thickness of the copper material to determine if a leak is possible, but

13

also to identify the weakest link in the tube.  Thus, the maximum corrosion thickness and the maximum pit depth are important considerations in failure analysis.  LT 0195-0017, 0028 (Abbott 1993, MTI #38).

> ### i.   The Corroded Wires Cannot Be Cleaned To Restore Them to the Pre-Corrosion Condition

64.     It is not possible to clean the wires of corrosion product to render them free of risk of future failure.  Trial Tr. (3/16/10), at p.281 (1-5) (Krantz); Trial Tr. (3/16/10), at p. 334(6-15) (Galler); Streit, at pp. 62(12) – 63(2); Trial Tr. (3/17/10), at p. 577(7-13) (Lee) (proposed cleaning method will not remove all corrosion); Trial Tr. (3/19/10), at pp. 902(8-9), 911(12-24) (Perricone) (same).

65.     Mr. Krantz attempted to clean a corroded wire from Plaintiffs' home in the manner recommended by Knauf, and copper sulfide corrosion remained after the attempted cleaning. H. Ex. 593-0001; Trial Tr. (3/15/10), at p. 239(6-10) (Krantz)

66.     There is no approved standard or method to clean copper sulfide corrosion on electrical wiring and electronic contacts and components in a home. ASTM G1-03, entitled "Standard Practice for Preparing, Cleaning, and Evaluating Corrosion Test Specimens," provides in section 7.1.3 that "[r]epeated treatment may be required for complete removal of corrosion products." The standard also references hydrochloric acid as a method to remove copper sulfide corrosion from copper. While this standard is not applicable to in-field situations such as Plaintiffs' home, it is the most analogous standard on cleaning of copper sulfide corrosion and highlights the difficulty of proper cleaning of corrosion products. Such cleaning methods are not a realistic option in Plaintiffs' home, or in any house with Knauf's drywall. H. Ex. 600-0005 (ASTM G1-03); Trial Tr. (3/15/10), at p. 242(20-22) (Krantz).

14

67.     Although the *current* state of the damaged electrical wires requires replacement, removal of the Knauf drywall alone will not stop *future* corrosion from occurring to the wires. Trial Tr. (3/16/10), at pp. 256(17) – 257(1) (Krantz); *see also* LT 241-0001 et seq. and in particular 0006 to 0010 (Jacob and Edwards, "Sulfide Scale Catalysis of Copper Corrosion").

68.     The corrosion on exposed wires will continue after the KPT drywall is removed because the copper sulfide already deposited on the wires will continue to cause corrosion. The humidity that exists within the house and walls will supply the necessary moisture for this corrosion process to continue. Sufficient microscopic moisture is known to exist in the walls because the documented copper sulfide corrosion that has already occurred on the wires could not have occurred without sufficient moisture. Trial Tr. (3/15/10), at pp. 215(20) – 216(1) (Krantz).

69.     The Court finds persuasive the opinion and actual real world experience of Mr. Krantz regarding continuing corrosion after the initial cause of a corrosive environment is removed. The Court thus finds it more probable than not that corrosion on copper and silver surfaces in the electrical system of the Hernandez home will continue to occur even after the KPT drywall is removed.

### ii.     The Corroded Wires Violate Applicable Building Codes

70.     The Romex insulation utilized in Plaintiffs' homes was type NM, which is not permissible for corrosive environments. Accordingly, engineering and general safety standards require the replacement of NM wires which have been exposed to this environment. Trial Tr. (3/15/10), at pp. 69(2) – 70(20), 96(12-18) (Rutila). In the wake of the floodwaters of Katrina, an NM wire in a home that was exposed to water for *any* length of time was required to be replaced. H. Ex. 650- 0002 (Underwriters Laboratory document entitled "After the Storm,

15

Floodwater Safety"); Trial Tr. (3/15/10), at p. 96(12-18) (Rutila). An analogous situation exists

with the corrosive environment to which the NM cabling in Plaintiffs' home has been exposed

because of KPT's drywall. Trial Tr. (3/15/10), at p. 70(10-11) (Rutila).

71.     As one of KPT's experts conceded, excessive corrosion could create fire hazards.

Trial Tr. (3/17/10), at p. 582(7-12) (Lee).

72.     Wires from homes without CDW (control home) did not show the severe

corrosion thicknesses associated with predicted failure, did not show thick copper sulfide

deposits, and did not show severe pitting found on the wires from CDW homes.   H. Ex. 597-

0029; Trial Tr. (3/15/10), p. 227(12-19) (Krantz).

73.     The "corrosive residue" on, and "deterioration by corrosion" to, the wires in the

Hernandez home are violations of electrical building codes promulgated by Louisiana.  As

KPT's own electrician and expert on the electric code of Louisiana testified, if a "wire is

corroded…it can't stay in the house…even just a ground wire." Trial Tr. (3/17/10), at p. 651(11-

18) (Canzoneri).

74.     The building code was drafted for life safety purposes and sets a minimum level

of safety.  The code's provisions are not discretionary.  Trial Preservation Testimony of Craig

Beyler at p. 203(13-15).

75.     Section E3304.6 of the National electrical code does not allow corrosive residues

on electrical equipment.  H. Ex. 155-0003 (Excerpt from Electrical Code). Electrical equipment

would include the electrical wiring that connects to the equipment. H. Ex. 155-0006 (Definition

of equipment from Electrical Code).

76.     ASTM B-3, entitled "Standard Specification for Soft or Annealed Copper Wire," is incorporated into the applicable building code for these houses. H. Ex. 112-0001 (ASTM B-3).

77.     ASTM B-3 provides in section 5.5 that "the wire shall be free of all imperfections not consistent with the best commercial practices." H.112-0001 (ASTM B-3).

78.     The wires in the Plaintiffs' home violate ASTM B-3, section 5.5, because the corrosion and pitting on the copper ground wires renders them *not* "free of all imperfections." H. Ex. 112-0002 (ASTM B-3).

79.     Section 5.4 of ASTM B-3 provides that copper wire is out of tolerance if the diameter of the wire varies by greater than 1%. Defendant's expert Craig Beyler admitted that corrosion thicknesses of greater than twenty (20) microns would result in the electrical wires in Plaintiffs' home being out of tolerance by greater than 1% as set forth in the standard. Trial Preservation Testimony of Craig Beyler at pp. 98(14) – 99(1).

80.     There are many areas of the home where the corrosion thicknesses on Plaintiffs' wires are greater than twenty (20) microns. Trial Tr. (3/15/10), at p. 228(6-17) (Krantz); *see also* H. Ex. 591-0001.

81.     Defendant's expert Craig Beyler testified that he performed contact resistance temperature testing pursuant to UL 498, Section 112. This standard provides a series of steps in performing temperature tests. Trial Preservation Testimony of Craig Beyler p. 83(3-9).

82.     Dr. Beyler failed to perform the overload test set forth in UL 498, Section 112 as a required step in performing temperature tests. Accordingly, his test results are not reliable. Trial Preservation Testimony of Craig Beyler pp. 76(17) – 77(12).

17

83.     Loose connections at switch, receptacle and other electrical devices occur in residential construction and are a proven source of fire. Trial Preservation Testimony of Craig Beyler p. 51(1-4).

84.     Increases in resistance cause an increase in heat which under the appropriate circumstances can cause a fire. Trial Preservation Testimony of Craig Beyler at pp. 19(5-13), 75(4) – 76(4).

85.     In the six (6) receptacles tested by Dr. Beyler, one was found to have a loose connection. Trial Preservation Testimony of Craig Beyler at p. 89(1-6).

86.     Dr. Beyler testified that he does not know what impact copper sulfide corrosion would have at the contact point of a loose connection. Trial Preservation Testimony of Craig Beyler at pp. 89(14) – 90(8).

