# Exhibit I

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM DIVISION

### Case No. 09-80743-MOORE

GENERAL FIDELITY  INSURANCE CO.,

       Plaintiff,

vs.

KATHERINE L. FOSTER, an individual;
NORTHSTAR HOLDINGS, INC., a Florida
corporation; NORTHSTAR HOMES, INC., A
Florida corporation; and NORTHSTAR
HOLDINGS, AT B & A, LLC, a Florida
Corporation,

       Defendants.

_____/

### PLAINTIFF GENERAL FIDELITY INSURANCE COMPANY'S MOTION FOR
### SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

Plaintiff, General Fidelity Insurance Company ("General Fidelity"), by and through

undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rule

for the Southern District of Florida 7.5, moves for a summary judgment that General

Fidelity has no duty to defend or indemnify Defendants Northstar Holdings, Inc., Northstar

Holdings at B & A, LLC, and Northstar Homes, Inc.  In support of its motion, General

Fidelity states:

### I.    Statement of material facts

#### A.    Procedural background

1.    On April 3, 2009, Katherine Foster ("Ms. Foster") filed a putative class action

in this Court, case number 9:09-cv-80535-JIC ("the underlying lawsuit"), alleging that her

home in Boynton Beach, Florida was built in 2006 with defective drywall (dkt. # 1-2.) ("Foster Complaint").

2. Ms. Foster is suing Northstar Homes, Inc., and Northstar Holdings, Inc., along with other defendants, for bodily injuries, property damage, and other damages she allegedly sustained as a result of the drywall in her home. Foster Compl. at ¶¶ 1-223.

3. Ms. Foster alleges that her lawsuit is a putative class action because: (1) she believes that Class Members number in at least the thousands; (2) common questions of fact and law exist as to all members of the Class; (3) her claims are typical of the claims of the Class; and (4) she is an adequate representative of the Class because she is a member of the Class and her interests do not conflict with the interests of the members of the Class she seeks to represent. Foster Compl. at ¶¶ 106-109.

4. Ms. Foster alleges that the drywall is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gasing" that created noxious, "rotten egg-like" odors, causing bodily injury and property damage. Foster Compl. at ¶ 2.

5. Ms. Foster alleges that the drywall released hydrogen sulfide, "a broad-spectrum poison, meaning that it can poison several different systems in the body, although the nervous system is most affected." Foster Compl. at ¶ 93.

6. Ms. Foster alleges that the drywall releases "caused medical ailments, including allergic reactions, coughing, sinus and throat infection, eye irritation, breathing disorders, other health problems, and/or significantly increased the risk of contracting a serious latent disease." Foster Compl. at ¶ 97.

7. Ms. Foster alleges in the underlying lawsuit that homes and bodies were "exposed to Defendants' drywall and the corrosive and harmful effects of the sulfide gases

and other chemicals being released from these proven hazardous substances." Foster Compl. at ¶ 98 (emphasis added).

8.     Ms. Foster further alleges that her damages include "costs of inspection as well as the costs and expenses necessary to remedy, replace and remove the defective drywall and Other Property that has been affected." Foster Compl. at ¶ 99.

9.     Ms. Foster alleges that the drywall was defective and the defendants failed to recall their product from the market because of its defects. Foster Compl. at ¶ 117.

10.    Ms. Foster alleges that as a result of the defective work and defective drywall, individuals have lost the use of their property. Foster Compl. at ¶ 222.

11.    On May 15, 2009, General Fidelity filed this action for declaratory judgment action, seeking a ruling from this Court that it owes no duty to defend or indemnify Northstar Homes, Inc., Northstar Holdings, Inc., and Northstar Holdings at B & A, LLC ("the Northstar Defendants"), in the underlying lawsuit (dkt #1).

12.    On January 11, 2009, the Northstar Defendants filed their Answer and Counterclaim for Declaratory Relief (dkt # 19).

