# EXHIBIT 14

3/6/2005
Contract Print Date

# RIVERCREST<sub>SM</sub>

In this agreement ("Agreement"), the words "BUYER," " "YOU" and "YOUR" mean or refer to all the buyers listed below who have signed this Agreement, jointly and severally. The words "SELLER," "US," "WE" and "OUR" mean or refer to **RIVERCREST, LLC**, whose address is 11807 Autumn Creek Drive, Riverview, Florida 33569, and its successors and assigns. The word "Community" means or refers to the master planned community being developed in Hillsborough County ("County"), Florida ("State"), under the name Rivercrest<sub>SM</sub> whose current boundaries are stated in a plat recorded in Plat Book __TBD__ , Page __TBD__ in the public records of the County, as amended from time to time (the "Plat").

Buyer(s): Louis Norman, Married person & Patricia S. Norman, Married person
<span style="margin-left:3em">Exact Legal Name(s) to appear on deed</span>

Address: 9410 Hidden Water Circle

City: Riverview

State: FL                                                                    Zip Code: 33569

Home Telephone: 813-842-5427          Office Telephone: 598-4963                                    Fax #:

E-Mail Address:

Social Security Number(s): 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 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

Sales Representative: SUSAN KULLA

Outside Broker (See Article 16 -- if not filled in, there is none): Henry Norman  -  Norman AND Associates.

1. **THIS IS WHAT YOU ARE BUYING FROM US.** You agree to buy and We agree to sell to You (on the terms and conditions stated in this Agreement) the following described real property:

   a.  A dwelling ("Home"), substantially similar to the __CAMELLIA II__ floor plan ("Floor Plan") as depicted on Our marketing brochure, Elevation __ELEVATION A - Garage Right__ which includes a [X] right-hand garage, or [ ] **left-hand garage**, together with the Personal Design Selections chosen by or for You (see Article 5 for more information about choosing Your Personal Design Selections). **Model homes, if any, may differ from the Floor Plan and the actual construction specifications of the Home. YOU ACKNOWLEDGE THAT YOU MAY RELY ONLY ON THE GENERAL LOCATIONS AND RELATIVE SIZES SHOWN ON THE FLOOR PLAN AND NOT ON ANY MODELS.**

   b.  The Home will be located on Lot __012__ , Block __28__ , of the Plat ("Homesite"), the street address of which is __TBD__ , Riverview, Florida  33569.  In this Agreement, the Homesite and the Home are sometimes referred to together as the "Property." The sale of the Property will be considered a single sale, the Home not being separable from the Homesite.

2. **THIS IS WHAT YOU ARE PAYING FOR THE PROPERTY.**

   The purchase price that You will pay for the Property is the sum of all of the following ("Total Purchase Price"):

   a.  **Base Price**                                                            $_____227,900.00

   b.  **Options & Extras** (including Elevation, Floor Plan Selections per attached Addendum "A," and additional funds required pursuant to any other exhibits or schedules attached to this Agreement)          $_____0.00

   c.  **Homesite Premium**                                                     $_____0.00

   **Subtotal**                                                                $_____227,900.00

Page 1 of 16

INITIAL 
INITIAL

Agreement for Sale

    d.    You must also pay such additional sums as are required for Your Personal Design Selections which are set forth in the Design Options Agreement (as amended from time to time) which You will sign after this Agreement. See Article 5 and note that some of these sums shall be due prior to Closing (as defined below).

    e.    In addition, You will be paying other costs, including but not limited to the "Closing Costs" described in Article 13, when this transaction is concluded at a closing ("Closing") that will be scheduled pursuant to Article 11.

    f.    All other sums required by this Agreement to be paid by You.

**3.    THIS IS YOUR GOOD FAITH DEPOSIT.** You are obligated to make the following payments:

| PAYMENT | DUE DATE | AMOUNT |
|---|---|---|
| **Initial Deposit** | When you sign this Agreement | $_____ 1,000.00 |
| **Second Deposit** (which together with the Initial Deposit shall equal five percent (5.00%) of the Total Purchase Price) | _____ (If not filled in, these funds are due within seven (7) days after You sign this Agreement) | $_____ 0.00 |
| **Design Selections Deposit** | Pursuant to Article 5 | Pursuant to Article 5 |

    The Initial Deposit, the Second Deposit and the Design Selections Deposit, after they are received by Us or the Escrow Agent, are collectively referred to in this Agreement as the "Deposit Funds." The Escrow Agent is Rivercrest Title, LLC or such other entity as designated and determined by Us.

**YOU ACKNOWLEDGE THAT WE ARE NOT OBLIGATED TO COMMENCE CONSTRUCTION OF THE HOME UNTIL ALL DEPOSIT FUNDS HAVE BEEN RECEIVED. IF ANY OF YOUR DEPOSIT FUNDS ARE PAID LATE, THE CLOSING DATE MAY BE DELAYED.**

    Section 501.1375 of the Florida Statutes provides that: THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO TEN PERCENT (10%) OF THE TOTAL PURCHASE PRICE), DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER. You **must** choose <u>one</u> of the following two options:

**BUYER'S INITIALS**

_____    a.    You elect to have the Deposit Funds (up to ten percent (10%) of the Total Purchase Price) held in escrow. Because You have selected this option, We will be entitled to all interest earned, if any, on the Deposit Funds. We may still, however, use the Deposit Funds if We post a bond for the Deposit Funds or, We may borrow funds which We would not otherwise have to borrow if You had allowed the Deposit Funds to be used for construction purposes. If We obtain the bond, You will pay for the costs of the bond (or Your share of such cost if the bond covers more than one deposit). If We borrow money, You may be charged for the interest on the borrowed money, but will receive a credit against such charge for the amount of interest actually earned on the Deposit Funds.

*PSN*
  *LN*    b.    You waive the right to have the Deposit Funds held in escrow and therefore do not have to pay any of the bonding or borrowing expenses described above. You understand that We will receive all the interest, if any, earned on the Deposit Funds.

    If there is a dispute as to any part of the Deposit Funds, the dispute will be submitted to binding arbitration (see Article 19 for more information). In any dispute, the party who is entitled to receive the Deposit Funds will also be entitled to receive the interest earned on the Deposit Funds, if any.

**4.    THIS IS HOW YOU MUST PAY THE TOTAL PURCHASE PRICE.** The balance due at Closing (which is the Total Purchase Price less the Deposit Funds) must be paid by cashier's check or wire transfer only. All payments must be made in U.S. funds and all checks must be payable on a bank located in Florida. **YOU ARE REQUIRED TO PAY ALL CASH FOR THE**

INITIAL _*PSN*_
INITIAL _*LN*_

Agreement for Sale

**PURCHASE OF THE PROPERTY.**  However, You may choose <u>one</u> of the following two options (if You do not initial either option, it will be assumed that You have chosen option A.

**BUYER'S
INITIALS**

_____  a.  **YOU DO NOT NEED A MORTGAGE.**  If You choose this option, then Your obligation to purchase the Property is not contingent, in any way, upon obtaining mortgage financing, or upon any conditions of any financing that You may seek.  The Closing may not be delayed if You decide later to borrow money for Your purchase of the Home but Your lender does not have sufficient time to process the loan,  if You fail to qualify for a loan, or if You obtain the loan but Your lender does not deliver the loan funds on the Closing Date.  At least sixty (60) days prior to the Closing, You must still give Us the name, phone number and address of any lender who will be providing any of the closing proceeds.

