1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF LOUISIANA

3

4    ******************************************************************

5    IN RE: CHINESE-MANUFACTURED      CIVIL DOCKET NO. MDL 2047
     DRYWALL PRODUCTS LIABILITY       SECTION "L"
6    LITIGATION                       NEW ORLEANS, LOUISIANA
                                      FRIDAY, JANUARY 29, 2010 2:00 P.M.
7

8    THIS DOCUMENT RELATES TO:

9    #09-6687, GERMANO V
     TAISHAN GYPSUM CO., LTD.
10
     ******************************************************************
11
                TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
12           HEARD BEFORE THE HONORABLE ELDON E. FALLON
                  UNITED STATES DISTRICT JUDGE
13

14
     APPEARANCES:
15

16   FOR THE PLAINTIFFS:          HAUSFELD LLP
                                  BY:  RICHARD S. LEWIS, ESQUIRE
17                                1700 K STREET, N.W.
                                  SUITE 650
18                                WASHINGTON DC  20006.

19
                                  LAW OFFICES OF RICHARD J. SERPE
20                                BY:  RICHARD J. SERPE, ESQUIRE
                                  CROWN CENTER, SUITE 3120
21                                580 EAST MAIN STREET
                                  NORFOLK VA  23510
22

23                                HERMAN HERMAN KATZ & COTLAR
                                  BY:  RUSS HERMAN, ESQUIRE
24                                     LEONARD DAVIS, ESQUIRE
                                  820 O'KEEFE AVENUE
25                                NEW ORLEANS LA  70113

```
 1   APPEARANCES CONTINUED:

 2
                                GAINSBURGH BENJAMIN DAVID
 3                              MEUNIER AND WARSHAUER
                                BY:  GERALD E. MEUNIER, ESQUIRE
 4                              2800 ENERGY CENTRE
                                1100 POYDRAS STREET, SUITE 2800
 5                              NEW ORLEANS LA  70163.

 6

 7                              SEEGER WEISS, LLP
                                BY:  CHRISTOPHER A. SEEGER, ESQ.
 8                              550 BROAD STREET, SUITE 920
                                NEWARK NJ  07102
 9

10
     FOR THE DEFENDANTS:         BAKER & MCKENZIE, LLP
11                              BY:  DONALD HAYDEN, ESQUIRE
                                MELLON FINANCIAL CENTER
12                              1111 BRICKELL AVENUE
                                SUITE 1700
13                              MIAMI FL  33131.

14
                                BAKER & MCKENZIE, LLP
15                              BY:  DOUGLAS B. SANDERS, ESQUIRE
                                ONE PRUDENTIAL PLAZA
16                              130 E. RANDOLPH DRIVE
                                CHICAGO IL  60601
17
                                FRILOT, LLC
18                              BY:  KERRY MILLER, ESQUIRE
                                ENERGY CENTRE, 36TH FLOOR
19                              1100 POYDRAS STREET
                                NEW ORLEANS LA  70163.
20

21

22   ALSO PRESENT:               FRED LONGER, ESQUIRE
                                JEFF BACKMAN, ESQUIRE
23                              JEFFREY GRAND, ESQUIRE
                                GARY BAUMANN, ESQUIRE
24

25
```

```
 1  APPEARANCES CONTINUED:

 2
                                 MIKE PETERSON, ESQUIRE
 3                               KENNETH HARDT, ESQUIRE
                                 CHRIS WIEMKEN, ESQUIRE
 4                               DAVID CONNER, ESQUIRE.

 5
                                 J. BRIAN SLAUGHTER, ESQUIRE
 6                               CAROL SMITH, ESQUIRE
                                 DONALD C. BROWN, ESQUIRE
 7                               CATHERINE GIARRUSSO, ESQUIRE.

 8
                                 JEFF KEISER, ESQUIRE
 9                               CHRISTY HOROWSKI, ESQUIRE
                                 ADAM FOSLID, ESQUIRE
10                               MICHAEL L. JACKSON, ESQUIRE.

11
                                 JOSEPH E. BUFFINGTON-B'HAM, ESQ
12                               DAN BRYSON, ESQUIRE
                                 MICHAEL J. EWYER, ESQUIRE
13                               KYLE SPAULDING, ESQUIRE

14
                                 STEVEN NICHOLS, ESQUIRE
15                               PAUL THIBODEAUX, ESQUIRE
                                 NOEL CAPPS, ESQUIRE
16                               WILLIAM DRURY, ESQUIRE

17
                                 DOROTHY WIMBERLY, ESQUIRE
18                               JENNIFER MCNAMARA, ESQUIRE
                                 DAWN BARRIOS, ESQUIRE
19                               RALPH AUCOIN, JR., ESQUIRE
                                 ZACHARY WOOL, ESQUIRE
20

21

22  OFFICIAL COURT REPORTER:     CATHY PEPPER, CRR, RMR, CCR
                                 500 POYDRAS STREET, ROOM B406
23                               NEW ORLEANS LA  70130
                                 (504) 589-7779
24
    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
25  PRODUCED BY COMPUTER.
```

1                                    **I N D E X**

2

3     ITEMS                                                    PAGE

4

5     *ROGER MORSE*..............................................     9

6     MR. MEUNIER...............................................    10

7     MR. LEWIS.................................................    21

8     MR. HAYDEN................................................    31

9     MR. SANDERS...............................................    36

10    MR. LEWIS.................................................    46

11    MR. SANDERS...............................................    48

12    *DR. MATTHEW PERRICONE*...................................    50

13    MR. LEWIS.................................................    52

14    MR. HAYDEN................................................    63

15    MR. LEWIS.................................................    72

16    *DEAN RUTILA*.............................................    75

17    MR. SANDERS...............................................    76

18    MR. LEWIS.................................................    80

19    MR. SANDERS...............................................    83

20    *J.R. SCULLY*.............................................    84

21    MR. LEWIS.................................................    88

22    MR. SANDERS...............................................    92

23    MR. HAYDEN................................................    93

24    MR. LEWIS.................................................    97

25    MR. HAYDEN................................................   100

1              **P-R-O-C-E-E-D-I-N-G-S**

2              FRIDAY, JANUARY 29, 2010

3          A F T E R N O O N   S E S S I O N

4              (COURT CALLED TO ORDER)

5

6

7          **THE DEPUTY CLERK:**  Everyone rise.

8          **THE COURT:**  Be seated, please.  Good afternoon, ladies

9  and gentlemen.  Counsel, make their appearance for the record,

10 please.

11         **MR. MEUNIER:**  Jerry Meunier for the *Germano* plaintiffs,

12 Your Honor.

13         **MR. HAYDEN:**  Don Hayden, Your Honor, on behalf of KPT.

14         **MR. SANDERS:**  Doug Sanders on behalf of intervenor KPT.

15         **MR. NICHOLS:**  Steve Nichols on behalf of Mitchell Homes.

16         **MR. MEUNIER:**  Your Honor, other counsel are here for

17 *Germano* plaintiffs who haven't been identified.

18         **MR. SEEGER:**  Chris Seeger for the *Germano* plaintiffs,

19 Your Honor.

20         **MR. SERPE:**  Richard Serpe for the *Germano* plaintiffs.

21         **MR. LEWIS:**  Richard Lewis for the Germano plaintiffs.

22         **THE COURT:**  We're here today to begin the court hearings

23 and trials in the *Chinese Drywall* MDL 2047.

24              Let me put the matter in perspective by briefly

25 reviewing with you the history of this litigation.  In the

1   aftermath of Hurricanes Katrina and Rita, rebuilding put a strain
2   on the United States building supplies, including drywall.

3              As a result, drywall manufactured by China was
4   brought into the United States and used in the construction and
5   refurbishing of houses throughout the country, and particularly
6   in the coastal states, the Gulf Coast and the East Coast.  Soon
7   after the installation of the Chinese drywall, homeowners began
8   to complain of the emission of smelly gasses, and corrosion, and
9   the blackening of metal wiring surfaces, and objects and the
10  breaking down of appliances in their homes.  Many of the
11  homeowners also began to complain of various physical
12  afflictions, which they believed to be caused by drywall.

13             Accordingly, these homeowners began to file suits
14  in various states and various federal courts throughout the
15  country against home builders; developers; installers; realtors;
16  brokers; suppliers; importers; exporters; distributors; and, of
17  course, manufacturers, who were involved with the Chinese
18  drywall.

19             Because of the commonality of facts in these
20  particular cases, the litigation was designated as a
21  multi-district litigation.  Pursuant to the transfer order from
22  the United States Judicial Panel on multi-district Litigation,
23  which was issued on June 15, 2009, some seven months ago, all the
24  federal cases involving Chinese drywall were consolidated for
25  pretrial proceedings and sent to the United States District Court

1   for the Eastern District of Louisiana.

2          The present matter, which is one of the cases

3   transferred to this court, was initially filed in the

4   United States District Court for the Eastern District of

5   Virginia.  It was brought as a class action on behalf of owners

6   and residents of homes in the Commonwealth of Virginia,

7   containing defective Chinese drywall that was designed and

8   manufactured by the defendant, Taishan Gypsum Company, LTD.

9          The defendant, Taishan, is a Chinese corporation,

10  who has its principal place of business located in Shandong

11  province, China.  On June 8th, 2009, a summons was issued to

12  Taishan; and on September 23, 2009, it was returned as executed.

13  In short, Taishan has been properly served.

14         Now, the delay for answering has long past, and

15  notwithstanding that, no answer or responsive pleadings have been

16  filed by Taishan.  On November 18, 2010, the Plaintiffs Steering

17  Committee filed a motion seeking a default judgment as to

18  Taishan.

19         On November 20, 2010, the Court issued an order of

20  preliminary default.  Subsequently, the Court issued a scheduling

21  order for a hearing on the final default judgment proceeding

22  which would take place against Taishan.  The Court declared its

23  intent to utilize the hearing as a vehicle to consider the scope

24  and extent of the appropriate remediation necessary for

25  properties that are impacted by Chinese drywall.

1          Some seven properties were selected as being

2     representative of a variety of the claimed damages of this entire

3     litigation.  Parties similarly situated, or having a common

4     interest in this matter, were given an opportunity to intervene

5     and participate in these proceedings.  One of these intervenors

6     was Knauf Plasterboard, Taishan Limited.  Because of the issues

7     involved in this default hearing, it necessitates expert

8     testimony.  This is an expert-testimony-driven issue.

9          The Court, therefore, is required to vet the

10    proposed experts to make a determination as to the sufficiency of

11    the facts and data used and the reliability and methodology

12    relied upon by these experts in formulating their opinion.  The

13    Court set this hearing, which is often termed a *Daubert* hearing,

14    for today, January 29, 2010.  Of course, notice was given well in

15    advance and posted on the Web site.

16          This hearing is to consider these preliminary

17    evidentiary matters.  Hereafter, namely, on February 19, the 20th

18    and 22, the Court will convene a final default hearing, at which

19    time the interested parties will have an opportunity to present

20    evidence in support of their respective positions.  Following

21    this latter hearing, the Court will make a determination on the

22    nature and scope of remediation in these seven homes.  Hopefully,

23    however, this will serve as some guidance on other cases or for

24    other cases similarly situated.

25          The PSC and Knauf have filed various motions, which

1    are referred to as *Daubert* motions, contesting the right of the

2    experts to testify, trying to exclude their testimony, or

3    restrict their testimony, to certain areas.  The PSC has filed a

4    Motion to Exclude or limit the testimony of Roger G. Morse and

5    Matthew J. Perricone, Ph.D.  Knauf has filed three *Daubert*

6    motions to exclude or restrict the testimony of Dean Rutila,

7    Donald Galler, and Dr. J.R. Scully.

8              I've received extensive briefs from the parties, as

9    well as the expert reports, and have had a chance to review the

10   material given to me, as well as some other material that I am

11   familiar with, and I'll hear from the parties at this time.

12             I would like to take them in the order that you

13   gave them to me.  As I understand, the first motions will be

14   presented by the plaintiffs, and the first person that they

15   contest is Roger Morse; is that correct?

16        **MR. MEUNIER:**  That's correct, Your Honor.

17        **THE COURT:**  As I understand, Roger Morse is an architect

18   and he opines that the emission of corrosive and noxious gasses

19   from the drywall can be reduced materially by installing and

20   retrofitting and air conditioning, which he terms an ECS.

21             As I understand, the plaintiffs seek to exclude or

22   limit the testimony of Roger Morse because they feel that it

23   lacks reliability.  They indicate that no builder in the

24   United States or elsewhere is known to have employed the ECS,

25   which is environmental control systems I understand.

1          Second, they feel that there is no peer review or

2    published literature supporting the ECS, no government or

3    scientific group, they feel, has ever endorsed the ECS.  They

4    complain that there is no error rate.  And, finally, that there

5    is no data that the ECS has ever been used in an occupied home.

6          The defendant, as I understand, responds that there

7    is reliability to the ECS.  The science, they say, behind the ECS

8    is not new or novel and is grounded in the literature.  Although

9    its use, they concede, in residential settings has not been

10   tested or peer-reviewed since it has only been used in five test

11   houses and one occupied house, at least as of today or at the

12   time they filed the motion.

13         They also say that the real world use and

14   government endorsements that the plaintiffs complain of is,

15   indeed, a red herring.  And, finally, they say that the witness

16   is a residential construction expert; and he, like the

17   plaintiffs' experts, have relied on the opinions of others,

18   Dr. Sharp, Dr. Perricone, for the core science, which is behind

19   this ECS.

20         That's what I gleaned from the briefs, but I'll

21   hear from the parties at this time.

22         **MR. MEUNIER:**  Thank you, Your Honor.  May it please the

23   Court, Jerry Meunier, appearing today with others as counsel for

24   the homeowners in this matter.  At the outset, Judge, if you'll

25   permit me just a brief comment from the plaintiffs perspective on

1   the context of this *Daubert* hearing, it's important, because the

2   context for plaintiffs has both factual and procedural

3   implication.

4          The seven Virginia homeowners, for whom we speak

5   today, have intervened in *Germano* to seek the entry of a default

6   judgment against Taishan Gypsum Company Limited and with other

7   plaintiffs, they allege, and this is from the first amended

8   complaint in *Germano*, that the defective drywall in their homes

9   is defective because gypsum and other components have broken down

10  and released sulfides and other noxious gases.  And they allege

11  that these sulfides and gases have caused corrosion and damage to

12  personal property in the home.

13         Your Honor, this is important not only because upon

14  the entry of a default judgment that we seek, the defendant

15  Taishan will be precluded from disputing such well-pled factual

16  allegations.  But it's important for another reason.  It's

17  important because these allegations bring the Court, and the

18  intervenors, not just the plaintiffs but others who have chosen

19  to intervene in these proceedings, to the threshold of the

20  question which is at hand, which is not the question whether

21  there's a problem, which is not a question whether Chinese

22  drywall emits sulfide gasses.  It's a question not of whether

23  there's a problem, but a question of what the solution to the

24  problem is; and Your Honor has made it quite clear, just now and

25  throughout this case, that the February 19 hearing will focus on,

1    and likewise today's *Daubert* hearing, must relate to the nature

2    and scope of property damage remediation required to make these

3    plaintiff families, these seven families, whole.

4              And to the extent that the seven homes are as you

5    suggest, and as we have endeavored to establish, are fair cross

6    representations of the larger population of Chinese drywall

7    affected properties, obviously the answer to this important

8    question has broad application.

9              Now, the key touchstones of a *Daubert* inquiry are

10   often referred to under Rule 702 as the two R's, reliability and

11   relevance.  The majority opinion in *Daubert*, in fact, defined the

12   essential role of the gatekeeper as seeing to it that experts,

13   quote, "Both rest on reliable foundation and are relevant to the

14   task at hand."

15             Now, my colleague, Richard Lewis, in a moment, will

16   come to the podium and set forth the plaintiffs' position.  Why

17   under the established *Daubert* criteria of peer review, acceptable

18   rate of error, general acceptance, et cetera, the methodologies

19   of Knauf's expert Mr. Morse and others, does not pass *Daubert*

20   muster in terms of being reliable.

21             My intent with the Court at the outset is really to

22   bring attention more to the second "R," which is not relevance in

23   the traditional sense of whether it's probative -- obviously, all

24   of these solutions are relative and probative in the broad sense

25   to the remediation issue -- but more to the specific meaning

1  *Daubert* gives to relevance which is fit.  Which has to do, Judge,

2  not with so much the reliability of the methodology, but whether

3  the application -- the application of the methodology -- to the

4  task at hand is a fit, and that's an important *Daubert* inquiry.

5  Because the real world remediation, which

6  is the legal task at hand, requires that we not get into

7  speculation, that we not get into what is underway and evolving,

8  and that we talk about what is relevant to the task at hand,

9  which is to remediate these homes.

10  And so the question in the language of 702 is not

11  just the reliability of the methodology, but whether the witness

12  has applied the principles and methods reliably to the facts of

13  the case.  So let's consider that in the case of Mr. Morse and,

14  in fact, others.

15  Mr. Morse, as you say, proposes to testify at the

16  February 19 hearing in support of ECS, environmental control

17  system, which is a system to reduce Chinese drywall off-gassing

18  to a non-detectable level in homes.

19  As an alternative, there will be proposals to use

20  visual corrosion scaling with XRF technology to selectively

21  identify Chinese drywall and remove it selectively.  But

22  specifically with respect to ECS, the question becomes whether it

23  passes *Daubert* muster as being reliably applied to the task at

24  hand to the facts of this case.

25  And I suggest to the Court that there are two many

1    reasons why it does not.  The first reason it does not is because

2    it is by nature experimental.  The system in question, ECS, is

3    not commonly available, is not commercially produced, is not

4    approved by any authority, is not recognized by any industry or

5    government entity.  It is a child of the Knauf experts and their

6    lawyers who sat around a table in this case and devised this

7    system as a possible solution for litigation.  So it's devised

8    within the parameters of this case.

9              And we suggest that, in fact, there is not a

10   witness who can demonstrate that the system has been in place

11   long enough and reliably enough to actually do what it purports

12   to do.  And so for the reason that it's experimental, it's not a

13   fit.  Not for real-world remediation.

14             The second reason the system does not pass *Daubert*

15   muster is because it cannot make the plaintiffs whole.  Now, this

16   is a basic thought.  If the task at hand is remediation, not

17   mitigation, remediation, putting the plaintiffs back into the

18   position in their homes that existed before and without the

19   off-gassing from drywall, this system leaves the source of

20   contamination in place, allows off-gassing to continue, but by

21   treating it as a moisture problem, seeks to reduce levels in the

22   living space to non-detect levels, to the same levels that's

23   outside air.  And I suggest to the Court, for reasons I'll detail

24   in a moment, that doesn't, by definition, by nature, make the

25   plaintiffs whole.  It doesn't amount to remediation.  It amounts

1    to litigation.  And for that reason --

2         THE COURT:  As I understand, they have to keep the

3    windows closed and run it 24 hours a day for 365 days?

4         MR. MEUNIER:  Your Honor, exactly.  It's sort of like a

5    plaintiff -- it leaves the house in the position of an eggshell

6    plaintiff.  Instead of curing the disease, we're putting the

7    patient on a lifetime respirator.

8              Forget about opening the windows on a summer day to

9    watch your kids play or hear them.  Forget about it if you're

10   late paying your electricity bill and the system shuts down and,

11   because of that humidity, gets to a level where the off-gassing

12   is now felt.

13             It cannot be seen as a make-whole remedy because

14   it's a different, there are conditions imposed upon the homeowner

15   that did not exist, and would not exist, but for Chinese drywall.

16        THE COURT:  Of course, they're saying you're arguing the

17   conclusions and not the methodology, that that's not part of

18   *Daubert*.

19        MR. MEUNIER:  Your Honor, my argument is that when you

20   seek to apply a mitigation strategy in a case about remediation,

21   you have a fundamental *Daubert* issue in that you are taking

22   methodology, which, look, it may work for mitigation, but that's

23   not what this case is about.

24             So I suggest to the Court it's more than outcome.

25   Because *Daubert* says, you got to fit the case.  It's got to be

1   relevant to the task at hand.  And that's why I began by

2   emphasizing what our task at hand is, which is remediation,

3   real-world remediation.

4           Judge, as the Supreme Court approached *Daubert* in

5   1993, it was surrounded by a full-throated debate about junk

6   science in the courtroom.  And so in closing his opinion on

7   behalf of the majority, Justice Blackmun spoke to those on both

8   sides of the junk science debate.

9           To those who were fearful that so-called "let it go

10  to the weight" gatekeepers would still allow bogus expert

11  testimony in trials, he referred us to the traditional tool of

12  advocacy, cross-examination, et cetera, which would be continuing

13  safeguards.

14          But to those who feared that strict gatekeeping

15  would exclude novel or cutting-edge science from the courtroom,

16  Justice Blackmun made it a very astute and, for our purposes,

17  quite germane observation about the difference between evolving

18  science and the needed discipline of trial evidence.

19      He said there are important differences between the quest

20  for truth in the courtroom and the quest for truth in the

21  laboratory.  In the courtroom, we have to resolve disputes

22  finally and quickly.  Never more true than in this case.  And he

23  said:  "Conjectures are of little use in the project of reaching

24  a quick, final, and binding legal judgment, often of great

25  consequences."

1    So, as I mentioned earlier, we may set up at
2  Tulane University a wonderful forum one day on whether this AC
3  system with a special filter and a dehumidifier is what
4  homeowners may prefer to use as a means to mitigate.  And it may
5  be that they'll say, you know, that's good enough, and we can
6  have a nice debate about that.
7    In the courtroom, where the task at hand is
8  remediation, I suggest to you that in *Daubert* we see language
9  which makes a very meaningful difference for your purposes
10 between what we're up to here -- hard, fast remediation
11 solutions -- and things that don't quite get us through
12 remediation; they mitigate; they make the plaintiff better off
13 than he was.
14    And I really think -- I'm not going to call it
15 "junk science" -- but I really think this is one of the key often
16 overlooked points of *Daubert*.  That it's not just the methodology
17 that's questionable on its face, it's when you try to bring
18 methodology into the courtroom where it doesn't belong because we
19 have to make a solution in a different way in the courtroom.  We
20 need a different kind of discipline than the ones that scientists
21 use.
22    You know, Judge, you will see throughout these
23 briefs, acknowledgments about how this is all evolving;
24 acknowledgments about how we're still trying to come up with a
25 protocol.  That's fine.  We don't condemn that process.  We just

1   say that in the here and now, for these seven homeowners, that it

2   is difficult, if not impossible, to image *Daubert* quality

3   evidence permitting the embrace of that which is necessarily

4   experimental, and necessarily not designed to be a real-world

5   solution.

6            Your Honor, I know, you know, you were the

7   presiding judge in *Vioxx*, where the science and the evidence

8   concerning that drug were matured and well developed by the time

9   the litigation began.  I suggest to the Court that in this case,

10  the debate about how to effectually remediate continues.

11           In fact, there's been a news article just recently

12  about how HUD says, you know, we'll have a remediation protocol

13  for you later in the spring; we're working on it.  So that's

14  what's happening in the real world, but we're in a courtroom,

15  where the plaintiffs need to know that they can seek an effective

16  remediation.  Our remediation is you strip the drywall out.  Go

17  back to studs.  Put them back where they were without it.  And I

18  suggest to the Court there's a *Daubert* issue with anything that

19  is experimental by definition seeks to do less.

20           So let me give you one example, Your Honor, before

21  I move on about the experimental nature.  These are not my words.

22  This is from the deposition of Mr. Morse.  And what we were

23  asking about were the filters.  You know, they're going to tell

24  you, this is an AC system.  It's nothing fancy, nothing new, but

25  they come with a special filter and then there's a dehumidifier,

1   and it keeps the home to 70 degrees, or 40 to 45 percent

2   humidity, and in Mr. Morse's view, because you control moisture

3   on a continual basis, as long as it's running, as long as you pay

4   your bills, as long as you keep your windows closed, it's

5   running, you're controlling moisture, you've still got the

6   off-gassing, but you've attacked the moisture which is what

7   brings it into the living space.  So we're asking him about the

8   filters.

9           Now, they put this system into test homes this past

10  summer.  And we're asking about filters.  And Mr. Morse says, his

11  words, not ours, what about the filters?  He said there was

12  experimentation going on with the filters.  We say, okay.  And

13  then he says:  "You know, you have to talk to Phil Goad or Matt

14  Perricone or Sandy Sharp" -- these are other Knauf experts --

15  "about exactly what was done.  But the final filters for the

16  systems in these houses wasn't installed until November" -- two

17  or three months ago -- "different things were being tried out."

18          Again, the point I simply make is, and you'll find

19  it, Judge, replete, as I say, in their briefing, we're talking

20  about XRF as well, we're still studying it.  We're still trying

21  to figure it out.  We're still trying to come up with the right

22  filter, the right protocol.

23          Your Honor, let me end then by returning to the --

24  not to the experimental nature but to the not-made-whole issue

25  once more.  Which, again, because the scope of remediation is the

1   focus of these proceedings, we suggest can only be resolved by

2   the question not of what makes the plaintiffs better off --

3   that's not the question -- the question is what makes them whole.

4            And the admission that this ECS is a system that

5   will reduce Chinese drywall off-gassing without eliminating it,

6   the admission that this is a system whereby the sulfur gas

7   emissions from the drywall which are left in the home will surely

8   increase -- admittedly increase if and when the system ever shuts

9   down, ever breaks, is ever turned off, I believe, I submit to the

10  Court, those admissions are tantamount to the certainty that this

11  system cannot -- cannot -- make the plaintiffs whole, cannot be a

12  remediation remedy in a courtroom, and cannot for that reason

13  satisfy the fifth requirement or application of method

14  requirement of *Daubert*.

15           We may wish, as Justice Blackmun has suggested, to

16  have scientific debate about ECS with Mr. Morse, but, we would

17  submit, not in the parameters of this trial.  And we should not,

18  therefore, elevate to the level of *Daubert*-worthy evidence what

19  is, in effect, the experimental use, subject to ongoing tryout,

20  of something which cannot, by definition, fit or respond to the

21  legal claim for remediation in this case.

22           What we need is real-world remediation, which makes

23  the plaintiffs whole, not better.  And, therefore, under *Daubert*,

24  we suggest that Mr. Morse's testimony in support of the ECS must

25  be excluded; and with respect to any other experts, Your Honor,

1   who would purport at the February 19 hearing, to speak in support

2   of the application of ECS as a remediation remedy, we likewise

3   challenge that under *Daubert*.

4          And with that, I'll yield to my co-counsel,

5   Mr. Lewis.

6          **THE COURT:**  Okay.

7          **MR. LEWIS:**  Thank you, Your Honor.  Richard Lewis for

8   the PSC.

9          Your Honor, I'd like to follow-up on a couple of

10  points and deal more directly with the scientific reliability

11  issue regarding Mr. Morse's opinion about the ECS.  And to do

12  that, I just need to briefly place his opinion in context with

13  the other opinions and the issues in the case.

14         There are really three types of expert opinions

15  being offered by the array of experts on both sides.  One is that

16  the damage -- the property is damaged because of the corrosive

17  off-gassing from the drywall.  That was the issue that

18  Mr. Meunier pointed out is not in dispute.  And, in fact, in the

19  expert reports themselves, there is no dispute between the Knauf

20  experts, the Mitchell experts, and the PSC experts that the

21  Chinese drywall emits corrosive gasses and there has to be a

22  remedy.

23         It's not acceptable.  Everyone agrees that's not an

24  acceptable situation for people to live in that environment.

25  There has to be a remedy.  But in addition to the fact that the

1    experts agree, I think it's important that the Court have an

2    understanding of the science underlying that agreement, because

3    it becomes important to understand the degree of the problem if

4    we're going to fix the problem.

5         And here we look to Sandia National Laboratories,

6    the premier engineering arm of the United States Government, who

7    was tasked by the Consumer Products Safety Commission to study

8    this particular problem, Chinese drywall and corrosion of the

9    electrical system in the home, and this is Exhibits 6 and 7 to

10   our motion, Your Honor.

11        Sandia National Laboratories and the Consumer

12   Products Safety Commission had an approach to this problem which

13   mirrored the approach that we took.  They went into the homes and

14   the verb they use is "harvested."  They harvested the corroded

15   electronic components from the home.  They took them out and they

16   took them back to the laboratory.

17        And when they went back to the laboratory, they

18   looked at the wires, the switches, and other electronic

19   components, and they determined that they were severely corroded.

20   The definition of corrosion is that there's a chemical reaction

21   going on on the surface of that metal and it's eating away at the

22   metal, whether it's wire or air conditioners or other metal

23   surfaces.

24        And everyone agrees that the air conditioning

25   coils, which are made out of copper in these homes, are being

1   destroyed by these gasses.  Everyone agrees with that.  But

2   Sandia went beyond the air conditioner and looked at the other

3   electronic components, and they observed what's called *pitting*.

4   They observed what's called *cracking*.

5            They observed corrosive deposits on top of the wire

6   and the holes in the wire where the pits are, and they measured

7   that corrosive deposit.  They measured it.  And they concluded

8   after measuring it, and observing the pitting, and observing the

9   cracking, that these environments, the homes of people in

10  Virginia, Florida, Louisiana that have Chinese drywall have a

11  Battelle rating of three or four corrosive environment.

12           Battelle is a lab that developed these standards in

13  the '70s.  And there are only four levels, one through four.

14  Four is the most severe, most corrosive level.  And three and

15  four are described, and this is in Exhibit 8, page 76 of our

16  papers, this is the MTI publication on atmospheric corrosion and

17  components in that corrosion, are described as severe industrial

18  corrosion and an atmosphere of severe industrial coercivity.

19  Those are the labels and the categories that the scientists at

20  Sandia National Lab and CPSC used to characterize these homes.

21           So I think it's important before we talk about

22  fixing the problem, that we understand that this is not a

23  discolored wire.  This is not something that can be wiped off

24  with a cloth by someone who is cleaning the home.  This, in the

25  are words of Sandia National Lab, is a severely corrosive

1    environment, such as that seen in industry.

2           And the CPSC goes on to conclude at page 12 of

3    Exhibit 6 that the kind of electrical components that are made

4    for residential use are not suitable -- a rather obvious

5    proposition -- for a severely corrosive industrial environment.

6    The problem is they've been there for three years for most of the

7    plaintiffs.  And they've suffered this corrosive environment and

8    they're damaged.  So that's the predicate for trying to

9    understand, how do we fix this problem, severely corrosive

10   environment.

11          Now, Knauf has two suggestions.  Mr. Morse is

12   talking about the ECS, and other exerts are talking about the XRF

13   and visualization of wires.  The way that you've asked that we

14   organize our arguments, we're only going to deal with ECS right

15   now.

16          Now, to put ECS in context, the most critical fact

17   about ECS, from an engineering point of view, from a public

18   health point of view, from an exposure point of view, is the

19   ECS's proposed solution actually leaves the corrosive drywall in

20   the home.  It doesn't touch it.  It just leaves it right where it

21   is for conceivably the next 50 to 60 years, as long as people are

22   going to live in that home.

23          This violates a basic tenet of controlling

24   pollution in an industrial environment, and certainly in a home

25   environment, which is get the source of the corrosive emission

1    out of the home.  This is not a factory.  These are homes.  Let's

2    get the source out, is a basic principle of how engineers look at

3    these type of environments.

4              Sometimes in a factory, it's not possible, because

5    of the products that are being made in that factory, but that

6    can't be said for a home.  A homebuilder does not design a home

7    to survive a severely corrosive industrial environment.

8              So, Your Honor, if I could briefly turn to the

9    bullet point items that you mentioned at pages 4 and 5 of our

10   brief, which are, we believe, six independent reasons why

11   Mr. Morse could not establish the requisite level or indicia of

12   scientific reliability for the ECS.

13       The first is that no builder anywhere in the United States,

14   even though this problem has been going on for years, and

15   builders are making their best judgments to try and respond to

16   the problem, not one builder has put the ECS in one house where

17   people live, or for that matter, in a house where people don't

18   live.

19             The only homes with ECS's in them are those that

20   have been rented by Knauf for purposes of defending in this

21   litigation.  Not a single home, not a single builder has opted

22   for this device.  And, therefore, it cannot be said that it's

23   generally accepted.

24             As Knauf admits in their papers, there's not a word

25   in the peer-reviewed literature about using an ECS to scrub

corrosive gasses out of a home.  There is a lot of information

about scrubbing corrosive gasses out of paper and pulper mills --

excuse me -- paper and pulp mills.  There is not a word about

using it on the question that's before the Court in this case,

these seven families and the thousands beyond them that have been

brought to the MDL, how to clean their home, not a word in the

peer-reviewed literature.

No government, or scientific, or engineering, or

independent group of engineers has endorsed the ECS.  And, more

importantly, Your Honor, as Mr. Meunier said, this idea did not

evolve in the engineering community.  It did not evolve at Sandia

Labs and the governmental engineering community.  It evolved at

the law firm of Knauf at a meeting with lawyers and Mr. Morse

present.  Mr. Morse testified to that on the 26th.

So when *Daubert* gets past the first five factors,

they list other things that are important to consider, and the

*Daubert* opinion says it's important to consider whether the

science was developed in the context of the way science really

occurs, or whether it was developed for the sole purpose of

litigation.

Unquestionably, there aren't any projects going on

in the research community where scientists are legitimately

saying, let's work on the ECS to see if we can cure the Chinese

drywall problem.  None of that has been put forward in evidence.

Also, Your Honor, there is no known error rate of

1    the ECS.  We do have evidence of when it shuts down in the Knauf

2    data, the -- all the factors that the device is designed to

3    control, humidity, pressure, temperature and concentration of gas

4    shoot right back up.  So we know from their data that that

5    happens when it shuts down.

6             We know from Exhibit 8, Dr. Abbott's publication on

7    corrosive atmospheres, and I would recommend to the Court pages

8    56 and 57 of Exhibit 8, where the literature shows -- the

9    peer-reviewed literature shows that when you try to retrofit or

10   go into an existing environment that's corrosive and you try and

11   retrofit an air filtration system to fix it, the failure rate is

12   greater than 50 percent; or the success rate is less than

13   50 percent.

14             Now, Knauf, in their papers, challenges our

15   argument that this is a retrofit.  But if Your Honor looks

16   carefully at 56 and 57 of Exhibit 8, the definition of a retrofit

17   is that the air filtration system was not put in at the time of

18   construction, it was retrofitted after the construction, which is

19   exactly what's being recommended here.  Three years, four years

20   after construction of these homes, the suggestion of Mr. Morse is

21   to retrofit three different devices that can't be bought as a

22   stand-alone item into the home to try and scrub out these

23   corrosive gasses.

24             Even the non-retrofit situation, according to the

25   data in Exhibit 8, fails as much as 50 percent of the time, but

1    the range of failure is much more favorable than with the

2    retrofit situation.  But neither is acceptable for people, for

3    residences, for people -- real people living in real homes.

4            And, Your Honor, this brings me to the fifth bullet

5    point, which is stating the obvious.  There is no data in the

6    record in this case, even though there are 25 expert reports

7    filed, with multiple appendices and spreadsheets, not one piece

8    of data from a home where people actually live in the home.

9            Now, why is that important?  It's important because

10   when people -- people are human, and when they live in homes,

11   they want to open windows.  They forget to turn on devices.  They

12   don't have industrial systematic maintenance plans.  There's all

13   kinds of human behaviors.  There are four seasons in the year.

14   This is not a sealed control room, like in a factory.  This is

15   home.

16           And one of the key differences between a control

17   room in a factory and these homes is as follows:  When Dr. Sharp,

18   one of the experts for Knauf, who Mr. Morse relies on, has a lot

19   of experience in scrubbing corrosive gasses out of factories; and

20   the reason they do it is they're trying to protect the control

21   room, where the electronics and the computer equipment is.  They

22   want to seal that room and protect it from what's coming out of

23   the manufacturing part of the plant, the corrosive gasses.

24           So the gasses are outside the control room.  The

25   source of the corrosion gasses is outside the control room.  We

1    want to protect the equipment in the control room.  Here, the

2    source of the corrosive gasses is inside the home.  It's in the

3    walls in every room, the children's rooms, the bathrooms, the

4    living room, the kitchen.

5            Yet, this plan says, leave it there.  So I would

6    suggest, Your Honor, that as *Daubert* talks about unjustified

7    extrapolation, moving from a factory, where you're trying to

8    protect a control room that's separate from the source of the

9    gas, is not an adequate basis to apply to a home, where the

10   source is actually in the room.

11           Finally, Your Honor, our sixth point on page 5

12   about why there's an adequate indicia of scientific reliability

13   for the ECS system, is that we were able to ask Ron Bailey, one

14   of our experts, a physical engineer, to make an inspection of one

15   of the experimental homes, and he was able to do that, I believe,

16   last Saturday.  Two days ago.

17           **MR. MEUNIER:**  Sunday.

18           **MR. LEWIS:**  I'm sorry, Sunday.

19           And Mr. Bailey was able to get into the home and

20   make an inspection, take some photographs, make some

21   observations.  His first observation -- and he is a gentleman

22   who's been studying Chinese drywall since the beginning in

23   Florida; he's been in dozens, if not hundreds, of Chinese drywall

24   homes -- first observation, the noxious odor is still there.

25   This is the test home with ECS that's supposed to be the

1   solution.  The noxious odor is still there.  And that affidavit

2   of Mr. Bailey is attached to our motion.

3              Second of all, he observed corrosion.  Now, is the

4   corrosion there from before the time the ECS was put in and we're

5   just going to leave it there, or is it new corrosion?  Well,

6   Mr. Bailey is going to need further testing.  He has opinions.

7   He believed he observed new corrosion, but he's going to need

8   further testing to confirm that.

