UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL Docket No. 2047 |
| THIS DOCUMENT RELATES TO: | SECTION: L |
| Sean and Beth Payton, et al. v. Knauff Gips, KG, et al. | JUDGE FALLON |
| Case No.: 2:09-cv-07628-EEF-JCW | MAG. JUDGE WILKINSON |

## AFFIDAVIT OF GREGG CARLSON

I, Gregg Carlson, being first duly sworn, do hereby affirm the following:

1. I am employed as Vice-President of Maronda Homes, Inc. of Florida ("Maronda"), and have personal knowledge of the matters stated herein.

2. I am familiar with the organization and operations of Maronda, as well as of its affiliated entities.

3. Maronda is a real estate developer and homebuilder that builds houses **only** in the State of Florida.

4. Maronda is a Florida corporation with its principal address in Pennsylvania.

5. It is a wholly owned subsidiary of Maronda, Inc., a Pennsylvania corporation with a principal place of business in Pennsylvania.

6. Neither Maronda, Maronda, Inc. nor any of their affiliated entities have ever built a home in Louisiana, sold a home in Louisiana, conducted or sought to

conduct business in Louisiana, advertised in Louisiana, nor in any way targeted their activities towards Louisiana.

7. In fact, neither Maronda, Maronda, Inc. nor any of their affiliated entities have ever transacted any business in Louisiana, contracted to supply services or things in Louisiana, committed any act or omission in Louisiana, caused injury or damage in Louisiana, done or solicited business in Louisiana, engaged in any persistent course of conduct in Louisiana, derived revenue from goods used or consumed or services rendered in Louisiana, had an interest in, used or possessed a real right on immovable property in Louisiana, manufactured a product or component thereof which caused damage or injury in Louisiana, or placed a product into the stream of commerce that could reasonably be foreseen, expected, or anticipated to eventually be found in Louisiana by reason of its nature and the marketing practices of Maronda, Maronda, Inc. or their affiliated entities.

8. Maronda itself never purchased or installed Chinese-manufactured drywall. For a limited period of time, two of its subcontractors, Defendant Residential Drywall, Inc. ("Residential Drywall") and another non-party entity, Frabel Construction, Inc. ("Frabel Construction"), purchased Chinese-manufactured drywall directly for installation in homes built by Maronda. Maronda was unaware that its subcontractors had purchased Chinese manufactured drywall.

9. After investigation, Maronda believes that only eleven houses constructed by Maronda incorporated Chinese-manufactured drywall. All eleven houses are located in Florida. Eight of these eleven houses have been fully remediated pursuant to a

protocol established by Maronda, with their owners thereafter fully releasing Maronda from any claims.

10. Of the three remaining houses that incorporate Chinese-manufactured drywall, two are owned by named Plaintiffs, Christopher George and Natalie Vacca ("George/Vacca") and Francesca and Brian Gardner ("Gardner").

11. All three of the houses that are believed to incorporate Chinese-manufactured drywall are located in the State of Florida.

12. All three of these houses incorporate components and/or materials brought into the State of Florida from out of state.

13. Exhibit A hereto is a true and correct copy of the Purchase Agreement between Maronda and the Gardners. Neither George/Vacca nor the third homeowner referenced above purchased their house from Maronda, but this form of Purchase Agreement is the same as the one entered into between Maronda and the original purchasers of both the George/Vacca house and the third house.

14. Attached hereto as Exhibit B is a letter from Maronda's counsel to counsel for the Gardners dated November 6, 2009 confirming Maronda's request to be permitted to remediate the house. Maronda's counsel never received a response to the November 6, 2009 letter, and Maronda has not yet been permitted to remediate the Gardner house.

15. There are two other houses in Florida on which Maronda has received claims from a law firm that such houses have Chinese drywall. Maronda does not believe that either house actually contains Chinese drywall but is still awaiting a response from that counsel to Maronda's request to inspect the houses.

I have read the foregoing and aver that the statements set forth above are true and correct based upon personal knowledge or upon information and belief.

_Gregg Carlson_

Sworn to and Subscribed
before me this 22nd day
of March, 2010.

_Dana Honaker_
Notary Public

My Commission Expires: 11/16/12



DANA HONAKER
Commission DD 838473
Expires November 16, 2012
Bonded Thru Troy Fain Insurance 800-385-7019

4

# EXHIBIT A



## MARONDA HOMES, INC. OF FLORIDA
## PURCHASE AGREEMENT

This PURCHASE AGREEMENT (the "Agreement"), made and entered into this 31st day of May, 2005 by and between MARONDA HOMES, INC. OF FLORIDA, a Florida corporation ("Seller") whose address is 5902 Breckenridge Pkwy, Suite B, Tampa FL, 33610 Buyer(s) named below ("Buyer"):

Buyer:

Brian K Gardner          ☒ Married  ☐ Single
Francesca B Gardner      ☒ Married  ☐ Single

Buyer's address          3504 Central Ave. # 204  Ft. Myers FL 33901

Email address:
Home Telephone Number:          (619)379-0918
Work Telephone Number:
Second Work Telephone Number:

1. PURCHASE AND SALE: Seller agrees to sell and Buyer agrees to buy, for the consideration and upon the terms hereinafter set forth, a single family residence (the "House") to be constructed on Lot No. and Block No. 17/2091/31 (the "Lot"), Unit/Section 7K/03 located within CAPE CORAL (the "Community"), LEE County (the "County"), Florida (the House and Lot are together referred to herein as the "Home"). Seller agrees to construct the House on the Lot substantially similar with (a) Seller's NEWBERRY 'H' 3BED model residence, (b) the Home Selection Sheet addendum to this Agreement and (c) Seller's plans and specifications for the House.

2. PURCHASE PRICE: The purchase price ($230525.00) for the Home purchased hereunder, exclusive of any Closing Costs as described in Section 5 and elsewhere herein, will be as follows:

| | |
|---|---|
| Purchase Price of the Home: | $230525.00 |
| Initial Deposit (upon signing) | $2000.00 |
| Additional Deposit (due upon mortgage approval or start of construction, whichever occurs first) | $4916.00 |
| Amount to be Financed | $218998.00 |
| Balance of Purchase Price due and payable in cash at closing | $223609.00 |

3. DEPOSIT

A. Buyer represents that Buyer has (or will have) sufficient cash available (together with the referenced mortgage or mortgages) to complete this transaction, including but not limited to the down payment and all costs associated with closing. Buyer shall be required to produce proof of sufficient available cash at any time upon the request of Seller. If Buyer cannot present such proof within two (2) days of request, Seller may terminate this Agreement without further notice to Buyer. Time is of the essence regarding all of the terms and conditions of this paragraph.

B. Should Buyer fail to make payment of any additional monies as required herein, or furnish false or incomplete information to Seller, Seller's agent, or the mortgage lender, concerning Buyer's legal or financial status, or fail to cooperate in the processing of the mortgage loan application, which acts would result in the failure to obtain the approval of a mortgage commitment, or fail to comply with any of the terms of Buy this Agreement and the sum or sums paid on account of the Purchase Price shall be forfeited to Seller as liquidated damages. Time is of the essence regarding all of the terms and conditions of this paragraph.

1



C. Pursuant to Section 501.1375(2), Florida Statutes, THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO TEN PERCENT OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY BUYER.

