UNITED STATES DISTRIC COURT
FORTHE EASTERN DISTRICT OF LOUISIANA

JOYCE W. ROGERS, individually, and on
behalf of all of others similarly situated.
[ADDITIONAL PLAINTIFFS LISTED ON
SCHEDULE OF PLAINTIFFS, ATTACHED                    CASE NO.: 10-362
HERETO AS EXHIBIT "A",                              SECT. L MAG 2

       Plaintiffs.                                AMENDED CLASS ACTION
                                                   COMPLAINT

v.

KNAUF GIPS KG; KNAUF PLASTERBOARD                  JURY TRIAL DEMAND
(TIANJIN) CO., LTD.; KNAUF
PLASTERBOARD (WUHU), CO., LTD.;
GUANGDONG KNAUF NEW BUILDING
MATERIAL PRODUCTS CO., LTD.
[ADDITIONAL DEFENDANTS LISTED ON
SCHEDULE OF DEFENDANTS, ATTACHED
HERETO AS EXHIBIT "B".

       Defendants.

_____/

**PROPOSED INTERVENOR COMPLAINT OF ALAN AND ANNETTE GODDARD
TO PLAINTIFFS' AMENDED OMNIBUS CLASS ACTION COMPLAINT (IV)**

     Pursuant to Fed. R. Civ. P. 23, the class representatives in this action bring suit on behalf

of themselves and all other similarly situated owners and residents of real property containing

defective Chinese manufactured drywall that was designed, manufactured, imported, distributed,

delivered, supplied, marketed, inspected, installed, or sold by the Defendants. In order to

accomplish an effective class structure, each of the class representatives is pursuing a nationwide class action against the Knauf entities,[1] who are the manufacturers of the drywall located in Plaintiffs' homes. Subordinate to the national class action, the identified class representatives are participating in subclasses asserting claims against each of their distributors, suppliers, importers, exporters, and brokers (Subclasses 1-11); each of their builders and developers (Subclasses 12-124); and each of their contractors and installers (Subclasses 125-42) for whom they have standing (class and subclass members shall be collectively referred to herein as "Class Members"). Each of the Defendants in this action are liable for damages incurred by Plaintiffs due to their role in the design, manufacture, importing, distributing, delivery, supply, marketing, inspecting, installing, or sale of the defective drywall at issue in this litigation.

## JURISDICTION, PARTIES, AND VENUE

1.      Original jurisdiction of this Court exists by virtue of 28 U.S.C. §1332(d)(2) and the Class Action Fairness Act ("CAFA"). See 28 U.S.C. § 1711, et. seq. The Plaintiffs and certain of the Defendants in these actions are citizens of different states and the amounts in controversy in these actions exceed five million dollars ($5,000,000.00), exclusive of interest and costs.

2.      For each subclass, the Court has original jurisdiction under CAFA and/or supplemental jurisdiction under 28 U.S.C. § 1367.

3.      Venue in this district satisfies the requirements of 28 U.S.C. §1391(b)(l)-(2) and (c) because Plaintiffs and a significant number of the absent class members reside in this jurisdiction and a substantial amount of the events and occurrences giving rise to these claims

---

[1] Knauf consists of Knauf GIPS KG, Knauf Plasterboard (Tianjin) Co., Ltd., Knauf Plasterboard (Wuhu), Co., Ltd., and Guangdong Knauf New Building Material Products Co., Ltd., (collectively "Knauf").

occurred in this District, or a substantial part of the property that is the subject of this action is situated in this district. Venue is otherwise appropriate in this district consistent with 28 U.S.C. § 1407 and the June 15, 2009 Transfer Order of the Judicial Panel on Multidistrict Litigation ("JPML"). *See In re: Chinese-Manufactured Drywall Products Liability Litigation*, 626 F.Supp.2d 1346 (J.P.M.L. Jun. 15, 2009).

<u>**PLAINTIFFS**</u>

4.      For purposes of clarity, the Plaintiffs are asserting claims on behalf of all owners and residents of the subject properties, including but not limited to, minors and other residents of the properties who do not appear herein as named plaintiffs.

5.      To the extent some of the Plaintiffs are already class representatives in *Payton, et al. v. Knauf Gips KG, et al.* Case *No.09-7628* (E.D.La,), they are not participating in the instant amended complaint as class representatives in the class asserted against Knauf. Such Plaintiffs are participating as class representatives in the instant amended complaint for non-manufacturing defendants in the chain of distribution for the defective drywall in their homes or other structures.

6.      Unless specifically stated to the contrary, all Plaintiffs are citizens of the state where they reside and all entities are citizens of the state where they are organized. Alternatively, all entities are citizens of the state of their principal place of business and/or of the state where the subject property is located.

7.      Plaintiff, Joyce W. Rogers is a citizen of Louisiana and owns real property located at 675 Solomon Drive, Covington, Louisiana 70433. Plaintiff is participating as a class representative in the class and subclasses as set forth in the schedules accompanying this amended complaint which are incorporated herein by reference.

8.     Plaintiffs Alan and Annette Goddard are citizens of Florida and together own real property located at 17865 Monte Vista Drive, Boca Raton, FL 33496.

9.     In addition to the aforementioned Plaintiffs, there are other named Plaintiffs enumerated in the schedules annexed to Plaintiffs' Amended Omnibus Class Action (IV) who are incorporated herein by reference to the Amended Omnibus Class Action (IV) Complaint.

10.     Plaintiffs are participating as class representatives in the class and subclasses as set forth in the schedules accompanying Plaintiffs' Amended Omnibus Class Action (IV) which are incorporated herein by reference.

## DEFENDANTS

11.     Unless specifically stated to the contrary, all individual defendants are citizens of the state where they do business and all entities are citizens of the state where they are organized. For those entities, where the state of organization is not listed, it is asserted upon information and belief that the entity is incorporated and/or organized in the state of its principal place of business.

12.     The Defendants include the following categories of defendants set forth below:

### The Manufacturing Defendants

13.     Defendant Knauf Gips is a German corporation doing business in several States, including but not limited to, Louisiana, Alabama; Florida, Mississippi, Texas, North Carolina, and Virginia. One of Knauf Gips' affiliates. Knauf Verwaltungsgsellschaft KG, owns a substantial stake in USG. Knauf Gips is a leading manufacturer of building materials and systems. Knauf Gips, together with its affiliates, including Knauf Tianjin, provides building materials and systems to customers in over 50 countries. including the United States. Upon information and belief at all times material hereto, Knauf Gips supervised, operated, trained and

-4-

otherwise exercised control and/or had the right to control the operations of Knauf Tianjin. And its agents apparent agents, and employees.

14.     Among other things, in 1995, Knauf Gips introduced its advanced production techniques and technology into China. From 1997 through 2001, Knauf Gips invested in China and established three plasterboard plants which are located in Wuhu, Tianjin and Dongguan. The product quality of all Knauf Gips' plants in China, including Knauf Tianjin, arc strictly controlled according to the requirements of Knauf Gips' headquarters in Germany. Moreover, Knauf Gips' sales and technical support teams support Knauf Gips' businesses throughout the world, including Knauf Tianjin in China. Knauf Tianjin and its employees are the actual and/or apparent agents of Knauf Gips. Building Material Products Co. Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon information and belief, Guangdong Knauf New Building Material Products Co., Ltd. Manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the exception that the drywall would be purchased by thousands of consumers, i1'not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Guangdong Knauf New Building Material Products Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Guangdong Knauf New Building Material Products Co. Ltd. manufactured and/or sold to certain suppliers in the United States. Knauf Gips KG, Knauf Plasterboard (Tianjin) Co. Ltd. Knauf Plasterboard (Wuhu), Co., Ltd. and Guangdong Knauf New Building Material Products Co., Ltd. shall be collectively referred to herein as "Knauf".

