```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2   ***********************************************************

 3
     IN RE:  CHINESE-MANUFACTURED        Docket No. 09-MD-2047
 4   DRYWALL PRODUCTS LIABILITY          New Orleans, Louisiana
                                         Monday, March 15, 2010
 5

 6

 7   THIS DOCUMENT RELATES TO:
     Case No. 09-CV-6050
 8

     Tatum B. Hernandez, et al
 9   v.
     Knauf Plasterboard (Tianjin)
10   Co., Ltd., et al
     ***********************************************************
11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
13              UNITED STATES DISTRICT JUDGE
                 VOLUME I - MORNING SESSION
14

15
     APPEARANCES:
16
     FOR THE PLAINTIFF:            HERMAN, HERMAN, KATZ & COTLAR
17                                 BY:  RUSS M. HERMAN, ESQ.
                                        STEPHEN J. HERMAN, ESQ.
18                                 820 O'Keefe Avenue
                                   New Orleans, LA 70130
19

20                                 GAINSBURGH BENJAMIN DAVID
                                   MEUNIER & WARSHAUER
21                                 BY:  GERALD E. MEUNIER, ESQ.
                                        MICHAEL J. ECUYER, ESQ.
22                                 1100 Poydras Street, Suite 2800
                                   New Orleans, Louisiana 70163
23

24                                 SEEGER WEISS
                                   BY:  CHRISTOPHER A. SEEGER, ESQ.
25                                 One William Street
                                   New York, New York 10004
```

```
 1                                  LEWIS & ROBERTS, PLLC
 2                                  BY:  DANIEL K. BRYSON, ESQ.
                                    3700 Glenwood Avenue, Suite 410
 3                                  Raleigh, North Carolina 27612

 4

 5   FOR THE DEFENDANT:             FRILOT L.L.C.
                                    BY:  KERRY J. MILER, ESQ.
 6                                  Energy Centre - Suite 3700
                                    1100 Poydras Street
 7                                  New Orleans, LA 70163-3700

 8
                                    BAKER McKENZIE
 9                                  BY:  DONALD HAYDEN, ESQ.
                                    1111 Brickell Avenue, Suite 1700
10                                  Miami, Florida 33131

11
                                    BAKER McKENZIE
12                                  BY:  DOUGLAS B. SANDERS, ESQ.
                                         ERIN M. MAUS, ESQ.
13                                       KYLE P. OLSON, ESQ.
                                    130 E. Randolph Drive
14                                  Chicago, Illinois 60601

15

16   Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR
                                    500 Poydras Street, Room HB-406
17                                  New Orleans, Louisiana 70130
                                    (504) 589-7776
18

19

20     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

1                              **I N D E X**

2

3    **WITNESSES FOR THE PLAINTIFF:**                    **PAGE/LINE:**

4

5    **DEAN A. RUTILA**

6

7      Voir Dire Examination by Mr. Seeger            25/2

8      Direct Examination by Mr. Seeger              33/18

9      Cross-Examination by Mr. Sanders              79/1

10     Redirect Examination by Mr. Seeger            95/13

11

12

13

14   **RAY PHILLIPS**

15

16     Direct Examination by Mr. Meunier             98/16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(MONDAY, MARCH 15, 2010)

(MORNING SESSION)


    (OPEN COURT.)

        THE COURT:  Be seated, please.  Good morning, ladies and
gentlemen.  Call the case, please.

        THE DEPUTY CLERK:  MDL No. 2047, in re:  Chinese Drywall,
reference Civil Action 09-6050, *Tatum Hernandez, et al., v. Knauf*
*Plasterboard Tianjin, Ltd.*

        THE COURT:  Counsel, make your appearance for the record
and indicate whether you're ready to proceed.

        MR. SEEGER:  Good morning, your Honor, Chris Seeger on
behalf of the Hernandez family, and we are ready.

        MR. MEUNIER:  Jerry Meunier for the plaintiffs, your
Honor.

        MR. BRYSON:  Dan Bryson.

        MR. HERMAN:  Steve Herman for the plaintiffs.

        MR. RUSS HERMAN:  And Russ Herman for the plaintiffs.

        MR. HAYDEN:  Your Honor, Don Hayden on behalf of Knauf
Plasterboard Tianjin and we are prepared.  With me is Doug Sanders,
Erin Moss, Kyle Olson and, of course, Kerry Miller.

        THE COURT:  Thank you very much.

        The present matter involves a claim for property damage.
The plaintiffs, Tatum B. Hernandez and Charlene Hernandez's home.

1    It began in January of 2005 when the plaintiff purchased a lot in

2    Mandeville, Louisiana, and shortly thereafter began the

3    construction of their home.  Plaintiffs moved into their home when

4    it was completed in August of 2006.  Their home is a one-bedroom --

5    one-story, three-bedroom, two-bath, single-family dwelling with

6    approximately 1,688 square feet of living space.

7            In the early part of 2009, the plaintiffs began to

8    suspect that their home contained contaminated Chinese drywall

9    after watching a local news program on the issue because of a

10   noxious smell in their home, the problems they had experienced with

11   the air conditioning system and other appliances, and their

12   identification of drywall in their home as "made in China".

13           On September the 1st of 2009, the plaintiffs filed a

14   lawsuit in the Eastern District of Louisiana, alleging that Chinese

15   drywall installed in their home was defective and emitted levels of

16   sulphur, methane, or other volatile organic chemical compounds that

17   cause corrosion of HVAC coils and refrigerator units, certain

18   electrical wiring, plumbing components and other household items,

19   as well as creating some noxious odors.

20           The plaintiffs claim that the defendants, Knauf

21   Plasterboard Tianjin Company, Ltd., KPT, manufactured, sold,

22   distributed, marketed and placed in the stream of commerce Chinese

23   drywall with the expectation that such drywall would be purchased

24   by consumers in the United States.  The plaintiffs brought this

25   lawsuit against KPT.  KPT does not dispute in this case that

1    tarnishing of certain metallic surfaces and odors are present in

2    the Hernandez house or that such effects are caused by off-gassing

3    from the Chinese drywall.  The issue in this case is the nature and

4    scope of the remedy and the cost of the repairs.

5            I'll hear from the parties by way of a brief opening

6    statement, and then we'll hear the evidence.

7            MR. SEEGER:  Good morning, your Honor.  Chris Seeger on

8    behalf of the Hernandez family.

9            Your Honor, there's probably nothing more important or

10   sacred to an American family than homeownership, where we raise our

11   families, we live and we build a home.  Short of a real health

12   problem, I can't think of anything more troubling to a homeowner

13   than to have a sick home, and the Hernandezes have a sick home, and

14   that's what we're here to remedy today.

15           Tatum and Charlene grew up in Houma, not too far away

16   from here.  Began dating in college, got married, and in 2005

17   decided to find a nice home to raise their family in.  Tatum's, I

18   believe it was an uncle, knew an owner of a lot in Mandeville.  The

19   lot was owned by a guy who also was a builder, so they decided to

20   purchase that lot and build their dream home.  It had a lot of

21   advantages, one is it was very close to New Orleans, they both work

22   in New Orleans, Tatum is with the passport services and Charlene is

23   with Ochsner.  And it was, as you saw from the site visit that we

24   all took, the property is beautiful.  It's a perfect place to raise

25   a family, plenty of open space.

1        Tatum's uncle was an architect, so they all got together

2   and designed what they thought was going to be their dream home,

3   the one home they would live in, raise their family, and that's

4   where they'd be.  But their dream of homeownership has really

5   turned into a nightmare for them.  The house, they're reminded

6   every single day they wake up in that home of the problem with

7   Chinese drywall.  They smell the odor and the problem with the

8   odor, and although it's not maybe the kind of odor when you walk

9   through the door that hits you in the face, it's there, it's

10  constant, it's affected their clothing.  Their family members don't

11  really want to come and spend the night or spend too much time in

12  the home, especially if they have children because they're

13  concerned about this chemical smell.

14        And the corrosion has been a nightmare for them.  They've

15  replaced refrigerators, microwave ovens, toasters, HVAC coils,

16  compressors.  I mean, the compressor that we all saw at the site

17  visit which looked nice outside the home was just replaced in

18  January.  This was maybe a footnote to what we'll be doing here

19  today, Judge, but when we talk about the remedy at the end of the

20  day when the court enters its judgment on this, timing is a big

21  issue.  That compressor that looked pretty good that we looked at,

22  if that sits there through the summer and goes into August or

23  September, it's not going to look like that because it's going to

24  continue to be exposed to humidity, temperature and the corrosive

25  gases from the Chinese drywall.

1              So what we need to do here, because this is a big

2    litigation and, you know, nothing focuses a litigation better than

3    one trial of one home, one house, than this will, is we need to

4    come up with a scope and a plan that doesn't cut corners, and I

5    would suggest to this court and your Honor that the plan proposed

6    by Knauf, although it seems reasonable when you look at the fact

7    that they're willing to replace the drywall, cuts corners.  And

8    nothing will highlight that I think to this court better than when

9    you really start hearing the testimony from the construction

10   experts, like the expert that we have brought, AL Mallet who is a

11   reputable local contractor, we'll talk to your Honor about that, as

12   opposed to finding somebody that will just get you the rock-bottom

13   prices and do the minimal amount necessary.

14             Another point that just easily highlights this is the

15   electrical.  You look at the two reports that we submitted from

16   contractors.  Al Mallet has a price in there of about 12 or $13,000

17   for electricity.  Ripping everything out.  They have a contractor

18   that's going to tell this court that he can do that job for $2,200.

19   Now, here is where the common sense part of this fits in and where

20   this just doesn't make any sense.  I am not drawing upon personal

21   experience, I think if any of us have ever dealt with an

22   electrician, we know that to get an electrician to replace 139

23   outlets and switches for $2,200, I remember the first time I saw

24   that I think I chuckled at it, and I think you're going to chuckle,

25   your Honor, when we ask Mr. Kruger questions about how he got to

1     that price.

2              So what's the appropriate remedy for the Hernandez

3     family?  It's going to be:  Open up those walls, take all of the

4     drywall off, take all of the electricity out, and there's a couple

5     of reasons why we will do that and I am going to get to that in a

6     minute, your Honor.  Take out the copper pipes because all of these

7     things show tarnish and corrosion.  What you will hear from our

8     scientists in this case is that the corrosion is going to continue

9     because it's deep down in microscopic pits, the product of the

10    corrosion is something called copper sulfide, which is above my pay

11    grade, but the experts will talk about, and all you need to do to

12    keep that process moving is add a little bit of moisture.  And we

13    don't mean water, you don't need to have raindrops on it,

14    microscopic moisture will keep that process going.  So if you leave

15    it behind and we turn out to be wrong here, your Honor, for some

16    reason you think that the defendant's plan makes some sense and

17    we're wrong, we're going to be opening up that house again in a few

18    years, because those systems are going to continue to fail, the

19    electrical switches won't work and there is a potential for

20    problems even greater than that.

21             So what aren't we fighting about, just to sort of frame

22    the issues in the case?  What we're not going to be arguing about,

23    your Honor, is the drywall because we've stipulated to several

24    things which are very important, and I believe the court has the

25    stipulation, and we will be referring to it over the next two or

1    three days.

2         The drywall in the Hernandez home, it's made by Knauf, no

3    battle over that.  The drywall emits reduced sulphur gases and the

4    drywall emits an odor, we've stipulated to that, there is no

5    dispute on that point.  The drywall is not fit for the ordinary and

6    intended purposes that it's supposed to be used for.  That we've

7    stipulated to, so your Honor doesn't have to decide that issue.

8         What do you have to decide?  There are two ways to really

9    get to the proposal that the plaintiffs make to the court, two

10   ways, and I believe that our, that the judgment at end of the day

11   will reflect our scope of remediation and our prices.

12        The first way is that you're going to hear from our

13   scientist that the corrosion is going to continue, that's plan one,

14   and we believe that the court will find that testimony very

15   compelling and support for it.  Plan two is, it's just practical.

16   You will hear from Beazer, and you will hear testimony about what

17   Lennar, the builders, the big builders in the country are doing

18   about this.  They are not doing this out of the kindness of their

19   heart, your Honor.  It makes sense that when you rip those walls

20   open, if you have any doubt about what's going on with the

21   electrical system or the plumbing, that's the time to rip it out

22   and replace it, it's not that much, it's not that expensive to do

23   once the house is already opened up.

24        This plan about sort of snipping and cutting and leaving

25   wires behind and leaving plumbing behind and, oh, that piece looks

1    good but another piece has a little tarnish on it, that's just

2    cutting corners, and we would recommend that the court not adopt

3    that.

4            So the two ways to get the plaintiffs is, you'll hear it

5    on the science but at end of the day it's just practical to do.

6            The witnesses you'll hear from, your Honor, who will give

7    you very compelling testimony.  The first one you're going to hear

8    from is Mr. Rutila from SGH, who is an experienced engineer who is

9    going to talk to you about the proper scope of remediation, his

10   extensive experience already with Chinese drywall, something we

11   believe is lacking in the plaintiff's experts -- I'm sorry, in the

12   defendant's experts, and why the building systems need to be

13   replaced and how the corrosive environment and the sulphur gases

14   will continue to affect the systems even after the drywall is gone.

15           Then you will hear from Mr. Phillips from Beazer, and he

16   is going to tell you, he is a nonparty in this case, it's very

17   compelling testimony, he is going to tell you what a major builder

18   is doing to remedy this problem.  And again, they are not doing

19   this out of the kindness of their heart, it is just the most

20   efficient way to remedy the problem of Chinese drywall; that is, to

21   tear out everything and start over again.

22           Mr. Krantz, who is our corrosion expert, will talk to you

23   about copper sulfide corrosion that's caused by the reduced sulphur

24   gases, how it will continue after the drywall is gone, why the

25   corrosion needs to be ripped out and replaced and that it cannot be

1  wiped clean.  There is no method, there is no acceptable method for

2  cleaning it; and even if you tried to, it's still going to be

3  there.  And their failure rates for electrical systems and their

4  components, if you leave the tarnish and the corrosion on there.

5        Mr. Galler will talk to you about the appliances and how

6  that happens, and finally, your you'll hear from Mr. Mallet in this

7  case.

8        Your Honor, at the end the plaintiffs are going to ask

9  this court to enter a judgment, adopting the plaintiff's scope of

10  remediation and the pricing system that we've submitted to your

11  Honor and you'll hear through testimony.  Thank you for your time.

12        THE COURT:  Thank you.  Let's hear from the defendants,

13  please.

14        MR. HAYDEN:  Certainly, your Honor.  Don Hayden on behalf

15  of Knauf Plasterboard Tianjin.  I've already introduced the rest of

16  our team, and we appreciate the opportunity to be before you.

17        We also wanted to thank the plaintiffs for their

18  cooperation in getting this trial ready for trial in front of you.

19  We have worked hard over weekends and over the last few weeks

20  getting the depositions done so that we could be before you on this

21  expedited basis.

22        We recognize that the end goal of the court is to get

23  some homes fixed, to get the houses repaired and get the people

24  back in them, and my client is certainly conscious of that.  And we

25  thank the court for its patience today and its continued patience

1    as we move forward on this expedited track.

2         The management of KPT certainly understands the concerns

3    of the Hernandezes and some of the other homeowners that we have

4    here in the United States that are experiencing the impacts of

5    Chinese drywall.  And we understand and want to provide assistance

6    in getting their homes back where they should be in these

7    situations where my client's product is involved.

8         But we also ask that you put yourselves in the shoes of

9    my client, who has been hauled into this court halfway across the

10   globe.  We're the only manufacturer who branded our product and

11   were the center of the controversy here for many, many months.

12   While others sit in the sidelines.

13        We believe that we've provided and will provide to the

14   court a reasonable and efficient cost repair for the Hernandez home

15   and for other homes that will be before the court.

16        Things that you need to keep in focus as we go forward:

17   The Hernandez home is about 1,900 square feet; with the garage, I

18   think it's 2,000 square feet.  And 90 percent of the home is KPT

19   board, is my client's board, we admit to that.  There's some

20   domestic board in there maybe in the kitchen or in the bathroom.

21   And the parties have agreed to the joint stipulation that my

22   opposing counsel has discussed, the narrowing of this case to a

23   violation of the Louisiana statute on redhibition, and we've

24   admitted that the drywall in the home units reduce certain sulphur

25   gases.

1          We're talking about one or two parts per billion at best,

2     well below any concerns for health issues from the standards that

3     we have out from the government agencies and other standards.  We

4     have admitted that given the odor and this sulphur emissions that

5     the product was not fit for its particular purpose.

6          And we're going to focus on, really, what's the

7     appropriate remedy here, what is it going to cost to repair the

8     house.  And I guess drawing from plaintiff's play book, your Honor,

9     science guides us.  We agree with the plaintiffs that we must first

10    look to science, and we've brought in some very recognized

11    scientists from across the country in their particular specialty

12    areas.  You're going to hear from Dr. Perricone.  Dr. Perricone, if

13    you could go back, Dr. Perricone is a material scientist; you're

14    going to hear from Dr. Lee.  Dr. Lee is the founder of RJ Lee

15    Group, a very respected consulting group here in the United States,

16    looking at issues with regard to contamination, with regard to

17    remediation, was very involved in the issues with regard to

18    contamination, the problems after 9/11.

19         You're going to hear from Craig Beyler, our fire safety

20    engineer, who will talk to you about different testing that he did

21    on electrical wires and electrical devices in the Hernandez home

22    and that the system is in compliance with UL standards, the United

23    Laboratory standards, which is, really, the standard that we look

24    to in that area.

25         And we also have, in the event that we have to go into

health issues, then by stipulation we have hoped to keep it outside

of the health issues and just focus on the property damage.  But to

the extent that there is some gray area and we need to go there,

Dr. Goad has been with us for many months because health was our

first concern, and we believe that there are no short or long term

health impacts and we will be looking at the property damage here

and how to fix it.

          Let's look at Dr. Perricone.  The three things that, most

important things that you should come away with from Dr. Perricone

is that the tarnished film on the unprotected copper wire does not

compromise the structural integrity of the components.  What do I

mean there is the copper wire that is uninsulated at the

connections will show a black tarnish, that's one of the primary

symptoms under the Florida Department of Health for determining if

there is Chinese drywall in the home.  But as we will show, that

tarnish does not compromise the integrity of the system or that

connection.

          Protected wire, the metal-to-metal contacts where the

connection, where the electrical circuit actually passes, are

uncompromised.  You're going to see pictures of bright, shiny metal

when the insulated wire is peeled back.  You're going to see

pictures of bright, shiny copper where the connection was made with

the copper wire at the switches and receptacles.

          We're also going to be talking about the impact on

plumbing.  We believe that while there will be a black tarnish on

1    plumbing, it's superficial, it's not going to impact and compromise

2    the structural integrity of those components.

3            And you're going to see a lot of photographic evidence,

4    you're going to see pipes and wires that you can hold in your hand,

5    and you're going to see pipes and wires at 1,000 times magnified.

6    Here is an example of what the wires look like in magnified

7    context, this is under the SEM, you're going to hear a little bit

8    about SEM, I believe in the prior trial that you had you heard a

9    little bit about that.

10            On your left, this is a wire that was pulled from the

11   Hernandez house.  On the left is an affected or impacted ground

12   wire, and you'll hear a lot about the hot and neutral wires and

13   also about the ground wire.  On the left is the ground wire that

14   was taken from the Hernandez house and on the right is the new

15   wire.  And there will be some testimony about whether, on a

16   cross-sectional basis, there has been sufficient impact to cause an

17   impact on the functional integrity of that wire and the electrical

18   system.

19            And as you'll see, there is -- there's not much

20   difference between the impacted wire and the new wire, as you look

21   at them up close.  And certainly it does not reach the level that

22   would require some impact on functionality.

23            If we go to the next slide, live and neutral wires in the

24   Hernandez house are not impacted.  Your Honor, if I could, here is

25   a switch, and you'll see the various wires that go out of that

1  switch and the various connections that you have, the ground wires,

2  and what we've done, your Honor, is to show you, if on the left

3  here is the wires before the INSULATION has been removed.  If you

4  go to the right, you'll see after the insulation has been removed

5  where you might see the blackening, the tarnish as we call it,

6  others call it corrosion, you're going to see the bright, shiny

7  copper underneath the wires.  Mr. Beyler, Mr. Lee, Mr. Perricone,

8  will all testify that the system will not be impacted, there will

9  not be a lack of functionality in the electrical system, and that

10  the blackening that you see with the uninsulated copper IS not

11  something that will follow-up throughout the insulated wire.

12        Now, you'll see some lamp cord, I think you may have seen

13  it in the last trial, that's a different circumstance and we will

14  talk a little bit about that, it doesn't have the true protection

15  that you would see with the hard plastic sheathing that you have

16  here.

17        If we go to the next slide.  This has to do with the

18  plumbing.  Once again, there's been some questions raised about

19  whether or not there is an impact, some pitting, some corrosion of

20  the pipes such that those would be impacted.  Your Honor, this is

21  the cold water pipe that came actually out of the Hernandez house.

22  You'll notice what appears to be some pitting, corrosion in the

23  inner diameter of a pipe there, that's inside the pipe.  That's not

24  something that has to do with sulphur emissions (INDICATING).

25        Actually on the same pipe we have the outer diameter,

1  which is exposed to the sulphur emissions in the house, and you're

2  not seeing any corrosion, any impact.  Once again, the pipe wall is

3  not being compromised, certainly not, and these are levels of high

4  microscopy.  And you'll see, once again, this is an interior

5  example and you see that there is, so you're actually seeing

6  corrosion inside of the pipe wall, not on the outside where the

7  sulphur gases are located.

8       MR. SEEGER:  Excuse me, your Honor, I hate to interrupt

9  counsel during his opening, but I think I have to make two quick

10 objections at this point.  The court had asked us to exchange, I

11 thought, photos and things like that in the opening.  We didn't use

12 any, but we never received these, but I have to put it on the

13 record, and then the other part of it is.

14      I believe that this is really argument in the opening

15 statement, your Honor.

16      MR. HAYDEN:  Your Honor, that's the last of the photos, I

17 just wanted to give you an idea of where the science is taking us

18 with regard to Mr. Perricone.

19      Dr. Lee is going to focus more on the remediation and

20 what the appropriate remediation is that will eliminate the cause

21 of the sulphur-related tarnishing, the corrosion and the odor.

22      And then we have Dr. Beyler, and Beyler is focused on

23 fire safety and looking at increases in temperature rise by testing

24 the wires and the devices that are used in the electrical system.

25 He tested the samples to measure temperature rises, did not find

1   anything that would indicate that the receptacles and connections

2   were not meeting UL listing standards for new devices.

3           I think you'll hear some testimony from Dr. Krantz and

4   others about testing that they did that did not show any

5   compromises as well.  He did some other testing with regard to the

6   neutral and hot wires being attached to the switches and then there

7   is also the neutral ground wire.  And you'll hear testimony about

8   how a ground wire under Romex cord, which is a Romex sheathing,

9   which is a loose sheathing that is put around the wires, that there

10  is some tarnishing of the ground wire.  Once again, we'll have

11  evidence that the electrical system is not impacted by that.

12          So we've looked at the science, but I think it's

13  important to not only to look at the science but to look at the

14  practicalities, and what we tried to do for the court today and

15  will provide over the course of the trial is looking at it from the

16  folks that are in the field, the tradesmen.  The people that have

17  their boots on the ground and have dealt with issues of corrosion,

18  they've dealt with the aftermath of Katrina, they were here when

19  this city was flooded, homes were flooded with brackish corrosive

20  toxic waters for days, weeks, months, and they were the ones that

21  were out there resolving those issues.

22          You're going to hear from Roy Carubba, he is a licensed

23  civil engineer and he is a general contractor here in the

24  metropolitan New Orleans area.  He'll testify about his

25  experiences, his background, how he has done many of these types of

1    renovations and repairs of homes.  He was very involved in

2    repairing homes after Katrina.  Behind him is Mark Hartenstein, an

3    electrician and a plumber.  So we've got Joe Plumber, we've got Joe

4    the electrician, and we've got Ray Canzoneri, who is an electrical

5    engineer who will talk a little bit about the code and how it

6    applies.

7            If you were to listen to the plaintiffs, your Honor, this

8    case is all about six inches, six inches.  You're going to hear a

9    lot about the six-inch rule and you're going to hear a lot about

10   dust and you're going to hear about a possibility that there might

11   be some future failure analysis, something might happen in the

12   future.

13           Now, we've got tradesmen that know what to do with six

14   inches, they're out in the field, they know why the six inches is

15   put in the boxes, it's for this very purpose, for then when you are

16   replacing and repairing, that you have six inches of available wire

17   to appropriately put in this switch or receptacle.  But what

18   plaintiffs are suggesting is because of the six-inch rule, the

19   whole house has to be replaced, and your Honor, I submit that you

20   have to look at the practicalities, you have to go to the

21   tradesmen, you have to understand what they do in the field.

22           I think that you'll find that both science and the

23   practicalities agree that tearing the Hernandez house up is not

24   necessary, the scope of work that they're -- they want to be

25   adopted by this court is one that is not grounded in science and is

1    grounded in uncertainty and on possibilities.

2            The plaintiff's remedies is overreaching for several

3    reasons:  It's excessive in scope.  Let's be clear.  The Hernandez

4    electrical system has not failed, life safety systems have not

5    failed, although we intend to replace the fire alarm and we intend

6    to replace any other life safety alarms in the Hernandez house.

7    The pipes have not leaked.  They're suggesting the removal of

8    nonimpacted materials and components without justification or based

9    upon some just amorphic cost benefit analysis.

10           I believe that you're also going to hear a lot from their

11   scientists about the risk of future failure, but no one is going to

12   offer you any evidence of failures that have existed that can be

13   causally related to the sulphur emissions, and I believe that we

14   have to look at and I believe the standards that the court has to

15   look at is probability, not possibility.  No one has established

16   that the failure of personal electronics or appliances in the

17   Hernandez house is related to the Chinese drywall insulation.

18           Here is where we come down.  The electrical system should

19   remain.  Once the drywall is removed, the source, the sulphur

20   emissions are gone.  Any tarnishing or pitting of the wires, the

21   wire connection, the ground wires, will end with no material impact

22   on the functionality.  The removal should solve the problem.

23   There's no evidence that the functionality will be impacted at a

24   later date.  There is no evidence that the pitting that is being

25   claimed by the plaintiffs, and I'm talking about pitting on the

1    electrical wiring and the electrical systems, will continue.  The

2    pitting that is talked about is not self-sustaining, and we'll talk

3    a little bit more about that in the next slide when we're looking

4    at why pipes should remain.

5           The presence of the tarnish on the pipes, it doesn't

6    cause continued or accelerated corrosion.  Once we remove the

7    source, once we get rid of the drywall, the pitting stops, the

8    tarnishing stops.  Pits that were observed are not self-sustaining.

9    Now, you're going to hear some testimony about, well, there's a

10   possibility that they can sustain, could be self-sustaining.

11          Now -- and the learned treatises or the reports of prior

12   experts, Dr. Scully I believe, are based upon instances where they

13   were doing studies of electrical devices and equipment that are

14   submerged in water.  I submit to the court the Hernandez house is

15   not submerged in water.  The Hernandez's house is not an aqueous

16   environment, there is no evidence that there is a situation where

17   there would be continued pitting and the electrical system or the

18   plumbing would in any way, shape, or form malfunction after we've

19   removed the drywall.

20          The HVAC system is a different situation, the HVAC copper

21   coils.  They operate in a very unique environment, because there

22   was some discussion, I believe, the last time you had some experts

23   in front of you, it's an inaqueous environment, it's in a situation

24   where you have these copper coils, which have cool freon passing

25   through them, you have air blowing on them which develops

1    condensation on those coils, which accelerates the reaction between

2    the copper and the sulfide gases and results in pitting and results

3    in the failures that we've seen in some of these Chinese drywall

4    houses of the HVAC systems, but that's separate and apart from any

5    of the other situations.  If you have water on electrical

6    connections, you have far greater problems here.  There is no

7    water, it is not self-sustaining and the drywall can be removed.

8            Finally, your Honor, I would ask that, we will be talking

9    about why their teardown is inflated.  The teardown that is being

10   suggested by their expert, Mr. Mallet, is four times that of the

11   teardown that was proposed by our general contractor.  Four times

12   what he proposed.  And we'll go through a few of the line items and

13   see where he may have miscalculated, where there's exaggeration,

14   where there is elements that really aren't a part of an appropriate

15   construction repair project.

16           This is not an asbestos abatement case, this is not a

17   situation where there is sufficient evidence to say that we have to

18   go into this house in big, old white space suits.  This is your

19   typical construction project.  It's a construction project, if done

20   appropriately, and under the normal and ordinary practice, where

21   dust can be contained, you will have an effective, a cost-effective

22   and efficient remediation of this house in 60 days according to

23   Mr. Carubba.  Actually, to sort of validate that, the cost that is

24   being suggested far exceeds the actual cost of building this house.

25           And finally, you're going to hear from Mr. Phillips.

DAILY TRANSCRIPT

1    Mr. Phillips from Beazer Homes, he does have some history with

2    remediating homes.  I believe they are in the process of

3    remediating in various stages 15 homes or thereabouts.  They've

4    moved along on four to six, I believe four to six are near

5    completion.  Two of their properties, actually the families are

6    going to get in in the next few weeks.  But I am going to question

7    Mr. Phillips on the costs that they incurred and I am -- and we

8    will make an apples-to-apples comparison, I am going to show, I

9    believe, that the costs that Beazer has incurred in implementing

10   the very same protocol that they want to use here was less than

11   half of what the plaintiffs are proposing here.

12             And with that, your Honor, I'd ask that we move forward

13   with the evidence in front of you.  Thank you.

14             THE COURT:  All right.  Thank you very much.  Let's hear

15   from the plaintiff, put on your evidence, please.

16             MR. SEEGER:  Your Honor, we call Mr. Dean Rutila.

17             THE DEPUTY CLERK:  Would you raise your right hand.

18        (WHEREUPON, DEAN A. RUTILA, WAS SWORN IN AND TESTIFIED AS

19        FOLLOWS:)

20             THE DEPUTY CLERK:  Please be seated.  And would you state

21   your name for the record.

22             THE WITNESS:  Dean A. Rutila.

23             THE DEPUTY CLERK:  Would you spell the last name.

24             THE WITNESS:  R-U-T-I-L-A.

25             THE DEPUTY CLERK:  Thank you.

