1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF LOUISIANA

3


4
      IN RE:   CHINESE MANUFACTURED DRYWALL      *
5              PRODUCTS LIABILITY LITIGATION     *
                                                 *
6                                                *
      **THIS DOCUMENT RELATES TO:**              *   MDL No. 2047
7                                                *
      Tatum B. Hernandez, *et al*               *   Section L
8                                                *
             versus                              *   New Orleans, Louisiana
9                                                *
      Knauf Plasterboard (Tianjin) Co.,          *   March 15, 2010
10       Ltd., *et al*                           *
                                                 *   1:45 p.m.
11    Case No. 09-CV-6050                         *
                                                 *
12    * * * * * * * * * * * * * * * * * * * *

13

14                   VOLUME I - AFTERNOON SESSION
                     PROCEEDINGS BEFORE THE
15                   HONORABLE ELDON E. FALLON
                   UNITED STATES DISTRICT JUDGE
16

17
      APPEARANCES:
18

19    For Tatum and Charlene      Herman, Herman, Katz & Cotlar, LLP
      Hernandez:                  BY:   RUSS M. HERMAN, ESQ.
20                                      STEPHEN J. HERMAN, ESQ.
                                  820 O'Keefe Avenue
21                                New Orleans, Louisiana 70113

22
      For Tatum and Charlene      Gainsburgh Benjamin David
23    Hernandez:                    Meunier & Warshauer
                                  BY:   GERALD E. MEUNIER, ESQ.
24                                1100 Poydras Street, Suite 2800
                                  New Orleans, Louisiana 70163
25


                              DAILY COPY

1    <u>APPEARANCES</u>:

2

3    For Tatum and Charlene           Seeger Weiss
     Hernandez:                       BY:  CHRISTOPHER A. SEEGER, ESQ.
                                      One William Street
4                                     New York, New York 10004

5

6    For Tatum and Charlene           Lewis & Roberts, PLLC
     Hernandez:                       BY:  DANIEL K. BRYSON, ESQ.
                                      3700 Glenwood Avenue, Suite 410
7                                     Raleigh, North Carolina 27612

8

9    For Knauf Plasterboard           Frilot, LLC
     (Tianjin) Co., Ltd:                BY:  KERRY MILLER, ESQ.
                                           KYLE A. SPAULDING
10                                    1100 Poydras Street, Suite 3700
                                      New Orleans, Louisiana 70163

11

12   For Knauf Plasterboard           Baker & McKenzie, LLP
     (Tianjin) Co., Ltd.:                 BY:  DONALD HAYDEN, ESQ.
13                                    1111 Brickell Avenue, Suite 1700
                                      Miami, Florida 33131

14

15   For Knauf Plasterboard           Baker & McKenzie, LLP
     (Tianjin) Co., Ltd.:                 BY:  DOUGLAS B. SANDERS, ESQ.
16                                         KYLE P. OLSON, ESQ.
                                           ERIN M. MAUS, ESQ.
17                                    130 E. Randolph Drive
                                      Chicago, Illinois 60601

18

19   Official Court Reporter:         Toni Doyle Tusa, CCR, FCRR
                                      500 Poydras Street, Room HB-406
20                                    New Orleans, Louisiana 70130
                                      (504) 589-7778

21

22

23
     Proceedings recorded by mechanical stenography, transcript
24   produced by computer.

25

DAILY COPY

1                        **I N D E X**

2                                                        PAGE

3    Ray Phillips

4         Direct Examination                            124
         Cross-Examination                             168
         Redirect Examination                          193

5

6    Brad Krantz
         Voir Dire Examination                         198
7        Direct Examination                            206

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      <u>**AFTERNOON SESSION**</u>

2      **(March 15, 2010)**

3   **THE DEPUTY CLERK:**  Everyone rise.

4     Be seated, please.  Good afternoon, ladies and

5 gentlemen.

6     You're still under oath, sir.

7     You may proceed, Counsel.

8   **MR. MEUNIER:**  Thank you, Your Honor.

9     (WHEREUPON **Ray Phillips**, having been duly sworn,

10 testified as follows.)

11       DIRECT EXAMINATION

12 BY MR. MEUNIER:

13 **Q.**  Mr. Phillips, we were discussing the Beazer scope of

14 Chinese drywall remediation.  I believe we had come down to the

15 component where you say you were repairing the place as

16 necessary, and then you began to list certain specific items,

17 some of which, as you heard in the stipulation, are not in

18 dispute.  So I want to focus just on the ones that are the

19 subject of dispute.

20     You mentioned something about tile already.  What is

21 Beazer's position on tile material?

22 **A.**  On flooring -- can you hear me?  I can't hear myself.

23 **Q.**  Yes.  You're fine.

24 **A.**  On flooring, we have been able and have been successful

25 saving it, putting a rubber interlocking mat down, and it's

1    working very well.  We tried the first house on wall tile and
2    were skeptical even trying, but we -- again, we're trying to
3    save everything we could.
4            One of the problems is when you're cutting the
5    drywall down to where the tile terminates, there's no way to
6    refinish it back.  You do that before the tile goes back up.
7    Plus, we broke a tile on the first one we tried.  Most of the
8    time, the dye lots are no longer going to match.  So it became
9    more difficult trying to work around it rather than get it out
10   of there.  So wall tile, we are getting rid of; floor tile, we
11   are saving.
12   Q.   How about cabinets?
13   A.   Cabinets, that was one we -- at the very beginning, I
14   guess, hindsight, a little naive, we thought we could save
15   those.  I started doing a study with putting a POD, a steel
16   POD, in the driveways for storage.  At that time, I was only
17   figuring, I think, four-and-a-half, five months, and now we're
18   six, maybe a tad better, so it would have been a worse
19   scenario.  But the cost of the delivery, rental, and pickup of
20   the POD was more expensive than the cabinets.  I probably
21   should have made that point with appliances as well.
22   Q.   With what?  I'm sorry.
23   A.   With appliances.  I was talking about appliances, other
24   reasons we came, but -- the storage I had mentioned, you know,
25   where you had to take care, put it somewhere.  In addition to

1  the cabinets, not only the POD was more expensive, that's

2  talking about putting it on the driveway.  So, again, we became

3  concerned, just like wood floors, that the weather elements,

4  humidity, could cause the joints and the cabinets to start to

5  open up and separate.  Then that was too expensive.  Then

6  you're, like, do you start taking all this stuff to an

7  air-conditioned space, which is even more money?  So it's

8  really a cost-ineffective method, so we get rid of cabinets.

9  **Q.**  So all cabinets are being removed and replaced with new

10 cabinets?

11 **A.**  Correct.

12 **Q.**  Because that's more cost-efficient than trying to save the

13 cabinet?

14 **A.**  Correct.

15 **Q.**  The next thing to talk about on this list would be

16 mirrors.  What is Beazer doing with respect to mirrors in these

17 homes?

18 **A.**  We are discarding.  That actually is one of the telltale

19 signs of identifying you've got positive Chinese drywall in the

20 house, in addition to copper wiring.  It's not like we have

21 seen this in every bathroom of every house, but it's very

22 predominant.  It desilvers around the edges, as well as the

23 medicine cabinets; you see the same thing.  Go to a house

24 that's negative, and you don't see that delamination.

25 **Q.**  I think we talked about plumbing fixtures already.

1    **A.**    We did.

2    **Q.**    We covered that already.

3    **A.**    We did.

4    **Q.**    That brings us, then, to the cleaning aspects of the

5    protocol, beginning with HEPA-vacuuming.  Tell the Judge what

6    HEPA-vacuuming is.

7    **A.**    My understanding is it's just a deeper filtering that

8    takes smaller and smaller particles out in cleaning out the

9    house than just a typical vacuum.

10            And as previous testimony, I don't know if they had

11   it backwards or if Lennar is also doing it.  We also

12   pressure-wash.  I think previous testimony was saying Lennar is

13   doing that.  I don't know what Lennar's doing, but we are doing

14   it.  I don't think they are.

15   **Q.**    So the HEPA-vacuuming you say here is to remove all

16   construction dust.  Let me ask you first:  What is the nature

17   of dust from drywall that's being pulled away in one of these

18   homes?

19   **A.**    I heard it earlier, but I've described it as it's --

20   excuse me.  It's like powder.  I mean, it's extremely fine.  It

21   just floats.  You can blow it like baby powder.  Obviously,

22   it's heavier than baby powder, but it's powder.

23   **Q.**    Has Beazer found it possible with the HEPA-vacuuming alone

24   to remove all of the drywall dust?

25   **A.**    *All* is the big word.  It is effective.  Pressure-washing

DAILY COPY

1   is not in our protocol.  It was recommended by the

2   professionals, that HEPA-vac, and the wiping down is adequate.

3   And, you know, so to literally go around with a rag and get up

4   into the trusses, all through the attic and be wiping every

5   crook and crevice -- you know, I mean, you can get all the dust

6   that would just be laying on something flat, but up in the

7   crevices, it didn't seem good enough to us.  It wasn't -- it

8   was not the protocol, though.

9           THE COURT:  Just ask him if you can minimize the dust

10   during the process.

11          MR. MEUNIER:  That's what we're going to get to next,

12   Judge.

13   BY MR. MEUNIER:

14   Q.   Just to finish on cleaning, after the HEPA-vacuuming, you

15   do a wipe-down, and you have gone to pressure-washing?

16   A.   And we pressure-wash, vacuuming simultaneously and

17   extracting the water that we're putting down, which would be

18   less water than constructing during rainy season.  We don't

19   leave the water sitting there, so we're not concerned for any

20   absorption into the wood.

21          THE COURT:  How do you do that?  How do you wash it

22   and not get the water into the wood?

23          THE WITNESS:  I'm not saying it doesn't get water

24   into the wood.  I'm saying it doesn't stay there, that it airs

25   out, and we don't allow it to puddle.  Just like during

DAILY COPY

1   construction in a rainy season, the house gets wet before it

2   gets roofed, but we would sweep off the deck.  The standing

3   water is what, in our experience, causes the damages.

4             So, yes, moisture does go in, but we're

5   extracting and vacuuming the water so we're not leaving any

6   puddles, plus it airs from there.  That begins the airing-out

7   process.

8   **BY MR. MEUNIER:**

9   **Q.**   How long do you air out these homes?

10  **A.**   We air out 14 days.

11  **Q.**   Now, you mentioned the time period.  Let me just confirm

12  this before we move to some videos.  The total time you find

13  needed to complete this remediation protocol, including the

14  air-out period, from move-out date by the owner to move-in

15  date, is what?

16  **A.**   A couple weeks from that being a complete answer, but it's

17  around six months, probably a little bit over six months.

18  **Q.**   Now, Mr. Phillips, you were present in Florida, in Tampa

19  Bay and in Fort Myers, in February this year when plaintiffs'

20  counsel visited some of these Beazer Homes?

21  **A.**   I was.

22  **Q.**   You were present when we took photographs and had video

23  taken of the activity there?

24  **A.**   Yes, I was.

25  **Q.**   Have you reviewed this video with me prior to your

1  testimony today?

2  **A.**  Yes, I have.

3  **Q.**  And you can verify that it's an accurate depiction of what

4  was filmed at the time?

5  **A.**  Yes.

6          **MR. MEUNIER:**  For the record, Your Honor, this has

7  been marked as Hernandez Exhibit 144.  It's a video segment of

8  a drywall demolition from wall areas.

9          **THE COURT:**  Are you going to introduce it?

10          **MR. MEUNIER:**  I will introduce it.  I'd like to offer

11  it.

12          **THE COURT:**  It's admitted.

13  **BY MR. MEUNIER:**

14  **Q.**  Tell us just what we're seeing here in terms of the

15  demolition technique being used by Beazer.

16  **A.**  This is going in and taking samples off of every wall, and

17  then there's one of the environmentalists that will record and

18  look at the back in trying to identify whose board it is.

19  **Q.**  How is the drywall attached to the studs?

20  **A.**  You've got the edges of a board, and then you've got all

21  the inside.  The inside is called the field.  When they lay a

22  board up on the wall, they use nails around the edges, and then

23  they come back with a screw gun and put the right amount in the

24  field, you know, up and down on the studs.  So it's screwed and

25  nailed.

1   **Q.**   Now, I notice these men are using a hammer to begin the

2   process of removing a section from the wall.

3   **A.**   Right.

4   **Q.**   Why not just go in with a knife and just very deliberately

5   cut where you need to cut to remove the drywall?  Why do it

6   this way?

7   **A.**   You can see how fast that is.  So, one, time.  A knife is

8   going to take a lot longer.  Maybe a saw would be just as fast,

9   but then you're creating even more dust than what you're doing

10  here.  So it's just speed, as well as they can knock holes --

11  we're not seeing it on this one.  They knock holes just to get

12  their hands in there so they can -- like a hand-hold to try to

13  pull the drywall down.

14  **Q.**   Is there any way to avoid breakage of pieces or sections

15  when they get removed from the wall?

16  **A.**   When they get removed from the walls?

17  **Q.**   These are 4-by-12 sections?

18  **A.**   Correct.

19  **Q.**   Has it been your experience that you can remove these

20  sections, even when they're large and available such as this,

21  without breaking the section?

22  **A.**   No.  The video's a good one there.  That's a middle

23  section.  That's a 4-foot board on the top.  Where you've got

24  that straight line, that's a 4-foot board on the bottom.  Then

25  they're filling up more in the center there.  You can see how

1    it's breaking apart there.  They're getting lucky there.

2    They're getting almost a full sheet there, almost, maybe two.

3    **Q.**   Where there's tearing of the drywall, do you see dust

4    being created?

5    **A.**   Oh, absolutely.  Yeah.

6              **MR. MEUNIER:**  Can we go to the video, the next

7    segment, please.

8                   Your Honor, for the record, this has been marked

9    as Hernandez Exhibit 143, and we would offer it into evidence.

10              **THE COURT:**  Let it be admitted.

11   **BY MR. MEUNIER:**

12   **Q.**   This section shows the removal from ceilings.  The drywall

13   is in the ceiling as well as the walls?

14   **A.**   Correct.

15   **Q.**   Likewise, has it been your experience that it's possible

16   to remove sections of drywall from the ceiling without tearing

17   sections apart?

18   **A.**   No, it's not been the experience.  You couldn't do it

19   without doing precise cuts prior to pulling.  Even then, you

20   couldn't do it because you're going to have screws going up and

21   down the studs that you don't know where they are.

22              I don't know how you could do it without, I mean,

23   quadruple the time.  For us, this is a money decision.  It's,

24   like, what's the fastest way to get in and out of there and --

25   **Q.**   Wouldn't you save money on the cleanup end if you didn't

1  create so much dust and did this in a much more deliberate and

2  careful manner?

3  **A.**   No.

4  **Q.**   Why not?

5  **A.**   Well, them gutting this -- this is a different place.

6  This looks like it's up in Hamptons.  It's a townhome.  This is

7  like a half a day; two, three, four hours that they've got this

8  drywall totally gutted.

9  **Q.**   All of it, ceiling and wall?

10  **A.**   Yeah.  They're still cleaning up and taking some pieces

11  out, but if you were trying to be delicate, you know, a half a

12  day is a week.  It's just going to grow.

13  **Q.**   Did Beazer ever consider putting up visqueen or other

14  coverings in order to minimize the amount of dust that got on

15  surfaces during demolition?

16  **A.**   You'd be spending a lot of time there resetting up a

17  blanket or a screen.  I don't know you how would do that except

18  a little space at a time in visqueen.  I've done that on a

19  small remodel job, where you're just isolating one little room

20  and you do a screen, but it's very impractical to try to do a

21  whole house where you'd be going and -- I don't know what you'd

22  visqueen except one little containment at a time, you know,

23  moving around the house.

24  **Q.**   Let me now move to some photographs that were taken on the

25  same visit in Florida.  First, I'd like to look at Hernandez

1   Exhibit 66.

2          Do you recognize this as one of the photographs taken

3   in the Beazer homes that were being remediated?

4   **A.**   Yeah.  One of the coils.

5          **MR. MEUNIER:**  I would offer this, Judge, as

6   Hernandez 66.

7          **THE COURT:**  Admitted.

8   **BY MR. MEUNIER:**

9   **Q.**   What do we see in this picture, Mr. Phillips?

10  **A.**   You can see the coil ends, the U's, they're all corroded.

11  **Q.**   Is this typical of what you have seen in the Beazer

12  homes --

13  **A.**   Yes.

14  **Q.**   -- with respect to the HVAC coil?

15  **A.**   Yes.  Actually, it's the first place we go.  If we were to

16  get another call, the very first place we go is the coil.

17  **Q.**   Let's look at the next picture, please.

18         **MR. MEUNIER:**  Your Honor, this is Hernandez

19  Exhibit 67, which we would offer into evidence.

20         **THE COURT:**  Let it be admitted.

21         **THE WITNESS:**  You can see, like, the bottom right

22  corner.

23  **BY MR. MEUNIER:**

24  **Q.**   Tell us what the picture shows first.

25  **A.**   Well, corrosion on the copper.  I don't know what that

DAILY COPY

1  line is, but it's a copper line.  It's right where the blower

2  is.  It seems the more that there's air movement, the more

3  there's corrosion.  That's a layman talking.  I don't know that

4  as a scientist.  But it just seems like where there's air

5  movement you see higher levels of corrosion.

6  **Q.**   Is this the back of one of the refrigerators in one of the

7  homes?

8  **A.**   Yes, it is.

9  **Q.**   This here is the blower that you were talking about --

10 **A.**   Yes.

11 **Q.**   -- that moves air?

12 **A.**   Yes.

13 **Q.**   Is this the corroded line we were referring to?

14 **A.**   The arrow is pointing to it, but the arrow should be

15 closer, but that is it.  That's it.  Yeah, that's it.

16 **Q.**   Again, I'll ask you --

17          **THE COURT:**  Does that affect the use, the efficiency

18 of the refrigerator, or not?

19          **THE WITNESS:**  I don't know that.  We're just

20 identifying it, that it has corrosion on it, and part of our

21 protocol is to eradicate.

22 **BY MR. MEUNIER:**

23 **Q.**   Now, we have discussed a line set.  I'd like to show you a

24 brief video segment on the line-set issue.

25          **MR. MEUNIER:**  It's been marked as Hernandez

DAILY COPY

1    Exhibit 141, which we would offer into evidence, Your Honor.

2             **THE COURT:**  Let it be admitted.

