1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2     *********************************************************************

3
      IN RE:  CHINESE-MANUFACTURED        Docket No. 09-MD-2047
4     DRYWALL PRODUCTS LIABILITY          New Orleans, Louisiana
                                          Tuesday, March 16, 2010
5

6

7     **THIS DOCUMENT RELATES TO:**
      Case No. 09-CV-6050
8
      Tatum B. Hernandez, et al
9     v.
      Knauf Plasterboard (Tianjin)
10    Co., Ltd., et al
      *********************************************************************
11

12                    TRANSCRIPT OF TRIAL PROCEEDINGS
                HEARD BEFORE THE HONORABLE ELDON E. FALLON
13                   UNITED STATES DISTRICT JUDGE
                     VOLUME II - MORNING SESSION
14

15
      APPEARANCES:
16
      FOR THE PLAINTIFF:              HERMAN, HERMAN, KATZ & COTLAR
17                                    BY:  RUSS M. HERMAN, ESQ.
                                          STEPHEN J. HERMAN, ESQ.
18                                    820 O'Keefe Avenue
                                      New Orleans, LA 70130
19

20                                    GAINSBURGH BENJAMIN DAVID
                                      MEUNIER & WARSHAUER
21                                    BY:  GERALD E. MEUNIER, ESQ.
                                          MICHAEL J. ECUYER, ESQ.
22                                    1100 Poydras Street, Suite 2800
                                      New Orleans, Louisiana 70163
23

24                                    SEEGER WEISS
                                      BY:  CHRISTOPHER A. SEEGER, ESQ.
25                                    One William Street
                                      New York, New York 10004

```
 1                                   LEWIS & ROBERTS, PLLC
 2                                   BY:  DANIEL K. BRYSON, ESQ.
                                     3700 Glenwood Avenue, Suite 410
 3                                   Raleigh, North Carolina 27612

 4

 5   FOR THE DEFENDANT:              FRILOT L.L.C.
                                     BY:  KERRY J. MILER, ESQ.
 6                                   Energy Centre - Suite 3700
                                     1100 Poydras Street
 7                                   New Orleans, LA 70163-3700

 8
                                     BAKER McKENZIE
 9                                   BY:  DONALD HAYDEN, ESQ.
                                     1111 Brickell Avenue, Suite 1700
10                                   Miami, Florida 33131

11
                                     BAKER McKENZIE
12                                   BY:  DOUGLAS B. SANDERS, ESQ.
                                          ERIN M. MAUS, ESQ.
13                                        KYLE P. OLSON, ESQ.
                                     130 E. Randolph Drive
14                                   Chicago, Illinois 60601

15

16   Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
                                     500 Poydras Street, Room HB-406
17                                   New Orleans, Louisiana 70130
                                     (504) 589-7776
18

19

20     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

DAILY TRANSCRIPT

**I N D E X**

**WITNESSES FOR THE PLAINTIFF:**                    PAGE/LINE:


**DANIEL KRANTZ**

  Cross-Examination by Mr. Sanders                 250/5

  Redirect Examination by Mr. Bryson              274/22


**TATUM B. HERNANDEZ**

  Direct Examination by Mr. Stephen Herman         283/23

  Redirect Examination by Mr. Hayden              294/9


**DONALD GALLER**

  Voir Dire Examination by Mr. Seeger             301/13

  Direct Examination by Mr. Seeger                309/2

  Cross-Examination by Mr. Sanders                334/23

  Redirect Examination by Mr. Seeger              344/18


**Ronald B. Bailey**

  Voir Dire Examination by Mr. Seeger             346/15

  Direct Examination by Mr. Seeger                349/24

  Cross-Examination by Mr. Hayden                 374/15

  Redirect Examination by Mr. Seeger              389/12

<u>P R O C E E D I N G S</u>

(TUESDAY, MARCH 16, 2010

(MORNING SESSION)


     (OPEN COURT.)

          THE COURT:  Be seated, please.  Good morning, ladies and

gentlemen.  Do we have a witness?

          MR. ECUYER:  Your Honor, a bit of housekeeping before we

begin this morning, if I may.

          THE COURT:  Okay, sure.

          MR. ECUYER:  Your honor, we would like to introduce by

way of trial deposition David J. Maloney, Jr., and we would like to

offer and file and introduce two exhibits, Hernandez 103 and 104,

in conjunction with Mr. Maloney's deposition testimony.

          THE COURT:  Okay, I'll admit the exhibits, and I'll make

the deposition a part of the record.

          MR. ECUYER:  Thank you, your Honor.

          THE COURT:  Thank you.

          As you know, we're continuing our ides of March trial,

and Mr. Witness, would you come forward, please, and take the

stand.  You will recall that we finished, that the plaintiffs

finished the direct examination and now we're beginning the

cross-examination.

          You're still under oath, sir.

          THE WITNESS:  Yes.

```
 1              THE COURT:  Pull that microphone a little bit closer to
 2    you.  You my proceed, counsel.
 3              MR. SANDERS:  Good morning, your Honor.
 4              THE COURT:  Good morning.
 5                         CROSS-EXAMINATION
 6    BY MR. SANDERS:
 7    Q.  Good morning, Mr. Krantz.
 8    A.  Good morning.
 9    Q.  We went through a lot of tarnish film pictures and showed a
10    table with different measurements of tarnish film yesterday, and I
11    believe that was at least in part of support of your assessment
12    under the Battelle standard as to the corrosivity of the
13    environment; is that correct?
14    A.  Yes.
15    Q.  And the material you were measuring, the copper sulfide, is
16    fairly friable, correct?
17    A.  Yes.
18    Q.  And it flakes off pretty easily with touch or with movement?
19    A.  Yes.
20    Q.  And you determined film thickness by looking at areas where
21    there's continuity between the film thickness and the copper
22    substrate, correct?
23    A.  As much as we could, yes.
24    Q.  And the idea is to measure that film thickness right on top of
25    the copper substrate?
```

1   A.  Yes.

2   Q.  Could we look at page 9 of 13 of Dr. Krantz's February 12th

3   report.  And actually, if we could blow up the bottom image.  This

4   is a little easier to see on the screen.  But this is one of your

5   film thickness measurements, correct?

6   A.  Yes.

7   Q.  On page 9.  And over here what we seem to see is a flake that

8   you've measured at 108, which appears to be floating out there in

9   space away from the copper substrate?

10  A.  Yes.

11  Q.  And if you back up a little bit and go to the right, there's

12  another flake that also seems to be turned up here?

13  A.  That one is, you know, there is deposits underneath that that

14  connect that to the copper.

15  Q.  But in your opinion, you've used these measurements to form the

16  basis of your opinions that that's the proper film thickness?

17  A.  Yes.

18  Q.  Including that 108 that's floating out there?

19  A.  Yeah, we used that.  You know, we measured this other one also

20  because we realized that that 108 was not attached.

21  Q.  The Battelle standard that you were talking about, that's a

22  standard that's used to classify corrosive environments?

23  A.  Yes.

24  Q.  And it's typically used in an industrial environment?

25  A.  That's where it was originally derived from, yes.

1    Q.  And in an industrial environment, you're normally process rooms

2    or pulp and paper plants or things like that, you're normally

3    subject to a constant level of corrosion?

4    A.  Yeah.  It was applied to control rooms within those plants,

5    yes.

6    Q.  And the analyses and the data that are backing that up assume

7    some level of corrosion over the time period which you're

8    measuring, correct?

9    A.  Yes.

10   Q.  Once we remove the drywall from the house you agree that the

11   source of corrosive gases will be gone?

12   A.  Yes.

13   Q.  Are you also familiar with other standards such as ISA?

14   A.  Yes, I am familiar with that one as well.

15   Q.  And it's a similar categorical standard in that it measures

16   corrosive environments, and I think they use different terms, G1,

17   G2, but they're similar to the Battelle standards?

18   A.  Very similar, yes.

19   Q.  And what they're measuring is the film thickness over a certain

20   period of time, correct?

21   A.  Yes.

22   Q.  Could we put up Plaintiff 62, please.

23           And this is the ISA S71.04 standard that I was talking

24   about?

25   A.  Yes.

1   Q.  If you turn to page 14 and blow up the table there.  This is a

2   similar table, the G1, G2, G3, as it is to the Battelle standards,

3   correct?

4   A.  Yes, similar.

5   Q.  And under the ISA standard, the way they measure the film

6   thickness is by a copper reactivity coupon, correct?

7   A.  That's a method that they mention, yes.

8   Q.  And if we turn to page 19 of Plaintiff 62, and if you look at

9   actually paragraph C.3, that's the sample analysis, that's the

10  method that they use to actually measure the film thickness,

11  correct?

12  A.  Yes.

13  Q.  And in these standards, similar to Battelle, well, in this

14  classification standard, they say that the film thickness should be

15  determined by cathodic reduction using the method of W.E. Campbell

16  and U.B. Thomas, correct?

17  A.  Yes, when you have test specimens, that would be a method that

18  would be used.

19  Q.  Can you describe what the cathodic reduction method is?

20  A.  Yeah, basically you're taking a, before you expose it you're

21  polishing a piece of copper or silver, you're exposing it to the

22  environment for a period of time.  When you remove it from that

23  environment, then you take it to a laboratory, you hook it up to an

24  electrochemical testing apparatus, you IMMERSE it in a specified

25  test solution, you then run an electrochemical test and it reduces

1   the deposits, the film on the surface of the test specimen, and

2   based on the recorded current and voltage you can determine what

3   species are potentially present and integrate the current to

4   determine the thickness.

5   Q.  And are you also familiar with the IEC 654-4 standard?

6   A.  I have read that one, yes.

7   Q.  Can we show Plaintiff's Exhibit 61.

8            This is an alternating French-English standard, so I am

9   going to try to get the pages correct here.  But similar to ISA or

10   similar to Battelle, this is another way to classify corrosive

11   environments, correct?

12   A.  Yes.

13   Q.  And if you turn to appendix B, which is 61-29.  This again

14   indicates that by using copper reactivity coupons you can measure

15   corrosivity in an environment over a period of time, correct?

16   A.  Yes.

17   Q.  If you go down to table B-1, much like the ISA or the Battelle

18   standard, while they only have three classes here, they're

19   measuring film formation over a period of time?

20   A.  Yes.

21   Q.  And you relied on Abbott's paper in applying the Battelle

22   method to your sampling?

23   A.  Yes, that was one of them.

24   Q.  Can we go to LT 195, please.  And if we turn to page 12, Abbott

25   also discusses ways to measure the corrosivity environment,

1   correct?

2   A.  Yes.

3   Q.  And if you could read that third bullet point for ME.

4   A.  "Direct measurement of relevant corrosion is the single best

5   descriptor of an operating environment.  The term direct

6   measurement refers specifically to the technology of coupon or

7   reactivity monitoring."

8   Q.  What you did is you took tarnish films on actual copper wires

9   and compared them to the Battelle standard, correct?

10  A.  Yes.

11  Q.  You didn't do any cathodic reduction to film to determine film

12  thickness?

13  A.  No, we did not, they were too thick for that.

14  Q.  And I think in the Sandia report when they were discussing the

15  Battelle classifications, they indicated that the measurements were

16  20 microns or so in the samples that they were using?

17  A.  Yes.

18  Q.  And they compared that to a Battelle Class III?

19  A.  Yes.

20  Q.  And if we turn to, I think it's page LT 26, or in this document

21  195-26.  That's the Battelle standard there and the three, and

22  what's the thickness range in microns for a year according to the

23  Battelle standard?

24  A.   .1 micron after one year for Battelle Class II.

25  Q.  And for III, what's the range, do you know?

1   A.  Let's see.  It says .1 TO .4 micron after one year.

2   Q.  So in four years, that would be a .4 to a 1.6 microns if you

3   assume linear --

4   A.  Yes.

5   Q.  -- which would be an aggressive rate of growth, correct?

6   A.  Correct.

7   Q.  And Sandia was comparing a 20-micron growth on a copper wire

8   and putting it in a category of around 3, which is a .4 to a 1.6

9   category according to Battelle?

10  A.  I believe they said a three or higher.

11  Q.  Did you do a similar conversion in comparing your film

12  thicknesses to the Battelle standard?

13  A.  Yes, we did.

14  Q.  So you compared the 20 microns that you had of 30 microns back

15  to the Battelle standard?

16  A.  Yes.

17  Q.  You had also talked about continuing corrosion, and you're

18  obviously aware, as we talked about, that KPT intends to remove all

19  of the drywall.

20  A.  Yes.

21  Q.  And so the source of corrosive gases will be gone.

22  A.  Yes.

23  Q.  And despite there being no further source of sulfide, reduce

24  sulphur gases, it's your opinion that the potential remains for

25  corrosion to continue on copper?

1   A.  Yes.

2   Q.  And you base that opinion primarily on Dr. Scully?

3   A.  Dr. Scully and the paper presented by Dr. Edwards, and

4   experience.  The literature talks about sulfide corrosion

5   continuing in sea water environments.  Dr., the Edwards paper was,

6   the first I had seen that was not in a sea water environment, he

7   used potable water, and in discussions with Dr. Scully who had

8   talked to Dr. Edwards, they were, he was convinced that this could

9   continue in atmospheric environment as well.

10  Q.  And in preparing your February 12th, 2010, report, you didn't

11  rely on any of Dr. Scully's reports?

12  A.  I had read them, but at that time I was under the impression

13  that he would be testifying and that I did not need to address

14  those things.

15  Q.  And so the reports that you prepared were based only on your

16  findings of your testing?

17  A.  Yes.

18  Q.  And you did indicate in your deposition that you intended to

19  offer some opinions that Dr. Scully's opinions were valid?

20  A.  Yes.

21  Q.  But you didn't issue any supplemental report or anything

22  outlining how you used those opinions?

23  A.  No, we did not.

24  Q.  Have you spoken to Dr. Scully since your March 5th deposition?

25  A.  Yes, I have.

1    Q.  At the time when I asked you how you could explain the

2    mechanism, you directed me to Dr. Scully.

3    A.  Yes.

4          MR. SANDERS:  I am in a bit of a bind here, your Honor,

5    to get into the methods of his testimony from yesterday since he

6    spoke to Dr. Scully since his deposition, and I guess I would move

7    to strike his opinions with respect to the reliance on Dr. Scully.

8          THE COURT:  I am going to deny that.  You can go into

9    whatever you think you need to go into.

10   BY MR. SANDERS:

11   Q.  Your opinion is that the reaction occurs because moisture is

12   present?

13   A.  Yes.

14   Q.  And you base that on the Edwards article, as you indicated?

15   A.  Yes.

16   Q.  Could we show Plaintiffs 241.  And if we, sort of hard to see

17   here, but if we look at the second, top of the second paragraph

18   where it starts, do sulfides play a similar role in the corrosion

19   of pure copper tubes and potable water, that's the question that

20   this paper was designed to answer?

21   A.  Yes, it was.

22   Q.  So we're talking about an environment here, where the metal is

23   in contact with water?

24   A.  Yes, it's immersed.

25   Q.  Completely immersed?

1  A.  Completely immersed.

2  Q.  Unlike the wires or the outside of the copper plumbing or

3  anything we're going to see in the Hernandez house?

4  A.  Correct, the wires do not get completely, do not get immersed

5  in water.

6  Q.  And if we turn to page, the next page, and again, they're

7  trying to mimic here what's found in potable water, right?

8  A.  I believe so.

9  Q.  And if you look at the solutions that they use in the first

10  paragraph and you compare their samples, they also include, if you

11  look in the first paragraph in the second sentence, chloride?

12  A.  Yes.

13  Q.  Sulfate?

14  A.  Yes.

15  Q.  And bicarbonate?

16  A.  Yes.

17  Q.  It's not just sulfide that's in there?

18  A.  Correct.

19  Q.  And in your past experience, I think you testified yesterday

20  was sea water and the heat exchangers that you were talking about?

21  A.  Yes.

22  Q.  You indicated that in that instance chloride and sulfate or

23  sulphur were part of the corrosive process?

24  A.  Yes.

25  Q.  And that's what kept the corrosion going once you tried to

1  clean it or remove the source?

2  A.  Well, what keeps the corrosion going was the sulfide.  The

3  materials that are used are considered reasonably resistant to

4  chloride, hence, they're using sea water applications, and it was

5  the corrosion caused by the sulfide that essentially poisoned the

6  protective nature, protective film that forms on the copper alloys.

7  Q.  And in that context yesterday you said sulphur?

8  A.  It was sulphur -- it was sulfide.

9  Q.  Other than the Edwards article and the sea water example, you

10  also, I think, have cited to the reaction on stainless steel of

11  chloride as a basis for this?

12  A.  Yes, as an example of another situation where corrosion can

13  continue.

14  Q.  Because chlorides are fairly bad actors and need to be

15  completely removed?

16  A.  You know, if they're resulted in pitting of stainless steels,

17  yes, you want to get them out to stop the pitting.

18  Q.  And you've testified that you're not sure whether anyone is

19  providing an adequate answer as to what level of humidity you need?

20  A.  There's discussions in the literature that suggests that at

21  room temperature you can have several monolayers of water present

22  that would be adequate to represent bulk water reactions.

23  Q.  But at least when I deposed you, you weren't sure what level of

24  humidity was necessary?

25  A.  No, I am not.

1   Q.  And the mechanism, I think, that we're talking about here,

2   according to Dr. Scully and yourself, is that copper sulfide will

3   somehow catalyze the reaction?

4   A.  Yes.

5   Q.  Copper sulfide itself in the film is fairly non-soluble?

6   A.  That's correct, it doesn't, in neutral water it does not

7   dissolve.

8   Q.  And in order for the reaction to occur, you need a source of

9   sulfide?

10  A.  For the sulfidation of copper to continue, you would need a

11  source of sulfide.

12  Q.  Mixed with air or moisture?

13  A.  Air, moisture.

14  Q.  And you haven't done any kind of testing actually on any copper

15  plumbing or pipes or wires to determine whether, in a moderate

16  humidity environment or non-aqueous environment the reaction will

17  continue?

18  A.  No, we haven't.  In the Edwards paper, the test that he

19  performed took several months.  We've not had that time available

20  and haven't been able to perform those tests.

21  Q.  You haven't been asked to come up with a test for that?

22  A.  Have not at this point.

23  Q.  And other than the Edwards paper and Dr. Scully opinion, you're

24  not aware of any tests that would confirm that copper sulfide

25  continues to corrode?

1  A.  In this situation, I am not aware that anyone has addressed

2  that issue.

3  Q.  And you don't have any idea or answer as to the likelihood or

4  actual likelihood of that risk?

5  A.  No, we don't.  We know that it's, it can occur.  We see in

6  other environments that corrosion can continue.  The Edwards paper,

7  you know, demonstrates that this reaction, that a reaction can

8  continue, corrosion rates can remain elevated even though the

9  sulfide is removed.  Granted, in an atmospheric environment, the

10  rate of that corrosion we would expect to be less, but again, we

11  don't know.

12  Q.  And there's no data to support or deny with a reasonable degree

13  of scientific certainty that it'll happen or not?

14  A.  Other than the Edwards paper, no.

15  Q.  Essentially this is based on a theory by Dr. Scully and the

16  Edwards paper that it'll happen under these conditions?

17  A.  It's based on the science that, you know, it's been shown to

18  happen in bulk water, and other atmospheric experts have said that

19  at room temperature enough bulk water can be absorbed on the

20  surface, enough water absorbed on the surface of copper to have the

21  same influence as bulk water.

22  Q.  And again, that assumption in there is that you have the copper

23  sulfide acting as some sort of catalyst to the mechanism?

24  A.  Yes.

25  Q.  You've done a lot of sampling on insulated live or neutral

1   wires, correct?

2   A.  Yes.

3   Q.  And I guess we saw the one sample of where there was some

4   breaking away or pulling away of the insulation yesterday.  But you

5   haven't seen in your samples significant evidence that there's

6   corrosion underneath that insulated portion?

7   A.  Correct.  Samples we had the corrosion seemed to diminish

8   within the first millimeter or so on the black and neutral wire.

9   Q.  Can we show F-5 of 14 from the 12/28 report.

10          And this is one of the samples you've done from a home in

11  Virginia, correct?

12  A.  Yes.

13  Q.  And obviously, there's the tarnishing around the outside edge

14  of the wire here?

15  A.  Uh-huh.

16  Q.  And then where the connection is made it's fairly clean copper?

17  A.  Yes.

18  Q.  And if we turn the page to the next page, you strip down a

19  portion here of the insulation fairly close to where the edge was?

20  A.  Yes.

21  Q.  And you actually did EDS testing, both of the area where the

22  tarnish was and then the area underneath the insulation, correct?

23  A.  Yes.

24  Q.  And this EDS testing shows that there's no sulphur peak there?

25  A.  That's correct.

1  Q.  And again, EDS testing, while it shows sulphur, it doesn't

2  actually tell whether it's a sulfide or a sulfate, correct?

3  A.  Correct, by itself it does not tell in what form any element is

4  present.

5  Q.  But at least there's supporting data from, you've done XRS?

6  A.  XRD.

7  Q.  XRD?

8  A.  X-ray diffraction.

9  Q.  And determined that?

10  A.  Yes.

11  Q.  And many of the other samples that you've done have shown the

12  same thing, that underneath insulated wires where the coating is

13  tight there's no sulphur?

14  A.  Yes, on the high-voltage conductors.

15  Q.  I think you said you relied on ASTM G46 to conduct your pit

16  measurement depths?

17  A.  Yes.

18  Q.  And that section that you relied on essentially was how you did

19  the, what is it, metallography?

20  A.  Metallographic cross section, yes.

21  Q.  And so you do that and then you get an image and you can try to

22  measure with the microscope the depth of the pits?

23  A.  Yes.

24  Q.  You indicated that yesterday you had gone back and corrected

25  the 41?

1    A.  Yes.

2    Q.  Micron pit?

3    A.  Uh-huh.

4    Q.  Did you correct any others when you went back and reviewed

5    that?

6    A.  No.  The others seemed to be appropriate.

7    Q.  If we could pull up Plaintiff's 108 -- nope, wrong one, I'm

8    sorry.  The G46 standard has a second section to it, Section 6,

9    which discusses how you might go about doing an analysis to

10   determine the potential for pitting on a copper surface, correct?

11   A.  I believe so.

12   Q.  That actually includes a statistical analysis or potential for

13   a statistical analysis, correct?

14   A.  Yes, uh-huh.

15   Q.  And in this case, you had plotted some of the pits that you had

16   come up with, but you didn't have enough to come up with a

17   statistical analysis?

18   A.  We did not do a statistical analysis, no.

19   Q.  So when we've seen all of the pitting depths, there's no

20   statistical basis to say that those depths are going to happen in

21   other copper, other forms of copper?

22   A.  Other than, you know, the fact that we found it on every sample

23   that we looked at.

24   Q.  But you don't have any statistical basis to say that it's more

25   likely or there's going to be a certain rate of growth?

1   A.  No, you can't ascribe a rate of growth to a measurement that's

2   made of one point in time, you need to make measurements over time.

3   I think the statistical analysis there also points to method to

4   determine if you've measured the deepest pit.  When you're doing

5   metallography, it's understood that you may not have sectioned that

6   pit at its deepest point or you may not have found the deepest pit

7   because you're looking at a very small area relative.

8   Q.  And it also comments that there are variations depending on,

9   for example, the level of corrosivity?

10  A.  I'm sorry?

11  Q.  Based on the corrosive gases, the levels of corrosive gases

12  that they're exposed to?

13  A.  Yeah.  There would be, you know, wires are potentially exposed

14  to different environments, slightly different environments in each

15  home.

16  Q.  And so the different samples you've taken, you've taken

17  samples, for example, of copper pipes from plumbing?

18  A.  I did not have a lot of copper pipes from plumbing.

19  Q.  And you've taken samples of wires?

20  A.  Taken samples of, plenty of samples of wires.

21  Q.  Both low-voltage and high-voltage?

22  A.  Yes.

23  Q.  And those are all in different locations of houses?

24  A.  Yes.

25  Q.  And in different houses in different climates?

1   A.  In different houses, different climates, yes.

2   Q.  In your report, you cited to an API standard in a discussion of

3   fitness of service or failure analysis, correct?

4   A.  We use that as an example.

5   Q.  And in that example, you had sort of a hypothetical chart of

6   how you might go about the example?

7   A.  As I would apply to a vessel, yes.

8   Q.  But you didn't actually do any fitness of service calculations

9   with respect to any of the samples that you've assessed?

10  A.  No, not from mechanical integrity.

11  Q.  And in order to do that sort of sample, one of the things you

12  need is, to know is the remaining thickness of the wire or whatever

13  you're actually trying to assess, correct?

14  A.  Yes.

15  Q.  And my understanding of the API is that it essentially

16  determines the thickness and then essentially you have an

17  acceptable level of corrosion or diminishment over time that you're

18  comparing it to, correct?

19  A.  Yes.

20  Q.  And you indicated the remaining thickness of the wire would

21  only impact its functionality electronically if there was enough

22  attack where it was being completely consumed and would break?

23  A.  No.  What we're concerned about is that if you get enough --

24  yeah, that is one concern, is that if it were to break.  The other

25  concern would be the generation of corrosion products that could

1    result in high resistance measurements.

2    Q.  So as we sit here, you're telling me that wire would only

3    impact its functionality -- are you saying that you don't agree

4    that it would only impact its functionality if it was completely

5    consumed?

6    A.  That would certainly impact its functionality, but corrosion

7    will also, you know, generates corrosion products that are not as

8    conductive as the base metal.  And if those were to get into a

9    contact or a connection could cause a problem.

10   Q.  Do you remember I deposed you on March 5th?

11   A.  Yes.

12   Q.  And you were under oath at that time?

13   A.  Yes.

14   Q.  And I asked you on page 143, line 8, "Would the remaining

15   thickness of the wire impact its functionality electronically?"

16   And you answered, "Only if there was -- if there was enough attack

17   where it was being completely consumed and would break."

18   A.  Okay.  I don't have that in front of me.

19   Q.  You were under oath, though, when you said that in your

20   deposition?

21   A.  Okay.

22              THE COURT:  Wait.  Do you want to see that?  Show it to

23   him, please.

24              MR. SANDERS:  I can show him.  May I approach?

25              THE COURT:  Yes.

1    BY MR. SANDERS:

2    Q.  Did I read that accurately?

3              THE COURT:  What page and line?

4              MR. SANDERS:  Page 143, line 8.

5              MR. BRYSON:  Your Honor, objection, can I see what he is

6    showing the witness?

7              THE COURT:  Yes.

8              THE WITNESS:  In this discussion, we're talking about

9    remaining thicknesses.

10             MR. SANDERS:  Right.

11   BY MR. SANDERS:

12   Q.  And I asked you, today you said that there were other concerns

13   or that -- I'd actually have to probably read it back.  You said, I

14   think you said that the thickness, that it wouldn't have to be

15   completely consumed in order to effect its attack.

16   A.  Well, yes.  We say here, you asked the question, "Will the

17   remaining thickness of the wire impact its functionality

18   electronically?  And only if there was -- if there was enough

19   attack where it was being completely consumed and would break.  So

20   what is your concern about --" your question, "So what is your

21   concern about electrical functionality then?"  My answer,

22   "Electrical functionality on wire is typically, one, is to conduct

23   current into its termination point where there is a connection so

24   that contact resistance -- "

25   Q.  And I am actually going to get there next.

1    A.  All right.

2    Q.  And the contact resistance point, you did resistance

3    measurements on some wire or in some implements of wiring, correct?

4    A.  Yes, we did.

5    Q.  And that was very low resistance levels?

6    A.  Yes.

7    Q.  Similar to the resistance testing that Sandia did?

8    A.  Yes.

9    Q.  So at least with respect to the samples that you tested and the

10   samples Sandia has tested, resistivity is low?

11   A.  Yes, at the point in time that we measured it.

12   Q.  Which was in December, I believe?

13   A.  Yes.

14   Q.  And you haven't done any other resistivity testing?

15   A.  No, we haven't.

16   Q.  You haven't tested any of the other electronics, low voltage or

17   high voltage, that you have seen?

18   A.  We tested a couple of the low-voltage wires that were attached

19   to a thermostat and got similar results.

20   Q.  Have you visited the Hernandez house?

21   A.  No, I have not.

22   Q.  And you went through some line sets the other day and showed

23   corrosion on those line sets?

24   A.  Yes.

25   Q.  Those weren't based on any sampling from the Hernandez house?

