1                UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF LOUISIANA

3

4

IN RE:  CHINESE MANUFACTURED DRYWALL   *

5       PRODUCTS LIABILITY LITIGATION  *
                               *

6                             *

**THIS DOCUMENT RELATES TO:**     *  MDL No. 2047

7                             *

Tatum B. Hernandez, *et al*     *  Section L

8                             *

     versus           *  New Orleans, Louisiana

9                             *

Knauf Plasterboard (Tianjin) Co.,   *  March 16, 2010

10  Ltd., *et al*                *
                               *

11  Case No. 09-CV-6050         *
                               *

12  * * * * * * * * * * * * * * * * * * * *

13

14            VOLUME II - AFTERNOON SESSION
              PROCEEDINGS BEFORE THE

15            HONORABLE ELDON E. FALLON
           UNITED STATES DISTRICT JUDGE

16

17

<u>APPEARANCES</u>:

18

19  For Tatum and Charlene     Herman, Herman, Katz & Cotlar, LLP
    Hernandez:              BY:  RUSS M. HERMAN, ESQ.

20                        STEPHEN J. HERMAN, ESQ.
                      820 O'Keefe Avenue

21                      New Orleans, Louisiana 70113

22

    For Tatum and Charlene     Gainsburgh Benjamin David

23  Hernandez:            Meunier & Warshauer
                      BY:  GERALD E. MEUNIER, ESQ.

24                        MICHAEL J. ECUYER, ESQ.
                      1100 Poydras Street, Suite 2800

25                      New Orleans, Louisiana 70163

1   <u>APPEARANCES</u>:

2
    For Tatum and Charlene          Seeger Weiss
3   Hernandez:                      BY:  CHRISTOPHER A. SEEGER, ESQ.
                                    One William Street
4                                   New York, New York 10004

5
    For Tatum and Charlene          Lewis & Roberts, PLLC
6   Hernandez:                      BY:  DANIEL K. BRYSON, ESQ.
                                    3700 Glenwood Avenue, Suite 410
7                                   Raleigh, North Carolina 27612

8
    For Knauf Plasterboard          Frilot, LLC
9   (Tianjin) Co., Ltd:             BY:  KERRY MILLER, ESQ.
                                         KYLE A. SPAULDING
10                                  1100 Poydras Street, Suite 3700
                                    New Orleans, Louisiana 70163
11

12  For Knauf Plasterboard          Baker & McKenzie, LLP
    (Tianjin) Co., Ltd.:            BY:  DONALD HAYDEN, ESQ.
13                                  1111 Brickell Avenue, Suite 1700
                                    Miami, Florida 33131
14

15  For Knauf Plasterboard          Baker & McKenzie, LLP
    (Tianjin) Co., Ltd.:            BY:  DOUGLAS B. SANDERS, ESQ.
16                                       KYLE P. OLSON, ESQ.
                                         ERIN M. MAUS, ESQ.
17                                  130 E. Randolph Drive
                                    Chicago, Illinois 60601
18

19  Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                    500 Poydras Street, Room HB-406
20                                  New Orleans, Louisiana 70130
                                    (504) 589-7778
21

22

23

24
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer.

DAILY COPY

1                            **I N D E X**

2                                                        PAGE

3    Alexis Mallet Jr.
          Voir Dire                                      397
4         Direct Examination                             402
          Cross-Examination                              462
5         Redirect Examination                           497

6
     Charlene Hernandez
7         Direct Examination                             505

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **<u>AFTERNOON SESSION</u>**

2             **(March 16, 2010)**

3          **THE DEPUTY CLERK:**  Everyone rise.

4          **THE COURT:**  Be seated, please.

5               Good afternoon, ladies and gentlemen.

6               Call your next witness, please.

7          **MR. ECUYER:**  Your Honor, Michael Ecuyer.  I'm here on

8     behalf of the Hernandezes.  At this time, we'd like to move

9     into evidence Dr. Lori Streit, PhD.  We've spoken with defense

10    counsel.  With regard to her deposition, there are edits that

11    are being made by both sides.  We will submit those cuts.

12               In addition, several exhibits to her deposition

13    were objected to, and those have been removed through mutual

14    agreement.  The exhibits to the deposition that will be coming

15    in are Exhibit 1, 7, 8, 9, 10, and 11.

16          **THE DEPUTY CLERK:**  Would you spell her last name,

17    please.

18          **MR. ECUYER:**  Sure.  S-T-R-E-I-T.

19               Dr. Streit has previously been tendered as an

20    expert in her field during the *Germano* case, Your Honor.

21          **THE COURT:**  Okay.  I'll admit the exhibits and make

22    the deposition a part of the record.

23               Who's your next witness, Counsel?

24          **MR. MEUNIER:**  Your Honor, plaintiffs call Al Mallet.

25

DAILY COPY

1    (WHEREUPON **Alexis Mallet Jr.**, having been duly sworn,

2    testified as follows.)

3    THE DEPUTY CLERK:  Would you state your name for the

4    record.

5    THE WITNESS:  Alexis Mallet Jr.

6    THE DEPUTY CLERK:  Would you spell the last name.

7    THE WITNESS:  M-A-L-L-E-T.

8                              **VOIR DIRE**

9    BY MR. MEUNIER:

10   Q.   Mr. Mallet, what's your address?

11   A.   103 Bradbury Crossing, Lafayette, Louisiana.

12   Q.   Your occupation?

13   A.   General contractor and construction consultant.

14   Q.   By whom are you employed?

15   A.   First General Services is the company that I own.

16   Q.   What is the nature of the business of First General

17   Services?

18   A.   That company performs insurance restoration work and

19   consultant services, construction consulting services.

20        MR. MEUNIER:  May we see the curriculum vitae, which

21   is 383-001.

22   BY MR. MEUNIER:

23   Q.   Do you recognize this as your curriculum vitae,

24   Mr. Mallet?

25   A.   Yes.

1    **Q.**   Is it correct and up-to-date in all respects?

2    **A.**   There may be a deposition or two that's not on there since

3    the last time we produced it.

4              **MR. MEUNIER:**  Your Honor, we would offer into

5    evidence as Hernandez 383-0001 the curriculum vitae of

6    Mr. Mallet.

7              **THE COURT:**  With the understanding that if you were

8    called to testify and would testify substantially the same as

9    the curriculum vitae, I'll admit it into evidence.

10             **MR. MEUNIER:**  Thank you, Your Honor.

11   **BY MR. MEUNIER:**

12   **Q.**   Let's look at page 5 of this document.  Mr. Mallet, what

13   is the extent of your formal education?

14   **A.**   I have a bachelor's degree from the University of

15   Louisiana in political science.

16   **Q.**   You are a Louisiana state-licensed general contractor?

17   **A.**   Yes, sir.  I'm also a state-licensed residential

18   contractor, state-licensed mold-remediation contractor, real

19   estate agent, licensed as to manufactured housing installation

20   contractor, and I have numerous certifications.

21   **Q.**   Sir, you don't have to go into it.  The record will speak

22   for itself.  Tell us about being a certified restorer for the

23   National Institute of Disaster Restoration.

24   **A.**   A certified restorer is the highest certification you can

25   achieve in that organization.  It deals with restoring damaged

1   buildings through various insurance-type losses dealing with

2   contents, structure, cleaning, remediation.

3            MR. MEUNIER:  May we see page 6.

4   BY MR. MEUNIER:

5   Q.   Mr. Mallet, does page 6 reflect the various areas in which

6   you have had continuing education in your field?

7   A.   Yes.  End of page 5 and 6 is general areas of continuing

8   education.

9   Q.   Your continuing education includes costing and estimating?

10  A.   Yes, sir.

11  Q.   It includes building codes and building standards?

12  A.   Yes, sir.

13  Q.   And it includes indoor environmental cleaning and

14  management of buildings?

15  A.   Yes, sir.

16  Q.   I think in the next paragraph after that listing you

17  mentioned that you have been involved in the construction,

18  estimating, inspection, testing, and analysis of thousands of

19  commercial, industrial, and residential projects.  Counting

20  residential alone, over all of your years of experience, how

21  many such projects have you been involved with?

22  A.   Well over 1,000 to 2,000.

23  Q.   How many years total experience in that do you have?

24  A.   Since I've started my own business, 36 years.

25            MR. MEUNIER:  May we see page 9.

DAILY COPY

BY MR. MEUNIER:

**Q.**   This lists your business affiliations.  It actually
indicates that you were the president of three different
companies; is that correct?

**A.**   Yes, sir.

**Q.**   What is the nature of the business of all of these
companies generally?

**A.**   Construction, different types of construction.

**Q.**   You are an advisory board member of the Investigative
Engineers Association.  Would you tell the judge what that
professional organization is.

**A.**   That's a group of engineers, International Organization of
Engineers, involved in the investigation, forensics work,
identifying problems, areas usually dealing with some sort of
an insurance claim.

            **MR. MEUNIER:**  May we see page 10.

BY MR. MEUNIER:

**Q.**   This lists your recognitions and awards.  I note that you
have been listed in the top 500 remodelers in the
United States.  Is that true?

**A.**   Yes, sir.

**Q.**   I also see that you've received a Phoenix Award for
international recognition for innovations in reconstruction
from the National Institute for Disaster Reconstruction.

**A.**   Yes, sir.

1  **Q.**   What was that award based on?

2  **A.**   The design and execution of a jacking and support system

3  for a theater within a shopping center that was affected by

4  tornadic winds.  We had to remove the exterior wall system but

5  at the same time keep the roof supported for both keeping it

6  from collapsing and from uplift from future winds while the

7  construction work was in progress.

8  **Q.**   The last listed award you have is from the Investigative

9  Engineers Association.  You received an Instructor Excellence

10  Award for Chinese drywall and other material defects.  Tell the

11  Court what that award is for.

12  **A.**   I gave a presentation in November in Las Vegas to the

13  Investigative Engineers Association dealing with defective

14  materials as they relate to building construction, and part of

15  that dealt with Chinese drywall issues.

16  **Q.**   Mr. Mallet, have you been qualified in various courts,

17  including federal courts, in the area of general contracting

18  and cost estimation and assessment of property damage?

19  **A.**   Yes, sir.

20        **MR. MEUNIER:**  Your Honor, at this time, I will tender

21  the witness under Rule 702 as a general contractor with

22  expertise in assessing the scope and estimating the cost of

23  construction damages and repairs.

24        **THE COURT:**  Any questions?

25        **MR. HAYDEN:**  No objection, Your Honor, with regard to

1   general contracting and cost estimating.

2           **THE COURT:**  The Court will accept him in the tendered

3   fields.

4                    **DIRECT EXAMINATION**

5   **BY MR. MEUNIER:**

6   **Q.**   Mr. Mallet, when were you first contacted to serve as an

7   expert in this case?

8   **A.**   Just after January 1 of this year -- of 2009.

9   **Q.**   What were you asked to do by the plaintiffs?

10  **A.**   I was asked to meet and perform an inspection on the home

11  of Mr. and Mrs. Hernandez to develop a scope of remediation and

12  to provide a cost estimate for that scope.

13  **Q.**   What, if any, involvement did you have prior to being

14  retained in this case with respect to the effects of Chinese

15  drywall or Chinese drywall remediations?

16  **A.**   We previously had performed inspections on at least one

17  residence prior to, but since sometimes -- maybe spring to

18  summertime of 2009 began doing research into the problems of

19  Chinese drywall, issues with the corrosion, potential

20  mitigation or remediation protocols, and began developing a

21  protocol for the remediation of Chinese drywall in buildings.

22  **Q.**   Why was it important to you, as a general contractor, to

23  conduct that independent research?

24  **A.**   Well, first of all, as a general contractor, having done

25  work subsequent to Hurricanes Andrew -- sorry.  Katrina and

                        DAILY COPY

1   Rita.  We were concerned if any of that material was in our

2   properties or on our projects and what to expect to look for if

3   we were called to investigate that.

4              And also doing work for insurance companies and

5   consulting work, it was almost inevitable that one of our

6   clients would call and ask us to become involved in reviewing,

7   estimating, or analyzing the buildings potentially with Chinese

8   drywall.

9   **Q.**   So is it true that before you came into this particular

10  case involving the Hernandez home, you had already developed

11  some idea about remediation issues dealing with Chinese

12  drywall?

13  **A.**   Yes, sir.

14  **Q.**   Tell the Court, then, what steps you took in this case to

15  familiarize yourself with the Hernandez property and with the

16  needed scope and cost of repairs.

17  **A.**   After having reviewed other protocols and having developed

18  a general protocol ourselves, I reviewed the property with

19  Mr. and Mrs. Hernandez, listened to the issues that they had

20  with appliances and air-conditioning system problems, the

21  testing that was performed on the house, and that Chinese

22  drywall had been identified in the home, and from that point

23  began photographing, measuring, and writing a scope of action

24  that would be necessary to remove the Chinese drywall and any

25  of the components of that residence that may be corroded from

1    the Chinese drywall.

2    **Q.**    On how many occasions have you visited and inspected the

3    Hernandez home?

4    **A.**    Personally, three.

5    **Q.**    All right.

6    **A.**    I've had people there on more occasions than that, but

7    I've been on that site three times.

8    **Q.**    You took measurements and photographs on those visits?

9    **A.**    Yes, sir.

10    **Q.**    What observations pertinent to Chinese drywall remediation

11    did you make on these visits to the Hernandez property?

12    **A.**    One was corrosion in the building, in the home, content

13    items that the Hernandezes showed to me that indicated

14    corrosion:  Hardware in the house such as doorknobs, hinges,

15    cabinet components, light-fixture receptacles, just various

16    items that they showed to me.

17    **Q.**    Did you engage the services of an electrical engineer as

18    part of your analysis?

19    **A.**    Yes, sir.  In our consulting work, we have a team of

20    engineers that come and testing companies that I work with on a

21    regular basis, and I incorporated the services of our

22    electrical engineer, Darrell Hicks.

23    **Q.**    Is it customary in your field and in your work as a

24    general contractor to consult with and rely on the input of an

25    electrical engineer when electrical issues are involved in a

1   case?

2   **A.**    Whether it's consulting or construction, we will generally

3   have our engineers review -- especially if we're doing a design

4   build, or just a project, we'll have our engineers review the

5   proposals that we are putting together to see if they meet the

6   applicable design standards.

7   **Q.**    Now, you mentioned that you have done research in the area

8   of Chinese drywall remediation.  Have you continued to stay

9   current with that research, particularly with announcements

10  from governmental agencies?

11  **A.**    Yes, sir, I have.

12  **Q.**    Have there been any recent announcements or statements

13  from government agencies which have been relevant in your

14  analysis of the scope and cost issues in this case?

15  **A.**    Yes, sir.

16          **MR. MEUNIER:**  Your Honor, I believe the next two

17  exhibits which follow that are the subject of objection.  I can

18  show them to the Court and then --

19          **THE COURT:**  That's fine.

20          **MR. MEUNIER:**  If I may approach the bench?

21          **THE COURT:**  Sure.

22          **MR. MEUNIER:**  Your Honor, for the record -- and I

23  know counsel has an objection.  Just to identify those

24  documents, one is a letter from the State of Florida Division

25  of Emergency Management to FEMA.  The other is a Consumer

406

1   Products Safety Commission alert to fire safety professionals.

2   We are not offering either document for the

3   truth of any matter asserted therein, but merely as a

4   demonstration of the support that this witness has continued to

5   seek and receive in his research.  To the extent that they are

6   hearsay, we think they fall within the 803 exception to

7   hearsay.

8   **MR. HAYDEN:**  Your Honor, I don't believe they fall

9   within 803.  I think it's merely an attempt to put into the

10  record some recent hearsay that has come up in the last few

11  days.

12  **THE DEPUTY CLERK:**  It would help if they would

13  identify them, Judge.

14  **THE COURT:**  Okay.  One is a letter of March 10 from

15  the Division of Emergency Management.  The other one --

16  **THE DEPUTY CLERK:**  Is there a number on them, though?

17  **MR. MEUNIER:**  For the record, Judge, they've been

18  given numbers, although obviously not yet offered.  The letter

19  from the State of Florida Division of Emergency Management has

20  been marked as Hernandez Exhibit 647.  The CPSC alert to fire

21  safety professionals has been marked as Hernandez Exhibit 539.

22  We would like the witness to be able to identify them,

23  Your Honor, and then offer them into evidence.

24  **THE COURT:**  With regard to the letter, the Division

25  of Emergency Management, I'm going to go ahead and exclude that

DAILY COPY

1    one.  With regard to the other one, 539, I won't make it a part
2    of the record, but I would let the witness look at it and say
3    that he's received it and is aware of it.
4            **MR. MEUNIER:**  Thank you, Your Honor.
5                 May we put up, then, Hernandez Exhibit 539?
6            **THE COURT:**  Yes.
7    **BY MR. MEUNIER:**
8    **Q.**   Mr. Mallet, do you recognize this document as one that you
9    received in your continuing research of Chinese drywall issues?
10   **A.**   Yes, sir.
11           **THE COURT:**  Try to keep your voice up, Mr. Mallet,
12   please.
13   **BY MR. MEUNIER:**
14   **Q.**   Would you just briefly tell the Court what was relevant or
15   significant to you in support of your assessment in this case
16   in light of this document.
17   **A.**   Part of our concern in remediation and the corrosion
18   issues within the home is the potential for fire.  The CPSC
19   alerting professionals to report any fires that potentially
20   were attached to or part of some Chinese drywall project
21   somewhat supported my position of how we go about our
22   remediation protocol.
23   **Q.**   Mr. Mallet, as a general contractor, whether or not a risk
24   such as a fire risk ultimately proves to be supported by the
25   weight of scientific evidence, once a federal agency announces

1    to fire safety professionals that it is investigating that risk
2    with respect to Chinese drywall, how does that influence you in
3    deciding the proper scope of Chinese drywall repair?
4    **A.**    While that is an issue and an issue that's being looked
5    at, it concerns us as to what goes into our scope, what will we
6    address and why will we address it.  Things such as wiring,
7    appliances, electrical or electronic items have to be looked at
8    carefully before we decide to leave it in a building or a home
9    for obvious reasons.  One is safety of the occupants; secondly,
10   the safety of the building.
11   **Q.**    Now, would you tell the Judge how you went about, in terms
12   of your methodology, arriving at the appropriate scope of
13   Chinese drywall repairs that was needed at the Hernandez home.
14   **A.**    In addition to researching other protocols and whatever
15   information that became available to us through the Indoor Air
16   Quality Association, through the restoration industry
17   publications that were sent to us, Internet research, review of
18   research done by the Florida Department of Health, taking those
19   elements and having inspected at least one house prior to being
20   asked to review the Hernandez house and physically looking at
21   wiring, air conditioning, the cleaning that was performed on
22   that particular house, I formulated my own protocol based on
23   that information.
24            I then went about the identification of various rooms
25   of the home, various quality of items in the home through

1   photographs; took measurements in a methodical way, my usual
2   method of left to right, front to back, height; and then
3   itemization of each and every item from the floors, walls to
4   ceilings; and documenting what has to be done to effect the
5   removal and replacement of, in this case, the drywall, what
6   items I felt could be salvaged, thought could be salvaged, what
7   items were not practical to salvage because of time or cost
8   issues, and wrote the scope.
9        Then from there, we inputted that information into a
10  computerized pricing system called Xactimate.  It's a unit cost
11  pricing system that's used by contractors, insurance companies,
12  and restoration companies throughout the United States,
13  England, Canada, and Australia and New Zealand, at least, and
14  it's internationally recognized.  We produced the estimate from
15  the scope of work that I wrote on site, then from there, after
16  it was produced, reviewed it, edited it, and then produced the
17  final estimate.
18       **MR. MEUNIER:**  Your Honor, Mr. Mallet has prepared a
19  PowerPoint with photographs and some other materials that we
20  have shown to Knauf's counsel.  I do not believe there are any
21  objections to the exhibits that are made part of this
22  PowerPoint, so I'd like to offer them now in advance so we
23  don't have to stop as we proceed.
24       For the record, Judge, the exhibit numbers are
25  Hernandez 560 through and including 573; Hernandez 382-0003;

DAILY COPY

410

1    Hernandez 542 through and including 555; Hernandez 556-0001

2    through 0007; Hernandez 477-0029, 30, and 31; and Hernandez

3    557-001 through 003.  I'll offer those into evidence at this

4    time.

