```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2   ***********************************************************

 3
     IN RE:  CHINESE-MANUFACTURED       Docket No. 09-MD-2047
 4   DRYWALL PRODUCTS LIABILITY         New Orleans, Louisiana
                                        Wednesday, March 17, 2010
 5

 6

 7   THIS DOCUMENT RELATES TO:
     Case No. 09-CV-6050
 8
     Tatum B. Hernandez, et al
 9   v.
     Knauf Plasterboard (Tianjin)
10   Co., Ltd., et al
     ***********************************************************
11

12              TRANSCRIPT OF TRIAL PROCEEDINGS
         HEARD BEFORE THE HONORABLE ELDON E. FALLON
13             UNITED STATES DISTRICT JUDGE
                VOLUME III - MORNING SESSION
14

15
     APPEARANCES:
16
     FOR THE PLAINTIFF:           HERMAN, HERMAN, KATZ & COTLAR
17                                BY:  RUSS M. HERMAN, ESQ.
                                       STEPHEN J. HERMAN, ESQ.
18                                820 O'Keefe Avenue
                                  New Orleans, LA 70130
19

20                                GAINSBURGH BENJAMIN DAVID
                                  MEUNIER & WARSHAUER
21                                BY:  GERALD E. MEUNIER, ESQ.
                                       MICHAEL J. ECUYER, ESQ.
22                                1100 Poydras Street, Suite 2800
                                  New Orleans, Louisiana 70163
23

24                                SEEGER WEISS
                                  BY:  CHRISTOPHER A. SEEGER, ESQ.
25                                One William Street
                                  New York, New York 10004
```

```
 1
                                    LEWIS & ROBERTS, PLLC
 2                                  BY:  DANIEL K. BRYSON, ESQ.
                                    3700 Glenwood Avenue, Suite 410
 3                                  Raleigh, North Carolina 27612

 4

 5   FOR THE DEFENDANT:            FRILOT L.L.C.
                                    BY:  KERRY J. MILER, ESQ.
 6                                  Energy Centre - Suite 3700
                                    1100 Poydras Street
 7                                  New Orleans, LA 70163-3700

 8
                                    BAKER McKENZIE
 9                                  BY:  DONALD HAYDEN, ESQ.
                                    1111 Brickell Avenue, Suite 1700
10                                  Miami, Florida 33131

11
                                    BAKER McKENZIE
12                                  BY:  DOUGLAS B. SANDERS, ESQ.
                                         ERIN M. MAUS, ESQ.
13                                       KYLE P. OLSON, ESQ.
                                    130 E. Randolph Drive
14                                  Chicago, Illinois 60601

15

16   Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR
                                    500 Poydras Street, Room HB-406
17                                  New Orleans, Louisiana 70130
                                    (504) 589-7776
18

19

20     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

1                    **I N D E X**

2

3

4   **WITNESS FOR THE DEFENDANT:**                    **PAGE/LINE:**

5

6

7   **RICHARD J. LEE**

8

9     Voir Dire Examination by Mr. Sanders        534/14

10    Direct Examination by Mr. Sanders          545/16

11    Cross-Examination by Mr. Seeger            566/5

12    Redirect Examination by Mr. Sanders        597/2

13

14

15

16  **VIDEO DEPOSITION OF CRAIG BEYLER**        599/13

17

18

19

20

21

22

23

24

25

DAILY TRANSCRIPT

P R O C E E D I N G S

(WEDNESDAY, MARCH 17, 2010)

(MORNING SESSION)

(OPEN COURT.)

THE COURT:  Be seated, please.  Good morning, ladies and gentlemen.  We're here today.  Are there any further witnesses from the plaintiff?

MR. SEEGER:  Your Honor, we do not have any further witnesses, I just want to make sure, do we have all of the exhibits in?

MR. MEUNIER:  Your Honor, just to be clear about a couple of exhibits, Judge, good morning, Jerry Meunier for the plaintiffs.

In connection with the deposition, I'm sorry, the testimony of Al Mallet, I want to be sure that we offered Hernandez Exhibit 383 in its entirety, that's his CV; and also with respect to Hernandez 557, we're offering pages 1, 2 and 3 of 557, which is the cost comparison table.

THE COURT:  Okay.  Those are admitted.

MR. MEUNIER:  Thank you.

THE COURT:  So the plaintiff rests, is that it?

MR. SEEGER:  Yes, your Honor, plaintiff rests.

THE COURT:  Subject to checking the exhibits.  Check the exhibits before we close the record whenever we do it and make sure they're in the form and fashion.

1          MR. SEEGER:  Your Honor, I'm sorry, Russ just reminded

2     me, it is also subject, we have to work out with you the issue of

3     attorneys fees and costs, so it's just subject to that.

4          THE COURT:  Let me hear from the defendants.

5          MR. SANDERS:  Yes, your Honor.  Before we go forward with

6     our first witness, I believe Mr. Bryson wanted to deal with an

7     issue with our second witness.

8          THE COURT:  Sure.

9          MR. SANDERS:  I understand they're bringing a *Daubert*

10    challenge.

11         MR. BRYSON:  Good morning, your Honor.  Dan Bryson for

12    the plaintiffs.  Your Honor, we have an objection to portions of

13    the testimony of Craig Beyler, he is KPT's fire safety expert, we

14    do not question his credentials, only his methodology.

15         The trial preservation deposition was taken on Friday,

16    March 12th.  We agreed to preserve all objections until the witness

17    was offered.  We understand that he is the second witness and it's

18    on videotape, and trying to save the court some time I think it

19    will be a couple of hours of videotape that they're offering.  It's

20    a technical argument.  We thought that it would be best to do this

21    orally rather than try to set it forth in a written motion.

22         THE COURT:  Sure.

23         MR. BRYSON:  Our particular objection, your Honor, is

24    with regard to his Exhibit 2 and all testimony associated with

25    Exhibit 2.

1          THE COURT:  Is this Exhibit 2 (INDICATING)?

2          MR. BRYSON:  That is -- no, your Honor, Exhibit 2, and we

3  have asked this morning -- we brought up and handed to you Exhibit

4  2, which is appendix C.

5          THE COURT:  I have it, C, this is it?

6          MR. BRYSON:  Yeah, Appendix C, that's their Exhibit 2,

7  which is DX 0009-0024.  And what he did, it's entitled Temperature

8  Test, and what he did is fairly simple to explain, their expert did

9  temperature tests with some wires.  Your Honor, he hooked wires up

10  to receptacles and then he measured the temperature of the wire at

11  the connection point on a receptacle or at the screw, at the

12  contact point.  Your Honor's heard a lot of testimony about that.

13          He testified that if the temperature at this connection

14  point was greater than 30 degrees centigrade, at that point you

15  violated the standard.  And if it's less than 30 degrees

16  centigrade, you're within the standard.  So quite simply, you look

17  at his tables and if you see numbers above 30, you're in violation

18  of the standard, and if you see numbers below 30 on all of his

19  tables, you know everything is okay and the wires are okay and

20  there's not a fire safety risk.  Not surprisingly, there's not many

21  30s on his tables.

22          He has five tables with variations that I want to briefly

23  tell you about, your Honor, but they all hinge on that 30 number.

24  Now, Mr. Beyler testified that he performed these tests pursuant to

25  UL 498, that's Underwriters Laboratory test, and here is a full

1    copy of that manual, but we have given the relevant pages to you

2    this morning.  And we pulled out the four pages that he's relying

3    upon.

4            If we can pull up Beyler 7001.  This is the standard that

5    Mr. Beyler testified that he performed these tests to.  And that is

6    without dispute.  If you look at his deposition, we've given you a

7    copy of his trial preservation deposition, your Honor, page 24, at

8    lines 21 through 24.  Without dispute this is the standard.  And he

9    testified that he did his temperature test pursuant to Section 112,

10   which is Beyler 7-129.

11           This is the temperature test, and 112.1.1 indicates that

12   anything above 30 degrees celsius you have an issue on this

13   temperature test.  So this particular section is what he performed

14   his tests in.

15           Now, there are various steps, your Honor, on performing

16   this test.  And a critical first step on this test, this

17   temperature test, it's not that long, is 112.1.3.  If we could go

18   to the next page.  And at the top of 112.1.3, if you could

19   highlight that, it says the temperature test is to be made

20   following the overload test on the devices.  The temperature test

21   is to be made following the overload test.

22           Now, the UL standard defines the overload test, the

23   overload test, it's Section 106.3, states that the receptacle is to

24   be cause to make and break 150 percent of rated current for 100

25   cycles of operation.  So the standard says before you start doing

1    temperature test on a receptacle, you have to run that receptacle

2    100 times at 150 times its rated amperage, like if it's a 20 amp

3    receptacle, you run it at 30 amps for 100 cycles and then you start

4    running these temperature tests to see if you have any sort of

5    overheating problem with the receptacle.

6          Your Honor, it is without dispute, without dispute,

7    Mr. Beyler skipped this part of the test.  He did not do it, not

8    surprising, because if you run this test, it kind of gives you more

9    of a real-life situation with regard to the receptacle.  He did not

10   run the overload test on any of his tables on any of his

11   receptacles that he did.

12         There's also another step with this, and you can see

13   we've given you the temperature test steps that you're supposed to

14   do, Section 112.1.7, if you could go to the next page.  There is a

15   particular gauge that you're supposed to use, it's called a

16   thermocouple, you hook the thermocouple on and it measures your

17   temperature reading, and it explains the type of thermocouple that

18   you're supposed to use.  It is without dispute that he did not use

19   the type of thermocouple device that you're supposed to use to

20   measure this temperature.

21         And this is key.  He didn't use it, and amazingly, a lot

22   of his temperatures are just below 30.  But he didn't use the right

23   device, as clearly set forth in the standard.  The manual here from

24   Mr. Sanders has a Ph.D. from Harvard and he has these steps that

25   are conveniently omitted.

1          And I've cited to your Honor, I've tabbed the pages of

2     the spots without dispute where he did not do, "Did you do the

3     overload test?  No.  Did you use this type of thermocouple?  No."

4     That's on page 78 of his deposition.

5          Now, this same methodology or lack of methodology was

6     followed on every single one of his tests, Tables 2, 3, 4, 5 and 6.

7     He has five tables, they start at Table 2.

8          Now, let's talk very briefly about each table.  Within

9     each table, your Honor, there are some things that are very

10    unreliable.  On Table 2, if we could pull that up, DX 0009-0029.

11    And if you could pull up right in the middle.  Your Honor, what he

12    did here on Table 2 and you're going to hear as you listen to all

13    of this videotape, unless we exclude it, Mr. Beyler had Mr. Lee and

14    Mr. Perricone send him some wires.

15         And they took some copper wires at RJ Lee and they

16    exposed them for one day, three days and seven days to 10.3 parts

17    per million of $H_2S$ hydrogen sulfide gas.  Wow, that's an

18    interesting experiment.  How did you determine the duration

19    exposure?  Mr. Beyler, I don't know.  Was there any standard that

20    the exposure was linked to?  I don't know.  What about the amount

21    of gas, what was that limited, what standard did that follow?  I

22    don't know.  So you just got some wires from RJ Lee that had turned

23    black after that exposure and you hooked them up under some screws

24    to start measuring the temperature differential?  That's right.

25         And that's what it was.  You have wires that were sent

1   that were pursuant to no standard and they're measuring, if we

2   could go to Table 2, which is the next page, and you can see we've

3   got all of these numbers that are less than 30 on a bunch of wires

4   that were exposed for one, three and seven days on a standard or

5   methodology that they just made up.  And they're going to say that

6   this is something that should be presented to this court.

7            And again, no overload test, used the wrong thermocouple

8   to do this test.

9            If we could go to Table 3.  Table 3, this is where they

10   tested -- go to the next page, Scott, if you could.  On Table 3,

11   this is another table and we looked at this table and if you -- and

12   this is where they tested some corroded ground wires, actual

13   corroded ground wires from some of the receptacles.  And you can

14   see outlets, some of these outlets are actually from the Hernandez

15   house.  And you see the column that's T max, Scott, that fourth

16   column that says T max, if you could highlight that column straight

17   down.  These are some temperature tests of some actual wires they

18   hooked up to a contact point.  And you see a few that are at 30, so

19   this is a table I am real interested in.

20            And then on the next column it says T max after cleaning,

21   and you can highlight that column, Scott.  And you see some numbers

22   there, look at the 67.1, where it says they cleaned the wire, they

23   hooked it up for testing and they started testing it.  And now it's

24   showing 67, which is well over 30.  I said, well, wow, that's a

25   good result.  And he goes, oh, actually that column, when we say

1    after cleaning, we actually didn't clean it.

2              So all of the numbers on top, 23.9, 25.3, 28.7, on that T

3    max after cleaning, even though he is in a trial preservation

4    deposition and taking his discovery deposition for the first time,

5    all of those numbers now he says are not after cleaning and that's

6    without dispute.  It makes absolutely no sense and is not reliable.

7              And then on Tables 4 -- and again, no overload test, used

8    the wrong thermocouple, and look, a lot of those readings are close

9    to the 30 mark, which he says is a problem.

10             And then the last three tables, your Honor, is Tables 4,

11   5, and 6.  What he did with these tests, your Honor, is,

12   Mr. Beyler, he took a length of wire and he hooked each end up to a

13   receptacle and then he took a temperature test right in the middle

14   of the wire.  And I said -- and then he took some measurements, you

15   know, is it greater than 30 or not.

16             I said, well, that's an interesting test you performed, is

17   that pursuant to any sort of standard, you know, measuring in the

18   middle of a wire?  He said, no, no, it's just something that I, you

19   know, that I made up.  It sounds cool to measure the temperature in

20   the middle of the wire, but there's absolutely no standard or

21   accepted testing protocol for that.  And on page 91 of his

22   deposition, your Honor, he admits that he didn't follow any

23   accepted testing protocol in doing this.

24             So in summary, your Honor, what do these numbers mean

25   that they intend to show you in about an hour and a half worth of

1    video?  They don't mean anything.  They're absolutely unreliable on

2    this particular exhibit.  And I don't need to tell your Honor about

3    their burden on this, but it's critical, the focus, and I quote

4    from your Honor's opinion from Germano ON *Daubert*, the focus is not

5    on the result or on conclusion, but on the methodology.  The

6    proponent need not prove that the expert's testimony is correct but

7    must prove by a preponderance of the evidence that the methodology

8    used by the expert was proper.

9           This methodology was not proper, it is without dispute

10   that it was not proper.  We should not be using the court's time

11   with this, and we would ask that this exhibit in its entirety be

12   stricken and all testimony associated with it be stricken.

13          And in the alternative, this Appendix C, you can see,

14   your Honor, that except for the tables, it contains a great deal of

15   opinion testimony, which they try to say is test procedures and

16   approach.  But if you read it, it has a lot of commentary in it

17   such that pages C-1, C-2, C-3, C-4, C-5, C-6, should be excluded as

18   impermissible opinion.  C-8, C-10 and C-11 should all be excluded

19   as impermissible opinion testimony from that exhibit.

20          Thank you, your Honor.

21          THE COURT:  Any response?

22          MR. SANDERS:  Good morning, your Honor.  Appendix, I

23   think it's Appendix 2 or C to the report, and it's -- it was a

24   trial Exhibit 2, are the test results that Dr. Beyler relies on.

25   And while Mr. Bryson indicated that he is not challenging

1    Mr. Beyler's credentials and he's not challenging the actual

2    results, that's really what he's doing here.  You just heard about

3    how the results shouldn't matter, and apparently how somebody who

4    does have a Ph.D. in engineering science, an M.S. in mechanical

5    engineering, an MSc in fire safety engineering, can't design a

6    PROPER test procedure or methods, which are all set out in that

7    appendices, to run a test that's relevant here.

8           Yesterday Mr. Seeger asked Mr. Galler whether or not,

9    other than resistance measurements there is something that he was

10   curious about, that he wanted to know, and what he said was, I am

11   curious about the impact on these, on this equipment of heat, of

12   temperature, and he was talking about, I think, switches and he was

13   talking about circuit breakers.  But another issue in this case or

14   another way of looking at this is to measure temperature as a

15   function of resistivity.  And that's what this is, these are test

16   results that do that.

17          And the standard that Dr. Beyler uses here is based on

18   the UL 498 standard, which they've excerpted four pages of, but

19   it's a fairly lengthy document describing how and what you would

20   need to do to list the switch to be new, to sell it on the market.

21   And that was the sort of conservative Basis, as Dr. Beyler

22   explains, that he used to set up his test protocol.

23          Within this standard is a method to do temperature

24   testing on the connections.  And that's what Dr. Beyler was asked

25   to do and that's what he's concerned about.  What is the impact of

1    corrosion on wires on connections to receptacles and switches such

2    that if you were to hook them up again or do some cleaning on them,

3    would that violate the standard 30-degree temperature standard,

4    which is a new standard, meaning that that's a conservative

5    standard to say that if a device or a receptacle meets that

6    30-degree standard, then you can market it as new, and he based it

7    on this.  I actually asked him in his redirect on pages 112 of the

8    trial transcript whether or not, with respect to the standard that

9    Mr. Bryson was talking about, whether he considered that in

10   designing his experiment, and of course he said he did.  And in his

11   determination that was not the purpose of what his test was, which

12   was to focus on the connections.

13            As he indicated in his cross to Mr. Bryson, there's a lot

14   of tests in here that would go to all different components of the

15   receptacle if the purpose was to say, this is a new receptacle

16   which we're going to sell.  But that wasn't the purpose, the

17   purpose was to design an experiment to which you can measure the

18   contact resistance where the wires are hooked up, and that's what

19   that particular temperature test goes to.

20            With respect to the wires, again on page 53 of his trial

21   deposition, I asked Mr. Beyler how he did the, starting at page 53,

