1            UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF LOUISIANA

3

4
   IN RE:  CHINESE MANUFACTURED DRYWALL      *
5          PRODUCTS LIABILITY LITIGATION     *
                                             *
6                                            *
   **THIS DOCUMENT RELATES TO:**             *  MDL No. 2047
7                                            *
   Tatum B. Hernandez, *et al*               *  Section L
8                                            *
        versus                               *  New Orleans, Louisiana
9                                            *
   Knauf Plasterboard (Tianjin) Co.,         *  March 17, 2010
10    Ltd., *et al*                          *
                                             *
11 Case No. 09-CV-6050                       *
                                             *
12 * * * * * * * * * * * * * * * * * * * * *

13

14            VOLUME III - AFTERNOON SESSION
              PROCEEDINGS BEFORE THE
15            HONORABLE ELDON E. FALLON
              UNITED STATES DISTRICT JUDGE
16

17 <u>APPEARANCES</u>:

18

19 For Tatum and Charlene      Herman, Herman, Katz & Cotlar, LLP
   Hernandez:                  BY:  RUSS M. HERMAN, ESQ.
20                                  STEPHEN J. HERMAN, ESQ.
                               820 O'Keefe Avenue
21                             New Orleans, Louisiana 70113

22

   For Tatum and Charlene      Gainsburgh Benjamin David
23 Hernandez:                    Meunier & Warshauer
                               BY:  GERALD E. MEUNIER, ESQ.
24                                  MICHAEL J. ECUYER, ESQ.
                               1100 Poydras Street, Suite 2800
25                             New Orleans, Louisiana 70163

1    <u>APPEARANCES</u>:

2
     For Tatum and Charlene        Seeger Weiss
3    Hernandez:                    BY:  CHRISTOPHER A. SEEGER, ESQ.
                                   One William Street
4                                  New York, New York 10004

5
     For Tatum and Charlene        Lewis & Roberts, PLLC
6    Hernandez:                    BY:  DANIEL K. BRYSON, ESQ.
                                   3700 Glenwood Avenue, Suite 410
7                                  Raleigh, North Carolina 27612

8
     For Knauf Plasterboard        Frilot, LLC
9    (Tianjin) Co., Ltd:           BY:  KERRY MILLER, ESQ.
                                        KYLE A. SPAULDING
10                                 1100 Poydras Street, Suite 3700
                                   New Orleans, Louisiana 70163
11

12   For Knauf Plasterboard        Baker & McKenzie, LLP
     (Tianjin) Co., Ltd.:          BY:  DONALD HAYDEN, ESQ.
13                                 1111 Brickell Avenue, Suite 1700
                                   Miami, Florida 33131
14

15   For Knauf Plasterboard        Baker & McKenzie, LLP
     (Tianjin) Co., Ltd.:          BY:  DOUGLAS B. SANDERS, ESQ.
16                                      KYLE P. OLSON, ESQ.
                                        ERIN M. MAUS, ESQ.
17                                 130 E. Randolph Drive
                                   Chicago, Illinois 60601
18

19   Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
                                   500 Poydras Street, Room HB-406
20                                 New Orleans, Louisiana 70130
                                   (504) 589-7778
21

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.

DAILY COPY

1                          <u>I N D E X</u>

2                                                    <u>PAGE</u>

3
   Craig Beyler (Video Deposition)              604
4

5  Raymond Canzoneri
        Voir Dire                               607
6       Direct Examination                      614
        Cross-Examination                       633
7       Redirect Examination                    673

8
   Mark Hartenstein
9       Voir Dire                               676
        Direct Examination                      678
10      Cross-Examination                       685
        Redirect Examination                    700
11

12 Bruce Fuselier
        Voir Dire                               702
13      Direct Examination                      704
        Cross-Examination                       712
14      Redirect Examination                    720

15

16

17

18

19

20

21

22

23

24

25

                          DAILY COPY

1                     **AFTERNOON SESSION**

2                     **(March 17, 2010)**

3        **THE DEPUTY CLERK:**  Everyone rise.

4        **THE COURT:**  Be seated, please.  We've got another 60

5 pages.  It looks like we've about another hour in this.

6             Let me mention that the exhibits that you all

7 are marking, in order for them to become trial exhibits at the

8 end of this deposition, let's offer, introduce, and file in

9 evidence the exhibits.  Give them a number so that we have it.

10 Give me some logistical situation.  What's our --

11        **MR. SANDERS:**  I'm done with the direct.  We have

12 cross.  Then we have some exhibits, which I can just indicate

13 their numbers.

14        **THE COURT:**  Let's do that at the end because I want

15 to hear from --

16        **MR. BRYSON:**  Your Honor, for the cross-examination,

17 we've edited that down to a little bit over 30 minutes, so it

18 won't be an hour, I assure you.

19        **THE COURT:**  I had it starting at page 64.  What is

20 the situation with the other witnesses?  How long do you

21 anticipate?

22        **MR. HAYDEN:**  Your Honor, we hope to have all of the

23 witnesses other than Dr. Perricone done today.

24        **THE COURT:**  Let's roll, then.

25        (WHEREUPON **Craig Beyler** testified by video

1  deposition.)

2          **THE COURT:**  Stop here?

3          **MR. SANDERS:**  Your Honor, if I may, we went over some

4  of it anyways in the *Daubert* issue earlier.  I think, with

5  agreement, I'd like to just -- can we submit the transcript for

6  evidence, put my redirect in the transcript and not play it

7  here?

8          **THE COURT:**  I'm sorry.  What do you want to do?

9          **MR. SANDERS:**  There's a small portion of redirect,

10  some of which I actually pointed you to when we were arguing

11  the *Daubert* issue earlier.

12          **THE COURT:**  Right.

13          **MR. SANDERS:**  I'd rather just submit that as part of

14  the actual record and not have to --

15          **THE COURT:**  It's attached, isn't it, as part of this?

16          **MR. SANDERS:**  It will be.

17          **THE COURT:**  I'll have that as part of the record.

18  Offer, introduce, and file into evidence your exhibits.

19          **MR. BRYSON:**  We'd like to move into evidence some of

20  these exhibits.  Beyler 6 from the trial transcript is actually

21  now marked Hernandez 369.  Beyler 7 from the video is

22  Hernandez 660.  Beyler 8 is Hernandez 650.  Beyler 9 is

23  Hernandez 112.  We'd like to move all those into evidence,

24  Your Honor, and renew our objection to their Exhibit 2.

25          **THE COURT:**  I'll admit those.

1          **MR. SANDERS:**  Obviously, they rested.  We're not
2    arguing about these exhibits in this case.
3               Our trial dep. Exhibit 1, which was the CV, is
4    DX207.  We'd move for that to be admitted.  The testing report
5    itself, not his expert report, is DX009-C.
6          **MR. BRYSON:**  That's the one that we have the
7    objection to for our arguments this morning, Your Honor.
8          **THE COURT:**  I'm going to admit that.
9          **MR. SANDERS:**  Exhibit 3 was the picture of, I
10    think -- I can't remember.  I'll have to go back and look --
11    one of the outlets that's up there.  That's DX218.  Another
12    picture was DX17.  Then the outlet itself is DX236.  I can't
13    remember which one, but one of those is the picture, if you'd
14    rather just have that in the record.
15          **THE COURT:**  Yes.
16          **MR. SANDERS:**  Then we also have three standards which
17    were referenced in his report that we need to urge.  DX23,
18    which is the UL 498 --
19          **MR. BRYSON:**  We brought that into evidence as well.
20    It's quite lengthy.  It's 200 or 300 pages.
21          **MR. SANDERS:**  Never mind.  We're fine.
22               DX24 is UL 719.
23          **THE COURT:**  There was an objection on that one.  I'll
24    overrule the objection and allow it into evidence, and the
25    others too.

607

1        **MR. HAYDEN:**  Your Honor, should we call our next

2   witness?

3        **THE COURT:**  Yes, please.

4        **MR. HAYDEN:**  Your Honor, we call Raymond Canzoneri.

5        (WHEREUPON **Raymond Canzoneri**, having been duly sworn,

6   testified as follows.)

7        **THE DEPUTY CLERK:**  Please be seated.  Would you state

8   your name for the record.

9        **THE WITNESS:**  My name is Raymond Canzoneri.

10       **THE DEPUTY CLERK:**  Would you spell the last name.

11       **THE WITNESS:**  It's C-A-N-Z-O-N-E-R-I.

12                              **VOIR DIRE**

13  BY MR. HAYDEN:

14  **Q.**   Mr. Canzoneri, what is your educational background?

15  **A.**   I have a bachelor's degree in electrical engineering,

16  1972, from Louisiana State University, Baton Rouge.

17  **Q.**   Sir, is that your résumé?

18  **A.**   Let me put my glasses on here.  Yes, it is.

19  **Q.**   Are you a certified professional engineer?

20  **A.**   I am.

21  **Q.**   In what fields?

22  **A.**   Electrical engineering.

23  **Q.**   Could you briefly describe for the Court your employment

24  background and professional background.

25  **A.**   I have a vast background in electrical engineering,

1  working for many electrical contractors throughout the years,

2  working for myself as an electrical contractor, and then

3  specifically having an inspection department directly after

4  Katrina, and doing design engineering on buildings, high-rise

5  apartment complexes, low-rise apartment complexes,

6  supermarkets, drugstores, etc., etc.

7  Q.    Does the résumé truly and accurately set forth your

8  background and employment history?

9  A.    It does.

10 Q.    Are you a certified electrical contractor?

11 A.    Absolutely certified.

12 Q.    Can you explain what an electrical contractor does.

13 A.    An electrical contractor builds what has been designed in

14 most cases.  Sometimes it's not designed; it's up to him to do

15 that.  He installs the electrical raceway, that is to say, for

16 the cable to be put into to be protected.  He installs the

17 conduit boxes, the receptacle boxes in the case where the NM

18 cable is used, installs the electrical service for the building

19 or for the edifice.  He also completes the motor-control

20 centers.  He sets them.  He sets the different breakers inside

21 of them.  I can go on and on what the function of the --

22 Q.    You're presently licensed?

23 A.    Absolutely licensed, and I'm licensed in like 23 states.

24 Q.    You've been an electrical contractor for how long?

25 A.    The electrical contractor, the first time I examined was

1  like 1982 or 1983.

2  **Q.**    You run your own business since 2005, Canzoneri &

3  Associates?

4  **A.**    Raymond Canzoneri & Associates, Inc.

5  **Q.**    Are you also a certified electrical inspector?

6  **A.**    Absolutely.  The International Residential Code, or the

7  IRC, in particular related to the International Code Council,

8  gives three examinations:  One called an E1; one called an E2;

9  and one that's called E3 as well.

10          E1 is the residential section.  E2 is the commercial

11  section.  E3 allows you to produce prints -- I mean it allows

12  you to accept prints, you know, in their correct form and okay

13  them.

14  **Q.**    Are you certified under those different subsections?

15  **A.**    On E1 and E2, I definitely am.  E3, I utilize my own

16  professional engineering to do that on my own.  I do not

17  certify prints that somebody would bring me.

18  **Q.**    You are certified under both E1 and E2; correct?

19  **A.**    Absolutely, yes.

20  **Q.**    What does an electrical inspector do?

21  **A.**    An electrical inspector visually comes to the job -- comes

22  to the job site and does a visual inspection of the component

23  parts that are placed by the electrician such as the cable, the

24  wiring, the boxes, the switches, the receptacle installation,

25  the service entity as far as the size of the service is

DAILY COPY

1  concerned, and any related activity that goes along with the

2  electrical construction.  He doesn't supervise it; he witnesses

3  it.

4  **Q.**   Then inspects it and determines that it's in conformance

5  with code?

6  **A.**   He passes that on and he allows the city entity, or the

7  specific entity or the utility, to turn the -- control the

8  power being turned on or turned off for that particular

9  edifice.

10  **Q.**   You're an electrical inspector in how many states?

11  **A.**   The electrical inspection, as far as E1 and E2 is

12  concerned, whenever the states recognize that possibility,

13  which I think is throughout the United States, having the

14  electrical contracting licenses, they go hand in hand.

15          Let me interject something here.  In Louisiana, if

16  you go to a specific site that is not controlled -- let's say

17  in the city of New Orleans that is controlled by the state, you

18  have, as the electrical engineer, the -- you have the authority

19  and you must witness that job as far as the installation is

20  concerned, and you have the ability to turn the power off or

21  turn the power on once it's finished.

22  **Q.**   How long have you been doing electrical inspections?

23  **A.**   Specifically, throughout my life as an electrical

24  contractor.  But in actuality, when we did the storm effort and

25  I started my electrical engineering company, it was right after

1   Katrina, so I'd say right just before Katrina and definitely

2   afterwards, and that was in 2005.

3   **Q.**   In the wake of Katrina, did you do a number of electrical

4   inspections?

5   **A.**   Absolutely did.

6   **Q.**   How many?

7   **A.**   It was in the thousands, particularly around 30,000.

8   **Q.**   How many residential inspections?

9   **A.**   Oh, it was over 25,000.

10  **Q.**   Are you a member of any electrical-inspector professional

11  organizations?

12  **A.**   I belong to the International Association of Electrical

13  Inspectors, and that's the IAEI.

14  **Q.**   Does your work as an electrical inspector require you to

15  be familiar with the electrical codes that would apply here in

16  the state of Louisiana?

17  **A.**   Absolutely, yes, sir.

18  **Q.**   What code is applicable here?

19  **A.**   The International Residential Code is the acceptable

20  standard by Louisiana.  It incorporates NFPA 70, which is the

21  National Electric Code.  And in this case, 2008, at this time.

22       **MR. HAYDEN:**  If you could show Defense Exhibit 240.

23  **BY MR. HAYDEN:**

24  **Q.**   Sir, I'm showing you the cover of this document.  Do you

25  recognize it?

1   A.   Absolutely.  It's what we refer to as the code.  It's the

2   NEC, 2008, NFPA 70.

3           MR. HAYDEN:  If we could go to Exhibit 239.

4           THE WITNESS:  You can see at the top, too, it says:

5   "National Electrical Code."  It says: "International Electrical

6   Code Series."  So it's part of the IRC.

7   BY MR. HAYDEN:

8   Q.   Now, next to that, I'm showing you another document.  Do

9   you recognize that?

10  A.   Absolutely do.

11  Q.   What is that?

12  A.   That's the International Residential Code in its entirety

13  for the electrical, and they have some other things, but

14  specifically for the electrical, and it includes NEC.  It's

15  adopted the NEC into it in its entirety.

16  Q.   Are these the codes that you rely on as an electrical

17  inspector here in the state of Louisiana?

18  A.   Absolutely, yes, sir.

19  Q.   Do you feel you're knowledgeable about the code and its

20  application in St. Tammany Parish?

21  A.   In particular, yes.

22  Q.   Why is that?

23  A.   Because of the E1 and E2 status that I have through the

24  International Residential Code.  That is the code that they

25  use.

1    **Q.**   Have you applied these codes in your work as an electrical

2    inspector?

3    **A.**   Yes, as well as in work as an electrical engineer as well.

4    **Q.**   To continue to be licensed and certified as an electrical

5    inspector, do you take continuing education courses?

6    **A.**   Absolutely do.

7    **Q.**   How often?

8    **A.**   It varies from state to state, but I can tell you Texas,

9    New Mexico, Oklahoma, Colorado, Montana, Nebraska, Ohio,

10   Kentucky, North Carolina, Florida, and Georgia.  I don't think

11   I've left too many out.

12   **Q.**   Do any of these continuing education courses revolve

13   around the codes?

14   **A.**   They absolutely do, and specifically they coordinate the

15   changes, specifically maybe an eight-hour course that does

16   that, and they show you the changes in 2008 as compared to the

17   previous 2005 code.

18   **Q.**   Do you consider yourself an expert in the codes that apply

19   to electrical systems in the state of Louisiana?

20   **A.**   Absolutely, yes, sir.

21          **MR. HAYDEN:**  Your Honor, I'd tender the witness as an

22   expert in the applicable electrical codes and electrical

23   engineering.

24          **MR. STEVE HERMAN:**  No objection.

25          **THE COURT:**  The Court will accept him as such.

1                          **DIRECT EXAMINATION**

2     **BY MR. HAYDEN:**

3     **Q.**   Mr. Canzoneri, do you have an opinion as to whether,

4     pursuant to the code, electrical wiring in the Hernandez home

5     needs to be replaced?

6     **A.**   I don't think the wiring does, yes.  That's my opinion:

7     It does not.

8     **Q.**   What's that opinion based on?

9     **A.**   It's based on my knowledge of the code, the fact that I've

10    been to a residence that had specific Chinese drywall.  Also,

11    I've been conferring with the electrician who's actually gone

12    to the house in Mandeville, the Hernandez home.  I've seen

13    pictures of the receptacle outlets, the switch outlets.  I know

14    that the Chinese drywall is still up in that home.  I've

15    actually held the receptacles in my hand.  I've physically

16    looked at the connection, tried to smell if I smelled any

17    residue whatsoever in it.

18            So I think I have really good knowledge.  I've seen

19    hundreds of pictures, specifically in the reports, the Beyler

20    report, and I've read documentation in that regard.  So I

21    believe I have a really good knowledge.

22    **Q.**   Have you been able to observe wire from the Hernandez

23    home?

24    **A.**   Absolutely.  They cut a specific sample out.  I didn't

25    note that earlier.  But, yes, I did.  I saw the ends of the

                          DAILY COPY

1   wiring.  I saw the tarnishment on the ends.

2   **Q.**   What did you observe?

3   **A.**   I saw the tarnishment on the ends of the wires.

4   **Q.**   When you say the "ends of the wire," what do you mean?

5   **A.**   Meaning the part that was in the receptacle itself, the

6   part that was exposed.

7   **Q.**   Can you describe this tarnishing.

8   **A.**   It was black in nature, easily removed.  It's very -- it's

9   a film.  It's easily taken off.

10  **Q.**   Were you able to examine whether there was any tarnishing

11  on the insulated portions of the wire?

12  **A.**   Absolutely no tarnishing on the insulated parts of the

13  wiring.

14  **Q.**   That is both the live, or hot, and neutral wires?

