```
 1                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2    ***********************************************************

 3
      IN RE:  CHINESE-MANUFACTURED        Docket No. 09-MD-2047
 4    DRYWALL PRODUCTS LIABILITY          New Orleans, Louisiana
                                          Thursday, March 18, 2010
 5

 6

 7    THIS DOCUMENT RELATES TO:
      Case No. 09-CV-6050
 8
      Tatum B. Hernandez, et al
 9    v.
      Knauf Plasterboard (Tianjin)
10    Co., Ltd., et al
      ***********************************************************
11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS
              HEARD BEFORE THE HONORABLE ELDON E. FALLON
13                  UNITED STATES DISTRICT JUDGE
                    VOLUME IV - MORNING SESSION
14

15
      APPEARANCES:
16
      FOR THE PLAINTIFF:              HERMAN, HERMAN, KATZ & COTLAR
17                                    BY:  RUSS M. HERMAN, ESQ.
                                          STEPHEN J. HERMAN, ESQ.
18                                    820 O'Keefe Avenue
                                      New Orleans, LA 70130
19

20                                    GAINSBURGH BENJAMIN DAVID
                                      MEUNIER & WARSHAUER
21                                    BY:  GERALD E. MEUNIER, ESQ.
                                          MICHAEL J. ECUYER, ESQ.
22                                    1100 Poydras Street, Suite 2800
                                      New Orleans, Louisiana 70163
23

24                                    SEEGER WEISS
                                      BY:  CHRISTOPHER A. SEEGER, ESQ.
25                                    One William Street
                                      New York, New York 10004
```

```
 1
                                    LEWIS & ROBERTS, PLLC
 2                                  BY:  DANIEL K. BRYSON, ESQ.
                                    3700 Glenwood Avenue, Suite 410
 3                                  Raleigh, North Carolina 27612

 4

 5   FOR THE DEFENDANT:             FRILOT L.L.C.
                                    BY:  KERRY J. MILER, ESQ.
 6                                  Energy Centre - Suite 3700
                                    1100 Poydras Street
 7                                  New Orleans, LA 70163-3700

 8
                                    BAKER McKENZIE
 9                                  BY:  DONALD HAYDEN, ESQ.
                                    1111 Brickell Avenue, Suite 1700
10                                  Miami, Florida 33131

11
                                    BAKER McKENZIE
12                                  BY:  DOUGLAS B. SANDERS, ESQ.
                                         ERIN M. MAUS, ESQ.
13                                       KYLE P. OLSON, ESQ.
                                    130 E. Randolph Drive
14                                  Chicago, Illinois 60601

15

16   Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR
                                    500 Poydras Street, Room HB-406
17                                  New Orleans, Louisiana 70130
                                    (504) 589-7776
18

19

20     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

DAILY TRANSCRIPT

**I N D E X**

**WITNESSES FOR THE DEFENDANT:**                    **PAGE/LINE:**

**ROY M. CARUBBA**

Voir Dire Examination by Mr. Hayden          726/25

Direct Examination by Mr. Hayden             736/8

Cross-Examination by Mr. Seeger              773/6

Redirect Examination by Mr. Hayden           800/10

<u>P R O C E E D I N G S</u>

(THURSDAY, MARCH 18, 2010)

(MORNING SESSION)


    (OPEN COURT.)

        THE COURT:  Be seated, please.  Good morning, ladies and gentlemen.  Our schedule today, as you know, is the second to last witness.  I understand the next witness, due to some personal problems, can't make it today, so I've extended his time until tomorrow.  We'll finish up tomorrow and then have oral argument following that witness's presentation.

        Let's call your witness, please.

        MR. HAYDEN:  Yes, your Honor.  We'd call Roy Carubba.

        THE COURT:  Come forward, please, sir.

        THE DEPUTY CLERK:  Would you raise your right hand.

    (WHEREUPON, ROY M. CARUBBA, WAS SWORN IN AND TESTIFIED AS FOLLOWS:)

        THE DEPUTY CLERK:  Please be seated and would you state your name for the record.

        THE WITNESS:  Roy Carubba.

        THE DEPUTY CLERK:  Would you spell the last name.

        THE WITNESS:  C-A-R-U-B-B-A.

        THE DEPUTY CLERK:  Thank you.

              VOIR DIRE EXAMINATION

BY MR. HAYDEN:

```
1   Q.  Good morning, Mr. Carubba.

2   A.  Good morning.

3   Q.  What is your trade or profession?

4   A.  I am a licensed civil engineer.

5   Q.  And what's your level of education?

6   A.  I have a bachelor of science in civil engineering from the

7   University of New Orleans, 1986.

8   Q.  And are you a licensed professional engineer?

9   A.  Yes.

10  Q.  And where are you licensed?

11  A.  Louisiana, Mississippi, Texas, Florida, Alabama, Georgia.  It's

12  on my résumé, some of it, some of it's not listed.

13  Q.  Has your license in any of those jurisdictions ever been

14  revoked or suspended?

15  A.  No.

16  Q.  In addition to practicing as a licensed civil engineer, are you

17  also a general contractor?

18  A.  Yes, I have licenses in residential and commercial building

19  construction.

20  Q.  And how long have you had those?

21  A.  Ten years, approximately, each.

22  Q.  Could you briefly describe for the court your employment

23  history after leaving the University of New Orleans?

24  A.  Yes.  I actually started working prior to graduation for a

25  company called River Consulting from 1985 to 1987.  After River
```

1    Consulting, URS Group 1987, then Barnes Engineering, and then after

2    Barnes, Wink Engineering until 1993, and in 1993 I started my own

3    company and have been employed as the president since.

4    Q.  And why did you start your own company?

5    A.  Well, the short version of that is, I just had difficulty

6    working for other people so I wanted to be on my own.

7    Q.  And what company is that?

8    A.  Carubba Engineering.

9    Q.  And are you the sole proprietor of that company?

10   A.  Yes.

11   Q.  And you've been in business for how long?

12   A.  Seventeen years.

13   Q.  Could you give the court some idea of the types of projects

14   that you've been involved in in those years?

15   A.  Yes.  Primarily my company is involved in commercial,

16   residential and industrial buildings.  We also do some specialty

17   types of engineering, marine structures, retaining walls, just

18   anything, really, structural; and in addition to the structural

19   portion of our practice, we do what we call civil projects, which

20   are water, sewer, drainage, roadways, municipal-type projects.

21        Really, the only thing we don't do in the discipline of

22   civil engineering is environmental work.

23   Q.  Could you highlight some of the major projects that you've

24   worked on in the last ten years?

25   A.  Certainly.  Probably most notable, we were fortunate enough to

1    work on the Superdome after Katrina, we did a roof analysis, as it

2    were, for the corrosion of some of the roof members, and in

3    addition to the corrosion on the roofing members, we also analyzed

4    all of the structural equipment that held up the audiovisual

5    equipment for the dome to make sure that it was going to perform

6    pursuant to being exposed to the winds and water of Katrina.  We

7    worked on the arena next door.  I've worked on --

8    Q.  What did you do at the arena?

9    A.  We did some analysis on the mechanical platforms during

10   construction.  There was an accident that occurred during erection

11   of those platforms and they hired our firm to do some forensic

12   analysis of those mechanical platforms, and in doing so, we ended

13   up getting involved in some other structural aspects of that

14   project.

15   Q.  Have you ever worked for Hilton?

16   A.  I've done many buildings for Hilton, the most notable of which

17   was a 14-story high-rise in Shreveport before Katrina, and it

18   actually got finished after Katrina.

19        And I've done, in the city, I mean, we've done multitudes

20   of multi-family projects, probably the closest one geographically

21   would be the Saulet Apartments, which is located in downtown New

22   Orleans.  After Katrina, we were part of the design team where we

23   reskinned the entire set of buildings for water damage, so we

24   opened up every single building, every exterior wall and replaced

25   it.  I've done --

```
 1   Q.  How many units was that?
 2   A.  It was a lot, it was probably three or 400 units.  It was a big
 3   development.
 4            We're working on a 35-million-dollar school project right
 5   now for the archdiocese of New Orleans in New Orleans East.  It's
 6   comprised of seven buildings, all steel construction, deep
 7   foundations with some interesting architectural features, big
 8   project.  We're working on some libraries for the city of New
 9   Orleans right now.
10            We've really done -- our cross-section of residential and
11   commercial work is extensive.  I've been involved in my career in
12   probably 5,000 projects.
13   Q.  Besides these larger projects, have you been involved in
14   residential projects?
15   A.  Many.
16   Q.  And have you been involved in residential renovation or repair
17   projects?
18   A.  Yes.
19   Q.  Could you give us some examples of some repair or renovation
20   projects that you were involved in?
21   A.  I mean, I've done everything from 500-square-foot additions to
22   the backs of people's single-family residences to
23   multi-million-dollar renovations.  Most notably, after Katrina, we
24   worked on several homes in Old Metairie on Bayou St. John, where we
25   had to go in and gut the affected areas from the flood waters and
```

1    remodel those homes with very exquisite finishes and equipment in

2    the houses, not just regular construction.

3            And I guess in regards to Katrina, we were fortunate

4    enough after Katrina to be involved in literally hundreds of

5    building inspections, where we looked at every type of damage,

6    ranging from minor wind damage to total inundation from flood

7    waters.  And my construction company after Katrina renovated

8    probably 25 single-family residences.

9    Q.  And in those renovations, would you evaluate the electrical and

10   plumbing and determine whether they needed to be replaced?

11   A.  Well, as a general contractor, my function would be to call the

12   appropriate subcontractors and have them go in and make their

13   evaluations, and as a general contractor, I would certainly rely on

14   their expertise to give me scope and magnitude of what those

15   repairs needed to be.

16   Q.  Could you briefly describe some of those projects that you were

17   involved in and what your role was after Katrina in those repairs?

18   A.  As an engineer or a contractor?

19   Q.  As an engineer and contractor.

20   A.  Well, I guess in addition, I am very fortunate to wear two

21   hats.  As an engineer, we would go in and evaluate and we would --

22   now, my discipline is civil engineering, so my expertise would be

23   in the structural aspects of those houses.  We would go in and

24   evaluate the overall structural condition and make sure that that

25   house could be renovated.  And in some cases we would recommend

1    renovation and some cases we would recommend demolition and

2    reconstruction.

3         So in addition to that, we would certainly call the

4    appropriate subconsultants to go in and evaluate the mechanical and

5    electrical aspects of that work.

6         As a contractor, we would kind of do the same thing on

7    the flip side, we would go in and perform the work that needed to

8    be done pursuant to some evaluation, and that work would be

9    including demolition of -- selective demolition, taking out

10   drywall, insulation, very similar to what we're talking about here.

11   Of course with the caveat that there was no Chinese drywall, to my

12   knowledge, when we were doing those renovations.  However, in scope

13   and magnitude, our work was very similar.

14        And we would rely on our subconsultants and

15   subcontractors to give us determinations as to whether or not

16   plumbing would need to be replaced, electrical components would

17   need to be replaced.  Very similar to what my subs testified to

18   yesterday.

19   Q.  Now, when you made the determination as to whether or not a

20   certain component of the home had to be replaced, did you take on

21   that risk?

22   A.  Well, you have to remember, I wear two hats, so you're asking

23   me as an engineer or a contractor?

24   Q.  First, as an engineer.

25   A.  Let me clear it up.  Because when Mr. Mallet testified the

1  other day, he made this big deal about explaining how, his words I

2  believe were something about shouldering the responsibility of

3  making decisions as to whether components stay in the house.

4  That's not a general contractor's responsibility.

5         There are two elements to construction, there's the

6  mental and the physical creation.  The mental is the why and the

7  construction is the how.  So the mental part, the intellectual

8  part, is done by an engineer or a design professional, and he gives

9  instructions to a contractor.  And to be blunt and candid,

10  contractors don't get paid to think, they get paid to do.  And they

11  rely on us to do the brain work.

12         So it is not the general contractor's responsibility to

13  determine the adequacy of a component.  Now, it is his

14  responsibility to bring up a concern that he may see in the field,

15  but it is ultimately up to a design professional, i.e., a

16  professional engineer or an architect, to decide what stays in a

17  house or what goes or what the scope of work is that ultimately

18  gets dictated to that contractor.

19  Q.  Fair enough.  After Katrina, you indicated you were involved

20  with residential projects, both as an inspector and as a general

21  contractor.

22  A.  As an engineer and a contractor, yes.

23  Q.  And as an engineer, how many homes were you involved with?

24  A.  Five to 600.  The exact number escapes me.  A bunch.

25  Q.  What experiences from those homes could assist in rendering

1    your opinions today?

2    A.  Well, I am going to qualify my comments.  I am a professional

3    engineer and a contractor, I am not a material scientist, I am not

4    a mold expert, I am not any of those things that have been brought

5    up during this testimony.  My experience is, during Katrina, what

6    we faced during Katrina on a daily basis, where we would go in

7    people's houses that had mold and/or water intrusion, and what we

8    would do as a matter of course in our work is we would go in, we

9    would rip out the drywall, get rid of all those materials that held

10   water, and we would dry the house out using dehumidifiers for a

11   nominal period of time, 24 hours, 48 hours maybe.  Because you have

12   to be careful with drying stuff out.

13        People get carried away with that, and what happens is,

14   houses are made of organic materials like wood, and wood from an

15   engineering standpoint derives it strength directly from how much

16   water is in the wood.  If it's too dry it gets weak, if it's too

17   wet it gets weak.  So you have to be careful when you go in there

18   dehumidifying things because you can get carried away.

19        So, long story short, we would go in, dry everything out

20   and then simply proceed with our reconstruction at that point.  And

21   at no point, whether it was a 500-square-foot house or a $2 million

22   house in Old Metairie did we ever undertake any what I would

23   consider extraordinary means and methods to dry these houses out

24   and/or -- I don't know how to say it.  We didn't take any

25   extraordinary measures when we were undertaking these renovations.

