1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF LOUISIANA

3

4
     IN RE:   CHINESE MANUFACTURED DRYWALL      *
5              PRODUCTS LIABILITY LITIGATION    *
                                                *
6                                               *
     **THIS DOCUMENT RELATES TO:**              *   MDL No. 2047
7                                               *
     Tatum B. Hernandez, *et al*                *   Section L
8                                               *
          versus                                *   New Orleans, Louisiana
9                                               *
     Knauf Plasterboard (Tianjin) Co.,          *   March 19, 2010
10     Ltd., *et al*                            *
                                                *
11   Case No. 09-CV-6050                        *
                                                *
12   * * * * * * * * * * * * * * * * * * * *

13

14                    VOLUME V - MORNING SESSION
                      PROCEEDINGS BEFORE THE
15                    HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE
16

17
     <u>APPEARANCES</u>:
18

19   For Tatum and Charlene      Herman, Herman, Katz & Cotlar, LLP
     Hernandez:                  BY:   RUSS M. HERMAN, ESQ.
20                                     STEPHEN J. HERMAN, ESQ.
                                 820 O'Keefe Avenue
21                               New Orleans, Louisiana 70113

22
     For Tatum and Charlene      Gainsburgh Benjamin David
23   Hernandez:                    Meunier & Warshauer
                                 BY:   GERALD E. MEUNIER, ESQ.
24                                     MICHAEL J. ECUYER, ESQ.
                                 1100 Poydras Street, Suite 2800
25                               New Orleans, Louisiana 70163

1    APPEARANCES:

2

3    For Tatum and Charlene          Seeger Weiss
     Hernandez:                      BY:  CHRISTOPHER A. SEEGER, ESQ.
                                     One William Street
4                                    New York, New York 10004

5
     For Tatum and Charlene          Lewis & Roberts, PLLC
6    Hernandez:                      BY:  DANIEL K. BRYSON, ESQ.
                                     3700 Glenwood Avenue, Suite 410
7                                    Raleigh, North Carolina 27612

8
     For Knauf Plasterboard          Frilot, LLC
9    (Tianjin) Co., Ltd:             BY:  KERRY MILLER, ESQ.
                                          KYLE A. SPAULDING
10                                   1100 Poydras Street, Suite 3700
                                     New Orleans, Louisiana 70163
11

12   For Knauf Plasterboard          Baker & McKenzie, LLP
     (Tianjin) Co., Ltd.:            BY:  DONALD HAYDEN, ESQ.
13                                   1111 Brickell Avenue, Suite 1700
                                     Miami, Florida 33131
14

15   For Knauf Plasterboard          Baker & McKenzie, LLP
     (Tianjin) Co., Ltd.:            BY:  DOUGLAS B. SANDERS, ESQ.
16                                        KYLE P. OLSON, ESQ.
                                          ERIN M. MAUS, ESQ.
17                                   130 E. Randolph Drive
                                     Chicago, Illinois 60601
18

19   Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                     500 Poydras Street, Room HB-406
20                                   New Orleans, Louisiana 70130
                                     (504) 589-7778
21

22

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.


                              DAILY COPY

1                        **I N D E X**

2                                                      PAGE

3  Matthew J. Perricone

4        Voir Dire                              817

5        Direct Examination                     824

6        Cross-Examination                      884

7        Redirect Examination                   913

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAILY COPY

814

**MORNING SESSION**

**(March 19, 2010)**

THE DEPUTY CLERK:  Everyone rise.

THE COURT:  Be seated, please.  Good morning, ladies and gentlemen.

MR. SEEGER:  Your Honor, we have a motion this morning.

THE COURT:  All right.

MR. SEEGER:  The Court's pretty much aware of the issues involving Dr. Perricone.  Last night, we had an opportunity to depose him about his testimony today. Your Honor, we really have to move for his exclusion for a few reasons that we believe the Court will -- and we hope you will agree.

Here is the report, Your Honor, that was served by Dr. Perricone and Dr. Lee.  They were both on this report, so they didn't serve separate reports.  It's not like, you know, one guys does appliances and one guy does copper.  They are both on this report.  They're both signatories to the report.

Your Honor heard from Dr. Lee.  Dr. Lee gave the opinion to this Court that the plaintiffs are all washed up and the corrosion stops once the drywall is removed.  Dr. Perricone was asked this question in his deposition last night, putting aside the issue of whether he should have been reviewing the

DAILY COPY

1    transcripts and all that because he came in late.  I asked him:

2            "Question:  Have you reviewed Dr. Lee's testimony in

3        this case that he just gave I think it was yesterday?

4            "Answer:  Yes, I have.

5            "Question:  Did he get anything wrong in his answers

6        regarding the removal -- removing the source of the

7        corrosion and that the corrosion would not continue?

8            "Answer:  My reading of Dr. Lee's testimony is that

9        it was a fair assessment and accurate."

10           Judge, why do you need to hear that twice?  Is

11   that really fair to these people right here that they bring in

12   duplicate witnesses on the very same issue?

13           That's not the only thing:  Tarnishing doesn't

14   exist under the jacket on the copper wires.  Judge, you heard

15   that from Dr. Lee.  I crossed him on it.  This witness has now

16   had an opportunity to see my cross on those points.

17           I wish I could say I've got a brand-new cross

18   for Your Honor, but the cross-points are the cross-points.  I

19   could go after this witness' qualifications.  We don't think

20   he's really qualified.  Again, I've been in this situation in

21   personal injury cases where you have like a cardiologist and a

22   physiologist and they're talking about the heart condition from

23   different aspects, same opinions with different aspects.  This

24   is identical.  We have a chart, if Your Honor's interested in

25   it, comparing exactly the points that Dr. Lee made and you're

1    going to hear again today.

2            Your Honor, that's our motion.

3            **THE COURT:**  The issue is really not a *Daubert* issue.

4    The issue is a cumulative issue, whether or not the testimony

5    is cumulative, and I don't know whether it is cumulative until

6    I hear it.  Let's, both sides, be conscious of that.  I don't

7    want to have two witnesses, three witnesses saying the same

8    thing as the first witness.  So be conscious of that and deal

9    with it.

10           Oftentimes, witnesses look at things from

11   different vantage points and they look at the same issue from

12   different vantage points.  We see that oftentimes in medical

13   issues and things of that nature.  I don't want him to just

14   restate everything that the other witnesses said.

15           **MR. SEEGER:**  Thank you, Your Honor.

16           **THE COURT:**  Thank you.

17           Another thing.  Let me make a comment about the

18   opportunity to review the testimony.  The person that's being

19   called is an expert witness.  Expert witnesses are allowed by

20   the courts to sit in the courtroom while other expert witnesses

21   testify because they can give an opinion, unlike fact

22   witnesses.  So fact witnesses we excluded because fact

23   witnesses, we want them to tell us what they saw, what they

24   heard, what they observed, and not any opinion on any other

25   witnesses.  That is not the case with experts.

1            Experts are individuals who can only give

2  opinions.  Basically, they don't have eyewitness information,

3  so they are allowed to sit in on testimony.  So he could have

4  sat in on the testimony as opposed to reading it.  I don't see

5  any prejudice by the fact that it was taken a day later.

6            **MR. SEEGER:**  I 100 percent agree with that.  We do it

7  all the time.  The only reason I think in this case it's

8  different is because it's the exact same testimony.

9            **THE COURT:**  Sure.  Let's call the witness.

10            **MR. SANDERS:**  Dr. Perricone.

11            (WHEREUPON **Matthew J. Perricone**, having been duly

12  sworn, testified as follows.)

13            **THE DEPUTY CLERK:**  Please be seated.  Would you state

14  your name for the record.

15            **THE WITNESS:**  My name is Matthew J. Perricone.

16            **THE COURT:**  Dr. Perricone, you've heard what I said.

17  I'm interested in your opinions, not reinforcing anybody else's

18  opinions in the case.  Do you understand that, sir?

19            **THE WITNESS:**  Yes, Your Honor.

20            **THE COURT:**  You may proceed, Counsel.

21                          **VOIR DIRE**

22  BY MR. SANDERS:

23  **Q.**   Good morning, Dr. Perricone.

24  **A.**   Good morning.

25  **Q.**   Where do you live?

1    **A.**    I live in Pittsburgh, Pennsylvania.

2    **Q.**    Who are you currently employed with?

3    **A.**    I'm employed by RJ Lee Group.

4    **Q.**    What is RJ Lee Group?

5    **A.**    RJ Lee Group is a materials characterization and

6    consulting firm complete with a laboratory.

7    **Q.**    What is your educational background?

8    **A.**    I hold a bachelor's, master's, and PhD in materials

9    science and engineering from Lehigh University.

10   **Q.**    Did you have any particular focus when you were going

11   through and getting your master's and your PhD?

12   **A.**    My focus during that time was on controlling the corrosion

13   resistance of welds made on stainless steel alloys.

14   **Q.**    So what exactly were you looking at there or examining?

15   **A.**    In that material system, particularly interested in

16   controlling the distribution of alloying elements in stainless

17   steels that provide their corrosion resistance, looking

18   specifically at how to control how those alloying elements are

19   distributed when fusion welds are made.

20   **Q.**    While you were in school there, were you involved in any

21   other projects with respect to corrosion?

22   **A.**    I was involved in multiple projects and contributed in

23   some part to work that was being done in the high-temperature

24   corrosion of sulfur onto iron-based alloys in fossil-fired

25   boilers.

1    **Q.**    After you graduated, where did you go?

2    **A.**    After I graduated, I was hired by Sandia National

3    Laboratories in Albuquerque, New Mexico.

4    **Q.**    Is that the same Sandia Laboratories that's investigating

5    corrosion in this case on behalf of the CPSC?

6    **A.**    Yes, it's the same laboratory.

7    **Q.**    Were you a postdoc there, or did you have a full-time job?

8    **A.**    I was hired as a full-time employee.

9    **Q.**    What did you do at Sandia?

10    **A.**    At Sandia, I worked in the joining and coatings department

11    and the materials science and engineering center and continued

12    work on control of microstructure of stainless steel welds as

13    well as, obviously, numerous different projects over the course

14    of my time of employment.

15    **Q.**    With respect to corrosion, were you doing anything

16    relating to corrosion still?

17    **A.**    The extent of my research continued regarding the control

18    of distribution of alloying elements and the fusions of welds.

19    Yes, my work included that type of corrosion control.

20    **Q.**    How long were you at Sandia?

21    **A.**    A little bit shy of two years.

22    **Q.**    Where did you go after that?

23    **A.**    I was hired by RJ Lee Group in Pittsburgh -- actually,

24    Monroeville, Pennsylvania.

25    **Q.**    We've heard a lot about sort of some of the techniques

1  that a materials scientist or others use.  Are you familiar

2  with SEM and EDS and other sort of testing techniques?

3  **A.**   Yes, I am.

4  **Q.**   Just briefly, could you explain what those are.

5  **A.**   Sure.  SEM stands for scanning electron microscopy.  It's

6  a useful technique in order to look at materials at very high

7  magnifications.  EDS refers to energy dispersive spectroscopy,

8  which allows us to look at the chemistry, the local chemistry,

9  in those locations at high magnification.

10 **Q.**   If you're looking at -- well, how many SEM images have you

11 looked at in your career?

12 **A.**   Thousands.

13 **Q.**   What about with respect to this case?

14 **A.**   Hundreds, certainly, in this case.

15 **Q.**   Is using part of those techniques part of your job

16 day-to-day as a materials scientist?

17 **A.**   Yes, it is.

18 **Q.**   Can you tell me what type of projects you have worked on

19 at RJ Lee.

20 **A.**   As a materials characterization and consulting firm, I've

21 worked on projects that have served a wide variety of

22 clientele, from industrial to governmental.  Those works have

23 included work in the medical device industry, have included

24 work in the manufacturing industry, as well, and dealing with

25 environmental impact issues that would deal with corrosion.

1   **Q.**   Have you been involved in any failure analysis work?

2   **A.**   Failure analysis is a routine and frequent part of my job

3   at RJ Lee Group.

4   **Q.**   What type of projects?  Can you give us one or two that

5   you've been involved in.

6   **A.**   I've worked on failure analyses that could range on things

7   that are fairly small, things like a medical implant that has

8   failed while in a patient, up to very large, industrial-sized

9   things like wind turbines for energy generation.

10   **Q.**   When you're looking at something like that, what is your

11   specific purpose, or what are you doing in that project?

12   **A.**   In those projects, the goals are to determine the cause of

13   failure, and that routinely involves the characterization and

14   investigation of the materials at issue to see how those

15   materials have either been impacted or behaved that may have

16   led to failure.

17   **Q.**   What about corrosion?  Have you worked on any

18   corrosion-related projects other than this at RJ Lee?

19   **A.**   Yes.  I've worked on several corrosion-related projects.

20   **Q.**   Could you describe a couple in the recent past.

21   **A.**   In the recent past, I've worked on projects that have

22   dealt with piping that have had corrosion issues to actually

23   performing laboratory tests to impose certain environments on

24   materials as part of either alloy development or probably more

25   specifically product development work.

1   **Q.**   Are there any particular cases in the recent last couple
2   of years that you've worked on that have dealt with corrosion
3   issues?
4   **A.**   There have been a couple what I would consider
5   larger-scale projects that I've worked on, one of which
6   involved a train derailment in South Carolina that involved a
7   spill of chlorine from a tank.  Another was the work that I did
8   in association with impacts from the World Trade Center dust
9   distribution.
10   **Q.**   What with respect to the train derailment that you were
11   talking about related to corrosion and how were you involved?
12   **A.**   The issues there related to dispersion of chlorine gas
13   that had been dispersed from a ruptured tank that was caused by
14   the trail derailment.  RJ Lee Group was involved in assessing
15   the town in which the derailment occurred and looking for
16   material impacts that may have been related to the dispersion
17   of that chlorine gas.  My involvement was kind of at a higher
18   level, looking at -- understanding the type of material impacts
19   one would expect from chlorine on these various materials.
20   **Q.**   What about the World Trade Center work?  What were you
21   doing there?
22   **A.**   The World Trade Center work that I did was involving some
23   structural or perceived structural damage on a building near
24   the World Trade Center site.  I was particularly involved in
25   looking at aluminum and steel materials to see what impacts, if

1    any, could be determined from the presence of the World Trade

2    Center dust that may have become entrained in those locations.

3    **Q.**    How did you assess the impacts on those materials?

4    **A.**    Those materials use various types of characterization

5    techniques, including optical microscopy and electron

6    microscopy, looking at how material may have been impacted, and

7    then determining whether or not that material needed either to

8    be replaced or remediated in some fashion.

9    **Q.**    Do you hold any positions with any professional

10   associations?

11   **A.**    Yes, I do.

12   **Q.**    What's that?

13   **A.**    Currently, I serve as the District 10 representative on

14   the chapter council of ASM International, which is the

15   professional society of materials scientists and engineers.  I

16   also serve on the handbook committee and the American Welding

17   Society.

18   **Q.**    This is what we've been seeing here as Exhibit DX205.

19   Dr. Perricone, could you just confirm, if you've been reading

20   along, that this is a true and correct copy of your résumé, or

21   your CV.

22   **A.**    Yes, it is.

23            **MR. SANDERS:**  I'd move that DX205 be admitted.

24            **THE COURT:**  It will be admitted.

25            **MR. SANDERS:**  I'd also tender Dr. Perricone as an

1    expert in the fields of materials science and corrosion.

2         **MR. SEEGER:**  No objection, Your Honor.

3         **THE COURT:**  The Court will accept him as an expert in

4    materials science and corrosion.

5                    **DIRECT EXAMINATION**

6    **BY MR. SANDERS:**

7    **Q.**   Dr. Perricone, how long have you been working on the

8    Chinese drywall project?

9    **A.**   I've been working on issues related to Chinese drywall for

10   about the last 15 months or so.

11   **Q.**   What has the purpose of your work been?

12   **A.**   The primary purpose of my work has been to evaluate

13   various materials within residences that contain Chinese

14   drywall, to determine what issues are present, particularly

15   initially taking a look at HVAC coils which had been reported

16   to be failing in houses containing Chinese drywall.

17   **Q.**   What's your role been in this project?

18   **A.**   My role at RJ Lee Group as it pertains to this project has

19   been team leader.

20   **Q.**   As a team leader, what are your responsibilities, and what

21   work have you performed?

22   **A.**   As team leader, primarily as a technical leadership in

23   terms of determining what type of testing would need to be

24   done, determining what samples to collect, how to analyze them,

25   and then interpretation of the results in the larger context of

                          DAILY COPY

1    the project, not just the individual samples.

