```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2   ***********************************************************

 3
     IN RE:  CHINESE-MANUFACTURED        Docket No. 09-MD-2047
 4   DRYWALL PRODUCTS LIABILITY          New Orleans, Louisiana
                                         Friday, March 19, 2010
 5

 6

 7   THIS DOCUMENT RELATES TO:
     Case No. 09-CV-6050
 8
     Tatum B. Hernandez, et al
 9   v.
     Knauf Plasterboard (Tianjin)
10   Co., Ltd., et al
     ***********************************************************
11

12                 TRANSCRIPT OF TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
13                 UNITED STATES DISTRICT JUDGE
                    VOLUME V - AFTERNOON SESSION
14

15
     APPEARANCES:
16
     FOR THE PLAINTIFF:          HERMAN, HERMAN, KATZ & COTLAR
17                               BY:  RUSS M. HERMAN, ESQ.
                                      STEPHEN J. HERMAN, ESQ.
18                               820 O'Keefe Avenue
                                 New Orleans, LA 70130
19

20                               GAINSBURGH BENJAMIN DAVID
                                 MEUNIER & WARSHAUER
21                               BY:  GERALD E. MEUNIER, ESQ.
                                      MICHAEL J. ECUYER, ESQ.
22                               1100 Poydras Street, Suite 2800
                                 New Orleans, Louisiana 70163
23

24                               SEEGER WEISS
                                 BY:  CHRISTOPHER A. SEEGER, ESQ.
25                               One William Street
                                 New York, New York 10004
```

```
 1                                LEWIS & ROBERTS, PLLC
 2                                BY:  DANIEL K. BRYSON, ESQ.
                                  3700 Glenwood Avenue, Suite 410
 3                                Raleigh, North Carolina 27612

 4

 5   FOR THE DEFENDANT:           FRILOT L.L.C.
                                  BY:  KERRY J. MILER, ESQ.
 6                                Energy Centre - Suite 3700
                                  1100 Poydras Street
 7                                New Orleans, LA 70163-3700

 8

 9                                BAKER McKENZIE
                                  BY:  DONALD HAYDEN, ESQ.
10                                1111 Brickell Avenue, Suite 1700
                                  Miami, Florida 33131

11

12                                BAKER McKENZIE
                                  BY:  DOUGLAS B. SANDERS, ESQ.
13                                     ERIN M. MAUS, ESQ.
                                       KYLE P. OLSON, ESQ.
14                                130 E. Randolph Drive
                                  Chicago, Illinois 60601

15

16   Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR
                                  500 Poydras Street, Room HB-406
17                                New Orleans, Louisiana 70130
                                  (504) 589-7776
18

19

20     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
21

22

23

24

25
```

DAILY TRANSCRIPT

1                              **I N D E X**

2

3   **CLOSING ARGUMENTS OF:**                        **PAGE/LINE:**

4

5     By Mr. Seeger                                 924/15

6

7     By Mr. Hayden                                 937/16

8

9     Rebuttal by Mr. Seeger                        955/16

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

(FRIDAY, MARCH 19, 2010)

(AFTERNOON SESSION)

THE COURT:  Be seated, please.  We're at the point now where I mentioned the evidence is in and I would like each side to make sure that I have the evidence in the form and fashion that they wish me to have it.  So check with Gaylyn before you leave today.

We're at the point where I can profit from some observations in the form of summation or oral arguments, so I'll hear from the parties at this time.

MR. SEEGER:  May I proceed, your Honor?

THE COURT:  You may proceed.

MR. SEEGER:  Thank you.  Judge, this trial, like any trial, is about the parties here, and we've had the Hernandezes sitting in this courtroom for a week now, listening to everybody discuss them.  But as you know, your Honor, it's not about the lawyers, it's ultimately about them and about KPT.

KPT doesn't have anybody here, they chose not to be here. Mr. Hayden wanted us to be appreciative of the fact that they're here in the first place, but they've chosen to avail themselves of the U.S. markets, and their product has actually shattered the dreams of many people, which I am hoping we're going to get to remedy today.

1       I think for me, maybe one of most telling moments

2  watching the trial is not so much watching the witnesses but

3  watching the Hernandezes testify knowing that they have two little

4  children in this house and watching Mr. Hernandez say to himself

5  that really what he wants to be able to do is protect his family.

6  And I am hoping that we come out of this with a remedy where these

7  people can leave here feeling like they protected their family and

8  that he's done all he can.

9       Now, what is there, ultimately, what is the proposal that

10 we are being, that's being put on the table by KPT?  One, I would

11 like to remind the court of the stipulation, that's where we

12 started, we're kind of coming back to where we started.  They've

13 acknowledged that their product is not fit for intended use, and it

14 emits sulphur gases and its odorous.

15      Now, Judge, I ask you to think about this in looking at

16 the evidence of this case.  Why do they get to come in now and tell

17 us what the scope and the cost of the remedy should be?  You've

18 seen the witnesses, we've heard the testimony.

19      You know, Mr. Mallet put in a price to renovate this home

20 that concededly, nobody is disputing the fact that it's probably

21 close to what they paid to build it in the first place.  That's no

22 surprise to anybody, that a renovation is going to cost almost as

23 much as the original project because anybody who has ever done a

24 renovation in their home knows that renovations are more expensive

25 than new construction, so there is no real surprise there.

1        And I'm going to get to talking about the experts toward

2    the end of my closing statement, and I think when you really do the

3    comparison, I think the weight is clearly in favor of the

4    plaintiffs on every level.

5        We started the case talking about that there are two ways

6    to get to the remedy that we proposed to your Honor.  One is, you

7    listen to the science and you conclude whatever you conclude what

8    we hope is on our side on the corrosion issue, that it will

9    continue.  You've heard Mr. Krantz, I mean, the man works for a

10   company called Corrosion Testing Labs, and then we heard from

11   Dr. Perricone and Dr. Lee.  You know, the one man who is basically

12   an asbestos expert for the defense, and the other one who is,

13   really, almost like he is a 31-year-old welding expert, he's had no

14   experience prior to coming to this court.  His résumé up until the

15   Time that he was deposed didn't even reflect corrosion experience

16   until, I guess, he got the idea that maybe he should put that World

17   Trade Center experience on there.  So let's get to the heart of

18   what we're really here about.

19       What does KPT say should be done?  Well, this is what

20   they want to leave behind in the homes of these people:  They want

21   to leave the dust because that's how fine it is, it's like

22   Johnson's baby powder, there is no way you're going to get that out

23   unless you follow the protocol that we've proposed to your Honor,

24   I'm looking at Hernandez 470 for the record.

25       The switches, we've been through all of this, your Honor,

1    they want to leave -- well, the switches they're going to replace,

2    but the contacts, they want to leave contacts that are in

3    appliances and things like that with sulphur -- silver sulfide on

4    them.  They want to leave plumbing fixtures with corrosion that

5    we've shown your Honor, not just through the experts, but under

6    microscopes and SEM analysis showing there's copper sulfide in

7    there.  They want to leave this behind in the walls.

8           Now, this is not what they paid for.  When they built

9    their dream house, they didn't pay for damaged copper.  They paid

10   for new copper.  How is the copper in wires damaged?  By their

11   product.  See, it should come out.

12          Here is a wire, taking their solution of cleaning, taking

13   a Scotch-Brite pad and trying to clean the wiring.  We did that

14   here.  We took their solution, we gave it to our scientists, they

15   tried to clean it, and what happened, it leaves behind copper

16   sulfide.

17          Now, the only evidence you've heard in this case, the

18   only testimony you really heard about, corrosion progressing, came

19   from our experts.  They haven't really proposed anything.  That ASM

20   manual that Mr. Sanders spent so much time redirecting on, his

21   witness didn't even discuss it last night.  He gave us no

22   references, he said, well, my answer is in the ASM manual, and all

23   of a sudden he walks in here today and he has chapter and verse of

24   where the court should look; and I think the court should look

25   there, because we've looked at it, it doesn't support what they

1   say.

