# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: **CHINESE-MANUFACTURED** | * | **MDL Docket No. 2047** |
| **DRYWALL PRODUCTS** | * | |
| **LIABILITY LITIGATION** | * | **SECTION L** |
| | * | |
| | * | **JUDGE FALLON** |
| | * | |
| | * | **MAG. JUDGE WILKINSON** |
| | * | |
| | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * | | |

**THIS DOCUMENT RELATES TO:** *Campbell-Clement/Schexnaydre v. Knauf Plasterboard (Tianjin) Co., Ltd, et al*  Case No. 09-7628

### KNAUF PLASTERBOARD (TIANJIN) CO. LTD'S
### MEMO IN SUPPORT OF ITS MOTION TO STRIKE AND/OR LIMIT THE
### <u>EXPERT OPINION TESTIMONY OF PLAINTIFF'S EXPERT DEAN RUTILA</u>

Knauf Plasterboard Tianjin Company, Limited ("KPT") submits this memorandum in support of its motion to exclude the testimony of Dean Rutila.  Mr. Rutila, a civil engineer, has been retained by plaintiffs in this case to offer various opinions regarding off-gassing, corrosion, functionality and safety of electrical wiring, applicable electrical codes and alleged appliance damage arising from the use of Chinese drywall in the *Clement* and *Campbell* residences. While KPT does not dispute Mr. Rutila's qualifications as a civil engineer, KPT does assert that, pursuant to *Daubert* and its progeny, the court should exclude those portions of Mr. Rutila's report and opinions that are unrelated to civil engineering because (1) Mr. Rutila lacks the required knowledge, experience or education to offer opinions in other scientific and technical specialties and (2) Mr. Rutila lacks the required supporting scientific data and has failed to apply sound methodology to certain of his opinions.

## FACTUAL BACKGROUND

On May 14, 2010, Mr. Rutila produced his expert reports regarding his "Investigation of Alleged Damage Due to Drywall" in the *Campbell* and *Clement* homes. Mr. Rutila's conclusions, found in the "Executive Summary" of his report, are nearly identical for both the *Campbell* and *Clement* homes. Copies of his expert reports are attached hereto as Exhibit A (*Campbell*) and Exhibit B (*Clement*), respectively. Mr. Rutila's conclusions are summarized below:

1. **Off-gassing -** Knauf gypsum wallboard manufactured in China creates sulfur off gases.

2. **Corrosion** – The sulfur off-gases allegedly emitted by the drywall cause corrosion to numerous building components within the home, including but not limited to electrical components such as receptacles and switches, and other copper components such as evaporator coils in HVAC units.

3. **Functionally and Safety of Electrical Components** – The current corrosion creates an increased risk of fire or electrical shock and there is an ongoing risk of future corrosion even if the drywall is removed.

4. **Appliances** – all appliances and electronics with contact switches and/or printed circuit boards should be replaced.

5. **Electrical Codes** – The local building codes require the use of electrical cables specifically "listed" for use in a corrosive environment.

For the reasons more fully set forth below, Mr. Rutila does not have the qualifications to offer such expert opinions, which are not based on any well-recognized or accepted scientific analysis or testing and therefore, amount to nothing more than mere speculation.

2

## LAW BACKGROUND

The admission of expert testimony is governed by Rule 702 under the Federal Rules of Evidence.  Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FRE 702 (West 2004).    The current version of Rule 702 was enacted in response to the United States Supreme Court's decision in *Daubert .v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).    The United States Supreme Court in both *Daubert v. Merrill-Dow Pharmaceuticals, supra* and subsequently in *Kumho Tire Co., Ltd. v. Carmichael*, 526 US 137, 119, S.Ct. 1167 (1999) designed the framework within which expert testimony should be evaluated.  That evaluation, though flexible, applies to each and every expert discipline. *See Kumho, supra.*

Plaintiffs, as the proponents of Mr. Rutila's testimony, must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not suggest a belief or unaccepted speculation."  *Mitchell v. Gencor, Inc.*, 165 F.3d 738, 780 (10th Cir. 1999). Plaintiffs must satisfy the Court that their expert meets the standards of reliability under Rule 702, and the court is not simply required to take the expert's word for it.  *See Caraker v. Sandoz Pharmaceuticals Corp.* 188 F.Supp.2d 1026 (S.D. Ill. 2001).  Unlike summary judgment, the qualifications and methodology employed by Rutila, are not construed in Plaintiffs' favor; Plaintiffs bear the burden of establishing the reliability and relevance of his opinions. *United States v. Hicks*, 389 F.3d 514 (5th Cir. 2004); *United States v. Fullwood*, 342 F.3d 409

(5th Cir. 2003); *In re Vioxx Products Liability Litigation*, 414 F.Supp.2d 574 (E.D. La. 2006). Mr. Rutila's opinions are unreliable and must be excluded because he is not qualified to render the opinions proffered in this matter, and he has not employed sound, scientific methods to reach his "opinions."

