Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

In re: CHINESE-MANUFACTURED    MDL Docket
DRYWALL PRODUCTS               No. 2047
LIABILITY LITIGATION
                               SECTION L

                               JUDGE FALLON

                               MAG. JUDGE
                               WILKINSON

30(b)(6) Videotaped Deposition of Springhill Hill, LLC, on behalf of their corporate representative, CHRISTOPHER L. KORNMAN, 5922 Annunciation Street, New Orleans, Louisiana 70115, taken in the offices of Sher Garner Cahill Richter Klein & Hilbert, 909 Poydras Street, Suite 2800, New Orleans, Louisiana 70112, on Thursday, the 10th day of June, 2010.

APPEARANCES:

   LAMBERT & NELSON
   (By: Hugh P. Lambert, Esquire)
   (By: Cayce C. Peterson, Esquire)
   701 Magazine Street
   New Orleans, Louisiana 70130
       (Attorneys for the Plaintiff's
        Steering Committee and John
        Campbell Slidell Property
        Management)



Magna Legal Services

ddd52cde-23e2-466b-bf35-b4efa5f8c8a6

Page 2

```
 1  APPEARANCES (continued):
 2
 3     IRPINO LAW FIRM
          (By: Anthony Irpino, Esquire)
 4        2216 Magazine Street
          New Orleans, Louisiana 70130
 5           (Attorney for the Plaintiffs)
 6
 7
        FRILOT, L.L.C.
 8        (By: Paul C. Thibodeaux, Esquire)
          1100 Poydras Street, Suite 3700
 9        New Orleans, Louisiana 70163
             (Attorneys for the Defendants,
10            Knauf Plasterboard Tianjin
              Company, a/k/a KPT)
11
12
        SHER GARNER CAHILL RICHTER KLEIN
13      & HILBERT, LLC
          (By: James M. Garner, Esquire)
14        (By: Matthew C. Clark, Esquire)
          909 Poydras Street
15        Suite 2800
          New Orleans, Louisiana 70112
16           (Attorneys for the Defendants,
              Southern Homes, LLC)
17
18
     THE VIDEOGRAPHER:
19
20      Karl Stiegman
21
     REPORTED BY:
22
23      JOSEPH R. KAISER, JR., CCR, RPR
        Certified Court Reporter
24      State of Louisiana
25           *   *   *   *   *
```

Page 3

```
 1             EXAMINATION INDEX
 2
 3                     Page No.
 4
     By Mr. Thibodeaux            9
 5
 6   By Mr. Lambert              60
 7
 8                EXHIBITS
 9
     No.                      Page No.
10
11   Exhibit 1                   14
12
     Exhibit 2                   20
13
14   Exhibit 3                   40
15
     Exhibit 4                   42
16
17   Exhibit 5                   44
18
     Exhibit 6                   46
19
20   Exhibit 7                   47
21
     Exhibit 8                   54
22
23   Exhibit 9                   57
24
     Exhibit 10                  59
25
```

Page 4

```
 1          EXHIBITS (CONTINUED):
 2
 3   No.                     Page No.
 4
     Exhibit 11                  52
 5
 6   Exhibit 12                  10
 7
     Exhibit 13                  73
 8
 9   Exhibit 14 (No such numbered exhibit)
10
11   Exhibit 15                 106
12
     Exhibit 16                 109
13
14
15         DESCRIPTIVE EXHIBIT INDEX
16
17
     Exhibit 1 - Binder of documents Bates
18   numbered 1-117, purchase orders
19
     Exhibit 2 - Documents Bates numbered 0118,
20   original construction budget
21
22   Exhibit 3 - Documents Bates numbered 0119,
     building permit
23
24
     Exhibit 4 - Documents Bates numbered 0120,
25   Certificate of Occupancy
```

Page 5

```
 1
         DESCRIPTIVE EXHIBIT INDEX (cont.):
 2
 3
     Exhibit 5 - Documents Bates numbered 0121
 4   through 136
 5
 6   Exhibit 6 - Documents Bates numbered 137
     through 144
 7
 8
     Exhibit 7 - Documents Bates numbered 145
 9   through 156, Act of Sale
10
11   Exhibit 8 - Documents Bates numbered 157
     through 179
12
13
     Exhibit 9 - Documents Bates numbered 180
14   through 181, Application to enroll 1032 in
     Home Buyers Warranty 2-10 and certificate
15   of actual coverage
16
17   Exhibit 10 - Documents Bates numbered 182
     through 236, first amendment to the
18   purchase agreement
19
20   Exhibit 11 - Documents Bates numbered 237
     through 239, marketing floor plan
21
22
     Exhibit 12 - Notice of Deposition
23
24
     Exhibit 13 - Letter to Mr. Adrian Kornman
25
```

Page 6

DESCRIPTIVE EXHIBIT INDEX (cont.):

Exhibit 14 - No such numbered exhibit

Exhibit 15 - Document showing change from Southern Homes, LLC to Southern Homes, LLC

Exhibit 16 - Map of subdivision

\* \* \* \* \*

Page 7

STIPULATION

It is stipulated and agreed by and between counsel for the parties hereto that the deposition of the aforementioned witness is hereby being taken for all purposes allowed under Article 1421, et seq., of the Louisiana Code of Civil Procedure, in accordance with law, pursuant to notice;
That the formalities of reading and signing are specifically not waived;
That the formalities of filing, sealing, and certification are specifically waived;
That all objections, save those as to the form of the question and the responsiveness of the answer, are hereby reserved until such time as this deposition, or any part thereof, may be used or sought to be used in evidence.
JOSEPH R. KAISER, JR., CCR, RPR Certified Court Reporter in and for the State of Louisiana, officiated in administering the oath to the witness.

Page 8

THE VIDEOGRAPHER:
We are now on the record. This begins Videotape Number 1 in the deposition of Christopher Kornman in the matter of Chinese-Manufactured Drywall Products Liability Litigation.
Today is Thursday, June 10th, 2010. The time indicated on the video screen is 3:14. This deposition is being taken place at 909 Poydras Street, New Orleans, at the request of Frilot, LLC.
My name is Karl Stiegman. I'm the videographer. The court reporter is Joe Kaiser. We are with Magna Legal Services.
Will counsel please introduce themselves and the parties they represent.
MR. THIBODEAUX:
Paul Thibodeaux on behalf of Knauf Plasterboard Tianjin Company, Limited.
MR. LAMBERT:
Hugh Lambert on behalf of the Plaintiff's Steering Committee and John Campbell, Slidell Property Management.
MR. GARNER:

