# EXHIBIT A

Lot Number: #13                    Model: Custom Design see exhibit "B"
Buyer: Feinberg
Date of Agreement: February 2, 2005

*Fla. Mailing
address:
P.O. Box 801503
Miami, 33 280*

### VILLA FLORA

### PURCHASE AND SALE AGREEMENT

THIS AGREEMENT is made by and between PROMENADE DEVELOPERS, LTD., a Florida limited partnership ("Seller"), and the Buyer(s) named below (collectively, "Buyer"):

Buyer(s): Manley Feinberg and Dianne Feinberg His Wife_____

Residence Address: 6802 Dartmoor Drive _____

City: Louisville _____ State: KY_____ Zip Code: 40222_____

Cellular Telephone: 954-895-0069_____ Satellite Telephone:011-874-762-944-636___
Telefax Number: 954-937-0377_____ Social Security No.(s):_____
Cruising E-Mail: MYtouche@skynmta.com
                        Msn.com
NAME, ADDRESS, TELEPHONE NUMBER AND TELEFAX NUMBER WHERE BUYER'S NOTICES ARE TO BE MAILED, PHONED OR TELEFAXED, IF DIFFERENT FROM ABOVE.

Name: _____

Street Address: _____

City:_____ State:_____ Zip Code:_____

Telephone:_____ Telefax No.:_____

Anticipated Date of Completion:_____ See paragraph 5 of this Agreement.

Escrow Agent: Steel Hector & Davis LLP

1.    **DESCRIPTION OF PROPERTY**. Seller agrees to sell to Buyer, on terms contained in this Agreement, Lot #13___, as shown on the proposed site plan attached hereto as Exhibit "A" and incorporated herein, together with the townhome residence to be constructed thereon; and together with all appurtenances thereto. The above-described Lot and improvements thereon are referred to in this Agreement as the "Property". The Property is located within that certain development known as Villa Flora ("Development") located on Williams Island, Aventura, Miami-Dade County, Florida.

2.    **PURCHASE PRICE**. The purchase price ("Purchase Price") for the Property, exclusive of any closing costs described in this Agreement, and subject to adjustment under Payment Option 2, shall be as follows:

| | | |
|---|---|---|
| Purchase Price | | $3,089,900_____ |
| Lot Price | . $ 900,000_____ | |
| Home Price | $ 2,189,900_____ | |

The Purchase Price shall be payable as follows:

| | | |
|---|---|---|
| a. | Lot Reservation Deposit (previously received) | $ 0_____ |
| b. | Deposit (Received this date) to be held by Escrow Agent: Steel Hector & Davis LLP, Until Closing of Home | $ 600,000_____  – *Held in escrow* |
| c. | Additional deposit due upon Receipt of the building permit (not to be held in escrow) | $ 300,000_____ |
| d. | Balance of Purchase Price | $ 2,189,900_____ |
| **TOTAL** | | $ 3,089,900_____   $ 3,089,900_____ |

The Balance of Purchase Price (Item d. above) ("Balance of Purchase Price") shall be payable in accordance with Payment Option 1 or Payment Option 2, at Purchaser's election drawn upon a bank located in the United States.

Purchaser hereby selects Payment Option 1 ✓ or Payment Option 2 ⊠ below: (Check one).

**Payment Option 1: Progress Payments**

The Balance of Purchase Price shall be payable in six (6) progress payments. Each progress payment shall be an amount equal to 16.67% of the Balance of Purchase Price and shall be paid as follows:

|   |   |   |
|---|---|---|
| a. | Completion of floor slab | $ 364,983 |
| b. | Block walls up; tie beam poured | $ 364,983 |
| c. | Roof dry-in; interior partitions installed | $ 364,983 |
| d. | Interior drywall taped and stucco finish coat applied; windows installed | $ 364,983 |
| e. | Cabinets and trim complete; Pool, tile and coping complete; patios and driveway complete | $ 364,983 |
| f. | Balance due at closing | $ 364,985 |

V/F-13

Respecting Payment Option 1, Seller shall notify Buyer upon completion of each stage of construction outlined above. Buyer shall make each payment, in full and in clear U.S. funds, within five (5) banking days from the date of Seller's notice. If Buyer fails to tender the payment as required by this paragraph, then Buyer shall be deemed to be in default of this Agreement and Seller may pursue any and all remedies Seller may have under this Agreement. If Seller elects to accept any such payment at a later date, Buyer shall pay to Seller, together with the additional deposit, a sum equal to interest at the highest lawful rate on the amount of the additional deposit from the date such payment was due to Seller to the date such payment was made to Seller.

**Payment Option 2: Balance of the Purchase Price at Closing**

The Balance of the Purchase Price shall be payable at closing. Buyer hereby acknowledges and agrees that Seller may obtain a mortgage loan to finance the construction of the improvements on the Property. In such case, the payment due at closing shall include a charge equal to five percent (5%) of the Balance of Purchase Price (Page 1, Paragraph 2, Item d.) to reimburse Seller for all costs incurred by Seller in connection with such mortgage loan.

Respecting Payment Option 1 and Payment Option 2, all deposits and progress payments shall be made in U.S. funds either in cash or by check drawn upon a bank located in the United States, subject to collection. All payments due at closing shall be paid by wire transfer to Escrow Agent's trust account one (1) day prior to closing.

3.   **DEPOSITS AND PAYMENTS**

a.       State law requires that the following statement be disclosed to buyers of residential units:

THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT SHALL PLACE DEPOSIT FUNDS (UP TO TEN PERCENT OF THE PURCHASE PRICE) IN AN INTEREST BEARING ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER.

b.       Seller can use all deposits in excess of ten percent (10%) of the purchase price prior to closing and the Escrow Agent is authorized to pay those deposits to Seller upon request by Seller.

c.       As to Payment Option 1, payments made thereunder shall be used from time to time to pay construction costs. By electing Payment Option 1, Buyer hereby waives the escrow requirement set forth in Paragraph 3a. above and authorizes the use of such payments for construction costs.

[_____]
Initials

d.       As to payment Option 2, if Buyer does not waive the escrow requirement in writing, Buyer's deposits up to ten percent (10%) of the Purchase Price shall be placed in escrow with Escrow Agent, and will be held and disbursed pursuant to Florida Statutes 501.1375. Buyer acknowledges that if Buyer does not waive the escrow requirement, interest accruing on the escrow account shall be paid to Seller at closing, and Buyer shall receive no credit for the accrued interest against the Purchase Price, except as stated below. In the event Buyer elects to have deposit funds held in escrow, Seller has two (2) options, as follows:

i.       Seller may borrow money in an amount equal to the funds held in escrow for construction purposes only (in addition to the amount of the construction mortgage shown above), in

2

which case any interest and costs incurred in connection with such loan, for a period not to exceed twelve (12) months, shall be paid by Buyer at closing, less any interest accrued on the escrow account, or

ii.    Seller may use the funds for building purposes following notification to Buyer and obtain a surety bond payable to Buyer in the amount of such funds. In such event, Buyer shall be charged at closing an amount equal to the premium for that portion of the bond securing Buyer's deposit.

Buyer hereby elects the alternative initialed below.

i.    To waive the right to require that deposit funds be deposited in an interest-bearing escrow account. In waiving this right, it is understood that Buyer will not be responsible for the cost referred to in paragraph 3d. (i) or (ii) above and that Seller shall have the right to use the full amount of Buyer's deposit for construction purposes.

[ X ]
Initials

ii.    To have deposit funds (up to ten percent [10%] of the Purchase Price) deposited in an interest-bearing escrow account. It is understood that Buyer will be responsible for the cost referred to in Paragraph 3d. (i) or (ii) above.


Initials

e.    Deposits which Buyer requires to be escrowed shall be held in escrow by Steel Hector & Davis LLP, Trust Account ("Escrow Agent"), which maintains a place of business located at 200 South Biscayne Boulevard, Ste. 4000, Miami, Florida 33131, in accordance with an Escrow Agreement ("Escrow Agreement") between Seller and Escrow Agent. The initial deposit and any additional deposit monies up to ten percent (10%) of the purchase price of the Property shall be held in an account together with payments of other purchasers of other properties in the Development. Monies held by Escrow Agent may be deposited in savings or time deposit accounts at a bank or savings and loan association insured by an agency of the United States Government or in securities of the United States Government or any agency thereof. Interest earned on said deposits shall be paid to the Seller, except in the event of Seller's default or as set forth in Paragraph 3d.(i) above. Notwithstanding the foregoing, payments for Extras shall not be escrowed but shall be paid to Seller.

f.    By signing this Agreement, Buyer expressly authorizes Escrow Agent to disburse Buyer's payments in accordance with the terms of the Escrow Agreement described above and to make final disbursements to Seller at closing, or sooner if Buyer is in default hereunder as provided in Paragraph 12 below. Buyer agrees to indemnify and hold Escrow Agent harmless from any claim or damages which may result from any escrow or disbursement of any of Buyer's payments pursuant to the Escrow Agreement described above, other than those claims or damages resulting from gross negligence or willful malfeasance.

4.    **SELLER FINANCING.** Buyer agrees that any lender advancing construction funds will have a first mortgage on the Property until closing. At that time, Seller may use all or a portion of the closing proceeds to release the Property from the lien of such mortgage. Buyer acknowledges that Seller may borrow construction money from lenders to construct the improvements on the Property. This Agreement and the deposits will not give any lien or claim against the Property and Buyer's rights hereunder will be subordinate to those of any lender holding a mortgage, whether or not such a mortgage secures the advancement of construction funds, even if such mortgage is placed on the Property after the date of this Agreement.

5.    **COMPLETION DATE.** Buyer understands that the Anticipated Date of Completion is an estimate of the completion date and does not constitute a representation or warranty by Seller. Seller will not be obligated to compensate Buyer for any expense or inconvenience which may be caused by Seller's failure to meet the Anticipated Date of Completion. Although Seller anticipates that the Anticipated Date of Completion will occur on the date set forth on page 1, pursuant to 15 USC § 1702, Seller unconditionally agrees that the Property will be completed and conveyed to Buyer not later than two (2) years after the date of this Agreement, subject, however, to delays caused by matters which are legally recognized as defenses to contract actions in the jurisdiction where the improvements are being erected.

6.    **CONSTRUCTION SPECIFICATIONS.**

a.    The materials, equipment and fixtures included in and to be used in constructing the Property will be substantially the same as those described in the floor plans and specifications attached hereto as Exhibits "B" and "C", respectively, and incorporated by reference herein. Buyer understands that floor plan dimensions are approximate and that there may be slight variations and modifications in these dimensions. Buyer further understands that any references to square footage under air conditioning are calculated based upon measurements from the external or outer perimetrical boundaries, that is, from the outside wall or partition enclosing such area(s). Buyer further understands that during construction certain changes in the plans and specifications may be desirable, as determined by Seller or as required by governmental authorities, lending institutions or job conditions, and by signing this Agreement Buyer authorizes such changes. Such changes may include, but are not limited to, minor

changes in the building location and orientation, the building's external configuration, its structural components, its finishes, the landscaping associated therewith, and changes in, additions to, or omissions of construction details. In addition, due to variation in sizes and shapes of lots in the Development, Buyer understands and agrees that Seller shall have the right to modify driveway, walkway, porch and/or patio plans as Seller deems necessary to conform to site conditions and/or Lot dimensions, and that certain lots may not accommodate particular pool and/or patio plans. Further, Buyer understands that the position of the side windows of the residence may be subject to modification depending upon the location of the residence. Buyer understands that Seller does not guarantee that room dimensions will be exactly as shown in the model, if any, or that the location of electrical outlets, wall switches, intercom speakers, built-in vacuum outlets and other similar items will be as located in the model and Buyer shall not hold Seller responsible for such variations. Notwithstanding the above, Seller will not make any modification which materially reduces the floor size of the residence being placed on the Property. Buyer further understands and acknowledges that many of the homes to be constructed within the Development require floor plans which are mirror images ("flipped") of the model floor plan. Buyer acknowledges that Seller's agents and/or representatives have fully explained and reviewed all of the foregoing facts with Buyer.

b.      Buyer further understands and agrees that certain of the finishing items, such as tile, carpet, cabinets, wood, paint, stain, and natural stone products are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturers from those shown in the model, if any, in illustrations or included in the specifications. Furthermore, if circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, Seller reserves the right to substitute equipment, material, appliances, etc., which in Seller's opinion are considered equal or better, subject to their availability. Buyer also understands that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor, if any. Buyer also understands that some of the model and/or common area landscaping may have been enhanced or planted at a more mature size than standard.

7.      SELECTION OF EXTRAS.

a.      Unless otherwise provided herein, all color selections and all selections of options, upgrades, modifications, and extras (collectively, the "Extras") must be made in writing within thirty (30) days of Seller's request therefor, which request may be by telephone, facsimile, mail or other reasonable means of communication. If Buyer fails to make such selections within said thirty (30) day period, Seller, at its sole discretion, may (i) make such selections on Buyer's behalf, and Seller's decision shall be binding on Buyer, or (ii) declare Buyer in default and exercise any and all remedies set forth in Paragraph 12 of this Agreement. In the event Seller does not exercise its rights under (i) or (ii) of the preceding sentence, the completion date and closing date for the Property shall be deemed automatically extended by the number of days which shall have elapsed following said thirty (30) day period through Buyer's completion of such written selections without any liability on the part of Seller therefor. Any selections made by Buyer after the thirty (30) day period shall not in any way obligate Seller, unless Seller agrees to same in writing. In the event Seller needs an earlier decision by Buyer in order to efficiently proceed with the planning and construction of the Property, Seller will give notice to Buyer and Buyer shall within ten (10) days make all such selections.

b.      The price of all such Extras shall be due and payable to Seller in full at the time ordered. The sum of the Purchase Price set forth in Paragraph 2 above and the price of all Extras selected after execution of this Agreement shall equal the "Total Purchase Price." Extras ordered by Buyer shall not be subject to cancellation by Buyer, nor shall Buyer be entitled to a credit or refund therefore. If this Agreement is terminated, all sums paid by Buyer to Seller for Extras shall be non-refundable unless Seller has defaulted in the performance of this Agreement. Buyer acknowledges that Seller will incur expenses in providing the Extras regardless of Buyer's consummation of this Agreement.

c.      Buyer acknowledges and understands that Seller's models contain extras which are not included in this Agreement. By executing this Agreement, Buyer acknowledges that Seller's agents and/or representatives have fully explained to Buyer's satisfaction which materials, equipment and fixtures are included in the Property.

d.      Should Seller fail to provide any item of construction required to be provided, Buyer's sole remedy therefor will be to collect from Seller an amount equal to the greater of (i) Seller's cost for such item and for the installation thereof had such item been installed at the appropriate time during construction, or (ii) the amount specifically charged for such item if such item is an Extra, and there is a specific charge made for it.

8.      INSPECTION PRIOR TO CLOSING. Buyer will be given a reasonable opportunity to inspect the Property with Seller's representative prior to closing, and at that time Buyer will sign a "Customer Walk-through List" listing any defects in workmanship or materials which Buyer discovers. If any item listed is actually defective in workmanship or materials in Seller's opinion (keeping in mind the construction standards prevalent in Miami-Dade County for similar property), Seller will be obligated to correct those defects at Seller's cost within a reasonable period of time after closing, but Seller's obligation to correct shall not be grounds for deferring the closing, nor for imposing any condition on closing. No escrows or holdbacks of closing funds will be permitted.

9.      CLOSING DATE.

a.      Buyer acknowledges and agrees that Seller has the right in its discretion to schedule the date, time and place for closing and that Buyer shall close on such date (the "Closing Date"). Buyer will be given at least ten (10) days' notice of the closing. Seller is authorized to postpone the closing at its discretion, in which event, Seller shall give Buyer at least three (3) days' notice of the new Closing Date. The issuance of a temporary Certificate of

Occupancy covering the Property by the proper governmental agency shall evidence that the Property is ready for delivery and shall be the sole condition of closing.

    b.    If Seller agrees in writing to reschedule closing at Buyer's request, prorations shall be as of the original Closing Date and Buyer agrees to pay at closing interest at the highest lawful rate on the outstanding balance of the Total Purchase Price, from the original Closing Date to the date of the actual closing. Seller is not required to agree to reschedule closing.

    c.    If Buyer fails to close on the Closing Date or any extension thereof to which Seller has agreed in writing, Buyer will be in default under this Agreement. Upon request of Buyer, Seller may permit closing by mail or through the use of overnight courier provided Buyer completes the closing by the Closing Date.

10.    **EVIDENCE OF TITLE AND CLOSING DOCUMENTS.**

    a.    Title to the Property will be marketable, subject only to those matters hereinbelow set forth. Buyer will receive an owner's title insurance commitment at closing as proof that title is marketable.

    b.    The owner's title insurance commitment shall be written on a Florida licensed title insurance company and issued by an agent of Seller's choosing, committing to insure the interest of Buyer in the amount of the Total Purchase Price. Seller shall cause a title insurance policy (the "Title Policy") to be issued subsequent to closing subject to those exceptions customarily contained in an ALTA Owner's Title Insurance Policy then being used by the title insurance company, and subject also to the following:

    i.    Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the Property.

    ii.    All applicable zoning ordinances and regulations.

    iii.    Real estate taxes and assessments for the year of conveyance and subsequent years, which are not yet due and payable, including taxes and assessments of any applicable improvement or taxing district, and pending municipal liens.

    iv.    Easements, restrictions and reservations common to the Development.

    v.    Declaration of Protective Covenants, Restrictions, and Easements for Villa Flora and Rules created thereunder; all of the terms of the Articles of Incorporation and Bylaws of Villa Flora Homeowners' Association, Inc., and any amendments and supplements to the above instruments (collectively, the "Declaration" or "Community Documents").

    vi.    Second Amended and Restated Declaration of Covenants, Restrictions and Easements recorded in Official Records Book 12103, Page 1723, and Rules created thereunder; all of the terms of the Articles of Incorporation and Bylaws of Williams Island Property Owners' Association, Inc., and any amendments and supplements to the above instruments (collectively the "Master Documents").

    vii.    Any laws and restrictions, covenants, conditions, limitations, reservations, agreements or easements recorded in the Public Records or imposed by governmental authorities.

    viii.    The general pre-printed exceptions contained in the Title Policy.

    ix.    Acts done or suffered by the Buyer and any mortgage obtained by the Buyer for the purchase of the Property.

    c.    Seller shall convey title to the Property to Buyer by Special Warranty Deed subject to the matters identified in paragraph 10b. The acceptance of the deed by Buyer shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to this Agreement, except those which are herein specifically deemed to survive the closing or which survive by operation of law.

    d.    Seller shall deliver a Bill of Sale, if any furnishings are included in the Property.

    e.    Seller shall deliver an Owner's Affidavit assuring that there are or will be no liens on the Property.

    f.    If Seller cannot provide marketable title as described above, Seller will have a reasonable period of time (not to exceed ninety (90) days) from the date of the scheduled closing to correct any defects in title. If Seller cannot or elects not to correct the title defects, Seller shall so notify Buyer within five (5) days subsequent to such ninety (90) day period, and Buyer, within ten (10) days following the date of Seller's notice, may elect one of the following options:

    i.    To accept title in the condition offered (with defects) and pay the balance of the Total Purchase Price for the Property, thereby waiving any claim with respect to such defects and agreeing not to make any claims against Seller because of the defects; or

ii.    To cancel this Agreement and receive a full refund of all deposits and accrued interest thereon, if any, whereupon this Agreement shall be terminated and Seller shall thereafter be relieved and released of all further liability hereunder. Buyer will not make additional claims against Seller.

g.    In the event Buyer does not notify Seller in writing within such ten (10) day period (time being strictly of the essence) as to which option Buyer elects, Buyer shall be conclusively presumed to have elected the option set forth in paragraph 10.f.i. above.

11.    <u>CLOSING COSTS.</u>

a.    Buyer understands and agrees that in addition to the balance of the Total Purchase Price, Buyer must pay certain other fees and costs at closing. These extra charges include:

i.    A closing fee payable to Seller or Seller's agent equal to one and one-half percent (1.5%) of the Total Purchase Price. Seller shall use a portion of same to pay the cost of recording the deed, Florida documentary stamps on the deed and the premium on the Buyer's Title Policy. In addition, Buyer shall be obligated to pay (a) any taxes or costs with respect to recording the deed to the extent same result from a rate in excess of $6.00 per thousand and (b) any premium on the Buyer's Title Policy to the extent of any increase in the promulgated risk rate subsequent to July 1, 1999.

ii.    Loan fees, loan closing costs and all other related sums if any, charged by Buyer's lender, including but not limited to attorneys' fees, escrows for taxes and insurance, recording fees, documentary stamps, intangible tax, credit reports and PMI insurance.

iii.    The payment to Villa Flora Homeowners' Association, Inc. (the "Association") of: (i) a working capital contribution equal to one-fourth (1/4) of the Property's share of annual assessments, plus (ii) a prorated assessment for the Property for the balance of the month in which the closing occurs, and (iii) the assessment for the month commencing after closing.

iv.    The payment to Williams Island Property Owners' Association (the "Master Association") of: (i) a working capital contribution, plus (ii) a prorated assessment for the Property for the balance of the month in which the closing occurs and (iii) the assessment for the month commencing after closing, all as are or may be required by the Master Association and/or the Master Documents.

v.    The cost of effectuating any changes in the plans and specifications, building materials or other items for the residence required by any governmental or quasi-governmental rule, regulation, code, order, statute, ordinance or the like (including but not limited to the Florida Thermal Efficiency Code, the Florida Lighting Efficiency Code, and any hurricane code).

b.    Taxes, assessments, and current expenses of the Property shall be prorated as of the date of closing. The balance due at closing shall be increased or decreased as may be required by proration. Taxes shall be prorated based on the current year's tax with allowance made for the maximum allowable discount. If closing occurs at a date when the current year's millage is not fixed and the current year's assessment is available, taxes will be prorated based upon such assessment and the prior year's millage. If the current year's assessment is not available, then taxes will be prorated on the prior year's tax. Any tax proration based on an estimate, at request of either Buyer or Seller, shall be adjusted upon receipt of the tax bill on condition that a statement to that effect is in the closing statement.

