## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **IN RE CHINESE-MANUFACTURED DRYWALL** | * | **MDL NO. 2047** |
| **PRODUCTS LIABILITY LITIGATION** | * | |
| | * | **SECTION "L"** |
| | * | |
| **THIS DOCUMENT RELATES TO:** | * | **JUDGE FALLON** |
| *Catalanotto*, No. 10-CV-01828 | * | |
| | * | **MAG. WILKINSON** |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

### DEFENDANT THE STANDARD FIRE INSURANCE COMPANY'S
### F.R.C.P. 12(b)(6) MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

### INTRODUCTION

Defendant The Standard Fire Insurance Company ("Standard Fire") seeks dismissal of

Plaintiff Mary Ann Catalanotto's Petition under Fed. R. Civ. P. 12(b)(6), because her insurance

claim is not covered by her homeowners' insurance policy issued by Standard Fire (the "Policy,"

Ex. A hereto).  This motion is filed pursuant to the July 1, 2010 order entered by the Court.

[Rec. Doc. 4300]

Catalanotto alleges that defective, Chinese-made drywall in her home has caused damage

to the HVAC coils, electrical wiring and fixtures, and plumbing components.  (Petition, ¶ 11

(attached to Notice of Removal).)  The Policy, however, does not insure the quality of the

components used to renovate Catalanotto's home or the risk that a defective building component

will cause the formation of a gas that contaminates the home and impacts other building

materials.  Any losses caused by the defects in the drywall and/or the gases it emits are

specifically excluded by exclusions in the policy for losses caused by:  (1) a latent defect; (2)

1

defective materials; (3) corrosion; and (4) a pollutant, defined to include gaseous contaminants or irritants.  There is also no coverage for the cost of removing and replacing the drywall itself for the additional reason that the policy covers a risk of "direct loss . . . only if that loss is a physical loss to property," and the drywall itself did not sustain a "direct" or "physical" loss.  Finally, any damage to Catalanotto's personal property also is not covered because personal property is only insured against 16 specific perils, none of which is applicable to their losses.  Catalanotto's claims for statutory bad faith and her vaguely-alleged claim of improper training of adjusters also fail to state a claim because she cannot recover on those causes of action where there is no coverage under the policy.  Catalanotto's claim under the Louisiana Valued Policy Law fails because her home is not a total loss due to a covered peril, and the Valued Policy Law applies only to a fire loss under a fire insurance policy, and is therefore inapplicable here.

Standard Fire is therefore entitled to judgment as a matter of law on all of Plaintiffs' claims, under Rule 12(b)(6).

# I.    LEGAL STANDARDS

Under Rule 12(b)(6), the well-pleaded allegations in the complaint are assumed to be true, and the motion will be granted if the plaintiff cannot recover, as a matter of law, on the facts alleged.  *In re Katrina Canal Breaches Consol. Litig.*, 495 F.3d 191, 205 (5th Cir. 2007); *Chauvin v. State Farm Fire & Cas. Co.*, 495 F.3d 232, 237 (5th Cir. 2007).

The insurance policy at issue is properly considered in this Rule 12 motion because it is central to Catalanotto's claims.  *See Katrina Canal Breaches*, 495 F.2d at 205.  In addition to the policy and facts alleged in the pleadings, the district court "may also consider matters of which [it] may take judicial notice."  *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996).  In deciding a 12(b)(6) motion, it is proper for a court to take judicial notice of

matters of public record.  *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994); *In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 170 n.1 (5th Cir. 1979) (court took judicial notice of prior proceedings in MDL).  If, based on the facts pleaded and judicially noticed, a successful affirmative defense appears, then dismissal under Rule 12(b)(6) is proper.  *Kansa Reinsurance Co., Ltd. v. Cong. Mortgage Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994).

Louisiana law governs the interpretation of the Policy in this case.[1]  Under Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Louisiana Civil Code."  *Katrina Canal Breaches*, 495 F.2d at 206.  This Court's role is to determine the parties' common intent from the language used in the Policy.   La. Civ. Code art. 2045; *see also Sher v. Lafayette Ins. Co.*, 988 So.2d 186, 192 (La. 2008).  The words in the Policy must be given their "generally prevailing meaning," and "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole."  La. Civ. Code arts. 2047, 2050.  When the words "are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  La. Civ. Code art. 2046.

Catalanotto, as the insured, bears the initial burden to allege, and ultimately prove, that the losses she is claiming fall within the Policy's grant of coverage.  *See Jones v. Estate of Santiago*, 870 So.2d 1002, 1010 (La. 2004).  This means that Catalanotto must prove that she sustained a "direct physical loss" with respect to each claimed item of damage.  If Catalanotto

---

[1] "In diversity cases . . . federal courts must apply state substantive law. . . .  In determining which state's substantive law controls, the court applies the choice-of-law rules of the forum state." *Katrina Canal Breaches*, 495 F.2d at 206 (citations omitted).  Louisiana's substantive law controls in actions concerning the interpretation of insurance policies issued to policyholders in Louisiana for property located in Louisiana.  *See id.*  Here, the Policy was issued to Catalanotto at an address in Louisiana and insured her property located in New Orleans, Louisiana.  (*See* Policy, Declarations.)

satisfies that burden, the burden then shifts to Standard Fire to establish that the claimed loss

falls within one of the Policy's exclusions.  *Id.* at 1010.  Once Standard Fire has established that

the claimed loss is excluded, Catalanotto bears the burden of proving the applicability of any

exception to the exclusion.  *See, e.g., Perrien v. State Farm Ins. Co.*, Civ. No. 06-8087, 2008

U.S. Dist. LEXIS 90617, at *6 (E.D. La. July 9, 2008) (Duval, J.).

