UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | : : : : : : : | MDL NO. 2047 SECTION:  L JUDGE FALLON MAG. JUDGE WILKINSON |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**This Document Relates to *Germano, et al. v. Taishan Gypsum Co. Ltd., et al.*, case no. 09-6687**

## FINDINGS OF FACT & CONCLUSIONS OF LAW

### TABLE OF CONTENTS

I.     Background & Procedural History..................................................................................3
II.    Findings of Fact & Conclusions of Law........................................................................6
       A.    Background: Gypsum & Drywall........................................................................6
       B.    How & When the Chinese Drywall was Installed in the Plaintiff-intervenor
             Homes....................................................................................................................8
       C.    General Scientific Findings on Chinese Drywall Which Distinguish it From
             Typical, Benign Drywall.....................................................................................12
       D.    Plaintiff-intervenor Homes Have Been Exposed to a Corrosive Environment
             Produced by Chinese Drywall............................................................................17
             1.    CPSC Standards.......................................................................................17
             2.    Florida Division of Health Standards......................................................18
             3.    Battelle & International Standards Association Classifications Indicate the
                   Corrosion Found in Plaintiff-intervenor Homes is Severe........................19
                   a.    Qualitative Criteria for Corrosivity..............................................20
                   b.    Quantitative Criteria for Corrosivity............................................21
             4.    Peer-reviewed Literature & Expert Opinion Consensus...........................23
       E.    Scope of Remediation........................................................................................26
             1.    All Drywall in the Plaintiff-intervenor Homes Needs to be Removed &
                   Replaced..................................................................................................27
                   a.    Drywall sales and delivery records, where available, lack the
                         reliability and precision necessary to locate all of the Chinese
                         drywall in a mixed drywall home..................................................28
                   b.    The Knauf proposed method, or combination of methods, for
                         selective drywall identification do not rise above the level of
                         experimental, and lack the scientific reliability necessary to
                         conduct a board-by-board removal system at the present time......29
                   c.    Removal of all drywall in a mixed home is efficient and cost



EXHIBIT
B

|   |   |   | effective..................................................................................31 |
|   |   | d. | It is not practical or economical to detect, selectively remove, and replace individual boards of Chinese drywall..............................33 |
|   | 2. | | All Electrical Wires in the Plaintiff-intervenor Homes Need to be Replaced..............................................................................34 |
|   |   | a. | Scientific Reasons........................................................34 |
|   |   | b. | Economic & Practical Reasons....................................38 |
|   | 3. | | All Copper Pipes in the Plaintiff-intervenor Homes Need to be Replaced39 |
|   |   | a. | Scientific Reasons........................................................39 |
|   |   | b. | Economic & Practical Reasons....................................40 |
|   | 4. | | HVAC Units in the Plaintiff-intervenor Homes Need to be Replaced......40 |
|   |   | a. | Scientific Reasons........................................................40 |
|   |   | b. | Economic & Practical Reasons....................................44 |
|   | 5. | | Selective Electrical Devices & Appliances in the Plaintiff-intervenor Homes Need to be Replaced....................................................46 |
|   |   | a. | Scientific Reasons........................................................46 |
|   |   | b. | Economic & Practical Reasons....................................49 |
|   | 6. | | Whether Flooring Needs to be Replaced...................................49 |
|   |   | a. | Carpet Must be Replaced..............................................49 |
|   |   | b. | Hardwood or Vinyl Flooring Must be Replaced..........................50 |
|   |   | c. | Tile Flooring May Need to be Replaced....................................50 |
|   | 7. | | Items Which Must be Removed With the Drywall May Need to be Replaced..............................................................................50 |
|   |   | a. | Cabinets Must be Replaced............................................51 |
|   |   | b. | Countertops Must be Replaced.......................................51 |
|   |   | c. | Trim, Crown Molding and Baseboards Must be Replaced...........51 |
|   |   | d. | Bathroom Fixtures Must be Replaced...........................52 |
|   | 8. | | Insulation Must be Replaced.....................................................52 |
|   | 9. | | The Plaintiff-intervenor Homes Will Need to be Cleaned with a HEPA Vacuum, Wet-wiped or Power-washed, & Allowed to Air-out After Remediation.................................................................................53 |
|   | 10. | | After Remediation, an Independent, Qualified Engineering Company Should Certify that the Homes are Safe for Occupation...........................53 |
|   | 11. | | The Scope of Work is Consistent with Chinese Drywall Remediation by National Homebuilders..................................................................54 |
|   | 12. | | The Court's Scope of Remediation as Compared to the NAHB & CPSC Remediation Protocols...................................................................55 |
|   | 13. | | The Plaintiff-intervenor Families Will be out of Their Homes for 4-6 Months During Remediation.................................................................56 |
| F. | | | The Costs of Repairing Virginia CDW Homes is on Average $86/Square Foot...57 |
| G. | | | It is Not Certain that Plaintiff-intervenors Have Suffered Property Devaluation Caused by the Chinese Drywall Contamination....................................60 |
| H. | | | Chinese Drywall Effects on Plaintiff-intervenors & Their Homes, & Their Resulting Damages.....................................................................61 |

1.  The Plaintiff-intervenor Cases Provide a Representative Cross-section of Homes Contaminated by Chinese Drywall & Persons Harmed by Chinese Drywall................................................................................62
2.  Law Applicable to Plaintiff-intervenors' Recovery of Damages...............64
3.  Plaintiff-intervenors & Their Damages.....................................................69
    a.  Deborah and William Morgan.....................................................69
        i.   Background.......................................................................69
        ii.  Damages............................................................................73
    b.  Jerry and Inez Baldwin.................................................................75
        i.   Background.......................................................................75
        ii.  Damages............................................................................78
    c.  Joe and Cathy Leach......................................................................79
        i.   Background.......................................................................79
        ii.  The Leach home is a unique example of known, localized use of Chinese drywall which can be repaired as a stand-alone unit of the home, without removing all drywall in the home.................................................................................82
        iii. Damages............................................................................83
    d.  Robert and Lisa Orlando................................................................84
        i.   Background.......................................................................84
        ii.  Damages............................................................................88
    e.  Fred and Vanessa Michaux.............................................................90
        i.   Background.......................................................................90
        ii.  Damages............................................................................93
    f.  Preston and Rachel McKellar.........................................................95
        i.   Background.......................................................................95
        ii.  Damages............................................................................99
    g.  Steven and Elizabeth Heischober..................................................101
        i.   Background.....................................................................101
        ii.  Damages..........................................................................104
III.  Conclusion..........................................................................................................106

## I. BACKGROUND & PROCEDURAL HISTORY

From 2004 through 2006, the housing boom and rebuilding efforts necessitated by various hurricanes led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions

of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall. Accordingly, these homeowners began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation pursuant to 28 U.S.C. § 1407. In response to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were transferred and consolidated for pretrial proceedings in the U.S. District Court, Eastern District of Louisiana.

The present matter commenced when Plaintiffs, on behalf of themselves and all other similarly situated owners and tenants, brought a class action against Defendants Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd. ("Taishan"); Tobin Trading, Inc.; Venture Supply, Inc.; Harbor Walk Development, LLC; and The Porter-Blaine Corp. Plaintiffs filed their initial complaint in the Eastern District of Virginia on May 1, 2009. Thereafter, on May 26, 2009, Plaintiffs filed their First Amended Complaint. On August 3, 2009, Plaintiffs received notice that service of process of the First Amended Complaint was perfected on Defendant Taishan. Plaintiffs' case was then transferred to the Eastern District of Louisiana on October 13, 2009. Subsequent to transfer, Plaintiffs moved to amend the First Amended Complaint to assert a national class against Taishan. Plaintiffs' motion to amend was granted.

The Second Amended Class Action Complaint asserts claims against Taishan for negligence, negligence per se, breach of express and/or implied warranties, private nuisance, unjust enrichment, violation of the Consumer Protection Acts and for equitable injunctive and medical monitoring. Since Taishan did not timely respond to the Complaint or enter its appearance in this litigation, Plaintiffs moved for a default judgment. On November 20, 2009, the Court granted a preliminary default against Taishan.

On November 25, 2009, the Court issued a scheduling order setting an evidentiary hearing to address the scope and extent of appropriate remediation, and the cost of remediation. Pursuant to the Court's scheduling order, interested parties were permitted to intervene in the proceeding. The Court granted a motion to intervene filed by William and Deborah Morgan, Preston and Rachael McKellar, Frederick and Vanessa Michaux, J. Jerry and Inez Baldwin, Joseph and Kathy Leach, Robert and Lea Orlando, and Steven and Elizabeth Heischober. These parties are known as the Plaintiff-intervenors. Knauf Plasterboard Tianjin Co. Ltd. and The Mitchell Company, Inc. also moved for and were granted intervention.

Vigorous discovery was conducted by the Intervenors. Depositions were taken and expert reports were exchanged. A *Daubert* hearing was held on January 29, 2010. Subsequently, the Intervenors filed numerous motions *in limine*. On the eve of the evidentiary hearing, both Knauf and The Mitchell Co. voluntarily withdrew from the proceeding, leaving only the Plaintiff-intervenors to put on evidence.

This default matter came on for hearing without a jury on February 19, 2010, and culminated on February 22, 2010. The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence, as well as the record. Pursuant to Rule 52(a) of the Federal Rules

of Civil Procedure, the Court issues the following Findings of Fact and Conclusions of Law. To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such and to the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

In this opinion, the Court will first discuss the general background of gypsum and drywall, then it will consider how and when the defective Chinese drywall was installed in the Plaintiff-intervenors' homes, next the scientific findings regarding Chinese drywall, the nature and level of the corrosive environment in the Plaintiff-intervenors' homes, the type and degree of resulting damages, the proper scope of remediation, and the costs of this remediation.

## II.  FINDINGS OF FACT & CONCLUSIONS OF LAW

### A.    BACKGROUND: GYPSUM & DRYWALL

Drywall is a widely used construction material that is also known as gypsum board, wallboard, plasterboard, sheetrock, and gyproc. P2.0006-0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)). A drywall panel is composed of a layer of hardened gypsum plaster sandwiched between two layers of paper liner. *Id.* Gypsum is a hydrated calcium sulfate, composed of two molecules of water ($H2O$) and one of calcium sulfate ($CaSO4$). *Id.*

The gypsum used to make drywall can be created both naturally and synthetically. *Id.* Naturally occurring gypsum is a deposit largely the result of the evaporation of water in ancient inland seas which contains large amounts of dissolved gypsum. P2.0051-001 (*Treatment and Disposal of Gypsum Board Waste*, Construction Dimension, February 1992 at 5). Synthetic gypsum is chemically identical to mineral gypsum, but the amount and types of trace materials and unreacted sorbents found in the source material can vary among power plants and among mines from which

it originates. P2.0006-0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)). Synthetic gypsum is generally obtained in the final stage of industrial processes, where sulfuric acid is neutralized by a calcium salt; for example it is produced as a byproduct of coal combustion power plants. *Id.*; P2.0240.0014 (ASTM International report).

To make drywall from gypsum, first gypsum is crushed or ground up and heated to about 350 degrees Fahrenheit to remove approximately seventy-five percent (75%) of its water content in a process called calcining, thereafter becoming a fine white powder. P2.0006-0003 (Cozen O'Connor, *Chinese Drywall Litigation: Subrogation Whitepaper* (2009)); P2.0051-0001 (*Treatment and Disposal of Gypsum Board Waste*, Construction Dimensions, February 1992 at 5). Second, the calcined gypsum is mixed with water, foam, and other additives to form a slurry which is fed between continuous sheets of paper on a continuous belt line. *Id.* Third, as the board moves down the belt line, the calcined gypsum recrystalizes or rehydrates, reverting to its original gypsum state, and the paper sheets become firmly bonded to the rehydrated core. *Id.* Finally, the board is cut to length and conveyed through dryers to remove free moisture. *Id.*

Historically, gypsum was used as far back as 3700 B.C. by the Egyptians as a base to preserve the wall murals in the pyramids. P2.0051-0001(*Treatment and Disposal of Gypsum Board Waste*, Construction Dimension, February 1992 at 6); P2.0240-0022 to -0023 (ASTM International, Oct. 2009 at 9-10). The Roman Empire used gypsum for interior purposes, such as the interior walls of Pompeii. *Id.* There is little information of the use of gypsum plaster during the Middle Ages. *Id.* The modern science of gypsum began with the discoveries by Antoine Lavoisier outlined in his two papers on gypsum presented to the French Academy of Sciences in 1765 and 1766. P2.0240-0022 to -0023 (ASTM International, Oct. 2009 at 11). In the United States, the use of gypsum board

started in the early 1950s and was driven by the following issues, (1) avoiding the drying time of

plaster which allowed earlier occupancy of buildings, and (2) the lack of skilled plasterers in many

locations.  P2.0240-0026(ASTM International, Oct. 2009, pg. 13).  Gypsum is fire resistant, thus

making it a preferable material for drywall.  P2.0051-0001 (*Treatment and Disposal of Gypsum*

*Board Waste*, Construction Dimensions, February 1992 at 6).

