P1.2006-0015, 0023 (Bailey Original Report), Trial Transcript at 2/19 Vol. I p. 79 (11-13)

(Phillips Testimony).

       b.     *Hardwood or Vinyl Flooring Must be Replaced*

The hardwood or vinyl flooring pose a challenge in some circumstances and in some

climates. P1.2016-0089 (SGH Original Report), Trial Transcript at 2/19 Vol. I p. 86 (7-8)

(Phillips Testimony). The unconditioned air during the remediation process can damage

hardwood floors. P1.2016-0089 (SGH Original Report), Trial Transcript at 2/19 Vol. I p. 86

(11-17) (Phillips Testimony). Dust generated during the remediation process will intrude into the

cracks and crevices of the flooring and may require resanding and refinishing the floors.

P1.2006-0015 (Bailey Original Report), Trial Transcript at 2/22 Vol. II p. 92 (10-14) (Wright

Testimony), Trial Transcript at 2/19 Vol. I p. 78 (2-5) (Phillips Testimony). In the representative

cases, the evidence supports the conclusion that the hardwood or vinyl flooring must be replaced

as part of the remediation. P1.2058-001 (Wright Scope of Remediation), Trial Transcript at 2/19

Vol. I p. 86 (11-19) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 92 (10-16) (Wright

Testimony).

       c.     *Tile Flooring May Need to be Replaced*

The evidence shows that tile flooring may be properly protected during the remediation

process, and if this can be done, the Court finds that it does not need to be removed and replaced.

In the case if the tile flooring is damaged, then it should be removed and replaced. Additionally,

tile that is affixed to the drywall will be ruined during the drywall removal and should be

replaced. 2/19 Vol. I, p. 82 (18-21) (Phillips Testimony).

      **7.**    **Items Which Must be Removed With the Drywall May Need to be Replaced**

     *a.    Cabinets Must be Replaced*

     The cabinets in the houses must be removed to gain access to the drywall.  P1.2016-0088 (SGH Original Report), Trial Transcript at 2/19 Vol. I p. 91 (10-16) (Phillips Testimony).  The testimony reveals that it would not be cost-effective to attempt to gently remove the cabinets and store them in a climate-controlled storage unit. Trial Transcript at 2/19 Vol. I p. 83 (13-20) (Phillips Testimony), Trial Transcript at 2/19 Vol. II p. 20 (16-22) (Smith Testimony), Trial Transcript at 2/22 Vol. II pp. 107 (22-25) - 108 (1-2) (Wright Testimony).  It is more cost-effective to replace the cabinets than attempt removal and storage.  Trial Transcript at 2/19 Vol. I at p.83 (13-20) (Phillips Testimony), Trial Transcript at 2/22 Vol. II, p.107 (22-25) - p.108 (1-2) (Wright Testimony).

     *b.    Countertops Must be Replaced*

     The countertops must be removed during the remediation to gain access to the drywall. P1.2005-0342 (Virtexco Quote for Morgan house.  All other quotes are the same on this issue.), Trial Transcript at 2/19 Vol. I p. 82 (11-15) (Phillips Testimony).  The contractors providing estimates for the Virginia homes indicate from experience that the countertops will chip or break during removal.  P1.2005-0342 (Virtexco Quote for Morgan house.  All other quotes are the same on this issue.).  Beazer testified that the countertops in Florida homes being remediated broke during removal. Trial Transcript at 2/19 Vol. I p. 84 (9-15) (Phillips Testimony).  Because of these factors, the countertops should be replaced as part of the remediation. P1.2005-0342 (Virtexco Quote for Morgan house.  All other quotes are the same on this issue.); Trial Transcript at 2/19 Vol. I pp. 83 (21-25) - 84 (1-19) (Phillips Testimony).

     *c.    Trim, Crown Molding and Baseboards Must be Replaced*

Trim, crown molding and baseboards are placed on top of the drywall.  P1.2016 (SGC

Original Report), Trial Transcript at 2/19 Vol.I p.87 (2-6)(Phillips Testimony).  They will have to

be removed to get to the defective drywall.  *Id*.  In most instances it is less costly to replace these

items than to take additional time to gently remove, store and put back the original materials.  *Id*.

This is the case with the representative homes.  *Id*.  Accordingly, the Court finds that these items

should be replaced.

> d.    *Bathroom Fixtures Must be Replaced*

Sinks, toilets and shower enclosures generally must be removed when the drywall is

removed because they are installed on top of drywall or to enable the remediation workers to

move freely.  It is more cost-effective to replaced these items than to gently remove, safely

transport and store, and reinstall at a later date.  P1.2050-0003 (Summaries of Cost Estimates);

Trial Transcript at 2/19 Vol.I p. 82(11)-p.83(1), p.84(20-24).  Thus these items should be

removed and replaced.

> **8.    Insulation Must be Replaced**

The insulation cannot be adequately protected during the remediation process.

P1.2058-001 (Wright Scope of Remediation).  The insulation will be damaged during the

removal of the drywall.  P1.2058-001 (Wright Scope of Remediation), Trial Transcript at 2/19

Vol. I p. 78 (15-17) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 93 (5-7) (Wright

Testimony).  It will also be contaminated with drywall dust produced during the removal of the

drywall.  P1.2058-001 (Wright Scope of Remediation), Trial Transcript at 2/19 Vol. I p. 78

(12-14) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 93 (1-3) (Wright Testimony).

The drywall dust cannot be properly cleaned or removed from the insulation.  P1.2058-001

(Wright Scope of Remediation), P1.2027-0023 (Wright original Report), P1.2016-0088 (SGH

Original Report), Trial Transcript at 2/19 Vol.I p. 78 (12-25) (Phillips Testimony),

P1-1803-0013, 0036 and 0012 (Photos of debris and dust in insulation fibers after CDW removal

from a Beazer home). It is more cost-effective to replace the insulation. P1.2058-001 (Wright

Scope of Remediation), Trial Transcript at 2/19 Vol. I p. 78 (19-23) (Phillips Testimony).

### 9. The Plaintiff-intervenor Homes Will Need to be Cleaned With a HEPA Vacuum, Wet-wiped or Power-washed, & Allowed to Air-out After Remediation

In order to eliminate the tremendous amount of dust produced from removal of the

drywall, and to eliminate the offensive odor of the Chinese drywall, Plaintiff-intervenors' homes

will need to be cleaned and aired-out after remediation is complete. A HEPA vacuum should be

used to remove the fine drywall dust and other particles. Additionally, the homes should be wet-

wiped or power washed to eradicate any remaining particles. Finally, the houses will need to air

out for between fifteen (15) and thirty (30) days. P1.2006-0083 (Bailey Original Report),

P1.2009-0067 (Debbas Original Report), Deposition of Ronald Bailey (2/2/10) at 304 (21-24).

The cleaning and airing-out is necessary to insure that all sulfur odors are gone. P1.2006-0083

(Bailey Original Report), P1.2016-0087 (SGH Original Report), Trial Transcript at 2/19 Vol. II

p. 34 (11-15) (Smith Testimony).

### 10. After Remediation, an Independant, Qualified Engineering Company Should Certify that the Homes are Safe for Occupation

Following the deconstructing phase of the remediation process, the houses will need to be

inspected by an independent and qualified engineering company. P1.2016-0084 (SGH Original

Report), Trial Transcript at 2/22 Vol. II pp. 123 (24) - 124 (7) (Wright Testimony). This is

important for insurance, resale potential, and peace of mind for the present occupants. The

independent and qualified engineering company should provide a letter or report indicating that the remediation has been correctly performed. P1.2016-0084 (SGH Original Report), Trial Transcript at 2/19 Vol. I p. 80 (11-14) (Phillips Testimony). The company should also provide a letter or report indicating that the homes are safe to be reoccupied. P1.2016-0084 (SGH Original Report), Trial Transcript at 2/22 Vol. II p.123 (24) - p.124 (7) (Wright Testimony).

### 11. The Scope of Work is Consistent With Chinese Drywall Remediation by National Homebuilders

The necessary remediation proposed by the PSC is essentially the same in all material respects as the scope of remediation being utilized by national builders Beazer Homes and Lennar Homes. Compare P1.2058-0001 (Wright Scope of Remediation) with P1.1888-0003 (Beazer Scope of Work) with P1.2016-0105 (Lennar Scope of Work), Trial Transcript at 2/22 Vol. I p. 99 (16-22) (Rutila Testimony). National builders Beazer and Lennar have also independently assessed the need for their remediation through scientific evidence, practical cost considerations, and hands-on experience with the problem. Trial Transcript at 2/19 Vol. I p. 69 (3-8), p.77 (4) - p.84 (24) (Phillips Testimony). Although in theory, a thorough cleaning or selective replacement of contaminated drywall may be an option, in practice however, the evidence however does not support the feasibility of such an option. The alternative remedies to a complete remediation that have been tried or suggested, such as selective identification and removal of Chinese Drywall, "cleaning" corroded wires, switches, and contact points, leaving corroded wires and switches in place, clipping the exposed ends of the corroded wires and splicing wires, or making new junction boxes, will not make the plaintiff whole, will not be adequate from a scientific or practical standpoint, and will not provide safety and marketability to the homeowner. P3.0544-0068-0070 (Acks Report) Trial Transcript at 2/19 Vol. I p. 75 (10-25)

(selective removal of CDW impossible) (Phillips Testimony), Trial Transcript at 2/22 Vol. I p.

125 (2-17) (impossible to reverse damage to wires by cleaning) (Rutila Testimony), Trial

Transcript at 2/19 Vol. I p. 80 (6-10, 15-22) (leaving wires in place, clipping and splicing through

junction boxes not to code and impossible to certify as safe) (Phillips Testimony).  The

impractical and time-consuming prospect of clipping, stripping and/or cleaning separate wires in

a switch or junction box is demonstrated by reference to the sample switch box removed by

Beazer's Jerry Smith from one of the Beazer homes.  P1.1981 (sample switch box with wiring

taken from Beazer home).  The only economically feasible option, at least at the present time, is

to totally gut the structure, take it down to the studs and remove and replace all wiring.

### 12.    The Court's Scope of Remediation as Compared to the NAHB & CPSC Remediation Protocols

After the hearing in the *Germano* matter, the National Association of Home Builders

(NAHB) and the Consumer Product Safety Commission (CPSC), each released their own

remediation protocols.  In its protocol, the NAHB recommends taking out all drywall in a home

unless the Chinese drywall is in a contained area.  Rebecca Mowbray, *Chinese Drywall Guidance*

*Offered by National Association of Home Builders*, The Times-Picayune, March 18, 2010,

http://www.nola.com/business/index.ssf/2010/03/chinese_drywall_guidance_offer.html.  It also

recommends taking out all plumbing, low-voltage wiring, and carpet.  *Id.*  Further, the NAHB

recommends the use of HEPA-filter vacuums to suck up dust, airing out homes over a period of

time, and paying for temporary living expenses for displaced families.  *Id.*  These

recommendations are consistent with the Court's own findings.

However, in contrast to the Court, the NAHB recommends removing only the damaged

ends of high-voltage wiring, but advises builders who are concerned about meeting building

codes or being cost-effective to take all wiring out. *Id.* It also provides that tile floors, cabinets,

and doors do not need to be replaced, unless it is more expensive to do so. *Id.* After hearing

considerable evidence in the crucible of a judicial hearing, the Court is convinced that at least

with regard to the representative cases this is not feasible or economically realistic.

The CPSC remediation protocol is largely consistent with the Court's protocol. Both call

for the replacement of all possible problem drywall, all fire safety alarm devices, all electrical

components and wiring, and all gas service piping and fire suppression sprinkler systems.

*Interim Remediation Guidance for Homes with Corrosion from Problem Drywall*, Consumer

Product Safety Commission & Department of Housing and Urban Development, April 2, 2010.

However, if a portion of drywall can be reasonably identified as non-problematic drywall, the

CPSC allows for leaving that drywall in place. *Id.*

The evidence reviewed by this Court indicates that the better and more realistic approach

dictates the removal of all drywall in those homes in which there is a substantial mixture. This is

necessary in order to remove and replace wires, pipes, and insulation, and to adequately clean the

home. Furthermore, the evidence indicates that it is virtually impossible to detect with

reasonable accuracy which is and which is not Chinese drywall.

### 13. The Plaintiff-Intervenor Families will be Out of Their Homes for 4-6 Months During Remediation

The evidence indicates that with regard to the representative homes, the remediation

process will require the removal and demolition of most interior building components in the

homes. P1.2058 (Wright's Scope of Remediation), Trial Transcript at 2/22 Vol. II p. 91 (6-16)

(Wright Testimony). Accordingly, the families will need to move out of their homes during the

remediation. Trial Transcript at 2/19 Vol. I p. 72 (24-25) (Phillips Testimony). The contractors

providing independent estimates to perform the remediation estimate that the process will take

four (4) to six (6) months to complete. P1.2050-0003 (Summaries of Cost Estimates), Trial

Transcript at 2/19 Vol. I p. 73 (5-6) (Phillips Testimony), Trial Transcript at 2/22 Vol. II p. 95

(25) - p. 26 (6) (Wright Testimony). The families are entitled to alternate living expenses during

the remediation process. Trial Transcript at 2/19 Vol. I p. 72 (22-24), p. 73 (8-10) (Phillips

Testimony).

