# HAILEY, McNAMARA, HALL, LARMANN & PAPALE, L.L.P.

### ATTORNEYS AT LAW

W MARVIN HALL*
LAURENCE E. LARMANN*
RICHARD T. SIMMONS, JR.*
DOMINIC J. OVELLA ± †
MICHAEL F. MENTZ
C. KELLY LIGHTFOOT
W. EVAN PLAUCHÉ †
MICHAEL J. VONDENSTEIN
JOHN T. CULOTTA* ±
DAVID K. PERSONS
JOHN E. UNSWORTH, JR.
CAROLINE D. IBOS
JOSEPH L. SPILMAN, III ∇A∇
CLAUDE A. GRECO
W. GLENN BURNS
KEVIN O. LARMANN
DARREN A. PATIN
ANNE E. MEDO
GABRIEL J. VENINATA
SEAN P. MOUNT †

APPELLATE COUNSEL
ALAYNE R. CORCORAN

OF COUNSEL
HENRY D. McNAMARA, JR
ANTONIO E. PAPALE, JR.*
JOHN F. YOUNG, JR.
JAMES D. GARVEY, JR.
CHARLES F. WARTELLE

WILLIAM R. SEAY, JR.
KATIE M. CUSIMANO
DAVID B. ESTES *
DAVID C. BACH◊
BRAD D. FERRAND
DANIEL R. HYNES
LAUREN E. BRISSI
JUSTIN E. ALSTERBERG
SHAILENDRA U. KULKARNI
JASON M. BAER

*PROFESSIONAL CORP.
ALSO ADMITTED IN:
◊ ALABAMA
◊ IOWA
∇ MARYLAND
† MISSISSIPPI
* ONLY IN MISSISSIPPI
± TEXAS
A WASHINGTON, D.C.

ONE GALLERIA BOULEVARD
SUITE 1400
METAIRIE, LOUISIANA 70001
TELEPHONE: (504) 836-6500
TELECOPIER: (504) 836-6565

MAILING ADDRESS:
P.O. BOX 8288
METAIRIE, LA 70011-8288

NEW ORLEANS OFFICE
1100 POYDRAS STREET
SUITE 2900
NEW ORLEANS, LA 70163
TELEPHONE: (504) 799-2271
TELECOPIER (504) 836-6565

GULFPORT OFFICE
1611 23RD AVENUE
SUITE 101
GULFPORT, MS 39501
TELEPHONE: (228) 864-5555
TELECOPIER: (228) 864-5546

BATON ROUGE OFFICE
10725 PERKINS ROAD
SUITE 200
BATON ROUGE, LOUISIANA 70810
TELEPHONE: (225) 766-8667
TELECOPIER: (225) 766-5549

www.haileymcnamara.com

July 23, 2009

**VIA FACSIMILE AND U.S. MAIL (504) 585-7775**
Mr. Donald McKay, Jr. Esq.
Mr. Jason R. Bonnet, Esq.
**Leak & Andersson, L.L.P.**
1100 Poydras Street, Suite 1700
New Orleans, Louisiana 70163

> *Re:*    *Policy Number: FH20073610139 01*
> *Claim Number: 2009OT001355*
> *Insured: Terrence M. Ross*
> *Ross v. C. Adams Construction/State Farm/LA Citizens Insurance*
> *L&A File No.: 3670/39555*
> *Our File No.: 2381-64814*

## COVERAGE DENIAL CORRESPONDENCE

Dear Counselors:

We have been retained by Louisiana Citizens Property Insurance Corporation ("Citizens") to respond to yours of June 23, 2009, by way of which you have made demand upon Citizens for first party coverage relative to damage allegedly resulting to the insured premises from the off-gassing of Chinese drywall which was allegedly used by the insured's contractor for post-Hurricane Katrina repairs to that premises. In this regard, nothing in yours has caused us to conclude that coverage exists under the referenced Citizens' policy for this claim; and, therefore, Citizens' position remains one of coverage denial for the claim.

**EXHIBIT**
"F"

First, your reliance upon <u>Doerr v. Mobil Oil</u>, 774 So.2d 119 (La. 2000) in relation to Citizens' coverage denial based on the operation of the pollution exclusion in Citizens' subject policy, is misplaced. At issue in <u>Doerr</u> was a general liability or third party liability policy (as defined in the Louisiana Insurance Code and to which the public policy considerations underlying the Louisiana Direct Action Statute are aimed) and the "total pollution exclusion" contained within that policy, and whether such exclusions serve to defeat liability coverage for St. Bernard Parish which had taken into its water system and distributed to its consumers certain hydrocarbons which had been discharged by the Mobil Oil Refinery up river from the water system's intake area. At issue here, however, is an entirely distinct form of pollution exclusion (as quoted in Citizens' correspondence to Mr. Ross, of April 29, 2009) contained within a first party (homeowner's) policy and which specifically removes property damage caused to the homeowner by "pollution" (gaseous irritants, fumes, vapors, chemicals, etc. as per the definition found within the exclusion, and which is clearly what your client is claiming the subject drywall to be producing/off gassing) from the risk of direct physical loss for which first party property coverage is afforded under the policy. Simply stated, the sulfur and related emissions from the drywall neither constitute "direct physical loss" (because that loss, in this case, was the property damage caused by Katrina, which your client's chosen contractor repaired with the allegedly defective drywall) nor a loss which is not otherwise excluded under the policy by operation of the pollution exclusion as heretofore discussed and as set forth in Citizens' prior correspondence.

Moreover, other exclusions within the subject Citizens' policy also serve to defeat coverage for this claim. Among these, are exclusion I. A. c.(6)(a) for loss caused by "deterioration", (b) for loss caused by "latent defect inherent vice, or any quality in property that causes it to damage or destroy itself", and (c) for loss caused by "rust or other corrosion".[1] Each of these clearly and unambiguously excludes from coverage the damage you and your client have asserted is being caused by the drywall (and its off-gassing) installed by your client's contractor, post-Katrina.

Likewise, Exclusion §I B. 3. c. and d., respectively relative to "[f]aulty, inadequate or defective [m]aterials used in repair, construction, renovation or remodeling" and property "[m]aintenance" – alone and in conjunction with the exclusions heretofore discussed – facially also apply and preclude coverage for your client's claims under Citizens' policy.[2]

Each of the Citizens' policy provisions to which reference has heretofore been made is facially clear and unambiguous, and either prevents coverage from ever attaching to your client's claim at all under the policy (because no covered direct physical loss is at issue) or causes your client's claim to be excluded from policy coverage. Obviously, Citizens reserves

---

[1] The policy's pollution exclusion to which reference was heretofore made is found within sub¶(e) of Coverages section I. A. c.(6), and shall not be further discussed here.

[2] Further, if the subject drywall is, in fact, emitting destructive vapors which are causing additional property damage, policy Conditions §I.B. requires the insured to take immediate steps to protect the property from further damage. We have been informed of no such steps having been taken thus far by your client.

Leak & Andersson, L.L.P.
July 23, 2009
Page 3

its right to rely on additional and/or completely different exclusions and other policy provisions, and/or to reconsider the position it has taken herein, should its continuing investigation or other efforts develop facts which suggest that it should do so.

We trust this letter to be self explanatory: simply stated, **no coverage exists under Mr. Ross' Louisiana Citizens Property Insurance policy for his first party claim against Citizens based on allegedly defective Chinese drywall incorporated by his contractor into his home in connection with repairs performed to the home necessitated by Hurricane Katrina damage.** Although we and Louisiana Citizens plan to expeditiously close our respective files relative to this claim at this time, should you wish to discuss Citizens' position further, or should something stated within this correspondence have caused confusion or otherwise been unclear to you, please do not hesitate to contact the undersigned at the above-listed Metairie, Louisiana address and/or telephone number.

Sincerely,

**JOHN T. CULOTTA**
**JOSEPH L. SPILMAN, III**
**DARREN A. PATIN**

/jld

INVESTIGATION OF IMPORTED DRYWALL
*STATUS UPDATE, DECEMBER 2009*

### I.   Overview

This update describes new developments in the ongoing investigation of imported drywall and supplements the previous reports provided to the Committee. As of December 22, 2009, the U.S. Consumer Product Safety Commission ("Commission" or "CPSC") had received 2360 incident reports related to drywall from 35 states, the District of Columbia, and Puerto Rico. More than 90% of reports continue to be from Florida, Louisiana, and Virginia.

Highlights this month include:

- Hosted a technical videoconference about problem drywall with the Chinese government (AQSIQ), December 9, 2009.

- Participated on panel in a town hall meeting on drywall hosted by Representative Cao in New Orleans, December 14, 2009.

- Issued a *Notice of Inquiry* requesting comment on a proposal to require identifying labels for drywall pursuant to Section 14(c) of the Consumer Product Safety Act (74 Fed. Reg. 66622), December 16, 2009.

- Met with HUD staff to assist them in developing guidance for the applicability of grant programs for drywall issues.

### II.   Federal, State and International Coordination

The CPSC and its partner agencies have continued to meet, especially to develop guidance for identification and remediation for the problem drywall. CPSC has been working with HUD to assist that agency in developing guidance for the use of the Community Development Block Grant program for the identification and remediation of problem drywall in homes. We continue to have weekly coordination meetings with our agency partners, and are working with the Council on Environmental Quality and the Domestic Policy Council. The CPSC is also continuing its dialogue with Chinese government officials, and conducted a staff-level video teleconference to exchange technical information about the efforts of CPSC and AQSIQ to find answers about drywall. Additionally, CPSC staff presented at a drywall town hall meeting hosted by Representative Cao in New Orleans, Louisiana.



III. **Progress in the Investigation**

CPSC continues to investigate the chain of commerce of drywall, and continues to question firms in the U.S. and abroad about their drywall activities. CPSC also continues to investigate all reports of fire incidents related to drywall, but none have been confirmed to be related.

Analyses continue as planned and discussed in earlier reports. CPSC is committed to the release of all findings as quickly as possible, while maintaining scientific integrity. Contract work on analysis of samples is proceeding with Environmental Health and Engineering, Sandia National Laboratory, Lawrence Berkeley National Laboratory, and the National Institute of Standards and Technology.

24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

STATE OF LOUISIANA

NO. 676-185                                                    DIVISION "P"

TERRENCE M. ROSS AND RHONDA B. ROSS

VERSUS

C. ADAMS CONSTRUCTION & DESIGN, LLC, STATE FARM MUTUAL INSURANCE
COMPANY AND LOUISIANA CITIZENS PROPERTY INSURANCE COMPANY

FILED _____       _____
                                              DEPUTY CLERK

### CROSS MOTION FOR SUMMARY JUDGMENT ON BEHALF OF
### DEFENDANT, LOUISIANA CITIZENS PROPERTY INSURANCE CORPORATION

**NOW INTO COURT**, through undersigned counsel, comes defendant, Louisiana Citizens Property Insurance Corporation, which, pursuant La.C.C.P. art. 966, hereby moves for summary judgment in its favor regarding the application of coverage exclusions contained in the homeowners' insurance policy issued to plaintiffs, Terrence M. and Rhonda B. Ross, for property damage allegedly caused by Chinese drywall installed in their home prior to plaintiffs' purchase of the home. As is set forth in the accompanying memorandum, the damage alleged by plaintiffs to the subject property was caused by: (i) a defective product, installed in plaintiffs' home through (ii) faulty workmanship, which caused damage to the home in the forms of (iii) pollution, and (iv) corrosion. As all of these damages are clearly and unambiguously excluded from coverage under the Louisiana Citizens' policy at issue, no coverage is afforded under the policy, as a matter of law.

**WHEREFORE**, Louisiana Citizens Property Insurance Corporation prays that its Cross Motion for Summary Judgment be granted and partial summary judgment be rendered in its favor, recognizing that plaintiffs' claims are excluded from coverage under the clear and unambiguous exclusions of the subject policy. For the convenience of this Honorable Court, mover herein respectfully requests that this Cross Motion for Summary Judgment be set for hearing at the same time as plaintiffs' previously filed Motion for Partial Summary Judgment.

*[SIGNATURE BLOCK FOLLOWS ON NEXT PAGE]*

DAP Library:2382-64814\MLD-000118_1_1

Respectfully submitted:

HAILEY, McNAMARA, HALL,
LARMANN & PAPALE, L.L.P.

By: _____

    JOHN T. CULOTTA, #17272
    DARREN A PATIN, #23244
    JOSEPH L. SPILMAN, III, #17813
    MACKENZIE L. DISMORE, #32428
    One Galleria Boulevard, Suite 1400
    Post Office Box 8288
    Metairie, Louisiana 70011-8288
    Tel.: (504) 836-6500
    *Counsel for Defendant Louisiana Citizens*
    *Property Insurance Corporation*

    - AND -

LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD

By: _____

    RALPH S. HUBBARD, III, #7040
    SETH A. SCHMEECKLE, #27076
    601 Poydras Street, Suite 2775
    New Orleans, Louisiana 70130
    Tel: (504) 568-1990
    *Counsel for Defendant Louisiana Citizens*
    *Property Insurance Corporation*

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing pleading has been served upon all counsel of record on this ___19___ day of ___March___, 2010 by:

    √ placing same in the U.S. Mail postage prepaid and properly addressed,
    ___ delivering by hand,
    √ facsimile, and/or
    ___ e-mail

    _____
    **DARREN A PATIN**

24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

STATE OF LOUISIANA

NO. 676-185

DIVISION "P"

TERRENCE M. ROSS AND RHONDA B. ROSS

VERSUS

C. ADAMS CONSTRUCTION & DESIGN, LLC, STATE FARM MUTUAL INSURANCE
COMPANY AND LOUISIANA CITIZENS PROPERTY INSURANCE COMPANY

FILED _____         _____

                                DEPUTY CLERK

## RULE TO SHOW CAUSE

Considering the foregoing Cross Motion for Summary Judgment;

**IT IS ORDERED** that plaintiffs show cause on the 5th day of April, 2010 at 9:00 a.m.,

why the Cross Motion for Summary Judgment filed on behalf of defendant, Louisiana Citizens

Property Insurance Corporation, should not be granted.

Gretna, Louisiana, this _____ day of _____, 2010.

                    _____

                         JUDGE

**PLEASE SERVE:**

Kevin O'Bryon, Esq.
1010 Common Street, Suite 1950
New Orleans, LA 70112
*Counsel for Plaintiffs*
***Terrence M. Ross and Rhonda B. Ross***

Raymond A. Pelleteri
**Pelleteri & Wiedorn, L.L.C.**
636 Carondelet Street
New Orleans, LA 70130
***Counsel for C. Adams Construction***

David A. Strauss, Esq.
**King, Krebs & Jurgens, PLLC**
201 St. Charles Avenue, 45th Floor
New Orleans, LA 70170
***Counsel for State Farm Mutual Insurance Company***

DAP Library:2382-64814\WLD-000118_1_1

24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

STATE OF LOUISIANA

NO. 676-185                                                         DIVISION "P"

TERRENCE M. ROSS AND RHONDA B. ROSS

VERSUS

C. ADAMS CONSTRUCTION & DESIGN, LLC,
STATE FARM MUTUAL INSURANCE COMPANY AND
LOUISIANA CITIZENS PROPERTY INSURANCE COMPANY

FILED _____        _____
                                      DEPUTY CLERK

MEMORANDUM IN SUPPORT OF LOUISIANA CITIZENS' CROSS
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

On cross-motions for summary judgment, Plaintiffs Terrence M. Ross and Rhonda B. Ross and Defendant Louisiana Citizens Property Insurance Corporation ("Louisiana Citizens") are both asking this Court to determine, as a matter of law, whether the Rosses' homeowners' insurance policy provides coverage for their property insurance claim. The Rosses claim that defective Chinese-made drywall in their home emits gases that caused corrosion of various metallic components of their home. (Exhibit "A": Petition, ¶ VI.)

