# Exhibit B – *in globo*

Westlaw.

--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)
**(Cite as: 2010 WL 1257770 (E.D.Mich.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan,
Southern Division.
UNIVERSAL IMAGE PRODUCTIONS, INC., a/
k/a Universal Image, Plaintiff,
v.
The CHUBB CORPORATION, Chubb Group Of
Insurance Companies, Chubb & Son, Inc., New Jersey Corporations; and Federal Insurance Company,
an Indiana Corporation, Defendants.
**Case No. 06-12805.**

March 29, 2010.

**Background:** Insured sued insurer to recover for
losses to insured's commercial property. Insurer
filed three motions for summary judgment.

**Holdings:** The District Court, Julian Abele Cook,
Jr., J., held that:
(1) insured did not suffer a "direct physical loss"
within the meaning the policy, and
(2) insured could not recover for business interruption, abandoned property, fixtures and non-leased
areas.

Motions granted.

West Headnotes

**[1] Insurance 217 ⚖1806**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1806 k. Application of Rules of Contract Construction. Most Cited Cases
Michigan courts apply general rules of contract
construction when interpreting insurance policies.

**[2] Insurance 217 ⚖1808**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1808 k. Ambiguity in General. Most
Cited Cases

**Insurance 217 ⚖1822**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1822 k. Plain, Ordinary or Popular
Sense of Language. Most Cited Cases
Under Michigan law, when construing an insurance
policy, a court must seek to determine if its language is clear and unambiguous on its face, and
therefore, if the language within the policy is clear
and unambiguous, its terms and words should be
enforced by utilizing their plain and commonly understood meaning.

**[3] Insurance 217 ⚖1808**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1808 k. Ambiguity in General. Most
Cited Cases
Under Michigan law, when construing an insurance
policy, a court may not create an ambiguity where
none exists.

**[4] Insurance 217 ⚖2142(1)**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2139 Risks or Losses Covered and
Exclusions
                217k2142 Water Damage
                    217k2142(1) k. In General. Most
Cited Cases

**Insurance 217 ⚖2146**

--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)
**(Cite as: 2010 WL 1257770 (E.D.Mich.))**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and Exclusions
          217k2146 k. Corrosion or Deterioration; Mold or Fungus. Most Cited Cases
Under Michigan law, insured claiming that water seepage caused a pervasive odor, mold and bacterial contamination did not suffer a "direct physical loss" within the meaning of an all-risk policy; the insured did not suffer any structural or any other tangible damage to the insured property, and the odor was not so pervasive as to render the premises uninhabitable.

**[5] Insurance 217 &#x25C8;&#x2248;2140**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and Exclusions
          217k2140 k. In General. Most Cited Cases
Under Michigan law, a policy under which an insurer agreed to pay for "direct physical loss or damage to building or personal property caused by or resulting from a peril not otherwise excluded" was an "all-risk" style of insurance coverage, meaning that the insured could recover for damage to the insured property regardless of the peril that caused the harm unless a particular peril was specifically excluded.

**[6] Insurance 217 &#x25C8;&#x2248;2138(1)**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2130 Property Covered or Excluded
          217k2138 Newly Acquired Property
            217k2138(1) k. In General. Most Cited Cases
Under Michigan law, insured allegedly forced to vacate the insured premises due to consequences of

water seepage could not recover under an all-risk policy for space that it had planned to occupy under an amendment to a lease agreement; insured had neither prepared any layout plans for the new area nor undertaken any concrete steps toward developing the space.

**[7] Insurance 217 &#x25C8;&#x2248;2136(4)**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2130 Property Covered or Excluded
          217k2136 Personal Property
            217k2136(4) k. Tools, Implements or Equipment. Most Cited Cases
Under Michigan law, insured allegedly forced to vacate the insured premises due to consequences of water seepage could not recover under an all-risk policy for discarded computers, refrigerator, and other equipment that was not sufficiently valuable to be placed in temporary storage along with other equipment.

**[8] Federal Civil Procedure 170A &#x25C8;&#x2248;2501**

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2501 k. Insurance Cases. Most Cited Cases
Genuine issues of material fact as to whether insured's claimed loss was attributable to defective planning, grading, or maintenance precluded summary judgment under Michigan law on insurer's claim that "Defective Maintenance Exclusion" provisions in an all-risk policy applied to preclude coverage.

**[9] Insurance 217 &#x25C8;&#x2248;2148**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and

--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)
**(Cite as: 2010 WL 1257770 (E.D.Mich.))**

Exclusions
         217k2148 k. Pollution or Contamination. Most Cited Cases
Under Michigan law, an exception to a "Pollutant Exclusion" in an all-risk policy for water which seeped through basements, foundations, walls or floors, applied in the case of an insured claiming that water seepage caused a pervasive odor, mold and bacterial contamination.

Mayer Morganroth, Jeffrey B. Morganroth Morganroth & Morganroth, PLLC, Birmingham, MI, Jason R. Hirsch, Morganroth & Morganroth, Southfield, MI, for Plaintiff.

Mark E. Shreve, Alan G. Davis, Karen Libertiny Ludden, Garan Lucow, Troy, MI, for Defendants.

*ORDER*

JULIAN ABELE COOK, JR., District Judge.

*1 In this case, the Plaintiff, Universal Image Productions, Inc. ("Universal"), seeks to obtain damages from the Defendant, Federal Insurance Company ("Federal")^FN1 on the basis of the parties' insurance policy which covers claims for losses to Universal's commercial property under two theories; namely, breach of contract, and violations of the Uniform Trade Practices Act, Mich. Comp. Laws § 500.2001, et seq.

On June 24, 2009 and July 30, 2009, Federal filed three motions for the entry of summary judgments relating to Universal's (1) claims which seek damages for its anticipated losses; (2) attempt to recover damages for business interruption, abandoned properties, fixtures, and areas not subject to its lease; and (3) effort to recover for concurrent causes of loss. Universal opposes Federal's motions.

I.

In 1986, the Supreme Court opined that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under Federal Rule of Civil Procedure 56(c), a motion for a summary judgment should be granted if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Here, the burden is on the movant to demonstrate the absence of a genuine issue of a material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In assessing a summary judgment motion, the Court must examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the nonmoving party. Fed.R.Civ.P. 56(c); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir.1991). It is the responsibility of the Court to determine "whether ... there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Hence, a summary judgment must be entered only if (1) the evidence clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law," *id.* at 252, 106 S.Ct. 2505, or (2) the opponent fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. Importantly, the presentation of a mere scintilla of supporting evidence is insufficient. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505, *quoted in Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989).

Inasmuch as this is a diversity case, the Court must apply the law of Michigan on the basis of the *Erie*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)
**(Cite as: 2010 WL 1257770 (E.D.Mich.))**

doctrine. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Thus, the Court is obliged to apply the law in accordance with the decisions of the Michigan Supreme Court. *See Meridian Mut. Ins. Co. v. Kellman,* 197 F.3d 1178, 1181 (6th Cir.1999). In those situations in which the Michigan Supreme Court has not addressed an issue, a decision by a Michigan appellate court binds this Court "absent a strong showing that the [Michigan Supreme Court] would decide the issue differently." *See Kurczi v. Eli Lilly & Co.,* 113 F.3d 1426, 1429 (6th Cir.1997).

**\*2** [1][2][3] Michigan courts apply general rules of contract construction when interpreting insurance policies. *South Macomb Disposal Auth. v. American Ins. Co.,* 225 Mich.App. 635, 653, 572 N.W.2d 686 (1997). When construing a policy, a court must seek to determine if its language is clear and unambiguous on its face. Therefore, if the language within the policy is clear and unambiguous, its terms and words should be enforced by utilizing their plain and commonly understood meaning. *Royal Prop. Group. LLC v. Prime Ins. Syndicate, Inc.,* 267 Mich.App. 708, 714, 706 N.W.2d 426 (2005); *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 206, 476 N.W.2d 392 (1991). Moreover, a court may not create an ambiguity where none exists. *Fire Ins. Exchange v. Diehl,* 450 Mich. 678, 687, 545 N.W.2d 602 (1996).

## II.

As a television production firm, Universal works with advertising agencies, editorial houses, and other companies to provide visual effects and production support for their respective endeavors. From 1989 through September of 2002, Universal operated its business on the second and third floors of a three-story commercial building in Southfield, Michigan ("the Building"). Prior to its occupancy, Universal had entered into several agreements with the owner of the Building ("the Landlord"), all of which were memorialized in two freestanding leases with six amendments. Most relevant to this

case is a lease which bore the date of May 6, 1997 ("the Lease") that required Universal to insure its own property.[FN2] Although Universal occupied portions of the first floor of the Building since February of 2001,[FN3] it had planned to expand this space for business purposes, as reflected in its " *Sixth Amendment to Lease Agreement* " ("the Sixth Amendment") which became effective on August 7, 2002. In support of its claims in this lawsuit, Universal contends that (1) the projected expansion on the first floor was critical to its growth, and (2) in relying upon the terms under the Sixth Amendment, it had planned to occupy this expanded area on September 1, 2002.

Universal claims that during the second week of August in 2002, and following a very heavy rainfall,[FN4] a foul odor began to permeate the entire first floor of the Building. When an employee complained about the presence of the odor, Universal's Senior Vice President Patricia Dial confirmed the problem and immediately scheduled air quality testing. On August 20th, she enlisted the aid of Jon Dattilo, a representative from an independent air quality agency, who observed mold and bulkwater inside the duct work of the Building. Thereafter, he characterized the ventilation system as being hazardous and recommended its immediate shutdown. Four days later, Dattilo confirmed the presence of (1) bacterial contamination in the air and (2) water inside the duct work.

Further testing of those areas on the first floor that were occupied by Universal revealed high levels of bacteria in the premises. In response, the Landlord shut down the air handling system, sealed off the air ducts, installed temporary cooling units, and cleaned portions of the ventilation system on the first floor. Notwithstanding these efforts by the Landlord to correct the situation, Universal contends that this cleansing process caused it to suffer a major disruption in its business activities. In its view, these efforts to correct the ventilation system produced an excessive amount of heat, which, in turn, endangered the health and welfare of the em-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)
**(Cite as: 2010 WL 1257770 (E.D.Mich.))**

ployees and adversely affected the operation of its business equipment. On the basis of a laboratory analysis in November 2002 which revealed the continuing presence of bacteria within the Building and acting upon the belief that its property would never be fully restored to its original condition, Universal moved its business to a new and permanent location in March of 2003.

### III.

### A.

*3 [4][5] Under its insurance contract with Universal, Federal agreed to pay for "direct physical loss or damage to building or personal property caused by or resulting from a peril not otherwise excluded." FN5 This is an "all-risk" style of insurance coverage, which means the insured can recover for damage to the insured property regardless of the peril that caused the harm unless a particular peril is specifically excluded. *See generally, Tower Automotive Inc. v. American Protection Ins. Co.,* 266 F.Supp.2d 664, 667-68 (W.D.Mich.2003). Universal bears the burden of demonstrating that its loss is covered by the Policy. *See generally, Clark v. Hacker,* 345 Mich. 751, 756, 76 N.W.2d 806 (1956).

Here, Universal argues that a covered peril-namely, water seepage into the Building-caused it to suffer a direct physical loss in the form of pervasive odor, mold and bacterial contamination (both visual and aerosolized), as well as water damage. Although the term "direct physical loss" is not defined in the Policy, at least one Michigan court has examined the causation aspect of this phrase in the context of an insurance contract. *See Acorn Inv. Co. v. Michigan Basic Property Ins. Assn.,* No. 284234, 2009 WL 2952677 at *2 (Mich.App. Sept. 15, 2009) (unpublished) (opining that the word "direct" signals immediate or proximate cause, as distinct from one that is remote or incidental, and concluding in part that extensive flooding caused by acts of

vandalism in the removal of piping amounted to a direct physical loss). According to Merriam Webster's Online Dictionary, the term "physical" is defined as something which has a "material existence: perceptible especially through the senses and subject to the laws of nature." Merriam-Webster, available at http://www.merriam-webster.com/ (last visited March 26, 2010).

Federal, in challenging this claim by Universal, argues that neither mold contamination nor the threat thereof constitutes a "direct physical loss" under the express language of the Policy. Both parties agree that neither of them are aware of any reported Michigan or Sixth Circuit case authority which has addressed this precise question. Nevertheless, Federal points to several cases from other jurisdictions which suggest that no physical loss occurs unless a contaminant actually alters the structural integrity of the property. *See generally, Mastellone v. Lightning Rod Mut. Ins. Co.,* 175 Ohio App.3d 23, 40-41, 884 N.E.2d 1130 (2008) (affirming lower court's ruling that dark staining from mold did not constitute "physical loss" where plaintiff's expert testified that mold could be removed from wood surface by bleaching and chemically treating affected areas); *Great Northern Ins. Co. v. Benjamin Franklin Federal Sav. & Loan Ass'n.,* No. 90-35654, 1992 WL 16749, *1 (9th Cir. Jan. 31, 1992) (unpublished) (opining that asbestos contamination represented an economic loss and not a physical loss, inasmuch as the building remained physically unchanged). Thus, absent material damage to the property, it is Federal's belief that Universal's claims for the presence of mold are *per se* invalid. In opposing Federal's arguments, Universal notes that courts in other circuits have applied a more liberal standard. *See, e.g., Columbiaknit, Inc. v. Affiliated FM Ins. Co.,* No. 98-434-HU, 1999 WL 619100 at *6-7, 1999 U.S. Dist. LEXIS 11873 at *16-19 (D. Oregon August 4, 1999) (unpublished) (noting that physical damage can be demonstrated by presence of strong pervasive, persistent or noxious odor and denying insurer's motion for summary judgment where the odor stemmed from mold

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)
**(Cite as: 2010 WL 1257770 (E.D.Mich.))**

damage caused by the leakage of water and moisture inside clothing warehouse); *Matzner v. Seaco Ins. Co.,* No. 96-0498-B, 1998 WL 566658, *3 (Mass.Super. Aug. 12, 1998) (finding that carbon monoxide contamination constitutes direct physical loss even though it did not produce tangible damage to the structure of the insured property); *Farmers Ins. Co. v. Trutanich,* 123 Or.App. 6, 11, 858 P.2d 1332 (1993) (denying summary judgment against insured because court deemed subject property to have been physically damaged by noxious odors emanating from methamphetamine laboratory in neighboring apartment unit); *Western Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 39, 437 P.2d 52 (Colo.1968) (determining that direct physical loss had occurred after receiving evidence of extensive accumulation of gasoline around and under a church building that rendered premises uninhabitable, even though the fuel was below explosion levels).

**\*4** After reviewing the authority presented by both parties, the Court finds Federal's argument to be more persuasive. Universal has not shown that it suffered any structural or any other tangible damage to the insured property. Rather, the bulk of Universal's argument relies upon proof that it suffered such intangible harms as strong odors and the presence of mold and/or bacteria in the air and ventilation system within its Building which, in its judgment, rendered the insured premises useless. As the district court noted in *Columbiaknit, supra,* however, even physical damage that occurs at the molecular or microscopic level must be "distinct and demonstrable." *Columbiaknit,* 1999 WL 619100 at \*7. Although Universal cites testimony which indicates that the entire first floor of its insured premises had been engulfed by an appalling odor, there is no evidence that this stench was so pervasive as to render the premises uninhabitable. The Court also notes that Universal's own expert, John Dattilo, did not even suggest that the entire premises be vacated. Rather, he merely recommended that (1) the occupants of the first floor wear respirators, (2) the Building owner authorize an im-

mediate shutdown of the ventilation system and (3) a complete remediation of the ventilation system be undertaken. Dattilo also suggested that only one employee (who was infected with bacterial pneumonia) avoid the affected floor. (Plaintiff's Response at 4). This fact-standing alone-distinguishes the current case from *Trutanich* and *Matzner, supra. See also, Western Fire Ins. Co. v. First Presbyterian, supra* (observing that the insured premises were rendered uninhabitable by the infiltration of (1) gasoline into the soil beneath the building, and (2) gasoline vapors into building's foundation, halls and rooms, which made use of the building dangerous). Inasmuch as Universal has failed to show that it suffered a direct physical loss under the Policy, Federal is entitled to a summary judgment.

B.

Federal next argues that it is entitled to a summary judgment on Universal's claim that it suffered losses related to the interruption of its business. In its view, Universal cannot recover under the "*Business Income with Extra Expenses* " section of the Policy unless the interruption of its business results from a direct physical loss. In support of its argument, Federal points to policy language which indicates that the insurance company "will pay for **business income** loss [Universal] incur[s] due to the actual impairment of [its] **operations....**" (Policy at 3 of 12, "*Business Income With Extra Expenses* ") (emphasis in original). However, such impairment must "be caused by or result from direct physical loss or damage by a **covered peril** to **property....**" *Id.* Federal also points out that Patricia Dial testified that no mold damage occurred to any of the company's equipment or property.

Federal's analysis here depends entirely on its earlier argument that Universal has not suffered a "direct physical loss." Because the Court, in adopting its above rationale, believes that Universal has failed to establish that such a loss occurred, Federal's request for the entry of a summary judgment on this issue will be granted. *Section IA, supra.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)
**(Cite as: 2010 WL 1257770 (E.D.Mich.))**

**\*5** The remaining portion of Federal's second motion seeks to prevent Universal from recovering payment from damage to (1) the space that it had not yet occupied, (2) property that was discarded during its move to a new building; and (3) any fixtures or permanent improvements to the premises.

[6] As to the first claim, Federal seeks to limit Universal's recovery for space that it had planned to occupy under the Sixth Amendment to the parties' Lease agreement. Federal points to the testimony of Patricia Dial who opined that Universal would not have been ready to occupy the expanded space for a period of six months. In response, Universal notes that not all of its claimed loss of profits are associated with the first floor expansion. Rather, Dial and others maintain that Universal had planned to move important segments of its existing operations into the expansion area. Yet, beyond its excitement about the prospects of the anticipated move, Universal's evidence on this point is entirely speculative. Dial acknowledged that Universal had neither prepared any layout plans for the new area nor undertaken any concrete steps toward developing the space. Inasmuch as Universal presented only a "mere scintilla" of evidence on this point, the Court finds that Federal is also entitled to a summary judgment on this issue.

[7] Federal also asks the Court to place a limitation upon Universal's claim for property that was allegedly abandoned when it moved to the temporary space. In making this statement, Federal relies upon Dial's repeated acknowledgment that Universal had left certain items behind because they could not easily fit into the new space. By contrast, Universal, while acknowledging that none of the challenged items were contaminated by mold or bacteria, submits that these properties became useless because of its forced relocation. The testimony, about which the parties have debated, revolves around Dial's statements that the discarded computers, refrigerator, and other equipment were not sufficiently valuable to be placed in temporary storage along with other equipment. In light of these representations, the Court finds that Universal cannot collect damages for these items.

Federal offers three distinct theories upon which it seeks to preclude Universal from claiming damages for building improvements. Yet, a review of the Policy reveals that the Court need not reach this question because Universal has failed to prove that it suffered a "direct physical loss" which would trigger the protections under the parties' insurance contract. *See,* Policy at 3 of 12, *"Building and Personal Property"* and Policy at 20, 21, 29 and 35 of 36, *"General Provisions"* (setting forth language within the Policy which makes it clear that Federal will cover "direct physical loss" or damage to building or personal property, which by cross-reference includes any fixtures, alterations, installations or additions that Universal makes a part of the Building at its expense, but cannot legally remove).

**\*6** For similar reasons, the Court need not resolve Federal's challenge to Universal's attempt to claim losses that occurred in newly acquired areas under Universal's Lease. *See* Policy at 3 of 12, *"Newly Acquired Premises"* (noting that Federal "will pay for direct physical loss or damage to ... building or personal property at newly acquired premises...."). Because this coverage, like other policy provisions, is based on a requirement that Universal experience a direct physical loss to its property, Federal is entitled to a summary judgment on this issue as well.

### C.

[8] In its final motion, Federal claims that, inasmuch as Universal's loss stems from at least one excluded cause (e.g., poor maintenance and design, and/or non-covered pollutants), Michigan law operates as a complete bar to recovery since courts typically deny coverage when concurrent causes of loss occur, but one of those causes is excluded under the Policy. *See, Iroquois on the Beach, Inc. v. General Star Indem. Co.,* 550 F.3d 585, 588 (6th Cir.2008) (observing that Michigan's default rule is that "a loss is *not* covered when it is concurrently

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)
**(Cite as: 2010 WL 1257770 (E.D.Mich.))**

caused by the combination of a covered cause and an excluded cause") (emphasis in original); *Vanguard Ins. Co. v. Clarke,* 438 Mich. 463, 468, 475 N.W.2d 48 (1991), *overruled in part on other grounds by Wilkie v. Auto-Owners Ins. Co.,* 469 Mich. 41, 664 N.W.2d 776 (2003) ("we perceive no compelling policy rationale to adopt the dual causation theory accepted in other jurisdictions .... no sound jurisprudential ... reason exists to introduce a legal theory or doctrine that departs from the literal interpretation of an unambiguous insurance contract.").[FN6]

As the insurer, it is Federal's burden to prove that one of the exclusions under the Policy is applicable here. *Heniser v. Frankenmuth Mutual Ins. Co.,* 449 Mich. 155, 161 n. 6, 534 N.W.2d 502 (1995). Although Federal's assessment of the concurrent loss rule is correct, a summary judgment cannot be granted on the basis of the facts of this case. First, in suggesting that Universal's claims are prohibited by the *"Defective Maintenance Exclusion"* provisions within the Policy, Federal points to the following language which exempts from coverage any loss or damage

> caused by or resulting from any faulty, inadequate or defective: planning ... development, surveying, siting; design specifications, plans, workmanship, repair, construction, renovation, remodeling, grading, ... or maintenance, of part or all of any property on or off the premises shown in the Declarations.

Policy at 7 of 36, *"General Provisions."* Federal cites testimony from Dattilo, who allegedly attributes, in part, the mold and water infiltration to poor maintenance, design and grading of the sub-grade duct work, and poor plumbing. In response, Universal points to the testimony of its engineering expert who testified that (1) there was nothing to suggest that the Building's air handling system had not been properly maintained, (2) he would not characterize the duct work as being faulty as the result of a design, construction or latent defect; and (3) water infiltrated the duct work because of a rising underground water table.

**\*7** A review of this competing evidence reveals that, unlike the insurance companies in those cases upon which it relies, Federal has not pointed to any uncontested facts which make it clear that the *"Defective Maintenance Exclusion"* provisions should apply. *See, e.g., Iroquois on the Beach, supra* at 586-87 (noting specifically that the parties did not contest the facts underlying the exclusion clause, and that "the record without dispute" established that water damage lasting fourteen days fell within the Policy's exclusion); *Vanguard, supra* at 468, 475 N.W.2d 48 (granting relief for the insurance company where plaintiff's counsel, in not contesting the facts underlying the excluded cause, argued erroneously that the case should have been allowed to proceed on *both* theories); *TMW Enterprises, Inc. v. Federal Ins. Co.,* No. 07-12230, 2009 WL 928227 at \*1 (E.D.Mich. Mar. 31, 2009) (noting specifically that it was undisputed that the damage was caused, at least in substantial part, by two concurrent causes: construction defects and water). A fair reading of the testimonies of Dattilo and Universal's engineering expert make it clear that neither person was willing to attribute the claimed loss to defective planning, grading, or maintenance.

[9] Federal also notes that Universal's claims were barred by the *"Pollutant Exclusion"* provision which precludes coverage for "loss or damage caused by or resulting from the mixture of or contact between property and a **pollutant** when such mixture or contact causes the property to be impure and harmful to: (1) itself or other property; (2) persons, animals or plants; [or] (3) land, water or air ...." (Policy at 8-9 of 36, *"General Provisions"* ) (emphasis in original). In turn, "Pollutant" is defined as, among other things, "organisms or microorganisms, including bacteria, fungus, mold or their spores or products...." (Policy at 31 of 36, *"General Provisions"* ).

As Universal correctly notes, this exclusion does not apply to "water that: (a) backs up or overflows

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)
**(Cite as: 2010 WL 1257770 (E.D.Mich.))**

through sewers, drains or sump; [or] (b) seeps or leaks through basements, foundations, roofs, walls, floors or ceilings of any building or other structure ...." Although it is of little practical consequence in light of an earlier determination in this case that Universal's damages do not amount to a covered loss, the Court concurs with Universal's conclusion that the exception to the *"Pollutant Exclusion"* applies here. The thrust of Universal's insurance claim is that a covered peril (i.e., water seepage into the Building) caused physical damage in the form of pervasive odor, mold and bacterial contamination (both visible and aerosolized). To this end, Universal's expert opined that the damage was precipitated by water and moisture migration and hydrostatic infiltration, which gave rise to uncontrolled mold growth, emission of microbial spores through the HVAC system, and elevated bacterial levels in the air. Under the Policy's plain language, the exception to the *"Pollutant Exclusion"* applies to water (presumably carrying pollutants) which seeps through basements, foundations, walls or floors. As applied here, it seems clear that this polluted water contaminated the Building's duct work. Thus, under the clear language of the exception, Universal's claims for losses caused by mold damage-if covered-would not be affected by the *"Pollutant Exclusion."* But, inasmuch as the Court has determined that Universal has not suffered a direct physical loss, Federal is ultimately entitled to a summary judgment.

