Westlaw.

Not Reported in N.E.2d, 2003 WL 21862170 (Ohio App. 6 Dist.), 2003 -Ohio- 4218
**(Cite as: 2003 WL 21862170 (Ohio App. 6 Dist.))**

c

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio,
Sixth District, Wood County.
Michael N. HEBAN, Appellant,
v.
AUTO-OWNERS INSURANCE CO., et al., Ap-
pellees.
No. WD-02-064.

Decided Aug. 8, 2003.

Insured brought suit against insurer, seeking cover-
age under commercial insurance policy for damages
to panes of clear glass that were to be used to con-
struct a commercial green house. The Court of
Common Pleas, Wood County, No. 01-CV-522,
granted summary judgment to insurer. Insured ap-
pealed. The Court of Appeals, Wood County, held
that insured's policy, which excluded losses or dam-
ages caused by corrosion, did not extend coverage
for damages to panes.

Affirmed.

West Headnotes

**Insurance 217 ☞2146**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2139 Risks or Losses Covered and
Exclusions
                217k2146 k. Corrosion or Deteriora-
tion; Mold or Fungus. Most Cited Cases
Insured's commercial insurance policy, which ex-
cluded losses or damages caused by corrosion, did
not extend coverage for damages to panes of clear
glass that insured intended to use to construct a

commercial greenhouse, regardless of the amount
of time it took for corrosion to occur, where corro-
sion was the result of insured's own improper stor-
age and maintenance of glass.
Steven Crossmock, for appellant.

Michael Manahan, for appellee.

LANZINGER, J.

*1 {¶ 1} This accelerated appeal comes to us from
a summary judgment issued by the Wood County
Court of Common Pleas in a case involving an in-
surance claim for damaged glass. Because we con-
clude that no material issues of fact remain in dis-
pute and that appellee was entitled to judgment as a
matter of law, we affirm.

{¶ 2} In 1998 or 1999, appellant, Michael Heban,
purchased 2,200 panes of clear glass for use in the
construction of a commercial greenhouse. The glass
was packaged in open top 100 pane bundles and
then stacked on pallets upright on edge. Heban
stored the glass outside and initially covered it with
a tarpaulin which blew off from time to time. Al-
though at first Heban would replace that tarpaulin,
eventually he stopped doing so, thus, allowing the
glass to be exposed to the elements.

{¶ 3} About two years after the purchase, when
Heban removed the glass from storage, he dis-
covered that the glass had become discolored.
Heban contacted appellee, Auto-Owners Insurance
Company ("Auto-Owners"), the issuer of his com-
mercial insurance policy, and initiated a claim.
Auto-Owners denied the claim, stating that the
damage was caused by maintenance corrosion, a
condition specifically excluded under the policy
language.

{¶ 4} Heban sued Auto-Owners to challenge the
denial of his claim.[FN1] Auto-Owners filed a mo-
tion for summary judgment, along with the affidavit
of Dennis L. McGarry, an engineer and professor at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2003 WL 21862170 (Ohio App. 6 Dist.), 2003 -Ohio- 4218
**(Cite as: 2003 WL 21862170 (Ohio App. 6 Dist.))**

Ohio State University. McGarry opined that the glass was corroded due to extended exposure to moisture between the closely stacked panes of glass. In turn, Heban offered the affidavit of Carlo Pantano, an engineer and professor at Penn State University. After reviewing all evidence presented, the trial court granted summary judgment in favor of Auto-Owners, noting that regardless of the length of time involved, the damage to the glass was caused by corrosion due to improper maintenance of the glass. Therefore, the court ruled that the claim was properly excluded by the policy language.

> FN1. Heban also sued Alex N. Sill Company ("Sill"), an agent which he had retained to try to obtain coverage under the Auto-Owners policy. Although Sill was unable to effect recovery on behalf of Heban, the company was included as a party defendant, since it claims it is entitled to 10% of any amount recovered under the policy.

{¶ 5} Heban now appeals from that judgment, setting forth the following two assignments of error:

{¶ 6} "First Assignment of Error

{¶ 7} "The trial court erred in holding that every corrosion loss, regardless of the length of time required to create the corrosion, is a 'maintenance' type loss.

{¶ 8} "Second Assignment of Error

{¶ 9} "The trial court erred in granting summary judgment to the insurance company which had the burden of proof, when the insurance company presented expert testimony which stated it was only a possibility that the loss had occurred in the fashion claimed by the insurance company and used as the basis for denial of coverage."

{¶ 10} We will address both assignments of error together.

{¶ 11} The standard of review of a grant or denial of summary judgment is the same for both a trial court and an appellate court. *Lorain Natl. Bank v. Saratoga Apts.* (1989), 61 Ohio App.3d 127, 129, 572 N.E.2d 198. Summary judgment will be granted if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of facts, if any, * * * show that there is no genuine issue as to any material fact" and, construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).

**\*2** {¶ 12} A motion for summary judgment first compels the moving party to inform the court of the basis of the motion and to identify portions in the record which demonstrate the absence of a genuine issue of material fact. If the moving party satisfies that burden, the nonmoving party must then set forth specific facts showing that there is a genuine issue for trial. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. Finally, it is well-established that an appellate court reviews summary judgments de novo; such judgments are reviewed independently and without deference to the trial court's determination. *Coventry Twp. v. Ecker* (1995), 101 Ohio App.3d 38, 41, 654 N.E.2d 1327; *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153.

{¶ 13} Insurance policies are generally interpreted by applying rules of contract law. *Burris v. Grange Mut. Cos.* (1989), 46 Ohio St.3d 84, 89, 545 N.E.2d 83, overruled on other grounds, *Savore v.. Grange Mut. Ins. Co.* (1993), 67 Ohio St.3d 500, 620 N.E.2d 809, paragraph one of the syllabus. If the insurance policy language is uncertain or ambiguous, the language will be construed strictly against the insurer and liberally in favor of the insured. *Faruque v. Provident Life & Acc. Ins. Co.* (1987), 31 Ohio St.3d 34, 38, 508 N.E.2d 949, citing to *Buckeye Union Ins. Co. v. Drice* (1974), 39 Ohio St.3d 95, at the syllabus. However, where the terms

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2003 WL 21862170 (Ohio App. 6 Dist.), 2003 -Ohio- 4218
**(Cite as: 2003 WL 21862170 (Ohio App. 6 Dist.))**

of an insurance policy are clear and unambiguous, those terms must be applied to the facts without engaging in any construction. *Santana v. Auto Owners Ins. Co.* (1993), 91 Ohio App.3d 490, 494, 632 N.E.2d 1308. In other words, the court must enforce the plain and ordinary meaning of unambiguous language as written. *Nationwide Mut. Ins. Co. v. Finkley* (1996), 112 Ohio App.3d 712, 715, 679 N.E.2d 1189: *Mehl v. Motorists Mut. Ins. Co.* (1992), 79 Ohio App.3d 550, 554, 607 N.E.2d 897. In this case, the commercial insurance policy reads, in pertinent part:

{¶ 14} "B. EXCLUSIONS

{¶ 15} " * * *

{¶ 16} "2. We will not pay for loss or damage caused by or resulting from any of the following:

{¶ 17} " * * *

{¶ 18} "(d) Maintenance type losses:

{¶ 19} " * * *

{¶ 20} (2) Rust, *corrosion,* fungus, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself.* * * "(Emphasis added.)

{¶ 21} Webster's Dictionary, 10th Edition, defines corrosion as "the action, process, or effect of corroding." Therefore, "corrosion" includes not only the end result, but the ongoing stages of the process of corroding.

{¶ 22} In this case, it is undisputed that for two years, the glass was stored outside, uncovered and subject to every weather condition, including rain and snow. It is also undisputed that corrosion caused the discoloration of the glass. Professor McGarry, Auto-Owner's expert, states that Heban's improper storage allowed moisture to enter the open bundles of glass panes, causing the corrosion. Professor Pantano, Heban's expert, does not dispute that the glass panes are corroded or that Heban's

storage method permitted moisture to enter the bundles. He simply states that, without knowing certain factors such as temperature, humidity, temperature-cycling, exposure to liquid water and the "nature of interleaving," it is impossible to determine the exact length of time needed for the packed sheets of glass to become corroded. Thus, the only dispute between the experts seems to be the length of time for the condition to have occurred. Although they may differ on how long it might take for corrosion of the panes, both experts agree that corrosion is caused by chemical reactions happening when moisture is trapped between the panes of glass.

*3 {¶ 23} In addition, Heban acknowledged in his deposition that he did not cover or store the glass to protect it from exposure to moisture. Thus, no matter whether the corrosion occurred in two years, two weeks, or two days, reasonable minds could only conclude that it was caused by Heban's own improper storage and maintenance of the glass. In our view, under the plain and ordinary meaning of the terms of the insurance contract, the damage to the glass was properly excluded as maintenance type corrosion. Therefore, we conclude that summary judgment was properly granted in favor of appellee since no material facts remain in dispute and reasonable minds could only conclude that appellant is entitled to judgment as a matter of law.

{¶ 24} Accordingly, appellant's two assignments of error are not well-taken and the judgment of the Wood County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.

JUDGMENT AFFIRMED.

KNEPPER and SINGER, JJ., concur.

Ohio App. 6 Dist.,2003.
Heban v. Auto Owners Ins. Co.
Not Reported in N.E.2d, 2003 WL 21862170 (Ohio App. 6 Dist.), 2003 -Ohio- 4218

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2000 WL 306654 (E.D.La.)
**(Cite as: 2000 WL 306654 (E.D.La.))**

**c**
Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
TRUS JOIST MACMILLAN, et al
v.
NEEB KEARNEY AND CO., INC., et al
**No. Civ.A.99-2964.**

March 23, 2000.

*MEMORANDUM AND ORDER*

SEAR, J.

*Background*

**\*1** Plaintiffs Trust Joist Macmillan, and/or Macmillan Bloedel Limited, and their insurer/subrogee American Home Assurance Company, individually and as issuing agent for Camarin Company, Ltd. ("Trus Joist"), bring suit against defendant companies and their insurers for negligence and breach of a maritime contract.

Plaintiffs contracted with defendant, Transportation Consultants, Inc., individually and d/b/a as TCI Trucking and Warehousing Services (TCI) to ship twelve steel bedplates from Taihei Machinery Works, Ltd. in Japan, to Natchitoches, Louisiana, and/or New Orleans, Louisiana. TCI contracted with defendants Neeb Kearney and Co, Inc., and/or The Kearney Companies, Inc. ("Kearney") to store the bedplates in their warehouse in New Orleans, Louisiana. Defendants, Liberty Mutual Insurance Company ("Liberty Mutual") and Scottsdale Insurance Company ("Scottsdale"), provide insurance to the defendants TCI and Kearney, respectively.

Plaintiffs allege that while the bedplates were in the warehouse, they were allowed to become wet by standing in fresh water and/or salt water, thereby suffering extensive damage. Plaintiff further alleges

that the defendants failed to notify the plaintiffs of the damage, which thereby caused the bedplates to suffer additional damage.

Defendant, Scottsdale, now moves for summary judgment dismissing all claims asserted by plaintiffs and finding it has no duty to defend or indemmify Kearney, on grounds that plaintiffs' allegations and the undisputed facts show that the alleged damage resulted from flood water and rust, both of which are excluded perils under the relevant policy.

Scottsdale's motion is opposed by plaintiffs, defendant Kearney, and co-defendant TCI.

*Discussion*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." [FN1]

FN1. Fed.R.Civ.P. 56(c).

Where, as here, the moving party bears the burden of proof at trial,[FN2] it must come forward with evidence which would "entitle it to a directed verdict if the evidence went uncontroverted at trial." [FN3] The nonmoving party may defeat the motion by demonstrating the existence of a genuine dispute of material fact or by showing that "the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." [FN4] However, the non-movant may not rest on mere conjecture, general denials, vague statements or allegations.[FN5] As in any summary judgment motion, the inferences drawn from the underlying facts must be viewed in a light most favorable to the nonmoving party.[FN6]

Not Reported in F.Supp.2d, 2000 WL 306654 (E.D.La.)
**(Cite as: 2000 WL 306654 (E.D.La.))**

Finally, the substantive law determines materiality of facts and only facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.[FN7]

> FN2. Under Louisiana law, an insurer asserting that a policy exclusion precludes coverage has the burden of proving that the exclusion applies to the particular loss before the court. *Calcasieu-Marine Nat'l Bank of Lake Charles v. American Employers' Ins. Co.*, 533 F.2d 290 (5th Cir.1976).

> FN3. *See Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir.1991) (citations omitted).

> FN4. *Id.* at 1265.

> FN5. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

> FN6. *See Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

> FN7. *See Anderson*, 477 U.S. at 248.

*2 To avoid liability to plaintiff and its duty to defend and indemnify its assured, Scottsdale relies on two exclusions contained in its policy. The first exclusion is one that excludes coverage for loss caused by flood or groundwater.[FN8] "Flood" is defined as "flood, surface water, waves, tidal water, or the overflow of a body of water all whether driven by wind or not."[FN9] Scottsdale argues that plaintiff's allegations and certain documentary evidence, including discovery responses and reports and correspondence of various individuals involved in the inspection of the steel plates show, as an undisputed matter of fact, that the damage in this case was due to flooding caused by Hurricane Georges.

> FN8. *See* Defendant's Exhibit A.

> FN9. *See id.* at AAIS IM-7655 Ed. 1.0, p. 1, ¶ 1.

The reports and correspondence relied on by Scottsdale in support of summary judgment are not supported by sworn affidavit or properly authenticated. Even were they acceptable summary judgment evidence, however, they do not establish with sufficient certainty the cause of the damage. In fact, several of them suggest causes other than flood water or groundwater.[FN10] Scottsdale has not carried its summary judgment burden on the flood exclusion.

> FN10. *See, e.g.,* Defendant's Exhibit F.

Second, Scottsdale relies on a "rust" exclusion. The pertinent policy language reads as follows:

2. We do not pay for loss or damage if one or more of the following exclusions apply to the loss:

a. Contamination or Deterioration-We do not pay for loss caused by contamination or deterioration including corrosion; decay; fungus; mildew; mold; rot; rust; or any quality, fault, or wekness in the covered property that causes it to damage or destroy itself.[FN11]

> FN11. *See* Defendant's Exhibit A at AAIS IM-7650 Ed. 1.0, Page 5, ¶ 2(a).

Scottsdale apparently suggests that merely because the bedplates are rusted, the rust exclusion precludes coverage. Clearly, however, the exclusion is designed to apply where corrosion, rust, or the like is the *cause* of property damage. It is not designed to preclude coverage when rust is the damage itself, as opposed to the cause of the damage. Even if there were some ambiguity about the meaning of this exclusion, for purposes of summary judgment any doubts should be resolved against exclusion. For this reason, summary judgment is not warranted pursuant to the rust exclusion.

Accordingly,

IT IS ORDERED that the motion for summary judgment of defendant Scottsdale Insurance Company IS DENIED.

Not Reported in F.Supp.2d, 2000 WL 306654 (E.D.La.)
**(Cite as: 2000 WL 306654 (E.D.La.))**

E.D.La.,2000.
Trus Joist Macmillan v. Neeb Kearney and Co., Inc.
Not Reported in F.Supp.2d, 2000 WL 306654
(E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Not Reported in F.Supp.2d, 2008 WL 1885326 (M.D.La.)
**(Cite as: 2008 WL 1885326 (M.D.La.))**

---

**H**
Only the Westlaw citation is currently available.

United States District Court,
M.D. Louisiana.
BARRY CONCRETE, INC.
v.
MARTIN MARIETTA MATERIALS, INC.
**Civil Action No. 06-504-JJB-CN.**

April 28, 2008.

*RULING ON MOTION FOR RECONSIDERA-*
*TION*

JAMES J. BRADY, Judge.

**\*1** This matter is before the court on a Motion for Reconsideration (doc. 40) by Third-Party Defendant, Western World Insurance Company (hereinafter "Western World"). Martin Marietta Materials, Inc. ("Martin Marietta") and Barry Concrete ("Barry") have filed opposition motions (docs. 45 and 44 respectively). Western World has filed a reply brief (doc. 46). Oral argument is not necessary. Jurisdiction exists pursuant to 28 U.S.C. §§ 1332, 1367.

*Analysis*

**I. Standard on Motion for Reconsideration**

Under Rule 54(b) of the Federal Rules of Civil Procedure, district courts have discretion to reconsider interlocutory rulings. *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 259 F.Supp.2d 471, 474-75 (M.D.La.2002). Although parties often discuss Fed. R. Civ. Pro. 59 in conjunction with motions for reconsideration, the plain language of Rule 59 indicates that it only applies "after entry of judgment" is made. Fed. R. Civ. Pro. 59. This distinction is relevant because the time limitations and standards for granting reconsidera-

tion are looser under Rule 54(b) than under Rule 59 . *Livingston.* 259 F.Supp.2d at 475. Because final judgment has not been entered in this matter, the ten day time restriction under Rule 59 is inapplicable and Martin Marietta's timeliness argument is without merit. [FN1]

> FN1. *See* Martin Marietta's Memorandum in Opposition to Western World Ins. Co.'s Motion for Reconsideration (doc. 45) at 3.

Courts are concerned with principles of finality and judicial economy, but even with that in mind, "the ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law." *American Canoe Ass'n, Inc. v. Murphy Farms, Inc.,* 326 F.3d 505, 515 (4th Cir.2003) (although not controlling on this court, this case provides an excellent explanation of motions for reconsideration and the applicable legal standards). As a result, the court retains jurisdiction under Rule 54(b) over all claims in a suit and may alter any earlier decision at its discretion until final judgment has been issued.

**A. Coverage Under the Auto Policy**

In light of case law not previously addressed in the parties' briefs, this court finds that it incorrectly applied the "Care, Custody, or Control Exclusion" to the Auto Policy, and this court must alter its prior holding to correct a manifest error of law. The Auto Policy does defines the term "property damage" as "damage to or loss of use of tangible property." [FN2] Pursuant to the Auto Policy, "property damage to ... property owned *or* transported by the 'insured' *or* in the 'insured's' care, custody, control" is excluded from coverage. [FN3] Louisiana courts have applied this exclusion to trucking companies transporting property for profit. *See Bergquist v. Fernandez,* 535 So.2d 827, 829 (La.App.2d Cir.1988) (enforcing the exclusion when a horse trailer overturned and damaged the horses being transported); *Allstate Ins. Co. v. Reid,* 934 So.2d

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1885326 (M.D.La.)
**(Cite as: 2008 WL 1885326 (M.D.La.))**

56, 61 (La.App. 1st Cir.2005) (enforcing a similar exclusion when a boat was damaged in transit on a trailer).

> FN2. Auto Insurance Policy (doc. 23, Exh. D) at 13.

> FN3. Auto Insurance Policy (doc. 23, Exh. D) at 4.

