Westlaw.

Not Reported in F.Supp., 1987 WL 4978 (E.D.La.)
**(Cite as: 1987 WL 4978 (E.D.La.))**

C

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
CONSTITUTION STATE INSURANCE COM-
PANY,
v.
WERNER ENTERPRISES, INC. d/b/a AUGIE'S
DELAGO.
**Civ. A. Nos. 86-1624, 86-3053.**

June 26, 1987.

MINUTE ENTRY

COLLINS, District Judge.

*1 The Court is presented with defendant's, Consti-
tution State Insurance Company, motion for partial
summary judgment and judgment on the pleadings
regarding plaintiff's claims for:

(I) damage to the Augie's Delago restaurant and its
appurtenances allegedly caused by windstorm and
covered under its multi-peril insurance policy with
defendants;

(II) loss of earnings due to business interruptions
caused by windstorm;

(III) consequential losses; and

(IV) claims for unfair trade practices.

I. DAMAGE TO AUGIE'S DELAGO RESTAUR-
ANT AND ITS APPURTENANCES

Defendant contends that the damages to the entire
restaurant, which occurred during Hurricane Juan,
were caused by an excluded peril under its policy
with plaintiff. Specifically, defendant alleges that
the damages came within the policy exclusion
which denies recovery for 'loss caused by, resulting
from, contributed to or aggravated by any of the

following: (2) Flood, surface water, waves, tidal
water or tidal wave, overflow of streams or other
bodies of water, or spray from any of the foregoing,
all whether driven by wind or not.'

If the cause of damage under a windstorm policy is
not the direct result of wind alone, but caused by a
combination of wind and water, then the insured
bears the burden of proof and may not recover un-
less it proves that the damage can be separated and
that the loss or damage was the direct result of
wind. Loyola University v. Sun Underwriters Ins.
Co., 93 F. Supp. 186 (E.D. La. 1950). Here, al-
though defendant has submitted the report of Mr.
Roberts, a meteorologist, to sustain its allegations
that the damage was caused by waves and/or high
water, substantial factual issues still exist as to
whether the damages are separable and whether
damage to the upper stories or other parts of the
restaurant could have been caused directly by the
windstorm.

Defendant further contends that the outdoor appur-
tenances surrounding the north, northeast and west
sides of the building, together with the entrance
walkway and stairs, were excluded under the policy
provision denying property coverage for damage to
'piers, wharves and docks.' Substantially disputed
factual issues remain as to whether the building ap-
purtenances at issue were used substantially as
docking facilities for the loading/unloading of pas-
sengers, etc., or used as deck-patio facilities as an
integral part of the restaurant.

Defendant's contention that the awnings destroyed
by the storm were not property covered under the
policy provisions is not seriously contested. Upon
oral arguments counsel for the parties agreed to
stipulate that the awnings in question were not
covered under the policy.

Considering the above factual issues regarding the
type of peril which caused the damage and whether
the property, other than the awnings, damaged was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 4978 (E.D.La.)
**(Cite as: 1987 WL 4978 (E.D.La.))**

included in the policy provisions, defendant's motion for summary judgment is hereby denied regarding the damage to the restaurant and all its appurtenances, except the awnings. As to plaintiff's claim for damage to the awnings, those claims are DISMISSED.

## II. LOSS OF EARNINGS DUE TO BUSINESS INTERRUPTIONS CAUSED BY THE WINDSTORM

**\*2** The defendant insurer's policy covers damages loss of earnings resulting directly from necessary interruption of business caused by perils insured against limited to $60,000.00 for each 30 days subject to an 'aggregate' limit of liability of $180,000.00. The policy goes on to limit actual losses to those that occur during the interruption of business 'for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged.'

Contractor, Richard Branch, estimated the repairs herein would take three weeks to complete, and George Werner testified that that was the estimate he was given by Branch. Although the actual length of time required to repair may have only been three weeks in this instance, plaintiff has alleged that although initial payments were made to Mr. Branch, due to financial difficulties and the failure of the insurance company to pay, he was unable to secure the contractor's services to perform the repairs in question.

In similar cases involving identical clauses, 'other circumstances <u>not bearing upon what is reasonably necessary to restore the premises to its previous condition</u>' have been held irrelevant in determining the reconstruction period during which the insured may recover loss of earnings. <u>Congress Bar & Restaurant, Inc. v. Transamerica Insur. Co.</u>, 165 N.W.2d 409 (Wisc. 1969) (emphasis added). Yet, availability of funds would arguably be a factor in determining whether the insured used due diligence

in performing repairs. In light of the disputed facts as to the period during which the insured could have, with due diligence, performed the repairs, summary judgment is not appropriate for this issue of damages. Wherefore, defendant's motion for summary judgment on plaintiff's loss of earnings claim is hereby DENIED.

Finally, plaintiff's claim loss of income during the storm, expenses incurred for the annual Halloween party, and loss of goodwill due to the closing of Augie's Delago. Although there remain factual issues in dispute concerning the cause of the damage to the building itself, Werner's testimony clearly shows that losses caused by the interruption of normal business were due to the rising water over the access road eliminating access to the insured premises. Consequently, these damages were caused by an excluded peril, and summary judgment is hereby GRANTED dismissing those claims.

## III. CONSEQUENTIAL LOSSES

Plaintiff's claims for consequential losses caused by the allegedly arbitrary refusal of the insurer to pay are clearly not allowed under Louisiana law. La. C.C. Art. 2000 provides that where plaintiff seeks to enforce an obligation on the part of the insurer and/or its agent to pay money in a suit on the contract, damages due to delay of performance are limited to interest on the unpaid balance from the time it is due, and if appropriate, the imposition of penalties and attorneys fees pursuant to L.R.S. 22:658. <u>See Bye v. American Income Life Insur. Co.</u>, 316 So. 2d 164 (La. App. 4th Cir. 1975).

## IV. CLAIMS FOR UNFAIR TRADE PRACTICES

**\*3** Plaintiff's claims for damages under the Louisiana Unfair Trade Practices and Consumer Protection Law must also be dismissed. LSA-R.S. 51:1406 provides that actions subject to the jurisdiction of the insurance commissioner are exempt from proceedings under the Louisiana Unfair Trade Practices and Consumer Protection Law. Since the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1987 WL 4978 (E.D.La.)
**(Cite as: 1987 WL 4978 (E.D.La.))**

insurance code contains specific provisions for unfair trade practices in LSA-R.S. 22:1213, this action clearly falls within the jurisdiction of the insurance commissioner.   Comeaux v. Pennsylvania General Ins. Co., 490 So. 2d 1191 (La. App. 3rd Cir. 1986).

Wherefore, defendant's motion for judgment on the pleadings regarding plaintiff's claims under the Louisiana Unfair Trade Practices and Consumer Protection Law is GRANTED and plaintiff's claims as to that cause of action are hereby DISMISSED.

To conclude, defendant's motion for summary judgment as to the damage to Augie's Delago Restaurant and its appurtenances, not including awnings, is DENIED. The parties have stipulated to the dismissal of plaintiff's claims for awnings. Defendant's motion for summary judgment as to plaintiff's claims for loss of earnings due to business interruptions caused by the windstorm is DENIED in part and GRANTED as to those losses of income during the storm claimed by plaintiff. Summary judgment is GRANTED regarding plaintiff's claims for consequential losses due to the insurer's failure to pay and GRANTED regarding plaintiff's claims for damages from defendant due to unfair trade practices.

E.D.La., 1987.
Constitution State Ins. Co. v. Werner Enterprises, Inc.
Not Reported in F.Supp., 1987 WL 4978 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

▷
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4. (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
Judy KODRIN; Michael Kodrin, Plaintiffs-Appellees
v.
STATE FARM FIRE AND CASUALTY COMPANY, Defendant-Appellant.
**Nos. 08-30092, 08-30169.**

March 11, 2009.

**Background:** Insureds sued homeowner's insurer in state court for coverage for damage to their home during Hurricane Katrina. After removal, the United States District Court for the Eastern District of Louisiana, 2007 WL 4191916 and 2007 WL 4163437, awarded insureds damages, penalties, plus attorney fees and costs, and insurer appealed.

**Holdings:** The Court of Appeals held that:
(1) court's instructions and interrogatories correctly recited Louisiana law by informing jurors that homeowner's insurer would not be liable if flood caused the damage where neither party contended at trial that a combination of wind and flood destroyed insureds' home, and
(2) insurer could not have been found to have acted in bad faith.

Affirmed in part, vacated in part, and remanded.

West Headnotes

**[1] Insurance 217 ⬗2142(5)**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2139 Risks or Losses Covered and Exclusions
            217k2142 Water Damage
                217k2142(5) k. Surface Water; Flood Exclusions. Most Cited Cases

**Insurance 217 ⬗2165(2)**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2139 Risks or Losses Covered and Exclusions
            217k2165 Proximate Cause
                217k2165(2) k. Combined or Concurrent Causes. Most Cited Cases

**Insurance 217 ⬗3579**

217 Insurance
    217XXXI Civil Practice and Procedure
        217k3579 k. Instructions. Most Cited Cases
District court's instructions and interrogatories correctly recited Louisiana law by informing jurors that homeowner's insurer would not be liable if flood caused the damage where neither party contended at trial that a combination of wind and flood destroyed insureds' home.

**[2] Insurance 217 ⬗2199**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2196 Evidence
                217k2199 k. Burden of Proof. Most Cited Cases

**Insurance 217 ⬗3579**

217 Insurance
    217XXXI Civil Practice and Procedure

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

217k3579 k. Instructions. Most Cited Cases
Under Louisiana law, insureds had burden of prov-
ing that their claim for damage to contents was
covered under named-peril provision of homeown-
er's policy, and instructions given by trial court
properly reflected such burden.

**[3] Insurance 217 ⟨⟩3360**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3358 Settlement by First-Party In-
surer
                217k3360 k. Duty to Settle or Pay.
Most Cited Cases
Homeowner's insurer could not have been found to
have acted in bad faith under Louisiana law solely
on basis that it denied payment to insureds for de-
molition of their home based on its determination
that the home and its contents were destroyed by
storm surge, an excluded cause of loss; insureds
offered no evidence that insurer believed that wind
was likely the cause of the damage but nevertheless
withheld payment. LSA-R.S. 22:658; LSA-R.S.
22:1220 (2008).
**\*672** John W. Redmann, Margaret Elizabeth
Madere, New Orleans, LA, for Plaintiff-Appellee.

William Ryan Acomb, Porteous, Hainkel & John-
son, New Orleans, LA, Adrianne Landry Baumgart-
ner, Porteous, Hainkel & Johnson, Covington, LA,
for Defendant-Appellant.

Appeal from the United States District Court for the
Eastern District of Louisiana, USDC No.
2:06-CV-8180.

Before KING, HIGGINBOTHAM, and WIENER,
Circuit Judges.

PER CURIAM:[FN*]

    FN* Pursuant to 5TH CIR. R. 47.5, the

court has determined that this opinion
should not be published and is not preced-
ent except under the limited circumstances
set forth in 5TH CIR. R. 47.5.4.

**\*\*1** The home of Plaintiffs-Appellees Judy and Mi-
chael Kodrin in Port Sulphur, Louisiana, was de-
molished in Hurricane Katrina. The Kodrins' in-
surer, Defendant-Appellant State Farm Fire and
Casualty Co. ("State Farm"), denied coverage on
their Katrina-related claim, asserting that the dam-
age was excluded from coverage under the policy
because it was caused by flooding rather than wind.
The Kodrins sued State Farm for coverage. A jury
sided with the Kodrins and awarded them $356,318
in damages and penalties, plus attorneys' fees and
costs. State Farm appeals the judgment. We affirm
in part and vacate in part.

## I. FACTS AND PROCEEDINGS

When Judy and Michael Kodrin returned to their
Port Sulphur, Louisiana, home following Hurricane
Katrina in 2005, they found nothing but a concrete
slab and debris. Their home and its contents were
gone. All that remained was their damaged roof,
which lay about 1,000 feet away. Many of the
homes in their neighborhood had been separated
from their foundations by floodwaters, carried off,
then collected together in one area. These other res-
idences had been severely damaged, but **\*673** re-
mained relatively intact, in contrast to the Kodrins'
home, which had been reduced to rubble. Because
the damage to their home appeared different from
that suffered by the other homes in the neighbor-
hood, the Kodrins concluded that theirs was des-
troyed by something other than the massive flood
that occurred when a nearby levee overtopped.
They speculated that a tornado had been spawned
during the storm and had demolished their house
before the floodwaters arrived.

The Kodrins held homeowner's and flood insurance
policies issued by State Farm.[FN1] The limits of
coverage under the homeowner's policy were:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

> FN1. The flood policy was issued through State Farm by the National Flood Insurance Program.

Coverage A (Building, i.e., home)-$105,000

Coverage B (Contents)-$78,750

Coverage C (Outbuildings)-$10,500

The coverage limit under the flood policy was $76,000.

The Kodrins notified State Farm of their homeowner's claim for wind damage on September 17, 2005. A State Farm adjuster inspected the property in mid-October and told the Kodrins that he would inform their insurer that they intended to make a claim for wind damage. State Farm sent a second adjuster to the property on November 26, 2005, the day after the remaining debris had been cleared away. In the meantime, State Farm was administering the payout on the flood policy.[FN2] The Kodrins settled that claim in December for the policy limit. At about the same time, State Farm had denied the wind damage claims that the Kodrins had submitted under the homeowner's policy.

> FN2. Mr. Kodrin testified that State Farm tried to get him to settle the flood policy over the phone, even before sending an adjuster to inspect the property. The Kodrins said they hesitated to settle the flood claim for fear it would jeopardize their claim for wind damage.

The Kodrins filed suit in August 2006 claiming, inter alia, (1) breach of contract; (2) bad faith under Louisiana Revised Statute § 22:1220 ("R.S.22:1220") for failure to adjust claims fairly and promptly and for failure to make reasonable efforts to settle the claims; and (3) arbitrary and capricious failure to make payment in violation of Louisiana Revised Statute § 22:658 (" R.S.22:658 "). State Farm removed the case to the Federal District Court for the Eastern District of Louisiana on the basis of diversity of citizenship.[FN3]

> FN3. State Farm is a citizen of Illinois. The Kodrins are citizens of Louisiana.

**\*\*2** Following a two-day trial in November 2007, a jury found that wind was the cause of the damage to the home and its contents. The jury awarded the Kodrins a total of $196,581, essentially the maximum aggregate amount under the applicable classes of homeowner's coverage, plus $9,737 for additional living expenses,[FN4] $25,000 each to Judy and Michael Kodrin for State Farm's arbitrary and capricious failure to pay within 60 days, and $50,000 each as penalties for that failure, finding State Farm liable under both R.S. 22:658 and 22:1220. The district court also entered judgment in favor of the Kodrins for attorneys' fees and costs in the amount of $139,234 pursuant to R.S. 22:658.[FN5] State Farm moved for judgment as a matter of law or to alter and amend the judgments, which motions were denied. State Farm timely filed its notice of appeal.

> FN4. The total is slightly higher than the combined coverage limits. We have not divined the reason for this, but as State Farm does not raise the issue, we do not quibble with it.

> FN5. The $150,000 in damages and penalties were awarded under R.S. 22:1220.

### \*674 II. ANALYSIS

State Farm raises a number of issues on appeal, each of which falls into either of two general claims of error: (1) The district court improperly instructed the jury, and (2) the Kodrins failed to offer legally sufficient evidence for a jury to find that State Farm acted in bad faith. In a diversity suit, we apply the substantive law of the forum state, in this case, Louisiana.[FN6]

> FN6. *Hyde v. Hoffmann-La Roche, Inc.,* 511 F.3d 506, 510 (5th Cir.2007).

### A. Jury Instructions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

State Farm contends that the jury instructions on the question of wind damage were erroneous because the district court failed to instruct the jury that (1) the Kodrins could recover only if their damage was caused *exclusively* by wind, and (2) the Kodrins had the burden of proving that the damage to the contents of their home was caused by wind.

### 1. Standard of Review

We review for abuse of discretion whether a jury was properly instructed.[FN7] "In diversity actions, a federal court's jury instructions must accurately describe the applicable state substantive law, but the district court has wide discretion in formulating the charge."[FN8] We will reverse "only if the charge as a whole creates a substantial doubt as to whether the jury has been properly guided in its deliberations."[FN9] Even if we find error, "we will not reverse if we determine, based on the entire record, that the challenged instruction could not have affected the outcome of the case."[FN10]

> FN7. *Baker v. Canadian Nat'l/Ill. Cent. R.R.,* 536 F.3d 357, 363-64 (5th Cir.2008).

> FN8. *Id.* at 364.

> FN9. *Id.* at 363-64.

> FN10. *Wright v. Ford Motor Co.,* 508 F.3d 263, 268 (5th Cir.2007) (internal quotation marks and citation omitted).

