# Exhibit B – *in globo*

Not Reported in F.Supp.2d, 2009 WL 23677 (E.D.La.)
**(Cite as: 2009 WL 23677 (E.D.La.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Samantha NGUYEN et al.
v.
ST. PAUL TRAVELERS INSURANCE CO.
**Civil Action No. 06-4130.**

Jan. 5, 2009.

Carl Nelson Finley, Carl N. Finley, Attorney at Law, Metairie, LA, Allan Kanner, Cynthia Green St. Amant, M. Ryan Casey, Kanner & Whiteley, L.L.C., New Orleans, LA, Daniel S. Gruber, Gruber & Gruber, Sherman Oaks, CA, Howard A. Snyder, Howard A. Snyder, Law Offices, Sherman Oaks, CA, James B. Kropff, Law Offices of James B. Kropff, Pasadena, CA, for Plaintiff.

Ralph Shelton Hubbard, III, Seth Andrew Schmeeckle, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, Wayne J. Lee, Heather Shauri Lonian, Michael Q. Walshe, Jr., Stone Pigman Walther Wittmann, LLC, John B. Davis, II, Baker Donelson Bearman Caldwell & Berkowitz, New Orleans, LA, Stephen E. Goldman, Wystan M. Ackerman, Robinson & Cole, LLP, Hartford, CT, Andrew C. Kolb, Baker Donelson Bearman Caldwell & Berkowitz, Baton Rouge, LA, Jennifer Labourdette, U. S. Army Corps of Engineers Office of Counsel, Kent A. Lambert, Baker Donelson Bearman Caldwell & Berkowitz, Robert I. Siegel, Gieger, Laborde & Laperouse, LLC, David Ira Bordelon, Matthew J. Ungarino, Ungarino & Eckert, LLC, Metairie, LA, for Defendants.

Mark William Smith, Mark W. Smith, APLC, Metairie, LA.

***ORDER***

SARAH S. VANCE, District Judge.

*\*1* Before the Court is plaintiffs' motion to alter or amend this Court's Order striking class allegations. For the following reasons, plaintiffs' motion is DENIED.

**I. BACKGROUND**

On June 27, 2006, Samantha Nguyen and Linh Van Pham filed a petition for damages in state court against Standard Fire. Plaintiffs own property in Louisiana that was damaged as a result of Hurricanes Katrina and/or Rita. They allege that defendant breached its insurance contract with plaintiffs by not including general contractor's overhead and profit costs when adjusting plaintiffs' insurance claims. Plaintiffs seek to bring their action on behalf of themselves and a class of persons defined in their petition. (R. Doc. 1-2.)

On November 21, 2007, plaintiffs filed an amended complaint. They allege that on August 29, 2005, they had a Standard Fire insurance policy in effect covering damage to their property located at 7656 Expedition Drive, New Orleans, Louisiana. (R. Doc. 302 ¶ 3.) Plaintiffs further allege that their insurance policy provides that defendant "will pay the cost to repair or replace" property damaged by a covered loss, including windstorm or hurricane. (*Id.* ¶¶ 6-7.) The policy provides that defendant will pay "no more than the actual cash value of the damage until actual repair or replacement is complete." (*Id.* ¶ 8.) Finally, plaintiffs allege that in adjusting plaintiffs' loss, defendant determined that to repair the property damage would require the involvement of more than three trades, noting in a footnote that their estimate reflects that the work would require ten trades. (*Id.* ¶¶ 10; 11 n. 1.) Defendant did not include general contractor overhead and profit ("GCO & P") as part of its actual cash value payment to plaintiffs, which plaintiffs allege was a breach of the insurance contract. (*Id.* ¶¶ 10-11.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 23677 (E.D.La.)
**(Cite as: 2009 WL 23677 (E.D.La.))**

Plaintiffs seek damages for defendant's breach of contract and bad faith in unreasonably failing to pay GCO & P as part of its actual cash value payment to plaintiffs, and for failing to inform plaintiffs of their right to GCO & P. (*Id.* ¶¶ 25-31.)

On December 18, 2007, Standard Fire moved to dismiss the amended complaint and to strike the class allegations. (R. Doc. 311.) On October 6, 2008, the Court denied Standard Fire's motion to dismiss, and granted its motion to strike because individual issues predominated over questions of law and fact common to the putative class. (R. Doc. 417.) Specifically, the Court held that the determination whether a general contractor's services were reasonably likely to be required was an individualized fact question that would have to be determined for every insured, and that this kind of case-by-case determination was inappropriate for class treatment. (*Id.*) Plaintiffs now move to have the Court alter or amend its judgment striking the class allegations.

## II. LEGAL STANDARD

The reconsideration of a judgment is an "extraordinary remedy" that is used "sparingly." *Templet v. HydoChem, Inc.,* 367 F.3d 473, 479 (5th Cir.2004). It is not a "vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Id.* The Court must "strike the proper balance between the need for finality and the need to render a just decision on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.,* 6 F.3d 350, 355 (5th Cir.1993).

**\*2** A moving party must satisfy at least one of the following criteria to prevail on a Rule 59(e) motion: (1) the motion is necessary to correct a manifest error of fact or law; (2) the movant presents newly discovered or previously unavailable evidence; (3) the motion is necessary in order to prevent manifest injustice; and (4) the motion is justified by an intervening change in the controlling law. *See Fidelity & Deposit Co. of Md. v. Omni Bank,* 1999 WL

970526, \*3 (E.D.La. Oct.21, 1999); *Burma Navigation Corp. v. M/V Reliant Seashore,* 1998 WL 781587, at \*1 (E.D.La. Aug.14, 1998).

## III. ANALYSIS

Plaintiffs argue four grounds for reconsideration. None is persuasive.

*First,* plaintiffs assert that this Court applied the wrong legal standard to defendant's motion to strike class allegations. According to plaintiffs, the Court should have applied the law applicable to rule 12(f), rather than rule 23(d)(1)(D). Although styled a "motion to strike," defendant's motion was properly considered under rule 23(d)(1)(D), and not rule 12(f). The Court did not strike plaintiffs' class allegations because their allegations were "redundant, immaterial, impertinent, or scandalous," and not because the allegations pleaded "an insufficient defense." Fed.R.Civ.P. 12(f). Rather, the Court exercised its authority under rule 23(d)(1)(D) to "require that the pleadings be amended to eliminate allegations about representation of absent persons" because the substantive requirements of rule 23 were not met. Courts have routinely applied rule 23(d)(1)(D) or its predecessor rule 23(d)(4) to motions to strike class allegations. *Aguilar v. Allstate Fire and Cas. Ins. Co.,* No. 06-4660, 2007 WL 734809 (E.D.La.3/6/07); *St. Germain v. Scottsdale Ins. Co.,* No. 07-3563, 2007 WL 3465391 (E.D.La.12/11/07); *Caruso v. Allstate Ins. Co.,* No.2007 WL 2265100 (E.D.La.8/3/07); *Terrebonne v. Allstate Ins. Co.,* 251 F.R.D. 208 (E.D.La.2007); *Stokes v. Allstate Indem. Co.,* No. 06-1053, 2007 WL 1875847 (E.D.La.6/28/07); *Chetta v. State Farm and Cas. Co.,* No. 06-4662, 2007 WL 1233546 (E.D.La.4/25/07). By contrast, plaintiffs have cited no case that applies rule 12(f) to strike class allegations, and the Court declines to reconsider its judgment on this basis.

*Second,* plaintiffs claim that the Court improperly made a finding of fact that defendant employed no standard to determine whether policyholders were

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 23677 (E.D.La.)
**(Cite as: 2009 WL 23677 (E.D.La.))**

entitled to payment for general contractor overhead and profit. Plaintiffs' argument, however, mis-characterizes the Court's order. Plaintiffs failed to cite authority in their brief in opposition that would prevent Standard Fire from showing on a case-by-case basis that each policyholder is not entitled to GNO & C payments. The Court decided only that individual issues predominate over questions of law or fact common to the putative class, because each policyholder's claim would involve individual questions of fact as to whether they are eligible for payment. The Court made no finding whatsoever regarding Standard Fire's actual practices.

**\*3** *Third,* plaintiffs argue that the Court's reliance on the Eleventh Circuit's decision in *Mills v. Fore-most Insurance Co.,* 511 F.3d 1300 (11th Cir.2008), was misplaced. The Court cited *Mills* to support its finding that this case is inappropriate for class treat-ment because each policyholder would have to show that he or she was reasonably likely to require a general contractor's services to recover. Plaintiffs' urge, as they did in their brief in opposition to the defendant's motion to strike, that *Mills* supports their argument that striking class allegations based on the pleadings is improper. The Court notes first that it did not rely solely on *Mills* to reach the hold-ing plaintiffs seek to alter, and plaintiffs make no effort to distinguish the other cases on which the Court relied. Further, as mentioned, plaintiffs ar-gued *Mills* in their brief in opposition to defendant's motion to strike, and the Court was not persuaded. Plaintiffs may disagree with the Court's analysis, but this is not grounds to reconsider the Court's judgment.

*Fourth,* plaintiffs ask that the Court permit discov-ery "on the limited issue of whether Standard Fire's adjusters employed a standard for determining Overhead and Profit.... Because the Court's Order focuses on whether Standard Fire's adjusters em-ployed a standard for determining Overhead and Profit, there are clearly factual issues between the parties that remain unresolved which could be clari-fied by additional discovery." Plaintiffs cannot use a Rule 59 motion to request more discovery. *King v. Cole,* 26 F.3d 720, 726 (7th Cir.1994). In addi-tion, plaintiffs still do not cite authority showing that Standard Fire cannot dispute whether GNO & C payments are required on a case-by-case basis. Consequently, plaintiffs fail to show how additional discovery would make this case appropriate for class treatment.

## IV. CONCLUSION

For the reasons stated above, plaintiffs motion to alter or amend the Court's order striking class alleg-ations is DENIED.

E.D.La.,2009.
Nguyen v. St. Paul Travelers Ins. Co.
Not Reported in F.Supp.2d, 2009 WL 23677 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp., 1996 WL 225017 (E.D.La.)
**(Cite as: 1996 WL 225017 (E.D.La.))**

C

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
SCHWEGMANN GIANT SUPER MARKETS
v.
NATIONAL HOLDINGS, INC., National Tea Co.
and National Super Markets, Inc.
**Civil A. No. 96-0699.**

April 30, 1996.

McNAMARA, District Judge.

*1 Before the court is the "Motion to Dismiss for Improper Venue or, Alternatively, to Dismiss or Stay under Federal Abstention Principles" filed by Defendant, National Tea Co. ("National"). Plaintiff, Schwegmann Giant Super Markets ("SGSM"), filed a memorandum in opposition. The motion, set for hearing on Wednesday, April 24, 1996, is before the court on briefs, without oral argument.

Having considered the memoranda of counsel and the applicable law, the court finds that the Motion to Dismiss should be granted on the basis of improper venue.

## I. Background

On or about November 23, 1994, National[FN1] and Schnuck Markets, Inc. ("SMI") entered into an Asset Purchase Agreement ("APA"), wherein SMI (Buyer) agreed to purchase certain assets owned or utilized by National (Seller) in connection with National's business of operating retail grocery and supermarkets in Missouri and Illinois ("Northern Division") and in Louisiana, Mississippi, and Alabama (Southern Division").

The APA provided that SMI could designate a "Primary Designee" to purchase certain National assets and business operations in the Southern Division. (See Defendant's Motion to Supplement Re-

cord, Ex. A, APA, pp. 79-81). The "Primary Designee" was defined as Schwegmann Giant Super Markets, Inc., Schwegmann Westside Expressway, Inc. and Plaintiff SGSM ("collectively, Schwegmann entities"). (APA, p. 12).[FN2]

Pursuant to the APA, National agreed that it would:

pending the Closing, conduct the business and operations of the Divisions, in the usual, regular and ordinary course, and maintain the assets, properties and existing insurance coverages of the Divisions, in substantially the same manner as previously maintained ...

(See APA, p. 47, para. 7.c (i)).[FN3]

The APA also contains a specific choice of law and forum selection clause which states:

*Governing Law: Forum.* This Agreement shall be governed by and construed in accordance with the laws of the State of Missouri without giving effect to any choice or conflict of law provisions or rule of that state or any other jurisdiction that would cause the application of the laws of any jurisdiction other than the State of Missouri. Buyer [SMI], the Primary Designee [the Schwegmann entities] and Seller [National] agree that disputes arising out of this Agreement shall be litigated in the United States District Court for the Eastern District of Missouri, provided that if subject matter jurisdiction over the dispute cannot be obtained in federal court, the dispute shall be litigated in the Circuit Court for St. Louis County, Missouri. Notwithstanding the foregoing, in the event that the dispute principally involves tangible property located in the Territory of the Southern Division, and provided that Buyer [[[SMI] is not a party to the dispute, the Primary Designee and Seller agree that disputes arising out of this Agreement shall be litigated in the United States District Court for the Eastern District of Louisiana, provided that if subject matter jurisdiction over the dispute cannot be obtained in federal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 225017 (E.D.La.)
**(Cite as: 1996 WL 225017 (E.D.La.))**

court, the dispute shall be litigated in the Civil District Court for the Parish of Orleans, Louisiana. By executing this Agreement or by accepting the benefits of being designated the Primary Designee, the Buyer, the Primary Designee and the Seller agree to submit to the personal jurisdiction of the applicable court specified above and to waive all claims objecting to the jurisdiction of such court based upon lack of personal jurisdiction, venue, *forum non conveniens,* or other basis.

**\*2** (*See* APA, p. 95, para. 12.1, emphasis added).

The transactions contemplated by the APA were closed on June 12, 1995. On February 26, 1996, Schwegmann filed this suit ("Louisiana Litigation") alleging that:

Despite the express covenants, [National] failed to conduct the business and operations of the Southern Division in the usual, regular and ordinary course, failed to maintain certain of the assets in substantially the same manner as previously maintained and took actions that resulted in a material adverse affect on the business. *In particular, the defendants failed to maintain the inventories of the Southern Division supermarket stores at substantially the same levels and in the same manner as previously maintained and delivered those stores to the plaintiff with the inventories at inadequate levels that were inconsistent with prudent business practices and defendants' past practices.*

(*See* Complaint, Para. 11, emphasis added).[FN4]

National now brings this "Motion to Dismiss for Improper Venue or, alternatively, to Dismiss or Stay under Federal Abstention Principles." National argues that under the requirements of the forum selection clause contained in the APA (Paragraph 12.I), this court is the improper venue because:

(1) the dispute does *not* principally involve *tangible* property; and

(2) although SMI is not a named party in the Complaint, SMI *is* a party to the dispute.

As discussed below, the court agrees that the dispute does *not* principally involve tangible property.

## *II. Legal Analysis*

Under both federal and Missouri law, "[a] forum selection provision in a written contract is *prima facie* valid and enforceable unless the opposing party shows that enforcement would be unreasonable." *Kevlin Services, Inc. v. Lexington State Bank,* 46 F.3d 13, 15 (5th Cir. 1995), *noting, M/s Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 92 S.Ct. 1907, 1913, 32 L.Ed.2d 513 (1972); *High Life Sales Co. v. Brown-Forman Corp.,* 823 S.W.2d 493, 497 (Mo. 1992) (*en banc*) ("By this opinion, we join the better-reasoned majority rule and will enforce [forum selection] clauses, so long as doing so is neither unfair nor unreasonable.").

Further, an action may be dismissed based solely upon a freely negotiated forum selection clause, where personal jurisdiction exists and venue is otherwise proper. *International Software Systems, Inc. v. Amplicon, Inc.,* 77 F.3d 112 (5th Cir. 1996).

Here, the parties expressly agreed that only if the "dispute principally involves tangible property located in the Territory of the Southern Division" could the dispute be litigated in Louisiana. In its Complaint, SGSM alleges, with specificity and particularity, that National failed to maintain inventories. (Complaint, Para. 11). The court finds that this allegation does *not* principally involve tangible property as it does not, for example, involve a dispute over the title to tangible property or the condition of tangible property.

**\*3** Rather, the allegation that National failed to maintain inventories "principally involves" National's alleged breach of a covenant in the APA relating to the way in which the business and operations of the Southern Division were conducted between execution of the APA and the closing of the asset transfers. (*See* Complaint, Paras. 9, 11-16).[FN5]

In resolving the dispute as to whether or not Na-

Not Reported in F.Supp., 1996 WL 225017 (E.D.La.)
**(Cite as: 1996 WL 225017 (E.D.La.))**

tional failed to maintain inventories, the court would not in any meaningful sense be focused on the tangible items of property that make up inventory. Instead, the court would be focused on how business was conducted before execution of the APA and after execution of the APA, but before closing. Thus, the court concludes that Louisiana venue is improper and SGSM's Complaint should be dismissed.[FN6]

Accordingly;

IT IS ORDERED that Defendant National's Motion to Dismiss for Improper Venue be and is hereby GRANTED, dismissing this suit *against all Defendants (National Tea Co., National Holdings, Inc. and National Super Markets, Inc.)* without prejudice;

IT IS FURTHER ORDERED that Defendant's alternative Motion to Dismiss or Stay under Federal Abstention Principles be and is hereby DISMISSED AS MOOT.

FN1. The APA actually defines "Seller" as National Holdings, Inc., National Tea Co. (Mover herein), and National Super Markets, Inc.

FN2. National, SMI and SGSM entered into a Designee Agreement on June 12, 1995, the date on which the transactions contemplated by the APA were closed. (*See* Defendant's Original Memo., Designee Agreement, Defendant's Ex. A-3).

FN3. Contemporaneously with the execution the APA, SMI entered into a second asset purchase agreement ("Southern Asset Purchase Agreement") with the Schwegmann entities, pursuant to which the Schwegmann entities were assigned the rights to purchase National's assets and business operations in the Southern Division. The Schwegmann entities were also assigned all the benefits of the covenants

owed by National under the APA, including National's covenants "with respect to the conduct of its business in the Southern Division pending the Closing." (*See* Plaintiff's Motion to Supplement Record, Southern Asset Purchase Agreement, pp. 25-26, Para. 7(j)(i)).

FN4. On March 7, 1996, National Tea Co., National Holdings, Inc., and National Supermarkets, Inc. filed suit against SMI and the Schwegmann entities in the Circuit Court of the County of St. Louis, Missouri ("Missouri Litigation"), alleging:

(1) SMI breached the APA by failing to fully reimburse National for the Northern Division Severance Obligations;

(2) The Schwegmann entities breached the APA and Designee Agreement by failing to fully reimburse National for the Southern Division Severance Obligations;

(3) Individual Defendant Schwegmann Giant Super Markets defaulted in the payment of certain real estate and personal property taxes which SGSM agreed to assume; and

(4) Schwegmann breached the forum selection clause found in the APA.

Additionally, in the Missouri Litigation, National seeks a Declaratory Judgment declaring, in part, that SMI and Schwegmann are both contractually obligated, and jointly and severally liable, to pay the final purchase price for the Southern Division assets and the Southern Closing Net Book Value amount under the APA and the Designee Agreement. (*See* Missouri suit, Defendant's Ex. B).

FN5. In its opposition memorandum, Plaintiff alleges for the first time that Na-

Not Reported in F.Supp., 1996 WL 225017 (E.D.La.)
**(Cite as: 1996 WL 225017 (E.D.La.))**

tional also failed to maintain the physical condition of the stores, which SGSM's representatives allegedly found to be "dirty, unsanitary and generally unkept." (SGSM's Opp. Memo., p. 4). The court does not consider this wholly new allegation in ruling on Defendant's Motion to Dismiss, because the Complaint alleges with *particularity,* and not by way of example, that National breached the APA by failing to maintain pre-APA inventories. (Complaint, Para. 11).

FN6. In concluding that the dispute does *not* principally involve tangible property, the court need not decide whether "[SMI] is a party to the dispute" (the second requirement for Louisiana venue under the forum selection clause).

E.D.La.,1996.
Schwegmann Giant Super Markets v. National Holdings, Inc.,
Not Reported in F.Supp., 1996 WL 225017 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

**H**
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007.   See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.  (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
CURTIS CALLAIS WELDING, INC., Plaintiff-
Appellant,
v.
STOLT COMEX SEAWAY HOLDINGS, INC.,
Defendants-Appellees.
**No. 04-30003.**

Decided Feb. 22, 2005.

**Background:** Provider of services and equipment to a company's offshore drilling and production business brought suit against the company for contractual defense and indemnification in connection with a personal injury claim brought against the provider by an employee of one of the company's subsidiaries. The United States District Court for the Eastern District of Louisiana, 2003 WL 22966344, granted summary judgment in favor of the company, and the provider appealed.

**Holdings:** The Court of Appeals held that:
(1) choice-of-law provision in the agreement between the parties, calling for the application of federal maritime law, did not violate any strong public policy of Louisiana, and
(2) an indemnity provision of the agreement could not be construed to require the company to indemnify the service provider's president in his individual capacity.

Affirmed.

West Headnotes

**[1] Contracts 95 🕭═129(1)**

95 Contracts
    95I Requisites and Validity
        95I(F) Legality of Object and of Consideration
            95k129 Obstructing or Perverting Administration of Justice
                95k129(1) k. Agreements Relating to Actions and Other Proceedings in General. Most Cited Cases

**Indemnity 208 🕭═30(8)**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts
            208k30 Indemnitee's Own Negligence or Fault
                208k30(8) k. Maritime Cases. Most Cited Cases
Louisiana Oilfield Anti-Indemnity Act (LOIA), created to eliminate defense and indemnity provisions forced on Louisiana oilfield contractors, did not apply to an agreement for the provision of services and equipment to a company's offshore drilling and production business, and thus, a choice-of-law provision in the agreement, calling for the application of federal maritime law, did not violate any strong public policy of Louisiana, and the choice-of-law provision was therefore effective under Louisiana's choice of law rules; the service agreement at issue did not pertain to an oil, gas, or water well. LSA-R.S. 9:2780; LSA-C.C. arts. 3515, 3537, 3540.