**B.     The Switches, Outlets, Light Fixtures, Thermostats, and Electronics with a Circuit Board Have Been Damaged and Must be Replaced.**

87.     Silver is the most preferred metal for use in electrical contacts. Trial Tr. (3/16/10), at p. 311(1-4) (Galler); LT 0202 (Chudnovsky 2008).

88.     Silver is used in practically every device that carries electrical current. Silver is a very conductive metal. Trial Tr. (3/16/10), at pp. 311(1-8), 313(16) – 314(22) (Galler).

89.     Silver is present in circuit breakers, light switches, thermostats, computers, televisions, and, generally, a device has silver in it "if it's got a switch on it." Trial Tr. (3/16/10), at pp. 313(19) – 314(22) (Galler).

90.     Silver is a preferred metal because it has good resistance to corrosion attacks from most sources. Trial Tr. (3/16/10), at pp. 310(3-5), 311(1-10) (Galler).

18

91.     However, the one agent that silver is readily corroded by is sulfur, which is silver's "Achilles heel." Trial Tr. (3/16/10), at pp. 310(2-5), 311(14) – 312(3) (Galler); LT 0202 (Chudnovsky 2008).

92.     The sulfur-induced corrosion of silver produces silver sulfides, which dramatically increase electrical resistance—by a factor of 100,000. Trial Tr. (3/16/10), at p. 313(6-15); *see also* LT 0202 (Chudnovsky 2008).

93.     Silver materials found in the Plaintiffs' home have been severely corroded by sulfur attack. Trial Tr. (3/16/10), at pp. 315(6) – 329(17), 326(6-7) (Galler); *see also* Trial Tr. (3/19/10), at p. 912(11-15) (Perricone) (agreeing sulfide corrosion was found on contacts in toaster).

94.     These findings were made using standard techniques such as scanning electron microscopy and energy dispersive spectroscopy. Trial Tr. (3/16/10), at pp. 306(22) – 308(3) (Galler).

95.     Defendant's experts made no examination of silver contacts and, thus, no analysis of the circuit boards in the Hernandez home, or any other CDW homes. Trial Tr. (3/19/10), at p. 912(7) (Perricone).

96.     Plaintiffs' expert Donald Galler has detected corrosion thickness of no less than 10 microns (100,000 Angstroms) on silver components which have been exposed to Chinese drywall. Trial Tr. (3/16/10), at p. 333(9-13) (Galler).

97.     Increased resistance to electrical conduction occurs when corrosion thicknesses measure as little as 200 angstroms. Trial Tr. (3/16/10), at pp. 332(11) – 333(6) (Galler); see *also* LT 0202-0004 (Chudnovsky 2008), LT 0195-0001, -0027, 0028 (Abbott, 1993, Fig. 1 (Effects of

19

Film Thickness on Contact Resistance) and Fig 2. (Effects of Environmental Severity on Component Failure Mechanism)).

98.    Increased failures occur when corrosion thicknesses measure as little as 1,000 angstroms (.1 micron), and possibly lower.  LT 0195-0001, -0027, 0028 (Abbott, 1993, Fig. 1 (Effects of Film Thickness on Contact Resistance) and Fig 2. (Effects of Environmental Severity on Component Failure Mechanism)).

99.    Given the minimal amount of corrosion that is needed to interfere with the proper function of electronic and electric switches, "[b]y the time relevant corrosion can be detected visually, the equipment may already be in an advanced stage of degradation." Trial Tr. (3/16/10), at p. 331(1-16) (Galler); LT 0195-0013 (Abbot 1993); *see also* Trial Tr. (3/16/10), at p. 277(20-23) (Galler).

100.    When a sulfide corrosion product exists, it increases resistance of electrical current through the connection.  Trial Tr. (3/16/10), at p. 313(8-15) (Galler); *see also* LT 0202-0001 (Chudnovsky 2008).

101.    This increased resistance causes either complete failure or excessive heating of the connection when energized.  Trial Tr. (3/16/10), at pp. 313(11-13), 329(3-17) (Galler); *see also* LT 0202-0001 (Chudnovsky 2008).

102.    Complete failure of a switch can lead to fires or other life safety problems, depending on the intended function of the switch.  For example, a malfunctioning circuit breaker can lead to fire hazards and injury.  Trial Tr. (3/16/10), at pp. 321(3) – 326(20), 329(10) – 330(5) (Galler).

103.    Corrosion can also lead to failure of the product.  Trial Tr. (3/16/10), at p. 313(6-15) (Galler); *see also* LT 0202-0001, et seq. (Chudnovsky 2008), LT 0195-0001, -0027, 0028 (Abbott, 1993 Fig. 1 (Effects of Film Thickness on Contact Resistance) and Fig 2. (Effects of Environmental Severity on Component Failure Mechanism)).

104.    Given that it has been established that the environment in the Hernandez home is a Level III or Level IV Battelle corrosive environment (as demonstrated *supra*), equipment failure rates in the home increase by at least a factor of 100.  LT 0195-0001, -0027, 0028 (Abbott, 1993, Fig. 1 (Effects of Film Thickness on Contact Resistance) and Fig 2. (Effects of Environmental Severity on Component Failure Mechanism)).

105.    It is probable that the lifespan of exposed devices with silver corrosion in Plaintiffs' home (specifically, those that have not already failed) has been substantially decreased:  "the corrosion rates we are seeing are probably ten times faster than they would ordinarily be.  So I would expect the reduction in the life of the equipment.  It could be 20 times, it could be five times, but it's pretty significant reduction in the life of the equipment."  Trial Tr. (3/16/10), at p. 332(3-8) (Galler).

106.    Circuit boards cannot be practically cleaned.  Trial Tr. (3/16/10), at p. 334(4-15) (Galler).

107.    Even if a circuit board is cleaned, the damage already caused by the corrosion remains a problem.  Trial Tr. (3/16/10), at p. 334(4-15) (Galler).

108.    Copper sulfide will have the same effects on function of those components relying on copper as a conductor.  Trial Tr. 93/16/10), at p. 332(11-15) (Galler).

21

109.    Because of the likelihood of damage to circuit boards, all appliances in the Hernandez home should be replaced. Trial Tr. (3/15/10), at pp. 77(19) – 78(2) (Rutila).

## IV. THE PLUMBING AND HVAC SYSTEMS ARE DAMAGED AND SHOULD BE REPLACED.

110.    Because these systems rely heavily on copper and silver components, the plumbing and HVAC systems have also been compromised by the Chinese drywall in the Hernandez home. Trial Tr. (3/15/10), at pp. 42(23) - 43(3) (Rutila); *see also* Streit 26(16)-27(13), 60(2-6).

111.    With plumbing, the problem is not limited to copper pipes. The brazing at the joints, which includes silver, is particularly vulnerable, and is likely to be deeply pitted. Trial Tr. (3/15/10), at pp. 36(12)-37(3), 37(24)-38(6), 39(25)-40(5), 40(18)-(23), 41(25)-42(17), 71(5)-(11) (Rutila).

112.    In addition, the components in items like hot water heaters are subject to corrosion from Chinese drywall. The individual inspection and evaluation of such components would entail a cost that exceeds the simple replacement price. Trial Tr. (3/15/10), at p. 71(18-22) (Rutila).

113.    As Plaintiffs' expert Dean Rutila concluded: "We know some elements of the copper piping system are compromised and have to be replaced. And for that reason, the items with respect to future corrosion . . . lead me to the conclusion that it should be removed." Trial Tr. (3/15/10), at p. 71(7-11) (Rutila).

114.    HVAC systems also include copper piping to carry the refrigerant throughout the system, including the coils which are particularly quick to corrode and fail. Streit, at pp. 67(13)-68(20), 87(1-10).