13.    On January 29, 2009, General Fidelity filed its Answer and Affirmative Defense to the Northstar Defendants' Counterclaim (dkt. # 25).

**B.     The Policies**

14.    General Fidelity issued to Northstar Holdings, Inc., a commercial general liability policy, policy number BAG0002215-00 with effective dates of coverage from October 22, 2006 to October 22, 2007 ("First Policy") (dkt #29). The First Policy names Northstar Holdings At B & A, LLC, as a "supplemental – named insured."

3

15.    General Fidelity subsequently issued to Northstar Homes, Inc., a commercial general liability policy, policy number BAG0004973-00 with effective dates of coverage from October 22, 2007 to October 22, 2008 ("Second Policy") (dkt # 30). The Second Policy names Northstar Holdings, Inc., and Northstar Holdings At B & A, LLC, as a "supplemental – named insured."

16.    General Fidelity also issued to Northstar Homes, Inc., a commercial general liability policy, policy number BAG0006227-00 with effective dates of coverage from October 22, 2008 to October 22, 2009 ("Third Policy") (dkt #31). The Third Policy names Northstar Holdings, Inc., and Northstar Holdings At B & A, LLC as a "supplemental – named insured."

17.    The Policies contain an Insuring Agreement that provides that General Fidelity will "pay those sums that the insured becomes legally obligated to pay because of 'bodily injury' or 'property damage' to which this insurance applies" (dkts # 29-31).

18.    The Insuring Agreement further provides that General Fidelity "will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply" (dkts 29-31).

19.    The Insuring Agreement limits coverage to "bodily injury" or "property damage" that occurs during the policy period (dkts #29-31).

20.    The Policies define an "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" (dkts # 29-31).

4

21.     The Policies define "bodily injury" to mean "bodily injury, sickness or disease

sustained by a person, including death resulting from any of these at any time (dkts # 29-31).

22.     The Policies define "property damage" as:

"Property damage" means:

a.          Physical injury to tangible property, including all
            resulting loss of use of that property. All such
            loss of use shall be deemed to occur at the time
            of the physical injury that caused it; or

b.          Loss of use of tangible property that is not
            physically injured. All such loss of use shall be
            deemed to occur at the time of the "occurrence"
            that caused it.

(dkts # 29-31).

23.     The Policies' Florida Total Pollution Exclusion Endorsement ("Total Pollution

Exclusion") provides:

## FLORIDA TOTAL POLLUTION EXCLUSION ENDORSEMENT

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

I.      For purposes of this endorsement only, exclusion f.
        under paragraph 2., Exclusions of SECTION I -
        COVERAGE A - BODILY INJURY AND PROPERTY
        DAMAGE LIABILITY is deleted and replaced by the
        following:

        This insurance does not apply to:

        **f.      Pollution**

        (1)     "Bodily injury" or "property damage" which would
                not have occurred in whole or part but for the
                actual, alleged or threatened discharge,
                dispersal, seepage, migration, release or escape
                of "pollutants" at any time.

                                5

(2)    Any loss, cost or expense arising out of any:

    (a)    Request, demand, order or statutory or
regulatory requirement that any insured or
others test for, monitor, clean up, remove,
contain, treat, detoxify or neutralize, or in
any way respond to, or assess the effects
of "pollutants"; or

    (b)    Claim or "suit" by or on behalf of a
governmental authority or others for
damages because of testing for,
monitoring, cleaning up, removing,
containing, treating, detoxifying or
neutralizing, or in any way responding to,
or assessing the effects of "pollutants."

II.    For purposes of this endorsement only, definition 15 of
SECTION V - DEFINITIONS is deleted and replaced by
the following:

    15.    "Pollutants" mean any solid, liquid, gaseous,
thermal, acoustic, electric, magnetic or
electromagnetic irritant or contaminant.
"Pollutants" include, but are not limited to,
smoke, vapor, soot, dusts, fumes, fibers,
radiation, acid(s), alkalis, chemicals and waste.
Waste includes materials to be recycled,
reconditioned or reclaimed.