*PSN*
 *LN*   b.  **YOU NEED A MORTGAGE.**  If You choose this option, then Your obligation to purchase the Property is contingent ("Mortgage Loan Contingency") upon obtaining a commitment ("Mortgage Loan Commitment") from a bona fide lending institution ("Mortgage Lender") for a mortgage loan ("Mortgage Loan") in an amount not exceeding <u>100</u> % of the Total Purchase Price **[if this blank is not filled in, then the amount cannot exceed 95% of the Total Purchase Price]**, but You must comply with all of the following terms and conditions (collectively, the "Mortgage Loan Obligations") in order to be eligible for this option:

i.  apply to a Mortgage Lender for a Mortgage Loan within **<u>five (5) days</u>** of the date that You sign this Agreement;

ii.  use Your good faith best efforts to obtain a Mortgage Loan Commitment and take such actions as are reasonably necessary in obtaining the Mortgage Loan;

iii.  promptly execute all documents and disclose all information to the Mortgage Lender related to obtaining the Mortgage Loan Commitment;

iv.  pay all costs, charges and expenses in connection with the Mortgage Loan Commitment;

v.  promptly comply with all requests of the Mortgage Lender to apply for and close such Mortgage Loan Commitment;

vi.  deliver to Us a copy of the Mortgage Loan Commitment, within **<u>five (5) days</u>** after You receive it (which shall not be more than forty (40) days from the day You sign this Agreement;

vii.  if requested by Us, You must make another application for a Mortgage Loan after being declined by a Mortgage Lender for a Mortgage Loan; and

viii.  use Your best efforts to satisfy the conditions contained within the Mortgage Loan Commitment within the time requirements contained in the Mortgage Loan Commitment and in this Agreement including, without limitation, the obligation to pay the Mortgage Lender any escrows of property insurance or ad valorem taxes, as required by such Mortgage Lender.

If You have performed all the Mortgage Loan Obligations, and if You do not secure an acceptable Mortgage Loan Commitment by 5:00 P.M. on <u>April 6 2005</u> **[if not filled in, the date is thirty (30) days from the day that You have signed this Agreement]** ("Commitment Deadline"), You must, within five (5) days after such failure, notify Us of this fact in writing and deliver to Us a copy of the written denial or unacceptable commitment from the Mortgage Lender (the "Loan Rejection Notice").  An acceptable Mortgage Loan Commitment is one that does not contain any conditions that are not acceptable to You.  We are not obligated to ask You whether Your application for the Mortgage Loan was approved or rejected or whether the Mortgage Loan Commitment was acceptable to You.  Upon the timely receipt of a Loan Rejection Notice from You, We may elect, in Our sole and absolute discretion, to notify You that We will do one of the following: (a) return the Deposit Funds and terminate this Agreement; or (b) extend the Commitment Deadline (provided that You have requested such Commitment Deadline extension in writing) to a date chosen by Us in Our sole and absolute discretion, but not later than the scheduled Closing Date.  If We elect (a) above, then this Agreement will terminate, and You will have no further rights under this Agreement or to any part of the Property.  Upon such termination, You and We shall be released from all liabilities and obligations arising from this Agreement except for those that expressly survive termination.

The Deposit Funds shall become non-refundable, and Your right to terminate this Agreement will end, upon expiration of this Mortgage Loan Contingency.  Please note that the Deposit Funds may also become non-refundable to You for other reasons including, without limitation, Your failure to deliver the Personal Design Selections to Us in accordance with Paragraph 5d.  This Mortgage Loan Contingency will expire immediately if any one of the following events occurs: (i) You have received an acceptable written Mortgage Loan Commitment; (ii) We do not receive a Loan Rejection Notice

                                                         INITIAL  *PSN*
                                                                          INITIAL   *LN*

Agreement for Sale

from You by the time You are required to deliver it to Us; or (iii) You do not strictly follow the requirements of this Article 4.  Once this Mortgage Loan Contingency has expired, You will not receive a refund of the Deposit Funds, and You will not be able to terminate this Agreement, even if: You are unable to close a Mortgage Loan due to an adverse change in Your personal or financial condition; the Mortgage Lender withdraws approval of the Mortgage Loan; You are unable to satisfy the Mortgage Lender's conditions for making the Mortgage Loan; there is a change in the amount, interest rate or terms of the Mortgage Loan; the Mortgage Lender goes out of business or stops making loans; or You decide that the conditions imposed upon the Mortgage Loan Commitment are not acceptable.

At Our request, You will give Us sufficient information to establish Your ability to pay the Total Purchase Price.  We have the right to terminate this Agreement within ten (10) days after You deliver a copy of Your Mortgage Loan Commitment to Us, if We determine, in Our sole and absolute discretion, that You may not be financially capable of fulfilling any conditions contained in the Mortgage Loan Commitment or of paying the Total Purchase Price.  Such termination must be in writing, and all Deposit Funds will be promptly returned to You, after which You will have no further rights under this Agreement or to any part of the Property. Upon such termination, You and We shall be released from all liabilities and obligations arising from this Agreement except for those that expressly survive termination.

5.   **SELECTING OPTIONAL FEATURES FOR YOUR HOME.  (Note: this process must be completed before We apply for a building permit.)**

a.   You may select from Our published list of design selections, available colors, materials and selections for the Home. You must **COMPLETE AND SUBMIT** Your selections ("Personal Design Selections") to Us in writing in the form of a Design Options Agreement (which You and We would sign) to make and finalize Your Personal Design Selections. It is Your responsibility to schedule an appointment with Us to make Your Personal Design Selections ("Personal Design Selections Appointment") within the time allowed by Paragraph 5(d).  The Design Options Agreement, when signed by You and Us, will be added to this Agreement as "Schedule B" or "Addendum B."

b.   We will not be responsible for delivery delays caused by any changes made by You after the Design Options Agreement is signed by You.  We are not required to agree to any changes or additions requested by You after You sign the Design Options Agreement, except as otherwise provided in this Agreement.

c.   If any approved Personal Design Selections are not made by Us, such omission shall not constitute grounds for deferring the Closing or for imposing any conditions on Closing and You shall have no claim against Us if We refund the portion of the Design Selections Deposit (see Paragraph 5(g) below) made by You toward its cost.

d.   You must deliver the Design Options Agreement to Us in writing no later than ~~45 days SW~~ ~~twenty-one (21) days~~ after We notify You that We need You to make Your Personal Design Selections (the "Personal Design Selection Period").  If You do not deliver Your Design Options Agreement to Us within the Personal Design Selection Period, then We may choose to do any of the following in Our sole and absolute discretion: (i) We will build the Home using design selections chosen by Us (provided that the Total Purchase Price is not increased by more than five percent (5%)) and You will not have the right to select the Personal Design Selections for the Home; (ii) We may permit You to complete the Personal Design Selections within such extension period that We may grant to You, and You may be required to pay Us a late submittal fee of Five Hundred and No/100 U.S. Dollars ($500.00) in addition to the Design Selections Deposit; or (iii) We may give notice to You that You are in default under this Agreement and if You have not cured the default within ten (10) days after such notice is sent to You, then We may terminate this Agreement by written notice to You and retain all Deposit Funds, at which time this Agreement will terminate and You will have no further rights under this Agreement or to any part of the Property.  Upon such termination, You and We shall be released from all liabilities and obligations arising from this Agreement except for those that expressly survive termination.  PLEASE NOTE THAT IF YOUR PERSONAL DESIGN SELECTIONS ARE LATE, THE APPLICATION FOR THE BUILDING PERMIT AND THE HOME'S COMPLETION DATE WILL BE DELAYED.

e.   Prices for Personal Design Selections shall remain the same during Your Personal Design Selection Period.  After the expiration of Your Personal Design Selection Period, prices are subject to change.

f.   Although We will not be required to accept changes ("Design Selections Changes") to the Personal Design Selections after You and We have signed the Design Options Agreement, if We do so, We will charge a fee of $250.00 ("Design Selections Change Fee") in addition to the cost of the Design Selection Changes.

g.   You must pay the following Design Selections Deposit to Us:

INITIAL  _PSN_
INITIAL  _LN_

i.  Subject to Our right to require the payment of the entire amount as noted in subsection (ii) below, You must deliver a deposit to Us in an amount equal to five percent (5.00%) of the total cost of the Personal Design Selections, due at the time You sign the Design Options Agreement.

ii.  We may require You to deposit up to the entire cost of the Personal Design Selections prior to the commencement of the construction of the Home if the Personal Design Selections exceed fifteen percent (15%) of the total cost of the Home.