9              But the two fundamental problems with the Chinese

10  drywall home -- and in common parlance, it stinks -- and

11  engineering importance, the electrical systems are being

12  compromised by corrosion, were demonstrated upon his first

13  inspection of this home two days ago.

14             So in sum, Your Honor, focusing on Mr. Morse and

15  his opinion on ECS and his reliance on Dr. Sharp's experience in

16  the workplace and Dr. Perricone's opinion that an ECS can stop --

17  can protect copper surfaces -- let me go back one second, Your

18  Honor.

19             I understand that judges often are confronted with

20  lawyers asking for exclusion; and it's very common for the Court

21  to explain to counsel, that goes to weight.  Very, very common.

22  If one does a Lexis search, there's millions of them.  This is a

23  different case, Your Honor.  This is not weight.

24             This is the fundamental reliability, is there any

25  indicia, any indicia in the peer-reviewed literature, any indicia

1  in the data that there is a scientifically reliable basis

2  today -- today -- not that it might happen in the future, as the

3  Court commented in Propulsid.  That's not good enough for a

4  *Daubert* hearing.

5          Is the information available today, the necessary

6  scientific indicia of reliability?  And if you look at the first

7  *Daubert* prong, has it been tested; the second *Daubert* prong, is

8  there peer review; the third, is there an error rate; the fourth,

9  is it generally accepted.  If you ask if this science was

10  developed in a litigation context, if you look at the words of

11  703 and ask, is there sufficient factual data that applies to

12  this setting, for all those reasons, this opinion doesn't meet

13  the minimum standard of scientific reliability and should be

14  excluded in this proceeding.

15          Thank you, Your Honor.

16      **THE COURT:**  Any response?

17      **MR. HAYDEN:**  Good afternoon, Your Honor.  Don Hayden on

18  behalf of Knauf Plasterboard Tianjin.  We'll call it "KPT" for

19  the rest of the afternoon.

20          I'm going to provide a quick overview and just

21  clarify what we're here about today before I'll hand the podium

22  over to my co-counsel, Doug Sanders.

23          First, while we separated these motions into a

24  Motion to Exclude certain testimony about, that is being offered

25  and opinions being offered by Roger Morse, and certain testimony

1   and opinions being offered by Matthew Perricone, what the

2   Plaintiffs Steering Committee is really attempting to exclude are

3   two separate pieces of opinions that are a part of the

4   remediation alternatives and the remediation tools that we

5   believe would be valuable in determining the best remediation

6   approach for the Chinese drywall homes that are at issue.

7              We've just heard from them why the ECS system or

8   the remediation alternative that -- one of the remediation

9   alternatives that we're suggesting should be stricken, and they

10  focused on the opinions and testimony of Roger Morse.

11             It needs to be clear first that the -- that it is

12  only the opinions of Roger Morse with regard to the ECS system

13  that are at -- that are being questioned today.  But it is also

14  important that the Court remember that the ECS system and the

15  opinions in support of the ECS system are being offered by a team

16  of experts that KPT has put forward.

17             We have a material science engineer, a doctorate.

18  We have an expert in the corrosion field, who has worked for over

19  30 years in the -- on corrosion in the sulfur and paper mills

20  which had similar problems with sulfur gas emissions.  Sometimes

21  gasses at much higher levels than the one or two parts per

22  billion that we're talking about here.  Certainly qualified

23  people that, for whatever reason, the Plaintiffs Steering

24  Committee has decided not to depose before the hearing today, but

25  certainly are going to be offering questions -- or offering

1    opinions regarding the ECS system.

2                   And we have a toxicologist who will be testifying

3    also about the air quality in the home and the reductions in the

4    reduced sulfur compounds that we find after the implementation of

5    the ECS system.

6                   The other part of the motions that we'll be talking

7    about later, and I'll be emphasizing on, is their suggestion that

8    we strike any reference to the use of a tool that has been used

9    in other analogous circumstances to identify and be a good

10   mechanism to find metal compounds.  It was used in the lead paint

11   investigations, and it certainly could be used here.

12                  It's the XRF, or x-ray fluoroscopy.  And they are

13   asking that that tool be stricken as a -- and I think it derives

14   primarily because of a confusion on their part that it's the

15   exclusive tool for making a differentiation as to whether a

16   particular wall or board has to be remediated.

17                  If you look at the testimony and opinions that were

18   rendered by Dr. Perricone and Mr. Morse together, you'll see that

19   it is just one of many tools.  I'm not going to get into that

20   right now.  But I just want the Court to really understand that

21   it's not really the testimony of Morse and Perricone, but it is

22   an effort on their part to cut away at one of the remediation

23   alternatives, the ECS, the environmental control system, which is

24   just one of the alternatives for remediation we're suggesting,

25   and with our partial board removal alternative that the XRF

1   methodology and technology that we have been using should not be

2   used.

3          In response to the PSC's claims, we submit the

4   following:  Our remediation methods are built on sound science.

5   They work.  They are reasonably reliable.  They provide

6   cost-effective methods to get at resolving the issues in these

7   homes.

8          In the case of the ECS, it provides a less invasive

9   method for reducing the sulfur compounds in the home, a method

10  that avoids the six-month relocation, the disruption of a

11  household that some households may find just something that they

12  would rather not go through if there is a reliable and reasonable

13  alternative; and we suggest the ECS system is that, and it's

14  based on sound science.

15         We give, essentially, the Court two repair options,

16  remove the Chinese drywall, remove the source, or remove -- keep

17  the Chinese drywall in place but control the environment.

18  Remove -- reduce the sulfur compounds so that they are not Class

19  3 -- Class 3 corrosion environments, but they are at levels that

20  are not causing corrosion in the home after the system has been

21  in place.

22         **THE COURT:**  They take issue, though, with the fact that,

23  what happens when the lights go out or the electricity goes off,

24  either due to some problem with the electricity or another

25  hurricane or a storm.  What happens in that situation?  Do the

1   gasses go up again?

2          **MR. HAYDEN:**  I'll let my co-counsel, who is going to go

3   into ECS talk a little bit about that, but what we'll show is

4   that actually was a test that we put in place ourselves.  The

5   gasses will begin to rise; but immediately when the system is put

6   back in place, the levels will drop within a few-day period back

7   to the levels that are appropriate.

8                  Let's put this all in context for the Court before

9   Mr. Sanders comes up here and talks to you about ECS.  We're

10  talking about seven homes in Virginia.  Three of those homes have

11  localized issues relating to the installation of the Chinese

12  drywall.  Three of those homes.

13                 As plaintiffs submit, at least in one of those

14  homes, the Leach home, the Chinese drywall installation was

15  limited to a wine cellar.  And they see that as -- a localized

16  removal as a viable option.

17                 The Baldwin home, another one of the homes, is

18  one -- a home where there was no Chinese drywall, as we see it

19  from the limited inspection that we were allowed at that home on

20  the second floor.  While the plaintiffs, and their experts, are

21  going to suggest to you that the fix for those homes is to

22  essentially gut them, and that the average cost of that is going

23  to be about 225,000 on average per house for these seven homes,

24  without really any scientific justification, essentially what

25  we're offering is a reasonable cost-efficient alternative to

 1   resolving the issues in these homes.

 2              Respectfully, KPT is bringing some reason, some

 3   rationality into how we can cost-effectively remediate these

 4   homes.  And I think that's what this Court was looking for when

 5   it asked that we look into the scope and effect, and that's why

 6   we have intervened into these hearings.

 7         **THE COURT:**  Okay.  Thank you very much.

 8         **MR. SANDERS:**  Your Honor, Doug Sanders on behalf of KPT

 9   as we're calling it.  I'll start talking while I lift this up

10   here.

11              I'm here to address the challenge ostensibly

12   against Roger Morse.  The plaintiffs, the PSC, has chosen to

13   address Roger Morse and challenged the entire -- entire ECS

14   through him.  And as you heard sprinkled throughout their

15   conversation about Roger Morse, you heard discussions of Matthew

16   Perricone, you heard discussions of Dr. Sharp.  You heard

17   discussions of the two people who, in a sense, are really the

18   science behind that, that ECS method.

19         **THE COURT:**  I think both sides have recognized that this

20   is a multifaceted problem, and you have multiple disciplines

21   dealing with this.  So they rely on each other.  I think that's a

22   fair statement.

23         **MR. SANDERS:**  They do rely on each other, Your Honor, as

24   you indicated.  And our biggest issue with them going to

25   challenge the entire system through Roger Morse is that it's

1   inappropriate at this time.  And I want to go through a little

2   bit about what the ECS is in response to their challenge of Roger

3   Morse.

4          Roger Morse, as you heard, is an architect and a

5   building person.  And he has done some work with the ECS, and

6   costing out the components, identifying, helping identify proper

7   components, measuring -- as you'll see at some point, these test

8   homes look like Swiss cheese with the number of pins and plugs

9   and things that we have in them in order to measure that the

10  system works -- and reporting on some of those things and

11  providing that advice.

12         But he's not the corrosion expert.  He's not the

13  other person.  That's Dr. Perricone.  And what Dr. Perricone and

14  Dr. Sharp have done is establishing the ECS and verifying that

15  the ECS does meet the standard of *Daubert*.

16         The ECS system, as a whole, is based on a

17  fundamental recognition by, I think, all sides' experts about

18  what the inherent factors are that impact the corrosive

19  environment in the home and impact the corrosion on metals, which

20  is a combination of humidity, of concentration, of time, and of

21  temperature.  And that science really, really is based on the

22  same peer-reviewed papers, the same analysis by both sides.

23         Based on that science, what the ECS does, and what

24  Dr. Sharp has shown, and what Dr. Perricone has also opined about

25  and verified, is that you can control those factors and

1    essentially bring the houses to a level at which there is no

2    corrosion or the corrosion is acceptable.  The same standards

3    that you heard Sandia Labs relied upon to define what might be

4    corrosion in a home now were based in industrial situations.

5         All this science admittedly comes out of industrial

6    situations, but it's the finding, the impacts and the coercivity

7    environment in a control room; and it's in place where there is

8    electronics, and all the things that Dr. Scully, the plaintiffs'

9    expert, admitted exist in a home.  The same exact things that you

10   have to deal with in a house.

11        The equipment isn't something, in our viewpoint

12   that is different.  They're Carrier air conditioners.  They're at

13   Roger Morse's opinions, I believe, Exhibits H-2 and H-3.  They

14   are commonly available.  They comprise an air conditioning

15   system, a dehumidifier and a filter.

16        Those are systems that all air conditioners and all

17   HVAC systems have.  We just set them up in a way that anybody --

18   we had actual contractors go in and set them up and set them up

19   to reduce those corrosive gasses.

20        Our evaluation of the effectiveness essentially is

21   tied into, and I believe as compared to the PSC scientists, is

22   tied into actual data.  And I want to talk about that a little

23   bit more in a second.  But it's tied into data that has been used

24   and verified in international standards that's all backed up with

25   actual failure data as to what actually happens long-term with

1    electrical components and electronic equipment.

2            Moreover, while there isn't a house, other than the

3    houses that we've rented in order to put this system in, these

4    systems, and the principles behind these systems are in the

5    thousands of similar, similar situations in the industrial

6    environment.

7            The point is that the PSC has charged that this was

8    done in the context of litigation.  You're aware, as anybody

9    else, the pace at which this has happened and that's the context,

10   obviously, that it was prepared in.  But it was prepared by

11   scientists who were looking at solutions and looking at different

12   options.  One is the ECS; the other is removal of the drywall in

13   order to solve the problem.

14           And the fact that it's in four test homes -- or

15   five test homes and unoccupied homes is to address the issues

16   that obviously you're concerned with through the *Daubert* hearing,

17   and the PSC is concerned about, which is testing and verifying

18   it.

19           There had to be a period at which this system was

20   put somewhere and we could verify that it worked before we could

21   stand here, or stand anywhere, and say, this system works.  So

22   it's obviously what we've done.  We were able to put it in last

23   summer.  We put it in in Florida in June, July, August,

24   September, some of the most humid and heated conditions in order

25   to make sure that it was tested under those conditions, and those

1  homes are still there.

2          Just a quick grasp on the role of temperature and

3  humidity, and this is for copper.  It's clear that our scientists

4  in this Rice papers are papers that our scientists and their

5  scientists rely on, that when you increase humidity, the reaction

6  increases; and that's one of the key components of the ECS and

7  why it works.  Obviously, if you were to remove the drywall, you

8  would also remove the source.  So of those three factors, that

9  worked.

10         We have -- and this is from Scully's deposition,

11 Exhibit 5, I believe it's record site four, our motion.  We have

12 based this -- this system and the testing of this system on the

13 same international and same national standards that most

14 corrosion scientists would use in assessing this problem; and,

15 indeed, the plaintiffs do as well.  And the fundamental one

16 that's referred to is ISAS 71.04, which I have up here on the

17 screen for you, Your Honor.

18         I have some points that are highlighted on it.  But

19 one of the things that the standard recognizes is the difficulty

20 of measuring a corrosive environment because of those different

21 factors.  And the way that these standards, both this standard

22 and some of the other standards, have set on to address the

23 difficulty is to put essentially a copper reactivity coupon, or

24 other metallic coupons, in a location which replicates where that

25 equipment is going to be.

1                   This standard essentially provides quantitative --

2      is the first point -- provides a quantitative measurement of the

3      overall corrosion potential in an environment.  It's not just a

4      qualitative, it's not just this is going to happen.  It's a

5      quantitative measurement based on standards and based on failure

6      data that you can say, this is a Class 1 environment, a Class 2

7      environment, this is what's going to happen.

8                   Similarly, the standard -- the standard itself says

9      that as a direct measure of overall corrosion, potential

10     reactivity monitoring involves the placement, again, of specially

11     prepared copper coupons in the operating environments.  Copper

12     has been selected again as a coupon material, because data

13     exists, which estimates copper film formation with reactive

14     corrosion environments.

15                  So from the *Daubert* standard standpoint and the

16     *Daubert* challenge, there is not a wealth of peer-reviewed

17     articles on Chinese drywall and solving the Chinese drywall

18     problem in homes.  It's a new problem.  That literature is all

19     being written.  But we went to and relied on standards that are

20     out there that are internationally recognized, and have been

21     recognized for years, to identify a way to say, does this system

22     work, and to generate data that is verifiable.

23                  We've turned all that data over to the plaintiffs.

24     And, although, they talk about it a little bit in their brief,

25     they're not saying, they're not challenging, at least not here,

1   that the 30-day coupon tests we're doing, as this standard

2   requires, and the tests that we're doing serially are not valid

3   data that we're generating when compared against the scale that

4   this standard and other standards sets out demonstrates that this

5   home, and the house, and the environment that we were putting --

6   we're creating there, isn't at a level at which there should not

7   be failure in electronics and the corrosion as well.

8           **THE COURT:**  Let me interrupt you for a moment, if I may.

9       As I understand what the plaintiffs -- well, they've said a

10  lot -- but one aspect of their argument is that in *Daubert* you

11  should have some -- there must be some relevance.  They say that

12  the job, or the task, or the issue is remediation, and that

13  remediation requires that it be removed and not controlled.

14          I don't think they dispute that the ECS is a device

15  which, when operative, controls the problem.  It reduces the

16  noxious gas to a livable level.  They complain, as I understand

17  it, on the relevance factor.  Because it is, at best, a control

18  of the problem and, therefore, it mitigates the problem and it

19  doesn't remove the problem.

20          You take the position that the mitigation is such a

21  degree that, in effect, by controlling it, it doesn't remove it

22  but it controls it for a long period of time?

23          **MR. SANDERS:**  It gets to the root causes and makes the

24  home where it does not have -- it's not going to have corrosive

25  failures of electrical equipment, electronic equipment under the

1    standards, and only guided by the standards that we've cited,

2    don't have premature failures.  It's not an issue.

3              The moisture levels in the board itself, and in the

4    other building products is reduced actually by the system.  And

5    as Dr. Scully indicated, that in itself, there is the potential

6    to actually reduce and impact the emissions, not just on the back

7    end of the equation.

8              What I think the PSC's relevance argument goes to

9    at the end of the day is, what is the appropriate measure of

10   damages for a particular plaintiff?  A particular plaintiff may

11   choose -- I think Mr. Hayden talked about that -- not to move out

12   of their house for six months and have to be relocated and to try

13   out this system because they're confident in the science, and

14   that's what we're talking about here, the science, and that it

15   works.

16             It puts them in a situation where they don't have

17   the same impacts.  They're comfortable that science shows them

18   that there's not going to be corrosion, and they're not going to

19   have appliances failing, and that's their measure of damage.

20        **THE COURT:**  Ordinarily, this wouldn't be -- it clearly

21   wouldn't be a *Daubert* issue.  It would really be focused on the

22   result and whether or not the result is appropriate.  The way

23   that it gets to bleed into *Daubert* is with the relevance

24   situation; and if the relevance, if the object is to remediate,

25   the issue is whether or not controlling it is relevant to the

1  evidence of dealing with remediation.

2      **MR. SANDERS:**  Obviously, Your Honor, we submit that it

3  is.  We submit that controlling it to a degree in which you've

4  gotten to that environment in which there will not be the impacts

5  that the plaintiffs' other experts, and some of the other experts

6  we're talking about, suppose will happen over time is repairs and

7  effective remedy.

8          Similarly, actually, probably, if you think about

9  it, to a radon system that's put in a home where you can't remove

10  the source, but you minimize it, and you may get to the point

11  where it's not impacted.  It would be the equivalent of something

12  like that.

13      **THE COURT:**  I guess the issue is whether this situation,

14  whether this complaint of the plaintiffs, focuses more on the

15  result as opposed to the admissibility of this particular --

16      **MR. SANDERS:**  Your Honor, as Mr. Hayden explained, and

17  you know our role in this proceeding, it not being our client's

18  product and our focus here was solely on discussing the scope of

19  remedy and what remedies might be there.  We are not focusing on

20  the choices and some of the other damages that plaintiffs are

21  complaining of.

22      **THE COURT:**  Okay.  All right.

23      **MR. SANDERS:**  Not to go over it too much or belabor it,

24  but, again, some of the same documents, and reliable sources, and

25  peer-reviewed articles that the plaintiffs' experts talk about,

1    such as the Abbott publication, indicate that direct measurement

2    of relevant corrosion is the single best descriptor of an

3    operating environment.

4              The best way to determine what that environment is

5    is to measure the coercivity.  And for Mr. Abbott that term is

6    the direct measurement which refers specifically to the

7    technology of coupon or reactivity monitoring.  And that's the

8    technology that we have put up.

9              And skip through this.

10             What we've done and how we've done it -- I'm sorry

11   it's a little blurry -- is in the homes that we put it in, we

12   have established several locations that are designed specifically

13   to replicate those difficult and different environments.

14             You have some in the center of the room.  You have

15   some on the face of the drywall, for example, on the outside

16   which might mimic a TV or something else that would be placed at

17   the wall.  And then you have wall cavities samples taken.  So

18   that you do sample in those micro-environments in the walls,

19   where electrical wiring and other components are, to make sure

20   the testing works.  And that's what we believe is the response to

21   the *Daubert* challenge on ESI.

22             Roger Morse aside, his role with respect to this is

23   much more limited and, therefore, we think the challenge is

24   misguided.  And that, in a sense, is our response.

25             **THE COURT:**  All right.  Thank you very much.

1                    Do we need any rebuttal on this or not?

2              **MR. LEWIS:**  Yes, Your Honor, if the Court would allow

3    it.

4         **THE COURT:**  All right.  Let's kind of make it quick so

5    we can get through.  I think I understand the issues.

6         **MR. LEWIS:**  Yes, Your Honor.  Quickly on rebuttal, we

7    make clear in our papers that it is an integrated opinion on ECS.

8    For example, Dr. Sharp has no data attached to either of his

9    reports.  You have to go and chase down the data he's relying on

10   in the Morse appendices and in the Perricone appendices.

11        **THE COURT:**  Do you complain that the ECS, while it's

12   operating, that there's some data that indicates that the gasses

13   are within a tolerable limit to reduce corrosion or actually

14   negate corrosion -- that no corrosion occurs while it's operating

15   with the windows closed and the doors closed?

16        **MR. LEWIS:**  Your Honor, we absolutely positively refute

17   the notion that the ECS machine can reduce sulfur gasses to get

18   rid of the stink and to stop the corrosion, and we have multiple

19   pieces of evidence to prove that.

20              One of which is Dr. Sharp's own data, Appendix A to

21   the Perricone report.  Using their method of coupons, Dr. Sharp

22   said, send the 14- and 30-day coupons to MeadWestvaco and have

23   them analyze them, and they did.  And this is in the back of

24   Appendix A.

25              And the standard for one year, the Knauf-Sharp

standard, is if the thickness on an item, standardized to one

year, is 1,000 angstroms, then it predicts failures.

And on page 3 of the letter that MeadWestvaco wrote

to Dr. Goad, the Knauf expert, they cite the following

thicknesses from their experimental homes in Florida:  Sample

4355 in the bedroom, 2,179 angstroms, more than twice the

one-year standard.  Sample 4370, 1,841 angstroms.  Sample 4396,

1,837 angstroms.

Bottom line, Your Honor, their method, their

surrogate coupons, they failed their own test, and they can't

show in their own data that they can stop corrosion.

More importantly, it's a guess.  It's an experiment

when it comes to the home.  Mr. Bailey's inspection showed that

the home still stinks and corrosion is still there, and their

test data shows that failures and corrosion will occur.

We do not concede in any shape or manner, and

there's no evidence in the record, including Mr. Sharp's

evidence, which includes readings above his own standards, even

if he used three manipulations to change the calculation that

MeadWestvaco did, there are still exceedances in Knauf's own

data.  So there's nothing to show that the corrosion and the

smell will go away in this record.

Finally, Your Honor, I think it's very important,

we said in our brief that Mr. Morse relies on Perricone and

Sharp.  We had to chase the data that Sharp relies on into the

1  Perricone report and into the Morse report.  It's not fair.  We

2  are challenging the opinion in every regard that ECS is a

3  scientifically reliable method of controlling corrosive gasses in

4  the home based on all of the evidence that Knauf put into the

5  record.

6           They shouldn't need our cross-examination to build

7  their record.  They had a chance to file reports and build their

8  record.  They had a chance to do redirect with Mr. Morse.

9  There's nothing in the record, scientifically reliable

10 information, to show that the stink and the corrosion can be

11 controlled by the ECS.  It's a theory; it's an idea; somebody

12 might prove it some day, but there's no evidence in this record

13 to show it.

14           Thank you, Your Honor.

15      **MR. SANDERS:**  Your Honor, if I may just be heard on one

16 quick point.

17           **THE COURT:**  All right.

18      **MR. SANDERS:**  If I could ask Rick, what home are you

19 talking about?

20      **MR. LEWIS:**  Here's the letter right here.  Page 2 and

21 page 3.

22      **MR. SANDERS:**  Your Honor, I believe the homes -- well, I

23 can't tell.  Which one are you talking about, 939?  This data

24 right here?

25      **MR. LEWIS:**  Let me see.  I'm talking about the homes in

1   this chart.  These are the examples that I presented to the

2   Court.

3           **MR. SANDERS:**  Just for clarification, the ones that are

4   over a thousand are actually our 939 Scarborough homes, which are

5   our positive control homes.  In other words, homes where we do

6   not have the ECS system in them.  We set up homes with the

7   system, homes without the system, in order to analyze whether

8   there would be differences and track them.  939 and this result

9   is not the home where the ECS is.  So obviously it's a home with

10  Chinese drywall that's unremediated.

11          And I guess that there's another point of clarity

12  for us, and for the PSC, and for the Court, we submitted our

13  briefs -- I mean, submitted reports to the Court, but I'm going

14  to ask that Professor Sharp's report and his rebuttal -- and we

15  can deal with this later if there's an objection -- be part of

16  this *Daubert* hearing.

17          **THE COURT:**  Okay.

18          **MR. MEUNIER:**  Your Honor, just on that point, and for

19  record purposes, it might be a good time to clarify that we had

20  indicated this in a pretrial meeting with Your Honor, but the

21  record which will be under seal is, by agreement, going to

22  consist of the depositions of Morse, Perricone, Scully, Galler

23  and Rutila, who are the five experts at issue in this hearing.

24          So all of their depositions will be delivered to

25  the courtroom deputy and placed in the record under seal.  And

1   then we had agreed all expert reports of these five experts at

2   least, and that includes their original, rebuttal and

3   supplemental reports, which we'll enumerate on a list and deliver

4   to your courtroom deputy, will likewise form part of the *Daubert*

5   record under seal by agreement.

6         What Mr. Sanders just referred to does go beyond

7   that a bit by suggesting we put in the expert report of an expert

8   who's not at issue in the *Daubert* case; and we've indicated,

9   since this is just coming up now, we'll work with him and

10   communicate to the Court on that matter.

11       **THE COURT:**  Okay.  The issue that everybody has to focus

12   on is that this is a multidiscipline approach.  So part of the

13   story is with one expert, but the rest of the story is with

14   another or two.  And so to put them all together is essentially

15   to get the big picture.

16         Everybody needs to be aware of that and give me the

17   information so that I can see the big picture.

18       **MR. MEUNIER:**  We'll do that, Your Honor.

19       **THE COURT:**  The next issue is with Dr. Matthew

20   Perricone.  Dr. Perricone is a material science analyst.  He

21   opines that there is a procedure for identifying the Chinese

22   drywall and removing it, and allowing the non-contaminated

23   drywall to remain in place.  And he speaks of those properties in

24   which there is a mixture of both Chinese drywall and non-Chinese

25   drywall.  He feels that that's the way to do it.

1           The plaintiff seeks to exclude or limit this

2    witness' testimony regarding the identification of the Chinese

3    drywall.  They complain and indicate that the basis of their

4    objection is that the plans are not written down, and they're not

5    based on any standards or reference.  The visual inspection tool

6    which he uses is subjective.  It's in the eye of the beholder,

7    and not trustworthy or reliable.

8           They complain that there's no protocol or strategy

9    for using the XRF tool to identify the Chinese drywall.  In

10   short, the plaintiffs contend that there is no scientifically

11   reliable basis or methodology which supports the unwritten plan

12   to use the two tools for the purpose of selective identification

13   and removal of the contaminated drywall.

14          The intervenor responds that although there is no

15   written protocol or plan, Dr. Perricone has devised a multi-step

16   plan which involves a detailed visual inspection and a

17   verification by the XRF.  Dr. Perricone, according to the

18   intervenor, was not tasked with devising a protocol for

19   conducting the XRF testing.  That was in the province of

20   Mr. Morse, who was not questioned on that particular issue.

21          Although, they say it is an open question

22   concerning the appropriate detection of the level of strontium,

23   this does not make the use of the XRF to detect or confirm

24   strontium unreliable.  In short, as I understand it from the

25   documentation submitted to me, the intervenor's position is that

1   it is not necessary to do the extensive remediation suggested by

2   the plaintiffs and that these experts support their position with

3   reliable and sound opinions.

4           I'll hear from the parties at this time.

5        **MR. LEWIS:**  Thank you, Your Honor.  If I could just ask

6   leave of the Court to deal with the issue that Mr. Sanders and I

7   were disagreeing about at the end in a two-page submission later

8   this week.

9        **THE COURT:**  All right.  That's fine.

10       **MR. LEWIS:**  Thank you, Your Honor.

11          The challenge is to Dr. Perricone and to the idea

12  that there is a method to selectively identify and remove Chinese

13  drywall from a home.  So we're challenging the idea that you can

14  identify it without destroying the home and cutting it up to

15  figure out what it is; and then we are challenging the idea that

16  it can be removed and the problem can be eliminated, while at the

17  same time leaving behind the domestic boards, being able to

18  figure out that difference.

19          And our position here, once again, is that the

20  question is:  Is there reliable scientific information, for

21  example, in the peer-review literature or other sources of data,

22  to show that this can be done?  Or is it an idea, something that

23  perhaps someone could experiment with some day and find out the

24  answer, but for which we don't have any reliable information to

25  know the answer today?

1    **THE COURT:**  But can't you detect it in some way?  In

2    other words, suppose -- it's true in the New Orleans area that

3    there's remediation and that some of the homeowners bought three

4    or four pieces of drywall and put three or four pieces of drywall

5    in.  They don't have any other drywall other than those four

6    pieces.  Before the storm everything was fine.

7    **MR. LEWIS:**  Yes, sir.  Right.  So the question that the

8    methodology that Knauf puts forward raises is, can we find the

9    three or four pieces?  Maybe the homeowner was there and can tell

10   you, it's those three, and I have no dispute with that.

11   **THE COURT:**  And in that situation, you remove those

12   three or four pieces and that's it.

13   **MR. LEWIS:**  If we're talking about that kind of a

14   localized situation of three to four pieces, with definitive

15   proof of identity -- which, by the way, I think is clearly a

16   hypothetical, Your Honor, compared to the typical experience that

17   we've seen in hundreds of homes -- those pieces could be removed.

18   The example of local corrosion that our experts

19   said could be dealt with on a local basis was the Leach home in

20   Virginia, where after the home was built and finished, they

21   decided to add on a wine room.  That wine room has no

22   ventilation.  It's not connected through ventilation with the

23   rest of the home.  And we know that that wine room was built with

24   Chinese drywall.

25   And it's in that narrow instance that it's true

1    that local remediation can be performed because we know that the

2    home wasn't built with Chinese drywall, and only the wine room

3    was because we have the delivery slip delivering the boards.

4          So there are these rare instances where that can

5    occur.

6          **THE COURT:**  And like downstairs fixed, and not upstairs,

7    for the same reason.

8          **MR. LEWIS:**  Your Honor, no, I disagree very much.  And

9    the Baldwin home is definitive proof of that, where it's known

10   that there is drywall downstairs and the air conditioner in the

11   attic is severely corroded beyond any dispute.  So there is a

12   mechanism to circulate corrosive gasses in the home that will

13   expose copper surfaces or silver surfaces.  And I need to spend a

14   moment on silver surfaces because those words don't upon in

15   Knauf's opposition brief on this issue.

16         Silver surfaces are extremely vulnerable to

17   corrosive gasses; and the level of corrosion on silver is not

18   dependent on humidity, as it is in copper.  In 90 percent of the

19   consumer electronics in a home have silver circuits in them.

20   Dr. Galler has documented corrosion of those contacts.  So that

21   is also part of the problem.  We're not just talking about

22   copper.

23         But the key to the method that Knauf properly

24   points out that the primary tool is not the XRF gun.  There's two

25   tools that both Dr. Perricone and Mr. Morse say can be used.  One

1   is that somebody, not clear, an electrician or some kind of an

2   expert --

3           **THE COURT:**  A visual inspection.

4       **MR. LEWIS:**  -- needs to pull all the wires out behind

5   all the plates in the house and look at them and give them a

6   score.

7           And the theory is that if it's very corroded, or

8   dark, or black, that the boards near there need to come out; but

9   if it's not, then they don't need to come out.  But if you're not

10  sure, you can bring in the second tool, which they say is an XRF

11  gun.  And we really want to direct our argument under *Daubert* to

12  establish that there's no reliable -- there's no scientifically

13  reliable indicia that either of those tools can be used for that

14  purpose.

15          And before I get to the substance of their plan,

16  the Court mentioned that the concept of, is writing it down

17  relevant?  We asked whether the protocol for grading the color of

18  the wires is written down, and Dr. Morse and Dr. Perricone said,

19  no, it's not.

20          And as late as last night, when we got a response

21  brief, we got two new expert affidavits that go to the issue of

22  the color scale -- there is a gentleman who gave an affidavit

23  about how he does it -- and the issue of XRF.  There is a

24  scientist who says, I work for a company called U.S. Risk

25  Management, and I have a protocol.

1           But the problem is that we need a plan that's

2    written down now, the one that should have come in their expert

3    reports that we can cross-examine, to find out if there's any

4    indicia of reliability for that plan.

5           And to the extent that the landscape keeps changing

6    and new ideas and new experts get introduced or the idea that,

7    we'll do it in the future, there's four references in the

8    defendant's brief last night that say, well, we're still working

9    on it; we're developing a protocol for XRF; and we might use the

10   Borescope; and we might take some samples back to the lab and use

11   the XRF machinery in the laboratory, which is different from the

12   XRF machinery in the field.

13          So the problem is that as we stand here today, we

14   can only look at whether there's reliable indicia of what they've

15   presented so far in their reports.  And I would ask the Court to

16   briefly turn to page 6 of our motion, and I'm going to summarize

17   the key reasons why there is a lack of indicia of scientific

18   reliability behind these two methods.

19          The first is that no major builder in the

20   United States, or elsewhere, has advocated that these two tools,

21   the color, scale, and the field use of the XRF can get the job

22   done.  And nobody's doing it, so there's no general acceptance.

23          There is no published peer-reviewed literature on

24   the color scale.  This is also something that wasn't written down

25   at the time of Dr. Perricone's deposition.  There is no

1   peer-reviewed literature on using an XRF gun in a home, a field

2   instrument, not a lab instrument, to verify whether or not

3   something is Chinese drywall or U.S. drywall.  Now, the Consumer

4   Products Safety Commission has looked very carefully at the XRF

5   gun.

6               Scott, I wonder if you could give me page 107 of

7   their report.

8               Your Honor, the Consumer Products Safety Commission

9   looked at this tool because it had potential, even though there

10  was no scientific foundation yet available, and they drew some

11  important conclusions.  And I would recommend to the Court to

12  read pages 105 to 108 of the 51-home study.

13              And what the Court -- what the CPSC said is, this

14  tool can be used as a screening device -- as a screening

15  device -- to figure out whether the home as a whole -- and that's

16  a quote from page 108 -- whether the home as a whole contains

17  Chinese drywall.

18              But also on 108 it says, it cannot be used for

19  individual determinations in situ, in the home, to determine by

20  looking at the strontium level if it is defective wallboard or

21  not.  So the CPSC is very clear that it cannot be used for the

22  purpose that the Knauf experts are suggesting.

23              Similarly, the Florida Department of Health agrees

24  that one can use the XRF tool in the field as a screening device.

25  But when the Florida Department of Health defined a confirmed

1  case of Chinese drywall and what the criteria were, they dropped

2  out, totally eliminated the use of XRF in any form, particularly

3  in the -- the field instrument to confirm that a board is Chinese

4  drywall.

5            So there's a very important scientific concept

6  here, which is the difference between a screening device to

7  figure out if there's something in a home.  Is there some

8  corrosion in the home?  The color scale may help.  Is there some

9  Chinese drywall in the home?  The XRF field instrument may help.

10 The difference between that and scientific confirmation that a

11 particular board is Chinese drywall, of the 3- to 400 boards that

12 might need to be evaluated in a home.

13           So both the CPSC and the Florida Department of

14 Health are consistent that in the field, if we're going to take

15 it out into the field, it's only a screening device.  And if we

16 have to go back to the lab, then we've defeated the whole purpose

17 of having the XRF device in the field.

18           And one of the amendments last -- in the brief that

19 we got last night is, well, we'll go back to the lab when we have

20 to.  Now, what does "go back to the lab" mean?  It means to come

21 in with a saw and cut out the drywall, take it back to the lab,

22 and try and evaluate the strontium.

23           But the problem is, as you can see from the chart,

24 the CPSC -- if you can blow that up -- compared the use of the

25 instrument in the field -- and that's the strontium, and that's

1    the horizontal axis -- to use of the instrument in the lab.  And

2    Dr. Perricone said, let's use 1,200 parts per million to tell if

3    it's defective drywall.

4              And if we use the field instrument, we get a lot of

5    what's called "false negatives."  And that means that using it in

6    the field, the instrument will say it's not above 1,200, it's not

7    defective Chinese drywall; but when you take it to the lab, they

8    say, oops, it really is defective.

9              And if you could highlight in red those readings in

10   the CPSC data, where if you looked at the field data, you'd say,

11   it's below 1,200, it's a negative.  But if you looked at the lab

12   data, the more precise instrument, all of those readings in that

13   box are, in fact, above 1,200.

14             So if this field instrument is used, I can't

15   estimate visually whether that's half of all the readings, but I

16   would say it's -- the red box is approximately half.  The CPSC is

17   saying, if we use the field instrument, we're going to get it

18   wrong half the time.

19             And the cost of getting it wrong is very serious,

20   Your Honor, when it's a false negative, because you leave the

21   Chinese drywall in the home.  And the whole point of the

22   remediation is defeated, not to mention the cost of coming back

23   at some point in the future and having to do it again.

24             So that tool is not reliable based on what the CPSC

25   is saying for the purpose -- it is reliable for screening, to

1    find out if there is any in the home, but not for the purpose of

2    selective identification and removal.

3            Similarly, there is nothing in the peer-reviewed

4    literature that says one can use this instrument to measure

5    strontium.   There is a standard that the EPA has that says you

6    can use this instrument to measure strontium in dirt, in soil, if

7    you're cleaning up a toxic waste site, nothing about using it in

8    the home to find strontium in wallboard.

9            So there's nothing in the literature.   There's

10   nothing in the data from the CPSC.  And when Dr. Perricone

11   presented his own data, which we were able to cross-examine him

12   on in his deposition, he admitted, in his own data set,

13   25 percent of the time he got it wrong, false negatives.  And

14   we've cited the deposition pages in our brief.  Perricone 164,

15   lines 5 through 16; Perricone 187, line 20 through Perricone 189,

16   line 12.