**WAIVER**   Buyer's Initials ___

Buyer hereby waives Buyer's rights under Section 501.1375 of the Florida Statutes, to have the Deposit, up to ten percent (10%) of the Purchase Price, deposited in an escrow account.

D. There shall be no money held in escrow for work which cannot be completed prior to Closing. In the event that any work is not completed, a Work Order from Seller to Buyer, stating that the work will be completed within a reasonable time after conditions permit, shall be considered sufficient to bind Seller to full performance.

4. MORTGAGE FINANCING:
A. If Buyer elects to obtain financing, Seller's obligations under this Agreement are contingent upon Buyer obtaining within ten (10) days after the date hereof, a binding commitment for a mortgage loan from a lending institution approved by Seller. If Buyer elects to utilize a mortgage broker, Seller reserves the right to approve of the broker selected by Buyer. Buyer agrees to apply for such mortgage financing within four (4) calendar days after the date of execution of this Agreement by Buyer. Buyer further agrees to fully cooperate with its lender in the production of all necessary information required for mortgage loan approval and to furnish such information within four (4) calendar days after request thereof. If Buyer obtains a loan commitment which contains any special condition which is not ordinarily contained in typical loan commitments for the Community in which the Lot is located, Seller, in Seller's sole discretion, may treat Buyer's loan application as having been denied; whereupon, Seller shall have the right to terminate this Agreement and return the Deposit less any costs incurred by Seller to perform under this Agreement and less a $250 administrative fee. Buyer will be solely responsible to ensure that the commitment is in effect on the Closing date and will pay additional fees or charges and consent to any modification of the terms of the commitment if required by the lender as a condition of permitting any necessary extension of the commitment. Buyer agrees to incur no debt subsequent to the date hereof or to take any actions subsequent to the date hereof which might jeopardize approval of Buyer's loan. If Buyer fully performs under this Agreement but is not approved for a mortgage loan as indicated herein, then Seller may, without prior notice or demand, terminate this Agreement. Upon such a termination, the Deposit (less any costs incurred by Seller to perform under this Agreement and less a $250 administrative fee) shall be refunded to Buyer within forty five (45) days. If Buyer does not make application in good faith, the entire Deposit shall be forfeited as liquidated damages. Buyer agrees that Buyer will assume responsibility for any loan disqualification before or after initial loan commitment is acquired and until loan closing with the Lender. It is Buyer's sole responsibility to satisfy any and all mortgage conditions at least two (2) weeks prior to the scheduled closing. Any loan disqualification caused by Buyer after a loan commitment is issued shall result in forfeiture of the Deposit paid by Buyer. In that event, Buyer shall nevertheless be bound to fulfill this Agreement if so determined by Seller. Time is of the essence regarding all of the terms and conditions of this paragraph.

B. If this sale is financed by a Federal Housing Administration ("FHA") or Veterans Administration ("VA") insured loan, it is expressly agreed that, notwithstanding any other provisions of this Agreement, Buyer shall not be obligated to complete the purchase of the Home described herein or to incur any penalty by forfeiture of earnest money Deposit or otherwise unless Buyer has been given, in accordance with the Department of Housing and Urban Development ("HUD") / FHA or VA requirements, a written statement by the Federal Housing Commissioner, Department of Veterans Affairs, or a Direct Endorsement lender setting forth the appraised value of the property of not less than the Purchase Price stated herein. The Buyer shall have the privilege and option of proceeding with the closing of this Agreement without regard to the amount of the appraised valuation. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does not warrant the value or the condition of the property. The Buyer should satisfy himself/herself that the price and condition of the property are acceptable.

C. Failure or refusal of Buyer's spouse for any reason, to execute the mortgage to be obtained by Buyer shall be deemed a default by Buyer.

D. This Agreement is subordinate to and subject to the lien and terms of any and all mortgages and related security agreements Seller may obtain to provide for the purchase of the Lot, construction of the House, and/or subdivision improvements, whether currently of record or executed and recorded anytime hereafter. However, Seller shall cause said liens, mortgages, or related encumbrances to be satisfied or released as to the Home prior to or at Closing. This paragraph shall be self-operative and no further instrument shall be required to effect such subordination.

E. Buyer represents and warrants that this Agreement and the mortgage loan referenced herein (if applicable) are not and will not be subject to or contingent upon Buyer selling and/or closing on the sale of Buyer's present residence or other property unless the parties execute an addendum to this Agreement to that effect. Failure to disclose such contingency will constitute a default by Buyer and the remedies for Buyer's default under this Agreement shall apply.

2

{DR502195;16}

5. CLOSING COSTS: Buyer understands and agrees that except as provided below, Buyer will pay all loan and Closing Costs. Closing Costs shall include, but shall not be limited to, the following:

(i) The cost of the documentary stamp taxes on the Deed and costs to record the Deed; and

(ii) Customary closing costs of a Buyer, including but not limited to such items as loan fees, loan closing costs and other related costs, attorneys' fees, escrows for taxes and insurance, recording fees, documentary stamp taxes on the Note, intangible taxes, credit reports and PMI insurance, if applicable; and

(iii) All additional costs related to the Home imposed by any governmental authority, and amounts related to the Community Homeowners' Association, if any; and

(iv) Current expenses of the Home including special assessments and current monthly assessments to one or more homeowners' associations will be adjusted between Seller and Buyer as of the date of the Closing. Buyer shall reimburse Seller for any prepaid expenses of the Home such as utility deposits, garbage assessments, assessments and capital contributions made to one or more homeowners' association, paid by Seller in advance and/or for the month of Closing; and

Seller shall pay for the premium for an owner's title insurance policy and, if required, a simultaneous lender's policy to be issued by Adnoram Title Company, Inc. together with associated title search fees, examination fees and settlement closing fees. In the case of an FHA insured or VA guaranteed loan, Buyer shall pay all Closing Costs, except for the items referenced in the preceding sentence, which can be charged to Buyer under FHA/VA regulations.

6. CONSTRUCTION REPRESENTATIONS: Construction of the House shall substantially conform to the plans and specifications and Home Selection Sheet on file at Seller's office, allowing minor deviations which may be occasioned by expediency, practicability and as are common in the construction industry in general, and subject to availability of labor and materials. Notwithstanding the above, Seller expressly reserves the right:

A. To make such modifications, additions or deletions (collectively the "Alterations") in or to the plans and/or Home Selection Sheet as may be required by lending institutions making mortgage loans on properties within the selected community, by public authorities, by legislation, by judicial determination, or as Seller may seem advisable and in the interest of the selected community, at large, provided none of the Alterations shall require substantial physical modification of the House; and

B. To make substitutions of materials or products in the construction of the House, provided such materials or products are substantially equal or superior to those shown in the plans and specifications and/or Home Selection Sheet.

C. To construct the House in such a manner that the garage attached to the House faces either right or left, at Seller's discretion. Buyer understands and acknowledges that many of the Houses to be constructed within the Community require floor plans which are opposite ("flipped") mirror images of the model floor plan. Buyer fully understands and accepts the floor plan configuration for the House selected by Seller.