15. In addition, there are other Manufacturing Defendants enumerated in Plaintiffs' amended Omnibus Class Action (IV) which are incorporated herein by reference to the Amended Omnibus Class Action (IV) Complaint.

**The Distributor/Supplier/Importer/Exporter/Broker Defendants**

16. Defendant USG Corporation is a Delaware corporation with a principal place of business in Chicago, Illinois. USG, together with its various affiliates, including its subsidiary, L&W Supply Corporation and Seacoast Supply Company, is the nation's largest distributor of drywall and related building products. USG, through its subsidiary L&W Supply Corporation, sold, distributed, supplied, marketed, inspected, imported, exported, or delivered the drywall at issue in this litigation. USG is responsible for the actions of its Subsidiary through control person and other management activities.

17. Defendant, Interior/Exterior Enterprises, LLC is an entity or individual with a principal place of business at 727 S. Cortez Street. New Orleans. Louisiana 70119. Defendant is organized under the laws of Louisiana. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

18. Defendant, Phillips Abita Lumber Company, Inc. d/b/a Abita Lumber Company, Inc. is an entity or individual with a principal place of business at 21459 Hwy. 36, Abita Springs, Louisiana 70428. Defendant is organized under the laws of Louisiana. Defendant is a importer, exporter, distributor, supplier or broker of drywall and related building products that engaged in these practices, which has resulted in harm and damages to Subclass Members.

19.     In addition, there are other Distributor/Supplier/Importer/Exporter/Broker Defendants enumerated in Plaintiffs' amended Omnibus Class Action (IV) which are incorporated herein by reference to the Amended Omnibus Class Action (IV) Complaint.

**The Developer/Builder Subclasses**

20.     Defendant, 3180 Lamb Court Acquisition. LLC is an entity or individual with a principal place of business at 3130 Day Avenue, Miami, Florida 33133. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

21.     Defendant. 616 LLC/Andy Ziffer is an entity or individual with a principal place of business at 508 S.W. 6th Avenue, Fort Lauderdale, Florida 33315. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

22.     Defendant, Woodside f/k/a GHO Properties is an entity or individual with a principal place of business at 3600 Burgundy Drive North, Palm Beach Gardens, Florida 33410. Defendant is organized under the laws of Florida. Defendant built certain Subclass Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

23.     Defendant, Woodside Homes of Southeast Florida, LLC is an entity or individual with a principal place of business at 2540 Metro Centre Blvd., Suite 3, West Palm Beach, Florida 33407. Defendant is organized under the laws of Florida. Defendant built certain Subclass

Members' homes and, directly or through agents, installed defective drywall in these homes, which has resulted in harm and damages to Subclass members as described herein.

24.     In addition, there are other Developer/Builder Defendants enumerated in Plaintiffs' amended Omnibus Class Action (IV) which are incorporated herein by reference to the Amended Omnibus Class Action (IV) Complaint.

**The Contractor/Installer Subclasses**

25.     Defendant, AI Brothers, Inc., is an entity or individual with a principal place of business at 2512 SW 22nd Place, Cape Coral, Florida 33914. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

26.     Defendant, Baystate Drywall, Inc. is an entity or individual with a principal place of business at 14420 SW 23 Street, Davie, Florida 33325. Defendant is organized under the laws of Florida. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

27.     Defendant, Can-Am Drywall, Inc. (successor to Baystate Drywall, Inc.) is an entity installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

28.     Defendant, Richard Hoover, is an entity or individual with a principal place of business at 20345 Sisters Road, Ponchatoula, Louisiana 70454. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

29.     Defendant, Robert/Charles Builders, Inc., is an entity or individual with a service address at Ziegenfuss, 705 NW 6th Street, Boca Raton, Florida 33486. Upon information and belief, Defendant constructed or installed defective drywall in the homes of certain Subclass Members, which has resulted in harm and damages to Subclass Members.

30.     In addition, there are other Contractor/Installer Defendants enumerated in Plaintiffs' amended Omnibus Class Action (IV) which are incorporated herein by reference to the Amended Omnibus Class Action (IV) Complaint.

## FACTS REGARDING PRODUCT DEFECT

31.     Upon information and belief, Defendants' drywall contains gypsum.

32.     In "defective drywall" (such as that designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold by Defendants herein), the gypsum and other components of the product break down and release sulfides and other noxious gases that are then emitted (or "off-gassed") from the drywall.

33.     Sulfides and other noxious gases, such as those emitted from Defendants' drywall, cause corrosion and damage to personal property (such as air conditioning and refrigerator coils, faucets, utensils, electrical wiring, copper, electronic appliances and other metal surfaces and property).

34.     Exposure to sulfide and other noxious gases, such as those emitted from Defendants' drywall, causes personal injury resulting in eye irritation, sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.

35.     As a direct and proximate result of Defendants' actions and omissions, Plaintiffs' and the Class Members' structures, personal property, and bodies have been exposed to

Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from Defendants' defective drywall.

36.     Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed and/or sold the defective drywall, which was unfit for its intended purpose and unreasonably dangerous in its normal use in that the drywall caused corrosion and damage to personal property in Plaintiffs' and Class Members' homes, residences or structures and/or caused personal injury resulting in eye irritation, a sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.

37.     Defendants recklessly, wantonly, and/or negligently manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed and/or sold the defective drywall at issue in this litigation.

38.     Defendants recklessly, want only and/or negligently implement faulty, procedures for purposes of formulating, preparing, testing, and otherwise ensuring the quality and/or character of the defective drywall at issue in this litigation.

39.     As a direct and proximate result of Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from these products, Plaintiffs and Class Members have suffered, and continue to suffer economic harm and/or personal injury.

40.     As a direct and proximate result of Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from these products, the Plaintiffs and the Class Members have suffered, and continue to suffer damages. These damages' include, but are not limited to, costs of inspection; costs and expenses necessary to remedy, replace and remove the defective drywall and other property that has been

-10-

impacted; lost value or devaluation of their homes, residences or structures and property as a direct result of damage caused to the property and indirect damage resulting from perceived defects to the property, including stigma damages; loss of use and enjoyment of their home and property; and/or damages associated with personal injuries.

41.     As a direct and proximate result of Defendants' defective and unfit drywall and the corrosive and harmful effects of the sulfide and other noxious gases being released from these products, Plaintiffs and the Class Members have been exposed to toxic gases, suffered personal injury, have been placed at an increased risk of disease, and have need for injunctive relief in the form of repair and remediation of their home, recision of their home purchase contracts, the ordering of emergency/corrective notice, the ordering of environmental testing and monitoring, and/or the ordering of medical monitoring.

## DRYWALL ALLEGATIONS

### Drywall Background

42.     Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, sheetrock, gyproc, or simply board.

43.     A drywall panel is made of a paper liner wrapped around an inner core made primarily from hardened gypsum plaster.

44.     Drywall is typically available in 4 ft (1219 mm) wide sheets of various lengths. Newly formed sheets are cut from a belt, the result of a continuous manufacturing process.

45.     The most commonly used drywall is one-half-inch thick but can range from one quarter (6.35 mm) to one inch (25.4 mm) thick.

46.     The core material of drywall, gypsum, is available in two forms, pure gypsum, which is naturally occurring, and synthetic gypsum, which is manmade.

47.     Pure gypsum is a white to transparent mineral, but sometimes impurities color it grey, brown, or pink.

48.     Synthetic gypsum is generally manufactured with byproducts of coal-fired power plants.

49.     Coal combustion byproducts ("CCBs" or "CCPs") are the inorganic residues that remain after pulverized coal is burned.