```
1                    VOIR DIRE EXAMINATION

2    BY MR. SEEGER:

3    Q.  Good morning, Mr. Rutila.

4    A.  Good morning.

5    Q.  Let's start with a little bit of your background so that the

6    court gets a sense of what your expertise is and what this is

7    about, okay?

8    A.  Fair enough.

9    Q.  Where do you work?

10   A.  I work at Simpson, Gumpertz and Heger, we are a 400-plus person

11   multidisciplinary engineering firm, scientists and engineers that

12   work on buildings and structures of nearly all types.

13   Q.  And what is your position at that firm?

14   A.  I am a senior principal and a director of the firm.

15   Q.  Now, what type of projects do you folks at SGH -- do you mind

16   if I refer to it as SGH?

17   A.  That's fine.

18   Q.  What type of projects do you folks take on there?

19   A.  We really work on all manners of buildings and most structures

20   that we have in this country, bridges, radio telescopes, tunnels,

21   pipes, and virtually anything you can imagine on a building.

22   Q.  And do you work on residences?

23   A.  Oh, yes, I work on many residences myself; some of the guys

24   that do radio telescopes don't do many.

25   Q.  Well, when you say many, why don't you quantify that for us a
```

1   little bit.

2   A.  I've personally worked on thousands of individual residences

3   over the 30 years of my career.

4   Q.  And could you give the court just what your educational

5   background is?

6   A.  I have a bachelor's degree and master's degree in civil

7   engineering from the University of Michigan, the master's degree I

8   received in 1979.  And that's my formal education.

9   Q.  And, Mr. Rutila, are you licensed in any states?

10  A.  Yes.  I am licensed in, a licensed professional engineer in 23

11  states, including Louisiana.

12  Q.  And talk to us a little bit about your work history, how did

13  you get into this field?

14  A.  Well, I grew up on a contractor's knee, I've been on

15  construction sites virtually all of my life, certainly since I was

16  eight.  I used to drive the crew with my younger brother.  And I

17  paid for my college working in various construction activities,

18  from actually building homes to working on power plants, surveying,

19  drafting, many of the activities in the engineering profession.

20          After graduating with a master's degree, I've been 30

21  years now designing, investigating, participating in renovation and

22  construction of virtually all types of buildings that we can

23  imagine.

24  Q.  And getting into that a little bit, can you talk to the court a

25  little bit about what type of projects you've been involved in that

1    round out your experience for giving opinions in court?

2    A.   The project list is very, very long, but particularly focused

3    on multidisciplinary projects, which is really the characteristic

4    of the Chinese drywall work, where I have to bring in and work with

5    scientists and engineers with a broad range.

6             And we can just start looking at examples of that, one

7    might be the Polk County Courthouse in Bartow, Florida.  I first

8    saw it when it was about a year old, brand-new building, about

9    20-some million dollars to build it, and we spent more money to fix

10   it.  And part of the investigation, really, as I dug into the

11   building, involved virtually anything that you can go into a

12   building, from fire safety to HVAC to thermal dynamics of moisture,

13   thermal dynamics of moisture every morning on a Monday they'd come

14   in and the ceiling tiles in the courtroom had collapsed just from

15   too much humidity.  And that really became an air leakage and

16   moisture management problem.

17            We evolved with brick masonry, stone masonry,

18   structural steel, had an interesting roofing system of foam,

19   plastic, a fiber material and plywood.  So all of those kind of

20   materials had to be brought into and all of those kind of expertise

21   had to be brought into that investigation.  Fairly characteristic

22   of the kinds of things that I get involved with.

23   Q.   Do you often go into, get involved in projects where you're not

24   really quite sure what might be the cause of the problem and you

25   have to do forensic-type work?

```
 1    A.  It's very common.  Virtually all of the time, when you're

 2    described a problem, when a problem is described to me, I obviously

 3    want to understand that problem; but you have to look beyond, and

 4    give you an example of a building at the University of Alabama

 5    where they thought they had a roof leak, and they sure enough did.

 6    But after many, many people tried to repair the roof leak, I

 7    investigated it and actually realized that it was a structural

 8    problem between an unusual roof deck, an unusual structure and

 9    literally had to condemn the building -- not literally, I condemned

10    the building until it could be repaired because the structure was

11    literally going to fall down.

12            And that's one of the characteristics of being an

13    investigator of buildings of, that I do, that you have to really

14    understand the building, not just the manifestation of the problem

15    first described to you.

16    Q.  Mr. Rutila, just briefly to round out your expertise, you've

17    also done some work, I believe, for the Pentagon and the hanger

18    that houses Air Force One; is that correct?

19    A.  I have, I mean, a lot of high-profile work like that.  The

20    Pentagon, it was really to help the Army CORPS of Engineers explain

21    to the Department of Defense why the work had to be done, and it

22    really involved excavating part of an underground structure that is

23    the Pentagon.