3    BY MR. MEUNIER:

4    **Q.**   Tell us what we see in this picture, please.

5    **A.**   This is a line set coming up to the air handler, and

6    you're pulling the -- I forget the name of the foam -- the

7    insulation foam, showing that the corrosion is further down

8    than just the part that was exposed.

9             I don't know if this video shows it.  It'll run down

10   through the platform.  It looks like it may show.  That's one

11   of the line sets.

12   **Q.**   This section of line set is not in an attic, is it?

13   **A.**   No.  This is on the second floor.  It's a platform in the

14   middle of the second floor.  The platform is like a wood table

15   that the air handler is sitting on top of.  Then you can see

16   that both the condensate line and that black line, the black

17   foam has the line set inside of it, and now it's going down

18   into the floor.  Now we're going back the other way.

19   **Q.**   Where will this line set ultimately run?

20   **A.**   It'll go to the -- continuously to the outside compressor.

21   **Q.**   Does it run through both the ceiling and the wall?

22   **A.**   On this particular one, no.  It runs in the floor and the

23   wall.

24   **Q.**   The floor and the wall?

25   **A.**   But, yeah, others will go through the ceiling and the

DAILY COPY

1   wall.

2   **Q.**   What do we see in this part over here?

3   **A.**   That's the other side of it out to the condenser.

4   **Q.**   This is where it connects to the outside condenser?

5   **A.**   Correct.

6   **Q.**   Is that a continuous section of copper or does it have --

7   **A.**   No.  It's one piece whole, and it's only soldered at each

8   end.

9   **Q.**   I'd like to show you just a couple series of photographs

10   to finish on this.  Could we go to 78, please, first.

11          **MR. MEUNIER:**  This is Exhibit 78, Your Honor, which

12   we'd offer into evidence.

13          **THE COURT:**  Admitted.

14          **THE WITNESS:**  I think that's what we just saw the

15   video of.

16   **BY MR. MEUNIER:**

17   **Q.**   I was going to ask.  Does this show --

18   **A.**   Yeah, I think it's identical.  It's the same unit.

19   **Q.**   So this is the line set?

20   **A.**   Correct.

21   **Q.**   Is that Armaflex that covers the line set?

22   **A.**   Yes, actually, it is.

23   **Q.**   How would you describe the nature of that material?  Is it

24   dense?  Course?

25   **A.**   Foam, very soft, spongy.

1  **Q.**   This line set would have been connecting to what inside of

2  this house?

3  **A.**   The air handler on this side.  It's soldered into the air

4  handler.

5  **Q.**   It goes down in through this area, which would be the --

6  **A.**   That's the floor --

7  **Q.**   -- floor.

8  **A.**   -- subfloor, because this is a two-story house, or

9  two-story townhome.

10 **Q.**   Then it would extend out into the wall and outside?

11 **A.**   After running down the floor.  It would run down the floor

12 first, then down the wall and out to the condenser.

13          **MR. MEUNIER:**  Let me see the next picture, please.

14 **BY MR. MEUNIER:**

15 **Q.**   Do you recognize this as one of the pictures of the line

16 set under the insulation?

17 **A.**   Yes.

18          **MR. MEUNIER:**  This has been marked, Your Honor, as

19 Exhibit Hernandez 79, which we offer into evidence.

20          **THE COURT:**  Let it be admitted.

21 **BY MR. MEUNIER:**

22 **Q.**   What do we see on the copper surface?

23 **A.**   More corrosion.

24 **Q.**   Let's, finally, go to the next picture on this series.  Do

25 you recognize this as a line set running through the house?

1  **A.**   Yes.  I can't remember if this was the same one that we

2  were just looking at.  I'm not sure.  It seemed like the

3  purpose of this was showing how difficult it would be to pull a

4  continuous line out where you can't solder or join it, and it's

5  just showing the complexity of where it's snaking and running

6  through the platform, then the floor, then the wall, that it

7  would be impossible to pull it and run new in without taking

8  the drywall out.

9         **MR. MEUNIER:**  Your Honor, that's been marked as

10  Hernandez Exhibit 80, which we will offer into evidence.

11        **THE COURT:**  Admitted.

12  **BY MR. MEUNIER:**

13  **Q.**   Let me next discuss a bit more with you, Mr. Phillips,

14  electrical wiring and switch and junction boxes.  First, tell

15  the Court generally what kinds of different electrical wiring

16  you find in homes.

17  **A.**   Typically, low voltage -- well, regular electrical and low

18  voltage like a phone, a doorbell, and then cable for TV.  I'm

19  sure there's something else, but like smoke detectors and --

20  but low voltage type things.

21  **Q.**   How are these typically insulated in homes or covered?

22  How are they covered?

23  **A.**   Some form of jacket.  I think the electrical -- I think

24  it's called a Romex.  I think the Romex is the outside jacket.

25  But the hot wires also have a jacket, a black and a white

1    jacket.  The ground is exposed.  All the others have some --

2    even the small, low voltage have some small jacket on them as

3    well.

4    **Q.**   What about ground wires?  How are they covered?

5    **A.**   They are within the Romex, if we're talking on electrical

6    wires.  It's the third wire.  It's in the Romex, and it's in

7    paper, but it's not encased, you know, with the plastic or

8    whatever it's made out of.

9    **Q.**   The Beazer protocol is to remove all of that electrical

10   wiring in the house; is that true?

11   **A.**   Correct.

12   **Q.**   Let me look at a photo with you which has been marked as

13   Hernandez Exhibit 81.  Do you recognize this from one of the

14   Beazer photos that we took?

15   **A.**   Yes.  It's one we've -- I think the switches have already

16   been snipped off to save.  That black wire going through the

17   hole I think is going to the doorbell.  I believe that's what

18   this one is.  That one --

19   **Q.**   Is this the Romex wiring that you were talking about?

20   **A.**   Yes.  Yes.  Yes, it is.

21   **Q.**   What kind of service would this kind of box provide?  What

22   would be the function of this?

23   **A.**   This looks like a four-gang switch box.  Well, it is a

24   four-gang switch box.  So four switches would be in there

25   controlling four different places.

1      **MR. MEUNIER:**  I'll marking this and offer it, Judge,

2    as Hernandez Exhibit 81.

3      **THE COURT:**  Admitted.

4    BY MR. MEUNIER:

5    **Q.**   Let's next look at 83, please.  Do you recognize this

6    picture as well?

7    **A.**   Yes.

8      **MR. MEUNIER:**  I'll offer it as 83, Your Honor.

9      **THE COURT:**  Admitted.

10   BY MR. MEUNIER:

11   **Q.**   Tell us what we see here.

12   **A.**   I believe that one is an outlet.  I know at one time there

13   were two or three pictures.  I don't know what we're getting

14   ready to look at.  This was showing that the wire is stapled to

15   the stud, that there's no slack.  So if we were like that,

16   where we cut the wires, then we're not going to have the same

17   length to be able to -- without putting junction boxes in to

18   repair it.

19   **Q.**   Is this typical to see Romex wiring running through

20   drilled holes in wood studs such as this?

21   **A.**   Yes.  Yes.

22   **Q.**   Is it typical to see Romex wiring stapled such as this?

23   **A.**   Yes.

24   **Q.**   I think in the next shot we see a close-up of that.

25     **MR. MEUNIER:**  This has been marked as Hernandez

1    Exhibit 84, Your Honor, and I would offer this as well.

2              THE COURT:  Admitted.

3    BY MR. MEUNIER:

4    Q.   This shows the stapling of a Romex wire?

5    A.   Uh-huh.

6    Q.   We talked earlier about the drywall dust, the fine,

7    powdery-like dust.  Have you observed it to be on wood stud

8    surfaces such as this after the removal of drywall?

9    A.   Yes, absolutely, especially on the horizontal pieces, you

10   know, where it starts to settle.  It would land more like on

11   the top of this than it would on the vertical piece.  We're

12   looking at vertical there.

13   Q.   Have you observed the drywall dust following removal of

14   the drywall to be on Romex wiring surfaces?

15   A.   Yes.

16   Q.   You take out all the wiring before you attempt any

17   cleanup; correct?

18   A.   Correct.  We take everything out down to the studs before

19   we start cleanup.

20   Q.   We see the next picture, which is 86.  Who is this

21   gentleman?  Do you recognize him?

22   A.   That's me.

23             MR. MEUNIER:  Your Honor, I'll offer Hernandez 86

24   into evidence.

25             THE COURT:  Admitted.

1   BY MR. MEUNIER:

2   **Q.**   What are you demonstrating here?

3   **A.**   I was explaining to you guys, like, if you were to cut

4   this wire in the box below that you'd be moving the box up to

5   where my hand is, and then a lot of the -- that one at least

6   has a switch going to turn on -- I mean, that is a switch going

7   to turn on a light at the top.  I don't know about this

8   particular one, but several of which has another one going down

9   to an outlet.  So if I move the box up because the wire's too

10  short, now it's going to be too short on the bottom side.

11  **Q.**   Let's look at the next picture, please, which has been

12  marked as Hernandez Exhibit 85.

13  **A.**   Yeah, they're -- the one --

14  **Q.**   Let's look at this one first.

15  **A.**   I'm sorry.

16  **Q.**   What is being demonstrated in this picture?

17  **A.**   That's showing that once you snip it you don't have enough

18  wire to rejoin the switches.

19          **MR. MEUNIER:**  I'll mark this, Your Honor as Hernandez

20  Exhibit 85.

21          **THE COURT:**  Admitted.

22  BY MR. MEUNIER:

23  **Q.**   What is significant about the measurement that is being

24  shown here?

25  **A.**   My understanding is that that's code.

DAILY COPY

1   **Q.**    What is code?

2   **A.**    The portion that you strip -- the portion that's inside

3   the box, it's to give a minimal amount that an electrician can

4   make up the switches and make up the outlets.  So the code is

5   saying that you've got to have 6 inches that come into the box.

6   And the Romex, that white jacket, will go into the box too.

7   Whatever the Romex is stripped, the white will go into the box

8   and not be left on the outside.

9   **Q.**    You have to have 6 inches of wire inside the box?

10  **A.**    Correct.

11  **Q.**    In this case, from above and below?  You'd have to take

12  the 6 inches from below as well as above?

13  **A.**    Correct.

14  **Q.**    Well, what would be wrong with snipping off what's in the

15  box and then adding new wire by splicing it to create the

16  6 inches?

17  **A.**    Well, this is me.  The point I was making earlier this

18  morning, if you could do that on the hot, the black and the

19  white wire, and you snip it and if that works and you're

20  rejoining it at some point, especially like that four-gang box

21  we just saw a few slides back, you're going to be having so

22  many wire nuts in addition to what's already there.  And I've

23  not tried it.  I don't even know if you can even get it in the

24  box.

25          To me, the bigger point is the ground wire, where --

DAILY COPY

1   if the point of snipping is to snip off corrosion and get it

2   back to clean, then the ground wire you'd be snipping all the

3   way to the back of the box, so there's nothing left to make up.

4   Now you're outside of the box.  Because with code, you've got

5   to be in a box.  You've got to be in an accessible box.  If you

6   could make it up inside this box, that would meet code.  But

7   with the ground wire on the outside, you're back to having to

8   add junction boxes to be able to splice on and give it more

9   wire.  So you'd have junction boxes all through the house.

10  **Q.**   Let's next go to photograph 92, please.  This is a picture

11  you also recognize from the series we took?

12  **A.**   Yes.

13           **MR. MEUNIER:**  I'd offer it, Judge, as Hernandez

14  Exhibit 92.

15           **THE COURT:**  Admitted.

16           **THE WITNESS:**  Here's a good example of what I was

17  just talking about.  You can see the three -- the black wire --

18  not the one in the center, but the far right wire, that's a

19  black wire.  Then you see the three white ones twisted

20  together?  Yes, those three.  To the left of that is two

21  more -- believe it or not, they're black wires.  They

22  have some -- that's black plastic that has either paint or

23  drywall sprayed on it, it's the reason it's white, but they're

24  black.  So you have three whites and three blacks there.  The

25  center one sticking out the furthest, that's just copper.

1   There's no jacket on that at all.

2   **BY MR. MEUNIER:**

3   **Q.**   That's the ground wire?

4   **A.**   That's the ground wire.  When I first saw this, I felt

5   that was the black hot, but that's actually the ground wire.

6   This is the point I'm making:  That's a naked wire, which is

7   typical.  It's how you would normally see it.  But if you're

8   going to reach way back into the box back there where that

9   pointer is to snip it, you no longer have any wire to make up

10  the run.  The ground wire is the problem with trying to do

11  that.

12  **Q.**   I understand.  Did Beazer ever consider cleaning these

13  visibly corroded copper wires as opposed to removing them?

14  **A.**   Five minutes of consideration.  One -- I don't remember if

15  we have a picture here, but --

16  **Q.**   Let's go to picture 93.

17  **A.**   That's a braided wire.  How do you clean that?

18          Even just the ones we just were looking at, where

19  it's just one little wire, how much time does it take to go and

20  clean, and that's believing that it's clean, that you really

21  got it clean.  Let's assume you did.  You're back to it's more

22  cost-effective to replace it than taking the time to clean

23  that.

24          **MR. MEUNIER:**  Your Honor, I'll mark this photo as

25  Hernandez Exhibit 93 and offer it into evidence.

1          **THE COURT:**  Admitted.

2    **BY MR. MEUNIER:**

3    **Q.**   Who is Jerry Smith?

4    **A.**   Jerry Smith is the superintendent on the job in

5    Fort Myers.

6    **Q.**   Did both you and Mr. Smith appear in this court as

7    witnesses earlier this year in the *Germano* case?

8    **A.**   Yes, we did.

9    **Q.**   What physical object did you and Mr. Smith bring with you

10   to court on that occasion?

11   **A.**   A similar -- either a three- or four-gang box with

12   switches still in tow like we were looking at earlier.

13   **Q.**   Did it come from one of the Beazer homes with Chinese

14   drywall that was being remediated?

15   **A.**   Yes, it did.

16          **MR. MEUNIER:**  For the record, Your Honor, I'm showing

17   the witness an electrical box that was previously marked and

18   entered into evidence in the *Germano* proceedings as

19   Exhibit P1.1891.  We will take pictures of it for this record,

20   but this is the actual exhibit from that record.

21   **BY MR. MEUNIER:**

22   **Q.**   Can you identify and show the Court what that box is,

23   please.

24   **A.**   It's like the one we were just looking at except this is a

25   three-gang, so it holds three switches; one, two, three.  You

1    can see the center wire, these little red ones here, that
2    should be shiny copper.  That's all corroded.  That's all the
3    way up.  You can see the entire part of it.
4              A surprise to us when we did this -- you know, we
5    were looking at a slide earlier that was showing the jacket was
6    pulled back and it was an inch and, I think, seven-eighths up
7    where it was black.  This one right here, this was up in the
8    wall.  Actually, it's coming off of it.  That's about 8 inches
9    back.
10   Q.   Is that a ground wire?
11   A.   That is the ground wire.
12   Q.   Inside of a paper sheath which, in turn, would be inside
13   the Romex?
14   A.   Yes.  It's inside paper.  It's inside this piece of paper
15   that's been pulled out and then inside this white jacket.  It's
16   not under a jacket like the hot wires have.
17   Q.   What was important to you in discovering this aspect of
18   this particular box that was removed from the Beazer home?
19   A.   Well, it's an after-the-fact.  It has nothing to do with
20   the protocol and how we got to we're replacing all the wire.
21   Actually, we pulled this one out because you wanted a physical
22   one at the last trial.  So this is just, by chance, a
23   discovery.  So it was a surprise to see that corrosion was up
24   in the jacket up inside the wall and not just what was exposed
25   inside the box.

1  Q.   So --

2  A.   It was a surprise.  It validated we made the right choice;

3  it didn't get us to the choice.

4  Q.   Made the right choice to do what?

5  A.   To get rid of all of the wire.

6  Q.   All wire?

7  A.   Yes.

8  Q.   If you had tried to clip that ground wire and that box

9  back to the rear of the box and then somehow splice onto it,

10  would that corroded section have been left in the home?

11  A.   Yes.  Yes.

12         MR. MEUNIER:  May I see photo 151, please.

13  BY MR. MEUNIER:

14  Q.   Do you recognize this as a photograph, Mr. Phillips, of

15  the object that you're holding?

16  A.   Yes.

17         MR. MEUNIER:  Your Honor, we will mark this

18  photograph as Hernandez 151 and offer it into evidence.

19         THE COURT:  Let it be admitted.

20         MR. MEUNIER:  That's 151-0001.

21           May we see the next picture, please.

22  BY MR. MEUNIER:

23  Q.   Do you recognize this as a picture of the same object from

24  the back side?

25  A.   Yes.

1          **MR. MEUNIER:**  Your Honor, we'll mark this and offer

2    it as Hernandez 151-0002.

3          **THE COURT:**  Admitted.

4    BY MR. MEUNIER:

5    **Q.**   Let me next finish up our discussion about your cleanup

6    protocol, Mr. Phillips.  I'd like to look with you at photo 94.

7    Do you recognize this picture?

8    **A.**   Yes.

9    **Q.**   What does it show?

10   **A.**   This is one of the houses that we've cleaned.  It's one

11   that we knew you guys were coming down to look at and so, for

12   just this one, we've left the wiring in for you to be able to

13   see before we took it out.  This has already been cleaned as

14   well as pressure-washed.  This house is several times cleaner

15   than a regular construction home.

16   **Q.**   You saved the original tile flooring in this case?

17   **A.**   Yes.  You can see it looks pristine.  The homeowner

18   couldn't believe it.

19          **MR. MEUNIER:**  Your Honor, I'll offer this as

20   Hernandez 94.

21          **THE COURT:**  Admitted.

22          **MR. MEUNIER:**  Next photo, please.

23   BY MR. MEUNIER:

24   **Q.**   Do you recognize this?

25   **A.**   Yes.  Same house.  More of the same.