```
 1    A.  No.  I believe we looked at two line sets, one was from a home
 2    in Florida and one a home in Virginia.
 3    Q.  Did you see the picture I showed, I think it was DX 232, of the
 4    line set from the Hernandez house?
 5    A.  Okay.
 6    Q.  And obviously, you haven't done any testing, but that's fairly
 7    shiny copper there?
 8    A.  It looks like a typical copper tube.
 9    Q.  And you mentioned formicary corrosion yesterday, but I want to
10    be clear.  You haven't seen any formicary corrosion in an HVAC
11    coil, have you, based in Chinese drywall?
12    A.  Not in the coil that we analyzed from the Virginia home.
13    Q.  And you haven't seen any formicary corrosion on any other
14    samples of wiring or --
15    A.  I have not seen it on wire, no.
16    Q.  You also discussed yesterday cleaning and you had an example, I
17    believe it's Plaintiff 593, of cleaning off the wire?
18    A.  Yes.
19    Q.  And I guess prior when I, you hadn't cleaned or tried to clean
20    anything when I deposed you on March 5th.
21    A.  That's correct.
22    Q.  So this was prepared, I guess, sometime in the last week?
23    A.  Yes.
24    Q.  Do you know whether KPT's plan, they intend to actually use
25    Scotch-Brite pads or brillo pads?
```

```
 1   A.  I haven't seen a written procedure of how they intend to do it.
 2   This was something that was mentioned in conversation, so we gave
 3   it a try.
 4   Q.  You haven't actually seen KPT's repair plan or what they intend
 5   to do?
 6   A.  I may have seen it, but I never received a copy for my
 7   possession.
 8   Q.  And in this example, you've obviously cleaned it off and then
 9   you go down, I think, and are you focussing on one of the, what
10   appear to be a dark area there?
11   A.  It would be one of the lighter areas that we focused on, yes.
12   Q.  And then you go down and to your left you see there that you
13   have, I guess, a spot of copper sulfide?
14   A.  Yes.
15   Q.  And the scale on that, I think to the right, is 100 microns,
16   and then you're looking at a bar on the left there of ten microns?
17   A.  Yes.
18   Q.  So that's about 70 or 80 microns wide?
19   A.  Yeah, it's small.
20   Q.  The standard you used that you were referring to about removing
21   metals, removing corrosion from copper, I think it was Plaintiff's
22   Exhibit 600.  That's a standard that's used to clean copper
23   surfaces in order to do testing on them, correct?
24   A.  It's intended for use in the laboratory when you're evaluating
25   a specimen and procedures you can use that will completely remove
```

1   the corrosion products without damaging the base metal.

2   Q.  And again, in a lab context, I think you mentioned yesterday

3   some, what you would call some pretty nasty chemicals.  But those

4   are being used in a lab context to assess a sample?

5   A.  Correct.

6   Q.  Do you have Plaintiff's 600?  And if you look at the

7   significance and use in 4.1, these procedures are designed to

8   remove corrosion products without significant removal of base

9   metal, as you said.  And the purpose of that is to allow accurate

10  determination of the mass loss of the metal or alloy that occurred

11  during exposure to corrosive environment, correct?

12  A.  Yes, in a laboratory in a test specimen, yes.

13  Q.  So that's a method you can use if you wanted to know how much

14  was lost to the tarnish mechanism or the corrosive mechanism,

15  right?

16  A.  Yeah, that would be the ideal use for it, yeah, the intended

17  use.

18  Q.  Did you actually measure how much was lost according to the

19  standards of any of the samples?

20  A.  No, because we didn't have any preexposure weights to base that

21  on.

22  Q.  Which is what you would need?

23  A.  You would need that, yes.

24  Q.  So you would use the tarnish film thicknesses that you saw?

25  A.  Yes, uh-huh.

```
 1  Q.  If we could go to page C-1 of the December 28th report.
 2          This is another sample of an outlet you assessed, and I
 3  think you've seen this before.  There is paint and other things on
 4  the copper wiring and the ground wiring?
 5  A.  Yes.
 6  Q.  And paint obviously isn't a conductive component?
 7  A.  Correct.
 8  Q.  And you're not an expert in building codes, are you?
 9  A.  No, I am not.
10  Q.  You don't know whether it would be allowable for paint to be on
11  wires?
12  A.  No, I don't.  I mean, I wouldn't want it there.
13  Q.  But in a lot of the samples you saw, obviously there was paint
14  on ground wires and on other wires?
15  A.  Yes.
16          MR. SANDERS:  I'm done, your Honor.  Thank you,
17  Mr. Krantz.
18          THE WITNESS:  Okay.
19          THE COURT:  Any redirect?
20          MR. BRYSON:  Yes, your Honor.
21                        REDIRECT EXAMINATION
22  BY MR. BRYSON:
23  Q.  Good morning, your Honor.  Good morning, Mr. Krantz.
24  A.  Good morning.
25  Q.  Mr. Krantz, what is preferable in your line of work, looking at
```

1  the actual corroded item or looking at a coupon?

2  A.  It's always preferred to have the actual corroded item.

3  Q.  Why?

4  A.  It tells you far more information than what a coupon would, the

5  actual item has been exposed to the entire environment for the

6  period of time that's being concerned, where coupon exposures

7  typically are a snapshot of what's occurring.

8  Q.  And what is the field of failure analysis again?

9  A.  It's the study of materials that have failed, and primarily

10  what we get are failures that have occurred as a result of

11  corrosion.

12  Q.  And when you look at an item that has failed, do you look at

13  the -- and with regard to pits, what type of pit do you look at

14  when you're analyzing those?

15  A.  We will look at the deepest pit, we'll look at the -- we may

16  look at the severity of the pitting as far as pitting density, but

17  primary concern is going to be the deepest pit.

18  Q.  Now, Mr. Sanders showed you a couple of other standards.  If we

19  could pull up Hernandez 62 on page 14.  And if we could highlight

20  this particular standard that he showed to you.  And did the CPSC,

21  to your knowledge, did they utilize this particular standard in

22  their analysis?

23  A.  This is the --

24  Q.  The ISA standard.

25  A.  -- ISA.  They referred to the Battelle.

1  Q.  And this is not the Battelle, is it?

2  A.  This is not the Battelle standard.

3  Q.  And to utilize this standard that Mr. Sanders brought up to

4  you, what does it say with regard to doing the test, what the

5  relative humidity should be?

6  A.  These are, it says in that paragraph there, 50 percent, less

7  than 50 percent.

8  Q.  And do you know if the relative humidity of the Hernandez house

9  in the summer, would it be in your opinion below or above 50

10  percent?

11  A.  I would expect it to be above 50 percent.

12  Q.  So would you find this standard to be applicable with regard to

13  the Hernandez house?

14  A.  As far as the criteria there, it's applicable in the fact that

15  the next sentence says that for 10 percent increases in relative

16  humidity, let's see, how's it -- for a given severity, level can be

17  expected to be increased by one level for each 10 percent increase

18  in relative humidity.

19  Q.  But if we don't know what their humidity levels are, would this

20  standard be applicable?

21  A.  No.  Based on that.

22  Q.  And he also showed you to the Abbott paper, can we pull up LT

23  195.  And go to page 12, which is what Mr. Sanders showed to you.

24  LT 195, page 12, he showed this particular page to you.  What is

25  the difference -- is there a difference between environmental

1    monitoring and failure analysis?

2    A.  Well, you would do, you may do environmental monitoring as part

3    of failure analysis.  In and of itself it's not necessarily

4    considered failure analysis.

5    Q.  Okay.  And I believe, and we'll go to page 26 of this same

6    document.  And it talks about the rate of corrosion after one year.

7    Are you aware of any coupon studies from the Hernandez house or any

8    house with regard to Chinese drywall exposure that showed corrosion

9    rates after one year of exposure with coupons?

10   A.  No, to my knowledge, there were no exposures that were done for

11   that length of time.

12   Q.  That's not been done?

13   A.  Correct.

14   Q.  And so what we do have is we have the actual items to look at,

15   correct?

16   A.  Yes.  Yes, we do.

17   Q.  In fact, if you'll turn to page 13 of this same document that

18   Mr. Sanders showed you, can you read this sentence to the court,

19   where it starts off by?

20   A.  "By the time relevant corrosion can be detected visually, the

21   equipment may already be in an advanced state of degradation."

22   Q.  And has that been your experience, Mr. Krantz?

23   A.  Yes.

24   Q.  AND so if we look at the standard that the government used, and

25   which standard was that again?

1   A.  It was the Battelle standard.

2   Q.  And if we could go to Hernandez 59, page 12.  And how is Class

3   III or Class IV described?

4   A.  Class IV is corrosion product on copper is primarily a sulfide

5   film with some oxide.

6   Q.  And of all of the dozens and dozens of wire samples that you've

7   examined, both on this house and other houses, what was the

8   corrosion product primarily?

9   A.  Primarily sulfide with some oxide.

10  Q.  Now, Mr. Sanders asked you some questions about, you know, if

11  you remove the corrosive environment does the corrosion continue.

12  Again, can you remind the court very briefly what has been your

13  experience prior to even being involved with Chinese drywall on

14  removing the corrosive environment and whether or not the corrosion

15  will continue?

16  A.  It's been our experience that if you remove a corrosive

17  environment, that in many instances corrosion may continue.  Again,

18  the example of the shipboard heat exchangers, where you've got

19  materials that are copper alloys that are used that are resistant

20  to sea water, but once those materials have been exposed to sulfide

21  the protective film that forms on those alloys is poisoned, and

22  such that even though oxides may continually -- may continue to

23  form, the sulfide poisons that so it's not fully protective.  So

24  when another corrosive agent is present, in that case sea water,

25  corrosion will continue at an accelerated rate.

1          In the case with stainless steels, when you've got

2    pitting corrosion, you may have an environment that doesn't have an

3    overly high level of chloride, but maybe something has changed in

4    the process temporarily and allowed pitting to initiate.  That

5    pitting will continue unless you're able to remove all of those

6    chlorides from that pit.

7          In the case of tube and sheath heat exchangers where

8    you've got deposits built up and you form crevices and you can get

9    concentration of corrodents to occur, sulfates, chlorides, which

10   all can be corrosive to copper, where just the typical water

11   flowing through by itself won't corrode the copper, but as these

12   corrodents concentrate, they can cause pitting and other types of

13   corrosion.

14         So when it's discovered, common practice is to, if

15   failure of the tubes hasn't occurred, is to go in and clean those

16   tubes, but you have to get them as clean as possible, back to

17   new-like condition, otherwise the corrosion will continue under

18   those deposits.

19   Q.  On this Jacobson Edwards paper, I believe Mr. Sanders pointed

20   out that the corrosion continued, but it was in an aqueous

21   environment, correct?

22   A.  Yes.

23   Q.  And I believe you testified to the court what is your opinion

24   with regard to whether or not there would be sufficient water for

25   the corrosion to continue in the Hernandez house?

1    A.  There would be sufficient -- and what we see on these wires is

2    you've got pitting, which is, occurs which requires water to be

3    present, so we know that these wires are in situations where water

4    is present on these wires in sufficient amount to sustain a pitting

5    reaction.

6          So you remove the sulfide gas, which is a good thing to

7    do, but you still have these corrosion products there and you've

8    got pits.  And if there's enough moisture, then you're going to

9    catalyze a corrosion reaction that, according to the Edwards paper,

10   is going to continue.

11         THE COURT:  Is it your position that with the pits, the

12   corrosive element infiltrates the pits and remains there?

13         THE WITNESS:  What Edwards says is that they took the,

14   sulfide doesn't dissolve, redissolve in the water, as long as it

15   remains a neutral pH.  What can occur is that water gets in it, it

16   continues to catalyze the reaction so that the copper is dissolved

17   into the water.  And as you dissolve more copper, you're creating

18   hydrogen ions, and those hydrogen ions can then depress the pH

19   within that pit, and at lower pHs, somewhere probably in the range

20   of three to four, you can dissolve the sulfide and release the

21   sulfide and create a sulfidation reaction again, which would then

22   further accelerate the corrosion.

23   BY MR. BRYSON:

24   Q.  But, Mr. Krantz, is it your opinion that the corrosion product

25   gets into the pits and can that be cleaned out?

1    A.   The corrosion products, as you've seen in many of the cross

2    sections, are in the pits, and the attempt at cleaning them that we

3    performed did not, was not successful at completely removing the

4    deposits, even though on the surface to the unaided eye it appeared

5    that there was clean wire.

6    Q.   And I believe we referred to -- did you refer to the ASTM

7    standard from the laboratory on how it indicated -- what did it

8    indicate you had to do to clean all of the corrosion product out of

9    the pit?

10   A.   In ASTM G46, it says that you need to go and look under a

11   microscope to ensure that you've cleaned those pits out.

12   Q.   And how do you clean the pit out pursuant to the ASTM, what's

13   the only full-proof method?

14   A.   Well, you can either -- they talk about chemical removal, they

15   also mention mechanical removal.  You could either go back and do

16   more mechanical removal until you, you basically sand it down

17   through all of those pits.  The chemical removal, like we talked

18   before, uses some very harsh chemicals that would be, you would

19   only want to use in the laboratory environment.

20   Q.   And indeed, you tried to use the Scotch-Brite pad, which we'll

21   represent to you, Mr. Perricone, Knauf's expert, is indicating as a

22   method for cleaning.

23   A.   Okay.

24   Q.   And you used the Scotch-Brite pad, and were you able to clean

25   out all of the corrosion?

1  A.  No, we were not.

2  Q.  We'll put up 59-10.  And just focus in on that paragraph.  Can

3  you read that paragraph or that sentence to the court?

4  A.  "A review of the INTERIM report by SNL (Tab A) and

5  conversations with SNL staff suggests that copper wiring is the

6  most susceptible electrical component to the effects of the

7  corrosive gases."

8  Q.  And in your opinion, had the wires from the multiple samples

9  you've reviewed been damaged by the corrosive gases?

10  A.  Yes, when you compare those to wires from a home that has not

11  been exposed to Chinese drywall, there is significant damage.

12  Q.  And have you ever seen any type of damage like that in all of

13  your years in corrosion with regard to copper wiring?

14  A.  No, I have not.

15       MR. BRYSON:  One second, your Honor.  No further

16  questions.

17       THE COURT:  All right.  You're excused.  Thank you, sir.

18       Let's call your next witness, please.

19       MR. HERMAN:  Good morning, your Honor, very briefly

20  before we call our next witness.  There's some exhibits that Knauf

21  had had objections to, we've conferred with them and we would now

22  like to offer, file and introduce some exhibits to which there are

23  no objections.

24       THE COURT:  All right.

25       MR. HERMAN:  And that would be Hernandez Exhibits 13, 14,

1   32, 33, 34, 35, 36, 38, 39, 40, 41, 42, 46, 50 and 428.  And I

2   would just like to, we'd offer, file and introduce those.

3            THE COURT:  Okay.  Any objection to that, to those?

4            MR. HAYDEN:  No objection.

5            THE COURT:  All right.  Let them be admitted then.

6            MR. HERMAN:  And then I would just like to point out on

7   the record briefly that with respect to Hernandez Exhibits 48 and

8   448, Knauf has relevance objections but advises that they have no

9   hearsay or other foundational or authenticity objections.

10           THE COURT:  All right.

11           MR. HERMAN:  And we would like to call Tatum Hernandez to

12  the stand.

13           THE COURT:  With 48 and 448 when you get to putting them

14  in, I'll hear the objections.

15           MR. HERMAN:  Yes, your Honor.  Tatum Hernandez.

16           THE DEPUTY CLERK:  Please raise your right hand.

17       (WHEREUPON, TATUM B. HERNANDEZ, WAS SWORN IN AND TESTIFIED AS

18       FOLLOWS:)

19           THE DEPUTY CLERK:  Please be seated, and would you state

20  your name for the record.

21           THE WITNESS:  Tatum Brian Hernandez.

22                        DIRECT EXAMINATION

23  BY MR. HERMAN:

24  Q.  Can you tell the court a little bit about yourself?

25  A.  Yes.  I was born in Houma, 1980, and I grew up in Chauvin, and

1  since that time I've been raised in south Louisiana.

2  Q.  Where do you live now?

3  A.  We live in Mandeville.

4  Q.  What's the address?

5  A.  68034 Marion Street.

6  Q.  Where are you employed?

7  A.  I work for the U.S. Department of State with the New Orleans

8  passport center.

9  Q.  Can you tell Judge Fallon a little bit about what you do on

10 day-to-day basis?

11 A.  Yes.  I supervise eight passport specialists, and we determine

12 citizenship and prevent passport fraud and identity theft.

13 Q.  Tell us a little bit about your family.

14 A.  I've been married for almost ten years.  I have two children,

15 Grant who is four, and Amelia who is two.

16 Q.  How did you come to live at the house on Marion Road?

17 A.  Well, when I was going to college, one semester I commuted from

18 Mandeville to Delgado, I lived with my aunt at that time in

19 Mandeville, which she actually lives next door.  And so I liked the

20 city of Mandeville and just the area and the rural environment and

21 the atmosphere.

22       And a friend of theirs, their sons played baseball

23 together and he actually owned the empty lot on the side of the

24 house, and his son, he was going to build a house for his son but

25 his son backed out.  So when he backed out, he told my aunt about

1    the property and she knew that Charlene was graduating from nursing

2    school and that we wanted to start a family and eventually settle

3    on the north shore, so it was a good opportunity.

4    Q.  Why did you want to live there in particular?

5    A.  Well, first of all, you know, I just found that the city was

6    very family oriented.  They have great parks, great public schools,

7    it was safe.  It reminded me a lot of some of the areas where I

8    grew up where I could go play in the woods and just have a lot of

9    property, and also, my aunt has four kids and when I was a teenager

10   I used to spend the summers with her when they lived in Metairie

11   and now her children could help us with ours.

12   Q.  How did you go about designing the house?

13   A.  My uncle who lives next door is an architect, and along with

14   the contractor, we picked out some plans that we liked and we

15   curtailed them and changed them a little bit, and so together

16   Marino actually drew the plans, but we worked on them together.

17   Q.  When you drew those designs, did you have any future planning

18   in mind?

19   A.  Yes.

20   Q.  Can you tell the court a little bit about that?

21   A.  Our house has a very high-peaked roof, so we built and paid

22   extra structurally to make it into a second story and also to

23   either add on to the side or to the back and just have a lot of

24   room to grow with our family if we wanted to.

25   Q.  What, if any, experience do you have with home construction?

1   A.  I don't have any.

2   Q.  When did you move into this house?

3   A.  We moved in around the first week of August in 2006.

4   Q.  And how did the AC system work?

5   A.  Well, it worked fine until the summer of 2007, and it started

6   to fail.

7   Q.  Can you tell the court a little bit about the problems that

8   you've had with your AC system in the house?

9   A.  Yes.  Well, we've had several failed evaporator coils, I

10  believe five or six total.  But the first time the freon was

11  leaking we called the builder, he called the AC technician to come

12  out, the one who installed it.  And he said it was low on freon and

13  that apparently there was a leak.  So he refilled it and days later

14  it went out completely.

15          So they thought that where he was detecting the leak that

16  there was maybe a hole in the copper in the wall.  So grant was

17  probably about a year and a half old at that time.  So they went to

18  his room and had to rip out the wall and found what they thought

19  was the leak.  And, you know, take out all of the insulation, patch

20  it back up.  And it turned out that it was the evaporator coil that

21  failed.

22  Q.  How many coils have you had in the house in the three and a

23  half years that you've been there?

24  A.  I believe we're on our sixth coil at this time.

25  Q.  In terms of window units, have you tried to use any window

1    units?

2    A.  Yes.

3    Q.  Please tell the court a little bit about that.

4    A.  It just depends on what time of the year, the AC would go out.

5    So if it was in the fall or the early spring, we could manage for a

6    few days until the AC was repaired.  But most recently when it went

7    out it was June or July, it was unbearable, so we, I believe we

8    spent a couple of nights at my aunt's house with the two kids and

9    then we borrowed an AC unit from a relative in Houma and then two

10   friends in Mandeville.

11         So we would strategically, I would take the time to put

12   them in the best places, I would put -- then I bought another unit

13   from Wal-Mart, put it in our bedroom, took Grant's toddler bed, we

14   kind of camped out in our room, had a small window unit for

15   Amelia's room, and we had that for about two, three months, so we

16   were either hot or freezing cold, and it was very damp inside the

17   house.

18   Q.  So how many window units have you had total in the house that

19   you can remember?

20   A.  I believe four.

21   Q.  And of those four, how many are still functioning properly?

22   A.  Well, one broke just a few weeks later, another one that we

23   borrowed wasn't working as efficiently by the time we got our AC

24   fixed, and all of them have black coils that I've seen.

25   Q.  You heard Mr. Rutila testify yesterday?

1   A.  Yes, sir.

2   Q.  And he talked about a window unit that he had taken a look at.

3   Do you know which window unit that is?

4   A.  Yes, that was the largest one that we probably ran the most, it

5   was in the center portion of the house near the dining room.

6   Q.  And how was that working when we sent it off to Mr. Rutila, to

7   the best of your perception?

8   A.  It just wasn't cooling as efficiently.

9   Q.  Have you had any trouble with your thermostat in your AC unit?

10  A.  Yes.  In January Charlene called me, and we had the whole unit

11  replaced and about a year ago, so she called me, and here it is the

12  coldest part of the year and the heater is going out.  Even on

13  emergency heat the thermostat is going on and off, on and off, the

14  system is going crazy.

15          So I came home, called our AC repairman who by that time

16  knew us very well, and came over about 7 P.M. that night to try to,

17  he said the thermostat failed and he replaced it.

18  Q.  What, if any, problems have you had with the outside compressor

19  unit?

20  A.  Right around the same time the compressor also failed.

21  Q.  And that was earlier this year?

22  A.  Yeah, in January.

23  Q.  Tell us about your experiences, if any, with problems, at least

24  based on your perception with other electrical appliances in the

25  home in the three and a half years that you've been there.