5              THE COURT:  Hearing no objection, I'll admit it.

6              MR. HAYDEN:  I think we're fine.

7    BY MR. MEUNIER:

8    Q.   So we're ready to proceed with the PowerPoint.  I think

9    you have the control of this, Mr. Mallet.  So as we go, please

10   allow the questions to finish, and then we'll go to the next

11   slide.

12             What is the first picture, which has been marked

13   560-001?

14   A.   This is the identification photograph we take at the

15   beginning of our inspection to identify the location of the

16   home.  It goes into a series of exterior photographs so that we

17   have a document if questions are raised as to the types of

18   materials or construction methods or design of the home.

19   Q.   This is the front of the home?

20   A.   This is the front elevation.

21   Q.   What's the next picture?

22   A.   This is the rear elevation of the home.  The two doors on

23   the decking goes into the living room area between the

24   fireplace.  The part of the home that's at a lower elevation

25   but connected by the roofline is the garage area.

1  **Q.**  What's the total square footage for living space in this

2  house?

3  **A.**  1,706 square feet according to the drawings.

4  **Q.**  That does not include the space in the garage?

5  **A.**  It does not include the garage, nor the porch area.

6  **Q.**  How is the garage connected to the home?

7  **A.**  By the roofline.

8  **Q.**  There's no walk-through into the garage?

9  **A.**  There's no walk-through.  There's a walk between the home

10  and the garage, and the roofs are connected.

11  **Q.**  How would you describe this type of construction?

12  **A.**  It's a pier-and-beam foundation with a wood-stud and

13  siding exterior, shingle roof.

14  **Q.**  Let's look at the next picture.  What do we see here?

15  **A.**  This is the master bedroom of the home.  Again, it's to

16  give me an indication and to document what's in each of the

17  rooms in case we need to refer back for note purposes or some

18  questioning that we may have.

19  **Q.**  Next picture.

20        **THE COURT:**  Let's designate the pictures when you say

21  "next picture."

22  **BY MR. MEUNIER:**

23  **Q.**  I'm sorry.  Let's back up.  I think we designated the

24  front picture.  The next picture, the rear of the house, is

25  561-0001.  The next is Hernandez 562.  That's the bedroom.

1          I think we're about to go to the next picture.  This

2    is 563.  What does Hernandez 563 show?

3    **A.**   It indicates the type of casing that was placed around the

4    doors in the home, millwork in the house.

5    **Q.**   In terms of quality construction, what does this picture

6    tell you about the construction of the Hernandez home?

7    **A.**   It's a better quality of material, more expensive because

8    it has to be milled with different types of blades rather than

9    just the plain wedge casing, 2-and-a-quarter-inch or

10   2-and-an-eighth-inch wedge casing.  This is a larger piece of

11   molding, a little bit thicker, and with more design.

12   **Q.**   Next picture.  This is Hernandez 564.  What does it show?

13   **A.**   That shows the crown molding in the home.  Usually, you'll

14   see 1-inch-and-three-eights to 2-inch crown molding in homes.

15   This was about 4, 4-and-a-half-inch crown molding.

16   **Q.**   Again, a little bit higher quality than a lot of homes you

17   see?

18   **A.**   Yes, a higher quality, and a little bit more expensive.

19   **Q.**   Let's go to the next picture, please.  This is

20   Hernandez 565.  What do we see in this picture?

21   **A.**   This is a partial view of the master bathroom.  That's the

22   whirlpool tub straight ahead with the vanity to the right.

23   **Q.**   There's been, in the stipulation with Knauf, an agreement

24   that all drywall comes out of the home except for certain green

25   boards in the bathroom areas.  Does this picture show us where

1   green boards would be located?

2   **A.**   It gives me an indication where it would be located, and

3   that's around the perimeter of the whirlpool tub.

4   **Q.**   What are green boards?

5   **A.**   It's a type of Sheetrock drywall with a water-resistant

6   paper that's used in wet areas in homes.

7   **Q.**   Would that not be Chinese-manufactured drywall?

8   **A.**   I don't know.

9   **Q.**   You don't know.  Is there a way, in your remediation

10   proposal, to save or reuse green boards that would be situated

11   around this tub?

12   **A.**   Not really.  The perimeter of the tub has a tile

13   application.  To remove the tub and the upper parts of the

14   wall, that's going to damage that Sheetrock paper in taking it

15   off.  Trying to repair that would be more expensive than

16   replacing those three sheets of Sheetrock.

17   **Q.**   Will you keep the tile flooring in this house?

18   **A.**   Yes, sir.  The ceramic tile floors are scheduled to

19   remain, and they're to receive a protective film on top of

20   them.

21              **MR. MEUNIER:**  May we see the next photo.

22   **BY MR. MEUNIER:**

23   **Q.**   This is Hernandez 566.  What does it show?

24   **A.**   This shows the type of baseboard.  It's a colonial-type

25   molding with a shoe molding butting up to the casing and the

1    raised-panel Masonite doors.  It also indicates the flooring in

2    the living room and hall that connects the children's bedroom.

3    It's a laminated, glue-down floor.

4    **Q.**    In your protocol, do you recommend, as Knauf does,

5    protecting and keeping this floor?

6    **A.**    No, sir, I do not.

7    **Q.**    Why not?

8    **A.**    Well, several reasons.  In review of information, one of

9    the contractors that has been performing remediation, Beazer

10   Homes, has been removing their wood floors.  Another

11   contractor, Lennar, has tried to salvage wood floors, but with

12   limited success.

13         Secondly, the protection of the floors during the

14   demolition and reconstruction presents a few different

15   problems.  One, it should be covered with a sealed material to

16   prevent dust from going into the cracks and crevices of the

17   floors themselves, the grooves, but that presents a problem

18   because then we're placing a vapor barrier on those floors on

19   the wrong side of the floor system.

20         Because we live in such a hot, humid climate, vapor

21   barriers should be placed on the outside, the warm side of the

22   building system or the warm side.  That prevents moisture from

23   penetrating into the building.  So if I put a sealant on top of

24   that wood floor, it encapsulates the moisture and will be

25   detrimental to that wood floor.

415

1           Secondly, to prevent other types of damage from
2   occurring, we would have to cover that floor with either a
3   cardboard roll-out material, tape and seal it, or some other
4   type of protective method to help prevent damage to those
5   floors from tools being dropped or being scratched.
6           We also have another issue when we take the
7   baseboards and the shoe molding away from the walls.  These
8   floors are not installed all the way to the base plate of the
9   wood framing, the stud framing.  They're typically
10  three-quarters to one inch away from the walls, so preventing
11  Sheetrock dust from getting underneath the wood edges will be
12  somewhat difficult.
13  Q.   This is a laminate-surface wood floor?
14  A.   Yes.  Yes.  It has a thin layer of laminated -- I think
15  this is oak.
16  Q.   Say someone drops a tool or some mark is made on a
17  laminate floor.  Can you just sand that out like you can with a
18  normal wood floor?
19  A.   Not typically.  Usually, the thickness of that laminate --
20  in real wood floors, the oak is normally three-quarters of an
21  inch to an inch thick.  We probably have maybe an eighth of an
22  inch of laminated oak on the top of these floors, so sanding,
23  removing even a sixteenth of an inch from these floors makes
24  that oak finish paper-thin.
25  Q.   During the demolition phase, there will be no electrical

DAILY COPY

1    power in the house?

2    **A.**    That's correct.

3    **Q.**    If you keep even a laminated wooden floor in a hot, humid

4    environment without climate control, does that affect the

5    floor?

6    **A.**    It will affect all the wood products in the house:

7    Framing, wood floors, any cellulose-type material left in that

8    house.

9    **Q.**    So your remediation protocol would be it's more

10   cost-effective and practical to replace this floor with a like

11   laminate wood floor?

12   **A.**    Correct.

13   **Q.**    Let's go to the next picture, please.  This is

14   Hernandez 567.  What do we see in this picture?

15   **A.**    This is the granite countertop in the kitchen.  There's a

16   2-foot-wide countertop.  There's a backsplash.  Then for the

17   majority of the run between the kitchen and living area,

18   there's a countertop, or snack bar, which is also granite.

19   **Q.**    Now -- I'm sorry.

20   **A.**    That's okay.  I was just going to point out a few things.

21   There are penetrations in the granite, such as electrical

22   outlets that we can see here and here, and the sink that all

23   have to be cut out in the placement of the granite.

24   **Q.**    The defendants agree all countertops are to be replaced.

25   Do you find that they have measured the same amount of granite

1  countertop in this house as you have?

2  **A.**   No, sir.

3  **Q.**   Does it appear that they have taken into account, for

4  example, the backsplash areas?

5  **A.**   It appears that there's a lack of either splash, snack-bar

6  top or, in addition, cabinet tops on the other side of the

7  kitchen next to the cabinet.

8  **Q.**   The defendants do propose to not replace but maintain

9  these cabinets.  Is there a problem, in your view, with doing

10  that in the area where they adjoin the granite countertops?

11  **A.**   Yes.  The granite countertops are usually glued very well

12  to the tops of the cabinets.  When the painter is caulking and

13  painting, he will caulk the bottom joint between the top of the

14  cabinet and the bottom of the granite in this area here, all

15  along this area.  On the flip side, the same thing on the other

16  side of that snack bar.  In removing the countertop, we've

17  encountered the problem of cutting the caulking away to detach

18  the granite from the cabinet base that won't cause a splitting

19  of the materials, the wood materials the cabinets are made of.

20          Secondly, with that, if we pull wood particles away

21  from the cabinet facing, or just in having to redo the caulk

22  and paint line, we have to sand and refinish that to build it

23  back up to the thickness of the rest of the cabinet face.

24  **Q.**   Let's look at the next picture, which has been marked as

25  Hernandez 568.  This is the tile floor that will be kept in the

1    house according to both Knauf and your protocol?

2    **A.**    That's correct.  This is the sitting area.  The tile floor

3    continues from the sitting area into the kitchen and laundry.

4    **Q.**    Did you notice this object when you visited the house?

5    **A.**    Yes, sir.  That's one of two dehumidifiers that the

6    Hernandezes have running in the home.

7    **Q.**    Let's look at the next picture, please.  This is

8    Hernandez 569.  What does it depict?

9    **A.**    This is the laundry room.  There's wire shelving in the

10   laundry, and this is the main breaker panel for the electrical

11   system.

12   **Q.**    Now, you recommend the removal of the breaker system?

13   **A.**    Not the box, but the bus bar and the breakers, yes, sir.

14   **Q.**    Why is that, sir?

15   **A.**    Well, several reasons.  Indications from the information

16   that I've researched state that the corrosion occurs in these

17   areas --

18           **MR. HAYDEN:**  Objection, Your Honor.  He's not being

19   called as a corrosion expert or an electrical engineer.

20           **MR. MEUNIER:**  Judge, he's saying what he relied upon

21   in order to reach his conclusion about this breaker.

22           **THE COURT:**  I'm listening to him.  I overrule the

23   objection.

24           **THE WITNESS:**  Information that we researched

25   indicates that the components within the breaker panel are

1    materials that will corrode.  We have removed breakers from

2    this panel and sent them off to be analyzed.  I think some of

3    the pictures that were shown in court earlier today are of

4    electrical breakers that came out of this panel.

5    **BY MR. MEUNIER:**

6    **Q.**   Let me ask this question.  You've got a debate about this.

7    You've got some scientists say the breakers are fine; some

8    scientists say it's a corrosion problem.  You're the general

9    contractor.  In the real world, what would a reputable

10   contractor do when there is such a debate going on about

11   whether or not there's corrosion in a breaker box?

12   **A.**   Well, because the liability will rest on my shoulders to

13   properly produce an adequate and proper scope of remediation,

14   we listen to one side and they say it's got corrosion and it

15   has to come out; the other side says it's corrosion, but it's

16   not to the level of failure.  But there are no documents that

17   give me any kind of clear indication that those components are

18   proper to leave in the house and that no problems will occur as

19   a result of that, of leaving those components in that house.

20          So without a clear-cut indication from those powers

21   that be or from some governmental issue that this is not a

22   problem, we cannot take the liability and the risk of leaving

23   materials in a house that we know is corroded and we don't know

24   what the end result of leaving them in the house is going to

25   be.

420

1   **Q.**   Let's go to the next picture please, which is

2   Hernandez 570.  What does it show?

3   **A.**   That's the security system, the main box for the security

4   system in the home.  It's in the laundry room.

5   **Q.**   Does your scope of remediation include the removal of the

6   security system, the alarm box, etc.?

7   **A.**   Yes, sir, it does.

8   **Q.**   Would your reason for that be the same as what you've just

9   been talking about with the circuit breaker?

10  **A.**   Yes.

11  **Q.**   Let's go to the next picture, which has been marked as

12  Hernandez 571.  Tell us what this shows.

13  **A.**   This is the area underneath the kitchen sink.  This is the

14  disposal system.  These are water lines that we have changed

15  out and sent some of these parts to be analyzed.  This is PVC

16  drain lines that are connected to the sink area, and the valves

17  that control those lines, those water lines.

18  **Q.**   Your recommendation, Mr. Mallet, is to remove all plumbing

19  in the house?

20  **A.**   To remove the copper, but especially the areas below sinks

21  and lavatories.  Whether we were performing a Chinese drywall

22  remediation or any other type of construction, we would have to

23  remove these items to remove and replace or remove and

24  reinstall sinks and cabinetry or walls behind the cabinetry.

25  **Q.**   Is your recommendation to remove and replace all the

1   plumbing fixtures and copper plumbing in the house?

2   **A.**   All of the copper plumbing and some of the fixtures.

3   **Q.**   Would there be difficulty in leaving the copper plumbing

4   lines in place and proceed with the demolition and cleanup with

5   it in place?

6   **A.**   Not so much in the demolition.  But in reinstalling

7   cabinetry without removing the valves, the stems, the traps,

8   and the lines, there's no way to put the new cabinets back in

9   place and up to the walls without removing those items.

10  **Q.**   Let's go to the next picture, please, which is

11  Hernandez 572.  What does it show?

12  **A.**   It shows the air-handling unit here, the long box.  It

13  shows the plenum, supply plenum.

14  **Q.**   "Plenum" is what this is called?

15  **A.**   Yes, sir.

16  **Q.**   P-L-E-N-U-M?

17  **A.**   P-L-E-N-U-M.  The air blows from the air-handling unit

18  into the plenum and into the branched ductwork that goes to the

19  individual rooms.  The plenum is made out of a duct board,

20  which is just an outside-lined, aluminum-type, scrim-faced foil

21  material with insulation on the inside.  The ductwork is

22  flexible duct that is externally wrapped.

23  **Q.**   I believe both Knauf and plaintiffs agree that all the

24  flexible ductwork is to be removed and replaced.

25          Let's talk about the HVAC system that is shown in

DAILY COPY

1    this picture.  You're aware that the HVAC coils in the
2    Hernandez home, which would be inside this air-handling box,
3    have been recently replaced and coated with -- I think it's
4    called Bronz-Glow, or some material that's supposed to be
5    prevention of corrosion?
6    A.    That's my understanding, yes, sir.
7    Q.    So knowing that, what is your recommendation with respect
8    to the HVAC system?
9    A.    Well, the other components in the HVAC system have
10   corrosion.  The expansion valve, the wiring, the circuitry was
11   removed from this unit and sent off for testing of the
12   corrosives.  We took the new materials, such as the expansion
13   valves and tubes that were installed in this unit, and put them
14   side by side and photographed them so that you could see the
15   significant difference between those items of new and old.
16          In addition, the interior of this air-handling system
17   is internally lined with insulation.  The box would have to be
18   taken apart, the insulation removed, new insulation placed on
19   the inside of the metal lining or box, and then reinstalled.
20   It's a significant amount of work.
21          We have, in the past, looked at the efficiency of
22   cost versus replacement in other non-Chinese drywall issues
23   that were not even in litigation, and it is simply easier and
24   just about as cost-effective to replace the air handler.
25   Q.    Even if the coils are now coated and not themselves a

1  problem, you believe it makes cost sense to remove the whole

2  system?

3  **A.**   Well, by the time you replace all of the various corroded

4  components and all of the insulation that's inside the unit,

5  the motor and any affected corroded components, you're probably

6  spending more money than changing out the air handler.

7  **Q.**   Now, there's a line set that connects this air-handling

8  system to the outside condenser and compressor; true?

9  **A.**   Yes, sir.

10  **Q.**   What is your recommendation, first, with respect to the

11  outside condenser and compressor?

12  **A.**   Originally, I estimated to change the outside compressor

13  because that was just my understanding of what was done on

14  other projects, but I wasn't quite grounded in the reasoning

15  for changing it out.  So I contacted one of our team members, a

16  mechanical engineer, and asked him to look into the necessity

17  for changing the outside unit.

18         **MR. HAYDEN:**  Your Honor, hearsay.

19         **MR. MEUNIER:**  Are you sure you want to object to

20  this?

21         I think this helps the defendant, Judge.  He was

22  explaining why he's going to keep the outside compressor, but

23  if we --

24         **MR. HAYDEN:**  Sorry, Judge.  I'm still in law school.

25         **THE COURT:**  Just tell us what you decided.

1          **THE WITNESS:**  I'm going to keep the compressor.

2    BY MR. MEUNIER:

3    **Q.**   Keep the compressor.

4          Now, let's talk about the line set.  First of all,

5    tell the Judge again:  What is the line set that connects the

6    outside compressor to this attic air handler?