22   what his basis was for extending the 498 standard to actually

23   measure the wires and the temperature rise in the wires.  And he

24   indicated that there isn't a UL test on wires, the wires usual test

25   is on insulation.  But the only difference here was that he was

1    measuring the test differential, he was measuring the temperature

2    of the wires with corrosion on them and trying to get an idea of

3    whether or not there were temperature raises in those wires.

4            With respect to wires and insulation, the test is

5    actually from a different standard 90 degrees.  And the idea was to

6    see, does it get to that point.

7            All of these are based on the standard here and there are

8    modifications to the standard.  What Mr. Bryson has raised, if

9    there's issue with, did you use the right thermocouple, it was a

10   modification proper, well, our expert has testified that he

11   believes it is, and he explains or could've explained how the

12   modification worked.  If Mr. Bryson wanted to get into it more in

13   the deposition and wanted to elicit testimony that might discredit

14   or put doubt on his results, he had an opportunity to do that.

15           But the method here is fundamentally sound based on a

16   well-recognized method and a portion of that method.  And we

17   believe it survives, should survive a *Daubert* challenge.

18           THE COURT:  Okay.  Any response?

19           MR. BRYSON:  Your Honor, just a very, very brief

20   response.  Your Honor, Mr. Sanders just basically just said he

21   designed the test for purposes of litigation.  He testified that he

22   was supposed to follow Section 112, the temperature test, he

23   admitted that in his testimony.  This test has steps that he

24   omitted.  There is -- he has no evidence that there are other

25   experts who have ever used or followed this type of test.  He said

1   this was the first time he had ever done it, this was the first

2   time he had ever pulled out receptacles and done this type of test.

3           There is no evidence of peer-reviewed literature that

4   supports the method in which Dr. Beyler did it, and they have the

5   burden to show those things and they have not met that burden, they

6   have developed the test for litigation purposes only and it should

7   be excluded.  Thank you.

8           THE COURT:  All right.  I do understand the issues

9   involved.  It has to do with *Daubert*, it has to do with

10  methodology, and of course with methodology that's what we do with

11  *Daubert.*  It comes rather late in the game, but that's neither here

12  nor there.  The court is required to serve as a gatekeeper in these

13  matters.

14          I'll reserve ruling on the exhibits, but I will allow the

15  testimony.  And the points that the plaintiffs raise are valid

16  points, but I think that they can go, he can make those in

17  cross-examination in any other areas, including rebuttal testimony,

18  if that's necessary to attack what this witness's conclusions show,

19  that this witness's conclusions are inaccurate because he

20  misapplied certain things.  But I'll let the testimony in.  So I'll

21  deny the motion.

22          MR. SANDERS:  Thank you, your Honor.

23          THE COURT:  Let's call your first witness, please.  I

24  understand that you've made motions for judgment as a matter of

25  law, I note that you vigorously present that question and raise all

1    of the issues that you've raised.  I'll take it under consideration

2    and I'll deny the motion.  So let's present your testimony.

3              MR. SANDERS:  I would like to call Dr. Richard Lee.

4              THE COURT:  Come forward, please, sir.

5              THE DEPUTY CLERK:  Sir, please step into the witness box.

6    Would you raise your right hand.

7         (WHEREUPON, DR. RICHARD J. LEE, WAS SWORN IN AND TESTIFIED AS

8           FOLLOWS:)

9              THE DEPUTY CLERK:  Please be seated, and would you state

10   your name for the record.

11             THE WITNESS:  My name is Richard J. Lee.

12             THE COURT:  You may proceed, counsel.

13                        VOIR DIRE EXAMINATION

14   BY MR. SANDERS:

15   Q.  Good morning, Dr. Lee.  What is your current position and who

16   do you work for?

17   A.  I am chief executive officer of the RJ Lee Group.

18   Q.  And if you could tell us, what is the RJ Lee Group?

19   A.  We are a company that is involved in scientific innovation,

20   testing and computer software.

21   Q.  And if you could tell us a little bit about your education and

22   sort of your roots.

23   A.  I grew up on a farm in northern North Dakota, which is just

24   about as far from New Orleans as you can get.  And I went to the

25   University of North Dakota in 1962, where I graduated with a double

1  major in physics and mathematics.  I then went to Colorado State

2  University, where I got a Ph.D. in theoretical solid state physics

3  and mathematics.

4  Q.  Could you explain for me what theoretical solid state physics

5  is?

6  A.  Theoretical solid state physics is the branch of science in

7  which you imagine the universe and how it is put together and the

8  way it works and develop theories, mathematical theories, to

9  express the behavior of properties, systems in the universe.

10  Q.  So where did that degree take you next?

11  A.  That degree took me to a regional campus of Purdue University

12  for three years, where I taught undergraduate and graduate physics,

13  undergraduate, primarily for engineers, and premed, pre-law and

14  graduate physics for graduate semi-conducted physics.

15  Q.  And here we actually have the front page of Mr. Lee's résumé,

16  just to sort of follow along.  Did you do anything outside of

17  teaching while you were at Purdue?

18  A.  While I was at Purdue, I got involved with SC Johnson and

19  Company in designing the transparent toothpaste, which was the goal

20  of a bunch of the commercial manufacturers of toothpaste at that

21  time, and then I got involved with Chrysler Corporation in

22  designing and developing the automotive catalyst system that, the

23  EPA had just mandated a reduction in NOX, carbon monoxide -- NOX

24  nitrous oxides and carbon monoxide, and Chrysler brought me in to

25  help design the catalyst system and the substrate for them.

1    Q.  And what is that, what is the catalyst system and the

2    substrate, what were you actually doing?

3    A.  The catalyst system is a porous gamma alumina, which is a form

4    of alumina, with a very fine, relatively poor crystal

5    microstructure, and you deposit either on that or in that compounds

6    which lower the amount of energy required to convert, reduce

7    nitrous oxides or carbon monoxide.

8    Q.  And after your time at Purdue, where did you go next?

9    A.  After three years at Purdue, I went to the United States Steel

10   Research Center in Monroeville, Pennsylvania.

11   Q.  And how long were you at U.S. Steel?

12   A.  I was at U.S. Steel 12 years and a few days.

13   Q.  And what were you hired to do when you first got to U.S. Steel?

14   A.  At U.S. Steel I was hired to be in the fundamental research

15   department, which was charged with looking at problems.  We did

16   not -- we don't -- I'll put it in the past tense I guess, we didn't

17   know how to solve at the time and figuring out what the issue was

18   and what could be done with it.

19          Then we worked with product development and engineers, so

20   we ranged from the mining, at the time we were a large exploration

21   and mining company, through the processing of iron ore, copper,

22   nickel and the other things, to the blast furnace, to the products,

23   and then followed that out into the product strip.

24          So if you bought a refrigerator from a company and the

25   paint didn't adhere, it ultimately came back to us.  And our

1    question was threefold:  Was this a materials problem, was it a

2    usage problem, did it have stuff sitting, weight sitting on it that

3    you shouldn't have, was it an adhesion problem, or was it a design

4    problem?  So our role was to characterize the material and work

5    with the engineers to either solve the problem, resolve the

6    customer issue, or identify an area where additional development

7    had to be done.

8    Q.  And when you first went to U.S. Steel, what was your specific

9    role in that process?

10   A.  I was a research engineer in charge of scanning electron

11   microscopy.

12   Q.  We've heard a little bit about SEM here.  If you could just

13   kind of tell me just briefly what that meant and what types of

14   things you did?

15   A.  At that time scanning electron microscopy on a commercial sense

16   was about four years old, and it represented the first major

17   opportunity for evaluation of materials that had come along,

18   really, three major steps:  One was the optical microscope and the

19   understanding of phases and identification of ores and ore

20   minerals.  The next was in the early '40s, late '30s, early '40s,

21   the development of the transmission microscope.  But this tool gave

22   you the opportunity to look at surfaces, to look at the chemistry

23   on an extremely small scale of that surface and then look at the

24   way that chemistry behaved.

25              So you look across things, over things, through things,

1   and determine the relationship between the chemical behavior, the

2   physical property you were evaluating.  At that time it was a

3   revolutionary tool.

4   Q.  And for a while there, you were involved in doing just that,

5   looking at things and cross-sections and other --

6   A.  I did that at U.S. Steel and I've done that, including the

7   design and development of the first computer-controlled electron

8   microscope after I formed RJ Lee Group.

9   Q.  And I guess at some point you moved up a little bit in the

10  group.  What did you become?

11  A.  Well, I like to say I moved up, but at that time the steel

12  industry was in a great recession, so to some extent it was a

13  little bit like sitting in a lake, with the water going down and

14  you came out of the lake, because if you survived, you were higher

15  in the corporation than you were before.  But eventually I became

16  head of the physics, surface science and electron microscopy

17  division.

18  Q.  And what areas did you focus on as the head of that group?

19  A.  I really had three areas in that group.  We were the lead

20  surface group or problem solving, whether at the plants, in Oramac

21  or at the customer level, that was like about the third.

22        We worked with people involved in product development,

23  and so there we were looking at failure analysis trying to decide

24  whether the failure was, like I described on the refrigerator, was

25  it a mechanical problem, a design problem or an environmental

1    problem, typically was the world we worked in.

2              Then in the early '70s we really came with the first

3    environmental awareness.  The awareness that you had to -- what we

4    were doing industrially and the environment we were creating wasn't

5    acceptable for the long-term.  So I was at the threshold of sort of

6    environmental science from one of the major polluters at that time

7    in the country, and that was about a third of my work.

8              And then developing new techniques and methods to solve

9    the problems that we didn't -- hadn't addressed.

10   Q.  And in your assessment of products and failure analysis, did

11   you address or work with corrosion issues?

12   A.  Corrosion was one of the leading issues in the steel industry.

13   There's two branches, sort of a physics that are sort of the fourth

14   and fifth branches, and that's corrosion and wear, and they're

15   still extremely important today.

16             But in corrosion we were trying to design systems which

17   would last 50 years in many circumstances, and to do that we had to

18   protect the steel from the environment because -- in some cases,

19   like we have something called corten steel, which is a passivated

20   oxide film on the surface of the steel, which gives it a very

21   attractive brownish color, but it really doesn't flake off and

22   peel, so it limits the corrosion.

23             Then we had our products, our galvanized products, our

24   tin-plated products, all of which the coating was there basically

25   for sacrificial purposes to protect the steel.  So you would coat

1    it, a turn plate, you put a lead zinc coating, lead tin, and that

2    would be corroded in place of the steel.  So it would protect the

3    steel, assuming it was adhering and well put on to pretty severe

4    environments.

5    Q.  Can you provide me an example of a project you worked on for

6    U.S. Steel involving corrosion?

7    A.  Yeah.  Probably one of the most interesting ones was we had, we

8    provided the cable, the steel cable, for the Golden Gate Bridge.

9    People started reporting corrosion phenomena going on on the cable.

10   And it was an extremely interesting problem, solving that problem,

11   so that we didn't have to replace all of the cable in the bridge or

12   have to -- have catastrophic failures.  It was an extremely

13   interesting challenge.

14   Q.  And obviously did you succeed?

15   A.  It's still there.

16   Q.  How did you end up at RJ Lee or, I guess, founding RJ Lee?

17   A.  Two things happened:  One, we had shrunk so much in research,

18   we started with 2,200 people in research and we were sort of the

19   Bell Labs of the metallurgical industry and we had shrunk to about

20   400 people, and I said to my boss the next time, don't ask me to

21   cut more people, just fire me and the group and we'll go out and

22   start up on our own.

23   Q.  And that's what happened, I guess?

24   A.  That's what happened.

25   Q.  One of the other areas you had mentioned that you were at U.S.

1   steel was sort of the environmental area.  What did you do or what

2   was your responsibility with respect to environmental issues?

3   A.  At the time, it was in the early '70s, '73, '74, '75.  The

4   whole issue of asbestos had just really become an issue, and so

5   there were cases involving Lake Superior and cases involving our

6   iron ore mines in Quebec and Labrador and Newfoundland, where we

7   had minerals which were, in some cases were asbestos and some cases

8   looked like asbestos.  And so our job was, we worked with the

9   agencies, we worked with everybody from the unions, to say is there

10  a problem, how much is the problem, and what do you do about the

11  problem.

12  Q.  And what did you do or what was your involvement in determining

13  what you do about the problem?

14  A.  Well, at that time, if you grabbed a particle out of the air

15  and had a totally unknown particle, there was no way of telling

16  whether or not it was asbestos or some other.  I developed

17  automated procedures to identify those particles and then count

18  them, and so in the process of doing that I ended up writing the

19  standards for asbestos and it became a significant component of the

20  business of RJ Lee Group.

21  Q.  And RJ Lee Group, could you tell me what the focus has been for

22  RJ Lee Group, and particularly your own focus?

23  A.  We're very much like the old industrial research laboratories.

24  We have a broad scale of scientists and probably something around

25  350 people today.  In that group, we have 20, 25 Ph.D.s, 30 or 40

1  bachelor's degrees and maybe 75 to 100 bachelor's degrees, and then

2  a lot of trained technicians, plus your ordinary kinds of support

3  staff, accountants, secretaries and facilities people and the like.

4  Q.  And what's your role in working on projects that you work on

5  with RJ Lee?

6  A.  I have a management team that does most of the day-to-day.  I

7  tend to be involved, like to be involved in project oversight and

8  program design and sort of when and where I can, a lot more than it

9  used to be in the old days than now, hands on, particularly

10  electron microscopy, I love that.

11  Q.  And can you give me some examples of any corrosion projects

12  that you've been involved in at RJ Lee in the last couple of years?

13  A.  Recently the, in the fairly recent past, there was a large

14  chlorine spill in South Carolina, right near the Savannah River

15  Plant, Savannah River Georgia plant, I forget the name of the town.

16  But we were brought in to assess how far the chlorine gas went.

17       It was pretty significant, actually.  Killed eight people

18  because they got, once the spill happened they ducked down on the

19  ground, which was exactly the wrong thing to do because chlorine

20  gas is heavier than air and it killed them.  And it killed the

21  animals, cats and dogs.

22       But we were charged with figuring out where did that

23  plume go, what did it impact, how corrosive was it, did people's

24  homes and furnishings, were they affected, and so on.  And as well

25  as the industrial impact on a textile mill, that was Avondale

1    Mill's textile mill.

2    Q.   And how were you involved in that project?

3    A.   I and my staff designed the program, walked the grounds in the

4    first days, here is the assessment process, then we managed the

5    damage process for the client, Norfolk Southern.  So people would

6    call up and say, hey, I think my home was impacted by this chlorine

7    spill, we set up a process which was a field inspection, field

8    testing and then sending samples if it was, both positive and

9    negative samples to the laboratory for confirmatory analysis.

10   Q.   So as Part of that project, you actually assessed and measured

11   whether or not things were corroded?

12   A.   Whether they were corroded and whether it was superficial or

13   whether it was, you know, fundamentally, whether or not it should

14   be replaced.  Either, or either because it was damaged or because

15   it was less expensive to replace it than it was to clean it.

16   Q.   And what about -- any other examples in the recent past?

17   A.   We were the lead environmental team in about ten of the

18   buildings affected by the World Trade Center event.  And we had the

19   old Federal Reserve Bank, which was immediately south of The World

20   Trade Center 2 and when the building went over, when The World

21   Trade Center 2 came down, it cut a 17-story gash in the side of our

22   building, and then the pressure brought all of the pulverized

23   contaminants and fire, we called it a cocktail that really had

24   never been seen before.

25          And the building, since we act like a vacuum cleaner, it

1    was lower pressure than the pressure wave of stuff that came out,

2    so it filled every nook and cranny.  And then to a lesser extent,

3    the other buildings around the area, buildings behind it.  And then

4    later on we looked at sort of the second wave of issues related to

5    buildings which hadn't been able to be cleaned the first time but

6    suffered some other kind of damage, in assessing whether or not

7    there was related to the World Trade Center event.

8    Q.  What were the problems or the issues that you were looking at

9    and how they impacted the building specifically?

10   A.  There were three or four really major issues, depending on the

11   building you were in.  But one was structural because we had fires,

12   which were pretty hot.  So assessing the impact of that, of the

13   fires on the steel and on the other materials.

14        The second was environmental.  How do you design the

15   cleanup process that would be effective, that would not be putting

16   people at risk after the fact from a health perspective or the

17   materials at risk for ongoing corrosion.

18        The third was the kind of long-term environmental

19   assessment.  Were the concentrations of airborne pollutants high

20   enough and what was near long-term risks to the population, which

21   was, people that were exposed that day weren't exactly there

22   expecting to be, have a building come down.

23   Q.  And with respect to the corrosion issues specifically, what

24   issues were you addressing, if you could give some examples?

25   A.  We did much the same.  We worked with engineers.  One of the

1   major issues was concrete, concrete and steel.  There was a lot of