15  **A.**   The hots and neutral only at its ends, and specifically

16  the ground at, you know, a ways up on that conductor.  It also

17  has -- I'm going to tell you like it is.  That paper insulation

18  that goes on -- it is an insulation.  It's not a thermoplastic,

19  but it is an insulation that goes on that end of the cable.

20  **Q.**   That would be with regard to which wire?

21  **A.**   To the ground wire.

22  **Q.**   With regard to the ground wire, what did you observe?

23  **A.**   It was tarnished.  It was tarnished because I saw that

24  they had removed the paper, so -- maybe a foot or two up, and I

25  had seen the tarnish on that specific one.

1   **Q.**   Was it the same tarnish that you saw on the hot and
2   neutral wires?
3   **A.**   Absolutely.
4   **Q.**   Anything different you observed with regard to the ground
5   wire?
6   **A.**   No difference.  No difference.
7   **Q.**   Now, did you have occasion to be in any other homes, any
8   homes in which there was Chinese drywall installed?
9   **A.**   I did go to the 209 Rue Esplanade home that had the walls
10  removed from the Chinese drywall, and I actually saw Mark
11  Hartenstein remove the ends of those wires and make up new
12  receptacles and new switches in that house.  I was able to see
13  a condition that was there that should be prevalent in all of
14  those homes.
15  **Q.**   Who's Mark Hartenstein?
16  **A.**   Mark Hartenstein is an electrical contractor who I've
17  known for at least 20 years.
18  **Q.**   Have you worked with Mr. Hartenstein before?
19  **A.**   Yes, I have.
20  **Q.**   So you were both at the Rue Esplanade home?
21  **A.**   That is correct.
22  **Q.**   You had an opportunity to examine receptacles and switches
23  that were in place in that home?
24  **A.**   That is correct, yes, sir.
25  **Q.**   What observations did you have at that home?

1  **A.**    That only the particular ends of those cables were

2  tarnished just where the copper wire was exposed.  There had

3  been -- even if you peeled it back a little bit, it was

4  pristine.

5  **Q.**    When you say "pristine," what do you mean?

6  **A.**    Nice, shiny copper coating.

7  **Q.**    Now, you indicated that you examined samples of the

8  Hernandez home wire?

9  **A.**    Yes, I did.

10 **Q.**    You reviewed samples of the receptacles and switches?

11 **A.**    Absolutely.

12 **Q.**    Did you see photos of the electrical system?

13 **A.**    Definitely.

14 **Q.**    What photos did you see?

15 **A.**    In the Hernandez home specifically, a switch box, a couple

16 switches in it; receptacles that were already made up or pulled

17 out, as well, pulled out to the fact that you could see the

18 wiring that was behind it; and closeup pictures in the reports,

19 in the Beyler report, that showed the tarnishment on the ends

20 of the wires themselves, on the ends of the cable.

21 **Q.**    Were you able to see anything from Chinese drywall homes

22 from other locations?

23 **A.**    Those were the only two that were observed.

24 **Q.**    Okay.  Did you have any conversations with Mr. Hartenstein

25 regarding what he saw at the home?

1   **A.**   Mr. Hartenstein called me, as a matter of fact, from the

2   Hernandez home.  When he had a question about splicing wire in

3   the box or replacing that receptacle, he was informed by

4   several other people that were there that he shouldn't be doing

5   that.

6   **Q.**   We'll get to that conversation later.

7          Did you review any reports of any of the experts in

8   this matter?

9   **A.**   Yes, I did.

10  **Q.**   Whose reports did you review?

11  **A.**   Dr. Lee was here this morning.  The Lee Perricone report

12  as well as Dr. Beyler.

13  **Q.**   You've been in court today, so you also observed their

14  testimony?

15  **A.**   Yes, sir.

16  **Q.**   Do you have any opinions as to whether the clipping of the

17  ends of live and neutral wires and reconnecting them to the new

18  switches and outlets, as KPT is suggesting, their protocol,

19  would be in violation of either code?

20  **A.**   I don't think the -- I don't think it is at all.  The

21  cross-sectional area is not damaged to the point that -- you

22  can just see the film on it.  It's infinitesimal.  I mean,

23  20 microns, good Lord.

24  **Q.**   Can you explain what you mean.  What is 20 microns?

25  **A.**   20 microns is 20 ten-thousandths of a millimeter.  It's

1   almost imperceptible.  You can see the blackness on the end of
2   it and you can wipe it off with your finger.
3   **Q.**   Now, have you heard what's been referred to in this --
4   have you ever heard of a rule called the 6-inch rule?
5   **A.**   I've been examining that rule.  I've heard that the 6-inch
6   rule is existing in the National Electric Code.  But in the
7   same paragraph with that particular sentence is one that says
8   if the opening to your box is 8 inches or less, all you need is
9   3 inches outside that box.
10          So I don't know -- most of the boxes that we're
11   concerned with, the receptacle boxes and the switch boxes, are
12   like two-and-an-eighth of an inch.  They come in from the top
13   or the bottom.  So specifically when you have enough slack to
14   make up that new connection or the old connection, you don't
15   have that 6 inches to deal with.
16          The only time that that comes into play is when an
17   inspector has a very large box, maybe he's going to put up a
18   chandelier or something, maybe that electrical contractor's
19   going to put up a chandelier and needs a lot of room to work
20   in, he'll utilize that 6 inches.  He needs it.  I don't know of
21   anyone -- and I've done thousands of inspections, and I never
22   called anybody down for having less than 6 inches in a box so
23   long as they had enough to make a -- so I'd refer to the 6-inch
24   rule as not bogus, but I'd perform the 3-inch rule, not the
25   6-inch rule.

1   **Q.**   Sir, have you ever denied an inspection because of the

2   6-inch rule application?

3   **A.**   Absolutely not.

4   **Q.**   How many inspections have you done of residential

5   properties here in the state of Louisiana?

6   **A.**   In Louisiana specifically, over 25,000.

7   **Q.**   Sir, if we could, why don't we put up the specific

8   reference to the 6-inch rule in the International Residential

9   Code.  If we could go to section 3906.10.3.

10  **A.**   It says:  Where conductors are to be spliced, terminated,

11  or connected to fixtures or devices, a minimum length of

12  6 inches of free conductor shall be provided at each outlet,

13  junction, or switch point.  The required length shall be

14  measured from the point in the box where the conductor emerges

15  from its raceway or cable sheath.  Where the opening to an

16  outlet junction or switch point is less than 8 inches in any

17  dimension, each conductor shall be long enough to extend at

18  least 3 inches outside of such opening.

19          So you just can't read the first sentence and call it

20  a day at only 6 inches.

21  **Q.**   With regard to this exception for where the opening to an

22  outlet, junction, or switch is less than 8 inches, would that

23  apply in a residential setting?

24  **A.**   Absolutely.  If we saw a common receptacle box in this

25  room, it probably would only be like two by two-and-an-eighth,

1   something to that dimension, maybe 3 inches tall at the worst.

2   **Q.**   So that would fall within the second sentence of this

3   rule?

4   **A.**   Absolutely.  That's where I'm going with that.

5   **Q.**   This is a code provision that applies to the length of

6   free wire; right?

7   **A.**   Absolutely.

8   **Q.**   In practice, how is this rule applied here in the state of

9   Louisiana, parish of St. Tammany?

10  **A.**   Again, an electrician for the first time is putting in

11  his -- he's running his cable, putting up his boxes.  They have

12  what they call a closed wall inspection, which allows the rest

13  of the walls to be closed up.  The electrical inspector, for

14  the first time, witnesses this, sees that there's enough

15  conductor in the box.  He goes about his merry way, absolutely

16  asks them to close up the walls.  And then an electrician --

17  the same one or another one from a different company -- comes

18  there and makes his connection up.  So he has the slack that he

19  needs to make up that wire at this particular point.

20  **Q.**   As someone who's an expert in the applicable electrical

21  code, what's your understanding of what the 6-inch rule is for?

22  **A.**   The 6-inch rule is for large installations where you need

23  enough conductor to splice from one area to another inside that

24  box if the box opening was greater than 8 inches.

25  **Q.**   What's the purpose for having this slack?

1   **A.**   The slack is actually for the electrician to take his

2   wire, take off the insulation enough to make a curl to go on

3   the screw or to stab into the back of the device as they're

4   implemented, and that's what it's for.  It's for ease of

5   working, not necessarily for safety's sake.

6   **Q.**   It's to make it more convenient for the electrician?

7   **A.**   Absolutely.

8   **Q.**   So he'll have enough area in which to work?

9   **A.**   Right.  Precisely.

10  **Q.**   Would that be in a renovation or repair situation?

11  **A.**   It makes no difference.  Particularly, this code applies

12  to first time.  Now, you know, you'd want enough in case you

13  ever wanted to do some kind of renovation so it would be nice

14  for the guy to come after you.  Yes, specifically, a couple

15  inches will do you.

16  **Q.**   As a certified electrical inspector, do you feel it's your

17  obligation to ensure the safety and reasonableness of the

18  electrical system for the homeowners?

19  **A.**   The code actually provides for that aspect.  There's a

20  code section that deals with the authority having jurisdiction.

21  If that person relies on his ability to be reasonable and

22  safety conscious, he should utilize that aspect of being the

23  authority having jurisdiction and granting whether or not that

24  particular installation is well within reason.

25  **Q.**   In your experience as an electrical inspector, do you have

1    occasion to speak with other electrical inspectors in the

2    field?

3    **A.**    Absolutely.  The International Association of Electrical

4    Inspectors is just for that purpose.  There's many electricians

5    who attend it.  All of the electrical building officials from

6    New Orleans, Jefferson Parish, even sometimes from St. Bernard

7    congregate, and you're encouraged to discuss those kind of

8    things.

9    **Q.**    In your career as a certified electrical inspector, have

10   you ever heard of an electrical system being rejected because

11   of the 6-inch rule?

12   **A.**    In my lifetime and throughout the United States and like I

13   mentioned earlier, I don't think -- I think that this would be

14   acceptable -- I know it's acceptable in all of those states

15   that I mentioned earlier, particularly Florida and Virginia.

16   **Q.**    Now, in the course of preparing for your testimony, did

17   you have occasion to see some pictures with regard to a

18   three-switch gang box and a two-switch gang box in the

19   Hernandez home?

20   **A.**    That's correct, I have.  I saw that in the report by

21   Beyler.  I saw those pictures in there.

22   **Q.**    With regard to those pictures, would those indicate that

23   the first sentence or the second sentence of this section would

24   apply?

25   **A.**    I would have to say that that box is not 8 inches in its

1    opening, so I think 3 inches is plenty.

2    Q.    As a certified electrical inspector here in the state of

3    Louisiana, do you think that's sufficient?

4    A.    Absolutely.  And when I did see that, it definitely had at

5    least 3 inches on the outside.

6    Q.    In your professional opinion, would it be reasonable to

7    remove the existing wiring in the situation with the Chinese

8    drywall, make some clips --

9    A.    I think it would be ridiculous to remove the cable.  I

10   think that the -- I know that it would be wasteful.  You'd be

11   throwing away good money.  Just leaving that conductor like it

12   is is perfectly okay.

13   Q.    Just so we're clear, you understand that the KPT protocol

14   suggests changing out switches and receptacles in the Hernandez

15   home?

16   A.    I absolutely do.

17   Q.    How would they go about replacing out those switches and

18   receptacles?

19   A.    I understand that the electrician involved would take off

20   or clip off that area that is exposed, that's blackened, remove

21   a small bit of insulation, make his termination up at that

22   particular point, and go on -- he'd clean up his connection,

23   which is good workmanship anyway, even if it was a brand-new

24   cable.  Any cable that an electrician does, he should clean up

25   that cable.

1  **Q.**   Why is that?

2  **A.**   Just to make the good connection, just to ensure there's a

3  good connection.

4  **Q.**   What about the ground wire?

5  **A.**   The same thing applies there.  Same thing.  I would duly

6  note that I would -- I think -- you know, I understand that the

7  infinitesimal amount of film that's on this cable is not -- it

8  doesn't decrease the cross-sectional area.  It doesn't impair

9  the current flow.  You know, once you make up the connection,

10 you don't even have to remove that.  As a measure of just good

11 workmanship, you'd remove that little cursory part there.

12 **Q.**   From your personal observations, have you been able to

13 remove the film?

14 **A.**   Absolutely, yeah.  Sure.

15 **Q.**   Now, you've heard testimony and you've seen reports which

16 indicate that the plaintiffs are suggesting that all the

17 electrical wiring in the home should be removed because of the

18 6-inch rule.  Do you believe that's right?

19 **A.**   I believe that to be ludicrous because it doesn't have

20 6 inches and going back on this rule where you really -- I

21 mean, it's a good 3-inches extension.  You could make up the --

22 I think it would be ludicrous to take all the cable out just to

23 get 6 inches in the box.

24 **Q.**   Sir, if we were to comply with the first sentence of

25 this -- which I believe your testimony is that for the boxes

1  that we have, that is not the applicable sentence; correct?

2  **A.**   That is correct.

3  **Q.**   To assure that we are meeting the 6-inch rule, as it's

4  been called, do you have any opinion how you could meet the

5  6-inch rule?

6  **A.**   Yes, I certainly do.  That box that you're putting your

7  receptacle in, or your switch, allows for a splice to happen.

8  So if you needed by circumstances that you go to the box and

9  you only have a few inches in there to begin with, you could

10  easily put a wire nut on there, which doesn't make you exceed

11  the volumetric capacity of that box.  You could add a few

12  inches of wire on there and thus necessitate, if you have to,

13  put 6 inches or 3 inches on there and make up your device at

14  that particular point.

15  **Q.**   For the Court and record, what do you mean by *splice*?

16  **A.**   *Splice* means the joining of two wires.  Generally, they're

17  twisted together and a component part called -- a part that is

18  approved for the purpose -- we commonly refer to it as a wire

19  nut, and it's placed over it.  It has an insulating value equal

20  to or more than the conductor's insulation that's on that

21  conductor already.  You securely fasten that new NM cable in

22  its pristine condition back into that box as if it never

23  happened.

24          **MR. HAYDEN:**   If we could go to 3906.10 -- 3306.10.  I

25  apologize.  No.  Right above it.  Splices.

1             **THE WITNESS:**  I think that's what we just talked
2  about:  The conductors shall be spliced or joined with splicing
3  devices listed for the purpose.  Splices and joints and the
4  free ends of the conductors shall be covered with an insulation
5  equivalent to the conductors or with an insulating device
6  listed for the purpose.
7             The device that I called out before, as I
8  commonly refer to it as a wire nut, is a wire connector.
9             The second-to-last sentence:  Wire connectors or
10  splicing means installed on conductors for a different purpose,
11  for direct burial, shall be listed for such use.
12             We're not talking about direct burial cables in
13  this case.  We're talking about the common house wiring that we
14  saw earlier as referred to as NM cable.  Its conductors can be
15  spliced in those boxes.
16  **BY MR. HAYDEN:**
17  **Q.**   You're aware of the fact that Mr. Hartenstein did some
18  harvesting of some switches and receptacles out of the
19  Hernandez home; correct?
20  **A.**   He absolutely did, yes.
21  **Q.**   Do you have an opinion as to whether or not he
22  appropriately spliced at those boxes?
23  **A.**   The way he went about his business is absolutely correct.
24  He used the approved devices that were listed for the purpose.
25  If he had to add a piece of wiring in there, that's what he

1   did; he spliced in the box.  He certainly replaced the
2   connection properly on that device.  So, yes.
3   **Q.**   Now, could you explain for the Court the difference
4   between a ground wire and a hot and neutral wire.
5   **A.**   A ground wire is simply a bonding wire.  What I mean by
6   that is it creates an equal potential throughout the electrical
7   system.  It's a redundancy of the neutral.  The neutral carries
8   the source current from the hot through whatever it's working
9   back to the circuit breaker that is giving the current to the
10  situation.
11          If for some strange reason that wire, that neutral
12  wire, is broken, then that ground wire becomes its backup wire
13  for all intents and purposes for this conversation, it never,
14  unless there's a short circuit, carries any current.  But in
15  case it does, it carries a fault current back to the source,
16  and no alternate parallel situation should occur so that the
17  circuit breaker can work.  It doesn't go to ground as such.  It
18  goes back to the source.
19  **Q.**   So would it be fair to say that the ground wire generally
20  doesn't have a continuous current?
21  **A.**   That's correct.
22  **Q.**   It only kicks in if the neutral wire fails?
23  **A.**   That's precisely correct.
24          **MR. HAYDEN:**  If we could go to IRC 3808.4.
25

1  BY MR. HAYDEN:

2  Q.    Do you see that?  We can blow it up.

3  A.    Yeah.  It's called the effective ground current path.

4  Q.    What is that provision?

5  A.    That's just what I had talked about earlier.  Every metal

6  connection in the home, particularly at that switch,

7  particularly at that receptacle, that ground wire is landed

8  there and brought back to the source voltage at that circuit

9  breaker in that circuit breaker panel, and it's connected to

10  ground.  At that particular point, that ground is also

11  connected, and only there is connected to the neutral bus bar

12  that's in that system.  So if you lose the neutral and you

13  don't want to become part of that return path to ground, that

14  ground wire carries that if that neutral stops working.

15  Q.    Mr. Canzoneri, a few other questions in that regard.  Do

16  you have any opinion whether the tarnish that is left on the

17  ground wire under the KPT proposal would violate any of the

18  provisions of the code?

19  A.    I don't think it -- I know it doesn't.  I really

20  understand the system, and the fact of the matter is it does

21  not.  It does not do that.

22  Q.    Why is that?

23  A.    It doesn't -- it is a -- being a semiconductor, okay,

24  there is some current that could be generated through it.  It's

25  not what I'd call totally resistive.  The film that's on there

DAILY COPY

1   is almost infinitesimal.  It's 20 microns at the biggest point.

2   **Q.**   Would it impact the functionality of the ground wire?

3   **A.**   It will not impact the functionality of the ground wire.

4   **Q.**   You're aware of the fact that the KPT proposal suggests

5   that the Chinese drywall is removed?

6   **A.**   Absolutely, thus necessitating the ending of the exposure

7   to the gases.

8   **Q.**   Is there any point in time where you'd say a ground wire

9   should be removed due to corrosion?