```
 1              Now, what we did do is, when I finished drying out a
 2    house, I would go in with a little moisture meter and check the
 3    studs and make sure that they were the proper moisture content.
 4    You have a few percentage points, but normally southern yellow pine
 5    needs to be about 19 percent.  And then if the homeowner had a
 6    concern about mold, if they requested it, we would get a mold
 7    person to come in and do an air quality test.  But I have to tell
 8    you, of all of the renovations we did, I didn't do that very often.
 9    And even in the gutting and the limited demolition work that we
10    did, we didn't do a lot of that.  We used what I would call normal
11    means and methods to effect our work.
12    Q.  During the course of your evaluation of these post Katrina
13    homes, did you evaluate electrical systems, plumbing and other home
14    components that had been in a corrosive environment for an extended
15    period?
16    A.  Through my subconsultants and subcontractors, yes.
17    Q.  And on those occasions, did you come to conclusions as to
18    whether or not to keep the electrical or plumbing?
19    A.  Of course.
20              THE COURT:  Are you going to tender him?
21              MR. HAYDEN:  Yes, your Honor.  I would tender him as an
22    expert in the area of general accounting, cost estimation and civil
23    engineering -- cost estimating, cost estimating.
24              MR. SEEGER:  Not accounting, right?
25              MR. HAYDEN:  Right.  Cost estimation.
```

 1               MR. SEEGER:  No objection.

 2               THE COURT:  Cost estimation and civil engineering.

 3          The court will accept him in those fields.

 4               MR. HAYDEN:  Your Honor, it was cost estimation, general

 5     contracting and as a civil engineer.

 6               MR. SEEGER:  No objection.

 7                         DIRECT EXAMINATION

 8     BY MR. HAYDEN:

 9     Q.  Have you been involved in cost estimation for residential

10     properties impacted by corrosion in their electrical or wiring

11     systems?

12     A.  Yes.

13     Q.  On how many occasions?

14     A.  Hundreds, on a limited basis.

15     Q.  Did there come a point in time where you were retained by the

16     Frilot firm, by Kerry Miller from the Frilot firm, to work in this

17     matter?

18     A.  Yes.

19     Q.  And when was that?

20     A.  On or about the second week in February.

21     Q.  And you're being paid for your services here today --

22     A.  Yes.

23     Q.  -- and in this engagement?  And you've been -- you've invoiced

24     for your time and costs, correct?

25     A.  Some of it, yes.

1   Q.  Prior to your engagement here, had you been offered as an

2   expert in the State of Louisiana?

3   A.  Yes.

4   Q.  Mr. Carubba, let me refer you to your report that you provided

5   to Kerry Miller on or about March 2nd.  I think it's Defendant's

6   35.  And if we could just highlight the bottom portion of the page.

7           Does your report set forth the tasks that you performed

8   or were asked to perform?

9   A.  Yes.

10  Q.  Did you visit the property?

11  A.  Yes.

12  Q.  Who was the team of tradesmen that you retained to work with

13  you on the assignment?

14  A.  Bruce Fuselier, Bruce's Plumbing; Mark Hartenstein, GraciHart

15  Electric; I had a carpenter named Ismael Jimenez (PHONETIC) --

16  please don't ask me to spell it -- he is a carpenter that I brought

17  in to look at some of the architectural cosmetic features of the

18  house; one of my employees, Dan Olivier who assists me in my work;

19  and then I had a gentleman from my engineering company named David

20  Workman who came in to take physical measurements for the purposes

21  of doing quantity calculations for the purposes of producing our

22  cost estimate.

23  Q.  Mr. Fuselier you saw testify yesterday?

24  A.  Yes.

25  Q.  And you've worked with him before?

1    A.  Yes.

2    Q.  And is he someone you would rely upon for his data on plumbing

3    costs?

4    A.  Yes.

5    Q.  Mr. Hartenstein, you heard him testify yesterday?

6    A.  Yes.

7    Q.  And he is an electrical -- electrician?

8    A.  Yes.

9    Q.  And is he someone you would rely on to provide you with an

10   appropriate cost estimate for the electrical work that needed to be

11   done?

12   A.  Yes.

13   Q.  When did you go out to the Hernandez property?

14   A.  I believe it was February 24th of this year.

15   Q.  And what did you do at the property?

16   A.  Well, my function was to make sure Bruce and Mark and David and

17   Danny and Ismael did their respective tasks to assist me in

18   producing the report that you have before you.  And my function was

19   also to observe and get an idea of what our potential scope and

20   magnitude would be for the renovation and the removal of this

21   Chinese drywall and the reconstruction of the home.

22   Q.  And what did you observe at the property?

23   A.  Well, in general, it's -- certainly when I walked in the house

24   I could smell the odor that emanates from the hydrogen sulfide gas.

25   I observed the fixture s, the finishes, the overall general layout

1   of the house.  I watched periodically what the electrician and the

2   plumber were doing, most notably I was able to observe Mark pull a

3   couple of sockets and switches, and he peeled back the sheathing so

4   I could look at the tarnish and the non-tarnished portions of those

5   wires.

6          Bruce took me outside and showed me -- not outside, he

7   took me and showed me a couple of the copper piping elements and

8   things that would support his work.  And then I walked around the

9   house with Danny and Ismael to get an idea of what we would have to

10  do architecturally to remove and reconstruct the home in its

11  present condition.

12         And in doing so -- by the way, that house is a typical

13  middle American house, and quite candidly, the finishes in that

14  house and the workmanship is mediocre, it's not anything to get

15  really excited about.  So I think that once it gets renovated, if a

16  good contractor does the work, these people are going to end up

17  getting a better product because what they have right now is not

18  that great.

19  Q.  Now, just so I understand for the record, Mr. Hartenstein was

20  there and Mr. Fuselier was there; is that right?

21  A.  Yes.

22  Q.  Mr. Jimenez was there?

23  A.  Yes.

24  Q.  And you had some other workers there?

25  A.  Just Danny and David.

1  Q.  Okay.  And you mentioned first you observed the fixtures in the

2  home.  What did you observe about the fixtures?

3  A.  I mean, for the visible portions of the fixtures, I.E., the

4  plumbing faucets and the light fixtures, in my opinion, they

5  looked, they appeared to be normal to me.  I didn't observe

6  anything, there's been a lot of discussion the last couple of days

7  about pitting and things like that.  And although I'm not a

8  material scientist or a toxicologist or any of these other experts

9  that you've employed, I do have 25 years in the construction

10 business.  I didn't see anything that would throw a red flag to me

11 that these things were in dire need of repair from my visual

12 observation of them.

13 Q.  And so with regard to the plumbing, you saw nothing that would

14 indicate that the structural integrity or functionality of the

15 plumbing system had been compromised?

16          MR. SEEGER:  Objection.  The witness just disqualified

17 himself as an expert and then tried to qualify himself as an

18 expert, your Honor, on this point.

19          THE COURT:  Just ask him what he saw.

20 BY MR. HAYDEN:

21 Q.  Did you see anything that was out of the ordinary from the

22 thousands of homes that you've been, residential homes that you've

23 inspected with the plumbing system?

24 A.  No.

25 Q.  Did you inspect the air conditioning system?

1    A.  I was going to go up in the attic and then Bruce came down and

2    told me that the coil was new.  And my appreciation of what was

3    going to happen in the remediation was the coil was going to be

4    removed, so I didn't go look at coil.  I relied on Bruce's

5    observation.

6            And the other parts of the mechanical system, the insides

7    of the ductwork, you can't, I mean, you're not able to see them, so

8    I didn't make the effort to go look at those.

9    Q.  Now, you mentioned that you looked at the electrical system.

10   Mark showed you parts of the electrical system?

11   A.  Parts of the electrical system.

12   Q.  What did he show you?

13   A.  I followed him and his crew around sporadically, and they took

14   the faceplates off the wall and pulled back the receptacles and the

15   light switches and showed me where the connections were and where

16   those exposed tarnished portions of the wire were, and then I asked

17   Mark to peel back some of the sheathing so I could observe what the

18   unexposed wire portions looked like.

19   Q.  And what did you see?

20   A.  Well, in my opinion, based on my visual observation, there were

21   certainly tarnish on the exposed portions.  The unexposed portions

22   appeared to be new to me.  I didn't see anything that would have

23   raised a red flag on the unexposed portions that were peeled back

24   for me to look at.

25   Q.  With regard to the exposed portions, could you describe for the

1    court what that looked or felt like?

2    A.  I actually rubbed it with my thumb, it just looked like

3    tarnish, very similar -- somebody in the course of this testimony a

4    couple of days ago described what happens when you take your silver

5    out and it gets tarnished from being in, it's the same thing, it

6    was a very light film of brown or black tarnish that was on the

7    surface of the copper wire.

8    Q.  Did you actually touch it?

9    A.  I did.

10   Q.  And did you observe anything when you touched it?

11   A.  It came right off.  And if you touched it with enough force,

12   one could almost match the surface of the untarnished portion of

13   the wire.  It appeared new once you removed the tarnish.

14   Q.  Now, I believe you said that Bruce took you around and showed

15   you some of the copper elements?

16   A.  Yes.

17   Q.  And did you observe anything there?

18   A.  As I sit here today, I don't remember seeing the tarnish on the

19   copper.  There may have been, but I can't sit here and recall it as

20   I sit here today.

21   Q.  After you were done with your inspection, what did you do?

22   A.  After we left the Hernandez residence on Marion Drive, we went

23   over to the town home where we were going to do our controlled

24   drywall removal, simply to just look around so I could tell my subs

25   where to go the next day and kind of marshal them and get them

1    organized to do that work the following day.

2    Q.  Did you have -- did there come a point in time where you had a

3    conversation with any of the consultants, the experts that have

4    testified here, about -- from Knauf, KPT?

5    A.  We had a conference call at my office on the afternoon of the

6    26th, which was a Friday.  And in that conference call -- and I

7    need to state for the record that during my deposition I didn't

8    recall at the time that I did have -- I didn't remember who was on

9    the conference call, so I was reminded of that by you guys after,

10   and I guess, truth be told, y'all have a much deeper understanding

11   of the case than I do.  So unfortunately, my short-term memory is

12   not that good, which I said in my deposition.

13            Well anyway, long story short, we had a conference call,

14   I believe that Perricone was in that conference call and I believe

15   that Mr. Locay was on that conference call, where we discussed

16   specific aspects of what we were --

17            MR. SEEGER:  Objection, your Honor.  Can we approach on

18   this for one second?

19            THE COURT:  Sure.

20        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD.)

21            MR. SEEGER:  I think I've been very quiet with the

22   objections, your Honor.  We've deposed these witnesses, and they

23   continue to march in this courtroom after their depositions with

24   new-found memories.  This witness specifically testified he never

25   had a discussion with him, I'll show you his testimony.  Now he

1    walks in and tells the court, you know, that he was reminded by the

2    lawyers after.  I have to object to that because I don't have an

3    opportunity to deal with that today.

4          MR. HAYDEN:  Why not?

5          MR. SEEGER:  Because he testified in his deposition just

6    last week, just last week.

7          MR. HAYDEN:  You can cross him on that.

8          MR. SEEGER:  Your Honor, it's every witness.  It's

9    Mr. Lee who has a different memory, they all say one thing that

10   happened days ago.

11         THE COURT:  It goes to credibility and I've noted that.

12         MR. SEEGER:  That's good enough for us.  Thank you, your

13   Honor.

14     (OPEN COURT.)

15   BY MR. HAYDEN:

16   Q.  Sir, you mentioned an Alex Locay.  What is your understanding

17   of who Mr. Locay is?

18   A.  He is a general contractor in Florida.

19   Q.  Did you do anything else, did you review any documents before

20   reaching your conclusions?

21   A.  Before rendering my report?  Yes.

22   Q.  What documents did you review?

23   A.  I reviewed -- I'd like to look at my report and see if I

24   specifically made reference, I mean, if not, I am going to do it

25   from memory recall.

1   Q.  Okay.

2   A.  Can we go back up to my scope of work?  Go back.

3          THE COURT:  Can you give him a copy of the report.  Do

4   you have a copy?

5          THE WITNESS:  It's electronic, although I can't

6   manipulate it and flip through it.

7          THE COURT:  All right.

8          THE WITNESS:  I need to get something where I can see my

9   report and see what documents I reviewed.

10         MR. HAYDEN:  May I approach, your Honor?

11         THE COURT:  Sure.

12         THE WITNESS:  I have in my report that I reviewed the

13  documents including -- by Perricone and Mr. Beyler, is that the

14  correct, Beyler or Beyler?

15  BY MR. HAYDEN:

16  Q.  Did you see a gentleman testify yesterday?

17  A.  Yes, it was the guy that was on the video testimony.

18  Q.  Did you actually review those reports?

19  A.  I have it in my report that I reviewed them prior to production

20  of this report.

21  Q.  Did they impact your decision?

22  A.  Well, as I stated earlier in my testimony, I am not a material

23  scientist or an expert in other areas, so I relied on those experts

24  to help formulate my opinion, which subsequently helped me

25  formulate my scope and magnitude of the renovation costs of this