2    **Q.**   In that context -- we've heard a mention by the plaintiffs

3    this morning -- what role did Dr. Lee play?

4    **A.**   Dr. Lee was involved in the project.  He provided, I would

5    say, guidance over the course of the project and participated

6    in the generation of the reports.

7    **Q.**   In the last 15 months, what percentage of your time has

8    been devoted to this?

9    **A.**   That certainly has varied from month to month.  The

10   project has lasted for 15 months.  Generally speaking, that

11   varied anywhere from 50 percent to 100 percent of my time; in

12   some cases, 100 percent of my time most recently.

13   **Q.**   How many people do you have working for you on this at

14   RJ Lee?

15   **A.**   RJ Lee Group employs a wide variety of people.  We have a

16   full-service laboratory in association with our company.  So,

17   therefore, I would estimate that there has been about 30

18   different employees, roughly, that have contributed to this

19   work either in terms of actual testing of samples at a

20   technician level all the way up through doing sample

21   preparation and collection of things like microscopy results.

22   **Q.**   Is your job to coordinate and oversee all of those people?

23   **A.**   Yes, to coordinate all of that and interpret results.

24   **Q.**   Are there multiple disciplines involved at RJ Lee in

25   putting together this effort?

1   **A.**   Yes, there are.

2           **MR. SEEGER:**  Objection, Your Honor, just to avoid the

3   leading.

4   **BY MR. SANDERS:**

5   **Q.**   What disciplines are involved at RJ Lee in the effort on

6   behalf of KPT?

7   **A.**   There are multiple scientific disciplines, including

8   chemistry, physics, materials science, corrosion, and

9   industrial hygiene.

10  **Q.**   Moving on to your specific work, how many homes with

11  Chinese drywall have you inspected?

12  **A.**   I have personally inspected approximately 20 to 25 homes.

13  **Q.**   Where have those homes been located?

14  **A.**   Those homes have been located in Louisiana, Florida, and

15  Virginia.

16  **Q.**   Does that also include the Hernandez house?

17  **A.**   Yes, it does.

18  **Q.**   Do you remember when you were at the Hernandez house,

19  approximately?

20  **A.**   As I recall, it was early January of this year.

21  **Q.**   In how many of those houses have you collected some

22  samples or done some sort of testing?

23  **A.**   My recollection is we've done testing or sample collection

24  in approximately 15 of those houses.

25  **Q.**   What was the focus of the sample collection or testing?

1    **A.**   The focus of the sample collection involved multiple

2    facets of the investigation.  As I had mentioned previously,

3    initial focus was on looking at HVAC coils which had been

4    reportedly failing at an accelerated rate.  Examination of

5    those coils led to the conclusion that the copper in those

6    coils was what was being affected.  So looking at other

7    copper-containing components in a household included things

8    like wiring and plumbing that was investigated further.

9    **Q.**   In each of those cases, did you take samples to review and

10   assess the components you were mentioning?

11   **A.**   A range of different types of samples were collected from

12   various addresses.

13   **Q.**   What in particular did you observe with regard to the HVAC

14   coils?

15   **A.**   I observed that the HVAC coils showed a particular

16   susceptibility towards pitting corrosion of the copper tubing.

17   While there is a lot of black discoloration of that copper, the

18   copper certainly shows pitting that has compromised significant

19   portions of the wall thickness.  That is due to the fact that

20   it can be differentiated from other environments in the house,

21   such that HVAC sees a much different environment during its

22   normal operation than you would experience in the living space

23   of the house.

24   **Q.**   Could you explain that a little bit more.  What are the

25   differences between an HVAC coil and the other copper

828

1   components of the house?

2   A.    Yes.  There are two distinctly important characteristics

3   of the environment that an HVAC coil operates.  Number one is

4   the significant amount of condensation that is frequently and

5   routinely generated through the operation of the coils, such

6   that the copper coils are often dripping with water during the

7   course of their operation.  That's something that I have

8   personally observed, as well as general knowledge of their

9   operation.

10          The other aspect of an HVAC coil is the high amount

11   of airflow that the HVAC coil sees.  Obviously, air is pulled

12   from the living space of the house and pulled across the coil

13   in order to provide air conditioning; and, because of that, the

14   delivery of molecules in the air that may exist in very low

15   concentrations in the living space, for example, the cumulative

16   effect of a large amount of air passing over the coil can cause

17   the coil to see a lot more of those molecules than would

18   normally be seen in other environments.

19   Q.    Have you done any testing to sort of confirm that that

20   actually is happening?

21   A.    Yes.  In fact, the work that was done in a number of

22   different houses involved the placement of copper reactivity

23   coupons.  These are coupons of pure copper that were placed in

24   multiple environments within the house for a specific period of

25   time, and then they were then collected and analyzed in the

1   laboratory to determine the nature and thickness of the tarnish
2   film that had developed on those coupons.  Based on a
3   comparison, then, of those observations as a function of
4   duration of exposure and the location within the house, we were
5   able to learn things about the different environments in the
6   house.
7   Q.   What standards did you use to conduct the tests or do
8   those measurements?
9   A.   Well, we relied on a couple of standards in terms of the
10  application of the use of coupons as well as the actual
11  analysis of those coupons.  We relied on an ISA standard on the
12  assessment of environments, which calls for the placement of
13  copper coupons.  It specifies a duration of exposure in order
14  to assess the environment and to rate the corrosivity of that
15  environment.
16       Then in terms of the characterization of those
17  coupons, we relied on a standby SEMI that distinguishes how to
18  use a technique called ESCA, which is a very surface-sensitive
19  technique.  It allows us to perform a depth profile through the
20  tarnish film and actually measure the thickness in that manner.
21  Q.   Before we talk about the differences in the coupon
22  measurements, was there another set of coupons at some point
23  that KPT was using and getting from another lab?
24  A.   Yes.  There were some coupons that were provided by
25  another laboratory and analyzed by another laboratory by a

830

1   different method.

2   Q.   What are the primary differences in the methods that were

3   used?

4   A.   The method that RJ Lee Group used, I termed it ESCA, which

5   is electron spectroscopy for chemical analysis.  The are placed

6   in a vacuum chamber and the depth or the thickness of the

7   tarnish film is measured directly by basically milling through

8   the tarnish film and measuring atomic profile so that you can

9   actually directly measure how thick the film is before you get

10  down to the bare copper.

11           In the other case, we used a method known as

12  stripping voltammetry.  That involves taking the coupon and

13  immersing it in a solution, and then driving the tarnish film

14  off electrochemically, and then, in essence, counting the atoms

15  as they come off the surface, and then calculating what the

16  thickness would have been with knowledge of the surface area of

17  that coupon.

18  Q.   In the actual calculation, were there some differences

19  between yours and their results based on what you thought was

20  the actual metal or the actual species you were detecting?

21  A.   Yes.  The ESCA analysis that we performed not only

22  provides the ability to depth profile, but it also provides

23  information about the chemical species, which told us that it

24  was copper(I) sulfide, commonly referred to as $Cu_2S$.  The

25  recorded values from the stripping voltammetry method refer to

DAILY COPY

1    the sulfide film that was formed as CuS, which is a different

2    compound.

3    **Q.**   Did you make some adjustments to try to correlate those

4    two measurements?

5    **A.**   Well, in looking at the data that we had collected using

6    the ESCA measurements and trying to understand the differences

7    between the coupons that were, in essence, put side by side in

8    the same environments, taking the species information we knew

9    was $Cu_2S$, I took a look at that stripping voltammetry data

10   within the context of if the atoms that were being sputtered

11   off were treated as $Cu_2S$, which we knew existed but were not as

12   reported in the stripping voltammetry data.

13   **Q.**   Despite those differences with respect to your opinion on

14   the difference in the HVAC environment, do they both support

15   the difference in the HVAC and the regular house?

16   **A.**   Yes, they do.

17   **Q.**   Could you explain how that is.

18   **A.**   Sure.  Any difference that would be made in interpreting

19   the stripping voltammetry results in terms of looking at

20   whether it's $Cu_2S$ or CuS, the end result is basically a shift

21   in the thickness results across the board.  So there's not a

22   difference in the relative difference from location to

23   location.

24        So if you look at just the stripping voltammetry

25   data, it's clear that the HVAC location had a very

1    significantly thicker tarnish film thickness regardless of

2    whether you measured it using stripping voltammetry or whether

3    you examined it using ESCA.  In fact, both methods showed

4    approximately about five times difference in thickness in terms

5    of what was sitting in the HVAC coil versus what we would see

6    out in the living space.

7            THE COURT:  But you're dealing with thickness as

8    opposed to absence?  I mean there's presence of corrosion in

9    each of those environments; one is thicker than the other?

10           THE WITNESS:  That's correct, Your Honor.  In both

11   cases, there were sulfides present regardless of location.

12           THE COURT:  The $Cu_2S$ was there in both?

13           THE WITNESS:  That's correct, Your Honor.

14   BY MR. SANDERS:

15   Q.   Just to clarify, were these tests performed in houses that

16   had Chinese drywall?

17   A.   Yes, they were.

18   Q.   The ISA standards have some classifications that are used

19   to explain the environmental -- or the measurements you get

20   from these results?

21   A.   Yes.  So the ISA standard sets out the type of testing

22   that should be done to characterize environments.  Then based

23   on the film thickness results, they have a ranking of the

24   different environments in terms of the corrosive nature of

25   those environments and how they might impact the reliability --

1  specifically, in the ISA standard, the reliability of

2  electronic equipment, which is known to be sensitive to these

3  types of environments.

4  **Q.**   We've heard a lot about the Battelle standard.  Is that

5  similar to the ISA standard?

6  **A.**   It is similar, particularly in terms of the use of coupons

7  in order to assess environments.  Generally speaking, the

8  ranking or characterization of those different environments

9  parallel each other quite a bit.

10  **Q.**   In what context are those standards typically applied?

11  **A.**   Those standards are typically applied in industrial

12  environments where the corrosive environments are going to

13  persist, so you take a look at the data and get a feel for the

14  reliability of that equipment if it exists in that environment

15  and continues to operate in that environment.

16  **Q.**   So what happens if you take away the source of corrosive

17  gases and there's no more corrosion?  To your measurements

18  under the standard.

19  **A.**   The measurements on the standard then no longer apply once

20  the equipment has been taken out of that environment and the

21  environment has significantly been altered.

22  **Q.**   What would you expect to get if you didn't have a source

23  anymore under either of the standards?

24  **A.**   I would expect to have the lowest rating or, for example,

25  in the ISA standard, the G1, that says that there's no

1  influence of corrosion on the reliability of electronic

2  equipment.

3  **Q.**   Were you able to collect samples and examine some of them

4  in the Hernandez house?

5  **A.**   Yes, I was.

6  **Q.**   What type of samples did you collect?

7  **A.**   RJ Lee Group got multiple types of samples from the

8  Hernandez residence.  Those included wires that were attached

9  to outlets and switches, were sections of copper plumbing taken

10  from underneath the kitchen sink, as well as copper plumbing

11  taken from the hot-water heater.  We also received samples of

12  architectural hardware:  Doorknobs, door stops.  Those are the

13  samples that were collected of actual materials.

14  **Q.**   What sort of analyses on the pipes and wiring did you

15  perform?

16  **A.**   Well, the type of tests that were done on both the wiring

17  and the plumbing were really materials impact assessments.

18  They were governed by metallurgical principles, taking a look

19  at cross-sections of the material to see to what extent either

20  wall thickness may have been compromised or intruded upon by a

21  reaction at the surface, and similarly looking at wires to see

22  to what extent those cross-sections of the wires may have

23  changed, looking for things like surface reactions and so

24  forth.

25  **Q.**   In your analysis and assessment about the Hernandez house,

DAILY COPY

1   did you rely on testing from other homes with Chinese drywall?

2   A.   In terms of looking at kind of the overall picture in

3   terms of my experience in examining houses with Chinese drywall

4   and those samples taken from those locations, the results that

5   I found from analysis from the Hernandez residence was not

6   substantially different from any of those other wires or

7   plumbing that I've seen.

8   Q.   Did you perform the same tests you did on the Hernandez

9   samples as you did at those other residences?

10   A.   Yes, I did.

11   Q.   Taken together, do the samples from the Hernandez house

12   and other residences with Chinese drywall, including KPT

13   drywall, support or form the basis of your opinion?

14   A.   Yes, that information forms the basis of my opinion.

15   Q.   Just to go through and look at some of the samples you

16   collected, would it help if we went through some pictures?

17   A.   Yes, it would.

18           MR. SANDERS:  Connie, if we could go to DX134.

19               Your Honor, I'd like to let him point things out

20   rather than me move around.

21           THE COURT:  That's fine.

22   BY MR. SANDERS:

23   Q.   Could you tell us what we're looking at here.  First,

24   identify what we're looking at.

25   A.   Yes.  These are wires that were removed from one of the

1  outlets that had been collected from the Hernandez residence.

2  The wires had been --

3        MR. SANDERS:  Before we go to that, I'd like to move

4  DX134 into evidence.

5        THE COURT:  The Court will admit it.

6        THE WITNESS:  These wires had been sectioned in the

7  field at this end location.  You can see where they're curved

8  here where the electrical connections have been made.  What

9  we're showing in this image is that when the sheathing has been

10  pulled back from where it initially existed here at these

11  locations, you can see that untarnished copper exists

12  underneath those sheath locations.

13        There's one exception to that, as you can see,

14  that in this area there was some evidence of tarnishing that

15  did not immediately stop here where the insulation appeared to

16  end.  However, on inspection of this location, we found that a

17  piece of the inner insulation -- there are basically two

18  materials wrapped around these wires.  One is the outer sheath

19  that we can see, which is the white and the black.  There's

20  also an interior, I believe, a nylon material that is wrapped

21  around.  That nylon material was missing and so, therefore,

22  there was a looser connection between the wire and insulation

23  up until about this point, where we then see that the

24  tarnishing has ceased where you had intact insulation.  That is

25  consistent with what we've seen in other locations.

1   **BY MR. SANDERS:**

2   **Q.**   To put this into context, how many samples of wires,

3   approximately, have you looked at in this case?

4   **A.**   In this case, we've looked at probably a total of 230

5   wires, roughly, to form the basis of my opinion.  Specifically

6   for the Hernandez house, I believe we looked at 10 different

7   wires.

8   **Q.**   Have you seen this tarnishing, out of those 230 samples or

9   so, before underneath the insulation?

10  **A.**   This was the first time that I had observed this type of

11  phenomenon, but it could be explained by the lack of a nylon

12  sheath or a tearing of that nylon sheath.  The reasons for that

13  are unclear, but that was an obvious difference.

14          **MR. SANDERS:**  If we could move to DX152.

15  **BY MR. SANDERS:**

16  **Q.**   What are we looking at here?  If you could just identify

17  it.

18  **A.**   Yes.  This is a photo of an outlet removed from a house in

19  Mandeville containing Chinese drywall.

20          **MR. SANDERS:**  Your Honor, I'd move Exhibit DX152 be

21  admitted.

22          **THE COURT:**  Let it be admitted.

23  **BY MR. SANDERS:**

24  **Q.**   If you could please explain what we're looking at or what

25  you're showing here.

838

1   A.   The purpose of this is simply to demonstrate that here, in

2   an outlet where you have the connections plugged into the back

3   of the outlet rather than wrapped around these terminals --

4   again, we pulled the sheathing back, and this is a good example

5   of the sheathed wires -- the tarnish does not exist underneath

6   the sheathing.  It's another example.

7           MR. SANDERS:  If we could go to Exhibit 153.

8   BY MR. SANDERS:

9   Q.   Again, what is this exhibit?

10  A.   Similarly, this is an exhibit of an outlet removed from a

11  house with Chinese drywall in Mandeville, Louisiana.

12  Q.   Is that actually the same outlet, just on the other side?

13  A.   I would have to go back previously.

14  Q.   I believe they're both labeled "outlet 67."

15  A.   If they're both labeled "outlet 67," then, yes, it's

16  simply the neutral wire side, whereas the other side we have

17  the hot wire.

18          MR. SANDERS:  I'd also like to move 153 in.

19          THE COURT:  Admitted.

20  BY MR. SANDERS:

21  Q.   Are your observations consistent with observations from

22  others with respect to the insulation and what we've seen under

23  the wires?