2          The only thing in this case that supports it are two

3   things:  It's the Edwards article, and we haven't made any bones

4   about this, there is not a ton of evidence and there's not a ton of

5   science on it, but the science that supports it is a peer-reviewed

6   journal article by Edwards that shows that the corrosion will

7   continue.  It explains how the testing was done and that when they

8   took the copper out of the aqueous environment and put the scales,

9   the corrosion scales back on it, it continued to corrode.

10         Well, that's what we're leaving behind in their home.  We

11  are going to leave copper sulfide.  If we leave these pipes in the

12  wall, we're going to leave copper sulfide in the pipes and it's

13  going to continue to corrode.  They don't want to replace the

14  appliances or wiring, this is what they want to leave behind.

15         And we really haven't even talked about things like soap

16  dishes and doorknobs and all of the other things that are in that

17  house that are corroded.  Picture frames.  Circuit boards with

18  corrosion.

19         So going back to our corrosion point, we brought you

20  Mr. Krantz, who not only gave you testimony in this case, your

21  Honor, about the Edwards article, but I would reference -- when

22  you're looking at the record here, I would reference his trial

23  testimony, where he explains to the court in response to the

24  court's questions about the importance of the presence of moisture

25  and the copper sulfide that's left behind and how will that

1    continue when you remove the corrosive environment.

2         And he says corrosion requires moisture.  Now, I would

3    like to just, one of those common sense points of the trial, your

4    Honor, I would like to kind of focus you on because something they

5    say makes no sense.  Their experts have come in here and they said

6    a couple of things, they said, well, if you take copper, if you

7    take sulfide gases or you take sulfide and you mix it with copper

8    in water, you're going to see this accelerated corrosion.  But if

9    you take the copper out of the water.

10        And then they say something else, they say, well, Mr. Lee

11   and Dr. Perricone said that copper sulfide is not soluble in water.

12   I mean, you can't have it both ways, you can't say, on one hand, it

13   doesn't react to water, and the on the other hand, water

14   accelerates the process.  You can't have it both ways and that's

15   exactly the kind of science they brought you.

16        As you thumb through the evidence in the case and you

17   thumb through their expert reports, pay very close attention,

18   please, your Honor, to their footnotes and their literature cites,

19   because there are none, there are none.  Their literature cites

20   are -- the full extent of their literature cites are, go look at

21   this book or go look at volume 13.  Like you're going to sit there

22   and read the entire volume trying to find maybe the one piece that

23   supports their argument.  It isn't -- the specific cites aren't

24   there because they don't exist.

25        What did Mr. Krantz tell you?  He says the corrosion

 1    requires moisture.  It's an acquiesce process but that the

 2    acquiesce process, just so there's no confusion, that water can be

 3    microscopic.  He talked about monolayers, that's like, it's

 4    microscopic, you would have to look at a monolayer under a

 5    microscope to even see it.  Moisture, humidity, anything of those

 6    things is enough to create the acquiesce environment necessary for

 7    the copper sulfide to continue the corrosion.

 8            And if you look at, you compare Mr. Krantz's CV against

 9    Dr. Perricone's, I think there's nothing you can conclude there,

10    but one man's really got corrosion experience and the other guy's

11    got a lot of time with welding.

12            You asked Mr. Krantz, what degree of moisture, he said it

13    wouldn't be that much, doesn't have to be visibly wet, he went on

14    to explain it.  But one important part in the transcript, which is

15    on page 235 of his trial testimony, where he says in response to

16    Mr. Bryson's questions, he says, Mr. Krantz's response, now, you

17    talked about a situation, he was asking about his experience with

18    corrosion continuing, he talked about a situation you've been

19    involved with where the corrosion with the shipboard heat

20    exchangers and when they're out to sea the corrosion continued.

21            I would ask the court to pay particularly close attention

22    because his analysis goes on for a while.  And it's not -- it

23    really links up the importance of the Edwards article and his own

24    personal experience with corrosion on shipboard heat exchangers,

25    where he has actually seen it, where they've removed the sulphur

1  gases but they have moisture because the ship is out to sea and the

2  corrosion continues.  I would ask the court to pay particularly

3  close attention to that.

4      I'd also ask the court to focus on Mr. Galler's

5  testimony, which is really unrebutted in this case.  They've got no

6  evidence to say that the appliances, that what's going on with the

7  appliances isn't exactly what we say is going on.  In fact, in the

8  one instance in the one question that I just asked their last

9  witness, he agreed with Mr. Galler that the silver sulfide

10  corrosion is on the contacts that he observed on the toasters.

11      Well, there's no reason to believe that the toaster is

12  the only appliance being affected by the silver -- it's got to be

13  all of the silver is being, all of the silver contacts are being

14  affected by the silver sulfide.

15      Mr. Galler testified to his honor that the corrosion he's

16  witnessed in this case is the worst he's seen in 30 years.  The

17  worst corrosion he's seen in 30 years.

18      We also would like to focus the court on the Abbott

19  article because we think this is critical and it says something

20  very important and that's, if you could pull up LT 0195.  And go to

21  page 0013.  I just want to remind the court of this language

22  because it's worth looking at.  LT 0195, page 0013.  This isn't our

23  expert saying this, this is in a peered-reviewed paper.  "By the

24  time relevant corrosion can be detected visually, the equipment may

25  already be in an advanced state of degradation."

1          Well, we know the corrosion can be seen visually, I mean,

2    that's all over the CPSC papers, that's all over the Sandia papers.

3    The discussion that they're having, most of the discussion there is

4    the visual observations of corrosion, not only on appliances but on

5    the copper wires and on the copper pipes.  We know it's there, we

6    see it.

7          We've seen evidence in this case where it's tried to be,

8    where we tried to clean it off and we can't.  It remains behind.

9    And that's not what the Hernandez family purchased.  They purchased

10   good, clean copper wires and copper pipes.  That has been damaged

11   by their drywall.

12         The Sandia report we referenced to your Honor, all over

13   this report are the concerns.  Now, I am not stating that their

14   conclusions but their concerns about fire and safety concerns.

15   They talk about their visual inspections and corrosion, and they

16   talk about the Battelle classifications.  Rating the corrosive

17   environment and the product that they seen from this corrosive

18   environment in the highest classifications for corrosion.

19         Let's talk a little bit about the contractors.  One thing

20   very significant, I mean, it's almost, you can almost look to just

21   the witnesses of the defendant and give us the remedy we're looking

22   for in this case, your Honor.  Their own witness, Mr. Canzoneri,

23   although we had some very funny moments about whether it was the

24   six inch rule or the three inch rule, there's a couple of things

25   that's very important, I think, to remember from that.

1       One is, their own witness, the person they chose to call

2  into this courtroom who is their electrical inspector, said if the

3  wire is corroded it cannot remain.  And the transcript reference is

4  PAGE 651.  Mr. Herman asked him, whatever the code requires, you

5  admit that if wire is corroded it can't stay in the house, right?

6  He said if the wire is corroded, and I'm not admitting it is, he

7  had no idea, Mr. Herman says, I understand, it can't stay in the

8  house, yes, that's correct.  That's their witness, they chose to

9  call him, that was their decision.

10      And on the six inch rule it's almost comical, but I think

11  I need to spend 30 seconds on this.  I am not sure that anybody

12  said that, you know, if you're five and 11/12 inches, that some

13  code inspector is going to walk in and say you did something wrong.

14  I am not sure that if you're at five and a half inches, some code

15  inspector is going to make a big deal about it.

16      The bottom line is, Judge, that there is a guideline, and

17  the guideline says you need six inches from the back of the box.

18  Now, if it's five and a half, five and three-quarters, six inches,

19  that's something that the inspectors can take care of.  But if

20  we're going to remedy this problem, you're going to go in and snip

21  outlets, I mean, if that's the remedy you adopt, and we ask you not

22  to, to adopt our remedy by taking it all out, why not do it right,

23  why even allow them to cut corners there?  I just don't think

24  that's something that we can take a chance with.

25      And Mr. Mallet and Mr. Carubba, you know, the credibility

1  of witnesses in this court is really up to your Honor to decide.  I

2  can give you my impressions of what you should keep in mind.  I

3  mean, again, you know, the defendants at the end of the day chose

4  to call who they chose to call.  Why they chose Mr. Carubba, I have

5  no idea.  But I can tell you this, on behalf of this family, they

6  wouldn't hire Mr. Carubba to do work in their house.