### A.    Qualifications

Under *Daubert* and its progeny, the Court must be satisfied that the witness is qualified to testify by virtue of knowledge, skill, experience, training or education.  *See id., accord Sittig v. Louisville Ladder Group, LLC*, 136 F.Supp.2d 610 (W.D. La. 2001).   Any opinion from an alleged expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist.  *See Watkins v. Telsmith, Inc.,* 121 F.3d 984, 991 (5th Cir. 1997).  If the district court finds that the witness is not qualified to testify in a particular field or on a given subject, the district court should refuse to allow that person to testify as an expert witness.[1]

While Mr. Rutila attempts to avoid the exclusion of his opinions by relying on third-parties, his opinions will plainly address areas that are beyond the scope of his knowledge, training or experience.  Reliance on these other sources, however, is not sufficient to establish Mr. Rutila's expertise in this area.  *See, e.g., McElroy v. Arkansas Log Homes, Inc.*, 1989 WL 18755 (D. Kan.) (finding that merely reading scientific articles did not qualify chemist to opine that alleged exposure caused symptoms in the plaintiff); *Siharath v. Sandoz Pharmaceuticals Corporation*, 131 F.Supp.2d 1347 (N.D. Ga. 2001) (review of materials outside

---

[1]    *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir. 1999); *Seatrax, Inc. v. Sonbeck Intern., Inc.*, 200 F.3d 358(5th Cir. 2000); *Verzwyvelt v. St. Paul Fire & Marine Insurance Company*, 175 F.Supp.2d 881, 887 (W.D. La. 2001); *Sittig v. Louisville Ladder Group, LLC, supra.*; *Summers v. Missouri Pacific Railroad Company*, 897 F.Supp. 533 (E.D. Okla 1995) (Court properly excluded psychologists report because psychologist was not an expert in medicine or toxicology, and causation was a medical issue.)

of expert's field does not render witness an "expert".); *Schmerling v. Danek Medical, Inc.* 1999 WL 712591 (E.D. Pa.). Mr. Rutila's opinions reach far beyond the scope of his experience and training and must, therefore, be excluded.

### B.   Reliability

Under *Daubert*, the district court must act as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Id.* 509 U.S. at 589; *Lassiegne v. Taco Bell Corporation*, 202 F.Supp. 2d 512, at 515 (E.D. La. 2002). The new version of Rule 702 affirms the trial court's role as gatekeeper and provides general standards for the trial court to use to assess the reliability and helpfulness of proffered expert testimony. *In re Propulsid Products Liability Litigation*, 261 F.Supp.2d 603 (E.D. La. 2003). Thus, before admitting the testimony of a witness proffered as an expert, the Court must engage in "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can properly be applied to the facts in issue." *Daubert*, 509 U.S. at 589, 592-593; *Sittig,* 136 F.Supp.2d 610, 617. This inquiry requires the court to assess the reasoning and the methodology underlying the expert's testimony.[2]

The aim of this inquiry is to exclude expert testimony based merely on subjective belief or unsupported speculation. *Lassiegne, supra.* Expert testimony is cloaked with the judicial imprimatur of reliability and apparent objectivity, obtained after scrutiny of its methodological underpinnings. *Rowe v. State Farm Mutual Auto Insurance Co.*, 670 So.2d 718, 725 (La. App. 3 Cir. 1996) *writ denied* 673 So.2d 611 (1996). Thus, "precautions must be taken lest a retained

---

[2]    The Supreme Court has articulated five, non-exclusive factors to consider when assessing whether a methodology is scientifically reliable. These factors are: (1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94; *accord Boganegra v. Vicmar Services, Inc.*, 320 F.3d 581 (5th Cir. 2003).

expert's testimony, 'dressed up and sanctified as the opinion of an expert,' be permitted to unduly influence the jury." *Id.* at 725, *quoting Viterbo v. Dow Chemical Company*, 826 F.2d 420 (5th Cir. 1987). Additionally, this inquiry is meant to ensure that any purported expert, whether basing testimony on professional study or personal experience, employs the level of intellectual rigor that characterizes the practice of the expert in the relevant field. *In re Propulsid Products Liability Litigation*, 261 F.Supp.2d 603, 606 (E.D. La. 2003) *quoting Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999).