Page 9

And James Garner and Matt Clark appearing for Southern Homes. And I think we can all agree we're appearing as what is the third party witness. We are not waiving anything. We've not appeared yet. I think we're named in some master complaint, but we have never -- I don't know if we've been served with this yet or not. Well, we're not waiving anything by appearing, correct, Skip?
MR. LAMBERT:
I understand.
MR. PETERSON:
And Cayce Peterson on behalf of John Campbell and the Clement family.
MR. GARNER:
And, Paul, you're going to get with Matt afterwards about witness cost and expenses, correct?
MR. THIBODEAUX:
That's right. I think Matt's going to get with my colleague Kyle.
MR. GARNER:
Thank you.
THE VIDEOGRAPHER:

Page 10

1    Would the court reporter please
2    swear in the witness.
3    CHRISTOPHER L. KORNMAN,
4    after having been first duly sworn by
5    the above-mentioned Certified Court
6    Reporter, was examined and testified as
7    follows:
8    EXAMINATION BY MR. THIBODEAUX:
9       Q.   Okay. Mr. Kornman, please state
10   your name and your address for the record,
11   please.
12      A.   Home address?
13      Q.   Sure.
14      A.   Christopher Lee Kornman, 5922
15   Annunciation Street, New Orleans, Louisiana
16   70115.
17      Q.   And who is your employer?
18      A.   Southern Homes, LLC.
19      Q.   And where is Southern Homes, LLC
20   located?
21      A.   2053 Gause Boulevard East, Suite
22   200, Slidell, Louisiana 70461.
23      Q.   I'm going to show you what I've
24   marked as Exhibit 12 to this deposition. I
25   mark it as Exhibit 12 due to the fact that

Page 11

1    we have some other exhibits that are 1
2    through 11 that we're going to get to that
3    are already marked.
4       Just please take a look at
5    Exhibit 12. Do you recognize that
6    document?
7       A.   Yes.
8       (Whereupon the document referred
9    to was marked for as Exhibit No. 12 for
10   identification.)
11   EXAMINATION BY MR. THIBODEAUX:
12      Q.   Okay. You understand that's a
13   30(b)(6) Notice of Videotaped Deposition?
14      A.   Yes.
15      Q.   Do you understand that you're
16   being set forth as a corporate
17   representative of Springhill, LLC for the
18   purposes of this deposition?
19      A.   Yes.
20      Q.   What is your role with
21   Springhill or your job title?
22      A.   President.
23      Q.   Okay. And what was your role in
24   2006?
25      A.   I think I was vice-president at

Page 12

1    that time.
2       Q.   How long have you been with
3    Springhill?
4       A.   Since 2003.
5       Q.   Okay. Did you have any direct
6    role in the construction of the home
7    located -- well, that has an address of
8    1032 Clarise Court in Slidell?
9       A.   What's the definition of direct?
10      Q.   Okay. Well, did you have any
11   role in that construction?
12      A.   Yes.
13      Q.   Okay. And what was your role in
14   that construction?
15      A.   As vice-president, I was
16   managing day-to-day activities of
17   Springhill, LLC, which included
18   construction of 1032 Clarise Court.
19      Q.   So you acted as -- somewhat as a
20   construction manager of that project?
21      A.   Not as a field construction
22   manager, as a manager in the corporate
23   office.
24      Q.   Okay. Let's take a look at
25   Exhibit 12. The last page you'll see

Page 13

1    Schedule A and Schedule B. With respect to
2    Schedule B, it requests that certain
3    documents be produced for the deposition.
4    Do you see that?
5       A.   Yes.
6    THE VIDEOGRPAHER:
7       We're going off the record.
8    It's 3:18. This is Videotape Number 1.
9       (Off the record.)
10   THE VIDEOGRAPHER:
11      Back on the record. It's 3:18.
12   This is Videotape Number 1.
13   EXAMINATION BY MR. THIBODEAUX:
14      Q.   Okay. It's my understanding
15   that in response to Exhibit 12 Springhill
16   produced documents that are Bates numbered
17   1032 CC-SPR 0001 through 0239. I'm going
18   to hand you a copy of a binder that I
19   received which has those documents in it.
20      Is that your understanding, that
21   those documents were produced in response
22   to Exhibit 12?
23      A.   Yes.
24      Q.   Okay. Are there any other
25   documents in Springhill's possession that

Page 14

1  are responsive to Exhibit 12 that weren't
2  produced?
3      A.  Not that I'm aware of.
4      Q.  Okay.  Are documents -- I'll
5  just refer to all the documents in this
6  binder as 1 through 239.
7      A.  Okay.
8      Q.  Are those documents, documents
9  that are kept in the normal course and
10 scope of Springhill's business?
11     A.  Yes.
12     Q.  All right.
13 MR. THIBODEAUX:
14     I'll mark as Exhibit 1 to this
15 deposition documents from that binder are
16 Bates numbered 1 through 117.
17     (Whereupon, the document
18 referred to was marked as Exhibit No. 1 for
19 identification.)
20 EXAMINATION BY MR. THIBODEAUX:
21     Q.  Would you please take a look
22 at those documents, and when you've
23 reviewed them, would you let me know what
24 those documents are?
25     A.  These are purchase orders issued

Page 15

1  by Springhill, LLC to various vendors,
2  suppliers, and subcontractors for
3  construction of 1032 Clarise Court.
4      Q.  Are these all of the purchase
5  orders that Springhill issued in the
6  construction of 1032 Clarise Court?
7      A.  Yes.
8      Q.  Would Exhibit 1 include -- well,
9  strike that.
10     Would these purchase orders in
11 Exhibit 1 have been issued at the time that
12 an individual job was set to be done on
13 1032 Clarise Court?
14     A.  They are issued in chunks.  So a
15 set of purchase orders related to certain
16 aspects of construction, a set is issued
17 just prior to the start of construction, a
18 set is issued at another specific time
19 point in construction, and a set is issued
20 at another time point.
21     Q.  And these purchase orders are
22 issued directly to vendors?
23     A.  Yes.
24     Q.  And so if you look at, for
25 example, Page 1 of Exhibit 1, Bates number

Page 16

1  Page 1, there's a box that says vendor, and
2  that is the vendor that the purchase order
3  is issued to?
4      A.  Correct.
5      Q.  And then there's an order date
6  at the top right?
7      A.  Yes.
8      Q.  What does that represent?
9      A.  That may -- I'm not exactly
10 certain.  Some of the data that's on the
11 purchase order is automatically generated
12 by our software system.
13     Q.  Okay.
14     A.  The order date may be just the
15 date that it was created in our system.
16     Q.  Okay.  If you look --
17     A.  I don't know -- in other words,
18 I don't know if it was the date it was
19 created in the system or the date it was
20 sent to the vendor.
21     Q.  Okay.  And each purchase order
22 also has a purchase order number at the top
23 right-hand corner; is that right?
24     A.  Yes.
25     Q.  Okay.  Is there any -- can you