12.    <u>DEFAULT.</u>

a.    If Buyer shall default in any of the things required of Buyer hereunder within the time allowed therefor, at Seller's option, Seller may avail itself of the equitable remedy of specific performance, or Seller may terminate this Agreement and retain all deposit(s) paid, or to be paid, by Buyer, including payments for Extras, together with interest earned if any, as liquidated damages, consideration for the execution of this Agreement and in full settlement of any claims. Buyer understands that Seller has taken the Property off the market and spent money on sales, advertising and promotion, and that Buyer's default will damage Seller. The parties acknowledge that it would be extremely difficult if not impossible to determine the actual damages incurred by Seller as a consequence of Buyer's breach. Therefore, the foregoing provisions with regard to damages are an attempt by the parties to liquidate the same and are not to be construed or considered as a forfeiture or penalty. Upon termination of this Agreement and retention of said liquidated sum by Seller, Buyer and Seller shall be relieved of all obligations under this Agreement. In such event, all Buyer's rights will end and Seller may resell the Property to any party as though this Agreement had never been made and Seller shall have no obligation to account to Buyer for any part of the proceeds of such sale. Buyer agrees not to sue Seller or its agents or the Escrow Agent for the return of any part of Buyer's deposit(s) or otherwise if this Agreement is terminated for Buyer's default. If Buyer's deposits are held in escrow, Buyer also agrees that upon default by Buyer, Buyer's deposit and any interest thereon belong to Seller, and Escrow Agent may rely on Seller's notice and shall be under no obligation to make any independent investigation or confirmation of Buyer's default.

b.      In the event of Seller's default, Buyer may seek specific performance or elect to terminate this Agreement and obtain a refund of Buyer's deposits together with accrued interest, if any, and any payment for Extras, without thereby waiving any action for damages resulting from Seller's breach.

c.      Should Buyer at any time indicate an intent not to comply with the provisions of this Agreement, Seller may require Buyer to reaffirm in writing Buyer's adherence to this Agreement. Failure by Buyer to do so within ten (10) days after written demand therefor shall be considered an event of default and shall entitle Seller to exercise all remedies set forth herein. Buyer shall detail in writing within said ten (10) day period each and every ground for refusing to complete this transaction or such ground shall be waived as a defense to any claim or cause of action arising out of or in connection with this Agreement.

13.     ATTORNEYS' FEES AND COSTS. In the event any litigation is commenced respecting this Agreement, the Property or the application of laws or regulations to any aspect of this transaction, each party shall pay its legal expenses, fees and costs at all trial and appellate levels.

14.     MAINTENANCE OF THE PROPERTY. From and after closing, Buyer shall be liable for the maintenance of the Property pursuant to the Declaration. In the event Buyer fails to properly maintain the Property, the Association shall have the right, but not the obligation, to do so, in which event Buyer shall pay all costs incurred by the Association. The Association shall have the right to assess the Property for all maintenance costs incurred, which assessments shall be secured by the assessment lien referred to in the Declaration. The terms of this Paragraph shall survive closing.

15.     LIMITATION OF WARRANTIES.

a.      Buyer warrants and represents that Buyer is purchasing the Property and the personal property located therein, if any, for normal residential use only. At closing, Seller shall give Buyer Seller's standard Limited Warranty, a copy of which Buyer acknowledges having received.

b.      SELLER'S LIMITED WARRANTY IS THE ONLY EXPRESS WARRANTY GIVEN. SELLER'S LIMITED WARRANTY IS GIVEN IN LIEU OF ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY AS TO THE PROPERTY, COMMON PROPERTIES AND ALL FIXTURES OR ITEMS OF PERSONAL PROPERTY SOLD PURSUANT TO THIS AGREEMENT OR ANY OTHER REAL OR PERSONAL PROPERTY WHATSOEVER CONVEYED HEREBY, WHETHER ARISING FROM CUSTOM, USAGE OR TRADE, COURSE OF DEALING, CASE LAW OR OTHERWISE, ANY AND ALL OF WHICH SELLER HEREBY DISCLAIMS. In the event a court of competent jurisdiction determines that this disclaimer is ineffective, the parties agree that any action brought under implied warranty must be brought within one (1) year from the date of Buyer's closing and all secondary, incidental and consequential damages are specifically excluded and disclaimed. Any warranties imposed by the Magnuson-Moss Warranty Act [15 U.S.C. §2301 et. seq. (1981)], if applicable, shall be limited to those set forth in the Limited Warranty and are otherwise specifically disclaimed. This clause shall survive the closing contemplated hereunder and the delivery of the Special Warranty Deed to Buyer. It is hereby acknowledged by the parties that all warranties offered by Seller and consumer product warranties covered by the manufacturer were made available to Buyer in accordance with the Magnuson-Moss Warranty Act.

16.     RESERVATION OF RIGHTS.

a.      Buyer hereby specifically authorizes Seller to file and place among the Public Records of Miami-Dade County, Florida, at such time as it determines, all documents and instruments which Seller deems necessary or desirable as supplements to the Declaration.

b.      The Property constitutes a part of a proposed Development which may result in the inclusion of additional lots and the construction of additional improvements. Seller is not obligated to add additional lots to the Development or to construct or complete any additional improvements to any other portion or stage of the Development.

c.      Buyer also acknowledges and agrees that Seller and its successors and assigns, have the absolute right to add, modify or eliminate lots, dwelling units and common areas (and, if any, facilities thereon) to, on or from the Development, and that no representation, warranty or assurance has been given to Buyer by any person or entity (i) that any such lots, dwelling units or common areas or facilities will or will not be added, modified or eliminated or (ii) as to the financial or other impact on any property owners' association which may assess charges against the Property, or on Buyer or the residents of the Development.

d.      So long as Seller shall own or have the right to acquire any lot in the Development, Seller may, in its sole discretion, modify and/or amend the site plan of Villa Flora provided the same does not substantially impair the construction of the improvements on the Lot or alter the boundary lines thereof so as to reduce its size. Such amendments to the site plan may include but are not limited to, the addition or elimination of lots, the combination of lots into single lots, the reconfiguration of lots, the elimination of lots to create common areas, including streets and roads, modification to the common areas, including streets, roads, gatehouses, entranceways and open areas, and relocation of drainage and irrigation systems. Buyer agrees that Seller shall have the right to amend the site plan without its consent, either before or after closing on the Lot. Provided, however, in the event the governmental entity having such jurisdiction requires Buyer's joinder, Buyer agrees to execute on demand such documents as may

reasonably be necessary to effectuate such amendment. In addition, Buyer does hereby appoint Seller its attorney-in-fact for this purpose, granting unto Seller full power and authority to execute such amendments on Buyer's behalf as may be deemed advisable by Seller, in its sole discretion, to the same extent as Buyer could do concerning the same, being personally present, and whatsoever Buyer's said attorney, or its substitute or substitutes shall do or cause to be done in, about or concerning these presents, Buyer hereby ratifies or confirms. This power of attorney may be exercised as often as Seller requires, and shall be deemed to be coupled with an interest.

    e.    Seller reserves the right to access Buyer's property for the purpose of building adjoining units or residences, or to construct upon the common areas. Seller has the right to construct fences or walls within any easement on the Property prior to or after closing and to put fences or walls on the Property line or within close proximity. This provision shall survive the closing.

17.    **MISCELLANEOUS PROVISIONS.**

    a.    Sales Commission. Seller will pay all sales commissions of Williams Island Realty Corp., which is the exclusive listing and sales agent for the Development. Buyer represents and warrants that it has dealt with no broker, salesman, agent or other person in connection with this transaction other than _____, and that no broker, salesman, agent or other person brought about this transaction, other than Williams Island Realty Corp. and said other broker, and Buyer agrees to indemnify and hold Seller harmless from and against any claims by any other broker, salesman, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Buyer with regard to this transaction. .This provisions of this paragraph shall survive the termination of this Agreement.

    b.    Transfer or Assignment. Buyer has no right to assign, sell or transfer Buyer's interest in this Agreement without Seller's prior written consent. Seller, in its sole discretion, may withhold its consent to any attempted assignment of this Agreement, and the Agreement shall remain in full force and effect. If Seller desires to sell the Development or any portion thereof before or during construction, Seller may assign or transfer Seller's interest in this Agreement without Buyer's consent and Seller shall be released from any and all liability hereunder.

    c.    Others Bound by this Agreement. This Agreement is binding on the parties hereto and their heirs, legal representatives and successors. If Buyer has received Seller's permission to assign or transfer this Agreement, then Buyer's approved assignees shall be bound by the terms of this Agreement.

    d.    Captions. All captions contained in this Agreement are for convenience only, shall not be deemed a part hereof and shall not affect the meaning or interpretation of this Agreement.

    e.    Florida Law. This Agreement will be governed and construed in accordance with the laws of the State of Florida.

    f.    Time of the Essence. Time is of the essence in this Agreement with respect to all obligations of Buyer hereunder. Respecting monetary obligations, in the event Buyer fails to remit any payments required hereunder when due, and Seller elects to accept same thereafter, said payment shall accrue interest at the then applicable highest lawful rate from the due date until the date of receipt by Seller. Said interest shall be paid together with the required payment.

    g.    Insulation Disclosure.

    Location:  Roof
        Type:      Fiberglass Batt
        Thickness:  10"
        R-value:    30

    Location:  Garage Ceiling
        Type:      Fiberglass Batt
        Thickness:  10"/6"
        R-value:    30/19

    Location:  House Ceiling
        Type:      Fiberglass Batt
        Thickness:  10"
        R-value:    30

    Location:  Garage Separation Wall
        Type:      Fiberglass Batt
        Thickness:  3"
        R-value:  . 11

    Location:  Exterior Walls: Masonry
        Type:      Foil
        Thickness:  N/A
        R-value:    4.2

Exterior Walls: Frame
    Type:        Fiberglass Batt
    Thickness:  3"
    R-value:    11

BUYER UNDERSTANDS AND ACKNOWLEDGES THAT: (i) ALL STATEMENTS REGARDING R-VALUE ARE BASED SOLELY UPON INFORMATION PROVIDED TO SELLER BY THE APPROPRIATE MANUFACTURER OF THE INSULATION LISTED ABOVE; AND (ii) SELLER IS NOT RESPONSIBLE AND SHALL HAVE NO LIABILITY FOR ANY ERROR MADE BY THE MANUFACTURER, INCLUDING, BUT NOT LIMITED TO ANY MISTAKE REGARDING THE INSULATION'S R-VALUE. Seller reserves the right to use a different type of insulation with a different thickness, type and R-Value in accordance with the terms of paragraph 6 of this Agreement.

h.     Notice. Except as otherwise set forth herein, any notice required or permitted to be given to Buyer under this Agreement may be delivered either personally, by mail addressed to Buyer at the address of Buyer set forth herein, or by telefax. Any notice required or permitted to be given to Seller under this Agreement must be mailed by United States certified mail, return receipt requested, postage prepaid to the following address:

As to Seller:        Promenade Developers, Ltd.
                    Attn: Eugene N. Suttin
                    5752 Vintage Oaks Circle
                    Boca Raton, FL 33496
                    Tel: (561) 496-7899
                    Facsimile: (561) 496-7894

With a copy to:        Karen P. Kondell, Esq.
                    Steel Hector & Davis LLP
                    200 South Biscayne Boulevard, Ste 4000
                    Miami, Florida 33131
                    Telephone: (305) 577-7000
                    Facsimile: (305) 577-7001

Any notice to Buyer or Seller under this Agreement, except as otherwise expressly provided herein, shall be deemed given and delivered when mailed or personally delivered in the manner set forth herein. An affidavit of one of the Seller's employees that such notice was given will be conclusive for purposes of proving that notice was given. All notices will be given to Buyer at the address or by use of the telephone or telefax number specified on page 1 of this Agreement unless Seller has received written advice from Buyer of a change therein prior to the date such notice is given. The fact that Buyer fails to receive the notice of closing or any other notice because of Buyer's failure to advise Seller of a change of address or phone number, or because of Buyer's failure to pick up a letter when Buyer has been notified of an attempted delivery or for any other reason, shall not relieve Buyer of his obligation to close on the Closing Date, unless Seller agrees in writing to postpone the Closing Date.

i.     Effective Date. The "Effective Date" of this Agreement shall be the date when the last one of Seller and Buyer has signed this Agreement.

j.     Radon Gas. Florida Statute 404.056(5), requires the inclusion of the following language in this Agreement:

"Radon Gas: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department."

The foregoing notice is provided in order to comply with state law and is for informational purposes only. Seller does not conduct radon testing with respect to the Property or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Property.

k.     Spa and Swimming Pool Maintenance. If Buyer has selected a spa and/or pool as an Extra, Buyer acknowledges and understands that the removal of water from a spa or swimming pool can result in the displacement of the spa or swimming pool from its foundation. Buyer should consult a local spa or swimming pool contractor for instructions as to the proper maintenance and use of Buyer's spa or swimming pool. Seller shall have no liability to Buyer for any such displacement after closing.

l.     Seller's Use of the Development. As long as Seller, its successors or assigns own any portion of the Development, Seller and its agents may establish or maintain construction, sales and leasing offices, advertising signs and banners, lighting and all other activities associated with the sale, development, and construction of a real estate development.

m.     Joint and Several Obligations. Buyers, if more than one, shall be jointly and severally liable for full performance of all obligations of Buyer hereunder.

n.   Interpretation.  It is hereby acknowledged that this Agreement has been negotiated by the parties at "arm's length"; thus, in the event of ambiguity, the rule of construction that such ambiguity shall be interpreted against the initial draftsman shall not apply.

o.   Water.  Buyer acknowledges that Seller has no control over water elevations.  Therefore, Buyer agrees to indemnify and hold harmless Seller from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including reasonable attorneys' fees and costs and appellate fees and costs, related to or arising out of any claim against Seller as a result of the water elevations.  The provisions of this paragraph shall survive closing and delivery of the deed to Buyer.

p.   Community Documents.  Buyer acknowledges receipt of, and agrees to be bound by, the following: the Declaration of Protective Covenants, Restrictions and Easements for Villa Flora, as previously amended or supplemented and as may be hereafter amended or supplemented, and the Articles of Incorporation, Bylaws, and any Rules and Regulations as amended and supplemented from time to time of Villa Flora Homeowners' Association, Inc. Buyer acknowledges and agrees that title to the Lot will be subject to the Community Documents.

q.   Receipt.  Buyer acknowledges receipt of the Master Documents, the Community Documents, a copy of the floor plan for the residence to be constructed on the Lot, and the Limited Warranty, which instruments are made a part of this Agreement.

r.   Association Membership.  Buyer acknowledges, that upon taking title to the Property, Buyer will be obligated to be a member of the Association and Master Association.  This Agreement shall constitute Buyer's subscription to membership in the Association and Master Association.  Buyer acknowledges that nominees of Seller shall serve as the initial officers and directors of the Association, and are authorized by Buyer to act for and on behalf of said Association in entering into any and all agreements as are provided in or contemplated by the Community Documents.  Buyer acknowledges and agrees to abide by all terms and provisions of the Community Documents and Master Documents, including the obligation to pay any fees, dues and assessments thereunder, and that title to the Property shall be subject thereto.  Buyer further acknowledges that maintenance fees for the Association and Master Association are subject to change at the discretion of their respective Boards of Directors.

s.   Membership Clubs.

i.   Buyer acknowledges and understands that ownership of the Property and/or membership in any homeowners' or property owners' association shall not confer rights of membership in, or any rights, easements (whether prescriptive or otherwise) or privileges with respect to the use and enjoyment of any properties or facilities owned or operated as a recreational, athletic or social club or organization, including without limitation, any spa, tennis courts, clubhouses, and dining facilities.

ii.   In the event that The Club of Williams Island (the "Club") is sold to the Master Association, the Club will become part of the property under the responsibility and control of the Master Association.  Buyer acknowledges and understands that Buyer (i) will purchase his or her Unit subject to (a) monthly Club assessments and dues imposed by the Master Association to cover the Unit's share of acquisition and refurbishment financing costs, and costs associated with Club operations and overhead, and (b) the lien rights of the Master Association if the assessment is not paid in a timely manner, (ii) will automatically become a Club Resident Member (defined below), for so long as he or she continues to own the Unit, upon acquisition of the Unit, and (iii) may at any time and from time to time during ownership of the Unit elect to become an Islander Resident Member (defined below), which will require paying additional dues set by the Master Association.  As used herein, the term (a) "Club Resident Member" shall denote a resident member that has the right to use the dining facilities (if any), but not general use of the spa and tennis facilities, and (b) "Islander Resident Member" shall denote a resident member that has the right to use all of the Club facilities (as same exist from time to time), including any dining facilities, spa and tennis facilities.

iii.   This paragraph shall survive closing.

t.   All Cash.  The transaction covered by this Agreement shall be on an all cash basis and shall not be subject to Buyer's procuring financing.

u.   Damage Before Completion.  If between the Effective Date and the closing of title, the Property is damaged by fire or other casualty, the following shall apply:

i.   Risk of loss to the improvements by fire or other casualty until the closing of title is assumed by Seller.  Seller shall have no obligation to repair or replace the improvements. Provided however, if Seller elects to repair or replace such loss or damage to the improvements, this Agreement shall continue in full force and effect  and Buyer shall not have the right to reject title or receive a credit against or abatement in the Purchase Price. In such event Seller shall be entitled to a reasonable period of time within which to complete repairs or replacement.  Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss or damage shall belong entirely to

Seller and if such proceeds shall be paid to Buyer, Buyer shall promptly upon receipt thereof turn same over to Seller.

    ii.    If Seller notifies Buyer that it does not elect to repair or replace any such loss or damage, then this Agreement shall be deemed cancelled and of no further force or effect, and Seller shall refund to Buyer all monies deposited hereunder, together with interest thereon, if any, whereupon the parties shall be released and discharged of all claims and obligations hereunder, except that if Buyer is then otherwise in default hereunder Seller shall retain all such deposits as and for liquidated damages.

  v.  Landscaping and Landscape Maintenance.

    i.    In order to create variety within the Development, the landscaping of each lot will not be uniform. Accordingly, Buyer hereby acknowledges and agrees that the landscaping of Buyer's Lot may vary from other lots in the Development. Further, Buyer acknowledges and agrees that such landscaping shall be maintained and irrigated by the Association pursuant to the Declaration.

    ii.    Buyer acknowledges that the irrigation system on the Lot may be installed so as to irrigate common areas in front, to the side and/or to the rear of the Lot and/or Property.

    iii.    The water to be used for purposes of irrigating the Lot and some or all of the common areas within the Property shall be provided by the Association and Buyer and the Association shall be charged therefor.

  w.  Severability Provision.

    i.    It is Buyer's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms. If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified. If the unenforceable part or parts cannot be so modified, such part of parts will be unenforceable and considered null and void in order that the mutual paramount goal that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms can be achieved.

    ii.    Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights and powers, or waiving or limiting any of Buyer's rights or powers or Seller's obligations (which otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the above judicial modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of his deposits, such offending rights, powers, limitations and/or waivers shall be struck, canceled, rendered unenforceable, ineffective and null and void. Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement (other than language which is intended specifically to create such a cancellation right).

    iii.    The following sentence will supersede and take precedence over anything else in this Agreement which is in conflict with it: If any provisions serve to limit or qualify Seller's substantial completion obligation as stated in Paragraph 5, or Buyer's remedies in the event that such obligation is breached and such limitations or qualifications are not permitted if the exemption of this sale from the Interstate Land Sales Full Disclosure Act pursuant to 15 U.S.C. § 1702(a)(2) is to apply or this Agreement is to otherwise be fully enforceable, then all those provisions are hereby stricken and made null and void as if never a part of this Agreement.

  x.    Recording. Neither this Agreement nor any notice, memorandum, or assignment thereof (nor any Lis Pendens) shall be recorded in the office of the Clerk of the Circuit Court of Miami-Dade County, Florida, and any recording of same by Buyer shall be considered a breach of this Agreement.

  y.    No Interest. Buyer acknowledges that, prior to the conveyance of title to the Property, Buyer has acquired no right, title, interest or lien rights therein by virtue of this Agreement, the deposits made hereunder, or otherwise.

  z.    Subordination. Buyer acknowledges that all of Buyer's rights hereunder (including any rights to a vendee's lien) are and shall be subordinate to the rights of Ohio Savings Bank or any other lender holding a mortgage encumbering the Property, whether or not such mortgage secures the advancement of acquisition and/or construction funds, even if such mortgage is placed on the Property after the date of this Agreement. This provision shall survive the closing.

aa.     Cooperation.  If after the closing it shall appear that there is an error in any of the closing documents, the parties agree to execute any further documents at the request of either party and to pay any amount required in order to correct the error.

bb.     Governmental Assessments.  Seller has provided to Buyer certain information that may affect the Property concerning assessments of governmental and quasi-governmental authorities.  Buyer acknowledges that it must make its own inquiries concerning the Property with the authorities having jurisdiction over the Property and that Seller shall not be liable for any information not disclosed to Buyer nor for any discrepancies between the information disclosed by Seller and the information as verified by Buyer.

cc.     Title to Property.  Seller may not own title to the Property on the date of execution of this Contract; however, Seller shall obtain title to the Property on or before the Closing Date.

dd.     No Entry.  Buyer acknowledges that all matters pertaining to the initial construction of the Property will be performed by Seller and Seller's representatives.  Buyer acknowledges and agrees that for reasons of safety and to comply with liability and insurance requirements imposed upon Seller, neither Buyer nor any agent of Buyer shall, until after the closing of this transaction, be permitted to enter upon the Property except at those times designated by Seller and only with Seller's prior written permission, and Buyer agrees not to interfere with or interrupt any workmen at the Property.  Buyer may not order any work on the Property.  Buyer acknowledges that any breach by Buyer of the terms and conditions contained in this paragraph shall be deemed to be a "material breach" and shall entitle Seller to declare the Agreement to be in default in accordance with the provisions of Paragraph 12 hereof.  Seller's failure to promptly take any remedial action with respect to Buyer's breach of the terms and conditions contained herein shall not be deemed an implied waiver of Seller's rights hereunder.

ee.     Return of Documents.  If this Agreement is canceled for any reason, Buyer agrees to return to Seller all Community Documents and Master Documents delivered at time of execution hereof, or to reimburse Seller One Hundred ($100.00) Dollars for the cost thereof.

ff.     Venue.  The venue of any litigation arising out of this Agreement shall be Miami-Dade County, Florida.

gg.     OTHER AGREEMENTS.  THIS AGREEMENT SUPERSEDES ANY AND ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN THE PARTIES HERETO, WHETHER ORAL OR WRITTEN, AND THIS AGREEMENT REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO.  NO REPRESENTATION OR INDUCEMENT, WHETHER ORAL OR WRITTEN, MADE PRIOR HERETO WHICH IS NOT INCLUDED IN THIS AGREEMENT SHALL HAVE ANY FORCE OR EFFECT.  THIS AGREEMENT MAY NOT BE CHANGED OR TERMINATED ORALLY AND MAY BE AMENDED OR MODIFIED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY EACH OF THE PARTIES HERETO.

hh.     DISCLOSURE SUMMARY.  IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 689.26, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE BUYER BEFORE EXECUTING THIS AGREEMENT, THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST.  ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT.  BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

BUYER SHOULD NOT EXECUTE THIS AGREEMENT UNTIL BUYER HAS RECEIVED AND READ THE DISCLOSURE SUMMARY.