## II.    BACKGROUND

In her Petition, Catalanotto alleges that she entered into a construction contract for the

renovation of her home in New Orleans, Louisiana, to repair damage sustained as a result of

Hurricane Katrina, including replacement of the drywall.  (Petition, ¶¶ 3-4.)  Following

completion of construction in late August 2007, Catalanotto returned to her home.  (*Id.*, ¶ 6.)

Over a year-and-a-half later, in May 2009, Catalanotto allegedly discovered Chinese-made

drywall in her home.  (*Id.*, ¶ 10.)  She claims to have later learned that the "Chinese Drywall

used to renovate the Home was causing damage to her person and property including but not

limited to HVAC coils, electrical wiring, electrical fixtures, and plumbing components." (*Id.*, ¶¶

10-11.)  Catalanotto asserts that her home "was renovated with products and materials that were

unfit for their intended use, including, but not limited to, drywall" and that the drywall contains

"redhibitory defects," rendering her home "unfit and useless for its intended purpose."  (*Id.*, ¶¶

12, 15.)  Catalanotto also alleges that she "began to experience problems, including but not

limited to problems with the air conditioning and electrical systems, only after moving into the

Home after completion of the renovation work." (*Id.*, ¶ 18.)

On or about September 25, 2009, Catalanotto notified Standard Fire about her discovery

of Chinese-made drywall and filed a claim.  (*Id.*, ¶19.)   Standard Fire thereafter conducted an

investigation, including a physical inspection of her home, and then denied her claim on or about

February 18, 2010. (*Id.*, ¶¶ 20-21.)

In May 2010, Catalanotto instituted the instant action, alleging claims against several

construction contractors as well as against Standard Fire.[2]  Against Standard Fire, Catalanotto

alleges that it breached the insurance contract, violated Louisiana's bad faith statutes, La. R.S.

22:1892 and 22:1973, breached its duties by failing to train its adjustors and violated the

Louisiana Valued Policy Law, La. Rev. Stat. 22:1318, by failing to pay the entire policy limit.

(*See* Petition, ¶¶ 87-104.)

Catalanotto repeatedly alleges that there are "defects" in the drywall that caused the

claimed damage to the electrical and plumbing components of her home.  (*See*, *e.g.*, Petition, ¶¶

10-12, 15-17, 49, 64-65, 69-70, 73-74.)  The Court can properly take judicial notice, as a matter

of public record and the record of this MDL proceeding, of the indisputable fact that Chinese-

made drywall releases sulfur-based gases that cause corrosion of metals, irritation to humans,

and odors.  *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, MDL No. 2047, Doc. 2380

("*Germano*"), at 12-14 (Ex. B hereto); Report of Consumer Product Safety Commission dated

Apr. 2, 2010 ("CPSC Report"), Executive Summary 1-2, 4 (Ex. C hereto).[3]

## III.   PLAINTIFF'S CLAIMED LOSSES TO HER DWELLING AND PERSONAL PROPERTY ARE NOT COVERED

Catalanotto's claim implicates the dwelling coverage in the Policy and may implicate the

personal property coverage; these coverages, however, operate differently.  The dwelling is

covered on an open peril basis, insuring against "risks of direct loss to property . . . only if that

---

[2] Standard Fire has moved to sever the claims against it from the claims against the contractors.  (Doc. 4380.)

[3] Standard Fire relies on these sources only for the indisputable facts set forth above.  It does not accept as true any other conclusions made by these sources, including but not limited to conclusions regarding the scope of required repairs, which are not at issue on this motion.

loss is a physical loss to property" that is not excluded.  (Policy, Form HO-3 (04-91), at 6.)
Personal property, in contrast, is covered only against losses caused by 16 specified named
perils.  (*Id.* at 10-11.)  The claim for alleged damage to her dwelling is addressed in Section A
below, and any claim for personal property loss that Catalanotto may be alleging is addressed in
Section B below.

### A.      There Is No Coverage For Losses To Catalanotto's Dwelling

The Policy's Coverage A insures "direct loss" that is a "physical loss" to "[t]he dwelling
on the 'residence premises' shown in the Declarations, including structures attached to the
dwelling."  (*Id.* at 2, 6.)  Coverage A governs claims for removing and replacing the drywall and
repairing the claimed damage to air conditioning equipment, electrical wiring, plumbing fixtures,
and other metallic building components.

The Policy does not provide coverage for these losses for several reasons.  First, any
damage caused by the defect in the drywall and/or the gases emitted from the drywall is excluded
as loss caused by latent defects, defective materials, and pollutants (gaseous contaminants).  The
damage to metallic surfaces in Catalanotto's residence caused by corrosion also is excluded by
the corrosion exclusion.  Second, any claim for the cost of removing and/or replacing the
defective drywall is not covered for the additional reason that the defective drywall itself has not
sustained the requisite direct physical loss.

### 1.      The Claimed Damage Caused By A Defect In The Drywall Or The Gases Emitted By the Drywall Is Excluded By Several Policy Exclusions

Any claimed damage to the Catalonotto home is excluded by exclusions for loss caused
by:  (1) latent defects; (2) faulty materials; (3) corrosion; and (4) pollutants (defined to include
gaseous contaminants or irritants).

### a.    Latent Defect Exclusion

Catalanotto's claimed property damage falls within the following exclusion from coverage for loss caused by a "latent defect":

> We do not, however, insure, for loss: . . .
>
> 2.  Caused by: . . .
>
>     (e)  Any of the following: . . .
>
>         (2)  Inherent vice, latent defect, mechanical breakdown;
>
>     . . .
>
> Under items 1. and 2., any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.

(Policy, Form HO-3 (04-91), at 6-7.)