## B.  HOW & WHEN THE CHINESE DRYWALL WAS INSTALLED IN THE PLAINTIFF INTERVENOR HOMES

The Chinese drywall in the present cases was manufactured by Shandong Taihe Dongxin Co.,

Ltd. which on September 10, 2007, changed its name to Taishan Gypsum Co., Ltd.  P3.0629-1000

(Affidavit of Russ M. Herman In Support of the Plaintiffs' Steering Committee's Evidentiary

Presentation Regarding Taishan Gypsum Co., Ltd. ¶15); Trial Transcript at 2/19 Vol.I p.9-18,

P3.0629-0150; P3.0629-0177 (Herman Opening).  Hereafter, Shandong Taihe Dongxin Co., Ltd. and

Taishan Gypsum Co., Ltd. shall be referred to as "Taishan."

On November 9, 2005, Venture Supply, Inc., a company in Norfolk, Virginina, provided

an original letter of credit in the amount of $429,600.00 to the order of Shandong Taihe Dongxin

Co. for 120,000 sheets of drywall to meet all USA ASTM ratings and fire rating standards.

P3.0629-1000 (Affidavit of Russ M. Herman ¶5), P1.1802-0063 to 0068.  On November 14,

2005, Frank Clem, manager of Venture Supply, was advised that the manufacturer was not clear

on U.S. ASTM ratings and Venture Supply was requested to remove U.S. ASTM requirements

from the letter of credit and rely solely upon Chinese ratings.  P3.0629-1000 (Affidavit of Russ

M. Herman ¶7).  Venture Supply then contracted with Taishan to purchase drywall.  P3.0629-

1000 (Affidavit of Russ M. Herman ¶¶7-8), P1.1802-0070.  Although it originally contracted to

meet United States' ASTM standards, Taishan insisted that the drywall it sold to Venture Supply,

Inc. would not be required to meet these standards. *Id.* Accordingly, on November 15, 2005, Venture Supply directed its bank to remove the U.S. ASTM requirement from the letter of credit to Taishan. *Id.* Pursuant to contract, on December 25, 2005, Taishan had 2,000 pallets of drywall shipped aboard the M/V Glykofillousa from the Chinese Port of Loading, Lianyungang. P3.0629-1000 (Affidavit of Russ M. Herman ¶¶10-11), P1.1802-0091, P1.1802-0003. The shipment arrived in the United States in February, 2006. *Id.*

On December 16, 2005, a second contract was signed between Venture Supply and Shandong Taihe Dongxin Co. for 100,000 sheets on 2,000 pallets to be shipped to Norfolk, Virginia. P3.0629-1000 (Affidavit of Russ M. Herman ¶12), P1.1802-0089, P1.1802-0003, P1.1802-0007. However, the second shipment of drywall was reduced to 53,912 sheets on 586 pallets, which was shipped onboard the M/V Atlantic Fortune from the Chinese Port of Loading, Lianyungang. *Id.* This shipment was off- loaded in Camden, New Jersey. *Id.*

All of Taishan's drywall sold to Venture Supply bore the following legend on end binding label tape: "4'x12'x1/2" Gypsum Board Distributed by Venture Supply, Inc." and on the back of the board: "Venture Supply, Inc. MFG. Shandong Taihe Dongxin, Co., Ltd., China." P3.0629-1000 (Affidavit of Russ M. Herman ¶6), Deposition of Samuel G. Porter (12/16/09, 12/17/09) at 321-322.

The Porter-Blaine Corporation, a company related to Venture Supply, Inc., purchased Taishan drywall from Venture Supply, Inc. *See* 2/19/10 Trial Transcript at p.17 (12-14). Venture Supply, Inc. shipped Taishan drywall to each of the seven intervening plaintiffs' (hereinafter "Plaintiff" or "Plaintiff-intervenor") homes and the drywall was thereupon installed by the Porter-Blaine Corporation in the homes. *See* Trial Transcript at 2/19 Vol.I p.17(9-14),

p.13(16-20), p.16(22) - 17(2), p.20(17-24) (Herman Opening).

The drywall product from China was never tested pursuant to the United States ASTM standard. P3.0629-1000 (Affidavit of Russ M. Herman ¶13), P1.1802-0046 to 0061, P1.1802-0023; Deposition of Samuel G. Porter (12/16/09) at p. 84-85. Venture relied on a representation that Chinese testing was equivalent to the U.S. testing standards. *Id.* However, the Chinese tests were accomplished by a government agency of the Republic of China and not by an independent testing laboratory. *Id.* Certificates of Quality were likewise issued by a government agency. P3.0629-1000 (Affidavit of Russ M. Herman ¶14), P1.1802-0045, P1.1802-0043. But the Certificate of Quality Management System Certification issued predates the production of the drywall shipped to the United States by at least two (2) years. *Id.*

On March 19, 2005, BNBM became the largest shareholder of Taihe Dongxin by purchasing sixty-five percent (65%) of the equity of Taishan Dongxin. P3.0629-1000 (Affidavit of Russ M. Herman ¶16), P3.0629-0150, P3.0629-0177. The state-owned Assets Supervision and Administration Commission of the State Counsel (SASAC) of the People's Republic of China controls the "plasterboard" manufacturing, exportation and certification industry. P3.0629-1000 (Affidavit of Russ M. Herman ¶¶18 -20), P3.0629-0113, P3.0629-0136, 0137. The SASAC supervises and manages the State-owned assets of the enterprises engaged in drywall production, including Taishan. *Id.* The degree of control SASAC (Government of China) exerts and influences is extensive. *Id.* For example, SASAC assumes the responsibility as the investor on behalf of the state; it supervises and manages the state-owned assets and enterprises; controls the value preservation and increment of the state-owned assets; guides and pushes forward the reform and restructuring of SOEs; appoints and removes top executives of

SOEs; is responsible for organizing SOEs to turn gains over to the state; is responsible for urging

SOEs to carry out laws and regulations for safety production; directs and supervises the

management work of local state-owned assets; and undertakes other tasks assigned by the State

Council. *Id.* Furthermore, SASAC oversees and controls 150 large central state-owned

enterprises (SOEs), including China National Building Material Group Corporation (AS CNBM

Group). P3.0629-1000 (Affidavit of Russ M. Herman ¶18), P3.0629-0113 to 0116. SASAC has

a presence in the United States through CNBM USA Corporation, located at 17800 Castleton

Street, City of Industry, California 91748. P3.0629-1000 (Affidavit of Russ M. Herman ¶21),

P3.0629-0122. SASAC owns 100% of the CNBM Group. *Id.* CNBM Group, in turn, owns

56.4% of the China National Building Material Company, Limited (CNBM Co., Ltd); 75% of

BNBM; 100% of CNBM Import and Export Co. and 100% of CNBM Academy. P3.0629-1000

(Affidavit of Russ M. Herman ¶19), P3.0629-0117 to 0120, P3.0629-0123 to 0125. CNBM Co.,

Ltd. Owns 52.40% of Beijing New Building Material Co., Ltd. (BNBM). *Id.* CNBM Group, in

turn, owns 56.4% of the China National Building Material. *Id.* CNBM USA was established in

2006 the same year that Taihe (Taishan) sold Chinese-manufactured drywall to Venture Supply

Inc. *Id.* CNBM (USA) Corporation has the announced mission to provide all kinds of building

materials and services in the national market. *Id.*

  CNBM's Gypsum Board business production on December 31, 2008 from its wholly

owned subsidiary, Taishan Gypsum Co., was $262.3 million yuan. P3.0629-1000 (Affidavit of

Russ M. Herman ¶22), P3.0629-0125, P3.0629-0331, 0332. Taihe's (Taishan) revenue for 2006

was 773,000,000 yuan. P3.0629-1000 (Affidavit of Russ M. Herman ¶23), P3.0629-0130. A

yuan is worth approximately 6.8 dollars. *Id.* Taishan manufactures more than 60 types of

products including standard plasterboard. P3.0629-1000 (Affidavit of Russ M. Herman ¶24),

P3.0629-0153. In addition to the shipments in 2006 to Venture Supply, Taishan Plasterboard

Co., Ltd. shipped 76 shipments of plasterboard to the U.S. between March 2006 and August 2007

to four U.S. ports. P3.0629-1000 (Affidavit of Russ M. Herman ¶25), P3.0629-0175.

**C.    GENERAL SCIENTIFIC FINDINGS ON CHINESE DRYWALL WHICH
DISTINGUISH IT FROM TYPICAL, BENIGN DRYWALL**

Chinese drywall is different from typical, benign drywall for the following reasons:

1.    Chinese drywall has a significantly higher average concentration of strontium and
significantly more detectable levels of elemental sulfur. P2.0135-0003.

2.    Chinese drywall releases reduced sulfur gases. P1.2025-0003, 0004, (Streit
Supplemental Report), Trial Transcript at 2/19 Vol.II p.57 (23)– p.58(18) (Scully
Testimony) (The Court has accepted Dr Scully as an expert in the fields of
corrosion, metallurgy, and materials science. Trial Transcript at 2/19 Vol. I, p.46
(19-24) (Scully Testimony)). The three main gases that are released from CDW
are hydrogen sulfide ($H_2S$), carbonyl sulfide (COS), and carbon disulfide ($CS_2$).
Trial Transcript at 2/19 Vol.II p.57 (23)–58(18) (Scully Testimony), Trial
Deposition of Lori Streit (2/16/10) at p.68(21)– p.69(3). The CDW also releases
elemental sulfur. P1.2025-0003, 0004 (Streit Supplemental Report). The
Plaintiffs' experts have detected reduced sulfur gas emissions by conducting
laboratory tests on samples of Chinese drywall. Trial Deposition of Lori Streit
(2/16/10) at p.24(16)– p.25(1). These emissions are also confirmed by strong
odors. Trial Deposition of Lori Streit (2/16/10) at p.55(10–14), Trial Transcript at
2/22 Vol.I p.101(7–14) (Rutila Testimony). The fact that Chinese drywall emits

sulfur gases has also been reported by the U.S. Consumer Products Safety

Commission, the Florida Department of Health, and other investigatory agencies

and firms.  Trial Deposition of Lori Streit (2/16/10) at p.68(21)– p.69(3),

p.80(1–17).

3.      The sulfur gases released by Chinese drywall are irritating to the human body.

Trial Deposition of Lori Streit (2/16/10) at p.55(15–21), Trial Transcript at 2/22

Vol.I p.101(17–19) (Rutila Testimony).  Exposed individuals reported irritation of

the eyes, respiratory system, and skin, among other things.  *Id.*

4.      The sulfur gases released by Chinese drywall cause offending odors in homes,

making them hard if not impossible to live in.  Trial Transcript at 2/19 Vol.I

p.53(23)-pg.54(7)(Morgan testimony), Trial Transcript at 2/22 Vol.I p.8(4-

17)(Michaux Testimony), Trial Deposition of Lori Streit (2/16/10) at p.55(10-1

5.      The sulfur gases released by Chinese drywall are corrosive to metals, particularly

copper and silver.  Trial Deposition of Lori Streit (2/16/10) at p.80(8–17),

p.90(23)– p.91(7), Trial Transcript at 2/19 Vol.II p. p.56 (19)– p.57(12),

p.59(3–12) (Scully Testimony)).  "Corrosion" is defined by the ASTM as the

chemical or electrochemical reaction between a material, usually a metal, and its

environment that produces a deterioration of the materials and its properties.