**F.      THE COSTS OF REPAIRING VIRGINIA CDW HOMES IS ON AVERAGE
         $86/SQUARE FOOT**

The evidence supports the conclusion that the average cost per square foot to repair the

*Germano* homes is $86. P1.20509-0001 (Remediation Estimate Averages), Trial Testimony at

2/22 Vol. II  p. 120 (12-14) (Wright Testimony). The average cost is the average of independent

quotes from two local reputable Virginia contractors. P1.2050-0003 (Summaries of Cost

Estimates), Trial Testimony at 2/22, Vol. II p. 117 (14-20) (Wright Testimony). Each contractor

was provided a defined scope of work for the homes. P1.2027-0130 (Portion of Contractor

Scope), Trial Testimony at 2/22, Vol. II p. 104 (8-11) (Wright Testimony). The defined scope of

work for the homes is virtually identical to the Beazer scope of work. P1.1888-0003 (Beazer

Scope of Work), Trial Testimony at 2/22 Vol. II p. 95 (11-13) (Wright Testimony). An

independent quote was obtained from a smaller contractor that specializes in the remodeling and

new construction of homes. P1.2050-0003 (Summaries of Cost Estimates), Trial Testimony at

2/22 Vol. II, p. 103 (9-13) (Wright Testimony). Additionally, an independent quote was obtained

from a larger contractor that specializes in multi-family and commercial construction.

P1.2005-0364 (Portion of Virtexco Estimate), Trial Testimony at 2/22 Vol. II p. 103 (20-23)

(Wright Testimony).

The cost per square foot to repair includes the following:

1.  Demolition and disposal of all damaged and affected building components in the homes. P1.2058-0001 (Wright's Scope of Remediation), P1.2050-0003 (Summaries of Cost Estimates), Trial Testimony at 2/22 Vol. II p. 93 (13-21) (Wright Testimony),

2.  Replacement of all drywall. P1.2058-0001 (Wright's Scope of Remediation), Trial Testimony at 2/22 Vol. II, p. 70 (12-17) (Wright Testimony); *see also* P2.0239-0007 (Muller, Control of Corrosive Gases),

3.  Replacement of the entire HVAC assembly. P1.2058-0001 (Wright's Scope of Remediation), Trial Testimony at 2/22 Vol. II p. 87 (13-16) (Wright Testimony).

4.  Replacement of all electrical wiring and devices such as receptacles and switches. P1.2058-0001 (Wright's Scope of Remediation), Trial Testimony at 2/22 Vol. II p. 75 (11-16) (Wright Testimony).

5.  Replacement of items that are damaged during the removal of the drywall, i.e., trim and baseboards. P1.2058-0001 (Wright's Scope of Remediation), Trial Testimony at 2/22 Vol. II p. 91 (6-16) (Wright Testimony).

6.  Replacement of items that are less expensive to replace than store, i.e., carpet. P1.2058-0001 (Wright's Scope of Remediation), Trial Testimony at 2/22 Vol. II p. 92 (8-16) (Wright Testimony).

However, the cost per square foot to repair does not include the replacement of the exterior shell of the house, including windows, exterior doors, structural members, exterior siding, roof trusses, the roof, concrete, and nails. P1.2058-0001 (Wright's Scope of Remediation).

The average cost to repair complies with RS Means data. Trial Testimony at 2/22 Vol. II p. 116 (16-22) (Wright Testimony).  RS Means is a publication which compiles data on a national basis for cost to repair and replace building components. P1.2027-0162 - 0165 (RS Means Data Excerpt, Trial Testimony at 2/22, Vol. II p. 112 (25), p. 113 (1-8) (Wright Testimony).

The average cost to repair the Plaintiff-intervenors' homes based upon the average cost to repair per square foot are as follows:

1.     The average cost to repair the Morgan house is $232,491. P1.2059-0001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II, p. 117 (22-24) (Wright Testimony).

2.     The average cost to repair the Baldwin house is $257,730.  P1. 2059-001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II p. 117 (25), p. 118 (1) (Wright Testimony).

3.     The average cost to repair the Orlando house is $249,140.  P1. 2059-001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II, p. 118 (2-3) (Wright Testimony).

4.     The average cost to repair the Leach house is $14,957.  P1. 2059-001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II, p. 118 (4-5) (Wright Testimony).

5.     The average cost to repair the Michaux house is $198,142.  P1.2059-001 (Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II, p. 118 (6-7) (Wright Testimony).

6.      The average cost to repair the McKellar house is $194,720.  P1.2059-001

(Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II  p. 118 (8-9)

(Wright Testimony).

7.      The average cost to repair the Heischober house is $312,755.  P1.2059-001

(Remediation Estimate Averages), Trial Testimony at 2/22 Vol. II p. 118 (10-11)

(Wright Testimony).

## G.   IT IS NOT CERTAIN THAT PLAINTIFF-INTERVENORS HAVE SUFFERED PROPERTY DEVALUATION CAUSED BY THE CHINESE DRYWALL CONTAMINATION

There is testimony that the representative properties suffered a diminution in value

because of the presence of the contaminated drywall.  Trial Deposition of Kenneth Acks (2/2/10)

at 10-28.  Kenneth Acks is an expert in the field of estimating economic impacts of

environmental hazards upon real estate.  *Id.*  Mr. Acks utilized reliable methodologies in

reaching his conclusions with respect to the diminution in values of the seven properties as a

result of the contaminated Chinese drywall.  *Id.*  Trial Deposition of Kenneth Acks (2/2/10) at

p.60- p.72, p.80- p.82, p.84- p.102.  According to Ack's testimony, the diminution in value of

each of the seven properties as a result of the contaminated Chinese drywall, assuming that the

property has been remediated or will be remediated with costs not borne by the property owner,

is as follows:

(1) 4020 Dunbarton Circle in Williamsburg - appraised value of $382,000, diminution of

25% and a diminution value of $95,500;

(2) 4043 Dunbarton Circle in Williamsburg - appraised value of $475,000, diminution of

10% and a diminution value of $46,500;

(3) 4091 Dunbarton Circle in Williamsburg - appraised value of $381, 000, diminution of

25% and a diminution value of $95,250;

(4) 8495 Ashington Way in Williamsburg - appraised value of $382,000, diminution of

25% and a diminution value of $95,500;

(5) 1008 Hollymeade Circle in Newport News - appraised value of $230,000, diminution

of 20% and a diminution value of $46,000;

(6) 901 Eastfield Lane in Newport News - appraised value of $267,500, a diminution

value of 20% and a diminution value of $53,500; and

(7) 214 A 80th Street in Virginia Beach, appraised value of $635,000, diminution of 30%

and a diminution value of $190,500.  P3.0563-0001 (Table with the descriptions of the

seven properties, the assessed values, and the appraised values as of August 31, 2008) and

P3.0569-0001 (Table with the diminution in values of the seven properties) Trial

Deposition of Kenneth Acks (2/2/10) at p.46- p.48, p.106- p.109.

Assuming that these properties are unremediated, according to Ack's testimony, the value of

each of the seven homes as a result of the contaminated Chinese drywall decreases by an

additional 5%, except for 4043 Dunbarton Circle which remains at a diminution value of 10%,

plus the costs of the remediation.  Trial Deposition of Kenneth Acks (2/2/10) at p.112- p.113.

Although diminution in value is a recognized item of damages under Virginia law, *see Averett v.

Shircliff*, 218 Va. 202, 208, 237 S.E.2d 92, 95 (Va. 1977), the Court finds that at this point it is

more speculative than actual.  If the repairs are made properly there may be no diminution in

value or at least it may be minimal.  So this item of damage will not be allowed.

## H.   CHINESE DRYWALL EFFECTS ON PLAINTIFF-INTERVENORS & THEIR HOMES, & THEIR RESULTING DAMAGES

1.    **The Plaintiff-intervenors Cases Provide a Representative Cross-section of Homes Contaminated by Chinese Drywall & Persons Harmed by Chinese Drywall**

The homes of the seven Plaintiff-intervenors are representative of a cross-section of contaminated homes, including single family homes, duplex construction, and townhomes. P1.2016-0009 (Original SGH/Rutila Report) (The Court has accepted Mr. Rutila as an expert in multidisciplinary investigations of building and construction problems. Trial Transcript at 2/22 Vol.II, p.95 (22-25) (Rutila Testimony)), P3.0544-0003, 0010, 0011, 0012, 0013 (Acks Report) (Kenneth Acks, MBA was tendered as, and the Court accepted him as, an expert in property devaluation and environmental impacts on property value. Trial Deposition of Kenneth Acks (2/2/10) at 28). They include a range of values, type of construction, and amount of drywall. For example:

a.    The original costs of these homes reflect a broad cross-section ranging from that of a modest townhome to that of a higher-end custom home, including an elevator and custom floors and cabinetry throughout the home. P3.0544-0002 (Acks Report).

b.    The homes are representative of new home construction as well as of an additional alteration made to a home after initial construction. P1.2027-0007 (Original Report of Ron Wright) (The Court has accepted Mr. Wright as an expert in civil engineering. Trial Transcript at 2/22 Vol.II, p.65 (15-17) (Wright Testimony)).

c.    The use of drywall in the homes, based upon sales and delivery records, spans a spectrum from a small delivery of 8 boards to homes built with over 200 4'x12'

sheets of drywall. P1.2016-0017-0018 (Original SGH/Rutila Report).

The Court was presented evidence by both PSC and Knauf experts that the chemical and

physical properties of Chinese-manufactured drywall (hereinafter "CDW" or "Chinese drywall")

do not differ significantly from region to region or state to state. P1.2025-0003, 0004 (Streit

Supplemental Report) (Lori Streit, Ph.D. was tendered as, and the Court accepted her as, an

expert in chemistry.  Trial Deposition of Lori Streit (2/16/10) at p. 11(4)-p.14(17), P.2023-

0015 – P2023-0020 (Original Streit Report, C.V.)), Deposition of Matthew Perricone (1/21/10)

at Exhibit 2, p. i, ¶4.7, Deposition of Sandy Sharp (2/5/10) at p.148(15)–p.150(11), Trial

Deposition of Lori Streit (2/16/10) at p.24(6)–p.25(1) (receiving different kinds of samples),

p.26(11–12), p.27(21)–p.28(7) (finding commonalities among Chinese products) (finding

samples from different sources to be similar).

These homeowners represent a broad cross-section demographically of families, ranging

from families with young children to couples approaching retirement, with a broad cross-section

of employments, including law enforcement, the military, the insurance industry, academia,

religious ministry, and business management.  Trial Transcript at 2/19 Vol.I pp. 49-61 (Morgan

Testimony), Trial Transcript at 2/19 Vol. II pp.113-122 (McKellar Testimony), Trial Transcript

at 2/22 Vol. I pp.4-14 (Michaux Testimony), Trial Transcript at 2/22 Vol.I pp. 78-87 (Heischober

Testimony), Trial Transcript at 2/22 Vol. II pp.31-38 (Baldwin Testimony), Trial Transcript at

2/22 Vol.II pp.43-52 (Leach Testimony), Trial Transcript at 2/22 Vol.II pp.52-62 (Orlando

Testimony).  The economic disruption and hardship suffered by these families are found to be

representative of the impact CDW has on homeowners.  *Id.*  Because of the wide spectrum

encompassed by these representative structures, the general principles found applicable to them

will have relevance, if not in toto, at least partially, to all of the homes contaminated by defective Chinese drywall.

### 2.   Law Applicable to Plaintiff-intervenors' Recovery of Damages

The Court finds that Plaintiff-intervenors' interests in their real properties have been injured by defendant Taishan's negligence in producing a defective product, and that they are entitled to recover the damages proximately caused by same. The applicable law is the law of Virginia as the facts indicate that the real property of the Plaintiff-intervenors is situated in Virginia, and the losses which are the subject of this proceeding likewise occurred in Virginia. Additionally, no intervenor has disputed that Virginia law applies to the claims of the intervening homeowners against the defendant Taishan.

Plaintiff intervenors' negligence claims are not barred by Virginia's economic loss rule. *See Proto v. The Futura Group, LLC., et al.*, CL09-2455, Hearing Tr., Dec. 7, 2009 (Va. Cir. Ct.) at 68 (overruling demurrer with respect to negligence); *see also In re: Chinese Manufactured Drywall Prod. Liab. Litig.*, MDL 2047 (E.D. La., Jan. 13, 2010) (rejecting the arguments that the economic loss rule barred plaintiffs' tort claims); *In re: All Pending Chinese Drywall Cases*, CL 09-3105, *et al.*, at 5-10 (Va. Cir. Ct. March 29, 2010). In general, the measure of damages in Virginia for a negligence action is "the amount necessary to compensate the injured party for the damage proximately caused by the tortious conduct." *Lochaven Co. v. Master Pools by Schertle, Inc.*, 233 Va. 537, 591, 357 S.E.2d 534, 537 (Va. 1987). With respect to injury to real property, Virginia allows damages to be measured by diminished value, the cost of repair or a combination of both. "Both rules are merely evidentiary methods for determining that amount which will compensate the owner for his actual pecuniary loss sustained as a result of a negligent wrongful

act." *Averett v. Shircliff*, 218 Va. 202, 208, 237 S.E.2d 92, 95 (Va. 1977); *accord, St. Martin v.*

*Mobil Exploration Producing U.S., Inc.*, No. 95-4128, 1998 U.S. Dist. LEXIS 12808, at *28-29

(E.D. La. 1998) (property damages may include cost of restoration that has been reasonably

incurred or the value of the property unless disproportionate); *McMinis v. Phillips*, 351 So.2d

1141 (Fla. App. 1977) (plaintiff may elect to recover reasonable cost of repairs).