There is no coverage for the cost of removing and replacing the drywall because the policy covers only a "risk of direct physical loss" that is not excluded, and the drywall itself did not sustain a "direct physical loss." There is also no coverage for any losses caused by the defects in the drywall and/or the gases it emits because these losses are specifically excluded by four exclusions in the policy for losses caused by: (1) a latent defect; (2) defective materials; (3) corrosion; and (4) a pollutant, defined to include gaseous contaminants or irritants. If *any* of these four exclusions are applicable there is no coverage, but *all four* apply here. Finally, there is no coverage for any damage to the contents of the Rosses' home because the policy covers only losses to personal property that are caused by specified perils, and any claimed damage to the contents was not caused by any of those covered perils.

The material facts are undisputed. As the Rosses' Petition explains, "[t]he foreign gypsum drywall installed in the residence is defective and emits levels of sulfur, methane and/or other volatile organic chemical compounds that cause corrosion of HVAC coils and refrigerator units, certain electrical wiring and plumbing components, and other household items, as well as

create noxious, 'rotten egg-like' odors." (Exhibit "A": Petition, ¶ VI.) Plaintiffs similarly admit in their own Statement of Uncontested Facts that "[t]he Chinese drywall exuded sulfuric gases that corroded the plumbing, electrical wiring and other metal components in the home." (Exhibit "B": Plaintiffs' Statement of Uncontested Facts, ¶ 3.) For the most part, the Rosses do not even contest that the exclusions are applicable on their face; instead, they argue that under Louisiana law some of the exclusions are unenforceable. All this Court must do is interpret the policy language, as a matter of law, and decide if the policy provisions are applicable and enforceable under Louisiana law. *See Sher v. Lafayette Ins. Co.*, 07-2441 (La. 4/8/08); 988 So. 2d 186, 192 ("Interpretation of an insurance policy usually involves a legal question which can be resolved properly in the framework of a motion for summary judgment.").

This Court should hold that the claimed losses are not covered, and grant summary judgment to Louisiana Citizens. The Louisiana Citizens policy does not insure the quality of the components used to build the Rosses' home or the risk that a defective building component will cause the formation of a gas that contaminates the home and impacts other building materials. There has not been any direct physical loss to the drywall—it is in pristine condition, as the photos of it show. (Exhibit "C": Gipson Aff., ¶3 and Ex. A; Exhibit "D": Moore Aff., ¶4.) The problem is that the drywall is emitting gases that cause corrosion of wiring, plumbing and other metallic components of the home. The Rosses' claim, therefore, falls within the exclusions for losses caused by: (1) latent defects; (2) defective materials; (3) corrosion; and (4) pollutants, defined to include gaseous contaminants or irritants. The losses claimed are caused by a latent defect in the drywall, which is a defective material, and are also caused by corrosion and by gaseous contaminants. This type of loss is simply not insured. The losses would be excluded if any one of these exclusions were applicable, but all four exclusions plainly apply here. The claimed damage to the Rosses' personal property is also not covered because personal property is only insured against 16 specific perils, none of which is applicable to their losses. Louisiana Citizens is therefore entitled to summary judgment.

## I.    STATEMENT OF UNDISPUTED MATERIAL FACTS

The parties agree on the following material facts:

1.    In January of 2007, the Rosses purchased a home located at 316 Woodvine Avenue in Metairie, Louisiana (the "Ross Residence") from Defendant C. Adams Construction

& Design, LLC ("Adams Construction"). (Exhibit "B": Plaintiffs' Statement of Uncontested Facts, at ¶ 1.)

2.      The Ross Residence had been flooded during Hurricane Katrina, and subsequently renovated by Adams Construction. (Exhibit "B": Plaintiffs' Memorandum, at 1.)

3.      Louisiana Citizens issued homeowners' policy number 981281474 633 1 (the "Policy") to Terrence Ross, insuring the Ross Residence. (Exhibit "B": Plaintiffs' Statement of Uncontested Facts, at ¶ 4.)    The Policy was in effect from December 29, 2007 to December 29, 2008, and renewal policies were issued for the policy periods of December 29, 2008 to December 29, 2009. (Exhibit "E": Charles Aff., ¶2 and Ex. A.)

4.      In March of 2009, the Rosses made an insurance claim with Louisiana Citizens "for damages caused by the Chinese drywall" (Exhibit "B": Plaintiffs' Statement of Uncontested Facts at ¶ 5), indicating that they had "discovered the presence of defective gypsum drywall" in their home. (Exhibit "A": Original Petition at ¶ XXIX.)

5.      The Rosses also contacted the Louisiana Department of Health and Hospitals ("DHH") regarding the suspected presence of Chinese-made drywall in their home.  On May 13, 2009, a DHH inspector visited the Ross Residence and reported the following observations: The compressed Freon line of the air conditioning unit, the electrical wires in the upstairs office, the hot water heater, and other metallic surfaces exhibited signs of damage caused by corrosion. (*See* Exhibit "B": Plaintiffs' Motion for Partial Summary Judgment, Ex. B.)  The television, microwave and other electronic devices had failed.  (*Id.*)  The drywall in the attic had with markings indicating that it had been made in China.  (*Id.*)  According to the DHH, these observations "support[ed] a conclusion of the presence of foreign drywall" in the Ross Residence. (*Id.*)

6.      The DHH's observations and conclusions are entirely consistent with the observations and conclusions of Louisiana Citizens' adjuster, who inspected the Ross Residence on March 26, 2009.[1] (Exhibit "C": Aff., ¶¶3-5; Exhibit "D": Moore Aff., ¶¶4-6.)

7.      Following this inspection, Louisiana Citizens denied the claim on the same grounds set forth herein. (*See* Exhibit "E": Charles Aff., ¶7; Exhibit "B": Plaintiffs' Motion for

---

[1] Louisiana Citizens' adjuster also noted water damage to ceilings in the living room and master bedroom as well as rotten wood on the exterior patio. (*See* Exhibit D to Plaintiffs' Motion for Partial Summary Judgment.)   These damages are not at issue in this lawsuit.

Partial Summary Judgment, Exs. D and F; *see also* Exhibit "F": Policy, Form HO 00 03 10 00, at 9, 12.[2])

8.      The Rosses allege, and Louisiana Citizens does not dispute for purposes of these motions, that:

a.      "The foreign gypsum drywall installed in the[ir] residence is defective and emits levels of sulfur, methane and/or other volatile organic chemical compounds that cause corrosion of HVAC coils and refrigerator units, certain electrical wiring and plumbing components, and other household items, as well as create noxious, 'rotten egg-like' odors." (Exhibit "A": Original Petition at ¶ VI.)

b.      The "Chinese drywall exuded sulfuric gases that corroded the plumbing, electrical wiring and other metal components in the home." (Exhibit "B": Plaintiffs' Statement of Uncontested Facts at ¶ 3.)

c.      The "defective drywall and its sulfur, methane and/or other volatile organic chemical compounds caused damage to . . . personal property . . . including . . . jewelry, appliances, electronics and other household items." (Exhibit "A": Original Petition at ¶ XIII.)

d.      These were "[h]idden defects in The Residence . . . ." (*Id.* at ¶ XVI.)

**II.     LIST OF THE ESSENTIAL LEGAL ELEMENTS**

Pursuant to Rule 9.10 of the Uniform District Court Rules, Louisiana Citizens respectfully submits the following list of essential legal elements:

1.      "An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code." *Sher v. Lafayette Ins. Co.*, 07-2441 (La. 4/8/08); 988 So.2d 186, 192; La. Civ. Code arts. 2045-2057.

2.      When an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation. *See* La. Civ. Code art. 2046; *see also Louisiana Ins. Guar. Ass'n v. Interstate Fire & Casualty Co.*, 630 So. 2d 759, 764 (La. 1994).

3.      The Rosses bear the burden of establishing that they have sustained a direct physical loss. *See Jones v. Estate of Santiago*, 03-1424 (La. 04/14/04); 870 So.2d 1002, 1010.

4.      The defective drywall in the Ross Residence has not sustained a direct physical loss because the drywall did not begin in "an initial satisfactory state that was changed by some external event into an unsatisfactory state." *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d

---

[2]  A copy of the relevant pages of the Policy is attached as Exhibit A to the Plaintiffs' Motion for Partial Summary Judgment.

267, 270-71 (5th Cir. 1990); *see also Tocci Bldg. Corp. v. Zurich Am. Ins. Co.*, 659 F. Supp. 2d

251 (D. Mass. Sept. 25, 2009); *Whitaker v. Nationwide Mut. Fire Ins. Co.*, 115 F. Supp. 2d 612

(E.D. Va. 1999); *Great Northern Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, 793 F.

Supp. 259, 261 (D. Or. 1990), *aff'd*, 953 F.2d 1387 (9th Cir. 1992).

     5.    The "latent defect" exclusion precludes coverage because the Chinese-made

drywall in the Ross Residence contained "a defect that is hidden or concealed from knowledge as

well as from sight and which a reasonable customary inspection would not reveal." *Nida v. State*

*Farm Fire & Cas. Co.*, 454 So.2d 328, 335 (La. App. 3d Cir. 1984); *see also City of Burlington*

*v. Hartford Steam Boiler Inspection & Ins. Co.*, 190 F. Supp. 2d 663 (D. Vt. 2002), *aff'd* 346

F.3d 70 (2d Cir. 2003); *U.S. West v. Aetna Cas. & Sur. Co.*, 117 F.3d 1415 (4th Cir. 1997)

(table); *Board of Educ. v. Int'l Ins. Co.*, 684 N.E.2d 978 (Ill. App. 1997); *Barbier v. Wade*, 517

So.2d 321 (La. App. 1st Cir. 1987); *Shields v. Penn. Gen. Ins. Co.*, 488 So.2d 1252 (La. App. 4th

Cir. 1986); *Harris v. Bardwell*, 373 So.2d 777 (La. App. 2d Cir. 1979); *Walker v. Travelers*

*Indemnity Co.*, 289 So.2d 864 (La. App. 4th Cir. 1974).

     6.    The "defective materials" exclusion precludes coverage because the Chinese-

made drywall in the Ross Residence is plainly faulty or defective, as the Rosses themselves

allege.  *See* Exhibit "A": Original Petition, ¶¶ VI, XII; *Carney v. Assurance Company of*

*America*, Civ. No. 04-3434, 2005 WL 899843 (D. Md. Apr. 19, 2005), *aff'd* 177 F.App'x 282

(4th Cir. 2006) (per curiam); *Rogers v. Unitrim Auto & Home Ins. Co.*, 388 F. Supp. 2d 638

(W.D.N.C. 2005); *Sapiro v. Encompass Ins.*, No. C03-4587, 2003 WL 2496090 (N.D. Cal. Nov.

2, 2004); *Tom Harrison Tennis Ctr. Ltd. v. Indoor Courts of Am., Inc.*, No CA2002-03-034, 2002

WL 31859462 (Ohio App. Dec. 23, 2002) *Falcon Prods., Inc. v. Ins. Co. of Penn.*, 615 F. Supp.

37 (E.D. Mo. 1985), *aff'd* 782 F.2d 779 (8th Cir. 1986); *Biebel Bros., Inc. v. United States Fid.*

*& Guar. Co.*, 522 F.2d 1207 (8th Cir. 1975).

     7.    The "corrosion" exclusion precludes coverage because "[t]he Chinese drywall

exuded sulfuric gases that corroded the plumbing, electrical wiring and other metal components

in the home."  (Exhibit "B": Plaintiffs' Statement of Undisputed Facts, ¶ 3.) *See also*

*Transcontinental Ins. Co. v. Guico Machine Works, Inc.*, Civ. Nos. 06-2516 & 06-3184, 2008

U.S. Dist. LEXIS 69972 (E.D. La. Sept. 17, 2008); *Orthopedic Practice, LLC v. Hartford Cas.*

*Ins. Co.*, Civ. No. 06-8710, 2008 U.S. Dist. LEXIS 18335 (E.D. La. March 10, 2008); *Gilbane*

*Bldg. Co. v. Altman Co.*, No. 04AP-664, 2005 Ohio App. LEXIS 981 (Ohio Ct. App. Mar. 8,

2005) (unpub.); *Heban v. Auto-Owners Ins. Co.*, No. WD-02-064, 2003 WL 21862170 (Ohio Ct. App. Aug. 8, 2003).

        8.     The "pollution" exclusion precludes coverage because the gases emitted by the drywall are gaseous irritants and contaminants as well as fumes, and the emissions were not caused by any of the 16 named perils in the Policy. (*See* Exhibit "B": Plaintiffs' Statement of Undisputed Facts, ¶ 3; Exhibit "F": Policy, Form HO 00 03 10 00, at 3, 8-11.) *See, e.g., Great Northern Ins. Co. v. Benjamin Franklin Fed. Sav & Loan Ass'n*, 793 F. Supp. 259 (D. Or. 1990), *aff'd*, 953 F.2d 1387 (9th Cir. 1992); *Brown v. Am. Motorists Ins. Co.*, 930 F. Supp. 207, 208-209 (E.D. Pa. 1996); *Hanover New England Ins. Co. v. Smith*, 621 N.E.2d 382, 419- 421 (Mass. Ct. App. 1993).

        9.     The Rosses' claimed personal property damage is not covered because it was not caused by any of the 16 named perils in the Policy. (Exhibit "F": Policy, Form HO 00 03 10 00, at 10-11.)

## III.   LEGAL STANDARDS

        Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. La.C.C.P. art. 966; *Reynolds v. Select Property, Ltd.*, 93-1480 (La. 4/11/94); 634 So.2d 1180, 1182. "Interpretation of an insurance policy usually involves a legal question which can be resolved properly in the framework of a motion for summary judgment." *Sher v. Lafayette Ins. Co.*, 07-2441 (La. 4/8/08); 988 So.2d 186, 192. Here, the parties agree that the material facts are not in dispute, leaving for this Court the legal question of how to apply the Policy provisions to those undisputed facts.

        "An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code." *Id.* at 192. This Court's role is to determine the parties' common intent from the language used in the Policy. La. Civ. Code art. 2045. The words in the Policy must be given their "generally prevailing meaning," and "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code arts. 2047, 2050. When the words "are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046.

        The Rosses, as the insureds, bear the initial burden to prove that the losses they are claiming fall within the Policy's grant of coverage. *See Jones v. Estate of Santiago*, 03-1424

(La. 04/14/04); 870 So.2d 1002, 1010.  This means that, with respect to each claimed item of damage, the Rosses must prove that they sustained a "direct physical loss."  If the Rosses satisfy that burden, the burden then shifts to Louisiana Citizens to establish that the claimed loss falls within one of the Policy's exclusions.  *Jones*, 870 So.2d at 1010.  Once Louisiana Citizens has established that the claimed loss is excluded, the Rosses bear the burden of proving the applicability of any exception to the exclusion.  *See Perrien v. State Farm Ins. Co.*, Civ. No. 06-8087, 2008 U.S. Dist. LEXIS 90617, at *6 (E.D. La. July 9, 2008) (Duval, J.); *Broussard v. State Farm Fire & Cas. Co.*, Civ. No. 06-8084, 2007 U.S. Dist. LEXIS 56767, at *7-8 (E.D. La. Aug. 2, 2007) (Vance, J.); *Ferguson v. State Farm Ins. Co.*, Civ. No. 06-3936, 2007 U.S. Dist. LEXIS 34030, at *5 (E.D. La. May 9, 2007) (Berrigan, J.).

## IV.    ARGUMENT

The Rosses' claim implicates both the dwelling and personal property coverages in the Policy, which operate differently.  The dwelling is covered on an open peril basis, insuring against "risk[s] of direct physical loss" that are not excluded.  (Exhibit "F": Policy, Form HO 00 03 10 00, at 8.)  Personal property, in contrast, is covered only against losses caused by 16 specified named perils.  (*Id.* at 10-11.)  The Rosses' claim for alleged damage to their dwelling is addressed in Section A below, and their claim for personal property loss is addressed in Section B below.