### IV.

**\*8** For the reasons that have been outlined above, Federal's motion for a summary judgment relating to the claims by Universal which seek damages for anticipated losses, as opposed to actual physical losses, is granted. Federal's motion for a summary judgment for business interruption, abandoned property, fixtures and non-leased areas is also granted. Finally, the Court grants Federal's request for the entry of a summary judgment with regard to concurrent causes of loss.

IT IS SO ORDERED.

FN1. In an order that was based upon the parties' stipulation and entered on August 15, 2006, Universal's claims against The Chubb Corporation, Chubb Group of Insurance Companies and Chubb & Son, Inc. were dismissed.

FN2. § 13.1 of the Lease requires Universal to insure its "furniture, fittings, installations, alterations, additions, partitions, fixtures and anything in the nature of leasehold improvements."

FN3. According to Universal, its 1st floor occupancy included a library, two "profit centers," a training area, and several other spaces that had been extensively renovated.

FN4. Federal disputes this characterization, and points to the records from the National Climatic Data Center for August of 2002 which purportedly show that the rainfall within the metropolitan area of Detroit during this time period was minimal.

FN5. The complete text of the provision is as follows: "We will pay for direct physical loss or damage to building or personal property caused by or resulting from a peril not otherwise excluded, not to exceed the applicable Limit Of Insurance for Building or Personal Property shown in the Declarations." (Policy at 3 of 12, Building and Personal Property).

FN6. Universal asks the Court to apply the minority rule on concurrent causes, which allows recovery when more than one cause of loss exists but one of those causes is excluded. The Court declines this invitation in light of clear precedent from the Michigan Supreme Court which compels the opposite conclusion.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)
**(Cite as: 2010 WL 1257770 (E.D.Mich.))**

E.D.Mich.,2010.
Universal Image Productions, Inc. v. Chubb Corp.
--- F.Supp.2d ----, 2010 WL 1257770 (E.D.Mich.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

**C**
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007.  See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.  (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
HARTFORD INSURANCE COMPANY OF the MIDWEST, Plaintiff-Counter Defendant-Appellant
Twin City Fire Insurance Company; Hartford Accident & Indemnity Company, Plaintiffs-Appellants
v.
MISSISSIPPI VALLEY GAS COMPANY; Atmos Energy Corporation, Successor in Interest to and doing business as Mississippi Valley Gas Company, Defendants-Counter Claimants-Appellees.
**No. 05-60299.**

May 25, 2006.

**Background:** Insurer brought declaratory judgment action on insured gas company's coverage claim under property insurance policies covering natural gas produced by certain designated wells. On cross motions for summary judgment, the United States District Court for the Southern District of Mississippi granted summary judgment in favor of gas company, and appeal was taken.

**Holding:** The Court of Appeals held that gas company's overpayment for recirculated gas from natural gas wells was a loss of "money," rather than covered property.
Reversed and judgment rendered.

West Headnotes

**Insurance 217** ☞2131

217 Insurance
   217XVI Coverage--Property Insurance
     217XVI(A) In General
      217k2130 Property Covered or Excluded
       217k2131 k. In General. Most Cited Cases
Under Mississippi law, insured gas company's overpayment for recirculated gas from natural gas wells, due to a tap that siphoned the gas and allowed it to be metered more than once, was a loss of "money," rather than covered property; gas from the wells was not physically lost or damaged in any way before it was eventually returned to the gas company after multiple passes through the meter and was not returned to the insured party in a damaged state.
**\*466** Brenda B. Bethany, C. Michael Ellingburg, Daniel, Coker, Horton & Bell, Jackson, MS, for Plaintiff-Counter Defendant-Appellant and Plaintiffs-Appellants.

Mary Ellen G. Patton, Dale G. Russell, Copeland, Cook, Taylor & Bush, Ridgeland, MS, for Defendants-Counter Claimants-Appellees.

Appeal from the United States District Court for the Southern District of Mississippi, No. 3:03-CV-1139.

Before KING, SMITH and BENAVIDES, Circuit Judges.

PER CURIAM: FN*

    FN* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**\*\*1** Plaintiff-appellant Hartford Insurance Company of the Midwest appeals the district court's grant of summary judgment in favor of defendant-ap-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

pellee Mississippi Valley Gas Company on its coverage claim in the amount of $557,919 under property insurance policies covering natural gas produced by certain designated wells. Hartford Insurance Company of the Midwest also appeals the district court's denial of its motion for summary judgment as well as its motion to strike portions of the affidavit of Mississippi Valley Gas Company's petroleum engineering expert, Wayne Stafford. We agree fully with the district court that resolution of this issue is "hardly apparent." That said, we REVERSE the district court's grant of summary judgment in favor of Mississippi Valley Gas Company and RENDER judgment for Hartford Insurance Company of the Midwest.

# I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns an insurance coverage dispute between plaintiff-appellant Hartford Insurance Company of the Midwest ("Hartford") and defendants-appellees Mississippi Valley Gas Company and its successor in interest Atmos Energy Corporation (collectively "MVG"). The basic factual predicate underlying the instant appeal is undisputed. In 1982, MVG began purchasing natural gas produced by the Asa Watson Well in Monroe County, Mississippi from the well's owner and operator, Howard G. Nason. In 1989, MVG entered a separate contract to purchase natural gas from a different well in Monroe County known as the Catherine Watson Well from Nason Production Company, Inc., Howard G. Nason, Howard F. Nason, and Anice H. Nason.[FN1] The gas produced from each well flowed through a separate line to a distinct sales meter, where the volume of gas from the well was compressed, measured, and ultimately delivered to MVG's pipeline. Pursuant to the contracts between MVG and the Nasons, legal title to the gas transferred from the Nasons to MVG at the point of the sales meter. After the gas was metered, it was transported to MVG's facilities and into high-pressure transmission lines for distribution.

FN1. After Howard G. Nason died in 1995, his interest in the wells passed to his wife, Anice.

**\*467** The district court's opinion succinctly describes the facts underlying the coverage claim:

When the Asa Watson Well stopped producing in March or April 1999, the Nasons removed the meter from the Asa Watson Well and diverted the gas production being sold to MVG from the Catherine Watson Well through the sales meter for the Asa Watson Well.

Thereafter, in September 2000, MVG discovered that an underground "tap" had been placed on MVG's line downstream of the meter which diverted gas from MVG's line through an underground pipe back to a point upstream of the meter, where the gas was reintroduced or reinjected into the gas stream. As a result of this recirculation, gas which had already been metered and purchased by MVG was recirculated and hence remetered and resold by the Nasons to MVG.

R. at 234-35. Based on reports from MVG's petroleum engineering expert Wayne Stafford's investigation, the recirculation scheme caused an estimated total monetary loss to MVG of $1,804,125 between 1986 and September 2000.[FN2]

FN2. Immediately after discovering the recirculation scheme, MVG began to withhold payments for natural gas purchases from another well owned by Anice Nason called the Simmons Well, claiming it was entitled to offset the unjust enrichment from the overpayment with respect to the two Watson Wells. On or about March 1, 2004, MVG reached a settlement with the Nasons and repaid $100,000 of the $747,000 it had previously withheld.

**\*\*2** In January 2003, MVG submitted a proof of loss claim in the amount of $557,919 to recoup a portion of this loss under the Hartford policies cov-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

ering the period between September 1, 1994 and January 31, 1999.[FN3] More specifically, MVG's "theft" claim was for the value of 226,742 Mcf of recirculated natural gas, which represented the difference between the volume of gas actually produced by and delivered to MVG from the wells during this period (17,285 Mcf) and that same volume of gas recirculated through the meter more than fourteen times (244,027 Mcf). MVG did not, however, include the small volume of gas consumed to execute the recirculation scheme itself in its claim under the Hartford policies.[FN4]

> FN3. MVG stipulated that it had withdrawn its claim on the policies issued *between* July 14, 1988 and September 1, 1994, and *after* January 31, 1999. We therefore limit our focus on this appeal to the Hartford policies covering the period between September 1, 1994 and January 31, 1999.

> FN4. During oral argument, Hartford stated that the recirculation scheme was basically equivalent to tampering with the meter itself. For example, recirculating the same volume of gas ten times through a properly calibrated meter would overcharge by the same amount as manipulating the meter to price at ten times the proper rate upon the first pass through the meter.

On September 30, 2003, Hartford filed a diversity action in the Southern District of Mississippi seeking a declaratory judgment that Hartford was not obligated to pay MVG's claim for loss of natural gas under the applicable property insurance policies. MVG filed an answer and counterclaim for declaratory relief on October 30, 2003, seeking an adjudication that the Hartford policies did indeed provide coverage for the claim. The parties submitted cross-motions for summary judgment on July 15, 2004.

The parties did not dispute before the district court that a "theft" that results in a loss of or damage to the covered property is covered under the relevant Hartford policies. They differed, however, in their characterization of the scheme and the precise nature of the alleged loss. MVG asserted that the recirculation scheme amounted to repeatedly stealing and reselling*468 the same volume of gas and therefore constitutes a covered "theft" under the policies. Hartford contended, however, that the insurance policies at issue do not provide coverage to MVG under these circumstances because: (1) the only property lost was "money" from overpaying for the volume of gas actually received, and purely monetary losses are expressly excluded from the definition of covered property; and (2) any loss of covered property was otherwise excluded from coverage under the "voluntary parting" exclusion or "missing property" limitation in the policies. On August 31, 2004, while the summary judgment motions were still pending, Hartford also moved to strike the affidavit of Wayne Stafford because it allegedly failed to comport with the formal requirements of FED.R.CIV.P. 56(e) and because certain portions allegedly contained inadmissible legal conclusions.

On January 18, 2005, the district court denied Hartford's motion for summary judgment and granted MVG's motion for summary judgment, "conclud[ing], albeit not with certainty, that MVG sustained a loss that falls within the coverage of Hartford's policies." R. at 233. With respect to the contested issue of whether the recirculation scheme constituted a "direct physical loss" of covered property under the Hartford policy, the court acknowledged that "there are compelling arguments on both sides of the issue." *Id.* at 236. The court rejected Hartford's characterization of MVG's claim as a "loss of money" from overpayment and found that "the facts readily support[ed] the conclusion that a theft occurred when the Nasons siphoned natural gas from MVG's pipeline." *Id.* at 237.

**\*\*3** In the court's view, the fact that the Nasons resold the natural gas they had stolen from MVG

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

to MVG, so that MVG thus ended up acquiring all the natural gas produced by the wells because the gas was recirculated through the meter rather than simply being siphoned off and sold to another buyer, does not change the fact that there was a dispossession, or "direct physical loss" of the natural gas, for a period of time.

*Id.*

After rejecting Hartford's contention that MVG suffered only a loss of money, the court summarily disposed of Hartford's alternative arguments that the policies' "voluntary parting" exclusion and "missing property" limitation applied to deny coverage. More specifically, the court found that (1) MVG did not "voluntarily part" with the gas that was siphoned off through the underground tap to fall within that exclusion; and (2) the "missing property" limitation did not apply given the physical evidence showing how the gas was diverted and remetered.

Because the district court's summary judgment order decided only the issue of coverage under the policies and not the precise extent of liability, Hartford submitted a motion for clarification accompanied by a request for certification of the coverage question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). In essence, Hartford contended that if coverage exists at all under the policies, it extended only to a single instance of recirculation. Consistent with its previous order, the court concluded that "the property at issue was repeatedly lost" and accordingly granted summary judgment in favor of MVG on the liability issue in the amount of $557,919. R. at 259. Having granted MVG's motion for summary judgment as to both the coverage and liability issues, the court found the request for discretionary interlocutory appeal pursuant to § 1292(b) to be moot and entered a final judgment in favor of MVG on March 3, 2005. Hartford timely filed its notice of appeal on March 29, 2005.

**\*469 II. STANDARD OF REVIEW**

We review a grant of summary judgment de novo, applying the same standards as the district court. *Fed. Ins. Co. v. Ace Prop. & Cas. Co.,* 429 F.3d 120, 122 (5th Cir.2005). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software Inc.,* 232 F.3d 473, 477 (5th Cir.2000) (citation omitted). A fact is "material" if "its resolution could affect the action's outcome." *Minter v. Great Am. Ins. Co. of N.Y.,* 423 F.3d 460, 465 (5th Cir.2005). The evidence and inferences from the summary judgment record must be viewed in the light most favorable to the nonmovant. *Id.*

**III. DISCUSSION**

**\*\*4** In resolving this coverage dispute, we must first examine the relevant provisions in the property insurance policies at issue. Interpretation of an unambiguous insurance contract is a question of law, which this court reviews de novo. *Am. States Ins. Co. v. Bailey,* 133 F.3d 363, 369 (5th Cir.1998). The parties further agree that Mississippi law governs this diversity action. "Under Mississippi law, an insurance policy is a contract subject to the general rules of contract interpretation." *ACS Constr. Co. of Miss. v. CGU,* 332 F.3d 885, 888 (5th Cir.2003) (citing *Clark v. State Farm Mut. Auto. Ins. Co.,* 725 So.2d 779, 781 (Miss.1998)). "Although ambiguities in an insurance policy are construed against the insurer, a court must refrain from altering or changing a policy where terms are unambiguous, despite resulting hardship on the insured." *Titan Indem. Co. v. Estes,* 825 So.2d 651, 656 (Miss.2002).

The Special Property Coverage Form provides cov-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

erage for "direct physical loss of or damage to Covered Property caused by or resulting from any Covered Cause of Loss." The parties agree that the "Covered Property" at issue under the policies is the natural gas produced by the designated Watson Wells. Under the policies, "Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is" otherwise excluded or limited by the operation of certain enumerated conditions in the policy, including the "voluntary parting" exclusion and "missing property" limitation.[FN5] The policies also provide that "theft" and "attempted theft" that result in loss of or damage to covered property constitute "specified causes of loss" under the policies. The policies, however, expressly exclude mere monetary losses from the definition of "covered property."[FN6]

> FN5. The "voluntary parting" exclusion expressly denies coverage for any loss or damage caused directly or indirectly by:
>
> i. Voluntary parting with any property whether or not induced to do so by any fraudulent scheme, trick, device or false pretense.
>
> The "missing property" limitation denies coverage for loss or damage to:
>
> c. **Missing Property**
>
> Property that is missing, if there is no physical evidence to show what happened to it. An example is a shortage disclosed on taking inventory.

FN6. Specifically, the policy excludes:

2. **Property Not Covered**

Covered Property does not include:

a. Accounts, bills, currency, deeds, evidences of debt, money, notes or securities.

**\*470** Given the unambiguous language in the relev-

ant insurance policies, the primary source of disagreement between the parties is how the loss suffered by MVG from the recirculation scheme should be characterized. Hartford contends that there was no actual deprivation of the covered property that would constitute a "theft" because MVG eventually received all of the natural gas produced from both Watson Wells pursuant to its contracts with the Nasons. In essence, Hartford contends that the only result of the recirculation scheme was to cause MVG to unwittingly overpay for the gas-i.e., MVG experienced only a loss of "money" that would not be covered under the clear terms of the relevant policies. On the other hand, MVG maintains that the district court correctly characterized the recirculation scheme as multiple, albeit temporary, "thefts" of the natural gas from the Catherine Watson Well that are covered under the policies.

As a general matter, property insurance coverage is triggered by some threshold concept of physical loss or damage to the covered property. *See* 10A COUCH ON INS. § 148:46 (3d ed.2005).

> The requirement that the loss be "physical," given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

**\*\*5** *Id.* We have previously stated that "[t]he language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state-for example, the car was undamaged before the collision dented the bumper." *Trinity Indus.. Inc. v. Ins. Co. of N. Am.,* 916 F.2d 267, 270-71 (5th Cir.1990). Consistent with these general principles, absent some physical manifestation of loss or damage to the gas itself, the property insurance policies issued by Hartford in this case expressly exclude mere monetary losses from cover-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

age.

The fundamental difficulty with MVG's position is that, except for the unclaimed de minimis portion of gas consumed to carry out the recirculation scheme, MVG actually received all of the available gas produced by the two Watson Wells. MVG cites *National Fire Insurance Co. of Hartford v. Slayden,* 227 Miss. 285, 85 So.2d 916, 917 (1956), for the proposition that even a temporary deprivation of property would be covered under an insurance policy that covered against "theft" losses. The holding in *Slayden* was actually considerably narrower than this and consistent with our disposition of the instant case. In *Slayden,* the Supreme Court of Mississippi affirmed in part a jury verdict assessing liability under an insurance policy where a third party had damaged the engine of a "bulldozer equipped tractor"-the covered property under the insurance policy-by improperly operating it without water. *Id.* Even though the damaged tractor itself was returned to the insured party, the court concluded that the damage resulting from temporary "theft" of the property was covered under the insurance policy.

To the contrary, here the gas from the Watson Wells was not physically lost or damaged in any way before it was eventually returned to MVG after multiple passes through the meter. In this sense, unlike the situation in *Slayden,* the covered property was not returned to the insured party in a damaged state. Therefore, MVG's proof of loss claim lacked the requisite "direct physical loss of or damage to" the **\*471** covered property under the insurance policies.

After careful examination of the relevant provisions in the Hartford policies, we conclude that MVG's overpayment for the recirculated gas from the Watson Wells is more accurately described as a loss of "money," rather than covered property. Accordingly, the district court erred in finding a covered loss under the insurance policies issued by Hartford. Because we reverse and render judgment in favor of Hartford based solely on our conclusion

that the recirculation scheme merely resulted in an uncovered loss of money, we expressly decline to reach the portions of the district court's decision concerning the application of the "voluntary parting" exclusion and "missing property" limitation under the policies. We also need not reach the issue of whether the district court erred in denying Hartford's motion to strike Wayne Stafford's affidavit.

## IV. CONCLUSION

**\*\*6** For the foregoing reasons, we REVERSE the district court's grant of summary judgment in favor of Mississippi Valley Gas Company on both the coverage and liability issues and RENDER judgment for Hartford Insurance Company of the Midwest. Costs shall be borne by Mississippi Valley Gas Company.

C.A.5 (Miss.),2006.
Hartford Ins. Co. of Midwest v. Mississippi Valley Gas Co.
181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 926981 (E.D.La.)
**(Cite as: 2009 WL 926981 (E.D.La.))**

H
Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
MAISTER ASSOCIATES
v.
STATE FARM FIRE AND CASUALTY COM-
PANY.
**Civil Action No. 06-0589.**

March 31, 2009.

Gilbert R. Buras, Jr., Gilbert R. Buras, Jr., Attorney at Law, Arthur W. Landry, Arthur W. Landry And Jeanne Andry Landry, LLC, New Orleans, LA, Paul C. Kurland, Ronald S. Herzog, Snow Becker Kraus, PC, New York, NY, for Plaintiff.

Wayne J. Lee, James Dalton Courson, Mary L. Dumestre, Stone, Pigman, Walther, Wittmann, LLC, New Orleans, LA, Sarah House Barcellona, Sarah H. Barcellona, Attorney at Law, Concord, NC, for Defendant.

### ORDER AND REASONS

ALMA L. CHASEZ, United States Magistrate Judge.

**\*1** Presently before the Court are cross-motions for summary judgment filed by State Farm Fire and Casualty Company and Maister Associates. (Rec.docs.33, 65).

This litigation ensued when Maister Associates, hereinafter Maister, brought suit in connection with damage to real property which it owns located at 100 Chateau Court, Houma, Louisiana, known as the Maison Terrebonne Apartments. The complex consists of one hundred twenty units housed in seventeen different buildings. At all relevant times, Maister was insured by State Farm Fire and Casu-

alty Company, hereinafter State Farm. The subject matter jurisdiction of the Court is based upon diversity and the allegation that the controversy at issue exceeds $75,000. 28 U.S.C. § 1332.

It is uncontroverted that State Farm originally issued a policy of insurance to plaintiff on December 19, 2001 which ran for a yearly time period. The policy was twice renewed, providing coverage through December 19, 2004. At issue herein is an interpretation of the language of State Farm's policy.

In its initial complaint, plaintiff contends that it was insured against "accidental direct physical loss" to its apartment complex as a result of "specified causes", including "water damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam". The complaint further alleges that, in June of 2004, Maister learned that certain tenants residing at the insured premises were contemplating suit against it on the grounds that "they had been injured by 'toxic mold' in their apartment units." Maister further alleges that it immediately notified State Farm of the situation.

Suit was eventually instituted in state district court on August 3, 2004 at which time both Maister and State Farm were named as defendants. That litigation was subsequently removed to this Court and litigated to a conclusion by dismissal on June 28, 2005. *Giroir, et al. v. Maister Associates, et al.,* 04-CV-2555 "I" (2). In that matter, plaintiffs, indeed, alleged that they were damaged because of toxic mold in their apartments.

State Farm retained the law firm of Stone, Pigman, Walther and Wittmann, hereinafter referred to as Stone, Pigman, to represent its interests in the aforementioned litigation. By letter dated September 10, 2004, State Farm advised Maister of its consent and approval of the retention of the law firm of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 926981 (E.D.La.)
**(Cite as: 2009 WL 926981 (E.D.La.))**

Middleberg, Riddle and Gianna, hereinafter Middleberg, at Maister's request to represent Maister's interest in the same litigation. As of October, 2004, Maister advised Middleberg that declining occupancy at the property, due to the allegedly toxic mold, was impacting Maister's ability to meet its operating expenses, mortgage, insurance and tax obligations. Maister advised Middleberg that it needed to repair the units in question to stem its economic losses.

The petition then goes on to allege that, once this issue was discussed with State Farm, Maister was advised that any actions undertaken to repair or remediate the vacant apartments would "be deemed by State Farm to be a failure to cooperate ... in the defense of the *Giroir* litigation and a breach of the insured's obligations under the terms of the policy and would result in State Farm's refusal to defend the *Giroir* case or satisfy any claims asserted therein." As a result thereof, Maister alleges that it continued to suffer income loss because it could not repair its property, per directions from State Farm, and that further damage accrued to the premises because of new breakages, cracks and leaks.

**\*2** On April 12, 2005, Maister alleges that it made written demand upon State Farm for coverage of the water and mold damage to the property resulting from covered occurrences during the effective dates of the policy and for the loss of income resulting from Maister's inability to repair and re-rent the units. In June, 2005, State Farm sought additional information pertaining to that claim which Maister alleges was provided. Maister also made demand under Coverage C of its policy for "actual loss of business income", alleging that its loss of income was the direct result of "cooperating with State Farm in connection with the defense of the *Giroir* lawsuit".

It is uncontroverted that State Farm agreed, under a reservation of rights, to provide plaintiff with a defense in the *Giroir* litigation pursuant to the provisions of its business policy insuring against third-party liability. State Farm reimbursed Maister's de-

fense costs related to this litigation, including the fee of the Middleberg firm. On June 28, 2005, the *Giroir* plaintiffs voluntarily dismissed their case with prejudice.

In its complaint, Maister asserts that State Farm is liable to it for all instances of loss, including the costs of repairs to its property resulting from the breaking or cracking of water containing systems and appliances, loss of business income resulting from accidental direct physical losses to the property and for "all other damages resulting from Maister's compliance with State Farm's requirements of cooperation in defense of the *Giroir* lawsuit", attorneys' fee, costs and penalties as provided for by LSA-R.S. §§ 22:1220 and 22:658.

In its motion for summary judgment (Rec.doc.33), State Farm argues that the policy covering plaintiff's property insures for damage caused by an "accidental direct physical loss" which plaintiff has not and cannot identify. According to defendant, any damage to the insured premises was caused by plaintiff's failure to perform ordinary maintenance and repair. In addition, litigation such as was pursued in the *Giroir* matter is not an accidental direct physical loss as contemplated by the policy and does not trigger the obligation to pay benefits. It is State Farm's position that all damage and/or loss which plaintiff might have sustained was as a result of perils excluded from coverage.

Federal Rule of Civil Procedure 56(c) requires that a district court grant summary judgment when the motion demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). Summary judgment is favored in federal courts. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075-76 (5 th Cir.1994).