**\*2** Barry Concrete alleges that the aggregate was damaged during transport,[FN4] and this court previously held that the aggregate was contaminated "during transport."[FN5] As the plain language of this policy excludes property damage to items "transported by the insured,"[FN6] the Auto Policy effectively excludes coverage for damage to the aggregate in the instant action. The court incorrectly ignored its own finding that the insured "transported" the aggregate in initially denying summary judgment, and this court now alters its prior holding to conform to its own findings of fact. The damage to the aggregate during transport is clearly excluded under the language of the Auto Policy.

> FN4. Barry's Petition for Damages (doc. 1, Exh. A) at ¶ 11.

> FN5. Ruling on Motion for Summary Judgment (doc. 34) at 6.

> FN6. Auto Insurance Policy (doc. 23, Exh. D) at 4.

In addition to damage to the concrete aggregate itself, Barry Concrete alleges that the contaminated concrete would not cure which necessitated the "demolition and the replacement of the concrete slab and foundation" when the aggregate was poured.[FN7] Barry Concrete further alleges that replacing the slab resulted in $378,000 in damages.[FN8] Western World contends that if damage to the transported aggregated is excluded, then consequential damages to the concrete slab are also excluded.[FN9]

> FN7. Barry's Petition for Damages (doc. 1, Exh. A) at ¶ 8-9.

> FN8. *Id.* at ¶ 10.

> FN9. Western World's Reply to Opposition (doc. 46) at 4-6.

Insurance companies in Louisiana are permitted to exclude coverage for consequential damages as a result of damage to property. *See Borden v. Howard Trucking Co., Inc.,* 454 So.2d 1081, 1086 (La.1983) ("*Borden I* "; ruling amended upon rehearing because the court utilized a definition not found in the policy; the policy language in the instant action resembles the initial, although incorrect, definition used by the court). In *Borden I,* the Louisiana Supreme Court held that loss of use is not an independent form of property damage, but merely measures part of the physical damage to property. *Id.* In other words, "[l]oss of use of physically damaged property is not property damage in and of itself. It is dependent on coverage afforded the damaged tangible property under the policy." *Id.* In other words, if the "injury to and/or destruction of property is not covered, the resulting loss of use is not covered ... The loss of use grew out of the injury and/or destruction, and since the injury and/or destruction were excluded, the loss of use was excluded as a necessary consequence." *Id.* at 1086, *quoting Torrington v. Aetna Casualty & Surety Co.,* 216 S.E.2d 547, 550 (S.C.1975).

In this case, the contamination of the aggregate during transport made it unsuitable for use as the sugar prevented the concrete from curing. The inability to employ the aggregate in its intended use constitutes "loss of use." Comparing the policy language analyzed in *Borden I* and upon rehearing *Borden II,* the language of the policy at issue mirrors the language in the initial *Borden* decision where the Louisiana Supreme Court denied coverage of consequential damages under the policy.[FN10] In its initial decision, the Louisiana Supreme Court relied on a definition of property damage including "physical injury to or destruction of tangible property which

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1885326 (M.D.La.)
**(Cite as: 2008 WL 1885326 (M.D.La.))**

occurs during the policy period, *including the loss of use thereof at any time resulting therefrom.* " *Borden I,* 454 So.2d at 1086 (emphasis added). On rehearing, the court reversed its prior finding because the true definition of property damage contained in the policy was "loss of use of tangible property which *has not been physically injured or destroyed.*" *Borden II,* 454 So.2d at 1090. The Supreme Court construed this limitation as excluding coverage for loss of use of *undamaged* property, but allowing recovery for loss of use of *damaged* property. *Id.*

> FN10. *See Borden v. Howard Trucking Co., Inc.,* 454 So.2d 1081, 1086 (La.1983) ("Borden I").

*3 The definition in the instant action resembles the definition used in *Borden I,* because it does not contain the limitation of property which "has not been physically injured or destroyed."[FN11] In the same opinion, the Louisiana Supreme Court also noted that it would be simple for an insurer to exclude consequential damages with a provision excluding coverage for "loss of market delay, loss of use, or any other remote or consequential loss." *Borden II,* 454 So.2d at 1091. The Western World policy excludes recovery for "property damage" to items "transported by the insured," and because "property damage" is broadly defined to include "damage to or loss of use of tangible property," Western World is not liable for loss of use of the aggregate including damage to the slab.

> FN11. *Borden v. Howard Trucking Co., Inc.,* 454 So.2d 1081, 1090 (La.1984) ("Borden II").

**B. Clarification of Coverage Under the Cargo Policy**

This court previously found that Western World's Cargo Policy effectively excluded coverage for damage to the aggregate under the contamination exclusion.[FN12] The contamination exclusion

denied coverage for damage to the aggregate caused by insufficient packaging, contamination, or leakage.[FN13] The Cargo Policy also excluded coverage for "delay, loss of market, or loss of use; or 'loss' caused by such delay, loss of market, or loss of use."[FN14] The court finds that the contamination to the aggregate made it unfit for use within the everyday meaning of the phrase. To clarify the court's initial ruling, the contamination provision excluded property damage to the aggregate itself; whereas; the "loss of use" provision excludes coverage of consequential damage to the concrete slab.

> FN12. Ruling on Motion for Summary Judgment (doc. 34) at 6.

> FN13. Cargo Insurance Policy (doc. 23, Exh. C) at 2-3.

> FN14. Cargo Insurance Policy (doc. 23, Exh. C) at 3.

Accordingly, the Motion for Reconsideration (doc. 40) by Western World is hereby **GRANTED,** and summary judgment on the issue of coverage under the Auto Policy is hereby **GRANTED** in favor of Western World. The court will entertain a Rule 54(b) Motion if such a motion is filed.

M.D.La.,2008.
Barry Concrete, Inc. v. Martin Marietta Materials, Inc.
Not Reported in F.Supp.2d, 2008 WL 1885326 (M.D.La.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas, Houston Division.
UNITED NATIONAL INSURANCE CO.,
Plaintiff,
v.
MOTIVA ENTERPRISES, L.L.C. and Hydro Tank,
Inc., Defendants.
**No. Civ.A. H-04-2924.**

Jan. 12, 2006.

Brian Scott Martin, Thompson Coe et. al., Jamie
Rohde Carsey, Houston, TX, for Plaintiff.

Timothy R. Ploch, Attorney at Law, Houston, TX,
Greg W. Curry, Thompson & Knight, Dallas, TX,
for Defendants.

MEMORANDUM AND ORDER

ROSENTHAL, J.

*1 This is an insurance coverage dispute arising out
of injuries three employees of Hydro Tank, Inc.
suffered on July 30, 2002, while removing petro-
leum waste materials from a fuel-mixing tank so
the tank could be cleaned and the materials re-
cycled or discarded. The tank was located at a pet-
roleum refinery in Port Arthur, Texas. The employ-
ees were working under a March 2002 contract
between the premises owner, Motiva Enterprises,
L.L.C., and Hydro Tank. In that contract, Hydro
Tank agreed to obtain a commercial general liabil-
ity (CGL) insurance policy with limits of not less
than $1 million per occurrence and $1 million gen-
eral aggregate, naming Motiva as an additional in-
sured. Hydro Tank obtained a CGL Policy from
American Equity with $1 million limits and an um-
brella policy from United National Insurance Com-
pany with $5 million limits. In this declaratory

judgment action, United National Insurance has
moved for summary judgment on two grounds.
First, United National asserts that Motiva is not an
"insured" covered under the United National Policy
issued to Hydro Tank. Second, United National as-
serts that the pollution exclusion in its Policy bars
coverage for the underlying *Durisio* plaintiffs'
claims. (Docket Entry Nos. 16, 47). Motiva has
filed responses, (Docket Entry Nos. 20, 58), to
which United National has replied, (Docket Entry
No. 68), and Motiva has surreplied, (Docket Entry
No. 70). Motiva has also filed a motion for leave to
file a Second Amended Answer, (Docket Entry No.
35), to which United National has responded,
(Docket Entry No. 39). Motiva has also filed a mo-
tion to strike certain summary judgment evidence
submitted by United National, (Docket Entry No.
57), to which United National has responded,
(Docket Entry No. 64). United National has also
filed a request for judicial notice, (Docket Entry
No. 65), to which Motiva has responded, (Docket
Entry No. 69).

Based on the motions and the pleadings, the record,
and the controlling law, this court denies United
National's motion for partial summary judgment on
the basis that Motiva is not an insured under the
Policy; denies Motiva's motion for leave to file a
second amended answer as moot; denies Motiva's
motion to strike; denies United National's request
for judicial notice; and grants United National's
motion for summary judgment based on the pollu-
tion exclusion. The reasons are explained below.
FN1

> FN1. This case had been stayed. (Docket
> Entry No. 56). After the case was trans-
> ferred to this court, and after hearing from
> the parties at a status conference on Octo-
> ber 11, 2005, this court agreed to address
> the summary judgment motions. Upon
> entry of this Memorandum and Opinion,
> the stay is lifted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

I. Background

A. The Parties and the *Durisio* Lawsuit

Motiva Enterprises, L.L.C. is a petroleum manufacturer with a refinery in Port Arthur, Texas. In the Spring of 2002, Motiva decided to destroy certain tanks used at the Port Arthur premises. Motiva contracted out the task of cleaning the tanks. Hydro Tank won the bid. In its May 2002 contract with Motiva, Hydro Tank agreed to obtain certain insurance naming Motiva as an additional insured and agreed to indemnify Motiva for losses arising out of the work Hydro Tank performed on Motiva's premises. (Docket Entry No. 47, Ex. B-1). Hydro Tank obtained an umbrella liability insurance policy from United National Insurance Company with $5 million limits,[FN2] and a commercial general liability policy from American Equity with $1 million limits.[FN3] The American Equity Policy was designated as "underlying insurance" on the United National Policy Schedule of Underlying Insurance.

> FN2. United National Policy Number CU 78355, issued on August 20, 2002.

> FN3. American Equity Policy Number ACC173232, issued on January 4, 2002.

**\*2** On July 30, 2002, Hydro Tank employees Kevin Washington and Jeffrie Sayrie entered a mix tank adjacent to tank number 1603. The mix tank received the residual material pumped out of tank 1603, which had been damaged and was slated for demolition. The "sludge" pumped into the mix tank was waste, to be collected and reused in the Motiva refinery or disposed of, so that the tank could be removed from the Motiva job site. The mix tank was approximately 8 feet wide, 20 feet long, and 10 feet deep. The top was half covered by a "shaker screen" and the remaining half by a steel grate. The top of the mix tank was not enclosed, but the interior of the tank was a confined space.

The materials pumped from tank 1603 to the mix tank included the No. 6 fuel oil normally stored in the tank and FC light cycle oil, or cutter stock, added to the fuel oil residual to make it "more pumpable." The summary judgment record includes Material Safety Data Sheets for both the fuel oil and the cutter stock. The MSDS for the delayed coker charge states that this product "may release hydrogen sulfide gas." The MSDS for FC light cycle oil states that the product contains .02 to 1.39 % by volume benzene and .02 to .03 % by volume hydrogen sulfide and that "Hydrogen Sulfide and other hazardous vapors may evolve and collect in the headspace of storage tanks or other enclosed vessels." The MSDS also states that "[v]aporization of H2S and that has been trapped in clothing can be dangerous to rescuers." (Docket Entry No. 44, Aff. of William R. Wilder, ¶ 9 & Ex. A-4). In recognition of these risks, the tank was equipped with monitors to detect hydrogen sulfide gases. Readings were taken just above the surface of the sludge. ( *See, e.g.,* Docket Entry No. 58, Ex. B-3, Dep. of Felix Solis, at 35-36).

On July 30, 2002, in the afternoon, Hydro Tank employees Washington and Sayrie entered the tank carrying shovels and a five-gallon bucket. Their task was to shovel the hard sludge that was underneath a layer of liquid on the bottom of the mix tank, have the bucket hauled to the top of the tank and emptied, and repeat the process. The men wore protective clothing, gloves, and a face respirator, although the respirator was not designed to protect against hydrogen sulfide gas. Workers took readings from monitors located on and in the tank and found no elevated levels of toxic substances. The two men were in the tank long enough to fill the five-gallon bucket with sludge and have the bucket hauled to the top of the tank. A few minutes later, a man on the top of the tank grid, William Harper, noticed that the two men inside the tank had collapsed. Jimmy Durisio entered the tank to help them. He found Washington lying face down in the sludge. Sayrie was nearby, with his face partially in the sludge. Durisio was able to lift them both and, with help from others, removed them from the tank.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

All three were taken to the hospital.

The evidence as to the nature of their immediate and long-term physical and mental states is conflicting, but Washington and Sayrie both assert that they suffered severe brain damage from exposure to toxic chemicals and vapors in the tank and are permanently disabled. Durisio asserts that he suffered back and pulmonary injuries as well as some neurological effects in rescuing the men. The record reflects that some of the emergency responders reported feeling nauseous and dizzy and also received medical attention on the date of the incident. Monitor readings taken after the incident did not show elevated levels of toxic substances in the mix tank. The record reflects conflicting inferences from these readings, ranging from finding support for the absence of hydrogen sulfide vapors in the tank during the incident to explaining that hydrogen sulfide vapors quickly dissipate and the readings were taken too long afterwards to be a useful indicator of conditions during the incident.

**\*3** All three employees filed suit (the *Durisio* suit) against Motiva in the state district court of Jefferson County, Texas. In the original and first seven amended petitions, plaintiffs alleged that Motiva had committed a number of negligent acts that caused plaintiffs' injuries and damages. In the eighth amended petition, the plaintiffs included allegations against Motiva for its own negligence. Plaintiffs alleged that they "were caused to sustain serious injuries while working in a tank when they were exposed to toxic levels of hydrogen sulfide and/or other chemicals and vapors." (Docket Entry No. 47, Ex. B-2 at ¶ 3.03). Plaintiffs alleged that Motiva "instructed Plaintiffs to enter the tank to 'clean it' and ... brought to Plaintiffs several buckets in which to fill the sludge from the mix tank.... Plaintiffs ... became overcome by chemicals and toxins owned by Defendant, Motiva Enterprises, L.L.C., causing brain injury and damage." (*Id.*). The *Durisio* plaintiffs alleged that Motiva "owned the product which was in the mix tank to which it refers to as hydrocarbon 'sludge.' The sludge was

known to Defendant, Motiva Enterprises, L.L.C. to contain hydrogen sulfide; however, Defendant nevertheless instructed Plaintiffs, Jeffrey Durisio[FN4] and Kevin Washington, to enter the mix tank." (*Id.* ).

> FN4. This appears to be a drafting error. The other allegations assert that Motiva ordered Sayrie and Washington, not Durisio and Washington, into the mix tank, and Durisio later entered to rescue them.

In the eighth amended petition, unlike the earlier petitions, plaintiffs added an allegation that Motiva was vicariously liable for Hydro Tank's acts or omissions that had caused the injuries and damages. The significance of this added allegation is that the additional insured endorsement of the United National Policy states that it does not apply if "liability for injury or damage is imposed or sought to be imposed on the additional insured because of its own acts or omissions...." (Docket Entry No. 20, Ex. A). That endorsement also states that "[i]f an agreement between the named insured and the additional insured promising indemnity and/or contribution in favor of the additional insured exists or is alleged to exist, the extent and scope of coverage under this insurance for the additional insured will be no greater than the extent and scope of indemnification of the additional insured which was agreed to by the named insured." (*Id.*). The indemnity provision in the March 2002 agreement between Hydro Tank and Motiva states in relevant part that Hydro Tank "shall protect, defend, indemnify and hold harmless" Motiva, from any losses, damages, suits, and expenses (including attorney's fees) "that arise out of or on account of any ... services performed by [Hydro Tank] on [Motiva's] premises, ... that involve ... injury ... to any person...." (Docket Entry No. 47, Ex. A-55 at AE0043). The provision states that Hydro Tank's indemnification obligation is "without regard to whether negligence, fault, or strict liability of an indemnified party is a concurrent or contributory factor." (*Id.*).

**\*4** Motiva settled the *Durisio* lawsuit with the three

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

employees and sought indemnity under the United National Policy, requesting the Policy limit of $5 million. United National denied the claim and filed this lawsuit for a judgment declaring that it owes no obligation under the Policy. A related coverage dispute is pending in Jefferson County, Texas state court, relating to the American Equity Policy's application to the loss. For the purpose of the federal suit, however, the parties have stipulated that United National does not dispute Motiva's "contention that American Equity Policy No. ACC173232 provides valid and collectible coverage to Motiva for the claims of the Duriso plaintiffs and for Hydro Tank's liability to Motiva." The parties have also stipulated that for the purpose of the federal suit, United National does not dispute Motiva's contention that the "indemnity contract between Hydro Tank and Motiva is valid and enforceable against Hydro Tank and that Hydro Tank agreed to defend and indemnify Motiva against the claims in the Duriso lawsuit." Additionally, United National agreed that this court "may assume Motiva would have valid and collectible coverage under the American Equity Policy for the claims of the Duriso plaintiffs and for Hydro Tank's liability to Motiva and that Motiva would be able to enforce the Indemnity Contract against Hydro Tank and that Hydro Tank agreed to defend and indemnify Motiva against the claims in the Duriso lawsuit." (Docket Entry No. 55, Ex. A).

B. The United National Policy Terms

United National's Policy issued to Hydro Tank on August 20, 2002 and was effective on the date of the incident. The commercial umbrella liability policy includes the following provisions relevant to this litigation:

2. Exclusions

* * * *

f. (1) "Bodily injury" or "property damage" which would not have occurred in whole or in

part but for the actual, alleged or threateded [sic] discharge, seepage, migration, dispersal, release, or escape of "pollutants" at any time.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in any way respond to, or assess the effects of "pollutants"; or;

(b) "Claim" or "suit" by or on behalf of any governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

> "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. "Waste" includes materials to be recycled, reconditioned, or reclaimed.

(Docket Entry No. 47, Ex. A-1, 2-3).
Section III - Who Is An Insured

* * * *

2. Except with respect to:

a. Any "auto," or

b. "Mobile equipment" registered in your name under any motor vehicle registration law;

*5 each of the following is also an insured:

* * * *

e. Any person or organization qualifying as an insured under any policy of "underlying insurance". Coverage afforded under such insurance under this policy applies only to injury or damage:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

(1) Which is covered by this policy; and

(2) Which is covered by the "underlying insurance" or would be covered but for the exhaustion of such policy's limits of insurance.

> This policy does not afford such person or organization limits of insurance in excess of the lessor of:

(1) The minimum limit of insurance you agreed to provide; or

(2) The limit of insurance under this policy.

f. Any person or organization for whom you have agreed in writing prior to any "occurrence" or "offense" to provide insurance such as is afforded by this policy, but only with respect to operations performed by you or on your behalf, or facilities owned or used by you. This policy does not afford such person or organization limits of insurance in excess of the lessor of:

(1) The minimum limit of insurance you agreed to provide; or

(2) The limit of insurance under this policy.