### 2. Exclusivity of Wind Damage

[1] The Kodrins' homeowner's policy insured their home and its contents against wind damage, but did not provide coverage for damage caused by flooding. Policies of this sort are common and have been much-litigated in the wake of Hurricane Katrina and other recent storms. We have held that a homeowner may recover under such a policy only when wind is the *exclusive* cause of the damage.[FN11] The Kodrins insist that Louisiana courts do

not read the provision so restrictively; rather, that they hold that coverage under a homeowner's policy is available if flooding is not the "proximate or efficient cause" of the damage.[FN12] We acknowledge the existence of tension between the relevant **\*675** case law of this circuit and that of the Louisiana intermediate courts, but we are bound by our own precedent.[FN13] Moreover, in this case, we view the distinction as being of little import. First, the divergent interpretations of this court and the Louisiana courts matter mainly when two forces, such as flood and wind, act together to cause damage. Here, there is no role for such a middle ground: Neither party maintained that wind and flood acted in some combination, only that one or the other caused all the damage. As a result, the jury's only options were 100 percent wind or 100 percent flood.[FN14] It was not presented with facts on which to determine that some combination of the two forces caused the damage, and it was not asked to decide on such a basis.

> FN11. *Bilbe v. Belsom,* 530 F.3d 314, 316-17 (5th Cir.2008) (applying *Leonard v. Nationwide Mutual Insurance Co.,* 499 F.3d 419, 430 (5th Cir.2007), to Louisiana law). The policy provision here at issue-called an "anti-concurrent cause" provision-bars recovery when wind and water act together or in sequence. *Id.*

> FN12. *Landry v. La. Citizens Prop. Ins. Co.,* 964 So.2d 463, 477 (La.App. 3d Cir.2007) ("[T]he fact that flood waters contributed to the damage or washes the property away does not compel a finding that flood damage was the efficient or proximate cause of the total loss."), *vacated in part on other grounds,* 983 So.2d 66 (La.2008); *see also Best v. State Farm Fire & Cas. Co.,* 969 So.2d 671, 675 (La.App. 4th Cir.2007) (quoting 11 COUCH ON INSURANCE 3d, § 153:17). The Kodrins reliance on *Roach-Strayhan-Holland Post No. 20, American Le-*

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

gion Club v. Continental Insurance Co. of New York is misplaced. 237 La. 973, 112 So.2d 680 (1959). The case interpreted a policy providing wind damage coverage following a windstorm and rejected consideration of the contribution of other factors, such as building decay, to the damage. Id. at 683. Although the policy contained a water damage exclusion, the exclusion was not at issue, indeed the court noted that the windstorm policy was "not otherwise limited or defined." Id.

FN13. See, e.g., FDIC v. Abraham, 137 F.3d 264, 268-69 (5th Cir.1998) (addressing instance of intervening contrary state appellate court decisions); see also First Nat'l Bank of Durant v. Trans Terra Corp. Int'l, 142 F.3d 802, 809 (5th Cir.1998) (decision of state intermediate court is a "datum for ascertaining state law," which must be considered by, but is not binding on this court). In this case, Bilbe was decided in 2008 after both Landry and Best.

FN14. State Farm contends that the jury was left to contemplate that a wind-driven storm surge might have destroyed the home and, thus, to determine incorrectly that wind coverage was permissible. See, e.g., Bilbe, 530 F.3d at 317 n. 3 ("The classic example of such a concurrent windwater peril is the storm-surge flooding that follows on the heels of a hurricane's landfall."). In Bilbe, the plaintiff sought coverage under her homeowner's policy based on the contention that Hurricane Katrina's winds drove the storm surge that inundated her home. Finding "storm surge" to be essentially synonymous with "flooding," the court affirmed the denial of coverage. Id. at 316. In the instant case, we find no merit in State Farm's assertion: The Kodrins maintained that a pre-flood tornado, not a

wind-driven storm surge, destroyed their home.

**\*3** Second, our holding in Bilbe creates a stricter rule than the Louisiana appellate court's Landry holding and thus is more favorable to State Farm-indeed, State Farm asserts that under Bilbe we must reverse. When we apply Bilbe, however, the jury instructions survive, so that even if we could consider Landry, we would not need to reach the issue. Thus, following Bilbe, the Kodrins could recover under their homeowner's policy only if the jury should find that wind alone, and not flooding at all, caused their loss. Conversely, if the jury should find that flooding destroyed the home, the policy's exclusionary clause would bar recovery.FN15

FN15. It is important to distinguish between this dispute over which force totally destroyed a home and cases in which the parties disagree as to the causes of various damaged elements of a home. Distinct elements of damage would have to be considered separately. Flood-damaged carpets, for example, would not bar recovery for a wind-damaged roof.

State Farm claims that the wording of the jury instructions vitiated the effect of the policy's flood exclusion by failing to make clear the all-or-nothing requirement of the homeowner's policy-as outlined in Bilbe. After stating that the Kodrins had the burden to prove that their claim was covered by the policy, the district court instructed the jury:

State Farm argues that it properly refused payment to the Kodrins based on its determination that the damage to plaintiffs' property was caused by water, which falls under the flood exclusion in plaintiffs' homeowner's policy, and not by wind. Under Louisiana law, State Farm bears the burden of proving the applicability of any exclusionary clause contained in its insurance policy by a preponderance of the evidence. If you find that State Farm has met its burden of proving by a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

preponderance of the evidence that the property damage *676 claimed by the Kodrins was caused by a non-covered peril, such as flooding, then State Farm is not liable to plaintiff for any damages under the policy.

State Farm complains that this instruction did not allow the jury to reach a third conclusion, *viz.,* that both wind and flood contributed to the damage and that, if this were the case, the Kodrins could not recover at all.

We are satisfied that the jury instruction correctly and unambiguously recited the law applicable in this case: If flood caused the damage "then State Farm is not liable." Again, neither State Farm nor the Kodrins contended at trial that a combination of wind and flood destroyed the Kodrins' home. State Farm insisted that flooding was the sole cause; the Kodrins were equally insistent that wind was the sole cause. The district court correctly observed that a complicated instruction addressing the combination of the two forces would be likely to do more harm than good, causing confusion by attempting to address a fact pattern not before the jury. As the parties claimed only that either wind alone or flood alone destroyed the home, it is they, not the court, who left the jury no way to find that the damage was caused by some combination of the two.

*3. Jury Interrogatories*

State Farm also complains that the jury interrogatories compounded the problem by asking only about wind. The first interrogatory asked: "Do you find by a preponderance of the evidence that Mrs. Kodrin sustained wind damage to her home?" The ensuing questions regarding other structures on the property and the contents of the home were worded identically.[FN16] If the jury answered the first questions for each category of property in the affirmative, the next interrogatory asked: "What amount does State Farm owe Mr. and/or Mrs. Kodrin for wind loss to their property?" The verdict form di-

vided this question by type of property: dwelling, other structures, dwelling contents, and additional living expenses.

> FN16. They asked: "Do you find by a preponderance of the evidence that Mrs. Kodrin sustained wind damage to any other structure on her property?" and "Do you find by a preponderance of the evidence that Mr. and Mrs. Kodrin sustained wind damage to the contents of their home?"

**4 We can see that, if viewed in a vacuum, the interrogatories might be confusing, but we are comfortable that on the basis of the discrete facts of this case and the way it was tried by the parties, they were not. First, as already discussed, neither side presented its case on a theory that wind was a *contributing* factor; wind either did or did not cause the damage entirely, depending on which party's version was accepted by the jury. This issue was central during the trial: State Farm argued vigorously that flooding caused the damage and for that reason, the Kodrins could not recover; the Kodrins argued the reverse. The jury was never presented with facts that would permit it to find that the wind caused some but less than all the damage or that flood caused some but less than all the damage, which is the concern State Farm raises. Additionally, the jury charge itself made clear that if flooding caused the damage, recovery was barred. As a result, the jury could answer the interrogatories affirmatively and find in favor of the Kodrins if-but only if-it found that flooding did not contribute to the destruction of the Kodrins' property. We always presume that jurors follow the instructions given by the trial court,[FN17] and State Farm offers no argument to persuade us to abandon this well-established presumption here.

> FN17. *Russell v. Plano Bank & Trust,* 130 F.3d 715, 721 (5th Cir.1997) (*quoting United States v. Fletcher,* 121 F.3d 187, 197 (5th Cir.1997)).

*677 The district court has broad discretion in for-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

mulating jury instructions, and in this case offered a sound rationale for its choice. State Farm must demonstrate that the language creates "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations."[FN18] Instead, its argument rests on the contention that the district court omitted an instruction regarding an argument not made by either side at trial. "In reviewing a trial judge's instruction to a jury, we must look at the charge as a whole."[FN19] When taken together and in context, the district court's instructions and interrogatories amply state the applicable law. As such, the trial court acted well within its discretion.

> FN18. *FDIC v. Mijalis*, 15 F.3d 1314, 1318 (5th Cir.1994) (internal quotation marks and citation omitted).

> FN19. *Farace v. Indep. Fire Ins. Co.*, 699 F.2d 204, 207 (5th Cir.1983).

*4. Burden of proof*

[2] Even though State Farm had the burden of proof that the damage to the Kodrins' home was excluded from coverage, the Kodrins had the burden of proof at all times with respect to coverage of their contents. Unlike the policy provision for coverage of the structure, the provision for coverage of its contents was on a so-called "named-peril basis," meaning that the contents of the Kodrins' home were covered *only if* they were damaged by an enumerated cause. "Windstorm or hail" were enumerated causes; flooding was not. This contrasts with the coverage provision for the Kodrins' home itself which was covered *unless* it was damaged by an enumerated exclusion, of which flooding was one. A named-peril provision requires the policyholder to prove that the claim is covered. Thus, the Kodrins had the burden of proof that the damage to or loss of the contents of their home was caused by wind.[FN20]

> FN20. *See, e.g., Best v. State Farm Fire & Cas. Co.*, 969 So.2d 671, 675 (La.App. 4th

Cir.2007) (quoting *Carriere v. Triangle Auto Serv.*, 340 So.2d 665, 666 (La.App. 4th Cir.1976)); *see also Opera Boats, Inc. v. La Reunion Française*, 893 F.2d 103, 105 (5th Cir.1990).

**\*\*5** The district court instructed the jury that the Kodrins had the burden of proving that their claims were covered. Specifically, the jury charge included four individual elements that the Kodrins had to prove:

> 1) That a valid enforceable contract existed between the parties; 2) That the claim for damage being made under the policy *is covered by the policy;* 3) The amount of the claim for damages under the contract; and 4) that State Farm breached the policy by failing to pay a covered claim.[FN21]

> FN21. Emphasis added.

The district court also instructed the jury that State Farm had the burden to prove the applicability of the exclusionary clause. State Farm protests that the district court did not provide a separate instruction regarding the burden of proof for the contents. Its argument appears to assume that the jury would interpret the instruction as to the exclusionary clause to mean that State Farm had the burden of proof across the boards.

The language of the charge is plain, and State Farm's suggested instruction would be largely redundant. The district court instructed the jury in detail that the Kodrins had the burden of proving coverage and that this burden only shifted with respect to the exclusionary clause.[FN22] (The jurors had the policy in front of them.) As **\*678** no exclusionary clause applied to the contents provision, the burden of proof obviously remained on the Kodrins. The interrogatories then separated out each of the categories of covered property so that the jury had to find with specificity that the cause of damage to each was wind if the Kodrins were to prevail.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

FN22. State Farm conflates this case with those in which plaintiffs proved only that damage was caused by a hurricane and insisted that was sufficient proof to bring a claim within coverage of a homeowner's policy. See, e.g., Broussard v. State Farm Fire & Cas. Co., 523 F.3d 618, 624-25 (5th Cir.2008). In Broussard, the plaintiff claimed to have fulfilled his burden by proving, without more, that the damage to his personal property resulted from Hurricane Katrina. We held that the plaintiff had to go further and prove that the damage was caused by a named peril, i.e., wind. Id. Broussard is inapposite to the instant case because there is no question that here the jury was instructed that the Kodrins had to do more than demonstrate the claimed damage was caused by a hurricane.

The interrogatory relevant to contents asked: "Do you find by a preponderance of the evidence that Mr. and Mrs. Kodrin sustained wind damage to the contents of their home?" If the jury instruction left any doubt as to the burden of proof of the cause of contents damage or loss, this interrogatory made perfectly clear that, to recover, the Kodrins had to prove wind damage to their contents.[FN23] Indeed, the entirety of the Kodrins' position at trial was that wind, not flooding, caused every bit of their damage. There is no basis on which the jury could have thought that State Farm had the burden of proof with respect to that provision. The instruction properly placed the burden on the Kodrins for proving coverage as the result of wind damage, and there it remained with the sole exception of the exclusionary clause that had no applicability to contents. Thus, to hold otherwise would require not only abandoning the presumption that jurors follow instructions, but also assuming, with no evidence or basis whatsoever, that these jurors acted in direct contravention to the charge given.

FN23. We construe the jury charge and interrogatories as a whole. Baker v. Canadian Nat'l/Ill. Cent. R.R., 536 F.3d 357, 363 (5th Cir.2008); Consol. Cigar Co. v. Tex. Commerce Bank, 749 F.2d 1169, 1173 (5th Cir.1985) ("[T]he test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of [the] issues and its duty to determine [the] issues.").

**B. Bad Faith**

*1. Standard of Review*

We review a district court's denial of a motion for judgment as a matter of law de novo and apply the same standards as the district court.[FN24] We construe the facts and draw all inferences in favor of the non-moving party, here, the Kodrins. We will reverse only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party."[FN25] Although our review is de novo, we afford "great deference" to the jury's verdict.[FN26]

FN24. Baker, 536 F.3d at 362.

FN25. Piñeda v. United Parcel Serv., Inc., 360 F.3d 483, 486 (5th Cir.2004).

FN26. Id.

*2. Analysis*

**\*\*6** Under Louisiana law, an insurer owes its policyholder a duty of good faith in settling claims.[FN27] Failure to pay a claim within 30 days of being presented with satisfactory proof of loss is a breach of the duty if it is "arbitrary, capricious, or without probable cause."[FN28] In Louisiana, such **\*679** a breach exposes the insurer to liability for damages and discretionary penalties under R.S. 22:1220 or to penalties and attorneys' fees under R.S. 22:658.[FN29] R.S. 22:1220 and 22:658 are penal in nature and must be construed strictly.[FN30]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

FN27. LA.REV.STAT. § 22:1220 (2007).

FN28. LA.REV.STAT. § 22:658(B)(1) (2007). Under R.S. 22:658(B)(1) "[f]ailure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor ... when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty ... as well as reasonable attorney fees and costs." An insurer is liable under R.S. 22:1220(B)(5) for "failing to pay the amount of any claim due any person insured by the contract *within sixty days* after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause." Emphasis added.

FN29. A plaintiff may get penalties under only one of the two statutes, whichever is higher, although he may get attorneys' fees under R.S. 22:658 if he is awarded penalties under R.S. 22:1220. *Calogero v. Safeway Ins. Co. of La.*, 753 So.2d 170, 174 (La.2000).

FN30. *Sher v. Lafayette Ins. Co.*, 988 So.2d 186, 206 (La.2008).

The insured has the burden of proving that the insurer acted in bad faith.[FN31] Under the applicable statutes, "arbitrary and capricious" means "vexatiously," as in a "vexatious refusal to pay" or a refusal to pay without reason or justification.[FN32] An insurer does not act arbitrarily or capriciously when its refusal to pay a claim is based on a genuine dispute over coverage or the amount of the loss.[FN33]

FN31. *Reed v. State Farm Mut. Auto. Ins. Co.*, 857 So.2d 1012, 1021 (La.2003).

FN32. *Id.*

FN33. *Id.; see Saavedra v. Murphy Oil U.S.A., Inc.*, 930 F.2d 1104, 1111 (5th Cir.1991).

The only evidence that the Kodrins offered to demonstrate that this denial was in bad faith is the fact of the denial itself and their expert's testimony that wind actually caused the damage to the home. This is evidence that State Farm was wrong about the cause of damage, but without more, it is not evidence of bad faith. An insurer cannot be held to have acted in bad faith simply because it eventually turned out to be wrong about the cause of the damage.[FN34] "Where there is a serious dispute as to the nature of the loss, thus leaving the question of coverage in doubt, the insurer's refusal to pay the claim is not arbitrary, capricious or without probable cause."[FN35] Instead, the Kodrins had the burden of proving that State Farm withheld payment unjustifiably and without cause, and they failed to do so. For example, the Kodrins offered no evidence that State Farm believed that wind was likely the cause of the damage but nevertheless withheld payment.

FN34. *Icklone v. Travelers Indem. Co.*, 345 So.2d 202, 203 (La.App. 3d Cir.1977) ("Penalties may not be assessed merely because the insurer is the unsuccessful litigant in a lawsuit.").

FN35. *Id.* At least one Louisiana court has held that when the cause of damage is hotly contested at trial this is evidence that the insurer *did not* act in bad faith. *Block v. St. Paul Fire & Marine Ins. Co.*, 742 So.2d 746, 755 (La.App. 2d Cir.1999).