**[2] Indemnity 208 🕭═33(8)**

208 Indemnity
    208II Contractual Indemnity
        208k33 Particular Cases and Issues
            208k33(8) k. Maritime Cases. Most Cited Cases
Under general maritime law, indemnity provision

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

of an agreement for the provision of services and equipment to a company's offshore drilling and production business could not be construed to require the company to indemnify the service provider's president in his individual capacity, in connection with injuries sustained by an employee of one of the company's subsidiaries, on the ground that the president was an employee of the provider; controlling precedent required a narrow reading of the provision, which precluded expansion of coverage beyond the scope of the provider.

**\*45** Robert S. Reich, John Steven Garner, Reich, Meeks & Treadaway, Metairie, LA, for Plaintiff-Appellant.

Ralph E. Kraft, Jessica Ann Devitt, Preis, Kraft & Roy, Lafayette, LA, for Defendants-Appellees.

Appeal from the United States District Court for the Eastern District of Louisiana (02-CV-3595).

Before JONES, SMITH, and STEWART, Circuit Judges.

**\*46** PER CURIAM: [FN*]

> FN* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**\*\*1** This is a suit for contractual defense and indemnification by Curtis Callais Welding, Inc. ("Callais Welding") against Stolt Comex Seaway Holdings, Inc. ("Stolt Holdings"). This suit arose following Brian Laine's filing of a negligence claim in a Louisiana court against the president of Callais Welding, Curtis Callais, Sr. ("Curtis, Sr."), in his individual capacity. Laine filed the state court suit after sustaining serious injuries during the course and scope of his employment with Big Inch Marine Systems, Inc. ("Big Inch"), a subsidiary of Stolt Offshore.

Callais Welding, the plaintiff-appellant, now appeals from the decision of the district court granting a cross-motion for summary judgment in favor of Stolt Holdings, the defendant-appellee. On appeal, Callais Welding asserts ten claims of error. Notwithstanding, the single dispositive issue is whether the district court erred in enforcing the choice-of-law provision in the Master Service Agreement ("service agreement") [FN1] between Callais Welding and Stolt Offshore. If the district court was correct in enforcing the choice-of-law provision, we need not address Callais Welding's other claims of error. Under general maritime law, the terms of the service agreement must be construed narrowly. The application of maritime law led to the district court's conclusion that Stolt Offshore was only required to defend and indemnify Callais Welding, the entity, not its employees and affiliates. Because we find that the district court was correct in enforcing the choice-of-law provision in the service agreement and in properly interpreting the provisions therein, the order of summary judgment in favor of Stolt Holdings is hereby AFFIRMED. [FN2]

> FN1. "A master service agreement is a blanket contract (whether or not so labeled) which covers any kind of work the independent contractor might be requested to perform for the principal and which renews automatically or continues in effect until either party gives notice of termination." *Stoot v. Fluor Drilling Serv., Inc.,* 851 F.2d 1514, 1519 (5th Cir.1988).

> FN2. Stolt Comex Seaway Holdings, Inc. is an affiliate of Stolt Offshore, Inc. ("Stolt Offshore"). Although Stolt Holdings was named as the defendant in Callais Welding's suit for defense and indemnification, Stolt Offshore is the official parent company of Stolt Holdings. Moreover, it is not altogether clear from the record why Callais Welding sued the affiliate company instead of the parent company.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

### BACKGROUND

*A. The Service Agreement*

Callais Welding is a Louisiana corporation with its principal place of business in Louisiana. Curtis, Sr. is the president and chief executive officer of Callais Welding. On September 15, 1995, Callais Welding entered into a Master Service Agreement with American Oilfield Divers, Inc. ("American Oilfield"). As the president and CEO, Curtis, Sr. was a signatory to the agreement, acting as the entity's agent. At the time the service agreement was executed, American Oilfield was also a foreign corporation, with its principal place of business in Louisiana.[FN3]

> FN3. Through acquisition and name change, American Oilfield became Stolt Offshore. For the purposes of diversity, the district court determined that by the time Callais Welding filed this suit for defense and indemnification, Stolt Offshore had pulled its charter from Louisiana and thereby severing any nexus to Louisiana.

The district court found that the provisions under the service agreement required*47 Callais Welding to provide services and equipment to American Oilfield for American Oilfield's offshore drilling and production business. The service agreement also contained a choice-of-law provision which provided that, if a dispute between any of the parties arose concerning the service agreement, then general maritime law would be used to resolve the disagreement.

Prior to the incident giving rise to this suit, American Oilfield became Stolt Offshore. As a result of the change, the service agreement was amended. The amendment provided that Stolt Offshore, American Oilfield's successor in interest, and all of Stolt Offshore's subsidiaries and affiliates, including Stolt Holdings, would become signatories to the original service agreement between Callais Welding and American Oilfield. As it pertains to this dispute, the district court found that the service agreement required Callais Welding to defend and indemnify Stolt Offshore in the event that claims were brought by Callais Welding against Stolt Offshore, its employees, affiliates or subsidiaries, or their employees.

**\*\*2** Conversely, the service agreement was conspicuously *silent* as to whether Stolt Offshore would be required to defend and indemnify Callais Welding's *employees, subsidiaries or affiliates, and any of their employees,* if a suit was brought against Callais Welding by Stolt Offshore, its employees, subsidiaries or affiliates, or any of their employees. As a result of this silence, the district court concluded that the amendment required Stolt Offshore and its subsidiaries and affiliates to defend and indemnify only Callais Welding from suits brought by Stolt Offshore, its employees, subsidiaries or affiliates, or any of their employees.

*B. Underlying Facts and Proceedings*

On August 31, 2001, while in the course and scope of his employ with Big Inch, another Stolt Offshore subsidiary, Brian Laine was injured at an *onshore* work site, in Houma, Louisiana. It can be gleaned from the record that, while Laine was inspecting a spool assembly, a crane that was lifting heavy objects capsized. As a result of the capsize, the heavy piece of tubing or piping being carried by the crane, i.e., the jumper, disconnected and fell onto the scaffolding where Laine was standing. The jumper struck Laine across his head and shoulders which resulted in Laine receiving severe injuries.

At the time of the accident, Curtis, Sr. was supervising the operation of the crane. Timothy Sutterfield, a supervisor for Triple C. Fabricators, Inc. ("Triple C"), another company working at the Houma site, was responsible for connecting the jumper assembly.[FN4]

> FN4. It should be noted that the record in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

dicates that, at the time of the incident, Curtis, Sr. was the director and an officer of Triple C. He was also one of the two incorporators of Triple C.

On August 9, 2002, just prior to the filing of their petitions in state court, Laine and his wife, Kimberly Laine, entered into a Mary Carter settlement agreement ("settlement agreement") with the following parties concerning Laine's claims arising from the accident: (1) Big Inch, (2) Stolt Offshore, and (3) both Big Inch's and Stolt Offshore's insurers and underwriters. The settlement agreement provided that the Laines would receive $350,825, in exchange for a release of all their claims against Big Inch, Stolt Offshore and their insurers and underwriters.

The settlement agreement specifically allowed for the release of Stolt Offshore *48 and Callais Welding, the entity, and further provided the Laines with the right to subrogate their claims and to reserve all their rights against any non-settling defendants. The Laines specifically excluded Triple C and Triple C's insurers and underwriters from the release agreement.

On August 30, 2002, Brian Laine, Kimberly Laine, and Big Inch all filed separate petitions for damages in the 32nd Judicial District Court, in the Parish of Terrebonne, Louisiana. The Laines named as defendants, Curtis, Sr., individually, Triple C and its insurer. The Laines did not name Callais Welding, the entity. The Laines' petitions alleged that Curtis, Sr. was liable for negligence because he ordered the use of an inappropriate crane to rig the jumper assembly. Their petitions alleged that Triple C was liable for negligence because Sutterfield, Triple C's employee, improperly connected the jumper assembly to the crane.

**\*\*3** In response to the state court claims, Callais Welding requested Stolt Holdings to indemnify and defend it in the state court proceeding even though Callais Welding was never named a party to the state court suit. Callais Welding contended that

Stolt Holdings, as Stolt Offshore's affiliate, was obligated to defend and indemnify it pursuant to the terms of the service agreement. Stolt Holdings, however, refused Callais Welding's request for protection, contending that Callais Welding was not a party to the lawsuit. Stolt Holdings further argued that the Laines' lawsuits were brought against Curtis, Sr.-in his individual capacity-and also that it was only obligated to defend and indemnify Callais Welding, the entity, not the entity's agents or employees.

In response, Callais Welding filed this defense and indemnification suit against Stolt Holdings in the United States District Court for Eastern District of Louisiana. Callais Welding's complaint alleged that Stolt Holdings, as an affiliate of Stolt Offshore, breached its contractual obligation under the service agreement by failing to defend and indemnify Callais Welding in the state court proceeding.

On November 6, 2003, Callais Welding moved for summary judgment, contending there was no genuine issue of material fact as to whether Stolt Holdings was required to defend and indemnify Callais Welding, its employees, subsidiaries and affiliates, and any of their employees in the state court proceeding. Callais Welding essentially argued that although the language under the service agreement did not expressly expand Stolt Holdings' duty to Callais Welding's agents and employees, or further, it must be implied from the language of the service agreement that Stolt Offshore's duty to Callais Welding was more expansive.

In its answer, Stolt Holdings argued that there were genuine issues of material fact concerning Callais Welding's claim of entitlement to defense and indemnification of Callais Welding's agents and employees, particularly with regard to its duty to defend and indemnify Curtis, Sr. Stolt Holdings specifically contended that because the claims in the state court proceeding were brought against Curtis, Sr., in his individual capacity, and not against the Callais Welding, the entity, or against Curtis, Sr., as agent of the entity, the indemnity provision under

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

the service agreement was not triggered. Stolt Holdings, therefore, argued that it, as an affiliate of Stolt Offshore, had no duty to protect Callais Welding from the claims raised against Curtis, Sr. in the state court proceeding. Stolt Holdings maintained that its only obligation under the service agreement was to Callais Welding, the entity.

On November, 18, 2003, Stolt Holdings filed a cross-motion for summary judgment,**49** now contending that there was no genuine issue of material fact that Stolt Holdings was *not* contractually obligated to defend and indemnify Callais Welding, based on the plain language of the service agreement. Stolt Holdings further contended that, under rules of general maritime law, the terms of the service agreement and all the provisions therein had to be construed narrowly. If read narrowly, Stolt Holdings argued, the district court necessarily had to disallow coverage to Callais Welding's employees since the agreement did not specifically provide for coverage of them.

**\*\*4** In considering the opposing motions, the district court determined that a conflict of laws dispute existed. Callais Welding contended that under the language of the service agreement the dispute between it and Stolt Holdings should be resolved under Louisiana law, and therefore, the doctrine of *respondeat superior* should be applied. Callais Welding principally relied on *Reliance Ins. Co. v. Bernard & Burke, Inc.* 428 So.2d 1097 (La.App. 1 Cir.1983) (observing that indemnity agreements will cover an entity's employees regardless of whether provisions in the contractual agreement specifically provide for coverage of the entity's agents, employees, or officers), for the proposition that an entity can only be liable through its agents or employees. 428 So.2d at 1102.

Stolt Holdings conversely argued that the language under the service agreement required the dispute to be resolved pursuant to general maritime law because the choice-of-law provision under the service agreement specifically required the parties to do so. To resolve the matter, the court interpreted the fol-

lowing pertinent language of the agreement:

6. INDEMNIFICATION (a) For purposes of this Agreement, the term "Company Indemnities" shall mean [Stolt Holdings] and all of its affiliated or parent or subsidiary companies or corporations (including, without limitation, the subsidiary signatories to this Agreement and all of the aforesaid entities' agents, officers, directors, employees, representatives and insurers, and all of the aforesaid entities' customers for whom Services under this Agreement are directly or indirectly provided during the term of this Agreement.

(b) *CONTRACTOR'S Indemnification.* Contractor assumes sole responsibility for and shall protect, defend, indemnify and hold the Company Indemnities harmless from and against any an all loss, damage, injury, liability, ...

....

(d) *COMPANY'S Indemnification.* Except as expressly set forth in Sections 6(a) through (c) above, the COMPANY [Stolt Holdings] assumes sole responsibility for and shall protect, defend, indemnify and hold CONTRACTOR [Callais Welding] harmless from and against any and all Losses arising out of, connected with ... any injury, ... to the COMPANY's [Stolt Holdings] employees and personnel or for loss of and/or damages to COMPANY'S [Stolt Holdings] property, vessels or equipment, by whomever brought, whether based on statute, tort, contract or quasi contract, and whether or not resulting from the contractual obligations assumed by the CONTRACTOR [Callais Welding]. Except as set forth in Sections 6(a) through (c) above, such indemnity shall apply whether or not the CONTRACTOR [Callais Welding] was or is claimed to be passively, concurrently or actively negligent or expressly negligent and regardless whether liability without fault (including but not limited to claims for unseaworthiness of vessels) is imposed **\*50** or sought to be imposed on the CONTRACTOR [Callais Welding].

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

**\*\*5** On December 15, 2003, the district court found that the choice-of-law provision in the agreement was valid and enforceable. Because the court determined that the application of general maritime law was not contrary to Louisiana's public policy, it thereby gave effect to the choice-of-law provision, thus obligating the parties to resolve the matter under general maritime law. The district court applied the rules under general maritime law, and consequently, interpreted the language under the agreement in favor of Stolt Holdings. The court relied on this court's prior holding in *Babcock v. Continental Oil Co.,* wherein we stated that under general maritime law an indemnity clause in a contract is to be interpreted narrowly and that the words of the contract are to be given their plain meaning. 792 F.2d 1346 n. 5 (5th Cir.1986).

Based on *Babcock,* the district court concluded that the plain language of the service agreement provided that Stolt Offshore, and thereby Stolt Holdings, was obligated to defend and indemnify only Callais Welding, not Callais Welding's agents or employees, including Curtis, Sr. Because Callais Welding was not a party to the state court proceeding, the court concluded that Stolt Holdings was not obligated to defend or indemnify Curtis, Sr. For this reason, the court granted Stolt Holdings' cross-motion for summary judgment and issued a memorandum of order and reasons to explain its decision. This appeal by Callais Welding ensued.

On appeal, Callais Welding contends that, at the time of the accident, Curtis, Sr. was in the course and scope of his employ for Callais Welding. Based on this contention, Callais Welding argues that Curtis, Sr. is covered for the negligence claims filed against him in the state court proceeding because Curtis, Sr. was acting as an agent or employee of Callais Welding.

Stolt Holdings conversely argues that Curtis, Sr. was working in his individual capacity, or, that he was in the course and scope of his employ for Triple C. Moreover, Stolt Holdings contends that under the plain language of the service agreement

its duty to defend and indemnify only extended to Callais Welding, not its agents or employees. Based on this argument, Stolt Holdings maintains that the indemnity provision in the service agreement was never triggered because Callais Welding was never named a party to the state court suit, and further, was specifically released from any liability by the settlement agreement.

### *JURISDICTION*

Although the district court properly concluded that the service agreement was not a maritime contract, the court nevertheless determined that diversity jurisdiction existed because at the time that Callais Welding filed this lawsuit, Stolt Holdings was a foreign corporation with its principal place of business outside the state of Louisiana. The court also noted that Callais Welding admitted in its complaint that diversity jurisdiction existed. We find no error. Also, we have jurisdiction over this matter pursuant to 28 U.S.C. § 1291, as this appeal is from a final judgment of the district court.

### *STANDARD OF REVIEW*

**\*\*6** We review *de novo* a district court's grant of a motion for summary judgment, applying the same standard as the district court did in the first instance. *See Burge v. Parish of St. Tammany,* 187 F.3d 452, 465 (5th Cir.1999). Summary judgment is appropriate where the moving party establishes "there is no genuine issue of material\*51 fact and that [it] is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden. *Celotex v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its summary judgment burden, the opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

its pleadings. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This showing requires more than some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### *DISCUSSION*

Concluding that the district court correctly gave effect to the choice-of-law provision in the service agreement, we accordingly apply the rules of contract interpretation under general maritime law to construe the meaning of the service agreement. The question becomes whether the service agreement can-under general maritime law-be construed to require Stolt Holdings to indemnify Curtis, Sr. on the basis that he is an employee of Callais Welding. Because we do not answer this question in the affirmative, we hold that the district court's order of summary judgment in favor of Stolt Holdings was proper.

### *1. Conflict of Laws*

[1] Since the parties continue to dispute the validity of choice-of-law provision, we first address the conflict of laws dispute.

In a federal diversity case, the conflict of laws of the forum state governs. FN5 *Roberts v. Energy Dev. Corp.,* 104 F.3d 782, 786 (5th Cir.1997). The rules governing Louisiana's conflict of laws are delineated under Louisiana Civil Code Articles 3540, FN6 3537, FN7 and 3515. FN8 "Louisiana generally allows*52 parties to select the law that will determine the outcome of the disputes arising from a contract." *Verdine v. Ensco Offshore Co.,* 255 F.3d 246, 250 (5th Cir.2001). Thus, Louisiana has no general prohibition against choice-of-law provisions. Indeed, under Article 3540 a choice-of-law provision is presumed valid and enforceable, until the provision is proven invalid. *Delhomme Indus., Inc. v. Houston Beechcraft, Inc.,* 669 F.2d 1049,

1058 (5th Cir.1982); *Cherokee Pump & Equip., Inc. v. Aurora Pump,* 38 F.3d 246, 250 (5th Cir.1994) (stating that Article 3540 "generally gives contracting parties the freedom to choose which state's laws will govern disputes arising out of the contract").

FN5. Callais Welding cites to *Reliance Ins. Co., supra,* for the proposition that there is no conflict of laws between Louisiana law and general maritime law because under the doctrine of *respondeat superior,* an entity can only be liable through its agents or employees. We reject this argument based on prior precedent in *Babcock,* discussed *infra.*

FN6. Article 3540 states as follows:

All other issues of conventional obligations [, i.e., contracts] are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

FN7. Article 3537 reads as follows:

That state is determined by evaluating the strength and pertinence of the relevant policies of the involved state in light of: (1) the pertinent contracts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

FN8. Article 3515 reads as follows:

Except as otherwise provided in this Book, an issue in a case having contracts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

Under article 3540, Louisiana courts typically will not invalidate a choice-of-law provision agreed upon between parties, unless the chosen law violates a strong public policy of the state. *See Delhomme,* 669 F.2d at 1058 (citing *Wilson v. Sawyer,* 106 So.2d 831, 833 (La.Ct.App.1958)); *see also Roberts v. Energy Dev. Corp.,* 235 F.3d 935, 938 (5th Cir.2000). *Cf. Matte v. Zapata Offshore Co.,* 784 F.2d 628, 631 (5th Cir.1986) (refusing to give effect to a choice-of-law provision as a violation of Louisiana public policy because the parties attempted to contract around Louisiana Oilfield Indemnification Act ("LOIA")). The party seeking to invalidate the choice-of-law provision bears the burden of proving invalidity. *Delhomme Indus., Inc.,* 669 F.2d at 1058. Moreover, "[o]ne state's law does not violate another state's public policy merely because the law of the two states differ." *Id.* (citing Restatement (Second) of Conflict of Laws § 90 comment b (1969)); *see also Cherokee Pump & Equip., Inc.* 38 F.3d at 252.

**\*\*7** The provisions under Article 3537 essentially guide us in determining which of the competing

laws, here federal maritime law or Louisiana general contract laws, is applicable, and Article 3515 guides courts in balancing the policies of the competing laws.

As the district court correctly concluded, but for the choice-of-law provision in the service agreement, it is clear that Louisiana's law would apply. [FN9] In addition, because Curtis, Sr.'s work was performed entirely on land, there is no need for concern that application of the choice-of-law provision will contravene any national interest in maintaining uniformity of maritime laws. *See Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982); *see also Green v. Vermilion Corp.,* 144 F.3d 332, 341 (5th 1998) (instructing that one of the fundamental premises of admiralty jurisdiction is that "uniformity is not to be sacrificed to accommodate state law") (citing Grant Gilmore Charles L. Black, Jr., The Law Admiralty § 6-58 to § 6-61 (2d Ed.1975)); *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 333 5th Cir. Unit A Aug. 1981) (observing that a party's contract to indemnify an indemnitee against the consequences of his own negligence does not violate any fundamental policy of maritime law); *but cf. Stoot,* 851 F.2d at 1518 (stating that "application of the [Louisiana Oilfield] Anti-Indemnity Statute does not conflict with any fundamental purpose of **\*53** maritime law"). All that is required in order to not violate admiralty jurisdiction is that "the contract clearly express[ ] such an obligation in unequivocal terms." *Corbitt,* 654 F.2d at 333. Because we conclude that the indemnity clause under the service agreement is unambiguous and unequivocal as to the intent of the parties, Article 3537 is not at issue for this analysis.

FN9. Louisiana is the only state whose policies could be impaired by enforcement of the choice-of-law provision in the defense and indemnity clauses of this service agreement and all of the injuries and transaction took place in Louisiana.

The question becomes whether the choice-of-law

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

provision violates a strong public policy of Louisiana. "Louisiana contract law generally 'allows a principal to be indemnified against his own negligence so long as that intent is clearly expressed.' " *Verdine,* 255 F.3d at 250 (quoting *Rodrigue v. LeGros,* 563 So.2d 248, 254 (La.1990). Notwithstanding, "[t]he [Louisiana] Oilfield Anti-Indemnity Act [ ("LOIA") ]creates a public policy exception to the general rule." *Id.;* LA.REV.STAT. 9:2780. "The Louisiana legislature adopted the act to eliminate defense and indemnity provisions forced on Louisiana *oilfield contractors.*" *Id.* at 250. Thus, if LOIA applies to the provisions in this service agreement, the indemnity agreement must be invalidated as being in contravention of Louisiana's public policy.