22

115.   Even coated coils, like in the Hernandez HVAC system, are vulnerable to failure in houses with Chinese drywall.  Trial Tr. (3/16/10), at p. 371(1-2) (Bailey).

116.   The coils in the refrigerator have also been corroded by the Chinese drywall. Trial Tr. (3/15/10), at pp. 62(16) – 63(2) (Rutila).

117.   In addition to the copper piping and coils, the wires and circuit boards in the air handing unit, like any of the other circuitry in the home, are compromised.  Trial Tr. (3/16/10), at pp. 370(19)-371(12) (Bailey).

118.   The insulation in the air-handling unit will also need to be replaced as it was exposed to the off-gassing from sulfur gases. Trial Tr. (3/16/10), at p. 371(10-12) (Bailey).

119.   Given the time to inspect each component of the air handling unit, and the cost of replacement of individual components, replacement of the entire air handling unit is more efficient and cost-effective.  Trial Tr. (3/16/10), at p. 371(12-16) (Bailey).

120.   Replacement of the outside condensor will also be needed to ensure that the efficiency of the HVAC system with a new air handling unit.  Trial Tr. (3/16/10), at p. 373(7-10) (Bailey).

121.   While the condenser in the Hernandez home was recently replaced, there may be substantial delay in any further remediation, including replacement of the air handling unit; thus exposing these components to further corrosion.

122.   In addition, this condenser is built to utilize the for old R-22 refrigerant, which is no longer produced for use. Any new air-handler unit will only be useable with the new refrigerant.  Trial Tr. (3/16/10), at pp. 372(14)-373(10) (Bailey).

23

## V.  PRACTICALITY, EFFICACY, AND COST-EFFECTIVENESS NECESSITATE A COMPREHENSIVE REMOVAL AND REPLACEMENT OF THE DRYWALL, AND THE ELECTRIC, HVAC, AND PLUMBING SYSTEMS.

123.    One of the key lessons learned by Beazer Homes ("Beazer") from actual experience is that it sometimes costs more to do what seems less.  Important examples are especially relevant in this case: Beazer has found that it is more cost-effective to remove and replace all electrical wiring, rather than attempt to clean, clip or splice corroded wire endings, and then confront the problem of relocating electrical boxes due to electrical code requirements that there be at least six inches of free wire inside boxes.  Trial Tr. (3/15/10), at p. 114 (18-25); p. 115 (24-25); and p. 116 (1-24) (Phillips).  That such labor-intensive work to clip and splice wire in multiple locations is impractical is evident from the undisputed testimony of Mr. Phillips that roughly 85% of electrical work is for labor, electrical wire being an inexpensive material.  Trial Tr. (3/15/10), at p. 152 (10-16) (Phillips).

124.    Beazer considered alternatives to the removal and replacement of all wiring, but found that, as a practical matter, total removal and replacement both eliminated risk and was more cost-effective.  Trial Tr. (3/15/10) at p 117 (2-7) (Phillips).

125.    As a practical matter, everything in front of drywall, such as cabinets, trim, fixtures and bathroom porcelain, needs to be removed.  Trial Tr. (3/15/10), at pp. 67(18)-68(24) (Rutila).

126.    Removal of items in front of the drywall, such as cabinets, trim, fixtures and bathroom porcelain, can easily damage even those items that a contractor might deem worth salvaging.  Trial Tr. (3/15/10), at pp. 67(18)-68(24) (Rutila).

127.    Wood floors should be removed.  In addition to likely damage during work, exposure to unconditioned air will cause warping and cracking.  It is impractical to air-condition

24

and dehumidify the space to preserve the wood floors.  Trial Tr. (3/15/10), at p. 73(6-24) (Rutila).

128.    Leaving in the electrical wiring is an impediment to proper cleaning of the home and removal of all drywall debris and dust.  Trial Tr. (3/16/10), at pp. 385(23)-386(4) (Bailey).

129.    To ensure that a full and complete remediation is accomplished, an independent environmental consultant should be retained, have final approval authority, and certify in writing the completion and safety of the remediation.  Trial Tr. (3/15/10) at p. 78 (3-18) (Rutila).

### A. A Comprehensive Clean-up Protocol is Necessary to Assure the Efficacy of the CDW Remediation

130.    Drywall remediation should be treated like remediation of an environmental contaminant, and requires a complete removal of not only the source of contamination but all dust associated with the source.  Trial Tr. (3/16/10), at pp. 350(21)-351(4) (Bailey).

131.    Drywall remediation will create substantial dust no matter how controlled the removal process.  Trial Tr. (3/15/10), at p. 75(5-24) (Rutila); *see also* Trial Tr. (3/16/10), at pp. 352(18)-353(15) (Bailey).

132.    Because of the time required for controlled removal of drywall, this technique is only appropriate for limited remediation, such as that required to remove mold contamination from a particular area of a home.  Full removal, through the demolition technique practiced by Beazer, is the preferred practice in this case.  Trial Tr. (3/16/10), at pp. 367(25)-368(11) (Bailey).

133.    Complete removal of the dust (whether from a controlled removal or otherwise) requires a regular vacuuming, followed by vacuuming with a HEPA filter, and finally a wipe-down of all surfaces with a damp cloth.  Trial Tr. (3/15/10), at pp. 75(25)-76(12) (Rutila); *see*

25

*also* Trial Tr. (3/16/10), at pp. 360 (17-25), 365(18-20), 368(12-25) (Bailey). This is the industry standard. Trial Tr. (3/16/10), at p. 360(17-25) (Bailey).

134.   KPT's own expert observed that HEPA vacuuming can be properly part of a remediation program for Chinese drywall, and would actually require less time and effort than conventional vacuuming. Trial Tr. (3/17/10), at p. 562(5-21) (Lee).

135.   The Scotch-Brite cleaning protocol proposed by KPT is based on no known standards, and is not completely effective.   Trial Tr. (3/19/10), at pp. 902(16)-903(14) (Perricone).

136.   After drywall removal and cleaning, Plaintiffs' home should be allowed to air out for up to 30 days. This allows all odors and gases to be eliminated while the studs of the home are exposed. Trial Tr. (3/15/10), at p. 77(6-18) (Rutila).

137.   Rebuilding without a proper airing out can lead to the recurrence or emergence of problems. Trial Tr. (3/15/10), at p. 77(6-18) (Rutila).

**B.   Plaintiffs' Remediation Cost Estimates are Based on Standardized Cost Methodologies and are Reliable and Reasonable**

138.   Based upon the testimony of Al Mallet, all wiring in the Hernandez home must be removed and replaced due to (1) electrical code concerns, (2) the potential risk of corrosion on the remaining wiring in the walls, (3) cleaning difficulties if the wiring were left in place, and (4) the alternative cost of clipping and splicing wire in electrical boxes. Trial Tr. (3/17/10), at p. 439-440 (Mallet).

139.   Al Mallet is a qualified and well-established general contractor. Trial Tr. (3/17/10), at p. 399-402 (Mallet). Not only has he performed scope of work and cost estimates for thousands of residential projects, but even before being retained in this case, he had done

independent research on Chinese drywall issues and had received commendation for a speech on Chinese drywall given at a meeting of the Investigator Engineer's Association. Trial Tr. (3/17/10), at p. 401 (8-15) (Mallet).

140.    Based upon what is known and stipulated in this case about the corrosive effects of Chinese drywall off-gassing, and also based on his independent research, experience, practical cost considerations, and inspection and observations of the Hernandez property, Mr. Mallet proposes to remove and replace:

      a.  all drywall;

      b.  the entire HVAC system;

      c.  all electrical wiring, the circuit breaker panel, and alarm system;

      d.  all plumbing components; and

      e.  all items such as countertops, molding, cabinets, and wood flooring, which will be either damaged during drywall removal or impractical to salvage and store.