All other terms and conditions of this policy remain unchanged.

(dkts # 29-31).

24.    Exclusion "m" – Damage to Impaired Property Or Property Not Physically

Injured provides:

**m.    Damage To Impaired Property Or Property Not
Physically Injured**

"Property damage" to "impaired property" or property
that has not been physically injured, arising out of:

        (1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

        (2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" afer it has been put to its intended use.

(dkts # 29-31).

25.    The Policies define "impaired property" as:

"Impaired property" means tangible property, other than "your product" or "you work", that cannot be used or is less useful because:

a.    It incorporates "your product" or "your work" that is known or thought to be known to be defective, deficient, inadequate or dangerous; or

b.    You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.[1]

(dkts # 29-31).

26.    Exclusion "n" of the Policies provide:

**n.    Recall Of Products, Work or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

---

[1] This definition is from the Third Policy (Coverage Form CG 00 01 12 07). The "Impaired Property" definition in the First and Second Policies (Coverage Form CG 00 01 12 04) contain the same language but in a slightly different format.

    (1)    "Your product";

    (2)    "Your work"; or

    (3)    "Impaired property";

    if such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

27.    The Policies define "your work" as:

"Your work"

a.    Means:

    (1)    Work or operations performed by you or on your behalf; and

    (2)    Materials, parts or equipment furnished in connection with such work or operations.

b.    Includes:

    (1)    Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

    (2)    The providing of or failure to provide warnings or instructions.

WHEREFORE, General Fidelity Insurance Company moves for a summary judgment that General Fidelity has no duty to defend or indemnify Defendants Northstar Holdings, Inc., Northstar Holdings at B & A, LLC, and Northstar Homes, Inc.

8

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.    Summary of argument

Florida law applies to the interpretation of the Policies.  Certain policy exclusions,
in particular the Total Pollution Exclusion, apply so that General Fidelity has no duty to
defend the Northstar Defendants against the underlying lawsuit.  Where there is no duty
to defend, there is no duty to indemnify.

### II.    Summary judgment standard

Summary judgment is appropriate where the pleadings and supporting materials
establish that there is no genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477
U.S. 317, 322 (1986).  When a genuine issue of material fact exists, as opposed to a
simple factual dispute, summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 247-48 (1986).  No genuine issue of material fact exists when the
nonmoving party "fails to make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party will bear the burden of proof
at trial."  *Celotex*, 477 U.S. at 322.

Here, summary judgment is appropriate because the duty to defend is a matter of
law to be decided by this Court, and there are no factual disputes that preclude summary
judgment.

9

## III.    Legal analysis

### A.    Florida law applies to the interpretation of the Policies

A federal court sitting in diversity must look to the forum state's choice of law rules
to determine the law applicable to the action. *Nova Cas. Co. v. Waserstein*, 424 F. Supp.
2d 1325, 1331 (S.D. Fla. 2006) (citing *Adolfo House Distrib. Corp. v. Travelers Prop. &
Cas. Ins.*, 165 F. Supp. 2d 1332, 1335 (S. D. Fla. 2001)). Florida courts apply the *lex loci
contractus* rule in insurance contract matters, unless a statute modifies or abrogates a
choice-of-law rule. *Nova Cas. Co.*, 424 F. Supp. 2d at 1331 (citing *Prime Ins. Synd. v. B.J.
Handley Trucking, Inc.*, 363 F.3d 1089, 1091 (11th Cir. 2004)). Under *lex loci contractus*,
the law of the jurisdiction where the contract was executed governs the interpretation of the
contract. *Id.* The *lex loci contractus* rule requires that courts interpret contracts by the law
of the state where the last act necessary to complete the contract occurred. *Jemco, inc.
v. United Parcel Service, Inc.*, 400 So. 2d 499, 500 (Fla. Dist. Ct. App. 1981).