**If the Design Selections Deposit is paid late or if the Design Options Agreement is completed but delivered to us after the Personal Design Selection Period, construction of the Home and the Closing Date will all be delayed.**

6.  **COMMENCEMENT AND COMPLETION OF YOUR HOME'S CONSTRUCTION**.

a.  We will begin processing the building permit application within thirty (30) days after all of the following have happened: (i) the Personal Design Selections have been finalized; (ii) the Design Options Agreement has been signed by You and Us; (iii) You have delivered to Us the Design Selections Deposit and are in compliance with the payment of the remainder of the Deposit Funds; and, (iv) You have delivered to Us and We have approved Your Mortgage Loan Commitment. The building permit is anticipated to be received within approximately __60__ **[if not filled in, then sixty (60) days]** after that. Once We receive the building permit, and We have received the balance of the Deposit Funds from You, then We will confirm or revise the Estimated Closing Date. As We are nearing the completion of the Home, We may again confirm or revise the Estimated Closing Date.

b.  The Home shall be substantially completed and Closing shall occur on or about the Estimated Closing Date (as revised from time to time pursuant to this Agreement), but no later than one (1) year after We receive the building permit, subject to the following: (i) postponements as permitted by this Agreement, (ii) the Design Options Agreement, (iii) delays in construction caused by unavailability of materials, equipment or supplies, strikes or other labor shortages, acts of God or nature including weather, government or court orders, (iv) delays caused by Your Design Selection Changes, and (v) other events out of Our control. Federal Law requires Us to tell You that the Home must be substantially completed and the Closing must occur no later than two (2) years after You sign this Agreement; provided, however, We may further extend the date of Closing only for events or conditions legally sufficient to constitute an impossibility of performance under the laws of the State, or You may elect to pursue any remedies available to You under law or in equity. At the time of Closing, We may still be in the process of completing the finishing details and landscaping of the Property or other property and common areas; this shall not be a reason to postpone the Closing.

c.  The Home will not be considered substantially complete until a final certificate of occupancy (or its equivalent) has been issued by the proper governmental authority (if such certificates are issued by the local government) and all customary utilities are connected to the Home. We are not responsible for the transfer of utilities (including without limitation water, electrical, cable service or telephone) to the Home. All utility transfers must be arranged by You prior to the Closing.

7.  **THINGS YOU NEED TO KNOW ABOUT HOW YOUR HOME WILL BE BUILT.** We will build the Home substantially in accordance with the plans and specifications, for the Floor Plan selected, that are maintained in Our construction office ("Seller's Plans and Specifications").

a.  It is a widely observed construction industry practice for plans and specifications for any home to be changed and adjusted from time to time in order to accommodate ongoing "in the field" construction factors. These changes and adjustments are essential in order to permit all components of the Home to be integrated into a well functioning and aesthetically pleasing Home in an expeditious manner. We will have the flexibility to make such changes to the Home without Your prior consent. Without limiting Our general right to make these changes, You agree that some specific changes that may be made are: the location of utility (including, but not limited to, electrical, cable television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes.

b.  We may "site" the Home in a position (both horizontally and vertically) that is different from that of the Floor Plan and Seller's Plans and Specifications including, without limitation, "reversing" the Home on the Homesite in a mirror image of the Seller's Plans and Specifications. If We determine that the Floor Plan selected by You cannot properly be "sited" on the Homesite, then You may within ten (10) days from receipt of notice, choose one of the following options: (i) select another available homesite ("New Homesite") upon which We will build the Home, provided the Home can

22186.7                    Page 5 of 16                    INITIAL  _PSN_
                                                           INITIAL  _LN_

Agreement for Sale

properly be "sited" on the New Homesite; (ii) select another Floor Plan offered by Us to be built on the Homesite ("New Floor Plan"); or (iii) receive a refund of the Deposit Funds, at which time this Agreement will terminate and You will have no further rights under this Agreement or to any part of the Property. Upon such termination, You and We shall be released from all liabilities and obligations arising from this Agreement except for those that expressly survive termination. In the event You choose options (i) or (ii), You and We shall immediately amend this Agreement to reflect any increase or decrease in the cost of the New Floor Plan or New Homesite compared with the cost of the original Floor Plan or original Homesite, as the case may be.

c.    Certain items (or, where appropriate, upgraded versions of such items), which may be seen in the model or in other homes within the Community or in illustrations, **ARE NOT** included with the sale of the Home including, without limitation, refrigerators, microwaves, washers, dryers, and ceiling fans. Items of this nature will not be included in the Home unless such items are specifically provided for in the Floor Plan or in Our published list of design features (if any) or the Design Options Agreement signed by both You and Us. If circumstances arise which warrant changes of suppliers, manufacturers, brand names or other items, We may substitute equipment, material, appliances, etc., which are of equal or better quality, in Our reasonable discretion, to that designated on Seller's Plans and Specifications.

d.    For safety reasons, neither You nor any of your representatives may visit the Homesite prior to the Closing unless You are accompanied by Our representative. Before the Closing, We will schedule a time for You to meet with one of Our representatives to visit the Home, at which time We will demonstrate its features ("New Home Orientation"). You will be asked at that time to sign a statement listing any defective work or materials which You discover. If any item on that statement is actually defective in workmanship or materials, and if We are unable to correct those defects prior to Closing, then We will be obligated to correct those defects, at Our cost, within a reasonable period of time after Closing (which will not exceed forty-five (45) days, subject to the availability of labor and/or materials). Uncorrected defective work or materials will not be grounds for delaying the Closing (unless We approve the delay), nor for imposing any conditions on Closing. You agree that NO ESCROWS OR HOLDBACKS OF CLOSING FUNDS WILL BE PERMITTED. Your failure to participate in the scheduled New Home Orientation will waive Your right to have a New Home Orientation.

e.    **DISCLAIMER OF IMPLIED WARRANTIES.** Except as set forth in any New Home Orientation statement, the Home and all component parts of the Home will be assumed to be in satisfactory condition as of the Closing Date, in compliance with Seller's Plans and Specifications, of the quality anticipated and fit for the purposes intended. You will receive at Closing a warranty agreement ("Warranty Agreement"). The warranties contained in the Warranty Agreement are the only warranties You will receive from Us concerning the Home. Specimen copies of the Warranty Agreement (as well as specimen copies of all manufacturers warranties which will be passed through to You at Closing, none of which are guaranteed in any way by Us) have been made available for Your review in Our construction office or are otherwise displayed in the applicable model or another appropriate location. EXCEPT AS EXPRESSLY PROVIDED IN THE WARRANTY AGREEMENT, WE MAKE NO WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHETHER ARISING UNDER STATE LAW OR THE MAGNUSON-MOSS WARRANTY ACT, INCLUDING BUT NOT LIMITED TO, ALL IMPLIED WARRANTIES OF FITNESS, MERCHANTABILITY, HABITABILITY, OR WORKMANSHIP. YOU SPECIFICALLY ACKNOWLEDGE OUR DISCLAIMER OF IMPLIED WARRANTIES AND YOU WAIVE ANY OTHER WARRANTIES NOT EXPRESSLY STATED IN THE WARRANTY AGREEMENT.

f.    **MOLD.** Whether or not You experience mold growth depends largely on how you manage and maintain the Home. Our responsibility as a homebuilder must be limited to things that we can control. We will repair or replace defects after the Closing in accordance with the Warranty Agreement for a limited period of time, but during that time You are responsible for maintenance of the home and repair of routine matters. After that time, You are responsible for all repairs and maintenance. At no time will We be responsible for any damages or injuries caused by mold, mildew or fungus, that may be associated with defects in Our construction, to include but not be limited to property damage, personal injury, loss of income, emotional distress, death, loss of use, loss of value, and adverse health effects, or any other effects.

g.    At the time of Closing, We may still be in the process of completing the finishing details and landscaping of the Property or other property and common areas; this will not be a reason to postpone the Closing.