17           And when we got his reliance material, we found

18   more false negatives that weren't in his report.  And we asked

19   him at his deposition, doesn't this show that your own data shows

20   that 25 to 36 percent of the time, your people got it wrong.  And

21   now whether it's Mr. Morse's people or Dr. Perricone's people,

22   we're not sure, but the data, we are sure, is referenced in the

23   Perricone report, and he was cross-examined on it.

24           So those would be the potential areas to find

25   indicia of reliability, peer-reviewed literature, some government

1    endorsement of this use, or Dr. Perricone's own data, all flunk

2    the *Daubert* test of reliability.

3                    Turning quickly, Your Honor, to the color grading

4    scale.  The scale that's not written down.  Once again, point No.

5    1 on page 6, no major builder is using it to decide how to

6    identify Chinese drywall and remove it.  There is no

7    peer-reviewed published literature that recognized that this

8    scale can be used for this purpose.

9                    None of the governmental entities that have looked

10   at Chinese drywall, the CPSC, Sandia National Labs, the EPA, are

11   saying for the purpose of identifying individual boards and

12   removal that this tool can be used.  Although, they readily say

13   the tool has potential as a screening device.

14                   And, finally, there is no published known error

15   rate of either of these tools.  But the error rate in

16   Dr. Perricone's own data was 25 to 36 percent for XRF, and

17   greater if you look at the CPSC data.

18                   We also looked at Dr. Perricone's scoring system.

19   When the scientist or the electrician pulls the wires out of the

20   wall, he or she is supposed to give it a score of one, two, three

21   or four.  One is the least tarnished and four is the most.

22                   And we looked at Dr. Perricone's data.  Some of

23   this is actually attached to the Goad report.  You have to chase

24   it through the appendices.  And in one room that had uniform

25   Chinese drywall, only Knauf in the ceiling, and uniform drywall

1   on the four walls, only domestic.  In that room, there were four

2   scores that were given for tarnish on four different receptacles,

3   and they covered the gamut.  There was a one; there was a 2;

4   there was a 3; and there was a 4.  Elsewhere in the same house,

5   on a single wall that was Knauf, known Chinese drywall, there was

6   a score of one, the least tarnished.

7          So if we're going to rely on the color scale, we're

8   going to make mistakes.  I can't tell you today the rate of

9   mistakes because we have to keep trying to analyze this data.

10  But clearly, in one room, if every -- with uniform drywall if we

11  use every score, it's going to be hard to figure out what to do

12  in that room.

13         Unless, of course, as Mr. Morse said, when in

14  doubt, rip it out.  That's what he finally said in his

15  deposition.  And that, Your Honor, brings us to the practical

16  consideration.  Not the scientific, but the practical.  And that

17  is, when we visited with Beazer and Lennar and toured their

18  remediations and asked them, can you selectively find the drywall

19  and take it out?  They said "no" for two reasons.

20         One, we can't do it; and, two, it's not worth it.

21  When you start cutting up the walls, some kind of surgery to

22  figure out which board is this, what about the board that goes

23  around the corner; what about the slice that you cut out under

24  the kitchen cabinet; what about the boards behind the cabinet

25  that we can't even access?

1    There is no practical way, according to Beazer and

2 Lennar, in our field visit -- and this is documented in the SGH

3 report at page 93 to 101, the notes from this field visit -- no

4 practical way to actually carry out this task of identifying the

5 Chinese drywall boards and removing it.  But more important to

6 the *Daubert* motion, there's no scientific tool, not the color

7 scale, not the XRF, not the combination, which has ever been

8 shown to work.

9    Finally, Dr. Perricone said that these two tools

10 are correlated.  And the science committee on the PSC said, if

11 they're correlated, there's got to be statistical evidence.

12 Certainly, Dr. Perricone is not using the word "correlated"

13 loosely to say, I eyeballed it and they go together.  And we

14 asked him at his deposition, did you do a statistical correlation

15 to show agreement between the color scale and the field use of

16 the XRF, and he said no.

17    So eyeballing -- when the stakes are this high,

18 spending tens if not hundreds of thousands of dollars to remove

19 Chinese drywall doesn't meet the *Daubert* requirement and doesn't

20 fit the facts of this case.

21    Thank you, Your Honor.

22    **THE COURT:**  Thanks.

23    **MR. HAYDEN:**  Again, Your Honor, Don Hayden on behalf of

24 KPT.

25    I will focus on the XRT methodology and technology.

1    First, let's make some things clear, and I think we already did

2    on the front end.  Mr -- or Dr. Perricone provides a wealth of

3    opinions here.  The focus, for whatever reason, by the PSC has

4    been on the use of XRF as a -- one of the tools that we are using

5    in our survey of these homes.

6              His opinions with regard to months and months of

7    testing, in both the test homes in the field and in his

8    laboratories, have not been raised with regard to *Daubert*.  It is

9    only related to the use of XRF as a device in the field to

10   determine a distinction between domestic drywall and Chinese

11   drywall.

12             And, again, Dr. Perricone is just one of the two

13   witnesses who would be testifying about how we would use the XRF.

14   The other being Mr. Morse, who was also deposed.  And they had an

15   opportunity to ask him about the survey and how the XRF device

16   would be used in the survey.

17             We believe that rather than looking to Lennar,

18   Beazer homebuilders, who may have a different bias or prejudice,

19   may be far along in their remediation programs, and certainly are

20   not scientists, and their hearsay decisions on whether or not

21   it's cost efficient to do certain things are not appropriate for

22   determining reasonable reliability or whether there is scientific

23   basis for our use of the XRF machine today.

24             We believe that the XRF machine, contrary to what

25   Mr. Lewis -- opposing counsel indicated, is supported by the

1   preliminary reports of the CPSC, the EPA and the Florida

2   Department of Health.  Unlike the PSC's experts, Dr. Perricone

3   has visited 20 to 30 homes.  He's been involved in the

4   implementation of the ECS.  And he has been using, and is

5   trained, in the use of the XRF device for inspection and

6   identification purposes.

7                Of all the opinions that Dr. Perricone has offered,

8   we're just going to look at XRF.  XRF is an important tool.  It's

9   not one that we created.  The XRF device is one that has been

10  used in the past.  It was used in the lead paint investigation.

11  It's been used, as opposing counsel mentioned, by the EPA.

12               In fact, Your Honor, the EPA last year -- and if I

13  could provide the Court with -- if I could approach the bench,

14  Your Honor?

15          **THE COURT:**  Yes.  Thank you.

16          **MR. HAYDEN:**  Here is an example of where the XRF device

17  was actually used as a device to identify, not just any metal,

18  but actually strontium in a different setting in 2007 by the EPA.

19               No one suggests that the XRF device is the

20  exclusive device that we would use in helping to identify what

21  board needs to be removed in a Chinese drywall-impacted home.

22               We should look also to the CPSC's most recent

23  guidance as of yesterday.  CPSC and HUD provided some guidance on

24  identifying Chinese drywall in an impacted home.  And, again,

25  strontium is identified as a good marker for identifying Chinese

1  drywall.

2          I think that this motion may come from a

3  misunderstanding of how the XRF device is going to be used, as we

4  are suggesting, in our partial board removal.  It's not that

5  we're suggesting that the gun is going to go in and we're going

6  to point it at every piece of board.  But it is only going to be

7  used after the visual inspection has been made at the receptacles

8  and switches.

9          The visual inspection, which has been part of the

10 determination of whether or not we have Chinese drywall from the

11 very beginning, early on the Florida Department of Health looked

12 at visual inspection.  And that is a big part of how we are

13 determining whether or not Chinese drywall is in that particular

14 part of the home.  You look to the receptacles and switches and

15 determine whether or not there is signs of tarnishing or

16 corrosion at those -- at those points.

17         It's only then when there are no visual signs or

18 evidence of impact that you would use the XRF device, and only in

19 a home where there is a marked variation between the scores for

20 domestic drywall versus Chinese drywall in that home.  If there

21 isn't a significant variance between the domestic drywall and the

22 Chinese drywall found in that home, then we would not be using

23 the XRF device.

24         Even plaintiffs' own experts rely on the use of the

25 XRF technique as an appropriate screening tool, and I reference

1    the Rutila and Nelson report at 81.  Plaintiffs also admit that

2    there are mixed homes present where localized repair is

3    sufficient.  We've talked about the wine cellar.  I believe the

4    Baldwin home is another one of the seven homes.  And I believe

5    there's a third home where there was Chinese and domestic board

6    dispersed throughout the homes.

7                We've laid out a multi-step survey protocol for

8    classifying drywall within a home, including the visual

9    inspection of the wires at the receptacles and switches to

10   determine impact.  And then tool inspection, only if the visual

11   inspection shows no observation of tarnishing, the XRF device

12   would be used.

13               Perricone testified with regard to that.  Morse

14   testified with regard to the method of surveying the house.  In

15   fact, there was not a detailed questioning of Morse.  Although,

16   Mr. Morse is the one who, with the assistance of Dr. Sproles from

17   CTEH, is developing the survey that we would use for determining

18   what board should be removed from the home.

19               And I'd ask that the Court look at first the

20   affidavit of Matthew Perricone.

21               I'm not good at that, Your Honor.

22               This is essentially right out of Dr. Perricone's

23   affidavit.  And in both his deposition and report and Mr. Morse's

24   testimony, there's a reference to the inspection that was

25   conducted by Dr. Robert Sproles.  We'll see an affidavit of

 1   Dr. Sproles as to the concerns that they have with regard to the

 2   numbering system for -- of one through four, and how that same

 3   numbering system, or something comparable to that, was used by

 4   the CPSC and Florida Department of Health.  So it's not something

 5   that is unique or unusual.  But it is followed by the numbering

 6   systems that are being used by the government agencies looking at

 7   this same issue.

 8           He looks to the CPSC report and indicates that one

 9   of the threshold requirements recognized by the CPSC in their

10   interim guidance for identification of houses with corrosion from

11   problems with drywall is the identification of tarnish in the

12   wiring and outlets and switches.  That's our first step in the

13   protocol that would be undertaken.

14           What Dr. Perricone says is the XRF is capable of

15   detecting very low levels of strontium in wallboard.  Once again,

16   it's a screening method.  He's trained.  He goes on how he is

17   trained, how he has used it in chamber studies conducted on the

18   Virginia homes.

19           And this whole idea of false negatives, Your Honor,

20   with regard to the Virginia homes, there were no false negatives.

21   There was a one-to-one correlation between what was found in the

22   chamber studies and what was found by the XRF machine in the

23   homes.

24           He goes on to discuss that XRF is used in a number

25   of applications with lead paint, children's toys, steel coatings,

1    and it certainly can be used here.

2            At 17, Your Honor, it indicates how the XRF

3    technology has been used by the CPSC, and states specifically

4    used a 1,200 parts per million strontium level, which was the

5    level that was used by Dr. Perricone when he was evaluating

6    Virginia homes.  And that was -- that comes out of the interim

7    report, as I suggested, that just came out yesterday.

8            And he goes on to indicate what was done here.  And

9    it indicates that the data he submitted to the Court demonstrated

10   100 percent accuracy with the ability to distinguish between the

11   Virginia homes capable of tarnishing copper from the drywall that

12   would not tarnish copper, contrary to the statements that are

13   being made by counsel for the plaintiff.

14           Counsel for the plaintiff is referencing specific

15   data points rather than looking at how we intend to use the XRF,

16   which would be first going into the home, identifying the levels

17   of strontium that will be found by the domestic board, finding

18   the levels of strontium that will be found by the Chinese drywall

19   in that home.  If there is a significant variance, then we could

20   use it as a screening tool, but a screening tool only after the

21   visual observation.

22           For purposes of assisting the Court, what we would

23   do is we would walk into a room, we would open up a receptacle

24   and switch on a wall.  If we found tarnishing, then that wall

25   would have to be removed.  If we did not find tarnishing, it

1 would be then that we would defer to the XRF machine to determine

2 if there was -- whether that wall contained Chinese drywall or

3 not.

4           And if that wall contained one board of Chinese

5 drywall, it may very well be for cost-benefit purposes that we

6 take out the whole wall rather than patching, which would be

7 labor intensive.  But it is an effective tool.  And it's an

8 effective tool that's going to make it more cost-efficient in

9 these Virginia homes, and in the thousands of homes that this --

10 that are at issue before this Court.  So the Court has to look

11 carefully at the XRF.

12           Once again, the "false negative" discussion,

13 it's a red herring.  It's a much ado about nothing.

14           I think that one other thing I'd like to point

15 to -- or two other things I'd like to point to.  First, I

16 believe --

17           Do you have Robert Sprole's affidavit?

18           Quickly, Your Honor, because I know we want to get

19 through these hearings, in response to their criticism of

20 Mr. Perricone and the use of XRF, we tried to -- and also the

21 criticism of the, as they called it, subjective marking of the

22 receptacles and switches for tarnishing or corrosion, he

23 references the Florida Department of Health.

24           He also goes on to discuss the -- from the very

25 beginning, how the -- I apologize -- the Florida Department of

1    Health in its case definition has indicated that one of the first

2    steps is looking at the receptacles and switches, seeing

3    blackening, and that is the first step in determining whether

4    they have Chinese drywall.

5              Then he goes on to talk about the CPSC and how the

6    CPSC uses similar marking.  Theirs was a three-point scale.  Ours

7    is a four-point scale.  One in our scale means no corrosion; two

8    means slight; three means moderate; four means severe.  If there

9    is slight corrosion, that would indicate to us that there was

10   Chinese drywall and that wall likely would have to be removed.

11             He goes on to indicate that he based the

12   methodology and protocol that he put in place on the methodology

13   that was employed by the CPSC, and the markings that he uses for

14   the tarnishing are comparable to those used by the CPSC.

15             And that he has prepared an inspection manual that

16   would be used by the individual who would be doing that to have

17   examples of what slight, moderate, and severe would be, or what

18   no tarnishing would be.  Something that would be developed.

19   Certainly, we wouldn't be putting people out in the field who

20   were untrained.  Similar to what was being done when we had

21   Crawford out doing threshold inspections.

22             Finally, Your Honor, the Florida Department of

23   Health case definition -- early on, the Florida Department of

24   Health was one of the first government agencies to get involved,

25   and they gave it a case definition for drywall associated

1  corrosion in residences.

2         And it gives the supporting indicia of drywall

3  associated with corrosion.  And one of the factors to look at is

4  observed analysis of drywall in homes where they found strontium

5  levels that exceeded 2,000 parts per million, and then they cite

6  to peer-reviewed articles at the end of their case definition,

7  which we're happy to provide to the Court, that were from the

8  symposium.  And we will provide the Court with the Florida

9  Department of Health's case definition for the record.

10        The levels that Dr. Perricone used were actually

11  much lower.  They were 1,200 parts per million strontium levels

12  in the Virginia home, and actually there were no false negatives

13  with regard to the testing with XRF in Virginia homes.

14        For that reason, I believe that the Motion to

15  Exclude the opinions with regard to XRF and its use as a workable

16  and viable tool in the partial board removal that we're

17  suggesting is appropriate.

18        **MR. LEWIS:**  Your Honor, might I be heard on rebuttal.

19        **THE COURT:**  Yes, let's make it brief.  We'll take a

20  10-minute break after this and come back and do the rest after.

21        **MR. LEWIS:**  Your Honor, to briefly address the -- what

22  Florida Department of Health and what the CPSC have said about

23  these two tools, they have been very careful, and very precise

24  about the appropriate use of these tools.  And I think the lines

25  are being blurred today in the argument, and I think we need to

1   go back to the source and look at the careful words that the CPSC

2   and the Department of Health in Florida used.

3           On the XRF, Counsel quoted from category 2 a

4   probable case.  And I agree that a screening tool, and the CPSC

5   and Department of Health in Florida have said can be used for

6   that purpose.  But category 3, a confirmatory case, when it comes

7   to deciding a particular board has to be taken out of the wall,

8   they drop the entire use of XRF.  It's not even one of the three

9   possibilities to use a field XRF to identify Chinese drywall in

10  the home for purposes of removal.

11          Similarly, Your Honor, the report from the CPSC

12  that came out yesterday that counsel referred to talks about the

13  use of XRF to detect strontium, Judge, quote, "Excluding the

14  exterior paper," and I've circled that in red, Your Honor.  To

15  exclude the exterior paper, one has to rip off the paper on the

16  drywall.  And that's what scientists do in the laboratory.  They

17  get a piece of drywall, they rip off the paper, they grind up the

18  gypsum and evaluate it.

19          The reason they do that, Your Honor, and the reason

20  that the CPSC has identified this high rate of false negatives is

21  because the paper, and the glue, and the spackle, and the seams

22  interfere with the ability of the XRF to work in the field.  So

23  when scientists go back to the lab, they strip away all those

24  confounders.  They strip the paper.

25          They get rid of the glue.  They make sure they're

1   not on a seam that has tape on it, and then they get an accurate

2   reading.  Only in the laboratory.  So the idea that we're going

3   to take drywall out of the home, cut it out of the home, take it

4   to a lab, and analyze it so we can make a decision about leaving

5   the drywall in the home or not, it defies common sense.  And

6   that's why Florida and the CPSC have never said, and there is not

7   a word in the record, that it can be used for anything but a

8   screening tool.

9        And the purpose for which the Knauf experts are

10  saying it needs to be used is not screening.  We're past

11  screening.  We're past knowing if the home has Chinese drywall.

12  Now we have to make a decision, board by board, room by room, in

13  or out?  And there is no methodology to do that, and none has

14  been set forth in this record.

15       Your Honor, Counsel said that they're developing a

16  protocol.  It's too late to develop a protocol.  This Court has

17  asked for us to present evidence now so decisions can be made for

18  real people in real homes, not ongoing scientific experiments.

19       And, finally, Your Honor, on the false negative

20  data, which has been documented in Florida by the CPSC, which has

21  been documented in Dr. Perricone's own data for Florida, with his

22  same instrument, now Dr. Perricone apparently is going to argue

23  that, when I used that same instrument in Virginia, it worked,

24  but it didn't work in Florida.

25       And that is a legitimate conclusion based on those

1   samples that he chose to present in his report.  But we now have

2   his reliance data.  We have the samples that he didn't report.

3   And at trial, we will show the same false negative problem that

4   Dr. Perricone had in Florida in Virginia.  The same false

5   negative problem the CPSC had in Virginia, Florida, and

6   Louisiana, we will show in these seven homes.

7           Thank you, Your Honor.

8           **THE COURT:**  Okay.  Thank you very much.  We'll stop here

9   and come back in ten minutes.  The Court will stand in recess.

10          **THE DEPUTY CLERK:**  Everyone rise.

11  (WHEREUPON, the Court took a recess.)

12          **THE DEPUTY CLERK:**  Everyone rise.

13          **THE COURT:**  Be seated, please.  We now move to -- let's

14  see -- the other motions.  We're on the defendants' objections.

15  We're dealing with Dean Rutila.  As I understand, this witness is

16  a civil engineer, and he's senior project manager.

17          The defendant says the witness is not qualified to

18  give an opinion, that the witness relies too much on others, and

19  that the opinion lacks sufficient facts and data, and the

20  opinions are duplicative.

21          The plaintiffs rebutted that argument by saying

22  that the witness is qualified; but if he's not qualified, it goes

23  to the weight and not to the *Daubert* issue.  They say the factual

24  basis or lack thereof goes to the weight and is not fodder for

25  *Daubert*.  They find -- they say the same thing for the opinion

1    lacking facts and data, but they say that it is not duplicative.

2    I'll hear from the parties.

3           **MR. SANDERS:**  Your Honor, Doug Sanders again on behalf

4    of KPT.

5              We challenge, and I guess I heard the deposition

6    that it's not like Atilla the Hun, which is no reference.  But

7    it's the only thing I can do to remember it's Rutila, according

8    to the evidence.  It's the only way I can actually remember it

9    myself.

10             We challenged Mr. Rutila on three counts.  One, he

11   does not have the expertise to testify about many of the opinions

12   that are included in his report.  Two, his compilation report

13   essentially is duplicative of the other experts which plaintiffs

14   intend to and have indicated that they're going to call.  And,

15   three, many of his experts in particular with respect to

16   corrosion, future risk and the mechanisms of corrosion are well

17   beyond his field again and also don't have sufficient bases.

18             On the first, the Seventh Circuit noted a case *Dura*

19   *Auto Systems v. CTS Corp.*, 285 F.3d 609 at 614, that the *Daubert*

20   test must be applied with due regard for the specialization of

21   modern science.  The scientist, however well credentialed he may

22   be, is not permitted to be the mouthpiece of a scientist in a

23   different specialty.  This would not be responsible science.

24             That's the thrust essentially of our first

25   argument.  Mr. Rutila is a building scientist.  He is an

1    engineer -- a structural engineer, but he is not a chemical

2    engineer.  He is not a metallurgist.  He's not a material

3    scientist.  And the majority of his report, and in his

4    deposition, he not only says, I rely on these people's opinions

5    and I have -- this is my opinion, they essentially dovetail in

6    the sense that he is reporting that items are corroded.  That

7    there is a future risk of harm; that there will be failures; that

8    you can't measure a corrosion mechanism by using this, you can do

9    it that way.  And that's his third report essentially.

10        **THE COURT:**  I had the impression that this individual

11   was the person who was looking at the big picture, and there were

12   other individuals looking at the specific aspects of the picture,

13   and he was trying to put them all together and show the big

14   picture.  Is that accurate?

15        **MR. SANDERS:**  I think he may be showing the big picture,

16   Your Honor, and putting them all together.  He was the project

17   coordinator, my understanding, and he also made observations.

18            But in putting that picture together, allowing him

19   to testify about the opinions that he's laid out in his summary

20   about the things that we are challenging here, that corrosion is

21   occurring, that the corrosion rate occurs in relative humidity at

22   higher rates or lower rates simply is outside of his scope of

23   field.

24            And would not permit us, for example, on cross to

25   really effectively be able to get at the bases of those opinions

1   or challenge them.  Because at some point, he's going to have to

2   defer to Dr. Scully, or Mrs. Streit, or one of the other,

3   Dr. Galler -- or Mr. Galler, one of the other people who are in

4   there.

5            **THE COURT:**  Didn't you do that with Roger Morse?  He

6   referred to Dr. Perricone and vice versa?

7            **MR. SANDERS:**  Roger Morse refers to those reports, but

8   he refers to something like the science behind why the ECS works

9   and then uses that under his own skill set to measure how a

10  building responds to humidity to offer a separate opinion

11  different from the opinion that the underlying scientists offer.

12  And that's why we think it's separate.

13            If you go through Mr. Rutila's report and you take

14  out essentially the pages that are based on the opinions of other

15  people, there's 14 through 40 which are based on Ronald Wright,

16  who's going to be an expert here.  There is based also on Lori

17  Streit, based on Mauro Scali, who's another person underneath

18  him, and Paul Scheiner, another person underneath him, and remove

19  those.

20            Similarly, pages 43 through 60, contain the

21  opinions of Dr. Scully, Barnett, Galler, and Bellemare, relating

22  to electrical wiring, corrosion and failures, something that's

23  not in his subject matter.  Similarly, pages 62 through 65

24  include the opinions of Kranz, who's been withdrawn, and Streit

25  again; pages 63 through 73 involve testing on HVAC coils and SVM

1    and those are the opinion of Bellemare, someone who is a material

2    scientist but who's not been disclosed as a testifying expert,

3    and it's beyond the expertise of Mr. Rutila.

4            And, finally, pages 77 to 104, which he ceded

5    essentially to Mr. Nelson, who works on the repair plans.

6    Really, all you have are some observations about building

7    materials, which is within his domain, and then conclusory

8    opinions, his executive summary, which essentially is wrapping up

9    but repeating all of those other people.  And for those grounds,

10   it's our primary reason on why we think he should be stricken.

11           With respect to some of the specific opinions he

12   gives on corrosion data, in particular on future risks, there's a

13   lot of consistent opinions that, by looking at the corrosion and

14   identifying the fact of corrosion, the fact that there is a

15   chemical reaction of copper sulfide over something else on the

16   copper wire, that that means necessarily that those wires will be

17   damaged and that they will fail.

18           Mr. Rutila in his deposition admitted that copper

19   oxide, for example, is corrosion, and also said that generally

20   does not cause failure.  Although, in electrical switches, it can

21   as well.

22           There's a distinguishing point and there has to be

23   either person who can opine or have the skill set to opine that.

24   And beyond that, there has to be some standards and methods that

25   are applied, other than looking at the wires and saying there's

1   corrosion and opining that at some point in the future there will

2   be corrosion.

3          Mr. Rutila cannot identify when, he cannot identify

4   specifically what standards or what he was referring to, other

5   than the combined opinions of the people that corrosion would

6   necessarily happen.  And for those reasons, we think that the

7   opinion does not have the proper bases that it needs to have and

8   would not be reliable under *Daubert*.

9          **THE COURT:**  Thank you.

10         What do you plan as the role of Rutila?

11         **MR. LEWIS:**  Your Honor, Mr. Meunier passed me a note and

12   told me to tell the judge that Mr. Rutila will not offer

13   duplicative opinions and he will not offer any opinions that are

14   not his own.

15         In the real world, Dean Rutila is a person, he's an

16   engineer, and a 400-person firm in Boston that fixes buildings,

17   fixes museums, fixes buildings, fixes homes.

18         When he does that, he puts together a team of

19   people at his firm, and I would think he should be applauded for

20   making sure on the question of corrosion that he had a Ph.D.

21   corrosion scientist on his team; and on the question of

22   chemistry, that he had a chemist on his team.  It doesn't mean

23   that he's not qualified to understand the kinds of decisions that

24   he makes in the real world every day on how to fix the building.

25         And to make those decisions in an informed way, he

1    needs information from those disciplines, which he can

2    understand.  But he went one step further and brought those

3    people together to get their information.  He sat with them in

4    the lab when they did the observation of the corrosion.  We're

5    not talking about predicting corrosion.  The corrosion is there.

6              He observed it, he photographed it, and, yes, he

7    does comment that Dr. Scully, at the University of Virginia, a

8    world class corrosion expert, knows more than him, and he's

9    right.  And we're not going to ask Rutila to give the ins and

10   outs of corrosion when Dr. Scully is here and he's a world class

11   expert.

12             So to make the informed decisions about how to fix

13   the building, he needs to know all of these disciplines, and he

14   will not be the primary witness on corrosion.  But his opinion

15   about how to fix the building is informed by the fact that the

16   HVACs are corroded and failing, that the wires are corroded and

17   pitted.  He has to rely on that information.  He understands it,

18   he's qualified to address it, but he won't be the primary person

19   to put it on, and he won't be the first witness.  He'll come

20   after others to say how this all relates to the repair that has

21   to be done.

22             His methodology, Your Honor, and that of his team,

23   is identical -- identical -- to what Sandia Labs did.  They went

24   into the homes in Virginia, they harvested the corroded

25   components, they took them back to the lab, they measured them,

1   they observed pitting, which is damage, they observed cracking,

2   which is damage, and they commented that the standards for

3   corrosion thickness were exceeded.  Based on the real, live

4   samples that he took out of the home, not coupons.

5            That methodology is affirmed by Sandia and the

6   CPSC, and also by textbooks.  Exhibits 2 and 3 to our Rutila

7   response attach the Perkins textbook and the ASM textbook which

8   say that the best material to evaluate is the real world failed

9   metal, not the coupons.

10           Counsel for Knauf is correct, there is a

11  methodology for looking at coupons.  It's been used primarily in

12  the workplace.  We think that they're extrapolating too far from

13  only workplace data to this case.  But none of that refutes the

14  idea what the best thing to look at, as made clear by Perkins and

15  made clear by Dr. Scully at length in his deposition, is the

16  items that have failed in the real world.  And that's how he's

17  conducted his research at the University of Virginia, and when he

18  himself was doing research for the Navy on corrosion problems.

19           So to conclude, then, on Dean Rutila, he is

20  qualified as an engineer and a person that has been fixing

21  buildings as the supervisor of a team of specialists.  The case

22  law is clear that when you have a multidisciplinary problem, you

23  need to put together a multidisciplinary team under *Daubert*, and

24  we've set that forward in our brief.

25           And his comments about corrosion and failure are

1   based fundamentally on the corrosion that exists today, the

2   damage and cracking that he observed, that he photographed using

3   electron microscopy, and that others, Dr. Scully and Kranz have

4   also photographed.

5           And, yes, we will ask Dr. Scully to address this in

6   the first instance; and Dean Rutila will only comment on it as it

7   relates to the repairs that need to be done to restore these

8   homes to their original condition.

9           If there are no other questions, Your Honor, that's

10  all I have.  Thank you.

11      **THE COURT:**  Okay.  Any rebuttal?

12      **MR. SANDERS:**  Just two minutes to clarify, Your Honor.

13  I think what I'm hearing is that he will only testify to his

14  observations and current corrosion, but I don't want to misquote

15  or misstate what the PSC has said.

16          The problem we have with Mr. Rutila is that his

17  techniques and this idea that you can rely on a multidisciplinary

18  procedure has really been done mostly in the medical context with

19  doctors and this has a much more divergent area of different

20  kinds of disciplines.

21          And he's a building scientist who when asked at

22  deposition about his -- the executive summary of the opinions,

23  and the opinions here, and who the "our" is and who the "with a

24  reasonable degree of scientific certainty" is, he said it was him

25  and Mr. Nelson who were going to give opinions, like the ones on

1  page 5, that the current corrosion and future corrosion absent a

2  remediation creates an increased risk of fire or electrical shock

3  within the homes.

4          And our point is that those types of opinions are

5  not within his discipline, are well beyond, and he should not be

6  able to give them.

7          **THE COURT:**  Okay.  All right.

8          Let me go to Scully, J.R. Scully, is the next one.

9  The parties seem to agree that this witness is, quote, well

10 educated, well respected and qualified corrosion expert.  The

11 defendant, however, objects to the portion of his testimony

12 regarding future risks, either based on measurements or evidence

13 of capillary corrosion, as being unreliable and improper, and his

14 opinion in this regard, they say, departs from recognized

15 standards and methods without a sufficient basis.

16         The plaintiffs rebut, taking the position that

17 neither argument raises *Daubert* issues.  It goes to the weight of

18 the opinion, and not methodology.  They say the methodology is

19 identical to the methodology used in the Sandia National

20 Laboratories, the U.S. government standard.

21         I'll hear from the parties.

22         **MR. SANDERS:**  Doug Sanders on behalf of KPT again.

23         Your Honor, you're correct, Dr. Scully is a

24 corrosion expert and a Ph.D., and on that regard we're not

25 challenging his credentials to discuss things and talk about

1    them.

2            What we're specifically challenging is his use of,

3    again, predicting future risks based on review of a handful of

4    samples from a number of particular homes, in this case, only

5    Virginia homes.  And to say that the level of corrosion on this

6    wire, in this one location, means that all wires are going to

7    fail or have a future risk of failure.

8            He relied on his report explicitly on several

9    standards, the ISA standard that I had put up on the board

10   before, which I'm not going to do again.  Another standard, IEC

11   654; another standard, ISO 11844; and then again, a publication

12   by Bill Abbott, who is recognized as an expert, which describes

13   how you go about measuring and monitoring corrosive environments.

14           And all of those standards and that Bill Abbott

15   article refer to and, in the standard sense, require the use of

16   copper reactivity coupons or at least some sort of metal coupon.

17   Again, as we went into before, the bases for that and the reason

18   that they do that and they're set up that way is because use of

19   those coupons in that context, as measured against the actual

20   numbers and the film thickness, what they do is they measure the

21   thickness of the corrosion layer that builds up, is tied to

22   experiences and failure data behind those standards.

23           And that gives you the level of confidence that the

24   data is reliable and can be relied on by this Court in the

25   *Daubert* standard.  It's replicable.  The plaintiffs could do the

1  exact same thing with copper coupons in Taishan homes.

2           And as the standard points out, and as Mr. Abbott

3  points out, the complexities, and Dr. Scully agrees with the need

4  to put coupons in certain locations so you're adequately

5  monitoring what you're monitoring, the complexity of the

6  different factors, the humidity, the concentration, the

7  variation -- or potential variations over time.

8           That's why you use this method.  It's a method not

9  so much of corrosion as it really is of the corrosive environment

10  over a specific period of time.  The standard says 30 days.

11  There are other time periods you can use to convert.  And it

12  measures the environment.

13           And that's why one wire sitting in a wall for three

14  years isn't the same.  Because it's not done with the method that

15  is expressly provided in those standards to say, this is what

16  happens over 30 days and this is what this standard says is

17  supported by the actual data.

18           And what Dr. Scully does, and some of the other

19  experts likely, is they look at this and they say the Sandia Labs

20  looked at a wire as well and said it was probably this kind of

21  corrosive environment.  I know that's what the Sandia Lab report

22  says, and you'll look at it.

23           But I don't think they are saying, and they have

24  not indicated, that there was a future risk of failure, which is

25  what we were talking about in the context of the ECS.  They

1  identify a corrosive environment.  And looking at a wire and

2  saying it's corroded is fine, but extrapolating that to future

3  risks is not, especially when you've deviated so far from the

4  standards, despite his 20 years in the field -- 30 years in the

5  field, and his opinion that he can do that.

6      **THE COURT:**  How does this play out?  You look at a wire,

7  and you don't see any evidence of corrosion, but he feels that

8  there's some capillary problem, and therefore in the future,

9  there is going to be evidence of corrosion?  Is that what

10  you're --

11      **MR. SANDERS:**  There are two different issues.  One is

12  the -- and actually by looking at a wire, I should have been more

13  specific.  It's actually using one of the enumerated tests to

14  measure the thickness, or a comparable test, of the corrosion

15  layer in a very, very tiny amount, angstroms, which is less than

16  nanometers, they're that small, and comparing that to the

17  standards in the table.

18      The second opinion that he talks about, this

19  capillary corrosion, is more related to an opinion that there is

20  a potential because of dust and other things to cause long-term

21  corrosion in low humidity environments as opposed to high

22  humidity environments.

23      And our point, on that side, is that in the wires

24  and all the evidence that he has, he says, there is no evidence

25  that we've really seen, and he didn't present any evidence, that

1   this was actually happening.  It's a possibility, and we're not

2   here to talk about possibilities.  We're talking about what's

3   actually based in the materials that he's seen.

4           And moreover, he did qualify his opinion a little

5   bit, maybe it's limited there, that he would anticipate that this

6   would happen in cold -- cold environments, like copper pipes and

7   HVAC systems.

8           But the two are separate.  One is trying to deviate

9   from the standard, trying to deviate from a method that is well

10  established, accepted throughout the industry and documented by

11  many international standards boards and use a different component

12  to measure it with.

13          The second one is opining about something that may

14  happen without any underlying data to support that opinion.

15          **THE COURT:**  Okay.

16          **MR. SANDERS:**  Thank you, Your Honor.

17          **MR. LEWIS:**  Thank you, Your Honor.  As to Dr. Scully,

18  and his use of the standards, the two texts I cited earlier,

19  Exhibits 2 and 3 to the Rutila response made clear that the best

20  material to look at is the actual failed item.  And when Sandia

21  looked at that material, they measured those thicknesses and came

22  to conclusions about the coercivity of the environment.  That's

23  exactly what Scully did.  Exactly the same thing as Sandia

24  National Labs did.

25          Further, he testified that the intent of the

1   standard is to use a surrogate when the real thing is not

2   available.  Here's a professor, 30 years in the field, head of

3   international corrosion science organizations, testifying at

4   length that this is an appropriate use of the standard.

5            The only thing to oppose that in this record is

6   argument from counsel.  The only thing.  There is no evidence

7   from another colleague, for example, who sits on the same boards

8   with Dr. Scully; or from Abbott, who Scully has personal

9   correspondence with, and he's cited it in his report, that this

10   would been an inappropriate use of this standard.

11            And the standard itself is called corrosion -- it's

12   called atmospheric corrosion of electronic equipment.  It's not

13   called corrosion of coupons.  Surrogates are used when the real

14   thing is not available.

15            I know this is a Daubert hearing and we're supposed

16   to be scientific, but I think there's an element of common sense

17   to this, and Dr. Scully explained it at length in his deposition

18   and it's cited in our response.

19            His opinions about risk are based fundamentally on

20   the current, present documented levels of corrosion.  Exhibit 11

21   to our motion against the Perricone opinion cites a chart from

22   the corrosion testing lab with 20 samples of pits and thicknesses

23   greater than ten microns -- greater than five microns.  I

24   apologize.  This is an enormous level of corrosion.  Enormous.

25            And if one -- if one applies that the way Sandia

1  did, one determines it's an unacceptable level.  It's a highly

2  corrosive environment.  That's what Dr. Scully has done.  He does

3  say that there is a risk of future corrosion, particularly on the

4  wires that are already corroded.  There's already copper sulfide

5  there.  There's already pits.  There's an irregular surface.  He

6  says the irregular surface is a major risk factor for future

7  corrosion.

8      **THE COURT:**  Even if the drywall is removed?

9      **MR. LEWIS:**  That question was not asked to him.  But he

10  did say that if the source of the sulfur emissions disappears,

11  there's still a possibility, if the corroded material is left

12  there, of future corrosion.  He did testify to that, and he did

13  say that in his second report, January 18.

14          Furthermore, his testimony about capillary

15  condensation is being mischaracterized.  What he said is that he

16  was concerned when you have cold copper that's wet -- and he's

17  not using the word "wet" the way you and I are, he's talking

18  about a micro environment of droplets that can come from dust or

19  dirt that's on a surface.