7. MODELS AND PLANS: If, before signing this Agreement, Buyer has viewed a certain model home (within the Community or at another community) and/or certain plans, drawings, or other rendering depicting examples of the type of house being purchased, the House, as built, will be substantially similar to the examples Buyer has viewed, but may differ because of (a) variations in some dimensions, (b) the use of materials different from those viewed by Buyer, (c) differences as to local building code requirements, and (d) differences as to standard features within the Community. Seller therefore makes no warranty, expressed or implied, that the House will conform to any model home, floor plan, or other rendering that may be used by Seller in the advertising or promotional programs. Closing of this sale constitutes Buyer's unconditional acceptance of the House as built without regard to variations or differences between the House and model home and/or drawings, renderings or plans viewed as examples by Buyer. Buyer's refusal to accept the House as built shall constitute an event of default of this Agreement for which Seller may retain the Deposit and exercise all other remedies pursuant to paragraph 18 herein. Seller makes no representation as to the location of (if applicable) utility boxes, street lights, fire hydrants, cluster mailboxes or storm drain inlets or basins, and septic drain fields.

3

{OR502195;16}

8. LOTS: Each Lot is unique in its size, shape and drainage characteristics. Buyer understands and agrees that the size of the Lot; the exact location of sidewalks and driveways (if any); and the drainage patterns of the Lot will differ from the model home plans, drawings or renderings Buyer has examined, and Seller reserves the right to determine the location and configuration of the House upon the Lot subject to subdivision requirements. In the event that the type of house desired by Buyer will not fit on the Lot within subdivision requirements, Seller shall so notify Buyer and this Agreement shall be terminated and the Deposit returned to Buyer and the parties shall be released from all further liability hereunder.

9. ADJACENT LAND USE: Seller shall not be liable to Buyer for any use or condition of property adjacent to or surrounding the Community or the Lot, whether or not owned by Seller, including but not limited to any commercial, industrial, multi-family or non-residential uses. Additionally, Seller makes no representation or warranty as to the future use and/or development of any adjacent land by any third party.

10. COMPLETION DATE: Seller is required to complete and does agree that the construction of the Home will be completed within a period of two (2) years; subject, however, to delays caused by events which would support a defense based upon impossibility of performance for reasons beyond Seller's control, including but not limited to, Acts of God, acts of governmental authority(ies) and courts of law, flood, hurricane, strikes, unavailability of materials, and labor conditions beyond Seller's control. If, because of such delays, the Seller is unable to substantially complete construction within two (2) years, the date of completion shall be extended by the delay period. It is the express intent of the parties that the parties' rights and obligations under this Agreement be construed in the manner necessary to exempt this Agreement and the sale of the Home from registration under the Interstate Land Sales Full Disclosure Act and the Florida Uniform Land Sales Practices Law, and both Buyer and Seller hereby expressly waive any right or provision of this Agreement that would otherwise preclude that exemption.

11. WARRANTY/DISCLAIMER:
A. Seller warrants all workmanship and materials in the House according to the terms and conditions of the Limited Warranty Agreement ("Limited Warranty") issued by Seller, incorporated by reference herein and made an express part hereof. Buyer acknowledges that a specimen copy of the Limited Warranty is available for the review of Buyer. At closing, Seller shall deliver all Limited Warranty documents to Buyer. The warranties made from Seller to Buyer shall be restricted solely to those contained in the Limited Warranty. Buyer agrees that Seller (and its employees, agents, brokers or other representatives) makes no additional warranty, representation or undertaking of any kind, express or implied, and that the Limited Warranty shall be in lieu of any other warranty including but not limited to, warranties of merchantability, habitability, quality or fitness for a particular purpose. Buyer agrees that except for the Limited Warranty and any items set forth in the inspection form, Buyer is buying and shall accept possession of, the premises "as is" and in the condition they are in at the time of Buyer's closing. Seller shall have no further liability or obligation whatsoever with respect to the Home or the condition or construction thereof, or any occurrence directly or indirectly arising therefrom. Upon closing Seller shall deliver to Buyer all manufacturers' warranties if any, covering the consumer products to be conveyed to Buyer herein, provided, that Seller shall not thereby be deemed to warranty such consumer products in any way, either expressed or implied, or to adopt any such manufacturers' warranty thereof. Notwithstanding any other provision in the Limited Warranty or herein to the contrary, Seller shall have no obligation to perform any Limited Warranty repairs, replacements or other duties unless Buyer grants reasonable access to the House to perform those activities during normal business hours (e.g., Monday through Friday between 9:00 a.m. and 5:00 p.m.). This Section 11A shall survive closing.

B. Seller makes no warranty whatsoever, either express or implied, as to the stability, firmness, consistency, permanence or habitability of the soil or subsurface conditions of the Lot, including but not limited to sinkholes, underground voids or organic material. Buyer expressly assumes the risk of any and all loss, damage or injury to the Lot, or to persons or property located on the Lot caused by soil or subsurface conditions, whether or not such conditions could have been discovered prior to the closing by any means whatsoever. This Section 11B shall survive closing.

12. PROOF OF COMPLETION: The House shall be considered complete when it has been constructed in substantial conformance with Seller's plans and specifications as provided for in this Agreement. When applicable, the local municipality's final inspection and approval in the form of a Certificate of Occupancy or the appropriate government agency's approval (i.e. FHA/VA), shall constitute uncontestable proof of completion.

13. CLOSING DATE: Without limiting Section 10 of this Agreement, Buyer acknowledges and agrees that Seller has the right, in its sole discretion, to schedule the date, time and place for the closing of the transaction contemplated by this Agreement ("Closing") and that Buyer shall close on such Closing date. Prior to the Closing, a temporary or permanent certificate of completion covering the Home shall be issued by the proper governmental agency. Buyer will be given at least three (3) days notice of the Closing date, time and place. Seller is authorized to postpone or advance the date of the Closing at its sole and exclusive discretion. Seller must, however, give Buyer reasonable notice of the new Closing date. Any notice of Closing may be given verbally, by telephone, facsimile, mail or other means of communication at Seller's option. An affidavit of one of Seller's employees or agents that such notice was given will be conclusive for purposes of proving that notice was given. All notices will be given to Buyer at the address or by use of the telephone number(s) specified on Page 1 of this Agreement unless Seller has received written notice from Buyer of any change therein prior to the date notice of Closing is given. If completion has occurred, as set forth in Section 10 herein, and the Closing is delayed at the request or through the default of Buyer or Buyer's lender, Seller may at its sole discretion, and without obligation to do so, reschedule Closing.

4

{OR502195;16}

Should Seller reschedule Closing, Buyer agrees that the balance of the Purchase Price, as set forth in Section 2 hereof, shall be subject to an increase at a rate equal to eighteen percent (18%) per annum from the date specified herein for Closing until fully paid, and all prorations shall be made to such date specified herein for Closing. Buyer agrees the late charge is appropriate in order to cover Seller's administrative and other expenses resulting from a delay in Closing. At Closing, Buyer agrees to pay to Seller the balance of the Purchase Price and any additional amounts Buyer owes under this Agreement by cashier's check or by federal wire transfer. Time is of the essence with regard to this Section 13.