50.     The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

51.     In order to meet emission standards, many utilities have installed flue-gas-desulfurization (FGD) equipment.  Flue gas desulfurization is a chemical process to remove sulfur oxides from the flue gas at coal-burning powerplants.

52.     Various FGD methods have been developed that chemically combine the sulfur gases released in coal combustion by reacting them with a sorbent, such as limestone or lime.

53.     As the flue gas comes in contact with the slurry of calcium salts, sulfur dioxide reacts with the calcium to form hydrous calcium sulfate, otherwise known as gypsum.

**How Drywall Is Created**

54.     In order to form drywall, gypsum must be "calcined," or partially dehydrated by heating.

55.     When gypsum is heated, it loses about three quarters of its water and becomes hemihydrate gypsum which is soft and can be easily ground to a powder called hemihydrate gypsum plaster.

56.     The gypsum powder is then mixed with water to form a paste or slurry.

-12-

57.     While the hemihydrate gypsum plaster is in slurry form, it is poured between two paper layers to make drywall.

58.     Drywall is formed by sandwiching a core of wet gypsum between two sheets of heavy paper or fiberglass mats. When the core sets and is dried in a large drying chamber, the "sandwich" becomes rigid and strong enough for use as a building material.

59.     The paste or slurry is typically mixed with fiber (usually paper and/or fiberglass), plasticizer, foaming agent, potash as an accelerator, starch or other chelate as a retarder, various additives that increase mildew and fire resistance (fiberglass or vermiculite), and water.

60.     Drywall may consist of two other materials with sulfur content: alkyl ethoxy sulfates as foaming agents and lignin or napthalene sulfonates as dispersing agents.

**The Defective Drywall Emits Noxious and Corrosive Levels of Sulfur**

61.     Upon information and belief, the drywall of Defendant(s) contained naturally mined gypsum and synthetic gypsum manufactured from CCBs.

62.     When gypsum, mined or synthetic, is subjected to certain environmental conditions, particularly the humidity indigenous to the South Florida climate, the product breaks down into sulfate ions which in turn can be chemically transformed into hydrogen sulfide gas and other sulfide gases.

63.     The problem of sulfide emissions from drywall is well-understood in the drywall industry and has been studied for many years.

64.     The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.

65.     Sulfide emissions from drywall have been a particular problem in landfills and, as such, many landfills refuse to accept drywall or place strict limitations on the amounts and on the ways in which drywall can be disposed.

**Drywall In The Plaintiff(s) Home(s)**

66.     Each Plaintiff(s) moved into a newly-constructed home in Palm Beach County, Florida (the "Building").

67.     Chinese-manufactured drywall was installed in each Building.

68.     Property damage was sustained to and within each Building and caused by the release of gases, fumes, and/or vapors from the Chinese-manufactured drywall brought into the Building in connection with operations being performed on behalf of the Builder/Developer of each  Building by the Builder/Developer's drywall subcontractor.

69.     Specifically, each Builder/Developer's drywall subcontractor brought Chinese drywall into the Building in connection with their operations as the installer of the drywall on behalf of the Builder/Developer.

70.     In reaction to the humidity indigenous to the South Florida climate, sulfuric compounds contained within the Chinese drywall (including one or more of hydrogen sulfide, carbonyl sulfide, and carbon disulfide) released gases, fumes, and/or vapors from the Chinese-manufactured drywall into the indoor air of the Building.

71.     This resulted in a sulfur odor, which could be smelled by the occupants variously throughout the Building and, eventually, which permeated much or all of the Building.

72.     The release of gases, fumes, and/or vapors from the Chinese-manufactured drywall brought into the Building in connection with operations being performed on behalf of the Builder/Developer by their drywall subcontractors caused and created property damage and/or

-14-

structure damage to the Building including corrosion on air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items, and the aforementioned sulfur odor which permeated much, if not all, of the Building.

73.     Plaintiff(s) discovered damage to one or more of the air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items in the Building and began to notice a periodic sulfur odor in the Building.

74.     The sulfur odor in the Building permeated much, if not all, of the Building on an ongoing basis and often could be smelled on clothing and skin after leaving the Building.

75.     After discovering the aforementioned damage to the Building and experiencing the sulfur odor, the Plaintiff(s) notified the Builder/Developer of the property damage to the Building, including air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items and the sulfur odor that permeated much, if not all, of the Building.

76.     The release of gases, fumes and/or vapors from the Chinese-manufactured drywall brought into the Building in connection with operations being performed on behalf of the Builder/Developer by their drywall subcontractor has been an ongoing and/or continuous occurrence and/or repeated exposure to substantially the same generally harmful conditions since such drywall was brought into the Building and/or installed.

77.     The property damage cannot be remedied simply by removing and repairing the Chinese-manufactured drywall in light of the additional damage it has caused to other parts of the

Building such as air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items.

78.    Moreover, the sulfur odor cannot be rectified by repairing or replacing the Chinese-manufactured drywall, and requires wholesale remediation and indoor air quality measures to eliminate the odor from the Building.

79.    Upon information and belief, the cost of completely removing, replacing and remediating the foregoing property damage to each Building is, at minimum, in the tens to hundreds of thousands of dollars.

80.    As a direct and proximate result of the conduct set forth above, the Building is defective, damaged, and not reasonably fit for continued habitation.

81.    As a proximate result of the Defect, Plaintiff(s) have been damaged in other ways which include, but are not limited to, destruction, in whole or in material part, of the Building, the loss of use of said property, and personal injury to the occupants.

82.    As a further and proximate result of the above, Plaintiff(s) has been, and will be required to employ engineers, contractors, and environmental specialists in an effort to repair, maintain, remediate and/or replace the defects in the Building and, as a further and proximate result of the above, Plaintiff(s) may also be required to employ medical and microbiological experts in the testing, clean-up and replacement of the Chinese-manufactured drywall in the Building and the AHU's, elimination of the sulfur odor, electrical and plumbing materials that have been damaged, therein requiring the evacuation and relocation of all of its occupants, replacement and/or proper microbial cleaning of all of the occupants' personal property, including furniture, clothing, books, papers, moving and storage of the occupants' personal property, temporary housing for the occupants

-16-

and sale and salvage expenses of the Buildings if the replacement and repair process cannot be safely completed.

83.    As a result of the Defendants' conduct, Plaintiff(s) has been required to retain the services of counsel to represent their interests in this action and are obligated to pay a reasonable fee for such services.

## CLASS ACTION ALLEGATIONS

### The Knauf Class

84.    All Plaintiffs bring this suit as a class action pursuant to Rules 23(a), (b)(l), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and the following Class comprised of:

> All owners and residents (past or present) of real property located in the United States containing defective Chinese drywall manufactured, sold, distributed, and/or supplied by Knauf.

### The Distributor/Supplier/Importer/Exporter/Broker Subclasses (Subclasses 1-11)

85.    The representative Plaintiffs with claims against their distributors/suppliers, set forth in the attached Schedule "1" (the alignment of Plaintiffs and Defendants is depicted in Schedule 1 for each subclass), assert subclasses pursuant to Rules 23(a), (b)(l), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and those similarly situated, against the distributors/suppliers for whom they have standing. The designated Plaintiffs in Schedule 1 define their subclasses to be as follows:

> All owners and residents (past or present) of real property located in the United States containing Knauf's defective drywall that was sold, distributed, supplied, marketed, inspected, imported, brokered, or delivered by each defendant identified in Schedule 1.