24            Am I doing something wrong?

25            THE DEPUTY CLERK:  If you'll just back away from it a
```

1    little bit.  That's fine.

2              THE WITNESS:  Okay.  I'm sorry.

3              THE DEPUTY CLERK:  That's good.

4              THE WITNESS:  And it really involved excavating this deep

5    structure and doing both material sampling of concrete and

6    waterproofing materials.  And really predicting the future of a

7    waterproofing material, and that really brought in that kind of

8    expertise of bringing all of the material science of those

9    particular products.  That's the kind of thing that we have to do.

10             The hanger at the Andrews Air Force Base was a wind

11   failure, but investigating it required wind tunnel study, weather

12   studies, air leakage studies, as well as materials of the plastics

13   and adhesive that we used, that we use modernly in buildings.  And

14   so you have to bring all of those different expertise into such an

15   investigation.

16   BY MR. SEEGER:

17   Q.  And can you tell us a little bit about what your background is

18   and your experience with copper sulfide corrosion?

19   A.  As a person that does a lot of work with buildings, one of the

20   things that I see from time to time are copper used in exterior

21   buildings, you imagine a copper roof or the like, and one of the

22   characteristic failures of that will be a pitting failure due to

23   local combustion nearby, often in the same building, of No. 6

24   bunker oil as a heating plant.

25             A lot of institutions and commercial establishments will

1    build -- will burn that type of oil for heating and cooling, and

2    the sulphur gases from that will then get deposited onto the copper

3    and cause pitting.  And that's something I've seen on quite a few

4    buildings.  Symphony Hall in Boston is an example of a building

5    where they burned the No. 6 oil and destroyed their own roofing

6    system.

7    Q.  And how many homes would you say you've examined in your career

8    where you've had building problems?

9    A.  Well, it's what I do in terms of examining buildings and

10   certainly thousands of them in terms of residential dwellings,

11   sometimes single-family, sometimes multi-family buildings.  But

12   certainly thousands.

13   Q.  And how does that compare, in your experience opening up

14   thousands of homes to look at building problems, how does that

15   compare with what you've observed in homes having Chinese drywall?

16   A.  There's a lot to learn and draw from it, of course, because as

17   an investigator of residential construction, it's very common to

18   have to disassemble to understand what's wrong.  Usually it's a

19   moisture problem, either from atmospheric moisture inside,

20   atmospheric moisture outside, water leakage, but we're always

21   finding -- not always, but quite often finding damage from that

22   moisture in these dwellings.

23          And the very important difference, though, is in all of

24   these homes, very, very rare to find anything of significant, in

25   terms of deterioration, to the electrical system.  Sometimes you'll

1   find a receptacle box or a galvanized conduit that's corroded due

2   to a property with a significant moisture problem, but very, very

3   rare to find anything wrong with the electrical system, that's why

4   seeing the type of corrosion that we're seeing here is very, very

5   unusual in residences to have other major, major issues.

6           And one of the things that I often do when I first come

7   to such a residential building is just take off a receptacle plate

8   because I can see around and see inside and get a good window into

9   just how the building was built and what's behind the drywall

10  before I start cutting it.  And for that reason, you know, I'm

11  always looking into receptacle boxes and seeing nothing like we're

12  seeing here.

13          So all I can say about the comparison is, the experience

14  is very useful but the manifestation of the problem is

15  unprecedented.

16  Q.  Mr. Rutila, could you tell the court a little bit about what

17  your experience today has been with Chinese drywall, how many

18  samples you've looked at, homes you've looked at, things of that

19  nature?

20  A.  Of course I've been to and looked at the Hernandez home.  I

21  looked at personally six homes in Virginia, and a seventh home that

22  was a negative control home in Virginia.  My staff has gone to

23  another six homes, Chinese drywall homes, in Virginia.  And also

24  have gone to homes being repaired by Lennar and by Beazer in

25  Florida, and in terms of samples in our laboratory, we have

1  examined dozens and dozens of samples from Virginia, from Florida

2  and certainly from the Hernandez home.

3  Q.  And finally, the samples have included what, copper, wires,

4  drywall, just to give the judge a background?

5  A.  They've included drywall, we look at those petrographically and

6  chemically; wires and electrical devices, receptacles, switches --

7  which we've taken apart and examined -- certainly wires in

8  sectioning them, similar to what we saw just a moment ago.

9          In terms of plumbing, looking at plumbing components,

10 brazes, for example, which I think maybe we'll see in a bit in

11 plumbing components, HVAC components, both consumer-type

12 electronics, as well as electronics from devices such as HVAC

13 equipment, broadly, all of the types of components that we think

14 both cause the damage and are being damaged by the sulphur gases.

15         MR. SEEGER:  Your Honor, at this point we would offer

16 Mr. Rutila as an expert in material sciences, building and

17 construction problems and remediation.

18         THE COURT:  Any questions?

19         MR. SANDERS:  Your Honor, just for the record, we

20 understand his testimony, his experience in the multidisciplinary

21 approach of building investigations and I will obviously ask some

22 questions on cross, but we would oppose any admission or

23 qualification as a material scientist or engineer, electrical

24 engineer, or corrosion expert.  And ask that he not be qualified

25 for those types of things.

 1          THE COURT:  You're not qualifying him as a corrosion

 2   expert, are you?

 3          MR. SEEGER:  No, your Honor, that's Mr. Krantz.  We are

 4   not qualifying Mr. Rutila in that area.

 5          THE COURT:  What is he an expert in material what?

 6          MR. SEEGER:  What we had proposed is material sciences.

 7   In counsel feels more comfortable with multidisciplinary

 8   investigations, that's fine with us, your Honor, rather than

 9   quibble over words.

10          MR. SANDERS:  Yeah, we will be fine with that as long as

11   his testimony is related to the actual investigations and not

12   opinions about things that cross over into more substantive types

13   of things.

14          THE COURT:  We'll take that on cross, but I'll qualify

15   him and accept him in multidisciplinary investigations.

16          MR. SEEGER:  Thank you, your Honor.  We move forward.

17                        DIRECT EXAMINATION

18   BY MR. SEEGER:

19   Q.  Mr. Rutila, you spoke to the court a little bit about your

20   experience with Chinese drywall.  Tell us about your observations

21   specifically with regard to the Hernandez house, what you did and

22   what you saw.

23   A.  I visited the home and by the time I had arrived, more than a

24   dozen people had arrived before me.  And that's important in terms

25   of my observations.  I entered -- as you know, you enter into a

1   living area, that includes a living room, dining room, kitchen.

2          I immediately went to the left wing, if you will, where

3   there are two children's bedrooms and a bathroom.  And in the two

4   children's bedrooms I observed apparent sulphur odors.  I did not

5   observe those odors in the living room when I first entered.

6          And then I went shortly thereafter to the right-hand

7   wing, if you will, which is the master suite, there's a play area,

8   a laundry room, master bedroom, closet and bathroom, and in those

9   areas I did not personally detect sulphur odors.

10          And then in terms of my work there, I looked at devices,

11  went in the attic.  As you know, it's a single-story home, built

12  about 48 inches off the ground on piers, and I did go into the

13  attic and looked at components and materials within the home.

14  Q.  And you made a reference before to apparent sulphur odors when

15  you came into the house and you went to the left where the

16  children's rooms were.  Just so we're clear, how would you describe

17  the odor?

18  A.  I didn't -- it wasn't right when I entered the home.  When I

19  entered the living room, I paused and did not detect anything

20  myself.  But in the children's rooms, the odor to me is of a stale,

21  burnt match, that's how it appeared to me at the Hernandez home, as

22  if there was a wet -- a match that had been ignited, put out and

23  allowed to sit there.  That's how I characterize it to myself.

24  Q.  Mr. Rutila, you had selected some photos that I have here that

25  we would use to show the court, if they will be helpful to you to

1   testify, would that be helpful?

2   A.  It would be.

3           MR. SEEGER:  Your Honor, with your permission?

4           THE COURT:  Yes.

5           MR. SEEGER:  Could we start, Scott, with the first photo,

6   which is Hernandez 599.

7           Your Honor, can I just, point of order, how would you

8   like to go about, and the counsel for the defense can tell me, how

9   do you want to go about moving these into evidence?  Can I do it at

10  the end?  If you have an objection, raise it.

11          MR. SANDERS:  We noticed some photos when I was going

12  through those that seem to be sort of supplied to us this weekend,

13  so I can object.

14          MR. SEEGER:  At the time I use them?

15          MR. SANDERS:  Or at the end, whatever you prefer.

16          MR. SEEGER:  Is that okay with you, your Honor?

17          THE COURT:  That's fine.

18  BY MR. SEEGER:

19  Q.  Mr. Rutila, tell us what you're observing here in this

20  photograph and why you selected this.

21  A.  This is a device from the plumbing.  At the left in the

22  photograph the silver light is a valve and, that's part of a valve,

23  and at the right is the white is a flexible tube that would fit up

24  to a faucet, and the copper and brass elements at the top are part

25  of the fittings.

1        THE COURT:  Why don't you offer that into evidence, then,

2   before you get into his testimony.  Once he identifies it, let's

3   get into evidence.

4        MR. SEEGER:  Okay, your Honor, we will do that.  So at

5   this point plaintiffs will move in Hernandez 599.

6        THE COURT:  Any objection?

7        MR. SANDERS:  No, sir.

8        THE COURT:  Let it be admitted.

9        MR. SEEGER:  Scott, can you please pull up Hernandez 603.

10  BY MR. SEEGER:

11  Q.  Mr. Rutila, would you please explain to us what this shows?

12  A.  Yes.  This is the, that was in the previous photograph was the

13  top end and what you see in a closer-up view is copper at the lower

14  left, that's copper pipe, and then it's brazed into a FITTING that

15  is then connected in turn to the plastic tubing.  And what's, of

16  course, of interest here is the apparent corrosion on the copper,

17  some of it is the bronze color we expect copper pipe to be and some

18  of it is black.

19        And what's important about black like this is that

20  sometimes it can be caused by the flux material used in making

21  copper fittings, and some of it, we'll see, is the copper sulfide,

22  which we know is from the corrosive gases.

23        And you'll see right at the lower red arrow, just above

24  that, is the brazing that's of interest because we have seen, and

25  we didn't see pitting in this particular braze, but that's an

1  example of the type of brazing that we've seen pitting in, in

2  Chinese drywall homes and is of particular concern if that were to

3  be, endeavored to be cleaned or left in place.

4          MR. SEEGER:  Your Honor, we would move in photo Hernandez

5  603 into evidence.

6          THE COURT:  Okay.  I'll admit it because it's the same

7  photograph.  But counsel, we're going to have to do it a little

8  differently.  You're going to have to show him the photographs at

9  the witness stand, let him look at it, he recognizes the photos,

10  they're photos of material taken from the Hernandez house.  And if

11  there's any objection, I'll hear them.  If not, then I'll admit

12  them all and then you can go through, because if you show him one

13  at a time and then he testifies to it, it's going to be a problem.

14         MR. SEEGER:  So I'll probably interrupt you after you

15  identify it and then we'll move it in and then you'll give an

16  opinion on it.

17         THE WITNESS:  I understand, I apologize.

18         MR. SEEGER:  So we move this, that's the same photograph.

19         THE COURT:  That's the same photo.

20         MR. SEEGER:  Right.

21  MR. SEEGER:

22  Q.  Mr. Rutila, tell us the significance in your opinion of what

23  we're seeing here.

24  A.  The copper, as you can see, has portions of it that are very

25  much bronze, as we'd expect, and then portions of it that have

1    black corrosion on it.  And in the electron microscope, we find

2    that some of that black is copper sulfide corrosion, and in other

3    samples, we did not section this one or clean the material off for

4    pitting, but we find pits underneath it.  And this goes, the pits

5    are everything in this discussion of copper plumbing because as you

6    heard earlier --

7              MR. SANDERS:  Your Honor, I didn't think he was a

8    corrosion expert, we seem to be getting into some corrosion issues

9    on pitting and other things.  Describing what he saw on these items

10   is okay.

11             THE COURT:  To the extent that that's an objection, I'll

12   overrule the objection.

13             MR. SEEGER:  Thank you, your Honor.  And we are not going

14   to ask him questions about whether it continues or any questions of

15   that nature.

16             THE COURT:  I mean, it is what it is, you can see it.

17             MR. SEEGER:  Right.

18   BY MR. SEEGER:

19   Q.  Mr. Rutila, is it part of your work to examine and sort of

20   diagnose whether you see a corrosion problem and what the cause of

21   the corrosion is, is that what you're doing?

22   A.  That's right.  And for the corrosion, I use my laboratory staff

23   and engineers at Simpson, Gumpertz and Heger who are skilled and

24   qualified to identify what these materials are and to do the

25   metallurgy questions that I ask them to do.  That's how I

```
1    investigate a device like this and form an opinion on what needs to
2    be done, which is really one of the main reasons why I am here
3    today.
4    Q.  Okay.  Thank you.  Scott, can you pull up Hernandez 621, and
5    Mr. Rutila can you just identify the photograph for his honor.
6    A.  This is a valve assembly from an HVAC unit that was taken from
7    a failed HVAC unit, not by myself, and taken by mechanics and then
8    provided to us when that HVAC unit was replaced, that's what this
9    is.
10            MR. SEEGER:  Your Honor, we would move this photo into
11   evidence.
12            THE COURT:  What's the number?
13            MR. SEEGER:  It's Hernandez 621.
14            MR. SANDERS:  Just object on foundation, whether it's the
15   Hernandez house.
16            THE COURT:  Ask him if it was from the Hernandez house.
17   BY MR. SEEGER:
18   Q.  Mr. Rutila, is it from the Hernandez house?
19   A.  It is.  I did not personally take it, but it's been identified
20   to me as a valve from the Hernandez house.
21            THE COURT:  All right.  I'll admit it.
22   BY MR. SEEGER:
23   Q.  Now, you can testify as to the significance of what you see in
24   this photo for the court.
25   A.  Yes.  Similar to the other device, it was a bronze body right
```

1    in the center there, the large mass, copper tubing going off and

2    coiled up to the upper left.  And of particular interest is the

3    copper tubing and where the copper tubing joins the bronze body at

4    that braze fitting in there.  And that's what we examined and found

5    copper sulfide corrosion in that location.

6    Q.  Let me show you the next photo because if you want to focus on

7    that piece, we'll do that.  Scott, pull up Hernandez 624, please.

8    And just identify what this photo is for the record, please.

9    A.  This is another view of the same device, and I'll explain the

10   angle and so on later, but that's what this is.

11           THE COURT:  I'll admit it.  What's the number?

12           MR. SEEGER:  It's Hernandez 624.

13   BY MR. SEEGER:

14   Q.  Now, Mr. Rutila, that's the area you focused on in the last

15   photo.  Tell us what the significance of this is.

16   A.  That's right.  You might zoom in to where the copper tube -- I

17   don't have a pointer to help you, right there, you've got it --

18   right in there is the area that we examined in our laboratory for

19   corrosion and identified copper sulfide corrosion of the tubing at

20   that location.

21   Q.  And what is the significance of that?

22   A.  Again, from our examination of other brazes and tubing, that's

23   a location where we have found deep pits and due to corrosion.

24   Q.  Mr. Rutila, we're going to pull up the next photo, Scott, can

25   you please pull up Hernandez 611.

```
 1              And, Mr. Rutila, please identify this photo for us.
 2   A.   This is a valve, a different one than we saw earlier, but a
 3   valve for a water distribution system for the Hernandez home.
 4              MR. SEEGER:  Your Honor, we would move Hernandez 611 into
 5   evidence.
 6              THE COURT:  Any objection to that?  That will be
 7   admitted.
 8   BY MR. SEEGER:
 9   Q.   Please tell us what the significance of this photo is,
10   Mr. Rutila.
11   A.   From this angle you see at the far upper right the short piece
12   of copper coming out of the device, and that is what we were
13   particularly interested in with this particular element.
14              MR. SEEGER:  All right.  And then we will pull up the
15   next photo which I think highlights that area a little better.
16   Scott, please pull up Hernandez 609.  And if can you please just
17   identify this and, your Honor, it's just another angle.
18              THE COURT:  I can see it, it's a blowup of a portion of
19   the prior exhibit.  I'll admit it.
20              MR. SEEGER:  Okay.  Thank you, your Honor, that's
21   HERNANDEZ 609.
22   BY MR. SEEGER:
23   Q.   Would you please tell us the significance of what you're seeing
24   here?
25   A.   Again, we looked at that copper, found copper sulfide corrosion
```

1    on the copper.  There's also some green, which is copper oxide, but

2    we found copper sulfide corrosion on that copper piece.

3            THE COURT:  Why don't you describe it for the record,

4    what about that looks like it's corrosion to you?

5            THE WITNESS:  Fair enough.  The copper itself has a

6    darker black character than you would expect on in-service copper

7    piping after --

8    BY MR. SEEGER:

9    Q.  Let me interrupt just so we're clear.  When you're saying

10   copper, you're talking about this piece right here, right?

11   A.  I am.  I am.  I'm talking about the short length of pipe where

12   the arrows are pointing more or less at.  That's a piece of copper

13   pipe.  It's been cut off and so that you can have the section and

14   the valve.  And the color of that that you see, is a fair color,

15   it's a blacker color than you would expect copper pipe in service

16   to be.  And the black, when examined in our laboratory under

17   electron microscope, shows copper sulfide crystals.

18           The other thing is, you can see some green spots near the

19   red arrow there, and that's not copper sulfide corrosion, that's a

20   mixture of copper oxide and probably, it's probably the flux used

21   when making solder joints.

22   BY MR. SEEGER:

23   Q.  Let me ask you this, Mr. Rutila.  With the photos that we've

24   just looked at involving copper pipes, is it consistent or

25   inconsistent with your observations from other homes that have had

1   Chinese drywall other than the Hernandez house?

2   A.  Yes.  And as these photographs show, there is variation in the

3   pipes, but these are consistent with what we've seen.

4   Q.  And, Mr. Rutila, we're going to move on to electrical wires,

5   okay, and we have a number of photographs here.

6           Scott, if we could pull up CDW 24-0116.  And could you

7   identify for the record what these items are?

8   A.  That's three photographs of a switch and then some of the

9   electrical connections on that switch from the Hernandez homes

10  known to us as TCH 02, just sample No. 2.

11          MR. SEEGER:  And, your Honor, at this point we would move

12  the three photos that are reflected on this one page into evidence.

13          THE DEPUTY CLERK:  How is it marked?

14          MR. SEEGER:  It's CDW 24-0116.

15          MR. SANDERS:  No objection.

16          THE COURT:  That will be admitted.

17          MR. SANDERS:  Is there an exhibit number?

18          MR. SEEGER:  Yeah, there are three different exhibit

19  numbers, do you want all three?

20          MR. SANDERS:  Yes.

21          MR. SEEGER:  The top photo is Hernandez 275, the middle

22  photo is Hernandez 276, and the bottom photo is Hernandez 277.

23  BY MR. SEEGER:

24  Q.  Mr. Rutila, would you please explain to us the significance of

25  these photographs and what you see here.  Do you want to blow up

1    the top one first?

2    A.  I'll do the general.  The top image is of the switch sample as

3    we received it.  And if you look at the ground wire connection at

4    the right and right where your dot is there.

5    Q.  All right, hold on, let us enlarge it so everybody can see.

6    For the record, we are looking at Hernandez 275.

7    A.  That's where the ground wire, where the blue arrow is, where

8    the ground wire was connected to the switching device.  And then

9    the subsequent photographs go into that in a bit more detail in

10   terms of how the wire was actually engaged, and the center

11   photograph or the top photograph now with the 6, you can see the

12   way in which the wire binding screw is brought over a loop in the

13   wire and you can see the corrosion, particularly of interest, the

14   blue arrow is of some interest, but another interest area is right

15   where the wire enters below the wire binding screw, right where

16   your dot is exactly.

17          And also the corrosion right at that interface with the

18   wire binding screw.  That's what's particularly of interest, and

19   with the electron microscope we've confirmed that that's copper

20   sulfide corrosion on that wire.  And of interest has been the

21   corrosion at these contact points.

22   Q.  Now, just to pause for one second.  When we were qualifying you

23   and asked you a question about the number of homes you've looked

24   at.  In all of the homes you've looked at, Chinese drywall, no

25   Chinese drywall, is it common to see that type of corrosion where

1    that is?

2    A.  No, it's unprecedented.  In terms of non-Chinese drywall homes.

3    In terms of Chinese drywall homes, it's a fairly common occurrence.

4    And that wire is fairly characteristic, sometimes they're black the

5    full length, sometimes the blackening is intermittent.  And the

6    blackening is characteristic of where we had the right conditions

7    of temperature to let there be microscopic moisture and sulphur

8    gases to induce the corrosion.

9            But sometimes you'll see it fully blackened and sometimes

10   you'll find a wire on a device even in a Chinese drywall home that

11   has only very small spots, and everything in-between.

12   Q.  And those very small spots you just described, would you

13   describe that as corrosion as well?

14   A.  Yes.  We look at those spots under electron microscope and

15   identify copper sulfide crystals, at many of those, at many of

16   those very small spots when we see it on the wire.

17   Q.  Mr. Rutila, let's go to the next photo.  Scott, can you pull up

18   Hernandez 605.

19           And just please identify this photo for his honor.

20   A.  This is another connection of a copper wire on a device, I

21   don't remember what the device number is from the photograph, but I

22   recognize the photograph as our own.  And as a sample of a device

23   from the Hernandez home.

24           MR. SEEGER:  And, your Honor, we would at this time move

25   in Hernandez 605.