DAILY COPY

1          **MR. MEUNIER:**  Your Honor, I'll offer this as
2    Hernandez Exhibit 95.
3          **THE COURT:**  Admitted.
4    BY MR. MEUNIER:
5    **Q.**   The wiring, as you say, was left in at our request even
6    though the house has been otherwise remediated and cleaned?
7    **A.**   Right.
8    **Q.**   Can you compare what you would believe the time it would
9    take a Beazer crew to remove and replace all of this visible
10   wiring that's shown in this area -- if we could back up to the
11   larger picture.  Compare that time taken to what you believe it
12   would take a Beazer crew to go to each junction box and snip
13   and splice and use wire nuts to save wire.  What would the time
14   comparison be?
15         **MR. HAYDEN:**  Objection:  Foundation.
16   BY MR. MEUNIER:
17   **Q.**   Based on your years of experience in the construction
18   field, do you know what it takes electrical workers to do
19   things like wiring and splicing?
20   **A.**   Wiring and splicing, no, because we haven't done it until
21   we got the Chinese drywall.  We haven't had that experience.  I
22   would guess, you know, you're looking at a couple of hours to
23   rip --
24         **MR. HAYDEN:**  Objection.
25         **THE COURT:**  Sustained.

1              How long would it take them to remove and

2    replace it?

3    BY MR. MEUNIER:

4    Q.   How long to remove and replace the wiring that's shown in

5    this picture?

6    A.   Remove, a couple hours; replace, half a day, six hours on

7    this.  This is a one-story house.

8    Q.   You're talking about the entire house?

9    A.   Yes.  That's probably a three-man crew.

10   Q.   Do you know how electrical wiring work breaks down as

11   between materials and labor from your experience in doing cost

12   estimations?

13   A.   Our understanding from the sub that we're using, his

14   copper -- the wiring is about 15 percent of his overall cost.

15   Q.   The rest, the other 85 percent, would be labor?

16   A.   Be labor, yes.

17   Q.   Now, does Beazer remove all circuit or control boards in

18   the home?

19   A.   Yes.

20         MR. MEUNIER:  May we see photo 88, please.

21   BY MR. MEUNIER:

22   Q.   What is in this picture?  Tell us what this is.

23   A.   That is out of an air handler.  That's like the circuit

24   board out of an air handler.

25         MR. MEUNIER:  I'll offer that, Your Honor, as

DAILY COPY

1   Hernandez Exhibit 88.

2              **THE COURT:**  Admitted.

3              **MR. MEUNIER:**  May we see 89.

4              **THE WITNESS:**  The same thing.

5   **BY MR. MEUNIER:**

6   **Q.**   That's the same board, a closer view --

7   **A.**   Yes.

8   **Q.**   -- of all the wiring and attachments?

9              **MR. MEUNIER:**  I'll offer that as Exhibit 89,

10  Your Honor.

11             **THE COURT:**  Admitted.

12             **MR. MEUNIER:**  May we see 90.

13  **BY MR. MEUNIER:**

14  **Q.**   Do you recognize this as a closeup photograph of that

15  circuit board?

16  **A.**   Yes.

17             **MR. MEUNIER:**  I'll offer this as Exhibit 90,

18  Your Honor.

19             **THE COURT:**  Admitted.

20  **BY MR. MEUNIER:**

21  **Q.**   Is there copper wiring and what you have observed to be

22  corrosion on this circuit board?

23  **A.**   Yes.  You can see the wiring going into the -- I forget

24  what you -- the thing toward the right, that big black thing,

25  it's like a terminal, a post-connect.  Then you see the red on

DAILY COPY

1    the far right all to the edge of the picture -- up a tad.  Oh,
2    I'm sorry.  I was looking at my screen.  I wasn't looking at
3    your laser.  Yes, right there.  That's very corroded below the
4    red jacket.
5             Then skip above all the colored wires and go up to
6    the top.  Well, same picture, but the other one was better.  So
7    if you go up higher above the long red wire, those two coming
8    in are also corroded.
9             MR. MEUNIER:  May we look at the next picture, which
10   is 91.
11   BY MR. MEUNIER:
12   Q.   Do you recognize this as a picture of that same area of
13   the circuit board from a different angle?
14   A.   Go back.  Now go back.  I meant back forward.  This
15   doesn't look like the exact same one.
16   Q.   Is it another circuit board from a Beazer home?
17   A.   Yeah.  Yeah, because there was a blue wire.  There's no
18   blue wire in this picture.
19             MR. MEUNIER:  Let me offer this as Hernandez
20   Exhibit 91, Your Honor.
21             THE COURT:  Admitted.
22             THE WITNESS:  You can see the orange one coming in,
23   and it's very corroded.  Then it's what I'd call a little
24   jumper.  It's like a U-shaped wire going into one post set to
25   another post set.  Those ends are very tarnished.  Actually,

1   every one of them.  The one that looks least tarnished is the

2   green one, although it's got the corrosion.  The others are

3   very corroded.

4   **BY MR. MEUNIER:**

5   **Q.**   Had you hoped at one point in your protocol to preserve

6   circuit boards?

7   **A.**   No.  We weren't going to dismantle -- once we decided that

8   we were going to get rid of the air handler as a component -- I

9   mean as a complete component.

10  **Q.**   Now let's go to photograph 96, and this is the last series

11  of pictures we'll show.  Do you recognize this picture as taken

12  at the house with the wiring?

13  **A.**   Yes.  It's just showing the cleaning, that we have to go

14  and get additional crumbs, just where the mud goes everywhere.

15          **MR. MEUNIER:**  I'll mark this, Your Honor, as

16  Exhibit 96 and offer it into evidence.

17          **THE COURT:**  Admitted.

18  **BY MR. MEUNIER:**

19  **Q.**   What do we see in this photograph in the center section?

20  **A.**   Well, that's just a soleplate.  It's what the studs attach

21  to in construction, the bottom plate or soleplate.  It's just

22  showing the drywall dust and where it got wet that, you know,

23  we've got to go in and clean more inside that soleplate, as

24  well as it's showing little crumbs around the PVC drain.

25  **Q.**   So this is drywall dust from the removal of the boards?

1   **A.**   Correct.

2         **MR. MEUNIER:**  Next photograph, please.

3   **BY MR. MEUNIER:**

4   **Q.**   Does this show part of the cleanup process?

5   **A.**   Yes.

6         **MR. MEUNIER:**  Your Honor, I'll mark --

7         **THE WITNESS:**  It's part of the wipe-down.

8         **MR. MEUNIER:**  Excuse me.  I'll mark it and offer it

9   as Hernandez 101.

10        **THE COURT:**  Admitted.

11   **BY MR. MEUNIER:**

12   **Q.**   So you have a manual wipe-down of surfaces?

13   **A.**   Yes.

14   **Q.**   Why do you do that?

15   **A.**   That's part of the protocol.

16   **Q.**   What do you --

17   **A.**   We're getting rid of all the dust.  It was to take the

18   dust out, HEPA-vac, and go in and wipe down everything.  Then

19   we've additionally added some pressure-washing, which seems to

20   get even more dust.

21   **Q.**   Don't you think if you had been more careful in taking

22   away boards and if you had put up visqueen, you could have

23   avoided this step?

24   **A.**   No.  No, I don't think you could have avoided it.  You may

25   have made it less, but you'd have spent more money getting

1   there.

2   **Q.**   You still feel you would have had to do the manual

3   wipe-down?

4   **A.**   Yeah.  Yeah.

5   **Q.**   The final photo is 102.

6   **A.**   Same thing.  It's just going in and wiping down additional

7   spaces.

8          **MR. MEUNIER:**  Your Honor, I'll mark and offer it as

9   Hernandez Exhibit 102, this last photograph.

10          **THE COURT:**  Admitted.

11   **BY MR. MEUNIER:**

12   **Q.**   Now, Mr. Phillips, I'd like to talk with you about the

13   cost of these Beazer repair activities in Florida.  Did you

14   establish a budget for the repairs at each of the Chinese

15   drywall homes in Fort Myers and in Tampa?

16   **A.**   Yes.

17   **Q.**   Would you explain to the Court how, generally, you go

18   about doing that.

19   **A.**   Well, the very initial one was pulling numbers from two,

20   three years back, when we originally built the house.  With the

21   change in the economy, we were hopeful that we would get better

22   pricings two, three years later.  So we would go out and get

23   estimates.

24          So that spreadsheet is just going through all the

25   trades or cost codes and putting dollar numbers of how much

1   does it take to do plumbing, how much is electrical, HVAC, all

2   the different components to put the house together to come up

3   with, you know, how much is it going to cost to repair this

4   house and make them whole.

5          **MR. MEUNIER:**  May we see Defense Exhibit DX0055-0001,

6   Borkowski.

7   **BY MR. MEUNIER:**

8   **Q.**   Do you recognize this document?

9   **A.**   Yes, I do.

10         **MR. MEUNIER:**  Your Honor, it's been marked as a

11  defense exhibit, but I'd like to make an offer of it into

12  evidence at this time.

13         **THE DEPUTY CLERK:**  Would you give us the number

14  again, please.

15         **MR. MEUNIER:**  DX0055-0001.

16         **THE WITNESS:**  I thought this was our exhibit.

17  **BY MR. MEUNIER:**

18  **Q.**   It's actually been marked by the defendants.

19  **A.**   Or our spreadsheet, I meant to say.

20         **THE COURT:**  Admitted.

21  **BY MR. MEUNIER:**

22  **Q.**   You recognize the document as your trade sheet, if you

23  will, for budgeting these repairs?

24  **A.**   Yes.  Yes.  Yes.  Yes.

25  **Q.**   Are these numbers shown on this trade sheet the actual

1   budgeted costs for these different items of Chinese drywall

2   repair for this particular property?

3   A.   These are now past budgeted.  These are actuals.

4   Q.   These are actual costs?

5   A.   Yeah.

6   Q.   Okay.

7   A.   We've now got the bids in, so these are actual numbers on

8   this.

9   Q.   What does the designation at the top tell us?

10  A.   The name of our homeowner, the lot number in the

11  community, the address, the plan number, and name.  "Windor" --

12  I shouldn't have said it was mine -- is Windsor.  It's missing

13  an "S."  The 1890 plan number, actually, in this community is

14  the square footage.

15  Q.   So this home is 1,890 square feet?

16  A.   Correct.

17  Q.   Is that living space?

18  A.   Yes, it's living space.

19  Q.   If we could look at the total document again at the

20  bottom, what was the total cost for this remediation?

21  A.   Just under 97 grand.

22  Q.   Has this remediation now been completed at this cost?

23  A.   This is one of the ones within a couple weeks will be

24  completed.

25  Q.   You're not going to spend any more money in the next

1    couple weeks on this job?

2    **A.**   If we get them moved in and don't have to pay more

3    stipends.

4    **Q.**   So for the square footage of 1,890 square feet, what did

5    this job cost Beazer on a per-square-foot basis?  If you'd

6    like, I have a calculator.

7    **A.**   Yeah.  I don't want to try to impress you.

8              **MR. MEUNIER:**  May I --

9              **THE WITNESS:**  That one would be $51.29.  $51.

10   BY MR. MEUNIER:

11   **Q.**   What type of construction is the Borkowski home?

12   **A.**   This is a block construction.  I can't remember.  That

13   would be a one-story, so the first floor is block.  Metal studs

14   if it's not a bearing wall, wood studs if it is a bearing wall,

15   wood trusses, and tile roof.

16   **Q.**   There have been other projects where you have arrived at

17   the point of being able to list actual costs and a total for

18   the remediation; correct?

19   **A.**   Correct.

20   **Q.**   You've seen those?  I think Knauf's counsel has shown them

21   to you.

22   **A.**   Correct.

23   **Q.**   There are several others?

24   **A.**   Yes.

25   **Q.**   Did the cost per square foot in these cases vary?

DAILY COPY

1   **A.**   Yes.

2   **Q.**   So even though you're doing the same scope of remediation,

3   you have a different cost per square foot?

4   **A.**   That's correct.

5   **Q.**   Why is that?

6   **A.**   A couple reasons.  One will be different amenities or

7   different options and selections, color selections, grades of

8   cabinet, countertops.  So just what a buyer chose to put in the

9   house will vary.  One puts more in than another.

10              The other, which is typical -- it's not an absolute,

11  but it almost is -- is the larger the house, the lower the

12  square footage because you're dividing by a larger square-foot

13  number.  So, typically, a larger house is going to show --

14  you're going to spend more money, but the price per square foot

15  is going to be a lower number.

16  **Q.**   So among the several jobs where, like Borkowski, you've

17  arrived at a point of being able to state costs like this, what

18  is the range from low to high in square-foot cost?

19  **A.**   I think the low to high on all of them -- there's four

20  that I've seen recently -- is like 38, 39 -- I think 39 to 52,

21  53, somewhere in there.

22  **Q.**   Is it true that the lower cost, the 39, is for a larger

23  home; the higher cost for a home more this size?

24  **A.**   I believe that's correct.

25  **Q.**   If I told you that the Hernandez home had approximately

DAILY COPY

1    1,700 square feet of living space, would it be true that the

2    Hernandez home in size is most equivalent to the Borkowski?

3    **A.**    Yes.  Of what we would have, that's the most comparable.

4    It's pretty close.

5    **Q.**    It would be smaller than Borkowski with 1,700 square feet

6    of living space?

7    **A.**    Correct.

8    **Q.**    In fairness, I'll tell you that there's a garage also

9    being remediated, which is --

10   **A.**    Around 400, yeah.

11   **Q.**    -- 469 square feet.  Does that change the fact that the

12   size of the square footage in the Hernandez remediation would

13   be most equivalent to this job among the Beazer jobs that have

14   reached this point?

15   **A.**    Yes.

16   **Q.**    So does the $51-per-square-foot cost to Beazer for this

17   work at this home represent what an owner in the same community

18   would have to pay a builder to accomplish the same work?

19   **A.**    No.

20              **MR. HAYDEN:**  Objection, Your Honor.

21   BY MR. MEUNIER:

22   **Q.**    Why not?

23              **THE COURT:**  Well, let's see.  I'll overrule the

24   objection.

25                   Why?

DAILY COPY

1   **BY MR. MEUNIER:**

2   **Q.**   Why not?

3   **A.**   It threw me off.  Do the question again.

4   **Q.**   Does the cost to Beazer of $51 a square foot for this work

5   represent what an owner in this same community would have to

6   pay a builder to do the same work for the same type of cost?

7   **A.**   No.  The first reason is this is warranty for Beazer, so

8   there's no markup and there's no profit added to these numbers.

9   We're simply restoring something.  It's not starting from new

10  and hoping to make profit on it.  So the warranty is the main

11  difference.

12          The other would be we're -- I don't know of late what

13  the actual number is, but we're around the eighth largest in

14  the nation.  So we're a large company and we have a better

15  buying power than a typical contractor, to a certain degree,

16  even a large general contractor, because we're dealing in

17  thousands of homes, where a large contractor may do 50 or 100.

18  So there's national deals on appliances and some of the

19  fixtures that we get that we're going to buy at a much better

20  rate than a homeowner is.

21          The other is subcontractors are going to give better

22  prices even on labor because they're hoping they're going to

23  get 20 homes to do for us, 100 homes, 500, whatever the

24  jurisdiction or area you're talking about.  Whereas a homeowner

25  on their own are going to be one house, and the guy's got to

1    make it or not on that one house.  So those are the main

2    differences.

3    **Q.**   From your knowledge and experience in costing jobs and

4    knowing about the cost of construction, can you estimate in

5    percentage terms what those various differences would be

6    between a cost to a builder such as Beazer and a cost to an

7    owner?

8    **A.**   Yes.  That's going not just in current day but through

9    past experiences and stuff when I did estimating and, you know,

10   that type of thing.  So there's some industry standard or

11   typical numbers that would be used.

12   **Q.**   The first difference you mentioned, buying power --

13   **A.**   Yeah.

14   **Q.**   -- tell the Court what you think a fair percentage

15   difference would be between a builder cost and an owner paying

16   for the same work based on that buying power difference.

17   **A.**   Well, as I said in the previous trial --

18           **MR. HAYDEN:**  Your Honor, objection.  I don't --

19           **THE COURT:**  Just answer rather than explain where you

20   said what you said.

21           **THE WITNESS:**  I'm sorry.  10 to 25 percent.

22   **BY MR. MEUNIER:**

23   **Q.**   What would be a fair middle percentage difference?

24   **A.**   Split it.

25   **Q.**   Which would be what?

1   **A.**   18, 17, 17.5.

2   **Q.**   That's buying power.  I'll just put "BP."

3          What's the next difference that you mentioned?

4   **A.**   The next would be overhead.

5   **Q.**   What is a standard percentage difference for overhead?

6   **A.**   10 percent.  That's one that doesn't vary as much, but

7   10 percent is still conservative but a hard-to-dispute number.

8   **Q.**   What would the next difference be?

9   **A.**   The next would be profit.

10  **Q.**   What would you consider to be an industry-based profit

11  percentage in your community if we're talking about what an

12  owner there would have to pay for?

13  **A.**   Again, I would say conservative, but I would say

14  15 percent.

15  **Q.**   Just to be clear, is the $51-a-square-foot difference that

16  you calculated for this Borkowski work exclusive of that

17  17.5 percent buying power add-on for the owner?  It does not

18  reflect that, does it?

19  **A.**   Correct.

20  **Q.**   Is it also true that the $51-a-square-foot number for

21  Borkowski does not reflect or include the overhead factor?

22  **A.**   One thing that I saw that I haven't seen before is, within

23  the budget, we have like a management repair number, which

24  would really -- would be overhead, would be a portion of the

25  overhead.

1  **Q.**   Where is that?

2  **A.**   Scroll down.  Keep going.  It would be towards the bottom.

3  Repair management, that 8,085 number, that would really be

4  overhead.

5  **Q.**   What is that $8,085 being spent on?

6  **A.**   That is primarily the superintendent in the field, as well

7  as we have another gentleman that is the one that meets with

8  the homeowners and goes over the release agreement and what all

9  their options are, trying to figure out when they're going to

10  move and how they're moving, where they're moving.  So the cost

11  of him, as well, is making up that number.

12  **Q.**   You're saying that would normally be something within this

13  10 percent overhead difference?

14  **A.**   Correct.  Correct.  If you were going to do it this way,

15  then you should take that out.

16  **Q.**   What's the total of the Borkowski again?  Can we see the

17  bottom, please.  96,932.26.  With your calculator, why don't

18  you subtract 8,085, and we'll work with a different total.

19  **A.**   That would be 88,847.

20  **Q.**   So if we took out that overhead item and worked with the

21  smaller total that you just gave, what would the cost per

22  square foot be to Beazer?

23  **A.**   47 even.

24  **Q.**   So now we're excluding all these factors of buying power,

25  overhead, and profit; correct?

DAILY COPY

1   A.   Correct.

2   Q.   What it cost Beazer for this job, 47 a square foot --

3   A.   Right.

4   Q.   -- can you convert that number, using your percentages, to

5   what an owner would pay for the same work.