```
 1   A.  Well, less than a year after we moved into the home, our
 2   refrigerator went out, so we had to, you know, get in contact with
 3   Sears, try to get it replaced under warranty, they didn't have the
 4   same model, we had a dorm refrigerator.  Charlene was pregnant and
 5   Grant was probably two years old at the time.
 6   Q.  So you have a new refrigerator now since you moved in?
 7   A.  Yes.
 8   Q.  And how does that work?
 9   A.  It's been functioning fine.  But I saw some copper pieces on
10   the back are black, and I was told they should be, they should be
11   copper.
12   Q.  Do you have any other experience -- I'll let you get some
13   water.  Have you had any other problems, at least based on your
14   perception, with electrical appliances in the home since you moved
15   in in August of 2006?
16   A.  Yes.  I know we had a toaster that went out.
17   Q.  When was that, to the best of your --
18   A.  It was somewhere around, probably less than a year after we
19   moved into the home, around the same time as the refrigerator.
20   Q.  Anything else that you can remember?
21   A.  My mom had moved and given us a TV that, a small TV to put in
22   the kids' playroom for them to watch videos and stuff.  And that
23   just, it worked for a few months and then it just randomly went
24   out.
25   Q.  Okay.  Anything else?
```

```
 1   A.  Not off the top of my head.  I'm sure there are some other

 2   things that I can't remember.

 3   Q.  Can you tell the court a little bit about all of the different

 4   inspections that you've had at your house?

 5   A.  We've had a ton of inspections.  And not just inspections but

 6   experts, scientists, electricians, plumbers, so many.  I was

 7   shocked, I was like, well, surely this will be the last one and

 8   then five more would come the next day.  And I tried to balance it

 9   out with trying not to take off of work too much unless I

10   absolutely had to.  So my wife was home and did a great job of

11   handling those inspectors.

12   Q.  Did the government have an opportunity to inspect your house?

13   A.  Yes.  The Consumer Products Safety Commission came at least

14   three occasions along with defendants' inspectors, our attorneys'

15   inspectors, court inspectors.  And it wasn't just, typically wasn't

16   just an in-and-out type of thing.  It was an all-day affair from

17   morning till late evening, and at one point I just told my wife

18   that at this point let's just leave the back door unlocked and they

19   can come and go as they want because it was almost like our home

20   wasn't ours anymore.

21   Q.  Can you tell the court a little bit about how you came to

22   discover that you had Chinese drywall in your house in the first

23   place?