7    **A.**   It is a continuous copper tubing line that goes from the

8    outside compressor to the inside air-handling unit.  It carries

9    the refrigerants from the inside to the outside.

10   **Q.**   Are you going to replace that entire line set?

11   **A.**   Yes, sir.

12   **Q.**   Aren't you aware that there's been a picture shown where

13   the Armaflex is taken away and there's a section of line set in

14   the attic that looks shiny and copper?

15   **A.**   Yes, sir, I am.

16   **Q.**   So why are you going to replace the line set?

17   **A.**   Well, what I haven't been shown is all of the concealed

18   areas of that line set in the wall system itself that's in the

19   area of the Sheetrock or encapsulated in the insulation behind

20   the Sheetrock.  Based on all of the other copper items that we

21   have looked at in the house, I can't imagine that that is not

22   affected, that hasn't been corroded also.

23   **Q.**   Let's look at the next photograph, which is Hernandez 573.

24   What does this show?

25   **A.**   It's a light in the attic.  It shows an indication of the

DAILY COPY

425

1   fasteners that are used in installing electrical lines in
2   homes.  Code requires the lines to be fastened, maximum, every
3   4-and-a-half feet or within 12 inches of any outlet or
4   penetration.
5   Q.   So behind the drywall in the Hernandez home in areas we
6   cannot see like we can see in the attic, you would think there
7   would be the same stapled Romex wiring occurring every so
8   often?
9   A.   That's correct.  A little bit later on, we'll have some
10  photographs showing the typical installation of the wiring.
11  Q.   You're aware, aren't you, Mr. Mallet, that in contrast to
12  your proposal to remove all the electrical wiring and replace
13  it all, Knauf is proposing in this home to keep the wiring and
14  splice it within boxes?
15  A.   Yes, sir.
16  Q.   You mentioned yesterday Mr. Hicks, who is your electrical
17  engineer on staff.
18  A.   Consultant engineer.
19        MR. MEUNIER:  Let's look at the next picture, which
20  is, Your Honor, not being marked or offered into evidence as an
21  exhibit, but it's simply being shown to corroborate the
22  witness' testimony.
23  BY MR. MEUNIER:
24  Q.   Do you recognize this as part of Mr. Hicks' report to you?
25        MR. HAYDEN:  Your Honor, before we go on, this is

DAILY COPY

1   still trying to get another expert report in through this

2   witness.  It's having to do with electrical issues by an

3   electrical engineer.  It's hearsay.

4           **MR. MEUNIER:**  Your Honor, experts, under Rule 703,

5   can and do rely on material that is not in and of itself

6   admissible.

7           **THE COURT:**  Let's see where we go with it.  Let's

8   just get him to make the conclusion.

9           **MR. MEUNIER:**  Okay.

10          **THE COURT:**  Why he did it is another issue.

11  **BY MR. MEUNIER:**

12  **Q.**   What conclusion did you make from the input given to you

13  by Mr. Hicks in this report pertinent to whether you should

14  remove all wiring or attempt to keep wiring in place?

15  **A.**   That the wiring should be removed throughout the house.

16  **Q.**   What was it about Mr. Hicks' input that helped persuade

17  you to that conclusion?

18          **MR. HAYDEN:**  Your Honor, may I have a continuing

19  objection to this?

20          **THE COURT:**  Yes.  Go ahead.

21          **THE WITNESS:**  Mr. Hicks calculated the amount of net

22  free space in the receptacle that electricians for, I think,

23  Knauf went to the home, removed light switches, cut the wiring,

24  and spliced wiring to that conductor coming into the box.

25          **MR. MEUNIER:**  We have some pictures of that.  If we

1  could show Hernandez 382.

2          **THE WITNESS:**  Yes, sir.

3  **BY MR. MEUNIER:**

4  **Q.**  Tell the Court what this slide shows.

5  **A.**  This is one of the children's bedrooms.  This is a

6  two-gang or two-switch box that the wires were cut, spliced,

7  and wire nuts were placed on those splices.

8          Each electrical box has a certain cubic inch of space

9  in that box, and the code requires a net free area for the air

10 passage in these boxes so that temperatures do not elevate and

11 damage to the insulators occur.

12         **THE COURT:**  Just a moment.

13         **MR. HAYDEN:**  Once again, Your Honor, I'd move to

14 strike all this.  He's now going into not what he did, but he's

15 testifying about whatever Hicks' opinions are.

16         **MR. MEUNIER:**  Your Honor, I think under Rule 703,

17 though, he's allowed to rely on, among other things, what

18 Hicks --

19         **THE COURT:**  Yes, he is, but why don't you just get to

20 the bottom line.

21         What did you do?

22         **THE WITNESS:**  Well, the bottom line is that there's

23 more wiring in the box than the code allows to have in a box by

24 splicing.

25         **THE COURT:**  Got it.

1   **BY MR. MEUNIER:**

2   **Q.**   To complete the picture, the pictures on the top, the top

3   two pictures, as well as the bottom picture on the left, are

4   all of the box after the Knauf folks had done their splicing

5   and --

6   **A.**   Yes, sir.

7   **Q.**   What is the picture on the bottom right?

8   **A.**   The electrical engineer instructed our electrician to

9   bring the box back into code compliance.  To do that, another

10  junction box had to be set below the switch box to make that

11  connection and extend the wire into the switch boxes.  So we

12  have a junction box now with a blank faceplate below the switch

13  box.

14  **Q.**   Why do you need another junction box here?  What is your

15  understanding of why that's needed?

16          **MR. HAYDEN:**  Your Honor, a continuing objection.

17          **THE COURT:**  Except he's been offered as an expert in

18  code and costs, so --

19          **MR. HAYDEN:**  No, Your Honor, not on code.  Cost

20  estimation, general contracting.

21          **THE COURT:**  You're right.  Cost and scope.

22          **MR. MEUNIER:**  Your Honor, I simply submit that in

23  order to make decisions on cost and scope, he has to know what

24  codes provide.

25          **THE COURT:**  I agree.  Overruled.

DAILY COPY

1  BY MR. MEUNIER:

2  Q.   What was your understanding of why another hole in the

3  wall had to be cut here for another junction box in order to

4  make the kids' junction box here compliant with code and not

5  overcrowded?

6  A.   Because, from knowledge, we cannot have a concealed

7  junction box in a wall or ceiling or floor system.  You have to

8  have access to that junction for servicing purposes.

9  Q.   Is there a code requirement that you're aware of that

10  there be 6 inches of free conductor inside a junction box?

11  A.   Yes, sir.

12  Q.   Is it your understanding that it's 6 inches of unspliced

13  wire?

14  A.   Unspliced wire.

15  Q.   Now, Mr. Mallet, you were present, weren't you, for the

16  Knauf demolition demonstration at the other home, the control

17  home in Mandeville?

18  A.   Yes, sir.

19  Q.   You've got in your PowerPoint certain pictures that you

20  think are relevant to discuss that were taken at that time?

21  A.   Yes, sir.

22  Q.   Let's look at the next picture, which is Hernandez 542.

23  What is that this?

24  A.   That's the identification photograph of 209 Rue Esplanade

25  in Mandeville, the control house.

DAILY COPY

1    **Q.**    Next picture, 543, what does this show?

2    **A.**    This is an overview of the rear wall of the second-floor

3    middle bedroom.  This is the area they began removal of the

4    Sheetrock from the walls.

5    **Q.**    What were they using to remove the Sheetrock in this

6    picture?

7    **A.**    They were using a knife to cut the Sheetrock in sort of a

8    methodological way to remove that in sections from the wall

9    system.

10   **Q.**    You've seen the Beazer method:  Make a hand-hold with a

11   hammer and pull the drywall away?  You've seen that?

12   **A.**    Yes, sir.

13   **Q.**    You've seen this method of cutting it with a knife?

14   **A.**    Yes, sir.

15   **Q.**    What method do you think is the most appropriate and

16   cost-efficient to use in the Hernandez remediation?

17   **A.**    Something in the middle.

18   **Q.**    What is that?

19   **A.**    Well, we would remove -- and there's no way really to

20   remove Sheetrock that's installed and properly installed in

21   whole sections.  The studs are 16 inches apart.  If it's

22   fastened correctly, it's screwed every 6 inches around the

23   perimeter, 12 inches in the center-stud areas, so it's going to

24   come out in pieces no matter how careful we do our work.

25             We wouldn't just go in and just break it apart to

1   take it out.  We would actually make it somewhat harder to

2   clean up afterwards, but to take it out in as large a piece as

3   is physically possible, as the Sheetrock would allow you to

4   release.

5   Q.   How would you do that?  How would you cut into the wall to

6   pull out large pieces?

7   A.   Well, we'd initially have to break into the wall or cut

8   open in a corner somewhere and begin at a logical point, such

9   as a door opening, a window opening, where we have an edge, a

10  natural edge, and then start pulling away from those areas.

11  Q.   With your hands?

12  A.   Well, you would need a pry bar, hammer, and hands.

13  Q.   Would you expect the Sheetrock to break?

14  A.   It's going to break.

15  Q.   Would you expect it to create dust?

16  A.   It's going to create dust.

17  Q.   Do you think there's any way to take off Sheetrock without

18  creating drywall dust?

19  A.   I haven't figured that out in 36 years.

20  Q.   The next picture is Hernandez 544.

21  A.   Yes, sir.

22  Q.   What is the relevance of this picture, and what does it

23  show?

24  A.   Even with the careful removal of the trim and Sheetrock in

25  the room, the molding still broke.  It still created issues

1   with matching, and it also created issues with the caulk and

2   paint lines against other wood materials in the home.

3               MR. HAYDEN:  Your Honor, for the record, we're not

4   disputing the trim as an issue.  We're replacing trim.

5               MR. MEUNIER:  I was about to just make that clear,

6   Judge.

7   BY MR. MEUNIER:

8   Q.   The molding and trim is coming out, according to Knauf's

9   protocol, but what was important to you about these pictures

10  nonetheless?

11  A.   Well, it's my understanding that while some of the trim is

12  coming out of the -- or the proposal is to take out the trim,

13  the casing around doors, the proposal does not include, to my

14  understanding, the replacement of the jambs, the material that

15  the casings are attached to.

16              In these photographs, we see where the removal of the

17  trim has left the caulking and the painting, and also it has

18  split the wood materials and left gouges in the jamb, causing a

19  condition to have to replace it regardless.

20              It also gives indication of no matter how careful we

21  are with removing the cabinets, at the joints and seams we're

22  going to have this very same condition to deal with:  Caulking

23  in the joints, paint in the joints that are going to have to be

24  scraped out and cleaned.  If it pops when you're taking those

25  components apart and out of the home, then you've got a

DAILY COPY

1  finishing issue to deal with.

2  **Q.**   Let's look at the next picture, which is Hernandez 545.

3  **A.**   Right.   Just indications of the caulking causing the trim

4  material to split when you're pulling it away.

5  **Q.**   That's a fairly small damage, though, isn't it?

6  **A.**   That is.

7  **Q.**   Why shouldn't the Hernandez family be able to tolerate

8  small damage like that to wood components that are pulled away?

9  **A.**   Well, the real small piece we might be able to put back

10  together; however, it makes it difficult.   Split moldings

11  generally are not what you find in a house, in the home.   You

12  only put whole pieces of material.   If they're split when

13  you're putting it up, it should be taken down and a nondamaged

14  piece installed.

15  **Q.**   Let's look at the next picture, which is 546.

16  **A.**   That's a door jamb that the casing was removed.   And in

17  this area here, that jamb was split and part of that wooden

18  member was pulled away.   We see the caulking and painting still

19  remaining.   So even if we did salvage this, we'd have to scrape

20  by hand all of the caulking and paint in this area, and then

21  sand it down smoothly to receive the new casing.

22  **Q.**   These pictures were taken at the demonstration house after

23  this careful effort was made by Knauf's people to remove the

24  drywall?

25  **A.**   That's correct.

1          **MR. HAYDEN:**  Objection, Your Honor:  Argumentative.

2   **BY MR. MEUNIER:**

3   **Q.**   Let's look at the next picture, and let me ask the

4   question first.  What kind of insulation is in the Hernandez

5   house?

6   **A.**   It's a blown-in insulation.

7   **Q.**   This picture, Hernandez 547, is what?

8   **A.**   This is the control house that has similar insulation

9   blown in the wall system.  I think we have a slide later that

10  shows the insulation attached to the studs and in the boxes.

11  **Q.**   So when the drywall is taken out of the Hernandez home,

12  the first thing you will see will be this blown-in insulation

13  material?

14  **A.**   That's correct.

15  **Q.**   Describe the material to the Judge.  Is this hard?  Is it

16  flexible?  Soft?

17  **A.**   No, it's slightly rigid because it's put in slightly wet,

18  and then it dries and it dries in place.  All of these are just

19  a whole bunch of particles that are just held together with a

20  glue mechanism.  When we take that out, it will be all over the

21  place.

22  **Q.**   Let's look at the next photo, please, which is

23  Hernandez 548.  What does this show?

24  **A.**   This shows the attachment of that blown insulation onto

25  the studs, framing member.  The exterior wall, which typically

1   is an OSB board -- which is just wood chips and glue -- it's a

2   rough finish, and the insulation sticks to it.  And we have

3   wiring, electrical wiring, and a low voltage wire for the alarm

4   system that runs through the studs.  Cleaning out those areas

5   will be difficult, if at all possible, with the wiring in the

6   walls.

7   Q.   So if you take out and scrape away the insulation and

8   leave the wiring, will cleanup be possible?

9   A.   Not total cleanup.

10   Q.   Why is that?

11   A.   Well, because I can't get in these penetrations in the

12   framing members to clean that area out because the wiring is

13   run in it.

14   Q.   Let's look at the next picture, which is Hernandez 549.

15   What are we showing here?

16   A.   This is typical of what we would see in a wall:  The

17   wiring running from one receptacle to the next, down the wall.

18   The wiring penetrates the studs.  You can also do the same

19   thing to the ceiling joists or the floor joists, making

20   cleaning in those openings next to impossible.

21   Q.   When you say "cleaning," you're talking about the fine

22   dust from drywall demolition?

23   A.   And the insulation.

24   Q.   Let's look at the next photo, which is Hernandez 550.

25   What does this show?

1    A.   When we looked at the picture of the light fixture in the
2    attic, we saw the attachment to the studs.  Here's where the
3    wire penetrates the fire blocking, and there's a fastener
4    within 12 inches of the fire blocking above and below.  There's
5    also another wire running right parallel to it, and the staples
6    have those wires attached firmly to the framing members, to the
7    studs.
8    Q.   In cleaning the drywall dust, why do you think you'd have
9    to get in the space between the wood stud and the stapled wire?
10   A.   Well, we couldn't perform a thorough cleaning of the
11   drywall dust or insulation with that wiring attached to the
12   stud.  We couldn't clean behind this area.
13   Q.   Let's look at the next picture, which is 551.  I think
14   we've already discussed enough of the wiring issue.
15           Let's go to 552.  What does this photograph show,
16   Mr. Mallet?
17   A.   One of the issues in removing the drywall from around
18   windows is the damage that it's going to cause to the flashing
19   material that captures any water leakage through the window,
20   around the perimeter of the window, and drains it out of the
21   building.
22           We can see that there was damage to the flashing in
23   various areas.  So in putting the home back together, we will
24   have to address that flashing and rewrapping that Sheetrock
25   opening with it and not impervious material.

DAILY COPY

1    **Q.**    This damaged to the flashing was seen after Knauf's method

2    of removing the drywall?

3    **A.**    Correct.

4    **Q.**    Why is it important to you, in bidding a job, to become

5    aware of issues like this, like this damaged window flashing?

6    **A.**    Well, if it's a fixed bid, anything that we don't place in

7    the bid will have to come out of our pocket to replace or

8    repair.  If this were an insurance repair job, if it wasn't

9    included on our scope, we would merely call the adjuster and

10    say, "Hey, there was flashing behind the trim that was damaged

11    when we took it off.  We need a supplement."  He would come

12    out, photograph it, and say, "Send your supplement in," and

13    issue an additional payment for it.

14    **Q.**    If there's a need for the Hernandezes to receive a certain

15    amount to hire you to do this job, these types of things are

16    going to be reflected in your bid?

17    **A.**    Yes, sir, they are.

18    **Q.**    Let's look at the next picture, which is Hernandez 553.

19    What does this show?

20    **A.**    This is a copper water line that's running in the plate of

21    the floor.  The copper water line has the black indicative

22    material, and it's running through the floor area.

23    **Q.**    Now, Knauf proposes to keep such copper plumbing in place

24    and then try to clean up the drywall dust.  Do you think that's

25    practical?

1  **A.**   It's not only not practical, it's not possible in some

2  areas.

3  **Q.**   Why do you say that?

4  **A.**   Well, everywhere it penetrates, such as these areas here,

5  I could neither clean this pipe nor adequately clean the hole

6  that penetrates the framing member.

7  **Q.**   Let's look at the next photos, which is Hernandez 554.

8  What does this photo depict?

9  **A.**   It indicates Sheetrock that was left in some of the wall

10  cavities in the house in the area downstairs.

11  **Q.**   So this is debris down an opening in a closet that's from

12  the original construction of this home?

13  **A.**   Yes, sir.

14  **Q.**   Is it typical to find debris like this in spaces like this

15  in home construction?

16  **A.**   If it's not properly cleaned before you finalize your

17  work, yes.

18  **Q.**   What's the relevance of noting this debris?

19  **A.**   Well, that those are issues that we have to deal with in

20  the final cleanup or in the remediation work that we're

21  performing.  If it's got Chinese drywall and there's

22  penetrations of anything in these areas, it has to be

23  addressed.

24  **Q.**   Let's look at the next photo, which is 555.  What does

25  this show?

1   A.    More of the same of the previous photograph.

2   Q.    So in the remediation of this home, if you find any debris

3   that is left over from the earlier construction, particularly

4   drywall debris, it's your proposal to thoroughly clean that?

5   A.    Correct.  Usually, we'll find on the studs, you see

6   further down here, Sheetrock compound that has to be dealt

7   with.

8         The other issue is where the studs will meet the

9   exterior sheathing, any separations between those areas will

10  have to be hand cleaned with brushes and can't just be simply

11  wiped down.

12  Q.    Let's next move to your cost estimate.  Before we do that,

13  Mr. Mallet, I want to return and wrap up the discussion about

14  electrical wiring.

15        Could you summarize for the Court all of the key

16  reasons you have for recommending to him that all of the wiring

17  be removed and replaced in this home as opposed to maintaining

18  it and splicing it within boxes.

19  A.    Yes, sir.  One of the first issues is dealing with the

20  code.  It's our understanding that the code does not allow the

21  splicing within 6 inches of the penetration of the box.  So any

22  splicing that's performed cannot be within 6 inches of that

23  entry from the back of the box.