2   issues relative and, depending on the building.  Some buildings

3   were, you couldn't -- we ended up saying you couldn't really repair

4   them, some buildings we ended up saying they can be repaired and

5   here is what you're going to have to do.

6           MR. SANDERS:  Your Honor, I would like to tender Dr. Lee

7   as an expert in investigation of physics and corrosion, material

8   science failure analysis and repair.

9           MR. SEEGER:  I was all prepared to yell no objection

10  until I heard physics of corrosion, your Honor.  You know what,

11  I'll save it for cross.

12          THE COURT:  All right.  The court will accept him in the

13  designated fields.

14          MR. SANDERS:  Thank you, your Honor.

15                      DIRECT EXAMINATION

16  BY MR. SANDERS:

17  Q.  Dr. Lee, could you explain your involvement in this

18  investigation and in the Hernandez case?

19  A.  I have not had any steady day-to-day involvement, but I've been

20  involved in, probably in the beginning and near the end of 2008 in

21  addressing, in sort of the experimental design, working with my

22  scientists, Dr. Perricone, I'll probably slip and call him Matt

23  during the -- Rickabaugh, Wagner AND LAVINE and other people who

24  worked on this problem in terms of oversight.  But I kind of call

25  it connecting the dots.

1   Q.  And have you seen or been to houses with Chinese drywall in

2   them?

3   A.  Yes, I have.

4   Q.  Where have you seen it?

5   A.  In Florida and in Mandeville, Louisiana.

6   Q.  And during the course of your oversight in the project, were

7   you involved in the preparation of all of the reports?

8   A.  Yes.  I reviewed the reports and I drafted sections of the last

9   report.  I tend to serve as the technical editor.

10  Q.  And what is your specific opinion in this case?

11  A.  The specific opinion is that removal of the drywall will

12  eliminate -- removal of the drywall is an effective means of

13  remediating the source of the corrosive gases and arresting the

14  corrosion; therefore, it's an effective remediation procedure.

15  Q.  And you mentioned arresting corrosion.  Is that one of the

16  bases of your opinion, that it's an effective remedy?

17  A.  Yes.

18  Q.  Can you explain what you mean by arresting the corrosion?

19  A.  By arresting the corrosion process, or it's been described

20  variously as tarnishing or corrosion, but it's a reduction of

21  oxidation reaction.  The arresting, that means that stopping it so

22  that it returns to a state that would not be different than what it

23  would be had this source or had the hydrogen sulfide and other

24  gases in combination never been there.

25  Q.  And is it your opinion that once the drywall is removed the

1   corrosion will continue or could continue?  The sulfide corrosion.

2   A.  It will -- I think you have to be careful with the use of terms

3   here.  The corrosion relating to, that is being affected or

4   impacted by the presence of reactive materials in the drywall is

5   the cause will stop.  But we live in a world where there is -- so

6   if you call that sulfidization or reduced sulphur corrosion or

7   whatever, or drywall corrosion, I don't care, but that will stop.

8   What will not stop is the normal tarnishing behavior that you see

9   in any home or in any material.  So...

10  Q.  Can you explain to the court and for us what the basic

11  mechanism right now is of the corrosion with the drywall in the

12  house?

13  A.  In the case of the drywall, the driving force is the production

14  of hydrogen sulfide gas.  That gas, as it approaches the wires in

15  the vicinity of the, let's take the wires, approaches the wire,

16  interacts either at the surface or in the atmosphere near the

17  surface of the wire.  It's pretty much a gas-based reaction, but

18  it's close to -- it would most likely take place in some kind of

19  association with some kind of condensed moisture on the surface,

20  even though -- and it will produce associate hydrogen sulfide

21  creating sulfide ions, which then give the copper in the wire the

22  opportunity to say, I can get to a state of what we call lower free

23  energy but a more relaxed state if I jump out of this lattice and

24  interact with that pipe.  It's like the copper gives up an

25  electron, it's released into the environment and is grabbed by the

1    sulphur.  And that film builds up.

2         What isn't completely clear and you see some different,

3    different is this film building from the top, is it building by

4    migration of the copper through the air or is it building like you

5    lift blocks, so is it building by reacting underneath the surface.

6    And very likely there's some of each going on.

7    Q.  What do you mean by the copper wanting to relax or join with

8    the sulphur?

9    A.  Well, if you think about, if you think about how we make metal

10   today, we take ore out of the ground that's been oxidized and is

11   stable, it's going to stay there basically forever, it's in a state

12   of, in physics we'd say is the lowest free energy.  It's kind of

13   like, kind of like my stomach when I was 17, it was pretty flat and

14   it took a lot of energy to keep that way.  When I'm 65, it's

15   relaxed.

16        So to make a metal we take this ore out of the ground, we

17   clean up all of the crud around it, and then we put it in a furnace

18   where we impart a lot of energy, heat it up, and then we let it

19   cool under controlled conditions, and we add various bits and

20   pieces of alloy metals and the result is a nice, rigid metal

21   structure.  But it's sitting there and it holds itself together,

22   but if you give it a little bit of energy, break one of those

23   bonds, it would like to go back to that state that it was in the

24   ground.  And that's really the relaxation.

25        In physics we call it going to a lower state of free

energy.  In chemistry they call it, they rate things by the electrochemical potential, electronegativity and/or the amount of energy required to disassociate the copper versus disassociate, so you have -- in corrosion engineering they call it cathodic and anodic reactions.

Q.  So what's the low state of energy here, what do we end up with?

A.  The low state of energy in this case, in the presence of a hydrogen sulfide gas, and something to help it disassociate is copper sulfide, $Cu_2S$.

Q.  And that's the film we find on the wires and the pipes and the other materials?

A.  That's what you find on the wires and the pipes.

Q.  And will that film, you said it's in a low state of energy, what does that mean, will it react again with water or other --

A.  No, it doesn't like water.  It's a fairly open structure, so water in the form of -- water in the form of vapor tends to penetrate it, but it doesn't like water.  You put a drop of water on it it'll bead up.  It has a very high surface tension.  So water isn't going to wet it.

        So once it's in that copper sulfide state, it basically will not engage in further reaction.

Q.  I think you were here for Mr. Krantz's testimony, and if you could put up LT 241, please, Connie.

        We've heard about the Edwards paper and its supporting kind of a continuous reaction of -- well, the continuous reaction

1    when you remove the source.  Are you familiar with this paper?

2    A.  Yes.

3    Q.  What is this paper designed to look at?

4    A.  This paper is designed to look at a problem that's been being

5    chased for a long time, and that's the corrosion of copper piping

6    in water supplies.  Originally, it started out with the sea water

7    problem, but in this paper they're trying to design an experiment,

8    they did design an experiment, which looked at basically what

9    amounts to a soft water corrosion and how that is enhanced or

10   modified, accelerated by the presence of soluble sulfides.

11   Q.  And if we go to page 2, I think the second full paragraph, it

12   describes how the experiment design is set up and what they put

13   into the water.  If you remember, if you could do that or we can

14   refer.

15   A.  Fundamentally, they added some carbonation, they added some

16   sulfate or sulfide, and they added some chloride to give you kind

17   of a typical mix of what you might expect in a potable soft water

18   supply.  And then they ran that, they used the carbonate basically

19   as a buffer so they could create a near-neutral pH and a high pH,

20   pH around 6, 6.5 or 7 and a pH of around 9.  And then they

21   circulated that water past the interior of this pipe when it was

22   charged with sulfide.

23   Q.  And that's representative of the environment, I guess, in

24   drinking water, but is that representative of an environment in

25   homes around wires and copper?

1  A.  Not around the outside, in the inside the, you know, you have

2  water flowing through with certain ions and you have the problems

3  with corrosion on the inside that's caused by simply either hard

4  water, soft water or the chemistry of ions in it.

5  Q.  And the Jacobs Edwards report indicates or I think concludes

6  that when they take it out of the, sulfide out, the reaction still

7  continues.  Can you explain what's happening there?

8  A.  No.  As I read that paper, they do not describe the reaction

9  continuing.  What they do is say when you take that system out of

10  the sulfide, maybe a little bit more, they mixed up two batches of

11  water, one where they added the sulfide the other where they

12  didn't.  So in both cases -- so they have a four by four

13  experiment.

14         After they ran this thing for nine months or something

15  like that, on the sulfide side, they put it in the water that's

16  similar to the water in the other side, the normal water.  So they

17  said, now what happens, after I've built up this sulfide film, what

18  happens if I put that back in sulfide free water?  And what they

19  found was that in comparison to normal corrosion of copper in

20  water, it was accelerated anywhere from five to 15 fold.

21  Q.  What's the specific reaction that's happening there, is that a

22  sulphur or sulfidation reaction?

23  A.  That's not a sulfidation reaction, that's a, that's one of a

24  number of reactions with general oxidation forming copper oxide,

25  cuprous oxide.  It depends on the hydrogen ion concentration and

1    the various ions that are present.

2    Q.  Can you explain for me what's happening in that sulfide free

3    now water with the sulfide, I guess, scale they have on them?

4    A.  Well, I think what's happening, you have the pipe that is

5    basically virgin copper, you then have a copper sulfide layer on

6    it.  And out here -- in here on the side, but if you imagine

7    there's a big surface, out here you have water and that water is

8    circulating by.

9          So the water provides a source of oxide or chloride ions.

10   And up to the surface the copper sulfide acts like a semiconductor,

11   you get transfer of electron hole pairs between the copper and the

12   water, and it enables the copper ions to come out in an anodic

13   fashion and go into the water where they tend to either, depending

14   on the level, they'll either sit there as positive ions balancing

15   the negative ion concentration or they will react with one of the

16   species of copper oxide starting off generally and precipitate out.

17   They prevented the precipitating out by replacing the water.  Every

18   month they'd change the water, so they kept a constant source of

19   new ions.

20   Q.  And you're talking about ions, I guess, and maybe it doesn't

21   matter, but what you're talking about in this water example,

22   they're not sulfide ions that are forming?

23   A.  Not after -- in the continuation, in part B of the experiment,

24   they're not sulfide ions, they're not talking about continued

25   sulfidization.

1  Q.  So how does that relate, then, back to our example of pipes and

2  wires and houses with a sulfide layer on it?  Why won't that

3  reaction occur in that context or why won't a sulfidation reaction

4  occur?

5  A.  Well, first of all, sulfidation reaction, I don't think anybody

6  claims, although in the testimony yesterday, at least for me, it

7  was a little bit confusing, because as long as your copper sulfide

8  is stable, there's no real claim that the, in the sense of a

9  chloride ion reaction, which is, you know, you can get a

10  self-catalyzing reaction.  There's really no suggestion that the

11  sulfidization is going to continue, that your sulfate, that your

12  iron copper sulfide is going to form, to resolve, recreate ions,

13  and you have a circuit going.

14        What will happen in the absence of the $H_2S$, part B of our

15  experiment, okay, well, you'll have moisture in the air, especially

16  if you have a wetting or increasing, wherever it's changing you'll

17  have a tendency to increase, create some disassociation, extract a

18  few ions, but then you've got maybe five to ten atomic layers of

19  moisture, and maybe it's over 150-angstrom, 200-angstrom, so you

20  have a total of maybe 3 or 400 water molecules and some oxygen.

21  Copper item comes out, the water starts to evaporate, what do you

22  get, you get a copper oxide.  So to the extent you can pacificate

23  copper, you'll pacificate it.

24        So, in effect, you went from a small anode and a large

25  cathode, which pulls the ions away, to a large anode and a small

1  cathode, where the reaction takes place and there's nowhere for it

2  to go.

3  Q.  So what do you end up with there, it's, say, copper oxide, is

4  that the same process that happens on wires normally?

5  A.  At that point it will be the same process that happens on a

6  wire normally.

7  Q.  And there's no impact or -- with the sulfide there, will there

8  be any impact or acceleration of that process?

9  A.  Well, it's a rate-limiting step.  It might happen a little

10  faster but it won't, it's got the same -- it can only go to the

11  same place, so initially you might get a little faster rate, but it

12  has the same rate limit.

13  Q.  So if I understand it, unlike the example on the pipe where the

14  water takes away the copper oxide or the copper ions, those stay on

15  the pipe?

16  A.  Yeah.  If you think about this from an atmospheric versus an

17  aqueous corrosion phenomena, an aqueous corrosion, we tend to lose

18  mass, you measure the corrosion by measuring how much material you

19  lost.  In atmospheric corrosion, you tend to gain mass because the

20  ions are not transported away.

21  Q.  Can we look at DX 158, please.

22        This is from your report.  Could you explain what we're

23  looking at here?

24  A.  This is a water pipe taken out of one of the units, I guess in

25  this case it's the Hernandez unit, 68034, in Mandeville, and the

1   inside -- in a sense, this represents a real version of the Edwards

2   experiment because on the inside surface you see the corrosion rate

3   that's due to the water flowing through the pipe and the reaction

4   of the copper with the water.

5           On the outside surface, and you can see the layer of

6   copper oxide that's formed there, there's probably a little

7   carbonate.  If you look at the grayer, if you go to the right hand,

8   upper right-hand picture.  Upper right-hand.

9   Q.  This is on the inner?

10  A.  Yeah, right there.  If you look at that, you can see that

11  there's a, that there's a pretty continuous corrosion layer right

12  along the surface.  You also see this is not a -- this water does

13  not contain sulfide.  There is no second layer, which would

14  represent the sulfide component.

15  Q.  Just to be clear, what's happening here inside of this pipe has

16  nothing to do with the sulphur gases outside of the Chinese

17  drywall?

18  A.  No.  This is water supply from Mandeville coming into the house

19  and reacting on the inside of the pipe.

20  Q.  And how does that compare to the outer layer --

21  A.  Well, I think this is probably one of the best examples you can

22  have where it shows that the comparison of the rate of attack

23  inside the pipe and the outside attack of the pipe you've got is a

24  relatively minor continuous corrosion on the outside of the pipe,

25  somewhat more aggressive, maybe two or three or four or five times

1    as much on the inside of the pipe.

2    Q.   Is this the layer of sulfide tarnish --

3    A.   Well, that's the sulfide layer where intersects with the

4    unaffected material.

5    Q.   So these are the, I guess, same pipe in the same magnification?

6    A.   Yeah.  If you take the, we took a ring of the pipe, cut it in a

7    transverse manner and mounted it in a manner that would preserve

8    the film, and compared the surface on the inside of the pipe and

9    outside the pipe.

10   Q.   I think Mr. Krantz had talked about some experience with heat

11   exchangers and saltwater.  Is that the same thing that's happening

12   up there or similar?

13   A.   Related.  You know, one of the problems with heat exchangers is

14   that you tend to get more pitting corrosion than this sort of

15   semi-continuous corrosion that you're seeing here.  But it's the

16   same kind of thing, you have a metal with -- to make that heat

17   exchanger work you don't want that corrosion layer on the inside of

18   that pipe.

19   Q.   And with respect to this layer of sulfide film that's there on

20   the copper pipe, it's your opinion that that won't continue to grow

21   once the sulphur, that sulfide layer will not continue once the

22   sulphur source is gone?

23            MR. SEEGER:  Objection, leading.

24            THE COURT:  Sustained.

25   BY MR. SANDERS:

1    Q.  What is your opinion with respect to the continuation of the

2    growth of the sulfide layer after the sulphur source is gone?

3    A.  Once you have no sulphur source, you will have some modicum of

4    continued atmospheric corrosion due to the normal environmental way

5    pipes function.  That rate will become, that rate will effectively

6    terminate.  It takes hundreds of years to effectively build up any

7    significant corrosion on the material.

8    Q.  And what is that, that's the copper oxide corrosion, what does

9    that look like?

10   A.  Primarily copper oxide.  That's going to depend, the form is

11   going to depend on the precise composition of the chemistry.  And

12   that's really more of a kinetic thing, it's really more

13   Dr. Perricone.

14   Q.  And if we could turn now to, and I guess that would be the

15   same, what's your opinion with respect to continued growth on wires

16   and other copper?

17   A.  It's the same.

18   Q.  Would that also apply to what we've talked a little bit about

19   silver, as well in the formation of silver sulfide?

20   A.  Yes.

21   Q.  So it's the same reaction?

22   A.  Physically, almost identical reaction.  Silver is a little

23   further down in terms of the -- it's a little easier to create a

24   reaction than copper.  But if you take a piece of silverware out of

25   your drawer, at least out of my mother's drawer and my wife's

1    drawer, maybe not my kids, but it'll be tarnished, you'll go to

2    clean it, and that will have that silver sulfide on it, one of the

3    forms.

4    Q.  But that will be from the, what's that, would that be from

5    the --

6    A.  Normal atmospheric.

7    Q.  Is that from a silver sulfide layer that's already there from

8    the drywall?

9              MR. SEEGER:  Objection.

10             THE WITNESS:  It's a slower process than what we're

11   seeing here, but it's kind of the normal effect.

12   BY MR. SANDERS:

13   Q.  Do you express the opinions you have just provided with a

14   reasonable degree of scientific certainty?

15   A.  Yes.

16   Q.  What other opinions do you have in support of the remedy with

17   respect to the functionality of the wiring and the pipes?

18   A.  Basically, if you don't, if your wire and your pipes, if you

19   remove the source, it will eliminate the corrosion.  The corrosion

20   as it exists, or tarnishing, is superficial in nature, hasn't

21   affected either the performance, electrical or mechanical

22   performance of the wire.  It pretty much is semi-continuous or

23   continuous corrosion phenomenon.  So it's not the kind that are

24   going to make a material change in cross-section to the point where