10  **A.**   Well, I mean, if it's grossly -- if the wire's about to

11  break, there's no mechanical or little mechanical connection,

12  that could be a place where that is involved, yes.

13  **Q.**   Did you see any ground wires here which showed a corrosion

14  that would cause you to remove the ground wire?

15  **A.**   Not at all.

16          **MR. HAYDEN:**  If we could look at 3808.17.

17  **BY MR. HAYDEN:**

18  **Q.**   Sir, do you recognize that provision of the code?

19  **A.**   Absolutely.  We talked about it earlier, about cleaning

20  the surface area of the wires that they exist now.  Many, many

21  pictures that I saw in these reports that I told you about

22  earlier, the Beyler and the Lee, showed me many, many places

23  where the drywall spray and/or paint was on the particular ends

24  of the cable and the insulation.  I think that's detrimental to

25  the source current, and I think that could become a hazard.

1    That's why this provision is in there, that that kind of stuff,

2    those kind of things, since they are on conductors, need to be

3    removed from the cable.

4  **Q.**   Are those the types of things that you see in thousands of

5    inspections that you've been involved with in residences?

6  **A.**   Unfortunately, that's part of the industry, that

7    overspray.  I've seen many guys take, you know, cardboard to

8    try to minimize the overspray aspect of it, yes.

9  **Q.**   How would you recommend that this be removed?

10  **A.**   I'd simply have my knife handy, a fingernail, just some

11   abrasive, a Scotch-Brite pad that they talked about earlier,

12   take that off of there.

13  **Q.**   Would this provision apply to the tarnish at issue, the

14   copper sulfide?

15  **A.**   Copper sulfide -- again, I'll go back to a circumstance

16   when I was much younger where we did a cathodic protection

17   survey in the city of New Orleans.  The city gas piping is

18   metal since God knows when, and they do an anticorrosive with

19   sinking anodes.  They actually use a copper sulfate solution

20   onto a bar with a cylinder that has a membrane on it, and they

21   place it into the ground somewhat, and they measure what could

22   be left as the anode.  If it's still plating off, they can

23   actually tell.  They go to the hand-hold, they open up the wire

24   that's there, and they connect that copper sulfate solution and

25   rod to see if that exists.  So, yeah.

1   **Q.**   Would the tarnish be considered conductive or

2   nonconductive?

3   **A.**   I think it's conductive.  Not "I think."  It is

4   conductive.

5   **Q.**   So that would be in contrast to the paint or lacquer that

6   you might find?

7   **A.**   It is in direct contrast because the paint or lacquer

8   enamel that's on there or any other -- like the drywall, it's

9   an insulator.  It should be removed.

10  **Q.**   In your opinion, does the tarnished ground wire need to be

11  cleaned along its entire length?

12  **A.**   No.  The cross-sectional area, or the surface area,

13  doesn't impede those amperes.  I read that also in the Beyler

14  report.  The heat constraint is where you would see that

15  element arise, and it doesn't.

16  **Q.**   In your opinion, does the tarnished ground wire need to be

17  cleaned at the connection points?

18  **A.**   I really don't think it does.  But showing good

19  workmanship, I think that I'd probably insist on it.

20  **Q.**   We've talked a little bit about the scope of the KPT

21  proposal for the electrical system.

22  **A.**   Uh-huh.

23  **Q.**   Is it your professional opinion that the electrical work

24  that KPT is proposing would be within code?

25  **A.**   Absolutely, yes, sir.

1  **Q.**   Does it follow industrial standards?

2  **A.**   It does.  If you remove the element, simply clip off the

3  ends, remove that part of it, reconnect it, there's no problem

4  with determination.

5  **Q.**   With regard to doing the splicing in the boxes, would

6  there be any problems with that with regard to the volume in

7  the box?

8  **A.**   Again, the code specifically enhances that method.  It

9  does tell you to do that, that you can splice in those boxes.

10  **Q.**   In your opinion, the work that Mr. Hartenstein did at the

11  Hernandez home with regard to harvesting those receptacles and

12  switches, did that comply with the code?

13  **A.**   Absolutely.  I think beyond a shadow of a doubt he did an

14  excellent job in replacing those receptacles and switches.

15         **MR. HAYDEN:**  Your Honor, we'd move into evidence

16  Defense Exhibits 239, 240, and Defense Exhibit 37.

17         **THE COURT:**  What is that?

18         **MR. STEVE HERMAN:**  No objection.

19         **THE COURT:**  Let it be admitted.

20         **MR. HAYDEN:**  Thank you, Your Honor.

21         **THE COURT:**  That's it?

22              Any cross?

23                    **CROSS-EXAMINATION**

24  BY MR. STEVE HERMAN:

25  **Q.**   Good afternoon.

DAILY COPY

1    **A.**   How are you doing?

2    **Q.**   Okay.  I think you mentioned very early on that an

3    electrical inspector has to personally come to the home and

4    personally visually inspect the house, doesn't supervise it,

5    but is there himself or herself; is that right?

6    **A.**   That's correct.

7    **Q.**   That's not what you did in this case; correct?

8    **A.**   That I did not do in the Hernandez house.  I did it at the

9    other edifice, 209 Rue Esplanade.  All I did was simply be

10   asked to witness those pictures and not become the authority of

11   the jurisdiction at that particular house.

12   **Q.**   You never actually went to the Hernandez home; correct?

13   **A.**   I did not, but I saw those pictures.  I saw hundreds of

14   pictures.  I saw pictures with the drywall on, with the boxes,

15   you know, with the components hanging out of them.  I

16   virtually -- and I actually held those samples in my hand, as I

17   told you earlier.

18   **Q.**   One sample?

19   **A.**   No.  It was five, six of them.

20   **Q.**   Well, we'll get to your deposition testimony about that

21   later.

22   **A.**   Okay.

23   **Q.**   Not only did you not go to the Hernandez home, you never

24   sent a certified inspector to the Hernandez home; correct?

25   **A.**   No, I didn't.  I don't think it was my job at that

1    particular point to do that.

2    **Q.**    Other than going to the Rue Esplanade home, do you have

3    any experience with Chinese drywall?

4    **A.**    Only the things that I've seen and the reports that I have

5    seen.  No, there's no other experience about that aspect of it.

6    But my 30 years of experience with everything else that I've

7    done, I think it's surely related to what I did at this

8    particular place.

9    **Q.**    You have no firsthand real-world experience with Chinese

10   drywall remediation; is that correct?

11   **A.**    That's correct.

12   **Q.**    You have performed no studies ever on sulfur corrosion of

13   copper versus other types of copper corrosion or oxidation;

14   correct?

15   **A.**    That's not my field.  I don't do those kind of scientific

16   aspects that you're talking about.

17   **Q.**    I think you mentioned in your deposition in the late '60s

18   you had some experience with a copper sulfate solution or

19   something?

20   **A.**    Yes.

21   **Q.**    Is that what you were referring to earlier?

22   **A.**    That's what I was referring to, yes.

23   **Q.**    Other than that, you have no real-world experience in

24   dealing with copper sulfide corrosion or tarnishing as opposed

25   to other oxidation; correct?

DAILY COPY

1  A.    Absolutely correct.

2  Q.    You haven't conducted or reviewed any studies to try to

3  determine whether, when they take the Chinese drywall out of

4  the environment, the corrosion continues; correct?

5  A.    The only things that I've done -- and I'm telling you,

6  Counselor, that I read those copious reports, Beyler, I

7  listened to the testimony today, and I believe they said

8  several times that if you remove the drywall, you remove the

9  source, and the conductivity of the wires are still there.  So

10  that's the things that I've accomplished in this research.

11  Q.    The video we just saw a few minutes ago --

12  A.    Uh-huh.

13  Q.    -- you didn't see that when you served your report,

14  though; correct?

15  A.    That's correct.

16  Q.    You didn't see that video before I took your deposition

17  last week; correct?

18  A.    No, sir.

19  Q.    You have no experience with silver sulfide; correct?

20  A.    Not at all.  I don't believe I have one iota of that.

21  Q.    You've done no laboratory analysis in this case?

22  A.    That's correct, Counselor.

23  Q.    Are you familiar with the Battelle classifications?

24  A.    You had showed me during my deposition an 8-1/2-by-11

25  floor plan, and you had 1, 2, 3, and 4 on there.  Those were

DAILY COPY

1    never explained to me, and I never bothered to do any more

2    research on that.

3    **Q.**   In all of your experience, you've never come across any

4    real-world experience with Battelle classifications; correct?

5    **A.**   That's correct.

6    **Q.**   You're not a metallurgist?

7    **A.**   I am not a metallurgist.

8    **Q.**   Not a materials expert?

9    **A.**   Not a materials expert.

10   **Q.**   Not a corrosion expert?

11   **A.**   No, sir.

12   **Q.**   You haven't been asked to look at or give an opinion on

13   the low voltage wiring within the Hernandez home?

14   **A.**   The low voltage wiring was not of my concern.  I was only

15   asked to take a look at the electrical wiring of the 15- and

16   20-amp variety.

17   **Q.**   You didn't look at or give an opinion about the electrical

18   appliances within the home; correct?

19   **A.**   No, sir, I did not.

20   **Q.**   Or the circuit boards?

21   **A.**   No, sir.  That's correct.

22          **MR. STEVE HERMAN:**  Could we look at Hernandez 451,

23   please.

24   **BY MR. STEVE HERMAN:**

25   **Q.**   Is this what you just referred to?

DAILY COPY

1  **A.**   That, Counselor, you showed me for the first time in my

2  deposition.

3  **Q.**   Do you remember looking at it in your deposition?

4  **A.**   Yes, sir.

5  **Q.**   Do you know what that is?

6  **A.**   No, sir, I don't.  I know it's a floor plan and it's got

7  numbers on it, and I know that it's a family room, a garage,

8  master bedroom, couple other bedrooms.

9  **Q.**   Do you see all those 3s and 4s?

10  **A.**   Absolutely.

11  **Q.**   You see "CTEH" up in the left?

12  **A.**   Yeah.  Center for Toxicology and Environmental Health.

13  **Q.**   Are you familiar with CTEH classifications from 1 to 4?

14  **A.**   That's not my forte, Counselor.

15  **Q.**   Do you know whether the Battelle classifications are the

16  same as or different from the CTEH classifications?

17  **A.**   No, sir, I sure don't.

18  **Q.**   In coming here today and giving your conclusion that, in

19  your opinion, the existing electrical wiring in the Hernandez

20  house is sufficient, you weren't provided with this analysis by

21  Knauf's own experts; correct?

22  **A.**   I hadn't seen it.  I don't recall it.  It could have been

23  in there, but I don't recall.

24  **Q.**   You really don't have any knowledge or opinion about the

25  corrosive level of the environment within the Hernandez home;

DAILY COPY

1   correct?

2   **A.**   Only what -- you know, seeing the ends of the cable that I

3   witnessed and those connections.  That's the only thing.

4   **Q.**   You pointed out either in your expert report or your

5   direct, or both, that you had inspected 30,000 homes in

6   New Orleans after Katrina; is that right?

7   **A.**   That's correct, yes.

8   **Q.**   After Katrina, any wiring that you determined had been

9   underwater had to be removed and replaced; correct?

10   **A.**   That's correct.

11   **Q.**   You didn't know whether it had been underwater for an hour

12   or 24 hours or 2 weeks; correct?

13   **A.**   You could only suppose.  You could jump to those

14   conclusions real quick.  That is not a good analogy as to what

15   happened in these homes.

16   **Q.**   Okay.  Even if you didn't see tarnish or corrosion on

17   those wires, you took it out; correct?

18   **A.**   We knew the waterline was above that system, above that

19   cabling, and the insulation was abraded by this terrible toxic

20   soup that was there.

21   **Q.**   The theory was, in that circumstance, that since the

22   wiring was exposed to a corrosive environment, it was safer to

23   just go ahead and take it out; correct?

24   **A.**   That specifically was it because of the corrosiveness of

25   that.  The ends of those wires that I saw in the Hernandez

DAILY COPY

1    home, as well as in the samples in the other home, is not

2    corrosion.  It is, in my opinion, tarnishment.

3    **Q.**   Are you going to testify here today in this courtroom that

4    of the 30,000 inspections that you went on after Katrina, every

5    single wire that you removed or authorized being removed, you

6    visibly confirmed that there was tarnish and corrosion?

7    **A.**   That is not a correct assumption.

8    **Q.**   Let's talk about the code a little bit.  As I understand

9    it, if you're going to do work or certify someone else's work

10   at the Hernandez home in Mandeville, you have to comply with

11   the CABO code; correct?

12   **A.**   It was recognized at one particular time.  Now the

13   International Residential Code is the acceptable standard.

14   **Q.**   You cite the CABO in your report; correct?

15   **A.**   I did.  I absolutely did.

16   **Q.**   It's applicable to St. Tammany, as far as you know;

17   correct?

18   **A.**   Correct.

19   **Q.**   And the NEC, which is NFPA 70; correct?

20   **A.**   Correct.

21   **Q.**   And the IRC, which is what you've been talking about;

22   correct?

23   **A.**   Correct.

24          **MR. STEVE HERMAN:**  Could you pull up Hernandez 155.

25

1   **BY MR. STEVE HERMAN:**

2   **Q.**   This is the 2003 version of the code; correct?

3   **A.**   That's correct.

4   **Q.**   We looked at this during your deposition; is that right?

5   **A.**   Yes.  I had the 2006 with me, which probably only --

6   **Q.**   It's easier to look at this one since we already have it

7   loaded up.  And I think you told me in your deposition that

8   there's no differences or material differences, at least as it

9   relates to your opinion in this case, between the 2000 code,

10   the 2003 code, and the 2006 code that you brought here with

11   you.  Correct?

12   **A.**   Very slight differences.

13   **Q.**   So if we look at the 2003 code, we should be okay?

14   **A.**   I think so, yes.

15   **Q.**   If not, let me know.  Okay?

16   **A.**   Yes.

17   **Q.**   Thank you.  In your expert report, you said that the

18   6-inch requirement only applied to new construction and not

19   renovations or repairs; is that right?

20   **A.**   At the time, yes, that is correct.  We didn't read on, at

21   that particular day, the second or third sentence in that

22   paragraph.

23   **Q.**   The one you pointed out to the Court today?

24   **A.**   The one that I pointed out to the Court today.

25   **Q.**   When you gave us your report, you had a completely

1   different theory; right?

2   A.   No.  No.

3   Q.   Okay.

4   A.   Yeah, we were talking about the 6-inch rule, but we never

5   went on to say about the boxes that are the receptacle variety

6   that are less than 8 inches in any direction and you can only

7   have 3 inches.  So I was agreeing to you on the 6 inches of a

8   box that is not of that variety.  It's much larger.

9   Q.   The second sentence that you looked at on direct, that's

10  something you came up with after your deposition; right?

11  A.   Because we never addressed it, yes.

12  Q.   Let's take this down for a second.  Let's look at

13  Exhibit Hernandez 392, if we could.

14          MR. STEVE HERMAN:  Your Honor, it may be easier for

15  the witness.  This is his report.  If I could approach, I could

16  give him a paper copy if that's easier for him to flip through.

17          THE COURT:  Okay.

18  BY MR. STEVE HERMAN:

19  Q.   Is that your report in this case, sir?

20  A.   That is my report.

21          MR. STEVE HERMAN:  Can we go to page 2 of this,

22  Scott.

23  BY MR. STEVE HERMAN:

24  Q.   Do you see this bullet point right here?

25  A.   Yeah.

1  **Q.**   That's what you submitted in this case originally with

2  your report; right?

3  **A.**   That's correct, yes.

4  **Q.**   Your reasoning or contention in this report was that the

5  6-inch rule didn't apply because it only applies to newly

6  constructed homes and not renovation; correct?

7  **A.**   Yes, that is correct.  The fact of the matter is that an

8  electrical inspector will come in, observe that there is enough

9  wire.  I've never seen it happen where the guy flips out a rule

10 and sees that you have 6 inches.  I've never had a house fail

11 because of that.  I've never failed any because of that.  But,

12 yes, my statement says that.

13 **Q.**   You've been proffered here today as an expert on the code;

14 correct?

15 **A.**   Yes.

16 **Q.**   And what the code means; correct?

17 **A.**   Right.

18 **Q.**   What you told us a couple weeks ago was that the code only

19 applied to new construction and not renovations; correct?

20 **A.**   In this particular instance, that's what it does.  It does

21 apply to the fact that the inspector's coming in for the first

22 time, they're about to close the walls on the edifice so they

23 can do the next part of it, and that when somebody comes back

24 in after him, puts a screwdriver to the device, has enough

25 cable to make the connection and go about his business, that's

 1  the applied intent of this rule.

 2  **Q.**    Okay.  Thank you.

 3           **MR. STEVE HERMAN:**  If we could go back to

 4  Exhibit 155.  If we could go to, Scott, page 2 of that, the

 5  electronic version, and go to section E3301.4, which I think is

 6  down here.

 7  **BY MR. STEVE HERMAN:**

 8  **Q.**    Do you see where it talks about additions and alterations?

 9  **A.**    Uh-huh.  Yes.

10  **Q.**    It says:  Any addition or alteration to an existing

11  electrical system shall be made in conformity with the

12  provisions of Chapters 33 through 42.

13           Do you see that?

14  **A.**    Yes, sir, I do.

15  **Q.**    You agreed with me last week that what Mr. Carubba wants

16  to do -- or what Mr. Hartenstein intends to do at the Hernandez

17  house, the KPT protocol, is an addition or alteration to an

18  existing electrical system; correct?

19  **A.**    Yes.

20  **Q.**    So the code would apply fully to this alteration just as

21  it would to new construction; correct?

22  **A.**    I said that, that's true, and it is true.

23  **Q.**    So what you said in your expert report was wrong; correct?

24  **A.**    I don't want to say I was wrong.  We just didn't go any

25  further with it.  Okay, Counselor?

645

1   **Q.**   Okay.   If we could zoom out a little bit.   Let's go to the

2   bottom right.   There's a section on inspection required.   Do

3   you see that?   3303.2.

4   **A.**   Right.

5   **Q.**   What does that say?

6   **A.**   New electrical work and parts of existing systems affected

7   by new work or alterations shall be inspected by the building

8   official to ensure compliance with the requirements of 33

9   through 42.