```
 1   house.
 2   Q.  What else did you do in order to come to your opinions today?
 3   A.  I mean, I reviewed the documents, I did a visual inspection of
 4   the house, I did the necessary cost estimating and mental
 5   gymnastics to come to that estimate to arrive at my scope and
 6   magnitude.
 7   Q.  Did you look at anything to validate the cost numbers that you
 8   were provided?
 9   A.  If you'll look at my report, I included Mr. Locay's estimate
10   simply to validate and confirm my scope and magnitude of my
11   estimate.
12   Q.  Prior to the report you also, you mentioned that you went to a
13   Mandeville townhouse; do you recall that?
14   A.  Yes.
15   Q.  And what was the purpose of going to the Mandeville townhouse?
16   A.  The purpose of going to the townhouse was to set up for a
17   drywall removal to determine through normal means and methods, in
18   my opinion, what the dust would be by taking out drywall in a room.
19   A controlled environment to take out drywall to see what dust was
20   kicked up during the demolition.
21   Q.  And did you undertake that drywall demolition exercise?
22   A.  Well, my crew did, yes.
23   Q.  And when was that?
24   A.  We started on the morning of the 25th and finished on the
25   afternoon of the 26th.
```

1  Q.  And were you present during the course of that exercise?

2  A.  Intermittently, yes.

3  Q.  Were you supervised in the activities of your workmen?

4  A.  Intermittently, yes.  Danny's the guy in my construction

5  company who kind of rides herd on the crews, so I rely on him for

6  the day-to-day, hour-to-hour, blow-by-blow stuff.  I came in at the

7  beginning, during and at the end, to observe what was going on and

8  just look at the finished product.

9  Q.  Did you evaluate the videotape that was taken of the work that

10  was being done by the workmen?

11  A.  Yes.

12  Q.  And were they following the scope of work that you were

13  proposing and are proposing that KPT follow for the drywall

14  demolition?

15  A.  Yes.

16  Q.  Did you have an opportunity to review the videotape and the

17  excerpts that have been put together for the court, to assist the

18  court on the type of drywall demolition that you are suggesting?

19  A.  Yes.

20  Q.  And does it truly and accurately portray the drywall demolition

21  as you believe it should be undertaken?

22  A.  Yes.

23       MR. HAYDEN:  Your Honor, I'd ask that we move that

24  exhibit into evidence.

25       THE COURT:  What exhibit is that?

1            MR. HAYDEN:  I don't know what he did with 190.

2            MR. SEEGER:  It's okay for him to put it up and then I'll

3    look at it.

4            THE COURT:  All right.  And what is this a video of?

5            MR. HAYDEN:  This is a video of the drywall demolition.

6    I think you saw work, or some drywall in the plaintiff's case of

7    this drywall demolition exercise that we did at the Mandeville

8    home, where we invited the plaintiffs to come in and look at it,

9    what the workmen are doing, and I can have the witness testify to

10   it.  It is following the protocol that he is suggesting.

11           THE COURT:  All right.  This is not the Hernandez house?

12           MR. HAYDEN:  This is not the Hernandez house.

13   BY MR. HAYDEN:

14   Q.  This is the one room where they were cutting drywall where they

15   were --

16   A.  This is the video of the still photographs that Mr. Mallet had

17   as part of his report.  Same house.

18           CONNIE:  It's better on a small screen.

19           THE WITNESS:  Yeah, it's much better on a small screen.

20   BY MR. HAYDEN:

21   Q.  Could you, Mr. Carubba, just explain what was going on?

22   A.  It's very simple.  I mean, the drywall crew is removing the

23   drywall from the walls by using utility knives and physical force

24   to take out sections at a time.

25   Q.  And why do you think that's important?

1   A.  Well, there's been a lot of discussion about means and methods

2   of how to efficiently and adequately demolish the drywall without

3   producing inordinate amounts of dust.  Drywall is a very brittle

4   material, so there's no way to escape the dust that's going to be

5   kicked out when the demolition starts.  This is a normal means and

6   methods for taking drywall out, and after Katrina when we gutted

7   houses, this is how we did it.

8           Now admittedly, in this video, this isn't the most

9   efficient way because there was so many people in the room.  And by

10  the way, for the record, the room was 13 by 14, it wasn't 12 by 12

11  or 14 by 16, it was 13 by 14, I checked my drawings this morning, I

12  think.

13          So anyway, it doesn't matter.  There was this big

14  monitoring thing in the middle of the room, so there was this

15  obstruction, and then of course there were people all over the

16  place, so this exercise was merely to see using what I would call

17  normal means and methods what production of dust would occur in the

18  home.  And that's what you're witnessing here, your Honor, they are

19  taking out chunks and pieces by hand pursuant to them using a

20  utility knife to make surgical cuts in it, where they could find a

21  way to grab onto the drywall and take it out.

22  Q.  Now, this is a different method than the hammer wielding method

23  of tearing down the drywall that was being proposed by others?

24  A.  Yes.

25  Q.  Do you think this is a more efficient method?

1    A.  I do.

2    Q.  And why is that?

3    A.  Well, I mean, the hammer method, it's ironic that since we're

4    all talking about dust here, it's ironic that somebody would

5    recommend that you go in there and wield the hammer, which is a

6    more dynamic force, if you will, than the static force of a knife,

7    you're guaranteed to kick up dust when you smack drywall with a

8    hammer because it's a very brittle material.

9         So you can certainly do it that way, but at the end of

10   the day, being a little bit more surgical about it, I don't think

11   you're going to lose any efficiency in doing so --

12   Q.  I hate to interrupt you --

13   A.  Go ahead.

14   Q.  -- but what were those workmen doing right there?

15   A.  There were wiping the wooden members down after removal of the

16   drywall.

17        MR. HAYDEN:  Your Honor, could we just note for the

18   record, because it's not on the videotape, there's no way to

19   measure how much time any of these things are, just so the court's

20   aware of that.

21        THE COURT:  All right.

22        THE WITNESS:  Well, that's okay, I mean, this wasn't a

23   time-dependent function from the standpoint of cost, we do this as

24   a dust-mitigation exercise.  So certainly, I mean, we could sit

25   here for 15 hours and watch it if you wanted a realtime display,

1    but the major highlights are caught on this video efficiently.

2    BY MR. HAYDEN:

3    Q.  And the amount of time that was spent in this home doing this

4    work, would that be consistent with the real time it would take to

5    do it in the Hernandez home?

6    A.  Of course not.

7    Q.  And why is that?

8    A.  Well, because we were in a confined space, number one; number

9    two, there was this monitoring device that if you know what you're

10   looking for in this video you'll see it, it's sitting right smack

11   dab in the middle of the room; and then, of course, there were the

12   multitude of non-construction personnel that were in the room

13   monitoring all of this stuff.  So, I mean, literally --

14   Q.  Were there lawyers there?

15   A.  Huh?

16   Q.  Where there lawyers there?

17   A.  Well, that was my way of saying lawyers.

18          But look, at the end of the day, it wasn't a very

19   efficient means -- it wasn't a very efficient way from a time

20   standpoint, but that wasn't the mission here.  The mission here was

21   to see, using normal means and methods, what type of dust we would

22   kick up during this demolition.

23          And, in fact, I got a call from Danny that evening

24   complaining that Ismael was complaining that every time they took

25   something down, or not every time, but they had to stop and show it

1   to somebody, it wasn't an efficient -- from a pure construction

2   standpoint it wasn't an efficient operation as it were.

3   Q.  But it does fairly and accurately show how you would clean the

4   Hernandez house?

5   A.  Yes.

6   Q.  Okay.  Now we're looking at the studs?

7   A.  The studs, the blocking, the ceiling joists, all the components

8   of the structural portions of that building.

9   Q.  And under your cost estimate, this is how you would leave the

10  home after you're done with demolition?

11  A.  Yes.

12  Q.  And that would be with the wire and plumbing still in?

13  A.  Yes.

14  Q.  And is the vacuum that they're using, what kind of vacuum are

15  they using there?

16  A.  A shop vac.

17  Q.  Okay.  It's not a Hepa vac?

18  A.  No.

19  Q.  Would you use a HEPA vac?

20  A.  I mean, you could, it's just the HEPA vac may be a little bit

21  more efficient, but you can get the same result with the shop vac,

22  you just have to do it a little bit more.

23  Q.  And this was done with a -- using a shop vac?

24  A.  Yes.

25  Q.  Now, after doing that dust containment exercise, did you do

```
 1   anything else before coming to, putting together your scope of work
 2   for this Hernandez job?
 3   A.  I mean, I did my cost estimate, and I can explain to you how I
 4   did that if you'd like.  I mean, my way of estimating, your Honor,
 5   is, I consider it to be very pragmatic, and it's certainly kept me
 6   out of trouble through the years.  It starts off --
 7   Q.  Before you jump into the cost estimate, let's talk about the
 8   cost of this scope of work.
 9   A.  Well, the scope of work was --
10   Q.  Why don't we put that up on the screen.
11   A.  Okay.
12   Q.  211.  This is the repair protocol for the Hernandez home.  Is
13   that a document that you authored?
14   A.  Yes.
15   Q.  And what is it?
16   A.  That's part of our report where we set forth the scope of work
17   and how we came up with it.
18   Q.  And this is what you determined needed to be repaired or
19   replaced in the home?
20   A.  Yes.
21   Q.  And is this your opinion to a reasonable degree of certainty?
22   A.  Yes.
23   Q.  And how did you come up with this protocol?
24   A.  Well, I relied on the other experts, I mean, the whole
25   discussion the last couple of days about the electrical and
```

1   plumbing, so I certainly deferred to my subs on what their

2   recommendations would be and also took into consideration what the

3   experts were recommending about the removal of the electrical and

4   plumbing systems, since they're two very large components of all of

5   this.

6           So my scope of work is essentially removing the fixtures

7   in the home that can be saved, it is removing the cabinets and

8   saving them, and any other object that's not drywall, certainly

9   we're going to take out the drywall, the insulation, we're going to

10  clean the house much in the same manner as in the video you just

11  observed, and then we're going to put everything back better than

12  we found it, as it were.

13  Q.  What about light fixtures?

14  A.  We're going to save the light fixtures.

15  Q.  What about the granite countertop?

16  A.  We are not going to -- you can't save the granite, it's very

17  difficult to remove it without cracking it.

18  Q.  So you're replacing the granite?

19  A.  We're going to replace the granite.

20  Q.  What about taking out switches and receptacles?

21  A.  We're going to take them out and put new switches and

22  receptacles.

23  Q.  What about with the HVAC system, does your scope of work

24  include replacement of the HVAC system?

25  A.  Not the entire system.  We're going to replace the flexible

1    ductwork and in most cases we would replace the coil, but I

2    believe, as Bruce testified yesterday, that the coil has been

3    recently replaced.  So in this particular case, we probably

4    wouldn't take it out.  And I think his estimate reflects that.

5    Q.  And did this particular coil, do you know if it had any coating

6    on it?

7    A.  I think Bruce testified that it was coated.

8    Q.  You heard Mr. Mallet testify about -- Mallet testify about the

9    cleaning that he believed needed to be undertaken?

10   A.  Yes.

11   Q.  Do you agree with that?

12   A.  No, grossly overstated.

13   Q.  Why is that?

14   A.  Well, I mean, first off, you take his line item of $15,000 for

15   an environmental engineer.  Now that engineer, if he is a P.E.,

16   he'll go for about $150 an hour.  That means that guy has got to

17   spend 100 hours at that house, that's two and a half weeks

18   full-time.  I have no clue what that guy is going to do for two and

19   a half weeks.

20        During Katrina when we had issues with mold and we had to

21   bring out a mold person or an environmental, somebody, which I

22   didn't have to do, by the way, but I knew people that did it, these

23   people would come out for four or five hours at the most, do

24   whatever -- they were giving out these mold certificates or

25   whatever it was.

1          And I never had to do it, but I just think that

2     Mr. Mallet's magnitude of the things he is proposing in his

3     estimate, that's the one that pops into my mind first, is grossly

4     overstated.

5          And I'm sorry, he has in his résumé that he's an

6     investigative engineer, I don't know of any license from the

7     national registration board or any state that I am licensed in that

8     has that designation as an investigative engineer.  So I don't know

9     what particularly qualifies him to make that assertion, but $15,000

10    for an environmental person to me is excessive.

11    Q.  Are you licensed as an inspector?

12    A.  I am licensed as a chief building official.

13    Q.  And what's that mean?

14    A.  That just means that I am able to interpret the code and make

15    decisions in code-related matters.

16    Q.  And so you're able to evaluate the various codes that would

17    apply here?

18    A.  Some of them.  I would not evaluate electrical or plumbing

19    codes.  My expertise is in building construction and our business,

20    because of the specialized nature of plumbing, HVAC and electrical,

21    those are deferred to other codes and other code officials.

22    Q.  And so you defer to other officials like Mr. Canzoneri?

23    A.  Yes.

24    Q.  With regard to doors, fixtures and cabinetry, are you replacing

25    that or keeping that?

1   A.   Doors, we're going to take the doors out, store them, put them

2   back in; cabinets we're going to take out; fixtures we're going to

3   take out and put back in.  The only thing we're not saving is the

4   granite and, of course, you know, the drywall and the carpet, you

5   can't save stuff like that.  We're going to save the hardwood

6   floors and the tile floors, protect them during demolition and

7   construction and then put it all back in.

8   Q.   Sir, where are you going to store the fixtures and cabinetry?

9   A.   In this house, we're going to use the garage as our storage

10  unit.

11  Q.   And are you concerned that that area will not be climate

12  controlled?

13  A.   No, we're going to put dehumidifiers in it and keep it at a

14  reasonable level of humidity.

15        By the way, Mr. Mallet also testified that he went

16  through this long-winded explanation about how you can't save the

17  wood floors because you're reversing the humidity in the house.

18  Can I tell you how many houses I've seen that were built before air

19  conditioning that have hardwood floors that are in perfect

20  condition, because it's not a function of air conditioning and

21  pulling the moisture out, it's a function of controlling the

22  humidity.  And a dehumidifier -- the best control for humidity is

23  just ventilation.

24        But forget about the ventilation.  If you put

25  dehumidifiers in and you're able to control the moisture contents,