24  A.   Yes, they are.

25  Q.   What about any governmental agencies; have they seen that?

839

1   **A.**   Specifically, the analysis by Sandia National Laboratories

2   demonstrated and pointed out the absence of tarnish film

3   underneath the insulation of the wires that they had observed

4   and reported on in their report.

5           **MR. SEEGER:**  Your Honor, I'm sorry to interrupt.  I

6   just realized this.  The photos that we just looked at -- I

7   don't know if you made it clear; if you did, I apologize -- are

8   from another house in Mandeville.  It's not the Hernandezes'.

9           **MR. SANDERS:**  We'll have a few from different houses

10  and, please, Dr. Perricone, if you could, point it out.

11          **THE COURT:**  The fact of the matter is that those

12  photographs, the last two or three, were from other houses?

13          **THE WITNESS:**  That's correct, Your Honor.

14          **MR. SEEGER:**  If counsel could just make that really

15  clear when he puts them up, then I'll know whether to object.

16          **MR. SANDERS:**  If we could look at Plaintiffs' 60, the

17  Sandia report.  This has been previously admitted into evidence

18  by plaintiffs.

19  **BY MR. SANDERS:**

20  **Q.**   If you could point out what Sandia concluded with respect

21  to insulated wires.

22  **A.**   Specifically, they use this set of images in figure 12 to

23  demonstrate the differences that they saw.  Where you had a

24  bare wire, they show the presence of a tarnish film on the

25  surface of the copper.  Then they show what they observed under

1    loose insulation, where largely the tarnish film was absent, or

2    maybe there was some evidence here of some tarnish.  Under

3    tight insulation, they demonstrated that there was an absence

4    of tarnish film.  I believe they reported that there was an

5    absence of the tarnish film approximately 1 millimeter into

6    where the insulation existed.

7    Q.   Well, actually, if you could read that last sentence there

8    above the pictures, what do they say their observations

9    indicate?

10   A.   Yes.  They state:  "These observations indicate that the

11   electrical insulation acts as a barrier to the corrosive gases

12   and protects the underlying copper."

13             **MR. SANDERS:**  If we could go to Defense Exhibit 136.

14   **BY MR. SANDERS:**

15   Q.   If you could just identify it for us before discussing

16   what this is.

17   A.   Yes.  This is a cross-section of a wire removed from the

18   Hernandez residence.

19             **MR. SANDERS:**  Your Honor, I'd move that Defense

20   Exhibit 136 be admitted.

21             **THE COURT:**  Let it be admitted.

22   **BY MR. SANDERS:**

23   Q.   What are you trying to show here with this image?

24   A.   This is an example of an image of a cross-section of a

25   wire that appears visibly tarnished on the surface, but

1  demonstrates the fact that any type of impact on the surface is

2  very, very small relative to the overall cross-section of the

3  material.

4           **MR. SANDERS:**  If we could go to Defense Exhibit 138.

5  **BY MR. SANDERS:**

6  **Q.**   And if you could just briefly identify this and describe

7  what this is.

8  **A.**   Yes.  This is an image of a cross-section of the wire

9  removed from the Hernandez residence compared to a new wire of

10  the same gauge.

11          **MR. SANDERS:**  Your Honor, I'd move that Defense

12  Exhibit 138 be admitted.

13          **THE COURT:**  Be admitted.

14  **BY MR. SANDERS:**

15  **Q.**   What are we looking at here?

16  **A.**   I would initially focus your attention on the image in the

17  lower-left portion.  This is the wire as received.  Clearly, we

18  see evidence of a lot of black tarnish over the surface.  This

19  was cross-sectioned through an area of the dark tarnish, and

20  the cross-section was observed as shown here in the upper left.

21          What's being shown here is the lack of significant

22  ingress of any of that tarnish film that exists on the surface

23  of the material into the actual cross-section of the material.

24  That is particularly shown when you look at a brand-new wire

25  that has never been installed of the same gauge, and comparison

1  of those two demonstrates the lack of impact of that tarnish

2  film on the cross-section of the wire.

3  **Q.**   Now, with respect to this, just so we're clear, have you

4  done any precise measuring of the cross-sections?

5  **A.**   As it pertains to an analysis or a tabulation of

6  diameters, for example, we have not.  We have compared these

7  images to cross-sections of exemplar new wires that had never

8  been exposed to Chinese drywall.

9  **Q.**   Based on this comparison, is it your opinion that there's

10  no significant corrosion damage to these wires?

11  **A.**   Yes.  As I stated previously, this shows the lack of

12  impact of the tarnish film on those wires.

13          **MR. SANDERS:**  If we could go to Defense Exhibit 142,

14  please.

15  **BY MR. SANDERS:**

16  **Q.**   If you could identify again what we're looking at here.

17  **A.**   This is a different cross-section of a different wire also

18  collected from the Hernandez residence, along with a picture of

19  a new wire.

20          **MR. SANDERS:**  I'd like to move DX142 into evidence,

21  Your Honor.

22          **THE COURT:**  Admitted.

23  **BY MR. SANDERS:**

24  **Q.**   Where are you taking these cross-sections, just to tell

25  us?

843

1   A.   Routinely, these cross-sections would be made outside of

2   the bend here, in an area where you have a significant dark

3   discoloration, so wanting to cross-section through an area that

4   had the dark tarnishing.

5   Q.   Again, what do you see when you go back up and you look at

6   the wiring in the Hernandez house versus a new wire?

7   A.   Well, again, we see a lack of ingress of any of the

8   tarnish film that does exist at the surface of the copper and

9   the lack of ingress at the surface.  When compared to a new

10  wire, there really is no significant difference that we see.

11  These are slightly smaller cross-sections simply because they

12  are a different gauge than the previous exhibit that we looked

13  at.

14            THE COURT:  Did you make any tests on the contact

15  points in the bend portion of the wires in any of your --

16            THE WITNESS:  RJ Lee Group did not perform contact on

17  the actual wires of the samples that were removed, Your Honor.

18  BY MR. SANDERS:

19  Q.   In your overall sort of opinions, have you relied on other

20  experts' opinions with respect to contacts in the wires?

21  A.   Yes.  I've relied on the work done by Dr. Beyler, who

22  examined the performance of these wires that were removed from

23  the field.

24            MR. SANDERS:  If I could go to DX144.

25

DAILY COPY

844

1   **BY MR. SANDERS:**

2   **Q.**   If you could indicate what this is and where it's from.

3   **A.**   This is a set of cross-sections; again, one from a house

4   with Chinese drywall.  In this case, this was from a house in

5   Virginia and compared to a new wire sample.

6   **Q.**   These examples that you had from this house in Virginia,

7   were they similar to the examples you were seeing in the

8   Hernandez house?

9   **A.**   Yes, the impacts were similar to what I was observing in

10  the Hernandez house.

11          **MR. SANDERS:**  Your Honor, I'd like to move to be

12  admitted Defense Exhibit 144.

13          **THE COURT:**  Admitted.

14  **BY MR. SANDERS:**

15  **Q.**   Again, could you explain what we're looking at here.

16  **A.**   Yes.  We're looking at a cross-section on the left of a

17  wire that was exposed to Chinese drywall.  Here is the

18  tarnished appearance of the wire as received.  Here is another

19  example of a new wire, the same gauge, demonstrating how

20  similar those cross-sections are.

21          **MR. SANDERS:**  I'd like to move to Defense

22  Exhibit 143.

23  **BY MR. SANDERS:**

24  **Q.**   What are we looking at here?

25  **A.**   These are examples of wires that were removed from a house

1  containing Chinese drywall from Williamsburg, Virginia.

2  **Q.**   Was the condition of those wires, when you saw them

3  originally, similar to the condition of the wires in the

4  Hernandez house?

5  **A.**   Yes.  The image shown in the upper left shows, in essence,

6  the as-received condition of those wires as they were attached

7  to an outlet showing areas of tarnishing discoloration similar

8  to what was observed in the Hernandez residence.

9          **MR. SANDERS:**  Your Honor, I'd move that Defense

10  Exhibit 143 be admitted.

11          **THE COURT:**  Be admitted.

12  **BY MR. SANDERS:**

13  **Q.**   You've got a picture on the left that says wires before

14  cleaning and then cleaned wires.  Could you explain what you

15  did here.

16  **A.**   This was a simple application of the -- manual application

17  of a Scotch-Brite pad in order to mechanically remove from the

18  surface the black tarnish that was observed in these locations.

19  So this image here is the same set of wires after they had been

20  cleaned using a Scotch-Brite pad.  These images here are

21  cross-sections of these same wires after cleaning.

22  **Q.**   Why did you pick a Scotch-Brite pad?

23  **A.**   Well, the use of a Scotch-Brite pad was -- the thought was

24  to come up with some type of simple cleaning solution that

25  could be readily applied in the field without the use of

DAILY COPY

1    chemicals or special training in order to apply.

2    **Q.**   So there's no standard that you're using here when you're

3    just cleaning the wires?

4    **A.**   No.   It's an application of a common household cleaning

5    technique in order to abrade the surface enough to remove the

6    tarnish.

7           **MR. SANDERS:**   If we could look at Plaintiffs'

8    Exhibit 149.

9    **BY MR. SANDERS:**

10   **Q.**   If you could identify what we're looking at here.

11   **A.**   This is a set of cross-sections of 14-gauge wire,

12   demonstrating what a new wire looks like, the cleaned wires I

13   believe we had just previously looked at, and then an

14   as-received wire taken from a house containing Chinese drywall.

15   **Q.**   Just to make it clear, I believe the upper right is from

16   1008 Hollymeade Circle, which we looked at before.   These other

17   two ones were also not from the Hernandez house but wires we

18   looked at before.

19   **A.**   That's correct, these are not from the Hernandez

20   residence.

21          **MR. SANDERS:**   Your Honor, I move that, Exhibit 149.

22          **THE COURT:**   Admitted.

23   **BY MR. SANDERS:**

24   **Q.**   What are you showing here?

25   **A.**   This is another demonstration of comparison of wires that

1   have been exposed to Chinese drywall, how their cross-sections

2   are the same as the cross-sections of a new wire that had never

3   been exposed to Chinese drywall, both before and after the type

4   of cleaning processes.  This is simply to demonstrate that the

5   use of a Scotch-Brite pad is not removing a significant amount

6   of copper material as you might apply it in the field.

7           **MR. SANDERS:**  If I could go to Plaintiffs'

8   Exhibit 593.

9   **BY MR. SANDERS:**

10  **Q.**   I showed you this last night when you came in, and I

11  indicated to you that this is an exhibit prepared by

12  Mr. Krantz.  It's an as-received wire and then a wire that's

13  been cleaned by Scotch-Brite.  What are your observations about

14  this exhibit?

15  **A.**   What I can observe is, number one, a significant

16  difference in the overall appearance of the surface after

17  Scotch-Brite cleaning.  The type of increased brightness of the

18  copper and the return of a coppery color is similar to the

19  images that were shown in the previous exhibit after cleaning

20  by RJ Lee Group.

21          What I do notice is that at this higher

22  magnification, not with just the naked eye, you do see some

23  evidence of some spots where there appears to be some black

24  tarnish that may remain.  And I observed here that there are

25  what appear to be scanning electron microscope images that show

1   that surface at an even higher magnification than what's shown
2   here.
3   Q.   Can you see the magnification bar and tell me what
4   magnification we're looking at, that copper sulfide, or that
5   image there?  Which image would you like to look at?
6   A.   Well, the important thing to look at here is what these
7   scale bars are because, obviously, the magnification, we're now
8   projecting this up into a large screen.  So to just kind of get
9   our bearings here, in the light optical image, we're dealing
10  with the scale bar being half a millimeter in length.
11          Here down below at the electron microscope images, if
12  we could zoom up on that, these magnifications here, this is
13  now 100 microns, or one-tenth of a millimeter.  Here is
14  10 microns at one-hundredth of a millimeter.
15  Q.   Backing up, what does the image on the left show of the
16  graph?  What is that?
17  A.   This appears to be a spectrum that would have been
18  collected by EDS in order to determine the chemical elements
19  that are present in those locations.
20  Q.   So do you think that even after the clean samples you were
21  looking at from those other houses, it's likely that there's
22  some copper sulfide material left on the wires?
23  A.   There appears to be a small amount of copper sulfide that
24  remains even after the application of the Scotch-Brite, as
25  shown here.

1  **Q.**    Does that surprise you?

2  **A.**    It does not.  The tarnish film would not have been

3  absolutely and completely removed 100 percent.  It doesn't

4  surprise me.

5  **Q.**    Is that a problem with respect to putting these wires back

6  into operation?

7  **A.**    In my opinion, it is not.

8  **Q.**    Why not?

9  **A.**    There are two important reasons why, placing them back in

10 operation, that it's not an issue:  One involves what, if any,

11 impact it would have on any type of continuing reaction; the

12 other involves what impact the presence of a small amount of

13 copper sulfide would have on the actual operation.

14         On the latter part, the impact on the operation, I

15 would --

16         **MR. SEEGER:**  Objection.  Your Honor, just for the

17 record, I want to note this exact issue was testified to by

18 Dr. Lee at page 590, lines 8 through 13 of his trial testimony.

19         **THE COURT:**  I'll let him testify.  I overrule the

20 objection.

21 **BY MR. SANDERS:**

22 **Q.**    Continue, please.

23 **A.**    In the case of the operation of the wires, I rely on

24 Dr. Beyler's testing that demonstrated a lack of impact even

25 when the wires were completely tarnished, either from the field

1    or intentionally tarnished from the laboratory, showing no

2    impact on the operation of the wires at contact points even

3    when that tarnish film completely coats the surface.  So the

4    fact that there's a small amount of material left over, there's

5    no reason to expect that that would have any material impact on

6    its operation.

7    **Q.**   What about the operational -- we were looking at the

8    cross-sections.  Do those also tell you something about the

9    tarnish film and whether there's any operational impact to the

10   wires?

11   **A.**   Yes.  Looking at the cross-sections are important to

12   examine whether or not the current-carrying capacity of the

13   wires have been impacted or if the mechanical integrity of the

14   wires are impacted.  You'd be concerned about if the

15   cross-sections had been significantly reduced or you had

16   ingress of the tarnish film through enough of the cross-section

17   to cause breakage.  Clearly, that would be an issue in terms of

18   operation.

19           In terms of the amount of material that's present,

20   that is available to actually carry the current for which these

21   wires are rated, the cross-sectional area is important.  That's

22   why we would compare cross-sections of wires exposed to Chinese

23   drywall to brand-new wires that have never been in service.

24   **Q.**   Again, based on those comparisons, what have you

25   concluded?

1  **A.**   I've concluded that there is no expected impact on the

2  current-carrying capacity of the wires, nor is there a concern

3  regarding mechanical breakage of the wires.

4  **Q.**   The other point you obviously mentioned is continuing

5  corrosion.  Very briefly, if you could explain why that's not

6  an issue.

7  **A.**   Well, continuing corrosion is not an issue because, in

8  moving forward, we're dealing with a situation that after the

9  wires have been cleaned and put back into service, they're

10 going into service in a condition where Chinese drywall is no

11 longer present and, therefore, a source of continuing

12 sulfidation or growth of copper sulfide no longer exists.

13 **Q.**   What if that little spot of copper sulfide was sitting in

14 a pit, though, would that continue to grow?

15          **MR. SEEGER:**  Objection.  Just for the record again,

16 Your Honor, testified to by Dr. Lee at page 546 of his trial

17 testimony.

18          **THE COURT:**  I understand.  I'll overrule it and allow

19 him to testify.

20          **THE WITNESS:**  No.  You would not expect the copper

21 sulfide to react.  Copper sulfide is an insoluble material in

22 water, so the presence of water is not going to cause the

23 copper sulfide to somehow dissolve and further react.  It's

24 stable at room temperature and pressure.  So it's sitting there

25 as the result of a corrosion reaction and it is, therefore, not

1  going to further react because it's not going to dissolve.

2  **BY MR. SANDERS:**

3  **Q.**  I think, citing to the Edwards paper, Mr. Krantz in his

4  testimony describes copper sulfide as a poison.  Do you agree

5  with that?

6  **A.**  No, I don't.

7        **THE COURT:**  Why would you clean the wires, then, if

8  you feel that way?

9        **THE WITNESS:**  The cleaning of the wires is simply

10  intended to be a method in order to ensure -- give peace of

11  mind in terms of making a good electrical connection.  It is

12  not intended to clean in order to somehow mitigate a further

13  reaction from taking place as much as it is, at the contact

14  points, you're simply wanting to provide an option to give an

15  electrician the peace of mind in making that connection a good

16  connection.