7          I don't know on who would want to hire Mr. Carubba if

8  they really knew about his background, if they knew about his

9  ethical violations, which he acknowledged.  I missed one, he told

10  me, he reminded us all that he had a fifth under a different

11  license.  You know, he sitting in this court didn't have his

12  numbers right.  He still doesn't know the final measurement for the

13  granite tops.  He never -- he still to this day, I mean, to the

14  time he walked in, after his deposition, by the time he took the

15  stand didn't have a number for installing the doors, he added that

16  after his deposition.  He was making changes to his proposal almost

17  right up to the time he was sitting in that chair, he was changing

18  his mind on things.

19          Mr. Mallet, on the other hand, has come up with a

20  proposal that you can check.  We can't check Mr. Carubba's prices

21  because that's a Roy Carubba pricing method.  There is no standard

22  way to check it.  But, Judge, you can check Mr. Mallet's prices.

23  It's Xactimate.  It is exactly the system that the insurance

24  companies use.  And what is Xactimate based on?  It's very much

25  like another standardized guideline that contractors use called

1    RSMeans.  Only the Xactimate version is cheaper.  That's why the

2    insurance companies like it, no secret there.

3              But we can't go and check Mr. Carubba's prices because

4    every time we asked him a question about where he got a price from,

5    he didn't know, somebody else did it, somebody else he called.

6    Even in the one instance where he needed an RSMeans price, he

7    called somebody to give it to him, he didn't even check the book

8    for himself.  I still sitting here today don't know what

9    Mr. Carubba's final prices are on those items.

10             And Mr. Mallet stands by his numbers, he did them once

11   and they stand up.

12             So my concluded remarks at this point, I would like to

13   obviously come up and rebut points that may be raised by my

14   colleague here, I think the question that we have to ask ourselves

15   is, you know, what if we're wrong here, what if the mistake goes

16   the wrong way?  What if, for some reason, Judge, you think, okay,

17   let's go with the KPT, KPT's proposal seems reasonable, seems

18   logical, we'll just cut out where we see the corrosion, you know.

19   What if we're wrong and the corrosion is behind those walls, and

20   we're back here or they're in the situation by themselves, you

21   know, a few years down the road where that stuff has to be ripped

22   out, why make that mistake when the evidence that you've seen is in

23   the few instances when we did peel back that wire, we have been

24   able to show your Honor that there is corrosion under that wire.

25   We've been able to show that to you.  Their proposal doesn't

1     resolve that.

2          In the instance, what they would like to do is, they

3     would like to just snip the end of the ground wire and re-hook up

4     the outlets.  They're not going to peel back the jacket.  I don't

5     care if it's six inches, 12 inches, I think their expert said they

6     went several inches back and they saw tiger striping.  Even

7     accepting their version of it, they acknowledge that if you adopt

8     their proposal, you'll be leaving corrosion behind in their house.

9     And that's why their proposal just doesn't stand up.

10         So where are we?  There's two ways to get here, one is to

11    accept the overwhelming evidence on the corrosion, that it will

12    continue.  We brought you credible experts on that point from

13    Mr. Galler, Mr. Krantz and their science.

14         They've really brought you nothing but theories, nothing

15    that you can look to, you won't be able to leave this courtroom,

16    your Honor, and open up a book and say defendants are right.

17    They're not.  And there's another reason why all of these, you

18    know, government entities, the CPSC and Sandia are still looking at

19    these issues is because they want to get this right.

20         But the other part of it is, it's just practical.  If

21    we're going to rip the walls open and we're going to take all of

22    the sheetrock off, why take the chance at this point with that huge

23    expense and all that's going on there to just clip and leave that

24    corroded wire behind?  Let's take it out, the walls are bare,

25    that's the best time to fix the problem, and it's not what they

1    bought.  Whatever is there, the corrosion that is there has been

2    caused by one thing, not by them.  We haven't heard evidence that

3    copper oxide is the problem, that's the natural process by which

4    copper patinas or oxidates.  That's not what we're talking about,

5    we're talking about a copper sulfide corrosion caused by KPT board

6    that emits sulphur gases.  So it's a problem caused by them.

7         So, Judge, what we ask you to do is to give the Hernandez

8    family what they paid for, give them the house they thought they

9    bought, don't make it any better, let's not give them the upgrades

10   that Mr. Carubba talked about, let's not do them any favors, let's

11   just give them the house that they paid for, that they built, that

12   they thought they had, until they installed the defective Chinese

13   drywall.  Thank you.

14        THE COURT:  Thank you, counsel.  Let's hear from the

15   defendant, please.

16        MR. HAYDEN:  Good afternoon, your Honor.  First I'd like

17   to thank the court for giving us the opportunity to be before you.

18   I commend the court's energy, fortitude and pushing us forward to

19   get this matter at issue and us dealing with the issue of how to

20   repair this home.

21        I also commend opposing counsel.  We've worked hard on a

22   very expedited basis, they've acted very professional, and we all

23   were working toward the final end of presenting to you two

24   alternative views of how this home could be repaired.

25        And I can't forget Mr. and Mrs. Hernandez, I thank them

1    for coming in here, given the fact that they have probably had just

2    about everyone in the last year through their house, I think, from

3    the CPSC to the Chinese government to individuals from the

4    manufacturer to the plaintiff's lawyers and to consultants and our

5    lawyers and consultants, and I realize that they've been through a

6    lot in the last year since they discovered that they had Chinese

7    drywall in their home.

8             We're here today because my client and the plaintiffs in

9    some ways are in some agreement.  We're in agreement that this home

10   should be repaired.  The question is how it has to be prepared --

11   or how it has to be repaired.  And I'll remind -- opposing counsel

12   asks why we get to talk about the repair, how the plaintiffs should

13   repair it.  And that's because we forget that -- and I want to

14   remind the court that the plaintiffs still have the burden of

15   proof, we did agree to a stipulation.

16            The stipulation clearly indicated that we would go

17   forward under a one count, the redhibition statute, and under the

18   Louisiana redhibition statute, plaintiffs still must prove actual

19   damages by a preponderance of evidence.

20            Now, there's been an attempt, maybe made implicitly or

21   implied during the course of the testimony that there should be

22   some burden shifting, that somehow we have the burden of

23   determining that our repair proposal is the appropriate one.  And I

24   submit that Louisiana law is still the same.  Plaintiff has the

25   burden of proving actual damages by a preponderance of the

1    evidence.  Possibility is not preponderance of evidence.

2    Possibility of damage at an undefined time and of an indefinite

3    amount does not constitute the probability that is necessary under

4    Louisiana law.

5            Louisiana courts go on to say that they're only entitled

6    to repair the house, repair the house that may be reasonably

7    incurred.  They're not entitled to damages far beyond what is

8    reasonable in scope, as well as cost.  It doesn't mean that we have

9    to remove a tarnish film, which has been established doesn't impact

10   upon the functionality of the electrical system and the plumbing.

11           And they're not entitled to costs that go beyond what's

12   necessary to restore the property to its original condition.

13           Your Honor, we submit that you don't have to pull out the

14   wires and you don't have to pull out the plumbing in this house.

15   I'd ask that we look at, really, what the plaintiffs want.  What

16   the plaintiffs want is a repair of their house that their expert

17   says will cost over $200,000 for a house that was built for

18   $175,000 back in 2006.  They're asking to tear down the house, down

19   to the studs, they're asking for removal of an HVAC system, where

20   the coils have been coated to protect against corrosion and the

21   condenser has just been replaced.  One of their experts even

22   suggested that the condenser did not need to be replaced.  One of

23   their experts said something else.  It's really unclear but they

24   want it all.

25           They want a removal of the electrical and the plumbing,

 1   where the functionality of those systems are not impacted.  They're

 2   also looking for relocation and storage costs, they're looking for

 3   some replacement of appliances.  I believe in the record is a

 4   listing of various appliances and how much they cost on the market,

 5   whether at Best Buy or however they determined it, but none of

 6   those electronics have been established to have failed.