The analysis required under *Daubert* and its progeny is designed to preclude a witness from offering casual observations and conclusory statements as "expert" testimony. *See, e.g., Hayes v. Raytheon Co.,* 801 F.Supp. 1326, 1331 (N.D. Ill. 1992); *Rayneaud v. Marin Marietta Corp.* 749 F.Supp. 1545, 1552 (D.C. Ill. 1990), *aff'd* 972 F.2d 304 (10th Cir. 1992); *see also Savage v. Union Pacific Railroad Company*, 67 F.Supp.2d 1021 (E.D. Ark. 1999) ("Expert opinion is not scientifically valid if it is based on wholly insufficient data."); *Ramsey v. Consolidated Rail Corporation*, 111 F.Supp.2d 1030 (N.D. Ind. 2000) (Expert must substantiate opinions, and cannot rest on mere conclusions without support.). *General Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (noting that in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered"); see also *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F.Supp. 1119, 1122 (N.D.Ill.1995)("The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue ... is too wide in the present case.")

As applied consistently throughout this jurisdiction, the aim of the *Daubert* inquiry is to exclude expert testimony that is based solely on subjective belief and unsupported speculation. *See, e.g., Watson v. Snap-On Tools, Inc.*, 2006 WL 2114558 (W.D. La.); *Kirkland v. Marriott*

*International, Inc.*, 416 F.Supp.2d 480 (E.D. La. 2006); *Messer v. Transocean Offshore USA, Inc.*, 2005 WL 283294 (E.D. La. 2005); *Fenimore v. American River Transportation Company*, 2005 WL 106776 (E.D. La. 2005); *Vekic v. Wood Energy Corporation*, 2004 WL 2367732 (E.D. La.).   As stated by the Third Circuit in *Rowe v. State Farm Mutual Auto. Inc.*, 95-669, p. 17 (La. App. 3rd Cir. 3/6/96), 670 So.2d 718, 729:

> Louisiana Code of Evidence Art. 702, like its federal counterpart, states that expert testimony must be based on "scientific, technical or other specialized knowledge."  Even then, such "testimony must rise to a threshold level of reliability in order to be admissible." *State v. Foret,* 93-246 (La. 11/30/93), 628 So.2d 116, 123 (adopting *Daubert*).  To be reliable, such testimony requires more than "subjective belief or unsupported speculation," *Daubert*, 1113 S.Ct. at 2795, and certainly it requires more than *subsidized* speculation: "experts whose opinions are available to the highest bidder have no place testifying in a court of law, before a jury and with the imprimatur of a trial judge's decision that he is an 'expert.'"  *In re: Aircraft Disaster at New Orleans, Louisiana,* 795 F.2d 1230, 1234 (5th Cir 1986).

(emphasis in the original).   Accordingly, when, as here, the proffered expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it.  *In re: Vioxx Products Liability Litigation*, 414 F.Supp.2d 574 (E.D. La. 2006).

Mr. Rutila's opinions are not based on sound methods or sufficient data and must, therefore, be excluded.  *See, e.g., Seatrax, Inc. v. Sonbeck Intern., Inc.*, 200 F.3d 358(5th Cir. 2000); *Brown v. Parker-Hannifin Corp.*, 919 F.2d 308 (5th Cir. 1990); *see also Sun Insurance Marketing Network v. AIG Life Insurance Company*, 254 F.Supp.2d 1239 (M.D. Fla. 2003).