Page 17

1  -- is that simply a tracking number, or can
2  you glean any information from those
3  numbers?
4      A.  Yes.  The 11/11 represents the
5  community, which is Villas at Springhill.
6  0024B represents the lot number, 24B, and
7  030 represents the specific purchase order
8  number.
9      Q.  Okay.  So 1032 Clarise Court is
10 also identified as Lot Number 24B of the
11 Villa development; is that right?
12     A.  Correct.
13     Q.  If you look down a little
14 further, it says house type, Cameron, ARH?
15     A.  Yes.
16     Q.  What is that?
17     A.  Cameron is a name for a floor
18 plan that Springhill, LLC designed
19 themselves.  "A" represents the elevation
20 that Cameron has, I think three elevations
21 in A, B, and C.
22     Q.  Is that reference to a Federal
23 flood elevation?
24     A.  No.  A front facade construction
25 elevation, a facade.  So the floor plan is

Page 18

1  the same and a buyer can choose either A,
2  B, or C facade. So it's just to sort of
3  change the design.
4       And RH stands for right hand.
5  If you're facing the house, that's the side
6  the driveway is on. So if you're facing
7  the house and it's a right hand, the
8  driveway is on the right-hand side.
9    Q.  Okay. So the purchase orders in
10 Exhibit 1 are only with respect to the --
11 well, strike that.
12      Let me back up for a second.
13 1032 Clarise Court is part of a duplex of
14 two units, correct?
15   A.  Correct.
16   Q.  It's one unit in a two-unit
17 duplex, right?
18   A.  Correct.
19   Q.  So all of the purchase orders in
20 Exhibit 1 are purchase orders only with
21 respect to that one unit in the duplex?
22   A.  Correct.
23   Q.  Okay. There's an entry too for
24 builder, Kramer?
25   A.  Uh-huh.

Page 19

1    Q.  And who is Kramer?
2    A.  Kramer is a former employee of
3  Springhill, LLC. He was -- builder
4  represents the project manager. He's the
5  employee of Springhill, LLC who's directly
6  responsible for construction activities.
7    Q.  Okay. Okay. If we turn to
8  Bates number 61 in Exhibit 1.
9    A.  Where do I find the --
10   Q.  I'm sorry. On the bottom
11 right-hand corner, you see how there's a
12 Bates number, it says 1032 CC-SPR and
13 there's a dash 00 --
14   A.  Yeah.
15   Q.  -- numbers, you're looking at
16 61.
17   A.  Okay.
18   Q.  Okay. This is a purchase order
19 to Graf's Drywall; is that right?
20   A.  Graf's Drywall, yes.
21   Q.  Okay. Can you explain to me
22 what this purchase order -- what work this
23 purchase order entails?
24   A.  It represents hanging the
25 drywall.

Page 20

1    Q.  Does it represent the material
2  cost of drywall at all?
3    A.  No. Just labor.
4    Q.  Okay. And who is Graf's
5  Drywall?
6    A.  He's the subcontractor who
7  performs the labor for installing drywall.
8    Q.  And he's based in Picayune,
9  Mississippi?
10   A.  Yes.
11   Q.  Does Springhill typically use
12 Graf's Drywall for hanging drywall jobs?
13   A.  Yes.
14   Q.  Are they a -- are they in any
15 way -- is Graf's in any way affiliated with
16 Springhill?
17   A.  No. They're -- you mean in a
18 legal sense?
19   Q.  Sure. Are they a third party --
20   A.  No.
21   Q.  -- contractor?
22   A.  They're a subcontractor, yes.
23   Q.  Do they do work for companies
24 other than Springhill?
25   A.  I'm sure they do.

Page 21

1    Q.  All right.
2    A.  You'd have to ask them.
3  MR. THIBODEAUX:
4       I'll mark as Exhibit 2 documents
5  that are Bates numbered -- or just Bates
6  numbered 0118.
7       (Whereupon, the document
8  referred to was marked as Exhibit No. 2 for
9  identification.)
10 MR. LAMBERT:
11      Paul, what was one?
12 MR. THIBODEAUX:
13      I'm sorry?
14 MR. LAMBERT:
15      One was the --
16 MR. THIBODEAUX:
17      One was the 1 through 117.
18 MR. LAMBERT:
19      Okay. And 2 is what?
20 MR. THIBODEAUX:
21      118.
22 EXAMINATION BY MR. THIBODEAUX:
23   Q.  It seems to me that Exhibit 2 is
24 a summary of the purchase orders in
25 Exhibit 1. Is that right?

Page 22

1  A. Exhibit 2 is the original
2  budget, construction budget. And then also
3  it shows all the costs posted to -- against
4  the budget for 1032 Clarise Court. So the
5  original estimate is the construction
6  budget prior to the start of construction.
7  JTD cost represents actual job-to-date cost
8  posted against the budget.
9  Q. Okay. If we look back at
10 Exhibit 1, Page 61, we have this $1,718
11 cost for drywall hanging.
12     Is that figure represented in
13 Exhibit 2? Just to kind of go to the
14 chase, towards the middle you'll see
15 drywall contractor.
16 A. Yes.
17 Q. Drywall board, drywall
18 contractor.
19 A. It would be a portion of Cost
20 Code 3055030, drywall contractor. $6,416
21 is the budget, job-to-date is 7587. So
22 this 1718 would be a portion of that.
23 Q. Okay. I guess my question is:
24 Where am I going to find the cost above
25 1718 that are included in the 7587, Exhibit

Page 23

1  2? Are those costs in the purchase orders
2  in Exhibit 1, I guess is my question?
3  A. They should be. You know, I'd
4  have to go through and add it all up.
5  Q. Okay. Yeah, right, that's
6  right. Yeah, if we look at Bates number 61
7  through 64 --
8  A. Uh-huh. So what are the --
9  those should add up to the 7580 -- well,
10 actually, they would probably add up to the
11 6416. I don't have a calculator.
12 Q. Sure. It should be close,
13 right?
14 A. Right. And then it looks like
15 there was probably some kind of variance to
16 get to the 7587.
17 Q. And what do you think that
18 variance would be based on?
19 A. It could be anything. It could
20 be strictly theoretical hypothesizing.
21 Q. I got you. It's not your
22 question. I just, you know -- anything you
23 might know.
24 MR. GARNER:
25     You don't have to guess. You