BUYER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE DISCLOSURE SUMMARY ATTACHED HERETO AND INCORPORATED HEREIN, AND THAT BUYER HAS READ AND EXECUTED SAID DISCLOSURE SUMMARY BEFORE EXECUTING THIS AGREEMENT.  THE DISCLOSURE SUMMARY IS PROVIDED TO BUYER IN COMPLIANCE WITH SECTION 689.26, FLORIDA STATUTES.


Initials

ii.     CONSTRUCTION INDUSTRIES RECOVERY FUND.  Pursuant to Section 489.1425 of the Florida Statutes, Seller provides the following notice.  PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND.  IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATION OF FLORIDA LAW BY A STATE LICENSED CONTRACTOR FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS:  (904) 727-6530, 7960 ARLINGTON EXPRESSWAY, SUITE 300, JACKSONVILLE, FLORIDA 32211.

jj.     ATTACHMENTS.

The following documents are attached to and form a part of this Agreement:

Check ( √ ) all that apply:

- ☐ Common Facilities Disclosure
- ☐ Department of Community Affairs Brochure (Energy)
- ☐ Disclosure Summary
- ☐ Limited Warranty

kk.    CONSTRUCTION DEFECT NOTICE.  FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY (60) DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS.  THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

IN WITNESS WHEREOF, the parties have hereunto affixed their respective hands and seals on the day and year set forth below next to their respective names.

Signed, sealed and delivered in the presence:

_____

_____

_____

BUYER
Dated:  2-2-05

BUYER
Dated:  2-2-05

PROMENADE DEVELOPERS, LTD., a Florida
limited partnership

By: _____
Authorized Signatory

Dated:  2-2-05

13

DISCLOSURE SUMMARY
FOR
VILLA FLORA

1.      AS A BUYER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF TWO HOMEOWNERS' ASSOCIATIONS.

2.      THE ASSOCIATIONS ARE KNOWN AS: a) VILLA FLORA HOMEOWNERS' ASSOCIATION, INC. AND b) WILLIAMS ISLAND PROPERTY OWNERS' ASSOCIATION, INC. THERE HAVE BEEN OR WILL BE RECORDED RESTRICTIVE COVENANTS GOVERNING THE USE AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.

3.      YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE TWO ASSOCIATIONS. YOU WILL NOT BE OBLIGATED TO PAY SPECIAL ASSESSMENTS TO THE RESPECTIVE MUNICIPALITY, COUNTY, OR SPECIAL DISTRICT. ALL ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.

4.      YOUR FAILURE TO PAY SPECIAL ASSESSMENTS OR ASSESSMENTS LEVIED BY MANDATORY HOMEOWNERS' ASSOCIATIONS COULD RESULT IN A LIEN ON YOUR PROPERTY.

5.      THERE IS NOT AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNERS' ASSOCIATIONS. THERE ARE NO PRIVATE CLUB FACILITIES WITHIN VILLA FLORA. THERE ARE PRIVATE CLUB FACILITIES WITHIN WILLIAMS ISLAND.

6.      THE RESTRICTIVE COVENANTS FOR THE ASSOCIATION CAN BE AMENDED WITHOUT THE APPROVAL OF THE ASSOCIATION MEMBERSHIP.

7.      THE STATEMENTS CONTAINED IN THIS DISCLOSURE FORM ARE ONLY SUMMARY IN NATURE, AND, AS A PROSPECTIVE BUYER, YOU SHOULD REFER TO THE COVENANTS AND THE ASSOCIATIONS' GOVERNING DOCUMENTS BEFORE PURCHASING THE PROPERTY.

8.      THESE DOCUMENTS ARE MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD OFFICE IN THE COUNTY WHERE THE PROPERTY IS LOCATED.

DATE: _____2-2-06_____

BUYER: _____

BUYER: _____

## COMMON FACILITIES DISCLOSURE

As required by Florida law, the purchaser(s) of property in Villa Flora (the "Development") is advised that the following recreational or other facilities are available for use by the property owners in the Development:

Landscaped plaza with fountain

Walkways

Entry feature and gate

There are no separate charges for the use of the facilities listed above. The homeowners association or any similar entity which owns and/or operates the facilities do, though, have the right to levy assessments which are used, in part, for the operation and upkeep of the facilities. Further, there may be other property (e.g., private roads, parks) in the Development and/or Williams Island which is owned or operated by the associations.

There is not a private membership club(s) located within Villa Flora. There may be a private membership club(s) located within Williams Island. If so, the availability of such facilities does not automatically extend to property owners as such but, rather, only to those persons who acquire the requisite membership in the club(s).

By signing below, the buyer(s) acknowledges receipt of this disclosure prior to the execution of a contract to purchase property in the Development and Williams Island.

Buyer: _____

Buyer: _____

Date: __2-2-06___

## ADDENDUM TO VILLA FLORA
## PURCHASE AND SALE AGREEMENT
between
PROMENADE DEVELOPERS, LTD., a Florida limited partnership, as Seller
and
MANLEY FEINBERG and _____Diane_____ FEINBERG, as Buyer(s)

Dated: 2 - 2 - 6 5

PROPERTY: LOT __13__, VILLA FLORA

The following terms and provisions shall be made a part of the above-described Purchase and Sale Agreement (the "Agreement").

**Payment Option:** Notwithstanding Buyer's initial election of Payment Option 2 under the Agreement, Buyer shall have the right to switch to Payment Option 1, provided written notice of such election is given to Seller prior to the date of Seller's application for the building permit. Furthermore, should Buyer elect Payment Option 2, notwithstanding anything in Section 2 of the Agreement to the contrary, the parties hereby acknowledge and agree that Seller shall notify Buyer of any default with regard to the progress payments. Notice regarding the completion of a construction stage and/or default shall be delivered to Buyer via telephone, e-mail or satellite phone. Buyer shall have a period of ten (10) calendar days from such notice in which to cure. Following expiration of the curative period, Seller may pursue any and all remedies Seller may have under the Agreement.

**Completion Date:** The following shall be added to Section 5 of the Agreement: "In the event that the improvements contemplated hereunder are not completed within sixteen (16) months following the issuance of the building permit, Seller shall be responsible for a per diem penalty in the amount of $150.00 from the first day of the seventeenth (17th) month until a temporary certificate of occupancy is issued, which penalty shall be paid at closing.

**Custom Design:** Attached hereto as Exhibit "X" are the floor plans for improvements to the Property approved by the parties. Seller shall submit said plans to the City of Aventura for approval. In the event that the City of Aventura does not approve said plans, Seller shall not be in default and Buyer, in its sole and exclusive discretion, shall either: (1) accept and proceed with the improvements as acceptable to and approved by the City of Aventura; or (2) terminate the Agreement and receive a refund of all deposits. Buyer shall deliver written notice of said election to Seller within three (3) days of Seller's advice to Seller regarding the City's failure to approve. Buyer shall not been entitled to request any revisions or modifications to said plans.

**Construction Specifications:**

Notwithstanding anything in Section 6(a) of the Agreement to the contrary, Seller shall have the right to make minor modifications in the plans and specifications without Buyer's consent. As to modifications which are of a substantial nature, Seller shall use reasonable efforts to consult with Buyer prior to making such modifications.

MIA2001 386589v1

1

Notwithstanding anything in Section 6(b) of the Agreement to the contrary, if Seller is to make any changes or substitutions to flooring, cabinetry, plumbing fixtures, door hardware, appliances and/or countertops it shall give Buyer notice thereof via telephone, e-mail or satellite phone, and Buyer shall have a period of five (5) calendar days following such notice in which to select an alternative. Provided, however, Buyer's approval shall not be required with respect to any items which are either unavailable at the time ordered or items which would result in a delay in construction.

<u>Selection of Extras</u>: Notwithstanding anything in Section 7 of the Agreement to the contrary, all selections and related requests may be made by telephone, e-mail or satellite phone.

<u>Closing Date</u>: Notwithstanding anything in Section 9 of the Agreement to the contrary, Buyer will be given at least twenty (20) days' notice of the closing, and Buyer shall have the option to extend the closing for an additional three (3) days, provided written notice of such extension is given to Seller at least ten (10) days prior to the original scheduled closing date.

<u>Closing Costs</u>: Notwithstanding anything in Section 11(a)(i) of the Agreement to the contrary, Buyer shall not be responsible for the payment of the one and one-half percent (1.5%) closing fee, but instead shall be responsible for actual closing costs, including, but not limited to, the premium on Buyer's Title Policy at the promulgated rate.

<u>Default</u>: The second sentence of Section 12(c) of the Agreement shall be modified to read as follows: "Failure by Buyer to do so within ten (10) days after written demand, confirmed via telephone, e-mail or satellite phone, shall be considered an event of default and shall entitle Seller to exercise all remedies set forth herein. This grace period and the grace period described under "Payment Option" above shall not apply to Buyer's obligation to close, as to which time is of the essence."

<u>Reservation of Rights</u>: The word "add" is hereby deleted from Section 16(c). The consecutive words "addition or" are hereby deleted from Section 16(d).

<u>Transfer or Assignment</u>: Notwithstanding anything in Section 17(b) of the Agreement to the contrary, Seller's prior written consent to any assignment, sale or transfer of Buyer's interest in the Agreement shall not be unreasonably withheld.

<u>Notice</u>: The first sentence of Section 17(h) of the Agreement shall be replaced with the following language: "Except as otherwise set forth herein, any notice required or permitted to be given to Buyer under this Agreement may be delivered either personally or by telephone, e-mail or satellite phone.

<u>Miscellaneous</u>: Except as necessary to conform hereto, the above-described Purchase Agreement shall be in full force and effect. In the event of any conflict between the Agreement and this Addendum, the Addendum shall prevail.

2

MIA2001 386589v1

**IN WITNESS WHEREOF,** the parties have hereunder set their hands and seals this _2_ day of _February_, 2005.

**BUYER(S):**

_[signature]_
Manley Feinberg

_[signature]_
Dianne Feinberg

**SELLER:**
PROMENADE DEVELOPERS, LTD.,
a Florida limited partnership

By: _[signature]_
   Authorized Signatory

MIA2001 386589v1

3

Exhibit "B"



Exhibit "B"





FEINBERG RESIDENCE

LOT 13, VILLA FLORA AT WILLIAMS ISLAND
CITY OF AVENTURA
DADE COUNTY, FLORIDA

by: VINTAGE PROPERTIES LTD.

SCOTT
BLAKESLEE
DISHER
& ASSOCIATES

GROUND
FLOOR PLAN



FEINBERG RESIDENCE

LOT 13, VILLA FLORA AT WILLIAMS ISLAND
CITY OF AVENTURA
DADE COUNTY, FLORIDA

by: VINTAGE PROPERTIES LTD.

SCOTT
BLAKESLEE
DISHER
& —
ASSOCIATES

drawing
GROUND
FLOOR PLAN

## STANDARD SPECIFICATIONS
## *Villa Flora at Williams Island*
### Exhibit "C" to Purchase and Sale Agreement
### dated  2 - 2 - 05  .

Page 1c

December 21, 2004

THIS EXHIBIT SPECIFIES THE STANDARD CONSTRUCTION FEATURES IN VILLA FLORA AT WILLIAMS ISLAND.

ALL RESIDENCES WILL BE CONSTRUCTED TO COMPLY WITH THE FLORIDA BUILDING CODE AND ARE SUBJECT TO ALL SPECIFIC LAWS AND CODES OF THE CITY OF AVENTURA, FLORIDA.

EXHIBIT TO PURCHASE AND SALES AGREEMENT DATED  2/2/05
AS TO LOT  13 , VILLA FLORA AT WILLIAMS ISLAND, FLORIDA.

## AIR CONDITIONING
* High energy efficiency meeting Florida Building Code and State of Florida comprehensive energy codes. Equipment manufactured by Trane (or equal).Minimum 10.0 Seer.
* Thermostats to be digital programmable manufactured by White Rogers or equal.

## APPLIANCES
* Kitchenaid 30" double self cleaning ovens with upper convection oven — KEBC208KSS
* Kitchenaid 27" built in microwave with trim kit — KCMS145JSS
* Thermador 36" Professional Series 6 star burners gas cooktop — PCS366US
* Island trim 36" for cooktop — GPS36ITS
* Dacor integrated ventilator with custom liner — IVS1
* Bosch fully integrated dishwasher — SHV46CO3UC
* Kitchenaid 42" built in refrigerator with I&W dispenser — KSSS42QMX
* Whirlpool Duet dryer in gas — GGW9200LT
* Whirlpool Duet washer — GHW9200LW

Page 2c

December 21, 2004

## CABINETS
* Wood Kitchen cabinets and Butler's pantry to be manufactured by Luxor or Kitchencraft Style from builders' selection.
* Custom crown molding at the upper cabinet tops and custom valance trim at bottom of lower cabinets.
* Kitchen cabinet height to be eight feet.
* Cabinet panels provided for refrigerator and dishwasher.
* Wood bath vanities to be manufactured by Wards or equal from builders' selection, 36" high, with glazed finish or manufactured by Avon gloss foil or equal 36" high.
* Laundry room cabinets to be a choice of matte "Foil" raised panel with matte laminate top and full back splash from builders' selection.
* Powder bath cabinet and top to have an allowance of $1500.00

## CARPET
* Carpeting allowance of $30.00 per square yard (material and labor) in Master bedroom including Sitting and closets, Master Dressing, Stairs, Club Room, Multi-Media, Pub Room, Mezzanine and Library.

* Carpet allowance of $25.00 per square yard (material and labor) in Bedroom 2 including closet, Bedroom 3 including closet, and Retreat.

## CAULKING
* All exterior windows and doors to be professionally caulked with two part high quality polyurethane caulking.

## CERAMIC
* Secondary baths including Den bath to have ceramic tiles as per model and builders' selection, to include bath floors, shower floors and walls to the ceiling. One shower listello included; Tile to be laid straight.

## CLOSET SHELVING
* Master closet shelving by homeowner
* Secondary closets, Pantry and Linen closets to have a shelving allowance of $3500.00 for the Capri model and $4000.00 for the Amalfi model.

## COUNTER TOPS
* Master bath, secondary bath vanity tops including den vanity to be slab marble with 1-1/2" ogee edge detail and 4" back splash from builders' selection.
* Powder bath top is included in allowance listed in cabinet section.
* Kitchen and butler's pantry counter tops to be granite with 1-1/2" ogee edge detail from builders' selection. Full back splash in granite, maximum back splash height to be 18" from builders' selection.

Page 2c

December 21, 2004

## CABINETS

* Wood Kitchen cabinets and Butler's pantry to be manufactured by Luxor or Kitchencraft Style from builders' selection.
* Custom crown molding at the upper cabinet tops and custom valance trim at bottom of lower cabinets.
* Kitchen cabinet height to be eight feet.
* Cabinet panels provided for refrigerator and dishwasher.
* Wood bath vanities to be manufactured by Wards or equal from builders'selection, 36" high, with glazed finish or manufactured by Avon gloss foil or equal 36" high.
* Laundry room cabinets to be a choice of matte "Foil" raised panel with matte laminate top and full back splash from builders' selection.
* Powder bath cabinet and top to have an allowance of $1500.00

## CARPET

* Carpeting allowance of $30.00 per square yard (material and labor) in Master bedroom including Sitting and closets, Master Dressing, Stairs, Club Room, Multi-Media, Pub Room, Mezzanine and Library.

* Carpet allowance of $25.00 per square yard (material and labor) in Bedroom 2 including closet, Bedroom 3 including closet, and Retreat.

## CAULKING

* All exterior windows and doors to be professionally caulked with two part high quality polyurethane caulking.

## CERAMIC

* Secondary baths including Den bath to have ceramic tiles as per model and builders' selection, to include bath floors, shower floors and walls to the ceiling. One shower listello included; Tile to be laid straight.

## CLOSET SHELVING

* Master closet shelving by homeowner
* Secondary closets, Pantry and Linen closets to have a shelving allowance of $3500.00 for the Capri model and $4000.00 for the Amalfi model.

## COUNTER TOPS

* Master bath, secondary bath vanity tops including den vanity to be slab marble with 1-1/2" ogee edge detail and 4" back splash from builders' selection.
* Powder bath top is included in allowance listed in cabinet section.
* Kitchen and butler's pantry counter tops to be granite with 1-1/2" ogee edge detail from builders' selection. Full back splash in granite, maximum back splash height to be 18" from builders' selection.

Page 3c

# ELECTRICAL

December 21, 2004

* Installation of high hats with black baffle and white trim as per the plan, high hats to be H99 ICT 4" aperture manufactured by Halo or equal. Water proof trim in wet areas.
* Fluorescent lighting in garage per plan.
* Fluorescent lighting in walk-in closets per plan
* Under counter lighting in the kitchen per plan.
* Interior Decora style switches-choice of white, ivory or almond.
* Exterior entry lighting on photo cells - front elevation and portico, per plan.
* Security double flood lights per plan.
* Bath exhaust fans over all water closets vented to exterior, additional exhaust in Master bath.
* Electric 400 AMP service.
* Electric for whirlpool at Master bath
* Ceiling fans are a Decorator Option and not included.

# ELEVATOR

* Whisper Ride elevator. Cab size is 4'-6" x 4'-6".
* Cab wall finish is choice of plastic laminate or wood  veneer (oak, mahogany or birch) with clear finish. Stainless steel handrail and finishes.
* Recessed down light.
* Unlocking device at each floor.
* In-car lowering in case of power failure.
* Alarm
* 8' high cab with emergency light.
* Ultima two speed motor.
* (1) outlet for phone and (1) 220v outlet for elevator equipment
* Motorized wood or clear lucite accordion gate
* Decorative top and bottom cover over motorized door operators.

# EXTERIOR DOORS

* All exterior doors to be manufactured by Ultimate or equal Dade County Approved impact resistant, wood interior aluminum clad exterior in driftwood exterior finish . Designs per plans and elevation. Interior to be  fully cased.
* Exterior door hardware is by Ultimate or equal; Choice of finishes from builders' selection.

# EXTERIOR GENERAL SPECIFICATIONS

* All exterior walls are concrete, block, and stucco; or stucco over ½" plywood and 2" x 4" wood framing. Stucco texture to be "Old World" per model building.
* Concrete tumbled pavers; Allowance of 1300 square feet with 50 lineal feet of risers
* All elevations as per architectural plans.
* Exterior decorative coach lights per plan supplied by Builder.
* Metal, insulated, double steel, garage doors,  flush with applied molding as per elevation.
* Garage door opener with two remote control operators.
* Exterior security lighting as shown on electrical plans.
* Acra Lastic Elasto-meric exterior paint over stucco.
* Custom designed lighted mailbox.
* Rain gutters and down spouts installed at exterior perimeter of roof.
* Custom design aluminum railings at balconies and exterior entry per elevation/floor plan.

Page 4c

December 21, 2004

## EXTERIOR - HARDSCAPE

* Patios and driveways are concrete tumbled pavers with 4" x 8" soldier course from builders' selection. Total allowance for hardscape pavers is 1300 square feet with 50 lineal feet of step risers.
* Landscape allowance of $15,000 includes custom landscape design by landscape architect, sod and irrigation system hooked up to irrigation metered water supply.
* The landscaping for the model units has been upgraded to reflect the potential appearance of a unit, allowing time for plant growth and development. The parties acknowledge and agree that the allowances provided for in this exhibit are not sufficient to purchase plant materials presently comparable to that of the models.
* Pool/Spa with child safety fence to have a combined allowance of $25,000.00.

## FIREPLACE AT LIVING ROOM

* Isokern 46" x 36" vent free gas fireplace with Peterson RDG9 Golden Oaks designer gas log set or equal.
* Mantle allowance of $1500.00.

## GAS (Natural)

* Install gas piping at cook top, dryer, (1) fireplace and pool heater.

## GENERAL STRUCTURAL SPECIFICATIONS

* Piling and grade beam construction.
* All building lots will have soil borings per code; Ground will be termite treated below building.
* Ground will be compacted and tested to meet local standards.
* Concrete footings and slabs will be 3000 PSI mix and reinforced with steel rods and wire mesh or "fibermesh" and minimum four mil. thick visqueen vapor barrier.
* All poured concrete slabs will be a minimum of 4" thick with steel reinforcing.
* Concrete blocks to be laid in full mortar beds.
* Roof structures will be a combination of truss systems and hand framing with 5/8 CDX plywood sheeting, 30 pound felt underlayment tin tagged to plywood, covered by 90 pound rolled roofing applied by hot mopping. Roof materials will be Hanson Spanish "S" Addison Blend set in approved foam adhesive; Pub balcony to have liquid applied waterproofing system.
* Flat roof areas to be heavy duty hot mopped rolled roofing system.
* Insulation in ceilings R-30 batt, exterior block walls R4.2 AL-FOIL, exterior wood walls R-11 batt, applies to air-conditioned space only. Sound insulation in walls between master bedroom / living room and family room / second bedroom. Sound insulation at stair landings, garage loft, party wall, 2nd and 3rd floor AC closets and laundry room.
* Second floor is engineered, steel reinforced precast concrete plank structural system (where applicable).