Louisiana courts interpreting the term "latent defect" in insurance policies have given the term its plain and ordinary meaning.  The Louisiana Third Circuit has held that a "latent defect" is "a defect that is hidden or concealed from knowledge as well as from sight and which a reasonable customary inspection would not reveal."  *Nida v. State Farm Fire & Cas. Co.*, 454 So.2d 328, 335 (La. App. 3d Cir. 1984) (quoting *Walker v. Travelers Indem. Co.*, 289 So.2d 864, 870 (La. App. 4th Cir. 1974)); *accord Barbier v. Wade*, 517 So.2d 321, 325 (La. App. 1st Cir. 1987); *Shields v. Penn. Gen. Ins. Co.*, 488 So.2d 1252, 1255 (La. App. 4th Cir. 1986); *Harris v. Bardwell*, 373 So.2d 777, 780 (La. App. 2d Cir. 1979).  In *Nida*, soil movement caused cracking of the foundation and the interior and exterior walls of the insured's house.  *Id.* at 329.  Noting that the foundation had not been built to withstand soil movement, the Third Circuit held that the damage was excluded from coverage under latent defect exclusion.  *Id.* at 335.  In reaching this conclusion, the court explained that "the defendant-insurer simply was not a guarantor of the constructor's building performance."  *Id.*

The weight of authority nationwide further supports Louisiana courts' application of the latent defect exclusion.[4]  For example, in *TRAVCO Ins. Co. v. Ward*, No. 2:10cv14, 2010 U.S. Dist. LEXIS 54387 (E.D. Va. June 3, 2010) (appeal pending), the court, interpreting identical policy language, determined that the latent defect exclusion precluded coverage for the costs of removing and replacing Chinese-made drywall where the defective drywall "[was] off-gassing and damaging other components of the [r]esidence." *Id.* at *28, 33-35.  In concluding that the damage to the insured's residence was a loss caused by a latent defect, the court observed that "[t]he latent defect exclusion is intended to remove the risk for losses that *result from flaws in property that are undetectable*, and hence unexpected," and "[l]osses from Chinese Drywall fit squarely into this category." *Id.* at *33-34 (emphasis added).  *See also City of Burlington v. Hartford Steam Boiler Inspection & Ins. Co.*, 190 F. Supp. 2d 663, 688 (D. Vt. 2002), *aff'd* 346 F.3d 70 (2d Cir. 2003) (surveying authority and concluding that "[i]n the ordinary sense of the term, 'latent defect' means a defect that is hidden, or which could not have been discovered by any known or customary test or examination"); *U.S. West v. Aetna Cas. & Sur. Co.*, 117 F.3d 1415 (table), 1997 U.S. App. LEXIS 17747, at *14-15 (4th Cir. 1997) ("[A]s a matter of the literal language of this term, 'latent defects' are only those which are not readily discoverable and integral to the damaged property by reason of *its* design or manufacture or construction.").

Applying a similar definition of latent defect to facts similar to the case at bar, the Illinois Appellate Court has held that a latent defect exclusion precluded coverage of claims relating to

---

[4] There are two Louisiana trial court decisions concerning homeowners' insurance claims for losses caused by Chinese-made drywall.  In *Ross v. C. Adams Construction & Design, L.L.C.*, No. 676-185 (La. 24th. Jud. Dist. Ct. Apr. 14, 2010) (Ex. D), the court, without articulating detailed reasons, granted the insurer's motion for summary judgment, which raised the same arguments raised herein.  In *Finger v. Audobon Ins. Co.*, 2010 WL 1222273 (La. Civ. Dist. Ct. Mar. 22, 2010), a New Orleans Civil District Court judge initially denied the insureds' motion for summary judgment.  The insureds then filed a motion to strike the insurer's affirmative defenses, making arguments virtually identical to its prior arguments in the summary judgment motion.  The state court orally granted the motion to strike and invited the insureds' attorney to provide him with a draft decision, which he signed without making any modifications.  *Finger* was cited to and rejected by the judge in *Ross*.  *Finger* was also rejected in *TRAVCO* as unpersuasive, unsupported by the case law, and contrary to the "clear weight of authority."  *See TRAVCO*, at *35-38.

asbestos-containing construction materials.  In *Board of Educ. v. Int'l Ins. Co.*, 684 N.E.2d 978 (Ill. App. 1997), the plaintiff school board sought coverage for the cost of removing paint, ceiling tile, floor tile, insulation and other materials made using asbestos fibers, claiming that these building materials were releasing hazardous substances into the air.  *Id.* at 979-80. Rejecting the school board's arguments for coverage, the court explained that "because the presence of asbestos material in the school buildings is not detectable by the naked eye and is not apparent to any but the most searching analysis, it is a latent defect subject to the latent defect exclusion."  *Id.* at 983.

Here, the damage to Catalanotto's residence plainly constitutes a loss caused by a "latent defect" because the problem with the Chinese-made drywall (*i.e.*, its gas emitting characteristic) is not visible or readily discoverable.  As alleged by Catalanotto in her Petition, "[t]he Chinese Drywall in the Home contains redhibitory *defects* and renders the Home *unfit and useless for its intended purpose*."[5]  (Petition, ¶ 15 (emphasis added); *see also id.*, ¶¶ 16-17, 35, 40-41, 49, 51, 59-60, 69, 73, 75, 84-85.)  Catalanotto also alleges that her home renovation, which included the installation of drywall, was completed on or about August 28, 2007, but she did not discover the Chinese-made drywall until May 2009.  (*See id.*, ¶¶ 4, 6, 10.)  These allegations, accepted as true, reflect that Catalanotto did not discover the defect in the drywall until over a year-and-a-half after the completion of her home renovation, making it a "latent" defect.  Because the latent defect in the drywall was the cause of any need to remove and replace the drywall as well as the claimed losses to the air conditioning equipment, the electrical wiring, the plumbing components, and the other metallic surfaces in Catalanotto's residence (*see id.*, ¶ 11), her claim is excluded by the latent defect exclusion.  If there were "direct physical loss" to the drywall

---

[5] The Civil Code provides, in pertinent part, that "[a] defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect."  La. Civ. Code art. 2520.

itself (an issue addressed below), it would also be excluded as a loss caused by a "quality in property that causes it to damage or destroy itself," which is separately excluded.  (Policy, Form HO-3 (04-91), at 7.)