P1.1852-0002 (ASTM Terminology), Trial Transcript at 2/19 Vol. II p.51(20)-

p.52(5) (Scully Testimony).  Copper and silver metal components in the Plaintiffs'

houses are extremely vulnerable to corrosion from exposure to the sulfur gases.

P2.0076-0001, 0002 (Graedel 1983 (copper)), Trial Transcript at 2/19 Vol.II

-13-

p.56(19–24) (Scully Testimony), P2.0202-0001, 0002 (Chudnovsky 2008

(silver)), Trial Transcript at 2/19 Vol.II p.157(13–18) (Galler Testimony).  The

sulfur gases, in reacting with metals, form sulfide deposits on the surfaces of the

metals.  Trial Deposition of Lori Streit (2/16/10) at p.80(8–17).  For example, a

reaction of sulfur gases with copper pipes will form copper sulfide on the metals.

Trial Deposition of Lori Streit (2/16/10) at p.72(18–24).  The reaction of sulfur

gases with metals can be said to be "consuming" the useful, pure metals by

replacing those metals with sulfides.  Trial Transcript at 2/19 Vol.II p.141 (15–16)

(Galler Testimony) (The Court has accepted Mr. Galler as an expert in the fields

of electrical engineering, power electronics, electrical machinery, and failure

analysis. Trial Transcript at 2/19 Vol.I, p.128 (3-7) (Galler Testimony)).

6.     The corrosion on metals caused by the sulfur gases emitted by Chinese drywall

causes premature failure of electrical & mechanical devices.  P1.2001-0019, 0020,

0021 (CTL/Krantz Original Report, HVAC Coil Failure due to Corrosion),

P3.0625-0001, 0002 (FRE 1006 Summary of HVAC Coil Failure Data), P1.2053-

0001 (Virginia Corrosion Thicknesses Exceed Failure Standard), Trial Transcript

at 2/19 Vol.II p.55(24) – p.156(17) (Galler Testimony), Trial Transcript at 2/19

Vol.II p.100(17) – p.101(16), p.152(22) – p.153(1) (Scully Testimony), Trial

Transcript at 2/22 Vol.I p.90(3-23) (Barnett Testimony proffer) (The PSC tenders

Dr. Barnett, and the Court accepts him as, an expert in Engineering and Fire

Safety.  Trial Deposition of Jonathan Barnett (2/12/10) at p. 11(14)-18(22),

P1.2015-0019 – P1.2015-0024 (Barnett Report, C.V.).  The Plaintiff-intervenors

-14-

have reported many premature failures of major appliances and consumer
electronics in their homes during their first three years of use of these homes.
P1.2018-0014, 0015, 0046 (SGH/Rutila Supplemental Report), Trial Transcript at
2/22 Vol.II p.11(23) – p.12(13)(Rutila Testimony).   Laboratory analysis of these
copper and silver components from the Virginia homes identified the corrosion as
the cause of an HVAC coil failure and severe corrosion deposits at the operative
connections in the appliances and in consumer electronics.   P1.2018-0015, 0046
(SGH/Rutila Supplemental Report), P1.2001-0019, 0020, 0021 (CTL/Krantz
Original Report), P1.2020-0002, 0003, 0004, (Original Galler Report), Trial
Transcript at 2/19 Vol.II p.48(23) – p.149(6)(Galler Testimony), Trial Transcript
at 2/19 Vol.II p.52(18) – p.53(4), p.65(6-16), p.111(18-23) (Scully Testimony).
Mechanical, electrical, and electronic failures have been shown to have occurred
prematurely due to the severe industrial corrosive environments in these Chinese
Drywall homes.   P1.2001-0019, 0020, 0021 (CTL/Krantz Original Report, HVAC
Coil Failure due to Corrosion), P3.0625-0001, 0002 (FRE 1006 Summary of
HVAC Coil Failure Data), P1.2053-0001 (Virginia Corrosion Thicknesses Exceed
Failure Standard), Trial Transcript at 2/19 Vol.II p.55(24) – p.156(17) (Galler
Testimony), Trial Transcript at 2/19 Vol.II p.100(17) – p.101(16), p.152(22) –
p.153(1) (Scully Testimony), Trial Transcript at 2/22 Vol.I p.90(3-23) (Barnett
Testimony proffer) (The PSC tenders Dr. Barnett, and the Court accepts him as,
an expert in Engineering and Fire Safety.  Trial Deposition of Jonathan Barnett
(2/12/10) at p. 11(14)-18(22), P1.2015-0019 – P1.2015-0024 (Barnett Report,

C.V.).  Evaluation of comparable HVAC systems, appliances, and electronics in

*control* homes (e.g., similar homes without Chinese Drywall) do not show

premature failures of HVAC systems, appliances, and electronics, and the wires

do not have corrosion product thicknesses that would predict premature failures.

P1.2022-0005, 0006, 0007, 0008 (Scully Supplemental Report), Trial Transcript

at 2/19 Vol.II p.1(23) – p.112(2) (Scully Testimony), Trial Transcript at 2/22

Vol.II p.12(18) – p.13(22), p.23(6-14) (Rutila Testimony), P1.1892-0001, 0002,

0003, P1.2057-0001, 0002, P1.2057-0001, 0002 (comparisons between corroded

electronics from CDW homes and electronics from control homes), Trial

Transcript at 2/19 Vol. II p.144(2-19), p. 149(7-16) (Galler Testimony).

7.      The corrosion on metals caused by the sulfur gases emitted by Chinese drywall

poses a fire risk.  Trial Transcript at 2/19 Vol. II p.130 (3–14) (Galler Testimony).

The corrosion increases resistance in the circuitry of appliances and electronics.

*See* P1.2020-0004 (Galler Report); *see also* P2.0202-0001 (Chudnovsky,

Corrosion of Electrical Conductors), Trial Transcript at 2/19 Vol. II p. 130 (3-14)

(Galler Testimony).  Increased resistance increases heat in appliances and

electronics.  P1.2020-0002 (Galler Report), Trial Transcript at 2/19 Vol. II p. 130

(3-14) (Galler Testimony).  This increased resistance can cause excessive heating

of the connection when energized.  *See* Trial Transcript at 2/19 Vol. II p. 129

(25)– p.130 (2) (Galler Testimony); *see also* P2.0202-0001 (Chudnovsky 2008).

Complete failure of a switch can lead to fires or other life safety problems,

depending on the intended function of the switch. Trial Transcript at 2/19 Vol. II

p.130 (3–14) (Galler Testimony).

Knauf Plasterboard Tianjin (hereinafter "Knauf" or "KPT") and Plaintiffs Steering Committee (hereinafter "PSC") experts agree that all of the problematic Chinese drywall products share similar chemical and physical properties.  P1.2025-0003, 0004, (Streit Supplemental Report), Deposition of Matthew Perricone Ph.D. (1/21/10) Ex. 2 (Perricone Original Report) at p. i (¶ 4.7), Deposition of Sandy Sharp (2/5/10) at p.148(15)– p.150(11), Trial Deposition of Lori Streit (2/16/10) at p.24(6)– p.25(1), p.26(11–12), p.27(21)– p.28(7) (finding commonalities among Chinese drywall products).

## D.   PLAINTIFF-INTERVENOR HOMES HAVE BEEN EXPOSED TO A CORROSIVE ENVIRONMENT PRODUCED BY CHINESE DRYWALL

The level of corrosive sulfur gases emitted by Chinese drywall in the Plaintiff-intervenors' homes exceed the safe level established by recognized standards, peer reviewed literature, and expert opinions and this corrosive environment has had a significant impact on the expose property.

### 1.   CPSC Standards

The seven Plaintiff intervenors' homes meet the CPSC "Interim Guidance – Identification of Homes with Corrosion from Problem Drywall (January 28, 2010)."  P1.1844-0001 (CPSC Guidance Problem Drywall), Trial Transcript at 2/22 Vol.II p.6(25) – p.7(5) (Rutila Testimony).  P1.1844-0001 (CPSC Guidance Problem Drywall), Trial Transcript at 2/22 Vol. II p.11(1-19) (Rutila Testimony).  The CPSC Guidance sets forth "Corroborating Evidence" for the presence of CDW in such homes.  *Id.*  The CPSC Guidance requires that 4 out of 6 types of corroborating evidence be met to establish a "Problem Drywall" home.  *Id.*  The six types of evidence are: (a)

-17-

corrosive conditions demonstrated by copper sulfide on copper coupons or confirmation of sulfur

in blackening of grounding wires and/or air conditioning coils; (b) confirmed markings of

Chinese origin on the drywall; (c) strontium levels (excluding the exterior paper) exceeding 1200

ppm; (d) laboratory elevated sulfur readings above 10 ppm; (e) elevated levels of $H_2S$, COS, $CS_2$;

and (f) corrosion of copper to form copper sulfide when copper is placed in test chambers with

drywall samples from the home. *Id.* The seven Plaintiff intervenors' homes meet the

corroborating evidence criteria set forth in the CPSC Guidance. P1.2025-0003, 0004. (Streit

Supplemental Report, off gassing studies), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I

p.39(24) – p.40(4), p.42 (8-14), p.51(13-25), p.59 (14) – p.60 (6) (Streit Testimony), P1.1824

(FRE 1006 Summary of Screening Data for Virginia Homes, (copper strips in mason jars and

laboratory verification of copper sulfide on HVAC and wire), P1.2001-0019, 0026, 0036,

P1.2002-0007 (CTL/Krantz Original and Supplemental Reports, laboratory confirmation copper

sulfide on wires and HVAC), P1.2021-0008, 0010, 0011, P1.2022-0020, 0021, 0022 (Scully

Original and Supplemental Reports, laboratory confirmation of copper sulfide on wires and

HVAC), Trial Transcript at 2/19 Vol.II p.111(13-22) (Scully Testimony, copper sulfide on wires

and HVAC) (The PSC tenders Brad Krantz, and the Court accepts him, as an expert in corrosion

science. P1.2001-0001 (Original CTL/Krantz Report, C.V.)), Trial Transcript at 2/22 Vol. II

p.5(13-17) (Rutila Testimony).

### 2.    Florida Division of Health Standards

The Florida Case Definition for "Confirmatory Evidence of Drywall Associated

Corrosion" includes three items. P1.1841-0001-0004 (FLA Case Definition), Trial Transcript at

2/22 Vol.II p.5(7) – p.8(25) (Rutila Testimony).   If any one of the three is positive, that is

considered confirmatory evidence. *Id.* The three types of confirmatory evidence are: (1) laboratory testing for elemental sulfur indicating that the gypsum source in the drywall contributes to the reduced sulfur gases emitted from the corrosive drywall; (2) laboratory analysis (i.e., headspace) for reduced sulfur gas emissions capable of causing copper corrosion in the house; and (3) qualitative analysis of suspect drywall for its ability to cause corrosion/blackening of copper under controlled conditions indicating drywall samples from the house emit gasses capable of corroding copper. *Id.* The Taishan drywall in the seven Virginia Plaintiff intervenors' homes meets at least one of the types of the confirmatory evidence criteria for the Florida Case Definition. P1. 2025-0003, 0004 (Streit Supplemental Report laboratory results for elevated sulfur, $H_2S$, COS, and $CS_2$), Deposition of Lori Streit (2/16/10) at 2/22 Vol.I p.39(24) – p.40 (5) (Streit Testimony); *see also* P1.2023-0011 (Streit Original Report), P1.1824-0001 (FRE 1006 Summary of Screening Data for Virginia Homes, "aging" tests showing blackening of copper strips in mason jars (chamber test)).