Pursuant to Virginia law, the Plaintiff-intervenors' can recover both the cost of repair and

the loss in value of their property after the repairs are completed.  The evidence at trial

established that for each of the properties at issue the damage is not permanent and is in fact

repairable.  Under these circumstances, the proper measure of damages is the cost of repair, plus

the amount the property was depreciated, if any, because it was damaged.  *Lee v. Bell*, 237 Va.

626, 379 S.E.2d 464 (Va. 1989) (cost of repair is proper measure of damages if evidence has

been introduced showing repair costs); *Lochaven*, 233 Va. at 538, 357 S.E.2d at 543 (plaintiff

entitled to recover all costs necessary to repair damage to embankment and pool deck caused by

negligence of pool cleaning company); *Westlake Props. v. Westlake Pointe Prop. Owners Ass'n*,

273 Va. 107, 126, 639 S.E.2d 257, 269 (Va. 2007) (jury was properly instructed that measure of

damages was reasonable cost of repairing or replacing the property, whichever is less, plus

necessary expenses shown by the evidence to have been incurred by the plaintiff); *Wittman*

*Family Trust v. Renaissance Housing Corp.*, 2000 Va. Cir. LEXIS 523 (Va. Cir., Nov. 30, 2000)

(in case involving defective siding material (EIFS), court held that "the measure of compensatory

damages is the cost of repair, unless the cost of repair would constitute economic waste.");

Virginia Model Jury Instructions, Instruction No. 9.060 (Property Damage: Partial Loss) ("When

personal property is partially damaged, the measure of damages is the reasonable cost of

repairing the property plus the amount, if any, the property was depreciated because it was

damaged, plus the necessary and reasonable expenses shown by the evidence to have been

incurred by the plaintiff as a result of the damage to the property.").

In addition to damage to real property, plaintiff intervenors' may recover damages to their

personal property shown to be caused by the defective Taishan drywall.  The measure of damages

for injury to personal property in Virginia is similar to that for real property.  Where personal

property has been either destroyed or damaged "the general rule for determining the amount of

damages for injury to personal property is the fair market value of the property before and

immediately after the property was damaged, plus necessary reasonable expenses incurred by the

owner in connection with the injury." *Averett*, 218 Va. at 206, 237 S.E.2d at 95 (Va. 1977).  As

with realty, the exception to the rule is where personal property has been damaged and can be

restored by repairs.  If the repairs would be less than the diminution in value because of the

injury, the amount recoverable is the cost of repairs and the diminution in market value of the

injured property, if any, after the repairs are made.  *Averett*, 218 Va. at 206.  Thus, if personal

property has been destroyed, the measure of damages is market value plus any reasonable and

necessary expenses incurred as a result of the injury.  However, if the personal property has been

damaged but not destroyed, the proper measure of damages is either (1) the diminution in market

value plus reasonable and necessary expenses incurred or (2) the reasonable cost of repair plus a

reasonable amount for lost value because of the injury, whichever is less.

Plaintiff-intervenors may recover damages to compensate for other losses caused by

Taishan's defective drywall, including alternative living costs, costs associated with foreclosures

and/or bankruptcy, additional amounts owed due to mortgage deferral, bankruptcy or inability to

refinance, and the loss of income. Under Virginia law, a plaintiff's recovery of damages includes

all damages proximately caused by the tortious conduct. *Lochaven*, 233 Va. at 541, 357 S.E.2d

at 537 ("The measure of damages in a negligence action is that amount necessary to compensate

the injured party for the damages proximately caused by the tortious conduct."); *see also Packett*

*v. Herbert*, 237 Va. 422, 377 S.E.2d 438 (Va. 1989) (damages to real property are not limited to

the diminution in value and may include damages for loss in use and other consequential

injuries); Restatement (Second) of Torts § 929 (1979) (providing that damages for injury to real

property include compensation for loss of use of the property and other consequential injuries in

addition to any permanent property damage, whether measured by restoration or market value);

*Averett*, 218 Va. at 206, 237 S.E.2d at 95 (citing with approval Section 928 of the Restatement of

the Law of Torts, which allows compensation for loss of use); *Seymour v. McDonald*, 24 Va.

Cir. 531 (1981) (consequential damages recoverable in addition to damages for injury to real

property); 5C Michie's Jurisprudence, Damages, § 32 (2006) (rule encompasses recovery of

expenses incidental to irreparable injury); J. Costello, Virginia Remedies, Damages, §

21.04[2][a] (foreseeable consequential damages recoverable); *accord Bailey v. Missouri P.R.*

*Co.*, 383 So. 2d 397, 402, 1980  La. App. LEXIS 3636 at *15 (1980) (tortfeasor must compensate

his victim "for even the most improbable severe consequences of his wrongful act.),  citing,

*Gallick v. B & O R.R.*, 83 S. Ct. 659 (U.S. 1963); McMinis, 351 So.2d at 1141 (relying on

Section 928 of the Restatement of Torts).   Damages for these consequential injuries are therefore

all recoverable under Virginia law.

Plaintiff-intervenors are entitled to recover damages for loss of use and enjoyment of a

residential property.  This is supported by *Bowers v. Westvaco Corp.*, 419 S.E.2d 661, 668 (Va.

1992), where the Virginia Supreme Court held that a loss of use and enjoyment award of
$473,000 was not excessive where the defendant operated a 24/7 truck staging operation 20 feet
from the plaintiff's driveway.  Additionally, the New Hampshire Supreme Court upheld a
$360,000 loss of use and enjoyment award in a case where plaintiff's only loss was the loss of
enjoyment in hiking and camping on his land after defendant cut down trees on the land.
*Berliner v. Clukay*, 834 A.2d 297 (N.H. 2003).  In *Hackney v. Courtland Homes*, 2006 WL
4394647 (Super. Ct. Ariz, 2006), a case arising from the construction of homes on expansive
soils, the jury awarded each of the five homeowners compensation for the cost of repair, $25,000
for diminished value, and $40,800 for loss of use and enjoyment.  In *Hardaway v. Arvida,* 1996
WL 33100325 (Ga. Super. 1996), a jury awarded the plaintiff homeowner $25,000 for property
damage and $20,000 for  loss of use and enjoyment in a case arising from damages caused by
water runoff from an upstream subdivision.  A jury awarded owners of a home located next to a
cabinet manufacturer $50,000 for loss of use in enjoyment in *Matuzsewski v. Imperial Cabinet*,
1990 WL 1084178 (Mich. Cir. Ct). In *Lyons v. Sparkle Plenty Car Wash*, 2002 WL 32138270
(Fla. Cir. Ct.), the jury awarded $10,000 for loss of use and enjoyment to homeowners who
bought their lots before construction of an adjacent carwash; and in *Pollack v. City of San
Antonio*, 2003 WL 21695559 (Tex. Dist), the jury awarded the plaintiff, whose home was located
adjacent to a negligently-maintained landfill, $10,000 for loss of use and enjoyment.  The loss of
use and enjoyment suffered by the Virginia CDW plaintiff intervenors (including past and future
displacement from the home, exposure to obnoxious gases, failures of electrical equipment,
increase risk of electric failure and fire, and total loss of enjoyment of the home) is significant
and more severe than several of the scenarios presented in the above-referenced jurisprudence.

In light of the above, to properly compensate the plaintiff intervenors for damages to their real property, the Court finds that the cost of repair shall include the cost of removing the source of corrosion from each home.

As discussed above, in order to make the Plaintiff-intervenors whole, they must be awarded a remedy which replaces all drywall, the electrical, electronic, and HVAC systems in the home, copper pipes in the home, and other copper and silver components in the home. The remedy also must provide a written guarantee to the owner from a certified environmental company that the home is free of contamination and damaged corroded components. Furthermore, in order to make the plaintiff intervenors whole, they must be awarded compensation for damaged personal property and other compensable damages as specified herein. The Court will now discuss this remediation protocol as it applies to the individual Plaintiff-intervenors' and their properties. In doing so, it will first provide detailed descriptions of each family and their circumstances arising from the Chinese drywall in their homes. The Court will then follow each description with a list of damages recoverable under the applicable law.

3.      **Plaintiff-intervenors & Their Damages**

a.      *Deborah and William Morgan*

i.      Background

Deborah and William Morgan own 8495 Ashington Way, Williamsburg, VA. P3.0419-0001- P3.0419-0003, P3.0398-0001 (Morgan deed, Morgan house photo), Trial Transcript at 2/19, Vol. I, p. 49 (25) - p.50 (5), (Morgan's Testimony). The Morgan home has 3,079 square feet. P1.2059-0001 (Remediation Estimate Averages). The Morgans have been

married 27 years, and have two daughters and a grandchild on the way. Trial Transcript at 2/19,

Vol.I, p. 49 (17-24), (Morgan's Testimony).  Bill Morgan retired from the Newport News police

force as a master police detective after 24 years.  He works now as a security manager for Camp

Perry in Williamsburg. Trial Transcript at 2/19, Vol.I, p.50 (11) - p.51 (2), (Morgan's

Testimony).  Deborah teaches teachers as an instructional coach for the Newport News public

school system.  She was named teacher of the year for 3 years during her career. Trial Transcript

at 2/19, Vol.I, p.51 (3-9), (Morgan's Testimony).

The Morgans purchased their home on July 14, 2006, for $383,199.89. P3.0419-0001-

P3.0419-0003 (Morgan deed), Trial Transcript at 2/19, Vol. I, p.51 (10-13), (Morgan's

Testimony), P3.0637-0011- P3.0637-0012 (Tuthill's Supplemental Exhibit Morgan-1 (Revised

for Trial Testimony) (The PSC tenders Ms. Tuthill, and the Court accepts her, as an expert in

financial accounting and analysis.  Trial Deposition of J.C. Tuthill (2/4/10) at p.19- p.24)).  For a

2007 refinance, the home was appraised for $470,000.00. P3.0419-0001- P3.0419-0003,

P3.0426-0001 - P3.0426-18 (Morgan Refinance Appraisal April 2007).

The Morgans chose to move inland to higher ground to avoid flooding. Trial Transcript at

2/19, Vol. I, p.52 (12-16), (Morgan's Testimony).  Bill and Deborah developed a strong

attachment to 8495 Ashington Way the first time they saw it.  While it was under construction

they would drive to see it 2-3 times per week. Mr. Morgan would climb through the windows to

look at it.  It was their dream home.  Trial Transcript at 2/19, Vol. I, p.52 (17) - p.53 (1),

(Morgan's Testimony).  The house was two stories.   The entire rear  of the house is basically one

room.  The dining room opens to the kitchen, the kitchen into the family room. Trial Transcript at

2/19, Vol.I, p.53 (5-13), (Morgan's Testimony).

The Morgans moved in on July 13 or 14, 2006. Trial Transcript at 2/19, Vol.I, p.54 (17-21), (Morgan's Testimony). They moved out of the home on June 23, 2009, having lived there just one month short of 3 years. P3.0407-0001- P3.0407-0014 (Lease), Trial Transcript at 2/19, Vol.I, p.55 (1-6), p.58 (1-5), (Morgan's Testimony). The Morgans complained that the house had a rotten chemical smell while the Morgans lived there. Trial Transcript at 2/19, Vol.I, p.53 (23) - p.54 (7), (Morgan's Testimony). Mrs. Morgan noticed the odor from the first day that they moved into the house; Mr. Morgan noticed it when they would leave for the weekend and then return. *Id.* The hot water heater of the Morgan home failed in the summer or fall of 2008, only two years after they moved in. Trial Transcript at 2/19, Vol.I, p.54 (7-12), p.54 (22-25), (Morgan's Testimony). Initially the electronic control box for it was replaced, but that remedy didn't work and the entire hot water heater was replaced. *Id.* After the water heater failed, one of their upstairs outlets failed, which tripped a circuit breaker. Trial Transcript at 2/19, Vol. I, p.55 (7-13), (Morgan's Testimony). Then two separate outlets in different rooms upstairs failed, but those failures did not trip the circuit breaker. *Id.* There was also an electrical short in the Morgans' HVAC system which caused a burning smell. Trial Transcript at 2/19, Vol. I, p.55 (7-25), (Morgan's Testimony). When the system was turned off awhile, the burning smell stopped; but when it was turned back on, the smell returned. *Id.* The Morgans slept through the night without heat. Mr. Morgan called an HVAC repair service, which advised that the short happened because a nut holding wires together had been burned through; but the repairman could not explain why that happened after testing the system. *Id.* The Morgans arranged for a more experienced company to inspect the HVAC system. *Id.* The inspector noticed a leak in the system, following which it was necessary to replace the HVAC coils in March or April 2009.

P3.0433-0001 - P3.0437-0001 (Morgan HVAC Repair Receipts), Trial Transcript at 2/19, Vol.I, p.56 (2-16), (Morgan's Testimony).