### A.    There Is No Coverage For Losses To The Rosses' Dwelling

The Policy's Coverage A insures "[t]he dwelling on the 'residence premises' shown in the Declarations, including structures attached to the dwelling," with respect to "risk of direct physical loss" that is not excluded.  (*Id.* at 2, 8.)  Coverage A governs the Rosses' claims for removing and replacing the drywall and repairing the claimed damage to air conditioning equipment, electrical wires, plumbing fixtures, and other metallic building components.

The Policy does not provide coverage for these losses for several reasons.  First, any claim for the cost of removing and/or replacing the defective drywall is not covered because the defective drywall itself has not sustained a direct physical loss.  Second, any damage caused by the defect in the drywall and/or the gases emitted from the drywall is excluded as loss caused by latent defects, faulty materials, and pollutants (gaseous contaminants).  Third, the damage to metallic surfaces in the Ross Residence caused by corrosion is also excluded by the corrosion exclusion.

1.    **The Cost of Removing And Replacing the Defective Drywall Is Not Covered Because The Defective Drywall Has Not Sustained A "Direct Physical Loss"**

The Policy insures "against risk of direct physical loss to property described in Coverages A and B" that is not excluded. (Exhibit "F": Policy, Form HO 00 03 10 00, at 8.) There is no coverage for property that has not experienced a "direct physical loss." Here, the Chinese-made drywall that was installed in the Ross Residence is physically intact, functional and has no visible damage (except for unrelated water damage). (Exhibit "C": Gipson Aff., ¶3; Exhibit "D": Moore Aff., ¶4.) Indeed, the photographs of the drywall show that it is in pristine condition (except for the unrelated water damage). (Exhibit "C": Gipson Aff., Ex. A.) The only reason for removing and replacing the drywall is that it is emitting "volatile organic chemical compounds," including sulfur and methane gases, that are contaminating the home and having detrimental impacts on other building components. (*See* Exhibit "A": Original Petition at ¶ VI.) The drywall has not suffered any direct physical loss, as is required in order to potentially trigger coverage under the Policy.

Because the phrase "direct physical loss" is not defined in the Policy, this Court must interpret the words according to their "generally prevailing meaning." La. Civ. Code art. 2047; *Sher*, 988 So. 2d at 193. As a leading insurance treatise explains, "[t]he requirement that the loss be 'physical,' given the ordinary definition of that term, is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." 10 Couch on Insurance § 148:46 (3d ed. 1998).

Consistent with this understanding, the U.S. Fifth Circuit has concluded under Louisiana law that "[t]he language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state – for example, the car was undamaged before the collision dented the bumper." *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 270-71 (5th Cir. 1990). In *Trinity*, the court considered whether a policy covering "all risks of physical loss or of damage to the subject matter" would cover the cost incurred to correct a shipbuilder's faulty workmanship in misaligning two sections of the ship's hull during construction. *Id.* at 267-68. The U.S. Fifth Circuit held that "the parties, by their language 'physical loss or damage', did not intend to cover the cost of repairing faulty initial construction." *Id.* at 272. It explained that coverage would potentially exist for

"accidents resulting from defective design or workmanship," if not excluded, "but not the cost of repairing the defect itself." *Id.* at 271.

Courts in other jurisdictions have reached the same conclusion. In *Great Northern Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, 793 F. Supp. 259, 261 (D. Or. 1999), *aff'd*, 953 F.2d 1387 (9th Cir. 1992), a tenant vacated the insured's building after learning that the building contained non-friable asbestos. *Id.* The court held that there was no "physical loss" because the building "remained physically intact and undamaged." *Id.* at 263. It reasoned that the insured's losses, namely asbestos removal expense and loss of use, were purely economic in character, emphasizing that the terms "direct" and "physical" in the insuring agreement "could only have been intended to exclude indirect, non-physical losses." *Id.*; *see also Wyoming Sawmills, Inc. v. Transportation Ins. Co.*, 578 P.2d 1253, 1256 (Or. 1978) (holding that, under a liability insurance policy, insurance company did not have duty to defend insured for expenses incurred in removing defective studs from the building because use of the word "physical" in definition of "property damage" negated "any possibility that the policy was intended to include 'consequential or intangible damage . . . .'").

In *Whitaker v. Nationwide Mut. Fire Ins. Co.*, 115 F. Supp. 2d 612 (E.D. Va. 1999), the plaintiffs sought coverage under their homeowner's policy for costs relating to their contractor's poor workmanship in building their home. The plaintiffs were dissatisfied with the quality of the contractor's work, and an architect/engineer had identified certain construction defects that required correction. *Id.* at 614-15. The court granted summary judgment for the insurer, holding that "Plaintiffs' claims for repair of the construction defects themselves are not covered by the policy because they do not allege claims for direct physical loss." *Id.* at 617. It noted that collateral damage to non-defective property that was caused by the construction defects could potentially be covered "as direct physical loss under the policy, absent the applicability of any exclusions." *Id.* at 617 n.6.

The court in *Tocci Bldg. Corp. v. Zurich Am. Ins. Co.*, 659 F. Supp. 2d 251 (D. Mass. Sept. 25, 2009), adopted a similar understanding of "direct physical loss." In that case, a severe rainstorm during construction of a hotel caused a section of a retaining wall to collapse. *Id.* at 253. The damaged section of the wall was repaired in a week, but the local building department required the insured to grout the remainder of the wall. *Id.* at 254. This expensive repair caused substantial delay in opening the hotel. The insured sought coverage for the costs associated with

grouting the undamaged portion of the wall, which had not collapsed during the rainstorm. *Id.* The policy covered "risk of direct physical loss" to covered property, except for excluded causes of loss. *Id.* at 259. Emphasizing that "only the 100' section of the wall that was repaired by August was physically damaged; the remainder of the wall was not damaged then or at any time thereafter," the court granted summary judgment to the insurer. *Id.* The court reasoned that "it is impossible to read the insurance policy as providing coverage . . . in the absence of . . . 'damage.' Since it is undisputed that the grouting was not required due to damage to the retaining wall, there was no loss and hence no coverage." *Id.*; *see also Bethesda Place Ltd. P'ship v. Reliance Ins. Co.*, Civ. No. HAR 91-1719, 1992 U.S. Dist. LEXIS 6522, at *9 (D. Md. Apr. 22, 1992) ("[C]ase law does not support the argument that a design defect in and of itself constitutes physical injury or damage to property from an external cause").

As in *Trinity*, *Great Northern*, *Whitaker* and *Tocci*, the cost of removing and replacing the undamaged but defective drywall in the Ross Residence is not covered because there was no "direct physical loss." The drywall sustained no visible or tangible damage, and it did not change state from an initial satisfactory condition to an unsatisfactory condition due to an external cause.

> **2.    The Claimed Damage Caused By A Defect In The Drywall Or The Gases Emitted By the Drywall Is Excluded By Several Policy Exclusions**

Even if the defective drywall were deemed to have sustained a "direct physical loss," the cost of removing and replacing the defective drywall, as well as any claim for damage to the building, its components or its contents (including air conditioning equipment, electrical wires, plumbing fixtures and other metallic surfaces), is excluded by four exclusions. These exclusions apply to loss caused by: (1) latent defects; (2) faulty materials; (3) corrosion; and (4) pollutants (including gaseous contaminants or irritants). Any one of these exclusions would be sufficient by itself to preclude coverage for the Rosses' claims. *See Terrebonne v. Charanie*, 06-843 (La. App. 5 Cir. 2/27/07), 952 So.2d 833, 836.

> **a.    Latent Defect Exclusion**

All of the Rosses' claimed property damage falls within the following exclusion from coverage:

> 2.  We do not insure, however, for loss: . . .
>
> > c.  Caused by: . . .
> >
> > > (6) Any of the following: . . .

        (b) Mechanical breakdown, *latent defect*, inherent vice, *or any quality in property that causes it to damage or destroy itself.*

. . .

Under 2.b. and c. above, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

(Exhibit "F": Policy, Form HO 00 03 10 00, at 8-10 (emphasis added).)

Louisiana courts interpreting the term "latent defect" in insurance policies have given the term its plain and ordinary meaning. For example, the Louisiana Third Circuit has held that a "latent defect" is "a defect that is hidden or concealed from knowledge as well as from sight and which a reasonable customary inspection would not reveal." *Nida v. State Farm Fire & Cas. Co.*, 454 So.2d 328, 335 (La. App. 3d Cir. 1984) (quoting *Walker v. Travelers Indemnity Co.*, 289 So.2d 864, 870 (La. App. 4th Cir. 1974)); *accord Barbier v. Wade*, 517 So.2d 321, 325 (La. App. 1st Cir. 1987); *Shields v. Penn. Gen. Ins. Co.*, 488 So.2d 1252, 1255 (La. App. 4th Cir. 1986); *Harris v. Bardwell*, 373 So.2d 777, 780 (La. App. 2d Cir. 1979). In *Nida*, soil movement caused cracking of the foundation and the interior and exterior walls of the insured's house. *Id.* at 329. Because the foundation had not been built to withstand ordinary soil movement, the Third Circuit held that the damage was excluded from coverage under a latent defect exclusion. *Id.* at 335. The court explained that "the defendant-insurer simply was not a guarantor of the constructor's building performance." *Id.*

The weight of authority nationwide also supports this interpretation of latent defect. *See, e.g., City of Burlington v. Hartford Steam Boiler Inspection & Ins. Co.*, 190 F. Supp. 2d 663, 688 (D. Vt. 2002), *aff'd* 346 F.3d 70 (2d Cir. 2003) (surveying authority and concluding that "[i]n the ordinary sense of the term, 'latent defect' means a defect that is hidden, or which could not have been discovered by any known or customary test or examination"); *U.S. West v. Aetna Cas. & Sur. Co.*, 117 F.3d 1415 (table), 1997 U.S. App. LEXIS 17747, at *14-15 (4th Cir. 1997) ("[A]s a matter of the literal language of this term, 'latent defects' are only those which are not readily discoverable and integral to the damaged property by reason of *its* design or manufacture or construction."). Applying a similar definition of latent defect to facts similar to the case at bar, the Illinois Appellate Court has held that the latent defect exclusion precludes coverage of claims relating to asbestos-containing construction materials. In *Board of Educ. v. Int'l Ins. Co.*, 684 N.E.2d 978 (Ill. App. 1997), the plaintiff school board sought coverage for the cost of removing paint, ceiling tile, floor tile, insulation and other materials made using asbestos fibers, claiming that these building materials were releasing hazardous substances into the air. *Id.* at 979-80.

Rejecting the school board's arguments for coverage, the court explained that "because the presence of asbestos material in the school buildings is not detectable by the naked eye and is not apparent to any but the most searching analysis, it is a latent defect subject to the latent defect exclusion." *Id.* at 983.

Here, the damage to the Ross Residence plainly constitutes a loss caused by a "latent defect" because the problem with the Chinese-made drywall (*i.e.*, its gas emitting characteristic) is not visible or readily discoverable. Indeed, the Rosses themselves describe the defect in the drywall as a "hidden defect" (Exhibit "A": Petition, ¶ XVI; Exhibit "B": Plaintiffs' Memo. at 6), which is exactly how *Black's Law Dictionary* defines the term "latent defect." *Black's Law Dictionary* 481 (9th ed. 2009) (defining "latent defect" as "*See* hidden defect"). Because the latent defect in the drywall was the cause of any need to remove and replace the drywall as well as the claimed losses to the air conditioning equipment, the electrical wiring, the plumbing components, and the other metallic surfaces in the Ross Residence, the Rosses' claim is excluded under the Policy's latent defect exclusion. If there were "direct physical loss" to the drywall itself, it would also be excluded as a loss caused by a "quality in property that causes it to damage or destroy itself," which is separately excluded. (Exhibit "F": Policy, Form HO 00 03 10 00, at 9.)

### b.    Faulty Materials Exclusion

The policy exclusion for faulty or defective materials also precludes coverage for the losses that the Rosses has claimed. This exclusion provides as follows:

> B. We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.
>
> . . .
>
> 3. Faulty, inadequate or defective: . . .
>
>    c. Materials used in repair, construction, renovation or remodeling; . . .
>
>    of part or all of any property whether on or off the "residence premises".

(Exhibit "F": Policy, Form HO 00 03 10 00, at 12.)

The Chinese-made drywall installed in the Rosses' home undoubtedly qualifies as a material that is "faulty" and "defective" within the plain meaning of those terms. Courts across the country have recognized that construction materials are defective in factual scenarios similar to what occurred here. Courts have applied the defective materials exclusion to preclude coverage for losses caused by the use of construction materials that had been contaminated by

exposure to radioactive materials, *Falcon Prods., Inc. v. Ins. Co. of Penn.*, 615 F. Supp. 37,39 (E.D. Mo. 1985), *aff'd* 782 F.2d 779 (8th Cir. 1986), the installation of an improper lining and insulation product, *Tom Harrison Tennis Ctr. Ltd. v. Indoor Courts of Am., Inc.*, No CA2002-03-034, 2002 WL 31859462, at *4 (Ohio App. Dec. 23, 2002), the use of improperly treated cedar siding and shingles, *Carney v. Assurance Company of America*, Civ. No. 04-3434, 2005 WL 899843 (D. Md. Apr. 19, 2005), *aff'd* 177 F.App'x 282 (4th Cir. 2006) (per curiam), the installation of substandard residential piping, *Rogers v. Unitrim Auto & Home Ins. Co.*, 388 F. Supp. 2d 638 (W.D.N.C. 2005), the use of lumber infested with dry rot, *Sapiro v. Encompass Ins.*, No. C03-4587, 2003 WL 2496090, at *5 (N.D. Cal. Nov. 2, 2004), and the use of a roofing asphalt that "was entirely unsuitable for the purpose" and necessitated the removal and replacement of the entire roof, *Biebel Bros., Inc. v. United States Fid. & Guar. Co.*, 522 F.2d 1207, 1211 (8th Cir. 1975).

Here, there is no dispute that the Chinese-made drywall installed in the Ross Residence is a defective material. The Rosses allege that "[t]he foreign gypsum drywall installed in the residence is *defective* . . . ." (Exhibit "A": Original Petition at ¶ VI (emphasis added); *see also id.* at ¶¶ V, IX, X, XI, XII, XIII, XVI, XX, XXVI, XXIX (repeatedly using the terms "defective" and "defect" in describing the drywall.) In response to Louisiana Citizens' Requests for Admission, the Rosses have expressly admitted that "*defective* Chinese drywall is present" in their property. (Exhibit "G": Plaintiffs' Response to Requests for Admission, dated Sept. 30, 2009, at 1 (emphasis added).)

Because the Rosses do not and cannot dispute that their losses were caused by a faulty or defective material, they ask this Court to disregard the plain language of the faulty materials exclusion and create a special exception because the defective drywall was installed prior to their purchase of the property. The plain language of the exclusion, however, contains no such exception. The exclusion has no provision concerning timing of installation, and, indeed, it is not limited to defective materials on the Rosses' own premises. Rather, it applies to defective materials "used in repair, construction, renovation or remodeling . . . of part or all of any property whether on or off the 'residence premises.'" (Exhibit "F": Policy, Form HO 00 03 10 00, at 12.) Given that the exclusion expressly applies not only when defective material is installed in the insured's property but also, for example, when it is installed in a neighbor's

property (over which the insured would have no control), the exclusion reasonably cannot be read to apply only when the insured has authorized installation of a defective material.