Under Rule 56, once the moving party carries its initial burden of demonstrating an absence of genuine issues of material fact, the burden shifts to the non-moving party to show that summary judgment

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 926981 (E.D.La.)
**(Cite as: 2009 WL 926981 (E.D.La.))**

should not be granted. *Celotex,* 477 U.S. at 324. The non-moving party must set forth specific facts demonstrating that there is a genuine issue of material fact. *Lujan v. Nat'l Wildlife Federation,* 497 U.S. 871, 884-85 (1990). It cannot satisfy its burden "by 'conclusory allegations,' by 'unsubstantiated assertions', or by a only a 'scintilla of evidence' ". *Little,* 37 F.3d at 1075 (internal citations omitted). Rather, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex,* 477 U.S. at 325). Moreover, a party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). There must be "significant probative evidence" on which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). Only admissible evidence-not argument in a brief or allegations of a complaint-can satisfy the non-movant's burden of proof. *Solo Serve Corp. v. Westowne Associates,* 929 F.2d 160, 164 (5th Cir.1991).

**\*3** In determining whether a genuine issue exists for trial, a court "must view the evidence introduced and all factual inferences from the evidence in the light most favorable to the party opposing summary judgment." *Hightower v. Tex. Hosp. Ass'n,* 65 F.3d 443, 447 (5th Cir.1995). However, a court may not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Little,* 37 F.3d at 1075 (citing *Lujan,* 497 U.S. at 888). " 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.' " *Ragas v. Tennessee Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998)(quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915-16 & n. 17 (5th Cir.), *cert. denied,* 506 U.S. 832 (1992)). "Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment." *Jones v. Potter,* 2007 WL 2071613 at \*6 (E.D.La. July 16,

2007).

State Farm insured Maison Terrebonne Apartments, owned by Maister, from December 19, 2001 through December 19, 2004 under policy number 98-CX-5416-5. (State Farm Ex. 2). In its "Coverage A" section, the policy insures against accidental direct physical loss to the insured premises when caused by an insured loss as follows:

> When a limit of insurance is shown in the Declarations for Coverage A, we will pay for accidental direct physical loss to buildings at the premises described in the Declarations caused by an insured loss.

> *Id.,* policy, p. 2.

The "Losses Insured" section of the policy further states:

> We insure for accidental direct physical loss to property covered under this policy unless the loss is:

> 1. limited in the PROPERTY SUBJECT TO LIMITATIONS section; or

> 2. excluded in the LOSSES NOT INSURED section that follows.

> *Id.,* policy, p. 6.

Thus, to be entitled to recover insurance proceeds for damage to the premises, there must be an accidental event that results in a direct physical loss that is not otherwise excluded by the policy. Additionally, the policy deductible, in this case $10,000 per occurrence, must also be satisfied before the obligation to pay is activated under Coverage A. (Rec.doc.33, Ex. 2).

Moreover, the "Losses Not Insured" section of the policy excludes certain accidental direct physical losses from coverage, providing in pertinent part:

> 2. We do not insure for loss either consisting of, or directly and immediately caused by, one or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 926981 (E.D.La.)
**(Cite as: 2009 WL 926981 (E.D.La.))**

more of the following: ...

d. smog, wear, tear, rust, corrosion, fungus, mold, decay, deterioration, hidden or latent defect of any quality in property that causes it to damage or destroy itself. But if accidental direct physical loss by any of the "Specified Causes of Loss" FN1 or by building glass breakage results, we will pay for that resulting loss;

> FN1. "Specified Causes of Loss" include "water damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam." *Id.,* policy, p. 1.

...

k. continuous or repeated seepage or leaking of water that occurs over a period of time.

**\*4** Accordingly, State Farm concedes that, under the policy, physical damage that occurs when a pipe suddenly bursts could be a covered loss. In contrast, it contends that physical damage that results from a slow leak over an extended period of time is not covered.

Nevertheless, State Farm argues that in order for Maister to recover for physical damages sustained to the insured premises under Coverage A, Maister must show that its premises suffered "accidental direct physical loss" between December 19, 2001 and December 19, 2004, which was not otherwise limited or excluded from the policy, and that the damage exceeded the $10,000 policy deductible per occurrence. On this argument, the Court concurs with State Farm and is of the opinion that Maister cannot withstand summary judgment on this issue.

Per minute entry dated September 12, 2007, the Court ordered Maister to supplement its opposition to State Farm's motion for summary judgment in two particulars. (Rec.doc.39). Maister was ordered to identify with particularity what "covered events"

occurred in its multiple apartment buildings for which it claims damages under the policy and when those occurrences took place. (*Id.*). Maister was also to supplement its position regarding the applicability of the policy deductible. (*Id.*).

Maister complied with the Court's order by filing a supplemental memorandum in opposition to the summary judgment on October 12, 2007. (Rec.doc.46). In that pleading Maister conceded that, except for the building containing apartments one through twenty which were affected by the collapsed sewer line, it was "unable to demonstrate from its records that ... physical damage to the [other] apartments" occurred from a covered event under the policy. Maister advised that its maintenance records were not sufficiently detailed to specify whether a leak had occurred from a burst pipe or as a result of slow deterioration. However, with respect to the collapse of the sewer line servicing the building containing apartments one through twenty, Maister advised that one of the plumber's bills indicated an opinion as to the source of a problem in July, 2004, i.e., "a break in the line", which Maister argues is clearly a "covered event". (Rec.doc.46, Ex. 3).

State Farm correctly argues that, as to the buildings other than the one containing units one through twenty, there is no evidence whatsoever that a covered event occurred which activates the terms of its policy. As to the building with units one through twenty, State Farm again correctly argues that its policy deductible has not been met in order to activate Coverage A of the policy. The only evidence pertaining to repair of the premises which plaintiff has furnished is a receipt for $125.00 from a plumber dated July 8, 2004 and another plumbing bill which was the subject of litigation in the amount of $5,590.80. (Rec.docs.46-3, 37-12). As to the latter sum, there is no break down as to location where service was rendered.

**\*5** Accordingly, all of plaintiff's claims enunciated herein under Coverage A of the policy will be dismissed with prejudice.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 926981 (E.D.La.)
**(Cite as: 2009 WL 926981 (E.D.La.))**

In addition to seeking compensation for physical losses, Maister also asserts a claim for insurance benefits for loss of business income under Coverage C of the policy. There does not appear to be a deductible in connection with these payments, if otherwise owed. (State Farm policy, p. 17).

Coverage C of the policy reads, in pertinent part, as follows:

If Loss of Income coverage is shown in the Declarations, we will pay:

a. for the actual loss of "business income" you sustained due to the necessary suspension of your "operations" during the "period of restoration". The suspension must be caused by accidental direct physical loss to property at the described premises, including personal property in the open (or in a vehicle) within 100 feet, caused by an insured loss; ...

"Business income" is defined as
net income (net profit or loss before income taxes) that would have been earned or incurred and continuing normal operating expenses, including payroll, incurred during the "period of restoration"; ...

"Period of restoration" is defined as the period of time that:
a. begins with the date of accidental direct physical loss caused by an insured loss at the described premises; and

b. ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

It is based upon the statement of the plumber noted hereinabove that Maister contends that an accidental direct physical loss occurred. However, the Court finds this insufficient for Maister to withstand summary judgment. The document supplied to the Court is merely a bill generated by Joe Blum, Jr. Plumbing Service, Inc. The bill was sent to Maison Terrebonne but does not reflect that the work per-

formed was carried out at that location.[FN2] It merely indicates that the work was to be billed to that location, which may or may not indicate that it was likewise performed there. The plumber, himself, has not signed an affidavit attesting to what he did or observed. There is merely a notation that the plumber apparently "ran a jetter through the main line in apt. 10 and 6, found that there is a break in the line." Whether this is a sewer or water line is not identified and certainly what would be needed to fix it is not suggested. Nor does the document indicate an opinion as to the cause for the break, i.e., deterioration or a sudden event.

FN2. Mr. Becker, the principal of Maister, testified in his deposition that he held an ownership interest in another property in Luling, La. at all relevant times, i.e., Lakewood. There is nothing to establish, since Mr. Blum was neither deposed nor furnished an affidavit, that work was not performed there as opposed to Maison Terrebonne. (Rec. doc. 33-5, p. 32, *et seq.*)

When questioned in his deposition as to the alleged accidental direct physical loss to the apartments, Mr. Becker testified as follows, in pertinent part:

... I went through all of the apartments to inspect the mold with Michael Waguespack, our attorney, to evaluate the situation. So he was able to locate minor amounts-somewhat larger than minor amounts of mold in all but a dozen apartments there. And they had various causes, some of which were pipe breakages. Some of which were sewerage overflows. Some of which were condensate. Things in the bathroom. The general conditions. Some of which were roof-related. Washing machines that were in the apartments, et cetera, et cetera. The whole assortment of different things, some of which would come under the language in the policy.

**\*6** (Rec. doc 33-5, p. 56, *et seq.*).

And further, Mr. Becker testified as follows:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 926981 (E.D.La.)
**(Cite as: 2009 WL 926981 (E.D.La.))**

Q. But if I look at Mr. Gallagher's report, and I see the different incidents where he found mold as a result of his inspection because of the Giroir lawsuit, can you tell me if any of those incidents, incidents of damage that Mr. Gallagher discovered, were ever reported to State Farm under your State Farm property damage policy before?

A. They were not. I think the answer is none of them were reported.

Q. Do you know why?

A. Because at the time it was ordinary maintenance and repair, and the mold and its effect from the lawsuit were not contemplated at the time. It would have come under the amount of deductible, and it would be pointless to require State Farm to inspect something that was, you know, $100 repair.

(Rec. doc. 33-5, p. 62, *et seq.*).

The Court notes that, as with Coverage A, the policy in question does not provide Coverage C benefits when the loss in question was caused by one or more of the following:

d. smog, wear, tear, rust, corrosion, fungus, mold, decay, deterioration ...

k. continuous or repeated seepage or leakage of water that occurs over a period of time ...

Clearly, the deposition of Mr. Becker indicates that the major issue herein was mold, a non-policy covered occurrence.

Additionally, State Farm correctly urges that Maister has presented no credible evidence to establish that any tenant was forced to move out of his/her unit at Maison Terrebonne so that repairs could be made to a broken pipe. Neither has plaintiff presented any accounting documents or affidavits quantifying the amount of income loss; no expert reports appear to have been generated in connection with this issue, although the deadline

for doing so had expired before the motion was taken under submission. Tax returns which Maister has furnished do not establish loss of income correlated with the alleged broken pipe.

Accordingly, the Court is of the opinion that summary judgment should be granted in favor of defendant in connection with Maister's claims for payment under Coverage C of the policy as an accidental event has not been sufficiently documented. At this stage of the litigation, it is insufficient to indicate that something which might qualify as an accidental event occurred at some unspecified past time. Additionally, the apartments impacted by the alleged accidental event have not been identified with properly documented affidavits or deposition testimony

Lastly, and perhaps the gravamen of this litigation concerns the applicability of Section L of the policy to the facts herein and whether State Farm can be responsible to plaintiff for lost rentals incurred when plaintiff was allegedly prevented from repairing the property during the course of the *Giroir* litigation.

Coverage L of the Comprehensive Business Liability section of the policy provides, in pertinent part, as follows:

**\*7 SUPPLEMENTARY PAYMENTS**

In addition to the Limit of Insurance, we will pay, with respect to any claims or suit we defend:

1. any expenses we incur;

2. up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Coverage L-Business Liability for **bodily injury** applies. We do not have to furnish these bonds;

3. the cost of bonds to release attachments but only for the amount within our Limit of Insurance. We do not have to furnish these bonds;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 926981 (E.D.La.)
**(Cite as: 2009 WL 926981 (E.D.La.))**

4. all reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or **suit**, including actual loss of earnings, up to $100 a day because of time off from work;

5. all costs taxed against the insured in the suit.

6. prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer;

7. all interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

Plaintiff's claim comes specifically under item "4" listed above and there appears to be a lack of jurisprudence interpreting said section.

Plaintiff contends that its loss of income attendant to the inability to rent the premises in question because it was instructed not to repair the property during the pendency of the *Giroir* litigation is an expense compensable under this section. For its part, State Farm argues that loss of rental income is not compensable under this section and, furthermore, even if it were, the amount is capped at $100 per day.

The Court will assume, without deciding, that plaintiff can make a claim for loss of rentals under item "4" above. However, in this instance plaintiff cannot establish that State Farm has taken any action which would trigger a policy provision in order to result in its liability to plaintiff for the following reasons:

Plaintiff contends that 1) upon instruction from Middleberg, which was ratified by State Farm, it was prohibited from effecting repairs to its apartments that were necessary to enable it to re-rent the apartments; 2) its inability to effect repairs suffi-

cient to enable it to re-rent the apartments resulted in a loss of earnings and the eventual failure of the business; 3) obedience to the instruction of Middleberg was compelled by the terms of the insurance policy on the property and by specific instruction from State Farm that it "comply with any request that [Middleberg] may make"; 4) it was told that disobedience of the instruction would result in loss of liability insurance coverage; and 5) its appreciation of the instructions and the consequences of disobedience was reasonable. (Rec.doc.65, p. 1-2).

**\*8** When the *Giroir* litigation was filed, plaintiffs' counsel moved for a protective order restraining Maister from demolishing the buildings or "removing any carpeting, ceiling tiles, sheetrock, etc." A rule to show cause was noticed in state district court to deal with that issue. But before that hearing could occur, the matter was removed to this court. An order as sought in the rule to show was never issued. But Maister was advised by Middleberg not to make any such repairs without court approval for fear of being accused of spoliation of evidence.

It is further clear from the record that it was plaintiff, through its principal, Brian Becker, who chose Middleberg as its counsel herein. (Rec.doc.33-5, pp. 72-74). State Farm agreed to allow and pay for Middleberg's representation of plaintiff. Stone, Pigman represented the interest of State Farm. Per letter dated September 10, 2004, State Farm advised plaintiff that it would pay for Middleberg's fees, that it would not interfere with Maister's attorney-client relationship with Middleberg, that Maister faced potential exposure in the *Giroir* litigation for damages not covered by the policy, that Maister might want to retain additional counsel to represent it for issues involving excess and/or coverage and that State Farm would not pay legal fees for advice rendered to Maister concerning coverage. (Rec.doc.65-10).

It is apparently Maister's contention that there was an "identity of interest" between Maister and State Farm such that advice by Middleberg concerning

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 926981 (E.D.La.)
**(Cite as: 2009 WL 926981 (E.D.La.))**

repair of the premises is also the advice of State Farm. Other than Maister's conclusory argument to this effect, there is nothing in the record to lead the Court to the same conclusion. In fact, the record reflects that, from the inception of the *Giroir* litigation, there was potential conflict between State Farm and Maister in that State Farm did not intend to honor a first-party claim by Maister concerning property damage to the premises or loss of rents due to its belief that any problems were caused by plaintiff's failure to maintain its property. Additionally, plaintiff was being sued in *Giroir* for items of damage for which State Farm was not responsible under its policy, i.e., punitive damages.

The record further reflects that Middleberg proposed a "plan of action", via letter of October 21, 2004, whereby the Court should authorize specific work to be performed to the property that involved mold or water damage in order to avert a claim of spoliation of evidence. However, Middleberg believed that Maister could and should repair water leaks, remove excess water and perform other maintenance not concerned with mold. (Rec.doc.65-12). State Farm points out that there is nothing in the record to establish that plaintiff followed Middleberg's recommendation by making the repairs that counsel suggested were appropriate without court order. (Rec. doc. 33-20, Affidavit of Fabian Patin, excerpt from General Report for All Buildings, Ch. 12 "Conclusions").

**\*9** But plaintiff's argument herein fails if there is no "identity of interest" between it and State Farm such that the advice of Middleberg becomes the advice of State Farm as well. There is nothing unusual about State Farm being represented by one counsel and Maister by another. This very fact belies commonality of interest and implies a conflict. As such, no "identity of interest" between the parties is apparent. The argument also fails absent proof that the advice given by Middleberg was faulty. On this issue as well, there is nothing in the record to establish that, in giving plaintiff the advice which was rendered, Middleberg breached the reasonable

standard of care in the legal community to establish that State Farm's interest was placed above Maister's. Such proof would require expert testimony which is also lacking herein.

Accordingly, the motion for summary judgment filed herein by State Farm is GRANTED and the motion for summary judgment filed herein by plaintiff is DENIED.

There will be judgment herein dismissing the claims of plaintiff, Maister Associates, against State Farm Fire & Casualty Insurance Company and State Farm General Insurance Company, with prejudice, at plaintiff's costs.

E.D.La.,2009.
Maister Associates v. State Farm Fire and Cas. Co.
Slip Copy, 2009 WL 926981 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 4286538 (E.D.La.)
**(Cite as: 2008 WL 4286538 (E.D.La.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
TRANSCONTINENTAL INSURANCE COM-
PANY
v.
GUICO MACHINE WORKS, INC.
Guico Machine Works, Inc.
v.
Transcontinental Insurance Co., et al.
**Civil Action Nos. 06-2516, 06-3184.**

Sept. 17, 2008.

John William Waters, Jr., Christopher Marx G'Sell,
David Edward Walle, Douglas M. Kleeman,
Gregory John McDonald, Bienvenu, Foster, Ryan
& O'Bannon, New Orleans, LA, for Transcontinent-
al Insurance Company.

Patricia Schuster LeBlanc, Joseph L. Montgomery,
Michael L. Fantaci, LeBlanc Butler, LLC, Metairie,
LA, for Guico Machine Works, Inc.

### ORDER AND REASONS

KURT D. ENGELHARDT, District Judge.

**\*1** Presently before the Court is Transcontinental
Insurance Company's Motion for Summary Judg-
ment (Rec.Doc. No. 73). Transcontinental Insur-
ance Company (TIC) contends that its policy (CNA
Policy Number B 2066467720) provides no cover-
age for the property damage claims asserted there-
under by the insured, Guico Machine Works, Inc.
("Guico").[FN1] TIC additionally urges dismissal of
Guico's claims for statutory penalties and bad faith
damages under La. R.S. 22:658 and La. R.S.
22:1220. As explained herein, **IT IS ORDERED**
that the motion is **GRANTED IN PART** and
**DENIED IN PART.**

FN1. The policy is attached as Exhibit A to
TIC's memorandum in support of motion
for summary judgment (Rec.Doc. No.
73-5). Individual pages of the policy are
identified herein by the assigned Bates
number.

TIC's motion is denied insofar as it seeks a ruling
that the policy's Windstorm Exclusion operates to
preclude coverage for any and all claims asserted
by Guico for damages suffered by its building and
equipment found at the insured location, *i.e.,* 1170
Destrehan Avenue, Harvey, Louisiana. While both
parties' experts agree that the force and pressure of
Hurricane Katrina's winds caused cinder blocks
from the neighboring building to fall upon and
damage Guico's building, the Court is not con-
vinced that that conclusion is determinative of all of
Guico's claims as a matter of law. Rather, the Court
finds a triable issue exists as to the applicability of
the exception to the Windstorm Exclusion set forth
in TIC's policy endorsement, which provides:

> But if Windstorm or Hail results in a cause of
> loss other than rain, snow, sand or dust, and that
> resulting cause of loss is a Covered Cause of
> Loss, we will pay for the loss or damage caused
> by such Covered Cause of Loss. For example, if
> the Windstorm or Hail damages a heating system
> and fire results, the loss or damage attributable to
> the fire is covered subject to any other applicable
> policy provisions.[FN2]

FN2. *See* Policy (Rec.Doc. No. 73-5) at
CNA00548.

Specifically, the Court finds Section D(1)(a)(1) and
Section F(2)(a) of the TIC policy, addressing
"Additional Coverages", and, defining "Specified
Causes of Loss," to be sufficiently ambiguous to al-
low the trier of fact to reasonably conclude that
Hurricane Katrina's winds caused "falling objects"
from the neighboring building to bring about the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4286538 (E.D.La.)
**(Cite as: 2008 WL 4286538 (E.D.La.))**

"collapse" of part of Guico's Destrehan Avenue building.[FN3]

>    FN3. *See* Policy (Rec.Doc. No. 73-5) at CNA00573 and CNA00576.

Turning to the damages for which Guico seeks payment of insurance benefits, TIC's motion for summary judgment is granted with respect to "loss or damage caused by or resulting from rust ..." or "dampness ... of atmosphere" based on the exclusions set forth in Sections B(2)(d)(2) and (7) of the policy.[FN4] Although these exclusions clearly would apply to an insured's failure to maintain and protect its property from rain and humidity under ordinary circumstances, the language of the exclusion is not so limited. Nor is it ambiguous. Rather, it simply excludes *all* loss or damage from rust or dampness of atmosphere.

>    FN4. *See* Policy (Rec.Doc. No. 73-5) at CNA00569-570.

Given the value and nature of Guico's equipment that was exposed to outside elements following the damage to its building, it reasonably could have sought out an insurance policy that either did not contain these exclusions, or included an exception when these particular causes of loss occurred as a natural and foreseeable result of a covered cause of loss. Unfortunately, it did not do so when it procured the TIC policy. Thus, in the absence of authority declaring such a limitation on coverage to be unlawful, the Court must enforce the terms of the parties' contract.

*\*2* Finally, given the foregoing rulings, the Court grants TIC's motion relative to Plaintiff's requests for penalties and statutory penalties and bad faith damages under La. R.S. 22:658 and La. R.S. 22:1220 except with respect to TIC's interpretation and application of the Windstorm Exclusion to Guico's claim.

The Court's rulings favorable to Guico are without prejudice, of course, to the Court's consideration of a motion made pursuant to Rule 50 of the Federal Rules of Civil Procedure following the submission of evidence at trial.

E.D.La.,2008.
Transcontinental Ins. Co. v. Guico Machine Works, Inc.
Not Reported in F.Supp.2d, 2008 WL 4286538 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

Only the Westlaw citation is currently available.

United States District Court, E.D. Virginia,
Norfolk Division.
TRAVCO INSURANCE COMPANY, Plaintiff,
v.
Larry WARD, Defendant.
**Civ. No. 2:10cv14.**

June 3, 2010.

**Background:** Insurer brought action against insured, seeking declaration that it was not liable under homeowners policy for damage to insured's residence caused by toxic gases released by drywall manufactured in China. Insurer moved for summary judgment.

**Holdings:** The District Court, Robert G. Doumar, J., held that:
(1) insured's residence sustained "direct physical loss" within meaning of policy;
(2) latent defect exclusion barred coverage for damage to insured's residence;
(3) faulty materials exclusion barred coverage for damage to insured's residence; and
(4) ensuing loss provision did not apply to cover damage to insured's residence.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Courts 170B €═>416**

170B Federal Courts
   170BVI State Laws as Rules of Decision
      170BVI(C) Application to Particular Matters
         170Bk416 k. Evidence Law. Most Cited Cases
When state law provides the rule for decision in a suit for declaratory judgment in federal court, whether or not the burden of proof should be shifted is determined according to the rule in the forum state for similar declaratory actions.

**[2] Declaratory Judgment 118A €═>341.1**

118A Declaratory Judgment
   118AIII Proceedings
      118AIII(E) Evidence
         118Ak341 Presumptions and Burden of Proof
            118Ak341.1 k. In General. Most Cited Cases
Under Virginia law, in an action for declaratory judgment, the burden of proof is not put on the plaintiff merely because he has filed the action; rather, the court must examine the underlying issues to determine who bears the burden of proof.

**[3] Insurance 217 €═>2117**

217 Insurance
   217XV Coverage--in General
      217k2114 Evidence
         217k2117 k. Burden of Proof. Most Cited Cases

**Insurance 217 €═>3575**

217 Insurance
   217XXXI Civil Practice and Procedure
      217k3572 Evidence
         217k3575 k. Burden of Proof. Most Cited Cases
In insurance contract disputes under Virginia law, the burden is on the policyholder to bring himself within the policy, and after the policyholder establishes a prima facie case, the burden shifts to the defendant insurance company to prove its affirmative defense.

**[4] Insurance 217 €═>2117**

217 Insurance
   217XV Coverage--in General
      217k2114 Evidence
         217k2117 k. Burden of Proof. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

Cases

**Insurance 217 ☜3571**

217 Insurance
   217XXXI Civil Practice and Procedure
      217k3571 k. Pleading. Most Cited Cases
Insurance policy exclusions are an affirmative defense, and accordingly, under Virginia law the burden is on the insurer to prove that an exclusion applies.

**[5] Insurance 217 ☜1813**

217 Insurance
   217XIII Contracts and Policies
      217XIII(G) Rules of Construction
         217k1811 Intention
            217k1813 k. Language of Policies.
Most Cited Cases
Under Virginia law, courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words that have been used in the documents.