(*Id.* at 6-7).

As noted, the United National Policy also includes an additional-insured endorsement, which reads:

> Who is an insured is amended to include the person or organization shown in the Schedule below, but only as respects liability imposed or sought to be imposed on such additional insured because of an alleged act or omission of the named insured:

1. If liability for injury or damage is imposed or sought to be imposed on the additional insured because of:

a. Its own acts or omissions, this insurance does not apply;

b. Its acts or omissions and those of the named insured, as to defense of the additional insured, this insurance will act as coinsurance with any other insurance available to the additional insured, in proportion to the limits of liability of all involved policies, and the Other Insurance provisions of this policy ... are amended accordingly. However, this insurance does not apply to indemnity of the additional insured for its own acts or omissions.

2. If an agreement between the named insured and the additional insured providing indemnity or contribution in favor of the additional insured exists or is alleged to exist, the extent and scope of coverage under this insurance of the additional insured will be no greater than the extent and scope of indemnification of the additional insured which was agreed to by the named insured.

(Docket Entry No. 20, Ex. A). The Schedule in the endorsement is listed as "BLANKET." (*Id.*).

Under its contract with Motiva, Hydro Tank also obtained a $1 million CGL policy from American Equity Insurance Company. (Docket Entry No. 47, Ex. B-1 at ¶ 15). As specified by the Motiva contract, Hydro Tank designated the American Equity Policy as "underlying insurance" to the United National Policy.

## II. The Controlling Legal Standards

### A. Summary Judgment

**\*6** Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Stahl v. Novartis Pharms. Corp.,* 283 F.3d 254, 263 (5th Cir.2002). The party moving for summary judg-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

ment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.,* 109 F.3d 1070, 1074 (5th Cir.1997). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir.2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster,* 227 F.3d 504, 508 (5th Cir.2000). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See id.* The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Webb v. Cardiothoracic Surgery Assocs.,* 139 F.3d 532, 536 (5th Cir.1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.,* 288 F.3d 721, 725 (5th Cir.2002); *Anderson,* 477 U.S. at 255. " Rule 56 *'mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." ' *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (quoting *Celotex,* 477 U.S. at 322).

**B. Texas Insurance Law**

In this diversity case, Texas law applies. *See, e.g., Cleere Drilling Co. v. Dominion Exploration & Prod., Inc.,* 351 F.3d 642, 646 (5th Cir.2003). Interpretation of a contract is a question of law. *Royal Ins. Co. of Am. v. Hartford Underwriters Ins. Co.,* 391 F.3d 639, 641 (5th Cir.2004); *Fisk Elec. Co. v. Constructors & Assoc., Inc.,* 888 S.W.2d 813, 815 (Tex.1993). Insurance policies are interpreted using the rules governing contract interpretation. *Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.,* 359 F.3d 770, 773 (5th Cir.2004) (citing *Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738, 740-41 (Tex.1998)). The goal in construing an insurance contract is to ascertain "the true intent of the parties as expressed in the instrument." *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). The policy should be considered as a whole, giving each part effect and meaning and rendering no provision superfluous. *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburg, Pa.,* 99 F.3d 695, 700 (5th Cir.1996).

**\*7** "If an insurance contract is expressed in unambiguous language, its terms will be given their plain meaning and it will be enforced as written." *Certain Underwriters at Lloyd's London v. C.A. Turner Constr. Co., Inc.,* 112 F.3d 184, 186 (5th Cir.1997). The court cannot look to parol evidence to determine the meaning of the insurance contract unless the court first determines that the insurance contract is ambiguous. *See Nat'l Union Fire Ins. Co.,* 907 S.W.2d at 520. "Language in insurance provisions is only ambiguous if the court is uncertain as to which of two or more meanings was intended." *St. Paul Fire & Marine Ins. Co. v. Green Tree Fin. Corp.,* 249 F.3d 389, 392 (5th Cir.2001). "If the court finds an ambiguity in the contract provisions, particularly in an exclusion clause, the court should construe the policy strictly against the insurer." *Valmont Energy Steel, Inc.,* 359 F.3d at 774 (citations omitted).

"An insurer's duty to defend and its duty to indem-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

nify are distinct and separate." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 468 (5th Cir.2002) (citing *Farmers Tex. County Mut. Ins. v. Griffin*, 955 S.W.2d 81, 82 (Tex.1997); *E & L Chipping Co. v. Hanover Ins. Co.*, 962 S.W.2d 272, 274 (Tex.App.-Beaumont 1998, no pet.); *Argonaut Sw. Ins. Co. v. Maupin*, 500 S.W.2d 633, 636 (Tex.1973)). The duty to defend is broader than the duty to indemnify. *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 552 (5th Cir.2004) (citing *Potomac Ins. Co. v. Jayhawk Med. Acceptance Corp.*, 198 F.3d 548, 551 (5th Cir.2000)). "The duty to indemnify arises from the actual facts that are developed to establish liability in the underlying suit." *Quorum Health Res., L.L.C.*, 308 F.3d at 468 (citing *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex.1997) (additional citations omitted)). An insured may have a duty to defend but, ultimately, no duty to indemnify. *Id.* (citing *Griffin*, 955 S.W.2d at 82).

Under the Texas "eight corners" or "complaint allegation" rule, this court must compare the allegations in the most recent amended petition filed in the underlying suit against the insured with the provisions of the insurance policy to determine if the allegations "fit within the policy coverage." *Quorum Health Res., L.L.C.*, 308 F.3d at 468. "The duty to defend analysis is not influenced by facts ascertained before suit, developed in the process of litigation, or by the ultimate outcome of the suit." *Id.* This court may look to extrinsic evidence only if the relevant pleading in the underlying case " 'does not contain sufficient facts to enable the court to determine if coverage exists." ' *Id.* (quoting *W. Heritage Ins. Co. v. River Entm't*, 998 F.2d 311, 313 (5th Cir.1993)). In an insurance coverage dispute analyzed under the eight corners rule, the insured party-here, Motiva-bears the initial burden of showing that there is coverage, while the insurer-United National-bears the burden of showing that any exclusion in the policy applies. If any allegation in the complaint is even potentially covered by the policy and not excluded, the insurer has the

duty to defend. *Id.* Conversely, an insurer is not required to defend if the complaint only alleges facts excluded by the policy. *Id.; Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 393 (5th Cir.1995).

III. Analysis

A. Whether Motiva Is an "Insured"

**\*8** United National first argues that Motiva is not an "insured" under the Policy. (Docket Entry No. 16). United National specifically argues that Motiva is not entitled to recover under the United National Policy because Motiva is only entitled to the limits of coverage that Hydro Tank was entitled to obtain under its agreement with Motiva, which was a CGL policy of at least $1 million in limits. The parties have stipulated that Motiva's losses from the *Durisio* lawsuit are within the American Equity Policy coverage-up to the limits of $1 million-and that Motiva has a valid indemnity agreement against Hydro Tank for the claims in the *Durisio* lawsuit.

The first paragraph of the additional insured endorsement of the United National Policy defines an "insured" as including a party that is held alleged to be or is liable because of an "alleged act or omission of the named insured," Hydro Tank. The second paragraph states that if the named and additional insured have an indemnity agreement in favor of the additional insured, "the extent and scope of coverage under this insurance of the additional insured will be no greater than the extent and scope of indemnification of the additional insured which was agreed to by the named insured." Paragraph III.2.f. of the United National Policy, which defines "who is an insured," states that an "insured" party includes:

> Any person or organization for whom you have agreed in writing prior to any "occurrence" ... to provide insurance such as is afforded by this policy, but only with respect to operations performed by you or on your behalf, or facilities owned or used by you. This policy does not af-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

ford such person or organization limits of insurance in excess of the lessor of

(1) The minimum limit of insurance you agreed to provide; or

(2) The limit of insurance under this policy.

(DE 20, Ex. A, at M002007, M002033).

United National's argument that Motiva is not an "insured" is not supported by the Policy terms. Motiva is an additional insured under the endorsement because the eighth amended petition in the *Durisio* lawsuit sought to hold Motiva vicariously liable for Hydro Tank's acts and omissions. The *Durisio* lawsuit sought to hold Motiva liable for the actions of Hydro Tank, which directed the tank cleaning operation. (*See* Docket Entry No. 47, Ex. B-2 at ¶ 4.024 ("Defendant, Motiva Enterprises, L.L.C. was responsible for Plaintiffs'/ Intervenors' injuries and damages and vicariously responsible for any acts of Hydrotank [sic], Inc., which were a proximate cause of the incident and/or injuries made the basis of this litigation.")). Under this endorsement, which is part of the policy, Motiva is an "insured" under the United National policy. *Cf. Mid-Continent Cas. Co. v. Swift Energy Co.,* 206 F.3d 487, 491-92 (5th Cir.2000); *Admiral Ins. Co. v. Trident NGL, Inc.,* 988 S.W.2d 451, 452-54 (Tex.App.-Houston [1st Dist.] 1999, pet. denied).

**\*9** Motiva is also an additional insured under paragraph 2 of the endorsement because there was an indemnity agreement between Hydro Tank and Motiva, in Motiva's favor. This provision states that the extent and scope of Motiva's coverage as an additional insured will be no greater than the extent and scope of indemnification that Hydro Tank agreed to provide Motiva. The parties have stipulated for the purposes of this lawsuit that the indemnity contract between Hydro Tank and Motiva is valid and enforceable and applies to the claims against Motiva in the *Duriso* lawsuit. Hydro Tank did not limit the amount of its indemnification obligation to Motiva in the May 2002 agreement.

Neither of these provisions supports United National's argument that Motiva is not an insured or that Motiva's right of recovery is limited to the $1 million limit under the American Equity Policy.

United National argues that under paragraph III.2.e of the Policy, Motiva's losses for the *Durisio* claims are not covered under the United National Policy. United National argues that under paragraph III.2.e, the Policy does not provide Motiva "limits of insurance in excess of ... [t]he minimum limit of insurance [Hydro Tank] agreed to provide"; that Hydro Tank agreed to and did provide the American Equity Policy, which has a $1 million limit, and which was scheduled as underlying insurance to United National's umbrella policy; and that given the parties' stipulation that Motiva is insured for the *Durisio* losses under the American Equity Policy, Motiva can only recover the $1 million available under that Policy. United National's argument is not persuasive. The Policy terms do not make the United National Policy coverage available only in the event Motiva is unable to recover from American Equity. Rather, under the Policy terms, United National must pay for Motiva's losses that are covered by the American Equity Policy but exceed its limits, up to $1 million in coverage (the minimum limit of insurance that Hydro Tank agreed to provide). In other words, the language of III.2.e, if applicable, limits the extent of United National's exposure to Motiva, but does not preclude coverage or deny Motiva the status of an "insured." United National's motion for partial summary judgment on the ground that Motiva was not an "insured" under the Policy is denied.[FN5]

> FN5. Because the Policy included Motiva as an "insured," Motiva's motion for leave to file a Second Amended Answer, (Docket Entry No. 35), in which Motiva proposed additional defenses to United National's argument, is moot.

**B. Whether the Pollution Exclusion Precludes Coverage**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

United National also seeks summary judgment on the ground that Motiva's losses falls within the Policy's "pollution" exclusion. (Docket Entry No. 47). Motiva responds with several arguments. (Docket Entry Nos. 58, 70). First, Motiva argues that the sludge was not a "pollutant" as defined by the Policy. Second, Motiva argues that fact issues remain as to: (1) why the *Durisio* plaintiffs collapsed; and (2) whether the *Durisio* plaintiffs' injuries resulted from exposure to sludge. Finally, Motiva contends that the Contractors' Limitation Endorsement in the United National Policy negates any possible effect of the pollution exclusion.

**\*10** The pollution exclusion in the United National Policy is broad:

> "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened [sic] discharge, seepage, migration, dispersal, release, or escape of "pollutants" at any time.

(Docket Entry No. 47, Ex. A-1 at 2-3). The definition of "pollutant" is also broad:

> "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. "Waste" includes materials to be recycled, reconditioned, or reclaimed.

(*Id.* at 3).

Similar provisions have been deemed unambiguous by numerous Texas courts and the Fifth Circuit. *See Amoco Prod. Co. v. Hydroblast Corp.,* 90 F.Supp.2d 727, 732-33 (N.D.Tex.1999), *aff'd,* 226 F.3d 642 (5th Cir.2000); *Certain Underwriters at Lloyd's London v. C.A. Turner Construction Co.,* 112 F.3d 184, 187 n. 4 (5th Cir.1997) (listing approximately fifteen cases from various jurisdictions, all interpreting the pollution exclusion clause as unambiguous); *Bituminous Cas. Co. v. Kenworthy Oil Co.,* 912 F.Supp. 238, 240 (W.D.Tex.1996), *aff'd,* 105 F.3d 656 (5th Cir.1996); *Hamm v. Allstate Ins. Co.,* 286 F.Supp.2d 790,

793-94 (N.D.Tex.2003); *Nat'l Union Fire Ins. Co. v. CBI Indus.,* 907 S.W.2d 517, 519 (Tex.1995); *Zaiontz v. Trinity Universal Ins. Co.,* 87 S.W.3d 565, 571-74 (Tex.App.-San Antonio 2002, rev. denied); *Reddy Ice Corp. v. Travelers Lloyd Ins. Co.,* 145 S.W.3d 337, 340 n. 2 (Tex.App.-Houston [14th Dist.] 2004, rev. denied); *Allen v. St. Paul Fire & Marine Ins. Co.,* 960 S.W.2d 909, 911-12 (Tex.App.-Texarkana 1998, no pet.). Motiva does not argue that the pollution exclusion is ambiguous. This court agrees that the provisions are unambiguous and that resort to parol evidence is not needed.

The parties disagree over the application of the unambiguous pollution exclusion to this case. United National relies on the eighth amended petition filed in the *Durisio* litigation in support of its argument that the allegations in this case trigger the pollution exclusion. Motiva argues that because the petroleum sludge in the mixing tank was contained where it was supposed to be, it was not itself a "pollutant," and that the *Durisio* plaintiffs did not plead facts that preclude coverage.

The eighth amended complaint in the *Durisio* litigation specifically alleges that Motiva owned the "sludge" in the mix tank and that "[t]he sludge was known to Defendant, Motiva Enterprises, L.L.C. to contain hydrogen sulfide." (Docket Entry No. 47, Ex. B-2 at ¶ 3.03). The eighth amended petition in the *Durisio* litigation specifically alleges that Motiva nevertheless instructed two of the defendants to enter the mix tank and that the plaintiffs' injuries "were caused ... when they were exposed to toxic levels of hydrogen sulfide and/or other chemicals or vapors" in the tank. (*Id.*). The petition alleges that "after Plaintiffs, Jeffrey Sayrie and Kevin Washington, had filled one bucket, they were overcome and caused to fall in the tank." (*Id.*). The petition alleges that the defendants sustained "serious injuries and damages while working in a tank when they were exposed to toxic levels of hydrogen sulfide and/or other chemicals and vapors. On the date of the incident ... Plaintiffs ... became overcome by chemicals and toxins owned by the Defendant ...

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

causing brain injury and damage". (*Id.*). The eighth amended petition alleges that exposure to toxic levels of hydrogen sulfide and other chemicals or vapors caused plaintiffs to sustain disabling brain damage and injury.

*11 Motiva argues that the *Durisio* plaintiffs did not plead that they had been injured by a "pollutant." They move to strike three paragraphs of an affidavit filed by William R. Wilder, Ph.D., a biochemist, on behalf of United National. In the affidavit, Dr. Wilder stated that the sludge and materials handled during the project of cleaning the mix tank could release hydrogen sulfide, benzene, and other volatile and semi-volatile hydrocarbon compounds, and that all three were contaminants or pollutants as defined in the Policy's pollution exclusion. The opinions as to the nature of the components of the sludge are not conclusory nor outside Dr. Wilder's expertise. To the contrary, the record includes Material Data Safety Sheets for the two substances making up the "sludge" identifying both hydrogen sulfide and benzene as components and describing their toxic qualities. Although this court need not rely on the challenged portions of the affidavit to resolve the coverage issue, the motion to strike is denied.[FN6]

> FN6. United National has filed a motion requesting this court to take judicial notice that hydrogen sulfide and benzene are both irritants or contaminants. (Docket Entry No. 65). A court cannot take judicial notice of a fact unless the question is beyond reasonable dispute. FED.R.EVID. 201(b). It is neither necessary nor proper for this court to resort to judicial notice. Plaintiffs have alleged that they were harmed by exposure to toxic levels of these and other chemicals. The motion for judicial notice is denied.

The Policy defines "pollutant" broadly, as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Docket Entry No. 47,

Ex. A-1, at 2-3). "Waste" includes materials to be recycled, reconditioned or reclaimed." (*Id.* at 3). Contaminant and irritants are part of the definition of "pollutants," not separate from or lesser in degree. Cases construing similar clauses that use but do not define the terms "contaminant" or "irritant" use ordinary definitions, defining "to contaminate" as "to soil, stain, corrupt or infect by contact or association ... to render unfit for use by the introduction of unwholesome or undesirable elements." *Cleere Drilling Co. v. Dominion Exploration & Prod., Inc.,* 351 F.3d 642, 652 (5th Cir.2003). "Irritation" is defined as, *inter alia,* "a condition of irritability, soreness, roughness, or inflammation of a bodily part." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 640 (9th ed.1990). The *Durisio* plaintiffs pleaded that they sustained brain damage as a result of exposure to toxic levels of hydrogen sulfide and other chemicals or vapors in waste material that they were walking through and shoveling up for recycling and disposal. They alleged that they were exposed to "pollutants."

Motiva relies on *Certain Underwriters at Lloyd's London v. C.A. Turner Construction Co.,* 112 F.3d 184 (5th Cir.1997). In that case, the Fifth Circuit endorsed a "common-sense approach" to interpreting the term "pollutant" in a similar pollution exclusion clause. *Id.* at 186-88. In that case, however, unlike the present case, the insurance policy exclusion did not define the term "pollutant." *Id.* at 186 ("Because the policy does not define 'pollution,' 'contamination,' or 'seepage,' they contend, the terms must be limited to their ordinary meaning."). In this case, by contrast, the United National Policy did define "pollutant," and did so broadly. In *C.A. Turner,* moreover, the focus of the court's opinion was to clarify that broad pollution exclusion clauses in CGL policies that by their terms applied to "liability for any bodily or personal injury" caused by pollution, contamination, or seepage were not limited to the context of widespread environment discharges and harms but also applied to claims arising from a "simple workplace accident." 112 F.3d at 187.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

*12 Motiva relies on the following language quoted in *C.A. Turner Construction:*

> The terms "irritant" and "contaminant," when viewed in isolation, are virtually boundless, for "there is virtually no substance or chemical in existence that would not irritate or damage some person or property." Without some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.