[3] State Farm denied payment to the Kodrins under their homeowner's policy on its determination that the home and its contents were destroyed by the storm surge (i.e., flooding), an excluded cause of loss.[FN36] State Farm declared that it determined flooding was the more likely cause of the damage to the home because (1) the Kodrins' neighborhood was inundated when a levee was overtopped during Hurricane Katrina, (2) the Kodrins' home was just one house away from that levee, and (3) many other

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

houses in the area were lifted off their foundations and destroyed by the floodwaters. The Kodrins themselves acknowledged that their claimed wind damage to their home was unusual in their neighborhood, advancing that a tornado must have caused the damage as their speculation why their home was the *680 only one in the area destroyed by wind, not flooding. On these facts, we perceive no probative evidence that State Farm acted in bad faith. State Farm's refusal to pay was with reason, FN37 even if the jury ultimately rejected that reason. FN38 The Kodrins have failed to prove otherwise; they essentially ask this court to find bad faith any time an insurer denies coverage and a jury disagrees. This would unduly pressure insurers to pay out claims that they have reason to believe lie outside the scope of coverage, solely to avoid penalties later. Such a rule would pervert the presumption that insurers act in good faith unless the insured proves bad faith, and this is foreclosed by Louisiana law. FN39

FN36. *See, Bilbe v. Belsom,* 530 F.3d 314, 317 (5th Cir.2008).

FN37. *Molony v. USAA Prop. & Cas. Ins. Co.,* 708 So.2d 1220, 1226 (La.App. 4th Cir.1998) (insurer's refusal to pay is not arbitrary and capricious "if there is a reasonable dispute between the insurer and insured as to the amount of a loss."). In this case, the dispute was over the all-or-nothing cause of the loss, not over some combined cause.

FN38. A determination of whether an insurer acted in good faith is based on the information known to the insurer at the time it refused payment. *La. Bag Co., Inc. v. Audubon Indem. Co.,* 999 So.2d 1104, 1113-14 (La.2008).

FN39. We caution insurers, however, that simply denying coverage on the basis that damage was caused by an excluded peril is not a route to avoiding R.S. 22:1220 and

22:658 penalties and fees. We decide this case on the Kodrins' failure to present evidence legally sufficient to prove bad faith.

**7 Awards and penalties under R.S. 22:1220 and 22:658, including damages awarded under R.S. 22:1220 for mental anguish, require that the insurer be proved to have acted arbitrarily and capriciously in violation of these statutes. As we hold that, as a matter of law, the Kodrins failed to bear their burden of proving that State Farm acted in bad faith, we vacate the district court's awards of penalties and damages under R.S. 22:1220 and its award of attorneys' fees under R.S. 22:658.

### III. CONCLUSION

We affirm the jury's finding of coverage and its award of damages for the loss of the Kodrins' home and its contents under the homeowner's policy. We vacate that portion of the court's judgment awarding penalties, damages, and attorneys' fees under R.S. 22:1220 and 22:658 resulting from the jury's finding of bad faith. We therefore remand this case to the district court with instructions to enter a revised judgment consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED for entry of judgment in accordance herewith.

C.A.5 (La.),2009.
Kodrin v. State Farm Fire and Cas. Co.
314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 537149 (E.D.La.)
**(Cite as: 2009 WL 537149 (E.D.La.))**

C
Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Patrick R. THOMPSON and Connie Eason
Thompson
v.
STATE FARM FIRE AND CASUALTY COM-
PANY.
**Civil Action No. 07-6733.**

March 3, 2009.

West KeySummary
**Insurance 217 ⟜3374**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3373 Amount and Items Recoverable
                217k3374 k. In General. Most Cited
Cases

**Insurance 217 ⟜3375**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(C) Settlement Duties; Bad Faith
            217k3373 Amount and Items Recoverable
                217k3375 k. Attorney Fees. Most
Cited Cases
Under Louisiana law, homeowner was not entitled
to award of enhanced penalties and attorney fees in
action against property insurer for bad faith breach
of contract. The homeowner's cause of action ac-
crued prior to the enactment of the statutory amend-
ment providing for enhanced penalties and attorney
fees, and the legislature did not intend the amend-
ment to apply retroactively. LSA-R.S. 22:1220,
22:658 (2005), 1:2.

Steven Barth Witman, Valerie Theng Matherne,
Law Offices of Steven B. Witman, Metairie, LA,
for Patrick R. Thompson and Connie Eason

Thompson.

Lindsay A. Larson, III, Adam Patrick Massey,
Christian A. Garbett, Sr., David A. Strauss, King,
Krebs & Jurgens, PLLC, New Orleans, LA, for
State Farm Fire and Casualty Company.

*ORDER & REASONS*

ELDON E. FALLON, District Judge.

**\*1** Before the Court is the Plaintiffs' Motion for
Partial Summary Judgment (Rec.Doc. No. 27), the
Defendant's Motion for Summary Judgment as to
Attorneys' Fees (Rec.Doc. No. 19), the Defendant's
Motion for Summary Judgment as to Coverage "B"
and "C" (Rec.Doc. No. 19), and the Defendant's
Motion for Summary Judgment as to Bad Faith
Claims (Rec.Doc. No. 21).

**I. BACKGROUND**

This case arises out of property damage as a result
of Hurricane Katrina. The Plaintiffs allege that the
hurricane caused extensive wind damage to the
home in which Plaintiffs were renting and residing,
located at 5844 Louis XIV Street in New Orleans,
Louisiana. Plaintiff originally filed suit against
State Farm Fire and Casualty Company ("State
Farm") in state court alleging that they held an in-
surance contract with State Farm covering their
home. The Plaintiffs notified State Farm of their
loss on September 5, 2005. Plaintiffs allege negli-
gence, breach of contract, bad faith, and arbitrary
and capricious action by State Farm and seek dam-
ages for property loss, loss of use and mental an-
guish, as well as penalties, attorneys' fees and costs
against State Farm pursuant to La.Rev.Stat. §§
22:658,[FN1] and 22:1220 [FN2]. State Farm has
answered and denies liability.

    FN1. Effective January 1, 2009, Section

Slip Copy, 2009 WL 537149 (E.D.La.)
**(Cite as: 2009 WL 537149 (E.D.La.))**

22:658 was renumbered and is now titled Section 22:1892. See La. Acts 2008, No. 415, § 1.

FN2. Effective January 1, 2009, Section 22:1220 was renumbered and is now titled Section 22:1973. See La. Acts 2008, No. 415, § 1.

On October 11, 2007, State Farm removed the case from state court asserting diversity jurisdiction pursuant to 28 United States Code Section 1332.

## II. MOTIONS AND ANALYSIS

### A. State Farm's Motion for Partial Summary Judgment as to Plaintiffs' Claim for Attorneys' Fees

State Farm seeks summary judgment as to Plaintiffs' claims for enhanced penalties and attorneys' fees under the amendments to La.Rev.Stat. § 22:658. State Farm contends that the 2006 amendment to Louisiana Revised Statute 22:658 is inapplicable to the Plaintiffs' claims, which, according to State Farm, accrued prior to the amendment. In response, the Plaintiffs argue that before the amendment, on November 8, 2005, the Plaintiffs provided satisfactory proof of loss only for their personal property located in the loft of the house based on the instructions of State Farm's adjuster. The Plaintiffs argue that they did not provide the Defendant with a full inventory of destroyed items, as an attachment to Responses to Request for Production of Documents, until May 12, 2008 after the effective date of the amendment, and that this list contained new damages that the Plaintiffs discovered they could submit.

Louisiana has two statutes which deal with enhanced damages where an insurer fails to timely pay covered claims: La.Rev.Stat. § 22:1220 and La.Rev.Stat. § 22:658. Attorneys' fees are neither specifically provided for nor recoverable under La.Rev.Stat. § 22:1220, *Malbrough v. State Farm Fire and Cas. Co.*, 1996 WL 533630 (E.D.La.

Sept.13, 1996), nor La. Civ.Code art 1997. *Sher v. Lafayette Insurance Co.*, 07-2441 (La.2008); 988 So.2d 186, 201. In 2003, the Louisiana Legislature amended Louisiana Revised Statute Section 658 to increase the statutory penalties for an insurer's bad faith breach of contract. Whereas the prior version of the statute had allowed for recovery of attorney's fees and penalties equal to only 10% of the plaintiff's proven damages, the 2003 amendment increased the penalty provision to 25% but omitted any award for attorney's fees. *See* 2003 La. Acts No. 790. On August 15, 2006, the Legislature again amended the statute, this time increasing the penalty provision to 50% of the plaintiff's proven damages and allowing for the award of attorney's fees.

**\*2** Because the Plaintiffs' cause of action accrued prior to the enactment of the amendment and the Legislature did not intend the amendment to apply retroactively, the amendment is not applicable to the Plaintiffs' claims. *Sher v. Lafayette Insurance Co.*, 07-2441 (La.2008); 988 So.2d 186. The Plaintiffs allege that State Farm acted in bad faith by failing to timely resolve their claims after sending an adjuster to inspect the residence in October 29, 2005. Under Louisiana law, in general "the determinative point in time separating prospective from retroactive application of an enactment is the date the cause of action accrues." *Cole v. Celotex*, 599 So.2d 1058, 1063 (La.1992); *see also Brown v. RJ Reynolds Tobacco Co.*, 52 F.3d 524, 527 ("A cause of action accrues when a plaintiff may bring a lawsuit."). Further, there is no evidence that the Louisiana Legislature intended the amendment to apply retroactively; rather, there is, to the contrary, considerable evidence that the Legislature intended not to apply the amendment retroactively. *See* La.Rev.Stat. Ann. § 1:2 ("No Section of the Revised Statutes is retroactive unless it is expressly so stated."); La. Civ.Code Ann. Art. 6 (1999) ("In the absence of contrary legislative expression, substantive laws apply prospectively only."); *see also Broussard v. State Farm Fire & Cas. Co.*, No. 06-8084, 2007 WL 2264535, *8 (E.D.La.Aug.2, 2007) ("The legislature did not include such an ex-

Slip Copy, 2009 WL 537149 (E.D.La.)
**(Cite as: 2009 WL 537149 (E.D.La.))**

pression [of retroactive application] in 2006 La. Acts No. 813, and federal and state courts have consistently declined to read in a legislative intent to retroactively apply amendments to Section 22:658 in its absence.").

In the instant case, the Plaintiffs' cause of action accrued upon State Farm's alleged bad faith in failing to timely resolve their claims after receiving the initial proof of loss-well before the Legislature amended Section 658.

The Louisiana Supreme Court's ruling in *Sher* clarified the law regarding the retroactivity of La.Rev.Stat. § 22:658, and the ruling discusses only two factual situations in which the amended statute could apply retroactively: (1) when satisfactory proof of loss is not first made before the effective amendment date (August 15, 2006), but a petition for damages is served after to trigger the amended statute, and (2) when the plaintiff discovers new damages and makes satisfactory proof of loss after the effective amendment date. *Calypso Bay, L.L.C. v. State Farm Fire and Cas. Co.,* No. 06-4367, 2008 WL 4286492 (E.D.La. Sept.19, 2008).

The Defendant argues that to allow Plaintiffs to get higher penalties and attorneys' fees would reward the Plaintiffs for failing to comply with the contract and giving an incorrect estimate of damages in the original proof of loss. In *Calypso Bay,* the plaintiffs argued that a new estimate of roof damage, submitted after the effective date of the amendment, allowed the plaintiffs to recover under the amended statute. However, the court found that the report did not show any new damages, and stated that the "[p]laintiff simply cannot benefit from its own adjuster's incorrect estimate, and later claim that the correction is a 'new' damage entitling it to increased penalties and claims for attorney's fees." *Id.* at *5. Similarly, the Plaintiffs in the instant case cannot rely on their own failure to submit an adequate inventory of damages to trigger the amendment.

*3 The Plaintiffs notified State Farm of their loss in September, 2005, State Farm inspected the property in October, 2005, and payment was made in November, 2005. The Plaintiffs first submitted a satisfactory proof of loss before the effective date of the amendment. Furthermore, the Plaintiffs do not contend that the inventory list that they submitted in 2008 included newly discovered damages. Accordingly, the Court grants the Defendant's motion for summary judgment on this issue and finds that the Plaintiffs' recovery of penalties under Section 22:658, if any, is limited to 25% of the amount found to be due to them under their homeowner's policy, and they are not entitled to attorney's fees.

**B. Plaintiffs' Motion for Partial Summary Judgment on Additional Living Expenses**

Plaintiffs seek summary judgement finding that their additional living expense ("ALE") coverage includes costs to move into a new apartment, where the rent in the new apartment was less than the amount they paid before the hurricane. In response, the Defendant argues that the Plaintiffs seek undocumented expenses, that the terms of the policy do not cover instances where the cost of rent is lower than the Plaintiffs' original rental expenses, and that the Plaintiffs' recovery depends on whether the premises were made uninhabitable due to a covered loss.

In *Young v. State Farm Fire & Cas. Ins. Co.,* 426 So.2d 636 (La.App. 1 Cir.1982), the defendant appealed the award of additional living expenses. The policy stated that it "covers the necessary increase in living expense incurred by the Named Insured to continue as nearly as practicable the normal standard of living...." *Id.* at 644-45. The plaintiff argued that even if no additional living expenses were incurred, he was still entitled to the fair value of what it would have cost to maintain the same standard of living as he had enjoyed in the larger house. The court found that since there was no evidence that additional expenses incurred or were required to maintain the plaintiff in a standard of living to that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 537149 (E.D.La.)
**(Cite as: 2009 WL 537149 (E.D.La.))**

which he was accustomed, the award of ALE was in error.

Similarly, the policy issued by State Farm in the instant case states, "When a Loss insured causes the residence premises to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living ..." Rec. Doc. No. 27-2. It is undisputed that the Plaintiffs' residence was uninhabitable. It is further undisputed that the cost of rent was less in the Plaintiffs' new premises was less than that in their original premises. To the extent that Plaintiffs seek ALE for rental costs that were less than that in their original premises, the Plaintiffs cannot recover. To the extent they seek damages for other expenses, the extent and nature of those expenses is a factual issue and summary judgment is not appropriate at this time.

**C. Defendant's Motion for Summary Judgment as to Coverage "B" and "C"**

*4 State Farm seeks summary judgment regarding Plaintiffs' recovery under Coverage "B" for personal property, and Coverage "C" for loss of use. State Farm argues that the Plaintiffs cannot recharacterize their personal property losses as ALE to recover for both, citing *Carlyon v. Aetna Cas. & Surety Co.*. 413 So.2d 1355, 1358 (La.App.1982). In that case, "[S]heets, towels, clothing and kitchen utensils [were] an expense of repairing or replacing personal property which had been damaged or destroyed by the fire and therefore fell within the coverage of the unscheduled personal property." The plaintiffs recovered for these losses under their insurance for personal property damage. The court found, "therefore, they were not additional living expenses as contemplated by the parties under the policy, but were recoverable under the loss or damage to unscheduled personal property provisions." *Id.* To the extent that the Plaintiffs seek to recover for these losses under both their ALE and personal property claims, summary judgment for the Defendant is granted.

The Defendant further urges that the Plaintiffs are not entitled to ALE after they moved into their new residence in October, 2005. The Defendant argues that ALE is meant only to provide for a transitional period, and the Plaintiffs, as renters, incurred no new expenses eligible for ALE coverage after they settled into their new rental home. The Plaintiffs' circumstances gives rise to a genuine issue of material fact as to when the Plaintiffs settled into their new home and incurred any additional living expenses after October 2006 to do so.

State Farm argues that the Plaintiffs have not met their burden of proving the existence of the loss, that such expenses were in addition to or an increase over normal living expenses, and that they were necessitated by covered damage. The Plaintiffs assert that they submitted sufficient evidence of their damages. The Plaintiffs further allege that they incurred necessary costs and cite an expert report as evidence that the expenses were caused by wind. The Defendant responds that the report does not credibly demonstrate the cause of Plaintiffs' personal property damage. The extent of the loss and whether the losses were caused by covered damage are factual issues and summary judgment is inappropriate at this time.

**D. State Farm's Summary Judgment Motion as to Bad Faith Claims**

State Farm seeks summary judgment on the Plaintiffs' claims for statutory bad faith penalties. Louisiana law provides that statutory penalties may be assessed against insurers in certain situations for failure to timely resolve claims or pay settlement awards. For example, Louisiana Revised Statute § 22:658 provides that failure to timely pay or attempt to settle a claim in certain circumstances shall subject the insurer to a penalty "when such failure is found to be arbitrary, capricious, or without probable cause." La.Rev.Stat. § 22:658 (B)(1). Louisiana Revised Statute § 22:1220 sets forth that an insurer that breaches its "duty of good faith and fair dealing" to the insured shall be sub-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 537149 (E.D.La.)
(Cite as: 2009 WL 537149 (E.D.La.))

ject to statutory penalties. La.Rev.Stat. § 22:1220.