Notwithstanding this exception, however, a panel of this court in *Transcontinental Gas Pipe Line Corp. v. Transp. Ins. Co.,* specifically limited the scope of LOIA's application. 953 F.2d 985, 991 (5th Cir.1992); *see also Verdine,* 255 F.3d at 251. To determine whether the provisions of LOIA were applicable, the court fashioned a two-part inquiry:

> **\*\*8** First, there must be an agreement that "pertains to" an oil, gas or water well. If the contract does not pertain to a well, the inquiry ends. Only if we determine that the contract has the required nexus to a well may we proceed to the second step of the process, [i.e.,] examination of the contract's involvement with "operations related to the exploration, development, production, or transportation of oil, gas, or water"... Therefore, if (but only if) the agreement (1) pertains to a well *and* (2) is related to exploration, development, production, or transportation of oil, gas, or water, will the Act invalidate any indemnity provision contained in or collateral to that agreement.

*Transcon. Gas Pipe Line Corp.,* 953 F.2d at 991; *accord Fontenot v. Chevron U.S.A., Inc.,* 676 So.2d 557, 564 (La.1996) (adopting the two-part test articulated in *Transcontinental* ).

We have carefully reviewed the language under the service agreement at issue and do not find that it pertains to an oil, gas, or water well. Accordingly, our inquiry concerning LOIA ends. Moreover, Callais Welding's dependence on *Reliance* for the proposition that a maritime contract in Louisiana must extend coverage to a company's agents and employees, even when the agreement does not expressly provide for such coverage, is of no avail. While it is true that the district court's ruling under the holding in *Reliance* would be contrary to Louisiana's public policy, the holding in *Reliance,* as the district court noted, is not public policy. *Reliance* is merely Louisiana law that differs from general maritime law with regard to how interpretation of indemnity should be done. As Judge Alvin Rubin so aptly noted in *Delhomme Indus., Inc.,* one set of laws "does not violate another state's public policy merely because the [competing] laws ... differ." 669 F.2d at 1058. Because Callais Welding's argument that the indemnity agreement contravenes Louisiana public policy, principally relies on the holding in *Reliance,* we find that Callais Welding has not met its burden sufficient to invalidate the choice-of-law provision. **\*54** As such, we move on to address the substantive issues of coverage as set out under the service agreement.

*2. Interpretation of the Service Agreement*

[2] The district court determined that this court's prior decision in *Babcock* was dispositive of the issues of coverage in this dispute. We agree.

"A contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties, ..." *Corbitt,* 654 F.2d at 333. This court has consistently held that when interpreting a contract under general maritime law, "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." *Id.* at 332-33 (citing *Hicks v. Ocean Drilling and Exploration Co.,* 512 F.2d 817, 825 (5th Cir.1975));

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

*see also Fontenot v. Mesa Petroleum,* 791 F.2d 1207, 1214 (5th Cir.1986). This court cannot look to extrinsic or parol evidence to construe the intent of the parties. *Corbitt,* 654 F.2d at 333. Moreover, the contract must be read as a whole and the words must be given their plain meaning.

**\*\*9** In *Babcock,* this court addressed a dispute concerning an indemnity provision that was strikingly similar to the one in the instant case. 792 F.2d at 1349-51. The panel in that case held that the indemnification agreement between a company and a contractor did not entitle the contractor's employees to indemnification for personal injury claims because the agreement did not expressly provide for coverage of the *contractor's* agents or employees, even though it expressly provided for coverage of the *company's* agents and employees. *Id.* at 1350-51. Moreover, the panel rejected arguments that failing to extend coverage to the entity's agents and employees where the agreement did not expressly do so would result in a "ludicrous result" on the basis that "an agreement to indemnify an employer without indemnifying its employees is meaningless." *Id.* at 1351.

Like the district court, we find that the language of the service agreement is unambiguous. We, therefore, need not look beyond the plain language of the service agreement to determine the intent of the parties. Thus, our task becomes to discern whether, under the plain language of the service agreement, the agreement can be construed to expand Stolt Holding's duty of defense and indemnification to Callais Welding's agents or employees, or further. We are restrained by controlling precedent to read narrowly the provision under this agreement. After careful review, we conclude that the service agreement in this case cannot be read to expand coverage beyond the scope of Callais Welding.

Section 6(a) of the agreement expressly states Stolt Offshore is inclusive of all of its "affiliated or parent or subsidiary companies [, including Stolt Holdings,] ... and all of the aforesaid entities' agents, officers, directors, employees...." There is no such

provision stating that the definition of Callais Welding is similarly expansive.

Likewise, section 6(b) of the service agreement calls for Callais Welding to defend and indemnify Stolt Offshore, as understood in section 6(a). It is clear from the plain language that section 6(a) intended to expand the meaning of Stolt Offshore beyond the mere limits of the entity. Yet, section 6(d) of the service agreement, delineating the obligations between the parties, cannot be read to suggests that the parties intended Stolt Offshore's duty of defense and indemnification was to expand **\*55** beyond the limits of Callais Welding, the entity.

This court has previously stated that "[a] contract to indemnify another for his own negligence imposes an extraordinary obligation ... [and that] an indemnitor [, here Stolt Offshore,] is entitled to express notice that under [its] agreement, and through no fault of [its] own, [it] may be called upon to pay damages caused solely by the negligence of [its] indemnitee." *Corbitt,* 654 F.2d at 333. This service agreement clearly does not provide Stolt Offshore with express notice that it will be called upon to defend and indemnify Callais Welding's agents or employees or its affiliates or subsidiaries. We find it highly persuasive of the parties' intent that one portion of the service agreement expressly includes coverage for Stolt Offshore's agents, employees, subsidiaries and affiliates, and yet, the other portion of the agreement remains conspicuously silent with regards to a more expansive duty of coverage to Callais Welding. Thus, it is clear from our reading of the plain language of the service agreement that the parties did not intend for Stolt Offshore's duty of defense and indemnification to expand beyond the coverage of Callais Welding, the entity. Curtis, Sr., in his individual capacity, or as agent to the entity, is not covered under this service agreement. [FN10] Callais Welding's argument that the district court's granting of Stolt Holdings' cross-motion for summary judgment was improper is therefore without merit.

FN10. Although the record is not clear

129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.)))**

    whether Triple C is an affiliate or subsidiary of Callais Welding, we for the same reasons hold that Triple C is not covered under the plain language of the service agreement.

### *CONCLUSION*

**\*\*10** Because we conclude that the district court's granting of Stolt Holdings' cross-motion for summary judgment was proper, the final judgment and order dismissing Callais Welding's claims against Stolt Holdings are therefore affirmed.

AFFIRMED.

C.A.5 (La.),2005.
Curtis Callais Welding, Inc. v. Stolt Comex Seaway Holdings, Inc.
129 Fed.Appx. 45, 2005 WL 408144 (C.A.5 (La.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

--- So.3d ----, 2010 WL 395614 (La.App. 4 Cir.), 2009-0861 (La.App. 4 Cir. 1/13/10)
**(Cite as: 2010 WL 395614 (La.App. 4 Cir.))**

H

NOTICE: THIS OPINION HAS NOT BEEN RE-
LEASED FOR PUBLICATION IN THE PER-
MANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAW-
AL.

Court of Appeal of Louisiana,
Fourth Circuit.
Jimmy BRUMLEY
v.
AKZONA, INC. f/k/a American Enka Corporation,
et al.
**No. 2009-CA-0861.**

Jan. 13, 2010.

**Background:** Child brought survival and wrongful
death action against owner of worksite premises
and others, alleging that father's death from malig-
nant mesothelioma was caused by father's exposure
to asbestos during employment. The Civil District
Court, Orleans Parish, No. 2008-1444,Michael G.
Bagneris, J., granted owner's forum non conveniens
motion and dismissed action without prejudice.
Child appealed.

**Holdings:** The Court of Appeal, Gorbaty, J., held
that:
(1) District Court was not appropriate forum, and
(2) a district court has discretion to respond to a
forum non conveniens plea and need not first take
up other threshold objections.

Affirmed.

Belsome, J., dissented and assigned reasons.

West Headnotes

**[1] Appeal and Error 30 ☞965**

30 Appeal and Error
30XVI Review
30XVI(H) Discretion of Lower Court
30k963 Proceedings Preliminary to Trial
30k965 k. Change of Venue. Most
Cited Cases
The standard of review of a trial court's decision to
grant a forum non conveniens motion is abuse of
discretion.

**[2] Courts 106 ☞28**

106 Courts
106I Nature, Extent, and Exercise of Jurisdiction
in General
106k28 k. Discretion as to Exercise; Forum
Non Conveniens. Most Cited Cases
When considering a forum non conveniens motion,
the courts look to the following private interest
factors: (1) convenience of the parties and wit-
nesses; (2) access to the sources of proof and evid-
ence, including viewing of the premises, if re-
quired; (3) costs of obtaining attendance of wit-
nesses; and (4) advantages and obstacles to a fair
trial. LSA-C.C.P. art. 123.

**[3] Courts 106 ☞28**

106 Courts
106I Nature, Extent, and Exercise of Jurisdiction
in General
106k28 k. Discretion as to Exercise; Forum
Non Conveniens. Most Cited Cases
Louisiana district court was not appropriate forum
for child's survival and wrongful death action
against owner of worksite premises and others
arising from father's alleged asbestos exposure dur-
ing employment, where father and child were Texas
residents, father received all his medical care in
Texas, vast majority of 53 defendants were located
in Texas and only one of eight Louisiana defend-
ants was located in trial court's parish, and seven of
eight fact witnesses were located in Texas. LSA-
C.C.P. art. 123(B).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2010 WL 395614 (La.App. 4 Cir.), 2009-0861 (La.App. 4 Cir. 1/13/10)
**(Cite as: 2010 WL 395614 (La.App. 4 Cir.))**

**[4] Courts 106 ☞28**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k28 k. Discretion as to Exercise; Forum Non Conveniens. Most Cited Cases
The explicit terms of the forum non conveniens statute indicate that a bias toward the plaintiff's choice of forum applies only when the plaintiff is a resident of the forum. LSA-C.C.P. art. 123(B).

**[5] Courts 106 ☞28**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k28 k. Discretion as to Exercise; Forum Non Conveniens. Most Cited Cases
The policy indicated by the language of the forum non conveniens statute is that proper venue in the parish of the plaintiff's residence is greatly favored. LSA-C.C.P. art. 123(B).

**[6] Courts 106 ☞28**

106 Courts
    106I Nature, Extent, and Exercise of Jurisdiction in General
        106k28 k. Discretion as to Exercise; Forum Non Conveniens. Most Cited Cases
A district court has discretion to respond at once to a defendant's forum non conveniens plea and need not take up first any other threshold objection, and thus a district court has discretion to decide a forum non conveniens issue without first determining venue.

Appeal from Civil District Court, Orleans Parish, No.2008-1444, Division "H-12", Honorable Michael G. Bagneris, Judge.Mickey P. Landry, Frank J. Swan-DavidR. Cannella, Philip C. Hoffman, Landry & Swarr, L.L.C., New Orleans, LA, and Waters & Kraus, LLP, Dallas, TX, for Plaintiff/Appellant.

Erin Fury Parkinson, Margaret Diamond, Angelina

Christina, McGlinchey Stafford, PLLC, John D. Person, Michael O. Waguespack, Sarah A. Lowman , Donald C. Douglas, Jr., Middleberg Riddle & Gianna, New Orleans, LA, and Richard A. Sherburne, Jr., Lori P. Moser, Middleberg Riddle & Gianna, Baton Rouge, LA, for Columbian Chemicals Company.

Paul S. Hughes, Talley Anthony Hughes & Knight, L.L.C., Mandeville, LA, for Tin, Inc.

(Court composed of Judge TERRI F. LOVE, Judge DAVID S. GORBATY, Judge ROLAND L. BELSOME).

DAVID S. GORBATY, Judge.

*1 In this appeal, plaintiff argues that the trial court erred in dismissing his claims for forum non conveniens. Finding no abuse of discretion by the trial court, we affirm.

### FACTS AND PROCEDURAL HISTORY

This litigation involves the survival and wrongful death claims filed by Curtis Brumley, the child of decedent Jimmy Brumley. It is alleged that Mr. Brumley contracted, and subsequently died from, malignant mesothelioma resulting from asbestos exposure. Plaintiff alleged that Mr. Brumley sustained significant occupational exposure to asbestos from 1952-1985 as an insulator at various worksites primarily in Texas and Louisiana.

Plaintiff is a Texas resident, as was decedent. Suit was filed in Orleans Parish against numerous defendants, including American Cyanamid, a premises defendant. The petition pleads generally that venue is proper in Orleans Parish under La. C.C.P. art. 73 and 74, because the wrongful conduct allegedly occurred in Orleans Parish, and each of the defendants is jointly and solidarity liable for the alleged injuries.

American Cyanamid filed an Exception of Improp-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2010 WL 395614 (La.App. 4 Cir.), 2009-0861 (La.App. 4 Cir. 1/13/10)
**(Cite as: 2010 WL 395614 (La.App. 4 Cir.))**

er Venue and Motion to Dismiss for Forum Non Conveniens, asserting that Texas is a more appropriate forum under La. C.C.P. art. 123(B). Other defendants pleaded exceptions to venue and joined in American Cyanamid's motion.

After a hearing, the trial court granted the forum non conveniens motion and dismissed the action without prejudice, reserving to plaintiff the right to re-file the action in a Texas court within sixty days. The trial court did not rule on the exception of improper venue. Plaintiff filed a Motion for New Trial and/or Clarification. The trial court denied the motions, finding that "[t]he overwhelming evidence is that this matter should be tried in Texas." Plaintiff subsequently filed this appeal.

### DISCUSSION

Plaintiff asserts that the trial court erred in granting the Motion to Dismiss for Forum Non Conveniens. American Cyanamid failed to offer sufficient evidence to overcome the great weight that should be given to plaintiff's choice of forum and to demonstrate that Texas is a more convenient forum in which to litigate the case, plaintiff contends. Orleans Parish is a proper forum, plaintiff argues, and defendants failed to establish the existence of an alternate and adequate forum.

[1] The standard of review in this case is whether the trial court abused its discretion in granting the forum non conveniens motion. "The abuse of discretion standard of review is appropriate because La. C.C.P. art. 123, which treats forum non conveniens, permits-it does not mandate-that a case be transferred if certain conditions are fulfilled. This gives the trial judge the discretion to grant the motion to transfer or not, and we review whether or not that discretion was abused." *Cantuba v. American Bureau of Shipping,* 01-1139 (La.App. 4 Cir. 2/13/02), 811 So.2d 50.

The trial court exercised this discretion to dismiss, recognizing that the court's "discretion has to be ex-

ercised weighing the criteria that one looks to to determine whether or not the case remains here or moves to Texas." The well-settled criteria that the trial court examined are provided by the governing article, La. C.C.P. art. 123(B):

*2 Upon the contradictory motion of any defendant in a civil case filed in a district court of this state in which a claim or cause of action is predicated upon acts or omissions originating outside the territorial boundaries of this state, when it is shown that there exists a more appropriate forum outside of this state, taking into account the location where the acts giving rise to the action occurred, the convenience of the parties and witnesses, and in the interest of justice, the court may dismiss the suit without prejudice.

The Louisiana Supreme Court has held that two interrelated purposes guide the application of the doctrine codified in Article 123: to ensure that the forum is fair and convenient to the parties and not a forum chosen by the plaintiff merely to harass the defendant; and to allow courts a mechanism to regulate crowded dockets by ensuring that cases of no interest to the community where the case is filed can be moved to a more appropriate forum. *See Fox v. Board of Sup'rs of La. State Univ.,* 576 So.2d 978, 987 (La.1991).

[2] In serving these dual purposes when considering a forum non conveniens motion, the courts look to the following private interest factors: (1) convenience of the parties and witnesses; (2) access to the sources of proof and evidence, including viewing of the premises, if required; (3) costs of obtaining attendance of witnesses; and (4) advantages and obstacles to a fair trial. *See E. Sondheimer Co. v. Hibernia Corp.* 97-2460 (La.App. 4 Cir. 12/10/97), 704 So.2d 386; *Symeonides v. Cosmar Compania Naviera, S .A.,* 433 So.2d 281 (La. 1 Cir.1983).

[3] The trial court found that the private interest factors weighed heavily in favor of Texas as the more convenient forum. He noted that decedent and plaintiff are Texas residents. Decedent received all

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2010 WL 395614 (La.App. 4 Cir.), 2009-0861 (La.App. 4 Cir. 1/13/10)
**(Cite as: 2010 WL 395614 (La.App. 4 Cir.))**

of his medical treatment in Texas, and therefore all of the medical evidence and witnesses are situated in Texas rather than Louisiana. Although plaintiff named approximately fifty-three defendants allegedly responsible for Mr. Brumley's exposure to asbestos, he claimed only eight Louisiana job sites and a single Orleans Parish location. The vast majority of decedent's employers and work sites are in Texas. The court further noted that seven of the eight fact witnesses are in Texas. The expert witnesses who will testify on plaintiff's behalf are located all over the country, and therefore are not centrally located and restricted to Louisiana, Texas, or any other state. After reviewing the facts and evidence in this case, we find that the trial court's conclusion that the private interest factors supported Texas as the more convenient forum was not an abuse of discretion.

[4] Plaintiff's argument that his suit is virtually insulated from a forum non conveniens dismissal because his "choice" of the Orleans Parish court is entitled to "great weight" is incorrect. The explicit terms of La. C.C.P. art. 123(B) indicate that a bias toward the plaintiff's choice of forum applies only when the plaintiff is a resident of the forum. "[N]o suit in which the plaintiff is domiciled in this state, and which is brought in a court which is otherwise a court of competent jurisdiction and proper venue, shall be dismissed pursuant to this Article."

**\*3** [5] As this court made clear in *Sondheimer*, "the only policy which can be logically gleaned from the language of La. C.C.P. art. 123 is that proper venue in the parish of the plaintiff's residence is greatly favored." 704 So.2d at 388. As Texas residents, neither the plaintiff nor the decedent has an entitlement to the resources of the court in Orleans Parish.

[6] Plaintiff also argues that the trial court erred in dismissing the case based on forum non conveniens without first ruling on one of the defendants' exception of venue. However, the trial court has jurisdiction to rule on the forum non conveniens motion regardless of whether venue is proper. The United States Supreme Court stated:

"[A] district court has discretion to respond at once to a defendant's forum non conveniens plea and need not take up first any other threshold objection ... We have essentially characterized forum non conveniens as a 'supervening venue provision, permitting displacement of the ordinary rules of venue, when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined.'"

*Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 127 S.Ct. 1184, 167 L.Ed.2d 15 (2007). This pronouncement clearly indicates a district court has discretion to decide a forum non conveniens issue without first determining venue.

Recently, the Louisiana Third Circuit addressed issues very similar to those raised in the present appeal in *Boudreaux v. Able Supply Co.*, 19 So.3d 1263, 2009 WL 3189200 (La.App. 3 Cir.), 2008-1350 (La.App. 3 Cir. 10/7/09), ---So.3d ----. In that case, as here, Texas residents sued dozens of defendants, alleging liability based on the decedent's exposure to asbestos during years of employment, primarily in Texas, where he also received medical treatment for mesothelioma and died. As in this case, discovery in the Vermilion Parish action showed that the decedent's work history in Louisiana comprised a very small fraction of his long career. American Cyanamid filed an exception of forum non conveniens, which was granted. On appeal, plaintiff raised four arguments also asserted in this case. The Third Circuit rejected these arguments and affirmed.

First, the *Boudreaux* court held that the proper rule mandated a "reluctance" to find that the out-of-state plaintiff's choice was a reasonable one. That reluctance could only be overcome by a "strong showing of convenience." Thus, the court rejected plaintiffs' argument that the court should defer to their choice of forum even though they were Texas residents. *Id.* at 6-7. Second, as here, the *Boudreaux* plaintiffs contended that a prerequisite for a forum non conveniens dismissal is a showing that there is an alternative, available forum where each and every de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2010 WL 395614 (La.App. 4 Cir.), 2009-0861 (La.App. 4 Cir. 1/13/10)
**(Cite as: 2010 WL 395614 (La.App. 4 Cir.))**

fendant is subject to jurisdiction. *Id.* at 7. The court of appeal affirmed the trial court's conclusion that no such requirement exists, noting that there may well be no single forum that has jurisdiction over each of the dozens of named defendants.

\*4 Next, the *Boudreaux* plaintiffs suggested that Article 123(B) allows a dismissal only if all the acts giving rise to the suit occur outside Louisiana. Again, the court of appeal found no such requirement, and recognized that the adoption of plaintiffs' argument would make Louisiana a haven for forum shoppers. *Id.* Finally, also as in this appeal, the *Boudreaux* plaintiffs argued that the trial court erred in deciding the forum non conveniens motion prior to ruling on pending venue exceptions. Relying on *Sinochem, supra,* the Third Circuit rejected that claim, finding that the trial court has discretion to rule on a forum non conveniens issue before determining venue. The Third Circuit's analysis of the issues virtually identical to those in the case at bar provides us additional basis for affirming the judgment on appeal.

**CONCLUSION**

Accordingly, for the foregoing reasons, the judgment of the trial court is affirmed.

**AFFIRMED**

BELSOME, J., Dissents with Reasons.
BELSOME, J., Dissents with Reasons.
Dismissing Mr. Brumley's lawsuit in favor of a Texas forum undermines his right to choose a venue; and secondly, it violates the very basic principles of judicial economy and efficiency by not establishing Texas as an available and adequate forum prior to the dismissal. Finding that Texas is a more appropriate forum is unreasonable. Therefore, I dissent.