Trial Tr. (3/17/10), at p. 403-404 (Mallet); Trial Tr. (3/17/10), at p. 421-423 (Mallet); Trial Tr. (3/17/10), at p. 426; 418-419; and p. 420 (Mallet); Trial Tr. (3/17/10), at p. 420 (18-25); and p. 421 (1-9) (Mallet).

141.    Mr. Mallet performed a room-by-room, detailed analysis, and utilized a nationally-accepted software program ("Xactimate") to determine what Mr. and Mr. Hernandez should expect to pay in their community for a proper remediation of their home. Trial Tr. (3/17/10), at p. 408 (11-25), and p. 409 (1-17) (Mallet).

142.    In determining the proper scope of remediation, Mr. Mallet took into account the fact that the Consumer Products Safety Commission recently has alerted fire safety professionals

27

to its investigation of the risk of electrical fires associated with Chinese drywall off-gassing and its corrosive effects on electrical systems. Trial Tr. (3/17/10), at p. 407-408 (Mallet).

143. Mr. Mallet relied on generally-accepted cost data sets and on cost methodologies which are routinely used by the insurance industry, in order to finalize his cost estimate in this case. Trial Tr. (3/16/10) at pp. 409 (9-17) and 443 (1-25) (Mallet); Trial Tr. (3/18/10) at p. 788 (10-19), 790 (4-7) (Carruba).

144. The Court accepts and adopts the opinion of Al Mallet that a reasonable cost estimate for the appropriate Chinese drywall remediation of the Hernandez home is $200,218.09. Trial Tr. (3/17/10), at p. 447 (18-21) (Mallet). Based on Mr. Mallet's testimony that a 40% "gross profit" factor is standard in the building industry, there is not a significant difference between the Beazer cost of remediation and the owner cost which Mr. Mallet has estimated in this case. Trial Tr. (3/17/10), at p. 484 (Mallet).

### C. Major U.S. Builders, Such as Beazer Homes, Have Successfully Remediated CDW Homes Utilizing the Same Scope of Work that Plaintiffs Seek to Obtain

145. Beazer Homes (an established national builder) has found approximately 44 of its homes in 2 Florida communities (Fort Myers and Tampa) to have Chinese drywall. Trial Tr. (3/15/10), at p. 100 (16-21) and p. 102 (20-22) (Phillips). Some of the Chinese drywall in these homes was manufactured by Knauf. Trial Tr. (3/15/10), at p. 103 (12-16) (Phillips). Beazer has decided upon an appropriate scope of Chinese drywall remediation involving Beazer-built homes in Florida, including homes where KPT drywall has been found. Trial Tr. (3/15/10), at p. 105 (12-16) (Phillips).

146.    To date, Chinese drywall has been successfully removed in approximately 20 of the 44 homes that Beazer is in the process of remediating. Trial Tr. (3/15/10), at p. 105 (8-11) (Phillips).

147.    The Beazer Work Authorization Agreement and Limited Release and Assignment of Property Damage Claims (H. Ex. 150, at 150-0003) sets forth in summary fashion (at p. 3), the scope of Chinese drywall remediation that Beazer is pursuing. Trial Tr. (3/15/10), at p. 110 (25) and p. 111 (1-3) (Phillips).

148.    Beazer also has found from experience that it is more cost-effective to replace cabinetry and wood flooring in homes, given the alternative costs of climate-controlled storage and reinstallation, not to mention the risk of damage during removal. Trial Tr. (3/15/10), at p. 125 (12-25) and p. 126 (1-14) (Phillips).

149.    Beazer removes and replaces all affected plumbing components, or fixtures and fittings that are made of copper or chrome as part of its remediation protocol. Trial Tr. (3/15/10), at p. 118-119 (Phillips).

150.    Beazer considered trying to salvage parts of the HVAC system, but ultimately decided to replace everything but the condenser, or outside compressor; this includes the line-set for the system (a continuous copper line from the air handler in the attic to the outside unit). Trial Tr. (3/15/10), at p. 112 (2-16) (Phillips).

151.    Beazer follows a thorough cleaning and air-out protocol, since Chinese drywall dust is extremely fine and tends to disburse and settle on all surfaces during the process of removal. Trial Tr. (3/15/10), at p. 127 (4-25), p. 128 (1-25); and p. 129 (1-10) (Phillips). The breakage of drywall into pieces when it is being removed is inevitable, as shown in the video-

taping of this activity both in Beazer homes and in the "control" home in Mandeville used by KPT. Trial Tr. (3/15/10), at p. 131 (14-25) and p. 132 (1-2) (Phillips).

152.     The scope of remediation proposed by Plaintiffs in this case is consistent with the scope of remediation which Beazer has found to be appropriate, and is based not simply on expert theories or opinions but on Beazer's actual experience. See Beazer Work Authorization Agreement and Limited Release and Assignment of Property Damage Claims (H. Ex. 150, at 150-0003).

153.     The cost of Beazer's Chinese drywall repairs can be compared to an owner's cost only if certain percentage adjustments are made to account for a national builder's buying power, for the additional charges any owner must pay in hiring a general contractor, for contractor overhead, and for contractor profit. Trial Tr. (3/15/10), at p. 163-167 (Phillips). In a Beazer home with total living area square footage slightly more than, but somewhat comparable to, the Hernandez home, the cost to Beazer of approximately $51 a square foot was converted by Mr. Phillips into an owner cost of approximately $70 a square foot for prevailing conditions in that same Florida community. Trial Tr. (3/15/10), at p. 159-167 (Phillips).

**D.     KPT's Experts Failed to Present Accurate and Substantiated Cost Data and a Cost Effective Remediation Plan**

154.     Defense expert Carruba required a day and a half to remove drywall in one room, and half of a day to clean that room, in contrast to Beazer's approach which removes all drywall from an entire home in one day. Trial Tr. (3/18/10) at p. 798 (4-15) (Carruba).

155.     Carruba plans to reuse electrical fixtures even though these have been exposed to the same corrosive environment as the switches and receptacles that require replacement under KPT's own protocol. Trial Tr. (3/18/10) at p. 796 (24) – 797 (9) (Carruba).

30

156.    The evidence showed that limited credibility should be afforded to KPT cost expert, Carruba, due to the ethical complaints and licensure challenges in his professional background, the inconsistency of his testimony on corrosion with record evidence, and the demonstrated inaccuracies in his cost estimates.  Trial Tr. (3/18/10) at p. 779 (12-19), 780 (25) - 782 (25), 786 (22) – 787 (24), 792 (14) – 793 (9), 795 (18) – 796 (7) (Carruba).

157.    The KPT proposal to save and store cabinetry and wood flooring is neither practical nor cost-effective.  Trial Tr. (3/17/10), at p. 413-416 and p. 420-421 (Mallet).

158.    Al Mallet prepared a cost comparison table to illustrate the ways in which his estimate differs from the estimates of both Mr. Carruba and Benchmark Custom Builders. Hernandez Exhibit 557.  These differences are due largely to inadequate measurements by Carruba and/or Benchmark, insufficient detail and foresight in their analysis, and/or approaches which either cut corners or won't work as a practical matter.  Trial Tr. (3/17/10), at p. 452-461 (Mallet).

**E.    Plaintiffs Cannot be Made Whole if Damaged and Corroded Components are Left In Place In the Home Instead of Being Removed.**

159.    The Carruba/Benchmark proposal that labor-intensive electrical work be undertaken to save, clip and splice all wire terminals in receptacles and boxes, ignores the practical difficulty of doing so without creating additional boxes, as well as the expense of inspection by a qualified electrical engineer to assure code compliance.  More importantly, cutting corners with wires in this way will fail to eliminate the potential for corrosion risk within the walls of the home after remediation, which is a potential risk the Hernandez family did not have in this home prior to the installation of the Chinese drywall, and one they should not be required to assume as part of a legal remedy in redhibition.