In this case, Florida law applies to the interpretation of the Policies. The policies
were executed, delivered, and the last act necessary to form the Policies took place in
Florida. The Northstar Defendants admit that Florida law applies to the interpretation of
the Policies (dkt # 15, at ¶ 10).

### B.    Comparing the allegations of the complaint to the policy determines the duty to defend

The interpretation of an insurance policy is a question of law for the court. *See, e.g.,
Rad Source Technologies, Inc. v. Essex Ins. Co.*, 902 So. 2d 264, 265 (Fla. Dist. Ct. App.
2005); *James River Ins. Co. v. Ground Down Eng'g*, 540 F.3d 1270, 1274 (11th Cir. 2008).
Florida courts construe insurance contracts according to their plain meaning. *Taurus*

10

*Holdings, Inc. v. United States Fid. and Guar., Co.*, 913 So. 2d 528, 537 (Fla. 2005); *Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 735 (Fla. 2002). Florida courts have rejected the doctrine of reasonable expectations and rely upon the plain language of the policy. *Deni Assocs. of Florida, Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1140 (Fla. 1998).

Under Florida law, the duty to defend is determined solely by the allegations of the complaint compared to the policy language. *National Union Fire Ins. Co. v. Lenox Liquors, Inc.*, 358 So. 2d 533, 536 (Fla. 1977); *Sunshine Birds and Supplies, Inc. v. U.S. Fidelity & Guaranty Co.*, 696 So. 2d 907, 910 (Fla. Dist. Ct. App. 1997). If the pleadings show the applicability of a policy exclusion, the insurer has no duty to defend. *State Farm Fire & Cas. Co. v. Tippett*, 864 So. 2d 31, 35 (Fla. Dist. Ct. App. 2003). Where there is no duty to defend, there is no duty to indemnify. *See Fun Spree Vacations, Inc. v. Orion Ins. Co.*, 659 So. 2d 419, 421 (Fla. Dist. Ct. App. 1995).

Comparing the allegations of the underlying lawsuit with General Fidelity's Policies determines General Fidelity's duty to defend. As discussed below, certain policy exclusions preclude coverage so General Fidelity owes no duty to defend and no duty to indemnify its insureds, the Northstar Defendants.

## C.    Certain policy exclusions preclude coverage

The allegations of the underlying lawsuit trigger certain policy exclusions, in particular the Total Pollution Exclusion. General Fidelity has no duty to defend the Northstar Defendants against the underlying lawsuit.

11

1. **The Total Pollution Exclusion precludes coverage for the bodily injury and property damage claims against the Northstar Defendants**

   a. **The Policies' Total Pollution Exclusion is unambiguous and enforceable**

The Policies' Total Pollution Exclusion precludes coverage. Florida courts and courts applying Florida law have consistently found pollution exclusions unambiguous and enforceable. *See, e.g., Deni*, 711 So. 2d at 1138 (finding the plain language of the pollution exclusion unambiguous and enforceable); *Dimmitt Chevrolet, Inc. v. Se. Fid. Ins. Corp.*, 636 So. 2d 700, 705 (Fla. 1993) (same).

In *Deni*, the Florida Supreme Court addressed whether a pollution exclusion in a commercial general liability policy precluded coverage for an indoor ammonia spill. The pollution exclusion and definition of "pollutants" in *Deni* are similar to the Total Pollution Exclusion and definition of "pollutants" in this case. The pollution exclusion in *Deni* precluded coverage for damages "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants." The Total Pollution Exclusion at issue here adds "seepage" and "migration" in addition to the other types of transmission. Additionally, the definition of "pollutant" in *Deni* was "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalines, chemicals and waste." The Total Pollution Exclusion in this case defines "pollutant" to also include any "acoustic, electric, magnetic or electromagnetic irritant or contaminant." Furthermore, the Total Pollution Exclusion provides that "'pollutants' include, but are not limited to, smoke, vapor, soot, dusts, fumes, fibers, radiation, acid(s), alkalis, chemicals and waste."