The provisions of this Article 7 will survive the Closing.

INITIAL _____
INITIAL _____

Agreement for Sale

8.   **YOU WILL BE A MEMBER OF A HOMEOWNERS ASSOCIATION.** Once You take title to the Property, You will automatically become a member of the Rivercrest Community Association, Inc. ("Association"). The Association is identified in recorded declarations and covenants that govern the use of the Property. As a member of the Association, You will enjoy all the rights and privileges of membership, and You will be responsible for all costs, obligations and liabilities of membership. By initialing below, You are acknowledging that before signing this Agreement You received a copy of the following documents:

**BUYER'S INITIALS:**

**a.**   all of the following "Community Documents":

*PSN LN*
  •   The Declaration of Covenants, Conditions and Restrictions for Rivercrest (as it is amended to incorporate the neighborhood and as it may be amended further, from time to time) (the "Rivercrest Declaration") administered by the Association.

*PSN LN*
  •   Articles of Incorporation, By-laws and Rules and Regulations of the Association.

*PSN LN*
  •   **DISCLOSURE SUMMARY.** YOU ACKNOWLEDGE THAT PRIOR TO SIGNING THIS AGREEMENT, YOU HAVE RECEIVED AND READ THE DISCLOSURE SUMMARY AS REQUIRED BY FLORIDA STATUTES SECTION 689.26, WHICH IS INCORPORATED HEREIN BY REFERENCE. YOU SHOULD NOT SIGN THIS AGREEMENT UNTIL YOU HAVE RECEIVED AND READ THE DISCLOSURE SUMMARY.

  IF THE DISCLOSURE SUMMARY REQUIRED BY FLORIDA STATUTES §689.26 HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS AGREEMENT, THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN THREE (3) DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

**b.**   and the following documents as well:

*PSN LN*
  •   The agency notice from Our affiliated broker as required by Florida law.

*PSN LN*
  •   An Affiliated Company Business Disclosure as required by Florida law.

*PSN LN*
  •   Energy rating pamphlet, and energy performance display card.

*PSN LN*
  •   Specimen Warranty Agreement.

If this Agreement is terminated for any reason, You will promptly return to Us all of the Community Documents.

9.   **TITLE TO YOUR PROPERTY.** At the Closing, You will receive from Us a Special Warranty Deed ("Deed") in recordable form conveying to You marketable title to the Property free and clear of all liens, encumbrances and exceptions, except for the following permitted exceptions ("Permitted Exceptions"):

a.   Liability for all taxes affecting the Property starting the year You receive title and continuing thereafter.

b.   All laws and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded in the public records of the County as of the date of Closing, or otherwise established with respect to the Property; for example, zoning restrictions, property use limitations and obligations, easements, rights of way, plat restrictions, agreements relating to telephone lines, water and sewer lines and other utilities, and matters arising from or connected with any applicable community development special tax district and specifically, the Rivercrest Community Development District, and declarations of covenants, conditions and restrictions set forth as part of the Community Documents.

c.   The restrictions, covenants, conditions, limitations, agreements, reservations, easements, terms and other provisions imposed by the documents contained or referred to in the Community Documents, as described in Article 8, which are

INITIAL   *PSN*
INITIAL   *LN*

Agreement for Sale

recorded by Us or Our affiliates now or at any time after the date of this Agreement in the public records of the County, and all amendments to any of such documents.

d.      Your mortgage, if any.

e.      All standard printed exceptions contained in an ALTA Owner's title insurance policy customarily issued in the County, except those standard printed exceptions that pertain to parties in possession, construction liens and unrecorded easements.

10.    **INSURING TITLE TO YOUR PROPERTY.** At the Closing, We will convey the Property to You free of Title Defects. "Title Defects" means anything that has a material adverse effect on title to the Property and which would render the title unmarketable, but does not include any of the Permitted Exceptions. Prior to Closing, You must obtain at Your cost a title insurance commitment ("Title Commitment") written by or for an insurer doing business in Florida ("Title Insurer") agreeing to issue to You, upon recording of the Deed, an owner's policy of title insurance (ALTA Form B) in the amount of the Total Purchase Price, insuring Your title to the Property ("Owner's Title Policy"). The Title Commitment shall show that, upon performance by Us of all of the items listed on Schedule B-1 of the Title Commitment, We can convey to You marketable fee simple title to the Property free and clear of all liens, encumbrances and exceptions, except for the Permitted Exceptions. You must notify Us in writing of any Title Defects which are objectionable to You by no later than five (5) days after You have received the Title Commitment. At Closing, You will pay the cost of the Title Policy; if Your Lender requires a lender's policy of title insurance, You will pay the cost of a simultaneous lender's policy. If You have not notified Us within forty five (45) days of the date that You sign this Agreement as to the title insurance agent who will be issuing the Owner's Title Policy, You will be considered to have irrevocably chosen Rivercrest Title, LLC as such title agent.

We will have sixty (60) days after receiving Your notice about objectionable Title Defects to either (i) remove the Title Defects, or (ii) deliver to You a Title Commitment which does not contain an exception for the Title Defect. If We fail to do either of these, then You will have the option of either: (i) accepting the title as it then is; or (ii) demanding a refund of the Deposit Funds, at which time this Agreement will terminate and You will have no further rights under this Agreement or to any part of the Property. Upon such termination, You and We shall be released from all liabilities and obligations arising from this Agreement except for those that expressly survive termination. We will use reasonable efforts to remove any Title Defects, but We are not obligated to institute a lawsuit or expend any sums to do so.

11.    **CLOSING DATE.** We will give You at least fourteen (14) days written notice ("Closing Notice") of the time and place of the Closing ("Closing Date"), and at least three (3) days oral notice of any change in the Closing Date. A change of time and place of Closing only (that is, one not involving a change of date) will not require any additional notice period. If We agree to delay the Closing Date at Your request (which We are not obligated to do), You will pay at the Closing (or in advance if so required by Us) a late closing charge equal to an annualized rate of _____ *12* _____ percent **[if not filled in, then twelve percent (12%)]** accrued on the Total Purchase Price of the Property, computed from the originally scheduled Closing Date through the actual Closing Date. **You will have no right of possession or use of the Home until after Closing; You will not be permitted to store any furniture or personal belongings in the Home prior to the Closing.**

**IF YOU DO NOT CLOSE ON THE CLOSING DATE, YOU WILL BE IN DEFAULT UNDER THIS AGREEMENT.** Upon Your default, We will have the right to terminate this Agreement by written notice to You and retain all Deposit Funds, at which time this Agreement will terminate and You will have no further rights under this Agreement or to any part of the Property. Upon such termination, You and We shall be released from all liabilities and obligations arising from this Agreement except for those that expressly survive termination.