20          And what he said is when you have that environment,

21  that could be a real problem, because of the condensation of that

22  water.  Even though it's not the kind of water you and I see

23  every day on the kitchen sink.  He's able to measure it.  He's

24  able to describe it.  He's able to cite literature that documents

25  this phenomenon.

1          And all he's saying is that it can contribute to

2   corrosion on cold, wet surfaces, such as HVAC coils, which

3   everybody in this case agrees are being destroyed by these

4   gasses, hardly a controversial opinion, and also cold water

5   pipes, copper pipes.

6          Dr. Perricone disagrees, says, I don't think those

7   cold water pipes are vulnerable to capillary condensation.

8   That's his opinion.  He's not an expert in corrosion.  But he's a

9   Ph.D. person at a responsible firm and he can give that opinion.

10          Scully, who is an expert in corrosion, can document

11   the phenomenon of capillary condensation in the literature and

12   explain it when asked at his deposition how it would participate,

13   not by itself, but one additional factor and a particular

14   surface, a cold, wet surface.

15          There is really not a *Daubert* question there.

16   There's two experts that disagree.  One cites the literature and

17   has 30 years of experience, one does.  The one with the

18   experience and the literature on that point is Dr. Scully.

19          Finally, Your Honor, the only time Dr. Scully said

20   that he didn't go out and look at the real-world failure, when he

21   had a choice, is when he was assigned to work on the Challenger

22   disaster.  Because there wasn't any material to look at because

23   it disintegrated in entering the earth's atmosphere.

24          So they set up an environment and used coupons to

25   try and predict, or extrapolate, whether corrosion was a factor.

1   Scully clearly testified, and the texts show, that when you can

2   go out and analyze the real pitting on a real surface, that's the

3   preferred method.  There's no *Daubert* issue to criticize him for

4   that.

5            Thank you, Your Honor.

6        **THE COURT:**  Any rebuttal on that one?

7        **MR. SANDERS:**  On the first point, Your Honor, the

8   standards say what they do, and they require certain methods, and

9   that method is the use of copper reactivity coupons.  Dr. Scully

10  can read intent into those standards.  The words with are what

11  they are.

12           At one point Dr. Scully said, well, it doesn't

13  forbid you from looking at direct equipment.  But it wouldn't

14  have been much of a standard if you didn't take the standard for

15  what it was.  And it's not just the ISA standard, it's several

16  other standards that do the exact same thing.

17           And he hasn't provided any testing data or any

18  other reason as to how you can extrapolate the levels that are

19  measured under that standard with the copper coupon to the wires

20  and other equipment that he's analyzed.

21       **THE COURT:**  Doesn't he talk about the pitting?  I

22  remember him testifying as to that.

23       **MR. SANDERS:**  The pitting is a different -- is a

24  localized corrosion issue and a different issue.  And the

25  question is if he can opine about the pitting and say there's an

1    issue there.

2            But with respect to looking at the wires and the

3    level of thickness of tarnishing in general and saying that meets

4    a Class 1 environment and that meets a Class 3 environment and

5    it's going to be highly corrosive or not, it's going to have

6    implications in the future or not, that's what we're talking

7    about.

8            Thank you, Your Honor.

9       **THE COURT:**  All right.  Thanks.  And, finally, we're on

10   Donald Galler.  Am I pronouncing that name right, Galler?  Okay.

11   This witness is an electrical engineer who focuses his practice

12   on the analysis of electrical and system failures.  He examines

13   samples of the electrical devices taken from the seven homes at

14   issue.  His opinion after the examination was that the copper

15   wiring and contacts were attacked by airborne sulfur vapors which

16   he believes caused the corrosion.

17           The defendants seek to exclude portions of his

18   testimony on the basis that he lacks knowledge in those fields

19   and that he lacks data to support his conclusions.  The plaintiff

20   rebuts their arguments by saying the witness is highly qualified

21   and that the defendants' attack goes to the weight rather than

22   the methodology.

23           I'll hear from the parties.

24       **MR. HAYDEN:**  Thank you, Your Honor.  Again, good

25   afternoon.  Don Hayden on behalf of KPT.

1    Given that it is Friday afternoon, I'll try -- and

2 we have talked a lot about *Daubert* and the reliability and issues

3 that come into play, I'll try to focus really what we're looking

4 at with Mr. Galler.

5    **THE COURT:**  Well, we reserved Saturday, too, if you

6 wanted to go forward.

7    **MR. HAYDEN:**  Hopefully, we won't have to go into

8 Saturday.  We have other things to do, mostly having to do with

9 this case, or other cases.

10    But Mr. Galler, as you said, is an electrical

11 engineer.  He does have experience.  We're not testing him on

12 those areas.  Really, the concern that we have here is the

13 limited involvement that Mr. Galler had, and the limits of his

14 investigation, and what he can testify to based upon what his

15 investigation involved.

16    He was contacted on, I believe, December 13 by

17 Mr. Rutila -- however we determined his pronunciation, whatever

18 it may be -- on the 13th; and on the 14th, he arrived at the

19 offices of SGH with Mr. Rutila, was able to preselect four

20 samples that he took back to his lab and examined under his

21 microscopy equipment that he had in his lab, which essentially

22 allows us to look at surfaces of the various samples at very high

23 microscopic views so that we can see the clusters and with the

24 silver -- with the silver sulfides you'll see a -- more of a

25 sharper edge, and with the copper sulfides, you'd see the

1    clusters.

2            So he performed the SEM and EDS analysis of those

3    four samples that included a standard AC receptacle, thermostat,

4    a toggle switch, and a contact for a HVAC system.  Nothing more.

5            And with regard to his opinions with regard to

6    those particular samples, I don't think that we have a problem

7    with those opinions.  But during the course of the deposition and

8    in what appeared to be background opinions that are referenced in

9    the report, he appears to go beyond those samples and provide

10   opinions with regard to the overall failure of other devices that

11   came from these homes.

12           He speaks about opinions with regard to electrical

13   wiring; although, he never examined any electrical wiring that

14   came from those homes.  He never examined any of the insulated

15   wire that came from those homes.  But offers opinions with regard

16   to whether there would be failure in the future.

17           He provides opinions with regard to the possibility

18   of failure of circuit breakers in the homes; although, he never

19   examined a circuit breaker.  He never did any field work.  He

20   never did any electrical inspection in the homes.  And his

21   analysis has to do with four devices, four unique devices that

22   came from, actually only two of the seven homes.

23           And, Your Honor, we would argue that while counsel

24   will show you that Mr. Galler was an author of a handbook by

25   McGraw Hill, certain chapters of that handbook that is nice and

1   thick, that does not in and of itself constitute a sufficient

2   basis for allowing him to extrapolate.

3            I think the Court, in your *Vioxx* decision with

4   regard to excluding certain expert opinions, went into great

5   detail that while an expert might be fully qualified, that does

6   not allow him to extrapolate and speculate.

7            And in this regard, Your Honor, we believe that

8   Mr. Galler goes beyond what his investigation involved.  He

9   extrapolates and offers opinions on all electrical wiring, on

10  devices that are unique to the devices that he investigated.  And

11  we believe that any of that type of opinion should be barred and

12  excluded in this case.

13           **THE COURT:**  Your opponents take the position that some

14  of the issues that you raise may well be valid, but that they can

15  be taken up under cross-examination and not dealt with in a

16  *Daubert* fashion.  How do you deal with that?

17           **MR. HAYDEN:**  Well, Your Honor, you're in a unique

18  position that you are both the gatekeeper and the trier of fact

19  in a bench trial.  But I think that you have to look at the issue

20  as the gatekeeper and is there a threshold for him to make a

21  determination, does he have sufficient basis to extrapolate from

22  four devices out to electrical wiring which he's never seen, or

23  to devices, like circuit breakers, which he has never examined,

24  in an area -- although, he has extensive experiences in product

25  failure, he would admit, and did admit in his deposition, he had

1   no experiences with the corrosion as a result of sulfur or other

2   corrosive gasses in a home environment.

3              So his experiences in that regard are limited, and

4   I think his investigation of four samples is not enough.

5              Thank you, Your Honor.

6        **THE COURT:**  Thank you.

7        **MR. LEWIS:**  Your Honor, I'll try and be brief here.  The

8   *Kumho* decision from the Supreme Court is relevant here, and I

9   quote from it:  "Experts of all kinds tie observations to

10  conclusions through the use of what Judge Learned Hand called

11  general truths derived from specialized experience."

12             Mr. Galler has specialized experience at

13  Massachusetts Institute of Technology, where he works in the

14  laboratory and evaluates corrosion, particularly on silver.  I

15  would agree with counsel that his opinions on copper wire are

16  probably redundant.  Because Dr. Scully and Rutila's labs both

17  documented the copper wire corrosion extensively, along with

18  reliance on the Kranz data.

19             But on silver, this is the only expert in the case

20  that has experience.  Scully's got the training.  But this man

21  has the experience of 20 years looking at silver contacts.  And

22  silver contacts occur on switches and in consumer electronic

23  products in the home.

24             And when he looked at those switches, he saw what

25  he called 200-micron thicknesses of corrosion on the silver

1    contacts.  That's off the chart.  There is no standard that even

2    contemplates that.  He described whiskers, a kind of irregular

3    formation.  And he concluded, I've never seen corrosion like this

4    in my experience.  It's that bad.

5         And counsel said in his deposition, so what?  Where

6    does that lead you?  It leads me, he said, to tell you that these

7    products are not going to lead their life as was planned, the

8    life span of this product.  These things are going to fail.  And

9    he bases that on his experience that he has never seen material

10   that's corroded this badly.

11        He also understands from reading the Sandia report,

12   which is a predicate to everything in this case, that these

13   items, it's not a fluke, it's not an anecdote.  They come out of

14   category 3, category 4, severely corrosive environments.  It's

15   not an extrapolation to realize the corrosion occurs in a

16   severely corrosive environment.

17        So his opinions at trial are primarily about

18   silver.  He will document the damage that exists today and talk

19   about the impact of that damage on the life of the vast array of

20   silver products in the home.  He will also talk about how the

21   silver is less dependent on humidity.  So the ECS fix or Band-Aid

22   won't respond to that.

23        And he will base that on his 20 years of

24   experience, his familiarity with the literature that he cited in

25   his report.  And I think for all of those reasons, there may be

1  some weight to cross-examine him on, but there's not a *Daubert*

2  issue that's been raised.

3  **THE COURT:**  They take issue with the data.  They say

4  it's insufficient.  He examined five elements from the seven

5  houses, and they argue that the samples that he examined, he may

6  be able to opine on those, but to extrapolate that every other

7  one is damaged, they feel is improper.

8  How do you deal with that?

9  **MR. LEWIS:**  Yes, Your Honor.  I think that every expert

10  in this case, the idea that somebody can walk into a home and

11  look at every wire in the home -- I'm guessing there are

12  thousands.  I don't even know -- no investigator has done

13  anything like that, including Sandia Labs.

14  The four samples that he looked at had 25 to 35

15  silver contacts, and it's those silver contacts that he's

16  commenting on.  And he's bolstering his opinion, and this is for

17  *Daubert*, he's got observation, he's got experience, he's got

18  literature, he's got the Sandia finding of the corrosive

19  environment.

20  All of this put together is overwhelming evidence

21  that these environments are harming silver.  And in any other

22  home environment, also classified as corrosive, one is likely to

23  see the same impacts.  No expert has looked at all of the wires

24  in all of the homes.

25  Thank you, Your Honor.

1          **THE COURT:**  Thank you very much.

2          **MR. HAYDEN:**  Real quick, Your Honor.  Very quick.

3          **THE COURT:**  Sure.

4          **MR. HAYDEN:**  With regard to the samples, other than he

5     believes he may -- it may have been that the thermostat failed.

6     He had no evidence from his investigation of the thermostat that

7     there was -- it showed actual failure there.  All he is doing is

8     raising some -- based on some speculation that these devices will

9     fail in the future sometime.

10          But he's unable to indicate that they have failed

11    to date; and if the source is removed, that they will fail in the

12    future if there is no longer the source which has caused the

13    coercivity, especially with the silver parts.  And he did admit

14    that with regard to corrosion rates, that the silver corrodes at

15    a much lower rate than the copper, which is the more reactive

16    metal for corrosion purposes.

17          **THE COURT:**  You see, I think those are valid issues.

18    The thing that concerns me is that I don't know whether it's a

19    *Daubert* issue or cross-examination issue.  I think it's valid

20    points that you raise, and to some extent goes to credibility,

21    and also goes to the validity of his opinions.  But I'm not quite

22    sure it focuses on the *Daubert* issues.

23          **MR. HAYDEN:**  As I said at the beginning, Your Honor, we

24    have no problem with his opinions with regard to those samples;

25    but when he extrapolates, that's where we're concerned, and I

1    think the *Daubert* comes into play.

2              Thank you.

3         **THE COURT:**  Thank you.  Any other motions that we have

4    to deal with?

5              I have it.  I've read the material that you've

6    given to me and the depositions, and so I'll be ready to rule on

7    this shortly.  I understand the issues and I'll be putting out an

8    opinion.  I should do something in writing for you.

9         **MR. MEUNIER:**  Thank you, Your Honor.  We will deliver,

10   for the record, the reports and depositions.

11        **THE COURT:**  That's fine.  I appreciate the briefs.  They

12   were well done.  The material that you gave me was very helpful

13   to me in understanding these issues.

14             Thank you.  The Court will stand in recess.

15        **THE DEPUTY CLERK:**  Everyone rise.

16             (WHEREUPON, at 5:03 p.m., the proceedings were

17   concluded.)

18                        *    *    *

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

     I, Cathy Pepper, Certified Realtime Reporter, Registered
Merit Reporter, Registered Professional Reporter, Certified Court
Reporter of the State of Louisiana, Official Court Reporter for
the United States District Court, Eastern District of Louisiana,
do hereby certify that the foregoing is a true and correct
transcript, to the best of my ability and understanding, from the
record of the proceedings in the above-entitled and numbered
matter.


                         *s/Cathy Pepper*_____

                         Cathy Pepper, CRR, RMR, CCR

                         Official Court Reporter

                         United States District Court

# #

**#09-6687** [1] - 1:9

# '

**'70s** [1] - 23:13

# 0

**07102** [1] - 2:8

# 1

**1** [3] - 41:6, 61:5, 93:4
**1,000** [1] - 47:2
**1,200** [6] - 59:2, 59:6, 59:11, 59:13, 69:4, 72:11
**1,837** [1] - 47:8
**1,841** [1] - 47:7
**10** [1] - 4:6
**10-minute** [1] - 72:20
**100** [2] - 4:25, 69:10
**101** [1] - 63:3
**104** [1] - 79:4
**105** [1] - 57:12
**107** [1] - 57:6
**108** [3] - 57:12, 57:16, 57:18
**11** [1] - 89:20
**1100** [2] - 2:4, 2:19
**1111** [1] - 2:12
**11844** [1] - 85:11
**12** [2] - 24:2, 60:16
**13** [1] - 94:16
**130** [1] - 2:16
**13th** [1] - 94:18
**14** [2] - 46:22, 78:15
**14th** [1] - 94:18
**15** [1] - 6:23
**16** [1] - 60:15
**164** [1] - 60:14
**17** [1] - 69:2
**1700** [2] - 1:17, 2:12
**18** [2] - 7:16, 90:13
**187** [1] - 60:15
**189** [1] - 60:15
**19** [4] - 8:17, 11:25, 13:16, 21:1
**1993** [1] - 16:5

# 2

**2** [6] - 41:6, 48:20, 62:3, 73:3, 82:6,

88:19
**2,000** [1] - 72:5
**2,179** [1] - 47:6
**20** [7] - 7:19, 60:15, 65:3, 87:4, 89:22, 97:21, 98:23
**200-micron** [1] - 97:25
**20006** [1] - 1:18
**2007** [1] - 65:18
**2009** [3] - 6:23, 7:11, 7:12
**2010** [5] - 1:6, 5:2, 7:16, 7:19, 8:14
**2047** [2] - 1:5, 5:23
**20th** [1] - 8:17
**21** [1] - 4:7
**22** [1] - 8:18
**225,000** [1] - 35:23
**23** [1] - 7:12
**23510** [1] - 1:21
**24** [1] - 15:3
**25** [5] - 28:6, 60:13, 60:20, 61:16, 99:14
**26th** [1] - 26:14
**2800** [2] - 2:4, 2:4
**285** [1] - 76:19
**29** [3] - 1:6, 5:2, 8:14
**2:00** [1] - 1:6

# 3

**3** [11] - 34:19, 47:3, 48:21, 58:11, 62:4, 73:6, 82:6, 88:19, 93:4, 98:14
**30** [7] - 32:19, 65:3, 86:10, 86:16, 87:4, 89:2, 91:17
**30-day** [2] - 42:1, 46:22
**31** [1] - 4:8
**3120** [1] - 1:20
**33131** [1] - 2:13
**35** [1] - 99:14
**36** [3] - 4:9, 60:20, 61:16
**365** [1] - 15:3
**36TH** [1] - 2:18

# 4

**4** [3] - 25:9, 62:4, 98:14
**40** [2] - 19:1, 78:15
**400** [1] - 58:11
**400-person** [1] - 80:16
**43** [1] - 78:20
**4355** [1] - 47:6

**4370** [1] - 47:7
**4396** [1] - 47:7
**45** [1] - 19:1
**46** [1] - 4:10
**48** [1] - 4:11

# 5

**5** [5] - 25:9, 29:11, 40:11, 60:15, 84:1
**50** [5] - 4:12, 24:21, 27:12, 27:13, 27:25
**500** [1] - 3:22
**504** [1] - 3:23
**51-home** [1] - 57:12
**52** [1] - 4:13
**550** [1] - 2:8
**56** [2] - 27:8, 27:16
**57** [2] - 27:8, 27:16
**580** [1] - 1:21
**589-7779** [1] - 3:23
**5:03** [1] - 101:16

# 6

**6** [4] - 22:9, 24:3, 56:16, 61:5
**60** [2] - 24:21, 78:20
**60601** [1] - 2:16
**609** [1] - 76:19
**614** [1] - 76:19
**62** [1] - 78:23
**63** [2] - 4:14, 78:25
**65** [1] - 78:23
**650** [1] - 1:17
**654** [1] - 85:11

# 7

**7** [1] - 22:9
**70** [1] - 19:1
**70113** [1] - 1:25
**70130** [1] - 3:23
**70163** [2] - 2:5, 2:19
**702** [2] - 12:10, 13:10
**703** [1] - 31:11
**71.04** [1] - 40:16
**72** [1] - 4:15
**73** [1] - 78:25
**75** [1] - 4:16
**76** [2] - 4:17, 23:15
**77** [1] - 79:4

# 8

**8** [5] - 23:15, 27:6, 27:8, 27:16, 27:25

**80** [1] - 4:18
**81** [1] - 67:1
**820** [1] - 1:24
**83** [1] - 4:19
**84** [1] - 4:20
**88** [1] - 4:21
**8th** [1] - 7:11

# 9

**9** [1] - 4:5
**90** [1] - 54:18
**92** [1] - 4:22
**920** [1] - 2:8
**93** [2] - 4:23, 63:3
**939** [3] - 48:23, 49:4, 49:8
**97** [1] - 4:24

# A

**Abbott** [6] - 45:1, 45:5, 85:12, 85:14, 86:2, 89:8
**Abbott's** [1] - 27:6
**ability** [3] - 69:10, 73:22, 102:8
**able** [13] - 29:13, 29:15, 29:19, 39:22, 52:17, 60:11, 77:25, 84:6, 90:23, 90:24, 94:19, 99:6
**above-entitled** [1] - 102:9
**absent** [1] - 84:1
**absolutely** [1] - 46:16
**AC** [3] - 17:2, 18:24, 95:3
**acceptable** [5] - 12:17, 21:23, 21:24, 28:2, 38:2
**acceptance** [2] - 12:18, 56:22
**accepted** [3] - 25:23, 31:9, 88:10
**access** [1] - 62:25
**according** [4] - 27:24, 51:17, 63:1, 76:7
**Accordingly** [1] - 6:13
**accuracy** [1] - 69:10
**accurate** [2] - 74:1, 77:14
**acknowledgments** [1] - 17:23, 17:24
**action** [1] - 7:5
**actual** [7] - 38:18, 38:22, 38:25, 85:19, 86:17, 88:20, 100:7

**ADAM** [1] - 3:9
**add** [1] - 53:21
**addition** [1] - 21:25
**additional** [1] - 91:13
**address** [7] - 36:11, 36:13, 39:15, 40:22, 72:21, 81:18, 83:5
**adequate** [2] - 29:9, 29:12
**adequately** [1] - 86:4
**admissibility** [1] - 44:15
**admission** [2] - 20:4, 20:6
**admissions** [1] - 20:10
**admit** [4] - 67:1, 96:25, 100:13
**admits** [1] - 25:24
**admitted** [3] - 38:9, 60:12, 79:18
**admittedly** [2] - 20:8, 38:5
**ado** [1] - 70:13
**advance** [1] - 8:15
**advice** [1] - 37:11
**advocacy** [1] - 16:12
**advocated** [1] - 56:20
**affected** [1] - 12:7
**affidavit** [6] - 30:1, 55:22, 67:20, 67:23, 67:25, 70:17
**affidavits** [1] - 55:21
**affirmed** [1] - 82:5
**afflictions** [1] - 6:12
**aftermath** [1] - 6:1
**afternoon** [5] - 5:8, 31:17, 31:19, 93:25, 94:1
**agencies** [2] - 68:6, 71:24
**ago** [4] - 6:23, 19:17, 29:16, 30:13
**agree** [4] - 22:1, 73:4, 84:9, 97:15
**agreed** [1] - 50:1
**agreement** [4] - 22:2, 49:21, 50:5, 63:15
**agrees** [6] - 21:23, 22:24, 23:1, 57:23, 86:3, 91:3
**Aid** [1] - 98:21
**air** [12] - 9:20, 14:23, 22:22, 22:24, 23:2, 27:11, 27:17, 33:3, 38:12, 38:14, 38:16, 54:10
**airborne** [1] - 93:15
**allegations** [2] - 11:16, 11:17

**allege** [2] - 11:7, 11:10
**allow** [3] - 16:10, 46:2, 96:6
**allowed** [1] - 35:19
**allowing** [3] - 50:22, 77:18, 96:2
**allows** [2] - 14:20, 94:22
**alone** [1] - 27:22
**ALSO** [1] - 2:22
**alternative** [5] - 13:19, 32:8, 33:25, 34:13, 35:25
**alternatives** [4] - 32:4, 32:9, 33:23, 33:24
**amended** [1] - 11:7
**amendments** [1] - 58:18
**amount** [2] - 14:25, 87:15
**amounts** [1] - 14:25
**analogous** [1] - 33:9
**analysis** [7] - 37:22, 72:4, 93:12, 95:2, 95:21
**analyst** [1] - 50:20
**analyze** [5] - 46:23, 49:7, 62:9, 74:4, 92:2
**analyzed** [1] - 92:20
**AND** [1] - 2:3
**anecdote** [1] - 98:13
**angstroms** [5] - 47:2, 47:6, 47:7, 47:8, 87:15
**answer** [4] - 7:15, 12:7, 52:24, 52:25
**answering** [1] - 7:14
**anticipate** [1] - 88:5
**apologize** [2] - 70:25, 89:24
**appearance** [1] - 5:9
**APPEARANCES** [3] - 1:14, 2:1, 3:1
**appeared** [1] - 95:8
**appearing** [1] - 10:23
**appendices** [2] - 28:7, 46:10, 61:24
**Appendix** [2] - 46:20, 46:24
**applauded** [1] - 80:19
**appliances** [2] - 6:10, 43:19
**application** [5] - 12:8, 13:3, 20:13, 21:2
**applications** [1] - 68:25
**applied** [4] - 13:12, 13:23, 76:20, 79:25
**applies** [2] - 31:11,

89:25
**apply** [2] - 15:20, 29:9
**appreciate** [1] - 101:11
**approach** [5] - 22:12, 22:13, 32:6, 50:12, 65:13
**approached** [1] - 16:4
**appropriate** [10] - 7:24, 35:7, 43:9, 43:22, 51:22, 64:21, 66:25, 72:17, 72:24, 89:4
**approved** [1] - 14:4
**architect** [2] - 9:17, 37:4
**area** [3] - 53:2, 83:19, 96:24
**areas** [3] - 9:3, 60:24, 94:12
**argue** [2] - 74:22, 95:23, 99:5
**arguing** [1] - 15:16
**ARGUMENT** [1] - 1:11
**argument** [10] - 15:19, 27:15, 42:10, 43:8, 55:11, 72:25, 75:21, 76:25, 84:17, 89:6
**arguments** [2] - 24:14, 93:20
**arm** [1] - 22:6
**array** [2] - 21:15, 98:19
**arrived** [1] - 94:18
**article** [2] - 18:11, 85:15
**articles** [3] - 41:17, 44:25, 72:6
**aside** [1] - 45:22
**ASM** [1] - 82:7
**aspect** [1] - 42:10
**aspects** [1] - 77:12
**assessing** [1] - 40:14
**assigned** [1] - 91:21
**assistance** [1] - 67:16
**assisting** [1] - 69:22
**associated** [2] - 71:25, 72:3
**astute** [1] - 16:16
**Atilla** [1] - 76:6
**atmosphere** [2] - 23:18, 91:23
**atmospheres** [1] - 27:7
**atmospheric** [2] - 23:16, 89:12
**attach** [1] - 82:7
**attached** [3] - 30:2, 46:8, 61:23
**attack** [1] - 93:21

**attacked** [2] - 19:6, 93:15
**attempting** [1] - 32:2
**attention** [1] - 12:22
**attic** [1] - 54:11
**AUCOIN** [1] - 3:19
**August** [1] - 39:23
**author** [1] - 95:24
**authority** [1] - 14:4
**Auto** [1] - 76:19
**available** [6] - 14:3, 31:5, 38:14, 57:10, 89:2, 89:14
**AVENUE** [2] - 1:24, 2:12
**average** [2] - 35:22, 35:23
**avoids** [1] - 34:10
**aware** [2] - 39:8, 50:16
**axis** [1] - 59:1

# B

**B'HAM** [1] - 3:11
**B406** [1] - 3:22
**backed** [1] - 38:24
**background** [1] - 95:8
**BACKMAN** [1] - 2:22
**bad** [1] - 98:4
**badly** [1] - 98:10
**Bailey** [4] - 29:13, 29:19, 30:2, 30:6
**Bailey's** [1] - 47:13
**BAKER** [2] - 2:10, 2:14
**Baldwin** [3] - 35:17, 54:9, 67:4
**Band** [1] - 98:21
**Band-Aid** [1] - 98:21
**Barnett** [1] - 78:21
**barred** [1] - 96:11
**BARRIOS** [1] - 3:18
**base** [1] - 98:23
**based** [23] - 34:14, 37:16, 37:21, 38:4, 40:12, 41:5, 48:4, 51:5, 59:24, 71:11, 74:25, 78:14, 78:15, 78:16, 78:17, 83:1, 84:12, 85:3, 88:3, 89:19, 94:14, 100:8
**Based** [2] - 37:23, 82:3
**bases** [5] - 76:17, 77:25, 80:7, 85:17, 98:9
**basic** [3] - 14:16, 24:23, 25:2
**basis** [12] - 19:3, 29:9,

31:1, 51:3, 51:11, 53:19, 64:23, 75:24, 84:15, 93:18, 96:2, 96:21
**bathrooms** [1] - 29:3
**Battelle** [2] - 23:11, 23:12
**BAUMANN** [1] - 2:23
**Beazer** [3] - 62:17, 63:1, 64:18
**becomes** [2] - 13:22, 22:3
**bedroom** [1] - 47:6
**BEFORE** [1] - 1:12
**began** [5] - 6:7, 6:11, 6:13, 16:1, 18:9
**begin** [2] - 5:22, 35:5
**beginning** [4] - 29:22, 66:11, 70:25, 100:23
**behalf** [11] - 5:13, 5:14, 5:15, 7:5, 16:7, 31:18, 36:8, 63:23, 76:3, 84:22, 93:25
**behaviors** [1] - 28:13
**behind** [10] - 10:7, 10:18, 36:18, 39:4, 52:17, 55:4, 56:18, 62:24, 78:8, 85:22
**beholder** [1] - 51:6
**belabor** [1] - 44:23
**believes** [2] - 93:16, 100:5
**Bellemare** [2] - 78:21, 79:1
**belong** [1] - 17:18
**below** [1] - 59:11
**bench** [2] - 65:13, 96:19
**benefit** [1] - 70:5
**BENJAMIN** [1] - 2:2
**best** [9] - 25:15, 32:5, 42:17, 45:2, 45:4, 82:8, 82:14, 88:19, 102:8
**better** [3] - 17:12, 20:2, 20:23
**between** [13] - 16:17, 16:19, 17:10, 21:19, 28:16, 58:6, 58:10, 63:15, 64:10, 66:19, 66:21, 68:21, 69:10
**beyond** [10] - 23:2, 26:5, 50:6, 54:11, 76:17, 79:3, 79:24, 84:5, 95:9, 96:8
**bias** [1] - 64:18
**big** [6] - 50:15, 50:17, 66:12, 77:11, 77:13, 77:15
**biggest** [1] - 36:24

**Bill** [2] - 85:12, 85:14
**bill** [1] - 15:10
**billion** [1] - 32:22
**bills** [1] - 19:4
**binding** [1] - 16:24
**bit** [6] - 35:3, 37:2, 38:23, 41:24, 50:7, 88:5
**black** [1] - 55:8
**blackening** [2] - 6:9, 71:3
**Blackmun** [3] - 16:7, 16:16, 20:15
**bleed** [1] - 43:23
**blow** [1] - 58:24
**blurred** [1] - 72:25
**blurry** [1] - 45:11
**board** [19] - 33:16, 33:25, 43:3, 58:3, 58:11, 62:22, 65:21, 66:4, 66:6, 67:5, 67:18, 69:17, 70:4, 72:16, 73:7, 74:12, 85:9
**boards** [9] - 52:17, 54:3, 55:8, 58:11, 61:11, 62:24, 63:5, 88:11, 89:7
**bogus** [1] - 16:10
**bolstering** [1] - 99:16
**Borescope** [1] - 56:10
**Boston** [1] - 80:16
**Bottom** [1] - 47:9
**bought** [2] - 27:21, 53:3
**box** [2] - 59:13, 59:16
**break** [1] - 72:20
**breaker** [1] - 95:19
**breakers** [2] - 95:18, 96:23
**breaking** [1] - 6:10
**breaks** [1] - 20:9
**BRIAN** [1] - 3:5
**BRICKELL** [1] - 2:12
**brief** [12] - 10:25, 25:10, 41:24, 47:24, 54:15, 55:21, 56:8, 58:18, 60:14, 72:19, 82:24, 97:7
**briefing** [1] - 19:19
**briefly** [5] - 5:24, 21:12, 25:8, 56:16, 72:21
**briefs** [5] - 9:8, 10:20, 17:23, 49:13, 101:11
**bring** [5] - 11:17, 12:22, 17:17, 38:1, 55:10
**bringing** [1] - 36:2
**brings** [3] - 19:7, 28:4,

62:15
**broad** [2] - 12:8, 12:24
**BROAD** [1] - 2:8
**broken** [1] - 11:9
**brokers** [1] - 6:16
**brought** [4] - 6:4, 7:5, 26:6, 81:2
**BROWN** [1] - 3:6
**BRYSON** [1] - 3:12
**BUFFINGTON** [1] - 3:11
**BUFFINGTON-B'**
 **HAM** [1] - 3:11
**build** [2] - 48:6, 48:7
**builder** [6] - 9:23, 25:13, 25:16, 25:21, 56:19, 61:5
**builders** [2] - 6:15, 25:15
**building** [10] - 6:2, 37:5, 43:4, 76:25, 78:10, 79:6, 80:24, 81:13, 81:15, 83:21
**buildings** [3] - 80:16, 80:17, 82:21
**builds** [1] - 85:21
**built** [4] - 34:4, 53:20, 53:23, 54:2
**bullet** [2] - 25:9, 28:4
**business** [1] - 7:10
**BY** [10] - 1:16, 1:20, 1:23, 2:3, 2:7, 2:11, 2:15, 2:18, 3:24, 3:25

---

**C**

**cabinet** [2] - 62:24
**calculation** [1] - 47:19
**CALLED** [1] - 5:4
**cannot** [12] - 14:15, 15:13, 20:11, 20:12, 20:20, 25:22, 57:18, 57:21, 80:3
**capable** [2] - 68:14, 69:11
**capillary** [6] - 84:13, 87:8, 87:19, 90:14, 91:7, 91:11
**CAPPS** [1] - 3:15
**careful** [2] - 72:23, 73:1
**carefully** [3] - 27:16, 57:4, 70:11
**CAROL** [1] - 3:6
**Carrier** [1] - 38:12
**carry** [1] - 63:4
**case** [37] - 11:25, 13:13, 13:24, 14:6,

14:8, 15:20, 15:23, 15:25, 16:22, 18:9, 20:21, 21:13, 26:4, 28:6, 30:23, 34:8, 50:8, 58:1, 63:20, 71:1, 71:23, 71:25, 72:6, 72:9, 73:4, 73:6, 76:18, 82:13, 82:21, 85:4, 91:3, 94:9, 96:12, 97:19, 98:12, 99:10
**cases** [6] - 6:20, 6:24, 7:2, 8:23, 8:24, 94:9
**categories** [1] - 23:19
**category** [4] - 73:3, 73:6, 98:14
**CATHERINE** [1] - 3:7
**CATHY** [1] - 3:22
**Cathy** [2] - 102:3, 102:14
**caused** [4] - 6:12, 11:11, 93:16, 100:12
**causes** [1] - 42:23
**causing** [1] - 34:20
**cavities** [1] - 45:17
**CCR** [2] - 3:22, 102:14
**ceded** [1] - 79:4
**ceiling** [1] - 61:25
**cellar** [2] - 35:15, 67:3
**CENTER** [2] - 1:20, 2:1
**center** [1] - 45:14
**CENTRE** [2] - 2:4, 2:18
**certain** [8] - 9:3, 31:24, 31:25, 64:21, 86:4, 92:8, 95:25, 96:4
**certainly** [5] - 24:24, 32:25, 33:11, 64:19, 69:1
**Certainly** [3] - 32:22, 63:12, 71:19
**certainty** [2] - 20:10, 83:24
**CERTIFICATE** [1] - 102:1
**Certified** [2] - 102:3, 102:4
**certify** [1] - 102:7
**cetera** [2] - 12:18, 16:12
**challenge** [10] - 21:3, 36:11, 36:25, 37:2, 41:16, 45:21, 45:23, 52:11, 76:5, 78:1
**challenged** [2] - 36:13, 76:10
**Challenger** [1] - 91:21
**challenges** [1] - 27:14

**challenging** [7] - 41:25, 48:2, 52:13, 52:15, 77:20, 84:25, 85:2
**chamber** [2] - 68:17, 68:22
**chance** [3] - 9:9, 48:7, 48:8
**change** [1] - 47:19
**changing** [1] - 56:5
**chapters** [1] - 95:25
**characterize** [1] - 23:20
**charged** [1] - 39:7
**chart** [4] - 49:1, 58:23, 89:21, 98:1
**chase** [3] - 46:9, 47:25, 61:23
**cheese** [1] - 37:8
**chemical** [3] - 22:20, 77:1, 79:15
**chemist** [1] - 80:22
**chemistry** [1] - 80:22
**CHICAGO** [1] - 2:16
**child** [1] - 14:5
**children's** [2] - 29:3, 68:25
**China** [2] - 6:3, 7:11
**CHINESE** [1] - 1:5
**Chinese** [67] - 5:23, 6:7, 6:17, 6:24, 7:7, 7:9, 7:25, 11:21, 12:6, 13:17, 13:21, 15:15, 20:5, 21:21, 22:8, 23:10, 26:23, 29:22, 29:23, 30:9, 32:6, 34:16, 34:17, 35:11, 35:14, 35:18, 41:17, 49:10, 50:21, 50:24, 51:2, 51:9, 52:12, 53:24, 54:2, 57:3, 57:17, 58:1, 58:3, 58:9, 58:11, 59:7, 59:21, 61:6, 61:10, 61:25, 62:5, 63:5, 63:19, 64:10, 65:21, 65:24, 65:25, 66:10, 66:13, 66:20, 66:22, 67:5, 69:18, 70:2, 70:4, 71:4, 71:10, 73:9, 74:11
**CHINESE-**
**MANUFACTURED**
 [1] - 1:5
**choice** [1] - 91:21
**choices** [1] - 44:20
**choose** [1] - 43:11
**chose** [1] - 75:1
**chosen** [2] - 11:18, 36:12