14. CLOSING AND TITLE INSURANCE: Closing shall be held at a location to be determined by Seller. Seller, through its affiliated company, Adnoram Title, Inc. shall prior to or at Closing, issue a title commitment to Buyer and further deliver to Buyer a title policy or policies as referenced in the title commitment within a reasonable time period following Closing. Title to the Home to be delivered to Buyer at Closing will be marketable and insurable, subject only to those matters hereinbelow set forth. In connection therewith:

A. Title to the Home shall be subject to the following: (1) zoning, building codes, ordinances, regulations, rights or interests vested in the United States of America or the State of Florida; (2) real estate taxes and other taxes for the year of conveyance and subsequent years including taxes or assessments of any special taxing or community development district (including assessments relating to capital improvements and bonds); (3) the general printed exceptions contained in an ALTA Owner's Title Insurance Policy; (4) utility easements, sewer agreements, developer agreements, telephone agreements, cable agreements, telecommunications, monitoring agreements, restrictions and reservations common to any plat affecting title to the Home; (5) any laws and restrictions, covenants, conditions, limitations, reservations, agreements, easements or other matters recorded in the Public Records (for example, property use limitations and obligations, easements (right-of-way) and agreements relating to telephone, gas or electric lines, water and sewer lines and drainage, provided such agreements do not prevent use of the Home for single family residential purposes); and (6) acts done or suffered by Buyer and any mortgage obtained by Buyer for the purchase of the Home. It is Buyer's responsibility to review and become familiar with each of the foregoing title matters, some of which are covenants, running with the land. If any title defects are discovered by Buyer after Closing, Buyer's sole remedy shall be to make a claim to Buyer's title insurer, if available.

B. Seller shall convey title to Buyer at Closing by delivery to Buyer of a Special Warranty Deed (the "Deed") describing the Home which shall convey title to Buyer subject to the matters described in Section A above. *Any such matters omitted from the Deed shall nevertheless be deemed to be included in the Deed.* This Section 14B shall expressly survive Closing and the delivery of the Deed. The acceptance of the Deed by Buyer shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to this Agreement, except those which are herein specifically deemed to survive the Closing or which may survive by operation of law (if any).

C. Seller shall provide an affidavit complying with the Foreign Investment in Real Property Tax Act of 1980, as amended, upon the written request of Buyer.

D. Seller may not own title to the Lot on the date of execution of this Agreement; however, Seller shall obtain title to the Lot on or before the date of Closing.

E. If Seller cannot provide marketable and insurable title as described above, Seller will have a reasonable period of time (at least one hundred and twenty (120) days) from the date of the scheduled Closing to attempt to correct any defects in title; provided, however, Seller shall not be obligated to incur any expense to clear title to the Home. If Seller cannot or elects not to correct the title defects, Seller shall so notify Buyer within such period, and Buyer may thereafter elect (by written notice from Buyer to Seller) one of the following two (2) options: (1) to accept title in the condition offered (with defects) and pay the balance of the Purchase Price for the Home (without set off or deduction therefor), thereby waiving any claim with respect to such title defects and Buyer shall not make any claims against Seller because of the title defects; or (2) to cancel this Agreement and receive a full refund of all monies deposited hereunder. If all monies deposited hereunder are refunded, Buyer agrees to accept such refund as full payment of Seller's liability hereunder, whereupon this Agreement shall be terminated, and Seller and Buyer shall thereafter be relieved and released of all further liability hereunder. Buyer shall not thereafter have any rights to make any additional claims against Seller. In the event Buyer does not notify Seller in writing within five (5) business days from the receipt of Seller's notice (time being strictly of the essence) as to which option Buyer elects, Buyer shall be conclusively presumed to have elected option (2) set forth above. Buyer shall be responsible for any pending and proposed liens, taxes and/or assessments for public improvements. Seller will be responsible for public improvement liens which have been certified as of the date of Closing.

15. PRORATIONS/PROPERTY TAX DISCLOSURE SUMMARY:
A. If real estate taxes for the year of Closing are assessed in the aggregate on the land comprising the portion of the Community where the Home is located, rather than on a homesite-by-homesite basis, Seller will pay such taxes in full when due, and Buyer will reimburse Seller at the Closing for Buyer's pro rata share of such taxes from the date of Closing (if such taxes are then known) or the Home's allocable share (so prorated) of Seller's estimate of those taxes (if such taxes are not then known) subject to readjustment at either the request of Seller or Buyer within six (6) months from the date when the actual tax amount is known.

If taxes for the year of Closing are assessed on a homesite-by-homesite basis but such taxes are not due on the date of the Closing, Buyer will be responsible for paying such tax bill in full when due and Seller will credit Buyer at the Closing for Seller's pro rata share of such taxes (if the amount of such taxes are then known) or the Seller's estimate of those taxes (if such taxes are not then known) through the date of Closing, subject to readjustment at either the request of Seller or Buyer within six (6) months from when the actual amount of the bill is known. If the Closing takes place after Seller has paid the taxes for the year of the Closing, Buyer will reimburse Seller at the Closing for Buyer's pro rata share of those taxes from the date of Closing.

B. BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF BUYER HAS ANY QUESTIONS CONCERNING VALUATION, BUYER SHOULD CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

16. COMPLETION OF AGREEMENT: Acceptance of the Deed by Buyer shall signify and confirm full and satisfactory performance of this Agreement by Seller. After the closing, Buyer will not be entitled to bring any claim against Seller arising from this Agreement, and all Buyer's surviving rights hereunder will be limited to and embodied in the Deed and Limited Warranty as expressly set forth in those instruments.

17. RIGHT TO CURE/ARBITRATION/MEDIATION OF DISPUTES:
A. CHAPTER 558 NOTICE OF CLAIM. CHAPTER 558, FLORIDA STATUTES, CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS CONTRACT A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

B. Notwithstanding the provisions of Section 17A hereinabove, the parties hereby agree that as a condition precedent to the commencement of any legal proceeding or action relating to this Agreement and after complying with Seller's right to cure provisions referenced in Section 17A above, that the parties will attempt to resolve any disputes arising hereunder by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the mediation rules promulgated by the American Arbitration Association. Request for mediation shall be filed in writing with the other party to the Agreement and with the American Arbitration Association. The request may be made concurrently with the following of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of sixty (60) days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

C. WITHOUT LIMITING ANY RIGHTS SET FORTH IN OTHER SECTIONS OF THIS AGREEMENT, AND AFTER THE REQUIREMENTS OF SECTION 17A AND 17B ABOVE HAVE BEEN SATISFIED, ANY AND ALL DISPUTES ARISING HEREUNDER, INCLUDING WITHOUT LIMITATION, THOSE DISPUTES CONCERNING THE DEPOSIT PAID BY BUYER (SUCH AS DETERMINING WHICH PARTY IS ENTITLED TO THE DEPOSIT PAID BY BUYER IN THE EVENT THIS AGREEMENT IS TERMINATED PRIOR TO CLOSING), SHALL BE SUBMITTED TO BINDING ARBITRATION AND NOT TO A COURT FOR DETERMINATION. ARBITRATION SHALL COMMENCE AFTER WRITTEN NOTICE IS GIVEN FROM EITHER PARTY TO THE OTHER, SUCH ARBITRATION SHALL BE ACCOMPLISHED EXPEDITIOUSLY IN THE COUNTY WHERE THE HOME IS LOCATED AND SHALL BE CONDUCTED IN ACCORDANCE WITH THE RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("AAA"). THE ARBITRATION SHALL BE CONDUCTED BY A SINGLE ARBITRATOR WHO IS MUTUALLY AGREED UPON BY THE PARTIES. THE ARBITRATOR SHALL BE SELECTED FROM A LIST OF ARBITRATORS SUBMITTED BY THE AAA AND SHALL HAVE EXPERTISE IN THE HOMEBUILDING AND CONSTRUCTION AREA OF LAW. JUDGMENT UPON THE AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF. EACH PARTY SHALL PAY HIS/HER OWN, LEGAL FEES AND COSTS AND ANY OTHER FEES INCURRED IN CONNECTION WITH AN ARBITRATION PROCEEDING WHICH ARISES OUT OF OR RELATES IN ANY WAY TO THIS AGREEMENT, THE HOME, THE RELATIONSHIP BETWEEN THE PARTIES, STATUTORY VIOLATIONS, AND/OR ANY ALLEGED DUTIES OR OBLIGATIONS BETWEEN THE PARTIES, PROVIDED, HOWEVER, THAT THE ARBITRATION PANEL SHALL AWARD THE ARBITRATORS' FEES AND COSTS TO THE PREVAILING PARTY IN ITS ARBITRATION JUDGMENT.