86.    The Distributor/Supplier/Importer/Exporter/Broker subclasses identified in Schedule 1 are comprised as follows:

Subclass #1: Andrews Hardware Company, Inc. d/b/a Andrews Ace Hardware

Subclass #2: Banner Supply Co.

Subclass #3: Banner Supply Company Fort Myers, LLC

Subclass #4: Cape Cement & Supply, Inc.

Subclass #5: Holmes Building Materials, LLC

Subclass #6: Interior/Exterior Building Supply, LP

Subclass #7: Interior/Exterior Enterprises, LLC

Subclass #8: L&W Supply Corporation d/b/a Seacoast Supply Company

Subclass #9: La Suprema Enterprise, Inc.

Subclass #10: La Suprema Trading, Inc.

Subclass #11: Phillips Abita Lumber Company, Inc. d/b/a Abita Lumber Company, Inc.

**The Builder/Developer Subclasses (Subclasses 12-124)**

87.    The representative Plaintiffs with claims against their builders/developers, set forth in the attached Schedule "2" (the alignment of Plaintiffs and Defendants is depicted in Schedule 2 for each subclass), assert subclasses pursuant to Rules 23(a), (b)(I), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and those similarly situated, against the builders/developers for whom they have standing. The designated Plaintiffs in Schedule 2 define their subclasses to be as follows:

> All owners and residents (past or present) of real property located in the United States containing Knauf's defective drywall where each of the defendants identified in Schedule 2 was the builder or developer of the property.

88.    The builder/developer subclasses identified in Schedule 2 are comprised as follows:

Subclass #12: 3180 Lamb Court Acquisition, LLC

-18-

Subclass #13: 616 LLC/ Andy Ziffer

Subclass #14: Aburton Homes, Inc.

Subclass #15: Adams Homes of Northwest Florida, Inc.

Subclass #16: Albanese-Popkin the Oaks Development Group, L.P.

Subclass #17: Angel Developments, LLC

Subclass #18: Antilles Vero Beach, LLC

Subclass #19: Aranda Homes, Inc.

Subclass #20: Arizen Homes

Subclass #21: Avalon Preserve Developers, LLC

Subclass #22: B & E Construction Miami Corp.

Subclass #23: Baywood Construction, Inc.

Subclass #24: Berrywood Estates a Senior Community, LLC

Subclass #25: Buquoi Construction,LLC

Subclass #26: Burmaster Construction, Inc.

Subclass #27: Cabot Homes

Subclass #28: Cajun Construction & Development, LLC

Subclass #29: Carribean Custom Builders and Developers

Subclass #30: Carter Custom Homes, Inc.

Subclass #31: Centerline Homes at Port St. Lucie, LLC

Subclass #32: Centerline Homes at Georgetown, LLC

Subclass #33: Centerline Homes, Inc.

Subclass #34: CL Architects & Contractors Corp.

Subclass #35: Comfort Home Builders, Inc.

Subclass #36: Completed Communities, ll, LLC

Subclass #37: Core Construction, LLC

Subclass #38: Cornerstone Group

Subclass #39: Cornerstone Group Development, LLC

Subclass #40: Cretin Homes, Inc.

Subclass #41: D.R. Horton, Inc.

Subclass #42: D&W Homes, LLC

Subclass #43: Davis General Contractors

Subclass #44: Delacruz Enterprise's, Inc.

Subclass #45: Diamond Court Construction Co.

Subclass #46: Edweaard Development Company, LLC

Subclass #47: Enchanted Homes, Inc.

Subclass #48: First Home Builders, Inc.

Subclass #49: First Home Builders of Florida I, LLC

Subclass #50: Freemar Homes, Inc.

Subclass #51: Grand Palazzo Hendricks, LLC

Subclass #52: Gregan Construction Corp.

Subclass #53: Gremillion Homes, Inc.

Subclass #54: Grove Hammocks Investments, LLC

Subclass #55: Groza Builders, Inc.

Subclass #56: Hanover Homes

Subclass #57: Hansen Homes of South Florida, Inc.

Subclass #58: Hilliard Butler Construction Company, Inc.

Subclass #59: Hovnanian Developments of Florida, Inc.

Subclass #60: Hovstone Properties of Florida, LLC

Subclass #61: HPH Properties, LLC

Subclass #62: Ironwood Properties, Inc.

Subclass #63: J. Cherry and Sons, Inc.

Subclass #64: James Stokley *d/b/a* Choctaw Builders, Inc.

Subclass #65: Jim Walter Homes, Inc.

Subclass #66: Joseph E. Clouse, Inc.

Subclass #67: JPG Enterprises, Inc. d/b/a Majestic Homes

Subclass #68: KB Homes

Subclass #69: Laporte Builders, Inc.

Subclass #70: Lavish Holding Corp.

Subclass #71: Lennar Homes, Corp.

Subclass #72: Lennar Homes, LLC

Subclass #73: Liberty Home Builders, Inc.

Subclass #74: Lifescape Buildings, LLC

Subclass #75: Linel Consulting, LLC

Subclass #76: Lloyd & Sons Construction, Inc.

Subclass #77: LPR Builders, Inc.

Subclass #78: LTL Construction, Inc.

Subclass #79: M J F Construction Corporation

Subclass #80: Majestic Homes & Realty SW, LLC

Subclass #81: Majestic Homes of Port St. Lucie, Inc.

Subclass #82: Majestic Homes of Vero Beach, Inc.

Subclass #83: Maronda Homes, Inc. of Florida

Subclass #84: Northstar Holdings at B & A, LLC

Subclass #85: O' Key Homes, Inc.

Subclass #86: PN K Builders, LLC

Subclass #87: Palm Isles Holdings, LLC

Subclass #88: Paul Homes

Subclass #89: Pine Ridge Real Estate Enterprises, LLC

Subclass #90: Port St. Lucie Builders, Inc.

Subclass #91: Pride Homes of Lakes by the Bay-Parcel H, LLC

Subclass #92: Princeton Homes, Inc.

Subclass #93: RCR Holding II, LLC

Subclass #94: RCR Holdings I and II, LL

Subclass #95: Richard Jones Construction Company, Inc.

Subclass #96: Rivercrest, LLC/The St. Joe Company

Subclass #97: Royal Homes, LLC

Subclass #98: Santa Barbara Townhomes, Inc.

Subclass #99: South Kendall Construction Corp.

Subclass #100: Southern Homes, LLC

Subclass #101: Sovereign Homes, LLC

Subclass #102: Standard Pacific of South Florida

Subclass #103: Standard Pacific of South Florida, GP, Inc.

Subclass #104: Standard Pacific of Tampa GP, Inc. f/k/a Westfield Homes Of Florida, Inc.

Subclass #105: Summit Contractors, Inc.

Subclass #106; Summit Homes, LLC n/k/a PHL Construction, LLC

Subclass #107: Sunrise Construction and Development, LLC

Subclass #108: Symphony Builders, Inc.

Subclass #109: The Kabar Group, LLC

Subclass #110: The Sterling Collection, Inc.

Subclass #111: Tillman Construction, Inc.

Subclass #112: Timberline Builders Inc.

Subclass #113: Treasure Coast

Subclass #114: Tuscan-Harvey Estates

Subclass #115: United Homes, Inc.

Subclass #116: United Homes International, Inc.

Subclass #117: Venus Street, LLC

Subclass #118: Villa Development, Inc.

Subclass #119: Waterways Join! Venture IV

Subclass #120: Waterways Joint Venture IV, LLC

Subclass #121: West Construction, Inc.

Subclass #122: Westminster Builders, Inc.