```
 1            THE COURT:  Okay.  Let it be admitted.
 2   MR. SEEGER:
 3   Q.  Mr. Rutila, can you tell us what you see in this photograph
 4   here?
 5   A.  Yes.  This is a wire engaged in binding screw, and of
 6   particular interest, the wire has the black copper sulfide
 7   corrosion in many locations, but particular interest is this where
 8   we even see, a little bit hard to see in the photo you have, but
 9   right in there you can even see the crystals growing out feather
10   like.  That roughness that you see there, right in there, yeah,
11   there you see them (INDICATING).  You can see the copper sulfide
12   crystals coming right off of the corroded wire.
13   Q.  And just to go back to the full photo.  Can you just orient us
14   to what we're seeing here, what is this right here (INDICATING)?
15   A.  That's a connection of a copper wire into a device and the wire
16   just comes in, bends around and gets attached, as is characteristic
17   of many electrical connections.
18            MR. SEEGER:  And I believe, Scott, if you can pull up
19   Hernandez 606, this is another view of this.  And, your Honor, it's
20   another view of what we were just looking at.  We'd move in 606?
21            THE COURT:  Okay, admitted.
22            THE WITNESS:  Right, that's just a different angle, the
23   same device.
24   BY MR. SEEGER:
25   Q.  Again, how would you describe what's going on here?
```

1    A.  Well, this one gives you a different view of this wire.  You

2    can still see on the left-hand side those crystals.  On the

3    right-hand side you just see a much more blotchy appearance because

4    of other materials contaminating the surface besides copper

5    sulfide, a little gypsum joint compound or things like that we see

6    occasionally on these wires.

7    Q.  And the other materials that we're referring to other than the

8    copper sulfide, is it common to see that?

9    A.  Yes, it is, because they do the rough wiring and then they do

10   the plaster and sometimes they get a bit on the wire.  It's not

11   supposed to be there, it's against code, but there it is.

12   Q.  Let's move on to, then, the next set of photos we have with

13   regard to the electrical wires.  Scott, can you please pull up

14   Hernandez 575-0001.

15           And can you just identify for us what we're looking at

16   here.  Hold on a second, Scott.  Could you identify what we're

17   seeing here, Mr. Rutila?

18   A.  This is a receptacle, excuse me, a light switch box from the

19   Hernandez home at the wall between the living room, dining room.

20   There's three switches and the wires.  And when it was removed, the

21   entire receptacle box as well as all of the wires entering the box,

22   as well as the switches, were all collected together.

23           MR. SEEGER:  We'd offer this into evidence, your Honor.

24           MR. SANDERS:  The only objection with this and the next I

25   think following exhibits is it includes, I think this was all

1    received after our deposition and produced to us over the weekend.

2    We did not have a chance, I am not sure how far you're going to go

3    beyond the pictures, to --

4         MR. SEEGER:  Well, we're going to go, we're going to do

5    pretty much what we've done with the last 20.

6         MR. SANDERS:  There is some analyses and other things

7    included that we haven't had a chance to question Dr. Rutila about.

8         MR. SEEGER:  Your Honor, there are no new opinions on

9    this.

10        THE COURT:  Yeah, I don't think that this is a problem

11   from the standpoint of examination, it's really identification.

12   I'll overrule the objection and allow it.

13        MR. SEEGER:  Okay.

14   BY MR. SEEGER:

15   Q.  Now, Mr. Rutila, what is the purpose of this photo, what does

16   it show?

17   A.  The purpose of it is generally to orient us, orient the court,

18   and then also to illustrate a few, a few points.  One of which is

19   that the photo, as it's shown here, but let's zoom in and maybe we

20   can see it a little bit better, the television screens show it

21   better, that the box has a lot of wires in it, and one of the

22   important things is a lot of those wires don't go right into the

23   switches but get joined together under wire nuts.  And it's an

24   appropriate and necessary way of putting together electrical

25   devices.

1          And then inside the boxes, as we'll see, there is

2    corrosion on the ground, which is fairly characteristic, but it

3    also gives a bit of a sense of the box that is existing, well,

4    until this was removed, was existing in the Hernandez home and that

5    is becomes part of the challenges in terms of what do we do when

6    the home is repaired.

7    Q.   Right.   And if we move on to the next photo, which is another

8    angle here, it's Hernandez 579-001, Scott.   And, your Honor, for

9    the record, this is just pulling out the switch out of the box we

10   were just looking at.

11         THE COURT:   I'll admit it.

12   BY MR. SEEGER:

13   Q.   Mr. Rutila, can you please describe in a little bit more detail

14   what we're seeing here?

15   A.   In these photos, two of the switches have been pulled out of

16   the box, and you can see the various wires coming off of them.

17   This particular switch in the foreground has two black wires coming

18   off of it.   Because of its purpose, that's not uncommon.

19         You can see both of the black wires have corrosion on the

20   exposed copper, and then you can also see that because of the

21   bending, the neck of the insulation at these two copper wires is

22   actually open just a bit.   And then we examined those wires in a

23   bit more detail.   So this is to orient you with the samples.

24         MR. SEEGER:   And I apologize for interrupting.   Scott,

25   can you pull up Hernandez 577-0001.   And, your Honor, this is just

1    a close-up of what we've been looking at.  We move this into

2    evidence.

3              THE COURT:  Yes, I'll admit it.

4    BY MR. SEEGER:

5    Q.  Mr. Rutila, can you explain it?

6    A.  This is, just as you said, a close-up of one of those black

7    wires where it's been removed from the wire binding screw, and now

8    we can see the black insulation jacket and we can see how, because

9    of the bending of the wire in order to make the assembly work in

10   the box, the insulation has been gapped open a little bit inside of

11   the box.

12   Q.  And, Mr. Rutila, I am going to move on, then, to the next

13   series of photos regarding electrical wire.

14             Scott, can you pull up Hernandez 580-0001, and can you

15   identify for the court what this is?

16   A.  This is that same wire having been disconnected and then some

17   of the black insulation.  You can see the hook at top --

18             MR. SEEGER:  Hold on before you describe too much.

19             THE WITNESS:  I apologize.  It's the same wire

20   disconnected and some of the insulation stripped.

21             MR. SEEGER:  Your Honor, we'd move this into evidence.

22             THE COURT:  Let it be admitted.

23   BY MR. SEEGER:

24   Q.  All right, Mr. Rutila, can you please explain your observations

25   here?

1    A.  So we stripped the black insulation back from where it was

2    necked and then look down the wire and, although the image doesn't

3    do it justice presented there, there are a series of, almost

4    forming a line, but a series of black spots on the wire underneath

5    the insulation, and it goes, we selected a spot, an inch and

6    seven-eighths down the wire, and confirmed that it's copper sulfide

7    corrosion, and an inch and seven-eighths down the wire from that

8    open end of the insulation.

9    Q.  Now, at this view, would you interpret what you see there as,

10   without magnifying it, just looking at it just as it is there,

11   would you interpret that as being shiny copper?

12   A.  Some of the copper is shiny, and it's shiny except for where

13   those black spots are.

14   Q.  And then, Scott, would you pull up Hernandez 581-0001.

15        And just identify for the court what this is before you

16   describe it.

17   A.  This is a laboratory electron microscope image and EDS plot

18   from that image.

19        MR. SEEGER:  And, your Honor, we really would use this

20   more by way of a demonstrative if that's okay with the court.

21        MR. SANDERS:  Same objection we had before, that it was

22   just recently received.

23        THE COURT:  All right.

24   BY MR. SEEGER:

25   Q.  Would you please describe for the court what this shows?

1    A.  This shows several things.  The lower image shows crystals that

2    are -- that's crystals at one of those black spots.

3    Q.  Now, just to be clear, we're looking at the wire that we just

4    saw in the last photo --

5    A.  That's right.

6    Q.  -- that appeared a little shinier.

7    A.  That's right, that's right.  That's that wire that was mostly

8    shiny with the line of black spots underneath the insulation.

9           This particular crystal is an inch and seven-eighths from

10   the open end of that insulation, we stripped it back, put that

11   black spot under the electron microscope and took this image of the

12   crystals.  And then we have to go back to the upper left of the

13   EDS, a plot of that, which Dr. Scheiner, our chemist at SGH,

14   confirms demonstrates that those are copper sulfide crystals.

15   Q.  And the test you referred to, EDS, can you just tell us what

16   that is and what that does?

17   A.  I rely heavily on Dr. Scheiner, but the essence of it is, the

18   electron microscope has a detector that collects the reflecting

19   particles or beam from the microscope and then analyzes those for

20   elemental component s.  So it's a detector that allows the electron

21   microscope to determine what actual elements are at the beam.

22   Q.  At this point let's move on to the next group of photos we have

23   regarding circuit boards and things like that.

24          THE COURT:  And after we get that in we'll take a break.

25          MR. SEEGER:  Oh, sure.  Do you want me to go through that

1    first, your Honor?

2              THE COURT:  Yes.

3              MR. SEEGER:  Scott, would you pull up CDW 24-0120.

4              THE DEPUTY CLERK:  Are you going to use the Hernandez?

5              MR. SEEGER:  Yeah, I am going to use, I'm going to

6    actually show this first and have him describe it and then we'll do

7    each photo if that's okay.  We have three on one page.

8              THE DEPUTY CLERK:  With the Hernandez numbers?

9              MR. SEEGER:  Yes.  For the record, I'll just identify the

10   photos.  It's top one is Hernandez 285, middle photo is Hernandez

11   286, and the bottom photo is Hernandez 287.

12   BY MR. SEEGER:

13   Q.  And could you just tell us what these are, identify these

14   photos first, please, Mr. Rutila?

15   A.  These are three images at different magnification, if you will,

16   of a thermostat from the Hernandez home.

17             THE COURT:  You offer those and I'll admit them.

18             MR. SEEGER:  Yes, thank you, your Honor.

19   BY MR. SEEGER:

20   Q.  All right.  Now, tell us a little bit more about what these

21   show and why we're concerned about these photos.

22   A.  The top image is really just to set the stage, you don't need

23   to blow it up.  It just shows the opening up of the thermostat to

24   expose the printed circuit board on the inside.  The middle image

25   is the circuit board and that's worth going in a bit.

1          MR. SEEGER:  Let's blow that up a bit.  Thank you, Scott.

2          THE WITNESS:  The circuit board has mounted on it, the

3     circuit board has mounted on it this little switching device, and

4     it's actually got a slide switch there that allows you to position

5     from hot, cold, fan only, and off.  And that's how the homeowner

6     would control the device.

7          The next image is what's underneath that.  The switching

8     device consists of a series of --

9     BY MR. SEEGER:

10    Q.  Just to be clear, you popped off the top of that?

11    A.  We've taken off the plastic cover, we've taken off the actual

12    slide switch and, to reveal what's mounted on the circuit board,

13    and this is the multi-position switch on the circuit board.  These

14    various slots line up or don't line up.  And as you move the switch

15    back and forth, you get different positions for controlling whether

16    the device is on, off, or heat or cool or fan only.

17         And then what we're looking at is the switching device,

18    metal bars that form the switch where the arrow is and the

19    corrosion on those bars.

20    Q.  And then let's go to the next set of photos, Scott, if you

21    could pull the page --

22    A.  Before you go, I'm sorry, I wasn't done, I should have

23    mentioned.  So we did examine that under the electron microscope

24    and determined that that's copper sulfide corrosion on those

25    switch -- on that switch.

1          MR. SEEGER:  And, Scott, can you pull up CDW 24-0121.

2    You don't have that?  Can you throw the ELMO on?  Can we get all

3    three of those in focus a little better?

4          And, your Honor, for the record, and I'll identify these,

5    these are just magnifications of the last page we were looking at.

6    The top photo is Hernandez 288, middle photo is Hernandez 289, and

7    the bottom is Hernandez 290, and we would move these in as well,

8    your Honor.

9          THE COURT:  I'll admit them.

10   MR. SEEGER:

11   Q.  Mr. Rutila, can you please describe what we're looking at at

12   the top?

13   A.  Well, I'll identify them first, these are --

14   Q.  You don't need to identify them, they're already in.

15   A.  Oh, I'm sorry.  The top is just a closer view of that same

16   switch bar, closer view of that same switch bar, and the copper

17   sulfide corrosion on the switch bar.

18   Q.  The switch bar is right here, this piece right here

19   (INDICATING)?

20   A.  That's one of them, there's a whole series from the previous

21   photographs, you would've known, there's about maybe 20 of those

22   intermittent pieces of copper that comprise the actual switching,

23   so that if you move the slide switch you get different contact

24   points.

25   Q.  And if the copper sulfide were not there, what would that

1   surface look like?

2   A.  It would look bright and shiny copper.

3   Q.  And can we go to the next photo, Hernandez 289.  And tell us,

4   what's the significance of this?

5   A.  This is, this is another view of the same device, and -- is it

6   the same device?  Yes, this is another view of the same device, and

7   we're going to look at some closer-up images at the green arrow,

8   excuse me, the blue arrow, where we found corrosion on some

9   components.

10  Q.  Right.  And, Scott, if you could pull up Hernandez 290.  And

11  blow that up.  Thank you.

12          Is that the area that you were talking about?

13  A.  That's correct.  Between Mr. Galler and our staff, they

14  identified those as rectifiers, and this is copper sulfide

15  corrosion on the tin lead, so they take the copper wire and they

16  put some tin on it, and that's copper sulfide corrosion on those

17  wires, really, for those rectifiers.

18  Q.  Okay.  And just a couple more photos to demonstrate this.

19  Scott, can you go to page, which is marked CDW 24-0133.

20          And just identify for the court what we're looking at

21  here.

22  A.  These are image s of a window air conditioner from the

23  Hernandez home.

24          MR. SEEGER:  We move this into evidence, your Honor.

25          THE DEPUTY CLERK:  Does it have Hernandez numbers?

1          MR. SEEGER:  Yes, the top photo is Hernandez 320 and the

2     one below that is Hernandez 321.

3          THE COURT:  Let it be admitted.

4     BY MR. SEEGER:

5     Q.  Please tell us, what's the significance of these photos?

6     A.  The top view is simply to orient us.  This is the side of the

7     air conditioner that would face the homeowner, you can see the

8     control panel up at the black, and then you can see the coils in

9     the shadow where the red arrow is.

10    Q.  Now, Hernandez 321, the next photo is, blows that up a little

11    bit, right?

12    A.  That's correct.  So that is copper sulfide corrosion we've

13    identified on the coils in that.  We are told that this device had

14    stopped working, we found that the coils still had the pressure,

15    they still had the R-22 gas and weren't leaking, but we did

16    determine that's copper sulfide corrosion.  So from that I conclude

17    that that's not the cause of the not working, it was electrical is

18    what I concluded.

19         MR. SEEGER:  And, Scott, if you can pull up the next

20    three photos, which is CDW 24-0134.

21         THE COURT:  Let's get to a breaking point, counsel.

22         MR. SEEGER:  Your Honor, this is just another view of the

23    air conditioner.

24         THE COURT:  What's the number?

25         MR. SEEGER:  Hernandez 322.

1           THE COURT:  Okay.  Let it be admitted.

2           MR. SEEGER:  Scott, go to the next two so we can just get

3     them admitted and we'll take a break.

4           This is Hernandez 323, which is a circuit board in the

5     air conditioner, your Honor.

6           THE COURT:  Let it be admitted.

7           MR. SEEGER:  And the final one is Hernandez 324, which is

8     a blowup of that.  And, your Honor, we can take a break right here.

9           THE COURT:  All right.  Let's take a break.  15 minutes

10    we'll stand in recess.

11           THE MARSHAL:  All rise.

12        (WHEREUPON, A RECESS WAS TAKEN.)

13        (OPEN COURT.)

14           THE COURT:  Be seated, please.  You're still under oath,

15    sir.

16           MR. SEEGER:  May I continue?

17           THE COURT:  Yes.

18    BY MR. SEEGER:

19    Q.  So, Scott, let's go to Hernandez 323.  And we were talking

20    about the air conditioning unit before just to reorient us.  What

21    is this again in this photograph that we're looking at?

22    A.  This is a printed circuit board from that window air

23    conditioning unit.  And I call your attention, among other things,

24    to these switches.  A lot of these devices when you have a panel on

25    the front you'll have an on/off switch, you'll see the one that