6   A.   You want to do the total or do you want to do them as we

7   go?

8   Q.   Why don't we do it one step at a time.

9   A.   Without buying power, they'd be at 55.23.  Overhead would

10   take it to 60.76.  It would be 69.87.

11   Q.   So if you were to convert or translate the Beazer cost as

12   a builder for this job to an owner cost, it would convert from

13   47 a square foot to 69.87 a square foot?

14   A.   That's how I would do it.

15   Q.   Let me, on overhead, ask if there is reference to just

16   corporate office, home office, as well as project specific

17   overhead on these jobs?

18   A.   No.

19   Q.   So when you talk about overhead at 10 percent, you're

20   including both the home office of Beazer --

21   A.   No.

22   Q.   You're not?

23   A.   No.

24   Q.   What are you including?

25   A.   I'm including if I was a general contractor and was hiring

DAILY COPY

1  a superintendent and put him on a job like a homeowner, that's
2  what kind of overhead --
3  **Q.**   The owner would have to pay?
4  **A.**   Right.
5  **Q.**   You don't think the owner would have to pay for
6  health-care benefits back at the home office in Atlanta?
7  **A.**   Yeah, you would.
8         **MR. HAYDEN:**  Objection:  Speculation.
9         **THE COURT:**  Sustained.
10        **MR. MEUNIER:**  No further questions.
11        **THE COURT:**  Any cross?
12                    **CROSS-EXAMINATION**
13 **BY MR. HAYDEN:**
14 **Q.**   Good afternoon, Mr. Phillips.
15 **A.**   Hi.
16 **Q.**   How are you doing?
17 **A.**   Good.
18 **Q.**   You've been with Beazer as vice president of operations in
19 Florida for seven years; is that right?
20 **A.**   I've been with Beazer for seven years.  I've been vice
21 president of operations for two.
22 **Q.**   Your company got involved in the Chinese drywall issue
23 probably in about March or April of last year?
24 **A.**   Of last year.  I think it was March.
25 **Q.**   Your involvement has been limited to two developments, if

1   I got that correct?

2   **A.**   We've only had exposure positive in two communities.

3   **Q.**   One in Fort Myers and one in Tampa --

4   **A.**   Correct.

5   **Q.**   -- is that right?

6   **A.**   Yeah.

7   **Q.**   I believe you talked about the Tampa property being

8   primarily townhomes?

9   **A.**   Correct.

10   **Q.**   And Fort Myers was the Magnolia Lakes property; correct?

11   **A.**   That's correct.  Single-family.

12   **Q.**   The property that we were just looking at, the Borkowski

13   property, that's a single-family stand-alone in Fort Myers?

14   **A.**   Correct.

15   **Q.**   If I recall correctly, you have three other properties

16   that are close to completion in that development; is that

17   right?

18   **A.**   That's correct.

19   **Q.**   You provided actual cost documents for those four

20   properties; is that right?

21   **A.**   Correct.

22   **Q.**   Counsel, I believe, referenced you to Defense Exhibit 55.

23        **MR. HAYDEN:**  Your Honor, I'm not sure if it was put

24   into evidence or not, but I think he established a foundation

25   previously.

1          **MR. MEUNIER:**  I had offered it, Your Honor.  I do not

2    object if it's offered now.

3          **THE COURT:**  Admitted.

4    BY MR. HAYDEN:

5    **Q.**   You indicated that of the properties that are involved in

6    your program, you're putting two families back into the homes

7    in a few weeks; is that right?

8    **A.**   In a couple weeks, yeah.  Six more about four weeks behind

9    that.

10   **Q.**   If I remember correctly, you have about 22 impacted

11   properties in Magnolia Lakes; is that right?

12   **A.**   I think it's 21, but close.

13   **Q.**   You began your program there in August of last year; is

14   that about right?

15   **A.**   I think so.

16   **Q.**   As we sit here today, none of the properties have been

17   fully completed and the families have moved back in; correct?

18   **A.**   That's correct.  So that's eight months, I guess.

19   **Q.**   You're about six months into the program; you have two

20   houses ready to return to owners and four more you think will

21   be ready in a few weeks?

22   **A.**   Yes.

23   **Q.**   Defense Exhibit 55, those are the actual general ledgers

24   of costs for those properties?

25   **A.**   Yes.

DAILY COPY

1   **Q.**   The first is the Borkowski property that we looked at;
2   correct?
3   **A.**   Correct.
4   **Q.**   The second on the second page would be the Batteau
5   property?
6   **A.**   Correct.
7   **Q.**   Third is the --
8   **A.**   Ciaffone.
9   **Q.**   -- Ciaffone.  The fourth is the turnkey; is that right?
10  **A.**   Yes.
11  **Q.**   You recall that we met yesterday?
12  **A.**   Yes.
13  **Q.**   I provided you with some summaries of that cost data that
14  you have?
15  **A.**   Yes.  Yes.
16  **Q.**   Did you have an opportunity to look at those summaries?
17  **A.**   I did.  I actually footed them.  The first page I did, I
18  didn't the back page.  But this morning I went through all
19  four, and they're accurate.
20  **Q.**   So the summaries that I provided to you -- and I'll
21  reference you first to Defense Exhibit 47.
22              **THE COURT:**  Are you offering 47?
23              **MR. HAYDEN:**  Yes, Your Honor, I'm offering 47.
24              **THE COURT:**  Admitted.
25              **MR. MEUNIER:**  Your Honor, if the witness verifies the

1   numbers on Exhibit 47, we have no objection.
2           **THE COURT:**  All right.  I'll admit it.
3   **BY MR. HAYDEN:**
4   **Q.**   That has to do with the turnkey property; correct?
5   **A.**   Correct.
6   **Q.**   I'd ask that you now go to Exhibit 48.  Defense Exhibit 48
7   has to do with the Batteau property; correct?
8           **THE COURT:**  You're offering that, and I will admit
9   it.
10  **BY MR. HAYDEN:**
11  **Q.**   The next property is Defense Exhibit 49, and that has to
12  do with the Borkowski property; correct?
13  **A.**   Yes, it did.  And just where I showed I did study today,
14  that's lot 111, where this one's showing lot 116.
15  **Q.**   Other than that, were the numbers on that exhibit correct?
16  **A.**   Yes, they were.  Yes.
17          **MR. HAYDEN:**  With that exception, Your Honor, I move
18  it into evidence.
19          **THE COURT:**  Admitted.
20  **BY MR. HAYDEN:**
21  **Q.**   Mr. Phillips, now I'd ask that you look at Exhibit 50.
22  That's the Ciaffone property?
23  **A.**   Yes.
24  **Q.**   Does that summary truly and accurately set forth your
25  actual costs for the repair of that home?

1   **A.**   Yes.

2             **THE COURT:**  Admitted.

3             **THE WITNESS:**  I don't know what I just answered.

4   You're talking the total cost at the top or the total cost on

5   the bottom?

6   **BY MR. HAYDEN:**

7   **Q.**   The total cost, 115,105.

8   **A.**   Yes.  Yes.

9   **Q.**   All these properties, they're all in Magnolia Lakes and

10  they're all on Little Gem Circle?

11  **A.**   Yes.

12  **Q.**   They're all single-families that were built at or around

13  the 2006 time frame?

14  **A.**   Yes.

15  **Q.**   Now, counsel took you to the Borkowski, which I believe is

16  Exhibit 49.  Why don't we work from that.  You'll see I broke

17  this down a little differently than in your cost sheet.

18  **A.**   Right.

19  **Q.**   I combined some things that might go together like

20  painting or cabinets or, with regard to demolition, rather than

21  four dumpster items, I collected those and indicated that that

22  was a trash disposal.

23  **A.**   Right.

24  **Q.**   You followed how we summarized those different line items

25  in this summary; correct?

1   **A.**   Yes.  This is the part that I studied this morning, is

2   this page, where I footed our total, and then the way you have

3   it broken out on those other two numbers, that it does tie

4   together with our numbers.

5   **Q.**   Sir, if you can see, the first line item is No. 1, removal

6   and repair of interior walls and drywall.  That's indicated to

7   be $6,000?

8   **A.**   Yes, I believe so.

9   **Q.**   Now, let's go down to the bottom of the page.  You'll see

10  that I've broken it into two different types of costs.  Do you

11  see that?

12  **A.**   Yes.

13  **Q.**   I call them A and I call them B.

14  **A.**   Yes.

15  **Q.**   Now, with regard to the costs in B, why don't we walk

16  through that.  The temporary accommodations reference, would

17  you agree that if you were doing an actual -- now, that has to

18  do with the accommodations for the individuals that are being

19  relocated?

20  **A.**   That's correct.

21  **Q.**   If you were a general contractor who was undertaking a

22  cost estimate for repairing a house, that number would not be

23  included in your cost estimate; correct?

24  **A.**   In the actual construction of the house?

25  **Q.**   Yes.

DAILY COPY

1   A.   No, it would not.

2   Q.   Generally, the contractor isn't responsible for relocation

3   of the folks, are they, in a repair?

4   A.   In a small guy?  No, I wouldn't think so.

5   Q.   The next has to do with management fee, and I believe

6   there was some discussion of that.

7   A.   Correct.

8   Q.   That has to do with Jerry Smith, and is it Glenn Davis?

9   A.   Glenn Davis, yes.

10   Q.   Jerry Smith is the individual who is your project manager

11   for the repair program, at least in the Fort Myers area?

12   A.   Correct.

13   Q.   Glenn Davis is the individual who is responsible for

14   helping the homeowners relocate, things of that nature;

15   correct?

16   A.   Yes, in both communities.

17   Q.   So those are costs that you pro rata out to the various

18   properties; correct?

19   A.   Correct.

20   Q.   The next is technical consulting.  Do you see that?

21   A.   Yes.

22   Q.   Now, that has to do with the hiring of Environ?

23   A.   That's correct.

24   Q.   Environ's the technical consultant that you've retained

25   for purposes of testing for defective drywall?

1  A.   Uh-huh.

2  Q.   Is that right?

3  A.   Yes.

4  Q.   And for undertaking preservation of evidence; is that

5  right?

6  A.   Yes.

7  Q.   And for determining product identification; is that right?

8  A.   That is correct.

9  Q.   They were out at the property on numerous occasions?

10 A.   Six.

11 Q.   Six different occasions; is that right?

12 A.   Correct.

13 Q.   They draft different reports for you.  They also preserve

14 the evidence pursuant to the Court's pretrial order on

15 preserving evidence; is that right?

16 A.   That's correct.

17 Q.   They charge you for storing that evidence at a certain

18 location; is that right?

19 A.   We're assuming.  I don't think the storage costs are

20 actually in these yet, but yes.

21 Q.   But that's a number that if you were to be doing it,

22 undertaking a normal repair, you would not be hiring an

23 environmental consultant; right?

24         MR. MEUNIER:  Objection, Your Honor, only because

25 we're not dealing with that, and there's a technical consulting

1   element in our cost list, so it's not pertinent to this.

2          **THE COURT:**  I'll let you cover that.  He's under

3   cross.  I overrule the objection.

4          **THE WITNESS:**  Will you ask me again.

5   **BY MR. HAYDEN:**

6   **Q.**   In a normal repair situation, you wouldn't be hiring an

7   environmental consultant, would you?

8   **A.**   In a normal repair?  Yeah, we actually do frequently.

9   **Q.**   The environmental consultant cost would not be at the

10  levels that we're seeing here, 12,500?

11  **A.**   No.  They would have no preservation.  It would be coming

12  in and giving a protocol and then maybe do an air test or some

13  other, like on mold remediation, different than this.

14  **Q.**   Something separate and apart.  In this situation, you have

15  Environ, who's coming in and first doing their phase 1

16  determination, whether or not there is affected Chinese

17  drywall?

18  **A.**   That's right.

19  **Q.**   Then they're coming in and trying to determine what

20  components are impacted; correct?

21  **A.**   Correct.

22  **Q.**   Then they're coming in and trying to determine what

23  manufacturer may be involved?

24  **A.**   Correct.

25  **Q.**   Then before the demolition they do what you call, I

1    believe, bag and tag?

2    **A.**    Yes.

3    **Q.**    They actually go through the house and they pull drywall,

4    they bag it and tag it, as well as pull samples of certain

5    components of the house; correct?

6    **A.**    They take plumbing fixtures, electrical outlet switches,

7    they clip some of the U's off of the coil, as well as drywall

8    samples.

9    **Q.**    They actually go through room by room and give you a

10   percentage of the different manufacturers' drywall that's in

11   that house?

12   **A.**    That's correct.

13   **Q.**    It's a pretty labor-intensive project; correct?

14   **A.**    A decent amount.

15   **Q.**    Would you agree that a majority of that is for litigation

16   purposes?

17   **A.**    Yes.

18   **Q.**    It's to sue my client or someone else at the end of the

19   day; correct?

20   **A.**    Right.

21   **Q.**    That's not part of the normal repair program, is it?

22   **A.**    No.

23   **Q.**    The total of that, the B costs, in this case is $46,024.

24   Do you see that?

25   **A.**    Uh-huh.

1   **Q.**   If we could go up to the A costs, that number is

2   $50,908.26; correct?

3   **A.**   That's what's left over.

4   **Q.**   If we can go up to the top, then.  If we're looking at the

5   A costs for this home, the actual cost per square foot for the

6   A costs would be $26.94; right?

7   **A.**   Yes.

8   **Q.**   This, you said, is probably, of the three, the most

9   comparable home of the four homes that you are close to

10  completion on?

11  **A.**   Correct.

12  **Q.**   If we could go quickly to Exhibit 47.  If we could just go

13  to the top of the page again, that summarizes the different

14  costs that are the A costs and the B costs.  Once again, the

15  cost per square foot for the A costs is $26.10; right?

16  **A.**   Yes.

17  **Q.**   We can go now to Exhibit 48.  If we could look at this

18  once again, this is a little bit larger home; correct?

19  **A.**   Right.  Uh-huh.

20  **Q.**   Once again, the cost per square foot for the A costs would

21  be $29.16 a square foot; right?

22  **A.**   Yes.

23  **Q.**   Then you have the additional B costs of $49,435?

24  **A.**   Correct.

25  **Q.**   If we could go down to the bottom of the page.  Once

DAILY COPY

1    again, you're seeing a large moving and storing cost?

2    **A.**    Yes.

3    **Q.**    That's for moving and storing the --

4    **A.**    Personal property.

5    **Q.**    Would it be fair to say that moving personal property is

6    not something that a general contractor's generally responsible

7    for in giving a cost estimate for the repair of a home?

8    **A.**    Yes.

9    **Q.**    Would it be fair to say that, again, you're not

10   responsible -- the general contractor, when giving a cost

11   estimate, doesn't factor in relocation of individuals in the

12   cost estimate, do they?

13   **A.**    No, not unless they did the original work.

14   **Q.**    But in the case of the Hernandez, that would not factor

15   in; correct?

16   **A.**    I would be unfamiliar.

17   **Q.**    Again, there's a management fee, which has to do with

18   Jerry Smith and Glenn Davis?

19   **A.**    Correct.

20   **Q.**    That would be considered some type of overhead of Beazer;

21   correct?

22   **A.**    Correct.

23   **Q.**    The technical consulting, again, is with Environ?

24   **A.**    Correct.

25   **Q.**    Now, what was the price range for the four homes that are

1    involved here, that we have cost items for, when you sold them
2    back in 2006?
3    **A.**   Oh, wow.  Just a general number, these were in the 300,000
4    to 400,000 range two, three years ago -- three, four years ago.
5    **Q.**   3,000 to 4,000?
6    **A.**   Three to four years ago, 300 to 400 grand.
7    **Q.**   300 to 400 grand.
8            Do you know what their fair market value is at the
9    present time or what you're listing them for?
10   **A.**   Well, we're complete in the community.  It's got to be in
11   the mid 200s; mid, high 200s.
12   **Q.**   Now, we talked a little bit about Environ and the
13   retention of Environ.  In the repair program, you suggested
14   that you use an airing out period of 14 days?
15   **A.**   Uh-huh.
16   **Q.**   Actually, Environ recommended an airing out of 10 days; is
17   that right?
18   **A.**   Correct.
19   **Q.**   You just decided that you wanted to increase it to 14?
20   **A.**   Right.
21   **Q.**   You haven't had an opportunity to view the Hernandez
22   house, have you?
23   **A.**   No, I have not.
24   **Q.**   Yesterday, did you have an opportunity to see the Mallet
25   cost estimate?

1   **A.**   What do you mean?

2   **Q.**   The cost estimate that has been provided by the expert in

3   this case on behalf of the plaintiffs.

4   **A.**   Yes.

5   **Q.**   If we could go to Plaintiffs' 477, page 32.

6       **THE COURT:**  Has that been admitted?

7       **MR. HAYDEN:**  It has not yet, Your Honor.

8       **THE COURT:**  Do you want to offer it?  Get him to

9   identify it.

10  **BY MR. HAYDEN:**

11  **Q.**   Sir, is that the cost estimate that you reviewed yesterday

12  with me?  And I refer you specifically to the recap sheet.

13  **A.**   Thank you.  Will you scroll the entirety of the one page.

14      Yes, that's the sheet you showed me.

15      **THE COURT:**  What is it?  A cost estimate for what?

16  **BY MR. HAYDEN:**

17  **Q.**   This is a cost estimate for the repair of the Hernandez

18  home, as far as you understand?

19  **A.**   I have very little understanding on this sheet, but it is

20  one that you showed me yesterday.  I'm not sure I'm thorough of

21  knowing where it comes from or who did it.

22      **THE COURT:**  Is that a plaintiff exhibit?

23      **MR. MEUNIER:**  It's part of the report of Mr. Mallet,

24  but I don't think there's a foundation for questioning this

25  witness about numbers that Mr. Mallet is proposing for a home.

1          **MR. HAYDEN:**  Your Honor, they have suggested that

2     this gentleman's cost numbers would be something that would

3     assist the Court in determining appropriate costs for repairing

4     the Hernandez home.  I'd like to just compare what Mr. Mallet,

5     their expert, has to say about what the costs should be versus

6     what Mr. Phillips has.

7          **THE COURT:**  Is he going to testify?

8          **MR. MEUNIER:**  Mr. Mallet is going to testify, Judge.