24   A.  We, March of last year we had just gotten back from a great

25   vacation with the kids, and a few days later Charlene called me
```

1    from work and she said that she seen a news report about this

2    couple in Pearl River who had Chinese drywall.  And they said that

3    there were other homes affected by this Chinese drywall, this

4    defective drywall, built around the same time, and our home was

5    built in that window.  And she said that I need to go look in the

6    attic, and I thought, well, surely it's not going to happen to us,

7    just that poor couple, I feel really bad for them.

8              A couple of days later I put the kids to bed, Charlene

9    was still at work, and I went into the attic and I saw, moved some

10   of the insulation and saw the K-N-A-U-F.  I called her and she

11   said, well, there should be some other letters, and sure enough,

12   T-I-A-J-I-N, and the light went off in my head and I just almost

13   wanted to fall through the attic.

14   Q.  What, if anything, have you done in connection with this

15   litigation to try to ascertain what it might cost to rent a

16   comparable home if you move out while the remediation is going on

17   or for any other reason?

18   A.  Charlene's friend is a real estate agent so we contacted her,

19   and she was kind enough to help us get some listings of comparable

20   homes in the Mandeville area.  So we've talked to her about that.

21   Q.  And what did you do with that information?

22   A.  Well, we passed it on to J.C. Tuthill.  Unfortunately, we

23   weren't able to move because of the price of these homes and it

24   just wasn't in our budget.

25   Q.  Can you afford to pay your mortgage and pay a mortgage on a

1   second house?

2   A.  No.  And that's the biggest predicament and that's what's

3   really difficult is so often, you know, people, I don't think they

4   mean it intentionally but that they know in the situation we're in,

5   they say, well, you're not still in the house, are you?  And it's

6   just crushing because I take pride in protecting my family and it's

7   just, it's tough, the finances, the financial part of it is tough.

8   Q.  You mentioned somebody named J.C. Tuthill, she is an

9   accountant?

10  A.  Yes.

11  Q.  And you provided her with some information in connection with

12  the litigation?

13  A.  Yes, we provided Ms. Tuthill with a ton of financial documents,

14  including receipts for repairs.  We put a lot of work into this and

15  going back and researching all of these things.  Luckily, we kept

16  pretty good records.

17          And in addition, we had someone give us an estimate on

18  moving from the house into a rental house, out of the rental house,

19  back into our home.  Rental insurance, deposits, loss of work, loss

20  of hours in pay.

21  Q.  You said something to me yesterday about, something about your

22  career.  Could you tell the court about that?

23  A.  Well, I work in passport services under the state department,

24  and right now the whole passport services is growing by leaps and

25  bounds.  And here in New Orleans it's a fairly small agency, so the

1   opportunity for growth and career advancement is limited and very

2   competitive.  And I was able to move up a little bit, but there's

3   job postings that come out all the time across the United States,

4   Hawaii, New York, everywhere you can imagine, and I can't even

5   consider applying to further my career and to make more money to

6   provide for my family because this house is just a financial

7   burden.  I just can't even consider it even if I wanted to.

8   Q.  What information, if any, in connection with litigation did you

9   provide to the personal property appraiser, I think his name is

10  Mr. Maloney?

11  A.  We went through the house and we looked at all of the items

12  that couldn't be easily cleaned, such as couches and mattresses and

13  so forth, and we estimated when we, I gave an idea of when we got

14  the items and how much we thought they were valued at.

15  Q.  I know you've read a bunch of pleadings and legal things and

16  stuff like that.  But could you just tell the court in your own

17  words what you're hoping to get out of this trial?

18  A.  We're just hoping that we could have our home repaired and

19  repaired beyond a doubt that it's going to be a safe place, that we

20  can drive up at home like we used to before March of last year and

21  take a deep breath and say, oh, we're home and this is our safe

22  place.

23         And right now our home, you know, it looks beautiful from

24  the outside but it's lost a lot of value to us emotionally, and

25  it's kind of put on hold the plans we had.  Right before we found

1   out we had the drywall we finally saved up enough money to do the

2   landscaping and pave the driveway and just really improve the value

3   of it and make it look good, and we're just not even willing to put

4   in one more dollar into this house.

5           MR. HERMAN:  Thank you.  No further questions, your

6   Honor.

7           THE COURT:  Thank you.  Cross.

8                   CROSS-EXAMINATION

9   BY MR. HAYDEN:

10  Q.  Good morning, Mr. Hernandez.

11  A.  Good morning.

12  Q.  I just have a few questions for you, just some clarification.

13  It's my understanding that you originally purchased the property on

14  which your home was built; is that right?

15  A.  That's correct.

16  Q.  And you bought it for about $30,000?

17  A.  Yes.

18  Q.  And then the way I understand it is, you then resold it to

19  Mr. Marino, who then entered into a real estate contract to

20  purchase or to construct the home for you on that site?

21  A.  Yes.

22  Q.  And the original contract was in March of 2005; is that right?

23  A.  I believe so.

24  Q.  And at the end of March of 2005, I believe the contract was a

25  contract for $195,000; is that right?

1   A.  The original contract, yes.

2   Q.  And that was for both the land and for building the house on

3   the land, correct?

4   A.  Yes.

5   Q.  And there were some delays in getting the home built, right?

6   A.  Yes.

7   Q.  And then Katrina hit and there were further delays; is that

8   right?

9   A.  Yes.

10  Q.  And you subsequently entered into another contract with

11  Mr. Marino in, I believe, the end of November of that same year?

12  A.  Yes.

13  Q.  And in that second contract, Mr. Marino indicated that there

14  were some additional costs and he asked that you split the

15  difference and increased the purchase price for the construction of

16  the house to $205,000; is that right?

17  A.  Right.

18  Q.  And if you were to back out the land, the value of the land,

19  the value to construct that house back then was about $175,000?

20  A.  Yes.

21  Q.  And you were supposed to move in in March of the following

22  year?

23  A.  Of what year?

24  Q.  2006.

25  A.  Yes.

1    Q.  But you didn't end up moving in until August of that year,

2    right?

3    A.  That's correct.

4    Q.  And that was because of some delays with Mr. Marino's

5    construction?

6    A.  Yes.

7    Q.  Did Mr. Mallet indicate how long it would take to repair your

8    home?

9    A.  He didn't indicate to me specifically.  But from the reports

10   I've read, I believe it says anywhere from four to six months.

11   Q.  So it's your understanding that it's going to take about four

12   to six months to repair your home?

13   A.  Yes.

14   Q.  Before Mr. Mallet came out to your home to investigate it and

15   to give a cost estimate, you hadn't obtained any estimates to

16   repair the house from anyone else, had you?

17   A.  No, we did not.

18   Q.  So the only -- and Mr. Mallet was retained by your attorneys,

19   wasn't he?

20   A.  Yes.

21   Q.  So prior to that you hadn't gone out and tried to find

22   estimates to repair your house?

23   A.  No, we --

24   Q.  Before the attorneys got involved?

25   A.  We didn't have any, we don't have any money to do it, so I

1  never sought estimates.

2  Q.  And I think you testified that your wife Charlene first heard

3  about Chinese drywall from watching Fox news in March of last year?

4  A.  Yes.

5  Q.  And then I think a few days later you went up in the attic and

6  you saw that there were some markings that were indicative of

7  Chinese drywall; is that right?

8  A.  Yes, yes.

9  Q.  You have a stand-alone garage; is that right?

10  A.  It's a detached garage, there's a covered walkway in-between

11  the garage and the house.

12  Q.  Now, that garage, does that have the same trim, baseboard and

13  casings as you do in the house?

14  A.  I am really not sure.  I don't think it has the, like crown

15  molding in the garage.

16  Q.  It doesn't have, it doesn't have crown moldings or baseboards,

17  does it?

18  A.  It may have baseboards.

19  Q.  Does it have the same trim that you would find inside the

20  house?

21  A.  In regards to trim, what specifically are you talking about?

22  Q.  Chair rail or any type of moldings, both at the ceiling or at

23  the base of the wall.

24  A.  I believe they have moldings, floor moldings, and there's a

25  ledge on the window.

1   Q.  Does it have the same amount of electricity that you would have

2   in the house?

3   A.  I am not an electrician or a contractor.

4   Q.  I appreciate that.

5           Now, you mentioned that there were certain products in

6   your home that you testified to that had failed since you've moved

7   in.

8   A.  Yes.

9   Q.  I think you talked about a toaster and maybe a TV?

10  A.  Yes.

11  Q.  And as you sit here today, you can't, you cannot relate the

12  failure of the TV or the toaster to the Chinese drywall, can you?

13  A.  Not scientifically.

14  Q.  Is that the same for the microwave and the refrigerator?

15  A.  No.

16  Q.  You can't determine, you -- you're not a scientist, you can't

17  determine if the failure of those was caused by the Chinese drywall

18  or was caused by some product failure?

19  A.  No, I can't.

20  Q.  Would the same hold true for the thermostat and the smoke

21  detector?

22  A.  I can't, but I saw visually corrosion on all of those items.

23  Q.  But as you sit here today, can you -- you're not qualified to

24  say that those products failed because of the Chinese drywall.

25  A.  I can't.

1          MR. HAYDEN:  That's all I have.

2          THE COURT:  Thank you.  Any redirect?

3          MR. HERMAN:  No redirect, your Honor.

4          THE COURT:  Okay.  You're excused.  Thank you, sir.

5     Who is the next one?

6          MR. SEEGER:  YOUR HONOR, at this point we call Donald

7     Galler.

8          THE COURT:  Why don't we take a break at this time, 15

9     minutes, and we'll get back.  The court will stand in recess.

10          THE DEPUTY CLERK:  Everyone rise.

11          THE MARSHALL:  All rise.

12     (WHEREUPON, A RECESS WAS TAKEN.)

13     (OPEN COURT.)

14          THE COURT:  Be seated, please.  Let's call your next

15     witness.

16          MR. ECUYER:  Your Honor, a little bit of housekeeping

17     again.  Mike Ecuyer on behalf of the Hernandezes.  Your Honor,

18     we've reached agreement with opposing counsel on several exhibits

19     and we would like to get them into the record at this time.  I

20     apologize for the length of this list but they are voluminous.

21     Hernandez Exhibits 7, 9, 10, 11, 17, 18, 19, 20, 21, 23, 26, 27,

22     28, 30, 31, 37, 43, 51, 379, 388, 398, 408, 409, 411, 412, 413, and

23     a string from 415 through 426, 429 through 435, and 437 through

24     447, and finally Exhibits 481 and 482.  And those last two items,

25     your Honor, are the expert report of J.C. Tuthill and her affidavit

1       in lieu of her live testimony, your Honor.

2               Additionally, we have the following exhibits, which we

3       would offer subject to defendant's objections as to relevancy, and

4       those would be:  399 through 407.  And they have no objection as to

5       the foundation or hearsay, just simply the relevance, and those are

6       wage documents of the Hernandezes.

7               THE COURT:  I will reserve ruling on 399 through 407 and

8       allow all of the other ones in at this time.  The defense has a few

9       at this time.

10              MR. HAYDEN:  Your Honor, before I forgot even though I

11      should probably wait until our case in chief, but there's an

12      agreement to put in Defendant's Exhibit 192, 193, and 195.

13              THE COURT:  Okay.  Do you want me to admit them now?

14              MR. HAYDEN:  And Exhibits 209 and 221, which are the

15      Roddewig declaration and affidavit, similar to the Tuthill that was

16      just put in.

17              THE COURT:  And you're be moving that they be admitted at

18      this time and I'll admit them.

19              MR. HAYDEN:  Yes, your Honor.  Thank you.

20              THE COURT:  Okay.  Thank you.

21              MR. SEEGER:  Judge, at this time we'll call Mr. Donald

22      Galler.

23              THE DEPUTY CLERK:  Mr. Galler, please step into the

24      witness box.  Would you raise your right hand.

25          (WHEREUPON, DONALD GALLER, WAS CALLED AS A WITNESS AND

1        TESTIFIED AS FOLLOWS:)

2            THE DEPUTY CLERK:  Please be seated and state your name

3    for the record.

4            THE WITNESS:  My name is Donald Galler.

5            THE COURT:  How do you spell that, sir?

6            THE WITNESS:  G-A-L-L-E-R.

7            THE DEPUTY CLERK:  You can back away from the mike just a

8    little bit.

9            THE WITNESS:  Okay.

10           MR. SEEGER:  May I proceed, your Honor?

11           THE COURT:  Yes, you may proceed.

12                        VOIR DIRE EXAMINATION

13   BY MR. SEEGER:

14   Q.  Mr. Galler, please tell the judge a little bit about your

15   educational background and your work experience.

16   A.  I have a bachelor's degree in electrical engineering from

17   Northeastern in 1976, I have a master's degree in electrical

18   engineering from the University of Connecticut in 1979.  At that

19   time I started to work for a small consulting company in the Boston

20   area.  Around 1988 that company was purchased by a company called

21   Failure Analysis Associates.  And both of these companies I was

22   involved in the investigating the failure of electrical and

23   electronic equipment.

24           I worked for Failure Analysis Associates, which changed

25   its name at some point to a company called Exponent, and it's a

1    national investigating firm.  I left there in about 1995 and went

2    to work part-time at the Massachusetts Institute of Technology in

3    Cambridge, Massachusetts.  And since '80 I've been involved, since

4    1980 I've been involved to some extent in pretty much specializing

5    in the failure of electrical and electronic equipment.

6    Q.  This may sound pretty obvious, but when an electrician or

7    electrical engineer talks about the failure of the electronic

8    equipment, what specifically are you talking about?

9    A.  Well, what I do is I look at equipment that's failed, either as

10   a fire investigation matter or an electric shock matter, I take

11   electronic stuff apart, try to figure out what the cause of the

12   failure was.  I frequently do a lot of optical and scanning

13   electron microscopy on parts.  I also test equipment to simulate

14   failure modes to see if something I've observed by doing the

15   optical or scanning electron microscopy can be repeated or

16   replicated in a laboratory.  So that's a thumbnail sketch of what I

17   do.

18   Q.  Do you have experience with these electrical components and

19   devices and corrosion as a cause of failure?

20   A.  Actually we don't see too much corrosion in the electronic

21   business, basically because the whole industry is geared towards

22   avoiding corrosion.  I do see contaminants on electronic equipment

23   frequently, so, for example, I will occasionally see oil deposits

24   or other foreign material on electrical contacts or on circuit

25   boards.  And those things are usually things we look for but don't

1    find quite as dramatically as we did in the Chinese drywall

2    investigation.

3    Q.  And how much of your time let's say over the last 20 years have

4    you spent looking at circuit boards, contact, switches, things like

5    that?

6    A.  Eighty percent of it probably.

7    Q.  Now, Mr. Galler, I want to put something up.  All right.  Can

8    you tell the court what is this book that I just put up?

9    A.  This is a handbook that I contributed to.  There are four

10   chapters that I would say authored say 80 percent of the material

11   in each of those four chapters.  And they cover things like wiring,

12   circuit boards, switches and relays and electronic components.

13   Q.  Now, we see at the top that the book is published by McCraw

14   Hill.  Who would read this book?

15   A.  It doesn't make very good bedtime reading.  Electrical

16   engineers who --

17   Q.  I have to tell you, some of this stuff puts most of us to

18   sleep.

19   A.  Sorry about that.  The electrical engineers who are looking at

20   equipment that's failed and they want to familiarize themself with

21   some of the basic techniques, the analysis techniques, some of

22   which I mentioned, the optical microscopies, scan electron

23   microscopy, X-ray analysis.  There's a whole host of techniques.

24   Q.  And on the list of contributors, is that you?

25   A.  That is.  And if you tell me which chapter that is I can tell

1   you why I am down so far on the list generally.

2   Q.  Actually it looks alphabetical in all fairness to you, you

3   shouldn't feel too bad.

4           Let's talk a little built and very quickly about the

5   chapters that you contributed to in this book.  Does that look like

6   one of them?

7   A.  Yes.

8   Q.  Is that your name at the top?

9   A.  Yes.

10  Q.  And why don't you tell us a little bit, quickly, like 30

11  seconds, on what this chapter is about.

12  A.  The wire and cable that frequently or wiring is frequently

13  involved in electrical accidents, automobile accidents, a fire in a

14  house.  And so one has to know a little bit about the structure of

15  the wire, what the wire is made out of, what the insulation

16  material is made out of, what some of the failure modes are, and

17  that's basically what this chapter covers.

18  Q.  And that was Chapter 15, now we're looking at Chapter 16 which

19  is also one you've contributed to.  Is that your name right there?

20  A.  Yes.

21  Q.  Just another 30 seconds about what this is about, switches and

22  relays?

23  A.  Switching devices which handle electric power are frequently

24  the topic of investigation in failure of equipment, if they're

25  fundamental component.  So this chapter covers the construction of

1  the switches and some of the analysis modes to try to figure out

2  why they failed.

3  Q.  And Chapter 18, there you are at the top.  And that's entitled

4  Failure Analysis of Components, another 30 seconds on this, please.

5  A.  Electronic components, little things we see on circuit boards,

6  we're not all students of circuit boards, electronic components,

7  capacitors, transistors, resistors those kind of things all have

8  failure modes.  Some of the investigating tools like X-ray, looking

9  at an optical microscope, looking at a scanning electron

10  microscope, those are common analysis tools.  The chapters cover

11  some of the failure modes and some of the analysis methods.

12  Q.  I just realized from my list and I forgot to bring it up.  You

13  also are a contributor to Chapter 14 in this book which is entitled

14  Failure Analysis of Printed Wiring Assemblies; is that correct?

15  A.  That's right.

16  Q.  Thirty seconds on that.

17  A.  That's sort of a more formal industry title for something we

18  normally call circuit boards, so printed wire assembly is a

19  different name for a circuit board, and a circuit board are found

20  in our computers, cell phones, pretty much electronic thing we own.

21  And there's a variety of failure modes and analysis methods, so

22  that's what the chapter covers.

23  Q.  And could you just spend a little time telling us from your

24  work experience the types of project you've worked on where you

25  have to bring to your bear your expertise and failure analysis of

1  components and things like that?

2  A.  I've worked on many, I try to make a mental list probably, 20

3  of these failure modes investigations, some of those are from

4  manufacturers who are simply having a production problem, others

5  are investigations of circuit boards that may have failed and

6  caused an accident or a possess of equipment to malfunction.  An

7  example of one is a circuit board from a charger for a portable

8  radio device, and the circuit board was causing an overheating

9  problem and the manufacturer was trying to get to the bottom of why

10  the circuit board was overheating.  And on that circuit board I

11  found a contamination left over from the manufacturing process

12  which then allowed basically a short or intermittent short to

13  develop between the two points on the circuit board.

14  Q.  Mr. Galler, are you -- would it be fair to say that you are

15  brought in to find out the cause of why thins are failing?

16  A.  That's right.

17  Q.  That's what you do?

18  A.  That's what I do.

19  Q.  And talk to us a little bit that in the course of doing what

20  you do, what type of tests you employ to get to the bottom of the

21  cause of certain failures?

22  A.  Primarily looking at these, the samples that were given to me

23  with optical microscopy and scanning electron microscopy.

24  Q.  Explain what those are?

25  A.  Electron microscopy is something that looks like people

1   sometimes think of these as a monocular device, a little thing you

2   put one eye in, but the failure analysis people and the

3   metallurgist tend to use a stereo microscope, so this is a

4   microscope that has a binocular pair of eye pieces that you look

5   in.

6           And the benefit of that is that you can essentially see

7   in sort of three dimensions like you do when you're looking around

8   the room.  And the magnifications of that are really limited to

9   about 500 or 1,000X.  Typically we don't go above about 500 times

10  magnification in an optical microscope of that type.

11          That is pretty good at showing you what the shape of a

12  part is or what its color is structurally; but beyond those

13  magnification levels, we frequently use a scanning electron

14  microscope.  And a scanning electron microscope is a different kind

15  of a device entirely, a scanning electron microscope you actually

16  don't see color, it's a gray scale image typically and the

17  magnification can be much higher.  I don't think in any of the

18  investigations I've done, I did in this I didn't go to about two to

19  000 time the magnification, that's kind of on the low scale of SEM

20  work, scanning electron microscopy work.

21          But the real feature that I've used a lot in this case, I

22  know a lot of the experts have been doing this, the SEM has

23  typically a subsystem associated with it where you can look at an

24  image, draw a box around part of the image, and as part of the

25  machine's operation it will tell you what elements are present in

1    that image area.  So not only can you tell a little bit about the

2    structure of what you're looking at but you can tell a little, tell

3    something about its composition as well.

4    Q.  And, Mr. Galler, tell us a little bit about how you got

5    involved in the Chinese drywall type corrosion?

6    A.  I was contacted by Mr. Rutila at Simpson, Gumpertz and Heger,

7    and this was originally around December 12th or so, and he asked me

8    to get involved in this investigation.  And it was not clear that I

9    would have time in my schedule to get involved.  He said I have

10   some very interesting samples, why don't you come over and take a

11   look at them.  So I went to his office, which is near where I work

12   in Cambridge, got some samples from him, and then began taking the

13   samples apart and doing microscopy on them, standard procedure.

14   Q.  And I don't want you to go into your opinion, I just want to at

15   this point before we qualify you let the judge know how got

16   involved, how you got involved?

17   A.  That's how I got involved.

18          MR. SEEGER:  Your Honor, at this point we would tender

19   Mr. Galler as an expert electrical engineering, power electronics,

20   electrical machinery and failure analysis.

21          THE COURT:  Any questions?

22          MR. SANDERS:  No, your Honor.

23          THE COURT:  The court will accept him in the tendered

24   fields.

25          MR. SEEGER:  Thank you, your Honor.

                         DIRECT EXAMINATION

BY MR. SEEGER:

Q.  Mr. Galler, you have been in the courtroom for a little bit
today, right?

A.  Yes.

Q.  I want to start off your direct with a question that was asked
of a prior witness.  Mr. Hernandez was asked if he could tie the
corrosion on his appliances and electrical equipment to the Chinese
drywall.  Were you here when that question was asked?

A.  Yes.

Q.  Do you have an opinion on that?

A.  Yes.

Q.  Could you please tell the court what your answer for that
question would be?

A.  The corrosion is a direct consequence of the vapors from the
Chinese drywall.

Q.  What are those vapors?

A.  Well, there's a couple that I am aware of.  I didn't analyze
the vapors but the vapors have sulphur in them, and I know that
from the scanning electron microscopy that I've done that I found
sulphur corrosive compounds on both the copper wiring and the
silver contacts.

Q.  And talk to us a little bit about, your give us an overview of
what the relationship between sulphur and the components in these
electrical equipment, you know, what the relationship is between

1    those things.

2    A.  Well, in electronic equipment copper and sulphur are very

3    prevalent -- copper and silver are very prevalent, and those

4    materials were really chosen so that because they resist corrosion

5    generally, but one of their weaknesses is sulphur.  And so in my

6    examination I observed sulphur compounds on both the copper and the

7    silver in the course of looking at the compounds.

8    Q.  And let me ask you, are you familiar with an article that was

9    written by Dr. Bella Chudnovsky?

10   A.  Well, tell me which article, but yes.

11   Q.  It's actually if we could just put it up on the screen, Scott,

12   it's LT 202.  Didn't occur to me that she might more than one, I

13   apologize.  The article we're looking at is Corrosion of Electrical

14   Conductors in Pulp and Paper Industrial Applications.  Do you see

15   that?

16   A.  Yes.

17   Q.  Is this an article that you've reviewed?

18   A.  Yes.

19   Q.  Is it something you rely upon in giving opinions here to the

20   court?

21   A.  Yes.

22   Q.  Let me ask you just consistent with something that you were

23   just talking about, if you could, Scott, if you could show the full

24   page, please, and if you could blow up the top part of this

25   paragraph (INDICATING).  Right here where it starts silver, Scott,

1    and, Mr. Galler, if you could read along with me, it says:  "Silver

2    and copper are probably the most widely used contact materials

3    available."  Do you agree with that statement?

4    A.  Yes.

5    Q.  Could you explain why that is?

6    A.  Two reasons:  The silver, copper and gold have the highest

7    electrical conductivity of the pure elements, that's the principle

8    reason.  And it turns out that silver being a noble metal, like

9    silver and gold it resists combinations -- excuse me, it resists

10   forming chemical compounds with other materials generally.  So

11   that's why silver is used for silver contacts and copper is used

12   because it's very available on the earth as a metal and it has very

13   high electrical conductivity.

14   Q.  And Scott, if you could show that entire page again, just one

15   other area.  From the middle down.  And the sentence right here,

16   Mr. Galler, where it says:  "Silver shows good resistance to

17   oxidation and tarnishing except in the presence of sulphur."  Is

18   that consistent with what you were just testifying about?

19   A.  Yes.

20   Q.  And could you tell us a little bit more about that?

21   A.  Well, in ordinary industrial environments and home

22   environments, there is not a widespread occurrence, it's a very

23   rare occurrence that we have sulphur vapors, and so for most

24   applications I would say 99.5 percent of the world's contact

25   applications silver works very well and avoids corrosion.  But

1   silver has an Achilles tendon, or Achilles heel is the expression,

2   it's sulphur, except in the presence of sulphur, that's what the

3   problem is.

4   Q.  And that next sentence says:  "Sulphur containing atmosphere

5   will produce silver sulfide that increases contact resistance."  Do

6   you see that?

7   A.  Yes.

8   Q.  What's the problem with -- what is silver sulfide and then what

9   is the issue with regard to silver contacts?

10  A.  Silver sulfide is a chemical compound formed of silver and

11  sulphur, and because it's essentially a chemical compound it's no

12  longer pure silver, and as I said earlier, silver is chosen because

13  of its high electrical conductive.  The silver sulfide is not

14  electrically conductive to the extent that silver is, and there's

15  been a big discussion about what that extent change is, but just to

16  sort of make it clear, the silver sulfide isn't half as bad as

17  silver, it's 100,000 times worse than silver.  So it's from an

18  electrical engineering standpoint, silver sulfide is not a

19  conductor, it's not a useful conductor.  In other words, you can't

20  stretch it out and connect it between two points and make an

21  electrical connection with it in any fashion.

22  Q.  Are you saying it interferes with the connection?

23  A.  It interferes with it, that's right.

24  Q.  And Scott, if you could go to page 3, please, of this article.

25  And if you could blow up the bottom half of the top photograph.

1  This last sentence that stars, however, if you could highlight that

2  whole thing from there down.

3  Mr. Galler, it says -- I am going to let you read that

4  because there are words in there I'll never be able to say.  So

5  what does that say?