24        Secondly, if the box, after it's spliced, is

25  overfilled and doesn't have the proper air space for heat

DAILY COPY

1    disbursement, that, in addition, won't meet the code.

2          Thirdly, in remediating, if we're able to cut wiring

3    and splice back, if the damage gets too close to the back end

4    of the box, where the wire penetrates through, we may not have

5    enough wire left to perform that splice.

6          In the cleaning of the home, any particulate that's

7    in between the stud and the receptacle boxes or, as we looked

8    at earlier, the attachments of the wiring to the walls won't be

9    able to be properly cleaned unless they're removed, cleaned

10   down, and put back in place.

11         And in removing the wiring, those staples tightly

12   fasten around the wire.  Removing that staple from around that

13   wire is very -- it's highly possible to damage the coating of

14   that wiring in removing the staples in our attempt to clean the

15   framing and wiring.

16   **Q.**   So we've got code.  We've got cleaning.  Any other

17   reasons?

18   **A.**   We have the corrosion issues.  We really don't know --

19   nobody has examined each and every outlet, each and every

20   switch box, each and every light penetration to tell us how far

21   back that each wire has to be cut back, and will we have enough

22   wire to create that splice in that junction box.

23         In addition, the cleaning issue of we really don't

24   have any idea when we're cleaning if we've cleaned it

25   adequately enough.

1   **Q.**   Well, Mr. Mallet, you've heard experts from Knauf say the

2   corrosion does not exist into the walls; it's not going to

3   continue after the drywall is out.  You've heard that

4   testimony?

5   **A.**   Yes, sir.

6   **Q.**   Why doesn't that satisfy you, as a general contractor,

7   that the Hernandez family, once they receive remediation costs,

8   should be able to go out in the real world and hire someone

9   like you to leave wire in the house?  Why wouldn't it be enough

10  that Knauf's experts say:  No Chinese drywall, no corrosion?

11          **MR. HAYDEN:**  Which question, Your Honor?

12  **BY MR. MEUNIER:**

13  **Q.**   Why wouldn't you be satisfied to hear that there are

14  experts on Knauf's side who say the corrosion won't continue

15  once the drywall's out, as a general contractor?

16  **A.**   Well, one reason is that there's probably the equal number

17  of experts on the other side that say it has to come out and

18  corrosion potential is still there in the house.  There's no

19  cut-and-dry directive as to whether or not that corrosion, one,

20  has thoroughly been removed, that everything that we saw is

21  going to be removed, and just the liability of keeping that

22  wiring in there if there's a problem that occurs.

23  **Q.**   In the real world, based on your experience, do you think

24  a reputable general contractor, knowing that there is a

25  legitimate debate and risk about corrosion, will propose to

1    leave wiring in this house and sign a deal with these people to
2    do that?
3              **MR. HAYDEN:**  Objection, Your Honor:  Argumentative.
4              **THE COURT:**  I'll overrule the objection.  Can you
5    answer that?
6              **THE WITNESS:**  Yes, sir.  I would think not.  I can't
7    imagine, knowing that there's an issue in the house already,
8    that the contractor would want to take that liability upon
9    himself.
10   **BY MR. MEUNIER:**
11   **Q.**   Is there any other reason besides the code issues, the
12   cleaning issues, and the corrosion issues that you have for
13   proposing to this Court that all wiring be removed and
14   replaced?
15   **A.**   We have one more C, the cost.  The cost of actually
16   standing there skinning wire pieces at a time to see how far
17   back you have corrosion in that wiring, and then getting
18   towards the back side of the box with enough room to work, it's
19   a labor-intensive -- it's not just walking in and somebody said
20   to take 3 inches of wire out of every outlet box or switch box
21   where you go in and measure and cut 3 inches.
22             Somebody's going to have to direct that electrical
23   contractor how far back each one of those wires need to be,
24   have the protective membrane removed, and that it's
25   satisfactorily been removed to splice those outlets.

1   **Q.**   Now, you mentioned, in doing your cost estimate, that you

2   have used a program or software program for that; is that true?

3   **A.**   Yes, sir.

4   **Q.**   What is the program?

5   **A.**   Xactimate.

6   **Q.**   That's X-A-C-T-I-M-A-T-E?  Xactimate?

7   **A.**   Yes, sir.

8   **Q.**   Tell the Judge what that is.

9   **A.**   That's a computer program that, among other things, is

10   used by contractors and insurance companies.  We enter the

11   dimensions of a room and the scope by code.  It takes and

12   applies unit costs on an item-by-item basis, and those unit

13   costs are updated on a quarterly basis but for that specific

14   geographical area, not a region.  Our estimate is for

15   Mandeville prices, average cost prices in the Mandeville area,

16   and those prices are updated quarterly.  Our estimate uses the

17   January 2010 pricing guide.

18   **Q.**   Is the Xactimate method of costing construction jobs one

19   that is used throughout the United States?

20   **A.**   And other parts of the world as well, yes.

21   **Q.**   How long has your company or your companies been using

22   Xactimate?

23   **A.**   Since the late 1980s.

24   **Q.**   Does the insurance industry use Xactimate?

25   **A.**   They use it and recognize it, yes, sir.

1   **Q.**   Now, let's look at the next slide in your display.  This

2   has been marked as Hernandez 556-0001 and 2.  This is 0001.

3   What is this form?

4   **A.**   This is what's called a tick sheet.  It's a general form.

5   **Q.**   Let's focus just on the top section.  We can show the

6   Court better what it is.

7   **A.**   It gives us places to input the data for each room, room

8   name, room sizes, any missing walls, by that meaning if there's

9   a large opening between -- for instance, at the Hernandez

10   house, between the kitchen and the living area, we subtract

11   that area from our estimate.  It's called a missing wall.

12   We'll tell the person in our office that is inputting the data

13   into the computer that she needs to put that missing wall data

14   so we don't pick up Sheetrock or trim molding, painting, so

15   forth.  It's the actual area of work.

16         Then from there we go down into the other areas that

17   gives us general items typically found in a residence that we

18   have to look at addressing.  Whether it's a remove and replace,

19   remove and reset, it's a guideline that we use.  It helps us to

20   not overlook things in the production of our scope on site.  I

21   will generally handwrite my scope, but use this as a general

22   overview to make sure that I've picked up everything that I

23   have to address within a room.

24   **Q.**   Have you gone through every room in the Hernandez house

25   and used the Xactimate software program to price this job?

1  A.   Yes, sir.

2  Q.   Have you prepared several slides just to illustrate what

3  you've done in the Hernandez house?

4  A.   Yes, sir.

5  Q.   Let's go to Hernandez 556-0003.  Zoom in a little bit on

6  this.

7  A.   This is a segment of the program that if we have a

8  question as to what type of materials or what kind of action is

9  included in that unit cost price, we can go to this price list

10 item by code and it gives us a description of what is inclusive

11 in that code.  It gives us an average life, if we need to

12 perform depreciation.  This happens to be a heater light in the

13 bathroom.  It's 100 cubic feet per minute of exhaust, and also

14 what it includes.  That's the labor, material, and removal,

15 which is further up at the top, if we go back up to the top.

16          This is the labor to install it.  It gives us the

17 component, the unit cost, the waste factor, because every

18 function on a job has waste, whether it's in material, in

19 worker slippage.  There's a calculated average waste for that

20 function.  The yield per hour and the extended cost.  The

21 materials, the same thing; the average price of the materials,

22 the waste, the extended cost, and the cost to remove those

23 particular items.

24          Then it gives us a labor burden to attach to that,

25 that when totaled up gives us the unit cost that is shown in

1    the estimate.

2    **Q.**   For this job, bathroom ventilation, fan light, and heater

3    replacement, you're going to bid 68.70 for labor and 246.07 for

4    materials?

5    **A.**   Yes, sir.

6    **Q.**   Let's just show one more thing.  Let's look at 556-0004 on

7    cabinetry.  This is the replacement; not to store and

8    reinstall, but to replace cabinets in the house?

9    **A.**   Yes, sir, it is.  The same scenario.  We have the labor,

10   the carpentry labor, finish carpentry labor to install, and how

11   many feet of cabinetry can be installed in an hour as an

12   average, the slippage percentage or the waste percentage, and

13   the extended cost of that per foot item.

14        Here, you have the material cost that's extended out

15   and the cost to remove, along with the labor burden and the

16   total price per linear foot to remove and replace that item of

17   cabinetry at the bottom, along with the description of that

18   cabinet material.  So we can get real detailed in what our

19   estimates include and how we arrive at those numbers if we need

20   to.

21   **Q.**   You supplied all those details for every room in this

22   house?

23   **A.**   Yes, sir.

24   **Q.**   You prepared a cost estimate that, I believe, is 31 pages

25   long; is that true?

1   **A.**   Yes.

2   **Q.**   I think we have, in your slide show, the summary page,

3   which is page 29, if we could see that, which is Hernandez

4   477-0029.  It should be the next one after that.  If we could

5   enlarge this area.

6           While we're waiting, tell the Judge what this page of

7   your estimate sets forth.

8   **A.**   After all of the items are inputted into the computer, it

9   produces a subtotal of the line items, and then it applies

10  material and equipment sales tax, and then it applies an

11  industry standard overhead and profit percentage of 10 and

12  10 percent:  10 percent overhead and 10 percent profit.  But

13  that is not the entire picture of the profit and overhead.

14          There are also items inclusive within unit cost that

15  cover for either soft or hard costs directly for that project.

16  And then the price percentage for the permitting is added.  The

17  total of the entire estimate is produced at the bottom.

18  **Q.**   So the total cost estimate to complete the proposed

19  remediation work at the Hernandez home is, in your view,

20  $200,218.09; is that correct?

21  **A.**   Yes, sir.

22          **MR. MEUNIER:**  I think there were two other pages

23  after this; one of which, Your Honor, we already looked at, I

24  think, when counsel for Knauf was questioning a witness, and

25  we'll show those.  This is recap by room, which we should mark

1  as Hernandez 477-0030.

2  **BY MR. MEUNIER:**

3  **Q.**   Tell the Judge what the recap by room is, Mr. Mallet.

4  **A.**   One of the breakdowns we're able to look at is the cost on

5  a room-by-room basis in our review of the data.

6  **Q.**   And the next and final page --

7          **THE COURT:**  The percent there is the percentage per

8  square footage --

9          **MR. MEUNIER:**  The right-hand column --

10         **THE COURT:**  -- that the room is?

11         **THE WITNESS:**  Yes, sir.  That's the percentage of the

12  estimate for that particular room.

13         **THE COURT:**  Okay.

14         **THE WITNESS:**  For instance, the master bedroom,

15  $11,000 is 7.2 percent of the estimate.

16         **THE COURT:**  I got it.

17  **BY MR. MEUNIER:**

18  **Q.**   All right, sir.  Let's look at the final page of your cost

19  estimate we're going to see here, which is Hernandez 477-0031,

20  and this is recap by category.  What does that mean?

21  **A.**   Correct.  Then here we can look at the cost by category:

22  Cabinetry, cleaning, demolition, drywall, and so forth.  It's

23  an accumulation of costs for each one of these functions.

24  **Q.**   Mr. Mallet, you mentioned profit, and I believe you have

25  in your slides a couple of narrative slides here now to take

DAILY COPY

1   the Judge through your explanation of what is meant in the

2   construction business, in your business, by gross profit.

3   Would you please explain.

4   **A.**   Yes.   There's basically four areas that make up the cost

5   of producing our construction projects, or any construction

6   project.   One is the direct job cost; how much does the labor

7   cost us directly, and how much does the material cost us

8   directly.

9        Then on top of that, we have a burden of workers'

10  comp, liability, unemployment insurance, federal and state, and

11  any other type of health benefits, vacation benefits that is

12  applied to the overall cost and added to the hard cost of the

13  employee's wages.

14       From there, the general overhead of the company is

15  applied to the estimate to cover home-office overhead, other

16  insurances such as liability that is not directly job related,

17  cost of fuel, vehicles, and so forth, tools that are not

18  directly related to the project, and then, of course, the

19  markup, the contractor's profit.

20       It's what keeps us in business and what keeps us

21  available to our clients in case there's issues that arise

22  after the project is finished, to be able to go back and

23  address warranty issues, especially if a subcontractor or a

24  supplier does not come back and take care of the issue if it's

25  his responsibility or liability.   So we have to have enough

450

1  markup in every project to be able to continually serve our
2  customers year after year after year.
3  **Q.**   You heard Mr. Ray Phillips' testimony in this court about
4  a 15 percent profit number if you were going to convert builder
5  costs to owner costs.  How does that compare to the profit
6  percentages that you are discussing here?
7  **A.**   Well, the builder profit, first of all, wasn't identified
8  as to whether it was gross or net, and I'm not sure.  It could
9  be either.  15 percent would be out of the general realm of
10 markup or profit that general contractors traditionally make,
11 and it is too low to cover all of the general contractor's
12 overhead.
13          Traditionally, a company producing about $1 million
14 of work a year will have an overhead amount of about
15 40 percent, or $400,000, on $1 million of work production.  So
16 while there may be a separate line item broken out for some
17 sort of a markup, or an overhead markup, there still has to be
18 within the various units within that estimate to take care of
19 the direct costs for that project.
20 **Q.**   Let's go to the next slide.  You talk about the item of
21 burden.  I think you mentioned this.  What you mean by *burden*
22 is what?
23 **A.**   Things such as taxes applied, unemployment taxes,
24 insurances, vacation pay, holiday pay, vehicle allowances, any
25 indirect cost of having employees work and giving benefits to

1  those employees to retain them.

2  **Q.**   That's built into the gross profit that you'll charge a

3  family for a restoration job like this?

4  **A.**   Correct, or any project.

5  **Q.**   What's the next component, job cost?

6  **A.**   Yes, the job cost.  We talked about it earlier.  It's the

7  direct cost of employee labor, the materials, the

8  subcontractors, the fees, disposal, and anything necessary to

9  physically produce or reproduce that job.

10  **Q.**   Then, finally, you have a slide here on overhead.

11  **A.**   The overhead is, again, the indirect cost that's applied

12  to every -- every company has.  Whether it's a telephone, an

13  insurance, rent, lights, water, they have an overhead to apply

14  to their operation.

15  **Q.**   Now, Mr. Mallet, did you see the cost estimates received

16  from the Knauf expert in this litigation, Mr. Carubba?

17  **A.**   Yes, sir.

18  **Q.**   Did you also see the cost estimate furnished, I believe,

19  through Mr. Carubba from a company called Benchmark Custom

20  Builders?

21  **A.**   Yes, sir.

22  **Q.**   Did you prepare a table of comparison showing by different

23  category and by total the differences between your cost

24  estimation and that of both Carubba and Benchmark Custom

25  Builders?

1   A.   Yes, sir, I did.

2   Q.   If we look at the next slide, please, which is Hernandez

3   557-0001, the first series of numbers on the left, the columns

4   on the left, would be your estimates for First General

5   Services?

6   A.   Yes, sir.

7   Q.   The middle columns would be Carubba?  That's the

8   defendant's, Knauf's construction expert?

9   A.   Yes, sir.

10   Q.   The third set of columns is Benchmark Custom Builders,

11   which is also being submitted in this case on behalf of Knauf;

12   true?

13   A.   Yes, sir.  That's my understanding.

14          MR. MEUNIER:  This is going to be in evidence.  This

15   is a three-page document, Your Honor, which I would just like

16   to point out a couple things on with the witness, and then

17   conclude.

18   BY MR. MEUNIER:

19   Q.   Let's just look first at demolition, which is the very

20   first entry, if we could enlarge that.  Your demolition total

21   cost is $12,626.71; correct?

22   A.   Yes, sir, that's correct.

23   Q.   Mr. Carubba's, if we go to the right, is $6,300?

24   A.   Yes, sir.

25   Q.   If we go further to the right, the Benchmark Homes number

1  is $5,300?
2  **A.**   Yes, sir.  $5,003.
3  **Q.**   $5,003.  I'm sorry.
4         What is your analysis about the difference in those
5  numbers?
6  **A.**   Well, if we take the standard labor costs as identified in
7  Xactimate as the labor rates for the Mandeville area and apply
8  those to a similar crew as was used in the Knauf house and
9  apply those to the charges here, our figure is -- to have all
10  of the demolition taken care of would take approximately
11  six-and-a-half days of work.
12         Now, that includes us walking in cold into this
13  house.  Only the furniture is removed.  We have to begin
14  removing cabinetry, flooring, light fixtures, plumbing
15  fixtures, tile on the walls, showers, whirlpools, shutters, and
16  package those shutters for storage, all of the base trim, shoe
17  molding, crown molding, so forth, granites, taking all of that
18  out of the house and disposing of it properly.  It's
19  time-consuming.
20         Even with a large crew, you're walking into a
21  building with having to set up scaffolding, set up ladders,
22  taking tools out, and there's a loss of time in the demolition.
23  Depending on the time of the year, the loss of time on a
24  project, by the OSHA standards that we work by, especially in
25  buildings without air conditioning, the hotter it gets, the

1   less time our people can stay in those buildings working on a

2   continuous basis without giving them breaks for rest and

3   drinks.  So there's a lot more than just walking into the

4   building to start taking Sheetrock out and throwing it into a

5   dumpster.

6   **Q.**   Knowing what you know, based on your experience, do you

7   think it is reasonable to expect that Mr. and Mrs. Hernandez

8   could accomplish the needed demolition in this case for either

9   $5,003 or $6,300 as proposed by Knauf?

10  **A.**   Not based on the average cost of and the time factors that

11  are assembled by Xactimate.

12  **Q.**   Let's look at cleanup, which is the third item down.  I'm

13  sorry.  I meant the one above that.

14         You have cleanup postdemolition, joists, studs,

15  walls, shutters, and the Xactimate number or the number that

16  you propose is $4,593.85?

17  **A.**   Yes, sir.

18  **Q.**   The numbers proposed by Mr. Carubba and then Benchmark is

19  either $2,800 or $2,400?

20  **A.**   Yes, sir.

21  **Q.**   Please reflect for us the difference in those numbers to

22  do the cleanup needed postdemolition.

23  **A.**   The cleanup entails the ceiling joists, the studs, plates,

24  the plywood floors that are left, or the ceramic floors that

25  are left in place, a thorough clean-down of all of those areas.

1    We have just over 2,000 square feet of area, about 2,200 square

2    feet of area that has to be addressed in the cleaning.  The

3    cleanup is just quite time-consuming.

4    **Q.**    You have a separate line item in your comparison table for

5    dehumidifiers, HEPA-vacuuming, negative air fans, and PPE for

6    cleanup.  What is PPE?

7    **A.**    Personal protection equipment.

8    **Q.**    Your proposal is that this item will cost $16,209.75.  You

9    did not see any numbers for this from the Carubba or Benchmark

10   Homes submission?

11   **A.**    No, sir, I did not.

12   **Q.**    We saw some cleanup numbers from the earlier line we

13   looked at.  Assume that they are going to say they can do all

14   the vacuuming and everything for those cleanup numbers of

15   $2,800 or $2,400.  Do you think that's possible?