25   you can, where you expect significant change in properties.

1    Q.  Can we look at DX 137.  And what is DX 137?

2    A.  That's called a distorted wire.

3    Q.  Is that because of our picture possibly?

4    A.  That's a comparison of a ground wire, and you can see that the

5    bit of tarnishing, sort of the irregular surface.  On the

6    right-hand side you can see the original, what would be a new wire.

7    You see there's some discontinuity surface imperfection because

8    this is an extrusion or wire-drying process, which these wires are

9    formed, so you leave some mechanical irregularities on the surface

10   of a wire.

11   Q.  Is there anything about the tarnish film around this wire that

12   concerns you?

13   A.  You mean in terms of a performance?

14   Q.  Yes.

15   A.  No.

16   Q.  Why not?

17   A.  Well, for the purposes of electrical properties, copper is

18   used, copper is copper.  It's used because it's a unique material.

19   It's almost like, it's close to zero resistance outside of the

20   semi-conductor or super conductor, as you can get.  It's basically

21   the most conductive material.

22        And then we have the benefit of Ohm's law, and that's

23   that resistance, okay.  Current takes the path of least resistance,

24   so that, in effect, when you put this tarnish layer on the surface

25   of the wire, you've created a parallel circuit.  The current says,

1  well, why would I go travel out in that outer layer because it

2  takes more energy to get through, I'll go on the inner.  And so you

3  get effectively no change in the electrical properties.

4           And obviously, this doesn't come anywhere close to, say,

5  a 30 percent reduction or whatever that would affect the mechanical

6  property.

7  Q.  I think in your assessment of this obviously, and we've seen

8  this all throughout the case, we've seen pictures of ground wires

9  or hot or neutral wires that have this layer on them, what's your

10 opinion with respect to their operation because of this tarnish

11 layer?

12 A.  Operationally, they're fine.  They've had no impact on -- what

13 I think you need to -- it's worth understanding that this corrosion

14 is, several things have to take place in order for it to happen:

15 You have to have some temperature or relative humidity cycling, you

16 have to have the source, and that creates a very superficial.  So

17 when you go into the contained spaces, you effectively, if you

18 don't have those things going on, it's an insignificant.  In this

19 kind of A case, it's materially insignificant, but functionally,

20 you know, it's not aesthetically pleasing.

21 Q.  And we've obviously been talking about wires, but would the

22 same opinion apply to copper plumbing and pipes?

23 A.  Right, sure.  There's no significant, no scientifically- or

24 materially-significant interaction of the pipes with the corrosive

25 gases.

1   Q.  And have you also reviewed Dr. Galler's report with respect to

2   the formation of silver sulfide in circuit breakers?

3   A.  Yes.

4   Q.  And are you aware of the, I don't think you were here, but the

5   pictures and the mapping of silver sulfide on the surface of those?

6   A.  Yes.

7   Q.  And what's your opinion with respect to the impact of silver

8   sulfide on the surface?

9   A.  That he observes spotty, localized sulfide.  We looked at a

10  circuit breaker and the contact zone is clean.  It won't affect the

11  performance.

12  Q.  Why not?

13  A.  Well, first of all, you need a physical layer of some kind, you

14  don't need all that thick of a physical layer, but it has to be a

15  physical layer.  The way contacts are made, basically by the high

16  spots on the wire, high spots on the mating surfaces, those would

17  come across and that's where your current is connected.

18          So you fundamentally have to cover those guys up with

19  enough thickness that you impede or you cause some kind of arcing

20  or something like that in the circuit breaker system.  They don't

21  satisfy the requirement that you've got this changing environment.

22  Q.  And you also, I think, provided some opinions about KPT's

23  proposed cleanup.  What's your familiarity with what KPT's

24  proposing to do to clean up the drywall and clean up the areas

25  afterwards?

1   A.  Basically, vacuuming, use a procedure that minimizes the dust

2   generation from a construction point of view.  And use a

3   conventional cleanup method, post cleanup, to what I have described

4   as a no-visible-dust standard.

5   Q.  And we've heard about, I think, HEPA vacuums or HEPA filters.

6   What is a HEPA filter?

7   A.  A HEPA filter is a filter which is designed to improve the

8   efficiency of dust collection.  So you bring, from a vacuum cleaner

9   you bring dust in and it comes up against the fabric.  A HEPA

10  filter has got a finer fabric, so it's more efficient.  In order to

11  compensate because it has a little better resistance, you use a

12  higher power -- so that, that basically, it's like an industrial

13  vacuum cleaner but with a more efficient filter.

14  Q.  And what if someone used a conventional shop vac, either just a

15  shop vac or with a drywall bag or something like that, what's the

16  difference?

17  A.  Well, with a conventional machine, when you first start out,

18  it's not as efficient.  Then the oscillator builds up and it

19  becomes more efficient.  But you end up, at least my opinion and I

20  think by our experience, that with an ordinary industrial versus a,

21  you get the same effect, it might take a little more effort.

22          In the case of a drywall, if you're reducing the

23  dust generation -- the issue is just fine dust, if you reduce the

24  fine dust generation through work practice, there's no reason you

25  can't.  Either one is an effective method.

1   Q.  And you mentioned a visually clean standard.  What does that

2   mean?

3   A.  What that means is, you look at a surface and it looks clean,

4   it is clean.

5   Q.  And have you done anything or what's the bases of that?

6   A.  Well, beginning with the whole range -- the thing in

7   environmental science, to develop methods to more efficiently clean

8   up, to eliminate contamination, we've done a lot of studies, we and

9   lots of other people have done a lot of studies, related to,

10  related to, how do you clean dust up, and starting with asbestos

11  but chemicals.

12          In the case of the World Trade Center, because of the

13  insurance requirements, the insurance requirements said bring the

14  material back to the state it would have been in before the event.

15  So it wasn't -- so you had to understand that.  So what we did was

16  go out in buildings around the country and look at surfaces which

17  were regularly cleaned, surfaces which were occasionally cleaned

18  and surfaces that were never cleaned and evaluate cleaning

19  techniques and dust loadings on those surfaces.  And from that you

20  fundamentally conclude that if you've got a semi-porous to

21  non-porous surface and it looks clean, it is.

22  Q.  Now, just to go back and just to make sure there's a finish on

23  the copper sulfide and some of the other issues, what about the

24  issue of solubility with copper sulfide?

25  A.  It's insoluble.  That means that it will not rerelease sulfide

1    ions.

2    Q.   What about in the presence of water or monolayers of water?

3    A.   Presence of water, you need a very acidic environment in order

4    to disassociate it.

5    Q.   So the film that's on the, the copper sulfide film, that won't

6    keep growing?

7    A.   No.

8    Q.   And that won't happen or won't keep happening -- what about the

9    copper pits, we've heard about pits for example, what about copper

10   sulfide and the pits?

11   A.   Well, I think the, if you leave copper sulfide -- I don't call

12   them pits.  If you look at this from a corrosion environment,

13   pitting corrosion, typically within the arc, it refers to a surface

14   which has got a passive film on it, and somewhere you have a break

15   or something like that and corrosion at that point, so you get a

16   relatively large void underneath, it can be a variety of shapes,

17   but the rest of the surfaces aren't.

18          You're pretty much the surface is uniformly affected, but

19   we're seeing these cups and, I mean, it's fair to call them pits,

20   it's fair to call them whatever, but they don't represent a pitting

21   mechanism, they represent basically some kind of imperfection,

22   which is rounding out faster or exposed to more surface area to the

23   event.

24          If you leave copper sulfide in those and you put a little

25   bit of moisture on top of one of those, you're going to get a

1 little bit of passivation of the copper film, and then a copper

2 substrate and then you're done for all practical purposes.

3 Q.  And if that happens, WHAT are you getting actually when that

4 happens, are you getting more copper sulfide forming?

5 A.  No, it's atmospheric copper corrosion in the absence of

6 sulfide.

7 Q.  And what do you end up with, the product?

8 A.  Typical product is cuprous or cupric, and there's a whole bunch

9 of mineral names, but that's a local kind of chemical, kinetic

10 phenomenon.

11 Q.  And will that continue forming or do any damage to the pipes?

12 A.  No.

13 Q.  And all of the opinions you've expressed here today, do you

14 hold them with a reasonable degree of scientific certainty?

15 A.  I do.

16        MR. SANDERS:  I'd also like to move into evidence the

17 pictures we looked at, DX 137 and DX 158, from the Hernandez house

18 and the comparison of the wires.

19        THE COURT:  Okay.  I'll admit them.

20        MR. SEEGER:  No objection.

21        THE COURT:  We'll take a break here.  The court will

22 stand in recess for 15 minutes.

23        THE MARSHAL:  All rise.

24    (WHEREUPON, A RECESS WAS TAKEN.)

25    (OPEN COURT.)

1          THE COURT:  Be seated, please.  You're still under oath,

2     sir.  You may cross-examine now.

3          MR. SEEGER:  All right.  Your Honor, thank you very much.

4                    CROSS-EXAMINATION

5     BY MR. SEEGER:

6     Q.  Dr. Lee, when we ended off one of the things I heard you say is

7     in the context of cleaning wire, I want to make sure I quote you

8     correctly, "if it looks clean, it is clean," that was your

9     testimony, right?

10    A.  I'm sorry, if --

11    Q.  "If it looks clean, it is clean."  Did you say that?

12    A.  Not with respect to wiring.  But with respect to dust.

13    Q.  So with respect to dust, I mean, we could throw out all of the

14    microscopes in this case, right?

15    A.  Pardon?

16    Q.  We should throw out all of the microscopes in this case, right,

17    we don't need the scientists to tell us that, do we?

18    A.  No, I don't think we need to throw out the microscopes at all.

19    I think it's the microscopes that have provided the basis for the

20    work and the understanding of what's required.

21    Q.  Now, Mr. Lee -- Dr. Lee, I apologize, you're not a chemist,

22    right?

23    A.  Nope.

24    Q.  And you don't have a degree in chemistry, do you, sir?

25    A.  Do I what?

1   Q.   You don't have a degree in chemistry, do you?

2   A.   No.

3   Q.   And the process whereby corrosion is created, fair to

4   characterize that as a chemical process?

5   A.   Well, you know, I think that's an age old argument.  If you're

6   a physicist, you say it's a physical process which amounts to a

7   change in the energy states, change in the electrodynamic energy of

8   the system.  If you're a chemist you describe it in terms of

9   entropy and the heat of reaction.  They are fundamentally different

10   ways of describing the same process.

11   Q.   Let me ask you a question.  We were talking about corrosion on

12   things like contacts and things like that.  Do you recall your

13   testimony?

14   A.   Pardon?

15   Q.   Do you recall your testimony about corrosion on circuit boards,

16   contacts, appliances, things like that?

17   A.   In the deposition?

18   Q.   No, this morning.

19   A.   Circuit boards --

20   Q.   You testified that there wasn't enough corrosion to interfere

21   with the resistivity of any of the electrical processes going on in

22   the house, do you recall that?

23   A.   Specifically with respect to the wires, yeah, that's correct.

24   Q.   With respect to the wires.  What about --

25   A.   With respect to the contacts I did not say that there's not

1    enough going on.  I said that if your contact is an environment

2    where there are changes in gas concentration, changes in relative

3    humidity, or those factors which accelerate corrosion, then it's

4    different than if it's in a stable environment.

5    Q.  You're aware in this case, you're generally aware of the facts

6    in the Hernandez case, right, sir, of what's going on in the house

7    with appliances and corrosion?

8    A.  Within reason.

9    Q.  So you're aware there are a number of appliances and electronic

10   devices in the home that have failed due to the corrosive

11   environment, you're okay with that?

12   A.  Well, I'm okay with the fact that there's a number of

13   appliances that have failed.  For example, I believe -- I am not

14   sure if Dr. Krantz forwarded them to us or whatever, but we looked

15   at a refrigerator, circuit board on the front panel, and that had

16   failed.  But it had not failed from a corrosive environment

17   resulting from hydrogen sulfide.

18   Q.  What else did you look at?  I mean, I think we're in agreement

19   in the refrigerator, it's a short circuit?

20   A.  Right.  But as I understood you said I was aware that that were

21   failure of corrosive environment, I simply pointed out to the

22   extent that our failures have been investigated, there are some but

23   like the thermostat I think where it gets in the right environment,

24   you're getting a temperature change, you're getting humidity, it's

25   got the silver.  But if you go look in the circuit breaker, it's

1   not been affected.

2   Q.  Did you look at a circuit breaker?

3   A.  Yes.

4   Q.  You went into the home and looked at a circuit breaker?

5   A.  No.  I had my guys go into a microscope and look at the circuit

6   breaker.

7   Q.  Is that in your report that you looked at a circuit breaker?

8   A.  No.  We actually got the parts after the report had been

9   published.

10  Q.  Well, I also deposed you.  Did you tell me in your deposition

11  that you looked at a circuit breaker?

12  A.  I don't remember.

13  Q.  Let me ask you this.  Are you aware of an organization called

14  ASTM?

15  A.  Yes.

16  Q.  What is ASTM?

17  A.  American Society for Testing and Materials.

18  Q.  Respected society, do you follow their rules and guidelines?

19  A.  Well, it's a -- well, it's a respected society that develops

20  consensus standards, bringing together all of the parties that are

21  involved, all of the stake holders.

22  Q.  Consensus standards you said?

23  A.  Yes.

24  Q.  Dr. Lee, let me just show you what I am about to read from, you

25  see that, it says ASTM at the top, standard terminology relating --

1    A.  I'm sorry, my ears are a little plugged up with my cold and

2    maybe it's age, but I am having a little bit of trouble hearing

3    you.

4    Q.  No problem, I have no problem speaking up.  Do you see what I'm

5    looking at here, do you see this document, it's an ASTM document,

6    do you agree with that?

7    A.  Yes.

8    Q.  The title there is Standard Terminology Relating to Corrosion

9    and Corrosion Testing.

10   A.  Yes.

11   Q.  Let's go to the definition of corrosion because I asked you a

12   question about whether it was a chemical or a physics process, do

13   you recall that?

14   A.  Yes.

15   Q.  Let's read this together.  "Corrosion, the chemical or

16   electrochemical reaction between a material, usually a metal, and

17   its environment that produces a deterioration of the material and

18   its properties."  Did I read that correctly?

19   A.  Yes, you did.

20   Q.  You disagree with that definition?

21   A.  No.

22   Q.  Any mention of physics in that definition?

23   A.  You have to understand the means underlying which a chemical

24   reaction takes place involves the physical structure and an

25   electronegativity of the bonding states in the atom.

1          So the reaction kinetics, I think I said on direct, are

2    really driven by the chemistry.  The reaction, the thermodynamic

3    side of it is really driven by the physics.

4    Q.  Let's talk a little bit about your background in corrosion.

5    Almost all of your background in corrosion has been regarding

6    galvanized steel; isn't that right?

7    A.  Certainly the dominant part.  But we're an industrial problem

8    solving group, as I mentioned.  The first or second problem that I

9    got faced with at U.S. Steel was a heat exchanger, heat exchanger

10   problem.  We solve those kind of problems throughout, we're even

11   solving them today.  They've never been totally solved.  It's an

12   ongoing challenge to the industry in terms of water composition,

13   reactivity of metals, the state.

14   Q.  And, Dr. Lee, I am going to try to get through this a little

15   quickly, so if you can answer my question yes or no, let me know;

16   and if you can't, let me know that.

17   A.  Certainly.

18   Q.  Thank you, Doctor.

19          I want to ask you about some of the work you've done.

20   You've got a pretty big CV, you have a lot of items on there, a lot

21   of publications, right?  Is that fair?

22   A.  Yes.

23   Q.  How many of those --

24   A.  I'll accept the description.

25   Q.  Let's take the last 20 years.  How many of the publications,

1    anything that you published that deal with corrosion in the last 20

2    years?

3    A.   Primarily -- none specifically, but primarily dealt with the --

4    the ones that most relate in the last 20 years, it's too far to

5    remember.  Let's take the last five to ten years.  Most of what

6    I've been involved in publication personally have been related to

7    the physical reactions taking place in concrete, most of which are

8    relating to the corrosive state of caused by carbonation and

9    sulfide, sulfate, chlorine.

10          And so I haven't dealt with the effects.  What I deal

11   with is what's the state of the material, how long is it for the

12   effect to take place.  In terms of the engineer corrosion, those

13   are generally other people's problems.

14   Q.   And you pretty much deal with what's under the microscope,

15   right, wasn't that your testimony at your deposition, I look at

16   what's under the microscope, not so much the process with regard to

17   corrosion?

18   A.   I think yes, that's pretty fair.  The part of the equation

19   that -- I'm sorry, that's a yes question.

20   Q.   Let me ask you this.  One of your opinions is that the

21   corrosion, whatever is there, the tarnish, the corrosion that's in

22   the house of the Hernandez family, you're saying it's okay once you

23   remove the drywall to go ahead and leave that in the wall, is that

24   your testimony?

25   A.   The wiring?

1    Q.  Yes.

2    A.  Yes.

3    Q.  Okay.  Have you contacted the CPSC to share your opinion with

4    them?

5    A.  No.  We've talked to the CPSC but I have not contacted them and

6    shared that opinion, no, sir.

7    Q.  You have talked to the CPSC?

8    A.  I have not personally but my guys have.

9          MR. SANDERS:  Objection.  Your Honor, some of the

10   discussions that we have the governmental agencies are protected,

11   so I'll let him talk about the contacts; but both from the CPSC

12   standpoint and our standpoint, what we actually talked about with

13   them is subject to their investigative privilege.

14         THE COURT:  I understand.  Just back away a little from

15   the microphone.

16         MR. SEEGER:  What we're talking about right now is

17   clearly not privileged, I am asking about what he's saying.

18         THE COURT:  Right.

19   BY MR. SEEGER:

20   Q.  So you personally have not --

21   A.  I have not.

22   Q.  You Dr. Lee have not talked to?

23   A.  I have not talked to or been contacted by CPSC.

24   Q.  You'd agree that -- don't you think you ought to contact them

25   with your conclusion that everything is safe in the wall, you go