10   **Q.**   Is the work that KPT proposes to do on the Hernandez house

11   new electrical work to an existing system?

12   **A.**   It's an alteration.

13   **Q.**   So this further indicates that what KPT wants to do with

14   their house would be applicable to the code; correct?

15   **A.**   Absolutely, yes, sir.

16   **Q.**   You're not a controlling authority in Mandeville; correct?

17   **A.**   No, but -- no, I'm not.

18   **Q.**   Mr. Hartenstein is not a controlling authority in

19   Mandeville; correct?

20   **A.**   That is correct.

21   **Q.**   An electrician does not have the authority to violate the

22   code, does he?

23   **A.**   Absolutely not.

24   **Q.**   Does an electrical engineer have authority to violate the

25   code?

DAILY COPY

1    **A.**   No, sir, he doesn't.

2    **Q.**   Does Mr. Carubba have authority to violate the code?

3    **A.**   Does not.

4    **Q.**   You're not aware of any permit process, with respect to

5    their home on Marion Road, where someone that you would

6    recognize as a controlling authority has opined about what is

7    or isn't required under the code; correct?

8    **A.**   To my knowledge, that has not happened, no.

9    **Q.**   Are you familiar with the alternate means and methods

10   provisions of the code?

11   **A.**   Counselor, I'm not sure I understand that aspect.

12   **Q.**   It's too broad of a question?

13   **A.**   It is a very broad question.  I guess if you wanted to

14   deviate from that, we'd have to go to some board or something.

15   That's what you're telling me, huh?

16   **Q.**   I didn't ask a very good question.  I apologize.  If you

17   wanted to deviate from what's in the IRC, there's a process for

18   that; right?  It's an alternate means and methods process?

19   **A.**   I believe there is, yes.

20   **Q.**   That process requires you to get a certification in

21   writing from a governing authority; correct?

22   **A.**   That's correct.

23   **Q.**   Are you aware of KPT or anyone going through that process

24   with respect to what KPT wants to do to the Hernandez home?

25   **A.**   Not to my knowledge at this particular time.  When the

1   time comes, I'm sure that the electrician who works on that job

2   will get a certificate to do just what you're asking me.

3   **Q.**   Now, you spoke to someone in the New Orleans permitting

4   department; correct?

5   **A.**   Correct.

6   **Q.**   Someone who does not have jurisdictional authority in

7   St. Tammany?

8   **A.**   That's absolutely correct.

9   **Q.**   You're paying this person $50 an hour on behalf of Knauf;

10  correct?

11  **A.**   I want to make a correction to that.  The guy normally

12  charges $150.  He charges me $100, yes.

13  **Q.**   On behalf of Knauf?

14  **A.**   Sir?

15  **Q.**   You hired him in this case on behalf of Knauf?

16  **A.**   No -- yes.  I hired him on behalf of myself in

17  relationship to this project, yes.

18  **Q.**   To give you advice; correct?

19  **A.**   Yes.

20  **Q.**   Even he said that you can't violate the code and the

21  6-inches rule applies; correct?

22  **A.**   We're not violating the 6-inch rule.  We're doing the

23  3-inch rule.  Okay?

24  **Q.**   Are you going to testify here today that this consultant

25  that you've hired in New Orleans, who's not a controlling

DAILY COPY

1    authority in Mandeville, has approved of this 3-inch rule that

2    you're introducing?

3    **A.**    I never said that once whatsoever.

4    **Q.**    Have you ever consulted -- I think his name was Chan or

5    Chen or something.  Have you consulted with him about the

6    3-inch rule?

7    **A.**    Larry Chan.  I have consulted with him in regards to the

8    opening of that box and the 3 inches that sticks out, and he's

9    perfectly fine with that.

10   **Q.**    When did this conversation take place?

11   **A.**    Counselor, I'm not sure I remember the exact date of it,

12   but it has happened in the past.

13   **Q.**    Before your deposition?

14   **A.**    No.  No.

15   **Q.**    Since your deposition?

16   **A.**    Since my deposition.

17            **MR. STEVE HERMAN:**  Let's look at Hernandez 155.

18   Scott, for you, it's page 3.  Let's look at IRC section

19   E3304.6, which I think is in the left middle.  Here you are.

20   **BY MR. STEVE HERMAN:**

21   **Q.**    You mentioned this provision in your report; correct, sir?

22   **A.**    Yes, I did.  I sure did.

23   **Q.**    What was the significance of this section in your report?

24   **A.**    The significance of this section was with regard to

25   elements that don't conduct electricity at the particular ends

649

1   of those cables or throughout the cable.  For example, if you

2   had drywall spray, overspray, or paint on that wire, then I

3   think that would adversely affect the operation, safe operation

4   of that wire, and needs to be cleaned.  That's what I was

5   referring to.

6   **Q.**   What about corrosive residues?

7   **A.**   Again, if you're talking about a real corrosion that is

8   not of this variety -- because I told you already in the past

9   that that film that's on there is just that; it is a

10  tarnishment and doesn't provide any corrosive residues on those

11  cables.  That's my contention.

12  **Q.**   Is that what you said in your report?

13  **A.**   Yeah.

14  **Q.**   Do you still have your report in front of you?

15  **A.**   Uh-huh.

16          **MR. STEVE HERMAN:**  Scott, could we put back up

17  Hernandez 392, page 3, the first bullet point.

18  **BY MR. STEVE HERMAN:**

19  **Q.**   What did you say about section 3904.6 of the code?

20  **A.**   I said:  Tarnishing of the copper ground wire does not

21  impact the ground wire's intended function and does not affect

22  the electrical system as a whole.  Section 3904.6 of the code

23  is not typically applied to wires but to electrical equipment

24  with internal parts, such as switches, receptacles, which

25  according to Roy Carubba's scope of work are being replaced

1  and, therefore, are not at issue.

2  **Q.**   So your original point, contrary to what you just

3  testified to a couple minutes ago, is that 3304.6, which says

4  you've got to get the corrosive residues off, the original

5  point was that doesn't apply because this isn't equipment;

6  right?

7  **A.**   Well, it's not equipment.  Wire is not equipment.  Your

8  devices are.

9  **Q.**   So even though you're supposed to get corrosive residue

10  off equipment, in your opinion, that doesn't include wires?

11  **A.**   Like I said before, if you want to include wiring in this

12  and you're calling this a corrosive element, it's not.  It's

13  tarnishment.  I don't think that you have to remove it, right.

14  **Q.**   In your report, you didn't say this section doesn't apply

15  because this isn't a corrosive residue; you said this section

16  doesn't apply because it's not equipment?

17  **A.**   Because it's not equipment.  You're trying to

18  cross-correlate it to something that I never said.

19  **Q.**   Well, I apologize.  I didn't mean to do that.

20            **MR. STEVE HERMAN:**  Can we look at the definition of

21  *equipment*, Hernandez 155, page 6.  It's at kind of the bottom

22  left.

23  **BY MR. STEVE HERMAN:**

24  **Q.**   What's the definition of *equipment*?

25  **A.**   As you read it here, it says that it's a general term

1    including material, fittings, devices, appliances, luminaires,

2    apparatus, and the like used as a part of or in connection with

3    an electrical installation.

4            We're talking about a panel board.  We're talking

5    about light fixtures.  We're talking about anything else but

6    wiring.  Okay?  Like a receptacle maybe.  Okay?  Not wires.

7    **Q.**   A general term including material that's part of or in

8    connection with electrical installation, in your professional

9    opinion as an expert on the code, doesn't include wiring?

10   **A.**   Does not.

11   **Q.**   Okay.  Whatever the code requires, you admit that if the

12   wire is corroded, it can't stay in the house; right?

13   **A.**   If the wire is corroded -- and I'm not admitting that this

14   wire is corroded.

15   **Q.**   I understand.

16   **A.**   It can't stay in the house, yes, that's correct.

17   **Q.**   Even just the ground wire?

18   **A.**   Even just the ground wire.

19   **Q.**   Tarnish can stay, but corrosion's got to go; right?

20   **A.**   Exactly.

21   **Q.**   How many microns of copper sulfide tarnish constitutes

22   corrosion?

23   **A.**   I don't know the answer to that question.  In this case,

24   the only evidence that I have that it's 20 microns is not a

25   significant -- it's infinitesimal.  It's barely measurable.

DAILY COPY

1  **Q.**    How many angstroms of copper sulfide tarnish would you say

2  constitutes corrosion?

3  **A.**    Again, I don't know the answer to that question.  I'm not

4  sure, relatively speaking, what an angstrom unit is.  It's a

5  unit of light, but I'm not positive of how big that is.

6  **Q.**    Do you have an opinion that if you get to an eighth of an

7  inch of tarnish that that's what constitutes corrosion?

8  **A.**    I did say that at one particular point.  Tarnish, you

9  know, it would be corrosion to my layman's terms at that

10  particular point, yes.

11  **Q.**    You told me that last week; right?

12  **A.**    Yes, I did.

13  **Q.**    Right.  You would have to get an eight of an inch before

14  it constitutes --

15  **A.**    I was of that opinion, that's correct.

16  **Q.**    An entire 12-gauge wire is an eighth of an inch; right?

17  **A.**    That's correct.

18  **Q.**    So unless it's eating through the entire wire, it's not

19  corrosion?

20  **A.**    If you want to play on words like that, go right ahead.  I

21  don't think that that's correct.

22  **Q.**    You haven't conducted or reviewed any studies to try to

23  determine whether the copper sulfide tarnish continues when the

24  drywall is removed from the environment; correct?

25  **A.**    The only things that I've read are in various reports, and

1  it says that when you remove the element, you remove the

2  source, and it doesn't continue after that.

3  Q.   You looked at one sample from the Hernandez house that, in

4  your opinion, was tarnished and not corroded; correct?

5  A.   That's correct, yes.

6  Q.   The sample that you looked at was tarnished on the hot,

7  the neutral, and the ground; right?

8  A.   The sample being the length of cable at the time that we

9  were talking.   Subsequently, I've seen receptacles and wires

10  connected to those receptacles that had that tarnishment on it.

11  Q.   Subsequent to your deposition?

12  A.   Yes, sir.

13  Q.   So when you gave your report, you'd only seen one sample?

14  A.   That's correct.

15  Q.   It was tarnished?

16  A.   That's correct.

17  Q.   When you gave your deposition, you'd only seen one sample,

18  and it was tarnished?

19  A.   That's correct.

20  Q.   Now you've seen a whole bunch of samples and they're

21  tarnished?

22  A.   They're tarnished.

23  Q.   You're relying on Mr. Hartenstein's observation that the

24  wire under the insulation looked okay to him?

25  A.   In one case, and in another cases I've actually peeled it

1    back and taken a look at it and seen that it was, as I said

2    earlier, pristine copper, shiny copper.

3    **Q.**   Visual inspection?

4    **A.**   Yes, sir.

5              **MR. STEVE HERMAN:**  Let's look at the MTI publication

6    38, which is LT195 at page 13.

7    **BY MR. STEVE HERMAN:**

8    **Q.**   I know the Judge has seen this, so I don't want to belabor

9    the point, but it says:  By the time relevant corrosion can be

10   detected visually, the equipment may already be in an advanced

11   state of degradation.

12             Do you agree or disagree with that?

13   **A.**   I'm not sure where this comes from, the context of this.

14   It could be written about almost anything.  I'm not sure it has

15   any effect on me in relationship to this cable that's in place,

16   that's being questioned.

17             **MR. STEVE HERMAN:**  Could we go to page 15 of the

18   paper.

19   **BY MR. STEVE HERMAN:**

20   **Q.**   I'm not sure if Judge Fallon has seen this:  The thickness

21   of films that may produce failure is often well below the

22   limits of visual detection.

23             Do you disagree with that?

24   **A.**   Again, I don't know what -- I understand the words that

25   I'm reading.  I don't particularly agree with that.  It looks

1    like somebody's opinion.

2              **MR. STEVE HERMAN:**  Let's go to the graph on page 27,

3    please.

4    **BY MR. STEVE HERMAN:**

5    **Q.**   Do you remember how we were trying to figure out a few

6    minutes ago the distinction between tarnish and corrosion?

7    **A.**   I understand what you're saying, yes.

8    **Q.**   I think you said it was measured, at least in your

9    opinion, in inches, not microns or angstroms; correct?

10   **A.**   When I said an eighth of an inch, that's what I meant.  I

11   understand the particular film that I'm seeing, this

12   tarnishment, is less than or equal to 20 microns.

13   **Q.**   Do you see that little A there with a little degree sign?

14   Does that mean angstroms, as far as you know?

15   **A.**   That could mean anything.  I don't know what that means.

16   **Q.**   Do you know what *contact resistance* means?

17   **A.**   I have a feeling I know what *contact resistance* means.

18   **Q.**   What do you feel it means?

19   **A.**   The resistance of that when it rests against some other

20   source; metal or wood or anything else that we would talk

21   about.

22   **Q.**   You didn't do any contact resistance on any of the

23   materials from the Hernandez home; correct?

24   **A.**   I have no earthly idea about that, no.

25   **Q.**   Before you saw the video a few minutes ago, you didn't

1  know anything about what Mr. Beyler did; correct?

2  **A.**   That's correct.

3  **Q.**   You see in this graph the spike in contact resistance at

4  the micron level or at the angstrom level?

5  **A.**   I'm not sure which one you're looking at here.  I see two

6  sets -- I see one -- two graphs -- three actually, three here,

7  and I'm not sure -- I saw the nickel alloys up here.  I'm

8  reading silver over here.  So what's your question?

9  **Q.**   Okay.  No.  I was just pointing to the --

10  **A.**   I can read this.

11  **Q.**   You see how it says "$10^3$"?  Do you know how many microns

12  $10^3$ angstroms is?

13  **A.**   I have no earthly idea.

14  **Q.**   Fair enough.

15          **MR. STEVE HERMAN:**  You can take that down, Scott.

16  Thanks.

17  **BY MR. STEVE HERMAN:**

18  **Q.**   You didn't review any of the plaintiffs' expert reports in

19  this case; correct?

20  **A.**   I'm not sure I understand what you mean by that.  I saw

21  Beyler's report and I saw Lee's report.  That's the two reports

22  that I saw.

23  **Q.**   Did you see anything from Mr. Krantz?

24  **A.**   I believe that -- this is the first time I'm hearing about

25  Krantz.  I could be mistaken, but I don't recall.

1  **Q.**   It's your opinion, based on your knowledge of the

2  Hernandez home, that there's no tarnishment or corrosion

3  underneath any insulated wire?  Would you say that?

4  **A.**   That's my complete assumption, yes, that that's correct.

5  I don't believe there's any tarnishment below those.

6          **MR. STEVE HERMAN:**  Can we pull up Hernandez 188,

7  please.

8  **BY MR. STEVE HERMAN:**

9  **Q.**   Have you ever seen this before?

10 **A.**   Unless it was in those other documents that I told you

11 about earlier, right offhand, I'm going to say, no, I haven't

12 seen it.

13 **Q.**   You weren't in the courtroom when Mr. Krantz testified?

14 **A.**   Was that very early this morning?

15 **Q.**   No.  It was a couple days ago.

16 **A.**   At this particular time, no, I don't think I have.

17 **Q.**   You see that second-to-last row?

18 **A.**   Uh-huh.

19 **Q.**   Insulated low voltage wire under insulation, tarnish

20 thickness and pit depth --

21 **A.**   Okay.

22 **Q.**   -- do you know what that means?

23 **A.**   22.5 um.  Is that micrometers?  I'm not sure what the U

24 stands for.

25          **MR. HAYDEN:**  Your Honor, I object.  It's improper

DAILY COPY

1    impeachment.  The gentleman's never seen the document before.

2    I'm not sure really where we're going.

3              **THE WITNESS:**  I could read it, but I don't know what

4    it means.

5    **BY MR. STEVE HERMAN:**

6    **Q.**   We'll move on to the next one.  Did you look at any other

7    recent analysis that was done after Mr. Hartenstein changed out

8    some of the outlets and switches in the Hernandez home?

9    **A.**   I have read the Beyler report.  Actually -- yes.  I mean,

10   the Beyler report and the Lee -- I can't remember the last

11   guy's name, but the Lee report and the -- that's the only two

12   that I've read.

13   **Q.**   You're intimately familiar with the work that

14   Mr. Hartenstein did at the Hernandez home; correct?

15   **A.**   You can say that, yes.  I'm more familiar with the work --

16   I know that he did the work.  He called me from the residence

17   while he was doing the work.  I've seen the pictures of the

18   before, and I've actually seen the work done at the

19   Rue Esplanade.  Why it would be anything different -- I have no

20   earthly idea why it would be different.

21   **Q.**   Let's look at Hernandez 575.  That's what we call a

22   three-gang box; right?

23   **A.**   That's correct.

24   **Q.**   Is that one of the boxes that Mr. Hartenstein looked at in

25   the Hernandez house?

DAILY COPY

1    **A.**   I'd have to say right offhand that if that was in the
2    report, I saw this photograph before, and it could very well be
3    what we're talking about, yes.
4    **Q.**   Let's assume hypothetically that it is.
5    **A.**   Okay.
6    **Q.**   Mr. Hartenstein said, based on his visual inspection, to
7    the naked eye there's no corrosion, correct, when he peeled
8    back the insulation?
9    **A.**   That's correct, yes.
10   **Q.**   You're relying on him to conclude that the existing wiring
11   in the Hernandez home is okay; correct?
12   **A.**   I actually saw a sample of maybe one of these, 25, 35 feet
13   of it.  So I looked at both ends and we -- we really did.  We
14   saw a sample from the Hernandez home.  Okay?  We're talking
15   about the Hernandez home; right?
16   **Q.**   Yeah.
17   **A.**   I saw a sample of the cable that they brought out of that
18   home.
19   **Q.**   25, 30 feet?
20   **A.**   Yeah, probably.  It was a good loop, three or four times.
21   It might have been 12, 15 feet.  Okay?
22   **Q.**   Okay.
23   **A.**   But it certainly had the tarnishment on each end.  When we
24   looked back under the insulation, it was pure.
25   **Q.**   Now let's go to Hernandez 580.  That black wire is a hot

1    wire; right?  Or is it a neutral wire?  I can't remember.