```
 1    then there's no reason that the elements of this house that have

 2    already been exposed to climate-controlled conditions, as

 3    Mr. Mallet said, cannot be preserved effectively and put back in.

 4            I did it during Katrina routinely.  We would go into

 5    people's homes, take the doors out, take some things out, put it in

 6    the garage, put dehumidifiers in, go about our business, put them

 7    back in and we're done.

 8            THE COURT:  Counsel, let's ask him questions so that he

 9    can focus on what you're talking about.

10    BY MR. HAYDEN:

11    Q.  Do you intend to remove moldings and trim?

12    A.  Yes.

13    Q.  Is there a reason why you're not trying to save those?

14    A.  They're very delicate and the means and methods of taking them

15    out are going to lend them to being destroyed.  You can't save

16    them.

17    Q.  Sir, you heard testimony that -- under the Mallet proposal that

18    the house would not be, would not have electricity for a period of

19    time.  Do you recall that?

20    A.  I do.

21    Q.  Under your scope of work, how long would the house be without

22    electricity?

23    A.  We would take the existing electrical service and extend

24    temporary power through the permanent pole outside for whatever our

25    needs were during renovation.  We would not let that house go
```

1  without electricity.

2  Q.  So the air conditioning could be running?

3  A.  Well, you could until it's time to change it.  You could let

4  the "old" air conditioner run with the damaged ductwork until it's

5  time to get to the point of construction where you can't let it

6  run.

7  Q.  Do you have any opinion on how long it would take to complete

8  your job?

9  A.  Yes.

10  Q.  And how long is that?

11  A.  Sixty days minimum.

12  Q.  Did you hear testimony over the last few days about airing out

13  the job?

14  A.  Yes.

15  Q.  Do you have an opinion as to whether the job needs to be aired

16  out?

17  A.  Yes, it doesn't need to be aired out for the time period that

18  Mr. Mallet prescribed.

19  Q.  Why is that?

20  A.  Because it just doesn't.  I mean, I am not an expert in the

21  other areas, but in my experience, mostly with Katrina, we didn't

22  go through any extraordinary means and methods to air out houses

23  that had prolonged exposure to water and/or mold in them.  The

24  compelling thing is, is to get that stuff out.  Once it's out and

25  you clean it and you make sure that the wooden components of the

1    house are at their proper moisture content, i.e., through

2    dehumidification and testing, it's my opinion you can go about your

3    business and proceed with the renovation.

4    Q.   During the course of your evaluation of this house, did you

5    notice certain defects in the materials and workmanship of the

6    house that you referenced in your report?

7    A.   Yeah.  I mean, I wouldn't call them defects.  As I said

8    earlier, some of the quality of the finishes is, I used the word

9    mediocre.  And certainly when we, if we were allowed to do the

10   work, when we put those finishes back in, they're going to be

11   better than what's in there now.

12   Q.   Okay.

13   A.   With no extra effort, by the way.  That was just sloppy work on

14   the part of whoever built the house.  And it was built right after

15   Katrina, so I would believe that, the way the labor markets were

16   and the pace at which people, some people were working.

17   Q.   And improving those areas of workmanship, would you be charging

18   extra for that?

19   A.   No, we wouldn't.

20   Q.   Now, you said you came to a cost estimate.  What is that?

21   A.   Can we pull it up?

22   Q.   Yeah.

23   A.   This estimate in total is $54,142.43 -- wait, you changed it on

24   me.  That's the updated, okay.  This is the most current.

25   Q.   And you made certain changes to your estimate recently.

1   A.  I did.

2   Q.  And why is that?

3   A.  Well, I had some mistakes in it that I didn't correct before I

4   got here.

5          MR. SEEGER:  Objection.  When was that corrected?  I am

6   not asking the witness, I'm asking counsel, when was it corrected?

7   The change, before or after his deposition?

8          MR. HAYDEN:  Why don't I ask him.

9          MR. SEEGER:  Before or after his deposition?

10          MR. HAYDEN:  It was after his deposition and after

11   Mr. Mallet's.

12          MR. SEEGER:  Objection.

13          THE COURT:  The court notes that the witness gave a

14   deposition, had material, had this estimate and now has changed it

15   after the deposition before his testimony here today.

16   BY MR. HAYDEN:

17   Q.  When was your deposition?  Was it less than a week ago?

18   A.  I don't remember the exact date.  It was pretty close.

19   Q.  Things have been moving along pretty fast here, right?

20   A.  Yeah.  We got involved in the middle of February, and we've

21   been ripping and running, and I apologize for the errors in my

22   estimate, it's just a function of, you know, we're human and I made

23   some mistake.

24          And by the way, there's nothing in the ethics of how

25   we're governed as engineers or contractors that require that we're

1    perfect.  Unfortunately, we're not perfect and we make mistakes.

2    But, you know, it's not a mistake unless you correct it.  So I

3    corrected it at the earliest possible time in good faith and

4    submitted it to this court in good faith, and I am here to talk

5    about it, so let's talk about it.

6    Q.  And actually that increased the estimate of the cost, correct?

7    A.  It did, by three dollars a square foot.

8    Q.  So why don't we go to those changes that you made.

9    A.  Okay.

10   Q.  What's the first change?

11   A.  Well, we left out re-installing the doors, and it's somewhere

12   on here.  Let's see, whoever is manipulating that just go slow.

13   Q.  It's right there.

14   A.  Install doors, $75 each, 15 doors, $1,125.

15   Q.  What's the next change?

16   A.  We inputted Mr. Hartenstein's electrical estimate incorrectly,

17   it was $2,200, the correct number is 3,400.

18   Q.  And then the next was with regard to countertops?

19   A.  Yeah, we busted the square footage on the granite.  It's

20   actually -- it's actually still 15 square feet too short, so

21   there's a little money left on the granite.

22   Q.  Okay.  Now, do you believe that this fairly and accurately

23   indicates the costs to repair the Hernandez home?

24   A.  Yes.

25   Q.  And why is that?

1   A.  Well, because I am comfortable with my scope and magnitude.

2   Q.  How did you come about these numbers?

3   A.  Well, for the specialty items, as I stated earlier, we relied

4   on Bruce's Plumbing and GraciHart Electric to give us those

5   plumbing, HVAC, and electrical numbers.  And then for the other

6   items, the cosmetic-type stuff is what I call it, CEI Construction

7   is going to self-perform that work.

8           So in the course of estimating it, Danny and I together

9   called various material suppliers and got our unit costs and

10   extended them for materials and labor into our estimate.

11   Q.  Sir, you heard Mr. Mallet talk about the Xactimate software

12   program that he used.  Did you use any software program like that?

13   A.  No.

14   Q.  How did you go about determining your numbers?

15   A.  We did it, what I would call, the old-fashioned way.  We pick

16   up the phone, call suppliers, got real numbers on materials and

17   then, of course, you know, we self-perform some of that work, so it

18   was a simple matter of talking to the people that were going to

19   physically do the work, get those numbers and extend them into our

20   estimate.

21   Q.  Do you feel that, actually talking to the actual workers and

22   subcontractors and getting estimates from them is a better way of

23   determining costs than putting it into a computer and getting some

24   numbers punched up?

25   A.  Well, I certainly think that computers have their function in

1   the way estimates are done, but of course I am going to say my way

2   is better.  But the Xactimate program, I think it's been stated in

3   here, that's an insurance company program that's used mostly for

4   adjustment.

5          I've been doing this a long time.  I don't know one

6   contractor that uses Xactimate when they give estimates to clients.

7   I don't.  They use what's called a CSI formatted estimate, which is

8   a fancy word for breaking things down by component.  Whether it's

9   electrical, mechanical, architectural, structural, that's the way

10  it's normally done in our industry.

11  Q.  Sir, I noticed that you put in for a 10 percent number for

12  overhead and a 10 percent for profit.  Is that standard in the

13  industry?

14  A.  Pretty much.  It varies a little bit but that's about right.

15  For a small job like this.

16  Q.  Do you include a material sales tax and equipment sales tax in

17  your estimate?

18  A.  No.

19  Q.  Why is that?

20  A.  It's included in the individual line items above.

21  Q.  And is that standard in the industry?

22  A.  Yes.

23  Q.  So you saw Mr. Mallet's estimate that, in addition to the

24  individual items that he had, he also had a line item for material

25  sales tax and equipment sales tax?

1   A.  Yes.

2   Q.  And those were put in before he did overhead and profit?

3   A.  Yes.

4   Q.  Is that something that is done in the normal course by a

5   general contractor?

6   A.  No.

7   Q.  Why is that?

8   A.  Well, as I stated earlier, Xactimate is not a program that's

9   used in our industry to do detailed cost estimates or hard bids for

10  clients.  It's done in a CSI formatted -- CSI is Construction

11  Specifications Institute, and they have line items or different

12  items that are very clearly spelled out in divisions, so Xactimate

13  is not normally used.

14  Q.  And is it the subcontractor's, do they usually include in their

15  bids the material sales tax and equipment sales tax?

16  A.  Yes.

17  Q.  So that would be reflected above the line?

18  A.  Well, let me put it to you this way:  It's their -- if they buy

19  materials for the job, they have to pay sales tax.  I hope they put

20  it in their estimate.  That's not reflected back to the general

21  contractor in any way, shape or form in our general conditions.  So

22  although I don't ever go to a sub and go, hey, by the way, did you

23  put your sales tax in there, I would think if they're in business

24  they know to do that.

25          But at the end of the day, it's not a line item in the

1   general contractor's bid and it shouldn't be there.

2   Q.  And the general contractor would include it in overhead or

3   profit?

4   A.  If it applied to us, in most cases it doesn't, but if it were,

5   it would be included in the overhead portion of our bid.

6   Q.  Now, in your report, if you could go to the top of the cost

7   estimate, you'll see on certain line items you have PN, what does

8   that refer to?

9   A.  Plaintiff's numbers.

10  Q.  Now, you indicated that you also talked to a Mr. Locay.

11  A.  Yes.

12  Q.  And why did you talk to Mr. Locay?

13  A.  I had a short discussion with him simply to just talk about the

14  scope and magnitude of each of our estimates and use it for

15  purposes of validation and confirmation of my numbers.

16  Q.  And why did you use Mr. Locay's numbers?

17  A.  Well, I didn't use his numbers.  I just simply talked to him

18  and looked at the scope and magnitude and it was, I mean, all

19  construction companies have their own ways of estimating, but at

20  the end of the day, our scopes and magnitudes were very similar.

21  Q.  Did you look at his report before you did your cost estimate?

22  A.  No.

23  Q.  Do you know if he has any experience in Chinese drywall?

24  A.  As I appreciate it, he's done some renovations in Florida,

25  which I didn't know at the time I did my work.

1    Q.  If you could go to the Mallet report.

2    A.  Mallet.

3    Q.  Mallet.  If you could go to the last page, the cost -- I

4    believe it's 29.  If we could blow that up.

5           Sir, this is the recap of the cost estimate by

6    Mr. Mallet.  Have you seen that before?

7    A.  Yes.

8    Q.  And you heard him testify about that report?

9    A.  Yes.

10   Q.  Do you have problems with the numbers that he's indicated for

11   each of the line items?

12   A.  I do.

13   Q.  And could you go through quickly with the court the areas of

14   concern that you have?

15   A.  Well, first off, his overall number is more money than it cost

16   to build this house, including the land, first, as a general.  This

17   house was built for 175,000 without the land, directly after

18   Katrina when material and labor prices were inflated.