17  **BY MR. SANDERS:**

18  **Q.**  Why don't you agree that the copper sulfide can be a

19  poison or impact the functionality of the wires?

20  **A.**  The copper sulfide is -- as has been shown, the copper

21  sulfide sits on the surface once formed.  It hasn't ingressed

22  into the wires.  In any type of continuing corrosion reaction,

23  corrosion occurs because you have reactive species that will

24  react and form a product or a different kind of species.  That

25  is the corrosion reaction that takes place.  In the absence of

1   a source of a hydrogen sulfide, there is no way for more copper

2   sulfide to form.  What's sitting there has already formed and

3   it's not going to somehow continue to propagate.

4   **Q.**   Before we move away, actually, let's look once more back

5   at wires at Defense Exhibit 156.

6           **THE COURT:**  While that's being pulled up, do you have

7   an opinion as to whether the corrosive element will remain?

8   Would corrosion continue as long as the corrosive element is

9   there?

10          **THE WITNESS:**  Yes, I have an opinion, Your Honor.

11  The presence of hydrogen sulfide-type corrodents has shown to

12  be readily reactive with copper and, therefore, you would

13  expect the potential for hydrogen sulfide to react if it was

14  still present or being emitted in the presence of Chinese

15  drywall without some remediation.

16          **THE COURT:**  Would it react to the point where the

17  mechanical integrity of the wire would be compromised?

18          **THE WITNESS:**  Your Honor, I've seen no evidence of

19  where I would have any concern regarding the mechanical

20  integrity of the wires.  As we've shown in the cross-sections,

21  the tarnish film basically is sitting at the surface.  It is

22  really very much almost a superficial, surficial-type film that

23  doesn't compromise the cross-section at all.

24          **THE COURT:**  If the corrosive element would remain for

25  an extended period of time, what would happen?  Do you have an

DAILY COPY

1   opinion on that, I should say?

2          **THE WITNESS:**  Yes, Your Honor.  A persistent source

3   of hydrogen sulfide would allow a reaction to continue to occur

4   such that tarnish film thickness would continue to thicken.

5   You may continue to have situations where the tarnish film,

6   because it's brittle, would just fall off and allow fresh

7   copper to be exposed and allow the reaction to continue.

8              With the presence of the corrosive species,

9   because the copper reacts so readily with it, there will be a

10  reaction.  But the kinetics of the rate of which that reaction

11  takes place is going to be dependent on a number of different

12  factors, including environmental, specifically humidity, and

13  the ability for ions to diffuse through that film.  Oftentimes,

14  that is a rate-limiting step, and it's not simply just a dose

15  reaction.

16  **BY MR. SANDERS:**

17  **Q.**   Following up on one question, why won't moisture -- I

18  think you had mentioned humidity.  Why won't humidity continue

19  the reaction with copper sulfide when you remove the source?

20  **A.**   The presence of humidity is but one part of the overall

21  equation, if you will, in terms of how the sulfide reaction

22  will take place.  You still need that corrosive species to be

23  present.  It's not just sulfur, because sulfur is present in

24  the sulfide, therefore, the reaction will take place.  It has

25  to be present as a hydrogen sulfide ion in order for the

DAILY COPY

1  reaction to take place.  The sulfur in the sulfide is already

2  tied up and is not available for further reaction simply in the

3  presence of no water.

4  **Q.**   If you could explain what we're looking at here.

5  **A.**   This is a set of images, primary images from Mr. Krantz'

6  supplemental report, I believe, in the *Germano* matter.

7  **Q.**   Do you know what house this was taken from, or what type

8  of wiring this is?

9  **A.**   This wiring is stranded wire that was taken from a

10  lighting fixture -- I believe it was a chandelier -- in one of

11  the houses containing Chinese drywall in the state of Virginia.

12       **MR. SANDERS:**  Your Honor, I'd move that Defense

13  Exhibit 156 be admitted.

14       **THE COURT:**  Admitted.

15  **BY MR. SANDERS:**

16  **Q.**   What are you showing here?  What did you do to make these

17  images?

18  **A.**   Well, what's shown here is -- this is simply the image

19  taken directly out of Mr. Krantz' report.  What's shown here on

20  the right used a piece of imaging software that simply allows

21  you to basically assign colors to the different pixels that

22  make up the copper components.  So that's what the red is here.

23       If all the copper was circular as, you know, there

24  was no evidence of any type of tarnish ingress as is shown here

25  and here and has been pointed out by the plaintiffs' experts,

DAILY COPY

1    you would have a total area of what the copper would have been

2    absent any of those voids.

3            You can then do the same thing with the copper that

4    remains.  So when you subtract the copper that remains from the

5    copper that would have been originally present, you get, in

6    essence, what the void space would be.

7            Looking at that, we can take a look at that the area

8    of the voids over the total cross-sectional area is less than

9    1 percent of the cross-section.

10           **MR. SEEGER:**  Your Honor, I have to object.  I'm

11   sorry.  The way this was described is an image from our

12   expert's report.  It's not.  The image on the left is.

13   Therefore, it's a demonstrative, and it's not properly

14   admitted.  If I don't see these in advance, it's hard for me to

15   make that call.  I'm sorry to make a late objection.

16           **MR. SANDERS:**  They're part of our exhibits.

17           **MR. SEEGER:**  That doesn't mean it gets admitted.

18           **MR. SANDERS:**  He's explaining what he did and why

19   it's relevant.

20           **THE COURT:**  The image on the left is the plaintiffs'.

21   What's the image on the right, 1 and 2?

22           **THE WITNESS:**  The images on the right are exactly the

23   same image except that there have been thresholding done in

24   order to basically count the number of pixels.  Here in the

25   yellow are the number of pixels that are here, the coppery

1   color in this image.  The red is the coppery color plus what

2   the void space is.  It's simply a matter of assessing this in

3   using image characterization to determine how much is void

4   space, Your Honor.

5           **THE COURT:**  What do you seek to demonstrate by that?

6           **THE WITNESS:**  Rather than looking solely on

7   individual strands of this overall bundle, you can see that in

8   this report the plaintiffs pointed out a couple of these,

9   showed some amount of what they called pits into the surface.

10  This was a way to assess how those pits factored into the

11  overall cross-section of the bundle as would be needed for

12  carrying the current for which it was intended, Your Honor.

13          **THE COURT:**  I'll admit it.

14  **BY MR. SANDERS:**

15  **Q.**   What did you ultimately conclude?

16          **THE DEPUTY CLERK:**  How was that marked?

17          **MR. SANDERS:**  It's marked Defense Exhibit 156.

18  **BY MR. SANDERS:**

19  **Q.**   What did you find by doing this analysis?

20  **A.**   The end result is that the area of the voids made up less

21  than 1 percent of the overall cross-section -- original

22  cross-section that was available for the current carrying for

23  those wires.

24          **THE COURT:**  Just so that I'm following you, you feel

25  that that shows that there's no insult to the integrity, but it

 1   doesn't remove the pits?

 2          **THE WITNESS:**  It does not remove the pits,

 3   Your Honor.  The intent here was to put the pits in the context

 4   of the overall --

 5          **THE COURT:**  Mechanical integrity?

 6          **THE WITNESS:**  And the current-carrying capacity, yes.

 7          **THE COURT:**  Right.  The same.

 8          **THE WITNESS:**  Yes, Your Honor.

 9   BY MR. SANDERS:

10   **Q.**   Dr. Perricone, I guess, as you concluded, that's less than

11   1 percent of the cross-section?

12   **A.**   Yes, that was the conclusion.

13   **Q.**   Is that important, that 1 percent?

14   **A.**   The 1 percent is not important, particularly when put in

15   the context, in general, of the manufacturing tolerances for

16   wires, which allow a 1 percent variation in diameter.  That

17   variation in diameter equates for an even larger variation in

18   cross-sectional area, definitely larger than the less than

19   1 percent we're showing here.

20   **Q.**   Which standard are you referring to?

21   **A.**   What I would be referring to there would not specifically

22   be for stranded wires; would be for the solid wire that we were

23   observing in the electrical systems within a house.

24   **Q.**   Let's move on to some of the piping and plumbing that you

25   looked at.

1        **MR. SANDERS:**  If we could go to Defense Exhibit 157.

2  **BY MR. SANDERS:**

3  **Q.**   If you could identify this for us.

4  **A.**   Yes.  This is a section of the cold-water supply pipe

5  taken from underneath the kitchen sink in the Hernandez

6  residence.

7        **MR. SANDERS:**  I'd like to move Defense Exhibit 157

8  into evidence.

9        **THE COURT:**  Admitted.

10 **BY MR. SANDERS:**

11 **Q.**   What are we looking at here?

12 **A.**   Here we're simply demonstrating the presence -- or the

13 appearance of the section of copper plumbing that was being

14 analyzed.  Here is a light optical microscope image at a higher

15 magnification of what this surface looks like.

16 **Q.**   Do you know whether there was any significant tarnishing

17 or blackening of this pipe?

18 **A.**   The tarnishing that was observed was observed in a small

19 amount of location here and maybe a little bit here in the back

20 and the back of this image in particular.  And then here, where

21 the joint exists, there was obvious black discoloration.

22 **Q.**   Did you do a cross-section of this pipe?

23 **A.**   Yes, we did.

24 **Q.**   Where did you do that cross-section?

25 **A.**   That cross-section -- I believe we did two.  I believe we

860

```
1   did a transverse cross-section through this portion of the
2   pipe, and then we also did cross-sections through the brazed
3   joint in order to assess the condition.
4   Q.   Do you have a sample of that pipe actually with you,
5   behind you to your left?
6   A.   Let me take a look.  I don't believe I have a sample of
7   that specific pipe with me.  I have a sample of a similar type
8   of plumbing taken from a different house.
9   Q.   We'll get there.
10           MR. SANDERS:  If I could move to Defense Exhibit 158,
11  please.  I think this might have been admitted with Dr. Lee.
12           THE DEPUTY CLERK:  Yes, it is.
13  BY MR. SANDERS:
14  Q.   Just briefly because he touched on it, this is the
15  cross-section from that last pipe we were looking at?
16  A.   That's correct.
17  Q.   If you could just quickly point out to the Court what
18  we're looking at here.
19  A.   Yes.  These are --
20           MR. SEEGER:  I'll just object.  He can speak quickly
21  if he wants, but it's the same testimony.  He acknowledged that
22  by acknowledging the exhibit.  Go ahead.
23           THE COURT:  Go ahead.
24           THE WITNESS:  This is just a series of images of
25  different parts of that cross-section.  These are all at the
```

DAILY COPY

1   same magnification.  These are all the outer diameter here, the

2   center and the bottom three, the outer diameter where the

3   tarnish film exists.

4                These two are the inner diameter that actually

5   carries the water in the cold-water supply and demonstrates the

6   difference of appearance at the surface of the inner diameter

7   versus the lack of impact on the outer diameter.

8             **MR. SANDERS:**  Let's move on to Defense Exhibit 159.

9   **BY MR. SANDERS:**

10  **Q.**   If you could identify this for me.

11  **A.**   Yes.  This is a similar cross-section, I believe, of the

12  same pipe and the outer diameter of the copper pipe from that

13  pipe removed from the Hernandez residence.

14            **MR. SANDERS:**  Your Honor, I'd move that Defense

15  Exhibit 159 be admitted.

16            **THE COURT:**  Be admitted.

17  **BY MR. SANDERS:**

18  **Q.**   What are we looking at here?  First of all, on the left,

19  what are we looking at?

20  **A.**   We see on the left is a scanning electron microscope

21  image.  This is a location where we're actually able to find

22  something other than a tarnish film sitting at the surface.

23  These show some ingress of the surface material into the pipe

24  wall thickness.  I would note that the scale bar here is around

25  10 microns, so we're dealing with something around 10 microns

1    or less, roughly, in these two locations.

2    **Q.**   Would you describe those as pitting corrosion?

3    **A.**   Morphologically, I would describe those appear to be like

4    pits.  But in terms of pitting corrosion as it would exist in

5    terms of something that would continue on its own, I don't see

6    evidence of that.

7    **Q.**   Why not?

8    **A.**   The fact that the pits contain oxygen and sulfur,

9    particularly the sulfur is consistent with the type of sulfide

10   reactions that we've consistently seen in houses with Chinese

11   drywall and have shown that and will not continue if there's

12   not a continuing source of hydrogen sulfide to cause a reaction

13   to occur.

14   **Q.**   Even if there was a continuing source, would you expect

15   there to be some aggressive pitting going on?

16   **A.**   As has been seen in other locations -- and I would point

17   out that this amount of ingress in a copper pipe is

18   significantly less than some of the things that have been

19   reported on wires, for example.  I wouldn't expect that these

20   would grow any more aggressively than anything else that we've

21   seen either on pipes or on wires.

22   **Q.**   You were looking at the images on the right.  What are

23   those?  How did you generate those images?

24   **A.**   These are a way of presenting a large amount of the type

25   of EDS chemical data that we've seen in some of the previous

1   exhibits, as you may recall, where we show the spectrum of

2   maybe either a single point or the average of a whole area, a

3   view showing what elements were present based on what peaks

4   were present.

5            These are maps containing a lot more information in

6   that you have EDS spectra corresponding to basically each pixel

7   of these images.  You have a map of where the oxygen exists at

8   the highest concentrations, where the sulfur exists at the

9   highest concentration relative to this image here, so that you

10  can see where the sulfur and oxygen also can coexist.  So it

11  gives us an opportunity to look at a wider field of view and

12  see how the elements are distributed to get a feel for what

13  reactions are occurring.

14  Q.   What does this show you, that the sulfur and the oxygen

15  combined are --

16  A.   This shows that we have a combination of sulfide forming

17  and oxide forming.  Based on experience, we've seen the type of

18  reactions you can observe when both oxide and sulfide have been

19  found to form due to exposure to drywall and just residential

20  environment.

21            MR. SANDERS:  If we could move to Defense

22  Exhibit 160.

23  BY MR. SANDERS:

24  Q.   If you could identify what we're looking at, first.

25  A.   Yes.  This would an interior diameter of that same pipe

DAILY COPY

1    we've been discussing from the Hernandez residence.

2              **MR. SANDERS:**  I'd move Defense Exhibit 160 in.

3              **THE COURT:**  Admitted.

4    **BY MR. SANDERS:**

5    **Q.**   What are you showing with this image?

6    **A.**   This is shown to be in contrast with the previous image,

7    where we were looking at the outer diameter where the tarnish

8    film exists.  Again, we're taking a look at the scanning

9    electron microscope image on the left.  I would draw your

10   attention to the fact that now this scale bar is not

11   10 microns, as it was previously, but it's actually 50 microns.

12             We observe ingress into the material.  Again, this is

13   where the water is actually transported.  We see ingress in

14   material of about maybe 40 to 50 microns.  That's significantly

15   more than what would be expected on the outside surface.  This

16   clearly is where the water is transported as part of the

17   operation of the pipe.

18             **MR. SANDERS:**  If we could back up.

19   **BY MR. SANDERS:**

20   **Q.**   What are you looking at again on the right side?

21   **A.**   So, again, we're looking at distribution of where the

22   elements exist in this.  So it gives us information as a

23   function of position, demonstrating that the deposits on the

24   surface are phosphorus and iron and that oxygen is present.

25   Likely an oxide is responsible for this location here, as shown

1    in this.

2    Q.   Is there any sulfur or sulfide in this?

3    A.   Sulfur is not shown because it was not found to be present

4    in this.

5    Q.   This is inside the pipe.  What's causing this reaction?

6    A.   This would be reaction with whatever species would be

7    present in the water supply that's being transported through

8    the pipe during its operation.

9    Q.   That's just an everyday sort of occurrence?

10   A.   Yes.  I have no reason to believe that its use would be in

11   any way different from any other pipe.

12            MR. SANDERS:  If we could move on to Defense

13   Exhibit 161.

14   BY MR. SANDERS:

15   Q.   What are we showing here?

16   A.   This is a cross-section now through the brazed connection

17   in that same cold-water supply pipe from the Hernandez

18   residence that we've been discussing to this point.

19            MR. SANDERS:  Your Honor, I'd like to move Defense

20   Exhibit 161 into the record.

21            THE WITNESS:  Admitted.

22   BY MR. SANDERS:

23   Q.   If you could describe what this is and what we're looking

24   at.

25   A.   What these series of images are presented to show is the

1  condition of the brazed joint shown here.  To orient you, we're

2  dealing with -- here's the copper plumbing that's coming down.