 7          They also ask for some incidental damages, including lost

 8   wages, that I don't believe are recoverable under the statute.

 9   And, your Honor, we have to look at what is really recoverable

10   under the statute.

11          In my opening and at the beginning of my case, we started

12   with science.  And at the end of our case, we ended with science.

13   We heard from Dr. Perricone this morning, and I think

14   Dr. Perricone's testimony was very compelling.  I hope the court

15   now understands why we felt it important that we put forward the

16   depth of the analysis that Dr. Perricone's undertaken over the last

17   15 months.

18          The functionality of the electrical wires and the

19   plumbing lines has not been impacted.  We heard that from our

20   experts; when pushed, we heard it from some of their experts.  The

21   tarnish film does not compromise the structural or the mechanical

22   integrity of either the electrical system or the plumbing system.

23   It doesn't impact the ground wires, we had a lot of discussion

24   about ground wires.  The tarnishing to the plumbing lines is

25   superficial and when the drywall is removed, and we're

1   suggesting -- we're removing that drywall, when that source is

2   gone, no corrosion will continue, no tarnishing will continue.  The

3   source is gone, the sulfide -- the copper sulfide will not continue

4   to grow.

5          If we could look at some of the testimony or some of the

6   exhibits.  This was discussed with several of the exhibits, but

7   these are wires out of the Hernandez home.  Here is the wires

8   before the sheathing is pulled back and here it is, you'll see it's

9   bright and shiny, I think you even had some of it in your hands,

10  your Honor.  You'll see an instance where, on occasion, it will go

11  an inch in, a half inch in, with a stripe; but for the most part,

12  once it's pulled back it's clean and shiny.

13         And we heard the testimony about the cross-section, about

14  the wire itself.  Here is a cross-section of the ground wire.  We

15  talked a lot about ground wires.  That's what the ground wire, the

16  impacted ground wire looks like.

17         If we could go to the next slide.  That also is another

18  cross-section of the ground wire.  And you'll see that the damage

19  is not significant.  It does not impact the cross-sectional

20  diameter.  The one percent necessary.

21         Here we have more pictures, this one is a cross-section

22  of ground wire, and once again, let's remember that the

23  connections, where the connections are made, the testimony is,

24  underneath those connections it's clean and shiny.

25         Here is some more wires, both, we talked about cleaning.

1    And you asked some questions of Dr. Perricone, do you really need

2    cleaning.  I think there was some other questions asked earlier

3    about cleaning, is cleaning really necessary.  Your Honor, quite

4    honestly, I think the testimony is that it's not necessary.  But

5    for, to give the plaintiffs some comfort, we are undertaking some

6    cleaning.  Here is what the wires looked like before cleaning, here

7    is what the wires look like after cleaning.

8         And here is what the wires look like, here is a new wire,

9    here is a wire out of a Chinese drywall home, here are some clean

10   wires.  And I'd submit, if I took the captions off and I mixed them

11   all up, I would have a hard time determining which one is the

12   tarnished wire and which one is the new wire.

13        If we go to the next.  We've also looked at the plumbing

14   lines.  The line that we've talked the most about is the cold water

15   supply because with cold water the argument would be that there

16   could be some sweating somewhere along the way.  Here is a cold

17   water supply line out of the Mandeville home, and I'd ask the court

18   to look at this.  This is really an interesting diagram, I think

19   that's pretty powerful.  And if we could, this shows, that same

20   line under SEM, and both sides talked about SEM, when you blow it

21   up and you can go to 100 times, 50 times, down to just microns.

22        And you'll see both the inner diameter and the outer

23   diameter of the pipe.  And if we could focus just on these two and

24   compare.  Let's just look at these two and compare.  The inner

25   diameter.  What we're talking about, this inner diameter, that's

1    not on our watch, that has nothing to do with copper sulfide.  That

2    has to do with what's happening with the pipe in the inside wall.

3         What we're talking about is the outer diameter here

4    (INDICATING).  And the distinction between this and -- this is a

5    normal pipe with some problems or some issues in the inside of the

6    pipe.  At that level it looks pretty nasty, but really, the

7    functionality is still there.  And I remind the court, this has

8    nothing to do with us, we're talking about the outer diameter.  And

9    this is with the tarnish on the outer diameter of the pipe.

10        If we go to the next slide.  This isn't a very clear

11   slide, hopefully it's a little clearer on the court's monitor, but

12   this is Dr. Rutila's hand and that Dr. Rutila's pulling back the

13   sweat insulation around the line set that goes in the air

14   conditioning in the Hernandez home.  And when you pull back this

15   covering, what he saw was clean, shiny copper that was not

16   impacted.  The functionality of the plumbing system, the

17   functionality of the electrical wiring in this house has not been

18   impacted, and we submit that they do not have to be removed.

19        There's no reason for -- there's been no evidence of

20   pinhole leaks, you heard that from Mr. Perricone this morning,

21   there is no evidence of pitting that would compromise the integrity

22   of the plumbing.  There was some other examples in the exhibits of

23   the ten micron pit versus the 50 micron pit.  We're talking about

24   ten microns, your Honor.  An issue that would not impact the

25   functional integrity of the plumbing lines.

1            What does the science tell us?  It tells us once you

2     remove the drywall, you remove the source of these sulphur

3     emissions and the sulphur tarnishing will stop.  And we also know

4     that adequate cleaning after demolition, we heard from our experts,

5     we heard from Mr. Mallet, we heard from Mr. Bailey, but adequate

6     cleaning whether it be with a shop vac or HEPA vac, we heard from

7     Dr. Lee, whether you use the shop vac or HEPA vac it means whether

8     you have to vacuum more times across the floor.  Well, one or the

9     other, that will be sufficient with a wet clean to pick up any dust

10    particles that might cause odor.

11            There is no scientific basis for the airing out that's

12    being suggested.  They're talking about 30 days of airing out.

13    Your Honor, the tradesman, they went through Katrina, there was no

14    airing out for 30 days.  Your Honor, I don't believe that the

15    science shows that this airing out period is necessary if the

16    appropriate cleaning is undertaken during the demolition.  And we

17    showed a mechanism to teardown the drywall to avoid additional

18    dust.  I think the dust issue is another red herring that's being

19    raised by the plaintiffs' experts.

20            Let's see the plaintiffs' experts really have admitted

21    to.  There's no data to support the proposition that the copper

22    corrosion would continue in the house once the drywall is removed.

23            They point to one article, the Edwards article, and I

24    want the court to look closely at the Edwards article, I think

25    Dr. Perricone explained it pretty well today.  It only applies in

1    an acquiesce environment.  And the most telling part of it is that

2    it assumes that sulfide is the cause of the copper weight loss

3    when, if you think about it, if copper sulfide was forming it would

4    result in weight gain.

5          This article has nothing to do with the Chinese drywall

6    situation.  Plaintiffs' experts have presented no testing that

7    would establish that copper sulfide continues in a non-aqueous

8    setting once you remove the source.  And we stand here, and we

9    stood here at the beginning of the trial telling you we're ready to

10   remove that source.

11         With regard to the silver sulfide, there's absolutely no

12   testimony that silver sulfide corrosion would continue after the

13   source is removed.  They don't even have an Edwards article with

14   regard to the silver sulfide because the source is gone, the

15   sulphur emissions no longer will cause this tarnishing, whether it

16   be a copper tarnishing or silver tarnishing that was experienced.

17         If we could go now to what the plaintiffs have said.  I

18   believe this is from Dr. Krantz.  And you can read it yourself,

19   your Honor, this is out of the trial testimony:  "And you don't

20   have any kind of testing actually on any copper plumbing or pipes

21   or wires to determine whether, in a moderate humidity environment

22   or non-aqueous environment the reaction will continue?  No, we

23   haven't.  And the Edwards paper, the tests that he performed for

24   several months, did not have that time available, haven't been able

25   to perform those tests.  You haven't been asked to come up with a

1  test for that?  Not at this point.  Other than the Edwards paper

2  and Dr. Scully's opinion, you're not aware of any tests that would

3  confirm that copper sulfide continues to corrode?  I am not aware

4  that anyone has addressed that issue.  And you don't have any idea

5  or answer as to the likelihood or actual likelihood of that risk?