**ARGUMENT**

**A.     Mr. Rutila Is Not Qualified By Education or Experience to Offer Any Expert Opinion Regarding Sulfur Off-Gassing and Has Not Performed Any Reliable Scientific Analysis In Support of His Opinions.**

As noted above, Mr. Rutila's report includes various expert opinions regarding "sulfur off gases" allegedly emitted from the drywall.  From the outset, Mr. Rutila concedes that he is not an expert with regard to "off-gassing"

> Q:     All right. Let's go back to your report, if we could, please, on page 2, and there's a discussion here of off-gassing. Let me make sure that we're clear here. You're not an expert in off-gassing, is that right?
>
> A:     I'm not a chemist not a chemistry expert. My expertise is leading this investigation. That's my expertise.
>
> Q:     The answer is no, you're not an expert in off-gassing?
>
> A:     I'm not a chemist or expert in chemistry, which I would take to mean off-gassing. (See deposition of Dean Rutila, p. 19, attached hereto as Exhibit C).

As a result, Mr. Rutila's opinions regarding "off-gassing" should be excluded on this basis alone.  However Mr. Rutila goes on to openly concede that he has not conducted any testing to support his "off-gassing" opinions."

> Q:     . . . Now you haven't done any testing on whether any building materials off-gas Chinese drywall; correct?
>
> A:     That's correct.
>
> Q:     And you haven't done any testing to determine whether any building materials saturate Chinese drywall gases, correct?
>
> A:     That's correct. (Rutila depo., p. 66-67).

Despite the admitted absence of any testing to support his off-gassing opinions, Mr. Rutila, nonetheless, asserts that building materials need four weeks to "off-gas" as part of the reconstruction of the subject homes. (Rutila report, p. 3; Rutila depo., p. 67-68).  However,

Rutila concedes that his expert report does not provide any scientific basis for this opinion and more importantly, he does not know how many days/weeks would be required to allow such "off-gassing" to occur. Instead, he merely asserts that because, in his experience, a time period of four weeks is used in other instances, unrelated to off-gassing, a similar time period should be used in this case with regard to the drywall. (Rutila depo., p. 43). Such opinions, without any scientific basis whatsoever, fail to meet the reliability requirements of Rule 702 as they are nothing more than pure speculation and should be excluded.

### B.   Mr. Rutila Is Not Qualified to Offer Expert Opinions On the Chemical Processes of Corrosion And The Potential For Future Corrosion.

Mr. Rutila has testified that he is going to be offering opinions with respect to corrosion based on his observations, including "the existence of apparent corrosion product" and "the significance of that in terms of makings repairs." (Rutila depo., p. 7-8). KPT does not contest Mr. Rutila's ability to offer such expert opinions based on his personal observations of corrosion. However, Mr. Rutila has also testified he will be offering "opinions in terms of the reasons for that corrosion based on our work and the work of others." (Rutila depo., p. 8). KPT strongly objects to Mr. Rutila offering any such opinions regarding the "reasons" for such corrosion.

First and foremost, Mr. Rutila openly admits that he is not a corrosion expert and does not have any specific training as a corrosion engineer. (Rutila depo., p. 7). Yet, Mr. Rutila offers the opinion that even after the removal of Chinese drywall, any corrosion products that remain in the home, will themselves, now be a source of sulfur, and thereby be a future source of corrosion. (Rutila depo., p. 12, 32-33). This opinion is completely beyond Mr. Rutila's expertise as a civil engineer and is nothing more than pure speculation. Mr. Rutila does not offer any scientific basis for this opinion, as none exists. In fact, Mr. Rutila admits that he did not conduct any testing in support of his opinions regarding the potential for future corrosion once

the Chinese drywall is removed from the residence[3] and admits that there is no "body of experience" that would allow him to quantify the risk, if any, of such future corrosion. (Rutila depo., p. 47).

Moreover, Mr. Rutila's opinions on the potential for future corrosion are based entirely on the testimony of plaintiffs' other expert, Mr. Krantz, and he freely admits "that specific work is outside [his] expertise." (Rutila depo., p. 70).  Therefore, Mr. Rutila's opinions are duplicative of those offered by other experts and will not assist the trier of fact. The court should accordingly strike Mr. Rutila's expert opinions on the subject of "reasons" for corrosion and the potential for future corrosion upon the removal of Chinese drywall from the subject residences.  Mr. Rutila simply is not qualified to offer such opinions and does nothing more than rely upon the expertise and experience of another testifying expert in formulating his opinions.  This type of reliance alone does not render Mr. Rutila an expert on the issue and he should be precluded from offering such opinions.