Page 24

1  don't have to guess.
2  EXAMINATION BY MR. THIBODEAUX:
3  Q. Yeah. I don't want you
4  guessing. If you don't know, just tell me
5  you don't know.
6  A. No. I don't know.
7  Q. Okay. So the original estimate
8  in Exhibit 2, the column original estimate,
9  are those numbers that are based on
10 estimates from actual subcontractors?
11 A. Well, every single job, because
12 we -- we build the same floor plan over and
13 over and over, we don't put -- send out
14 every single job for bid again. We
15 generate an estimate based on our knowledge
16 of what that job will most likely cost.
17 Q. Do you use any software to
18 determine that estimate?
19 A. Sure.
20 Q. Do you know the names of the
21 software that you use?
22 A. BuilderMT, Workflow Management.
23 Now, I don't know if at this time we --
24 over the years we changed software. So I
25 don't know if at the time we were using

Page 25

1  this software or not, but currently we're
2  using a software program called BuilderMT.
3  MR. LAMBERT:
4     That's M like in Mike; T like in
5  tango?
6  THE WITNESS:
7     Yes.
8  MR. LAMBERT:
9     And what's the other one you
10 use?
11 THE WITNESS:
12    We use Timberline Accounting,
13 BuilderMT, and I believe BuilderMT has
14 multiple pieces to it. They're the
15 software manufacturer.
16 EXAMINATION BY MR. THIBODEAUX:
17 Q. So just to make sure I
18 understand, am I right that the purchase
19 orders in Exhibit 1, the actual total order
20 dollars that are represented in Exhibit 1,
21 should then be also represented in the
22 job-to-date column of Exhibit 2?
23 A. Say that again.
24 Q. Should the numbers, the dollar
25 figures that are represented in the

Page 26

1   purchase orders in Exhibit 1, correspond to
2   the job-to-date column in Exhibit 2?
3       A.   No.  They'll correspond to the
4   original estimate.
5       Q.   Okay.  Then there will be some
6   variance?
7       A.   Correct.
8       Q.   And that will be the
9   job-to-date?
10      A.   If there was reason for a
11  variance, then that will get you to the
12  job-to-date.
13      Q.   Got you.  Thanks.
14           And the job-to-date column,
15  Exhibit 2, would represent the money that
16  the job was actually performed for?
17      A.   Correct.
18      Q.   If you look at Exhibit 1, Page
19  63.
20      A.   Uh-huh.
21      Q.   There's this drywall texture
22  purchase order for $4,432?
23      A.   Uh-huh.
24      Q.   Do you know what that entails?
25      A.   Texturing drywall.

Page 27

1       Q.   Could you just explain?
2       A.   After you hang drywall, you
3   spray on a texture, creates that, what we
4   call orange peel look, and then paint is
5   applied over texture.  It hides the seam.
6       MR. GARNER:
7            That's in addition to taping and
8   floating and all that stuff?
9       THE WITNESS:
10           After taping and floating is the
11  texturing.
12  EXAMINATION BY MR. THIBODEAUX:
13      Q.   Does that process allow you to
14  not spend as much money taping and
15  floating?
16      A.   No, not necessarily.
17      Q.   It does help you hide the seams?
18      A.   It does hide, correct, yes.
19      Q.   If we look at Page 65 of
20  Exhibit 1, it's a purchase order with
21  respect to bath cabinets.
22      A.   Uh-huh.
23      Q.   Do these costs, are they just
24  materials, or does it include installation?
25      A.   This is only material.

Page 28

1       Q.   Look at Page 80 of Exhibit 1.
2       A.   Okay.
3       Q.   It's a purchase order for paint.
4   Does this include the entirety of the
5   inside of the home?
6       A.   Yes.
7       Q.   Does that include materials and
8   labor?
9       A.   Yes.  Painters supply their own
10  material.
11      Q.   And that's Page 80, correct?
12      A.   Correct.
13      Q.   Take a look at Page 82 of
14  Exhibit 1.  What is this purchase order
15  for?
16      A.   Installation of cabinets,
17  installation of countertops, installation
18  of exterior locks.
19      Q.   With respect to cabinets and
20  countertops, would that be in the kitchen,
21  bathroom and anywhere else in the home that
22  might have cabinets and counters?
23      A.   Correct.
24      Q.   Look at Page 89, please, in
25  Exhibit 1.

Page 29

1       A.   Okay.
2       Q.   This is a purchase order for
3   glass mirrors installation.  Does that
4   include materials, as well?
5       A.   It includes materials except for
6   the powder room mirror.
7       Q.   How do you know that?
8       A.   I'm sorry.  I take that back.
9   In this particular plan, there is no powder
10  room.
11      Q.   Okay.  So it's all mirrors --
12      A.   Yes.
13      Q.   -- in the home?
14           Let's look at Page 94 in
15  Exhibit 1, please.  Can you explain to me
16  what this purchase order is for?
17      A.   Electrical trim.  Trim is the --
18  refers to the installation of the actual
19  fixtures.
20      Q.   So there would be a separate
21  purchase order for electrical wiring?
22      A.   Correct.
23      Q.   Okay.  Does the purchase order
24  on Page 94, does that represent materials
25  and labor?

<mark>Case 2:09-md-02047-EEF-MBN   Document 3728-1   Filed 06/14/10   Page 9 of 16</mark>

<mark>Page 30</mark>

1   A.  Yes. Oh, sorry. There may be a
2   purchase order to Pine Grove Electric,
3   which would be the fixture material.
4   Q.  I'm sorry?
5   A.  There may be a purchase order to
6   Pine Grove Electric, which would represent
7   the material separate from this. In that
8   case, this would just be labor.
9   Q.  Do you see that on Exhibit 2
10  anywhere?
11  A.  Yes. Cost Code Number 3055810,
12  electrical fixture trims. There's probably
13  a purchase order in here to Pine Grove
14  Electric which represents that $447.
15  Q.  Okay.
16  A.  And that would be for material.
17  And then the one you just asked me about, I
18  believe it's Number 94.
19  Q.  Right.
20  A.  Is the installation of the
21  material.
22  Q.  Okay. On Exhibit 2, do you see
23  a line item for electrical wiring, the
24  installation of electrical wiring?
25  A.  Yes.

Page 31

1   Q.  Can you point me to that?
2   A.  3033510, electrical fixture
3   rough-ins. I'm sorry. Electrical
4   contractor rough-ins for the installation
5   of wiring.
6   Q.  And that estimated cost was
7   $2,460?
8   A.  Yes.
9   Q.  Okay. And then it's going to
10  show you below that as the job-to-date?
11  A.  Yes.
12  Q.  Do you know who the
13  subcontractor, electrical subcontractor,
14  was for this job?
15  A.  Dixieland Forest Electric.
16  Q.  Do you know where they're
17  located?
18  A.  It says Abita Springs on the
19  purchase order.
20  Q.  Which purchase order is that?
21  A.  The one you referred me to, 94.
22  Q.  94? I got you. All right.
23      All right. If we look at Page
24  96, please, Exhibit 1, it's a purchase
25  order for $115 for electronics trim?