Page 5c

# GLASS SLIDING DOORS

December 21, 2004

* Glass sliding doors per plan are Dade County approved impact resistant manufactured by P.G.T. Industries or equal with tinted glass and driftwood aluminum frames.
* All glass sliding doors to have screens.

# LOW VOLTAGE

* "Future Smart" Networks structured wiring center located in garage.
* Joint cable television and phone  pre wire to be RU-4 quad shield cable TV and Category V phone run to each Bedroom, Kitchen, Gathering, Retreat, Library, Club room, Theater and Pub where applicable.
* Satellite prewiring to future satellite location
* Separate telephone pre wire to include an outlet in each Bedroom, Retreat, Kitchen, Gathering, Library where applicable, Theater, Club room and Pub. Wire to be four pair twisted Cat V- home run each line to structured media center.
* Apex Destiny 6100 Security system with battery, transformer, automatic dialer, door chime, dual dialing capabilities, (4) keypads, (1) exterior and interior siren, (3) motion detectors, and smoke and heat detectors per code.  All moveable openings and casement window screens protected.

# MIRRORS

* All baths excluding Powder bath to have  mirrors over  vanities.
* Full vanity width to underside of soffits;  Maximum height not to exceed 10'-0".

# MARBLE FLOORING

* Master bath marble flooring material allowance of $6.00 per square foot at bath floor, shower floor, and shower walls to ceiling.
* Master bath shower to have shower seat and shampoo niche per plan.
* Marble flooring material allowance of $6.00 per square foot at the following locations;
  Exterior entry and Steps, Vestibule, Grand Foyer, Elevator, Powder Bath, Coats, Laundry, Formal Dining, Living Room, Gathering Room, Kitchen, Butlers Pantry, Pantry, Informal Dining, Loft, Gallery, Master Vestibule and Covered Loggia.
* Ceramic from builders' selection at Master balcony, Bedroom 2 balcony, Retreat balcony, Pub balcony and Solarium.
* Saturnia window sills at all operable windows.

# MILLWORK AND HARDWARE

* All doors, baseboards, and trim to be paint grade.
* 8'-0" height interior doors to be solid core masonite- flush with applied molding - paint grade.
* Elevator and Theatre entry to have 8'-0" height one lite doors
* 5-1/4" high baseboards & 3-1/2" wide Casing to be Victorian  style, paint grade poplar.
* Robern PLM 16" x 30" medicine cabinet with flush mirrors and recessed cabinet unframed.
  All baths to have medicine cabinet excluding Powder bath and Master Bath.
* Exterior doors including front entry doors to be manufactured by Ultimate or equal, wood interior, aluminum clad exterior in driftwood exterior finish Dade County approved impact resistant. Designs as per model plans and elevation. Interior to be  fully cased.
* Bifolds doors to be flush with applied molding to match interior doors.
* Interior hardware is Ashley Norton "Chester" lever handles in polished brass finish.
* Exterior door hardware by Ultimate; Choice of finishes from builders' standard selection.
* Garage doors to have applied flex molding; design per elevations.

Page 6c

December 21, 2004

## PAINT/STAIN
* All interior walls and ceilings to be primed with one coat MAB Pro 30 flat latex and finished with one coat MAB Rich-lux wall shield flat latex.
* All doors, door casings, baseboards to be primed with Kilz and finished with (2) coats MAB Rich-lux oil enamel.
* Sherwin Williams interior high build primer applied to interior walls and ceilings.
* Interior paint package to consist of one trim color throughout entire house.
* Main area walls and ceilings to be same color; (Color #1)
* Secondary Bedrooms and Retreat walls and ceilings to be same color; (Color #2)
* Library walls and ceiling to be same color; (Color #3)
* Master Bedroom walls and ceilings to be same color; (Color #4)
* Paint garage door applied molding
* Stain and finish stair rail cap
* Stain garage floor

## PLUMBING
* Master bath lav faucets to be Sigma 2200 Georgian/Portifino crystal handles in polished brass finish.
* Master bath lavs to be Kohler Caxton K2211 - 19" x 15" under mount to be installed in standard slab marble top.
* Master bath tub to be free standing Hydro Nina 72x44x22 with full skirt from builders' standard selection.
* Master bath tub faucet to be Sigma 1850 Georgian/Portifino crystal handles; Floor mount faucet with hand shower in cradle.
* Master bath shower to have pressure balanced valve with Sigma 2200 Georgian/Portifino crystal handles in polished brass finish.
* Master bath water closet to be Kohler Revival K-3360 in one piece in polished brass with matching trip and supply.
* Master bath bidet to be Kohler Revival K-4830 with polished brass trim.
* Powder bath faucet to be Sigma 2200 Devon antique gold lav faucet.
* Powder bath lav to be Bates "Cheryl" Drop in bronze lav.
* Powder bath water closet to be Kohler K-3360 in polished brass with matching trip and supply.
* Secondary bath lav faucets to be Sigma 300 Windham series in polished brass..
* Secondary Vanity lavs to be Kohler Caxton K-2210 17"x14" undermount.
* Secondary bath tub to be Kohler Villager K715 cast iron in standard color.
* Secondary tub faucet to be Sigma 300 Windham series in polished brass.
* Secondary bath shower faucets to be Sigma 300 Windham Series in polished brass.
* Secondary bath water closets to be Kohler Wellworth lite K-3481 with concealed trap and matching trip and supply.
* Kitchen sink to be undercounter Franke PRX 120 stainless Steel.
* Veggie sink to be undercounter Franke ERX 110 stainless Steel .
* Kitchen and Veggie sink faucets to be manufactured by Hamat 3-2580 in stainless steel.
* Disposal at Kitchen sink and Veggie sink is ISE PRO333SS

Page 7c

December 21, 2004

## PLUMBING CONTINUED
* Laundry sink to be #10 with Delta #441 faucet
* Laundry to have recessed drip dry.
* Icemaker line to the refrigerator in kitchen.
* 100 gallon gas hot water heater with recirculating hot water pump.
* Exterior hose bibs per plan.
* Accessories allowance of $1500.00 per unit.

## PRECAST
* Interior precast columns are tapered Doric with ionic cap and base per floor plan.
* Exterior precast columns are tapered with corinthian cap and base per elevations.

## SHOWER ENCLOSURES
* Master bath shower to be frame-less 3/8" glass, 6'-8" high, swing door in polished brass or chrome finish. Layouts as per plans with glass to be clear or opaque.
* Secondary shower doors to be 1/4" frame-less bi-pass 6'-8" high, finish to be polished brass or chrome. Layouts as per plans with glass to be clear.

## STAIRS AND STAIR RAILINGS
* *Circular stair design per architectural plans*
* Closed end stringer design with closed riser system.
* Carpet grade treads
* Red oak #6010 hand rail-cap
* Newel post #4040 red oak where required
* Custom design vertical pickets, collars and forged scrolls.
* Iron to be primed only.
* Deck edge trim
* *Spiral stair design per architectural plans*
* Open riser system
* Steel pan treads to be straight
* Red oak wood tread covers and platform covers
* Handrail to be steel with Dixie profile design
* Balusters to be steel forged double spears and alternating bow-tie double spears
* Iron to be primed only

## WALL AND CEILING FINISH
* All interior walls and ceilings including garage are drywall with smooth finish prepared for application of Sherwin Williams interior High Build Primer (excluding garage masonry walls).
* Square corner bead in main living areas.
* Garage walls are smooth sponge coat cementacious stucco, garage ceiling orange peel over drywall.
* Interior walls and ceilings are ready for flat latex paint; High build primer applied to interior walls and ceilings.

## WINDOWS
* Windows to be impact resistant manufactured by CGI or equal, all aluminum in tan frames with tinted glass; Operable windows to be casement type.

Page 8c

December 21, 2004

## SUMMARY OF ALLOWANCES

* All allowance amounts include material and labor unless otherwise noted below:
* Powder Bath cabinetry and countertop
* Carpet allowance ........................................ $1,500.00
* Closet shelving allowance for Capri/Amalfi ....... $30.00 / $25.00 per square yard
* Tumbled paver/riser allowance at exterior hardscape ... $3500.00 / $4000.00
* Landscape/Irrigation/Sod ............................... 1300 square feet/50 lineal feet
* Pool including heater and safety fence ............... $15,000.00
* Fireplace mantle at Living Room ..................... $25,000.00
* Master Bath marble material .......................... $1,500.00
* Main floor marble material ............................ $6.00 per square foot (material)
* Plumbing accessories .................................. $6.00 per square foot (material)
  $1500.00

IN WITNESS WHEREOF, the parties have hereunder st their hands and seals this _2nd_
day of _Feb, 2005_.

Signed, sealed and delivered
in the presence of:

_[signature]_

_____

Signed, sealed and delivered
in the presence of:

_____

_____

_____

_____

SELLER:
Promenade Developers, LTD,
A Florida limited partnership
By _[signature]_
Authorized Signatory

PURCHASER:

_____

_____

_____

_____

Feb-04-05 04:29P                                                      P.01

## 2nd ADDENDUM TO VILLA FLORA PURCHASE AND SALE AGREEMENT
Between
Promenade Developers, LTD., a Florida limited partnership, as Seller Manley Feinberg
and Dianne Feinberg, as Buyers Dated 2-2-05
Property: Lot 13, Villa Flora

The following terms and provisions shall be made a part of the above-described Purchase
and Sale Agreement (the "Agreement").

1   Buyer may add any of the extras listed on "estimate of option" dated January
28, 2004 a copy of which is attached hereto as Exhibit I and Seller shall furnish
same at the cost set out in the estimate. Buyer shall notify Seller in writing in a
timely manner of said addition.

2.  Buyer may select materials such as marble flooring, granite countertop
material, ceramic tile and carpet from suppliers other than those supplied by
Seller, provided that Sellers' Labor Contractors' purchases and installs the
material and the materials are readily available and that the deliver of said
materials does not hold up the construction of the home. Seller shall not be liable
for nor shall provide a warranty of these items. In the event Buyer is not satisfied
with cabinet selections from Sellers' cabinet supplier, Buyer may provide an
alternate cabinet supplier, the acceptance of which shall be in the sole discretion
of the Seller.

3.  Sellers standard warranty is made apart of this agreement. A copy is attached
hereto as Exhibit II.

4.  The words "In Sellers opinion" of Section 8 shall be changed to "In the
opinion of a local building inspection service mutually agreed upon by both
Buyer and Seller."
The last sentence of Section 8 shall be deleted. In the event Walk Thru items shall
exceed $ 10,000 in Sellers reasonable opinion, Buyer shall be permitted to
withhold from the closing funds twice the funds sufficient to pay for correction of
the defects until said corrections are completed by Seller.

5.  All notices to Buyer shall be in writing to Buyer at 6802 Dartmour Drive,
Louisville, K.Y 40222 in addition to the notices provided to be delivered either
personally or by telephone, email or satellite phone.

6.  The parties acknowledge that Buyers are third party beneficiaries of the
escrow Agreement dated January 1,2005 between Steel Hector and Davis, LLP
and Promenade Developers, LTD.

7.  Seller shall pay for all labor and materials provided to the Lot 13 when due
and shall deliver the property free of mechanics liens.

8.  Vintage Properties Inc., hereby guarantees the execution of the Purchase and Sale Agreement dated February 03, 2005, between Promenade Developers, Ltd., and Manley and Dianne Feinberg.

IN WITNESS WHEREOF, the parties hereunder set their hands and seals this 3rd day of February, 2005.

BUYER(S):                                          SELLER:

                                                   PROMENADE DEVELOPS, LTD.,

Manley Feinberg                                    By: _____
                                                        Authorized Signatory

Dianne Feinberg

JOB: VF 4
FILE: F:\HOME\CONTRACT\VF\FEINBERG\ESTOPTIONS
DATE: 06/07/04

## ESTIMATE OF OPTIONS FOR FEINBERG RESIDENCE

TODAY'S DATE: JAN. 24, 2004

VILLAFLORA LOT 4
ADDRESS: CAPRI
MODEL

| CA# | AREA OF CONST | ROOM | DESCRIPTION | DEBIT | CREDIT | NET |
|---|---|---|---|---|---|---|
| CA01 | CABINETS | KITCHEN/BUTLERS | UPGRADE CABINETS PER SPECS AND CABINET DRAWINGS ILO STD | $33,164.25 | $26,632.00 | $7,331.25 |
|  |  | M-BATH | UPGRADE CABINETS PER SPECS AND CABINET DRAWINGS ILO STD | $8,192.00 | $3,852.00 | $4,340.00 |
|  |  | BTH-4 | UPGRADE CABINETS PER SPECS AND CABINET DRAWINGS ILO STD | $1,157.00 | $807.00 | $360.00 |
| CA02 | GRANITE | KITCHEN/BUTLERS PWDR BATH | GOLDEN OAK ANTIQUED WITH 1-1/2" EDGE PER SPECS (SPLASH IS IN CA03) TOP BY DECORATOR |  | $1,923.10 | ($1,923.10) |
|  |  | MASTER BATH | DORA ROYAL ANTIQUED WITH 3 CM COVE DUPONT EDGE AND 4" SPLASH PER SPEC4 | $3,202.31 | $2,769.00 | $433.31 |
|  |  | BATH-2 | HONED SATURNIA WITH 3 CM COVE DUPONT EDGE AND 4" SPLASH PER SPECS | $877.88 | $611.70 | $165.88 |
|  |  | BATH-3 | ALHAMBRA HONED LIMESTONE WITH 3 CM COVE DUPONT EDGE AND 4" SPLASH PER SPECS | $1,134.85 | $908.70 | $226.12 |
|  |  | BATH-4 | WALNUT ANTIQUED WITH 3 CM COVE DUPONT EDGE AND 4" SPLASH PER SPECS | $1,046.33 | $611.70 | $234.63 |
| CA03 | MARBLE/CERAMIC | MAIN FLOOR | MAIN FLOOR MARBLE INCLUDING COV, LOGGIA (MATERIAL ALLOWANCE OF $7.06 W/TAX) ONE TIME MODEL DISCOUNT FROM FORMS AND SURFACES | $50,786.75 | $33,296.50 | $17,500.25 |
|  |  | KITCHEN SPLASH | CERAMIC PER SPECS | $2,990.44 |  | $2,990.44 |
|  |  | M-BATH | MARBLE PER SPECS | $16,797.43 | $6,544.00 | $10,253.43 |
|  |  | BTH-2 | CERAMIC PER SPECS | $3,968.46 | $1,786.50 | $2,103.00 |
|  |  | BTH-3 | CERAMIC PER SPECS | $4,405.01 | $1,741.00 | $2,648.01 |
|  |  | BTH-4 | CERAMIC PER SPECS | $4,365.69 | $1,960.00 | $2,405.69 |
| CA04 | PLUMBING | HOUSE | REVISED PLUMBING PER SPECS (DOES NOT INCL PUB OR SERVING BAR SINKS/FAUCETS) | $5,171.18 |  | $5,171.18 |
| CA05 | SHWR ENCL | BTH-3 | UPGRADE HARDWARE COLOR | $124.00 |  | $124.00 |
|  |  | BTH-4 | UPGRADE HARDWARE COLOR | $124.00 |  | $124.00 |
| CA05 | MILLWORK MAT | HOUSE | MILLWORK MATERIAL PACKAGE PER SPECS | $26,709.10 | $13,418.97 | $13,290.13 |
|  | MILL LAB | HOUSE | MILLWORK LABOR PACKAGE PER SPECS | $13,807.40 |  | $13,807.40 |
| CA06 | ELEC LOW VLT | HOUSE | REVISED ELECTRICAL PER QUOTE DATED 01/20/04 (MISC. ITEMS) PER SPECS | $1,681.75 |  | $1,681.75 |
| CA07 | STAIRS & RAIL | MAIN STAIRS | CHANGE TO ACCEPT CARPET TREADS/RISERS | $1,470.15 |  | $1,470.15 |
| CA08 | ELEVATOR |  | UPGRADE HANDRAIL AND CALL BUTTON TO OIL RUBBED BRONZE FINISH | $782.75 |  | $782.75 |

Ex I

PAGE 1

02:08:05 PM

JOB: VF 4
FILE: F:\HOME\CONTRACT\WYFEINBERGEST\OPTIONS
DATE: 11/07/04

**ESTIMATE OF OPTIONS FOR FEINBERG RESIDENCE**

TODAY'S DATE:  JAN. 18, 2004

VILLAFLORA   LOT 4
ADDRESS:
MODEL   CAPRI

| CA # | AREA OF CONST | ROOM | DESCRIPTION | DEBIT | CREDIT | NET |
|------|---------------|------|-------------|-------|--------|-----|
| CA9 | ETCH GLASS | ELEVATOR | ETCH (3) 1-LITE ELEVATOR DOORS | $1,395.00 | | $1,395.00 |
| CA10 | F/D | CLUB ROOM | RECESS DETAIL | $465.00 | | $465.00 |
| | | KITCHEN | KITCHEN HOOD | $775.00 | | $775.00 |
| CA11 | FIREPLACE | HOUSE | (1) ADDITIONAL ISOKERN FIREPLACES IN MASTER BEDROOM | $4,752.50 | | $4,752.50 |
| CA12 | PRECAST | LIVING | PRECAST MANTLE W/ OVERMANTLE IN KEY STONE MOTIF (ALLOWANCE) | $5,990.00 | | $5,990.00 |
| | | KITCHEN | CUSTOM PRECAST HOOD (ALLOWANCE) | $2,325.00 | | $2,325.00 |
| | PRECAST | FIREPLACE | CREDIT STD MANTLE ALLOWANCE | | $1,500.00 | ($1,500.00) |
| CA13 | STUCCO | COVERED LOGGIA | CREDIT STD CEILING STUCCO WHERE PECKY/APPLIED MLDG IS GOING | | $500.00 | ($500.00) |
| CA14 | POOL | | POOL PER HARDSCAPE | $43,819.75 | | $18,819.75 |
| | SHELL | | POOL PILES | $3,460.05 | $25,000.00 | $3,460.05 |
| | | | MISC MOVING | $2,170.38 | | $2,170.38 |
| | POOL FENCE | | APPROX ALF OF CHILD SAFETY FENCE - COLOR TBD | $540.78 | | $540.78 |
| | ELECTRIC | | ELECTRIC FOR POOL/SPA | $1,905.60 | | $1,905.60 |
| | PRECAST | | (2) OXFORD URNS IN BONE COLOR BY ARTISTIC STATUARY | $666.59 | | $666.59 |
| | PLUMBING | | CONNECT LINE TO POOL AUTO FILL | $202.50 | | $202.50 |
| CA15 | PAVERS | | PAVERS PER HARDSCAPE PLAN - CR STD ALLOWANCE | $10,016.25 | $3,475.00 | $6,541.25 |
| | PAVER CLEANING | | CLEAN PAVERS | $622.50 | $270.00 | $352.50 |
| CA16 | FTR/CAP | BBQ | FOOTER/CAP | $2,605.50 | | $2,605.50 |
| | BLOCK | | BLOCK | $1,282.50 | | $1,282.50 |
| | STUCCO | | OLD WORLD STUCCO | $203.75 | | $203.75 |
| | PAINT | | PAINT | $337.50 | | $337.50 |
| | PRECAST | | PRECAST | $798.01 | | $798.01 |
| | CERAMIC | | TOP AND SPLASH | $668.90 | | $668.90 |
| | GRILL/DOORS | | DCS 36" ALL GRILL WITH ROTISSERIE AND (1) PAIR OF SS DOORS | $4,493.32 | | $4,493.32 |

PAGE 2

JOB: VF 4
FILE: P:\HOME\CONTRACT\WP\PEINBERG\ESTOPTIONS
DATE: 05/07/04

# ESTIMATE OF OPTIONS FOR PEINBERG RESIDENCE

TODAY'S DATE:  JAN. 28, 2004

VILLA FLORA   LOT 4
ADDRESS:
MODEL        CAPRI

| CA # | AREA OF CONST | ROOM | DESCRIPTION | DEBIT | CREDIT | NET |
|------|---------------|------|-------------|-------|--------|-----|
| CA16 | GAS | | GAS LINE TO GRILL | $270.00 | | $270.00 |
| | ELECTRIC | | GRILL OUTLET | $128.25 | | $128.25 |
| CA17 | ELECTRIC/LSCAPE | | SUPPLY/INSTALL (16) NADCO LANDSCAPE LIGHTS | $3,180.02 | | $3,180.02 |
| | | | MISC LANDSCAPE OUTLETS | $229.50 | | $229.50 |
| CA18 | METALWORK | EXT FENCE | 3ILF OF 5'H FENCE | $1,485.00 | | $1,485.60 |
| | | | (2) GATES PER PLAN | $810.00 | | $810.00 |
| CA19 | FRAMING | | FRAME FOR PUB | $877.60 | | $877.60 |
| | APPL | | U-LINE ECHELON REFRIG WITH OVERLAY KIT | $1,771.36 | | $1,771.36 |
| | CABINET | | CUSTOM CABINET | $9,990.00 | | $9,990.00 |
| | GRANITE | | KEYS GRANITE ANTIQUE BROWN WITH 3/4" BEVEL W/3/4" OFFSET EDGE AND NO SPLASH | $3,079.15 | | $3,079.15 |
| | PLUMBING | | FRANKE ADX110-14 14X17 SS SINK WITH SIGMA MONTE CARLO 12891 1.26 FAUCET | $1,073.26 | | $1,073.26 |
| | ELECTRIC | | MISC ELECTRICAL CHANGES | | | ($438.50) |
| | MILLWRK | | SUPPLY (2) 3080 INTERIOR DOORS | $505.71 | $38.50 | $505.71 |
| | MILL LAB | | INSTALL (2) 3080 INTERIOR DOORS | $337.50 | | $337.50 |
| CA20 | ELECTRIC | LIBRARY | FLOOR OUTLET / PHONE OUTLET | $513.00 | | $513.00 |
| CA21 | CABINETS | POWDER BATH | POWDER ROOM VANITY/SINK COMBO SUPPLIED BY CARLS FURNITURE | $1,413.83 | | $1,413.83 |
| | | | CREDIT STD ALLOWANCE | | $1,500.00 | ($1,500.00) |
| CA22 | POOL | EXTERIOR | POOL COPING SELECTION TO BE 4"X 8" TUMBLED E-2 | $472.75 | | $472.75 |
| CA23 | INSULATION | THEATRE | CREDIT R-11 INSULATION BY PROFESSIONAL INSULATORS IN 2ND FLR CEILING COVERED BY MEDIA | N/C | | |
| CA24 | STAIRS | MAIN STAIRS | CHANGE TREADS AND RISERS TO OAK PER APPROVED SAMPLE | $6,600.50 | | $6,600.50 |
| | PAINT | | STAIN TREADS AND RISERS; PAINT STAIR SKIRT | $3,138.75 | | $3,138.75 |
| | STAIRS | | REVERSE CARPET TREADS AND RISERS AS SHOWN IN CA08 | | $1,099.00 | ($1,099.00) |
| | WOOD | | SOLID 2-1/4" X 3/4" OAK FLOORING AT LANDING TO MATCH TREADS AND RISERS | $1,080.00 | | $1,080.00 |
| CA25 | CARPET | M-BED | UPGRADE CARPET TO D'ESTE ILO STD | $7,299.30 | $2,820.00 | $4,479.30 |
| | | RETREAT | UPGRADE CARPET TO VALENCIA ILO STD | $1,308.75 | $600.00 | $708.75 |
| | | BED-2 | UPGRADE CARPET TO TOSCANA ILO STD | $1,427.23 | $950.00 | $477.23 |
| | | LIB/PUB/CLUB/BED-3 | UPGRADE CARPET TO TRINOLIN X-O STD | $11,013.30 | $6,680.00 | $4,333.50 |