### b.      Faulty Materials Exclusion

The Policy's exclusion for faulty or defective materials also precludes coverage for the losses claimed.  This exclusion provides as follows:

> 2.  We do not insure for loss to property described in Coverages A and B caused by any of the following.  However, any ensuing loss to property described in Coverages A and B not excluded or excepted in this policy is covered.
>
> . . .
>
> c.  Faulty, inadequate or defective: . . .
>
> > 3.  Materials used in repair, construction, renovation or remodeling; . . .
>
> of part or all of any property whether on or off the 'residence premises.'

(Policy, Form HO-3 (04-91), at 8-9.)

The Chinese-made drywall installed in Catalanotto's home undoubtedly qualifies as a material that is "faulty" and "defective" within the plain meaning of those terms.  Indeed, Catalanotto's own Petition repeatedly alleges that the drywall contains "defects and renders the Home unfit and useless for its intended purpose."  (Petition, ¶ 15; *see also id.*, ¶¶ 16-17, 49, 64-65, 69-70.)  Courts across the country have applied exclusions for loss caused by faulty materials in similar circumstances.  Most recently, in *TRAVCO Ins. Co. v. Ward*, the court rejected the insured's contention that the faulty or defective materials exclusion did not apply to the losses resulting from the Chinese-made drywall because the drywall was "serving its normal function and purpose." 2010 U.S. Dist. LEXIS 54387, at *36 (internal quotation marks omitted).   In holding that the exclusion was applicable, the court noted, *inter alia*, that "[a]lthough the Drywall has not collapsed or otherwise physically deteriorated, it is certainly not serving its

purpose as a component of a livable residence." *Id.* at \*37-39.  The court also noted that, as in

the case at bar, the insured had alleged that the drywall contained defects. *Id.* at 38-39.

Other courts have reached similar results. *See, e.g.*, *Tom Harrison Tennis Ctr. Ltd. v.

Indoor Courts of Am., Inc.*, No. CA2002-03-034, 2002 Ohio App. LEXIS 6987, at \*11 (Ohio

App. Dec. 23, 2002) ("A loss that results from an alleged breach of the implied warranty of

fitness for a particular purpose necessarily involves a loss caused by or resulting from faulty,

inadequate or defective materials used in repair, construction, renovation or remodeling.").  They

have therefore applied the defective materials exclusion to preclude coverage for losses caused

by the installation of an improper lining and insulation product, *id.*, the use of improperly treated

cedar siding and shingles, *Carney v. Assurance Company of America*, Civ. No. 04-3434, 2005

U.S. Dist. LEXIS 6640, at \*3-4 (D. Md. Apr. 19, 2005), *aff'd* 177 F.App'x 282 (4th Cir. 2006)

(per curiam), the installation of substandard residential piping, *Rogers v. Unitrim Auto & Home

Ins. Co.*, 388 F. Supp. 2d 638 (W.D.N.C. 2005), the use of lumber infested with dry rot, *Sapiro v.

Encompass Ins.*, No. C03-4587, 2004 U.S. Dist. LEXIS 22054, at \*14-16 (N.D. Cal. Nov. 2,

2004), the use of construction materials that had been contaminated by exposure to radioactive

materials, *Falcon Prods., Inc. v. Ins. Co. of Penn.*, 615 F. Supp. 37, 39 (E.D. Mo. 1985), *aff'd*

782 F.2d 779 (8th Cir. 1986), and the use of a roofing asphalt that "was entirely unsuitable for

the purpose" and necessitated the removal and replacement of the entire roof, *Biebel Bros., Inc.

v. United States Fid. & Guar. Co.*, 522 F.2d 1207, 1211 (8th Cir. 1975).

Here, there is no dispute that the Chinese-made drywall installed in Catalanotto's

residence is a faulty or defective material.  Indeed, Catalanotto alleges that "[t]he Chinese

Drywall in the Home contains redhibitory *defects* and *renders the Home unfit and useless for its

intended purpose*."  (Petition, ¶ 15 (emphasis added); *see also id.*, ¶¶ 16-17, 49, 59-60, 69, 73,

75, 84-85 (repeatedly using the term "defect" in describing the drywall); *see also Ward*, 2010 U.S. Dist. LEXIS 54387, at *39 (stating that "the fact that [the insured] himself described the Drywall as 'defective' certainly weighs in favor of the application of the exclusion").  As alleged by Catalanotto, all of the claimed losses are the direct result of the installation of the Chinese-made drywall in her residence.  (*See* Petition, ¶¶ 11, 26.)  The exclusion for loss caused by defective materials thus applies to preclude coverage for all damage resulting from the defect in the drywall.

### c.     Corrosion Exclusion

The Policy also excludes loss caused by corrosion, as follows:

We do not, however, insure for loss: . . .

> 2.  Caused by: . . .
>
>> (e)  Any of the following: . . .
>>
>>> (3) Smog, rust or other corrosion;
>>
>> . . .
>
> Under items 1. and 2., any ensuing loss to property described in Coverages A and B not excluded  or excepted in this policy is covered.