### 3. Battelle & International Standards Association Classifications Indicate the Corrosion Found in Plaintiff-intervenor Homes is Severe

The Plaintiff intervenors' homes demonstrate levels of corrosion found in the most severe industrial corrosive environment. Trial Transcript at 2/19 Vol. II p.112(9-15) (Scully Testimony). P2.0195-0026, 0065, 0066 (Abbott, 1993, MTI #38), Trial Transcript at 2/19 Vol.II p.92 (11-18), p.83 (8-14) (Scully Testimony); *see also* P2.0228-0012 (p. 360) (Sinclair text), P2.0245-0003 (Abbott 1988). According to the Battelle Classification scheme, the recognized standard for measuring corrosivity of environments, there are four Classifications ranging from benign to severe industrial. *Id.* The Classifications are characterized as I (benign), II (mild), III (moderately severe), and IV (severe industrial). *Id.* The International Standards Association

(ISA) has developed a parallel corrosivity classification scheme. P1.0176-0003, 0014, Trial Transcript at 2/19 Vol.II p.91(12-15) (Scully Testimony). Additionally, the corrosivity classification schemes established by standard-setting organizations such as International Standards Organization (ISO) mirror the Battelle and the ISA standards. P1.1836-0001, (ISO 11844 Corrosivity Standard), P1.0091 (IEC 654-4 Corrosivity Standard), Trial Transcript at 2/19 Vol. II p.112 (6-15) (Scully Testimony).

The Battelle Classification Scheme for Corrosive Environments establishes qualitative and quantitative criteria to be used to classify environments. P2.0195-0017, 0026, 0065, 0066 (Abbott 1993, MTI #38), P2.0228-0012 (Sinclair text), Trial Transcript at 2/19 Vol.II p.91(6-15) (Scully Testimony). These criteria are discussed in turn.

a. *Qualitative Criteria for Corrosivity*

The qualitative criteria for Battelle Corrosivity Classifications schemes are as follows:

    a.    No significant corrosion observed, well-controlled environment;

    b.    Pore corrosion mechanism begins, operating reliability affected, unprotected copper contains oxide and chloride;

    c.    Moderately severe environment, associated with industrial operation, pore corrosion and creep, corrosion product on unprotected copper rich in sulfide and oxide; and

    d.    Severe industrial environment, corrosion mechanism dominated by creep, corrosion product on copper primarily a sulfide. P2.0195-0026, 0065, 0066 (Abbott 1993, MTI #38), P2.0228-0012 (Sinclair text), Trial Transcript at 2/19 Vol.II p.91(5)-94(4) (Scully Testimony).

The wires and HVAC coils that were removed from the Plaintiff-intervenor homes were shown in the laboratory to have a corrosion product that is primarily copper sulfide and/or rich in sulfide. P2.0195-0066 (Abbott 1993, MTI #38), P2.0228-0012 (Sinclair text), P1.2001-0019, 0026, 0036, 0040, 0042, 0043, 0044, 0045, 0046, P1.2002-0007 (CTL/Krantz Original and Supplemental Reports), P1.2021-0008, 0010, 0011, 0012, 0013, 0017, 0018, 0027, 0029, 0031, 0033, 0035, P1.2022-0020, 0021, 0022, 0023, 0024, 0025, 0030, 0031, (Scully Original and Supplemental Reports), Trial Transcript at 2/19 Vol.II p.111(18-22) (Scully Testimony). The wires and HVAC coils that were removed from the Plaintiff intervenors' homes demonstrated both pore corrosion and creep corrosion. P1.2022-0006, 0007, 0008 (Scully Supplemental Report), Trial Transcript at 2/19 Vol.II p.51 (3-19) (Scully Testimony). Based solely on these qualitative Battelle corrosivity criteria, the homes of the Plaintiff intervenors are classified as severe industrial corrosive environments. Trial Transcript at 2/19 Vol.II p.83(8-14), p.112(3-8) (Scully Testimony). Sandia National Laboratories (SNL) also established that wires taken from Chinese Drywall (CDW) in Virginia, Florida, and Louisiana homes in the SNL study demonstrated a corrosion product rich in copper sulfide, pore corrosion and creep corrosion, and classified the CDW environments from which the wires were taken to be severely corrosive. P1.0060-0050, 0057, 0063 (CPSC/Sandia Report), Trial Transcript at 2/19 Vol.II p.80(2) – p.81(17), p. 82(24) – p.83(14), p.94 (7-20) (Scully Testimony).

      *b.    Quantitative Criteria for Corrosivity*

The Battelle Corrosivity Classifications, as well as ISA and the other corrosivity standards, also have quantitative criteria for the levels of corrosive environments. The qualitative criteria are based on corrosion product thickness measurements, measured in

-21-

angstroms, units used to measure electromagnetic radiation equal to one ten-billionth of a meter,

or microns, linear measurements equivalent to one-millionth of a meter. The Battelle qualitative

thickness criteria are as follows:

a.    < 300 angstroms for 30 days (< .03 microns)

b.    300-1000 angstroms for first year (.03 - .1 microns)

c.    1000-4000 angstroms for first year (.1 - .4 microns)

d.    > 4000 angstroms for first year (> .4 microns)

P2. 0195-0026, 0065, 0066 (Abbott, 1993 MTI #38), P2.0228-0012 (Sinclair text), Trial

Transcript at 2/19 Vol.II p.92(11) – p.93(14) (Scully Testimony).

The wires that were removed from the Plaintiff intervenors' homes demonstrated

corrosion product thicknesses far above the severe industrial corrosivity environment 4000

angstroms threshold, adjusted to a 3 year thickness (Virginia Plaintiff intervenor homeowners

resided in the homes approximately 3 years). P1.2053-0001 (Examples of Virginia Components

Exceeding Three Year Battelle Standard), Trial Transcript at 2/19 Vol.II p.82(24) – p.83(14)

(Scully Testimony). The measured corrosion thicknesses on the wires from the Virginia homes

meet the Battelle Classification IV quantitative criteria for a severely industrial corrosive

environment based on either a "linear growth law" or a "Parabolic growth law." P1.2053-0001

(Examples of Virginia Components Exceeding Three Year Battelle Standard), Trial Transcript at

2/19 Vol.II p.97(5) – p.98(10), p.99 (11-15) (Scully Testimony). Corrosion product thickness

measurements on wires from the Virginia homes that meet the quantitative criteria for Battelle

Corrosive Classification IV (severe industrial) were also documented by measurements on wires

from CDW homes by the Sandia National Laboratory and by three other laboratories performing

expert work in this case.  P1.0060-0013, 0050, 0055, 0057, 0063 (CPSC/Sandia Report),

P1.2002-0007 (CTL/Krantz Laboratory), P1.2022-0009, 0010 (Scully, U Va. Laboratory),

P1.2018-0010, 0011, 0012 (SGH/Rutila laboratory), Trial Transcript at 2/19 Vol.II p.110 (14) –

p.111(10) (Scully Testimony).  Thus, the bottom line is that the Plaintiff intervenors' homes

demonstrate a Battelle classification for corrosivity which is a "severe industrial" environment,

whether one applies the qualitative or the quantitative Battelle corrosivity criteria to corroded

wires and corroded HVAC samples taken from these homes.  Trial Transcript at 2/19 Vol.II

p.112(3-15)(Scully Testimony).

### 4.    Peer-reviewed Literature & Expert Opinion Consensus

The application of Battelle, ISA, and other corrosive environment criteria to real world

components is demonstrated in the peer-reviewed literature.  P1.2051-0001, 0002 (Literature re

Corrosion Real World Components), P2.0223-0003 (Abbott 1991), P2.0222-0006 (Abbott

Review Flowing Mixed Gases), P2.0229-0003, 0004, 0005, 0008 (Comizolli, 1992), Trial

Transcript at 2/19 Vol.II p.92 (18-25), p.159(23) – p.160(2) (Scully Testimony).  The application

of Battelle, ISA, and other corrosive environment criteria to real world components is

demonstrated in industry standards for corrosivity such as the International Society of Corrosion

Engineers (NACE) Standard Recommended Practice Preparation, Installation, Analysis, and

Interpretation of Corrosion Coupons in Oilfield Operations.  P1.1853-0004 (NACE Standard).

The application of Battelle, ISA, and other corrosive environment criteria to real world

components is also demonstrated by the Chinese Drywall Investigation performed by Sandia

National Laboratories as documented in the CPSC/Sandia "Interim Report on the Status of

Electrical Components Installed in Homes with Chinese Drywall."  P1.060-0050, 0057

(CPSC/Sandia Report), Trial Transcript at 2/19 Vol.II p.82(24) – p.83(12), p.99(7-15)(Scully

Testimony). The application of Battelle, ISA, and other corrosive environment criteria to real

world components is supported by the expert opinion of Dr. John Scully, a leader in the field of

corrosion science in the academic, military, and publishing arenas, as well as by other leaders in

the field. P1.2022-0009, 0009, 0010 (Original and Supplemental Reports of John Scully),

P1.2052-0001, 0002 (List of Individuals Contacted by John Scully regarding Measurements on

Real Components and use of Standards), Trial Transcript at 2/19 Vol.II p.39(15-25), p.40(1-8),

p.41(5) – p.42(14), p.112 (3-8) (Scully Testimony).

Based on the Battelle corrosivity criteria, corrosion scientists have established a "failure

threshold" to predict electrical and electronic failures based on measuring corrosion product

thicknesses on real world components or copper reactivity coupons standardized to a given

period of time that the copper is exposed to the corrosive environment. The standard failure

threshold is 1000 angstroms (.1 micron) for the first year of exposure, or 300 angstroms (.3

micron) for 30 days of exposure. P2.0195-0017, 0026, 0028, 0065, 0066 (Abbott 1993 MTI

#38), P1. 0176-0014 (ISA Standard 71.04), Trial Transcript at 2/19 Vol.II p.92 (11-23), p.94 (24)

– p.95(5), p.103(5-10), p.111 (3-10) (Scully Testimony). The components at issue in this case

that were taken from Virginia homes and analyzed in the laboratory do exceed the recognized

1000 angstroms (.1 micron) failure threshold standard for the first year of exposure by many

multiples and even by orders of magnitude in some cases. P1.2053-0001 (Examples of Virginia

Components with Thicknesses Over Failure Threshold), P1.2022-0009, 0010 (Scully

Supplemental Report), P1.2002-0007 (CTL/Krantz Supplemental Report), P1.2018-0009, 0010,

0011, 0012 (SGH/Rutila Supplemental Report), Trial Transcript at 2/19 Vol.II p.98 (11) –

p.99(15), p.104 (3-14), p.110 (16) – p.112 (8)(Scully Testimony).  Thus, premature failures are

predicted by Dr. John Scully.  *Id.*

As set forth in the peer-reviewed literature, consensus standards, the opinion of several

experts in the field, and the expert opinion of Dr. John Scully, the use of real world components

under real world exposure conditions and durations of exposure provide more comprehensive

and accurate information than the use of copper reactivity coupons, particularly if the coupons

are deployed for short periods (such as less than one year).  P1.1843-0001 (ASTM Standard for

Corrosion Tests, recommend exposures over one year to account for seasonal variation and other

variables), P2.0236-0001 (Perkins, Corrosion Manual), P2.0205-0009 (Tran 2003), P1.2051-

0001, 0002 (Literature Regarding Corrosion Assessment of Real Components), P1.2052 (List of

Individuals Contacted regarding use of Real Components), Trial Transcript at 2/19 Vol.II p.

108(17-25) (Scully Testimony).  Nevertheless, the use of copper reactivity coupons may provide

useful corrosion information, particularly when the real world components are not available for

testing.  P2.0228-0001 (Sinclair, Corrosion Manual), P2.0236-0001 (Perkins, Corrosion Manual).

The limitations of copper reactivity coupons are that they tend to underestimate corrosion

thicknesses particularly when deployed for short durations of time.  P2.0247-0002 (Dean,

Corrosion Text), P1.1843-0001 (ASTM Standard for Corrosion Tests), P2.0205-0009 (Tran

2003).  Nevertheless, even with the limitations described above, the use of copper reactivity

coupons in CDW homes produces data which also predicts premature electrical and electronic

failures.  The prediction of failure of electronic and electrical components (standardized to one

year) in Florida and Louisiana CDW homes is also confirmed by the Knauf expert, Dr. Sandy

Sharp, based on Dr. Sharp's copper reactivity coupon data from MeadWestVaco (MWV) and Dr.