Due to their concern for fire safety following these developments, the Morgans bought two fire extinguishers for their home. P3.0430001- P3.0430-0002 (Morgan Fire Extinguisher Receipts), Trial Transcript at 2/19, Vol. I, p.56 (17-25), (Morgan's Testimony). Still, Mr. Morgan worried when he and his wife went to sleep that the house might catch fire, since the outlets had failed without tripping the circuit breakers. *Id.* In addition, the Morgans' smoke detector stopped working a year ago, as did a couple of computers, and a TV. Trial Transcript at 2/19, Vol.I, p.58 (6-14), (Morgan's Testimony). The control panel for the security system had to be replaced. *Id.* Counsel sent the Morgan's TV for laboratory analysis and the TV circuitry was found to be corroded. Trial Transcript at 2/19, Vol. I, p.58 (17-24), (Morgan's Testimony).

Mr. Morgan initially was reluctant to believe his home had CDW. Trial Transcript at 2/19, Vol. I, p.57 (13-14), (Morgan's Testimony). Mr. Morgan eventually found a "Venture Supply" label on the CDW in his attic. Trial Transcript at 2/19, Vol. I, p.57 (18-23), (Morgan's Testimony). The Venture label was discovered in March or April 2009, and the Morgans moved out on June 23, 2009. Trial Transcript at 2/19, Vol. I, p.58 (1-5), (Morgan's Testimony).

After the Morgans left their home, they moved into a rental home for which they pay $1,900 per month. P3.0409-0001, P3.0407-0001-P3.0404-0014 (Morgan Chapter 13 Receipt, Morgan Lease), Trial Transcript at 2/19, Vol. I, p.59 (4-13), (Morgan's Testimony). They could not also afford to pay their mortgage of $2,835 per month, so they filed for bankruptcy protection. *Id.* Filing for bankruptcy was made necessary because the Morgans could not afford their mortgage payments. Trial Transcript at 2/19, Vol I, p.59 (14-15); p.59 (16-25), (Morgan's

Testimony).  Both Mr. Morgan and his elder daughter are cancer survivors, and the Morgans' younger daughter still lived with them at 8495 Ashington Way.  The family was unwilling to endure further exposure to Chinese drywall. Trial Transcript at 2/19, Vol. I, p.59 (25) - p.60 (3), (Morgan's Testimony).  Mr. Morgan was credible in his testimony as to the difficulty of missing mortgage payments. Trial Transcript at 2/19, Vol. I, p.60 (4-7), (Morgan's Testimony).  The Morgans are still in bankruptcy. They paid out-of-pocket costs for their bankruptcy filing as well as attorney's fees. P3.0409-0001 (Morgan Chapter 13 Receipt), Trial Transcript at 2/19, Vol.I, p.60 (8-12), (Morgan's Testimony), Trial Transcript at 2/19, Vol.I, p.60 (4-7), (Morgan's Testimony).  The Morgans have received a letter from the bankruptcy trustee to the effect that the mortgage company will be allowed to foreclose on their home; and this probably will occur in the near future, unless the company decides it does not want the property. Trial Transcript at 2/19, Vol.I, p.60 (13-18), (Morgan's Testimony).

Mr. Morgan has spent a significant amount of time allowing access to his home for testing and inspection, and gathering receipts for all of his expenses. Experts have reviewed all of his damaged possessions in order to obtain estimates on costs. He also worked with a CPA in New Orleans to prepare a summary of economic losses.  The summary is a fair and accurate statement reflecting his economic damages. Trial Transcript at 2/19, Vol.I, p.60 (21) - p.61 (20), (Morgan's Testimony).

ii.     Damages

The average cost of remediation of the Morgan home is $232,491. P1.2059-0001, P3.0637-0011-P3.0637-0012 (Remediation Estimate Averages, Tuthill's Supplemental Exhibit Morgan-1 (Revised for Trial Testimony)).

The loss of the Morgan's personal property is $886.  P3.0546-0001- P3.0546-0039, P3.0637-0011-P3.0637-0012 (David Maloney's expert report (David J. Maloney  is a Certified Member of the International Society of Appraisers (ISA) , and the PSC  requests that the Court accept his expert opinions in the discipline of personal property appraisal. P3.0545-0009) (Maloney C.V.)),  Tuthill's Supplemental Exhibit Morgan-1 (Revised for Trial Testimony)).

The past and future repair costs for the Morgans, including the Home Environmental Inspection post-remediation, is $13,876.29. P3.0637-0011-P3.0637-0012 (Tuthill's Supplemental Exhibit Morgan-1 (Revised for Trial Testimony)).

The economic losses associated with the Morgan's foreclosure and bankruptcy are $120,080. P3.0637-0011-P3.0637-0012 (Tuthill's Supplemental Exhibit Morgan-1 (Revised for Trial Testimony)), Deposition of J.C. Tuthill (2/4/10) p.95- p.103.

The alternative living costs recurring on a monthly basis during remediation to their home are $2380 per month.  Assuming the remediation will take six months, the total recurring monthly costs are $14,280.

The Morgans have suffered the loss of use and enjoyment of their home and personal property.  Repeated electronic failures and the real possibility of electrical fires, coupled with concerns for their family's health, forced the Morgans to abandon their home, to put the home into foreclosure and to file for bankruptcy.  The Morgans moved out of the house on June 23, 2009 and will never return.  Trial Transcript at 2/19, Vol.I, p. 49 (17)- p. 61 (25) (Morgan's Testimony), P3.0546-0001 - P3.0546-0039 (Expert report of David Maloney), P3.0637-0011-P3.0637-0012 (Tuthill's Supplemental Exhibit Morgan-1 (Revised for Trial Testimony).

Assuming remediation is complete within six months, the total of damages proven by the

Morgans is $381,613.29, plus an award for loss of use and enjoyment of the home to be

determined by the Court.  P3.0637-0011-P3.0637-0012 (Tuthill's Supplemental Exhibit

Morgan-1 (Revised for Trial Testimony).

> b.    *Jerry and Inez Baldwin*

> i.    Background

Jerry and Inez Baldwin bought their single-family home with Chinese drywall at 4020

Dunbarton Circle in Williamsburg, Virginia, on November 21, 2006, for $376,719.15.

P3.0179-0001 (Baldwin Deed), Trial Transcript at 2/22, Vol.II, p.31 (13-20) (Baldwin's

Testimony).  They lived in the Atlanta area when Mr. Baldwin accepted a new position with his

employer in Newport News, VA. Trial Transcript at 2/22, Vol.II, p.32 (15-19) (Baldwin's

Testimony).  The Baldwins selected this newly-constructed home at the time when Mrs.

Baldwin's mother was living with them, they needed a house with a full bathroom and bedroom

on the first floor for her convenience.  Trial Transcript at 2/22, Vol.II, p.32 (20) - p.33 (7)

(Baldwin's Testimony).  The Baldwin residence has 2,957 square feet. P1.2059-0001 (Wright's

Remediation Estimate Averages).  The  Baldwins' down payment was $100,000, and they also

paid for $12,000 in upgrades.  The Baldwins made this down payment in order to reduce their

mortgage payments. Trial Transcript at 2/22, Vol.II, p.33 (8-17) (Baldwin's Testimony).  The

move-in date was late November 2006. Trial Transcript at 2/22, Vol.II, p.32 (9-10) (Baldwin's

Testimony).

Jerry and Inez Baldwin still live in the house at 4020 Dunbarton Circle because they

cannot afford to move out and make both pay mortgage and rent payments.  Trial Transcript at

2/22, Vol.II, p.32 (11-14) (Baldwin's Testimony).  Mr. Baldwin worries about the health of his

family, including his 33-year old son and grandchildren when they visit.  Trial Transcript at 2/22,

Vol.II, p.38 (12-16) (Baldwin's Testimony).

The Baldwin house has Chinese drywall from Venture Supply. P3.0200-0001 (Venture

Supply Invoice), Trial Transcript at 2/22, Vol.II, p.34 (23-25) (Baldwin's Testimony).

The Baldwins have experienced numerous electrical failures in their home.  They are on a

third set of HVAC coils in the garage (the previous two having failed).  Their microwave and

refrigerator failed; and their thermostat failed.  P3.0207-0001- P3.0211-0001, P3.0212-0001,

P3.0215-0001, P3.0204-0001, P3.0205-0001, P3.0206-0001 (HVAC Repairs, Microwave

repairs, Refrigerator repairs), Trial Transcript at 2/22, Vol.II, p.32 (1-10) (Baldwin's Testimony).

Two computers in the Baldwin home also have failed.  These were located in the office on the

first floor, what would have been Mrs. Baldwin's mother's bedroom. P3.0204-0001,

P3.0205-0001, P3.0206-0001 (Computer repair & replacement), Trial Transcript at 2/22, Vol.II,

p.32 (1-10), p.33 (18-24) (Baldwin's Testimony).  When the computers failed, the Baldwin

family lost personal photography, recipes, and documents.  They had not backed up the computer

and the data was irretrievable. Trial Transcript at 2/22, Vol.II, p.35 (3-8) (Baldwin's Testimony).

This irreplaceable personal property had unique and significant value for these Plaintiffs.

Knauf's experts tested the ceiling in the first floor office, and reported that the drywall

was domestic and not Chinese.  Mr. Rutila (plaintiffs' expert) drilled core samples and tested

them in a lab; he concluded that the drywall was indeed Chinese and was releasing corrosive

gases. Trial Transcript at 2/22, Vol.II, p.34 (8) - p.35 (2) (Baldwin's Testimony).  However, Mr.

and Mrs. Baldwin wish to remediate their whole house, both floors, because they have had

failures on both floors. Trial Transcript at 2/22, Vol.II, p.35 (17-18) (Baldwin's Testimony).  For example, the coils on their second floor air handler are black, and the Baldwins have been told that they need to be replaced. Trial Transcript at 2/22, Vol.II, p.35 (9-18) (Baldwin's Testimony). Additionally, the lamp brought into the courtroom was also in the first floor office. (The lamp was discussed by Mr. Rutilla as having corrosion in its cord.) Trial Transcript at 2/22, Vol.II, p.33 (23) - p.34 (4) (Baldwin's Testimony).

When the home is remediated, the Baldwins will have to move out of the house, which will represent a hardship for them. Trial Transcript at 2/22, Vol.II, p.35 (19-22) (Baldwin's Testimony).

The Baldwin's mortgage lender offered a forbearance of payments for three months. Trial Transcript at 2/22, Vol.II, p.35 (23) - p.36 (25) (Baldwin's Testimony).  The interest would accrue and would be due at the end of the 3 months. *Id.*  The lender was willing to discuss extending the forbearance at the end of the 3 months. *Id.*  The Baldwins declined. *Id.* Jerry and Inez Baldwin have tried to refinance their mortgage loan to take advantage of lower interest rates, but they were unable to find a lender which would loan money for a Chinese drywall home. Trial Transcript at 2/22, Vol.II, p.37 (1-12) (Baldwin's Testimony).  Jerry Baldwin is 59 and had hoped to retire in 6 years to collect a higher social security payment. However, the home in Williamsburg represents a major portion of his financial assets.  If the bank forecloses and the $265,000 mortgage balance becomes due, this would deplete virtually all of this family's savings. Trial Transcript at 2/22, Vol.II, p.37 (13) - p.38 (6) (Baldwin's Testimony).  Mr. and Mrs. Baldwin have been diligent in saving and planning for retirement; but the economic consequences of the events associated with CDW have had a devastating impact on their lives.

Trial Transcript at 2/22, Vol.II, p.38 (19-25) (Baldwin's Testimony).

Mr. and Mrs. Baldwin worked with counsel and a forensic accountant (J.C. Tuthill) to verify that the summary exhibit attached to the Tuthill report is an accurate statement of the financial damages these plaintiffs have suffered. P3.0637-0001- P3.0637-0002 (Tuthill's Supplemental Exhibit Baldwin-1 (Revised for Trial Testimony).

ii.    Damages

The cost of remediation of the Baldwin home is $257,730.00. P1.2059-0001 (Wright's Remediation Estimate Averages), P3.0637-0001- P3.0637-0002 (Tuthill's Supplemental Exhibit Baldwin-1 (Revised for Trial Testimony).

The remediation of the Baldwin home should take between 4 and 6 months.

The future alternative living costs, non-recurring, for the Baldwins is $7,895.43. P3.0637-0001- P3.0637-0002 (Tuthill's Supplemental Exhibit Baldwin-1 (Revised for Trial Testimony).

The alternative living costs recurring on a monthly basis post-trial until the remediation is done are $4,844.98.  P3.0637-0001- P3.0637-0002 (Tuthill's Supplemental Exhibit Baldwin-1 (Revised for Trial Testimony).  Assuming the remediation of their home is going to take six months, the total recurring monthly costs are $29,069.88.

The loss of personal property of the Baldwins is $2,075.00.  P3.0546-0001- P3.0546-0039 (Expert report of David Maloney), P3.0637-0001- P3.0637-0002 (Tuthill's Supplemental Exhibit Baldwin-1 (Revised for Trial Testimony).

The cost for repairs of the Baldwin property, both past and future, including the Home Environmental Inspection post-remediation, is $17,769.80. P3.0637-0001- P3.0637-0002

(Tuthill's Supplemental Exhibit Baldwin-1 (Revised for Trial Testimony).

The Baldwins have suffered the loss of use and enjoyment of their home. Jerry and Inez Baldwin worked during their 40 year marriage to build enough equity in their home which would enable them to retire in 7 years. They pride themselves in never missing a mortgage payment. They have lost that financial security their home provided. The Baldwins have also lost 2 computers (and the data thereon), a refrigerator, a microwave, and have suffered through more air conditioning problems in the 3 years they have been in the home than the average person experiences in their lifetime. P3.0546-0001- P3.0546-0039 (Expert report of David Maloney), P3.0637-0001- P3.0637-0002 (Tuthill's Supplemental Exhibit Baldwin-1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol.II, p.31 (12) - p.38 (25) (Baldwin's Testimony).