To support their theory that the defective materials exclusion does not apply, the Rosses rely exclusively on *Husband v. Lafayette Ins. Co.*, 93-815 (La. App. 5 Cir. 3/16/94); 635 So.2d 309. That case involved unauthorized renovations by a tenant, not defective materials, and is readily distinguishable. In *Husband*, the plaintiffs rented their home under a lease agreement that expressly forbade the tenant from making any "additions or alterations to the premises" without the plaintiffs' written permission. *Id.* at 310. Despite this agreement, the tenant "painted over paneled walls, wallpapered walls, stained wood moldings and doors and the brick fireplace. He ripped up carpeting and replaced it with linoleum. He also placed mirrored tiles on both the wallpaper and painted walls." *Id.* at 310-11. The work was "shoddy and extremely unprofessional." *Id.* at 311.

The Louisiana Fifth Circuit held that an exclusion for faulty "workmanship" did not apply to a loss that was more akin to vandalism than to a loss caused by the defective nature of construction work. The court emphasized that "[t]he fact that the renovations were faulty does not change the nature of the damages herein. *Had the renovations been satisfactory, the damage nevertheless still would have occurred.*" *Id.* at 312 (emphasis added). In other words, the exclusion was inapplicable because the loss was not caused by the faulty nature of the work, but because the work itself was unauthorized and changed the character of the building when the property owner/insured did not want it changed. *Id.*

The Rosses' reliance on *Husband* is clearly misplaced. Unlike in *Husband*, the work performed on the Rosses' home was not unauthorized work, and if the drywall installed in the Rosses home was not defective, there would be no damage. That is in sharp contrast to *Husband*, where even if the renovations were beautifully done, the court would have found that there was coverage for the cost of repairing/undoing them because they were unauthorized. *Husband* also appears to be premised on a rationale that a homeowner should bear the responsibility for selecting a qualified and reputable contractor. *Id.* at 311. As noted above, however, the faulty materials exclusion expressly applies to situations in which the insured has

no control over the selection of a contractor. Moreover, even where homeowners select the contractor, they are almost never involved in selecting the manufacturer of the drywall.[3]

Apart from *Husband*, the Rosses also argue that there is a "public policy of discouraging negligence on the part of the homeowner [that] is simply absent when the homeowner does not own the property during repairs." (Exhibit "B": Plaintiffs' Memo. at 8.) But they fail to cite any legislative authority that would allow this Court to make such a ruling. *See, e.g., Needom v. Robein*, 7 So. 3d 30, 38 (La. App. 4 Cir. 2009) ("Unlike the legislative branch of government, the judicial branch is prohibited from indulging in the selection of its policy preferences . . . ."); *Saltzman v. Broussard*, 736 So. 2d 243, 247 (La. App. 3 Cir. 1999) ("In the specific context of a homeowner's policy . . . a court should not proceed to act on a supposed public policy not announced or implied by the legislature.").

All of the Rosses' claimed losses are the direct result of the installation of the Chinese drywall in their house. (*See* Exhibit "A": Original Petition at ¶ VI.) There can be no question that the drywall is faulty or defective. The exclusion for loss caused by defective materials clearly applies to preclude coverage of all damage resulting from the defect in the drywall.

### c.     Corrosion Exclusion

The Policy also excludes loss caused by corrosion, as follows:

2.   We do not insure, however, for loss: . . .

    c.   Caused by: . . .

        (6) Any of the following: . . .

            (c) Smog, rust or other corrosion, or dry rot.

        . . .

    Under 2.b. and c. above, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

(Exhibit "F": Policy, Form HO 00 03 10 00, at 8-10.)

The claimed damage to metals and metallic surfaces (including, but not limited to, air conditioning equipment and a garage door) falls within the exclusion for loss caused by "corrosion." Corrosion is, of course, the process by which the surface of a metal or other material wears away or deteriorates. *See, e.g., Reliance Ins. Co. v. Cooper/T. Smith Corp.*, Civ.

---

[3] *Husband* also has never been cited by any court in Louisiana in the sixteen years since it was decided, and therefore is not *jurisprudence constante*. *See Borel v. Young*, 07-0419 (La. 7/1/08); 989 So. 2d 42, 65 ("Under the civilian tradition, a single decision is not binding on our courts; however, when a series of decisions form a 'constant stream of uniform and homogeneous rulings having the same reasoning,' jurisprudence constante applies and operates with 'considerable persuasive authority.'").

Nos. 00-0251 & 00-0280, 2001 WL 530438, at *2 n.4 (S.D. Ala. Apr. 24, 2001); *Pioneer Chlor Alkali Co. v. National Union Fire Ins. Co.*, 863 F. Supp. 1226, 1235 (D. Nev. 1994). The losses being claimed by the Rosses include damage caused by corrosion. The Rosses allege that the Chinese drywall in their home emits gases "that **cause corrosion** of HVAC coils and refrigerator units, certain electrical wiring and plumbing components, and other household items . . . ." (Exhibit "A": Petition, ¶ VI (emphasis added).) In their Statement of Undisputed Facts, the Rosses similarly state that "[t]he Chinese drywall exuded sulfuric gases that **corroded** the plumbing, electrical wiring and other metal components in the home." (Exhibit "B": Plaintiffs' Statement of Undisputed Facts, ¶ 3 (emphasis added).)

Two judges of the United States District Court for the Eastern District of Louisiana have recently applied similar exclusions to preclude coverage for equipment that rusted as a result of Hurricane Katrina. In *Transcontinental Ins. Co. v. Guico Machine Works, Inc.*, Civ. Nos. 06-2516 & 06-3184, 2008 U.S. Dist. LEXIS 69972 (E.D. La. Sept. 17, 2008), the insured's roof was damaged during the hurricane, leaving its equipment exposed to the elements. Judge Englehardt granted summary judgment to the insurer, holding that, under an exclusion for "loss or damage caused by or resulting from rust," there was no coverage for rust damage resulting from water infiltration through the damaged roof. *Id.* at *4-5. Judge Englehardt emphasized that the policy language unambiguously "excludes *all* loss or damage from rust or dampness of atmosphere." *Id.* (emphasis added). *See also Orthopedic Practice, LLC v. Hartford Cas. Ins. Co.*, Civ. No. 06-8710, 2008 U.S. Dist. LEXIS 18335, at *8 (E.D. La. March 10, 2008) (Porteous, J.) (policy excluded "loss or damage caused by or resulting from . . . rust, corrosion"; court granted summary judgment to insurer on claim for rust and mold damage to second floor of building caused by moist environment from flooding on first floor, holding that "evidence of rust and mold to Plaintiff's equipment is immaterial, as the Policy expressly excludes rust and mold").

Courts in other jurisdictions similarly have held that corrosion exclusions preclude coverage for losses similar to the Rosses' loss. For example, the Ohio Court of Appeals enforced the corrosion exclusion where the claimed damage consisted of "discoloration of the stainless steel door hardware, switch plates and copper piping" in rooms where concrete floors had been treated with chemical agents during construction to etch them in preparation for their final sealing. *Gilbane Bldg. Co. v. Altman Co.*, No. 04AP-664, 2005 Ohio App. LEXIS 981 (Ohio Ct. App. Mar. 8, 2005) (unpub.). The construction contractor had improperly diluted the etching

chemicals, which "caused an acid vapor to form in the electrical/mechanical rooms in which the concrete floor etching was performed." *Id.* at \*2-3. The acid vapor reacted with metal surfaces in these rooms, causing the "discoloration" that was claimed. The court of appeals affirmed the entry of summary judgment in favor of the insurer, concluding that the loss was excluded under an exclusion for loss caused by corrosion. *Id.* at \*17; *see also Heban v. Auto-Owners Ins. Co.*, No. WD-02-064, 2003 WL 21862170, at \*2 (Ohio Ct. App. Aug. 8, 2003) (holding that corrosion exclusion precluded coverage for discoloration of glass panes caused by corrosion from rain water entering between the stacked panes).

Ignoring these authorities and the plain language of the corrosion exclusion, the Rosses rely heavily on a <u>single</u> <u>unpublished</u> <u>federal district court</u> opinion, which is inapposite. In *Trus Joist Macmillan v. Neeb Kearney & Co.*, No. 99-2964, 2000 U.S. Dist. LEXIS 3852 (E.D. La. March 24, 2000) (Sear, J.), the plaintiff brought suit against a storage facility and its liability insurer for damage to the plaintiff's bedplates. *Id.* at \*2. The liability insurer moved for summary judgment, arguing that it had no duty to defend or indemnify the storage facility because the loss was excluded under the policy's exclusions for loss caused by flood or groundwater, and "loss caused by . . . contamination or deterioration including corrosion; . . . rust . . . ." *Id.* at \*3. The court held, however, that the insurer "[did] not establish with sufficient certainty the cause of the damage," and that "merely because the bedplates are rusted" would not necessarily establish that rust was the cause of the damage. *Id.* at \*6-7. Consequently, the court denied summary judgment. *Id.*

*Trus Joist* also stated in dicta that "the exclusion is designed to apply where corrosion, rust, or the like is the cause of property damage" and "[i]t is not designed to preclude coverage when rust is the damage itself, as opposed to the cause of the damage." *Id.* But the word "rust" is often used to refer to the substance that forms on metal as a result of the process of corrosion. *See American Heritage Dictionary of the English Language* (4th ed.) (defining rust as "[a]ny of various metallic coatings, especially oxides, formed by corrosion"). Where rust is the damage, corrosion is typically the cause.

Here, contrary to Plaintiffs' argument, the process of corrosion was the cause of the claimed damage to metal fixtures in the Ross Residence. The word "corrosion," when used in the Policy to describe a cause of loss, refers not to the damage itself but the process by which a metal component is gradually worn away and becomes damaged. *See, e.g., Cooper/T. Smith Corp.,*

2001 WL 530438, at *2 n.4; *Pioneer Chlor Alkali Co.*, 863 F. Supp. at 1235. Plaintiffs'

argument was expressly rejected in *Kay v. United Pac. Ins. Co.*, 902 F. Supp. 656 (D. Md. 1995),

where the court persuasively explained that an insured cannot avoid the applicability of an

exclusion for loss caused by corrosion by attempting to characterize "corrosion" as the substance

that forms on the metal as opposed to the process by which the metal wears away:

> [P]laintiffs go further and argue that "corrosion" has two meanings - the process
> of corrosion and the product of corrosion - and that Exclusion 2.g. is intended to
> cover only the latter, i.e., the corrosion itself, not an effect of the process of
> corrosion such as the loss of required structural strength. There are three fallacies
> in this argument. First, plaintiffs have not presented one shred of evidence to
> suggest that the parties did not intend that the word "corrosion" as used in
> Exclusion 2.g. was not intended to encompass both aspects of its commonly
> understood meaning. Second, although there are two definitions given to
> "corrosion" in Webster's Third International Dictionary, and although the second
> definition is "a product of corrosion," the first definition itself includes both of
> the meanings ascribed by plaintiffs: "the action, process or effect of corroding."
> Third, when Exclusion 2.g. is read in its entirety, i.e. beginning at the start of the
> exclusions section on page 1 rather than with the alphabetical heading g., it
> seems apparent that as a matter of grammatical structure corrosion is being used
> in its sense of a process, not in its sense of a completed state. Beginning at the
> beginning, the Exclusion states: "we will not pay for loss, expense or damage . . .
> caused by or resulting from . . . corrosion." Thus read, that which is being
> excluded is precisely that which plaintiffs seek to include: losses and damages,
> such as the loss of required structural strength, that are the effects of corrosion.

*Id.* at 658.

Similarly here, Plaintiffs' argument that the word "corrosion" refers only to the outcome

of the process of corrosion as opposed to the process itself is sophistry and makes no difference

in applying the policy. If the "corrosion" is the physical substance that has formed on the surface

of the metallic components of the Ross home, that substance is what has caused damage to the

metal, and the exclusion for loss caused by corrosion thus applies. Similarly, if the "corrosion"

is the process by which the metallic components have worn away, that process has caused

damage to the metal, and therefore the exclusion applies. The exclusion for loss caused by

corrosion was plainly intended to apply to the deterioration of metal. The damage to the metal

components of the Rosses' home was caused by corrosion, and therefore is excluded.

### d. Pollution Exclusion

#### i. The Plain Language Of The Exclusion Applies To The Rosses' Loss

The Rosses devote an extensive portion of their memorandum to the pollution exclusion.

While the Court need not reach this issue because the three other exclusions plainly apply, the

pollution exclusion is also applicable. The pollution exclusion in the Policy provides as follows:

2. We do not insure, however, for loss: . . .

c.  Caused by: . . .

(6) Any of the following: . . .

(e) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage C.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed;

. . .

Under 2.b. and c. above, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered.

(Exhibit "F": Policy, Form HO 00 03 10 00, at 8-10.)

The plain language of this exclusion clearly applies to the Rosses' claim.  Plaintiffs' Statement of Uncontested Facts states that "[t]he Chinese drywall exuded sulfuric gases that corroded the plumbing, electrical wiring and other metal components in the home." (Exhibit "B": Plaintiffs' Statement of Uncontested Facts at ¶ 3.)  The Petition further alleges that these gases "create noxious, 'rotten egg-like' odors." (Exhibit "A": Original Petition at ¶ VI.)  These gases plainly qualify as "pollutants" under the Policy because they are "gaseous . . . irritant[s] or contaminant[s]," as well as "fumes," and they were "discharge[d], dispers[ed] . . . [or] release[d]" from the drywall. (Exhibit "F": Policy, Form HO 00 03 10 00, at 9.)  Gases that cause corrosion of building components and create noxious odors plainly constitute "gaseous . . . contaminants."  Damage caused by these gases is therefore excluded.

In addition to being contaminants, the gases released by the drywall also constitute "irritants" and "fumes."  Gases that produce "noxious, 'rotten egg-like' odors" (Exhibit "A": Original Petition at ¶ VI) are clearly irritants—they provoke displeasure and annoyance.  *See Wakefield Pork, Inc. v. RAM Mut. Ins. Co.*, 731 N.W.2d 154, 161 (Minn. App. 2007) (holding that a complaint alleging "harm from the '[g]ases, hydrogen sulfide among others,' and the 'noxious and offensive odors' that emanated from appellant's pig farm . . . alleged damage from a substance that is plainly covered by the insurance policy's pollution exclusion").  The emissions from the drywall also constitute "fumes."

Because the gases emitted from the drywall constitute "pollutants," coverage for the damage they cause is excluded "unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage C." (Exhibit "F": Policy, Form HO 00 03 10 00, at 9.)  The discharge of gases from the Rosses' drywall was not

caused by any of the named perils.[4] The Rosses' claim for damage caused by these gases thus falls squarely within the plain language of the Policy's pollution exclusion.

Courts have repeatedly enforced pollution exclusions in the context of first-party property policies as applied to losses similar to the Rosses' loss. *See, e.g., Great Northern Ins. Co. v. Benjamin Franklin Fed. Sav & Loan Ass'n*, 793 F. Supp. 259 (D. Or. 1990), *aff'd*, 953 F.2d 1387 (9th Cir. 1992) (enforcing pollution exclusion and holding that costs to remove asbestos from insured building are expressly barred from coverage); *Brown v. Am. Motorists Ins. Co.*, 930 F. Supp. 207, 208-209 (E.D. Pa. 1996) (enforcing unambiguous pollution exclusion and holding that alleged damage to house from fumes from sealant that migrated into insured's house was excluded), *aff'd*, 111 F.3d 125 (3d Cir. 1997).

### ii. *Doerr* Is Inapplicable to the Pollution Exclusion in the Rosses' Policy

The Rosses contend that the Policy's pollution exclusion is inapplicable because, under *Doerr v. Mobil Oil Corp.*, 00-0947 (La. 12/19/00); 774 So.2d 119, 122, a pollution exclusion applies only to "professional polluters." (*See* Exhibit "B": Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment, at 4.). *Doerr* involved a commercial general liability ("CGL") policy and is inapplicable here on numerous grounds.