**[6] Evidence 157 ☜461(1)**

157 Evidence
   157XI Parol or Extrinsic Evidence Affecting Writings
      157XI(D) Construction or Application of Language of Written Instrument
         157k461 Showing Intent of Parties as to Subject-Matter
            157k461(1) k. In General. Most Cited Cases

**Insurance 217 ☜1809**

217 Insurance
   217XIII Contracts and Policies
      217XIII(G) Rules of Construction
         217k1809 k. Construction or Enforcement as Written. Most Cited Cases

**Insurance 217 ☜1822**

217 Insurance
   217XIII Contracts and Policies
      217XIII(G) Rules of Construction
         217k1822 k. Plain, Ordinary or Popular Sense of Language. Most Cited Cases
When the language of an insurance policy is clear and unambiguous, under Virginia law, courts do not employ rules of construction, but rather they give the language its plain and ordinary meaning and enforce the policy as written; however, if the contract is found to be lacking in clarity, the court should resort to parol evidence to ascertain the true intention of the parties.

**[7] Insurance 217 ☜1835(2)**

217 Insurance
   217XIII Contracts and Policies
      217XIII(G) Rules of Construction
         217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers
            217k1835 Particular Portions or Provisions of Policies
               217k1835(2) k. Exclusions, Exceptions or Limitations. Most Cited Cases
Under Virginia law, exclusionary language in an insurance policy will be construed most strongly against the insurer.

**[8] Insurance 217 ☜2140**

217 Insurance
   217XVI Coverage--Property Insurance
      217XVI(A) In General
         217k2139 Risks or Losses Covered and Exclusions
            217k2140 k. In General. Most Cited Cases
Under Virginia law, insured's residence sustained "direct physical loss" within meaning of homeowners policy when it was rendered uninhabitable by toxic gases released by drywall manufactured in China, even though drywall was still intact.

**[9] Insurance 217 ☜2140**

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and
Exclusions
          217k2140 k. In General. Most Cited
Cases
Under Virginia law, latent defect exclusion in
homeowners policy did not apply to bar coverage
for damage to insured's air conditioner and garage
door caused by toxic gases released by drywall
manufactured in China; drywall was not integral to
air conditioner or garage door.

**[10] Insurance 217 ☞2140**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and
Exclusions
          217k2140 k. In General. Most Cited
Cases
Under Virginia law, latent defect exclusion in
homeowners policy barred coverage for damage to
insured's residence caused by toxic gases released
by drywall manufactured in China; drywall was in-
tegral to residence's manufacture and construction.

**[11] Insurance 217 ☞2156**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and
Exclusions
          217k2156 k. Faulty Workmanship or
Materials. Most Cited Cases
Under Virginia law, faulty materials exclusion in
homeowners policy barred coverage for damage to
insured's residence caused by toxic gases released
by drywall manufactured in China; drywall was de-
fective.

**[12] Insurance 217 ☞2146**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and
Exclusions
          217k2146 k. Corrosion or Deteriora-
tion; Mold or Fungus. Most Cited Cases
Under Virginia law, corrosion exclusion in
homeowners policy barred coverage for damage to
structural, mechanical, and plumbing systems in in-
sured's residence caused by toxic gases released by
drywall manufactured in China.

**[13] Insurance 217 ☞2146**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and
Exclusions
          217k2146 k. Corrosion or Deteriora-
tion; Mold or Fungus. Most Cited Cases
Insurance policy exclusions for damage caused by
corrosion preclude recovery for any damage caused
to property because of contact with any corrosive
agent under Virginia law.

**[14] Insurance 217 ☞2148**

217 Insurance
    217XVI Coverage--Property Insurance
      217XVI(A) In General
        217k2139 Risks or Losses Covered and
Exclusions
          217k2148 k. Pollution or Contamina-
tion. Most Cited Cases
Under Virginia law, pollution exclusion in
homeowners policy barred coverage for damage to
insured's residence caused by toxic gases released
by drywall manufactured in China; sulfur gases re-
leased by drywall were pollutants.

**[15] Insurance 217 ☞2148**

217 Insurance
    217XVI Coverage--Property Insurance

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

217XVI(A) In General
217k2139 Risks or Losses Covered and Exclusions
217k2148 k. Pollution or Contamination. Most Cited Cases
Under Virginia law, pollution exclusions in property insurance policies are not limited to traditional environmental pollution.

**[16] Federal Courts 170B ☜372**

170B Federal Courts
170BVI State Laws as Rules of Decision
170BVI(A) In General
170Bk372 k. Diversity of Citizenship Jurisdiction. Most Cited Cases
The federal courts in diversity cases, whose function it is to ascertain and apply the law of a state as it exists, should not create or expand that state's public policy.

**[17] Insurance 217 ☜2165(2)**

217 Insurance
217XVI Coverage--Property Insurance
217XVI(A) In General
217k2139 Risks or Losses Covered and Exclusions
217k2165 Proximate Cause
217k2165(2) k. Combined or Concurrent Causes. Most Cited Cases
Under Virginia law, ensuing loss provision in homeowners policy did not apply to cover damage to insured's residence caused by toxic gases released by drywall manufactured in China; although damage occurred gradually over period of time, it was single discrete loss from single discrete injury and was excluded by other provisions in policy.
Wystan Michael Ackerman, Robinson & Cole LLP, Hartford, CT, for Plaintiff.

Jeffrey Arnold Breit, Breit Drescher & Imprevento PC, Norfolk, VA, for Defendant.

***ORDER & OPINION ON MOTION FOR SUM-***

***MARY JUDGMENT***

ROBERT G. DOUMAR, District Judge.

**\*1** This matter comes before the Court on a Motion for Summary Judgment, filed by Plaintiff TRAVCO Insurance Company ("Plaintiff") on March 18, 2010. This case involves a dispute over an insurance policy. Defendant Larry Ward ("Defendant") owns a residence that is insured under a homeowners insurance policy issued by Plaintiff. (Compl.1, 8-9.) Defendant's residence contains walls that were constructed using sheets of drywall manufactured in China. (Compl.10.) On September 23, 2009, Defendant reported an insurance claim to Plaintiff seeking coverage for damages allegedly caused by this Chinese drywall. (Compl.26.) On January 7, 2010, Plaintiff denied Defendant's claim and filed a declaratory judgment action in this Court. (Compl. 32; *see also* Compl. Ex. C.) Plaintiff seeks a declaration that it is not liable for the damage caused by the Chinese drywall. (Compl.15.)

The home insurance policy in question, homeowner's policy # 9812814746331 ("the Policy"), provides coverage for "direct physical loss to property described in Coverages A and B." (Compl. Ex. A at 8.)[FN1] Coverage A consists of the "dwelling on the 'residence premises,' " and Coverage B consists of other structures on the premises. (*Id.* at 2-3.) This coverage is subject to a number of exclusions, including exclusions for latent defects, faulty materials, corrosion, and pollution. (*Id.* at 8-12.) The Policy contains an ensuing loss provision, however, which restores coverage for ensuing losses not otherwise excluded by the Policy. The Policy also provides coverage for personal property in Coverage C, but this coverage is limited to "direct physical loss" caused by an enumerated list of causes. (*Id.* at 9-10.)

Based on a review of applicable Virginia law,[FN2] the Court finds that the Ward Residence and its components suffered a "direct physical loss" within the meaning of the Policy. The Court also finds, however, that four separate exclusions apply to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

damage claimed. Specifically, the claimed losses are excluded by the Policy's latent defect, faulty materials, corrosion, and pollutant exclusions. Moreover, none of the losses now claimed by Defendant qualify for coverage under the Policy's ensuing loss provisions. The Court will not categorically rule out, however, the possibility that other as-yet-unclaimed losses might be subject to coverage under the Policy's ensuing loss provisions. Accordingly, Plaintiff's Motion for Summary Judgment is **GRANTED IN PART, DENIED IN PART.** The Court hereby enters a declaratory judgment providing as follows:

1. The Policy does not provide coverage for the cost of removing and/or replacing the Drywall in the Ward Residence;

2. The Policy does not provide coverage for the damage claimed by Mr. Ward to the air conditioning equipment at the Ward Residence, which resulted from corrosion;

3. The Policy does not provide coverage for the damage claimed by Mr. Ward to the garage door at the Ward Residence, which resulted from corrosion;

*2 4. The Policy does not provide coverage for the damage claimed by Mr. Ward to the flat screen televisions; and

5. The Policy does not provide coverage for any presently claimed damages caused by the Drywall in the Ward Residence or for any presently claimed damage caused by the discharge of gas from the Drywall, including but not limited to any damage to wiring and copper components of the home.

# I. FACTUAL AND PROCEDURAL BACKGROUND

*1. The Policy*

Defendant owns a residence located at 214 80th St.

in Virginia Beach ("the Ward Residence"). (Compl. 8; Ans. 8.) Defendant purchased this residence on May 1, 2007. (*Id.*) On May 7, 2007, Defendant took out a homeowner's insurance policy, Policy No. 981281476331, issued by Plaintiff. (Comp. 9; Ans. 9.) The Policy initially covered the Ward Residence from May 7, 2007 to May 7, 2008; Defendant renewed the policy twice for coverage from May 7, 2008 to May 7, 2010. (*Id.*)

The Policy is divided into two Sections. Section I provides property coverage, and Section II provides liability coverage. (Compl.Ex.A.) Section I is further subdivided into four separate Coverage sections. Coverage A provides coverage for the dwelling, Coverage B provides coverage for other structures, Coverage C provides coverage for personal property, and Coverage D provides coverage for loss of use.

The core of the Policy is in Section I-Perils Insured Against, which provides as follows:

1. We insure against risk of direct physical loss to property described in Coverages A and B.

2. We do not insure, however, for loss:

a. Excluded under Section 1-Exclusions; or

b. Caused by:

...

(6) Any of the following:

...

(b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

(c) Smog, rust or other corrosion, mold, fungi, wet or dry rot;

...

(e) Discharge, dispersal, seepage, migration, re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

lease or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed

....

Under 2.b. above, any ensuing loss to property described in Coverages A and B not excluded by any other provision in this policy is covered.

(Compl. Ex. A at 8-9.) The Policy does not define "direct physical loss." However, it does define "Property Damage" as "physical injury to, destruction of, or loss of use of tangible property." (*Id.* at 2.)

Section I-Exclusions sets forth twelve different categories of exclusions. In relevant part, it provides as follows:

B. We do not insure for loss caused by any of the following. However, any ensuing loss which is not excluded by any other provision in this policy is covered.

*3 ...

3. Faulty, inadequate or defective:

...

b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c. Materials used in repair, construction, renovation or remodeling;

...

of part or all of the property whether on or off the

"residence premises."

(*Id.* at 10-12.)

Coverage C provides for coverage against "direct physical loss to the property described in Coverage C caused by any of the following perils, unless the loss is excluded in Section I-Exclusions." (*Id.* at 9-10.) The Policy then lists seventeen specific perils such as fire and theft. None of these perils is relevant to the present case. (*Id.*)

Coverage D provides for the payment of additional living expenses. Specifically, it provides that "[i]f a loss covered under Section I makes that part of the 'residence premises' where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living." (*Id.* at 4.)

*2. The Insurance Claim*

The Ward Residence contains walls that were constructed using sheets of Chinese drywall ("the Chinese Drywall"). (Compl. 10; Ans. 10.) Over time, the Chinese Drywall in the Ward Residence has released sulfuric gas into the Residence. (*See generally* Hejzlar Dec.) On August 10, 2009, Defendant filed a lawsuit in the Circuit Court for the City of Norfolk against several development and supply companies, alleging that they constructed his home with "inherently defective" drywall. (Mumford Aff. Ex. A.) The suit is captioned *Ward v. Peak Building Corp.* In relevant part, Defendant alleges that the Chinese Drywall in his home "emits various sulfide gasses and/or other toxic chemicals through 'off-gassing' that create noxious odors and cause damage and corrosion." *Ward v. Peak Building Corp.,* No. CL09-5167, Compl. 11 (Va. Cir. Ct. filed Aug. 10, 2009). Defendant further claims that the "compounds emitted by the drywall at issue are also capable of ... harming the health of individuals." *Id.* 12. The case is currently part of a multi-district litigation pending in the Eastern District of Louisiana. *See In re Chinese-Manufactured Dry-*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

*wall Prods. Liability Litig.,* MDL No.2047, 626
F.Supp.2d 1346 (J.P.M.L. June 15, 2009).

While this state court lawsuit was pending, Defend-
ant began to prepare an insurance claim. Defendant
retained Dr. Zdenek Hejzlar, an occupational safety
and health engineer, to inspect his home. On Au-
gust 26, 2009, Dr. Hejzlar personally inspected the
Ward Residence. (Compl. 13-14; Ans. 13-14.) Ad-
ditionally, Dr. Hejzlar instructed an investigator to
perform a second inspection of the Ward Residence
on August 31, 2009. (Compl. 18; Ans. 18.) Dr.
Hejzlar found, *inter alia,* that the level of sulfur gas
inside the Ward Residence was twenty times higher
than ambient levels; that there was "widespread im-
pact to susceptible metal surfaces (e.g.copper, sil-
ver, chrome) such as HVAC coils, electrical wiring
in outlets, ground wires and other metallic sur-
faces"; and that the residents of the home should be
relocated to assure their safety. (Hejzlar Dec.)

*4 On September 23, 2009, Defendant filed a claim
with Plaintiff, seeking coverage for damages related
to the Chinese Drywall. (Compl. 26; Ans. 26.) On
January 7, 2010, Plaintiff sent Defendant a letter
denying coverage for his claim. (Compl.Ex. C.)
Plaintiff also informed Defendant that it would be
filing suit in this court "seeking a declaratory judg-
ment that your policy does not provide coverage for
your claim." (*Id.*)

*3. Present Suit*

On January 7, 2010, Plaintiff filed a declaratory
judgment action in this Court pursuant to 28 U.S.C.
§ 2201.[FN3] Plaintiff seeks a declaration "that, un-
der the Policies, it has no obligation to provide cov-
erage for the losses claimed by Mr. Ward."
(Compl.74.) More specifically, Plaintiff requests
that the Court grant the following relief:

  A. Enter a declaratory judgment that the Policy
  does not provide coverage for the cost of remov-
  ing and/or replacing the Drywall in the Ward
  Residence;

B. Enter a declaratory judgment that the Policy
does not provide coverage for the damage
claimed by Mr. Ward to the air conditioning
equipment at the Ward Residence;

C. Enter a declaratory judgment that the Policy
does not provide coverage for the damage
claimed by Mr. Ward to the garage door at the
Ward Residence;

D. Enter a declaratory judgment that the Policy
does not provide coverage for the damage
claimed by Mr. Ward to the flat screen televi-
sions;

E. Enter a declaratory judgment that the Policy
does not provide coverage for any damage caused
by the Drywall in the Ward Residence or for any
damage caused by the discharge of gas from the
Drywall, including but not limited to any damage
to wiring and copper components of the home;
and

  F. Grant such other relief as this Court deems just
  and appropriate.

(Compl. at 15.)

Plaintiff's argument proceeds by dividing Defend-
ant's insurance claim into three categories: a claim
for the cost of removal and replacement of the
Chinese Drywall; a claim for damage to Plaintiff's
air conditioning equipment and garage door; and a
claim for damage to Plaintiff's flat screen televi-
sions. Plaintiff then argues that it is not liable for
any of these three claims.

With regard to the claim for the cost of removing
the Chinese Drywall, Plaintiff argues that "the Dry-
wall has not sustained a 'direct physical loss,' and
therefore does not fall within the grant of coverage
in the Policy." (*Id.* 56.) Plaintiff further argues that
even if there had been a direct physical loss to the
Drywall, this loss would be excluded from coverage
under either the latent defect or faulty material ex-
clusions quoted above. (*Id.* 57-58.) For similar reas-
ons, Plaintiff argues that the presence of gas and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

odor in the does not constitute a "direct physical loss," and would be subject to exclusion under the latent defect or faulty materials exclusions in any event. (*Id.* 59-61.) Additionally, Plaintiff argues that any direct physical loss caused by gas and odor would be subject to the pollutant exclusion.

*5 Plaintiff concedes that the damage caused to the air conditioning equipment and garage door in the Ward Residence does constitute a direct physical loss. Plaintiff argues, however, that this loss is subject to the latent defect exclusion, the faulty material exclusion, the pollutant exclusion, and the corrosion exclusion. (*Id.* 63-65.)

Turning to the flat screen televisions, Plaintiff argues that the televisions are personal property covered under Coverage C of the Policy. Coverage C only provides coverage for certain enumerated perils. Plaintiff argues that none of the enumerated perils applies in this case. (*Id.* 67-68.) Plaintiff further argues that any damage to the televisions is excluded by the faulty material exclusion described above. (*Id.* 69.)

Defendant filed an Answer on March 4, 2010. On March 8, 2010, Defendant filed a Motion to Transfer Venue, seeking to transfer this action to the United States District Court for the Eastern District of Louisiana. The Court denied this Motion on March 30, 2010.

## II. MOTION FOR SUMMARY JUDGMENT

On March 18, 2010, Plaintiff filed a Motion for Summary Judgment. In this Motion, Plaintiff repeats the arguments presented in the Complaint. To reiterate these arguments briefly, Plaintiff argues as follows:

The Policy does not provide coverage for these losses for several reasons. First, any claim for the cost of removing and/or replacing the drywall is not covered because the drywall itself has not sustained a direct physical loss. Second, any damage caused by the drywall and/or the gases

emitted from the drywall, including the claimed damage to metallic surfaces, is excluded as loss caused by a latent defect, faulty materials, and pollutants (gaseous contaminants.) Third, any damage to metallic surfaces in Mr. Ward's home is also independently excluded because loss caused by corrosion is excluded.

(Pl.'s Mem. of Law in Supp. of its Mot. for Sum. J. 11 [hereinafter Pl.'s Br.].)

Defendant filed a Memorandum in Opposition on April 19, 2010. Defendant argues that he "has easily met his light burden of establishing coverage because his 'dwelling,' has been physically damaged, such damage being an undisputed fact." (Def.'s Resp. in Opp. to Pl.'s Mot. for Sum. J. 8 [hereinafter Def.'s Br.].) Defendant points to the definition of "Physical Damage" in the policy, which includes "loss of use of tangible property." ( *Id.*) Defendant further notes that while the Drywall in his home "is still functioning as it was intended, it is nevertheless causing harm to other components of the home...." (*Id.* at 8-9.) Finally, Defendant argues that even if the Drywall itself has not sustained a direct physical loss, Plaintiff is still liable for the cost of remediation because removal of the Drywall is necessary to fix damaged wiring and plumbing. (*Id.* at 9.)

Defendant argues that none of the exclusions in the Policy applies. With regard to the latent defect exclusion, Defendant argues that "the intent of the exclusion is to preclude inevitable damage to the product itself from, for example internal decomposition." (*Id.* at 12-16.) Turning to the faulty materials exclusion, Defendant argues that this exclusion does not apply because the Drywall "is serving its intended purpose." (*Id* . at 22-23.) As for the corrosion exclusion, Defendant argues that it is inapplicable because corrosion was not the proximate cause of the damage, but rather its effect. (*Id.* at 23-25.) Finally, Defendant maintains that the pollution exclusion is inapplicable because this exclusion applies only to environmental damage, not to damage from substandard building materials. (*Id.* at 25-30.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

Additionally, Defendant argues that even if one of these four exclusions apply, Plaintiff is still liable under the "ensuing loss" provisions in the Policy. ( *Id.* at 17-21.) Defendant further contends that the ensuing loss provision provides coverage for the damage to his personal property. (*Id.* at 31.)

**\*6** Plaintiff filed a rebuttal brief on April 26, 2010. FN4 The Court held a hearing on May 18, 2010, and heard argument from the parties.

## III. LEGAL STANDARD

Although Virginia law governs the substantive aspects of this case, the procedural aspects of summary judgment are determined by federal law. *Hartfield v. Occidental Chem. Corp.,* 842 F.2d 1290 (4th Cir.1988) (unpublished); *see also Caesar Elecs. Inc. v. Andrews.* 905 F.2d 287, 289 n. 3 (9th Cir.1990). Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Factual disputes which do not raise a " *genuine* issue of *material* fact" are insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644-45 (4th Cir.2002), while also abiding by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club. Inc.,* 346 F.3d 514, 526 (4th Cir.2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

[1][2] This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201. Virginia law must be utilized to determine the question of coverage in this Policy written in Virginia for a homeowner of a Virginia home. *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.,* 377 F.3d 408, 419 (4th Cir.2004) (citing *Buchanan v. Doe,* 246 Va. 67, 431 S.E.2d 289, 291 (Va.1993)). "When state law provides the rule for decision in a suit for declaratory judgment in federal court, whether or not the burden of proof should be shifted is determined according to the rule in the forum state for similar declaratory actions." *Farnsworth Cannon. Inc. v. Grimes,* 635 F.2d 268, 273 (4th Cir.1980). Under Virginia law, "[i]n an action for declaratory judgment, the burden of proof is not put on the plaintiff merely because he has filed the action. Rather, the Court must examine the underlying issues to determine who bears the burden of proof." *Rainwater Concrete Co. v. Cardinal Concrete Co.,* 17 Va. Cir. 325 (Va.Cir.Ct.1989) (citing *Reasor v. City of Norfolk,* 606 F.Supp. 788, 793 (E.D.Va.1984)).

[3][4] In an insurance contract dispute, Virginia courts place the burden on the policyholder "to bring himself within the policy." *Maryland Cas. Co. v. Cole,* 158 S.E.2d 873, 876 (Va.1931). After the policyholder establishes a *prima facie* case, the "burden shift[s] to the defendant insurance company to prove its affirmative defense." *RML Corp. v. Assurance Co. of America,* 60 Va. Cir. 269 (Va.Cir.Ct.2002). Policy exclusions are an affirmative defense; accordingly, "the burden is upon the insurer to prove that an exclusion applies." *Allstate Ins. Co. v. Guathier,* 273 Va. 416, 641 S.E.2d 101, 104 (Va.2007) (quoting *Transcontinental Ins. Co. v. RBMW, Inc.,* 262 Va. 502, 512, 551 S.E.2d 313 (2001)).

**\*7** [5][6][7] Virginia courts "interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words that have been used in the documents." *Floyd v. Northern Neck Ins. Co.,* 245 Va. 153, 427 S.E.2d 193, 196 (Va.1993). When the language of the "policy is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

clear and unambiguous, courts do not employ rules of construction, rather, they give the language its plain and ordinary meaning and enforce the policy as written." *Partnership Umbrella. Inc. v. Fed. Ins. Co.,* 260 Va. 123, 530 S.E.2d 154, 160 (Va.2000). If, on the other hand, the contract is found to be lacking in clarity, the "court should resort to parol evidence to ascertain the true intention of the parties." *Aetna Cas. & Sur. Co. v. The Fireguard Corp.,* 249 Va. 209, 455 S.E.2d 229, 232 (Va.1995) . Exclusionary language "will be construed most strongly against the insurer." *Allstate,* 641 S.E.2d at 104.

Insurance contracts are merely another type of contract, and the court must construe a policy's terms to mean what they say. *See Pilot Life Ins. Co. v. Crosswhite,* 206 Va. 558, 145 S.E.2d 143, 146 (Va.1965) (stating that "it is the function of the court to construe the language of the contract as written"). Although the equities often favor the insured, a court must give meaning to the written language of the policy. Law and economics tell us that the person who can best bear the loss is the group, because the group is merely the group of persons who are insured. But if many people go to the trough at the same time, the trough soon empties. *See generally* James M. Fischer, *Why Are Insurance Contracts Subject to Special Rules of Interpretation?: Text Versus Context,* 24 Ariz. St. L.J. 995, 1060-66 (1992) ("Although insureds may present sympathetic cases for loss transference, public policy does not mandate a system for compensating insureds.").

## IV. ANALYSIS

As discussed above, the initial burden rests upon Defendant to "bring himself within the policy." *Maryland Cas. Co.,* 158 S.E.2d at 876. Plaintiff concedes that the damage to Defendant's garage door and air conditioning unit falls within the Policy, but argues that neither the cost of removing and replacing the Chinese Drywall itself nor the damage to Defendant's televisions is covered. (*See*

Pl.'s Br. at 11-14; 26). Part IV.1 addresses the question of whether the Chinese Drywall falls within the policy. For the reasons stated below, the Court finds that the Ward Residence has suffered a "direct physical loss" and that the cost of removing and replacing the Chinese Drywall does fall within the policy. The separate question of whether the damage to Defendant's televisions is covered is addressed separately in Part IV.6 of this Opinion.