*Id.* at 188 (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,* 976 F.2d 1037, 1043 (7th Cir.1992) (additional citations omitted in original)). In *C.A. Turner Construction,* the Fifth Circuit adopted this "common-sense" approach and applied it to hold that the pollution exclusion barred coverage for losses from a worker's injuries suffered when a discharge of phenol gas filled a tent in which he was welding pipe. "The emission of the harmful fumes filled up a temporary plastic tent that enclosed scaffolding intended to support at least three people. The scope of this release distinguishes it from the Seventh Circuit's example of the spill of a bottle of Drano and supports our conclusion." 112 F.3d at 188. Similarly, in the present case, the substances to which the *Durisio* plaintiffs alleged they were exposed are not slight exposures that would ordinarily cause no harm related to their potential to irritate or contaminate. Rather, the *Durisio* plaintiffs alleged that they were exposed to such high levels of toxic substances as to cause brain damage. Considering the allegations in the eighth amended petition as allegations of

"pollution" does not offend the common-sense approach the Fifth Circuit endorsed in *C.A. Turner.*

Motiva contends that the petroleum sludge that allegedly caused the injuries to the *Durisio* plaintiffs was not a "pollutant" because the sludge did not leave the storage tank in which it was collected before it was recycled or discarded. Motiva cites *Auto Stores, Inc. v. United Capitol Insurance Co.,* 845 F.Supp. 428 (W.D.Mich.1993), in which the court held that gasoline contained in a tank intended to hold gasoline was not a "pollutant" under a pollution exclusion clause that defined "pollutants" as "solid, liquid, gaseous or thermal irritants or contaminants, including smoke, vapor, soot, fumes, acids, biological elements and agents, and visual esthetics [sic]." *Id.* at 439. That case, however, involved breach of contract claims arising out of a dispute over the installation of gasoline containment systems and counterclaims that the defendant negligently installed the systems. *Id.* at 431. The case had nothing to do with injuries allegedly caused by exposure to the gasoline. Furthermore, in rejecting the insurance company's claims, the court noted that if the underlying conduct had involved testing for pollutants (which it did not), "only such damage resulting from the operations being performed, i.e., from the testing itself, [would be] excludable under the [pollution] endorsement." *Id.* at 437 (footnote omitted). If anything, this dicta marginally helps United National's argument that the *Durisio* plaintiffs' injuries were caused by their exposure to pollutants.

*13 Motiva argues that when a pollutant is intentionally placed within a container designed to hold that substance, the "discharge, dispersal, seepage, migration, release, or escape" requirement is satisfied only by the release of pollutants from the containment area. *See, e.g., Broderick Inv. Co. v. Hartford Acc. & Indem. Co.,* 954 F.2d 601, 607 (10th Cir.1992); *Compass Ins. Co. v. City of Littleton,* 984 P.2d 606, 617-18 (Colo.1999). Texas courts have held that similar "absolute" pollution exclusions bar coverage for all injuries caused by expos-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

ure to pollutants that have been dispersed, discharged, or released in some fashion that causes exposure, including in spaces where the pollutants were intended to be used. *See, e.g., Hamm v. Allstate Ins. Co.,* 286 F.Supp.2d 790 (N.D.Tex.2003) (pollution exclusion applied and no duty to defend or indemnify building owner from lessee's complaint that chemicals used in remodeling project caused injury); *Zaiontz v. Trinity Universal Ins. Co.,* 87 S.W.3d 565 (Tex.App.-San Antonio 2002, rev. denied) (alleged injury suffered from worker spraying "smoke and fire odor eliminator" in the interior of a smoke-damaged airplane was subject to pollution exclusion clause because although the substance was used in an intended location and for its intended purpose, there was a release or discharge of a pollutant within the meaning of the clause). In this case, similarly, plaintiffs alleged that toxic components of the sludge were released or dispersed in a fashion that resulted in brain injury to two of the plaintiffs.

Motiva argues that fact issues remain as to the actual cause of the *Durisio* plaintiffs' injuries. The summary judgment record includes a large stack of deposition excerpts, expert reports, hospital and medical records, and witness statements. The documents contain conflicting conclusions as to whether there were toxic levels of hydrogen sulfide present in the mix tank as a result of the employees' entry and agitation of the sludge from moving about the tank and shoveling up enough to fill a five-gallon bucket; whether the employees were "overcome" and fell into the sludge as a result of heat and excessive clothing rather than because of toxic fumes released from the sludge; whether the employees were injured because of hypoxia from prolonged face-down submergence in the sludge rather than inhaling hydrogen sulfide vapors; and whether the employees were in fact injured as extensively as they claimed. Motiva posits that the *Durisio* plaintiffs might have been overcome by heat exhaustion or poor ventilation and fallen into the sludge. Motiva points to testimony by two workers at the scene who claimed that the *Durisio* plaintiffs

wore too much clothing into the tank on a very warm day, and to an accident investigation report that lists oxygen deficiency and heat exhaustion as possible causes of at least part of the workers' injuries. (Docket Entry No. 58 at 13). Additionally, Motiva cites evidence that the air monitors in the tank did not go off and points to statements by some workers that they did not notice the distinctive, rotten-egg smell of hydrogen sulfide at the scene. The record includes evidence that the smell and amounts of hydrogen sulfide vapors dissipate quickly but that fleeting exposures can result in significant and permanent harm.

**\*14** The record does not create a disputed fact issue material to determining the duty to defend or indemnify. The broad pollution exclusion applies to "bodily injury ... which would not have occurred in whole or in part but for the actual, alleged, or threatened discharge, seepage, migration, dispersal, release or escape of 'pollutants.' " The petition alleges that the injuries the *Durisio* plaintiffs sustained would not have occurred at least in part but for exposure to toxic levels of hydrogen sulfide and other chemicals or vapors that were components of, and emanated from, the sludge. The unambiguous Policy provision excludes coverage for the alleged cause of the *Durisio* plaintiffs' injuries. *Cf. Hydroblast Corp.,* 90 F.Supp.2d at 733 (interpreting a nearly identical provision and holding that "[t]he Court is satisfied that 'but for' the discharge of Selexol at Amoco's Sundown plant, albeit an isolated discharge, Ybarra and Bounds would not have received their alleged injuries.... Accordingly, coverage is excluded for the personal injuries alleged in the Ybarra-Bounds litigation.").

Finally, Motiva cites the Contractors Limitation Endorsement of the United National Policy to argue that the pollution exclusion does not apply. The endorsement provides, in relevant part, as follows:

> Except insofar as coverage is available to the insured in valid and collectible 'underlying insurance' as listed in the Schedule of Underlying Insurance, and then only for such liability

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)
**(Cite as: 2006 WL 83482 (S.D.Tex.))**

for which coverage is afforded under the 'underlying insurance' for the full limit shown, this insurance does not apply to: a. Any liability assumed by any insured under any contract or agreement....

(Docket Entry No. 47, Ex. A-1). Motiva contends that because Hydro Tank assumed liability for the *Duriso* losses under its contract with Motiva, and that liability was covered by a valid and collectible underlying insurance policy issued by American Equity, the United National Policy adopts the coverage of the underlying policy with regard to that liability. As a result, the pollution exclusion simply does not apply.

Motiva relies on *XL Specialty Insurance Co. v. Kiewitt Offshore Services, Ltd.,* 336 F.Supp.2d 673 (S.D.Tex.2004), in support of this argument. The court interpreted a standard Contractors Limitation Endorsement identical to the one in the United National Policy, but the court did not hold that the endorsement trumped other policy exclusions. The policy excluded the coverage sought; however, the policy exclusion had an *exception* "to that exclusion if coverage for such liability is afforded under the underlying general liability policy."   *Id.* at 676. The court consistently applied both policies, as required under the rules governing interpretations of insurance contracts. *See, e.g., Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994) (reciting the longstanding maxim that courts interpreting insurance contracts must give meaning to every provision and avoid rendering any provision meaningless). No such exception to the pollution exclusion is present in this case. The Contractors' Limitation Endorsement does not invalidate or create an exception to the pollution exclusion provision in the United National Policy.[FN7]

> FN7. Motiva also cites *Gould v. Arkwright Mutual Ins. Co.,* 907 F.Supp. 103 (M.D.Pa.1995). It is unclear that the court in that case followed the same law that applies here. Moreover, in that case, the provision that the court held would establish

follow-form coverage trumped the pollution exclusion in the excess policy was part of a specific exception to the pollution exclusion. "I. This policy shall not apply, unless insurance is provided by a policy listed in the schedule of underlying insurance, and then for no broader coverage than is afforded by such insurance: ... VI. to any liability of any INSURED arising out of the discharge, dispersal, release or escape of ... pollutants." *Id.* at 106-07. In the present policy, the endorsement at issue is not an exception to the pollution exclusion. In addition, the court in that case read the endorsement as creating follow-form coverage, finding that the requirement that the underlying insurance could not expand the coverage of the excess policy also meant that the excess policy had to provide at least the coverage of the underlying insurance. Such a reading appears to be at odds with the Texas canons of interpretation.

**\*15** United National's motion for partial summary judgment on the basis of the pollution exclusion is granted.

IV. Conclusion

United National's motion for partial summary judgment on the ground that Motiva is not an "insured" under the Policy is denied. United National's motion for partial summary judgment on the ground that Motiva's claim is excluded under the "pollution exclusion" is granted. The parties must inform the court of any remaining issues to be resolved or submit a proposed final judgment by January 27, 2006.

S.D.Tex.,2006.
United Nat. Ins. Co. v. Motiva Enterprisees, L.L.C.
Not Reported in F.Supp.2d, 2006 WL 83482 (S.D.Tex.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in N.E.2d, 2005 WL 2600651 (Ohio App. 8 Dist.)
**(Cite as: 2005 WL 2600651 (Ohio App. 8 Dist.))**

H
Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR
REPORTING OF OPINIONS AND WEIGHT OF
LEGAL AUTHORITY.

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.
Lawrence Y. HO., et al. Plaintiffs-Appellants
v.
STATE FARM FIRE & CASUALTY CO. et al.
Defendants-Appellees.
**No. 86217.**

Oct. 13, 2005.

**Background:** Insureds brought action against
homeowners' insurer, alleging bad faith in the hand-
ling of claim for chemical contamination from
chemicals used to remove smoke odor after fire.
The Common Pleas Court, Cuyahoga County, No.
CV-417824, granted insurer summary judgment. In-
sureds appealed.

**Holding:** The Court of Appeals, Blackmon, A.J.,
held that policy excluded claims for contamination.

Affirmed.

**[1] Insurance 217 ☞3360**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3358 Settlement by First-Party In-
surer
                217k3360 k. Duty to Settle or Pay.
Most Cited Cases
Homeowners' policy specifically excluded coverage
for losses caused by contamination, and thus, in-
surer did not act in bad faith in denying insureds'
claim that their home was making them ill after
fire, where expert's investigation indicated that the

house was contaminated by chemicals used to re-
move smoke odor.

**[2] Judgment 228 ☞185.1(4)**

228 Judgment
    228V On Motion or Summary Proceeding
        228k182 Motion or Other Application
            228k185.1 Affidavits, Form, Requisites
and Execution of
                228k185.1(4) k. Matters of Fact or
Conclusions. Most Cited Cases
Insurance adjuster's conclusory statements in sum-
mary judgment affidavit that the homeowners'
policy exclusion for contamination was not pertin-
ent to insureds' fire and smoke claim was insuffi-
cient to create a genuine issue of material fact as to
insurer's justification for denying claim in order to
preclude summary judgment on insureds' bad faith
claim.

Civil appeal from Common Pleas Court Case No.
CV-417824, Affirmed.Thomas G. Kelley, Cleve-
land, for Plaintiffs-Appellants.

Paul D. Eklund, Davis & Young, Cleveland, for
Defendants-Appellees.

Vincent A. Defalice, Feldstein, Grinberg, Stein &
McKee, Pittsburgh, for II Rep-Z, Inc.

Hunter Scott Havens, Hermann, Cahn & Schneider,
LLP, Cleveland, for Unsmoke Systems, Inc.

BLACKMON, Administrative J.

*1 {¶ 1} In this accelerated appeal, appellant
Lawrence Y. and Connie Ho and their children
Marie, Neville, Vanessa, and Julia, appeal from the
trial court's granting of summary judgment in favor
of appellee State Farm Fire & Casualty Company
("State Farm"). The Hos present the following error
for our review:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 2600651 (Ohio App. 8 Dist.)
**(Cite as: 2005 WL 2600651 (Ohio App. 8 Dist.))**

"I. The trial court erred in granting defendant State Farm Fire and Casualty Company's motion for summary judgment per the dictates of Civil Rule 56(C)."

{¶ 2} Having reviewed the record and pertinent law, we affirm the decision of the trial court. The apposite facts follow.

{¶ 3} On September 14, 2000, the Hos filed a complaint against Roth Cleaning Company ("Roth") and Unsmoke Systems, Inc. ("Unsmoke") for damages they sustained to their home as a result of Roth contaminating their home with a product manufactured by Unsmoke for the elimination of smoke odors. In the complaint, the Hos also asserted claims against State Farm for vicarious liability for Roth's negligent acts and for bad faith based on State Farm's handling of their claim.

{¶ 4} The Hos entered into a confidential settlement agreement with Roth and Unsmoke and dismissed them from the suit. They also voluntarily dismissed their vicarious liability claim against State Farm. Their claim against State Farm for bad faith, however, remained. After discovery was complete, State Farm filed a motion for summary judgment, which the Hos opposed.

{¶ 5} The evidence attached to the motions indicated that on February 10, 1997, the Hos sustained property damage to their home due to a small fire that originated in the living room fireplace. The fire was quickly discovered and reported to the fire department. The fire department responded and extinguished the fire within a short time.

{¶ 6} The Hos reported the claim to State Farm that afternoon. State Farm gave the Hos the names of several contractors to help with repairs, but suggested they use Roth Construction Company because of its proximity to the Hos' home. The Hos thereafter called Roth. Roth came to the home that day and boarded up the damaged structural area of the house. Roth Construction Company contacted Roth Cleaning Company to eliminate the smell of smoke.

Roth initially used a chemical product called "Unsmoke." When this was not effective, Roth fogged the home with ozone for forty-eight hours.

{¶ 7} Upon returning to the home, the Hos contend they immediately experienced eye irritation, skin rashes, and respiratory problems. The Hos called Roth to complain. Roth's representative returned to the home to investigate and informed the Hos the air was breathable. The day after, the entire family became ill. The Hos refused to remain in the home and moved to the Embassy Suites Hotel.

{¶ 8} The Hos informed State Farm that they would not live in the home due to the problem with exposure to the chemicals. According to State Farm, it agreed to pay for the Hos' hotel expenses based on the fire damage to the home and not the chemical exposure. However, State Farm hired Electro Analytical to test the air quality and surfaces inside the house to determine the cause of the Hos' illness.

*2 {¶ 9} Electro Analytical determined that the chemical concentrations in the home were tolerable, but noted that some people may be hyper-sensitive to the chemicals due to "genetic factors, age, personal habits (smoking, alcohol, or other drugs), medication, or previous exposure." Electro Analytical recommended to State Farm that further testing was needed.

{¶ 10} The Hos were unsatisfied with Electro Analytical's report; therefore, they hired Peter Lubs, an industrial hygiene consultant, to examine the home. Lubs stated in his report that the Hos' home had been contaminated by the chemicals Roth used for cleaning, which permeated the surfaces of the contents of the home. He further stated that the chemical levels in the air made the home uninhabitable. He advised the Hos not to attempt to reinhabit the home until it was decontaminated.

{¶ 11} A copy of this report was sent to State Farm. State Farm continued to pay for the Hos' living expenses incurred by living outside the home. However, pursuant to the insurance policy, addi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 2600651 (Ohio App. 8 Dist.)
**(Cite as: 2005 WL 2600651 (Ohio App. 8 Dist.))**

tional living expense payments cannot exceed twelve months. Therefore, after one year, State Farm terminated any further payments for additional living expenses.

{¶ 12} State Farm ultimately paid the Hos $12,036 for loss suffered due to the fire and $51,914 for additional living expenses. The Hos have not attempted to decontaminate the house and have not resumed living there.

{¶ 13} The trial court granted State Farm's motion for summary judgment stating in pertinent part as follow:

"In the case at bar, plaintiff failed to make a formal demand as required by the policy for the initiation of a claim. No formal claim for the damage caused by contamination was ever created. State Farm therefore did not deny plaintiffs' claim, let alone deny the claim in bad faith.

"Assuming arguendo that plaintiffs' [sic] made a valid claim, the report provided to State Farm by Electro-Analytical furnished reasonable justification for the denial of the purported claim. * * *." FN1

FN1. Journal Entry, February 9, 2004.

{¶ 14} In their sole assigned error, the Hos claim the trial court erred by granting summary judgment in favor of State Farm on its bad faith claim. The Hos claim there is a genuine issue of fact regarding whether State Farm adequately investigated the Hos' insurance claim related to the contamination of their house by Roth. We disagree.

### STANDARD OF REVIEW

{¶ 15} We review an appeal from summary judgment under a de novo standard of review. FN2 Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.

FN3 Under Civ.R. 56, summary judgment is appropriate when: (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the non-moving party, reasonable minds can reach only one conclusion which is adverse to the non-moving party. FN4

FN2. *Baiko v. Mays* (2000), 140 Ohio App.3d 1, 746 N.E.2d 618, citing *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 506 N.E.2d 212; *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.* (1997), 121 Ohio App.3d 188, 699 N.E.2d 534.

FN3. Id. at 192, 699 N.E.2d 534, citing *Brown v. Scioto Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 622 N.E.2d 1153.

FN4. *Temple v. Wean United, Inc.* (1997), 50 Ohio St.2d 317, 327, 364 N.E.2d 267.

**\*3** {¶ 16} The moving party carries an initial burden of setting forth specific facts which demonstrate his or her entitlement to summary judgment. FN5 If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will be appropriate only if the non-movant fails to establish the existence of a genuine issue of material fact. FN6

FN5. *Dresher v. Burt,* 75 Ohio St.3d 280, 292-293, 1996-Ohio-107.

FN6. Id. at 293, 662 N.E.2d 264.

### BAD FAITH CLAIM

[1] {¶ 17} We affirm the trial court's granting of summary judgment in favor of State Farm, but do so on different grounds based on our de novo review of the record. Although State Farm argues no claim was made by the Hos regarding contamina-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 2600651 (Ohio App. 8 Dist.)
**(Cite as: 2005 WL 2600651 (Ohio App. 8 Dist.))**

tion claims, we conclude the record sufficiently demonstrates a claim was made, but that it was properly denied because the policy excludes damages caused by contamination.

{¶ 18} "An insurer fails to exercise good faith in the processing of a claim of its insured where its refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor. [citations omitted]."[FN7] Here, the evidence indicates that the Hos advised State Farm that their home was making them ill. In response, State Farm investigated the matter by sending Electro Anaytical to the premises to determine the cause of the Ho family's health problems.