**\*5** Under Louisiana law, however, the determination of whether an insurer acted arbitrarily, capriciously, or without probable cause necessarily depends on the facts of each individual case. *See Roberie v. S. Farm Bureau Cas. Ins. Co.,* 250 La. 105, 194 So.2d 713, 716 (La.1967) ("A determination as to what constitutes bad faith or lack of good faith depends on the facts and circumstances of each case."); *see also Combetta v. Ordoyne,* 04-2347, pp. 8-11 (La.App. 1 Cir. 5/5/06); 934 So.2d 836, 842-43 ("In order to determine whether or not an insurer acted reasonably and in good faith in negotiating and settling a claim, one must look to the facts of the individual case."). Moreover, in bad faith actions against an insurer, the insured bears a considerable burden because "the insured is seeking extra-contractual damages, as well as punitive damages." *See Lewis v. State Farm Ins. Co.,* 41-527, p. 25 (La.App. 2 Cir. 12/27/06); 946 So.2d 708, 725. The insured must prove that the "insurer knowingly committed actions which were completely unjustified, without reasonable or probable cause or excuse." *See Holt v. Aetna Cas. & Sur. Co.,* 28450-CA, p. 18 (La.App. 2 Cir. 9/3/96); 680 So.2d 117, 130."

Turning to the instant case, the Court finds that State Farm did not act arbitrarily, capriciously, or without probable cause in resolving the Plaintiff's insurance claims. State Farm had a reasonable basis to defend against the Plaintiffs' claim in light of the fact that the property was flooded with over six feet of water. An inspection of the Plaintiffs' property in October 2005 revealed extensive flood damage, which is not covered by the Plaintiffs' policy. The adjuster's assessment of the wind-related damage was subsequently verified by Defendant's expert, finding that the extent of wind damage was minimal. The Plaintiffs were paid for the damage to all of their contents above the flood line. The Plaintiffs seek damages for the property below the flood line. The Plaintiffs' position is that the property below the flood line was first damaged by a covered peril,

namely wind driven rain, and they are entitled to recover for this damage even if the flood further damaged the property. There is a legitimate issue as to whether and to what extent wind driven rain damaged the property below the flood line since it sat in flood waters for several weeks. To deny such claim as a result of the findings of an inspection is not arbitrary or capricious.

In addition, the Plaintiffs seek an additional amount of over $20,000 in ALE under their loss of use coverage (Coverage "C"). However, there is a genuine dispute as to whether the receipts appropriately documented the Plaintiffs' additional living expenses, and whether the Plaintiffs experienced any necessary increase in their costs; thus the Plaintiffs have not set forth any evidence that State Farm's actions were arbitrary, capricious or without probable cause. Although it may well be true that the amounts paid are not sufficient to fully compensate the Plaintiffs for the damages to the property, the fact that the parties dispute the total damages caused by a covered peril does not warrant the imposition of statutory penalties for bad faith. As a result, the Court finds that State Farm is entitled to summary judgment as to the claims for statutory bad faith penalties.

### III. CONCLUSION

**\*6** For the reasons stated above, the Defendant's Motion for Summary Judgment as to Attorneys Fees (Rec.Doc. No. 19) is GRANTED, the Plaintiffs' Motion for Partial Summary Judgment (Rec.Doc. No. 27) is DENIED, the Defendant's Motion for Summary Judgment as to Coverage "B" and "C" (Rec.Doc. No. 20) is GRANTED in part and DENIED in part, and the Defendant's Motion for Summary Judgment as to Bad Faith Claims (Rec.Doc. No. 21) is GRANTED.

E.D.La.,2009.
Thompson v. State Farm Fire and Cas. Co.
Slip Copy, 2009 WL 537149 (E.D.La.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Slip Copy, 2009 WL 537149 (E.D.La.)
**(Cite as: 2009 WL 537149 (E.D.La.))**

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

Only the Westlaw citation is currently available.

United States District Court, W.D. Louisiana,
Alexandria Division.
FERRELLGAS, L.P.
v.
James W. McCONATHY, et al.
**Civil Action No. 1:10-cv-00178.**

March 15, 2010.

John D. Ryland, Provosty Sadler et al, Alexandria, LA, Rick Frawley, Ferrellgas, Liberty, MO, for Ferrellgas, L.P.

Robert P. Lombardi, Kullman Firm, New Orleans, LA, for James W. McConathy, O'Nealgas Inc.

### RULING

DEE D. DRELL, District Judge.

*1 Before the Court is a Motion for Preliminary Injunction (Doc. 5) filed by the plaintiff. For the following reasons, the plaintiff's motion will be DENIED. Disposition will follow by a separate judgment.

### I. Background

The plaintiff, Ferrellgas, L.P. ("Ferrellgas"), is a Louisiana propane retail and services company. Ferrellgas employed defendant James W. McConathy ("Mr.McConathy") as the operations manager of its service center in Bossier City, Louisiana. On March 24, 1998, Mr. McConathy signed a Ferrellgas Employee Agreement ("Agreement") which contained confidentiality, non-competition, and non-solicitation clauses. Most controversially, the non-competition/solicitation clause [FN1] provided that, "in the county or counties where Employee had contact with Ferrellgas customers on behalf of

Ferrellgas," Mr. McConathy was not to "directly or indirectly, in person or through others, for the benefit of [Mr. McConathy] or another, call upon, solicit, sell, divert, take away, deliver to, accept business or orders, or otherwise deal with Ferrellgas' Customers, nor shall Employee, in any capacity, assist another to do so." (Doc. 1-1, p. 1, Part III, ¶ 6(a)). The Agreement also contains provisions describing "Confidential Information," which Ferrellgas claims is valuable proprietary information under its exclusive ownership.[FN2] As to the geographical boundaries of the non-competition clause, no specific parishes (or counties) are identified by name, or referenced in any attachments to the Agreement. All Ferrellgas employees were required to sign the same contract.

> FN1. As we will explore in more detail below, the language pertaining to competition and solicitation flows together in the Agreement. For the sake of clarity, we will refer to the provision as the "non-competition clause."

> FN2. This information consists, in part, of "Customer Information," a term defined in the Agreement basically as relevant proprietary and consumer-related information pertaining to past, current, and prospective Ferrellgas customers. (Doc. 1-1, p. 3, Exh. A).

Mr. McConathy's employment with Ferrellgas was terminated, suddenly and unexpectedly, on the evening of Friday, October 9, 2009. According to Mr. McConathy, he was fired just before 5:00 p.m., left the building immediately, and returned the next day to collect his personal items. His supervisor was waiting for him, and his computer had already been removed from his office. Subsequently, Mr. McConathy was hired by defendant O'Nealgas, Inc. ("O'Nealgas"), a propane retailer in direct competition with Ferrellgas. According to Ferrellgas, Mr. McConathy, with the assistance of O'Nealgas, is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

improperly using Confidential Information and other trade secrets to solicit Ferrellgas customers.

On February 8, 2010, Ferrellgas filed a complaint (Doc. 1), alleging: (1) Mr. McConathy has breached the terms of the Agreement by improperly using confidential and other trade secret information to solicit Ferrellgas customers; and (2) the Confidential Information used by Mr. McConathy constitutes "trade secrets" under the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. R.S. § 51:1431 et seq., and as such, Mr. McConathy's use of that information constitutes "misappropriation" in violation of the LUTSA.[FN3]

> FN3. The complaint seeks an order: (1) enjoining Mr. McConathy from soliciting Ferrellgas customers, interfering with Ferrellgas's relationships with its customers, or aiding others in doing so; (2) enjoining Mr. McConathy and O'Nealgas from using Ferrellgas's Customer Information; (3) enjoining Mr. McConathy from any further breaches of the Agreement, and ordering his compliance with the terms of the Agreement; (4) awarding compensatory damages; (5) awarding attorneys' fees; and (6) awarding any other just relief.

The plaintiff moved for a preliminary injunction barring Mr. McConathy's solicitation of its customers and use of its trade secrets. (Doc. 5). The Court held a preliminary injunction hearing on February 26, 2010, at which several witnesses testified and counsel for both parties submitted arguments to the Court. Mr. McConathy testified that he has solicited approximately ten of Ferrellgas's 8,500 to 10,000 customers, and has only been successful at acquiring the business of one Ferrellgas customer. Mr. McConathy contends that: (1) the Agreement is invalid under Louisiana statutory law because it failed to list the parishes in which solicitation of Ferrellgas customers would be prohibited; (2) the Agreement contains a vague term used to describe the parishes contemplated by the agreement; and (3) the identity of and other information pertaining

to Ferrellgas customers is not confidential information or trade secrets, and thus, its use cannot constitute a violation of the LUTSA.

*2 In spite of a forum selection clause in the Agreement which provides that Missouri law would govern any disputes arising under the contract, we observed, and the parties have agreed, that Louisiana law, as it stood in 1998, properly applies in this case. The contract was executed in Louisiana by a Louisiana resident at plaintiff's north Louisiana office. Following the hearing, the Court afforded the parties the opportunity to further brief the issues which the Court considered vital to the disposition of Ferrellgas's motion. After carefully reviewing all of the information submitted by the parties, the Court is now prepared to rule.

## II. *Law and Analysis*

### A. Preliminary Injunction

To be granted the "extraordinary equitable remedy" of a preliminary injunction, a plaintiff must establish four elements:

> (1) a substantial likelihood of success on the merits;

> (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied;

> (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and

> (4) that the injunction will not disserve the public interest.

*Reliant Energy Servs., Inc. v. Enron Canada Corp.,* 349 F.3d 816, 826 n. 7 (5th Cir.2003) (quoting *Hoover v. Morales.* 164 F.3d 221, 224 (5th Cir.1998)). In determining whether to grant a preliminary injunction, "the court must ... state the findings and conclusions that support its action." Fed.R.Civ.P. 52(a)(2).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
(Cite as: 2010 WL 1010831 (W.D.La.))

Given the extraordinary nature of the remedy, "a preliminary injunction ... should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville,* 577 F.3d 250, 253 (5th Cir.2009) (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.,* 328 F.3d 192, 195-96 (5th Cir.2003)). Furthermore, in accord with settled precedent sanctioning less formal procedures at the preliminary injunction stage, the Court has considered evidence which may otherwise be inadmissible, including hearsay evidence. *See Sierra Club, Lone Star Chapter v. F.D.I.C.,* 992 F.2d 545, 551 (5th Cir.1993) (internal citations omitted). Notwithstanding procedural informalities, however, the record must clearly support the Court's decision as to whether to grant a preliminary injunction. *See Petrello v. Nath,* No. 08-20718, 2009 WL 3416230, at *4 (5th Cir. Oct.23, 2009).

Here, the principal focus of both parties has remained upon the likelihood that Ferrellgas's claims will be successful on the merits. More specifically, the linchpin issues in this case are whether Ferrellgas will likely prevail in its attempt to enforce the non-solicitation clause in the Agreement, or obtain injunctive relief based upon the defendants' alleged violations of the LUTSA.

**B. The Agreement**

Ferrellgas first argues that Mr. McConathy has solicited or provided services to Ferrellgas customers with whom he had contact as a Ferrellgas employee, in clear violation of the terms of the Agreement. Mr. McConathy conceded that he has solicited Ferrellgas customers in parishes in which he had contact with those customers as a Ferrellgas employee. In short, Mr. McConathy basically admitted that he has breached the spirit, if not the terms, of the Agreement. However, the defendants argue that: (1) the non-competition clause was unenforceable under Louisiana law in force when the agreement was executed, because it fails to specifically list the parishes to which it applies; (2) the non-competition

clause is unenforceable because some of its terms are vague; and (3) the "Savings Clause" in the contract cannot be used to reform or delete invalid provisions because the Court would have to take a word-by-word approach to make the terms enforceable. Because we agree with the defendants' first argument, we will not address the latter two points in detail.

*3 Louisiana public policy has strongly and consistently disfavored agreements restraining trade, such as non-competition and non-solicitation agreements. *See SWAT 24 Shreveport Bossier, Inc. v. Bond,* 808 So.2d 294, 298 (La.2001) (noting "the longstanding public policy of Louisiana ... to prohibit or severely restrict [noncompetition] agreements"); *see also Millet v. Crump,* 687 So.2d 132, 135 (La.App. 5th Cir.1996) ("Louisiana has a strong public policy against non-competition agreements."). Accordingly, the Louisiana statute governing non-competition provisions begins with the statement that "[e]very [such] contract or agreement, or provision thereof ... except as provided in this Section, shall be null and void." La. R.S. § 23:921(A).

Valid non-solicitation clauses are therefore the exception, rather than the rule. Such exceptions are provided for within the statute. The Louisiana Supreme Court made clear that, under Louisiana law in effect in 1998, non-solicitation clauses which met the statutory requirements were generally enforceable. Specifically, the 1989 amendment to La. R.S. § 23:921 (which was still in force at the time that Mr. McConathy signed the Ferrellgas contract) "limited a valid noncompetition agreement to one in which the employee agreed to refrain from 'carrying on or engaging in a business similar' to that of the former employer or from soliciting customers of the employer subject to certain other restrictions." *SWAT 24,* 808 So.2d at 305. The court interpreted this provision to mean that "an employee whose noncompetition agreement comports with the requirements of La. R.S. § 23:921(C) may be validly restricted from carrying on or engaging in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

his own competing business *and from soliciting customers of the employer for his own competing business or the competing business of another." Id.* at 307 (emphasis added). Therefore, in principle, Ferrellgas was allowed to include a non-solicitation clause in its employment contracts which applied to former employees working for Ferrellgas competitors, such as O'Nealgas.

However, a non-solicitation clause must comport with the requirements of the governing Louisiana statute to be enforceable. In general, a non-competition provision must be strictly limited to designated parishes and contain a maximum term of two years. *See* La. R.S. § 23:921(C). The statute provides, in relevant part, that an employee "may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer *within a specified parish or parishes,* municipality or municipalities, or parts thereof." *Id.* (emphasis added).[FN4] While non-solicitation clauses are theoretically distinct from non-competition clauses, they must still independently satisfy the requirements of La. R.S. § 23:921(C). *VartechSys., Inc. v. Hayden,* 951 So.2d 247, 260-61 (La.App. 1st Cir.2006). The proper interpretation of the italicized "geographical limitation" clause has generated a longstanding controversy among Louisiana courts.

> FN4. This current language has remained unchanged since the agreement was signed, and therefore, we will refer to this provision in the present tense for the sake of clarity.

*4 Mr. McConathy argues, and the bulk of Louisiana courts agree, that a noncompetition agreement must identify by name the parishes or municipalities to which it applies. For instance, the majority of Louisiana appellate courts have held that "general reference in the agreement to whatever parishes, counties or municipalities the Company conducted business did not comply with the statute." *Bell,* 983 So.2d at 933 (chronicling Louisiana cases in agree-

ment); *accord. L & B Transport, LLC v. Beech,* 568 F.Supp.2d 689, 693 (M.D.La.2008) ("Because Section 921 speaks to non-competition within a specified parish or parishes, municipality or municipalities, or parts thereof, Louisiana courts have stated that non-competition agreements failing to specify the parish, municipality or parts thereof are unenforceable.") (internal quotation omitted).[FN5] Similarly, Louisiana courts have consistently rejected cases in which the geographical limitation contained in a non-competition agreement was expressed only in terms of distance.[FN6] In short, when a non-competition agreement fails to name or list the parishes to which it applies, most courts in Louisiana will find the agreement invalid. *See, e.g., Aon Risk Servs.,* 807 So.2d at 1060-61.

> FN5. Other instances abound in which courts have rejected non-competition clauses that merely referenced, rather than listed by name, the parishes or municipalities to which they applied. *See, e.g., Action Revenue Recovery, L.L.C. v. eBusiness Group, L.L.C.,* 17 So.3d 999, 1003 (La.App. 2d Cir.2010) (rejecting a non-competition clause which applied "to all parishes or counties ARR/FAC covers on a like business in said parishes or counties"); *Aon Risk Servs., Inc. v. Ryan,* 807 So.2d 1058, 1060-61 (La.App. 2d Cir.2002) (invalidating a non-competition clause which covered ' "whatever parishes, counties and municipalities the Company or Hall'... conducted business").

> FN6. *See, e.g., Garcia v. Banfield Pet Hosp., Inc.,* No.2009 CA 0466, 2010 WL 199263, at *3 (La.App. 1st Cir. Jan.21, 2010) (invalidating a "non-competition agreement [which] prohibit[ed] competition 'within a six-mile (6) radius of either of the [Clinic's] places [of] business on the date of her termination of employment' "); *Francois Chiropractic Ctr. v. Fidele,* 630 So.2d 923, 926 (La.App. 4th Cir.1993)

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

(refusing to enforce a non-competition agreement that precluded competition "within a ten (10) mile radius of the outer city limits of New Orleans, Louisiana").

By contrast, the Louisiana Third Circuit Court of Appeal "has held that the failure to identify each parish by name does not automatically nullify the agreement; rather, its validity depends on whether the area is 'identifiable.' " *Monumental Life Ins. Co. v. Landry,* 846 So.2d 798, 801 (La.App. 3d Cir.2003). In one such opinion, the court found "identifiable" the parishes covered by a provision barring competition and solicitation "within the parishes in which [the plaintiff] carries on a like business." *Petroleum Helicopters, Inc. v. Untereker,* 731 So.2d 965, 968 (La.App. 3rd Cir.1999) . The court reasoned that the employee plaintiff would "surely be aware of the parishes in which [the employer defendant] conducts its business." *Id.* Ferrellgas has put forth a very similar rationale in this case.