Even though Mr. Brumley's right to choose a forum is not given the same degree of weight as if Louisiana was his home forum, the case law does not imply that his right to choose a forum is inconsequen-

tial. To the contrary, the courts have found that while balancing the private interest factors, the court must also give the "relevant deference" to the plaintiff's choice of forum. *Alpine View Co., Ltd. v. Atlas Copco AB,* 205 F.3d 208 (5th Cir.2000) citing *re Air Crash,* 821 F.2d 1147 (5th Cir.1987). Mr. Brumley resided and worked in the state of Louisiana for approximately four years. He has alleged substantial occupational exposure to asbestos during those four years at numerous sites. Thus, he has sufficiently pled valid causes of actions which arose in Louisiana, including Orleans Parish. For these reasons this case is distinguishable from the cases cited by the majority.

The commentary on Article 123 describes its purpose as follows:

> The purpose of the principle is to guarantee that the forum is fair and convenient to the litigants and ***not a situs chosen by the plaintiff to harass the defendant.*** The doctrine is also designed to provide a method to regulate overcrowded dockets by permitting judges to transfer ***cases of no interest to the jurisdiction*** where the proceeding is filed to a more appropriate forum. (emaphasis added).

1 La. Prac. Civ. Proc. Article 123 (2009 ed.). Mr. Brumley's tenure and alleged exposure to asbestos in Louisiana proves that the forum was not selected to harass the defendants, while also establishing a compelling reason for this jurisdiction to take interest in the case.

\*5 Additionally, the record does not indicate that the alternate forum is both available and adequate for Mr. Brumley's case. In *Alpine View,* the United States Fifth Circuit reiterated what must be considered when determining if an alternative forum is available and adequate. The forum is considered available if the entire case and all parties can come within the jurisdiction of that forum; and the forum is adequate when the parties will not be deprived of all remedies or treated unfairly. *Alpine View, supra.* A determination of whether the alternate forum is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2010 WL 395614 (La.App. 4 Cir.), 2009-0861 (La.App. 4 Cir. 1/13/10)
**(Cite as: 2010 WL 395614 (La.App. 4 Cir.))**

available and adequate must be made prior to assessing the private interest and public interest factors. *Id.*

The defendants in the *Alpine View* case stipulated to the foreign forum and the court found that sufficient to conclude that the forum was available. *Id.* There has been no such showing in the instant case. As a matter of fact, the record would indicate that such a stipulation may have been rejected by some, if not all, of the defendants. In any case, the record does not provide proof of an available forum. Until an available forum is established, the potential for multiple suits and inconsistent judgments is a real concern. Thus, at this time, the principles of judicial economy and efficiency weigh in favor of Louisiana maintaining jurisdiction.

Accordingly, I find the trial court abused its discretion in dismissing Mr. Brumley's lawsuit for forum non conveniens.

La.App. 4 Cir.,2010.
Brumley v. Akzona, Inc.
--- So.3d ----, 2010 WL 395614 (La.App. 4 Cir.), 2009-0861 (La.App. 4 Cir. 1/13/10)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

▷
This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007.   See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.  (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
Judy KODRIN; Michael Kodrin, Plaintiffs-Appellees
v.
STATE FARM FIRE AND CASUALTY COMPANY, Defendant-Appellant.
**Nos. 08-30092, 08-30169.**

March 11, 2009.

**Background:** Insureds sued homeowner's insurer in state court for coverage for damage to their home during Hurricane Katrina. After removal, the United States District Court for the Eastern District of Louisiana, 2007 WL 4191916 and 2007 WL 4163437, awarded insureds damages, penalties, plus attorney fees and costs, and insurer appealed.

**Holdings:** The Court of Appeals held that:
(1) court's instructions and interrogatories correctly recited Louisiana law by informing jurors that homeowner's insurer would not be liable if flood caused the damage where neither party contended at trial that a combination of wind and flood destroyed insureds' home, and
(2) insurer could not have been found to have acted in bad faith.

Affirmed in part, vacated in part, and remanded.

West Headnotes

**[1] Insurance 217 ☞2142(5)**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2139 Risks or Losses Covered and
Exclusions
            217k2142 Water Damage
                217k2142(5) k. Surface Water;
Flood Exclusions. Most Cited Cases

**Insurance 217 ☞2165(2)**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2139 Risks or Losses Covered and
Exclusions
            217k2165 Proximate Cause
                217k2165(2) k. Combined or Concurrent Causes. Most Cited Cases

**Insurance 217 ☞3579**

217 Insurance
    217XXXI Civil Practice and Procedure
        217k3579 k. Instructions. Most Cited Cases
District court's instructions and interrogatories correctly recited Louisiana law by informing jurors that homeowner's insurer would not be liable if flood caused the damage where neither party contended at trial that a combination of wind and flood destroyed insureds' home.

**[2] Insurance 217 ☞2199**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2196 Evidence
                217k2199 k. Burden of Proof. Most
Cited Cases

**Insurance 217 ☞3579**

217 Insurance
    217XXXI Civil Practice and Procedure

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

217k3579 k. Instructions. Most Cited Cases
Under Louisiana law, insureds had burden of proving that their claim for damage to contents was covered under named-peril provision of homeowner's policy, and instructions given by trial court properly reflected such burden.

**[3] Insurance 217 ⟨⟩3360**

217 Insurance
   217XXVII Claims and Settlement Practices
     217XXVII(C) Settlement Duties; Bad Faith
       217k3358 Settlement by First-Party Insurer
         217k3360 k. Duty to Settle or Pay.
Most Cited Cases
Homeowner's insurer could not have been found to have acted in bad faith under Louisiana law solely on basis that it denied payment to insureds for demolition of their home based on its determination that the home and its contents were destroyed by storm surge, an excluded cause of loss; insureds offered no evidence that insurer believed that wind was likely the cause of the damage but nevertheless withheld payment. LSA-R.S. 22:658; LSA-R.S. 22:1220 (2008).
***672** John W. Redmann, Margaret Elizabeth Madere, New Orleans, LA, for Plaintiff-Appellee.

William Ryan Acomb, Porteous, Hainkel & Johnson, New Orleans, LA, Adrianne Landry Baumgartner, Porteous, Hainkel & Johnson, Covington, LA, for Defendant-Appellant.

Appeal from the United States District Court for the Eastern District of Louisiana, USDC No. 2:06-CV-8180.

Before KING, HIGGINBOTHAM, and WIENER, Circuit Judges.

PER CURIAM: [FN*]

   FN* Pursuant to 5TH CIR. R. 47.5, the

court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**\*\*1** The home of Plaintiffs-Appellees Judy and Michael Kodrin in Port Sulphur, Louisiana, was demolished in Hurricane Katrina. The Kodrins' insurer, Defendant-Appellant State Farm Fire and Casualty Co. ("State Farm"), denied coverage on their Katrina-related claim, asserting that the damage was excluded from coverage under the policy because it was caused by flooding rather than wind. The Kodrins sued State Farm for coverage. A jury sided with the Kodrins and awarded them $356,318 in damages and penalties, plus attorneys' fees and costs. State Farm appeals the judgment. We affirm in part and vacate in part.

**I. FACTS AND PROCEEDINGS**

When Judy and Michael Kodrin returned to their Port Sulphur, Louisiana, home following Hurricane Katrina in 2005, they found nothing but a concrete slab and debris. Their home and its contents were gone. All that remained was their damaged roof, which lay about 1,000 feet away. Many of the homes in their neighborhood had been separated from their foundations by floodwaters, carried off, then collected together in one area. These other residences had been severely damaged, but **\*673** remained relatively intact, in contrast to the Kodrins' home, which had been reduced to rubble. Because the damage to their home appeared different from that suffered by the other homes in the neighborhood, the Kodrins concluded that theirs was destroyed by something other than the massive flood that occurred when a nearby levee overtopped. They speculated that a tornado had been spawned during the storm and had demolished their house before the floodwaters arrived.

The Kodrins held homeowner's and flood insurance policies issued by State Farm. [FN1] The limits of coverage under the homeowner's policy were:

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

FN1. The flood policy was issued through State Farm by the National Flood Insurance Program.

Coverage A (Building, i.e., home)-$105,000

Coverage B (Contents)-$78,750

Coverage C (Outbuildings)-$10,500

The coverage limit under the flood policy was $76,000.

The Kodrins notified State Farm of their homeowner's claim for wind damage on September 17, 2005. A State Farm adjuster inspected the property in mid-October and told the Kodrins that he would inform their insurer that they intended to make a claim for wind damage. State Farm sent a second adjuster to the property on November 26, 2005, the day after the remaining debris had been cleared away. In the meantime, State Farm was administering the payout on the flood policy.[FN2] The Kodrins settled that claim in December for the policy limit. At about the same time, State Farm had denied the wind damage claims that the Kodrins had submitted under the homeowner's policy.

FN2. Mr. Kodrin testified that State Farm tried to get him to settle the flood policy over the phone, even before sending an adjuster to inspect the property. The Kodrins said they hesitated to settle the flood claim for fear it would jeopardize their claim for wind damage.

The Kodrins filed suit in August 2006 claiming, inter alia, (1) breach of contract; (2) bad faith under Louisiana Revised Statute § 22:1220 ("R.S.22:1220 ") for failure to adjust claims fairly and promptly and for failure to make reasonable efforts to settle the claims; and (3) arbitrary and capricious failure to make payment in violation of Louisiana Revised Statute § 22:658 (" R.S.22:658 "). State Farm removed the case to the Federal District Court for the Eastern District of Louisiana on the basis of diversity of citizenship.[FN3]

FN3. State Farm is a citizen of Illinois. The Kodrins are citizens of Louisiana.

**2 Following a two-day trial in November 2007, a jury found that wind was the cause of the damage to the home and its contents. The jury awarded the Kodrins a total of $196,581, essentially the maximum aggregate amount under the applicable classes of homeowner's coverage, plus $9,737 for additional living expenses,[FN4] $25,000 each to Judy and Michael Kodrin for State Farm's arbitrary and capricious failure to pay within 60 days, and $50,000 each as penalties for that failure, finding State Farm liable under both R.S. 22:658 and 22:1220. The district court also entered judgment in favor of the Kodrins for attorneys' fees and costs in the amount of $139,234 pursuant to R.S. 22:658.[FN5] State Farm moved for judgment as a matter of law or to alter and amend the judgments, which motions were denied. State Farm timely filed its notice of appeal.

FN4. The total is slightly higher than the combined coverage limits. We have not divined the reason for this, but as State Farm does not raise the issue, we do not quibble with it.

FN5. The $150,000 in damages and penalties were awarded under R.S. 22:1220.

### *674 II. ANALYSIS

State Farm raises a number of issues on appeal, each of which falls into either of two general claims of error: (1) The district court improperly instructed the jury, and (2) the Kodrins failed to offer legally sufficient evidence for a jury to find that State Farm acted in bad faith. In a diversity suit, we apply the substantive law of the forum state, in this case, Louisiana.[FN6]

FN6. *Hyde v. Hoffmann-La Roche, Inc.,* 511 F.3d 506, 510 (5th Cir.2007).

### A. Jury Instructions

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

State Farm contends that the jury instructions on the question of wind damage were erroneous because the district court failed to instruct the jury that (1) the Kodrins could recover only if their damage was caused *exclusively* by wind, and (2) the Kodrins had the burden of proving that the damage to the contents of their home was caused by wind.

*1. Standard of Review*

We review for abuse of discretion whether a jury was properly instructed.[FN7] "In diversity actions, a federal court's jury instructions must accurately describe the applicable state substantive law, but the district court has wide discretion in formulating the charge."[FN8] We will reverse "only if the charge as a whole creates a substantial doubt as to whether the jury has been properly guided in its deliberations."[FN9] Even if we find error, "we will not reverse if we determine, based on the entire record, that the challenged instruction could not have affected the outcome of the case."[FN10]

FN7. *Baker v. Canadian Nat'l/Ill. Cent. R.R.,* 536 F.3d 357, 363-64 (5th Cir.2008).

FN8. *Id.* at 364.

FN9. *Id.* at 363-64.

FN10. *Wright v. Ford Motor Co.,* 508 F.3d 263, 268 (5th Cir.2007) (internal quotation marks and citation omitted).

*2. Exclusivity of Wind Damage*

[1] The Kodrins' homeowner's policy insured their home and its contents against wind damage, but did not provide coverage for damage caused by flooding. Policies of this sort are common and have been much-litigated in the wake of Hurricane Katrina and other recent storms. We have held that a homeowner may recover under such a policy only when wind is the *exclusive* cause of the damage.[FN11] The Kodrins insist that Louisiana courts do

not read the provision so restrictively; rather, that they hold that coverage under a homeowner's policy is available if flooding is not the "proximate or efficient cause" of the damage.[FN12] We acknowledge the existence of tension between the relevant **\*675** case law of this circuit and that of the Louisiana intermediate courts, but we are bound by our own precedent.[FN13] Moreover, in this case, we view the distinction as being of little import. First, the divergent interpretations of this court and the Louisiana courts matter mainly when two forces, such as flood and wind, act together to cause damage. Here, there is no role for such a middle ground: Neither party maintained that wind and flood acted in some combination, only that one or the other caused all the damage. As a result, the jury's only options were 100 percent wind or 100 percent flood.[FN14] It was not presented with facts on which to determine that some combination of the two forces caused the damage, and it was not asked to decide on such a basis.

FN11. *Bilbe v. Belsom,* 530 F.3d 314, 316-17 (5th Cir.2008) (applying *Leonard v. Nationwide Mutual Insurance Co.,* 499 F.3d 419, 430 (5th Cir.2007), to Louisiana law). The policy provision here at issue-called an "anti-concurrent cause" provision-bars recovery when wind and water act together or in sequence. *Id.*

FN12. *Landry v. La. Citizens Prop. Ins. Co.,* 964 So.2d 463, 477 (La.App. 3d Cir.2007) ("[T]he fact that flood waters contributed to the damage or washes the property away does not compel a finding that flood damage was the efficient or proximate cause of the total loss."), *vacated in part on other grounds,* 983 So.2d 66 (La.2008); *see also Best v. State Farm Fire & Cas. Co.,* 969 So.2d 671, 675 (La.App. 4th Cir.2007) (quoting 11 COUCH ON INSURANCE 3d, § 153:17). The Kodrins reliance on *Roach-Strayhan-Holland Post No. 20, American Le-*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

*gion Club v. Continental Insurance Co. of New York* is misplaced. 237 La. 973, 112 So.2d 680 (1959). The case interpreted a policy providing wind damage coverage following a windstorm and rejected consideration of the contribution of other factors, such as building decay, to the damage. *Id.* at 683. Although the policy contained a water damage exclusion, the exclusion was not at issue, indeed the court noted that the windstorm policy was *"not otherwise limited or defined." Id.*

FN13. *See, e.g., FDIC v. Abraham,* 137 F.3d 264, 268-69 (5th Cir.1998) (addressing instance of *intervening* contrary state appellate court decisions); *see also First Nat'l Bank of Durant v. Trans Terra Corp. Int'l,* 142 F.3d 802, 809 (5th Cir.1998) (decision of state intermediate court is a "datum for ascertaining state law," which must be considered by, but is not binding on this court). In this case, *Bilbe* was decided in 2008 after both *Landry* and *Best.*

FN14. State Farm contends that the jury was left to contemplate that a wind-driven storm surge might have destroyed the home and, thus, to determine incorrectly that wind coverage was permissible. *See, e.g., Bilbe,* 530 F.3d at 317 n. 3 ("The classic example of such a concurrent wind-water peril is the storm-surge flooding that follows on the heels of a hurricane's landfall."). In *Bilbe,* the plaintiff sought coverage under her homeowner's policy based on the contention that Hurricane Katrina's winds drove the storm surge that inundated her home. Finding "storm surge" to be essentially synonymous with "flooding," the court affirmed the denial of coverage. *Id.* at 316. In the instant case, we find no merit in State Farm's assertion: The Kodrins maintained that a pre-flood tornado, not a

wind-driven storm surge, destroyed their home.

**\*\*3** Second, our holding in *Bilbe* creates a stricter rule than the Louisiana appellate court's *Landry* holding and thus is more favorable to State Farm-indeed, State Farm asserts that under *Bilbe* we must reverse. When we apply *Bilbe,* however, the jury instructions survive, so that even if we could consider *Landry,* we would not need to reach the issue. Thus, following *Bilbe,* the Kodrins could recover under their homeowner's policy only if the jury should find that wind alone, and not flooding at all, caused their loss. Conversely, if the jury should find that flooding destroyed the home, the policy's exclusionary clause would bar recovery.[FN15]

FN15. It is important to distinguish between this dispute over which force totally destroyed a home and cases in which the parties disagree as to the causes of various damaged elements of a home. Distinct elements of damage would have to be considered separately. Flood-damaged carpets, for example, would not bar recovery for a wind-damaged roof.

State Farm claims that the wording of the jury instructions vitiated the effect of the policy's flood exclusion by failing to make clear the all-or-nothing requirement of the homeowner's policy-as outlined in *Bilbe.* After stating that the Kodrins had the burden to prove that their claim was covered by the policy, the district court instructed the jury:

State Farm argues that it properly refused payment to the Kodrins based on its determination that the damage to plaintiffs' property was caused by water, which falls under the flood exclusion in plaintiffs' homeowner's policy, and not by wind. Under Louisiana law, State Farm bears the burden of proving the applicability of any exclusionary clause contained in its insurance policy by a preponderance of the evidence. If you find that State Farm has met its burden of proving by a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

preponderance of the evidence that the property damage *676 claimed by the Kodrins was caused by a non-covered peril, such as flooding, then State Farm is not liable to plaintiff for any damages under the policy.

State Farm complains that this instruction did not allow the jury to reach a third conclusion, *viz.,* that both wind and flood contributed to the damage and that, if this were the case, the Kodrins could not recover at all.

We are satisfied that the jury instruction correctly and unambiguously recited the law applicable in this case: If flood caused the damage "then State Farm is not liable." Again, neither State Farm nor the Kodrins contended at trial that a combination of wind and flood destroyed the Kodrins' home. State Farm insisted that flooding was the sole cause; the Kodrins were equally insistent that wind was the sole cause. The district court correctly observed that a complicated instruction addressing the combination of the two forces would be likely to do more harm than good, causing confusion by attempting to address a fact pattern not before the jury. As the parties claimed only that either wind alone or flood alone destroyed the home, it is they, not the court, who left the jury no way to find that the damage was caused by some combination of the two.

*3. Jury Interrogatories*

State Farm also complains that the jury interrogatories compounded the problem by asking only about wind. The first interrogatory asked: "Do you find by a preponderance of the evidence that Mrs. Kodrin sustained wind damage to her home?" The ensuing questions regarding other structures on the property and the contents of the home were worded identically.[FN16] If the jury answered the first questions for each category of property in the affirmative, the next interrogatory asked: "What amount does State Farm owe Mr. and/or Mrs. Kodrin for wind loss to their property?" The verdict form divided this question by type of property: dwelling, other structures, dwelling contents, and additional living expenses.

> FN16. They asked: "Do you find by a preponderance of the evidence that Mrs. Kodrin sustained wind damage to any other structure on her property?" and "Do you find by a preponderance of the evidence that Mr. and Mrs. Kodrin sustained wind damage to the contents of their home?"

**4 We can see that, if viewed in a vacuum, the interrogatories might be confusing, but we are comfortable that on the basis of the discrete facts of this case and the way it was tried by the parties, they were not. First, as already discussed, neither side presented its case on a theory that wind was a *contributing* factor; wind either did or did not cause the damage entirely, depending on which party's version was accepted by the jury. This issue was central during the trial: State Farm argued vigorously that flooding caused the damage and for that reason, the Kodrins could not recover; the Kodrins argued the reverse. The jury was never presented with facts that would permit it to find that the wind caused some but less than all the damage or that flood caused some but less than all the damage, which is the concern State Farm raises. Additionally, the jury charge itself made clear that if flooding caused the damage, recovery was barred. As a result, the jury could answer the interrogatories affirmatively and find in favor of the Kodrins if-but only if-it found that flooding did not contribute to the destruction of the Kodrins' property. We always presume that jurors follow the instructions given by the trial court,[FN17] and State Farm offers no argument to persuade us to abandon this well-established presumption here.

> FN17. *Russell v. Plano Bank & Trust,* 130 F.3d 715, 721 (5th Cir.1997) (*quoting United States v. Fletcher,* 121 F.3d 187, 197 (5th Cir.1997)).

*677 The district court has broad discretion in for-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

mulating jury instructions, and in this case offered a sound rationale for its choice. State Farm must demonstrate that the language creates "substantial and ineradicable doubt whether the jury has been properly guided in its deliberations."[FN18] Instead, its argument rests on the contention that the district court omitted an instruction regarding an argument not made by either side at trial. "In reviewing a trial judge's instruction to a jury, we must look at the charge as a whole."[FN19] When taken together and in context, the district court's instructions and interrogatories amply state the applicable law. As such, the trial court acted well within its discretion.

> FN18. *FDIC v. Mijalis,* 15 F.3d 1314, 1318 (5th Cir.1994) (internal quotation marks and citation omitted).

> FN19. *Farace v. Indep. Fire Ins. Co.,* 699 F.2d 204, 207 (5th Cir.1983).