31

160.    Irrespective of the scientific debate about corrosion, pitting, or the continuance of problems with wires in walls after removal of Chinese drywall, the Hernandez family and whatever contractor they may retain in the future to remediate their home, must address a now-publicized and legitimate risk of corrosion on copper metal surfaces left in the home after the KPT drywall is removed.  Trial Tr. (3/17/10), at p. 477 (16-21) (Mallet). No reputable contractor would accept this risk of keeping copper and/or silver metal in the home after these materials existed in a corrosive environment, and neither would a reputable environmental consultant approve a remediation of the Hernandez home if the potential for such a corrosion risk remains. Trial Tr. (3/17/10), at p. 500-501 (Mallet).

161.    Just as Beazer seeks to assure that owners are made whole without further legal recourse against the builder, a general contractor will do the same with respect to the Hernandez family.  Plaintiffs more likely than not will pay for repairs that resolve reasonable doubts as to future corrosion now by removing all copper pipes, copper wiring and silver contacts from the home, rather than being obliged by a prospective contractor to leave these exposed items in the home behind new drywall with an express assumption of the attendant risk.

162.    Under its warranty agreement with homeowners, Beazer's remediation objective has been to make these owners whole by restoring the homes to the condition they were in prior to, and without, the installation of the Chinese drywall. Trial Tr. (3/15/10), at p. 105 (17-25) and p. 106 (1) (Phillips).  In addition, as established by the testimony of Beazer V.P. Ray Phillips, there is a second important objective underlying the company's protocol: it seeks to accomplish Chinese drywall remediation in the most practical and cost-effective way possible.  Trial Tr. (3/15/10), at p. 105 (17-25) and p. 106 (1) (Phillips).

32

## VI. PLAINTIFFS HAVE INCURRED SIGNIFICANT ECONOMIC DAMAGES CAUSED BY CORROSIVE CDW IN ADDITION TO THE COST OF REMEDIATION.

163.   Mr. and Mrs. Hernandez have been married for almost ten years and have two children (Grant, age 4, and Amelia, age 2). Trial Tr. (3/16/10), at p. 284 (14-15) (T. Hernandez).

164.   Charlene Hernandez was born in 1980 and is a graduate of LSU Health Sciences Center. She works as Registered Nurse at Ochsner. Trial Tr. (3/16/2010), at p. 505(16-19) (C. Hernandez).

165.   Mr. Hernandez works for the U.S. Department of State with the New Orleans passport center, supervising passport specialists to determine citizenship and prevent passport fraud and identity theft. Trial Tr. (3/16/10), at p. 284 (7-12) (T. Hernandez).

166.   Mr. and Mrs. Hernandez currently reside at 68034 Marion Street, Mandeville. They moved into the home the first week of August, 2006. Trial Tr. (3/16/10), at p. 283 (25), 284 (1-5), 286 (2-3) (T. Hernandez).

167.   The home in Mandeville is the first one Plaintiffs have owned. They had planned on raising their family there and one day expanding the house. Trial Tr. (3/16/10), at p. 506(10-12) (C. Hernandez).

168.   From the time she moved in, Mrs. Hernandez noticed an unusual odor in the house. She thought it was due to the new construction of the house and that it would not last. She cleaned, mopped, dusted, vacuumed, deodorized with sprays and candles, but found that the odor did not go away. Trial Tr. (3/16/10) at p. 506(16-20) (C. Hernandez).

169.   Mrs. Hernandez described the chemical odor as that of a burned match. Trial Tr. (3/16/10) at p. 506(25) (C. Hernandez).

33

170.    There is a fireplace in the house, and the last time it was used was during the closing ceremonies of the Olympics (February 2010).  Trial Tr. (3/16/10) at p. 507 (4-6) (C. Hernandez).

171.    Mr. and Mrs. Hernandez, to minimize the odor in the home, purchased two dehumidifiers because they were advised that the odor might be lessened if the humidity were lower.  They started using the units in April, 2009; but, by that summer, the dehumidifiers started making noises and worked only intermittently.  *See* H. Ex. 558 (FRE 1006 Summary of Property Failure Data in the Hernandez Home); Trial Tr. (3/16/10) at p. 507(12-16) (C. Hernandez).

172.    Mrs. Hernandez testified that the family's clothing has a burned, chemical smell. She has tried washing, drying, and dry cleaning, but the strong smell in the clothing remains. Trial Tr. (3/16/10) at p. 507(23-25) (C. Hernandez).

173.    Mrs. Hernandez once took 8 large bags of her children's used clothes to a consignment shop in Mandeville.  The shop advised that they could not sell the clothes because they had a strange smell.  Trial Tr. (3/16/10) at p. 508(3-14) (C. Hernandez)Mrs. Hernandez hired a cleaning service to steam clean a wool rug in the living room and a twin mattress in her son's room, both of which were retaining the chemical order in the home.  After attempting to clean the items, the service advised that it could not eliminate the odor.  Trial Tr. (3/16/10) at p. 508(20) – p. 509(4) (C. Hernandez); *see* H. Ex. 31 and 32 (Stanley Steamer Quote and Invoice)

174.

175.    The air conditioner in the Hernandez home initially failed in the summer of 2007. Since that time, the evaporator coils have failed repeatedly.  Trial Tr. (3/16/2010), at p. 286 (4-21) (T. Hernandez).

34

176.     Plaintiffs have had numerous problems with their HVAC system, which was originally installed in July, 2006.  In mid-June, 2007, a leak in the system was detected.   In June, 2007, the 11-month old HVAC coil was replaced.  It was replaced again in August, 2008, after the new coil started to leak Freon and cause damage to walls, doors, and moldings.  Two months later, in October, 2008, both the compressor and the evaporator coil failed.  From October, 2008 - January, 2009, Plaintiffs lived without both emergency heat and air-conditioning.  In January, 2009, the entire indoor and outdoor HVAC unit was replaced.   In July and August, 2009, the HVAC coils again began to leak and failed, and a new coil was sent to Bronz-Glo to be coated. In September, 2009, the coated coil was installed.  The thermostat was installed in August, 2006, failed and then was replaced in January, 2010.  In January, 2010, problems were detected with the compressor, which had been installed in January, 2009, and later that same month the compressor was replaced.  *See* H. Ex. 558 (FRE 1006 Summary of Property Failure Data in the Hernandez Home).

177.     Plaintiffs have lived in the home for 3-1/2 years, and currently are using the sixth evaporator coil for the HVAC system.   Trial Tr. (3/16/10), at p. 286 (22-24) (T. Hernandez).

178.     On occasions when the air conditioning system failed during the summer, Plaintiffs were obliged to spend some nights at a family member's home.  They also found it necessary to borrow air-conditioning window units.  Trial Tr. (3/16/10), at p. 287 (3-17) (T. Hernandez).

179.     Plaintiffs have used a total of 4 air-conditioning window units.  One failed in just a few weeks; another didn't work efficiently; and the others have tarnished, black coils. The one

not working efficiently was the largest unit that was used, and was sent to Plaintiffs' expert Dean

Rutila for analysis. Trial Tr. (3/16/10), at p. 287 (18-24), 288 (2-8) (T. Hernandez).

180.    In January 2010, the emergency heat mode on the thermostat in the Hernandez

house began to fail. Trial Tr. (3/16/10), at p. 288 (9-17) (T. Hernandez).

181.    The outside compressor also failed in January 2010. Trial Tr. (3/16/10), at p. 288

(18-22) (T. Hernandez).

182.    Less than 1 year after the Plaintiffs moved in, the refrigerator in the home failed.

The refrigerator was replaced, but now the copper connections in the back of it are black. Trial

Tr. (3/16/10), at p. 289 (1-11) (T. Hernandez).