In *Deni*, the Court found the plain language of the pollution exclusion clear and unambiguous. *Id.* at 1138. The Court rejected the insured's argument that the pollution exclusion was ambiguous because the policy did not define certain words, such as "irritant" and "contaminant." *Id.* at 1139. The Court also rejected the insured's argument that pollution exclusions apply only to industrial and environmental pollution. *Id.* at 1138-39. The Court concluded that the policy excluded coverage for the indoor ammonia spill because of the unambiguous language in the pollution exclusion. *Id.* at 1140.

After *Deni*, the Eleventh Circuit Court of Appeals ruled that similar pollution exclusions preclude insurance coverage for injuries caused by "pollutants." *See, e.g.*, *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1277 (11th Cir. 2008) (finding bodily injuries suffered as a result of construction debris causing methane gas were excluded under the pollution exclusion); *Admiral Ins. Co. v. Feit Mgmt. Co.*, 321 F.3d 1326, 1330 (11th Cir. 2003) (holding that injuries caused by toxic fumes from a hot water heater were excluded by the policy's pollution exclusion); *Auto Owners Ins. Co. v. City of Tampa Hous. Auth.*, 231 F.3d 1298,1300-01 (11th Cir. 2000) (concluding that injuries from ingesting and inhaling lead from old, crumbling paint were excluded because they fell within the pollution exclusion); *Technical Coating Applicators, Inc. v. United States Fid. & Guar.*, 157 F.3d 843, 846 (11th Cir. 1998) (concluding that the pollution exclusion precluded coverage for respiratory problems sustained by breathing vapors emitted by roofing products).

This Court has also enforced pollution exclusions to preclude coverage for bodily injury and property damage. *See, e.g.*, *First Specialty Ins. Corp., v. GRS Mgmt. Assocs.,*

13

*Inc.*, No. 08-81356-CIV, 2009 WL 2524613, 5-6 (S. D. Fla. Aug. 17, 2009) (holding that the
pollution exclusion applied to a contaminant allegedly present in a swimming pool);
*Philadelphia Indem. Ins. Co. v. Yachtsman's Inn Conod Assoc., Inc.*, 595 F. Supp. 2d 1319,
1325 (S.D. Fla. 2009) (concluding that injuries allegedly sustained from being exposed to
feces, raw sewage, and battery acid fell within the policy's pollutant definition and were
excluded); *Nova Casualty Co.*, 424 F. Supp. 2d at 1333-34 (finding living organisms,
microbial populations, airborne and microbial contaminants, and indoor allergens fit the
definition of "contaminant" and were excluded from coverage under the pollution
exclusion).

In this case, the Policies' Pollution Exclusion is virtually identical to the pollution
exclusions that courts in Florida have applied indoors and found unambiguous and
enforceable. In light of these cases, the Policies' Total Pollution Exclusion precludes
coverage for all "bodily injury" and "property damage" claims against the Northstar
Defendants in the underlying lawsuit.

> **b.    Ms. Foster alleges in the underlying lawsuit that the releases from the drywall are "pollutants"**

Ms. Foster alleges in the underlying lawsuit that the harmful gases and chemicals
released from the drywall are "pollutants," as defined in the Total Pollution Exclusion.

The Total Pollution Exclusion defines "pollutant" as "any . . . *gaseous . . . irritant or
contaminant*." (Emphasis added). The Total Pollution Exclusion provides that a "pollutant,"
which is an "irritant" or "contaminant," includes "fumes" and "chemicals." In determining
whether a substance is an "irritant" or "contaminant," "the court should look to see if the
disputed substance is alleged to have had a particular effect commonly thought of as

14

'irritation' or 'contamination.' " *Nova Cas. Co.*, 424 F. Supp. 2d at 1334 (citing *Deni*, 711 So. 2d at 1139). Ms. Foster alleges that the gases and chemicals released from the defective drywall are irritants.