12.    **CLOSING DOCUMENTS.** At Closing, We will deliver to You the following "Closing Documents": (i) the Deed; (ii) an Owner's (No Lien, Gap and FIRPTA) Affidavit (which may be one affidavit), in such form as is customarily acceptable to the title company for purposes of removing any standard title exceptions; (iii) a statement describing in detail the consideration, prorations, adjustments, costs and expenses associated with this transaction ("Settlement Statement"); (iv) a copy of the certificate of occupancy or equivalent from the governmental agency having jurisdiction over the Home; (v) a bill of sale; and (vi) an as-built survey. At Closing, You will deliver to Us the following: (i) the Total Purchase Price, minus the Deposit Funds, plus or minus any other prorations and other adjustments to be made in accordance with this Agreement; (ii) the Settlement Statement signed by You; (iii) a signed "Disclosure and Acknowledgment" acknowledging various disclaimers, disclosures and other matters described in this Agreement; and (iv) all other documents reasonably necessary or appropriate to effect the intent of this Agreement.

13.    **CLOSING COSTS.** You must pay certain fees or costs (collectively, the "Closing Costs") when You take title at the Closing, which include, but are not limited to, the following:

INITIAL _PSN_

INITIAL _LN_

Agreement for Sale

**BUYER'S INITIALS:**

*PSN*          *LN*

a.  The Property's share of assessments charged by the Association(s) prorated for the number of days during the quarter during which You will obtain title to the Property;

b.  A prepayment of the Association's assessments for the Property for the quarter immediately following the quarter in which Closing occurs;

c.  Any costs, fees, charges, points or prepaid items imposed by Your Lender;

d.  Any late fees, costs, charges or expenses provided for elsewhere in this Agreement;

e.  i.   If the current real estate tax bill is available and if we have paid the ad valorem real estate taxes on the Property, Your share of taxes and assessments which will be prorated based on the current assessed year's taxes and assessments with due allowance made for the maximum allowable discount;

   ii.   If the current real estate tax bill is not available as of the Closing Date, We will not have been able to pay the taxes and You will receive a tax bill from Hillsborough County later in the year. In such event and for purposes of the Closing, taxes shall be based on the prior year's tax bill and You will be given a credit for that portion of the estimated taxes applicable to the portion of the year that the Property is owned by Us. If the value of the completed Home is not included in the assessed value shown in the most recent real estate tax bill and the current year's taxes would be computed on the basis of the Property being improved, then taxes shall be prorated based upon the prior year's millage rate and at an equitable, estimated assessment to be reasonably determined by Us based on the assessments of similar homes in the area (up to the amount of the Total Purchase Price);

   iii.   In the event any proration is based on an estimate or a prior year's tax bill, either You or We may request a re-proration after the Closing based on actual figures, provided that the actual figures are at least ten percent (10%) higher or lower than the estimates used. If the applicable tax bill includes land other than the Property, Your share shall be equitably determined by Us based on square footage;

   iv.   Community Development District assessments are assessed in advance for the District's next fiscal year and are prorated accordingly.

f.  The cost of officially recording the Deed;

g.  Documentary stamp tax on the Deed;

h.  Other fees and costs normally paid in the County by the buyer of a residence;

i.  The premium on the Owner's title policy and the simultaneous lender's title policy and any applicable endorsements, the cost of the title search, title examination, and settlement fee; and

j.  Our and the Escrow Agent's actual costs of providing documents and information to the closing agent, Your attorney and the Mortgage Lender in preparation for the Closing.

**We will pay the following fees and costs:**

k.  A final as-built survey;

l.  The Builder Portion of the water and sewer reservation tap fee for the Home. Please see Section 15f for more details; and

m.  Our share of prorated taxes and assessments if the current year's tax statement has been issued. Otherwise, We will give you a credit at closing in accordance with subparagraph (e) above for our share of the estimated taxes for the current year.

INITIAL *BN*
INITIAL *LN*

Agreement for Sale

The Settlement Statement will detail these charges. If there is a mistake on the Settlement Statement, You and We will have a continuing duty to correct the error, and that may require You or Us to make adjustments or additional payments. If there is a dispute between You and Us concerning a post-Closing correction to the Settlement Statement, that dispute will be submitted to binding arbitration in accordance with Article 19. This Article 13 shall survive Closing and any termination of this Agreement.

14.    **REMEDIES FOR DEFAULT**.

    a.    If You:

        i.    default under this Agreement prior to the Closing and You do not cure the default within ten (10) business days after We give You written notice of the default, or

        ii.    do not close on the Closing Date set forth in the Closing Notice, or

        iii.    indicate to Us prior to the Closing that You will not be able to close this transaction, and You fail to give Us adequate assurance of future performance in writing within ten (10) business days after notice is given by Us to You of the uncertainty of Your performance,

    then We will have the right to terminate this Agreement by written notice to You and retain all Deposit Funds, at which time this Agreement will terminate and You will have no further rights under this Agreement or to any part of the Property. Upon such termination, You and We shall be released from all liabilities and obligations arising from this Agreement except for those that expressly survive termination, and We may retain all Deposit Fund(s) (together with interest, if any), as liquidated damages. You acknowledge that the extent and amount of Our actual damages would be uncertain and that all the Deposit Funds (together with interest, if any) are agreed and liquidated damages and are not a penalty.

    b.    Since certain parts of this Agreement survive Closing or termination, then if You default under this Agreement after the Closing, We will be entitled to all rights and remedies described in this Agreement, and those available at law and in equity, including the right to specifically enforce the terms of this Agreement.

    c.    If We default under this Agreement, You will give Us written notice and if We have not cured the default within ten (10) business days after We receive the notice, You may either terminate this Agreement by delivering written notice of termination to Us, or You may pursue any remedy available to You at law or in equity. If You elect to terminate this Agreement, the Deposit will be refunded to You (together with interest, if any) and You and We shall be released from all liabilities and obligations arising from this Agreement except for those that expressly survive termination.

The provisions of this Article 14 will survive Closing.

15.    **IMPORTANT FACTS ABOUT OWNING PROPERTY IN THE COMMUNITY.** You are buying a home in a community that has not yet been completely planned and developed, and We want You to know what to expect and what Your obligations are as a property owner in the Community. By buying the Property, You agree to all of the following:

    a.    We may keep offices and model homes in the Community. This may include advertising signs and other promotional devices necessary or helpful for sales, leasing or management.

    b.    We may or may not build additional improvements on those portions of the Community that We still own, except that We will complete the following described "Community Infrastructure," subject to conditions beyond Our control which constitute impossibility of performance under State law: (i) roads to the Homesite, (ii) water, sewer and other utilities, (iii) recreation center and swimming pool, soccer field, tennis courts and volleyball courts. We are not obligated to build or complete any additional improvements in the Community, and the construction or completion of any additional improvements will not be a pre-condition to Your obligation to purchase the Property. Plans for designing, developing, building and marketing the Community, including other houses in the vicinity of the Property, constantly change, and no one has the authority to promise to You that those plans will not change in the future. We have the absolute right to add, modify or eliminate homesites, dwellings and common areas (and any facilities thereon) to, on or from the Community generally without notice and without Your consent. Any such changes may have a financial or other impact on the Association, which assesses charges against Your Property, for which We will not be responsible. Other than for completion of the Community Infrastructure, You acknowledge and agree that You are not entitled to rely on and have

INITIAL _____ *PSN*

INITIAL _____ *LN*

Agreement for Sale

not received or relied on any representations, warranties or guarantees whatsoever as to: (i) the design, construction, completion, development, use, benefits or value of the Community and the Neighborhood; or (ii) the number, types, sizes, prices or designs of residential or other structures which are to be built in any part of the Community or Neighborhood. You will not pay or give, and You acknowledge that You have not paid or given, any consideration to Us or any of Our Affiliates for any such representation, warranty or guaranty.  "Affiliate," for the purposes of this Agreement, means a person or entity which (either directly or indirectly, through one or more intermediaries) controls, is in common control with or is controlled by, Us, and any person or entity that is a director, trustee, officer, employee, agent, partner, shareholder, member, subsidiary, successor-in-interest, successor-by-merger, or attorney of any of the foregoing.