**Chris** [1] - 5:18
**CHRIS** [1] - 3:3
**CHRISTOPHER** [1] - 2:7
**CHRISTY** [1] - 3:9
**circled** [1] - 73:14
**Circuit** [1] - 76:18
**circuit** [3] - 95:18, 95:19, 96:23
**circuits** [1] - 54:19
**circulate** [1] - 54:12
**circumstances** [1] - 33:9
**cite** [3] - 47:4, 72:5, 90:24
**cited** [6] - 43:1, 60:14, 88:18, 89:9, 89:18, 98:24
**cites** [2] - 89:21, 91:16
**civil** [1] - 75:16
**CIVIL** [1] - 1:5
**claim** [1] - 20:21
**claimed** [1] - 8:2
**claims** [1] - 34:3
**clarification** [1] - 49:3
**clarify** [3] - 31:21, 49:19, 83:12
**clarity** [1] - 49:11
**class** [3] - 7:5, 81:8, 81:10
**Class** [4] - 34:18, 34:19, 41:6, 93:4
**classified** [1] - 99:22
**classifying** [1] - 67:8
**clean** [1] - 26:6
**cleaning** [2] - 23:24, 60:7
**clear** [11] - 11:24, 32:11, 40:3, 46:7, 55:1, 57:21, 64:1, 82:14, 82:15, 82:22, 88:19
**clearly** [4] - 43:20, 53:15, 62:10, 92:1
**CLERK** [4] - 5:7, 75:10, 75:12, 101:15
**client's** [1] - 44:17
**closed** [3] - 15:3, 19:4, 46:15
**closing** [1] - 16:6
**cloth** [1] - 23:24
**clusters** [2] - 94:23, 95:1
**CO** [1] - 1:9
**co** [3] - 21:4, 31:22, 35:2
**co-counsel** [3] - 21:4, 31:22, 35:2
**Coast** [2] - 6:6
**coastal** [1] - 6:6

**coatings** [1] - 68:25
**coercivity** [5] - 23:18, 38:6, 45:5, 88:22, 100:13
**coils** [3] - 22:25, 78:25, 91:2
**cold** [7] - 88:6, 90:16, 91:2, 91:4, 91:7, 91:14
**colleague** [2] - 12:15, 89:7
**color** [9] - 55:17, 55:22, 56:21, 56:24, 58:8, 61:3, 62:7, 63:6, 63:15
**combination** [2] - 37:20, 63:7
**combined** [1] - 80:5
**comfortable** [1] - 43:17
**coming** [3] - 28:22, 50:9, 59:22
**comment** [3] - 10:25, 81:7, 83:6
**commented** [2] - 31:3, 82:2
**commenting** [1] - 99:16
**comments** [1] - 82:25
**commercially** [1] - 14:3
**Commission** [4] - 22:7, 22:12, 57:4, 57:8
**Committee** [3] - 7:17, 32:2, 32:24
**committee** [1] - 63:10
**common** [6] - 8:3, 30:10, 30:20, 30:21, 74:5, 89:16
**commonality** [1] - 6:19
**commonly** [2] - 14:3, 38:14
**Commonwealth** [1] - 7:6
**communicate** [1] - 50:10
**community** [3] - 26:11, 26:12, 26:22
**company** [1] - 55:24
**Company** [2] - 7:8, 11:6
**comparable** [3] - 68:3, 71:14, 87:14
**compared** [4] - 38:21, 42:3, 53:16, 58:24
**comparing** [1] - 87:16
**compilation** [1] - 76:12

complain [8] - 6:8, 6:11, 10:4, 10:14, 42:16, 46:11, 51:3, 51:8
complaining [1] - 44:21
complaint [2] - 11:8, 44:14
complexities [1] - 86:3
complexity [1] - 86:5
component [1] - 88:11
components [12] - 11:9, 22:15, 22:19, 23:3, 23:17, 24:3, 37:6, 37:7, 39:1, 40:6, 45:19, 81:25
compounds [4] - 33:4, 33:10, 34:9, 34:18
comprise [1] - 38:14
compromised [1] - 30:12
COMPUTER [1] - 3:25
computer [1] - 28:21
concede [2] - 10:9, 47:16
conceivably [1] - 24:21
concentration [3] - 27:3, 37:20, 86:6
concept [2] - 55:16, 58:5
concern [1] - 94:12
concerned [4] - 39:16, 39:17, 90:16, 100:25
concerning [2] - 18:8, 51:22
concerns [2] - 68:1, 100:18
conclude [2] - 24:2, 82:19
concluded [3] - 23:7, 98:3, 101:17
conclusion [1] - 74:25
conclusions [5] - 15:17, 57:11, 88:22, 93:19, 97:10
conclusory [1] - 79:7
condemn [1] - 17:25
condensation [4] - 90:15, 90:21, 91:7, 91:11
condition [1] - 83:8
conditioner [2] - 23:2, 54:10
conditioners [3] - 22:22, 38:12, 38:16
conditioning [3] - 9:20, 22:24, 38:14
conditions [3] - 15:14,

39:24, 39:25
conducted [3] - 67:25, 68:17, 82:17
conducting [1] - 51:19
confidence [1] - 85:23
confident [1] - 43:13
confirm [3] - 30:8, 51:23, 58:3
confirmation [1] - 58:10
confirmatory [1] - 73:6
confirmed [1] - 57:25
confounders [1] - 73:24
confronted [1] - 30:19
confusion [1] - 33:14
Conjectures [1] - 16:23
connected [1] - 53:22
CONNER [1] - 3:4
consequences [1] - 16:25
consider [5] - 7:23, 8:16, 13:13, 26:16, 26:17
consideration [1] - 62:16
consist [1] - 49:22
consistent [2] - 58:14, 79:13
consolidated [1] - 6:24
constitute [1] - 96:1
construction [5] - 6:4, 10:16, 27:18, 27:20
consumer [2] - 54:19, 97:22
Consumer [4] - 22:7, 22:11, 57:3, 57:8
contact [1] - 95:4
contacted [1] - 94:16
contacts [7] - 54:20, 93:15, 97:21, 97:22, 98:1, 99:15
contain [1] - 78:20
contained [2] - 70:2, 70:4
containing [1] - 7:7
contains [1] - 57:16
contaminated [2] - 50:22, 51:13
contamination [1] - 14:20
contemplates [1] - 98:2
contend [1] - 51:10
contest [1] - 9:15
contesting [1] - 9:1
context [12] - 11:1,

11:2, 21:12, 24:16, 26:18, 31:10, 35:8, 39:8, 39:9, 83:18, 85:19, 86:25
continual [1] - 19:3
continue [1] - 14:20
CONTINUED [2] - 2:1, 3:1
continues [1] - 18:10
continuing [1] - 16:12
contractors [1] - 38:18
contrary [2] - 64:24, 69:12
contribute [1] - 91:1
control [17] - 9:25, 13:16, 19:2, 27:3, 28:14, 28:16, 28:20, 28:24, 28:25, 29:1, 29:8, 33:23, 34:17, 37:25, 38:7, 42:17, 49:5
controlled [2] - 42:13, 48:11
controlling [6] - 19:5, 24:23, 42:21, 43:25, 44:3, 48:3
controls [2] - 42:15, 42:22
controversial [1] - 91:4
convene [1] - 8:18
conversation [1] - 36:15
convert [1] - 86:11
coordinator [1] - 77:17
Copper [1] - 41:11
copper [27] - 22:25, 30:17, 40:3, 40:23, 41:11, 41:13, 54:13, 54:18, 54:22, 69:11, 69:12, 79:15, 79:16, 79:18, 85:16, 86:1, 88:6, 90:4, 90:16, 91:5, 92:9, 92:19, 93:14, 94:25, 97:15, 97:17, 100:15
corrosive [40] - 9:18, 21:16, 21:21, 23:5, 23:7, 23:11, 23:14, 23:25, 24:5, 24:7, 24:9, 24:19, 24:25, 25:7, 26:1, 26:2, 27:7, 27:10, 27:23, 28:19, 28:23, 29:2, 37:18, 38:19, 40:20, 42:24, 48:3, 54:12, 54:17, 85:13, 86:9, 86:21, 87:1, 90:2, 93:5, 97:2, 98:14, 98:16, 99:18, 99:22
core [1] - 10:18
corner [1] - 62:23
Corp [1] - 76:19
corporation [1] - 7:9
correct [5] - 9:15, 9:16, 82:10, 84:23, 102:7
correlated [3] - 63:10, 63:11, 63:12
correlation [2] - 63:14, 68:21
correspondence [1] -

89:9
corroded [12] - 22:14, 22:19, 54:11, 55:7, 77:6, 81:16, 81:24, 87:2, 90:4, 90:11, 98:10
corrodes [1] - 100:14
corrosion [113] - 6:8, 11:11, 13:20, 22:8, 22:20, 23:16, 23:17, 23:18, 28:25, 30:3, 30:4, 30:5, 30:7, 30:12, 32:18, 32:19, 34:19, 34:20, 37:12, 37:19, 38:2, 38:4, 40:14, 41:3, 41:9, 41:14, 42:7, 43:18, 45:2, 46:13, 46:14, 46:18, 47:11, 47:14, 47:15, 47:21, 48:10, 53:18, 54:17, 54:20, 58:8, 66:16, 68:10, 70:22, 71:7, 71:9, 72:1, 72:3, 76:16, 77:8, 77:20, 77:21, 78:22, 79:12, 79:13, 79:14, 79:19, 80:1, 80:2, 80:5, 80:20, 80:21, 81:4, 81:5, 81:8, 81:10, 81:14, 82:3, 82:18, 82:25, 83:1, 83:14, 84:1, 84:10, 84:13, 84:24, 85:5, 85:21, 86:9, 87:7, 87:9, 87:14, 87:19, 87:21, 89:3, 89:11, 89:12, 89:13, 89:20, 89:22, 89:24, 90:3, 90:7, 90:12, 91:2, 91:8, 91:10, 91:25, 92:24, 93:16, 97:1, 97:14, 97:17, 97:25, 98:3, 98:15, 100:14, 100:16
corrosive [40] - 9:18, 21:16, 21:21, 23:5, 23:7, 23:11, 23:14, 23:25, 24:5, 24:7, 24:9, 24:19, 24:25, 25:7, 26:1, 26:2, 27:7, 27:10, 27:23, 28:19, 28:23, 29:2, 37:18, 38:19, 40:20, 42:24, 48:3, 54:12, 54:17, 85:13, 86:9, 86:21, 87:1, 90:2, 93:5, 97:2, 98:14, 98:16, 99:18, 99:22
cost [9] - 34:6, 35:22, 35:25, 36:3, 59:19,

59:22, 64:21, 70:5, 70:8
cost-benefit [1] - 70:5
cost-effective [1] - 34:6
cost-effectively [1] - 36:3
cost-efficient [2] - 35:25, 70:8
costing [1] - 37:6
COTLAR [1] - 1:23
Counsel [5] - 5:9, 69:14, 73:3, 74:15, 82:10
counsel [14] - 5:16, 10:23, 21:4, 30:21, 31:22, 35:2, 64:25, 65:11, 69:13, 73:12, 89:6, 95:23, 97:15, 98:5
country [2] - 6:5, 6:15
counts [1] - 76:10
couple [1] - 21:9
coupon [6] - 40:23, 41:12, 42:1, 45:7, 85:16, 92:19
coupons [15] - 40:24, 41:11, 46:21, 46:22, 47:10, 82:4, 82:9, 82:11, 85:16, 85:19, 86:1, 86:4, 89:13, 91:24, 92:9
course [5] - 6:17, 8:14, 15:16, 62:13, 95:7
Court [59] - 6:25, 7:4, 7:19, 7:20, 7:22, 8:9, 8:13, 8:18, 8:21, 10:23, 11:17, 12:21, 13:25, 14:23, 15:24, 16:4, 18:9, 18:18, 20:10, 22:1, 26:4, 27:7, 30:20, 31:3, 32:14, 33:20, 34:15, 35:8, 36:4, 46:2, 49:2, 49:12, 49:13, 50:10, 52:6, 55:16, 56:15, 57:11, 57:13, 65:13, 67:19, 69:9, 69:22, 70:10, 72:7, 72:8, 74:16, 75:9, 75:11, 85:24, 96:3, 97:8, 101:14, 102:4, 102:5, 102:6, 102:15, 102:16
court [2] - 5:22, 7:3
COURT [54] - 1:1, 3:22, 5:4, 5:8, 5:22, 9:17, 15:2, 15:16, 21:6, 31:16, 34:22,

36:7, 36:19, 42:8, 43:20, 44:13, 44:22, 45:25, 46:4, 46:11, 48:17, 49:17, 50:11, 50:19, 52:9, 53:1, 53:11, 54:6, 55:3, 63:22, 65:15, 72:19, 75:8, 75:13, 77:10, 78:5, 80:9, 83:11, 84:7, 87:6, 88:15, 90:8, 92:6, 92:21, 93:9, 94:5, 96:13, 97:6, 99:3, 100:1, 100:3, 100:17, 101:3, 101:11
**courtroom** [11] - 16:6, 16:15, 16:20, 16:21, 17:7, 17:18, 17:19, 18:14, 20:12, 49:25, 50:4
**courts** [1] - 6:14
**covered** [1] - 62:3
**CPSC** [31] - 23:20, 24:2, 57:13, 57:21, 58:13, 58:24, 59:10, 59:16, 59:24, 60:10, 61:10, 61:17, 65:1, 65:23, 68:4, 68:8, 68:9, 69:3, 71:5, 71:6, 71:13, 71:14, 72:22, 73:1, 73:4, 73:11, 73:20, 74:6, 74:20, 75:5, 82:6
**CPSC's** [1] - 65:22
**cracking** [4] - 23:4, 23:9, 82:1, 83:2
**Crawford** [1] - 71:21
**created** [1] - 65:9
**creates** [1] - 84:2
**creating** [1] - 42:6
**credentialed** [1] - 76:21
**credentials** [1] - 84:25
**credibility** [1] - 100:20
**criteria** [2] - 12:17, 58:1
**critical** [1] - 24:16
**criticism** [2] - 70:19, 70:21
**criticize** [1] - 92:3
**cross** [10] - 12:5, 16:12, 48:6, 56:3, 60:11, 60:23, 77:24, 96:15, 99:1, 100:19
**cross-examination** [4] - 16:12, 48:6, 96:15, 100:19
**cross-examine** [3] - 56:3, 60:11, 99:1
**cross-examined** [1] -

60:23
**CROWN** [1] - 1:20
**CRR** [2] - 3:22, 102:14
**CTEH** [1] - 67:17
**CTS** [1] - 76:19
**cure** [1] - 26:23
**curing** [1] - 15:6
**current** [3] - 83:14, 84:1, 89:20
**cut** [4] - 33:22, 58:21, 62:23, 74:3
**cutting** [3] - 16:15, 52:14, 62:21
**cutting-edge** [1] - 16:15

## D

**damage** [9] - 11:11, 12:2, 21:16, 43:19, 82:1, 82:2, 83:2, 98:18, 98:19
**damaged** [4] - 21:16, 24:8, 79:17, 99:7
**damages** [3] - 8:2, 43:10, 44:20
**DAN** [1] - 3:12
**dark** [1] - 55:8
**data** [57] - 8:11, 10:5, 27:2, 27:4, 27:25, 28:5, 28:8, 31:1, 31:11, 38:22, 38:23, 38:25, 41:6, 41:12, 41:22, 41:23, 42:3, 46:8, 46:9, 46:12, 46:20, 47:11, 47:15, 47:21, 47:25, 48:23, 52:21, 59:10, 59:12, 60:10, 60:11, 60:12, 60:19, 60:22, 61:1, 61:16, 61:17, 61:22, 62:9, 69:9, 69:15, 74:20, 74:21, 75:2, 75:19, 76:1, 79:12, 82:13, 85:22, 85:24, 86:17, 88:14, 92:17, 93:19, 97:18, 99:3
**date** [1] - 100:11
**Daubert** [64] - 8:13, 9:1, 9:5, 11:1, 12:1, 12:9, 12:11, 12:17, 12:19, 13:1, 13:4, 13:23, 14:14, 15:18, 15:21, 15:25, 16:4, 17:8, 17:16, 18:2, 18:18, 20:14, 20:18, 20:23, 21:3, 26:15, 26:17, 29:6, 31:4, 31:7, 37:15, 39:16,

41:15, 41:16, 42:10, 43:21, 43:23, 45:21, 49:16, 50:4, 50:8, 55:11, 61:2, 63:6, 63:19, 64:8, 75:23, 75:25, 76:19, 80:8, 82:23, 84:17, 85:25, 89:15, 91:15, 92:3, 94:2, 96:16, 99:1, 99:17, 100:19, 100:22, 101:1
**Daubert-worthy** [1] - 20:18
**DAVID** [2] - 2:2, 3:4
**DAVIS** [1] - 1:24
**DAWN** [1] - 3:18
**days** [5] - 15:3, 29:16, 30:13, 86:10, 86:16
**DC** [1] - 1:18
**deal** [8] - 21:10, 24:14, 38:10, 49:15, 52:6, 96:16, 99:8, 101:4
**dealing** [3] - 36:21, 44:1, 75:15
**dealt** [2] - 53:19, 96:15
**DEAN** [1] - 4:16
**Dean** [5] - 9:6, 75:15, 80:15, 82:19, 83:6
**debate** [5] - 16:5, 16:8, 17:6, 18:10, 20:16
**December** [1] - 94:16
**decide** [1] - 61:5
**decided** [2] - 32:24, 53:21
**deciding** [1] - 73:7
**decision** [4] - 74:4, 74:12, 96:3, 97:8
**decisions** [5] - 64:20, 74:17, 80:23, 80:25, 81:12
**declared** [1] - 7:22
**default** [7] - 7:17, 7:20, 7:21, 8:7, 8:18, 11:5, 11:14
**defeated** [2] - 58:16, 59:22
**defective** [7] - 7:7, 11:8, 11:9, 57:20, 59:3, 59:7, 59:8
**defendant** [6] - 7:8, 7:9, 10:6, 11:14, 15:17, 84:11
**defendant's** [1] - 56:8
**DEFENDANTS** [1] - 2:10
**defendants** [1] - 93:17
**defendants'** [2] - 75:14, 93:21
**defending** [1] - 25:20

**defer** [2] - 70:1, 78:2
**defies** [1] - 74:5
**define** [1] - 38:3
**defined** [2] - 12:11, 57:25
**definition** [10] - 14:24, 18:19, 20:20, 22:20, 27:16, 71:1, 71:23, 71:25, 72:6, 72:9
**definitive** [2] - 53:14, 54:9
**degree** [4] - 22:3, 42:21, 44:3, 83:24
**degrees** [1] - 19:1
**dehumidifier** [3] - 17:3, 18:25, 38:15
**delay** [1] - 7:14
**deliver** [2] - 50:3, 101:9
**delivered** [1] - 49:24
**delivering** [1] - 54:3
**delivery** [1] - 54:3
**demonstrate** [1] - 14:10
**demonstrated** [2] - 30:12, 69:9
**demonstrates** [1] - 42:4
**Department** [14] - 57:23, 57:25, 58:13, 65:2, 66:11, 68:4, 70:23, 70:25, 71:22, 71:23, 72:9, 72:22, 73:2, 73:5
**departs** [1] - 84:14
**dependent** [2] - 54:18, 98:21
**depose** [1] - 32:24
**deposed** [1] - 64:14
**deposit** [1] - 23:7
**deposition** [19] - 18:22, 40:10, 56:25, 60:12, 60:14, 60:19, 62:15, 63:14, 67:23, 76:5, 77:4, 79:18, 82:15, 83:22, 89:17, 91:12, 95:7, 96:25, 98:5
**depositions** [4] - 49:22, 49:24, 101:6, 101:10
**deposits** [1] - 23:5
**deputy** [2] - 49:25, 50:4
**DEPUTY** [4] - 5:7, 75:10, 75:12, 101:15
**derived** [1] - 97:11
**derives** [1] - 33:13
**describe** [1] - 90:24
**described** [3] - 23:15,

23:17, 98:2
**describes** [1] - 85:12
**descriptor** [1] - 45:2
**design** [1] - 25:6
**designated** [1] - 6:20
**designed** [4] - 7:7, 18:4, 27:2, 45:12
**despite** [1] - 87:4
**destroyed** [2] - 23:1, 91:3
**destroying** [1] - 52:14
**detail** [2] - 14:23, 96:5
**detailed** [2] - 51:16, 67:15
**detect** [4] - 14:22, 51:23, 53:1, 73:13
**detectable** [1] - 13:18
**detecting** [1] - 68:15
**detection** [1] - 51:22
**determination** [4] - 8:10, 8:21, 66:10, 96:21
**determinations** [1] - 57:19
**determine** [6] - 45:4, 57:19, 64:10, 66:15, 67:10, 70:1
**determined** [2] - 22:19, 94:17
**determines** [1] - 90:1
**determining** [5] - 32:5, 64:22, 66:13, 67:17, 71:3
**develop** [1] - 74:16
**developed** [6] - 18:8, 23:12, 26:18, 26:19, 31:10, 71:18
**developers** [1] - 6:15
**developing** [3] - 56:9, 67:17, 74:15
**deviate** [2] - 88:8, 88:9
**deviated** [1] - 87:3
**device** [22] - 25:22, 27:2, 42:14, 57:14, 57:15, 57:24, 58:6, 58:15, 58:17, 61:13, 64:9, 64:15, 65:5, 65:9, 65:16, 65:17, 65:19, 65:20, 66:3, 66:18, 66:23, 67:11
**devices** [11] - 27:21, 28:11, 93:13, 95:10, 95:21, 96:10, 96:22, 96:23, 100:8
**devised** [3] - 14:6, 14:7, 51:15
**devising** [1] - 51:18
**difference** [5] - 16:17, 17:9, 52:18, 58:6, 58:10

**differences** [3] - 16:19, 28:16, 49:8
**different** [22] - 15:14, 17:19, 17:20, 19:17, 27:21, 30:23, 38:12, 39:11, 40:20, 45:13, 56:11, 62:2, 64:18, 65:18, 76:23, 78:11, 83:19, 86:6, 87:11, 88:11, 92:23, 92:24
**differentiation** [1] - 33:15
**difficult** [2] - 18:2, 45:13
**difficulty** [2] - 40:19, 40:23
**direct** [5] - 41:9, 45:1, 45:6, 55:11, 92:13
**directly** [1] - 21:10
**dirt** [2] - 60:6, 90:19
**disagree** [2] - 54:8, 91:16
**disagreeing** [1] - 52:7
**disagrees** [1] - 91:6
**disappears** [1] - 90:10
**disaster** [1] - 91:22
**discipline** [3] - 16:18, 17:20, 84:5
**disciplines** [4] - 36:20, 81:1, 81:13, 83:20
**disclosed** [1] - 79:2
**discolored** [1] - 23:23
**discuss** [3] - 68:24, 70:24, 84:25
**discussing** [1] - 44:18
**discussion** [1] - 70:12
**discussions** [3] - 36:15, 36:16, 36:17
**disease** [1] - 15:6
**disintegrated** [1] - 91:23
**dispersed** [1] - 67:6
**dispute** [5] - 21:18, 21:19, 42:14, 53:10, 54:11
**disputes** [1] - 16:21
**disputing** [1] - 11:15
**disruption** [1] - 34:10
**distinction** [1] - 64:10
**distinguish** [1] - 69:10
**distinguishing** [1] - 79:22
**distributors** [1] - 6:16
**District** [7] - 6:25, 7:1, 7:4, 102:6, 102:16
**DISTRICT** [3] - 1:1, 1:2, 1:12
**district** [2] - 6:21, 6:22
**divergent** [1] - 83:19

**DOCKET** [1] - 1:5
**doctorate** [1] - 32:17
**doctors** [1] - 83:19
**DOCUMENT** [1] - 1:8
**document** [2] - 91:10, 98:18
**documentation** [1] - 51:25
**documented** [7] - 54:20, 63:2, 74:20, 74:21, 88:10, 89:20, 97:17
**documents** [2] - 44:24, 90:24
**dollars** [1] - 63:18
**domain** [1] - 79:7
**domestic** [7] - 52:17, 62:1, 64:10, 66:20, 66:21, 67:5, 69:17
**Don** [4] - 5:13, 31:17, 63:23, 93:25
**DONALD** [2] - 2:11, 3:6
**Donald** [2] - 9:7, 93:10
**done** [18] - 19:15, 37:5, 37:14, 39:8, 39:22, 45:10, 52:22, 56:22, 69:8, 71:20, 81:21, 83:7, 83:18, 86:14, 90:2, 99:12, 101:12
**doors** [1] - 46:15
**DOROTHY** [1] - 3:17
**doubt** [1] - 62:14
**Doug** [5] - 5:14, 31:22, 36:8, 76:3, 84:22
**DOUGLAS** [1] - 2:15
**dovetail** [1] - 77:5
**down** [13] - 6:10, 11:9, 15:10, 20:9, 27:1, 27:5, 46:9, 51:4, 55:16, 55:18, 56:2, 56:24, 61:4
**downstairs** [2] - 54:6, 54:10
**dozens** [1] - 29:23
**Dr** [75] - 9:7, 10:18, 27:6, 28:17, 30:15, 30:16, 33:18, 36:16, 37:13, 37:14, 37:24, 38:8, 43:5, 46:8, 46:20, 46:21, 47:4, 50:19, 50:20, 51:15, 51:17, 52:11, 54:20, 54:25, 55:18, 56:25, 59:22, 60:10, 60:21, 61:1, 61:16, 61:18, 61:22, 63:9, 63:12, 64:2, 64:12, 65:2, 65:7, 67:16, 67:22,

67:25, 68:1, 68:14, 69:5, 72:10, 74:21, 74:22, 75:4, 78:2, 78:3, 78:6, 78:21, 81:7, 81:10, 82:15, 83:3, 83:5, 84:23, 86:3, 86:18, 88:17, 89:8, 89:17, 90:2, 91:6, 91:18, 91:19, 92:9, 92:12, 97:16
**DR** [1] - 4:12
**drew** [1] - 57:10
**DRIVE** [1] - 2:16
**driven** [1] - 8:8
**drop** [2] - 35:6, 73:8
**droplets** [1] - 90:18
**dropped** [1] - 58:1
**drug** [1] - 18:8
**DRURY** [1] - 3:16
**Drywall** [1] - 5:23
**DRYWALL** [1] - 1:5
**drywall** [103] - 6:2, 6:3, 6:7, 6:12, 6:18, 6:24, 7:7, 7:25, 9:19, 11:8, 11:22, 12:6, 13:17, 13:21, 14:19, 15:15, 18:16, 20:5, 20:7, 21:17, 21:21, 22:8, 23:10, 24:19, 26:24, 29:22, 29:23, 30:10, 32:6, 34:16, 34:17, 35:12, 35:14, 35:18, 39:12, 40:7, 41:17, 45:15, 49:10, 50:22, 50:23, 50:24, 50:25, 51:3, 51:9, 51:13, 52:13, 53:4, 53:5, 53:24, 54:2, 54:10, 57:3, 57:17, 58:1, 58:4, 58:9, 58:11, 58:21, 59:3, 59:7, 59:21, 61:6, 61:10, 61:25, 62:5, 62:10, 62:18, 63:5, 63:19, 64:10, 64:11, 65:21, 65:24, 66:1, 66:10, 66:13, 66:20, 66:21, 66:22, 67:8, 68:11, 69:11, 69:18, 70:2, 70:5, 71:4, 71:10, 71:25, 72:2, 72:4, 73:9, 73:16, 73:17, 74:3, 74:5, 74:11, 90:8
**drywall-impacted** [1] - 65:21
**due** [2] - 34:24, 76:20
**duplicative** [4] - 75:20, 76:1, 76:13, 80:13

**Dura** [1] - 76:18
**during** [1] - 95:7
**dust** [2] - 87:20, 90:18

**E**

**early** [2] - 66:11, 71:23
**earth's** [1] - 91:23
**EAST** [1] - 1:21
**East** [1] - 6:6
**Eastern** [3] - 7:1, 7:4, 102:6
**EASTERN** [1] - 1:2
**eating** [1] - 22:21
**ECS** [64] - 9:20, 9:24, 10:2, 10:3, 10:5, 10:7, 10:19, 13:16, 13:22, 14:2, 20:4, 20:16, 20:24, 21:2, 21:11, 24:12, 24:14, 24:16, 24:17, 25:12, 25:16, 25:25, 26:9, 26:23, 27:1, 29:13, 29:25, 30:4, 30:15, 30:16, 32:7, 32:12, 32:14, 32:15, 33:1, 33:5, 33:23, 34:8, 34:13, 35:3, 35:9, 36:13, 36:18, 37:2, 37:5, 37:14, 37:15, 37:16, 37:23, 39:12, 40:6, 42:14, 46:7, 46:11, 46:17, 48:2, 48:11, 49:6, 49:9, 65:4, 78:8, 86:25, 98:21
**ECS's** [2] - 24:19, 25:19
**edge** [2] - 16:15, 94:25
**EDS** [1] - 95:2
**educated** [1] - 84:10
**effect** [3] - 20:19, 36:5, 42:21
**effective** [5] - 18:15, 34:6, 44:7, 70:7, 70:8
**effectively** [2] - 36:3, 77:25
**effectiveness** [1] - 38:20
**effectually** [1] - 18:10
**efficient** [3] - 35:25, 64:21, 70:8
**effort** [1] - 33:22
**eggshell** [1] - 15:5
**either** [6] - 34:24, 46:8, 55:13, 61:15, 79:23, 84:12
**ELDON** [1] - 1:12

**electrical** [18] - 22:9, 24:3, 30:11, 39:1, 42:25, 45:19, 78:22, 79:20, 84:2, 93:11, 93:12, 93:13, 94:10, 95:12, 95:13, 95:20, 96:9, 96:22
**electrician** [2] - 55:1, 61:19
**electricity** [3] - 15:10, 34:23, 34:24
**electron** [1] - 83:3
**electronic** [7] - 22:15, 22:18, 23:3, 39:1, 42:25, 89:12, 97:22
**electronics** [4] - 28:21, 38:8, 42:7, 54:19
**element** [1] - 89:16
**elements** [1] - 99:4
**elevate** [1] - 20:18
**eliminated** [2] - 52:16, 58:2
**eliminating** [1] - 20:5
**elsewhere** [2] - 9:24, 56:20
**Elsewhere** [1] - 62:4
**embrace** [1] - 18:3
**emission** [3] - 6:8, 9:18, 24:25
**emissions** [4] - 20:7, 32:20, 43:6, 90:10
**emits** [2] - 11:22, 21:21
**emphasizing** [2] - 16:2, 33:7
**employed** [2] - 9:24, 71:13
**end** [6] - 19:23, 43:7, 43:9, 52:7, 64:2, 72:6
**endeavored** [1] - 12:5
**endorsed** [2] - 10:3, 26:9
**endorsement** [1] - 61:1
**endorsements** [1] - 10:14
**ENERGY** [2] - 2:4, 2:18
**engineer** [10] - 29:14, 32:17, 75:16, 77:1, 77:2, 80:16, 82:20, 93:11, 94:11
**engineering** [6] - 22:6, 24:17, 26:8, 26:11, 26:12, 30:11
**engineers** [2] - 25:2, 26:9
**enormous** [1] - 89:24

**Enormous** [1] - 89:24
**entering** [1] - 91:23
**entire** [5] - 8:2, 36:13, 36:25, 73:8
**entities** [1] - 61:9
**entitled** [1] - 102:9
**entity** [1] - 14:5
**entry** [2] - 11:5, 11:14
**enumerate** [1] - 50:3
**enumerated** [1] - 87:13
**environment** [37] - 21:24, 23:11, 24:1, 24:5, 24:7, 24:10, 24:24, 24:25, 25:7, 27:10, 34:17, 37:19, 38:7, 39:6, 40:20, 41:3, 41:6, 41:7, 42:5, 44:4, 45:3, 45:4, 86:9, 86:12, 86:21, 87:1, 88:22, 90:2, 90:18, 90:20, 91:24, 93:4, 97:2, 98:16, 99:19, 99:22
**environmental** [3] - 9:25, 13:16, 33:23
**environments** [13] - 23:9, 25:3, 34:19, 41:11, 41:14, 45:13, 45:18, 85:13, 87:21, 87:22, 88:6, 98:14, 99:21
**EPA** [6] - 60:5, 61:10, 65:1, 65:11, 65:12, 65:18
**equation** [1] - 43:7
**equipment** [11] - 28:21, 29:1, 38:11, 39:1, 40:25, 42:25, 89:12, 92:13, 92:20, 94:21
**equivalent** [1] - 44:11
**error** [6] - 10:4, 12:18, 26:25, 31:8, 61:14, 61:15
**ESI** [1] - 45:21
**especially** [2] - 87:3, 100:13
**ESQ** [2] - 2:7, 3:11
**ESQUIRE** [36] - 1:16, 1:20, 1:23, 1:24, 2:3, 2:11, 2:15, 2:18, 2:22, 2:22, 2:23, 2:23, 3:2, 3:3, 3:3, 3:4, 3:5, 3:6, 3:6, 3:7, 3:8, 3:9, 3:9, 3:10, 3:12, 3:12, 3:13, 3:14, 3:15, 3:15, 3:16, 3:17, 3:18, 3:18, 3:19,

3:19
**essential** [1] - 12:12
**essentially** [17] - 34:15, 35:22, 35:24, 38:1, 38:20, 40:23, 41:1, 50:14, 67:22, 76:13, 76:24, 77:5, 77:9, 78:14, 79:5, 79:8, 94:21
**establish** [3] - 12:5, 25:11, 55:12
**established** [3] - 12:17, 45:12, 88:10
**establishing** [1] - 37:14
**estimate** [1] - 59:15
**estimates** [1] - 41:13
**et** [2] - 12:18, 16:12
**evaluate** [3] - 58:22, 73:18, 82:8
**evaluated** [1] - 58:12
**evaluates** [1] - 97:14
**evaluating** [1] - 69:5
**evaluation** [1] - 38:20
**evidence** [26] - 8:20, 16:18, 18:3, 18:7, 20:18, 26:24, 27:1, 44:1, 46:19, 47:17, 47:18, 48:4, 48:12, 63:11, 66:18, 74:17, 76:8, 84:12, 87:7, 87:9, 87:24, 87:25, 89:6, 99:20, 100:6
**evidentiary** [1] - 8:17
**evolve** [1] - 26:11
**evolved** [1] - 26:12
**evolving** [3] - 13:7, 16:17, 17:23
**EWYER** [1] - 3:12
**exact** [3] - 38:9, 86:1, 92:16
**Exactly** [1] - 88:23
**exactly** [4] - 15:4, 19:15, 27:19, 88:23
**examination** [5] - 16:12, 48:6, 93:14, 96:15, 100:19
**examine** [3] - 56:3, 60:11, 99:1
**examined** [8] - 60:23, 94:20, 95:13, 95:14, 95:19, 96:23, 99:4, 99:5
**examines** [1] - 93:12
**example** [9] - 18:20, 45:15, 46:8, 52:21, 53:18, 65:16, 77:24, 79:19, 89:7
**examples** [2] - 49:1, 71:17

**exceedances** [1] - 47:20
**exceeded** [2] - 72:5, 82:3
**exclude** [8] - 9:2, 9:6, 9:21, 16:15, 32:2, 51:1, 73:15, 93:17
**Exclude** [1] - 9:4, 31:24, 72:15
**excluded** [3] - 20:25, 31:14, 96:12
**excluding** [1] - 96:4
**Excluding** [1] - 73:13
**exclusion** [1] - 30:20
**exclusive** [2] - 33:15, 65:20
**excuse** [1] - 26:3
**executed** [1] - 7:12
**executive** [2] - 79:8, 83:22
**exerts** [1] - 24:12
**Exhibit** [8] - 23:15, 24:3, 27:6, 27:8, 27:16, 27:25, 40:11, 89:20
**Exhibits** [4] - 22:9, 38:13, 82:6, 88:19
**exist** [3] - 15:15, 38:9
**existed** [1] - 14:18
**existing** [1] - 27:10
**exists** [3] - 41:13, 83:1, 98:18
**experience** [14] - 28:19, 30:15, 53:16, 91:17, 91:18, 94:11, 97:11, 97:12, 97:20, 97:21, 98:4, 98:9, 98:24, 99:17
**experiences** [4] - 85:22, 96:24, 97:1, 97:3
**experiment** [2] - 47:12, 52:23
**experimental** [9] - 14:2, 14:12, 18:4, 18:19, 18:21, 19:24, 20:19, 29:15, 47:5
**experimentation** [1] - 19:12
**experiments** [1] - 74:18
**expert** [34] - 8:7, 8:8, 9:9, 10:16, 12:19, 16:10, 21:14, 21:19, 28:6, 32:18, 37:12, 38:9, 47:4, 50:1, 50:7, 50:13, 55:2, 55:21, 56:2, 78:16, 79:2, 81:8, 81:11, 84:10, 84:24, 85:12,

91:8, 91:10, 96:4, 96:5, 97:19, 99:9, 99:23
**expert-testimony-driven** [1] - 8:8
**expertise** [2] - 76:11, 79:3
**Experts** [1] - 97:9
**experts** [34] - 8:10, 8:12, 9:2, 10:17, 12:12, 14:5, 19:14, 20:25, 21:15, 21:20, 22:1, 28:18, 29:14, 32:16, 35:20, 37:17, 44:5, 44:25, 49:23, 50:1, 52:2, 53:18, 56:6, 57:22, 65:2, 66:24, 74:9, 76:13, 76:15, 86:19, 91:16
**explain** [2] - 30:21, 91:12
**explained** [2] - 44:16, 89:17
**explicitly** [1] - 85:8
**exporters** [1] - 6:16
**expose** [1] - 54:13
**exposure** [1] - 24:18
**expressly** [1] - 86:15
**extensive** [2] - 9:8, 52:1, 96:24
**extensively** [1] - 97:17
**extent** [4] - 7:24, 12:4, 56:5, 100:20
**exterior** [2] - 73:14, 73:15
**extrapolate** [6] - 91:25, 92:18, 96:2, 96:6, 96:21, 99:6
**extrapolates** [2] - 96:9, 100:25
**extrapolating** [2] - 82:12, 87:2
**extrapolation** [2] - 29:7, 98:15
**extremely** [1] - 54:16
**eye** [1] - 51:6
**eyeballed** [1] - 63:13
**eyeballing** [1] - 63:17