Printed: May 31st, 2005 17:55:49

D. BY INITIALING BELOW, BUYER AGREES TO HAVE ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DOCUMENT SIGNED OR INITIALED IN CONNECTION WITH THIS AGREEMENT, THE HOME, THE RELATIONSHIP BETWEEN THE PARTIES, STATUTORY VIOLATIONS, AND/OR ANY ALLEGED DUTIES OR OBLIGATIONS BETWEEN THE PARTIES DETERMINED BY BINDING ARBITRATION AND HEREBY ACKNOWLEDGES AND AGREES THAT IT HAS UNEQUIVOCALLY GIVEN UP AND WAIVED ANY RIGHT OR OPPORTUNITY TO FILE, LITIGATE, OR HAVE HEARD ANY CLAIMS, CAUSES OF ACTION OR DISPUTES IN A FEDERAL, STATE OR OTHER COURT OF LAW OR EQUITY. IN NO EVENT SHALL BUYER BE ENTITLED TO A TRIAL BY JURY. IN THE EVENT THAT BUYER FILES ANY ACTION IN A COURT OF LAW AGAINST SELLER, BUYER CONSENTS TO THE IMMEDIATE ENTRY OF AN ORDER OF DISMISSAL WITH PREJUDICE OF ALL CAUSES OF ACTION AGAINST SELLER. IN SUCH EVENT BUYER SHALL REIMBURSE SELLER FOR ALL ATTORNEYS FEES AND COSTS INCURRED IN OBTAINING SUCH ORDER OF DISMISSAL.

BUYER'S INITIALS

E. Notwithstanding the foregoing, this Section 17 shall not apply to any disputes arising under Section 10 of this Agreement.

F. Without limiting any other provision herein, this Section 17 shall survive closing.

18. BUYER'S DEFAULT:

A. <u>Liquidated Damages Prior to Payment of Additional Deposit</u>. If, prior to payment of the Additional Deposit specified in Section 2 herein, Buyer defaults or fails to perform any term or condition of this Agreement, including a failure by Buyer to pay the Additional Deposit, the Initial Deposit specified in Section 2 of this Agreement shall be retained by Seller as liquidated and agreed upon damages, whereupon the parties' rights, privileges and obligations hereunder shall terminate and the parties shall have no further obligation to perform the remaining terms and conditions of this Agreement. The parties acknowledge and agree that the exact amount of damages which would be sustained by Seller as a result of Buyer's default and/or failure to perform are not readily ascertainable and that the Initial Deposit represents a fair and reasonable forecast of Seller's damages in the event of a default by Buyer prior to payment of the Additional Deposit.

B. <u>Liquidated Damages After Payment of Additional Deposit</u>. If, after payment of the Additional Deposit specified in Section 2 herein, Buyer defaults or fails to perform any term or condition of this Agreement, Seller shall be entitled to recover liquidated damages from Buyer in an amount equal to ten percent (10%) of the Purchase Price. In the event Seller has received Deposits from Buyer under Section 2 of this Agreement which are less than ten percent (10%) of the Purchase Price, Seller shall be entitled to retain the Deposits as partial payment of the liquidated damages and may proceed with an action at law to recover the balance of the liquidated damages. In the event the Deposits received by Seller under Section 2 of this Agreement are greater than or equal to ten percent (10%) of the Purchase Price, Seller shall retain an amount equal to ten percent (10%) of the Purchase Price as liquidated damages and shall return the excess, if any, to Buyer, whereupon the parties' rights, privileges and obligations hereunder shall terminate and the parties shall have no further obligation to perform the terms and conditions of this Agreement. The parties acknowledge and agree that the exact amount of damages which would be sustained by Seller as a result of Buyer's default and/or failure to perform are not readily ascertainable and that ten percent (10%) of the Purchase Price represents a fair and reasonable forecast of Seller's damages in the event of a default by Buyer after payment of the Additional Deposit.

C. <u>Specific Performance</u>. Notwithstanding the foregoing, in the event Buyer defaults or fails to perform any term or condition of this Agreement, Seller shall be entitled to seek specific performance of Buyer's obligations as an alternative to liquidated damages.

19. SELLER'S DEFAULT:

A. <u>Notice Period</u>. Buyer shall give written notice to Seller following Seller's default under this Agreement as a condition precedent to seeking any remedy against Seller. The written notice shall specify the default in detail. The notice to be given pursuant to this Section 19A shall be delivered to Seller in the same manner noted in Section 21 of this Agreement.

B. <u>Cure Period</u>. Seller shall have up to ninety (90) days from the date Seller receives the written notice (the "Cure Period") to correct any default or to otherwise respond to Buyer in the event Seller determines that no default has occurred. Seller shall have the Cure Period to inspect and correct any alleged default or to otherwise respond to Buyer in the event Seller determines that no default has occurred.

C. <u>Expiration of Cure Period</u>. Buyer agrees that Buyer shall seek no remedy against Seller prior to the expiration of the Cure Period. Seller shall have the right, but not the obligation, to take action during the Cure

D. <u>Remedy</u>. If prior to Closing, Seller fails to perform under this Agreement, Buyer may exercise any and all legal remedies available at law or equity including, but not limited to a return of the Deposit. After Closing, Buyer's rights and remedies under this Agreement shall be limited exclusively to those expressly set forth in the Deed and the Limited Warranty.

7

{OR502195;16}

A. <u>Buyer's Obligations to Permit Inspection</u>. Buyer agrees that once Buyer has given written notice to Seller pursuant to Section 19(A), Buyer shall be obligated to permit Seller and its agents to perform inspection of the Home and to perform all tests and/or all repair/replacement deemed necessary by Seller to respond to such notice at all reasonable times. Buyer agrees that any inspection, test and/or repair/replacement scheduled on a business day between 9:00 a.m. and 5:00 p.m. shall be deemed scheduled at a reasonable time. The rights reserved in this Section include the right of Seller to repair or address, in Seller's sole option and expense, any aspect of the Home deemed defective by Seller during its inspection of the Home.