Subclass #123: Woodside f/k/a GHO Properties

Subclass #124: Woodside Homes of Southeast Florida, LLC

### **The Contractor/Installer Subclasses (Subclasses 125-142)**

89.     The representative Plaintiffs with claims against their contractors/installers, set forth in the attached Schedule "3" (the alignment of Plaintiffs and Defendants is depicted in Schedule 3 for each subclass), assert subclasses pursuant to Rules 23(a), (b)(I), (b)(2), (b)(3)

and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and those similarly situated, against the contractors/installers for whom they have standing. The designated Plaintiffs in Schedule 3 define their subclasses to be as follows:

> All owners and residents (past or present) of real property located in the United States containing Knauf's defective drywall where each of the defendants identified in Schedule 3 was the contractor or installer of the drywall for the property.

90.     The contractor/installer subclasses identified in Schedule 3 are comprised as follows:

Subclass #125: AI Brothers, Inc.

Subclass #126: Baystate Drywall, Inc.

Subclass #127: Can-Am Drywall, Inc. (successor to Baystate Drywall, Inc.)

Subclass #128: Chicas Construction, Inc.

Subclass #129: Construction Building Services, Inc.

Subclass #130: D & C Construction Group, Inc.

Subclass #131: Florida Style Services, Inc.

Subclass #132: George Meza

Subclass #133: Gomez Interiors, Inc.

Subclass #134: Interior/Exterior Building Supply, LP

Subclass #135: Interior/Exterior Enterprises, LLC

Subclass #136: L.R. Gardere Drywall Construction, Inc.

Subclass #137: Mandy Drywall, Inc.

Subclass #138: Marsiglia Construction Company

Subclass #139: Mesa Construction Group, Inc.

Subclass #140: Moore Unique Interiors, Inc.

Subclass #141: Richard Hoover

Subclass #142: Robert/Charles Builders, Inc.

**General Class Allegations and Exclusions from the Class Definitions**

91.     The following Persons shall be excluded from the Class and Subclasses: (1) Defendants and their subsidiaries, affiliates, officers and employees; (2) all Persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

92.     Upon information and belief, Knauf's defective and unfit drywall was installed in at least hundreds of homes, residences, or other structures owned by Plaintiffs and Class Members. Therefore, the Classes and Subclasses are sufficiently numerous such that the joinder of all members of the Classes and Subclasses in a single action is impracticable.

93.     There are numerous common questions of law and fact that predominate over any questions affecting only individual members of the Class or Subclasses. Among these common questions of law and fact are the following:

   a.     whether Defendants' drywall products that release sulfide and other noxious gases are defective and/or unfit for their intended purpose;

   b.     whether Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold defective drywall products;

   c.     whether Plaintiffs are entitled to recover compensatory, exemplary, incidental, consequential, and/or other damages as a result of Defendants' unlawful and tortious conduct; and

   d.     whether Plaintiffs are entitled to recover injunctive and/or equitable relief as a result of Defendants' unlawful and tortious conduct.

94.     The legal claims of named Plaintiffs are typical of the legal claims of other Class and Subclass Members. Additionally, for each of the subclasses that named Plaintiffs seek to participate in. the legal claims of the named Plaintiffs are typical of the legal claims of other Subclass Members. Named Plaintiffs have the same legal interests and need for legal remedies as other Class and/or Subclass Members.

95.     Named Plaintiffs are adequate representatives of the Class and Subclasses in which they participate, together with their legal counsel, each will fairly and adequately protect the interests of Class and Subclass Members. Named Plaintiffs have no known conflict with the Class or Subclasses and are committed to the vigorous prosecution of this action.

96.     The undersigned counsel are competent counsel experienced in class action litigation, mass torts, and complex litigation involving defective and harmful products. Counsel will fairly and adequately protect the interests of the Classes and/or Subclasses.

97.     The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(l) because prosecuting separate actions by or against individual Class and/or Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class and Subclass members that would establish incompatible standards of conduct for the party opposing the Class and Subclass; or adjudications with respect to individual Class and Subclass members that, as a practical matter, would be dispositive of the interests of the other Class and Subclass members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

98.     The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the Class

and/or Subclass, so that final injunctive relief is appropriate respecting the Class and/or Subclass as a whole.

99.    A class action is superior in this case to other methods of dispute resolution. The Class and Subclass members have an interest in class adjudication rather than individual adjudication because of their overlapping rights. It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class and Subclass Members would protect their rights on their own without this class action case. Management of the class will be efficient and far superior to the management of individual lawsuits. Accordingly, Plaintiffs' legal claims are properly certified pursuant to Rule 23(b)(3).

100.    The issues particularly common to the Class and Subclass members' claims, some of which are identified above, are alternatively certifiable pursuant to Fed. R. Civ. P. 23(c)(4), as resolution of these issues would materially advance the litigation, and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

## COUNT I
## NEGLIGENCE
### (Against All Defendants)

101.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

102.    Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) installing, j) marketing, and/or k) selling this drywall, including a duty to adequately warn of their failure to do the same.

103.    Defendants knew or should have known that their wrongful acts and omissions would result in harm and damages in the manner set forth herein.

-27-

104.   Defendants breached their duty to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling this drywall.

105.   Defendants likewise breached their duties to Plaintiffs and Class Members by failing to warn about the defective nature of the drywall. Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the property and bodies of Plaintiffs and Class Members.

106.   Defendants breached their duty to exercise reasonable care to timely remove and/or recall from the market and/or otherwise prevent the continued contact of Plaintiffs and Class Members with the drywall upon leaning it had been sold in an unreasonably dangerous condition.

107.   Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

108.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein.

**COUNT II**
**NEGLIGENCE PER SE**
**(Against All Defendants)**

109.   Plaintiffs adopt and restate the preceding paragraphs as fully set forth herein.

110.   Defendants owed statutory duties to Plaintiffs and Class Members to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, I) marketing, and/or j) selling this drywall.

-28-

111.     Defendants breached their statutory duties to the Plaintiffs and Class Members by failing to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, I) marketing, and/or j) selling this drywall.

112.     Defendants likewise breached their statutory duties, including but not limited to those imposed under the International Building Code *("IBC')* and other State and local Building Codes, to Plaintiffs and Class Members by failing to warn about the defective nature of the drywall. For instance, it is specifically alleged that Defendants furnished the drywall in violation of ASTMC C 1396/C 1396M-069, and its predecessor(s).

113.     Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the property and bodies of Plaintiffs and Class Members.

114.     Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

115.     As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT III
## STRICT LIABILITY
### (All Defendants)

116.     Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

117.     At all times relevant hereto, Defendants were in the business of distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

118.    The drywall, including that installed in the homes of Class Members was placed by Defendants in the stream of commerce.

119.    Defendants knew that the subject drywall would be used without inspection for defects by consumers.

120.    Defendants intended that the drywall reach the ultimate consumers, such as Class Members, and it indeed reached Class Members when it was installed in their homes.

121.    When installed in Class Members' homes, the drywall was in substantially the same condition as it was in when Defendants manufactured, sold, and/or delivered it.

122.    At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendants, and in accordance with the Defendants' directions and instructions.

123.    The subject drywall was not misused or altered by any third parties.

124.    The Defendants' dryv.'a11 was defectively manufactured, designed, inspected, tested, marketed, distributed, and sold.

125.    The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing..

126.    The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywa1I with levels of sulfur that were too high and emitted various sulfide gases and/or other chemicals through off-gassing.

127.    The drywall was also defective because it was improperly exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold in a defective condition, as described above.

-30-

128.    The Defendants' defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to Class Members.

129.    The drywall is also defective and unreasonably dangerous because Defendants failed to adequately warn and instruct Class Members of the defective design, inspection, testing, manufacturing, marketing, and selling of the drywall.