```
 1   says power, on/off switch and so on.  That's what they look like
 2   underneath the faceplate.
 3   Q.  And if we can move on, Scott, to Hernandez 324.  Is that a
 4   better example of what you're talking about?
 5   A.  That's right.  We're just looking in closer at that power
 6   switch.
 7   Q.  Now, what are we observing here on the surface of that switch?
 8   A.  That's been disassembled and what we're seeing is silver
 9   sulfide corrosion on the surface of the switch.
10   Q.  And what color should that be?
11   A.  It would be a shinny silver like color.
12           THE COURT:  We talked about copper before, what metal is
13   that?
14           THE WITNESS:  It's silver sulfide so the underlying
15   switch is silver and then the corrosion, the black corrosion is
16   silver sulfide.
17   BY MR. SEEGER:
18   Q.  Mr. Rutila, just to follow-up on that, what is about copper and
19   silver and sulfur gases, can you explain to us what the relation is
20   there?
21   A.  Well, as you'll be hearing from Mr. Galler, those metals are
22   selected because they're highly resistant to corrosion in the every
23   day atmosphere around us, and the sulphur gases unfortunately are
24   highly corrosive to those particular metals.  So metals selected
25   because they don't corrode in the ordinary atmosphere of a home,
```

1    for example, are greatly affected by the sulphur corrosive gases

2    produced by the Chinese drywall.

3    Q.  And let me just pause here also for a second before we go on

4    with the photos, and ask you a question about the role of moisture

5    in corrosion.  Can you tell us what role moisture plays with

6    corrosion?

7    A.  In addition to the sulphur gases or any other corrosive agent

8    you need moisture.

9    Q.  How much moisture are we talking about, a rain drop, less,

10   more?

11   A.  It does not have to be visible.  It is unlikely --

12           THE COURT:  Wait, there's an objection.  I sustain the

13   objection, he is going too far into the area of corrosion, I

14   sustain the objection.

15           MR. SEEGER:  All right.  Let's go to, Scott, Hernandez

16   612.

17   BY MR. MEUNIER:

18   Q.  And if you could identify for us what this is, please,

19   Mr. Rutila.

20   A.  This is a circuit board from a television set, 13 inch

21   television set from the Hernandez home.

22           MR. SEEGER:  And Scott -- your Honor, I'm sorry, we

23   identified that, can I move that into evidence please, it's

24   Hernandez 612.

25           THE COURT:  Let it be admitted.

1          MR. SEEGER:  And I would like to take another photo with

2     this, Scott, pull up 614, please.

3     BY MR. SEEGER:

4     Q.  Just tell us what that is, Mr. Rutila.

5     A.  This is a collection of components that I removed from that

6     circuit board, switches, resisters -- that's a resister

7     (INDICATING) -- this is a similar switch to what we saw before and

8     another device, I actually don't recollect what the device is, that

9     we removed that had corrosion on them (INDICATING).

10    Q.  This circuit board you said earlier is from the television set,

11    right?

12    A.  That's correct.

13    Q.  Do common appliances and devices in the home all have circuit

14    boards like this?

15    A.  Of the dozens and dozens of devices I've looked at in Chinese

16    drywall homes, all of them have a printed circuit board in one way,

17    shape, or form, and that one the television is much larger, some of

18    them are quite small.

19    Q.  And what are your observations with regard to Hernandez 614?

20          THE COURT:  Is that in evidence, counsel?

21          MR. SEEGER:  Judge, I'm sorry.

22          THE COURT:  Let it be admitted into evidence.

23          MR. SEEGER:  Thank you.

24    BY MR. SEEGER:

25    Q.  What about your observations with regard to this photograph?

1   A.   This is a collection of devices that we found copper sulfide or

2   silver sulfide, the switch had silver sulfide, the others all had

3   copper sulfide corrosion on them.

4          MR. SEEGER:  And, Scott, if you pull up Hernandez 615.

5          And, your Honor, this is just a blow up of one of these

6   pieces we're moving into evidence.

7          THE COURT:  Let it be admitted.

8   BY MR. SEEGER:

9   Q.   Tell us specifically what you see here?

10  A.   The photo doesn't do it justice, but this is right by the power

11  source for the television.  This holds a small fuse and the fuse

12  has been removed, and you can see the fuse slipped into this body

13  on either side of these flanges, and you can see the corrosion of

14  that fuse retainer, and even underneath where the fuse contact

15  points are, there is corrosion.

16  Q.   I want to move ahead a little bit, Mr. Rutila.  You have had an

17  opportunity in addition to the electronic devices, you've had an

18  opportunity to look at other items in the house, picture frames,

19  lamps, things like that?

20  A.   I looked in the back of the refrigerator and the copper tubing

21  in the back of the refrigerator were corroded, and I looked at

22  household items around the home as well.

23  Q.   And your observations with regard to those items like the

24  refrigerator and things like that, are they consistent with what

25  we're seeing in these photographs?

```
 1   A.  Yes.  Many of the items show corrosion that are surprising to
 2   me as an investigator.
 3   Q.  Well, let me just back up.
 4             MR. SEEGER:  I don't know if we have a number for this
 5   one, do we?
 6             Your Honor, just to mark for identification what I am
 7   just going to show the witness as a demonstrative, if it's okay, is
 8   Hernandez 651.
 9             THE COURT:  Are you admitting it?  You're not admitting
10   it?  If you admit it let's substitute a photograph.
11             MR. SEEGER:  Okay.  Your Honor, that's what we'll do,
12   we'll substitute a photograph.
13             THE DEPUTY CLERK:  You're admitting it then.  Judge?
14             THE COURT:  Yes, I will admit it in the form of a
15   photograph.
16             MR. SEEGER:  Thank you, your Honor.  May I approach the
17   witness just to show it to him?
18             THE COURT:  Yes.
19             MR. SEEGER:  Your Honor, later when the Hernandezes take
20   the stand we will have them testify that that's their lamp.
21   BY MR. SEEGER:
22   Q.  Mr. Rutila, what are your observations with regard to this
23   lamp?
24   A.  When I first saw the lamp in the living room right near the
25   front door, I looked at it top to bottom, and the first significant
```

1    observation I saw was the clear plastic cord has a silver looking

2    wire underneath the yellow insulation; and it's a braided cord, a

3    braided wire, and the braided wire has a black stripping on it.

4    And that was the significant observation that I did, and I suspect

5    it's copper sulfide corrosion, I haven't taken it apart, but it's

6    very similar to the similar wires that Mr. Krantz has done

7    previously and identified copper sulfide corrosion on the wire.

8    Q.  And you've obviously seen lamp cords like that in your

9    experience; is that fair to say?

10   A.  Yes.

11   Q.  And what color would you expect that to be if that didn't have

12   copper sulfide on it?

13   A.  The yellow I believe is just how the manufacturer chose in

14   terms of the plastic insulation.  But the wire would have a silver

15   looking appearance.

16   Q.  And, Scott, can you pull up Hernandez, it's a photograph,

17   Hernandez 272, please.  And, Mr. Rutila, can you just identify what

18   this is?

19   A.  That is a picture frame which, from the Hernandez home that I

20   saw there.

21          MR. SEEGER:  And, your Honor, we would move this into

22   evidence, the photo Hernandez 272.

23          THE COURT:  Let it be admitted.

24          MR. SEEGER:  Also, your Honor, we have the actual picture

25   frame.  May I hand this to the witness?