9          Can I be clear about my objection?  This is an

10    invited comparison between what Mr. Mallet says an owner is

11    going to have to pay for these items as opposed to the numbers

12    that this gentleman has, which is strictly what Beazer, the

13    builder, might have as a cost.  So I don't know if we're now

14    going to do some attempt to convert and translate, but it's a

15    comparison of apples and oranges.  I don't think he's in a

16    position to know --

17         **THE COURT:**  I understand the objection.  He's under

18    cross, so I'll let him go.  Let's see.

19         If you can answer, fine; if you can't, just say

20    you can't.

21         **MR. HAYDEN:**  Thank you, Your Honor.

22    **BY MR. HAYDEN:**

23    **Q.**   If you could look at this -- first, why don't we look at

24    the bottom of this cost estimate.  You'll see that --

25         **THE COURT:**  First, let's see.  Do you agree that it's

1    admissible?

2              **MR. MEUNIER:**  Your Honor, it's part of the report of

3    the expert.  We were not planning to admit the narrative report

4    of an expert.  He's going to be here to testify.

5              **THE COURT:**  I don't know whether I'm going to be

6    admitting it or not, then.  Let's see where we go with this.

7    **BY MR. HAYDEN:**

8    **Q.**   Mr. Phillips, do you see where Mr. Mallet has added a

9    10 percent overhead and a 10 percent profit?  Do you see that?

10   **A.**   Uh-huh.

11   **Q.**   You're suggesting that you would add 15 percent profit.

12   **A.**   Yeah.  Both of ours are conservative.  His is more than

13   mine.

14   **Q.**   Then he also adds a material sales tax and equipment sales

15   tax.  Do you see that?

16   **A.**   Yes.

17   **Q.**   Is it your testimony that those numbers would generally --

18   the sales tax numbers would be included in the numbers that you

19   would get from your subcontractors?

20   **A.**   They would be in the individual breakdown of the trades

21   unless we were buying the material directly.  But we were

22   buying them from a sub, so they would take care of the taxes

23   themselves.

24   **Q.**   Those numbers would be reflected in your numbers in

25   Section A of my summaries?

1   A.   In the line item of my spread -- I think we're saying the
2   same thing.  It's --
3   Q.   Is it appropriate to add material sales tax and equipment
4   sales tax onto the cost that you sustained from the labor and
5   equipment that subcontractors are providing to you?
6   A.   No.  We don't do that.
7          **MR. HAYDEN:**  If we could go to the Borkowski summary,
8   please.  I believe it's 49.
9   **BY MR. HAYDEN:**
10  Q.   Now, in the Borkowski summary, you indicated first -- I
11  believe, as Mr. Meunier put it on the board, you helped him
12  with a calculator and determined some additional numbers you
13  would add on if you were a general contractor rather than doing
14  warranty work here at Beazer.
15  A.   Correct.  Correct.
16  Q.   I believe you believed that you, as a national company,
17  would be getting some discounting that a custom builder would
18  not have; correct?
19  A.   Correct.
20  Q.   Do you recall testifying in the trial in the *Germano*
21  matter?
22  A.   Yes.
23  Q.   Do you recall testifying at that time that the discount
24  that you would see as a national builder would be 10 percent?
25  A.   Actually, in the transcript, it's 10, 20, and 25 is what I

1   said, and then we chose to go with the conservative.

2   **Q.**   The conservative being?

3   **A.**   10.

4   **Q.**   10 percent.  So --

5   **A.**   At this time, he was asking -- I said 10, 20, 25.  He said

6   where would it fit, and I said split it.  It's like page 93 or

7   94.

8   **Q.**   Actually, if I could go to the --

9           **MR. HAYDEN:**  Can you blow up page 108.

10  **BY MR. HAYDEN:**

11  **Q.**   I'm showing you the questions and answers that were posed

12  to you in this courtroom in the *Germano* matter, and I believe

13  it is clear here that you were asked the question.

14          "Answer:  So if you're at 50, I would add 10 percent

15          because of not having buying power."

16          Is that what you answered?

17  **A.**   That particular time, yes, but earlier I said 10, 20, or

18  25.

19          **MR. MEUNIER:**  Objection for lack of completeness,

20  Your Honor.

21  **BY MR. HAYDEN:**

22  **Q.**   If we could go back to the Borkowski summary.  Now, sir,

23  if we start at the assumption that the cost per square foot is

24  26.94 -- do you see that?

25  **A.**   Yes.

1   **Q.**   If you added the 17.5 percent that you believe you're
2   entitled to because of discounting, could you help me with the
3   numbers.
4   **A.**   Yes.  That would change it to 31.65.
5   **Q.**   If you added a 10 percent discount or 10 percent overhead
6   onto that, what would you get?
7   **A.**   That would be 34.82.
8   **Q.**   If you added the 15 percent profit onto that, what would
9   you get?
10  **A.**   That would be 40.04.
11  **Q.**   Would it be fair to say that if we are just looking at the
12  hard costs separate and apart from the costs that I've
13  segregated out in Exhibit B, the cost per square foot for the
14  four homes that you are nearly completed on ranges from $26.10
15  to $29.16 before adding on the discount, the overhead, and the
16  profit?
17  **A.**   Yes.
18  **Q.**   In the same way, the other three properties, if you went
19  through that same process, you would be able to estimate what
20  the cost per square foot would be for you to repair those four
21  homes in the same manner following the Beazer protocol?
22  **A.**   Without preservation and such?
23  **Q.**   Yes.
24  **A.**   Yes.
25              **THE COURT:**  By "such," you mean the things he put in

1  B?
2           **THE WITNESS:**  Correct.  Correct.
3  **BY MR. HAYDEN:**
4  **Q.**   Just so I'm clear, the things that I put in B was the
5  management fees; correct?
6  **A.**   Yes.  Yes.  The bottom square down there.
7  **Q.**   Okay.
8  **A.**   Yeah.
9  **Q.**   If you're getting overhead over here, that should be
10 deducted; correct?
11 **A.**   He did that.  The answer is:  Yes.  And this math here,
12 that was deducted.
13 **Q.**   It was deducted in the math that you just did with me;
14 correct?
15 **A.**   Before the math I just did with you.
16 **Q.**   Okay.
17 **A.**   They took the 8,000 off before he did all this math.
18 **Q.**   Now, the technical consultant is the Environ work?
19 **A.**   Correct.
20 **Q.**   The moving and storage, do you know if the moving and
21 storage amount was included in the Mallet estimate for the
22 Hernandez home?
23 **A.**   No, I do not know.
24 **Q.**   You've indicated that you get better prices because you're
25 a national builder than a custom builder would get; correct?

1   A.   Right.

2   Q.   So you would expect that your costs, some of your line

3   items for these particular homes, should come in cheaper than

4   the costs for subcontractors or for materials that are set

5   forth in the Mallet report; correct?

6   A.   I'm not familiar with the Mallet report, but I'm pretty

7   certain that we would be getting better prices than what a

8   small contractor would get.

9   Q.   Just so I understand, the work you're doing is warranty

10  work; right?

11  A.   Yes.

12  Q.   The product that you, Beazer Homes, sells is a home.  It's

13  a home that you can walk into and move into; right?

14  A.   That's right.

15  Q.   You're not selling individual components; right?

16  A.   Correct.

17  Q.   Your warranty would apply to all the fixtures and to the

18  appliances; right?

19  A.   The whole house.

20  Q.   So if the stove broke three weeks later, you'd go in and

21  either repair or replace the stove?

22  A.   Yes.

23  Q.   If a pipe broke and it impacted on other components, you'd

24  go in and repair and replace any damaged goods; correct?

25  A.   That's correct.

1  **Q.**   Would you say that you're in a unique position to other

2  defendants in this lawsuit because you have a contractual

3  obligation to the homeowners?

4  **A.**   Give me an example of another defendant.  What do you

5  mean?

6  **Q.**   The manufacturer.

7  **A.**   So am I in an unusual position?  I'm sorry.

8  **Q.**   Let me step back.

9  **A.**   Okay.

10  **Q.**   Beazer Homes is a defendant in the multidistrict

11  class-action litigation before this Court; right?

12  **A.**   I don't know that.  I'm sure.  I don't know.

13  **Q.**   Beazer, like other home builders, continues to sell homes

14  in the Tampa and Fort Myers areas; correct?

15  **A.**   In the Tampa area.  We've pulled out of Fort Myers.

16  **Q.**   You continue to sell a lot of homes on a national basis;

17  right?

18  **A.**   Oh, absolutely, yes.

19  **Q.**   You have a brand to protect; correct?

20  **A.**   Yes.

21  **Q.**   You're proud of your brand; right?

22  **A.**   Yes.

23  **Q.**   Part of your goal, in undertaking the repair program, was

24  to keep that brand untarnished; right?

25  **A.**   Yes.

1    **Q.**    Another part of the reason for a repair program by a home
2    builder here is to avoid litigation; would that be fair?
3    **A.**    Yes.
4    **Q.**    You wanted to assure your homeowners that you'd stand
5    behind your product; is that right?
6    **A.**    Yes.
7    **Q.**    You wanted to give your homeowners some comfort that you
8    had solved the entire issue; right?
9    **A.**    Yes.
10   **Q.**    If that meant airing out the house for 30 days, you aired
11   out the house for 30 days?
12   **A.**    Yes.
13   **Q.**    The airing out of the house for 30 days or 14 days, that's
14   not based on science, is it?
15   **A.**    10 days was based on science.  I say "science."  It was
16   based on our specialist that said 10.  We just thought we'd go
17   ahead a full two weeks.
18   **Q.**    Just so I understand, the appliances that you're
19   replacing, those haven't failed in the Beazer homes, have they?
20   **A.**    Not that I'm aware of.
21   **Q.**    I think that Mr. Meunier may have touched on this.  In
22   your agreement with the homeowners, you don't make any
23   provision for payment for personal property?
24   **A.**    We don't ask them to give up their rights to pursue later.
25   It comes up often in signing the agreement.  And we've said if

1   a homeowner can show us something that they're concerned, that
2   we would consider it, but to date that hasn't happened.
3   **Q.**   In the 31 homes -- 31 or so homeowners, is that how many
4   you've signed up for your program?
5   **A.**   Yes.
6   **Q.**   You have not received any claims, any formal claims, for
7   personal property; correct?
8   **A.**   That's correct.
9   **Q.**   Just so I understand, your program started in August of
10  last year; right?
11  **A.**   I think so.
12  **Q.**   Lennar had already been in the business of repairing homes
13  back in February or March of last year; is that right?
14  **A.**   I'd be speculating.
15  **Q.**   You indicated that they were the leaders of the pack and
16  they were the ones you went to; correct?
17  **A.**   Yes.  Yes.
18  **Q.**   You looked to them to determine what you would do with
19  regard to what you had to do in repairing houses?
20  **A.**   I'd say more we looked to the consultant that they
21  discovered.
22  **Q.**   That was Environ; right?
23  **A.**   Yes.
24  **Q.**   So you're using the same consultant?
25  **A.**   Yes.

1    **Q.**   At the time you started your program, Lennar was at least

2    six months into their program?

3    **A.**   Correct.

4    **Q.**   They had been doing certain things for their homeowners

5    that it would be hard for you to do less than what they had

6    offered; correct?

7    **A.**   Yes and no.  If they were doing something that we felt was

8    outlandish, we wouldn't do it just because they started it.  So

9    not fully.

10   **Q.**   If they were replacing appliances, it would be very

11   difficult for you not to replace appliances?

12   **A.**   It would offer an additional challenge.  The truth is I

13   don't know if they're replacing appliances or not.

14           **MR. HAYDEN:**  That's all I have.  Thank you,

15   Your Honor.

16           **THE COURT:**  Any redirect?

17                       **REDIRECT EXAMINATION**

18   BY MR. MEUNIER:

19   **Q.**   On appliances, Mr. Phillips, if an owner comes to you in

20   one of these homes and makes a case for replacement of

21   appliances based on corrosion, you'll take care of it?

22   **A.**   It's already part of our protocol.  We're doing it anyway.

23   **Q.**   I think counsel used the word *normal*, so I'll use it.  Do

24   you consider Chinese drywall remediation projects to be normal

25   projects?

1    **A.**   No.  It's the first in my history.

2               **MR. MEUNIER:**  Could I see Defense Exhibit 55 with the

3    B costs.  I'm sorry.  It was the last exhibit up.

4               **MR. HAYDEN:**  49.

5    **BY MR. MEUNIER:**

6    **Q.**   You've indicated this is not your normal project.

7    **A.**   Correct.

8    **Q.**   It's a Chinese drywall remediation project.

9    **A.**   Correct.

10   **Q.**   In the context of doing a Chinese drywall remediation,

11   would Beazer consider there to be any basis for not expending

12   the costs that counsel has listed in B; specifically, moving

13   and storage, temporary accommodations, technical consulting?

14   **A.**   No.

15   **Q.**   Were you aware that, at the technical consulting,

16   Mr. Mallet actually includes a number higher than $12,500;

17   namely, $15,000?

18   **A.**   No.

19   **Q.**   Would you do without environmental consulting in a project

20   like this that's not a normal project but a Chinese drywall

21   project?

22   **A.**   No.

23   **Q.**   Why not?

24   **A.**   Well, it's the scientific expertise we don't have, just

25   like we would bring them in on like a mold remediation.  You

 1   bring in the specialists.

 2   **Q.**   Moving and storage will be a cost to the owner, won't it?

 3   **A.**   Yes.

 4   **Q.**   Temporary accommodations will be a cost to the owner?

 5   **A.**   Yes.

 6   **Q.**   In being cost-effective, have you been influenced by

 7   protection of your brand name?

 8   **A.**   Not in the sense of how we figured out what the protocol

 9   would be.

10   **Q.**   Or the costs?

11   **A.**   Well, protocol gets to costs of what you're going to do.

12   You're evaluating costs as well.  So, no, brand or marketing or

13   advertising had nothing to do with us figuring out what we

14   thought was the right thing to do.

15   **Q.**   In being cost-effective, have you been influenced by

16   litigation concerns?

17   **A.**   No, by the evidence of what we're spending.

18   **Q.**   You don't include in your cost list, your trade sheet,

19   things like permits, drawings, etc.; correct?

20   **A.**   We should have a permit in there.  Drawings, we don't need

21   because the house is already built.

22   **Q.**   I didn't see for Borkowski --

23         **MR. MEUNIER:**  Could we put up --

24         **THE WITNESS:**  I can't remember.  Yeah, I think we

25   have a permit number.  It's a low number because it's like

1    a four or five -- there's one right -- well, huh.  Yeah, we're

2    paying something, but it's nothing -- we don't repay impact

3    fees.  Thanks for pointing that out, because we'll start to

4    figure that.

5    **BY MR. MEUNIER:**

6    **Q.**    Just tell Beazer, "You're welcome."

7    **A.**    It is nominal.  I mean, it's like $500 or less.  It's not

8    like 14,000, 15,000, with impact fees and such.

9    **Q.**    Does that same markup percentage apply to a permit fee

10   that an owner would have to pay?

11   **A.**    Yes.  Yes.

12   **Q.**    To make the owner whole, to be cost-efficient, is it still

13   your testimony that for the Borkowski job, 1,890 square feet,

14   the $47 cost to Beazer translates to 69.87 for the owner per

15   square foot?

16   **A.**    Yes, it is.

17                **THE COURT:**  Thank you, sir.  You're excused.

18                    We'll stop here for 15 minutes.  The Court will

19   stand in recess for 15 minutes.

20                **THE DEPUTY CLERK:**  Everyone rise.

21                (WHEREUPON the Court took a brief recess.)

22                **THE DEPUTY CLERK:**  Everyone rise.

23                    Be seated, please.

24                **THE COURT:**  Call your next witness.

25                **MR. BRYSON:**  Thank you, Your Honor.  The plaintiffs

DAILY COPY

1   call Brad Krantz.

2               I met with Mr. Sanders prior to this

3   examination, and we have been able to come to an agreement on a

4   number of exhibits.  With the Court's permission, we would tell

5   you the numbers and have those moved into evidence at this

6   time.

7               **THE COURT:**  Okay.

8               **MR. BRYSON:**  That would be exhibit numbers 109; 134;

9   389; 590; 591 after blacking out the right-hand column of that

10  exhibit pursuant to the Court's ruling this morning; 592; 593;

11  594; 595; 596; 597; 598; and 600.  We would move that all those

12  exhibits be received into evidence.

13              **THE COURT:**  I understand it's without objection.  The

14  Court will admit them.

15              **MR. SANDERS:**  There's one that had some writing.

16  It's hearsay from the report.  The pictures and the test

17  results are fine.  I can't remember which one.  It may be 596,

18  but --

19              **MR. BRYSON:**  Whichever one may have had a few

20  sentences, we will make sure that's blacked out.

21              **THE COURT:**  Let them be admitted.

22              **MR. BRYSON:**  Thank you, Your Honor.  There are two

23  exhibits that we have he has objection to, and at the

24  appropriate spot in the examination I will bring that to the

25  Court's attention.

1          (WHEREUPON **Brad Krantz**, having been duly sworn,

2     testified as follows.)

3          **THE DEPUTY CLERK:**  Please state your full name and

4     correct spelling for the record.

5          **THE WITNESS:**  Brad Krantz.

6                                **VOIR DIRE**

7     **BY MR. BRYSON:**

8     **Q.**   Good afternoon, Mr. Krantz.  Can you explain to the Court

9     where you work.

10    **A.**   Corrosion Testing Laboratories in Newark, Delaware.

11         **MR. BRYSON:**  We would ask that Hernandez 389 be

12    brought up on the screen, page 1.

13    **BY MR. BRYSON:**

14    **Q.**   Can you explain to the Court your position with Corrosion

15    Testing Laboratories.

16    **A.**   I'm the director of laboratory services.

17    **Q.**   Move that microphone, if you could, a little bit closer

18    in.

19    **A.**   All right.

20    **Q.**   In your position as director of laboratory services, can

21    you explain to the Court what your job responsibilities are.

22    **A.**   I'm responsible for the daily operations of the

23    laboratory.  That would include corrosion testing and failure

24    analysis, as well as a minor amount of chemical analysis.

25    **Q.**   We'll talk more about each of those in a few minutes.  Can

1   you explain to the Court your educational background.

2   **A.**   I have a bachelor's of science from Iowa State University,

3   and I'm a NACE-certified materials selection/design specialist.

4   **Q.**   What is a NACE-certified specialist?  Can you explain to

5   the Court in detail what that is.