6  A.  Well, I think leaving out the formulas and the various unit

7  discussions in parenthesis, basically what this says is that

8  electrical resistivity of silver sulfide is about 1,000 times

9  higher than that of silver, so that means it's 100,000 times worse

10  than silver as an electrical conductor.

11  Q.  Is there an example of that you can give us, when you say it's

12  100,000 times worse?

13  A.  Well, let's just say if you put a thin film of silver sulfide

14  between the layers of a switch, you might expect the switch to not

15  work at all.

16  Q.  Now, silver -- you can take that down, Scott.  Spent a lot of

17  time talking about silver and copper.  How prevalent is silver in

18  electrical components?

19  A.  It's very prevalent, silver is the material of choice for

20  electrical contacts and switches, so it's found in light switches

21  on the wall, it's found in circuit breakers in our electric service

22  panels.  But those are the two sort of big applications what most

23  people don't realize because they don't take things apart for a

24  living like I do is that there are silver contacts in various

25  switching devices in practically every appliances in somebody's

1    home.

2            So, for example, if you have a dryer, the dryer typically

3    has two thermostats in it, one makes the dryer operate at about the

4    right temperature and one is the protective device to make sure it

5    doesn't go above a certain temperature if the first thermostat

6    fails.  And those two are thermostatic devices where contacts open

7    and close, and those contacts are silver.

8            The contacts on a light switch hanging down from the

9    ceiling, if it's got a switch on it, those are silver contacts.

10   Contacts on a switch on a coffee maker, toaster, blender, pretty

11   much everything that has a switch in it that's sort of a visible

12   button-type switch is going to have silver contacts.

13   Q.  When we say switch, we kind of I think we visualize a wall

14   switch where you flick it.  There are different types of switches?

15   A.  That's right.  I mean, visually what I am saying is the pendant

16   type switch that hangs down from a kitchen ceiling like where

17   there's a little knob and you roll the little knob between your

18   fingers, the operating mechanism will have silver contacts.

19           In a toaster when the toast goes up and down and shuts

20   the power off to the toaster automatically that will have silver

21   contacts.  So there's silver contacts built into pretty much every

22   appliances that we have, refrigerators as well.

23   Q.  Thank you, Mr. Galler.  We have some photos that we are going

24   to spend a little time going through relatively quickly.  Be

25   helpful to you in explaining to the court some of your opinions?

1    A.   Absolutely.

2    Q.   Scott, if we could start with Hernandez 264.  And there are

3    three pages of this that we're going to go through, 264-001, 002

4    and 003.  Can you identify, just at this point identify for his

5    honor what we're looking at here.

6    A.   This is a wall switch, the kind you have on your wall to turn

7    the lights on and off with.  So the top photo basically I have

8    taken the wall switch apart and the bottom photo is looking into

9    the working assembly, the guts if you will, and there is a couple

10   of shiny strips of metal.  On the ends of the strips of metal if we

11   go to the next photo we'll see that there's --

12          MR. SEEGER:  Pause right there.  Let's go back.  And,

13   your Honor, we move Hernandez 264-001 into evidence?

14          THE COURT:  Admitted.

15   BY MR. SEEGER:

16   Q.   And would you like to go to the next photo?

17   A.   Yes.

18          MR. SEEGER:  And, your Honor, just for the record, we

19   would move this into evidence as well, it's just another angle.

20          THE COURT:  All right.  Admitted.

21   BY MR. SEEGER:

22   Q.   Tell us what you did here.

23   A.   Looking again into the internal mechanism, this is two views of

24   the electrical contact assembly.  And so the way this switch works

25   is there's a stationary contact and a movable contact --

1   Q.  Do you have a pointer up there?  It might help move along, I

2   think we put one up there for you.

3   A.  Oh, great.  They're a little hard to see in the photos, so

4   there's a metal arm, there's a contact assembly here and another

5   one at the bottom of the arm.  And when the switch is on, the arm

6   is up and these two contacts sort of touch -- they don't sort of

7   touch, they touch.

8           One is connected to this big screw on the outside and the

9   other arm is connected to another big screw which would be further

10  down in the picture.  So the external electrical connections are

11  made to the two part, one is the stationery contact and one is the

12  arm that is the movable contact.

13          This is another view of the lower photograph, it's just

14  another view, so there's a brass arm and it moves up and down.  And

15  there's another smaller brass arm, both of these arms have silver

16  contacts.  Just to be clear what we're not seeing here is actually

17  the mating surface between the two contacts.  It's the lower

18  surface under my pointer on the top one and the top surface of a

19  sort of a disc that's at the extreme right hand end of this movable

20  arm (INDICATING).

21  Q.  On the mechanics of this, the movable arm that you're talking

22  about, that's connected to the actual switch that you throw up and

23  down?

24  A.  That's right.  The plastic part that's the switch that sticks

25  out, or the lever that sticks out, it moves against this arm.  And

1  basically what happens is when it moves this way, it sticks a

2  little further into the body of the switch.  It pushes the arm down

3  and that separates the contact.

4  　　　　MR. SEEGER:  And Scott, if we can go to the next one,

5  003.  And, your Honor, it's just another, a magnification of the

6  same thing, we would move it into evidence.

7  　　　　THE COURT:  Okay.  Admitted.

8  BY MR. SEEGER:

9  Q.  Mr. Galler, would you please tell the judge what you're looking

10  at here.

11  A.  This is one of the contacts and what we're seeing normally here

12  would be something that would look like a quarter, in other words,

13  it will be shiny, silvery looking metal and it's attached to a

14  brass arm, so the part that's going up toward the upper left-hand

15  corner is brass and the circular area that's partially covered with

16  this gray stuff, white spots on it is a silver contact.

17  Q.  And by the way, this switch we're looking at, where is this

18  from?

19  A.  This is from the Hernandez house.

20  Q.  And what is the -- what is this black stuff here (INDICATING)?

21  A.  The black stuff is a combination of corrosive agents, mostly

22  it's silver sulfide.

23  Q.  And, Scott, if we could go to Hernandez 494.  And could you

24  just identify for us what this is?

25  A.  That's a scanning electron microscope image of the edge of the

1  contact button.

2  Q.  Of what we were just looking at?

3  A.  What we just looked at.  So the button part at a much higher

4  magnification --

5          MR. SEEGER:  I have to stop you there.  Your Honor, we

6  would like to move into evidence Hernandez 494.

7          THE COURT:  Admitted.

8  BY MR. SEEGER:

9  Q.  Go ahead, Mr. Galler.

10  A.  So this curve edge is the edge of the button part and this

11  curved edge down here is the edge of the brass that it's sitting

12  on.  So we're looking at an edge area.

13  Q.  Besides what we're looking at, tell us what's on there, why you

14  did this and hat it means?

15  A.  I put this in a scanning electron microscope to look a little

16  closer at the structure, the black material and also determine its

17  composition.

18  Q.  What is the composition?

19  A.  And the composition of the black material, well the black

20  material has a significant part of it is sulphur, so this is a

21  sulphur corrosive product.

22  Q.  Is that sulphur corrosion product, is that a problem for that

23  contact?

24  A.  Yes, it is.

25  Q.  And why is that?  And I know you spoke about it a little bit

1    before, but just briefly why is that?

2    A.  Well, the normal appearance of this would be shiny white metal

3    with essentially nothing else on it, pure silver because that's

4    what the contact material is designed as.  And the sulphur forms a

5    corrosion product and the corrosion products are all

6    non-conductive, silver sulfide, any other chemical compounds that

7    are on the surface of the contract, those are non-conductive.  So

8    they interfere with the connection between the two contacts.

9    Q.  And, Scott, if you could go to Hernandez 495.  And, Mr. Galler,

10   if you could identify for the court, don't blow it up yet, please,

11   just identify for the court what this is.

12   A.  This is an analysis that was done from the previous image, so

13   the previous image there were two boxes and this is the results of

14   what is called energy dispersive spectroscopy, it's a technique for

15   analyzing the amount of the elements in a scanning electron

16   microscope, and in particular in this case it's the images I had

17   marked on the previous slide.

18          MR. SEEGER:  Your Honor, at this point we would move in

19   Hernandez 495.

20          THE WITNESS:  Admitted.

21   BY MR. SEEGER:

22   Q.  Go ahead and explain what this says to the judge.

23   A.  Well, there's two areas, there was a shiny spot on the contact,

24   so I was trying to verify that the contacts basically were silver

25   and that's sort of the bigger box, I should point to these, that's

1   this area here (INDICATING).  And basically this graph shows the

2   elemental, the elements that are in this sample.  And the box below

3   it shows composition of the material.  And it shows that this is 99

4   percent silver.

5          So here in the area where there was a little bit of

6   silver space in the middle of the contact, that's essentially pure

7   silver, just trying to establish what the base composition of the

8   material is.  And the graph below it, if we could see the graph

9   below it, that's this little area here where the black deposits

10  were, that has about two percent by weight sulphur in it

11  (INDICATING).  So that black fuzzy stuff is a sulphur -- is the

12  result of a sulphur compound.

13         MR. SEEGER:  And, Scott, if you can go to Hernandez 496.

14  Your Honor, we would move this into evidence, it's a magnification

15  of what we were looking at.

16         THE COURT:  Admitted.

17  BY MR. SEEGER:

18  Q.  Mr. Galler, tell us what this is.

19  A.  That image is just another scanning electron microscope image

20  of the black deposit on the edge of the contact, but this time I

21  was trying to see what the structure of that material was, and I

22  see this sort of granular material that's visible at 1,000 times

23  magnification.

24  Q.  And what's the significance of that?

25  A.  Well, what we would expect to see is smooth silver and the

1    purpose of taking the picture was to show that there's a material

2    there that's sort of a granular chemical compound as opposed to a

3    smooth pure metal.

4    Q.  Now, Mr. Galler, we are going to move on to a circuit breaker

5    that you looked at.  Okay?

6    A.  Okay.

7    Q.  Scott, if you could pull up Hernandez 265.  And can you just

8    identify at this point what this shows, this photo?

9    A.  This is a contact from a circuit breaker that was removed from

10   the Hernandez house.

11   Q.  Now, if you could just take a second and just orient us to what

12   a circuit breaker it, its function in the house?

13   A.  The electric power comes into the house and there's usually a

14   panel in the basement -- I say basement, I shouldn't say that.

15   There's a panel somewhere where you have a series of things that

16   looks like -- look like switches.  But they're called circuit

17   breakers --

18            THE COURT:  Move this a little further from you.

19            THE WITNESS:  I am doing a little bit of popping here,

20   sorry.

21            So the purpose of the circuit breaker is really it's got

22   two purposes, it does act as a way of disconnecting things so that

23   if you have to have your house serviced you can disconnect the

24   power to a particular area.  And the other thing that it does, and

25   it's sort of a safety related function, is if there's a short in an

1    appliances or wiring in your house, the circuit breaker detects the

2    very high levels of current that occur and then interrupts the

3    circuit, that is shuts the power off automatically.

4           So if you're using your hedge trimmers and you cut the

5    extension cord to your hedge trimmers by mistake, you'll get a

6    short and the circuit breaker will trip.  If the circuit breaker

7    wasn't there what probably would have is the extension cords would

8    overheat and you would have a fire.  So they're sort of there --

9    they're there to protect the wiring and appliances in your house.

10   Q.  Now, if you can just tell us what we're looking at here in this

11   photo, you identified it but tell us what the significance of it

12   is.

13   A.  This is a contact assembly taken out of a circuit breaker from

14   the Hernandez house.  And I was examining this and doing some

15   microscopy to determine whether there was any evidence of silver

16   corrosion on knowing that the contacts were essentially going to be

17   silver.

18   Q.  What did you find?

19   A.  I found that the contacts were a silver tungsten alloy, and I

20   found deposits of silver sulfide on the surface of the contacts.

21          MR. SEEGER:  And, Scott, if you could go to Hernandez

22   265-002.

23          Your Honor, this is just an enhancement of what we were

24   looking at, move it into evidence.

25          THE COURT:  Admitted.

BY MR. SEEGER:

Q.  Go ahead, Mr. Galler, tell us what we see here.

A.  This is actually the circuit breaker before I removed the contacts out.  So this lever is what you would see sticking out of the panel, the electrical panel in your house.  And the contacts are --

Q.  That's the switch?

A.  That's the switch, right.  As I said earlier, you can operate the switch to disconnect the power to a particular circuit in your house for servicing, but also the reason the thing looks so complicated inside is that there's a mechanism which detects the current and sort of makes the contacts open automatically.

      The contacts are actually in the lower left-hand corner down here, and I think the next picture shows them a little bit better.  So there's sort of two brackets holding the contacts and the contacts are touching.  So there's a brass looking bracket on the right with a silver button, circular silver button, and another silver circular button on a bracket fixed on the left side.  The contacts are now in a closed position, so that would be the power on.

Q.  Mr. Galler, did you take another close-up of those contacts right there to determine if they were silver sulfide on them?

A.  I performed some scanning electron microscopy to determine whether they were silver sulfide.

Q.  Scott, can you put up Hernandez 498.  Does this picture reflect

1  the scanning SEM that you did?

2  A.  Yes.

3          MR. SEEGER:  Your Honor, we would move this into

4  evidence.

5          THE COURT:  Admitted.

6  BY MR. SEEGER:

7  Q.  Go ahead, Mr. Galler, tell us what you found.

8  A.  So you actually can't see much in this example.  What I was

9  looking for was the basic composition of the silver contacts and

10  the bracket that it was mounted on.  So you do see a granular

11  appearance but at this magnification you really can't tell what it

12  is.  So there's a subsequent analysis, we should go to the next.

13  Q.  That's what I'm about to do.  Scott, if you could pull up

14  Hernandez 499-001.  And what is this, Mr. Galler?

15  A.  That's an SEM analysis or EDS analysis of the contact.

16          MR. SEEGER:  Your Honor, we move Hernandez 499.

17          THE COURT:  Let it be admitted.

18          MR. SEEGER:  Scott, can we go to split screen and show

19  both of those.

20  BY MR. SEEGER:

21  Q.  Mr. Galler, tell us what your analysis of this contact showed.

22  A.  First in the top part of the analysis which corresponds to the

23  larger box, I see that the contact is made out of silver and

24  tungsten, so this is a silver tungsten alloy.  And there's a small

25  amount, a small amount of sulphur detected at this point.

1          The next part of the analysis is the box down here, and

2     here we see -- actually I think this is two, so it's the smaller

3     area here where we now start to see slightly higher levels of

4     sulphur in particular areas.  And there may be a third one.

5     Q.  I am going to go to that.  And, Scott, if we could pull up

6     Hernandez 500.  Is this the third one -- it doesn't say 500.  Is

7     that it?  Yes, that's it.

8          Mr. Galler, just identify what this is before I move it,

9     so I can move it into evidence.

10    A.  This is a scanning electron microscope photo at higher

11    magnification of the contact and the corresponding EDS analysis.

12    Q.  It's the same contact we've been looking at, right?

13    A.  Yes.

14          MR. SEEGER:  Your Honor, we move in Hernandez 500.

15          THE COURT:  Admitted.

16    BY MR. SEEGER:

17    Q.  Mr. Galler, please tell us what this shows.

18    A.  At higher magnification we see chunks of material.  This sort

19    of -- at the magnification 1,000 times on a contact surface like

20    this, the sort of flat uniform gray surface material was what we

21    would expect to see.  Anything that looks like a chunk or sort of

22    distinct deposit sitting above the surface is something that's not

23    part of the native contact material.

24          So I was interested in seeing what it was, did the

25    standard thing making a little box appear on that chunk of

1    material, and the chunk of material turns out to be a silver

2    sulfide compound.  So there's sulphur in that structure.

3    Q.  In looking at contacts and switches and things like this, have

4    your findings been consistent with the photographs we're looking at

5    here, silver sulfide on the contacts?

6    A.  I found, consistently found silver sulfide on pretty much all

7    of the samples that I looked at with respect to this case.

8    Q.  And what about the copper samples you looked at?

9    A.  Comer samples all had copper sulfide on them to some extent,

10   varying degrees but all with copper sulfide.

11   Q.  And copper sulfide to copper, is that the same what silver

12   sulfide is to silver?

13   A.  Pretty much the same relationship that sulphur compounds are

14   non-conductive materials, basically non-conductive materials which

15   interfere with the electrical process the metal is intended for.

16   Q.  Briefly I want to go through a handful of other photos.  Scott,

17   could you please pull up Hernandez 323.

18            MR. SEEGER:  Your Honor, this is already in evidence.

19            THE COURT:  All right.

20   BY MR. SEEGER:

21   Q.  Mr. Galler, this is I'll represent we have a prior photo, is a

22   circuit board from a window air conditioning unit.  Is that

23   something that you looked at?

24   A.  Yes -- excuse me.  I don't think I've seen this sample myself

25   physically.

1   Q.  I meant the photo, I'm sorry, you're right, not the sample

2   itself, you didn't actually have the physical circuit board in your

3   hand?

4   A.  Correct.

5   Q.  The photo.  Have you looked at this photo?

6   A.  I have.

7   Q.  And, Scott, if you could also pull up a blowup of this which is

8   Hernandez 324, and your Honor this is already in evidence.

9        What is that item right there that says power underneath it,

10  what is that?

11  A.  That's a button on the circuit board so basically it's a

12  switch.

13  Q.  Is that button supposed to look like that?

14  A.  It's exterior appearance that's about what it's supposed to

15  look like.  When we take it apart is when we find things that are

16  unusual.

17  Q.  Right.  What about the surface, what color should that be?

18  A.  The switch is in this box, what's unusual is the copper traces

19  at the edges seem to be discolored.

20  Q.  And Scott, if you could go to Hernandez 300.  Also can you --

21  actually, can you pull up the whole page, it's CDW 24-0126.  There

22  you go.

23        MR. SEEGER:  For the record, your Honor, I just want to

24  identify these.  The top one the toaster is Hernandez 300, the

25  middle photo is Hernandez 301, and the bottom photo is Hernandez

1    302.

2    BY MR. SEEGER:

3    Q.  Mr. Galler, can you identify, other than the toaster at the top

4    which I think speaks for itself, the middle photo and the bottom

5    photo?

6    A.  The middle photo is a circuit board in the toaster which

7    controls the -- it basically shuts the power off to the toaster

8    when the toast is done.

9    Q.  And the bottom photo?

10   A.  And the middle photo is a circuit board that has a couple of

11   switch contacts on it, and the lower switch contact in the red

12   circle, in the red circle is shown at a higher magnification in the

13   bottom photograph.

14   Q.  And in the middle photo where the red circle is, that contact,

15   can you describe what you see there?

16              THE COURT:  Are those in evidence already?

17              MR. SEEGER:  Your Honor, they're not, I apologize.  I

18   would like to move in at this point Hernandez 300, 301 and 302.

19              THE COURT:  And you represent that's from the Hernandez

20   house?

21              MR. SEEGER:  Yes, your Honor.

22              THE COURT:  Let it be admitted.

23              THE WITNESS:  The middle photograph, now the top, has two

24   sets of contacts.  Each pair has a movable arm, which is mounted on

25   the circuit board on a strip of metal and then a stationery

1    contact.  So the two contacts open and close by this upper arm

2    moving down to meet the stationary contact.

3            And what's noticeable sort of remarkable about this is

4    that there's a distinct burn mark on the circuit board.  So this

5    upper contact appears, you can see the background of material of

6    the circuit board has this sort of like tan color, here it's been

7    discolored by overheating in the contact system below.

8    Q.  Now, I want to ask you a question about that specifically.  Is

9    there a concern in your opinion with regard to either a failure

10   analysis or any safety issues when you see that?

11   A.  Yes.  The toaster is probably going to fail fairly soon because

12   these contacts are clearly not operating properly, and another sort

13   of observation about they're not operating properly is that when

14   they open and close normally they would not overheat the circuit

15   board.  So they're causing a breakdown of the insulating material

16   on the circuit board, plus they're just not, they're probably not

17   mating properly when the circuit is closed.

18   Q.  And before when we discussed circuit breakers in the home, do

19   you have concerns with regard to safety and the corrosion that you

20   observed there?

21   A.  Yes.

22   Q.  Why is that?

23   A.  Yes.  The circuit breakers are designed to provide that second

24   function which I described where they interrupt the current when

25   there's a short circuit in the house.  And the design of those is

1    intended, their design is made so that they don't have any kind of

2    contamination in them.  They have to withstand a significant amount

3    of electrical activity or like an arc essentially during a short

4    period of time when the contact is open when there's a short

5    circuit.

6              And so the concern is that if there's any contamination

7    that they may not be able to operate properly when the contact's

8    open in a short circuit condition and that's sort of their safety

9    related function.

10   Q.  It's to shutdown the current?

11   A.  Correct.

12   Q.  Mr. Galler, I believe this has been used a couple of times, I

13   just wanted to get your opinion on an article that I would like to

14   show, it's LT 0195, Scott, can you pull that up.  Is this an

15   article that you've looked at?

16   A.  Yes.

17   Q.  And relied upon in giving your opinions here in this court?

18   A.  Yes.

19   Q.  And the title of this article for the record is Atmospheric

20   Corrosion of Control Equipment.  Scott, if we could go to page 5,

21   which for the record is P2.0195-0013.

22             MR. SEEGER:  I thought I identified it, but if I didn't

23   it's LT 0195 is the document, your Honor.

24   BY MR. SEEGER:

25   Q.  And could we blow up the highlighted area.  Do you see the

1    language there, Mr. Galler, it says:  "By the time relevant

2    corrosion can be detected visually, the equipment may already be in

3    an advanced state of degradation."  Do you see that with that?

4    A.  Yes.

5    Q.  And why is that?

6    A.  My experience in failure analysis and my familiarity with the

7    requirements for producing new electronic equipment.  Generally

8    visible corrosion on anything that's in the electronics industry

9    that's being checked for quality control or being packaged for

10   delivery to a customer, any kind of a visibly, a visible corrosion

11   product or discoloration is considered grounds for rejecting the

12   equipment.  And at that point if you can see it, it's considered

13   pretty severe.

14   Q.  Rejecting meaning that equipment wouldn't even make it out the

15   door?

16   A.  Correct.

17   Q.  Mr. Galler, with regard to doing the remediation of an

18   environment where Chinese drywall, would you recommend leaving any

19   appliances or electrical components behind that had visual

20   corrosion?

21   A.  No.

22   Q.  And do you have an opinion with regard to failure rates on

23   appliances that have visible corrosion on them?

24   A.  I could say that they would fail a lot more than uncorroded

25   products; but to tell you exactly what the failure rates would be,

1    I can't.

2    Q.  Would you expect it to live out its useful life?

3    A.  Not at all.  I think sort of in general terms it looks to me

4    like the corrosion rates we're seeing are probably ten times faster

5    than they would ordinarily be.  So I would expect the reduction in

6    the life of the equipment.  It could be 20 times, it could be five

7    times, but it's pretty significant reduction in the life of the

8    equipment.

9    Q.  And, Scott, if you can go to page 23 of this article, which is

10   0027 okay.  Can you blow up this graph.

11        Mr. Galler, this is a graph you identified for me that

12   you wanted to explain.  Would you please tell the court what this

13   shows.

14   A.  This graph shows the relationship between the electrical

15   resistance of a switch and the amount of a corrosive deposit or the

16   deposit on the surface of the switch contacts.  And the axis, the

17   horizontal axis is sort of odd units, angstroms -- so an angstrom

18   has actually got to do with light wave length, but they use it here

19   because it's convenient, it's a convenient sort of reference.

20   1,000 angstrom where it says ten to three is what people generally

21   consider as a coating thickness that you would be able to see.  In

22   other words, if you had a glass slide and you put a coating of

23   metal on it and it was 100 angstroms thick, you could hold that

24   slide up to the light and see light through it even though there's

25   a coating of metal on it.  When it gets to be about 500 and

1  typically around 1,000, if you deposited metal on a clear slide and

2  then held it up to the light, you would notice a significant

3  darkening of the glass or maybe it would be opaque at that point.

4          So that relatively thin layer is the threshold at which

5  the deposits on a contact surface begin to affect the electrical

6  performance of the contact.

7  Q.  What have you observed in looking at devices that have been in

8  Chinese drywall environment?

9  A.  Well, the silver and sulphur deposits that I observe in various

10 shapes were in most cases at least I think the smallest I ever

11 observed was ten microns and I'll translate that that ten microns,

12 one micron is 10,000 angstroms.  So ten microns is 100,000

13 angstroms.

14 Q.  Where is that on this chart?

15 A.  It's not on the chart.

16 Q.  So it's off the chart?

17 A.  It's off the chart.  Ten to the fourth would be 10,000

18 angstroms which is only really one micron.

19 Q.  We would have to have the chart go out up around here

20 (INDICATING)?

21 A.  That's right.  So at levels that are portrayed on this chart,

22 one micron coating isn't even quite on the chart, and basically the

23 chart is showing that the increase in electrical resistance is

24 1,000 times greater than it would normally be with just the one

25 micron coating and we're coating particles of copper and sulphur

1    that are at least, I think the smallest I saw was ten microns on

2    the circuit breaker contacts.  And in most cases the deposits are

3    piles of 20 micron nodules or things even much larger than that.

4    Q.  Let me ask you this.  All of the things we've talked about

5    circuit boards, switches, contacts, can these be cleaned?

6    A.  Well, some of them you could try to clean and you may even get

7    to a point where visually they look like they're clean, but it's

8    not clear that the corrosion that's taken place doesn't

9    detrimentally already affect things.

10          So, for example, the circuit boards that are corroded and

11   damaged, you can't clean those, they're already damaged.  Wires and

12   contacts with sulphur on them, those either don't work -- the

13   cleaning processes either don't work well or just impractical.  So

14   it would be impractical to clean every light switch, the contacts

15   on every light switch in the house.

16   Q.  Mr. Galler, all of the opinions you've expressed to this court,

17   do you hold those to a reasonable degree of certainty as an expert

18   in your field?

19   A.  I do.

20          MR. SEEGER:  Your Honor, that's all I have for now.

21          THE COURT:  All right.  Any cross?

22                    CROSS-EXAMINATION

23   BY MR. SANDERS:

24   Q.  Good morning, Mr. Galler.

25   A.  Good morning, Mr. Sanders.