16   **A.**    Not based on my knowledge of restoration cleaning.

17   **Q.**    What about HEPA-vacuuming?  We've heard reference to

18   Shop-Vac and special filters for Shop-Vac.  What is your

19   proposal on the use of HEPA-vacuuming?

20   **A.**    I have seen a number of protocols or data in reviewing our

21   initial preparation of a protocol, long before we became

22   involved in the Hernandez house, and the use of HEPA-vacuuming,

23   which is high-efficiency particulate filters that will capture

24   dust and mold particles down to 4 microns in diameter.

25   Basically, that's what we're looking at with the drywall

1    demolition, is very fine particulate that we need to remove

2    from surfaces and from the air.

3    **Q.**   Let's drop down to the bottom of the first page, which is

4    painting walls and ceilings.  Your proposal for painting walls

5    and ceilings is $10,085.82, which is roughly twice what the

6    painting proposal is from Carubba, $5,088, or Benchmark Custom,

7    $4,240.  How do you explain that?

8    **A.**   The unit cost price I used, using even other sources other

9    than Xactimate, such as RSMeans, that's the application of one

10   coat of paint on all of the new Sheetrock, trim work, and all

11   the new materials in the house.  That is not impossible, but

12   that's not the proper method of painting.

13             Typically, we'll have a first coat of primer paint so

14   that the finish coats can adhere to that primer, and then two

15   top coats of finish paint on walls, ceilings, door trims,

16   baseboards, shoe moldings, crown moldings, cabinetry, so forth.

17   **Q.**   Is that normally the layer of paint you get when you get a

18   new-home construction?

19   **A.**   That is the typical application, yes.

20   **Q.**   To put this family back where they were with respect to

21   painting, you propose the same number of coats?

22   **A.**   That is correct.

23   **Q.**   Let's look at the next page, and let's go to the carpet,

24   which is this item here.  For carpet, you measured 684 square

25   feet of carpet; correct?

457

1    **A.**    Yes, sir.   The actual room size is 525.57 between the

2    master bedroom, the master closet, and the two children's rooms

3    and closets.

4    **Q.**    To replace all that carpet, you have a cost of $2,338.40?

5    **A.**    Yes, sir.

6    **Q.**    What were the costs and amount of carpeting that you saw

7    in the proposals from Carubba and Benchmark?

8    **A.**    In Benchmark was $1,076, and Mr. Carubba had $820.75.

9    **Q.**    These measurements of 245 square feet in the case of

10   Carubba and 28 square yards in the case of Benchmark, how does

11   that compare to the amount of carpet that you measured?

12   **A.**    That amount of carpet in the other two estimates is

13   basically in the two children's bedrooms and omits the master

14   bedroom, the master closet area, as far as a rough overview of

15   the difference of carpeting.

16   **Q.**    So you don't believe the other bids measured all the

17   carpeting?

18   **A.**    They don't include it.   Whether they measured it or not, I

19   don't know, but it couldn't include it.

20   **Q.**    Let's go to granite countertops, which is this item.

21   There's an agreement that granite countertops have to be

22   replaced.   You measured the square footage to be 55.46 square

23   feet for a replacement cost of $4,599.85; correct?

24   **A.**    Yes, sir.

25   **Q.**    Now, in the original bid from Mr. Carubba, he proposed

1    that he would replace 20 square feet of granite countertop as
2    opposed to 55.46; correct?
3    A.    Yes, sir.
4    Q.    Then last night about 11:00 p.m., we got a new number,
5    didn't we?
6    A.    Yes, sir.
7    Q.    What is the new square footage number?
8    A.    40 square feet of granite.
9    Q.    Is he still short?
10   A.    Yes, sir, still about a third short.
11   Q.    Did you measure not just the countertop but the backsplash
12   as well?
13   A.    And the snack bar top, yes, sir.
14   Q.    Then the bid from whoever at Benchmark Custom is still
15   apparently 20 square feet as opposed to your 55.46; correct?
16   A.    Yes, sir.  Right.
17              Also, the differences in cost.  We took the average
18   cost of granite that ranges from around $55 or $60 a square
19   foot on the low end to around $125 or so a square foot on the
20   high end.  We took what the system says is the average cost of
21   granite at $80 a square foot versus the $65 on the very low end
22   of the granite cost and thicknesses.
23   Q.    Are you endeavoring to match the quality of the countertop
24   that's in the Hernandez home today?
25   A.    Yes, sir.

1    Q.   The final item I'll look at with you, Mr. Mallet, before

2    we finish is the electrical, which is on the last page,

3    Hernandez 557-0003.  You have a proposed bid of $15,192 to

4    remove and replace all the wiring in the house?

5    A.   Yes, sir.  In addition to switches, fixtures, the

6    lighting, the low voltage alarm system, and the bus bar and

7    breakers in the main distribution panel.

8    Q.   That was based upon Xactimate numbers?

9    A.   Yes, sir, it is.

10   Q.   Standardized but adjusted to this community in Mandeville?

11   A.   Yes, sir.

12   Q.   The Carubba number for the proposed electrical remediation

13   work in this case is -- well, it was until 11:00 last night

14   $2,200; correct?

15   A.   Yes, sir.

16   Q.   It changed, didn't it?

17   A.   Yes, sir.

18   Q.   What does Mr. Carubba come up to now?

19   A.   $3,400.

20   Q.   $3,400.  Do you know why he changed?

21   A.   No, sir.

22   Q.   Do you have any idea?

23   A.   No, sir.  I don't know what's even inclusive in any one of

24   these prices to begin with, so I don't know what they changed

25   it to or what reason.

DAILY COPY

460

1   **Q.**   You've not seen any Xactimate-type detailing on their
2   calculations?
3   **A.**   No detailing, whether it's hand calculations for labor and
4   materials or anything of that nature.
5   **Q.**   Now, the Benchmark Custom folks, they're at $1,597 for
6   this, and they've stayed there apparently; correct?
7   **A.**   Yes, sir.  That appears just to address -- at the 139
8   each, that's the number of electrical outlets and switches and
9   light openings in the house.
10  **Q.**   Now, you told the Judge earlier that one of your four C's
11  for the proposal to remove and replace all of the electrical
12  wiring was cost?
13  **A.**   Yes, sir.
14  **Q.**   And yet you're going to ask Mr. and Mrs. Hernandez to
15  spend $15,192.02 to perform electrical remediation, whereas
16  Mr. Carubba is only going to charge them $3,400 to keep the
17  wiring in place and do this splicing.  Do you think, first of
18  all, that it's realistic for a contractor in this house to
19  accomplish a splicing job such as Knauf has described for
20  $3,400?
21  **A.**   No, sir.
22          **MR. HAYDEN:**  Objection:  Argumentative.
23          **THE COURT:**  He has answered it.  Let's move on.
24  BY MR. MEUNIER:
25  **Q.**   Do you think that's a realistic number?

1    **A.**    No, sir.

2    **Q.**    Why not?

3    **A.**    Because of the work that has to be effected and that I

4    described earlier and the type of splicing and inspection that

5    would have to be done by an engineer or some inspector

6    approving that work as it went.

7    **Q.**    How about the Benchmark number of $1,597?  Do you think

8    that's realistic to accomplish that work?

9    **A.**    Just off the top, it appears not to address removal and

10   replacement of any light fixtures, of any contacts on doors and

11   windows for the alarm system.  Even if they're not changing

12   that, it's still going to have to be attached and reset when

13   you take the Sheetrock or the door jambs and casings off.  And

14   it's just a number of items within the electrical that doesn't

15   appear to have been addressed other than the switches and

16   receptacles.

17   **Q.**    Finally, Mr. Mallet, do you believe that your proposal of

18   $200,218.09 in today's market will accomplish the proper and

19   complete Chinese drywall remediation of the home of Mr. and

20   Mrs. Hernandez?

21   **A.**    That should put them back whole, as though the Chinese

22   drywall had not been installed in the home.

23          **MR. MEUNIER:**  Thank you, sir.

24          **THE COURT:**  We'll stop here for 15 minutes.  Court

25   will stand in recess.

462

```
 1              THE DEPUTY CLERK:  Everyone rise.
 2              (WHEREUPON the Court took a brief recess.)
 3              THE DEPUTY CLERK:  Everyone rise.
 4              THE COURT:  Be seated, please.
 5                   You are still under oath, sir.
 6                   You may cross-examine, Counsel.
 7                        CROSS-EXAMINATION
 8    BY MR. HAYDEN:
 9    Q.   Thank you, Your Honor.  Good afternoon, Mr. Mallet.  How
10    are you today?
11    A.   Fine.  Thank you.
12    Q.   Sir, would it be fair to say you've never previously
13    repaired Chinese drywall in a home?
14    A.   Repaired, yes, correct.
15    Q.   That is correct?
16    A.   Yes, that's correct.
17    Q.   Have you ever repaired a home in St. Tammany Parish?
18    A.   Oh, yes.
19    Q.   When was the last time you did so?
20    A.   Katrina.
21    Q.   Back at the time of Katrina.  Since Katrina, have you done
22    any renovation work in St. Tammany Parish?
23    A.   No, sir.
24    Q.   But you've been in the general contracting business for a
25    number of years; almost 30 years, I believe you testified?
```

DAILY COPY

1   **A.**   36.

2   **Q.**   Would you agree that it's not unusual in the Louisiana

3   environment to have some tarnishing on copper, given oxidation

4   and the like?

5   **A.**   Copper naturally oxidizes, but not in the manner that we

6   see it in the Hernandez house.

7   **Q.**   So you've seen oxidation of metals here in Louisiana prior

8   to first going into your first Chinese drywall home; correct?

9   **A.**   Yes.  I see oxidation regularly.

10  **Q.**   So it's not unusual to see some copper oxidation, some

11  type of material on copper pipes; right?

12  **A.**   That's correct.  Typical oxidation will look green and

13  brown on copper.

14  **Q.**   When you went into your first Chinese drywall home in the

15  fall of last year, the material that you saw on the copper was

16  black, not brown or green; right?

17  **A.**   That's correct.

18  **Q.**   So it was a little different, but it was a tarnishing of

19  some sort; correct?

20  **A.**   Yes.  More of almost like a soot material that comes off

21  on your hands real easily, as opposed to the tarnishing or the

22  oxidation normally seen on copper.

23  **Q.**   The oxidation or tarnishing that you normally see is sort

24  of like a -- can be like a rusty material?

25  **A.**   No.  It's more in the -- it's almost more in the finish --

1    color of the finish that it turns versus what we've seen in the

2    Chinese drywall houses, that it's more like a soot that's

3    attached to the copper membrane.

4    **Q.**    Right.  Where with the normal copper oxidation, it's

5    almost like -- some people call it a patina?

6    **A.**    Patina.

7    **Q.**    Sometimes you have copper roofs and they put the patina on

8    it so it turns a greenish color?

9    **A.**    The patina is a natural reaction to atmospheric

10   conditions.  It's not applied to the copper.

11   **Q.**    In the Chinese drywall homes, what you're finding, you're

12   saying, is like soot that comes off in your hand easily;

13   correct?

14   **A.**    Yes, sir.

15   **Q.**    That's what you saw in the first Chinese drywall home that

16   you went to sometime in the fall of last year.  I believe it

17   was the Blue residence.

18   **A.**    Yes, sir.

19   **Q.**    That was in the Lakeside neighborhood?

20   **A.**    Yes, sir.  Lakeview maybe.

21   **Q.**    Lakeview neighborhood?

22   **A.**    Lakeview, yes, sir.

23   **Q.**    I'm not familiar to the geography around here.  Was that

24   the only Chinese drywall home that you'd been into before you

25   went to the Hernandez home in February of this year?

1  **A.**    Yes, that's the first that I physically encountered.

2  **Q.**    That's the only home, Chinese drywall home, that you were

3  in before you were in the Hernandez home; correct?

4  **A.**    That's correct, but it's not the only information that

5  I've gathered prior to going into that home.

6  **Q.**    Sure.  I believe you testified that you did some research

7  on the Internet and you looked into it, as you would a

8  developer, because you were concerned that homes that you may

9  have built might have Chinese drywall in it; correct?

10  **A.**    Also from the consulting end.  I figured it was just

11  inevitable.  For instance, when the situations with exterior

12  buildings came about, we began doing research into that.  When

13  the PEX piping conditions began to occur in homes, we began

14  doing research into that so we could be prepared for when our

15  clients called.

16  **Q.**    So that you could provide them with expert consulting work

17  in the event that there was litigation in the future; correct?

18  **A.**    Not necessarily litigation but just insurance claims.

19  **Q.**    In the event there were insurance claims, you could go and

20  investigate those claims for insurance companies; correct?

21  **A.**    Correct, and give the adequate information to our clients.

22  **Q.**    Actually, you were a speaker in November of last year in

23  Las Vegas on the Chinese drywall issue to a group of insurance

24  investigators; correct?

25  **A.**    Investigative engineers, yes, sir.

1   **Q.**   Now, is it your standard practice and procedure, as a
2   general contractor here in Louisiana, when removing drywall to
3   vacuum and to do a wet wipe-down?
4   **A.**   It depends on the conditions and what the circumstances
5   are.  If it's strictly a remodeling job, we may not do the
6   wipe-down.  More than likely, we'll do the HEPA-vacuuming.
7   Certainly, if it's a mold remediation or a fire restoration
8   job, then both of those functions will occur.
9   **Q.**   Just so I understand it, with your normal renovation,
10  would you leave drywall dust and drywall remnants in the
11  cavities of the property?
12  **A.**   No, we will not because it will typically show up under
13  some either wind event or negative air event that occurs in the
14  house.  It will find its way under the baseboards or shoe
15  molding into the interior portions of the house.
16  **Q.**   The concern you have there is, with additional dust, fine
17  dust like that, it would get in the air and could cause
18  problems with allergies and other problems for the people that
19  live there?
20  **A.**   Just that and general cleaning problems and aggravated
21  clients.
22  **Q.**   I believe you testified that before you did your cost
23  proposal that you were out on the Hernandez site on two
24  occasions, on January 8 and January 17; is that right?
25  **A.**   I think those are the correct dates.

467

```
 1    Q.    On January 8, you went out and talked to Mr. and
 2    Mrs. Hernandez and some of the attorneys?
 3    A.    Yes, sir.
 4    Q.    Then the next time that you went out to the site on
 5    January 17 that you went out with a friend, and essentially
 6    what you did was you measured each of the rooms for purposes of
 7    determining your scope of work?
 8    A.    Well, it assisted me in that I measured and then wrote
 9    down the details of each of the items in the room that I would
10    have to address in the removal and replacement of the
11    Sheetrock.
12              MR. HAYDEN:  Could I get the overhead.
13    BY MR. HAYDEN:
14    Q.    Sir, I'm showing you what is an exhibit from your
15    deposition.  Do you recall these notes?  Are these your
16    handwritten notes from January 17 of this year?
17    A.    Yes, sir, they are.
18    Q.    This is the first page of five pages of notes.  If we'll
19    just look at this first page, is this how you would write down
20    your scope of work for purposes of your cost estimation?
21    A.    That would be my scope, yes.
22    Q.    "R&R" means remove and replace; is that right?
23    A.    Yes, sir.
24    Q.    Then "R & Reset" is to remove and reset?
25    A.    Yes, sir.
```

1   **Q.**   This was your original scope of work; you just handwrote

2   what you felt needed to be done in each of the rooms?

3   **A.**   Yes, sir.

4   **Q.**   Then you also took some measurements for each of the

5   rooms; is that right?

6   **A.**   Yes, sir.

7   **Q.**   You had a friend of yours that was with you that was

8   assisting you in that regard?

9   **A.**   Taking some measurements, yes.

10  **Q.**   That took approximately the whole day just to collect

11  those measurements?

12  **A.**   Yes, sir.

13  **Q.**   Would it be fair to say that after you collected those

14  measurements and that site visit, you were able to take that

15  information and give it to your sister, Charlene?

16  **A.**   Yes, sir.

17  **Q.**   And then she inputted it into the computer for you;

18  correct?

19  **A.**   Yes, sir.

20  **Q.**   And that's when Xactimate does its work; correct?

21  **A.**   Yes, sir.

22  **Q.**   Essentially, you put in the measurements of the room and

23  whether you're replacing the different components of the room

24  and the activities that you're undertaking with regard to each

25  room, and then the computer spits out numbers for each of those

DAILY COPY

1  assigned activities or pieces of material?

2  A.   Yes, sir.

3  Q.   That's how we ended up with your first cost estimate; is

4  that right?

5  A.   Yes, sir.

6  Q.   That was the cost estimate that was provided to us with

7  your report on or about February 12 of this year; is that

8  right?

9  A.   Yes, sir.

10  Q.   Then there were some changes to your report after

11  February 12 of this year, weren't there?

12  A.   Yes, sir.

13  Q.   Now, those were provided to me shortly before your

14  deposition, I believe, on March 9 of this year; is that right?

15  A.   Yes, sir.

16  Q.   You made changes to your cost estimate, just like

17  Mr. Carubba made some changes to his cost estimate, because you

18  noticed some things had to be changed after you reviewed your

19  report and cost estimate; correct?

20  A.   I think the main item was adding the garage to the

21  estimate.

22  Q.   Okay.  And that resulted in you having to go back out to

23  the house on or about February 25; is that right?

24  A.   Yes, sir.  It was the same day we observed the control

25  house, whatever date that was.

1    **Q.**    So your first report that you provided to us, the first

2    cost estimate, did not include the garage, did it?

3    **A.**    That's correct.

4    **Q.**    And then you made some changes and you provided us with a

5    new report?

6    **A.**    Yes, sir.

7    **Q.**    Sir, in your report, you included appliances in your cost

8    estimate.  Do you recall that?

9    **A.**    Yes, sir.

10   **Q.**    Doesn't Mr. Maloney include a cost for the appliances in

11   his report that's been provided to the Court?

12   **A.**    As an appraisal, yes, sir.

13   **Q.**    So if the Court were to include Mr. Maloney's cost for the

14   appliances and your cost for the appliances, then there'd be

15   some double-dipping; correct?

16   **A.**    That's correct.

17   **Q.**    For purposes of the Court understanding, the Court should

18   not include both your appliance line item and the numbers that

19   are provided by Mr. Maloney with regard to the appliances in

20   the home; correct?

21   **A.**    To the extent that that appraisal was for cost estimating

22   of contents, we only dealt with the appliances, so I'm not sure

23   what the rest of the report is involving.  If the Court is

24   taking both my estimate and Mr. Maloney's estimate into

25   consideration of the costs, then, yes, the appliances would be

471

1  in both reports.

2  **Q.**   Originally, you had some other numbers for appliances, but

3  I believe that you changed your report to reflect the appliance

4  numbers that are set forth in the Maloney report; is that

5  right?