```
 1   ahead and close it up, leave it in there and put new drywall up?
 2   A.  Well, my answer to that is no, it's not my responsibility or
 3   appropriate for me.
 4   Q.  Well, it's a big problem that's been created by the company
 5   you're working with, isn't it, this Chinese drywall is a problem,
 6   isn't it?
 7             MR. SANDERS:  This is argumentative, your Honor.
 8             THE COURT:  Well, he is under cross.
 9             THE WITNESS:  Well, I think it is a significant problem,
10   it's unfortunate that it occurred or is occurring.  I think that
11   there's many facets, but what is really important is that competent
12   scientists sit down and look at the problem, not in say what is the
13   state of the material and what should be done about it.
14   BY MR. SEEGER:
15   Q.  Let me follow-up on that but I really want to close out this
16   one point.
17             Your conclusion that it's okay to leave the tarnished and
18   corroded wire in the wall, don't you think?
19   A.  But --
20   Q.  Okay.  Go ahead.
21   A.  First of all, I don't want you to walk away with the impression
22   that the tarnish and corroded wires is throughout the wall.  There
23   is at the ends of the hot and cold, there's tarnish on the exposed
24   and there's tarnish to some extent in the ground wire.
25   Q.  Okay.  And you looked at all of the other wiring in the house?
```

1   Did you look at any other wire, did you strip back jackets on the

2   wiring and look at it under a microscope?

3   A.  We're talking about Hernandez?

4   Q.  Yes.

5   A.  Okay.  Yes, we did.

6   Q.  And where is that in your report?

7   A.  Pardon?

8   Q.  Did you include that in your report?

9   A.  The --

10  Q.  Was that the photo that you showed the court, the image with

11  the wire that looked like --

12  A.  No.  I think if you look at appendix A2 of the report, the

13  wires that were examined visually and with the wire stripped back.

14  This is really Dr. Perricone's --

15  Q.  That's what I was about to ask you.

16  A.  Okay.

17  Q.  That's not your part of the report?

18  A.  Pardon?

19  Q.  That's not your part of the report, is it?

20  A.  Well, it's my report but in terms of the work, specific work

21  that was done, you know, I don't want -- I have an area that I am

22  testifying about, Dr. Perricone has an area he is going to testify

23  about.

24  Q.  So let me ask you this, I just want to follow this up.  With

25  the CPSC and Sandia you're aware that the government right now is

1    spending a lot of money to look at whether there are any type of

2    safety, fire, you know, problems related to the wire caused by

3    Chinese drywall.  You're aware that investigation is going on right

4    now as we speak, right?

5    A.  I am aware, I don't know about the CPSC, I am aware that

6    Sandia's investigation investigated a number of -- they filed an

7    initial report and as I understand it, although I haven't seen any

8    recent updates, their investigation is continuing.

9    Q.  And so do you intend to contact them and share your opinion

10   that it's okay, other than snipping and cutting outlet it's okay to

11   leave wires in the wall?

12           MR. SANDERS:  What Mr. Lee does on behalf of our

13   company --

14           THE COURT:  Not only that but let's move on, counsel,

15   I've heard enough of that.

16   BY MR. SEEGER:

17   Q.  Dr. Lee, what are the gases that are involved in the corrosive

18   involved, what are the gases being emitted from Chinese drywall?

19   A.  The principal one that has been observed is hydrogen sulfide.

20   Q.  What are the others?

21   A.  There's probably some carbonyl sulfide and some carbon

22   disulfide.  There may be some other low, very low concentrations.

23   I think if you go to Dr. Goad's report you'll see a list of the

24   gases that have been detected, also CPSC.

25   Q.  All right.  Now let me ask you this.  Do you agree that the

1   pitting that has created by the corrosion in the Chinese drywall

2   environment cannot be cleaned off the wire?

3   A.  Well, I think that answer is no but I think the efficiency with

4   which you get the wire clean can depend on the methodology.

5   Q.  Okay.  But the pitting cannot be cleaned off the wire, is that

6   your answer?

7   A.  Well, let me rephrase your question.  I'll try to get an answer

8   that makes sense.  I don't think you're asking can the pitting be

9   cleaned off.  I think you're asking if the sulfide, at least if I

10  understand it, the sulfide that's in the corrosion zone, in the

11  depth of the corrosion zone that people have referred to as

12  pitting, can be cleaned up.  The answer is yes or a combination.

13  Is it going to be 100 percent, probably not.

14  Q.  So you're acknowledging that at least some of the copper

15  sulfide would be left in the pits?

16  A.  Could be.

17  Q.  So I'd like to now ask you some questions about the Edwards

18  article that you testified about.  Do you recall talking about that

19  a little bit?

20  A.  Yes, I do.

21  Q.  Now, what support do you have for your opinion that once the

22  copper sulfide is in the pit s that the corrosion will not

23  continue, do you have literature support for that?

24  A.  What kind of corrosion are you talking about?

25  Q.  Copper sulfide corrosion.

1   A.  That the copper sulfide -- that the corrosion resulting from

2   copper sulfide -- hydrogen sulfide gas?

3   Q.  Right.

4   A.  If you don't have a sulfide --

5   Q.  No, literature support, sir.  I'm sorry.

6   A.  Pardon?

7   Q.  Literature support.

8   A.  Oh, literature support is go look up the thermodynamics of

9   copper sulfide, you'll find that it's insoluble.  That's

10  fundamentally if you form a thermodynamically stable compound, it

11  will not re-release the sulfide.  So if you stop the source or

12  arrest the source, the corrosion related to the sulfide will cease.

13  Q.  Okay.  Scott, can you put up LT 241 and go to page 0006.  The

14  language I would like to specifically focus on, Dr. Lee, is at the

15  bottom.  I want to start at the bottom of this paragraph.

16          Do you see where it says:  "Because the corrosion rates

17  remain accelerated after a long absence of soluble sulfides, the

18  elevated corrosion rate cannot be attributed to the sulfides in the

19  solution but must be due to the scale formed when the sulfides are

20  present."  Did I read that correctly?

21  A.  You read it correctly.  And they're correct.

22  Q.  Okay.  And let's go to 0010.  And blowup this conclusion right

23  here -- I'm sorry, the third one.  "The accelerated corrosion can

24  be produced by a catalytic layer of sulfide scale on pipe.  When

25  the scale is removed and the copper metal is placed in water