2    **A.**   It could be a traveler.  It could be a switch length.  But

3    go ahead.

4    **Q.**   Well, if it's --

5    **A.**   For all intents and purposes, it could be either/or.

6    **Q.**   Let's assume that it's from the three-gang box that we

7    just looked at.  It's not a ground; right?

8    **A.**   I don't know.

9    **Q.**   You don't know?

10   **A.**   I would think it --

11   **Q.**   Would ground wire be insulated with a black wire?

12   **A.**   Yeah, sure.  Sure.  It should be green, according to the

13   code, but it could have a black on it and you could put tape

14   over it.  Okay?

15   **Q.**   Do you see how it's stripped back like Mr. Hartenstein

16   said he did?

17   **A.**   Yes.

18   **Q.**   About an inch and five-eighths, an inch and three-fourths?

19   **A.**   Uh-huh.

20   **Q.**   Do you see any corrosion there?

21   **A.**   It's really tough to see.  I see a black line that goes

22   along maybe -- what is that -- less than 2 inches, possibly, on

23   the photograph.  That could be anything.  That could be a piece

24   of that black insulation being peeled off as it goes along.

25   **Q.**   If you looked at that, you'd say that's okay, that can

1  stay in the house because that's not corroded; right?  That's

2  your opinion?

3  **A.**   That's my opinion.

4  **Q.**   Let's go to Hernandez 581.  Do you see how that shows that

5  there's copper sulfide beneath that insulation where you

6  thought it was clear?

7  **A.**   Okay.  If that's the case in this case.

8  **Q.**   You have no way of disputing that; correct?

9  **A.**   I have no way of disputing it or agreeing to it, in

10  essence.

11  **Q.**   Even though it looks good to the naked eye, underneath the

12  insulation there could still be copper sulfide corrosion;

13  correct?

14  **A.**   That's the point that you made before.  That's not the

15  conclusion that I've made.

16  **Q.**   Let's go back to the code.  Let's go to the part you were

17  talking about.

18         **MR. STEVE HERMAN:**  This is Hernandez 155, Scott,

19  page 4.  I think it's over here.

20  **BY MR. STEVE HERMAN:**

21  **Q.**   You were looking at a different version of some code, but

22  it's the same language; right?

23  **A.**   In this case, it's the NEC, and it's the one that we

24  referred to before.  We talked about the 6 inches, talked about

25  the 3 inches, and that's what I say.  That's what I contend.

1  Those outlet boxes don't have 8 inches from any point.  And I

2  tell you that the 3 inches is perfectly all right to make up

3  that device in that box.

4  Q.   It says:  Where conductors are to be spliced, terminated,

5  or connected to fixtures or devices, a minimum length of

6  6 inches of free conductor shall be provided at each outlet,

7  junction, or switch point.

8           Do you see that?

9  A.   Okay.

10 Q.   Do you see where it says "free"?

11 A.   I see that.

12 Q.   That means that if you're going to make a splice, you need

13 to have 6 inches of free conductor before you make that splice;

14 correct?

15 A.   It doesn't mean that at all.

16 Q.   Does it suggest that?

17 A.   No, it does not.  You're reading words into it.  You could

18 have 6 inches in there if you want to.  If you splice onto it,

19 you'll have 6 inches of free space in there.

20 Q.   Do you recall me reading this provision to you during your

21 deposition?

22 A.   Yes, I did.

23 Q.   Do you recall when I asked you:

24          "So when you're going to make a splice, you have to

25 have 6 inches before that splice of free conductor before you

DAILY COPY

1  make the splice; right?"

2  **A.**   I agreed with you, but we did not read on in there when we

3  knew that 3 inches -- you were alluding to the fact that you

4  needed -- absolutely needed 6 inches in that box.  I'm telling

5  you right here, right now, and again that you only need

6  3 inches in those outlet boxes.

7  **Q.**   You were wrong a week ago?

8  **A.**   I was wrong in the fact that I told you, I gave up on you,

9  that I gave you 6 inches, and that I didn't go on to say that

10  you can have 6 inches when you're splicing that box.  You kept

11  on beating on the fact that you needed 6 inches and I said,

12  "Yeah, you need 6 inches."

13  **Q.**   Let's look at the last sentence that you were just

14  directing the Court's attention to a few minutes ago, the

15  8-inch provision, I call it, this last sentence.

16         Now, first of all, I think we established a couple

17  minutes ago that you didn't say anything about that in your

18  expert report; right?

19  **A.**   That's correct.

20  **Q.**   Second of all, you have absolutely no idea how many boxes

21  or receptacles or switches or anything else in the Hernandez

22  home falls under this provision; correct?

23  **A.**   I have a real good idea.

24  **Q.**   You've never been to the home; right?

25  **A.**   I didn't have to go to the home.

DAILY COPY

1    **Q.**    You never looked at any of the boxes?

2    **A.**    I did look at them.  I looked at them on pictures.

3    **Q.**    Okay.

4    **A.**    The drywall was still up.  Their guy saw it as well as I

5    did.

6    **Q.**    It's your testimony that by looking at the photographs,

7    you can tell whether there's 8 inches in each box that's in the

8    Hernandez home as it sits today?

9    **A.**    No.  8 inches meaning the opening of the box being

10   8 inches.

11   **Q.**    What does that mean?

12   **A.**    That means that I know what a three-gang box looks like in

13   this case, and it's not 8 inches in any direction.  So it's

14   less than 8 inches.  So you could have 3 inches sticking out of

15   the box to make up your device on.

16   **Q.**    Let me ask you something.  Where it says that each

17   conductor shall be long enough to extend at least 3 inches

18   outside of such opening, that means the opening front part of

19   the box; right?

20   **A.**    That's correct.

21   **Q.**    So you have to extend it out behind the front of the box;

22   correct?

23   **A.**    No.

24   **Q.**    Past the opening of the box?

25   **A.**    You have to extend it beyond the opening of the box.

1    **Q.**   So it has to go from the back of the box to the front of

2    the box; right?

3    **A.**   No.  No.  It could come -- no.  It just has to stick out

4    past the front of the box for the 3 inches.

5    **Q.**   Okay.

6    **A.**   Wherever the wire is coming from, let's assume -- or let's

7    take a box, for example, that I don't have here with me.  Go to

8    your house; go to that house.  It's probably two-and-an-eighth

9    inches, in reality, the depth of that box.  So where could the

10   wire come in from?  Maybe the back of the box, the top of the

11   box, the bottom of the box, the side of the box.  So you're

12   going to have whatever length that is plus those 3 inches.

13   That's what they're getting at:  3 inches, enough to make up

14   the device and shove it back in there.

15   **Q.**   So you need to have 3 inches plus the area in the box;

16   correct?

17   **A.**   If it comes from the back of the box, because that's what

18   I'm saying.  If it comes from the side or the top or the

19   bottom, then you'll have just that much more.

20   **Q.**   Well --

21   **A.**   If you had more than that, if you had the 6 inches that

22   you were talking about, you'd never get those devices back in

23   the box.  That's the real world.

24           **MR. STEVE HERMAN:**  Let's look at the whole paragraph,

25   if we could, Scott.

1  **BY MR. STEVE HERMAN:**

2  **Q.**   If I understand you correctly, it's your testimony as an

3  expert on code interpretation, as an expert electrical

4  engineer, that the last sentence in that provision is an

5  exception to the first sentence in that provision; correct?

6  **A.**   It is also in that paragraph.  It's not an exception.

7  **Q.**   It's an additional provision; right?

8  **A.**   It's a provision.

9  **Q.**   You have to have 6 inches before the splice and, in

10  addition --

11  **A.**   No.

12  **Q.**   -- where the opening to an outlet is less than 8 inches,

13  you need to have 3 inches past the front of the box; right?

14  **A.**   That's your interpretation.  It's not mine.

15  **Q.**   There's two requirements there, not one?

16  **A.**   No.  No, it's not.

17  **Q.**   Okay.  Remember I asked you in your deposition if you

18  talked to anybody at NFPA about this?

19  **A.**   I did.

20  **Q.**   And you said --

21  **A.**   Anything in the NFPA in regards to drywall, and it's no.

22  I said no.

23  **Q.**   You said you talked to Mr. Chan?

24  **A.**   Then I qualified that.  He's on Code-Making Panel 18.

25  **Q.**   The guy who you paid?

1   **A.**   The guy who I paid.

2   **Q.**   Even he said you couldn't violate the 6-inch rule; right?

3   **A.**   I never said he said that.

4   **Q.**   Okay.  Well, I didn't want to have to do this, but let me

5   try to find this.

6          **MR. STEVE HERMAN:**  I apologize to the Court for the

7   delay.

8          **THE WITNESS:**  If you're saying -- go ahead.

9   **BY MR. STEVE HERMAN:**

10  **Q.**   Did I give you your deposition?

11  **A.**   I have it right here, Counselor.

12  **Q.**   I'm sorry.  That's your report.

13  **A.**   I don't have my deposition.

14         **MR. STEVE HERMAN:**  May I approach, Your Honor?

15         **THE COURT:**  Absolutely.

16  **BY MR. STEVE HERMAN:**

17  **Q.**   If you turn to page 60, do you remember when I asked you

18  the question at line 6:

19         "Would it be a fair characterization to say that he,

20  meaning Mr. Chan, agrees that the code requires 6 inches, but

21  in his opinion it's okay for people to violate that provision

22  of the code?"

23         Do you remember when I asked you that?

24  **A.**   I remember.  And I said, you know, he wouldn't let you

25  violate the code.  However, there is a standing specific in

1   that code that the authority having jurisdiction can, with

2   reasonableness in regards to safety, not make that happen.

3   Okay?

4   Q.   Just so the record's clear, that's something you just

5   added a second ago.  That's not what you said in your

6   deposition; right?

7   A.   Okay.

8   Q.   Can you read for the Court your answer at line 12, please.

9   A.   That's true.  "He wouldn't say that."  Is that what you're

10  referring to?

11  Q.   Yes.  "He wouldn't say that.  He wouldn't say that.  He

12  wouldn't say *violate*."  Correct?

13  A.   Right.

14  Q.   What's the next question I asked you?

15  A.   "Well, what would he say based on your conversations with

16  him?"

17  Q.   What was your answer?

18  A.   I said, "We'll go back and say that the 6-inch rule

19  applies throughout."

20  Q.   That's what you said at your deposition; right?

21  A.   Okay.  That's right.

22  Q.   No ifs, ands, or buts?

23  A.   In that regard, if you're talking about that specific

24  6-inch free conductor at that particular point, no regards to

25  the second part of that paragraph where we're talking about an

1    opening being less than 8 inches and having 3 inches, you're

2    right.

3              **THE COURT:**  Counsel, do you have much more on this?

4              **MR. STEVE HERMAN:**  No, Your Honor.

5    **BY MR. STEVE HERMAN:**

6    **Q.**   I do have one last point.  I'm going to skip to the last

7    point that doesn't have anything to do with the code.

8              It's your opinion, as I understand it, that the

9    existing wires in the Hernandez house are sufficient; is that

10   correct?

11   **A.**   That's correct.

12   **Q.**   You never went to the Hernandez property?

13   **A.**   I'm going to qualify it again.  I didn't have to.

14   **Q.**   You never sent a certified inspector to the Hernandez

15   property?

16   **A.**   No, I did not.

17   **Q.**   You relied solely on the observations of Mr. Hartenstein;

18   correct?

19   **A.**   And my physical observations of that cable, the existing

20   wiring that was done there by virtue of the samples that were

21   given to me or the receptacles and the wiring that I saw.  And

22   the answer is I think it should -- I think it's very well done

23   that way.

24   **Q.**   At the time of your report and at the time of your

25   deposition, you'd only seen one sample, correct, from the

1    Hernandez house?

2    **A.**    At the time of that, that's correct.

3    **Q.**    That sample was corroded; correct?

4    **A.**    That sample had tarnishment on the ends of those wires.

5    **Q.**    Within the Romex, it was corroded, correct, or tarnished,

6    if you like your word better?

7    **A.**    I like my word better because it's more representative of

8    the issue that's going on.  It was only tarnished on the very

9    ends of that cable and somewhat of the ground wire.

10    Infinitesimal.

11    **Q.**    Didn't you tell me in your deposition it was also

12    tarnished under the Romex?

13    **A.**    Counselor, I don't remember saying that.

14    **Q.**    Well, you don't know exactly where that one sample was

15    taken from; correct?

16    **A.**    No, sir, I don't.

17    **Q.**    You don't know when that wiring had been installed or

18    replaced in the home?

19    **A.**    That's correct.

20    **Q.**    Or how long it had been in that environment?

21    **A.**    No.

22    **Q.**    You conducted no laboratory analysis?

23    **A.**    Absolutely did not, sir.

24    **Q.**    Sitting here today, can you tell the Court what is the

25    condition of the wiring in the Hernandez kitchen?

1   **A.**   I have not seen that kitchen.  I've only seen boxes that

2   were taken photographs of, and I do not know the condition of

3   the kitchen.

4   **Q.**   Can you tell the Court, sitting here today, what's the

5   condition of the wiring in the laundry room in the Hernandez

6   home?

7   **A.**   Again, Counselor, I haven't been to that room, so I

8   couldn't tell you.

9   **Q.**   We noted in your deposition that you didn't put your

10   little engineering stamp on your report; right?

11   **A.**   It's irrelevant, I think.  When I sign my name

12   "Raymond Canzoneri, PE," why would I ever think that putting

13   the seal on that particular letter happens to be -- it happens

14   to be the same thing.

15   **Q.**   As a professional engineer, you would not put your stamp

16   on a document certifying that it wasn't necessary to remove and

17   replace existing electrical wiring without actually reviewing

18   the existing electrical wiring; correct?

19   **A.**   That's not what I said.  That's not what I said, not at

20   all.

21   **Q.**   You would put your stamp on that?

22   **A.**   I'd put my stamp on it.  I signed my name with "PE" on it,

23   didn't I?  I told you it was the same thing.

24   **Q.**   Do you still have your deposition?

25   **A.**   Right here.

```
1   Q.   Do you recall me asking you, page 14, line 24 of your
2   deposition:
3            "As a professional engineer, would you put your stamp
4   on a document certifying in your professional opinion that it
5   wasn't necessary to remove and replace existing electrical
6   wiring without actually reviewing the existing electrical
7   wiring?"
8            Do you remember me asking you that?
9   A.   I did.  You did say that.  Okay?  And, you know, if it's
10  out of context at this particular point -- you know, I think
11  it's out of context.
12            THE COURT:  Well, what's the answer first?
13  BY MR. STEVE HERMAN:
14  Q.   What's the answer?
15  A.   The answer is without -- I did have knowledge of the cable
16  and I saw that, and I saw those --
17            THE COURT:  Wait, wait, wait.  What's the answer?
18            THE WITNESS:  Would you ask the question again.
19  BY MR. STEVE HERMAN:
20  Q.   What was your answer at page 15, line 6 in the deposition?
21  A.   Okay.  I'll read it to you.
22  Q.   Thank you.
23  A.   "You know, I noticed the one thing that you didn't" --
24            Is that the same place?  No.
25  Q.   Page 15.
```

1    **A.**    Page 15, line 13?

2    **Q.**    No.  Page 15, line 6.

3    **A.**    Line 6:  "On that particular house, no."

4             **MR. STEVE HERMAN:**  Thank you.  No further questions.

5    We would like to, if it hasn't already been admitted, offer,

6    file, and introduce Exhibit Hernandez 155.

7             **THE WITNESS:**  Can I add something further to that?

8             **THE COURT:**  Yes, you can.

9             **THE WITNESS:**  Your Honor, I was confused at the time.

10   I was actually talking about -- they were asking questions

11   about the Hernandez house, and I was thinking about the house

12   that I had been to.  So in that regard, if you ask me the

13   question about being -- you know, physically being there, would

14   I stamp that, no, because I was over at the other house at that

15   particular time.

16            **THE COURT:**  Any redirect?

17            **THE DEPUTY CLERK:**  Judge, he's offered --

18            **THE COURT:**  I've admitted it.

19            **MR. HAYDEN:**  Real quickly, Your Honor.

20                      **REDIRECT EXAMINATION**

21   BY MR. HAYDEN:

22   **Q.**   Mr. Canzoneri, there was some question about whether or

23   not the inspector for the parish of St. Tammany had approved

24   the electrical system being proposed by KPT.  Do you recall

25   that?

1    A.   I do recall that.

2    Q.   They haven't approved it because no plans have been put

3    forward as of yet; correct?

4    A.   No, nothing has been --

5    Q.   No permit has been requested?

6    A.   To my knowledge, no, there has not been.

7    Q.   Do you have any opinion as to whether it would be approved

8    under the applicable codes?

9    A.   I believe it would be, sure.  Yes.

10   Q.   One other point of clarification.  I believe you may have

11   indicated that before hearing Mr. Beyler today, you hadn't

12   heard or seen anything about his opinions.  You did read his

13   report; correct?

14   A.   I did read his report.  Maybe at the time that I was being

15   deposed I didn't realize that I had read it.

16              **MR. HAYDEN:**  That's all I have.

17              **THE COURT:**  You're excused.  Thank you, sir.

18                   We'll come back in 15 minutes, 4:20.

19              **THE DEPUTY CLERK:**  Everyone rise.

20              (WHEREUPON the Court took a brief recess.)

21              **THE DEPUTY CLERK:**  Everyone rise.

22              **THE COURT:**  Be seated, please.

23              **MR. ECUYER:**  Michael Ecuyer.  Briefly, without

24   objection, we have an exhibit discussed this morning during

25   Dr. Lee's testimony, Hernandez 132.

1          **MR. SANDERS:**  No objection.

2          **THE COURT:**  Admitted.

3          **MR. SANDERS:**  I probably mumbled.  I'd like to

4     withdraw what was DX17 and introduce DX217.

5          **THE COURT:**  Let that be admitted.

6               Let's just talk logistics first.  As I

7     understand, Counsel, you're going to call two witnesses this

8     afternoon, and then one witness in the morning.  Who's in the

9     morning?

10         **MR. HAYDEN:**  Roy Carubba, the general contractor.

11         **THE COURT:**  Then because of some personal problems

12    with the witness, the last witness will be on Friday morning at

13    what time?