19          Now, in the worst construction economy where labor is

20   plentiful, he's got a number of 200,000 to renovate it, assuming

21   that the foundation, the frame and the roof is intact, which is

22   probably $25 a square foot by itself.  So the entire estimate in my

23   opinion is grossly overstated, both in scope and magnitude.

24   Q.  If you could go to the cabinetry.

25   A.  Okay.

1    Q.  Well, first you'll notice that he has a line item for

2    appliances.  Are you replacing appliances?

3    A.  No.

4    Q.  Then with regard to cabinetry, do you feel that that's an

5    appropriate cost?

6    A.  It's expensive.

7    Q.  And have you seen the cabinetry that's in the Hernandez home?

8    A.  Yes.

9    Q.  And it's your opinion that this is an expensive cost for

10   replacing it?

11   A.  In my opinion, it's an upgrade.

12   Q.  With regard -- what's the next line item that you have concern

13   with?

14   A.  Well, his demolition cost is over double what mine is, which I

15   find quite curious because he went through this long-winded

16   explanation about how meticulous we did it and how inefficient it

17   was, and then his is double what mine is.  He's wielding a hammer.

18   Q.  After hearing his testimony, do you have any reason to change

19   your cost estimates?

20   A.  No.

21   Q.  And why is that?

22   A.  Well, because I am comfortable with it.

23        By the way, after Katrina we were getting three dollars a

24   square foot to demolish in that Katrina market.  It's now four

25   years later, and I probably could beat that 6,300 if I had time to

1    shop it a little bit more.  So I am quite comfortable with the

2    6,300.

3    Q.  What's the next line item that you have significant concern

4    with?

5    A.  His drywall number is pretty high.

6    Q.  What about his painting number?

7    A.  I just -- I have no clue where he got that paining number.

8    That's $17,000 to repaint a 2,000-square-foot house with nine-foot

9    ceilings.  It just doesn't cost that much.

10   Q.  How much should it cost?

11   A.  I think -- I have to look at my estimate, but I believe it's 60

12   cents a square foot and there's 8,480 square feet, do the math,

13   it's $5,000 and some pennies.  That's all day long you can get

14   painters to work for under a dollar a square foot.  That's a primer

15   coat and two finish coats, which is what you put in new

16   construction.  So I don't know where he got the, what is it,

17   fifteen-nine to paint that house.

18   Q.  Actually, if you'll look to the painting line item.

19   A.  Oh, sorry, 17, I was looking at drywall -- I mean, demolition.

20   Q.  And you believe it, it says 60 cents a square foot?

21   A.  I would have to look at my estimate, I'm pretty sure it's

22   around 60 cents a square foot.

23   Q.  Did you do anything to verify that that number is a valid

24   number, 60 cents a square foot?

25   A.  I talked to my painter.

1    Q.  Are you familiar with RSMeans?

2    A.  I am.

3    Q.  Do you use that on occasion?

4    A.  No.

5    Q.  Why not?

6    A.  Because I don't like it.  Well, I don't like it because I find

7    it to be cumbersome, number one; and I am pretty simple-minded, I

8    like to do things simply.  But, number two, RSMeans is constantly

9    updating these unit costs and they attempt, bless their hearts, to

10   do it geographically; but the truth of it is, by the time you

11   navigate through RSMeans, it's just a lot easier to pick up the

12   phone and call somebody that does it every day.

13   Q.  The old-fashion way?

14   A.  The old-fashion way, it works every time.

15   Q.  And you feel the old-fashioned way gets you a valid, more valid

16   and accurate cost estimate?

17   A.  No, I don't feel, I know.  It really is a better way of doing

18   it.  On a simple project like this, where the scope and magnitude

19   is very definable, in my opinion, going to something like Means or

20   Xactimate is not only not prudent, it doesn't produce an accurate

21   portrayal of what the cost is.  It's just a lot easier to do it the

22   old-fashioned way.

23   Q.  What about the -- any of the other line items that you have

24   significant problem with?

25   A.  Wait, slow down.  He's got twelve-five for permits.  I don't

1   know where that came from.  The permit is normally one to two

2   percent of the construction costs, which is under $1,000 in this

3   case.

4   Q.  Did you hear him testify about an environmental consultant?

5   A.  Yeah, that's the guy -- maybe I said 15,000 erroneously.  Is

6   that lumped into this?

7   Q.  Assuming that's lumped into that.

8   A.  Yeah, okay.  Well, that explains where he got it.

9   Q.  Is that appropriate?

10  A.  I don't think it's appropriate at all, having an environmental

11  guy spend 20, 30 hours out there, but it's in his estimate.

12  Q.  You've been involved in repair work where environmental people

13  are involved, haven't you?

14  A.  Yes.

15  Q.  Would you expect a charge of 12 or $15,000 to just go out and

16  evaluate a property?

17  A.  Well, let me just, I mean, I've never done any Chinese drywall

18  stuff, so, but in general, you would bring an environmental person

19  out if there's, you know, asbestos or something.  My experience is,

20  you mostly get these environmental people when you have commercial

21  projects.  For whatever the reason.  And it's not really my area of

22  expertise, but in my observation in residential work, it's not

23  normal or customary to see something like this.

24  Q.  And are you, as you sit here today, are you comfortable with

25  the cost estimate that you provided to the court?

1  A.  Yes.

2  Q.  And do you believe to a reasonable degree of certainty in your

3  field that that cost is the cost it would take to repair this home?

4  A.  Yes.

5  Q.  And you've reviewed your scope of work, you believe the scope

6  of work that you put forward is the appropriate scope of work to a

7  reasonable degree of certainty?

8  A.  Yes.

9  Q.  And why are you so sure about that?

10  A.  I mean, 25 years of experience, I have a degree in engineering

11  and I hold licenses in general contracting, and I -- I've just been

12  involved in a lot of projects.  This is a fairly simple project in

13  scope, to be able to quantify it is not difficult.  It's very

14  definable.

15  Q.  If you were offered this job today, would you sign the contract

16  under this scope of work and with the limitations of these costs?

17  A.  Yes.

18          MR. HAYDEN:  I don't have any other questions.

19          THE COURT:  Let's take a break here, 15 minutes.  The

20  court will stand in recess.

21          THE DEPUTY CLERK:  Everyone rise.

22      (WHEREUPON, A RECESS WAS TAKEN.)

23      (OPEN COURT.)

24          THE COURT:  Be seated, please.  You're still under oath,

25  sir.

1              THE WITNESS:  Yes.

2              THE COURT:  Cross-examine.

3              MR. SEEGER:  May I proceed, your Honor?

4              THE COURT:  Yes.

5                         CROSS-EXAMINATION

6    BY MR. SEEGER:

7    Q.  Mr. Carubba, you testified today that you spoke with Alex

8    Locay, that's your testimony now?

9    A.  Yes.

10   Q.  Benchmark Builders?

11   A.  Yes.

12   Q.  Do you remember I asked you a bunch of questions about

13   Benchmark Builders and Alex Locay last Thursday, March 11th?

14   A.  Yes.

15   Q.  So we didn't miss that topic in your deposition, you and I, we

16   had a lot of time to talk about that, didn't we?

17   A.  We talked about it.

18   Q.  Let me show you your deposition testimony and the questions you

19   were asked and the answer you gave in your deposition, okay, sir?

20   A.  Yes.

21      (WHEREUPON, A VIDEO CLIP WAS PLAYED.)

22      "Q. Okay.  Now, let me ask you this.  Does Benchmark Custom

23      Builders -- I forgot the name of the guy who owns this.

24      What's the guy's name?

25      A. I have no idea who you're talking about.  Who's Benchmark

1    Custom Builders?

2    Q.  You tell me, you included it in your --

3    A.  Oh, that's the guy --

4        MR. THIBODEAUX:  Is that what you're referring to?

5        THE WITNESS:  Yeah, that's the guy in Florida.

6        MR. THIBODEAUX:  That's Exhibit B.

7        THE WITNESS:  Yeah.

8    BY MR. SEEGER:

9    Q.  Do you know who he is?

10   A.  My understanding is that guy did an estimate

11   simultaneously with mine.

12   Q.  Who hired him?

13   A.  I don't know.  Somebody on our side, I guess.

14   Q.  How did he wind up in your expert report?

15   A.  I just put it in there as a pure comparison to mine in

16   scope and magnitude.

17   Q.  Did you have any conversations with this guy?

18   A.  Nope.  In fact, I didn't even know he did the report until

19   after I finished mine.

20   Q.  And then why did you see it necessary to include it?

21   A.  Well, I just said I put it in there as a matter of

22   reference just to substantiate and compare it to what I did.

23       And coincidentally, the order of magnitude of his

24   renovation is very close to mine.

25   Q.  We're going to talk about that in a second.

1      A.  Okay.

2      Q.  I mean, can you answer questions about where he got his

3      prices from?

4      A.  No, because I never talked to him.  I did a cursory review

5      only of his report.  I just looked at the bottom line.

6      Q.  But my question to you is, before you included this man's

7      pricing in your sworn declaration here, did you think you

8      should talk to him and ask him a little bit about his numbers,

9      or no?

10     A.  What sworn declaration?

11     Q.  Well, this report.  You signed it.

12     A.  Okay.

13     Q.  And your word is good, I take it?

14     A.  Of course.

15     Q.  Okay.  So, did you make an effort to contact him?

16     A.  No.  It was my --"

17     (WHEREUPON, THE VIDEO CLIP WAS CONCLUDED.)

18  BY MR. SEEGER:

19  Q.  That was your testimony just one week ago from today, right?

20  A.  Yes.

21  Q.  Mr. Carubba, let me ask you this.  Can we see Hernandez 393.

22  What's that document, do you recognize it?  It's your report,

23  right?

24  A.  Yes.

25  Q.  Let's go to your report on page 2.  And, Scott, if you could

1    pull up, actually this is the paragraph right here I would like to

2    have nice and large so the witness can see it (INDICATING).

3              This is from your report and the date of your report is

4    March 2nd, 2010, right, Mr. Carubba?

5    A.  Yes.

6    Q.  You signed this report?

7    A.  Yes.

8    Q.  You read it?

9    A.  Yes.

10   Q.  You stand by it?

11   A.  Yes.

12   Q.  In your report you say you reviewed the costs of repair and

13   discussion regarding the cost of repair with Alex Locay, Benchmark

14   Custom Builders, another experienced general contractor who has

15   experience in repairing Chinese drywall houses in Florida and who

16   reviewed, who reviewed my scope of work and assumptions and further

17   validated those amounts based upon his experiences and accepted

18   pricing guidelines and provided me with a comparable cost estimate.

19   Now, that was what you wrote in your report on March 2nd, right?

20   A.  Yes.

21   Q.  So we have three versions now and I want to ask you to tell us

22   what the final version is.  Version 1, you never spoke to him when

23   you did your report; Version 2 is what you said in the deposition,

24   that you never spoke to him at the time of the report -- I'm sorry,

25   Version 2 is what's in your report; and Version 3 is what you're

1    telling us now today.  So which one do you want to pick?

2    A.  Mr. Locay was on a conference call on February 26th --

3    Q.  My question to you is which of those three, it's in your report

4    on March 2nd you spoke to him --

5            MR. HAYDEN:  Objection, argumentative.

6            THE COURT:  He is under cross, I overrule the objection,

7    go ahead.

8    BY MR. SEEGER:

9    Q.  I am going to make my question really clear because this is

10   important.  You agree it's important what we're doing here today,

11   right?

12   A.  Of course.

13   Q.  You have to be honest, you know that, right?

14   A.  Of course.

15   Q.  So Version 1:  It's in your report on March 2nd that you spoke

16   to him.

17   A.  Yes.

18   Q.  Version 2:  Your deposition says I never spoke to him.

19   Version 3 is:  Yes, I spoke to him, the lawyers reminded me.  Which

20   one?  Please pick one.

21   A.  I spoke to Mr. Locay on our conference call on February 26th at

22   my office.  At the time of my deposition unfortunately I didn't

23   recall that he was on that conference call, and unfortunately in

24   the riggers of getting our work done on the pace we had to work

25   under -- and I think I even stated to you, with all due respect, in