3  Here's the brass fitting that it's being connected to.  This

4  material is added in order to provide a good seal between these

5  two components.  This type of joining process, the brazing

6  process, is meant to melt this material and provide basically a

7  good joint, a good paste or connection between the two, but

8  doesn't melt the copper or the brass.

9         What this is intended to show is, as we showed

10  previously, in the area of the joint was where there was a lot

11  of black discoloration.  We don't see any evidence of intrusion

12  of that tarnish film in any way compromising the structural

13  integrity of the joint.  These images shown here, where you

14  have these large voids, these are characteristics of porosity,

15  which routinely will form during the joining process.

16  **Q.**   The holes that you see here, they don't have anything to

17  do with Chinese drywall; it's just part of the way it works?

18  **A.**   The subsurface voids that are observed here have

19  everything to do with the way the pipes were joined.  There's

20  no evidence that there's any relationship at all to exposure to

21  Chinese drywall.

22  **Q.**   What are we looking at on the pictures on the right?

23  **A.**   When this joint is made, you can see it goes from very

24  thick, where this is where you're getting the strength of your

25  joint here, where most the material is, but this will flow up

1   and out until it gets very thin at the top part of the copper,

2   and then all the way out here to the tail, where you're all the

3   way out onto the brass.  There is simply trying to show the

4   total joint.

5   **Q.**   Did you do any additional work?  Did you observe any

6   copper sulfide or sulfide materials on this joint?  Do you

7   recall?

8   **A.**   We did look at this under the electron microscope to see

9   what we could find in terms of the presence of sulfide on the

10   surface.  As I recall, there was no intrusion into the

11   material.  Any sulfides that were present stayed at the surface

12   of the material, were superficial.

13           **MR. SANDERS:**  I'd like to move to Defense

14   Exhibit 164.

15   **BY MR. SANDERS:**

16   **Q.**   What are we looking at here?

17   **A.**   This is a hot-water heater pipe collected from a house in

18   Bradenton, Florida, containing Chinese drywall.

19   **Q.**   Is this representative of samples you've seen that have

20   been impacted by Chinese drywall?

21   **A.**   Yes.  This type of dark black appearance is similar to

22   what we've seen in pipes that have been tarnished.

23           **MR. SANDERS:**  I'd like to move Defense Exhibit 164

24   into evidence, Your Honor.

25           **THE COURT:**  Admitted.

1    BY MR. SANDERS:

2    Q.    So what are we looking at?

3    A.    That is a copper pipe complete with -- you can see the

4    kind of silvery areas are where the brazed joints were, but you

5    see that the copper no longer has a coppery appearance but has

6    a very tarnished appearance.  This is sitting out in a garage,

7    I believe, in a house in Bradenton, Florida.

8              MR. SANDERS:  If we could move to Defense

9    Exhibit 165.

10   BY MR. SANDERS:

11   Q.    What are we looking at here?

12   A.    This is a section of that same pipe we just looked at

13   removed from the house in Bradenton, Florida.

14             MR. SANDERS:  This is Defense Exhibit 165.

15             THE COURT:  You're admitting that?  The Court will

16   admit it.

17   BY MR. SANDERS:

18   Q.    What are you showing with this?

19   A.    This simply demonstrates where cross-sections would be

20   made in order to take a look at the wall thickness and the

21   structural integrity of that pipe.

22             MR. SANDERS:  If we could move to Defense

23   Exhibit 166.

24   BY MR. SANDERS:

25   Q.    What are we showing here?

1   **A.**   These are cross-sections of that same pipe we were just

2   looking at.

3              **MR. SANDERS:**  Your Honor, I move that this be

4   admitted.

5              **THE COURT:**  Admitted.

6   **BY MR. SANDERS:**

7   **Q.**   Can you describe what we're looking at here.

8   **A.**   Yes.  All these images are looking at the same

9   magnification, I believe, showing multiple fields of view of

10  that same cross-section, demonstrating that again this would be

11  the outer diameter, where we saw the black tarnish film.  This

12  would be the inner diameter, where water service actually took

13  place.  You can actually see, at least at this low

14  magnification, some presence of some type of surface scale on

15  the inner diameter.  It's difficult to see even on this

16  magnification on the outer diameter even though it was visibly

17  black.

18  **Q.**   Do you have, actually, a sample of this pipe?

19  **A.**   Yes, I do.

20  **Q.**   Could you take it out and show it to the Court.

21             **MR. SANDERS:**  I don't know if you want to examine it,

22  Your Honor.

23             **THE COURT:**  Yes.

24  **BY MR. SANDERS:**

25  **Q.**   Maybe you could explain what he's looking at.

1        **THE WITNESS:**  Your Honor, this is a section of that

2   pipe.  The cross-section that you're looking at on the screen

3   now is right at the cut end that you're looking at.

4        **THE COURT:**  What's inside of it?  Do you know?

5        **THE WITNESS:**  What's inside appears to be some type

6   of surface deposit likely from the operation of this.  This had

7   been in operation, but I don't know specifically what that is.

8   BY MR. SANDERS:

9   **Q.**    Is there an exhibit number on that?

10  **A.**    The exhibit number on this is DX0125B.

11       **MR. SEEGER:**  I just haven't seen it.

12       **MR. SANDERS:**  I move that that be admitted as well.

13       **THE COURT:**  Let it be admitted.

14       **MR. SANDERS:**  If we could go to Defense Exhibit 168.

15  BY MR. SANDERS:

16  **Q.**    Could you tell me what we're looking at here.

17  **A.**    This is called type K plumbing from that same house in

18  Bradenton, Florida.  This would be the type of plumbing that

19  would be under a faucet, similar to what was removed from the

20  Hernandez residence.

21  **Q.**    What was the other type plumbing we used, type L?

22  **A.**    I believe it was type L, yes.

23  **Q.**    Where is that usually used?

24  **A.**    As was shown before in the type of hot-water heater

25  application is a good example of it.

1   **Q.**    Do we have a physical sample of this as well?

2   **A.**    Yes, we do.

3   **Q.**    Could you please take it out and help me with the exhibit

4   number.

5   **A.**    The exhibit number is DX0125A.

6          **MR. SANDERS:**  Your Honor, if you'd like to look at

7   it.

8          **THE COURT:**  Yes.  What's the environment that the

9   hot-water heater is exposed to?

10          **THE WITNESS:**  The hot-water heater will be exposed to

11  maybe slightly different environments depending on where they

12  are located in the house.  In this case, it's sitting in a

13  garage, which is an un-air-conditioned space.  I've also seen

14  them present in attics and utility rooms.  So it can vary from

15  residence to residence.  The conditioning of the environment

16  could have a different impact on the reactivity of those.

17          **MR. SANDERS:**  I'd like to move 168 and 125A into

18  evidence.

19          **THE COURT:**  Let it be admitted.

20          **MR. SANDERS:**  If we could move on to Defense

21  Exhibit 169.

22  **BY MR. SANDERS:**

23  **Q.**    What are we showing here?

24  **A.**    This is a higher-magnification image of that same pipe.

25  The cut section that does not contain the fitting is what is

1    the physical sample that was just placed into evidence.

2              **MR. SANDERS:**  I would like to move Defense

3    Exhibit 169 into evidence.

4              **THE COURT:**  Admitted.

5              **MR. SANDERS:**  Can we move to Defense Exhibit 170.

6    **BY MR. SANDERS:**

7    **Q.**   What are we looking at here, Dr. Perricone?

8    **A.**   This is cross-sections of that same pipe we were just

9    discussing, demonstrating again that the wall thicknesses are

10   generally uniform or unimpacted.  Even though the presence of

11   the tarnish film is here at the outer surface, there's no

12   visible sign, at least this magnification, of ingress into the

13   wall thickness.

14             **MR. SANDERS:**  I'd like to move Defense Exhibit 170

15   into evidence.

16             **MR. SEEGER:**  Your Honor, I'm just concerned that when

17   somebody's reading these transcripts, they're not going to know

18   that that's a Florida house.  So if counsel could just identify

19   in advance where the --

20             **THE COURT:**  Sure.  That's fair enough.  That's fair

21   enough.

22   **BY MR. SANDERS:**

23   **Q.**   Just to be clear, Exhibits 164, 165, 166, 168, 169, and

24   now 170 are from a house in Bradenton, Florida; is that

25   correct, Dr. Perricone?

1  **A.**   Yes, that's correct.

2  **Q.**   125A and B, the physical samples, are also from that

3  Bradenton house?

4  **A.**   Yes, that's correct.

5  **Q.**   The corrosion that you've seen and the tarnishing on the

6  outside of these samples, are they similar to the tarnishing

7  that you observed in the Hernandez house?

8  **A.**   Yes, they are.

9         **MR. SANDERS:**  If we could move on to Defense

10  Exhibit 171, which is also from the same Bradenton house.

11  **BY MR. SANDERS:**

12  **Q.**   What are we looking at here?

13  **A.**   This is a higher-magnification image of the same

14  cross-sections of the type K plumbing, demonstrating here where

15  the sulfide layer exists, the tarnish film exists, that there's

16  no ingress into the material beyond surface irregularities, as

17  is shown in these images.

18         **MR. SANDERS:**  I'd like to move Defense Exhibit 171

19  into evidence.

20         **THE COURT:**  Admitted.

21         **MR. SANDERS:**  If we could go to Defense Exhibit 174.

22  **BY MR. SANDERS:**

23  **Q.**   Could you tell me what we're looking at here.

24  **A.**   Yes.  This is a cross-section of what's titled "new

25  plumbing," or plumbing that has not been put into service, of

1   similar type K copper that we were just discussing.

2   **Q.**   So this was from the store, not in a house with Chinese

3   drywall or any other house?

4   **A.**   That's correct.

5           **MR. SANDERS:**  Your Honor, I'd like to move Defense

6   Exhibit 174 into evidence.

7           **THE COURT:**  Admitted.

8   BY MR. SANDERS:

9   **Q.**   If we go to Defense Exhibit 175, what are we looking at

10  here?

11  **A.**   These are cross-sections at higher magnification of that

12  same new plumbing.  They're shown specifically to show the type

13  of surface irregularities that are simply commonly occurring

14  during the manufacture of this type of product, showing the

15  type of surface irregularities.

16          **MR. SANDERS:**  I move 175 into the record.

17          **THE COURT:**  Admitted.

18  BY MR. SANDERS:

19  **Q.**   So how does that compare to what you see on a pipe that's

20  been impacted by copper sulfide?

21  **A.**   Well, what is particularly interesting is when these are

22  compared to the same images shown previously for the type K

23  plumbing from the house in Bradenton that contained Chinese

24  drywall, that the surface condition, as shown in the underlying

25  copper, shows the same type of irregularities; shows, you know,

1   an absence of anything significantly different, because of the

2   presence of the tarnish film, and are reminiscent of the type

3   of surface irregularities that are seen in other components

4   where there's some reported intrusion of tarnish film into the

5   underlying copper.

6   **Q.**   In the samples that you reviewed, have you seen any

7   evidence of pinhole leaks or anything in copper plumbing?

8   **A.**   I have not seen any evidence of that, no.

9   **Q.**   What about significant pits that might damage the

10  functionality of the plumbing?

11  **A.**   No, I have not.

12  **Q.**   If we could go to Defense Exhibit 177 and identify this

13  for the Court.

14  **A.**   Yes.  This is new plumbing for type L.  This is the larger

15  of the two types of plumbing that we've taken a look at, that

16  we looked at previously.  This has never been placed into

17  service.  It has never been exposed to Chinese drywall.

18          **MR. SANDERS:**  I'd like to move Defense Exhibit 177

19  into evidence.

20          **THE COURT:**  Admitted.

21  **BY MR. SANDERS:**

22  **Q.**   What are we looking at here?

23  **A.**   These are optical microscope images of the surface,

24  demonstrating that there are a lot of surface irregularities

25  that occur due to the manufacture of the material as the copper

1   is deformed to mold it into shape.  You can see a lot of nicks

2   and scratches and folds in the material that result in a not

3   completely smooth surface.

4              THE COURT:  Do you have any feeling as to whether

5   that makes cleaning difficult or impacts cleaning in any way?

6              THE WITNESS:  Your Honor, yes, I do.  The presence of

7   these types of surface defects, as it were, would have a

8   similar impact to -- as would any type of surface irregularity.

9   Tarnish film hugs the surface, as we've seen it do.  If it's

10  not boldly exposed on the surface, there could be an avenue for

11  a sulfide to be left behind.

12             THE COURT:  What's the significance of that, though,

13  if it is?

14             THE WITNESS:  There is no significance in leaving

15  behind sulfide in terms of the source of continuing corrosion,

16  Your Honor.

17  BY MR. SANDERS:

18  Q.   Do you hold that opinion with a reasonable degree of

19  scientific certainty?

20  A.   Yes, I do.

21  Q.   If we could move on to a completely different type of

22  component, Defense Exhibit 184.  If you could identify this for

23  the Court.

24  A.   Yes.  This was a refrigerator control board that was

25  received as removed from the Hernandez residence.

DAILY COPY

1          **MR. SANDERS:**  I'd like to move Defense Exhibit 184

2     into the record.

3          **THE COURT:**  Admitted.

4     BY MR. SANDERS:

5     **Q.**   What are we looking at here, Dr. Perricone?

6     **A.**   This is a control board taken from a refrigerator that had

7     reportedly failed in the circuit board.  There are clear signs

8     of overheating of the circuit board, the black discoloration

9     shown in this area and had deposited here on both sides of the

10    plastic shell, indicating that maybe some type of

11    high-temperature event had occurred during the event of the

12    failure.

13    **Q.**   Did you do any additional analysis of this circuit board?

14    **A.**   Yes, we did.

15         **MR. SANDERS:**  If I could go to Defense Exhibit 187.

16              I don't think that's 187.

17    BY MR. SANDERS:

18    **Q.**   Can you just identify what this is.

19    **A.**   Yes.  This is a scanning electron microscope image and the

20    corresponding spectrum from what is titled "The Burnout Site"

21    on that refrigerator control board from the Hernandez

22    residence.

23         **MR. SANDERS:**  I'd like to move Defense Exhibit 187

24    into the record.

25         **THE COURT:**  Admitted.

1  **BY MR. SANDERS:**

2  **Q.**   What are we looking at here?

3  **A.**   The assessment of the refrigerator control board to

4  clearly show that it was in a failed condition.  Examination of

5  the components, particularly in the area where the black soot

6  was present, the highest quantity, revealed that there were a

7  couple of pin connectors in that board where the power comes

8  into the board that had melted.  There was a lot of melting

9  around this area.  It was consistent with a high-temperature

10 event.  This spectrum shows right in this immediate vicinity of

11 that location the absence of sulfur, which has typically been a

12 marker for determining whether material has been impacted by

13 exposure to Chinese drywall.

14 **Q.**   Did you do anything else to confirm whether or not this

15 type of board had an issue or problem?

16 **A.**   We performed a general survey of the board using a

17 scanning electron microscope looking for evidence of sulfur

18 specifically in other locations and did not find them in the

19 area that the failure had occurred.

20 **Q.**   In coming to form your opinions, did you look at the

21 tarnish film data and the pit measurements of Mr. Krantz?

22 **A.**   Yes.  I reviewed Mr. Krantz' data, yes.

23 **Q.**   Have you considered the film thicknesses that he measured

24 in giving your opinions here that there's no damage to copper

25 wires or plumbing?

1    **A.**   I've reviewed his data and I'm aware of the measurements

2    he has made in terms of forming my opinions.

3           **MR. SANDERS:**  Can I go to what's page 9 of

4    Mr. Krantz' February 12 report.

5    **BY MR. SANDERS:**

6    **Q.**   If you could look at the bottom image.  I think you've

7    indicated you've performed a lot of metallography; is that

8    right?

9    **A.**   Yes.

10   **Q.**   What is that again?

11   **A.**   Metallography is the preparation of typically metallic

12   specimens in cross-section most frequently in order to observe

13   either the microstructure or surface characteristics, as is

14   shown here.

15   **Q.**   What is the goal in performing that?  What are you trying

16   to do?

17   **A.**   Well, in performing a cross-section, you're typically

18   trying to assess what the condition of the material is.  In the

19   case where we're dealing with the tarnish film, we're

20   particularly interested in seeing how much material is involved

21   in the reaction, and so we focus on the surface appearance of

22   the material.

23   **Q.**   What are your observations of this metallographic sample?