6  No, we don't."  That's what we said.

7          And they talk about Dr. Scully.  Opposing counsel

8  referenced in his cross-examination of Dr. Perricone where Sandy

9  Sharp was, Dr. Sharp who was the witness that we disclosed when we

10  were involved in the *Germano* manner.  I submit where is Dr. Scully?

11  Dr. Scully, if you'll recall, when you heard testimony in the

12  *Germano* matter, he was their expert on corrosion.  Where is he

13  today?  He is the one who was able to talk about self-sustaining

14  corrosion after removal.  But I submit that Dr. Scully's not here

15  because Dr. Scully was unwilling to go the extra mile and go beyond

16  what the Edwards article says.  And they have no testimony or basis

17  for saying that the corrosion will continue after we remove the

18  drywall.

19          The next thing the plaintiffs admit:  No corrosion on

20  wires with intact insulation.  If we could go to the next.  And

21  once again:  "And there's no data to support or deny with a

22  reasonable degree of scientific certainty that it'll happen or not?

23  Other than the Edwards paper, no.  There's no evidence once again,

24  there's no evidence to causally link the failure of the electronics

25  from the Hernandez house to the silver sulfides?  There's no

1   evidence of silver or copper sulfide deposits causing failure in

2   the switches, the circuit boards, or plumbing in the Hernandez

3   house."

4          You heard some testimony of Dr. Galler about there be

5   being some corrosion, but he was not able to link any of the

6   corrosion to a failure in any of the electronics or any of the

7   other devices that are set forth in Hernandez, I believe it's

8   Hernandez 558, the summary of the things that the Hernandezes claim

9   have failed.  Those things very well may have failed, but there's

10  no causal connection to those failures and the Chinese drywall.

11         There was some reference to the HVAC system and albeit we

12  will agree that the HVAC system was a unique environment, it's an

13  aqueous setting and those coils were failing because of the aqueous

14  setting, the unique environment, that was discussed by the

15  witnesses.

16         But with regard to these other products, there's no basis

17  for that at all.

18         If we could go to some of Mr. Rutila's testimony.

19  Dr. Rutila's testimony.  And it's page 90, line 6 to 90, 14:  "But

20  for the devices that you looked at, you were not actually able to

21  identify a link between the copper sulfide and the silver sulfide

22  and the corrosion product and the failure?  Not certainly.  And

23  that would be the same for the other devices that you talked about

24  today?  That's correct."

25         If we go to 91, 7 and 91, 12:  "With respect to the wires

1   and plumbing and other copper or silver copper devices in the walls

2   that might be left there by KPT's protocol, at this time you just

3   don't know, you don't have an opinion about whether those things

4   will fail?  That's correct.  It's unchartered water, really."

5   That's not preponderance of the evidence.  That's not probability,

6   that's just possibility and speculation.

7          After the drywall is removed there is no longer a

8   corrosive environment.  No scientific evidence to support that.

9   This drywall dust issue is a red herring, your Honor.  I reference

10  to Bailey, page 383.  At 7, if you could move back a little so I

11  can -- "And as you sit here today, you can't say how many

12  particulates of drywall dust would be necessary to result in

13  continued odor or sulphur emissions, can you?  Not specifically,

14  no.  There's no data in the industry based on this particular

15  problem, it's new, and that we're aware of nobody whose done these

16  studies.  And you would agree that if the drywall, the Chinese

17  drywall was removed, you would be removing the source of the

18  problem.  Removing the drywall removes the source of the problem."

19          Let's go to Mallet -- Mallet, Mallet, I am not sure, your

20  Honor, I am not good at pronunciations.

21          "Mr. Bailey said he couldn't quantify the amount of

22  drywall dust that would cause problems with regard to odor or

23  sulphur emission, correct?  That's correct.  No one who's

24  testified, that you've heard from, has indicated that a small

25  amount of drywall dust is sufficient to cause odors and continued

1  problems with corrosion?  That's correct.  Actually, I've not heard

2  from or read any reports or testimony from anybody that's given any

3  indication about how much drywall dust left in a house would be

4  acceptable.  You haven't heard one way or another?  That's

5  correct."

6          The plaintiffs have a burden of proof, your Honor, and I

7  submit that the drywall dust is a red herring.  We've submitted the

8  protocol where we're wiping it clean, you saw that demonstrative

9  where we did that drywall demolition, where we were able to wipe

10  clean and show surfaces, the framing, the studs that were clean, no

11  evidence of dust.

12          I think that the next thing the plaintiffs have to admit

13  is that testing the materials to new product standards is an

14  appropriate evaluation of product performance.  We heard that from

15  Dr. Galler and I reference the citation.  This confirms what

16  Dr. Beyler, our expert from Harvard on fire safety and on the

17  engineer from Hughes Associates said with regard to his testing of

18  new wires and connections.  It confirms RJ Lee's comparisons of

19  cross-sections of exposed wiring and plumbing to new manufacturing

20  tolerances.  We're looking at new wire compared to the existing

21  wire.  We were looking at UL standards, which are the standards

22  that are for quality control before a product goes out to the

23  market, and under those standards, our experts found that there was

24  no impact on the functionality.

25          Plaintiffs' experts agree that the testing devices in

1    real world scenarios, such as operating wires and connections under

2    load, what Dr. Beyler did is the preferred method of testing those.

3          Your Honor, if we could go now, we've learned what the

4    science says, let's hear what the tradesmen say.

5          THE DEPUTY CLERK:  Mr. Hayden, you have 15 minutes.

6          MR. HAYDEN:  Thank you.

7          The boots on the ground tradesmen.  They talked about a

8    scope of work.  A scope of work necessary to repair the Hernandez

9    home, and it doesn't require removing of electrical or plumbing.

10   These are the guys who do it every day.  They say that any concerns

11   about dust are alleviated through careful demolition.  You saw the

12   video, you saw how they were doing it.  Now, they wanted to

13   extrapolate the time that it took them with eight lawyers and ten

14   consultants or -- and two videographers and two photographers in a

15   whether it be a 12 by 14 or 14 by 16 room, that just ain't right.

16          But it does indicate that it can be done.  And our people

17   are willing to do it.  And it does indicate that to the extent that

18   we have to do cleaning of the ends of the wires, of the ground

19   wires, it can be done with traditional cleaning methods.  Opposing

20   counsel has Scotch-Brite pads, it could be done or use something

21   like that so a general tradesman understands and can undertake it

22   in the field.  Let's go to the next slide.

23          I said at the beginning that this case would all be about

24   some six inch rule, that opposing counsel would be talking about

25   six inches.  And I was kind of amazed that in a federal court for

1    an afternoon we would be talking about whether or not six inches

2    would require us to tear out the entire electrical system in a

3    house.  That just isn't practical.  We brought in the code experts,

4    we brought in the engineers, we brought in the general contractors

5    who do it in the field, they've never seen that, that's not a

6    reason to tear out an entire house.  That's just not the real world

7    application, your Honor.

8         The next thing, your Honor, is with regard to cost

9    estimates.  Xactimate.  Xactimate.  Mr. Mallet says that 99 percent

10   of his estimate was determined by Xactimate.  It's computer

11   software.  He punches -- he goes in and measures a room and he

12   takes it to his sister and she inputs it into a computer and out

13   spits a cost estimate.  That isn't really real world.

14        Whether you like Mr. Carubba or not, your Honor,

15   Mr. Carubba is real world.  He got on the phone, he called the

16   tradesmen that do the work and he found out what they would charge.

17   That's how it's done in the real world.  And we had guys who have

18   been through post Katrina, they went through situations where they

19   were repairing a lot of homes with corrosion, mold, toxic -- what

20   did they call it, toxic soup.  And that just doesn't justify that

21   this should have a much higher repair protocol than what we used in

22   the Katrina situation.

23        If we could go to the next slide.  Here is the real

24   important thing for your Honor because beginning of the trial the

25   plaintiffs offered someone from, that's not a party to this case,

1    it's somebody from the home builders.  And, your Honor, they

2    testified that, he testified that he followed a certain protocol

3    and plaintiffs will submit that that's the protocol that they're

4    using and that's the protocol that should be implemented by the

5    court.