### C.     Mr. Rutila's Opinions Regarding the Functionality and Safety of Electrical Wiring in the Residence is Unreliable.

Mr. Rutila believes that the current corrosion, as well as the risk of future corrosion, may affect the functionality of the electrical wiring in the home and pose a fire hazard.  Once again, Mr. Rutila does not have the qualifications to offer such opinions.

Q:     You're not a fire or safety expert, correct?

A:     I'm not an electrical safety expert. I am a safety expert in that I am qualified by the OSHA Training Institute to provide construction safety training, but I don't think that was the intent of your question.

Q:     Right. You're not a fire safety expert?

---

[3]   Q:     And you've done no testing yourself to confirm or negate the possibility of future corrosion absent Chinese drywall, correct?

A:     **I have not done any such testing**. (Rutila depo., pp. 70) (emphasis added).

> A:      I'm not a fire safety expert. (Rutila depo., pp. 42).

Furthermore, Mr. Rutila admits that he did not conduct any testing in support of his increased fire hazard opinions.

> Q:      All right. Well, what type of testing would be required to determine whether or not corrosion on electrical components resulted in increased risk of fire or electric shock?
>
> A:      If we look at the UL standard, the number I don't recall, but it's listed in my documents, for the listing of electrical components, you'll see that there is a many-step process for that listing. As an example, in order to study the risks from this corrosion, that process would have to be implements on a sufficient variety of corroded cables and devices to fully understand it.
>
> Q:      You haven't done any of that testing, correct?
>
> A:      No. (Rutila depo., p. 41-42).

Similarly, Mr. Rutila does not have any scientific basis for his opinions that the corrosion may have an effect on the functionality of the electrical wiring in the subject residence.

> Q:      . . . you didn't do any testing to effect the functionality or safety of PMC 20 based on this microscopic evidence of copper sulfur, correct?
>
> A:      Not based on the visual evidence or the microscopic. I did not test the wire for functionality. (Rutila depo., p. 30-31).

Mr. Rutila also admits that the amount of corrosion he observed visually or that was in a micrograph image, does not impact the functionality of the subject electrical wire. (Rutila depo., p. 31-32).  Nonetheless, Rutila identifies a number of hazards that he believes *may* affect the long term functionality of the electrical wire including (1) the corrosion affecting connections and (2) future corrosion. (Rutila depo., p. 31-32, 48-49).  However, such opinions are purely speculative as he admittedly has not tested the subject wire and not done any testing to support any future impact on the functionality of the wire by corrosion. (Rutila depo., p. 49-50).

Therefore, any and all opinions regarding the functionality and safety of the electrical wire in the subject residences should be excluded.

### D.     Mr. Rutila Has Failed to Present Any Scientific Basis for His Opinion Calling for the Replacement of All Appliances in the Subject Homes.

Mr. Rutila boldly asserts that all "appliances and electronics with contact switches and/or printed circuit boards, such as televisions, computers, dishwashers and refrigerators should be replaced." (Rutila report, p. 3). However, Mr. Rutila openly admits that he conducted absolutely zero testing on the appliances in the Clement home.

> Q:     . . . In terms of the appliance [sic], thought, you didn't do any testing on the refrigerator, oven, anything like that, the big appliances, larger appliances?
>
> A:     Did no laboratory testing. . . (Rutila depo., p. 74-75).

In fact, Mr. Rutila concedes that he is not aware of any problems that the Clements have experienced with regard to such appliances. (Rutila depo., p. 75). Moreover, Mr. Rutila's expert opinions regarding corrosion in the contact switches or circuit boards of such appliances is based on his general experience and not on any observations, analysis or testing conducted in connection with the specific Clement appliances. (Rutila depo., p. 75-76).

Mr. Rutila attempts to bolster his opinions with respect to such appliance and electronics by asserting that he did conduct some testing on the coffee maker in the Clement home, as well as visually observing black corrosion on the refrigerator.[4] However, any reference to such testing and visual observation is missing from Mr. Rutila's report. (Rutila depo., p. 74-75). Courts have routinely limited experts to only those opinions expressly set forth in their reports. *See. Amtel Corp. v. Info. Storage*, 189 F.R.D. 410, 411 (W.D. Cal. 1999); *Inline Connection Corp. v. AOL Time Warner, Inc.*, 472 F.Supp.2d 604, 614 (D. Del. 2007); *Volvo Trucks N.A.,*

---

[4]     Mr. Rutila also asserts that his expert opinions rely upon the testing conducted by Mr. Galler with respect to a smoke detector, thermostat and circuit board of the air handling unit. (Rutila depo., p. 74).