Page 32

1   A.  Uh-huh.
2   Q.  What does that include?
3   A.  Phone and cable.
4   Q.  Does it also include smoke
5   detectors?
6   A.  No, sir. Smoke detectors by
7   code are installed by the electrician,
8   licensed electrician.
9   Q.  So that would be included in the
10  electrical contractor --
11  A.  Yes.
12  Q.  -- rough-in that we talked about
13  in Exhibit 2?
14  A.  Correct. Well, the rough-in
15  would be the wiring. The trim would be the
16  installation of the actual -- the physical
17  smoke detector.
18  Q.  Got you. So the low voltage
19  wiring would be included in the normal and
20  then cable wiring the electrician would
21  wire in?
22  A.  The low vol -- in St. Tammany,
23  the code is that the smoke detectors have
24  to be installed by the licensed contractor,
25  not the low voltage contractor. The low

Page 33

1   voltage contractor would be Sound Security.
2   Q.  So on Page 96, the electronics
3   trim would not include the low voltage
4   wiring; is that right?
5   A.  No. What I'm saying is that --
6   it sounds like what you're saying is that
7   you're referring to the smoke detectors as
8   low voltage, which I understand. What I'm
9   saying is, yes, they are low voltage, but
10  they're required to be installed by a
11  licensed electrician.
12      Low voltage, in my definition of
13  it, also includes phone, cable -- the way
14  we refer to low voltage is the unlicensed
15  installation -- doesn't require a licensed
16  electrician to install phone, cable, if
17  there happens to be computer wiring, stuff
18  like that.
19  Q.  Low voltage wiring that services
20  smoke detectors and doorbells, for
21  instance, would have to --
22  A.  Are all installed by the
23  licensed electrician, Dixieland.
24  Q.  Okay.
25  A.  So they would be in the

<mark>9 (Pages 30 to 33)

Magna Legal Services

ddd52cde-23e2-466b-bf35-b4efa5f8c8a6</mark>

Page 34

1  electrical, not the electronics item in
2  here.
3      Q.  Okay.  In Exhibit 2?
4      A.  Correct.
5      Q.  Got you.
6      A.  The only thing in electronics is
7  phone and cable.
8      Q.  Look at Page 103 of Exhibit 1,
9  please.
10     A.  Okay.
11     Q.  It's a purchase order for HVAC
12 trim for $935.  What does that entail?
13     A.  The trim is the installation of
14 the grills, the registers.
15     Q.  So if we look at Exhibit 2, the
16 entry for HVAC rough, what would that
17 include?
18     A.  Installation of the ductwork.
19 At that time, they're most likely
20 installing the actual unit, the compressor,
21 and the unit in the attic.
22     Q.  Would HVAC rough include the
23 materials -- the materials cost?
24     A.  Yes.
25     Q.  So that would include the HVAC

Page 35

1  unit and the ducts themselves?
2      A.  Correct.
3      Q.  Okay.  Look at Page 113, please,
4  Exhibit 1.
5      A.  Okay.
6      Q.  What work does this purchase
7  order include?
8      A.  Painting final.  It's basically
9  touching up.
10     Q.  Touching up?
11     A.  Uh-huh.
12     Q.  Okay.  You said earlier that
13 painting includes material costs, as well?
14     A.  Yes.
15     Q.  All right.  Let's take a look at
16 Exhibit 2, just a few general questions
17 about this one.
18         Top left-hand corner there's an
19 entry, 11-11-24B.
20     A.  Yes.
21     Q.  What does that mean?
22     A.  That's the same thing I answered
23 before.  11-11 represents the community,
24 which is Villas at Springhill, although
25 technically, that was our marketing name

Page 36

1  for it, but in the -- it was platted by the
2  parish as Oak Hill, which is why it says
3  Oak Hill there.
4      Q.  Got you.
5      A.  So 11-11 is our community
6  number, 0024B is the lot number.
7      Q.  Okay.  And Exhibit 2 has a date
8  on the top right-hand corner of June 3rd,
9  2010.
10     A.  Uh-huh.
11     Q.  So --
12     A.  It's just a reprint.
13     Q.  Because you printed it on
14 June 3rd, 2010?
15     A.  Uh-huh.
16     Q.  Okay.  Does Exhibit 2 represent
17 all of the costs to date that Springhill
18 spent on 1032 Clarise Court?
19     A.  Yes.
20     Q.  And that number would be
21 $114,043?
22     A.  Yes.
23     Q.  Does Exhibit 2 also include
24 overhead costs in the construction of 1032
25 Clarise Court?  I mean, I see things like

Page 37

1  building permits that, you know, aren't
2  included in the purchase order in
3  Exhibit 1, I believe.
4      A.  Overhead as defined by profit?
5      Q.  I would say no, no, just as
6  defined by the costs associated with
7  actually constructing 1032?
8         MR. LAMBERT:
9             You mean hard costs?
10        MR. THIBODEAUX:
11            Right, right.
12        THE WITNESS:
13            This represents all hard and
14 soft costs.  Hard costs are sticks and
15 bricks.  Soft costs are permits,
16 inspections.
17 EXAMINATION BY MR. THIBODEAUX:
18     Q.  And Exhibit 2, to the extent
19 that any of these line entries include
20 material costs, that would also include
21 applicable sales taxes?
22     A.  Yes.  Well, there are -- yes.
23 If they're our responsibility.  In some
24 cases, it's the responsibility of the
25 trade.

Page 38

1  Q. But if it's the responsibility
2  of the trade, that would be represented in
3  the estimate that they give you?
4  A. Yes. For example, on the
5  purchase order, there's a line item for
6  tax.
7  Q. Right. Okay.
8  A. So the total order is the number
9  that's in this estimate.
10 Q. Okay. So if we look at
11 Exhibit 2, Springhill initially estimated
12 that the job would cost $108,136; is that
13 right?
14 A. Yes.
15 Q. There are $37,679 in what you
16 termed as variances?
17 A. Yes.
18 Q. Is that right?
19     The majority of that which is
20 attributable to lot purchase price; is that
21 right?
22 A. Yes. It's not technically a
23 variance. It's just the way the system is
24 calculating the lot purchase price across
25 the columns.