JOB: VF 4
FILE: F:\HOME\CONTRACT\MW\FEINBERG\ESTOPTIONS
DATE: 03/07/04

**ESTIMATE OF OPTIONS FOR FEINBERG RESIDENCE**

TODAY'S DATE: JAN. 28, 2004

VILLAFLORA    LOT 4
ADDRESS:
MODEL:    CAPRI

| CA # | AREA OF CONST | ROOM | DESCRIPTION | DEBIT | CREDIT | NET |
|------|------|------|------|------|------|------|
| | | THEATRE STAIRS | UPGRADE CARPET TO TRINIDLIN ILO STD CREDIT STD CARPET AND LABOR TO INSTALL | $3,639.45 | $1,578.00 $14,750.00 | $2,061.45 ($4,750.00) |
| CA26 | | THEATRE STAIRS | YARDAGE ADJUSTMENT FOR FINAL FIELD MEASUREMENT OF STAGE PLATFORM CARPET FOR 2ND TO 3RD FLOOR STAIRS IS TRINIDLIN SEAGRASS | $739.50 $3,044.25 | | $739.50 $3,044.25 |
| CA27 | MILLWORK MAT | DINING | NOTE: NO CARPET TO BE SUPPLIED FOR 1ST TO 2ND FLOOR STAIRS CHANGE COFFER FLEX CROWN FROM PCM #25 TO PCM 407 | | $411.07 | ($411.07) |
| CA28 | STAIR RAIL | 2ND FLOOR BALCONY | FILIGREE DETAIL (SAME AS LOT 3) AT BALCONY SEE DETAIL ATTACHED | $3,308.50 | | $3,308.50 |
| CA29 | MARBLE | FOYER ARCHES | ADD HALLA TOP W/ #23 EDGE AT (2) NICHES (PER DETAIL) | $1,333.23 | | $1,333.23 |
| | | SILLS | CHANGE MATERIAL AT SILLS FROM SATURNIA TO HALLA STONE TO MATCH MAIN FLOOR MATERIAL | | | |
| CA30 | EXT FIXT ELECTRIC | BBQ | SUPPLY (4) MURRAY FEB85 #CI, 1907 BK MEDIUM PIER LIGHTS W/ (4) PIER MOUNTS BK WIRE FOR COACH LIGHTS AND INSTALL | $1,598.33 $895.32 | | $1,598.33 $895.32 |
| CA31 | HOUSE #5 | EXTERIOR | HOUSE #5 SUPPLIED BY SPANISH PLATES, STYLE #1 - CREDIT STD ALLOWANCE | | $32.00 | ($32.00) |
| CA32 | ETCH GLASS | ELEVATOR | ETCH GLASS DESIGN AT (8) ELEVATOR DOORS - CREDIT ALLOWANCE SHOWN IN CA11 SEE DETAIL ATTACHED FOR DESIGN | $1,762.50 | $800.00 | $962.50 |
| CA33 | APPLIANCES | LAUNDRY | SUPPLY/INSTALL PEDESTAL BASES IN WHITE FOR WASHER AND DRYER | $427.98 | | $427.98 |
| CA34 | ETCHING | THEATRE | ETCH (2) THEATRE DOORS WITH STAR DESIGN PER DETAIL ATTACHED | $572.40 | | $572.40 |
| CA35 | MIRROR | ELEVATOR | SUPPLY/INSTALL (8) ANTIQUE LAMINATED SAFETY GLASS MIRROR IN ELEVATOR PANELS | $2,333.00 | | $2,333.00 |
| CA37 | MIRROR | SERVING BAR | SUPPLY/INSTALL ANTIQUED MIRROR SPLASH INCLUDING RETURNS 15-7/8" IN LENGTH | $579.70 | | $579.70 |
| CA38 | LANDSCAPE CABINETS | EXTERIOR FAMILY LOFT STAIRS | UPGRADE LANDSCAPE ALLOWANCE CUSTOM TV CABINET CUSTOM BOOK CASE AND BASE CABINET CUSTOM STAIR CURB AND MOLDING | $25,300.00 $12,420.00 $11,340.00 $3,780.00 | $15,000.00 | $10,300.00 $12,420.00 $11,340.00 $3,780.00 |
| CA39 | | | | | | |

PAGE 4

01/28/2005

02:06:06 PM

ESTIMATE OF OPTIONS FOR FEINBERG RESIDENCE

JOB: VF 4
FILE: F:\HOME\CONTRACT\WF\FEINBERG\ESTOPTIONS
DATE: 1/27/04

TODAY'S DATE: JAN. 25, 2004

VILLAFLORA   LOT 4
ADDRESS:
MODEL     CAPRI

| CA # | AREA OF CONST | ROOM | DESCRIPTION | DEBIT | CREDIT | NET |
|------|---------------|------|-------------|-------|--------|-----|
| CA40 | SHELVING GRANITE | MASTER CLOSET | MAHOGANY MELAMINE CLOSET SYSTEM WITH ISLAND & DRAWER UNIT | $15,930.00 | | $15,930.00 |
| | | | SUPPLY/INSTALL 2CM CLASSIC LIGHT SATURNA HALF WITH #23 EDGE AT ISLAND IN CLOSET | $2,250.18 | | $2,250.18 |
| CA41 | CUSTOM CAB GRANITE | SERVING BAR | CUSTOM CABINET | $8,480.00 | | $8,480.00 |
| | | | HALLA STONE TOP WITH 1 3/4" BEVEL 3/4" OFFSET SQUARE - NO SPLASH | $1,283.80 | | $1,283.80 |
| | FRAMING | | ADD ARCH | $108.78 | | $108.78 |
| CA42 | MIRROR | LIVING FIREPLACE | SUPPLY/INSTALL ARCH TOP 17 PIECE ANTIQUED MIRROR ON DWG WITH BUTTONS | $1,302.00 | | $1,302.00 |
| | | | PER DETAIL | | | |
| CA42 | | HOUSE | SUPPLY/INSTALL LITE TOUCH CONTROL SYSTEM (INCLUDES ELECTRIC) | $21,202.53 | | $21,202.53 |
| CA43 | | HOUSE | SUPPLY/INSTALL A PAIR OF SPEAKER WIRING WITH VOL CONTROL WIRING IN (10) LOCATIONS | $4,250.72 | | $4,250.72 |
| CA44 | LOW VOLT ELECTRIC | | MULTI MEDIA THEATRE BY HOME SYSTEM CONTROL | $39,488.15 | | $39,488.15 |
| | | | DBL DUPLEX OUTLET FOR EQUIPMENT | $114.75 | | $114.75 |
| | | | SUPPLY & INSTALL (4) HALO H-2926T STEP LIGHTS PER SKETCH | $848.60 | | $848.60 |
| | INSULATION SHELL | | ADD'L R-11 INSULATION FOR SOUND | $1,347.30 | | $1,347.30 |
| | | | BUILD STAGE STRUCTURE | $4,907.64 | | $4,907.64 |
| CA45 | LOW VOLT | HOUSE | SUPPLY/INSTALL (10) PAIRS OF ELAN SPEAKERS WITH NILES VC | $5,965.36 | | $5,965.36 |
| | | | (PREWIRE PREVIOUSLY ACCOUNTED FOR IN CA08) | | | |
| CA46 | CABINET | | CUSTOM BOOK CASE AND TV CABINET | $19,900.00 | | $19,900.00 |
| | | | | $529,080.43 | $116,574.74 | $387,505.69 |

PAGE 5

01/28/2005

02:08:06 PM

## LIMITED WARRANTY

1.  The undersigned, hereinafter referred to as the "Developer", warrants that for a period of one year form the date of closing of title your home will be free from defects due to noncompliance with the Construction Standards attached to this Warranty.

2.  The Developer warrants that for a period of five (5) years from the issuance of a Certificate of Occupancy for your unit:

    a.  Your unit will be free from major structural defects. A major structural defect is actual physical damage to the following load-bearing portions which affect their load-bearing functions to the extent that the home becomes unsafe, unsanitary or otherwise unlivable:  a) foundation systems and footings; b) beams; c) girders; d) lintels; e) columns; f) walls and partitions; g) floor systems; and h) roof framing systems.  Repair of a major structural defect is limited to (i) the repair of damage to the load-bearing elements, and (ii) the repair of those items in your home damaged by the major structural defect which make the home unsafe, unsanitary or otherwise unlivable.

3.  The Developer warrants that for a period of two (2) years from the issuance of a Certificate of Occupancy for your unit:

    a.  The electrical, plumbing, heating, cooling and ventilating systems of your home, exclusive of appliances, fixtures or items of equipment, will be free from defects due to non-compliance with the Construction Standards attached to this Warranty.

4.  In connection with appliances or electrical equipment, the Developer provides manufacturers' warranties which are delivered to you at closing of title.

5.  The following are not covered by this Warranty:

    a.  Defects in common area swimming pools and other recreational facilities; driveways; walkways; fences; landscaping (including sodding, seeding, shrubs, trees, and plantings); off-site improvements, or any other improvements not a part of the home itself.

Ex II

(2)

**b.** Damage to any property which is not included in the purchase price of the unit.

**c.** Any damage to the extent it is caused ~~or made worse~~ *WW* by:

    (1) Negligence, improper operation by anyone other than the Developer or its employees, agents, or subcontractors; or

    (2) Failure of anyone other than the Developer or its employees, agents or subcontractor to comply with the warranty requirements of the manufacturers of the appliances, equipment or fixtures; or

    (3) Your failure to give notice to the Developer of any defects within a reasonable time; or

    (4) Changes of the grading of the ground by anyone other than the Developer, its employees, agents, or subcontractors; or

    (5) Dampness or condensation due to your failure to maintain adequate ventilation.

**d.** Any loss or damage which you have not taken timely action to minimize.

**e.** Any defect in, or caused by, materials or work supplied by anyone other than the Developer or its employees, agents, or subcontractors.

**f.** Normal wear and tear or normal deterioration.

**g.** This Warranty expressly excludes from its coverage any liability on the part of the Developer whatsoever for items, be they decorative, structural or otherwise, that are installed by the Owner after the closing.

**h.** Loss or damage resulting from accidents, riot and civil commotion, fire, explosion, smoke, water escape, falling objects, aircraft, vehicles, Acts of God, lightning, windstorm, hail, flood, mudslide, earthquake, wind driven water, and changes in the level of the underground water table which are not reasonably foreseeable.

**i.** Any damage caused by soil movement for which compensation is provided by legislation or which is covered by other insurance.

(3)

j.   Insect damage.

k.   Any loss or damage which arises while the home is being
used primarily for nonresidential purposes.

l.   Any condition which does not result in actual physical
damage to the home.

m.   Bodily injury.

n.   Damage to personal property located in your home and
items not installed by the Developer.  Homeowners are
advised to maintain insurance to cover such damages.

o.   Replacement or repair of wall, floor covering or other
personal property installed by owner after closing that
may be damaged by the repairing of cracks, nail pops
and similar work done under this Warranty.

p.   Consequential damages.

6.   Implied warranties, including but not limited to warranties
of merchantability, fitness for a particular purpose, and
habitability, are limited to the warranty periods set forth
above.

7.   If a defect appears which  you think is covered by this
Warranty, you must notify us, in writing, at the address set
forth below, of any defect in any item covered by this
Warranty no later than 30 days after the Warranty period on
that item expires.

8.   Upon receipt of notice from you, if the defective item is
covered by this Warranty, we will repair, replace or pay you
the reasonable cost of repairing or replacing the defective
item; however, we will not pay you in total more than the
purchase price of your home.  It is our choice whether to
repair, replace or pay.

(4)

9. This Warranty is extended to you as the first purchase of your home. It is ~~not~~ transferable.

DEVELOPER:

VINTAGE PROPERTIES V, LTD.,
a Florida limited partnership

Address:  5752 Vintage Oaks Circle
Delray Beach, Florida  33484

By:_____

Title:_____

Dated:_____, 19___

## CONSTRUCTION STANDARDS
### Workmanship and Materials:  First Year Only

### Site Grading and Drainage

Settling of ground around foundation walls, utility trenches or
other filled areas shall not interfere with water drainage away
from the home.  The Developer will fill settled areas affecting
proper drainage at owner's request once during the warranty
period.  Owner shall be responsible for removal and replacement
of landscaping not installed by the Developer or its
subcontractors affected by the fill.

The builder shall establish the necessary grades and swales to
insure proper drainage away from the home.  Standing or ponding
water shall not remain for extended periods in the immediate area
of the house after a rain (generally no more than 24 hours),
except in swales which drain other areas, or in areas where some
pumps discharge, a longer period can be anticipated (generally no
more than 48 hours).  The possibility of standing water after an
unusually heavy rainfall should be anticipated by the owner.  No
grading determination shall be made while the ground is
saturated.

### Concrete

Cracks in garage slabs in excess of 1/4 inch in width or 1/4 inch
in vertical displacement shall be repaired.

Except where a floor or portion of floor has been designed for
specific drainage purposes, concrete floors in rooms designed for
habitability shall not have pits, depressions or areas of
unevenness exceeding 1/4 inch in 32 inches.

Cracks in concrete slab-on-grade floors which rupture the
finished flooring material shall be repaired.

Concrete surfaces shall not pit, scale or spall to the extent
that the aggregate is exposed and loosened under normal
conditions of weathering and use.  The Developer will take
whatever corrective action is necessary to repair defective
concrete surfaces.  The Developer is not responsible for
deterioration caused by salt, chemicals, mechanical implements
and other factors beyond its control.

Stoops, steps, or garage floors shall not settle, heave or
separate in excess of one inch from the house structure.  Water
should drain from outdoor stoops and steps.  The possibility of
minor water standing on stoops for a short period after rain can
be anticipated.

(2)

## Roofing

The Developer shall repair any and all leaks to the roof, skylights and plumbing vents during the term of this Warranty. Under no circumstances shall the Developer be responsible for consequential damages resulting from such leaks, as for example, damage done to Owner's personal possessions, furniture, wallpaper and carpet.  The Owner is responsible for these damages and should purchase the proper amount of homeowner's insurance to insure against damage of said items.  Developer, however, will reimburse the Owner for the deductible amount on any such homeowner's insurance up to the amount of $250.00

## Masonry

Small cracks not affecting structural stability are not unusual in mortar joints of masonry foundation walls.  Cracks greater than 1/8 inch in width shall be repaired by painting or patching.

Small hairline cracks due to shrinkage and settlement are common in mortar joints in masonry construction.  Cracks greater than 3/8 inch width shall be repaired by painting or patching.  The Developer shall not be responsible for color variation between old and new mortar.

## Wood and Plastic

Floor squeaks and loose subfloor are often temporary conditions common to new home construction and a squeak-proof floor cannot be guaranteed.  The Developer will correct the problem only if it is caused by an underlying construction defect.

Wood floors shall not have more than 1/4 inch ridge or depression within any 32 inch measurement when measured parallel to the joists.  Allowable floor and ceiling joist deflections are governed by the applicable building code.

All interior and exterior walls have slight variances on their finished surfaces.  Bowing of walls should not detract from or blemish the walls' finished surface.  Walls bowing more than 1/4 inch out of line within any 32 inch horizontal or vertical measurement will be repaired.  Square and round drywall edges both horizontal and vertical may exceed this standard.  It is normal for an edge to "flair" from the flat surface adjacent to it due to the finish requirements of the edges.

Walls more than 1/4 inch out of plumb for any 32 inch vertical measurement will be repaired.

(3)

Joints in moldings or joints between moldings and adjacent surface which result in open joints exceeding 1/8 inch in width shall be repaired. Caulking is acceptable.

Joints between exterior trim elements, including siding and masonry, shall not result in open joints in excess of 3/8 inch. In all cases the exterior trim, masonry and siding shall be capable of performing its function to exclude the elements. The Developer will repair such open joints. Caulking is acceptable.

### Thermal and Moisture Protection

Insulation shall be installed in accordance with applicable energy and building code requirements.

Roof or flashing shall not leak under normally anticipated conditions. The Developer will repair any verified roof or flashing leaks not caused by owner's actions or negligence.

Water shall drain from flat roofs except for minor ponding following rainfall or when the roof is specially designed for water retention. The Developer will take corrective action to assure proper drainage of roof.

All siding shall be installed according to the manufacturer's and industry's standards. Separations and delaminations shall be repaired or replaced. Repaired area may not match the color of the original surface.

Gutters and downspouts shall not leak, but gutters may overflow during heavy rain. The Developer shall repair leaks.

Cracks in gypsum wallboard exceeding 1/8 inch in width shall be repaired once during the warranty period.

The Developer will replace cracked ceramic tiles and marble and re-secure loose tiles unless defects were caused by owner's action or negligence. The Developer will not be responsible for discontinued patterns or color variations in marble or ceramic tile.

Cracks in grouting of ceramic tile joints are commonly due to normal shrinking conditions. The Developer will repair grouting on floors or walls, if necessary, once during the warranty period. The Developer will not be responsible for color variations or discontinued color grout.

(4)

Cracks between floorboards in excess of 1/8 inch in width shall be corrected by filling or replacing at the Developer's option.

Nail pops which have broken the surface of resilient flooring will be corrected. The Developer, at its option, will repair or replace resilient floor covering in the affected area with similar material. The Developer, at its option, will repair or replace the affected resilient floor covering as required. The Developer will not be responsible for discontinued patterns or color variation of floor covering or for problems caused by owner's neglect or abuse.

Gaps shall not exceed 1/10 inch width in resilient floor covering joints. Where dissimilar materials abut, a gap not to exceed 1/8 inch is permissible. The Developer, at its option, will repair or replace the affected resilient floor as required. The Developer will not be responsible for discontinued patterns or color variation of floor covering, or for problems caused by owner's neglect or abuse.

Exterior paints or stains shall perform in accordance with the manufacturer's specifications during the warranty period. However, fading is normal, and the degree is dependent on climatic conditions. If paint or stain is defective, the Developer will properly prepare and refinish affected areas, matching color as closely as possible. Where finish deterioration affects the majority of the wall area, the whole area will be refinished.

Repairs to painting required under this Warranty shall be finished to match surrounding areas as closely as possible.

Small amounts of water may stand in gutters immediately after a rain. If the gutter is unobstructed by debris and the water level exceeds one inch in depth, the Developer will correct the drainage problem.

Joints and cracks in exterior wall surfaces and around openings shall be properly caulked to exclude the entry of water. The Developer will repair and/or caulk joints or cracks in exterior wall surfaces once during the warranty period.

(5)

**Doors and Windows**

Exterior doors will warp to some degree due to temperature
differential on inside and outside surfaces.  However, they shall
not warp to the extent that they become inoperable or cease to be
weather resistant or exceed 1/4 inch, measured diagonally from
corner to corner.  The Developer will correct or replace and
refinish defective doors during the warranty period.

Interior doors (full openings) shall not warp in excess of 1/4
inch, measured diagonally from corner to corner.  The Developer
will correct or replace and refinish doors to match existing
doors as nearly as possible during the warranty period.

Split panels on the inside of the exterior door shall not allow
light to be visible through the door.  If light is visible, the
Developer will fill split and match paint or stain as closely as
possible once during the first year warranty period.

Garage doors shall operate properly.  The Developer will correct
or adjust garage doors as required, unless it determines that the
defect results from owner's actions or negligence.

Garage doors shall be installed as recommended by the
manufacturer.  Some entrance of the elements can be expected
under abnormal conditions.  The Developer will adjust or correct
garage doors to meet manufacturer's recommendations.

Windows shall operate with reasonable ease as designed.  The
Developer will correct or repair any defective windows as
required.

Windows will collect condensation on interior surfaces when
extreme temperature differences and high humidity levels are
present.  If directly attributed to faulty installation by the
Developer, the Developer will correct or repair such windows as
required.

Some infiltration of air is normally noticeable around doors and
windows, especially during high winds.  Poorly fitted
weatherstripping shall be adjusted or replaced by the Developer.
It may be necessary for the owner to have storm doors and windows
installed to provide satisfactory solutions in high wind areas.

(6)

**Finishes**

Cracks in interior walls, floors and surfaces greater than 1/8 inch in width shall be repaired once during the warranty. In no event shall the developer be responsible for and subsequently does not warrant or guarantee the matching of paint colors, tile, marble, grout, or wallpaper (if builder installed) in connection with such repair.

Natural finishes on interior woodwork shall not deteriorate during the first year of ownership. However, varnish type finishes used on the exterior will deteriorate rapidly and are not covered by this Warranty. The Developer will retouch affected areas of natural finish interior woodwork matching the color as closely as possible.

Developer will correct visible gaps in carpet seams. Seams will be visible in all carpet types. Some types of carpet will have visible "pocketing" of the seams.