(Policy, Form HO-3 (04-91), at 6-7, as modified by Form HO-827 LA (04-03), at 2.)

Corrosion is, of course, the process by which the surface of a metal or other material wears away or deteriorates.  *See*, *e.g.*, *Reliance Ins. Co. v. Cooper/T. Smith Corp.*, Civ. Nos. 00-0251 & 00-0280, 2001 WL 530438, at *2 n.4 (S.D. Ala. Apr. 24, 2001).  It is clear that the losses being claimed by Catalanotto include damage caused by corrosion.  She alleges that the Chinese drywall in her home has damaged her "HVAC coils, electrical wiring, electrical fixtures, and plumbing components."  (Petition, ¶ 11.)  There can be no dispute that the claimed damage to the

metallic surfaces was caused by corrosion resulting from sulfur gases.  *See Germano*, at 13-14
(Ex. B); CPSC Report, at 1-2 (Ex. C).

Two judges of this District have recently applied the corrosion exclusion to preclude
coverage for equipment that rusted as a result of Hurricane Katrina.  In *Transcontinental Ins. Co.
v. Guico Machine Works, Inc.*, Civ. Nos. 06-2516 & 06-3184, 2008 U.S. Dist. LEXIS 69972
(E.D. La. Sept. 17, 2008), the insured's roof was damaged during the hurricane, leaving its
equipment exposed to the elements.  Judge Englehardt granted summary judgment to the insurer,
holding that, under the policy's rust exclusion, there was no coverage for rust damage resulting
from water infiltration through the damaged roof.  *Id.* at * 5.  Judge Englehardt emphasized that
the policy language unambiguously "excludes *all* loss or damage from rust or dampness of
atmosphere."  *Id.* (emphasis added).  *See also Orthopedic Practice, LLC v. Hartford Cas. Ins.
Co.*, Civ. No. 06-8710, 2008 U.S. Dist. LEXIS 18335, at *8 (E.D. La. March 10, 2008)
(Porteous, J.) (granting summary judgment to insurer on claim for rust and mold damage to
second floor of building caused by moist environment from flooding on first floor, holding that
"evidence of rust and mold to Plaintiff's equipment is immaterial, as the Policy expressly
excludes rust and mold").

Consistent with this understanding, courts in other jurisdictions have held that the
corrosion exclusion precludes coverage for losses similar to Catalanotto's loss.  For example, in
*TRAVCO*, the district judge held that the insured's claimed losses to the structural, mechanical
and plumbing components of his home stemming from the installation of Chinese-made drywall
fell within the corrosion exclusion.  The court explained that the "the ordinary meaning of
corrosion includes the 'action or process of corroding,'" and that was plainly what had caused
the damage.  *TRAVCO,* at *42.  The court rejected the insured's argument that the loss itself was

the corrosion, and therefore the loss was not caused by corrosion, because that would "render the corrosion exception meaningless." *Id.*  The court instead followed the "weight of authority," which holds that the corrosion exclusion "precludes recovery for damages caused by corrosion *regardless of what caused the corrosion* or how suddenly the corrosion occurred."  *Id.* at \*41 (emphasis added; internal quotation marks omitted).[6]

Here, as in *TRAVCO,* the corrosion exclusion is plainly applicable to the claimed damage to metal components of the Catalanotto home.

### d.    Pollution Exclusion

#### i.    The Plain Language Of The Exclusion Applies To Ms. Catalanotto's Loss

Although the three other exclusions plainly apply, Catalanotto's claim is also barred by the pollution exclusion in the Policy, which provides as follows:

We do not, however, insure for loss: . . .

2. Caused by: . . .

(e) Any of the following: . . .

(2) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against Under Coverage C of this policy.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed;

. . .

Under items 1. and 2., any ensuing loss to property described in Coverages A and B not excluded  or excepted in this policy is covered.

---

[6] *See also Gilbane Bldg. Co. v. Altman Co.*, No. 04AP-664, 2005 Ohio App. LEXIS 981, at \*17 (Ohio Ct. App. Mar. 8, 2005) (unpub.) (holding that discoloration of metal components in building due to chemical agents used during construction was excluded by an exclusion for loss caused by corrosion); *Heban v. Auto-Owners Ins. Co.*, No. WD-02-064, 2003 WL 21862170, at \*2 (Ohio Ct. App. Aug. 8, 2003) (holding that corrosion exclusion precluded coverage for discoloration of glass panes caused by corrosion from rain water entering between the stacked panes).

(Policy, Form HO-3 (04-91), at 6-7.)

It is indisputable that Chinese-made drywall releases sulfur gases that cause corrosion of building components, are irritating to humans, and produce an offensive odor.  *Germano*, at 12-13.  These sulfur gases plainly qualify as "pollutants" under the Policy because they are "gaseous . . . irritant[s] or contaminant[s]," as well "fumes," and they were "discharge[d], dispers[ed] . . . [or] release[d]" from the drywall.  (Policy, Form HO-3 (04-91), at 6-7.)  Gases that cause corrosion of building components and create offensive odors plainly constitute "gaseous . . . contaminants."

In addition to being contaminants, the gases released by the drywall also constitute "irritants" and "fumes."  Gases that are irritating to the human body and produce offensive odors (*see Germano*, at 13) are plainly "irritants."  *See Wakefield Pork, Inc. v. RAM Mut. Ins. Co.*, 731 N.W.2d 154, 161 (Minn. App. 2007) (holding that a complaint alleging "harm from the '[g]ases, hydrogen sulfide among others,' and the 'noxious and offensive odors' that emanated from appellant's pig farm . . . alleged damage from a substance that is plainly covered by the insurance policy's pollution exclusion").  As one court put it in applying the pollution exclusion in a similar context, "[w]e would be doing a disservice to the English language if we were to say that asbestos fibers, which are a health hazard because of their irritant effects on the human body, are not an irritant."  *Board of Regents v. Royal Ins. Co.*, 517 N.W.2d 888, 892 (Minn. 1994).