Sharp's own published industrial electrical and electronic equipment corrosion failure threshold. P1.2056-0001 (FRE 1006 Florida, Louisiana, and Virginia Coupon Data), Deposition of Sandy Sharp (2/5/10) at 2/22 Vol.II p.39(17) – p.40(1), p.40 (7-9), p.42(5-14) (Sharp Testimony), Trial Transcript at 2/19 Vol.II p.102 (15) – p.03(10) (Scully Testimony). The CPSC also utilized copper reactivity coupons in the 51 Home Study and this process revealed that the corrosion thickness measurements on these coupons from CDW homes in Virginia, Florida, and Louisiana exceed the 300 angstrom failure threshold for 30 days and also predicted premature failures. P1.0019-0084, 0085, 0086, 0129 (CPSC 51 Home Study), Trial Transcript at 2/19 Vol.II p.111 (3-10) (Scully Testimony). Thus, based on measuring the thickness of the corrosion product on real world components in four different laboratories (Sandia, Scully/U Va, CTL/Krantz, and SGH/Rutila), and on copper reactivity coupons in two different laboratories (MWV and CPSC); these six different laboratories predict premature electrical and electronic failures in CDW homes due to the corrosivity of the environment produced by Chinese drywall. P1.2022-0009, 0010 (Supplemental Scully Report), Trial Transcript at 2/19 Vol.II p.10(10) – p.112(15), p.100(23) – p.101(16), p.104 (3-14) (Scully Testimony).

In summary, by any recognized standard, high levels of corrosive gases are present in the representative homes. This condition is clearly irritating and harmful to residents and destructive to property. It has to be remediated. The challenge for the Court is to determine the scope of this remediation.

E.   **SCOPE OF REMEDIATION**

The evidence supports the conclusion that the appropriate remediation for the Plaintiff-intervenor homes includes the removal of all drywall, all electrical wiring, the entire HVAC

system, and many other items such as appliances, carpet, cabinetry, trim work and flooring. P1.1888-0003 (Beazer Scope of Remediation), P1.2058-0001 (Wright Scope of Remediation), Trial Transcript at 2/19 Vol. I at 77 (4) - 84 (24) (Phillips Testimony), Trial Transcript at 2/22 Vol. I p. 98 (13-21), 99 (16-22) (Rutila Testimony), Trial Transcript at 2/22 Vol. II p. 28 (10-13) (Rutila Testimony). The scope of this remediation is supported by both the scientific and practical evidence presented. Trial Transcript at 2/22 Vol. II p. 28 (10-13) (Rutila Testimony), p. 69 (2-10) (Wright Testimony).

The scientific evidence demonstrated that corrosion has damaged most components that contain copper or silver. P1.2016-0109 (SGH Original Report), Trial Transcript at 2/22 Vol. II p. 28 (4-6), (10-13) (Rutila Testimony). The practical evidence demonstrated that selective removal of only CDW is not feasible or cost-effective in this case. Trial Transcript 2/19 Vol. I p. 75 (10-25) (Phillips Testimony). The practical evidence further revealed that attempting to gently remove, store or clean or protect carpet, cabinetry or flooring is not feasible or cost-effective. P1.2050-0003 (Summaries of Cost Estimates), Trial Transcript at 2/19 Vol. I p.79 (1-13) (carpets), p.77 (18-20) (cabinets), p.86 (2-19) (wood floors) (Phillips Testimony). The practical evidence also indicates that items such as trim work and base boards will likely be ruined or extensively damaged when the drywall is removed. P1.2016-0087 (SGH Original Report), Trial Transcript 2/19 Vol. I p. 87 (2-6) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 91 (13-16) (Wright Testimony). The Court will now discuss the details of and justification for the scope of this remediation.

### 1.  All Drywall in the Plaintiff-intervenor Homes Needs to be Removed & Replaced

As indicated above, the Chinese drywall in the Plaintiff-intervenors' homes emits a foul

odor, irritates the human body, and emits sulfur gases which corrode copper and silver, metals of which most electronic and mechanical objects are made, thus reducing these objects life span and posing a fire risk and making the homes hard, if not impossible, to live in. Accordingly, all Chinese drywall must be removed from the Plaintiff-intervenors' homes. There seems to be little or no dispute on this issue. There is dispute, however, over the scope of remediation where the home contains both Chinese drywall and non-Chinese drywall. The issue is whether all drywall should be removed or only the problematic drywall in this case. The overwhelming evidence reveals that in such mixed structures it is necessary to remove all the drywall, both Chinese and other, for the following reasons.

   a.      *Drywall sales and delivery records, where available, lack the reliability and
           precision necessary to locate all of the Chinese drywall in a mixed drywall home.*

   During the construction phase of the Intervenors' homes, available sales records from Venture Supply, Inc., showed that between 45 and 212 sheets of CDW were delivered to each of these homes. P1.2016-0017, 0018 (SGH/Rutila Original Report), Trial Transcript at 2/22 Vol. I p.5 (5-9)(Michaux Testimony), Trial Transcript at 2/22 Vol. II p.17 (5-9)(Rutila Testimony), 2/22 Vol. II p.53 (14-17)(Orlando Testimony). Trial Transcript at 2/19 Vol. I p.22 (11-13)(Opening Statement). In some, but not all cases, additional "stacking" records were provided, indicating the number of domestic boards as opposed to CDW which were placed on a given Plaintiff-intervenors' floor. Trial Transcript at 2/22 Vol. II p.19 (10-18) (Rutila Testimony). In the home with the second least number of boards (45 boards in the Michaux home according to these Venture records), Chinese drywall was found to be scattered among all three floors of the home. Trial Transcript at 2/22 Vol. I p.5 (5-9), p.12 (24) - p.13(6) (Rutila Testimony). Trial Transcript

at 2/22 Vol. I p.5 (5-9)(Michaux Testimony).  In another Intervenor family's home (Baldwin), the

stacking records indicated 77 sheets were placed only on the first floor of the home.  The second

floor air conditioning zone of the Baldwin home, which is fed by air wholly from this floor, has

suffered copper sulfide corrosion from gases released by CDW.  Trial Transcript at 2/22 Vol. II

p.20 (6-15) (21-24) - p.21 (3)(Rutila Testimony).  The second floor of the house also has light

switches which have suffered silver sulfide corrosion from gases released by CDW.

P1.2049-0008 to -0011 (SGH analysis of Baldwin light switches showing silver sulfide

corrosion) P3.0636-0001 (Schematic of second floor, with sample locations), Trial Transcript at

2/22 Vol. II p.20(6-15), p.22(3-15)(Rutila Testimony).  The experts retained by Knauf

documented second floor switches and outlets that had suffered visible copper sulfide corrosion.

P1.2003-3686 (Floor plan with corrosion locations), Trial Transcript at 2/22 Vol., II p.24

(1-18)(Rutila Testimony).  In a home with identical "stacking" records, testing by SGH has

demonstrated that CDW has been scattered among domestic board on the second floor of a home

that was supposed to be, according to the records, CDW free.  P1.1870-0001-018 and

027,P1.2062-001 and 002 (Nguyen Venture and Porter Blaine records, photographs of Venture

label cut from second floor), Trial Transcript at 2/22 Vol. II p.26(21) - p.(27)(15)(Rutila

Testimony).  Accordingly, the Court finds that these records were not sufficiently reliable to

conclude that the second floor of the home did not contain CDW.  P1.2028-0047 and 0048

(Venture and Porter records), Trial Transcript at 2/22 Vol. II p.17(5-13) (Rutila Testimony).

> b.  *The Knauf proposed method, or combination of methods, for selective drywall
> identification do not rise above the level of experimental, and lack the scientific
> reliability necessary to conduct a board-by-board removal system at the present
> time.*

Experts retained by Knauf suggested that using a combination of screening tools

(including XRF and the subjective color coding of wires) eliminated the need to remove all drywall in a home with mixed sources of drywall.  For the reasons set forth in the Court's Order of February 18, 2010, granting the PSC's Daubert motion in part, the Court finds that handheld XRF is unreliable for the purpose of identifying CDW on a board-by-board basis.  The Court similarly finds that the observation of corrosion on electrical and mechanical systems in homes informs the determination of whether the home, as a whole, suffers from corrosive attack associated with CDW as reflected in the screening definitions for Florida and CPSC set forth, supra.  P1.1841-0001-0004 (FLA Case Definition), P1.1844-0001(CPSC Guidance Problem Drywall), Trial Transcript at 2/19 Vol. II p.8(1-24)(Smith Testimony),  Trial Transcript at 2/22 Vol, II p.4 (22) - p.7 (5)(Rutila Testimony).  Despite the utility of these methods for home characterization, they lack the precision and accuracy necessary to conduct individual board identification as evidenced by the decision by Florida and the CPSC to eliminate this method from any confirmatory testing.  Trial Transcript at 2/22 Vol. II p.7 (18) - p.8(17)(Rutila Testimony).  PSC expert Dean Rutila explained six reasons why observation of corrosion on a wire is not a reliable tool to be used for the purpose of selective identification and removal of CDW.  The six reasons are: (1) CPSC and FDOH have determined that it is a screening tool, not a tool for CDW board by board identification; (2) no governmental or peer-reviewed endorsement exists for board by board identification; (3) it is an incorrect assumption that effects of corrosive CDW are only very localized-these gases actually disburse throughout the house; (4) there are no available receptacles next to many boards in house, e.g., "scarce" in ceilings; (5) it is impractical to determine where one drywall board stops and next one starts; and (6) there is no guarantee that all CDW contamination can be removed or certify the same to code officials.

Trial Transcript at 2/22 Vol.II p.9 (9) - p.10(2) (Rutila Testimony). Defendant Knauf provided

expert reports extensively reporting on the visible corrosion of wires as well as findings from

their field use of XRF. The Court finds that this method, like the handheld XRF gun, also

produced "false negatives," e.g., concluding that ceilings and rooms within homes were

CDW-free, when subsequent testing of the homes demonstrates CDW labels and follow-up

laboratory testing confirmed that the board was Chinese and was releasing corrosive gases.

P1.1851-0003 to 0005, 0029 to 0051 (Streit Supplemental Data, ICP and sulfur offgas studies

show Orlando and Baldwin boards deemed not CDW, are in fact CDW and do offgas at

excessive levels), Trial Transcript at 2/22 Vol. II p.34 (8-25) (Baldwin Testimony), Trial

Transcript at 2/22 Vol. II. p.58 (17) - p.59(10) (Orlando Testimony). The intervenor homes have

suffered corrosive attack and, in order to make the plaintiff whole, any system that lacks the

ability to definitely identify the offensive drywall is unacceptable and rejected by this Court. The

regulatory and scientific record demonstrates that removing all drywall from a mixed drywall

home is the only method that ensures this goal is obtained.

      c.    *Removal of all drywall in a mixed home is efficient and cost effective*

      Large Florida homebuilders with extensive experience in CDW remediation have

determined that removal of all drywall in affected homes is efficient and cost-effective, and that

attempted selective identification and removal of CDW is neither efficient nor cost- effective.

P1.1888-0001 to 0016 (Beazer scope of work, authorization), Trial Transcript at 2/19 Vol. I p.75

(10) - p.76 (2)(Phillips Testimony), Trial Transcript at 2/22 Vol. I p.98(13-21), p.99(6-15)(Rutila

Testimony). The Court finds that removal of all drywall from a CDW home has been

demonstrated repeatedly to be an efficient method of repair. Trial Transcript at 2/19 Vol. I p.

-31-

74(74-75), p.76(1-3), p.88 (11-14), p.93(5-11)(Phillips Testimony), Trial Transcript 2/19 Vol. II

p.17 (14-19)(Smith Testimony).  In testimony from homebuilders in Florida, coupled with

photographic and videographic evidence, the Court finds that a home can be stripped of all

drywall in a matter of hours.  Trial Transcript at 2/19 Vol. II p.16 (25) - p.17(7)(Smith

Testimony), Trial Transcript at 2/19 Vol.I p. 93 (5-11) (Phillips Testimony).  For complete

drywall removal, the removal process does not call for highly-skilled workers and removes

drywall from the home rapidly and efficiently. Trial Transcript at 2/19 Vol. II p.17(14-19) (Smith

Testimony), Trial Transcript at 2/19 Vol. I p.93 (5-11)(Phillips Testimony).  In contrast, for

attempted selective drywall removal, assuming that boards could be accurately identified (which

the Court rejects), CDW would have to be "surgically excised" from a mixed CDW home,

followed by the installation of new board in its place.  The record shows this is neither practical

nor cost-efficient.  Trial Transcript at 2/19 Vol.I p.98(1-16)(Phillips Testimony), Trial Transcript

at 2/19 Vol.II p.17(20) - p.18(7)(Smith Testimony).  The Court finds that selective removal of

drywall, with the corresponding need to patch the borders between old and new board, is

time-consuming and requires a highly-skilled drywall installer to attempt to conceal the patch.