Assuming remediation is complete within six months of trial, the total of economic damages proved by the Baldwins is $341,699.11 plus an award for loss of use and enjoyment of the home to be determined by the Court. P3.0637-0001- P3.0637-0002 (Tuthill's Supplemental Exhibit Baldwin-1 (Revised for Trial Testimony).

       *c.*    *Joe and Cathy Leach*

       i.    Background

Joe and Cathy Leach purchased a single family home at 4043 Dunbarton Circle in Williamsburg, Virginia, on July 23, 2008, for $475,000.00. P3.0295-0001- P3.0295-0003 (Leach Deed), Trial Transcript at 2/22, Vol.II, p.44 (4-11) (Leach's Testimony). The house is a ranch-style construction with a full basement. It is built in equal sizes on both levels, and features a bonus room above the garage. The main level is three bedrooms, dining and living rooms and kitchen; the downstairs has an office, an entertainment room and another full master

-79-

suite. Trial Transcript at 2/22, Vol.II, p.44(21) - p.45(2) (Leach's Testimony).  The house is two

levels on a hill.  The basement is fully redone. Trial Transcript at 2/22, Vol.II, p.45 (3-10)

(Leach's Testimony).

     The previous owners added a wine room to the basement, which has the Chinese Drywall.

Trial Transcript at 2/22, Vol.II, p.46 (19-25), p.44 (12-16) (Leach's Testimony).  The wine room

had been added by the previous owners to maximize space by finishing off the under part of the

porch.  It is 10 feet by 10 feet. Trial Transcript at 2/22, Vol.II, p.46 (9-18) (Leach's Testimony).

The house only has 8 sheets of Chinese Drywall. Trial Transcript at 2/22, Vol.II, p.46 (19-25),

p.44 (12-16) (Leach's Testimony).  The wine room has no HVAC vents so the air doesn't

circulate when the door is closed. They keep the door closed all the time. Trial Transcript at 2/22,

Vol.II, p.51 (14-19), p.52 (1-6) (Leach's Testimony).  The prior owners used a dehumidifier in

the home's wine room, but the dehumidifier failed. Trial Transcript at 2/22, Vol.II, p.51 (21-25)

(Leach's Testimony).

     Cathy and Joe Leach currently live in the home with their two children, Joseph and Sarah.

Trial Transcript at 2/22, Vol.II, p.45 (11-13) (Leach's Testimony).  Mr. Leach is a military officer

for the Department of Defense, working on special operations projects.  He often is called to duty

away from home.  Trial Transcript at 2/22, Vol.II, p.43 (17-25), p. 48 (17-21) (Leach's

Testimony).  Cathy Leach's parents used to live in the full suite in the basement.  When the

family's young son Joseph went downstairs to visit his grandparents, he would get nosebleeds.

Joseph was instructed not to go downstairs for two weeks; the nosebleeds stopped.  Once, he

went downstairs and the bleeds began. Trial Transcript at 2/22, Vol.II, p.45 (14) - p.46 (1)

(Leach's Testimony).  Cathy Leach's parents lived in the finished basement of the house, but

moved out because of the Chinese drywall and the respiratory symptoms the family linked to Chinese Drywall. Trial Transcript at 2/22, Vol 2, p.47(12) - p.48 (19-37) (Leach's Testimony). When Cathy Leach's parents moved out, this imposed a burden on the family because Mrs. Leach works during the day and Mr. Leach is out-of-town for his job. The loss of this prior support was disruptive for the family. Trial Transcript at 2/22, Vol.II, p.48 (14-21) (Leach's Testimony). Cathy Leach works outside the home for an insurance company in Richmond.  When her parents moved out, she had to find day care and after school care for the children. They moved out so quickly that Mrs. Leach had to  make hurried arrangements for the children. Trial Transcript at 2/22, Vol.II, p.49(2-9) (Leach's Testimony).

The Leach family lost about 2400 square feet of their home when they shut off the basement due to CDW. P3.0284-0001 (Leach Floor Plan), Trial Transcript at 2/22, Vol.II, p.48 (9-13) (Leach's Testimony).  Chinese Drywall, even confined to one room in the Leach house, has greatly impacted this family. Trial Transcript at 2/22, Vol.II, p.49 (10-13) (Leach's Testimony).

Joe Leach wished to remediate the house himself, trying to arrange something with the builder.  This plan did not work; the Chinese Drywall remains. Trial Transcript at 2/22, Vol.II, p.49 (14- 25) (Leach's Testimony).  Mr. and Mrs. Leach recognize that CDW remediation will be a very extensive project, due to the need to run new electrical wires from the wine room to the electrical panel. Trial Transcript at 2/22, Vol.II, p.50 (1-9) (Leach's Testimony).

Cathy and Joe Leach tried to refinance their mortgage when interest rates dropped by 2 percentage points, but were unable to do so because of the presence of Chinese Drywall.  The refinance would have saved them about $600 per month. P3.0302-0001, P3.303-0001-

P3.303-0002 (Leach Refinance Denials), Trial Transcript at 2/22, Vol.II, p.50 (10-23) (Leach's Testimony).

Joe Leach has missed a couple of job opportunities due to the Chinese Drywall; he had to turn down two job offers because he would have to move out of Virginia, and it would not have been possible to sell this Chinese Drywall house quickly enough. Trial Transcript at 2/22, Vol. , p.50 (18) - p.51(1) (Leach's Testimony). The Chinese Drywall has had a significant impact on Mr. Leach's ability to earn a living for his family. Trial Transcript at 2/22, Vol.II, p.52 (2-5) (Leach's Testimony).

The odor in the room of the Leach home with Chinese drywall is very noticeable and strong. Trial Transcript at 2/22, Vol.II, p.52 (12-13) (Leach's Testimony). Mr. Leach described the smell as pungent, like swamp gas or a sewer- type odor. It was this odor which originally led the family to have the room inspected; they thought there was water damage in the area. P3.0285-0001-P3.0285-0003 (Inspection Report); Trial Transcript at 2/22, Vol.II, p.52 (7-13) (Leach's Testimony).

Mr. and Mrs. Leach worked with counsel, the appraisers and a forensic accountant (J.C. Tuthill) to assure the summary exhibit attached to the latter's report was an accurate statement of financial damages. P3.0637-0005- P.3.0637-0006 (Tuthill's Supplemental Exhibit Leach-1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol.II, p.51 (6-11) (Leach's Testimony).

> ii.     The Leach home is a unique example of known localized use of Chinese drywall which can be repaired as a stand-alone unit of the home, without removing all drywall in the home

The Leach home is an example of an extremely localized use of CDW in a single room added to the home after home construction was completed. P1.2016-0018, 0110 (Original

SGH/Rutila Report), Trial Transcript at 2/22, Vol.II, p.44(12-16), p.46(19-25), p.51(14-19),

p.52(1-6), p.46(2-7), p.46(9-18) (Leach Testimony).  The room was small, and was conceived by

the original owner to be used as a wine room.  P1.2016-0018, 0110 (Original SGH/Rutila

Report), Trial Transcript at 2/22, Vol.II, p.44(12-16), p.46(19-25), p.51(14-19), p.52(1-6),

p.46(2-7), p.46(9-18) (Leach Testimony). The plaintiffs purchased the home from the original

owner, but the room had never been utilized for its intended purpose.  *Id.*  Because this small

room was to be climate-controlled, there were no HVAC registers or returns for the HVAC

system on the lower floor of the house where the room was added.  P1.2016-0018, 0110

(Original SGH/Rutila Report), Trial Transcript at 2/22, Vol.II, p.44(12-16), p.46(19-25),

p.51(14-19), p.52(1-6), p.46(2-7), p.46(9-18) (Leach Testimony).  After careful investigation, the

experts retained by the PSC concluded that no damage had been done to the mechanical systems

of the Leach home due to the lack of air circulation to or from the room.  P1.2016-0018, 0110

(Original SGH/Rutila Report), Trial Transcript at 2/22, Vol.II, p.44(12-16), p.46(19-25),

p.51(14-19), p.52(1-6), p.46(2-7), p.46(9-18) (Leach Testimony).  In the context of a small repair

or addition such as this where the corrosive gases from CDW are isolated from the other portions

of the home by physical and mechanical barriers, drywall removal only in such an area is

feasible.  P1.2016-0018, 0110 (Original SGH/Rutila Report), Trial Transcript at 2/22, Vol.II,

p.44(12-16), p.46(19-25), p.51(14-19), p.52(1-6), p.46(2-7), p.46(9-18) (Leach Testimony).  The

Court finds, however, that the installation of even small numbers of Chinese drywall boards in a

home requires extensive repairs and results in significant other consequential damages as set

forth in the following.

iii.     Damages

The cost of remediation of the Leach home is $14,957.00. P1.2059-0001 (Wrights' Remediation Estimate Averages), P3.0637-0005- P.3.0637-0006 (Tuthill's Supplemental Exhibit Leach-1 (Revised for Trial Testimony).

The loss of personal property of Joe and Cathy Leach is $5,564.00. P3.0546-0001-P3.0546-0039 (Expert report of Dave Maloney), P3.0637-0005- P.3.0637-0006 (Tuthill's Supplemental Exhibit Leach-1 (Revised for Trial Testimony).

The costs for repair of the Leach property, both past and future, including the Home Environmental Inspection post-remediation, is $13,199.12. P3.0637-0005- P.3.0637-0006 (Tuthill's Supplemental Exhibit Leach-1 (Revised for Trial Testimony).

The Leach's lost about $600 per month due to their inability to refinance their mortgage because of the Chinese drywall in their home.  Over twelve months, the Leach's additional costs due to their inability to refinance are $7,200. P3.0637-0005- P.3.0637-0006 (Tuthill's Supplemental Exhibit Leach-1 (Revised for Trial Testimony).  This amount will be allowed, but to extend this amount into the future is too speculative.

The total monthly recurring economic damages for the Leach's is $1,635.29 per month for March- August 2010.  Assuming the remediation takes six months, the total monthly recurring economic damages are $9,811.74.  P3.0637-0005- P.3.0637-0006 (Tuthill's Supplemental Exhibit Leach-1 (Revised for Trial Testimony).

Joe and Cathy Leach have suffered a loss of the use and enjoyment of their home and their personal property.  When the Chinese Drywall was discovered in August 2009, their large home was essentially divided in half, one half being a basement.  The basement of the house now is closed off due to the Chinese Drywall in the wine room.  Mr. Leach bought a new computer

and moved his office upstairs. No one can use the elaborate entertainment system in the basement. P3.0546-0001 - P3.0546-0039 (Expert report of David Maloney), P3.0637-0005-P.3.0637-0006 (Tuthill's Supplemental Exhibit Leach-1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol.II, p.43 (17) - p.52 (13) (Leach's Testimony).

Assuming remediation is complete within six months of trial, the total of all economic damages proven by Joe and Cathy Leach is $59,676.86, plus an award for loss of use and enjoyment of the home to be determined by the Court. P3.0637-0005- P3.0637-0006 (Tuthill's Supplemental Exhibit Leach-1 (Revised for Trial Testimony).

### d.   *Robert and Lisa Orlando*

#### i.   Background

Robert and Lisa Orlando purchased a single family home at 4091 Dunbarton Circle, Williamsburg, Virginia, for $369,500 on June 4, 2009. P3.0500-0001- P3.0500-0003 (Orlando deed), P3.0637-0013- P3.0637-0014 (Supplemental Exhibit Orlando-1 (Revised for Trial testimony)), Trial Transcript at 2/22, Vol.II, p.53 (5-13) (Orlando's Testimony). The appraised value of the home at the time of the sale was $372,000. P3.0519-0002 (Orlando appraisal for purchase). The Orlando residence has 3,245 square feet. P1.2059-0001. The Orlandos put down $150,000 when they purchased the house. The money for the down payment was all the money they had saved. This $200,000 investment was the biggest they had ever made. It was a little under 1/2 of the purchase price. P3.0521-0001- P3.0521-0002 (Settlement Statement), Trial Transcript at 2/22, Vol.II, p.55 (20-24), p.55 (1) - p.56 (7) (Orlando's Testimony). The Orlandos looked forward to the move because the home was to have an in-ground pool. Trial Transcript at 2/22, Vol.II, p.54 (16-23) (Orlando's Testimony). They paid $50,000 for the in-ground pool. *Id*.

The Orlandos have three sons (twins who are 18 and one who is 13). The family moved down from upstate New York to Virginia when Mr. Orlando accepted a job in 2009. This was a significant move because the twins missed their senior year in high school in New York. Trial Transcript at 2/22, Vol.II, p.54 (1-3), p.54 (9-12) (Orlando's Testimony).

The Orlando house had 163 4x12 boards of Venture Supply drywall delivered to it. Trial Transcript at 2/22, Vol.II, p.53 (14-17) (Orlando's Testimony).