Unlike the Rosses' homeowners' policy, which provides coverage for physical damage to their home, the CGL policy in *Doerr* provided coverage for the insured's liabilities to third parties if the insured was alleged to be legally liable for causing bodily injury or property damage.[5] The "total" pollution exclusion in *Doerr* provided that the insurer would not be responsible for defending or indemnifying an insured if the insured were alleged to have caused bodily injury or property damage and pollution was a contributing cause of the insured's

---

[4] The sixteen perils named in Coverage C are: (1) fire or lightning; (2) windstorm or hail; (3) explosion; (4) riot or civil commotion; (5) aircraft; (6) vehicles; (7) smoke; (8) vandalism or malicious mischief; (9) theft; (10) falling objects; (11) weight of ice, snow or sleet; (12) accidental discharge or overflow of water or steam; (13) sudden or accidental tearing apart, cracking, burning or bulging of certain types of building systems; (14) freezing; (15) sudden and accidental damage from artificially generated electrical current; and (16) volcanic eruption. (Policy, Form HO 00 30 10 00, at 10-11.)

[5] The *Doerr* opinion does not quote or explain the CGL policy's grant of coverage. A typical CGL policy provides that the insurer "will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of A. bodily injury or B. property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage ...." *Ricks v. Kentwood Oil Co.*, 2010 La. App. LEXIS 237, at *7 (La. App. 1 Cir. Feb. 23, 2010). A typical definition of "bodily injury" is "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom." *Id.* at *9. A typical definition of "property damage" is "(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period." *Id.* The liability insurance coverage portion of the Rosses' Policy has a similar grant of coverage, and does not contain any pollution exclusion. (*See* Policy, Form HO 00 03 10 00, at 1-2, 16-19.)

liability. In particular, the *Doerr* policy provided that "[t]his insurance does not apply to . . . 'Bodily injury', 'property damage', 'personal injury' or 'advertising injury' which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time." *Id.* The policy thus required the insurer to defend and indemnify the insured for claims by third parties asserting that the insured was legally responsible for "bodily injury" or "property damage," but excluded any obligation to defend or indemnify if the insured's liability was alleged to have been caused in whole or part by the release or discharge of "pollutants."

In interpreting this exclusion, the *Doerr* court found the exclusion to be overly broad, and limited its scope by holding that the insurer was obligated to defend and indemnify its insured, unless the insured was alleged to have caused bodily injury or property damage ***and*** the allegedly responsible insured was in the business of polluting. The court noted that a broad reading of the exclusion could "exclude coverage for anything from the release of chlorine gases by a conglomerate chemical plant to the release of carbon monoxide from a small business owner's delivery truck. It could be read to exclude injuries resulting from a slip and fall on an oil-slicked beach to a slip and fall on spilled gasoline at a corner service station." *Id.* at 124. The court concluded that Louisiana law did not require enforcing the exclusion as written because applying the exclusion to circumstances like these would constitute "absurd results." *Id.* The court then reviewed the history and purpose of the pollution exclusion in liability insurance policies, finding that the exclusion was developed in the 1970s and broadened in the 1980s, in response to an increase in environmental enforcement by the federal government, and that the purpose was to exclude any obligation to defend or indemnify a business for causing environmental pollution. *Id.* at 126-27. The court concluded that "[g]iving these pollution exclusions a strictly literal reading without regard to the limited purpose behind their post-CERCLA [Comprehensive Environmental Response, Compensation, and Liability Act of 1980] formation would thwart the very purpose of a comprehensive general liability policy." *Id.* at 127.

The *Doerr* court constructed the following test to determine whether the exclusion would apply: "(1) Whether the insured is a 'polluter' within the meaning of the exclusion; (2) Whether the injury-causing substance is a 'pollutant' within the meaning of the exclusion; and (3) Whether there was a 'discharge, dispersal, seepage, migration, release or escape' of a pollutant

by the insured within the meaning of the policy." *Id.* at 135. The court further instructed that the following factors should be considered in determining whether the insured is a "polluter": "the nature of the insured's business, whether that type of business presents a risk of pollution, whether the insured has a separate policy covering the disputed claim, whether the insured should have known from a read of the exclusion that a separate policy covering pollution damages would be necessary for the insured's business, who the insurer typically insures, any other claims made under the policy," and any other factor deemed relevant. *Id.*

*Doerr* is inapplicable here for several reasons. First, there is a fundamental difference between the purpose of a liability policy and the purpose of a property policy. A liability policy provides coverage for certain types of harm caused by the insured to third parties. In contrast, a property policy insures the insured's own property against risk of direct physical loss caused by specified perils (under named peril coverage) or by any non-excluded cause (under open peril coverage). Property policies cover acts of God, negligence of third parties, and negligence of the insured, whenever the cause is not excluded. The identity of the person who caused the harm is not relevant. Consequently, it would make no sense to focus on whether the insured caused the "pollution" or was a "polluter" in interpreting the scope of coverage under a property policy.

In this regard, the *Doerr* court's focus clearly was on liability insurance coverage for businesses insurance, not house insurance for homeowners. The inquiry that *Doerr* prescribed for determining whether a business insured qualifies as a professional polluter makes no sense in the context of a homeowner making claim for damage to his or her house. Because the issue in *Doerr* was whether the policy covered the insured business' liabilities for causing pollution, the court found it important to determine whether the insured was in the business of polluting, and held that the pollution exclusion would only apply if the insured were engaged in the business of polluting. *Doerr*, 774 So. 2d at 135 (emphasis added). The relevant factors cited by the court in *Doerr*, therefore, included "the nature of the insured's ***business***," "whether that type of ***business*** presents a risk of pollution," and "whether the insured should have known from a read of the exclusion that a separate policy covering pollution damages would be necessary for the insured's ***business***." *Id.* (emphasis added). These criteria, which are directed to whether a CGL policy protects a business from liability for pollution, are not transferable to a case involving a homeowners' claim to recover the cost of repairing damage to his or her house.

Second, the pollution exclusion in the Rosses' Policy is different from the "total" pollution exclusion in the CGL policy in *Doerr*. Unlike the CGL policy in *Doerr*, which attempted to exclude coverage when the insured became legally liable for causing or contributing to pollution damage, the pollution exclusion in the Rosses' homeowners' policy expressly provides coverage for damage to the Rosses' house when "the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage C." (Policy, Form HO 00 03 10 00, at 9.) Thus, if the release of the pollutant is caused by a fire, explosion, a vehicle or any of the other named perils, the loss is covered. In effect, the exclusion and the exception for named perils convert the Policy from providing open peril coverage to providing "named peril" coverage with respect to pollution-related losses. Unlike the policy in *Doerr*, the Rosses' Policy *covers* property damage caused by carbon monoxide (or gasoline or motor oil) released from a vehicle. *See Doerr*, 774 So. 2d at 124. What is excluded is where a pollutant is released by a non-specified peril, such as a defective building material, and causes property damage. This does not lead to absurd results, and the exclusion must therefore be enforced as written. *See* La. Civ. Code art. 2046.[6]

Third, the rationale of *Doerr*, which was heavily based on the history of the pollution exclusion in CGL policies, is inapplicable to property policies. Property policies contained exclusions for loss caused by contamination long before the environmental movement that led to the broader pollution exclusion in liability policies. *See, e.g.*, *Aetna Cas. & Surety Co. v. Yates*, 344 F.2d 939, 940-41 (5th Cir. 1965) (quoting policy that excluded "loss caused by . . . contamination"); *Am. Cas. Co. of Reading, Penn. v. Myrick*, 304 F.2d 179, 181 (5th Cir. 1962) (policy excluded "loss or damage caused by or resulting from . . . contamination" unless caused by explosion). This exclusion did not come about as a response to changing risk created by new legislation. Nor was it intended to "shift coverage away" from traditional property insurance policies to specialized policies that would insure against environmental contamination. *See Doerr*, 774 So.2d at 126. And, significantly, the contamination exclusion was enforced where the insureds were not "polluters." *See, e.g.*, *Myrick*, 304 F.2d at 183 (applying contamination

---

[6] It is also worth noting that the liability insurance coverage in the Rosses' Policy (Section II), which provides coverage for certain types of claims made by third parties against the Rosses, has no pollution exclusion. (*See* Policy, Form HO 00 03 10 00, at 16-19.) Thus, contrary to the "absurd results" the court found in *Doerr*, the Rosses' Policy would provide liability coverage for "the release of carbon monoxide from [the Rosses'] truck," and "a slip and fall on spilled gasoline" on their property, as well as "bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a [swimming] pool." *See Doerr*, 774 So.2d at 124.

exclusion where pipe broke, releasing ammonia); *McQuade v. Nationwide Mut. Fire Ins. Co.*, 587 F. Supp. 67, 68 (D. Mass. 1984) (applying exclusion to homeowner's loss caused by chemicals sprayed by exterminator); *Hartory v. State Auto. Mut. Ins. Co.*, 552 N.E.2d 223, 225 (Ohio App. 1988) (applying exclusion to homeowners' loss caused by methane gas from neighboring landfill). The longstanding "contamination" exclusion in first-party property policies later became a pollution exclusion in which "pollutants" are defined to include "contaminants." But nothing in the language or history of this exclusion suggests that it was precipitated by "the federal government's war on active polluters." *Doerr*, 774 So. 2d at 126. The *Doerr* court's historical rationale for interpreting the total pollution exclusion in CGL policies is thus inapplicable here.

Fourth, extending *Doerr* to the pollution exclusion in the property insurance section of a homeowners' policy would eviscerate the exclusion. Plaintiffs argue that the exclusion cannot apply to them because they "are not professional polluters. They are simply homeowners . . . ." (Exhibit "B": Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment, at 5.) If that were the test for applying the pollution exclusion in a homeowners policy, the exclusion would become meaningless. A homeowner is <u>never</u> a "professional polluter" in the sense that a commercial business can be. It is thus difficult to imagine any situation in which the Rosses' version of the pollution exclusion would apply, except perhaps where a homeowner intentionally uses his or her property as a waste dump. There is no need for a pollution exclusion to address that scenario because a homeowners' policy does not cover land (*see* Exhibit "F": Policy, Form HO 00 03 10 00, at 3 ("We do not cover . . . Land")), and it excludes intentional acts (*see id.* at 12).[7]

Thus, applying *Doerr* to the pollution exclusion in the Rosses' homeowners policy would lead to the very sort of "absurd consequences" that the *Doerr* court wanted to prevent. This Court should find *Doerr* inapplicable and enforce the plain language of the pollution exclusion in the Rosses' Policy as written.

**B.     There Is No Coverage For The Rosses' Personal Property Losses**

In addition to the dwelling damage discussed above, the Rosses have claimed damage to personal property including jewelry, small appliances and electronics. (Exhibit "E": Charles

---

[7] Louisiana Citizens also respectfully submits that *Doerr*, a <u>4-3 decision</u>, is wrongly decided for all of the reasons set forth in Justice Victory's strong dissent. Louisiana Citizens expressly reserves the right to seek to overturn *Doerr* if the pollution exclusion remains at issue and this case reaches the Louisiana Supreme Court.

Aff., ¶5.) Under Coverage C, the Policy covers damage to "personal property owned or used by an 'insured' while it is anywhere in the world" if that damage is caused by any of the 16 perils that are named in the Policy.[8] (*See* Exhibit "F": Policy, Form HO 00 03 10 00, at 3, 10-11.) The Rosses' claim that toxic gas released from the drywall in their home damaged their personal property does not fall within any of these named perils. This claim is therefore not covered.

Even if the damage to the Rosses' personal property had been caused by one of the named perils, however, coverage would nevertheless be barred by the faulty or defective materials exclusion, as discussed above, which applies to Coverage C. (*See id.* at 11-12.)

## V.    CONCLUSION

For all of the foregoing reasons, this Court should hold that the Policy does not provide coverage for the cost of removing or replacing the defective drywall in the Ross Residence and does not cover any damage caused by the drywall or by the discharge of gases from the drywall. This Court should therefore deny the Rosses' Motion for Partial Summary Judgment, grant Louisiana Citizens' Cross-Motion for Summary Judgment, and enter judgment as a matter of law in favor of Louisiana Citizens on all claims against it.

**[SIGNATURE LINE ON NEXT PAGE]**

---

[8] Those named perils are: (1) fire or lightning; (2) windstorm or hail; (3) explosion; (4) riot or civil commotion; (5) aircraft; (6) vehicles; (7) smoke; (8) vandalism or malicious mischief; (9) theft; (10) falling objects; (11) weight of ice, snow or sleet; (12) accidental discharge or overflow of water or steam; (13) sudden or accidental tearing apart, cracking, burning or bulging of certain types of building systems; (14) freezing; (15) sudden and accidental damage from artificially generated electrical current; and (16) volcanic eruption. (*Id.* at 10-11.)

Respectfully submitted:

HAILEY, McNAMARA, HALL,
LARMANN & PAPALE, L.L.P.

By: _____

JOHN T. CULOTTA, #17272
DARREN A PATIN, #23244
JOSEPH L. SPILMAN, III, #17813
MACKENZIE L. DISMORE, #32428
One Galleria Boulevard, Suite 1400
Post Office Box 8288
Metairie, Louisiana 70011-8288
Tel.: (504) 836-6500
*Counsel for Defendant Louisiana Citizens
Property Insurance Corporation*

and

LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD

By: _____

RALPH S. HUBBARD, III, #7074
SETH A. SCHMEECKLE, #27076
601 Poydras Street, Suite 2775
New Orleans, Louisiana 70130
Tel: (504) 568-1990
*Counsel for Defendant Louisiana Citizens
Property Insurance Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon all counsel of

record on this _____ day of March, 2010 by:

___ placing same in the U.S. Mail postage prepaid and properly addressed,
___ delivering by hand,
___ facsimile, and/or
___ e-mail

_____

24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

STATE OF LOUISIANA

NO.: 676-185

DIVISION "P"

TERRENCE M. ROSS AND RHONDA B. ROSS

VERSUS

C. ADAMS CONSTRUCTION AND DESIGN, LLC, STATE FARM MUTUAL
INSURANCE COMPANY AND LOUISIANA CITIZENS PROPERTY
INSURANCE COMPANY

FILED:_____                    _____

                                                           DEPUTY CLERK

## MEMORANDUM IN OPPOSITION TO CITIZENS' CROSS-MOTION FOR SUMMARY JUDGMENT

MAY IT PLEASE THE COURT:

Plaintiffs Terrence and Rhonda Ross respond to the lengthy summary judgment memorandum of Louisiana Citizens Property Insurance Corporation in hopes of assisting the Court by clarifying the issues necessary to decision.[1]

Importantly, both sides agree that the essential material facts are undisputed, and that the question of insurance coverage is a matter of law ripe for decision by the Court.

While Citizens' memo references a large number of reported cases, not a single one of the cited cases involve Chinese drywall. Most of the cases cited by Citizens are from other jurisdictions and are without precedential value in Louisiana. There can be no room for dispute that Louisiana law controls the interpretation of the policy issued for delivery in Louisiana by a Louisiana insurer to a Louisiana resident, covering Louisiana property.

Although the issues presented by this motion are of vital concern to the many homeowners in Jefferson Parish and elsewhere who have found their properties afflicted by the effects of Chinese drywall, when the Ross' motion was filed undersigned counsel was not aware of any decisions

---

[1] Louisiana Citizens has filed a consolidated memorandum both opposing the Ross' summary judgment and purporting to file a cross-motion for summary judgment. Although the cross-motion was filed and served too late under La. CCP 966(B), this opposition is submitted in order to permit the cross-motion to be considered at the April 5, 2010 hearing.

IMAGED FEB 31 '10

relating to insurance coverage for the resulting damages.  Thousands of homeowners have been financially stymied from remedying Chinese drywall problems by the stonewalling effect of coverage denials by their homeowners' insurers, just as attempted by Citizens in this case.  It was thought that this case could be the first to pierce the spurious defenses the insurers pled in order to avoid paying Chinese drywall claims arising under the policies for which they charged and gladly accepted exorbitant premiums.