Demonstrating that the claimed damage falls within the Policy is only the first step. Should Defendant successfully carry his burden, the burden shifts to Plaintiff to demonstrate that one of the exclusions in the Policy applies. As noted above, Plaintiff argues that the latent defect, faulty materials, corrosion, and pollution exclusions all apply. (*See* Pl.'s Br. at 14-25.) The Court addresses each of these exclusions separately in Part IV.2, Part IV.3, Part IV.4, and Part IV.5, respectively. For the reasons stated therein, the Court finds that at least one of the four exclusions applies to each of the claimed losses to the Ward Residence and its components.

**\*8** Because the exclusions apply, Defendant can only recover if the claimed loss is an "ensuing loss to property described in Coverages A and B not excluded by any other provision in" the Policy. (Compl. Ex. A at 8.) The Court addresses this ensuing loss provision in Part IV.6 of this Opinion. For the reasons set forth therein, the Court finds that the ensuing loss provision does not apply to any of the claimed losses presently before the Court. The Court does not categorically rule out the possibility, however, that other unclaimed losses might be subject to coverage.

### 1. Direct Physical Loss

[8] Defendant seeks to recover for the cost of removing and replacing the Chinese Drywall. To bring this claim within the Policy, Defendant must demonstrate that a "direct physical loss" has occurred. (*See* Compl. Ex. A at 8.) The parties disagree as to whether the Ward Residence has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

suffered a "direct physical loss." The Policy does not define the term "direct physical loss," although it defines "Property Damage" as "physical injury to, destruction of, or loss of use of tangible physical property." (*Id.* at 2.) Plaintiff argues that there has been no direct physical loss because the Drywall is "physically intact, functional and has no visible damage." (Pl.'s Br. at 11.) In response, Defendant points to the definition of "Property Damage" in the Policy. (Def.'s Br. at 8.) He argues that there has been "Property Damage," and thus direct physical loss, because he has been forced to leave his residence. (Def.'s Br. at 8.) Defendant further argues that loss of use is sufficient to constitute direct physical loss under Virginia law, citing *U.S. Airways v. Commonwealth Ins. Co.*, 64 Va. Cir. 408 (Va.Cir.Ct.2004). (*Id.* at 8-9.) Finally, Defendant argues that even if there has been no direct physical loss to the Drywall, Plaintiff is still liable to pay for the costs of reasonable repair. (*Id.* at 11.)

The Court finds that the Ward Residence has suffered a direct physical loss, based on a review of relevant precedent. The only Virginia case on the subject is *U.S. Airways v. Commonwealth Ins. Co.*, 64 Va. Cir. 408 (Va.Cir.Ct.2004). In *U.S. Airways,* the plaintiff's insurance policy insured "against all risk of direct physical loss of or damage to property described herein." After the September 11th attacks, the federal government shut down Reagan National Airport for nearly a month. U.S. Airways filed a claim, but its insurer denied coverage because there was no physical damage to U.S. Airways' property. The court rejected this argument, ruling that "[d]amage to the physical property of U.S. Airways is not a condition precedent to recovery for business interruption." *Id.* at *5.

At first glance, *U.S. Airways* appears to strongly support Defendant's position. As Plaintiff points out, however, *U.S. Airways* can be read in two different ways. (*See* Pl.'s Reb. Br. in Further Supp. of Its Mot. for Summ. J. 4 [hereinafter Pl.'s Reb. Br.].) Broadly interpreted, *U.S. Airways* stands for the proposition that actual physical damage is not ne-

cessary to trigger coverage "against all risk of direct physical loss of or damage to property." But the case can also be read more narrowly for the proposition that damage to property specifically owned by the insured-as opposed to property owned by a third party-is not necessary. *See U.S. Airways,* 64 Va. at *4 ("Rather, the Policy only uses the terms 'direct' and 'property' without any definitions or references to what property must be damaged or where the loss must have occurred prior to civil authority intervention."). Under this latter interpretation, damage to property is still a necessary predicate to insurance coverage, although the property in question need not be owned by the insured.

***9** Since *U.S. Airways* does not provide a clear answer to the question presented, the Court must look to precedent from other jurisdictions. The majority of cases appear to support Defendant's position that physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces. For example, in *Hughes v. Potomac Insurance Co.,* 199 Cal.App.2d 239, 18 Cal.Rptr. 650 (1962), the land around the insured's home fell away in a landslide, leaving the home perched on a cliff. The court held that this constituted a physical loss to the dwelling, stating as follows:

> To accept appellant's interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such a position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.

*Id.* at 248-249, 18 Cal.Rptr. 650; *see also Essex v. BloomSouth Flooring Corp.,* 562 F.3d 399, 406 (1st

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
(Cite as: 2010 WL 2222255 (E.D.Va.))

Cir.2009) (applying Massachusetts law and finding that unpleasant odor was physical injury to property); *Motorists Mutual Ins. Co. v. Hardinger,* 131 Fed.App'x 823, 825-27 (3d Cir.2005) (applying Pennsylvania law and finding that bacteria contamination of well water would constitute direct physical loss to house if it rendered it unusable); *Western Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 437 P.2d 52, 55 (Colo.1968) (*en banc* ) (gasoline fumes which rendered church building unusable constitute physical loss); *Farmers Ins. Co. of Oregon v. Trutanich,* 123 Or.App. 6, 858 P.2d 1332, 1336 (Or.Ct.App.1993) (cost of removing odor from methamphetamine lab constituted a direct physical loss); *Murray v. State Farm Fire & Cas. Co.,* 203 W.Va. 477, 509 S.E.2d 1, 17 (W.Va.1998) (home rendered unusable by increased risk of rockslide suffered direct physical loss even in the absence of structural damage).

In support of its argument that physical damage requires some physical alteration or injury to the property's structure, Plaintiff cites a number of cases from other jurisdictions. The cases Plaintiff cites are all readily distinguishable, however, in that they do not involve situations in which the property in question was rendered unusable. *See Port Authority of N.Y. & N.J. v. Affiliated FM Ins. Co.,* 311 F.3d 226, 236 (3d Cir.2002) ("The structure continues to function-it has not lost its utility."); *Whitaker v. Nationwide Mut. Fire Ins. Co.,* 115 F.Supp.2d 612, 614 (E.D.Va.1999) (insured was "dissatisfied with the quality and workmanship of" construction); *Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n,* 793 F.Supp. 259, 263 (D.Or.1990) (insured filed claim for loss of assessment value and loss of a tenant). In the present case, by contrast, Defendant's home has been rendered uninhabitable by the toxic gases released by the Chinese Drywall. This is a critical distinction. *See Port Authority,* 311 F.3d at 236 (" '[P]hysical loss or damage' occurs only if an actual release of asbestos fibers ... has resulted in contamination of the property ..., *or the structure is made useless or uninhabitable* ...." (emphasis added)).

*10 Plaintiff also tries to buttress its argument by noting that the Policy provides for payment of "Additional Living Expense" in the event that "loss covered under Section I of the Policy makes that part of the 'residence premises' where you reside not fit to live in...." Plaintiff argues that under Defendant's interpretation, a loss of use would always qualify as a "loss covered under Section I," and the words "loss covered under Section I" would therefore become meaningless. This is not true. Even if a total loss of use does constitute a *per se* "direct physical loss," the loss might still be subject to an exclusion, and thus not "covered under Section I."

The Court's conclusion that Defendant has suffered a direct physical loss is strengthened by the fact that the Policy specifically defines "Property Damage" to include "loss of use of tangible property." When read in the context of the precedent discussed above, this definition suggests that the parties intended to define "direct physical loss" to include total loss of use. If Plaintiff intended to define covered losses more narrowly, it should have done so more clearly. "Having failed to do so, [Plaintiff] cannot now rewrite a policy it issued in hopes of avoiding the terms of an instrument it drafted." *Greenbaum v. Travelers Ins. Co.,* 705 F.Supp. 1138, 1142 (E.D.Va.1998) (mem.).

In light of the precedent discussed above, the Court finds that Defendant has carried his burden to "bring himself within the policy." *Maryland Cas. Co.,* 158 S.E.2d at 876. Accordingly, the Court must now determine whether one of the exclusions set forth in the Policy applies.

*2. Latent Defect*

In Section 1-Perils Insured Against, the Policy provides as follows:

   2. We do not insure, however, for loss:

   a. Excluded under Section 1-Exclusions; or

   b. Caused by:

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

...

(6) Any of the following:

...

(b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

...

Under 2.b. above, any ensuing loss to property described in Coverages A and B not excluded by any other provision in this policy is covered.

(Compl. Ex. A at 8.)

[9] Plaintiff argues that this latent defect exclusion applies in the present case. Plaintiff urges the Court to interpret latent defect as a defect that "is not visible or readily discoverable, and did not manifest itself until some time after installation." (Pl.'s Br. at 16.) Applying this definition, Plaintiff claims that the property damage in this case was caused by a latent defect, namely, defects in the chemical composition of the Chinese Drywall. (*Id.*) Plaintiff further notes that Defendant himself described the Chinese Drywall as a "latent Defect" in his state court lawsuit, *Ward v. Peak Building Corp.* (*Id.* at 16-17.)

In response, Defendant argues that the phrase "latent defect" in the Policy is qualified by the modifier "that causes it to damage or destroy itself." (Def.'s Br. at 13-14.) Defendant asserts that the intent of the latent defect exclusion is to "remove the risk transfer of 'expected losses,' such as the gradual deterioration of a product because it has a certain shelf life." (*Id.* at 12.) By this standard, the Chinese Drywall in the Ward Residence does not have a latent defect because it is not deteriorating or damaging itself. In essence, the Defendant contends that the Drywall is defective but not a "latent defect."

*11 At the hearing, the parties appeared to conflate

the latent defect and faulty material exception. In point of fact, "latent defect" is a term of art that has a specialized meaning different from "faulty material." In their briefing, the parties apparently agree that, at a minimum, a latent defect must be "integral to the damaged property by reason of *its* design or manufacture or construction." *U.S. West v. Aetna Cas. & Sur. Co.,* 117 F.3d 1415 (4th Cir. July 16, 1997) (unpub. table op.) (emphasis in original). This restriction is intrinsic to the very definition of "latent defect." [FN5] The Fourth Circuit addressed this limitation at length in *U.S. West v.Aetna Casualty & Surety Co.,* 117 F.3d 1415 (4th Cir. July 16, 1997) (unpub. table op.). In *U.S. West,* the insured owned plastic battery jars which had been lubricated with a gel. The gel had a corrosive effect on the battery jars, and caused them to split open and leak. The Fourth Circuit held that the damage to the battery jars was not caused by a latent defect:

> The corrosive effect of the Aqua Gel II surely resulted in a "defect" in and damage to the batteries, but it was not a defect integral to (latent in) their design, manufacture or construction. Though, by definition, every "latent defect" in insured property is likely to be "not readily discoverable," the converse of that proposition does not follow. Not every defect that is not readily discoverable is a "latent" one; only those not readily discoverable that also are integral to the damaged property's design or manufacture or construction fit that description. The defect here does not fit it.

117 F.3d 1415 (citation omitted).

In light of *U.S. West,* it is clear that the damage to Defendant's air conditioner and the damage to his garage door were not caused by a latent defect. The Chinese Drywall in the Ward Residence, like the lubricating gel in *U.S. West,* is not integral to the damaged air conditioner or garage door. To the contrary, there is no indication that the air conditioner or the garage door were manufactured or constructed in a defective manner.

[10] Defendant's claim for the cost of removing and

Page 14

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

replacing the Chinese Drywall presents a more difficult question. In a certain sense, the Drywall is not "damaged property" at all, and thus its defects cannot be latent defects within the meaning of *U.S. West.* But Defendant cannot argue that he has suffered a "direct physical loss" within the meaning of the Policy, and then turn around and claim that the relevant property remains in an undamaged state. As discussed above, Defendant's claim is for the damages to the Ward Residence. There is no question that the Ward Residence suffers from defects "that ... are integral to the damaged property's design or manufacture or construction." *U.S. West,* 117 F.3d 1415. Specifically, the Ward Residence contains defective Drywall that is off-gassing and damaging other components of the Residence. The Drywall is plainly integral to the Residence's manufacture and construction. Accordingly, the Court finds that the damage to the Ward Residence is a loss caused by a latent defect.

**\*12** Defendant's arguments to the contrary are without merit. Defendant argues that the application of the latent defect exclusion to Chinese Drywall cases is inconsistent with the purpose of the exclusion, which is "to remove the risk transfer of 'expected losses,' such as the gradual deterioration of a product because it has a certain shelf life." (Def.'s Br. at 12.) In fact, the purpose of the exclusion is precisely the opposite. The latent defect exclusion is intended to remove the risk for losses that result from flaws in property that are undetectable, and hence unexpected. *See Glens Falls Ins. Co. v. Long,* 195 Va. 117, 77 S.E.2d 457, 459 (Va.1953) (defining latent defect as "defect which reasonably careful inspection will not reveal" (quotation omitted)).[FN6] Losses from defective Chinese Drywall fit squarely within this category.

Defendant cites *Finger v. Audobon Ins. Co.,* No. 09-8071, 2010 WL 1222273 (La.Civ.Dist.Ct. Mar. 22, 2010) in support of his argument that the latent defect exclusion is inapplicable to losses from Chinese Drywall. Although *Finger* did indeed reject a latent defect exclusion under strikingly simil-

ar facts, the Court finds it to be unpersuasive. As discussed above, there is an inherent contradiction in arguing that property has suffered a "direct physical loss" while simultaneously maintaining that the property is not damaged. Under Fourth Circuit precedent, it is sufficient that the defect be "integral" to the damaged property; it is not necessary to show that the defect is coextensive with the damaged property. *See U.S. West,* 117 F.3d 1415. Moreover, another Louisiana district court has ruled contrary to *Finger* and granted summary judgment to an insurer on facts similar to the case at hand. *See Ross v. C. Adams Const. & Design, L.L. C.,* No. 676-185 (La. 24th. Jud.Dist.Ct. Apr. 14, 2010).

For the foregoing reasons, the Court finds that the cost of removing and replacing the Chinese Drywall is excluded by the Policy's latent defect exclusion.

*3. Faulty Materials*

Section I-Exclusions provides as follows:

  B. We do not insure for loss caused by any of the following. However, any ensuing loss which is not excluded by any other provision in this policy is covered.

  ...

  3. Faulty, inadequate or defective:

  ...

  b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

  c. Materials used in repair, construction, renovation or remodeling;

  ...

  of part or all of the property whether on or off the "residence premises."

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

(Compl. Ex. A at 8.)

[11] Plaintiff argues that this "exclusion for loss caused by faulty or defective materials clearly applies to preclude coverage of all damage resulting from the defect in the drywall." (Pl.'s Br. at 18.) In response, Defendant argues that the Chinese Drywall is not subject to the faulty material exception because it "is serving its normal function and purpose and has not caused damage to itself." (Def.'s Br. at 23.) Defendant cites *Finger* in support of this proposition.

**\*13** The Court is somewhat skeptical of the argument that the Drywall is "serving its intended purpose." Although the Drywall has not collapsed or otherwise physically deteriorated, it is certainly not serving its purpose as a component of a livable residence. In any event, Defendant's argument-that an item cannot be faulty or defective if it is "serving its intended purpose"-is contrary to ordinary English usage. In common parlance, the word "faulty" is not limited to faults that prevent an entity from accomplishing its intended purpose and itself. *See* Oxford English Dictionary (2d Ed.1989) (defining "faulty" as "[c]ontaining faults, blemishes or defects; defective, imperfect, unsound"). The same principle applies to the word "defective."^FN7

Consistent with the ordinary meaning of the words "faulty" and "defective," courts have held that the faulty materials exclusion can apply even when the property in question may be serving its intended purpose. *See Yale Univ. v. Cigna Ins. Co.,* 224 F.Supp.2d 402 (D.Conn.2002) (otherwise functional building materials containing lead and asbestos subject to faulty materials exclusion); *Falcon Prods., Inc. v. Ins. Co. of Pa.,* 615 F.Supp. 37, 39 (E.D.Mo.1985) (scrap metal containing radioactive pellets was "faulty material"); *Wurtele v. Cincinnati Ins. Co..* No. 8:07cv340, 2009 WL 205057 (D. Neb. Jan 27, 2009) (street pavement which expanded, damaging insured's property, was "faulty workmanship"); *Arkin v. Fireman's Fund Ins. Co.,* 228 Ga.App. 564, 492 S.E.2d 314, 317 (Ga.Ct.App.1997) (negligent installation of drive-

way, which led to damage over time to underlying culverts, subject to faulty workmanship exception); *Hartford Cas. Ins. Co. v. Evansville Vanderburgh Public Lib..* 860 N.E.2d 636, 647 (Ind.Ct.App.2007) (use of high-frequency pile driver, which caused soil "densification" which in turn led to building collapse, qualified as "faulty workmanship"). The only authority to the contrary appears to be *Finger.* Again, the Court declines to follow *Finger.* In rejecting the insurer's faulty material exclusion, the *Finger* court cited no authority in support of its holding. The clear weight of authority stands against *Finger* and supports the application of the faulty material exclusion.

The Court notes that Defendant himself repeatedly describes the Drywall as "defective" in his state court suit. For example, Defendant states that "[t]he drywall, used in [the Ward Residence] is inherently defective because it emits various sulfide gases and/or other toxic chemicals through 'off-gassing' that create noxious odors and cause damage and corrosion...." *Ward v. Peak Building Corp.,* No. CL09-5167, Compl. 11 (Va. Cir. Ct. filed Aug. 10, 2009). Defendant is certainly not estopped from urging a different definition of "defective" in this present action. *See Nautilus Ins. Co. v. Gardner,* No. Civ.A. 04-1858, 2005 WL 664358, at \*6 n. 3 (E.D.Pa. Mar.21, 2005). But in the absence of some evidence that the parties intended to assign a specialized meaning to the word "defective" in the Policy, the fact that Defendant himself described the Drywall as "defective" certainly weighs in favor of the application of the exclusion.

*4. Corrosion*

**\*14** Section I-Property Coverages provides as follows:

2. We do not insure, however, for loss:

a. Excluded under Section 1-Exclusions; or

b. Caused by:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

...

   (6) Any of the following:

...

   (c) Smog, *rust or other corrosion,* mold, fungi, wet or dry rot;

(Compl. Ex. A at 8) (emphasis added).

[12] Plaintiff argues that "the claimed damage to metals and metallic surfaces (including but not limited to, air conditioning equipment and a garage door) falls within the exclusion for loss caused by 'corrosion.' " (Pl.'s Br. at 20). Plaintiff notes that Defendant referred to corrosion in his state court complaint. Specifically, Defendant stated that the Drywall caused "corrosion ... to the structural, mechanical and plumbing systems of [Mr. Ward's] home such as the framing, heating, air-conditioning and ventilation ('HVAC') units, refrigeration coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring, as well as personal and Other Property such as microwaves, utensils, electronic appliances, jewelry, and other household and personal property items ." *Ward v. Peak Building Corp.,* No. CL09-5167, Compl. 11 (Va. Cir. Ct. filed Aug. 10, 2009).

For his part, Defendant argues that the corrosion exclusion is not applicable because "the loss ... is not caused by corrosion (instead corrosion is the loss caused by the gases emitted by the drywall)." (Def.'s Br. at 23.) In support of this assertion, Defendant cites *Finger* and *Pioneer Chlor Alkali Co. v. Nat'l Union,* 863 F.Supp. 1226 (D.Nev.1994). In *Pioneer Chlor,* a rag was stuffed into a pipe, diverting chemicals which corroded holes into the pipe. As a result, chloride gas leaked out and caused environmental damage. The district court ruled that the corrosion exclusion did not apply because a reasonable jury could find that the rag, rather than the corrosion in the pipe, was the cause of the damage. *Id.* at 1231-32.

[13]  The  weight  of  authority  tends  to  favor

Plaintiff's position. As a general rule, "[e]xclusions for damages caused by 'corrosion' precludes [sic] recovery for any damage caused to property because of contact with any corrosive agent. Most jurisdictions hold that an exclusion for damages caused by corrosion precludes recovery for damages caused by corrosion regardless of what caused the corrosion or how suddenly the corrosion occurred." 11 Couch on Ins. § 153:80; *see, e.g., Arkwright-Boston Manufacturers Mutual Insurance Co. v. Wausau Paper Mills Co.,* 818 F.2d 591, 594-95 (7th Cir.1987) (corrosion exclusion applied to equipment damaged by acid spill); *Alex R. Thomas & Co. v. Mutual Service Casualty Ins. Co.,* 98 Cal.App.4th 66, 119 Cal.Rptr.2d 394 (Cal.App.2002) (corrosion exclusion applied to damage from chlorine wearing away coils); *Gilbane Building Co. v. Altman Co.,* No. 04AP-664, 2005 WL 534906 (Oh.Ct.App. Mar. 8, 2005) (corrosion exclusion applied to damage stemming from contractor negligence).

*15 The Court agrees with these precedents for two reasons. First, the ordinary meaning of corrosion includes the "action or process of corroding." Oxford English Dictionary (2d Ed.1989). As it is undisputed that the damage to the "structural, mechanical and plumbing systems" of the Ward Residence was caused by the "action or process of corroding," the corrosion exclusion unambiguously applies. *See Kay v. United Pac. Ins. Co.,* 902 F.Supp. 656, 658 (D.Md.1995) (applying corrosion exclusion on these grounds). Second, Defendant's position would tend to render the corrosion exception meaningless. As the court stated in *Bettigole v. American Employers Insurance Co.,* 30 Mass.App.Ct. 272, 567 N.E.2d 1259, 1262 (Mass.App.Ct.1991), if Defendant's "view were adopted, the corrosion exclusion would tend to disappear altogether because some similar agent of the process could always be identified." *Accord Central Int'l Co. v. Kemper Ins. Companies.* No. 97-CV-10630, 1999 WL 694048 (D.Mass. Apr.22, 1999).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

Defendant's reliance on *Pioneer Chlor* is misplaced. In *Pioneer Chlor,* the insured did not seek to recover for the corroded material itself. Rather, the insured sought coverage for damage relating to chlorine gas that passed through corroded pipes and contaminated the entire structure. The court expressed no doubt that the "chemical reaction which caused the perforations and the chemical reaction which caused the hole at the elbow were corrosion," and thus excluded from coverage. 863 F.Supp. at 1236. The only question was whether the subsequent release of chlorine gas was also subject to the corrosion exclusion, or whether the misplaced rag was the "efficient proximate cause" of the gas release. As such, *Pioneer Chlor* is of no assistance to Defendant in the present case, where the claim is for damage to the corroded material itself. *See Alex R. Thomas & Co. v. Mutual Service Casualty Ins. Co.,* 98 Cal.App.4th 66, 119 Cal.Rptr.2d 394 (Cal.Ct.App.2002) (distinguishing *Pioneer Chlor* on these grounds). Indeed, *Pioneer Chlor* actually supports Plaintiff's argument because the court found the damage to the pipe to be "corrosion."

Based on the foregoing, the Court finds that the claimed losses to the structural, mechanical, and plumbing components of the Ward Residence to be excluded by the corrosion exclusion.

*5. Pollution*

In Section I-Coverages, the Policy provides:

2. We do not insure, however, for loss:

a. Excluded under Section 1-Exclusions; or

b. Caused by:

...

(6) Any of the following

...

(e) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against under Coverage C.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**\*16** (Compl. Ex. A at 8.)

[14] Plaintiff argues that this pollution exclusion bars coverage for Defendant's damages, stating that "the sulfuric gases released by the Chinese drywall in Mr. Ward's residence plainly qualify as" irritants, contaminants, and fumes. (Pl.'s Br. at 23.) Defendant argues that the pollution exclusion is inapplicable because the Chinese Drywall is not a recognized environmental pollutant, and the gases in question were not widely released into the environment. (Def.'s Br. at 25-30.)

Pollution exclusions are a frequently litigated topic, and "there exists not just a split of authority, but an absolute fragmentation of authority." *Porterfield v. Audobon Indem. Co.,* 856 So.2d 789, 800 (Ala.2000). Roughly speaking, most states fall "into one of two broad camps." *Apana v. TIG Ins. Co. .,* 574 F.3d 679, 682 (9th Cir.2009). The first camp consists of courts that "have concluded that the clause is intended to preclude coverage for environmental pollution, not for 'all contact with substances that can be classified as pollutants.' " *Keggi v. Northbrook Prop. & Cas. Co.,* 199 Ariz. 43, 13 P.3d 785, 790 (Ariz.2000) (quoting *Stoney Run Co. v. Prudential-LMI Comm. Ins. Co.,* 47 F.3d 34, 38 (2d Cir.1995)). The second camp consists of courts that have refused to read such a distinction into seemingly unambiguous pollutant exclusions. *See, e.g., Bituminous Cas. Corp. v. Sand Livestock Systems, Inc.,* 728 N.W.2d 216, 221 (Iowa 2007) ("But the plain language of the exclusions at issue here makes no distinction between 'traditional environmental pollution' and injuries arising from normal business operations.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

Virginia appears to fall within the latter camp. In *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.,* 271 Va. 574, 628 S.E.2d 539 (Va.2006), the Virginia Supreme Court addressed the application of a pollutant exclusion to the release of toxic trihalomethanes ("THMs") into a municipal water supply. The court held that the pollutant exception applied, stating as follows: "By definition, the THMs involved in *Cunningham* are 'contaminants.' Therefore, according to the plain language of the insurance policy in the instant case, because they are 'contaminants,' THMs are 'pollutants.' " *Id.* at 541.