> FN7. *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397, paragraph one of syllabus.

{¶ 19} Electro Analytical discovered the concentrations of chemicals in the home were tolerable; however, it advised State Farm that further testing was needed. The Hos, thereafter, sent their expert, Peter Lubs, to the premises. Peter Lubs opined in his report that the house was contaminated with chemicals from Roth's deodorizing process. This report was sent to State Farm. Based on this report by the Hos' expert, State Farm found no further investigation was mandated because "contamination" was specifically excluded by the Hos' homeowner policy. Section I, Losses Not Insured, provides in pertinent part:

> "1. We do not insure for any loss to the property described in Coverage A which consists of, or is directly or immediately caused by * * *:

> "j. contamination."

{¶ 20} State Farm advised the Hos' attorney in a letter dated September 23, 1997, that any claim related to contamination would be denied due to the policy's exclusion of damages related to contamination. Therefore, the Hos were placed on notice that their claim for contamination damages was denied.

{¶ 21} Pursuant to Zoppo,[FN8] an insurer acts in good faith if it has reasonable justification in denying the claim. In the instant case, State Farm's refusal to reimburse the Hos for damages caused by the contamination was justified because damages related to contamination were excluded by the policy. There is no basis for a bad faith claim, when the claim is specifically excluded by the policy.[FN9]

> FN8. Supra.

> FN9. See, *Andray v. Elling*, 6th Dist. No. L-04-1150, 2005-Ohio-1026; *Boughan v. Nationwide Prop. & Cas. Co.*, 3rd Dist. No. 1-04-57, 2005-Ohio-244 at P19; *Westfield Ins. v. Barnett*, 7th Dist. No. 306, 2003-Ohio-6278; *Crutchfield v. Century Surety Co.* (Dec. 22, 1992), 10th Dist. No. 92AP-908.

[2] {¶ 22} Although the Hos claim Richard Andrews' affidavit creates an issue of fact regarding their bad faith claim, we disagree. Richard Andrews is an insurance adjuster for J.H. Moorehead and Associates. Andrews averred that State Farm's exclusion of the Hos' claim based on contamination was "disingenuous," because Andrews believed the "exclusion of contamination is simply not pertinent to the fire and smoke claim of the Hos."[FN10] However, Andrews' statements are merely conclusory and fail to consider the expert testimony regarding the fact that the Hos' home was contaminated with the deodorizing chemicals.

> FN10. Andrews Affidavit at paragraghs 7 and 8.

*4 {¶ 23} Moreover, there is no evidence State Farm engaged in bad faith in handling the claim. Upon being advised of the Hos' health problems related to the home, State Farm promptly investigated the matter. When State Farm discovered the cause of the problem was contamination, it refused to take any further action because damages related to contamination were specifically excluded under the policy. This was a reasonable justification for refus-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 2600651 (Ohio App. 8 Dist.)
**(Cite as: 2005 WL 2600651 (Ohio App. 8 Dist.))**

ing to cover any alleged claim or refusing to incur further expenses in investigating the matter.

{¶ 24} Although the Hos attempt to argue that the fire was the cause of the contamination, we disagree. It is true the fire caused the smell of smoke in the home, requiring the home to be deodorized. However, Roth's negligence in attempting to rid the home of the smoke odor was an intervening cause. Roth's misuse of the chemicals was the cause of the contamination, not the odor of smoke itself. Accordingly, the Hos' sole assigned error is overruled.

Judgment affirmed.

It is ordered that appellees recover of appellants their costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

ANN DYKE, J., and JAMES D. SWEENEY, J., FN* concur.

    FN*  SITTING  BY  ASSIGNMENT: JUDGE JAMES D. SWEENEY, RETIRED, OF THE EIGHTH DISTRICT COURT OF APPEALS.

N.B. This entry is an announcement of the court's decision. See App.R. 22(B), 22(D) and 26(A); Loc.App.R. 22. This decision will be journalized and will become the judgment and order of the court pursuant to App.R. 22(E) unless a motion for reconsideration with supporting brief, per App.R. 26(A), is filed within ten (10) days of the announcement of the court's decision. The time period for review by the Supreme Court of Ohio shall begin to run upon the journalization of this court's an-

nouncement of decision by the clerk per App.R. 22(E). See, also, S.Ct.Prac.R. II, Section 2(A)(1).

Ohio App. 8 Dist.,2005.
Ho v. State Farm Fire & Cas. Co.
Not Reported in N.E.2d, 2005 WL 2600651 (Ohio App. 8 Dist.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d, 2005 WL 3542899 (E.D.La.)
**(Cite as: 2005 WL 3542899 (E.D.La.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Brent J. HOLLAND
v.
Prosper P. BREAUX, et al.
**No. Civ.A. 04-3028.**

Nov. 22, 2005.

Terry Allen Bell, Bell Law Office, Belle Chasse,
LA, for Brent J. Holland.


ORDER AND REASONS

AFRICK, J.

**\*1** The matter before the Court is a motion, filed on
behalf of defendant, Great Northern Insurance
Company ("Great Northern"), seeking summary
judgment pursuant to Rule 56(c)[FN1] of the Federal
Rules of Civil Procedure. Plaintiff, Brent Holland
("Holland"), opposes the motion. For the following
reasons, defendant's motion for summary judgment
is GRANTED.

> FN1. Rule 56(c) provides, in pertinent part,
> that "[t]he judgment sought shall be
> rendered forthwith if the pleadings, depos-
> itions, answers to interrogatories, and ad-
> missions on file, together with the affi-
> davits, if any, show that there is no genu-
> ine issue as to any material fact and that
> the moving party is entitled to a judgment
> as a matter of law."

*BACKGROUND*

On May 16, 2000, plaintiff Holland paid
$1,100,000 to purchase a house, located at 18120
Hosmer Mill Road, Covington, Louisiana, from

Prosper Breaux.[FN2] In order to determine the re-
placement value of the home, plaintiff arranged for
an appraisal of the property by Tony Williamson, a
representative of Chubb & Son. Plaintiff did not,
however, have any structural assessment or formal
inspection of the house performed before executing
the sale.[FN3] Great Northern, a division of the
Chubb Group of Insurance Companies,[FN4] issued a
"Masterpiece" homeowners insurance policy cover-
ing the house, which became effective on the date
of sale.[FN5] The policy contained two noteworthy
exclusions:

> FN2. Rec. Doc. No. 31, pp. 1, 3.

> FN3. Rec. Doc. No. 24, Def.'s Ex. F, p. 38.

> FN4. Rec. Doc. No. 31, Pl.'s Ex. 10, p. 7.

> FN5. Rec. Doc. No. 24, p. 7; Def.'s Ex. 1,
> p. 2.

Gradual or sudden loss. We do not cover any loss
caused by wear and tear, gradual deterioration, rust,
fungi, bacteria, mold, corrosion, dry or wet rot,
warping, insects or vermin. We also do not cover
any loss caused by inherent vice, latent defect or
mechanical breakdown. But we do insure ensuing
covered loss unless another exclusion applies.[FN6]

> FN6. Rec. Doc. No. 24, Def.'s Ex. A, p. 22.

Faulty planning, construction or maintenance. We
do not cover any loss caused by the faulty acts, er-
rors or omissions of you or any other person in
planning, construction or maintenance. It does not
matter whether the faulty acts, errors or omissions
take place on or off the insured property. But we do
insure ensuing covered loss unless another exclu-
sion applies. "Planning" includes zoning, placing,
surveying, designing, compacting, setting specifica-
tions, developing property and establishing building
codes or construction standards. "Construction" in-
cludes materials, workmanship, and parts or equip-
ment used for construction or repair.[FN7]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3542899 (E.D.La.)
**(Cite as: 2005 WL 3542899 (E.D.La.))**

FN7. Rec. Doc. No. 24, Def.'s Ex. A, p. 24.

In late November, 2003, plaintiff noticed that the walls in the house were cracking, the floor in two rooms was beginning to sag and separate, and doors were settling.[FN8] Plaintiff's initial investigation revealed that the floor joists and piers under the house were wet and rotted. Plaintiff found that untreated lumber had been used in the construction of the house and that poor drainage caused water to flow off the roof and under the house.[FN9] In addition, plaintiff found that a dryer exhaust was venting hot moist air into the crawl space below the house.[FN10]

FN8. Rec. Doc. No. 31, p. 3.

FN9. Rec. Doc. No. 31, p. 3.

FN10. Rec. Doc. No. 31, p. 3.

Plaintiff submitted a claim to Great Northern on December 1, 2003. On December 15, 2005, defendant notified plaintiff that, because of the "gradual or sudden loss" exclusion in plaintiff's policy, plaintiff's claim might not be covered under the policy.[FN11] On January 31, 2004, Kevin Vanderbrook, a structural engineer retained by Great Northern, inspected the property and determined that the deterioration and rot in the house "resulted from faulty planning, construction and maintenance."[FN12] In March, 2004, a structural engineer retained by plaintiff, Darrell Fussell of H & H Engineering, Inc., also inspected the property.[FN13] On April 9, 2004, Great Northern notified plaintiff that his policy would not be renewed due to the overall physical condition of the home.[FN14]

FN11. Rec. Doc. No. 31, Pl.'s Ex. 3.

FN12. Rec. Doc. No. 24, Def.'s Ex. C, p. 2.

FN13. Rec. Doc. No. 31, Pl.'s Ex. 7.

FN14. Rec. Doc. No. 31, Pl.'s Ex. 2.

**\*2** Plaintiff filed his complaint against Prosper Br-

eaux and Great Northern on November 5, 2004, alleging that the defendants' actions had caused "diminution in value of the home," repair costs, mental anguish, anxiety, and undue stress.[FN15] Plaintiff invokes this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff seeks damages "to compensate plaintiff for his injuries, losses, and damages, plus interest from date of judicial demand until paid and all costs of these proceedings."[FN16] On November 2, 2005, this Court granted defendant Proper Breaux's motion for summary judgment.[FN17]

FN15. Rec. Doc. No. 1, ¶ 18.

FN16. Rec. Doc. No. 1, p. 4.

FN17. Rec. Doc. No. 35.

Great Northern's motion for summary judgment presents two main arguments: (1) the damage to the house is not covered by plaintiff's policy because of the "faulty planning, construction, or maintenance" and the "gradual or sudden loss" exclusions, and (2) plaintiff's reliance on the appraisal of the house by Williamson, the Chubb & Son representative, was misplaced. Plaintiff opposes the motion.

*LAW AND ANALYSIS*

*I. Standard of Law*

Summary judgment is proper when, after reviewing the "pleadings, depositions, answers to interrogatories ... [and] affidavits," the court determines that there is no issue of material fact. Fed.R.Civ.P. 56(c). The party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 266, 274 (1986). The party seeking summary judgment need not produce evidence negating the existence of material

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3542899 (E.D.La.)
**(Cite as: 2005 WL 3542899 (E.D.La.))**

fact, but need only point out the absence of evidence supporting the other party's case. *Celotex.* 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1195 (5th Cir.1986) (internal quotation omitted).

Once the party seeking the summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). The showing of a genuine issue is not satisfied by creating some metaphysical doubt as to the material facts by conclusory allegations, unsubstantiated assertions, or by only a scintilla of evidence. *Little v. Liquid Air Corp..* 37 F.3d 1069. 1075 (5th Cir.1994) (internal citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211-12 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.*

## II. Arguments

*\*3* Defendant argues that the damage to plaintiff's house is clearly not covered by plaintiff's homeowners insurance policy because of the specific exclusions for "faulty planning, construction, or maintenance" and "gradual or sudden loss." Plaintiff admits that a reading of the "gradual or sudden loss" exclusion, by itself, "would seem to indicate that the Masterpiece policy afford[s] no coverage for Holland's claim." [FN18] Plaintiff's opposition does not argue that the policy's exclusions do not apply. Instead, plaintiff challenges the construction of the insurance policy. Plaintiff's contention is that, read as a whole, the terms of the policy do cover the loss. Sitting in diversity pursuant to 28 U.S.C. § 1332, the Court will apply the substantive

law of Louisiana, the forum state. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188, 1194 (1938).

> FN18. Rec. Doc. No. 31, p. 10. Plaintiff's brief does not appear to address defendant's primary argument that the "faulty planning, construction, or maintenance" exclusion in the policy precludes coverage.

### A. Damage from Dryer Exhaust

Plaintiff first attempts to create an issue of material fact by exposing what he views as an omission in defendant's assessment of the property and subsequent denial of coverage. Plaintiff notes that the affidavit provided by defendant's engineer, Kevin Vanderbrook, fails to identify the dryer exhaust as a contributing factor to the rot and deterioration in the house's foundation. [FN19] Plaintiff appears to argue that, because defendant relied on Vanderbrook's assessment in its decision to refuse coverage, an issue of material fact exists as to the cause of the damage to the house.

> FN19. Rec. Doc. No. 31, p. 7.

Plaintiff does not, however, explain why the damage caused by the dryer exhaust does not fall under the policy exclusion for "faulty planning, construction, or maintenance." In its motion, defendant cites plaintiff's engineer, Darrell Fussell, who confirmed that the dryer exhaust contributed to the damage to the floor joists. [FN20] Defendant's motion argues that this exhaust was a design defect for which coverage is precluded by the insurance policy's exclusions. Plaintiff, though, neglects to present any argument in response. Because plaintiff has failed to allege any specific facts as to why damage from the dryer exhaust should not be excluded as a design defect, the Court finds plaintiff has created no genuine issue of material fact.

> FN20. Rec. Doc. No. 24, pp. 18-19; Def.'s Ex. D, p. 15.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3542899 (E.D.La.)
**(Cite as: 2005 WL 3542899 (E.D.La.))**

*B. House and Contents Coverage*

Plaintiff next compares the "Deluxe House Coverage" section of the insurance policy with the "Standard Contents Coverage" section and notes that the contents coverage section specifically excludes damage from collapse, inadequate removal of water by sump pumps, and accidental discharge or overflow of water or steam. Plaintiff argues that the house coverage section, which fails to exclude or mention these causes of damage, should thus be deemed to cover loss from them.[FN21]

> FN21. Rec. Doc. No. 31, pp. 10-12. Plaintiff's argument comparing the house and contents coverage sections adopts an *expressio unius est exclusio alterius* posture; that is, the expression of an exclusion in one section of the policy indicates the absence of that exclusion in another. *See* Black's Law Dictionary 603 (7th ed.1999) (defining the Latin phrase as "[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative"). The Court does not find this interpretation binding, however, absent evidence that the policy's drafters intended such a construction. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 386 n. 23, 103 S.Ct. 683, 690 n. 23, 74 L.Ed.2d 548, 559 n. 23 (1983) ("We also reject application of the maxim of statutory construction, *expressio unius est exclusio alterius.* "); Reed Dickerson, *The Interpretation and Application of Statutes* 234-35 (1975) ("Far from being a rule, it is not even lexicographically accurate, because it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds.").

Plaintiff's arguments fail to show, however, that the collapse, inadequate sump pumps, and dryer steam are not addressed by the policy exclusions. For example, plaintiff contends that "[e]vidence produced in this case indicates clearly that the floor of the billiards room collapsed. There is no exclusion for collapse, so the loss should be covered."[FN22] Plaintiff, however, does not provide specific facts to explain why this collapse is not the result of "faulty planning, construction, or maintenance," which is the core of defendant's motion. Without any specific facts, the Court cannot find that plaintiff has created a genuine issue of material fact with regard to the policy exclusions.

> FN22. Rec. Doc. No. 31, p. 10. At several points in his brief, plaintiff refers to the "collapse" of the house. The verb "collapse" means "[t]o fall down or inward suddenly; cave in," and the noun is "[t]he act of falling down or inward ... [a]n abrupt failure of function." American Heritage Dictionary 261 (1976). None of the facts that plaintiff presents to describe the collapse, however, support the suddenness with which these definitions characterized the term. Instead, plaintiff seems to be using the word "collapse" to dramatize what appears otherwise as a slow deterioration of the house and a similarly slow appearance of the defects. The Court will accept plaintiff's use of "collapse," though, as it does not affect the final determination of defendant's motion.

*C. "Ensuing Loss" Provisions*

**\*4** Finally, Holland challenges the clarity of the policy, arguing that the "ensuing loss" provisions in the policy's exclusions "create a never ending cycle of coverage questions that in themselves serve to make the policy ambiguous."[FN23] Plaintiff postulates that, even if the damage to the house's foundation was excluded by the "gradual or sudden loss" provision, the policy language attached to the exclusion-"But we do insure ensuing covered loss unless another exclusion applies"-mandates a determination that damage to unaffected parts of the house

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2005 WL 3542899 (E.D.La.)
**(Cite as: 2005 WL 3542899 (E.D.La.))**

caused by repairs to the foundation be covered as an ensuing loss.[FN24]

FN23. Rec. Doc. No. 31, p. 13.

FN24. Rec. Doc. No. 31, pp. 13-14.

The Court agrees that "[e]xclusions must be narrowly construed and any ambiguity should be construed in favor of coverage." *Great American Ins. Co. v. Gaspard,* 608 So.2d 981, 984 (La.1992); *see also Newby v. Jefferson Parish Sch. Bd.,* 738 So.2d 93, 96 (La.App. 5th Cir.1999) (summarizing *Breland v. Schilling,* 550 So.2d 609 (La.1989)). Plaintiff's interpretation of the policy's ensuing loss provisions, however, is not convincing.