The Louisiana Supreme Court has not definitively resolved this issue. As such, we must observe the following standards in reaching our determination:

When a state's highest court has not decided an issue involving the application of state law, "it is the duty of the federal court to determine, as best it can, what the highest court of the state would decide." "Although we are not bound by state appellate court decisions, we will not disregard them 'unless [we are] convinced by other persuasive data that the highest court of the state would decide otherwise.' "

*Verdine v. Ensco Offshore Co.,* 255 F.3d 246, 252 (5th Cir.2002) (quoting *Transcon, Gas Pipe Line Corp. v. Transp. Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992)).

Ultimately, we find no reason to conclude that the Louisiana Supreme Court would deviate from the approach articulated by the majority of the state appellate courts. The state's high court has held that

"because [non-competition agreements] are in derogation of the common right, they must be strictly construed against the party seeking their enforcement." *Swat 24,* 808 So.2d at 298. Taking into account the strong public policy component involved, Louisiana courts have generally required "mechanical adherence to the requirements listed in the law (especially the geographical and time limitations)." *Sentilles Optical Servs., Div. of Senasco, Inc. v. Phillips,* 651 So.2d 395, 399 (La.App. 2d Cir.1995). Moreover, in order to give effect to the word "specified" in the statute, courts must require that parishes be designated, rather than enforce general phraseology which would allow the geographical scope of non-competition agreements to be expanded and contracted *ad infinitum. See Aon Risk Servs.,* 807 So.2d at 1060-61.

**\*5** Again, the disputed clause in this case prohibits competition or solicitation "in the county or counties where Employee had contact with Ferrellgas customers on behalf of Ferrellgas." (Doc. 1-1, p. 1, Part III, ¶ 6). This clause substantially compares to language prohibiting competition in parishes where the employer conducts business, which has been consistently rejected by most Louisiana courts. The language is also far more indefinite than a distance-oriented limitation. Overall, the Agreement here not only fails to specifically list the parishes that it covers, but also does not make reference to any list or other data set which would clearly define its scope. Therefore, we find that the non-competition provision does not conform to the requirements of La. R.S. § 23:921(C), at least as interpreted by the majority of Louisiana appellate courts.

Even if the Third Circuit interpretation of the statute were correct, however, we find that the disputed provision in this case does not make the parishes which it covers sufficiently "identifiable." We first must blow past the fact that the contract only refers to "counties," and does not mention Louisiana geography at all. Then, although Ferrellgas has submitted to the Court in its filings a list of twenty par-

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

ishes assigned to the Bossier City service center, no such listing was included in, attached to, or referenced by the contract that Mr. McConathy signed. In fact, no documentary evidence before the Court indicates that those twenty parishes are the sole territory of the Bossier City service center. Rather, the testimony and filings indicated that these parishes are in some way "assigned to" the Bossier City location.

Nonetheless, if a twenty-parish territory for the Bossier City service center had been made clear in the evidence, the geographical limitation in the Agreement contains further ambiguities. Nowhere does the non-competition provision state that it applies in parishes assigned to any particular service center, or the service center at which the employee works. Instead, the agreement specifies "the county or counties where Employee had *contact* with Ferrellgas customers on behalf of Ferrellgas." (Doc. 1-1, p. 1, Part III, ¶ 6(a)). Uncontroverted testimony adduced at the hearing showed that communicating with past, current, and prospective customers was at least a significant portion of Mr. McConathy's job. The term "contact," however, is not defined in the Agreement.[FN7] Mr. McConathy estimated that his customer base at Ferrellgas vacillated between 8,500 and 10,000 customers. (Doc. 16, p. 86). The retail propane market, by all accounts, is a highly volatile and competitive one, with customers exchanging information and changing providers at a rapid rate. More importantly, however, Mr. McConathy testified that, in certain circumstances, he interacted with potential customers, face-to-face, not only in parts of Louisiana not "assigned to" Bossier City, but also in other states.

> FN7. Counsel for the plaintiff attempted to assemble a definition of the term "contact" from the definitions of two other terms in the Agreement, as well as its "plain and ordinary meaning." (Doc. 20, pp. 5-6). The complexity of that process, in and of itself, evidences the flaws in the provision. Nevertheless, the definition is: "contacts of a

commercial nature which occurred between the employee and any person or entity that has either (a) purchased propane-related goods or services within the last two years, or (b) been actively solicited by Ferrellgas or receive a quote, proposal or estimate with [sic] the last year." (Doc. 20, p. 5). Of course, the terms within this definition contain ambiguities (such as the use of the phrase "actively solicited"). What distinguishes this sort of definition from even the most elastic construction of La. R.S. § 23:921 is that the employee would be required to make a number of rather complex, time-consuming, and individualized determinations regarding Ferrellgas customers. Doing so would be challenging for a current employee of a business with far less customers in a far less chaotic market. Doing so for Mr. McConathy after he was terminated from Ferrellgas, without access to Ferrellgas's records, would be overwhelming or impossible.

**\*6** By any definition, then, use of the term "contact" to mark the geographical boundaries of the Ferrellgas Agreement left those boundaries far from "identifiable." Such vagueness is fatal to enforcement of the provision in Louisiana, even under the more forgiving standards specified by the Third Circuit. For instance, the court in *Gearheard v. De Puy Orthopaedics, Inc.* rejected a non-competition provision which applied "to the DePuy Territory in which [Gearheard] sold Products at the time of the change in control," because the agreement failed to define the term "sold." No. CIV.A.99-1091, 1999 WL 638582, at \*5 (E.D.La.1999). The court explained that "[t]he term 'sold' in the non-competition provision at issue is more equivocal than the broad terms 'carries on a like business,' " and thus, was "vague in its geographical scope and ... [failed to] substantially conform to the requirements of [the statute]." *Id.* The term "contact" in the Ferrellgas Agreement suffers from this same de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

ficiency.

In sum, application of the non-competition provision in the Ferrellgas Agreement is amorphous at best. Given the strong public policy disfavoring restraints on competition, the mandate that we strictly construe non-competition agreements against the employer, the ambiguity of the terms of this Agreement, and the volatility of the market to which it applies, we find that the Ferrellgas Agreement is unenforceable. In ruling on these particular facts, we in no way imply that a legally enforceable non-competition agreement could be drafted in this market. We merely find that the Ferrellgas Agreement does not pass muster under governing Louisiana law.[FN8]

> FN8. It is of no moment that Mr. McConathy, as Ferrellgas's employee and agent, attempted to enforce the Agreement against an employee in the past. Counsel for the plaintiff points to a prior lawsuit filed by Ferrellgas against a former employee, seeking injunctive relief based upon very similar grounds. *Ferrellgas, L.P. v. Redwine*, No. 1:07-cv-1036. That case was resolved by settlement before the Court ruled upon the viability of the Agreement, and any positions taken by Mr. McConathy on the company's behalf in that proceeding do not impact our legal conclusions in this case.

Moreover, we decline to reform the Agreement to bring it into conformity with La. R.S. § 23:921(C). The Agreement contains a "Savings Clause" which states: "The provisions of this Agreement are separate and severable. If any provision in this Agreement is determined to be void, that provision may be changed or deleted by a Court so that this Agreement may be enforced." (Doc. 1-1, p. 2, Part IV, ¶ 9). Although Ferrellgas has not emphasized the potential application of this clause in its arguments to the Court, fair resolution of this case requires that we address it.

In some limited instances, Louisiana courts have applied severability clauses to enforce otherwise invalid non-competition agreements. Most notably, the Louisiana Supreme Court in *SWAT 24* reaffirmed its prior enforcement of a severability clause which "did not require a court to reform, redraft, or create a new agreement," but rather "required only that the offending portion of the agreement be severed." 808 So.2d at 308-09. Ultimately the court found that "[t]he language of the Agreement makes it possible to excise the offending language from the noncompetition clause without doing undue damage to the remainder of the provision." *Id.*[FN9]

> FN9. At least one appellate court viewed the *SWAT 24* decision as an expansive one: "Prior to *SWAT 24*. Louisiana courts had allowed reformation of non-compete agreements that were overly broad, but only those that were unreasonable as to territory or time. The decision in *SWAT 24* indicates a more expansive use of severability or savings clauses to reform and enforce non-compete agreements." *Vartech Sys., Inc.,* 951 So.2d at 257 n. 10 (citations omitted).

In this case, Mr. McConathy argues that the non-competition provision would either have to be excised or rewritten entirely to be enforced. We agree. The noncompetition and non-solicitation provisions are largely intertwined in the Agreement.[FN10] Severing these clauses in some way would thus be a word-by-word exercise. Even so, the offending language is not readily replaceable. If the Court were to omit the "contact" clause in the Agreement, it would be forced to either generate and substitute its own clause, or leave the Agreement with no geographical scope whatsoever. Both alternatives are legally impermissible.

> FN10. The next paragraph in the Agreement, however, prohibits direct or indirect interference "with the business relationship between Ferrellgas and any Ferrellgas Customers." (Doc. 1-1, p. 2, Part III, H 6(b)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
(Cite as: 2010 WL 1010831 (W.D.La.))

To whatever extent this provision may be considered a part of the non-competition agreement, it is subject to the same geographical limitation as the preceding provision, and causes no independent enforceability issues.

*7 Interpreting the doctrine of reformation as it has been applied to Louisiana non-competition clauses, the court in *L & B Transport, LLC* declined to revise an otherwise invalid non-competition clause, stating:

[T]he majority of the courts in Louisiana decline to save invalid non-competition provisions through reformation. If courts always reformed invalid non-competition provisions, "employers would be free to routinely present employees with grossly overbroad covenants not to compete." Furthermore, the reformation of these non-competition provisions would "place courts in the business of either saving or writing a contract that is not generally favored by law."

568 F.Supp.2d at 693-94 (internal citations omitted). Both scenarios contemplated by the court appear in this case: the non-competition provision presented in the Ferrellgas Agreement, as we have explained, is "grossly overbroad," and attempting to enforce the provision would impose upon the Court the improper task of rewriting the contract. *See id.* As such, the Savings Clause in the Agreement may not be applied in this case.

Therefore, the Court finds that the non-competition provision in the Ferrellgas Agreement is invalid and unenforceable under Louisiana law. Ferrellgas's motion for preliminary injunction is accordingly DENIED as it applies to the Agreement.

### C. The LUTSA

Ferrellgas next argues that Mr. McConathy and O'Nealgas are using Customer Information, as that term is defined in the Agreement, to solicit Ferrellgas customers.[FN11] Ferrellgas maintains that

Customer Information may properly be characterized as "trade secrets," as such information is compiled and kept secret at great effort and expense to the company. They also claims that Mr. McConathy's alleged use of such information constitutes "misappropriation" under the LUTSA, because Mr. McConathy was obligated to protect the secrecy of this information under the Agreement. (Doc. 1-1, p. 1, Part III, ¶ 5). The defendants, however, argue that: (1) customer identities are not trade secrets; (2) Ferrellgas cannot show that the defendants have "misappropriated" any information; and (3) Customer Information includes lists, but not an employee's general knowledge or memory regarding Ferrellgas customers.

FN11. "CustomerInformation" is defined in the Agreement as "information that Ferrellgas has developed, acquired, organized, compiled, or maintained regarding its customers, former customers, and prospective customers while developing and operating its business, including, but not limited to, information relating to their identity, location, personnel, usage of petroleum products, and incidental or related appliances, equipment and supplies, purchasing experience, delivery schedules and routing, payment habits, credit experience, renewal and expiration dates, and other terms and conditions contained in contracts and ownership of storage facilities." (Doc. 1-1, p. 3, Exh. A).

Broadly, the LUTSA proscribes the misappropriation of information that constitutes "trade secrets." *See* La. R.S. § 51:1431. A plaintiff may obtain injunctive relief for either "[a]ctual or threatened misappropriation." La. R.S. § 51:1432.[FN12] "In order to show that the trade secrets have been misappropriated, [the employer] would have to prove that (1) a trade secret existed, and (2) that they were misappropriated by the [employee]." *Advance Prods. & Svs., Inc. v. Simon*, 944 So.2d 788, 793 (La.App. 3d Cir.2006).[FN13]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
(Cite as: 2010 WL 1010831 (W.D.La.))

FN12. The statute also contains provisions allowing claimants to recover damages for actual losses and unjust enrichment. *See* La. R.S. § 51:1433.

FN13. The term "misappropriation" is defined as

disclosure or use of a trade secret of another without express or implied consent by a person who ... at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

La. R.S. § 51:1431(2). There is a logical argument that Mr. McConathy's use of Ferrellgas's Customer Information would be "misappropriation," if he had such information and if it constituted "trade secrets." The latter two issues, however, are in serious doubt, and will thus occupy the bulk of our analysis.

The LUTSA provides a specific definition of the term "trade secret": "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that ... derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and ... is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
*8 La. R.S. § 51:1431(4). Phrased differently, "[a] trade secret is information that has independent economic value because it is not generally known or readily ascertainable and efforts are taken to maintain the information's secrecy." *SDT Indus., Inc. v. Leeper,* 793 So.2d 327, 333 (La.App. 2d Cir.2001). Determining whether information qualifies as trade secrets is a question of fact. *Corrosion Specialties and Supply, Inc. v.*

*Dicharry,* 631 So.2d 1389, 1391 (La.App. 5th Cir.1994). However, Louisiana courts have held that "[a] customer list or special pricing list may be a trade secret if efforts are made to maintain its secrecy." *Pontchartrain Med. Labs. Inc. v. Roche Biomedical Labs., Inc.,* 677 So.2d 1086, 1090 (La.App. 1st Cir.1996) (citing *Wyatt v. PO2. Inc.,* 651 So.2d 359 (La.App. 2d Cir.1995); *see also Core v. Martin,* 543 So.2d 619, 621 (La.App. 2d Cir.1989) ("Although customer lists may constitute trade secrets, the threshold inquiry in every trade secrecy case is whether a legally protectable trade secret exists in fact.").

In this case, Ferrellgas maintains detailed customer records on its computer system, to which all employees have access. This may raise an issue of whether appropriate efforts are made by Ferrellgas to keep that data secret. However, that issue is moot, because there is no evidence, and no formal allegation by Ferrellgas, that Mr. McConathy is using or is in possession of any type of physical customer list. While there was some testimony at the preliminary injunction hearing expressing suspicion that Mr. McConathy may have retained a customer list, or other Ferrellgas data, no evidence to corroborate such an allegation has been presented to the Court. Instead, Mr. McConathy testified that he was suddenly terminated, his computer was removed from his office, he removed his personal items under the watch of his supervisor, and that he took nothing belonging to Ferrellgas upon his termination.

Ferrellgas is correct that, under the LUTSA, there is no explicit requirement that information must be in writing in order to be considered "trade secrets." Thus, according to Ferrellgas, the types of information that Mr. McConathy is purportedly utilizing which may constitute trade secrets are: (1) expertise that Mr. McConathy acquired as the manager of Ferrellgas's Bossier City service center, such as knowledge of "contract terms, credit information, volume usage, propane decision makers, pricing arrangements, and margins" (Doc. 20, p. 10) pertain-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

ing to Ferrellgas's customers ("customer information"); and (2) the identities of and relationships with Ferrellgas customers ("customer identities").

As to the first category, there is no evidence before the Court indicating that Mr. McConathy is in possession of any customer information beyond what he may remember from his frequent interactions with customers. Put simply, Ferrellgas has presented no evidence that Mr. McConathy took any customer files, has any means of accessing Ferrelgas's record system, or otherwise retained physical data relative to its customers. Mr. McConathy's memory as to the reliability, value, and operations of certain customers does not constitute "trade secrets." *See Millet,* 687 So.2d at 136 (holding that information that an insurance agent "could recall ... about renewals on some of her former clients because of the long-term relationship with them through her business as well as socially" did not constitute trade secrets). Moreover, the expertise and knowledge acquired by Mr. McConathy is not protected under the LUTSA. Louisiana courts have repeatedly emphasized that "[a] former employee who enters business in competition with his former employer necessarily utilizes the experience he acquired and the skills he developed while in a former employment." *Boncosky Servs., Inc. v. Lampo,* 751 So.2d 278, 287 (La.App. 1st Cir.1999); *see also Ashland Chemical, Inc. v. Lombardino,* No. 92-2434, 1993 WL 390147, at *4 (E.D.La. Sept. 23, 1993) ("Clearly, a former employee is 'allowed to rely on his memory or general knowledge and skill gained in his former employment' without violating a nondisclosure covenant.") (quoting *NCH Corp. v. Broyles,* 749 F.2d 247, 254 (5th Cir.1985)).

**\*9** Additionally, a number of facts cast serious doubt upon the secrecy of customer information in general in this case. Testimony at the hearing indicated that, while possibly time-consuming to compile, most or all of Ferrellgas's customer information may be obtained by lawful means. O'Nealgas has frequently solicited Ferrellgas customers, and has likely gathered such information on its own.

Furthermore, gas purchasing customers in this market often disclose contract terms and pricing arrangements amongst themselves and to competing providers, in order to obtain more favorable terms, according to the hearing testimony. Much of the information sought to be protected by Ferrellgas is subject to frequent change given the nature of the industry in general and this market in particular.