*4. Burden of proof*

[2] Even though State Farm had the burden of proof that the damage to the Kodrins' home was excluded from coverage, the Kodrins had the burden of proof at all times with respect to coverage of their contents. Unlike the policy provision for coverage of the structure, the provision for coverage of its contents was on a so-called "named-peril basis," meaning that the contents of the Kodrins' home were covered *only if* they were damaged by an enumerated cause. "Windstorm or hail" were enumerated causes; flooding was not. This contrasts with the coverage provision for the Kodrins' home itself which was covered *unless* it was damaged by an enumerated exclusion, of which flooding was one. A named-peril provision requires the policyholder to prove that the claim is covered. Thus, the Kodrins had the burden of proof that the damage to or loss of the contents of their home was caused by wind.[FN20]

> FN20. *See, e.g., Best v. State Farm Fire & Cas. Co.,* 969 So.2d 671, 675 (La.App. 4th

Cir.2007) (quoting *Carriere v. Triangle Auto Serv.,* 340 So.2d 665, 666 (La.App. 4th Cir.1976)); *see also Opera Boats, Inc. v. La Reunion Française,* 893 F.2d 103, 105 (5th Cir.1990).

**\*\*5** The district court instructed the jury that the Kodrins had the burden of proving that their claims were covered. Specifically, the jury charge included four individual elements that the Kodrins had to prove:

> 1) That a valid enforceable contract existed between the parties; 2) That the claim for damage being made under the policy *is covered by the policy;* 3) The amount of the claim for damages under the contract; and 4) that State Farm breached the policy by failing to pay a covered claim.[FN21]

> FN21. Emphasis added.

The district court also instructed the jury that State Farm had the burden to prove the applicability of the exclusionary clause. State Farm protests that the district court did not provide a separate instruction regarding the burden of proof for the contents. Its argument appears to assume that the jury would interpret the instruction as to the exclusionary clause to mean that State Farm had the burden of proof across the boards.

The language of the charge is plain, and State Farm's suggested instruction would be largely redundant. The district court instructed the jury in detail that the Kodrins had the burden of proving coverage and that this burden only shifted with respect to the exclusionary clause.[FN22] (The jurors had the policy in front of them.) As *\*678* no exclusionary clause applied to the contents provision, the burden of proof obviously remained on the Kodrins. The interrogatories then separated out each of the categories of covered property so that the jury had to find with specificity that the cause of damage to each was wind if the Kodrins were to prevail.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

FN22. State Farm conflates this case with those in which plaintiffs proved only that damage was caused by a hurricane and insisted that was sufficient proof to bring a claim within coverage of a homeowner's policy. *See, e.g., Broussard v. State Farm Fire & Cas. Co.,* 523 F.3d 618, 624-25 (5th Cir.2008). In *Broussard,* the plaintiff claimed to have fulfilled his burden by proving, without more, that the damage to his personal property resulted from Hurricane Katrina. We held that the plaintiff had to go further and prove that the damage was caused by a named peril, i.e., wind. *Id. Broussard* is inapposite to the instant case because there is no question that here the jury was instructed that the Kodrins had to do more than demonstrate the claimed damage was caused by a hurricane.

The interrogatory relevant to contents asked: "Do you find by a preponderance of the evidence that Mr. and Mrs. Kodrin sustained wind damage to the contents of their home?" If the jury instruction left any doubt as to the burden of proof of the cause of contents damage or loss, this interrogatory made perfectly clear that, to recover, the Kodrins had to prove wind damage to their contents.[FN23] Indeed, the entirety of the Kodrins' position at trial was that wind, not flooding, caused every bit of their damage. There is no basis on which the jury could have thought that State Farm had the burden of proof with respect to that provision. The instruction properly placed the burden on the Kodrins for proving coverage as the result of wind damage, and there it remained with the sole exception of the exclusionary clause that had no applicability to contents. Thus, to hold otherwise would require not only abandoning the presumption that jurors follow instructions, but also assuming, with no evidence or basis whatsoever, that these jurors acted in direct contravention to the charge given.

FN23. We construe the jury charge and interrogatories as a whole. *Baker v. Canadian Nat'l/Ill. Cent. R.R.,* 536 F.3d 357, 363 (5th Cir.2008); *Consol. Cigar Co. v. Tex. Commerce Bank,* 749 F.2d 1169, 1173 (5th Cir.1985) ("[T]he test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of [the] issues and its duty to determine [the] issues.").

**B. Bad Faith**

*1. Standard of Review*

We review a district court's denial of a motion for judgment as a matter of law *de novo* and apply the same standards as the district court.[FN24] We construe the facts and draw all inferences in favor of the non-moving party, here, the Kodrins. We will reverse only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for a party."[FN25] Although our review is *de novo,* we afford "great deference" to the jury's verdict.[FN26]

FN24. *Baker,* 536 F.3d at 362.

FN25. *Piñeda v. United Parcel Serv., Inc.,* 360 F.3d 483, 486 (5th Cir.2004).

FN26. *Id.*

*2. Analysis*

**\*\*6** Under Louisiana law, an insurer owes its policyholder a duty of good faith in settling claims.[FN27] Failure to pay a claim within 30 days of being presented with satisfactory proof of loss is a breach of the duty if it is "arbitrary, capricious, or without probable cause."[FN28] In Louisiana, such **\*679** a breach exposes the insurer to liability for damages and discretionary penalties under R.S. 22:1220 or to penalties and attorneys' fees under R.S. 22:658.[FN29] R.S. 22:1220 and 22:658 are penal in nature and must be construed strictly.[FN30]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))

FN27. LA.REV.STAT. § 22:1220 (2007).

FN28. LA.REV.STAT. § 22:658(B)(1) (2007). Under R.S. 22:658(B)(1) "[f]ailure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor ... when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty ... as well as reasonable attorney fees and costs." An insurer is liable under R.S. 22:1220(B)(5) for "failing to pay the amount of any claim due any person insured by the contract *within sixty days* after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause." Emphasis added.

FN29. A plaintiff may get penalties under only one of the two statutes, whichever is higher, although he may get attorneys' fees under R.S. 22:658 if he is awarded penalties under R.S. 22:1220. *Calogero v. Safeway Ins. Co. of La.*, 753 So.2d 170, 174 (La.2000).

FN30. *Sher v. Lafayette Ins. Co.*, 988 So.2d 186, 206 (La.2008).

The insured has the burden of proving that the insurer acted in bad faith.[FN31] Under the applicable statutes, "arbitrary and capricious" means "vexatiously," as in a "vexatious refusal to pay" or a refusal to pay without reason or justification.[FN32] An insurer does not act arbitrarily or capriciously when its refusal to pay a claim is based on a genuine dispute over coverage or the amount of the loss.[FN33]

FN31. *Reed v. State Farm Mut. Auto. Ins. Co.*, 857 So.2d 1012, 1021 (La.2003).

FN32. *Id.*

FN33. *Id.*; *see Saavedra v. Murphy Oil U.S.A., Inc.*, 930 F.2d 1104, 1111 (5th

Cir.1991).

The only evidence that the Kodrins offered to demonstrate that this denial was in bad faith is the fact of the denial itself and their expert's testimony that wind actually caused the damage to the home. This is evidence that State Farm was wrong about the cause of damage, but without more, it is not evidence of bad faith. An insurer cannot be held to have acted in bad faith simply because it eventually turned out to be wrong about the cause of the damage.[FN34] "Where there is a serious dispute as to the nature of the loss, thus leaving the question of coverage in doubt, the insurer's refusal to pay the claim is not arbitrary, capricious or without probable cause."[FN35] Instead, the Kodrins had the burden of proving that State Farm withheld payment unjustifiably and without cause, and they failed to do so. For example, the Kodrins offered no evidence that State Farm believed that wind was likely the cause of the damage but nevertheless withheld payment.

FN34. *Icklone v. Travelers Indem. Co.*, 345 So.2d 202, 203 (La.App. 3d Cir.1977) ("Penalties may not be assessed merely because the insurer is the unsuccessful litigant in a lawsuit.").

FN35. *Id.* At least one Louisiana court has held that when the cause of damage is hotly contested at trial this is evidence that the insurer *did not* act in bad faith. *Block v. St. Paul Fire & Marine Ins. Co.*, 742 So.2d 746, 755 (La.App. 2d Cir.1999).

[3] State Farm denied payment to the Kodrins under their homeowner's policy on its determination that the home and its contents were destroyed by the storm surge (i.e., flooding), an excluded cause of loss.[FN36] State Farm declared that it determined flooding was the more likely cause of the damage to the home because (1) the Kodrins' neighborhood was inundated when a levee was overtopped during Hurricane Katrina, (2) the Kodrins' home was just one house away from that levee, and (3) many other

314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.)))**

houses in the area were lifted off their foundations and destroyed by the floodwaters. The Kodrins themselves acknowledged that their claimed wind damage to their home was unusual in their neighborhood, advancing that a tornado must have caused the damage as their speculation why their home was the *680 only one in the area destroyed by wind, not flooding. On these facts, we perceive no probative evidence that State Farm acted in bad faith. State Farm's refusal to pay was with reason, FN37 even if the jury ultimately rejected that reason. FN38 The Kodrins have failed to prove otherwise; they essentially ask this court to find bad faith any time an insurer denies coverage and a jury disagrees. This would unduly pressure insurers to pay out claims that they have reason to believe lie outside the scope of coverage, solely to avoid penalties later. Such a rule would pervert the presumption that insurers act in good faith unless the insured proves bad faith, and this is foreclosed by Louisiana law. FN39

> FN36. *See, Bilbe v. Belsom*, 530 F.3d 314, 317 (5th Cir.2008).

> FN37. *Molony v. USAA Prop. & Cas. Ins. Co.*, 708 So.2d 1220, 1226 (La.App. 4th Cir.1998) (insurer's refusal to pay is not arbitrary and capricious "if there is a reasonable dispute between the insurer and insured as to the amount of a loss."). In this case, the dispute was over the all-or-nothing cause of the loss, not over some combined cause.

> FN38. A determination of whether an insurer acted in good faith is based on the information known to the insurer at the time it refused payment. *La. Bag Co., Inc. v. Audubon Indem. Co.*, 999 So.2d 1104, 1113-14 (La.2008).

> FN39. We caution insurers, however, that simply denying coverage on the basis that damage was caused by an excluded peril is not a route to avoiding R.S. 22:1220 and

22:658 penalties and fees. We decide this case on the Kodrins' failure to present evidence legally sufficient to prove bad faith.

**7 Awards and penalties under R.S. 22:1220 and 22:658, including damages awarded under R.S. 22:1220 for mental anguish, require that the insurer be proved to have acted arbitrarily and capriciously in violation of these statutes. As we hold that, as a matter of law, the Kodrins failed to bear their burden of proving that State Farm acted in bad faith, we vacate the district court's awards of penalties and damages under R.S. 22:1220 and its award of attorneys' fees under R.S. 22:658.

### III. CONCLUSION

We affirm the jury's finding of coverage and its award of damages for the loss of the Kodrins' home and its contents under the homeowner's policy. We vacate that portion of the court's judgment awarding penalties, damages, and attorneys' fees under R.S. 22:1220 and 22:658 resulting from the jury's finding of bad faith. We therefore remand this case to the district court with instructions to enter a revised judgment consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED for entry of judgment in accordance herewith.

C.A.5 (La.),2009.
Kodrin v. State Farm Fire and Cas. Co.
314 Fed.Appx. 671, 2009 WL 614521 (C.A.5 (La.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp., 1996 WL 33370649 (N.D.Miss.)
**(Cite as: 1996 WL 33370649 (N.D.Miss.))**

**H**

Only the Westlaw citation is currently available.

United States District Court, N.D. Mississippi,
Delta Division.
James C. DIAL, Sr. Plaintiff
v.
THE HARTFORD ACCIDENT & INDEMNITY
CO. Defendant
**No. CIV.A. 2:95CV38-D-B.**

Jan. 25, 1996.

MEMORANDUM OPINION

DAVIDSON, District J.

*1 This cause comes before the court upon the defendant's Motion for Summary Judgment. The plaintiff, James C. Dial, Sr., has sued The Hartford Accident & Indemnity Company ("Hartford") alleging that the defendant breached its duty of good faith and fair dealing by refusing to honor Dial's workers' compensation claims arising from an isolated incident of exposure to welding fumes. Hartford contends in its Motion for Summary Judgment that the Mississippi Workers' Compensation Commission ("Commission") already determined that Hartford was not contractually obligated for those claims and that the Commission's adjudication bars this suit for punitive and exemplary damages. In the alternative, Hartford submits that it had an arguable reason for denying Dial's claims which also precludes any exemplary award. After a thorough review of the record in this cause, the undersigned finds that the defendant's motion for summary judgment is not well taken and it shall be denied.

FACTUAL BACKGROUND [FN1]

FN1. In a motion for summary judgment, the facts must be construed in the light most favorable to the non-moving party. *Matagorda County v. Russel Law,* 19 F.3d 215, 217 (5th Cir.1994). The court's recitation of the facts in this case reflects this rule.

Bolivar County Gravel ("BCG") employed James Dial as a towboat pilot and dredge operator for approximately ten (10) years prior to November 24, 1986. [FN2] United States Fidelity & Guaranty Company ("USF & G") wrote BCG's workers' compensation coverage for the first eight and a half of those ten years. However, from May 14, 1985, through November 24, 1986, Hartford insured BCG for workers' compensation payments including reimbursement of medical bills and travel expenses.

FN2. Prior to that employment, Dial had worked various other jobs for BCG's predecessors which also exposed him to welding fumes and smoke for approximately twenty (20) years. See *Bolivar County Gravel Co. v. Dial,* 634 So.2d 99 (Miss.1994), for a thorough review of the facts of this case.

Dial suffered an employment-related disability on or about November 24, 1986, when he inhaled some poisonous fumes while welding. This disability, which plagues him to this day, eventually required Dial to leave his job on September 11, 1987, and he has not been employed since that time.

After Dial inhaled the fumes, he continued to work that day and the next thirty days without lost time. On December 20, 1986, Dial went to the Bolivar County Hospital emergency room complaining of breathing difficulties and weakness. Following that visit, he did not return to work until February 2, 1987. Dial requested workers' compensation benefits during that time, claiming a job-related injury due to the November 24, 1986, incident. Hartford refused to pay until Dial underwent an independent examination by a pulmonary specialist, Barry L.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 33370649 (N.D.Miss.)
**(Cite as: 1996 WL 33370649 (N.D.Miss.))**

Whites, M.D., in Jackson, Mississippi. After receiving the results of that examination,[FN3] Hartford paid Dial's medical expenses and all compensation benefits owed him up to February 2, 1987.

> FN3. Dr. Whites concluded at that time, based in part upon the limited information Dial's doctor had provided, that the welding fumes Dial inhaled on November 24, 1986, probably contributed to Dial's lung problems.

Dial resumed his job on February 2, 1987, and worked without lost time through September 12, 1987, at which time his breathing difficulties aggravated and he became unable to return to work. He has been unemployed since that time and Hartford does not dispute his claim of total disability as of that September date.

Subsequently, Dial filed a workers' compensation claim seeking permanent disability benefits from Hartford for the November 24, 1986, incident which he alleged left him permanently and totally disabled. Because of Dial's preexisting lung difficulties,[FN4] Hartford initially refused to pay until the receipt of supplemental medical information. Dial later amended his claim to add USF & G as a party and include an alternative cause of action for "repetitive exposures" with BCG dating from 1977 through November 23, 1986. USF & G and BCG both settled with Dial who discharged them under the Mississippi Workers' Compensation Act for any lung impairment resulting from his exposures prior to May 1985, the inception date of Hartford's coverage. That left only Hartford in the case with two causation issues as to his permanent disability: (1) the causal effect of Dial's inhalation of noxious agents on November 24, 1986; and (2) the causal effect of Dial's repetitive exposures from May 1985 through November 23, 1986, the period Hartford insured BCG.

> FN4. Dial had been hospitalized for lung problems in 1980 and suffered a collapsed lung in May, 1983. He also was a heavy ci-

garette smoker until he quit in 1982, smoking up to two packs a day for 25 to 28 years. *Dial,* 634 So.2d at 101.

**\*2** The Administrative Law Judge (ALJ) rejected the isolated incident of November 24, 1986, as having any causal relationship with Dial's permanent lung disability.[FN5] The ALJ did award benefits, however, based on the repetitive exposure theory. Both Dial and Hartford appealed that decision to the Commission which affirmed the ALJ except for reducing the final disability award by 90% after finding that 90% of Dial's lung damage was due to a pre-existing lung disease for which Hartford was not liable.[FN6] This decision was ultimately affirmed by the Mississippi Supreme Court. *Bolivar County Gravel Co. v. Dial,* 634 So.2d 99 (Miss.1994). Hartford then promptly paid Dial's lung-related medical expenses and all disability benefits to which he was entitled due to the 10% award.

> FN5. The ALJ found that Dial was temporarily totally disabled for a period beginning December 20, 1986, and ending February 2, 1987 due to his exposure on November 24, 1986. ALJ's Order, at 12, attached as Defendant's Exhibit 5H. However, the ALJ further found that Dial suffered no lasting impairment from that temporary disability. *Id.* at 2 ("Medical testimony herein compels the conclusion that claimant fully recovered from the episode of November 24, 1986, on or about February 2, 1987."); *Dial,* 634 So.2d at 100.

> FN6. Although Dial did appeal the Commission's reduction of his award based on repetitive exposure, Hartford asserts that Dial did not appeal any further the Commission's rejection of Dial's claim for permanent disability benefits on account of the isolated November exposure. Defendant's Brief, at 2. Dial does not dispute this statement in his brief. Without further re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 33370649 (N.D.Miss.)
**(Cite as: 1996 WL 33370649 (N.D.Miss.))**

> cord evidence on this matter, Dial is bound
> to that holding due to the relevant statutory
> language.

> The final award of the commission shall
> be conclusive and binding unless either
> party to the controversy shall, within
> thirty (30) days from the date of its filing
> in the office of the commission and noti-
> fication to the parties, appeal therefrom
> to the circuit court of the county in
> which the injury occurred.

> Miss.Code Ann. § 71-3-51.

Subsequently, Dial sued Hartford in state court al-
leging that Hartford breached its duty of good faith
and fair dealing by refusing to promptly pay sub-
mitted claims. Hartford removed the case to this
court and filed its Motion for Summary Judgment
presently under consideration.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admis-
sions on file, together with the affidavits, if any,
show that there is no genuine issue as to any mater-
ial fact and that the moving party is entitled to a
judgment as a matter of law." F.R.C.P. 56(c). The
party seeking summary judgment carries the burden
of demonstrating that there is an absence of evid-
ence to support the non-moving party's case.
*Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106
S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once a
properly supported motion for summary judgment
is presented, the burden shifts to the non-moving
party to set forth specific facts showing that there is
a genuine issue for trial. *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91
L.Ed.2d 202 (1986); *Brothers v. Klevenhagen,* 28
F.3d 452, 455 (5th Cir.1994). "Where the record,
taken as a whole, could not lead a rational trier of
fact to find for the non-moving party, there is no
genuine issue for trial." *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct.
1348, 89 L.Ed.2d 538 (1986); *Federal Sav. & Loan
Ins. v. Krajl,* 968 F.2d 500, 503 (5th Cir.1992). The
facts are reviewed drawing all reasonable infer-
ences in favor of the party opposing the motion.
*Matagorda County v. Russel Law,* 19 F.3d 215, 217
(5th Cir.1994).

### DISCUSSION

In resolving matters of substantive law in diversity
cases such as this, the court is *Erie*-bound to apply
Mississippi law. *Erie RR v. Tompkins,* 304 U.S. 64,
58 S.Ct. 817, 82 L.Ed.2d 1188 (1938); *Eichenseer
v. Reserve Life Ins. Co.,* 682 F.Supp. 1355, 1361
(N.D.Miss.1988). Hartford submits that summary
judgment is appropriate because (1) Dial was not
awarded contractual damages grounded on the
November 24, 1986, incident, and (2) Hartford has
demonstrated the absence of any genuine issue of
material fact and it is entitled to judgment as a mat-
ter of law.

### A. Award Of Contractual Damages

**\*3** Dial has brought a bad faith action based solely
on his single exposure to welding fumes on Novem-
ber 24, 1986. *See* Plaintiff's Complaint, ¶ IV. "[A]
'prerequisite to the award of punitive damages
[under such an action] is the determination that the
plaintiff is entitled to contractual damages." ' *Dial
v. Hartford Accident & Indemnity Co.,* 863 F.2d 15,
16 (5th Cir.1989) (quoting *McCain v. Northwestern
Nat'l Ins. Co.,* 484 So.2d 1001, 1002 (Miss.1986)).
Hartford asserts that the ALJ and the Commission
declined to award Dial disability benefits due to the
isolated exposure. This asseveration is partially cor-
rect. The ALJ found that Dial fully recovered from
the November incident and rejected Dial's claim for
permanent disability benefits grounded on that
single exposure. However, the ALJ did hold Hart-
ford liable for temporary total disability benefits
from December 20, 1986, through February 2,
1987, due to Dial's exposure in November. ALJ Or-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 33370649 (N.D.Miss.)
**(Cite as: 1996 WL 33370649 (N.D.Miss.))**

der, at 15, attached as Defendant's Exhibit 5H.

The wording of Dial's Complaint could lead to some confusion on this issue. It states that:

[O]n or about November 24, 1986, the Plaintiff seriously injured his lungs which has caused Plaintiff serious *permanent* and total disability, which disability has continued to the present time.

Plaintiff's Complaint, ¶ IV (emphasis added). However, as noted earlier, the ALJ, whose decision the Commission later affirmed, found that Dial fully recovered from that single exposure by February 2, 1987, and that Dial's permanent disability was not a result of that incident, but resulted from repetitive exposures. Therefore, Hartford was not held contractually liable for Dial's permanent disability claim grounded on the isolated November incident and cannot be liable for a bad faith action grounded on such a claim. *Shepherd v. Boston Old Colony Ins. Co.,* 811 F.Supp. 225, 230-31 (S.D.Miss.1992) ("A further feature of Mississippi law is the well-settled principle that a worker may not bring a bad faith claim against the insurer unless first a determination has been made that the worker was entitled to the benefits at issue in the underlying workers' compensation action.") (citing cases); *see also Dial,* 863 F.2d at 16 ("A claim of entitlement to worker's compensation benefits is a matter within the exclusive original jurisdiction of the ... Commission."); Miss.Code Ann. § 71-3-47.