183.    The microwave in the Hernandez home started to malfunction about one year

after the Plaintiffs moved in. *See* H. Ex. 558 (FRE 1006 Summary of Property Failure Data in

the Hernandez Home); Trial Tr. (3/16/10) at p. 509 (8-11) (C. Hernandez).

184.    Just prior to the start of the trial of this case, Mrs. Hernandez plugged in a food-

frying appliance in her kitchen and a blue spark shot out of the outlet. Trial Tr. (3/16/10) at p.

509 (12-16) (C. Hernandez).

185.    Mrs. Hernandez contacted an electrician to address the fact that many of the lights

and outlets stopped working on one side of the house. The electrician advised that one of the

switches was very corroded, causing others to fail. Trial Tr. (3/16/10) at p. 509 (21) – p. 510 (4)

(C. Hernandez).

186.    Plaintiffs also had a VCR, which was working when they moved into the home,

but which stopped working in 2007. In addition, they had a TV which worked when they moved

36

in, but which began to blink on and off and then failed altogether in late 2008 or early 2009. *See* H. Ex. 558 (FRE 1006 Summary of Property Failure Data in the Hernandez Home).

187.    Plaintiffs have had to replace a toaster, which was working when they moved into the house in mid-2006 and stopped working in 2007. *See* H. Ex. 558 (FRE 1006 Summary of Property Failure Data in the Hernandez Home).

188.    Plaintiffs had a smoke detector installed when they moved into the house in August, 2006; and, in 2009, it started to malfunction. *See* H. Ex. 558 (FRE 1006 Summary of Property Failure Data in the Hernandez Home).

189.    In mid-2007, Plaintiffs bought a laptop. By mid-2008, it began to malfunction. *See* H. Ex. 558 (FRE 1006 Summary of Property Failure Data in the Hernandez Home).

190.    A TV in the children's playroom worked for a few months and then it failed as well. Trial Tr. (3/16/10), at p. 289(13-24) (T. Hernandez).

191.    In preparation for trial, Mr. and Mrs. Hernandez prepared a list of appliances and components of the house that have failed since they moved in. Trial Tr. (3/16/10) at p. 510(8-20) (C. Hernandez).

192.    A summary of the appliance and component failures in the Hernandez home was admitted into evidence under FRE 1006. *See* H. Ex. 558 (FRE 1006 Summary of Property Failure Data in the Hernandez Home).

193.    Mrs. Hernandez noticed corrosion on the cord of a lamp from the living room, underneath the plastic covering for the cord. The wire had turned black. *See* H. Ex. 661 (Hernandez lamp photograph); Trial Tr. (3/16/10) at p. 511 (21-25) (C. Hernandez).

37

194.   Mrs. Hernandez also noticed corrosion on two small garbage cans which she bought in August or September of 2006. There are pitted areas and spots. One of these cans was sent for testing. Mrs. Hernandez bought it in January 2010, and there already is visible corrosion. *See* H. Ex. 219 (Hernandez trash can photograph); Trial Tr. (3/16/10) at p. 512 (11-23) (C. Hernandez).

195.   Plaintiffs have a silver picture frame from their wedding, which has three panels. In the middle, they have their wedding invitation, and one side of the invitation is a picture of Tatum as a child. On the other side of the invitation is a picture of Charlene as a child. Before they moved into their house, the frame was silver and shiny. There are now large black spots on the frame. *See* H. Ex. 272 (Hernandez picture frame photograph); Trial Tr. (3/16/10) at p. 513 (14-22) (C. Hernandez).

196.   Plaintiffs had an antique, bronze-colored door stop in their children's bathroom. It is now black with corrosion. The door hardware in the house now looks black, like the doorstop. *See* H. Ex. p. 658 (Hernandez door stop photograph); Trial Tr. (3/16/10) at p. 514(6-12) (C. Hernandez).

197.   Plaintiffs discovered Chinese drywall in their home in March 2009. They contacted a realtor to help them find comparable homes to rent in the Mandeville area and have provided these rental figures to J.C. Tuthill Trial Tr. (3/16/10), at p. 291 (14-24) (T. Hernandez).

.

198.   In investigating the possibility of moving out of their house because of the problems with Chinese drywall, Plaintiffs concluded that they could not do so because they cannot afford both mortgage and rent. A friend offered them a FEMA trailer to put on their land,

but it was too small, and Mrs. Hernandez did not want to put her family into the trailer because of concerns about formaldehyde. There also was no bathtub in the trailer, so Mrs. Hernandez would have to hose her children in order to wash them. Also, there was no crib or place for Plaintiffs' 2-year old daughter to sleep. Trial Tr. (3/16/10) at p. 514(22) – p. 515(13) (C. Hernandez).

199.    Plaintiffs contacted their mortgage company, and were offered a 90-day moratorium on mortgage payments. On the 91st day, however, the prior payments owed would be due. Financially, this is impossible for Plaintiffs. Trial Tr. (3/16/10) at p. 515(20) – p. 516(1) (C. Hernandez).

200.    Plaintiffs' builder had certain properties which he had not yet sold, and he offered to let them move into one of them. However, he advised they would have to move out of the house as soon as he sold it, so Plaintiffs had no guarantee as to how long they could stay in this house. This was not a feasible solution for the Hernandez family. Trial Tr. (3/16/10) at 516(4-13) (C. Hernandez).

201.    The necessity of litigation has disrupted the enjoyment of the Plaintiffs' residence. There have been numerous home inspections by experts, electricians, plumbers and attorneys. The CPSC has inspected the home more than once. The Court has inspected the home. Mr. Hernandez endeavored to limit the amount of time away from his job for these events, and so Mrs. Hernandez arranged to be home for the activity when it was necessary for someone to be present. The inspections often lasted a full day, from morning until late evening. Trial Tr. (3/16/10), at p. 290 (3-20) (T. Hernandez).

39

202.    The fact that Plaintiffs cannot afford to pay both their mortgage note on their home and the rental of an alternative place to live, pending remediation, has proven to be a source of significant emotional distress and mental anguish for Plaintiffs.  Trial Tr. (3/16/10), at p. 291 (25), 292 (1-7) (T. Hernandez).

203.    Plaintiffs attested to having provided to J.C. Tuthill (Plaintiffs' expert Certified Public Accountant and Forensic Accountant) all available receipts for repairs related to system and appliance failures, plus cost estimates they obtained for moving out of and back into their home for the period of remediation, as well as potential rental and alternative living costs and documentation of lost income due to repairs, inspections, and litigation-necessitated absences from their respective jobs.  Trial Tr. (3/16/10), at p. 292 (8-20) (T. Hernandez).

204.    Mrs. Hernandez verified that she provided documentation and other information, such as receipts, loss of wages, and estimates to move out and other alternative living costs to Ms. Tuthill.  Trial Tr. (3/16/10) at p. 511(11-13) (C. Hernandez).

205.    The presence of Chinese drywall has hampered the career of Mr. Hernandez. Passport services is a growing profession, although activity in the New Orleans area is limited. There are job postings which would both further Plaintiff's career and result in higher income, but these positions are out of town.  Mr. Hernandez cannot apply because the present house is a financial burden which cannot be sold so he cannot be transferred within the Passport services area.  Trial Tr. (3/16/10), at p. 292 (21-25), 293 (1-7) (T. Hernandez).

206.    Plaintiffs seek to have their home repaired and restored to a safe place for their family.  Shortly before March 2009, they had saved money to do landscaping and pave the

driveway to improve the home's look and value, but plans have been put on hold indefinitely, pending remediation. Trial Tr. (3/16/10), at p. 293 (15-25), 294 (1-4) (T. Hernandez).