Ms. Foster alleges in the underlying lawsuit that the drywall emitted "various *sulfide gases* and/or other *chemicals* through 'off-*gasing*' that created noxious, 'rotten egg-like' *odors.*" Foster Compl. at ¶ 2 (emphasis added). Ms. Foster alleges that the drywall released hydrogen sulfide, "a broad-spectrum *poison*, meaning that it can poison several different systems in the body, although the nervous system is most affected." Foster Compl. at ¶ 93 (emphasis added). Ms. Foster further alleges in the underlying lawsuit that homes and bodies were "exposed to Defendants' drywall and the *corrosive and harmful effects* of the *sulfide gases and other chemicals* being released from these proven *hazardous substances.*" Foster Compl. at ¶ 98 (emphasis added). Ms. Foster contends that the drywall releases caused "medical ailments, including allergic reactions, coughing, sinus and throat infection, *eye irritation*, breathing disorders, other health problems, and/or significantly increased the risk of contracting a serious latent disease." Foster Compl. at ¶ 97 (emphasis added)

Ms. Foster alleges that the drywall emissions or releases have caused bodily injury and property damage. Ms. Foster's allegations of the harmful, corrosive, poisonous gases and chemicals released from the drywall have caused irritation and contamination. These drywall releases, as alleged by Ms. Foster, fall within the Total Pollution Exclusion's definition of "pollutants." *See Technical Coating*, 157 F.3d at 846 (determining that vapors emitted from roofing products that allegedly caused respiratory problems were pollutants);

15

*Nova Cas. Co.*, 424 F. Supp. 2d at 1334 (finding bacteria to be a contaminant because it allegedly "infected the plaintiffs' bodies or made them impure by contact").

Based on the foregoing, the Policies' Total Pollution Exclusion precludes coverage for the bodily injury and property damage claims against the Northstar Defendants.

### c. The Total Pollution Exclusion bars coverage for any clean up and removal efforts

The Total Pollution Exclusion precludes coverage for inspecting, removing, and replacing the drywall. The Total Pollution Exclusion specifically bars coverage for any loss arising out of any "Claim or 'suit' by . . . others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of 'pollutants.' "

In *James River*, the Eleventh Circuit interpreted a similar pollution exclusion when one of the claims involved removing petroleum drums, the surrounding contaminated soil, and disposing of both at a special waste facility. 540 F. 3d at 1272. The Eleventh Circuit found that the claim arose directly out of the alleged discovered pollution so that the pollution exclusion applied to preclude coverage for the pollution and clean up efforts *Id.* at 1275. As a result, the Eleventh Circuit directed the district court to enter an order granting summary judgment in favor of the insurer. *Id.* at 1277.

In the instant case, Ms. Foster is suing the Northstar Defendants for the inspection, removal, and replacement of the drywall, including testing for and monitoring the alleged harmful effects of the drywall. Foster Compl. at ¶ 99. As discussed above, based on Ms. Foster's allegations in the underlying lawsuit, the drywall releases are "pollutants." This

16

claim falls within the Total Pollution Exclusion that excludes coverage for testing, removing, and cleaning up pollutants.

### 2. Exclusion "m" excludes coverage for loss of use of a home that has not suffered property damage

Exclusion "m" excludes all claims against the Northstar Defendants for the loss of use of a home that has not suffered property damage. Courts apply Exclusion "m" in circumstances where the insured's work or product is deficient, that deficiency causes loss of use of property, and correction of the deficiency restores the property to full use. *See, e.g.*, *Transcon. Ins. Co. v. Ice Sys. of Am., Inc.*, 847 F. Supp. 947 (M. D. Fla. 1994); *Commercial Union Ins. Co. v. R. H. Barto Company*, 440 So. 2d 383 (Fla. Dist. Ct. App. 1983).