c.    **COMPLETING THE COMMUNITY WILL REQUIRE MAJOR AND CONSTANT CONSTRUCTION WORK. THIS MAY INCLUDE CONTROLLED FOREST AND VEGETATION BURNS, EXCAVATION, DREDGING, EARTHMOVING, CONSTRUCTION, CLEARING, TREE REMOVAL AND OTHER DEVELOPMENT ACTIVITIES WITHIN OR AROUND THE COMMUNITY, BOTH BEFORE AND AFTER YOU CLOSE ON THE PURCHASE OF YOUR HOME.  BY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE OUR RIGHT TO CONDUCT ALL THIS CONSTRUCTION WORK AND AGREE THAT YOU WILL NOT (I) DEEM ANY OF THESE ACTIVITIES TO BE NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, (II) ENTER, OR ALLOW ANY OTHERS UNDER YOUR CONTROL TO ENTER, ANY AREAS WHERE SUCH ACTIVITIES ARE BEING CONDUCTED (EVEN WHEN THE ACTIVITIES HAVE TEMPORARILY CEASED, SUCH AS DURING NON-WORKING HOURS); AND (III) HOLD US OR OUR AFFILIATES LIABLE OR SUE US OR OUR AFFILIATES FOR ANY DAMAGE, INJURY OR DEATH ARISING FROM OR CONNECTED WITH ANY OF THE ACTIVITIES DESCRIBED ABOVE. WE WILL NOT BE RESPONSIBLE FOR ANY INJURIES INCURRED BY YOU OR YOUR GUESTS IF YOU VISIT YOUR HOMESITE PRIOR TO CLOSING, OR ANY OTHER HOMESITE IN THE COMMUNITY AT ANY TIME.**

d.    The Association may own recreational and social facilities ("Association Amenities") and operate them for the benefit of its members.  The Community Documents describe who has the right to use the Association Amenities.  You should refer to the Community Documents to determine what are your rights and eligibility with respect to use of the Association Amenities.  The right to use or enjoy any Association Amenities is set forth in the Community Documents.  Furthermore, You will have no rights or privileges with respect to other amenities adjacent to the Community which are not owned by the Association.  Except for specific rights and privileges explicitly granted to You by the Community Documents for facilities owned by the Association, You will have no rights or privileges to use recreational amenities within or adjacent to the Community.

e.    **YOUR PROPERTY IS INCLUDED WITHIN A COMMUNITY DEVELOPMENT DISTRICT. Your Property is located within the boundaries of the Rivercrest Community Development District (the "CDD" or the "District"). The CDD is a special purpose form of local government established and existing pursuant to Chapter 190, Florida Statutes established to finance, fund, plan, acquire, construct or reconstruct, enlarge or extend, equip, operate and maintain certain community infrastructure systems, facilities and services for storm water management and drainage including roadways, parks and recreation, water and sewer utilities and such other systems, facilities and services as are allowed by Chapter 190, Florida Statutes ("District Improvements").  The Rivercrest Community Development District imposes and levies taxes and assessments which will be used to pay for the construction, operation and maintenance costs of certain public facilities and services of the District and which are set annually by the governing board of the District.  These taxes and assessments are in addition to county and other local governmental taxes and assessments and all other taxes and assessments provided for by law.**

BUYER'S
INITIALS:    _PSN_        _LN_

f.    Hillsborough County Capacity Assessment Program.  Rivercrest participates in and the Homesite is subject to the Hillsborough County Capacity Assessment Program ("CAP") pursuant to Hillsborough County Ordinance No. 96-07. The Capacity Assessment Program provides for the periodic payment (rather than in a lump sum) of Hillsborough County's water and wastewater capacity reservation fees for all new homes. In the case of Rivercrest, the program requires payment by the developer of a portion (the "Builder Portion") of the fee prior to the issuance of a certificate of occupancy; We will pay the Builder Portion prior to closing and the remainder will be assessed against the Homesite over a period of twenty (20) years.  An assessment of $316.19 will appear each year on the annual real estate property tax statement as a non-ad valorem line item beginning with the statement for the tax year 2002 and ending with the statement for the tax year 2022.  You will be responsible for payment of such assessment during the period that You own the Property.

22186.7                              Page 11 of 16                              INITIAL _PSN_

                                                                                INITIAL _LN_

Agreement for Sale

g.   The Homesite may be located next to or near one or more bodies of water.  All of the water bodies are part of a water drainage and management plan for the Community and are not designed to be aesthetic features.  You acknowledge and agree that:

    i.   The water levels in all of the water bodies will rise and fall -- sometimes dramatically -- for a variety of reasons, such as fluctuations in groundwater elevations, weather conditions, pumping from wells for water needs, and the irrigation of homes and common areas.  We do not regulate or control the water levels of any bodies of water, and You agree to release Us and Our Affiliates from any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including attorneys' fees and costs and appellate fees and costs, related to, arising out of, or resulting from changes in the water elevations, including without limitation, the absence of any water in the bodies of water.  In no event will any part of the Total Purchase Price or a Homesite Premium be refunded due to changes in water levels.

    ii.   The design and maintenance of the water bodies is regulated by various government agencies.  You may not alter, modify, expand or fill any bodies of water or wetlands located in the Community without the prior written approval of those agencies and Us.  Easements or other use restrictions may be imposed and recorded against the title to the Property at any time in order to promote the regulatory authority of these government agencies.

h.   Utility, lake maintenance or other easements located on or adjacent to the Homesite may permit the holder of the easement to have access to the Homesite and adjacent common areas for the purpose of installing and maintaining equipment, and may prohibit You from putting any structures or equipment over the easement area on the Homesite.  We do not control, and We are not responsible for, the actions of any easement holder.  You may be required by the easement holder to tear down anything that is built over the easement area, in which case You will not be compensated for the loss by Us or the easement holder.  Please refer to a survey of the Property for the locations of any easements and to a copy of each easement for the specific restrictions and rights created by it.  Copies of easements are available from Your title agent.

i.   Both the Property and the Community are vulnerable to the dangerous effects of hurricanes and other violent storms.  You should take adequate safety precautions (including evacuation) in the event of a hurricane to avoid injury and the loss of life and property.

j.   Habitat management activities inside or near the Community may be performed by Us, our affiliates, by the Association and other landowners, or by state or local government agencies.  Some of these activities may be necessary to prevent uncontrolled wildfires and could involve burning trees, groundcover and other vegetation, resulting in (among other things) intense heat, heavy smoke and airborne ash.  By signing this agreement, You acknowledge and agree that You will not deem any of these habitat management activities to be nuisances or noxious or offensive activities.

The provisions of this Article 15 shall survive Closing and delivery of the Deed.

**16.  SALES COMMISSIONS.**  We will pay a commission to Our affiliated broker and to the Outside Broker, if any, named on the first page of this Agreement.  If You have consulted or dealt with any other broker, salesperson, agent or finder, You will pay all commissions, over and above the Total Purchase Price, due to any broker who is not Our affiliate or is not named in this Agreement as the Outside Broker.  You will indemnify and hold Us harmless from the claims of any such person or company claiming commissions.  You acknowledge and agree that We may pay, at any time before the Closing, part or all of the sales commission to the Outside Broker and the sales representative of Our affiliated broker.  This Article 16 shall survive Closing and any termination of this Agreement.