**F**

**F.3d** [1] - 76:19
**face** [2] - 17:17, 45:15
**fact** [16] - 12:11, 13:14, 14:9, 18:11, 21:18, 21:25, 24:16, 34:22, 39:14, 59:13, 65:12, 67:15, 79:14, 81:15, 96:18

**factor** [4] - 42:17, 90:6, 91:13, 91:25
**factories** [1] - 28:19
**factors** [8] - 26:15, 27:2, 37:18, 37:25, 40:8, 40:21, 72:3, 86:6
**factory** [6] - 25:1, 25:4, 25:5, 28:14, 28:17, 29:7
**facts** [7] - 6:19, 8:11, 13:12, 13:24, 63:20, 75:19, 76:5
**factual** [4] - 11:2, 11:15, 31:11, 75:23
**fail** [5] - 79:17, 85:7, 98:8, 100:9, 100:11
**failed** [6] - 47:10, 82:8, 82:16, 88:20, 100:5, 100:10
**failing** [2] - 43:19, 81:16
**fails** [1] - 27:25
**failure** [16] - 27:11, 28:1, 38:25, 41:5, 42:7, 79:20, 82:25, 85:7, 85:22, 86:24, 91:20, 95:10, 95:16, 95:18, 96:25, 100:7
**failures** [7] - 42:25, 43:2, 47:2, 47:15, 77:7, 78:22, 93:12
**fair** [3] - 12:5, 36:22, 48:1
**FALLON** [1] - 1:12
**false** [12] - 59:5, 59:20, 60:13, 60:18, 68:19, 68:20, 70:12, 72:12, 73:20, 74:19, 75:3, 75:4
**familiar** [1] - 9:11
**familiarity** [1] - 98:24
**families** [3] - 12:3, 26:5
**fancy** [1] - 18:24
**far** [4] - 56:15, 64:19, 82:12, 87:3
**fashion** [1] - 96:16
**fast** [1] - 17:10
**favorable** [1] - 28:1
**feared** [1] - 16:14
**fearful** [1] - 16:9
**February** [4] - 8:17, 11:25, 13:16, 21:1
**federal** [2] - 6:14, 6:24
**felt** [1] - 15:12
**few** [1] - 35:6
**few-day** [1] - 35:6
**field** [30] - 32:18, 56:12, 56:21, 57:1,

57:24, 58:3, 58:9, 58:14, 58:15, 58:17, 58:25, 59:4, 59:6, 59:10, 59:14, 59:17, 63:2, 63:3, 63:15, 64:7, 64:9, 71:19, 73:9, 73:22, 76:17, 77:23, 87:4, 87:5, 89:2, 95:19

**fields** [1] - 93:18

**fifth** [2] - 20:13, 28:4

**figure** [7] - 19:21, 52:15, 52:18, 57:15, 58:7, 62:11, 62:22

**file** [2] - 6:13, 48:7

**filed** [8] - 7:3, 7:16, 7:17, 8:25, 9:3, 9:5, 10:12, 28:7

**film** [2] - 41:13, 85:20

**filter** [4] - 17:3, 18:25, 19:22, 38:15

**filters** [6] - 18:23, 19:8, 19:10, 19:11, 19:12, 19:15

**filtration** [2] - 27:11, 27:17

**final** [4] - 7:21, 8:18, 16:24, 19:15

**Finally** [5] - 29:11, 47:23, 63:9, 71:22, 91:19

**finally** [8] - 10:4, 10:15, 16:22, 61:14, 62:14, 74:19, 79:4, 93:9

**FINANCIAL** [1] - 2:11

**fine** [5] - 17:25, 52:9, 53:6, 87:2, 101:11

**finished** [1] - 53:20

**fire** [1] - 84:2

**firm** [4] - 26:13, 80:16, 80:19, 91:9

**first** [24] - 9:13, 9:14, 11:7, 14:1, 25:13, 26:15, 29:21, 29:24, 30:12, 31:6, 32:11, 41:2, 56:19, 67:19, 68:12, 69:16, 71:1, 71:3, 71:24, 76:18, 76:24, 81:19, 83:6, 92:7

**First** [3] - 31:23, 64:1, 70:15

**fit** [6] - 13:1, 13:4, 14:13, 15:25, 20:20, 63:20

**five** [7] - 10:10, 26:15, 39:15, 49:23, 50:1, 89:23, 99:4

**fix** [8] - 22:4, 24:9,

27:11, 35:21, 80:24, 81:12, 81:15, 98:21

**fixed** [1] - 54:6

**fixes** [4] - 80:16, 80:17

**fixing** [2] - 23:22, 82:20

**FL** [1] - 2:13

**floor** [1] - 35:20

**FLOOR** [1] - 2:18

**Florida** [24] - 23:10, 29:23, 39:23, 47:5, 57:23, 57:25, 58:13, 65:1, 66:11, 68:4, 70:23, 70:25, 71:22, 71:23, 72:8, 72:22, 73:2, 73:5, 74:6, 74:20, 74:21, 74:24, 75:4, 75:5

**fluke** [1] - 98:13

**flunk** [1] - 61:1

**fluoroscopy** [1] - 33:12

**focus** [7] - 11:25, 20:1, 44:18, 50:11, 63:25, 64:3, 94:3

**focused** [2] - 32:10, 43:21

**focuses** [3] - 44:14, 93:11, 100:22

**focusing** [2] - 30:14, 44:19

**fodder** [1] - 75:24

**follow** [1] - 21:9

**follow-up** [1] - 21:9

**followed** [1] - 68:5

**Following** [1] - 8:20

**following** [2] - 34:4, 47:4

**follows** [1] - 28:17

**FOR** [2] - 1:16, 2:10

**forbid** [1] - 92:13

**foregoing** [1] - 102:7

**forget** [1] - 28:11

**Forget** [2] - 15:8, 15:9

**form** [2] - 50:4, 58:2

**formation** [2] - 41:13, 98:3

**formulating** [1] - 8:12

**forth** [2] - 12:16, 74:14

**forum** [1] - 17:2

**forward** [5] - 26:24, 32:16, 53:8, 82:24, 94:6

**FOSLID** [1] - 3:9

**foundation** [2] - 12:13, 57:10

**four** [30] - 23:11, 23:13, 23:15, 27:19, 28:13, 39:14, 40:11, 53:4, 53:5, 53:9,

53:12, 53:14, 56:7, 61:21, 62:1, 62:2, 68:2, 71:7, 71:8, 94:19, 95:3, 95:21, 96:22, 97:4, 99:14

**Four** [1] - 23:14

**four-point** [1] - 71:7

**fourth** [1] - 31:8

**FRED** [1] - 2:22

**Friday** [1] - 94:1

**FRIDAY** [2] - 1:6, 5:2

**FRILOT** [1] - 2:17

**front** [1] - 64:2

**full** [1] - 16:5

**full-throated** [1] - 16:5

**fully** [1] - 96:5

**fundamental** [5] - 15:21, 30:9, 30:24, 37:17, 40:15

**fundamentally** [2] - 83:1, 89:19

**Furthermore** [1] - 90:14

**future** [21] - 31:2, 56:7, 59:23, 76:16, 77:7, 79:12, 80:1, 84:1, 84:12, 85:3, 85:7, 86:24, 87:2, 87:8, 90:3, 90:6, 90:12, 93:6, 95:16, 100:9, 100:12

## G

**GAINSBURGH** [1] - 2:2

**Galler** [14] - 9:7, 49:22, 54:20, 78:3, 78:21, 93:10, 94:4, 94:10, 94:13, 95:24, 96:8, 97:12

**gamut** [1] - 62:3

**GARY** [1] - 2:23

**gas** [5] - 20:6, 27:3, 29:9, 32:20, 42:16

**gases** [2] - 11:10, 11:11

**gasses** [24] - 6:8, 9:18, 11:22, 21:21, 23:1, 26:1, 26:2, 27:23, 28:19, 28:23, 28:24, 28:25, 29:2, 32:21, 35:1, 35:5, 38:19, 46:12, 46:17, 48:3, 54:12, 54:17, 91:4, 97:2

**gassing** [7] - 13:17, 14:19, 14:20, 15:11, 19:6, 20:5, 21:17

**gatekeeper** [3] - 12:12, 96:18, 96:20

**gatekeepers** [1] - 16:10

**gatekeeping** [1] - 16:14

**general** [4] - 12:18, 56:22, 93:3, 97:11

**generally** [3] - 25:23, 31:9, 79:19

**generate** [1] - 41:22

**generating** [1] - 42:3

**gentleman** [2] - 29:21, 55:22

**gentlemen** [1] - 5:9

**GERALD** [1] - 2:3

**germane** [1] - 16:17

**GERMANO** [1] - 1:9

**Germano** [7] - 5:11, 5:17, 5:18, 5:20, 5:21, 11:5, 11:8

**GIARRUSSO** [1] - 3:7

**given** [5] - 8:4, 8:14, 9:10, 62:2, 101:6

**Given** [1] - 94:1

**gleaned** [1] - 10:20

**glue** [2] - 73:21, 73:25

**Goad** [3] - 19:13, 47:4, 61:23

**government** [8] - 10:2, 10:14, 14:5, 26:8, 60:25, 68:6, 71:24, 84:20

**Government** [1] - 22:6

**governmental** [2] - 26:12, 61:9

**grading** [2] - 55:17, 61:3

**GRAND** [1] - 2:23

**grasp** [1] - 40:2

**great** [2] - 16:24, 96:4

**greater** [4] - 27:12, 61:17, 89:23

**grind** [1] - 73:17

**grounded** [1] - 10:8

**grounds** [1] - 79:9

**group** [2] - 10:3, 26:9

**guess** [4] - 44:13, 47:12, 49:11, 76:5

**guessing** [1] - 99:11

**guidance** [4] - 8:23, 65:23, 68:10

**guided** [1] - 43:1

**Gulf** [1] - 6:6

**gun** [5] - 54:24, 55:11, 57:1, 57:5, 66:5

**gut** [1] - 35:22

**Gypsum** [2] - 7:8, 11:6

**gypsum** [2] - 11:9, 73:18

**GYPSUM** [1] - 1:9

## H

**H-2** [1] - 38:13

**H-3** [1] - 38:13

**half** [3] - 59:15, 59:16, 59:18

**Hand** [1] - 97:10

**hand** [11] - 11:20, 12:14, 13:4, 13:6, 13:8, 13:24, 14:16, 16:1, 16:2, 17:7, 31:21

**handbook** [2] - 95:24, 95:25

**handful** [1] - 85:3

**happy** [1] - 72:7

**hard** [2] - 17:10, 62:11

**hardly** [1] - 91:4

**HARDT** [1] - 3:3

**harm** [1] - 77:7

**harming** [1] - 99:21

**harvested** [3] - 22:14, 81:24

**HAUSFELD** [1] - 1:16

**HAYDEN** [12] - 2:11, 5:13, 31:17, 35:2, 63:23, 65:16, 93:24, 94:7, 96:17, 100:2, 100:4, 100:23

**Hayden** [6] - 5:13, 31:17, 43:11, 44:16, 63:23, 93:25

**HAYDEN..................
........................** [4] - 4:8, 4:14, 4:23, 4:25

**head** [1] - 89:2

**health** [1] - 24:18

**Health** [13] - 57:23, 57:25, 58:14, 65:2, 66:11, 68:4, 70:23, 71:1, 71:23, 71:24, 72:22, 73:2, 73:5

**Health's** [1] - 72:9

**hear** [7] - 9:11, 10:21, 15:9, 52:4, 76:2, 84:21, 93:23

**heard** [10] - 32:7, 36:14, 36:15, 36:16, 37:4, 38:3, 48:15, 72:18, 76:5

**HEARD** [1] - 1:12

**hearing** [20] - 7:21, 7:23, 8:7, 8:13, 8:16, 8:18, 8:21, 11:1, 11:25, 12:1, 13:16, 21:1, 31:4, 32:24, 39:16, 49:16, 49:23,

83:13, 89:15
**hearings** [3] - 5:22, 36:6, 70:19
**hearsay** [1] - 64:20
**heated** [1] - 39:24
**help** [2] - 58:8, 58:9
**helpful** [1] - 101:12
**helping** [2] - 37:6, 65:20
**Hereafter** [1] - 8:17
**hereby** [1] - 102:7
**HERMAN** [3] - 1:23, 1:23
**herring** [2] - 10:15, 70:13
**high** [4] - 63:17, 73:20, 87:21, 94:22
**higher** [2] - 32:21, 77:22
**highlight** [1] - 59:9
**highlighted** [1] - 40:18
**highly** [3] - 90:1, 93:5, 93:20
**Hill** [1] - 95:25
**himself** [1] - 82:18
**history** [1] - 5:25
**holes** [1] - 23:6
**home** [91] - 6:15, 10:5, 11:12, 19:1, 20:7, 22:9, 22:15, 23:24, 24:20, 24:22, 24:24, 25:1, 25:6, 25:21, 26:1, 26:6, 27:22, 28:8, 28:15, 29:2, 29:9, 29:19, 29:25, 30:10, 30:13, 33:3, 34:9, 34:20, 35:14, 35:17, 35:18, 35:19, 37:19, 38:4, 38:9, 42:5, 42:24, 44:9, 47:13, 47:14, 48:4, 48:18, 49:9, 52:13, 52:14, 53:19, 53:20, 53:23, 54:2, 54:9, 54:12, 54:19, 57:1, 57:15, 57:16, 57:19, 58:7, 58:8, 58:9, 58:12, 59:21, 60:1, 60:8, 65:21, 65:24, 66:14, 66:19, 66:20, 66:22, 67:4, 67:5, 67:8, 67:18, 69:16, 69:19, 72:12, 73:10, 74:3, 74:5, 74:11, 82:4, 97:2, 97:23, 98:20, 99:10, 99:11, 99:22
**homebuilder** [1] - 25:6
**homebuilders** [1] -

64:18
**homeowner** [2] - 15:14, 53:9
**homeowners** [8] - 6:7, 6:11, 6:13, 10:24, 11:4, 17:4, 18:1, 53:3
**Homes** [1] - 5:15
**homes** [80] - 6:10, 7:6, 8:22, 11:8, 12:4, 13:9, 13:18, 14:18, 19:9, 22:13, 22:25, 23:9, 23:20, 25:1, 25:19, 27:20, 28:3, 28:10, 28:17, 29:15, 29:24, 32:6, 34:7, 35:10, 35:12, 35:14, 35:17, 35:21, 35:23, 36:1, 36:4, 37:8, 39:14, 39:15, 40:1, 41:18, 45:11, 47:5, 48:22, 48:25, 49:4, 49:5, 49:6, 49:7, 53:17, 64:5, 64:7, 65:3, 67:2, 67:4, 67:6, 68:18, 68:20, 68:23, 69:6, 69:11, 70:9, 72:4, 72:13, 74:18, 75:6, 80:17, 81:24, 83:8, 84:3, 85:4, 85:5, 86:1, 93:13, 95:11, 95:14, 95:15, 95:18, 95:20, 95:22, 99:24
**Honor** [94] - 5:12, 5:13, 5:16, 5:19, 9:16, 10:22, 11:13, 11:24, 15:4, 15:19, 18:6, 18:20, 19:23, 20:25, 21:7, 21:9, 22:10, 25:8, 26:10, 26:25, 27:15, 28:4, 29:6, 29:11, 30:14, 30:18, 30:23, 31:15, 31:17, 36:8, 36:23, 40:17, 44:2, 44:16, 46:2, 46:6, 46:16, 47:9, 47:23, 48:14, 48:15, 48:22, 49:18, 49:20, 50:18, 52:5, 52:10, 53:16, 54:8, 57:8, 59:20, 61:3, 62:15, 63:21, 63:23, 65:12, 65:14, 67:21, 68:19, 69:2, 70:18, 71:22, 72:18, 72:21, 73:11, 73:14, 73:19, 74:15, 74:19, 75:7, 76:3, 77:16, 80:11, 81:22, 83:9, 83:12,

84:23, 88:16, 88:17, 91:19, 92:5, 92:7, 93:8, 93:24, 95:23, 96:7, 96:17, 97:5, 97:7, 99:9, 99:25, 100:2, 100:23, 101:9
**HONORABLE** [1] - 1:12
**Hopefully** [2] - 8:22, 94:7
**horizontal** [1] - 59:1
**HOROWSKI** [1] - 3:9
**hours** [1] - 15:3
**house** [12] - 10:11, 15:5, 25:16, 25:17, 35:23, 38:10, 39:2, 42:5, 43:12, 55:5, 62:4, 67:14
**household** [1] - 34:11
**households** [1] - 34:11
**houses** [7] - 6:5, 10:11, 19:16, 38:1, 39:3, 68:10, 99:5
**HUD** [2] - 18:12, 65:23
**human** [2] - 28:10, 28:13
**humid** [1] - 39:24
**humidity** [13] - 15:11, 19:2, 27:3, 37:20, 40:3, 40:5, 54:18, 77:21, 78:10, 86:6, 87:21, 87:22, 98:21
**Hun** [1] - 76:6
**hundreds** [3] - 29:23, 53:17, 63:18
**hurricane** [1] - 34:25
**Hurricanes** [1] - 6:1
**HVAC** [5] - 38:17, 78:25, 88:7, 91:2, 95:4
**HVACs** [1] - 81:16
**hypothetical** [1] - 53:16

**I**

**idea** [12] - 26:10, 48:11, 52:11, 52:13, 52:15, 52:22, 56:6, 68:19, 74:2, 82:14, 83:17, 99:10
**ideas** [1] - 56:6
**identical** [2] - 81:23, 84:19
**identification** [6] - 51:2, 51:12, 60:2, 65:6, 68:10, 68:11
**identified** [3] - 5:17,

65:25, 73:20
**identify** [14] - 13:21, 33:9, 37:6, 41:21, 51:9, 52:12, 52:14, 61:6, 65:17, 65:20, 73:9, 80:3, 87:1
**identifying** [8] - 37:6, 50:21, 61:11, 63:4, 65:24, 65:25, 69:16, 79:14
**identity** [1] - 53:15
**IEC** [1] - 85:10
**IL** [1] - 2:16
**image** [1] - 18:2
**immediately** [1] - 35:5
**impact** [6] - 37:18, 37:19, 43:6, 66:18, 67:10, 98:19
**impacted** [4] - 7:25, 44:11, 65:21, 65:24
**impacts** [4] - 38:6, 43:17, 44:4, 99:23
**implementation** [2] - 33:4, 65:4
**implication** [1] - 11:3
**implications** [1] - 93:6
**importance** [1] - 30:11
**important** [20] - 11:1, 11:13, 11:16, 11:17, 12:7, 13:4, 16:19, 22:1, 22:3, 23:21, 26:16, 26:17, 28:9, 32:14, 47:23, 57:11, 58:5, 63:5, 65:8
**importantly** [2] - 26:10, 47:12
**importers** [1] - 6:16
**imposed** [1] - 15:14
**impossible** [1] - 18:2
**impression** [1] - 77:10
**improper** [2] - 84:13, 99:7
**IN** [1] - 1:5
**inappropriate** [2] - 37:1, 89:10
**include** [1] - 78:24
**included** [2] - 76:12, 95:3
**includes** [2] - 47:18, 50:2
**including** [4] - 6:2, 47:17, 67:8, 99:13
**increase** [2] - 20:8, 40:5
**increased** [1] - 84:2
**increases** [1] - 40:6
**indeed** [2] - 10:15, 40:15
**independent** [2] - 25:10, 26:9

**indicate** [7] - 9:23, 45:1, 51:3, 69:8, 71:9, 71:11, 100:10
**indicated** [8] - 36:24, 43:5, 49:20, 50:8, 64:25, 71:1, 76:14, 86:24
**indicates** [4] - 46:12, 68:8, 69:2, 69:9
**indicia** [12] - 25:11, 29:12, 30:25, 31:6, 55:13, 56:4, 56:14, 56:17, 60:25, 72:2
**individual** [4] - 57:19, 61:11, 71:16, 77:10
**individuals** [1] - 77:12
**industrial** [9] - 23:17, 23:18, 24:5, 24:24, 25:7, 28:12, 38:4, 38:5, 39:5
**industry** [3] - 14:4, 24:1, 88:10
**information** [9] - 26:1, 31:5, 48:10, 50:17, 52:20, 52:24, 81:1, 81:3, 81:17
**informed** [3] - 80:25, 81:12, 81:15
**inherent** [1] - 37:18
**inquiry** [2] - 12:9, 13:4
**inside** [1] - 29:2
**inspection** [18] - 29:14, 29:20, 30:13, 35:19, 47:13, 51:5, 51:16, 55:3, 65:5, 66:7, 66:9, 66:12, 67:9, 67:10, 67:11, 67:24, 71:15, 95:20
**inspections** [1] - 71:21
**installation** [3] - 6:7, 35:11, 35:14
**installed** [1] - 19:16
**installers** [1] - 6:15
**installing** [1] - 9:19
**instance** [2] - 53:25, 83:6
**instances** [1] - 54:4
**Instead** [1] - 15:6
**Institute** [1] - 97:13
**instrument** [15] - 57:2, 58:3, 58:9, 58:25, 59:1, 59:4, 59:6, 59:12, 59:14, 59:17, 60:4, 60:6, 74:22, 74:23
**insufficient** [1] - 99:4
**insulated** [1] - 95:14
**integrated** [1] - 46:7
**intend** [2] - 69:15,

76:14
**intensive** [1] - 70:7
**intent** [4] - 7:23,
    12:21, 88:25, 92:10
**interest** [1] - 8:4
**interested** [1] - 8:19
**interfere** [1] - 73:22
**interim** [2] - 68:10,
    69:6
**international** [4] -
    38:24, 40:13, 88:11,
    89:3
**internationally** [1] -
    41:20
**interrupt** [1] - 42:8
**intervene** [2] - 8:4,
    11:19
**intervened** [2] - 11:5,
    36:6
**intervenor** [3] - 5:14,
    51:14, 51:18
**intervenor's** [1] -
    51:25
**intervenors** [2] - 8:5,
    11:18
**introduced** [1] - 56:6
**invasive** [1] - 34:8
**investigated** [1] -
    96:10
**investigation** [6] -
    65:10, 94:14, 94:15,
    96:8, 97:4, 100:6
**investigations** [1] -
    33:11
**investigator** [1] -
    99:12
**involve** [1] - 78:25
**involved** [6] - 6:17,
    8:7, 65:3, 71:24,
    94:15, 96:8
**involvement** [1] -
    94:13
**involves** [2] - 41:10,
    51:16
**involving** [1] - 6:24
**irregular** [3] - 90:5,
    90:6, 98:2
**ISA** [2] - 85:9, 92:15
**ISAS** [1] - 40:16
**ISO** [1] - 85:11
**issue** [37] - 8:8, 12:25,
    15:21, 18:18, 19:24,
    21:11, 21:17, 32:6,
    34:22, 36:24, 42:12,
    43:2, 43:21, 43:25,
    44:13, 49:23, 50:8,
    50:11, 50:19, 51:20,
    52:6, 54:15, 55:21,
    55:23, 68:7, 70:10,
    75:23, 92:3, 92:24,

93:1, 93:14, 96:19,
    99:2, 99:3, 100:19
**issued** [4] - 6:23, 7:11,
    7:19, 7:20
**issues** [15] - 8:6,
    21:13, 34:6, 35:11,
    36:1, 39:15, 46:5,
    84:17, 87:11, 94:2,
    96:14, 100:17,
    100:22, 101:7,
    101:13
**item** [3] - 27:22, 47:1,
    88:20
**ITEMS** [1] - 4:3
**items** [4] - 25:9, 77:6,
    82:16, 98:13
**itself** [6] - 41:8, 43:3,
    43:5, 89:11, 91:13,
    96:1

# J

**J.R** [3] - 4:20, 9:7,
    84:8
**JACKSON** [1] - 3:10
**January** [2] - 8:14,
    90:13
**JANUARY** [1] - 1:6,
    5:2
**JEFF** [2] - 2:22, 3:8
**JEFFREY** [1] - 2:23
**JENNIFER** [1] - 3:18
**Jerry** [2] - 5:11, 10:23
**job** [2] - 42:12, 56:21
**JOSEPH** [1] - 3:11
**JR** [1] - 3:19
**judge** [2] - 18:7, 80:12
**Judge** [7] - 10:24,
    13:1, 16:4, 17:22,
    19:19, 73:13, 97:10
**JUDGE** [1] - 1:12
**judges** [1] - 30:19
**judgment** [5] - 7:17,
    7:21, 11:6, 11:14,
    16:24
**judgments** [1] - 25:15
**Judicial** [1] - 6:22
**July** [1] - 39:23
**June** [3] - 6:23, 7:11,
    39:23
**junk** [3] - 16:5, 16:8,
    17:15
**Justice** [3] - 16:7,
    16:16, 20:15
**justification** [1] -
    35:24

# K

**Katrina** [1] - 6:1
**KATZ** [1] - 1:23
**keep** [4] - 15:2, 19:4,
    34:16, 62:9
**keeps** [2] - 19:1, 56:5
**KEISER** [1] - 3:8
**KENNETH** [1] - 3:3
**KERRY** [1] - 2:18
**key** [6] - 12:9, 17:15,
    28:16, 40:6, 54:23,
    56:17
**kids** [1] - 15:9
**kind** [9] - 17:20, 24:3,
    46:4, 53:13, 55:1,
    62:21, 86:20, 90:22,
    98:2
**kinds** [4] - 28:13,
    80:23, 83:20, 97:9
**kitchen** [3] - 29:4,
    62:24, 90:23
**Knauf** [24] - 8:6, 8:25,
    9:5, 14:5, 19:14,
    21:19, 24:11, 25:20,
    25:24, 26:13, 27:1,
    27:14, 28:18, 31:18,
    46:25, 47:4, 48:4,
    53:8, 54:23, 57:22,
    61:25, 62:5, 74:9,
    82:10
**Knauf's** [2] - 12:19,
    47:20, 54:15
**Knauf-Sharp** [1] -
    46:25
**knowing** [1] - 74:11
**knowledge** [1] - 93:18
**known** [5] - 9:24,
    26:25, 54:9, 61:14,
    62:5
**knows** [1] - 81:8
**KPT** [10] - 5:13, 5:14,
    31:18, 32:16, 36:2,
    36:8, 63:24, 76:4,
    84:22, 93:25
**Kranz** [3] - 78:24,
    83:3, 97:18
**Kumho** [1] - 97:8
**KYLE** [1] - 3:13

# L

**LA** [4] - 1:25, 2:5,
    2:19, 3:23
**lab** [17] - 23:12, 56:10,
    57:2, 58:16, 58:19,
    58:20, 58:21, 59:1,
    59:7, 59:11, 73:23,

74:4, 81:4, 81:25,
    89:22, 94:20, 94:21
**Lab** [3] - 23:20, 23:25,
    86:21
**labels** [1] - 23:19
**labor** [1] - 70:7
**Laboratories** [3] -
    22:5, 22:11, 84:20
**laboratories** [1] - 64:8
**laboratory** [7] - 16:21,
    22:16, 22:17, 56:11,
    73:16, 74:2, 97:14
**Labs** [7] - 26:12, 38:3,
    61:10, 81:23, 86:19,
    88:24, 99:13
**labs** [1] - 97:16
**lack** [2] - 56:17, 75:24
**lacking** [1] - 76:1
**lacks** [4] - 9:23, 75:19,
    93:18, 93:19
**ladies** [1] - 5:8
**laid** [2] - 67:7, 77:19
**landscape** [1] - 56:5
**language** [2] - 13:10,
    17:8
**larger** [1] - 12:6
**last** [7] - 29:16, 39:22,
    55:20, 56:8, 58:18,
    58:19, 65:12
**late** [3] - 15:10, 55:20,
    74:16
**latter** [1] - 8:21
**LAW** [1] - 1:19
**law** [2] - 26:13, 82:22
**lawyers** [3] - 14:6,
    26:13, 30:20
**layer** [2] - 85:21, 87:15
**Leach** [2] - 35:14,
    53:19
**lead** [5] - 33:10, 65:10,
    68:25, 98:6, 98:7
**leads** [1] - 98:6
**Learned** [1] - 97:10
**least** [7] - 10:11,
    35:13, 41:25, 50:2,
    61:21, 62:6, 85:16
**leave** [4] - 29:5, 30:5,
    52:6, 59:20
**leaves** [4] - 14:19,
    15:5, 24:19, 24:20
**leaving** [2] - 52:17,
    74:4
**left** [2] - 20:7, 90:11
**legal** [3] - 13:6, 16:24,
    20:21
**legitimate** [1] - 74:25
**legitimately** [1] -
    26:22
**length** [3] - 82:15,
    89:4, 89:17

**Lennar** [3] - 62:17,
    63:2, 64:17
**LEONARD** [1] - 1:24
**less** [5] - 18:19, 27:12,
    34:8, 87:15, 98:21
**letter** [2] - 47:3, 48:20
**level** [18] - 13:18,
    15:11, 20:18, 23:14,
    25:11, 38:1, 42:6,
    42:16, 51:22, 54:17,
    57:20, 69:4, 69:5,
    85:5, 85:23, 89:24,
    90:1, 93:3
**levels** [17] - 14:21,
    14:22, 23:13, 32:21,
    34:19, 35:6, 35:7,
    43:3, 68:15, 69:16,
    69:18, 72:5, 72:10,
    72:11, 89:20, 92:18
**LEWIS** [22] - 1:16,
    5:21, 21:7, 29:18,
    46:2, 46:6, 46:16,
    48:20, 48:25, 52:5,
    52:10, 53:7, 53:13,
    54:8, 55:4, 72:18,
    72:21, 80:11, 88:17,
    90:9, 97:7, 99:9
**Lewis** [5] - 5:21,
    12:15, 21:5, 21:7,
    64:25
**LEWIS......................**
    **......................** [7] -
    4:7, 4:10, 4:13, 4:15,
    4:18, 4:21, 4:24
**Lexis** [1] - 30:22
**LIABILITY** [1] - 1:5
**life** [3] - 98:7, 98:8,
    98:19
**lifetime** [1] - 15:7
**lift** [1] - 36:9
**lights** [1] - 34:23
**likely** [3] - 71:10,
    86:19, 99:22
**likewise** [3] - 12:1,
    21:2, 50:4
**limit** [4] - 9:4, 9:22,
    46:13, 51:1
**Limited** [2] - 8:6, 11:6
**limited** [6] - 35:15,
    35:19, 45:23, 88:5,
    94:13, 97:3
**limits** [1] - 94:13
**line** [3] - 47:9, 60:15,
    60:16
**lines** [2] - 60:15, 72:24
**list** [2] - 26:16, 50:3
**literature** [21] - 10:2,
    10:8, 25:25, 26:7,
    27:8, 27:9, 30:25,
    41:18, 52:21, 56:23,

57:1, 60:4, 60:9, 60:25, 61:7, 90:24, 91:11, 91:16, 91:18, 98:24, 99:18
**Litigation** [1] - 6:22
**LITIGATION** [1] - 1:6
**litigation** [11] - 5:25, 6:20, 6:21, 8:3, 14:7, 15:1, 18:9, 25:21, 26:20, 31:10, 39:8
**livable** [1] - 42:16
**live** [7] - 21:24, 24:22, 25:17, 25:18, 28:8, 28:10, 82:3
**living** [4] - 14:22, 19:7, 28:3, 29:4
**LLC** [1] - 2:17
**LLP** [4] - 1:16, 2:7, 2:10, 2:14
**local** [3] - 53:18, 53:19, 54:1
**localized** [5] - 35:11, 35:15, 53:14, 67:2, 92:24
**located** [1] - 7:10
**location** [2] - 40:24, 85:6
**locations** [2] - 45:12, 86:4
**long-term** [2] - 38:25, 87:20
**LONGER** [1] - 2:22
**look** [28] - 15:22, 22:5, 25:2, 31:6, 31:10, 33:17, 36:5, 37:8, 55:5, 56:14, 61:17, 65:8, 65:22, 66:14, 67:19, 70:10, 72:3, 73:1, 82:14, 86:19, 86:22, 87:6, 88:20, 91:20, 91:22, 94:22, 96:19, 99:11
**looked** [15] - 22:18, 23:2, 57:4, 57:9, 59:10, 59:11, 61:9, 61:18, 61:22, 66:11, 86:20, 88:21, 97:24, 99:14, 99:23
**looking** [19] - 36:4, 39:11, 57:20, 64:17, 68:6, 69:15, 71:2, 77:11, 77:12, 79:13, 79:25, 82:11, 87:1, 87:12, 92:13, 93:2, 94:3, 97:21
**looks** [2] - 27:15, 68:8
**loosely** [1] - 63:13
**Lori** [1] - 78:16
**LOUISIANA** [2] - 1:2, 1:6

**Louisiana** [5] - 7:1, 23:10, 75:6, 102:5, 102:6
**low** [2] - 68:15, 87:21
**lower** [3] - 72:11, 77:22, 100:15
**LTD** [2] - 1:9, 7:8

# M

**machine** [5] - 46:17, 64:23, 64:24, 68:22, 70:1
**machinery** [2] - 56:11, 56:12
**MAIN** [1] - 1:21
**maintenance** [1] - 28:12
**major** [3] - 56:19, 61:5, 90:6
**majority** [3] - 12:11, 16:7, 77:3
**make-whole** [1] - 15:13
**man** [1] - 97:20
**Management** [1] - 55:25
**manager** [1] - 75:16
**manipulations** [1] - 47:19
**manner** [1] - 47:16
**manual** [1] - 71:15
**MANUFACTURED** [1] - 1:5
**manufactured** [2] - 6:3, 7:8
**manufacturers** [1] - 6:17
**manufacturing** [1] - 28:23
**marked** [1] - 66:19
**marker** [1] - 65:25
**marking** [2] - 70:21, 71:6
**markings** [1] - 71:13
**Massachusetts** [1] - 97:13
**material** [16] - 9:10, 32:17, 41:12, 50:20, 60:17, 77:2, 79:1, 82:8, 88:20, 88:21, 90:11, 91:22, 98:9, 101:5, 101:12
**materially** [1] - 9:19
**materials** [2] - 79:7, 88:3
**Matt** [1] - 19:13
**matter** [8] - 5:24, 7:2, 8:4, 10:24, 25:17,

50:10, 78:23, 102:10
**matters** [1] - 8:17
**MATTHEW** [1] - 4:12
**Matthew** [5] - 9:5, 32:1, 36:15, 50:19, 67:20
**matured** [1] - 18:8
**Mauro** [1] - 78:17
**McGraw** [1] - 95:25
**MCKENZIE** [2] - 2:10, 2:14
**MCNAMARA** [1] - 3:18
**MDL** [3] - 1:5, 5:23, 26:6
**MeadWestvaco** [3] - 46:22, 47:3, 47:20
**mean** [3] - 49:13, 58:20, 80:22
**meaning** [1] - 12:25
**meaningful** [1] - 17:9
**means** [9] - 17:4, 58:20, 59:5, 71:7, 71:8, 79:16, 85:6
**measure** [13] - 37:9, 41:9, 43:9, 43:19, 45:5, 60:4, 60:6, 77:8, 78:9, 85:20, 87:14, 88:12, 90:23
**measured** [6] - 23:6, 23:7, 81:25, 85:19, 88:21, 92:19
**measurement** [4] - 41:2, 41:5, 45:1, 45:6
**measurements** [1] - 84:12
**measures** [1] - 86:12
**measuring** [4] - 23:8, 37:7, 40:20, 85:13
**MECHANICAL** [1] - 3:24
**mechanism** [3] - 33:10, 54:12, 77:8
**mechanisms** [1] - 76:16
**medical** [1] - 83:18
**meet** [3] - 31:12, 37:15, 63:19
**meeting** [2] - 26:13, 49:20
**meets** [2] - 93:3, 93:4
**MELLON** [1] - 2:11
**mention** [1] - 59:22
**mentioned** [4] - 17:1, 25:9, 55:16, 65:11
**Merit** [1] - 102:4
**metal** [9] - 6:9, 22:21, 22:22, 33:10, 65:17, 82:9, 85:16, 100:16
**metallic** [1] - 40:24

**metallurgist** [1] - 77:2
**metals** [1] - 37:19
**method** [17] - 20:13, 34:9, 36:18, 46:21, 47:9, 48:3, 52:12, 54:23, 67:14, 68:16, 86:8, 86:14, 88:9, 92:3, 92:9
**methodologies** [1] - 12:18
**methodology** [22] - 8:11, 13:2, 13:3, 13:11, 15:17, 15:22, 17:16, 17:18, 34:1, 51:11, 53:8, 63:25, 71:12, 74:13, 81:22, 82:5, 82:11, 84:18, 84:19, 93:22
**methods** [7] - 13:12, 34:4, 34:6, 56:18, 79:24, 84:15, 92:8
**Meunier** [5] - 5:11, 10:23, 21:18, 26:10, 80:11
**MEUNIER** [12] - 2:3, 2:3, 5:11, 5:16, 9:16, 10:22, 15:4, 15:19, 29:17, 49:18, 50:18, 101:9
**MEUNIER.................
..................** [1] - 4:6
**MIAMI** [1] - 2:13
**MICHAEL** [2] - 3:10, 3:12
**micro** [2] - 45:18, 90:18
**micro-environments** [1] - 45:18
**microns** [2] - 89:23
**microscopic** [1] - 94:23
**microscopy** [2] - 83:3, 94:21
**might** [11] - 31:2, 38:3, 44:19, 45:16, 48:12, 49:19, 56:9, 56:10, 58:12, 72:18, 96:5
**MIKE** [1] - 3:2
**MILLER** [1] - 2:18
**million** [4] - 59:2, 69:4, 72:5, 72:11
**millions** [1] - 30:22
**mills** [3] - 26:2, 26:3, 32:19
**mimic** [1] - 45:16
**minimize** [1] - 44:10
**minimum** [1] - 31:13
**minutes** [2] - 75:9, 83:12