20. INTERFERENCE/CONSTRUCTION ACTIVITIES: BUYER HAS NO RIGHT TO ENTER OR OCCUPY THE HOME BEFORE CLOSING WITHOUT SELLER'S WRITTEN APPROVAL. A CONSTRUCTION SITE IS A DANGEROUS PLACE AND BUYER IS PROHIBITED FROM ENTERING THE HOME WITHOUT WRITTEN PERMISSION FROM A MARONDA REPRESENTATIVE. IF BUYER RECEIVES PERMISSION, BUYER MUST BE ACCOMPANIED BY A MARONDA REPRESENTATIVE. IF BUYER OR BUYER'S DEPENDENTS, GUESTS, COMPANIONS OR INVITEES SUSTAIN ANY PERSONAL INJURY OR CAUSE ANY PERSONAL INJURY TO THIRD PARTIES OR CAUSE PROPERTY DAMAGE TO THE HOME, OR EQUIPMENT THEREON, WITH OR WITHOUT SELLER'S CONSENT, BUYER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS SELLER, ITS AGENTS AND EMPLOYEES FROM ANY CLAIMS, LOSS, DAMAGE OR EXPENSE ARISING FROM SUCH PERSONAL INJURY OR PROPERTY DAMAGE, INCLUDING ATTORNEYS' FEES AND BUYER, FOR HIMSELF AND HIS HEIRS, HEREBY WAIVE AND RELINQUISH ANY AND ALL CLAIMS OR CAUSES OF ACTION AGAINST SELLER OR ITS EMPLOYEES OR AGENTS ARISING FROM PERSONAL INJURY OR PROPERTY DAMAGE SUSTAINED UPON THE HOME.

PRIOR TO CLOSING, BUYER SHALL NOT ENTER UPON OR WITHIN THE HOME AND MAKE ANY CHANGES, ADDITIONS OR ALTERATIONS IN THE CONSTRUCTION OF THE HOUSE INCLUDING, BUT NOT LIMITED TO THE INSTALLATION OR ADDITION OF ANY EQUIPMENT, ELECTRICAL WIRING, MATERIALS, APPLIANCES, WALL COVERINGS OR PAINT. FURTHER, BUYER SHALL GIVE NO DIRECTION TO SELLER'S CONSTRUCTION CREW OR ANY SUBCONTRACTOR WORKING ON THE HOUSE, AND NO COMMITMENTS MADE BY SUCH CREW MEMBER OR SUBCONTRACTOR SHALL BE BINDING UPON SELLER. BUYER AGREES NOT TO INTERFERE WITH, RESTRICT, INTERRUPT, HARASS OR OBSTRUCT CONSTRUCTION OR ITS PROGRESS, PHYSICALLY, BY NUISANCE OR IN ANY OTHER MANNER. SO DOING SHALL CONSTITUTE A BREACH OF THIS AGREEMENT AND A FAILURE TO PERFORM ON THE PART OF BUYER. UNDER SUCH CIRCUMSTANCES, AT SELLER'S OPTION, SELLER SHALL BE ENTITLED TO THE REMEDIES SET FORTH IN SECTION 18 HEREIN.

ALL OWNERS, OCCUPANTS AND USERS OF THE COMMUNITY ARE HEREBY PLACED ON NOTICE, AND AGREE THAT (1) SELLER AND/OR ITS AGENTS, CONTRACTORS, SUBCONTRACTORS, LICENSEES AND OTHER DESIGNEES, AND/OR (2) ANY OTHER PARTIES, WILL BE, FROM TIME TO TIME, CONDUCTING EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR IN PROXIMITY TO THE COMMUNITY. BY THE ACCEPTANCE OF THEIR DEED OR OTHER CONVEYANCE OR MORTGAGE, LEASEHOLD, LICENSE OR OTHER INTEREST, AND BY USING ANY PORTION OF THE COMMUNITY, EACH SUCH OWNER, OCCUPANT AND USER AUTOMATICALLY ACKNOWLEDGES, STIPULATES AND AGREES (i) THAT NONE OF THE AFORESAID ACTIVITIES SHALL BE DEEMED NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, HEREUNDER OR AT LAW GENERALLY, (ii) NOT TO ENTER UPON, OR ALLOW THEIR CHILDREN OR OTHER PERSONS UNDER THEIR CONTROL OR DIRECTION TO ENTER UPON (REGARDLESS OF WHETHER SUCH ENTRY IS TRESPASS) ANY PROPERTY WITHIN OR IN PROXIMITY TO THE AREA WHERE SUCH ACTIVITY IS BEING CONDUCTED (EVEN IF NOT BEING ACTIVELY CONDUCTED AT THE TIME OF ENTRY, SUCH AS AT NIGHT OR OTHERWISE DURING NON-WORKING HOURS), (iii) SELLER AND THE OTHER AFORESAID RELATED PARTIES SHALL NOT BE LIABLE FOR ANY AND ALL LOSSES, DAMAGES (COMPENSATORY, CONSEQUENTIAL, PUNITIVE OR OTHERWISE), INJURIES OR DEATHS ARISING FROM OR RELATING TO THE AFORESAID ACTIVITIES, EXCEPT RESULTING DIRECTLY FROM SELLER'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (iv) ANY PURCHASE OR USE OF ANY PORTION OF THE COMMUNITY HAS BEEN AND WILL BE MADE WITH FULL KNOWLEDGE OF THE FOREGOING AND (v) THIS ACKNOWLEDGMENT AND AGREEMENT IS A MATERIAL INDUCEMENT TO SELLER TO SELL, CONVEY, AND/OR ALLOW THE USE OF THE HOME. THIS SECTION 20 SHALL SURVIVE THE CLOSING.

21. NOTICE: Except as provided for in Section 13 with respect to notices of the scheduled date of Closing, any notice required or permitted to be given in connection with this Agreement shall be in writing and sent by United States certified mail, overnight courier or facsimile to Buyer or Seller at the addresses on page 1 of this Agreement, and additionally to Seller by hand delivery at Seller's sales office for the Community. All notices shall only be effective upon receipt or refusal to accept receipt. Buyer shall provide Seller with an updated address should Buyer move or change address.

22. ASSIGNMENT: Buyer may not assign this Agreement or Buyer's rights hereunder. Any assignment is void and deemed a default hereunder.

23. CAPTIONS: The captions and title of the various sections and paragraphs of this Agreement are for convenience and reference only and in no way define, limit or describe the scope or intent of this Agreement, nor in any way affect his Agreement.

24. ENTIRE AGREEMENT: BUYER HAS READ THIS AGREEMENT AND EACH ADDENDUM ATTACHED HERETO AND ACKNOWLEDGES THAT THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN BUYER AND SELLER. THIS AGREEMENT CAN ONLY BE AMENDED IN WRITING AND ANY AND ALL PRIOR AGREEMENTS, REPRESENTATIONS, UNDERSTANDINGS, AND ORAL STATEMENTS NOT REFLECTED IN THIS AGREEMENT SHALL HAVE NO EFFECT AND ARE NOT BINDING ON SELLER. BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED ON ANY REPRESENTATIONS, NEWSPAPER, RADIO OR TELEVISION ADVERTISEMENTS, WARRANTIES, STATEMENTS, OR ESTIMATES OF ANY NATURE WHATSOEVER WHETHER WRITTEN OR ORAL, MADE BY SELLER, SALES PERSONS, AGENTS, OFFICERS, EMPLOYEES, CO-OPERATING BROKERS (IF ANY) OR OTHERWISE EXCEPT AS HEREIN SPECIFICALLY REPRESENTED. BUYER HAS BASED HIS/HER DECISION TO PURCHASE THE HOME ON PERSONAL INVESTIGATION AND OBSERVATION.