130.    Class Members were unaware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Class Members, acting as reasonably prudent people discovery that Defendants' drywall was defective, as set forth herein, or perceive its danger.

131.    Defendants' defective drywall was much more dangerous and harmful than expected by the average consumer and by Class Members.

132.    Defendants' defective drywall benefit to Class Members, if any, was greatly outweighed by the risk of harm and danger to them.

133.    The defects in the drywall, as well as Defendants' failure to adequately warn Class Members of the defects rendered the drywall unreasonably dangerous and was the direct and proximate cause of damages and/or personal injuries to Class Members.

## <u>COUNT IV</u>
## BREACH OF EXPRESS AND/ORIMPLIEDW
### (All Defendants)

134.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

135.    Defendants and/or their agents were in privity with Plaintiffs and Class Members and/or Plaintiffs and Class Members were foreseeable third party beneficiaries of any warranty.

136.    At the times Defendants utili7.ed, supplied, inspected, and/or sold this drywall for use in structures ov.ned by Plaintiffs and Class Members, Defendants knew, or it was reasonably foreseeable, that the drywall would be installed in structures owned by Plaintiffs and Class Members for use as a building material, and expressly or impliedly warranted the product to be fit for that use.

137.    Defendants placed their drywall products into the stream of commerce in a defective condition and these products were expected to, and did, reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

138.    The drywall was defective and not merchantable because it was unfit for the uses intended or reasonably foreseeable by Defendants; to wit, the installation of the drywall in structures owned by Plaintiffs and Class Members for use as a building material, because it contained defects as set forth herein.

139.    The Defendants breached their warranty because the drywall was not fit and safe for the particular purposes for which the goods were required (to be installed in structures owned by Plaintiffs and Class Members as a building material) due to the defects set forth herein.

140.    Defendants had reasonable and adequate notice of the Plaintiffs' and the Class Members' claims for breach of warranty and failed to cure.

141.    As a direct and proximate cause of Defendants' breach of warranties, Plaintiffs and Class Members have incurred harm and damages and/or personal injuries as described herein.

## COUNT V
## BREACH OF THE IMPLIED WARRANTY OF FITNESS AND MERCHANTABILITY PURSUANT TO FLORIDA STATUTJ£S SECTION 718.203
### (On Behalf of Plaintiffs Who Own Condominiums in the State of Florida)
### (Against Builders Only)

142.   Plaintiffs adopt and restate the preceding paragraphs as it fully set forth herein.

143.   Subclass Members who own condominiums in Florida, are owners of condominiums as that term is defined by Florida Statutes section 718.503.

144.   Such Subclass Members, as owners, are entitled to the benefit of the statutory warranties of fitness and merchantability pursuant to Florida Statutes section 718.203.

145.   Each of the builders who are subject to this claim are developers, as defined by Florida Statutes section 718.203(16), as they created condominiums or offered condominiums for sale in the ordinary course of business.

146.   Pursuant to Florida Statutes section 718.203(1)(a-e), each of the builders who are subject to this claim is deemed to have granted Subclass Members, who own condominiums in Florida, an implied warranty of fitness and merchantability for the purposes or uses as follows:

a. As to each unit, a warranty for 3 years commencing With the completion of the building containing the unit.

b. As to the personal property that is transferred with, or appurtenant to, each unit, a warranty which is for the same period as that provided by the manufacturer of the personal property, commencing with the date of closing of the purchase or the elate of possession of the unit, whichever is earlier.

c. As to all oilier improvements for the use of unit owners, a 3year warranty commencing with the date of completion of the improvements.

-33-

d. As to all other personal property for the use of unit owners, a warranty which shall be the same as that provided by the manufacturer of the personal property.

e. As to the roof and structural components of a building or other improvements and as to mechanical, electrical, and plumbing elements serving improvements or a building, except mechanical elements serving only one unit, a warranty for a period beginning with the completion of construction of each building or improvement and continuing for 3 years thereafter or 1 year after owners other than the developer obtain control of the association, whichever occurs last, but in no event more than 5 years.

147.   At all times relevant hereto, routine maintenance was performed by Subclass Members and/or the builders who are subject to this claim or by an association controlled by such builders.

148.   At the times the builders who are subject to this claim installed, utilized, supplied, inspected, and/or sold drywall for use in the Subclass Members' homes, the builders knew, or it was reasonably foreseeable, that the drywall would be installed in the Subclass Members' homes for use as a building material, and warrantied the product be fit and merchantable for that use:

149.   Defendants' drywall product was placed into the stream of commerce by the builders who are subject to this claim in a defective condition and was expected to, and did, teach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it was sold.

150.   The drywall was defective because it was not fit for the Uses intended or reasonably foreseeable by the builders; to wit, the installation of the drywall in Subclass Members' homes for use as a building material, because it contained defects as set forth herein.

151.    The builders who are subject to this claim breach the implied warranty of merchantability and fitness because the drywall was not fit to be installed in Subclass Members' homes as a building material due to the defects set forth herein.

152.    The builders who are subject to this claim had reasonable and adequate notice of the

153.    Subclass Members' claims for breach of implied warranty of fitness and merchantability and failed to cure.

154.    As a direct and proximate cause of the builders' breach of the warranties under Florida Statutes section 718.203, Subclass Members have incurred harm and damages and/or personal injuries as described herein.

### COUNT VI
### BREACH OF THE IMPLIED WARRANTY OF HABITABILITY
### (Against Builders Only)

155.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

156.    The Builder Defendants were in direct contractual privity with their Subclass Members.

157.    The drywall that the Builder Defendants installed in the homes of Subclass Members was placed into the stream of commerce by the Builder Defendants in a defective condition and was expected to, and did, reach users, handlers, and persons coming into contact with said drywall product without substantial change in the condition in which it was sold.

158.    Certain Subclass Members bought their homes containing defective drywall based upon the judgment of the Builder Defendants.

159.    The Builder Defendants breached the implied warranty of habitability because the defective drywall causes Subclass Members homes not be meet ordinary, normal standards

reasonably to be expected of living quarters of comparable kind and quality due to the defect set forth herein.

160.    The Builder Defendants had reasonable and adequate notice of the claims of the Subclass Members for breach of implied warranty of habitability and failed to cure.

161.    As a direct and proximate cause of the Builder Defendants' breach of the implied warranty of habitability, Plaintiffs and Subclass Members have incurred harm and damages and/or personal injuries as described herein.

**COUNT VII**
**BREACH OF CONTRACT**
**(Against Builders Only)**

162.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

163.    As part of the agreements to purchase real properties from the Builder Defendants, for which Subclass Members paid valuable consideration, the Builder Defendants contracted with Subclass \1embcrs to construct homes that would be free of defects.

164.    The Builder Defendants materially breached their contracts by providing Subclass Members with defective homes; to wit, the homes contained drywall that is inherently defective because it emits various sulfide and other noxious gases through off-gassing that causes harm and damage as described herein.

165.    As a direct and proximate cause of the Builder Defendants' breach of contract, Plaintiffs and Subclass Members have incurred harm and damages as described herein.

**COUNT VIII**
**VIOLATION OF THE LOUISIANA NEW HOME WARRANTYACT**
**(on Behalf of Plaintiffs Who Own Homes in the State of Louisiana)**
**(Against Louisiana Builders Only)**

166.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

-36-

167.    The Louisiana New Home Warranty Act provides protection to owners of homes against builders in connection with the construction of the homes.

168.    For each applicable subclass, every subclass plaintiff is an "owner," as that term is defined by LSA-R.S. 9:3143(3), who is asserting a claim under the New Horne Warranty Act against their "builder," as that term is defined by LSA-R.S. 9:3143(1).