```
 1              THE COURT:  Yes.
 2    BY MR. MEUNIER:
 3    Q.  Mr. Rutila, would you please tell us what your observations are
 4    with regard to this picture frame?
 5    A.  Yes.  The frame has, as you can see in the photograph, these
 6    black blotches in many places on it.  I've been told that this is
 7    silver, but what I see is the silver-like material appears to be
 8    coated with something, possibly a plastic.  And then underneath
 9    that coating, whatever the underlying material is, is corroding.  I
10    can't, without taking it apart, demonstrate what the actual
11    mechanism is of silver corrosion or something else.  But that's
12    what I can see from this.  And it's the sort of thing that
13    demonstrates that underneath that plastic coating some
14    deterioration is occurring.
15    Q.  Okay.  And, Mr. Rutila, you have also looked at items at the
16    house and examined them like hair dryers; is that fair?
17    A.  Yes.
18    Q.  Rather than continue to just show photos for the next hour, we
19    can go on forever with millions of photos in this case, tell the
20    court what your observations are with regard to the hair dryer,
21    toasters, or other appliances that you've taken apart and looked
22    at.  Is it consistent with what we've seen in the photographs
23    today?
24    A.  Yes.  We've taken apart dozens of items from the Hernandez
25    home, and some of them you find only one or two parts on a printed
```

1  circuit board with corrosion, some of them you have to take apart a

2  switch before you find the corrosion, some of them the corrosion is

3  very evident as soon as you open up the casing.  But in each

4  instance of the electronic devices, we find corrosion of components

5  in printed circuit boards or on switches, confirmed electron

6  microscope and EDS as copper sulfide or silver sulfide corrosion.

7          Of other devices, non-electronic devices, doorknobs, door

8  strike plates, there is all of these are a brass material and

9  intentionally in the Hernandez home as part of the manufacturing

10  process give it a dark patina so they're actually darkened on

11  purpose and then as part of the architecture of the home.  But even

12  that dark patina has a blotchiness to it that, for example, strike

13  plate from the door we confirmed with electron microscope as copper

14  sulfide corrosion.

15          Same thing with a wine rack, there was a wine rack from

16  the home that had blotchiness to it.  And again, under the electron

17  microscope confirmed that it's being corroded, it's got copper

18  sulfide corrosion on it.

19  Q.  Actually let me just show you one photo I think which

20  demonstrates what you're talking about.  Scott, can you please pull

21  up Hernandez 534.  Could you just identify for the court what this

22  is?

23  A.  That's a doorknob.  And what's important about it -- excuse me,

24  identify it.

25          MR. SEEGER:  Your Honor, we would move 534 into evidence.

1          THE COURT:  Let it be admitted.

2          THE WITNESS:  Pardon me.

3    BY MR. SEEGER:

4    Q.  Go ahead and describe it.

5    A.  This black that you see is an intentional part of the doorknob,

6    it's intentionally black.  This blotchiness though is the

7    corrosion, and I didn't put this particular device under the

8    electron microscope but there's a matching strike plate that goes

9    with it that has the same intentional black patina and confirmed

10   that that is copper sulfide corrosion on the strike plate looks

11   just like that.

12   Q.  Now, Mr. Rutila, let's move on to the questions about the scope

13   of remediation.  Do you have opinions on what would be the

14   appropriate scope of remediation for the Hernandez house?

15   A.  I do.

16   Q.  And could you please tell us what you believe should be done to

17   remedy the problem here?

18   A.  Yes.  As we already know, the Chinese drywall has to go, that's

19   been agreed upon.  In terms of when that's done the cellulose

20   insulation, the blown-in insulation is going to -- needs to go,

21   it's going to fall out anyway, I believe that's been agreed upon.

22          The cabinets, most of the fixture s, the fixtures in the

23   cabinet, for example the sinks, the toilets, those devices all need

24   to be removed in order to take out the drywall.  The trim in the

25   house around the windows and at the base of the walls, around the

1  doors all needs to be removed in order to take out the Chinese

2  drywall.

3  Q.  Let me pause you on that.  Is there any way to leave the trim

4  and these fixtures in place and still remove the drywall?

5  A.  Some of the trim you could probably get a tool and gouge the

6  drywall behind it, but then you've got to remove the nails and get

7  the new drywall back behind it so not practically.  If I had to

8  scratch out a little drywall, I probably could figure out a way

9  behind a piece of trim, but it's not practical.

10  Q.  Do you have an opinion as to if you pull the trim out and the

11  cabinets and the fixtures out, what the likelihood of them being

12  damaged is?

13  A.  It simply depends on the care of the worker.  My father was a

14  finish carpenter and we would take amazing things apart sometimes

15  and in spite of the best care, sometimes you break them and

16  sometimes you don't.  So with extreme care, a lot of these items

17  could be taken apart and salvaged.  You'll break some, inevitably,

18  I can tell you from that experience.

19       And then the question is are you going to have someone

20  with that skill set, literally a cabinetmaker taking apart stuff.

21  And if you do, you'll get most of it in one piece.  But if you're

22  going to use otherwise skilled construction workers, carpenters

23  that would normally install the stuff, you're going to break a lot

24  of it.

25  Q.  With regard to electric wires, copper wires, and the copper

1   pipes, what's your opinion there on the scope of remediation?

2   A.  In terms of the electrical wires, we know that the switches and

3   the receptacles, low voltage devices, smoke alarms and the like

4   have been agreed upon to be removed here.  The copper wire though

5   we know that we have found corrosion under the Romex jacket of the

6   ground concealed in the wall, we know on another house.  We know

7   that on this house we find corrosion underneath the insulation on

8   the hot wire on two devices.

9           What we don't know is how far that corrosion goes.  What

10  we don't know is forgetting about the behavior of that wire today

11  what its future performance is going to be.  And so because that

12  wire was never intended for use in a corrosive atmosphere, the

13  prudent course of action is to remove that wire.

14  Q.  When you say never intend for a corrosive atmosphere, please

15  explain to the court what you're talking about.

16  A.  It's type NM wire, non-metallic jacketed, and it's not intended

17  for use in a corrosive atmosphere.  And the particular issue is the

18  ground wire in an NMC cable has by intent of the Underwriters

19  Laboratory insulation on the ground wire, and that's not there.

20  Q.  So I just want to also be clear, and I'm sorry if I'm beating

21  this horse, but when you say not intend for a corrosive

22  environment, do you mean for any period of time?  Can it be in a

23  corrosive environment and then you remove the corrosive environment

24  and just still leave it there in your opinion?

25          MR. SANDERS:  Objection, this calls for an opinion on

1    corrosion.

2              MR. SEEGER:  I don't think it does, your Honor, I

3    think --

4              THE COURT:  Let's reframe the question.

5    BY MR. SEEGER:

6    Q.  The NM wire, when you say it wasn't intended to be in a

7    corrosive environment --

8              THE COURT:  What do you mean by that?

9              MR. SEEGER:  Yes, what do you mean by that?

10             THE WITNESS:  We know from the building code that NM wire

11   is not intended for use in a corrosive atmosphere.  The particular

12   definitions of corrosive atmosphere are not that well defined.  But

13   what we do know is that, for example, Underwriters Laboratory with

14   the flood, with the flooding as a result of Hurricane Katrina has

15   advised that the safe thing to do is to remove the wire because the

16   use of NM wire in a corrosive atmosphere simply is not understood,

17   it's not been studied, and it is guesswork as far as the future.

18   And it's an increased risk of what's going to happen as a result of

19   that corrosion underneath the jacket and underneath the insulation

20   that creates a risk that is not studied.

21   BY MR. SEEGER:

22   Q.  What about, what are your opinions on scope with regard to the

23   HVAC system?

24   A.  You asked about the plumbing, I didn't answer, all I did was

25   the HVAC.  Now' I'll come back to the plumbing because I forgot.

1  Q.  No, let's do the pluming, I'm sorry.  You're right, thank you

2  for the correction.

3      What are your opinions with regard to the copper pipes

4  and the plumbing?

5  A.  The copper pipes have corrosion, they have pits, the pits are

6  small compared to the thickness of the tubes; but of most

7  importance are the pits that we've seen at brazes, so we know some

8  elements of the copper piping system are compromised and have to be

9  replaced.  And for that reason, the items with respect to future

10 corrosion that we'll be hearing about lead me to the conclusion

11 that it should be removed.

12      The hot water heater is an interesting question at the

13 Hernandezes, it's up in the attic.  Down low in the attic the

14 Chinese drywall is there with insulation and no vapor air barrier

15 there, so at least in the area of the insulation we know it's a

16 corrosive environment.  Up high on the hot water heater we see much

17 less corrosion.

18      The only way I can make a certain determination of the

19 hot water heater is to take it apart and look at it in more detail

20 in the laboratory, disassemble it.  And for the hot water heater

21 under that circumstance, instead of taking it apart and

22 disassembling it, I advise to replace it.

23 Q.  Okay.  Let's move on to the HVAC system, Mr. Rutila.  What are

24 your opinions there?

25 A.  The Hernandez HVAC system, as I understand it, the Knauf has

1    agreed to replace the flexible ductwork.  If you go up in the attic

2    you'll see literally a spider legs like ductwork coming off of the

3    cabinet, those do need to be replaced and that's the right thing to

4    do.

5            The cabinet up in the attic has a lot of new components, I

6    haven't actually been able to figure out if it's a new cabinet or

7    not.  But that goes to the question of when does it get replaced.

8    Those copper tubes were recently installed, the circuit board I

9    don't see corrosion on it, I'd have to take it apart as we've

10   learned to see if it has corrosion on it.  So the circuit board I

11   would replace because of that, same thing with the contractor, you

12   have to take it apart to know whether it's been damaged or not.

13           If you do the repairs right away, probably that unit has

14   a lot -- excuse me, that unit has a lot less risk.  If you wait

15   through the summer, that unit has a lot more risk to it.  So

16   depending on when it is, I advise to replace the unit on the

17   roof -- excuse me, the unit in the attic.

18        Now, with respect to the unit outside, it was very recently

19   replaced --

20   Q.  You're referring to the compressor?

21   A.  The compressor.  Very recently replaced.  Has not gone through

22   a significant heating/cooling season since it's been replaced.  If

23   the assembly, the rest of the assembly gets replaced, probably not

24   much risk in keeping it.  If you go through the summer from what we

25   learned of compressor failures, probably quite a bit of risk of

1    doing it.  So I think that would be instructive in terms of

2    replacing the compressor or not.

3    Q.  Let me ask you about wood flooring.  Nobody is contending that

4    the corrosion affects wood flooring, correct?

5    A.  That's correct.

6    Q.  So why would you take out the wood flooring?

7    A.  The only reason to take it out is the practical management of

8    the risk by the contractor.  The risks that need to be managed by

9    the contractor about damaging it from workers walking on it and

10   obviously you can put protection on it, so it might get damaged by

11   that.

12        The other one is it will get damaged depending on the

13   time of the year and the temperature and humidity cycles.  That

14   would left to the Louisiana atmosphere that is not in a conditioned

15   home is going to cycle seasonally between eight and 14, 12, 14

16   percent moisture content.  And that cycling of the moisture causes

17   it to swell and shrink and will damage -- what it'll do is open up

18   the joints in the wood.

19        So contractor really has two choices:  One is to

20   condition the home during the renovation or to remove it and

21   replace it.  And I expect that the experiences of most contractors,

22   and I believe -- it's what we heard from Beazer is that their

23   judgment is to replace it.  But simply because providing temporary

24   air conditioning in that environment would be pretty difficult

25   Q.  Putting aside Beazer, have you had an opportunity to review the

1  remediation protocols or remediation by any builders who are right

2  now remediating Chinese drywall problems?

3  A.  Beazer, Lennar, and one in Virginia whose name is escaping me.

4  It'll come to me.  I don't remember the Virginia contractor's name.

5  Q.  And what did you notice with regard to Lennar and Beazer, what

6  did you notice they were doing with regard to wood floor?

7  A.  One was endeavoring to keep it and one was replacing it.  And I

8  believe it's Lennar who was endeavoring to replace -- keep it and

9  having mixed success, sometimes succeeding and sometimes not.  And

10 absorbing the risk of that decision.

11 Q.  Now, let me ask you this question.  When you tear out drywall,

12 could you explain what that environment is like with regard to dust

13 and the mess involved in tearing out drywall to the court?

14        MR. SANDERS:  Object to foundation.  With respect to this

15 drywall or any drywall or his experience?

16        MR. SEEGER:  My first question was any drywall, and I can

17 ask about Chinese drywall specifically if you would like.

18 BY MR. SEEGER:

19 Q.  Do you have experience -- what experience do you have with

20 remediations where drywall is torn out?

21 A.  I have extensive remediation experience with drywall.  First

22 off, as well as during investigations it's very common, I need to

23 direct workers to remove drywall during investigations.  But then

24 during remediation it often has to be removed for either practical

25 reasons or because it's damaged.

1    Q.  So you have experience actually viewing it and seeing it and

2    experience with whatever environment created by that tear out?

3    A.  Yes, specifying the work and directing repairs, I have quite a

4    bit of experience in all of that.

5    Q.  Can you describe for us what that environment looks like when

6    you're tearing drywall out in a house, especially when it's a

7    complete gut and all of the drywall comes out?

8    A.  Sure.  Unless you were actually to unscrew or unnail each

9    board, you're going to break out the drywall into pieces.  And even

10   if you tried to, as I tried many times to manage the dust in

11   investigation, try to remove a board by unscrewing it, you still

12   end up cutting the joint compound, the gypsum that's put over

13   joints, or else you end up cutting the sheath with some sort of a

14   knife or saw.  Any of those cutting activities create a fine powder

15   which, if you don't control that powder, just goes everywhere, just

16   becomes air borne and then floats in whatever air currents happen

17   to be in the house.

18          So the best you can do is to have that fine powder, you

19   can suck it up as much as you can -- which we do in

20   investigations -- and you still end up finding that every surface

21   when you're done has a fine powder.  If you do it more practically

22   from a demolition standpoint, you tear it out as fast as you can,

23   get the dirty work over as fast as you can, and you make quite a

24   mess.

25   Q.  And what's your recommendation as to how to control that dust

1    or clean that dust after that type of work has been done where

2    drywall has been torn out?

3    A.  Because you can't eliminate the generation of dust during the

4    removal, you have to clean it up.  And it's a fine dust.  If you

5    just take a shop vac and shop vacuum by basement, you'll still

6    clean out most of it but you'll still leave that fine dust.  And

7    you have to have a method of either using dampness or better

8    vacuums to remove it all.

9           And it should be removed with good filtered vacuum,

10   so-called HEPA filters that remove 99 percent of the dust, and then

11   certain kinds of surfaces will have to either be damped wiped or

12   we've heard the method of washing which I don't think I would do.

13   Q.  Let's pause on that.  Why wouldn't you do the washing because

14   that is a proposal by the other side that you've seen, correct?

15   A.  It is.

16   Q.  Why wouldn't you do that?

17   A.  The way in which Lennar does the washing, they wash and vacuum

18   right there, and that seems to for them to manage the risk fairly

19   well, but the concern with moisture is introducing the moisture is

20   that you run the risk of causing some other problem, particularly

21   moisture problems either causing things to swell or causing things

22   to have amplified mold on them.  And that's the concern we always

23   have about introducing moisture in any clean up is just turning one

24   problem for another one.

25   Q.  Now, you also in one of your protocols call for an air out

1   period.  Can you explain to the court what the air out period is

2   and why you believe that's needed?

3   A.  In any sort of work like this, experience teaches us that you

4   want to recondition the space before putting it back.  I don't have

5   any scientific basis that says that there will be residual odors in

6   the house.  But the air out purpose is to allow, if there is any of

7   that residual odor, to be evacuated.  And second off, to allow the

8   house to be conditioned after the any spillage or anything that

9   happens during the demolition before you put it back together

10  again.

11  Q.  Well, you started your answer by saying experience teaches us.

12  This idea of airing out, this isn't something new that you invented

13  for Chinese drywall; is that fair to say?

14  A.  No, that's correct.  Virtually any new construction today

15  includes periods of air out between either demolition or different

16  component installation phases.  It's just that we learned that if

17  you build them too fast or work too fast that these, the lack of an

18  air-out period causes unanticipated problems.

19  Q.  I just have two, three more questions.  What about appliances,

20  what would you do with those?

21  A.  The typical household appliances -- refrigerator, range, oven,

22  microwave -- they all have printed circuit boards in them, some of

23  them have could copper tubing, those -- they're all going to be

24  compromised by it and you can expect premature problems with them.

25  So it's prudent to replace them so you're back to square 1.

1    Otherwise you're having a refrigerator in a brand new house go in a

2    couple of years and that's what I would expect.

3    Q.  Do you have an opinion as to whether homeowners that are having

4    Chinese drywall and the problems remediated should have an

5    environmental consultant sign off on the work once it's done?

6    A.  I believe they should for the simple reason that somebody has

7    to be responsible for the work throughout and much of the work can

8    be done under the responsibility of a general contractor as I've

9    outlined it.  Anything that stays behind though is of particular

10   interest from a responsibility standpoint.

11          So obviously the house stays behind, the shell of the

12   house stays behind.  So the question is who is qualified to

13   exercise responsibility and tell the Hernandez that this house is,

14   in fact, ready to be put back together again.  And that really

15   isn't something that the general contractor does, it's a fox

16   watching the hen house, if you will; it's something that an

17   environmental consultant is the right skill set for making that

18   determination.

19   Q.  Mr. Rutila, the opinions that you've expressed to this court

20   today, do you hold those a reasonable degree of certainty as an

21   expert in the fields that you've been qualified?

22   A.  I do.

23          MR. HERMAN:  Okay.  Your Honor, I'll save for redirect.

24          THE COURT:  Okay.  Cross.  I'll go to about 12:30 today.

25                      CROSS-EXAMINATION

1   BY MR. SANDERS:

2   Q.   Good morning, Mr. Rutila.

3   A.   Good morning.

4   Q.   I think as you said, your company sort of brings a

5   multi-disciplinary approach to the whole remediation effort,

6   correct?

7   A.   Both to the remediation as well as the investigation.

8   Q.   And you recognize, I guess as soon as you became involved that

9   that was something you had to do in this case?

10  A.   Yes.

11  Q.   And so you included other people who have experience and

12  scientific background in chemistry and metallurgy and material

13  science?

14  A.   Correct.

15  Q.   And I think from looking at your reports and listening to you

16  before, you've had as many as a dozen other people working on this

17  matter from your company?

18  A.   There's more than a dozen, yes.

19  Q.   And you yourself, you're not a chemical engineer?

20  A.   I am not.

21  Q.   And you're not a material scientist?

22  A.   I am an engineer and I use material science every day, but I do

23  not call myself a material scientist.

24  Q.   And you don't have a degree in any material science?

25  A.   Any civil engineering degree includes work in material science

1   but is not a degree in material science.

2   Q.  And you're also not a metallurgist?

3   A.  I am not.

4   Q.  And prior to this, you don't recall any particular experience

5   with corrosion to electrical wiring or components?

6   A.  As part of my work, no.

7   Q.  When you prepared your scope of remediation for the Hernandez

8   house and you submitted that on February 12th, you hadn't visited

9   the Hernandez house yet, had you?

10  A.  That's correct, I had not.

11  Q.  And there were no real differences between the scope you

12  prepared for other houses and the Hernandez house, is there?

13  A.  That's correct.

14  Q.  You did actually inspect the house on February 23rd at the end

15  of February?

16  A.  23rd of February, yes, sir.

17  Q.  And after you visited the house, were there any scope changes

18  or did you make any changes to your repair plan?

19  A.  No, I did not.

20  Q.  You also have indicated that you've been able to talk to

21  Lennar, for example, about their approach to remediation?

22  A.  That's correct.

23  Q.  And the reason that they were doing what they were doing with

24  their plan is because of business construction decision, correct?

25          MR. SEEGER:  Your Honor, I just object, he wouldn't know

1   what's in the head of the business people.

2              THE COURT:  Let's reframe that, his understanding.

3   BY MR. SANDERS:

4   Q.   It's your understanding that the reason they were doing what

5   they were doing is because of business construction decision?

6   A.   That's my interpretation of what they're doing, they never told

7   me but that's how I view it.

8   Q.   And I think as you've indicated for all practical purposes, the

9   Lennar and Beazer scope of remedy and repair is the same as the one

10  you're proposing?

11  A.   In most ways.  There are subtle differences between those two,

12  but in most ways they're the same.

13  Q.   And I think you were talking about risks just a moment ago and

14  the fact that an individual job might depend on a contractor,

15  general contractor's comfort with risk when he is proposing the

16  scope of repair?

17  A.   That's correct.  And comfort in how he's going to pay for that

18  risk.

19  Q.   So there's certain choices and certain things in a home that

20  will make a scope of repair different, for example, small things

21  like fastens on the cabinet that put together?

22  A.   If I understand the question, how the cabinet was initially

23  fastened would affect your evaluation or any worker's evaluation of

24  how to take it apart and the risk of taking it apart, if I

25  understand you correctly.

1    Q.  Yes.  And you mentioned the wood floors as another example

2    where a contract is going to have to assess the actual house, look

3    at the house and make a determination as to whether he wants to

4    preserve that floor or take it out.

5    A.  That's correct.  And how he assesses the risk in terms of who

6    is going to pay if he gets it wrong and so on.

7    Q.  So remediation, the choice of repair is actually at some level

8    going to be a local thing that's decide by a contractor who intends

9    to do the work in a particular house?

10   A.  Yes.  Even if I were in charge of hiring a contractor, I would

11   expect any contractor to come to me with ideas, that's what

12   contractors do, and any contractor with ideas will be different

13   than the next.  They all will look at it slightly differently.

14   Q.  And I want to talk about some of the things that you observed

15   while you were at the house.  You did go up into the attic and look

16   at equipment, the water heater, and other things in the attic?

17   A.  I did.  I did more than that, but, yes, I did those thing.

18   Q.  Could you put up Exhibit DX-235.  This is a picture actually

19   from you, if you recognize it, it's picture No. 3077 on reliance

20   materials that you gave us.  Do you recognize that or do I have to

21   show you the book and binder with those in there?

22   A.  I know I took a photograph just like it, so if you represent to

23   me it's that photograph I will accept that.

24          MR. SANDERS:  Okay.  I'd like to move DX-235 in.

25          THE COURT:  Let it be admitted.

1   BY MR. SANDERS:

2   Q.   You were describing the water heater, for example, which is up

3   in the attic, correct?

4   A.   That's correct.

5   Q.   And I think you indicated that, and these are pictures of some

6   of the pipes that for most purposes look fairly shinny and

7   uncorrode, correct?

8   A.   That's right.   They, like some of the other things we looked

9   at, the reflection of the flash is inaccurate that it's a shiny

10   material.   There are some black spots on it, but for the most part

11   it is shinny copper or slightly brown copper that we would expect.

12   Q.   And to be fair, I think some of those upper pieces were

13   actually salvaged by people during this whole thing, but the rest

14   of the copper, even the piping, the horizontal piping also looks

15   fairly unaffected?

16   A.   That's correct.

17   Q.   And this is an environment where from what you understand the

18   floor of the ceiling or the floor of the attic or the ceiling from

19   the room below is all KPT board, correct?

20   A.   That's right.   The assembly that you might stand on consists