6   **A.**   Yes.  It's part of the NACE recognition program of

7   continuing education to --

8   **Q.**   Well, what does "NACE" stand for?

9   **A.**   "NACE" stands for National Association of Corrosion

10  Engineers.  It's a program that they have to ensure that their

11  members are well-educated and recognized by their peers as

12  understanding corrosion and being qualified to work in that

13  area.

14          There's various levels, starting at corrosion

15  technician up to several types of corrosion specialists.  Each

16  category, you are required to have a certain amount of

17  experience, education, as well as passing a certification exam

18  and providing references from other corrosion specialists.

19  **Q.**   Can you explain to the Court each step that you have been

20  through and how much experience you had to have and what type

21  of tests you had to take.

22  **A.**   As a corrosion technician, you're required to have two

23  years' experience, and you take a test that covers the basics

24  of corrosion.  It's a two-hour exam, and you're required to

25  provide at least two references.

1   **Q.**   Did you pass that step?

2   **A.**   Yes, I did.  I passed it on the first try.

3   **Q.**   When did you pass that?

4   **A.**   I believe in '91 or '92.

5   **Q.**   What's the next step?

6   **A.**   The next step is corrosion technologist, which requires, I

7   believe, five years' experience and again another exam.  I

8   believe it's a four-hour exam.  You're required to provide the

9   references again.

10   **Q.**   What type of experience were the five years to be?

11   **A.**   In corrosion under -- yeah, corrosion experience directly

12   with -- dealing with corrosion in one form or another.

13   **Q.**   You passed that exam as well?

14   **A.**   Yes, I did.

15   **Q.**   What's the next step?

16   **A.**   The next step was a senior corrosion technologist.  You're

17   required to have eight years' experience and pass another exam.

18   This exam is an eight-hour test, much more thorough

19   examination; and again references.

20   **Q.**   Again, did you have the requisite experience and pass that

21   examination?

22   **A.**   Yes, I did.

23   **Q.**   Then what's the next step?

24   **A.**   Then the next step was the specialist, and I chose the

25   materials selection/design category, which again requires the

1  same eight years minimum experience; another exam that deals

2  specifically with materials and design; and references from

3  corrosion specialists.

4  **Q.**   That's your current position today, is materials

5  selection/design specialist?

6  **A.**   Yes.

7  **Q.**   Can you explain to the Court what *materials selection*

8  means.

9  **A.**   It means selecting materials that will be compatible with

10  expected exposure, whether it's atmospheric, immersion,

11  assisting the designers of equipment so that they can choose

12  the right materials.

13  **Q.**   What about *design specialist*?

14  **A.**   Helping the designers of those things design their vessels

15  and whatnot so that they don't build in corrosion problems such

16  as crevices or stress-rising situations.

17  **Q.**   Are you a member of any professional organizations?

18  **A.**   Yes.  I'm a member of NACE and ASTM.

19  **Q.**   As part of your work experience in corrosion and failure

20  analysis, can you explain to the Court what that typically

21  involves in your day-to-day activities.

22  **A.**   On the corrosion testing side, we do various types of

23  corrosion testing, from standardized ASTM and NACE standard

24  tests to other recognized standards.  We do customized testing

25  to assist our clients to solve specific problems.  We'll do

1  process simulations.  There may be some very simple tests to
2  very complicated tests.
3         On the failure analysis side, we will get samples
4  from our clients, and they want to know what caused the
5  corrosion, what's caused the failure.  We'll collect
6  information.  We'll do optical and microscopic analysis.
7  Typically, we will do some electron beam analysis in a scanning
8  electron microscope, chemical analysis through EDS.  We may
9  also do metallographic cross-sections to look at the type of
10  corrosion that's occurred and, if there's pitting, what type of
11  pitting has occurred; if there were material defects that could
12  have led to the corrosion.
13  **Q.**   As the director of laboratory services at CTL, do you
14  supervise other employees?
15  **A.**   Yes, I do.
16  **Q.**   Can you explain that to the Court a little bit.
17  **A.**   We have seven employees now.  We have a metallurgical
18  engineer, a mechanical engineer, and three technicians, and a
19  receptionist.  I'm aware of the projects they're working on,
20  and I assist each of them with solving the particular issues
21  that they have before them.
22  **Q.**   Have these employees assisted you in the work that you,
23  hopefully, intend to testify about today?
24  **A.**   Yes, they have.
25  **Q.**   Over the course of your career, how many samples would you

DAILY COPY

1  say you have analyzed for issues related to corrosion?

2  **A.**    Thousands.

3  **Q.**    How many samples would you say you have investigated with

4  regard to failure analysis?

5  **A.**    Hundreds.

6  **Q.**    Do you have any experience with regard to sulfur gas

7  corrosion, specifically?

8  **A.**    Yes.

9  **Q.**    Can you explain those instances to the Court.

10 **A.**    We have had experience with sulfide corrosion of shipboard

11 heat exchangers when they were being built in a polluted bay.

12 They were exposed to sulfide.  When they went out to sea, the

13 sulfide was removed from the exposure, but the heat exchangers

14 continued to corrode to failure.

15          We have had experience with testing of electrical

16 contacts in an acceptance test using hydrogen sulfide.  These

17 were gold-plated copper contacts, where the contact resistance

18 is measured over time, and then the results were supplied to

19 our client.

20          We have done testing of hydrogen sulfide exposure to

21 communication boxes that would go on the outside of a home, the

22 cable box or telephone box, to determine if the enclosures were

23 adequately protected, adequately sealed, to protect the circuit

24 boards inside.

25          We have also done high-temperature testing of sulfide

1    gases for gas desulfurization.  We do testing of dissolved

2    hydrogen sulfide in a corrosive environment for steel that's

3    used in the oil and gas industry.  We have done, I'm sure,

4    several other projects.

5    Q.    Any for museums?

6    A.    Yes.  We did some work with the National Park Service of

7    evaluating the effects of various atmospheric pollutants on

8    museum artifacts:  Lead, copper, silver.

9    Q.    So, of this experience, some of these involved copper and

10   copper alloys and other types of metals?

11   A.    Yes.

12   Q.    Now, prior to being retained as an expert by the

13   Plaintiffs Steering Committee, had you had any exposure to

14   Chinese drywall?

15   A.    Yes, we had.

16   Q.    Can you explain those situations to the Court.

17   A.    My first exposure was working with an air-conditioning

18   manufacturer.  I was at their site on a separate matter, and

19   they brought in a coil that had come from a Florida home.  It

20   was -- the exposed copper was black and had a dark black scale

21   that was flaking off, and they asked me to take a sample of

22   that and analyze it to see if it was indeed caused by sulfur

23   corrosion.

24   Q.    Any other examples of exposure to Chinese drywall prior to

25   being retained as an expert by the plaintiffs?

DAILY COPY

1   **A.**   The next instance was another air-conditioning coil

2   manufacturer who sent us samples of failed tubes from an

3   air-conditioning coil.  They had marked spots where they were

4   leaking and asked us to cross-section to determine the type of

5   failure.

6   **Q.**   Did you analyze those samples?

7   **A.**   Yes, we did.

8   **Q.**   We'll talk more about them in a bit.  Any other examples

9   of Chinese drywall that you have been involved with at CTL?

10  **A.**   Yes.  That same manufacturer then sent us some small

11  quantities of drywall and asked us to replicate a test that was

12  on the Internet using FTIR, Fourier transform infrared.  We did

13  those tests, compared it to the results that were posted on the

14  Internet, and got similar results.

15  **Q.**   Any others?

16  **A.**   We also did some exposure testing for this same client.

17  They wanted to see if hydrogen sulfide, carbon disulfide, and

18  carbonyl sulfide would corrode copper in the manner that we had

19  seen in the failed tubes.

20  **Q.**   Have you done any work for any agency of the government

21  related to Chinese drywall?

22  **A.**   We did a small amount of work for EHE in the 51-home study

23  that was published by CPSC.  We analyzed some of the test

24  specimens that were exposed in the homes to determine the

25  corrosion products and deposits that were on the surface.

1   **Q.**   Do you have some publications in the fields of corrosion

2   and failure analysis?

3   **A.**   Yes.  There's several publications.  Most of them deal

4   with electrochemical testing to replicate specific

5   environments.  The first few are coauthored papers dealing with

6   biologically influenced corrosion.  The other papers have to

7   deal with, you know, galvanic corrosion.  One paper has to deal

8   with protective finishes that were applied to silver for

9   atmospheric corrosion.  The application there would have been

10  for museum artifacts.

11           **MR. BRYSON:**  Your Honor, we would like to tender

12  Mr. Krantz as an expert in the field of corrosion and failure

13  analysis.

14           **THE COURT:**  Any questions on his expertise?

15           **MR. SANDERS:**  No, Your Honor.

16           **THE COURT:**  The Court will accept him in the tendered

17  fields.

18                        **DIRECT EXAMINATION**

19  BY MR. BRYSON:

20  **Q.**   Can you define *corrosion* for the Court.  And I would ask

21  that Hernandez 134, page 2, be put on the screen.

22  **A.**   Yes.  This is the ASTM definition of *corrosion*:  The

23  chemical or electrochemical reaction between a material,

24  usually a metal, and its environment that produces a

25  deterioration of the material and its properties.

**Q.**    Mr. Krantz, in your position of evaluating corrosion, can you explain to the Court what standard methodologies you use in examining items that are sent to you for analysis.

**A.**    Yeah.  When we are doing failure analysis, the first thing that we are going to do is, when it comes in, we're going to look at it, collect as much background information surrounding the failure as is available or can be shared with us.  We'll look at it under the microscope, both optical and electron beam, if necessary.

            Depending on what we see, we may choose one of several different types of tests to perform.  Typically, it would involve some energy dispersive spectroscopy elemental analysis of corrosion products.  If it's a fracture, use the SEM to look at the fracture faces.  If there's pitting, we may make cross-sections to determine the type of pitting that's occurred, how deep the pits have gone.

**Q.**    Mr. Krantz, what is *pitting* as defined by the ASTM?  If we can go to page 4.

**A.**    *Pitting* is corrosion of a metal surface confined to a point or small area that takes the form of cavities.

**Q.**    Make sure the Court is clear.  How do you measure pits?

**A.**    There's several ways to measure pits.  If you follow ASTM G46, you can make a cross-section and measure the depth using a calibrated scale under microscope.

**Q.**    With regard to taking photos, using scanning electron

1    microscopes, and doing cross-sections to determine film

2    thickness and pit depths, is that something that you've done

3    throughout the course of your career?

4    A.    Yes, we have.

5    Q.    Is that the same type of procedure you used on the samples

6    that we're going to talk about today?

7    A.    Yes.

8    Q.    Are you familiar with the Battelle classification system?

9    A.    Yes.

10            MR. BRYSON:   If I might approach, Your Honor?

11            THE COURT:   Yes.

12   BY MR. BRYSON:

13   Q.    Has the CPSC described the Battelle classification system

14   in their November 2009 report?

15   A.    Yes, they have.

16   Q.    Would that assist you in your description of that standard

17   to the Court?

18   A.    Yes.

19   Q.    I have handed you what we have marked as Exhibits 59 and

20   Hernandez 60.  Can you identify that document to the Court,

21   please.

22   A.    Yes.  It's the interim report on the status of the

23   analysis of electrical components installed in homes with

24   Chinese drywall prepared by the Consumer Products Safety

25   Commission in November of 2009.

1    **MR. BRYSON:**  Your Honor, we would move that exhibit

2  into evidence.

3    **MR. SANDERS:**  Your Honor, we object on the grounds

4  that these reports are all preliminary.  They're actually

5  stamped "Draft:  Do Not Cite," I think, on many of them.

6    While, obviously, experts can rely on them in

7  providing their opinions and assisting them in providing

8  opinions, the documents themselves are not reliable enough or

9  authenticated that they would meet the government records

10  exception.

11    **MR. BRYSON:**  Your Honor, if I might respond.

12  Mr. Sanders actually made reference to this report earlier in

13  the day.  We would assert that this falls under hearsay

14  exception 803(8) under the public records, reports, statements,

15  or data compilations in any form, the rule states, of public

16  offices or agencies setting forth the activities of the office

17  or agency or matters observed.

18    It's directly from the rule.  We think it would

19  fall into that category and should be admitted.

20    **THE COURT:**  I think that 803(8) is applicable in this

21  particular case as the records, reports, statements, or data

22  compilation -- it says "in any form" -- of public offices or

23  agencies setting forth, among other things, matters observed

24  pursuant to a duty imposed by law as to which matters there was

25  a duty to report.  This is in civil cases, of course.

1          It's labeled as a preliminary report, as a

2    draft, but it is "in any form," and it is not excluded.  There

3    is a provision that sometimes it can be excluded.  We see that

4    in Coast Guard records oftentimes in their reports of

5    collisions.  And that, of course, is excluded specifically by

6    statute.  This is not excluded by statute, so I see it as

7    governed by 803(8).  I will overrule the objection and admit

8    it.

9          **THE DEPUTY CLERK:**  59 and 60?

10         **MR. BRYSON:**  59 and 60, which is the CPSC report, and

11   the attached appendix is the Sandia National Laboratories

12   report.

13   **BY MR. BRYSON:**

14   **Q.**   If you go to Hernandez 59, page 12.

15         **THE COURT:**  The Court has also reviewed the report.

16   The report is a work in progress, as is said, but I'll take it

17   as such.

18         **MR. BRYSON:**  Thank you, Your Honor.

19   **BY MR. BRYSON:**

20   **Q.**   Mr. Krantz, the Battelle classification system, did it

21   exist outside the CPSC report?

22   **A.**   Yes.

23   **Q.**   Can you explain the Battelle classification system that's

24   set forth in the CPSC report to the Court, please.

25   **A.**   What they have here is they describe it as -- this is for

211

1     copper.  Class I is where no significant corrosion has been

2     observed.  Class II, corrosion product on unprotected copper

3     contains primarily oxides and chlorides.  Class III, corrosion

4     product on unprotected copper is rich in sulfide and oxide.

5     The most severe, Class IV, corrosion product on copper, is

6     primarily a sulfide film with some oxides present.

7     **Q.**   Mr. Krantz, are there corrosion thicknesses that are also

8     associated with this standard?

9     **A.**   Yes, there is.

10     **Q.**   Would learned treatise 195 assist you in explaining that

11     to the Court?

12     **A.**   Yes.

13     **Q.**   Can you identify that document for the Court, please.

14     **A.**   Yes.  It's Atmospheric Corrosion of Control Equipment.

15     It's a paper prepared by Mr. Abbott for MTI and published under

16     the MTI jurisdiction.

17     **Q.**   If we could go to page 66 of that learned treatise.  Who

18     is Mr. Abbott?

19     **A.**   He is a well-respected corrosion expert, particularly in

20     the area of atmospheric corrosion.

21     **Q.**   Is he cited in the CPSC Sandia report?

22     **A.**   I believe he is.

23     **Q.**   Thank you.  Can you explain to the Court the thicknesses

24     that are associated with corrosion with regard to the Battelle

25     classification standard.

1  **A.**   In Class III, what they cite is that thicknesses that

2  range between .1 to .3 microns after a year fall into that

3  class.  In Class IV, thicknesses that are in excess of

4  .3 microns would fall into severe/industrial environment.

5  **Q.**   So if you are looking at an item after three years, what

6  thickness would you use?

7  **A.**   The minimum thickness would be .3 microns.

8  **Q.**   Most of the items you looked at in the Hernandez house are

9  how old?

10  **A.**   Approximately three years, as I understand.

11  **Q.**   So .3 after three years, with regard to the Battelle

12  classification system, what would that mean?  .3 microns.

13  **A.**   What that means is it would classify this in a moderately

14  severe environment and that it predicts failure in the future.

15        We would expect to see copper sulfide films.  In

16  plated devices, we would expect to see pore corrosion with

17  creep occurring.

18  **Q.**   So if we see thicknesses on samples that are in excess of

19  .3 microns after three years, what would that indicate?

20  **A.**   That would indicate that they have been exposed to a

21  moderately severe environment and that the thicknesses at that

22  level are predictive of failure.

23  **Q.**   What is pore corrosion and creep?

24  **A.**   In any plated device, you're going to have small pores

25  where -- say, like a typical plated device on copper is going

1    to be gold plating on nickel over copper on a contact.  There

2    will be small pores within those coatings, and the copper will

3    corrode at those pores.  When you get creep, what it is is the

4    corrosion products are spreading from that area and cover more

5    than just the opening of the pore.

6    **Q.**   Now, you testified that, if you fall into these

7    categories, it's predictive of failure.  Do you know when an

8    item is going to fail if it has a thickness of .3 microns after

9    three years or higher?

10   **A.**   No, we don't.  We just know that there's a higher risk, a

11   higher probability that failure is going to occur at some point

12   in the future.

13   **Q.**   Now, does the corrosion associated with sulfur gas

14   exposure increase or grow over time?

15   **A.**   It grows over time.

16   **Q.**   Now, can you explain to the Court how sulfur gas corrosion

17   grows.

18   **A.**   Yes.  Initially, it grows rapidly as it reacts with the

19   copper oxide surface on the copper.  There will be defects in

20   that surface where the sulfide will initiate.  It will slowly

21   spread to cover the surface.  Once the surface becomes covered,

22   then the growth rate will decrease as the corrodents have to

23   diffuse through that layer.

24          The layer will continue to grow.  When it reaches a

25   critical thickness, which in the literature has been reported

```
 1   to be approximately 1 micron, then that layer will crack or
 2   spall off, exposing fresh copper, and the process starts over.
 3   At that point, the corrosion rate tends to become -- it becomes
 4   accelerated and approaches a linear function.
 5   Q.   So it goes up and then it plateaus off?
 6   A.   It increases and then it kind of plateaus.  It doesn't
 7   really stop, but it slows dramatically, and then it reaches a
 8   point where it starts to accelerate again.
 9   Q.   Kind of in a stair-step fashion?
10   A.   Yes.
11             THE COURT:  What is the mechanism of failure caused
12   by corrosion?
13             THE WITNESS:  Well, in this instance with copper --
14             THE COURT:  With copper and silver.
15             THE WITNESS:  Right.  With copper and silver, the
16   primary purposes in this instance is electrical conductivity,
17   and corrosion products typically are less conductive than the
18   metal underneath.  As these products grow, then any connection
19   that they invade a connection or on switches where they contact
20   one another, then that film is going to create a higher
21   resistance.  They will either cease to function or, in an
22   extreme case, you can get overheating.
23             THE COURT:  Is it necessary for the wire to actually
24   break for that to happen?
25             THE WITNESS:  No, it's not necessary for the wire to
```

1    break.