```
1    Q.  I want to clarify something just so I know what we're talking

2    about.  When we had talked a couple of weeks ago you had indicated

3    that the only device that you thought might have failed because of

4    sulphur gas was a cathode ray TV that you had observed; is that

5    true?

6    A.  I don't think that's how it was represented.  I don't think

7    that's what I said.

8    Q.  So you stated today that you're aware of other devices that

9    you've actually examined and found a root cause as a result of

10   sulfide gas failure?

11   A.  Well, I think you asked me whether I was aware of things having

12   failed as a result of the sulphur contamination in your first

13   question, and your second question was about root cause analysis;

14   so let's -- if you want to ask me what I did root cause analysis on

15   myself, then that's one question.

16   Q.  Root cause analysis of sulfide is different than general

17   sulphur gases, correct?

18   A.  Well, the materials that, the materials and equipment that

19   failed I believe were caused by the sulphur corrosion and we have

20   lots of evidence that there is sulphur corrosion.  That's different

21   than did I do a root cause analysis on a particular item.

22   Q.  What items did you do that analysis on?

23   A.  I'm sorry, could you please --

24   Q.  What items did you do that root cause analysis on?

25   A.  I only did the root cause analysis on the television set, so I
```

1  think that's what you were discussing.

2  Q.  Yes.  So with respect to -- and I believe it was a cathode ray

3  TV?

4  A.  That's correct.

5  Q.  And you looked at that TV set, and just for everybody's

6  benefit, that's an older TV that has a tube in it, correct?

7  A.  Correct.

8  Q.  And it's different than, not everybody has them obviously, the

9  flat screen panels and panels like we have here?

10  A.  Correct.

11  Q.  And in that one TV set you focused a diode, right?

12  A.  That's right.

13  Q.  And the diode has a magnetic function that it goes through?

14  A.  An electric function, not a magnetic function.

15  Q.  Sorry.  That's the piece of the TV you thought might have

16  failed because of copper sulfide, correct?

17  A.  That's right.

18  Q.  Do these TVs have diodes in them?

19  A.  These TVs, what are you pointing?

20  Q.  Like an LCD or flat panel?

21  A.  They all have diodes in them to some extent, a diode is very

22  common electronic component.  The thing that's peculiar about the

23  cathode ray tube set was that it has a high voltage system, the

24  diode that I was looking at was in the high voltage system.  So

25  these things that we're looking at here on flat displays on

1  computers and flat TV screens don't have a high voltage system.

2  Q.  So is that a high voltage diode that you were looking at in

3  that case?

4  A.  Correct.

5  Q.  And that's the only item or device that you actually did a

6  cause analysis of?

7  A.  Actually there was another, there was another product which I

8  did not remember during my deposition which I have since been

9  reminded of, which was a hair dryer which I believe was also from

10  the Hernandez house.

11  Q.  And do you know whether that hair dryer had actually failed?

12  A.  Yes, it had.

13  Q.  So it didn't work when you turned it on?

14  A.  Correct, didn't work.

15  Q.  And what did you determine about that hair dryer?

16  A.  There was a switch which was basically in its on state but not

17  conducting.  I disassembled the switch and found the copper sulfide

18  deposits on the switch contact.

19  Q.  Did you do any EDS to measure the thickness of those deposits?

20  A.  I don't think the deposits were in a condition where one could

21  reliably measure thickness as in the context of thickness of

22  coatings on wires; in other words, it was -- there were piles of

23  material mixed with other debris.

24  Q.  What were the other debris?

25  A.  There was some kind of a grease I believe also in the switch.

1    Q.  Because the switch is a point where somebody's finger or thumb

2    turns it up and down and turns it on and off?

3    A.  Correct.

4    Q.  Other than the hair dryer and the cathode ray TV, there aren't

5    any other devices which you did a cause analysis of?

6    A.  The root cause analysis meaning what exactly?

7    Q.  Meaning a determination that this specific device failed and

8    how it failed as a result of sulphur gases.

9    A.  To pinpoint the sulphur deposits on this particular component,

10   that will be correct, just those two.

11   Q.  And in your discussion of silver thicknesses, you didn't do any

12   kind of film measurement or cross-sections or anything to measure

13   the actual silver sulfide thickness?

14   A.  I did not.

15   Q.  Could we take a look at circuit breaker picture, which I

16   believe is 500, Plaintiff's 500.  If you could blow up the picture

17   a little bit.  That's I guess based on the scale there, we're

18   talking about a less than ten micron piece of silver sulfide?

19   A.  Correct.

20   Q.  And that's -- that piece being there or others like it is part

21   of the bases of your opinion that the circuit breaker may fail in

22   the future?

23   A.  That's correct.

24   Q.  And you don't know when or have any way of knowing when that

25   might happen, do you?

1    A.   No, I don't.  Sooner than normal.

2    Q.   And the ten micron particle we see there is different than some

3    of the other analyses you did of other switches, like light

4    switches in the Hernandez house, in that there's a lot more in the

5    light switches?

6    A.   I am not sure what your question is.

7    Q.   That ten micron particle is a lot smaller and different than

8    the analyses you did of the switches, the light switches?

9    A.   Generally that's correct.

10   Q.   The pictures we saw of the light switches where you identified

11   the sulfide, that's on the edges of the light switches you were

12   focussing on?

13   A.   Well, it's on the contact surface.  It seems that the silver

14   sulfide likes to grow on edges, the crystal form seems to grow on

15   edges more prevalent.  But -- in a more prevalent way.  But it was

16   also on the surfaces as well.

17   Q.   And I think when we looked at that chart the percentage on the

18   surface, the contact where it actually made it was significantly

19   less than on the edges, correct?

20   A.   Well, there was a -- part of the analysis I was doing was to

21   confirm that the base metal was silver, so I had intentionally

22   aimed the beam at a clean spot on the contacts just to confirm that

23   we were looking at a contact which in its sort of purest state

24   would be basically pure silver as opposed to some alloy or

25   something like that.  I was just trying to get the base composition

1   at that point.

2   Q.  And that's what you fund on that contact point?

3   A.  Yes.

4   Q.  You didn't do or you haven't have any done resistance

5   measurements on these contacts or switches?

6   A.  No, I have not.

7   Q.  So you haven't determined what resistance in ohms or anything

8   might result from the sulfide deposits that are on the switches?

9   A.  No, I have not.  And I am not sure that resistance measurements

10  alone tell the story anyway.

11  Q.  Quite obviously that's a fairly common way of measuring

12  resistance in a switch or another electrical component, correct?

13  A.  It is.

14  Q.  That's what Sandia did when they were looking at the

15  receptacle --

16  A.  I am not saying they did it right either.  I am saying they did

17  it, but the real story, the real story is not just told by the

18  resistance alone.  So the resistance measured by itself is not, is

19  not it my opinion a complete picture of the problem.

20  Q.  But this is at least one of the steps that the government

21  agency which has been charged with investigating this has done?

22  A.  Correct.  That's a step they used.

23  Q.  You discussed the smaller switches that are in many of the

24  microprocessors or circuit boards that you find in appliances?

25  A.  Correct.

1   Q.  And the mechanism by which, I'm sure you'll correct me, that

2   something might happen there is if there was enough of a silver

3   buildup inside that switch to, there's a couple of ways I think:

4   One, bridge between the contact that pushes down and the actual

5   stable silver contact beneath it, right?

6   A.  That's one mechanism.

7   Q.  And then the way those switches work is that they go down and

8   there's posts that come up and that's how they make the connection,

9   right?

10   A.  Correct.

11   Q.  So another mechanism might be a bridging between the posts and

12   the contact itself on the base, correct?

13   A.  Correct.

14   Q.  And you haven't seen that result in any actual failures?

15   A.  Let me answer the question this way.  The several of the

16   circuit boards that I examined that had switches that had silver

17   sulfide contamination were handed to me from known locations where

18   a homeowner had said this circuit isn't working anymore; for

19   example, the circuit board of a thermostat, the homeowner said it

20   doesn't work anymore.  So I know there was a failure on the board.

21   Q.  But I am talking about the actual switch mechanism itself.  And

22   in your investigation switches that you've opened up and you've

23   looked for that bridging of silver, you haven't seen any connection

24   between silver sulfide and those components?

25   A.  I don't think I observed that directly, no.

1    Q.  Is silver sulfide soluble?

2    A.  Is it soluble in what?

3    Q.  In water.

4    A.  In water?  Actually it doesn't matter what the solvent is, I

5    don't know the answer.

6    Q.  You don't know whether silver sulfide is soluble?  In water?

7    A.  I don't know whether it's soluble in water.

8    Q.  You don't know whether copper sulfide is soluble in water?

9    A.  No, I don't.

10   Q.  If we could go to what's been marked I believe LT 195.  I

11   believe I believe it's page 8.  Might be LT 195-A, I don't have a

12   marked copy.  It's page 7 of the actual document itself.

13        And if you go to the bottom paragraph, that example that

14   you saw in that chart in figure 1.  That table you were looking at

15   doesn't provide information on either the rate at which films will

16   form or the environments in which they will develop, that's what

17   this states here, correct?

18   A.  The diagram we were looking at on the following page?

19   Q.  Figure 1.

20   A.  Figure 1?

21   Q.  If we go to that back page was identified as figure 1.

22   A.  I think your question was -- could you repeat the question,

23   please?

24   Q.  Sure.  If you go to page 7 again.  The article itself notes

25   that that diagram doesn't provide any information with either the

1   rate at which films will form or the environments in which they

2   form.  Correct?

3   A.  I think that's correct.

4   Q.  So by the environments in which they form there's no indication

5   in that table what the composition of that silver tarnish film is?

6   A.  Not in the -- I am not sure that the graph itself has any

7   information about the composition.

8   Q.  Whether it's silver sulfide or some other film tarnish?

9   A.  That's right.  But, but if you read the paper, you read the

10  entire article they are talking about sulphur being the dominant

11  corrosion product on silver contact.

12  Q.  I understand that.  But this article points out in this table

13  that it's unknown whether or not what the actual environment once

14  these measures were taken, correct?

15  A.  That's what it says.

16  Q.  And you were going on the X axis below and pointing out that

17  ten to the third, is that 1,000 angstroms?  If we could pull it --

18  A.  No, an angstrom, one angstrom is ten to the fourth -- I'm

19  sorry, one micron is 10,000 angstroms, so it's ten to the 4th.

20  Q.  The ten to the third number there is 1,000?

21  A.  That's correct.

22  Q.  And the ten to the fourth is one micron?

23  A.  Is one micron, that's right.

24  Q.  And obviously indicated if we went out to the next, one more

25  step it would be ten microns?

1   A.  Correct.

2   Q.  And on the left side, with contact resistance, what scale is it

3   measuring that in?

4   A.  It's in milliohms.

5   Q.  It starts at one milliohm?

6   A.  Correct.

7   Q.  And my understanding is that it's 1,000 milliohms to an ohm?

8   A.  Correct.

9   Q.  So the top of the chart is 1,000 is one ohm?

10  A.  That's correct.

11  Q.  So again, if you went up another bar presumably you would be at

12  ten ohms, 100 ohms, and so on?

13  A.  Correct.

14          MR. SANDERS:  Thank you, your Honor.

15          THE COURT:  Okay.  Any redirect?

16          MR. SEEGER:  Just a couple of questions, your Honor.

17                      REDIRECT EXAMINATION

18  BY MR. SEEGER:

19  Q.  Mr. Galler, you were asked if you measured resistance, and the

20  question you gave Mr. Sanders was not sure that tells the story

21  either.  Could you explain for the court what you mean by that?

22  A.  The resistance of contacts when they're corroded is only one

23  electrical measurement, and the problem with that electrical

24  measurement in this particular case, and I am thinking now on

25  things like switches that handle electric power like a wall switch

1   or a circuit breaker, is that in addition to having a certain

2   resistance, the switch has to be able to withstand a certain amount

3   of thermal power and watts and that is when the switch opens and

4   there is an arc for a circuit breaker it has to absorb a certain

5   amount of heat.

6           And its ability to absorb heat isn't measured just by the

7   resistance and really the best way to do it would be to operate the

8   switches under load to see what they do.  So we're trying to use a

9   particular -- we meaning we experts and the laboratories are trying

10  to use that resistance measurement as an indication of how is this

11  switch going to behave in the future as if it's okay or it's not

12  okay.  And I think that's generally -- I think that's not a good

13  idea, I don't think that by itself tells the whole story.

14  Q.  And, Mr. Galler, just one other thing.  In the chapter that

15  Mr. Sanders refer to the Abbott paper, which, Scott, is LT 195 and

16  if you could put up page 7 of that document Mr. Sanders was on.

17          If we could just blowup this section right here

18  (INDICATING).  Right here at the beginning, right here at the

19  beginning of this report, Mr. Galler, do you see where it says:

20  "For the purpose of this report, the most important conclusions are

21  that:  Extremely thin films may produce significant electrical

22  degradation; and, the thickness of film that may produce failure is

23  often well below the limit of visual detection."  Do you agree with

24  that?

25  A.  Yes.

```
 1            MR. SEEGER:  Nothing further.

 2            THE COURT:  Okay.  You're excused.  Thank you, sir.  Call

 3   your next witness, please.

 4            MR. SEEGER:  Your Honor, at this point we would call Ron

 5   Bailey.

 6            THE DEPUTY CLERK:  Please raise your right hand.

 7         (WHEREUPON, RON BAILEY, WAS SWORN IN AND TESTIFIED AS

 8         FOLLOWS:)

 9            THE DEPUTY CLERK:  Please be seated.  Would you state

10   your name for the record.

11            THE WITNESS:  Ronald Brian Bailey.

12            MR. SEEGER:  May I proceed, your Honor?

13            THE COURT:  Yes, please.

14                         VOIR DIRE EXAMINATION

15   BY MR. SEEGER:

16   Q.  Mr. Bailey, would you please tell the court a little bit about

17   your background, your educational background and your work

18   experience?

19   A.  I am a licensed mechanical engineer.  My educational background

20   is I have a bachelor of science in mechanical engineering from

21   Rochester Institute of Technology.  I've been in the practice of

22   consulting engineering since 1972 working for different firms up

23   until 1979 when I started my own firm as a consulting engineering

24   firm.

25   Q.  Go ahead, Mr. Bailey, I'm sorry, I didn't mean to cut you off.
```

1    A.   Basically what we do is mechanical engineering.  We also do

2    building science work, we do a lot of investigation and remediation

3    when it comes to mold, water intrusion related functions.

4    Q.   When you say building science, could you just tell us what

5    building science work is?

6    A.   Building science is the materials and the way they work within

7    the building environment.  It has anything to do with the

8    properties of structurally staying together, the way they service

9    within the industry, the way they allow moisture to go in and out

10   through vapor pressure.  It's a very diverse area.

11   Q.   And do you have any licensing with regard to either your

12   engineering license or other things that you do?

13   A.   I have a license in the state of Florida and the State of

14   Louisiana as a licensed professional engineer.

15   Q.   Do you have experience with indoor air quality?

16   A.   I do.  I hold certifications in indoor air quality, three

17   different certifications:  One is the CIAQP, Certified Indoor Air

18   Quality Professional, it's given through the Association of Energy

19   Engineers; I have the certified indoor environmental consultant

20   through the American Indoor Air Quality Association, and a

21   certified microbial remediator that's also through the AmIAQ.

22   Q.   And do you have -- I don't know if you mentioned it, if you did

23   I'm sorry, I zoned out for a second.  Do you have any

24   certifications in indoor environmental consulting?

25   A.   Those were the certifications in the indoor environmental

1    consulting.

2    Q.  And what about HVAC air conditioning -- what does HVAC stand

3    for actually?

4    A.  Heating, ventilation, and air conditioning.

5    Q.  Do you have experience in the design and observation in HVAC

6    systems?

7    A.  We have substantial experience in the design of HVAC systems in

8    residential, commercial and industrial environments.

9    Q.  Have you actually conducted investigations with regard to

10   indoor air quality?

11   A.  I have.

12   Q.  Could you tell us a little bit about what some of these

13   investigations were for?

14   A.  Well, it varies quite a bit.  But, you know, some of them are

15   investigations for odor, some are investigations because of water

16   intrusion or mold.  Of recent the Chinese drywall.

17   Q.  And you mentioned mold.  Can you talk to us, have you been

18   involved in mold remediations?

19   A.  I have.  I've personally been involved in over, well over 200

20   projects in mold remediation where I myself have been on the site.

21   And our firm has done hundreds of mold remediation consultants

22   where we generated the remediation plan, overseen the removal, and

23   basically certified the environment after it's been done.

24   Q.  And in those remediations have they involved tearing out

25   drywall and things like that?

1    A.  They have.

2    Q.  And how far back does your experience go, when did you first

3    get involved, let me ask you this way, with dry Chinese drywall?

4    A.  It was sometime around the vicinity of August, September I

5    believe of 2008 when we first heard about the Chinese drywall

6    through a list server that we're on, and from there we caught our

7    interest, started investigating that and started getting reports of

8    coil failures, odors in homes, and it went from there.

9    Q.  And prior to meeting any of the lawyers in this specific case,

10   did you have opinions on appropriate, the appropriate scope of

11   remediation for homes with Chinese drywall?

12   A.  We did.  As a group of individuals because of some of the

13   feedback we were getting for the lack of -- any kind of a standard

14   removal protocol, we sat down with a group of individuals and wrote

15   a protocol.

16           MR. SEEGER:  Your Honor, at this point we would tender

17   Mr. Bailey as an expert in HVAC, building science and remediation.

18           THE COURT:  Any questions on his qualifications?

19           MR. HAYDEN:  Your Honor, no objection.

20           THE COURT:  Okay.  I'll admit him in those fields,

21   building science and remediation.

22           MR. SEEGER:  Thank you, your Honor.

23                         DIRECT EXAMINATION

24   BY MR. SEEGER:

25   Q.  Could you give us a little bit more specifics about your

1   experience in the area of demolition, we're going to talk a little

2   bit about today about your opinions and how to demolish Chinese

3   drywall and how to go about doing this.  Okay?

4   A.  We've been involved in several different types of projects,

5   some of them just renovated projects where the drywall is taken out

6   due the fact that walls are being removed and areas are being

7   changed.

8           But more than that we've been involved in the microbial

9   remediation area where it's more surgically removed.  Where you go

10  in and demolish under some controlled conditions for some very

11  specific reasons of release of dust and that type of thing, you're

12  actually looking to not have the, whatever is on the board in mold

13  go airborne.  You can't prevent it, but you try to limit it the

14  best you can.

15          And you're working in limited areas, you're not doing

16  generally a whole demolition of a whole house.

17  Q.  Do you think of mold, let's focus on mold for a second, as an

18  environmental contaminant?

19  A.  It is an environmental contaminant and basically is treated as

20  such.

21  Q.  Do you have an opinion as to whether Chinese drywall is an

22  environmental contaminant and should be treated as such?

23  A.  I do.  And basically that opinion is that what we've seen with

24  the reports is that it is a problem with the materials within the

25  drywall and that basically in its removal you need to remove not

1   only the drywall but the pieces and dust that's from it to assure

2   that you're going to get the majority of the dust that's in the

3   house and remove it so that you have negligible amounts of dust in

4   the home.

5   Q.  And would it make sense to you to do a remediation to leaving

6   more dust behind than necessary?

7   A.  No, no.  There's a couple of ways you can do the remediation,

8   but none of it's going to be dust free.  And so basically in your

9   demolition one of the requirements is going to be to clean up the

10  dust.  And the way that we focus on that is we look at doing a

11  gross clean up of the heavy materials first, swept off the floors

12  and get it out --

13  Q.  When you say the heavy materials, you mean the big piece of

14  drywall that comes off the wall?

15  A.  The big pieces and chunks.

16  Q.  Let me ask you this.  Scott, can we go to Hernandez 460.  And

17  can you just identify at this point what this photo shows?

18  A.  This was a demolition that we attended in south Florida where

19  the basically the drywall was just torn off the walls.

20          MR. SEEGER:  Your Honor, at this point we would like to

21  move Hernandez 460 into evidence.

22          MR. HAYDEN:  Was the witness present?

23          MR. SEEGER:  I think he just testified to that.

24          THE WITNESS:  I was present during that demolition.

25          THE COURT:  All right.  Okay.  Admitted.

1   BY MR. SEEGER:

2   Q.  And this photo here, does this accurately reflect when you were

3   talking about removing the big pieces, does this help demonstrate

4   that?

5   A.  Well, no.  This is fairly uncontrolled and not cleaned up

6   during the demolition.  This is a lot of debris, we would like to

7   see it a little bit more controlled than what you see here.

8   Q.  In your experience though putting aside the environmental

9   contamination situation, does this look like a typical sort of tear

10  out of drywall to you?

11  A.  It's typical to what we see.  One of the problems that we have

12  in the drywall tear out is getting the pieces down.  In this

13  particular case, this is a condominium where the debris has to be

14  taken out through an elevator, has to be put in containers,

15  breaking it into smaller pieces has its advantage in being able to

16  wrap it up, get it into bags, get it into containers and get it

17  out.

18  Q.  This doesn't -- this picture doesn't necessarily show it well,

19  but how would you describe the dust that's generated by drywall, is

20  it fine?

21  A.  It's a fine dust and the haze you see in the air here is a fine

22  dust, it's still present after the tear out.

23  Q.  And, Scott, can you go to Hernandez 470.  Mr. Bailey, just at

24  this point can you identify what this photo is?

25  A.  That's the bottom of my boot on a home in West Palm Beach where

 1   the -- basically the area had been broom swept.

 2   Q.  Hold off on that.

 3           MR. SEEGER:  So, your Honor, at this point we would move

 4   470 into evidence.

 5           THE COURT:  I'll admit it.

 6   BY MR. SEEGER:

 7   Q.  Go ahead and tell us what it shows.

 8   A.  This one had been broom swept clean and this is the state of

 9   the drywall dust that was remaining on the floors that we objected

10   to when we were looking over this for the owner of the home.

11   Q.  And what's on the bottom there, if you would run your finger

12   across it, how fine would that be, could you compare it to like a

13   baby powder or something like that?

14   A.  It's a fine powder, maybe not as fine as talcum, but it is a

15   fine powder.

16   Q.  Have you had an opportunity to review the demolition plan that

17   is proposed by the contractor working for the defense lawyers?

18   A.  I attended a demolition that they conducted in Louisiana here,

19   yes.

20   Q.  And tell us a little bit about what your understanding of what

21   that demolition was supposed to show, what was it supposed to

22   demonstrate?

23   A.  Well, my understanding was it was supposed to demonstrate a

24   fairly clean removal and controlled removal of drywall.

25           MR. HAYDEN:  Objection, your Honor.  He can give his

```
 1   understanding, but it was --

 2           THE COURT:  That's what he just said, what his

 3   understanding was.  Go ahead.

 4           MR. SEEGER:  That's all I have on that.  That was the

 5   only question.

 6           THE COURT:  All right.

 7   BY MR. SEEGER:

 8   Q.  Mr. Bailey, did you have an opportunity to shoot video of the

 9   demolition that you observed that was done by the contractor hired

10   by the defense lawyers?

11   A.  I didn't shoot a video, A.J. Valenti was there and shot the

12   video for me.

13   Q.  Have you had an opportunity to look at it?

14   A.  I have.

15   Q.  Would it be helpful for you to describe some of your opinions

16   on that process if we showed some of that video to the court?

17   A.  It could help.

18   Q.  So, Scott, do we have Hernandez 654 ready to go?

19           MR. SEEGER:  Your Honor, I believe these are all

20   relatively short, if you lose any patience we'll move on, I just

21   want to show you.

22           THE COURT:  Let's just make sure they accurately reflect

23   what he saw.