6  **A.**   Yes, sir.  They were slightly different.  Because the

7  Maloney report was being offered and the numbers were close, we

8  just matched his numbers.

9  **Q.**   In your report, you indicate that all the appliances

10  should be replaced, and you give a cost estimate for that.

11  **A.**   Yes, sir.

12  **Q.**   That's not because the appliances were failing; correct?

13  **A.**   Well, that's partly true, partly not true.

14  **Q.**   Did anyone indicate that any of the kitchen appliances

15  were failing?

16  **A.**   Yes, sir.

17  **Q.**   Who indicated that?

18  **A.**   I didn't recall this at the time of my deposition, but

19  Mr. Hernandez told us that the refrigerator that was originally

20  in the house was replaced.  And then we had guys go over and

21  take the microwave and stove hood, ventilation hood, out

22  because they were malfunctioning.  A television set and -- I

23  guess it's called a small appliance, the toaster, had to be

24  sent off for examination.

25  **Q.**   I guess I wasn't clear.  With regard to major appliances,

1   the kitchen appliances --

2   **A.**   Yes, sir.

3   **Q.**   -- at the time of your cost estimate, all of the kitchen

4   appliances in the Hernandez home were operating; correct?

5   **A.**   I don't remember if we took those, microwave and hood

6   vent, out before or after the report.

7   **Q.**   So you don't know, as you sit here today, of any failed

8   appliances that are included in your report?

9   **A.**   Well, the microwave and hood vent.

10  **Q.**   When were those reported malfunctioning?

11  **A.**   I don't know when they were reported.  We were just asked

12  to go in and take those apart and send them off to -- I don't

13  know if it was a corrosion specialist or some other company.

14  **Q.**   Other than taking them apart and sending them to someone,

15  you didn't do any failure analysis with regard to those

16  appliances; right?

17  **A.**   No, we did not.

18  **Q.**   Is it true that prior to this litigation, you did not do a

19  scope of work for the repair of a Chinese drywall house?

20  **A.**   That is not quite accurate.  Scope of repairs?  In the

21  Blue house, we gave a verbal report to Mr. Lambert and his

22  client regarding what items we thought needed to be replaced,

23  or we recommended replacing, and the issues on additional

24  cleaning.

25  **Q.**   You did not provide a written scope of work to Mr. Lambert

DAILY COPY

1   or his clients, did you?

2   **A.**   No.  It was verbal.

3   **Q.**   Actually, hadn't the demolition of that house already

4   occurred by the time you got involved?

5   **A.**   The Sheetrock and cabinets and trim were out, but not the

6   mechanical systems, not the electrical systems, and not the

7   doors.

8   **Q.**   You were not asked to move forward with any formal written

9   scope of work in that matter, were you?

10  **A.**   No, we were not.  I think the homeowner was performing the

11  work himself, and the attorneys needed to know what additional

12  actions needed to occur.

13  **Q.**   Sir, you're not an electrician; correct?

14  **A.**   No, I am not a licensed electrician.

15  **Q.**   You're not an electrical engineer; correct?

16  **A.**   I'm not.  However, I employ electricians and electrical

17  engineers on a regular basis to work with me.

18  **Q.**   And a Mr. Hicks that's been referenced, he's not employed

19  by you, is he?

20  **A.**   He is not, but he works for me on an ongoing basis.

21  **Q.**   He's an independent contractor?

22  **A.**   He is.

23  **Q.**   He was not retained in this matter until on or about

24  February 25; isn't that right?

25  **A.**   Yes, that's correct, in the *Hernandez* matter.  However, he

1    had been working with me developing the protocol for Chinese
2    drywall and had inspected the Blue project with me also.
3    **Q.**   With regard to the Hernandez matter, he was not retained
4    until on or about February 25; correct?
5    **A.**   I think that's correct.
6    **Q.**   He gave a report on March 5?
7    **A.**   Correct.
8    **Q.**   So that was after your report of February 12; correct?
9    **A.**   That's correct.
10   **Q.**   That's after you provided counsel and Knauf/KPT with your
11   report and scope of work here; correct?
12   **A.**   That's correct.
13   **Q.**   And that's after you gave your cost estimate here;
14   correct?
15   **A.**   That's correct.
16   **Q.**   He was only brought in after an electrician had harvested
17   certain switches from the Hernandez house on or about
18   February 25; correct?
19   **A.**   That's correct.
20   **Q.**   Sir, you testified about going to the drywall demolition
21   that occurred at a townhouse in Mandeville on or about
22   February 25?
23   **A.**   Yes, sir.
24   **Q.**   You indicated that you had certain observations, and we
25   looked at certain pictures from that event.  Do you recall that

1   from Mr. Meunier's direct?

2   **A.**   Yes, sir.

3   **Q.**   You didn't attend the second day of that event, did you?

4   **A.**   No, sir.  It was my understanding the only thing they were

5   going to do on the second day was remove the carpeting, so I

6   didn't think it was necessary for me to watch them remove

7   carpeting, but obviously there was much more work done after

8   that.

9   **Q.**   You didn't see the cleanup after they were done removing

10   the drywall, did you?

11   **A.**   No, sir.

12   **Q.**   You don't know if it would have met, I think as you call

13   it, the white-glove test that you wanted to see in the Blue

14   house; is that correct?

15   **A.**   I have no idea what the condition was.

16   **Q.**   So, as you sit here today, you can't say one way or

17   another whether there were still drywall particles in the

18   Mandeville townhouse room that had been demolished after they

19   were done?

20   **A.**   No, sir.  Neither have I seen a report that gave clearance

21   to the work that was performed, whether it was cleaned

22   adequately, and whether anybody would sign off -- any

23   environmental engineer or environmental hygienist would sign

24   off on the cleaning of that project.

25   **Q.**   Just so the Court understands, the day you were there,

1   where they took the drywall down, there were approximately nine
2   people at the event in this 12-by-12-foot room; correct?
3   **A.**   It was 14-by-16 and there were people in and out of the
4   room, as we mentioned in my report, a few attorneys who were
5   sort of not necessary, but --
6   **Q.**   We like to think we're necessary.
7   **A.**   Not in a construction situation.  They were in the way.
8           **THE COURT:**  They get in the way.
9           **THE WITNESS:**  They're in the way, sir.
10  **BY MR. HAYDEN:**
11  **Q.**   Would it be fair to say that the lawyers got in the way
12  for the workmen that day, as they always do?
13  **A.**   Well, in all joking aside, there were a number of people
14  in the room, and there's no doubt that there was some
15  interference or slowing of the work that was performed.
16  **Q.**   Part of your scope of work requires that there be
17  HEPA-vacuuming and a wet wipe-down after the drywall demolition
18  in the Hernandez house; correct?
19  **A.**   Yes, sir.
20  **Q.**   That's based upon what others have told you about the
21  possibilities with regard to the dust particles from Chinese
22  drywall; correct?
23  **A.**   Actually, it's based upon the absence of information
24  telling me that there is a specific quantity of drywall dust
25  that can be left in the home and not be problematic.

1    **Q.**    You were here earlier today when Mr. Bailey testified,
2    weren't you?
3    **A.**    Yes, sir.
4    **Q.**    Mr. Bailey said he couldn't quantify the amount of drywall
5    dust that would cause problems with regard to odor or sulfur
6    emissions; correct?
7    **A.**    That's correct.
8    **Q.**    No one who's testified, that you've heard from, has
9    indicated that a small amount of drywall dust is sufficient to
10   cause odors and continued problems with corrosion?
11   **A.**    That's correct.  Actually, I've not heard from or read any
12   reports or testimony from anybody that's given any indication
13   about how much drywall dust left in a house would be
14   acceptable.
15   **Q.**    You haven't heard one way or another?
16   **A.**    That's correct.  So in the absence of any direct
17   information, we have to remediate the house in a manner that
18   gives us the most assurance that we are removing the
19   contaminants within the house so that we don't have problems
20   with that project and the homeowners don't have problems with
21   that project.
22   **Q.**    Just so I understand, you used an Xactimate software to
23   determine the cost estimate?
24   **A.**    That was the basis for our cost.  It wasn't entirely used,
25   but it is by far the majority of the items in the costing.

1   **Q.**   Would you say that 99 percent of your cost estimate is

2   determined by Xactimate?

3   **A.**   Probably.

4   **Q.**   What that involves is you taking the measurements that you

5   did on or about January 17 and inputting that into the computer

6   software, and the computer software spits out some cost

7   estimates; correct?

8   **A.**   That's correct, but that's not where it stops.  Then the

9   estimate and my notes are sent back to me with my photographs,

10   and then I review the scope in its entirety, both scope,

11   quantity, and unit cost price, to see if there's, one, a

12   misapplication of a code because they misunderstood what I was

13   writing, or if a code was just inaccurately inputted.

14          And because there's no cost system that can possibly

15   contain the hundreds of thousands of components and work

16   actions that are involved in all of the incredibly wide variety

17   of projects that we work on, we utilize more than one cost

18   system, and sometimes we just have to go out and get with our

19   people and put together a unit cost price on something.

20   **Q.**   If I could ask you to look at Plaintiffs' Exhibit 477, and

21   if we could go back to the first page.  This is a summary

22   sheet.

23          **MR. HAYDEN:**  If I could go back to the first page.

24   Highlight that.

25          **THE COURT:**  Do you want some water?

1          **THE WITNESS:**  Thank you.

2    **BY MR. HAYDEN:**

3    **Q.**   Is this the first page of your cost estimate?

4    **A.**   Yes, sir, it is.

5    **Q.**   It indicates that the date assigned -- do you see that?

6    Was that the date that you were engaged?

7    **A.**   On or about, yes, sir.  It would have been the date we

8    filled out the data sheet on the project.

9    **Q.**   The date entered, is that the date that the information

10   was entered in the computer?

11   **A.**   Yes, sir.

12   **Q.**   The operator, Charlene, that's your sister?

13   **A.**   Yes, sir.  She taught me how to turn my computer off and

14   on.

15   **Q.**   And the price list, it looks like what appears to be a

16   computer format.  Is that the Xactimate software that's used?

17   **A.**   Yes, sir.  "LA" represents Louisiana; "MA" represents

18   Mandeville; "5" is the version of the software; "B" represents

19   both contents and building materials; and "January 10" is the

20   year and date of the last revision of the price sheet, of the

21   cost estimate.

22   **Q.**   Before providing this cost estimate, would you also

23   consider this document to be your scope of work?

24   **A.**   My initial scope is my written.  But, yes, that would be

25   the scope that we would follow in the project.

DAILY COPY

480

1   **Q.**   Your initial handwritten notes were from walking the site

2   and taking the measurements and indicating on handwritten notes

3   what's to be replaced or stored?

4   **A.**   Generally.  And then when I sit down with my notes,

5   photographs, and then the first version of the estimate, then

6   I'll make any changes or corrections at that time.

7   **Q.**   At the time you gave us your report of cost estimate, had

8   you looked at the Beazer scope of work?

9   **A.**   Yes, sir.  I had looked at a number of protocols earlier

10  in 2009, a number of different protocols.

11  **Q.**   Is it fair to say that your protocol is consistent with

12  the Beazer protocol?

13  **A.**   That I can remember, I think that's correct.  I think they

14  parallel.

15  **Q.**   If I could take you to the last page of your scope of work

16  and cost estimate, page 31.  Do you see that?

17  **A.**   Yes, sir.

18  **Q.**   Now, is that a recap of the total costs that you believe

19  are required to repair the Hernandez house?

20  **A.**   Yes, sir.

21          **MR. HAYDEN:**  Now, I'd ask if we could put that side

22  by side with Exhibit 48.  I'm sorry.  49.  I'm making your life

23  difficult.

24  **BY MR. HAYDEN:**

25  **Q.**   Sir, I'm showing you both your recap sheet as well as the

1   recap of the costs that were incurred by a Beazer home with

2   approximately the same square footage.  Specifically, if we

3   could look at your painting.  First, why don't we look at your

4   price to the total costs under A.

5           MR. MEUNIER:  Your Honor, could we, just for the

6   record, confirm that this is counsel's recap?  Mr. Phillips did

7   say the numbers were correctly transposed, but I think counsel

8   will agree that he did his own categorization of numbers.

9           THE COURT:  A and B?

10          MR. MEUNIER:  Not only that, Judge, the recap of the

11  numbers.  Counsel took numbers from a Beazer document, and he

12  himself added them and put them into his categories.  So I want

13  the witness to be clear that this document was not generated by

14  Beazer or by Ray Phillips.

15          THE COURT:  Do you understand that?

16          THE WITNESS:  Yes, sir.

17  BY MR. HAYDEN:

18  Q.   Given that, there's an appreciable difference between the

19  costs on the Beazer homes versus the costs that you believe it

20  will take the repair the Hernandez home; correct?

21  A.   That's correct.  I believe I went into that scenario in my

22  deposition as to part of why the differences are so far apart.

23  Q.   If you could look at their costs for painting versus your

24  costs for painting.  You have a cost of $17,000 for the

25  painting of the Hernandez home, where the Beazer indicates that

482

1   the painting of the interior would be $2,241.  Any explanation

2   for the difference between the two?

3   **A.**   My first question is:  What all is included in that price?

4   Is it just Sheetrock painting?  Is it trim?  Is it cabinetry?

5   Did they buy prefinished cabinetry?  Did they buy prefinished

6   trim?  Are the doors prefinished?  Is it textured?  Are the

7   textures similar?  How many coats of paint did they put?  Did

8   they put the general three coats of primer and two finish

9   coats?  Unless you can tell me that, I couldn't --

10  **Q.**   Sir, you --

11          **THE COURT:**  Wait, wait, wait.

12          **MR. MEUNIER:**  Your Honor, may I just interpose

13  another objection?  I can make it continuing.  But as counsel

14  knows, he is comparing cost figures that Beazer incurs, not

15  that an owner would incur.  The bid that this gentleman has

16  given is what Mr. and Mrs. Hernandez have to pay a contractor

17  to do the work.  Counsel is showing numbers that a national

18  builder spends on a project, and it's apples and oranges.  I'll

19  make that continuing.

20          **THE COURT:**  You can cover that on redirect.  I'll

21  overrule the objection.

22  **BY MR. HAYDEN:**

23  **Q.**   Is it your understanding under the Beazer protocol that

24  they are replacing cabinetry?  Correct?

25  **A.**   That's correct.  It doesn't state what type of cabinets.

DAILY COPY

1  It also doesn't state if they're prefinished or not.

2  **Q.**   Do you think that the Hernandez home is a higher quality

3  home than the Beazer homes?

4  **A.**   I don't know what it is.  I've never seen the

5  specifications on the Beazer homes.  All I can testify to is

6  what is in the Hernandez home.  The Hernandez home has

7  shop-built cabinets rather than a purchased cabinet out of,

8  say, Home Depot or Lowe's, and it has wood components rather

9  than a particle board with laminated finishes on it.

10 **Q.**   First, let's go to the Beazer summary just briefly.  If we

11 could look at the price per square foot they would charge.  Do

12 you see that?  With all costs in, their number is $51.29;

13 correct?

14 **A.**   Say it again, please.

15 **Q.**   With all costs included, their number is $51.29; correct?

16 **A.**   Yes, sir.  That's their hard costs.

17 **Q.**   Your cost per square foot would be about $100 a square

18 foot; correct?

19 **A.**   That's correct.  Because as we discussed in my deposition

20 at length, Beazer's providing and producing this at their hard

21 costs.  They're not making a profit redoing their own projects.

22 There's no soft costs, indirect or direct overhead.  There's no

23 profit.  Any of the built-in costs that we talked about

24 earlier, if you remember the screen, showed -- and I discussed

25 earlier that the general indirect overhead on the project is

484

1    40 percent.  So if you take that price and divide it by .60 to
2    give you the 40 percent markup that the industry states
3    contractors typically make, that price is going to be
4    significantly higher and very close to the price that I have
5    quoted.
6    **Q.**   Sir, if you could look at just -- and then we can move on.
7    If you look at their plumbing cost versus your plumbing cost,
8    is it fair to say that yours is approximately three times the
9    cost of the cost of plumbing with the Beazer home?
10   **A.**   That would be correct.  It would also depend on several
11   things:  Whether they used mostly PVC pipe for water, how much
12   copper they used.  It would also depend on the quality of the
13   plumbing fixtures.  And also, this is hard cost, once again,
14   without any supervision, any markup, any direct or indirect job
15   costing.  So once again, if you take their price, divide it by
16   .60, you'd have a significantly different price than what
17   you're looking at here.
18   **Q.**   Sir, why don't we go back to your cost estimate, your
19   recap sheet.  If we could focus on some of these line items.
20   In particular, the last line item in the recap before overhead
21   and profit are added on is water extraction and remediation.
22   Do you see that?
23   **A.**   Yes, sir.
24   **Q.**   That's 8 percent of the cost; is that correct?
25   **A.**   Yes, sir.

1   Q.    That involves dehumidification of the job site?

2   A.    That is dehumidification and air monitoring, air cleaning,

3   and HEPA-vacuuming.

4   Q.    The dehumidification -- you're dehumidifying a job even

5   though you're taking up the wood floors; correct?

6   A.    Oh, absolutely, yes.  What we're doing is taking a house

7   and doing it backwards.  Originally, if we had built this

8   house, we would have started from ground up.  By the time we

9   blacked this house in and dried it in, there would have been a

10  significant amount of time that would have elapsed between the

11  dry-in and the installation of the Sheetrock, insulation, and

12  floor and finishing materials.  So in that time period, the

13  house is dehumidifying itself, or it is forced to dehumidify

14  until the wood-related equivalent moisture content of the

15  materials and the wood is at or near 12 to 14 percent relative

16  humidity on moisture content.

17          Here, we're doing it backwards.  We have a house

18  that's been under climate control for four years.  We're taking

19  it out of climate control.  There's nothing to control the

20  humidity or the temperature in the house, so the wood and all

21  the wood products in the house are hygroscopic; they're going

22  to absorb the humidity as it rises within the house.  We

23  typically have humidities between 60 and 90-plus percent here

24  in Louisiana.

25  Q.    What's the humidity at the present time here today?

1    A.    Today, I don't know.

2    Q.    It's not 60 or 90 percent, is it?

3    A.    I said typically.

4    Q.    That's in the summer months; right?

5    A.    No.  That's for the majority of the year.  Actually, in

6    the summer months, it is quite high, and we have our own

7    climate designation as hot and humid, temperature zone, here in

8    the New Orleans area.

9              We're undoing the house.  This house was under

10   climate control for four years.  It's acclimated.  All the

11   products in it have acclimated to something between 40 and

12   60 percent relative humidity, approximately.  That's the design

13   criteria for the interior living space.  So when we release

14   these materials to the atmosphere, uncontrolled atmosphere,

15   they're going to begin absorbing the relative humidity that is

16   in the ambient air.

17   Q.    So how long do you think the house is going to be left

18   open?