```
 1    without sulfides, the corrosion rate returns to normal levels.
 2    When this scale is smeared on a fresh copper pipe surface, the
 3    resulting corrosion rate in water without sulfides is immediately
 4    comparable to that obtained after months of exposure to soluble
 5    sulfides."  Do you agree with that?
 6    A.  This is --
 7    Q.  Do you agree with it?
 8    A.  Well, this is an answer that I'm either going to have to
 9    explain or we're going to spend a lot of time.
10    Q.  Let's start with do you agree or disagree?
11    A.  The answer is, yes, I agree with it but, and that's a very
12    significant but.  When they're talking about the corrosion rate
13    after removal of the sulfides, they're talking about the corrosion
14    rate that went on in the water which never seen sulfides.
15            And so the issue is not that they've discovered something
16    that is physically impossible, the issue is that this layer of
17    sulfide material acts as a semiconductor, and that means that it
18    facilitates the transfer of electron hole pairs and it takes the --
19    allows the ions that are in the water a place to capture --
20    accelerates the rate at which copper can be moved into the water.
21            It is not talking -- when you say the corrosion rate
22    returns to normal levels, they're not talking about sulfide --
23    Q.  Just for the record, I didn't say that.
24    A.  Pardon?
25    Q.  I didn't say that, sir.  You said when I say, I didn't say
```

1   that.

2   A.   No, right there, you read it.

3   Q.   Right.   Okay.   Now, let me ask you this.   What assurance do you

4   have that the corrosion products -- I am going back to cleaning,

5   this theory that the corrosion can be cleaned off -- what assurance

6   do you have, you, Dr. Lee, and your report and the work you've done

7   in this case, that the corrosion products have been removed from

8   the pits of the copper from the cleaning process that you

9   recommend?

10  A.   Well, it depends on the process that you use.

11  Q.   What process did you use?

12  A.   Well, we've used a number of processes and you can -- we've

13  used a number of processes that include the Brasso, including

14  Scotch-Brite, just a number of different series of applications.

15  Q.   Let me ask you this.   Once you did that, did you go -- did you

16  do this -- I'd like to know your knowledge of this.   Did you do a

17  test where you looked at cross-sections of the copper pipe after it

18  was cleaned in multiple locations?

19  A.   No, I did not.   I looked at the surface, not the

20  cross-sections.

21  Q.   Now, I want to talk to you a little bit about your opinions in

22  your report about leaving the copper wire in the wall after the

23  Chinese drywall has been replaced, okay, I want to focus you on

24  that.   Have you reviewed the CPSC report on that?

25  A.   If you have a particular -- I have but if you have a particular

1    section, you would have to show it to me.

2    Q.  Okay.  Sir, I want to ask you generally.  Are you familiar with

3    the CPSC and the Sandia report?

4    A.  In general, but I don't keep it in my head.

5    Q.  But you've reviewed them?

6    A.  Yes.

7    Q.  You're aware that the CPSC has raised numerous concerns about

8    leaving wire that's been exposed to Chinese drywall behind in the

9    wall after a remediation, are you?

10   A.  Well, not as I read it, no.  CPSC concluded that they had not

11   had any failures.

12   Q.  That's failure, that's different from what I am saying they're

13   concerned.  You are aware that they are concerned about this

14   problem and looking at it right now, the fire and safety problems

15   with leaving the corroded wire behind, correct?

16   A.  Yeah.  But I don't think it's CPSC, as I understand it, maybe

17   CPSC is doing something I don't know about, but Sandia is examining

18   the question.

19   Q.  I'm sorry, Sandia, you're aware that they are looking at this

20   issue and concerned about it, are you not?

21   A.  Yes, they're addressing it.

22   Q.  Can we go to 59 and then go to 0006.  It's Hernandez 59.  And

23   if we could start -- I'm sorry, could you get that lead in sentence

24   right above.  This is from the report.

25           "The objective is to determine what extent the electrical

1    and fire safety components are being corroded and what effect the

2    corrosion could have on their safe operation.  Excessive corrosion

3    could create hazards in the following areas:"  And then there's a

4    number of them, do you see that, under fire?  Do you agree with all

5    of that?  Excessive corrosion --

6    A.  That's what we examined, those are the same issues.

7    Q.  But I am asking you about the report, Dr. Lee.  Do you agree

8    that excessive corrosion could create hazards in the following

9    areas:  Deterioration of wiring connections -- these are fire

10   hazards listed, so I am not going to read them all.  Do you agree

11   with that?

12   A.  Yes.

13   Q.  And if you could go to 12, please, Scott -- oh, I'm sorry, 13,

14   at the top here.  "Based on the degree of corrosion observed --"

15   this is Sandia, right, we're still in the same place together,

16   Dr. Lee, Sandia?

17   A.  Yes.

18   Q.  "Based on the degree of corrosion observed on all of the

19   samples provided to SNL, as well as the presence of corrosion

20   products that are creeping into inert surfaces, SNL staff believe

21   that the Battelle corrosive environments that the copper wiring has

22   been exposed to could be as severe as either Class III or Class

23   IV."  Do you agree with that?

24   A.  In terms of the microns per year defined in the Battelle

25   classes, yes.  At certain locations, particularly in the

1    connectors.

2    Q.  Now, you've done some measurements of pitting depths in your

3    report, right, Dr. Lee?

4    A.  Yes.  In terms of observation.

5    Q.  And your measurements in your report go anywhere from 10 to 20

6    microns deep; is that fair?

7    A.  Yes.

8    Q.  Have you looked at the work done by Mr. Krantz in this case?

9    A.  Yes.

10   Q.  And have you looked at his measurements, his micron depths of

11   the corrosion pits that he's measured and looked at?

12   A.  Yeah.  They're generally the same order.  He's got some issues

13   related to how the samples were prepared and how he made the

14   measurements.  But generally, I don't think there's -- there's sort

15   of a uniform corrosion which has resulted in sort of two to five

16   micron loss of cross section what people are describing as pitting,

17   which is in the range of 10 to 20 microns.

18   Q.  Would you call a 20 micron pit superficial?

19   A.  Yes.

20   Q.  Would you call a 30 micron pit superficial?

21   A.  Yes.

22   Q.  Do you know anybody else, is there any published literature,

23   books, anything you can refer us to that agrees that 30 micron pit

24   is superficial?

25   A.  Well, I think essentially if you're talking -- this is

1   something that depends on the dimension of the object that's being

2   corroded relative to the dimension of the corrosion.  If you're

3   talking about 100 micron diameter wire, which really doesn't exist,

4   in very fine circuits, a 20 micron pit is pretty significant.

5   Q.  What about a wire in the Hernandez house?

6   A.  Pardon me?

7   Q.  What about the wires in the Hernandez house?

8   A.  Oh, the wires in the Hernandez house are sort of in-between the

9   one and two millimeter thickness.

10  Q.  So my question --

11  A.  In this case the corrosion is superficial.

12  Q.  So my question to you, is there anybody other than Dr. Lee that

13  you can point to, anything published that agrees that a 20 or 30

14  micron pit is superficial?

15  A.  Well, I really can't point to something because I don't think

16  this question has been addressed.  But when you look at corrosion

17  phenomena, you deal with corrosion; so there's lots of published

18  literature, like G46 or something like that, where you're looking

19  at corroding, you're talking about corrosion as a function of cross

20  section.  And superficial as generally taken could be less than a

21  few percent.  Probably go to an ASM, ASM standards kind of in terms

22  of and find --

23  Q.  But you can't point to one right now, sir?

24  A.  I can't point to one.

25  Q.  Okay.  Let me ask you this.  So if the wiring is left in the

1    Hernandez house, under your remediation plan, the pitting on the

2    wires whatever exists would remain, correct, yes or no?

3    A.  Well, the wires need to be cleaned or they can be peeled back

4    and cut and then there's no -- no pit -- no cut beyond the tarnish

5    and reconnected.

6    Q.  But whatever is there would remain in the wall --

7    A.  Whatever is behind that.  There's nothing there except

8    untarnished wire.

9    Q.  You've acknowledged that at least in some of these pits there

10   would be some copper sulfide, correct?

11   A.  If you clean the wires there may be some pits with some trace

12   amounts of copper sulfide left.

13   Q.  And our position is, our experts' position is that if there's

14   copper sulfide in the pit, the corrosion can continue.  You

15   disagree with that, right?

16   A.  Would you repeat that again?

17   Q.  Our experts believe, Mr. Krantz and the experts that have

18   testified for this court, that if there's copper sulfide in the

19   pits, in the corrosion pits, it's a catalyst for future corrosion.

20   I understand you disagree but you understand that's our experts'

21   opinions?

22   A.  I think this is a time when you need to be precise in terms of

23   your language.

24   Q.  Okay.

25   A.  If you say your experts say that in the event copper sulfide is