14         **THE DEPUTY CLERK:**  9:30.

15         **THE COURT:**  Then I'll hear closing arguments after

16    that and the case will be submitted.  I'm not going to dictate

17    my opinion from the bench.  I sometimes do, but I'm not going

18    to do it this time, so give me a closing argument.  If you need

19    to supplement the closing argument with a short brief, we'll do

20    it, but I need your findings of fact and conclusions of law.

21    I'll talk with you about that from the standpoint of timing.

22         **MR. HAYDEN:**  Thank you, Your Honor.

23         **THE COURT:**  Call your next witness.

24         **MR. HAYDEN:**  Mark Hartenstein.

25

DAILY COPY

1          (WHEREUPON **Mark Hartenstein**, having been duly sworn,

2    testified as follows.)

3          **THE DEPUTY CLERK:**  Please be seated.  Would you state

4    your name for the record.

5          **THE WITNESS:**  Mark Hartenstein.

6          **THE DEPUTY CLERK:**  Would you spell the last name.

7          **THE WITNESS:**  H-A-R-T-E-N-S-T-E-I-N.

8          **THE COURT:**  You may proceed, Counsel.

9                              **VOIR DIRE**

10   BY MR. HAYDEN:

11   **Q.**   Mr. Hartenstein, what's your educational background?

12   **A.**   I graduated high school, and then I got three years of

13   school at Delgado Community College.

14   **Q.**   You're presently employed?

15   **A.**   Yes.

16   **Q.**   What's your profession?

17   **A.**   Electrical contractor.

18   **Q.**   How long have you been an electrical contractor?

19   **A.**   I went into business in 1995.

20   **Q.**   How many residential electrical wiring jobs have you

21   worked on in the New Orleans area?

22   **A.**   I've been in the industry since 1982.  I've probably been

23   on -- it's a hard number to come up with.  Several hundred.

24   **Q.**   Can you explain what a typical residential electrical

25   wiring job entails.

1   **A.**   When you have the main service, which includes the outside

2   meter stem, meter pan, electrical panel, circuit breakers, and

3   all your inside wiring, light fixtures.

4   **Q.**   Have you been involved in residential renovations and

5   repairs?

6   **A.**   Yes.

7   **Q.**   Is that common for you to be involved with residential

8   renovations?

9   **A.**   Yes.

10  **Q.**   Who's your current employer?

11  **A.**   One of the owners of Graci Hart Electric.

12  **Q.**   What's your position with Graci Hart?

13  **A.**   Co-owner.

14  **Q.**   How long have you been with Graci Hart?

15  **A.**   We formed Graci Hart in 2001.

16  **Q.**   The business of Graci Hart is undertaking electrical

17  contracting; correct?

18  **A.**   Yes.  Residential and commercial.

19          **MR. HAYDEN:**  Your Honor, I'd tender him as an expert

20  electrician.

21          **MR. STEVE HERMAN:**  No objection.

22          **THE COURT:**  Let him be admitted.  I'll recognize him

23  in that field as an expert.

24

25

1                     **DIRECT EXAMINATION**

2    BY MR. HAYDEN:

3    **Q.**   How did you become involved in this case?

4    **A.**   I was contacted by Carubba Engineering several weeks ago.

5    They asked me to come look at a home that had Chinese

6    Sheetrock.

7    **Q.**   Who from Carubba Engineering called you?

8    **A.**   I believe Dan Olivier.

9    **Q.**   What did they ask you to do?

10   **A.**   They asked me to come out to the Hernandez home to remove

11   some outlets and switches.

12   **Q.**   Is it typical for a contractor like Carubba to subcontract

13   electrical services for renovation projects?

14   **A.**   Yes.

15   **Q.**   And have you worked with them before?

16   **A.**   No.

17   **Q.**   Is it typical for an electrical subcontractor to provide a

18   general contractor with an opinion on the necessary scope of

19   electrical work in a renovation or repair job?

20   **A.**   At times, yes.

21   **Q.**   That's what you did in this instance?

22   **A.**   Yes.

23   **Q.**   How did you go about coming to determining what the scope

24   of work was for the electrical system?

25   **A.**   We met at the Frilot law firm previously, I think, and

DAILY COPY

1  then discussed going to the home, said that they wanted to

2  harvest some switches and outlets for a metal expert to review

3  them.

4  **Q.**   Then did you go to the home?

5  **A.**   Yes.

6  **Q.**   When did you go to the Hernandez home?

7  **A.**   I don't recall the date we went.  Sometime in March.

8  **Q.**   At or about that time, did you remove some switches and

9  receptacles?

10  **A.**   Yes.

11  **Q.**   Where were they located?

12  **A.**   Master bedroom, two other bedrooms, I believe in the den

13  area, and we removed a smoke alarm in the hall.

14  **Q.**   At that time, did you have any observations with regard to

15  the electrical system in the home?

16  **A.**   We noticed the tarnishing, the black film on the ends of

17  the wires.

18  **Q.**   Have you seen anything like that before?

19  **A.**   No.

20  **Q.**   Did you attempt to strip the wires that were located at

21  the receptacles and switches?

22  **A.**   Yes.  The ones that we harvested for the metal expert, we

23  cut those back, we stripped them and installed new switches and

24  outlets.

25  **Q.**   When you stripped the wires, did they appear normal?

DAILY COPY

1    **A.**    Yes.

2    **Q.**    When I say "normal," what do you understand that to be?

3    **A.**    Well, when we cut them back, we cut the exposed copper off

4    the ends, stripped them back about a quarter to a half inch,

5    and the copper was clean in appearance, shiny.

6    **Q.**    At the connections, what did the copper appear to look

7    like?

8    **A.**    Before or after?

9    **Q.**    Before.

10   **A.**    Before, they were dark.

11   **Q.**    Can you describe for the Court what you mean by "dark."

12   **A.**    It was pretty dark, black in color, had like just a

13   small -- a light film on them.

14   **Q.**    Did you do anything with the harvested switches and

15   receptacles after you removed them?

16   **A.**    Well, before we took some of the outlets and switches off,

17   we had rubbed some of the black off out of curiosity what the

18   stuff was.

19   **Q.**    Were you able to remove it?

20   **A.**    Most of it, yes.

21   **Q.**    How did you remove it?

22   **A.**    We just used our fingers.

23   **Q.**    Do you have any opinion, based on your professional

24   experience, whether the existing electrical wiring can be used

25   in the Hernandez home?

1    A.    From my opinion, you can reuse the stuff, but that was

2    from me calling different people and asking their opinions of

3    it.   I had called Ray Canzoneri during the process when I was

4    there at the Hernandez home and described what was going on.   I

5    had told him:   "Most of the stuff is coming off in our hands,

6    and I don't feel any pitting or rough surface on it."

7    Q.    Now, you looked at how many switches and receptacles in

8    that home?

9    A.    I had two employees with me that day.   We probably --

10   combined, we probably took out, if I remember right, 10, 12,

11   outlets and switches.   We put back some of them, but we also

12   harvested some for the metal expert to take with him.

13   Q.    You said you saw what appeared to be some black on the

14   ends of the uninsulated wire?

15   A.    On the ground wire, yes.

16   Q.    Did you also see it on the hot and neutral wire?

17   A.    Yes, on the exposed hot and neutral, before we stripped

18   the wire.

19   Q.    That's what you saw.   You also attempted to feel those

20   wire connections?

21   A.    Yes.

22   Q.    You also felt the ground wire?

23   A.    Yes.

24   Q.    When you felt it, what did you feel?

25   A.    As I said a minute ago, it still felt smooth in its

1  makeup, and most of the black came off when you were rubbing on

2  it.

3  **Q.**   Now, based upon your review of the Hernandez house and

4  evaluating what the cost would be, did you make a proposal for

5  undertaking the electrical work that was to be undertaken at

6  the Hernandez house?

7  **A.**   Yes.

8  **Q.**   What work does that proposal include?

9  **A.**   We proposed to take all the light fixtures down, package

10  them up, leave them on site; remove all the outlets and

11  switches; and then after they re-Sheetrock the home, install

12  new outlets and switches and reinstall the existing light

13  fixtures.

14  **Q.**   At the switches and receptacles, what did you intend to do

15  with the live and neutral wires?

16  **A.**   Upon reinstalling the new ones, we were going to just

17  strip back the new copper wire.

18  **Q.**   So you would clip the wires?

19  **A.**   Clip the wires on the end.

20  **Q.**   Did you perform any testing on the wires at the Hernandez

21  home?

22  **A.**   We used our basic voltage meters while we were there and

23  tested to see if we had voltage on each device that we fooled

24  with.

25  **Q.**   What did you find?

1   A.   We found 120 volts at each location.

2   Q.   Is that normal?

3   A.   Yes.

4   Q.   Did you test if the equipment wires were reattached to new

5   receptacles, whether you would have the required voltage?

6   A.   Well, we tested them before we took them apart.  They had

7   120.

8   Q.   Did you test them after?

9   A.   I think a couple of them we did test afterwards, and it

10  had 120 volts.

11  Q.   Were the results the same?

12  A.   Yes.

13  Q.   You already mentioned Mr. Canzoneri.  You were here when

14  he testified?

15  A.   Yes.

16  Q.   Have you worked with Mr. Canzoneri before?

17  A.   Yes.

18  Q.   Do you look to him to provide you with information with

19  regard to compliance with code?

20  A.   Code and engineering questions.

21  Q.   Have you worked with Mr. Canzoneri before?

22  A.   Yes.

23  Q.   Let me show you what's been marked as Defense Exhibit 214.

24  215.  I'm sorry.

25         **MR. HAYDEN:**  Your Honor, may I approach the witness?

DAILY COPY

1      **THE COURT:**  Yes.

2    BY MR. HAYDEN:

3    **Q.**   Sir, I'm showing you what eventually will be up, but I

4    believe it's Defense Exhibit 215.  Have you seen that before?

5    **A.**   Yes.

6    **Q.**   What is that?

7    **A.**   This was a minor inspection report we turned in after

8    looking at the home.

9    **Q.**   Did you provide that report?

10   **A.**   Yes.

11   **Q.**   Then after reviewing the house, did you give a cost

12   estimate with regard to what the cost would be for undertaking

13   this scope of work?

14   **A.**   Yes.

15   **Q.**   What was that?

16   **A.**   I believe it was $3,400.

17       **MR. HAYDEN:**  That's all I have.  I'll move that into

18   evidence.

19       **THE COURT:**  Let it be admitted into evidence.

20       Let me just ask one question.  If you had to

21   take out all the wire and put in all new wire, what would you

22   charge?

23       **THE WITNESS:**  I'd probably have to revisit the house,

24   Your Honor, and do some measurements.

25       **THE COURT:**  I understand.  That's fair.

1                           CROSS-EXAMINATION

2    BY MR. STEVE HERMAN:

3    Q.   On the inspection report that we just looked at, it notes

4    that you observed black residue on the copper wire; is that

5    right?

6    A.   Yes.

7    Q.   So just so we're clear, that includes the hot wires where

8    there's no insulation, the neutral wires where there's no

9    insulation, and the ground wires pretty much everywhere; right?

10   A.   Yes.

11   Q.   You talked about how you removed 10 or 12 switches, but

12   you put most of them back.  You only actually harvested a

13   couple; correct?

14   A.   Correct.

15   Q.   Most of them you just pulled out, looked at them, put them

16   back in; right?

17   A.   Correct.

18   Q.   The switches and the wires that you looked at, you don't

19   know how long they had been exposed to the drywall; right?

20   A.   No.

21   Q.   You don't know when they were installed or replaced?

22   A.   No.

23   Q.   Do you know how long the circuit breaker was involved in

24   that environment or exposed to that environment?

25   A.   No.

1    **Q.**    Now, you looked at around 20 wires under the insulation by

2    the naked eye, I think you told last week.  Does that sound

3    about right?

4    **A.**    That sounds about right.

5    **Q.**    Just so we're clear, that's not wires from 20 different

6    receptacles.  That's just 20 individual wires; right?

7    **A.**    That's correct.

8    **Q.**    You did no laboratory analysis?

9    **A.**    No.

10   **Q.**    No metal analysis?

11   **A.**    No.

12   **Q.**    You didn't review any lab analysis or metal analysis from

13   any of the other experts in the case?

14   **A.**    I had said in my deposition that I didn't, and I believe I

15   made a mistake.  I think I read -- I believe it might have been

16   Mr. Beyler's report before that deposition.

17   **Q.**    Did that have an influence on your opinion?

18   **A.**    I don't know if it did or didn't, but I'm not the one --

19   early on, I'd say -- I can't say if you can save the wire or

20   not without a metal expert saying you can.

21   **Q.**    That's not within your expertise?

22   **A.**    No, sir.

23   **Q.**    You realize that Mr. Canzoneri, who you were relying on,

24   he was relying on you to say that the wiring under the

25   insulation was okay, huh?

1   A.    That's my opinion.  When you strip back the wire, it looks

2   good.

3   Q.    He was relying on you and you were relying on him, huh?

4   A.    (NO RESPONSE)

5   Q.    In any event, you talked about this voltage testing a

6   little bit.  You didn't compare the voltage -- when you cleaned

7   the wires, you didn't compare voltage precleaning to

8   postcleaning; right?

9   A.    When we first took the switches out in the kids' bedroom,

10  I remember us putting our tester on there and testing voltage.

11  Q.    Just to make that sure it worked?

12  A.    In both bedrooms.

13  Q.    Did you tell me about that during the deposition?

14  A.    I don't remember.

15  Q.    You certainly did no formal conductivity testing or

16  resistance testing that's been discussed earlier in the day?

17  A.    No.

18  Q.    Nothing according to, like, ASTM standards or anything

19  like that?

20  A.    No.  I wouldn't be familiar with that.

21  Q.    What does *box fill* or *box volume* mean?

22  A.    I think we're referring to the cubic-inch capacity of the

23  box.

24  Q.    Just for the Court's benefit, what does that mean?

25  A.    The end result is how many wires, how many conductors you

1    can put in a box.

2    **Q.**   There's a limit on that?

3    **A.**   Yes.

4    **Q.**   Is that a code issue, to your knowledge?

5    **A.**   Yes.

6    **Q.**   When you were at the Hernandez home, you actually took

7    samples from two different boxes; right?

8    **A.**   Yes.

9    **Q.**   You made new splices in those boxes?

10   **A.**   One of the bedrooms, I know we made splices in the box.

11   **Q.**   For one of the boxes, you did a box fill calculation;

12   right?

13   **A.**   I believe we did.

14   **Q.**   For the other one, at least as far as you could recall in

15   your deposition, you didn't; right?

16   **A.**   I don't think -- I know we did at least one there on site.

17   **Q.**   Okay.

18   **A.**   It was just kind of talking back and forth.

19          **MR. STEVE HERMAN:**  If we could look at Defense

20   Exhibit 212.  Do we have that in our system?

21   **BY MR. STEVE HERMAN:**

22   **Q.**   If we look at the electrical here, do you know what this

23   is, Mr. Carubba's original estimate?

24   **A.**   Okay.

25   **Q.**   We looked at this during your deposition?

DAILY COPY

1  A.   Yes.

2  Q.   You see where it says:  Electrical, $2,200?

3  A.   Yes.

4  Q.   That wasn't the bid that you gave to Mr. Carubba, was it?

5  A.   No.  I believe my bid was around $3,400.

6  Q.   Let's look at Defense Exhibit 214, please.  Do you know

7  what this is, this Benchmark estimate?

8  A.   I believe you showed me this during the deposition.

9  Q.   That's another estimate that came from Mr. Carubba, as far

10  as you know at least?  Where does it say it's for electrical?

11  I think it's down here somewhere.  "139 each," do you know what

12  that means?

13  A.   I'm guessing he's counting devices, outlets, fixtures.

14  The total count of everything is 139 items.

15  Q.   It says whoever this was apparently is going to do it for

16  $11.49 each for a total price of $1,597.11.  Do you see that?

17  A.   Yes.

18  Q.   That's certainly not a bid that you gave to Mr. Carubba,

19  is it?

20  A.   No.

21  Q.   Or to Benchmark?

22  A.   No.

23       **MR. STEVE HERMAN:**  Could we look at Hernandez 454,

24  please.

25

**BY MR. STEVE HERMAN:**

**Q.**  Do you remember looking at this photo or one like it during your deposition?

**A.**  Yes.

**Q.**  You recognize this as a two-gang box in one of the bedrooms at the Hernandez home?

**A.**  I said it could be a box from the Hernandez home.

**Q.**  It's not inconsistent with your recollection, is it?

**A.**  Excuse me?

**Q.**  It's not inconsistent with your recollection?  There's nothing that would make you think, "Oh, this is definitely not it"?

**A.**  It could be; it could not be.

**Q.**  Let's just assume that it is.  You see how there's corrosion or tarnish or whatever you want to call it on ground wires, huh?  It's pointing to the Romex?

**A.**  Yes.  It appears to be, yes.

**Q.**  So if there's tarnish that goes into the Romex, you're just going to leave that there?

**A.**  Yes.

**Q.**  If we go to Hernandez 455, this is actually after you-guys did your work, huh?  The same two-gang switch?

**A.**  If that's the box, yes.

**Q.**  You have a shiny, new copper ground wire somewhere in there; right?

1   **A.**   Yes.

2   **Q.**   You have that spliced into the old, corroded black ground

3   wire; right?

4   **A.**   To the old wiring, yes.

5   **Q.**   You just left it in there; correct?

6   **A.**   Yes.

7   **Q.**   We talked about the Romex.  This is just plain NM cable;

8   right?

9   **A.**   Romex, yes.

10  **Q.**   It's not NM-C?

11  **A.**   I've got to tell you.  I've never heard of -- I've heard

12  of NM-B but not NM-C.

13  **Q.**   Other than Mr. Canzoneri, is there any authority you can

14  cite for the proposition that it's okay to leave tarnished or

15  corroded ground wires in a house?

16  **A.**   There's nobody else I consulted besides Mr. Beyler's

17  report.

18  **Q.**   There's nothing you can cite us to other than Mr. Beyler's

19  report, as we sit here today?

20  **A.**   No.

21  **Q.**   Is there any authority that you can cite to that it's okay

22  to leave regular NM cable that's been exposed to a corrosive

23  environment in a house?