```
 1   my deposition that my short-term memory is not good.
 2   Q.  We just --
 3   A.  No --
 4   Q.  How about your long-term memory, is that good?
 5   A.  I do the best I can.
 6   Q.  Mr. Carubba --
 7   A.  And at no point did I intentionally with any malice
 8   aforethought or any intention to deceive say anything intentionally
 9   that wasn't accurate.  The truth of the matter is I did speak to
10   Mr. Locay, I didn't recall it at the time of my deposition, I am
11   very sorry for that.
12        As I sit here today, my version is I spoke to Mr. Locay,
13   he did produce his estimate simultaneous with mine, I did not rely
14   on it, simply put it in as a means of validation and confirmation
15   of my scope and magnitude.
16        And, yes, I had subsequent conversations with the
17   attorneys in the case --
18   Q.  And they reminded you?
19   A.  They did.
20   Q.  Okay.  Now, Mr. Carubba, when I asked you the questions and I
21   played it for everybody -- and this is my last question on this
22   point, I am not going to beat it -- I asked you the question about
23   your conversations with Mr. Locay six different times in six
24   different ways that day; is that fair, do you agree with that?
25   A.  Certainly.
```

1  Q.  So here is my next question:  You described the Hernandez home

2  is mediocre and then what they have right now is not great.  That

3  was your testimony earlier, right?

4  A.  Yes.

5  Q.  What they have right now is the home with Chinese drywall and

6  wires corroding; is that right?

7  A.  It certainly has Chinese drywall in it, yes.

8  Q.  And you also made a comment before about your way of estimating

9  has kept you out of trouble.  It hasn't kept you from being sued a

10  lot though, right, Mr. Carubba?

11  A.  Yes.

12  Q.  You've been sued a lot?

13  A.  If you say so.

14  Q.  You've been sued a lot.  How many times do you think you've

15  been sued?

16  A.  I think we discussed it in my deposition, and my recall is not

17  that good, but let's say 20 --

18  Q.  Twenty times?

19  A.  -- in that many years.

20  Q.  You're being sued currently, right, aren't you involved in a

21  lawsuit right now involving a company called Jay's Body Shop versus

22  you?

23  A.  Yes.

24  Q.  What did they say you did wrong there?

25  A.  We designed the foundation for a body shop in Kenner and the

1  owner had some hairline cracks, and unfortunately he's asserting

2  that those cracks are the result of some structural deficiencies in

3  the design.

4  Q.  Right.  Okay.  You have a number of lawsuits like that,

5  especially involving foundations, right?

6  A.  Yes.

7  Q.  And, Mr. Carubba, I also asked you at your deposition if you

8  had any citations or problems regarding dishonest business

9  practices or your ethics, do you recall me asking you about that?

10  A.  I don't recall the exact words you used.  If you used dishonest

11  and ethics, I guess I have to trust that you said it.  I believe

12  you.

13  Q.  And you cited to me four times where you had been cited for or

14  at least taken up -- I'll talk to one where you actually said you

15  did it -- but at least four times where you've been cited for

16  dishonest and unethical conduct, right?

17  A.  I don't know that I'd use the word dishonest.

18  Q.  Would you like me to find the deposition?

19  A.  You can.

20  Q.  Scott, pull up from the transcript, you don't have to pull up

21  the video, page 129, line 4 through 23.

22          MR. HAYDEN:  What page again?

23          MR. SEEGER:  Page 129, lines 4 through 23.

24  BY MR. SEEGER:

25  Q.  I'm sorry, do you have the question before that?  I thought I

```
 1   had it.  All right.  Skip it.  If you can find -- Jeff, if you can
 2   find that cite and put it up.
 3          So here is my question I'm going to do.  You testified in
 4   one of those instances where you pled guilty to being -- a
 5   dishonest business conduct or an ethical charge involved a claim in
 6   1998 you said, right, where somebody used your license; is that
 7   right?
 8   A.  Yes.
 9   Q.  Now, have you had an opportunity to talk to the lawyers and
10   think about that testimony a little bit before -- since the
11   deposition?
12   A.  No.
13   Q.  And you still stand by the fact that that was in 1998?
14   A.  To the best of my recollection.
15   Q.  Could I have the overhead projector.  Do you see your name up
16   there?
17   A.  Yes.
18   Q.  Hold on, let me get you the first page which has the date --
19   I'm sorry, at the top.  Do you see at the top it says July 2003?
20   A.  Yes.
21   Q.  And underneath that it says Roy Carubba, that's you, right?
22   A.  Yes.
23   Q.  "Allegation:  Allowing license to be used by unlicensed
24   contractor to perform work in an amount in excess of $50,000."  Do
25   you see that?
```

1    A.  Yes.

2    Q.  It says here you pled guilty and your settlement offer was

3    accepted.  Is that true?

4    A.  Yes.  That's not the same license that I was referring to in

5    1998.

6    Q.  Anything untrue about that?

7    A.  Hold on, it's not funny.  In 1998, the thing that I described

8    here in my deposition was for my engineering license.  In July of

9    2003, that's my contractor's license.

10   Q.  Oh, okay.

11   A.  They're different licenses.

12   Q.  Did you make that clear to me when I asked you about dishonest

13   or unethical conduct that you had, in fact -- so this is in

14   addition to the four you talked to me about in your deposition; is

15   that right?

16   A.  Well, I thought when you were asking me those questions you

17   were asking me about my engineering license.  I didn't know --

18   Q.  So you have four --

19   A.  I didn't know that you were specifically referring to my

20   contractor license.

21   Q.  You have four under your engineering license and this is in

22   addition, this is under your contract's license?

23   A.  Yes.

24   Q.  So this is five?

25   A.  Yes.

1    Q.  Thank you.  And you talked about, you talked about -- in your

2    testimony earlier you talked about your discussions with your

3    plumber, I'm sorry, his name is Fuselier?

4    A.  Fuselier.

5    Q.  And your testimony here in this court today was that the subs

6    tell you what needs to be replaced.  Right, the subs tell you what

7    needs to be replaced, that's your testimony, right?  With regard to

8    coils and wires -- I'm sorry, my question wasn't clear.  I am

9    talking about the plumber, Fuselier, and he does HVAC and plumbing,

10   right?

11   A.  Yes.

12   Q.  And your testimony in response to Mr. Hayden's question was

13   that the plumbers, the electricians, they tell you what needs to be

14   replaced in the house, isn't that your testimony?

15   A.  Yes.

16   Q.  Did you listen to Mr. Fuselier when he testified in that seat

17   yesterday?

18   A.  Yes.

19   Q.  You're aware of what he said about the HVAC coils?

20   A.  In general, yes.

21   Q.  In general, are you aware of the fact --

22   A.  Are you going to ask me specific questions I am going to ask

23   you to recall whatever it is you're going to ask me so I can speak

24   specifically to it.

25   Q.  That's fair.

1    A.  Okay.

2    Q.  Okay.  So I am going to ask you a specific question.  Did you

3    hear him when he said that when he went to replace -- he was going

4    to give you a price on the HVAC coils, you told him not to replace

5    the coils.  Was he lying or are you off about that?  I just want to

6    know who told who that the coils don't get replaced?

7    A.  My recollection was that he came to me and said that the coils

8    had recently been replaced and that we weren't going to replace

9    them.

10          Of course the conversation between a sub and a general

11   is, Bruce isn't going to say as a sub that he told me to replace

12   them.  He defers the final decision to me.  Now maybe his wording

13   wasn't as eloquent as it could have been, but the way the

14   communication would have happened, he would have come to me and

15   said, look, I think these coils need to be replaced and then I as a

16   general would say, okay, go ahead and replacement.

17          So in that light, yes, I told him to replace them or not

18   replace them because the decision falls with the general

19   contractor.

20   Q.  Let's take a look at this testimony, okay, Mr. Carubba?

21   A.  Sure.

22   Q.  He was asked by Mr. Herman:

23       "Q. With the coils, first you were told that you were going to

24       replace the coils, right, with the new coils?

25       A.  Well, what I was told when I came in -- and again, I had

1      no briefing before we came to this house, so it's not like we

2      had a bunch of meetings talking about it.

3      Q.  Okay.

4      A.  I immediately went in, and the talk in the house was

5      air-condition coils have be replaced.

6      Q.  Okay."  Said Mr. Herman.

7      "A.  It wasn't until after that I found out those had been

8      replaced.

9      Q.  All right.

10     A.  But then he also said that on this house, because of

11     whatever coils they put in there, they didn't even want me to

12     take them out, clean them, and put them back in.  They wanted

13     me to just leave it like it was."

14         So Mr. Herman says:

15     "Q.  First, you were going to replace them."

16         Then -- whatever, I am going to skip a little bit.  And

17     he says:

18     Q.  You didn't make any of those decisions -- here is the

19     important part where Mr. Herman says to Mr. Fuselier:

20     "Q.  You didn't make any of those decisions, correct?

21     A.  No.  I was told that at different times that, no, this is

22     not what we are doing.  I don't know who was making them.  I

23     don't know where it was coming from.  I just tried to adjust

24     my prices verbally as we went.

25     Q.  For you, those instructions came from Mr. Carubba; right?

```
 1        A.  Oh, I'm sorry.  Yes, sir.  Yes, sir.  I apologize."
 2   BY MR. SEEGER:
 3   Q.  Does that refresh your recollection about the discussion you
 4   had with Mr. Fuselier about the HVAC coils?
 5   A.  Yes.
 6   Q.  Now, when I deposed you I asked you if you had reviewed any of
 7   the defendant's expert reports.  Do you remember the answer you
 8   gave me one week ago?
 9   A.  I don't.  I'm sure you're going to refresh me.
10   Q.  I am.  The answer was, no, I didn't review any of the expert
11   reports.  And what did you say today in response to Mr. Hayden
12   questions in front of the judge about reviewing expert reports at
13   the time you did your report?
14   A.  Beyler and Perricone.
15   Q.  And who reminded you of those since last Thursday?
16   A.  I don't recall.
17   Q.  And you also during your deposition testified that the scope of
18   the work that you were told to do came from the lawyers.  Is that
19   still your testimony today or are you going to change that?
20   A.  I am going to stay with that.
21   Q.  You're going to stay with that, okay.  Save me some questions.
22        Now, you also testified today that you saw no evidence of
23   pitting or corrosion at the house, do you remember that?
24   A.  Yes.
25   Q.  Can I see Hernandez 532.  How many times have you been to the
```

1   Hernandez house, Mr. Carubba, once, right?

2   A.  Yes.

3   Q.  Okay.  In that one time you went did you notice that?

4   A.  I don't recall seeing that.

5   Q.  Did you look in the bathrooms?

6   A.  I did.

7   Q.  Did you look at the fixtures around the sink and things like

8   that?

9   A.  I did.

10  Q.  So you didn't see that when you walked through the house,

11  right?

12  A.  No.

13  Q.  Okay.  Well, let me ask you this.  How about Hernandez 534.

14  Did you turn any doorknobs when you were in the house?

15  A.  I did.

16  Q.  Did you notice that corrosion and pitting?

17  A.  I did not.

18  Q.  Okay.  How about Hernandez 218.  Did you look at any pictures

19  that were sitting around, sort of open and obvious for everyone to

20  look at when you walked through the house?

21  A.  I didn't.

22  Q.  So you didn't notice that picture frame right there and the

23  corrosion on that as well, did you?

24  A.  No.

25  Q.  Okay.  Now, just a few questions on your pricing.  There's been

```
 1    a lot of testimony on this already.  There's two standardized

 2    guidelines for pricing construction jobs, one is RSMeans, right,

 3    you agree?

 4    A.  No.

 5    Q.  You don't agree that that's a standardized guideline?

 6    A.  I think Means is a standardized reference material.

 7    Q.  Standardized reference material.  And the other standardized

 8    reference material is Xactimate, you've heard of that, right?

 9    A.  Yes.

10    Q.  And RSMeans is a national guide, isn't it, it covers all areas

11    of the country?

12    A.  Yes.

13    Q.  It even makes adjustments for places like Louisiana where the

14    prices might be a little different because that's what they do,

15    right?

16    A.  Yes.

17    Q.  And Xactimate, that's widely used by most insurance companies,

18    fair enough?

19    A.  Yes.

20    Q.  And that also makes adjustments based on local customs and

21    practices, doesn't it?

22    A.  Yes.

23    Q.  But the Roy Carubba method isn't to follow either one of those

24    guidelines, is it?