24   **A.**   This metallographic sample appears to be a copper

25   component -- it's labeled "black wire" -- where there sees some

1    sign of what appears to be tarnish film; some that is close to

2    the surface, others that have clearly broken off and have

3    become embedded in the epoxy in which this is mounted.  In

4    order to prepare the specimen, you don't just simply cut the

5    piece of metal and try to prepare it by hand.  We typically

6    mount it in a polymer in order to make it easier for handling

7    preparation.

8    **Q.**   Would you consider the measurements here to be accurate

9    measurements of film thickness?

10   **A.**   No, I would not.

11   **Q.**   Why not?

12   **A.**   The measurements that are displayed here may be accurate

13   measurements of the actual dimensions of what's being shown in

14   the image.  But as they relate to how those features existed on

15   the surface of the material, it's impossible to tell once it

16   has been completely detached from the underlying material,

17   particularly something in the example shown to the left of the

18   image, where you have clearly an elongated portion of tarnish

19   and you have no idea how that sat on the surface, whether it

20   grew straight up or was somehow angled.  So relating that to

21   how the film thickness existed on the surface, these

22   measurements don't accurately depict that.

23            **MR. SANDERS:**  If we could move to Krantz page 5 of 13

24   from the February 12 report and look at the bottom image again.

25

DAILY COPY

1    **BY MR. SANDERS:**

2    **Q.**   What are your observations about this sample?

3    **A.**   This sample shows clear evidence of delamination of the

4    tarnish film from the surface of the material, or separation of

5    the tarnish film from the surface of the material.  So a

6    measurement from the surface material out to this,

7    quote/unquote, "highest point" does not appear to be an actual

8    description of what the actual film thickness was as it was

9    adhered to the material.

10   **Q.**   That was a reported 37.7 microns?

11   **A.**   That's what it says on the image, yes.

12           **MR. SANDERS:**  If we could move to page 7 of 13 and

13   the bottom image again.

14   **BY MR. SANDERS:**

15   **Q.**   What are your observations about this sample, for example?

16   **A.**   Well, there are a number of things.  One is that the

17   tarnish film appears very irregular.  And it's unclear, based

18   on this image, what feature is actually being measured here as

19   tarnish film.

20           It also appears that the mounting material being used

21   is significantly different in this case as was previously used

22   in terms of epoxy, so the type of mounting that would have been

23   done.  If, in fact, this is like a Bakelite structure, there's

24   a lot more pressure and heat applied to the sample upon sample

25   preparation that wouldn't exist in the other epoxy mounts.

1  **Q.**   Why do you think that might have been what happened here?

2  **A.**   The appearance of what I believe is a mounting material --

3  it's hard to tell from this image and this magnification, but

4  it's clear there's a lot of disruption at the surface.  And

5  it's unclear what here is related to mounting material and what

6  here is related to tarnish film.  This is an uninsulated wire,

7  so I'm not entirely sure what we're looking at beyond that.

8  **Q.**   Dr. Perricone, the assessments and testing you've done,

9  the wire assessments for the Hernandez house and other

10  locations, some of which we've looked at here, are they

11  contained in appendix A1 of your report?

12  **A.**   Yes, I believe they are.

13         **MR. SANDERS:**  We've marked that as DX1A1, and I move

14  that that be admitted into evidence.

15         **MR. SEEGER:**  Judge, could we look at it and do it at

16  the end?

17         **THE COURT:**  Sure.

18         **MR. SANDERS:**  I'm going to do the same for A2, which

19  is the Hernandez house assessment plumbing that we looked

20  through, as well as other pictures.

21         **THE COURT:**  I reserve ruling until the plaintiffs

22  have an opportunity look at it.

23         **MR. SANDERS:**  Great.

24  BY MR. SANDERS:

25  **Q.**   Do you have an opinion to a reasonable degree of

883

1   scientific certainty, based on this data and your report,

2   whether or not the wires in the Hernandez house can remain

3   after the Chinese drywall is removed?

4   **A.**   Yes, I have an opinion.

5   **Q.**   What is that?

6   **A.**   That the wiring does not need to be removed once the

7   Chinese drywall has been removed from the residence.

8   **Q.**   Similarly, do you have an opinion with respect to the

9   copper plumbing we were looking at in the Hernandez house,

10  whether that needs to be removed after the source is removed?

11  **A.**   Yes, I do.

12  **Q.**   What is that opinion?

13  **A.**   That the plumbing does not need to be removed once the

14  Chinese drywall has been removed from the residence.

15  **Q.**   That's with a reasonable degree of scientific certainty?

16  **A.**   Yes, it is.

17          **MR. SANDERS:**  We have some standards and things that

18  we'd like to move in that I think are unopposed, but we'll just

19  wait until the end.

20          **THE COURT:**  Just a question:  Do you have any view as

21  to whether or not the wiring or the plumbing needs to be

22  cleaned or should be cleaned?

23          **THE WITNESS:**  Your Honor, you refer to the exposed

24  portions that have been tarnished?

25          **THE COURT:**  Yes.

1          **THE WITNESS:**  Yes.  My opinion would be that there's

2     no reason to remove the tarnish film in terms of concerns about

3     continued operation of those components.

4          **THE COURT:**  Have you made any tests regarding odor?

5          **THE WITNESS:**  I have not performed any tests

6     regarding odor, Your Honor.

7          **THE COURT:**  We'll take a break here, a 15-minute

8     break.

9          **THE DEPUTY CLERK:**  Everyone rise.

10          (WHEREUPON the Court took a brief recess.)

11          **THE DEPUTY CLERK:**  Everyone rise.

12          **THE COURT:**  You're still under oath.

13                    **CROSS-EXAMINATION**

14     BY MR. SEEGER:

15     **Q.**   Dr. Perricone, you're 31 years old; right?

16     **A.**   Yes, that's correct.

17     **Q.**   You've been a PhD for less than five years; right?

18     **A.**   Yes.  I graduated in July of '05, I believe.

19     **Q.**   You've never published corrosion research in a

20     peer-reviewed journal, have you?

21     **A.**   As it pertains to corrosion-related research, I have

22     published in an area describing the general impact of

23     metallurgy on stainless steels.  On corrosion specifically as

24     it relates to reactions, the answer is no.

25     **Q.**   Are you teaching any courses in any colleges on corrosion

1   and corrosion processes?

2   **A.**   I am not currently teaching, no.

3   **Q.**   Have you written any textbook chapters on corrosion or the

4   corrosion processes?

5   **A.**   I have written a section of the American Welding Society

6   handbook scheduled to come out shortly relating the welding of

7   super-austenitic stainless steels, where one of the major

8   concerns in terms of the welding of those types of alloys is

9   the maintenance of corrosion resistance in those welds.  That's

10  my involvement on that handbook committee in the American

11  Welding Society.

12  **Q.**   Did you send that article to be published?

13  **A.**   That article has not yet been published.

14  **Q.**   Are you a member of the National Association of Corrosion

15  Engineers?

16  **A.**   I am not.

17  **Q.**   The articles that are on your CV, they mostly relate to

18  welding and stainless steel; isn't that right?

19  **A.**   They largely relate to welding, yes.

20  **Q.**   Your experience at Sandia, that relates to welding and

21  stainless steel as well, doesn't it?

22  **A.**   A lot of the work that was done at Sandia was in reference

23  to welding of stainless steel but was not exclusively limited

24  to that.

25  **Q.**   You are a member of the American Welding Society; right?

1   A.   Yes, I am a member.

2   Q.   Now, when were you retained by KPT to be their expert in

3   this case?

4   A.   My understanding is that RJ Lee Group was retained in, I

5   believe, July of 2008.

6   Q.   Now, prior to that, Dr. Perricone, you never really held

7   yourself out as having any particular corrosion experience, did

8   you?

9   A.   In terms of holding myself out, certainly I have done work

10  in the area of corrosion.  This would be my first testimony

11  regarding corrosion as an expert.

12  Q.   Mr. Krantz, for example, do you know the name of the

13  company he works for?

14  A.   If memory serves, I believe it's Corrosion Technology

15  Laboratories.

16  Q.   The first word:  Corrosion Technology Laboratories; right?

17  A.   (NO RESPONSE)

18  Q.   So let me ask you this:  On your CV, which we have --

19  actually, we have a couple versions of your CV; isn't that

20  right, Dr. Perricone?

21  A.   I'm not clear what versions that you're referring to.

22  Q.   Well, you were deposed in the *Germano* litigation, which is

23  a case before this; right?

24  A.   Yes, that's correct, I was.

25  Q.   You had a CV that was in use by you prior to ever being

1    retained by the defendants to give corrosion opinions regarding

2    Chinese drywall; right?

3    A.    Yes.  I have a CV that I would routinely update.

4          MR. SEEGER:  Actually, could we go to the overhead

5    projector, please.

6    BY MR. SEEGER:

7    Q.    I want to just focus your attention.  That's you at the

8    top.  Right, Dr. Perricone?

9    A.    Yes, it is.

10   Q.    RJ Lee Group, that's your employer right here.  I want to

11   focus you right around this section of your CV.  Are you

12   looking at that?

13   A.    Yes.

14   Q.    The first item is:  Project management and analysis, root

15   cause failure analysis, extensive experience in the areas of

16   solidification and microstructural analysis.

17         Let me show you the CV that you began using after you

18   were retained by KPT in this litigation.  Okay?  What's that?

19   What's that entry right there, Dr. Perricone?

20   A.    That entry is the -- refers to conducting studies of

21   corrosion impact on a variety of materials, including impact of

22   World Trade Center dust on building components.

23   Q.    I'm from New York, so I know the answer to this question,

24   but when was the World Trade Center disaster?  2001; right?

25   A.    That's correct.

1    **Q.**    So the work you did was sometime before 2008 on the

2    World Trade Center; isn't that right?

3    **A.**    I believe either prior to 2008 or in 2008 itself.

4    **Q.**    You were working on that project before you were retained

5    by KPT.  Isn't that what you testified to in your deposition?

6    **A.**    I believe that's correct, yes.

7    **Q.**    That was added for the purposes of this litigation, wasn't

8    it?

9    **A.**    That section was added as part of a routine update of CVs

10   that we would go through as part of the normal course of doing

11   business.  As I get more experience on various aspects,

12   particularly working in a consulting firm, where we have a wide

13   variety of clients, the need to update CVs with relevant

14   experience is common practice.

15   **Q.**    Any of the lawyers suggest to you it was good idea to add

16   that for the purposes of this litigation, to add your new

17   corrosion experience?

18   **A.**    I have no recollection that any such instruction or

19   suggestion was given.

20   **Q.**    You spent a little time talking about a refrigerator

21   circuit board.  Do you recall those photographs that

22   Mr. Sanders was showing you?

23   **A.**    I do recall those.

24   **Q.**    Do you understand, sitting here today, that there's no

25   dispute that that was a short circuit that caused that -- that

DAILY COPY

1    that's not really in dispute that that's a corrosion-related

2    incident?  Are you aware of that?

3    **A.**   I am not sure I understood your question.

4    **Q.**   Is there any dispute between the experts in this case

5    about what the cause of that short circuit was with the circuit

6    board you were talking about?

7    **A.**   To my knowledge, I don't know that any expert has asserted

8    that that circuit board failed as -- that was caused by

9    exposure to Chinese drywall.

10   **Q.**   I want to talk to you also about one of the exhibits.  I

11   don't know if I remember the exhibit number.  It was one of the

12   defense exhibits that Mr. Sanders put up where it showed a

13   cross-section of the wire and it was a really nice, perfect

14   circle.  Do you recall talking about that?

15          There we go.  That photo right there that you were

16   talking about, now that's where you took a wire and you took a

17   slice; right?  You cut the wire and you looked at it from an

18   angle; right?

19   **A.**   That's correct.  That's what those cross-sections

20   represent.

21          **MR. SEEGER:**  Can we go to the overhead.

22   **BY MR. SEEGER:**

23   **Q.**   Let me make sure I drew this correctly.  So what

24   Dr. Perricone did is you took the wire and you sliced it like

25   that; right?  And then you looked at it from this direction, or

1   this direction, whatever; right?

2   A.   That's correct.

3   Q.   What did Mr. Krantz do?  Mr. Krantz took the wire, laid it

4   on its side, and he cross-sectioned it all the way down, didn't

5   he?

6   A.   I'm not aware that that was exactly how it was done,

7   but --

8   Q.   You're not aware of that sitting here right now?

9   A.   I don't know that I would have made that distinction that

10  that's how those wires were prepared, no.

11  Q.   Did you read his report?

12  A.   Yes, I did.  Yes, I did.

13  Q.   If you want to really see if there's pitting or problems

14  with the wire, don't you think the method of slicing it down

15  the middle and getting a look at it is better than what you

16  did?

17  A.   No, I don't.

18  Q.   What did you do?  Did you pick the shiniest spot to cut it

19  at?

20  A.   No.  Actually, the intent was to cut through a portion of

21  the wire that showed particularly dark tarnishing to see what

22  evidence there would be of ingress into the material.

23  Q.   Right.  Okay.

24  A.   The orientation that you refer to with Mr. Krantz, the

25  reason why there could be issues with that is, in particular

1   with these wires that have been in service, obviously, they've

2   been bent in terms of part of their installation.  In terms of

3   metallographically preparing a cross-section such that you

4   would need to polish the centerline of that wire is very

5   difficult to do even in a straight specimen.  So to do that in

6   a situation where the wire could be bent in a number of

7   different planes -- keep in mind, in any of these

8   cross-sections, you're looking at a two-dimensional

9   representation of a three-dimensional part.  The distortions of

10  being in and out of plane, particularly in a longitudinal

11  section, as you described, could be fraught with difficulties

12  in terms of the sample preparation process that wouldn't

13  immediately be evident just looking at those cross-sections.

14  Q.   I no idea what you just said, but that's fine.

15       Dr. Perricone, you're aware that KPT had another

16  expert in this case by the name of Dr. Sandy Sharp in the

17  *Germano* litigation; right?

18  A.   Yes, I'm aware of that.

19  Q.   "Yes" or "no," if you can tell me.  Dr. Sharp had a

20  problem with some calculations that you did in *Germano*, didn't

21  he?  He disagreed with you on some calculations?

22  A.   My understanding is, yes, his testimony was that he

23  disagreed with me.

24  Q.   Where is Dr. Sharp in the *Hernandez* litigation?  Is he

25  testifying?

1  **A.**   To my knowledge, he is not.

2  **Q.**   Was he fired?  Do you know?

3  **A.**   I don't know how he was retained or --

4         **MR. SANDERS:**  Objection, Your Honor, as to foundation

5  or what he knows about this.

6         **MR. SEEGER:**  I'll withdraw the question.

7  **BY MR. SEEGER:**

8  **Q.**   You testified earlier on some questions from Mr. Sanders

9  about some ISA standards.  Do you recall that?

10  **A.**   Yes, I do.

11  **Q.**   You used those standards to make coupon measurements;

12  right?

13  **A.**   I used those standards as the basis for using coupons in

14  order to assess environments.

15  **Q.**   Now, let's be clear.  Just so the Court's clear on this,

16  when you're talking about measuring tarnish and corrosion -- by

17  the way, you like the word *tarnish* better than you like the

18  word *corrosion*, don't you?

19  **A.**   I don't have a particular affinity for one term or

20  another.

21  **Q.**   How come you don't say *corrosion*, I mean, like in the

22  Sandia report?  They use the word *corrosion*, don't they?

23  **A.**   I believe they do use the term *corrosion*.

24  **Q.**   Why won't you?

25  **A.**   I believe I have referred to corrosion in various aspects.

1   I have typically made the distinction in terms of conversing
2   about the various impacts seen in residential environments to
3   distinguish corrosion as it may occur in an aqueous environment
4   versus tarnishing, which is commonly referred to in terms of
5   sphere corrosion processes.
6           Particularly, tarnishing is associated with a type of
7   discoloration of a metal at its surface.  Corrosion typically
8   denotes a connotation of metal loss or damage to materials.  So
9   I've just been making the distinction to make the distinction
10  between those types of conditions.
11  Q.   Dr. Perricone, in these ISA tests, when you were measuring
12  corrosion on coupons, the point I wanted to make is this:  When
13  you're looking at tarnishing coupons, that's a surrogate
14  method.  That's another way of looking at what might be going
15  on on pipes, but it's not looking at the pipes.  It's looking
16  at a piece of copper that you installed in the house for
17  testing purposes.  Right?
18  A.   The use of a copper coupon is intended to characterize the
19  environment, not to assess the condition of any one component
20  in the house.
21  Q.   So when you did the testing on the copper coupons, did you
22  measure relative humidity at the time?  I looked in your report
23  and I couldn't find that.
24  A.   I believe relative humidity measurements were made and
25  would have been presented in a parallel report, I believe, by

1  Dr. Goad.

2  **Q.**   But in your report, the testing that you testified to the

3  Court to, was that done by Dr. Goad or by you, the coupon

4  testing?