6              And when we do an apples to apples comparison, Beazer was

7    able to confirm that this thing is a lot cheaper to repair than

8    what's being submitted by the plaintiffs.  It shows the plaintiffs

9    overreaching.  If you look at it just with the hard costs as I did,

10   attest 23 to $29 a square foot.  Let's agree with Mr. Phillips

11   about the fact that they, because they're a national home builder

12   are entitled to a 10 percent discount, that should be added on, 10

13   percent overhead.  17.5 percent profit which is 7.5 percent more

14   than either of the other contractors have suggested.

15             But that only leaves -- these are in comparable homes,

16   four comparable homes.  Beazer has completed four Chinese drywall

17   homes, 32.50 to 40.58 a square foot, and that's after adding in

18   what needs to be added in.

19             The Mallet estimate is 60 to 70 percent more than the

20   Beazer actual costs with all of this added in.  The actual costs,

21   even when adjusted for what a homeowner would pay.

22             That's why I believe the plaintiffs really are

23   overreaching, that's really what should be telling for the court.

24             The teardown proposal is more than the cost of the

25   construction of the house.  The teardown proposal is more than

1    double what Beazer who has implemented their own protocol took to

2    finish these houses, they're done with the houses.

3            This computer generated estimate is not real world.  The

4    tradesmen, they were the ones who can tell you what real world

5    costs to repair this house is.

6            And I am going to end with science again.  There's no

7    basis for this teardown proposal in the science.

8            Your Honor, I do feel for Mr. and Mrs. Hernandez, but I'd

9    ask that, you know, they should be able to take some comfort from

10   what they heard today from Dr. Perricone and from Dr. Lee and from

11   Dr. Beyler and others.  Unlike the plaintiffs who brought in their

12   consultants in November or December of last year, RJ Lee has been

13   on this for 15 months, I'll submit it might have even been longer.

14           And I'll submit counsel made a big deal out of it.  We

15   spent a lot of money, KPT spent a lot of money on this.  We've

16   analyzed it to try to find a fix to try and find the best way to

17   fix these houses.  And how to fix in particular the Hernandez

18   house.

19           The amount that was stated is not an amount that was on

20   the investigation of the Hernandez house obviously, it's on our

21   investigation over many months when we were first made aware of

22   this issue here.

23           I'll acknowledge that we've brought in the best and

24   brightest scientists and looking how to best repair the houses.

25   We're not ashamed of that, we're not ashamed of our commitment to

1    come into this jurisdiction, and we're not ashamed of the fact that

2    we're here with the court.  Let's not forget that KPT's come

3    forward with their experts here today and their science and we've

4    made it available to you, to the government agencies that want to

5    hear from us, to anyone, to the plaintiffs, whoever wants to see

6    it, even though the CPSC hasn't completed their investigation, the

7    Florida Department of Health isn't done with their investigation;

8    EPA, HUD, they're all still undertaking this, these huge

9    investigations that have been described as the largest that they've

10   ever undertaken.

11            Let's not forget that my client agreed to a waiver of

12   service back in October or November, a waiver of a right they have

13   under an international treaty, a time-honored treaty so that

14   claimants, like the Hernandezes and others, could be before you and

15   so that we could move forward, your Honor, on an expedited basis so

16   that we can try and fix the homes.

17            Let's not forget that we agreed to a stipulation with

18   regard to the redhibition statute so that we could move forward,

19   cut to the chase as to what really needs to be done.  And what we

20   have -- what we have to do to fix this.  KPT stands ready to repair

21   the houses, but at a reasonable cost and based on the science that

22   we have.

23            You heard from Mr. Phillips from Beazer, we're all

24   concerned about costs.  But we have to listen to the science.  And

25   based on the science, and I'd ask the claimants listen to the

1    science, there should be some comfort that their health and safety

2    will not be compromised, we will remove that drywall and we believe

3    that we can adequately repair that home and that home can be

4    repaired according to the estimates as stated.

5            Your Honor, we will indicate, if we could put this on

6    the -- there's the numbers.  There's Mr. Carubba's cost estimate

7    with the changes that were reflected on the stand.  That's the cost

8    to repair this house.  We'd ask the court to reference the

9    affidavit of Mr. Roddewig that we put forward, he was going to be

10   one of our consultants, and it's been submitted that he would --

11   that the temporary housing for the 60 days that Mr. Carubba said it

12   would take to fix it would be $3,600.  That's the amount it takes

13   to repair the house.  And, your Honor, we stand ready to move

14   forward.  Thank you.

15           THE COURT:  Thank you, counsel.  Let's hear rebuttal.

16           MR. SEEGER:  Yes, your Honor.  I guess we should thank

17   KPT for showing up and answering the lawsuit of the Hernandez

18   family.  They really sound like they've been victimized by that.

19   What's wrong here, I think if anyone's been victimized, it's the

20   Hernandez family by drywall they acknowledge is defective.

21           Judge, they have a right to their own opinions, they

22   don't have a right to their own facts.  If they're going to put the

23   testimony up of our experts, they have to get it right.  So let's

24   just correct this for the record.  This is Mr. Galler testifying:

25   "Do you have an opinion with regard to failure rates on appliances

1   that have visible corrosion on them?  I could say that they would

2   fail a lot more than uncorroded products; but to tell you exactly

3   what the failure rate would be, I can't.  Would you expect it to

4   live out its useful life?  Not at all.  I think sort of in general

5   terms it looks to me like the corrosion rates we're seeing are

6   probably ten times faster than they would ordinarily be, so I would

7   expect the reduction in the life of the equipment.  It could be 20

8   times, it could be five times, but it's pretty significant, it's a

9   pretty significant reduction in the life of the equipment."

10          Your Honor, that's damage.  That's the damages right

11  there.  You know, what do we need to prove here to this court?

12  That it's more likely than not.  What is it more likely than not?

13  It's more likely than not that the corrosion is going to continue

14  because we've given you literature proof of that and we've given

15  you an expert that actually has expertise in this area who is

16  actually competent to testify.

17          What else is more likely than not?  We've also shown you

18  that it's more likely than not that the product as it exists in the

19  house, the wire and the copper pipes that we're talking about is

20  today as we speak damaged.  And that it will fail if left alone and

21  it will fail at a rate faster than its useful life, faster than

22  it's supposed to fail.

23          So there are the damages right there.  There's nothing

24  speculative about that, and we're not asking for repair costs

25  beyond what's necessary to restore.  They damaged their wires.

1   Under what other circumstance in a lawsuit do you get the right to

2   go in and damage somebody else's property with your defective

3   material and property and then say I am not responsible for it?  I

4   mean, isn't it a reasonable consequence, we know it's a foreseeable

5   consequence of corrosion on wires because you've heard more science

6   than you probably care to hear about sulphur gases and copper and

7   silver, it corrodes it.  And that's the problem that we're dealing

8   with.

9          We're not asking them for any upgrades, we're not asking

10  for anything -- as far as Mr. Carubba's price of sixty something

11  thousand dollars, it's just laughable, it really is just laughable.

12  I mean, it's unfortunate that KPT may have to spend almost the cost

13  of building a new home to renovate and cure their problem.  But it

14  is a problem that they created.

15         There isn't anybody in this court that has come in the

16  entire week and said that the Hernandezes have had anything to do

17  with the defective drywall in this house or the corrosion that's

18  going to be left behind in their walls based on their proposal,

19  it's a problem they've created, your Honor.  They've created with

20  their defective drywall that they chose to ship.  And that they

21  acknowledge is defective.

22         Right now there are pits and corrosion in the wire.  We

23  can't leave that behind, they didn't pay for that.  That's not what

24  the law gives them, the law gives them back what they're entitled

25  to.

1          Now, the one point that they seem to love in their

2     questioning of the builders, you know, it took a lot of courage for

3     an independent builder to come in here.  You know, they've crossed

4     them -- the implication is there could be some discussions going on

5     or maybe they've got a lawsuit against KPT, I have no idea.  All I

6     know is it takes a lot of courage for somebody independent to come

7     into court, raise his hand under oath, and do what Mr. Phillips did

8     and what Beazer allowed him to do in this courtroom.