*Inc. v. Crescent Ford Truck Sales, Inc.*, 2006 WL 1030394, \*5 (E.D. La. Apr. 19, 2006).  In this case, Mr. Rutila should similarly be precluded from offering any opinions that he admittedly did not include in his expert reports. Ultimately, Mr. Rutila's opinions regarding the appliances in the subject residences should be excluded as they are unreliable, speculative and without any scientific basis whatsoever.

> **E.     Mr. Rutila Is Not Qualified To Offer Expert Opinions With Respect to Local Electrical Codes**

According to Mr. Rutila, the National Electric Code "requires electrical cables to be listed for a corrosive environment" and it is his opinion that the particular cable in the subject residences does not meet this requirement. (Rutila depo., p. 44).  However, Mr. Rutila does not have any personal knowledge of the specific electrical codes applicable to the parishes in which the subject homes are located.  Mr. Rutila has never been a licensed electrician or electrical inspector.  In fact, the totality of Mr. Rutila's qualifications and experience on the subject of electrical codes is merely the knowledge that the National Electric Code applies in Louisiana.

> Q:     . . . did you specifically review the electrical codes applicable to Jefferson Parish with regard to the Clement home in[sic] St. Tammany Parish with regard to the Campbell property?
>
> A:     I did not. I reviewed the National Electric Code as it related to other parishes.
>
> Q:     Have you ever done any electrical work in Louisiana?
>
> A:     No.
>
> *          *          *
>
> Q:     But you're not a licensed electrician?
>
> A:     I am not.
>
> Q:     You're not a licensed inspector?

13

A:      I'm not.

Q:      And you've not taken any class regarding the electrical code applicable here beyond just basic electrical engineering courses taken in your civil engineering curriculum?

A:      I have not.  That's correct.

Q:      And you're not familiar with the electrical codes applicable in Louisiana, including Jefferson Parish and St. Tammany Parish?

A:      No. I'm familiar with the National Electric Code.

Q:      . . . But you're not familiar with the code specifically applicable to Jefferson and St. Tammany Parish; correct?

A:      That's correct. (Rutila depo., p. 44-45.)

Mr. Rutila simply does not have the requisite level of experience or knowledge to qualify as an expert offering opinions on the electrical codes at issue. The fact that he did not even review the electrical codes for the specific parishes at issue speaks volumes as to the lack of reliability of his opinions and as such, they should be excluded by this Court.

## <u>CONCLUSION</u>

Under Rule 702 of the Federal Rules of Evidence, this Court acts as a "gatekeeper" to assure that expert testimony amounts to more than mere conjecture. Here, the proposed testimony of Mr. Rutila falls far short of the mark. Mr. Rutila does not have the requisite qualifications, experience or expertise to offer expert opinions in this case. Mr. Rutila's opinions in support of the plaintiff's off-gassing, corrosion, functionality and safety, electrical codes and appliance damage are completely unreliable and irrelevant as they are based on nothing more than unsupported speculation and conjecture. Mr. Rutila has failed to conduct any independent testing to support his expert opinions.  As a result, the plaintiffs have failed to meet the *Daubert*

burden for admission of Mr. Rutila's testimony. KPT's motion should therefore be granted and

Mr. Rutila's expert testimony struck and/or limited.

Respectfully submitted,

BY:  s/Kerry J. Miller
MILES P. CLEMENTS (#4184)
PETER E. SPERLING (#17812)
KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
FRILOT L. L. C.
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile:  (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No. 0097136)
BAKER & MCKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL  33131
Telephone:     (305) 789-8966
Facsimile:     (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
BAKER & MCKENZIE LLP
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL  60601
Telephone:     (312) 861-8075
Facsimile:     (312) 698-2375
Email: douglas.b.sanders@bakernet.com

Counsel for Defendant, Knauf Plasterboard
(Tianjin) Co., Ltd

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served upon Plaintiffs' Liaison Counsel, by email, and to all parties in the *Campbell and Clement* proceeding by email and by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana under seal, on this 12th day of June, 2010.

_____s/Kerry J. Miller_____