Page 39

1  Q. Who did Springhill buy the lot
2  from?
3  A. I don't recall exactly. We work
4  with one of two developers and they're
5  related. And I don't recall what the
6  entity was that we purchased these lots
7  from -- this lot.
8  Q. When you say these lots --
9  A. This lot.
10 Q. Were multiple lots purchased at
11 the same time in this area of development?
12 A. Yes.
13 Q. And that -- how many total lots
14 did Springhill own in what you described as
15 the Villas?
16 A. I'd have to look. I don't
17 remember the exact. All of them.
18 Q. I think we'll get to that in a
19 minute. I think it's like 30 something.
20 A. Yeah.
21 Q. There's an entry on Exhibit 2
22 for unallocated, $7,500. Do you know what
23 that is?
24 A. Yes. Unallocated represents
25 everything that can't be posted to a

Page 40

1  specific job, for example, toilets and
2  trash bins. We don't have one trash bin
3  for every house. We typically have one for
4  every two houses or every three houses. So
5  because they can't be posted to a specific
6  lot, we create in accordance with the
7  National Association of Home Builders
8  standards an unallocated cost code. So we
9  divide up all of the costs that can't be
10 attributed -- allocated to a specific lot
11 and come up with a number that is used as
12 budgeted for each lot.
13     MR. LAMBERT:
14         When you say toilets, you're
15 talking Port-O-Lets, right?
16     THE WITNESS:
17         Port-O-Lets, correct. It's
18 basically anything that can't be attributed
19 specifically to this house.
20 EXAMINATION BY MR. THIBODEAUX:
21 Q. I'm going to mark as Exhibit 3 a
22 document. It's Bates number 0119. Take a
23 look at that for me.
24 A. Uh-huh.
25     (Whereupon, the document

Page 41

1  referred to was marked as Exhibit No. 3 for
2  identification.)
3  EXAMINATION BY MR. THIBODEAUX:
4  Q. Do you know what that is?
5  A. It's a building permit issued by
6  St. Tammany Parish for construction of 1032
7  Clarise Court.
8  Q. Okay. And so this was --
9  Exhibit 3 was a document that was filled
10 out by Springhill and submitted to St.
11 Tammany Parish?
12 A. Correct.
13 Q. And then St. Tammy Parish would
14 approve -- approve that document?
15 A. Well, this is -- we fill out a
16 permit application and they issue this
17 building permit.
18 Q. Okay. In the top left-hand
19 corner, there's a Lynn, I'm not sure what
20 the last name is, K-U-Y-L-E-N, name. Do
21 you know who that is?
22 A. No. I believe that's the parish
23 employee. That's not a Springhill, LLC
24 person.
25 Q. Okay. Towards the top on the

11 (Pages 38 to 41)

Magna Legal Services

ddd52cde-23e2-466b-bf35-b4efa5f8c8a6

Page 42

1  left-hand side there's a value entry for
2  $65,000. Do you see that?
3     A.  Yes.
4     Q.  What does that represent?
5     A.  I don't know.
6     Q.  Let's see. When was this
7  building permit submitted?
8     A.  It says it was received 1/13/06.
9     Q.  So is the $65,000 number what
10 Springhill valued the property at in
11 January of 2006?
12    A.  I don't recall.
13    Q.  Okay. I'll mark as Exhibit 4,
14 Number 0120. Do you recognize that
15 document?
16    A.  Yes.
17       (Whereupon, the document
18 referred to was marked as Exhibit No. 4 for
19 identification.)
20 EXAMINATION BY MR. THIBODEAUX:
21    Q.  What is that document?
22    A.  A Certificate of Occupancy
23 issued by St. Tammany Parish for 1032
24 Clarise Court.
25    Q.  Does this -- does Exhibit 4, is

Page 43

1  it something that's issued by the parish
2  once construction is complete?
3     A.  Yes.
4     Q.  Okay. So was construction of
5  1032 Clarise Court complete by August 8,
6  2006?
7     A.  Yes. Well, they issued the
8  Certificate of Occupancy after the final
9  inspection. That's their definition of
10 completion of construction, the parish's
11 definition.
12    Q.  Okay. Did the construction of
13 1032 Clarise Court proceed at the same time
14 as the construction of other units in that
15 development?
16    A.  Yes.
17    Q.  Okay. How many units -- I think
18 we already talked about you don't know
19 specifically, but was the construction done
20 in phases, or was it done all at the same
21 time?
22    A.  I don't recall exactly. I can
23 tell you typically how we operate.
24    Q.  How do you typically operate?
25    A.  A certain number of -- a certain

Page 44

1  number of -- we start a certain number of
2  houses per month so there's a continuous
3  cycle of construction, starts and closings.
4     Q.  Based on Exhibit 1 -- well,
5  let's see. Actually, based on Exhibit --
6  would I be correct in assuming that
7  Exhibit 3, the building permit, you would
8  not have started construction until the
9  building permit was issued?
10    A.  Correct.
11    Q.  Okay. So I'd be right in
12 assuming that the 1032 Clarise Court was
13 constructed sometime between January 23rd,
14 2006, and August 8, 2006, correct?
15    A.  Yes.
16 MR. THIBODEAUX:
17    I'm going to mark as Exhibit 5
18 documents that have been Bates numbered 121
19 through 136.
20       (Whereupon, the document
21 referred to was marked as Exhibit No. 5 for
22 identification.)
23 EXAMINATION BY MR. THIBODEAUX:
24    Q.  Just take a look at those
25 documents, please.

Page 45

1     A.  Okay.
2     Q.  What are those documents?
3     A.  They're all different. Do you
4  want me to explain each one?
5     Q.  Let's see. Well, let's look at
6  Page 121.
7     A.  Okay.
8     Q.  Letter of Certification, what is
9  this document?
10    A.  This is a letter issued by
11 Engineering Services, Inc. certifying that
12 the post-tensioning tendons were installed
13 and stressed.
14    Q.  If we look at Page 124, you see
15 in the middle it says Lot 24A and B of
16 plain, Phase 2?
17    A.  Yes.
18    Q.  I'm just going back to my
19 question before about phases.
20       Does Phase 2 tell you anything
21 about how 1032 Clarise Court was
22 constructed relative to the other units in
23 the Villas?
24    A.  No. The Phase 2 is how the
25 parish approved the plats. They approved