Wall to wall carpeting installed as the primary floor covering, when stretched and secured properly, shall not come up, become loose, or separate from its point of attachment during normal use. The Developer will re-stretch or re-secure carpeting it installed as needed.

Cracks are not unusual in exterior stucco wall surfaces. Cracks greater than 1/8 inch in width shall be repaired once during the warranty period.

**Equipment**

Countertops fabricated with high pressure laminate covering shall not delaminate. The Developer will replace delaminated coverings to meet specified criteria.

Warpage of kitchen cabinets shall not exceed 1/4 inch as measured from face frame to point of furthermost warpage with door or drawer front in closed position. The Developer will correct or replace doors or drawer fronts.

Gaps between cabinets, ceilings or walls shall not exceed 1/4 inch in width.

(7)

## Mechanical

Any valve or faucet leaking as a result of defects in material or workmanship will be repaired or replaced by the Developer. Any defective plumbing fixture or fitting which does not comply with its manufacturer's standards will be repaired or replaced by the Developer.

There will be some noise emitting from the water pipe system due to the flow of water. However, the developer will make corrections to eliminate water hammer.

The heating system shall be capable of producing an inside temperature of 70 degrees Fahrenheit, as measured in the center of each room at a height of 5 feet above the floor, under local outdoor winter design conditions, as specified in applicable federal, state or local energy codes.

The cooling system shall be capable of maintaining a temperature of 78 degrees Fahrenheit as measured in the center of each room at a height of 5 feet above the floor, under local outdoor summer design conditions, as specified in ASHRAE handbook. In the case of outside temperatures exceeding 95 degrees Fahrenheit, a differential of 15 degrees Fahrenheit from the outside temperature will be maintained. Federal, state or local energy codes shall supersede this standard where such standards have been locally adopted.

## Electrical

Fuses and circuit breakers (excluding ground fault interrupters) shall not activate under normal usage. The Developer will correct wiring circuitry not conforming to applicable electrical code requirements.

All switches, fixtures and outlets shall operate as intended. The Developer will repair or replace defective switches, fixtures and outlets.

Ground fault interrupters can be tripped very easily. Tripping is not covered unless due to a construction defect.



(8)

## Security System

It is understood and agreed that Developer is not an insurer of the person or property and the Developer makes no guarantee or warranty, including any implied warranty of merchantability or fitness that the equipment supplied will avert or prevent occurrences or the consequences therefrom which the system is designed to detect or avert.

## Systems - First and Second Year

All on-site service connections to municipal water main and private water supply shall be the Developer's responsibility. Private systems shall be designed and installed in accordance with all approved building, plumbing, and health codes.  If the water supply systems fail to deliver water, the Developer will repair same only if the failure is the result of its defective workmanship or materials.

No leaks of any kind shall exist in any soil, waste, vent or water pipe.  The Developer will make repairs to eliminate leakage.  Condensation on piping does not constitute leakage and is not covered.  If a problem occurs as a result of defective construction, the Developer will repair.

Sewers, fixtures and drains shall operate properly.  If a problem occurs as a result of defective construction, the Developer will repair the affected sewers, fixtures or drains.

Refrigerant lines shall not develop leaks during normal operation.  The Developer will repair leaking refrigerant lines and re-charge unit unless damage was caused by owner.

Duct work shall remain intact and securely fastened.  The Developer will re-attach and re-secure all separated or unattached ductwork.

Wiring should be capable of carrying the designed load for normal residential use.  The Developer will repair wiring not conforming to applicable code specifications.

*Ok per
Line 4/26*

## 3rd ADDENDUM TO VILLA FLORA PURCHASE AND SALE AGREEMENT
### Between
Promenade Developers. LTD., a Florida limited partnership, as Seller Manley Feinberg
and Dianne Feinberg, as Buyers Dated 2-2-05
Property: Lot 13, Villa Flora

The following terms and provisions shall be made a part of the above-described Purchase
and Sale Agreement (the "Agreement").

1. Seller shall deliver the Property free of any liens. Purchase and Seller
recognize that the deposit in the amount of $600,000 is being held in an
Escrow account, which shall be released at the closing of the Property. Seller
shall "bond off" any mechanics liens which, may occur during the
construction of the home, which in the aggregate exceed $300,000. In the
event there are any liens on the property at the time of closing, Purchaser may
use all or part of the deposit being held in escrow to pay off such liens,
however, prior to such payoff Purchaser shall give Seller the option to bond
off any such liens at Sellers' expense.

2 The exterior of units 12+13 shall not be pink

IN WITNESS WHEREOF, the parties hereunder set their hands and seal this 3rd
day of February 2005.

BUYER(S):

Manley Feinberg

Dianne Feinberg

SELLER:
PROMENADE DEVELOPS, LTD.,

By: _____
     Authorized Signatory

**IN WITNESS WHEREOF,** the parties have hereunder set their hands and seals this _____ day of _____ *Feb* _____ , 2005.

**BUYER(S):**

_____
Manley Feinberg

_____
Dianne Feinberg

**SELLER:**
PROMENADE DEVELOPERS, LTD.,
a Florida limited partnership

By: _____
    Authorized Signatory

3

MIA2001 386589v1

# EXHIBIT B

Plaintiff Profile Form – Residential Properties

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | For Internal Use Only |
|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | SECTION: L |
| THIS DOCUMENT RELATES TO: ALL CASES | JUDGE FALLON |
| | MAG. JUDGE WILKINSON |

For Internal Use Only
File Number _____
Date Received _____

This Plaintiff Profile Form must be completed and signed by every person making a claim in this litigation using one form per affected address. In completing this Profile Form, you are under oath and must provide information that is true and correct to the best of your knowledge. If you cannot recall all of the details requested, please provide as much information as you can and expressly indicate "unknown" in the space provided when not known. You must supplement your responses if you learn they are incomplete or incorrect in any material respect. You may and should consult with your attorney if you have any questions regarding completion of this form. If you are completing the form for someone who has died or who cannot complete the Profile Form, please answer as completely as you can for that person.

The questions and requests for production contained within this Profile Form are non-objectionable and shall be answered without objection. By answering this Profile Form, you are not waiving the attorney work product and/or attorney client privileges. Similarly, by disclosing the identity of consultants, such consultants may remain non-testifying experts and are subject to all protections afforded by law.

To the extent that the form does not provide enough space to complete your responses, you may attach as many sheets of paper as necessary. All photographs produced in response to this form shall be in color and attached to or printed on 8 1/2" x 11" white paper.

## Section I. Property Information

Name Property Owner: Manley & Dianne Feinberg

Address of Affected Property: 1514 Island Blvd
Aventura, FL 33160

Is this Property: ☑ Residential  ☐ Commercial  ☐ Governmental

Name of Person Completing this Form: Manley Feinberg

Is above your primary residence? ☑ Yes  ☐ No

Mailing Address (if different):

Phone: ( )

* If your response is commercial or governmental you should not fill out the remaining questions, you will receive a follow up form at a later date.

Circle one: ☑ Owner-Occupant  ☐ Owner Only  ☐ Renter-Occupant

Represented By: Greg Weiss – Leopold Kuvin

Address: 2925 PGA Blvd
Suite 200
Palm Beach Gardens, FL 33410

Phone: (561) 515-1400

Case No. /Docket Info: 09-5628

## Section II. Insurance Information

Homeowner / Renter Insurer: Manley & Dianne Feinberg

Policy #: PCG 00004788554

Agent: Atlass Insurance Group

Address: 1300 SE 17th Street
Suite 220
Ft Lauderdale FL 33316

Phone: 954 525-0582

+ Attach Copy of Insurance Declaration Page ✓

## Section III. Claimant Information

| Name of Claimant | Dates Occupied Move-In | Dates Occupied Leave | Gender | Date of Birth | Are you claiming personal injuries? Circle One | Identify Claimant Status as an Owner Occupant, an Owner Only, or an Occupant or Renter Only |
|---|---|---|---|---|---|---|
| Manley Feinberg | 1/15/07 | 10/4/09 | M | 5/16/55 | ☐ Yes ☑ No | Owner-Occupant |
| Dianne Feinberg | 1/15/07 | 10/4/09 | F | 9/28/40 | ☐ Yes ☑ No | Owner-Occupant |
| | / / | / / | M / F | / / | ☐ Yes ☐ No | |
| | / / | / / | M / F | / / | ☐ Yes ☐ No | |
| | / / | / / | M / F | / / | ☐ Yes ☐ No | |
| | / / | / / | M / F | / / | ☐ Yes ☐ No | |
| | / / | / / | M / F | / / | ☐ Yes ☐ No | |
| | / / | / / | M / F | / / | ☐ Yes ☐ No | |
| | / / | / / | M / F | / / | ☐ Yes ☐ No | |

* Personal injuries include claims for mental anguish and medical monitoring.

Feinberg000001

Plaintiff Profile Form - Residential Properties

## Section IV. Inspection Information

1.0. Have you, or has anyone on your behalf, conducted an inspection into whether Chinese-manufactured drywall is present in your home?  ● Yes   No ○

1.1. If "Yes" to Question 1.0 Section IV. Who conducted the inspection? *Engineering Systems Inc*

1.2. When did the inspection take place? 8 13 09

2.0. Has a determination been made that Chinese-manufactured drywall is present in your home?  ● Yes   No ○

2.1. If "Yes" to Question 2.0. Section IV. Who made this determination? *Gypsum Construction Consulting*

2.2. When was this determination made? 8 12 2009

## Section V. Drywall Information

| Drywall Manufacturer | Markings on Drywall | Location in Home |
|---|---|---|
| Knauf | Knauf — China | Attic - Walls |
| | | |
| | | |

## Section VI. Home Information

| | | | Yes | No |
|---|---|---|---|---|
| Approx. Sq. Ft. of House: | 6,800 | | | |
| Estimated Sq. Ft. of Drywall: | 27,300 | Occupied | ✓ | |
| Height of Interior Walls | 10.5 | Year-round | | |
| Number of Bedrooms: | 4 | Summer | | |
| Number of Bathrooms: | 4½ | Winter | | |

### Plumbing System

| | Blackening or Corrosion? | | |
|---|---|---|---|
| | Yes | No | N/A |
| PVC/ CPVC/ Plastic Piping | | | ✓ |
| Copper Piping | | | |
| Copper Fixtures | | | |
| Other Fixtures | ✓ | | |
| Were repairs made to the plumbing system? | Yes | | |
| Dates: Jan 09 + Aug 09 | | | |

### Electrical System

| | Blackening or Corrosion? | | |
|---|---|---|---|
| | Yes | No | N/A |
| Receptacles | ✓ | | |
| Switches | ✓ | | |
| Main Panel | ✓ | | |
| 2nd Panel | ✓ | | |
| Exposed Copper Wires | ✓ | | |
| Were repairs made to the electrical system? | | ✓ | |
| Dates: | | | |

+ Attach Copy of Floor Plan on 8 1/2" X 11" paper ✓

## Section VII. Construction/Renovation Information

### Date Range for New Home Construction: (Month/Day/Year)

| | |
|---|---|
| Start Date: 6 15 2005 | Completion Date 1 15 2006 |
| Move In Date: 1 15 2007 | Date Acquired Home 12 10 2006 |

### Date Range for Renovations: (Month/Day/Year)

| | |
|---|---|
| Start Date: 12 15 2010 | Completion Date 12 15 2010 |
| Move In Date: 1 15 2011 | |

| Renovation(s) | Yes | No | N/A |
|---|---|---|---|
| First Floor: 1/2 Wall of drywall replaced | ■ | | |
| First Floor: Full Wall of drywall replaced | ■ | | |
| Second Floor: Any drywall replaced | ■ | | |

## Section VIII. Homebuilder/ General Contractor/ Developer Information

Homebuilder/ General Contractor/ Developer's Name:

*Promenade Developers*

Address: *2400 High Ridge Road Suite 102*
*Boynton Beach, FL 33426*

Phone: (   )   -

+ Attach Copy of Construction/Renovation Contract

+ Attach Copy of New Home Warranty Declaration

## Section IX. Drywall Installer

Drywall Installer's Name:

*Baystate Drywall Inc*

Address: *4851 SW 111 Terrace*
*Davie, FL 33328*

Phone: (   )   -

## Section X. Drywall Supplier

Drywall Supplier's Name:

*Banner Supply   Cemex Const*

Address: *1660 SW 9 Court   Materials FL*
*Pompano Beach FL   1501 Belvedere*
*33069   Rd Tax Dept*
*W Palm Beach*
*FL 33406*

Phone: (   )   -

Plaintiff Profile Form – Residential Properties

**Section XI. Verification of Plaintiff Profile Form**

I declare under penalty of perjury under the laws of the United States of America and pursuant to 28 U.S.C. § 1746 that all information provided in this Plaintiff Profile Form is true and correct to the best of my knowledge, and that I have supplied all of the documents requested in this declaration to the extent that such documents are in my possession, custody or control.

| _____ | _____ | _____ | _____ |
| Claimant's Signature | Date Signed | Claimant's Signature | Date Signed |

11-27-09

| _____ | _____ | _____ | _____ |
| Claimant's Signature | Date Signed | Claimant's Signature | Date Signed |

11/27/09

| _____ | _____ | _____ | _____ |
| Claimant's Signature | Date Signed | Claimant's Signature | Date Signed |

Page 9

Feinberg000003



**Private Client Group**
A division of AIU Holdings



**H O M E O W N E R S**

<u>American Home Assurance Co.</u>
(Name of issuing company)

Endorse          Effective: 12/07/2009

# Declarations Page

Your Declarations Page shows at a glance the coverage you have and your premium. Your Declarations Page is part of your policy. Please read your policy carefully, including your Declarations Page and any attached Endorsements, for a description of your coverage.

Policy Number:
PCG 0004788554

Name of Insured and Mailing Address:
Manley and Dianne Feinberg
1524 Island Blvd
Aventura, FL 33160

Policy Period: 12/07/2009 - 12/07/2010
At 12:01 A.M. standard time at your mailing address shown below

Agency Name, Address, Phone # & Code:
Atlass Insurance Group
1300 SE 17th Street
Suite 220
Fort Lauderdale, FL 33316

(954) 525-0582          0062681

### YOU WILL BE BILLED SEPARATELY FOR ANY PREMIUM DUE.

The kind of losses that are covered and any special limits or deductibles that apply, are explained in detail in your Policy. Summary of Coverage by Location:

**1524 Island Boulevard     Aventura, FL 33160**

| COVERAGE | PAYMENT BASIS | COVERAGE LIMIT |
|---|---|---|
| House | Extended Rebuilding Cost | $3,206,294 |
| Other Permanent Structures | Extended Rebuilding Cost | $509,349 |
| Contents | Replacement Cost | $1,273,376 |
| Loss of Use | | $961,888 |
| Liability | | $500,000 |
| Medical Payments | | $10,000 |
| Rebuilding to Code (Law and Ordinance - 30%) | | $961,888 |

| | |
|---|---|
| Citizens Property Insurance Corporation Emergency Assessment: | $111.23 |
| Florida Hurricane Catastrophe Fund Emergency Assessment: | $79.00 |
| Florida Insurance Guaranty Fund Assessment: | $72.30 |
| Emergency Management, Preparedness, and Assistance Trust Fund: | $2.00 |

Location Premium: $8,209.53

Deductible applied to this location:
Standard (All Other Perils):     $10,000

**Inflation Guard -** The amount of coverage of the house, contents and other permanent structures for the above location will be increased annually by 6.00% applied pro rata during the Policy Period.

| | |
|---|---|
| Total Citizens Emergency Assessment: | $111.23 |
| Total Florida Hurricane Catastrophe Fund Emergency Assessment: | $79.00 |
| Total Florida Insurance Guaranty Fund Assessment: | $72.30 |

Location Extension Schedule Premium:
Total Premium:     $8,209.53

Feinberg000004

0005-0000476-0008659

# SKETCH / AREA TABLE

| Site Address | 1524 | ISLAND BLVD  13 | | Parcel ID: | 28-2210-079-0024 | | |
|---|---|---|---|---|---|---|---|
| City | | | County  Miami Dade | | State  FL | | Zip  - |
| Owner Name  PROMENADE DEVELOPERS LTD | | | | | | Building ID | 1 |



Comments        @

| Code | Description | Year Of | %of Base | Unit Area | Effective Area | Heated Area | PctInc | Depreciated CAMA Value |
|---|---|---|---|---|---|---|---|---|
| BAS | Base Area 1st and 4t | 2006 | 100.00% | 1,865 | 1,865 | 1,865 | 0 | $512,875 |
| GRF | Garage, Finished | 2006 | 66.70% | 632 | 422 | 0 | 0 | $116,050 |
| BAI | Base Area 2nd and 3r | 2006 | 80.00% | 2,568 | 2,054 | 2,568 | 0 | $564,850 |
| BAI | Base Area 2nd and 3r | 2006 | 80.00% | 1,727 | 1,382 | 1,727 | 0 | $380,050 |
| OP2 | Porch 2nd Floor | 2006 | 40.00% | 273 | 109 | 0 | 0 | $29,975 |
| OPU | Porch, Inserted | 2006 | 50.00% | 273 | 136 | 0 | 0 | $37,400 |
| OPU | Porch, Inserted | 2006 | 50.00% | 81 | 40 | 0 | 0 | $11,000 |
| OP2 | Porch 2nd Floor | 2006 | 40.00% | 210 | 84 | 0 | 0 | $23,100 |
| XHT | Extra Hieght | 2006 | 100.00% | 270 | 270 | 270 | 0 | $74,250 |

Feinberg000005

Lot Number: #13
Buyer: Feinberg
Date of Agreement: February 7, 2005

Model: Custom Design see exhibit "B"

## VILLA FLORA

## PURCHASE AND SALE AGREEMENT

    THIS AGREEMENT is made by and between PROMENADE DEVELOPERS, LTD., a Florida limited partnership ("Seller"), and the Buyer(s) named below (collectively, "Buyer"):

Buyer(s): Manley Feinberg and Dianne Feinberg His Wife _____

Residence Address: 6802 Dartmoor Drive _____

City: Louisville _____  State: KY _____  Zip Code: 40222

Cellular Telephone: 954-895-0069 _____
Telefax Number: 954-937-0377 _____  Satellite Telephone: 011-874-762-944-636
Cruising E-Mail: MYfontche@skymate.com _____  Social Security No.(s): _____

NAME, ADDRESS, TELEPHONE NUMBER AND TELEFAX NUMBER WHERE BUYER'S NOTICES ARE TO BE MAILED, PHONED OR TELEFAXED, IF DIFFERENT FROM ABOVE.

Name: _____

Street Address: _____

City: _____  State: _____  Zip Code: _____

Telephone: _____  Telefax No.: _____

Anticipated Date of Completion: _____  See paragraph 5 of this Agreement.

Escrow Agent: Steel Hector & Davis LLP

1.    **DESCRIPTION OF PROPERTY.** Seller agrees to sell to Buyer, on terms contained in this Agreement, Lot #13, as shown on the proposed site plan attached hereto as Exhibit "A" and incorporated herein, together with the townhome residence to be constructed thereon; and together with all appurtenances thereto. The above-described Lot and improvements thereon are referred to in this Agreement as the "Property". The Property is located within that certain development known as Villa Flora ("Development") located on Williams Island, Aventura, Miami-Dade County, Florida.

2.    **PURCHASE PRICE.** The purchase price ("Purchase Price") for the Property, exclusive of any closing costs described in this Agreement, and subject to adjustment under Payment Option 2, shall be as follows:

| | | |
|---|---|---|
| Purchase Price | | $3,089,900 |
| | | |
| Lot Price | $ 900,000 | |
| Home Price | $ 2,189,900 | |

The Purchase Price shall be payable as follows:

| | | | |
|---|---|---|---|
| a. | Lot Reservation Deposit (previously received) | $ 0 | |
| b. | Deposit (Received this date) to be held by Escrow Agent; Steel Hector & Davis LLP, Until Closing of Home | $ 600,000 | |
| c. | Additional deposit due upon Receipt of the building permit (not to be held in escrow) | $ 300,000 | |
| d. | Balance of Purchase Price | $ 2,189,900 | |
| **TOTAL** | | $ 3,089,900 | $ 3,089,900 |

The Balance of Purchase Price (Item d. above) ("Balance of Purchase Price") shall be payable in accordance with Payment Option 1 or Payment Option 2, at Purchaser's election drawn upon a bank located in the United States.

    Purchaser hereby selects Payment Option 1 _____ or Payment Option 2 _____ below: (Check one)

MIA2001 160383v10

Feinberg000006

**Payment Option 1: Progress Payments**

The Balance of Purchase Price shall be payable in six (6) progress payments. Each progress payment shall be an amount equal to 16.67% of the Balance of Purchase Price and shall be paid as follows:

| | | |
|---|---|---|
| a. | Completion of floor slab | $ 364,983 |
| b. | Block walls up; tie beam poured | $ 364,983 |
| c. | Roof dry-in; interior partitions installed | $ 364,983 |
| d. | Interior drywall taped and stucco finish coat applied; windows installed | $ 364,983 |
| e. | Cabinets and trim complete; Pool, tile and coping complete; patios and driveway complete | $ 364,983 |
| f. | Balance due at closing | $ 364,985 |

Respecting Payment Option 1, Seller shall notify Buyer upon completion of each stage of construction outlined above. Buyer shall make each payment, in full and in clear U.S. funds, within five (5) banking days from the date of Seller's notice. If Buyer fails to tender the payment as required by this paragraph, then Buyer shall be deemed to be in default of this Agreement and Seller may pursue any and all remedies Seller may have under this Agreement. If Seller elects to accept any such payment at a later date, Buyer shall pay to Seller, together with the additional deposit, a sum equal to interest at the highest lawful rate on the amount of the additional deposit from the date such payment was due to Seller to the date such payment was made to Seller.

**Payment Option 2: Balance of the Purchase Price at Closing**

The Balance of the Purchase Price shall be payable at closing. Buyer hereby acknowledges and agrees that Seller may obtain a mortgage loan to finance the construction of the improvements on the Property. In such case, the payment due at closing shall include a charge equal to five percent (5%) of the Balance of Purchase Price (Page 1, Paragraph 2, Item d.) to reimburse Seller for all costs incurred by Seller in connection with such mortgage loan.