Because the gases emitted from the drywall constitute pollutants, coverage for the damage they cause is excluded "unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against Under Coverage C of this policy."   (Policy,

Form HO-3 (04-91), at 9.)  None of those named perils are applicable here.[7]  Accordingly, the claimed damage falls squarely within the plain language of the Policy's pollution exclusion.

Courts have repeatedly enforced pollution exclusions in the context of first-party property policies as applied to losses similar to a Chinese drywall loss.  *See, e.g.*, *Great Northern Ins. Co. v. Benjamin Franklin Fed. Sav & Loan Ass'n*, 793 F. Supp. 259 (D. Or. 1990), *aff'd*, 953 F.2d 1387 (9th Cir. 1992) (enforcing pollution exclusion and holding that costs to remove asbestos from insured building are expressly barred from coverage); *Brown v. Am. Motorists Ins. Co.*, 930 F. Supp. 207, 208-209 (E.D. Pa. 1996) (enforcing unambiguous pollution exclusion and holding that alleged damage to house from fumes from sealant, a common household product, that migrated into insured's house was excluded), *aff'd*, 111 F.3d 125 (3d Cir. 1997); *Hanover New England Ins. Co. v. Smith*, 621 N.E.2d 382, 419- 421 (Mass. Ct. App. 1993) (enforcing exclusion for losses directly caused by release . . . of contaminants or pollutants" where home heating oil released into cellar of insured's house).

In arguing that the pollution exclusion does not apply, Catalanotto likely will rely heavily on *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 122 (La. 2000), for the proposition that a pollution exclusion applies only to "professional polluters."  *Doerr*, however, involved a commercial general liability ("CGL") policy and is inapplicable here on numerous grounds.  Unlike Catalanotto's homeowners' policy, which provides coverage for physical damage to her home, the CGL policy in *Doerr* provided coverage for the insured's liabilities to third parties if the

---

[7] The sixteen perils named in Coverage C are: (1) fire or lightning; (2) windstorm or hail; (3) explosion; (4) riot or civil commotion; (5) aircraft; (6) vehicles; (7) smoke; (8) vandalism or malicious mischief; (9) theft; (10) falling objects; (11) weight of ice, snow or sleet; (12) accidental discharge or overflow of water or steam; (13) sudden or accidental tearing apart, cracking, burning or bulging of certain types of building systems; (14) freezing; (15) sudden and accidental damage from artificially generated electrical current; and (16) volcanic eruption.  (Policy, Form HO-3 (04-91), at  7-8.)

insured was alleged to be legally liable for causing bodily injury or property damage.[8]  The
"total" pollution exclusion in *Doerr* provided that the insurer would not be responsible for
defending or indemnifying an insured if the insured were alleged to have caused bodily injury or
property damage and pollution was a contributing cause of the insured's liability.  *Id.*  The *Doerr*
court concluded that the "total" pollution exclusion was overly broad and limited its scope by
holding that the insurer was obligated to defend and indemnify its insured, unless the insured was
alleged to have caused bodily injury or property damage and the allegedly responsible insured
was in the business of polluting.  *Id.* at 135.[9]

      *Doerr* is inapplicable here for several reasons.  First, there is a fundamental difference
between the purpose of a liability policy and the purpose of a property policy.  A liability policy
provides coverage for certain types of harm caused by the insured to third parties.  In contrast, a
property policy insures the insured's own property.  The inquiry that *Doerr* prescribed for
determining whether a business insured qualifies as a professional polluter—*i.e.*, "the nature of

---

[8] The *Doerr* opinion does not quote or explain the CGL policy's grant of coverage.  A typical CGL policy provides
that the insurer "will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay
as damages because of  A. bodily injury or  B. property damage to which this insurance applies, caused by an
occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages
on account of such bodily injury or property damage …."  *Ricks v. Kentwood Oil Co.*, 2010 La. App. LEXIS 237, at
*7 (La. App. 1 Cir. Feb. 23, 2010).  A typical definition of "bodily injury" is "bodily injury, sickness or disease
sustained by any person which occurs during the policy period, including death at any time resulting therefrom."  *Id.*
at *9.  A typical definition of "property damage" is "(1) physical injury to or destruction of tangible property which
occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of
tangible property which has not been physically injured or destroyed provided such loss of use is caused by an
occurrence during the policy period."  *Id.*  The liability insurance coverage portion of Catalanotto's Policy has a
similar grant of coverage, and does not contain any pollution exclusion.  (*See* Policy, Form HO-03 (04-91), at 12-
17.)

[9] The *Doerr* court constructed the following test to determine whether the exclusion would apply:  "(1) Whether the
insured is a 'polluter' within the meaning of the exclusion; (2) Whether the injury-causing substance is a 'pollutant'
within the meaning of the exclusion; and (3) Whether there was a 'discharge, dispersal, seepage, migration, release
or escape' of a pollutant by the insured within the meaning of the policy."  *Id.* at 135.  The court further instructed
that the following factors should be considered in determining whether the insured is a "polluter": "the nature of the
insured's business, whether that type of business presents a risk of pollution, whether the insured has a separate
policy covering the disputed claim, whether the insured should have known from a course of the exclusion that a
separate policy covering pollution damages would be necessary for the insured's business, who the insurer typically
insures, any other claims made under the policy," and any other factor deemed relevant.  *Id.*

the insured's **business**" and "whether that type of **business** presents a risk of pollution—makes no sense in the context of a homeowner making claim for damage to his or her house.