Beazer Homes projected that to do this type of patchwork would require a four-to five-fold

increase in cost per square foot, which estimate matched the estimate for such patch work

provided by the experts retained by the PSC.  Trial Transcript at 2/19 Vol.I p.95 (6-17), p.98

(1-6)(Phillips Testimony), Trial Transcript at 2/19 Vol. II p.17 (8-13)(Smith Testimony).  The

Court also finds that walls with certain types of finish applied are extremely difficult to repair as

it is not possible to "feather" the finish.  Repairs of this sort will not restore the home to its

original condition.  Trial Transcript at 2/19 Vol.I p.98 (1-16)(Phillips Testimony), Trial

Transcript at 2/19 Vol. II p.17(20) - p.18(7)(Smith Testimony).

        *d.*     *It is not practical or economical to detect, selectively remove, and replace*
            *individual boards of Chinese drywall*

Impacted homes were frequently built with a mixture of Chinese drywall and domestic

drywall. P1.2016-0017, 0018 (Original Wright Report, summary of delivery records),

P1.2016-0017, 0018 (SGH/Rutila Original Report, number of boards on delivery records) Trial

Transcript at 2/19 Vol. I p.67 (2-14)(Phillips Testimony).  The 4' x 12' Chinese drywall boards

manufactured by Taishan were cut to fit a myriad of locations around these homes, resulting in

sections of boards divided and installed as needed to fit the specific room.  Trial Transcript at

2/19 Vol. I p.92(25) - p.93(4)(Phillips Testimony), Trial Transcript at 2/19 Vol. II p.12

(3-13)(Smith Testimony), P1.2050-0007, 0008, 0009 (Drywall layout diagrams by Ron Wright).

Trial Transcript at 2/22 Vol. II p.74 (1-9) (Wright Testimony).  The Court received evidence of a

typical home drywall installation that included a closet with many small pieces of drywall

segments and a ceiling with 11 segments of drywall.  Trial Transcript at 2/19 Vol. I p.15

(6-9)(Opening Statement), Trial Transcript at 2/19 Vol. II p.14(1-5)(Smith Testimony).

P1.2050-0007, 0008, 0009 (Drywall layout diagrams by Ron Wright).  In rooms with ceilings

greater than 8 feet in height, drywall installers frequently install a narrow band of drywall to

make up the distance between two horizontal boards (8") and the ceiling.  Trial Transcript at 2/19

Vol. I p.26 (2-5)(Opening Statement), Trial Transcript at 2/19 Vol. II p.30 (20-24)(Smith

Testimony). P1.1803-0121, 0122 (Photos of Ron Wright holding sections of drywall at Beazer

home).  As a large drywall board is cut to fit a given area, the remaining portion of the board is

set aside for use in an area of the home that requires a similarly sized board.  In this way, a single

board will frequently be cut into segments that are within a room, a floor, and a home.  Trial

Transcript at 2/19 Vol. I p.26(25) - p.27(7)(Opening Statement), Trial Transcript at 2/19 Vol. II

p.12(14-22)(Smith Testimony). P1.2050-0007, 0008, 0009 (Drywall layout diagrams by Ron

Wright). Once installed, the finishing process for drywall, which includes taping and multiple

layers of drywall finish followed by sanding and painting, renders the demarcation between

drywall segments almost impossible and certainly impractical to detect. Trial Transcript at 2/19

Vol. I p.75(16-21), p.92 (2-16)(Phillips Testimony), Trial Transcript at 2/19 Vol. II p.12(23) -

p.13(2)(Smith Testimony). P1.1803-0121, 0122 (Photos of Ron Wright holding sections of

drywall at Beazer home). Additionally, many of the drywall boards are placed behind kitchen

cabinets, bathroom vanities, appliances, mechanical equipment, and other objects that further

conceal their location. Trial Transcript at 2/19 Vol. I p.85(12-23)(Phillips Testimony), 2/22 Vol.

II p.90(1-15) (Wright Testimony).

### 2. All Electrical Wires in the Plaintiff-intervenor Homes Need to be Replaced

#### a. *Scientific Reasons*

The electrical systems of the seven homes include copper low voltage wires which carry

current to smoke detectors, fire alarms, and thermostats, among other devices. Trial Transcript at

2/22 Vol.I, p.98 (16-21) (Rutila Testimony). The homes also have copper high voltage electrical

wires which carry current between electrical components such as circuit breakers, receptacles,

and switches. Trial Transcript at 2/19 Vol.II, p.25(19-24) (Smith Testimony). Corrosive gases

emitted from Chinese drywall cause significant damage to copper high and low voltage wires as a

result of the buildup of thick films or corrosion product. P1.0060-0011, (CPSC/Sandia Report).

CDW also causes pitting to occur on wires as was demonstrated by the Sandia National

Laboratories. P1.0060-0011, 0063 (CPSC/Sandia Report). Pits in the wires from the Plaintiff

intervenors' homes ranged from 10 microns to 29 microns in depth. P1.2002-0007 (CTL/Krantz Supplemental Report), P1.1808-0001 (ASTM Pitting Evaluation Standard), Trial Transcript at 2/19 Vol. II p.83(5-7)(Scully Testimony). It is highly probable that there exist in the Plaintiff intervenors' homes corroded wires with a distribution of pit sizes, some of which would be larger than the deepest pit measured by CDW investigators. P1.1808-0001 (ASTM Pitting Evaluation Standard), P1.1806-0001, 0002 (ASTM Standard on Statistics and Corrosion), Trial Transcript at 2/19 Vol. II p.68(14-15) (Scully Testimony). This further confirms the corrosion is due to the exposure to Chinese drywall.

In failure analysis, where the concern is the "weakest link" because the goal is to prevent failures and protect against life safety issues connected to failures (i.e., corrosion increases resistance which increase heat and generates a fire risk), one must focus on the most vulnerable components. P1.0195-0017, 0028 (Abbott 1993, MTI #38), Trial Transcript at 2/19 Vol. II p. 69(3-13) (Scully Testimony), Trial Transcript at 2/19 Vol. II p. 159(9-22) (Galler Testimony), Deposition of Jonathan R. Barnett (2/12/10) at p. 46(12-23). For example, in failure analysis of a copper tube, it is important not only to look at average thickness of the copper material to determine if a leak is possible, but more importantly to look at the weakest link in the tube. *Id.* Thus, the maximum corrosion thickness and the maximum pit depth are important considerations in failure analysis. *Id.* Wires from homes without CDW, namely the control homes, did not show the severe corrosion thicknesses associated with predicted failure, did not show thick copper sulfide deposits, and did not show severe pitting found on the wires from CDW homes. P1.2022-0045 (Scully Original Report), P2.2022-0041, 0042, 0048 (Supplemental Scully Report), Trial Transcript at 2/19 Vol. II p. 109(15-17) (Scully Testimony).

The insulation jackets on electrical wires do not adequately protect them from corrosive

attack. P1.2001-0017 (Original CTL/Krantz Report), P1.2022-0053, 0058 (Supplemental Scully

Report), Trial Transcript at 2/19 Vol. II p. 98(19)- p.99(3) (Scully Testimony), Trial Transcript at

2/22 Vol. II p. 79(22)- p.80(8) (Wright testimony), Deposition of Lori Streit (2/16/10) at 2/22

Vol. I p. 64(7-23). Reactive sulfur gases permeate the sheathing and corrode wires from the

inside out. *Id.* This penetration of wire insulation has been demonstrated in both "lamp cord"

wires and under the jackets of Romex high voltage wire on the grounding wire which lacks its

own insulation. P1.2022-0053, 0058 (Supplemental Scully Report) (evaluation lamp chord,

BDM-5), P1.2001-0017 (Original CTL/Krantz Report) (evaluation of ground wire under Romax,

BDM-39), Trial Transcript at 2/19 Vol. II p. 98(19)- p.99(3) (Scully Testimony), Trial Transcript

at 2/22 Vol. II p. 79(22)- p.80(8) (Wright Testimony), Deposition of Lori Streit (2/16/10) at 2/22

Vol. I p. 64(7-23) (Streit Testimony). The corrosive attack from CDW occurs even on insulated

wires within the walls of the home. *See* P1.1981 (switch box from Beazer home). This was

demonstrated on the marked wire attached to a light switch box taken from one of the Beazer

homes. *Id.* The corrosive attack also occurs on lamp cords which are in the center of a room

away from drywall sources. P1.2022-0053, 0058 (Scully Supplemental Report), Trial Transcript

at 2/22 Vol. I p. 122(20)- p.123(24) (Rutila Testimony).

The corrosive environments in these homes will result in premature failures of the

electrical system according to the expert analysis of both PSC experts and at least one Knauf

expert. P1.2001-0019, 0020, 0021 (CTL/Krantz Original Report, HVAC Coil Failure due to

Corrosion), P3.0625-0001, 0002 (FRE 1006 Summary of HVAC Coil Failure Data),

P1.2053-0001 (Virginia Corrosion Thicknesses Exceed Failure Standard), Trial Transcript at

2/19 Vol.II p.55(24) – p.156(17) (Galler Testimony), Trial Transcript at 2/19 Vol.II p.100(17) –

p.101(16), p.152(22) – p.153(1) (Scully Testimony), Trial Transcript at 2/22 Vol.I p.90(3-23)

(Barnett Testimony proffer) (The PSC tenders Dr. Barnett, and the Court accepts him as, an

expert in Engineering and Fire Safety.  Trial Deposition of Jonathan Barnett (2/12/10) at p.

11(14)-18(22), P1.2015-0019 – P1.2015-0024 (Barnett Report, C.V.).

It is not feasible to clean the wires of corrosion product to render them free of risk of

future failure.  Trial Transcript at 2/19 Vol. II p. 84(3-11) (Scully testimony), Trial Transcript at

2/19 Vol. I p. 80(15-22) (Phillips testimony), Trial Transcript at 2/22 Vol. I p. 125(2-17) (Rutila

testimony).  To do this, one would have to remove the wire, remove the insulation on the wire,

clean the wire, and reinstall the wire insulation.  *Id.*  Such a process is not only time consuming

but needs special equipment and expertise.  *Id.*

The Romex insulation utilized in Plaintiffs' homes was type NM which is not sufficient

for corrosive environments.  Trial Transcript at 2/22 Vol. I p. 124(3, 12-14, 20-21) (NM not

suitable for corrosive environment) (Rutila Testimony), Trial Transcript at 2/22 Vol. I p.

125(18-23) (Wires must be removed once exposed) (Rutila Testimony, Trial Deposition of

Jonathan R. Barnett (2/12/10) at p. 27(13-16), 38(15)-39(4).  Engineering standards require the

replacement of wires which have been exposed to this environment.  *Id.*

Building codes are drafted for life safety purposes and generally set a minimum level of

safety.  Trial Deposition of Jonathan Barnett (2/12/10) at p. 19(10)-20(19).  A building code is

usually prescriptive and not discretionary.  Trial Deposition of Jonathan Barnett (2/12/10) at p.

19(10)- p.20(19).  Corrosion on active residential wiring is a violation of the national safety code

as well as the safety and building codes of the various states.  Trial Deposition of Jonathan

Barnett (2/12/10) at p. 26(13)- p.29(16), 38(5)- p.38(18), p.39(7)- p.40(21), 43(9)- p.43(24), p. 46(1)-48(18), p. 55(3)- p.56(1), p. 120(4)- p.122(10); P1.1807-0003, -0006 (Excerpt from Electrical Code); P1.1818-0001 (ASTM B-3);P1.1819-0003 (NFPA 921, Guide for Fire and Explosion Investigations, section 8.9.2.3 "Poor Connections");P2.0195-0027 (Abbott, Atmospheric Corrosion on Control Equipment, 1993); P2.0202-0004 (Chudnovsky, Corrosion of Electrical Conductors, 2008); P2.0234-0005 (Glowing Connections, Fire Technology Journal, Vol.I8, No. 4, 1982).  The "corrosive residue" on, and "deterioration by corrosion" to, the wires are violations of electrical codes promulgated by Virginia.  P1.1814-0003 (Integrity of Electrical Equipment), P1.1817-0003 (Integrity of Electrical Equipment), Trial Transcript at Trial Transcript at 2/22 Vol. II p. 77(8-13) (Wright Testimony), Deposition of Jonathan R. Barnett (2/12/10) at p. 35(18-24)).