After living in the home for four weeks, having just finished the landscaping and the pool, the Orlandos received a letter from the builder saying that they may have 172 sheets of Chinese drywall. P3.0507-0001 (Orlando Letter from American Eastern dated 7/16/09), Trial Transcript at 2/22, Vol.II, p.55 (3-7) (Orlando's Testimony). The families in Mrs. Orlando's community who have Chinese Drywall have shared information with one another during the past months. Trial Transcript at 2/22, Vol.II, p.55 (16-19) (Orlando's Testimony). The Orlandos first noticed a smell when they toured the house; they thought it was from the previous owner's two children in diapers. After they moved in, the smell got progressively worse. Trial Transcript at 2/22, Vol.II, p.56 (8-19) (Orlando's Testimony). The Orlandos had all the carpets in the home cleaned, but the smell did not go away. P3-0523-0001 (Orlando carpet cleaning receipt), Trial Transcript at 2/22, Vol.II, p.56 (17-18) (Orlando's Testimony). Mrs. Orlando describes the odor as similar to the smell of spent fireworks. Trial Transcript at 2/22, Vol.II, p.56 (20-22) (Orlando's Testimony).

The Orlando's hot water heater failed. The previous owner told them that in three years the air conditioner went out 2 times. The Orlandos had problems with their HVAC unit the summer of 2009. The person who came to look at their HVAC unit in August 2009 showed them

the pits in the HVAC coils and could not believe that the coils were only a year old. He thought the unit was much older. P3.0524-0001 (Orlando email from Atlantic Constructors), Trial Transcript at 2/22, Vol.II, p.55 (25) - p.57 (9).

Mr. and Mrs. Orlando remained in the house 7 months.  It was not a difficult decision to move out because they believed that, if Chinese Drywall caused pitting in metal that it also posed a risk to the family's young children's health. Trial Transcript at 2/22, Vol.II, p.57 (10-17) (Orlando's Testimony).  For as long as they were in the house, Mr. and Mrs. Orlando believed there was more Chinese drywall upstairs than downstairs.  They brought mattresses downstairs, and one son slept on a mattress on the floor in the study while the rest of the family slept in the master bedroom. Nathan Orlando, age 17, was embarrassed that he had to sleep in the same room as his parents. Trial Transcript at 2/22, Vol.II, p.57 (20) - p.58 (1), p.58 (4-10) (Orlando's Testimony).  Mrs. Orlando put a curtain across the top of the stairs to try to trap the air and gases and smell upstairs. Trial Transcript at 2/22, Vol.II, p.58 (2-3) (Orlando's Testimony).
The Orlando family was careful to figure out how to move out of this home and not jeopardize their credit. Trial Transcript at 2/22, Vol.II, p.57 (17-19) (Orlando's Testimony).

Having moved out of their CDW home, the Orlando family pays rent of $2,000, higher than the home's mortgage payment of $1,211.89.  Still, they prefer to be out of the CDW house. P3.0637-0013- P.3.0637-0014 (Tuthill's Supplemental Exhibit Orlando-1 (Revised for Trial Testimony)), Trial Transcript at 2/22, Vol.II, p.58 (11-16) (Orlando's Testimony), P3.0506-0001-P3.0506-0005 (Lease).

Knauf experts reported that there was no Chinese Drywall in the ceilings of the bedroom or in two tested places in the living room of the Orlando house. Trial Transcript at 2/22, Vol.II,

p.58 (17-24) (Orlando's Testimony).  The Orlandos thereafter allowed their counsel to remove

the entire ceiling of the house; and, on the back of the removed drywall, there were markings of

Venture Supply, i.e., Taishan. Trial Transcript at 2/22, Vol.II, p.59 (1-10) (Orlando's Testimony).

The Orlandos desire that their home be stripped to the studs with new drywall and with

complete mechanical and electrical systems replaced. Trial Transcript at 2/22, Vol.II, 59:11-15

(Orlando's Testimony).

Mr. and Mrs. Orlando have worked with counsel, the appraisers and a forensic accountant

(J.C. Tuthill) to assure the summary exhibit attached to the latter's report is an accurate statement

of financial damages. P3.0637-0013- P.3.0637-0014 (Tuthill's Supplemental Exhibit Orlando-1

(Revised for Trial Testimony)), Trial Transcript at 2/22, Vol 2, p.59 (16-25)  (Orlando's

Testimony).

     ii.    Damages

The cost of remediation of the Orlando home is $249,140. P1.2059-0001, P3.0637-0013-

P3.0637-0014 (Remediation Estimate Averages, Tuthill's Supplemental Exhibit Orlando-1

(Revised for Trial Testimony)).

The remediation of the Orlando home should take between 4 and 6 months.

The alternative living costs, non-recurring, both past and future, for the Orlandos are

$16,656.23. P3.0637-0013- P.3.0637-0014 (Tuthill's Supplemental Exhibit Orlando-1 (Revised

for Trial Testimony)), Trial Deposition of J.C. Tuthill (2/4/10) at p.31(110-112).

The alternative living costs recurring on a monthly basis post trial are $2,368.92.

P3.0637-0013- P.3.0637-0014 (Tuthill's Supplemental Exhibit Orlando-1 (Revised for Trial

Testimony)), Trial Deposition of J.C. Tuthill (2/4/10) at p. 31(110-112).  Assuming remediation

occurs within six months, the total recurring monthly living costs are $14,213.52.

The loss of personal property of the Orlando belongings is $2,375. P3.0546-0001-
P3.0546-0039, P3.0637-0013- P.3.0637-0014 (Expert report of Dave Maloney, Tuthill's
Supplemental Exhibit Orlando-1 (Revised for Trial Testimony)).

The repair costs of the Orlando property, both past and future, including the Home
Environmental Inspection post-remediation, are $14,426.09.  P3.0637-0013- P.3.0637-0014
(Tuthill's Supplemental Exhibit Orlando-1 (Revised for Trial Testimony)).

The additional amounts owed by the Orlandos for mortgage deferral for 1 year are
$11,094.60. P3.0637-0013- P.3.0637-0014 (Tuthill's Supplemental Exhibit Orlando-1 (Revised
for Trial Testimony), Trial Deposition of J.D. Tuthill (2/4/10) at p. 113(15)- p.115(15).

The Orlandos have suffered the loss of use and enjoyment of their home and personal
property. Lisa and Bob Orlando and their sons lived in their home only 7 months moving out
February 1, 2010.  The move has cost them the use of their home.  They essentially abandoned
their second story as the majority of the Chinese Drywall is believed to be there.  The family
lived in one-half of the house for 7 months. Trial Transcript at 2/22, Vol.II, p. 53 (1)- p. 59 (25)
(Orlando's Testimony), P3.0546-0001 - P3.0546-0039 (Expert report of David Maloney),
P3.0637-0013- P.3.0637-0014 (Tuthill's Supplemental Exhibit Orlando-1 (Revised for Trial
Testimony)).

Assuming remediation is complete within six months of trial, the total of all economic
damages proven by the Orlando's is $307,905.44 plus an award for loss of use and enjoyment of
the home and personal property to be determined by the Court. P3.0637-0013- P.3.0637-0014
(Tuthill's Supplemental Exhibit Orlando-1 (Revised for Trial Testimony)).

e.    *Fred and Vanessa Michaux*

i.    <u>Background</u>

Fred and Vanessa Michaux purchased their townhouse with Chinese drywall at 901

Eastfield Lane, Newport News, VA, on November 1, 2007, for $267,500. P3.0464-0001

(Michaux Deed) Trial Transcript at 2/22, Vol.I, p.4 (17-20), p.5 (1- 4) (Michaux Testimony).

The Michaux residence has 2,367 square feet and is a 3 story townhome. P1.2059-0001 (Wright's

Remediation Estimate Averages), P3.0443-0001 (Photo of townhome), Trial Transcript at 2/22,

Vol.I, p.5 (12-25) (Michaux Testimony).   On the first floor is Mr. Michaux's office, which is like

a living room, a half bath, 2 car garage, and a laundry room; the second floor is the main living

space with living room, half bath, dining room, great room, and TV room; the third floor has 3

bedrooms and 2 full baths. P3.0444-0001- P3.0444-0003 (Michaux floor plan), Trial Transcript

at 2/22, Vol.I, p.5 (16-22) (Michaux Testimony).   The down payment was $40,000 which took

the Michauxs 10 years to accrue. P3.0466-0001- P3.0466-0004 (Michaux Mortgage Documents),

Trial Transcript at 2/22, Vol.I, p.13 (14-15) (Michaux Testimony).

Mr. Michaux is a pastor of the City Life Church in Newport News. Trial Transcript at

2/22, Vol.I, p.6 (20-23) (Michaux Testimony).   They have three children:  Derrick (9), Ethan (7)

and Claire (5).   Trial Transcript at 2/22, Vol.I, p. 6 (15-17) (Michaux Testimony).   Mr. and Mrs.

Michaux were attracted to this home because it provided space for their career activity.   The

couple offers  marriage counseling, which they could provide in the privacy of the first floor.

The second floor afforded space for hosting church meetings, which they conduct about twice a

week.   The Michaux children are home-schooled in the townhome.   The Michaux family life,

church life and school life were all accommodated within the townhome. Trial Transcript at 2/22,

Vol.I, p.7 (3-25) (Michaux Testimony).  City Life Church does not own a building; therefore, various church meetings were held in the Michaux home. Trial Transcript at 2/22, Vol.I, p.6(24) - p.7 (2) (Michaux Testimony).

This townhouse is in the same neighborhood as the McKellar's, i.e., Hollymeade, where 36 or 37 of the 67 units have Chinese drywall. Chinese drywall has had a major impact on the neighborhood, as it is now about half-vacant. Trial Transcript at 2/22, Vol.I, p.6 (3-14) (Michaux Testimony).  Venture Supply's records show that 45 sheets of Chinese drywall were delivered to the house during construction. P3.0494-0001, P3.0495-0001 (Venture Supply Documents), Trial Transcript at 2/22, Vol.I, p.5 (5-9) (Michaux Testimony).  The expert testing by Knauf and the PSC confirmed that there is Chinese drywall on every floor of the Michaux home. Trial Transcript at 2/22, Vol.I, p.12 (24) - p.13 (6) (Michaux Testimony).

When Mr. and Mrs. Michaux moved into the house, they smelled an unusual odor, but thought it was from new construction. They noticed that the smell was even stronger when they got back from vacations after the house had been closed. Mrs. Michaux thought that the smell would fade as time passed, but it didn't.  It got stronger.  Trial Transcript at 2/22, Vol.I, p.7 (4-13) (Michaux Testimony).  The smell lingers in the kids' school books, in all clothing and linens, and possessions.  Mrs. Michaux cannot get the smell out of these things even now, although the family has not been back to live at the home in 6 months.  Trial Transcript at 2/22, Vol.I, p.8 (20-23), p.9 (1-11) (Michaux Testimony).  The Michaux family has had to prioritize items to replace due to the smell for financial reasons.  The children got new mattresses.  Other items were kept simply because the family cannot afford to replace them. Trial Transcript at 2/22, Vol.I, p.9 (11-16) (Michaux Testimony).

-91-

Mr. and Mrs. Michaux moved out of the townhome on September 5, 2009, just 2 days after confirmation that it had Chinese Drywall.  They were concerned with CDW associated health issues with the children which prompted them to find an apartment and move out quickly. Trial Transcript at 2/22, Vol.I, p.8 (17-19), p.9 (3), p.10 (8-12) (Michaux Testimony).  The Michaux son suffers from eczema and allergies. Trial Transcript at 2/22, Vol.I, p.12 (2-6) (Michaux Testimony).

One evening, Mr. and Mrs. Michaux turned off the power to the home, looked with a flashlight at their copper wires, and found them black. Trial Transcript at 2/22, Vol.I, p.9 (17) - p.10 (3) (Michaux Testimony).  In the Michaux home there has been HVAC coil failureS, as well as many electronic failures. P3.0480-0001- P3.0486-0001 (HVAC repair records), Trial Transcript at 2/22, Vol.I, p.10 (4-8) (Michaux Testimony).

The Michaux family's church moved the family from their home into a small apartment while they were on vacation, so the family would not have to sleep in a Chinese Drywall house anymore. Trial Transcript at 2/22, Vol.I, p.12 (7-14) (Michaux Testimony).  It was emotionally difficult for this family to move out of their house.  Mrs. Michaux thought they would spend many years in it. Trial Transcript at 2/22, Vol.I, p.11 (21) - p.12 (2) (Michaux Testimony).

For five months Mr. and Mrs. Michaux paid both their rent and their monthly mortgage of $1,263.94. This was a great financial hardship for the family. P3.0637-0009- P3.0637-0010 (Supplemental Tuthill Exhibit), Trial Transcript at 2/22, Vol.I, p.10 (14-16) (Michaux Testimony).  To survive the 5 months of paying rent and the mortgage, the Michaux family used emergency savings and cashed in stock.  They did everything a family would do to protect their credit. P3.0455-0001- P3.0455-0002 (Line of credit statement), Trial Transcript at 2/22, Vol.I,

p.11 (5-9) (Michaux Testimony).  In January, 2010, Mr. and Mrs. Michaux received a mortgage

deferral from their mortgage company. While they do not make mortgage payments now, interest

continues to accrue, and at the end of the deferral their mortgage schedule will be reassessed. The

mortgage company will only commit to a 90 day deferral each time, so the deferral must

re-negotiated every three months to ask for a new deferral. P3.0456-0001- P3.0456-0003

(Michaux Mortgage Deferral), Trial Transcript at 2/22, Vol.I, p.10 (10-14), p.10 (19-25)

(Michaux Testimony).  The bank will not guarantee extending the deferral; it remains possible

that Mr. and Mrs. Michaux will have to walk away from their home and relinquish ownership to

the bank. Trial Transcript at 2/22, Vol.I, p.11 (12-14) (Michaux Testimony).  This accrued

interest is also a hardship for the Michaux family.  Trial Transcript at 2/22, Vol.I, p.11 (1-5)

(Michaux Testimony).  They have already met with a bankruptcy lawyer. Trial Transcript at 2/22,

Vol.I, p.10 (14-17) (Michaux Testimony).  The Michaux family moved out of the small

apartment on February 1, 2010 to a rental house that could more comfortably accommodate the

family. P3.0450-0001- P3.0450-0010 (Lease), Trial Transcript at 2/22, Vol.I, p.10 (5-9)

(Michaux Testimony).