But, the Civil District Court for the Parish of Orleans has beaten this Court to the punch.  Attached as Exhibits I and J are the March 22, 2010 judgment and reasons in the Chinese drywall case of Finger v. Audubon Insurance Company, No. 09-8071, deciding the identical issues in favor of the homeowner and against the insurer.

Citizens' memo mentions six separate policy provisions[2] which are variously contended to present coverage issues.  A quick explanation of the referenced policy provisions and controlling Louisiana jurisprudence reveals that the policy provides coverage for the Ross' claim.

The Ross' Citizens policy incorporates a coverage part that is commonly referred to as the Homeowners-3 or HO-3, a 22 page ISO form bearing number HO 00 03 10 00.  Under Coverage A-Dwelling, Louisiana Citizens argues that the Ross' replacement of the Chinese drywall itself is not covered, since it does not fall within the grant of coverage: "We insure against risk of direct physical loss to property described in Coverages A and B." (Page 8 of 22.)  Citizens argues that the drywall itself is not damaged as it allegedly did not sustain a "direct physical loss." (Citizens' Memo at p. 1.)  This is incorrect, for two reasons.  First, Citizens concedes that the wires and plumbing inside the walls are damaged and require replacement.  It is obviously necessary to remove or cut into the drywall in order to gain access to the wiring and plumbing, such that replacement of the drywall is part of the job of replacing the damaged wiring and plumbing.

---

[2] Citizens' initial reservation of rights communication dated March 20, 2009 (Exhibit "C" to the Ross' Summary Judgment Memo) referenced only Exclusion B.3: defective workmanship/materials.  The subsequent denial of April 29, 2009 (Exhibit "D" to the Ross' Summary Judgment Memo) referenced only the pollution exclusion, c.(6)(e).  A subsequent letter from Citizens' attorneys dated June 23, 2009 (Exhibit "F" to the Ross' Summary Judgment Memo) referenced the pollution exclusion, plus c.(6) exclusions for deterioration, latent defect and corrosion, plus the B.3 faulty materials/maintenance.

2

CMC-185

Secondly, the off-gassing process constitutes "direct physical loss" as required by the policy. "Direct physical loss" is not a defined term within the policy. The process by which elemental sulphur and strontium migrate from within the drywall product upon exposure to ordinary levels of humidity and heat to form hydrogen sulfide and other naturally-occurring chemical compounds can only result from a direct physical loss to the drywall, as the elemental sulphur and strontium move from the drywall into the atmosphere of the home.[3] These compounds result in the formation of copper sulfide, silver sulfide or similar compounds upon exposure to metal surfaces within the home. If the chemical components of the drywall remained within the drywall product, there would be no direct physical loss and there would be no resulting damage to the other components of the home. The physical migration of chemical components of the drywall from inside the drywall to the atmosphere clearly constitutes a direct physical loss to a component of the insured dwelling.

The HO-3 policy form enumerates nine specific exclusions which apply to the dwelling coverage, at pages 11-12 of 22. Louisiana Citizens does not contend that any of these Section I - Exclusions A apply to defeat coverage for the Ross claim.

However, Citizens contends that several other exclusions appearing on page 9 of 22, at Section I A2c.(6) do apply. These begin with c.(6)(b) for loss caused by: any of the following: (b) "mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself; . . .".

By its own terms, this exclusion does not apply to the drywall, since the drywall does not actually destroy itself in the off-gassing process. As noted by Citizens (Memo at p. 8), the drywall continues to function as a wall even as it emits the sulfide compounds which damage the other metal components of the home. The quality of the drywall does not cause it to destroy itself, but to damage other property in the home. The Finger court's Reasons for Judgment arrive at the same conclusion. Exhibit J, Paragraphs 21-23, 25-26.

---

[3] Some of the chemical reactions involved in off-gassing from Chinese drywall are described in the attached Exhibit "H", a January 28, 2010 publication by the Consumer Product Safety Commission entitled Interim Guidance - Identification of Homes with Corrosion from Problem Drywall.

3

IMAGED MAR 3 1 '10

Louisiana Citizens next contends that the limitation at I A2c.(6)(c) for loss caused by "smog, rust or other corrosion, or dry rot;" applies. Here, the Ross' damage is not caused by corrosion; instead, it is the corrosion that is the loss. The _Finger_ court came to the same conclusion in rejecting the corrosion exclusion. Exhibit J, Paragraph 24.

Citizens next contends that the pollution exclusion set forth at I A2c.(6)(e) applies to bar coverage. Plaintiffs will not repeat the Supreme Court's exposition in Doerr v. Mobil Oil Corporation, 2000-0947 (La. 12/19/00), 774 So.2d 119, to the effect that this exclusion is intended to apply only to environmental damage caused by active industrial polluters. Plaintiffs observe that Citizens' ultimate rejoinder to the applicability of _Doerr_ is a contention that _Doerr_ was wrongly decided by the Supreme Court. (Citizens' Memo at p. 24.) If that is so, it is an error which can only be corrected by the Supreme Court. The _Finger_ court concluded that the pollution exclusion does not, and was never intended, to apply to residential homeowners' claims for damages caused by substandard building materials. Exhibit J, Paragraphs 18-20.

Another reason that the three above coverage limitations within c.(6) do not bar coverage for a Chinese drywall claim is that they are limited by the exception to c.(6) at pages 9-10. This states that "any ensuing loss" to property, not precluded by another policy provision, remains covered for these hazards. That is, the latent defect, corrosion and pollution exclusions on which Citizens relies do not apply to defeat coverage for the ensuing loss to metallic components, by the clear language of the policy.

Citizens next relies on an exclusion for defective materials, which is contained within Section I - Exclusions B. The exclusions within this section, unlike the nine enumerated exclusions in Section I - Exclusions A, apply only to direct loss to property, and do not apply to ensuing loss to property. That is, the damaged property is not covered, but other property which suffers loss as a result of the problem with the damaged property is covered. Section I - Exclusion B(3) precludes coverage for the following, but not any ensuing loss: faulty, inadequate or defective: . . . (c) materials used in repair, construction, renovation or remodeling; . . .". (Page 12 of 22.) Under this provision, coverage is not provided in the event that the insured utilizes faulty materials in repair,

4

IMAGED MAR 3 1 '10

W710-185

construction or renovation.  Ensuing loss as a result of the use of the faulty material would be covered.

This provision does not apply to our case because the insured did not utilize any materials, for repair, construction, renovation or otherwise.  Instead, the insured purchased an entire residence, which happened to consist in part of the off-gassing Chinese drywall.  The Chinese drywall was already in place, just like the roof and the windows, when the Rosses bought their HO3 policy from Citizens.  Thus, damage to the drywall remains a covered claim.  By its own terms, this provision does not bar coverage for the ensuing loss to metal components within the home.  (This ground for coverage, or reason not to apply the exclusion, was not addressed by the Finger court, since the Finger homeowner did not buy an intact home already containing Chinese drywall.)

The Finger court instead concluded that the "defective materials" exclusion (which is part of a "Faulty, Inadequate or Defective Planning" exclusion in the Audubon policy, almost identical to Exclusion B.3 in the HO3 form) does not apply because the Chinese drywall is not defective.  Exhibit J, Paragraphs 26-28.  The Finger court reasoned that the Chinese drywall is not defective because it continues to perform as intended for the purpose of drywall, which function is not impaired by the problem of off-gassing.

Finally, Citizens seeks to avoid coverage for the contents of the Ross' home, as distinguished from the components of the home.  This coverage for these items comes under Section I - Coverage C - Personal Property.  The policy states (page 3 of 22) "we cover personal property owned or used by an "insured" while he is anywhere in the world."  As noted at page 10 of 22, damage to personal property described in Coverage C must result from one of the sixteen specified perils listed at pages 10-11 of the HO-3 policy form.  Included among these is Peril 7, Smoke: "This peril means sudden and accidental damage from smoke, including the emission or puff back of smoke, soot, fumes or vapors from a boiler, furnace or related equipment."  "Smoke" is not a defined term in the policy.  Webster's New Collegiate Dictionary defines "smoke" as:

> 1a: The gaseous products of burning carbonaceous materials made visible by the presence of small particles of carbon
>
> b: A suspension of particles in a gas

5

IMAGED MAR 3 1 '10

There can be no question that the elemental sulphur and strontium emitted by off-gassing Chinese drywall into the air of the home constitute a suspension of particles in a gas, thereby coming within the peril of "smoke" as an insured peril under the Citizens policy. Strontium burns on exposure to air. To the extent that the policy can be interpreted two ways, depending upon the varying definitions of smoke set out in the dictionary, the policy is ambiguous. Where a policy provision can reasonably be interpreted in two different ways, the Court is required to choose the interpretation which expands coverage in favor of the insured, rather than the one which restricts coverage in favor of the insurer. Yount v. Maisano, 627 So.2d 148 (La. 1993).

The Finger decision simply affirms that the various exclusions within a standard homeowners policy do not apply to bar coverage for claims arising from Chinese drywall damages, as a matter of Louisiana law. This is exactly what the Rosses contended in their motion for summary judgment. Citizens cannot carry its burden of proving that any of the exclusions apply. The Court should grant the Ross' motion and deny the cross-motion of Louisiana Citizens.

Respectfully submitted:

KEVIN O'BRYON (LSBA 10151)
O'Bryon & Schnabel, PLC
1010 Common Street
Suite 1950
New Orleans, LA 70112
Telephone: (504) 799-4200
Facsimile: (504) 799-4211

CERTIFICATE OF SERVICE
I do hereby certify that I have on this 31ˢᵗ day of ___March___, 20 10 served a copy of the foregoing pleading on counsel for all parties to this proceeding, by mailing the same by United States mail, properly addressed, and first class postage prepaid.

6

IMAGED MAR 3 1 '10

**Interim Guidance – Identification of Homes with Corrosion from Problem Drywall** [1]
by the Consumer Product Safety Commission
and the Department of Housing and Urban Development
January 28, 2010
Executive Summary

**EXHIBIT**
H

This preliminary identification guidance represents what the Federal Interagency Task Force on Problem Drywall believes is the best approach based on the limited information available today. This identification guidance is based primarily on the presence of metal corrosion in homes as well as other indicators of problem drywall.  Additional work will continue to validate these methods and the identification guidance will be modified as necessary.

**Identification Method**
The identification process is two steps: (1) an initial or threshold inspection to find visual signs of metal corrosion and evidence of drywall installation during the relevant time period, and (2) the identification of corroborating evidence or characteristics.

**Step 1: Threshold Inspection**
Visual inspection [2] must show:
    (a) Blackening of copper electrical wiring and/or air conditioning evaporator coils; and
    (b) The installation of new drywall (for new construction or renovations) between 2001 and 2008.
A positive result for this step (including both criteria) is a prerequisite to any further consideration.

**Step 2: Corroborating Evidence**
Because it is possible that corrosion of metal in homes can occur for other reasons, it is important to obtain additional corroborating evidence of problem drywall. Homes with the characteristic metal corrosion problems must also have at least 2 of these corroborating conditions if the new drywall was installed between 2005 and 2008. For installations between 2001 and 2004, at least 4 of the following conditions must be met. Collecting evidence of these corroborating conditions will in some cases require professional assessors and/or testing by analytical laboratories.

    (a) Corrosive conditions in the home, demonstrated by the formation of copper sulfide on copper coupons (test strips of metal) placed in the home for a period of 2 weeks to 30 days or confirmation of the presence of sulfur in the blackening of the grounding wires and/or air conditioning coils;
    (b) Confirmed markings of Chinese [3] origin for drywall in the home;
    (c) Strontium levels in samples of drywall core found in the home (i.e. excluding the exterior paper surfaces) exceeding 1200 parts per million (ppm);
    (d) Elemental sulfur levels in samples of drywall core found in the home exceeding 10 ppm;
    (e) Elevated levels of hydrogen sulfide, carbonyl sulfide and/or carbon disulfide emitted from samples of drywall from the home when placed in test chambers using ASTM Standard Test Method D5504-08 or similar chamber or headspace testing [4];
    (f) Corrosion of copper metal to form copper sulfide when copper is placed in test chambers with drywall samples taken from the home.

---

[1] This is a staff document, and has not been reviewed or approved by, and may not necessarily reflect the views of, the Commission or the Department.
[2] For example, the Florida Department of Health's Self-Assessment Guide on signs that a home may be affected by drywall associated corrosion (http://www.doh.state.fl.us/environment/community/indoor-air/inspections.html) has questions that may be helpful; mention in this guidance of this or other references does not imply endorsement.
[3] This does not imply that all Chinese drywall or that only Chinese drywall is associated with these problems, but that among homes with the characteristic corrosion, Chinese drywall is a corroborating marker for the characteristic problems.
[4] ASTM International. Standard D5504-08: Standard Test Method for Determination of Sulfur Compounds in Natural Gas and Gaseous Fuels by Gas Chromatography and Chemiluminescence, 2008. http://www.astm.org/Standards/D5504.htm. Subsequent revisions by ASTM of this standard will be considered to be "similar chamber or headspace testing" methods.

IMAGED MAR 3 1 '10

WGC-185

## Detailed Description

### Introduction

This preliminary identification guidance represents what the Federal Interagency Task Force on Problem Drywall believes is the best approach based on the limited information available today. We recognize that important additional guidance is still needed to clarify qualifications for inspectors and test laboratories and to describe methods for making the measurements in the criteria defined herein. This interim identification guidance is being released in recognition of the immediate need of homeowners for this information. Consumers should exercise caution in contracting for testing, and should be diligent in confirming the references, qualifications, and background of individuals and firms that offer such testing[5]. Scientific investigations have moved as quickly as possible to understand the complex problems presented by the issue of Chinese[6] drywall. The scientific work completed to date by the Federal Interagency Task Force has been essential to building the foundation for decision-making by homeowners and local, state and federal authorities.[7] The investigation continues on several fronts to expand our understanding of this issue – but the Task Force believes that current information is sufficient to develop interim guidance on how to identify homes with problems associated with this drywall.

Findings have shown a strong association between the presence of problem drywall and metal corrosion in homes. The results of investigations reported by the Federal Interagency Task Force provide criteria and indicators for identifying those homes. The Task Force developed this preliminary guidance document based on these findings.

This identification guidance is based primarily on the presence of metal corrosion in homes as well as other indicators of problem drywall. It is possible to misclassify homes because of other possible sources of metal corrosion such as volatile sulfur compounds from sewer gas, well water, and outdoor contaminants that may enter the home independent of the drywall in the home. Homes may also be misclassified as having no drywall problem due to the absence of characteristics found to be typical in the limited testing to date. Given these limitations, additional work will continue to validate these methods and the identification guidance will be modified as necessary.

### Identification Method

The identification process will be two steps: (1) an initial or threshold inspection to find visual signs of metal corrosion and evidence of drywall installation in the relevant time period, and (2) the identification of corroborating evidence or characteristics.

### Step 1: Threshold Inspection

A visual inspection shall seek to identify blackening of copper electrical wiring and/or air conditioning evaporator coils (or documentation of replacement of evaporator coils due to blackened corrosion causing failure), and the installation of new drywall (for new construction or renovations) between 2001 and 2008. Meeting both criteria for this step is a prerequisite for further consideration.

---

[5] FTC Consumer Alert, "Defective Imported Drywall: Don't Get Nailed by Bogus Tests and Treatments", http://www.ftc.gov/bcp/edu/pubs/consumer/alerts/alt164.pdf, December 2009.
[6] The Interagency Task Force on Problem Drywall is conducting a broad investigation and its studies have included both Chinese and non-Chinese samples. While this work does reference "Chinese" drywall as a general term, we have not concluded that all Chinese-manufactured drywall may present corrosion or health issues, or that drywall made elsewhere will never present these issues.
[7] Reports and information released regarding Chinese drywall can be found at www.drywallresponse.gov.