Defendant correctly notes that *City of Chesapeake* involved "traditional environmental pollution," in that the "THMs at issue in *City of Chesapeake* were recognized environmental pollutants and the emissions occurred outdoors." Defendant argues that the Virginia Supreme Court "had no reason to address the issue of whether its opinion applied to events occurring within an enclosed area," (Def.'s Br. at 28), and urges this court to instead apply a pre-*City of Chesapeake* precedent, *Unisun Ins. Co. v. Schulwolf,* 53 Va. Cir. 220 (2000). In *Unisun,* a Virginia Circuit Court declined to apply a pollutant exception clause to lead paint, stating that "it is reasonable to conclude that the exclusion clause applies only to claims based on environmental pollution." *Id.* at *4.

*17 The Court must decline this invitation to second-guess the Virginia Supreme Court. In two cases decided in the wake of *City of Chesapeake,* courts within this jurisdiction applied pollutant exclusions to the release of household pollutants. In *Firemans Ins. Co. v. Kline & Son Cement Repair,* 474 F.Supp.2d 779 (E.D.Va.2007), a contractor applied an epoxy sealant to a concrete floor in a warehouse. A warehouse employee was injured by the release of epoxy fumes. The employee filed suit against the contractor, and the contractor sought indemnity for this claim pursuant to a commercial general liability (CGL) policy. The insurer denied coverage based on a pollutant exclusion. Applying

Virginia law, the court ruled in favor of the insured. The court specifically rejected the argument now presented by the Defendant, stating as follows:

> The Supreme Court of Virginia did not expressly limit its holding in *City of Chesapeake* to cases involving "traditional" environmental pollution, and there is no reason to believe that it would do so if presented with the facts of the instant case. The Court explicitly refused to look to the holdings of courts in other jurisdictions which had interpreted similar pollution exclusion provisions. Rather, the Court simply applied the facts of the case to the language presented in the policy's pollution exclusion clause, and analyzed the results under well-established Virginia contract law. ....[T]he insureds contend that the Pollution Exclusion clause is not applicable because the facts of this case do not evince a traditional pollution scenario.... The argument belies Virginia's settled principles of contract interpretation. Nowhere in the Policy is there any reference to the word "environment," "environmental," "industrial," or any other limiting language suggesting the pollution exclusion is not equally applicable to both "traditional" and indoor pollution scenarios.

*Id.* at 796-99 (footnote omitted). Similarly, in *West American Ins. Co. v. Johns Bros., Inc.,* 435 F.Supp.2d 511 (E.D.Va.2006), a court in this jurisdiction applied a pollutant exclusion to the discharge of residential heating oil.

[15] The Court finds *Firemans Ins. Co.* to be persuasive. Under Virginia law, pollutant exclusions are not limited to "traditional environmental pollution." Although *City of Chesapeake* did happen to involve traditional pollutants, the Virginia Supreme Court stated its holding in a simple syllogism: Because the harm was caused by the release of a pollutant, the pollutant exclusion applied. This is consistent with basic principles of Virginia insurance law, which has long taken the position that "no court can 'insert by construction, for the benefit of a party, a term not express in the contract.' " *Baldwin v. Baldwin,* 44 Va.App. 93, 603 S.E.2d 172,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

176 (Va.2004) (quoting *Am. Spirit Ins. Co. v. Owens,* 261 Va. 270, 541 S.E.2d 553, 555 (Va.2001)).

[16] To the extent that the parties raise policy considerations for or against *City of Chesapeake,* these arguments are addressed to the wrong forum. The Supreme Court of Virginia creates its own policy, not this Court. "[T]he federal courts in diversity cases, whose function it is to ascertain and apply the law of a State as it exists, should not create or expand that State's public policy." *St. Paul Fire & Marine Ins. Co. v. Jacobson,* 48 F.3d 778, 783 (4th Cir.1995). Defendant's interpretation may be more consistent with the historical development of pollutant exclusions in insurance law. His interpretation may present a well-reasoned method for reigning in potentially broad pollutant exclusion clauses. It may be consistent with precedent in other jurisdictions, including *Finger.* But unless and until the Virginia Supreme Court accepts these arguments and reverses *City of Chesapeake,* this Court remains bound by that holding. *See Continental Cas. Co. v. Advance Terrazzo & Tile Co., Ins.,* 462 F.3d 1002, 1007-10 (8th Cir .2006) (refusing to consider policy arguments & precedent from other jurisdictions in construing pollutant exclusion as matter of state law).

*18 Applying *City of Chesapeake,* the Court must determine whether there has been a "[d]ischarge, dispersal, seepage, migration, release or escape of pollutants" within the meaning of the pollutant exclusion. (Compl. Ex. A at 8.) Defendant argues that the pollutant exclusion does not apply because Chinese Drywall is not a contaminant or a pollutant. (Def.'s Br. at 28.) While counsel gets points for creativity, the Court rejects this argument. Although the Drywall itself may not be a pollutant, the gases it releases are. There is no dispute that the Chinese Drywall has released reduced sulfur gases into the Ward Residence. (*See* Hejzlar Dec. 9; Def.'s Br. at 4.) Both state and federal authorities recognize reduced sulfur gases as pollutants.[FN8] *See, e.g.,* Standards of Performance for Kraft Pulp

Mill: Standard for Total Reduced Sulfur (TRS), 40 C.F.R. § 60.823 (2000) (regulating emission of "total reduced sulfur"); Prevention of Significant Deterioration Areas, 9 Va. Admin. Code § 5-20-205 (2010) (listing reduced sulfur gases as "criteria pollutants"). Moreover, the broad definition of pollutants in the Policy includes "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Compl. Ex. A at 8.) Under any reasonable definition of these terms, the gases released into the Ward Residence qualify as irritants and contaminants.[FN9]

For similar reasons, the Court rejects Defendant's argument that there has been no discharge or dispersal because "there are no facts suggesting any movement by the" Chinese Drywall. (Def.'s Br. 29 n. 34.) It is obvious that the relevant dispersal or discharge in this case is the discharge and dispersal of sulfuric gas from the Drywall. *See, e.g., Peace ex rel. Lerner v. Northwestern National Insurance Co.,* 228 Wis.2d 106, 596 N.W.2d 429 (Wis.1999) (holding that lead in paint that chips, flakes, or is reduced to dust is a pollutant). It is an undisputed fact that the Chinese Drywall in Defendant's home has "off-gassed," dispersing and discharging sulfuric gases into the Ward Residence. (*See* Hejzlar Dec. 7; *Ward v. Peak Building Corp.,* No. CL09-5167, Compl. 11.)

*6. Ensuing Loss*

[17] After listing the latent defect, pollution, and corrosion exclusions in Policy Section 2.b, the Policy states that "[u]nder 2 .b. above, any ensuing loss to property described in Coverages A and B not excluded by any other provision in this policy is covered." The faulty material exclusion is subject to a similar clause, which states that "any ensuing loss which is not excluded by any other provision in this policy is covered."

Defendant argues that even if the exclusions listed above allow "TravCo to exclude insuring the

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

[Chinese Drywall], it still must pay for damages caused by the ensuing loss to other components of the home." (Def.'s Br. at 17.) In response, Plaintiff argues that the ensuing loss provision does not apply if "there was no subsequent ensuing cause of loss separate and independent from the initial excluded cause of loss." (Pl.'s Br. at 17) (quoting *Weeks v. Co-operative Ins. Cos.,* 149 N.H. 174, 817 A.2d 292, 296 (N.H.2003)).

**\*19** The ensuing loss provisions in the Policy only provide coverage for a loss if three conditions are met. First, the loss must be "ensuing." Second, the loss cannot be "excluded by any other provision" in the Policy. Finally, if the loss ensues from an original loss excluded by the latent defect, corrosion, or pollutant exclusion, the loss must be a loss to "property described in Coverages A and B." Applying the language of the Policy to the facts at hand, the Court finds that the ensuing loss provisions are not applicable for two reasons.

First, none of the losses claimed qualify as "ensuing" losses. An ensuing loss is a loss that occurs subsequent in time to an initial loss.[FN10] In the present case, only a single claimed loss has occurred. The Chinese Drywall released reduced sulfur gases which harmed Defendant, members of his family, and items of personal property inside the Ward Residence. Although this damage occurred gradually over a period of time, it still represents a single discrete loss from a single discrete injury, namely the off-gassing of defective Chinese Drywall. *See Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts,* No. CV-01-1362, 2002 WL 31495830 (D. Or. June 18, 2002) (finding mold to be subject to water exclusion because "mold, unlike fire, is not an 'ensuing loss' due to the lack of any intervening cause other than time beyond the initial water damage"); *cf. GTE Corp. v. Allendale Mutual Ins. Co.,* 372 F.3d 598, 613-614 (3d Cir.2004) (finding that ensuing loss provision does not cover expenses of correcting excluded design defect); *Acme Galvanizing v. Fireman's Fund Ins. Co.,* 221 Cal.App.3d 170, 270 Cal.Rptr. 405, 411 (Cal.Ct.App.1990)

("We interpret the ensuing loss provision to apply to the situation where there is a "peril," i.e., a hazard or occurrence which causes a loss or injury, separate and independent...."); *Wright v. Safeco Ins. Co.,* 124 Wash.App. 263, 109 P.3d 1, 7 (Wash.Ct.App.2004) (denying coverage under mold exclusion because "Wright has not introduced any evidence of a supervening cause that broke the causal connection between the construction defects and the mold damage").

Second, even if the losses to the components of the Ward Residence could somehow be characterized as "ensuing losses," they would still be losses "excluded by any other provision" in the Policy-specifically, the corrosion exclusion.[FN11] However the chain of events is structured, the damage to the metallic components of Defendant's Residence is a loss caused by the "action or process of corroding." Thus, this loss is subject to the corrosion exclusion even if the other exclusions-pollutant, faulty materials, or latent defect-are set aside under the ensuing loss provision. *See Smith v. Westfield Ins. Co.,* No. 06-3077, 2007 WL 1740816 (E.D.Pa. June 15, 2007) ("Here, the policy specifically excludes coverage for 'mold'.... So, if the damage to the interior of the house is itself mold or wet rot, even if the damage is an 'ensuing loss' from the faulty construction, is it not covered by the policy."); *Wright,* 109 P.3d at 7("Because Wright's policy contains a provision that specifically excludes damages caused by mold, the ensuing loss provision of the exclusion in Wright's policy does not cover mold damages.").

**\*20** To the extent that Defendant argues that the ensuing loss provisions create coverage for the damage to his televisions, his argument is without merit for a third reason. The damage to the televisions is not covered by the Policy, because none of the seventeen enumerated causes in Coverage C for personal property applies. An ensuing loss provision does not create coverage where none exists. Rather, an ensuing loss provision operates as an exception to an exclusion, restoring coverage that has otherwise been removed by an exclusion. *See Weeks v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

*Co-Operative Ins. Companies,* 149 N.H. 174, 817 A.2d 292, 296 (N.H.2003) (ensuing loss provision "operates to *restore* coverage if the damage ensues from a covered. cause of loss" (emphasis added)); *Wright,* 109 P.3d at 5 ("Ensuing loss provisions are exceptions to policy exclusions and should not be interpreted to create coverage."). Because the damage to the Defendant's televisions would not be covered even in the absence of any exclusions, the ensuing loss provision cannot provide coverage.

The Court emphasizes the narrowness of its holding. The damage to Defendant's property is extensive, and the secondary consequences may not be fully realized at this point. The Court cannot speculate as to whether some of these secondary losses might qualify for coverage under the ensuing loss provision. Rather, the Court must confine its inquiry into the question of whether Plaintiff is entitled to the declaratory relief it seeks.

On the basis of the facts in the record, the Court concludes that Plaintiff is entitled to the relief requested, with one important caveat. Plaintiff requests a "a declaratory judgment that the Policy does not provide coverage for any damage caused by the Drywall in the Ward Residence or for any damage caused by the discharge of gas from the Drywall, including but not limited to any damage to wiring and copper components of the home." To the extent that this declaration might suggest that the Policy does not cover "any ensuing loss to property described in Coverages A and B not excluded by any other provision in" the Policy, the Court must deny this request for relief. If, for example, a thief were to notice the Ward Residence is empty and decide to rob the house, this loss might be covered as an ensuing loss-eventhough it would arguably be a loss "caused" by the Drywall. At present, there is no indication that Defendant has a potential claim for any such secondary losses. But in an abundance of caution, the Court will phrase its declaratory judgment so as not to preclude such claims should any arise.

For the foregoing reasons, the Court finds that the ensuing loss provision does not apply to any of Defendant's claimed losses. The Court expresses no opinion on whether the provision might apply to other as-yet-unclaimed losses.

## V. CONCLUSION

Plaintiff's Motion for Summary Judgment is hereby **GRANTED IN PART, DENIED IN PART.** The Court hereby enters a declaratory judgment as follows:

**\*21** 1. The Policy does not provide coverage for the cost of removing and/or replacing the Drywall in the Ward Residence;

2. The Policy does not provide coverage for the damage claimed by Mr. Ward to the air conditioning equipment at the Ward Residence, which resulted from corrosion;

3. The Policy does not provide coverage for the damage claimed by Mr. Ward to the garage door at the Ward Residence, which resulted from corrosion;

4. The Policy does not provide coverage for the damage claimed by Mr. Ward to the flat screen televisions; and

5. The Policy does not provide coverage for any presently claimed damages caused by the Drywall in the Ward Residence or for any presently claimed damage caused by the discharge of gas from the Drywall, including but not limited to any damage to wiring and copper components of the home.

The Clerk of the Court is **DIRECTED** to transmit a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

    FN1. When referring to page numbers in the Policy, the Court refers to the page numbers contained in the original document, rather than the pagination of the doc-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

ument in CM/ECF.

FN2. Virginia law must be utilized to determine the question of coverage in this Policy written in Virginia for a homeowner of a Virginia home. *Seabulk Offshore, Ltd. v. Am. Home Assur. Co.,* 377 F.3d 408, 419 (4th Cir.2004) (citing *Buchanan v. Doe,* 246 Va. 67, 431 S.E.2d 289, 291 (Va.1993) ).

FN3. Section 2201 provides as follows: "In a case of actual controversy within its jurisdiction, except [in certain enumerated cases], any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

FN4. The Court commends the parties on their excellent briefing of the complex issues in this case.

FN5. To the extent that Defendant argues that the Policy's exclusion for latent defect is further limited by the words "that causes it to damage or destroy itself," the Court finds this argument to be unpersuasive. Defendant's proposed construction conflicts with the ordinary meaning of the policy language. The Policy excludes damage caused by "Mechanical breakdown, latent defect, inherent vice, *or any* quality in property that causes it to damage or destroy itself ." (Compl. Ex. A at 8) (Emphasis added.) The natural reading of this phrase is that it sets forth four distinct causes: mechanical breakdowns, latent defects, inherent vices, and other qualities in property. Only the last cause is modified by the words "that causes it to damage or

destroy itself." Where the phrase "A, B, or C" is used, C is an alternate, as are A as well as B. The Defendant in essence wants to change the word "or" to "and." Of course, this alternative phrasing would render"latentdefect"meresurplusage-another factor that leads the Court to reject Defendant's proposed construction. *See Great Am. Ins. Co. v. Cassell,* 15 Va. Cir. 214, at *3 (1988) (language in insurance contract "should not be lightly cast aside nor interpreted as unintended surplusage").

FN6. To be sure, latent defect exclusions are historically related to wear and tear exclusions, which do exclude coverage for inevitable and predictable loss over time. Under the "objective theory" of fortuity, property insurance is "thought to be something that happened to the property from an external cause, not something inherent or latent in the property; damage from such an inherent cause was considered, like wear and tear, a certainty and, hence, uninsurable." *Chadwick v. Fire Ins. Exchange.* 17 Cal.App.4th 1112, 21 Cal.Rptr.2d 871, 875 (Cal.Ct.App.1993). Despite this historical background, however, the latent defect exclusion is consistently applied to losses that go well beyond expected deterioration in physical property. *See, e.g,, Bd. of Educ. of Maine Tp. High School Dist. 207 v. Int'l Ins. Co.,* 292 Ill.App.3d 14, 225 Ill.Dec. 987, 684 N.E.2d 978 (Ill.App.Ct.1997) (applying latent defect exclusion to asbestos contamination).

FN7. An argument could be made that the word "inadequate" is limited to shortcomings that prevent an entity from fully achieving its intended purpose. Because the Court finds that the Chinese Drywall is unambiguously defective and faulty, however, the Court need not parse the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)
**(Cite as: 2010 WL 2222255 (E.D.Va.))**

meaning of "inadequate."

FN8. Reduced sulfur gases are gasesous compounds in which sulfur is present in a lower oxidation state. Long-term exposure to reduced sulfur gas has been found to cause health problems. *See* Kaye H. Kilburn, *Hydrogen Sulfide and Reduced-Sulfur Gases Adversely Affect Neurophysiological Functions,* Toxicology and Industrial Health, Vol. 11, No. 2, 185-197 (1995).

FN9. A contaminant, as that term is used in insurance contracts, is a "substance that, because of its nature and under the particular circumstances, was not generally supposed to be where it was located and caused injurious or harmful effects to people, property, or the environment." *Hastings Mut. Ins. Co. v. Safety King, Inc.,* 286 Mich.App. 287, 778 N.W.2d 275 (Mich.App.2009). The sulfur gas in the Ward Residence clearly fits within this definition, because it was not "supposed to be" in the Residence and it has harmed Defendant and the components of his home. Similarly, an irritant is a substance that is capable of causing physical irritation. The sulfur gas in the Ward Residence has given Defendant and his family nosebleeds; accordingly, it is an irritant.

FN10. The word "ensuing" can carry two different meanings in ordinary English usage. lossOne meaning is "[i]mmediately subsequent, coming next." Oxford English Dictionary, 2d Ed., 1989. Another meaning is simply "[r]esulting." "Because the meaning of 'ensuing' need not-but may-imply a causal component, an 'ensuing loss' need not-but only may-be a loss causally related to an earlier cause, excluded or otherwise. All that may be required for an ensuing loss is that it occurred later in time." *TMW Enterprises, Inc. v. Federal Ins. Co.,* No. 07-CV-12230 (E.D.Mich.

Mar. 31, 2009).

FN11. Depending on the causal theory, other exclusions might also apply. For example, if the Court were to somehow construe the installation of defective Drywall and the release of sulfuric gas as separate losses, the pollutant exception would also apply to the "ensuing" release of toxic gas.

E.D.Va.,2010.
TRAVCO Ins. Co. v. Ward
--- F.Supp.2d ----, 2010 WL 2222255 (E.D.Va.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

TWENTY FOURTH JUDICIAL DISTRICT COURT

PARISH OF JEFFERSON

STATE OF LOUISIANA

NO. 676-185                                             DIVISION: "P"

**TERRENCE M. ROSS AND RHONDA B. ROSS**

*VERSUS*

**C. ADAMS CONSTRUCTION & DESIGN, L.L.C, ET AL**

FILED: _April 14th, 2010_           CODED _Kimberly F. Sims_
                                             **DEPUTY CLERK**

## JUDGMENT

684
P1

This matter came before this court on April 5, 2010, for hearing on a Motion For Partial Summary Judgment filed by plaintiffs, Terrence M. Ross and Rhonda B. Ross and against defendant, Louisiana Citizens Property Insurance Company and a Cross-Motion For Summary Judgment filed by defendant, Louisiana Citizens Property Insurance Company against plaintiffs. Following the hearing, the matter was taken under advisement.

Accordingly, when after having considered the pleadings filed, the law, evidence and argument of counsel:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Motion For Partial Summary Judgment filed by plaintiffs, Terrence M. Ross and Rhonda B. Ross and against defendant, Louisiana Citizens Property Insurance Company, be and is hereby **DENIED** at plaintiffs' cost.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the Cross-Motion For Summary Judgment filed by defendant, Louisiana Citizens Property Insurance Company be and is hereby **GRANTED** at plaintiffs' cost.

**JUDGMENT READ, RENDERED AND SIGNED** on this 14th day of April, 2010 at Gretna, Louisiana.

CODED

LEE V. FAULKNER, JR.
**DISTRICT JUDGE**

CODED

ISSUED (3) 305 Not Signed mailed
DATE _4.14.10_
_KSims_
Deputy Clerk
IMAGED APR 1 5 '10

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 687184 (E.D.La.)
**(Cite as: 2008 WL 687184 (E.D.La.))**

H

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
ORTHOPEDIC PRACTICE, LLC
v.
HARTFORD CASUALTY INSURANCE COM-
PANY.
**Civil Action No. 06-8710.**

March 10, 2008.

Sidney Donecio Torres, III, Roberta L. Burns, Law
Offices of Sidney D. Torres, III, Chalmette, LA,
Jacques Francois Bezou, Richard R. Ray, The
Bezou Law Firm, Covington, LA, for Orthopedic
Practice, LLC.

Ralph Shelton Hubbard, III, Seth Andrew
Schmeeckle, Lugenbuhl, Wheaton, Peck, Rankin &
Hubbard, New Orleans, LA, Christopher W. Martin
, Martin R. Sadler, Patrick M. Kemp, Martin, Dis-
iere, Jefferson & Wisdom, LLP, Houston, TX, for
Hartford Casualty Insurance Company.

### *ORDER AND REASONS*

G. THOMAS PORTEOUS, JR., District Judge.

**\*1** Before the Court is a Motion for Summary Judg-
ment filed on behalf of the Defendant, Hartford
Casualty Insurance Company ("Hartford")
(Document 37). The parties waived oral argument
and the matter was taken under submission on
September 26, 2007. The Court, having considered
the arguments of the parties, the Court record, the
law and applicable jurisprudence, is fully advised in
the premises and ready to rule.

## I. BACKGROUND

Plaintiff operated a medical practice in a suite on
the second floor of the Chalmette Medical Center.
Hartford issued a business insurance policy to
Plaintiff. During Hurricane Katrina, the first floor
of the Chalmette Medical Center was submerged by
flood waters. Plaintiff's medical and office equip-
ment and supplies, located on the second floor of
the building, remained dry.

Plaintiff made a claim for damage to business per-
sonal property and for lost business income. Con-
tending that none of the business personal property
was damaged, much less damaged by a covered
cause of loss, Hartford made no payments to
Plaintiff for the business personal property.
However, access to the Chalmette Medical Center
was prohibited and no utilities were working after
Hurricane Katrina. In addition, the Chalmette Med-
ical Center building was damaged and Plaintiff sub-
mitted that 30% of its business came from depend-
ant properties. Based on these facts, Plaintiff was
paid $111,301 in business income losses.

Hartford now moves for summary judgment on the
entirety of Plaintiff's breach of contract claim. Con-
tending that they owe no indemnity obligation un-
der the Policy, Hartford also claims that Plaintiff's
extra-contractual claims fail as a matter of law.

## II. LAW AND ANALYSIS

### A. SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide that
summary judgment should be granted only "if the
pleadings, depositions, answers to interrogatories,
and admissions on file, together with the affidavits,
if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
a judgment as a matter of law." FED.R.CIV.P.
56(c). The party moving for summary judgment
bears the initial responsibility of informing the dis-
trict court of the basis for its motion, and identify-
ing those portions of the record which it believes
demonstrate the absence of a genuine issue of ma-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 687184 (E.D.La.)
**(Cite as: 2008 WL 687184 (E.D.La.))**

terial fact. *Stults v. Conoco, Inc.,* 76 F.3d 651, 655-56 (5th Cir.1996) (citing *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 912-13 (5th Cir.) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)), *cert. denied,* 506 U.S. 832 (1992)). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis supplied); *Tubacex, Inc. v. M/V RISAN,* 45 F.3d 951, 954 (5th Cir.1995).

**\*2** Thus, where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co.,* 475 U.S. at 588. Finally, the Court notes that substantive law determines the materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

## B. PLAINTIFF'S BREACH OF CONTRACT CLAIM

### 1. Personal Business Property

Plaintiff seeks payment under its business personal property coverage for its inability to retrieve office and medical equipment and supplies for an unspecified period of time. The Policy provides coverage for direct physical loss or damage to the equipment and supplies:

### SPECIAL PROPERTY COVERAGE FORM

### A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in

the Declarations (also called described premises in this policy) caused by or resulting from any Covered Cause of Loss.