The Fifth Circuit's most recent explication of ensuing loss coverage was in *Ochsner Medical Foundation v. Allendale Mutual Insurance Co.,* 219 F.3d 501 (5th Cir.2000). In that case, the plaintiff had purchased an all-risk insurance policy from defendant that insured several of plaintiff's properties, including one property under construction. *Ochsner,* 219 F.3d at 502-03. During construction of the property, plaintiff discovered that several of the concrete caps covering the building's foundation were cracking. *Id.* at 503. After attempting to repair the cracking, plaintiff discovered additional cracking and notified Allendale. *Id.* Allendale investigated the problems and denied coverage, citing exclusions in the insurance policy. *Id.* One exclusion read: "This policy does not insure against ... faulty workmanship, material, construction, or design from any cause, unless physical damage not excluded by this Policy results, in which event, this Policy will cover only such resulting damage...." *Id.* In its arguments, Ochsner did not deny that the damage to the building's foundation was the result of "faulty workmanship, material, construction, or design." *Id.* at 504. Instead, Ochsner argued that the damage fell under the policy language covering "resulting physical damage," which the court described as "an exception to the exclusions." *Id.* at 505. Ochsner contended that, while the original cracking of the foundation was not covered by the

policy, the later cracking "constitute[d] 'resulting physical damage' not excluded, i.e., covered by the policy." *Id.*

The court, applying Louisiana law, found that the "resulting physical damage" clause "contemplated damage that is different in kind, not merely degree." *Id.* at 506. The court noted that "[a]ll-risk insurance policies generally are viewed as limiting recovery to those losses in which the cause is external to the structure insured, as opposed to an internal or inherent defect in the item of property which is damaged." *Id.* at 506 (citing *Couch on Insurance,* 3d § 148:59, at 148-104 (1998)) (internal quotations omitted). In *Ochsner,* the initial and subsequent cracking were not sufficiently disparate events: the "minor damage to the foundation [did] not 'cause' the more severe structural impairment. The cracking is the impairment; they are synonymous." *Id.*

**\*5** In *U.S. Industries, Inc. v. Aetna Casualty & Surety Co.,* 690 F.2d 459 (5th Cir.1982), another diversity case involving Louisiana substantive law, the Fifth Circuit also denied coverage for faulty workmanship despite an ensuing loss clause. There, the insured plaintiff had been hired to construct a steel tower composed of welded steel plates. *Id.* at 460. The final step in the construction involved heating the skin of the tower to a certain temperature to relive stress on the plates. *Id.* at 461. Because of excessive heat during this treatment, the tower developed imperfections and began to lean to one side. *Id.* The plaintiff's policy excluded loss from "faulty workmanship but not excluding resultant physical loss or damage to other property insured hereunder." *Id.* at 462 n. 4. The plaintiff argued that the stress-relieving treatment was separate from the construction of the tower itself and, as such, "a fortuitous event extraneous to the construction process ... so as not to be within the faulty workmanship exclusion clause." *Id.* at 461. The court found that "the stress-relieving was as much an integral part of the construction of the tower as was the initial fabrication and welding" and that "faulty workmanship

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3542899 (E.D.La.)
**(Cite as: 2005 WL 3542899 (E.D.La.))**

in the stress-relieving portion of the construction of the tower ... was as much 'faulty workmanship' as would have been the concededly excluded defective welding in the initial phases of construction." *Id.* at 462 n. 4.

An earlier Fifth Circuit case, albeit one involving Texas law, reveals the same reasoning with facts particularly analogous to those before the Court. In *Aetna Casualty & Surety Co. v. Yates,* plaintiffs sued to recover for damage to their home under an all-risk homeowners policy issued by Aetna. 344 F.2d 939, 940 (5th Cir.1965). Plaintiffs discovered that "the joists, sills and subflooring of their home were almost completely rotted away" due to inadequate ventilation in the home's crawl space. *Id.* Their insurance policy excluded "[l]oss caused by inherent vice, wear and tear, deterioration; rust, rot, mould [sic] or other fungi; dampness of atmosphere, [and] extremes of temperature." *Id.* at 940-41. These exclusions, however, did not apply to "ensuing loss caused by collapse of building ... [or] water damage ... provided such losses would otherwise be covered under this policy." *Id.* at 941.

The plaintiffs argued that, because their damage was caused by the condensation of moist air into water, this "exclusion from the exclusion" covered their loss. *Id.* The Fifth Circuit, however, found otherwise. The court found that plaintiff's reading of the policy would "require that rot and water damage be in some sense separable events." *Id.* The court refused to adopt this reading, declaring instead that "[w]e do not think that a single phenomenon that is clearly an excluded risk under the policy was meant to become compensable because in a philosophical sense it can also be classified as water damage." *Id.; see also Holden v. Connex-Metalna,* 1999 U.S. Dist. LEXIS 18714, at *6 (E.D.La. Nov. 23, 1999), *rev'd in part on other grounds,* 203 F.3d 358 (5th Cir.2002) (reviewing Fifth Circuit "ensuing loss" jurisprudence and finding: (1) damage that falls under the exclusion and the ensuing damage must be separable events and different in kind, not degree, and (2) the fact that an

excluded event is the proximate cause of the ensuing loss does not necessarily preclude coverage, *inter alia*).

*6 Plaintiff's arguments ignore the "ensuing loss" case law. The "ensuing loss" provisions in the policy's exclusions do not make the policy ambiguous, but instead provide coverage for loss that is separate and extraneous from the original damage. The floor of the house, which sagged because of the rotting foundation, would not be covered by the "ensuing loss" provision because the floor damage is not separable from the damage to the house's foundation. Likewise, the damaged walls and door frames that sagged because of the rotting foundation cannot be analyzed separately from the damaged foundation.

Plaintiff insists that "these conditions were not caused by the rot or gradual deterioration, but were instead caused by the collapse resulting from the rot and deterioration." [FN25] Plaintiff, though, has failed to show how this collapse is distinct from the damage to the foundation of the house. The rot and deterioration are not "different in kind," *Ochsner,* 219 F.3d at 506, from the subsequent collapse and sagging floors, and the sagging floors and doors were not caused by any extraneous event separate from the rotting foundation. Plaintiff has failed to create a genuine issue of material fact as his arguments do not present any specific factual support that would demonstrate why the "ensuing loss" provisions provide coverage for any damage to the house or why these provisions make the policy ambiguous. [FN26]

> FN25. Rec. Doc. No. 31, p. 14.

> FN26. Defendant also argues that plaintiff's reliance on the property appraisal by Tony Williamson, an employee of Chubb & Son, was improper. Rec. Doc. No. 24, pp. 22-25. Plaintiff does not address this argument in his opposition, nor does the Court find this issue necessary to its decision.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3542899 (E.D.La.)
**(Cite as: 2005 WL 3542899 (E.D.La.))**

Accordingly,

IT IS ORDERED that defendant's motion for summary judgment IS GRANTED.

Houston, Texas, November *17,* 2005.

E.D.La.,2005.
Holland v. Breaux
Not Reported in F.Supp.2d, 2005 WL 3542899 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2005 WL 899843 (D.Md.)
**(Cite as: 2005 WL 899843 (D.Md.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Maryland.
Caren CARNEY, et al.
v.
ASSURANCE COMPANY OF AMERICA
**No. Civ. JFM-04-3434.**

April 19, 2005.

C. Edward Hartman, III, Annapolis, MD, for Caren
Carney, et al.

George E. Reede, Jr., Niles Barton and Wilmer
LLP, Baltimore, MD, for Assurance Company of
America.

MEMORANDUM

MOTZ, J.

**\*1** Caren M. Carney and Jane O'Neill have brought
this action for breach of contract and a declaratory
judgment against Assurance Company of America.
[FN1] Defendant provided a builder's risk insurance
policy covering a new home that plaintiffs were
having constructed, and plaintiffs claim that certain
damages they have suffered are covered by the
policy. Defendant has filed a motion for summary
judgment. The motion will be granted.[FN2]

> FN1. Plaintiffs originally instituted this ac-
> tion in the Circuit Court for Anne Arundel
> County, Maryland, and it was removed to
> this court by defendant on the basis of the
> parties' diversity of citizenship.

> FN2. Also pending are a motion to compel
> discovery filed by plaintiff and a motion to
> strike the motion to compel filed by de-
> fendant. Any response that defendant
> might make to the discovery requests in

question would not affect my ruling on de-
fendant's summary judgment motion.
Therefore, both the motion to compel and
the motion to strike will be denied as moot.

I.

In August 2001, Plaintiffs contracted with Melvin
Merritt, a general contractor, for construction of a
deck house, which consisted of extensive cedar
wood siding on the exterior and interior of the
dwelling. Merritt contracted with Mark Good, a
subcontractor, to paint and treat the wood with a
preservation product. In January 2003, Plaintiffs
"first learned that as the result of poor workman-
ship performed by Merritt's painting subcontractor,
the wood siding was damaged and destroyed."
(Am.Compl.¶ 12.) At the same time Plaintiffs "first
became aware that the wood siding of their home
was damaged and destroyed as a direct result of im-
proper, inadequate, and defective painting and fin-
ishing. (Am.Compl.¶ 22.) On May 21, 2003,
Plaintiffs filed a claim with Defendant for this dam-
age under the builder's risk policy. On August 21,
2003, Defendant denied plaintiff's claim because its
investigation disclosed that the wood was not
treated and protected properly by the contractor,
and that plaintiffs' damages therefore fell within a
policy exclusion for loss "caused by faulty, inad-
equate, and defective ... workmanship." (Def.'s Ex.
10 at 1-2.)[FN3]

> FN3. A claim case manager of defendant
> initially denied plaintiffs' claim on the
> basis of a "wear and tear" exclusion as
> well on the basis of the faulty workman-
> ship exclusion. Although defendant repres-
> ents in its reply memorandum that it con-
> tinues to believe the wear and tear exclu-
> sion applies, it has not pressed the conten-
> tion during this litigation. Plaintiffs argue
> that its failure to do so creates a genuine
> issue that precludes the entry of summary

Not Reported in F.Supp.2d, 2005 WL 899843 (D.Md.)
**(Cite as: 2005 WL 899843 (D.Md.))**

judgment. Arguably, there might be a basis for such an argument if the wear and tear exclusion had been the only ground on which defendant originally denied coverage. But that is not the case. Rather, defendant has chosen to pursue at this stage one of two exclusions upon which it denied plaintiffs' claim.

## II.

Plaintiff's allegations in paragraphs 12 and 22 of the amended complaint squarely bring their claim into the exclusion for faulty workmanship. They repeated the substance of these allegations in their answer to the fifth interrogatory propounded by defendant, in which they describe the cause of loss as follows:

As a result of the failure of Merritt and his subcontractors to properly administer the Sikkens product to the siding and shingles, the cedar was destroyed.

Plaintiffs seek to escape the consequences of their own averments by distinguishing between "accidentally improperly timed but otherwise proper installation" of the wood in question and the improper staining of that wood. They assert that because it was the former that caused their damages, the policy exclusion does not apply. They also contend that because they are seeking recovery not for the cost of removing and replacing the stain but replacing the underlying wood materials, their claim is covered.

The distinctions drawn by plaintiff are insignificant. Assuming that the installation of the wood was otherwise proper, the "untimeliness" of the installation itself was faulty workmanship. Likewise, the improper staining of the wood equally constituted "faulty workmanship." Therefore, however the subcontractor's mistakes are characterized, the policy exclusion applies.

**\*2** The other arguments plaintiffs make are equally unavailing. Assuming, as plaintiffs contend, that

there is circularity in the language of the policy (using the same terms to define other terms), plaintiffs have made no showing that any such circularity removes their claim from the exclusion for faulty workmanship. Likewise, assuming that the exception contained in the faulty workmanship exclusion for a "loss by a covered cause of loss" is redundant, plaintiffs have made no showing that the redundancy creates an ambiguity that removes their claim from the exclusion.[FN4]

> FN4. It is to be noted that plaintiffs' contention that the exception clause is redundant itself is unpersuasive. Such exceptions appear to be routine in the industry and apply to such situations where an excluded cause of loss, e.g., an earthquake, may both independently cause damage and result in a fire, an occurrence that is a covered cause of loss. In that situation the direct earthquake damage would not be insured but the ensuing fire damage would be insured. Cf. *McEvoy v. Security Fire Ins. Co. of Baltimore,* 73 A. 157, 110 Md. 275 (1909).

Finally, plaintiffs' attempt to distinguish *Arnold v. Cincinnati Ins. Co.,* 276 Wis.2d 762, 688 N.W.2d 708 (Wis.Ct.App.2004), a case relied upon by defendant, is unpersuasive. In *Arnold,* the court held that there was no coverage for rot and mold damage caused to a house and the cedar siding of a house as a result of contractors' faulty work. Plaintiffs have responded to *Arnold* only by submitting the affidavit of a lawyer who asserts that in his experience, "Wisconsin law is generally more favorable than Maryland law is to insurance companies." Aside from the fact that legal arguments on summary judgment motions should be made in memoranda, not by way of affidavit, the fact that Wisconsin law generally may be more favorable than is Maryland law to insurers does not mean that on a specific issue Wisconsin and Maryland law differ. In the final analysis, plaintiffs' position is that an exclusion for faulty workmanship does not encompass what they

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 899843 (D.Md.)
**(Cite as: 2005 WL 899843 (D.Md.))**

themselves have alleged to be damage resulting from "poor workmanship" and "improper, inadequate, and defective painting and finishing." Not surprisingly, they cite no Maryland case in support of this view.

A separate order granting defendant's motion and entering judgment on its behalf is being entered herewith.

### ORDER

For the reasons stated in the accompanying memorandum, it is, this 19th day of April 2005

ORDERED

1. Plaintiffs' motion to compel is denied as moot;

2. Defendant's motion to strike is denied as moot;

3. Defendant's motion for summary judgment is granted; and

4. Judgment is entered in favor of defendant against plaintiffs.

D.Md.,2005.
Carney v. Assurance Co. of America
Not Reported in F.Supp.2d, 2005 WL 899843 (D.Md.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2264535 (E.D.La.)
**(Cite as: 2007 WL 2264535 (E.D.La.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Paul and Jane BROUSSARD
v.
STATE FARM FIRE AND CASUALTY COM-
PANY.
**Civil Action No. 06-8084.**

Aug. 2, 2007.

Stephen O. Scandurro, Dominick J. Scandurro, Jr., Scandurro & Layrisson, L.L.C., New Orleans, LA, for Paul and Jane Broussard.

David A. Strauss, Adam Patrick Massey, Christian Albert Garbett, Lindsay A. Larson, III, King, LeBlanc & Bland, LLP, New Orleans, LA, for State Farm Fire and Casualty Company.

### *ORDER AND REASONS*

SARAH S. VANCE, United States District Court.

*\*1 Before the Court is defendant State Farm Fire and Casualty Company's motion for declaratory judgment on several pending issues in this matter. Because this is not a declaratory judgment proceeding brought by the insurer pursuant to Rule 57 of the Federal Rules of Civil Procedure and the Declaratory Judgment Act, 28 U.S.C. § 2201, the Court will treat defendant's motion as a Rule 12(c) motion for judgment on the pleadings to the extent that it challenges plaintiffs' claims based on the pleadings and a Rule 56 motion for summary judgment to the extent that it relies on matters outside the pleadings. For the following reasons, the Court GRANTS in part and DENIES in part defendant's motion.

### I. BACKGROUND

Plaintiffs Paul and Jane Broussard are Louisiana homeowners whose property was rendered a total loss as a result of Hurricane Katrina. Plaintiffs' home, which was located in Plaquemines Parish, was insured under a homeowner's policy and a flood policy, both issued by defendant State Farm. Plaintiffs assert that the amount that they have received thus far from State Farm under both their homeowner's and flood policies has not fully compensated them for their covered losses. The homeowner's policy contained coverage limits of $159,600 on the dwelling, $87,780 on contents, and $15,960 on the dwelling extension. The flood policy contained coverage limits of $131,300 on the dwelling and $50,300 on its contents. To date, State Farm has paid plaintiffs $40,422.44 for damage to the dwelling and dwelling extension [FN1] and $25,296.81 for contents under their homeowner's policy, as well as $131,300 for dwelling and $52,800 for contents under their flood policy. In sum, plaintiffs have received $249,819.25 under both policies.

> FN1. Plaintiffs assert that only $20,020.88 of that amount represents payment for damage to their dwelling structure, with the remainder directed toward damage to the dwelling extension and removal of a tree.

Plaintiffs contend that they have been underpaid on their policies because their dwelling was determined to be a total loss in the aftermath of Hurricane Katrina. Plaintiffs complain that the perils of wind *and* water caused the loss of their property, which they assert had a pre-storm value of more than $400,000. Accordingly, plaintiffs contend that the approximate total of $151,000 that they have been paid under their flood and homeowner's policies for damage to their dwelling falls well short of their actual covered loss. In addition to their breach of insurance contract claim on their homeowner's policy, plaintiffs assert causes of action under La.Rev.Stat. §§ 22:658 and 22:1220 for State Farm's alleged ar-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2264535 (E.D.La.)
**(Cite as: 2007 WL 2264535 (E.D.La.))**

bitrary or capricious failure to timely pay their claim after it received satisfactory proof of loss. They seek attorney's fees under Section 22:658, as well as general damages under Section 22:1220. Finally, plaintiffs assert a claim under La.Rev.Stat. § 22:695, Louisiana's Valued Policy Law.

State Farm now moves for a declaration on several issues presented in this matter. Specifically, it argues: (1) that plaintiffs bear the burden of proving coverage under their homeowner's policy; (2) that plaintiffs are estopped from recovering for a total loss under their homeowner's policy after recovering the full limits under their flood policy; (3) that plaintiffs are entitled to recover, at most, the difference between the limits under their homeowner's policy and the amount that they have already been paid under their flood policy; (4) that plaintiffs' bad faith claims under Sections 22:658 and 22:1220 fail as a matter of law; and (5) that plaintiffs' claims under Sections 22:658 and 22:1220 can only be brought under the pre-Katrina versions of those statutes. The Court rules on these issues as follows.

## II. LEGAL STANDARDS

### A. Motion for Judgment on the Pleadings

*2 A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a Rule 12(b)(6) motion to dismiss. *See Johnson v. Johnson,* 385 F.3d 503, 529 (5th Cir.2004) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 313 n. 8 (5th Cir.2002) ("The standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6).")). To withstand a Rule 12(b)(6) motion, plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1974 (2007) . "Factual allegations must be enough to raise a right to relief about the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (internal citations omitted).

### B. Motion for Summary Judgment

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.,* 910 F.2d 167, 178 (5th Cir.1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex,* 477 U.S. at 325; *see also Lavespere,* 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex,* 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1996).

## III. DISCUSSION

### A. Burden of Proof Under Plaintiff's Homeowner's Policy

Another court in the Eastern District of Louisiana recently addressed the requisite burdens of proof as to coverage under a homeowner's insurance policy in Louisiana. *See Ferguson v. State Farm Ins. Co.,* 2007 WL 1378507 (E.D.La. May 9, 2007) (Berrigan, J.). In *Ferguson,* the court found:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2264535 (E.D.La.)
**(Cite as: 2007 WL 2264535 (E.D.La.))**

[T]here are two distinct burdens of proof in this case: Coverage A for the dwelling and other structures, and Coverage B for personal property.

Coverage A, for the dwelling and other structures, is an "open peril" policy, providing coverage for "accidental direct physical loss," subject to the policy's specific exclusions, limitations and conditions. Under an open peril policy, if the insureds meet their threshold burden of proving an accidental direct physical loss to the insured property, then the burden shifts to the insurer to prove the applicability of any asserted exclusion by a preponderance of the evidence. Under Louisiana law, the insurance company has the burden to prove that a loss comes within a policy exclusion.... Should the defendant meet their threshold burden of proving the exclusion, the burden will again shift back to the plaintiffs to prove they fall under an exception to the exclusion, by a preponderance of the evidence.

**\*3** Coverage B, for the contents or personal property, is a "named peril" policy, providing coverage for "accidental direct physical loss," on a named or specific peril basis. Under a named peril policy, the plaintiffs are required to prove by a preponderance of the evidence that their personal property was lost or damaged due to a specified covered risk named in the policy. Should the plaintiffs meet this threshold requirement, the burden then shifts to the insurer to prove the applicability of any asserted exclusion by a preponderance of the evidence....