Perhaps most importantly, there is no evidence before the Court of an "[a]ctual or threatened misappropriation" of any customer information which may justify the issuance of an injunction. *See* La. R.S. § 51:1432.. Even if Mr. McConathy memorized some information related to some of Ferrellgas's thousands of customers, and even if that information constituted "trade secrets," there has been no firm indication that he used such information to solicit Ferrellgas customers as an employee of O'Nealgas.

Thus, we are left only with the issue of whether Mr. McConathy's memory of some Ferrellgas customers may be protected under the LUTSA. We find that the identity of Ferrellgas's customers on these facts may not properly be characterized as "trade secrets." Any such identities that Mr. McConathy recalls were learned through his experience with Ferrellgas, and have not been retained in list form. Mr. McConathy's awareness of customer identities, along with some customer information, falls within the general category of knowledge, savvy, and skills which a former employee is entitled to utilize in competition with a former employer. *See Boncosky Servs., Inc. v. Lampo,* 751 So.2d 278, 287 (La.App. 1st Cir.1999). To repeat, Mr. McConathy's memory of the names and addresses of his customers does not constitute protected "trade secrets":

> Under the circumstances of this case, [the defendant's] mental knowledge, from years of employment with [the plaintiff], of the names and addresses of the plaintiff's customers are not trade secrets since they are easily ascertainable and generally available to the public. Louisiana courts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

have consistently declined to issue an injunction against a former employee's solicitation of customers when the former employee relied on his memory and did not have a list.

*L & B Transport, LLC v. Busby,* No. 06-310-FJP-SCR, 2008 WL 4845103, at * (M.D.La. Feb.12, 2008) (quoting *Weighing & Control Servs., Inc. v. Bert Williams,* No. 88-5211, 2008 WL 4845103, at *1 (E.D.La. Jan. 24, 2009); *see also Millet,* 687 So.2d at 135-36 (holding that customer names, addresses, and renewal times were not "trade secrets" because the former employee committed much of this information to memory, or was reminded of the information when former customers initiated contact).[FN14]

> FN14. We recognize that the contact information for some customers in this area may not be highly publicized. But considering the free flow of information in the propane gas market, customer identities may be fairly characterized as "generally accessible," at least among competing providers in the same geographical area.

***10** A closely analogous case involved a claim for damages by a plaintiff nurse staffing business against its former regional director, brought under the Louisiana Unfair Trade Practice and Consumer Protection Law, La. R.S. 51:1401, *et seq.,* a statute comparable in many ways to the LUTSA. *Nursing Enters., Inc. v. Marr,* 719 So.2d 524, 526 (La.App. 2d Cir.1998). In that case, the defendant resigned from her position and formed her own nurse staffing business in competition with the plaintiff. *Id.* at 526-27. After finding no evidence that the defendant took any property (such as an actual list of customers) with her upon resigning, the court next considered whether the defendant "misappropriated information considered to be trade secrets which she obtained during her employment." *Id.* at 529. In denying the plaintiff's unfair trade practices claim, the court reasoned as follows:

  The evidence shows that [the defendant] did

not violate her fiduciary duty to Nursing [the plaintiff] by using its trade secrets in the formation and operation of Lifeline. In fact, the information Nursing alleges [the defendant] misappropriated does not qualify as trade secrets. As for nurse lists, the evidence shows that [the defendant] ... had a personal relationship with many of these nurses and one could expect the nurses to follow [the defendant] if they were being treated well by her and the company with which she was associated. In addition, these nurses were not exclusive to one agency. The testimony showed that nurses usually signed on with more that one agency to ensure they had consistent work. Finally, [the defendant] testified that she was a member of an organization through which she could receive a list of all nurses in the state of Louisiana.

  Nursing claims that [the defendant] used either client lists or the relationships established with clients during her employment with Nursing to lure those clients, especially Willis-Knighton Hospital, to do business with Lifeline. As stated by [the defendant], the names and numbers of the hospitals and other medical providers is easily accessible through the local telephone book....

  Nursing also claims that [the defendant] misappropriated information related to nurses' salaries and client charges. Again, even if proven to be true, this information does not constitute trade secrets. The testimony shows that nurses routinely volunteered how much they were being paid by an agency. [The defendant] testified that she and other agency directors exchanged information and that the hospitals would release information relating to other agencies' charges in an effort to get a better contract price from her.

*Id.*

The circumstances before the Court are highly comparable to the facts in *Nursing Enters., Inc.,* Developing personal relationships with clients was an important aspect of Mr. McConathy's job at Fer-

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

rellgas. He testified that the one and only Ferrellgas customer who has come to O'Nealgas since his employment initiated contact with him. (Doc. 16, pp. 49-50, 77, 83-84). According to the evidence, customers routinely change providers in the propane industry, and share a great deal of information regarding their arrangements, such as contract terms, prices, and volume with competing providers in order to obtain lower quotes. Information passes between customers and competitors very frequently, and thus, rival companies often know a great deal about one another's operations. As we have noted, and the evidence explains, customers may volunteer (or even fabricate) information to obtain more favorable terms. Before Mr. McConathy was hired, O'Nealgas very likely knew not only the identity of many of Ferrellgas's customers, but also information relative to those customers' "contract terms, credit information, volume usage, propane decision makers, pricing arrangements, and margins." (Doc. 20, p. 10).

\*11 Considering all of these circumstances, we find that the information sought to be protected by Ferrellgas does not constitute "trade secrets" under the LUTSA. The evidence does not reflect that Mr. McConathy is in possession of any information beyond the identities, and perhaps the general operations, of certain Ferrellgas customers. His knowledge and skill was acquired through experience and has been retained only in his memory. Moreover, the disputed information is obtainable through lawful means, and, by all accounts, is disseminated freely among customers and competitors. Even if this information constituted "trade secrets," there is no evidence before the Court to indicate that Mr. McConathy used any information to solicit Ferrellgas customers, aside from basic identifying information. Therefore, Ferrellgas's motion for preliminary injunction must be DENIED as to its claim that Mr. McConathy and O'Nealgas have violated the LUTSA.

## IV. *Conclusion*

For the foregoing reasons, the plaintiff's Motion for Preliminary Injunction (Doc. 5) will be DENIED. In light of this ruling, the parties will be ORDERED to inform the Court as to whether they intend to pursue the merits of this dispute within thirty days from the date of the issuance of this ruling.

W.D.La.,2010.
Ferrellgas, L.P. v. McConathy
Slip Copy, 2010 WL 1010831 (W.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 2448253 (E.D.La.)
(Cite as: 2009 WL 2448253 (E.D.La.))

C
Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Robert E. ALLEN
v.
Newell NORMAND et al.
Civil Action No. 09-2825.

Aug. 7, 2009.

Robert E. Allen, Leakesville, MS, pro se.

Daniel Rault Martiny, Martiny & Associates,
Metairie, LA, for Newell Normand.

David Glen Sanders, Bridget Benoit Denicola,
Louisiana Department of Justice, Litigation Division,
Baton Rouge, LA, for Robert Murphy.

Barron Charles Burmaster, District Attorney's Office,
Gretna, LA, for Paul Connick.

### ORDER

MARTIN L.C. FELDMAN, District Judge.

*1 The Court, having considered the complaint, the
record, the applicable law, the Report and Recommendation
of the United States Magistrate Judge,
and the failure of plaintiff to file an objection to the
Magistrate Judge's Report and Recommendation,
hereby approves the Report and Recommendation
of the United States Magistrate Judge and adopts it
as its opinion in this matter. Therefore,

IT IS ORDERED that plaintiff's motions for injunctive
relief, Record Doc. Nos. 39 and 41, are
DENIED, that defendants' motion to dismiss and/or
for summary judgement, Record Doc. Nos. 10, 22
and 26, are hereby GRANTED, and that plaintiff's
complaint is dismissed with prejudice.

### ORDER ON MOTIONS, AND REPORT AND RE-COMMENDATION

JOSEPH C. WILKINSON, JR., United States Magistrate
Judge.

Plaintiff, Robert Allen, is a prisoner currently incarcerated
in the South Mississippi Correctional Institution
in Leakesville, Mississippi. He filed this
complaint pro se and in forma pauperis pursuant
to 42 U.S.C. § 1983 against Jefferson Parish Sheriff
Newell Normand, Judge Robert Murphy of the 24th
Judicial District Court in Jefferson Parish and Jefferson
Parish District Attorney Paul Connick.
Plaintiff alleges that he was falsely arrested on
September 25, 2008 on a theft charge that originated
in Jefferson Parish in 2000 and that he was
wrongfully incarcerated in the Jefferson Parish Correctional
Center for 88 days after being arrested,
until the charge was dismissed. He seeks $3.7 million
in damages, expungement of the arrest from his
record and a public apology. Record Doc. No. 2
(Complaint at ¶ V).

On April 28, 2009, I conducted a telephone conference
in this matter. Participating were plaintiff pro
se and Daniel Martiny, David Glen Sanders, Bridget
Benoit Denicola and Barron Burmaster, counsel
for defendants. Plaintiff was sworn and testified for
all purposes permitted by *Spears v. McCotter,* 766
F.2d 179 (5th Cir.1985), and its progeny.

### THE RECORD

Plaintiff testified that he has been incarcerated in
Mississippi since December 22, 2008, based upon
revocation of his probation for a previous conviction
for "uttering forgery," and that he is currently
serving a term of two years in prison. He confirmed
that he asserts a single claim in this case based
upon his allegedly false arrest on September 25,
2008 on an eight-year-old Jefferson Parish theft
charge.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

Allen testified that, on September 25, 2008 he was transported from the Acadia Parish jail in Crowley, Louisiana, to Jefferson Parish by two Jefferson Parish sheriff's deputies based upon a charge of theft of more than $100 from a Metairie, Louisiana, car dealership in April 2000. He stated that he told the two transport deputies at the time they picked him up that he had been incarcerated in Mississippi at the time of the alleged theft in April 2000 and that he therefore could not have committed that offense. Allen testified that he was incarcerated in the Acadia Parish jail on September 25, 2008 on a charge of passing a bad check.

**\*2** Plaintiff acknowledged that he was arrested on September 25, 2008 based upon a bill of information issued in 2000, asserting the theft charge in Jefferson Parish. Allen said he had *not* been arrested in Jefferson Parish in 2000 on that charge because "I was in the State of Mississippi. I was incarcerated. I had been incarcerated at that time since December 2, 1999" at the Delta Correctional Facility in Greenwood, Mississippi. He said he remained incarcerated in Mississippi continuously from December 2, 1999 until July 19, 2004.

Allen said he has not seen the bill of information charging him with the April 2000 theft in Jefferson Parish. He stated that the warden at the Acadia Parish jail tried to explain Allen's situation to the Jefferson Parish transport deputies, but that they took Allen to Jefferson Parish anyway and charged him with the 2000 theft, which he testified he could not have committed. Allen testified that he was taken to Judge Murphy's courtroom in Jefferson Parish on October 2, 2008, where he attempted to explain that he had been incarcerated in Mississippi at the time of the alleged theft. Allen stated that the judge would not listen to his explanation and asked him about his history of felony convictions and whether he would accept "time served' in exchange for a guilty plea, but Allen refused. Allen said that he gave his "time sheets" concerning his past incarceration in Mississippi to the court and the assistant district attorney, "but they wouldn't do anything."

Asked if the transportation deputies from Jefferson Parish had a warrant or an attachment for Allen's arrest when they picked him up in Crowley, plaintiff stated, "I've never seen anything," and said he did not know whether the deputies had any such documentation. He said he overheard the deputies say that, if Allen actually had been incarcerated in Mississippi at the time of the alleged theft in 2000, "he wouldn't be there [in jail in Jefferson Parish] long."

Plaintiff testified that after the charges against him in Jefferson Parish were dismissed, he was transported to jail in Mississippi based on a Mississippi warrant for his arrest, which alleged a probation violation. Allen added, "I feel that I should be owed something. I spent 88 days [in the Jefferson Parish jail]. There were three court hearings, ... October 2nd, October 30th and 11/6/08, and I had to go all the way to December 18th [2008] before anything was completed. And the assistant D.A. read the same information on December 18th to Judge Murphy that stated that I was incarcerated." He complained that he was brought to the Jefferson Parish court eight years after the theft was alleged to have occurred.

On cross-examination, Allen denied any dealings concerning an automobile in Jefferson Parish in 2000. He also denied having been arrested in St. Tammany Parish on a bad check charge in April 2000, because he was incarcerated in Mississippi on that date. He denied information that defense counsel said he had obtained, indicating that Allen had not been incarcerated in Mississippi until November 2000. Allen acknowledged that he was represented by appointed counsel during the Jefferson Parish court proceedings in 2008 and that he had given his lawyer his Mississippi incarceration records at that time.

**\*3** At the time of the *Spears* hearing, two motions to dismiss filed by defendants were pending: (1) Judge Murphy filed a Rule 12(b)(6) motion to dismiss, arguing that plaintiff's suit was barred by 42 U.S.C. § 1997e(e), the Eleventh Amendment and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

the doctrine of judicial immunity. Record Doc. No. 10.(2) District Attorney Connick filed a Rule 12(b)(6) motion to dismiss, arguing that the complaint fails to state a claim upon which relief can be granted and asserting the doctrine of prosecutorial immunity. Record Doc. No. 15. Plaintiff filed written oppositions to both motions. Record Doc. Nos. 22, 26.

At the conclusion of the hearing, the court converted Connick's motion to a motion for summary judgment and ordered defendants Normand and Connick to file a new motion for summary judgment that would include the necessary verified exhibits concerning the issue of probable cause to arrest Allen in September 2008. Allen was given time to file a response. Record Doc. Nos. 28, 33.

Defendants' new motion for summary judgment and plaintiff's opposition memorandum were filed timely. Record Doc. Nos. 31, 37. In his opposition, plaintiff asked for leave to file additional exhibits. His request for an extension of time was granted and he was ordered to file any additional materials no later than June 29, 2009. Record Doc. No. 38.

Plaintiff did not file a timely supplemental memorandum that included the records from the Mississippi jail that he was seeking. Instead, on June 15, 2009, he filed a memorandum in which he stated that he has sent three requests to Harrison and Lamar Counties in Mississippi seeking documents, but the counties have not responded. Among other requests (addressed below) in his memorandum, Allen asked the court to order the Mississippi counties to provide him with the documents he has requested. Alternatively, he asked whether he can subpoena the documents. Record Doc. No. 39, at pp. 2-3.

Construing this portion of plaintiff's memorandum as a motion for extension of time to obtain the Mississippi records, the motion is DENIED. No further extensions of time will be granted for Allen to obtain the records, because these records are immaterial and irrelevant in this action. For purposes of de-

fendants' pending motions, Allen does *not* need to show that he could not have committed the theft with which he was charged in Jefferson Parish. The only relevant fact for purposes of the motions, and it is undisputed on the current record, is that the theft charge against him was dismissed.

The verified exhibits filed by defendants Connick and Normand with their motion for summary judgment establish that the following proceedings took place in the 24th Judicial District Court for Jefferson Parish. On May 11, 2000, Allen was charged with the theft on April 7, 2000 of an automobile valued at over $1,000, in violation of La.Rev.Stat. § 14:67. Record Doc. No. 31-6, Defendants' Exh. 1, Bill of Information. Allen did not appear for arraignment hearings on May 19 and June 22, 2000. The court's minute entries for those dates indicate that he was never arrested on the charge. The district attorney requested and the court ordered that an attachment be issued. Record Doc. Nos. 31-7, 31-8, Defendants' Exhs. 2, 3, minute entries. The attachment order stated that Allen was charged with one violation of La.Rev.Stat. § 14:67, for theft of more than $100. The order directed the Sheriff of Jefferson Parish to "attach the body of" Allen and bring him before the court to answer for contempt in failing to attend the two hearings. Record Doc. No. 31-6, Defendants' Exh. 4, Attachment.

*4 A "Case Review" printout that was attached as an exhibit to defendant Connick's motion to dismiss is still not verified and was not attached to the motion for summary judgment filed by Connick and Normand. However, Allen's testimony and written submissions confirm what the Case Review record shows. When he was brought before the court, he entered a plea of not guilty. Hearings were held on October 2, October 30, November 6 and December 18, 2008. His attorney filed a motion to quash, which was granted on December 22, 2008, and the theft charge was dismissed. Record Doc. No. 15-6, Defendant's Exh. 1, Case Review, *State of Louisiana v. Robert Allen*, No. 2889-D.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

## I. *ORDER ON MOTIONS*

As noted above, plaintiff's memorandum filed on June 15, 2009 contained several requests, which the court construes as motions. Record Doc. No. 39. In addition to the previously addressed request for extension of time to obtain the records from Mississippi, Allen seeks leave to add a new defendant, Evans Schmidt, who was his public defender on the theft charge in Jefferson Parish. He also seeks leave to add Judge Murphy's bailiff, Jefferson Parish Sheriff's Deputy Porter, to his witness list. Finally, he asked that counsel be appointed to represent him. Record Doc. No. 39. On June 24, 2009, plaintiff filed another motion to amend to add Schmidt as a defendant. Record Doc. No. 42.