However, the Complaint can be read to embrace a claim for bad faith refusal to pay benefits due for *temporary* disability caused by the isolated event. It further states:

The Hartford Accident and Indemnity Company has breached its duty of fair dealing and good faith owed to Plaintiff in the following respects:

(a). failing to pay medical and drug bills at a time when the Defendant knew Plaintiff was totally disabled and entitled to said benefits under said insurance policy.

Plaintiff's Complaint, ¶ VI. By not limiting his claim to benefits due because of *permanent* disability, Dial's Complaint can be read to include a bad faith claim for failure to pay temporary disability benefits due as a result of the November incident. *See Information Resources, Inc. v. United States,* 950 F.2d 1122, 1127-28 (5th Cir.1992) (noting that complaint need only assert facts sufficient to give defendant notice), *superseded on other grounds, Venen v. United States,* 38 F.3d 100 (5th Cir.1994). As those benefits were awarded in the ALJ's Order, Dial's bad faith claim grounded on Hartford's delay in paying temporary benefits and medical bills is not barred by the prerequisite that contractual liability attach before such a claim may be brought.

### B. Elements of Bad Faith

**\*4** In the alternative, Hartford submits that Mississippi law precludes any award of exemplary damages to Dial because Hartford had an arguable reason for denying Dial's claims.

Under Mississippi law in order to recover punitive damages for an insurer's bad faith refusal to pay a claim, the plaintiff must prove two things: (1) that the insurer had no legitimate or arguable reason to deny payment on the claim, *and* (2) that the insurer acted with gross and reckless disregard for the insured's rights so that it becomes a heightened tort.

*Prudential Property & Casualty Ins. Co. v. Mohrman,* 828 F.Supp. 432, 440 (S.D.Miss.1993) (emphasis added). The Mississippi Supreme Court defines an "arguable reason" as
one in support of which there is some credible evidence. There may well be evidence to the contrary. A person is said to have an arguable reason for acting if there is some credible evidence that supports the conclusions on the basis of which he acts.

*Id.* (quoting *Blue Cross & Blue Shield, Inc. v. Campbell,* 466 So.2d 833, 851 (Miss.1984)). However, the lack of an arguable reason alone does not lead inevitably to an imposition of punitive

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 33370649 (N.D.Miss.)
**(Cite as: 1996 WL 33370649 (N.D.Miss.))**

damages. Not only must the plaintiff demonstrate the absence of an arguable reason, but he must also show "some wilful or malicious wrong or the gross or reckless disregard for the rights of others." *Id.* (quoting *Eichenseer v. Reserve Life Ins. Co.,* 682 F.Supp. 1355, 1363 (N.D.Miss.1988)).

#### 1. An Arguable Reason

Hartford asserts that Dial must necessarily lose on the first prong-lack of an arguable reason. As previously noted, Dial had been a heavy smoker for approximately 25 to 28 years prior to November 24, 1986. He also had a history of lung-related difficulties. On the day in question, Dial had been welding out in the open and not in an enclosed space where welding fumes could have accumulated. Furthermore, Dial continued to work the rest of the day in question and for the following thirty (30) days with no lost time. Because of these circumstances surrounding Dial's claim for temporary total disability benefits, Hartford submits it had more than an arguable reason to delay payment.[FN7]

> FN7. Hartford further submits that when it was first notified of Dial's disability, the notice merely stated Dial was expected to be absent from work only three (3) days. Workers' compensation benefits are not required until five (5) consecutive days are missed. Miss.Code Ann. § 71-3-11. Hartford contends it was unaware of the length of Dial's leave until late January. At that time, Hartford turned the file over to a claims adjustor. Atkinson Aff., Oct. 5, 1995, at 2.

Hartford turned Dial's file over to a claims adjustor in January and refused payment until an independent doctor could evaluate Dial's condition. Such an examination did not occur until April 15, 1987, when a pulmonary specialist, Dr. Barry Whites, in Jackson, Mississippi, conducted an interview with Dial. After his examination, Dr. Whites tendered to Hartford his opinion that the November 24, 1986,

exposure probably contributed to Dial's lung problems necessitating his leave from work December 1986 through February 1987. Whites Depo., Apr. 6, 1988, attached as Defendant's Exhibit 5G, at 29-30. On May 20, 1987, Hartford remitted to Dial all payments due him for his period of temporary total disability. Atkinson Aff., Oct. 5, 1995, at 5.

Dial submits that Hartford did not have an arguable reason to delay payment of his claim because Hartford had no opinion from any doctor contradicting Dial's doctor, Dr. A.W. Lindsey, who had examined Dial and determined that the November exposure caused Dial's temporary total disability. Although the facts appear to favor Hartford, the undersigned cannot say as a matter of law that Hartford had an arguable reason for delaying action on Dial's claim. However, this conclusion alone does not inevitably lead to a denial of Hartford's summary judgment motion since the court must also address the second prong of the bad faith claim.

#### 2. Heightened Tort

*\*5* The gravamen of Dial's argument for maliciousness or wilfulness on Hartford's part is the amount of time that elapsed between when Dial first submitted his claim for temporary total disability payments in December and the time when Hartford complied with his request in May of the following year. This delay of approximately five (5) months is part of what Dial alleges constitutes bad faith on the part of Hartford. Hartford offers a detailed explanation of its actions during those five months as it continued to evaluate Dial's claim. Atkinson Aff., Oct. 5, 1995, at 2-5. However, the court is again unable to say as a matter of law that such a delay was not in gross disregard of Dial's rights.

Dial also offers record evidence that Hartford instructed the Bolivar Insurance Agency, Hartford's local insurance representative, to refrain from forwarding to Hartford any more of Dial's bills related to the November incident. Plaintiff's Exhibit 1. Certainly such evidence, in addition to the five-month

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 33370649 (N.D.Miss.)
**(Cite as: 1996 WL 33370649 (N.D.Miss.))**

delay in payment, precludes an award of summary judgment in Hartford's favor.

## CONCLUSION

Hartford was held contractually liable under the Workers' Compensation Act for compensation due Dial for his temporary total disability arising from his exposure to welding fumes on November 24, 1986. Therefore, Dial has demonstrated the prerequisite of contractual liability for this bad faith claim, precluding an award of summary judgment on that ground. Furthermore, based on the record, the court cannot hold as a matter of law that Hartford had an arguable reason for delaying payment of those benefits approximately five (5) months, or that Hartford did not act in reckless disregard of Dial's rights in this matter. Based on the foregoing, the court is of the opinion that Hartford's motion for summary judgment is not well taken and it shall be denied.

A separate order in accordance with this opinion shall issue this day.

## ORDER DENYING SUMMARY JUDGMENT

Pursuant to a memorandum opinion entered this day, the court upon due consideration of defendant's motion for summary judgment, finds the said motion not well taken and the same will be denied.

It is therefore ORDERED that:

1) defendant's motion for summary judgment be, and it is hereby, DENIED.

All memoranda, depositions, affidavits and other matters considered by the court in denying the defendant's motion for summary judgment are hereby incorporated and made a part of the record in this cause.

N.D.Miss.,1996.
Dial v. Hartford Accident & Indemnity Co.
Not Reported in F.Supp., 1996 WL 33370649

(N.D.Miss.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 1890104 (W.D.Va.)
(Cite as: 2006 WL 1890104 (W.D.Va.))

C
Only the Westlaw citation is currently available.

United States District Court,
W.D. Virginia.
John STYLES, Plaintiff,
v.
LIBERTY MUTUAL FIRE INS. CO., Defendant.
No. 7:06CV00311.

July 7, 2006.

Melvin E. Williams, Johnson Ayers & Matthews, Roanoke, VA, for Plaintiff.

Jason Guy Moyers, Frankl Miller & Webb LLP, Roanoke, VA, for Defendant.

*MEMORANDUM OPINION*

TURK, Senior J.

**\*1** The plaintiff, John Styles, filed a civil action in state court against the defendant, Liberty Mutual Fire Insurance Co., ("Liberty Mutual"), arising from fire damage that occurred on his property. The defendant removed the action to this court and filed a motion to dismiss. The court heard oral arguments on July 5, 2006. After consideration of the merits of the arguments, the defendant's motion to dismiss is Denied.

I.

On July 16, 2004, a fire occurred on the plaintiff's property which damaged the structure located on the property and destroyed the plaintiff's personal possessions. The plaintiff had a homeowner's policy with the defendant which covered losses due to fire on the property. Upon investigation by the defendant and the local arson investigators, it was determined that the plaintiff committed the arson and was criminally charged. The charges were subsequently

*nolle prosequied.* The plaintiff has maintained throughout that he did not commit the arson.

Due to the defendant's investigation and conclusion that the plaintiff committed the arson, it denied the plaintiff's loss claim request. The plaintiff filed this action alleging that the defendant breached the terms of the homeowner's policy contract by denying coverage and acted in bad faith.

II.

Dismissal under Rule 12(b)(6) is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In considering a motion to dismiss, the court accepts as true all well-pleaded allegations in the complaint in the light most favorable to the plaintiff while drawing all reasonable factual inferences from those facts in the plaintiff's favor. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir.1999); *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). The function of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint and not the facts that support it. *Neitzke v. Williams,* 490 U.S. 319, 326-27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). The defendant argues that the claim for bad faith should be dismissed without prejudice because, as a matter of law, it cannot proceed until a judgment against the insurer has been issued. In the alternative, the defendant argues that a bad faith claim cannot be based on the timing of the insurer's coverage decision or the fact that the insurer cooperated with fire officials in the arson investigation.

III.

There is no separate tort of bad faith involving insurance coverage disputes in Virginia. *See A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.,* 798

Not Reported in F.Supp.2d, 2006 WL 1890104 (W.D.Va.)
(Cite as: 2006 WL 1890104 (W.D.Va.))

F.2d 669, 676 (4th Cir.1986). There is, however, a statutorily created remedy that allows a court to award attorney's fees and costs to the insured if the insurer acted in bad faith. *See* Va.Code § 38.2-209. The defendant is correct that an award of fees and costs under this statute cannot be adjudicated until a decision has been issued on the breach of contract claim. It is incorrect, however, in asserting that the statutory remedy must be dismissed until the contract claim is decided.

**\*2** Like any fee-shifting statute, Section 38.2-209 is not an independent substantive cause of action but a remedy providing incentive for parties to bring the underlying claim and a punishment for the offending party. *See CUNA Mut. Ins. Soc'y v. Norman,* 237 Va. 33, 38, 375 S.E.2d 724 (1989) ("This statute is both punitive and remedial in nature."). A demand under a fee-shifting statute is a corollary to the substantive cause of action. It is not pled separately because it is not a separate cause of action but a request in conjunction with the claim from which it arises. *See Salomon v. Transamerica Occidental Life Ins. Co.,* 801 F.2d 659, 661 (4th Cir.1986) (referring to a previous version of the fee-shifting statute, which is essentially similar to the current amendment, "the attorney fees statute, does not create a cause of action, but merely permits the award of attorney fees where a private cause of action already exists."). It need not be pled only after a judgment on the substantive claim but the court will only pass on the issue once a decision has been reached on the breach of contract claim.

The defendant relies on *U.S. Airways, Inc., v. Commonwealth Ins. Co.,* 64 Va. Cir. 408, 2004 WL 1094684 (Va. Cir. Ct.2004) (unpublished) and cases citing to it, for the proposition that a bad faith claim under the statute must be dismissed until a judgment on the breach of contract issue is decided. The *U.S. Airways* court correctly states that the fee-shifting statute does not create a separate cause of action. *Id.* at \*9. It, however, dismisses the fee request claim until after a judgment on the breach of contract issue is decided. No Virginia Supreme

Court opinion has held this proposition. Furthermore, *U.S. Airways* creates a troubling paradox as to how and when a petitioner must raise the issue of fees and costs under the statute.

If the *U.S. Airways* court intended that the fee request be filed in a subsequent civil action, a party could not do such because a request under Section 38.2-209 is not a separate cause of action that can be independently brought. *See Salomon,* 801 F.2d at 661; *U.S. Airways,* 2004 WL 1094684 at \*9. If the *U.S. Airways* court intended that the fee request be made for the first time after judgment on the coverage issue, the defendant would be prejudiced by not having notice at the outset of the action that it could be subject to a claim of fees and costs. *See generally Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.,* 705 F.2d 712, 716 n. 4 (4th Cir.1983) (stating, *inter alia,* that [petitioner's] failure to specifically state a claim for fees in the complaint barred such relief); *see also Bullock v. Bullock,* 2001 WL 1178534 (Va. Cir. Ct.2001) (unpublished) ("The Court believes that the failure to file a pleading putting the other side on notice of a claim for attorney's fees bars [petitioner] from making that claim at this time."); *Countryside Proprietary, Inc. v. King,* 1991 WL 834799 (Va. Cir. Ct.1991) (unpublished) ( "[A] party seeking recovery for attorneys fees and costs must request them in a pleading filed before trial.").

**\*3** The plain language of the statute makes clear that the fee request be brought within the same suit as the substantive claim. The statute states that in any civil action where there is a coverage dispute, the insured can recover fees and costs if the insurer acted in bad faith. *See* Va.Code § 38.2-209. Similar to any civil action in which costs or other fees are demanded, the request is entertained by the court only after the substantive cause of action is adjudicated. A request for fees or costs is not set out in a subsequent separate civil action but in the same matter from which it arises. Such a request must be made in the complaint, although it is not considered until the denouement of the case. Therefore, the fee request will not be dismissed because it has been

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

properly pled.

In addition, the court finds unconvincing the defendant's argument that discovery on the breach of contract claim and bad faith issue be bifurcated. The issue of coverage is intimately intertwined with the issue of bad faith. The breach of contract claim is premised on the plaintiff's allegation that the defendant denied his claim in bad faith. The defendant's actions subsequent to the loss claim filed by the plaintiff are material not only for the issue of bad faith but also to the issue of whether coverage should have been denied. This is because the defendant's rationale for its coverage decision will ultimately affect whether such decision was correct and whether there was bad faith.

Whether the defendant's denial of coverage under the policy was proper will depend on whether there is evidence that the plaintiff committed the arson. Whether the plaintiff committed arson will invariably include evidence as to how the defendant reached its conclusions, including details of the defendant's investigation and its interaction with local fire investigators. It would be inefficient to bifurcate discovery on issues that parallel each other and thus, the court will allow discovery on both issues to proceed simultaneously.

IV.

In the alternative, the defendant argues that two of the plaintiff's bases for his bad faith argument cannot proceed as a matter of law. First, the defendant argues that an assertion of bad faith premised on the timing of the insurer's coverage decision is not recognized in Virginia. Liberty Mutual extracts from *CUNA* the proposition that the length of time it takes for the insurer to make a coverage decision is not applicable in the bad faith analysis. The defendant, however, misconstrues *CUNA. CUNA* listed several factors that a court could consider in evaluating bad faith. *CUNA,* 237 Va. at 38, 375 S.E.2d 724. The list of factors, however, was not an exhaustive or exclusive list.

As the *CUNA* court stated earlier in its opinion, "in evaluating the conduct of an insurer, courts should apply a reasonableness standard." *Id.* Such a standard is not amenable to a precise definition because it depends on the circumstances of each individual case. Due to the vagueness of a reasonableness standard, the *CUNA* court decided to give guidance to lower courts by listing non-exclusive factors that should be considered. *See Winston v. State Farm Fire & Cas. Co.,* 97 F.3d 1450, 1996 WL 500943 *3 (4th Cir.1996) (unpublished) (explaining the inquiry into bad faith by stating "[s]everal of the non-exclusive factors" offered by *CUNA* ). Never in *CUNA* or its progeny, did the Virginia Supreme Court hold that others factors may not be material. FN1 The timing of a coverage decision, especially if severely tardy, would be a material factor to consider on the issue of bad faith. Otherwise, an insurer could indefinitely delay issuing a coverage decision without fear of penalty. Such conduct would not be reasonable or in good faith.

> FN1. The defendant's citation to *HHC Assocs. v. Assurance Co. of Am.,* 256 F.Supp.2d 505 (E.D.Va.2003) for the proposition that timing cannot be a factor to be considered is unconvincing because the Fourth Circuit in *Winston,* albeit it an unpublished opinion, stated that the *CUNA* factors were non-exclusive.

*4 Second, the defendant is incorrect that the Arson Reporting Immunity Act ("ARIA"), Va.Code § 27-85.5, immunizes it from liability without exception. ARIA only immunizes the insurer for release of information arising from arson, made without actual malice. *See* Va.Code § 27-85.5E ("[P]ursuant to subsections A or B of this section [an insurance company] shall be immune from any liability arising out of a civil action ... unless actual malice on the part of the insurance company ... is present.") (emphasis added). The plaintiff is alleging that the defendant's interaction with fire officials was without merit and in bad faith. In essence, the complaint is alleging that the defendant knew it

Not Reported in F.Supp.2d, 2006 WL 1890104 (W.D.Va.)
**(Cite as: 2006 WL 1890104 (W.D.Va.))**

did not have reason to report that the plaintiff committed arson when it did so to arson investigators, in order to avoid its obligations under the insurance by having the plaintiff criminally prosecuted. Such conduct would support a claim of actual malice. Whether evidence of such nefarious conduct exists to survive summary judgment is questionable. The plaintiff's allegations, however, taken as true and in the light most favorable to him, state a claim.

## V.

The plaintiff's request for fees and costs under Section 38.2-209 is properly pled. Discovery on the breach of contract claim and bad faith issue will proceed simultaneously. Furthermore, the issue of bad faith can proceed on the plaintiff's allegations that the defendant conspired with fire officials and that it unreasonably delayed issuing a coverage decision.

W.D.Va.,2006.
Styles v. Liberty Mut. Fire Ins. Co.
Not Reported in F.Supp.2d, 2006 WL 1890104 (W.D.Va.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2002 WL 32121257 (E.D.La.)
(Cite as: 2002 WL 32121257 (E.D.La.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
NEW ORLEANS ASSETS, L.L.C.
v.
TRAVELERS PROPERTY CASUALTY COM-
PANY
No. Civ.A. 01-2171, Civ.A. 02-974.

Filed July 16, 2001.
Sept. 12, 2002.

Richard P. Richter, James M. Garner, Martha Y.
Curtis, Emma E. Daschbach, Sher Garner Cahill
Richter, Klein McAlister & Hilbert, LLC, New Or-
leans, LA, Christopher Walt, Christopher Walt, At-
torney at Law, La Jolla, CA, for New Orleans As-
sets, L.L.C., plaintiff.

Richard S. Vale, Pamela Ferrage Noya, William
Clay Cruse, Blue Williams, L.L.P., Metairie, LA,
for Carl E Woodward LLC, defendant.

Marshall Mc Alis Redmon, William Bowen McRae,
Jr., Phelps Dunbar, LLP, Baton Rouge, LA, Mi-
chael David Kurtz, Shaw Norton, LLP, New Or-
leans, LA, for Atha Architecture, P.C., defendant.

Glenn Paul Orgeron, Benjamin R. Grau, Thomas A.
Porteous, Terrance Anthony Prout, Lemle & Kelle-
her, LLP, New Orleans, LA, for Ellis Co Inc, de-
fendant.

Leonard L. Kilgore, III, David Kimberly Nelson,
Erich Phillip Rapp, Kean, Miller, Hawthorne,
D'Armond, McCowan & Jarman, LLP, Baton
Rouge, LA, Julie Parelman Silbert, Kean, Miller,
Hawthorne, D'Armond, McCowan & Jarman, LLP,
Energy Centre, New Orleans, LA, Terrence D. Mc-
Cay, Kean, Miller, Hawthorne, D'Armond, Mc-
Cowan & Jarman, LLP, Lake Charles, LA, Yul D.
Lorio, Yul D. Lorio, Attorney at Law, Lake
Charles, LA, for Omnova Solutions Inc, defendant.

Howard Louis Murphy, Victor John Franckiewicz,
Jr., Anne Burguieres Rappold, Deutsch, Kerrigan &
Stiles, New Orleans, LA, for Associated Design
Group, Inc., defendant.

Elliot Ross Buckley, Jr., Kingsmill Riess, LLC,
New Orleans, LA, for Commercial Painting Com-
pany, Inc., defendant.

Donald Edward McKay, Jr., Leake & Andersson,
LLP, Energy Centre, New Orleans, LA, J. Ashley
Inabnet, Mark W. Mercante, Mark Wayne Frilot,
Shaw Norton, L.L.P., Mandeville, LA, for Perez
Ernst Farnet, a Professional Corporation, Architects
and Engineers, (incorrectly named as Perez Farnet
Ernst) fka Perez Ernst Farnet Architects and Plan-
ners, defendant.

Dennis J. Phayer, Burglass & Tankersley, L.L.C.,
Metairie, LA, for Louisiana Insurance Guaranty As-
sociation, defendant.

Marshall Mc Alis Redmon, William Bowen McRae,
Jr., Edward Winter Trapolin, Krebs, Farley & Pelle-
teri, LLC, New Orleans, LA, Michael David Kurtz,
for Alan Paul Atha, defendant.

Julie Parelman Silbert, Terrence D. McCay, Yul D.
Lorio, for Muraspec North America LLC fka Gil-
man Wallcovering, defendant.

Edward D. Markle, Markle & Associates, APLC,
New Orleans, LA, for Eykon Wall Source, Inc. fka
Arton South Inc dba Arton South Inc, defendant.