207.    Under its warranty agreement with homeowners, Beazer pays a $3,200 per month stipend to displaced homeowners during the remediation period. Trial Tr. (3/15/10), at p. 110 (11-16) (Phillips).

208.    Mr. Maloney, as personal property appraiser, visited with Plaintiffs in their home and inspected items of property that cannot be cleaned, such as couches and mattresses. Plaintiffs advised Mr. Maloney of the amounts for which they purchased the items. Trial Tr. (3/16/10), at p. 293 (8-14) (T. Hernandez).

209.    Mr. Maloney personally inspected property in the Hernandez home in the presence of Mr. and Mrs. Hernandez, took photographs of items to be appraised and made notations for each item. The inspection took four (4) to five (5) hours. Mr. Maloney then conducted research on replacement prices and prepared his appraisal report. *See* H. Ex. 103 (Curriculum Vitae); Trial Tr. (3/2/10), at 22 (1-24), 23 (1-5), 37 (16-24), 38 (1-16), 42 (20-24), 43 (1-22) (Maloney).

210.    Replacement cost new is defined as the cost necessary to replace the item being appraised with a brand-new item of like kind, quality and utility, or with a new upgraded item if the original model is out of production. This definition is adopted by the ISA. *See* H. Ex. 103 (Curriculum Vitae); Trial Tr. on (3/2/2010), at 24 (1-9), 25 (1-6) (Maloney).

211.    The replacement cost new for small appliances and electronics, corroded items and furnishings made of materials which where absorbent in nature such as fabrics (labeled

"Hernandez_1" through "Hernandez_32") total eight thousand thirty-six dollars ($8,036). *See* H. Ex. 104 (Valuation of Personal Property); Trial Tr. (3/2/10), at 30 (11-21) (Maloney).

212.     The electrical appliances and electrical equipment ("Hernandez _ 33" through "Hernandez _ 40") have a total replacement value new of three thousand eight hundred seventy-one dollars ($3,871.00). These electrical appliances and electrical equipment appraisals were done for the bidders for the remediation of the home. *See* H. Ex. 104 (Valuation of Personal Property): Trial Tr. (3/2/10), at 29 (22-24), 30 (1-10) (Maloney).

213.     This appraisal total, $3,871, of Mr. Maloney for electrical appliances and electrical equipment was provided to, and included within, the total remediation cost appraisal of Al Mallet. Trial Tr. (3/17/10), at 498 (21) to 499 (24) (Mallet) .

214.     Ms. Tuthill  calculated the non-recurring (one time expense) alternative living costs for Mr. and Mrs. Hernandez to be $14,862.62 which will be incurred when the Hernandez family moves out of the residence  while the home is being remediated.. *See* H. Ex. 481-0003 (Tuthill's Revised Supplemental Exhibit).

215.     Ms. Tuthill  calculated the recurring (monthly) alternative living costs for Mr. and Mrs. Hernandez to be $3,006.81, which will be incurred monthly when the Hernandez family moves out of the residence while the home is being remediated.. *See* H. Ex. 481-0003 (Tuthill's Revised Supplemental Exhibit).

216.     Ms. Tuthill  calculated Plaintiffs' personal property loss (per the report of David J. Maloney, Jr. of Frederick Appraisal Claims & Estate Services) for small appliances and electronics, corroded items, and furnishings with absorbent fabrics to be $8,036.00. This amount does not include $3,871 for the replacement of electrical appliances and electrical equipment as

it is in Plaintiffs' expert Al. Mallet's total for remediation.. *See* H. Ex. 481-0003 (Tuthill's Revised Supplemental Exhibit). .

217.    Mr. Mallet utilized Mr. Maloney's replacement appraisal for the electrical appliances and electrical equipment, $3,871, and adjusted it to include taxes, delivery and other appropriate charges to Mr. Maloney's appraised value to arrive at a true replacement cost of $4,560.05, which is  included in Mr. Mallet's total remediation cost estimate of $200,218.09. Trial Tr. (3/17/10), at 498 (21) to 499 (24) (Mallet Testimony)

218.    Ms. Tuthill calculated the repair costs incurred by Plaintiffs prior to trial to be $2,682.29. *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

219.    Ms. Tuthill calculated the repair costs to be incurred by Plaintiffs, post-trial, to be $2,365.64. *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

220.    Ms. Tuthill calculated Tatum Hernandez's loss of income in the amount of $1,601.55, due to his missing work because of repairs necessitated by the CDW and expert and inspection activity at his home, necessitated by this litigation. *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

221.    Ms. Tuthill calculated Charlene Hernandez's loss of income in the amount of $1,392.00, due to her missing work because of repairs necessitated by the CDW and expert and inspection activity at her home, necessitated by this litigation. *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

222.    Ms. Tuthill calculated the reduction in property tax assessment afforded Plaintiffs by the St. Tammany Assessor and credited the amount of $1,499.68 against the Plaintiffs' claims. *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

43

223.    Ms. Tuthill calculated and concluded that the subtotal of costs incurred prior to trial by Mr. and Mrs. Hernandez for loss of personal property, repairs, loss of income (with a credit for property tax reduction)  as $12,212.16.  *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

224.    Ms. Tuthill calculated and concluded the total of non-recurring (one time) amounts for remediation, alternative living costs, and repair costs, post trial, for the Plaintiffs is $229,658.51.  *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

225.    Ms. Tuthill calculated and concluded the total of monthly amounts, post trial, which will be incurred by the Plaintiffs for alternative living expenses as $3,006.81 monthly. *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

226.    The total of Mr. and Mrs. Hernandez past and future economic losses is $229,658.51  *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

227.    Assuming the remediation is complete within six months, the amount of costs associated with the monthly alternative living costs for this period is $18,040.86 ($3,006.81 times 6 months). *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

228.    The total damages proven by the Plaintiffs is $247,699.37. *See* H. Ex. 481-0004 (Tuthill's Revised Supplemental Exhibit).

VII.    **CONCLUSIONS OF LAW**

229.    The real property of the Plaintiffs is situated in Louisiana, and the losses that are the subject of this case likewise occurred in Louisiana.  Both parties agree that Louisiana law applies to this action.  The Court agrees that Louisiana law will apply to these claims.

230.    The Court accepts the stipulation of the parties and finds that Defendant KPT is the manufacturer and seller of the drywall at issue in this case.

231.   As the manufacturer of the drywall, KPT is directly and independently liable to Plaintiffs for redhibitory defects existing at the time of delivery. *See Aucoin v. Southern Quality Homes*, 984 So.2d 685, 693 (La. 2008). Further, as the manufacturer of the drywall, KPT is conclusively presumed to be in "bad faith" under Civil Code Article 2545. *See* REVISION COMMENT (b), La.C.C. 2545 (1993) ("Under this Article, a manufacturer is presumed to know the defects in the things it manufactures.... Thus, regardless of what his actual knowledge may be, a manufacturer is deemed to be in bad faith in selling defective products"). Based on the forgoing, KPT is liable to Plaintiffs for:

    i.     the return of the purchase price of the drywall with interest from the time it was paid;

    ii.    the reasonable expenses occasioned by the sale of the drywall;

    iii.   reasonable expenses incurred for the preservation of the drywall and associated components;

    iv.   damages; and,

    v.    reasonable attorneys fees.

232.   KPT is also liable for damages under Louisiana Civil Code Article 2524. *See, e.g.*, REVISION COMMENT (b), La.C.C. 2524 ("when the thing sold is not fit for its ordinary use, even though it is free from redhibitory defects, the buyer may seek dissolution of the sale and damages, or just damages, under the general rules of conventional obligations"); *Walton Construction Company v. G.M. Horne*, 984 So.2d 827, 838 (La. App. 1st Cir. 2008),(Downing, J., concurring) ("The warranty of fitness which, by law, comes with my air conditioner, doesn't just run to the guy who bought it to install it, it runs to me, the ultimate consumer, for which it was intended. This allows me, the ultimate consumer, to sue the manufacturer without also suing the (probably broke and long gone) contractor, distributor, or middle man").