Exclusion "m" precludes coverage for loss of use of property from the Northstar Defendants's own work or product, if there was no property damage. The underlying lawsuit alleges that as a result of the defective work and defective drywall, individuals have lost the use of their property. Foster Compl. at ¶ 222. Without more, Exclusion "m" precludes coverage for all loss of use claims against the Northstar Defendants where the homes did not suffer any "property damage."

### 3. Exclusion "n" precludes costs for a recall from the market

Ms. Foster alleges in the underlying lawsuit that the drywall was defective and the defendants failed to recall its product from the market because of its defects. Foster Compl. at ¶ 117. If the defective drywall is recalled like Ms. Foster alleges it should have been, Exclusion "n" would preclude recovery for all costs incurred in removing the drywall from the market.

17

Courts have found that Exclusion "n" "operates to bar coverage for costs associated with the recall or removal of the product from the marketplace." *See Arcos Corp. v. Am. Mut. Liab. Ins. Co.*, 350 F. Supp. 380, 385 n.2 (E.D. Pa. 1972); *Parker Hannifin Corp. v. Steadfast Ins. Co.*, 445 F. Supp. 2d 827, 834 (N.D. Ohio 2006). A Florida court upheld this exclusion. *See Aetna Cas. & Sur. Co. v. Deluxe Sys., Inc.*, 711 So. 2d 1293, 1297 (Fla. Dist. Ct. App. 1998).

In this case, Exclusion "n" precludes coverage for all costs incurred from the removal of the drywall if the drywall is removed from the market like Ms. Foster alleges it should be.

## D. The Policies do not cover claims for removing and replacing the defective drywall

Ms. Foster alleges that drywall is inherently defective. Foster Compl. at ¶ 2. Ms. Foster asserts claims for remedying, replacing and removing the defective drywall. Foster Compl. at ¶ 99. The Policies do not cover claims for removing and replacing the drywall.

Under Florida law, a commercial general liability policy does not cover replacing or repairing a defective product or defective work. *See Auto-Owners Insurance Co. v. Pozzi Window Co.*, 984 So. 2d 1241 (Fla. 2008); *United States Fire Insurance Co. v. J.S.U.B.*, 979 So. 2d 871 (Fla. 2007); *LaMarche v. Shelby Mutual Ins. Co.*, 390 So. 2d 325 (Fla. 1980).

In *J.S.U.B.*, after the owners moved into their new homes, damage to the foundations, drywall, and other interior portions of the homes appeared. 979 So. 2d at 875. The damage to the homes was caused by the contractor's use of poor soil and poor soil compaction. *Id.* The insurers argued that the defective work rendered the entire project damaged from its inception and the entire project was the contractor's work so

18

there could be no property damage. *Id.* at 883. The Court rejected the argument that faulty construction could never result in "property damage," by explaining that "faulty workmanship or defective work that has damaged the otherwise nondefective completed project has caused 'physical injury to tangible property' within the plain meaning of the definition in the policy." *Id.* at 889. However, the Court also explained that "[i]f there is no damage beyond the faulty workmanship or defective work, then there may be no resulting 'property damage'." *Id.* The Court recognized a difference between a claim for repairing or removing defective work, which is not a claim for "property damage," and a claim for repairing damage caused by the defective work, which is a claim for "property damage." *Id.*

The Court in *Pozzi Window* further explained this concept. The dispute in *Pozzi Window* involved the cost of replacing windows. 984 So. 2d at 1243. Throughout the litigation, the parties disputed whether the windows were defective when purchased or were damaged due to faulty installation. *Id.* at 1247-48. The Court explained that because the subcontractor's defective installation of the defective windows is not itself "physical injury to tangible property," there would be no "property damage" under the terms of the CGL policies. *Id.* at 1249.