**17.  NOTICES.**  Whenever this Agreement requires You or Us to give notice to one another, the notice must be in writing unless otherwise permitted by the express terms of this Agreement.  Written notice must be sent to the address set forth on Page 1 of this Agreement by express mail, courier or certified mail, postage prepaid, with a return receipt requested.  You may change the address where notices are sent by giving Us written notice of the address change in the manner required by this Article 17, and We may give You notice of Our address change in the same way.  After the Closing, notices will be sent to You at the address of the Home unless You instruct Us otherwise in writing.  Notices (other than a change of address) will be effective on the date properly mailed, telecopied or placed with a private express delivery system (e.g. FedEx or Airborne), whether or not received.  Notice of a change of address will be effective upon receipt.  If We are changing the Closing Date as permitted by Article 11, We may give

22186.7

INITIAL _PSN_

INITIAL _LN_

notice by e-mail or by leaving an oral message on an answering machine or voice-mail system.  This Article 17 shall survive Closing and any termination of this Agreement.

18.  **TRANSFER OR ASSIGNMENT.**  You may not assign, sell or transfer any rights or interests in this Agreement without Our prior written consent.  After any assignment of Your rights and interests in this Agreement, You will continue to be responsible for all of the Buyer's obligations arising from this Agreement if Your assignee breaches any part of this Agreement, including the failure to close.  We may, in Our sole and absolute discretion, assign, pledge and encumber Our rights and interests in this Agreement.

19.  **ARBITRATION AND DISPUTE RESOLUTION.**  Any and all disputes between You and Us or Our affiliates, including without limitation those arising from or related in any way to (a) this Agreement or the Warranty Agreement, (b) Your purchase, ownership or use of the Property, (c) the design or construction of the Home, (d) Our sale or marketing of the Home, (e) personal injuries or any other torts, (f) the improvement, development or maintenance of the Community or the Homesite, or (g) the Deposit Funds, shall be submitted to final and binding arbitration and not to a court for determination.  Prior to commencement of arbitration, You and We must attempt to resolve the dispute by mediation.  If mediation fails to resolve all disputes, arbitration may be initiated by either You or Us and shall be conducted by the American Arbitration Association (in accordance with its applicable rules of procedure, and the State's Arbitration Code) which will appoint three neutral arbitrators, at least one of whom must be an attorney.  The parties may agree to a greater number of arbitrators.  The decision rendered by the arbitrators may be entered in any Court having jurisdiction thereof, and reduced to a judgment.  The parties shall share equally the arbitrators' fees and costs.  Each party will be responsible to pay its own attorneys' fees, costs and expenses arising as a result of any suit or arbitration proceeding and neither You nor We will be entitled to recover our respective attorneys' fees, costs or expenses from one another. If We are subject to arbitration for any claim which could involve Your rights or obligations, or relates to Your dealings or transactions with us, then You hereby consent to being joined in such arbitration for final and binding determination of Your rights and obligations.  You will not object to our joinder of any parties We deem necessary for the full and complete resolution of any issues raised in any arbitration between You and Us.  You and We waive any right to trial by jury in any dispute between You and

20.  Us or our affiliates, regardless of the nature of such dispute.  You agree that You will not voluntarily join, or participate as a member of a class, in any judicial action alleging, involving or relating to matters which are capable of or subject to arbitration pursuant to this paragraph.  You agree that there shall be no right or authority for any claims to be arbitrated on a class action or consolidated basis or on a basis involving claims brought in a purported representative capacity on behalf of the general public, other homeowners, or other persons similarly situated.  This Article shall survive Closing and any termination of any other terms of this Agreement.  If any portion of this Article is determined to be unenforceable or void, You and We agree that the unenforceable or void portion shall be removed from this Agreement, and the remaining portions shall remain in force and effect as if the removed portion had never existed.

NOTICE REQUIRED BY STATE LAW:  FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY COMMENCE LEGAL ACTION (SUCH AS ARBITRATION OR A LAWSUIT) FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME.  SIXTY (60) DAYS BEFORE YOU COMMENCE LEGAL ACTION, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS.  YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS.  THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

20.  **GOVERNING LAW.**  This Agreement will be governed by the laws of the state of Florida.

21.  **TIME OF THE ESSENCE**.  The performance of all obligations on the precise times stated in this Agreement is of absolute importance and failure to perform any of them on time is a default, time being of the essence.

22.  **RECORDING.**  Neither this Agreement, nor any notice or summary hereof, may be recorded among any public records.

23.  **RADON GAS**.  Florida law requires the following disclosure:  Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of

INITIAL  _PSN_
INITIAL  _LN_

Agreement for Sale

radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from Your county public health unit.

24. **RESPA DISCLOSURE.** As required by the Real Estate Settlement Procedures Act of 1974, You acknowledge that We have not directly or indirectly required You, as a condition of this sale, to purchase either an owner's or mortgagee's title insurance policy from any particular insurer or agency.

25. **INSULATION.** We have advised You, as required by the rules of the Federal Trade Commission, that We currently intend to install in the Home the insulation disclosed below. The R-Value and other information shown below is based solely on the information given by the appropriate manufacturers (based on the thicknesses listed) and You agree that We are not responsible for the manufacturers' errors or omissions.

| TYPE | MINIMUM THICKNESS | MINIMUM R-VALUE | LOCATION |
|------|-------------------|-----------------|----------|
| Batt | 6.25 | R-19 | Vaulted Living Area Ceilings – batt/blown |
| Blown | 7.75 | R-19 | Other Living Area Ceilings- batt/blown |
| Batt | 3.5 | R-11 | Exterior Frame Walls |
| Batt | 3.5 | R-11 | Living Area Garage Walls |
| Batt | 6.25 | R-19 | Interior Ceiling Knee Walls |
| Foil Back | N/A | R-4.2 | Exterior Block Walls |
| Foam Seal | _____ | ____ | All Doors and Windows |

26. **ENERGY DISCLOSURES.** We hereby notify You that You may have the Home's energy-efficiency rating determined in accordance with the Florida Building Energy Efficiency Rating Act ("Energy Act") under Section 553.990, *et seq.*, of the Florida Statutes. If You have requested an energy-efficiency rating as provided above, the cost of such energy-efficiency rating shall be paid by You and You acknowledge receipt of a copy of such rating prior to the execution of this Agreement. You also acknowledge receipt of: (i) the information brochure prepared by the Florida Department of Community Affairs which is required to be provided to prospective purchasers under Section 553.996 of the Florida Statutes and contains information on the Energy Act and the energy rating system; and (ii) an energy performance level display card in accordance with Section 553.9085 of the Florida Statutes, which contains the minimum energy saving features that will be installed in the Home. We are providing the disclosures to You set forth in this Article 26 in accordance with Sections 553.9085 and 553.996 of the Florida Statutes and in no event shall You have the right to terminate this Agreement as a result of any of the information disclosed by the energy-efficiency rating (if requested), the energy performance level display card, or any other information given to You under the terms of this Article 26.

27. **CONSTRUCTION INDUSTRIES RECOVERY FUND.** PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE-LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS: DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION, CONSTRUCTION INDUSTRY LICENSING BOARD, 7960 ARLINGTON EXPRESSWAY, SUITE 300, JACKSONVILLE, FLORIDA 32211-7467. PHONE: (904) 727-3696.

28. **UNPLATTED HOMESITE.** THIS ARTICLE APPLIES TO YOU ONLY IF THE LAND CONTAINING THE HOMESITE HAS NOT BEEN PLATTED.

A plat showing units or lots in the Neighborhood has not yet been recorded, and any site plan or depiction ("Preliminary Plat") of the land containing the Homesite shown to You has been used merely for convenience of reference only and the land containing the Homesite will be platted eventually.