**mirrored** [1] - 22:13
**mischaracterized** [1] - 90:15
**misguided** [1] - 45:24
**misquote** [1] - 83:14
**misstate** [1] - 83:15
**mistakes** [2] - 62:8, 62:9
**misunderstanding** [1] - 66:3
**Mitchell** [2] - 5:15, 21:20
**mitigate** [2] - 17:4, 17:12
**mitigates** [1] - 42:18
**mitigation** [4] - 14:17, 15:20, 15:22, 42:20
**mixed** [1] - 67:2
**mixture** [1] - 50:24
**moderate** [2] - 71:8, 71:17
**modern** [1] - 76:21
**moisture** [5] - 14:21, 19:2, 19:5, 19:6, 43:3
**moment** [4] - 12:15, 14:24, 42:8, 54:14
**monitoring** [5] - 41:10, 45:7, 85:13, 86:5
**month** [1] - 34:10
**months** [5] - 6:23, 19:17, 43:12, 64:6
**Moreover** [1] - 39:2
**moreover** [1] - 88:4
**Morse** [44] - 9:4, 9:15, 9:17, 9:22, 12:19, 13:13, 13:15, 18:22, 19:10, 20:16, 24:11, 25:11, 26:13, 26:14, 27:20, 28:18, 30:14, 31:25, 32:10, 32:12, 33:18, 33:21, 36:12, 36:13, 36:15, 36:25, 37:3, 37:4, 45:22, 46:10, 47:24, 48:1, 48:8, 49:22, 51:20, 54:25, 55:18, 62:13, 64:14, 67:13, 67:15, 67:16, 78:5, 78:7
**Morse's** [6] - 19:2, 20:24, 21:11, 38:13, 60:21, 67:23
**MORSE..................
..................** [1] - 4:5
**most** [8] - 23:14, 24:6, 24:16, 39:24, 40:13, 61:21, 65:22
**mostly** [2] - 83:18,

94:8
**motion** [9] - 7:17,
10:12, 22:10, 30:2,
40:11, 56:16, 63:6,
66:2, 89:21
**Motion** [3] - 9:4,
31:24, 72:14
**motions** [8] - 8:25,
9:1, 9:6, 9:13, 31:23,
33:6, 75:14, 101:3
**mouthpiece** [1] -
76:22
**move** [3] - 18:21,
43:11, 75:13
**moving** [1] - 29:7
**MR** [82] - 4:6, 4:7, 4:8,
4:9, 4:10, 4:11, 4:13,
4:14, 4:15, 4:17,
4:18, 4:19, 4:21,
4:22, 4:23, 4:24,
4:25, 5:11, 5:13,
5:14, 5:15, 5:16,
5:18, 5:20, 5:21,
9:16, 10:22, 15:4,
15:19, 21:7, 29:17,
29:18, 31:17, 35:2,
36:8, 36:23, 42:23,
44:2, 44:16, 44:23,
46:2, 46:6, 46:16,
48:15, 48:18, 48:20,
48:22, 48:25, 49:3,
49:18, 50:18, 52:5,
52:10, 53:7, 53:13,
54:8, 55:4, 63:23,
65:16, 72:18, 72:21,
76:3, 77:15, 78:7,
80:11, 83:12, 84:22,
87:11, 88:16, 88:17,
90:9, 92:7, 92:23,
93:24, 94:7, 96:17,
97:7, 99:9, 100:2,
100:4, 100:23, 101:9
**MTI** [1] - 23:16
**multi** [4] - 6:21, 6:22,
51:15, 67:7
**multi-district** [2] -
6:21, 6:22
**multi-step** [2] - 51:15,
67:7
**multidisciplinary** [3] -
82:22, 82:23, 83:17
**multidiscipline** [1] -
50:12
**multifaceted** [1] -
36:20
**multiple** [3] - 28:7,
36:20, 46:18
**museums** [1] - 80:17
**must** [4] - 12:1, 20:24,
42:11, 76:20

**muster** [3] - 12:20,
13:23, 14:15

# N

**N.W** [1] - 1:17
**name** [1] - 93:10
**namely** [1] - 8:17
**nanometers** [1] -
87:16
**narrow** [1] - 53:25
**National** [7] - 22:5,
22:11, 23:20, 23:25,
61:10, 84:19, 88:24
**national** [1] - 40:13
**nature** [6] - 8:22, 12:1,
14:2, 14:24, 18:21,
19:24
**Navy** [1] - 82:18
**near** [1] - 55:8
**necessarily** [4] - 18:3,
18:4, 79:16, 80:6
**necessary** [3] - 7:24,
31:5, 52:1
**necessitates** [1] - 8:7
**need** [17] - 17:20,
18:15, 20:22, 21:12,
30:6, 30:7, 46:1,
48:6, 54:13, 55:8,
55:9, 56:1, 58:12,
72:25, 82:23, 83:7,
86:3
**needed** [1] - 16:18
**needs** [8] - 32:11,
50:16, 55:4, 65:21,
74:10, 80:7, 81:1,
81:13
**negate** [1] - 46:14
**negative** [6] - 59:11,
59:20, 70:12, 74:19,
75:3, 75:5
**negatives** [7] - 59:5,
60:13, 60:18, 68:19,
68:20, 72:12, 73:20
**Nelson** [3] - 67:1,
79:5, 83:25
**Never** [1] - 16:22
**never** [10] - 74:6,
95:13, 95:14, 95:18,
95:19, 95:20, 96:22,
96:23, 98:3, 98:9
**New** [1] - 53:2
**new** [8] - 10:8, 18:24,
30:5, 30:7, 41:18,
55:21, 56:6
**NEW** [5] - 1:6, 1:25,
2:5, 2:19, 3:23
**NEWARK** [1] - 2:8
**news** [1] - 18:11

**next** [3] - 24:21, 50:19,
84:8
**nice** [2] - 17:6, 95:25
**NICHOLS** [2] - 3:14,
5:15
**Nichols** [1] - 5:15
**night** [3] - 55:20, 56:8,
58:19
**NJ** [1] - 2:8
**NO** [1] - 1:5
**nobody's** [1] - 56:22
**NOEL** [1] - 3:15
**non** [5] - 13:18, 14:22,
27:24, 50:22, 50:24
**non-Chinese** [1] -
50:24
**non-contaminated** [1]
- 50:22
**non-detect** [1] - 14:22
**non-detectable** [1] -
13:18
**non-retrofit** [1] - 27:24
**none** [2] - 74:13,
82:13
**None** [2] - 26:24, 61:9
**NORFOLK** [1] - 1:21
**not-made-whole** [1] -
19:24
**note** [1] - 80:11
**noted** [1] - 76:18
**notes** [1] - 63:3
**nothing** [9] - 18:24,
47:21, 48:9, 60:3,
60:7, 60:9, 60:10,
70:13
**Nothing** [1] - 95:4
**notice** [1] - 8:14
**notion** [1] - 46:17
**notwithstanding** [1] -
7:15
**novel** [2] - 10:8, 16:15
**November** [3] - 7:16,
7:19, 19:16
**noxious** [5] - 9:18,
11:10, 29:24, 30:1,
42:16
**number** [3] - 37:8,
68:24, 85:4
**numbered** [1] - 102:9
**numbering** [3] - 68:2,
68:3, 68:5
**numbers** [1] - 85:20

# O

**O'KEEFE** [1] - 1:24
**object** [1] - 43:24
**objection** [2] - 49:15,
51:4

**objections** [1] - 75:14
**objects** [2] - 6:9,
84:11
**observation** [7] -
16:17, 29:21, 29:24,
67:11, 69:21, 81:4,
99:17
**observations** [5] -
29:21, 77:17, 79:6,
83:14, 97:9
**observed** [10] - 23:3,
23:4, 23:5, 30:3,
30:7, 72:4, 81:6,
82:1, 83:2
**observing** [2] - 23:8
**obvious** [2] - 24:4,
28:5
**obviously** [6] - 12:7,
12:23, 39:10, 39:16,
39:22, 49:9
**Obviously** [2] - 40:7,
44:2
**occupied** [2] - 10:5,
10:11
**occur** [3] - 47:15,
54:5, 97:22
**occurring** [1] - 77:21
**occurs** [4] - 26:19,
46:14, 77:21, 98:15
**odor** [2] - 29:24, 30:1
**OF** [3] - 1:2, 1:11, 1:19
**off-gassing** [7] -
13:17, 14:19, 14:20,
15:11, 19:6, 20:5,
21:17
**offer** [4] - 78:10,
78:11, 80:12, 80:13
**offered** [6] - 21:15,
31:24, 31:25, 32:1,
32:15, 65:7
**offering** [3] - 32:25,
35:25
**offers** [2] - 95:15, 96:9
**OFFICES** [1] - 1:19
**offices** [1] - 94:19
**Official** [2] - 102:5,
102:15
**OFFICIAL** [1] - 3:22
**often** [5] - 8:13, 12:10,
16:24, 17:15, 30:19
**Once** [2] - 61:4, 68:15,
70:12
**once** [2] - 19:25, 52:19
**One** [12] - 8:5, 21:15,
39:12, 46:20, 54:25,
61:21, 62:20, 71:7,
76:10, 87:11, 88:8,
91:16
**ONE** [1] - 2:15
**one** [78] - 7:2, 10:11,

17:2, 17:15, 18:20,
23:13, 25:16, 28:7,
28:16, 28:18, 29:13,
29:14, 30:17, 30:22,
32:8, 32:21, 33:19,
33:22, 33:24, 35:13,
35:17, 35:18, 40:6,
40:15, 40:19, 42:10,
46:25, 47:1, 47:7,
48:15, 48:23, 50:13,
56:2, 57:24, 58:18,
60:4, 61:20, 61:24,
62:3, 62:6, 62:10,
64:4, 64:12, 65:9,
65:19, 67:4, 67:16,
68:2, 68:8, 68:21,
70:4, 70:14, 71:1,
71:24, 72:3, 73:8,
73:15, 78:2, 78:3,
81:2, 84:8, 85:6,
86:13, 87:13, 88:13,
89:25, 90:1, 91:13,
91:17, 92:6, 92:12,
99:7, 99:22
**one-to-one** [1] - 68:21
**one-year** [1] - 47:7
**ones** [3] - 17:20, 49:3,
83:25
**ongoing** [2] - 20:19,
74:18
**oops** [1] - 59:8
**open** [3] - 28:11,
51:21, 69:23
**opening** [1] - 15:8
**operating** [4] - 41:11,
45:3, 46:12, 46:14
**operative** [1] - 42:15
**opine** [4] - 79:23,
92:25, 99:6
**opined** [1] - 37:24
**opines** [2] - 9:18,
50:21
**opining** [2] - 80:1,
88:13
**opinion** [25] - 8:12,
12:11, 16:6, 21:11,
21:12, 26:17, 30:15,
30:16, 31:12, 46:7,
48:2, 75:18, 75:19,
75:25, 77:5, 78:10,
78:11, 79:1, 80:7,
81:14, 84:14, 84:18,
87:5, 87:18, 87:19,
88:4, 88:14, 89:21,
91:4, 91:8, 91:9,
93:14, 96:11, 99:16,
101:8
**opinions** [50] - 10:17,
21:13, 21:14, 30:6,
31:25, 32:1, 32:3,

32:10, 32:12, 32:15, 33:1, 33:17, 38:13, 52:3, 64:3, 64:6, 65:7, 72:15, 75:20, 76:11, 77:4, 77:19, 77:25, 78:14, 78:21, 78:24, 79:8, 79:11, 79:13, 80:5, 80:13, 83:22, 83:23, 83:25, 84:4, 89:19, 95:5, 95:7, 95:8, 95:10, 95:12, 95:15, 95:17, 96:4, 96:9, 97:15, 98:17, 100:21, 100:24

**opponents** [1] - 96:13

**opportunity** [3] - 8:4, 8:19, 64:15

**oppose** [1] - 89:5

**opposed** [2] - 44:15, 87:21

**opposing** [2] - 64:25, 65:11

**opposition** [1] - 54:15

**opted** [1] - 25:21

**option** [1] - 35:16

**options** [2] - 34:15, 39:12

**ORAL** [1] - 1:11

**ORDER** [1] - 5:4

**order** [9] - 6:21, 7:19, 7:21, 9:12, 37:9, 39:3, 39:13, 39:24, 49:7

**Ordinarily** [1] - 43:20

**organizations** [1] - 89:3

**organize** [1] - 24:14

**original** [2] - 50:2, 83:8

**ORLEANS** [5] - 1:6, 1:25, 2:5, 2:19, 3:23

**Orleans** [1] - 53:2

**ostensibly** [1] - 36:11

**ourselves** [1] - 35:4

**outcome** [1] - 15:24

**outlets** [1] - 68:12

**outs** [1] - 81:10

**outset** [2] - 10:24, 12:21

**outside** [5] - 14:23, 28:24, 28:25, 45:15, 77:22

**overall** [3] - 41:3, 41:9, 95:10

**overlooked** [1] - 17:16

**overview** [1] - 31:20

**overwhelming** [1] - 99:20

**own** [14] - 46:20,

47:10, 47:11, 47:18, 47:20, 60:11, 60:12, 60:19, 61:1, 61:16, 66:24, 74:21, 78:9, 80:14

**owners** [1] - 7:5

**oxide** [1] - 79:19

## P

**p.m** [1] - 101:16

**P.M** [1] - 1:6

**pace** [1] - 39:9

**PAGE** [1] - 4:3

**Page** [1] - 48:20

**page** [12] - 23:15, 24:2, 29:11, 47:3, 48:21, 52:7, 56:16, 57:6, 57:16, 61:5, 63:3, 84:1

**pages** [1] - 25:9, 27:7, 57:12, 60:14, 78:14, 78:20, 78:23, 78:25, 79:4

**paint** [3] - 33:10, 65:10, 68:25

**Panel** [1] - 6:22

**paper** [9] - 26:2, 26:3, 32:19, 73:14, 73:15, 73:17, 73:21, 73:24

**papers** [7] - 23:16, 25:24, 27:14, 37:22, 40:4, 46:7

**parameters** [2] - 14:8, 20:17

**parlance** [1] - 30:10

**part** [13] - 15:17, 28:23, 32:3, 33:6, 33:14, 33:22, 49:15, 50:4, 50:12, 54:21, 66:9, 66:12, 66:14

**partial** [3] - 33:25, 66:4, 72:16

**participate** [2] - 8:5, 91:12

**particular** [15] - 6:20, 22:8, 33:16, 43:10, 44:15, 51:20, 58:11, 66:13, 73:7, 76:15, 79:12, 85:4, 91:13, 95:6

**particularly** [4] - 6:5, 58:2, 90:3, 97:14

**parties** [9] - 8:19, 9:8, 9:11, 10:21, 52:4, 76:2, 84:9, 84:21, 93:23

**Parties** [1] - 8:3

**parts** [6] - 32:21, 59:2,

69:4, 72:5, 72:11, 100:13

**pass** [2] - 12:19, 14:14

**passed** [1] - 80:11

**passes** [1] - 13:23

**past** [6] - 7:14, 19:9, 26:15, 65:10, 74:10, 74:11

**patching** [1] - 70:6

**patient** [1] - 15:7

**PAUL** [1] - 3:15

**Paul** [1] - 78:18

**pay** [1] - 19:3

**paying** [1] - 15:10

**peer** [18] - 10:1, 10:10, 12:17, 25:25, 26:7, 27:9, 30:25, 31:8, 37:22, 41:16, 44:25, 52:21, 56:23, 57:1, 60:3, 60:25, 61:7, 72:6

**peer-review** [1] - 52:21

**peer-reviewed** [14] - 10:10, 25:25, 26:7, 27:9, 30:25, 37:22, 41:16, 44:25, 56:23, 57:1, 60:3, 60:25, 61:7, 72:6

**people** [24] - 21:24, 23:9, 24:21, 25:17, 28:2, 28:3, 28:8, 28:10, 32:23, 36:17, 60:20, 60:21, 71:19, 74:18, 78:3, 78:15, 79:9, 80:5, 80:19, 81:3

**people's** [1] - 77:4

**PEPPER** [1] - 3:22

**Pepper** [3] - 102:3, 102:13, 102:14

**per** [6] - 32:21, 35:23, 59:2, 69:4, 72:5, 72:11

**percent** [9] - 19:1, 27:12, 27:13, 27:25, 54:18, 60:13, 60:20, 61:16, 69:10

**performed** [2] - 54:1, 95:2

**perhaps** [1] - 52:23

**period** [4] - 35:6, 39:19, 42:22, 86:10

**periods** [1] - 86:11

**Perkins** [2] - 82:7, 82:14

**permit** [2] - 10:25, 77:24

**permitted** [1] - 76:22

**permitting** [1] - 18:3

**Perricone** [45] - 9:5, 10:18, 19:14, 32:1, 33:18, 33:21, 36:16, 37:13, 37:24, 46:10, 46:21, 47:24, 48:1, 49:22, 50:20, 51:15, 51:17, 52:11, 54:25, 55:18, 59:2, 60:10, 60:14, 60:15, 60:23, 63:9, 63:12, 64:2, 64:12, 65:2, 65:7, 67:13, 67:20, 68:14, 69:5, 70:20, 72:10, 74:22, 75:4, 78:6, 89:21, 91:6

**Perricone's** [9] - 30:16, 56:25, 60:21, 61:1, 61:16, 61:18, 61:22, 67:22, 74:21

**PERRICONE............ .................** [1] - 4:12

**person** [11] - 9:14, 37:5, 37:13, 77:11, 78:17, 78:18, 79:23, 80:15, 81:18, 82:20, 91:9

**personal** [2] - 11:12, 89:8

**perspective** [2] - 5:24, 10:25

**PETERSON** [1] - 3:2

**Ph.D** [4] - 9:5, 80:20, 84:24, 91:9

**phenomenon** [2] - 90:25, 91:11

**Phil** [1] - 19:13

**photographed** [3] - 81:6, 83:2, 83:4

**photographs** [1] - 29:20

**physical** [2] - 6:11, 29:14

**picture** [7] - 50:15, 50:17, 77:11, 77:12, 77:14, 77:15, 77:18

**piece** [3] - 28:7, 66:6, 73:17

**pieces** [9] - 32:3, 46:19, 53:4, 53:6, 53:9, 53:12, 53:14, 53:17

**pins** [1] - 37:8

**pipes** [4] - 88:6, 91:5, 91:7

**pits** [3] - 23:6, 89:22, 90:5

**pitted** [1] - 81:17

**pitting** [7] - 23:3, 23:8, 82:1, 92:2, 92:21,

92:23, 92:25

**place** [12] - 7:10, 7:22, 14:10, 14:20, 21:12, 24:17, 34:21, 35:4, 35:6, 38:7, 50:23, 71:12

**placed** [2] - 45:16, 49:25

**placement** [1] - 41:10

**plaintiff** [10] - 12:3, 15:5, 15:6, 17:12, 43:10, 51:1, 69:13, 69:14, 93:19

**Plaintiffs** [4] - 7:16, 32:2, 32:23, 67:1

**plaintiffs** [34] - 5:11, 5:17, 5:18, 5:20, 5:21, 9:14, 9:21, 10:14, 10:25, 11:2, 11:7, 11:18, 14:15, 14:17, 14:25, 18:15, 20:2, 20:11, 20:23, 24:7, 35:13, 35:20, 36:12, 40:15, 41:23, 42:9, 44:14, 44:20, 51:10, 52:2, 75:21, 76:13, 84:16, 85:25

**PLAINTIFFS** [1] - 1:16

**plaintiffs'** [6] - 10:17, 12:16, 38:8, 44:5, 44:25, 66:24

**plan** [8] - 29:5, 51:11, 51:15, 51:16, 55:15, 56:1, 56:4, 80:10

**planned** [1] - 98:7

**plans** [3] - 28:12, 51:4, 79:5

**plant** [1] - 28:23

**Plasterboard** [2] - 8:6, 31:18

**plates** [1] - 55:5

**play** [4] - 15:9, 87:6, 94:3, 101:1

**PLAZA** [1] - 2:15

**pleadings** [1] - 7:15

**pled** [1] - 11:15

**plugs** [1] - 37:8

**podium** [2] - 12:16, 31:21

**point** [30] - 19:18, 24:17, 24:18, 25:9, 28:5, 29:11, 37:7, 39:7, 41:2, 44:10, 48:16, 49:11, 49:18, 59:21, 59:23, 61:4, 66:6, 70:14, 70:15, 71:6, 71:7, 78:1, 79:22, 80:1, 84:4, 87:23, 91:18, 92:7, 92:12

**pointed** [1] - 21:18
**points** [9] - 17:16, 21:10, 40:18, 54:24, 66:16, 69:15, 86:2, 86:3, 100:20
**pollution** [1] - 24:24
**population** [1] - 12:6
**portion** [1] - 84:11
**portions** [1] - 93:17
**position** [10] - 12:16, 14:18, 15:5, 42:20, 51:25, 52:2, 52:19, 84:16, 96:13, 96:18
**positions** [1] - 8:20
**positive** [1] - 49:5
**positively** [1] - 46:16
**possibilities** [2] - 73:9, 88:2
**possibility** [3] - 88:1, 90:11, 95:17
**possible** [2] - 14:7, 25:4
**posted** [1] - 8:15
**potential** [8] - 41:3, 41:9, 43:5, 57:9, 60:24, 61:13, 86:7, 87:20
**POYDRAS** [3] - 2:4, 2:19, 3:22
**practical** [4] - 62:15, 62:16, 63:1, 63:4
**practice** [1] - 93:11
**precise** [2] - 59:12, 72:23
**precluded** [1] - 11:15
**predicate** [2] - 24:8, 98:12
**predict** [1] - 91:25
**predicting** [2] - 81:5, 85:3
**predicts** [1] - 47:2
**prefer** [1] - 17:4
**preferred** [1] - 92:3
**prejudice** [1] - 64:18
**preliminary** [3] - 7:20, 8:16, 65:1
**premature** [1] - 43:2
**premier** [1] - 22:6
**prepared** [4] - 39:10, 41:11, 71:15
**preselect** [1] - 94:19
**present** [8] - 7:2, 8:19, 26:14, 67:2, 74:17, 75:1, 87:25, 89:20
**PRESENT** [1] - 2:22
**presented** [4] - 9:14, 49:1, 56:15, 60:11
**presiding** [1] - 18:7
**pressure** [1] - 27:3
**pretrial** [2] - 6:25,

49:20
**primarily** [3] - 33:14, 82:11, 98:17
**primary** [4] - 54:24, 79:10, 81:14, 81:18
**principal** [1] - 7:10
**principle** [1] - 25:2
**principles** [2] - 13:12, 39:4
**probable** [1] - 73:4
**probative** [2] - 12:23, 12:24
**problem** [37] - 11:21, 11:23, 11:24, 14:21, 22:3, 22:4, 22:8, 22:12, 23:22, 24:6, 24:9, 25:14, 25:16, 26:24, 34:24, 36:20, 39:13, 40:14, 41:18, 42:15, 42:18, 42:19, 52:16, 54:21, 56:1, 56:13, 58:23, 75:3, 75:5, 82:22, 83:16, 87:8, 90:21, 95:6, 100:24
**problems** [4] - 30:9, 32:20, 68:11, 82:18
**procedural** [1] - 11:2
**procedure** [2] - 50:21, 83:18
**proceeding** [3] - 7:21, 31:14, 44:17
**PROCEEDINGS** [3] - 1:11, 3:24, 5:1
**proceedings** [6] - 6:25, 8:5, 11:19, 20:1, 101:16, 102:9
**process** [1] - 17:25
**PRODUCED** [1] - 3:25
**produced** [1] - 14:3
**product** [3] - 44:18, 96:24, 98:8
**PRODUCTS** [1] - 1:5
**Products** [4] - 22:7, 22:12, 57:4, 57:8
**products** [5] - 25:5, 43:4, 97:23, 98:7, 98:20
**Professional** [1] - 102:4
**Professor** [1] - 49:14
**professor** [1] - 89:2
**programs** [1] - 64:19
**project** [3] - 16:23, 75:16, 77:16
**projects** [1] - 26:21
**prong** [2] - 31:7
**pronouncing** [1] - 93:10
**pronunciation** [1] -

94:17
**proof** [2] - 53:15, 54:9
**proper** [2] - 37:6, 80:7
**properly** [2] - 7:13, 54:23
**properties** [4] - 7:25, 8:1, 12:7, 50:23
**property** [3] - 11:12, 12:2, 21:16
**proposals** [1] - 13:19
**proposed** [2] - 8:10, 24:19
**proposes** [1] - 13:15
**proposition** [1] - 24:5
**Propulsid** [1] - 31:3
**protect** [5] - 28:20, 28:22, 29:1, 29:8, 30:17
**protocol** [14] - 17:25, 18:12, 19:22, 51:8, 51:15, 51:18, 55:17, 55:25, 56:9, 67:7, 68:13, 71:12, 74:16
**prove** [2] - 46:19, 48:12
**provide** [6] - 31:20, 34:5, 65:13, 72:7, 72:8, 95:9
**provided** [3] - 65:23, 86:15, 92:17
**provides** [5] - 34:8, 41:1, 41:2, 64:2, 95:17
**providing** [1] - 37:11
**province** [2] - 7:11, 51:19
**PRUDENTIAL** [1] - 2:15
**PSC** [12] - 8:25, 9:3, 21:8, 21:20, 36:12, 38:21, 39:7, 39:17, 49:12, 63:10, 64:3, 83:15
**PSC's** [3] - 34:3, 43:8, 65:2
**public** [1] - 24:17
**publication** [4] - 23:16, 27:6, 45:1, 85:11
**published** [4] - 10:2, 56:23, 61:7, 61:14
**pull** [1] - 55:4
**pulls** [1] - 61:19
**pulp** [1] - 26:3
**pulper** [1] - 26:2
**purport** [1] - 21:1
**purports** [1] - 14:11
**purpose** [11] - 26:19, 51:12, 55:14, 57:22, 58:16, 59:25, 60:1,

61:8, 61:11, 73:6, 74:9
**purposes** [9] - 16:16, 17:9, 25:20, 49:19, 65:6, 69:22, 70:5, 73:10, 100:16
**Pursuant** [1] - 6:21
**Put** [1] - 18:17
**put** [31] - 5:24, 6:1, 19:9, 24:16, 25:16, 26:24, 27:17, 30:4, 32:16, 35:4, 35:5, 35:8, 39:3, 39:20, 39:22, 39:23, 40:23, 44:9, 45:8, 45:11, 48:4, 50:7, 50:14, 53:4, 71:12, 77:13, 81:19, 82:23, 85:9, 86:4, 99:20
**puts** [2] - 43:16, 53:8, 80:18
**putting** [7] - 14:17, 15:6, 42:5, 71:19, 77:16, 77:18, 101:7

**Q**

**qualified** [10] - 32:22, 75:17, 75:22, 80:23, 81:18, 82:20, 84:10, 93:20, 96:5
**qualify** [1] - 88:4
**qualitative** [1] - 41:4
**quality** [2] - 18:2, 33:3
**quantitative** [3] - 41:1, 41:2, 41:5
**quest** [2] - 16:19, 16:20
**questionable** [1] - 17:17
**questioned** [2] - 32:13, 51:20
**questioning** [1] - 67:15
**questions** [2] - 32:25, 83:9
**quick** [7] - 16:24, 31:20, 40:2, 46:4, 48:16, 100:2
**Quickly** [2] - 46:6, 70:18
**quickly** [2] - 16:22, 61:3
**quite** [4] - 11:24, 16:17, 17:11, 100:21
**quote** [5] - 12:13, 57:16, 73:13, 84:9, 97:9
**quoted** [1] - 73:3

**R**

**R's** [1] - 12:10
**radon** [1] - 44:9
**raise** [2] - 96:14, 100:20
**raised** [2] - 64:8, 99:2
**raises** [2] - 53:8, 84:17
**raising** [1] - 100:8
**RALPH** [1] - 3:19
**RANDOLPH** [1] - 2:16
**range** [1] - 28:1
**rare** [1] - 54:4
**rate** [12] - 10:4, 12:18, 26:25, 27:11, 27:12, 31:8, 61:15, 62:8, 73:20, 77:21, 100:15
**rates** [3] - 77:22, 100:14
**rather** [6] - 24:4, 34:12, 64:17, 69:15, 70:6, 93:21
**rating** [1] - 23:11
**rationality** [1] - 36:3
**ray** [1] - 33:12
**RE** [1] - 1:5
**reaching** [1] - 16:23
**reaction** [3] - 22:20, 40:5, 79:15
**reactive** [2] - 41:13, 100:15
**reactivity** [5] - 40:23, 41:10, 45:7, 85:16, 92:9
**read** [3] - 57:12, 92:10, 101:5
**readily** [1] - 61:12
**reading** [2] - 74:2, 98:11
**readings** [4] - 47:18, 59:9, 59:12, 59:15
**ready** [1] - 101:6
**real** [22] - 10:13, 13:5, 14:13, 16:3, 18:4, 18:14, 20:22, 28:3, 74:18, 80:15, 80:24, 82:3, 82:8, 82:16, 89:1, 89:13, 90:21, 91:20, 92:2
**Real** [1] - 100:2
**real-world** [5] - 14:13, 16:3, 18:4, 20:22, 91:20
**realize** [1] - 98:15
**really** [21] - 12:21, 17:14, 17:15, 21:14, 26:18, 32:2, 33:20, 33:21, 35:24, 36:17, 37:21, 43:21, 55:11,

59:8, 77:25, 83:18, 86:9, 87:25, 91:15, 94:3
**Really** [2] - 79:6, 94:12
**Realtime** [1] - 102:3
**realtors** [1] - 6:15
**reason** [17] - 11:16, 14:1, 14:12, 14:14, 15:1, 20:12, 28:20, 32:23, 36:2, 54:7, 64:3, 72:14, 73:19, 79:10, 85:17, 92:18
**reasonable** [4] - 34:12, 35:25, 64:22, 83:24
**reasonably** [1] - 34:5
**reasons** [8] - 14:1, 14:23, 25:10, 31:12, 56:17, 62:19, 80:6, 98:25
**rebuilding** [1] - 6:1
**rebut** [1] - 84:16
**rebuts** [1] - 93:20
**rebuttal** [7] - 46:1, 46:6, 49:14, 50:2, 72:18, 83:11, 92:6
**rebutted** [1] - 75:21
**received** [1] - 9:8
**recent** [1] - 65:22
**recently** [1] - 18:11
**receptacle** [2] - 69:23, 95:3
**receptacles** [6] - 62:2, 66:7, 66:14, 67:9, 70:22, 71:2
**recess** [3] - 75:9, 75:11, 101:14
**recognition** [1] - 37:17
**recognized** [8] - 14:4, 36:19, 41:20, 41:21, 61:7, 68:9, 84:14, 85:12
**recognizes** [1] - 40:19
**recommend** [2] - 27:7, 57:11
**recommended** [1] - 27:19
**record** [20] - 5:9, 28:6, 40:11, 47:17, 47:22, 48:5, 48:7, 48:8, 48:9, 48:12, 49:19, 49:21, 49:25, 50:5, 72:9, 74:7, 74:14, 89:5, 101:10, 102:9
**RECORDED** [1] - 3:24
**red** [5] - 10:15, 59:9, 59:16, 70:13, 73:14
**redirect** [1] - 48:8
**reduce** [8] - 13:17,

14:21, 20:5, 34:18, 38:19, 43:6, 46:13, 46:17
**reduced** [3] - 9:19, 33:4, 43:4
**reduces** [1] - 42:15
**reducing** [1] - 34:9
**reductions** [1] - 33:3
**redundant** [1] - 97:16
**refer** [1] - 85:15
**reference** [5] - 33:8, 51:5, 66:25, 67:24, 76:6
**referenced** [2] - 60:22, 95:8
**references** [2] - 56:7, 70:23
**referencing** [1] - 69:14
**referred** [7] - 9:1, 12:10, 16:11, 40:16, 50:6, 73:12, 78:6
**referring** [1] - 80:4
**refers** [3] - 45:6, 78:7, 78:8
**refurbishing** [1] - 6:5
**refute** [1] - 46:16
**refutes** [1] - 82:13
**regard** [25] - 32:12, 48:2, 64:6, 64:8, 67:13, 67:14, 68:1, 68:20, 72:13, 72:15, 76:20, 84:14, 84:24, 95:5, 95:10, 95:12, 95:15, 95:17, 96:4, 96:7, 97:3, 100:4, 100:14, 100:24
**regarding** [4] - 21:11, 33:1, 51:2, 84:12
**Registered** [2] - 102:3, 102:4
**relate** [1] - 12:1
**related** [2] - 64:9, 87:19
**RELATES** [1] - 1:8
**relates** [2] - 81:20, 83:7
**relating** [2] - 35:11, 78:21
**relative** [2] - 12:24, 77:21
**released** [1] - 11:10
**relevance** [8] - 12:11, 12:22, 13:1, 42:11, 42:17, 43:8, 43:23, 43:24
**relevant** [7] - 12:13, 13:8, 16:1, 43:25, 45:2, 55:17, 97:8
**reliability** [18] - 8:11, 9:23, 10:7, 12:10,

13:2, 13:11, 21:10, 25:12, 29:12, 30:24, 31:6, 31:13, 56:4, 56:18, 60:25, 61:2, 64:22, 94:2
**reliable** [20] - 12:13, 12:20, 31:1, 34:5, 34:12, 44:24, 48:3, 48:9, 51:7, 51:11, 52:3, 52:20, 52:24, 55:12, 55:13, 56:14, 59:24, 59:25, 80:8, 85:24
**reliably** [3] - 13:12, 13:23, 14:11
**reliance** [4] - 30:15, 60:17, 75:2, 97:18
**relied** [6] - 8:12, 10:17, 38:3, 41:19, 85:8, 85:24
**relies** [4] - 28:18, 47:24, 47:25, 75:18
**relocated** [1] - 43:12
**relocation** [1] - 34:10
**rely** [8] - 36:21, 36:23, 40:5, 62:7, 66:24, 77:4, 81:17, 83:17
**relying** [1] - 46:9
**remain** [1] - 50:23
**remediate** [4] - 13:9, 18:10, 36:3, 43:24
**remediated** [1] - 33:16
**remediation** [40] - 7:24, 8:22, 12:2, 12:25, 13:5, 14:13, 14:16, 14:17, 14:25, 15:20, 16:2, 16:3, 17:8, 17:10, 17:12, 18:12, 18:16, 19:25, 20:12, 20:21, 20:22, 21:2, 32:4, 32:5, 32:8, 33:22, 33:24, 34:4, 42:12, 42:13, 44:1, 52:1, 53:3, 54:1, 59:22, 64:19, 84:2
**remediations** [1] - 62:18
**remedies** [1] - 44:19
**remedy** [7] - 15:13, 20:12, 21:2, 21:22, 21:25, 44:7, 44:19
**remember** [4] - 32:14, 76:7, 76:8, 92:22
**removal** [9] - 33:25, 35:16, 39:12, 51:13, 60:2, 61:12, 66:4, 72:16, 73:10
**remove** [14] - 13:21, 34:16, 40:7, 40:8,

42:19, 42:21, 44:9, 52:12, 53:11, 61:6, 63:18, 78:18
**Remove** [1] - 34:18
**removed** [9] - 42:13, 52:16, 53:17, 65:21, 67:18, 69:25, 71:10, 90:8, 100:11
**removing** [2] - 50:22, 63:5
**rendered** [1] - 33:18
**rented** [2] - 25:20, 39:3
**repair** [4] - 34:15, 67:2, 79:5, 81:20
**repairs** [2] - 44:6, 83:7
**repeating** [1] - 79:9
**replete** [1] - 19:19
**replicable** [1] - 85:25
**replicate** [1] - 45:13
**replicates** [1] - 40:24
**report** [29] - 46:21, 48:1, 49:14, 50:7, 57:7, 60:18, 60:23, 61:23, 63:3, 67:1, 67:23, 68:8, 69:7, 73:11, 75:1, 75:2, 76:12, 77:3, 77:9, 78:13, 85:8, 86:21, 89:9, 90:13, 95:9, 98:11, 98:25
**Reporter** [6] - 102:3, 102:4, 102:5, 102:15
**REPORTER** [1] - 3:22
**REPORTER'S** [1] - 102:1
**reporting** [2] - 37:10, 77:6
**reports** [13] - 9:9, 21:19, 28:6, 46:9, 48:7, 49:13, 50:1, 50:3, 56:3, 56:15, 65:1, 78:7, 101:10
**representations** [1] - 12:6
**representative** [1] - 8:2
**require** [2] - 85:15, 92:8
**required** [2] - 8:9, 12:2
**requirement** [3] - 20:13, 20:14, 63:19
**requirements** [1] - 68:9
**requires** [3] - 13:6, 42:2, 42:13
**requisite** [1] - 25:11
**research** [3] - 26:22, 82:17, 82:18
**reserved** [1] - 94:5