25. BINDING EFFECT/EFFECTIVE DATE: This Agreement shall not be binding on Seller until executed by a Vice-President of Seller. The effective date of this Agreement shall be the latest of the execution dates adjacent to the signature line provided for on the last page of this Agreement.

26. LOT PURCHASE: Seller's obligations under this Agreement are contingent upon Seller successfully purchasing the Lot from its current owner within a period of time sufficient to enable Seller to perform its obligations hereunder, if Seller is not the current owner of the Lot.

27. TERMITES: Seller shall furnish to Buyer no later than Closing, a Termite Soil Treatment Guarantee and a Subterranean Termite Contract issued by a locally licensed exterminator.

28. ELECTROMAGNETIC FIELDS: All power lines and electrical appliances that draw electric current have electromagnetic fields (EMF) around them. Seller has no expertise or information about EMF or the detection of EMF and does not review or monitor research efforts regarding EMF. As a result, Seller does not make representations or warranties of any kind related to EMF. Buyer's local electric utility company servicing the Home or Buyer's state or local environmental, energy or health agencies or the regional office of the Environmental Protection Agency may provide such information.

29. RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

Seller disclaims and assumes no liability, and Buyer waives all warranties, either expressed or implied, including any warranties or habitability or fitness of purpose that could be construed to cover the presence of radon or other environmental pollutants. The only warranties Seller provides to Buyer are those contained in the limited warranty described in Section 11 above.

30. AGREEMENT NOT TO BE RECORDED: Buyer covenants that Buyer shall not record this Agreement, any memorandum hereof, or any other document, notice, claim, instrument or the like which may create a cloud on title with respect to the Home, in the Public Records of the County. Buyer agrees that if Buyer records any of the foregoing, or causes the recordation of the same, Buyer shall be responsible for paying all of Seller's legal fees and expenses incurred in removing the cloud on title caused by such recordation. Seller's rights under this Section shall be in addition to Seller's remedies for Buyer's default provided in Section 18 of this Agreement and shall survive termination of this Agreement by Seller.

31. WAIVER: Seller's waiver of any of its rights or remedies shall not operate to waive any other of Seller's rights or remedies or to prevent Seller from enforcing the waived right or remedy in another instance.

32. INSULATION: Pursuant to Section 460.16 of the Code of Federal Regulations, the Insulation Disclosure Addendum attached hereto is incorporated herein by reference and made a part hereof.

33. ENERGY RATING: Pursuant to Section 553.996 of the Florida Statutes, Buyer may request that Seller cause a State Certified Energy Rater to perform an energy efficiency rating on the Home being purchased. Buyer hereby releases Seller from any responsibility or liability for the accuracy or level of the rating and Buyer understands and agrees that this Agreement is not contingent upon Buyer approving the rating, that the rating is solely for Buyer's own information and that Buyer will pay the total cost of the rating. Buyer hereby acknowledges the receipt of the Department of Community Affairs information brochure regarding the Florida Energy Efficiency Rating System together with an energy performance level (EPL) display card as required pursuant to Section 553.9085 of the Florida Statutes.

9

{OR502195;16}

34. VENUE/APPLICABLE LAW: Each Buyer acknowledges that the Home is located in the County (identified on Page 1 of this Agreement) and Seller has an office in the County. Accordingly, an irrebuttable presumption exists that the only appropriate venue for the resolution of any dispute lies in the County. In addition to the foregoing, Buyer and Seller agree that the venue for resolution of any dispute lies in said County. Additionally, Buyer agrees that any disputes regarding this Agreement shall be settled in accordance with Florida Law.

35. EXECUTION: This Agreement may be executed in any number of counterparts, any one and all of which shall constitute the agreement of the parties, and each of which shall be deemed an original, but all of which together shall constitute one and the same document. Facsimile signatures shall be sufficient to make this Agreement binding.

36. SURVIVAL AND SEVERABILITY: The provisions and disclaimers in this Agreement which are intended to have effect after the Closing, which include but shall not be limited to Sections 11A, 11B, 14B, 17, and 20, shall survive the Closing. In the event that any provision of this Agreement shall be void or unenforceable, such clause or provision shall be deemed deleted so that the balance of the Agreement is enforceable.

37. MISCELLANEOUS: Wherever used in this Agreement, the singular shall include the plural, the plural the singular, and the use of any gender shall be applicable to all genders. If two or more persons are identified as Buyers in the Agreement, any one of them have the right and authority to bind the other(s) in all matters relating to this Agreement.

38. MOLD: Mold is a type of fungus that occurs naturally in the environment. All mold is not harmful, but certain strains of mold have been shown to have adverse health effects in susceptible persons. Residential home construction is not, and cannot be, designed to exclude mold spores. Mold growth requires moisture which must be kept to a minimum to avoid the growth of mold within the Home. Common sources of moisture include spills, leaks, overflows, condensation, and high humidity. By minimizing moisture, a homeowner can reduce or eliminate mold growth. Running the Air Conditioning System within the Home at very low temperatures for excessive periods of time can create moisture and lead to the growth of mold in the Home.

AS FURTHER STATED IN THE MOLD NOTICE, DISCLOSURE AND WAIVER AGREEMENT ATTACHED HERETO, SELLER DISCLAIMS AND ASSUMES NO LIABILITY AND BUYER WAIVES ALL WARRANTIES, EITHER EXPRESSED OR IMPLIED, INCLUDING ANY WARRANTIES OR HABITABILITY OR FITNESS FOR A PARTICULAR PURPOSE THAT COULD BE CONSTRUED TO COVER THE PRESENCE OF MOLD WITHIN THE HOME. THE ONLY WARRANTIES SELLER PROVIDES ARE THOSE CONTAINED IN THE HOMEOWNER'S MANUAL DESCRIBING SELLER'S LIMITED WARRANTY.

39. HOMEOWNERS' ASSOCIATION DISCLOSURE STATEMENT: In compliance with the requirements of Section 720.401, Florida Statutes, Buyer, by execution of the Homeowners' Association Disclosure Addendum attached hereto, acknowledges and affirms that Seller has fully disclosed to Buyer the existence of the Homeowners' Association and Buyer's obligations and liabilities relating thereto.

> NOTE: BUYER SHOULD NOT EXECUTE THIS AGREEMENT UNTIL BUYER HAS RECEIVED AND READ THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401, FLORIDA STATUES, WHICH IS ATTACHED HERETO. IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT OR REPRESENTATIVE WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.

40. LACK OF RELIANCE ON SELLER: Section 720.402, Florida Statutes, provides a cause of action to any person who, in reasonable reliance upon any material statement or information that is false or misleading and published by or under authority from a developer in advertising and promotional materials, including, but not limited to, a contract of purchase, a declaration of covenants, exhibits to a declaration of covenants, brochures, and newspaper advertisements, pays anything of value toward the purchase of a parcel in a community located in the State of Florida.