169.    Implicit in every Builder Defendant's building contract is the requirement that the work to be completed be performed in a workmanlike manner that is free from defects in material and workmanship.

170.    Each of the Builders who are subject to this claim violated their duty to use materials that are free from defects. The drywall used by these Builders is defective for the reasons set forth above.

171.    Given the defect in the Kanuf drywa11, the Builders knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

172.    As a direct and proximate cause of the Builders' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT IX
### REDHIBITION
**(By Louisiana Plaintiffs Against All Defendant's)**

173.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

174.    The drywall manufactured, distributed and/or sold by Defendants was hot reasonably fit for its ordinary and intended purpose.

175. Defendants are therefore liable to Louisiana Plaintiffs for all damages reasonable in the premises, in accordance with La Civ. Code art. 2524.

176. In addition, or in the alternative, the drywall manufactured, distributed. and/or sold by Defendants contained redhibitory defects, in that, at the time of delivery, the propensity to emit or off-gas Sulfer compounds and/or other potentially harmful, irritating and/or corrosive substances renders the drywall so useless and/or inconvenient that it must be presumed that Plaintiffs would not have purchased the drywall had they known of the defect or defects.

177. In the alternative, the defects are redhibitory in that, while not rendering the drywall totally useless, diminish the drywall's use and/or value to such an extent that it must be presumed that the buyer would have bought it, but for a lesser price.

178. The Manufacturing Defendants are conclusively presumed to know of the defects in the drywall manufactured by them.

179. In addition, it is believed and alleged that All Defendants knew of the defects in the drywall at the time the drywall was delivered and/or sold.

180. Defendants have had numerous opportunities to repair and/or replace the drywall and associated fixtures and/or building components and have failed to do so; in addition, and/or in the alternative, such requests have been. would have been and/or would be futile; Manufacturing Defendants and/or Distributor Defendants are, moreover, deemed to be placed on notice when notice is provided to Builder Defendants (and/or Distributor Defendants); and All Defendants, in addition, or alternatively, had actual knowledge of the problems in the drywall and the need for replacement, remediation and/or repair.

181. All Defendants are therefore liable to all Louisiana Plaintiffs for a return of the purchase price, (with interest from the time it was paid), reimbursement of the reasonable

expenses occasioned by the sale and those incurred for the preservation of the drywall and associated items, for damages, and for reasonable attorneys' fees, in accordance with La. Civ. Code art. 2545.

182.    In the alternative, to the extent that any Distributor Defendant and/or Builder Defendant did not know of the defects in the drywall at the time of delivery and/orsa1e, the defendants are liable to Louisiana Plaintiffs to repair, remedy or correct the defect; and/or, if unable to do so, for a return of the purchase price, (with interest from the time it was paid), reimbursement of the reasonable expenses occasioned by the sale, and those expenses incurred for the preservation of the drywall and associated items, in accordance with La. Civ. Code art. 2531.

## COUNT X
### LOUISIANA PRODUCTS LIABILITY ACT
**(Manufacturing Defendants)**
**(Pleaded in the Alternative Against Distributor Defendants)**

183.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

184.    In addition to any and all damages, attorneys fees and other remedies made available to Louisiana Plaintiffs under the warranty of fitness and/or warranty against redhibitory defects, the Manufacturing Defendants are liable to Louisiana Plaintiffs under the Louisiana Products Liability Act, ("LPLA"), La. R.S. 9:2800.5 I, *et seq.*

185.    The LPLA is also pleaded in the alternative with respect to any Distributor Defendant who might be considered a "manufacturer" under La. R.S. 9:2800.53(1)(a) (labels or otherwise holds the drywall out as his own), 9:2800.53(1)(b) (exercises control over or influences a characteristic of the drywall causing damage), 9:2800.53(l)(c) (the manufacturer of a product which contains the drywall as a component part), and/or 9:2800.53(1)(d) (a seller of a

product of an alien manufacturer where the seller is in the business of importing or distributing the drywall for resale and is the *alter ego* of the alien manufacturer).

186.    The Manufacturing Defendants, upon information and belief; expressly warranted that "the gypsumboards manufactured and sold ... are guaranteed to be free from defects in materials and workmanship."

187.    The Manufacturing Defendants expressly warranted that "the gypsumboards were manufactured in accordance to ASTM C36."

188.    The drywall at issue is, in all cases, unreasonably dangerous by virtue of the unreasonable off-gassing and/or emission of Sulfer compounds and/or other corrosives, toxins and/or irritants, which do not in any way contribute to or enhance the utility of the drywall, yet pose a risk to the wiring, plumbing, appliances, personal property, overall economic value of the property and financial security of the owner, and/or the health of the residents of the property.

189.    At all times pertinent and material hereto, there existed alternative feasible manufacturing processes and/or designs of drywall which perform all of the functions and utility of traditional drywall, without emitting unreasonable levels of Sulfer and/or other toxic and/or corrosive compounds.

190.    At all times pertinent and material hereto, Manufacturing Defendants (and/or Distributer Defendants who may be considered "manufacturers" under the Il'LA) knew that their drywall was unreasonably dangerous and/or defective as set forth herein.

191.    In the alternative, Manufacturing Defendants (and/or Distributor Defendants who may be considered "manufacturers" under the LPLA) should have, at all times pertinent and material hereto, known of the unreasonably dangerous and/or defective characteristics and/or conditi6ns, had they reasonably employed then-existing scientific and/or technical knowledge,

reasonable testing, and/or other reasonable and then-accepted methods of quality assurance and/or quality control.

192.    Defendants' drywall is unreasonably dangerous in composition or construction in that, at the time it left Defendant's control, it deviated in a material way from Defendants own specifications or performance standards.

193.    In addition, and in the alternative, Defendants; drywall is unreasonably dangerous in design, in that, at the time the drywall left Defendant's control, there existed an alternative design for the product that was capable of preventing Plaintiffs' damage, and the likelihood of causing the plaintiffs' damage and the gravity of that harm outweighed the burden (if any) on the Defendant in adopting such alternative design and the adverse effect (if any) on the utility of the drywall.

194.    In addition, and in the alternative, Defendants' drywall is unreasonably dangerous in that it fails to conform to an express warranty about the product which induced the use of the product and caused damage to Plaintiffs to the extent that the warranty was untrue.

195.    In addition, and in the alternative, Defendants' drywall is unreasonably dangerous due to an inadequate warning, in that, at the time the drywall left Defendant's control, the drywall possessed a characteristic that might cause damage and yet Defendant failed to use reasonable care to provide an adequate warning of such characteristics and/or dangers to users and/or handlers of the drywall.

196.    Defendants are therefore liable to Louisiana Plaintiffs for all damages reasonable in the premises.

## COUNT XI
## PRIVATE NUSANCE
### (All Defendants)

197.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

198.    The Defendants' tortious or wrongful acts or omissions have caused sulfide gas and/or other chemical leaching into structures owned by Plaintiffs and Class Members which has unreasonably interfered, and continues to interfere, with the Plaintiffs' and Class Members' use and enjoyment of their properties and caused them harm and damage as discussed herein.

199.    Defendants' interference has impaired the rights of Plaintiffs, and Class Members' health, comfort, safety, free use of their property, and/or peaceful enjoyment of their property.

200.    Defendants' invasions were intentional and unreasonable, and/or unintentional but otherwise negligent or reckless.

201.    The interference with Plaintiffs' and Class Members' use of their property caused by Defendants is substantial and is ongoing.

202.    Defendants' private nuisance was the direct, proximate, and foreseeable cause of Plaintiffs' and Class Members' damages, injuries, harm, loss, and increased risk of harm, which they suffered and will continue to suffer.