21   of, from the bottom Chinese drywall, the wood framing that's filled

22   in with cellulose insulation and wires and the like lays under that

23   cellulose insulation.   And then some places there's a panelling

24   that you can walk on, other places you see the insulation and this

25   sits up on top of that.

1   Q.  And in another picture, if we could go to Defense Exhibit 232.

2   This also is picture No. 387 from your camera that you took.  Would

3   you agree with that representation?

4   A.  That's correct.  It's not my hand, somebody's helping me hold

5   the jacket while I take the photograph.

6         MR. SANDERS:  And I would like to move this into

7   evidence.

8         THE COURT:  Let it be admitted.

9   BY MR. SANDERS:

10  Q.  This is the line set, correct, that goes from the outside

11  compressor to the HVAC unit?

12  A.  That's correct.  The set means, if you will, the pair, the

13  small tube is up above and you can just barely see it, and then the

14  larger tube is wrapped in the insulation there, that's the set

15  (INDICATING).

16  Q.  And this is the -- the smaller tube is the one -- which way

17  does that one go, back or to the HVAC unit?

18  A.  That has compressed gas, it's going to the air handler.

19  Q.  And the one coming back is the wider tube which at times has

20  colder gas or colder liquid in it?

21  A.  That's correct.

22  Q.  And I guess here you're opening or someone for you is opening

23  up the installation there?

24  A.  That's right.  Someone else had cut the insulation, presumably

25  to make a similar examination, and I asked somebody to hold that

1   open while I took a picture.

2   Q.  And the line set, at least here in the attic, looks very shinny

3   and much like regular copper?

4   A.  For the most part.  It does have, as I said earlier on some of

5   the wires, it does have some black spots on it; but it's for the

6   most part a bronze color which I would expect of a line set tube.

7   Q.  If we could go to Defense Exhibit 234.  And this is a

8   picture -- it may actually be sideways --

9   A.  It is.

10  Q.  -- but I think for our purposes it's probably okay.  This is

11  picture No. 461 from your camera, and it's a picture of a circuit

12  breaker in the Hernandez house, correct?

13  A.  It's upside down right now but that's true.

14          MR. SANDERS:  I would like to move this into evidence,

15  your Honor.

16          THE COURT:  Let it be admitted.

17  BY MR. SANDERS:

18  Q.  And again, the copper wiring in this circuit breaker on the

19  side there looks fairly untarnished, correct?

20  A.  That's correct.  It's, again, you can see the reflection from

21  my camera flash, it was energized so I didn't get close enough to

22  see if there were spots or not to be framed.  But from where I

23  stood, it looked uncorroded.

24  Q.  And this circuit breaker box is actually inside the house in

25  the laundry room, right?

1   A.  It is.  This is in the laundry room, which is off to the right

2   as you enter.

3   Q.  Looking at some of the pictures you showed us earlier, Connie,

4   if you could find Plaintiff's Exhibit 276.  And this was, or is

5   from the Hernandez house, a close-up of a typical connection

6   between a wire, ground wire it looks like in this case, and a

7   receptacle or a switch, correct?

8   A.  Yeah.  Careful with the word typical.  It is from the Hernandez

9   house, it is a connection between a copper wire and a device, I

10  don't remember what 02 is, if it was a switch, I think it was.

11          The typical part you have to be more careful about

12  because the attachment of the wire under the screw varies broadly

13  and this is certainly within that variation.

14  Q.  And when you were pointing out corrosion and other products on

15  this screw assembly, it's your understanding that KPT as part of

16  its remedy is going to provide new receptacles and switches,

17  correct?

18  A.  That's correct.

19  Q.  And what's the white powder, is that gypsum powder or paint on

20  the ground wires up there, that's not a corrosion product, is it

21  (INDICATING)?

22  A.  If you're referring to this white and that white, I don't

23  remember whether it's paint or joint compound, but it's a foreign

24  material that is on the wire, that is not a corrosion.

25  Q.  It's not copper sulfide at least?

1    A.  It is not copper sulfide.

2    Q.  And in a wire in a house, you also might expect to find or at

3    least see that there's copper oxide on the wires as well, correct?

4    A.  That's correct.  We can be sure there's copper oxide on that

5    wire in these bronze areas (INDICATING).

6    Q.  And copper oxide is also a corrosion or type of corrosion?

7    A.  It is.

8    Q.  If we could go to Hernandez or Plaintiff 609.  You had looked

9    at this and I guess you pointed out in this sample blotches of

10   copper oxide as well as the black sort of copper sulfide layers?

11   A.  I did.  The green is more than just copper oxide but there's

12   copper oxide in there, that's right.

13   Q.  Did you do anything to determine whether or not or what the

14   thickness layers were of either of those compounds, copper oxide

15   versus copper sulfide?

16   A.  Not in this sample, no.

17   Q.  And it's my understanding that you're not doing any, you're not

18   providing any opinions about future corrosion or corrosion of

19   future risk, right?

20   A.  I am and I have provided an opinion about future risks, but not

21   opinion about the future corrosion, for example, of this device.

22   Q.  You haven't done any sampling or any testing of electrical

23   wiring or devices with respect to resistivity, for example?

24   A.  No, we have not.

25   Q.  And have you done anything to measure temperature rises

1    pursuant to UL or other standard that might determine whether the

2    device actually operating still with the corrosion on it?

3    A.  No, we have not.

4    Q.  You're aware that Sandia Labs did do resistivity testing on a

5    handful of devices?

6    A.  I am aware of their tests.

7    Q.  And that Sandia concluded that those devices they assessed were

8    operating normally?

9    A.  That's correct.  They did, by the way, though, include in the

10   report that further testing was needed of the portions of devices

11   that they had not tested yet.

12   Q.  I understand they have ongoing testing.  But with the respect

13   to the resistivity tests that they did, those devices were working

14   normally?

15   A.  That's correct.

16   Q.  And if you could go to Hernandez 577.  How many samples have

17   you seen in this investigation with the insulation sort of pulled

18   away like that?

19   A.  I haven't counted, but in two boxes that we call 45 and 46 we

20   saw several of them.  There's a wire nut in another sample 45 where

21   black wires were brought together and they also had that separation

22   like that.  I've seen it on some and not on others.

23   Q.  And those two boxes that you're just describing, those were in

24   the Hernandez house and were collected as part of the investigation

25   of the house?

1    A.  That's correct.

2    Q.  Other than in these samples, I believe you've said you looked

3    at hundreds of wires, and you and others have looked at insulation

4    covering of hot and neutral wires or live and neutral wires in

5    electrical distribution systems, correct?

6    A.  That's correct.

7    Q.  And normally where there's a tight connection, there's not this

8    gap here, when you peel that open there's bare copper there without

9    corrosion, correct?

10   A.  Where we've done that we haven't seen the corrosion that we

11   saw, for example, in this one.  We've done it on a handful.

12   Q.  And if we go to Hernandez 580.  When you looked at this and

13   that stripe that's coming down, is that consistent with air

14   infiltrating from the edge of that opening there?

15   A.  We can't be sure.  It's not -- I don't consider it entirely

16   coincidental that air coming down either caused or contributed to

17   it.  We're just not sure.

18   Q.  But all of the other samples that you've seen where there's a

19   tight insulator you haven't seen corrosion when you've lifted that

20   up and looked at it?

21   A.  That's correct in terms of the insulation under hot and neutral

22   wires, that second layer of insulation.  I am not referring to the

23   corrosion of ground underneath the outer jacket.

24   Q.  You discussed in reference several electrical devices and

25   appliances that you assessed in your investigation?

1    A.  That's correct.

2    Q.  And you looked at those devices and I think you said you

3    determined that there was copper sulfide on some components of

4    those devices?

5    A.  Or silver sulfide as the case may be, that's correct.

6    Q.  But for those devices that you looked at, you were not actually

7    able to identify a link between the copper sulfide and silver

8    sulfide and the corrosion product and the failure?

9    A.  Not certainly, for example, on the hair dryer there were three

10   components with corrosion, all of which might have.  But we did not

11   reverse engineer the process to figure out what was going on.

12   Q.  And that would be the same for the other devices that you

13   talked about today?

14   A.  That's correct.

15   Q.  Are you aware of the home builders protocol with respect to the

16   replacement of property and what they actually replace?

17   A.  Are you referring to, for example, Beazer and Lennar?

18   Q.  I am.

19   A.  I am aware.

20   Q.  And I think they replace -- they don't replace things that

21   aren't normal for them to replace other than when they build or

22   construct the buildings, correct?

23   A.  That's correct.  What Beazer testified as to the elements they

24   are including in their replacement protocol were those that they

25   provided, refrigerator, range, microwave oven, oven.  I frankly

1    don't remember if there were others.

2    Q.  But it's not other household goods or other electrical devices

3    or other equipment in the house?

4    A.  That's correct.  They've not described replacing those items as

5    part of the protocol.

6    Q.  And you don't -- well, strike that.

7          I think as you've indicated with respect to the wires and

8    plumbings and the other copper or silver copper devices in walls

9    that might be left there by KPT's protocol, at this time you just

10   don't know, you don't have an opinion about when those things will

11   fail?

12   A.  That's correct.  It's unchartered water, really.

13   Q.  So you can't provide an opinion as to the ultimate time or some

14   kind of a definitive risk as to when those will fail?

15   A.  No.  We know that both copper pipes and electrical wires are

16   commonly used 50 years.  We don't know what this will do to that

17   long-term performance.

18   Q.  And you also I think discussed the cleaning protocol or the

19   cleaning method that you recommend and the hiring of an

20   environmental consultant, for example, correct?

21   A.  That's correct.

22   Q.  But at this time you don't have a specific standard or you're

23   not aware of a specific standard that environmental consultant

24   would apply in order to determine when everything is clean?

25   A.  Well, that's correct.  There is no standard for cleaning

1   Chinese drywall homes.  And my experience has been when we come in

2   to such unchartered water, we apply a standard as the most common

3   one is the EPA New York City mold remediation standard.  But the

4   environmental consultant can determine for him or herself what

5   would be the appropriate standard.

6   Q.  So you're not proposing, you don't have in mind a particular

7   standard to apply to the Hernandez's house after it's remediated

8   and cleaned to say, okay.  This house is clean now?

9   A.  I have in my mind a great deal of experience, and I would be

10  surprised if, again I were in charge of the remediation, of a

11  protocol that varied substantially from the one I described.  But I

12  certainly would be very interested and informed by an opinion of

13  the appropriately skilled environmental consultant.

14  Q.  And what most companies do, except for Beazer, is they go in

15  with a HEPA vacuum or some sort of vacuum and they vacuum up all of

16  the dust, correct?

17  A.  Well, that would be the cleaning protocol that they would

18  require.  The environmental consultant doesn't do the cleaning,

19  just determines that it's been done sufficiently.

20  Q.  I'm sorry, let me back up.  Actually talking about what Lennar

21  does right now or what I think you proposed in your proposal,

22  that's to use a HEPA vacuum or some kind of vacuum, and yours is a

23  HEPA vacuum, and actually try to get or get all of the dust that

24  you can, correct?

25  A.  Get the dust that can be collected by such a device, exactly.

1    Q.  And then use some sort of wet or damp wiping method as well?

2    A.  The damp wiping on certain surfaces would be a good idea.  On

3    other surfaces it would not be useful, certain rough sources

4    certainly not particularly useful.

5    Q.  But you're not proposing anything like the wet scrubbing

6    method, for example, Beazer has talked about?

7    A.  I am intrigued by it and I can see its value, I am just

8    concerned about the greater risk of spillage.  So at this point in

9    time I wouldn't do it.

10   Q.  And if you were to hire or look for an environmental consultant

11   who could sort of sign off on this job, what qualifications would

12   they have?

13   A.  I would look for experience in doing various remediations,

14   common remediations that I would be interested in would be asbestos

15   mold remediation because of the tremendous experience that the

16   construction industry has developed, contractors know how to do

17   those kind of protocols.  And so you're not asking somebody to do

18   something they haven't done before.

19           And I would look for experience both in designing

20   protocols for that type of work and then providing oversight and

21   clearance, that is making the decision that, yes, the space is

22   clean to my protocol, the consultant's protocol and ready for

23   reconstruction

24   Q.  And you also indicated that the wire because it's just an NM

25   cable shouldn't be in the houses.

1   A.  It shouldn't be left in the houses, that's correct.  What I

2   said was that the NM cable has been exposed to a corrosive

3   environment which it was never intended to be exposed to and should

4   not be left there.

5   Q.  And the building codes and the electrical code that you cite to

6   say that the NM cable should not be, is it your testimony that they

7   should not be in a corrosive environment?

8   A.  That's correct.

9   Q.  And obviously after the drywall is removed it's no longer a

10  corrosive environment?

11  A.  That's correct.

12  Q.  Your recommendation to remove wires and plumbing, and I know

13  you're not giving this opinion, but is that based on the risks that

14  the corrosion could continue even when the source is removed?

15  A.  That's correct.  Because of the combination of what is there

16  and future moisture sources which we know are there that it will

17  continue.

18  Q.  And to confirm a couple more things that you're not taking out.

19  You don't have any technical need or you don't see any need to take

20  out the PVC or polyethylene piping, for example?

21  A.  In terms of PVC typically sanitary waste piping, no, from a

22  technical standpoint.  In terms of polyethylene piping, in

23  Hernandez it might be limited to the final connection to certain

24  devices.

25          So once you're taking out the cabinet and the sink and

1    the other materials, you're going to take off that as well.  But if

2    there were -- and I haven't seen behind the walls -- polyethylene

3    distribution piping, no reason to believe from a technical

4    standpoint that that has to be removed, of course all of the copper

5    connections within it are a problem.

6    Q.  And by technical what I am asking is, there's no evidence that

7    there's cross contamination or any kind of functional problem with

8    the piping itself?

9    A.  That's correct.

10                MR. SANDERS:  We're good for now.  Thanks.

11                THE COURT:  Any redirect?

12                          REDIRECT EXAMINATION

13   BY MR. SEEGER:

14   Q.  Let me ask you these questions and try to eliminate some of

15   this.  You were asked questions about copper oxide, correct, sir?

16   A.  Yes.

17   Q.  Is the problem in homes that you've looked at with Chinese

18   drywall, is that problem with copper oxide?

19   A.  No.  The copper oxide is ordinary, we see it all the time.

20   Q.  So when you testified earlier about your experience in opening

21   up walls and looking at corrosion, is copper oxide something you

22   would expect to see in any home on copper?

23   A.  That's correct.

24   Q.  And the problem with Chinese drywall is copper sulfide; is that

25   right?

1   A.  In terms of corrosion of copper, that's the corrosion product

2   that is of interest.

3   Q.  You were asked questions about whether you believe or when you

4   believe the wiring or the copper pipes could fail in the house, do

5   you recall a couple of questions asked by Mr. Sanders?

6   A.  I do.

7   Q.  You testified earlier on direct about something called UL

8   standards.  What is UL?

9   A.  It's Underwriters Laboratory.

10  Q.  And do you recall telling the judge about what UL had

11  recommended in homes that were affected by water after Katrina?

12  A.  Yes.  UL published a recommendation in terms of dealing with

13  homes that have suffered flooding, specifically in response to

14  Katrina, but not only in response to Katrina.  And their

15  recommendation is that since you don't know what's in the water,

16  you don't know what corrosive materials are in the water, and they

17  don't know what the damage due to those materials will do to the NM

18  cable, they say the safest thing to do is replace it.

19  Q.  And specific cases or all cases?

20  A.  In all cases of the flooding.

21  Q.  You were also asked some questions about a photograph that we

22  looked at earlier.  Just to save time, Scott, could you turn on the

23  ELMO.

24         For the record I am looking at Hernandez 577.  And this

25  is the exact wire that you peeled the jacket back on that you

1   looked at with Mr. Sanders, right?

2   A.  That's correct.

3   Q.  So Hernandez 580 that we're looking at right now, that's the

4   same wire that he asked you questions about, right?

5   A.  That's correct.

6   Q.  Mr. Rutila, in your opinion do you care whether the corrosion

7   on that wire comes in through the open jacket or any other way as

8   an expert in this field?

9   A.  I am interested in it, but the critical thing is that it's

10  corroded, that's what's important to me.

11  Q.  In your opinion based on the protocol proposed by Knauf which

12  would have been clipping the ground wires and putting in just

13  receptacles and switches, would that corrosion have been left

14  behind?

15  A.  Yes, it would.

16  Q.  You were asked questions about Sandia analysis that was done on

17  homes with Chinese drywall, right?

18  A.  Yes.

19  Q.  Do you know how many receptacles they looked at in that study?

20  A.  I don't remember the precise number, it was a handful, five or

21  six, I don't remember the precise -- might have been eight, I think

22  eight sticks in my mind as I'm sitting here.

23  Q.  And how many receptacles in the course of the work that you've

24  done with Chinese drywall, in this litigation and elsewhere, how

25  many receptacles, outlets, switches have you looked at?

1   A.  Hundreds.

2             MR. SEEGER:  Your Honor, that's all I have.

3             THE COURT:  All right.  You're excused.  Thank you, sir.

4   Let's see if we can start another witness until 12:30.

5             MR. MEUNIER:  Yes, your Honor, the plaintiffs call Ray

6   Phillips.

7             THE COURT:  Mr. Phillips.

8             THE DEPUTY CLERK:  Mr. Phillip, please step into the

9   witness box.  Would you raise your right hand.

10     (WHEREUPON, RAY PHILLIPS, WAS SWORN IN AND TESTIFIED AS

11     FOLLOWS:)

12             THE DEPUTY CLERK:  Please be seated.  And would you state

13  your name for the record.

14             THE WITNESS:  My name is Ray Phillips.

15                       DIRECT EXAMINATION

16  BY MR. MEUNIER:

17  Q.  Good morning, Mr. Phillips, what is your address, sir?

18  A.  1537 Eagle Nest Circle, Winter Springs, Florida.

19  Q.  What is your occupation?

20  A.  I work for a national home builder, I am vice-president of

21  operations for the Florida division.

22  Q.  Which home builder is that?

23  A.  Beazer Homes.

24  Q.  What are your duties and responsibilities as the vice-president

25  for the Florida operations of Beazer?

 1   A.  It's all within the operational side, predominantly I am in

 2   charge of all construction, all of warranty, and the customer

 3   service and legal matters with both of those.

 4   Q.  Now, you have agreed to appear here voluntarily as a witness?

 5   A.  That's right.

 6   Q.  But in fairness, you have been willing to meet with counsel for

 7   both Knauf and plaintiffs prior to your testimony?

 8   A.  That's correct.

 9   Q.  How many years experience do you have in the construction

10   business?

11   A.  In the industry I've got 32 years, in national home building I

12   have 22 years.

13   Q.  How much of your current work has been residential as opposed

14   to other types of construction?

15   A.  Of the current work?  It's 100 percent.

16   Q.  100 percent.  And how much experience before Beazer did you

17   have with residential construction?

18   A.  The majority of the previous ten years, I don't know, six,

19   seven years of ten.  I did grocery stores prior.

20   Q.  And in your work with residential construction, Mr. Phillips,

21   you have experience estimating the cost and scope of repair work?

22   A.  Yes.

23   Q.  How many states does Beazer operate in?

24   A.  I don't know the number, it's in the teens.  I think it's

25   around 17, 18 states.

1    Q.  And drywall is one of the materials that Beazer uses in its

2    construction?

3    A.  In all houses.

4    Q.  Tell the court typically how Beazer obtains and then installs

5    drywall for residential projects.

6    A.  May be exclusive, but for the most part we would contract

7    through a subcontractor, a vendor who would turn as a turnkey

8    operation, meaning he purchases his own drywall, has it delivered

9    to the job and that's how we would contract.

10   Q.  How did Beazer first become aware of concerns regarding Chinese

11   drywall in the homes that it had constructed?

12   A.  First was, my recall, was the beginning of the media, a little

13   over a year ago, maybe about this time, February, March '09, it

14   started hitting the TV in our Fort Myers area, so that was the

15   beginning.

16   Q.  And in which Beazer developments or communities was Chinese

17   manufactured drywall found to have existed?

18   A.  Several states have been -- we've had inquiries in several

19   states, but thus far it's been out of two, I don't know, 300 or so

20   calls that we received, it's all been limited to two communities in

21   Florida.  One of which is in Fort Myers, the other is in Tampa.

22   Q.  What is the name of the Fort Myers community?

23   A.  That's Magnolia Lakes.

24   Q.  And the name of the Tampa community?

25   A.  That is Hampton Lakes.

1    Q.  Can you just generally describe the types of communities these

2    are where homes have been built by Beazer?

3    A.  The latter, Tampa, Hampton Lakes is a rather high-end town home

4    complex, it's a string of town home, seven, eight and ten unit

5    configurations put together, two and three story, mostly two story.

6    Of the three story, the first floor is zoned as a commercial where

7    they can live in the top two floors and get a commercial space they

8    can do on the first floor.

9           And Fort Myers, Magnolia, that is single family homes,

10   both one and two story; and probably I am going to guess 1,900 to

11   the mid high, 3,000 square foot size.

12   Q.  Where were these homes built, what period of time?

13   A.  '05, '06.

14   Q.  And has Beazer undertaken an investigation to determine the

15   extent to which the homes in these two communities are influenced

16   or affected by Chinese drywall?

17   A.  Yes.

18   Q.  What has Beazer done?

19   A.  For discovery?

20   Q.  In order to investigate the extent of the drywall problem.

21   A.  Well, I say the beginning we were, we benefited from the

22   education and insight from Lennar homes who had already discovered

23   I think in their homes and was somewhat free to share as we were

24   all exploring and trying to understand things, but they were kind

25   of leaders of the pack in their education, and as well helped us

1    get in contact with the professional ENVIRON for the scientific

2    side.  So that's how we began.

3    Q.  How many homes in the Fort Myers community of Magnolia Lakes

4    have now been confirmed, how many Beazer Homes have been confirmed

5    to have Chinese manufactured drywall?

6    A.  We're now at 21.

7    Q.  And that is out of a total of how many homes in that community?

8    A.  In Magnolia, I think it's 116.

9    Q.  So 21 to date have been confirmed to have Chinese drywall?

10   A.  That's correct.

11   Q.  Your investigation is continuing?

12   A.  Yeah.  I think we've been in about 70 or so.

13   Q.  And in the Tampa community of Hampton Lakes, how many Beazer

14   Homes have been confirmed to have Chinese manufactured drywall?

15   A.  There's an exception there, but we're at 23 out of 108.  Four

16   of those 23 are a studio or granny flat on top of the garage that

17   it's only that space above the garage, and these garages are

18   detached from the main building, the main part of the building is

19   not been positive.

20   Q.  So to date that means 44 homes have been affected by Chinese

21   drywall that were built by Beazer?

22   A.  That's correct.

23   Q.  And what is Beazer's plan now to conclude or to complete its

24   investigation of the extent of your Chinese drywall?  What method

25   will you use to finish your investigation?

1   A.  Well, the beginning, if I am understanding the question, help

2   me if I am not answering right, the beginning we got a lot of calls

3   through the national call center, which has gotten less and less

4   through this past year.  And so we began soliciting those two

5   communities once we discovered our full exposure had been in those

6   two communities, we started sending out letters to the other buyers

7   trying to get access to go in and inspect their home.  Is that what

8   you're asking?

9   Q.  Yes.  So using a call center and also some letters of

10  solicitation?

11  A.  Correct.

12  Q.  Now, have you been able to identify the manufacturers of the

13  Chinese drywall that have been found in these 44 homes to date?

14  A.  Yes.  We do that as we start taking the board down, Knauf,

15  Taishan, and I think another one we found some is Taihe or

16  something close to that.

17  Q.  Knauf, Taishan and --

18  A.  Taihe.

19  Q.  Taihe?

20  A.  Yeah.

21  Q.  When you determine that it is a particular manufacturer

22  involved, does your protocol call for you to contact that

23  manufacturer?

24  A.  We give notice to them, to the distributor and to the installer

25  that we contracted with.