2         **MR. BRYSON:**  If I might approach, Your Honor?

3         **THE COURT:**  Yes.

4    BY MR. BRYSON:

5    **Q.**   What I'm handing you, is this a learned treatise article

6    that also explains how corrosion grows in a stair-step fashion?

7    **A.**   Yes, it is.

8    **Q.**   This is learned treatise 205, page 1.  If we can put that

9    on the screen.

10        Can you identify this document to the Court.

11   **A.**   Yes.  It's the atmospheric corrosion of copper by hydrogen

12   sulfide in underground conditions by Tran and others.

13   **Q.**   *Corrosion Science*, what is that?

14   **A.**   That's a highly respected journal in the field of

15   corrosion.

16   **Q.**   What you just explained, if we go to page 15, under

17   "Conclusion," does the conclusion set forth the corrosion

18   growth mechanism that you just talked about?

19   **A.**   Yes, it does.

20   **Q.**   So to be clear, with this type of corrosion, it will

21   continue; it will not level off over time.  Is that correct?

22   **A.**   That's correct.

23        **THE COURT:**  Is it dependent upon the continuous

24   exposure to the corrosive element?

25        **THE WITNESS:**  What he is talking about here is based

DAILY COPY

1  on continuous exposure to both hydrogen sulfide and humidity.

2  BY MR. BRYSON:

3  Q.   If you take out the corrosive environment, will the

4  corrosion continue?

5  A.   In my opinion, the corrosion will still continue, maybe at

6  a different rate, but another literature citing will suggest

7  that the corrosion will continue.

8           MR. BRYSON:  We have some literature about that.  We

9  can discuss that now, if Your Honor likes, or we can do it

10  later.

11           THE COURT:  Whatever you prefer.  You are asking the

12  questions.

13  BY MR. BRYSON:

14  Q.   Now, let's talk a little bit more about Chinese drywall,

15  then, and your exposure to it.  You had mentioned in your

16  qualifications that some HVAC manufacturers had sent you some

17  things.  Can you explain to the Court, now, what you looked at

18  and what you tested for and what you found.

19  A.   On those particular ones?

20  Q.   Yes.

21  A.   Well, on the first ones, we said -- well, specifically, we

22  were allowed to take just samples of deposits, and we put them

23  in the electron microscope and did an elemental analysis and

24  determined that it was primarily copper, sulfur, with some

25  oxides and carbon.

1          On the second set, we had two failures that we

2    cross-sectioned.  We found that the failures had an appearance

3    of what's commonly called "formicary corrosion."  It's a

4    directional type of pitting that's somewhat unique to copper.

5    There was also sulfide film on the surface.  We concluded that

6    the failures were due to a synergistic effect of the formicary

7    and sulfide corrosion.

8    **Q.**   Had you looked at HVAC coils prior to receiving these?

9    **A.**   Yes.  We have looked at hundreds over the years.

10   **Q.**   Had you ever seen a problem like this before?

11   **A.**   No, we had not seen this particular type of problem.

12   **Q.**   At that time, did you know they had been exposed or in an

13   environment of Chinese drywall?

14   **A.**   Yes.  That's what we were told.

15   **Q.**   What work did you do, again, for the government on the

16   51-home study?

17   **A.**   We looked at some of the copper and silver coupons that

18   had been exposed in the homes.  We were asked to do surface

19   analysis of the deposits, which was done by, again, the

20   electron microscope and the EDS elemental composition.

21   **Q.**   What did you find?

22   **A.**   We found that, on the silver, there was silver and sulfur;

23   on the copper, there was copper and sulfur.  What was

24   surprising was that the copper coupons came back after -- I

25   think it was a 14-day exposure.  They still appeared

1    bright-colored and yet you could discern in the electron
2    microscope that a film had formed, and that film was high in
3    copper and sulfur.
4    **Q.**   Now, you have looked at some houses up in Virginia in
5    addition to the Hernandez house; correct?
6    **A.**   That's correct.
7    **Q.**   Now, back to the CPSC Sandia report.  Is there information
8    in that report that was instructive in your investigation of
9    these houses?
10   **A.**   Yes, there was.
11         **MR. BRYSON:**  If we could put up Hernandez 59, page 9.
12   **BY MR. BRYSON:**
13   **Q.**   Can you indicate to the Court what was instructive for you
14   in that sentence.
15   **A.**   What they are saying here is that the corrosion that they
16   observed on the electrical components, particularly the wiring,
17   is of significance.  It shows significant corrosion present.
18   **Q.**   Okay.  Page 10.  The top paragraph first.  What was
19   instructive from that?
20   **A.**   What they say, there's, you know, a review of the interim
21   report by SNL, which is the Sandia National Laboratory.
22   Conversations with SNL staff suggests that copper wiring is the
23   most susceptible electrical component to the effects of the
24   corrosive gases.
25   **Q.**   The next page, or the bottom paragraph, what does that, in

DAILY COPY

1    general, say?  You don't have to read it.

2    **A.**    In general, it describes a similar growth of the copper

3    film, and it talks about how they saw a corrosive thickness

4    that varied from, basically, zero to 20-thousandths of a

5    millimeter.  Then they saw what they call "microcavities" --

6    what we call "pits" -- underneath these deposits.

7    **Q.**    20-thousandths of a millimeter, how many microns is that?

8    **A.**    I'm sorry.  20 microns.

9    **Q.**    If we could go to page 13 or the next page.  Can we focus

10   in on that page there, that diagram.  What was instructive and

11   significant about that to you?

12   **A.**    This is a cross-section of one of the wires that they

13   had --

14   **Q.**    What type of wire?  Ground wire?

15   **A.**    I believe it was a ground wire.

16   **Q.**    It says that.

17   **A.**    Okay.  Yeah.

18   **Q.**    Can you explain what we are looking at.

19   **A.**    Yeah.  What they used to create this was a focused ion

20   beam instrument that focuses an electron beam onto the surface,

21   makes a very nice cross-section into it like a scalpel, very

22   high-tech way of doing the metallographic cross-sections that

23   we do.  The advantage here is they can do it without disturbing

24   the deposits.

25   **Q.**    Do you have this type of fancy equipment in your lab?

1    A.    No, we don't.   That's limited, typically, to universities

2    and national laboratories.

3    Q.    What was the corrosion thickness?

4    A.    If you look at the -- they have got a micron bar,

5    calibration bar, down here, and it appears that that would be

6    about 20-thousandths thick.

7    Q.    20 microns?

8    A.    20 microns.   I'm sorry.

9    Q.    What is this area right here?

10   A.    That would be a pit, what they are calling a "spongiform"

11   texture, and it appears to be about 10 microns deep.

12   Q.    If we could go to page 13, what was instructive to you on

13   this?

14   A.    They believe the Battelle corrosive environments that the

15   copper wiring has been exposed to could be as severe as either

16   Class III or Class IV.

17   Q.    Go to page 23.   Again, is this a description of that

18   particular copper ground wire we just looked at?

19   A.    Yes.   It's a picture -- they're referring to that picture.

20   Q.    Is this from Sandia National Labs?

21   A.    I believe this is the Sandia.   In their report, it was

22   figure 13.   The image clearly show a 20-micron thick sulfide

23   with a cauliflower-like morphology.   The thickness exceeds the

24   expected for a Class II corrosion environment and suggests that

25   the actual environment is likely a Class III or higher.

1    **Q.**   Class III or higher is what micron thickness?

2    **A.**   The .1 and higher.

3    **Q.**   After three years, it would be --

4    **A.**   After three years, it would be .3.

5    **Q.**   What we are seeing here on this ground wire is --

6    **A.**   20 microns.

7    **Q.**   How many?  That's -- I can't --

8    **A.**   Several times higher.

9    **Q.**   I can't do the math, but what --

10          **MR. SANDERS:**  Your Honor, this is exactly the type of

11   testimony that I was objecting to.

12          **MR. BRYSON:**  We are moving on.

13          **THE COURT:**  Let's move on.

14   BY MR. BRYSON:

15   **Q.**   Have you examined any samples from the Hernandez home?

16   **A.**   Yes, I have.

17   **Q.**   If we could go to 597-11.  Can you identify for the Court

18   what we are looking at.

19   **A.**   Yes.  This is a ground wire and switch.  In the upper left

20   there, that's how we received it.  There was a separate bag,

21   where the ground wire was in a separate bag.  We unbagged them.

22   This is what we had.  This is the ground wire.

23          As you can see, there's some white stuff there that's

24   probably paint, and there's some black discoloration that is

25   typical of the sulfide corrosion.

1    **Q.**    Explain to the Court what this is.

2    **A.**    The top picture is a cross-section of that wire.  We

3    cross-sectioned the wire in the area of where the loop was made

4    at the connection.

5             The top picture shows the pitting that we observed.

6    That's the deepest pit.  There were several pits along the

7    surface that we could see.  This is the deepest one.

8    **Q.**    How deep is the pit?

9    **A.**    22.5 microns.

10   **Q.**    How thick was the corrosion thickness?

11   **A.**    The next picture then shows the corrosion thickness, which

12   we measure to be 37, almost 38 microns.  37.7.

13   **Q.**    What is this?

14   **A.**    This is SEM images of the surface of that wire, showing

15   the deposits on the surface; and an EDS analysis showing the

16   elemental composition of copper, sulfur, and a little bit of

17   oxygen.

18   **Q.**    Would you explain that to the Court.

19   **A.**    Yeah.  Like you said, this is the EDS.  You have copper

20   that shows up in three locations on the spectrum.  Sulfur shows

21   up here.  You've got a little bit of oxygen there.  This is

22   consistent with what we have seen with copper sulfide.

23   **Q.**    Now, have you looked at a number of other wires from the

24   house where you used these same three steps:  Picture,

25   cross-section, EDS?

223

1    **A.**    Yes.  Uh-huh.

2    **Q.**    Let's run through these pretty swiftly if we can.  If we

3    can go to TCH -- do you know what "TCH" stands for?

4    **A.**    Yes.  It's a reference to the Hernandez home.

5    **Q.**    If we can go to 597-12.  What is that?

6    **A.**    That's a receptacle and, again, a ground wire that we

7    received.  Again, the upper left is how we received it and as

8    we unpackaged it.  The bottom right there is the ground wire

9    showing black deposits and paint residues.

10   **Q.**    Next picture.  What is this?

11   **A.**    Again, this is the maximum pit depth and the thickness of

12   the corrosion layer.

13   **Q.**    What's the depth of the pit?

14   **A.**    Again, 22.5 microns and 19-micron depth of the deposit,

15   thickness of the deposit.

16   **Q.**    If we could go to TCH-13, which is 597-13.

17   **A.**    Again, the --

18   **Q.**    Oh, excuse me.  Go back one.  Yeah.  I'm sorry.  The SEM.

19   **A.**    Yes.  That's the SEM images of the surface.  Again, we see

20   the copper and sulfur.  We see a trace amount of chlorides in

21   this one, as well as some calcium, suggesting there's some

22   drywall dust in this as well.  The source of the chloride was

23   not determined.

24   **Q.**    Did you perform the same analysis on TCH-13, TCH-24, and

25   TCH-36?

1  A.   Yes, we did.

2  Q.   Do you have a summary chart on all of these samples which

3  show the thicknesses and --

4  A.   Yes.

5  Q.   Did all of those samples show -- what did they show with

6  regard to the EDS?

7  A.   They showed very similar, that there was copper and sulfur

8  present.  Occasionally, we would see some chloride present as

9  well.  There may have been small amounts of calcium present.

10  Q.   Can we go to Hernandez 597-14.  I don't think we need to

11  go through three more of those.  Can we go to 597-14.  Can you

12  explain to the Court what this sample is.

13  A.   Yes.  The top one is an insulated wire and -- two

14  insulated wires we received.  The bottom one is a braided wire.

15  It's hard to --

16  Q.   Can we focus in on --

17  A.   I believe that came from the alarm panel.  Yeah, that came

18  from an alarm panel.  The TCH is the sample number that was

19  supplied to us, and the CTL is our internal sample number.

20  Q.   Is this a low voltage wire?

21  A.   Yes, that would be a low voltage wire.

22  Q.   Could we go to 597-6.  The low voltage wire, what did the

23  cross-section show?

24  A.   This shows where -- here in this top picture, you see a

25  pit that is underneath the tinplating of that wire.  I think

DAILY COPY

225

1  these wires were tinplated.  You have got pores where corrosion

2  has occurred underneath.  And then you can see that not only do

3  you have deposits at the pore site, but you have creep

4  occurring out from there.

5          Similar is down here.  You can see the corrosion

6  occurs, undermining type of corrosion, underneath that plating.

7  We have pit depths of 25 microns and tarnish thicknesses of

8  17.5 to 19 microns.

9  Q.   Explain to the Court again what creep is.

10 A.   Creep is exactly what you see here, where you have got the

11 corrosion products that are moving away from the pore openings.

12 So just being right at the pore openings, and that's suggesting

13 that you have this type of corrosion occurring underneath that

14 is undermining the plating.

15 Q.   If we can go to 597-15, what is this sample?

16 A.   These are some low voltage wires and a ground wire that we

17 received.  Again, you can see at the exposed tips, where

18 they're darkened, there's black deposits on them.

19 Q.   597-07, what is this?

20 A.   This is a cross-section of the ground wire and looks like

21 the -- yeah, that's the pit, 38 microns deep.  You have a scale

22 thickness of about 30 microns.

23 Q.   Go to 592-0001.  Can you explain to the Court what sort of

24 summary exhibit we are looking at.

25 A.   Yeah.  What we did here is we took -- somehow that box got

1   moved, but we took this wire right here and we cross-sectioned

2   it, which is in the picture to the right.  We did a

3   longitudinal cross-section so we could see the pitting as it

4   occurs along the length of the wire.

5          You can see where the insulation is.  In this area

6   here outside the wire, the surface look is typical of what we

7   see with the copper sulfide deposits.  Elemental analysis

8   confirms that it's copper and sulfur, and we have got pits in

9   the area of about 13 microns and about a 14-micron deposit

10  layer.

11  **Q.**   Did you strip off the insulation?

12  **A.**   We did not strip off the insulation.  In the

13  cross-section --

14          **MR. SANDERS:**  Objection to the leading nature.

15          **THE COURT:**  Yes.

16  **BY MR. BRYSON:**

17  **Q.**   I'm sorry, Mr. Krantz.  What did you do next?

18  **A.**   Next we looked at the area again underneath the

19  insulation, and we found that corrosion was present all along

20  underneath the insulation.  The deepest pit was in this area,

21  about 3/10ths of an inch from the end of the insulation.  The

22  pit was about 5 microns deep.

23  **Q.**   What type of corrosion product underneath was it?

24  **A.**   It was copper sulfide there as well.

25  **Q.**   Did you look at any controls?

227

1   A.   Yes, we did.

2   Q.   Can we go to Hernandez 597, page 30.  Can you explain to

3   the Court what we are looking at.

4   A.   Yes.  This is sample received from a control home in

5   Virginia.  This is a switch as it was in the wall.  This is how

6   we received it in this bag.  As we disassembled it, you can see

7   here the ground wire, and it's a ground wire removed from the

8   switch.

9   Q.   What is this white substance on the ground wire?

10  A.   The white stuff is most likely paint.  Occasionally, you

11  know, it's a mix of paint and maybe drywall dust.

12  Q.   Can you go to 597-29.  What are we looking at now?

13  A.   This is a cross-section we made of that wire in the area

14  of the loop, and you can see that there's been no deterioration

15  on the surface.

16  Q.   To your knowledge, did this home have Chinese drywall?

17  A.   To my knowledge, it did not.

18  Q.   Are there any pits on this particular cross-section?

19  A.   There were no pits or corrosion deposits on this wire.

20  Q.   Can we go to an SEM of it, which is 597-31.

21  A.   These were some of deposits that we saw on the outside of

22  the wire.  The top there is the white deposit which, if you can

23  blow that up a little, we see titanium and calcium, chloride.

24  It's consistent with paint.

25  Q.   On any of the EDS you did, was there copper sulfide that

DAILY COPY

1    you saw of any significant amount?

2    A.    No, we didn't.  We looked at -- there was some small area

3    that had some deposits that had a morphology similar to copper

4    sulfide, but again we found that it was most likely drywall

5    dust.  Calcium and sulfur are very similar.

6    Q.    Have you prepared a chart which summarizes all the

7    Hernandez wire samples that you looked at?

8    A.    Yes, we did.

9    Q.    Show 591-1.

10   A.    This is a summary of the deepest pits that we found --

11   Q.    I'm sorry.  Not pits.

12   A.    I'm sorry.  Corrosion thickness.  My apology.

13          After three years of exposure, these all far exceed

14   the .1-micron criteria as established by Battelle.

15   Q.    What would the Battelle standard be after three years?

16   A.    After three years would be .3.  You can see that some of

17   these would exceed that by several hundred times.

18   Q.    Have you prepared a summary chart which indicates the pit

19   depths?

20   A.    Yes, we have.

21   Q.    Can we go to 590-001 and, really, just with regard to his

22   column.

23   A.    Yes.

24   Q.    What is this column?

25   A.    This column is the maximum pit depths that we measured.

1   We can see that they are of similar depth as what was seen in

2   the CPSC, and some of them are much deeper.  They talk about a

3   10-micron pit, and ours varied from 5 to 38 microns deep.

4   **Q.**   Have you looked at other examples of wires similar to this

5   on other homes containing Chinese drywall?

6   **A.**   Yes, we have.

7   **Q.**   These are in the Virginia homes?

8   **A.**   Yes.

9   **Q.**   If we can pull up Hernandez 594-1.  If you can explain to

10  the Court again what we are looking at.

11  **A.**   This was a foam wire that was removed from the kitchen of

12  that home.  When the phone cable comes in, there's several

13  twisted pairs.  This was a pair that was unused, and so it had

14  just been snipped off at this end.  So this end had been

15  exposed to the atmosphere, and this end was unexposed and was

16  where we had cut it from the cable.

17  **Q.**   What did you find?

18  **A.**   What we found is, when we stripped the insulation back, we

19  found that the wire at the snipped end, which was 6 inches from

20  the exposed end, had black deposits on it.  When we

21  cross-sectioned it, we found pitting present there as well.