24   BY MR. SEEGER:

25   Q.  This first clip Hernandez 654 from the first day it shows a
```

1    stairway, you've had an opportunity to look at that video yourself?

2    A.  I have and I actually saw that.

3    Q.  And you were actually present when this was going on as well,

4    right?

5    A.  That's correct.

6    Q.  If we could show that, Scott.  And if you could just talk us

7    through what you're seeing here.

8         (WHEREUPON, THE VIDEO WAS PLAYED.)

9         THE WITNESS:  Basically what you see here is the

10   protection on the stairs that had been laid down was not properly

11   laid down, it isn't secured properly, it was a trip hazard.  As you

12   see, the worker's coming down the steps here, he's carrying a

13   couple of long boards, he is not concentrating on walking down

14   these steps and looking at loose materials.

15        So the individual that removed that from the bottom

16   protection did the proper thing.  Later on after a few minutes they

17   put that back on and they tied it back down better.  But that type

18   of thing is the thing that you really need to pay close attention

19   to for workers safety.

20        (WHEREUPON, THE VIDEO WAS CONCLUDED.)

21   BY MR. SEEGER:

22   Q.  And the next clip that we have, which is Hernandez 652.  I

23   don't think we need volume on this.  Do we need volume on this, Mr.

24   Bailey, so we can have you talk us through it?

25        (WHEREUPON, THE VIDEO WAS PLAYED.)

1    A.  We don't need it.  That's the front of the place, and this is

2    an individual removing a baseboard carefully, trying to preserve

3    the baseboard.  This is just him trying to take it out.  The amount

4    of time it's taking him to try and preserve that baseboard.

5    Q.  The baseboard right there, do you have an opinion --

6    A.  Hold that video.

7        (WHEREUPON, THE VIDEO WAS PAUSED.)

8    Q.  Is that a unique or very expensive baseboard as far as your

9    experience?

10   A.  No.  That's a fairly inexpensive baseboard, it's not an

11   advanced grade, it's inexpensive.

12            MR. HAYDEN:  Your Honor, we've stipulated to removing

13   baseboards.  I don't know what the relevance is.

14            MR. SEEGER:  I just have a question or two on it, that's

15   all.

16            THE COURT:  All right.

17   BY MR. SEEGER:

18   Q.  How much time did he spend working on that piece did you

19   observe?

20   A.  I didn't time him.  It took him awhile to get it off.  But it

21   took awhile to get it off and it came off and it was rough, and in

22   some cases they fractured the base moldings and the moldings that

23   came off of the door.

24   Q.  And the Sheetrock, just to be clear, goes down behind that

25   baseboard all the way to the floor, right?

1    A.  It does and the baseboard has to be removed in order to remove

2    all of the drywall.

3    Q.  Okay.  You can go ahead, Scott.

4       (WHEREUPON, THE VIDEO WAS RESUMED.)

5    A.  This is an individual starting to take the drywall off, this is

6    the first piece they got off.  They're trying to take it off in as

7    big of pieces they can, and what you see here is a very slow,

8    methodical process of trying to break it away and get it away in as

9    large of chunks as they can.  Basically the removal of drywall,

10   it's a material that breaks pretty easily and it's fairly hard to

11   get off.

12   Q.  So the workers here, your understanding is the workers here are

13   employed by a contractor that was hired by the defendants to do

14   this demolition, right?

15   A.  That was my understanding.

16   Q.  Okay.  You can keep going.

17   A.  As they work here, what you see was the number of pieces that

18   come off.  That's showing the insulation in the wall that's behind

19   which is a soft surface, makes it hard for them to pry against.

20         You'll notice they did make a cut across the wall, but

21   when you get to the edge of the wall there's no vertical cut and

22   that's because there is a plaster stop in there that you cannot cut

23   through with a drywall knife.

24   Q.  And was it generally your observation that what we're seeing

25   here, the drywall broke into pieces, is that pretty much what you

1   observed?

2   A.  That's pretty much what we observed throughout the project.

3   Q.  What's that that he's touching in the wall there, he's touching

4   something?

5   A.  That's the wall insulation, it's a blown-in insulation that's

6   blown in and compacted into the wall.

7           And as you continue to watch, you'll see that this does

8   not come off in large pieces and over time you watch the debris

9   build up on the floor.  It is not a clean process.

10  Q.  Now, the room that was being demolished that day, how big was

11  it?  Was it a whole house?

12  A.  No, it was maybe 14 by 16 feet.

13  Q.  So this was a demolition of just one room?

14  A.  This was a demolition of just one room with one closet and a

15  hallway.

16  Q.  In the state where they were attempting to be careful and

17  cutting it, what was your observations with regard to dust and

18  mess?

19  A.  They did keep the airborne dust down to a very light degree.

20  They still had a lot of pieces on the floor and there was still

21  dust on the floor.  But it wasn't airborne like in the pictures

22  that you saw in the other demolition previously.

23          THE COURT:  What does he have on his face?

24          THE WITNESS:  The one individual has, that's called a P95

25  respirator, it filters out 95 percent of the fines.  The other

1    individual doesn't have anything on his face.

2         One of the things that they did is after pulling this for

3    about, oh, about this point in time right here is when they opened

4    the windows to the space to air it out.

5         And again, you're looking here at the debris that shows

6    you no matter whether it's controlled or uncontrolled, you're going

7    to have a lot of debris on the floors.  Here they've left the

8    carpet in place.

9         If you could hold that video there for one second.

10   (WHEREUPON, THE VIDEO WAS PAUSED.)

11        THE WITNESS:  You have the carpet in place, and that in

12   itself is going to give some problems later on as we see in the

13   video.  Normally what you would like is to have a flat hard

14   surface, but they left the carpet in place to catch some of the

15   fines.

16        Go ahead and continue on.

17   (WHEREUPON, THE VIDEO WAS RESUMED.)

18        Again, as he tries to take that off, you can see that

19   it's just impossible to get large pieces.  You see the Beazer video

20   that was presented the other day that it showed if you break hand

21   holds into this thing and you have two guys teaming together you

22   can break it off in pretty good chunks.  They were having a hard

23   time with their techniques in getting this off in a controlled

24   fashion.  They didn't hold down the dust in the space, but the

25   space regardless still has to be cleaned in the same manner whether

1    it's cleaned this way.

2    BY MR. SEEGER:

3    Q.  And you're not saying there was no dust, right?

4    A.  Oh, no, there was dust.

5    Q.  With regard to the amount of dust you saw, what would be your

6    recommendation as to how that dust is cleaned up?

7    A.  Well, if wouldn't matter whether it was this controlled

8    demolition or it was a demolition where --

9    Q.  Actually I think that's a better question, I'd like to ask

10   that.  Does it matter to you, with regard to the cleanup that

11   follows the tear out, whether they do it in this so-called

12   controlled environment which is slow or methodical or the Beazer

13   approach?

14   A.  It wouldn't.  And the reason being is that -- if you hold that

15   video there, too, please.

16        (WHEREUPON, THE VIDEO WAS PAUSED.)

17        THE WITNESS:  The problem is you have to clean up the

18   dust, and the process is to try to get out all of the dust that you

19   possibly can within reason.  And using what is in the industry for

20   both asbestos, mold remediation and just general indoor air quality

21   cleaning, basically what you're going to do is you're going to

22   gross vacuum the space, take all of the bulks and heavier fines

23   out.  Then you're going to touch the surface a second time with a

24   HEPA vacuum, vacuuming the spaces and getting some of the lighter

25   dust out.  And third you go back and wipe the surfaces down.

 1          Now, it's important that you start high and work to low.

 2    BY MR. SEEGER:

 3    Q.  Pause on that for one second, Mr. Bailey, because I think it's

 4    important we talk about the way you think it should be done and

 5    that the court understands what they did.

 6          So I want to move on now to the cleanup part.  Would that

 7    be in the next video?

 8    A.  That would be in the next video, yes.

 9    Q.  So, Scott, if we could go ahead with Hernandez 653.

10        (WHEREUPON, THE VIDEO WAS PLAYED.)

11         Now, how many days -- just pause that one second, Scott.

12         How many days were you there?

13    A.  Pardon?

14    Q.  How long were you there?

15    A.  I was there the one day.  The second day during the cleanup I

16    wasn't present at the cleanup.  I viewed the video from the

17    cleanup.

18    Q.  Is it your understanding that for the one room that they

19    demolished that that was a two-day process to tear out and clean up

20    the Sheetrock?

21    A.  By the clock times that you see on the video, it was a two-day

22    process.  The first day that I recall they had four workers and a

23    supervisor worked on their home all day to demolish it.  The second

24    day if you count the number of workers that show up, you had five

25    workers and one supervisor, all of them working to clean it up.

```
 1    And the video ends at approximately six hours, but they still
 2    hadn't finished the entire cleanup.
 3              THE COURT:  Just a moment.  Go ahead.
 4              MR. HAYDEN:  Your Honor, I have no objection to this
 5    witness talking about his visual observations the first day.  We're
 6    now on the second day and he was not present.
 7              THE COURT:  He wasn't there, right.  That's fair.
 8              MR. SEEGER:  Well, your Honor, I think that the film here
 9    would just demonstrate the defendant's proposal for how they're
10    going to clean up because this is what they say they're going to do
11    and get Mr. Bailey's opinions.
12              MR. HAYDEN:  Your Honor, that totally mischaracterizes
13    what the intention of this was.
14              THE COURT:  Okay.  I will let him testify when he was
15    there, but when he was not there for him to look at a video.
16              MR. SEEGER:  Even if he saw the video of what happened
17    the second day, your Honor, as an expert he can still see and rely
18    on, right?
19              MR. HAYDEN:  Your Honor, it's the second day, he wasn't
20    there, he can't say that that truly and accurately portrays what
21    was going on.
22              MR. SEEGER:  That's a disingenuous objection, that's a
23    video of what happened.  We can call -- in this case are we going
24    to call everybody that took a photograph?
25              THE COURT:  The problem that I am faced with, if there's
```

1   an agreement that that's the video of what's happened and it's

2   accurate as to what's happened, he can testify as to whether or not

3   it was done properly.  But if you question whether or not the video

4   is accurate, then that's a problem from an evidentiary standpoint.

5         MR. SEEGER:  I can -- to have him testify about this

6   subject to connect them, I'll be happy to bring the videographer in

7   and put him up there for two minutes.

8         THE COURT:  What's your position, do you want to consult

9   with counsel?

10        MR. HAYDEN:  Your Honor, we had our own videographer, if

11  he wants to play this video, this gentleman just can't comment as

12  to what's going on in the video, he wasn't there.

13        THE COURT:  I understand, you can make that argument or

14  you can make that point on cross-examination.  But the way I see it

15  is if the video was taken during the time these individuals did the

16  work, then I think, I mean, it's authentic.  If you tell me that

17  the video was spliced or if there's an argument that it's

18  inaccurate or it wasn't taken at that time or that it's a different

19  house, then it goes to the authenticity.  But if there's an

20  agreement that it's authentic, then I'll let him see it and testify

21  as to it.

22        MR. HAYDEN:  Your Honor, actually, I don't have a problem

23  with him playing it, he has no personal knowledge of it.  And it is

24  a spliced video and no one from their side was present at the time

25  of the final cleanup.  This gentleman can't comment on how clean

```
1    the site was at the time we were completed.

2              So with those objections, I don't know what it's used

3    for.

4              THE COURT:  All right.  Okay.  Look.  This is what I'll

5    do.  From a standpoint, I'll let him look at the video and let him

6    testify as to his opinion as to how they're doing, but I think

7    counsel is right as to whether or not it was clean or not, that's

8    something beyond his approach.

9              MR. SEEGER:  And, your Honor, I did not intend to ask

10   that question.

11             THE COURT:  Okay.

12             MR. SEEGER:  So if we can go ahead, Scott, and roll this

13   video.

14        (WHEREUPON, THE VIDEO WAS PLAYED.)

15   BY MR. SEEGER:

16   Q.  Mr. Bailey, from the video, what are they doing here, can you

17   tell?

18   A.  What they're doing here is brushing down the different

19   components, just brushing the dust down onto the floor.  And you've

20   got a guy working high and right here you've got a guy working low

21   brushing off some areas.  So what you have is basically they're

22   cleaning the debris off the different pieces.  You can see some of

23   the dust coming off here and here the individual is vacuuming high.

24   Q.  Is that a HEPA vacuum by the way?

25   A.  That is not, that's a shop vac.
```

1    Q.  What do you mean by a shop vac, is that basically a common

2    vacuum?

3    A.  It's a common vacuum, has a pretty good filter on it, bought

4    it's basically a vacuum that you use to clean up wood dust and not

5    necessarily fines and indoor quality cleaning.

6    Q.  Now, in your opinion when you have done, you know, mold

7    remediations let's say, what type of vacuum have you used in those

8    instances?

9    A.  In any kind of indoor air quality clean you're using what's

10   called a HEPA vacuum.  If you could hold that video for a minute.

11        (WHEREUPON, THE VIDEO WAS PAUSED.)

12        THE WITNESS:  The HEPA vacuum basically is a vacuum that

13   with a filter that's designed to minimize any re-entrainment of the

14   dust into the atmosphere.

15   BY MR. SEEGER:

16   Q.  So with regard, just generally, regular vacuum versus a HEPA

17   vacuum, which one is going to get a lot more of the dust?

18   A.  Well, a HEPA vacuum is going to get a lot more of the dust and

19   give you a higher assurance that the dust isn't going to be

20   re-entrained back into the space.

21   Q.  All right.  And can we continue with the video.

22        (WHEREUPON, THE VIDEO WAS RESUMED.)

23   Q.  All right.  And can we continue with the video?

24   A.  Here again we have a guy that's now brushing and spraying a

25   liquid above an area that was brushed off before.  He is spraying a

1    chlorinated water solution based on some --

2         MR. HAYDEN:  Your Honor, the narrative, I object, he

3    wasn't there.  We can see what it is.

4         THE COURT:  Yeah, just tell us what you see as opposed

5    to, because I don't see anything there that would tell me that it's

6    chlorinated.

7         THE WITNESS:  Okay.  Basically, he's brushing a surface,

8    spraying it and brushing it.

9         Here you have an individual that starts to clean the

10   plumbing.  Could you freeze that there for one second.

11        (WHEREUPON, THE VIDEO WAS PAUSED.)

12        THE WITNESS:  He's starting to clean the plumbing that's

13   behind the bathroom of the wall that backs up to there.  And you'll

14   notice the time is about 10:19.  If you go ahead and run the rest

15   of that.

16        (WHEREUPON, THE VIDEO WAS RESUMED.)

17        What you see is this individual cleans this plumbing.  He

18   puts a lot of effort into cleaning.

19   BY MR. SEEGER:

20   Q.  When you say cleaning, he is trying to wipe off the tarnish; is

21   that fair?

22   A.  He is trying to wipe off the black deposit that's on the pipe.

23   And through this video he works for about 17, 18 minutes --

24        MR. HAYDEN:  Your Honor, we don't know what went on in

25   that 17 minutes, this gentleman wasn't there and we're now just

1   assuming that because time is passed on a video that's been spliced

2   that we can say that it went for 17 minutes.  I'm sorry, this is

3   getting --

4         THE COURT:  Yeah, no, that's a fair objection.  Let's

5   move on.

6         MR. SEEGER:  We don't even need the video, your Honor,

7   we'll get rid of it.  Pull the video down.

8         THE COURT:  Let's move on.

9   BY MR. SEEGER:

10  Q.  So do you have opinions, Mr. Bailey, on what the proper scope

11  of the demolition and cleanup process would look like in a Chinese

12  drywall remediation?

13  A.  The proper scope is to remove the materials out of the home.

14  And whether you try to do it controlled or uncontrolled, just like

15  you saw in the Beazer video, but in the Beazer video you can see

16  they were getting larger pieces off and their methodology, they

17  were using a hammer to do it.

18  Q.  Can I ask you a question about that?  Sorry, Mr. Bailey, but I

19  think it's important.  The question I'm asking is, Beazer video

20  that you saw, the way they were taking the drywall down?

21  A.  Yes.

22  Q.  Now, you've been involved -- have you been involved on

23  construction sites before?

24  A.  Yes, I have.

25  Q.  And in terms of normal and customary way of taking down

1   drywall, is that more consistent with the Beazer approach, would

2   you say?

3   A.  Well, it is.  You've got to get hand holes into the drywall and

4   you've got to pull the drywall off the surface.

5   Q.  So you kind of go in there and they punch out holes?

6   A.  Yeah, you don't take it off -- as controlled as they were doing

7   it on the first day, we do do some controlled demolition in the

8   mold remediation, but that's basically to confine, you're doing

9   surgical cuts across the wall and you're pulling just small

10  portions of the wall down.  You're not remediating an entire home,

11  you're just doing small areas that are contained.

12  Q.  Now, if you can continue telling us your opinions on what the

13  proper clean up would be after the drywall is off.

14  A.  The proper clean up is to work in a room from high to low.  You

15  would take and start with vacuuming with a standard vacuum, shop

16  vac, construction vacuum, to get the big material so that you don't

17  load the finer HEPA filtration devices.  Then you come back and

18  contact that surface a second time with a HEPA vacuum to get the

19  fine dust up off of that surface.

20          And then, thirdly, you come back and contact it for a

21  third time.  We use, have the contractors use a dampened rag to

22  pick the debris up off of the surfaces, rinse the rag frequently so

23  that they keep it clean, and basically work again top to bottom so

24  that you don't have debris falling on surfaces that you already

25  have cleaned.

1           The one thing that we noted in the tear out of this home

2    is they left the carpet in place.  The carpet when it's removed is

3    going to kick up different materials on the surfaces that you've

4    already cleaned and you've got to reclean them, it's inefficient.

5    The other thing that some contractors like to use is a rolling

6    scaffold when they're doing the cleaning, which basically gives

7    them --

8           MR. HAYDEN:  Your Honor, he wasn't present on the second

9    day when they --

10          MR. SEEGER:  He's not testifying about the second day.

11          THE COURT:  Yeah, I didn't understand him testifying

12   about that.  Go ahead.

13          THE WITNESS:  It gives you a hard surface for the casters

14   to roll on, and it's easier to roll along and get your surfaces and

15   do continuous cleanings so you're not climbing up and down off a

16   ladder, which is stressing the workers.  And it's also hoping that

17   they don't stretch out to try and get a surface clean, it just

18   gives you a lot better methodology to assure the cleanliness of the

19   space.

20   BY MR. SEEGER:

21   Q.  I want to move on from that.  Does that encompass all of your

22   opinions on the cleanup process?

23   A.  It does, yes.

24   Q.  I want to talk to you about the HVAC system.  Could you please

25   explain to the court briefly the components, all of the components

1  that are known as the HVAC system in the house?

2  A.  In these homes you have an outside, what's called a condenser

3  and compressor.  Then you have a line set that runs from the

4  compressor condenser to the air handling unit.  That air handling

5  unit is generally either located in a closet in the home or it's

6  located in the attic, as it is in the Hernandez home.

7          In that air handler is an evaporator coil that does the

8  cooling, you have a fan that moves the air from the house, from a

9  return placed in the house out through ductwork in places it back

10  in the home.

11  Q.  Okay.  Do you have an opinion as to whether the HVAC

12  system should be -- well, first of all, let me ask you this:  Have

13  you been to the Hernandez house?

14  A.  Yes, I have.

15  Q.  Have you had an opportunity to look at the HVAC system?

16  A.  I have.

17  Q.  Do you have an opinion as to whether that system should or

18  should not remain in the context of a remediation of the drywall?

19  A.  I have an opinion of that, and my opinion is the air handling

20  unit should be replaced in that home.

21  Q.  And why is that?

22  A.  There are several reasons, and we've seen it in the testimony

23  that's been given here about the effects on the control boards and

24  on the electronics that are within them, the wires, the motors and

25  the coil.  Even though the Hernandez unit has got a coated coil

1    installed now, we have had experience now on one particular project

2    where we have had three coated coils fail and we, in talking with

3    David Krause of the Department of Toxicology, there are

4    reports that other coated coils have failed.

5              MR. HAYDEN:  Objection, your Honor.

6              THE COURT:  Sustained.

7    BY MR. SEEGER:

8    Q.  Go ahead.  Just ignore the part about your discussion with

9    David Krause, but you can continue.

10   A.  So additionally, inside the air handling unit are fiberglass

11   materials, and those fiberglass materials should be removed and

12   replaced, basically making that that you're rebuilding that air

13   handler.  It would be like having a car that's in an accident,

14   you're basically rebuilding that thing from parts.  And by the time

15   you get through rebuilding from parts, the cost of the parts, the

16   air handling unit gets very expensive because you're parts add up.

17   Q.  So let me ask you the question this way, and I don't want to

18   know about any specifics with conversations with anybody, but have

19   you, have you communicated with certain government entities about

20   what their opinions are and whether HVAC coils should or should not

21   be replaced, even coated coils?

22             MR. HAYDEN:  Objection, your Honor, that will be hearsay.

23             THE COURT:  Well, he's just asking him whether he's

24   communicated, not what they said.

25             MR. SEEGER:  Exactly.

1          THE WITNESS:  I have.

2     BY MR. SEEGER:

3     Q.  And have you relied upon those discussions and communications

4     in forming your opinions?

5     A.  Though it's helped support our opinions, basically the

6     experience we've had with the coating coils failing, to me, the

7     ones that we've seen, they show that basically the coated coils are

8     failing for some reason.  We have not had the opportunity to

9     analyze them, we've just gotten another case with them.

10    Q.  Mr. Bailey, when we went to look at the house, some of us saw

11    outside compressor unit that our understanding is is relatively

12    new, I think it was installed in January.  Do you have that

13    understanding?

14    A.  Well, there's an outside condenser unit and inside that

15    condensing unit is a compressor.  And the only thing that's been

16    renewed in there is the compressor portion.  The compressor failed

17    and has been replaced, it is new in that unit.

18    Q.  And is it still your opinion that that unit with the compressor

19    and the condenser should be replaced as well?

20    A.  Well, the problem comes in the fact that, as of January 1st,

21    the rules on making equipment have changed.  Basically because of

22    the Montreal protocol, R-22 is no longer produced for use --

23    Q.  You have to tell us what R-22 is.

24    A.  R-22 is the refrigerant that is used in that particular

25    condenser at the Hernandez home.  R-22 is the number that's given

 1    to that particular refrigerant.  That refrigerant has certain bans

 2    on it and they can no longer make new equipment as of January 1st.

 3    Because of that, they're going to have to buy an air handling unit

 4    that's adapted to another refrigerant.

 5         It has not been tested through the normal DOE procedures

 6    of the procedures of AHRI, which is a certifying agency for them

 7    for capacity and energy efficiency.  And once you change that air

 8    handling unit, in order to assure that you have the original energy

 9    efficiency and capacity of that unit, you would have to change the

10    outside unit also.

11    Q.  Just a couple of more questions, Mr. Bailey.  In your

12    experience as a building scientist and in remediation, have you had

13    experience with electrical code issues?

14    A.  I have.  And as a consulting engineer in the normal portion of

15    our practice, and on some of the code boards that I sit on, we have

16    to make judgments on that, yes.

17    Q.  And I just want to ask you because there's been some testimony

18    on it, but with regard to the cutting out and replacing of an

19    outlet or a light switch in a home, do you have an opinion as to

20    whether the code requires six inches, less or more, of the ground

21    wire to be available in that box?

22         MR. HAYDEN:  Objection, your Honor.  Foundation, he's not

23    been established as an electrical engineer or an electrician.

24         MR. SEEGER:  Your Honor, I believe he's been qualified as

25    an expert in building --

```
 1              THE COURT:  I think we're -- well, but we're going

 2   outside of it.  But I do understand the area.

 3              MR. SEEGER:  Okay.

 4              THE COURT:  I've heard other witnesses on it.

 5   BY MR. SEEGER:

 6   Q.  And the opinions that you've given this court this morning,

 7   Mr. Bailey, do you hold those to a reasonable degree of certainty

 8   in your fields of expertise?

 9   A.  I do.

10              MR. SEEGER:  That's all I have, your Honor.

11              THE COURT:  Let's go to 12:30.  You may cross-examine,

12   counsel.