19   A.    Well, un-air-conditioned will be for several months.

20   Q.    How long do you think this job is going to take?

21   A.    Approximately four months.

22   Q.    Of the four months, when are you going to close up the

23   building?

24   A.    Well, the building will be closed -- the doors will be

25   closed immediately.  However, you're taking all of the

DAILY COPY

1   insulation out of the walls, all of the insulation out of the

2   ceilings.  This building will have no walls or ceilings that

3   will help encapsulate -- put the climate zone and encapsulate a

4   dry, cool area.  So we have all of the inside of the building

5   open to the attic, which is open to the outside because it's

6   vented to the outside.  So the relative humidity is going to,

7   by nature of diffusion, move from the outside to the inside

8   because it's dryer and cooler on the inside.

9   Q.   So when do you intend to put the dehumidifiers in the

10  house?

11  A.   About the time we finish with the demolition.

12  Q.   How far into the construction project do you intend to

13  finish the demolition?

14  A.   How far?  I think it's within three or so weeks.

15  Q.   Just so I understand, sir, you're replacing cabinetry;

16  correct?

17  A.   Yes.  Correct.

18  Q.   You're replacing the woodwork?

19  A.   Yes, sir.

20  Q.   You're removing all of the drywall?

21  A.   Yes, sir.

22  Q.   The only thing you're keeping with regard to the flooring

23  is the tile; correct?

24  A.   Yes, sir.

25  Q.   Now, you indicate that the cleaning of the house is going

1   to take approximately 4 people 10 to 12 days; is that right?

2   **A.**   No.   I think we indicated -- yeah, five people about --

3   yes.

4   **Q.**   Is that correct?

5   **A.**   That's correct.

6   **Q.**   You're also estimating that it's going to take 16 days to

7   air out the building?

8   **A.**   Well, that, and as it's being aired out, the cleaning

9   that's going to be occurring at the same time.   So it's not

10  total air-out in that time frame.

11  **Q.**   What is the total air-out time?

12  **A.**   I think the allocation was around three weeks for air-out

13  and cleaning.

14  **Q.**   That's not based upon any science; correct?

15  **A.**   No.   Unfortunately, there's no science available to us to

16  give us much guidance other than what's happened in other

17  conditions or other projects.

18  **Q.**   Now, your cost estimate also indicates a substantial

19  amount for an environmental consultant; is that right?

20  **A.**   That's correct.

21  **Q.**   I believe it's $15,000 that would be under permits and

22  fees?

23  **A.**   That's correct.

24  **Q.**   You were here when Mr. Bailey testified; correct?

25  **A.**   That's correct.

1   **Q.**   He's considered an environmental consultant under the

2   protocol; correct?

3   **A.**   I guess.  I don't know.

4   **Q.**   Did you hear him testify in that regard?

5   **A.**   Yes.

6   **Q.**   Do you recall him testifying that he would charge about

7   $1,200 for a letter indicating that the drywall had been

8   removed?

9   **A.**   Yes, sir.

10  **Q.**   Would you revise your cost estimate given that

11  Mr. Bailey's number is substantially less than $15,000?

12  **A.**   No, sir.

13  **Q.**   Why are you indicating that it's going to cost $15,000?

14  **A.**   Well, I'm not sure all what Mr. Bailey was going to

15  provide in those services.  However, I believe one of the

16  builders has an environmental contractor or environmental

17  person who inspects and tests during the process, and their

18  number is $12,500.

19          What the environmental engineer is proposing to do is

20  to document the work as it goes and to oversee, photograph, and

21  test -- whatever test needs to be done -- during and at the

22  conclusion of the demolition and prior to the reinstallation of

23  the new materials, also that the environment inside is

24  controlled.  Because as we talked about a few minutes ago,

25  we're taking this house apart; we're exposing the house to the

1    elements.  Before we can put new materials back in, we have to

2    acclimate or keep that house acclimated to around 12 to

3    14 percent humidity, moisture content, in the studs, in the

4    plywood floors, in the ceiling joists, and any other wood

5    materials that are left in that house.  He would verify prior

6    to the reconstruction that the cleaning has been performed and

7    that the environment is proper for the reentry of new building

8    materials and components.

9    **Q.**   Sir, did you have an environmental consultant bid this

10   out?

11   **A.**   Yes, I did.

12   **Q.**   Who was that?

13   **A.**   Ritter Consulting Engineers.

14   **Q.**   Did they indicate that it would cost $15,000 to undertake

15   the work here?

16   **A.**   Yes, sir.  That's the quote from them.  Mr. Ritter, aside

17   from an environmental engineer, also teaches environmental

18   science at LSU.

19   **Q.**   Would part of the work that he would undertake there also

20   be involved in litigation, preservation of evidence?

21   **A.**   Repeat again, please.

22   **Q.**   This bid, it sounds like it also includes testing and

23   preservation of evidence.

24   **A.**   Evidence?  No.  It would be to verify the clean

25   environment and that the work we performed was performed

1    correctly.  And at the end, he could produce a written report

2    of what was done with photographs and signing off on the

3    project in his written report to give to the Hernandezes so

4    that they could produce that -- in case they should decide to

5    sell the home, they could show that the work was performed and

6    performed under the guidance and oversight of an environmental

7    engineer and signed off on.

8    Q.   Well, why don't we compare your cost estimate to that of

9    Mr. Carubba's.  It's Exhibit 237.  Appearing first, let's look

10   at the demolition.  Would you agree that the demolition costs

11   are double what Mr. Carubba indicates?  Correct?

12   A.   That's correct.

13   Q.   You're disposal costs, your cleanup costs, are three times

14   as much; is that correct?

15   A.   That's correct.

16   Q.   Your drywall costs are twice as much; is that correct?

17   A.   That's correct.

18   Q.   The painting that you're requiring is two times as much;

19   correct?

20   A.   Over two times as much.

21   Q.   The bathroom cabinets, I believe, are 10 times as much; is

22   that correct?

23   A.   I would have to go into the estimate to tell you, but part

24   of the problem is that we have no idea what's inclusive in this

25   estimate.  There's no detail to anything, and quantities vary

1  significantly.  There's no backup to the estimate, none was

2  provided to me, as to how any of these numbers were arrived --

3  how he arrived at any of these numbers.

4  **Q.**    Why don't we go to Hernandez Exhibit 557, please.

5  **A.**    When I checked his numbers against other nationally

6  recognized cost-estimating sources such as RSMeans, his costs

7  didn't come near the published prices for those pricing guides

8  either.  So I'm not sure where these numbers come from.

9  **Q.**    If we can go to page 2 of Hernandez 557, which was shown

10  earlier in the direct examination.  If you look to the

11  installation of bathroom cabinets, would you agree that the

12  installation of bathroom cabinets is 10 times -- your charge is

13  10 times that of Mr. Carubba's?

14  **A.**    Let's see.  Where are we?  Can you tell me where we are?

15  **Q.**    Page 2, install bathroom cabinets.

16  **A.**    Yes.  Okay.  Yes, sir.  Just think about he's charging

17  $16.50 a foot for cabinets, but Benchmark is charging over $5 a

18  foot just for baseboards, almost $5 a foot for baseboards.  How

19  can you even begin to equate that you can build a cabinet for

20  $16.50 a foot when the cost of baseboards is almost a third of

21  that?

22  **Q.**    With regard to kitchen cabinets, your installation cost

23  for the lower cabinet is 10 times more than that of

24  Mr. Carubba's; correct?

25  **A.**    That's correct.

1   **Q.**   With the installation of the upper kitchen cabinets, it's

2   eight times more?

3   **A.**   Well, that's correct, except his numbers are not correct.

4   His quantities are wrong.  Once again, he's charging $16.50 for

5   cabinets.  You couldn't buy a door for that, not a single door.

6   **Q.**   Sir, let's look at some of those bathroom cabinets.

7   **A.**   Yes, sir.

8   **Q.**   If we can go to Plaintiffs' 457.  Sir, during the course

9   of visiting the home, you took pictures while you were going

10  through the home.  Do you recall that?

11  **A.**   Yes, sir.

12  **Q.**   You attached those to your report?

13  **A.**   Yes, sir.

14  **Q.**   I'd like to show you some of those pictures just so we

15  have a fair understanding of what we're talking about.

16  **A.**   Sure.

17  **Q.**   Are those the kitchen cabinets that you would be

18  replacing?

19  **A.**   Bathroom?

20  **Q.**   Bathroom.

21  **A.**   Yes, sir.  That's the master bathroom.

22  **Q.**   Just so I understand, those are the cabinets that you'd be

23  replacing; correct?

24  **A.**   That is correct.  It has raised-panel doors.

25  **Q.**   Sir, you answered my question.  Thank you.

1    **MR. MEUNIER:**  Your Honor, I'd like the witness to be
2    able to explain his answers.

3    **THE COURT:**  Do you need to explain it?

4    **THE WITNESS:**  Well, he's asking me about the
5    disparaging cost differences.  The only way I know how to do
6    that is to explain what's all inclusive in our estimate, and I
7    have no idea what's included in the $16.50.

8    **MR. HAYDEN:**  At this point in time, Your Honor, all
9    I'm trying to do is just identify the different cabinetry, and
10   then we can move on.

11   **THE COURT:**  Okay.  I'll let you cover it on redirect.
12   BY MR. HAYDEN:
13   Q.    If we could go to 128.  Is this the cabinets that you are
14   replacing?
15   A.    That's a portion of the kitchen cabinets, yes, sir.
16   Q.    That's the top of the kitchen cabinets?
17   A.    That's a portion of the tops of the kitchen cabinets.
18   Q.    If we could go to 155, please.  Are those the types of
19   light fixtures that you're replacing?
20   A.    Some of them.  Some of them are recessed lights.  There's,
21   I think, two chandelier-type lights.  There's hanging fans with
22   lights.
23   Q.    If we can go to 167, please.  Is that one of the fan light
24   fixtures that you'd be replacing?
25   A.    Yes, sir.

1   **Q.**   If we could go to 173.  That's the mantel that you're

2   going to be replacing; correct?

3   **A.**   The what?

4   **Q.**   The mantel.

5   **A.**   Yes, the mantel.  Also, the ceramic surround for that

6   mantel and the hearth and seat below that is all part of

7   removing the fireplace system.

8   **Q.**   Sir, at the beginning of your testimony, I believe there

9   was some discussion about some recent pronouncement by the

10  CPSC.  Do you recall that?

11  **A.**   Yes, sir.

12  **Q.**   And that asks if anyone had any evidence of any fires

13  relating to Chinese drywall; correct?

14  **A.**   Yes, sir.

15  **Q.**   Just so we're all clear, the document indicates that no

16  fires have been corroborated to date relating to Chinese

17  drywall; correct?

18  **A.**   That's correct.  My interpretation of that bulletin was

19  that they suspect the possibility of fires occurring because of

20  corrosion and corrosion of electrical systems, and they want

21  that to be reported to them so that they can document it.

22  **Q.**   There's been no fires corroborated to date relating to

23  Chinese drywall according to the CPSC; correct?

24  **A.**   That is correct.

25  **Q.**   That's by their statement of March 10; correct?

1  **A.**    That is correct.  However, the conditions are conducive

2  for fires to occur because of the corrosion.

3  **Q.**    Sir, you're indicating that the electrical and the

4  plumbing should be replaced because of the possibility of

5  failure; is that right?

6  **A.**    Well, the electrical we know has failed in some instances,

7  or the electronic portions of the house have failed, and we

8  know we have corrosion.  There's no directive from anyone, from

9  any governmental agency, from any authority, that says that

10  leaving this in will not create an issue, a problem, or a

11  malfunction with the home's systems.  We know we have corrosion

12  in the electrical panels.  We know the breakers are corroded.

13  We know that the --

14  **Q.**    Sir, in the Hernandez home, there's no evidence that the

15  breakers have failed; correct?

16  **A.**    What's your definition of *failure*?

17  **Q.**    Do you have any basis or any evidence of product failure

18  in the Hernandez house related to Chinese drywall?

19  **A.**    Well, it's my understanding from earlier testimony that

20  the breakers have corroded and contact points have corroded to

21  a point that just because the failure hasn't manifested in a

22  problem that the corrosion is, in fact, the failure.

23  **Q.**    Sir, you're not a corrosion expert, are you?

24  **A.**    I'm not, but I've done a fair amount of research and

25  written papers, one paper and two articles, I think it is, on

1  corrosion of components in electrical systems in homes.

2  **Q.**    Before this, before your involvement with the Chinese

3  drywall home in November and then again with the Hernandez

4  home, you had no involvement whatsoever with the impact of

5  sulfur gases on copper; correct?

6  **A.**    No, sir, but I've had experience with electrolysis in

7  copper systems in homes and the recurrence of the problems if

8  they're not addressed properly and insurance companies who have

9  had to pay twice for the same claims because the corrosion

10  remained and the electrolysis wasn't eliminated.

11  **Q.**    Prior to this case or the Blue home that you inspected,

12  you had no involvement, no experience whatsoever with

13  sulfurization of copper; correct?

14  **A.**    That is correct.

15        **MR. HAYDEN:**  That's all I have.

16        **THE COURT:**  Any redirect?

17        **MR. MEUNIER:**  Just briefly, Your Honor.

18                    **REDIRECT EXAMINATION**

19  BY MR. MEUNIER:

20  **Q.**    Mr. Mallet, you visited the Hernandez home three times?

21  **A.**    Yes, I did.

22  **Q.**    On which date or dates did you take the photographs that

23  we have put in evidence?

24  **A.**    They've been taken over a course of time.  The ones I took

25  were taken on maybe the 17th of January and on the 25th of

DAILY COPY

498

1  February.  Those photographs that are in my report and that I

2  have submitted have been taken along the course of time between

3  my second inspection and through this last weekend.

4  **Q.**   Counsel pointed out that your entry of data into the

5  Xactimate program was on January 20, 2010; correct?

6  **A.**   Yes, sir.

7  **Q.**   But the date of your final cost estimate was March 10,

8  2010, wasn't it?

9  **A.**   Yes, sir.

10 **Q.**   Your finalization of the data printed out by that program

11 took approximately two months?

12 **A.**   Yes, sir.  I didn't just stop at that scope.

13         **MR. MEUNIER:**  Your Honor, we earlier offered as

14 Hernandez 477 only pages 29, 30, and 31 of the cost estimate,

15 but I would now like to make our offer of Hernandez 477 with

16 respect to all 31 pages of the cost estimate.  That's pages 1

17 through 31.

18         **MR. HAYDEN:**  No objection.

19         **THE COURT:**  Let it be admitted.

20 **BY MR. MEUNIER:**

21 **Q.**   Let me clarify the appliances for the record, if we can.

22 Let's go to page 31 of the cost estimate, 477.  Counsel used

23 the word *double-dipping*, and I want to make sure we're clear

24 about this.  You have for total dollars for appliance

25 replacement $4,560.05?

DAILY COPY

1   A.   Yes, sir.

2   Q.   To what extent did you take numbers from the appliance

3   estimates of plaintiffs' expert David Maloney?

4   A.   Whatever items he had included in his report; I think the

5   refrigerator, washer and dryer, maybe the freezer.  I think

6   that might have been all.

7   Q.   If Mr. Maloney's total for appliances came to $3,871, is

8   it fair to say that you have additional appliances included in

9   your remediation?

10  A.   Well, what we have is the cost of installation of

11  appliances.  We can't just pick up the phone and order a 17- or

12  18-foot refrigerator and have it magically appear and connected

13  in the home.  We have to either pick it up or have it

14  delivered.  The cost of delivery is not included.  The taxes

15  are not included.  The installation of water lines for the

16  icemaker is not included, nor is the unpacking of the unit,

17  cleaning of the unit, and putting it in place, with the

18  refrigerator included.

19  Q.   So if the Court had Mr. Maloney's itemization on personal

20  property and took out just the appliance items in Maloney's

21  report and considered included in your number, they would be

22  with the added costs of installation?

23  A.   Yes, sir.  If they took just the difference and left it

24  in, that would be accurate.

25  Q.   The replacement of wiring that you recommend is not based

1   only on the corrosion risk, as we've discussed; correct?

2   **A.**   No, sir, it's not.

3   **Q.**   But how in the real world does a legitimate risk of

4   corrosion or failure influence, in your experience, the bidding

5   of a job by a general contractor involving electrical systems?

6   **A.**   We have, in the past, when we've done just bid work, been

7   directed to replace damaged X, whether it's wiring, whether

8   it's Sheetrock.  I was writing a report for another case in

9   federal court here dealing with damaged Sheetrock in fire

10  stations in Terrebonne Parish.  The architect's directive to

11  the contractors was to replace all damaged Sheetrock.  No

12  quantities, no directives as to which rooms, how high, anything

13  of that nature.  So the contractor is going to make his

14  assessment as to what needs to be changed and why he's going to

15  change it and then bid accordingly.

16          In our case, based on my knowledge and experience of

17  problems with electrical wiring, problems with corrosion, the

18  problems with just effecting the repairs by splicing and trying

19  to piecemeal this together doesn't make sense from a time-wise

20  and an estimating -- but then I'm taking the risk away from

21  everybody else and placing it on my shoulders if I don't do

22  what's prudent.

23          There's no science to say that there is or there

24  isn't definitive directions as to what to do.  None.  So if I

25  don't replace that wiring or electrical components that we know

1    is corroded -- it's not a question of whether or not they're

2    corroded, but there's no definitive statement from any source

3    that says there's not going to be a problem with that -- then

4    I'm taking the liability away from everyone.

5              And when everybody walks out of this courtroom and

6    the courtroom doors are locked and I perform that job, if

7    something goes wrong, it's me that has to take care of it.  It

8    will be on my shoulders to repair it or to face the owners for

9    what hasn't been done properly, or God forbid something happens

10   to the homeowners and I have to deal with that.

11   Q.   Based on your experience, is it your view that it is more

12   likely than not that the Hernandezes will need enough money to

13   pay any legitimate contractor to cover that risk?

14   A.   That's correct.

15   Q.   Now, the Beazer home that counsel referred you to had

16   1,890 square feet with a cost to Beazer of $51 a square foot;

17   correct?

18   A.   Yes, sir.

19   Q.   The living space of square feet in the Hernandez home is

20   less than 1,890; is that true?

21   A.   Living, yes, sir.

22   Q.   Is it generally true that the same work done in a smaller

23   home in a larger home, you're going to have a larger cost per

24   square foot in the smaller home?

25   A.   Absolutely.  Your costs are concentrated.  And it also

1   depends on what materials you're using, location.  The state or

2   the locality is going to have somewhat of an impact on how much

3   the cost of that project is because your insurance and tax

4   structures are going to be different from one locale to the

5   next, from one state to the next.

6            We pay exorbitant workers' comp and liability

7   insurance rates here in Louisiana.  It's a fact of life.  They

8   have to be factored into the cost of a project.  Other states

9   don't necessarily have -- as we well know, don't have the high

10  insurance costs that we have here to deal with.