```
 1    left in a pit that the sulfide corrosion will continue.  I disagree
 2    with that.
 3    Q.  Okay.
 4    A.  It's just physically not right.  If you say --
 5    Q.  Go ahead.
 6    A.  -- that in copper sulfide that the normal environmental
 7    corrosion will occur, then that answer is yes.  Physically there's
 8    some low level of tarnish that goes on, but it's not going on under
 9    the covering, it's going on in the exposed areas.
10    Q.  Let me ask you a question, okay.  So whatever pits are there
11    remains, whatever copper sulfide is in the pits remains; the
12    question I have to you is this, do you agree that when the
13    Hernandez family built the house that none of those conditions
14    existed at that time on that wire?
15    A.  The copper sulfide did not exist on that wire.  There were
16    surface imperfections.
17    Q.  Now, how many examples of sheath wire, wire that's covered in
18    the wall did you look at, did you personally look at to determine
19    if there was corrosion underneath?
20    A.  Of the wire in the wall?
21    Q.  Yeah.
22    A.  I would guess it's between our reports --
23    Q.  I am asking about you.
24    A.  I'm saying personally I am trying to give you an answer.
25    Q.  Okay.  I apologize.
```

```
 1   A.  Our report I take half a dozen wires from the Hernandez home

 2   that were peeled back.  From other people it's probably more than

 3   that but I forget.

 4   Q.  All right.  Let me refresh your memory.  Here is a page from

 5   your report in this case.  This is from page 9 of your report, sir.

 6   You looked at three samples, does that help refresh your

 7   recollection?

 8   A.  Okay.

 9   Q.  And based on that -- now, how many miles of wire --

10   A.  It says three outlets, right.

11   Q.  Okay.

12   A.  Okay.  So there's a hot and a cold on each outlet.  We peeled

13   back, if you go to the figures, we peeled back the wire on the hot

14   and the cold, I think that's six, that's what I said was a half a

15   dozen.

16   Q.  What am I doing, am I reading this wrong?  Three samples,

17   Outlet 2, Outlet 62 and Outlet 44 were selected for additional

18   evaluation.  Are you saying there's three others?

19   A.  No.  I'm saying there's two wires, there's a hot and cold on

20   each outlet.

21   Q.  Okay.  But there are three samples that you looked at, that's

22   the language that I took right from your report, three samples,

23   right?