24  **A.**   If we got involved in something like this, we'd probably

25  go to a local authority.  We do a lot of work in New Orleans

DAILY COPY

1   and Metairie.  If there was a flood like there was in 1995,
2   New Orleans inspectors and Jefferson inspectors said because it
3   was rising water and not floodwater from lakes or rivers, they
4   allowed them to just leave the wire and reuse it.
5   Q.   Was that wiring corroded with sulfur compounds and sulfur
6   corrosion?
7   A.   Not that I know of.
8   Q.   You've never dealt with sulfur corrosion, to your
9   knowledge?
10  A.   Not my knowledge.
11  Q.   Do you have any authority for the proposition that it's
12  okay to just clip and snip tarnished or corroded wires?
13  A.   I don't have that authority.
14  Q.   Do you have the authority that you don't need to have
15  6 inches before the splice?
16  A.   I don't have the authority to make that decision.
17  Q.   Let's look at Hernandez 453, please.  This is a junction
18  box that you-guys looked at at the Hernandez home; right?
19  A.   No.  I don't recognize -- you showed me this box in the
20  deposition.
21  Q.   Okay.  You didn't recognize it there?
22  A.   We did not see this box at the Hernandez home.  This is
23  out of the wall.  Someone cut off all the conductors.
24  Q.   Well, let's assume hypothetically that you were going to
25  do the work in the bid that you gave to Mr. Carubba.  Okay?

1   A.    Uh-huh.

2   Q.    Would you expect to find a three-gang box like this in the

3   Hernandez home if you came to do that work?

4   A.    Sure.

5   Q.    Why is that called a three-gang box?

6   A.    You can put three devices in it.

7   Q.    I think you testified that it takes you or one of your men

8   10 or 12 or 13 minutes to change out one of those three-gang

9   boxes; right?

10  A.    Change out the devices in the three-gang boxes.

11  Q.    You've already removed the plates; right?

12  A.    Yes.

13  Q.    You have to remove the plates, and you're going to clean

14  the ground wires?

15  A.    If that's what we're directed to do, yes.

16  Q.    What are you going to clean the ground wires with?

17  A.    Whatever product they come up with.

18  Q.    Did you tell me in the deposition you weren't going to

19  clean them; you were going to snip them to wherever you snipped

20  the hot and neutral wires just for consistency purposes?

21  A.    That's correct.

22  Q.    You didn't say anything about cleaning in your deposition?

23  A.    I don't remember.

24  Q.    Were you here when one of the experts testified, from an

25  ASTM standard, that to clean this type of corrosion you have to

DAILY COPY

694

1   use hydrochloric acid or sodium cyanide?

2   **A.**   No, I don't remember hearing that.

3   **Q.**   Are those types of products that you commonly work with?

4   **A.**   No.

5   **Q.**   In any case, you either clean or snip or do something with

6   the ground wires; right?

7   **A.**   Yes.

8   **Q.**   Then you'd have to unscrew the hots, one at each switch;

9   right?

10  **A.**   Yes.

11  **Q.**   You'd have to unscrew the neutrals, one at each switch;

12  right?

13  **A.**   All your neutrals are tapped together and pushed to the

14  back of the box.

15  **Q.**   Okay.

16  **A.**   They don't physically attach to the switches.

17  **Q.**   So you don't have to fool with them at all?

18  **A.**   Well, if we're going to go in and change the devices in

19  there, because of the tarnishing on the ends, we'd probably

20  strip those back and retap them.

21  **Q.**   So you're going to clip the neutrals and retap them?

22  **A.**   Yes.

23  **Q.**   One for each switch, or one for each Romex cable?

24  **A.**   Typically, yes.

25  **Q.**   You're going to splice in the new hot wires, one for each

1  switch?

2  A.    If the hot wires aren't long enough, we'd splice on an

3  additional piece.

4  Q.    You're going to put wire nuts on all those splices; is

5  that right?

6  A.    However many you need.

7  Q.    You're going to screw the hots back onto the outlets;

8  right?

9  A.    Yes.  Correct.

10  Q.    You're going to shove all that back in the box, assuming

11  that it fits; right?

12  A.    Yes.

13  Q.    You're going to do your box fill calculations?

14  A.    Yes.

15  Q.    Do you know, sitting here, what the acceptable box volume

16  is for that box?

17  A.    No.

18  Q.    You'd have to look on the box and find that out; right?

19  A.    Yes.

20  Q.    Then figure it out; right?

21  A.    Correct.

22  Q.    Then you'd have to go to somebody like Mr. Canzoneri to

23  make sure that it's all done to code; right?

24  A.    No.

25  Q.    You don't have to make sure that what you've done is with

1   code?

2   A.   We would have an inspection, but I'm not going to call

3   Mr. Canzoneri and ask him how to figure the box fill in a box.

4   Q.   But everything I just went through, you're going to do all

5   that in 10 minutes?

6   A.   Yes.

7   Q.   We talked about your bid for the job.  If we could look at

8   Hernandez 46.

9   A.   Can I make a comment about this box?

10  Q.   Yeah, sure.

11  A.   You've got seven wires in that box.

12  Q.   Okay.

13  A.   That's poor workmanship.  A decent electrician's going to

14  bring a feed in, feed out, which is your hot coming in, your

15  hot leaving, and it's going to have three cables leaving, one

16  for each switch.  He's not going to put seven wires in there.

17  It makes his job very difficult to come trim this box out.

18  Q.   If you came to this box and saw this box like this,

19  there's a bunch more stuff that you'd have to do to make it

20  work right; right?

21  A.   On this poor workmanship, yes.  Most electricians don't do

22  this.

23  Q.   If you went to a job and it was messed up, you'd fix it;

24  right?

25  A.   Yes.

1  **Q.**   That would take time; right?

2  **A.**   Yes.

3  **Q.**   Now, if we go to Hernandez 486, would that change your

4  bid?

5  **A.**   On that box, probably.

6  **Q.**   Okay.

7  **A.**   If it's one or two boxes in the whole house, no, we're not

8  going to bother with that.  If there's several like that, we'd

9  have to get back with the contractor and discuss the options.

10 **Q.**   I know you don't recognize it, but assuming that that's a

11 box from the house, that's something that you obviously didn't

12 notice when you were there; right?

13 **A.**   Right.

14 **Q.**   Now, is this your bid that you made, that you gave to

15 Mr. Carubba?

16 **A.**   Yes.

17 **Q.**   It was for $3,400?  This is the bid that you gave to

18 Mr. Carubba; right?

19 **A.**   Yes.

20 **Q.**   It says somewhere on there -- I don't know if we really

21 have to blow it up, but it says that you're not responsible for

22 damaged light fixtures and missing fixture parts; is that

23 correct?

24 **A.**   Correct.

25 **Q.**   It says that you're leaving the panel and the breakers as

1  is; correct?

2  **A.**   Yes.

3  **Q.**   So you're not doing that; right?

4  **A.**   Correct.

5  **Q.**   Then somewhere in there -- let me see if I can find it.   I

6  think it's right here.   It says, "We will extend wire as needed

7  to meet code."   What does that mean?

8  **A.**   Well, everybody -- when we were on site that day, I

9  believe his name was Skip, or you, kept making comments about

10  you need 6 inches in a box.

11  **Q.**   Uh-huh.

12  **A.**   So I told him on site, I said, "If we need more wire,

13  we'll add more on with a wire nut."

14  **Q.**   Okay.   So assuming that you need the 6 inches, that's

15  something else that you have to do as part of your bid; right?

16  **A.**   If you need more wire -- like we went back to the

17  Esplanade house one day to reinstall everything.   Some of the

18  wires were short, probably two or three of them out of the six

19  to eight devices I fooled with, so I just tapped on additional

20  wire.   But it's not every box.

21  **Q.**   If somebody from NFPA or an electrical engineer indicated

22  to you that you had to have 6 inches before the splice, that

23  would make the job a lot more complicated, huh?

24  **A.**   It would add more work to it.

25  **Q.**   Would it change the bid?

1   **A.**   It could.

2   **Q.**   Now, did you bill Knauf for what you did at the Hernandez

3   house the day that you were there?

4   **A.**   We billed them for our time there.

5           **MR. STEVE HERMAN:**  Can we pull up Hernandez 540,

6   please.

7   **BY MR. STEVE HERMAN:**

8   **Q.**   Do you recognize that as your bill?

9   **A.**   Yes.

10  **Q.**   That's your bill for the day that you were there; right?

11  **A.**   Yes.

12  **Q.**   You were just there for a couple hours, huh?

13  **A.**   Travel time and everything.  It says it right here in the

14  bill:  Two men, three hours; one man, six hours.

15  **Q.**   All you did that day, you pulled some stuff out, put it

16  back in, you changed out a few switches; right?

17  **A.**   That day's not a typical day.  I'm not going to walk in a

18  house with 20 attorneys and a cameraman and pictures and

19  chitchat.  We're going to come in and do our job and leave.

20  **Q.**   I understand, but I'm not sure you answered my question.

21  That day, all you did was you went in, you pulled some stuff

22  out, put it back in, looked at it, and changed out a few

23  switches; right?

24  **A.**   Yes.

25  **Q.**   Your bill was for over $1,100; right?

1  **A.**   Yes.

2          **MR. STEVE HERMAN:**  No further questions, Your Honor.

3  We would offer, file, and introduce Defense Exhibits 212 and

4  214 and Plaintiffs' Exhibits Hernandez 540 and 543, 544, and

5  545.

6          I apologize.  I need some help.  454, 453, 455,

7  and 46.

8          **THE COURT:**  What do you have?

9          **MR. HAYDEN:**  With regard to 212, I believe it's the

10  earlier estimate, and we put forward a revised estimate.

11          **THE COURT:**  For completeness sake, I understand that,

12  but I'll admit it.

13                    **REDIRECT EXAMINATION**

14  BY MR. HAYDEN:

15  **Q.**   Sir, on that day that you were out at the Hernandez house,

16  did you look at the circuit breakers?

17  **A.**   Yes.

18  **Q.**   Did you see any problems there?

19  **A.**   They appeared normal.

20  **Q.**   In your experience, is the 6-inch rule applied to the free

21  length of wire in a box?

22          **MR. STEVE HERMAN:**  Objection.  I think it's outside

23  his scope.

24          **THE COURT:**  He didn't even cover the 6-inch rule.

25  That was the last witness.

1          **MR. HAYDEN:**  I'm mixing them up, Your Honor, but I
2    think he raised it in cross.
3          **MR. STEVE HERMAN:**  I think it's outside his
4    expertise.
5          **THE WITNESS:**  I don't know if I'm answering your
6    question.  I believe the code says you're supposed to have
7    6 inches.
8    BY MR. HAYDEN:
9    **Q.**   Have you ever had an experience where an inspector has not
10   certified your job?
11   **A.**   Never, no.  I want to say something.  Orleans Parish has
12   some of the hardest inspectors in the state.  I've never been
13   turned down or commented against how much wiring we have in a
14   box.  Too many wires might have came up.  But the 6-inch rule,
15   this is almost going back to Ohm's law.  When you're in school,
16   we spent a whole semester on Ohm's law, and we've never used it
17   in the field.  This is something that we just don't use.
18          **THE COURT:**  I don't think we've covered Ohm's law.
19   Anything else?
20          **MR. HAYDEN:**  No more on the 6-inch rule, Your Honor.
21          **THE COURT:**  You're excused.  Thank you.
22              Any other witnesses?
23          **MR. SANDERS:**  One more.
24
25

1          (WHEREUPON **Bruce Fuselier**, having been duly sworn,

2   testified as follows.)

3          **THE DEPUTY CLERK:**  State your name for the record.

4          **THE WITNESS:**  Bruce Fuselier.

5          **THE DEPUTY CLERK:**  Would you spell the last name.

6          **THE WITNESS:**  F-U-S-E-L-I-E-R.

7                              **VOIR DIRE**

8   BY MR. SANDERS:

9   **Q.**   Mr. Fuselier, could you please tell us what your education

10  and background is.

11  **A.**   I'm a licensed master plumber, a licensed master gas

12  fitter, and a licensed master mechanical contractor.  I've been

13  in business for 30 years doing commercial and residential.

14  **Q.**   Have you always had those licenses the entire time, those

15  30 years, or did you have to do something to earn those?

16  **A.**   No.  In order to open a plumbing business, you have to

17  have -- my plumbing license and my gas license I got 30 years

18  ago.  My mechanical license I got approximately five years

19  later.

20  **Q.**   As a plumber, are you always both a plumber and an HVAC

21  specialist, or is that just something you decided to do?

22  **A.**   I'm sorry?

23  **Q.**   As a plumber, do you both always, HVAC and plumbing?

24  **A.**   No, I don't always do it.  It was more when I was doing

25  larger jobs that you do both the plumbing and the mechanical.

DAILY COPY

1  **Q.**   How many plumbing jobs have you done in New Orleans or the
2  New Orleans area in those 30 years?
3  **A.**   Oh, thousands upon thousands, since I was -- before I
4  opened my business.  I've been doing it since I was 14.
5  **Q.**   What's your current business?
6  **A.**   It's a plumbing company and air conditioning.
7  **Q.**   Are you the owner?
8  **A.**   Yes, I am.
9  **Q.**   How long have you had your own business?
10 **A.**   I've had it since I was 23, which is 29 years.
11 **Q.**   How many HVAC installations or modifications have you made
12 during those 30 years?
13 **A.**   I've done not quite as much as plumbing, but commercial
14 I've done hundred-ton chillers, I've done large, huge, 5, 10,
15 15-ton systems on a regular basis.  A couple hundred probably.
16 Residential systems after Katrina, maybe 300.
17 **Q.**   Was that something obviously particular to Katrina that
18 you were involved in in the residential area?
19 **A.**   Well, yeah, because it was so hard to get people that,
20 when we went in, they just let me do both.  It was easier for
21 the contractor to deal with one person.
22 **Q.**   What kind of conditions did you find in the plumbing and
23 the HVAC systems in Katrina?
24 **A.**   In the plumbing system, we relatively didn't find a whole
25 lot of problems.  Most of the problems in the plumbing system

1    was just already old cast iron.  Once they ripped the walls

2    out, that was fine.  There was no damage from the water.  There

3    was no damage of the copper from the water.  But on the gas

4    side, the black steel from the water was starting to rust

5    profusely, and we replaced any gas piping that was submerged

6    underwater.

7           Air condition-wise, the only thing we replaced were

8    the condensers that went underwater, or the air handlers if

9    they were under the house and went underwater, or in the house

10   and went underwater.  If they were in the attic, 9 out of 10

11   times we used the same one, but we replaced the ductwork

12   because of mold.

13          **MR. SANDERS:**  I would like to tender Mr. Fuselier

14   here as an expert in plumbing.

15          **MR. STEVE HERMAN:**  No objection.

16          **THE COURT:**  The Court will accept him as an expert in

17   plumbing.

18                        **DIRECT EXAMINATION**

19   **BY MR. SANDERS:**

20   **Q.**   Obviously, you said you also perform residential plumbing

21   and HVAC jobs?

22   **A.**   Correct.

23   **Q.**   How did you become involved in this matter?

24   **A.**   I do work for Roy Carubba for his construction company.  I

25   do his plumbing and air-conditioning projects.

1  Q.   Why did he call you?  Do you know?  What did he ask you to

2  do?

3  A.   He asked me if I would mind going and taking a look at

4  this house and giving him my opinion of what kind of condition

5  the air-conditioning system was in and what kind of condition

6  the plumbing was in.

7  Q.   Did you have a chance to do that?

8  A.   Yes, sir, I did.

9  Q.   Do you remember when you did that?

10  A.   It was in February, but I don't have the date on me.  I

11  apologize.  But it's the same date that, you know, I met all

12  the attorneys and everyone else was there.  Mr. Hartenstein was

13  there.

14  Q.   Could you tell me what you saw with respect to the

15  plumbing and HVAC system.

16  A.   None of the walls were really open.  There was very, very

17  little stuff we could see in the walls of the house because

18  they obviously didn't tear the Sheetrock out.  Underneath the

19  cabinets, they told me that the supply lines going from the

20  stop valves to the faucets had already been harvested by

21  somebody else, but that the copper coming out of the wall under

22  the cabinets was original.  That copper showed no sign of any

23  black tarnish.  The stop valves were still chrome and shiny.

24  The physical plumbing fixtures still seemed to be intact, as

25  I'm assuming they were installed.

1  **Q.**   Did you see any signs of black tarnish on anything when

2  you were in the house?

3  **A.**   Yes.  When we went into the attic, it was brought to my

4  attention that we could see the black tarnish on the copper

5  plumbing pipes on the water heater, in which it was very

6  lightly tarnished, and that's where we harvested copper for

7  both sides to send off and have tested.

8  **Q.**   What else was up in the attic?  Was the HVAC --

9  **A.**   The air handler for the air-conditioning unit was also in

10  the attic.  We opened it up.  We looked at the coils.  We

11  looked at the blower motor.  We looked at the electrical

12  contactors.

13         Unfortunately, the coils had already been changed, so

14  I haven't seen the coils, the old coils.  I haven't seen any

15  reports on the coils.  All I've seen is that the manufacturer

16  took them back and gave them new ones for that.

17         The blower motor was in good working order, no signs

18  of any debris on it.  The electrical connectors, the electrical

19  contactors, breakers were completely clean.  There was no

20  tarnish on any of the wires in that because that box is a

21  separate box from the air handler.

22  **Q.**   What do you mean it's a separate box?

23  **A.**   The air handler was split up into three sections:  The

24  section that holds the coil; the section that holds the blower

25  motor; the section that holds the electrical stuff.  And they

1   deliberately seal off the electrical components from the blower

2   motor in the event that something would happen, the wire would

3   start smoldering, that the air didn't pull the smoke into the

4   house and feed the fire.  So it's sealed between the two units

5   by a sheet-metal wall.

6            **MR. SANDERS:**  Can we put up DX213.

7   **BY MR. SANDERS:**

8   **Q.**   What is that?

9   **A.**   That was my report of what I looked at and what I found at

10  the Hernandez house.