25    A.  It's not the Roy Carubba method, it is a tried and true method
```

1   in construction that when one has to provide a price because we

2   hire subcontractors, it is usual and customary for us to consult

3   with those subcontractors during our pricing and not relegate it to

4   a computer program that may or may not be current in its updates.

5   Q.  Let me just --

6   A.  So it's not a process that I invented, it's something that

7   contractors use.  And as I stated earlier in my deposition, I don't

8   know of any general contractor that estimates with Xactimate.  Now

9   maybe some of them use RSMeans because RSMeans is a more

10  appropriate means and methods of estimates.  But at the end of the

11  day, it certainly is a more prudent way of estimating in my opinion

12  to just pick up the phone and call suppliers and subs to get real

13  world realtime prices.

14  Q.  Right.  But at the end of the day we've got, you're in a

15  courtroom testifying to a judge about these people's homes and

16  we're trying to find a price for what the proper price should be

17  for fixing their house.  And you've got two standard methods,

18  they're also indisputable, you have RSMeans and Xactimate, and you

19  chose the Roy Carubba method.  And by the way, which one is

20  cheaper?

21  A.  Mine is more accurate in my opinion.

22  Q.  Which one is cheaper?

23  A.  Xactimate or RSMeans, which one are you asking?

24  Q.  Who gave the cheapest prices here between you --

25  A.  I did.

1   Q.  Mr. Mallet testified, and I don't have to repeat his testimony,

2   he said he used Xactimate.  Whose price is cheaper here?

3   A.  Mine.

4   Q.  Now, by the way, this RSMeans guideline, it gets updated every

5   year, doesn't it?

6   A.  I think it's actually more than annually, I believe they may

7   update it quarterly, I am not sure.

8   Q.  And it's actually online if you don't want to put the books in

9   your office, you can go online and check these prices, can't you?

10  A.  I would certainly think so, yes.

11  Q.  But you don't even have that, do you, because when you needed a

12  painting price you had to make some phone calls to a friend to get

13  the RSMeans quote, you didn't even check if yourself, did you?

14  A.  Well, Mr. Seeger --

15  Q.  It's an easy question.

16  A.  It is.  There is no reason for me to do that because I believe

17  it's more reliable and I stand behind the method that I used to

18  estimate the cost of renovating this home.  It's more accurate in

19  my opinion to call a subcontractor and get a real price than to

20  relegate it to a reference book.

21  Q.  Let's focus on painting.  You didn't do that.  You called

22  somebody to give you the RSMeans price for the painting number,

23  didn't you?

24  A.  Yes.

25  Q.  You didn't even take the book yourself, open it up, find the

1  painting column, and come up with a price, you called somebody?

2  A.  Yes.

3  Q.  And you actually -- I asked you this question also in your

4  deposition.  You have an expectation of doing a lot of remediation

5  work for KPT in this case, don't you?  I mean, not just the

6  Hernandez house, you're hoping to get other work in this, aren't

7  you?

8  A.  I would have to defer back to my deposition because I don't

9  remember what I answered.

10       MR. SEEGER:  Okay.  Can you put up page 73, line 21,

11  Scott, through 74, line 3.

12     (WHEREUPON, A VIDEO CLIP WAS PLAYED.)

13     "Q.  What were you told to do?

14     A.  I was asked to come up with a construction cost estimate

15     to renovate the homes that were constructed with KPT, Chinese

16     drywall.

17     Q.  Were you told it was going to be potentially more than one

18     home, many homes?

19     A.  Yes.  And yes."

20     (WHEREUPON, THE VIDEO CLIP WAS CONCLUDED.)

21  BY MR. SEEGER:

22  Q.  Does that refresh your recollection?

23  A.  Yes.

24  Q.  Now, let's spend a little bit more time on pricing and I'm

25  almost done.  I want to talk about how you got some of these prices

1  so low.

2          So when I deposed you, we had your report and we had

3  Exhibit B to your report.  Which at the time is what we were

4  thinking was your cost estimate, correct?

5  A.  Yes.

6  Q.  So can we go to Hernandez 393 and go to Exhibit B, Scott.  Yes,

7  yeah, I'm sorry, Exhibit B.  That's page 0008.

8          And that's what we had on March 2nd, this is the scope of

9  everything you gave us, right?

10  A.  Yes.

11  Q.  And then after your deposition a couple of days ago you updated

12  that, right, we got DX 237.  Is it possible to show that

13  side-by-side?

14          So let's find electric on the original Exhibit B, the

15  first one attached to your report, down toward the bottom.  And

16  that's your price of $2,200, right, that's the price you had in

17  there?

18  A.  Yes.

19  Q.  And then sometime around your deposition, I can't remember if

20  it was before or after, Mr. Hartenstein was deposed by Mr. Herman,

21  right?

22  A.  I assume so, I didn't keep up with his schedule with the

23  attorneys.

24  Q.  And Mr. Hartenstein's deposition testimony, as well as his

25  trial testimony was, he didn't send you a bid for $2,200, he sent

1  you a bid for $3,400, right?

2  A.  That's correct.

3  Q.  Do you want to explain how the wrong number got put in there?

4  A.  It was just a simple error in producing the report.

5  Q.  Okay.  Now, let's talk a little bit about that electrical

6  price.  So now the number is $3,400, that's the new number, you

7  stand by that one, right?

8  A.  It was always 3,400 for Mark, I just inputted it incorrectly in

9  my initial estimate.

10  Q.  Okay.  So for $3,400, the scope of Mr. Hartenstein's work is to

11  replace 139 outlets and switches in their home, right?  Clean the

12  corrosion off the ground wires, take out the old, and put in 139

13  outlets and switches throughout the home, that's the price, right?

14  A.  I would have to certainly look at his estimate, I believe you

15  if you tell me that's what it is.

16  Q.  You have your report in front of you, if you would like to

17  satisfy yourself there's 139 outlets and switches.

18  A.  I don't know that my report has his renovation estimate.  I

19  certainly --

20  Q.  Mr. Carubba, I'll represent to you and make it easy, it's 139

21  outlets and switches.

22  A.  Okay.

23  Q.  Here is my question.  $3,400 to replace 139 outlets and

24  switches and yet Mr. Hartenstein had to go to the property to

25  harvest some samples for the lawyers to look at, right?

1   A.  Yes.

2   Q.  And he harvested, what did he harvest, let's take a look, ten

3   switches and eight receptacles.  Do you dispute that?

4   A.  No.

5   Q.  Ten switches, eight receptacles, so 18.  And he took a smoke

6   detector and he took a circuit breaker.  Okay.  Any dispute about

7   that?

8   A.  No.

9   Q.  And he sent you a bill for that too, didn't he?

10  A.  Yes.

11  Q.  Because this bill says it went to you.  Can we have Hernandez

12  540, please.  Sorry Scott, I don't mean to make you jump around.

13          So for the pricing of harvesting 18 outlets and switches,

14  one smoke detector -- which is popping it off and taking it down --

15  and a circuit breaker, he sends a price for $1,144, that's his

16  bill, isn't it?

17  A.  Yes.

18  Q.  So he is going to, for $3,400 he is going to replace 139

19  switches and outlets, right?

20  A.  Yes.  You're comparing apples to oranges.  Well, because

21  Mr. Hartenstein when he made the initial visit to the Hernandez's

22  home, once again, very similarly to what we did at the town home,

23  there were attorneys present and people, he couldn't efficiently do

24  his work.

25  Q.  I understand.  I understand.

1    A.  I'm hoping you do because it's not a fair comparison to use

2    that number and try to extrapolate it into a hard bid number where

3    he can get in without resistance, get there early in the morning so

4    that travel cost is spread over eight work hours, not two, and it

5    dramatically increases the efficiency.  So it's not a fair

6    comparison.

7    Q.  Did you sit in the courtroom when Mr. Hartenstein also

8    testified and he was critical somewhat of the way the electric was

9    done in some of the electrical boxes in the Hernandez home, did you

10   hear him when he testified that if he is required to do it the

11   right way, that's going to be more than $3,400 as well.  Did you

12   hear that testimony?

13   A.  I did.  If he encounters such elements in the house, yes.

14   Q.  Which he saw in the box in one picture we showed him, he said

15   there is a problem with that, I would have to fix that.  Right?

16   A.  He also said if it was isolated he wouldn't charge anymore

17   money to do it.

18   Q.  Okay.  So let's go back to the split screen, if we can, of the

19   two estimates.  Now, you came up with a new line item on DX 237,

20   which was the exhibit you produced to us after your deposition, and

21   that was to install doors, right?

22   A.  Yes.

23   Q.  That wasn't even there on your original pricing, was it?

24   A.  That's correct.

25   Q.  The only reason it's there, let's be fair, is I asked you

1   questions about where is your price to install the doors and you

2   didn't have an answer at your deposition, right?

3   A.   That's correct.

4   Q.   Okay.  And the granite countertops, sitting here today you're

5   still not sure if you got that measurement right, are you?

6   A.   I know what the correct measurement is, it's still

7   misrepresented inadvertently on my estimate.

8   Q.   Would you like to start this all over again, do you want to

9   reprice this job?

10  A.   No.

11  Q.   Let me ask you this.  You testified that the granite

12  countertops need to be replaced.  We're in agreement on that,

13  right?

14  A.   Yes.

15  Q.   You testified that the reason for that is they're likely to

16  break, that's your testimony, right?

17  A.   Yes.

18  Q.   You testified that the wood trim and molding needs to be

19  replaced, right, because they're delicate and likely to break?

20  A.   Yes.

21  Q.   Yet you think you can save their cabinets, their kitchen

22  cabinets, right?

23  A.   Yes.

24  Q.   Now, you testified that the switches and receptacles should be

25  replaced in the house, right?

1    A.  Yes.

2    Q.  And that the smoke detector should be replaced in the house,

3    right?

4    A.  Yes.

5    Q.  Because they have corroded electrical components, right?

6    A.  Yes.

7    Q.  Yet you think it's okay to leave, take the right fixtures and

8    put those back in the house, don't you?

9    A.  Yes.

10   Q.  Now let's talk about the demolition a little bit.  You heard

11   Mr. Bailey testify who had been qualified as an expert like you, in

12   this court, that the normal and customary method for ripping out

13   drywall is to break holes with a hammer and rip it off the wall,

14   and you disagree with him, right?

15   A.  Yes.

16   Q.  And you heard the Beazer guy testify, Mr. Phillips, that that's

17   the way Beazer does it and you disagree with him as well, right?

18   A.  Yes.

19   Q.  And the Beazer company is a really big construction company,

20   aren't they?

21   A.  If you say so.  I am not familiar with their firm.

22   Q.  So you did this demo job on another home, it's not on the

23   Hernandez's home, you did a demo job where you demoed one room,

24   right?

25   A.  Yes.

1   Q.  Using the method that you showed to this court in your direct

2   testimony, right, of cutting the drywall, right?

3   A.  Yes.

4   Q.  How long did it take to remove the drywall?

5   A.  A day.

6   Q.  A day.  Well, in your deposition testimony you said a day and a

7   half, so which is it?

8   A.  Okay.

9   Q.  Which is it?

10  A.  A day and a half.

11  Q.  Thank you.  How long did it take to clean?

12  A.  We were there a total of two days so by mathematics a half day

13  to clean it.

14  Q.  One room?

15  A.  One room.

16  Q.  Did you hear Mr. Phillips from Beazer testify that it takes a

17  half a day to remove the drywall in a house?  Did you hear that?

18  A.  I'm sure I heard it, I don't recall it as I sit here today.

19  Q.  Now, how much did Mr. Jimenez, that's who you testified did the

20  demo work in the demo house, how much did he charge would you for

21  the two days?

22  A.  I would have to have his bill.

23  Q.  Can he have Hernandez 649.

24  A.  I think maybe a couple of thousand dollars, something like that

25  in that order of magnitude.

1   Q.  For two days work Mr. Jimenez charged you $2,035 for a 200

2   square foot room, right?

3   A.  Yes.

4   Q.  Do you know what Mr. Mallet's price is for the entire house?

5   A.  $15,000, something like that.

6   Q.  Twelve, $13,000?

7   A.  Okay.

8   Q.  So if you extrapolate 2,000 to -- I'm sorry, if you extrapolate

9   $2,000 to demo a 200 square foot room to a 2,000 square foot house,

10  looks like Mr. Mallet got the price right there as well, doesn't

11  it?

12  A.  It's not a fair comparison.  Because as I stated earlier in my

13  testimony, there were many people in that room and the exercise was

14  simply for dust control and not for the efficiency of construction.

15  Q.  Last question --

16  A.  So although your analysis is, I believe to be oversimplified, I

17  stand by the 6,300 that we have in our estimate for the reasons I

18  described herein.

19  Q.  Okay.  Last question.  Removing the dust after the demo.  It's

20  your testimony that you can use a vacuum, a shop vac vacuum,

21  correct?

22  A.  Yes.

23  Q.  In those reports, now you're saying today to the court that you

24  read Mr. -- Dr. Perricone's report, that's your new testimony,

25  right, that you read his report?

1  A.  Yes.

2  Q.  Did you see what Dr. Perricone and Dr. Lee recommend to clean

3  the dust in the house?  What did they recommend?

4  A.  I would have to ask you to show it to me, which I'm sure you

5  would be happy to do if I don't recall it.

6  Q.  How about a HEPA vac?

7  A.  Okay.

8  Q.  So you're disregarding their advice on this as well, correct?