5  **A.**   The coupon testing was performed by me, by RJ Lee Group.

6  **Q.**   Did you check to see what the relative humidity was at the

7  time that the testing was done on the coupons?

8  **A.**   Yes, I've reviewed data that's been presented about the

9  relative humidity in the houses that that testing occurred in.

10  **Q.**   What was it?

11  **A.**   My recollection, that the humidity varied significantly

12  from time of day and time of year and depending, obviously, on

13  what location the house was in that testing was being done.

14  **Q.**   I'm sorry.  I didn't hear the last part of what you said.

15  **A.**   The actual location of the house, geographic location of

16  the house in which the testing or assessment was being done.

17  **Q.**   Right.  What was the relative humidity at the time of

18  testing?

19  **A.**   As I recall, it was on the order of -- it would vary

20  between 50 and 80 percent relative humidity --

21  **Q.**   Okay.

22  **A.**   -- if memory serves.

23  **Q.**   Did you actually read the ISA standard that you cited to

24  earlier with regard to environmental conditions for process

25  measurement and control systems?

1   A.    Yes.

2   Q.    Did you take note of this table?

3            MR. SEEGER:  Could I have the overhead.

4                 For the record, I'm looking at Hernandez 62.

5   BY MR. SEEGER:

6   Q.    Do you see that top part?  It says:  "The gas

7   concentration levels shown below are provided for reference

8   purposes.  They're believed to approximate the copper

9   reactivity levels stated below provided the relative humidity

10  is less than 50 percent."

11            That's from the ISA guideline that you used; right?

12  A.    Yes, that's correct.

13  Q.    Let me stay on coupons for a second.  When did you do the

14  coupon testing?  What time of year?  What period of time was

15  that?

16  A.    Coupon testing --

17  Q.    At the Hernandez house.  I apologize.

18  A.    Coupon testing was performed in the Hernandez residence, I

19  believe, during the month of January into February of 2009.

20  Q.    Right.

21  A.    Or 2010.  I apologize.

22  Q.    You understand that that's not -- I'm not saying there

23  isn't humidity all the time, but that's not a particularly

24  humid time of year in Louisiana.  Would you agree with that?

25  A.    Yes.  I would expect the humidity in winter, for example,

1   relative humidity to be less than, say, the heat of summer.

2   **Q.**   You acknowledge there's a reaction between the sulfur

3   gases coming off of the drywall, the KPT drywall, and humidity?

4   There's a relationship there, right, in terms of causing

5   corrosion?

6   **A.**   Yes, on copper.  Particularly, copper demonstrates a

7   sensitivity to humidity.

8   **Q.**   The table in your report at appendix 2 -- do you see that

9   right there at the top?  These are the test results you got.

10  Do you see where it says the sulfide thickness in angstroms?

11  Relatively low numbers; wouldn't you agree with me?

12  **A.**   Yes.

13  **Q.**   That's measuring the thickness of corrosion; right?

14  **A.**   The tarnish film thickness on the -- yes.

15  **Q.**   You can call it tarnish.  You call it "tomato."  I call it

16  "tomato."

17          Let's go to another piece of your report, though.

18  You also did testing in a house in Florida, didn't you, back in

19  June, June of 2009?  Right?  You're involved in that?  You're

20  aware of that, aren't you?

21  **A.**   Yes, I did.

22  **Q.**   You got much higher readings during that humid -- you

23  would acknowledge that in June in Florida, it's pretty humid;

24  right?

25  **A.**   Yes, I would acknowledge that.

1  **Q.**   You got much higher readings here, didn't you, in this

2  table?

3  **A.**   Yes, we did.

4  **Q.**   Now, are you familiar with ASTM guidelines?

5  **A.**   As a general sense, yes.

6  **Q.**   Well, your partner, Dr. Lee, sits on many ASTM committees;

7  right?

8  **A.**   Yes, he does.

9  **Q.**   Are you familiar with the guideline for conducting

10  atmospheric corrosion tests on metals?  Did you ever read that?

11  **A.**   I believe I have.

12         **MR. SEEGER:**  For the record, it's Hernandez 129.

13  **BY MR. SEEGER:**

14  **Q.**   At the top, you can see the ASTM logo; right,

15  Dr. Perricone?

16  **A.**   Yes.

17         **MR. SEEGER:**  Your Honor, we'd move this into

18  evidence.

19         **THE DEPUTY CLERK:**  It's already in.

20         **MR. SEEGER:**  I'm sorry.

21  **BY MR. SEEGER:**

22  **Q.**   Let's read this together.  Let's start right down here in

23  section 3.  Do you see where it says:  "Because of the

24  variability and complexity of weather effects and the

25  industrial and natural factors influencing the atmospheric

1   corrosivity of a test site, a multiyear exposure period should
2   be considered to minimize their influence."
3           Did I read that correctly?
4   A.   Yes, you did.
5   Q.   "Also, as corrosivity may vary at a site from season to
6   season, exposure should be made either at the same time of the
7   year to minimize variability or these differences should be
8   established by multiple exposures."
9           Did I read that correctly?
10  A.   Yes.
11  Q.   You agree with that, don't you?
12  A.   Yes.  We see variability from time to time, from year to
13  year, on location to location.  I think the data, as presented,
14  demonstrates that that variability can occur, and the
15  reactivity of the copper will be affected by those changes in
16  atmospheric conditions.
17  Q.   Do you recall talking about tarnishing under insulation
18  with Mr. Sanders?  One of the things you said about missing
19  vinyl mesh on the wire that showed corrosion underneath -- do
20  you recall that?  That was the reason why you're saying that's
21  how the corrosion got underneath the wire?
22  A.   Yes.  That was a visible defect in that particular
23  location and it corresponded to the tarnish.
24  Q.   Is that opinion in your report anywhere, the mesh is
25  missing?

DAILY COPY

1    **A.**   I don't have a specific recollection of whether or not

2    that is.

3             **MR. SANDERS:**  Why don't you show him the particular

4    opinion.  He can confirm or deny it.

5             **MR. SEEGER:**  Excuse me?

6             **MR. SANDERS:**  Do you want to show him the opinion?

7             **MR. SEEGER:**  No.  I'm asking if the opinion is in his

8    report.  He said "no."  But thank you for clarifying that.

9    **BY MR. SEEGER:**

10   **Q.**   I have a few more topics.  Let me just take a second to

11   look at it because I only got to depose you last night.

12            **MR. SEEGER:**  Can we have Exhibit 60.

13   **BY MR. SEEGER:**

14   **Q.**   You recognize what this document is; right?

15   **A.**   Yes, I do.

16   **Q.**   That's the Sandia report on corrosion in Chinese drywall;

17   right?

18   **A.**   Yes, that's correct.

19   **Q.**   Now, when you're talking about -- I believe it was in the

20   context of the wire where you peeled back the jackets.  You did

21   a visual inspection of the wire underneath; right?

22   **A.**   Yes, that was a visual inspection of the wire underneath.

23   **Q.**   You're a scientist.  You have microscopes and things like

24   that in your office, don't you?

25   **A.**   Yes.  I have access to those, certainly.

1    **Q.**    This report that you read, on page 36, which is 0036 --

2              **MR. SEEGER:**  If you could blow up the bottom section.

3    If I can find a pointer.  Right there.

4    **BY MR. SEEGER:**

5    **Q.**    Do you see where it says -- well, first, it says:

6    "Further observation and analysis of receptacles and other

7    harvested components could provide results that vary from the

8    results obtained to date."

9              They say that future work is expected to include it,

10   and you've got all these tests.  Did you do any of those on the

11   wire under the jackets?

12   **A.**    I don't have a specific recollection of performing

13   analysis on the wire surfaces.  The SEM and EDS analysis was

14   done in locations of cross-sections but not on actual wire

15   surfaces.

16   **Q.**    To date, your company has billed about $2 million in

17   expert fees to KPT to give opinions in this litigation; isn't

18   that fair?

19   **A.**    Any billing -- which I am not in charge of the billing

20   aspect, but any billing would include fees for labor, as you

21   suggest.  We also have a full-service laboratory.

22   **Q.**    Well, how about just answering the first part.  It's about

23   $2 million?

24   **A.**    It very well could be that amount.

25   **Q.**    Has anybody cut your budget back and said don't perform --

1   have you been told by the lawyers not to perform certain tests?

2   **A.**   I've performed the investigation to the extent that I felt

3   I needed to in order to reach the conclusions that I have.

4   **Q.**   You've looked at six outlets from six homes; right?

5   **A.**   I don't believe that's -- I have an immediate recollection

6   of three from the Hernandez location.

7   **Q.**   Right.

8   **A.**   I'd have to go back and look through a report to see how

9   many outlets were actually presented in my report in order to

10  determine that.

11  **Q.**   Do you recall your testimony about this slide?

12  **A.**   Yes, I do.

13  **Q.**   Just to cut to the chase on this, you do acknowledge

14  there's copper sulfide left behind; right?

15  **A.**   It certainly appears to -- the EDS spectrum shows a small

16  peak of sulfur.  I'm not entirely sure where on that image the

17  spectrum was taken, whether that's an average or not.  So there

18  does show to be some sulfur present.  How that's distributed

19  across that cross-section is unclear, but there appears to be

20  sulfur.

21  **Q.**   Here's my question:  When the Hernandez family built this

22  house with brand-new wire, did it come like that?

23  **A.**   I have not observed the new wires that we've presented

24  having that type of product on its surface.

25  **Q.**   By the way, you hold the opinion that as to HVAC coils and

1    pipes, that they cannot be fully cleaned with the Scotch-Brite

2    pad; right?

3    **A.**    Could you clarify.  When you say "coils and pipes," are

4    you talking about the pipes as it relates to the HVAC coil?

5    **Q.**    HVAC coils and copper pipes in the house cannot be

6    adequately cleaned?  You can't clean off all the copper

7    sulfide, can you?

8    **A.**    From what I've observed, 100 percent removal simply with a

9    Scotch-Brite pad appears to not be consistently achievable.

10   Whether that is adequate for the purposes of remediation or

11   ensuring that the continued function will be possible, actual

12   cleaning for the plumbing and so forth, as I've stated

13   previously, would not appear to have an impact on its continued

14   performance.  So cleaning of just a pipe sitting in the wall is

15   not necessary.

16   **Q.**    I'm not asking you that.  I'm just asking you:  Can you

17   clean all the copper sulfide off the pipes and HVAC coils in

18   their home with Scotch-Brite pads?

19   **A.**    The removal of some of the sulfide scale certainly is

20   possible; but as is shown in this exhibit, there can be some

21   left behind at a microscopic level.

22   **Q.**    That's a Scotch-Brite pad; right?

23   **A.**    Yes.

24   **Q.**    This is the scientific method that we're going to propose

25   to this family to clean off their wires, HVAC coils, and copper

DAILY COPY

1  pipes?  That's what you're saying, that's okay?

2  A.   The method that's being offered is one that could be

3  easily applied in the field to remove the bulk of the tarnish

4  film in order to establish good electrical contact by an

5  electrician.

6  Q.   What ASTM standard supports what you just said?

7  A.   I'm not aware of an ASTM standard specifically governing

8  the use or application of Scotch-Brite pads.  Instead, it was

9  considered as a common, easily applied field technique that

10 could be used without extensive technical training in order to

11 achieve the results that you've shown here in this exhibit.

12 Q.   Does 3M recommend you use Scotch-Brite pads for the

13 cleaning of copper sulfide off pipes and HVAC coils?

14 A.   I'm not aware of such a recommendation.

15 Q.   Have you even read the package on a Scotch-Brite pad?

16 A.   I'm sure I have at one point.

17 Q.   Your opinion that corrosion stops when you remove the

18 Chinese drywall, tell the Court one -- just one -- study other

19 than the study that we propose, the Edwards article, that

20 supports your opinion that the corrosion stops.

21 A.   There is very common knowledge regarding basic corrosion

22 processes.

23 Q.   Oh, that's it?  Just common knowledge?

24 A.   Common technical knowledge for those who are materials

25 scientists and who work in field of corrosion failure analysis,

1  that in order for a corrosion reaction to occur you actually

2  have to have chemical species available for those reactions to

3  occur.  If you remove the species part, the reactant part of

4  the equation, you're not going to generate the same products.

5  **Q.**   I gave you a heads-up on this question last night because

6  I asked you the exact same question at 7:30 in their office.

7  Have you come up with one literature reference that the Court

8  can go look at that supports what you just said?  Tell us where

9  to go.  We have computers.

10  **A.**   Again, the basic literature in the *ASM Handbook* would be a

11  good general reference for corrosion and discussion of the type

12  of reactions that can occur.

13  **Q.**   Okay.

14  **A.**   That really is why you go to all the trouble of assessing

15  environments to determine what materials would be good to use

16  in a given environment because you need to know what species

17  are present and what reactions can occur in order to determine

18  the right material, determine the right conditions that the

19  material needs to be put in, and what the appropriate

20  performance would be.

21  **Q.**   Let's go back to Sandia for a second.  You're aware that

22  in the Sandia report they say that visual inspection of pipes

23  shows severe corrosion?  Would you agree with that?

24  **A.**   I don't have a specific recollection of that section.  I

25  could take a look at the report.  I'd be happy to do so.

1    **Q.**   Let me ask you this to save a little time.  You're aware

2    that in the Sandia report they classify the Chinese drywall

3    environment in a home as a Class III or Class IV in terms of

4    Battelle classifications?  You're aware of that; right?

5    **A.**   I don't believe that's exactly what the Sandia report

6    concluded.  In fact, they refer to the Battelle Class III and

7    IV as their assessment of the samples that they received

8    suggested that the components had been exposed to that

9    environment, to those types of environments.  But I don't

10   believe they asserted that the environment was, in fact,

11   characterized as a Class III or Class IV.

12   **Q.**   I'm going to look at Hernandez 65 [*sic*].  Do you see where

13   it says, "Based on the degree of corrosion observed on all of

14   the samples provided to SNL" -- that's Sandia Labs, right, SNL?

15   **A.**   Yes.  That's a common designation.

16   **Q.**   ". . . as well as the presence of corrosion products that

17   are creeping onto the inert surfaces, SNL staff believe the

18   Battelle corrosive environments that the copper wiring has been

19   exposed to could be as severe as either Class III or Class IV."

20          That's what it says; right?

21   **A.**   Yes.  I'd actually point specifically, though, to that

22   last sentence, where they were, I believe, careful to include

23   "could be as severe as," which is based on the assessment of

24   the actual components at issue but is not an actual

25   characterization of the environment, which generally the

DAILY COPY

1   Battelle standards on which they refer to, the use of a copper

2   coupon would be used to classify the --

3   **Q.**   Do you think there's some logical relationship between the

4   environment being corrosive and the samples that they've seen

5   exhibiting corrosion that's consistent with a Class III or

6   Class IV environment?  There's some connection there; right?

7   **A.**   Certainly, in terms of -- previously in that same report,

8   they describe the type of corrosion products one would expect

9   in those various classes.  Those were not based on film

10  thicknesses per se, but rather whether sulfides were present,

11  whether oxides were present.  In that regard, that, I believe,

12  is one of the main reasons why they made that designation.

13  **Q.**   Now, this photo that we're looking at is also from the

14  Sandia report; right?

15  **A.**   Yes, I recognize it as such.

16  **Q.**   Do you recognize that being a piece of copper electric

17  wire?

18  **A.**   Yes.  The caption says it's surface corrosion on a ground

19  wire.

20  **Q.**   On a ground wire.  Based on that scale of 10 microns in

21  the lower right-hand corner there, how deep would you say this

22  is based on that scale?  About 20-microns?  15, 20 microns?

23  **A.**   Based on this scale, I would view this area of ingress

24  into the copper as approximately 10 microns or so --

25  **Q.**   You're aware that we --

DAILY COPY

1    **A.**    -- from what I can see here.

2    **Q.**    You're aware we have measurements in this case, some from

3    you, some from Mr. Krantz, that go as deep as 30 microns into

4    wiring; correct?

5    **A.**    Yes, I'm aware of those measurements.

6              **MR. SEEGER:**  Excuse me one second.  I'm sorry.  I'm

7    actually cutting things away.