9          They were very clear on a couple of points in questioning by

10    Mr. Meunier:  Their price is around 40, $50 a square foot, but it

11    doesn't include overhead, it doesn't include the markups for things

12    like their back office costs; but more importantly, more

13    importantly and the real take away from that testimony was that

14    they have efficiencies that the Hernandezes do not have.

15          If they pick up the phone and call Mr. Mallet, they're

16    going to get market prices that go to a homeowner.  They pick up

17    the call and call ABC Construction they're going to get those

18    prices.  Beazer has a warehouse of equipment, they've got a fleet

19    of workers, they have efficiencies and these people can't take

20    advantage of it.

21          And by the way, that's not being offered by KPT.  KPT

22    isn't saying we'll do the remediations, we will supply the builder.

23    They're going to have a judgment from this court and sufficient

24    money to fix the problem they've created, and they've got to go out

25    in the marketplace and pay the rates that home owners pay, not that

1   builders pay.  So that's a big distinction.  I am not even sure

2   it's worth them harping on.  I don't think it helps them.

3          My understanding of the law of redhibition is that you

4   get what you paid for.  They paid for a new house with shiny copper

5   wire.  Mr. Hayden loves putting that picture up of shiny copper

6   wire and he must forget what went on in this courtroom, that that

7   wire has been peeled back and it has been shown to have corrosion

8   under it.  It doesn't matter if it looks shiny to the eye.  Under a

9   microscope it has black sulfide deposits.

10          If it had anything else, we wouldn't even be having this

11   discussion with the court.  We know that black sulfide deposits

12   came from their Sheetrock.  There is no other source of it in the

13   house, they haven't even introduced that type of evidence yet, they

14   haven't even tried to give you an alternative cause, they haven't

15   said it's in the atmosphere, it's growing from a rock, it's coming

16   from under the house.  They acknowledge it's from them.

17          But they want to be able to get to pick what the scope is

18   and what they want to pay.  It's unfortunate that they've caused a

19   lot of damage and they have to pay for it.  At the end of the day

20   that's a problem they created.  I think the only thing they are

21   we're focused today is what puts them back in their house, what

22   turns their house from a sick house with bad drywall to a healthy

23   house with healthy wiring and healthy plumbing.  To them and their

24   children.

25          You know, this talk about experts and whether -- where's

1    Dr. Scully.  Dr. Scully's opinions have been adopted wholesale by

2    Mr. Krantz.  All experts aren't available to come to trial.  The

3    point that was being made in case it was dismissed by Dr. Perricone

4    is that they had an expert in the prior litigation that criticized

5    his calculations and he disappeared.  I don't know why he

6    disappeared but he is gone.

7         I don't know why we haven't heard from a KPT witness.

8    Their whole case is based on expert testimony.  Where is somebody

9    from the home office that can tell us exactly what happened?  Where

10   is somebody from the home office that says, hey, we understand the

11   problem, we're going to take responsibility for it and we're going

12   to do the right thing.  Instead of sending a team of lawyers to go

13   and do their bidding for them, which is what we do, we're doing

14   their bidding.  But our client is sitting here in this courtroom.

15   They sat here all week and they listened to this case.  Where is

16   their client?

17        And maybe he is hiding in the back, I don't know.  I

18   don't see anybody sitting here and they haven't been introduced to

19   us.

20        There's no evidence, they claim no evidence of silver or

21   copper sulfide.  You would have to ignore the testimony, you would

22   have to really ignore the testimony in the case, your Honor, to

23   come to that conclusion.  We've proven that it's more likely than

24   not that the wiring in the house, the corrosion on the wires and on

25   the pipes is more likely than not to cause failure.  It is damaged

1    as it sits there today.

2           And it's more probable than not that the cost of the

3    Hernandez family will be what Mr. Mallet determined the costs will

4    be using a standardized pricing guideline, prices that you can

5    check as opposed to Mr. Carubba whose entire testimony I would

6    submit was made up for the purpose of this case.

7           Thank you, your Honor.

8           THE COURT:  Okay.  Thank you very much.  Both of you.

9           Let me make just a couple of general comments first.  I

10   will give counsel an opportunity to speak.  First, both counsel

11   mentioned that I had put this case on an expedited track, and

12   they're right, I have.  And the reason for that is obvious to me.

13   Both sides agree that the drywall emits gases which contain

14   sulphur, which contaminates or causes problems whether it's

15   corrosion, whether you call it corrosion or something else, it

16   affects copper and it affects silver.

17          Both sides agree that it has to be taken out.  So

18   whatever affect it has produced, it's going to get worse if it

19   stays in.  The longer it stays in, it's obvious the problem is

20   going to get worse.  So I think we've got to deal with it and we

21   have to deal with it as fast as possible.

22          Secondly, these cases, MDL cases are difficult to handle

23   because of just the sheer numbers of the cases.  They're able to be

24   done, however, because the cases because of their numbers, because

25   of the gravity of the problems, the best of the best attorneys

1  handle these matters.  And it's because of their work and their

2  effort and their ability that the courts are able to focus on the

3  problems.  And I've seen that in this case as well.  We have a good

4  counsel group who focused the court on the issues, the significant

5  issues.

6      I hope the other aspect of the case can be focused on,

7  too.  It's one thing to theoretically think about a case or

8  theoretically analyze a case, but there's nothing like putting it

9  before a court, a jury, Judge, and advocating the position.  And I

10  think when you do that, after you do that, both sides have to take

11  a look at this matter and these problems and focus on whether or

12  not you've learned enough from this experience to take a global

13  look at the problem to see whether or not the whole matter can be

14  resolved in a much quicker way.

15      But I do see this as an urgent issue and I'll be working

16  on it with dispatch, I'll be beginning in a couple of moments on

17  the case.  And I'll be issuing any opinions as quickly as I can,

18  I'll reasonably issue it.

19      So I do appreciate the work that the parties have given

20  to me and have given to me volumes of material, and I ask that you

21  once again make sure that I have all of the exhibits in the form

22  and fashion that you wish them to be in.

23      Finally, on a total different matter, I've been presented

24  by counsel for both sides with the newspaper today, and there's I

25  know a concern on each of both or at least one aspect, one side of

1    the case with this matter, and I'll ask them if you have any

2    comments on it at this time.

3            MR. RUSS HERMAN:  May it please the court, good

4    afternoon, Judge Fallon.  I want to thank you for the opportunity

5    to address on the record an issue which is critical for my friends

6    the Hernandez and 6,000 other families we know about.

7            I first want to thank defense counsel who have handled

8    themselves very professionally.  This matter could not have been

9    expeditiously brought into a court of law without counsel on both

10   sides acting in the highest level of professionalism.

11           For 65 years, and we're now in our third generation, we

12   have always believed that a court in the United States of America

13   is a temple of justice and that when facts and law are weighed in a

14   crucible of adversary chemistry, when you have lawyers who are the

15   finest in the United States representing a corporate entity that

16   they feel very strongly about or a family such as the Knauf family,

17   they're willing to spend as much resources and as much time as it

18   takes to present a case.

19           And facing those Goliaths, our Davids spending whatever

20   we can for the folks we represent, like the Hernandezes, out of

21   that crucible comes the best opportunity for justice because your

22   Honor, and a jury that sometimes sits in that box (INDICATING), you

23   are the safety valve of the Constitution.  Without these courts, we

24   would be in the streets.  And we will accept whatever your Honor's

25   verdict is, and I am not going to talk about the facts or the law

1    in this case.