Magna Legal Services

ddd52cde-23e2-466b-bf35-b4efa5f8c8a6

```
                                    Page 46
 1  Phase 1 and then they approved Phase 2.
 2     Q.   Got you.
 3     A.   Not related to our construction.
 4     Q.   And the plats you're referring
 5  to, is that what is Pages 127 through 136?
 6     A.   I have to see what you're
 7  looking at. In here?
 8     Q.   It's in there, yes. Just keep
 9  going.
10     A.   No. These are surveys.
11     Q.   Okay.
12     A.   The plat is the parish approval
13  of the whole subdivision.
14     Q.   Okay. Got you.
15     MR. THIBODEAUX:
16        I'm going to mark as Exhibit 6,
17  Pages 137 -- Pages 137 through 144.
18     THE WITNESS:
19        Okay.
20        (Whereupon, the document
21  referred to was marked as Exhibit No. 6 for
22  identification.)
23  EXAMINATION BY MR. THIBODEAUX:
24     Q.   It looks like Pages 137 through
25  139 are all related to termites?
```

```
                                    Page 47
 1     A.   Yes.
 2     Q.   Did 1032 Clarise Court have any
 3  termite issues before you sold the
 4  property?
 5     A.   No. It's required -- it's
 6  required to have a wood-destroying insect
 7  report to sell the property.
 8     Q.   Did 1032 Clarise Court fail any
 9  inspections before the Certificate of
10  Occupancy was issued?
11     A.   Not that I recall. I wouldn't
12  know that necessarily.
13     Q.   All right. Let's look at what
14  I'm going to mark as Exhibit 7, Pages 145
15  through 156.
16        What is that document?
17     A.   This is the purchase agreement.
18        (Whereupon, the document
19  referred to was marked as Exhibit No. 7 for
20  identification.)
21  EXAMINATION BY MR. THIBODEAUX:
22     Q.   Okay. So --
23     A.   Wait. I'm sorry. No, it's not.
24  This is the Act of Sale between Springhill,
25  LLC and Slidell Property Management.
```

```
                                    Page 48
 1     Q.   If we look at Page 146.
 2     A.   Okay.
 3     Q.   I see in -- under acquisitions
 4  in the second bullet 24B.
 5     A.   Yes.
 6     Q.   Okay. So this Act of Sale did
 7  pertain to 1032 Clarise Court, correct?
 8     A.   Yes.
 9     Q.   All right. And so Springhill,
10  LLC sold 1032 Clarise Court to Mr. Campbell
11  of Slidell Property Management, LLC?
12     A.   No.
13     Q.   No?
14     A.   Springhill, LLC sold the
15  property to Slidell Property Management,
16  LLC.
17     Q.   Okay. And that was on
18  December 8, 2006, right?
19     A.   Yes.
20     Q.   Now, the purchase price that's
21  represented on Page 147 is $5,387,995?
22     A.   Yes.
23     Q.   Is there a separate breakdown of
24  the prices for each unit?
25     A.   No.
```

```
                                    Page 49
 1     Q.   Okay. Did you ever have 1032
 2  Clarise Court appraised individually?
 3     A.   I don't know if we did or if
 4  Slidell Property Management, LLC did. I
 5  don't recall.
 6     Q.   Did Springhill, LLC ever rent
 7  any of the properties that were involved in
 8  the sale to Slidell Property Management
 9  before those units were sold to Slidell
10  Property Management?
11     A.   No.
12     Q.   Did Springhill, LLC retain any
13  interest in the properties that were sold
14  to --
15     A.   No.
16     Q.   -- Slidell Property Management?
17     A.   No.
18     Q.   All right. I think that there
19  are three different versions of houses that
20  are included in Exhibit 7 --
21     A.   Yes.
22     Q.   -- the units that were sold to
23  Slidell Property Management. Let's just
24  assume that there were 36 units that were
25  sold. I could be wrong on that, but let's
```

Magna Legal Services

ddd52cde-23e2-466b-bf35-b4efa5f8c8a6

Page 50

1  just assume --
2      MR. GARNER:
3          This is your deposition of the
4  case we're not in. So for our standpoint,
5  I'll just object that the documents state
6  whatever the documents state.
7      MR. THIBODEAUX:
8          Right, okay.
9      MR. GARNER:
10         Rather than assuming things, we
11 have legal -- you're a Louisiana lawyer.
12 You know all public records doctrine and
13 all that stuff.
14     MR. THIBODEAUX:
15         I just wanted to know --
16     MR. GARNER:
17         I'm okay with you asking the
18 question.
19     MR. THIBODEAUX:
20         Yeah, I hear you.
21     MR. LAMBERT:
22         He's not telling him not to
23 answer.
24     MR. GARNER:
25         Yes.

Page 51

1      MR. THIBODEAUX:
2          Yeah, right, right. Yeah, I
3  hear you.
4      MR. LAMBERT:
5          He said it's a terrible
6  question.
7  EXAMINATION BY MR. THIBODEAUX:
8      Q.  I just want to know are the
9  documents -- I mean, are the units, all of
10 the units involved in the sale, were they
11 the same on the interior?
12     A.  No.
13     Q.  They're different square footage
14 sizes, things of that nature?
15     A.  Yes.
16     Q.  There are three different square
17 footage sizes, then; is that right?
18     A.  Yes.
19     Q.  Would all of the units have the
20 same quality of trim?
21     A.  Yes. There may be one or two
22 instances where, I would have to go back
23 and look, where we installed an upgrade.
24     Q.  What would those upgrades
25 included?

Page 52

1      A.  Nicer appliances or nicer
2  countertops, nicer cabinets.
3      Q.  Did 1032 Clarise Court have any
4  upgrades?
5      A.  I don't believe so. I'd have to
6  check.
7      Q.  Are there any documents we have
8  before us that we could look at to
9  determine that; do you know?
10     A.  You probably just have to
11 physically walk into the house.
12     Q.  If we look at what I'll mark as
13 Exhibit 11, it's page -- Bates number 237
14 to 239.
15     A.  Okay.
16         (Whereupon, the document
17 referred to was marked as Exhibit No. 11
18 for identification.)
19 EXAMINATION BY MR. THIBODEAUX:
20     Q.  Do you know what that document
21 is?
22     A.  Yes.
23     Q.  What is that?
24     A.  This is a marketing floor plan
25 that we use to show what the layout and the

Page 53

1  floor plan of the house is and the square
2  footage.
3      Q.  Is this the layout and floor
4  plan at 1032 Clarise Court?
5      A.  Yes.
6      Q.  Looking at these three
7  documents, does that tell you anything
8  about any upgrades that might have been
9  installed at 1032 Clarise Court?
10     A.  Well, there's some handwritten
11 notes on Number 238. I'd say attic stairs,
12 insulation upgrade, floodlights, surround
13 sound, intercom system, fan blocks. I
14 don't know who made those handwritten
15 notes.
16         I also don't know if those
17 handwritten notes are referring to what
18 should be documented on the sheet or what
19 should -- or what is actually in the house.
20 Because in another handwritten note it said
21 standard, so. So, again, without walking
22 into the house -- the answer is the sheets
23 don't help.
24     Q.  Got you.
25         Did Springhill have any

Magna Legal Services

ddd52cde-23e2-466b-bf35-b4efa5f8c8a6

Page 54

1  agreement with Slidell Property Management
2  to construct 1032 Clarise Court and the
3  other houses in the development and then
4  sell them to Slidell Property Management?
5      A.  No.  They were under
6  construction.  We would have built them
7  regardless.
8      Q.  Regardless?
9      A.  Uh-huh.  Most or all of them
10 were under construction or completed by the
11 time we sold them.
12     Q.  Some were not complete, though,
13 when you did sell to Slidell Property
14 Management, correct?
15     A.  I don't remember the time line
16 exactly.
17     MR. THIBODEAUX:
18        All right.  I'm going to mark as
19 Exhibit 8, documents that are Bates
20 numbered 157 through 179.
21     THE WITNESS:
22        Okay.
23        (Whereupon, the document
24 referred to was marked as Exhibit No. 8 for
25 identification.)