Respecting Payment Option 1 and Payment Option 2, all deposits and progress payments shall be made in U.S. funds either in cash or by check drawn upon a bank located in the United States, subject to collection. All payments due at closing shall be paid by wire transfer to Escrow Agent's trust account one (1) day prior to closing.

3.   **DEPOSITS AND PAYMENTS.**

    a.   State law requires that the following statement be disclosed to buyers of residential units:

        THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT SHALL PLACE DEPOSIT FUNDS (UP TO TEN PERCENT OF THE PURCHASE PRICE) IN AN INTEREST BEARING ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER.

    b.   Seller can use all deposits in excess of ten percent (10%) of the purchase price prior to closing and the Escrow Agent is authorized to pay those deposits to Seller upon request by Seller.

    c.   As to Payment Option 1, payments made thereunder shall be used from time to time to pay construction costs. By electing Payment Option 1, Buyer hereby waives the escrow requirement set forth in Paragraph 3a. above and authorizes the use of such payments for construction costs.

[    ]
Initials

    d.   As to payment Option 2, if Buyer does not waive the escrow requirement in writing, Buyer's deposits up to ten percent (10%) of the Purchase Price shall be placed in escrow with Escrow Agent, and will be held and disbursed pursuant to Florida Statutes 501.1375. Buyer acknowledges that if Buyer does not waive the escrow requirement, interest accruing on the escrow account shall be paid to Seller at closing, and Buyer shall receive no credit for the accrued interest against the Purchase Price, except as stated below. In the event Buyer elects to have deposit funds held in escrow, Seller has two (2) options, as follows:

        i.   Seller may borrow money in an amount equal to the funds held in escrow for construction purposes only (in addition to the amount of the construction mortgage shown above), in

which case any interest and costs incurred in connection with such loan, for a period not to exceed twelve (12) months, shall be paid by Buyer at closing, less any interest accrued on the escrow account, or

ii.    Seller may use the funds for building purposes following notification to Buyer and obtain a surety bond payable to Buyer in the amount of such funds. In such event, Buyer shall be charged at closing an amount equal to the premium for that portion of the bond securing Buyer's deposit.

Buyer hereby elects the alternative initialed below.

i.    To waive the right to require that deposit funds be deposited in an interest-bearing escrow account. In waiving this right, it is understood that Buyer will not be responsible for the cost referred to in paragraph 3d. (i) or (ii) above and that Seller shall have the right to use the full amount of Buyer's deposit for construction purposes.

[ X ]
Initials

ii.    To have deposit funds (up to ten percent [10%] of the Purchase Price) deposited in an interest-bearing escrow account. It is understood that Buyer will be responsible for the cost referred to in Paragraph 3d. (i) or (ii) above.

[ _____ ]
Initials

e.    Deposits which Buyer requires to be escrowed shall be held in escrow by Steel Hector & Davis LLP, Trust Account ("Escrow Agent"), which maintains a place of business located at 200 South Biscayne Boulevard, Ste. 4000, Miami, Florida 33131, in accordance with an Escrow Agreement ("Escrow Agreement") between Seller and Escrow Agent. The initial deposit and any additional deposit monies up to ten percent (10%) of the purchase price of the Property shall be held in an account together with payments of other purchasers of other properties in the Development. Monies held by Escrow Agent may be deposited in savings or time deposit accounts at a bank or savings and loan association insured by an agency of the United States Government or in securities of the United States Government or any agency thereof. Interest earned on said deposits shall be paid to the Seller, except in the event of Seller's default or as set forth in Paragraph 3d.(i) above. Notwithstanding the foregoing, payments for Extras shall not be escrowed but shall be paid to Seller.

f.    By signing this Agreement, Buyer expressly authorizes Escrow Agent to disburse Buyer's payments in accordance with the terms of the Escrow Agreement described above and to make final disbursements to Seller at closing, or sooner if Buyer is in default hereunder as provided in Paragraph 12 below. Buyer agrees to indemnify and hold Escrow Agent harmless from any claim or damages which may result from any escrow or disbursement of any of Buyer's payments pursuant to the Escrow Agreement described above, other than those claims or damages resulting from gross negligence or willful malfeasance.

4.    **SELLER FINANCING.** Buyer agrees that any lender advancing construction funds will have a first mortgage on the Property until closing. At that time, Seller may use all or a portion of the closing proceeds to release the Property from the lien of such mortgage. Buyer acknowledges that Seller may borrow construction money from lenders to construct the improvements on the Property. This Agreement and the deposits will not give any lien or claim against the Property and Buyer's rights hereunder will be subordinate to those of any lender holding a mortgage, whether or not such a mortgage secures the advancement of construction funds, even if such mortgage is placed on the Property after the date of this Agreement.

5.    **COMPLETION DATE.** Buyer understands that the Anticipated Date of Completion is an estimate of the completion date and does not constitute a representation or warranty by Seller. Seller will not be obligated to compensate Buyer for any expense or inconvenience which may be caused by Seller's failure to meet the Anticipated Date of Completion. Although Seller anticipates that the Anticipated Date of Completion will occur on the date set forth on page 1, pursuant to 15 USC § 1702, Seller unconditionally agrees that the Property will be completed and conveyed to Buyer not later than two (2) years after the date of this Agreement, subject, however, to delays caused by matters which are legally recognized as defenses to contract actions in the jurisdiction where the improvements are being erected.

6.    **CONSTRUCTION SPECIFICATIONS.**

a.    The materials, equipment and fixtures included in and to be used in constructing the Property will be substantially the same as those described in the floor plans and specifications attached hereto as Exhibits "B" and "C", respectively, and incorporated by reference herein. Buyer understands that floor plan dimensions are approximate and that there may be slight variations and modifications in these dimensions. Buyer further understands that any references to square footage under air conditioning are calculated based upon measurements from the external or outer perimetrical boundaries, that is, from the outside wall or partition enclosing such area(s). Buyer further understands that during construction certain changes in the plans and specifications may be desirable, as determined by Seller or as required by governmental authorities, lending institutions or job conditions, and by signing this Agreement Buyer authorizes such changes. Such changes may include, but are not limited to, minor

changes in the building location and orientation, the building's external configuration, its structural components, its finishes, the landscaping associated therewith, and changes in, additions to, or omissions of construction details. In addition, due to variation in sizes and shapes of lots in the Development, Buyer understands and agrees that Seller shall have the right to modify driveway, walkway, porch and/or patio plans as Seller deems necessary to conform to site conditions and/or Lot dimensions, and that certain lots may not accommodate particular pool and/or patio plans. Further, Buyer understands that the position of the side windows of the residence may be subject to modification depending upon the location of the residence. Buyer understands that Seller does not guarantee that room dimensions will be exactly as shown in the model, if any, or that the location of electrical outlets, wall switches, intercom speakers, built-in vacuum outlets and other similar items will be as located in the model and and Buyer shall not hold Seller responsible for such variations. Notwithstanding the above, Seller will not make any modification which materially reduces the floor size of the residence being placed on the Property. Buyer further understands and acknowledges that many of the homes to be constructed within the Development require floor plans which are mirror images ("flipped") of the model floor plan. Buyer acknowledges that Seller's agents and/or representatives have fully explained and reviewed all of the foregoing facts with Buyer.

        b.      Buyer further understands and agrees that certain of the finishing items, such as tile, carpet, cabinets, wood, paint, stain, and natural stone products are subject to size and color variations, grain and quality variations, and may vary in accordance with price, availability and changes by manufacturers from those shown in the model, if any, in illustrations or included in the specifications. Furthermore, if circumstances arise which, in Seller's opinion, warrant changes of suppliers, manufacturers, brand names or items, Seller reserves the right to substitute equipment, material, appliances, etc., which in Seller's opinion are considered equal or better, subject to their availability. Buyer also understands that Seller has the right to substitute or change materials and/or stain colors utilized in wood decor, if any. Buyer also understands that some of the model and/or common area landscaping may have been enhanced or planted at a more mature size than standard.

7.    **SELECTION OF EXTRAS**

        a.      Unless otherwise provided herein, all color selections and all selections of options, upgrades, modifications, and extras (collectively, the "Extras") must be made in writing within thirty (30) days of Seller's request therefor, which request may be by telephone, facsimile, mail or other reasonable means of communication. If Buyer fails to make such selections within said thirty (30) day period, Seller, at its sole discretion, may (i) make such selections on Buyer's behalf, and Seller's decision shall be binding on Buyer, or (ii) declare Buyer in default and exercise any and all remedies set forth in Paragraph 12 of this Agreement. In the event Seller does not exercise its rights under (i) or (ii) of the preceding sentence, the completion date and closing date for the Property shall be deemed automatically extended by the number of days which shall have elapsed following said thirty (30) day period through Buyer's completion of such written selections without any liability on the part of Seller therefor. Any selections made by Buyer after the thirty (30) day period shall not in any way obligate Seller, unless Seller agrees to same in writing. In the event Seller needs an earlier decision by Buyer in order to efficiently proceed with the planning and construction of the Property, Seller will give notice to Buyer and Buyer shall within ten (10) days make all such selections.

        b.      The price of all such Extras shall be due and payable to Seller in full at the time ordered. The sum of the Purchase Price set forth in Paragraph 2 above and the price of all Extras selected after execution of this Agreement shall equal the "Total Purchase Price." Extras ordered by Buyer shall not be subject to cancellation by Buyer, nor shall Buyer be entitled to a credit or refund therefore. If this Agreement is terminated, all sums paid by Buyer to Seller for Extras shall be non-refundable unless Seller has defaulted in the performance of this Agreement. Buyer acknowledges that Seller will incur expenses in providing the Extras regardless of Buyer's consummation of this Agreement.

        c.      Buyer acknowledges and understands that Seller's models contain extras which are not included in this Agreement. By executing this Agreement, Buyer acknowledges that Seller's agents and/or representatives have fully explained to Buyer's satisfaction which materials, equipment and fixtures are included in the Property.

        d.      Should Seller fail to provide any item of construction required to be provided, Buyer's sole remedy therefor will be to collect from Seller an amount equal to the greater of (i) Seller's cost for such item and for the installation thereof had such item been installed at the appropriate time during construction, or (ii) the amount specifically charged for such item if such item is an Extra, and there is a specific charge made for it.

8.    **INSPECTION PRIOR TO CLOSING.** Buyer will be given a reasonable opportunity to inspect the Property with Seller's representative prior to closing, and at that time Buyer will sign a "Customer Walk-through List" listing any defects in workmanship or materials which Buyer discovers. If any item listed is actually defective in workmanship or materials in Seller's opinion (keeping in mind the construction standards prevalent in Miami-Dade County for similar property), Seller will be obligated to correct those defects at Seller's cost within a reasonable period of time after closing, but Seller's obligation to correct shall not be grounds for deferring the closing, nor for imposing any condition on closing. No escrows or holdbacks of closing funds will be permitted.

9.    **CLOSING DATE.**

        a.      Buyer acknowledges and agrees that Seller has the right in its discretion to schedule the date, time and place for closing and that Buyer shall close on such date (the "Closing Date"). Buyer will be given at least ten (10) days' notice of the closing. Seller is authorized to postpone the closing at its discretion, in which event, Seller shall give Buyer at least three (3) days' notice of the new Closing Date. The issuance of a temporary Certificate of

Occupancy covering the Property by the proper governmental agency shall evidence that the Property is ready for delivery and shall be the sole condition of closing.

b.    If Seller agrees in writing to reschedule closing at Buyer's request, prorations shall be as of the original Closing Date and Buyer agrees to pay at closing interest at the highest lawful rate on the outstanding balance of the Total Purchase Price, from the original Closing Date to the date of the actual closing. Seller is not required to agree to reschedule closing.

c.    If Buyer fails to close on the Closing Date or any extension thereof to which Seller has agreed in writing, Buyer will be in default under this Agreement. Upon request of Buyer, Seller may permit closing by mail or through the use of overnight courier provided Buyer completes the closing by the Closing Date.

10.    **EVIDENCE OF TITLE AND CLOSING DOCUMENTS.**

a.    Title to the Property will be marketable, subject only to those matters hereinbelow set forth. Buyer will receive an owner's title insurance commitment at closing as proof that title is marketable.

b.    The owner's title insurance commitment shall be written on a Florida licensed title insurance company and issued by an agent of Seller's choosing, committing to insure the interest of Buyer in the amount of the Total Purchase Price. Seller shall cause a title insurance policy (the "Title Policy") to be issued subsequent to closing subject to those exceptions customarily contained in an ALTA Owner's Title Insurance Policy then being used by the title insurance company, and subject also to the following:

i.    Encroachments, overlaps, boundary line disputes, or other matters which would be disclosed by an accurate survey and inspection of the Property.

ii.    All applicable zoning ordinances and regulations.

iii.    Real estate taxes and assessments for the year of conveyance and subsequent years, which are not yet due and payable, including taxes and assessments of any applicable improvement or taxing district, and pending municipal liens.

iv.    Easements, restrictions and reservations common to the Development.

v.    Declaration of Protective Covenants, Restrictions, and Easements for Villa Flora and Rules created thereunder; all of the terms of the Articles of Incorporation and Bylaws of Villa Flora Homeowners' Association, Inc., and any amendments and supplements to the above instruments (collectively, the "Declaration" or "Community Documents").

vi.    Second Amended and Restated Declaration of Covenants, Restrictions and Easements recorded in Official Records Book 12103, Page 1723, and Rules created thereunder; all of the terms of the Articles of Incorporation and Bylaws of Williams Island Property Owners' Association, Inc., and any amendments and supplements to the above instruments (collectively the "Master Documents").

vii.    Any laws and restrictions, covenants, conditions, limitations, reservations, agreements or easements recorded in the Public Records or imposed by governmental authorities.

viii.    The general pre-printed exceptions contained in the Title Policy.

ix.    Acts done or suffered by the Buyer and any mortgage obtained by the Buyer for the purchase of the Property.

c.    Seller shall convey title to the Property to Buyer by Special Warranty Deed subject to the matters identified in paragraph 10b. The acceptance of the deed by Buyer shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to this Agreement, except those which are herein specifically deemed to survive the closing or which survive by operation of law.

d.    Seller shall deliver a Bill of Sale, if any furnishings are included in the Property.

e.    Seller shall deliver an Owner's Affidavit assuring that there are or will be no liens on the Property.

f.    If Seller cannot provide marketable title as described above, Seller will have a reasonable period of time (not to exceed ninety (90) days) from the date of the scheduled closing to correct any defects in title. If Seller cannot or elects not to correct the title defects, Seller shall so notify Buyer within five (5) days subsequent to such ninety (90) day period, and Buyer, within ten (10) days following the date of Seller's notice, may elect one of the following options:

i.    To accept title in the condition offered (with defects) and pay the balance of the Total Purchase Price for the Property, thereby waiving any claim with respect to such defects and agreeing not to make any claims against Seller because of the defects; or

Feinberg000010

ii.     To cancel this Agreement and receive a full refund of all deposits and accrued interest thereon, if any, whereupon this Agreement shall be terminated and Seller shall thereafter be relieved and released of all further liability hereunder. Buyer will not make additional claims against Seller.

g.     In the event Buyer does not notify Seller in writing within such ten (10) day period (time being strictly of the essence) as to which option Buyer elects, Buyer shall be conclusively presumed to have elected the option set forth in paragraph 10.f.i. above.

11.    **CLOSING COSTS.**

a.     Buyer understands and agrees that in addition to the balance of the Total Purchase Price, Buyer must pay certain other fees and costs at closing. These extra charges include:

i.     A closing fee payable to Seller or Seller's agent equal to one and one-half percent (1.5%) of the Total Purchase Price. Seller shall use a portion of same to pay the cost of recording the deed, Florida documentary stamps on the deed and the premium on the Buyer's Title Policy. In addition, Buyer shall be obligated to pay (a) any taxes or costs with respect to recording the deed to the extent same result from a rate in excess of $6.00 per thousand and (b) any premium on the Buyer's Title Policy to the extent of any increase in the promulgated risk rate subsequent to July 1, 1999.

ii.     Loan fees, loan closing costs and all other related sums if any, charged by Buyer's lender, including but not limited to attorneys' fees, escrows for taxes and insurance, recording fees, documentary stamps, intangible tax, credit reports and PMI insurance.

iii.     The payment to Villa Flora Homeowners' Association, Inc. (the "Association") of: (i) a working capital contribution equal to one-fourth (1/4) of the Property's share of annual assessments, plus (ii) a prorated assessment for the Property for the balance of the month in which the closing occurs, and (iii) the assessment for the month commencing after closing.

iv.     The payment to Williams Island Property Owners' Association (the "Master Association") of: (i) a working capital contribution, plus (ii) a prorated assessment for the Property for the balance of the month in which the closing occurs and (iii) the assessment for the month commencing after closing, all as are or may be required by the Master Association and/or the Master Documents.

v.     The cost of effectuating any changes in the plans and specifications, building materials or other items for the residence required by any governmental or quasi-governmental rule, regulation, code, order, statute, ordinance or the like (including but not limited to the Florida Thermal Efficiency Code, the Florida Lighting Efficiency Code, and any hurricane code)

b.     Taxes, assessments, and current expenses of the Property shall be prorated as of the date of closing. The balance due at closing shall be increased or decreased as may be required by proration. Taxes shall be prorated based on the current year's tax with allowance made for the maximum allowable discount. If closing occurs at a date when the current year's millage is not fixed and the current year's assessment is available, taxes will be prorated based upon such assessment and the prior year's millage. If the current year's assessment is not available, then taxes will be prorated on the prior year's tax. Any tax proration based on an estimate, at request of either Buyer or Seller, shall be adjusted upon receipt of the tax bill on condition that a statement to that effect is in the closing statement.

12.    **DEFAULT**

a.     If Buyer shall default in any of the things required of Buyer hereunder within the time allowed therefor, at Seller's option, Seller may avail itself of the equitable remedy of specific performance, or Seller may terminate this Agreement and retain all deposit(s) paid, or to be paid, by Buyer, including payments for Extras, together with interest earned if any, as liquidated damages, consideration for the execution of this Agreement and in full settlement of any claims. Buyer understands that Seller has taken the Property off the market and spent money on sales, advertising and promotion, and that Buyer's default will damage Seller. The parties acknowledge that it would be extremely difficult if not impossible to determine the actual damages incurred by Seller as a consequence of Buyer's breach. Therefore, the foregoing provisions with regard to damages are an attempt by the parties to liquidate the same and are not to be construed or considered as a forfeiture or penalty. Upon termination of this Agreement and retention of said liquidated sum by Seller, Buyer and Seller shall be relieved of all obligations under this Agreement. In such event, all Buyer's rights will end and Seller may resell the Property to any party as though this Agreement had never been made and Seller shall have no obligation to account to Buyer for any part of the proceeds of such sale. Buyer agrees not to sue Seller or its agents or the Escrow Agent for the return of any part of Buyer's deposit(s) or otherwise if this Agreement is terminated for Buyer's default. If Buyer's deposits are held in escrow, Buyer also agrees that upon default by Buyer, Buyer's deposit and any interest thereon belong to Seller, and Escrow Agent may rely on Seller's notice and shall be under no obligation to make any independent investigation or confirmation of Buyer's default.

MIA2001 1603R3v9

6

b.    In the event of Seller's default, Buyer may seek specific performance or elect to terminate this Agreement and obtain a refund of Buyer's deposits together with accrued interest, if any, and any payment for Extras, without thereby waiving any action for damages resulting from Seller's breach.

c.    Should Buyer at any time indicate an intent not to comply with the provisions of this Agreement, Seller may require Buyer to reaffirm in writing Buyer's adherence to this Agreement. Failure by Buyer to do so within ten (10) days after written demand therefor shall be considered an event of default and shall entitle Seller to exercise all remedies set forth herein. Buyer shall detail in writing within said ten (10) day period each and every ground for refusing to complete this transaction or such ground shall be waived as a defense to any claim or cause of action arising out of or in connection with this Agreement.

13.    **ATTORNEYS' FEES AND COSTS.** In the event any litigation is commenced respecting this Agreement, the Property or the application of laws or regulations to any aspect of this transaction, each party shall pay its legal expenses, fees and costs at all trial and appellate levels.

14.    **MAINTENANCE OF THE PROPERTY.** From and after closing, Buyer shall be liable for the maintenance of the Property pursuant to the Declaration. In the event Buyer fails to properly maintain the Property, the Association shall have the right, but not the obligation, to do so, in which event Buyer shall pay all costs incurred by the Association. The Association shall have the right to assess the Property for all maintenance costs incurred, which assessments shall be secured by the assessment lien referred to in the Declaration. The terms of this Paragraph shall survive closing.

15.    **LIMITATION OF WARRANTIES.**

a.    Buyer warrants and represents that Buyer is purchasing the Property and the personal property located therein, if any, for normal residential use only. At closing, Seller shall give Buyer Seller's standard Limited Warranty, a copy of which Buyer acknowledges having received.

b.    SELLER'S LIMITED WARRANTY IS THE ONLY EXPRESS WARRANTY GIVEN. SELLER'S LIMITED WARRANTY IS GIVEN IN LIEU OF ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY AS TO THE PROPERTY, COMMON PROPERTIES AND ALL FIXTURES OR ITEMS OF PERSONAL PROPERTY SOLD PURSUANT TO THIS AGREEMENT OR ANY OTHER REAL OR PERSONAL PROPERTY WHATSOEVER CONVEYED HEREBY, WHETHER ARISING FROM CUSTOM, USAGE OR TRADE, COURSE OF DEALING, CASE LAW OR OTHERWISE, ANY AND ALL OF WHICH SELLER HEREBY DISCLAIMS. In the event a court of competent jurisdiction determines that this disclaimer is ineffective, the parties agree that any action brought under implied warranty must be brought within one (1) year from the date of Buyer's closing and all secondary, incidental and consequential damages are specifically excluded and disclaimed. Any warranties imposed by the Magnuson-Moss Warranty Act [15 U.S.C. §2301 et. seq. (1981)], if applicable, shall be limited to those set forth in the Limited Warranty and are otherwise specifically disclaimed. This clause shall survive the closing contemplated hereunder and the delivery of the Special Warranty Deed to Buyer. It is hereby acknowledged by the parties that all warranties offered by Seller and consumer product warranties covered by the manufacturer were made available to Buyer in accordance with the Magnuson-Moss Warranty Act.