Second, the pollution exclusion in Catalanotto's Policy is different from the "total" pollution exclusion in the CGL policy in *Doerr*.  Unlike the CGL policy in *Doerr,* which attempted to exclude coverage when the insured became legally liable for causing or contributing to pollution damage, the pollution exclusion in the Catalanotto Policy expressly provides coverage for damage to her residence when "the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage C."  (Policy, Form HO-3 (04-91), at 7.)  Thus, if the release of the pollutant is caused by a fire, explosion, vehicle or any of the other named perils, the loss is covered.  The exclusion applies if a pollutant is released by a non-specified peril, such as a defective building material, and causes property damage.[10]

Third, the rationale of *Doerr*, which was heavily based on the history of the pollution exclusion in CGL policies, is inapplicable to property policies.  Property policies contained exclusions for loss caused by contamination long before the environmental movement that led to the broader pollution exclusion in liability policies.  *See, e.g.*, *Aetna Cas. & Surety Co. v. Yates*, 344 F.2d 939, 940-41 (5th Cir. 1965) (quoting policy that excluded "loss caused by . . . contamination"); *Am. Cas. Co. of Reading, Penn. v. Myrick*, 304 F.2d 179, 181 (5th Cir. 1962) (policy excluded "loss or damage caused by or resulting from . . . contamination" unless caused by explosion).  Significantly, the contamination exclusion was enforced where the insureds were not "polluters."  *See, e.g.*, *Myrick*, 304 F.2d at 183 (applying contamination exclusion where pipe

---

[10] It is also worth noting that the liability insurance coverage in Catalanotto's Policy (Section II), which provides coverage for certain types of claims made by third parties against Catalanotto, has no pollution exclusion.  (*See* Policy, Form HO-3 (04-91), at 12-17 .)  Thus, contrary to the "absurd results" the court found in *Doerr*, the Catalanotto Policy would provide liability coverage for "the release of carbon monoxide from [a] truck," and "a slip and fall on spilled gasoline" on her property, as well as "bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a [swimming] pool."  *See Doerr*, 774 So.2d at 124.

broke, releasing ammonia); *McQuade v. Nationwide Mut. Fire Ins. Co.*, 587 F. Supp. 67, 68 (D. Mass. 1984) (applying exclusion to homeowner's loss caused by chemicals sprayed by exterminator); *Hartory v. State Auto. Mut. Ins. Co.*, 552 N.E.2d 223, 225 (Ohio App. 1988) (applying exclusion to homeowners' loss caused by methane gas from neighboring landfill).  The *Doerr* court's historical rationale for interpreting the total pollution exclusion in CGL policies is thus inapplicable here.

Fourth, extending *Doerr* to the pollution exclusion in the property insurance section of a homeowners' policy would eviscerate the exclusion.  A homeowner is never a "professional polluter" in the sense that a commercial business can be.  This Court should find *Doerr* inapplicable and enforce the plain language of the pollution exclusion in the Policy as written.

## 2. The Cost of Removing and Replacing the Defective Drywall Is Also Not Covered Because the Drywall Has Not Sustained a "Direct Physical Loss"

An additional reason why there is no coverage for the claimed damage to the drywall itself is that the Policy insures "against risks of direct loss to property described in Coverages A and B only if that loss is a physical loss to property."  (Policy, Form HO-3 (04-91), at 6.)  There is no coverage for property that has not experienced a "direct loss," or if the loss is not "a physical loss to property."  Here, Catalanotto does not allege that the drywall itself has sustained a "direct loss" or a "physical loss."[11]

As a leading treatise explains, "[t]he requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer merely suffers a

---

[11] Standard Fire does not dispute, for purposes of this motion, that there is direct loss and physical loss to some electrical and plumbing components of the Catalanotto home.

detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 10 Couch on Insurance § 148:46 (3d ed. 1998).

Consistent with this understanding, the U.S. Fifth Circuit has concluded under Louisiana law that "[t]he language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state – for example, the car was undamaged before the collision dented the bumper." *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 270-71 (5th Cir. 1990). In *Trinity*, the court considered whether a policy covering "all risks of physical loss or of damage to the subject matter" would cover the cost incurred to correct a shipbuilder's faulty workmanship in misaligning two sections of the ship's hull during construction. *Id.* at 267-68. The U.S. Fifth Circuit held that "the parties, by their language 'physical loss or damage', did not intend to cover the cost of repairing faulty initial construction." *Id.* at 272. It explained that coverage would potentially exist for "accidents resulting from defective design or workmanship," if not excluded, "but not the cost of repairing the defect itself." *Id.* at 271.

A number of courts in other jurisdictions have reached similar conclusions. *See Great Northern Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, 793 F. Supp. 259, 263 (D. Or. 1999), *aff'd*, 953 F.2d 1387 (9th Cir. 1992) (holding that where building contained non-friable asbestos, there was no "physical loss" because the building "remained physically intact and undamaged"); *Whitaker v. Nationwide Mut. Fire Ins. Co.*, 115 F. Supp. 2d 612, 617 (E.D. Va. 1999) (holding that claims for repair of construction defects were not claims for "direct physical loss"); *Tocci Bldg. Corp. v. Zurich Am. Ins. Co.*, 659 F. Supp. 2d 251, 259 (D. Mass. 2009) (holding that, because of the lack of "direct physical loss," there was no coverage for the undamaged portion of a retaining wall where the building department required it to be grouted

20

due to the collapse of another portion of the wall); *Bethesda Place Ltd. P'ship v. Reliance Ins. Co.*, Civ. No. HAR 91-1719, 1992 U.S. Dist. LEXIS 6522, at *9 (D. Md. Apr. 22, 1992) ("[C]ase law does not support the argument that a design defect in and of itself constitutes physical injury or damage to property from an external cause").[12]

Here, there is no allegation that the drywall sustained any visible or tangible damage or that it changed state from an initial satisfactory condition to an unsatisfactory condition due to an external cause. Therefore, as in *Trinity*, the cost of removing and replacing the undamaged but defective drywall in Catalanotto's residence is not covered because there was no "direct" or "physical" loss.