  *b.* *Economic & Practical Reasons*

   It is practical to remove the wiring while all the drywall is out of the home because of the ease of access to the cavities where the wiring is located.  The replacement of the electrical wires, requires access to wall and ceiling cavities currently covered by drywall.  Trial Transcript at 2/22 Vol. II p.30(4-13) (Rutila Testimony), Trial Transcript at 2/22 Vol. II p.79(9-16), p.82(20) - p.83(22) (Wright Testimony). The Court was presented evidence that the network of wires in the home, including low and high voltage, phone, cable, and other system wires, is extremely complex and dispersed throughout the ceilings and walls.  *Id.*  Electrical wires are stapled in place within the wall cavities pursuant to applicable building codes.  Trial Transcript at 2/22 Vol. II p.80 (11-14), p.81(3-22), p.82(13) - p.83(3) (Wright Testimony).  These wires cannot be removed without gaining access to the wall cavity.  *Id.*  The evidence also demonstrates that replacement

of all wiring is warranted because of practical cost considerations.  P1.2050-003 (Summaries of

Cost Estimates); Trial Transcript at 2/19 Vol.I pg.79(22)-pg.80(10), p.81(1-6).

The Court finds that it both economical and practical to remove all the wiring while the

drywall is gone, rather than removing only some of the wiring at this time and then risk later have

to tear down the drywall again in the case that additional wiring exposed to the sulfur gases is

harmed or fails.  Additionally, the low-voltage wiring supporting life and safety devices such as

fire alarms and smoke detectors should be removed and replaced because of the low cost of

replacement when compared with the high risk of injury or death if these devices are not

functioning properly.

### 3. All Copper Pipes in the Plaintiff-intervenor Homes Need to be Replaced

#### a. Scientific Reasons

Copper pipes are utilized to carry water and copper plumbing components form integral

parts of the plumbing system, including risers (attached fixtures to delivery lines), shower control

devices, pressure regulators, and a variety of other applications.  Trial Transcript at 2/22 Vol. I p.

108(19-22) (Rutila Testimony).  The corrosive gases responsible for destroying copper in wiring

have also damaged the plumbing and mechanical copper components.  P1.1848-0001, 0002

(Rutila Dew Point Analysis), P1.2016-0421, 0422, 0424 (SGH/Rutila Original Report), Trial

Transcript at 2/22 Vol. I p.108(19) - p.109(2) (Rutila Testimony), Trial Transcript at 2/19 Vol. II.

p.81(25) - p.83(14), p.88(25) - p.89(17) (Scully Testimony).  This corrosion caused pitting which

leaves corrosion product in the wall of the pipe.  *Id.*  From a scientific standpoint, under normal

operating conditions, humidity and microscopic moisture on these pipes (or other copper surfaces

such as coils or wire) will create the conditions for the deepening of these pits by the reactivation

of the corrosion inside the pit, regardless of whether or not the defective drywall is removed.

P2.0241-2804, 2805 (Jacobs 2000), P1.1836-0021 (ISO 11844-1 Corrosion Standard),

P2.0228-0011 (Sinclair, Corrosion Manual), P2.0070-0006, 0010, 0015, 0016(Freeman 2009),

Trial Transcript at 2/19 Vol.II p.84(19) - p.87(8) (Scully Testimony).  The evidence supports the

conclusion that copper pipes with significant corrosion and pits cannot be adequately "cleaned."

Trial Transcript at 2/19 Vol.II p.84(3-11) (Scully Testimony).

     *b.*    *Economic & Practical Reasons*

     The plumbing systems in homes are impossible to remove or replace in walls and ceilings

when drywall is present. Trial Transcript at 2/19 Vol.II at p.23(17) - p.24(3) Smith Testimony,

Trial Transcript at 2/22 Vol. II p.90 (1-15) (Wright Testimony).  Thus it is practical to remove

the plumbing while all the drywall is out of the home because of the ease of access to the cavities

where the plumbing is located.  *Id.*  Also from a practical standpoint, builders have rejected the

prospect of "cleaning" the corrosion off of copper components, finding it is more cost-effective

and less time-consuming to simply remove and replace them.  Trial Transcript at 2/19 Vol. I

p.79(22) - p.81(6) (Phillips Testimony).

    **4.**    **The HVAC Units in the Plaintiff-intervenor Homes Need to be Replaced**

     *a.*    *Scientific Reasons*

     Heating, ventilating, and air-conditioning ("HVAC") units contain both copper

and silver components, all of which are corroded by the sulfur gases emitted by Chinese drywall.

KPT experts agree that the HVAC systems in the seven (7) Plaintiff homes have been badly

corroded by CDW.  P1.2022-0009 (Scully Supplemental Report), Trial Transcript at 2/22 Vol. I

p. 111 (12-16) (Rutila Testimony).  For example, the air handlers of the HVAC systems of the

Plaintiff-intervenor homes are corroding in multiple areas including the coils, circuit board, and contactor switch. P1.2018-0006 (SGH/Rutila Report), P4.0002-0054 (Galler Report), P1.2020-0028 to 0034 (Galler Original Report for Air Handling Contactor), Trial Transcript at 2/22 Vol. I p.110 (6-21), p.113 (7) - p.114 (10) (Rutila Testimony), Trial Transcript at 2/19 Vol. II p. 146 (1-25), p.153 (8) - p.155 (5) (Galler Testimony).

The copper coils of HVAC systems are similarly failing because of the sulfur gas emitted from CDW.   P1.2006-0016 (Bailey Report) (The PSC tenders Ronald Bailey, and the Court accepts him as an expert in Engineering and Indoor Air Quality, P1.2006-0001 (Original Bailey Report, C.V.), P1.2016-0078 (SGH Original Report) Trial Transcript at 2/22 Vol. I p. 111 (12-16) (Rutila Testimony).   The coils are part of the air handler in the HVAC system. P1.2016-0067 (SGH Original Report), Trial Transcript at 2/22 Vol. I p. 104 (18-19), p. 110 (6-21) (Rutila Testimony).   The sulfur gas from CDW causes a heavy black corrosion on HVAC coils. P1.2016-0077 (SGH Original Report), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 52 (6-10), p.68 (25) - p.69 (17) (Streit Testimony).   The sulfur gas from CDW causes copper sulfide corrosion on HVAC coils. P1.2016-0077 (SGH Original Report), Trial Transcript at 2/19 Vol. II  p. 61 (22-25) (Scully Testimony).   The copper sulfide corrosion causes pitting in the HVAC coils. P1.2001-0018 to 0020 (CTL Original Report), Deposition of Lori Streit (2/16/10) at 2/19 Vol. II p. 65 (1-23), p. 66 (1) (Streit Testimony).   The copper sulfide corrosion in the pits of the HVAC coils will continue even after the CDW is removed and replaced. P1.2021-0013 (Scully Original Report), Trial Transcript at 2/19 Vol. II  p. 85 (1-25),  p. 86 (1-13) (Heischober Testimony).   The corrosion caused by CDW causes the copper to develop a spongiform texture. Trial Transcript at 2/19 Vol. II p. 80 (11-25), p. 81 (1-20) (Scully Testimony); see also

P1.060-0010 and 0011 (CPSC/Scandia Report discussing spongiform texture. ). The corrosion

caused by CDW has resulted in multiple failures of HVAC coils in Plaintiffs' homes. P3.0635

(RE 1006 Summary of HVAC Coil Failure Data), Trial Transcript at 2/22 Vol. I p.111 (12-16)

(Rutila Testimony).

By contrast the HVAC coils from control homes do not demonstrate corrosive attacks.

P1.2016-0066 (SGH Original Report with photo of shiny HVAC copper tubes in control home),

Trial Transcript at 2/19 Vol. I p.111(23) - p.112(2) (Scully Testimony), Deposition of Lori Streit

(2/16/10) at 2/22 Vol. I p. 47 (10-17) (Streit Testimony), Trial Transcript at 2/22 Vol. I p. 96

(7-8), p. 111 (16) (Rutila Testimony). The HVAC coils from control homes have no copper

sulfide corrosion. P1.2016-0066 (SGH Original Report), P1.2018-0007 (SGH/Rutila Report),

Trial Transcript at 2/19 Vol. II p.154 (11-23) - p.155 (2) (Galler Testimony), Trial Transcript at

2/22 Vol. I p. 96 (7-8), p.111 (16) (Rutila Transcript), Deposition of Lori Streit (2/16/10) at 2/22

Vol. I p. 47 (10-17) (Streit Testimony).

Additionally, the corrosion caused by CDW in the Virginia homes attacks the brazes that

connect copper pipes. P1.2001-0019 (CTL Original Report), Trial Transcript at 2/22 Vol. I p.108

(22-25), p. 109 (1-12) (Rutila Testimony), Trial Transcript at 2/22 Vol. I p.111 (4-8) (Rutila

Testimony).

The circuit boards of the air handler are also corroding. P1.1866-0003 (Photo of corrosion

on Morgan HVAC circuit board), Trial Transcript at 2/22 Vol. I p.114 (11-25), p. 115 (1-5)

(Rutila Testimony), Trial Transcript at 2/19 Vol. II p. 153 (8-25), p. 154 (1-25), p. 155 (1-2)

(Rutila Testimony). Corrosion on circuit boards increases resistance which leads to premature

failure. P1.2020-0003 (Galler Original Report), Trial Transcript at 2/19 Vol.II, p. 89 (15-25), p.

90 (1-23) (Scully Testimony).  The contactor switches of the air handler are also corroding.

P1.2020-0028 to 0034 (Galler Original Report), Trial Transcript at 2/22 Vol. I p.113 (10-25, p.

114 (1-10) (Rutila Testimony), Trial Transcript at 2/19 Vol. II p. 146 (1-25) (Rutila Testimony).

Corrosion on contactor switches increases resistance which leads to failure. P1.2020-0028 to

0034 (Galler Original Report), Trial Transcript at 2/19 Vol. II p.130 (3-16) (Galler Testimony),

Trial Transcript at 2/22 Vol. II p. 146 (21-25) (Galler Testimony).

 Due to the corrosion in multiple areas of the air handler units in these homes, the entire

unit must be replaced. P1.2016-0109 (SGH Original Report Conclusions), Trial Transcript at

2/22 Vol. II p. 87 (13-25), p. 88 (1-11) (Wright Testimony).  The air handler units of other

national builders such as Beazer and Lennar exhibit similar problems and are being replaced.

P1.1888-0003 (Beazer Scope of Work), P1.2016-0105 (SGH Original Report discussing Lennar

scope of repair), Trial Transcript at 2/22 Vol. I p.116 (23-25). p.117 (1-11) (Rutila Testimony).

 The refrigerant that causes cooling in an HVAC system is circulated through a copper

pipe called a "line set." P1.1848-0001 and 0002 (Rutila Analysis of Dew Point); Trial Transcript

at 2/19 Vol. II p. 21 (7-10) (Smith Testimony), Trial Transcript at 2/22 Vol. I p. 104 (8-14), p.

117 (4-6) (Rutila Testimony).  The line set pipe connects the interior air handling units to the

outside compressor units. Trial Transcript at 2/19 Vol. II p.21 (7-10) (Smith Testimony), Trial

Transcript at 2/22 Vol. I p. 104 (8-14), p. 116 (23-25), p. 117 (1-6) (Rutila Testimony), Trial

Transcript at 2/19 Vol. I p. 21 (11-15) (Morgan Testimony).  The line set pipes run through the

interior walls from the air handler unit until it exits the house to connect to the air compressor.