Mr. and Mrs. Michaux worked with counsel and the accountant to make sure the

summary exhibit was an accurate statement of the financial damages. P3.0637-0009-

P3.0637-0010 (Tuthill's Supplemental Exhibit Michaux-1 (Revised for Trial Testimony), Trial

Transcript at 2/22, Vol.I, p.13 (18) - p.14 (2) (Michaux Testimony).

ii.    Damages

The cost of remediation of the Michaux home is $198,142.00. P1.2059-0001 (Wright's

Remediation Estimate Averages), P3.0637-0009- P3.0637-0010 (Tuthill's Supplemental Exhibit

Michaux-1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol.I, p.13 (18) - p.14 (2) (Michaux Testimony).

The remediation of the Michaux home should take between 4 and 6 months.

The alternative living costs, non-recurring, both past and future for the Michaux's are $10,576.70. P3.0637-0009- P3.0637-0010 (Tuthill's Supplemental Exhibit Michaux-1 (Revised for Trial Testimony).

The alternative living costs recurring on a monthly basis post trial are $2,397.90. P3.0637-0009- P3.0637-0010 (Tuthill's Supplemental Exhibit Michaux-1 (Revised for Trial Testimony). Assuming remediation will occur in six months, the total monthly living costs are $14,387.40.

The loss of personal property of the Michauxs is $7,620.00. P3.0546-0001- P3.0546-0039 (Expert report of Dave Maloney), P3.0637-0009- P3.0637-0010 (Tuthill's Supplemental Exhibit Michaux-1 (Revised for Trial Testimony).

The costs for repair of the Michaux property, both past and future, including the Home Environmental Inspection post remediation, is $14,606.73. P3.0637-0009- P3.0637-0010 (Tuthill's Supplemental Exhibit Michaux-1 (Revised for Trial Testimony).

The additional amounts owed by the Michauxs for mortgage deferral for 12 months are $11,701.08. P3.0637-0009 - P3.0637-0010 (Tuthill's Supplemental Exhibit Michaux-1 (Revised for Trial Testimony).

The additional expenses, offset by the property tax savings due to an assessment reduction, are a credit of $1,426.11. P3.0637-0009 - P3.0637-0010 (Tuthill's Supplemental Exhibit Michaux-1 (Revised for Trial Testimony), P3.0459-0001 (Property tax assessment).

Fred and Vanessa Michaux sustained a loss of use and enjoyment of both personal property and their home. After living in their townhome for only 19 months, they abandoned it due to Chinese Drywall. Within 2 days of confirmation of the Chinese Drywall they moved out, fearing for their health. This townhome was the center of the family, pastoral, and educational lives of the entire family, and the church. P3.0546-0001- P3.0546-0039 (Expert report of Dave Maloney), P3.0637-0009 - P3.0637-0010 (Tuthill's Supplemental Exhibit Michaux-1 (Revised for Trial Testimony), Trial Transcript at 2/22, Vol.I, p.4 (12) - p. 14 (2)  (Michaux's Testimony)

Assuming remediation is complete within six months of trial, the total of damages proven by the Michauxs are $255,607.80 plus an award for loss of use and enjoyment of the home and personal property to be determined by the Court. P3.0637-0009 - P3.0637-0010 (Tuthill's Supplemental Exhibit Michaux-1 (Revised for Trial Testimony).

> f.      *Preston and Rachel McKellar*

> i.      Background

Preston and Rachel McKellar own a townhome at 1008 Hollymeade Circle, Newport News, Virginia. P3.0357 (McKellar's deed), Trial Transcript at 2/19, Vol.II, p. 113 (11-14) (McKellar's Testimony).  Preston and Rachel McKellar purchased the home on August 30, 2006 for the sum of $197,110. P3.0357 (McKellar's deed), P3.0358 (McKellar's deed), Trial Transcript at 2/19, Vol.II, p.114(24)-p.115(2) (McKellar's Testimony).  The townhome was appraised for $198,000 at the time of purchase. P3.0360-0001- 0012 (McKellar's 2006 Appraisal).  The townhome was appraised for $249,000 at the time of refinance in April 2008. P3.0364-0001-0011 (McKellar's 2008 Appraisal).  The townhome has 2,115 square feet. P1.2059-0001 (Wrights' Remediation Estimate Averages).

-95-

Preston and Rachel McKellar moved in the townhome in August of 2006. Trial Transcript at 2/19, Vol.II, p.116 (8) (McKellar's Testimony), P3.0637-0007 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony). This was Mr. and Mrs. McKeller's first home. Mr. McKellar is a middle school teacher who teaches science and social studies. Mrs. McKellar was a pediatric nurse but has been a housewife since William was born. Trial Transcript at 2/19, Vol.II, p.114 (14-23) (McKellar's Testimony). Trial Transcript at 2/19, Vol.II, p.116 (8) (McKellar's Testimony). Preston McKeller described how pleased the couple was with the home initially. Trial Transcript at 2/19, Vol.II, p.116 (5-6) (McKellar's Testimony). Preston and Rachel McKellar lived in the townhome until their son, William, was born. Trial Transcript at 2/19, Vol.II, p. 113 (21-25) (McKellar's Testimony).

The McKellars lived in their townhome about 3 years. Trial Transcript at 2/19, Vol.II, p.116 (11-13) (McKellar's Testimony). The McKellars moved out of the townhome about a month or two after they found out about Chinese Drywall. Trial Transcript at 2/19, Vol.II, p.114 (10-13) (McKellar's Testimony). Preston, Rachel, and William McKellar moved out of the townhome on November 7, 2009 as a consequence of suspected health effects of Chinese drywall. P3.0637-0007 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony), Trial Transcript at 2/19, Vol.II, p.113 (19-20) (McKellar's Testimony), Trial Transcript at 2/19, Vol.II, p.118 (1-15) (McKellar's Testimony). The McKellars' ultimately made the decision to move out of their townhome based on health concerns for their son symptoms associated with CDW. William had trouble breathing in his second floor nursery. Mrs. McKellar was having constant headaches. Mr. McKellar was congested and could hardly breathe. Once they learned the house had Chinese drywall, they decided to get out of the house as soon as

they could. Trial Transcript at 2/19, Vol.II, p.118 (91- 115) (McKellar's Testimony).

The McKellar's infant son's nursery was on the second floor of the townhome, the same

floor which showed severe corrosion on wires, according to the testimony of Plaintiffs' expert Dr.

John Scully. Hearing Dr. Scully's testimony was frightening for Mr. McKellar. Trial Transcript

at 2/19, Vol.II, p.118 (16-25) (McKellar's Testimony). Rachel McKellar gave birth to a second

son, Gabriel, 4 weeks ago. Trial Transcript at 2/19, Vol.II, p.114 (1-3) (McKellar's Testimony).

The townhome has Venture Supply Chinese Drywall. Trial Transcript at 2/19, Vol.II,

p.115 (3-5) (McKellar's Testimony). The McKellars' first became aware they had Chinese

drywall in their house when they received a letter saying the townhome may have Chinese

Drywall. They asked their builder about it, and the builder assured them that the home did not.

Trial Transcript at 2/19, Vol.II, p.115 (6-12) (McKellar's Testimony). The McKellars began

experiencing persistent air conditioner and electrical problems and ultimately Mr. McKellar

crawled into the attic, moved some insulation aside and saw that the drywall said Venture Supply

on it. Trial Transcript at 2/19, Vol.II, p.115 (13-19) (McKellar's Testimony). The existence of

Chinese drywall was confirmed by inspectors and scientists hired by counsel. Trial Transcript at

2/19 Vol.II, p.115 (19-22) (McKellar's Testimony).

The McKellars' first noticed electrical equipment failures within thirty (30) days after

moving into their home. Trial Transcript at 2/19, Vol.II, p.116 (14-18), p.117 (1) (McKellar's

Testimony). Virtually every month, there was an AC or heating failure in the McKellar home.

Trial Transcript at 2/19, Vol.II, p.117 (1-3) (McKellar's Testimony). The HVAC technicians

called on by the McKellars were required to constantly return. Mr. McKellar persisted in seeking

their attention and eventually had the HVAC coil replaced. Trial Transcript at 2/19, Vol.II, p.117

-97-

(4-9) (McKellar's Testimony).

The community of Hollymeade is a close-knit group with an advisory board. Mr. McKellar and Mr. Michaux and 3 other homeowners sit on the board. Trial Transcript at 2/19, Vol.II, p.117 (13- 17) (McKellar's Testimony). Mr. McKellar kept in touch with other people in the community and noticed that all had similar complaints about their homes. Trial Transcript at 2/19, Vol.II, p.117 (18- 22) (McKellar's Testimony).

The McKellars now live in an apartment in the Featherstone Apartments. They have an 8 month lease. The apartment has 3 small bedrooms. Trial Transcript at 2/19, Vol.II, p.119 (1-7) (McKellar's Testimony).

Prior to the discovery of Chinese drywall in their home, the McKellars' prided themselves on being able to pay their bills and support the family. Mr. McKellar never thought he would ever have to think of bankruptcy. He has been researching bankruptcy. Trial Transcript at 2/19, Vol.II, p.120 (13-21) (McKellar's Testimony). Since discovering CDW and moving out of their home and into an apartment, the McKellars' are subsisting through loans and assistance from family and friends, as well as a mortgage moratorium. Trial Transcript at 2/19, Vol.II, p.119 (11-14) (McKellar's Testimony). The McKellars received a six (6) month moratorium on their mortgage beginning in January, although interest continues to run. Trial Deposition of J.D. Tuthill (2/4/10) at p.77 (24) - p.78(20). Their moratorium will expire in June and the McKellars will try to get an extension. Trial Transcript at 2/19, Vol.II, p.119 (18-19) (McKellar's Testimony). Even with the moratorium, the McKellars have to pay association dues, moving expenses, and a second mortgage note. P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony), Trial Transcript at 2/19, Vol.II, p.119 (19-24)

-98-

(McKellar's Testimony).  Mr. McKellar has gotten a second job, working more hours, which

takes him away from his family. Trial Transcript at 2/19, Vol.II, p.121 (2-3) (McKellar's

Testimony).  The McKellar's savings are almost gone. Trial Transcript at 2/19, Vol.II, p.119 (23)

(McKellar's Testimony).  Mr. McKellar's cannot afford to pay both the mortgage of $1,139 and

rent of $1,204 monthly indefinitely. P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental

Exhibit McKellar-1 (Revised for Trial Testimony), Trial Transcript at 2/19, Vol.II, p.120 (11-12)

(McKellar's Testimony).

<u>ii.    Damages</u>

Mr. McKellar has identified as accurate the summary of damages compiled by J.C.

Tuthill.  Trial Transcript at 2/19, Vol.II, p. 121(13)-p.122(2) (McKellar Testimony),

P3.0637-0007 - P3.0637-0008, P3.0622-0008- P3.0622-0009 (Tuthill's Supplemental Exhibit

McKellar-1 (Revised for Trial Testimony).

The cost to remediate the McKellar townhome is $194,720. P3.0637-0007 -

P3.0637-0008, (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony),

P1.2059-0001 (Wright's Remediation Estimate Averages).

The remediation will take between 4 and 6 months.

The alternative living costs for the McKellars which are non-recurring, both past and

future, is $19,623.21. P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1

(Revised for Trial Testimony), Trial Deposition of J.D. Tuthill (2/4/10) at p.31 (12-18).

The alternative living costs for the McKellars which recur monthly total $1,211.13

monthly for the months of March-June 2010 and $2,029.43 for July 2010 forward. P3.0637-0007

- P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony), Trial

Deposition of J.D. Tuthill (2/4/10) at p.72 (14) - p.73 (16).  Assuming it will take six months to remediate the McKeller's home, the total of monthly living costs will be $8903.38.

On July 1, 2010 the McKellars will move into a larger rental property as the apartment is too small for their growing family. P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony).

The personal property loss of the McKellars' belongings total $3,585. P3.0546-0001 - P3.0546-0039 (Expert report of David Maloney), P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony).

The cost to repair items damaged by Chinese Drywall, including the home environment inspection post-remediation, is $13,998.35.  P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony).

The additional costs associated with the McKellar mortgage moratorium for 12 months are $10,914.48. P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony).

Mr. McKellar's lost income from his teaching job as a result of having to miss work and be home for repairmen is $1336.60. P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony).

The McKellars' property assessment was lowered to $100,600, resulting in a savings to the family of $1,339.80. P3.0616-0001 (McKellar City of Newport News Property Information), P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony).