IMAGED MAR 3 1 '10

**Rationale**

Visual observations of corrosion of air conditioning evaporator coils and/or electrical wiring by trained inspectors is believed to be a prerequisite for consideration of a home as having problem drywall. The Florida Department of Health has long included such corrosion as part of its definition of problem drywall homes[8,9]. It is appropriate to limit the dates to the relevant time period, as this corresponds to the vast majority of complaints received by the Consumer Product Safety Commission (CPSC), also much older homes could exhibit corrosion due to different sources acting over longer periods of time.

A CPSC contractor completed a detailed study of 51 homes in Florida, Louisiana, Virginia, Alabama, and Mississippi; the report was issued on November 23, 2009 and is available on www.drywallresponse.gov. This investigation included inspections of each home for the presence and extent of corrosion. Copper and silver metal test strips, called "coupons," were also placed in the home for 2 weeks to test the corrosive environment of each house. The copper and silver coupons showed significantly higher rates of corrosion in homes where complaints had been registered than in the control homes. The dominant types of corrosion on the coupons were copper sulfide and silver sulfide, respectively, as determined by additional laboratory tests. Copper sulfide and silver sulfide appear as a black coating on copper or silver metal. Visual inspection and evaluation of electrical (ground) wire corrosion also revealed statistically significant greater corrosion in complaint homes compared to the control homes.

**Step 2: Corroborating Evidence**

Because it is possible that corrosion of metal in homes can occur for other reasons, it is important to obtain additional corroborating evidence of problem drywall. Homes with the characteristic metal corrosion problems must also have at least 2 of these corroborating conditions if the new drywall was installed between 2005 and 2008. For installations between 2001 and 2004, at least 4 of the following conditions must be met. Collecting this corroborating evidence will in some cases require professional assessors and/or testing by analytical laboratories.

  (a) Corrosive conditions in the home, demonstrated by the formation of copper sulfide on copper coupons (test strips of metal) placed in the home for a period of 2 weeks to 30 days or confirmation of the presence of sulfur in the blackening of the grounding wires and/or air conditioning coils;
  (b) Confirmed markings of Chinese[10] origin for drywall in the home;
  (c) Strontium levels in samples of drywall core found in the home (i.e., excluding the exterior paper surfaces) exceeding 1200 parts per million (ppm);
  (d) Elemental sulfur levels in samples of drywall core found in the home exceeding 10 ppm;
  (e) Elevated levels of hydrogen sulfide, carbonyl sulfide and/or carbon disulfide emitted from samples of drywall from the home when placed in test chambers using ASTM Standard Test Method D5504-08 or similar chamber or headspace testing[11];
  (f) Corrosion of copper metal to form copper sulfide when copper is placed in test chambers with drywall samples taken from the home.

---

[8] Case Definition (03-31-09) for Premature Copper Corrosion in Residences Possibly Associated with the Presence of Imported Drywall from China.
[9] Case Definition (12-18-09) for Drywall Associated Corrosion in Residences, (http://www.doh.state.fl.us/ENVIRONMENT/COMMUNITY/indoor-air/casedefinition.html.)
[10] This does not imply that all Chinese drywall or that only Chinese drywall is associated with these problems, but that among homes with the characteristic corrosion, Chinese drywall is a corroborating marker for the characteristic problems.
[11] ASTM International. Standard D5504-08: Standard Test Method for Determination of Sulfur Compounds in Natural Gas and Gaseous Fuels by Gas Chromatography and Chemiluminescence. 2008. http://ww.astm.org/Standards/D5504.htm. Subsequent revisions by ASTM of this standard will be considered to be "similar chamber or headspace testing" methods.

IMAGED MAR 3 1 '10

Ce7e-185

### Rationale

The Federal Interagency Task Force's study of the elemental and chemical composition of 17 drywall samples shows higher concentrations of elemental sulfur and strontium in Chinese drywall than in non-Chinese drywall.[12] Additionally, the 51-home study (41 homes with reported problems and 10 control homes) also found a correlation between elevated strontium levels and problem homes.[13] Additional studies have also found sulfur and strontium to be associated with problem drywall homes. Thus, the presence of elevated levels of either elemental sulfur or strontium is believed to be corroborating evidence for homes with problem drywall.

The 51-home study and the preliminary corrosion reports[14,15] also found that the type of corrosion present on copper coupons and copper electrical wire and air conditioning evaporator coils was copper sulfide. Thus, the confirmation of copper sulfide or sulfur in the corrosion of the copper (and similarly silver sulfide or sulfur in the corrosion on silver coupons) is believed to be a corroborating marker.

Chinese drywall installed in the affected period has been associated with the types of corrosion problems reported. This does not imply that all Chinese drywall or that only Chinese drywall is associated with these problems, but that among homes with the characteristic corrosion, Chinese drywall is a corroborating marker for the characteristic problems. It is not absolutely necessary for the markings to be found as in some cases Chinese drywall does not have markings indicating nation of origin.

Additionally, the preliminary results reported for the study underway at the Lawrence Berkeley National Laboratory indicated that higher levels of total volatile sulfur compounds were released by Chinese drywall samples compared to domestic drywall samples, and the fifty-one home study reported an association between hydrogen sulfide levels in homes and corrosion in those homes. Thus it is believed that one of the possible corroborating tests which could be considered is emissions testing from suspect drywall from homes. Another similar corroborative test that could be considered is determining if corrosion of copper metal to form copper sulfide occurs when copper is placed in test chambers with drywall from the home at elevated humidity. Chamber tests may be costly and time consuming options.

### Continuing Development of this Guidance

We will incorporate future findings as appropriate to improve upon this preliminary guidance. More information on problem drywall is available at the federal Drywall Information Center website, www.drywallresponse.gov.

---

[12] Statistical Analysis of the Chemical Screening of a Small Sample of Unused Chinese and non-Chinese Drywall, October 30, 2009, http://www.cpsc.gov/info/drywall/TabA.pdf.
[13] U.S. Consumer Product Safety Commission Staff Summary of Contractor's Indoor Air Quality Assessment of Homes Containing Chinese Drywall, November 23, 2009, http://www.cpsc.gov/info/drywall/51homeStudy.pdf.
[14] Status Report on the Preliminary Analysis of HVAC, Gas Distribution, and Fire Safety Equipment Installed in Homes with Chinese Drywall, November 23, 2009, http://www.cpsc.gov/info/drywall/PrelimHVACGasDistFireSyst.pdf.
[15] Interim Report on the Status of the Analysis of Electrical Components Installed in Homes with Chinese Drywall, November 23, 2009, http://www.cpsc.gov/info/drywall/prelimelectrical.pdf.

IMAGED MAR 3 1 '10

4

EXHIBIT
I

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

No. 09-8071

DIVISION "

SIMON FINGER AND REBECCA FINGER

-VERSUS-

AUDUBON INSURANCE COMPANY

FILED: _____          _____
                                    DEPUTY CLERK

### JUDGMENT

This matter came for hearing on March 12, 2010 on the Plaintiffs' Motion to Strike and Defendant's Motion for Sanctions and Motion to Quash;

APPEARING WERE:

Allan Kanner, Esquire, Melissa M. Fuselier, Esq., Hugh Lambert, Esq., Cayce Peterson, Esq. and Soren Giselson, Esq., for Plaintiffs, Simon and Rebecca Finger, and

Andrew A. Braun, Esq. and Margaret L. Sunkel, Esq. for Defendant, Audubon Insurance Company.

After consideration of the arguments of counsel and the briefs filed by the parties, the Court GRANTS Plaintiffs' Motion to Strike and DENIES Defendant's Motion for Sanctions and Motion to Quash as follows:

IT IS HEREBY ORDERED, JUDGED AND DECREED that Plaintiffs' Motion to Strike is GRANTED and pursuant to the plain language of the Audubon policy, Louisiana law governing insurance, and the undisputed facts, Audubon's affirmative defenses of the "Pollution or Contamination," "Gradual or Sudden Loss" and "Faulty, Inadequate or Defective Planning" are hereby stricken as affirmative defenses.

IT IS HEREBY ORDERED, JUDGED AND DECREED that the "Pollution or Contamination" exclusion which reads:

1.        Pollution or Contamination

We do not cover any loss, directly or indirectly, regardless of any cause or event contributing concurrently or in any sequence to the loss, caused by the discharge, dispersal, seepage, migration or release or escape of pollutants. Nor do we cover the cost to extract pollutants from land or water, or the cost to remove, restore, or replace polluted or contaminated land or water. A "pollutant" is any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and "waste." A "contaminant" is an impurity resulting from the

 

mixture of or contact with a foreign substance.   "Waste" includes materials to be disposed of, recycled, reconditioned or reclaimed.

in the Audubon policy is hereby stricken as an affirmative defense.

IT IS HEREBY ORDERED, JUDGED AND DECREED that the "Gradual or Sudden Loss" exclusion which reads:

> 2.          Gradual or Sudden Loss
>
> We do not cover any loss caused by gradual deterioration, wet or dry rot, warping, smog, rust or other corrosion. In addition, we do not cover any loss caused by inherent vice, wear and tear, mechanical breakdown or latent defect. However, we do insure ensuing covered loss unless another exclusion applies.

in the Audubon policy is hereby stricken as an affirmative defense.

IT IS HEREBY ORDERED, JUDGED AND DECREED that the "Faulty, Inadequate or Defective Planning" exclusion which reads:

> 8.  Faulty, Inadequate or Defective Planning
> We do not cover any loss caused by faulty, inadequate or defective:
> a.   Planning, zoning, development, surveying, siting;
> b.   Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> c.   Materials used in repair, construction, renovation or remodeling, grading or compaction; or
> d.   Maintenance; of part or all of any property whether on or off the residence. However, we do insure ensuing covered loss unless another exclusion applies.

in the Audubon policy is hereby stricken as an affirmative defense.

IT IS HEREBY ORDERED, JUDGED AND DECREED that Defendant's Motion for Sanctions is DENIED.

IT IS HEREBY ORDERED, JUDGED AND DECREED that Defendant's Motion to Quash is DENIED.

Signed this 22ⁿᵈ day of _____ Mar _____, 2010.

_____
JUDGE LLOYD MEDLEY

IMAGED MAR 3 1 '10

-2-

69 6-185

EXHIBIT
J

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

No. 09-8071

DIVISION "D-16"

SIMON FINGER AND REBECCA FINGER

-VERSUS-

AUDUBON INSURANCE COMPANY

FILED: _____

_____
DEPUTY CLERK

## REASONS FOR JUDGMENT

This matter was brought before the Court on Plaintiffs, Simon and Rebecca Fingers ("the Fingers") Motion to Strike and Audubon Insurance Company's ("Audubon")'s Motion for Sanctions and Motion to Quash.  Appearing were: Allan Kanner, Melissa M. Fuselier, Hugh Lambert, Cayce Peterson and Soren Giselson for the Fingers; and Andrew A. Braun and Margaret L. Sunkel for Audubon.  The parties briefed the issues and presented oral argument on March 12, 2010.  For the following reasons, this Court grants the Fingers' Motion to Strike, denies Audubon's Motion for Sanctions and denies Audubon's Motion to Quash.

1.    The Fingers purchased Audubon's homeowners policy number AIG PCG 0001243490 for the policy period March 2009-March 2010. (*See* Petition, ¶ 4; Audubon's Original Answer ¶ 4; Audubon's Amended Answer ¶ 4).

2.    On June 11, 2009 the Fingers filed a claim under the Audubon policy. (*See* Petition ¶ 8; Audubon's Original Answer ¶ 8; Audubon's Amended Answer ¶ 8).

3.    On July 16, 2009, Audubon denied in writing the Fingers' claim. (*See* Petition ¶ 11; Audubon's Original Answer ¶ 11; Audubon's Amended Answer ¶ 11).

4.    Audubon's letter of denial contained a list of three policy exclusions on which it relied to deny the Fingers' claim: (1) the pollution ("POL") exclusion, (2) the gradual or sudden loss ("GSL") exclusion and (3) the faulty, inadequate or defective planning ("FIDP") exclusion. (*See* Ex. C to Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment).

5.    Audubon utilized the three exclusions as affirmative defenses in Audubon's Answer filed on October 5, 2009. (*See* Audubon's Original Answer ¶ 3, 4 and 5).

6.    The Fingers filed a Motion for Partial Summary Judgment on November 3, 2009, addressing Audubon's defenses based on these three exclusions.  The matter was fully briefed

IMAGED MAR 3 1 '10

-1-

and argued, and the Court denied the Fingers' Motion on January 15, 2010 as premature. (*See* Order Denying Summary Judgment and the Court's January 15, 2010 transcript).

7.    After the filing of the Fingers' Motion for Partial Summary Judgment and after the deposition of Audubon's corporate representative Kathleen Spinella, Audubon filed its Amended Answer, omitting its POL exclusion as an affirmative defense. (*See* Audubon's Amended Answer ¶ ¶ 1, 2, 3 & 4). In its Opposition to Plaintiffs' Motion for Partial Summary Judgment, Audubon argued that it did not intend to re-assert this defense. (*See* Audubon Insurance Company's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment). However, since the pollution exclusion remains a part of the current case as a reason for Audubon's denial of the Fingers' claim, the Court will address all three exclusions under La. C. C. P. Art. 964.

## LOUISIANA LAW GOVERNING INSURANCE

8.    In reviewing the exclusions that Audubon pled as affirmative defenses, the Court is aware of certain governing principles of Louisiana law.

9.    Louisiana courts adhere to the general principle that "when the language in an insurance contract is clear and unambiguous the agreement must be enforced as written." *Cent. La. Elec. Co. v. Westinghouse Elec. Corp.*, 579 So.2d 981, 985 (La. 1991).

10.    Interpretation of an insurance contract is generally a question of law. *Brown v. Drillers, Inc.*, 93-1019 (La. 1994), 630 So.2d 741, 749-750; *Munsch v. Liberty Mutual Ins. Co.*, 2005-0147 (La. App. 1st Cir. 2/10/06), 928 So.2d 608, 613.

11.    Audubon admitted in its Answer that "the policy speaks for itself." (See Audubon's Original Answer ¶ 5; Audubon's Amended Answer ¶ 5). Audubon's designated corporate representative, Kathleen Spinella ("Spinella"), testified during her 1442 deposition that "the policy speaks for itself." Spinella stated: "the policy spoke for itself." (*See* Spinella Deposition, p. 58:22-25).

12.    As a general rule, insurance policies should be interpreted to effect, not deny, coverage. *Breland v. Schilling*, 550 So.2d 609-611 (La. 1989); *Reynolds v. Select Properties, Ltd.*, 93-1480 (La. 4/11/94), 634 So.2d 1180, 1183; *In re Katrina Canal Breaches Consolidated Lit.*, 495 F.3d 191, 207-208 (E.D. La. 2007); *Holden v. Conne-Metalna*, 2001 WL 40994 *2 (E.D. La. 1/16/01).

IMAGED MAR 3 1 '10

-2-

(o)(l-181-

13.    If the language of the insurance contract is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied. *Garcia v. St. Bernard Parish School Bd.*, 576 So.2d 975, 976 (La. 1991); *Carney v. America Fire & Indemnity Co.*, 371 So.2d 815, 818 (La. 1979); 15 W.McKenzie and H. Johnson, <u>Louisiana Civil Law Treatise, Insurance Law and Practice</u> § 2 (1986). Spinella admits this fact during her deposition when she stated:

> Q: I said, given your experience in working with insureds and how they might interpret or understand the policy, do you think that a person would read this and think that they would need to buy additional coverage to cover Chinese drywall?
>
> A: It would depend on the person. If I read it, I would know it. I'm a person. There's other persons that may not.

(*See* Spinella Deposition, pp. 72:24-73:6).