### 3. Covered Causes of Loss

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

a. Excluded in **B., EXCLUSIONS;** or

b. Limited in Paragraph **A.4.,** Limitations; that follow.

Robert Currie, adjustor for Hartford, recommended no payment to Plaintiff for business personal property based on his inspection of Plaintiff's office in which he found "no evidence of damage to the office or its contents." Arguing that Plaintiff has failed to provide any evidence of direct physical loss of or damage to business personal property, Defendant contends that Plaintiff's claim for business personal property damage coverage fails.

Plaintiff disputes this claim relying on photographs which show mold contamination of medical equipment and were presented to Mr. Currie, and provided to Hartford in the Rule 26(A) Initial Disclosures. Mr. Currie's final report contains a notation next to a picture of Orthopedic's x-ray machine evidencing his observation of rust on the stainless steel parts of the machine and also indicates that he was unable to determine if any of the business personal property had sustained damage due to the power outage. In addition, Plaintiff references a letter from Hartford's inside claims handler to Dr. Baker which states:

We are writing in reference to your property claim, submitted as a result of Hurricane Katrina. We hired Reid, Jones, McRorie & Williams to adjust your claim. Unfortunately, their report indicated that the only possible damage was to the equipment, but it had not yet been confirmed, due to the inaccessibility of the office. We recently learned that there was many other damaged

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 687184 (E.D.La.)
**(Cite as: 2008 WL 687184 (E.D.La.))**

items, including all of the medication. We will consider any property that was damaged in your office. Please forward documentation to the attention of the undersigned ..."

Plaintiff argues that this supports its argument that genuine issues of material facts exist as to the claims asserted against the defendant.

**\*3** We must examine the terms of the Policy, which provides:

**SPECIAL PROPERTY COVERAGE FORM**

**B. EXCLUSIONS**

2. We will not pay for loss or damage caused by or resulting from:

  c. Miscellaneous Types of Loss:

  (2) *Rust,* corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself.

  (5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents, *mold,* spore or other animals.

An insurance policy is a contract, and it constitutes the law between the parties. *Pareti v. Sentry Indem. Co.,* 536 So.2d 417, 420 (La.1988). The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent. *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.,* 630 So .2d 759, 763 (La.1994). The parties' intent, as reflected by the words in the policy, determines the extent of coverage. *Id.* (emphasis added). When the words of the policy are clear and explicit and lead to no absurd consequences, the policy must be enforced as written and courts may make no further interpretation in search of the parties' intent. *Peterson v. Schimek.* 729 So.2d 1024, 1028 (La.1999).

The Louisiana Supreme Court has succinctly articu-

lated the well-settled burden of proof in a suit on an insurance policy: "[i]n an action under an insurance contract, the insured bears the burden of proving the existence of the policy and coverage. The insurer, however, bears the burden of showing policy limits or exclusions." *Tunstall v. Stierwald,* 809 So.2d 916, 921 (La.2002). Thus, Plaintiff must prove coverage. To reach trial on this issue and avoid summary judgment, Plaintiff must have "significant probative evidence" on which the trier of fact could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986).

The words of the Policy at issue are clear and explicit and, if enforced, will lead to no absurd consequence. As this Court must enforce the contract as written, evidence of rust and mold to Plaintiff's equipment is immaterial, as the Policy expressly excludes rust and mold.

In addition to rust and mold damage, Plaintiff argues that a genuine issue of material fact exists with respect to the electrical damage. However, Plaintiff submitted no evidence that the equipment was in fact damaged electrically. Defendant argues, and this Court agrees, that Bob Currie's inability to test the equipment for electrical damage is insufficient to raise a genuine issue of material fact as to whether the property was in fact damaged electrically. Plaintiff must do more than simply show that there is some metaphysical doubt as to the material facts. Fed.R.Civ.P. 56(e).

Accordingly, Plaintiff has offered no evidence of a covered cause of loss and failed to meet its burden of proof, Hartford is entitled to summary judgment as a matter of law.

*2. Business Income Coverage*

**\*4** Contending that the differences of opinions and findings between each of the parties' forensic accounts creates a genuine issue of material fact, Plaintiff argues that summary judgment is not ap-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 687184 (E.D.La.)
**(Cite as: 2008 WL 687184 (E.D.La.))**

propriate on the issue of whether Plaintiff is entitled to an increase in the amount already received in business income coverage. The business income coverage provision in the Policy at issues provides coverage only when the suspension of operations was caused by covered direct physical loss or damage to the property. *See* Exhibit A to Hartford's Motion for Summary Judgment, Policy, Special Property Coverage Form Page 5 of 17, Section A. Cover, 5. Additional Coverages, k. Business Income. The only evidence presented by Plaintiff to support its argument that the damage to the equipment or medication resulted from a covered cause of loss that caused the suspension of operations is the rust and mold, both of which are not covered causes of loss because each are excluded under the Policy.

The Court agrees with defendant's contention that the accountant's opinion on the amount of business income actually lost by Plaintiff has no bearing on this coverage issue because he adds nothing towards establishing that the loss of business income is attributable to a covered cause of loss. His report raises no genuine issue of material fact as to whether business income was caused by a covered cause of loss. As Plaintiff has no evidence that the alleged property damage was caused by or a result of a covered cause of loss, Hartford is entitled to summary judgment on Plaintiff's business income claim.

## C. PLAINTIFF'S EXTRA-CONTRACTUAL CLAIMS

Finally, Plaintiff pleads a claim for insurance bad fait and seeks penalties and attorney fees. Louisiana law recognizes that extra-contractual claims do not stand alone, but depend on a valid underlying claim. *Clausen v. Fidelity & Deposit Co. Of Md.,* 660 So.2d 83, 85-86 (La.Ct.App.1995) (no cause of action for bad faith "absent a valid, underlying, insurance claim"); *Phillips v. Patterson,* 813 SO.2d 1191, 1195 (La.Ct.App.2002) (same); *Hardy v.. Hartford Ins. Co.,* 236 F.3d 287, 293 (5th Cir.2001) (holding that where insurer had no duty to provide

coverage, it did not violate La. R.S. 22:1220). This Court has found that contractual claim fails a as a matter of law. Therefore, Plaintiff's extra-contractual claims also fail as a matter of law.

Accordingly,

**IT IS ORDERED** that Hartford Insurance Company's Motion for Summary Judgment (Rec.Doc.37) is **GRANTED.**

E.D.La.,2008.
Orthopedic Practice, LLC v. Hartford Cas. Ins. Co.
Not Reported in F.Supp.2d, 2008 WL 687184 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 4855484 (S.D.Fla.)
**(Cite as: 2009 WL 4855484 (S.D.Fla.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Florida,
In Admiralty.
ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, Plaintiff/Counter-Defendant,
v.
LAGO CANYON, INC., Defendant/
Counter-Plaintiff.
**No. 06-60889-CIV.**

Dec. 9, 2009.

West KeySummary
**Insurance 217 ⟳2219**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2219 k. In General. Most Cited
Cases

**Insurance 217 ⟳2230**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(D) Ocean Marine Insurance
            217k2218 Risks Covered and Exclusions
                217k2230 k. Proximate Cause. Most
Cited Cases
The proximate cause of the damage to the ship was
the failure of the hose barb which resulted from
corrosion, and since the insurance policy did not
cover damage from corrosion, the damage was not
covered by the policy. The insured alleged that the
use of the hose barb was a manufacturer's defect, as
the type of metal used would corrode and require
replacement faster than other parts of the ship. Des-
pite it being a manufacturer's defect, which the
policy covered, the proximate cause of the damage
was still corrosion, and corrosion was a cause of
damage excluded under the insurance policy.

Andrew Warren Anderson, Michelle Otero Valdes,
Lawrence Jacobson, Houck Anderson PA, Miami,
FL, for Plaintiff/Counter-Defendant.

Michelle Otero Valdes, Houck Anderson P.A.,
Miami, FL, Robert Lyston Jennings, Jennings &
Valancy, Fort Lauderdale, FL, for Defendant/
Counter-Plaintiff.

*ORDER DENYING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND GRANTING
PLAINTIFF'S CROSS-MOTION FOR SUM-
MARY JUDGMENT*

JAMES L. COHN, District Judge.

**\*1 THIS CAUSE** is before the Court upon Defend-
ant's Renewed Motion Following Remand for Par-
tial Summary Judgment as to Coverage [DE 344]
("Motion") and Plaintiff's Cross-Motion for Sum-
mary Judgment [DE 353] ("Cross-Motion"). The
Court has carefully considered the Motion, the
Cross-Motion, all of the parties' submissions, argu-
ment of counsel on December 9, 2009, and is other-
wise fully advised in the premises.

I. BACKGROUND

Defendant Lago Canyon, Inc. ("Lago") owns a
yacht that partially sank at a dock while undergoing
engine repairs ("the Vessel"), causing over $1.2
million in damages ("the Loss"). Plaintiff St. Paul
Fire and Marine Insurance Company filed a com-
plaint for a declaratory judgment to determine cov-
erage under a marine insurance policy it had issued
to Lago ("the Policy"). Lago counterclaimed for
breach of the Policy.

The property damage coverage section of the Policy
provides that Plaintiff "will pay for accidental dir-
ect physical loss of or damage to [the] yacht except
as specifically stated or excluded in this policy."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 4855484 (S.D.Fla.)
**(Cite as: 2009 WL 4855484 (S.D.Fla.))**

DE 1 at 12.[FN1] The parties agree that "accidental" loss or damage to the yacht covers fortuitous loss unless subject to an exclusion. The coverage paragraph also states that if the loss is caused by a "provable manufacturer's defect," no deductible will apply. Before trial, on motion for summary judgment, this Court concluded that the Policy indicates that a loss must be fortuitous to be covered and that a "manufacturer's defect" is an example of a covered, fortuitous loss where no deductible applies.

> FN1. The complete property damage coverage section of the Policy provides as follows:
>
> **Coverage Provided:** We will pay for accidental direct physical loss or damage to your yacht *except as specifically stated or excluded in the policy.* The amount of Property Damage Coverage for your yacht is shown on the Declarations Page. The Deductible Amount shown on the Declarations Page applies to each occurrence unless a more specific deductible for that particular property applies. If the loss or damage is caused by a provable manufacturer's defect, caused by fire not originating from your yacht, or results from a collision caused by another vessel, no deductible will apply.
>
> DE 1 at 12.

Thereafter, the Court held a three-day bench trial and found the following: (1) the proximate cause of the damage was the failure of a brass hose barb[FN2] which resulted from corrosion, (2) the Policy specifically excluded corrosion, and (3) a provable manufacturer's defect was not shown. The Court, however, did find that the manufacturer's use of yellow brass for the hose barb, knowing its exposure to saltwater, created a condition likely to cause corrosion. This was considered by the Court as a design defect as opposed to a manufacturer's defect.

The Court found that the manufacturer's use of yellow brass for the hose barb was not covered by the term "manufacturer's defect" in the Policy.

> FN2. Throughout this order, the terms "hose barb" and "hose bib" are used interchangeably.

Lago appealed this Court's judgment. The Eleventh Circuit found that this Court erred when it concluded that a design defect was not a manufacturer's design defect. The Eleventh Circuit concluded that the phrase "manufacturer's defect" as used in the Policy includes "defects attributable to the manufacturer whether in the manufacturer's design or manufacturing of the product." DE 301 at 18. Because this Court did not construe the policy to cover loss attributable to the manufacturer's design defect, this Court did not determine whether "the use of yellow brass rose to the level of a manufacturer's design defect and, if so, what impact this had on the multiple causation issues in the case and the court's other fact findings." *Id.* at 19.

**\*2** The Eleventh Circuit vacated this Court's judgment in favor of St. Paul and remanded the case to this Court "for further bench trial proceedings as to the alleged 'manufacturer's defect' and prejudgment interest issues." *Id.* at 21. Defendant has moved for partial summary judgment on the manufacturer's defect issue. In its response, Plaintiff also moved for summary judgment.

## II. DISCUSSION

### *A. Legal Standards*

The Court may grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant "bears the initial responsibility of informing the district court of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 4855484 (S.D.Fla.)
**(Cite as: 2009 WL 4855484 (S.D.Fla.))**

basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). According to the plain language of Fed.R.Civ.P. 56(e), the non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita,* 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby,* 911 F.2d 1573, 1577 (11th Cir.1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted).

### B. Coverage

The Court must first determine whether the Policy provides coverage for the Loss. As noted above, the Policy provides coverage as follows:_____

**Coverage Provided:** We will pay for accidental direct physical loss or damage to your yacht *ex-*

*cept as specifically stated or excluded in the policy.* The amount of Property Damage Coverage for your yacht is shown on the Declarations Page. The Deductible Amount shown on the Declarations Page applies to each occurrence unless a more specific deductible for that particular property applies. If the loss or damage is caused by a provable manufacturer's defect, caused by fire not originating from your yacht, or results from a collision caused by another vessel, no deductible will apply.

**\*3** DE 1 at 12 (emphasis added) ("Coverage Provision"). The first sentence of the Coverage Provision explains that the Policy covers accidental direct physical loss or damage unless such loss is specifically excluded in the Policy. The next three sentences of the Coverage Provision do not create or provide coverage. Rather, those sentences address how much coverage is available to the insured, the amount of the insured's deductible and whether the deductible applies to the loss.

Thus, unless the Policy specifically excluded the cause of the Loss, coverage exists. The portion of the Policy pertaining to exclusions provides as follows:

**Exclusions:** We will not provide Property Damage Coverage for any loss or damage caused by or resulting from wear and tear, electrolysis, lack of maintenance, corrosion, deterioration, mold, or fiberglass blistering. We will not provide coverage for any loss or damage to the provisions of your yacht, including alcoholic beverages.

DE 1 at 13. If Plaintiff proves that wear and tear, electrolysis, lack of maintenance, corrosion, deterioration, mold, or fiberglass blistering was the cause of the Loss, then no coverage exists. *See State Farm Mut. Auto. Ins. Agency v. Pridgen,* 498 So.2d 1245, 1247-48 (Fla.1986) (finding the burden is on the insurer to prove a loss was caused by an exclusion to the policy).

Defendant contends the cause of the Loss was a

Page 4

Slip Copy, 2009 WL 4855484 (S.D.Fla.)
**(Cite as: 2009 WL 4855484 (S.D.Fla.))**

manufacturer's defect-a cause of loss not excluded by the Policy. Plaintiff, on the other hand, contends the cause of the Loss was corrosion-a cause of loss explicitly excluded by the Policy.

*1. The Use of a Yellow Brass Hose Barb Constitutes a Manufactuer's Defect*

Plaintiff issued the Policy to insure the Vessel. As the Court found at trial, and the Eleventh Circuit affirmed, the Policy provides coverage for losses caused by a manufacturer's defect. Defendant contends that "[t]he undisputed evidence of record establishes that the loss was in fact caused by a 'provable manufacturer's defect,' and the Court should therefore find coverage for the loss exists under the policy as a matter of law." Motion at 2.

In support of its contention, Defendant states the following facts: 1) "A failed hose barb was the source of water intrusion;" 2) "The Vessel partially sank as a result of the water intrusion caused by the failure of the hose barb;" 3) "The failed hose barb was an original part of the Vessel installed by the manufacturer;" and 4) "The failed hose barb was made of 'yellow brass.' " *Id.* at 2-3. Furthermore, Defendant asserts as an undisputed fact that "[t]he owner of a vessel can do nothing to prevent the dezincification of uninhibted yellow brass" and that "[t]he Owner's Manual for the Vessel does not warn of the risks of dezincification in the air conditioning system, nor are there any maintenance recommendations from the manufacturer which address this issue." *Id.* at 3. Defendant also maintains that "Stewart Hutcheson, a marine surveyor who was produced by St. Paul as one of two of its corporate representatives on the issue of causation, concluded in his April 2, 2006 report to St. Paul, that the loss 'was caused by a defectively designed and installed plumbing fixture .' " *Id.* at 4 (citations omitted). "Hutcheson further concluded that the failed fitting was 'not of marine grade.' " *Id* . Similarly, "David Wills, P.E., St. Paul's other Rule 30(b)(6) designee on the issue of causation, stated: 'The copper alloy, commonly known as yellow brass, used to manu-

facture the hose bibs present in the air condition piping assembly is not recommended for seawater service,' citing the ASM Metals Handbook." *Id.* at 4-5 (citations omitted).

*4 Plaintiff does not contest any of those facts. *See* DE 353 at 1 (adopting the quoted statement of facts as its own). Rather, Plaintiff makes the following five arguments in opposition to the Defendant's Motion and in support of its own Cross-Motion: 1) the hose bib lasted at least as long as its "reasonably expected life service;" 2) any problems with the hose bib "could have and should have been detected through customary and ordinary inspection, as required by the standards of prudent seamanship[;]" 3) Florida's consumers products liability law suggests that the use of a yellow brass hose bib did not constitute a design defect; 4) "Yellow Brass Components are Widely-Used in Marine Salt Water Cooling Systems[;]" 5) "The Defendant's Position that the Loss is Attributable to the Inevitable Process of Dezincification, if Accepted, Precludes Recovery Under the Policy[;]" and 6) "Even if the use of Yellow Brass was a Manufacturer's Defect there is no Coverage for the Loss under the Policy of Insurance." Cross-Motion at 5-17. The Court will address each of these arguments in turn.

a. Reasonable Expected Life Service

Plaintiff asserts that a hose bib made of yellow brass would be expected to last about five years. DE 353 at 3. Plaintiff further points out that the hose bib on the Vessel lasted almost seven years. *Id.* at 3. Thus, Plaintiff argues, the hose bib "lasted as long as intended-there was no 'defect' in its design." [FN3] Cross-Motion at 8. Plaintiff has missed the point.

> FN3. To support its argument, Plaintiff asserts that "[i]f a product functions as intended for the length of time reasonably expected by the manufacturer, it cannot be considered defective merely because other

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 4855484 (S.D.Fla.)
**(Cite as: 2009 WL 4855484 (S.D.Fla.))**

products last longer." DE 353 at 4.

Defendant does not contend that the hose bib contained a design defect. Rather, Defendant necessarily argues that *the Vessel* contained a design defect. It is irrelevant if a yellow brass hose bib lasted as long as intended because the actual subject of the Policy-the Vessel-did not last as long as intended. FN4 The Vessel did not last as long as intended because the designer/manufacturer of the Vessel elected to use a yellow brass hose bib even though both parties recognize that "other metals would have given a longer service time." *Id.* at 7.

> FN4. Plaintiff asserts that "[a]ccording to Dr. Fisher, the life expectancy of a '74 Sunseeker 'should be something well in excess of twenty years.' " 353 at 4.

Plaintiff points out that "Mr. Grate testified that from a metalurigical perspective there are a number of other metals readily available for use in manufacturing the hose bib which, if used, would have been expected to provide a longer service life in the same environment because they would not have been subject to dezincification." Cross-Motion at 5. Plaintiff responds that "[a] hose bib made from any one of these metals eventually will corrode and deteriorate in a salt water environment and ultimately require replacement." *Id.* at 6.

The Court recognizes that all materials eventually break down. A manufacturer need not use the best or most expensive components in its products to avoid a finding of a "manufacturer's defect" in its product(s). Rather, a manufacturer need only use a component that is reasonable when considering a variety of factors including, but not limited to, cost and the expected life of the product. Here, the evidence indicates that the cost of a more durable hose barb would be negligible and that the hose barb could not be expected to last even a third as long as the expected life of the product.

**\*5** Moreover, the Court recognizes that not all components of all products are intended to last as long

as the product itself (e.g., the tires or window wipers on an automobile). In such instances, however, the manufacturer typically advises the owner, through an owner's manual or otherwise, that such parts require periodic replacement. Here, as demonstrated above, the evidence shows the manufacturer never advised the owner of the Vessel that the yellow brass hose bib required periodic maintenance or replacement.

Stated differently, a manufacturer's decision to use a component with an expected service life far shorter than the expected service life of the product that incorporates that component, coupled with the manufacturer's failure to inform the owner of the product that the component requires maintenance and/or replacement long before the expected service life of the product expires, FN5 constitutes a manufacturer's defects. FN6

> FN5. Plaintiff argues "[i]n Dr. Fisher's view, unless the manufacturer clearly identifies an individual metal piece as susceptible to a shorter service life, then there is no reason to suspect it will not last the life of the vessel." Cross-Motion at 8. Plaintiff than calls this conclusion "startling." *Id.* The Court does not find this conclusion remotely startling. Indeed, the Court finds Dr. Fisher's conclusion to be perfectly reasonable.

> FN6. Although the question would become closer-and might require a different conclusion-if the component part that caused the product's failure lasted nearly as long as the expected life of the product, the facts here do not require the Court to make a close call.

b. Customary or Ordinary Inspection

Plaintiff contends that "any problems associated with the hose bib could have and should have been detected through customary and ordinary inspec-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 4855484 (S.D.Fla.)
**(Cite as: 2009 WL 4855484 (S.D.Fla.))**

tion, as required by the standards of prudent seamanship." Cross-Motion at 3. Even if true, Plaintiff's contention is irrelevant.

The detection of a defective component obviously does not render the component any less defective. FN7 Thus, Plaintiff must be arguing either that Defendant's failure to detect the component is an affirmative defense that reduces Plaintiff's potential liability or that Defendant's failure to identify the manufacturer's defect was the proximate cause of the Loss. As discussed above, the Eleventh Circuit remanded this case so that this Court could resolve the narrow manufacturer's defect issue and its interplay with the corrosion exclusion. Were the Court to decide whether inspection would have revealed the alleged defect, the Court's ruling would be in derogation of the doctrine of the law of the case. *See* section II.B.1.e, *infra.* Thus, the Court will not address this portion of Plaintiff's argument. FN8

> FN7. If the manufacturer/designer of the Vessel elected to use a hose bib made out of sugar, but the owner of the Vessel detected the sugar hose bib before it melted, would the design/manufacture of the Vessel contain a defect? If a yacht sinks in the ocean and no one is there to see it, does it still sink? The Court finds the answer to these profound questions is "yes."

> FN8. Regardless, as demonstrated below, the Court does not find that the failure to identify the manufacturer's defect was the proximate cause of the Loss.

### c. Florida's Consumer Products Liability Law Does Not Apply Here

Plaintiff asserts that "the Eleventh Circuit's opinion confirms the paucity of relevant precedent in the general maritime law on the interpretation of 'manufacturer's defect' and, by implication, of 'design defect,' within a policy of marine insurance." Cross-Motion at 6. "The Court," Plaintiff

continues, "must therefore turn to Florida law for guidance." *Id.* Plaintiff then maintains that "[t]he obvious analogy lies within Florida's consumer products liability law." The Court disagrees.

Products liability sounds in tort, but this action is based on a contract. Indeed, as Plaintiff itself points out, "[t]he interpretation of the provisions of an insurance *contract* is a matter of law to be decided by the court." *Id.* at 12 (emphasis added). Consequently, the Court finds it more appropriate to apply principles of contract law, rather than principals of tort law, in the instant action.

**\*6** In *Dahl-Eimers v. Mutual of Omaha Life Insurance Co.,* the court set forth several rules of construction developed under Florida law for interpreting insurance contracts. *See* 986 F.2d 1379, 1381-82 (11th Cir.1993). The first of those rules requires a court to "assess the natural or plain meaning of the policy language." *Id.* at 1381. Here, the issue before the Court hinges upon the meaning of the words "manufacturer" and "defect" in the Policy.

The American Heritage Dictionary defines "manufacturer" as follows: "A person, enterprise, or entity that manufactures, esp. the owner or operator of a factory." FN9 Similarly, the American Heritage Dictionary defines "defect" as follows: "1. The lack of something necessary or desirable for completion or perfection; deficiency; 2. An imperfection; fault." *American Heritage Dictionary* (2d College Ed.1985).

> FN9. The American Heritage Dictionary contains the following definition for "manufacture": "1. a. To make or process (a raw material) into a finished product, esp. by means of a large-scale industrial operation. b. To make or process (a product), esp. with the use of industrial machings. 2. To create produce, or turn out in a mechanical manner. 3. To concoct or invent; fabricate."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 4855484 (S.D.Fla.)
**(Cite as: 2009 WL 4855484 (S.D.Fla.))**

Under the facts of this case, the Court finds that use of a yellow brass hose barb in the Vessel was an imperfection and a fault. Accordingly, using the natural, plain meaning of the words "manufacturer" and "defect," the Court finds that the use of a yellow brass hose barb was a manufacturer's defect.