*Ferguson,* 2007 WL 1378507, at \*1-2 (internal citations omitted).

State Farm does not dispute these basic principles of Louisiana insurance law, which the Court adopts in full here. Rather, State Farm contends that, apart from the issue of whether plaintiffs' losses are covered losses under the terms of their homeowner's coverages, plaintiffs must also prove the amount of their covered damages. Plaintiffs do not contest this assertion. The Court finds that, in order

to recover for a breach of an insurance contract, plaintiffs are required to prove the amount of their claim for covered damages under their homeowner's policy by a preponderance of the evidence. *See* COUCH ON INSURANCE § 175: 92 (3d ed. 2006) ("In accord with general principles governing the law of damages, there can be no recovery for items where their existence and value are not proved."); *see also Burrell v. Seguros America Banamex, S.A.,* 316 So.2d 177, 179 (La.App. 4th Cir.1975) ("Under the circumstances we conclude plaintiffs' burden of proving the extent of damage from the fire required some showing beyond the mere presentation of a disputed estimate."); *Grand Pelican Furniture Co. v. Cambridge Mut. Fire Ins. Co.,* 263 So.2d 91, 92-93 (La.App. 1st Cir.1972) (finding that "[t]here is no doubt of the damage inflicted upon plaintiff's upholstered furniture by the smoke, but the matter of resulting loss is highly questionable" and then concluding that plaintiff had not carried its burden of proving amount of loss). Moreover, in a situation, such as here, where a covered and a non-covered peril may have contributed to plaintiffs' loss, plaintiffs are required to prove the amount of segregable damage caused by the covered peril. *See Wellmeyer v. Allstate Ins. Co.,* 2007 WL 1235042, at \*2 (E.D.La. Apr. 26, 2007) ("nothing bars the Wellmyers from collecting under their homeowner's policy for wind damage and from collecting under their flood policy if they can segregate and prove the two types of damages"); *see also Fiess v. State Farm Lloyds,* 392 F.3d 802, 807 (5th Cir.2004) (applying Texas law to find that "[b]ecause the insured may only recover for damage caused by covered perils, the insured bears the burden of presenting evidence that will allow the trier of fact to segregate covered losses from non-covered losses"); COUCH ON INSURANCE § 175:9 (3d ed. 2006) ("It is an insured's burden to produce evidence that would afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by the covered peril and that by the excluded peril.").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2007 WL 2264535 (E.D.La.)
**(Cite as: 2007 WL 2264535 (E.D.La.))**

**B.   Application  of  Estoppel  Principles  to Plaintiffs' Wind Claim**

*4 State Farm contends that plaintiffs should be estopped, either under the principles of equitable or judicial estoppel, from claiming that they suffered a total loss due to wind damage after recovering the full limits under their flood policy. As an initial matter, State Farm mischaracterizes plaintiffs' claims. Plaintiffs do not assert that they suffered a total loss caused by wind. Rather, they argue that their home suffered wind damage apart from and in addition to flood damage, and request compensation only for that wind damage. That they seek the full limits of their homeowner's policy does not necessarily equate to a claim based on a total loss, particularly since plaintiffs present evidence that their property was worth more than its insured value. This Court has already ruled in a similar case that no policy provision or legal principle prevents plaintiffs from recovering for previously uncompensated, covered damage, without reference to the amount received under their flood policy, so long as the combined recovery does not exceed the value of their property. *See Weiss v. Allstate Ins. Co.,* 2007 WL 891869, at *3 (E.D.La. Mar. 21, 2007).

Moreover, State Farm's estoppel argument (whether equitable or judicial in nature) fails because the mere receipt of payments under plaintiffs' flood policy does not, without more, amount to a representation that plaintiffs' damage was caused exclusively by water such that their recovery must be limited accordingly. *See id.* at *2. Here, State Farm has not produced a signed proof of loss, any other sworn document, or evidence of any statement by plaintiffs in which they characterize their losses as exclusively a result of flooding. In fact, plaintiff Paul Broussard avers that "we did not submit any documents or written proof of loss to State Farm" on the flood claim. (R. Doc. 21, Affidavit of Paul Broussard). Plaintiffs also deny ever stating that their home "was completely demolished by flooding or a total loss from flooding." (*Id.*). Paul Broussard avers that "it was obvious from my first in-

spection sometime in late September or early October that our house had wind-related damages." (*Id.* ). Moreover, Broussard states that the State Farm adjuster who inspected plaintiffs' property after Katrina determined that there had been wind damage and submitted a claim for that damage under their homeowner's policy. (*Id.*). State Farm ultimately paid plaintiffs for some wind damage to their dwelling, dwelling extension, and contents. Given these facts, plaintiffs' conduct is not so unambiguous as to amount to a representation that their home was destroyed by flooding. Thus, on this record, State Farm has failed to carry its burden to obtain summary judgment on its estoppel claim. *See Weiss,* 2007 WL 891869, at *2 (rejecting insurer's estoppel argument based on absence of evidence of any representation by plaintiffs that their damages were caused by flooding).

**C. Whether Plaintiffs' Recovery is Limited to the Value of Their Homeowner's Policy**

*5 State Farm next argues that plaintiffs' recovery, if any, should be limited to $11,820.75, which it contends represents the difference between the pre-storm value of their dwelling, contents, and dwelling extension and the amounts that they already have received under their homeowner's and flood policies. State Farm relies on the coverage limits in plaintiffs' homeowner's policy to determine the pre-storm value of their property.

It is well established that insurance contracts are contracts of indemnity. *See, e.g., Berkshire Mut. Ins. Co. v. Moffett,* 378 F .2d 1007, 1011 (5th Cir.1967); *Wright v. Assurance Co. of America,* 728 So.2d 974, 975 (La.App.2d Cir.1999). It is also axiomatic that an insured cannot recover for the same loss twice under a contract for property insurance. *See, e.g., Cole v. Celotex Corp.,* 599 So.2d 1058, 1080 (La.1992) ("As a general rule, the claimant may recover under all available coverages provided that there is no double recovery."); *see also Wellmeyer,* 2007 WL 1235042, at *3 ("an insured cannot recover twice for the same loss"). Plaintiffs in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2264535 (E.D.La.)
**(Cite as: 2007 WL 2264535 (E.D.La.))**

this case are not claiming that wind caused the total loss of their property, as was the situation in *Weiss.* (There, the Court gave a jury instruction limiting plaintiffs' recovery to the maximum permitted under their homeowner's policy.) Rather, plaintiffs claim that they had segregable wind and flood damages. Thus, they seek a recovery of previously uncompensated, covered damage, and they argue that the combined amount of the already compensated wind and flood damages and the uncompensated wind damages does not exceed the total value of their property. *See Weiss,* 2007 WL 891869, at *3. They submitted evidence that the estimated replacement cost of their property is $432,951.75. (R. Doc. 21, Ex. 1, Gilbert Report; Ex. 7, Residential Substantial Damage Estimate). They also submitted evidence that they suffered $232,062.14 in wind damage to their dwelling, for which they have only been paid about $20,000 under their homeowner's policy. (*Id.*). They further provided State Farm with documentation showing at least $137,000 in damages to their contents, a figure which approximates the amount of combined coverage they had for wind and flood damage to their contents. (R. Doc. 21, Ex. 8, Contents List).

The Court is therefore not presented with undisputed evidence that conclusively establishes the value of plaintiffs' home and contents. The well-established propositions that insurance contracts are contracts of indemnity and that an insured cannot recover an amount greater than her loss support the result State Farm seeks only if the facts as to the value of plaintiffs' home and contents and the cause of their total loss are resolved in State Farm's favor. *See Weiss,* 2007 WL 891869, at *3. Thus, on this record, the Court cannot find as a matter of law that plaintiffs are limited to a specific recovery based on the defendant's asserted valuation of plaintiffs' property.

**4. Propriety of Recovery Under La.Rev.Stat. §§ 22:658 and 22:1220**

*6 State Farm also asks the Court to dispose of

plaintiffs' claims under Sections 22:658 and 22:1220. State Farm asserts that, assuming *arguendo* that it is found liable for breaching plaintiffs' homeowner's policy, plaintiffs have nonetheless failed to offer any evidence tending to show that its conduct in this matter was arbitrary, capricious, or without probable cause. Whether the Court views this a motion for judgment on the pleadings or a motion for summary judgment, State Farm's argument is without merit on this record.

Plaintiffs' state court petition specifically alleges that "plaintiffs promptly reported the damage to the defendant which knew almost immediately that plaintiffs' property had sustained severe physical and structural damage from the winds and, later, the storm surge." (R. Doc. 1-2, at ¶ 7). The petition also asserts that State Farm's adjuster concluded in November 2005 that he could not pay for any damages to their property located below the approximate level of the flood waters, ignoring indications that wind damaged the interior of their home, including contents, before the flood waters arrived. (*Id.* at ¶¶ 8, 9). Moreover, plaintiffs contend that they submitted a satisfactory proof of loss to State Farm "long before" they filed their state court petition. (R. Doc. 1-2, at ¶ 15). Clearly, plaintiffs have pleaded a set of facts that could entitle them to relief under either Section 22:658 or 22:1220.

Plaintiffs have also submitted evidence, unrebutted at this point, supporting what they allege in their petition. As noted earlier, their expert engineering report prepared by James Gilbert states that plaintiffs sustained wind damages in the amount of $232,062.14, representing approximately 53.6 percent of the replacement cost/actual cash value of the dwelling. (R. Doc. 21, Ex. 1, Gilbert Report; Ex. 7, Residential Substantial Damage Estimate). The report notes that "there was wind damage visible throughout the area near the house," that "there was visible damage to the roof, soffit and facia of the house," and that "a portion of the rear masonry wall was collapsed." (*Id.*). It concludes that "it is more likely than not that the winds severely dam-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2264535 (E.D.La.)
**(Cite as: 2007 WL 2264535 (E.D.La.))**

aged the roof, facia and soffit allowing large amount of water to enter the building prior to storm surge." (*Id.*). Furthermore, Paul Broussard states that a State Farm adjuster informed him that State Farm would not compensate plaintiffs through their homeowner's policy for any damage resulting from wind or wind-driven rain that may have occurred "below the water line" because plaintiffs' property had been flooded as well. (R. Doc. 21, Ex. 9, Interrogatory Answers). He avers that the adjuster told him that this determination "had come out of 'Dallas'-by which [the adjuster] meant State Farm's offices." (R. Doc. 21, Affidavit of Paul Broussard). This, Broussard states, despite the adjuster's conclusion that "the roof was 'totaled.' " (*Id.*).

*7 Thus, plaintiffs contend that, in light of this unrebutted evidence, State Farm's refusal to tender an additional amount to plaintiffs under their homeowner's policy was arbitrary or capricious. The Court finds this evidence, though limited, sufficient to defeat defendant's summary judgment motion. Plaintiffs have created a genuine issue of fact as to whether State Farm knew it owed plaintiffs more money for wind damage but nevertheless refused to compensate them within thirty or sixty days after receipt of satisfactory proof of loss.

**5. Applicability of 2006 Amendments to La.Rev.Stat. §§ 22:658 and 22:1220 to Plaintiffs' Claims**

In plaintiffs' state court petition, filed on August 28, 2006, and served on State Farm on September 14, 2006, plaintiffs assert that they are entitled to penalties under La.Rev.Stat. §§ 22:658 and 22:1220. State Farm contends that plaintiffs are limited to recovery under Section 22:658 of a potential penalty of 25 percent and no attorney's fees. State Farm relies on the version of La.Rev.Stat. § 22:658 in place in the immediate aftermath of Hurricane Katrina, which is when it asserts that it was alleged to have arbitrarily and capriciously failed to make a payment or written offer to settle plaintiffs' property damage claim within thirty days after receipt of sat-

isfactory proofs of loss. 2003 La. Acts No. 790 (increasing penalties under La.Rev.Stat. § 22:658 from 10 percent to 25 percent).

State Farm's position finds support in plaintiffs' state court petition, in which plaintiffs assert that they "provided the defendant with satisfactory proof of loss *long before* the filing of this petition. In addition, State Farm has already inspected the property, an act which by itself qualifies as satisfactory proof of loss." (R. Doc. 1-2, at ¶ 15) (emphasis added). It was not until August 15, 2006 that the Louisiana legislature's most recent amendment to La.Rev.Stat. § 22:658 went into effect, increasing maximum penalties for violations of the statute from 25 percent to 50 percent and authorizing recovery of "reasonable attorney fees and costs." *See* 2006 La. Acts No. 813; *see also* La. Const. art. 3, § 19 (stating that all laws enacted during a regular session of the legislature shall take effect on August 15 of the calendar year in which the regular session is held). The Louisiana Supreme Court has stated that generally "the determinative point in time separating prospective from retroactive application of an enactment is the date the cause of action accrues." *Cole v. Celotex,* 599 So.2d 1058, 1063 (La.1992); *see also Brown v. RJ Reynolds Tobacco Co.,* 52 F.3d 524, 527 (5th Cir.1995) ("A cause of action accrues when a plaintiff may bring a lawsuit."). Thus, under Section 22:658, plaintiffs' cause of action accrued when State Farm allegedly failed to make payment on their property damage claim thirty days after receiving a satisfactory proof of loss. *Cf. Manuel v. La. Sheriff's Risk Mgmt. Fund,* 664 So.2d 81, 87 (La.1995) ("The cause of action that gave rise to this litigation was the failure to pay within 30 days."). It appears then, based on plaintiffs' own representation that they submitted to their insurer a satisfactory proof of loss "long before" August 28, 2006, that the 50 percent penalty provision was not enacted until after State Farm allegedly violated the statute, and hence plaintiffs could have brought their lawsuit.

*8 Moreover, as plaintiffs concede, there is no sup-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2264535 (E.D.La.)
**(Cite as: 2007 WL 2264535 (E.D.La.))**

port for the proposition that the 2006 amendment to Section 22:658 was intended to apply retroactively to causes of action that accrued before it went into effect. Under La.Rev.Stat. § 1:2, "No Section of the Revised Statutes is retroactive unless it is expressly so stated." The legislature did not include such an expression in 2006 La. Acts No. 813, and federal and state courts have consistently declined to read in a legislative intent to retroactively apply amendments to Section 22:658 in its absence. *See, e.g., Ferguson,* 2007 WL 1378507, at *3 (holding that 2006 amendments to Section 22:658 are not to be applied retroactively); *Tomlinson v. Allstate Ins. Co.,* Civ. Docket No. 06-617 (E.D.La. Feb. 12, 2007) (Feldman, J.) (same); *Lewis v. State Farm Ins. Co.,* 946 So.2d 708, 728-29 (La .Ct.App.2006) (applying version of Section 22:658 in place at time that plaintiffs' causes of action arose regardless of later amendment); *Geraci v. Byrne,* 934 So.2d 263, 267 (La.Ct.App.2006) (same).

The Court therefore concludes that plaintiffs' recovery of penalties under Section 22:658, if any, is limited to 25 percent of the amount found to be due to them under their homeowner's policy, and they are not entitled to attorney's fees under the statute.

**IV. CONCLUSION**

For the foregoing reasons, the Court GRANTS in part and DENIES in part State Farm's motion for judgment on the pleadings and/or motion for summary judgment.

E.D.La.,2007.
Broussard v. State Farm Fire and Cas. Co.
Not Reported in F.Supp.2d, 2007 WL 2264535 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 1378507 (E.D.La.)
**(Cite as: 2007 WL 1378507 (E.D.La.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
James M. FERGUSON and Lorie Ann Ferguson
v.
STATE FARM INSURANCE COMPANY.
**Civil Action No. 06-3936.**

May 9, 2007.

Gilbert V. Andry, IV, The Andry Law Firm, Michael Jay Winsberg, Michael Winsberg, Attorney at Law, New Orleans, LA, for James M. Ferguson and Lorie Ann Ferguson.

***ORDER***

HELEN G. BERRIGAN, United States District Judge.

*\*1* Before the Court are issues of law and fact for which the Court ordered briefing by both parties. After considering the briefs and reply briefs filed by the parties, the law and the facts, the Court comes to the following conclusions.

**1. Whether any evidence of the flood claim is relevant to this claim?**

On April 23, 2007,[FN1] the Court determined "that evidence of flood claims and payments is inadmissible with respect to the jury trial of the homeowner's claim ... However ... (i)n the event of recovery under the homeowner's policy, it shall be reduced by the amount of flood payments already made up to the pre-storm value of their property."[FN2] Upon reconsideration, the Court finds it erred with regard to the inadmissibility of the evidence of the flood claim. Evidence that the Plaintiffs purchased flood insurance and received payment on that claim is relevant to State Farm's defense against the

Plaintiffs' claims for bad faith penalties under La.Rev.Stat. Ann. 22:658 and 22:1220.

FN1. Rec. Doc. 101.

FN2. *Id.*

**2. Whether replacement costs are the same as "actual cash value."**

The Court finds that replacement cost is not the same as actual cash value. Replacement cost is "[t]he cost of a substitute asset that is equivalent to an asset currently held. The new asset has the same utility but may or may not be identical to the one replaced ."[FN3] On the other hand, actual cash value is the "[r]eplacement cost minus normal depreciation."[FN4] The parties have conceded that plaintiffs' homeowner's policy was a replacement cost policy rather than an actual cash value policy.[FN5]

FN3. *Black's Law Dictionary,* 8th edition, p. 372.

FN4. *Black's Law Dictionary,* 8th edition, p. 1586.

FN5. See certified policy attached as exhibits to Rec. Doc. 90 (defendant) and Rec. Doc. 92 (plaintiff).

**3. Burdens of Proof**

The Court finds there are two distinct burdens of proof in this case: Coverage A for the dwelling and other structures, and Coverage B for personal property.

Coverage A, for the dwelling and other structures, is an "open peril" policy, providing coverage for "accidental direct physical loss," subject to the policy's specific exclusions, limitations and conditions.[FN6] Under an open peril policy, if the in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1378507 (E.D.La.)
**(Cite as: 2007 WL 1378507 (E.D.La.))**

sureds meet their threshold burden of proving an accidental direct physical loss to the insured property, then the burden shifts to the insurer to prove the applicability of any asserted exclusion by a preponderance of the evidence.[FN7] Under Louisiana law, the insurance company has the burden to prove that a loss comes within a policy exclusion.[FN8] "Any exclusion from coverage in an insurance policy must be clear and unmistakeable ... The burden is on the insurer to prove the applicability of an exclusionary clause in a policy of insurance."[FN9] "Since the claim arises out of a contract of insurance between plaintiff and the defendant and involved coverage for which she paid a premium, the degree of proof required to avoid liability under its contractual obligation must be certain and decisive, leaving no area for speculation and assumption. Accordingly, the defendant in the instant matter had the burden to establish by a preponderance of the evidence ..."[FN10]

> FN6. See *Christiansen v. State Farm Mut. Auto Ins. Co.,* 552 So.2d 1377, 1378 (La.App. 5th Cir.1989.); also *Ingersoll-Rand Fin. Corp. v. Employers Ins. Of Wausau,* 771 F.2d 910, 912 n. 2 (5th Cir .1985).