Plaintiff's motion to amend his complaint to add public defender Schmidt as a defendant is DENIED as futile. To state a claim under Section 1983, plaintiff must show "(1) deprivation of a right, privilege or immunity secured by the federal laws or Constitution (2) *by one acting under color of state law.* " *Mississippi Women's Med. Clinic v. McMillan,* 866 F.2d 788, 791 (5th Cir.1989) (emphasis added); *accord Morris v. Dearborne,* 181 F.3d 657, 666 n. 6 (5th Cir.1999). Plaintiff must show that the defendant's actions are "fairly attributable to the state." *West v. Atkins,* 487 U.S. 42, 49 (1988). However, it is well established that a public defender is not generally considered to be a state actor. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Small v. Dallas County,* 170 Fed. Appx. 943, 2006 WL 925500, at *1 (5th Cir.2006); *Hudson v. Hughes,* 98 F.3d 868, 873 (5th Cir.1996). Because Schmidt is not a state actor, plaintiff's attempt to add a Section 1983 claim against him has no basis in federal law. If the motion to amend were granted, the claim against Schmidt would be dismissed on motion for failure to state a claim. Accordingly, the motion to amend is futile.

Allen's motion to add another witness to his witness list is DISMISSED AS PREMATURE. If this report and recommendation is accepted and plaintiff's lawsuit is dismissed, the motion will be moot. If the report and recommendation is not adopted, plaintiff can reurge the motion.

Plaintiff sent another memorandum to the court that was filed on June 17, 2009, in which he asks again that the court appoint counsel to represent him. Record Doc. No. 41. Plaintiff also contends in this memorandum that he received a letter from counsel for Sheriff Normand, which allegedly included a threat. Allen requests the court to order Sheriff Normand's counsel not to communicate with him and to remove Sheriff Normand's counsel from representing his client.

**\*5** Allen's motion to have counsel appointed is DENIED. "A district court should appoint counsel in a civil rights case only if presented with exceptional circumstances." *Norton v. Dimazana,* 122 F.3d 286, 293 (5th Cir.1997). Having also considered the factors suggested in *Ulmer v. Chancellor,* 691 F.2d 209, 213 (5th Cir.1982), I find that this case is not complex and that plaintiff is capable of adequately presenting it, as he demonstrated during the April 28, 2009 conference with the court and in his written submissions in opposition to the pending motions. As a direct participant in the events that allegedly formed the basis of his complaint, he has been in a position adequate to investigate the case. The evidence that has been or may be presented is simple and will require no particular skill in its presentation.

The motion to require Sheriff Normand's counsel not to communicate with Allen is DENIED. Plaintiff has not demonstrated that counsel threatened him in any way.

As to plaintiff's requests that the court order the Mississippi counties to produce records and remove Sheriff Normand's counsel from representing his client, the court construes these requests as a motion for injunctive relief. That motion is addressed below in my report and recommendation.

## II. *STANDARDS OF REVIEW*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

(A) *28 U.S.C. § 1915A Screening*

A prisoner's pro se complaint for alleged civil rights violations must be screened by the court as soon as practicable after docketing, regardless whether it has also been filed in forma pauperis. 28 U.S.C. § 1915A(a); *Lair v. Purdy,* 84 Fed. Appx. 413, 2003 WL 23021483, at *1 (5th Cir.2003); *Lewis v. Estes,* 242 F.3d 375, 2000 WL 1673382, at *1 (8th Cir.2000); *Shakur v. Selsky,* 391 F.3d 106, 112 (2d Cir.2004); *Martin v. Scott,* 156 F.3d 578, 579-80 (5th Cir.1998). Such complaints by prisoners must be dismissed upon review if they are frivolous or fail to state a claim upon which relief can be granted. 28 U.S.C. § 1915A(b)(1); *Bridgewater v. Simmons,* No. 08-40597, 2009 WL 1181518, at *1 (5th Cir. May 1, 2009); *Shakur,* 391 F.3d at 113; *Carr v. Dvorin,* 171 F.3d 115, 116 (2d Cir.1999).

The purpose of a *Spears* hearing is to dig beneath the conclusional allegations of a pro se complaint, to ascertain exactly what the prisoner alleges occurred and the legal basis of the claims. *Spears,* 766 F.2d at 180. "[T]he *Spears* procedure affords the plaintiff an opportunity to verbalize his complaints, in a manner of communication more comfortable to many prisoners." *Davis v. Scott,* 157 F.3d 1003, 1005-06 (5th Cir.1998). The information elicited at such an evidentiary hearing is in the nature of an amended complaint or a more definite statement under Fed.R.Civ.P. 12(e). *Longoria v. Dretke,* 507 F.3d 898, 901 (5th Cir.2007); *Wilson v. Barrientos,* 926 F.2d 480, 481 (5th Cir.1991); *Adams v. Hansen,* 906 F.2d 192, 194 (5th Cir.1990). "Upon development of the actual nature of the complaint, it may also appear that no justiciable basis for a federal claim exists." *Spears,* 766 F.2d at 182.

*6 The court may make only limited credibility determinations in a *Spears* hearing, *Norton,* 122 F.3d at 292 (citing *Cay v. Estelle,* 789 F.2d 318, 326-27 (5th Cir.1986), *overruled on other grounds by Denton v. Hernandez,* 504 U.S. 25 (1992)), and may consider and rely upon documents as additional evidence, as long as they are properly identified,

authentic and reliable. "The Court should allow proper cross-examination and should require that the parties properly identify and authenticate documents." *Id.* (citing *Wilson,* 926 F.2d at 482-83).

After a *Spears* hearing, the complaint may be dismissed as legally frivolous if it lacks an arguable basis in law, *Jackson v. Vannoy,* 49 F.3d 175, 176-77 (5th Cir.1995); *Moore v. Mabus,* 976 F.2d 268, 269 (5th Cir.1992), or "as factually frivolous only if the facts alleged are 'clearly baseless,' ... [or] when the facts alleged rise to the level of the irrational or wholly incredible." *Id.* at 270.

(B) *Rule 12(b)(6) Motions*

When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the court must take the well-pleaded factual allegations of the complaint as true. *In Re Katrina Canal Breaches Litig.,* 495 F.3d 191, 205 (5th Cir.2007). "All questions of fact and any ambiguities in the current controlling substantive law must be resolved in the plaintiff's favor." *Lewis v. Fresne,* 252 F.3d 352, 357 (5th Cir.2001); *accord Lovick v. Ritemoney Ltd.,* 378 F.3d 433, 437 (5th Cir.2004).

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.' 'Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).' " *In Re Katrina Canal Breaches Litig.,* 495 F.3d at 205 (quoting *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1974, 1965 (2007) (quotation marks, citations and footnote omitted)).

Motions to dismiss for failure to state a claim are viewed with disfavor and are rarely granted. *Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 570 (5th Cir.2005). "However, conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *United States ex rel. Bain v. Georgia Gulf*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

*Corp.,* 386 F.3d 648, 654 (5th Cir.2004) (quotation omitted).

(C) *Summary Judgment*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue of material fact, but it is not required to negate elements of the nonmoving party's case. *Capitol Indem. Corp. v. United States,* 452 F.3d 428, 430 (5th Cir.2006) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).

**\*7** A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). No genuine issue of material fact exists if a rational trier of fact could not find for the nonmoving party based on the evidence presented. *National Ass'n of Gov't Employees v. City Pub. Serv. Bd.,* 40 F.3d 698, 712 (5th Cir.1994).

To withstand a properly supported motion, the nonmoving party who bears the burden of proof at trial must come forward with evidence to support the essential elements of its claim. *Id.* (citing *Celotex,* 477 U.S. at 321-23). "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex,* 477 U.S. at 323; *accord Capitol Indem. Corp.,* 452 F.3d at 430.

"Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists." *Edwards v. Your Credit, Inc.,* 148 F.3d 427, 432 (5th Cir.1998); *accord*

*Murray v. Earle,* 405 F.3d 278, 284 (5th Cir.2005). "*We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.*" *Badon v. R J R Nabisco Inc .,* 224 F.3d 382, 394 (5th Cir.2000) (quotation omitted) (emphasis in original). "Conclusory allegations unsupported by specific facts ... will not prevent the award of summary judgment; 'the plaintiff [can]not rest on his allegations ... to get to a jury without any "significant probative evidence tending to support the complaint." ' " *National Ass'n of Gov't Employees,* 40 F.3d at 713 (quoting *Anderson,* 477 U.S. at 249).

"Moreover, the nonmoving party's burden is not affected by the type of case; summary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (quotation omitted) (emphasis in original); *accord Duron v. Albertson's LLC,* 560 F.3d 288, 291 (5th Cir.2009).

III. *ANALYSIS*

(A) *Judicial Immunity*

Plaintiff's claim against Judge Murphy is barred by judicial immunity. For more than one hundred years, judges have been held immune from liability for judicial acts done within their jurisdiction. *Stump v. Sparkman,* 435 U.S. 349, 356 (1978) (citing *Bradley v. Fisher,* 80 U.S. 335 (1871)); *Mays v. Sudderth,* 97 F.3d 107, 110 (5th Cir.1996). "A judge, of whatever status in the judicial hierarchy, is immune from suit for damages resulting from any acts performed in a judicial role." *Ammons v. Baldwin,* 705 F.2d 1445, 1447 (5th Cir.1983) (citations omitted); *accord Hosseini v. Sharp,* 216 Fed. Appx. 392, 2006 WL 3019245, at \*1 (5th Cir.2006). This judicial immunity applies even if a judge is accused of acting maliciously or corruptly. *Stump,* 435 U.S. at 356-57; *Pierson v. Ray,* 386 U.S. 547, 554 (1967), *overruled in part on*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

other grounds by *Harlow v. Fitzgerald,* 457 U.S. 800 (1982), *as recognized by Hill v. Shelander,* 992 F.2d 714, 716 (7th Cir.1993); *Hosseini,* 2006 WL 3019245, at *1 (citing *Mays,* 97 F.3d at 110-11). Judicial officers are absolutely immune from liability for damages unless they are without jurisdiction. *Moore v. King,* 210 F.3d 366, 2000 WL 290132, at *1 (5th Cir.2000) (citing *Mays,* 97 F.3d at 111); *Davis v. Bayless,* 70 F.3d 367, 373(5th Cir.1995).

**\*8** In the past, however, judicial officers did not enjoy absolute immunity from suits seeking injunctive relief. Relief of that nature was available under Section 1983 against state court judges acting in their judicial capacity. *Pulliam v. Allen,* 466 U.S. 522, 541-42 (1984). However, the Federal Courts Improvement Act of 1996 ("FCIA") amended Section 1983 to provide that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief is unavailable." 42 U.S.C. § 1983.

The FCIA therefore statutorily overruled *Pulliam's* holding regarding the availability of injunctive relief against a state judge in his official capacity. *Guerin v. Higgins,* No. 00-0244, 2001 WL 363486, at * 1 (2d Cir. Apr. 11, 2001); *Green v. District Attorney Ofc.,* No. 08-3685, 2009 WL 651132, at *5 (E.D.La. Mar. 10, 2009) (Feldman, J.); *Nollet v. Justices,* 83 F.Supp.2d 204, 210 (D.Mass.2000); *see also Bolin v. Story,* 225 F.3d 1234, 1242 (11th Cir.2000) (The 1996 amendment to Section 1983 limits the relief available against a federal judge to declaratory relief.). Thus, injunctive relief against Judge Murphy is not available to Allen in this Section 1983 action. *Green,* 2009 WL 651132, at *5; *Collins v. Drake,* No. 07-8220, 2009 WL 653053, at *7 (E.D.La. Jan. 30, 2009) (Chasez, M.J.), *report & recommendation adopted,* 2009 WL 653047 (E.D.La. Mar. 12, 2009) (Duval, J.); *Tesmer v. Granholm,* 114 F.Supp.2d 603, 618 (E.D.Mich.2000); *Nollet,* 83 F.Supp.2d at 210.

Furthermore, to whatever extent, if any, that Allen

seeks an order of this court directing Judge Murphy to take some action concerning plaintiff's state court proceedings, a federal court has no power to direct a state court or its judicial officers in the performance of their duties when mandamus is the only relief sought. *Rhodes v. Keller,* 77 Fed. Appx. 261, 2003 WL 22309132, at *1 (5th Cir.2003); *Santee v. Quinlan,* 115 F.3d 355, 356-57 (5th Cir .1997); *Prestenbach v. Louisiana,* No. 08-4726, 2008 WL 5391994, at * 1 (E.D.La. Dec. 19, 2008) (Barbier, J.); *Scott v. Coady,* No. 08-4649, 2008 WL 4891114, at *2 (E.D.La. Oct. 22, 2008) (Vance, J.). This court is without authority to order officials of the state court in which plaintiff's case is pending to treat his claims in any particular way, or to otherwise interfere with the rulings of its judges.

To whatever extent, if any, that Allen seeks declaratory and injunctive relief against Judge Murphy and the other defendants, his claims against Judge Murphy are within the scope of the judge's role as a judicial officer and therefore within his jurisdiction. Consequently, the doctrine of absolute judicial immunity bars Allen's suit for injunctive relief against Judge Murphy. For these reasons, Judge Murphy's motion must be granted, and all of Allen's claims against Judge Murphy must be dismissed as legally frivolous or for failure to state a claim for which relief can be granted.

### (B) *Prosecutorial Immunity*

**\*9** Plaintiff has named Connick, the Jefferson Parish District Attorney, as a defendant in this case based solely upon Connick's actions as a prosecutor in connection with state court criminal proceedings against Allen. However, the district attorney is immune from suit for damages in this instance.

Courts employ a "functional" test to determine whether officials are entitled to absolute immunity, in which they look to the "nature of the function performed, not the identity of the actor who performed it." *Forrester v. White,* 484 U.S. 219,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

227-29 (1988); *accord Hill v. City of Seven Points,* 31 Fed. Appx. 835, 2002 WL 243261, at *10 (5th Cir.2002); *Hulsey v. Owens,* 63 F.3d 354, 356 (5th Cir.1995).

It is well established that prosecutors are immune from liability under Section 1983 for actions taken as an advocate in pursuit of a criminal prosecution. *Cleavinger v. Saxner,* 474 U.S. 193, 200 (1985); *Quinn v. Roach,* No. 08-40633, 2009 WL 1181072, at *9 (5th Cir. May 4, 2009); *Hill,* 2002 WL 243261, at *10. This immunity applies to a prosecutor's actions in "initiating prosecution and carrying [a] criminal case through the judicial process." *Id.* (quotation omitted); *accord Buckley v. Fitzsimmons,* 509 U.S. 259, 270, 272 (1993); *Quinn,* 2009 WL 1181072, at *9.

Thus, "[a] prosecutor enjoys absolute immunity from personal liability for damages under section 1983 for actions 'initiating a prosecution and ... presenting the State's case' and those 'intimately associated with the judicial phase of the criminal process.' " *Esteves v. Brock,* 106 F.3d 674, 676 (5th Cir.1997) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430-31 (1976)); *accord Quinn,* 2009 WL 1181072, at *9; *Hill,* 2002 WL 243261, at *10. "A prosecutor's absolute immunity will not be stripped because of action that was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Kerr v. Lyford,* 171 F.3d 330, 337 & n. 10 (5th Cir.1999), *abrogated in part on other grounds by Castellano v. Fragozo,* 352 F.3d 939 (5th Cir.2003) (quotation omitted); *accord Champluvier v. Couch,* 309 Fed. Appx. 902, 2009 WL 320829, at *1 (5th Cir.2009); *Hill,* 2002 WL 243261, at *10.

Furthermore, once a probable cause determination has been made, the Constitution does not require a prosecutor to dismiss charges as soon as the prosecutor obtains exculpatory evidence. *Walker v. Gasparini,* 210 F.3d 377, 2000 WL 133837, at *1 (7th Cir.2000); *Garcia v. City of Chicago,* 24 F.3d 966, 970 (7th Cir.1994); *Guzman-Rivera v. Rivera-Cruz,*

55 F.3d 26, 31 (1st Cir.1995). As discussed fully in the next section of this report and recommendation, the Jefferson Parish Sheriff's deputies had probable cause to arrest Allen, based on the attachment issued by the state court. Here, as in *Walker* and *Guzman-Rivera,* although "exculpatory evidence later turned up, the prosecutors are absolutely immune from liability for their evaluation of the evidence and their decision to continue prosecuting [plaintiff]" until the theft charge was ultimately dismissed. *Walker,* 2000 WL 133837, at *1; *see also Guzman-Rivera,* 55 F.3d at 31 ("Even if it were shown that the defendants reviewed the evidence, found Guzman innocent, and did nothing, their decision ... not to dismiss his criminal case lies at the heart of the prosecutorial function," which renders them immune from liability).

**\*10** However, while prosecutors enjoy absolute immunity from damages liability, they are not immune from Section 1983 suits seeking injunctive relief. *Supreme Ct. v. Consumers Union of U.S., Inc.,* 446 U.S. 719, 736-37 (1980) (citing *Gerstein v. Pugh,* 420 U.S. 103 (1975)). Allen seeks monetary damages but, reading his complaint broadly, he also seeks declaratory and injunctive relief in the form of expungement of the arrest from his record and a public apology.