Howard Bruce Kaplan, Robert A. McMahon, Jr.,
Ann Marie Sico, Bernard, Cassisa, Elliott & Davis,
Metairie, LA, for Patton Wallcoverings, Inc., de-
fendant.

Jon A. Gegenheimer, Edward D. Markle, (See
above), Markle & Associates, APLC, New Orleans,
LA, for Arton South Corporation, (Incorrectly sued
as Eykon Wall Source Inc. a/k/a Arton South Inc.)
aka Eykon Wall Source, Inc., defendant.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 32121257 (E.D.La.)
**(Cite as: 2002 WL 32121257 (E.D.La.))**

Fred Turner Hinrichs, U.S. Attorney's Office, New Orleans, LA, for United States of America, on behalf of its agency, the Federal Bureau of Investigations, movant.

Richard S. Vale, Pamela Ferrage Noya, William Clay Cruse, Blue Williams, L.L.P., Metairie, LA, for Carl E Woodward LLC, third-party plaintiff.

David Ira Bordelon, Matthew J. Ungarino, Wayne Robert Maldonado, Ungarino & Eckert, LLC, Metairie, LA, for Legion Indemnity Company, third-party defendant.

Richard S. Vale, Pamela Ferrage Noya, William Clay Cruse, Blue Williams, L.L.P., Metairie, LA, for Carl E Woodward LLC, third-party plaintiff.

Thomas Joseph Eppling, Craig Wren Brewer, Robin Hoban Vogt, Staines & Eppling, Metairie, LA, for Western Waterproofing Company, third-party defendant.

Richard S. Vale, Pamela Ferrage Noya, William Clay Cruse, Blue Williams, L.L.P., Metairie, LA, for Carl E Woodward LLC, third-party plaintiff.

Lawrence Jude Boasso, Waller & Associates, Metairie, LA, for Travelers, third-party defendant.

Richard S. Vale, Pamela Ferrage Noya, William Clay Cruse, Blue Williams, L.L.P., Metairie, LA, for Carl E Woodward LLC, third-party plaintiff.

Lawrence J. Duplass, Kelly Cambre Bogart, Louis Oliver Oubre, Duplass, Zwain, Bourgeois & Morton, Metairie, LA, for Automated Logic, third-party defendant.

Richard S. Vale, Pamela Ferrage Noya, William Clay Cruse, Blue Williams, L.L.P., Metairie, LA, for Carl E Woodward LLC, third-party plaintiff.

Troy Nathan Bell, Glenn Lyle Maximilian Swetman, Robert P. Vining, Francesca A. Bridges, Aultman, Tyner, Ruffin & Yarborough, Ltd., New Orleans, LA, for Sunbelt Controls, third-party defendant.

Richard S. Vale, Pamela Ferrage Noya, William Clay Cruse, Blue Williams, L.L.P., Metairie, LA, for Carl E Woodward LLC, third-party plaintiff.

David Joseph Krebs, Maura Zivalich Pelleteri, Thomas Matthew Beh, Sarah S.W. Mahoney, Krebs, Farley & Pelleteri, LLC, New Orleans, LA, for Hardin Construction Company, Inc., third-party defendant.

Lawrence J. Hand, Jr., Thomas A. Porteous, for A-1 Glass Services, Inc., third-party defendant.

### ORDER AND REASONS

FELDMAN, J.

**\*1** Before the Court is defendant's Motion for Summary Judgment. For the reasons that follow, the motion is GRANTED.

### Background

New Orleans Assets, L.L.C. is the owner of a building located at 2901 Leon C. Simon Drive in New Orleans which is leased to the Federal Bureau of Investigation and known as the New Orleans Regional Headquarters of the FBI. Travelers issued a commercial insurance policy providing property damage coverage for the building. The policy, with a coverage period of August 15, 2000 to January 1, 2001, provided that Travelers "will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss."

NOA contends that it first discovered mold contamination at the FBI building on July 28, 2000. On October 19, 2000, NOA advised Travelers of the mold damage by way of a telephone call to the Travelers reporting center. A Travelers representative, in an effort to gather preliminary information regarding NOA's claim, called and left two voice-mail messages for NOA principal Anthony Hai on October 23, 2000 and November 16, 2000. NOA

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 32121257 (E.D.La.)
**(Cite as: 2002 WL 32121257 (E.D.La.))**

did not return either of the phone calls.

Travelers received no response from, and had no further contact with, NOA until March 12, 2001. During this four month period, NOA conducted its own investigation as to the cause of the mold and entered into an agreement with its general contractor, Carl E. Woodward, L.L.C., to remediate the mold contamination.

After NOA re-contacted Travelers in mid-March 2001, Travelers gathered preliminary information about the claim. On April 11, 2001, Travelers conducted a cursory inspection of the mold damage in the FBI Building. The NOA claim was referred to the Travelers Property Major Case Unit on May 1, 2001. On May 4, 2001, Travelers retained an air quality expert to assist its investigation. Also on May 4, 2001, Travelers advised NOA's counsel in writing that Travelers' actions "during the conduct of this investigation will not waive any of our rights to deny coverage at a later date."

On May 24, 2001, the principals of NOA met with Travelers adjuster Maurice Black to inspect the building and discuss the claim. During that meeting, NOA contends that Black stated the damages constituted a "covered loss" under the terms of the Travelers policy. Five days later, Travelers retained a building sciences expert to assist its investigation. Damage reports were issued by the air quality expert on August 3, 2001, and by the building sciences expert on September 25, 2001. On October 9, 2001, Travelers issued a letter denying coverage.

NOA sued Travelers for breach of insurance contract, detrimental reliance, statutory penalties, and reformation of contract. Travelers moves for summary judgment dismissal of all claims.

### I. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

**\*2** The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *See id.* Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50. Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. *Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 649 (5th Cir.1992). Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims. *Id.* Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. *Martin v. John W. Stone Oil Distrib., Inc.,* 819 F.2d 547, 549 (5th Cir.1987). Finally, in evaluating the summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255.

### II. *Insurance Policy Trigger Theory*

Two theories can inform a judgment as to when an insurance policy is triggered-the exposure theory, and the manifestation theory. Under the exposure theory, damage is deemed to have occurred when the negligent act that caused the damage was committed. In *Oxner v.. Montgomery,* 794 So.2d 86, 93 (La.App. 2 Cir. 8/1/01), which actually applied the manifestation theory, the court explained that "where damage develops over a period of time from continuous or repeated exposure to injurious conditions, courts have determined that the occurrence

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 32121257 (E.D.La.)
**(Cite as: 2002 WL 32121257 (E.D.La.))**

took place either at the inception of the exposure period or continuously during the entire course of exposure, as in asbestos cases." [FN1] *See also Cole v. Celotex Corp.,* 599 So.2d 1058 (La.1992). The more prevalent manifestation theory, in contrast, deems property damage to occur at the point when it becomes manifest, or when it is discovered. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Valentine,* 665 So.2d 43 (La.App. 1st Cir. 11/9/95)(finding no coverage where faulty electrical wiring installed during the policy period caused a fire after the policy expired).

> FN1. In *Orleans Parish School Board v. Scheyd, Inc.,* 673 So.2d 274 (La.App. 4th Cir. 4/24/96), cited by Woodward, the court did not apply the exposure theory. Instead, it held that even under the manifestation theory, the plaintiff's petition, which did not allege a specific date for the damage, did not unambiguously exclude coverage.

In *Korossy v. Sunrise Homes, Inc.,* 653 So.2d 1215 (La.App. 5th Cir. 3/15/95), excessive uneven settling of the foundations caused damage to a number of homes. The court found that, because the effects of the uneven settling did not become "damage" until they were discovered by the homeowners, the manifestation theory applied even though the damage to the foundations was due to "continuous or repeated exposure to injurious conditions over a course of time." *See also James Pest Control, Inc. v. Scottsdale Insurance Co.,* 765 So.2d 485 (La.App. 5 Cir. 6/27/00) (holding that manifestation theory applied to termite damage).

As this Court concluded in its January 25, 2002 Order granting Legion Indemnity summary judgment, the mold damage in this construction defect case is more analogous to the uneven settling in *Korossy* and termite damage in *James Pest Control* than it is to personal injury asbestos cases. Thus, the claims in this case are analyzed under the manifestation theory.

*III. Application*

*Claim 1: Breach of Insurance Contract*

**\*3** Although NOA stipulated that some property damage manifested itself prior to the August 15, 2000 commencement of the Travelers policy period, it nonetheless contends that Travelers policy provides coverage for the FBI Building because some mold damage was discovered during the policy period. Plaintiff's assertion misinterprets the character of the manifestation theory.

The manifestation theory incorporates the "loss in progress" rule that an insurer cannot insure against a loss that is known or apparent to the insured. Thus, the insurer on the risk at the time of discovered damage is liable for the entire loss, even if the property damage progresses after the policy expires. *See Chemstar, Inc. v. Liberty Mut. Ins. Co.,* 797 F.Supp. 1541, 1551 (C.D.Cal.1992) (holding that "coverage is triggered when property damage first manifests, and the insurer on the risk at the time of first manifestation is liable for the entire loss, even if the property damage progresses after the policy expires.").[FN2] "Loss in progress" is founded on the fortuity requirement inherent in the nature of an insurance contract:

> FN2. The loss-in-progress rule and the manifestation trigger protect an insured's access to insurance. Even if damage manifests in a building, subsequent insurers would be willing to issue policies because they could rely on the loss-in-progress rule to preclude coverage for progressive property damage.

One party undertakes to indemnify another against loss arising from certain specific contingencies or perils. Fundamentally and shortly, it is contractual security against possible anticipated loss. Risk is essential and, equally so, a shifting of its incidence from one to another.
Ostrager and Newman, *Handbook on Insurance*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 32121257 (E.D.La.)
**(Cite as: 2002 WL 32121257 (E.D.La.))**

*Coverage Disputes* § 8.02[d](11th ed.2002), quoting *Epmeir v. United States,* 199 F.2d 508, 509-10 (7th Cir.1952). Because the mold contamination manifested before the Travelers policy period commenced, the Court determines that the policy does not cover the damage. Thus, Travelers is entitled to summary judgment on NOA's claim of breach of contract.

*Claim 2: Waiver and Detrimental Reliance*

NOA contends that Travelers' conduct between the time it was notified of the mold damage and its eventual denial of coverage effectively waived its rights to deny coverage. Waiver applies when a party knowingly and voluntarily relinquishes its right to deny coverage. *See Tate v. Charles Aguillard Ins. & Real Estate, Inc.,* 508 So.2d 1371 (La.1987). The only evidence supporting NOA's waiver claim is Maurice Black's May 24, 2001 statement to NOA that the mold damage was a "covered loss." Black's statement does not constitute a waiver, however, because twenty days prior to NOA's conversation with Mr. Black, Travelers advised NOA's counsel in writing that:

We will conduct our investigation under a full reservation of rights. Our actions during the conduct of this investigation will not waive any of our rights to deny coverage at a later date. We will inform you of our decision, regarding coverage, upon the completion of our investigation.

Thus, the record demonstrates that Travelers neither voluntarily nor knowingly waived its rights to deny coverage.

NOA further asserts that it detrimentally relied upon Maurice Black's "covered loss" statement. Three things prove detrimental reliance: (1) a representation by conduct or work; (2) justifiable reliance thereon; and (3) a change of one's position to one's detriment because of the reliance. *Nicholas v. Allstate Ins. Co.,,* 765 So.2d 1017, 1031 (La.08/31/00).

*4 Detrimental reliance cannot be established here for two reasons. First, Black's statement in May 2001 did not cause NOA to change its conduct; NOA had committed in October 2000 to "fund all costs and expenses" necessary to remediate the FBI Building with Carl E. Woodward, L.L.P. Thus, the change in NOA's position occurred before-and therefore not because of-Black's statement. Second, NOA's reliance upon Black was unjustified because the "covered loss" statement was made at the outset of Travelers' investigation and shortly after Travelers expressly reserved its full rights in a letter to NOA counsel. Thus, Travelers is entitled to summary judgment on the claims of waiver and detrimental reliance.

*Claim 3: Statutory Penalties*

NOA contends that it is entitled to statutory penalties because Travelers' acted untimely and in bad faith, thereby violating Louisiana Revised Statute §§ 22:658 and 2:1220. To prove untimeliness, a party must establish that the insurer received satisfactory proof of loss, failed to pay the claim within the applicable statutory period (30 days for § 22:658(A)(1) and 60 days for § 22:1220(B)(5)), and that the failure to timely tender a reasonable amount was arbitrary and capricious. *Block v. St. Paul Fire & Marine Ins. Co.,* 742 So.2d 746, 752 (La.App. 2 Cir. 9/22/99); La.Rev.Stat. §§ 22:658(A)(1), 22:1220(B)(5).

Satisfactory proof of loss within the meaning of § 22:658 is that which is sufficient to fully apprise the insurer of the insured's claim. *Id.* An insurer need need not accept its insured's own representations as to the extent or cause of the damage without having the opportunity to verify these claims to a reasonably degree of satisfaction. *Id.* Moreover, the insurer is entitled to conduct its own investigation to determine the cause and extent of the damage forming the basis of the claim. *Id.*

Travelers hired independent investigators, including an air quality expert and a buildings science expert,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 32121257 (E.D.La.)
**(Cite as: 2002 WL 32121257 (E.D.La.))**

to assist it in gathering the facts underlying NOA's claim. Travelers received satisfactory proof of loss upon completion of the last expert report on September 25, 2001. As Travelers issued its coverage determination within two weeks of receiving satisfactory proof of loss, NOA has not established that Travelers failed to provide coverage notification within the applicable statutory period. Thus, NOA's claim of untimeliness is unfounded.

The Court also determines that the May 2001 statements by Maurice Black did not violate § 22:1220(B)(1). Section 1220(B)(1) applies when an insurer "knowingly ... misrepresent[s] pertinent facts or insurance policy provisions." NOA does not infer that Black knowingly engaged in wrongful conduct by stating that the mold damage was a "covered loss." The Court further determines that NOA has not established that Travelers breached the duty of good faith and fair dealing required by § 22:1220(A). Thus, Travelers is entitled to summary judgment on the claim of statutory penalties.

*Claim 4: Reformation of Contract*

**\*5** NOA's final point is that the Travelers policy should be reformed to provide coverage for the mold damage. Reformation of an insurance policy is appropriate only if that policy fails to reflect the original mutual intentions of the parties at the time of the drafting of the agreement. *See, e.g., Motors Ins. Co. v. Bud's Boat Rental, Inc.,* 917 F.2d 199, 203 (5th Cir.1990). Moreover, the Fifth Circuit has warned that "[r]eformation is warranted only ... to embody the parties' mutual intent; otherwise, the courts would, in effect, be rewriting the contract." *Id.* Travelers is entitled to summary judgment because NOA has not produced competent evidence to support its claim that the parties' mutual intentions were not reflected in the policy.

Accordingly, defendant Travelers' Motion for Summary Judgment is GRANTED.

E.D.La.,2002.

New Orleans Assets, L.L.C. v. Travelers Property Cas. Co.
Not Reported in F.Supp.2d, 2002 WL 32121257 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Georgia, Atlanta Division.
PLANTATION PIPE LINE COMPANY, Plaintiff,
v.
CONTINENTAL CASUALTY COMPANY, Defendant.
**No. 1:03-CV-2811-WBH.**

Sept. 25, 2006.

Brian C. Quinn, David J. Taylor, Max F. MacCoby, Neal Goldfarb, Thomas K. Bick, Tighe Patton Armstrong Teasdale, Washington, DC, Shattuck Ely, Fellows Johnson & La Briola, Atlanta, GA, for Plaintiff.

Charles A. Booth, David A. Beke, Edward M. Pinter, Kyle M. Medley, Michael L. Anania, Ford Marrin Esposito Witmeyer & Gleser, New York, NY, James E. Brown, Cozen O'Connor, Raymond T. Letulle, Cozen & O'Connor, West Conshohocken, PA, John L. Choate, Allan Levin, Cozen & O'Connor, Atlanta, GA, Kristin Werner, Cozen & O'Connor, Philadelphia, PA, for Defendant.

*ORDER*

HUNT, J.

*1 This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment on the Issue of Timely Notice [122], Defendant's Cross-Motion for Partial Summary Judgment on the Issue of Timely Notice [143], Plaintiff's Motion for Partial Summary Judgment on the Trigger of Coverage Issue [137], Defendant's Cross-Motion for Partial Summary Judgment on the Trigger of Coverage Issue [159], Defendant's Motion for Summary Judgment on the Issue of No Occurrence [185], Defendant's Motion for Summary Judgment on the Negli-gent and Bad Faith Failure to Settle Claim [187], Defendant's Motion to Strike the Declaration of Robert Hinchee [179], Defendant's Motion to Strike Portions of Expert Report and Trial Testimony of Richard T. Dewling [189], Defendant's Motion to Strike the Expert Report and Trial Testimony of Robert N. Hughes [191], Defendant's Motion to Strike the Expert Report and Trial Testimony of Gene Schmidt [193], Defendant's Motion to Strike the Expert Reports of Wayne Grip and Robert E. Hinchee [195], Plaintiff's Motion to File Sur-reply [221], and Plaintiff's Motion to Strike the Declaration of Dr. David Huntley [198].[FN1]

> FN1. Also before the Court are various motions to exceed page limitations [136, 166, 173].

## I. BACKGROUND

This diversity action is brought by Plantation Pipe Line (hereinafter "Plaintiff" or "PPL") against its first layer excess liability insurer, Continental Casualty Company (hereinafter "Continental" or "Defendant"), seeking coverage pursuant to two umbrella excess liability policies for third-party claims arising from a gasoline pipeline leak that occurred in the mid-to-late 1960s from one of Plaintiff's pipelines running through Marion County, Mississippi. Plaintiff is claiming coverage under two policies, each with a three-year period of coverage, ranging from November 30, 1963 through November 30, 1969.

*Events in Marion County, Mississippi*

Plaintiff owns a system of pipelines through which it transports petroleum products on behalf of different customers. Three of those pipelines, buried underground, run through Marion County, Mississippi. One of these is what the parties refer to as the "12-inch" pipeline and define as a pipeline passing through Marion County that is 12 and 3/4 inches in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

outside diameter, a designated "MDA line," and was used (and continues to be used) primarily to transport gasoline.

On January 27, 1968, an aerial patrol pilot contracting with Plaintiff reported evidence of a leak from Plaintiff's pipeline at a location near the town of Kokomo in Marion County, Mississippi. Plaintiff dispatched a maintenance crew to the scene of the leak on that same day and began excavating the area until dark, but the crew was unable to locate the leak. The next day, Plaintiff's crew met with Dolphus Jacob (now deceased), a cotton farmer who owned the land where the leak occurred. Mr. Jacob showed Plaintiff a portion of his property where his cotton crop had failed to grow for the previous two years. The crew found gasoline just under that surface and located the source of the leak a corroded weld on the bottom side of the 12-inch pipeline. Soon after removing the surface soil from this area, gasoline escaping from the leak was audible. Aerial photography demonstrated, and the parties do not dispute, that the pipeline leak had been occurring for at least three years.

**\*2** Plaintiff clamped a temporary patch over the hole in the 12-inch pipeline to seal it off. Plaintiff then pressured the line up to 500 pounds-per-square inch in an effort to determine whether any other leaks existed on that line.[FN2] Plaintiff asserts that the results of this test indicated that no other leaks existed on the pipeline system in Marion County. Defendant responds that the pressure test revealed only that no other large leaks existed at that time. Plaintiff's crew probed the pipeline from the leak site north to the location first excavated where approximately three barrels of gasoline had accumulated. The result of this probe indicated that gasoline had drained from the leak down the pipeline ditch before coming to the surface. Plaintiff estimated the leak did not amount to more than 10 barrels. The next day, on January 29, 1968, Plaintiff's crew welded a permanent patch over the hole in the pipeline. On that same day, Plaintiff paid Dolphus Jacob $200 as compensation for the two years of

damage to his cotton crop and property, as well as for the release of Plaintiff from any future liability.

> FN2. Defendant asserts that the pressure test would determine whether any large leaks existed on the line, but would probably not detect whether a pinhole leak existed. Defendant admits that Plaintiff repaired the leak, but asserts that Plaintiff failed to make efforts to remove the contamination or properly assess the volume of product lost.

Plaintiff's employee, L.G. Mikell, the Division Line Foreman for Plaintiff's Western Division, prepared a "Repair, Break or Leak Report" summarizing the discovery and repair of the pipeline leak. Robert Culver, Plaintiff's Division Manager at that time, approved the report. Culver sent interoffice correspondence to H.M. Dryer, his immediate supervisor, on January 31, 1968, setting forth the events on the Jacob property. *See* Second Declaration of Robert Culver [123], Ex.C.

A year later on January 16, 1969, Plaintiff received a call from B.L. Dunaway,[FN3] whose property adjoined the Jacob farm, who complained that a well on his property used for poultry farming smelled of gasoline. Dunaway advised Plaintiff that the water had been in this condition for about a year. The well on the B.L. Dunaway property is approximately 800-1000 feet from the leak located on the Jacob property. Plaintiff's employees, G.L. Vaughn and L.G. Mikell, went to the B.L. Dunaway property and detected a definite odor of gasoline in the well. Mikell thereafter met with B.L. Dunaway. In exchange for an executed settlement agreement and release, Plaintiff agreed to drill a new well and install a new pump on the property at Plaintiff's expense. Plaintiff completed the work by April of 1969. Mikell prepared an interoffice memo documenting the events related to the B.L. Dunaway property that Culver received. Plaintiff incurred approximately $1000 in costs for providing the new well and compensating B.L. Dunaway in exchange for the settlement and release.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

FN3. The parties' briefs refer to B.L. Dunaway using both Mr. and Mrs. suffixes.