45

233.  Under Louisiana law, when property is damaged through the fault of another, the primary goal is to restore the property, as nearly as possible, to the state it was in immediately prior to the damage.  It is well-settled, in this regard, that the measure of property damage is the cost of restoring the property to its former condition.  Generally, Louisiana courts consider the cost of restoration to be the proper measure of damage where the thing damaged can be adequately repaired.  No mechanical rule is applied with exactitude.  Each case must rest on its own facts and circumstances. *Coleman v. Victor*, 326 So.2d 344, 347 (La. 1976); *Mossy Motors, Inc. v. Sewerage and Water Board of New Orleans*, 753 So.2d 269, 277 (La. App. 4th Cir. 1999); *Alpha Alpha v. Southland Aviation*, 697 So.2d 1364, 1372 (La. App. 3rd Cir. 1997); *Summarell v. Ross*, 660 So.2d 112, 116-117 (La. App. 2nd Cir. 1995).

234.  Consistent with this precedent, the Court finds that the remediation program advocated by KPT will not adequately restore the property to its former condition.  Plaintiffs purchased a new home and are entitled to have it restored to a new condition (i.e., without any corrosion, tarnishing, residue, or other damage to wiring and other components).  Additionally, the Court also finds that the remediation program advocated by KPT will not adequately restore Plaintiffs' home because it does not address any deterioration and corrosion that will occur in the future.

235.  While KPT notes that the Plaintiffs' proposed costs of remediation ($200,218.09), H. Ex. 477, slightly exceeds the original construction cost ($176,030.00), the Court does not find the difference to be either "disproportionate" or "economically wasteful"; and, in any event, because the home is intended for a purpose personal to Plaintiffs, the damages owed by KPT should include the reasonable and necessary costs of the repairs, even though it may be greater

46

than the original price of construction. *See Roman Catholic Church of the Archdiocese of New Orleans v. Louisiana Gas Serv. Co.*, 618 So.2d 874, 880 (La. 1993) ("If a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building"); *St. Martin v. Mobil Exploration and Production*, 1997 WL 587758 (E.D.La. Sept. 19, 1997) (denying summary judgment under Roman Catholic Church where restoration cost was more than five times the estimated market value of the property).

236.   Under Louisiana law, the trial court has discretion to grant or deny credit to the seller for use by the purchaser or depreciation. *See Magee v. Brown*, 859 So.2d 720, 723 (La. App. 4th Cir. 2003), citing, *Guillory v. Jim Tatman's Mobile Homes, Inc.,* 490 So.2d 1185 (La. App. 3rd Cir. 1986).  As noted by the Louisiana Supreme Court:

> Compensation for the buyer's use... ought not be granted automatically by the courts; even the value of an extensive use may be overridden by great inconvenience incurred because of the defective nature of the thing and constant interruption in service caused by the seller's attempts to repair.

*Capitol City Leasing Corp. v. Hill*, 404 So.2d 935, 939 (La. 1981), quoting *Alexander v. Burroughs Corp.*, 359 So.2d 607, 610-611 (La. 1978).  Moreover, the seller has the burden of proving the amount of depreciation or other value of the buyer's use of the thing.  *Magee*, 859 So.2d at 724, citing, *Holloway v. Gulf Motors, Inc.*, 588 So.2d 1322 (La. App. 2nd Cir. 1991); see also, *Underwriters at Lloyds v. OSCA, Inc.,* No. 03-20398, 2006 WL 941794, at pp.**13-14 (5th Cir. April 12, 2006), citing Louisiana Power & Light v. Smith, 343 So.2d 367, 372 (La. App. 4th Cir. 1977).  Given the circumstances endured by the Plaintiffs, no credit for Plaintiffs' use will be extended to KPT as: (i) The use of the family home and affected personal property by Plaintiffs was accompanied by great inconvenience and interruption; and (ii) KPT did not present

47

any evidence from which the use to Plaintiffs or any alleged "betterments" to the home could be quantified.

237.    A credit for depreciation is also not appropriate in this case since the repairs will not extend the useful life of the property as it existed before the damage. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505-506 (5th Cir. 1994); *Freeport Sulphur Co. v. S.S. Hermosa*, 526 F.2d 300 (5th Cir. 1976). KPT has failed to establish that the repairs/remediation of the property will extend the useful life of the property since the home was new, and had not depreciated at all, when the defective drywall was first purchased by the Plaintiffs.

238.    Accordingly, the Court finds that Plaintiffs are entitled to an award of $200,218.09, as the cost to remediate and adequately restore the property to its former condition.

239.    Plaintiffs are entitled to an award of attorneys' fees. *See* LA. CIV. CODE ART. 2545; *see, e.g., Aucoin v. Southern Quality Homes*, 984 So.2d 685, 698 (La. 2008); *Capitol City Leasing Corp. v. Hill*, 404 So.2d 935, 939 (La. 1981). The Court has severed the issue, and will determine the appropriate amount of attorneys' fees and costs at a subsequent proceeding in accordance with FED. RULE CIV. PRO. 54(d)(2).

240.    In sum, the Hernandez family has suffered damages in the amount of $247,699.37, assuming the remediation period is six months. The Court finds Plaintiffs Hernandez are entitled to recover these damages. Thus, the Court awards damages to the Hernandez family in the amount of $247,699.37, plus reasonable attorneys' fees, the costs of these proceedings, and legal interest until paid.

48

Respectfully submitted,


_____ /s/ Stephen J. Herman _____
Russ M. Herman
Leonard A. Davis
Stephen J. Herman, T.A.
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*and Counsel for Mr. & Mrs. Hernandez*


Arnold Levin
Fred S. Longer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

**ON THE BRIEF**

Stephen J. Herman
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
sherman@hhkc.com

Fred S. Longer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
alevin@lfsblaw.com

Dawn M. Barrios
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
barrios@bkc-law.com

Gerald E. Meunier
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Christopher Seeger
SEEGER WEISS, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Jeffrey S. Grand
SEEGER WEISS, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
jgrand@seegerweiss.com

Scott Alan George
SEEGER WEISS, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
sgeorge@seegerweiss.com

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Daniel K. Bryson
LEWIS & ROBERTS
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
BARRIOS, KINGSDORF & CASTEIX, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
BECNEL LAW FIRM. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Victor Manuel Diaz
PODHURST ORSECK, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
vdiaz@podhurst.com

Ervin A. Gonzalez
COLSON, HICKS, EIDSON, COLSON
 MATTHEWS, MARTINEZ, GONZALES,
 KALBAC & KANE
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
LEVIN, PAPANTONIO, THOMAS,
 MITCHELL, ECHSNER & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
LAMBERT AND NELSON
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Bruce William Steckler
BARON & BUDD, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Gerald E. Meunier
GAINSBURGH, BENJAMIN, DAVID,
 MEUNIER & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
PARKER, WAICHMAN, ALONSO LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

James Robert Reeves
LUMPKIN & REEVES
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
SEEGER WEISS, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Scott Wm. Weinstein
MORGAN & MORGAN
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Daniel K. Bryson
LEWIS & ROBERTS
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Jeremy W. Alters
ALTERS, BOLDT, BROWN, RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@abbrclaw.com

Richard J. Serpe, Esquire
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail <u>or</u> by hand delivery and e-mail <u>and</u> upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 31st day of March, 2010.

/s/ Stephen J. Herman
Stephen J. Herman
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Ave.
New Orleans, LA  70113
PH:  (504) 581-4892
Fax:  (504) 561-6024
ldavis@hhkc.com