Conversely, if the claim was for the repair or replacement of windows that were not initially defective but were damaged by the defective installation, then there was physical injury to tangible property and coverage would exist for the costs of repair or replacement of the windows because the subcontractor's defective installation caused "property damage." *Id.* The Court pointed out that the homeowners separately purchased the

19

windows. *Id.* The Court explained that damage to the windows caused by the defective installation is no different from damage to any other personal property (like wallpaper or furniture) of the homeowner. *Id.*

Florida courts have limited coverage for "property damage" to those instances where a "defective component results in physical injury to some *other* tangible property." *Pozzi Window*, 948 So. 2d at 1248 (emphasis added). Moreover, the defective drywall itself is not "property damage" as a result of an "occurrence." In *Auto Owners Insurance Company v. Tripp Construction, Inc.*, 737 So. 2d 601, 601 (Fla. Dist. Ct. App. 1999), the court held that the homeowners' claims against a contractor for "the actual defects in the construction of the homes, particularly relating to the roofs of the homes" were not property damage, whereas their claims for damage to other elements of the home caused by construction defects were property damage. In *West Orange Lumber Company, Inc. v. Indiana Lumbermens Mutual Insurance Company*, 898 So. 2d 1147, 1148 (Fla. Dist. Ct. App. 2005), the court held that the cost of removing and replacing the wrong grade of cedar installed by a subcontractor was not property damage.

The Policies do not cover claims for the removal and replacement of the defective drywall against the Northstar Defendants.

## IV. Conclusion

Florida law applies to the interpretation of the Policies. Certain policy exclusions, in particular the Total Pollution Exclusion, apply so that General Fidelity has no duty to defend the Northstar Defendants against the underlying lawsuit. Where there is no duty to defend, there is no duty to indemnify.

20

Based on the foregoing, General Fidelity Insurance Company moves for a summary

judgment that General Fidelity has no duty to defend or indemnify Defendants Northstar

Holdings, Inc., Northstar Holdings at B & A, LLC, and Northstar Homes, Inc.

Respectfully submitted,

/s Ryan K. Hilton
R. STEVEN RAWLS, ESQ.
Florida Bar No. 938254
srawls@butlerpappas.com
RYAN K. HILTON, ESQ.
Florida Bar No.: 0304610
rhilton@butlerpappas.com
ROBERT J. WITMEYER, ESQ.
Florida Bar No.: 10249
rwitmeyer@butlerpappas.com
BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP
777 S. Harbour Island Boulevard
Suite 500
Tampa, Florida 33602
Telephone:   (813) 281-1900
Facsimile:   (813) 281-0900
Attorneys for Plaintiff, General Fidelity Insurance
Company

21

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified via transmission of Notices of Electronic Filing generated by CM/ECF.

/s Ryan K. Hilton
RYAN K. HILTON

22

## SERVICE LIST

### GENERAL FIDELITY INSURANCE COMPANY v. KATHERINE L. FOSTER, an individual; NORTHSTAR HOLDINGS, INC., a Florida corporation; NORTHSTAR HOMES, INC., a Florida corporation; and NORTHSTAR HOLDINGS AT B & A, LLC, a Florida corporation

### Case No.: 09-80743-Civ-MOORE

### United States District Court, Southern District of Florida

MICHAEL K. WILSON, P.A.
mkwilson@broadandcassel.com
BROAD AND CASSEL
390 N. Orange Avenue
Orlando, FL 32801
Telephone: (407) 839-4200
Facsimile: (407) 425-8377
Attorney for Defendants,
Northstar Holdings, Inc.,
Northstar Homes, Inc., and
Northstar Holdings at B & A, LLC

JEREMY W. ALTERS, ESQ.
Jeremy@abbrclaw.com
ALTERS BOLDT BROWN RUSH CULMO, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, FL 33137
Telephone: (305) 571-8550
Facsimile: (305) 571-8558
Attorneys for Defendant,
Katherine L. Foster

23