A plat showing the Neighborhood's lots will be recorded prior to Closing ("Recorded Plat"). If You find that the size, location or dimensions of the Homesite as depicted on the Recorded Plat deviate materially from the Homesite as depicted on the Preliminary Plat, You must notify Us in writing specifying details of any defects within ten (10) days after a copy of the Recorded Plat is received by the Title Insurer. A deviation shall not be considered material unless: (a) the surface area of the Homesite as platted is more than ten percent (10%) smaller than the Homesite as depicted in the Preliminary Plat; or (b) the Homesite is not adjacent to the same road, amenity or other lots as depicted in the Preliminary Plat. After We receive Your written notice, We will have

INITIAL _PSN_

INITIAL _LN_

Agreement for Sale

ninety (90) days within which to remove material defects, failing which, You will have the option of (i) either accepting the Homesite as it then is without any discount or price reduction, or (ii) demanding a refund of the Deposit Funds which shall immediately be returned to You, at which time this Agreement will terminate and You will have no further rights under this Agreement or to any part of the Property.  Upon such termination, You and We shall be released from all liabilities and obligations arising from this Agreement except for those that expressly survive termination.

You will not be required to close the purchase of the Property until the Homesite has been platted.  If You close the purchase of the Property, all objections to differences between the Preliminary Plat and the Recorded Plat will be considered waived.

29.   **DURATION OF OFFER.**  Until signed by Us, this Agreement will be considered to be an offer irrevocable by You for a period of seven (7) days after You sign this Agreement.  If this Agreement is not signed by Us and delivered to You on or before seven (7) days after You sign it, then this offer will be considered void.

30.   **ENTIRE AGREEMENT.**  You may rely only on explicit promises made in this Agreement, the Warranty Agreement, or in a written addendum to this Agreement signed by Our authorized representative at or after the time We sign this Agreement.  If You require a specific promise or representation about anything that is important to Your purchase of the Property, and it is not found in this Agreement or the Warranty Agreement, it must be added to this Agreement in writing.  Otherwise, it will not be binding on Us or enforceable by You.  **This Agreement is the entire agreement for Your purchase and Our sale of the Property and once it is signed, it can only be amended in writing.   ANY CURRENT OR PRIOR AGREEMENTS, REPRESENTATIONS, UNDERSTANDINGS AND ORAL STATEMENTS, INCLUDING, BUT NOT LIMITED TO, RENDERINGS OR REPRESENTATIONS CONTAINED IN SALES BROCHURES, ADVERTISING OR SALES MATERIALS AND ORAL STATEMENTS BY SALES REPRESENTATIVES, IF NOT EXPRESSED IN THIS AGREEMENT OR IN THE WARRANTY AGREEMENT, ARE VOID AND HAVE NO EFFECT.   YOU ACKNOWLEDGE AND AGREE THAT YOU HAVE NOT RELIED ON ANY SUCH ITEMS.**

| Addendum | Name of Addendum | BUYER'S INITIALS indicating the Addenda attached hereto: |
|---|---|---|
| A | Addendum to Agreement for Sale | _PSN_ |
| B | Design Options Agreement | _LN_ |

INITIAL _PSN_
INITIAL _LN_

Agreement for Sale

SELLER:

RIVERCREST, LLC,
a Delaware limited liability company

By:  _____
Signature of Authorized Representative

KELLY DANIEL
_____
Printed Name of Authorized Representative

Dated:  _____3-15-05_____

**NOTE: BEFORE YOU SIGN THIS AGREEMENT, YOU SHOULD READ IT AND THE COMMUNITY DOCUMENTS CAREFULLY AND YOU ARE FREE TO CONSULT AN ATTORNEY OF YOUR CHOICE. THIS AGREEMENT IS A LEGALLY BINDING CONTRACT. BY SIGNING BELOW, YOU AND WE AGREE TO BE OBLIGATED TO COMPLY WITH ALL THE TERMS AND PROVISIONS OF THIS AGREEMENT. YOU ARE ADVISED TO CAREFULLY REVIEW SUCH TERMS AND PROVISIONS AS WELL AS THE VARIOUS DISCLAIMERS APPEARING IN THIS AGREEMENT.**

BUYER(S):

_____        _____
Signature of Buyer                                       Signature of Buyer

Louis Norman                                               Patricia S. Norman
_____        _____
Printed Name of Buyer                                  Printed Name of Buyer

Dated:  _March 6, 2005_               Dated:  _6 MAR 05_

### Equal Housing Opportunity.

"Rivercrest [SM]," is a service mark of Rivercrest, LLC.

INITIAL   PSN
INITIAL   LN

EXHIBIT "A"

# RIVERCREST<sup>SM</sup>

| 11807 Autumn Creek Drive, Riverview, Florida 33569  •  (___) ___-____ |

## ADDENDUM # ____ TO AGREEMENT FOR SALE
## DESCRIBING OPTIONS AND EXTRAS

BUYERS: _Louis Norman, Married person & Patricia S. Norman, Married person_ _____

LOT: _012_      BLOCK: _28___ of HOUSE TYPE: _CAMELLIA II_____ ELEVATION: _ELEVATION A -
Garage Right_

### RECAP OF SELLING PRICE

It is agreed and understood that the purchase price of:
shall include the following:                                        $ _227,900.00_

| | | |
|---|---|---|
| 1. | Base selling price | $ 227,900.00 |
| 2. | Location Premium | $ 0.00 |

**OPTIONS AND EXTRAS:**

| | |
|---|---|
| elevation A | $ — 0 — |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |
| | $ |

TOTAL OPTIONS AND EXTRAS FROM THIS PAGE:        $ 0.00

TOTAL SALES PRICE INCLUDING OPTIONS AND EXTRAS        $ 227,900.00

Page 1 of 2

BUYER(S):

_D S Norman_ (signature)

_Louis Norman_ (signature)

Date: _6 Mar 05_

Rev. 11-28-2001

SELLER:

**RIVERCREST, LLC**

By:  St. Joe Towns & Resorts, L.P., a Delaware
     limited partnership, as its authorized agent

    By:  St. Joe/Arvida Company, Inc., a Florida
     corporation, as its general partner

    By: _(signature)_
     Signature of Authorized
     Representative

    _KELLY DANIEL_
     Printed Name of Authorized
     Representative

Dated: _3-15-05_

# RIVERCREST<sup>SM</sup>

| 11807 Autumn Creek Drive, Riverview, Florida 33569 • (813) 672-4900 |
|---|

## DEPOSIT RECEIPT

PROJECT:  Ph2 Floral Series 60' Q                                COMMUNITY: RIVERCREST<sup>sm</sup>

| DATE:   3-6- 2005 | LOT: 012        BLOCK: 28 |
|---|---|
| Buyer(s): Louis Norman    Patricia S. Norman | PLAT BOOK: TBD      PLAT PAGE: TBD |
| Address: 9410 Hidden Water Circle | HOUSE TYPE:  CAMELLIA II |
| City: Riverview          State: FL          Zip: 33569 | ELEVATION: ELEVATION A - Garage Right |
| Telephone: 813-842-5427 | DATE OF SALE: 03/06/2005 |

Seller: ST. JOE HOME BUILDING, L.P.

DEPOSIT CHECK AMOUNT: $ 1,000.00                PAYABLE TO: RIVERCREST, LLC

The undersigned hereby acknowledges receipt of funds as follows:
Total Previous Deposit(s) ....................................................$_____ — o —_____
Additional Deposit this date................................................$_____ — o —_____
Total Deposit as of this date...............................................$_____ 1,000.00_____

COMMENTS:_____ VA _____

The undersigned acknowledges receipt of the check described above, the proceeds of which are intended to be included in the buyer's deposit on the purchase of a home to be constructed on the above-described property. The undersigned acknowledges and agrees to deposit the funds in accordance with the terms and conditions of the Agreement for Sale between Buyer and Seller.

**BUYER(S):** *Pat Norman*                         **RECIPIENT:**
_____               _____
*Louis Norman*                                      By:_____
Date: 6 March 2005                                  Its:_____
                                                    Date:_____

COPIES:  Buyer, Sales Office File, Sales Person, Accounting (2)

Rev. 11-28-2001