**residences** [2] - 28:3, 72:1
**residential** [3] - 10:9, 10:16, 24:4
**residents** [1] - 7:6
**resolve** [1] - 16:21
**resolved** [1] - 20:1
**resolving** [2] - 34:6, 36:1
**respect** [6] - 13:22, 20:25, 45:22, 76:15, 79:11, 93:2
**respected** [1] - 84:10
**Respectfully** [1] - 36:2
**respective** [1] - 8:20
**respirator** [1] - 15:7
**respond** [3] - 20:20, 25:15, 98:22
**responds** [3] - 10:6, 51:14, 78:10
**response** [10] - 31:16, 34:3, 37:2, 45:20, 45:24, 55:20, 70:19, 82:7, 88:19, 89:18
**responsible** [2] - 76:23, 91:9
**responsive** [1] - 7:15
**rest** [5] - 12:13, 31:19, 50:13, 53:23, 72:20
**restore** [1] - 83:7
**restrict** [2] - 9:3, 9:6
**result** [6] - 6:3, 43:22, 44:15, 49:8, 97:1
**retrofit** [7] - 27:9, 27:11, 27:15, 27:16, 27:21, 27:24, 28:2
**retrofitted** [1] - 27:18
**retrofitting** [1] - 9:20
**returned** [1] - 7:12
**returning** [1] - 19:23
**review** [6] - 9:9, 10:1, 12:17, 31:8, 52:21, 85:3
**reviewed** [14] - 10:10, 25:25, 26:7, 27:9, 30:25, 37:22, 41:16, 44:25, 56:23, 57:1, 60:3, 60:25, 61:7, 72:6
**reviewing** [1] - 5:25
**Rice** [1] - 40:4
**RICHARD** [3] - 1:16, 1:19, 1:20
**Richard** [4] - 5:20, 5:21, 12:15, 21:7
**Rick** [1] - 48:18
**rid** [2] - 46:18, 73:25
**rip** [3] - 62:14, 73:15, 73:17
**rise** [5] - 5:7, 35:5,

75:10, 75:12, 101:15
**Risk** [1] - 55:24
**risk** [8] - 76:16, 77:7,
84:2, 85:7, 86:24,
89:19, 90:3, 90:6
**risks** [4] - 79:12,
84:12, 85:3, 87:3
**Rita** [1] - 6:1
**RMR** [2] - 3:22, 102:14
**Robert** [2] - 67:25,
70:17
**ROGER** [1] - 4:5
**Roger** [17] - 9:4, 9:15,
9:17, 9:22, 31:25,
32:10, 32:12, 36:12,
36:13, 36:15, 36:25,
37:2, 37:4, 38:13,
45:22, 78:5, 78:7
**role** [5] - 12:12, 40:2,
44:17, 45:22, 80:10
**Ron** [1] - 29:13
**Ronald** [1] - 78:15
**room** [24] - 28:14,
28:17, 28:21, 28:22,
28:24, 28:25, 29:1,
29:3, 29:4, 29:8,
29:10, 38:7, 45:14,
53:21, 53:23, 54:2,
61:24, 62:1, 62:10,
62:12, 69:23, 74:12
**ROOM** [1] - 3:22
**rooms** [1] - 29:3
**root** [1] - 42:23
**Rule** [1] - 12:10
**rule** [1] - 101:6
**run** [1] - 15:3
**running** [2] - 19:3,
19:5
**RUSS** [1] - 1:23
**Rutila** [21] - 9:6, 49:23,
67:1, 75:15, 76:7,
76:10, 76:25, 79:3,
79:18, 80:3, 80:10,
80:12, 80:15, 81:9,
82:6, 82:19, 83:6,
83:16, 88:19, 94:17,
94:19
**Rutila's** [2] - 78:13,
97:16
**RUTILA**......................
........................ [1] -
4:16

## S

**s/Cathy** [1] - 102:13
**safeguards** [1] - 16:13
**Safety** [4] - 22:7,
22:12, 57:4, 57:8

**sample** [1] - 45:18
**Sample** [3] - 47:5,
47:7
**samples** [18] - 45:17,
56:10, 75:1, 75:2,
82:4, 85:4, 89:22,
93:13, 94:20, 94:22,
95:3, 95:6, 95:9,
97:4, 99:5, 99:14,
100:4, 100:24
**SANDERS** [21] - 2:15,
5:14, 36:8, 36:23,
42:23, 44:2, 44:16,
44:23, 48:15, 48:18,
48:22, 49:3, 76:3,
77:15, 78:7, 83:12,
84:22, 87:11, 88:16,
92:7, 92:23
**Sanders** [8] - 5:14,
31:22, 35:9, 36:8,
50:6, 52:6, 76:3,
84:22
**SANDERS**.................
........................ [5] -
4:9, 4:11, 4:17, 4:19,
4:22
**Sandia** [19] - 22:5,
22:11, 23:2, 23:20,
23:25, 26:11, 38:3,
61:10, 81:23, 82:5,
84:19, 86:19, 86:21,
88:20, 88:23, 89:25,
98:11, 99:13, 99:18
**Sandy** [1] - 19:14
**sat** [2] - 14:6, 81:3
**satisfy** [1] - 20:13
**Saturday** [3] - 29:16,
94:5, 94:8
**saw** [2] - 58:21, 97:24
**scale** [14] - 42:3,
55:22, 56:21, 56:24,
58:8, 61:4, 61:8,
62:7, 63:7, 63:15,
71:6, 71:7
**Scali** [1] - 78:17
**scaling** [1] - 13:20
**Scarborough** [1] -
49:4
**scheduling** [1] - 7:20
**Scheiner** [1] - 78:18
**science** [28] - 10:7,
10:18, 16:6, 16:8,
16:15, 16:18, 17:15,
18:7, 22:2, 26:18,
31:9, 32:17, 34:4,
34:14, 36:18, 37:21,
37:23, 38:5, 43:13,
43:14, 43:17, 50:20,
63:10, 76:21, 76:23,
78:8, 89:3

**scientific** [20] - 10:3,
20:16, 21:10, 25:12,
26:8, 29:12, 31:6,
31:13, 35:24, 52:20,
56:17, 57:10, 58:5,
58:10, 62:16, 63:6,
64:22, 74:18, 83:24,
89:16
**scientifically** [5] -
31:1, 48:3, 48:9,
51:10, 55:12
**scientist** [9] - 55:24,
61:19, 76:21, 76:22,
76:25, 77:3, 79:2,
80:21, 83:21
**scientists** [13] - 17:20,
23:19, 26:22, 38:21,
39:11, 40:3, 40:4,
40:5, 40:14, 64:20,
73:16, 73:23, 78:11
**scope** [7] - 7:23, 8:22,
12:2, 19:25, 36:5,
44:18, 77:22
**score** [4] - 55:6,
61:20, 62:6, 62:11
**scores** [2] - 62:2,
66:19
**scoring** [1] - 61:18
**Scott** [1] - 57:6
**screen** [1] - 40:17
**screening** [15] - 57:14,
57:24, 58:6, 58:15,
59:25, 61:13, 66:25,
68:16, 69:20, 73:4,
74:8, 74:10, 74:11
**scrub** [2] - 25:25,
27:22
**scrubbing** [2] - 26:2,
28:19
**Scully** [29] - 9:7, 38:8,
43:5, 49:22, 78:2,
78:21, 81:7, 81:10,
82:15, 83:3, 83:5,
84:8, 84:23, 86:3,
86:18, 88:17, 88:23,
89:8, 89:17, 90:2,
91:10, 91:18, 91:19,
92:1, 92:9, 92:12,
97:16
**Scully's** [2] - 40:10,
97:20
**SCULLY**....................
........................ [1] -
4:20
**seal** [4] - 28:22, 49:21,
49:25, 50:5
**sealed** [1] - 28:14
**seam** [1] - 74:1
**seams** [1] - 73:21
**search** [1] - 30:22

**seasons** [1] - 28:13
**seated** [2] - 5:8, 75:13
**second** [10] - 12:22,
14:14, 30:17, 31:7,
35:20, 38:23, 55:10,
87:18, 88:13, 90:13
**Second** [2] - 10:1,
30:3
**SECTION** [1] - 1:5
**see** [19] - 17:8, 17:22,
26:23, 33:18, 35:15,
35:18, 37:7, 48:25,
50:17, 58:23, 67:25,
75:14, 87:7, 90:22,
94:23, 94:24, 94:25,
99:23, 100:17
**SEEGER** [3] - 2:7, 2:7,
5:18
**Seeger** [1] - 5:18
**seeing** [2] - 12:12,
71:2
**seek** [6] - 9:21, 11:5,
11:14, 15:20, 18:15,
93:17
**seeking** [1] - 7:17
**seeks** [3] - 14:21,
18:19, 51:1
**seem** [1] - 84:9
**selected** [2] - 8:1,
41:12
**selective** [2] - 51:12,
60:2
**selectively** [4] - 13:20,
13:21, 52:12, 62:18
**SEM** [1] - 95:2
**send** [1] - 46:22
**senior** [1] - 75:16
**sense** [8] - 12:23,
12:24, 36:17, 45:24,
74:5, 77:6, 85:15,
89:16
**sent** [1] - 6:25
**separate** [5] - 29:8,
32:3, 78:10, 78:12,
88:8
**separated** [1] - 31:23
**September** [2] - 7:12,
39:24
**serially** [1] - 42:2
**serious** [1] - 59:19
**Serpe** [1] - 5:20
**SERPE** [3] - 1:19,
1:20, 5:20
**serve** [1] - 8:23
**served** [1] - 7:13
**set** [15] - 8:13, 12:16,
17:1, 38:17, 38:18,
40:22, 49:6, 60:12,
74:14, 78:9, 79:23,
82:24, 85:18, 91:24

**sets** [1] - 42:4
**setting** [2] - 31:12,
65:18
**settings** [1] - 10:9
**seven** [15] - 6:23, 8:1,
8:22, 11:4, 12:3,
12:4, 18:1, 26:5,
35:10, 35:23, 67:4,
75:6, 93:13, 95:22,
99:4
**Seventh** [1] - 76:18
**several** [3] - 45:12,
85:8, 92:15
**severe** [5] - 23:14,
23:17, 23:18, 71:8,
71:17
**severely** [8] - 22:19,
23:25, 24:5, 24:9,
25:7, 54:11, 98:14,
98:16
**SGH** [2] - 63:2, 94:19
**Shandong** [1] - 7:10
**shape** [1] - 47:16
**Sharp** [11] - 10:18,
19:14, 28:17, 36:16,
37:14, 37:24, 46:8,
46:21, 46:25, 47:25
**Sharp's** [4] - 30:15,
46:20, 47:17, 49:14
**sharper** [1] - 94:25
**shock** [1] - 84:2
**shoot** [1] - 27:4
**short** [3] - 7:13, 51:10,
51:24
**shortly** [1] - 101:7
**show** [13] - 35:3,
47:11, 47:21, 48:10,
48:13, 52:22, 60:19,
63:15, 75:3, 75:6,
77:13, 92:1, 95:24
**showed** [2] - 47:13,
100:7
**showing** [1] - 77:15
**shown** [2] - 37:24,
63:8
**shows** [6] - 27:8, 27:9,
43:17, 47:15, 60:19,
67:11
**shuts** [4] - 15:10,
20:8, 27:1, 27:5
**side** [1] - 87:23
**sides** [4] - 16:8, 21:15,
36:19, 37:22
**sides'** [1] - 37:17
**significant** [2] - 66:21,
69:19
**signs** [2] - 66:15,
66:17
**silver** [19] - 54:13,
54:14, 54:17, 54:19,

94:24, 97:14, 97:19, 97:21, 97:22, 97:25, 98:18, 98:20, 98:21, 99:15, 99:21, 100:13, 100:14
**Silver** [1] - 54:16
**Similar** [1] - 71:20
**similar** [4] - 32:20, 39:5, 71:6
**similarly** [2] - 8:3, 8:24
**Similarly** [7] - 41:8, 44:8, 57:23, 60:3, 73:11, 78:20, 78:23
**simply** [2] - 19:18, 77:22
**single** [4] - 25:21, 45:2, 62:5
**sink** [1] - 90:23
**site** [3] - 8:15, 40:11, 60:7
**sits** [1] - 89:7
**sitting** [1] - 86:13
**situ** [1] - 57:19
**situated** [2] - 8:3, 8:24
**situation** [9] - 21:24, 27:24, 28:2, 34:25, 43:16, 43:24, 44:13, 53:11, 53:14
**situations** [3] - 38:4, 38:6, 39:5
**six** [3] - 25:10, 34:10, 43:12
**six-month** [1] - 34:10
**sixth** [1] - 29:11
**skill** [2] - 78:9, 79:23
**skip** [1] - 45:9
**SLAUGHTER** [1] - 3:5
**slice** [1] - 62:23
**slight** [3] - 71:8, 71:9, 71:17
**slip** [1] - 54:3
**small** [1] - 87:16
**smell** [1] - 47:22
**smelly** [1] - 6:8
**SMITH** [1] - 3:6
**so-called** [1] - 16:9
**soil** [1] - 60:6
**sole** [1] - 26:19
**solely** [1] - 44:18
**solution** [6] - 11:23, 14:7, 17:19, 18:5, 24:19, 30:1
**solutions** [3] - 12:24, 17:11, 39:11
**solve** [1] - 39:13
**solving** [1] - 41:17
**someone** [3] - 23:24, 52:23, 79:1
**sometime** [1] - 100:9
**Sometimes** [2] - 25:4,

32:20
**somewhere** [1] - 39:20
**Soon** [1] - 6:6
**sorry** [2] - 29:18, 45:10
**sort** [2] - 15:4, 85:16
**sound** [3] - 34:4, 34:14, 52:3
**source** [14] - 14:19, 24:25, 25:2, 28:25, 29:2, 29:8, 29:10, 34:16, 40:8, 44:10, 73:1, 90:10, 100:11, 100:12
**sources** [2] - 44:24, 52:21
**space** [1] - 14:22, 19:7
**spackle** [1] - 73:21
**span** [1] - 98:8
**SPAULDING** [1] - 3:13
**speaks** [2] - 50:23, 95:12
**special** [2] - 17:3, 18:25
**specialists** [1] - 82:21
**specialization** [1] - 76:20
**specialized** [2] - 97:11, 97:12
**specially** [1] - 41:10
**specialty** [1] - 76:23
**specific** [6] - 12:25, 69:14, 77:12, 79:11, 86:10, 87:13
**specifically** [6] - 13:22, 45:6, 45:12, 69:3, 80:4, 85:2
**speculate** [1] - 96:6
**speculation** [2] - 13:7, 100:8
**spend** [1] - 54:13
**spending** [1] - 63:18
**spreadsheets** [1] - 28:7
**spring** [1] - 18:13
**sprinkled** [1] - 36:14
**Sprole's** [1] - 70:17
**Sproles** [3] - 67:16, 67:25, 68:1
**stakes** [1] - 63:17
**stand** [6] - 27:22, 39:21, 56:13, 75:9, 101:14
**stand-alone** [1] - 27:22
**standard** [34] - 31:13, 37:15, 40:19, 40:21, 41:1, 41:8, 41:15, 42:1, 42:4, 46:25,

47:1, 47:7, 60:5, 84:20, 85:9, 85:10, 85:11, 85:15, 85:25, 86:2, 86:10, 86:16, 88:9, 89:1, 89:4, 89:10, 89:11, 92:14, 92:15, 92:19, 95:3, 98:1
**standardized** [1] - 47:1
**standards** [28] - 23:12, 38:2, 38:24, 40:13, 40:21, 40:22, 41:5, 41:19, 42:4, 43:1, 47:18, 51:5, 79:24, 80:4, 82:2, 84:15, 85:9, 85:14, 85:22, 86:15, 87:4, 87:17, 88:11, 88:18, 92:8, 92:10, 92:16
**standpoint** [1] - 41:15
**start** [2] - 36:9, 62:21
**State** [1] - 102:5
**statement** [1] - 36:22
**statements** [1] - 69:12
**STATES** [2] - 1:1, 1:12
**States** [11] - 6:2, 6:4, 6:22, 6:25, 7:4, 9:24, 22:6, 25:13, 56:20, 102:6, 102:16
**states** [3] - 6:6, 6:14, 69:3
**stating** [1] - 28:5
**statistical** [2] - 63:11, 63:14
**steel** [1] - 68:25
**Steering** [3] - 7:16, 32:2, 32:23
**STENOGRAPHY** [1] - 3:24
**step** [5] - 51:15, 67:7, 68:12, 71:3, 81:2
**steps** [1] - 71:2
**Steve** [1] - 5:15
**STEVEN** [1] - 3:14
**still** [14] - 16:10, 17:24, 19:5, 19:20, 19:21, 29:24, 30:1, 40:1, 47:14, 47:20, 56:8, 90:11
**stink** [2] - 46:18, 48:10
**stinks** [2] - 30:10, 47:14
**stop** [4] - 30:16, 46:18, 47:11, 75:8
**storm** [2] - 34:25, 53:6
**story** [2] - 50:13
**strain** [1] - 6:1
**strategy** [2] - 15:20, 51:8

**STREET** [6] - 1:17, 1:21, 2:4, 2:8, 2:19, 3:22
**Streit** [3] - 78:2, 78:17, 78:24
**stricken** [3] - 32:9, 33:13, 79:10
**strict** [1] - 16:14
**strike** [1] - 33:8
**strip** [3] - 18:16, 73:23, 73:24
**strontium** [17] - 51:22, 51:24, 57:20, 58:22, 58:25, 60:5, 60:6, 60:8, 65:18, 65:25, 68:15, 69:4, 69:17, 69:18, 72:4, 72:11, 73:13
**structural** [1] - 77:1
**studies** [2] - 68:17, 68:22
**studs** [1] - 18:17
**study** [2] - 22:7, 57:12
**studying** [2] - 19:20, 29:22
**subject** [2] - 20:19, 78:23
**subjective** [1] - 51:6, 70:21
**submission** [1] - 52:7
**submit** [6] - 20:9, 20:17, 34:3, 35:13, 44:2, 44:3
**submitted** [4] - 49:12, 49:13, 51:25, 69:9
**Subsequently** [1] - 7:20
**substance** [1] - 55:15
**success** [1] - 27:12
**suffered** [1] - 24:7
**sufficiency** [1] - 8:10
**sufficient** [7] - 31:11, 67:3, 75:19, 76:17, 84:15, 96:1, 96:21
**suggest** [13] - 12:5, 13:25, 14:9, 14:23, 15:24, 17:8, 18:9, 18:18, 20:1, 20:24, 29:6, 34:13, 35:21
**suggested** [3] - 20:15, 52:1, 69:7
**suggesting** [7] - 32:9, 33:24, 50:7, 57:22, 66:4, 66:5, 72:17
**suggestion** [2] - 27:20, 33:7
**suggestions** [1] - 24:11
**suggests** [1] - 65:19
**suitable** [1] - 24:4

**SUITE** [5] - 1:17, 1:20, 2:4, 2:8, 2:12
**suits** [1] - 6:13
**sulfide** [3] - 11:22, 79:15, 90:4
**sulfides** [4] - 11:10, 11:11, 94:24, 94:25
**sulfur** [10] - 20:6, 32:19, 32:20, 33:4, 34:9, 34:18, 46:17, 90:10, 93:15, 97:1
**sum** [1] - 30:14
**summarize** [1] - 56:16
**summary** [3] - 77:19, 79:8, 83:22
**summer** [3] - 15:8, 19:10, 39:23
**summons** [1] - 7:11
**Sunday** [2] - 29:17, 29:18
**supervisor** [1] - 82:21
**supplemental** [1] - 50:3
**suppliers** [1] - 6:16
**supplies** [1] - 6:2
**support** [8] - 8:20, 13:16, 20:24, 21:1, 32:15, 52:2, 88:14, 93:19
**supported** [2] - 64:25, 86:17
**supporting** [2] - 10:2, 72:2
**supports** [1] - 51:11
**suppose** [2] - 44:6, 53:2
**supposed** [3] - 29:25, 61:20, 89:15
**Supreme** [2] - 16:4, 97:8
**surely** [1] - 20:7
**surface** [7] - 22:21, 90:5, 90:6, 90:19, 91:14, 92:2
**surfaces** [9] - 6:9, 22:23, 30:17, 54:13, 54:14, 54:16, 91:2, 94:22
**surgery** [1] - 62:21
**surrogate** [2] - 47:10, 89:1
**Surrogates** [1] - 89:13
**surrounded** [1] - 16:5
**survey** [5] - 64:5, 64:15, 64:16, 67:7, 67:17
**surveying** [1] - 67:14
**survive** [1] - 25:7
**SVM** [1] - 78:25
**Swiss** [1] - 37:8

**switch** [2] - 69:24, 95:4
**switches** [10] - 22:18, 66:8, 66:14, 67:9, 68:12, 70:22, 71:2, 79:20, 97:22, 97:24
**symposium** [1] - 72:8
**system** [50] - 13:17, 14:2, 14:7, 14:10, 14:14, 14:19, 15:10, 17:3, 18:24, 19:9, 20:4, 20:6, 20:8, 20:11, 22:9, 27:11, 27:17, 29:13, 32:7, 32:12, 32:14, 32:15, 33:1, 33:5, 33:23, 34:13, 34:20, 35:5, 36:25, 37:10, 37:16, 38:15, 39:3, 39:19, 39:21, 40:12, 41:21, 43:4, 43:13, 44:9, 49:6, 49:7, 61:18, 68:2, 68:3, 93:12, 95:4
**systematic** [1] - 28:12
**systems** [9] - 9:25, 19:16, 30:11, 38:16, 38:17, 39:4, 68:6, 88:7
**Systems** [1] - 76:19

**T**

**table** [2] - 14:6, 87:17
**TAISHAN** [1] - 1:9
**Taishan** [11] - 7:8, 7:9, 7:12, 7:13, 7:16, 7:18, 7:22, 8:6, 11:6, 11:15, 86:1
**talks** [4] - 29:6, 35:9, 73:12, 87:18
**tantamount** [1] - 20:10
**tape** [1] - 74:1
**tarnish** [3] - 62:2, 68:11, 69:12
**tarnished** [2] - 61:21, 62:6
**tarnishing** [9] - 66:15, 67:11, 69:11, 69:24, 69:25, 70:22, 71:14, 71:18, 93:3
**task** [11] - 12:14, 13:4, 13:6, 13:8, 13:23, 14:16, 16:1, 16:2, 17:7, 42:12, 63:4
**tasked** [2] - 22:7, 51:18
**team** [7] - 32:15,

80:18, 80:21, 80:22, 81:22, 82:21, 82:23
**technique** [1] - 66:25
**techniques** [1] - 83:17
**technology** [6] - 13:20, 34:1, 45:7, 45:8, 63:25, 69:3
**Technology** [1] - 97:13
**temperature** [3] - 27:3, 37:21, 40:2
**ten** [2] - 75:9, 89:23
**tenet** [1] - 14:23
**tens** [1] - 63:18
**term** [3] - 38:25, 45:5, 87:20
**termed** [1] - 8:13
**terms** [2] - 9:20, 12:20
**test** [13] - 10:10, 19:9, 29:25, 35:4, 37:7, 39:14, 39:15, 47:10, 47:15, 61:2, 64:7, 76:20, 87:14
**tested** [2] - 10:10, 31:7, 39:25
**testified** [5] - 26:14, 67:13, 67:14, 88:25, 92:1
**testify** [7] - 9:2, 13:15, 76:11, 77:19, 83:13, 90:12, 94:14
**testifying** [5] - 33:2, 64:13, 79:2, 89:3, 92:22
**testimony** [19] - 8:8, 9:2, 9:3, 9:4, 9:6, 9:22, 16:11, 20:24, 31:24, 31:25, 32:10, 33:17, 33:21, 51:2, 67:24, 84:11, 90:14, 93:18
**testing** [12] - 30:6, 30:8, 39:17, 40:12, 45:20, 51:19, 64:7, 72:13, 78:25, 89:22, 92:17, 94:11
**tests** [3] - 42:1, 42:2, 87:13
**textbook** [2] - 82:7
**textbooks** [1] - 82:6
**texts** [2] - 88:18, 92:1
**THE** [58] - 1:12, 1:16, 2:10, 5:7, 5:8, 5:22, 9:17, 15:2, 15:16, 21:6, 31:16, 34:22, 36:7, 36:19, 42:8, 43:20, 44:13, 44:22, 45:25, 46:4, 46:11, 48:17, 49:17, 50:11, 50:19, 52:9, 53:1,

53:11, 54:6, 55:3, 63:22, 65:15, 72:19, 75:8, 75:10, 75:12, 75:13, 77:10, 78:5, 80:9, 83:11, 84:7, 87:6, 88:15, 90:8, 92:6, 92:21, 93:9, 94:5, 96:13, 97:6, 99:3, 100:1, 100:3, 100:17, 101:3, 101:11, 101:15
**Theirs** [1] - 71:6
**themselves** [1] - 21:19
**theory** [2] - 48:11, 55:7
**therefore** [7] - 8:9, 20:18, 20:23, 25:22, 42:18, 45:23, 87:8
**thereof** [1] - 75:24
**thermostat** [3] - 95:3, 100:5, 100:6
**they've** [4] - 24:6, 24:7, 42:9, 56:14
**THIBODEAUX** [1] - 3:15
**thick** [1] - 96:1
**thickness** [6] - 47:1, 82:3, 85:20, 85:21, 87:14, 93:3
**thicknesses** [4] - 47:5, 88:21, 89:22, 97:25
**third** [3] - 31:8, 67:5, 77:9
**THIS** [1] - 1:8
**thousand** [1] - 49:4
**thousands** [5] - 26:5, 39:5, 63:18, 70:9, 99:12
**Three** [3] - 27:19, 35:10, 35:12
**three** [22] - 9:5, 19:17, 21:14, 23:11, 23:14, 24:6, 27:21, 40:8, 47:19, 53:3, 53:4, 53:9, 53:10, 53:12, 53:14, 61:20, 71:6, 71:8, 73:8, 76:10, 76:15, 86:13
**three-point** [1] - 71:6
**threshold** [4] - 11:19, 68:9, 71:21, 96:20
**throated** [1] - 16:5
**throughout** [7] - 6:5, 6:14, 11:25, 17:22, 36:14, 67:6, 88:10
**thrust** [1] - 76:24
**Tianjin** [1] - 31:18
**tie** [1] - 97:9
**tied** [4] - 38:21, 38:22,

38:23, 85:21
**tiny** [1] - 87:15
**TO** [2] - 1:8, 5:4
**today** [18] - 5:22, 8:14, 10:11, 10:23, 11:5, 31:2, 31:5, 31:21, 32:13, 32:24, 52:25, 56:13, 62:8, 64:23, 72:25, 83:1, 98:18
**today's** [1] - 12:1
**together** [10] - 33:18, 50:14, 63:13, 77:13, 77:16, 77:18, 80:18, 81:3, 82:23, 99:20
**toggle** [1] - 95:4
**tolerable** [1] - 46:13
**took** [7] - 22:13, 22:15, 22:16, 75:11, 81:25, 82:4, 94:20
**tool** [25] - 16:11, 33:8, 33:13, 33:15, 51:5, 51:9, 54:24, 55:10, 57:9, 57:14, 57:24, 59:24, 61:12, 61:13, 63:6, 65:8, 66:25, 67:10, 69:20, 70:7, 70:8, 72:16, 73:4, 74:8
**tools** [11] - 32:4, 33:19, 51:12, 54:25, 55:13, 56:20, 61:15, 63:9, 64:4, 72:23, 72:24
**top** [1] - 23:5
**totally** [1] - 58:2
**touch** [1] - 24:20
**touchstones** [1] - 12:9
**toured** [1] - 62:17
**toxic** [1] - 60:7
**toxicologist** [1] - 33:2
**toys** [1] - 68:25
**track** [1] - 49:8
**traditional** [2] - 12:23, 16:11
**trained** [3] - 65:5, 68:16, 68:17
**training** [1] - 97:20
**TRANSCRIPT** [2] - 1:11, 3:24
**transcript** [1] - 102:8
**transfer** [1] - 6:21
**transferred** [1] - 7:3
**treating** [1] - 14:21
**trial** [5] - 16:18, 20:17, 75:3, 96:19, 98:17
**trials** [2] - 5:23, 16:11
**tried** [2] - 19:17, 70:20
**trier** [1] - 96:18
**true** [4] - 16:22, 53:2, 53:25, 102:7

**trustworthy** [1] - 51:7
**truth** [2] - 16:20
**truths** [1] - 97:11
**try** [11] - 17:17, 25:15, 27:9, 27:10, 27:22, 43:12, 58:22, 91:25, 94:1, 94:3, 97:7
**trying** [11] - 9:2, 17:24, 19:20, 19:21, 24:8, 28:20, 29:7, 62:9, 77:13, 88:8, 88:9
**tryout** [1] - 20:19
**Tulane** [1] - 7:17
**turn** [1] - 25:8, 28:11, 56:16
**turned** [2] - 20:9, 41:23
**Turning** [1] - 61:3
**TV** [1] - 45:16
**twice** [1] - 47:6
**Two** [2] - 29:16, 76:12
**two** [31] - 12:10, 13:25, 19:16, 24:11, 30:9, 30:13, 32:3, 32:21, 34:15, 36:17, 50:14, 51:12, 52:7, 54:24, 55:21, 56:18, 56:20, 61:20, 62:19, 62:20, 63:9, 64:12, 70:15, 71:7, 72:23, 83:12, 87:11, 88:8, 88:18, 91:16, 95:22
**two-page** [1] - 52:7
**type** [1] - 25:3, 96:11
**types** [2] - 21:14, 84:4
**typical** [1] - 53:16

**U**

**U.S** [3] - 55:24, 57:3, 84:20
**unable** [1] - 100:10
**unacceptable** [1] - 90:1
**under** [17] - 12:10, 12:17, 20:23, 21:3, 39:25, 42:25, 49:21, 49:25, 50:5, 55:11, 62:23, 78:9, 80:8, 82:23, 92:19, 94:20, 96:15
**underlying** [3] - 22:2, 78:11, 88:14
**underneath** [2] - 78:17, 78:18
**undertaken** [1] - 68:13
**underway** [1] - 13:7
**uniform** [3] - 61:24, 61:25, 62:10

**unique** [4] - 68:5, 95:21, 96:10, 96:17
**United** [11] - 6:2, 6:4, 6:22, 6:25, 7:4, 9:24, 22:6, 25:13, 56:20, 102:6, 102:16
**UNITED** [2] - 1:1, 1:12
**University** [3] - 17:2, 81:7, 82:17
**unjustified** [1] - 29:6
**Unless** [1] - 62:13
**Unlike** [1] - 65:2
**unoccupied** [1] - 39:15
**Unquestionably** [1] - 26:21
**unreliable** [2] - 51:24, 84:13
**unremediated** [1] - 49:10
**untrained** [1] - 71:20
**unusual** [1] - 68:5
**unwritten** [1] - 51:11
**up** [29] - 17:1, 17:10, 17:24, 19:21, 21:9, 27:4, 35:1, 35:9, 36:9, 38:17, 38:18, 38:24, 40:16, 45:8, 49:6, 50:9, 52:14, 58:24, 60:7, 62:21, 69:23, 73:17, 79:8, 85:9, 85:18, 85:21, 91:24, 96:15
**upstairs** [1] - 54:6
**uses** [4] - 51:6, 71:6, 71:13, 78:9
**utilize** [1] - 7:23

## V

**VA** [1] - 1:21
**valid** [4] - 42:2, 96:14, 100:17, 100:19
**validity** [1] - 100:21
**valuable** [1] - 32:5
**vapors** [1] - 93:15
**variance** [1] - 66:21, 69:19
**variation** [2] - 66:19, 86:7
**variations** [1] - 86:7
**variety** [1] - 8:2
**various** [5] - 6:11, 6:14, 8:25, 94:22
**vast** [1] - 98:19
**vehicle** [1] - 7:23
**ventilation** [2] - 53:22
**verb** [1] - 22:14
**verifiable** [1] - 41:22

**verification** [1] - 51:17
**verified** [2] - 37:25, 38:24
**verify** [2] - 39:20, 57:2
**verifying** [2] - 37:14, 39:17
**versa** [1] - 78:6
**versus** [1] - 66:20
**vet** [1] - 8:9
**viable** [2] - 35:16, 72:16
**vice** [1] - 78:6
**view** [4] - 19:2, 24:17, 24:18
**viewpoint** [1] - 38:11
**views** [1] - 94:23
**violates** [1] - 24:23
**Vioxx** [2] - 18:7, 96:3
**Virginia** [20] - 7:5, 7:6, 11:4, 23:10, 35:10, 53:20, 68:18, 68:20, 69:6, 69:11, 70:9, 72:12, 72:13, 74:23, 75:4, 75:5, 81:7, 81:24, 82:17, 85:5
**visit** [2] - 63:2, 63:3
**visited** [2] - 62:17, 65:3
**visual** [11] - 13:20, 51:5, 51:16, 55:3, 66:7, 66:9, 66:12, 66:17, 67:8, 67:10, 69:21
**visualization** [1] - 24:13
**visually** [1] - 59:15
**vulnerable** [2] - 54:16, 91:7

## W

**walk** [2] - 69:23, 99:10
**wall** [13] - 33:16, 45:17, 61:20, 62:5, 69:24, 70:2, 70:4, 70:6, 71:10, 73:7, 86:13
**wallboard** [3] - 57:20, 60:8, 68:15
**walls** [4] - 29:3, 45:18, 62:1, 62:21
**WARSHAUER** [1] - 2:3
**WASHINGTON** [1] - 1:18
**waste** [1] - 60:7
**watch** [1] - 15:9
**water** [4] - 90:22, 91:4, 91:7

**wealth** [2] - 41:16, 64:2
**Web** [1] - 8:15
**week** [1] - 52:8
**weight** [8] - 16:10, 30:21, 30:23, 75:23, 75:24, 84:17, 93:21, 99:1
**WEISS** [1] - 2:7
**well-pled** [1] - 11:15
**wet** [4] - 90:16, 90:17, 91:2, 91:14
**whereby** [1] - 20:6
**WHEREUPON** [2] - 75:11, 101:16
**whiskers** [1] - 98:2
**whole** [15] - 12:3, 14:15, 14:25, 15:13, 19:24, 20:3, 20:11, 20:23, 37:16, 57:15, 57:16, 58:16, 59:21, 68:19, 70:6
**WIEMKEN** [1] - 3:3
**WILLIAM** [1] - 3:16
**WIMBERLY** [1] - 3:17
**windows** [5] - 15:3, 15:8, 19:4, 28:11, 46:15
**wine** [6] - 35:15, 53:21, 53:23, 54:2, 67:3
**wiped** [1] - 23:23
**wire** [15] - 22:22, 23:5, 23:6, 23:23, 79:16, 85:6, 86:13, 86:20, 87:1, 87:6, 87:12, 95:15, 97:15, 97:17, 99:11
**wires** [15] - 22:18, 24:13, 55:4, 55:18, 61:19, 67:9, 79:16, 79:25, 81:16, 85:6, 87:23, 90:4, 92:19, 93:2, 99:23
**wiring** [9] - 6:9, 45:19, 68:12, 78:22, 93:15, 95:13, 96:9, 96:22
**wish** [1] - 20:15
**withdrawn** [1] - 78:24
**witness** [12] - 10:15, 13:11, 14:10, 75:15, 75:17, 75:18, 75:22, 81:14, 81:19, 84:9, 93:11, 93:20
**witness'** [1] - 51:2
**witnesses** [1] - 64:13
**wonder** [1] - 57:6
**wonderful** [1] - 17:2
**WOOL** [1] - 3:19
**word** [6] - 25:24, 26:3,

26:6, 63:12, 74:7, 90:17
**words** [9] - 18:21, 19:11, 23:25, 31:10, 49:5, 53:2, 54:14, 73:1, 92:10
**workable** [1] - 72:15
**workplace** [3] - 30:16, 82:12, 82:13
**works** [8] - 37:10, 39:21, 40:7, 43:15, 45:20, 78:8, 79:5, 97:13
**world** [14] - 10:13, 13:5, 14:13, 16:3, 18:4, 18:14, 20:22, 80:15, 80:24, 81:8, 81:10, 82:8, 82:16, 91:20
**worth** [1] - 62:20
**worthy** [1] - 20:18
**wrapping** [1] - 79:8
**Wright** [1] - 78:15
**writing** [2] - 55:16, 101:8
**written** [7] - 41:19, 51:4, 51:15, 55:18, 56:2, 56:24, 61:4
**wrote** [1] - 47:3

## X

**x-ray** [1] - 33:12
**XRF** [57] - 13:20, 19:20, 24:12, 33:12, 33:25, 51:9, 51:17, 51:19, 51:23, 54:24, 55:10, 55:23, 56:9, 56:11, 56:12, 56:21, 57:1, 57:4, 57:24, 58:2, 58:9, 58:17, 61:16, 63:7, 63:16, 64:4, 64:9, 64:13, 64:15, 64:23, 64:24, 65:5, 65:8, 65:9, 65:16, 65:19, 66:3, 66:18, 66:23, 66:25, 67:11, 68:14, 68:22, 68:24, 69:2, 69:15, 70:1, 70:11, 70:20, 72:13, 72:15, 73:3, 73:8, 73:9, 73:13, 73:22
**XRT** [1] - 63:25

## Y

**year** [5] - 28:13, 46:25, 47:2, 47:7, 65:12

**years** [14] - 24:6, 24:21, 25:14, 27:19, 32:19, 41:21, 86:14, 87:4, 89:2, 91:17, 97:21, 98:23
**yesterday** [3] - 65:23, 69:7, 73:12
**yield** [1] - 21:4

## Z

**ZACHARY** [1] - 3:19