EXCEPT AS SET FORTH ELSEWHERE HEREIN, INCLUDING THE LIMITED REPRESENTATIONS AND WARRANTIES OF SELLER IN SECTION 11A ABOVE, BUYER ACKNOWLEDGES, BY INITIALING BELOW, THAT BUYER HAS INDEPENDENTLY, AND WITHOUT RELIANCE ON ANY STATEMENTS OF, OR ANY INFORMATION PROVIDED BY, SELLER OR ANY AGENT OR REPRESENTATIVE OF SELLER, DECIDED TO EXECUTE THIS AGREEMENT.

Buyer's Initials _____

{OR502195;16}

41. CONSTRUCTION LICENSING BOARD: Pursuant to Section 489.1425 of the Florida Statutes, Seller provides the following notice. PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE-LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS.

FLORIDA CONSTRUCTION LICENSING BOARD<br>
1940 NORTH MONROE STREET<br>
TALLAHASSEE, FL 32399-0783<br>
850-487-1395

42. ADDENDUMS:

    - [x] Affiliated Business Disclosure Form (MFC Mortgage, Inc. of Florida)
    - [x] Energy Information Brochure FSEC-EB-1 and Receipt
    - [x] Energy Performance Level (EPL) Display Card and Receipt
    - [x] Receipt for Homeowners Limited Warranty Booklet
    - [x] Insulation Addendum
    - [x] Mold Notice, Disclosure and Disclaimer
    - [ ] Homeowners' Association/Assessments Disclosure (Receipt for Homeowners Association Documents)
    - [ ] Community Development District
    - [ ] Alternate Lender Addendum
    - [ ] Additional Deposit Promissory Note
    - [ ] Contruction Lien Addendum (applicable when building on customer's lot)

THIS IS A LEGALLY BINDING AGREEMENT, AND SHOULD BE READ THOROUGHLY PRIOR TO SIGNING. IF BUYER HAS ANY QUESTIONS REGARDING BUYER'S RIGHTS OR RESPONSIBILITIES UNDER THIS AGREEMENT, BUYER SHOULD CONSULT AN ATTORNEY. BUYER'S SIGNATURE AND/OR INITIALS ON THIS AGREEMENT, THE EXHIBITS AND ADDENDA EVIDENCES BUYER'S ACCEPTANCE AND UNDERSTANDING OF IT'S TERMS AND THAT BUYER IS NOT RELYING ON ANY STATEMENT, PROMISE, CONDITION OR STIPULATION (ORAL OR OTHERWISE) NOT SPECIFICALLY SET FORTH IN THIS AGREEMENT. BUYER UNDERSTANDS THAT SELLER IS RELYING ON BUYER'S ACKNOWLEDGEMENT AND REPRESENTATIONS CONTAINED IN THIS PARAGRAPH, AND SELLER WOULD NOT AGREE TO SELL THE HOME TO BUYER WITHOUT SAID ACKNOWLEDGMENT AND REPRESENTATIONS BY BUYER.

THE _____ COMMUNITY DEVELOPMENT DISTRICT MAY IMPOSE AND LEVY TAXES OR ASSESSMENTS, OR BOTH TAXES AND ASSESSMENTS, ON THIS PROPERTY. THESE TAXES AND ASSESSMENTS PAY THE CONSTRUCTION, OPERATION, AND MAINTENANCE COSTS OF CERTAIN PUBLIC FACILITIES AND SERVICES OF THE DISTRICT AND ARE SET ANNUALLY BY THE GOVERNING BOARD OF THE DISTRICT. THESE TAXES AND ASSESSMENTS ARE IN ADDITION TO COUNTY AND OTHER LOCAL GOVERNMENT TAXES AND ASSESSMENTS AND ALL OTHER TAXES AND ASSESSMENTS PROVIDED FOR BY LAW.

☐ CHECK HERE IF HOME IS LOCATED WITHIN A COMMUNITY DEVELOPMENT DISTRICT.

[SIGNATURE PAGE FOLLOWS]

Buyer: _____  Buyer: _____
Name: _____  Name: _____
Date: 5-31-05                                    Date: 5/31/05

Name: _____  Name: _____
Date: _____  Date: _____

Sales Representative/Witness
Name: _____
Date: 5/31/05

Not binding upon seller until signed by Vice President

Seller: Maronda Homes, Inc. Of Florida

By: _____
Name: Larry Ripley
Its: Vice President
Date: _____

12

**EXHIBIT B**

# Holland & Knight

200 South Orange Avenue, Suite 2600 | Orlando, FL 32801 | T 407.425.8500 | F 407.244.5288
Holland & Knight LLP | www.hklaw.com

November 6, 2009

Scott J. Johnson
407 244 1126-Direct Dial
scott.johnson@hklaw.com

**VIA FACSIMILE ONLY**

Robert P. Brown, III, Esq.
Alters Boldt Brown Rash Culmo
Miami Design District
4141 Northeast 2nd Avenue, Suite 201
Miami, FL 33137

Jeremy W. Alters, Esq.
Alters Boldt Brown Rash Culmo
Miami Design District
4141 Northeast 2nd Avenue, Suite 201
Miami, FL 33137

Re: Francesca and Brian Gardner/Maronda Homes, Inc. of Florida
Claim regarding defective drywall

Gentlemen:

I am following up my letter to Mr. Brown dated July 14, 2009, and my subsequent letter to Mr. Alters dated September 18, 209. Apparently both of you are dealing on this matter, and both of you are communicating to my client directly, even though I have previously sent both of you the above-referenced letters requesting that further contact be with me. It would also be helpful if you identified which one of you will be the lead attorney on this matter, so that I am communicating with one of you.

To remind you further of the prior communications, my letter to Mr. Brown dated July 14 acknowledged that our firm is representing Maronda Homes involving several homes our client discovered were constructed with Chinese drywall. We are addressing those issues through an agreed remediation procedure with the homeowners. We would like to undertake the same procedure with the home of your clients.

My subsequent letter to Mr. Alters of September 18 further confirmed the desire of Maronda Homes to address the drywall issues of your clients' home. In that letter I also advised that I had received communication from a third attorney in your firm, Mr. Crenshaw, who never followed up with me on the most recent communication I had with him. That letter also advised that Mrs. Gardner had direct contact with my client to request remediation. My client advised her that we needed to deal through your law firm.

Atlanta • Bethesda • Boston • Chicago • Fort Lauderdale • Jacksonville • Los Angeles
Miami • New York • Northern Virginia • Orlando • San Francisco
Tallahassee • Tampa • Washington, D.C. • West Palm Beach
Abu Dhabi • Beijing • Caracas* • Mexico City • Tel Aviv* •*Representative Office

Robert P. Brown, III, Esq.
Jeremy W. Alters, Esq.
November 6, 2009
Page 2.

The next action to occur was Mr. Brown sending a letter dated October 27, 2009, again directly to my client at an address in Pennsylvania. I would therefore request that you confirm to me who I will deal with, and further confirm whether your clients will voluntarily allow Maronda Homes to proceed with the remediation, just as my client has successfully performed for several other homes known to have a Chinese drywall issue.

You are also advised responsive to Mr. Brown's letter of October 27 that my client has no insurance providing coverage. As noted, my client is advising of its desire to immediately address the issue of the drywall to voluntarily remediate the issue, reserving rights against the company that supplied and installed the drywall.

I wait your reply. Thank you.

Sincerely yours,

HOLLAND & KNIGHT LLP

Scott J. Johnson

SJJ/lly

#8954814_v1