203.    As a direct and proximate cause of Defendants' creation of a private nuisance, Plaintiffs and Class Members have incurred harm and damages and/or personal injuries as described herein.

## COUNT XII
## NEGLIGENT DISCHARGE OF ACORROSIVE SL'BSTANCE
### (All Defendants)

204.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

205.     Defendants had actual or constructive knowledge of the extremely corrosive and dangerous propensities of the drywall at issue in this litigation.

206.     Notwithstanding their actual or constructive knowledge of the corrosive and dangerous propensities of the drywall, Defendants nevertheless designed, manufactured, imported, distributed, delivered, supplied, marketed, inspected, installed, or sold the drywall for use in the homes or other structures owned by Plaintiffs and «lass members.

207.     By causing the sale, distribution, delivery, and/or supply of the drywall under these circumstances, Defendants breached their duty to exercise reasonable care and created a foreseeable zone of risk of injury to Plaintiffs and class members.

208.     Defendants likewise breached their duties to Plaintiffs and Class Members by failing to warn about the corrosive and dangerous propensities of the drywall. Defendants, through the exercise of reasonable care, knew or should have known the nature of the defective drywall and the adverse effects that it could have on the property and bodies of Plaintiffs and Class Members.

209.     Plaintiffs and class members have suffered injuries by virtue of their exposure to the defective drywall at issue in this litigation. Given the defect in the Defendants' drywall, Defendants knew or should have known that their product could, and would cause harm, damages and/or personal injuries to Plaintiffs and Class Members.

210.     As a direct and proximate result of Defendants' acts and omissions, Plaintiffs and Class Members were harmed and have incurred damages and/or personal injuries as described herein. The injuries sustained by Plaintiffs and Class Members are within the foreseeable zone of risk created by Defendants.

## COUNT XIII
## UNJUST ENRICHMENT
### (All Defendants)

211.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

212.    Defendants received money as a result of Plaintiffs' and Class Members' purchases of Defendants' defective drywall, or purchases of structures containing this drywall, either directly or through an agent, and Defendants wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

213.    Defendants' acceptance and retention of these benefits under the circumstances make it inequitable and unjust for Defendants to retain the benefit without payment of the value to the Plaintiffs and the Class Members.

214.    Defendants, by the deliberate and tortious conduct complain of herein, have been unjustly enriched in a manner which warrants restitution.

## COUNT XIV
## VIOLATIOX OF CONSUMER PROTECTION ACJS
### (All Defendants)

215.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

216.    This is an action for relief under the various Consumer Protection Acts of the jurisdictions in which affected properties are present, including but not limited to, L.SA-R.S. 51:1401, *et seq.* (Louisiana Unfair Trade Practices and Consumer Protection Law); Ala Code 1975 § 8-19-1, *et seq.* (Alabama Deceptive Trade Practices Act); G.S. § 75-1.1, *ef seq.* (North Carolina Consumer Protection Act); F.S. § 501.201, *et seq.* (Florida Deceptive and Unfair Trade Practices Act); Va. Code. Ann. § 59.1-196, *et seq.* (Virginia Consumer Protection Act); Tex. B~. Com. Code Ann. § 17.41, *et seq.* (Texas Deceptive Trade Practices-Consumer Protection Act); Miss. Code Ann. § 75-24-1, *et seq.* (Mississippi Consumer Protection Act).

217.    The Defendants' acts and omissions as well as their failure to use reasonable care in this matter as alleged in this amended complaint, including but not limited to, the knowing misrepresentation or failure to disclose the source, affiliation, origin, characteristics, ingredients, standards and quality of defective drywall constitute violation of the provisions of the Consumer Protection Acts of the Relevant States.

218.    Plaintiffs and Class Members have suffered actual damages result of Defendants, violation of these Consumer Protection Acts and are entitled to relief.

219.    As a direct and proximate cause of Defendants' violations of the Consumer Protection Acts of the Relevant States, Plaintiffs and Class Members have incurred harm and damages as described herein.

## COUNT XV
## EQUITABLE AND INJUNCTIVE RELIEF AND MEDICAL MONITORING
### (All Defendants)

220.    Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

221.    Plaintiffs and the Class Members are without adequate remedy at law, rendering injunctive and other equitable relief appropriate.

222.    Plaintiffs and the Class Members will suffer irreparable harm if the Court does not render the injunctive relief and medical monitoring relief set forth herein, and if defendants are not ordered to recall, buy back, rescind, and/or repair the structures owned by Plaintiffs and Class Members.

223.    Plaintiffs, on behalf of themselves and all others similarly situated, demand injunctive and equitable relief and further, that defendants be ordered to: (1) to buy back or rescind the contracts for Plaintiffs' and Class Members' homes or other structures, or in the alternative, remediate, repair and/or replace the drywall in such structures upon proof by the

defendants of the feasibility of such remedy or repair; (2) cease and desist from misrepresenting to the Class and the general public that there is no defect in, or danger associated with, the drywall; (3) institute, at their own cost, a public awareness campaign to alert the Class and general public of the defect and dang~ associated with the drywall; and (4) create, fund, and support a medical monitoring program.

224.   Until Defendants' defective drywall has been removed and remediated, defendants must provide continued environmental and air monitoring in the structures owned by Plaintiffs and Class Members.

225.   Plaintiffs and Class Members have been exposed to greater than normal background levels of sulfides and oilier hazardous chemicals as a result of exposures to Defendants' defective and unfit drywall and have suffered personal injuries as a result

226.   The sulfides and other noxious gases which have been released from Defendants drywall and to which Plaintiffs and Class Members have been exposed are proven hazardous, dangerous, or toxic substances.

227.   Plaintiffs' and Class Members' exposures were caused by the Defendant's negligent or otherwise tortious conduct.

228.   Plaintiffs' and Class Members' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

229.   The method and means for diagnosing the Plaintiffs' and Class Members' potential medical problems are well accepted in the medical and scientific colIl1llunity and will be of great benefit to the Plaintiffs and Class Members by preventing or minimizing health problems that they may encounter as a result of the defective and unfit drywall.

230.    As a proximate result of their exposure to sulfide and other noxious gases from Defendants' defective and unfit drywall, Plaintiffs and Class Members have developed a significantly increased risk of contracting a serious latent disease.

231.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

232.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Class and Subclass Members, hereby demand a trial by jury as to all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated demand upon Defendants jointly and severally for:

a.    an order certifying the case as a class action;

b.    an order certifying the Class and each of the Subclasses;

c.    an order appointing Plaintiffs as the Class Representatives of the Class;

d.    an order appointing undersigned counsel and their firms as counsel for the Class;

e.    compensatory and statutory damages;

f:    punitive damages as allowed by law;

g.    pre and post-judgment interest as allowed by law;

h.    injunctive relief;

i.    an award of attorneys' fees as allowed by law;

j.      an award of taxable costs; and

k.      any and all such further relief as this Court deems just and proper.


                                        Respectfully submitted,

Dated:  May 17, 2010


                                        By: _____/s/_____
                                               Scott N. Gelfand, Esq.
                                               SCOTT N. GELFAND, P.A.
                                               5501 University Drive
                                               Suite 101
                                               Coral Springs, FL 33067
                                               Phone: (954) 255-7900
                                               Facsimile: (954) 255-7905


                        <u>**CERTIFICATE OF SERVICE**</u>

     I  HEREBY  certify  that  a  true  and  correct  copy  of  the  foregoing  was  served  via

Lexis/Nexis file and serve on this 17th day of May, 2010.


                             By:  /s/ Scott N. Gelfand_____
                                     Florida Bar No. 0538711