```
 1    Q.   In the Beazer Homes where you have found Knauf Chinese drywall,

 2    has Knauf been contacted?

 3               MR. HAYDEN:  Objection, relevance.

 4               THE COURT:  Where are we going with the question?

 5               MR. MEUNIER:  Just background information, Judge.  The

 6    next question might be more pertinent, your Honor.

 7    BY MR. MEUNIER:

 8    Q.   Has Knauf inspected any of the Beazer Homes?

 9               MR. HAYDEN:  Objection, relevance.

10               THE COURT:  I'll overrule it.  To your knowledge.

11    BY MR. MEUNIER:

12    Q.   Has Knauf inspected any of the Beazer Homes that you

13    identified?

14    A.   I didn't think so.  To be honest, I don't know the answer.

15    Q.   Now, does Beazer have new construction warranty agreements with

16    the owners of these homes in Fort Myers and Tampa?

17    A.   Yes.

18    Q.   And has Beazer undertaken repairs in these homes, these Chinese

19    drywall homes pursuant to these agreements?

20    A.   Correct.

21    Q.   At this time, Mr. Phillips, how many remediation jobs have

22    actually been completed by Beazer?

23    A.   None have been completed.

24    Q.   How many are underway at this point?

25    A.   It's in the low 20s, I don't know the current number.  I am
```

1   talking for both cities, it's probably 23, 24 are underway.  We've

2   got two that will be completed in the next two, maybe three weeks.

3   And then there's six -- about another four, in about four more

4   weeks there is an additional six that will be completed.  So we are

5   coming up on our first completed.  And of those 44 total, it's in

6   the low 30s, 31, 32, that we have permission to follow through and

7   put their house back.

8   Q.  Can you tell me, can you tell the court how many cases are

9   there in which the removal of the drywall has been accomplished?

10  A.  It's going to be close to that 20 number.  I don't know the

11  number.

12  Q.  Now in your capacity as the vice-president for Florida

13  operations of Beazer, were you given authority to determine the

14  scope and cost of appropriate repairs for these Chinese drywall

15  homes?

16  A.  I was.

17  Q.  And in making this determination for the company, tell the

18  court what your primary objectives were.

19  A.  The main one was to honor our warranty and to get our customer,

20  our homeowner whole.  Second, but a close second, was to do it at

21  the least expense possible, which what can we say.

22  Q.  When you say make the owner whole, what do you mean by that?

23  A.  Put the house back to the way they thought they were buying it

24  from us as.

25  Q.  Before it had Chinese drywall?

1   A.  Correct.

2   Q.  And when you say do it in the most cost efficient way, what do

3   you mean by that?

4   A.  That means trying to make decisions on what's necessary to

5   discard and what can be salvaged.

6   Q.  Would you state for the court what role, if any, public

7   relations or customer relations played in your decision making as

8   to scope and cost of repair?

9   A.  That would be unrelated.

10  Q.  And why is that?

11  A.  It's just that's not a point that came into play to figure out

12  what to do, especially after determining how much and how expensive

13  it is to make them whole, I don't want to sound bad but I don't

14  know that we would spend that kind of money for customer relation.

15  Q.  Now, you mentioned that Beazer contacted Lennar about Chinese

16  drywall remediation?

17  A.  We were involved with discussions with Lennar.  I don't know

18  which way it started, I don't know with Beazer who contacted

19  Lennar.

20  Q.  And did you --

21  A.  I don't know if it was Jerry our superintendent in the field,

22  so I am not sure.

23  Q.  That would be Jerry Smith?

24  A.  Correct.

25  Q.  Were there any other builders besides Lennar who communicated

1   with Beazer about the Chinese drywall remediation issue?

2   A.  I am not aware.  I became very involved when we started meeting

3   with our environmentalists or ENVIRON, is the name of the company,

4   where we were trying to assess a protocol and understand the cost.

5   Q.  Well, you mentioned ENVIRON, tell the court what role ENVIRON

6   played in your analysis?

7   A.  My understanding was that scientific side of, you know, what

8   was going on, this corrosion; another was how to identify the

9   symptoms in a house, they're the ones that educated us how to go

10  into a house and determine positive or negative.  As well as giving

11  advice on what they thought the properties of this corrosion would

12  be and whether it stops, how far it goes and that type of thing.

13  Q.  Was the ultimate decision though of how far to go in the scope

14  of repair work your decision?

15  A.  It was mine.

16  Q.  Has the same Chinese drywall repair protocol for Beazer been

17  used in both communities, both Fort Myers and Tampa?

18  A.  Yes.

19  Q.  And has it been used in cases where there is both Knauf Chinese

20  drywall and other types of Chinese drywall?

21  A.  The corrosion is the same.  We would already begin the protocol

22  without knowing whose board is whose.  That's part of the discovery

23  after you start doing the repair, so we wouldn't know who the board

24  is.  But your answer, yes, it would be the same scope.

25  Q.  The same scope is used regardless of which manufacturer?

1   A.   Correct.

2   Q.   Do you know of any reason why this protocol would be

3   geographically limited to these two communities as opposed to other

4   communities where Beazer might find Chinese drywall?

5   A.   No, the corrosion would be the same no matter what city it's

6   in.

7   Q.   Why would the remediation activities not vary with geographic

8   location?

9   A.   I thought I just answered -- I don't get the question.

10  Q.   Why would you not have to change the scope of what you do from

11  location to location?

12  A.   There's no difference.  I mean, if there's corrosion whether

13  it's in Fort Myers or whether it's in Tampa, our understanding of

14  how to take care of that would not change because it's a different

15  zip code.

16  Q.   Let me show you a document, Mr. Phillips, that's been

17  previously marked as Hernandez Exhibit 50 (SIC), and ask you if you

18  recognize this document?

19  A.   Yes.

20  Q.   What is it?

21  A.   It's our release agreement.

22  Q.   For the Chinese drywall remediation?

23  A.   Correct.

24        MR. MEUNIER:  Your Honor, I would offer into evidence as

25  Hernandez 50 (SIC) the work authorization agreement for Beazer

1    Homes?

2              THE COURT:  Any objection?

3              MR. HAYDEN:  No objection.

4              THE COURT:  Let it me admitted.

5              MR. MEUNIER:  Did I say 50?  I'm sorry, Hernandez Exhibit

6    150.

7              THE COURT:  150.

8    BY MR. MEUNIER:

9    Q.  Now, in signing this agreement with Beazer, does the owner

10   release all claims against Beazer dealing with Chinese drywall?

11   A.  No, not personal effects, personal injury.

12   Q.  So those claims are not affected by this?

13   A.  Correct.

14   Q.  Can we look at page 8, please.  There's a section here entitled

15   assignment of claims, do you see that, Mr. Phillips?

16   A.  Yes.

17   Q.  Tell the court what this assignment of claims provision calls

18   for.

19   A.  Well, we had no clue at the time, but at such point later on if

20   we were able to get other support for the others that are involved

21   that, you know, we wanted to have access to that rather than the

22   homeowners since we're making them whole on our own.

23   Q.  Has the owner's assignment of claims to Beazer under this

24   agreement influenced your decision about the appropriate scope or

25   cost of Chinese drywall cases?

1    A.   No, it doesn't.

2    Q.   Why not?

3    A.   We've already determined how we're going to fix the house and

4    we're going to fix the house, but we're going -- we are requiring

5    them to release -- I guess in that sense we're not going to do it

6    if they don't give us a release, that would be the only exception.

7    I don't know if that answers the question.

8    Q.   Let's go to page 4.  And in paragraph 5 there's reference to a

9    monthly stipend, correct?

10   A.   Yes.

11   Q.   So how much does Beazer under this agreement pay an owner

12   during the period the owner is displaced from the home?

13   A.   We do it for the entire time that they're displaced on a

14   monthly basis.

15   Q.   And how much do you pay?

16   A.   3,200.

17   Q.   How, if at all, does this provision influence you in

18   determining and pursuing the appropriate repairs?

19   A.   Just time is of the essence.  The quicker, I mean, our first

20   prediction was we thought we were going to do it in four and a half

21   months.  These first two are looking like six, maybe a tad more.

22   We're hoping to get a little more efficient as we're doing these

23   new ones, because of the moneys that we're paying in addition to

24   all of the repair, we're anxious to get them back in.

25   Q.   Let me look with you now at page 3 of the agreement.  Does this

DAILY TRANSCRIPT

1    page set forth in summary fashion the scope of Chinese drywall

2    remediation that Beazer is pursuing?

3    A.  Yes, it does.

4    Q.  And because of the stipulation in this case, Mr. Phillips, it

5    will not be necessary for me to review each and every item, I will

6    just state the pertinent part of the stipulation at this point,

7    your Honor.

8            It's stipulated in this case that with respect to the

9    appropriate scope of remediation for the Hernandez home, the

10   parties agree that, except with respect to the possibility of

11   maintaining certain green board in the bathrooms, all drywall in

12   the home, both Chinese manufactured and domestic, will be removed

13   and replaced, as well as all insulation, all flexible ductwork, all

14   switches, all receptacles, all molding, and the countertops.

15           So let me first review with you the second item on this

16   protocol, Mr. Phillips, which is the removal and replacement of all

17   affected HVAC systems.  First, what is meant by the HVAC system?

18   A.  I think it's heating, venting and air condition, the air

19   handler on the inside; condenser, compressor on the outside; a

20   plenum and duct work, so it's what heats and cools the house.

21   Q.  Does it include the line set?

22   A.  Yes.

23   Q.  What is a line set?

24   A.  I am not an expert in HVAC, but that's the freon being

25   transported to and from the air handler and the compressor.  So

1    it's a copper line, we saw some pictures earlier.

2    Q.  Has Beazer ever considered preserving or not replacing any part

3    of the HVAC system?

4    A.  Considered them all and determined to replace them all except

5    the condenser.  With the communities that we were doing, we had

6    already upgraded to the new energy code, as well as the new

7    requirement of freon that we didn't have to replace.  We were aware

8    some others had been replacing them, but since the first time they

9    were put in to the date that they're being replaced now, the code

10   had changed, so we elected not to replace the condenser on the

11   outside.

12   Q.  That's the outside compressor?

13   A.  Correct.

14   Q.  That's not exposed to the corrosive environment?

15   A.  Correct.  But we would be replacing the line set all the way to

16   it.

17   Q.  All the way to it.  Next you remove and replace all smoke

18   detectors.  And why is that?

19   A.  Well, I mean, the easy answer trying to keep up and save is

20   would be a challenge, it's not have a very expensive item; but more

21   because of the corrosion in the wiring.

22   Q.  You remove and replace all hot water heaters?

23   A.  Same reasoning, both for copper fittings as well as wiring.

24   Q.  You remove and replace all ductwork?

25   A.  Yes.

1   Q.  Now, is there both flexible and non-flexible ductwork?

2   A.  I think technically speaking the answer would be yes, but we,

3   we're like 95 percent flexible ductwork.  So the plenum would be

4   made up out of board and then there may be a box here and there in

5   an attic that other flex pipe would vent off on, but we don't do

6   any runs with duct board.  So it's all flex.

7   Q.  What role did the presence of drywall dust play in your

8   decision on ductwork removal?

9   A.  A lot.  To us it seemed very hard that we would be able to

10  clean the inside of the duct, as well it's not a very expensive

11  item; so it's easier to go in and get it out so you can start

12  making the repair.

13  Q.  You can skip insulation and go to the removal and replacement

14  of all carpet.  Tell the court why that decision was made.

15  A.  Well, it's not hard to imagine but especially if you've been in

16  a house under this kind of construction, I don't know of any way

17  that you can possibly protect the carpet; so the next thing would

18  be whether you pull it up, the foam would be wasted because they

19  put an adhesive down that the foam sticks to the concrete so it's

20  going to rip and tear.  But the carpet could come up, but now

21  you've got some carpet -- and not a very expensive item as well.

22          But it's been installed for a few years and then you're

23  going to go back and start stretching it, so where it's been taped

24  and put together before at the seams, you're running the risk of

25  having problems with that.  If you tried, you're probably going to

1    end up wasting money doing it and then pulling it out and going to

2    buy the new instead of just doing it upfront.

3    Q.  Now, I don't see a reference specifically to uncarpeted area

4    such as hardwood floors.  Do you have hardwood floors in the Beazer

5    homes?

6    A.  We do in the town homes in the Hamptons.

7    Q.  And what has been the decision with respect to those floors?

8    A.  To take them out.  We originally was hoping not to do that --

9    we are saving tile floors, but even the previous testimony was the

10   same reason, rationale with us.  First, we thought it would be

11   almost impossible to protect them during construction, but more so

12   we were, you know, once construction starts and the power is

13   killed, the HVAC comes out, it's now exposed to the weather and

14   elements, the humidity, especially in Florida, and we were worried

15   about joints opening up.  As well as if you've ever seen moisture,

16   the edge around the joints can curl up a tad.  And so I ended up

17   deciding to get rid of it.

18   Q.  Now, Beazer removes and replaces all electrical wiring,

19   including low voltage wiring in the home.  Correct?

20   A.  Yes.

21   Q.  Would you please explain that decision to the court.

22   A.  Well, the main reason, one of the predominant areas were the

23   symptoms show themselves, and in all of our cases it's throughout

24   the house, you can go to every room and find that the corrosion is

25   there.

1    Q.  Be more specific, when you say you go to every room and find

2    it, what are you looking at?

3    A.  Well, first like going in and inspecting a home, we would be

4    taking a cover plate off, whether it's an outlet or a switch, and

5    pulling it out.  And the easiest is to look at the ground wire

6    because it's stripped in its entirety, so it's not in a jacket,

7    it's fully exposed, you simply can see it first.  And without a

8    flashlight.  Whereas the part of the energized part, the hot part,

9    the black and the white wire, they're curled around a screw, you

10   can still find it just as dominant as on the ground wire but you

11   have to look harder.

12          So that's what you're looking for.  So saying we go to

13   every room and pull out one or two and check.

14   Q.  Well, what if Chinese drywall were in a home and you only saw

15   observable or visible blackening or corrosion on the ground wire in

16   one receptacle but didn't in another, why wouldn't you just save

17   some of the wiring and take out only what the corroded part would

18   show?

19   A.  I don't know how you would manage that.  But in our cases, we

20   were finding it throughout.  It doesn't mean every single one, but

21   the majority are corroded.  And in our houses, I don't know that

22   we've had any that's 100 percent Chinese board, but yet there are

23   still outlets throughout the house that are corroded.

24          Then from there, I mean, we looked at what's been talked

25   here, the snip and clip, the clean, and it seemed impractical, it

1    started to seem as though you're going to spend more in labor to

2    achieve that to just simply pull it out.  We found out the wiring

3    is about 15 percent of the overall electrical costs, so it's not a

4    huge number once you've gone that far.

5         You have the unknown of whether you fixed it or not.  If

6    you didn't, then you're leaving a homeowner possibly a fire, I

7    don't know, fires; and another for business, if it were to be a

8    problem later we're going to spend this twice.  We're spending

9    close to 100 grand.  So if we save big numbers, 10 grand, 20 grand

10   and then we have to go back a year, two years, three years from now

11   and spend 100 grand again, it just didn't make sense.

12        The sniping and cutting as I understood it, I don't know

13   how you can achieve that with the amount of wire that's in a house.

14   The main one -- I've heard, I am aware of this discussion and I get

15   clipping the black and the white wire and that you could remake up

16   if it's too short, you can remake that up.  A couple of things, I

17   could see you getting by with this, it would meet code, but you

18   start to run out of room in the box if now you're going to double

19   up a wire nut next to wiring, that could be a problem.

20        The one that I'm struggling with is the ground wire is

21   naked all the way to the back of the box, it's not just five

22   eighths or three quarters of an inch, so I don't know how you do

23   that.  So now you're back to the wire is too short and you're going

24   to be adding junction boxes.

25   Q.  And I think we'll see some pictures later that talk about this.

1   A.   Yes.

2   Q.   So Beazer has considered alternatives for removal and

3   replacement of all wiring?

4   A.   Yes.

5   Q.   And you have found as a practical matter this is a more cost

6   efficient manner?

7   A.   Yes.  And it's absolute, you're eliminating risks.  So.

8   Q.   And we have an agreement here on switches and receptacles, I'll

9   skip that.

10              Plumbing components, you remove and replace all affected

11  plumbing components.  Tell us what you mean by all affected

12  plumbing components.

13  A.   That's talking about the fixtures and as well the fittings.  In

14  both of our communities we are not using, in our affected

15  communities, we're not using copper piping.  I believe it's in

16  Tampa, Hampton Lakes we use PVC and in the Fort Myers we were using

17  Pex, which is some kind of polyvinyl or polychloride, I'm not sure

18  what it is, but it's more of a plastic.  So on the Pex they are

19  connected by copper fittings and a copper flange and we are taking

20  those off and replacing them.

21  Q.   Why are you doing that?

22  A.   Because they're affected by the corrosion, whereas the piping

23  itself we're not replacing, we're leaving it in the home.

24  Q.   The PVC or Pex?

25  A.   Correct.  Then on the fixtures, both supply tubes bringing the

1   water up from an angle stop, we'll start with the angle stop.  The

2   angle stop is -- and again, I am not a scientist -- but it's

3   chrome, whatever chrome is made out of, I've heard nickel or

4   silver, I don't know, but it's one of the signs, like a shower arm,

5   a shower head, a discussion plate, and the angle stop itself you

6   see the pitting and the curling up of the chrome like you would --

7           MR. HAYDEN:  Objection, your Honor, he can give visual

8   observations, but to the extent he is giving opinions on corrosion,

9   I object.

10          THE COURT:  He's giving -- I am just understanding what

11  he's seen, he doesn't know why it's happening, just that it's

12  happening.

13          THE WITNESS:  What I am describing is not in the houses

14  that don't have Chinese drywall.  It's more of what you would see

15  of a fixture installed in the woods and all of the weather and the

16  elements and all that kind of thing, you would see it just starting

17  to delaminate and peel and that kind of thing.  So it was pointed

18  out by ENVIRON that it's one of the symptoms to look for.

19  BY MR. MEUNIER:

20  Q.  So the removal of all affected plumbing means copper

21  connections --

22  A.  Correct.

23  Q.  -- fittings, as well as the chrome --

24  A.  The fixtures themselves, both the copper that's coming up from

25  below, if it's integral, it has the corrosion, as well as the

1  finish on the fixture itself.

2  Q.  Now, Beazer agrees to remove and replace all affected original

3  appliances.  Would you please explain what is meant by that.

4  A.  Yeah.  The easiest one to tell there is the refrigerator

5  because I guess it has a condenser, certainly has a blower, and I

6  think every single case the refrigerator, you roll it out, you saw

7  the corrosion.  In our case in both communities bisque was a very

8  common color selected at the time, that's discontinued.  So, one,

9  we couldn't match them, as well as we remained concerned that the

10  other appliances had the wiring in the components, too, so we

11  elected to replace those.

12        The list would be like a refrigerator, a dryer, washer, a

13  microwave, a range, a dishwasher, and that's whether we provided it

14  or the homeowner bought it aftermarket; like if we didn't give them

15  a washer and dryer, then we would either get them the closest model

16  to what they had or compensate them for the washer and dryer.

17  Q.  And that was on the basis that even those appliances that you

18  had not originally supplied had been exposed to the drywall?

19  A.  Correct.

20  Q.  What about electronic appliances, such as televisions and

21  computers, those types of things?

22  A.  You know, we've been asked about them as we're getting ready to

23  start the construction, we're not excluding those and we've told

24  our customers that if someone can show us that we certainly would

25  still consider it, but to date we haven't seen any ourselves.

1          MR. MEUNIER:  Your Honor, this might be a good time to

2    take a break.

3          THE COURT:  We'll stop here and come back at 1:45.  The

4    court will stand in recess until 1:45.

5          (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

6

7                         * * * * * *

8

9                      REPORTER'S CERTIFICATE

10

11     I, Karen A. Ibos, CCR, Official Court Reporter, United States

12    District Court, Eastern District of Louisiana, do hereby certify

13    that the foregoing is a true and correct transcript, to the best of

14    my ability and understanding, from the record of the proceedings in

15    the above-entitled and numbered matter.

16

17

18    _____

19          Karen A. Ibos, CCR, RPR, CRR

20          Official Court Reporter

21

22

23

24

25

DAILY TRANSCRIPT