22  Those pits were 5.6 microns deep.

23  **Q.**   So is the corrosion that you found on this telephone wire,

24  low voltage wire, similar or consistent to the corrosion you

25  found on the low voltage alarm wire in the Hernandez house?

1  A.    Yes.  Very similar.

2  Q.    With regard to the other homes that you have looked at and

3  examined, did you prepare a summary chart of those tarnish

4  thicknesses and pit depth measurements?

5  A.    Yes, we did.

6  Q.    Can we see Hernandez 596-001.  Just in general -- I don't

7  want you to read every category -- are these tarnish

8  thicknesses and pit depths and --

9  A.    Yeah.  We have got the thicknesses, the maximum

10  thicknesses that we measured on these samples that were

11  primarily ground wires and a few low voltage wires.

12          The next column is the maximum pit depths.  Some of

13  these were on the AC coil as well.  But we have got pit depths

14  that, you know, range from 7 microns up to 29, 13, 16.5.

15  Q.    I believe right there, that one, as Mr. Sanders pointed

16  out in your deposition, is an error; right?

17  A.    Yes, that was an error.  We went back and remeasured that,

18  and it measured 23.6.

19  Q.    Now, have you done more investigation and prepared yet

20  another summary chart of corrosion thicknesses and pitting

21  depths on even more samples?

22  A.    Yes, we did.

23  Q.    Can we pull up 598-001.  Now, what is different about this

24  one?

25  A.    In this one, we were supplied ground wires from the boxes,

1    and they were supposedly snipped off at the end, back of the

2    box, and so we looked at -- we made a cross-section of the tip

3    and somewhere in the middle, approximately the middle of that

4    wire, and then at the very end of the wire where it exited the

5    electrical box.

6            What we found on many of these is that the pits

7    continued along the length of the wire.  There may have been

8    some areas where there was discontinuous corrosion, but we

9    still observed deep pitting at the very end, where it exits the

10   electrical box.

11   Q.    Make sure we're clear on this.  Right where the ground

12   wire comes out the receptacle box, that would be identified as

13   what?

14   A.    The end.

15   Q.    And then it would be the middle, I guess, is the middle?

16   A.    The middle.

17   Q.    And then the tip would be --

18   A.    The tip would be where it was connected to the electrical

19   fixture.

20   Q.    With regard to that top one, if we could go to Hernandez

21   598-0004.  Can you explain to the Court what we are looking at.

22   A.    This is the corrosion that was observed at the tip of that

23   wire.  These are the pits that were present.  The deepest one

24   there is 16.4 microns.  The next picture to the right is the

25   area where there was --

1  Q.   That one's also the tip?

2  A.   Yeah.

3  Q.   We're going to go to the middle.

4  A.   Corrosion thickness 13 microns.  Below it is in the

5  middle.  We see, again, we have got pitting, corrosion scale,

6  and we see a pit that's 17.2 microns deep.

7  Q.   Go to the next page, 5.  What does the end of the wire --

8  this would be the part, I believe you testified, closest to the

9  receptacle box?

10  A.   Yes, that would be the part closest to the receptacle box.

11  And, again, you see deep pits, 10 microns, and scale in areas

12  that are, you know, 14 microns thick.

13  Q.   If we can go back to 598-0001.  We won't go through any

14  others in the interest of time, but did you do that for other

15  houses, the same kind of drill?

16  A.   Yes.  There were several from the Virginia homes that we

17  did.

18  Q.   Tip, middle, end?  Tip, middle, end?

19  A.   Tip, middle, end.  Tip, middle, end.  And we got similar

20  results.

21  Q.   Now, have you also looked at any line sets?

22  A.   Yes, we did.

23  Q.   Can we go to 598-0007.  What do you see on this particular

24  line set?

25  A.   On this line set, we see pits that are 26.5 microns deep,

1    and we have got corrosion scale that's about 8 microns thick.

2    Q.    Did you look at a line set from the Hernandez house?

3    A.    No, we did not.

4    Q.    Do you have an understanding of what a line set is?

5    A.    Yes.

6    Q.    What is that?

7    A.    It's the copper tubes that run from the inside coil to the

8    outside compressor.

9    Q.    Is that a continuous run of metal?

10   A.    Yes.  Yeah, they are continuous, with no breaks in the

11   middle.

12   Q.    So if you cut it, do you know what you have to do?

13   A.    If you cut it, then generally I think they recommend that

14   you replace the whole line set because it's intended not to

15   have joints.  Otherwise, the risk of leaks.

16   Q.    Now, let's shift gears, if we can, to talking about,

17   Mr. Krantz, what happens if the Chinese drywall is removed.  Do

18   you have any opinion about whether the corrosion will continue

19   if the Chinese drywall is removed?

20   A.    Yes, I do.  I believe corrosion could continue.

21   Q.    Do you have any experience in your background with regard

22   to corrosion that was occurring and the source of the corrosion

23   was removed?

24   A.    Yes.  Earlier, when we talked about the shipboard heat

25   exchangers, they had been fitted up in a bay that was known to

1    contain polluted waters.

2    **Q.**    What bay?

3    **A.**    Prudhoe Bay up in Canada.

4    **Q.**    So what was happening?

5    **A.**    What was happening is that the ships were in for refit and

6    the heat exchangers, which are used in the air-conditioning

7    systems, were being replaced.  They take in outside water, run

8    it through an air-conditioning coil, similar to what's in a

9    home except they are using the cold water as opposed to freon.

10   They weren't supposed to be used during fit-up because it was

11   known that it could cause corrosion problems.  However, they

12   were used anyway.

13   **Q.**    What type of corrosion was in the water?

14   **A.**    There were sulfides in the water, which initiated sulfide

15   corrosion.  These heat exchangers were made out of copper

16   alloys, various copper alloys.  When they went out to sea, the

17   units were still functioning, and clean water was flushed

18   through the systems to clean everything out.  However, the

19   corrosion continued until these units ultimately failed.

20   **Q.**    That's something that you looked at?

21   **A.**    Yes.  We had an opportunity to look at those and assist

22   with the failure analysis of those items.

23          **THE COURT:**  Is the presence of moisture necessary for

24   corrosion to continue when the corrosive element is removed or

25   the factor is removed?

1          THE WITNESS:  Corrosion requires moisture.  It's an

2     aqueous process.  In this instance, you know, we see there's

3     pitting that's occurring, which is indicative that moisture is

4     present on these components.

5          THE COURT:  What degree of moisture?

6          THE WITNESS:  It wouldn't be such that, necessarily,

7     that it gets wet, visibly wet, but it would be -- in a humid

8     environment, you get monolayers of water that form on the

9     surface.  As the humidity rises and the number of monolayers

10    increases, you reach a point where it will behave like bulk

11    water, and the reactions that occur in bulk water apply to this

12    environment.

13    BY MR. BRYSON:

14    Q.   For us laymen in the crowd, what's a monolayer?

15    A.   It would be a one, you know, molecule layer of water.

16    Q.   Microscopic?

17    A.   Microscopic, yes.

18    Q.   Is that type of water, in your opinion, present in the

19    walls of the Hernandez house?

20    A.   It would be present most everywhere.

21    Q.   Okay.  Thank you.

22         Now, you had talked about a situation you have been

23    involved in where there was corrosion with these shipboard heat

24    exchangers and then, when they went out to sea, the corrosion

25    continued.  Do you have any other experience in this area of

DAILY COPY

1   the corrosive environment being removed and the corrosion
2   continuing?
3   **A.**   Yes.  When you clean out commercial heat exchangers,
4   air-conditioning units, you know, they may use river water or
5   whatnot as a coolant, and deposits will build up within those
6   units and allow the corrodents -- chloride, sulfur, or
7   whatnot -- to accumulate under these deposits.
8           Periodically, they will go in and clean these things.
9   If they don't do a thorough job of cleaning, they are leaving
10  the concentrated corrodents behind, and the issues that they're
11  trying to remove by cleaning continue.
12          Another example would be the chloride pitting of
13  stainless steels, where the chlorides get down into the pits.
14  If they have to do any repair work, they have to grind out all
15  that metal to get rid of the chlorides because it's almost
16  impossible to remove those from the pits that form.  Left in
17  place, they would continue to eat through the metal there.
18          **THE COURT:**  Is the presence of pits necessary for the
19  corrosion to continue once the corrodent is removed?
20          **THE WITNESS:**  No, not necessarily.  The pits provide
21  a place for the corrosion products to get trapped and makes it
22  difficult to clean.
23          **MR. BRYSON:**  Can I approach, Your Honor?
24          **THE COURT:**  Yes.
25

1 BY MR. BRYSON:

2 Q.   Mr. Krantz, are you aware of any learned treatise articles

3 that discuss sulfide corrosion continuing on copper even after

4 the corrosive environment is removed?

5 A.   Yes.  There's a paper by Jacobs and Edwards.

6        MR. BRYSON:  If we could show LT (learned treatise)

7 241, page 1, and focus in on the top.

8 BY MR. BRYSON:

9 Q.   Where was this particular paper published and by who?

10 A.   It doesn't say on the -- the publishing company is a

11 British publishing company.  At the end of the paper --

12 Q.   Speak more into the microphone, please.

13 A.   At the end of the paper, on LT 241-0010, there's an

14 acknowledgment that this was supported by a fellowship from the

15 National Science Foundation.

16 Q.   If we could go to 241, page 6.  Can you explain in general

17 what happened in this particular learned treatise.

18 A.   Yeah.  What he did is he ran some tests where he took some

19 copper coupons, put them into a sulfide environment.  It was an

20 immersion surface.  They were wetted and exposed for several

21 months under a couple different conditions, and he grew a

22 sulfide corrosion film.

23        After seven or eight months of exposure, he then

24 transferred those coupons to a nonsulfide environment, and he

25 observed that the corrosion continued even after removal of the

1   sulfide environment.

2   **Q.**   Go to the next page.

3   **A.**   He determined, based on those results, that the elevated

4   corrosion rate could not be attributed to the sulfides in

5   solution but must be due to the scale formed when the sulfides

6   are present.

7   **Q.**   What was the final opinion with regard to the items that

8   were being studied?  If we could go to page 08.  241-08.

9   **A.**   The result of his work, he predicted that pipelines that

10  have sulfides, exposed to sulfide corrosion, their lifetime

11  will be decreased to one to three years as opposed to maybe as

12  high as 400 years.

13  **Q.**   Now, these particular samples of this experiment, it was

14  in an aqueous environment?

15  **A.**   Yes, it was.

16  **Q.**   To make sure that we're clear on this, in your opinion,

17  what would be the source of the water in a house for the

18  corrosion to continue if the Chinese drywall is removed?

19  **A.**   Humidity is adequate to put several monolayers of water

20  moisture on the surface.  If you're to get enough to form that

21  would cover a pit, then that would be adequate for corrosion to

22  reinitiate within that pit.

23  **Q.**   Mr. Krantz, let's take it a step farther.  Let's say you

24  removed the Chinese drywall, and then you take a Scotch-Brite

25  pad, which has been proposed by KPT.  If you take a

1    Scotch-Brite pad and try to clean it, could you remove all the
2    corrosion?
3    **A.**   No, I don't believe you could.
4    **Q.**   What, if any, experiment have you performed in that
5    regard?
6    **A.**   We took a ground wire from the Hernandez home, and we
7    cleaned it with Scotch-Brite until it appeared to be bright
8    copper.  Then we looked in the SEM to see if -- optically and
9    in the SEM to see if there was any evidence of pitting or
10   sulfide deposits left.
11   **Q.**   Can we see 593-0001.  Can you explain to the Court what
12   we're looking at.
13   **A.**   Yes.  The top picture is the wire that we used for the
14   cleaning.  This is a picture from the --
15   **Q.**   From the Hernandez house?
16   **A.**   From the Hernandez house, yes.
17   **Q.**   Was this the worst one?
18   **A.**   It was the only one we had left.
19   **Q.**   When you had wires, were there any that were darker than
20   that?
21   **A.**   Yes.  There were some that were much worse than this.
22   **Q.**   Okay.
23   **A.**   This is the typical appearance of this wire.  There was
24   scattered black deposits, you know, paint present as well.
25              We took the Scotch-Brite and abraded the surface

DAILY COPY

1   until it looked like clean, fresh copper.  This is at about

2   32X, and you can see the small black spots that are indicative

3   that pits are still present.

4           When we went into the SEM at those spots, you can see

5   these white, light-colored deposits, which we later analyzed to

6   contain sulfur, indicative that the copper sulfide was still

7   present.

8   Q.   This was a wire that you had in your hand --

9   A.   Yes.

10  Q.   -- when you cleaned it?

11  A.   Yes.  I have it right here.

12  Q.   Can you show that to the Court.

13          MR. BRYSON:  We are not offering that into evidence,

14  Your Honor.  It's just for demonstrative purposes.  This is in

15  evidence, though.  If I might approach.

16  BY MR. BRYSON:

17  Q.   Does the ASTM provide any guidance with regard to any

18  standards for cleaning of corrosion?

19  A.   Yes.  There are standards for cleaning corrosion test

20  specimens in the laboratory.

21  Q.   Can we go to Hernandez 109-0001.  What is this document

22  entitled?

23  A.   It's ASTM G46, the standard guide for examination and

24  evaluation of pitting corrosion.

25  Q.   Just this part right here.

DAILY COPY

1    **A.**   "To expose the pits fully, use recommended cleaning

2    procedures to remove the corrosion products and avoid solutions

3    that attack the base metal excessively.  See practice G1."

4    **Q.**   What does it say about trying to scrub with a

5    stiff-bristle brush?

6    **A.**   That will often enlarge pit openings sufficiently to

7    removal --

8    **Q.**   It will actually undercut the metal?

9    **A.**   Yeah, undercut the metal and make the pits easier to

10   evaluate.

11   **Q.**   With regard to practice G1, what does it say about

12   cleaning.  If we can go to 600-0001.  What is this standard?

13   **A.**   It's the ASTM G1 standard practice for preparing,

14   cleaning, and evaluating corrosion test specimens.

15   **Q.**   Can we go to 0002, just this second paragraph.  The second

16   paragraph, 7.1.1.

17   **A.**   "An ideal procedure should remove only corrosion products

18   and not" --

19           **THE COURT:**  Closer to the microphone, please.

20           **THE WITNESS:**  I'm sorry.  "An ideal procedure should

21   remove only corrosion products and not result in removal of any

22   base metal."

23   **BY MR. BRYSON:**

24   **Q.**   0003.

25   **A.**   "Repeated treatments may be required to complete removal

DAILY COPY

242

1    of corrosion products.  Removal can often be confirmed by

2    examination with a low power microscope (for example, 7 to

3    30X).  This is particularly useful with pitted surfaces when

4    corrosion products may accumulate in pits."

5    Q.   Does the standard provide a chemical method of trying to

6    remove corrosion products?

7    A.   Yes, they do.

8    Q.   If we can go to the next page, 0005.  If we can focus in

9    on this section.  Can you explain to the Court what we are --

10   A.   Yeah.  These are cleaning methods for cleaning copper.

11   Here it says a particular solution removes copper sulfide

12   corrosion products that may not be removed by hydrochloric acid

13   treatment.

14          Typically, when we are trying to clean copper, we

15   will use a hydrochloric acid solution.  Here it gives some

16   hints that if that doesn't completely remove the sulfide, then

17   to try a sodium cyanide solution.

18   Q.   In your experience, Mr. Krantz, what kind of chemical do

19   you need to completely removal the corrosion product from wire?

20   A.   These are some pretty nasty, aggressive chemicals,

21   hydrochloride acid and sodium cyanide, which you would not want

22   to use at the same time in the field.

23   Q.   Can you use a Scotch-Brite pad to get rid of all the

24   corrosion without these chemicals?

25   A.   No, we were not able to do so.  Well, if you scrub long

243

1   enough, you probably could, but you don't know where you are at

2   until you do a microscopic examination.

3   **Q.**   That would be out in the field?

4   **A.**   Yes.

5   **Q.**   Mr. Krantz, can you summarize your opinions for the Court.

6   **A.**   Yes.  It's our opinion that the wires have been

7   aggressively attacked.  There are corrosion failures that

8   exceed the Battelle criteria of .1-micron per year.  We have

9   pit depths that are 10 microns and deeper that are similar to,

10   deeper to, than those reported in the CPSC and Sandia reports.

11        Scotch-Brite is not an adequate cleaning method for

12   the wires.  We observed corrosion deposits underneath

13   insulation on low voltage wires and observed them on the high

14   voltage wires.

15   **Q.**   In all of these, what is the cause of the copper sulfide

16   corrosion, in your opinion?

17   **A.**   In our opinion, it's coming from the Chinese drywall.

18   **Q.**   What is your opinion with regard to what should be done

19   with all of the wiring in the house?

20   **A.**   It's our opinion that the wire should be removed.

21   **Q.**   That would include the low voltage and the high voltage?

22   **A.**   Yes, including the low voltage and high voltage wires.

23   **Q.**   Do you hold all of these opinions within a reasonable

24   degree of scientific certainty?

25   **A.**   Yes, I do.

DAILY COPY

1          **MR. BRYSON:**  Your Honor, could I have just one

2     second?

3          **THE COURT:**  Yes.

4          **MR. BRYSON:**  Thank you, Mr. Krantz.

5          **THE WITNESS:**  No further questions.

6          **THE COURT:**  Let me see counsel for both sides just on

7     logistics, please.  I don't need this on the record.

8          (WHEREUPON there was a conference at the bench

9     outside the presence of the court reporter.)

10         **THE COURT:**  We'll stop here and start tomorrow at

11    8:30.

12              Mr. Krantz, I don't want you to talk to anybody

13    tonight about your testimony because I'm interrupting it.  We

14    are finished with the direct, and you are subject to

15    cross-examination.  I don't want you to talk to anyone.

16         **THE WITNESS:**  Okay.

17         **THE COURT:**  The Court will stand in recess until 8:30

18    in the morning.

19         **THE DEPUTY CLERK:**  Everyone rise.

20         (WHEREUPON the Court was in recess for the evening.)

21                         * * *

22

23

24

25

1        <u>**CERTIFICATE**</u>

2                I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, do hereby certify that the foregoing is a true

5    and correct transcript, to the best of my ability and

6    understanding, from the record of the proceedings in the

7    above-entitled and numbered matter.

8

9

10                              <u>s/ Toni Doyle Tusa</u>
                                Toni Doyle Tusa, CCR, FCRR
11                              Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAILY COPY