13              MR. HAYDEN:  Thank you, your Honor.

14                          CROSS-EXAMINATION

15   BY MR. HAYDEN:

16   Q.  Good afternoon, Mr. Bailey, how are you?

17   A.  Very good.

18   Q.  Just to clarify with regard to your attendance at this tear out

19   of drywall in one room in a townhouse in Mandeville that you

20   discussed and we saw some video of?

21   A.  Yes.

22   Q.  Can I take you back there?  Actually -- I don't want that.

23   With regard --

24              MR. SEEGER:  Do you want to use the video now?

25              MR. HAYDEN:  Yes, I want to use the video now, Judge.
```

1           MR. SEEGER:  I got yelled at for using it.

2           MR. HAYDEN:  Actually, put that up, why don't we go back

3     to that first picture.

4     BY MR. HAYDEN:

5     Q.  Now, this is a picture that you testified about, and it's a

6     site that you were also at in Florida, correct?

7     A.  That is correct.

8     Q.  And that's the Beazer site, correct?

9     A.  No, it is not.

10    Q.  That's just another site that you were at?

11    A.  That is Peninsula II site.

12    Q.  So that's a condominium that's located in Adventura, Florida?

13    A.  That is correct.

14    Q.  And this shows the drywall, how drywall was removed by one

15    demolition group, correct?

16    A.  That is correct.

17    Q.  And as you testified, I think that appears to be a pretty

18    uncontrolled demolition, would that be fair to say?

19    A.  It was -- there were a couple of crews in there just breaking

20    it into pieces and getting it on the floor and then cleaning it up,

21    yes.

22    Q.  Were you actually present during that demolition?

23    A.  I was.

24    Q.  And so there was plenty of dust, wasn't there?

25    A.  I'm sorry?

1   Q.  There was plenty of dust from that uncontrolled demolition.

2   A.  There was plenty of dust, yes.

3   Q.  And were you present at another demolition by Beazer over in

4   Fort Myers?

5   A.  I was not.  I've only seen portions of the video.

6   Q.  So you saw portions of the videos.  I believe there were other

7   plaintiffs' experts that were present at that, Mr. Wright possibly?

8   A.  Ron Wright is my understanding, and somebody from SGH.

9   Q.  And the portions of the video that you saw of that Beazer

10  demolition, that was, in your mind also, an uncontrolled

11  demolition, correct?

12  A.  Well, from my understanding --

13  Q.  From what you could see.

14        MR. SEEGER:  I object, your Honor, what's good for the

15  goose, you know, he wasn't there.  I've been sitting here quietly

16  for a day and a half, but he wasn't there.  Objection.

17        THE COURT:  All right.

18        MR. HAYDEN:  The tap of the shoulder was appreciated by

19  my honored colleague.

20  BY MR. HAYDEN:

21  Q.  You mentioned that you did see those videos, sir?

22  A.  I saw it here yesterday in the courtroom.

23  Q.  Oh, okay.  And did that appear to be a controlled or

24  uncontrolled demolition?

25  A.  I guess I would look at that as a semi-controlled.  It actually

1  came off in big chunks, and the handlers were smashing through the

2  drywall to get the hand holes.  We would like to see a little bit

3  more controlled, but that was effective.  It got it out in a hurry.

4  Q.  They were using hammers and picks, right?

5  A.  Hammers and hands.

6  Q.  Hammers and hands.  And I believe that Beazer has indicated

7  that they could get the demolition done in half a day for a single

8  family home; is that about right?

9  A.  That's what was indicated the other day, yes.

10  Q.  There is another method to tearing out the drywall; you could

11  do it with knives, correct?

12  A.  You could do it with knives, but when you're doing it with

13  knives, first of all, knives do not cut through drywall, knives are

14  made to score drywall and break them.  Cutting through with knives

15  is tedious and, at best, inefficient and not effective.  Usually

16  what you'll see somebody do is do it with a saw.

17  Q.  On February 25th when you were out there, they were doing it

18  with knives, trying to cut out the board with knives, correct?

19  A.  Well, they did some knifing of it.  The knifing had very little

20  effect, the guys were putting a lot of pressure on those knives to

21  try to get down through the board, but they weren't getting all the

22  way through the board before they would pull on it and break it

23  off.

24  Q.  And it was kind of difficult to work with knives in, it would

25  be difficult to work with knives in a lot when you had several

1    people observing you, correct?

2    A.  No.  You're working with a knife placed directly against the

3    material and pulling it down.  There was nobody within the direct

4    vicinity of them that would have stopped them from using that knife

5    effectively.

6    Q.  Just so I am clear.  On the 25th, this was a teardown of

7    drywall in a room about 12 by 14 feet?

8    A.  12 by 14, maybe a foot or so larger, yeah.

9    Q.  A foot or so larger, 12 by 12; is that right?

10   A.  12 by 14, a foot or so larger makes it 13 by 15.

11   Q.  Whatever it may be, you were present, correct?

12   A.  I was.

13   Q.  Mr. Rutila was present, right?

14   A.  No.

15   Q.  Mr. Mallet was present?

16   A.  Yes.

17   Q.  Mr. Lambert was present, correct?

18   A.  For a while, yes.

19   Q.  Yes.  And I believe a few lawyers were present from the, from

20   my side as well, correct?

21   A.  There may have been one or two there, yes.

22   Q.  And was there an individual from CTEH present?

23   A.  There was one or two individuals there from CTEH.

24   Q.  And CTEH is a consultant for us, correct?

25   A.  That's my understanding.

1   Q.  And at least for a time, Mr. Carubba was present?

2   A.  For a very short brief times, yes.

3   Q.  So with a bunch of lawyers and a bunch of experts, would you

4   say that it wasn't really a real-life demolition situation?

5   A.  Well --

6   Q.  Would you agree with me?

7   A.  I don't agree with you.  I think it was a real-life demolition

8   situation.  If you're asking if it inhibited them or slowed them

9   down, yeah, it slowed them down slightly.  When you look at five

10  guys to tear out one room for a full day, it didn't inhibit them a

11  half a day's worth of time.

12  Q.  Oh, I'm sorry, I forgot about the two videographers, they were

13  also in the room, weren't they?

14  A.  Yes, there were two videographers, yes.

15  Q.  And weren't they taking pictures after each one of the pieces

16  was taken off and each of the experts went in and examined the

17  different components of the home after the removal of the drywall?

18  A.  Well, there was pictures being taken, and the guys, as they

19  pulled it off, sometimes turned around and displayed the board, the

20  markings on the back of the board, before they were carried out of

21  the room.

22  Q.  Wouldn't you agree that if greater care is given in the removal

23  of the drywall that there would be less dust from the drywall

24  removal?

25  A.  There would be less dust.  But you cannot eliminate the dust in

1    any kind of a drywall situation, even, especially when you're

2    knifing the drywall because the knifing process is cutting through

3    it and creating the fines in and of itself.

4    Q.  And just so I understand, you were there on this first day, but

5    on the second day they actually undertook the cleaning of the site,

6    correct?

7    A.  That is correct.

8    Q.  Or that's what you understood because you weren't there.

9    A.  That is correct.

10   Q.  So you never looked at how the studs of the walls looked after

11   they were done cleaning?

12   A.  That is correct.

13   Q.  And you didn't look at the electrical outlets to see if there

14   was any drywall particles after they were done cleaning?

15   A.  We did not.

16   Q.  And when you say we, the plaintiffs did not?

17   A.  Well, myself.  I did not.

18   Q.  Now, you talked about HEPA vacuuming.  On this site they used

19   shop vacs with drywall bags.  Is that your understanding?

20   A.  That is not my understanding.  There was no bag in that vacuum.

21   I did see the vacuum taken apart several times, and there was no

22   drywall bag in there.

23   Q.  If you put a dry -- there are drywall bags on the market that

24   can, that are, their very purpose is to collect drywall dust.

25   A.  That is correct.

1   Q.  And in your mind, would a shop vac with a drywall bag in it be

2   sufficient to collect the dust in a drywall demolition?

3   A.  No.  Not when you're dealing with a contaminant, reactive dust,

4   and in my mind or it is my opinion that basically to get that

5   reactive dust out, you should go to the extent of what the industry

6   has for taking contamination out and that is HEPA vacuum.

7   Q.  Now you're calling it a contaminant.  Usually a contaminant

8   would be where there's VOCs, do you know what I'm talking about?

9   A.  Well, that can be one of the contaminates.

10  Q.  Now, that's volatile organic compounds?

11  A.  That is correct.

12  Q.  And where volatile organic compounds are involved, you've

13  considered that to be a contaminant?

14  A.  That can be a contaminant within a space, it can be an odor

15  within a space, but it is a contaminant.  But we're not talking

16  about volatile organic compounds, we're talking about particulate.

17  Q.  No, we're not.  And the only reason that you consider it a

18  contaminant is because of what you believe is the reactivity of the

19  boards, correct?

20  A.  Well, it's not what I believe, it's basically what, what the

21  industry has come to know is that the board is what is creating the

22  corrosion within the space and the odors within the space, and that

23  is within the material of the drywall.  And so it is prudent to

24  remove all of that material out of that space.

25  Q.  But you're not called here today to give an opinion on

1    causation, are you?

2    A.  No, I am not.  But I am called here today to say what is

3    reasonable to get the dust out of that space, and if a part of that

4    dust is what's causing part of that problem, then basically what I

5    am looking at and what my opinion is is that HEPA vacuuming is the

6    appropriate method and means to take it out.

7    Q.  And as you sit here today, you can't quantify how much dust

8    would be sufficient to cause the odor to continue in a home?

9    A.  Though I can't quantify that, we have had some experience in a

10   couple of remediations where until the fine cleaning was done, the

11   odor did not go away.  And it took the fine cleaning in order for

12   it to disappear.

13   Q.  And I believe you testified about that in your deposition,

14   there were one or two occasions where you were acting as a

15   consultant, where you observed insufficient cleaning and an

16   uncontrolled demolition of the drywall in a Chinese drywall home,

17   correct?

18   A.  Well, one of them was somewhat uncontrolled, yes.  It was where

19   I was not the consultant for the tear out.  We were the consultant

20   just hired by the owner to oversee it.  And when they were done

21   with it and they said they were done, which is one of the pictures

22   we looked at before of the bottom of my shoe, they indicated that

23   they were done and they were ready to go back with the materials

24   but yet the odor wasn't gone.  The house sat for over 45 days and

25   then was finally cleaned, and once it was cleaned the odor went

1    away.

2    Q.  But if you did the vacuuming, an appropriate cleaning and a

3    wipe down, you wouldn't have that problem, would you?

4    A.  If you did an appropriate cleaning and a wipe down, it appears

5    in the couple of jobs that we have been involved in that the, you

6    don't have that problem.

7    Q.  And as you sit here today, you can't say how many particulates

8    of drywall dust would be necessary to result in continued odor or

9    sulphur emissions, can you?

10   A.  Not specifically, no.  There's no data in the industry based on

11   this particular problem, it's new, and that we're aware of, nobody

12   has done those studies.

13   Q.  And you would agree that if the drywall, the Chinese drywall,

14   was removed, you would be removing the source of the problem?

15   A.  Removing the drywall removes the source of the problem.  But

16   you also have to remove all of the dust from it, yes.

17   Q.  But you can't say how much dust is too much dust?

18   A.  We know that if you don't do the fine cleaning, that basically

19   your odor doesn't go away, so that is too much dust.

20   Q.  But the fine cleaning can be done with a wipe down, correct?

21   A.  Well, it can be done with a process that is standard in the

22   industry for that type of cleaning, has been proved to be effective

23   to give you negligible residue or negligible dust within a home.

24   Q.  When you say it's established in the industry, you can't mean

25   with regard to Chinese drywall because this is a new phenomena,

1    correct?

2    A.  It's a new phenomenon, but what we are doing is applying proven

3    techniques to the new phenomenon that is basically used out there

4    in both indoor air quality cleaning, just cleaning dust and

5    allergens out of the home and cleaning asbestos and in cleaning

6    microbials.

7    Q.  Well, sir, you've never been involved in asbestos abatement,

8    have you?

9    A.  We have not been involved in asbestos, we don't do asbestos

10   abatement.

11   Q.  So when you say applying established protocols, you would mean

12   in, with regard to removing dust and allergens from the air after

13   demolition, correct?

14   A.  Well, the techniques that are used both in cleaning allergens

15   out of the air and cleaning up mold, both of those were basically

16   the protocols that were in the asbestos industry that came over and

17   were applied to those types of situations.

18   Q.  Sir, but this isn't asbestos, is it?

19   A.  Though it's not asbestos, asbestos is .7 to 90 microns in

20   diameter, anything below ten microns is deemed destroyable.  Same

21   thing with mold, mold is 3 to 30.  When you're dealing with

22   allergens, you're dealing with stuff in those capacities or size

23   ranges, and this is absolutely the technique that's used to assure

24   that you have negligible dust.

25   Q.  You have no reason to believe that the drywall dust stays

1    airborne and would cause problems as you have in asbestos, correct?

2    A.   You have airborne drywall dust that gets onto surfaces, we are

3    just looking to effectively remove it all just as they are in

4    looking at removing effectively all of the asbestos.

5    Q.   It falls to the surfaces, it doesn't remain airborne as you

6    might find in asbestos, correct?

7    A.   Asbestos will settle out after awhile, it's just that these

8    things, any kind of fines such as drywall dust or asbestos are

9    easily re-entrained into the air, and so you want to get those

10   contaminants out of the air.

11   Q.   And to do that you recommend hand cleaning of the joists and

12   the frames?

13   A.   We do.

14   Q.   And that cleaning could also be done with tackified towels,

15   could it not?

16   A.   It could be done with tackified towels.  The problem that you

17   have is basically quality control in the space.  The workers are

18   more apt to rinse a cloth than they are to continue to look at the

19   tackified cloth as to when it gets loaded.

20   Q.   If you actually left the electrical in the unit after the

21   demolition, the drywall demolition, you don't have a problem with a

22   wet wipe if the electrical was still left in the unit, correct?

23   A.   Well, I have a problem with leaving the electrical in.  But the

24   electrical wiring and boxes left in are just an additional obstacle

25   to clean around.  You have to contact them, again with the vacuum,

1    to get the heavy debris off.  You've got your wires to work around

2    inside a box and clean inside the box, not only to vacuum inside

3    the box but to hand wipe inside the box.  So it just becomes a more

4    time-consuming process.

5    Q.  But if the court were to assume that the electrical could stay

6    in, you could still implement your protocol of a wet wipe, correct?

7    A.  You could vacuum and wet wipe the wires, you have some

8    restraints that would have to be cut in order to do it.  They

9    usually use wire ties to bind blocks of wire together to be able to

10   clean them efficiently.  You would have to clip those restraints

11   and rub down the wires and then put the restraints back on.

12   Q.  Sir, weren't you -- as the course of your business, Bailey

13   Engineering Corporation, you advertise on the internet, don't you?

14   A.  We have a web site, yes.

15   Q.  And you advertise for providing Chinese drywall investigations

16   and inspections, correct?

17   A.  We have information on there about Chinese drywall.  I don't

18   know that we advertise those services on there.

19   Q.  Part of your protocol indicates that there should be an

20   environmental consultant involved?

21   A.  That is correct.

22   Q.  And would you consider yourself such an environmental

23   consultant?

24   A.  We would, yes.

25   Q.  And I think you said that you would charge for drafting a

1   protocol for the cleaning of the house and the like, approximately

2   1,200 to $1,500; is that right?

3   A.  I don't recall.  Generally it's going to be between 1,500 and

4   2,500, I would think.  The thing is, we have to make a site visit

5   to the house to get an understanding of the constraints of the

6   house, whether it's a condo or whether it's a single family,

7   whether it's within a townhouse complex, a controlled residential

8   facility, because that all changes a lot of the means and methods

9   of taking dumpsters in and out of the site, getting worker access,

10  working within the confines of the space.  So you have to visit the

11  site, you have to write an adaptive protocol specifically to the

12  project.

13  Q.  And I believe your protocol indicates that you would have a

14  final letter from the environmental consultant indicating that the

15  drywall had been removed?

16  A.  Yes.  We would do that, it would be an additional service that

17  we would charge for, to go to the site, look at the site, the

18  cleanliness, and again, write a letter indicating that the

19  materials had been removed per our protocol.

20  Q.  And you would do a nasal test and a visual observation; is that

21  right?

22  A.  Basically, that's what we're looking at right now is a

23  definition to see, is just check for cleanliness and check for

24  odor.

25  Q.  And that cost, I believe you testified to, would be between

1   $650 and $1,200, correct?

2   A.  That's approximately correct.  Again, I don't do the pricing in

3   my firm, and there's reasons for that, I'm usually low.  But that

4   is what I quoted in my deposition, I believe.

5           THE COURT:  Let's get to a point where you can stop.

6           MR. HAYDEN:  And I have one or two more questions, your

7   Honor, and I think we're ready to go.

8           THE COURT:  Okay, that's fine.

9   BY MR. HAYDEN:

10  Q.  Now, part of your protocol is an airing out of the property,

11  correct?

12  A.  That is correct.

13  Q.  And you recommend -- you indicated that the odor goes away in

14  about seven to ten days; is that right?

15  A.  That's what we're experiencing, is the odor, once it's cleaned,

16  will go away in seven to ten days.  Now, that's in very specific

17  humid conditions, closing up the house and dehumidifying during the

18  evenings.

19  Q.  And you're aware of at least one home builder in Florida, GL

20  Homes, that airs it out for seven to ten days; is that right?

21  A.  They have, there's indications that they have found the same

22  thing, seven to ten days to air it out, yes.

23          MR. HAYDEN:  I believe that's all I have, your Honor,

24  thank you.

25          THE COURT:  Do you have a lot for redirect?

1          MR. SEEGER:  I have probably three minutes.  Do you want

2     me to go now?

3          THE COURT:  Okay, let's do it.

4          MR. SEEGER:  Your Honor, just a couple of things because

5     there were questions about odors and sulphur gases and stuff.  Just

6     want to remind the court that in the stipulation entered by the

7     parties, we've stipulated that the drywall in the plaintiff's home

8     emits certain, produces sulphur gases and that the drywall emits an

9     odor.

10          THE COURT:  Right.

11                         REDIRECT EXAMINATION

12     BY MR. SEEGER:

13     Q.  And just quickly if I can have the ELMO up here.

14          This photograph that's in evidence, Mr. Bailey, you said

15     you identified that site as Peninsula II in Adventura, Florida; is

16     that correct?

17     A.  That is correct.

18     Q.  And whose drywall is that on the floor?

19     A.  Well, it's a mixture of seven different manufacturers,

20     including KPT and a couple of other manufacturers.

21     Q.  KPT, the defendant here, right?

22     A.  Yes.

23     Q.  Another couple of quick questions.  Can I have, Scott, up on

24     the board Hernandez 395.

25          Are you aware of a report submitted in this case by

1    Drs. Perricone and Lee?

2    A.  I am.

3    Q.  Have you had an opportunity to take a look at that?

4    A.  I have.

5    Q.  Can you go to page 10, please, Scott.

6            You were asked questions about the HEPA vac.  Do you

7    recall that?

8    A.  Yes.

9    Q.  I would like to just ask you if you agree with Drs. Perricone

10   and Lee on page 10 of this report.  Scott, if you could blow up the

11   last paragraph.

12           I don't have my pointer, it says the removal.  "The

13   removal can be effectively performed using conventional abatement

14   methodologies.  For example, covering floors and non-impacted

15   surfaces, placing barriers, doorways, over paths for dust movement,

16   followed by HEPA vacuuming, damp wiping and visual inspection has

17   been shown to reduce the residual dust mass concentrations to

18   negligible concentrations."  Did I pretty much read that correctly?

19   A.  You did.

20   Q.  They are recommending HEPA vacuuming just like you are, right?

21   A.  Yes, they were.

22   Q.  Now, can you show footnote 6 at the bottom, please, Scott.

23   Blow up the footnote there where we got that site from.  National

24   Institute of Building Sciences, guidance manual, Asbestos

25   Operations and Maintenance Work Practices, Second Edition.

1              So it looks like Drs. Perricone and Lee are relying on

2    asbestos for an example for HEPA vacuuming, correct?

3    A.  That appears that way to me, yes.

4    Q.  There's a couple of others.

5              MR. SEEGER:  Your Honor, I just want to know if this

6    opened the door to a follow-up question on electrical code, because

7    Mr. Hayden asked a question about leaving the wiring in place and

8    cleaning around it.  Would you allow me a follow-up or have you had

9    enough on that?

10             THE COURT:  Yeah, no.

11             MR. SEEGER:  I want to keep you happy, Judge.

12             And then, let's see, I think I had one more question.

13   BY MR. SEEGER:

14   Q.  You have actually done Chinese -- you have actually designed a

15   protocol for the remediation of homes with Chinese drywall,

16   correct?

17   A.  That is correct.

18   Q.  And you did that prior to being hired by any of the lawyers in

19   this case for the Hernandez family; is that fair?

20   A.  That is correct.

21   Q.  Have you seen, have you actually observed Chinese drywall

22   remediations?

23   A.  I have.

24   Q.  And in your experience, the plan that you've attached to your

25   report, we don't have to go into it, save time, the Judge has it,

1   have your opinions changed or do you still stand by that protocol

2   that's attached to your report?

3   A.  We do, yes.

4          MR. SEEGER:  That's all I have, your Honor.

5          THE COURT:  Thank you, you're excused, sir.

6          We'll come back at 1:45.  The court will stand in recess

7   until 1:45.

8       (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

9

10                    *  *  *  *  *  *

11

12                  REPORTER'S CERTIFICATE

13

14   I, Karen A. Ibos, CCR, Official Court Reporter, United States

15   District Court, Eastern District of Louisiana, do hereby certify

16   that the foregoing is a true and correct transcript, to the best of

17   my ability and understanding, from the record of the proceedings in

18   the above-entitled and numbered matter.

19

20

21

22          Karen A. Ibos, CCR, RPR, CRR

23          Official Court Reporter

24

25

DAILY TRANSCRIPT