11  **Q.**   So you don't see that cost to Beazer of $51 a square foot

12  as being inconsistent with the cost per square foot the

13  Hernandezes would pay you under your scope of remediation?

14  **A.**   It's not.  And the testimony that I remember from whomever

15  it was from Beazer cleared that matter up, that none of their

16  overhead costs or profits or any of that was inclusive, aside

17  from the fact that this is an international construction

18  company.  What they can buy materials and get labor for is

19  going to be a difference.  In some cases, it may be

20  significantly different from what we can buy products at

21  locally.

22  **Q.**   Let me ask you about the length of this job.  You've

23  indicated it's about a four-month time for doing the actual

24  work?

25  **A.**   Approximately, yes, sir.

DAILY COPY

1    **Q.**   You've also indicated that there will be a period of
2    cleaning and airing out.  What do you expect to be the total
3    time out of the home that will have to be experienced by
4    Mr. and Mrs. Hernandez from move-out to move-in date?
5    **A.**   That number is about 17 weeks if everything goes --
6    **Q.**   If everything goes well?
7    **A.**   As we put it on the paper, just like the estimates, if
8    everything goes like we wrote it, then this is what it will be.
9    **Q.**   Finally, you talked about the environmental consultant
10   report you built into your remediation plan and how that will
11   give the Hernandez family some document for possible resale.
12   Have you heard the testimony from Beazer about the walk-through
13   that they do with owners, where the house is stripped to studs
14   before they put the new drywall in?
15   **A.**   Yes, sir.
16   **Q.**   Will that be part of your remediation plan as well?
17   **A.**   Yes, sir.  In our other type of remediation jobs, for
18   instance, in mold, widespread mold, and fire with a lot of
19   soot, there's something called "psychological odor" that we
20   don't want to have to deal with, that people think they smell
21   what they think they smell.
22          To the extent that you show them how well you've
23   cleaned and the efforts you've made to remove, in this case,
24   the Chinese drywall contaminants and the particulate from that,
25   it gives them the peace of mind, and they can walk through it

1    and tell you whether they think anything needs to be done.

2    They have a visual of what's going on.

3            It is not an encapsulated wall and ceiling system

4    that they walk back into the home after everything is completed

5    and have the thoughts:  Did they take everything out?  Did they

6    clean it properly?  Am I going to have problems with this in

7    the future?

8            So it's a psychological matter, and it's classified

9    as "psychological odor" in the restoration business.  It's a

10   prudent thing for us, as contractors, to do, is to walk through

11   and ask them if they see anything, do we need to address

12   anything, do they have any concerns, should we do anything that

13   we haven't addressed in the way of their concerns.

14           **MR. MEUNIER:**  Thank you.  No more questions.

15           **THE COURT:**  You're excused.  Thank you, sir.

16               We have one more witness?

17           **MR. SEEGER:**  May we approach?

18           **THE COURT:**  Let me see counsel.

19           (WHEREUPON there was a conference at the bench

20   outside the presence of the court reporter.)

21           **THE COURT:**  Let's call your next witness, please.

22           **MR. STEVE HERMAN:**  Plaintiffs call Charlene

23   Hernandez.

24

25

DAILY COPY

```
 1                (WHEREUPON Charlene Hernandez, having been duly
 2    sworn, testified as follows.)
 3                THE DEPUTY CLERK:  Please be seated.  Would you state
 4    your name for the record.
 5                THE WITNESS:  Charlene Hernandez.
 6                          DIRECT EXAMINATION
 7    BY MR. STEVE HERMAN:
 8    Q.    Are you nervous?
 9    A.    (NODS HEAD)
10    Q.    It's okay.  Are you all right?
11    A.    Yeah.
12    Q.    Take your time.
13    A.    I just have to make sure I have Kleenex.
14    Q.    Take your time.  Can you tell Court a little bit about
15    yourself.
16    A.    I was born in 1980 in Houma.  I lived my whole childhood
17    there in Houma.  I went to LSU.  I went to LSU, then went to
18    LSU Health Sciences Center and graduated.  I'm a registered
19    nurse.
20    Q.    Where are you employed?
21    A.    At Ochsner.  I'm actually a labor-and-delivery nurse.
22    Q.    We heard a little bit from Tatum, but why did you in
23    particular want to live in this house?
24    A.    Well, I was finishing up nursing school.  I was going to
25    graduate in May 2005.  We were thinking about starting a family
```

506

1    and we knew we wanted to be in a home.  We love the

2    North Shore.  We love the church that we go to and the great

3    schools, safe atmosphere, but we also wanted to be near family.

4             Tatum's aunt and uncle live in Mandeville, and she

5    called us one day and said, "The lot that's across the creek

6    from me, someone told me that it was going up for sale."  So we

7    decided that would be great since we wanted to live on the

8    North Shore and we really wanted to be near family.

9    **Q.**   How did it feel when you first moved into the house?

10   **A.**   We were excited.  It was our first house.  We just were

11   elated.  We were thinking about things that we wanted to do

12   with the house and future expansion one day.  We were excited.

13   **Q.**   I know it's kind of subjective, but could you just tell

14   the Court from your perception what the odor's like that you

15   experienced.

16   **A.**   From the time we moved in, I told Tatum and I would tell

17   his aunt:  "Something smells funny in this house."

18            I thought:  "Well, it's new.  It's new, new

19   everything, so maybe that's it," but the odor never went away.

20            I would clean, mop, dust, vacuum.  As a mother, my

21   kids were playing on the floor, and I would say:  "What smells

22   in this house?"

23            I thought I wasn't doing what I needed to do, so I

24   would clean more, buy candles.  I could never get it out.  It's

25   like a chemical smell, sometimes like a terrible burnt-match

1    smell.

2    **Q.**    Just for the Court's benefit, when is the last time, to

3    your recollection, that you used the fireplace in your house?

4    **A.**    It's been several weeks.  I believe it was the closing

5    ceremonies of the Olympics.  We were watching the Olympics and

6    we had the fireplace going.

7    **Q.**    Do you want to take a minute?

8    **A.**    I think I'm good.

9    **Q.**    What, if anything, have you done to try to reduce the

10   odors or the gases in the home in terms of a dehumidifier or

11   something like that?

12   **A.**    We air out the house as much as we can.  When it's nice

13   outside, we'll open up the windows and doors and let fresh air

14   in.  We borrowed two large dehumidifiers, one on each side of

15   the house, and we run those because we've heard that with less

16   humidity that the odor is less.  We try and do that.

17   **Q.**    How, at least based on your perception, does the drywall

18   affect your clothes?

19   **A.**    All our clothes smell no matter what we do.  I can smell

20   it on my sweater right now.  It's on my children's clothes.

21   **Q.**    What attempts have you made to try to clean them to try to

22   get the smell out?

23   **A.**    I mean, just normal washing, drying, dryer sheets, dry

24   cleaning, but it's just there.  It's just a strong, strong

25   smell.

1   **Q.**   Could you tell the Court a little bit about what happened
2   when you tried to sell some of your kids' old clothes.
3   **A.**   I was going through closets and, you know, kids grow
4   quickly, so they grow out of their clothes very quickly.  We
5   have a consignment shop in Mandeville.  It's a popular place.
6   People bring their nice children's clothes and the place will
7   buy them back and then sell them, put them on the rack and sell
8   them.  I brought I think it was eight large bags of clothes,
9   and the girl called me the next day.  I could tell she was
10  nervous on the phone.
11         She didn't know exactly how to say it, but she said:
12  "The clothes you brought in were very nice.  We really like
13  them, but they have a strange smell.  I don't know exactly what
14  it is, but I can't sell them smelling like that."
15  **Q.**   Are you all right?
16  **A.**   (NODS HEAD)
17  **Q.**   Have you made any effort to try to clean other items in
18  your home like carpets or couches or anything like that?  Take
19  your time.
20  **A.**   I have.  We had Stanley Steemer come out to do -- we had a
21  wool area rug in our living room, and the twin mattress in my
22  son's room.  They came out and they steam cleaned it really
23  well.
24         He said:  "Ma'am, I cleaned it as well as I can, but
25  the smell doesn't come out."

509

1          He even wrote it on the paper that, as well as he

2     cleaned it, the smell wouldn't come out.  He said, from his

3     experience, that strong smells won't come out of thick things

4     like mattresses.

5     **Q.**   We talked a little bit about some of the electrical

6     components and appliances with Tatum.  Is there anything that

7     he forgot that you remember?

8     **A.**   I don't know if he talked about the microwave.  I guess

9     about a year after we moved in, it started to malfunction.  The

10    noises wouldn't work.  You didn't know when your food was

11    cooked.

12         Friday night, actually, we were cooking and making

13    hamburgers and french fries for the kids, and when I plugged in

14    the FryDaddy to get the grease hot to try to fry the french

15    fries, there was a blue spark that shot out of the outlet.  I

16    had to jump back.

17         I'm sorry.

18    **Q.**   It's okay.  Take your time.

19         Have you had any other problems with light switches

20    or outlets or sockets, anything like that?

21    **A.**   I did, actually, on one side of the house.  A lot of the

22    lights weren't working on one side of the house and the outlets

23    weren't working.  I would go to plug in the vacuum and that

24    didn't work, so we called an electrician.

25         He came out and he said one of the -- I don't

DAILY COPY

1    understand anything about electricity, but he said that one of

2    the switches was very corroded and it was causing the ones

3    further down to fail.  So he had to fix it.  I think it was 11

4    switches and lights that didn't work.

5    **Q.**   In preparation for the trial, did you work on a list of

6    electrical appliances and components in the house that, at

7    least based on your perception, you had problems with?

8    **A.**   Yes.

9         **MR. STEVE HERMAN:**  Can we bring up Hernandez 558,

10   please.

11   **BY MR. STEVE HERMAN:**

12   **Q.**   Is this the list that you put together with Tatum?

13   **A.**   Yes, sir, it is.

14   **Q.**   Is it true and accurate to the best of your knowledge,

15   recollection, and belief?

16   **A.**   Yes.  We worked on it and everything, we think, is as

17   accurate as possible.

18        **MR. STEVE HERMAN:**  Your Honor, we'd like to offer,

19   file, and introduce 558.

20        **THE COURT:**  I'll admit it.

21   **BY MR. STEVE HERMAN:**

22   **Q.**   We talked about some of the samples that have been taken.

23   Some of the experts, you've heard their testimony.  Some of the

24   things that are on this list, have they all been provided to

25   various different experts for testing and stuff?

1    **A.**    A lot of them have gone for testing.  I think everything

2    went except like the refrigerator couldn't go because the Sears

3    people took that, but mostly everything else.

4    **Q.**    Some of the stuff you had problems with maybe went back

5    before you knew that you had Chinese drywall; is that fair?

6    **A.**    Yeah.  Some of the stuff was 2007 and 2008, when we had no

7    idea.  We don't know why things were failing.  We just thought

8    we had a lot of things going wrong.

9    **Q.**    Did you provide other documents and information to some of

10   the experts in the case?

11   **A.**    Ms. Tuthill, we provided a lot of receipts, loss of wages,

12   receipts for repairs, estimates to move out of our house,

13   estimates of how much a comparable house would be in our area.

14   **Q.**    Have you brought anything with you that you'd like to show

15   the Judge?

16   **A.**    I do, actually.  Do you know where the box is?

17   **Q.**    I think one of the former witnesses talked about this.

18            **MR. STEVE HERMAN:**  May I approach, Your Honor?

19            **THE COURT:**  Yes.

20   **BY MR. STEVE HERMAN:**

21   **Q.**    If you could just tell the Court what that is.

22   **A.**    This is a lamp that's sitting in our living room, but what

23   we noticed about it is the -- just underneath the plastic, you

24   see that the wiring is black.  I don't know anything about

25   wiring, but I don't think it's supposed to be black.

1        **MR. STEVE HERMAN:**  I think, for the record,

2   Your Honor, that was admitted as Hernandez 651.

3        **THE COURT:**  Right.

4   **BY MR. STEVE HERMAN:**

5   **Q.**   What else did you bring?

6   **A.**   A garbage can.

7   **Q.**   A garbage can?  Is this what you were referring to?

8   **A.**   Yes.

9        **MR. STEVE HERMAN:**  May I approach, Your Honor?

10       **THE COURT:**  Yes.

11       **THE WITNESS:**  This one -- I can't remember if I

12   bought it in August or September of '06, right after we moved

13   in -- and you can see it's turned black.  There's pits and

14   spots and corrosion that kind of comes off on your fingers.

15            I had two like this, and so they sent one for

16   testing.  So I actually went to Target just to replace one of

17   my garbage cans.  I needed another one.  They actually had the

18   same kind at Target just in January.  You can see the

19   difference, what it's supposed to look like and what it looks

20   like after three years in my house.

21            Actually, this one is just from January, but

22   it's already turned darker than it was when I bought it, and

23   you can already start to see the corrosion.

24       **MR. STEVE HERMAN:**  Your Honor, we have a photo of the

25   two trashcans, which is Hernandez 219.

1          **THE COURT:**  All right.

2          **MR. STEVE HERMAN:**  We'd like to offer, file, and

3    introduce the photograph.

4          **THE COURT:**  Admitted.

5    **BY MR. STEVE HERMAN:**

6    **Q.**   Is there anything else you brought to show the Judge or

7    asked me to bring?

8    **A.**   There's two more things.  One is a picture frame.

9    **Q.**   A picture frame.  The Judge has seen this.

10         **MR. STEVE HERMAN:**  May I approach, Your Honor?

11         **THE COURT:**  Yes.  It's kind of a show-and-tell.

12   **BY MR. STEVE HERMAN:**

13   **Q.**   What would you like to tell the Court about that?

14   **A.**   This is a picture frame from our wedding.  That's our

15   wedding invitation in the middle, and a picture of Tatum when

16   he was a baby, and myself.  We had this in our apartment before

17   we moved into our home.  It was silver and shiny.  It was fine.

18         After we moved in, I guess months after we moved in,

19   we started to notice black spots and flaking, and so I just --

20   I took the picture frame down and I put it in a closet.  Then

21   one day, when I was cleaning out the closet, I pulled it out,

22   and this is what it looked like.

23         **MR. STEVE HERMAN:**  Your Honor, a photograph of the

24   frame has been admitted already as Hernandez 272.

25

1    **BY MR. STEVE HERMAN:**

2    **Q.**   Finally, we have one last item.

3    **A.**   It's a doorstop.

4          **MR. STEVE HERMAN:**  May I approach, Your Honor?

5          **THE COURT:**  Yes.

6          **THE WITNESS:**  Thank you.  This is a doorstop taken --

7    I think it's from my children's bathroom, and you can see that

8    it's totally black and corroded.  It used to be like an antique

9    bronze color.  If you touch it with your hands, your fingers

10   will turn black and you'll get the markings all over.  This is

11   what all of my doorstops look like, and my knobs, and all my

12   hardware in my house.

13         **MR. STEVE HERMAN:**  Your Honor, if we could just take

14   the photograph and introduce it as Hernandez 658, if that's all

15   right.

16         **THE COURT:**  Admitted.

17   **BY MR. STEVE HERMAN:**

18   **Q.**   Are you all right?

19   **A.**   Uh-huh.

20   **Q.**   Okay.  What, if any, efforts did you-guys undertake to see

21   if you could maybe move out of the house?

22   **A.**    Well, I have a friend that's a real estate agent, so she

23   emailed me some listings of rental homes in the Mandeville area

24   that are comparable to our house.  We saw the homes and we saw

25   the price, and we can't afford our mortgage and rent.

1          I have another friend who's a friend from church.
2    Her dad is a pastor and he said:  "I have a FEMA trailer if you
3    want to put that on your property and live in that."
4          So we went out to see it.  I went out to see it with
5    my friend.  We had pictures of it.  So I went up the stairs and
6    walked in, and the smell -- there's another smell in the FEMA
7    trailer.  And then with the controversy with the formaldehyde,
8    I didn't want to put my family in something that maybe is
9    worse.  I don't know.
10         Also, it is extremely small for four people.  There's
11   no bathtub.  So my kids, I'd have to hose them down.  My
12   daughter is only two, so there's no crib or any place for her
13   to sleep.
14   **Q.**   It's okay.
15   **A.**   You can go on.
16   **Q.**   Are you all right?
17   **A.**   Yeah.
18   **Q.**   Did you do any investigation with your mortgage company to
19   see if they could work you with on your mortgage?
20   **A.**   We did.  We contacted our mortgage company.  They called
21   us or sent us a letter -- I can't remember -- and they said,
22   "We'll offer you a 90-day moratorium," which meant for three
23   months we wouldn't have to pay our mortgage, but on the 91st
24   day the total amount was due.  So that means for those 90 days,
25   we would have to be saving the money to pay on the 91st day, so

1  we didn't see how that would be very helpful.

2  **Q.**   What, if anything, did the builder offer to do for

3  you-guys?

4  **A.**   He had some properties.  He had one house in specific that

5  was on the market that he couldn't sell.

6          He said:  "Well, I have this house that you can move

7  into, but as soon as I get a buyer you have to move out."

8          So we were trying to clarify:  "Well, does that mean

9  we have a couple months before you sell it?"

10         "No.  As soon as I sell it, you have to get out."

11         So that means if he sold it in two weeks, we would

12  have to move again and not know where we were going to go.  We

13  would probably just end up having to move back into our home.

14  **Q.**   What are your current plans?

15  **A.**   Well, we're hoping for some kind of resolution to this.

16  **Q.**   I understand.

17  **A.**   But if it doesn't come soon, we're going to have to move

18  out.  I don't know how financially we can afford it.  Maybe I

19  can borrow money from somebody or something, but that's it.

20  This is my option.  That's why I'm sitting here.

21         **MR. STEVE HERMAN:**  No further questions.

22         **THE COURT:**  Any cross?

23         **MR. HAYDEN:**  No.

24         **THE COURT:**  You're excused.  Thank you, ma'am.

25             We'll stop here and come back tomorrow at 8:45.

DAILY COPY

1    The Court will stand in recess until then.

2            MR. SEEGER:  As far as resting our case, you want us

3    just to take care of that in the morning, whatever's left over?

4            THE COURT:  Yes.  Let's make sure you've got all the

5    exhibits in the form and fashion that you need them in.

6            THE DEPUTY CLERK:  Everyone rise.

7            (WHEREUPON the Court was in recess for the evening.)

8                               * * *

9                           **CERTIFICATE**

10           I, Toni Doyle Tusa, CCR, FCRR, Official Court

11   Reporter for the United States District Court, Eastern District

12   of Louisiana, do hereby certify that the foregoing is a true

13   and correct transcript, to the best of my ability and

14   understanding, from the record of the proceedings in the

15   above-entitled and numbered matter.

16

17

18                              s/ Toni Doyle Tusa
                                Toni Doyle Tusa, CCR, FCRR
19                              Official Court Reporter

20

21

22

23

24

25

                              DAILY COPY