24   A.  Three outlets.

25   Q.  Okay.  And based on that you concluded -- let me ask you this.
```

1    How many miles of wire do you think are in that house?

2    A.  I don't know.

3    Q.  So based on those three outlets, those three samples, you've

4    concluded that there's no corrosion under the wires anywhere in the

5    house, right?

6    A.  That would be correct.

7    Q.  I want to talk to you a little bit about your resistivity

8    testing.  Now just be really clear, when you say resistivity that's

9    the ability of two things that are supposed to conduct electricity

10   and something getting in the way of that conduction, is that a fair

11   characterization of that process?

12   A.  The simple answer is no, so let me help you.

13   Q.  Help me.

14   A.  Resistivity is the measure of the energy required to transport

15   current.  And in the case of the way you were describing it,

16   contact resistance is what you were describing.  Resistivity is an

17   intrinsic property of the wire.

18   Q.  Are you familiar with ASTM standards that tell you exactly how

19   to test the resistivity of wires, are you familiar with them?

20   A.  In general.  It depends on whether you're measuring resistivity

21   or contact resistance.

22   Q.  All right.  Let me see if I can help with that.  How about

23   Standard Test Method for Resistivity of Electrical Conductor

24   Materials, you're aware of that ASTM guideline for doing that type

25   of testing?

1   A.  I would have to see it.

2   Q.  Can you put up Hernandez 450.  Do you recognize it?

3   A.  (WITNESS REVIEWS DOCUMENT.)  Not specifically, but, yes.

4   Q.  And, Dr. Lee, in all fairness, you didn't do any resistivity

5   testing for the conclusions that went into your report, right?

6   A.  No.  But you can calculate the resistivity just because we know

7   that, we know the resistivity of copper.

8   Q.  Now -- oh, by the way on this I just want to come back to the

9   ASTM point, you sit on the ASTM committees, don't you?

10  A.  Various committees.

11  Q.  Various ASTM committees?

12  A.  Yeah.

13  Q.  So, I mean, you would think that if you were going to do

14  certain types of tests, you would want to know what the

15  organization on whose committees you sit on how they recommend

16  doing it, wouldn't you?

17  A.  Well, I think the answer to that is in general yes.  The

18  question is whether you're looking at something that's specifically

19  addressed in the standard.

20  Q.  And, Dr. Lee, you recognize what I just put up as Hernandez

21  450, you recognize that, don't you, as the Suggested Method for

22  Testing Resistivity of Electrical Conductor Materials, fair enough?

23  A.  Yes.

24          MR. SEEGER:  Your Honor, can we move this into evidence?

25          MR. SANDERS:  I mean, I don't know if there's any

1   foundation for him having looked at it or not looked at or

2   considered it in his report, if he knows that.

3            THE COURT:  I'll admit it.

4   BY MR. SEEGER:

5   Q.  So now tell us how you tested resistivity and came to your

6   conclusions and you put those in the report, tell us what tests you

7   did.

8   A.  We did not determine resistivity, we looked at the resistivity

9   of copper wire.  We evaluated the change in cross section, which is

10  the change in -- which translates -- the resistivity does not

11  change in these wires.  The resistivity is an intrinsic property

12  which is a function of the copper and the copper alloy that's in

13  question.  The resistance of a wire which, if you look at this

14  equation, and it's actually better on the screen, if you can blowup

15  3.2.

16  Q.  3.2 right here (INDICATING)?

17  A.  Yes.  That equation under there.  The resistivity is expressed

18  as þ -- the resistivity times the cross-sectional area of the wire

19  over the length of the wire being examined.

20  Q.  That's a good lead in, so here are my questions about the test.

21  Did you follow these guidelines, what this says, this document, did

22  you follow what this, how this recommends testing resistivity when

23  you tested resistivity of wiring in the Hernandez home?

24  A.  We did not test the resistivity.

25  Q.  What did you test?

1    A.  We estimated the change in resistance so we could look at the

2    change in power consumption.  If you're dealing with this wire,

3    there's two things that are important:  One is the current carrying

4    capacity; and, two, is when you get to a point where the resistance

5    is affected enough that you'll start generating heat.  So in a

6    practical sense resistivity is not affected of the copper by an

7    external corrosion process.

8    Q.  And you -- so this test you're telling me that we have up on

9    the board here, Scott, if you can go back to the front page where

10   it says Standard Test for Resistivity of Electrical Conductor

11   Materials, the test and procedure in this document you say do not

12   apply to what you do, is that your testimony?  I am just trying to

13   find out.

14   A.  I am trying to think of how to explain it to you in a manner

15   you understand.

16   Q.  Can you just answer that question?

17          MR. SEEGER:  Your Honor, I would just like a yes or no,

18   did he follow the procedures in this document.

19          MR. SANDERS:  That's not the question you asked.

20          THE COURT:  Yes, let's restate the question.  He wants to

21   know that question, did you and why?  You can explain why.

22          THE WITNESS:  The answer is we did not measure

23   resistivity of the conductor material because the resistivity of

24   copper is known.  It's specified as a part of the electrical codes.

25   BY MR. SEEGER:

1   Q.  And with regard to having anything that may interfere with

2   resistivity, is that a test that would be prescribed by these

3   guidelines that we just looked at?

4   A.  Well, the simple material, if I understand the question, is no.

5   Q.  Now, I asked you questions about the procedures used to test

6   wires in the Hernandez house for resistivity.  Do you recall me

7   asking you some questions about that in your deposition?

8   A.  Yes.

9   Q.  I'm sorry, Dr. Lee, can I back up to the resistivity point

10  because maybe I can do a better job of asking the questions this

11  time.

12          This is page 11 from your report which is marked as

13  Hernandez 395.  Do you see the part I just flagged right there

14  where it says:  "Current carrying capacity is determined by the

15  ability of a material to carry current," and you defined it as

16  resistivity there, "and the amount of material available to do so."

17  Correct?

18  A.  That's very precise and it's right.

19  Q.  So now if corrosion were to eat up the material available to do

20  so, would that interfere with resistivity?

21  A.  No.  In fact, that sentence goes right to the point that I've

22  been trying to express and does it better and clearer than I've

23  been.  There's two parts, one is the ability of a material to carry

24  current (resistivity).  The second is the amount of material

25  available to do so, and that's the cross-sectional area.  So

1  resistance is determined basically by the combination of the

2  resistivity times the amount of material available to carry the

3  current.

4        So when you look at change, the issue with the copper

5  sulfide film is has it reduced the cross-sectional area, it does

6  not reduce the resistivity.

7  Q.  And my question to you is, what specific tests did you do to

8  test resistivity on the wires in the Hernandez home?  Can you just

9  layout what they are?

10 A.  We did not measure resistivity in the wires in the Hernandez

11 home.

12 Q.  All right.  So the issue of whether the corrosion at any point

13 in their wiring system interferes with resistivity is not a

14 question you looked at?

15 A.  No, because it doesn't.

16 Q.  Okay.  Do you agree that if there's enough corrosion on a

17 contact switch, let's say in an appliance, in a wall switch or

18 something like that, that you can interfere with the operation of

19 the circuit with the conductivity of that switch?

20 A.  Yes.

21 Q.  And what testing did you do on electrical contacts and switches

22 in the Hernandez home?

23 A.  We looked at -- we mentioned earlier we looked at the one

24 refrigerator component -- we got these things very late, just

25 before I came down here -- and we looked at a circuit breaker, took

1    that apart and looked at the contact area.  And I forget, I think

2    that may be it, there may be some other.

3    Q.  You actually remembered more than when I asked you the exact

4    same question in your deposition, Dr. Lee.

5    A.  Oh, okay.  All right.

6    Q.  Because in your deposition I asked you what test you did, and

7    you said you didn't remember and you did not, that Dr. Perricone

8    did them.  So now your testimony has changed?  And I deposed you

9    last week.

10   A.  Now I remember.

11   Q.  I don't either.

12   A.  No, I said now I remember.

13   Q.  Oh, now you remember, okay.

14   A.  The circuit breaker, this stuff is in progress, okay, because

15   of the lateness from which we received the materials.

16   Q.  When I deposed you last Thursday you had everything, right?

17   A.  When you deposed -- I think yeah, yeah, we were examining the

18   parts while we were doing it.

19   Q.  Are you familiar with an ASTM standard that measures contact

20   resistance, or am I getting that question wrong?

21   A.  In general I would have to refer to specifically the standard.

22   I forget, there's two standard s, one is 250 and the other is 500

23   or something.

24   Q.  We're looking at what is marked as Hernandez 132.  Again,

25   that's -- do you see that it's got the trademark of the ASTM in the

1    upper left-hand corner?

2    A.   That's 539?

3    Q.   Right.

4    A.   Contact resistance.

5    Q.   And you see the title Standard Test Methods for Measuring

6    Resistance of Electrical Connections (static contacts).  Is that

7    the right test that we'd use?

8    A.   For contacts that's the test that we would use.

9    Q.   Do you know if Dr. Perricone followed this standard when he did

10   the testing for contact resistance?

11   A.   I think I told you in the deposition he did not measure contact

12   resistance.

13   Q.   I don't have that.

14   A.   We use a test -- there's another test which is 250 or 279 or

15   something like that, which is a test for measuring film --

16   Q.   Is that the test you did?

17   A.   -- insulator.

18   Q.   That's the test you did?

19   A.   Yes.

20   Q.   That's an ASTM guideline?

21   A.   Not a guideline, it's a standard.

22   Q.   Dr. Lee, when I asked you what testing did you do on electrical

23   contacts in receptacles and switches at the Hernandez house, your

24   answer was:  "I don't -- we've examined the switches, you'd have to

25   ask Matt or Dr. Perricone whether or not there was any resistance,

1    I don't recall seeing resistance measurements, contact resistance."

2    That was your answer, right?

3    A.  That's true for the contact.  The resistance test we did were

4    measured the resistance of the sulfide film on a coupon in order to

5    evaluate the film thickness.  We did not make contact resistance

6    measurements, that I am aware of as I testified.

7    Q.  Just a couple more questions.  Do you agree that even a thin

8    layer of tarnish can diminish a contact's capacity to carry

9    current?

10   A.  Depending on the nature of the contact.  But as a general

11   proposition, a layer of tarnish will affect contact resistance.

12   Q.  And sulfide gases on silver create what type of reaction?

13   A.  They create a reaction which silver sulfide is forming.

14   Q.  Do you agree with this statement:  "By the time relevant

15   corrosion can be detected visually, the equipment may already be in

16   an advanced state of degradation."  Do you agree or disagree with

17   that?

18   A.  That's -- in general that's true, but not from a forensics

19   perspective.

20           MR. SEEGER:  Your Honor, if I could just have ten seconds

21   to look at what I've got here, I think I've covered it.

22           THE COURT:  All right.

23           MR. SEEGER:  That's all I have.

24           THE COURT:  Any redirect?

25           MR. SANDERS:  Quickly.

```
 1                    REDIRECT EXAMINATION

 2   BY MR. SANDERS:

 3   Q.  Just very quickly and this whole wire resistance issue.  What

 4   you did or didn't do is part of your opinion.  How were you talking

 5   about resistance and the ability of wires to capture current?

 6   A.  Resistance is basically the current carrying capacity.

 7   Resistivity is a fundamental property of the material.  When you --

 8   Ohm's law basically says the resistance is the resistivity, that

 9   symbol þ, which is a Greek symbol, times the length over the area.

10   Þ is measured in centimeter.

11   Q.  What do you illustrate here by this chart and how is it

12   relevant to the wires here?

13   A.  For the purposes of looking at these wires and asking the

14   question:  What's the loss in cross section and how does that

15   affect the resistance, which then in turn will affect heat

16   production, I just did the -- calculate the resistance, calculate

17   the change in resistance and calculated the power as a function of

18   loss of cross section.

19          We are -- the individual points on that graph are at

20   units of 20 micron increments of corrosion lost.  So the first

21   point for a gauge 12 is a 20 micron, how much cross section did you

22   lose at 20 microns.  If you drop your -- I don't know if I have the

23   ability here -- if you drop your -- take the lowest point of the

24   black curve furthest to the left, that's sort of the upper limit of

25   what we've observed in tarnish related to these cases right there
```

1    (INDICATING).

2         At that point, the change in power used to carry the

3    current is about .08, .05 watts.  If you think about it in a half

4    amp, if you put a lamp at the end of a -- plug it into an outlet,

5    you might be carrying something like a half amp in order to produce

6    the power.  That half amp produces about a quarter of a watt of

7    heat in a meter of wire.  The change in that in the resulting from

8    the corrosion is about .01, so it's about one hundredth of a

9    percent.

10   Q.  At what point along this, and I guess this is measuring the

11   area lost here, what point along this graph does that become a

12   problem with respect to generating heat or resistance?

13   A.  What this graph really shows is you don't arrive ultimately

14   until you lose a very major part of the cross section, you really

15   don't affect the current carrying capacity.  But somewhere between,

16   around the order of 50 percent and depends on what the safety

17   margins you want to allow, you get into a situation where you're

18   actually going to start affecting the mechanical problems.  They

19   will be affected first.

20   Q.  And with respect to, just to be clear on the discussion of the

21   Edwards article and the reaction that's occurring, why is what

22   Mr. Krantz described in the Edwards article and the accelerated

23   corrosion that was described there, why wouldn't that occur on the

24   wires or copper plumbing?

25   A.  In the wires make modest changes in humidity like you do in a

```
 1    house, there's going to be little bits of water put on the wire,

 2    that will cause release of a few ions.  Those ions don't have

 3    anywhere to go, there's only a little bit of water so that

 4    automatically extinguishes it.  That water will get evaporated

 5    somewhere else or get another little bit of water, and it's just

 6    what's going on in the development of copper corrosion in the

 7    atmosphere anyway.

 8                MR. SANDERS:  That's all I have.

 9                THE COURT:  All right.  You're excused, sir.  Thank you.

10    Let's go to the next witness, please.  Call your next witness.

11                MR. SANDERS:  We have the Beyler video, we can do that.

12                THE COURT:  All right.

13         (WHEREUPON, THE VIDEO DEPOSITION OF CRAIG BEYLER WAS PLAYED.)

14         (WHEREUPON, THE VIDEO DEPOSITION OF CRAIG BEYLER WAS PAUSED.)

15                THE COURT:  We'll stop here.  You had no further

16    questions as I see.

17                MR. SANDERS:  No.

18                THE COURT:  All right.  We'll stop here then and return

19    at 1:45.

20                MR. SEEGER:  Your Honor, we have like a two-minute issue.

21    Would you rather deal with it after lunch or do you want us to

22    approach and talk to you about it?

23                THE COURT:  Yes, why don't you come on up.

24         (WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD AND A LUNCH

25           RECESS WAS TAKEN.)
```

* * * * * *


REPORTER'S CERTIFICATE


I, Karen A. Ibos, CCR, Official Court Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.


_Karen A. Ibos_

Karen A. Ibos, CCR, RPR, CRR

Official Court Reporter