11  **Q.**   Was this the proposed scope of work that you turned in to

12  Mr. Carubba?

13  **A.**   Yes.  This is what I was asked to look at and proposed,

14  that this is what we were going to propose to do to put the

15  house back in proper working order.

16  **Q.**   If you could, just outline your proposal for us.

17  **A.**   All right.  Well, to start with, it says that the only

18  black residue I found on the copper pipes were in the attic.

19  That copper residue wiped off relatively easy with a damp rag

20  to visually having nothing on it at all.

21            I don't think that the copper pipes need to be

22  replaced.  The basis upon why I think that is I've been in

23  atmospheres where muriatic acid and chlorine was stored in

24  places that had copper plumbing, and it does exactly what this

25  is doing.  It starts to leave residue on the pipes.  So we

DAILY COPY

1    immediately -- once we evacuate the stuff out of the room,

2    clean the pipes, we don't have any more problems.  That's why I

3    feel just wiping them down would be more than enough.

4    **Q.**    Do you feel that you need to wipe them down?

5    **A.**    I don't think it's necessary because most items like this,

6    once you remove the source, once you move a gallon of muriatic

7    acid out of something, it stops.  If you don't keep feeding it,

8    it doesn't continue.

9    **Q.**    You didn't seen any functional problems with the pipes

10   that you observed, at least in here?

11   **A.**    No.  I'm just saying since you're opening all the walls

12   up, just as a courtesy, just to ease somebody's mind, just to

13   wipe them off.  You're going through all this work, it would be

14   stupid not to do five minutes more of work.

15   **Q.**    What else do you propose to do?

16   **A.**    The flex ducts would be very difficult to clean because of

17   the ribs in them, so we proposed to replace all of the flex

18   ducts for the air-conditioning system, but leaving the boxes

19   and using the same grilles that could be wiped off and cleaned.

20           At the time, we were going to pull the coils out,

21   clean them, and put them back in.  But as that turned out

22   later, since it already has new coils, they decided that that

23   didn't have to happen on this one.

24   **Q.**    Did you have an opportunity to look at the line set that

25   goes to the HVAC system?

1   A.   Yes.  We cut the insulation on the suction side, which is
2   the side that gets cold and sweats.  We cut the insulation in
3   two spots and peeled it open and took pictures of it, and there
4   was no sign of any residue of any tarnish or anything on it.
5   Q.   What do you mean by "sweats"?  Why would that line sweat?
6   A.   Well, the way an air-condition system works is when you
7   compress freon, it's hot.  After the compressor compresses the
8   freon, the hot freon runs through the coils outside.  It tries
9   to cool it off as much as it can.
10          It goes up in the attic with the smaller of the two
11  copper lines; normally a three-eighths-inch line or a half-inch
12  line.  It goes up, and it's hot, so it never sweats.  It goes
13  into the coils.
14          Once the expansion valve turns it into a gas, it
15  becomes ice-cold.  That's why your coils sweat.  You're running
16  hot air over ice-cold.  It creates sweat.  The balance of the
17  freon obviously is not hot yet, so it goes down the suction
18  line from the air condition, from the air handler, to the
19  compressor to go through the cycle again.  So if you didn't
20  insulate it, then obviously it would just constantly drip the
21  sweat and condensate just like the coils because it's hot
22  inside of the attic.
23  Q.   What does the insulation do?  Does it still sweat under
24  the insulation?
25  A.   No.  Well, no, because the insulation makes up -- the only

1    time you can have condensation is if you mix hot and cold

2    direct.  Rubatex insulation keeps the cold in, keeps the hot

3    out.  There's never any contact.  So the line set literally --

4    when we were there, when we cut it open, you saw for yourself

5    that it wasn't -- you know what I mean.  It wasn't wet.  It

6    wasn't, you know --

7    Q.   Why are you worried about there being condensation on that

8    line set?

9    A.   Well, because it would literally drip through the ceiling.

10   It would literally ruin -- you'd have mold in your attic.  It

11   would literally make puddles of water.  Not just a little bit;

12   puddles and puddles of water.

13   Q.   So is that insulated all the way down through the whole

14   thing?

15   A.   It's insulated from where it comes out of the coils, all

16   the way down to the compressor.

17   Q.   What about copper pipes in general in the house; is there

18   a lot of condensation on them in your experience?

19   A.   Under very, very, very extreme circumstances, you might

20   get a little bit, but it's very rare because normally the

21   copper pipes that are in the wall, there's insulation around

22   them already, and the cold water that runs through them is

23   normally cold inside of the house or hot inside of the house,

24   one way or the other, and there's very, very little.

25          Once in a while, mainly on commercial buildings,

1    where there's long lines running in an empty space, you will

2    get some condensation.  But in a residential house, you very

3    rarely have that.  It comes out of the bottom of the slab,

4    comes up, makes a loop, goes right to the plumbing fixture, and

5    you just don't have that condensation problem.

6    **Q.**   I think you said earlier that you're going to take the

7    flex duct out, but what about the other -- is it a fiberglass

8    box or any other ductwork?

9    **A.**   Right.  The duct-board plenums you can clean.  There's no,

10   you know -- and there's nothing -- I mean, there's nothing

11   there.  Anything that very well could have gotten -- could have

12   been in there will obviously be neutralized once all the

13   drywall's gone.

14   **Q.**   So the scope of work we just described here, is that the

15   only work you think that needs to be done in the Hernandez

16   house?

17   **A.**   Yes, in the Hernandez house, correct.

18   **Q.**   What did you charge or what's your cost, if you recall,

19   for this work?  Do you remember what your bid was?

20   **A.**   For what I did or what needs to be done?

21   **Q.**   For what we've just discussed here, the scope of work.

22   **A.**   For what needs to be done was $4,500 to remove all of the

23   plumbing fixtures and put them all together and pack them in

24   storage provided by the contractor and replace the flex ducts.

25           In my original proposal, I have removing the coils,

1    and then I was told later that we were not going to remove the

2    coils on this application since they were already replaced.

3    **Q.**   Were there any other adjustments that Mr. Carubba made

4    with respect to the work that you're doing or what work would

5    be shared between you two?

6    **A.**   Not to my knowledge.

7             **MR. SANDERS:**  That's all I have.

8             **THE COURT:**  Cross.

9             **MR. STEVE HERMAN:**  Thank you.  If you can put up

10   Defense Exhibit 213.  Thanks.

11                          **CROSS-EXAMINATION**

12   **BY MR. STEVE HERMAN:**

13   **Q.**   Could you just read these two sentences right here,

14   please.  You might be able the read them better on your screen.

15   **A.**   I inspected all exposed copper water piping, plumbing

16   fixtures, and connections.  I found that the copper had black

17   residue on it, but did not have to -- but did not harm pipe and

18   can be wiped right off with a damp cloth.

19   **Q.**   You didn't write anything actually in your report saying

20   that you only saw it in the attic; right?

21   **A.**   I didn't write it in my report.  I said the only place

22   that I was able to look at it was in the attic, with the

23   exception of underneath the kitchen sink and underneath the

24   lavatories, where it was exposed, because there were no walls

25   cut open where there was plumbing behind it.

1   **Q.**   You don't know, sitting here today, whether what you saw

2   was copper sulfide corrosion as opposed to some other type of

3   oxidation or corrosion; correct?

4   **A.**   No, I do not.

5   **Q.**   Other than going to the Hernandez house and the

6   Rue Esplanade house, you have no experience with Chinese

7   drywall; correct?

8   **A.**   No, sir.

9   **Q.**   You mentioned something about muriatic acid, I think.

10  **A.**   Right, which is a step below sulfuric acid.

11  **Q.**   Okay.

12  **A.**   Which emits very similar fumes, but --

13  **Q.**   You don't have any actual experience with hydrogen sulfide

14  or copper sulfide corrosion; correct?

15  **A.**   Not directly.  I've worked in some plants that it might

16  have been present that might have been the problem.  Most acid

17  conditions I've found leaves a light black residue just like

18  this.

19  **Q.**   You were making an analogy from muriatic acid and your

20  experience with that to sulfuric acid or hydrogen sulfide?

21  **A.**   They told me there was acid in the drywall.  I had no real

22  bet on what's in the drywall and what's not.  I was making a

23  comparison because it looked very similar.  I assumed that the

24  people that are actually doing all the analysis would give me

25  the proper terminology of what was causing what.

1    **Q.**    At the Hernandez house, you didn't look at the compressor

2    outside, did you?

3    **A.**    I didn't open it up.  I went outside and visually looked

4    at the outside; but, no, we did not open the compressor.

5    **Q.**    You didn't look at any of the plumbing behind the walls,

6    obviously?

7    **A.**    I didn't see any of the plumbing in the walls because none

8    of the walls were open and we weren't allowed to cut any walls

9    at that time.

10   **Q.**    The line set, you saw a part of the line set in the attic

11   where it was ventilated, but you didn't see any line set behind

12   the wall; correct?

13   **A.**    I didn't see any line set in the wall.  I did see it

14   outside by the air conditioner, and I did see it where it came

15   out of the wall in the attic and went across the attic to the

16   air compressor.

17   **Q.**    You didn't look at any of the pipes under a microscope;

18   right?

19   **A.**    No.  No.  Absolutely not.

20   **Q.**    Or do any chemical analysis?

21   **A.**    No.

22   **Q.**    Or laboratory analysis?

23   **A.**    No.  I just harvested the pipes for y'all to send to the

24   experts to do that.

25   **Q.**    Did you review any of the testimony by any of the

1  contractors or builders that are actually doing remediation in

2  Florida?

3  **A.**   Oh, no.

4  **Q.**   Like Mr. Phillips, you didn't see his testimony the other

5  day?

6  **A.**   No.  Well, I saw whatever you showed me at the deposition

7  from Benchmark, if that constitutes what you're asking me.  I

8  saw that quote, but I saw no reports.  I saw no --

9  **Q.**   Okay.  That's something else, but thanks.

10          The pipe that you did take from the attic, you don't

11  know how long it had been there; correct?

12  **A.**   Well, it looked to have been there since the house was

13  built.  The reason why I'm saying that is because most of the

14  fittings and most of the stuff there all kind of matched.  They

15  all were soldered the same way.  They all used the same flux.

16  So I'm just assuming that the section I cut out of was there

17  from the original installation when the house was built.

18  **Q.**   You submitted a bid to Mr. Carubba?

19  **A.**   Yes, I did.

20  **Q.**   In fact, you submitted two bids; right?

21  **A.**   Yeah.  I submitted a bid with two parts, correct.

22          **MR. STEVE HERMAN:**  Could we see Exhibit 43, please,

23  Hernandez 43.

24          **THE WITNESS:**  That's it.  That's the bid.

25          **MR. STEVE HERMAN:**  If we can try and kind of blow up

1   the top part.

2   **BY MR. STEVE HERMAN:**

3   **Q.**   This is what you were just mentioning, the $4,500?

4   **A.**   Yes.

5   **Q.**   That's because in order to take out the drywall, you've

6   got to take out toilets?

7   **A.**   Take all the fixtures out, correct.

8   **Q.**   You're going to take that out and put that back for

9   $4,500?

10  **A.**   Right.

11  **Q.**   That doesn't include storage; correct?

12  **A.**   No.

13  **Q.**   Let's talk about the other part of the quote, which is for

14  the HVAC system; right?

15  **A.**   Right.

16  **Q.**   That was originally for $1,800?

17  **A.**   $1,800.

18  **Q.**   With the coils, first you were told that you were going to

19  replace the coils, right, with new coils?

20  **A.**   Well, what I was told when I came in -- and, again, I had

21  no briefing before we came to this house, so it's not like we

22  had a bunch of meetings talking about it.

23  **Q.**   Okay.

24  **A.**   I immediately went in, and the talk in the house was

25  air-condition coils have to be replaced.

1   **Q.**   Okay.

2   **A.**   It wasn't until after that I found out those had been

3   replaced.  All right.  But then they also said that on this

4   house, because of whatever coils they put in there, they didn't

5   even want me to take them out, clean them, and put them back

6   in.  They wanted me to just leave it just like it was.

7   **Q.**   First, you were going to replace them, then you were going

8   to clean them and not replace, then you were going to do

9   nothing with them?

10  **A.**   Yeah.  Now we're going to do absolutely nothing.

11  **Q.**   You didn't make any of those decisions; correct?

12  **A.**   No.  I was told that at different times that, no, this is

13  not what we're doing.  I don't know who was making them.  I

14  don't know where it was coming from.  I just tried to adjust my

15  prices verbally as we went.

16  **Q.**   For you, those instructions came from Mr. Carubba; right?

17  **A.**   Oh, I'm sorry.  Yes, sir.  Yes, sir.  I apologize.

18  **Q.**   So he wasn't relying on you to tell him what to do with

19  the HVAC system; he was telling you what to do?

20  **A.**   No, not on this one.  You see, we have extenuating

21  circumstances again.

22  **Q.**   Okay.

23  **A.**   The coil was sent back to the factory.  I've never, ever

24  in my life seen a factory honor the warranty on a coil that

25  wasn't their problem.  Never.  They, for some reason, honored

1  this one, and I find it awfully strange.  That's why I was
2  looking for a report.  I have yet to see any reports on that.
3  **Q.**   Well, for this bid that you submitted to Mr. Carubba, you
4  were going to replace all the flex duct and you were going to
5  clean but not replace the coils?
6  **A.**   Right.
7  **Q.**   That was going to cost $1,800?
8  **A.**   $1,800.
9  **Q.**   So your total bid to Mr. Carubba was $6,300; correct?
10  **A.**   Correct.
11  **Q.**   Then he beat you down a couple thousand; right?
12  **A.**   Well, he took the coils out of it.  That's $1,000 because
13  you have to vacuum the freon down or it's a $10,000 fine.  And
14  then from there, he asked me if he used his laborers to
15  physically transport the fixtures, pack them, and he would be
16  responsible for them, we dropped the labor down another $600,
17  if my memory serves me correct, but I don't have the paper in
18  front of me.
19  **Q.**   Let's look at Defense Exhibit 212.  This is the original
20  Carubba estimate?  Do you even know?
21  **A.**   I'll tell you in a minute.
22         Yes, that's the original Carubba estimate.
23  **Q.**   So you gave him $6,300 originally, and by not changing
24  the -- by not cleaning the coils and then asking you to work
25  with him, he kind of beat you down --

1   **A.**    Took off $1,000.  And since he figured he was going to

2   have laborers there already, he was going to do that, and he

3   was going to wipe down any exposed pipes in the walls also.  He

4   was taking that out of my scope.

5   **Q.**    So he said, "Can you work with me on the price?" and he

6   got you down to $4,800; right?

7   **A.**    Right.

8   **Q.**    Let's look at Defense Exhibit 214.  Do you know what this

9   is?

10  **A.**    The first time I saw this was at the deposition, and I had

11  not seen it before.  I have not a clue who Benchmark is.

12  **Q.**    I think if we go down a little bit, we can see where they

13  have -- see the plumbing fixtures?

14  **A.**    Yeah.  He's got $1,800 to remove and reinstall.

15  **Q.**    You didn't give him that price, did you?

16  **A.**    Absolutely not.

17  **Q.**    You can't do it for that price, can you?

18  **A.**    No, I cannot.

19  **Q.**    Let's see Hernandez 484.  What is this?  I didn't have

20  this during your deposition, did I?

21  **A.**    That was if we -- that was if we replaced -- that was if

22  we literally replaced everything, everything in the home.  That

23  was if we literally cut all the plumbing out, cut all the air

24  condition out, threw it in the garbage can, brought in a new

25  air-condition system, all new plumbing, water pipes, drain

DAILY COPY

1  pipes, which is ridiculous.  Obviously, there's nothing wrong

2  with any plastic, but I was just asked to -- what would I do if

3  we were going to stack this house out, how much would it be,

4  and that's where that figure came from.

5  **Q.**   Mr. Carubba asked you to do this?

6  **A.**   Yes.

7  **Q.**   You put this together for a total of $23,000; right?

8  **A.**   Right.

9       **MR. STEVE HERMAN:**  No further questions.

10      **THE COURT:**  Any redirect?

11      **MR. SANDERS:**  Just two points.

12                     **REDIRECT EXAMINATION**

13  **BY MR. SANDERS:**

14  **Q.**   Mr. Herman asked you about another house on

15  209 Rue Esplanade.  Did you also look at that house?

16  **A.**   Yes, I did.

17  **Q.**   What did you see there, very quickly?

18  **A.**   There we saw the same tarnish on the water pipes that were

19  in the walls where they removed the Chinese drywall from.

20  **Q.**   Did you do anything to try to wipe or did you brush off

21  the tarnish?

22  **A.**   Well, unfortunately, I made the mistake, after I took one

23  of the pieces out, of holding it in my hand too long and all

24  the black tarnish was gone, so I had to go back and do it

25  another -- do two more because if you just held it too long,

1   you wiped it all off.  So I did it again so that way everyone

2   would have samples that had some black tarnish on it.

3          **MR. STEVE HERMAN:**  What was that exhibit?

4          **MR. SANDERS:**  It's 484.  No, it was the Benchmark

5   one.  Sorry.

6          **MR. STEVE HERMAN:**  Defense Exhibit either 212 or 214.

7          **MR. SANDERS:**  214.

8   **BY MR. SANDERS:**

9   **Q.**   If you blow that up, on the bottom there, there's a

10  plumbing fixture remove-and-reinstall number, $1,700, and then

11  there's an HVAC flex duct and coil number for 21, and then

12  another number for 16.  That number, if you add all those up

13  together, isn't that much different than the original bid you

14  gave for all that work?

15  **A.**   Right.

16         **MR. SANDERS:**  Nothing else.

17         **THE COURT:**  You're excused.  Thank you, sir.

18             We'll come back tomorrow at 8:45.  Court will

19  stand in recess until 8:45.

20         **THE DEPUTY CLERK:**  All rise.

21         (WHEREUPON the Court was in recess for the evening.)

22                      * * *

23

24

25

1                        **<u>CERTIFICATE</u>**

2              I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, do hereby certify that the foregoing is a true

5    and correct transcript, to the best of my ability and

6    understanding, from the record of the proceedings in the

7    above-entitled and numbered matter.

8

9

10                                    <u>s/ Toni Doyle Tusa</u>
                                     Toni Doyle Tusa, CCR, FCRR
11                                   Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25