9  A.  Well, your words are strong.  I would make my own decision, and

10  my experience the shop vac is adequate to remove the dust.  I

11  believe Dr. Lee said in his testimony that you could use a shop

12  vac, it would just take more passes than a HEPA vac.

13          MR. SEEGER:  That's what he said in his testimony in the

14  court.  Thank you very much.

15          Oh, your Honor, can I offer in Hernandez 532 and 218?

16  Are you guys okay with that?

17          MR. HAYDEN:  Yes, that's fine.

18          THE COURT:  Let them be admitted.

19                         REDIRECT EXAMINATION

20  BY MR. HAYDEN:

21  Q.  Mr. Carubba, I just want to clear up a few things.  First with

22  regard to Mr. Hartenstein, you saw an invoice for work that he did

23  at the Hernandez house that counsel just put up on the screen --

24  A.  Yes.

25  Q.  -- do you recall that?  And that had to do with harvesting of

1  switches and outlets?

2  A.  Yes.

3  Q.  It was for both the Hernandez house and the townhouse, correct?

4  A.  I would have to look at the invoice and see if he specified it;

5  but if you tell me that that's what it is, I believe you.

6  Q.  So it was actually two properties and it was the harvesting of

7  evidence for the lawyers, right?

8  A.  Yes.

9  Q.  And that's not -- would they follow the same protocol as they

10  would when they were removing the switches and receptacles in a

11  scope of work protocol that you're suggesting?

12  A.  No.

13  Q.  And when they were doing it they had several lawyers breathing

14  down their backs, didn't they, you were there?

15  A.  Yes.

16  Q.  And actually the harvesting of the switches and receptacles --

17          MR. SEEGER:  Your Honor, can we just stop the leading?

18          MR. HAYDEN:  That's fine.

19          THE COURT:  Sustain the objection.

20  BY MR. HAYDEN:

21  Q.  Did they do anything else that day?  Was that the same day as

22  the inspection?

23  A.  Mr. Hartenstein is an electrician and he has a means and method

24  of doing his work, the purpose of doing this work was to facilitate

25  the processes of this legal matter.  So he didn't operate, he and

1   his crew, with the normal efficiency that they would do, he had to

2   start and stop his work, just like the drywall people did when he

3   took the drywall out of the townhouse.

4          So comparing his bill to what he would do in a hard bid

5   construction job where he has the time and not the restrictions of

6   this being a legal matter but a pure construction project, his

7   efficiency is going to go way up.

8   Q.  How many people were in that Hernandez house that day?

9   A.  I mean, I had my people there and there were several attorneys

10  on both sides of this case, a lot.  And the attorneys were

11  following everybody around.  So there's no way that Mark or Bruce

12  or Ismael in the demolition of the drywall could operate in a

13  normal means and methods manner of doing construction.  It's

14  impossible.

15         That wasn't the purpose in doing all of this.  The

16  purpose was to provide information for this legal matter.

17  Q.  Now, sir, let's go back to these claims of complaints that

18  opposing counsel referenced at the beginning of his

19  cross-examination.  Could you tell, could you explain to the court,

20  those were complaints to what body?

21  A.  I have an engineer's license and a contractor's license.  Okay.

22  Mr. Seeger brought up a complaint in 2003 from my contracting

23  license, and I got -- I did a job in Baton Rouge and I was out of

24  town and I had my bookkeeper cut a check.  And in her ignorance,

25  she cut it to a subcontractor instead of -- she didn't follow the

1    proper procedure.

2         There are certain ways you have to pay people, and it was

3    just a simple error and coincidentally somebody complained to the

4    board and I was guilty of that error.  But it was just --

5    Mr. Seeger used words like dishonest and unethical.  And in a black

6    and white world, it could certainly be construed that way.  But the

7    truth of it is, it was a battlefield mistake.

8    Q.  And it was to a board?

9    A.  It was to the contracting board, which is different from my

10   engineering board.

11        Now, I thought when Mr. Seeger was asking me those

12   questions he was asking me specifically about my engineering

13   license.  At no time did I attempt to deceive or conceal what he

14   brought up today.

15   Q.  And let's talk about with regard to your contracting license --

16   or that was with regard to your contracting license?

17   A.  Yes.

18   Q.  Okay.  And then he raised some issues with complaints with

19   regard to your engineering license.  Do you recall that?

20   A.  Yes.

21   Q.  Why don't you walk through for the court what we're really

22   talking about here.

23   A.  Your Honor, I've been involved in thousands of projects, and we

24   live unfortunately in a very litigious society.  I can't control

25   when people want to sue my company.  Now, there are several --

1 there were several instances where it was my responsibility and

2 they became legal matters, and I addressed them and stood up for

3 them and fixed those problems.

4 Q.  Let's explain them.  Why don't you walk through each one of

5 those.

6 A.  The first one was shortly after I started my practice in the

7 early '90s, I did a set of house plans for somebody and I neglected

8 to affix my company logo on the drawing, just ignorance, I was a

9 new business owner and I just neglected to do that one detail.  So

10 I got reported to the engineering board.  They fined me $50 and

11 made me take an ethics exam.

12 Q.  How much?

13 A.  It was some nominal amount of money.

14    The second complaint came shortly thereafter.  I did a

15 set of plans for a gentleman and his driveway cracked.  Well, they

16 said it was my fault.  Come to find out this guy was unloading

17 engines --

18    MR. SEEGER:  Objection.  Foundation for what this guy was

19 doing or anybody was doing.

20    THE WITNESS:  Well, I do remember.  This guy was --

21    MR. SEEGER:  I have to address it to the judge, sorry.

22    THE COURT:  The question is how does he know, so he is

23 objecting.

24    THE WITNESS:  I'm sorry, did I say something wrong?

25 BY MR. HAYDEN:

1    Q.  How do you know that?

2    A.  How do I know what?

3    Q.  About what you were about to say?

4    A.  I remember the guy lodged a complaint because his driveway

5    cracked, and I rode by his house to go look at it and there he was

6    unloading engines with a dual axle truck.  Come to find out, he was

7    unloading engines and that heavy axled vehicle is what cracked his

8    driveway.  So it wasn't my fault.  However in the world we live in

9    people are able to lodge complaints and he lodged a complaint.

10   That was in the early '90s right after I started my practice.

11   Q.  Did you pay a fine there?

12   A.  I don't remember paying anything for that one.

13           The third one was in 1998 where one of my employees was

14   using my stamp behind my back.  He was, in my ignorance again being

15   a young business owner, I didn't lock my stamp up and he was using

16   it behind my back.  And long story short, this particular homeowner

17   had a problem with his house.  So I went out to look at it because

18   he called my office requesting that I come look at his foundation.

19   Well, the foundation was in Pass Christian, Mississippi and it had

20   a Louisiana stamp on my foundation drawing.  Well, I'm sorry, I

21   wouldn't have stamped something in Mississippi with a Louisiana

22   stamp.

23           So upon further investigation I found out that this

24   person in my office was stamping -- he was drawing plans for people

25   and using my stamp.

1          So long story short, the board got wind of it because I

2    went to the home owner and I told him the truth, and I said Mr. --

3    I don't remember his name -- that's not my work, he reported me for

4    being honest to him.  And that's a very egregious thing in our

5    business to not have supervision over your stamp.  So I guess in

6    hindsight I should have kept it under lock and key, it's not my

7    nature to do that, but that's the way in practiced in 1998.

8          So I got fined $5,000 for that offense because I was

9    honest and told the truth.  They published it in the periodical

10   magazine, our monthly publication, and that was that.

11         Now, the last one was a guy in Baton Rouge where I

12   designed a bulkhead for him to lower his boat in the water.  And he

13   was not happy with what I did so he reported me to the board.

14   Nothing came of it, but I still got reported to the --

15         Can I tell you something?  I don't know how you exist in

16   business and not have people -- you can't make everybody happy.

17   But at no time in my practice have I ever endeavored, to use

18   Mr. Seeger's words, dishonest or unethical behavior, never.  I get

19   up every day and try to do the right thing.  Unfortunately the

20   world we live in people sue and they can make gray items appear

21   black and white, which is why we're all in this room today.

22   Q.  Is that the extent of the complaints that you recall to the

23   board?

24   A.  To my recollection, yes.

25   Q.  And that's after -- that's the extent of your complaints over

1   how many years have you been in business?

2   A.  Tomorrow makes 17 years, 6 years prior for other employers.

3   Q.  And I believe you testified, how many different properties have

4   you been involved with?

5   A.  Over 5,000.

6   Q.  So you're familiar with folks working in the parish of

7   St. Tammany?

8   A.  Yes.

9   Q.  And the contractors who work there and the engineers?

10  A.  Some, yes.

11  Q.  Have you ever heard of Mr. Mallet or --

12  A.  Mallet.

13          MR. SEEGER:  Objection, your Honor.

14  BY MR. HAYDEN:

15  Q.  -- working in the parish of St. Tammany?

16  A.  No.

17  Q.  Ever hear of Mr. Hicks ever working in the parish of

18  St. Tammany?

19  A.  No.

20          MR. HAYDEN:  I think that's all I have.

21          THE COURT:  All right.  Thank you, you're excused, sir.

22          MR. HERMAN:  Your Honor, before we recess, I wanted to

23  clear up a few things with the exhibits.

24          I've spoken to defense counsel and they have no objection

25  to the admission of Hernandez 483 and Hernandez 484, which were

1    from Mr. Fuselier's testimony yesterday.  Also there are two ASTM

2    standards to which there are no objection on the spreadsheet, which

3    are Hernandez Exhibits 128 and 129.  We would like to offer, file

4    and introduce them.

5          MR. SANDERS:  I don't remember how they were used, but.

6          THE COURT:  I'll admit them.

7          MR. HERMAN:  Hernandez 452, your Honor may recall is the

8    Crawford TIP inspection report.  There is an objection to it on

9    their spreadsheet, but your Honor may recall that when we went to

10   the visual inspection of the Hernandez home that was provided to

11   the court, and I don't think defense counsel objected to it at the

12   time, and we just thought for completeness of the record that

13   should be admitted.

14         THE COURT:  Okay.  Any objection?

15         MR. SANDERS:  We object as it's not relevant, but if it

16   comes in it's not a problem.

17         THE COURT:  Right.  I'll admit it, I find it relevant.

18         MR. HERMAN:  Thank you, your Honor.

19         MR. SANDERS:  One thing for us from yesterday, is defense

20   Exhibit 213, which is the scope of work for the plumber.

21         MR. SEEGER:  We're okay.

22         THE DEFENDANT:  Let it be admitted.  Let's make sure we

23   have it.

24         MR. HAYDEN:  Your Honor, I believe these are the exhibits

25   for Mr. Carubba.  Could I check with the clerk, have we moved in

1     defendant's Exhibit 237 and 211.

2                THE DEPUTY CLERK:  No.

3                MR. HAYDEN:  237 is the revised cost estimate.

4                MR. SEEGER:  It's part of his report, your Honor, so it

5     wouldn't be admitted into evidence.

6                MR. HAYDEN:  The cost estimate was separate and apart,

7     and the scope of work which was an exhibit.

8                MR. SEEGER:  The division of Exhibit B is part of his

9     report so it wouldn't be moved into evidence, right?

10               MR. HAYDEN:  It's a cost estimate just like Mr. Mallet's

11    cost estimate.

12               MR. SEEGER:  They didn't move Mr. Mallet's report into

13    evidence.  You did?

14               MR. HAYDEN:  You also did the attachments.

15               THE DEPUTY CLERK:  What number is it?

16               MR. SEEGER:  We did, fine, I'm sorry, your Honor.

17               THE DEPUTY CLERK:  I thought you did.

18               MR. HAYDEN:  We're not actually moving the reports.

19               THE COURT:  Right, putting in the estimate.

20               THE DEPUTY CLERK:  211 and 237.

21               MR. HAYDEN:  Yes.

22               THE COURT:  Those are the attachments to the report.

23               Okay.  Both sides check with Gaylyn to make sure you have

24    the exhibits and then tomorrow, what time tomorrow?

25               THE DEPUTY CLERK:  9:30 tomorrow we'll hear from the last

1   witness, and then I'll hear closing arguments from the parties.

2            MR. SEEGER:  Thank you.

3            THE COURT:  The court will stand in recess.

4            THE DEPUTY CLERK:  Everyone rise.

5         (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

6

7

8                        *  *  *  *  *  *

9

10

11

12                     REPORTER'S CERTIFICATE

13

14     I, Karen A. Ibos, CCR, Official Court Reporter, United States

15   District Court, Eastern District of Louisiana, do hereby certify

16   that the foregoing is a true and correct transcript, to the best of

17   my ability and understanding, from the record of the proceedings in

18   the above-entitled and numbered matter.

19

20

21

22            Karen A. Ibos, CCR, RPR, CRR

23            Official Court Reporter

24

25