8    **BY MR. SEEGER:**

9    **Q.**    The capacity to carry current, let's just talk about that

10   for a second.  Now, did you perform a test on a wire from the

11   Hernandez house to test its capacity to carry current?

12   **A.**    No.  My assessment of wires from the Hernandez house was

13   focused on looking at cross-sections of those wires as it would

14   pertain to carrying current.

15   **Q.**    Did you reach a conclusion as to the capacity of the wires

16   in the Hernandez house to carry current?

17   **A.**    Yes, that there was no impact of the tarnishing to the

18   underlying wire that would impair its ability to carry the

19   current for which it is rated.

20   **Q.**    Right.  Your protocol was to take a single cross-section

21   from each wire and measure its circumference; isn't that right?

22   **A.**    The focus was to look at the cross-sections of the wires,

23   and they were compared to exemplars of new wire of the same

24   gauge and shown not to be different in cross-sections.

25   **Q.**    I just want to make sure I got an answer to that question.

1   The test you did was to take a cross-section of the wire and
2   measure across the wire; isn't that right?
3   A.   The test we did was looking at a cross-section of the wire
4   and examining the surface of the wire both at low and at high
5   magnifications.  We showed a number of different exhibits to
6   see if there was any evidence of ingress into the copper wire
7   or whether the original surface could still be visible.  In
8   many cases, aside from the pits that have been pointed out by
9   the plaintiffs and by the data that we've provided, there was
10  not intrusion into the surface of those or that original
11  surface, in many cases, was still present --
12  Q.   Dr. Perricone, I get lost in all that.  I'm just trying to
13  ask you a simple question, so if you can answer "yes" or "no."
14  Did you just take a cross-section and measure across the wire?
15  That was your test; right?
16  A.   The test was do the cross-section and compare it to a new
17  wire.
18  Q.   Okay.  Fine.  What standard or guideline supports that as
19  a testing method for the current-carrying capacity of a wire?
20  Tell me where to look.
21  A.   That assessment was done based on a metallurgical
22  evaluation that I would do in the normal course of an
23  assessment of either a failure analysis or materials impact
24  analysis as part of more of a scientific investigation based on
25  my common knowledge and experience in my field and not a

1    specific ASTM standard, for example, that would specifically

2    deal with current-carrying capacity.

3    **Q.**    That's Dr. Perricone's test that you came up with based on

4    what you thought made sense?  That's what you did; right?

5    **A.**    Actually, it's more than that.  If you take a look at just

6    the common description, common textbook description of

7    *current-carrying capacity*, where it specifically states that

8    the two major portions of a material that determine

9    current-carrying capacity are the resistivity of that material,

10   which is an inherent materials property, and then the amount of

11   material that's present.

12           That's routinely expressed as a function of them, of

13   the resistence and the cross-section area.  So measurement of

14   the cross-sectional area or assessment of the cross-sectional

15   area was a straightforward way to assess the current-carrying

16   capacity based on that basic definition.

17   **Q.**    Dr. Perricone, this is your transcript from last night.

18   Page 56, do you see that at the top?  Here's a question I asked

19   you last night:

20           "Question:  And so I'm just asking just to close out

21       my questioning here, did you, when you thought you were

22       doing this -- I understand you did tests which made sense

23       to you as a scientist.  Did you go and see if there were

24       sort of standardized tests that someone else might do to

25       test the same thing?"

1          **MR. SANDERS:**  I'm still going to object to the form

2     of that question.

3          **MR. SEEGER:**  That was good.

4     **BY MR. SEEGER:**

5     **Q.**   Continuing:

6          "Answer:  In terms of assessing the current-carrying

7          capacity --

8          "Question:  Yes.

9          "Answer:  -- I applied what the -- basically, the

10         definition of the current -- the ability for a wire to

11         carry current and assessed those parameters accordingly.

12         The extent that there were other methods different than

13         what I used, I can't say at this point."

14         **MR. SANDERS:**  I don't think that's even impeaching.

15    That's what he just testified to.

16    **BY MR. SEEGER:**

17    **Q.**   That was your answer last night; right?

18    **A.**   Yes.  I believe it was consistent with what I just said in

19    terms of --

20    **Q.**   Where did you mention the textbook, though, the textbook

21    you just mentioned now?  Did you mention a textbook to me I

22    could go look at last night?

23    **A.**   I referred to just a basic textbook definition, a general

24    textbook definition.  There are several textbooks I could look

25    up and point you to.

911

1   **Q.**   As part of your general knowledge, that's what you're

2   referring to; right?

3   **A.**   Yes.

4   **Q.**   By the way, you're aware, sitting here today, that Sandia

5   is still looking at the issue of whether there's a fire or

6   safety hazard with regard to wires that have been exposed to a

7   Chinese drywall environment?  You are aware that research is

8   under way; correct?

9   **A.**   I'm aware that research in general is ongoing.  To what

10   extent Sandia specifically is addressing fire-related issues,

11   for example, I don't know.

12   **Q.**   You don't know.  You don't claim that the corrosion

13   material can be cleaned from low voltage wires -- where's that

14   lamp -- like this lamp right here; right?  You're not saying

15   that we can clean the corrosion off these wires?

16          **MR. SANDERS:**  Which wire, low voltage?

17   **BY MR. SEEGER:**

18   **Q.**   Well, this wire on this lamp.  Are you claiming that?

19   **A.**   In order to clean that surface --

20   **Q.**   Clean off the corrosion.

21   **A.**   -- you would have to remove the sheathing in order to

22   access it.  In essence, you would have to fix that.  So

23   replacing the cord, for example, would be, I think, more

24   reasonable in that example rather than to do a cleaning.

25   **Q.**   Replacing the cord.  You didn't attempt to clean any low

1  voltage wiring or contacts with regard to appliances or
2  anything like that, did you?
3  **A.**   No.   The only focus was on wires specifically.
4  **Q.**   Did you conduct any testing on low voltage wire or silver
5  contacts other than the one refrigerated circuit board that
6  shorted out?
7  **A.**   No, we did not perform testing on silver contacts.
8  **Q.**   You did look at one item, which was a toaster, from the
9  Hernandez house; right?
10  **A.**   Yes.
11  **Q.**   Mr. Galler looked at the toaster, and you agree with
12  Mr. Galler that there's sulfide corrosion on the contacts;
13  right?
14  **A.**   Yes, that his analysis showed that there was sulfide
15  present.
16          **MR. SEEGER:**   Your Honor, that's all I have for now.
17  I guess that's all I have.
18          **THE COURT:**   Any redirect?
19          **MR. SEEGER:**   Wait.   I'm sorry.   I need to move into
20  evidence Hernandez 62 and 65.
21          65 is the Sandia report; right?   Somebody tell
22  me what it is.
23          We'll come back to this, Your Honor.
24          **THE COURT:**   62 is what?
25          **MR. SANDERS:**   62, we've already moved that in.

DAILY COPY

1          **MR. SEEGER:**  We'll move it in too.

2          **THE COURT:**  Admitted.  Any redirect?

3          **MR. SANDERS:**  If you can turn the ELMO back on.

4                          **REDIRECT EXAMINATION**

5     **BY MR. SANDERS:**

6     **Q.**   Dr. Perricone, when was your expert report due in this

7     case, if you recall?

8     **A.**   I honestly can't recall.  I believe it was late February.

9     **Q.**   So if you wanted to include any copper reactivity

10    measurements in your report, when would you have had to do

11    those measurements?

12    **A.**   I believe we were given access to the Hernandez residence

13    in early January 2010 was the first opportunity that I was

14    given.

15    **Q.**   The measurements you received from those, which were low,

16    did they weigh one way or another in your opinions that you

17    don't need to remove the copper wiring or the copper plumbing

18    once the source is removed?

19    **A.**   No.  They don't have bearing on those opinions, no.

20    **Q.**   Mr. Seeger asked you about pits and whether or not a

21    30-micron pit or a 20-micron pit, or let's say a 50-micron pit,

22    would bear on your opinion that the cross-sectional portion of

23    the wire is impacted.  How does that, if at all?

24    **A.**   I think that was exactly why we went to showing that

25    exhibit and walking through the exhibits at the magnifications

                              DAILY COPY

1    that were done.  Looking at the entire cross-section of the

2    wire is so informative because it puts into the larger context

3    the size of those pits that are being described are so very

4    small relative to the overall cross-section of the material.

5            I mean, I point out, for example, 30 microns for a

6    pit, the average width of a human hair is about 70 microns.  So

7    you're talking about very, very small depth of penetration for

8    any of these pits even though they look particularly -- well,

9    at high magnification, they can appear to be larger.

10   **Q.**   For the stranded wire -- first of all, is this low voltage

11   wiring or high voltage wiring, if you know?

12   **A.**   I don't know that I would specifically characterize it as

13   one or the other.  I would tend to characterize that simply as

14   sheathed stranded wire, which is different than the solid wire

15   that is typically used to carry a current to plugs in your

16   house.

17   **Q.**   Have you seen any cross-sections or any examination of the

18   wire from this lamp?

19   **A.**   No, I have not.

20   **Q.**   Are you aware of plaintiffs having done any?

21   **A.**   I'm not aware of such analysis.

22   **Q.**   You saw cross-sections that Mr. Krantz did from a similar

23   strand of wire in a Virginia house; correct?

24   **A.**   Yes, that's correct.

25   **Q.**   What's your opinion about whether or not --

DAILY COPY

1      **MR. SEEGER:**  Objection to the leading.

2  **BY MR. SANDERS:**

3  **Q.**   What's your opinion about whether or not there's any

4  impact in functionality of that stranded wire?

5  **A.**   As we showed previously, the impact of the loss of

6  cross-section was less than 1 percent of the total

7  cross-section of the material.  I would have no basis for

8  considering that other similar types of wires in a house with

9  Chinese drywall would be substantially different than that

10  analysis or would be impacted to any greater extent than what

11  was shown.

12  **Q.**   What would happen to any of the sulfide corrosion or

13  tarnishing in that wire once the source was removed?

14  **A.**   There's no expectation that continued growth would occur

15  once the source is removed.

16  **Q.**   You mentioned, I think -- well, first of all, what is the

17  only article that plaintiffs have cited in support of their

18  argument that corrosion is going to continue?

19  **A.**   In my review, their reports have demonstrated that they

20  relied on an article by Edwards regarding continued corrosion

21  as it relates to copper sulfide.

22  **Q.**   In your opinion, does that have any bearing on continued

23  sulfur corrosion?

24  **A.**   It does not.

25  **Q.**   Why is that?

916

1   A.   There are several reasons why that paper is not applicable

2   to houses with Chinese drywall.  First and foremost, I point

3   out that the whole point of that article and that study was to

4   examine what's going on inside copper pipes, where water is

5   being distributed, as opposed to on the surface of copper

6   pipes, where you're dealing with an atmospheric not an aqueous

7   corrosion solution.

8          There was also no discussion in those reports

9   regarding continued growth of any type of the sulfide layer.

10  It just talked about metal loss, which is typically not what we

11  would see in an atmospheric corrosion setting where you're

12  looking at weight gain versus weight loss in an aqueous

13  setting.

14  Q.   In the Edwards' paper, why was there metal loss?  What was

15  happening there, actually?

16  A.   Well, one of the things that was in the Edwards paper,

17  aside from simply being a fully immersed type of test, they

18  would periodically, over the long duration of the test, flow

19  water through the chamber.  So there would be a flow component

20  that would sweep away any metal that may have gone into

21  solution.  When I say "gone into solution," that would have

22  been dissolved and would leave behind a gap in the underlying

23  metal.

24          When you have flow of the water, you will physically

25  sweep away those ions.  Whereas in the case of an atmospheric

1    corrosion situation, those ions aren't going to be swept away

2    by a flow.  They're sitting on a surface, and as the water

3    dissipates, the ions are still going to be present there in

4    that location.

5    **Q.**    I think you mentioned in response to Mr. Seeger's cross --

6    and it's in your report -- relying on ASM standards?

7    **A.**    Yes.  I relied on *ASM Handbook* information, yes.

8    **Q.**    What is the *ASM Handbook*?

9    **A.**    *ASM Handbook* is a publication of ASM International, which

10   is, I believe, the largest professional society for materials

11   scientists and engineers.  It's a very large, multi-volume

12   resource for materials information.  It is peer-reviewed, and

13   it's data that has been generated by leading materials

14   scientists.

15   **Q.**    What specific section or sections did you rely on?

16   **A.**    There were multiple sections of Volume 13 of *ASM Handbook*,

17   which refers to corrosion issues.  I specifically relied on

18   Volumes A and B, one of which -- I believe in B -- contained a

19   section on copper and copper alloys.

20   **Q.**    This we've marked for identification as DX241.  What

21   section of the *ASM Handbook* is that?

22   **A.**    I believe that's out of Section 13B of the *ASM Handbook*.

23   **Q.**    What does it deal with?

24   **A.**    Corrosion of copper and copper alloys.

25   **Q.**    Did you rely on that in forming your opinions?

1   **A.**   Yes, I did.

2   **Q.**   I'd like to show you a specific page of this section,

3   page 15.  If you could close in on this paragraph here.  If you

4   could read that first sentence there starting with "Atmospheric

5   Testing."

6   **A.**   Yes.  It states:  "Atmospheric Testing:  In a variety of

7   applications, such as electrical and architectural components,

8   the behavior of copper alloys when fully immersed in solution

9   is not relevant with regard to their performance under various

10  atmospheric conditions."

11  **Q.**   What was the status of copper alloys in the Edwards paper?

12  **A.**   They were fully immersed.

13          **MR. SEEGER:**  For completeness, can you just read the

14  next sentence.

15          **THE COURT:**  106, I'll allow the next sentence to be

16  read.

17          **THE WITNESS:**  The next sentence is:  "Constant

18  humidity and temperature chambers are used to evaluate the

19  relevant atmospheric behavior of the materials."

20          **MR. SANDERS:**  We have, I believe, some exhibits to

21  move in that are not objected to.  They're standards that

22  Dr. Perricone relied on:  DX223, DX224, DX225, DX226, DX227,

23  DX230.  I don't believe those were objected to.

24          **MR. SEEGER:**  Your Honor, they're attempting to move

25  in some learned treatises.  We'd have to look at them.  They

DAILY COPY

1   wouldn't be admissible.

2           MR. SANDERS:  Your Honor, they're ASTM standards.

3   They could read them all.

4           THE COURT:  I understand.

5           MR. ECUYER:  We did agree to the ones Mr. Sanders

6   just read out.  The only three we reserve objection to are

7   Defense Exhibits 228, 229, and 241, as learned treatises,

8   Your Honor.

9           MR. SANDERS:  Which I'm not moving in.

10          THE COURT:  I'll allow those with the exception of

11  the ones that were objected to as being the treatises.

12          MR. SANDERS:  We had a cleanup, and I'm sorry to

13  belabor this point about the appendices, which are the actual

14  sampling data that Dr. Perricone and his report relied upon.

15  We would move these appendices into evidence, which is DX1A1.

16          THE COURT:  What's your position on the appendices?

17          MR. SEEGER:  They're part of an expert record.  They

18  all contain narratives, which would otherwise be inadmissible.

19  The photos, we've separated out.  I'm okay if he wants to put

20  photos in, but the tables that are interpretive, the

21  demonstratives, the narratives would not be ordinarily

22  admitted.

23          MR. SANDERS:  Your Honor, our position, if we look at

24  this, it's similar to some of the materials that came in with

25  Dr. Krantz.  What these are are descriptions of figures, and

DAILY COPY

1  maybe if we can take some time over the break I can agree to

2  black out some things.

3       THE COURT:  I'll let you do that.  I'll reserve

4  ruling on that.

5       MR. SANDERS:  Thank you, Your Honor.

6       THE COURT:  Anything further?

7       MR. SANDERS:  No, your Honor.

8       THE COURT:  You're excused.  Thank you, sir.

9            We'll come back, then, at 1:45 and I'll hear

10  oral argument on that.  Court will stand in recess until 1:45.

11       THE DEPUTY CLERK:  Everyone rise.

12                 (LUNCHEON RECESS)

13                      * * *

14                   CERTIFICATE

15       I, Toni Doyle Tusa, CCR, FCRR, Official Court

16  Reporter for the United States District Court, Eastern District

17  of Louisiana, do hereby certify that the foregoing is a true

18  and correct transcript, to the best of my ability and

19  understanding, from the record of the proceedings in the

20  above-entitled and numbered matter.

21

22

23                      s/ Toni Doyle Tusa

                        Toni Doyle Tusa, CCR, FCRR
24                      Official Court Reporter

25

                     DAILY COPY