2          But I am going to talk, and forgive me for my passion,

3    the FDA, the CPSC, the EPA who are supposed to be watch dogs for

4    these people, and this gentleman is employed by the United States

5    of America, how ironic it is, when the watch dogs that are supposed

6    to protect us deny us access because it's true that certain

7    defendants in this drywall litigation have full-time lobbyists in

8    D.C. dealing with the CPSC, the EPA, and we are denied access.

9          When the CPSC went to China, God forbid if I wanted to go

10   to Beijing or my colleagues did, we would go to Tatum.  We would

11   give him a driver's license, a birth certificate, he'd issue

12   something in 24 hours saying an American citizen can go to Beijing

13   or Shanghai.  But when the CPSC goes to investigate under the rule

14   and the foot of the Chinese government and its pawns who during the

15   same period of time, 2005, 2006 to 2008 distributed in this country

16   17 different products during the same time directed at our

17   children, everything from Bat Mobiles with led paint to little

18   girls doll dresses, and they refused to come into this court and we

19   are denied, as advocates for our folks, the opportunity to go with

20   the CPSC to confront the Chinese and the CPS doesn't go to every

21   mine, every gypsum mine, it doesn't go every factory, it goes to

22   some negotiated narrowed view of what the Chinese tell them is the

23   Chinese version.  That's not adversary.  That's not the crucible of

24   justice in an American court.

25          So are we to accept for the Hernandez family a watch

1    dog -- I'm sure the CPSC is like -- is doing the best it can, it's

2    always underfunded, but what is the rule that keeps the consumer

3    advocates from the doorstep of the watch dog that's supposed to

4    watch them?

5            Am I angry about it, you bet, because I learned last

6    night from Kerry Miller, who I think is one of the finest lawyers

7    in the country, and he's always fair, he's always ethical, and I

8    don't like to do battle with him because he's extraordinarily

9    competent, that the CPSC in a couple of weeks is going to issue its

10   rulings on what should happen to the Hernandez and 6,000 other

11   families.  Where are they?  Is there a CPSC representative in this

12   courtroom?  Have they heard the direct and cross-examination of

13   experts?  No.  They want expert reports of Mr. Carubba.  They want

14   expert reports of an engineer that's -- well, I am not going to

15   comment on the evidence, but the CPSC is going to issue its rulings

16   without listening to one moment of cross-examination, without

17   observing one witness.

18           And we will accept what your Honor rules.  We believe

19   you've heard whatever can be heard, but we will not on their behalf

20   of the 6,000 people we represent accept findings that are not full

21   remediation.  If they come from a watch dog agency in which

22   defendants have been allowed access for months before we were even

23   able to get a FOIA request answered.

24           Now, I want to talk about the home builders.  In this

25   morning's newspaper, and this really emphasizes the point.  I don't

1  know whether -- you know, we took our clients to dinner the other

2  night, I wanted them to see how we act when we're not in the

3  courtroom.  I think it was a revelation for them to find out we're

4  human.

5          MR. SEEGER:  I think it just frightened them.

6          THE COURT:  Let's begin summing up, Mr. Herman.

7          MR. HERMAN:  Let me finish by reading just one sentence

8  from the newspaper, these are the home builders.  "From a builder's

9  perspective, when the NAHB says this is the way you ought to do it,

10  then this is the way we will do it."  Well, from an advocate's

11  perspective for consumers, we will accept your Honor's ruling.  Not

12  what the home builders think ought to be done and not what the CPSC

13  thinks ought to be done.

14          Thank you, your Honor.

15          THE COURT:  Anything from the other side?

16          MR. HAYDEN:  Yes, your Honor, just briefly.  Kerry

17  Miller.  I appreciate Mr. Herman's passion, I just want to make

18  sure that the post closing presentation is not part of the evidence

19  in the case.

20          THE COURT:  It's not part of the evidence at all, that's

21  the whole point that I make to both of you all.  I've heard the

22  evidence, anything subsequent to my hearing the evidence has

23  nothing to do with the facts of this case.  I am confined to the

24  facts of this case and the evidence presented by both of you in

25  this case.  And that's all.  And the inspection that I made of the

1    home at the request of both parties, everybody needs to know that

2    the court went to the house and saw all of the material that they

3    pointed out to me.

4         MR. MILLER:  And again, appreciative of his passion and

5    presentation, your Honor, I just want to make sure the record is

6    clear that I have not spoken directly to the CPSC, I made a comment

7    to Mr. Herman and to the court in chambers that I had heard and the

8    source of my information was the news media in the course of

9    questioning me.  So I want to make sure that that information is

10   understood.

11        THE COURT:  I didn't interpret anything that was said

12   that you said.

13        MR. HAYDEN:  That I have no direct information from any

14   federal agency about anything that they are doing.

15        THE COURT:  I understand that.  One moment.  There are a

16   couple, just for housekeeping matters, there are a couple of

17   rulings that I reserved, H-48, H-448, H-399-407, I understand that

18   these have to do with the scope of the law applicable to the case,

19   and I ask counsel in their findings of fact to address those

20   particular items and I'll deal with.

21        I'll make the case submitted and I'll start my opinion

22   immediately.  The court will stand in recess.

23        THE DEPUTY CLERK:  Judge, just a minute.  We have another

24   matter.

25        MR. SANDERS:  1-A1, 1-A2, 1-A3, 1-AB.

1          THE DEPUTY CLERK:  You need to put it on the record.

2          MR. SANDERS:  Excuse me, your Honor, we were trying to

3    clean up some of these exhibits before lunch.  And I have some tabs

4    marked by the plaintiffs which we'll redact and remove.  But except

5    for these redactions, we move into the record Exhibit 1-A1, 1-A2,

6    1-A3, 1-B, 1-D, 1-C, and I think that's it actually.

7          MR. ECUYER:  For ease of reference that is the entire

8    appendicis to Dr. Perricone's report when you go back and look at

9    the transcript, with the four redactions.

10         THE COURT:  And what is that, you're offering that into

11   evidence?

12         MR. SANDERS:  I am offering that.

13         THE COURT:  What's your position on that, what's the

14   plaintiff's position?

15         MR. ECUYER:  We have no objection, your Honor, save the

16   four paragraphs that we are going to redact before it comes into

17   evidence.

18         THE COURT:  Okay.  I'll move those into evidence with the

19   understanding you will remove those paragraphs.

20         MR. SANDERS:  And then there's two more standards that

21   were agreed DX-63 and DX-65.

22         MR. ECUYER:  No objection, your Honor.

23         THE COURT:  Okay.  I will admit those into evidence.

24         MR. HERMAN:  Your Honor, just one last clarifying thing

25   for the record.  I think everybody is on the same page about this.

DAILY TRANSCRIPT

1   It's our understanding that the proposed findings of fact will only

2   include, if anything, the right of the plaintiffs to an attorney

3   fee award, but the attorney's fee issue will be dealt with in some

4   type of subsequent proceeding.

5            THE COURT:  Yes, I am going to sever that aspect of the

6   case out and I will talk with you all after I've issued an opinion,

7   I will have a status conference and we'll get you in court on the

8   best way of dealing with that.  I can do it -- most of the time I

9   do it on paper, but if we need any particular evidence, I'll

10  discuss it with you and I will set something up.  I will sever

11  that, the attorneys fee, the scope of the attorneys fee out of the

12  case, I'll just deal with whether or not there is a potential.

13           MR. HERMAN:  Thank you, Judge.

14           MR. HAYDEN:  Your Honor, a point of clarification, I

15  think it was discussed but when do you want the proposed findings

16  of fact?

17           THE COURT:  Give me some input from both of you all.

18           MR. SEEGER:  We picked the 29th.

19           MR. MEUNIER:  March 29th, Judge, that's two weeks.

20           THE COURT:  I would like them both at the same time, all

21  I need is one response.  That's about ten days from now.

22           MR. SEEGER:  Yes, your Honor.

23           THE COURT:  Are you okay with that, both sides?

24           MR. SEEGER:  We'll do it.

25           MR. HAYDEN:  Okay.

1      THE COURT:  We'll do it then.  That's fine.  Thanks again

2  for your help.

3      MR. MEUNIER:  Thanks, your Honor.

4    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

5

6                 *  *  *  *  *  *

7

8              REPORTER'S CERTIFICATE

9

10   I, Karen A. Ibos, CCR, Official Court Reporter, United States

11  District Court, Eastern District of Louisiana, do hereby certify

12  that the foregoing is a true and correct transcript, to the best of

13  my ability and understanding, from the record of the proceedings in

14  the above-entitled and numbered matter.

15

16

17  _____

18            Karen A. Ibos, CCR, RPR, CRR

19            Official Court Reporter

20

21

22

23

24

25

DAILY TRANSCRIPT