Page 55

1  EXAMINATION BY MR. THIBODEAUX:
2      Q.  Do you know what those documents
3  are?
4      A.  Yes.
5      Q.  Okay.  What are they?
6      A.  The letter -- 157 is a letter
7  from legal representation of Slidell
8  Property Management, Baker Donelson, to
9  Springhill, LLC.
10     Q.  Okay.
11     A.  Noticing us of conditions that
12 they wanted to be fixed prior to the sale
13 of the property.
14     Q.  Okay.  And that was prior to the
15 sale of the property?
16     A.  Prior to closing the property.
17     Q.  Okay.  The first paragraph they
18 -- paragraph they talk about 38 units be
19 acquired in the second conveyance.
20     A.  Uh-huh.
21     Q.  1032 Clarise was included in
22 that second conveyance, though, right?
23     A.  I believe so.
24     Q.  All right.  If we look back at
25 Pages 159 through -- well, let's just look

Page 56

1  at Page 159.
2      A.  Okay.
3      Q.  What is that document?
4  MR. LAMBERT:
5        Where are you?
6  MR. THIBODEAUX:
7        159.
8  THE WITNESS:
9        I believe these are John
10 Campbell's handwritten notes from his
11 personal inspection of the property
12 detailing items he believed should be
13 fixed.  I wasn't with him when he made
14 these notes.  So I can't say for sure.
15 EXAMINATION BY MR. THIBODEAUX:
16     Q.  These were sent as part of the
17 letter that's on Page 157?
18     A.  Yes, uh-huh.
19     Q.  Did Mr. Campbell ever report to
20 Springhill that there was a strange smell
21 in the 1032 Clarise Court unit?
22     A.  Not that I recall.
23     Q.  Did he ever raise any issues
24 with whether he thought there was Chinese
25 drywall in 1032 Clarise Court?

Page 57

1      A.  Not that I recall.
2  THE VIDEOGRAPHER:
3        Excuse me, counsel, I need to
4  change the tapes.  We're going off the
5  record.  This is the end of Videotape
6  Number 1.  It's 4:11.
7        (Off the record.)
8  THE VIDEOGRAPHER:
9        We're back on the record.  This
10 is the beginning of Videotape Number 2.
11 It's 4:18.
12 MR. THIBODEAUX:
13        I'm going to show you what I've
14 marked as Exhibit 9.  It's Bates numbered
15 180 through 181.
16        (Whereupon, the document
17 referred to was marked as Exhibit No. 9 for
18 identification.)
19 THE WITNESS:
20        Okay.
21 EXAMINATION BY MR. THIBODEAUX:
22     Q.  What are those documents?
23     A.  181 is the application to enroll
24 1032 in Home Buyers Warranty 2-10 Warranty.
25 And then 180 is the certificate of the

Page 58

1 actual coverage.
2    Q.  Is 181 an application that was
3 filled out by Springhill?
4    A.  Yes.
5    Q.  Who is Debra Guidry?
6    A.  She's an employee of Springhill.
7    Q.  Okay.  So this was done on --
8 let's see.  Page 181, there's a date of
9 10/31/2006.  You see that?
10   A.  Yes.
11   Q.  And there's a -- in the rate
12 formula section, there's $136,470 listed as
13 the final sales price.  Do you see that?
14   A.  Uh-huh.
15   Q.  On October 31st, 2006, did
16 Springhill consider 1032 Clarise Court to
17 be worth $136,470?
18   A.  I don't recall how that number
19 was derived.
20   Q.  Do you know -- do you know how
21 that number would be derived?
22   A.  Well, in --
23   MR. GARNER:
24       I object to the form.  Go ahead.
25 Didn't he already answer that?  Go ahead.

Page 59

1 EXAMINATION BY MR. THIBODEAUX:
2    Q.  Any idea -- do you have any
3 knowledge about how Springhill would derive
4 this number?
5    A.  Normally, that number would be
6 from the HUD sales price, but in this case,
7 because this is a sale of multiple
8 properties all lumped together, there was
9 no HUD price for each individual lot.  I
10 don't know how that number was derived.
11   MR. THIBODEAUX:
12       I'll mark as Exhibit 10
13 documents that are Bates numbered 182
14 through 236.
15       (Whereupon, the document
16 referred to was marked as Exhibit No. 10
17 for identification.)
18   THE WITNESS:
19       Okay.
20 EXAMINATION BY MR. THIBODEAUX:
21   Q.  Let's take a look at Page 182.
22       What is that document?
23   A.  The purchase agreement.
24 Actually, this is the First Amendment to
25 the purchase agreement between Springhill,

Page 60

1 LLC and Slidell Property Management, LLC.
2    Q.  Okay.  Has Springhill renovated
3 any homes that it's built that contained
4 Chinese drywall?
5    A.  No.
6    Q.  Does it have any plans to
7 renovate any homes that contain Chinese
8 drywall?
9    A.  Not today.
10   Q.  Are you aware of any homes that
11 Springhill has built that have Chinese
12 drywall, I guess other than the ones in the
13 Villas?
14   A.  Yes.
15   Q.  Do you know how many?
16   A.  I believe two.
17   Q.  Okay.  And where are those
18 houses located?
19   A.  In Springhill subdivision.
20   Q.  And where is that?
21   A.  It's directly adjacent to the
22 Villas at Springhill.
23   Q.  Okay.
24   MR. THIBODEAUX:
25       I don't have any further

Page 61

1 questions.
2    MR. GARNER:
3        Are we done?
4    MR. LAMBERT:
5        No, we're not done.  I have
6 questions.
7 EXAMINATION BY MR. LAMBERT:
8    Q.  Let's start where we left off.
9        The homes that were renovated in
10 the Springhill subdivision, were those
11 built by either Southern Homes or by
12 Springhill, LLC?
13   A.  Yes.
14   Q.  And I take it by your --
15   MR. GARNER:
16       Wait.  Go ahead.
17   THE WITNESS:
18       When you say renovated, you mean
19 renovated as in taking out Chinese drywall?
20 EXAMINATION BY MR. LAMBERT:
21   Q.  I used the wrong word.
22 Remediated.
23   A.  No.  We have not remediated any
24 houses at all.
25   Q.  No, no.  My question is