16.    **RESERVATION OF RIGHTS.**

a.    Buyer hereby specifically authorizes Seller to file and place among the Public Records of Miami-Dade County, Florida, at such time as it determines, all documents and instruments which Seller deems necessary or desirable as supplements to the Declaration.

b.    The Property constitutes a part of a proposed Development which may result in the inclusion of additional lots and the construction of additional improvements. Seller is not obligated to add additional lots to the Development or to construct or complete any additional improvements to any other portion or stage of the Development.

c.    Buyer also acknowledges and agrees that Seller and its successors and assigns, have the absolute right to add, modify or eliminate lots, dwelling units and common areas (and, if any, facilities thereon) to, on or from the Development, and that no representation, warranty or assurance has been given to Buyer by any person or entity (i) that any such lots, dwelling units or common areas or facilities will or will not be added, modified or eliminated or (ii) as to the financial or other impact on any property owners' association which may assess charges against the Property, or on Buyer or the residents of the Development.

d.    So long as Seller shall own or have the right to acquire any lot in the Development, Seller may, in its sole discretion, modify and/or amend the site plan of Villa Flora provided the same does not substantially impair the construction of the improvements on the Lot or alter the boundary lines thereof so as to reduce its size. Such amendments to the site plan may include but are not limited to, the addition or elimination of lots, the combination of lots into single lots, the reconfiguration of lots, the elimination of lots to create common areas, including streets and roads, modification to the common areas, including streets, roads, gatehouses, entranceways and open areas, and relocation of drainage and irrigation systems. Buyer agrees that Seller shall have the right to amend the site plan without its consent, either before or after closing on the Lot. Provided, however, in the event the governmental entity having such jurisdiction requires Buyer's joinder, Buyer agrees to execute on demand such documents as may

reasonably be necessary to effectuate such amendment. In addition, Buyer does hereby appoint Seller its attorney-in-fact for this purpose, granting unto Seller full power and authority to execute such amendments on Buyer's behalf as may be deemed advisable by Seller, in its sole discretion, to the same extent as Buyer could do concerning the same, being personally present, and whatsoever Buyer's said attorney, or its substitute or substitutes shall do or cause to be done in, about or concerning these presents, Buyer hereby ratifies or confirms. This power of attorney may be exercised as often as Seller requires, and shall be deemed to be coupled with an interest.

    e.    Seller reserves the right to access Buyer's property for the purpose of building adjoining units or residences, or to construct upon the common areas. Seller has the right to construct fences or walls within any easement on the Property prior to or after closing and to put fences or walls on the Property line or within close proximity. This provision shall survive the closing.

17.    **MISCELLANEOUS PROVISIONS.**

    a.    Sales Commission. Seller will pay all sales commissions of Williams Island Realty Corp., which is the exclusive listing and sales agent for the Development. Buyer represents and warrants that it has dealt with no broker, salesman, agent or other person in connection with this transaction other than _____, and that no broker, salesman, agent or other person brought about this transaction, other than Williams Island Realty Corp. and said other broker, and Buyer agrees to indemnify and hold Seller harmless from and against any claims by any other broker, salesman, agent or other person claiming a commission or other form of compensation by virtue of having dealt with Buyer with regard to this transaction. This provisions of this paragraph shall survive the termination of this Agreement.

    b.    Transfer or Assignment. Buyer has no right to assign, sell or transfer Buyer's interest in this Agreement without Seller's prior written consent. Seller, in its sole discretion, may withhold its consent to any attempted assignment of this Agreement, and the Agreement shall remain in full force and effect. If Seller desires to sell the Development or any portion thereof before or during construction, Seller may assign or transfer Seller's interest in this Agreement without Buyer's consent and Seller shall be released from any and all liability hereunder.

    c.    Others Bound by this Agreement. This Agreement is binding on the parties hereto and their heirs, legal representatives and successors. If Buyer has received Seller's permission to assign or transfer this Agreement, then Buyer's approved assignees shall be bound by the terms of this Agreement.

    d.    Captions. All captions contained in this Agreement are for convenience only, shall not be deemed a part hereof and shall not affect the meaning or interpretation of this Agreement.

    e.    Florida Law. This Agreement will be governed and construed in accordance with the laws of the State of Florida.

    f.    Time of the Essence. Time is of the essence in this Agreement with respect to all obligations of Buyer hereunder. Respecting monetary obligations, in the event Buyer fails to remit any payments required hereunder when due, and Seller elects to accept same thereafter, said payment shall accrue interest at the then applicable highest lawful rate from the due date until the date of receipt by Seller. Said interest shall be paid together with the required payment.

    g.    Insulation Disclosure.

        Location:  Roof
            Type:      Fiberglass Batt
            Thickness: 10"
            R-value:  30

        Location:  Garage Ceiling
            Type:      Fiberglass Batt
            Thickness: 10"/6"
            R-value:  30/19

        Location:  House Ceiling
            Type:      Fiberglass Batt
            Thickness: 10"
            R-value:  30

        Location:  Garage Separation Wall
            Type:      Fiberglass Batt
            Thickness: 3"
            R-value:  11

        Location:  Exterior Walls: Masonry
            Type:      Foil
            Thickness: N/A
            R-value:  4.2

Feinberg000013

Exterior Walls: Frame
    Type:    Fiberglass Batt
    Thickness:  3"
    R-value:    11

BUYER UNDERSTANDS AND ACKNOWLEDGES THAT: (i) ALL STATEMENTS REGARDING R-VALUE ARE BASED SOLELY UPON INFORMATION PROVIDED TO SELLER BY THE APPROPRIATE MANUFACTURER OF THE INSULATION LISTED ABOVE; AND (ii) SELLER IS NOT RESPONSIBLE AND SHALL HAVE NO LIABILITY FOR ANY ERROR MADE BY THE MANUFACTURER, INCLUDING, BUT NOT LIMITED TO ANY MISTAKE REGARDING THE INSULATION'S R-VALUE. Seller reserves the right to use a different type of insulation with a different thickness, type and R-Value in accordance with the terms of paragraph 6 of this Agreement.

    h.    **Notice.** Except as otherwise set forth herein, any notice required or permitted to be given to Buyer under this Agreement may be delivered either personally, by mail addressed to Buyer at the address of Buyer set forth herein, or by telefax. Any notice required or permitted to be given to Seller under this Agreement must be mailed by United States certified mail, return receipt requested, postage prepaid to the following address:

    As to Seller:    Promenade Developers, Ltd.
        Attn: Eugene N. Suttin
        5752 Vintage Oaks Circle
        Boca Raton, FL 33496
        Tel: (561) 496-7899
        Facsimile: (561) 496-7894

    With a copy to:    Karen P. Kondell, Esq.
        Steel Hector & Davis LLP
        200 South Biscayne Boulevard, Ste 4000
        Miami, Florida 33131
        Telephone: (305) 577-7000
        Facsimile: (305) 577-7001

Any notice to Buyer or Seller under this Agreement, except as otherwise expressly provided herein, shall be deemed given and delivered when mailed or personally delivered in the manner set forth herein. An affidavit of one of the Seller's employees that such notice was given will be conclusive for purposes of proving that notice was given. All notices will be given to Buyer at the address or by use of the telephone or telefax number specified on page 1 of this Agreement unless Seller has received written advice from Buyer of a change therein prior to the date such notice is given. The fact that Buyer fails to receive the notice of closing or any other notice because of Buyer's failure to advise Seller of a change of address or phone number, or because of Buyer's failure to pick up a letter when Buyer has been notified of an attempted delivery or for any other reason, shall not relieve Buyer of his obligation to close on the Closing Date, unless Seller agrees in writing to postpone the Closing Date.

    i.    **Effective Date.** The "Effective Date" of this Agreement shall be the date when the last one of Seller and Buyer has signed this Agreement.

    j.    **Radon Gas.** Florida Statute 404.056(5), requires the inclusion of the following language in this Agreement:

    "Radon Gas: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health department."

    The foregoing notice is provided in order to comply with state law and is for informational purposes only. Seller does not conduct radon testing with respect to the Property or the Condominium, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Property.

    k.    **Spa and Swimming Pool Maintenance.** If Buyer has selected a spa and/or pool as an Extra, Buyer acknowledges and understands that the removal of water from a spa or swimming pool can result in the displacement of the spa or swimming pool from its foundation. Buyer should consult a local spa or swimming pool contractor for instructions as to the proper maintenance and use of Buyer's spa or swimming pool. Seller shall have no liability to Buyer for any such displacement after closing.

    l.    **Seller's Use of the Development.** As long as Seller, its successors or assigns own any portion of the Development, Seller and its agents may establish or maintain construction, sales and leasing offices, advertising signs and banners, lighting and all other activities associated with the sale, development, and construction of a real estate development.

    m.    **Joint and Several Obligations.** Buyers, if more than one, shall be jointly and severally liable for full performance of all obligations of Buyer hereunder.

9

Feinberg000014

n.  Interpretation.  It is hereby acknowledged that this Agreement has been negotiated by the parties at "arm's length"; thus, in the event of ambiguity, the rule of construction that such ambiguity shall be interpreted against the initial draftsman shall not apply.

o.  Water.  Buyer acknowledges that Seller has no control over water elevations.  Therefore, Buyer agrees to indemnify and hold harmless Seller from and against any and all losses, claims, demands, damages, costs and expenses of whatever nature or kind, including reasonable attorneys' fees and costs and appellate fees and costs, related to or arising out of any claim against Seller as a result of the water elevations.  The provisions of this paragraph shall survive closing and delivery of the deed to Buyer.

p.  Community Documents.  Buyer acknowledges receipt of, and agrees to be bound by, the following: the Declaration of Protective Covenants, Restrictions and Easements for Villa Flora, as previously amended or supplemented and as may be hereafter amended or supplemented, and the Articles of Incorporation, Bylaws, and any Rules and Regulations as amended and supplemented from time to time of Villa Flora Homeowners' Association, Inc. Buyer acknowledges and agrees that title to the Lot will be subject to the Community Documents.

q.  Receipt.  Buyer acknowledges receipt of the Master Documents, the Community Documents, a copy of the floor plan for the residence to be constructed on the Lot, and the Limited Warranty, which instruments are made a part of this Agreement.

r.  Association Membership.  Buyer acknowledges, that upon taking title to the Property, Buyer will be obligated to be a member of the Association and Master Association.  This Agreement shall constitute Buyer's subscription to membership in the Association and Master Association.  Buyer acknowledges that nominees of Seller shall serve as the initial officers and directors of the Association, and are authorized by Buyer to act for and on behalf of said Association in entering into any and all agreements as are provided in or contemplated by the Community Documents.  Buyer acknowledges and agrees to abide by all terms and provisions of the Community Documents and Master Documents, including the obligation to pay any fees, dues and assessments thereunder, and that title to the Property shall be subject thereto.  Buyer further acknowledges that maintenance fees for the Association and Master Association are subject to change at the discretion of their respective Boards of Directors.

s.  Membership Clubs.

i.  Buyer acknowledges and understands that ownership of the Property and/or membership in any homeowners' or property owners' association shall not confer rights of membership in, or any rights, easements (whether prescriptive or otherwise) or privileges with respect to the use and enjoyment of any properties or facilities owned or operated as a recreational, athletic or social club or organization, including without limitation, any spa, tennis courts, clubhouses, and dining facilities.

ii.  In the event that The Club of Williams Island (the "Club") is sold to the Master Association, the Club will become part of the property under the responsibility and control of the Master Association.  Buyer acknowledges and understands that Buyer (i) will purchase his or her Unit subject to (a) monthly Club assessments and dues imposed by the Master Association to cover the Unit's share of acquisition and refurbishment financing costs, and costs associated with Club operations and overhead, and (b) the lien rights of the Master Association if the assessment is not paid in a timely manner, (ii) will automatically become a Club Resident Member (defined below), for so long as he or she continues to own the Unit, upon acquisition of the Unit, and (iii) may at any time and from time to time during ownership of the Unit elect to become an Islander Resident Member (defined below), which will require paying additional dues set by the Master Association.  As used herein, the term (a) "Club Resident Member" shall denote a resident member that has the right to use the dining facilities (if any), but not general use of the spa and tennis facilities, and (b) "Islander Resident Member" shall denote a resident member that has the right to use all of the Club facilities (as same exist from time to time), including any dining facilities, spa and tennis facilities.

iii.  This paragraph shall survive closing.

t.  All Cash.  The transaction covered by this Agreement shall be on an all cash basis and shall not be subject to Buyer's procuring financing.

u.  Damage Before Completion.  If between the Effective Date and the closing of title, the Property is damaged by fire or other casualty, the following shall apply:

i.  Risk of loss to the improvements by fire or other casualty until the closing of title is assumed by Seller.  Seller shall have no obligation to repair or replace the improvements. Provided however, if Seller elects to repair or replace such loss or damage to the improvements, this Agreement shall continue in full force and effect and Buyer shall not have the right to reject title or receive a credit against or abatement in the Purchase Price. In such event Seller shall be entitled to a reasonable period of time within which to complete repairs or replacement.  Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss or damage shall belong entirely to

Seller and if such proceeds shall be paid to Buyer, Buyer shall promptly upon receipt thereof turn same over to Seller.

    ii.    If Seller notifies Buyer that it does not elect to repair or replace any such loss or damage, then this Agreement shall be deemed cancelled and of no further force or effect, and Seller shall refund to Buyer all monies deposited hereunder, together with interest thereon, if any, whereupon the parties shall be released and discharged of all claims and obligations hereunder, except that if Buyer is then otherwise in default hereunder Seller shall retain all such deposits as and for liquidated damages.

v.    Landscaping and Landscape Maintenance.

    i.    In order to create variety within the Development, the landscaping of each lot will not be uniform. Accordingly, Buyer hereby acknowledges and agrees that the landscaping of Buyer's Lot may vary from other lots in the Development. Further, Buyer acknowledges and agrees that such landscaping shall be maintained and irrigated by the Association pursuant to the Declaration.

    ii.    Buyer acknowledges that the irrigation system on the Lot may be installed so as to irrigate common areas in front, to the side and/or to the rear of the Lot and/or Property.

    iii.    The water to be used for purposes of irrigating the Lot and some or all of the common areas within the Property shall be provided by the Association and Buyer and the Association shall be charged therefor.

w.    Severability Provision.

    i.    It is Buyer's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms. If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety, unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified. If the unenforceable part or parts cannot be so modified, such part of parts will be unenforceable and considered null and void in order that the mutual paramount goal that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms can be achieved.

    ii.    Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights and powers, or waiving or limiting any of Buyer's rights or powers or Seller's obligations (which otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the above judicial modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of his deposits, such offending rights, powers, limitations and/or waivers shall be struck, canceled, rendered unenforceable, ineffective and null and void. Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement (other than language which is intended specifically to create such a cancellation right).

    iii.    The following sentence will supersede and take precedence over anything else in this Agreement which is in conflict with it: If any provisions serve to limit or qualify Seller's substantial completion obligation as stated in Paragraph 5, or Buyer's remedies in the event that such obligation is breached and such limitations or qualifications are not permitted if the exemption of this sale from the Interstate Land Sales Full Disclosure Act pursuant to 15 U.S.C. § 1702(a)(2) is to apply or this Agreement is to otherwise be fully enforceable, then all those provisions are hereby stricken and made null and void as if never a part of this Agreement.

    x.    Recording. Neither this Agreement nor any notice, memorandum, or assignment thereof (nor any Lis Pendens) shall be recorded in the office of the Clerk of the Circuit Court of Miami-Dade County, Florida, and any recording of same by Buyer shall be considered a breach of this Agreement.

    y.    No Interest. Buyer acknowledges that, prior to the conveyance of title to the Property, Buyer has acquired no right, title, interest or lien rights therein by virtue of this Agreement, the deposits made hereunder, or otherwise.

    z.    Subordination. Buyer acknowledges that all of Buyer's rights hereunder (including any rights to a vendee's lien) are and shall be subordinate to the rights of Ohio Savings Bank or any other lender holding a mortgage encumbering the Property, whether or not such mortgage secures the advancement of acquisition and/or construction funds, even if such mortgage is placed on the Property after the date of this Agreement. This provision shall survive the closing.

aa.    Cooperation.  If after the closing it shall appear that there is an error in any of the closing documents, the parties agree to execute any further documents at the request of either party and to pay any amount required in order to correct the error.

bb.    Governmental Assessments.  Seller has provided to Buyer certain information that may affect the Property concerning assessments of governmental and quasi-governmental authorities.  Buyer acknowledges that it must make its own inquiries concerning the Property with the authorities having jurisdiction over the Property and that Seller shall not be liable for any information not disclosed to Buyer nor for any discrepancies between the information disclosed by Seller and the information as verified by Buyer.

cc.    Title to Property.  Seller may not own title to the Property on the date of execution of this Contract; however, Seller shall obtain title to the Property on or before the Closing Date.

dd.    No Entry.  Buyer acknowledges that all matters pertaining to the initial construction of the Property will be performed by Seller and Seller's representatives.  Buyer acknowledges and agrees that for reasons of safety and to comply with liability and insurance requirements imposed upon Seller, neither Buyer nor any agent of Buyer shall, until after the closing of this transaction, be permitted to enter upon the Property except at those times designated by Seller and only with Seller's prior written permission, and Buyer agrees not to interfere with or interrupt any workmen at the Property.  Buyer may not order any work on the Property.  Buyer acknowledges that any breach by Buyer of the terms and conditions contained in this paragraph shall be deemed to be a "material breach" and shall entitle Seller to declare the Agreement to be in default in accordance with the provisions of Paragraph 12 hereof.  Seller's failure to promptly take any remedial action with respect to Buyer's breach of the terms and conditions contained herein shall not be deemed an implied waiver of Seller's rights hereunder.

ee.    Return of Documents.  If this Agreement is canceled for any reason, Buyer agrees to return to Seller all Community Documents and Master Documents delivered at time of execution hereof, or to reimburse Seller One Hundred ($100.00) Dollars for the cost thereof.

ff.    Venue.  The venue of any litigation arising out of this Agreement shall be Miami-Dade County, Florida.

gg.    OTHER AGREEMENTS.    THIS AGREEMENT SUPERSEDES ANY AND ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN THE PARTIES HERETO, WHETHER ORAL OR WRITTEN, AND THIS AGREEMENT REPRESENTS THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO.  NO REPRESENTATION OR INDUCEMENT, WHETHER ORAL OR WRITTEN, MADE PRIOR HERETO WHICH IS NOT INCLUDED IN THIS AGREEMENT SHALL HAVE ANY FORCE OR EFFECT. THIS AGREEMENT MAY NOT BE CHANGED OR TERMINATED ORALLY AND MAY BE AMENDED OR MODIFIED ONLY BY AN INSTRUMENT IN WRITING SIGNED BY EACH OF THE PARTIES HERETO.

hh.    DISCLOSURE SUMMARY.  IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 689.26, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE BUYER BEFORE EXECUTING THIS AGREEMENT, THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST.  ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

BUYER SHOULD NOT EXECUTE THIS AGREEMENT UNTIL BUYER HAS RECEIVED AND READ THE DISCLOSURE SUMMARY.

BUYER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE DISCLOSURE SUMMARY ATTACHED HERETO AND INCORPORATED HEREIN, AND THAT BUYER HAS READ AND EXECUTED SAID DISCLOSURE SUMMARY BEFORE EXECUTING THIS AGREEMENT.  THE DISCLOSURE SUMMARY IS PROVIDED TO BUYER IN COMPLIANCE WITH SECTION 689.26, FLORIDA STATUTES.


Initials

ii.    CONSTRUCTION INDUSTRIES RECOVERY FUND.  Pursuant to Section 489.1425 of the Florida Statutes, Seller provides the following notice.  PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND, IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATION OF FLORIDA LAW BY A STATE LICENSED CONTRACTOR.  FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS:  (904) 727-6530, 7960 ARLINGTON EXPRESSWAY, SUITE 300, JACKSONVILLE, FLORIDA 32211.

jj.    ATTACHMENTS.

The following documents are attached to and form a part of this Agreement:

12

Feinberg000017

Check ( √ ) all that apply:

☐.   Common Facilities Disclosure
☐   Department of Community Affairs Brochure (Energy)
☐   Disclosure Summary
☐   Limited Warranty

kk.      CONSTRUCTION DEFECT NOTICE.  FLORIDA  LAW  CONTAINS  IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION  AGAINST  A  CONTRACTOR,  SUBCONTRACTOR,  SUPPLIER  OR  DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY (60) DAYS BEFORE  YOU  FILE  YOUR  LAWSUIT,  YOU  MUST  DELIVER  TO  THE  CONTRACTOR, SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION  CONDITIONS  YOU  ALLEGE  ARE  DEFECTIVE  AND  PROVIDE  YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS.  THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

        IN WITNESS WHEREOF, the parties have hereunto affixed their respective hands and seals on the day and year set forth below next to their respective names.

Signed, sealed and delivered in the presence:

_____

_____              BUYER _____
                                             Dated:   12-2-05

_____              BUYER _____
                                             Dated:   3-2-05

_____

_____              PROMENADE DEVELOPERS, LTD., a Florida
                                             limited partnership

                                             By: _____
                                                 Authorized Signatory

                                             Dated:   2-2-05

# EXHIBIT C

# City of Aventura

Community Development Department
19200 West Country Club Drive, 4th Floor
Aventura, Florida 33180
(305) 466-8937

**Temporary or Permanent
Certificate of Occupancy/Completion**

Nº 1648

☐ TCO    ☐ TCC    ☐ CO    ☐ CC

Date: 11-30-06

Permit Number: 5-1091    Folio Number: 28-2210-079-0021

Owner or Tenant: EUGENE N SUTTIN

Lot: _____  Block: _____  Subdivision: _____

Address: 1524 ISLAND BLVD

Approved Use for Occupancy: RESIDENTIAL LOT #13

Remarks: CERTIFICATE OF OCCUPANCY.

Fee: $402.24



_____
Signature of Building Official