**B.    There Is No Coverage For Catalanotto's Personal Property Losses**

In addition to the dwelling damage discussed above, Catalanotto may claim damage to personal property. (*See* Petition, ¶ 11.) Under Coverage C, the Policy covers damage to "personal property owned or used by an 'insured' while it is anywhere in the world" if that damage is caused by any of the 16 perils that are named in the Policy. (*See* Policy, Form HO-3 (04-91), at 2, 7-8.) Catalanotto's personal property losses do not fall within any of these named perils. This claim is therefore not covered.

Even if the damage to Catalanotto's personal property had been caused by one of the named perils, however, coverage would nevertheless be barred by the faulty or defective materials exclusion, as discussed above, which applies to Coverage C. (*See id.* at 8-9.)

---

[12] *TRAVCO* reached a contrary result on this point in the course of ruling for the insurer in a Chinese drywall case, but the court was not bound by (and did not even acknowledge) the federal Fifth Circuit precedent in *Trinity,* which governs this Court's application of Louisiana law. *See TRAVCO,* at *21-28. The court also incorrectly relied on a definition of "Property Damage" that was used only in the *liability* insurance section of the homeowners' policy and has no bearing on first-party property insurance coverage. The same is true here – the Catalanotto Policy uses the defined term "Property Damage" only in Section II of the Policy, which provides third-party liability insurance coverage for claims made by third parties against the insured.

IV.   **BECAUSE THERE IS NO COVERAGE UNDER THE POLICY, THE BAD FAITH AND VALUED POLICY LAW CLAIMS ALSO FAIL AS A MATTER OF LAW**

In her Petition, Catalanotto asserts statutory bad faith claims under La. R.S. 22:1973 and 22:1892.  (Petition, ¶¶ 87-93).  It is well settled that without a viable underlying claim for breach of contract, a plaintiff cannot prevail on statutory bad faith claims.  *See Clausen v. Fid. & Deposit Co. of Md.,* 660 So. 2d 83, 85 (La. 1995) (stating that "a plaintiff attempting to base her theory of recovery against an insurer on these statutes must first have a valid, underlying substantive claim upon which insurance coverage is based"); *Bradley v. Allstate Ins. Co.*, 606 F.3d 215, 2010 U.S. App. LEXIS 9510, at *37-38 (5th Cir. 2010) (same).  Catalanotto also pleads a vague claim for failure to properly train adjusters.  (Petition, ¶¶ 95-96.)  While this claim is not properly pled, *see Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009), and there is no such cause of action under Louisiana law, Catalanotto plainly cannot prevail on such a claim where there was no coverage under her policy, and thus the nature of the adjusters' training is irrelevant.  Catalanotto also alleges that Standard Fire violated Louisiana's Valued Policy Law, La. Rev. Stat. 22:1318.  (Petition, ¶ 100-104.)  The Valued Policy Law, however, applies only where "a property is rendered a total loss from a "*covered peril,*" and there is no coverage here. *Chauvin*, 495 F.3d at 239 (affirming dismissal of claims where total loss was not caused by a covered peril) (emphasis added).  Moreover, the Valued Policy Law applies only to losses caused by fire under a fire insurance policy, and is therefore inapplicable here.  *See Landry v. La. Citizens Prop. Ins. Co.*, 983 So. 2d 66, 76 n.10 (La. 2008); *In re Katrina Canal Breaches Consol. Litig.*, 601 F. Supp. 2d 809, 824-25 (E.D. La. 2009) (Duval, J.); *Hibbets v. Lexington Ins. Co.*, 2009 U.S. Dist. LEXIS 54777, at *7-8 (E.D. La. June 12, 2009) (Barbier, J.); *Crescent City*

*Prop. Redevelopment Assoc., LLC v. USAA Cas. Ins. Co.*, 2009 U.S. Dist. LEXIS 29988, at *8-9

(E.D. La. Apr. 7, 2009) (Lemelle, J.).

**V.      CONCLUSION**

      For all of the foregoing reasons, this Court should grant Standard Fire's Motion to

Dismiss and dismiss the Petition, in its entirety, for failure to state a claim upon which relief

could be granted.

                        Respectfully Submitted,

                        */s/Seth A. Schmeeckle*
                        **Ralph S. Hubbard III, La. Bar No. 7040**
                        **Seth A. Schmeeckle, La. Bar No. 27076**
                        **LaDonna G. Wilson, La. Bar No. 29102**
                        601 Poydras Street, Suite 2775
                        New Orleans, LA 70130
                        Telephone:    (504) 568-1990
                        Facsimile:     (504) 310-9195
                        e-mail:          rhubbard@lawla.com
                                      sschmeeckle@lawla.com
                                      lwilson@lawla.com

                        **Attorneys for The Standard Fire Insurance**
                        **Company**

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that the above and foregoing Memorandum in Support of Motion to Dismiss has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and e-mail <u>or</u> by hand delivery and e-mail <u>and</u> upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this <u>19th</u> day of July, 2010.

                        */s/Seth A. Schmeeckle*
                          **Seth A. Schmeeckle, La. Bar No. 7040**