Trial Transcript at 2/19 Vol. II p. 22 (21-25), p. 23 (1-16) (Smith Testimony).  The line sets in

these homes have a heavy black corrosion caused by CDW sulfur gasses. P1.1871-0002 and 0003

(CTL Supplement No. 2), Trial Transcript at 2/19 Vol. II p. 21 (20-25), p. 22 (1-3, 9-10) (Smith

Testimony), Trial Transcript at 2/22 Vol. I p. 116 (9-16) (Rutila Testimony), Trial Transcript at

2/22 Vol. I p. 105 (8-17) (Rutila Testimony). When the temperature of any copper pipe, such as

the line set, in a house drops below the "dew point," moisture will form and make the pipe

particularly susceptible to the CDW sulfur gases. P1. 1848-0001 and 0002 (Rutila Analysis of

Dew Point), Trial Transcript at 2/22 Vol. I p. 103 (6-16) (Rutila Testimony). Cross-sections of

the line set pipe in these homes demonstrate deep pitting caused by CDW sulfur gasses.

P1.1871-0002, 0003 (CTL Supplement No. 2), Trial Transcript at 2/19 Vol. II  p. 64 (10-15)

(Scully Testimony). The line set pipes of other national builders such as Beazer and Lennar

exhibit similar problems and are being replaced. P1.1888-0003 (Beazer Scope of Work), Trial

Transcript at 2/22 Vol. I p.116 (23-25), p. 117 (1-11) (Rutila Testimony), Trial Transcript at 2/19

Vol. I p. 77 (2-4) (Streit Testimony). The heavy corrosion to the line set pipes requires

replacement. Trial Transcript at 2/22 Vol. II p. 23 (20-25) (Wright Testimony).

        b.     *Economic & Practical Reasons*

     The "line-sets" described above are installed in a home in one continuous piece from

outside compressor to the air handler unit. Trial Transcript at 2/19 Vol.I p.76 (8-16) (Phillips

Testimony), Trial Transcript at 2/19 Vol.II p.21 (7-10)(21-25), p.22 (21) - p.24(3) (Smith

Testimony). For upstairs air handler units, these lines frequently run through interior walls and

ceilings. *Id.* These lines are installed first, and wiring, insulation, and other equipment are

installed over them, rendering them impossible to access for removal and replacement without

first removing all drywall. *Id.* Replacement of the line set pipes requires removal of all drywall

in those areas of the walls where the pipe runs. Trial Transcript at 2/19 Vol. II p. 23 (17-25), p.

24 (1-3) (Smith Testimony).  Accordingly, it makes sense to replace these items since they are

suffering from corrosion and are most easily removed and replaced while the drywall is gone.

The outside compressors may need to be replaced in these homes, and should be

evaluated on a case-by-case basis. P1.2006-0016 (Bailey Original Report), Trial Transcript at

2/22 Vol. II p. 88 (4-11) (Wright Testimony), Trial Transcript at 2/22 Vol. II p. 27 (4-25), p. 28

(1-13), p. 30 (4-23) (Rutila Testimony).  The outside compressors demonstrate excessive wear

from excessive operation. Trial Transcript at 2/22 Vol. I p. 116 (23-25), p. 117 (1-11) (Rutila

Testimony), Trial Transcript at 2/22 Vol. II p. 30 (4-23) (Rutila Testimony).  The excessive

operation of the compressor is caused by attempting to circulate coolant through a failed and

corroded coil in the air handling unit. Trial Transcript at 2/22 Vol. I p. 98 (22-25), p. 99 (1-4); p.

30 (4-23) (Rutila Testimony).  The outside compressor may also need to be replaced to match the

connections on new air handling units, and should be evaluated on a case-by-case basis.

P1.2006-0016 (Bailey Original Report), Trial Transcript at 2/19 Vol. I p. 98 (22-25), p. 99 (1-5),

p. 117 (7-11) (Rutila Testimony), Trial Transcript at 2/22 Vol. II p. 88 (4-11) (Wright

Testimony).  The connections between the air handler and compressor have been altered due to

changes in refrigerant regulations. P1.2006-0016 (Bailey Original Report).

The duct work that runs from and to the air handling unit must be replaced.

P1.2006-0017 (Bailey Original Report), Trial Transcript at 2/19 Vol. I p. 77 (25), p. 78 (1-11)

(Phillips Transcript), Trial Transcript at 2/22 Vol. II p. 88 (21-23) (Wright Testimony).

Particulate matter from the CDW is in the ductwork. PP1.2006-0017 (Bailey Original Report),

Trial Transcript at 2/19 Vol.I, p. 78 (3-5) (Phillips Testimony).  The duct work cannot be

adequately cleaned. P1.2006-0018 (Bailey Original Report), Trial Transcript at 2/19 Vol. I p. 78

(6-9) (Phillips Testimony). The contractors for these homes could not obtain quotes to even attempt cleaning of the ductwork. P1.2050-0003 (Summaries of Cost Estimates), Trial Transcript at 2/19 Vol. I p.47 (2-10) (Opening Statement). Even if attempts could be made at cleaning the ductwork, the cost of cleaning would be greater than simply replacing the ductwork. P1.2027-0023 (Wright Report), Trial Transcript at 2/19 Vol. I p. 77 (25), p. 78 (11) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 88 (12-23) (Wright Testimony). Other national builders like Beazer and Lennar are replacing the duct work. P1.1888-0003 (Beazer Scope of Work), Trial Transcript at 2/19 Vol. I p. 77 (25), p. 78 (1-11) (Phillips Testimony).

### 5. Selective Electrical Devices & Appliances in the Plaintiff-intervenor Homes Need to be Replaced

#### a. *Scientific Reasons*

Silver is a very conductive metal and is used in the electronic contacts in practically every device that carries electrical current. P1.2020-0004 (Galler Original Report), Trial Transcript at 2/19 Vol. II p. 128 (12–24) (Galler Testimony). For example, silver is present in circuit breakers, light switches, thermostats, computers, televisions, and generally "[a]nything that has a button." P1.2020-0004 (Galler Original Report), Trial Transcript at 2/19 Vol. II p. 128(13)– p.129(8) (Galler Testimony). It is a preferred metal because it has good resistance to corrosion attacks from most sources. Trial Transcript at 2/19 Vol. II p. 157 (13–14) (Galler Testimony). However, like copper, its Achille's heel is sulfur. P1.2020-0004 (Galler Original Report), Trial Transcript at 2/19 Vol. II p. 157 (13–18) (Galler Testimony). Silver is readily corroded by sulfur. *Id.* When it is exposed to sulfur, silver sulfides are produced. Trial Transcript at 2/19 Vol. II p. 158 (6–10) (Galler Testimony); *see also* P2.0202 (Chudnovsky

-46-

2008).

When a sulfide corrosion product exists, it dramatically increases resistance of electrical current through the connection. *See* Trial Transcript at 2/19 Vol. II p. 129 (20–24) (Galler Testimony); *see also* P2.0202-0001 (Chudnovsky 2008). This increased resistance can cause either complete failure or excessive heating of the connection when energized. *See* Trial Transcript at 2/19 Vol. II p. 129 (25)– p.130 (2) (Galler Testimony); *see also* P2.0202-0001 (Chudnovsky 2008). Complete failure and/or excessive heat of a switch can lead to fires or other life safety problems, depending on the intended function of the switch. Trial Transcript at 2/19 Vol. II p.130 (3–14) (Galler Testimony). For example, a malfunctioning safety cut-off switch in a clothes dryer might cause a fire. *Id.*

Corrosion can also lead to premature failure of the electrical device or appliance. Trial Transcript at 2/19 Vol. II p. 130 (15–16); see also P2.0202-0001, et seq. (Chudnovsky 2008), P2.0195-0001, -0027, 0028 (Abbott, 1993 Fig. 1 (Effects of Film Thickness on Contact Resistance) and Fig 2. (Effects of Environmental Severity on Component Failure Mechanism)). The lifespan of devices with silver corrosion has been seriously diminished. Trial Transcript at 2/19 Vol. II p. 156 (10–13) (Galler Testimony). The silver corrosion found on the Plaintiffs' devices indicates that they were in a "Level III" or "Level IV" corrosive environment as measured on an objective corrosion scale. Trial Transcript at 2/19 Vol. II p.160 (6–9) (Galler Testimony). Level IV is the worst. *Id.* In a Level III environment, equipment failure rates increase by a factor of 100. Trial Transcript at 2/19 Vol. II p.160 (3–6) (Galler Testimony); see also P2.0195-0001, -0027, 0028 (Abbott, 1993, Fig. 1 (Effects of Film Thickness on Contact Resistance) and Fig 2. (Effects of Environmental Severity on Component Failure Mechanism)). The lifespan of devices

-47-

with silver corrosion can be decreased to a tenth or a quarter of its normal lifespan.  Trial

Transcript at 2/19 Vol. II p. 156 (14–17) (Galler Testimony).

Most of the appliances and electronics located in the representative homes need to be

replaced due to corrosion on metallic contact surfaces and on other metallic components.

P1.2018-0012 (SGH/Rutila Report), Trial Transcript at 2/19 Vol. I p. 81 (18-25) (Phillips

Testimony), Trial Transcript at 2/19 Vol. II at 156 (18-19) (Galler Testimony).  As discussed

above, the corrosion has damaged the copper wiring in the appliances and electronics.

P1.2018-0006 (SGH/Rutila Report), Trial Transcript at 2/19 Vol. II p. 156 (2-9) (Galler

Testimony), Deposition of Lori Streit (2/16/10) at 2/22 Vol. I p. 69 (11-17) (Streit Testimony).

The corrosion also has damaged the silver contacts in the appliances and electronics.

P1.2018-0006 (SGH/Rutila Report), Trial Transcript at 2/19 Vol. II p.129 (16) - p.130 (2), p.141

(15-20) (Galler Testimony).

Refrigerators are particularly susceptible to damage from the sulfur gasses due to the cool

copper lines and compressor which circulate refrigerant. P1.2018-0007 (SGH/Rutila Report).

They are also particularly susceptible to damage from the sulfur gasses due to the high air flow

caused by the compressor fan. P1.2018-0008 (SGH/Rutila Report), Trial Transcript at 2/19 Vol.

II p. 19 (2-14) (Smith Testimony).

Electronic systems in the Plaintiff-intervenors' homes houses have failed. P1.2018-0014

(SGH/Rutila Report, Appendix 1, Summary of Failures), Trial Transcript at 2/22 Vol. II pp.

11(20) - 12(5) (Rutila Testimony).  Electronic systems in the Plaintiff intervenors' homes are

damaged by the corrosion. P1.2020-0003 (Galler Report), Trial Transcript at 2/22 Vol. II p. 89

(15-20) (Wright Testimony), Trial Transcript at 2/19 Vol. II pp. 155 (24) - 156 (9) (Galler

Testimony). Electronic systems in the Plaintiff intervenors' homes are likely to fail before their normal and expected periods of use end. P1.2020-0003 (Galler Report), P1.2006-0018 (Bailey Report), Trial Transcript at 2/19 Vol. II p. 156 (10-17) (Galler Testimony). Examples of damaged or failed electronic systems include televisions, computers, and any other item with a circuit board. P1.2018-0014 (SGH/Rutila Report, Appendix 1, Summary of Failures), Trial Transcript at 2/19 Vol. II p. 12 (6-13) (Smith Testimony).

### b.   *Economic & Practical Reasons*

Replacement of electronic devices and appliances damaged by sulfur gases emitted by Chinese drywall makes sense under practical cost considerations. P1.2050-0003 (Summaries of Cost Estimates); Trial Transcript at 2/19 Vol.I pg.77. It is more cost effective to replace items such as smoke detectors, than to remove them from the home, transport them to and store them in a facility, and transport them back to the home. *Id.*

### 6.   **Whether Flooring Needs to be Replaced**

### a.   *Carpet Must be Replaced*

The carpet in the houses cannot be adequately protected during the remediation process. P1.2027-022 (Wright Original Report), P1.2006-0015 and -0023 (Bailey Original Report), Trial Transcript at 2/19 Vol. I p. 79 (4-6) (Phillips Testimony), Trial Transcript at 2/22 Vol. II. p. 92 (10-14) (Wright Testimony). Attempting to remove and store the carpet during the remediation is not cost-effective. P1.2027-022 (Wright Original Report), P1.2006-0015 and -0023 (Bailey Original Report), P1.2050 (Summaries of Cost Estimates), Trial Transcript at 2/19 Vol. I p. 79 (6-13) (Phillips Testimony). The evidence indicates that it would be cheaper to replace the carpet than attempt storage and reinstallation. P1.2027-022 (Wright Original Report),

-49-