The McKellars have suffered the loss of use and enjoyment of their home. They began to

-100-

experience failures of the air conditioning and heat within 30 days of moving into their townhome, and only lived in the townhome (albeit in less than ideal living conditions due to numerous and frequent mechanical and electrical failures) for 35 months. They have been out of their townhome since November 2009. Trial Transcript at 2/19, Vol.II, p.113 (8) - p.122 (2) (McKellar's Testimony), P3.0546-0001 - P3.0546-0039 (Expert report of David Maloney), P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1) (Revised for Trial Testimony).

Assuming remediation is complete within six months of trial, the total of damages proven by the McKellars is $251,741.22, plus an award for loss of use and enjoyment of the home to be determined by the Court. P3.0637-0007 - P3.0637-0008 (Tuthill's Supplemental Exhibit McKellar-1 (Revised for Trial Testimony).

### g.   *Steven and Elizabeth Heischober*

#### i.   Background

Steven and Elizabeth Heischober purchased their Chinese drywall duplex at 214A 80th Street, Virginia Beach, VA on November 10, 2006, for $795,000. P3.0253-0001- P3.0253-0002 (Heischober Deed), Trial Transcript at 2/22, Vol.I, p.78 (25) - p.79 (4) (Heischober's Testimony), P3.0637-0003- P3.0637-0004 (Tuthill's Supplemental Exhibit Heischober-1 (Revised for Trial Testimony). The Heischobers had previously lived in one home for 20 years and, when they sold that home, they made a substantial amount of money. They searched for a home in which to retire for more than a year. They wanted a first floor bedroom or elevator, and this home had both. It was ideal for them, and would suit them in their later years. Trial Transcript at 2/22, Vol.I, p.81 (8-23) (Heischober's Testimony). The Heischobers made a down payment of

$345,000, a significant investment for them. Trial Transcript at 2/22, Vol.I, p.84 (25) -p.85 (1)

(Heischober's Testimony).  The duplex has 3,055 square feet. P1.2059- 0001 (Wright's

Remediation Estimate Averages).  The duplex is 1 ½ blocks from the Atlantic Ocean; west of the

home is a state park with an entrance from the end of the street.  The Heischobers enjoy long

walks in the park and on the beach.  They enjoy having pet dogs in the neighborhood. Trial

Transcript at 2/22, Vol.I, p.79 (20) - p.80 (3), p.80 (14-15) (Heischober's Testimony).  The

Heischober duplex is well situated within walking distance from restaurants, festivals and events

at the beach in the summer.  Trial Transcript at 2/22, Vol.I, p.80 (4-6) (Heischober's Testimony).

Steven and Elizabeth Heischober live in their duplex with their daughter Allison, who is a senior

in college and lives with them for summer vacation and holidays. Trial Transcript at 2/22, Vol.I,

p.80 (21) - p.81 (1-3) (Heischober's Testimony).  Allison Heischober experienced some physical

symptoms that have been associated with Chinese Drywall: rashes and respiratory issues. Trial

Transcript at 2/22, Vol.I, p.81 (4-7) (Heischober's Testimony).

     The Heischobers moved out of the duplex on August 28, 2009, about 6 weeks after

finding out that it contained Chinese drywall. Trial Transcript at 2/22, Vol.I, p.80 (23-25)

(Heischober's Testimony).  Ten months after the Heischobers moved into the duplex, the

transformer in their home was replaced.  They experienced problems with both HVAC units'

coils.  The home had 2 air conditioners (upstairs and downstairs) and 7 coils were replaced in

less than 3 years.  The frequency of the replacements increased.  The sixth coil was replaced in

August 2009 and the replacement turned black in two months.  The seventh coil was removed in

December 2009 and not replaced. P3.0266-0001, P3.0267-0001, P3.0268-0001, P3.0269-0001,

P3.0270-0001- P3.0270-0002, P.30271-0001, P3.0272-0001- p3.0272-0002, P3.0273-0001,

P3.0274-0001, P3-0275-0001, P3.0627-0001, P.3-0628-0001, P.30630-0001 (Invoices and work

orders from Metro Mechanical for HVAC repairs), Trial Transcript at 2/22, Vol.I, p.82 (1-12),

p.83 (3-7) (Heischober's Testimony), P3.0637-0003- P3.0637-0004 (Tuthill's Supplemental

Exhibit Heischober-1 (Revised for Trial Testimony). One of the Heischober HVAC coils

(number 6) was sent to Charlottesville to Dr. Scully as SLH 27. Trial Transcript at 2/22, Vol.I

p.83 (8-12) (Heischober's Testimony). The Heischober's experienced many electric failures: a

computer monitor failed and the hard drive crashed. Trial Transcript at 2/22, Vol1, p.82 (19-24)

(Heischober's Testimony); in the spring of 2008 the Heischober TV failed, Trial Transcript at

2/22, Vol.I, p.82 (25) - p.83 (1) (Heischober's Testimony); a switch in the Heischober master

bedroom closet failed. Trial Transcript at 2/22, Vol.I, p.83 (1-2) (Heischober's Testimony). The

Heischober's clothes dryer was tested, which testing revealed corrosion on the inside of the dryer.

Trial Transcript at 2/22, Vol.I, p.83 (13-25), p.84 (6-9) (Heischober's Testimony). The

Heischobers are seeking replacements for all their appliances. Trial Transcript at 2/22, Vol.I, p.84

(10-12) (Heischober's Testimony).

One of Mrs. Heischober's biggest concerns is the potential of improper remediation in the

other owner's duplex side. With the common wall possibly being made of stacked drywall, if the

other owner remediates later than the Heischobers, the dust and debris can come into their side.

Trial Transcript at 2/22, Vol.I, p.84 (13-24), p.85 (3-4) (Heischober's Testimony)

The Heischobers moved out of their home on August 28, 2009. They do not plan to

return, without full remediation of the property. Trial Transcript at 2/22, Vol.I, p.85 (5-6)

(Heischober's Testimony).

The Heischobers, on discovering that their home had Chinese drywall, obtained estimates

on their own to have their home fixed. The amount of the estimate was staggering, and the bank would not loan them the money for the remediation. Trial Transcript at 2/22, Vol.I, p.85 (9-22) (Heischober's Testimony).  The Heischobers have delayed any action to repair, pending a proper protocol to remediate. Trial Transcript at 2/22, Vol.I, p.85 (22) - p.86 (1) (Heischober's Testimony).

Mrs. Heischober worked with counsel and a forensic accountant to calculate damages. She has reviewed the latter's summary and finds it accurate and complete. Trial Transcript at 2/22, Vol.I, p.86 (18) - p.87 (3) (Heischober's Testimony).

ii.      Damages

The remediation of the Heischober home will take between 4 and 6 months.

The cost of remediation of the Heischober side of the duplex is $312,755. P1.2059-0001 (Wright's Remediation Estimate Averages), P3.0637-0003-P3.0637-0004 (Tuthill's Supplemental Exhibit Heischober-1 (Revised for Trial Testimony).

The non-recurring alternative living costs, both past and future, for Mr. and Mrs. Heischober are $11,006.84. P3.0637-0003-P3.0637-0004 (Tuthill's Supplemental Exhibit Heischober-1 (Revised for Trial Testimony).

The monthly recurring alternative living costs for the Heischobers post-trial are $1,822.50 monthly. P3.0637-0003-P3.0637-0004 (Tuthill's Supplemental Exhibit Heischober-1 (Revised for Trial Testimony).  Assuming the remediation will take six months, the total monthly recurring costs are $10,935.

The Heischober's loss of personal property is $12,004. P3.0546-0001-P.30546-0039 (Expert Report of David Maloney), P3.0637-0003-P3.0637-0004 (Tuthill's Supplemental Exhibit

Heischober-1 (Revised for Trial Testimony).

The repair costs of the Heischobers, including both past and future expenses and the Home Environmental Inspection post-remediation, are $17,314.66. P3.0637-0003-P3.0637-0004 (Tuthill's Supplemental Exhibit Heischober-1 (Revised for Trial Testimony).

The additional costs the Heischobers will pay for the mortgage deferral for 12 months are $19,656.48. P3.0637-0003-P3.0637-0004 (Tuthill's Supplemental Exhibit Heischober-1 (Revised for Trial Testimony), Trial Deposition of J.C. Tuthill (2/4/10) at p.48 (4) - p.49 (19).

The Heischobers were granted a property tax reduction by the assessor of $2,785.71. P3.0637-0003-P3.0637-0004 (Tuthill's Supplemental Exhibit Heischober-1 (Revised for Trial Testimony), Trial Deposition of J.C. Tuthill (2/4/10) at p.49 (20) - p.50 (21).

The Heischobers have suffered the loss of use and enjoyment of their home and their personal property. Their retirement home in an idyllic neighborhood is now their albatross. The electronic breakdowns began just 10 months after they moved into the home. From that month forward, they were plagued with appliance failures and attempted repairs. They had 7 HVAC coils replaced in about a 2 year period. They abandoned the home and their belongings in August 2009. Deprived of the use and enjoyment of their home for more than 7 months, they now live in a state of disruption.  Trial Transcript at 2/22, Vol.I, p.78 (19) - p.87 (14) (Heischober's Testimony), P3.0546-0001 - P3.0546-0039 (Expert report of David Maloney), P3.0637-0003-P3.0637-0004 (Tuthill's Supplemental Exhibit Heischober-1 (Revised for Trial Testimony)).

Assuming remediation is complete within six months of trial, the total of damages proven by the Heischobers is $380,886.27, plus an award for loss of use and enjoyment of the home to

be determined by the Court. P3.0637-0003-P3.0637-0004 (Tuthill's Supplemental Exhibit
Heischober-1 (Revised for Trial Testimony).

### III. CONCLUSION

In summary, based upon the Findings of Fact and Conclusions of Law, the Court finds
that scientific, economic, and practicality concerns dictate that the proper remediation for the
Plaintiff-intervenors is to remove all drywall in their homes, all items which have suffered
corrosion as a result of the Chinese drywall, and all items which will be materially damaged in
the process of removal.   Accordingly, the Court further finds that the Plaintiff-intervenors are
entitled to recover damages as follows:

    a.    Plaintiff intervenors William and Deborah Morgan have suffered property
damages, personal property damages, and other forms of compensable damages in the
amount of $381,613.29.  In addition, the Court finds that Plaintiff intervenors William
and Deborah Morgan have suffered loss of use and enjoyment damages in the amount of
$100,000.00.  The Court awards Plaintiff intervenors William and Deborah Morgan total
damages, caused by Taishan, in the amount of $481,613.29.

    b.    Plaintiff intervenors Jerry and Inez Baldwin have suffered property damages,
personal property damages, and other forms of compensable damages in the amount of
$341,699.11.  In addition, the Court finds that Plaintiff intervenors Jerry and Inez
Baldwin have suffered loss of use and enjoyment damages in the amount of $100,000.00.
The Court awards Plaintiff intervenors Jerry and Inez Baldwin total damages, caused by
Taishan, in the amount of $441,699.11.

    c.    Plaintiff intervenors Joseph and Cathy Leach have suffered property damages,

personal property damages, and other forms of compensable damages in the amount of $59,676.86. In addition, the Court finds that Plaintiff intervenors Joseph and Cathy Leach have suffered loss of use and enjoyment damages in the amount of $30,000.00. The Court awards Plaintiff intervenors Joseph and Cathy Leach total damages, caused by Taishan, in the amount of $89,676.86.

d.      Plaintiff intervenors Bob and Lisa Orlando have suffered property damages, personal property damages, and other forms of compensable damages in the amount of $307,905.44. In addition, the Court finds that Plaintiff intervenors Bob and Lisa Orlando have suffered loss of use and enjoyment damages in the amount of $100,000.00. The Court awards Plaintiff intervenors Bob and Lisa Orlando total damages, caused by Taishan, in the amount of $407,905.44.

e.      Plaintiff intervenors J. Frederick and Vannessa Michaux have suffered property damages, personal property damages, and other forms of compensable damages in the amount of $255,607.80. In addition, the Court finds that Plaintiff intervenors J. Frederick and Vannessa Michaux have suffered loss of use and enjoyment damages in the amount of $100,000.00. The Court awards Plaintiff intervenors J. Frederick and Vanessa Michaux total damages, caused by Taishan, in the amount of $355,607.80.

f.      Plaintiff intervenors Preston and Rachel McKeller have suffered property damages, personal property damages, and other forms of compensable damages in the amount of $251,741.22. In addition, the Court finds that Plaintiff intervenors Preston and Rachel McKeller have suffered loss of use and enjoyment damages in the amount of $100,000.00. The Court awards Plaintiff-intervenors Preston and Rachel McKellar total

damages, caused by Taishan, in the amount of $351,741.22.

      g.     Plaintiff intervenors Steven and Elizabeth Heischober have suffered property

damages, personal property damages, and other forms of compensable damages in the

amount of $380,886.27.  In addition, the Court finds that Plaintiff intervenors Steven and

Elizabeth Heischober have suffered loss of use and enjoyment damages in the amount of

$100,00.00.  The Court awards Plaintiff intervenors Steven and Elizabeth Heischober's

total damages, caused by Taishan, in the amount of $480,886.27.

In sum, the Court awards all seven Plaintiff intervenor families monetary damages for their

losses caused by the defendant Taishan in the total amount of $2,609,129.99.


New Orleans, Louisiana, this 8th day of April 2010.

                               _____
                               ELDON E. FALLON
                               UNITED STATES DISTRICT JUDGE