14.    The Fingers alleged in their Petition for Damages that the Audubon policy is an all-risk policy. (See Petition, ¶ 7). Audubon answered that the policy speaks for itself. (See Audubon's Original Answer, ¶ 7; Audubon's Amended Answer ¶ 7). In Audubon's July 16, 2009 denial letter to the Fingers, Audubon cited its policy's insuring agreement, "This policy covers you against all risks of direct physical loss or damage to your house, contents and other permanent structures unless an exclusion applies." (*See* Ex. C to Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment).

15.    Audubon's policy is an "all risk" policy. An "all risk" policy is an insurance policy which covers all risks unless clearly and specifically excluded. *Young v. United States Automotive Ass'n Cas. Co.*, 2007-1590 (La. App. 4th Cir. 6/10/09), 15 So.3d 327, 329. Under Louisiana law, it is the insurance company's burden to prove that a loss comes within a policy exclusion. *Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250, 1252 (La. 1993). An insured who owns an "all risk" insurance policy has a "very light" burden and must only show that damage to the insured's property occurred. *Walker v. Travelers Idem. Co.*, 289 So.2d 864, 872 (La. App. 4th Cir. 1974), *citing* ARNOLD COUCH ON INSURANCE, 13th ed. § 48:139; *Dawson Farms, L.L.C. v. Millers Mutual Fire Ins. Co.*, 34,801 (La. App. 2nd Cir. 8/1/01) 794 So.2d 949, 951; *Cochran v. Travelers Ins. Co.*, 606 So.2d 22, 24 (5th Cir. 1992).[1]

---

[1] "Generally, an 'all risk' insurance policy creates a special type of coverage extending to risks not usually covered under other insurance, and recovery under an 'all risk' policy will, as a rule, be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." *Walker*, 289 So.2d at 868.

IMAGED MAR 3 1 '10



16.    Exclusions are strictly construed, and the insurer generally has the burden of proving the applicability of the exclusion. *Garcia*, 576 So.2d at 976; *Chambers v. First Nat. Life. Ins. Co. of New Orleans*, 253 So.2d 636, 638 (La. App. 4th Cir. 1971). Once the property owner establishes that a loss occurred, the burden shifts to the insurer to establish an applicable exclusion under the terms of the policy. *Walker*, 289 So.2d at 871; *Myevre v. Continental Cas. Co.*, 245 So.2d 785, 786-787 (La. App. 4th Cir, 1971). It is the insurer who bears the burden of proving the applicability of any exclusionary clause within any policy. *Blackburn v. National Union Fire Ins. Co. of Pittsburgh*, 2000-2668 (La. 2001), 784 So.2d 637, 641; *Veade v. Louisiana Citizens Property Ins. Com.*, 2008-0251 (La. App. 4th Cir. 2008); 985 So.2d 1275, 1279; *Dickerson v. Lexington Ins. Co.*, 2009 WL 130207 (5th Cir. 1/21/09); *Grilletta v. Lexington Ins. Co.*, 2009 WL 294934 (5th Cir. 1/8/09); *Ponchartrain Gardens, Inc. v. State Farm General Ins. Co.*, 2009 WL 86671 (E.D. La. 1/13/09). Audubon agrees. Spinella testified that:

> Q: Do you agree that the burden is on the insurer to show that a damage is excluded?
>
> MR. FRANK: Was that the end of it?
> MR. CASEY: Yes.
>
> MR. FRANK: Objection to the extent it calls for a legal conclusion. If you know, you can go ahead and answer.
>
> A: I am pretty sure that that's the way — I mean that we usually, if we feel something is not covered, we document why and explain it. That would be what we would do.

(*See* Spinella Deposition, p. 68:10-21).

17.    Exclusions must be interpreted as narrowly as possible in order to provide maximum coverage for the insured. *Crutchfield v. Landry*, 1999-2822 (La. App. 4th Cir. 3/15/00), 757 So.2d 858, 860-861. Any ambiguity in an exclusion should be narrowly construed in favor of coverage. *Yount v. Maisano*, 627 So.2d 148, 151 (La. 1993).

### AUDUBON'S POLICY EXCLUSIONS

18.    The POL exclusion language in the Fingers' Audubon policy provides as follows:

1.    Pollution or Contamination

We do not cover any loss, directly or indirectly, regardless of any cause or event contributing concurrently or in any sequence to the loss, caused by the discharge, dispersal, seepage, migration or release or escape of pollutants. Nor do we cover the cost to extract pollutants from land or water, or the cost to remove, restore, or replace polluted or contaminated land or water. A "pollutant" is any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and "waste." A "contaminant" is an impurity resulting from the

IMAGED MAR 3 1 '10

-4-

C716·1E5

mixture of or contact with a foreign substance.  "Waste" includes materials to be disposed of, recycled, reconditioned or reclaimed.

(*See* Audubon Policy, Part II, Section D(1), FING 0223).

19.    The POL exclusion does not, and was never intended, to apply to residential homeowners claims for damages caused by substandard building materials. *Doerr v. Mobil Oil Corporation*, 2000-0947 (La. 12/19/00), 774 So.2d 119, 134; *State Farm Fire Ins. Co. v. MLT Construction Co.*, 2002-1811 (La. App. 4th Cir. 6/4/03), 849 So.2d 762, 770.  The Louisiana Department of Insurance determined that a "pollution incident" under a pollution exclusion in homeowners' policies only refers to an incident which causes "environmental damage," or "injurious [to the environment, not the claimant] presence in an upon the land, the atmosphere, or any watercourse or body of water of solid, liquid, gaseous or thermal contaminants, irritants or pollutants." (*See* Advisory Letter No. 97-01 Commissioner of Insurance, State of Louisiana (June 4, 1997)).

20.    The fact that Chinese drywall releases various gases into the home is not sufficient to qualify as a "pollutant" under the pollution exclusion, which this Court interprets consistent with *Doerr v. Mobil Oil*. (*See* Mallet Affidavit, Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion to Strike and Opposition to Defendant's Motion for Sanctions, Ex. G).  Audubon acknowledged in its response to Plaintiffs' Motion for Partial Summary Judgment that its pollution exclusion was inapplicable and Audubon amended its Answer accordingly. (*See* Audubon Insurance Company's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment, I; Audubon's Amended Answer ¶¶ 1, 2, 3 & 4).  The Homeowners Amendatory Endorsement – Louisiana (PCHO-AELA (09/06) included in the Fingers' policy deletes the POL exclusion in its entirety. (*See* Plaintiffs' Memorandum in Support of Plaintiffs' Partial Motion for Summary Judgment, Ex. A).

21.    The GSL exclusion language in the Fingers' Audubon policy provides as follows:

2.    Gradual or Sudden Loss

We do not cover any loss caused by gradual deterioration, wet or dry rot, warping, smog, rust or other corrosion.  In addition, we do not cover any loss caused by inherent vice, wear and tear, mechanical breakdown or latent defect.  However, we do insure ensuing covered loss unless another exclusion applies.

(*See* Audubon Policy, Part II, Section D(2), FING 0223).

IMAGED MAR 3 1 '10

-5-

C09/10-1PS

22.     The GSL Exclusion is designed to exclude expected losses.  Wilson, Bill, ed.
*Forms & Substance-Coverage Concerns, Quirks and Solutions*, Independent Agent, May 2004 at
p. 12.  Coverage is required here because "the purpose of the policy is to secure an indemnity
against accidents which may happen, not against events which must happen."  *Boudreaux v.
Verret*, 422 So.2d 1167, 1172 (La. App. 3rd Cir. 1982); *Gulf Transp. Co. v. Fireman's Fund Ins.
Co.*, 83 So. 730, 733 (Miss. 1920).

23.     The Fingers' losses relate to the drywall off-gasing, not by wear, tear and/or
gradual deterioration.  (*See* Plaintiff's Memorandum in Support of Plaintiffs' Motion to Strike,
Ex. I).  Both Audubon's expert, Dr. Zdenek Hejzlar, and the Fingers' inspector, Al Mallet, agree
that the Fingers' damages are caused by the sulphurous gases emitting from the Chinese drywall.
(*See* Plaintiffs' Memorandum in Support of Partial Summary Judgment, Ex. B; Plaintiffs' Reply
to Defendants' Opposition to Plaintiff's Motion to Strike and Opposition to Defendant's Motion
for Sanctions, Ex. G).

24.     Audubon suggests that the phrase "rust or other corrosion" bars coverage.  This
position is rejected because the plain language of the GSL exclusion refers to: "any loss caused
by....rust or other corrosion."  (*See* Audubon Policy, Part II, Section D(2), FING 0223).  The
exclusion is intended to apply where corrosion, rust or the like is the cause of the property
damage; it is not designed to preclude coverage when the rust or corrosion is the damage itself.
*Trus Joint MacMillan v. Neeb Kearey*, 2000 WL 306654 (E.D. La. 2000).  Here, the corrosion
caused to the metals in the Fingers' home by the sulphurous gases released by the Chinese
drywall is the loss, not the cause of the loss, indicating the corrosion language of the Gradual or
Sudden Loss exclusion does not bar coverage.  (*See* Plaintiffs' Reply to Defendant's Opposition
to Plaintiffs' Motion for Partial Summary Judgment, I(B)).

25.     The GSL exclusion also refers to losses caused by an "inherent vice" or "latent
defect."  Audubon's insurance policy does not define these terms.  Black's Law dictionary defines
a latent, inherent, or hidden defect as: "a product imperfection that is not discoverable by
reasonable inspection."  See *Black's Law Dictionary*, 481 (9th ed. 2009).  Again, the Louisiana
jurisprudence, which is rooted in Maritime law, focuses on inevitable losses due deterioration of
the thing.  See ARNOLD COUCH ON MARITIME INSURANCE (11th ed) § 778.  The inherent vice or
latent defect exclusion applies to "a loss due to any quality in the property that causes property to
damage or destroy itself that results from something within the property itself as opposed to



some outside force." FC&S Online, *Processors Coverage Form, Insurance Services Office Non-filed IM Coverage*, December 2005, http://www.nationalunderwriterpc.com. First party policies typically exclude damages due to an inherent vice or latent defect in order to prevent the insurer from having to compensate the insured for property that "has its own shelf life and will eventually wear out or break down because of intrinsic quality or nature." Eugene Wollan, *Risks Not Taken*, John Liner Review 86, (Fall 2006). Here, there is no evidence that the Chinese drywall is damaging or destroying itself, indicating the "inherent vice" or "latent defect" language from the GSL exclusion does not apply. (*See* Plaintiff's Memorandum in Support of Plaintiffs' Motion to Strike, I). Audubon's expert report likewise does not evidence any damage to the drywall itself. (*See* Plaintiffs' Memorandum in Support of Partial Summary Judgment, Ex. B).

26.     One of the insidious characteristics of Chinese drywall is that, while it off-gases, it performs all of the expected functions of drywall, such as fire protection, sounds and heat insulation, holding paint on the walls and allowing for the hanging of picture frames and other wall mounted items. Spinella agreed that the drywall itself was not harmed and stated during her deposition that:

> Q: Were the damages to the Fingers; drywall itself direct or indirect?
>
> A: We found no damages to the drywall.
>
> Q: And were the damages to the Fingers' metallic components direct or indirect?
>
> A: We found those are a direct result of the gases emitted or given off by the drywall.

(*See* Spinella Deposition, p. 74:18-24).

27.     The FIDP exclusion language in the Fingers' Audubon policy provides as follows:

> 8.    Faulty, Inadequate or Defective Planning
> We do not cover any loss caused by faulty, inadequate or defective:
> a.    Planning, zoning, development, surveying, siting;
> b.    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> c.    Materials used in repair, construction, renovation or remodeling, grading or compaction; or
> d.    Maintenance; of part or all of any property whether on or off the residence. However, we do insure ensuing covered loss unless another exclusion applies.

(*See* Audubon Policy, Part II, Section D(8), FING 0223).

IMAGED MAR 3 1 '10                                    -7-                          

28.     Chinese drywall is not defective within the meaning of the FIDP exclusion. (*See* Plaintiff's Memorandum in Support of Plaintiffs' Motion to Strike II). Again, Audubon did not provide a useful definition of this exclusion in its contract. (*See* Audubon Policy, Part II, Section D(8), FING 0223). Interpreting the plain language of the Audubon policy, the Chinese drywall "defect" is not one that renders the drywall unable to perform the purpose of drywall. (*Id.*; *see also* Plaintiffs' Memorandum in Support of Partial Summary Judgment, III(C)). Indeed, it has not been alleged that the subject drywall would be defective in all geographies. The Chinese drywall here can still act as an aesthetic or "finishing" material for a home. Rather, the damage that the Chinese drywall causes is based upon a quality distinct from these roles. Audubon agrees. Spinella testified that:

> Q: Did Audubon investigate as to whether the drywall was installed correctly or incorrectly?
>
> A: No.
>
> Q: Is there a reason why they didn't investigate?
>
> A: It wasn't germane to the issue.
>
> Q: Why not?
>
> A: The question was whether the drywall was causing the problem itself, not whether it was hung correctly.

(*See* Spinella Deposition, pp. 78:22-79:6). Simon Finger testified that he did not consider the drywall "defective" and stated:

> Q: Okay. Do you consider that the off-gasing, while not a structural defect of fault in the drywall, is a defect or fault in the drywall?
>
> MR. KANNER: Object to the form of the question.
>
> THE WITNESS: I think the drywall off-gases. I don't—I don't — that is what I think. I don't—
>
> BY MR. FRANK: You don't consider that defective?
>
> A: No.
>
> Q: No?
>
> A: No.
>
> Q: You don't consider it faulty?
>
> A: No, because —
>
> Q: You think it's functioning properly?

IMAGED MAR 3 1 '10

A: As drywall, I think its functioning properly.

(*See* Simon Finger Deposition, pp. 88:22-89:16).

29.    This last statement suggests that Audubon's denial was primarily based on the POL exclusion. Audubon's expert report does not mention the need to address any issue other than the fact that the Chinese drywall is off-gasing and its consequences. (*See* Plaintiff's Memorandum in Support of Partial Summary Judgment, Ex. B). Audubon's expert report does not characterize the drywall as "defective." *Id.*

30.    In light of the Court's disposition of this matter, the Court need not address ensuing loss in any detail.[2]

31.    All exhibits and documents referenced herein are made part of the record. In addition, the entirety of Kathleen Spinella, Simon Finger and Rebecca Fingers' depositions will also be made part of the record.

IT IS HEREBY ORDERED, JUDGED AND DECREED THAT: The Fingers' Motion to Strike Audubon's affirmative defenses No. 3, the Gradual or Sudden Loss exclusion, and No. 4, the Faulty, Inadequate or Defective Planning exclusion, is hereby granted.  This Court also finds that the Pollution exclusion does not apply to the Fingers' claim.

IT IS HEREBY ORDERED, JUDGED AND DECREED THAT:
Audubon's Motion for Sanctions is hereby denied.

IT IS HEREBY ORDERED, JUDGED AND DECREED THAT: Audubon's Motion to Quash the depositions of Donna Jones, Bret Resweber and Zednek Hejzlar is hereby denied.

Dated: March 22 nd, 2010

_____
The Honorable Lloyd J. Medley

ENTERED ON MINUTES

MAR 2 3 2010

---

[2] Louisiana courts have permitted the ensuing loss provision to provide for coverage for damages resulting from a previous excluded loss. *See Tex-LA Properties v. South State Ins. Co.*, 514 So.2d 707, 710 (La. App. 2nd Cir. 1987); *Dawson*, 794 So.2d at 949; *Holden v. Connex-Metlana*, 2000 WL 1875338 *7-8 (E.D. La. 12/12/00); *Dawson*, 794 So.2d at 952; *Lake Charles Harbor & Terminal District v. Imperial Casualty & Indemnity Co.*, 857 F.2d 286, 288 (5th Cir. 1988).

IMAGED MAR 3 1 '10