### d. Wide Use of Yellow Brass

Plaintiff points to evidence that "yellow brass is used in a variety of salt water plumbing systems aboard yachts" and that "the use of yellow brass components is safe and effective, provided that they are inspected and maintained." Cross-Motion at 10. Even if use of yellow brass is commonplace on-board yachts, which the Court does not decide, the use may still constitute a manufacturer's defect. As discussed above, if a component will inevitably fail long before the reasonable expected life of the Vessel and the manufacturer does not inform the owner of such inevitable failure, the use of such a component may constitute a manufacturer's defect. *See* section II.B.1.a, *supra.* Plaintiff's argument that the use of yellow brass is not a manufacturer's defect because it is common is unpersuasive.

### e. Inevitable Dezincification of Hose Barb Does Not Preclude Coverage

Plaintiff contends that "the position taken by [Defendant] in its Motion, if accepted by the Court, establishes that the [Vessel] was in an unseaworthy condition at the commencement of the Policy term. Accordingly, under well-entrenched principles of maritime law governing the interpretation of marine insurance contracts, the Policy is void *ab initio."* Cross-Motion at 12. Essentially, Plaintiff argues that if the Vessel would inevitably fail due to dezincification of the hose barb, the Vessel was not seaworthy when Plaintiff issued the Policy. Even if the Court accepted Plaintiff's logic-which it does not [FN10]-the Court cannot find for Plaintiff on this argument.

FN10. Suggesting a vessel will inevitably

become unseaworthy is not the same as suggesting it *is* unseaworthy as soon as it is built.

The doctrine of the "law of the case" provides that a ruling from a federal court "not only establishes a precedent for subsequent cases under the doctrine of *stare decisis,"* but also establishes "the law which ... it itself will, normally, apply to the same issues in subsequent proceedings in the same case." *Morrow v. Dillard,* 580 F.2d 1284, 1289 (5th Cir.1978) (internal quotation omitted). The doctrine is " 'based upon sound policy that when an issue is once litigated and decided, that should be the end of the matter.' " *Id.* (quoting *United States v. U.S. Smelting Refining & Mining Co.,* 339 U.S. 186, 198, 70 S.Ct. 537, 94 L.Ed. 750 (1950)). Stated differently, the law of the case requires that once an issue has been decided at one stage of a case, that decision is binding at later stages of the same case. *United States v. Escobar-Urrego,* 110 F.3d 1556 (11th Cir.1997).

*7 Here, the Court already determined that the Policy provides coverage for manufacturer's defects. [FN11] The Eleventh Circuit affirmed that determination. Indeed, the Eleventh Circuit remanded this case "for further bench trial proceedings consistent with this Court's ruling [only] as to the 'manufacturer's defect' issue." DE 301. Thus, the Court may not address additional issues without finding its ruling in derogation of the law of the case. *See Parker v. Scrap Metal Processors, Inc.,* 468 F.3d 733, 741 (11th Cir.2006). In other words, that ship has sailed.

> FN11. Provided, of course, that no exclusion applies.

### 2. Even Though the Use of a Yellow Brass Hose Barb Constitutes a Manufacturer's Defect, the Proximate Cause of the Loss Was Corrosion, a Cause of Loss Excluded Under the Policy

To determine whether the loss is covered under the

Slip Copy, 2009 WL 4855484 (S.D.Fla.)
**(Cite as: 2009 WL 4855484 (S.D.Fla.))**

Policy, the Court applies the doctrine of proximate cause. *Standard Oil Co. v. United States,* 340 U.S. 54, 57-58, 71 S.Ct. 135, 95 L.Ed. 68 (1950); *Lanasa Fruit S.S. & Importing Co. v. Universal Ins. Co.,* 302 U.S. 556, 562, 58 S.Ct. 371, 82 L.Ed. 422 (1938); *Tillery v. Hull & Co.,* 876 F.2d 1517 (11th Cir.1989). Proximate cause "does not necessarily refer to the cause nearest in point of time to the loss." *Standard Oil Co.,* 340 U.S. at 58. Rather, "it refers to the cause which is most nearly and essentially connected with the loss as its efficient cause." *Id.* The cause must be the "predominate and determining" cause of the loss. *Id.* Thus, if the proximate cause of the Loss is listed within the Policy's exclusions, no coverage exists.

On May 6, 2008, the Court entered its Findings of Fact and Conclusions of Law [DE 269] ("Findings"). In its Findings, the Court determined the following: 1) A failed hose barb was the source of the water intrusion into the Vessel; 2) The hose barb fractured as a result of corrosion[FN12] 3) Corrosion is specifically listed as an exclusion to coverage; and 4) The proximate cause of the loss was the failure of the hose barb which resulted from corrosion. Findings at 4, 7.

> FN12. Defendant contends that the hose barb failed as a result of dezincification which is a specific type of corrosion not contemplated by the corrosion exclusion in the Policy. The Policy, however, excludes "corrosion." The Policy does not define "corrosion." The Court, therefore, gives corrosion its plain meaning. *See Dahl-Elmers v. Mutual of Omaha Life Ins. Co.,* 986 F.2d 1379, 1381-82 (11th Cir.1993); *State Farm Fire & Cas. Co. v. Met. Dade County,* 639 So.2d 63, 65 (Fla.Dist.Ct.App.1994). Thus, the Court interprets "corrosion" to encompass any and all types of corrosion. Stated differently, the Court declines to read into the Policy a meaning of corrosion that encompasses some forms of corrosion and excludes oth-

ers.

The Eleventh Circuit did not disturb any of those findings. Accordingly, such findings constitute the law of the case. Furthermore, the parties have submitted no new evidence that cast doubt on those findings. The Court, therefore, concludes once again that the proximate cause of the loss was the failure of the hose barb which resulted from corrosion. Because the proximate cause of the Loss was corrosion, and corrosion is a cause of loss excluded under the Policy, no coverage exists for the loss of the Vessel.

### III. CONCLUSION

In light of the foregoing, it is **ORDERED AND ADJUDGED** that Defendant's Renewed Motion Following Remand for Partial Summary Judgment as to Coverage [DE 344] is **DENIED.** Plaintiff's Cross-Motion for Summary Judgment [DE 353] is **GRANTED.**

**DONE AND ORDERED.**

S.D.Fla.,2009.
St. Paul Fire and Marine Ins. Co. v. Lago Canyon, Inc.
Slip Copy, 2009 WL 4855484 (S.D.Fla.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in N.E.2d, 2005 WL 534906 (Ohio App. 10 Dist.), 2005 -Ohio- 984
**(Cite as: 2005 WL 534906 (Ohio App. 10 Dist.))**

▷

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio, Tenth District, Franklin
County.
GILBANE BUILDING COMPANY, Plaintiff, .
v.
THE ALTMAN COMPANY, Defendant-
Third-Party Plaintiff-Appellant,
v.
ACE PROPERTY & CASUALTY INSURANCE
COMPANY, fka Cigna Casualty Insurance Com-
pany, Third-Party Defendant-Appellee.
**No. 04AP-664.**

March 8, 2005.

**Background:** Property owner's construction man-
ager brought action against contractor that per-
formed concrete floor etching. Contractor filed
third-party complaint against insurer that issued
builder's risk policy. The Court of Common Pleas,
Franklin County, No. 01CVH07-6612, granted
summary judgment in favor of insurer. Contractor
appealed.

**Holding:** The Court of Appeals, McGrath, J., held
that rust and corrosion exclusion in builder's risk
insurance policy barred coverage.
Affirmed.

**Insurance 217 ☞2146**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2139 Risks or Losses Covered and
Exclusions
                217k2146 k. Corrosion or Deteriora-
tion; Mold or Fungus. Most Cited Cases
Rust and corrosion exclusion in builder's risk insur-

ance policy barred coverage for property damage to
building's metal surfaces and piping that was
caused by negligence of contractor that performed
concrete floor etching and that failed to properly di-
lute muriatic acid product that was used in etching
process; exclusion covered not only gradually
forming rust but also fast-forming rust, and exclu-
sion's exception for loss caused by specified cause
of loss did not apply because acid vapor was not a
cause of loss that was specified in policy.

Appeal from the Franklin County Court of Com-
mon Pleas.Lane, Alton & Horst, Jeffrey W. Hutson,
Vincent I. Holzhall, and Edward G. Hubbard, for
third-party plaintiff-appellant.

Mozley, Finlayson & Loggins, Wayne Taylor and
Lawrence B. Domenico; Smith, Rolfes & Skavdahl
Co., L.P.A., and Thomas F. Glassman, for third-
party defendant-appellee.

OPINION

MCGRATH, J.

**\*1 {¶ 1}** Third-party plaintiff-appellant, The Alt-
man Company ("Altman"), appeals from the judg-
ment of the Franklin County Court of Common
Pleas denying its motion for summary judgment
and granting summary judgment to third-party de-
fendant-appellee, ACE Property & Casualty Insur-
ance Company ("ACE"). For the reasons that fol-
low, we affirm.

**{¶ 2}** Altman and ACE filed with the trial court a
stipulated statement of material facts for purposes
of their respective motions for summary judgment.
According to the stipulated facts, "Gilbane Building
Company ('Gilbane') was hired to be the construc-
tion manager for the construction of a new facility
in Columbus, Ohio for Chemical Abstract Services
('CAS')." (Feb. 28, 2003, Stipulated Facts, at 2.)
Gilbane entered into a contract with Altman,

Not Reported in N.E.2d, 2005 WL 534906 (Ohio App. 10 Dist.), 2005 -Ohio- 984
**(Cite as: 2005 WL 534906 (Ohio App. 10 Dist.))**

"whereby Altman agreed to work as a trade contractor to provide cast-in-place concrete for the building." Id. The contract "called for Altman to 'etch' the concrete floor, which essentially involves removing the chemical agents used to cure the concrete floor and to rough the surface of the floor so it can receive the final sealant and treatment." Id. at 3. "Altman performed the concrete floor etching in January and February 2001 in the mechanical/electrical rooms of the building and the UPS rooms." Id.

{¶ 3} The method selected to perform the etching process was to use a muriatic acid product called E-Z Muriatic Acid. The directions on the product bottle directed the user to dilute the acid before using. Altman admitted that it "was negligent in its mixture, use and application of the E-Z Muriatic Acid in that it did not properly dilute the acid before applying it to the concrete floor." Id. at 4. "Altman's mixture, use and application of the E-Z Muriatic Acid caused an acid vapor to form in the electrical/mechanical rooms in which the concrete floor etching was performed." Id. at 5.

{¶ 4} In early February 2001, representatives of CAS informed Gilbane that "they had observed discoloration of the stainless steel door hardware, switch plates and copper piping" in the rooms where the concrete floor was etched. Id. "The corrosion and rust on the metal surfaces of the equipment and piping in the electrical/mechanical rooms and UPS rooms in which the etching was performed was caused by acid vapor in the air reacting with the metal surfaces of the equipment and piping, and forming corrosive reactions." Id. The equipment and piping that was damaged as a result of the rust and corrosion has either been replaced or repaired.

{¶ 5} Litigation ensued over the project. Gilbane filed a complaint against Altman, Ohio Farmer's Insurance Company, and Westfield Insurance Company ("Westfield"), who issued a commercial liability policy to Altman. Altman filed a third-party complaint against ACE, as an insured under a builder's risk policy issued by ACE to CAS. The parties filed various motions for summary judgment in the trial court. In a lengthy decision, the trial court resolved many of the outstanding issues between and among the parties. As a result of the trial court's decision, and before a judgment entry was filed, the parties participated in mediation and settlement negotiations, which resulted in a majority of the claims being settled. However, one of the issues not resolved by the parties was Altman's claim against ACE. By way of judgment entry, the trial court dismissed all claims with prejudice, except those by and between ACE, Altman and Westfield. In the same judgment entry, the court entered judgment in favor of ACE against Altman declaring that the builder's risk policy issued by ACE did not provide insurance coverage. Specifically, in the trial court's decision, the trial court determined that the "faulty workmanship" exclusion and the "rust and corrosion" exclusion in the policy issued by ACE barred coverage as to Altman, and thus granted summary judgment in favor of ACE.

**\*2 {¶ 6}** On appeal, Altman asserts the following assignment of error:

THE TRIAL COURT ERRED AS A MATTER OF LAW IN GRANTING THIRD-PARTY DEFENDANT ACE PROPERTY & CASUALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT AND IN DENYING THIRD-PARTY PLAINTIFF THE ALTMAN COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT.

{¶ 7} Civ.R. 56(C) states that summary judgment shall be rendered forthwith if "the pleadings, depositions, answers to interrogatories, written admissions, answers to interrogatories, written admissions, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

{¶ 8} Accordingly, summary judgment is appropriate only where: (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 534906 (Ohio App. 10 Dist.), 2005 -Ohio- 984
**(Cite as: 2005 WL 534906 (Ohio App. 10 Dist.))**

viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party. *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, 629, 605 N.E.2d 936, citing *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 65-66, 375 N.E.2d 46. "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record * * * which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264. Once the moving party meets its initial burden, the nonmovant must then produce competent evidence showing that there is a genuine issue for trial. Id. Summary judgment is a procedural device to terminate litigation, so it must be awarded cautiously with any doubts resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358-59, 604 N.E.2d 138.

{¶ 9} Appellate review of summary judgments is de novo. *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588, 641 N.E.2d 265; *Midwest Specialties, Inc. v. Firestone Tire & Rubber Co.* (1988), 42 Ohio App.3d 6, 8, 536 N.E.2d 411. We stand in the shoes of the trial court and conduct an independent review of the record. As such, we must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds. See *Dresher*; supra; *Coventry Twp. v. Ecker* (1995), 101 Ohio App.3d 38, 41-42, 654 N.E.2d 1327.

{¶ 10} Since the parties have stipulated to the facts of this case, there is no genuine issue of material fact for this court to consider. Rather, this case turns on the stipulated facts when matched to the provisions of the builder's risk policy issued by ACE and the exclusions contained therein. "[I]nsurance contracts must be construed in accordance with the same rules as other written con-

tracts." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096. Words and phrases used in insurance policies " 'must be given their natural and commonly accepted meaning, where they in fact possess such meaning, to the end that a reasonable interpretation of the insurance contract consistent with the apparent object and plain intent of the parties may be determined." ' *Tomlinson v. Skolnik* (1989), 44 Ohio St.3d 11, 12, 540 N.E.2d 716, quoting *Gomolka v. State Auto. Mut. Ins. Co.* (1982), 70 Ohio St.2d 166, 167-168, 436 N.E.2d 1347. Ambiguities in insurance policies should be construed liberally in favor of coverage. *Yeager v. Pacific Mut. Life Ins. Co.* (1956), 166 Ohio St. 71, 139 N.E.2d 48, paragraph one of the syllabus.

**\*3** {¶ 11} A builder's risk policy, like the one issued by ACE, is primarily designed to insure against catastrophic losses to the property. The types of losses contemplated are those related to events such as fire, flooding and hurricanes. Altman argues that the "rust and corrosion" exclusion in the builder's risk policy issued by ACE does not clearly and unambiguously exclude coverage for a fast-acting chemical reaction, and therefore, Altman is entitled to coverage pursuant to the policy. The "rust and corrosion" exclusion provides in pertinent part:

We will not pay for *loss* caused by or resulting from any of the following, except as provided under Automatic Extensions of Coverage.

\* \* \*

d. (1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in the property that caused it to damage or destroy itself;

\* \* \*

But if *loss* from *Specified Causes of Loss* or building glass breakage results, we will pay for that resulting *loss*.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in N.E.2d, 2005 WL 534906 (Ohio App. 10 Dist.), 2005 -Ohio- 984
**(Cite as: 2005 WL 534906 (Ohio App. 10 Dist.))**

{¶ 12} Altman argues that while the parties stipulated that the loss is due to rust and corrosion, which is excluded under the policy, the court should apply the commonsense and ordinary understanding of the terms "rust" and "corrosion," and conclude that a "fast-acting, acid-based chemical reaction," which undisputedly caused the rust and corrosion in this case, is not the type of rust and corrosion intended to be excluded under the policy. In support of its position, Altman relies on *Heban v. Auto-Owners Ins. Co.,* Wood App. No. WD-02-264, 2003-Ohio-4218. In *Heban,* panes of glass were stored outside, and exposed to the elements for a period of two years. The experts agreed that the panes of glass were corroded, but disagreed as to how long it took for the panes of glass to corrode. The insurance policy at issue in *Heban* excluded "maintenance type losses" including, "[r]ust, corrosion, fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself." Id. at P. 20. The court in *Heban* stated:

Thus, the only dispute between the experts seems to be the length of time for the condition to have occurred. Although they may differ on how long it might take for corrosion of the panes, both experts agree that corrosion is caused by chemical reactions happening when moisture is trapped between the panes of glass.

In addition, Heban acknowledged in his deposition that he did not cover or store the glass to protect it from exposure to moisture. Thus, no matter whether the corrosion occurred in two years, two weeks, or two days, reasonable minds could only conclude that it was caused by Heban's own improper storage and maintenance of the glass. In our view, under the plain and ordinary meaning of the terms of the insurance contract, the damage to the glass was properly excluded as maintenance type corrosion. Therefore, we conclude that summary judgment was properly granted in favor of appellee since no material facts remain in dispute and reasonable minds could only conclude that appellant is entitled

to judgment as a matter of law.

*4 Id. at ¶ 22-23.

{¶ 13} It is important to note that the policy in *Heban* excluded "maintenance type" losses. The policy at issue in the case sub judice simply provides that any loss caused by rust or corrosion is not covered. A close reading of *Heban* actually supports ACE's position. The court in *Heban* held that regardless of whether the corrosion occurred over "two years, two weeks, or two days," it was clear that the corrosion was due to Heban's own improper storage and maintenance of the glass, thus rendering it maintenance-related corrosion that was excluded under the policy. It was irrelevant to the court in *Heban* how long it took for the rust and corrosion to form because the parties agreed that the damage was due to rust and corrosion, and it was established that the rust and corrosion was due to the negligence of Heban. The ACE policy excludes coverage for loss due to rust and corrosion, and does not qualify the exclusion by limiting its application to only long-term rust or corrosion as opposed to rust or corrosion that forms quickly. Therefore, to find that coverage is available, this court must find that the words "rust" and "corrosion" mean only rust and corrosion that forms gradually. However, there is nothing in *Heban* to suggest that such an interpretation is required; in fact, the court in *Heban* suggests that the terms "rust" and "corrosion" include either rust and corrosion that forms gradually, or rust and corrosion that forms quickly.

{¶ 14} Altman also urges this court to consult *Arkwright-Boston Manufacturers Mut. Ins. Co. v. Wausau Paper Mills Co.* (C.A.7, 1987), 818 F.2d 591. In *Arkwright,* the insured sought to recover damages sustained to a steel reactor caused by sulfuric acid forming in the reactor and causing corrosion. The policy excluded from coverage loss caused by "rust and corrosion." The insured argued that the damage was not caused by corrosion, but by a sudden "acid attack" due to the negligence of its employees. The court held that the damage was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 534906 (Ohio App. 10 Dist.), 2005 -Ohio- 984
**(Cite as: 2005 WL 534906 (Ohio App. 10 Dist.))**

"corrosion" and thus precluded under the exclusion, and that such was "precisely the type of corrosion the policy was intended to exclude." Id. at 596. Altman argues that the court in *Arkwright* applied the dictionary definition of the term "corrosion" to the case before it and found that the damage was corrosion pursuant to the ordinary understanding of the word corrosion. However, how the corrosion occurred in *Arkwright* appears immaterial. There is nothing in the opinion to suggest that the speed at which the corrosion occurred was critical to the court's determination of whether or not the damage at issue was caused by corrosion. In this case, unlike *Arkwright,* there is no dispute, and, in fact, it is stipulated that the damage is rust and corrosion.

{¶ 15} Altman also relies on *S.W. Energy Corp. v. Continental Ins. Co.* 1999 UT 23, 974 P.2d 1239. However, in *S.W. Energy Corp.,* the issue was whether or not a loss was caused by rust and corrosion, not how long it took for the corrosion to form. The decision does not offer an opinion relevant to this court's inquiry, which is whether or not ACE's policy should be interpreted as excluding only slow forming rust and corrosion.

*5 {¶ 16} Similarly, *Bettigole v. American Employers Insurance Co.* (1991), 30 Mass.App.Ct. 272, 567 N.E.2d 1259, offers no comment on whether only gradually forming corrosion is excluded under a policy with a rust and corrosion exclusion, as opposed to fast-forming rust or corrosion. The court in *Bettigole* was faced with the issue of whether or not the damage was excluded under the policy's rust and corrosion exclusion or whether the corrosion was only a secondary cause of loss, with the corrosion following as a consequence. In *Bettigole,* the insured made a claim for damage to a parking deck. De-icing salts caused the damage to the parking deck due to chloride ions filtering through the cracks in the concrete and corroding the steel frame. The insured argued that the corrosion was a secondary cause of the loss, as the release of chloride ions was the primary cause of loss. The court rejected the insured's argument and held that cover-

age was barred by the rust and corrosion exclusion. The court reasoned that if plaintiff's view were adopted, "the corrosion exclusion would tend to disappear altogether because some similar agent of the process could always be identified." Id. at 1262.

{¶ 17} Also, relied on by Altman is *Central International Co. v. Kemper Natl. Ins. Cos.* (C.A.1, 2002), 202 F.3d 372. In that case, steel coils were placed on a cargo ship in Spain for delivery to the West Indies. When unpacked in the West Indies, the coils were corroded. The court found that coverage for the damage was not available because of the policy's rust and corrosion exclusion. The policy in *Central International* covered all risks of "physical loss or damage [to the cargo] from any external cause," but also contained an exclusion that provided, "[h]owever, as respects steel products and all metals: excluding rusting, oxidation, discoloration and corrosion; also excluding bending, twisting, crimping, and end damage." Id. at 373. However, because of the language in the policy in *Central International,* the timing of the corrosion to form was not an issue in the case. There is no suggestion that quick forming corrosion was not covered and only gradual forming rusting or corrosion was covered.[FN1]

FN1. Altman concedes in its brief that "[a]lthough one might point to *Central International* as a case in which the length of time for the discoloration and corrosion to develop was relatively short, the case is distinguishable because of the exclusionary language at issue and because the court simply did not address the 'damage over time' concept." Altman's brief, at 25.

{¶ 18} The ACE policy bars coverage for loss resulting from rust and corrosion. The policy does not qualify this exclusion to cover only gradual-forming rust and corrosion or fast-forming rust and corrosion. The parties have stipulated that the loss at issue here was due to corrosion and rust on the metal surfaces of the equipment and piping in the electrical/mechanical rooms and the UPS rooms in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 534906 (Ohio App. 10 Dist.), 2005 -Ohio- 984
**(Cite as: 2005 WL 534906 (Ohio App. 10 Dist.))**

which the etching was performed. Therefore, this court finds that the "rust and corrosion" exclusion in the policy provided by ACE bars coverage.

{¶ 19} An exception to the "rust and corrosion" exclusion is if the loss is caused by a "specified cause of loss." With respect to specified causes of loss, the policy states in part:

*6 *Specified Causes of* Loss mean the following: Fire, lightning, explosion, windstorm or hail, smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; *sinkhole* collapse; volcanic action; falling objects; weight of snow, ice or sleet; *water damage.*

{¶ 20} Altman argues that the muriatic acid vapor is considered "smoke," and thus, coverage is available pursuant to the exception to the "rust and corrosion" exclusion. Here, Altman relies on *Midwest Specialties, Inc. v. Westfield Ins. Co.* (Apr. 1, 1994), Montgomery App. No. 14027. However, as argued by ACE, *Midwest Specialties* concerned an issue of fact as to whether the resulting damage was caused by smoke or acid vapor, because the parties' experts used the terms interchangeably. In the present case, it is undisputed that the rust and corrosion was caused by an acid vapor as evidenced by the parties' stipulated facts. Given that the rust and corrosion in this case was caused by an acid vapor and such is not included in the list of "specified causes of loss," this court finds that the exception to the "rust and corrosion" exclusion is not applicable.

{¶ 21} Because this court finds that coverage is not available to Altman due to the rust and corrosion exclusions in the policy, and because this court finds that no exception to the exclusion applies, Altman's remaining arguments regarding the "faulty workmanship" exclusion are rendered moot and need not be addressed by this court.[FN2]

> FN2. The parties conceded during oral argument that if this court were to find that coverage is barred due to the "rust and cor-

rosion" exclusion, the court need not address the arguments relating to the "faulty workmanship" exclusion.

{¶ 22} For the foregoing reasons, we overrule Altman's assignment of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

PETREE and FRENCH, JJ., concur.
Ohio App. 10 Dist.,2005.
Gilbane Building Co. v. Altman Co.
Not Reported in N.E.2d, 2005 WL 534906 (Ohio App. 10 Dist.), 2005 -Ohio- 984

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.