> FN7. *Myevre v. Continental Cas. Co., App.* 4 Cir.1971, 245 So.2d 785, application denied 258 La. 764, 247 So.2d 863.

> FN8. *Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London,* 616 So.2d 1250 (La.1993); *Crocker v. Roach,* 33,507 (La.App.2d Cir.08/23/00), 766 So.2d 672, writ denied, 774 So.2d 983 (La.2000).

> FN9. *Landry v. Louisiana Hosp. Service, Inc.,* 449 So.2d 584, 586 (La.App. 1 Cir.1984), citations omitted.

> FN10. *Ferro v. Gebbia,* 252 So.2d 545, 547 (La.App., 1971), citations omitted.

**\*2** The defendant has conceded that the plaintiffs have met their threshold burden of proving an accidental direct physical loss to the dwelling and other structures under Coverage A, as plaintiffs are the named insured; the policy was in effect on the date of the loss; and the house was reduced to a slab as a result of Hurricane Katrina. Accordingly, the Court finds that the burden of proof is on the defendant to prove any exclusion for Coverage A, for the dwelling and others structures, by a preponderance of the evidence.[FN11] Should the defendant meet their threshold burden of proving the exclusion, the burden will again shift back to the plaintiffs to prove they fall under an exception to the exclusion, by a preponderance of the evidence.[FN12]

> FN11. Defendant State Farm cites *Royal Surplus Lines Ins. Co. v. Brownsville Independent School Dist.* 404 F.Supp.2d 942 (S.D.Tex.2005) as evidence that their burden of proving an exclusion is only to "adduce evidence" or "demonstrate that an exclusion arguably applies." However, that language is from the Texas Insurance Code and does not apply under Louisiana law.

> FN12. The Court notes that in *In re Katrina Canal Breaches Consol. Litig.,* 466 F.Supp.2d 729, 762-63 (E.D.La 2006), which defendant cites, Judge Duval upheld as valid and enforceable a water damage exclusion for flooding regardless of the cause. However, in this case the issue is the apportionment of damage between those caused by flood and those caused by wind, and not whether the exclusionary clause is valid.

Coverage B, for the contents or personal property, is a "named peril" policy, providing coverage for "accidental direct physical loss," on a named or specific peril basis. Under a named peril policy, the plaintiffs are required to prove by a preponderance of the evidence that their personal property was lost or damaged due to a specified covered risk named in the policy.[FN13] Should the plaintiffs meet this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1378507 (E.D.La.)
**(Cite as: 2007 WL 1378507 (E.D.La.))**

threshold requirement, the burden then shifts to the insurer to prove the applicability of any asserted exclusion by a preponderance of the evidence, as discussed above.

> FN13. See *Opera Boats v. La Reunion Francais,* 702 F.Supp. 1278 (E.D.La.1989) , affirmed, 893 F.2d 103 (5th Cir.1990); *Cambre v. The Travelers Indemnity Company,* 404 So.2d 511 (La.App.1981).

The defendant has not conceded that the plaintiffs have met their threshold burden of proving the accidental direct physical loss *of their personal property* was due to a specified covered risk named in the policy, namely a windstorm.[FN14] In an action by an insured on an insurance contract, the burden of proof is on the insured to establish every fact essential to his cause of action and also to establish that his claim is within policy coverage."[FN15] "It is well settled that when a plaintiff must prove a disputed fact by a preponderance of the evidence, he must prove that the existence of the disputed fact is more probable than its nonexistence."[FN16] Accordingly, the Court finds that the burden of proof is on the plaintiff to prove that any damage under Coverage B, for the contents or personal property, was caused by a named peril, by a preponderance of the evidence.

> FN14. See certified insurance policy, FERGUSON 0175.

> FN15. *Collins v. New Orleans Public Service, Inc.,* App. 4 Cir.1970, 234 So.2d 270, writ refused 256 La. 375, 236 So.2d 503.

> FN16. *Davidson v. United Fire & Cas. Co.* 576 So.2d 586, 590 (La.App. 4 Cir.,1991), citing *Town of Slidell v. Temple,* 246 La. 137, 164 So.2d 276 (La.1964); *Perkins v. Texas & New Orleans Railroad,* 243 La. 829, 147 So.2d 646 (La.1962).

**4. Estoppel-whether the insured are estopped from claiming their home was a total loss due to**

**wind and/or tornado because the insured made a flood claim and received their full flood policy limits.**

The Court finds that the plaintiffs are not estopped from making a claim against their homeowner policy. Plaintiffs argue they filed claims for coverage under both policies. The defendant has conceded that the flood insurance claim was paid on the basis of a telephone conversation, without an inspection; that the plaintiffs neither stated nor did they sign a proof of loss claiming that their home was destroyed solely as a result of flooding.

Again, the Court finds that the apportionment of loss due to wind and water is a factual matter for the jury to decide.

**5. Whether the insureds are limited to recovery of the difference between the pre-Katrina value of their dwelling and contents and the flood policy payments made to date on that dwelling and contents.**

*3 "Compensation for property which is lost or destroyed is the value of the property at the time of the loss."[FN17] Plaintiffs and defendant dispute the value of the property at the time of the loss. The Court finds this is a factual matter for the jury to decide.[FN18]

> FN17. *Hammett v. New Orleans Diamond and Jewelry Wholesalers, Inc.* 580 So.2d 1077, *1082 (La.App. 4 Cir.1991), citing *Langendorf v. Administrators of Tulane Educational Fund,* 361 So.2d 905 (La.App. 4th Cir.), writ denied 363 So.2d 1384 and 364 So.2d 120 (La.1978).

> FN18. The Court notes that the jury may find that the plaintiffs loss was sustained from both wind and water. "[A] combination of wind and flooding may have possibly damaged the Wellmeyers' home .... nothing bars the Wellmeyers from collecting under their homeowner's policy for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1378507 (E.D.La.)
**(Cite as: 2007 WL 1378507 (E.D.La.))**

wind damage and from collecting under their flood policy for flood damage if they can segregate and prove the two types of damages." *Wellmeyer v. Allstate Ins. Co.,* 2007 WL 1235042, 2 (E.D.La.2007).

The Court previously ordered "in the event of recovery under the homeowner's policy, it shall be reduced by the amount of flood payments already made up to the pre-storm value of their property." [FN19] The Court's order was in accord with the principle that the fundamental purpose of property insurance is indemnity, not profit. [FN20] As noted earlier, the Court overstated the position. The jury is the finder of fact. Once the jury apportions the percentage of damage caused by wind and the percentage of damage caused by flood, the appropriate calculations will be made. Each policy will then be responsible for its portion of the damage, if any, as determined by the jury. [FN21]

FN19. Rec. Doc. 101.

FN20. See *Berkshire Mut. Ins. Co. v. Moffett,* 378 F.2d 1007, 1011 (5th Cir.1967); 15 La. Civ. L. Treatise, *Insurance Law & Practice* § 312 (3rd ed.): "[I]nsurance should be a device for making a person whole after a loss is suffered rather than a way in which he might increase his wealth." See also *Cole v. Celotex Corp.,* 599 So.2d 1058, 1080 (La.1992): "As a general rule the claimant may recover under all available coverages provided that there is no double recovery."

FN21. See calculation examples in # 9.

**6. Whether the doctrines of equitable and judicial estoppel both preclude the insureds from any recovery under their Homeowner's Policy in light of their previous position that their loss was the result of flood and their current contrary and irreconcilable contention that wind and/or a tornado destroyed their home prior to any flood or surge touching their home.**

As discussed under # 4, the Court finds that the plaintiffs are not estopped from making a claim against their homeowner policy. Plaintiffs argue they filed claims for coverage under both their flood and homeowner policies. The defendant has conceded that the flood insurance claim was paid out on the basis of a telephone conversation, without inspection, and the plaintiffs never stated nor signed a proof of loss alleging that their home was destroyed solely as a result of flooding. Again, the Court finds that the apportionment of loss due to wind and water is a factual matter for the jury.

**7. Whether the August 2006 amendments to the Louisiana Bad Faith Statutes apply retroactively to this claim which arose out of an event that occurred in August 2005.**

The Louisiana legislature's most recent amendment to La.Rev.Stat. § 22:658 [FN22] went into effect on August 15, 2006, and increased the penalties for violations of the statute from 25 percent to 50 percent in addition to adding recovery for reasonable attorney fees and costs. [FN23]

FN22. Payment and adjustment of claims, policies other than life and health and accident; personal vehicle damage claims; penalties; arson-related claims suspension ...

(3) Except in the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim and of a claim for reasonable medical expenses within fourteen days after notification of loss by the claimant. In the case of catastrophic loss, the insurer shall initiate loss adjustment of a property damage claim within thirty days after notification of loss by the claimant. Failure to comply with the provisions of this Paragraph shall subject the insurer to the penalties provided in R.S. 22:1220 ...

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1378507 (E.D.La.)
**(Cite as: 2007 WL 1378507 (E.D.La.))**

(4) All insurers shall make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim ...

B. (1) Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4), respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings. LSA-R.S. 22:2658.

FN23. 2006 La. Acts No. 813. (See Historical and Statutory Note: Acts 2006, No. 813, § 1, in par. (B)(1), in the first sentence, twice substituted "fifty percent" for "twenty-five percent" and added "as well as reasonable attorney fees and costs", and added the last sentence.)

Thus, the 50 percent penalty provision was not enacted until after State Farm allegedly violated the statute. Under La.Rev.Stat. § 1:2, "No Section of the Revised Statutes is retroactive unless it is expressly so stated." The legislature did not include such an expression in 2006 La. Acts No. 813, and federal and state courts have consistently declined to read in a legislative intent to retroactively apply amendments to La.Rev.Stat. § 22:658 in its absence.[FN24]

> FN24. See *Tomlinson v. Allstate Ins. Co.,* Civ. Docket No. 06-617 (E.D.La. Feb. 12, 2007), holding that 2006 amendments to La.Rev.Stat. § 22:658 are not to be applied retroactively; *Lewis v. State Farm Ins. Co.,* 946 So.2d 708, 728-29 (La.Ct.App.2006), applying version of La.Rev.Stat. § 22:658 in place at time that plaintiffs' causes of action arose; *Geraci v. Byrne,* 934 So.2d 263, 267 (La .Ct.App.2006), same.

The Louisiana legislature's most recent amendment to La.Rev.Stat. § 22:1220 [FN25] went into effect on February 23, 2006, and added a provision awarding penalties for failure to pay claims pursuant to La.Rev.Stat. § 22:658.2, when the failure is arbitrary, capricious, or without probable cause.[FN26] Like the amendment to La.Rev.Stat. § 22:658, the legislature did not expressly state the amendment to La.Rev.Stat. § 22:1220 was retroactive, and so no legislative intent to retroactively apply it is appropriate.

> FN25. Good faith duty; claims settlement practices; cause of action; penalties

> A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1378507 (E.D.La.)
**(Cite as: 2007 WL 1378507 (E.D.La.))**

any damages sustained as a result of the breach.

B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A ...

(2) Failing to pay a settlement within thirty days after an agreement is reduced to writing ...

(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause ...

(6) Failing to pay claims pursuant to R.S. 22:658.2 when such failure is arbitrary, capricious, or without probable cause.

C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings....

LSA-R.S. 22:1220.

FN26. Amended by Acts 2006, 1st Ex.Sess., No. 12, § 1, eff. Feb. 23, 2006. (See Historical and Statutory Note: Acts 2006, 1 st Ex.Sess., No. 12, § 1, added par. (B)(6).)

**\*4** The Court therefore concludes that plaintiffs' recovery of penalties under La.Rev.Stat. § 22:658, if

any, is limited to 25 percent of the amount found to be due to them under their homeowner's policy, and no attorney fees may be awarded under this statute. The Court further concludes that plaintiff's recovery of penalties under La.Rev.Stat. § 22:1220, if any, is limited to any penalties available under the statute as it existed at the time the cause of action arose.

Finally, the Court notes that a decision for the plaintiffs in this case would not automatically entitle them to recover penalties. "La.R.S. 22:1220 is a penal statute and must be strictly construed, and the insurer has the right to litigate claims without being subjected to damages and penalties." [FN27] Any claim for penalties will have to be presented to the jury separately from the issue of causation of damages and proved by a preponderance of the evidence. "The Louisiana phrase, 'arbitrary, capricious, or without probable cause,' is synonymous with 'vexatious'. Both describe an insurer whose willful refusal of a claim is not based on a good faith defense." [FN28] "Whether an insurer has been arbitrary and capricious is generally a question of fact." [FN29] The Court finds that the issue of any penalties factual matter for the jury to decide.

> FN27. *Bennett v. State Farm Insurance Company,* 869 So.2d 321, 328, 2003-1195 (La.App. 3 Cir. 3/24/04), citing *Darby v. Safeco Ins. Co.,* 545 So.2d 1022 (La.1989).

> FN28. *La. Maint. Serv. Inc. v. Certain Underwriters at Lloyd's of London,* 616 So.2d 1250 (La.1993), citing *Phillip Rosamond Drill. Co.. Inc. v. St. Paul F. & M.I. Co.,* 305 So.2d 630 (La.App. 2nd Cir.1974.

> FN29. *La. Maint. Serv. Inc. v. Certain Underwriters at Lloyd's of London,* 616 So.2d 1250 (La.1993).

**8. Calculations of potential payments available under the homeowner's policy should plaintiffs ultimately prevail.**

While it is true that plaintiffs paid for two separate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 1378507 (E.D.La.)
**(Cite as: 2007 WL 1378507 (E.D.La.))**

policies, one homeowner and one flood, that does not equate to double coverage in the event of a given loss. The flood policy is not excess insurance. Instead, it covers a loss not covered by the homeowner policy. Plaintiffs achieved full coverage by having two policies, so that either homeowner or flood insurance would cover any loss in full, or at least to the value they selected in their contracts. Plaintiffs could have purchased more insurance coverage on either policy by paying higher premiums. By choosing a lower level of coverage, the plaintiffs assumed some of the risk of any potential loss for the benefit of a lower premium. However, even had plaintiffs purchased higher coverage, the matter in dispute in this case would still exist, as Hurricane Katrina caused extensive wind damage and also produced unprecedented flooding. The parties are in disagreement as to the amount of damage caused by the wind itself and the flooding.

The value of the property and the apportionment of damage to either wind or water or both, as discussed earlier, is a matter for the jury to decide. The following examples set forth the calculations that will be used should plaintiffs prevail. These hypothetical examples merely illustrate the calculations, assuming that any burdens of proof have been sufficiently met to satisfy the jury, and in no way are to be interpreted as expressing any opinion by the Court on causation.[FN30] In addition, they do not deal with any penalty issues, which would be a factual matter for the jury to decide.[FN31]

> FN30. The Court is mindful of the possibility the jury could find different percentages of damage were proved for the dwelling than for contents. Should that happen, the Court will adjust the calculations accordingly. In the interests of clarity, the Court will not engage in that speculative calculation here.

> FN31. The Court notes that if the plaintiffs prevailed and the jury awarded penalties, they would have to fall within the proper

statutory limitations as discussed earlier.

*5 As a starting point, the following policy amounts are set forth:

The maximum homeowner policy benefit payable for a 100% covered loss, where the replacement value for the dwelling exceeded the policy limits, is $353,625.00.[FN32] This amount is reached by combining coverage for the dwelling ($172,500.00 plus $34,500.00 [20% excess] for a total of $207,000.00); other structures ($17, 250 .00); and contents ($129,375.00).[FN33] Under no circumstances could the homeowner policy be interpreted to pay any higher amount than $353, 625.00.

> FN32. The defendant points out that if the replacement cost for the dwelling is more than the policy limits, the plaintiff is entitled to a 20 percent increase on that portion of the policy, which provision is designed to protect insureds when replacement costs rise.

> FN33. The maximum homeowner policy benefit payable for a total covered loss, where the replacement value for the dwelling **equaled** the policy limits, would be $319,125. This amount is reached by combining coverages for the dwelling ($172,500.00); other structures ($17, 250.00); and contents ($129,375.00). However, neither party argues that the replacement cost is less than or equals the policy limits in this case. Accordingly, the Court will use the amount derived from applying the 20% bonus in this example.

The maximum flood policy benefit payable for a 100% covered loss was $167,700. This amount is reached by combining coverage for the dwelling ($137,700.00) and contents ($30,000.00). Under no circumstances could the flood policy be interpreted to pay any higher amount than $167,700.00.

***Hypothetical # 1: The jury finds 100% of the dam-***

Not Reported in F.Supp.2d, 2007 WL 1378507 (E.D.La.)
**(Cite as: 2007 WL 1378507 (E.D.La.))**

*age was attributable to wind and 0% was attributable to flooding.*

In this scenario, the plaintiffs would be entitled to the full benefit of the homeowner policy, or $353,625.00. From that amount would be subtracted the payments plaintiffs received from the flood policy, or $167,700.00, to avoid double recovery. The defendant would then owe plaintiffs the difference, or $185,925.00.[FN34]

> FN34. Whether the flood insurance overpayments in a hypothetical situation such as this would have to later be returned to the federal government is not at issue here; again, these calculations are illustrative only.

*Hypothetical # 2: The jury finds 100% of the damage was attributable to flooding and 0% was attributable to wind.*

In this scenario, the plaintiffs would be entitled to the full benefit of the flood policy, or $167,700.00. Plaintiffs have already received this amount from their flood policy, and double recovery would not be an issue. The defendant would owe nothing.

*Hypothetical # 3: The jury finds 25% of the damage was attributable to wind and 75% was attributable to flooding.*

In this scenario, the plaintiffs would be entitled 25% of the homeowner policy benefit, or $88,406.25. Plaintiffs would also be entitled to 75% of the flood policy benefit, or $125,775.00. The total amount awarded to the plaintiff would be $214,181.25. From that amount would be subtracted the payments they have already received from the flood policy, or $167,700.00. The defendant would owe the difference, or $46,481.25.

*Hypothetical # 4: The jury finds 75% of the damage was attributable to wind and 25% was attribut-*

*able to flooding.*

In this scenario, the plaintiffs would be entitled 75% of the homeowner policy benefit, or $265,218.75. Plaintiffs would also be entitled to 25% of the flood policy benefit, or $41,925.00. The total amount awarded to the plaintiff would be $307,143.75. From that amount would be subtracted the payments plaintiffs have already received from the flood policy, or $167,700.00. The defendant would owe the difference, or $139,443.75.

E.D.La.,2007.
Ferguson v. State Farm Ins. Co.
Not Reported in F.Supp.2d, 2007 WL 1378507 (E.D.La.)

END OF DOCUMENT