To the extent that plaintiff seeks injunctive relief in the form of expungement of the arrest record, he fails to establish the necessary elements for the relief sought. As a threshold matter, he lacks standing to bring his claim for injunctive relief.

[A] plaintiff lacks standing to sue under Article III of the Constitution unless she alleges an actual case or controversy. In other words, the plaintiff must show a personal stake in the outcome of the case by alleging direct injury that is real and immediate, not conjectural or hypothetical. Thus, " *[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects."*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

*Srivastava v. Newman,* 12 Fed. Appx. 369, 2001 WL 338110, at *3 (7th Cir.2001) (quoting *O'Shea v. Littleton,* 414 U.S. 488, 495-496 (1974)) (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983); *Sierakowski v. Ryan,* 223 F.3d 440, 442-44 (7th Cir.2000); *Garcia,* 24 F.3d at 969) (emphasis added). In the instant case, just as in *Srivastava,* Allen's "request for an injunction arises from a criminal case that has long since terminated. [He] alleged no threatened or pending criminal prosecution and therefore lacks standing to seek injunctive relief." *Id.*

Allen's claimed injuries resulting from his arrest, namely, being held for 88 days in the Jefferson Parish Jail, occurred solely in the past. The theft charge against him was dismissed and he was released from the custody of the Jefferson Parish Sheriff. There is no possibility that he will be arrested or incarcerated on the theft charge again. The 24th Judicial District Court's records reflect that the charge was dismissed and any search of his criminal history will also reflect the dismissal. His continued incarceration in Mississippi is pursuant to a conviction in that state unrelated to the Louisiana theft charge. Thus, Allen lacks standing to bring a claim for injunctive relief. In the absence of standing, no actual case or controversy exists for purposes of Article III of the Constitution, which means that this court lacks jurisdiction to decide plaintiff's claim. *Lyons,* 461 U.S. at 101-03; *Srivastava,* 2001 WL 338110, at *3.

Second, even if plaintiff had standing to seek an injunction, "[t]he equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again-a likelihood of substantial and immediate irreparable injury." *Lyons,* 461 U.S. at 111. "[R]ecognition of the need for a proper balance between state and federal authority counsels restraint in the issuance of injunctions against state officers engaged in the administration of the states' criminal laws in the absence of irreparable injury

which is both great and immediate." *Id.* (quotation omitted). The same facts that demonstrate that Allen lacks standing also establish the nonexistence of any likelihood of substantial and immediate irreparable injury if his arrest record is not expunged.

*11 Third, plaintiff has not identified any statute that would authorize the expungement of his arrest record. Rather, he relies solely on alleged constitutional grounds. This court has the power to expunge records of an unconstitutionally obtained indictment, arrest and/or conviction. *Tabbaa v. Chertoff,* 509 F.3d 89, 96 (2d Cir.2007); *United States v. Rowlands,* 451 F.3d 173, 176-77 (3d Cir.2006); *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.,* 386 F.3d 1148, 1152 (D.C.Cir.2004); *United States v. Sumner,* 226 F.3d 1005, 1010-11 (9th Cir.2000); *United States v. McLeod,* 385 F.2d 734, 749-50 (5th Cir.1967); *United States v. Goodrich,* No. 94-8054-CR, 2008 WL 398950, at * 1 (S.D.Fla.2008) (citing *Rogers v. Slaughter,* 469 F.2d 1084, 1085 (5th Cir.1972)).

However, " 'the court's privilege to expunge matters of public record is one of exceedingly narrow scope.' " *Cavett v. Ellis,* 578 F.2d 567, 568 (5th Cir.1978) (quoting *Rogers,* 469 F.2d at 1085) (internal citations omitted); *see also Thompson v. Rutherford County,* No. 07-5680, 2009 WL 776104, at *1 (6th Cir. Mar. 24, 2009) (quoting *United States v. Flowers,* 389 F.3d 737, 739 (7th Cir.2004) ) ("[T]he power is one of exceedingly narrow scope, and 'the balance very rarely tips in favor of expungement.' "); *Rowlands,* 451 F.3d at 176-77 (quotation omitted) ("The collective experience of our judiciary reflected by reported cases ... discloses that expunction of criminal court records is an extraordinary remedy," which is used only to remedy "an unconstitutional conviction or an abuse of power."); *United States v. Friesen,* 853 F.2d 816, 818 (10th Cir.1988) (Only "unusually compelling circumstances ... justify the exercise of the trial court's 'narrow' power to order expunction."); *In re TwoBears,* No. 80-20073-Bre, 2007 WL 1232043, at *1 (W.D.Tenn. Apr. 26, 2007) (The remedy "is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

appropriate only when a defendant is factually innocent *and* can demonstrate that the continued public availability of the record will cause great harm that outweighs the public and governmental interest in maintaining the record.").

Thus, the rule enunciated by the Fifth Circuit in *Cavett* and *Rogers* "prohibits a lower federal court from ordering the editing of public records in the general case. [Unless plaintiff] has alleged [a] special circumstance that would take him out of the *Rogers* rule, the district court [is] clearly correct in dismissing [a Section 1983 plaintiff's] request for the expunction of public records." *Id.*

*McLeod* provides an example of extraordinary circumstances in which the Fifth Circuit ordered expungement. The defendants were white county officials, including a state court judge, in Selma, Alabama. In 1963, defendants repeatedly arrested, tried and convicted local African-Americans who tried to register to vote, and other persons who encouraged the local African-Americans to register, on various charges, such as disturbing the peace, concealing their identity and driving cars with minor violations of traffic laws. *McLeod,* 385 F.2d at 738-39. The Fifth Circuit found that defendants' actions threatened, intimidated and coerced African-Americans with respect to their right to vote, in violation of the Civil Rights Act of 1957. *Id.* at 741-43. The court granted the request of the United States to "expunge from the record all arrests and convictions resulting from the prosecutions which form the basis for these suits." *Id.* at 750.

**\*12** In the instant case, as discussed in the following section of this opinion, Allen has failed to produce any evidence to create a genuine issue of material fact that his arrest violated the Constitution. In the absence of a colorable constitutional violation, the mere dismissal of the theft charge against him is "not alone sufficient to justify the exercise of such an extraordinary remedy" as expungement. *United States v. Montgomery,* No. 7:07-CR-28(HL), 2008 WL 276555, at \*1 (M.D.Ga. Jan. 29, 2008). Because plaintiff has not alleged any special cir-

cumstance that would take his case out of the general *Rogers* rule, his claim for injunctive relief must be dismissed.

"Public policy requires here that the retention of records of the arrest and of the subsequent proceedings be left to the discretion of the appropriate authorities." *Cavett,* 578 F.2d at 568. However, Allen is not without a remedy. Louisiana law provides a specific procedure for expungement of arrest records by the court of the parish where he was arrested. La.Rev.Stat. § 44:9B(1). Thus, plaintiff's claim for expungement must be brought before the 24th Judicial District Court for Jefferson Parish.

Accordingly, District Attorney Connick is entitled to summary judgment in his favor on plaintiff's claim for injunctive relief, and his motion should be granted.

### (C) *False Arrest/False Imprisonment*

Even if defendants Murphy and Connick were not immune from suit, summary judgment must be granted dismissing plaintiff's complaint against all three defendants because the undisputed facts establish that Allen cannot prevail on his claims of false arrest and false imprisonment.

The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted-indeed, for every suspect released. Instead, [p]olice officers are ... required under the Fourth Amendment to make a determination of probable cause before any significant pretrial restraint of liberty.

*Sorenson v. Ferrie,* 134 F.3d 325, 328 n. 3 (5th Cir.1998) (citing *Baker v. McCollan,* 443 U.S. 137, 145 (1979); *Duckett v.. City of Cedar Park,* 950 F.2d 272, 278 (5th Cir.1992)) (quotations omitted).

To succeed on a claim of false arrest in violation of either the Fourth Amendment or Louisiana state law, plaintiff must establish that defendants did not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

have probable cause to make an arrest. Probable cause exists under federal law when the facts available at the time of the arrest would support a reasonable person's belief that an offense has been or is being committed and that the individual arrested is the guilty party. *United States v. Hearn,* 563 F.3d 95, 103 (5th Cir.2009); *Sorenson,* 134 F.3d at 328; *Wells v. Bonner,* 45 F.3d 90, 95 (5th Cir.1995); *United States v. Raborn,* 872 F.2d 589, 593 (5th Cir.1989). Similarly, under Louisiana law, probable cause exists "when the detaining officer has articulable knowledge of particular facts sufficient to reasonably suspect the detained person of criminal activity." *Tabora v. City of Kenner,* 650 So.2d 319, 322 (La.App. 5th Cir.1995) (citations omitted). Thus, if Allen "cannot show that the [arresting] officers lacked probable cause, [he] has failed to state the violation of a constitutional right." *Sorenson,* 134 F.3d at 328.

**\*13** To establish a claim for false imprisonment under federal law, plaintiff must prove (1) an intent by defendant to confine him, (2) acts resulting in confinement, (3) plaintiff's consciousness of confinement or resulting harm, and (4) the deprivation of a constitutional right, such as the right not to be arrested or detained without probable cause. A plaintiff seeking recovery for false imprisonment under federal constitutional law must establish that the defendant's misconduct exceeds mere negligence. *Brown v. Bryan County,* 67 F.3d 1174, 1180, 1181 (5th Cir.1995); *Sanders v.. English,* 950 F.2d 1152, 1159 (5th Cir.1992); *Simmons v. McElveen,* 846 F.2d 337, 339 (5th Cir.1988).

To succeed on a claim of false imprisonment under Louisiana law, plaintiff must show that he was detained unlawfully. Detention is unlawful if it is made without color of legal authority. Thus, false imprisonment occurs when an arrest is made either without probable cause, without any legal process or warrant, or under a warrant that is null and void on its face. *Winn v. City of Alexandria,* 685 So.2d 281, 283 (La.App. 3d Cir.1996); *Slaydon v. Department of Wildlife & Fisheries,* 636 So.2d 1151, 1152

(La.App. 3d Cir.1994); *Hays v. Hansen,* 692 So.2d 3, 5 (La.App. 4th Cir.1997); *Tabora,* 650 So.2d at 322; *Patin v. Duplessis Pontiac-Buick-GMC,* 632 So.2d 790, 792 (La.App. 1st Cir.1993).

In the Fifth Circuit, a court's

> determination concerning probable cause is guided by the Supreme Court's mandate in *Illinois v. Gates:* We look to the totality of the circumstances to determine whether probable cause, or in this case arguable probable cause, existed. We are mindful of the notion that "probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules."

*Mendenhall v. Riser,* 213 F.3d 226, 231 (5th Cir.2000) (quoting *Illinois v. Gates,* 462 U.S. 213, 232 (1983)).

> The law charges us with determining the reasonableness of the actions taken in light of the cause that existed *at the time of arrest* .... "Whether [an] arrest [is] constitutionally valid depends in turn upon whether, *at the moment the arrest was made,* the officers had probable cause to make it-*whether at that moment* the facts and circumstances within their knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense."

*Id.* (quoting *Hunter v. Bryant,* 502 U.S. 224, 228 (1991)) (emphasis by the Fifth Circuit). A later dismissal of the charge, a subsequent failure of a court to find probable cause or even an acquittal is not determinative of whether probable cause existed to make an arrest. *Id.; Byers v. City of Eunice,* 157 Fed. Appx. 680, 2005 WL 3228114, at \*4 (5th Cir.2005); *Wells,* 45 F.3d at 95. "Whether the crime actually occurred or whether a suspect is eventually convicted is irrelevant to the probable cause analysis. The inquiry focuses only on what the *officer* could have reasonably believed at the time...." *Mor-*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

*ris v. Dillard Dept. Stores, Inc.,* 277 F.3d 743, 754 n. 10 (5th Cir.2001) (citing *Sorenson,* 134 F.3d at 328 n. 3).

**\*14** In the instant case, Allen was arrested in September 2008 pursuant to an attachment issued by a state court judge in Jefferson Parish in June 2000. On May 11, 2000, Allen was charged with theft of an automobile valued at over $1,000 in violation of La.Rev.Stat. § 14:67. When he did not appear for hearings on May 19 and June 22, 2000, the court ordered that an attachment be issued. The attachment directed the Sheriff of Jefferson Parish to "attach the body of" Allen and bring him before the court to answer for contempt in failing to attend the hearings. The attachment also stated that Allen was charged with one violation of La.Rev.Stat. § 14:67, for theft of more than $100. The Sheriff's deputies who transported Allen from the Acadia Parish jail to Jefferson Parish had probable cause to arrest him based on the attachment, a form of legal process that was facially valid.

Because the deputies had probable cause to arrest Allen, neither the arrest nor the subsequent 88-day detention were unconstitutional. Defendants are entitled to summary judgment in their favor as a matter of law on plaintiff's false arrest and false imprisonment claims.

## IV. *MOTIONS FOR INJUNCTIVE RELIEF*

As noted above, Allen has asked the court in two recently filed memoranda to (1) order the Mississippi counties where he was jailed in 2000 to produce records of his incarceration and (2) remove Sheriff Normand's counsel from representing his client. Record Doc. Nos. 39, 41. The court treats these requests as motions for injunctive relief.

According to Rule 65(b) of the Federal Rules of Civil Procedure, a party seeking a temporary restraining order and/or preliminary injunction must set forth "specific facts shown by affidavit or verified complaint" that show that the moving party

will suffer irreparable injury before a hearing on the matter may be held. A temporary restraining order and preliminary injunction are extraordinary equitable remedies that may be granted only if plaintiff establishes four essential elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause defendants; *and* (4) that the injunction will not disserve the public interest. *Sugar Busters LLC v. Brennan,* 177 F.3d 258, 264 (5th Cir.1999). The requisite showing is "a *substantial* threat of *irreparable* injury if the injunction is not issued." *DSC Commc'ns Corp. v. OGI Techs., Inc.,* 81 F.3d 597, 600 (5th Cir.1996) (emphasis added).

Applying the foregoing legal standards to the facts he alleges, plaintiff's testimony, written submissions and the record establish that he is *not* entitled to a temporary restraining order or preliminary injunction. Although plaintiff's written submissions allege that Sheriff Normand's counsel threatened him, Record Doc. No. 41 at p. 1, and that he needs the records from Mississippi to support his opposition to the pending motions to dismiss and for summary judgment, these wholly unsubstantiated allegations are the rankest form of speculation, and Allen has not established that any injury he may suffer in the future would be irreparable. Any cognizable injury that he may suffer as a result of defendants' alleged or anticipated actions may adequately be remedied through the ordinary judicial process without need for a preliminary injunction or temporary restraining order.

**\*15** It also cannot be concluded that plaintiff's complaint presents "a substantial likelihood of success on the merits." *DSC Commc'ns Corp.,* 81 F.3d at 600. Plaintiff's allegations must be accepted as true for the initial screening process required for such cases. 28 U.S.C. § 1915A; *Martin v. Scott,* 156 F.3d 578 (5th Cir.1998). Furthermore, the court must take the well-pleaded factual allegations of the complaint as true when considering a motion to dis-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Slip Copy, 2009 WL 2448253 (E.D.La.)
**(Cite as: 2009 WL 2448253 (E.D.La.))**

miss under Fed.R.Civ.P. 12(b)(6), and factual con-
troversies are construed in the light most favorable
to the nonmovant when addressing a motion for
summary judgment. I have complied with these
standards above. However, no such requirement ap-
plies to plaintiff's request for injunctive relief. As
discussed in the preceding sections, Allen has not
shown that a violation of his clearly established
constitutional rights has occurred. Moreover, be-
cause Allen seeks an injunction, injunctive relief by
this court that would interfere with the administra-
tion of prison or Clerk of Court functions in Missis-
sippi or with Sheriff Normand's right to choose
counsel to represent him, without justification,
would disserve the public interest.

For all of these reasons, plaintiff's motion for in-
junctive relief should be **DENIED.**

### RECOMMENDATION

For all of the foregoing reasons, it is **RECOM-
MENDED** that defendants' motions to dismiss and/
or for summary judgment, Record Doc. Nos. 10, 22
and 26, be GRANTED, that plaintiff's motions for
injunctive relief, Record Doc. Nos. 39 and 41, be
DENIED and that plaintiff's complaint be **DIS-
MISSED WITH PREJUDICE.**

A party's failure to file written objections to the
proposed findings, conclusions, and recommenda-
tions in a magistrate judge's report and recommend-
ation within ten (10) days after being served with a
copy shall bar that party, except upon grounds of
plain error, from attacking on appeal the unobjec-
ted-to proposed factual findings and legal conclu-
sions accepted by the district court, provided that
the party has been served with notice that such con-
sequences will result from a failure to object. *Dou-
glass v. United Servs. Auto Ass'n,* 79 F.3d 1415,
1430 (5th Cir.1996) (en banc).

E.D.La.,2009.
Allen v. Normand
Slip Copy, 2009 WL 2448253 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.