Plaintiff routinely prepares leak reports for every pipeline leak it experiences. These reports are maintained indefinitely in Plaintiff's files. The only such report in Plaintiff's files documenting a pipeline leak in Marion County was the one reflecting the leak that was discovered and repaired in January 1968, thus indicating there were no other leaks in Marion County. [FN4] At the time, Plantation considered the pipeline leak in Marion County to be only a minor leak, explaining why Robert Culver, the Division Manager, did not travel to the "Dunaway Site" [FN5] to personally oversee Plaintiff's repair of the leak as he did at other sites where a leak was considered more serious. Between the time that Plaintiff settled with B.L. Dunaway in January 1969 and the time Robert Culver left Plaintiff in 1986, Culver did not know of any other demands or complaints by landowners in Marion County, Mississippi. If such complaint had been made, it would have been brought to Culver's attention.

FN4. *See* Pl's Stmt. Uncontested Facts on Timely Notice Issue [122] at ¶ 28, Def's Resp. [143] at ¶ 28.

FN5. As defined by the parties, the Dunaway Site refers to the site in Marion County, Mississippi in and around the properties owned by Jacob, Dunaway and others that have been impacted by gasoline as delineated by Plaintiff's remedial contractors. The Dunaway Site is located approximately 25 miles northeast of Plaintiff's Osyka, Mississippi pumping station.

**\*3** The gasoline "plume" resulting from the pipeline leak discovered in 1968 continued to migrate. In May 1993, another Marion County landowner, Hugh Dunaway, notified Plaintiff that he smelled gasoline in a well on his property. This well was approximately 2300 feet from the original leak site. Plaintiff investigated the complaint and had a replacement well installed on that property. In January 1994, the Mississippi Department of Environmental Quality (hereinafter "MDEQ") issued an administrative order requiring Plaintiff to submit a work plan to determine the extent of the gasoline contamination at the Dunaway Site. [FN6] Hugh Dunaway and members of his family ultimately filed suit against Plaintiff in May of 1996, alleging property damage from exposure to the gasoline from the pipeline leak. [FN7] Other Marion County residents filed 65 similar lawsuits against Plaintiff alleging harm from the gasoline contamination over the next three years. That contamination is referred to by the parties as the "Dunaway Site Contamination," and it is presently undisputed that all of the contamination resulted from the leak discovered in 1968.

FN6. The MDEQ Order notes that Plaintiff previously sampled eight active water supply wells in the vicinity of the Dunaway Site and did not detect gasoline in any of them.

FN7. The Dunaway suit is the only Mississippi claim that resulted in a judgment after a bench trial, resulting in a judgment against Plaintiff for approximately $530,000. All other claims were settled prior to trial.

*The Policies At Issue*

Continental issued two policies to Plaintiff relevant to this litigation one effective from November 30, 1963 through November 30, 1966 and the second effective from November 30, 1966 though November 30, 1969 (hereinafter referred to as "the Policies"). [FN8] The Policies provided coverage for claims in excess of the $1 million ceiling on an underlying general liability policy, issued by another insurer, up to a maximum of $5 million per occurrence. Plaintiff notified Defendant of the Dunaway

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

Site contamination on August 31, 1994,[FN9] Defendant has denied that it has any coverage obligation arising out of the Dunaway Site contamination. As a result of the leak and the subsequent lawsuits, Plaintiff represents that it has incurred approximately $8.7 million dollars in judgment/settlement damages, approximately $2.5 million in defense costs, and just under $2 million in site remediation costs.

> FN8. Neither party has located a copy of the Second Continental Policy. The parties have stipulated, however, that the missing policy adopts all terms and conditions of the first policy in effect from November 30, 1963 through November 30, 1966. Additionally, Defendant sold Plaintiff a third excess policy in effect from November 30, 1969 through November 30, 1972. That third policy is not at issue in the present litigation.

> FN9. Plaintiff's notice to Defendant referenced only two policies, the one in effect from 1966-1969 and one in effect from 1969-1972.

The following policy language is pertinent to the issues before the Court. The Policies state that Defendant will

> [I]ndemnify the Insured for all sums which the Insured shall be obligated to pay by reason of the liability imposed upon the Insured by law ... for damages, direct or consequential, and expenses, all as defined by the term "ultimate net loss" on account of ... Property Damage ... caused by or arising out of each occurrence.

(Decl. Mark R. Caramanica [160], Ex. J, Continental Casualty Co. Policy).

"Occurrence" is defined as

> [A]n event or continuous or repeated exposure to conditions, which unexpectedly causes ... Property Damage ... during the policy period. All such

exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence.

*Id.* at ¶ 6 of Policy.

**\*4** Property Damage is defined as "direct or consequential damage to or destruction of tangible property, including the loss of use thereof." *Id.* at ¶ 3 of Policy.

### The Present Litigation

Plaintiff filed the present complaint for declaratory and other relief, alleging claims for breach of contract and negligent and bad faith failure to settle, and seeking a declaratory judgment that Defendant is obligated to indemnify Plaintiff against all damages and defense costs incurred as a result of the Mississippi lawsuits and all future remedial costs incurred by Plaintiff connected with the pipeline leak.[FN10]

> FN10. Because many of the Court's findings of fact are intertwined with its analysis of whether the parties have met their respective evidentiary burdens, the remaining relevant facts are set forth in the Discussion below.

### II. DISCUSSION

### Summary Judgment Motions

The parties have submitted four summary judgment motions for the Court's consideration: (1) Timely Notice, (2) Trigger of Coverage, (3) No Occurrence, and (4) Bad Faith & Failure to Settle. After briefing, the parties concluded that the Court should first consider the motions for partial summary judgment concerning the Trigger of Coverage issue. The Court will therefore address that motion first and then turn to remaining substantive issues.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.56(c), *Eberhardt v. Waters,* 901 F.2d 1578, 1580 (11th Cir.1990). In analyzing the motion, the Court views the facts in the light most favorable to the nonmoving party and makes all factual inferences in favor of that party. *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 918 (11th Cir.1993), *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1529 (11th Cir.1997). "The court must avoid weighing conflicting evidence or making credibility determinations." *Hairston,* 9 F.3d at 919. "Where a reasonable fact finder may 'draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." ' *Id.* (quoting *Barfield v. Brierton,* 883 F.2d 923, 933-34 (11th Cir.1989)).

Cross Motions for Partial

The issue before the Court in these motions is whether Defendant's policies have been "triggered" by the property damage in Marion County, Mississippi that gave rise to the third-party claims against Plaintiff. The diversity action is governed by Georgia law. Unfortunately, neither the state legislature, the Georgia Supreme Court, nor the Georgia Court of Appeals has resolved the question of the applicable trigger test in an environmental contamination case.

Plaintiff urges the Court to hold that "property damage takes place under occurrence-based liability policies at the time contaminants are released into the environment." Plaintiff refers to this theory as the "injury-in-fact trigger test," and submits that the appropriate finding in this case is that "all policies in effect from the initial release until the discovery of the release (or alternatively, until the release comes to an end, if it does so before discov-

ery) are triggered." Applying this test to the undisputed facts of this case, Plaintiff asks the Court to further conclude that "property damage," as that term is defined by the policy, "took place at the Dunaway Site from the time the pipeline leak began until its discovery and repair by Plantation" in 1968, thus triggering both policies at issue in this litigation.

**\*5** Defendant responds that the Policies are not triggered based on the plain language of the insurance contract itself, because Plaintiff fails to establish that the property damage for which it seeks coverage, as that term is defined in the Policies, happened during the relevant policy periods. Defendant submits that coverage in this situation depends not on the timing of the event (the leak clearly occurred during the policy period), but on the timing of the property damage. The property damage for which Plaintiff seeks coverage must occur during the policy period. Because Plaintiff fails to make such showing, contends Defendant, summary judgment should be entered in its favor.[FN11]

> FN11. Alternatively, even if the policy periods were triggered, submits Defendant, the alleged damages would not reach Defendant's excess level of coverage under a pro-rata allocation. For reasons set forth more fully in footnote 22, the Court declines to address Defendant's allocation argument as premature.

Without guidance from the state courts regarding the appropriate trigger of coverage under these excess liability policies, the Court begins with the ordinary rules of contract construction. *See Park N' Go v. U.S. Fidelity,* 266 Ga. 787, 791, 471 S.E.2d 500 (1996) ("Under Georgia law, contracts of insurance are interpreted by ordinary rules of contract construction."). Pursuant to these rules, the Court must read the policy as a whole and give the words their usual, common, and ordinary meaning. *See Bold Corp. v. National Union Fire Ins. Co.,* 216 Ga.App. 382, 383-84, 454 S.E.2d 582 (1995). Any ambiguities in an insurance contract must be con-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

strued favorably to the insured and against the insurer. *See Davis v. United American Life Ins. Co.,* 215 Ga. 521, 527, 111 S.E.2d 488 (1959). Furthermore, the insurance contract must be read in accordance with the reasonable expectations of the insured, where possible. *See Richards v. Hanover Ins. Co.,* 250 Ga. 613, 615, 299 S.E.2d 561 (1983). The Court examines the Policies in accordance with these general principles. Additionally, despite the lack of authority from state courts, federal district courts in all three of Georgia's districts have addressed this trigger issue, to a certain extent.

The Court begins its analysis with an environmental contamination case addressing the trigger of coverage issue from the Middle District of Georgia, *South Carolina Ins. Co. v. Coody,* 813 F.Supp. 1570 (M.D.Ga.1993). There, Judge Owens addressed contamination at an electroplating plant due to improper disposal of hazardous waste on the site. As a result of the contamination, the owners of the property, who did not operate the plant, were liable for cleaning up the property and sought coverage for the clean-up costs of that particular property pursuant to two different insurance policies. Judge Owens determined that "if [the Insured] can establish that environmental damage occurred within the effective periods of these policies, then they are entitled to coverage under each policy." *Id.* at 1575. After reviewing the various trigger rules that courts have adopted over time, Judge Owens found it unnecessary to adopt a particular approach under the facts of that case, as the result was the same under any theory. *Id.* at 1576. However, the Court also opined that in environmental contamination cases, "the accident and the injury occur at virtually the same time." *Id.* In reaching this conclusion, Judge Owen relied on an Eighth Circuit case and further found that "environmental damage occurs at the moment that hazardous wastes are improperly released into the environment. Thus, the improper release is both the cause and the injury that triggers coverage." *Id.* (quoting, *Continental Ins. Co. v. Northeastern Pharmaceutical & Chemical Co.,* 811 F.2d 1180, 1189 (8th Cir.1987) (concluding that

state and federal governments saddled with clean-up costs suffer "property damage" at the time that hazardous wastes are improperly released into the environment)). Under the facts before Judge Owens, it was undisputed that the hazardous materials were released directly onto the property in question during the effective dates of one of the two policies at issue in the litigation. *Id.* at 1577 ("The Byron property was initially exposed to and actually injured by this industrially-generated sludge during the 1984 policy period").

**\*6** Next, addressing the trigger of coverage issue with respect to underground petroleum contamination at two gas stations from leaking storage tanks, Judge Bowen in the Southern District of Georgia agreed with the Insured's position that "coverage applies if the contamination *develops* during the dates of coverage," *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 926 F.Supp. 1566, 1570 (S.D.Ga.1995), *rev'd on other grounds,* 150 F.3d 1327, 1328 (11th Cir.1998), and rejected the Insurer's argument that coverage is not triggered unless the property damage occurs and is *discovered* during the policy period. *Id.* (emphasis in original). Applying the general rules of contract construction, Judge Bowen held that "exposure during dates of coverage to conditions that result in property damage constitutes an 'occurrence' within the meaning of these insurance contracts." *Id .* at 1578.[FN12] On appeal, the Eleventh Circuit summarized the district court's holding as follows "coverage is triggered when property damage occurs within the policy period even if not discovered within the policy period." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 119 F.3d 883, 886 (11th Cir.1997). Finding that the case involved controlling questions of Georgia law and that no controlling precedent existed, the Eleventh Circuit certified two questions to the Georgia Supreme Court, one of which was "What is the appropriate trigger of coverage under general liability policies such as the ones at issue in this case?" *Id.* at 887. The Georgia Supreme Court ultimately resolved the case by answering the second, unrelated certified question and declined to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

address the question regarding trigger of coverage that would have been pertinent to this litigation. *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.,* 269 Ga. 326, 327, 498 S.E.2d 492 (1998). In a written dissent, however, Justice Carley addressed the issue of coverage, stating that the Insurer's position that coverage is triggered only when property damage both occurs *and* is *discovered* within the policy period was "incompatible with the language of the policies at issue here." *Id.* at 334, 498 S.E.2d 492 (emphasis in original). Justice Carley did not determine what other trigger of coverage test should apply, concluding that Boardman would be covered under any other trigger test under the facts of that case. He explained that the "majority rule in cases involving environmental damage is that the actual injury, which in this case is the contamination of the soil and groundwater, occurred at the same time that the soil and groundwater were exposed to the petroleum leaks. Since the exposure was simultaneous with the actual injury, it follows that Boardman is covered under any 'non-manifestation' trigger of coverage." *Id.* at 335, 498 S.E.2d 492.

> FN12. In *Boardman,* the insurance contract at issue contained language somewhat similar to the ones at issue in this case. Specifically, the *Boardman* policy provided that the company would pay all sums that the insured became liable to pay as damages because of property damage caused by an occurrence. *Id.* at 1577. The policy defined "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." The relevant portion of the policy defined "property damage" as "physical injury to or destruction of tangible property which occurs during the policy period ..." *Id.*

The trigger of coverage issue was addressed about a year later again by Judge Owens in the Middle District of Georgia. *See Briggs & Stratton Corp. v. Royal Globe Ins. Co.,* 64 F.Supp.2d 1346 (M.D.Ga.1999). There, the issue involved whether coverage existed for environmental clean-up costs for hazardous substances discharged onto a particular piece of property. The policy at issue provided coverage for property damage caused by an 'occurrence.' The relevant portion of the insurance policy defined property damage as "physical injury to or destruction of tangible property which occurs during the policy period." *Id.* at 1349. Agreeing with the *Boardman* decision, Judge Owens rejected the Insurer's position that property damage must be discovered during the policy period, instead finding that "the environmental damage to the [property at issue] occurred when electroplating operations involving the discharge of hazardous wastes were discharged on the [property at issue] between April 1, 1985, and April 1, 1986 [the policy period at issue in the litigation]." *Id.* at 1350.

**\*7** Thereafter, Judge Thrash addressed the issue of the appropriate coverage in *Arrow Exterminators, Inc. v. Zurich American Ins Co.,* 130 F.Supp.2d 1340 (N.D.Ga.2001). That case involved customer claims for termite damage against *Arrow,* a termite exterminator company, alleging negligent performance. Arrow sought coverage under an occurrence-based liability policy substantially similar to the ones in this case and those at issue in *Boardman* and *Briggs.* The *Arrow* policy provided coverage for property damage caused by an occurrence. *Id.* at 1349. The policy further required that the property damage occur during the policy period. *Id.* Agreeing with the analysis of Judge Bowens and Justice Carley in *Boardman* and Judge Owens in *Briggs,* Judge Thrash concluded that coverage is provided "if property damage 'occurs during the policy period," ' rejecting the Insurer's position that coverage exists only when property damage both occurs and is discovered during the policy period. *Id.*[FN13]

> FN13. These district court orders and the parties in this case refer to several different trigger tests, such as the "exposure" trig-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

ger, the "continuous cover" trigger, or the "injury-in-fact" trigger. At one point in its brief, Plaintiff refers to its definition of the "injury-in-fact" test as alternatively being called a "multiple or continuous" trigger test. *See* Pl's Motion P Summ. J[137] at 14.

> In its present analysis, the Court consciously avoids using a particular label in resolving the present trigger issue, instead focusing on the actual language and analysis in these cases. Neither the district courts nor the parties can agree about the appropriate verbiage for the different trigger theories, however, it is the substance, not the name that controls.

Both parties argue that the above cases support their respective positions. Plaintiff argues that these cases establish that in environmental contamination matters, property damage occurs at the time that the contaminants are released into the environment and continues until either the release comes to an end or the contamination is discovered, which ever occurs first. Under this definition, Plaintiff submits that the property damage at the Dunaway Site took place during the effective dates of both policies at issue herein, because the leak occurred around 1965 and ended with Plaintiff's discovery and repair in January of 1968.

Defendant, on the other hand, submits that these cases confirm that an Insured must establish that property damage for which it seeks coverage occurred during the policy periods. Defendant does not argue that the damage must both occur and be discovered during the Policy period, a position that has been squarely rejected by the federal district courts in Georgia, rather, Defendant submits that under the plain language of the Policies, Plaintiff must prove that the damage occurred during the policy period, even though the damage was discovered after the expiration of the Policies.[FN14]

> FN14. Defendant takes the position generally that "policies are triggered that [are] in

effect while the waste [is] in fact causing [property damage] to the properties in question." Def's Opp. to Pl's Motion P Summ. J[159] at 18.

In carefully reviewing the case law addressed above, the Court is particularly mindful that those cases did not address the precise issue before the Court, an environmental contamination followed by a migration of the contaminants to other properties. All of the cases cited above involve, or at least presume, a simultaneous exposure and actual injury to the property in question. Nevertheless, a reasonable application of these cases to the facts herein support the Defendant's position that under the unambiguous language of the Policies at issue in this litigation, coverage is triggered for property damage that occurs within the effective dates of the Policy periods, regardless of when that damage is discovered.

**\*8** In light of this conclusion, the Court must further decide the following for the purpose of determining trigger of coverage, when does property damage occur in environmental contamination cases if a release of contaminants is followed by a migration of the contaminants to other properties? Plaintiff relies on the above cited cases to argue that property damage occurs at the time the contaminants are released, regardless of when the contaminant actually comes into contact with the properties in question, and continues until either the release ends or the contamination is discovered, whichever occurs first. According to Plaintiff, if the triggering event occurs during the effective dates of the Policies, then those Policies are triggered and Defendant is liable for all resulting losses incurred by Plaintiff during and after the Policies' expiration dates. Particular damage to third-parties is irrelevant, submits Plaintiff, as long as the leak occurred during the policy period.

The Court respectfully disagrees with Plaintiff on this issue, and finds that such a conclusion would contradict both the plain language of the Policies and the district court cases discussed above that have addressed the trigger of coverage issue in

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
(Cite as: 2006 WL 6106248 (N.D.Ga.))

Georgia. In the Court's view, these district court cases support the conclusion that property damage occurs under the particular occurrence-based Policies at issue in this litigation when the gasoline migrated to the properties for which Plaintiff seeks coverage, and the burden of establishing that damage rests with Plaintiff. The Court further agrees with Justice Carley, however, that Plaintiff may satisfy this burden by demonstrating that "the property damage more likely than not occurred during a period of coverage." *Boardman,* 498 S.E.2d at 499 (Carley, J, dissenting), *see also, Spartan Petroleum Co. v. Federated Mutual Ins. Co.,* 162 F.3d 805, 810 (4th Cir.1998) (involving a case of leaching pollutants onto third-party property, the Fourth Circuit, applying South Carolina law, held that in cases involving "progressive damage affecting multiple properties, the injury-in-fact trigger requires an insured to demonstrate that during the policy period an injury, caused by the underlying 'occurrence,' occurred to the property that is the subject of the underlying third-party action."); *Employer's Ins. of Wausau v. The Duplam Co.,* No. 94 Civ 3143, 1999 WL 777976 at *28 (S.D.N.Y. Sept.30, 1999) (applying New York law to a migrating contamination case and finding that "coverage is not triggered by the release of contaminants alone. Since actual property damage must occur during the policy period as the authorities instruct, mere discharge cannot trigger coverage when the damage allegedly caused thereby did not commence until the pollutants reached, and contaminated, the subject property.").

Defendant next argues that Plaintiff fails to set forth any evidence demonstrating that the properties for which it seeks coverage suffered damage during the relevant policy periods. Instead, according to Defendant, the record evidence demonstrates that the bulk of the contamination, if not all of it, reached the properties in question well after Defendant's coverage period ended. In support of this argument, Defendant relies in-part on the testimony of Plaintiff's project manager for remediation, Jerry Aycock, who Defendant contends testified in his deposition that once the gasoline plume reached

groundwater it would have moved at a rate of 188 feet per year. Defendant asserts this means that the contamination would not have reached Hugh Dunaway's property, nearly a half mile away from the leak, until 1977 at the earliest. Aycock further testified, according to Defendant, that the benzene concentration at a monitoring well located 8/10ths of a mile from the leak increased 700 fold, from "3 ppb" [FN15] in 1995 to "2,800 ppb" in 2002, and he attributed this change to normal plume migration. [FN16]

> FN15. According to that deposition, "ppb" stands for "parts per billion."

> FN16. Mr Aycock further explained this increase in concentration of benzene: "This [monitoring well, CAD-2] is in the down-gradient portion of the plume. And when CAD-2 was installed, it was slightly impacted. And as this portion of the plume moved downgradient, these concentrations increased." Aycock Depo, [160] at p. 163.

*9 In response, Plaintiff submits the Declaration of Robert Hinchee, one of Plaintiff's experts who earlier submitted an expert report and was deposed by Defendant. In this declaration, [FN17] Hinchee provides an opinion concerning what properties were impacted by the leak prior to the expiration of the Policies. Specifically, Hinchee opines that the gasoline plume had "probably" (meaning more likely than not) migrated to particular properties by November 30, 1969. [FN18] He further declares that in his opinion, it is possible the gasoline plume had reached its full extent by November 30, 1969. [FN19] If this particular plume did migrate to the full extent presently observed by November 30, 1969, then additional properties would have been impacted by that plume. [FN20]

> FN17. Plaintiff submitted an amended declaration [200] in response to Defendant's objection to his first declaration. The Court relies on both of these declarations for purposes of resolving the present dispute.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.