Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

FN18. Specifically, Hinchee states that the gasoline plume from the 1968 leak had probably migrated under all or a portion of the following properties (in addition to the Jacob property where the leak initially occurred). Properties BD-1, JD-1, PD-1, WM-1, UN-1, UN-2, LD-1 and the Hugh Dunaway chicken farm property. *See* Hinchee Declaration [200] at ¶ 20.

FN19. Hinchee has observed gasoline plumes migrate at rates in excess of 1,000 feet per year prior to stabilizing.

FN20. Specifically, properties VD-2, HT-2, TT-1, TT-2, HT-1, BB-2, BB-1 and JB-1.

Defendant now moves the Court to strike the Hinchee Declaration [179] and further offers the Declaration of David Huntley to rebut the Hinchee Declaration. Huntley concludes that by November 30, 1969 the gasoline plume from the 1968 leak traveled no more than 700 feet downgradient from the B.L. Dunaway well, meaning that the plume could not have reached Hugh Dunaway's adjacent chicken farm or the other subject properties by the expiration of the Policy periods. Plaintiff moves the Court to strike the Huntley Declaration [198].

Regarding Hinchee, Defendant moves the Court to strike his declaration, arguing that it exceeds the scope of his expert report and that it fails Federal Rule of Evidence 702 for lack of reliability. Regarding Huntley, Plaintiff moves the Court to strike his declaration because it was submitted after the court-ordered expert discovery cut-off and because it is irrelevant. The Court addresses each motion in turn.

### Declaration of Robert Hinchee

Defendant first argues that Hinchee's opinion regarding when the gasoline contamination probably or possibly migrated from the original leak site is not contained within his expert report, and Hinchee

further testified in his deposition that he was not offering an opinion on when the plume reached certain properties at issue in the litigation. Defendant also contends that the declaration fails to satisfy the *Daubert* requirements as set forth in Federal Rule of Evidence 702.

In his expert report, Hinchee states that the contamination at issue reached its current extent well before its discovery in the mid 1990s. Defendant objects to Hinchee now offering a particular time frame in which the plume reached particular properties, arguing that his new opinions go to a key issue in the case, when did the property damage occur. The Court disagrees with Defendant that Hinchee is now offering a totally new opinion from that offered in his expert report or deposition. In his deposition, Hinchee did state that he had not made specific calculations or estimations concerning when the contamination first reached Hugh Dunaway's property and that he did not expect to testify as to when the contamination reached that particular piece of property. Hinchee Depo. [252] at 108. However, based on his experience with other plumes and similar hydrogeology, Hinchee further testified that he believed the plume reached its maximum extent within a few years of the initial release. *Id.* at 108-110. He also stated that the gasoline plume "stabilized" relatively quickly after the initial leak. *Id.* at 109-110. It is clear from his testimony that Hinchee had an opinion concerning when the plume reached its maximum extent and he is now elaborating on that opinion with respect to the actual timing of that occurrence. The timing of the property damage is now a central issue in this case, one that will require expert testimony for resolution. *See Hartford Cty. v. Hartford Mutual Ins. Co.,* 327 Md. 418, 610 A.2d 286, 295 (Md.1992) ("Whether at any time during the policy period the discharge of contaminants into the soil and underlying groundwater is of sufficient gravity to prove detectable 'property damage' within the policies' definition of that term is quite likely a matter for expert testimony."). *Arrow,* 136 F.Supp.2d at 1350 (noting that the determination of whether property

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

damage occurred within a policy period will make the trial of a case "messy and protracted," but that fact cannot change the unambiguous language of the policies). Therefore, the Court finds that Hinchee's declaration is not in violation of Federal Rule of Civil Procedure 26(a)(2)(B),[FN21] because the opinions set forth therein are not a significant departure from either his expert report or his deposition testimony.

> FN21. The relevant portion of Rule 26(a)(2)(B) states that the expert report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor, the data or other information considered by the witness in forming the opinions, any exhibits to be used as a summary of or support for the opinions, the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years, the compensation to be paid for the study and testimony, and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

**\*10** Defendant also urges the Court to strike the declaration for failing to satisfy the requirements of Federal Rule of Evidence 702, arguing that Hinchee's opinions are unsupported by reliable foundational facts, data or reasoning, and it will not assist the trier of fact. Defendant submits that Hinchee offers only conclusory statements about the migration of the contamination that are unsupported by any facts or process of reasoning. Defendant further submits that Hinchee should not be permitted to offer his conclusions based solely on his experience, as he fails to identify any specific experience that aided him in reaching his conclusions. He further fails to set forth the factual basis for his conclusion or discuss the hypotheses considered and rejected. Absent this information, submits Defendant, the declaration is nothing more than mere speculation that will not assist the trier of fact.

The admissibility of this evidence is governed by Federal Rule of Evidence 702 and the Supreme Court's ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 594-95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *see also, Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 145, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Federal Rule of Evidence 702 provides

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The Supreme Court [Missing Text] scientific and technical expert testimony is admissible only if it is reliable and relevant. *Daubert,* 509 U.S. at 594-95. Trial courts, therefore, act as gatekeepers to ensure the reliability and relevance of such testimony. *Kumho Tire,* 526 U.S. at 145.

The Eleventh Circuit holds that expert testimony is admissible only if

> (1) the expert is qualified to testify competently regarding the matters that he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert,* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Abreu,* 406 F.3d 1304, 1306 (11th Cir.2005). The burden of establishing the admissibility of such evidence lies with the proffering party,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

in this case Plaintiff. *Daubert,* 509 U.S. at 593.

Plaintiff responds that the thrust of Hinchee's declaration is as follows "By the date of the expiration of the Second Continental Policy (November 30, 1969), much of the migration of the gasoline groundwater plume at the Dunaway Site had already taken place, and had probably impacted a majority of the properties that ultimately gave rise to Plantation's losses." Pl.'s Resp. to Def.'s Motion Strike [199] at 3. Plaintiff submits that the methodology and assumptions utilized by Hinchee are well-established and scientifically reliable. Furthermore, says Plaintiff, his testimony will assist the trier of fact, assuming that the Court agrees with Defendant on the trigger of coverage issue.

**\*11** For the record, the Court notes that Defendant does not challenge Hinchee's qualifications and a review of his background confirms that he is clearly an expert in the field of environmental remediation with a substantial amount of experience with petroleum contamination sites, Hinchee states that he has personally worked on well over 1,000 petroleum contaminated sites and has personally observed plumes on over 1,000 sites.

To evaluate the reliability of expert testimony, courts consider, to the extent possible "(1) whether the expert's theory can be and has been tested, (2) whether the theory has been subjected to peer review and publication, (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *United States v. Frazier,* 387 F.3d 1244, 1262 (11th Cir.2004). While illustrative, these factors are not exhaustive, "not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion. *Id.*

Turning to Hinchee's declaration, he states that over the last eight years, he has become personally familiar with the Dunaway Site contamination, including the movement of gasoline in the groundwater plume. Using contour maps and data developed by Plaintiff's consultants since 1994, Hinchee states that the direction of the groundwater flow is downgradient and, based on his professional understanding of groundwater flow, he states it is probable that the gradient and flow were the same in 1964 as today. To support his opinion that the migration occurred both quickly and in a particular direction, Hinchee notes that on reviewing the "boring logs and cross-sections" generated by Plaintiff, the site consists of layers of highly permeable sands and gravel that have the potential to conduct the gasoline plume rapidly. Next, based on his scientific background, published literature (including some of his own) and practical experience, Hinchee explains the primary mechanisms by which gasoline plumes migrate and states that this particular plume's migration involved all three mechanisms that he describes in his report. *See* Second Hinchee Decl. [200] at ¶ 11-15. Hinchee also states that he considered three different approaches to determine whether particular properties were impacted by the plume by November 1969(1) fate-and-transport modeling, (2) migration rate estimates based on observations since the mid 1990s, and (3) empirical projection based on known facts and observations of the plume behavior in the late 1960s and since the mid 1990s. He further explains why he discarded the fate-and-transport modeling and the plume observation approaches and instead relied on the empirical projection method based on the known facts and known plume behavior in the 1960s and 1990s. *Id.* at ¶ 16-19. Finally, he explains how he estimated the probable extent of the plume by November of 1969. *Id.* at ¶ 20.

**\*12** To be sure, Defendant vigorously disagrees with Hinchee's conclusion concerning the migration of this gasoline plume. However, Defendant has not convinced the Court that Hinchee fails to set forth the methodology he implemented in arriving at his conclusions. The gatekeeping function of the Court must focus on the underlying methodology. *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir.2000). "The soundness of the factual underpinnings of the expert's analysis and the correctness of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or where appropriate, on summary judgment." *Id., see also, Quiet Technology DC-8, Inc. v. Hurel-Dubois UK LTD.,* 326 F.3d 1333, 1345 (11th Cir.2003)("The alleged flaws in [the expert's] analysis are of a character that impugn the accuracy of his results, not the general scientific validity of his methods. The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination."), *Hemmings v. Tidyman's, Inc.,* 285 F.3d 1174, 1188 (9th Cir.2002)("In most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility")(quoted in, *Quiet Technology* ).

On cross examination, Defendant will have the opportunity to challenge Hinchee's credibility by questioning him about, among other things, the scientific basis for his conclusions and the accuracy of his underlying data. In other words, "the question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided with the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith,* 215 F.3d at 719, *see also, Quiet Technology,* 326 F.3d at 1341 ("[A] district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury. Quite the contrary, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence")(quoting, *Daubert,* 509 U.S. at 596). Consequently, the Court cannot appropriately conclude that Hinchee's methodology is unreliable in light of his second declaration setting forth in detail the basis for his opinion. Rather, the Court finds that Hinchee adequately sets forth his reasoning, his relevant experience and the hypotheses that he both considered and rejected in reaching his conclusions. *Smith,* 215 F.3d at 719

("It is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound."). Finally, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier,* 387 F.3d 1244, 1263 (11th Cir.2004). Clearly, the subject matter at issue in this expert report is now a central issue in this case and is something beyond the understanding of the average juror. Therefore, the Court further finds that this testimony will assist the trier of fact determine an unresolved issue in this case. For all of these reasons, Defendant's Motion to Strike the Declaration of Robert Hinchee [179] is DENIED.

### Declaration of David Huntley

**\*13** In response to Hinchee's declaration, Defendant offers the declaration of David Huntley, another expert in the field of groundwater hydrology, remediation and environmental forensics. His declaration criticizes Hinchee's conclusions and further offers a conflicting opinion about the velocity of the plume as it migrated through the Dunaway Site properties, concluding that Hugh Dunaway's property was not impacted by November 30, 1969.

Plaintiff moves the Court to strike the declaration, arguing that it is untimely and irrelevant. The Court disagrees with Plaintiff on both points. First, the Court is permitting Plaintiff to offer the Hinchee declaration in its reply brief, which expands upon his expert report and deposition testimony, therefore, Defendant is justified in obtaining and presenting rebuttal expert testimony on this issue. Plaintiff will be permitted, of course, to depose Huntley if it so wishes. Second, Plaintiff argues that the declaration is not relevant to the trigger issue because the only relevant inquiry for purposes of triggering coverage is when the triggering event took place, not when the resulting damage occurred. For the reasons set forth above, the Court

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

disagrees with Plaintiff on this issue, therefore, evidence addressing whether property damage occurred during the relevant policy periods is relevant to the issue of whether coverage exists under these Policies. Therefore, Plaintiff's Motion to Strike the Declaration/Expert Report of David Huntley [198] is DENIED.

In sum, regarding the pending Cross-Motions for Partial Summary Judgment on the Trigger of Coverage Issue [137, 159], the Court has identified the appropriate test for determining whether coverage is triggered under the facts of this case. That determination demonstrates that issues of fact remain concerning whether property damage occurred within the policy periods, thereby triggering coverage under the Policies, therefore, the Court DENIES the parties motions for partial summary judgment on the trigger issue.[FN22]

> FN22. The Court is mindful of Defendant's alternative argument that even if the Policies are triggered in this case, any damages must be allocated among all policies in effect between 1965 and 1993. In essence, Defendant asks the Court to find as a matter of law that if there is property damage pursuant to these policies and that property damage continued to occur after the effective dates of these Policies, than all successive insurance policies are triggered and the damage must be allocated on a pro rata basis among all the policies. Defendant acknowledges that the Georgia appellate courts have not addressed this argument. Because issues of fact exist concerning whether property damage even occurred within the effective dates of these Policies, the Court declines to address Defendant's allocation argument as premature.

Cross Motions for [Missing Text] Timely Notice
[122, 143]

Defendant contends that Plaintiff failed to provide timely notice of the gasoline leak, thereby breaching the terms of the Policies and forfeiting coverage. Plaintiff argues that its notice was timely as a matter of law. Both parties seek summary judgment on this issue. The relevant notice provisions state

*Notice of Occurrence*

> Whenever the Insured has information from which the Insured may reasonably conclude that an occurrence covered hereunder involved injuries or damages which, in the event that the Insured should be held liable, is likely to involve this Policy, notice shall be sent to the Company as soon as practicable, provided however, that failure to notify the Company of any occurrence which at the time of its happening did not appear to involve this policy, but which at a later date would appear to give rise to claims hereunder, shall not prejudice such claims.
> **\*14** (Decl. Mark R. Caramanica [160], Ex. J, Continental Casualty Co. Policy, Conditions at ¶ 5).

By way of a letter dated August 31, 1994, Plaintiff notified Defendant, as its excess liability carrier, of the 1968 pipeline leak in Marion County, Mississippi. The notification letter, however, referenced only two policies: the one in effect from November 30, 1966 through November 30, 1969 and another in effect from November 30, 1969 through November 30, 1972. The 1969-1972 Policy is not at issue in this litigation. The letter did not reference the earlier Policy in effect from November 30, 1963 through November 30, 1966.

In these motions, both parties discuss and refer to the outcome of a related coverage dispute between Plaintiff and its primary general liability insurance carrier, Royal Indemnity Company (hereinafter "Royal") regarding the same pipeline leak. In 1998, Plaintiff brought a declaratory judgment action against Royal in the Superior Court of Fulton County, seeking a judgment that Royal owed a duty

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

to defend and indemnify Plaintiff in connection with the Dunaway Site contamination. The superior court found that prompt notice was a condition precedent to coverage under that general liability policy and that Plaintiff's delay in notifying its primary insurance carrier "as soon as practicable"[FN23] of the 1968 pipeline leak was unreasonable as a matter of law, thereby forfeiting coverage *Plantation Pipeline Co. v. Royal Indemnity Co.,* 245 Ga.App. 23, 537 S.E.2d 165 (Ga.Ct.App.2000) (affirming the superior court's decision to grant summary judgment to Royal on the issue of timely notice). In affirming the trial court's decision, the appellate court found that because contamination was found on two separate properties, and in light of the language in the B.L. Dunaway release, "PPL [Plaintiff] at least should have foreseen a reasonable likelihood that additional damage related to the 1968 leak could occur," and should have notified its primary liability carrier at that time. *Id.* at 168.

> FN23. Plaintiff notified Royal of the pipeline leak in 1993. The Royal Policy contained the following notice provision
>
> In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonable obtainable information with respect to the time, place and circumstances thereof, and the name and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.
>
> *Plantation,* 537 S.E.2d at 166.
>
> Notably, the Royal Policy did not include the "likely to involve" or the "reasonably conclude" language in the excess policies at issue herein.

Defendant argues that with regard to the excess liability policies at issue herein, Plaintiff knew that it faced a multi-million dollar exposure as a result of

the pipeline leak during at least two different time periods before August of 1994, thereby making Plaintiff's notice untimely (1) upon discovery of the leak in the late 1960s and the resulting claims with Jacob and B.L. Dunaway; and (2) when Hugh Dunaway reported contamination of his poultry well in May of 1993, after which Plaintiff received a hired consultant's "remediation" plan in June 1993 and the Mississippi Department of Environmental Quality ("MDEQ") issued an administrative order on January 7, 1994, requiring Plaintiff to submit a work plan and investigate the extent of soil and groundwater contamination. Defendant submits that Plaintiff should have notified Defendant about the pipeline leak on either of these occasions. Instead, submits Defendant, Plaintiff waited until August 31, 1994 to notify Defendant about the leak with regard to the Policy in effect from 1966-1969. Not until January 18, 1999, contends Defendant, did Plaintiff provide notice about the Policy in effect between 1963-1966, more than five years after the original date of notice. As such, according to Defendant, Plaintiff's notice was untimely as a matter of law, thereby forfeiting coverage under both Policies, and it moves the Court to grant summary judgment in its favor on the issue of timely notice. Plaintiff moves the Court to hold that Plaintiff's notice to Defendant was timely. The Court addresses all of these arguments in turn.

**\*15** Generally, under Georgia law, "whether an insured's notice to an insurer is 'as soon as practicable' is a question of fact for a jury ." *Richmond v. Georgia Farm Bureau Mut. Ins. Co.,* 140 Ga.App. 215, 231 S.E.2d 245, 249 (Ga.Ct.App.1976). However, courts may rule on this question as a matter of law if under all the facts and circumstances, it can be determined that the insured's delay in providing notice to the insurance company was unjustified and unreasonable. *Id.* at 249. "Compliance with a prompt notice provision acts as a condition precedent to coverage under the policy ." *South Carolina Ins. Co. v. Coody,* 957 F.Supp. 234, 237 (M.D.Ga.1997) (relying on *Richmond,* 231 S.E.2d at 250).[FN24] Notice provisions "enable the insurer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

to inform itself promptly concerning the accident, so that it may investigate the circumstances, prepare for a defense, if necessary, or be advised whether it is prudent to settle any claim arising therefrom." *Kitt v. Shields Ins. Co.,* 240 Ga. 619, 621, 241 S.E.2d 824, 825 (1978)(internal citations and quotations omitted); *see also, Southeastern Express Systems, Inc. v. Southern Guaranty Ins. Co. of Georgia,* 224 Ga.App. 697, 701, 482 S.E.2d 433, 436 (1997)("Timely notice and delivery of suit papers are critical to the [insurance] contract because it bears upon the insured's risk and the and the insurer's ability to investigate, prepare to defend, or seek to reduce potential liability by settlement").

> FN24. Plaintiff submits that the notice provision under the Policies in this case was not a condition precedent to coverage because the terms "provided" or "on condition that" do not appear in the notice clause. Additionally, the Policies do not contain an explicit statement that the notice clause is a condition precedent to coverage. Absent the provision being a condition precedent to coverage, Plaintiff further submits that even if its notice was untimely, coverage would not be forfeited unless Defendant can demonstrate that it was prejudiced by the timing of the notice.

> Defendant responds that the notice provision is a condition precedent to coverage, as the Policies explicitly state that Defendant "Agrees with the Named Insured specified in the Declarations, made a part hereof, *subject to the limitations, terms and conditions hereinafter mentioned ...*" (emphasis supplied). Thereafter, the notice provision at issue in this case is located in the section of the Policies entitled "Conditions."

> The Court agrees with Defendant that under the plain language of the Policies, compliance with the notice provision is a condition precedent to coverage in this

case, therefore, if the notice is untimely, coverage is forfeited regardless of the prejudice to the Insurer. *See Townsend v. National Union Fire Ins. Co.,* 196 Ga.App. 789, 397 S.E.2d 61, 63 (Ga.Ct.App.1990) ("Prejudice or lack thereof to the insurer is not a factor in assessing whether or not the delay in notice is excusable and the ultimate determination of its being reasonable, i.e. 'as soon as practicable' ").

In addition to these well-settled principles of insurance law, there are two cases that specifically address notice under excess liability policies that are similar, if not essentially identical, to the ones at issue herein *Lumbermens Mutual Casualty Co. v. Plantation Pipeline Co.,* 214 Ga.App. 23, 447 S.E.2d 89 (Ga.Ct.App.1994) involved coverage under an excess liability policy with a notice provision that stated "[w]henever it appears that an occurrence is likely to involve indemnity under this policy, written notice thereof shall be given to the company or any of its authorized agents as soon as practicable." *Id.* at 90-91. At issue was a pipeline leak in Mecklenburg County, North Carolina in 1975 that was repaired immediately upon discovery in 1975, after which Plantation began efforts to recover the spilled petroleum. It discontinued recovery efforts in 1984 after it was no longer recovering a measurable quantity of petroleum product. *Id.* at 90. In total, Plantation recovered just over 2,000 barrels of spilled petroleum during the recovery efforts, with all but eight or so barrels being recovered prior to January of 1983. Plantation recovered no measurable amount of product between June of 1983 and September of 1984 when it discontinued its efforts. Between 1975 and 1984, Plantation expended less than $19,000 on the recovery operation and $3,000 in settlements with a property owner.

In 1990, the North Carolina Department of Health and Natural Resources ("DEHNR") ordered Plantation to carry out a remedial plan. Within a few days

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

of that Order, Plantation notified all of its insurance carriers that it faced possible responsibility for such remedial action and requested that the insurance carriers defend and indemnify it for this potential liability. *Id.* The cleanup costs at the site were estimated to range as high as $4 million. Lumbermens Mutual Casualty ("LMC"), one of the excess carriers with a policy effective from 1972 through 1975 and providing coverage up to $5 million for claims in excess of a $3 million ceiling on a different policy, argued that Plantation's claim was untimely. LMC argued that the number of barrels recovered by Plantation, coupled with the fact that it entered into a release and settlement agreement with a property owner, established that notice was untimely, and further argued that Plantation should have notified the insurance carriers as soon as the leak was discovered. The Georgia Court of Appeals disagreed.

**\*16** Focusing on the fact that the claims involved an excess liability policy, the appellate court explained that "the notice obligation is triggered by the insured's assessment of the likelihood of the monetary amount of the property damage for which it may be liable exceeding the 'ceiling' of the primary policy." *Id.* at 91. Coverage under the excess policy would not be reached until the limits of all underlying policies were exhausted, in that case $3 million. In nine years of recovery activity, noted the court of appeals, Plantation expended $18,663 on cleanup and $3,000 to obtain the release and settlement agreement. *Id.* Furthermore, not until 1990 did a government agency make a demand upon Plantation to conduct further remediation. The appellate court concluded that the word "likely" as that term was used in that policy, "means probable, not merely possible." Given the facts of that case, the court of appeals did not agree with LMC that Plantation "was 'clearly aware' that coverage under the LMC policy would be involved," and affirmed the lower court's ruling that Plantation's claim was timely filed. *Id.*

In *Evanston Ins. Co. v. Stonewall Surplus Lines Ins.*

*Co.,* 111 F.3d 852, 860 (11th Cir.1997), the Eleventh Circuit construed an excess liability policy that provided

> [Insured] shall immediately give to [insurer] written notice directed to Shand, Moran & Company, Inc., 1 American Plaza, Evanston, Illinois 60201 of an occurrence, claim or suit which is reasonably likely to involve [insurer] under this policy.

The *Evanston* case involved an auto accident resulting in death to one person and serious injuries to another. The insured notified its primary insurance carriers on the day of the accident, but not its excess liability carriers, Evanston being one of the excess carriers. A personal injury lawsuit ensued and the lawyers handling the matter consistently evaluated the case at no more than $3.5 million; however, a jury returned a verdict in excess of $20 million. The insured notified Evanston of the claim on the first day of that trial. The parties ultimately settled the case for $7.5 million, but Evanston contended that it did not owe coverage because it did not receive timely notice. *Id.* at 852-857.

The Eleventh Circuit held that the timing of the insured's notification to Evanston was reasonable as a matter of law because the insured acted with due diligence, it evaluated the claim after being advised by competent attorneys, and the likelihood of such an excessive verdict was remote. *Id.* at 862. The court commented that excess liability carriers do not want notice of every claim, as they do not tender a defense of such claims, therefore, the court reiterated that with respect to the phrase "likely to involve" in the policy, "the word likely means probable not merely possible." *Id.* at 860 (quoting, *Lumbermens,* 447 S.E.2d at 91) (internal quotations omitted). Pursuant to the language of an excess policy, "[w]hen notice is required is, necessarily, a question of judgment." *Id.* Regarding judgment, the Court explained

> **\*17** This standard requires the insured to base its judgment regarding the amount of the claim against it upon sound reasons. Mere guesswork

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
(Cite as: 2006 WL 6106248 (N.D.Ga.))

will not be enough, ignorance is no defense. An insured cannot be heard to say it did not know when it did not inquire. The insured must use due diligence and take appropriate steps to make an informed judgment regarding the nature and amount of the claim. Nevertheless it is equally clear that, as judgment is involved, reporting perfection will not be attained.

*Id.* at 861, 447 S.E.2d 89.

In sum, "this issue concerns what [the insured] knew, and when it knew it. We do not ask whether [the insured's] evaluation of the case was 'correct' or 'mistaken' but whether, at the time, it was based upon reason." *Id.* at 862, 447 S.E.2d 89.

Pursuant to all of this case law, Defendant first argues that Plaintiff should have reasonably known in the late 1960s that its excess insurance carriers would likely be impacted and it should have notified Defendant about the leak at that time. In support of this argument, Defendant relies on: (1) the statement by the Georgia Court of Appeals that Plaintiff "should have foreseen a reasonable likelihood that additional damage to the 1968 leak could occur", (2) the reported contamination of B.L. Dunaway's well in 1969, which notified Plaintiff that the leak was obviously larger than originally thought and that the contamination was migrating, and (3) the language in the release that Plaintiff obtained from B.L. Dunaway in 1969 providing that "there exists the possibility that with future rains some soaked-in and otherwise hidden petroleum product may be washed up and brought to the surface so as to be a potential source of further pollution." FN25

> FN25. Defendant further argues that Plaintiff failed to report the pipeline leak to the Department of Transportation ("DOT") in violation of federal regulations. As support for this argument, Defendant cites the Court to Title 49 of the Code of Federal Regulations § 180 26-28 (1968). The Court notes that although the

regulations support Defendant's position that environmental accidents involving a leak of more than 50 barrels and/or property damage in excess of $1,000 must be reported to the DOT, the regulations, in and of themselves, do not establish that Plaintiff's actions in 1968 or 1969 violated that law. Plaintiff acknowledges that it did not report the leak to the DOT in the 1960s, but it does not concede that it violated any regulations as a result.

Plaintiff responds that in the late 1960s, it could not have reasonably foreseen that its ultimate loss would exceed $1 million, thereby triggering its excess liability insurance policies. In support of this position, Plaintiff relies on the following evidence (1) by January 29, 1968, two days after discovering the leak, Plaintiff's crew had welded a permanent patch over the hole in the pipeline,[FN26] (2) on January 28, 1968, the pipe line was pressured up to 500 pounds-per-square inch against a closed valve at Collins, Mississippi to check the patch and determine whether other leaks existed on the line;[FN27] (3) three barrels of spilled petroleum product were observed at the excavation site, (4) Plaintiff entered into a settlement and release agreement with Mr. Jacob in 1968 for a payment of $200, (5) when notified in January of 1969, about the contamination of B.L. Dunaway's well, located about 800 feet from the leak, Plaintiff paid to have a new well installed and entered into a settlement and release agreement with him for a total payment of approximately $1,000, (6) Robert Culver, the Division Manager for the Western Division of Plantation who supervised Plaintiff's response to the leak in 1968 and 1969, states in a declaration that Plaintiff considered the leak in Marion County to be only a minor leak, and that after the repairs were made in 1968 and the settlements were reached with Jacob and Dunaway, Plaintiff "believed these incidents had been completely resolved and that no formal claims would be made against Plantation as a result of the leak",[FN28] (7) between the time of the settlement with Dunaway in January 1969 and Cul-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

ver's departure from Plantation in 1986, Culver knew of no other demands or complaints by landowners in Marion County, Mississippi.

> FN26. Robert Culver's memo to H.M. Dreyer dated January 31, 1968 regarding the leak states
>
> > The patch was welded in place on Monday, January 29, 1968. The entire weld not covered by the patch was cleaned to bare metal and given a thorough inspection. It appeared to be in sound condition with only slight evidence of corrosion. This also applies to the pipe on either side of the weld. Although it was covered with a layer of red rust, only very shallow pits were visible. There was no real concentration of corrosion at either location where the pipe was excavated and exposed.
> >
> > Regarding Plaintiff's estimation of the how much product was lost during the spill, the same report states "As to how much product was lost, we hesitate to even guess. Accumulation in the bellholes and the product that stained the surface would not have amounted to 10 barrels."
>
> *See* Second Decl. Robert Culver [123]. Ex. C.

> FN27. Robert Culver states in his declaration that pressure readings at Collins and Baton Rouge indicated that there were no other leaks on the system. *See* Second Culver Decl. [123] at ¶ 5.

> FN28. Second Declaration of Robert Culver [123] at ¶ 17.

**\*18** Based on this evidence, submits Plaintiff, it had no reason to reasonably foresee that it would incur remedial costs as a result of this pipeline leak sufficient to trigger its excess liability insurance policy.

The Court agrees. Although the Georgia Court of Appeals found that Plantation should have foreseen a reasonable likelihood of additional damage from the 1968 leak sufficient to trigger its *primary* liability policy, the Court does not believe that conclusion is equally applicable with respect to the *excess* liability policy, a policy that would not provide coverage until Plaintiff incurred at least $1 million in loss. Defendant has not convinced the Court, based on the evidence in the record, that Plaintiff should have reasonably concluded in 1968 or 1969 that the pipeline leak would be "likely to involve" the Policies at issue in this litigation. To be sure, Plaintiff's evaluation of the incident in the late 1960s may not have been accurate; however, "[w]e do not ask whether [the insured's] evaluation of the case was 'correct' or 'mistaken' but whether, at the time, it was based upon reason." *Evanston,* 111 F.3d at 862. After carefully considering the record evidence, the Court disagrees with Defendant that as a matter of law Plaintiff should have concluded in 1968 or 1969 that the pipeline leak was likely to involve its excess liability policies and, therefore, that Plaintiff had a duty to notify Defendant about the leak at that time. Therefore, Plaintiff's lack of notice to Defendant in 1968 or 1969 was reasonable as a matter of law.

Next, Defendant argues that Plaintiff should have provided notice of the leak after the events in May and June of 1993. Defendant cites to the following evidence in support of that position (1) Hugh Dunaway reported gasoline in his poultry well in May 1993, approximately 2,300 feet from the location of the original leak; (2) as part of its investigation and remediation efforts, Plaintiff's environmental consultant, "CH2M Hill," provided Plaintiff with three options for addressing the well contamination on Hugh Dunaway's property. Defendant, through the use of an expert, estimates that the third option would have cost in excess of $2 million to implement for the entire Site;[FN29] (3) in September 1993, CH2M provided Plaintiff with a memorandum concerning "Potential Investigative Approaches for Response to MDEQ-Dunaway Site,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

Mississippi," wherein CH2M discusses implementation of corrective actions.[FN30] Defendant submits that the remedial techniques discussed in that memo would exceed $1 million in 1993, (4) on January 7, 1994, after the MDEQ and Plaintiff negotiated over drafts, the MDEQ issued an administrative order directing Plaintiff "to develop and submit a remedial investigation workplan [sic] that will determine the source or sources of the groundwater contamination and will delineate the vertical and horizontal extent of the groundwater and soil contamination", (5) Plaintiff put its primary carrier, Royal, on notice of the leak on June 17, 1993, and (6) Plaintiff knew, or should have known, that remediation efforts in Marion County would likely exceed $1 million, because in 1991 the estimated costs for site remediation concerning a different and smaller leak in Mecklenburg County, North Carolina exceeded $1.6 million. Defendant submits that in the face of all this evidence pointing to a massive gasoline leak that required further investigation and substantial remediation, Plaintiff unreasonably waited another 15 months before notifying Defendant of the leak.

> FN29. In support of this argument, Defendant submits the declaration of Philip Watters, a chemical engineer specializing in soil contamination and pollutants. Watters reviewed a letter dated June 15, 1993 from CH2M to Plaintiff regarding "evaluation for potential water supply well options for the Dunaway Farm" That letter provided Plaintiff with three remedial options (1) construct a new well similar to the existing one in an area with no known contamination, (2) provide piping and metering for tieing [sic] into the McGee Creek rural water supply system, or (3) construct a new well into the Miocene aquifer (approximately 350' deep). *See* Pinter Decl. [144], Ex. A. CH2M recommended the third option and Watters estimates that in 1993, such remedial action would have cost $2.3 million to imple-

ment. CH2M's actual estimated cost for implementing option three on Hugh Dunaway's property, however, was $59,728. It appears, therefore, that Defendant's expert is taking the actual cost of implementing this particular remediation option regarding the specific well on Hugh Dunaway's property and estimating what it would have cost Plaintiff to implement that option across the entire Dunaway Site. Nothing in the record reflects that Plaintiff ever received an estimate in excess of $2 million in 1993.

> FN30. Defendant does not provide a complete quote from the memorandum concerning *possible* corrective actions. The relevant paragraph from the memo states

> > Existing data indicates that potential groundwater receptors are not being exposed to gasoline constituent from local residential water supply wells. Therefore, corrective actions, if necessary, are not proposed until the subsurface data are evaluated. If corrective action is necessary, remobilization and well construction would follow. Wells are anticipated to include both vapor and groundwater extraction and air sparging wells in conjunction with monitoring wells and/or piezometers to confirm the groundwater capture zone and containment of the plume.

> Second Watters Decl. [168]. Ex. C, p.5.

**\*19** Plaintiff responds that it could not have reasonably foreseen that costs associated with the Dunaway Site might involve its excess liability policies until well after it notified Defendant of the leak in August 1994. In support of this position, Plaintiff relies on the following evidence (1) in 1972, Plaintiff excavated the entire length of the 12-inch pipeline in Marion County to repair or replace any portion of line that evidenced corrosion.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

No leaks were found during this refurbishing project; (2) High Dunaway contacted Plaintiff in 1993 regarding the contamination of his poultry well and this marked the first time since 1969 that Plaintiff had any indiction that another landowner may have been impacted by the leak; (3) by December 31, 1993, Plaintiff had incurred a total of $58,267 in connection with the Dunaway Site; (4) in January 1994, the administrative order from the MDEQ noted that Plaintiff previously sampled eight active water supply wells in the vicinity of the Hugh Dunaway property and did not detect gasoline constituents in any of them, (5) the MDEQ Order also concluded that "[b]ased upon the data submitted by respondent to date, there does not now exist any eminent danger to human health or the environment as would necessitate the implementation of Interim Remedial Measures, (6) Plaintiff's February of 1994 predictions about the potential costs for the remediation efforts were $210,000 in 1994, $200,000 in 1995, $100,000 in 1996, $40,000 in 1997 and $40,000 in 1998, providing a total projected cost of $643,000 through 1998, (7) soil vapor surveys conducted along the pipeline and Hugh Dunaway's property in April of 1994 did not detect gasoline vapors, (8) between May 23 and May 26, 1994, Plaintiff sampled shallow groundwater at three locations on Hugh Dunaway's property and found no trace of gasoline constituents; (9) a June 29, 1994 status report by Paul Wallace, the project manager for Plaintiff's remedial contractor, CH2M, shows that as of June 1994, Plaintiff had budgeted $152,556 for the investigation of the Dunaway Site, (10) Wallace states in his declaration that the June 1994 report reflects that at that time, "there remained far too many unknowns for Plantation to determine the extent of the gasoline contamination at the Dunaway Site or the costs Plantation would eventually have to incur in responding to the contamination. I can say without hesitation that no one at CH2M Hill or Plantation at this time believed those response costs would ultimately exceed $1 million",[FN31] (11) in August 1994, the same month that Plaintiff sent notice to Defendant, Plaintiff discovered what appeared to be free

product (i.e., pure gasoline) in a deep aquifer under Hugh Dunaway's property, (12) as of December 31, 1994, Plaintiff had incurred $202,372.00 in connection with the Dunaway Site,[FN32] (13) in February 1995, Plaintiff's revised five-year cost projection estimated that the total response costs for the Dunaway Site contamination through 1999 would be approximately $886,000.00, (14) the first lawsuit regarding the leak was filed against Plaintiff in May 1996, (15) Plaintiff's total costs related to the Dunaway Site did not reach $1 million until October 1997. The costs reached $2 million in June of 1999.

FN31. *See* Pl.'s Stmt. Uncontested Facts [122] at ¶ 61 and Def.'s Response [143] at ¶ 61. It appears, however, that Defendant's responses to Plaintiff's statement of uncontested facts are misnumbered, at least to a certain extent. Although Defendant admits ¶ 61 in its response to Plaintiff's material facts, it appears that it is objecting to and/or denying ¶ 61 in its response at ¶ 63. Where possible, the Court has attempted to determine which responses apply to which of Plaintiff's numbered facts, but Defendant is ultimately responsible for the accuracy of its responses.

FN32. Defendant submits that any event after notice was provided to Defendant is immaterial to the timely notice issue. In the Court's view, the evidence has some bearing concerning the reasonableness of Plaintiff's judgment as to when to notify Defendant about the leak. Although most of the evidence addresses the events leading up to the date of notification, the Court cannot conclude that costs incurred after notification are totally irrelevant to the issue.

**\*20** In light of this evidence, submits Plaintiff, it notified Defendant of the occurrence well before Plaintiff knew the extent of the gasoline contamination, or the cost the company would eventually in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

cur in responding to the contamination. The Court agrees. Again, the issue before the Court is not whether Plaintiff was correct or mistaken in its evaluation, rather, the issue is "what [Plaintiff] knew, and when it knew it." *Evanston,* 111 F.3d at 862. The Court must ask, in light of the evidence "did [Plaintiff] exercise due diligence in gathering information regarding the [leak], make an informed judgment and come to a reasonable evaluation of less than [the excess liability coverage]? If so, then it fulfilled its contractual duty to Defendant. Whether it turned out later that [Plaintiff's] evaluation was incorrect is irrelevant under the contract." *Id.*

In this case, beginning in May of 1993, Plaintiff received its first contact since 1969 from a property owner concerning the leak. Plaintiff thereafter began working with environmental consultants and investigating the contamination. In September of 1993, a memo from Plaintiff's environmental consultants stated that potential groundwater receptors were not being exposed to gasoline constituent from local supply wells. Plaintiff had incurred less than $60,000 in costs by December of 1993. The January 1994 order from MDEQ noted that eight wells tested by Plaintiff did not reveal any contamination and further found that no "eminent danger to human health or the environment" existed at that time. By February of 1994, Plaintiff predicted that it would incur no more than $643,000 in costs through 1998. Further testing in April and May of 1994 along the pipeline and on Hugh Dunaway's property did not detect petroleum. Plaintiff discovered in August of 1994 that a deep aquifer on Hugh Dunaway's property was contaminated. Plaintiff put Defendant on notice that same month.

Defendant presents an expert who, after the fact, offers his opinion concerning the cost of implementing particular remediation efforts. However, in reaching his conclusion that the remediation technique used on Hugh Dunaway's property would cost in excess of $2 million to implement, he fails to even acknowledge that the actual estimated cost

for that project was less than $60,000. Therefore, the Court can only presume that Watters is estimating what it would have cost Plaintiff to implement that option across the entire Site in May of 1993; however, for the reasons stated herein, the record does not support the conclusion that Plaintiff could have reasonably known in May of 1993 that it would incur over $2 million in loss. Regarding the September 1993 memo to Plaintiff addressing potential investigative approaches, Watters opines that the well remediation discussed therein would cost well in excess of $1 million to implement. Again, the problem with Defendant's estimations is the total lack of regard for the content of the memo. Yes, CH2M discussed the process Plaintiff would have to undergo to address potentially contaminated wells, but immediately before addressing that process, CH2M noted that corrective action may not be necessary at that time because the groundwater receptors were not being exposed to gasoline from the local wells. *See* Second Watters Decl. [168], Ex. C, p.5. Therefore, this letter from the environmental consultants to Plaintiff explores the *possibility* of further contamination and potential corrective actions. *Lumbermens* explains that the likely-to-involve language in these notice provisions means "probable, not merely possible" *Lumbermens,* 447 S.E.2d at 91. Finally, the Court is not persuaded by Defendant's argument that Plaintiff should have provided notice about the leak in Marion County, Mississippi because an earlier leak in Mecklenburg County, North Carolina cost in excess of $1.6 million to clean-up. The issue, as explained by the Eleventh Circuit, is whether Plaintiff acted diligently in gathering information regarding the leak in Mississippi, not North Carolina, and whether it made a reasonable evaluation of the potential loss in Mississippi, even if that evaluation turned out to be wrong. Certainly, mere guesswork is not enough and ignorance is no defense, but based on the evidence in the record, as set forth above, the Court finds that Plaintiff was sufficiently diligent in its efforts to evaluate the extent of its loss beginning in May of 1993 and that it satisfied its contractual obligation to Defendant when it provided no-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

tice of the claim in August of 1994.[FN33]

> FN33. This conclusion is further supported by the "savings clause" in Defendant's notice provisions "[F]ailure to notify the Company of any occurrence which at the time of its happening did not appear to involve this policy, but which at a later date would appear to give rise to claims hereunder, shall not prejudice such claims."

**\*21** Finally, the last issue regarding notice concerns the August of 1994 notice letter, identifying the Policy in effect between November 30, 1966 through November 30, 1969,[FN34] but not referencing the Policy in effect between 1963 and 1966. Not until January of 1999 did correspondence from Plaintiff to Defendant mention the earlier policy. Defendant submits that there is no explanation for the additional 5-year delay in providing Defendant with notice regarding the earlier policy, and argues that coverage is therefore forfeited with respect to this earlier policy.

> FN34. As mentioned previously, the parties have never located a copy of the 1966-1969 Policy.

Plaintiff responds that the majority of courts addressing this issue hold that notice to an insurer under one policy constitutes notice under all other policies issued to that same insurer. The Court agrees with Plaintiff regarding the majority rule and finds that the August 1994 notice to Defendant constitutes notice as to both policies at issue in this litigation. *See Caldwell v. Life & Casualty Ins. Co. of Tenn.*, 144 S.E.2d 678, 678-79 (Ga.Ct.App.1928) (holding that submission of proof of loss on one policy sufficient to satisfy notice requirement on second policy issued by same insurance company, provided that "the proof so furnished substantially conforms to the requirements as to proof of loss in the first policy."), *Rose Medical Center v. State Farm Mut. Auto. Ins. Co.*, 903 P.2d 15, 17-18 (Colo.Ct.App.1994) ("[W]e conclude that when an insurance carrier receives adequate notice of a

claim under one policy or coverage, it has notice as to all coverages when ... the information contained in the notice is sufficient for both."); *Casualty Ins. Co. v. E.W. Corrigan Const. Co.*, 247 Ill.App.3d 326, 187 Ill.Dec. 20, 617 N.E.2d 228, 233 (Ill.App.Ct.1993) ("We ... conclude that an insurer is chargeable with knowledge of all policies issued by it to the insured.")(quoting, *Duggan v. Travelers Indemnity Co.* ., 383 F.2d 871, 874 (1st Cir.1967), *High Voltage Engineering Corp. v. American Employer's Ins. Co.*, No. 941033, 1995 WL 809577 at \*3 (Mass.Super.1995) (holding that notice under excess policy that did not provide coverage was sufficient notice pursuant to a primary general liability policy that did offer coverage despite insured's failure to identify correct policy.).

In conclusion, for the reasons set forth herein, the Court finds that Plaintiff satisfied its contractual obligations under both of the Policies when it notified Defendant about the pipeline leak in Marion County, Mississippi in August of 1994. As such, Plaintiff's Cross-Motion for Partial Summary Judgment on the Timely Notice Issue [122] is GRANTED and Defendant's Cross-Motion for Summary Judgment on the same [143] is DENIED.[FN35]

> FN35. For the record, the Court notes that Plaintiff's position is that it had no obligation to notify Defendant about the leak until it reasonably believed that its losses would exceed $2 million, because there are two underlying primary policies (one from Royal and one from Travelers) both with $1 million limits. Plaintiff contends that because both of these underlying policies were triggered by the property damage at the Dunaway Site, the excess policies would not begin coverage until the loss exceeded $2 million. In making that argument, however, Plaintiff submitted that notice was timely even if the excess policies were triggered after losses exceeded $1 million.
>
> In an effort to be conservative in resolv-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

ing the present notice dispute, and only for that purpose, the Court assumed that excess coverage would begin when Plaintiff experienced costs in excess of $1 million. The Court makes no finding regarding whether either of the underlying policies were triggered.

### Defendant's Motion for Summary Judgment on the Issue of No Occurrence [185]

Defendant moves the Court to find as a matter of law that the pipeline leak does not fall within the policy definition of an occurrence, because Plaintiff expected both the leak and the resulting damage; therefore, Defendant owes no coverage. The Policies define an "occurrence" as "an event or continuous or repeated exposure to conditions, which unexpectedly causes Personal Injury and/or Property Damage during the policy period."

**\*22** The issue presented by this motion is whether the property damage caused by the pipeline leak was unexpected.[FN36] For the reasons stated below, the Court finds that genuine issues of material fact exist with respect to whether the property damage was unexpected in this case, precluding the resolution of this issue at the summary judgment stage.

> FN36. Despite a great deal of criticism by both sides concerning how best to frame the issue, the parties appear to agree that the relevant inquiry for purposes of this motion is whether the property damage at issue was unexpected. *See* Def.'s Reply Mot. Summ. J [226] at 6–7 (stating that "[t]here is no coverage under the Continental Policies for expected property damage."), Pl.'s Opp'n Mot. Summ. J[217] at 12 ("The relevant inquiry is whether Plantation expected the actual property damage that occurred at the Dunaway Site").

Defendant argues that the resulting losses to Plaintiff from the pipeline leak do not constitute an "occurrence" because Plaintiff's actions and inac-

tions before and after the leak's discovery vitiate any right to seek reimbursement for damages under these policies. Defendant specifically argues that (1) Plaintiff expected such leaks and the resulting damages because it was fully aware before it discovered this particular leak that the pipeline was corroded and chronically leaked, and (2) the resulting damages were expected after Plaintiff discovered the leak but failed to properly investigate, remediate and/or warn surrounding neighbors of the leak. Consequently, submits Defendant, it owes no coverage to Plaintiff for the Dunaway Site claims.

Regarding the argument that Plaintiff knew the pipeline was corroded and chronically leaking, Defendant relies on portions of the "Plantation Pipeline Company Economic Study No. 4-71" (hereinafter the 1971 Study) that is an "Evaluation of Repair and Operation Alternative for 12″/10″ Mainline System." *See* Pinter Declaration [186], Ex. A Relying on this internal 1971 Study, Defendant asserts that Plaintiff experienced 36 leaks on the 12-inch pipeline between 1941 (when it was installed) through 1968. The pipeline stretches for 429 miles. By 1944, Plaintiff recognized that "certain of the uncoated sections of lines were subject to excessive corrosion and that protective measures must be taken." While Plaintiff "cathodically coated" (described as an "anti-corrosive wrapping") certain portions of the pipeline after installation, Plaintiff recognized as early as 1952 that such coating "would not fully protect bare lines." In 1961, "Pipe-to-Soil" surveys demonstrated that only 54% of the pipeline running from Oskya to Collins (which includes the Dunaway Site) was adequately protected. By 1966, only 40.5% of the pipeline from Osyka to Collins was categorized as adequately protected. The section of the pipeline at the Dunaway Site was not coated, meaning it was "bare," until after the leak. Defendant submits that the totality of these circumstances demonstrate that Plaintiff knew or should have known that the unprotected portions of the pipeline would leak and cause damages, thereby precluding coverage under the Policies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

Concerning Plaintiff's actions after the discovery of the leak in 1968, Defendant argues that coverage is precluded because the damage caused by the leak was an expected consequence of Plaintiff's failure to adequately investigate and remediate the contamination upon discovery. Relying on expert testimony, Defendant asserts that (1) Plaintiff failed to determine the size and scope of the leak in 1968, ignoring its own internal policies and inadequately confining its probe of the pipeline to two discrete locations, (2) Plaintiff did nothing to treat or remove the contamination that it did discover, such as excavating the contaminated soil, cultivating and fertilizing the soil to enhance remediation, or hauling away the contaminated soil and replacing it with backfill; and (3) Plaintiff did not implement any monitoring practices, such as sampling existing water wells, installing additional groundwater recovery wells, pumping contaminated groundwater to the surface, or conducting annual surveys of the residents.[FN37] Based on the totality of Plaintiff's failure to act, argues Defendant, there is no occurrence under the Policies, because Plaintiff knew or should have known that its behavior would result in future claims. Additionally, contends Defendant, the settlement and release agreement with B.L. Dunaway explicitly acknowledges the possibility of future problems, demonstrating that Plaintiff expected more property contamination from the leak.

> FN37. Defendant relies on the expert reports and deposition testimony of Douglas Chisholm and Philip Watters in support of these arguments.

**\*23** Plaintiff responds that the particular damage for which it seeks coverage as a result of the pipeline leak was unexpected and therefore covered under the terms and conditions of the Policies. While Plaintiff acknowledges that it was aware generally of the risk of corrosion or leaks somewhere along the 429 mile pipeline, such general awareness is insufficient to establish that it expected the particular loss at the Dunaway Site. A generalized, non-specific expectation of loss some-

where, some place, is not enough to exclude coverage, submits Plaintiff, because Defendant cannot establish, based on the record evidence, that Plaintiff expected the resulting property damage. Additionally, Plaintiff further represents that nothing about its response to the leak in 1968 could reasonably lead to the conclusion that it expected the later discovered damages.

Concerning whether it expected the actual leak at issue, Plaintiff relies on both the 1971 Study and the deposition testimony of Defendant's corrosion expert, Douglas Chisholm, who acknowledged that when Plaintiff built the pipeline in 1941, it was consistent practice in the industry to coat only the portions of the line believed to be in high risk areas (those with "low soil resistivity") and leave other sections bare (those in areas of high resistance soils). Chisholm Dep. [217], Ex. A, at 57; *see also* 1971 Study [187], Ex. A. Appendix, p. 11 (stating that Plaintiff laid the pipeline "[i]n accordance with the best thinking and practices at the time ...") Chisholm testified that he was unaware of any law or regulations in effect in 1941 that required coating on underground pipelines. *Id.* at 56.[FN38] He further acknowledged that there were no applicable published industry standards and/or recommendations until the 1960s. After installing the pipeline, Plaintiff implemented and maintained a "regular program of corrosion protection." 1971 Study [187], Ex. A, at p. 1. Relying on the 1971 Study, Plaintiff further submits that it spent millions of dollars updating the cathodic protection on the pipeline, installing "sacrificial anodes" in the 1940s, "impressed current" systems in the 1950s, and coating additional portions of the line in the 1950s and 1960s. Defendant's expert agreed in his deposition that Plaintiff's efforts were reducing the risk of future leaks up through the mid-1960s. Chisholm Depo. [217], Ex. A, at p. 136-138 ("From 1953 to 1960, the leak rate decreased measurably. From 1960 to 1966, the curve was at its shallowest. So whatever was happening, and we don't have the details of all of the things that occurred in the pipeline, something healthy was going on between

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

'60 and '66").[FN39] Plaintiff further relies on the very existence of the internal 1971 Study, submitting that it evidences Plaintiff's attempt to understand and combat corrosion on the pipeline. Finally, Plaintiff submits that the preventative measures touted by Defendant would not have eliminated the risk of corrosion and leaks, but only reduced the risk. Chisholm Depo. [217], Ex. A, at p. 150 ("If I were to testify before you with the opinion that you can eliminate all leaks, that would be impeachable testimony. It's not possible"). In addition to the evidence cited above, Plaintiff argues that Defendant's evidence demonstrates only that Plaintiff realized that there was a generalized risk of a pipeline leak, not that it expected the particular leak at the Jacob farm.

> FN38. Chisholm also testified, though, that it was known prior to 1941 that coating and cathodic protection were required to protect buried steel pipelines. *Id.* at 55, 397 S.E.2d 61.

> FN39. According to Chisholm, things took a turn for the worse from 1966-1969 (the time frame wherein this leak was discovered) and Plaintiff did not have its corrosion problem under control.

**\*24** Responding to Defendant's argument that Plaintiff expected the ensuing property damage due to its allegedly inadequate response to the leak, thereby defeating coverage, Plaintiff contends that, at most, Defendant has demonstrated that Plaintiff was negligent in the way that it responded to the leak in the late 1960s and that such negligence contributed to the future losses. However, negligently causing harm is not the same as expecting that harm, argues Plaintiff, and Defendant has not established that Plaintiff expected the damage at the Dunaway Site. There is no "negligence" exclusion in the Policies. The relevant inquiry, submits Plaintiff, is what it subjectively expected with respect to the losses from the pipeline leak, not what the reasonable person might have expected in the late 1960s. While Plaintiff admits that its pipeline

crew underestimated the severity of the leak in 1968, this does not mean that it forfeited coverage under these insurance policies because of that oversight. As to the language in the settlement and release agreement with B.L. Dunaway, Plaintiff asserts that this boilerplate language recognizes nothing more than the mere possibility of potential pollution, not that Plaintiff subjectively expected further damage.

Furthermore, as rebuttal to Defendant's argument and expert testimony that Plaintiff's response to the leak in 1968 and 1969 was inadequate, Plaintiff relies, in part, on the expert testimony of Richard Dewling and Gene Schmidt. Dewling concludes that Plaintiff's response to the leak in the late 1960s should be judged by the knowledge and standards as they existed then, not by present-day environmental standards. Schmidt asserts that Plaintiff's response to the pipeline leak was reasonable, in accordance with standard practices at that time, and that Plaintiff reasonably believed in the late 1960s that it would incur no further costs in connection with the pipeline leak. Defendant moves the Court to strike portions of Dewling's report and all of Schmidt's report. The Court briefly addresses these motions.

Dewling offers four opinions in his report. Defendant objects to the second and third opinions. After considering the parties' arguments, the Court presently defers ruling on Defendant's motion to strike, because the portions of Dewling's report to which the Defendant does not object confirm that this issue must be submitted to the trier of fact. Specifically, Dewling concludes in his first opinion that the additional actions Defendant's experts think Plaintiff should have implemented in the 1960s were not ones typically used during that time period. Plaintiff offers this evidence to rebut Defendant's argument that Plaintiff did not adequately respond to the leak in the 1960s. Additionally, Dewling explains in his fourth opinion that environmental knowledge throughout the 1970s and earlier concerning groundwater contamination issues were

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

primitive when evaluated against today's standards, therefore, it is inappropriate to hold Plaintiff to a higher standard of knowledge than regulators or practicing professionals possessed during that same period. Whether Dewling will be permitted to testify on the subjects that Defendant objects to presently will be determined prior to trial.[FN40] Therefore, Defendant's Motion to Strike portions of Dewling's Expert Report and Related Trial Testimony [189] is DENIED WITHOUT PREJUDICE and with LEAVE TO RENEW.

> FN40. The Court is referring to Defendant's assertion that Dewling offers impermissible opinions and interpretations of various statutes and whether his opinion, that Defendant describes as a survey of the development of environmental remediation and regulations, is irrelevant. Prior to trial, Defendant may renew its motion to strike concerning Dewling, however, no further briefing is necessary.

*25 Plaintiff also offers the opinions of Gene Schmidt, who evaluated and assessed the cumulative actions taken by Plaintiff in response to the leak at the Dunaway Site. He offers five opinions on this topic and Defendant moves the Court to strike the entire report, arguing that his opinions are inadmissible under Federal Rules of Evidence 702 and 403 because: (1) Schmidt is not an expert in pipeline operations or corrosion, (2) he relies upon "assumed" facts that are incomplete and self-serving, and (3) his ultimate conclusions are a restatement of that which Plaintiff asked him to assume. After due consideration of Defendant's arguments, the Court is going to permit Schmidt to offer his expert testimony in this case. With respect to qualifications, the Court finds that Schmidt has an ample amount of relevant experience regarding appropriate responses to environmental contamination, both in 1968 and presently, having been personally responsible for investigating, detecting, assessing and remediating several thousand contaminated sites, many of which involved petroleum re-

leases from pipelines. He further served on a national task force for thirteen years that was charged with evaluating and researching detection and remediation of "petroleum hydrocarbons in the subsurface." Although Schmidt acknowledges in his deposition that he is not an expert with respect to either corrosion or actual pipeline operations, this admission does not render his opinions about the reasonableness of Plaintiff's response to the pipeline leak inadmissible, especially in light of his relevant experience in responding to, detecting and remediating environmental contamination, including petroleum groundwater contamination. Defendant will certainly be able to elicit on cross-examination that Schmidt is not an expert in corrosion or pipeline operations, and explore the limitations of his testimony in light of that fact. Concerning Defendant's arguments relative to the accuracy or correctness of Schmidt's conclusions based upon his factual assumptions, the Court reiterates that such arguments go to the weight of the evidence, not its admissibility. *Smith,* 215 F.3d at 719. Defendant will have the opportunity to challenge the accuracy of Schmidt's factual assumptions on cross-examination. Therefore, Defendant's motion to strike Schmidt's Expert Report and Related Trial Testimony [193] is DENIED.

Turning back to the occurrence issue before the Court and Defendant's motion for summary judgment, neither the parties nor the Court have identified Georgia case law directly on point with this particular issue. However, in reaching its conclusion that this issue is properly submitted for resolution to the trier of fact, the Court reiterates that Georgia's rules of insurance contract construction dictate that, "insurance policy exclusions are construed most strongly against the insurer and in favor of providing the indemnity sought." *Southern Guaranty Ins. Co. v. Saxon,* 190 Ga.App. 652, 379 S.E.2d 577, 578 (1989) (viewing the definition of occurrence as a policy exclusion). The Court also agrees with Plaintiff that the relevant inquiry is whether the resulting property damage was unexpected from the standpoint of Plaintiff, not some

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

other objective measure. *Clausen v. Aetna Casualty & Surety Co.,* 754 F.Supp.2d 1576, 1582 (S.D.Ga.1990) (noting that "damage caused by the release of pollutants is covered unless the *insured* expected or intended the release) (emphasis in the original).[FN41] Finally, the Court recognizes that the Supreme Court of Alabama, applying Georgia law, resolved a case between these same parties concerning a different pipeline leak in Alabama. *Continental Casualty Co. v. Plantation Pipeline Co.,* 902 So.2d 36 (Ala.2004). In that case, Continental also moved for summary judgment on the issue of no occurrence, arguing that the Alabama leak did not fall within the policy definition of "occurrence" because Plantation expected petroleum contamination from its pipeline.[FN42] The trial court denied Continental's motion for summary judgment on that issue. *Id.* at 38-39. The trial court further excluded the same 1971 Economic Study in evidence in this case from the trial and Continental appealed that decision, arguing that the trial court erred in excluding evidence relevant to Continental's defense that the leak was expected and therefore not an insured event. *Id.* at 42. The Supreme Court of Alabama first noted that Continental was permitted to cross-examine the President of Plantation regarding the 1971 Study, and then held that the trial court did not abuse its discretion in excluding the evidence. In reaching this conclusion, the court reasoned, "[e]vidence that Plantation had general knowledge of the risk of a leak does not establish that Plantation subjectively expected or intended pipeline leaks." *Id.* at 43 (relying on *Saxon,* 379 S.E.2d at 578), *see also, Glen Falls Ins. Co. v. Donmac Golf Shaping Co. Inc.,* 203 Ga.App. 508, 417 S.E.2d 197, 199 (Ga.Ct.App.1992) (addressing the negligent placement and construction of a golf course onto federally protected wetlands, the court identified the coverage issue as whether the insured "had the specific intent called for by the policy to cause the alleged damages," and concluded that "mere knowledge and appreciation of a risk short of a substantial certainty, is not the equivalent of intent.").

FN41. The Court notes that the Policies are silent with respect to whether the "unexpectedly" language in the definition of occurrence should be viewed from an objective or subjective point of view. In the face of such silence, the Court finds that the contract could be construed two different ways, therefore, "it will be construed against the insurance company and in favor of the insured." *Claussen v. Aetna Casualty & Surety Co.,* 259 Ga. 333, 380 S.E.2d 686 (Ga.1989), *see also, Sawhorse, Inc. v. Southern Guaranty Ins. Co. of Ga.,* 269 Ga.App. 493, 604 S.E.2d 541, 543-44 (Ga.Ct.App.2004) ("[C]ontracts are construed against the insurer if the provisions are susceptible to more than one interpretation.").

FN42. The definition of "occurrence" in the Alabama case is only somewhat similar to the one herein "an accident, ... which results, during the policy period, in bodily injury or property damage neither expected or intended from the standpoint of the insured." *Id.* at 39, 604 S.E.2d 541.

**\*26** The cases upon which Defendant relies also support the Court's conclusion that this issue cannot be resolved at the summary judgment stage. For example, the Eighth Circuit addressed whether multiple sewage back-ups from the city system into a residential home caused by a municipality's negligence constituted an "occurrence" as that term was defined by a liability policy. *City of Carter Lake v. Aetna Casualty & Surety Co.,* 604 F.2d 1052 (8th Cir.1979). In holding that after the first sewage back-up the subsequent ones were not unexpected, and therefore not occurrences under the policy, the Eighth Circuit explained:

For the purposes of an exclusionary clause in an insurance policy the word "expected" denotes that the actor knew or should have known that there was a substantial probability that certain consequences will result from his actions. If the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

insured knew or should have known that there was a substantial probability that certain results would follow his acts or omissions then there has not been an occurrence or accident as defined in this type of policy when such results actually come to pass. The results cease to be expected and coverage is present as the probability that the consequences will follow decreases and becomes less than a substantial probability.

*Id.* at 1058-59 (relying on R. Keeton, Basic Text on Insurance Law s 54(c), at 298-300 (1971)).[FN43]

> FN43. *Ashland Oil, Inc. v. Miller Oil Purchasing Co.,* 678 F.2d 1293 (5th Cir.1982). cited by Defendant is distinguishable from the facts of this case, because there, the Insured sought coverage for contamination of two million barrels of crude oil as a result of intentionally injecting waste material into the pipeline. The Fifth Circuit concluded that the policy at issue excluded coverage for the damage, because the insured intended for the hazardous materials to be discharged into the pipeline, therefore, the resulting damages were expected. Obviously, nothing in the record suggests that Plaintiff consciously or intentionally released gasoline from its pipeline. *See also, Bitmus Casualty Co. v. Tonka Corp.,* 9 F.3d 51 (8th Cir.1993) (holding that groundwater contamination was not an occurrence under an insurance policy because Tonka intentionally dumped solvent waste on the property and therefore the resulting damage was expected).

> *Portal Pipeline Co. v. Stonewall Ins. Co.,* 256 Mont. 211, 845 P.2d 746 (Mont.1993) is equally inapplicable. There, a crude oil pipeline operator unlawfully permitted the injection of a high-pressure butane gas into its pipeline carrying crude oil, after which an oil company which contracted to have its crude oil transported on that pipeline filed suit against the operator. The pipeline operator attempted to recover its costs in settling that lawsuit from its insurance carrier. The Montana Supreme Court held that the claim did not constitute an occurrence under the terms of the policy, because the pipeline operator intentionally accepted high-pressure butane gas into its pipeline, knowing that it was unlawful to do so and knowing that its actions "were expected to cause injury to [the oil company's] refinery." *Id.* at 749.

> All of these cases address intentional acts by a corporation that caused damage, and those courts found that because the acts were intentional, the resulting damages were to be expected. In the present situation, we are faced with an unintentional leak that caused damage, and the issue is whether the resulting damages were expected.

Based on the evidence in this case, it is presently disputed whether Plaintiff knew there was a substantial probability that the damages would result from the pipeline leak at the Dunaway Site. Specifically, Defendant presents evidence that Plaintiff had a history of leaks on the pipeline and knew that portions of the line were both subject to corrosion and inadequately protected. Through expert witnesses. Defendant also presents evidence that Plaintiff did not properly respond to the leak in 1968, thereby making it substantially probable that further damage would occur. Plaintiff responds with evidence that it followed consistent industry practices when it installed the pipeline in 1941 and, thereafter, that it maintained an effective system to protect the integrity of the pipeline. Plaintiff further submits expert testimony that it reasonably responded to the leak in accordance with standard practices at that time. Because of the conflicting evidence in the record, the Court leaves for the trier of fact whether the damages for which Plaintiff seeks

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

coverage were unexpected. Defendant's motion for summary judgment on the occurrence issues is DENIED.

### Defendant's Motion for Summary Judgment re Negligent & Bad Faith Failure to Settle [187]

Count III of Plaintiff's complaint asserts a claim for negligent and bad faith failure to settle a claim. "An insurance company may be liable for damages to its insured for failing to settle the claim of an injured person where the insurer is guilty of negligence, fraud, or bad faith in failing to compromise the claim." *Southern General Ins. Co. v. Holt*, 262 Ga. 267, 416 S.E.2d 274, 276 (Ga.1992). The rationale behind this rule is that "the insurer may not gamble with the funds of its insured by refusing to settle within the policy limits." *McCall v. Allstate Ins. Co.*, 251 Ga. 869, 310 S.E.2d 513, 515 (Ga.Ct.App.1984). Regarding the negligence claim, "the insured may sue the insurer for failure to settle only when the insured had a duty to settle the case, breached that duty, and its breach proximately caused damage to the insured beyond the damages, if any, contemplated by the insurance contract." *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1546-47 (11th Cir.1991).[FN44] With respect to bad faith, "if there is any reasonable ground for contesting the claim there is no bad faith and it is error to award penalty and attorney's fees." *Commercial Union Ins.Co. v. F.R.P. Co.*, 172 Ga.App. 244, 322 S.E.2d 915, 921 (Ga.Ct.App.1984).

> FN44. The Eleventh Circuit also notes "In any case, the difference in the standards of negligence and bad faith may be only semantic." *Id.* at 1548 n. 26, 845 P.2d 746 (citing *U.S. Fidelity & Guaranty Co. v. Evans*, 116 Ga.App. 93, 156 S.E.2d 809, 811 (Ga.Ct.App.1967) (difference between bad faith and negligence is "mere terminology" and "means little")).

**\*27** Plaintiff alleges that Defendant had repeated opportunities to contribute to the settlement of the Mississippi lawsuits for amounts well within the policy limits and that Defendant refused to make such contributions. That refusal, argues Plaintiff, resulted in greater damages to Plaintiff in terms of payments for settlements and defense costs. Specifically, Plaintiff represents that in January of 2003, it could have settled all remaining Dunaway Site claims for $5 million, but Defendant refused to contribute the limits of its policy towards settling those claims. Plaintiff ultimately resolved the remaining claims for $6,420,000.00 by February of 2005. Had Defendant agreed to provide $5 million in January of 2003, Plaintiff contends that it would not have incurred the additional $1,420,000.00 in settlement payments and $1,408,234.00 in additional defense costs.

For the reasons set forth herein and in Defendant's motion for summary judgment, the Court finds that this claim should be dismissed as a matter of law. First, for all of the reasons set forth in this Order, the Court finds that reasonable grounds exist for contesting Plaintiff's claim, therefore, the bad faith claim against Defendant fails as a matter of law.

Second, regarding the negligence claim, even assuming that Defendant owed a duty to settle the claims and that it breached that duty,[FN45] the Court also agrees with Defendant that Plaintiff has not demonstrated that Defendant's refusal to contribute $5 million towards settling the remaining claims in January of 2003 proximately caused Plaintiff's alleged damages. Plaintiff's President, Mr. Bannigan, testified at his deposition that Plaintiff had the independent financial capacity to settle these cases for $5 million in 2001 or 2002, defeating Plaintiff's argument that Defendant's refusal to provide the settlement funds put Plaintiff's interests at risk and caused it to incur further costs. Plaintiff responds, however, that Mr. Bannigan stated in a declaration that Plaintiff did not have time to secure approval from its Board of Directors to globally settle the remaining claims by January of 2003, As of January 2003, Plaintiff had authority

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

from the Board of Directors to settle the claims for $3 million. Acquiring authorization for the additional funds could take several months, according to Bannigan, therefore, Plaintiff could not authorize a settlement of the claims for $5 million in January of 2003 without Defendant's contribution.

> FN45. The Court assumes this only for the purpose of resolving the pending motion and for no other reason. The Court is presently unsure whether Defendant owed a duty to settle these claims, however, it need not reach that issue to resolve the pending motion.

The evidence in the record, however, demonstrates that Plaintiff's counsel, John Corlew, informed Plaintiff before January of 2003 that he believed the cases could be settled for $5 million. Corlew Dep. [256] at 106. Corlew testified that he believed the cases would settle for $5 million at the end of a mediation that occurred sometime in 2002, possibly even before September of 2002, and that he communicated this information to Plaintiff. *Id.* at 104, 107-08, 322 S.E.2d 915. A reasonable interpretation of this evidence is that Plaintiff knew the remaining claims could potentially be settled for $5 million dollars prior to January of 2003, and could have sought authorization from the Board of Directors to settle the claims. Furthermore, Corlew testified that Plaintiff never stated that it could not settle the claims because the insurance carriers were not providing settlement funds, nor did Plaintiff alter any litigation strategies or settlement offers because the insurance carriers were not providing a defense. *Id.* at 157, 322 S.E.2d 915. In the face of this evidence, the Court finds that Plaintiff has failed to demonstrate that Defendant's refusal to participate in the settlement of these claims proximately caused any alleged damages, and the Court GRANTS Defendant's Motion for Summary Judgment [187] on this claim.

CONCLUSION

**\*28** For all of the reasons set forth herein, Plaintiff's Motion for Partial Summary Judgment on the Issue of Timely Notice [122] is GRANTED, Defendant's Cross-Motion for Partial Summary Judgment on the Issue of Timely Notice [143] is DENIED, Plaintiff's Motion for Partial Summary Judgment on the Trigger of Coverage Issue [137] is DENIED, Defendant's Cross-Motion for Partial Summary Judgment on the Trigger of Coverage Issue [159] is DENIED, Defendant's Motion for Summary Judgment on the Issue of No Occurrence [185] is DENIED, Defendant's Motion for Summary Judgment on the Negligent and Bad Faith Failure to Settle Claim [187] is GRANTED, Defendant's Motion to Strike the Declaration of Robert Hinchee [179] is DENIED, Defendant's Motion to Strike Portions of Expert Report and Trial Testimony of Richard T. Dewling [189] DENIED WITHOUT PREJUDICE and with LEAVE TO RENEW, Defendant's Motion to Strike the Expert Report and Trial Testimony of Robert N. Hughes [191] is DENIED WITHOUT PREJUDICE and with LEAVE TO RENEW, Defendant's Motion to Strike the Expert Report and Trial Testimony of Gene Schmidt [193] is DENIED, Defendant's Motion to Strike the Expert Reports of Wayne Grip and Robert E. Hinchee [195] is DENIED WITHOUT PREJUDICE and with LEAVE TO RENEW, Plaintiff's Motion to File Sur-reply [221] is GRANTED, Plaintiff's Motion to Strike the Declaration of Dr. David Huntley [198] is DENIED.[FN46]

> FN46. Also before the Court are various motions to exceed page limitations [136, 166, 173], all of which are GRANTED. For future reference, however, the Court does not intend to permit filings in excess of the applicable page limitations absent extraordinary circumstances.

> Additionally, the Court denies without prejudice the Motions to Strike concerning Robert Hughes [191] and Wayne Grip and Robert Hinchee [195] because it did not consider any of that evidence

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)
**(Cite as: 2006 WL 6106248 (N.D.Ga.))**

in connection with resolving the pending motions. The parties are instructed to confer with one another and if Plaintiff intends to offer this evidence at trial, Defendant may renew those motions prior to trial if it so chooses, although no further briefing of these issues will be necessary.

It is so ORDERED.

N.D.Ga.,2006.
Plantation Pipe Line Co. v. Continental Cas. Co.
Not Reported in F.Supp.2d, 2006 WL 6106248 (N.D.Ga.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

**C**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007.   See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.  (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
HARTFORD INSURANCE COMPANY OF the MIDWEST, Plaintiff-Counter Defendant-Appellant Twin City Fire Insurance Company; Hartford Accident & Indemnity Company, Plaintiffs-Appellants
v.
MISSISSIPPI VALLEY GAS COMPANY; Atmos Energy Corporation, Successor in Interest to and doing business as Mississippi Valley Gas Company, Defendants-Counter Claimants-Appellees.
No. 05-60299.

May 25, 2006.

**Background:** Insurer brought declaratory judgment action on insured gas company's coverage claim under property insurance policies covering natural gas produced by certain designated wells. On cross motions for summary judgment, the United States District Court for the Southern District of Mississippi granted summary judgment in favor of gas company, and appeal was taken.

**Holding:** The Court of Appeals held that gas company's overpayment for recirculated gas from natural gas wells was a loss of "money," rather than covered property.
Reversed and judgment rendered.

West Headnotes

Insurance 217 ⬤⟞2131

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2130 Property Covered or Excluded
                217k2131 k. In General. Most Cited
Cases
Under Mississippi law, insured gas company's overpayment for recirculated gas from natural gas wells, due to a tap that siphoned the gas and allowed it to be metered more than once, was a loss of "money," rather than covered property; gas from the wells was not physically lost or damaged in any way before it was eventually returned to the gas company after multiple passes through the meter and was not returned to the insured party in a damaged state.
**\*466** Brenda B. Bethany, C. Michael Ellingburg, Daniel, Coker, Horton & Bell, Jackson, MS, for Plaintiff-Counter   Defendant-Appellant   and Plaintiffs-Appellants.

Mary Ellen G. Patton, Dale G. Russell, Copeland, Cook, Taylor & Bush, Ridgeland, MS, for Defendants-Counter Claimants-Appellees.

Appeal from the United States District Court for the Southern   District   of   Mississippi,   No. 3:03-CV-1139.

Before KING, SMITH and BENAVIDES, Circuit Judges.

PER CURIAM: FN*

> FN* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**\*\*1** Plaintiff-appellant Hartford Insurance Company of the Midwest appeals the district court's grant of summary judgment in favor of defendant-ap-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

pellee Mississippi Valley Gas Company on its coverage claim in the amount of $557,919 under property insurance policies covering natural gas produced by certain designated wells. Hartford Insurance Company of the Midwest also appeals the district court's denial of its motion for summary judgment as well as its motion to strike portions of the affidavit of Mississippi Valley Gas Company's petroleum engineering expert, Wayne Stafford. We agree fully with the district court that resolution of this issue is "hardly apparent." That said, we REVERSE the district court's grant of summary judgment in favor of Mississippi Valley Gas Company and RENDER judgment for Hartford Insurance Company of the Midwest.

# I. FACTUAL AND PROCEDURAL BACK-GROUND

This case concerns an insurance coverage dispute between plaintiff-appellant Hartford Insurance Company of the Midwest ("Hartford") and defendants-appellees Mississippi Valley Gas Company and its successor in interest Atmos Energy Corporation (collectively "MVG"). The basic factual predicate underlying the instant appeal is undisputed. In 1982, MVG began purchasing natural gas produced by the Asa Watson Well in Monroe County, Mississippi from the well's owner and operator, Howard G. Nason. In 1989, MVG entered a separate contract to purchase natural gas from a different well in Monroe County known as the Catherine Watson Well from Nason Production Company, Inc., Howard G. Nason, Howard F. Nason, and Anice H. Nason.[FN1] The gas produced from each well flowed through a separate line to a distinct sales meter, where the volume of gas from the well was compressed, measured, and ultimately delivered to MVG's pipeline. Pursuant to the contracts between MVG and the Nasons, legal title to the gas transferred from the Nasons to MVG at the point of the sales meter. After the gas was metered, it was transported to MVG's facilities and into high-pressure transmission lines for distribution.

FN1. After Howard G. Nason died in 1995, his interest in the wells passed to his wife, Anice.

**\*467** The district court's opinion succinctly describes the facts underlying the coverage claim:

When the Asa Watson Well stopped producing in March or April 1999, the Nasons removed the meter from the Asa Watson Well and diverted the gas production being sold to MVG from the Catherine Watson Well through the sales meter for the Asa Watson Well.

Thereafter, in September 2000, MVG discovered that an underground "tap" had been placed on MVG's line downstream of the meter which diverted gas from MVG's line through an underground pipe back to a point upstream of the meter, where the gas was reintroduced or reinjected into the gas stream. As a result of this recirculation, gas which had already been metered and purchased by MVG was recirculated and hence remetered and resold by the Nasons to MVG.

R. at 234-35. Based on reports from MVG's petroleum engineering expert Wayne Stafford's investigation, the recirculation scheme caused an estimated total monetary loss to MVG of $1,804,125 between 1986 and September 2000.[FN2]

FN2. Immediately after discovering the recirculation scheme, MVG began to withhold payments for natural gas purchases from another well owned by Anice Nason called the Simmons Well, claiming it was entitled to offset the unjust enrichment from the overpayment with respect to the two Watson Wells. On or about March 1, 2004, MVG reached a settlement with the Nasons and repaid $100,000 of the $747,000 it had previously withheld.

**\*\*2** In January 2003, MVG submitted a proof of loss claim in the amount of $557,919 to recoup a portion of this loss under the Hartford policies cov-

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

ering the period between September 1, 1994 and January 31, 1999.[FN3] More specifically, MVG's "theft" claim was for the value of 226,742 Mcf of recirculated natural gas, which represented the difference between the volume of gas actually produced by and delivered to MVG from the wells during this period (17,285 Mcf) and that same volume of gas recirculated through the meter more than fourteen times (244,027 Mcf). MVG did not, however, include the small volume of gas consumed to execute the recirculation scheme itself in its claim under the Hartford policies.[FN4]

> FN3. MVG stipulated that it had withdrawn its claim on the policies issued *between* July 14, 1988 and September 1, 1994, and *after* January 31, 1999. We therefore limit our focus on this appeal to the Hartford policies covering the period between September 1, 1994 and January 31, 1999.

> FN4. During oral argument, Hartford stated that the recirculation scheme was basically equivalent to tampering with the meter itself. For example, recirculating the same volume of gas ten times through a properly calibrated meter would overcharge by the same amount as manipulating the meter to price at ten times the proper rate upon the first pass through the meter.

On September 30, 2003, Hartford filed a diversity action in the Southern District of Mississippi seeking a declaratory judgment that Hartford was not obligated to pay MVG's claim for loss of natural gas under the applicable property insurance policies. MVG filed an answer and counterclaim for declaratory relief on October 30, 2003, seeking an adjudication that the Hartford policies did indeed provide coverage for the claim. The parties submitted cross-motions for summary judgment on July 15, 2004.

The parties did not dispute before the district court

that a "theft" that results in a loss of or damage to the covered property is covered under the relevant Hartford policies. They differed, however, in their characterization of the scheme and the precise nature of the alleged loss. MVG asserted that the recirculation scheme amounted to repeatedly stealing and reselling**468 the same volume of gas and therefore constitutes a covered "theft" under the policies. Hartford contended, however, that the insurance policies at issue do not provide coverage to MVG under these circumstances because: (1) the only property lost was "money" from overpaying for the volume of gas actually received, and purely monetary losses are expressly excluded from the definition of covered property; and (2) any loss of covered property was otherwise excluded from coverage under the "voluntary parting" exclusion or "missing property" limitation in the policies. On August 31, 2004, while the summary judgment motions were still pending, Hartford also moved to strike the affidavit of Wayne Stafford because it allegedly failed to comport with the formal requirements of FED.R.CIV.P. 56(e) and because certain portions allegedly contained inadmissible legal conclusions.

On January 18, 2005, the district court denied Hartford's motion for summary judgment and granted MVG's motion for summary judgment, "conclud[ing], albeit not with certainty, that MVG sustained a loss that falls within the coverage of Hartford's policies." R. at 233. With respect to the contested issue of whether the recirculation scheme constituted a "direct physical loss" of covered property under the Hartford policy, the court acknowledged that "there are compelling arguments on both sides of the issue." *Id.* at 236. The court rejected Hartford's characterization of MVG's claim as a "loss of money" from overpayment and found that "the facts readily support[ed] the conclusion that a theft occurred when the Nasons siphoned natural gas from MVG's pipeline." *Id.* at 237.

**3 In the court's view, the fact that the Nasons resold the natural gas they had stolen from MVG

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

to MVG, so that MVG thus ended up acquiring all the natural gas produced by the wells because the gas was recirculated through the meter rather than simply being siphoned off and sold to another buyer, does not change the fact that there was a dispossession, or "direct physical loss" of the natural gas, for a period of time.

*Id.*

After rejecting Hartford's contention that MVG suffered only a loss of money, the court summarily disposed of Hartford's alternative arguments that the policies' "voluntary parting" exclusion and "missing property" limitation applied to deny coverage. More specifically, the court found that (1) MVG did not "voluntarily part" with the gas that was siphoned off through the underground tap to fall within that exclusion; and (2) the "missing property" limitation did not apply given the physical evidence showing how the gas was diverted and remetered.

Because the district court's summary judgment order decided only the issue of coverage under the policies and not the precise extent of liability, Hartford submitted a motion for clarification accompanied by a request for certification of the coverage question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). In essence, Hartford contended that if coverage exists at all under the policies, it extended only to a single instance of recirculation. Consistent with its previous order, the court concluded that "the property at issue was repeatedly lost" and accordingly granted summary judgment in favor of MVG on the liability issue in the amount of $557,919. R. at 259. Having granted MVG's motion for summary judgment as to both the coverage and liability issues, the court found the request for discretionary interlocutory appeal pursuant to § 1292(b) to be moot and entered a final judgment in favor of MVG on March 3, 2005. Hartford timely filed its notice of appeal on March 29, 2005.

**\*469 II. STANDARD OF REVIEW**

We review a grant of summary judgment de novo, applying the same standards as the district court. *Fed. Ins. Co. v. Ace Prop. & Cas. Co.,* 429 F.3d 120, 122 (5th Cir.2005). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Hamilton v. Segue Software Inc.,* 232 F.3d 473, 477 (5th Cir.2000) (citation omitted). A fact is "material" if "its resolution could affect the action's outcome." *Minter v. Great Am. Ins. Co. of N.Y.,* 423 F.3d 460, 465 (5th Cir.2005). The evidence and inferences from the summary judgment record must be viewed in the light most favorable to the nonmovant. *Id.*

### III. DISCUSSION

**\*\*4** In resolving this coverage dispute, we must first examine the relevant provisions in the property insurance policies at issue. Interpretation of an unambiguous insurance contract is a question of law, which this court reviews de novo. *Am. States Ins. Co. v. Bailey,* 133 F.3d 363, 369 (5th Cir.1998). The parties further agree that Mississippi law governs this diversity action. "Under Mississippi law, an insurance policy is a contract subject to the general rules of contract interpretation." *ACS Constr. Co. of Miss. v. CGU,* 332 F.3d 885, 888 (5th Cir.2003) (citing *Clark v. State Farm Mut. Auto. Ins. Co.,* 725 So.2d 779, 781 (Miss.1998)). "Although ambiguities in an insurance policy are construed against the insurer, a court must refrain from altering or changing a policy where terms are unambiguous, despite resulting hardship on the insured." *Titan Indem. Co. v. Estes,* 825 So.2d 651, 656 (Miss.2002).

The Special Property Coverage Form provides cov-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

erage for "direct physical loss of or damage to Covered Property caused by or resulting from any Covered Cause of Loss." The parties agree that the "Covered Property" at issue under the policies is the natural gas produced by the designated Watson Wells. Under the policies, "Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is" otherwise excluded or limited by the operation of certain enumerated conditions in the policy, including the "voluntary parting" exclusion and "missing property" limitation.[FN5] The policies also provide that "theft" and "attempted theft" that result in loss of or damage to covered property constitute "specified causes of loss" under the policies. The policies, however, expressly exclude mere monetary losses from the definition of "covered property."[FN6]

> FN5. The "voluntary parting" exclusion expressly denies coverage for any loss or damage caused directly or indirectly by:
>
> i. Voluntary parting with any property whether or not induced to do so by any fraudulent scheme, trick, device or false pretense.
>
> The "missing property" limitation denies coverage for loss or damage to:
>
> **c. Missing Property**
>
> Property that is missing, if there is no physical evidence to show what happened to it. An example is a shortage disclosed on taking inventory.
>
> FN6. Specifically, the policy excludes:
>
> **2. Property Not Covered**
>
> Covered Property does not include:
>
> a. Accounts, bills, currency, deeds, evidences of debt, money, notes or securities.

**\*470** Given the unambiguous language in the relevant insurance policies, the primary source of disagreement between the parties is how the loss suffered by MVG from the recirculation scheme should be characterized. Hartford contends that there was no actual deprivation of the covered property that would constitute a "theft" because MVG eventually received all of the natural gas produced from both Watson Wells pursuant to its contracts with the Nasons. In essence, Hartford contends that the only result of the recirculation scheme was to cause MVG to unwittingly overpay for the gas-i.e., MVG experienced only a loss of "money" that would not be covered under the clear terms of the relevant policies. On the other hand, MVG maintains that the district court correctly characterized the recirculation scheme as multiple, albeit temporary, "thefts" of the natural gas from the Catherine Watson Well that are covered under the policies.

As a general matter, property insurance coverage is triggered by some threshold concept of physical loss or damage to the covered property. *See* 10A COUCH ON INS. § 148:46 (3d ed.2005).

> The requirement that the loss be "physical," given the ordinary definition of that term is widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to preclude any claim against the property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property.

**\*\*5** *Id.* We have previously stated that "[t]he language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state-for example, the car was undamaged before the collision dented the bumper." *Trinity Indus., Inc. v. Ins. Co. of N. Am.,* 916 F.2d 267, 270-71 (5th Cir.1990). Consistent with these general principles, absent some physical manifestation of loss or damage to the gas itself, the property insurance policies issued by Hartford in this case expressly exclude mere monetary losses from cover-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.)))**

age.

The fundamental difficulty with MVG's position is that, except for the unclaimed de minimis portion of gas consumed to carry out the recirculation scheme, MVG actually received all of the available gas produced by the two Watson Wells. MVG cites *National Fire Insurance Co. of Hartford v. Slayden,* 227 Miss. 285, 85 So.2d 916, 917 (1956), for the proposition that even a temporary deprivation of property would be covered under an insurance policy that covered against "theft" losses. The holding in *Slayden* was actually considerably narrower than this and consistent with our disposition of the instant case. In *Slayden,* the Supreme Court of Mississippi affirmed in part a jury verdict assessing liability under an insurance policy where a third party had damaged the engine of a "bulldozer equipped tractor"-the covered property under the insurance policy-by improperly operating it without water. *Id.* Even though the damaged tractor itself was returned to the insured party, the court concluded that the damage resulting from temporary "theft" of the property was covered under the insurance policy.

To the contrary, here the gas from the Watson Wells was not physically lost or damaged in any way before it was eventually returned to MVG after multiple passes through the meter. In this sense, unlike the situation in *Slayden,* the covered property was not returned to the insured party in a damaged state. Therefore, MVG's proof of loss claim lacked the requisite "direct physical loss of or damage to" the **\*471** covered property under the insurance policies.

After careful examination of the relevant provisions in the Hartford policies, we conclude that MVG's overpayment for the recirculated gas from the Watson Wells is more accurately described as a loss of "money," rather than covered property. Accordingly, the district court erred in finding a covered loss under the insurance policies issued by Hartford. Because we reverse and render judgment in favor of Hartford based solely on our conclusion

that the recirculation scheme merely resulted in an uncovered loss of money, we expressly decline to reach the portions of the district court's decision concerning the application of the "voluntary parting" exclusion and "missing property" limitation under the policies. We also need not reach the issue of whether the district court erred in denying Hartford's motion to strike Wayne Stafford's affidavit.

### IV. CONCLUSION

**\*\*6** For the foregoing reasons, we REVERSE the district court's grant of summary judgment in favor of Mississippi Valley Gas Company on both the coverage and liability issues and RENDER judgment for Hartford Insurance Company of the Midwest. Costs shall be borne by Mississippi Valley Gas Company.

C.A.5 (Miss.),2006.
Hartford Ins. Co. of Midwest v. Mississippi Valley Gas Co.
181 Fed.Appx. 465, 2006 WL 1489249 (C.A.5 (Miss.))

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

C

Only the Westlaw citation is currently available.

United States District Court, W.D. Louisiana,
Alexandria Division.
FERRELLGAS, L.P.
v.
James W. McCONATHY, et al.
**Civil Action No. 1:10-cv-00178.**

March 15, 2010.

John D. Ryland, Provosty Sadler et al, Alexandria,
LA, Rick Frawley, Ferrellgas, Liberty, MO, for
Ferrellgas, L.P.

Robert P. Lombardi, Kullman Firm, New Orleans,
LA, for James W. McConathy, O'Nealgas Inc.

### *RULING*

DEE D. DRELL, District Judge.

**\*1** Before the Court is a Motion for Preliminary Injunction (Doc. 5) filed by the plaintiff. For the following reasons, the plaintiff's motion will be DENIED. Disposition will follow by a separate judgment.

### I. *Background*

The plaintiff, Ferrellgas, L.P. ("Ferrellgas"), is a Louisiana propane retail and services company. Ferrellgas employed defendant James W. McConathy ("Mr.McConathy") as the operations manager of its service center in Bossier City, Louisiana. On March 24, 1998, Mr. McConathy signed a Ferrellgas Employee Agreement ("Agreement") which contained confidentiality, non-competition, and non-solicitation clauses. Most controversially, the non-competition/solicitation clause [FN1] provided that, "in the county or counties where Employee had contact with Ferrellgas customers on behalf of

Ferrellgas," Mr. McConathy was not to "directly or indirectly, in person or through others, for the benefit of [Mr. McConathy] or another, call upon, solicit, sell, divert, take away, deliver to, accept business or orders, or otherwise deal with Ferrellgas' Customers, nor shall Employee, in any capacity, assist another to do so." (Doc. 1-1, p. 1, Part III, ¶ 6(a)). The Agreement also contains provisions describing "Confidential Information," which Ferrellgas claims is valuable proprietary information under its exclusive ownership.[FN2] As to the geographical boundaries of the non-competition clause, no specific parishes (or counties) are identified by name, or referenced in any attachments to the Agreement. All Ferrellgas employees were required to sign the same contract.

> FN1. As we will explore in more detail below, the language pertaining to competition and solicitation flows together in the Agreement. For the sake of clarity, we will refer to the provision as the "non-competition clause."

> FN2. This information consists, in part, of "Customer Information," a term defined in the Agreement basically as relevant proprietary and consumer-related information pertaining to past, current, and prospective Ferrellgas customers. (Doc. 1-1, p. 3, Exh. A).

Mr. McConathy's employment with Ferrellgas was terminated, suddenly and unexpectedly, on the evening of Friday, October 9, 2009. According to Mr. McConathy, he was fired just before 5:00 p.m., left the building immediately, and returned the next day to collect his personal items. His supervisor was waiting for him, and his computer had already been removed from his office. Subsequently, Mr. McConathy was hired by defendant O'Nealgas, Inc. ("O'Nealgas"), a propane retailer in direct competition with Ferrellgas. According to Ferrellgas, Mr. McConathy, with the assistance of O'Nealgas, is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

improperly using Confidential Information and other trade secrets to solicit Ferrellgas customers.

On February 8, 2010, Ferrellgas filed a complaint (Doc. 1), alleging: (1) Mr. McConathy has breached the terms of the Agreement by improperly using confidential and other trade secret information to solicit Ferrellgas customers; and (2) the Confidential Information used by Mr. McConathy constitutes "trade secrets" under the Louisiana Uniform Trade Secrets Act ("LUTSA"), La. R.S. § 51:1431 et *seq.,* and as such, Mr. McConathy's use of that information constitutes "misappropriation" in violation of the LUTSA.<sup>FN3</sup>

> FN3. The complaint seeks an order: (1) enjoining Mr. McConathy from soliciting Ferrellgas customers, interfering with Ferrellgas's relationships with its customers, or aiding others in doing so; (2) enjoining Mr. McConathy and O'Nealgas from using Ferrellgas's Customer Information; (3) enjoining Mr. McConathy from any further breaches of the Agreement, and ordering his compliance with the terms of the Agreement; (4) awarding compensatory damages; (5) awarding attorneys' fees; and (6) awarding any other just relief.

The plaintiff moved for a preliminary injunction barring Mr. McConathy's solicitation of its customers and use of its trade secrets. (Doc. 5). The Court held a preliminary injunction hearing on February 26, 2010, at which several witnesses testified and counsel for both parties submitted arguments to the Court. Mr. McConathy testified that he has solicited approximately ten of Ferrellgas's 8,500 to 10,000 customers, and has only been successful at acquiring the business of one Ferrellgas customer. Mr. McConathy contends that: (1) the Agreement is invalid under Louisiana statutory law because it failed to list the parishes in which solicitation of Ferrellgas customers would be prohibited; (2) the Agreement contains a vague term used to describe the parishes contemplated by the agreement; and (3) the identity of and other information pertaining

to Ferrellgas customers is not confidential information or trade secrets, and thus, its use cannot constitute a violation of the LUTSA.

**\*2** In spite of a forum selection clause in the Agreement which provides that Missouri law would govern any disputes arising under the contract, we observed, and the parties have agreed, that Louisiana law, as it stood in 1998, properly applies in this case. The contract was executed in Louisiana by a Louisiana resident at plaintiff's north Louisiana office. Following the hearing, the Court afforded the parties the opportunity to further brief the issues which the Court considered vital to the disposition of Ferrellgas's motion. After carefully reviewing all of the information submitted by the parties, the Court is now prepared to rule.

## II. *Law and Analysis*

### A. Preliminary Injunction

To be granted the "extraordinary equitable remedy" of a preliminary injunction, a plaintiff must establish four elements:

> (1) a substantial likelihood of success on the merits;

> (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied;

> (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and

> (4) that the injunction will not disserve the public interest.

*Reliant Energy Servs., Inc. v. Enron Canada Corp.,* 349 F.3d 816, 826 n. 7 (5th Cir.2003) (quoting *Hoover v. Morales,* 164 F.3d 221, 224 (5th Cir.1998)). In determining whether to grant a preliminary injunction, "the court must ... state the findings and conclusions that support its action." Fed.R.Civ.P. 52(a)(2).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Given the extraordinary nature of the remedy, "a preliminary injunction ... should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements." *Bluefield Water Ass'n, Inc. v. City of Starkville,* 577 F.3d 250, 253 (5th Cir.2009) (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.,* 328 F.3d 192, 195-96 (5th Cir.2003)). Furthermore, in accord with settled precedent sanctioning less formal procedures at the preliminary injunction stage, the Court has considered evidence which may otherwise be inadmissible, including hearsay evidence. *See Sierra Club, Lone Star Chapter v. F.D.I.C.,* 992 F.2d 545, 551 (5th Cir.1993) (internal citations omitted). Notwithstanding procedural informalities, however, the record must clearly support the Court's decision as to whether to grant a preliminary injunction. *See Petrello v. Nath,* No. 08-20718, 2009 WL 3416230, at *4 (5th Cir. Oct.23, 2009).

Here, the principal focus of both parties has remained upon the likelihood that Ferrellgas's claims will be successful on the merits. More specifically, the linchpin issues in this case are whether Ferrellgas will likely prevail in its attempt to enforce the non-solicitation clause in the Agreement, or obtain injunctive relief based upon the defendants' alleged violations of the LUTSA.

## B. The Agreement

Ferrellgas first argues that Mr. McConathy has solicited or provided services to Ferrellgas customers with whom he had contact as a Ferrellgas employee, in clear violation of the terms of the Agreement. Mr. McConathy conceded that he has solicited Ferrellgas customers in parishes in which he had contact with those customers as a Ferrellgas employee. In short, Mr. McConathy basically admitted that he has breached the spirit, if not the terms, of the Agreement. However, the defendants argue that: (1) the non-competition clause was unenforceable under Louisiana law in force when the agreement was executed, because it fails to specifically list the parishes to which it applies; (2) the non-competition

clause is unenforceable because some of its terms are vague; and (3) the "Savings Clause" in the contract cannot be used to reform or delete invalid provisions because the Court would have to take a word-by-word approach to make the terms enforceable. Because we agree with the defendants' first argument, we will not address the latter two points in detail.

**\*3** Louisiana public policy has strongly and consistently disfavored agreements restraining trade, such as non-competition and non-solicitation agreements. *See SWAT 24 Shreveport Bossier, Inc. v. Bond,* 808 So.2d 294, 298 (La.2001) (noting "the longstanding public policy of Louisiana ... to prohibit or severely restrict [noncompetition] agreements"); *see also Millet v. Crump,* 687 So.2d 132, 135 (La.App. 5th Cir.1996) ("Louisiana has a strong public policy against non-competition agreements."). Accordingly, the Louisiana statute governing non-competition provisions begins with the statement that "[e]very [such] contract or agreement, or provision thereof ... except as provided in this Section, shall be null and void." La. R.S. § 23:921(A).

Valid non-solicitation clauses are therefore the exception, rather than the rule. Such exceptions are provided for within the statute. The Louisiana Supreme Court made clear that, under Louisiana law in effect in 1998, non-solicitation clauses which met the statutory requirements were generally enforceable. Specifically, the 1989 amendment to La. R.S. § 23:921 (which was still in force at the time that Mr. McConathy signed the Ferrellgas contract) "limited a valid noncompetition agreement to one in which the employee agreed to refrain from 'carrying on or engaging in a business similar' to that of the former employer or from soliciting customers of the employer subject to certain other restrictions." *SWAT 24,* 808 So.2d at 305. The court interpreted this provision to mean that "an employee whose noncompetition agreement comports with the requirements of La. R.S. § 23:921(C) may be validly restricted from carrying on or engaging in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

his own competing business *and from soliciting customers of the employer for his own competing business or the competing business of another." Id.* at 307 (emphasis added). Therefore, in principle, Ferrellgas was allowed to include a non-solicitation clause in its employment contracts which applied to former employees working for Ferrellgas competitors, such as O'Nealgas.

However, a non-solicitation clause must comport with the requirements of the governing Louisiana statute to be enforceable. In general, a non-competition provision must be strictly limited to designated parishes and contain a maximum term of two years. *See* La. R.S. § 23:921(C). The statute provides, in relevant part, that an employee "may agree with his employer to refrain from carrying on or engaging in a business similar to that of the employer and/or from soliciting customers of the employer *within a specified parish or parishes,* municipality or municipalities, or parts thereof." *Id.* (emphasis added).[FN4] While non-solicitation clauses are theoretically distinct from non-competition clauses, they must still independently satisfy the requirements of La. R.S. § 23:921(C). *VartechSys., Inc. v. Hayden,* 951 So.2d 247, 260-61 (La.App. 1st Cir.2006). The proper interpretation of the italicized "geographical limitation" clause has generated a longstanding controversy among Louisiana courts.

> FN4. This current language has remained unchanged since the agreement was signed, and therefore, we will refer to this provision in the present tense for the sake of clarity.

*4 Mr. McConathy argues, and the bulk of Louisiana courts agree, that a noncompetition agreement must identify by name the parishes or municipalities to which it applies. For instance, the majority of Louisiana appellate courts have held that "general reference in the agreement to whatever parishes, counties or municipalities the Company conducted business did not comply with the statute." *Bell,* 983 So.2d at 933 (chronicling Louisiana cases in agree-

ment); *accord. L & B Transport, LLC v. Beech,* 568 F.Supp.2d 689, 693 (M.D.La.2008) ("Because section 921 speaks to non-competition within a specified parish or parishes, municipality or municipalities, or parts thereof, Louisiana courts have stated that non-competition agreements failing to specify the parish, municipality or parts thereof are unenforceable.") (internal quotation omitted).[FN5] Similarly, Louisiana courts have consistently rejected cases in which the geographical limitation contained in a non-competition agreement was expressed only in terms of distance.[FN6] In short, when a non-competition agreement fails to name or list the parishes to which it applies, most courts in Louisiana will find the agreement invalid. *See, e.g., Aon Risk Servs.,* 807 So.2d at 1060-61.

> FN5. Other instances abound in which courts have rejected non-competition clauses that merely referenced, rather than listed by name, the parishes or municipalities to which they applied. *See, e.g., Action Revenue Recovery, L.L.C. v. eBusiness Group, L.L.C.,* 17 So.3d 999, 1003 (La.App. 2d Cir.2010) (rejecting a non-competition clause which applied "to all parishes or counties ARR/FAC covers on a like business in said parishes or counties"); *Aon Risk Servs., Inc. v. Ryan,* 807 So.2d 1058, 1060-61 (La.App. 2d Cir.2002) (invalidating a non-competition clause which covered ' "whatever parishes, counties and municipalities the Company or Hall'... conducted business").

> FN6. *See, e.g., Garcia v. Banfield Pet Hosp., Inc.,* No.2009 CA 0466, 2010 WL 199263, at *3 (La.App. 1st Cir. Jan.21, 2010) (invalidating a "non-competition agreement [which] prohibit[ed] competition 'within a six-mile (6) radius of either of the [Clinic's] places [of] business on the date of her termination of employment' "); *Francois Chiropractic Ctr. v. Fidele.* 630 So.2d 923, 926 (La.App. 4th Cir.1993)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
(Cite as: 2010 WL 1010831 (W.D.La.))

(refusing to enforce a non-competition agreement that precluded competition "within a ten (10) mile radius of the outer city limits of New Orleans, Louisiana").

By contrast, the Louisiana Third Circuit Court of Appeal "has held that the failure to identify each parish by name does not automatically nullify the agreement; rather, its validity depends on whether the area is 'identifiable.' " *Monumental Life Ins. Co. v. Landry,* 846 So.2d 798, 801 (La.App. 3d Cir.2003). In one such opinion, the court found "identifiable" the parishes covered by a provision barring competition and solicitation "within the parishes in which [the plaintiff] carries on a like business." *Petroleum Helicopters, Inc. v. Untereker,* 731 So.2d 965, 968 (La.App. 3rd Cir.1999). The court reasoned that the employee plaintiff would "surely be aware of the parishes in which [the employer defendant] conducts its business." *Id.* Ferrellgas has put forth a very similar rationale in this case.

The Louisiana Supreme Court has not definitively resolved this issue. As such, we must observe the following standards in reaching our determination:

> When a state's highest court has not decided an issue involving the application of state law, "it is the duty of the federal court to determine, as best it can, what the highest court of the state would decide." "Although we are not bound by state appellate court decisions, we will not disregard them 'unless [we are] convinced by other persuasive data that the highest court of the state would decide otherwise.' "

*Verdine v. Ensco Offshore Co.,* 255 F.3d 246, 252 (5th Cir.2002) (quoting *Transcon, Gas Pipe Line Corp. v. Transp. Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992)).

Ultimately, we find no reason to conclude that the Louisiana Supreme Court would deviate from the approach articulated by the majority of the state appellate courts. The state's high court has held that

"because [non-competition agreements] are in derogation of the common right, they must be strictly construed against the party seeking their enforcement." *Swat 24,* 808 So.2d at 298. Taking into account the strong public policy component involved, Louisiana courts have generally required "mechanical adherence to the requirements listed in the law (especially the geographical and time limitations)." *Sentilles Optical Servs., Div. of Senasco, Inc. v. Phillips,* 651 So.2d 395, 399 (La.App. 2d Cir.1995). Moreover, in order to give effect to the word "specified" in the statute, courts must require that parishes be designated, rather than enforce general phraseology which would allow the geographical scope of non-competition agreements to be expanded and contracted *ad infinitum.* See *Aon Risk Servs.,* 807 So.2d at 1060-61.

**5** Again, the disputed clause in this case prohibits competition or solicitation "in the county or counties where Employee had contact with Ferrellgas customers on behalf of Ferrellgas." (Doc. 1-1, p. 1, Part III, ¶ 6). This clause substantially compares to language prohibiting competition in parishes where the employer conducts business, which has been consistently rejected by most Louisiana courts. The language is also far more indefinite than a distance-oriented limitation. Overall, the Agreement here not only fails to specifically list the parishes that it covers, but also does not make reference to any list or other data set which would clearly define its scope. Therefore, we find that the non-competition provision does not conform to the requirements of La. R.S. § 23:921(C), at least as interpreted by the majority of Louisiana appellate courts.

Even if the Third Circuit interpretation of the statute were correct, however, we find that the disputed provision in this case does not make the parishes which it covers sufficiently "identifiable." We first must blow past the fact that the contract only refers to "counties," and does not mention Louisiana geography at all. Then, although Ferrellgas has submitted to the Court in its filings a list of twenty par-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

ishes assigned to the Bossier City service center, no such listing was included in, attached to, or referenced by the contract that Mr. McConathy signed. In fact, no documentary evidence before the Court indicates that those twenty parishes are the sole territory of the Bossier City service center. Rather, the testimony and filings indicated that these parishes are in some way "assigned to" the Bossier City location.

Nonetheless, if a twenty-parish territory for the Bossier City service center had been made clear in the evidence, the geographical limitation in the Agreement contains further ambiguities. Nowhere does the non-competition provision state that it applies in parishes assigned to any particular service center, or the service center at which the employee works. Instead, the agreement specifies "the county or counties where Employee had *contact* with Ferrellgas customers on behalf of Ferrellgas." (Doc. 1-1, p. 1, Part III, ¶ 6(a)). Uncontroverted testimony adduced at the hearing showed that communicating with past, current, and prospective customers was at least a significant portion of Mr. McConathy's job. The term "contact," however, is not defined in the Agreement.[FN7] Mr. McConathy estimated that his customer base at Ferrellgas vacillated between 8,500 and 10,000 customers. (Doc. 16, p. 86). The retail propane market, by all accounts, is a highly volatile and competitive one, with customers exchanging information and changing providers at a rapid rate. More importantly, however, Mr. McConathy testified that, in certain circumstances, he interacted with potential customers, face-to-face, not only in parts of Louisiana not "assigned to" Bossier City, but also in other states.

> FN7. Counsel for the plaintiff attempted to assemble a definition of the term "contact" from the definitions of two other terms in the Agreement, as well as its "plain and ordinary meaning." (Doc. 20, pp. 5-6). The complexity of that process, in and of itself, evidences the flaws in the provision. Nevertheless, the definition is: "contacts of a

commercial nature which occurred between the employee and any person or entity that has either (a) purchased propane-related goods or services within the last two years, or (b) been actively solicited by Ferrellgas or receive a quote, proposal or estimate with [sic] the last year." (Doc. 20, p. 5). Of course, the terms within this definition contain ambiguities (such as the use of the phrase "actively solicited"). What distinguishes this sort of definition from even the most elastic construction of La. R.S. § 23:921 is that the employee would be required to make a number of rather complex, time-consuming, and individualized determinations regarding Ferrellgas customers. Doing so would be challenging for a current employee of a business with far less customers in a far less chaotic market. Doing so for Mr. McConathy after he was terminated from Ferrellgas, without access to Ferrellgas's records, would be overwhelming or impossible.

**\*6** By any definition, then, use of the term "contact" to mark the geographical boundaries of the Ferrellgas Agreement left those boundaries far from "identifiable." Such vagueness is fatal to enforcement of the provision in Louisiana, even under the more forgiving standards specified by the Third Circuit. For instance, the court in *Gearheard v. De Puy Orthopaedics, Inc.* rejected a non-competition provision which applied "to the DePuy Territory in which [Gearheard] sold Products at the time of the change in control," because the agreement failed to define the term "sold." No. CIV.A.99-1091, 1999 WL 638582, at \*5 (E.D.La.1999). The court explained that "[t]he term 'sold' in the non-competition provision at issue is more equivocal than the broad terms 'carries on a like business,' " and thus, was "vague in its geographical scope and ... [failed to] substantially conform to the requirements of [the statute]." *Id.* The term "contact" in the Ferrellgas Agreement suffers from this same de-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

ficiency.

In sum, application of the non-competition provision in the Ferrellgas Agreement is amorphous at best. Given the strong public policy disfavoring restraints on competition, the mandate that we strictly construe non-competition agreements against the employer, the ambiguity of the terms of this Agreement, and the volatility of the market to which it applies, we find that the Ferrellgas Agreement is unenforceable. In ruling on these particular facts, we in no way imply that a legally enforceable non-competition agreement could be drafted in this market. We merely find that the Ferrellgas Agreement does not pass muster under governing Louisiana law.[FN8]

> FN8. It is of no moment that Mr. McConathy, as Ferrellgas's employee and agent, attempted to enforce the Agreement against an employee in the past. Counsel for the plaintiff points to a prior lawsuit filed by Ferrellgas against a former employee, seeking injunctive relief based upon very similar grounds. *Ferrellgas, L.P. v. Redwine,* No. 1:07-cv-1036. That case was resolved by settlement before the Court ruled upon the viability of the Agreement, and any positions taken by Mr. McConathy on the company's behalf in that proceeding do not impact our legal conclusions in this case.

Moreover, we decline to reform the Agreement to bring it into conformity with La. R.S. § 23:921(C). The Agreement contains a "Savings Clause" which states: "The provisions of this Agreement are separate and severable. If any provision in this Agreement is determined to be void, that provision may be changed or deleted by a Court so that this Agreement may be enforced." (Doc. 1-1, p. 2, Part IV, ¶ 9). Although Ferrellgas has not emphasized the potential application of this clause in its arguments to the Court, fair resolution of this case requires that we address it.

In some limited instances, Louisiana courts have applied severability clauses to enforce otherwise invalid non-competition agreements. Most notably, the Louisiana Supreme Court in *SWAT 24* reaffirmed its prior enforcement of a severability clause which "did not require a court to reform, redraft, or create a new agreement," but rather "required only that the offending portion of the agreement be severed." 808 So.2d at 308-09. Ultimately the court found that "[t]he language of the Agreement makes it possible to excise the offending language from the noncompetition clause without doing undue damage to the remainder of the provision." *Id.*[FN9]

> FN9. At least one appellate court viewed the *SWAT 24* decision as an expansive one: "Prior to *SWAT 24,* Louisiana courts had allowed reformation of non-compete agreements that were overly broad, but only those that were unreasonable as to territory or time. The decision in *SWAT 24* indicates a more expansive use of severability or savings clauses to reform and enforce non-compete agreements." *Vartech Sys., Inc.,* 951 So.2d at 257 n. 10 (citations omitted).

In this case, Mr. McConathy argues that the noncompetition provision would either have to be excised or rewritten entirely to be enforced. We agree. The noncompetition and non-solicitation provisions are largely intertwined in the Agreement.[FN10] Severing these clauses in some way would thus be a word-by-word exercise. Even so, the offending language is not readily replaceable. If the Court were to omit the "contact" clause in the Agreement, it would be forced to either generate and substitute its own clause, or leave the Agreement with no geographical scope whatsoever. Both alternatives are legally impermissible.

> FN10. The next paragraph in the Agreement, however, prohibits direct or indirect interference "with the business relationship between Ferrellgas and any Ferrellgas Customers." (Doc. 1-1, p. 2, Part III, H 6(b)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

To whatever extent this provision may be considered a part of the non-competition agreement, it is subject to the same geographical limitation as the preceding provision, and causes no independent enforceability issues.

**\*7** Interpreting the doctrine of reformation as it has been applied to Louisiana non-competition clauses, the court in *L & B Transport, LLC* declined to revise an otherwise invalid non-competition clause, stating:

[T]he majority of the courts in Louisiana decline to save invalid non-competition provisions through reformation. If courts always reformed invalid non-competition provisions, "employers would be free to routinely present employees with grossly overbroad covenants not to compete." Furthermore, the reformation of these non-competition provisions would "place courts in the business of either saving or writing a contract that is not generally favored by law."

568 F.Supp.2d at 693-94 (internal citations omitted). Both scenarios contemplated by the court appear in this case: the non-competition provision presented in the Ferrellgas Agreement, as we have explained, is "grossly overbroad," and attempting to enforce the provision would impose upon the Court the improper task of rewriting the contract. *See id.* As such, the Savings Clause in the Agreement may not be applied in this case.

Therefore, the Court finds that the non-competition provision in the Ferrellgas Agreement is invalid and unenforceable under Louisiana law. Ferrellgas's motion for preliminary injunction is accordingly DENIED as it applies to the Agreement.

## C. The LUTSA

Ferrellgas next argues that Mr. McConathy and O'Nealgas are using Customer Information, as that term is defined in the Agreement, to solicit Ferrellgas customers.[FN11] Ferrellgas maintains that

Customer Information may properly be characterized as "trade secrets," as such information is compiled and kept secret at great effort and expense to the company. They also claims that Mr. McConathy's alleged use of such information constitutes "misappropriation" under the LUTSA, because Mr. McConathy was obligated to protect the secrecy of this information under the Agreement. (Doc. 1-1, p. 1, Part III, ¶ 5). The defendants, however, argue that: (1) customer identities are not trade secrets; (2) Ferrellgas cannot show that the defendants have "misappropriated" any information; and (3) Customer Information includes lists, but not an employee's general knowledge or memory regarding Ferrellgas customers.

FN11. "CustomerInformation" is defined in the Agreement as "information that Ferrellgas has developed, acquired, organized, compiled, or maintained regarding its customers, former customers, and prospective customers while developing and operating its business, including, but not limited to, information relating to their identity, location, personnel, usage of petroleum products, and incidental or related appliances, equipment and supplies, purchasing experience, delivery schedules and routing, payment habits, credit experience, renewal and expiration dates, and other terms and conditions contained in contracts and ownership of storage facilities." (Doc. 1-1, p. 3, Exh. A).

Broadly, the LUTSA proscribes the misappropriation of information that constitutes "trade secrets." *See* La. R.S. § 51:1431. A plaintiff may obtain injunctive relief for either "[a]ctual or threatened misappropriation." La. R.S. § 51:1432.[FN12] "In order to show that the trade secrets have been misappropriated, [the employer] would have to prove that (1) a trade secret existed, and (2) that they were misappropriated by the [employee]." *Advance Prods. & Svs., Inc. v. Simon,* 944 So.2d 788, 793 (La.App. 3d Cir.2006).[FN13]

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

FN12. The statute also contains provisions allowing claimants to recover damages for actual losses and unjust enrichment. *See* La. R.S. § 51:1433.

FN13. The term "misappropriation" is defined as

disclosure or use of a trade secret of another without express or implied consent by a person who ... at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

La. R.S. § 51:1431(2). There is a logical argument that Mr. McConathy's use of Ferrellgas's Customer Information would be "misappropriation," if he had such information and if it constituted "trade secrets." The latter two issues, however, are in serious doubt, and will thus occupy the bulk of our analysis.

The LUTSA provides a specific definition of the term "trade secret": "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that ... derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and ... is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
**\*8** La. R.S. § 51:1431(4). Phrased differently, "[a] trade secret is information that has independent economic value because it is not generally known or readily ascertainable and efforts are taken to maintain the information's secrecy." *SDT Indus., Inc. v. Leeper*, 793 So.2d 327, 333 (La.App. 2d Cir.2001). Determining whether information qualifies as trade secrets is a question of fact. *Corrosion Specialties and Supply, Inc. v.*

*Dicharry*, 631 So.2d 1389, 1391 (La.App. 5th Cir.1994). However, Louisiana courts have held that "[a] customer list or special pricing list may be a trade secret if efforts are made to maintain its secrecy." *Pontchartrain Med. Labs. Inc. v. Roche Biomedical Labs., Inc.*, 677 So.2d 1086, 1090 (La.App. 1st Cir.1996) (citing *Wyatt v. PO2, Inc.*, 651 So.2d 359 (La.App. 2d Cir.1995); *see also Core v. Martin*, 543 So.2d 619, 621 (La.App. 2d Cir.1989) ("Although customer lists may constitute trade secrets, the threshold inquiry in every trade secrecy case is whether a legally protectable trade secret exists in fact.").

In this case, Ferrellgas maintains detailed customer records on its computer system, to which all employees have access. This may raise an issue of whether appropriate efforts are made by Ferrellgas to keep that data secret. However, that issue is moot, because there is no evidence, and no formal allegation by Ferrellgas, that Mr. McConathy is using or is in possession of any type of physical customer list. While there was some testimony at the preliminary injunction hearing expressing suspicion that Mr. McConathy may have retained a customer list, or other Ferrellgas data, no evidence to corroborate such an allegation has been presented to the Court. Instead, Mr. McConathy testified that he was suddenly terminated, his computer was removed from his office, he removed his personal items under the watch of his supervisor, and that he took nothing belonging to Ferrellgas upon his termination.

Ferrellgas is correct that, under the LUTSA, there is no explicit requirement that information must be in writing in order to be considered "trade secrets." Thus, according to Ferrellgas, the types of information that Mr. McConathy is purportedly utilizing which may constitute trade secrets are: (1) expertise that Mr. McConathy acquired as the manager of Ferrellgas's Bossier City service center, such as knowledge of "contract terms, credit information, volume usage, propane decision makers, pricing arrangements, and margins" (Doc. 20, p. 10) pertain-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

ing to Ferrellgas's customers ("customer information"); and (2) the identities of and relationships with Ferrellgas customers ("customer identities").

As to the first category, there is no evidence before the Court indicating that Mr. McConathy is in possession of any customer information beyond what he may remember from his frequent interactions with customers. Put simply, Ferrellgas has presented no evidence that Mr. McConathy took any customer files, has any means of accessing Ferrelgas's record system, or otherwise retained physical data relative to its customers. Mr. McConathy's memory as to the reliability, value, and operations of certain customers does not constitute "trade secrets." *See Millet,* 687 So.2d at 136 (holding that information that an insurance agent "could recall ... about renewals on some of her former clients because of the long-term relationship with them through her business as well as socially" did not constitute trade secrets). Moreover, the expertise and knowledge acquired by Mr. McConathy is not protected under the LUTSA. Louisiana courts have repeatedly emphasized that "[a] former employee who enters business in competition with his former employer necessarily utilizes the experience he acquired and the skills he developed while in a former employment." *Boncosky Servs., Inc. v. Lampo,* 751 So.2d 278, 287 (La.App. 1st Cir.1999); *see also Ashland Chemical, Inc. v. Lombardino,* No. 92-2434, 1993 WL 390147, at *4 (E.D.La. Sept. 23, 1993) ("Clearly, a former employee is 'allowed to rely on his memory or general knowledge and skill gained in his former employment' without violating a nondisclosure covenant.") (quoting *NCH Corp. v. Broyles,* 749 F.2d 247, 254 (5th Cir.1985)).

**\*9** Additionally, a number of facts cast serious doubt upon the secrecy of customer information in general in this case. Testimony at the hearing indicated that, while possibly time-consuming to compile, most or all of Ferrellgas's customer information may be obtained by lawful means. O'Nealgas has frequently solicited Ferrellgas customers, and has likely gathered such information on its own.

Furthermore, gas purchasing customers in this market often disclose contract terms and pricing arrangements amongst themselves and to competing providers, in order to obtain more favorable terms, according to the hearing testimony. Much of the information sought to be protected by Ferrellgas is subject to frequent change given the nature of the industry in general and this market in particular.

Perhaps most importantly, there is no evidence before the Court of an "[a]ctual or threatened misappropriation" of any customer information which may justify the issuance of an injunction. *See* La. R.S. § 51:1432.. Even if Mr. McConathy memorized some information related to some of Ferrellgas's thousands of customers, and even if that information constituted "trade secrets," there has been no firm indication that he used such information to solicit Ferrellgas customers as an employee of O'Nealgas.

Thus, we are left only with the issue of whether Mr. McConathy's memory of some Ferrellgas customers may be protected under the LUTSA. We find that the identity of Ferrellgas's customers on these facts may not properly be characterized as "trade secrets." Any such identities that Mr. McConathy recalls were learned through his experience with Ferrellgas, and have not been retained in list form. Mr. McConathy's awareness of customer identities, along with some customer information, falls within the general category of knowledge, savvy, and skills which a former employee is entitled to utilize in competition with a former employer. *See Boncosky Servs., Inc. v. Lampo,* 751 So.2d 278, 287 (La.App. 1st Cir.1999). To repeat, Mr. McConathy's memory of the names and addresses of his customers does not constitute protected "trade secrets":

> Under the circumstances of this case, [the defendant's] mental knowledge, from years of employment with [the plaintiff], of the names and addresses of the plaintiff's customers are not trade secrets since they are easily ascertainable and generally available to the public. Louisiana courts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

have consistently declined to issue an injunction against a former employee's solicitation of customers when the former employee relied on his memory and did not have a list.

*L & B Transport, LLC v. Busby,* No. 06-310-FJP-SCR, 2008 WL 4845103, at \* (M.D.La. Feb.12, 2008) (quoting *Weighing & Control Servs., Inc. v. Bert Williams,* No. 88-5211, 2008 WL 4845103, at \*1 (E.D.La. Jan. 24, 2009); *see also Millet,* 687 So.2d at 135-36 (holding that customer names, addresses, and renewal times were not "trade secrets" because the former employee committed much of this information to memory, or was reminded of the information when former customers initiated contact).[FN14]

> FN14. We recognize that the contact information for some customers in this area may not be highly publicized. But considering the free flow of information in the propane gas market, customer identities may be fairly characterized as "generally accessible," at least among competing providers in the same geographical area.

\*10 A closely analogous case involved a claim for damages by a plaintiff nurse staffing business against its former regional director, brought under the Louisiana Unfair Trade Practice and Consumer Protection Law, La. R.S. 51:1401, *et seq.,* a statute comparable in many ways to the LUTSA. *Nursing Enters., Inc. v. Marr,* 719 So.2d 524, 526 (La.App. 2d Cir.1998). In that case, the defendant resigned from her position and formed her own nurse staffing business in competition with the plaintiff. *Id.* at 526-27. After finding no evidence that the defendant took any property (such as an actual list of customers) with her upon resigning, the court next considered whether the defendant "misappropriated information considered to be trade secrets which she obtained during her employment." *Id.* at 529. In denying the plaintiff's unfair trade practices claim, the court reasoned as follows:

The evidence shows that [the defendant] did

not violate her fiduciary duty to Nursing [the plaintiff] by using its trade secrets in the formation and operation of Lifeline. In fact, the information Nursing alleges [the defendant] misappropriated does not qualify as trade secrets. As for nurse lists, the evidence shows that [the defendant] ... had a personal relationship with many of these nurses and one could expect the nurses to follow [the defendant] if they were being treated well by her and the company with which she was associated. In addition, these nurses were not exclusive to one agency. The testimony showed that nurses usually signed on with more that one agency to ensure they had consistent work. Finally, [the defendant] testified that she was a member of an organization through which she could receive a list of all nurses in the state of Louisiana.

Nursing claims that [the defendant] used either client lists or the relationships established with clients during her employment with Nursing to lure those clients, especially Willis-Knighton Hospital, to do business with Lifeline. As stated by [the defendant], the names and numbers of the hospitals and other medical providers is easily accessible through the local telephone book....

Nursing also claims that [the defendant] misappropriated information related to nurses' salaries and client charges. Again, even if proven to be true, this information does not constitute trade secrets. The testimony shows that nurses routinely volunteered how much they were being paid by an agency. [The defendant] testified that she and other agency directors exchanged information and that the hospitals would release information relating to other agencies' charges in an effort to get a better contract price from her.

*Id.*

The circumstances before the Court are highly comparable to the facts in *Nursing Enters., Inc.,* Developing personal relationships with clients was an important aspect of Mr. McConathy's job at Fer-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1010831 (W.D.La.)
**(Cite as: 2010 WL 1010831 (W.D.La.))**

rellgas. He testified that the one and only Ferrellgas customer who has come to O'Nealgas since his employment initiated contact with him. (Doc. 16, pp. 49-50, 77, 83-84). According to the evidence, customers routinely change providers in the propane industry, and share a great deal of information regarding their arrangements, such as contract terms, prices, and volume with competing providers in order to obtain lower quotes. Information passes between customers and competitors very frequently, and thus, rival companies often know a great deal about one another's operations. As we have noted, and the evidence explains, customers may volunteer (or even fabricate) information to obtain more favorable terms. Before Mr. McConathy was hired, O'Nealgas very likely knew not only the identity of many of Ferrellgas's customers, but also information relative to those customers' "contract terms, credit information, volume usage, propane decision makers, pricing arrangements, and margins." (Doc. 20, p. 10).

*11 Considering all of these circumstances, we find that the information sought to be protected by Ferrellgas does not constitute "trade secrets" under the LUTSA. The evidence does not reflect that Mr. McConathy is in possession of any information beyond the identities, and perhaps the general operations, of certain Ferrellgas customers. His knowledge and skill was acquired through experience and has been retained only in his memory. Moreover, the disputed information is obtainable through lawful means, and, by all accounts, is disseminated freely among customers and competitors. Even if this information constituted "trade secrets," there is no evidence before the Court to indicate that Mr. McConathy used any information to solicit Ferrellgas customers, aside from basic identifying information. Therefore, Ferrellgas's motion for preliminary injunction must be DENIED as to its claim that Mr. McConathy and O'Nealgas have violated the LUTSA.

IV. *Conclusion*

For the foregoing reasons, the plaintiff's Motion for Preliminary Injunction (Doc. 5) will be DENIED. In light of this ruling, the parties will be ORDERED to inform the Court as to whether they intend to pursue the merits of this dispute within thirty days from the date of the issuance of this ruling.

W.D.La.,2010.
Ferrellgas, L.P. v. McConathy
Slip Copy, 2010 WL 1010831 (W.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2004 WL 768901 (E.D.Mich.)
**(Cite as: 2004 WL 768901 (E.D.Mich.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan,
Northern Division.
Nancy WHITTUM, Craig Mason, Amanda
Shinaver, Sylvia Braddock, Tenisha Johnson, John
Doe, detainees and prisoners of Saginaw County
jail, and Jane Doe, detainees and prisoners of
Saginaw County jail, Plaintiffs,
v.
SAGINAW COUNTY, Charles Brown, Sheriff,
John Doe, and Jane Doe, Defendants.
**No. 02-10313-BC.**

April 1, 2004.

James I. DeGrazia, O'Connor, DeGrazia, Bloom-
field Hills, MI, for Defendants.

Christopher J. Pianto, Fletcher, Wolf, Flint, MI, for
Plaintiffs.

### *OPINION AND ORDER DENYING
PLAINTIFFS' MOTION TO CERTIFY CLASS*

DAVID M. LAWSON, District Judge.

**\*1** This case is now before the Court on the motion
by the plaintiffs to certify the matter as a class ac-
tion under Federal Rule of Civil Procedure 23. The
named plaintiffs all have been pretrial detainees or
prisoners in the Saginaw County Jail who claim
that the defendants subjected them to an unlawful
disrobing procedure when the jail inmates were re-
quired to change from their personal clothing to jail
garb while awaiting arraignment, or inmates who
were forced to undergo a strip search in violation of
Michigan's strip search statute. The plaintiffs' fed-
eral claims in this Court are based on 42 U.S.C. §
1983. The plaintiffs also have alleged state law
claims for gross negligence, invasion of privacy,

and violations of Michigan statutory law. They seek
both monetary damages and injunctive relief. The
Court heard oral argument on March 16, 2004 dur-
ing which the plaintiffs' attorney clarified his pro-
posed definition of the two subclasses to be certi-
fied. The Court finds that none of the named
plaintiffs would fit within the proposed subclass
definitions, and therefore the plaintiffs have failed
to demonstrate that their claims are typical of either
of the subclasses and that they are proper represent-
atives of the subclasses. The motion for class certi-
fication, therefore, will be denied.

I.

The plaintiffs in this case are challenging two
policies that allegedly have been part of the jail ad-
ministration plan at Saginaw County. The first
policy, according to the plaintiffs, entails strip
searching both male and female pre-arraignment
detainees who are unable to post bond and then are
required to change from their own clothing into jail
uniforms before they are lodged. The plaintiffs con-
tend that during this process, detainees are subject
to viewing, touching and searching by jail person-
nel of the opposite gender. The second subclass
consists of male prisoners who have been convicted
and sentenced and who are allowed to leave the jail
facility during the day on work release programs.
The plaintiffs allege that these inmates are routinely
strip searched, sometimes by female guards, when
they return to the jail at the end of the day. The
plaintiffs assert that the strip searches conducted
pursuant to these policies take place regardless of
the existence of reasonable suspicion or probable
cause. They contend that these practices violate
their rights under the Fourth, Eighth, and Four-
teenth Amendments.

The named plaintiffs in this case are Nancy Whit-
thum, Craig Mason, Amanda Shinaver, Sylvia
Braddock, and Tenisha Johnson. All of the
plaintiffs save Whitthum also are named as

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 768901 (E.D.Mich.)
**(Cite as: 2004 WL 768901 (E.D.Mich.))**

plaintiffs in another case against Saginaw County pending in this Court, which challenges the practice of removing the clothing of inmates at the jail whenever they are placed in administrative segregation. All of the named plaintiffs purport to represent the first putative subclass. *See* Second Amended Complaint, ¶¶ 8-9. Mason is the only plaintiff who claims to represent the second putative subclass. *See id.* at ¶ 10.

**\*2** It appears to be undisputed that the Saginaw County Jail holds 525 inmates, and that jail personnel process-or "book"-between 40 and 60 individuals per day, booking between 12,000 and 14,000 people per year. Over 100 male prisoners participate in the work-release program. The plaintiffs allege that at least 30 women have been unlawfully strip searched as part of the defendants' policy.

In their brief in support of the motion to certify the class, the plaintiffs offer the following definitions of two subclasses:

A class and/or subclass of both male and female pre-arraignment detainees of the Saginaw County Jail who were or will be subjected to strip searches violative of their constitutional and statutory protected rights subjecting the detainees to unnecessary viewing and touching by correction officers, at times by those of the opposite sex, while they are unnecessarily changed from their personal attire to jail garb while awaiting arraignment.

A class and/or subclass of male prisoners of the Saginaw County Jail who were or will be subjected to group, cross-gender strip searches, violative of their constitutionally protected rights.

Pls' Brief in Support of Pls' Motion for Class Certification at 1. During the hearing, the Court observed that members of the second subclass could be inmates convicted of either felonies or misdemeanors since a felon who receives a sentence of one year or less under Michigan law generally serves that time in a county jail rather than the state prison system. The Court also noted that the Sixth

Circuit has held that strip searches of jail detainees who have been arrested on felony charges are constitutional even absent reasonable suspicion. *See Dufrin v. Spreen,* 712 F.2d 1084, 1087 (6th Cir.1983) (citing *Bell v. Wolfish,* 441 U.S. 520 (1979)). The plaintiffs' attorney then proposed to refine the subclass definitions by limiting the first subclass to all persons forced to change into jail clothes because they were unable to post bond, and narrowing the second subclass solely to misdemeanor prisoners, not felons.

The defendants oppose the motion on the ground that the plaintiffs have failed to establish that they have met any of the requirements for class certification under Rule 23. At the hearing, the defendants raised the claim that none of the named plaintiffs fall into the definition of either subclass. The Court allowed both parties to supplement the record with the depositions of the putative class members on this question. The Court took the matter under advisement and, after reviewing the depositions furnished, concludes that the matter is ready for decision.

II.

According to Federal Rule of Civil Procedure 23, a matter may proceed as a class action in the name of representative parties if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims and defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613 (1997) (citing Fed.R.Civ.P. 23(a)); *Olden v. LaFarge Corp.,* 203 F.R.D. 254, 268 (E.D.Mich.2001). These factors normally are referred to as numerosity, commonality, typicality, and adequacy of representation.

**\*3** Evaluating these factors, the Sixth Circuit has affirmed in an unpublished opinion an order certify-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 768901 (E.D.Mich.)
**(Cite as: 2004 WL 768901 (E.D.Mich.))**

ing a class in a challenge to a jail policy authorizing the strip search of persons arrested for nonviolent petty offenses. See *Eddleman v. Jefferson Cty.,* No. 95-5394, 1996 WL 495013 (6th Cir. Aug. 29, 1996) . The plaintiffs here place heavy reliance on this decision; however the Court finds features of the present case that track in a different direction.

The Court is satisfied that the numerosity requirement has been satisfied here. The named plaintiffs have identified at least 100 male prisoners who participated in the work release program and at least 30 women who were strip searched pursuant to the challenged policy. "The numerosity requirement is met when plaintiffs demonstrate that the number of potential class members is large, even if plaintiffs do not know the exact figure." *In re Consumers Power Co. Sec. Litig.,* 105 F.R.D. 583, 601 (E.D.Mich.1985). The Court may consider many factors, including "class size, ease of identification of members of the proposed class, geographic distribution of class members, and the ability of the class members to pursue individual actions." *Krieger v. Gast,* 197 F.R.D. 310, 314 (W.D.Mich.2000). The number of potential claimants identified by the named plaintiffs indicates that joinder of all of them would be impractical. In addition, the amount of each claim, perhaps no more than a few hundred dollars, is a relatively small amount suggesting that a class action may be the only effective remedy.

The second prerequisite for class certification, commonality, simple means that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). This provision does demand that all questions of law and fact raised in the complaint are common. "The standard is not demanding. ' Rule 23(a) simply requires *a* common question of law or fact.' " *Rockey v. Courtesy Motors, Inc.,* 199 F.R.D. 578, 583 (W.D.Mich.2001) (quoting *Bittinger v.. Tecumseh Prods. Co.,* 123 F.3d 877, 884 (6th Cir.1997)). In a case such as this, where it is alleged that all the class members challenge the same administrative policy of allowing strip searches ab-

sent reasonable suspicion, commonality can be readily established. However, the concept of commonality, which, according to Sixth Circuit precedent, tends to merge with the typicality requirement, *see Rutherford v. City of Cleveland,* 137 F.3d 905, 909 (6th Cir.1998), calls for an assessment of the claims of the larger group in light of the claims asserted by the named plaintiffs; that analysis impacts the question of adequacy of representation as well. The Sixth Circuit has explained that the requirements of commonality and typicality "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and *whether the named plaintiff's claim and the class claims are so interrelated* that the interests of the class members will be fairly and adequately protected in their absence." *Ibid.* (emphasis added) (quoting *Gen. Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 157 n. 13 (1982)).

**\*4** In this case, the record presently before the Court indicates that none of the named plaintiffs fall within either of the subclasses that they propose. None of the female plaintiffs were strip searched because they were lodged over night when they could not post bail. For instance, at her deposition, Amanda Shinaver testified as follows:

Q. What happened at the Saginaw County Jail in 2001?

A. Well, I was taken from the police car to the holding tank, and then from the holding tank to the processing area to be fingerprinted and photographed. And then I was taken into a room, I'd say to the right of the processing area, where a female officer stripped me and searched me and told me that I had to shower because I had to wash off my makeup and my hair spray.

Q. And how soon was this after you were brought into the police department that you were asked to go to the room to the right of the processing area?

A. That was approximately an hour after I had been

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 768901 (E.D.Mich.)
**(Cite as: 2004 WL 768901 (E.D.Mich.))**

there.

...

Q. And then did you change into some other clothes?

A. Yes.

Q. What other clothes did you change into? Did you change into jail clothes?

A. Yes.

Q. What color were they?

A. I don't recall.

Q. And then what happened?

A. I was put back in the holding tank.

Q. Then what happened? How long where you there?

A. I don't recall. I think it was over eight hours.

Q. Then did you get out of there?

A. How did I get out of there?

Q. Yes. How did you get out of there?

A. My dad posted bail for me.

Deposition of Amanda Shinaver at 18-21 attached as Ex. H to Pls.' Supplemental Attachments. Shinaver does not fall within the defined class because she was not subjected to a strip search while changing from personal attire to prison garb while awaiting arraignment. Moreover, her father posted bond so she was not required to strip because of a policy requiring all overnight visitors to change into jail uniforms.

Nor is Nancy Whittum an adequate class representative. She stated:

Q. The Saginaw County Jail records show that you arrived at 4:30 and you were bonded out at 5:01. Is that your memory, too?

A. Bonded out at 5:01, no. My memory was more like I got home at seven.

...

Q. Do you remember being in the county jail for a total of a half an hour?

A. No.

Q. How long do you think you were there?

A. About three hours.

...

A. Yep, and the sheriffs. And after being in that cell for awhile, having my named called. The lady came over and she asked me to follow her. She brought me to this room over to the right of the cell that had a table, some chairs, an orange chair. And she asked me to take my clothes off, and my shoes and my socks. I put my shoes on the ground, pulled my socks inside out, lifted my bra up and my boobs.

Q. You did this yourself or she did?

A. I had to do this. Then I had to pull down my pants and panties and bend over and cough for her, and then I had to do it again.

*5 ...

Q. What happened after that?

A. And she told me to get dressed. So I got dressed and she took me back to the cell and locked me up.

...

Q. You said it seemed like hours and then afterward, you were taken and booked?

A. Yes. Then after I was photographed and printed, they told me to wait over on the side. And then he said I could call someone if I want to to [sic] come

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 768901 (E.D.Mich.)
**(Cite as: 2004 WL 768901 (E.D.Mich.))**

and get me. My boys were already there.

Deposition of Nancy Whittum at 41, 43, 45 attached as Exhibit I to Pls' Supp. Att. Whittum also does not fall within the defined class because she was not subjected to a strip search while changing from personal attire to prison garb while awaiting arraignment, nor was she required to strip because of a policy requiring all overnight visitors to change into jail uniforms, as her testimony clearly demonstrates.

The parties have not furnished the deposition of Sylvia Braddock. There is no evidence before the Court indicating that her claim is typical of the other members of the subclasses defined by the plaintiffs' counsel. The parties have advised the Court that Tenisha Johnson is no longer a party to this action.

Craig Mason is not an adequate representative for a subclass of misdemeanants in the work release program because he was incarcerated after he was convicted of a felony: drunken driving, third offense (known as operating under the influence of intoxicating liquor, or OUIL). *See* Mich. Comp. Laws § 257.625(9)(c). Mason testified:

Q. And then since 2000, where else have you been incarcerated?

A. Just the Saginaw County Jail.

Q. And you were there from April of 2001 to February of 2002?

A. Yep.

Q. And you brought in on an OUIL, per se, third?

A. Third one.

Q. What was your sentence on that?

A. That was a year.

Deposition of Craig Mason at 10, 29 attached as Ex. J to Pls' Supp. Att.

Nor do the named plaintiffs satisfy the typicality requirement. Typicality requires that a "sufficient relationship exist[ ] between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Stout v. Byrider*, 228 F.3d 709, 717 (6th Cir.2000) (citation omitted). Here, there is a disconnect between the definitions of the putative subclasses and the conduct about which the named plaintiffs complain. Although the named plaintiffs base their federal cause of action on the same legal theories as the putative class, their own characterization of the defendants' conduct toward each of them places them outside the class. The named plaintiffs' claims are not "typical" because they do not "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members." *In Re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir.1996).

For these same reasons, the named plaintiffs are not adequate class representatives. They do not fall within the definition of either of the putative subclasses. At least one of the proposed class members must be an adequate class representative to satisfy Rule 23(a)(4). In addition, the Court must consider whether the named plaintiffs' participation in a similar lawsuit against these same defendants challenging another jail administration policy calling for the removal of inmates' clothing allegedly for security reasons might cause a conflict that might undermine the loyalty of these representatives to the broader class. *See Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 678-79 (N.D.Ohio 1995) (noting that the named plaintiffs' participation in a parallel state court lawsuit alleging the same defect in the same product created a potential conflict of interest because of the possible disincentive to vigorously represent the interests of the absent class members). Indeed, "adequacy of representation" requires the court to determine whether the class members have interests that are antagonistic to the other class members. *Stout*, 228 F.3d at 717.

*6 Aa previously mentioned, all of the named

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 768901 (E.D.Mich.)
**(Cite as: 2004 WL 768901 (E.D.Mich.))**

plaintiffs except Nancy Witthum are participating in another lawsuit challenging jail policies against these same defendants. The potential exists for a compromise of all of the named parties' claims against Saginaw County as part of a global settlement, which may not serve the interests of the entire class and its absent members. This potential conflict of interest, coupled with the named plaintiffs falling outside the subclasses, compel the conclusion that the plaintiffs have failed to satisfy Rule 23(a)(4).

### III.

The plaintiffs have not satisfied the requirements of Rule 23(a). If they had, they also would have had to satisfy at least on of the requirements of Rule 23(b). *Olden,* 203 F.R.D. at 270. Because of the determination that Rule 23(a) is not satisfied, the Court need not assess the plaintiffs' motion under the standards of Rule 23(b).

The plaintiffs have not established the prerequisites for class certification.

Accordingly, it is **ORDERED** that the plaintiffs' motion to certify the class [dkt # 29] is **DENIED.**

E.D.Mich.,2004.
Whittum v. Saginaw County
Not Reported in F.Supp.2d, 2004 WL 768901 (E.D.Mich.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 411559 (E.D.La.)
**(Cite as: 2009 WL 411559 (E.D.La.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Valdir XAVIER, et al.
v.
BELFOR USA GROUP, INC.
**Civil Action Nos. 06-491, 08-949, 06-7804,
08-3736.**

Feb. 13, 2009.

West KeySummary
**Labor and Employment 231H ⟲⟳2380(1)**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(B) Minimum Wages and Overtime
Pay
         231HXIII(B)6 Actions
            231Hk2378 Pleading
               231Hk2380 Complaint, Petition, or
Declaration
                  231Hk2380(1) k. In General.
Most Cited Cases
Former unskilled laborers stated a claim that they
were employees under the Fair Labor Standards Act
(FLSA). The laborers claimed that the company
they worked for as temporary laborers should have
paid them overtime compensation, and that they
were employees because they were provided with
uniforms, safety training, and tools, the company
set their work schedules, they often worked for the
company for extended periods of time, and they
performed manual labor at the company's direction.
Fair Labor Standards Act of 1938, § 16(b), 29
U.S.C.A. § 216(b).

Hector A. Linares, Juvenile Justice Project of
Louisiana, Jennifer Jean Rosenbaum, Clarence F.
Favret, III, Ashley Brooke Robinson, Favret, De-
marest, Russo & Lutkewitte, New Orleans, LA,
Mary C. Bauer, Naomi Tsu, Atlanta, GA, Nancy Pi-

card, Julie Marie Richard-Spencer, Robert H. Ur-
ann, Robein, Urann, Spencer, Picard & Cangemi,
APLC, Metairie, LA, Gregory J. McCoy, Ronald J.
Vander Veen, Cunningham Dalman, P.C., Holland,
MI, Jose A. Sandoval, Robert Anthony Alvarez,
Law Office of Jose A. Sandoval, P.C., Wyoming,
MI, Mark H. Verwys, Plunkett Cooney, Grand Rap-
ids, MI, for Valdir Xavier, et al.

Michael David Kurtz, Brian M. Ballay, Erin E. Pel-
leteri, Steven F. Griffith, Jr., Baker Donelson Bear-
man Caldwell & Berkowitz, New Orleans, LA, for
Belfor USA Group, Inc.

***ORDER***

JAY C. ZAINEY, District Judge.

*1 Before the Court are a **Motion to Dismiss
(Rec.Doc.404)** filed by defendant Belfor USA
Group, Inc. ("Belfor"), and a **Motion to Dismiss
Certain Plaintiffs' Claims and Demands
(Rec.Doc.390),**[FN1] also filed by Belfor. The Nava
plaintiffs oppose both motions. The motions, set for
hearing on January 21, 2009, are before the Court
on the briefs without oral argument. For the reasons
that follow, both motions are GRANTED IN PART
AND DENIED IN PART.

> FN1. Belfor filed this motion in the altern-
> ative to its motion to dismiss
> (Rec.Doc.404), which moves for dismissal
> of all claims. According to Belfor, if the
> motion to dismiss (Rec.Doc.404) all claims
> is granted, then this second motion be-
> comes moot.

**I. *NAVA ACTION BACKGROUND***

This action was originally filed by Juan Antonio
Alfaro Nava against Belfor in the Eastern District
of Michigan. That Court transferred the case to this

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 411559 (E.D.La.)
**(Cite as: 2009 WL 411559 (E.D.La.))**

district after concluding that the *Nava* complaint was nearly identical to the *Obando* [FN2] complaint pending in this Court. After the suit was pending in this district Plaintiffs filed their Second Amended Complaint (Rec.Doc.374) without opposition from Belfor. [FN3] The *Nava* action is consolidated with the *Xavier* and *Obando* actions. [FN4] The Second Amended Complaint (hereinafter "the Complaint") is styled a "hybrid 29 U.S.C. § 216 collective action and Rule 23 class action complaint" against Belfor for engaging in a pattern or practice of unlawful conduct that resulted in the violation of Plaintiffs' rights under the FLSA and the wage and hour laws of the states of Ohio, Pennsylvania, South Carolina, and Texas. (Rec. Doc. 374 ¶ 1).

> FN2. The *Obando* action (06-7804) was filed in October 2006 by Orestes Obando and Adan Gonzalez on behalf of themselves, and those similarly situated, against Belfor and Ticos, one of Belfor's subcontractors, alleging *inter alia* violations of the Fair Labor Standards Act ("FLSA"). The *Obando* plaintiffs sought to certify a nationwide FLSA collective action of those individuals who performed manual labor for Belfor anytime within 3 years of the initial complaint and who did not receive overtime compensation. The *Obando* plaintiffs also sought class certification of claims brought under the state laws of Louisiana, Pennsylvania, Ohio, California, and Illinois.
>
> Via prior motion practice, the *Obando* state class action claims have been dismissed (Rec.Doc.240) and certification of the nationwide FLSA collective action has been denied (Rec.Doc.330). On January 21, 2009, the magistrate judge denied Plaintiffs' motion to file a fourth amended complaint. (Rec.Doc.425).
>
> The master case, *Xavier v. Belfor* (06-491), was certified as a collective action for settlement purposes. The class

is defined as

> All individuals who were directly or indirectly employed by subcontractors Expro Services, Inc., Ticos Construction, LLC, M-2, Inc., Carl E. Woodward, LLC, and Vent-Vac Systems, LLC on Belfor Projects in the Gulf Coast area arising from or relating to storm damage caused by Hurricane Katrina and who were owed and did not receive overtime wages pursuant to 29 U.S.C. § 207.
>
> Rec. Doc. 140. The settlement in that case is nearly complete.
>
> FN3. Belfor had filed motions to dismiss (Rec. Docs. 336 & 337) Plaintiffs' First Amended Complaint and Plaintiffs had filed motions to certify a Rule 23 class (Rec.Doc.348) and to certify an FLSA collective action (Rec.Doc.345), based on the allegations contained in that complaint. On October 29, 2008, the Court held a status conference at which it dismissed Plaintiffs' motions as premature. (Rec.Doc.362). The Court was persuaded that Belfor's motions to dismiss should be considered first. Plaintiffs were given two weeks to file their oppositions to Belfor's motions to dismiss. In addition to filing their oppositions, Plaintiffs filed the instant Second Amended Complaint and Belfor then withdrew its then-pending motions to dismiss. (Rec.Doc.376).
>
> FN4. *Ticos Construction, LLC v. Belfor USA Group, Inc.* is also part of the consolidation.

Belfor is a restoration and remediation company and it specializes in emergency response. In the regular course of its business, Belfor contracts with various temporary labor suppliers to obtain the unskilled manual laborers necessary to providing its services. (Comp.¶ 21). Plaintiffs were unskilled

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 411559 (E.D.La.)
**(Cite as: 2009 WL 411559 (E.D.La.))**

manual laborers recruited and hired by Belfor or its subcontractors to perform manual labor for Belfor at various projects throughout the United States, including Alabama, Florida, Georgia, Louisiana, Mississippi, Ohio, Pennsylvania, North Carolina, South Carolina, Texas, and Virginia. (Comp.¶¶ 22-23). Plaintiffs were compensated on an hourly-rate basis and routinely worked in excess of 8 hours per day, and in excess of 40 hours per week, for up to 7 days a week. (*Id.* ¶¶ 28-29). Plaintiffs maintain that they were not paid any overtime premium as required by state and federal law, (*id.* ¶ 30), and that they were not timely paid all compensation due them as required by law, (*id.* ¶ 33). Plaintiffs maintain that Belfor has a company-wide decision, policy, or plan of contracting with various subcontractors to obtain unskilled manual laborers in order to circumvent its obligations as an employer under the FLSA and the wage and hour laws of the various states in which it had projects. (Comp.¶ 37).

Plaintiffs allege that Belfor was their "employer" and that its conduct violated the FLSA. Plaintiffs allege claims on behalf of an FLSA collective class, which they believe consists of over 1,000 individuals, defined as:

**\*2** All persons who were members of Belfor's "traveling labor force," and whose services were billed for by Belfor to its clients as "temporary local labor," who directly or through "captive labor contractors or companies" ("Subcontractors") were employed by Belfor to perform unskilled manual labor at various projects throughout the United States over the last three years prior to the filing of the initial complaint and through the final disposition of this action, and who were eligible for and entitled to overtime pay pursuant to the FLSA, 29 USC 207, but did not receive overtime pay because of Belfor's decision, policy or plan to deprive them of that pay.

(Comp.¶ 39).

Plaintiffs also allege what in effect amounts to four

state law class actions defined as an Ohio Class, Pennsylvania Class, South Carolina Class, and Texas Class.[FN5] (Comp.¶ 45). Plaintiffs allege that certification of these classes is appropriate pursuant to Rule 23(b)(2) and (b)(3). (*Id.* ¶¶ 63, 70, 77, & 84). The allegations made with respect to each state class are discussed in greater detail below.

> FN5. Plaintiffs' complaint is somewhat confusing in that it alleges a "State Class" that is further subdivided into the four state subclasses of Ohio, Pennsylvania, South Carolina, and Texas listed above. The complaint does not suggest, however, that any plaintiff is a member of this larger State Class aside from being a member of one of the four subclasses. In other words, the State Class would seem to consist *only* of the sum whole of the four state subclasses. Thus, in effect Plaintiffs have pled four separate class actions, each based on the law of a different state.

Belfor now moves pursuant to Rule 12(b)(6) to dismiss all claims filed by the *Nava* plaintiffs in Civil Action 08-3736. (Rec.Doc.404). In the alternative, Belfor seeks dismissal of all claims filed by plaintiffs Ricardo Manuel and Joao Batista Silva (Rec.Doc.390), pursuant to the Court's Order of October 9, 2008, which was entered in the *Xavier* matter. Belfor also seeks dismissal of certain state law claims asserted on behalf of certain workers who allegedly performed work in Ohio, Pennsylvania, South Carolina, and Texas.

## II. *DISCUSSION*

### A. Belfor's Motion to Dismiss (Rec.Doc.404)

#### *The Parties' Arguments*

Belfor moves pursuant to Rule 12(b)(6) to dismiss all claims asserted in the *Nava* plaintiffs' complaint. (Rec.Doc.404). Belfor contends that the Complaint is nothing but a cosmetically altered copy of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 411559 (E.D.La.)
**(Cite as: 2009 WL 411559 (E.D.La.))**

*Obando* complaint. Thus, Belfor contends that the Court should apply the reasoning used in *Obando* to this action and dismiss the *Nava* plaintiffs' claims in their entirety.

With respect to the state law class actions, Belfor argues that the Complaint fails to plead facts sufficient to state a claim upon which the relief sought-class adjudication-can be based. Belfor contends that under controlling Fifth Circuit precedent and this Court's prior ruling in *Obando,* the Complaint fails to state a claim that can be certified under Rule 23(b)(3).[FN6] Belfor asseverates that the predominance requirement is not met because the employment relationship between each potential class member and Belfor requires a wholly individualized analysis given that Belfor did not ostensively employ any of the plaintiffs. According to Belfor, the issue of employer status must be analyzed on an individual basis-per job, per subcontractor, per potential class member, and per day, and the only way that the Court can ascertain whether Belfor was the employer of any particular plaintiff is to analyze the litany of factors for each individual employee and/ or subcontractor on the jobs at issue.

> FN6. Plaintiffs also alleged a class pursuant to Rule 23(b)(2) and Belfor challenged certification under that section as well. However, in their memorandum in opposition Plaintiffs clarified that they are seeking certification under Rule 23(b)(3) and not under Rule 23(b)(2). (Rec. Doc. 413 p. 21). Thus, those claims will be dismissed.

**\*3** Belfor contends that Plaintiffs' allegation that Belfor had a corporate "policy" of using a subcontractor system to effectuate violations of the FLSA is of no moment. Belfor contends that the only way to determine whether it used the subcontractor system as a subterfuge is through consideration of the highly individualized and fact-intensive employer test. Moreover, Belfor points out that there is no authority for the proposition that such a policy would permit the Court to ignore the Fifth Circuit's multi-factored employer test and deem Belfor the employer of the thousands of workers that worked for its subcontractors.

Belfor adds that the individualized nature of the question of damages proves fatal to the class action claims. Belfor argues that the *Nava* claims are similar to the *Obando* claims in that there is no suitable class-wide formula for an award of monetary relief. According to Belfor, each class member's damage award will be a highly individualized analysis of different subcontractor payroll records, sign-in sheets, check stubs, and affidavits, assuming of course that the subcontractor even kept adequate records.

With respect to the FLSA collective action,[FN7] Belfor contends that the complaint is devoid of factual allegations sufficient to state a claim under the Rule 8(a) standards announced in *Bell Atlantic v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Belfor contends that Plaintiffs are attempting to employ some type of pre-*Twombly* standard. As with the state law class action claims, Belfor argues that the Complaint lacks factual support for Plaintiffs' contention that Belfor was their employer. Belfor contends that Plaintiffs have pled only legal conclusions with respect to employment status and no facts.

> FN7. Belfor also applies its FLSA arguments to the state law class actions.

In opposition, Plaintiffs point out that this case is still in the pleading stages and Belfor has filed a Rule 12(b)(6) motion so the only question is whether the Complaint meets the minimum pleading requirements of Rule 8(a). Plaintiffs maintain that *Bell Atlantic v. Twombly, supra,* did not articulate a heightened fact pleading requirement but merely explains that a complaint must allege enough facts to raise a reasonable expectation that discovery will reveal evidence of the claim. Plaintiffs argue that Belfor's motion is actually an unsupported Rule 56 motion for summary judgment based not on any evidence but merely on factual assertions and legal arguments made by Belfor's attorneys.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 411559 (E.D.La.)
**(Cite as: 2009 WL 411559 (E.D.La.))**

Plaintiffs recognize that their complaint must factually allege employer status. However, having had the benefit of no discovery to date, Plaintiffs contend that they are not required at this stage to provide evidentiary support for their factual allegations. Plaintiffs also take issue with the contention that the status of the employer/employee relationship would require individualized analysis. Plaintiffs contend that if they can prove the allegations in their complaint that support employer status then it is a simple matter of determining who is on the pertinent rosters.

*4 Regarding damages, Plaintiffs argue that the calculations for each worker will not be untenable or overly time-consuming and that payroll records can be used. Also, the Court could consider bifurcating the issue of liability from damages. Either way, Plaintiffs have not alleged unmanageable classes.

In sum, Plaintiffs urge the Court to deny Belfor's motion, without regard to what took place in *Obando,* and pray for an answer from Belfor, a scheduling conference, and normal discovery so that this matter can proceed.

### Law and Analysis

Motions to dismiss for failure to state a claim are viewed with disfavor and are rarely granted. *Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 570 (5th Cir.2005) (citing *Shipp v. McMahon,* 199 F.3d 256, 260 (5th Cir.2000)). In deciding a motion to dismiss under Rule 12(b)(6), the district court accepts as true those well-pleaded factual allegations in the complaint. *Id.* (citing *C.C. Port, Ltd. v. Davis-Penn Mortgage Co.,* 61 F.3d 288, 289 (5th Cir.1995)). To survive a Rule 12(b)(6) motion to dismiss, a complaint "does not need detailed factual allegations," but must provide the plaintiff's grounds for entitlement to relief-including factual allegations that when assumed to be true "raise a right to relief above the speculative level." *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir.2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S.

544, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007)). Conversely, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.' " *Id.* (quoting *Twombly,* 127 S.Ct. at 1966).

### 1. State Law Class Actions

Federal Rule of Civil Procedure 23 governs class actions in the United States district courts. The prerequisites to a class action are that:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Pro. 23(a). A class action may be maintained if the prerequisites in 23(a) are satisfied and if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. Pro. 23(b)(3).

As in the *Obando* matter, the Court is persuaded that the class allegations fail to meet the Rule 23(b)(3) predominance requirement. (Rec. Doc. 240 at p. 13). The question as to whether Belfor was the actual employer of each of the individual class members is such an individualized inquiry and predominates over any common fact issues. As noted in *Obando,* the Court will first have to look at the individual relationship of each worker with Belfor prior to addressing liability. That analysis will re-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 411559 (E.D.La.)
**(Cite as: 2009 WL 411559 (E.D.La.))**

quire an employee/employer test under the applicable state law. After that determination is made and assuming that Belfor is found to be the employer, the Court would then have to look at each state statute and compare that statute with the facts as to each individual plaintiff to determine if a violation occurred. This would engage the Court in looking at each job site in each state for each class member for each day and hour worked. The nuances in each respective state's law requires an individualized analysis as to each class member.

*5 Moreover, the foregoing problems are not solved by the *Nava* plaintiffs' attempt to create four separate state law subclasses. It remains that for each member of each of the four subclasses the "employer" determination must be made individually.

For the foregoing reasons, the motion to dismiss is GRANTED as to the state class action claims.

**2. *FLSA Collective Action***

Title 29 of the United States Code, § 216(b) of the FLSA creates a cause of action for employees against employers, who violate the overtime compensation requirements. Section 216(b) provides, in pertinent part:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.... An action ... may be maintained ... by any one or more employees for and on behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C.A. § 216(b) (West 1998). Section 216(b)

establishes an "opt-in" scheme under which plaintiffs must affirmatively notify the court of their intention to become parties to the suit. *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1212 (5th Cir.1995). Pursuant to the statute the term "employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee.... 29 U.S.C.A. § 203(d) (West 1998 & Supp.2008).

Plaintiffs allege that they performed unskilled general labor, that they were paid on an hourly basis, that they routinely worked in excess of 40 hours per week, and that they were not paid any overtime premium. (Comp.¶¶ 27, 28, 29, 30). Plaintiffs also allege that Belfor was their employer as that term is defined in the FLSA. (*Id.* ¶¶ 35, 36). Contrary to Belfor's assertions, Plaintiffs have not pled a mere legal conclusion with respect to their status as employees. Rather, Plaintiffs have pled that Belfor provided them with uniforms, safety training, and tools (Comp.¶ 24), that Belfor set their work schedules (*Id.* ¶ 25), that they often worked for Belfor for extended periods of time (*Id.* ¶ 26), and that they performed manual labor at Belfor's direction (*Id.* ¶ 23). At this stage the Court accepts Plaintiffs' allegations as true, and while the Court is not deciding that Plaintiffs can establish employer status based solely upon these allegations, the Court is persuaded that Plaintiffs do state a claim under the FLSA. Belfor's motion to dismiss the FLSA claims is therefore DENIED.

For the foregoing reasons, Belfor's Motion to Dismiss (Rec.Doc.404) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to the state law class action claims and DENIED as to the FLSA claims.

**B. Belfor's Motion to Dismiss Certain Plaintiffs' Claims and Demands (Rec.Doc.390)**

**1. *Manuel and Silva Claims***

*6 Belfor seeks dismissal of all claims brought by

Slip Copy, 2009 WL 411559 (E.D.La.)
**(Cite as: 2009 WL 411559 (E.D.La.))**

plaintiffs Ricardo Manuel and Joao Batista Silva arguing that Manuel and Batista cannot participate in the *Nava* action because their claims were fully and finally resolved in *Xavier*. Manuel and Silva both opted into the *Xavier* settlement, received payments, and executed releases. According to Belfor, the October 9, 2008, order issued in the *Xavier* matter prohibited two other *Xavier* plaintiffs from joining *Nava* and those plaintiffs had not even executed releases.

In opposition, Manuel and Silva argue that the release and the settlement agreement only pertained to the claims raised in *Xavier* and that any provision in the release seeking to waive claims neither raised nor compensated in the lawsuit should be void as contrary to public policy.

The motion is DENIED at present. Belfor places far too much emphasis on the October 9, 2008, order entered in *Xavier*. (Rec.Doc.346). In conjunction with that order the Court was never called upon to determine the enforceability of the broad release executed by the *Xavier* opt-ins. Rather, the Court denied the three motions to dismiss because the Court did not think it appropriate that those plaintiffs be allowed to refile *their Xavier claims* in another forum having already opted in to the *Xavier* settlement. It does not follow, however, that denying an opportunity to forum shop the *Xavier* claims entails precluding certain plaintiffs from being able to assert claims wholly unrelated to the claims in *Xavier*. The October 9, 2008, order was not intended to have such an effect and Belfor's reliance on it for such a proposition is misplaced.

If the releases signed by the employees in *Xavier* are as broad as Belfor contends,[FN8] or as broad as the release language contained in the settlement agreement itself, then the claims of Ricardo Manuel and Joao Batista Silva will be subject to dismissal *if the release is enforceable as to claims not at issue in Xavier*. The *Lynn's Food* case cited by Plaintiffs in their opposition is clearly distinguishable because it involved a purported FLSA settlement by non-represented employees who had never filed a lawsuit. *Lynn's Food Stores, Inc. v. United States of America*, 679 F.2d 1350 (11th Cir.1982). The Court is simply not prepared to dismiss Manuel and Batista's claims until it is convinced that the releases are enforceable as broadly as they are written.

> FN8. Neither party provided the Court with a copy of the individual releases signed by the employees. Exhibit 1 to Plaintiffs' opposition is the Collective Action Settlement Agreement signed by the attorney for the *Xavier* plaintiffs and by Belfor's representative. (Rec.Doc.414). It references an exhibit that would be the "Individual Release" but it was not attached.

**2. Ohio Claims**

Belfor argues that liquidated damages are not available under Ohio law. Belfor also argues that it was not required to keep wage records because it did not employ Plaintiffs.

In opposition, Plaintiffs concede that Ohio law does not allow for liquidated damages. Plaintiffs contend that the issue of whether Belfor employed them has yet to be determined.

The motion is GRANTED as to the claim for liquidated damages under Ohio law and DENIED as to the wage records. As noted above, Plaintiffs have alleged sufficient facts regarding the issue of employment status.

**3. Pennsylvania Claims**

*7 Belfor argues that Plaintiffs fail to state a claim under Pennsylvania's Wage Payment and Collection Law ("WPCL") because that law requires a wage and hour contract between the claimant and the alleged employer. Belfor contends that Plaintiffs undisputedly did not have a contract of employment with Belfor and that they did not allege such in the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 411559 (E.D.La.)
**(Cite as: 2009 WL 411559 (E.D.La.))**

Complaint.

In opposition, Plaintiffs suggest that their claim is actually brought under Pennsylvania's Minimum Wage Act, Pa. Stat. Ann. tit. 43, § 333.104, which contains its own civil action enforcement provision in Pa. Stat. Ann. tit. 43, § 333.113.

The motion is GRANTED as to any claims brought under the WPCL and DENIED as to any claims brought under the Minimum Wage Act of 1968.

### 4. South Carolina Claims

Belfor argues that it is not subject to South Carolina's Payment of Wages Act ("SCPWA") because it did not employ Plaintiffs, and specifically because it was not responsible for handling payment of wages. Alternatively, Belfor argues that no South Carolina law determines the maximum number of hours employees may work without receiving overtime pay.

In opposition, Plaintiffs concede that South Carolina has no overtime statute. They persist, however, in their claim that Belfor violated state law by failing to keep required records and by failing to properly pay wages.

The motion is DENIED. The Court may ultimately determine that Plaintiffs' claims under South Carolina law rely upon an overly expansive interpretation of the employer definition but for now the Court is persuaded that Plaintiffs have alleged sufficient facts regarding the issue of employment status.

### 5. Texas Claims

Belfor argues that it is not subject to Texas' Payday Law because it did not employ Plaintiffs, and specifically because it was a general contractor exempt from the act. Belfor points out that Texas has no overtime statute.

In opposition, Plaintiffs concede that Texas has no

overtime statute. They persist, however, in their claim that Belfor violated state law by failing to keep required records and by failing to properly pay wages.

The motion is DENIED. The Court may ultimately determine that Belfor's acted solely as a general contractor with respect to Plaintiffs' but for now the Court is persuaded that Plaintiffs have alleged sufficient facts regarding the issue of employment status.

For the foregoing reasons, Belfor's Motion to Dismiss Certain Plaintiffs' Claims and Demands (Rec.Doc.390) is GRANTED IN PART AND DENIED IN PART. The motion is DENIED insofar as it seeks to dismiss *all* claims brought by plaintiffs Ricardo Manuel and Joao Batista Silva. The motion is GRANTED as to the claim for liquidated damages under Ohio law and DENIED as to the wage records claim under Ohio law. The motion is GRANTED as to any claims brought under the Pennsylvania WPCL and DENIED as to any claims brought under Pennsylvania's Minium Wage Act. The motion is GRANTED as to any overtime claims under South Carolina law and DENIED as to the records claim under South Carolina law. The motion is GRANTED as to any overtime claims under Texas law and DENIED as to the records claim under Texas law.

*8 Accordingly;

**IT IS ORDERED** that the **Motion to Dismiss (Rec.Doc. 404)** filed by defendant Belfor USA Group, Inc. is **GRANTED IN PART AND DENIED IN PART** as explained above;

**IT IS FURTHER ORDERED** that the **Motion to Dismiss Certain Plaintiffs' Claims and Demands (Rec.Doc. 390)** filed by defendant Belfor USA Group, Inc. is **GRANTED IN PART AND DENIED IN PART** as explained above.

E.D.La.,2009.
Xavier v. Belfor USA Group, Inc.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 411559 (E.D.La.)
**(Cite as: 2009 WL 411559 (E.D.La.))**

Slip Copy, 2009 WL 411559 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 1999 WL 415390 (E.D.Pa.)
**(Cite as: 1999 WL 415390 (E.D.Pa.))**

▷

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Jean CARPENTER, Plaintiff,
v.
BMW OF NORTH AMERICA, INC., Defendant.
**No. CIV. A. 99-CV-214.**

June 21, 1999.

*MEMORANDUM*

KELLY.

**\*1** Before this Court is Plaintiff's Motion for Class Certification. Plaintiff has brought claims against Defendant BMW of North America, Inc. ("BMW") based on Consumer Fraud Statutes, fraud, negligent misrepresentation and breach of contract. Plaintiff alleges that BMW has engaged in a scheme to defraud purchasers through written misrepresentations regarding certain 1999 BMW 3 and 5 series models. More specifically, Plaintiff alleges that BMW has marketed the GM five-speed automatic transmissions in these models as a BMW product, since the introduction of the vehicles into the market place on or about July 1, 1998. For the following reasons, Plaintiff's Motion for Class Certification will be denied.

I. *STANDARD FOR CLASS CERTIFICATION*

"To obtain class certification, plaintiffs must satisfy all of the requirements of Rule 23(a) and come within one provision of Rule 23(b)." *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 624 (3d Cir.1996), *aff'd*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). Rule 23(a) requires plaintiffs to establish (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. FED.R.CIV.P. 23(a). More specifically, Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

*Id.*

In addition to satisfying 23(a) requirements, a putative class must satisfy one part of subsection 23(b). In the instant action, Plaintiff seeks certification pursuant to 23(b)(3), which requires that (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED.R.CIV.P. 23(b)(3).

II. *COMMONALITY AND PREDOMINANCE*

As stated above, class certification requires that there be questions of law or fact common to the class and that such common questions predominate over any questions affecting only individual members.[FN1] *Georgine*, 83 F.3d at 626. Here, the limited common issues identified by Plaintiff cannot satisfy the predominance requirement in this case.

> FN1. "Rule 23(a)(2) does not require that all questions of law or fact that are raised be common to the entire class." *Truckway, Inc. v. General Electric*, Civ. A. No. 91-0122, 1992 WL 70575, \*3 (E.D.Pa. March 30, 1992). Indeed, the actual language of the rule suggests that there simply be at least more than one question of law or fact. *Id.* Because in this case there are factual and legal issues common to the proposed plaintiff class as to whether

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 415390 (E.D.Pa.)
**(Cite as: 1999 WL 415390 (E.D.Pa.))**

BMW deceived consumers regarding the maker of the transmissions of the subject automobiles, the commonality element is satisfied.

The parties agree that to determine each class member's legal rights, this Court will have to apply the law of each of the 50 states.[FN2] Def.'s Brief at 16; Plf.'s Brief at 24-25.

> FN2. "[E]xistence of state law variations is not alone sufficient to preclude class certification." *Chin v. Chrysler Corp.,* 182 F.R.D. 448, 458 (D.N.J.1998), (citing *In re School Asbestos Litig.,* 789 F.2d 996, 1011 (3d Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986), and *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 815 (3d Cir.), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995)).

[W]here the applicable law derives from the law of the 50 states, as opposed to a unitary federal cause of action, differences in state law will "compound the [ ] disparities" among class members from the different states. Thus, ... certification of a nationwide class in which the law of the 50 states, rather than federal law, must be identified and applied, places the burden upon plaintiffs to "credibly demonstrate, through an 'extensive analysis' of state law variances, 'that class certification does not present insuperable obstacles.' "

*2 That common issues must be shown to "predominate" does not mean that individual issues need be non-existent. All class members need not be identically situated upon all issues so long as their claims are not in conflict with each other. The individual differences, however, must be of lesser overall significance and they must be manageable in a single class action....

*Chin v. Chrysler Corp.,* 182 F.R.D. 448, 453 (D.N.J.1998) (citations omitted).

In an effort to meet her burden of providing an "extensive analysis" of state law variations, Plaintiff has submitted a series of charts and affidavits (Plf.'s Exhs. "K" through "R") utilized in *In re Prudential Ins. Co. America Sales Litigation,* 148 F.3d 283 (3d Cir.1998), *cert. denied,* 119 S.Ct. 890 (1999), setting forth an analysis of the various state laws applicable to the legal claims of common law fraud, breach of contract, negligent misrepresentation, consumer fraud and punitive damages, at issue in the instant action. Plaintiff emphasizes that the *Prudential* plan was adopted by the Third Circuit Court of Appeals and, thus, should be adopted by this Court.[FN3]

> FN3. The fact that the Third Circuit Court of Appeals affirmed the district court's approval of the plan submitted in *Prudential* does not ensure adoption of the same plan in this or any other case by Plaintiff merely submitting the same charts and exhibits used by the plaintiff in *Prudential. Cf. Tylka v. Gerber Products Co.,* 178 F.R.D. 493, 498 n. 3 (N.D.Ill.1998) ("Plaintiffs should not expect the court to ferret through, disseminate, and craft manageable schemes from these exhibits when that burden clearly rests with Plaintiffs.").

However, as the court observed in *In re Jackson Nat'l Life Ins. Co. Premium Litigation,* 183 F.R.D. 217 (W.D.Mich.1998), *Prudential* is distinguishable both factually and procedurally:

*Prudential* is distinguishable not only factually-by virtue of the uniformity of alleged misrepresentations, which simplified fact issues ..., but also procedurally inasmuch as the *Prudential* class was certified for settlement purposes only. The Third Circuit observed in affirming the *Prudential* class certification that when a district court is confronted with a request for settlement-only class certification, it "need not inquire whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial." 148 F.3d at 316 n. 57, quoting *Am-*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 415390 (E.D.Pa.)
**(Cite as: 1999 WL 415390 (E.D.Pa.))**

*chem,* 117 S.Ct. at 2248. *See also Chin,* 182 F.R.D. at 458; *Ford Vehicle Paint,* 182 F.R.D. at 225-26; *Ford Ignition Switch,* 174 F.R.D. at 350. Here in contrast, plaintiffs seek nationwide class certification of multiple state law claims of some 300,000 class members involving various factual premises for trial. *Manageability is therefore a very real concern.*

*Id.* at 224 (emphasis added). The same can be said for the case at hand.[FN4] Here, "[t]he numerous state law variations implicated by certification of a nationwide class ... militate against a finding that a class action is the superior method for adjudication of the controversy." *Id.* at 223; *see also Castano v. American Tobacco Co.,* 84 F.3d 734, 745 n. 19 (5th Cir.1996) ("the greater the number of individual issues, the less likely superiority can be established."); *In re American Medical Systems, Inc.,* 75 F.3d 1069, 1085 (6th Cir.1996) ("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action.").

> FN4. For example, as BMW correctly points out, *see* Def.'s Brief at 24-28, the state laws vary significantly with regard to elements such as burden of proof, knowledge, and duty to disclose which are necessary to establish plaintiff's fraud-based claim. *See, e.g., In re Ford Motor Company Vehicle Paint Litigation,* 182 F.R.D. 214, 223 (E.D.La.1998).

**\*3** In addition, Defendant argues that "proof of individual reliance, which cannot be presumed, overwhelms any common issues." Def.'s Brief at 18. Plaintiff counters by arguing that the fraud claim in this case stems from misleading omissions which does allow for reliance to be presumed. Plf.'s Brief at 26-27 (citing *Prudential,* 148 F.3d at 314). However, the cases supporting the proposition that reliance may be presumed are federal securities fraud cases. *See In re Ford Motor Co. Bronco II*

*Product Liab. Litig.,* 177 F.R.D. 360, 374 (E.D.La.1997).

Here, the claims at issue involve state law fraud claims, not federal securities fraud claims.[FN5] Under such circumstances, district courts have generally held that proof of reliance is required. *See, e.g., Ford Vehicle Paint,* 182 F.R.D. at 221; *Jackson Nat'l Life Ins.,* 183 F.R.D. at 222; *In re Ford Motor Co. Ignition Switch Products Liability Litigation,* 174 F.R.D. 332, 346 (D.N.J.1997); *Ford Bronco II,* 177 F.R.D. at 374; *Truckway, Inc. v. General Electric,* Civ. A. No. 91-0122, 1992 WL 70575, *5-6 (E.D.Pa. March 30, 1992); *Rosenstein v. CPC Int'l, Inc.,* Civ. A. No. 90-4970, 1991 WL 1783, *4-5 (E.D.Pa. Jan.8, 1991); *Strain v. Nutri/Systems, Inc.,* Civ. A. No. 90-2772, 1990 WL 209325, *7 (E.D.Pa. Dec.12, 1990).

> FN5. The presumptive reliance theory upon which Plaintiff relies "has generally been limited to the securities market where the courts can presume 'a nearly perfect market in information.' " *Maguire v. Sandy Mac., Inc.,* 138 F.R.D. 444, 451 (D.N.J.1991); *Ford Bronco II,* 177 F.R.D. at 374 (same); *see also Jackson,* 183 F.R.D. at 222 ("The *Prudential* presumption was premised on the existence of uniform and material misrepresentations."). In this case, where Plaintiffs have alleged that BMW has misrepresented the origin of its 3 and 5 series' transmissions through written promotional and marketing materials, it would be illogical to presume reliance where the effect, if any, of various marketing materials on each class member's purchase will have to be analyzed. *See Buford v. H & R Block, Inc.,* 168 F.R.D. 340, 360-61 (S.D.Ga.1996).

BMW also asserts that claims under each of the 50 states' consumer protection statutes are overwhelmed by individual issues.[FN6] *BMW of North America, Inc., v. Gore,* 517 U.S. 559, 568-69, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ( "No one

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 415390 (E.D.Pa.)
**(Cite as: 1999 WL 415390 (E.D.Pa.))**

doubts that a state may protect its citizens by prohibiting deceptive trade practices.... But the states need not, and in fact do not, provide such protection in a uniform manner."); *Tylka,* 178 F.R.D. at 498 ("[A] brief review of the [consumer fraud] statutes reveals not only nuances, but differing standards of proof, procedure, substance, and remedies."). Plaintiff, in response, argues that all of the Consumer Protection Laws around the United States were created to protect consumers from deceptive conduct and can be grouped into 3 categories-(1) those prohibiting any "unfair or deceptive act or practice, either with no further specificity or with an included but not limited to list of specific practices that are prohibited, (2) those limiting claims to a "laundry list" of more specifically defined practices, with a number these remaining quite broad, and (3) those states that adopted either the first or second group, but have added a scienter requirement. Plaintiff concludes, based on her division into the above groups, that the consumer fraud laws "can easily be divided into subclasses and cha [r]ged to the jury." Plf.'s Brief at 36. Such a proffer, however, is "overly simplistic." *Tylka,* 178 F.R.D. at 498 (finding that plaintiffs failed to meet their burden and demonstrate that the nuances of 50 consumer fraud statutes and 50 common laws are manageable).

> FN6. With respect to the Pennsylvania Act, BMW correctly contends that an individual inquiry will be required to determine which Pennsylvania purchasers: 1) use the automobile "primarily for personal, family or household purposes;" 2) read any of the complained of promotional materials; 3) interpreted those promotional materials in the manner suggested by plaintiffs; 4) relied upon that interpretation of those representations as a basis in purchasing their BMW automobile; and 5) would have purchased a different automobile or would have purchased the same car only for a lesser amount. Def.'s Brief at 29-30.

*4 As for Plaintiff's contract claims, BMW points out that individual issues arise in each case regarding privity requirements [FN7] and whether BMW promotional statements were an "affirmation of fact." Def.'s Brief at pp. 36-37. BMW further contends that multiple factual issues exist as to whether class members had read or should have been aware of any of the public disclosures of the source of the five-speed automatic transmission, whether each class member read, or should have read or been aware of the information furnished to each purchaser on the Monroney Label [FN8], and whether any statement was, or was not considered by each purchaser to be merely opinion or puffery. Def.'s Brief at 37. Plaintiff, on the other hand, contends that the only determination relevant to this Court would be whether BMW failed to deliver a "BMW" product, "since all class members clearly entered into a contract to purchase their cars." Plf.'s Sur-reply at 16. In doing so, Plaintiff fails to address why resolution of the Plaintiff's breach of contract claims will not require this Court to examine the facts and circumstances of each individual case to determine whether a representation made by BMW concerning the origin of the five-speed automatic transmissions in the subject automobiles formed a "basis of the bargain." *Cf. Mack v. GMAC,* 169 F.R.D. 671, 678 (M.D.Ala.1996) ("The same problems which plague the plaintiff's fraud claims also plague the plaintiff's inducement of breach of contract and inducement of fiduciary duty claims."); *Jackson Nat'l Life Ins.,* 183 F.R.D. at 222 ("[A] showing of plaintiffs' reliance is essential also to their breach of contract claim."). The problem of sorting out these individual issues at trial weighs against granting class certification.

> FN7. *See, e.g., Ford Ignition Switch,* 174 F.R.D. at 346 (recognizing that the need for plaintiffs in a proposed class action to prove contractual privity will require the court to undertake an inquiry that will turn on the facts particular to each individual plaintiff).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 415390 (E.D.Pa.)
**(Cite as: 1999 WL 415390 (E.D.Pa.))**

FN8. The "Monroney Label" on Plaintiff's 1999 BMW 328ia four-door sedan stated that the five-speed automatic transmission was sourced in "France," the engine was sourced in "Germany" and the car was assembled in "Munich, Germany." Def.'s Ex. 10.

Furthermore, it will be difficult to formulate any measure of damages for representative plaintiff, let alone a uniform measure for a nationwide class because of the state law variations that exist with regard to 1) calculation of diminution in value, 2) limitation of incidental and consequential damages in contract actions, and 3) the Consumer Protection Acts' methodologies used to calculate actual damages as well as variations in the 21 states that provide for minimum statutory damages, treatment of punitive and treble damages and the requisite level of culpability required, and the availability of attorney fees.

For example, Plaintiff's claimed damages for her fraud and contract claims will be for alleged diminution in the value of the product, her "loss of the premium price paid ... for a BMW deigned and manufactured automobile...." Plf.'s Exh. A at ¶¶ 40 and 50. In *Chin,* the court noted that "the value of [a] vehicle[ ] is dependent on a whole host of individualized factors including age, mileage, repair and maintenance history and accidents or damage." *Chin,* 182 F.R.D. at 463. That different state law formulations for considering the above factors may result in some plaintiffs not being entitled to any compensatory damages weighs against a finding that a class action is the superior method of adjudication and that common issues of fact and law predominate. *Id.*

**\*5** Plaintiff also seeks to compel BMW to offer rescission to the class members, an equitable remedy that is only available under specific limited factual circumstances. *Chin,* 182 F.R.D. at 463 ("The appropriateness of rescission would be determined under the applicable laws of the 52 jurisdictions."). Such wide variation of state laws regarding the

types of damages to which class members are entitled provides another basis for class certification to be denied.

## III. *THE PROPOSED CLASS ACTION LACKS SUPERIORITY*

Rule 23(b)'s second requirement calls for the demonstration by class representatives that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *Ford Ignition Switch,* 174 F.R.D. at 351; *Chin,* 182 F.R.D. at 462. Both predominance and superiority must be satisfied by the putative class representative in order for class certification to be granted. This Court concludes that even if Plaintiff could have satisfied the predominance requirement, the instant class certification motion would fail nonetheless on the basis of the superiority requirement.

It is generally desirable to litigate similar, related claims in one forum, especially where, as here, the recovery being sought by each of the plaintiffs is not sufficiently large to render individualized litigation a realistic possibility. The attractiveness of this proposition begins to fade, however, as the intricacies of a trial on a class-wide basis are considered. As demonstrated below, Plaintiff cannot overcome numerous factual and legal issues and offer a workable plan to take advantage of the economies of class treatment. *Cf. Chin,* 182 F.R.D. at 462-63.

For example, BMW argues that with the variations in state law it would be next to impossible to instruct a jury on the relevant law. Def.'s Brief at 47 (citing *American Medical Systems,* 75 F.3d at 1085) ). While BMW admits that state law variations alone may not be sufficient to preclude class certification, BMW points out Plaintiff's failure to provide a "trial blueprint to this Court to make the action manageable." *Id.* at 47-48; *see also Chin,* 182 F.R.D. at 458. In this regard, BMW criticizes Plaintiff for not submitting any sample jury instructions or jury verdict forms as was done in *Prudential* and other cases. In a surreply, Plaintiff attempts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 415390 (E.D.Pa.)
**(Cite as: 1999 WL 415390 (E.D.Pa.))**

to justify this failure with the explanation that because Plaintiff specifically adopted the plan approved by the Third Circuit Court of Appeals, and Judge Wolin, in *Prudential,* there apparently was no need to submit proposed jury instructions and verdict forms, "the realities of the situation [being] that this case will most likely never go to trial if Plaintiffs are successful in achieving national class certification." Plf.'s Surreply at 16. Plaintiff follows this remarkable explanation with a sketchy proposal for managing the plethora of managability problems.[FN9]

> FN9. It is well-settled that "a district court must first find a class satisfies the requirements of Rule 23, regardless [of] whether it certifies the class for trial or for settlement." *Prudential,* 148 F.3d at 308. While Plaintiff highlights this principle when discussing the Third Circuit's adoption of the plaintiffs' class certification plan in *Prudential,* see Plf.'s Surreply at 14, by neglecting to submit a feasible trial blueprint, Plaintiff has curiously dismissed the need to seriously treat this litigation as if it could proceed to trial and be manageable in class form.

**\*6** First, Plaintiff suggests having 51 subclasses, i.e., a subclass for each jurisdiction, with no plan as to how the jury could meaningfully be instructed on the laws of each jurisdiction with respect to plaintiff's multiple claims, each of which contains numerous elements, multiplied by thousands of class members. *Id.* Next, Plaintiff proposes only three subclasses for the Consumer Fraud Count, despite the numerous individual issues presented by the variations in state statutes. Similarly, Plaintiff disregards the state law variances that will need to be addressed to prove a breach of contract, having boldly stated that no subclasses are needed. As for negligent misrepresentation, BMW correctly charges that Plaintiff has apparently ignored her own Exhibit N, indicating that the elements needed to establish negligent misrepresentation will vary

among the 50 states, with some states not even recognizing such a claim. And Plaintiff's assertions that only three sub-classes will be necessary to cover all of the state law variations regarding Plaintiff's fraud and punitive damage claims is not supported by Exhibits M and O to Plaintiff's Brief.[FN10]

> FN10. The Supreme Court of the United States has recognized that "states necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *BMW v. Gore,* 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

Plaintiff's proposed jury interrogatories are likewise inadequate. The 11 questions drafted by Plaintiff merely scratch the surface of a mountain of difficult issues that a class action trial of this magnitude would present. As BMW puts it:

> Although plaintiff admits that even under her proposal there are numbers of subclasses required, she submits only one set of jury interrogatories. Thus, even under plaintiff's proposal, the 11 questions are insufficient. Plaintiff makes no attempt to set forth jury interrogatories for each of its proposed sub-classes nor does she attempt to delineate which jury interrogatories account for the variances admitted by plaintiff in the various causes of action.

Def.'s Supp. Mem. at 10. Thus, while Plaintiff has presented to this Court an analysis of the laws of each of the 50 states for each of their causes of action, Plaintiff fails to meet her burden of setting forth a workable plan for dealing with the problems a trial would present.[FN11]

> FN11. It is worth noting that "no federal court has attempted to try a case under the laws of every state." *Chin,* 182 F.R.D. at 461.

In a similar case, a Louisiana federal court, in con-

Not Reported in F.Supp.2d, 1999 WL 415390 (E.D.Pa.)
(Cite as: 1999 WL 415390 (E.D.Pa.))

sidering the superiority of the class action mechanism, analyzed the public policy justifications for the use of class actions. *Ford Bronco II*, 177 F.R.D. at 375. Having already noted extensive manageability problems in that case resulting from the need to determine and apply the law of 50 jurisdictions and in trying to isolate common issues from individualized issues, the court further determined:

> [T]he meager nature of individualized recovery is but one factor considered under the superiority analysis. Two other important factors that inform the analysis are the effect certification will have on the defendant (e.g., will it create undue pressure to settle?) and the effect certification will have on judicial resources (e.g., is the cause of action immature in the sense that there is no real track record of resolution of similar claims, and will it create manageability problems?).

*7 In connection with the judicial efficiency/manageability factor, the Fifth Circuit in *Castano* noted not only that the case presented an immature tort and would benefit from some individual state court litigation, but also that the difficulty of the choice of law issue alone may justify refusal to certify the class. The *Castano* court observed that the complexity of the choice of law inquiry "makes individual trials a more attractive alternative and, ipso facto, renders class treatment not superior."

*Id.* at 375-76 (adding emphasis). As already discussed above, similar manageability problems are present in the instant action.

## IV. *NUMEROSITY AND TYPICALITY*

BMW further objects to class certification based on numerosity and typicality requirements. At this point in time, Plaintiff has merely alleged that "upon information and belief, the proposed class consists of tens of thousands of Plaintiffs who have purchased the Subject Automobiles since their introduction into the marketplace on or around July 1,

1998." Plf.'s Mem. at 10. Plaintiff notes that "[t]he documents produced by BMW pursuant to Plaintiffs' discovery will confirm this allegation." *Id.* at n. 3. While Plaintiff is not required to fix a precise number, Plaintiff must show some evidence of the existence of the numbers of persons for whom she speaks. Mere speculation is insufficient. To the contrary, "[a] higher level of proof than mere common sense impression or extrapolation from cursory allegations is required." *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 681 (S.D.Cal.1999). Thus, Plaintiff's failure to present any evidence to back up her allegation that the proposed class is so "numerous" that joinder of all members is impracticable provides further grounds for Plaintiff's Motion for Class Certification to be denied.

In addition, "Rule 23(a) requires that the claims or defenses of the class representative be typical of the entire class." *Truckway*, 1992 WL 70575 at *3. The Third Circuit has described the typicality requirement as follows:

> The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees. The inquiry assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented.

*Georgine,* 83 F.3d at 631.

Here, BMW argues that Mr. and Mrs. Carpenter's joint purchase of their vehicle based on their own unique tastes, knowledge, experience and interaction with various dealership personnel make this case atypical. Def.'s Brief at 53. In its responsive brief, BMW also complains that Plaintiff's definition of the class is improper and overly broad because she also seeks to proceed on behalf of all purchasers of the 1999 BMW 528 ia model automobile, which is not presently equipped with a five-speed automatic transmission as alleged by

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 415390 (E.D.Pa.)
**(Cite as: 1999 WL 415390 (E.D.Pa.))**

Plaintiff. According to BMW, this overly expansive definition of the proposed class presents specific typicality problems in that purchasers of the 5 series vehicles based their purchase on separate advertisements and promotions.

**\*8** However, "[t]he Third Circuit has observed that 'typical' does not mean 'identical'." *Strain,* 1990 WL 209325 at \*4 (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1984)). Rather, "the court must focus on whether the plaintiffs' individual circumstances are markedly different or whether the legal theory upon which the claims are based differs from that upon which the claims of the other class members will be based." *Id.* Here, Plaintiff alleges she has been injured as a result of BMW's scheme to deceive consumers by selling, promoting, and marketing the Subject Automobiles as having automatic transmissions that were manufactured and designed by BMW, when they actually contained transmissions manufactured and designed by General Motors. Accordingly, Plaintiff's claims are representative of the other class members and, thus, satisfy "the relatively loose typicality threshold test as enunciated in *Falcon v. General Telephone,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), by the showing of a sufficient interrelationship between the claims of the representative and those of the class." *Id.* (citations omitted). Yet, satisfaction of the typicality requirement is not enough to justify granting the instant motion.[FN12]

> FN12. Rule 23's adequacy of representation requirement "tests the qualifications of the counsel to represent the class" and "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Prudential,* 148 F.3d at 312 (citations omitted). BMW does not dispute that counsel for Plaintiff is competent and experienced in complex class action litigation. Thus, this final factor does not stand in the way of class certification.

Because Plaintiff has not met her burden of establishing that the proposed class meets all of Rule 23

's requirements, Plaintiff's Motion for Class Certification will be denied. An appropriate Order follows.

### ORDER

AND NOW, this 21st day of June, 1999, upon consideration of Plaintiff's Motion for Class Certification and Defendant's Response thereto, it is hereby ORDERED that said motion is DENIED.

E.D.Pa.,1999.
Carpenter v. BMW of North America, Inc.
Not Reported in F.Supp.2d, 1999 WL 415390 (E.D.Pa.)

END OF DOCUMENT

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 2850020 (S.D.Ind.)
**(Cite as: 2006 WL 2850020 (S.D.Ind.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Indiana,
Indianapolis Division.
Patricia VEERKAMP and Patricia Tinsley, individually and on behalf of others similarly situated,
Plaintiffs,
v.
U.S. SECURITY ASSOCIATES, INC., Defendant.
**No. 1:04-cv-0049-DFH-TAB.**

Sept. 29, 2006.

Amy Ficklin Debrota, The Debrota Law Firm LLC, Indianapolis, IN, for Plaintiffs.

David P. Knox, George W. Singleton, Herbert E. Gerson, Timothy S. Bland, Ford & Harrison LLP, Memphis, TN, Trenten D. Klingerman, Stuart & Branigin LLP, Lafayette, IN, for Defendant.

ENTRY ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

DAVID F. HAMILTON, District Court Judge.

**\*1** In this collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.,* defendant U.S. Security Associates, Inc. ("USSA") has moved for summary judgment on the claims of some plaintiffs. Plaintiffs' central theory under the FLSA is that USSA required its security guard employees to be present at work for 15 or 20 minutes before the scheduled start of their shifts but did not pay them for that time at work before the scheduled start of the shifts. Plaintiffs have also filed a motion to certify a plaintiff class with multiple subclasses of employees in 27 states other than Indiana who assert only state law claims. As explained below,

USSA's motion for summary judgment is granted in part and denied in part. Plaintiffs' motion to certify a plaintiff class under Rule 23 is denied.

I. *USSA's Motion for Summary Judgment*

To win summary judgment, USSA must show that there is no genuine dispute as to any material fact. Fed.R.Civ.P. 56. Plaintiffs are entitled to the benefit of conflicts in the evidence and to the most favorable reasonable inferences that might be drawn from that evidence. Because the different issues are so distinct, the court states the relevant facts in the discussion of each issue.

A. *Consent Form Responses*

The plaintiffs who opted in to join this action under the collective action procedures of the FLSA, see 29 U.S.C. § 216(b), filled out consent forms and signed them under penalty of perjury. Each form contained several questions, including question number 2: "Did U.S. Security Associates, Inc. require you to report to work prior to the start of your shift?" The plaintiff was asked to circle yes or no. Question number 3 was: "If yes, indicate how early you had to report."

Twenty-seven plaintiffs answered no to question number 2. Three plaintiffs did not answer the question. USSA has moved for summary judgment as to those 30 plaintiffs. Plaintiffs have agreed that 19 of these plaintiffs do not have viable claims.[FN1]

> FN1. USSA is entitled to summary judgment as to Barbara Andrews, Charles Burns, Chris Byers, Barry Fitzgerald, Phyllis Gross, Barry Lee Harrington, Linda Johnson, Michael Johnson, William Lee, Richard Payne, Willie Robinson, John Royal, Renise Shobe, Gary Simpson, William Smith, Bonita Springfield, Chere Thompson, Zach DeLongchamp, and

Not Reported in F.Supp.2d, 2006 WL 2850020 (S.D.Ind.)
**(Cite as: 2006 WL 2850020 (S.D.Ind.))**

Daniel Richardson. See Docket No. 201 at 2-3. By separate motion filed on September 28, 2006, plaintiffs formally moved to dismiss the claims of most of these plaintiffs, and the court is granting that dismissal by separate order.

One of the remaining plaintiffs, Larry Gick, submitted an affidavit stating that he forgot to answer the question and that USSA in fact required him to report 15 minutes before the start of his shift. Pl.Ex. A. His affidavit does not contradict any prior sworn statement and is sufficient to raise a genuine issue of fact as to his claim.

Nine additional plaintiffs (Wesley Guffey, Lakescha Nielson, Elmer Smith, Olanda Russell, Larry Washington, Joe Moss, Judy Bowling, Rita Ware, and Jamie Taylor) answered no on the form. In response to the motion for summary judgment, they submitted affidavits asserting that USSA had in fact required them to report early and had not paid for that time. The affidavits stated that their consent form answers were wrong. Taylor's affidavit said she mistakenly circled no and had intended to circle yes. Guffey and Bowling said they did not understand the question on the form. The remaining six plaintiffs in this group said that they thought the question referred to coming in hours early to cover other shifts.

**\*2** USSA argues the affidavits should not create a genuine issue of fact. Noting that the consent forms were submitted under oath, USSA relies on the line of cases rejecting parties' efforts to create sham issues of material fact by submitting affidavits contradicting their sworn deposition answers. See, e.g., *Stinnett v. Iron Works Gym,* 301 F.3d 610, 614-15 (7th Cir.2002); *Russell v. Acme-Evans Co.,* 51 F.3d 64, 67-68 (7th Cir.1995). Plaintiffs rely on the line of cases allowing parties and other witnesses to correct or clarify answers, especially if they found the questions confusing. See, e.g., *Maldonado v. U.S. Bank & Mfrs. Bank,* 186 F.3d 759, 769 (7th Cir.1999) (affirming denial of plaintiff's motion to strike defense affidavit correcting errors from deposition after witness consulted relevant files; district court had discretion to treat explanation as legitimate reason for changing deposition testimony); *Bank of Illinois v. Allied Signal Safety Restraint Systems,* 75 F .3d 1162, 1169-70 (7th Cir.1996) (collecting examples on both sides of the problem). Also, of course, even a deponent is allowed to correct her answers upon reviewing the transcript. Fed.R.Civ.P. 30(e).

Witnesses and parties sometimes make mistakes. That is true of both plaintiffs and defendants. Not every contradiction between sworn statements is a case of perjury. The Seventh Circuit has explained:

The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended. To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact.

*Bank of Illinois v. Allied Signal Safety Restraint Systems,* 75 F.3d at 1170, quoting *Tippens v. Celotex Corp.,* 805 F.2d 949, 953 (11th Cir.1986).

Lawyers and judges also know that people sometimes say yes when they mean no, both in casual conversation and even in testimony. Most trials produce at least one or two surprising answers, followed by the question: "Are you sure?" And we know that some witnesses and parties honestly misunderstand questions from time to time, even if the questions seem clear to lawyers and judges upon reflection. In this case, plaintiffs' counsel checked

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2850020 (S.D.Ind.)
**(Cite as: 2006 WL 2850020 (S.D.Ind.))**

with the 30 plaintiffs who gave the "wrong" answers on their consent forms. Most stood by their answers; their claims must be dismissed. A few said they had made mistakes and that in fact USSA had required them to arrive early for work. Their correcting affidavits are corroborated by testimony from other employees at the same locations.

**\*3** For purposes of summary judgment, these plaintiffs have offered plausible explanations for their errors. The court cannot conclude that these nine affidavits are merely sham attempts to create an issue of fact. The circumstances here allow a reasonable inference that these nine plaintiffs made honest mistakes. The original answers and corrections present genuine issues of fact that cannot be resolved by the court on summary judgment. At trial, USSA will have an opportunity to offer the prior inconsistent statements to challenge the credibility of these plaintiffs.

The 30th plaintiff in this group is Donald Bellew, whose case is addressed separately below. USSA is entitled to summary judgment on the FLSA claims of the persons named in footnote 1, above.

### B. *FLSA Statute of Limitations*

The FLSA has a two year statute of limitations, except that the limit is extended to three years if the defendant's violation was "willful." 29 U.S.C. § 255(a). Defendant argues that the FLSA claims of 125 additional plaintiffs are barred by the statute of limitations-some by the two year limit and some even by the three year limit. Plaintiffs respond that (1) they can prove willful violations, saving 84 of the plaintiffs' claims, and (2) that an additional 37 plaintiffs should be entitled to equitable tolling. Plaintiffs concede that the FLSA claims of three plaintiffs-Joe Mathes, Penny Maxwell, and Oliver Smith-are barred by the three year limit and that equitable tolling does not apply, so that USSA is entitled to summary judgment on their FLSA claims.

### 1. *Willfulness*

The Supreme Court has interpreted the "willful" element in the FLSA statute of limitations to require a showing that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988). USSA argues that plaintiffs cannot show willfulness. USSA relies on several formal, company-wide policies stating that employees are not required to arrive any earlier than the scheduled starting times for their shifts. USSA also relies on affidavits from managers stating that they adhere to these policies. USSA acknowledges that at one work site in Lafayette, Indiana, a "General Order" was in effect for a time requiring employees to arrive before their shifts began. USSA contends that it inherited this policy from a predecessor and competitor and that it changed this policy as soon as its district manager learned of it.

Plaintiffs have come forward with conflicting evidence. They have submitted a number of affidavits from employees at many locations stating that their supervisors instructed them to arrive early. See Pl.Ex. G. For example, former supervisor Ryan Goss testified that it was company policy to require all security guards to report for work 15 minutes before their scheduled shifts began, but to allow them to "officially clock in" only five minutes before the shifts began. He added that guards violating the policy were subject to disciplinary action. Troy Warner worked as a guard and testified that he saw the policy in writing on the company bulletin board. Calvin Green testified that his supervisor told him he was required to show up 15 minutes early for work and was not paid for that time. Patricia Tinsley testified that her supervisor told her she had to show up 15 minutes early, that she was not paid for the time, and that she was not allowed to conduct personal business during that time. Amy Blunk testified that she was instructed to report 15 minutes early and "punch in" with a timecard that was not used to calculate her pay. Instead, pay was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2850020 (S.D.Ind.)
**(Cite as: 2006 WL 2850020 (S.D.Ind.))**

based on other time sheets recording assigned shift hours rather than actual work hours. Timothy Hulbert testified that his supervisors told him he was required to be at work 15 minutes early and was not paid for the time.

**\*4** Plaintiffs also argue that different inferences should be drawn from the USSA documents. First, the documents support an inference that USSA management knew that a policy of requiring guards to arrive early without paying for the time would violate the FLSA. Second, plaintiffs have come forward with some documents showing a written policy that an employee would be tardy if he arrived later than 20 minutes before the scheduled start of his shift. Pl. Exs. H & I. The policy states that the time would not be paid but that the employee would have a paid break during the shift to compensate. Yet plaintiffs have come forward with affidavits stating that they did not receive such breaks. Also, some of the policies indicate that guards would be paid only for their shift time and that the arriving guard and departing guard would need to record the same time for beginning and ending their respective work periods. Although that might seem reasonable at first glance, there would necessarily need to be some overlap in the shift changeovers. Under the FLSA, both employees are entitled to be paid for all their time at work, including the overlap between shifts.

More generally, plaintiffs have come forward with evidence that USSA actually practiced such a policy at so many locations, over so long a time, and under so many local supervisors that a jury could reasonably infer a broad company policy, notwithstanding the sworn denials of senior management. USSA points out that 19 plaintiffs testified (in their consent forms) that they were not required to report to work prior to the start of their shift, but hundreds have testified that they were subject to such a policy. This is not the stuff of summary judgment.

USSA contends that plaintiffs' evidence is not specific enough to create a genuine issue of material

fact, citing Judge Tinder's decision in *Harrison v. Superior Carpet Installers, Inc.,* 2002 WL 243657 (S.D.Ind. Jan. 4, 2002), granting summary judgment for an employer in an FLSA case. The issue in *Harrison* was whether the employer required employees to return to the employer's shop at the end of the work day. The case is similar to this one on the issue of the employer's policies. Plaintiff Harrison submitted his own affidavit and affidavits from other former employees asserting that the employer required them to report to the shop at the end of the day. The employer responded with affidavits from its president denying there was such a policy and affidavits from 26 current employees stating that there was no such policy and that they had occasionally gone straight home without stopping at the shop and had not been disciplined. Judge Tinder credited the defendant's evidence. He concluded that the plaintiff's evidence was too vague and conclusory to present a genuine issue of material fact: "The former employees do not state how they became aware of the alleged policy or requirement or how long it had been in place, and they do not identify who or what specific written policy required them to return to the shop at the end of the day. They do not give any examples of instances in which the failure to follow the alleged policy resulted in discipline or reprimand." *Id.* at 6. (In footnote 9, Judge Tinder noted that one former employee named a specific manager who had reprimanded him for failing to return to the shop at the end of the day, but this evidence was deemed irrelevant because there was no indication that the incident occurred within the two-year limitations period.)

**\*5** The court is not persuaded by USSA's reliance on *Harrison,* however, that plaintiffs in this case have failed to raise a genuine issue of fact as to whether there was a widespread policy or practice that violated the FLSA, one so widespread that a jury could reasonably find a willful violation. *Harrison* appears to present conflicting affidavits, and the decision is close to the line that marks the outer boundary for using the summary judgment procedure.[FN2] In any event, *Harrison* is distinguishable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2850020 (S.D.Ind.)
**(Cite as: 2006 WL 2850020 (S.D.Ind.))**

here based on the sheer volume of evidence from so many employees at so many different locations, including evidence from at least one former supervisor. The plaintiffs' affidavits in this case are also corroborated to some degree, at least on summary judgment, by internal USSA documents that are consistent with their testimony. The decision is also distinguishable to some extent because the plaintiff in *Harrison* was relying on evidence from witnesses who had not worked for the employer during any relevant time period. See 2002 WL 243657, at *6 & *8. Also, the basis for the employees' knowledge of the alleged policy here is evident. An employee can reasonably be expected to know what behavior is expected of him. The suggestion that a company's actual practices differ from the lawyer-approved written policies is not startling.

> FN2. The court in *Harrison* noted that its decision was not intended for precedential use. 2002 WL 243657, n. 1.

The record here therefore presents a classic credibility contest. USSA managers testify that they complied with the law. Employees testify that they did not. The court cannot resolve that issue on summary judgment. Because the evidence would allow a reasonable jury to find that USSA violated the FLSA willfully with a general practice, USSA is not entitled to summary judgment as to 84 plaintiffs who turned in their consent forms between two and three years after their employment had ended.

### 2. Equitable Tolling

Plaintiffs argue that 37 plaintiffs who filed their consent forms outside the three year statute of limitations should be allowed to pursue their claims based on the doctrine of equitable tolling. As a general rule, equitable tolling may allow a late claim where the defendant has misled the plaintiff about his cause of action, where the plaintiff has been prevented in some extraordinary way from asserting his rights, or where the plaintiff has timely asserted his rights in the wrong forum. *E.g., Hann v. Craw-*

*ford & Co.,* 2005 WL 2334676, at *5 (W.D.Pa. Aug. 9, 2005) (considering application of doctrine to FLSA claims); see also *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 451 (7th Cir.1990) (equitable tolling generally "permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence he is unable to obtain vital information bearing on the existence of his claim.").

There is no assertion here that USSA actively misled plaintiffs or concealed anything from them. To support their theory, plaintiffs offer evidence that USSA did not post the required notice of employees' FLSA rights. Department of Labor regulations require an employer to post and to keep posted a notice explaining the FLSA "in conspicuous places in every establishment where such employees are employed so as to permit them to observe readily a copy." 29 C .F.R. § 516.4. Plaintiffs have offered affidavits from several plaintiffs testifying that they did not see FLSA notices at the locations where they worked for USSA.

*6 It is not at all clear that a failure to comply with the regulation tolls the FLSA's statute of limitations. The regulation itself does not provide for that sanction. The court appeared to find such an effect in *Hann v. Crawford & Co.,* 2005 WL 2334676, at *5, citing *Nogar v. Henry F. Teichmann, Inc.,* 640 F.Supp. 365, 370 (W.D.Pa.1985) (tolling 300-day statute of limitations under Age Discrimination in Employment Act where it was undisputed that defendant did not post required notices and did not have other evidence that plaintiff was aware of his rights); accord, *English v. Pabst Brewing Co.,* 828 F.2d 1047, 1049-50 (4th Cir.1987) (stating that failure to post could toll statute of limitations under ADEA but affirming summary judgment where plaintiff's affidavit stated only that he was not aware of any notice and defendant showed that it had posted the notice). In *Hann,* however, the court ultimately rejected the equitable tolling theory, finding that the employer had satisfied the posting requirements by posting the notice at its main office and relying on other notices at multi-employer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2850020 (S.D.Ind.)
**(Cite as: 2006 WL 2850020 (S.D.Ind.))**

sites. 2005 WL 2334676, at *5-6.

In this case, USSA has offered evidence that FLSA posters were displayed at its Indianapolis headquarters where all applicants for jobs appeared in person and where all guards were required to report for orientation. Guards also received manuals that informed them at least generally about the FLSA. Some plaintiffs have testified that they did not see FLSA posters at their actual work locations, but they were outside contractors working at locations that USSA did not control. Also, the statement that an employee did not see such a notice does not mean there was no notice.

Plaintiffs have failed to come forward with evidence sufficient to support their equitable tolling theory. Their affidavits do not dispute defendant's assertion that FLSA notices were posted at USSA's own office in Indianapolis or that employees received written materials with information about the FLSA and overtime pay and related issues. See Pl.Ex. U. The affidavits do not even claim the plaintiffs were not aware of their rights under the FLSA. This court agrees with *Hann* that an employer who assigns employees to work at another employer's location need not duplicate FLSA and parallel notice requirements. (It seems unlikely at best that the many major employer sites where USSA guards worked all failed to comply with the basic and well-known FLSA posting requirements.[FN3]) The undisputed evidence also shows that USSA did not rely solely on the posting at its headquarters to inform employees of their rights under the FLSA. Finally, plaintiffs' affidavits (from only 12 of the 37) stated only that they did not see such a notice at the sites they were guarding, which is not sufficient to present a genuine issue of material fact on this point. *English,* 828 F.2d at 1050.

> FN3. The locations included the Indianapolis Star newspaper, Bank One, the Indianapolis Airport, Federal Express, the Subaru factory near Lafayette, Staples, GAF, a high school, and CVS Pharmacies. Pl.Ex. U.

On this record, a jury could not reasonably find that USSA actively misled the plaintiffs or concealed their rights from them. USSA is entitled to summary judgment on the FLSA claims of the 37 plaintiffs who have relied on equitable tolling to avoid the statute of limitations.[FN4]

> FN4. The 37 plaintiffs who lose on this ground are Doris Adkins, Mark Adkisson, Ella Bell, Harvey Brown, Troy Brown, John Bundy, Spencer Cistrunk, Richard Cosgrove, Dwayne Evans, Darlene Frazier, Jamin Goodner, Jennifer Graham, Kindell Graham, Jamie Gramelspacher, George Harrison, Terry Heistand, Donnette Hellums, Jennifer Isenhower, John Johnson, Deborah Jones, Amos Kosia, James Lawson, Wallace Magee, Rozelle Manning, David Matherly, Tara McGee, Rodrick McMurray, Nicole McVea, Charlotte Mickle, Nicholas O'Neill, Christine Ovellette, Terence Sanders, James Sickle, Michelle Sutton, Richard Tyson, James Wilson and Terry Yoder. See Docket No. 201 at 3-4.

*C. State Law Statute of Limitations*

**\*7** Plaintiffs also assert several claims under state law, including statutory claims for unpaid wages, conversion, breach of an implied contract, and unjust enrichment. Indiana provides a two year statute of limitations for an action "relating to the terms, conditions, and privileges of employment," except for actions based on a written contract. Ind.Code § 34-11-2-1. Plaintiffs agree that the two year statute applies to their claims for conversion and for unpaid wages. They contend that their claims for breach of an implied contract and for unjust enrichment would be governed by a six year statute. However, all of plaintiffs' claims "relat[e] to the terms, conditions, and privileges of employment" and are subject to the two-year statute. See *Miller v. International Harvester Co.,* 811 F.2d 1150, 1151-52 (7th Cir.1987) (applying two year statute

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2850020 (S.D.Ind.)
**(Cite as: 2006 WL 2850020 (S.D.Ind.))**

to claim that employee quit his job in reliance upon a promise to begin paying him a pension at age 55; Indiana's employment statute of limitations was not limited to claims asserting claims for breach of contract).

The state law claims were subject to the Rule 23 class action allegations in the original complaint filed in an Indiana state court on December 11, 2003. This court denied class certification on the state law claims on March 15, 2005. As a general rule, an applicable statute of limitations is tolled while a complaint seeking class certification is pending. *E.g., American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 554 (1974) ("the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action"); *Hemenway v. Peabody Coal Co.,* 159 F.3d 255, 265-66 (7th Cir.1998). That effect ends, however, when the court denies class certification. *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 354 (1983); *Culver v. City of Milwaukee,* 277 F.3d 908, 914 (7th Cir.2002). For the FLSA opt-in plaintiffs, it would be appropriate to treat the filing of each consent form as an assertion of any state law claims that plaintiff might have. The filing of the consent form was the time that each plaintiff is deemed to have joined this action as a plaintiff, and is comparable to that plaintiff's filing of his or her own complaint.

Accordingly, the two year statute of limitations for state law claims will need to be applied one plaintiff at a time. That application will need to be based on the following principles. First, all Indiana state law claims are subject to a two-year statute of limitations. Second, the statute was tolled from December 11, 2003 until March 15, 2005. The clock then started again on March 16, 2005 and stopped again when each FLSA plaintiff filed his or her consent form.

For now, defendant USSA's motion for summary judgment on the state law claims is granted in part, to the extent that the foregoing principles have been

determined as a matter of law. The motion is denied with respect to application of those principles to individual plaintiffs because the defendant argued the motion without taking into account the tolling the resulted from the original complaint.

### D. *Donald Bellew*

**\*8** Plaintiff Donald Bellew reported on his consent form that he had not been subjected to a policy of being required to report early and not being paid for that time, but that he had been required to work past the scheduled end of his shifts and had not been paid for that time. USSA argues that his claims should be dismissed without prejudice because he was not similarly situated to the other plaintiffs. Plaintiffs argue that Bellew's claims are similar enough to those of the other plaintiffs, involving the transfer of responsibility at the shift change, to handle his claims as part of the same case. Under defendant's analysis, Bellew would need to file a separate lawsuit to assert his claims. In the court's view, Bellew's claims are simply the opposite side of the same coin, namely FLSA claims arising from shift changes. There is no need to require Bellew to file a separate lawsuit in which much of the discovery and other work might need to be repeated. How best to handle Bellew's claims for trial is an issue the court will address at a later stage of the case.

### II. *Motion to Certify Plaintiff Class Under Rule 23*

Plaintiffs have also filed a motion to certify a plaintiff class action under Rule 23 of the Federal Rules of Civil Procedure for assertion of state law claims (Docket No. 226). The motion asks the court to revisit the issues addressed when the court denied Rule 23 class certification on March 15, 2005, but without prejudice to possible reconsideration. Plaintiffs seek certification of a plaintiff class consisting of current and former USSA employees in 27 states other than Indiana, asserting claims arising only under state law, but of 27 states.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2850020 (S.D.Ind.)
**(Cite as: 2006 WL 2850020 (S.D.Ind.))**

The motion must be denied because plaintiffs have not shown how the court could have subject matter jurisdiction over the purely state law claims. Plaintiffs have not shown a basis for diversity jurisdiction. (USSA removed the case based on federal question jurisdiction.) Supplemental jurisdiction under 28 U.S.C. § 1367(a) cannot be stretched so far as to treat the state law claims of employees in other states as being part of the same case or controversy as the FLSA claims of employees in Indiana.

Even if jurisdiction were available, the proposed class could not satisfy the requirements of Rule 23(b)(3) that common issues would predominate and that a class action would be a superior method for managing the controversy. Assuming for the sake of argument that a class action might be appropriate for state law claims by employees within one state, the proposal for a class action combining claims under 27 different states is a non-starter. The Seventh Circuit has repeatedly reversed certifications of multi-state class actions asserting claims arising under different states' laws. *E.g., In re Bridgestone/Firestone Litigation,* 288 F.3d 1012, 1015, 1020-21 (7th Cir.2002) (reversing class certification order; "No class action is proper unless all litigants are governed by the same legal rules."); *Isaacs v. Sprint Corp.,* 261 F.3d 679, 682 (7th Cir.2001) (reversing preliminary class certification order for nationwide class); *In re Rhone-Poulenc Rorer, Inc.,* 51 F.3d 1293, 1300-02 (7th Cir.1995) (granting writ of mandamus requiring decertification). Without repeating the discussions in those cases, they show that the proposed class could not be certified.[FN5]

> FN5. The plaintiffs' new motion to certify a class does not seek to include in the class any USSA employees who worked in Indiana and who did not opt-in to the FLSA collective action.

*Conclusion*

*9 For the foregoing reasons, defendant USSA's motion for partial summary judgment (Docket No. 151) is granted on the FLSA claims of the following plaintiffs: Barbara Andrews, Charles Burns, Chris Byers, Barry Fitzgerald, Phyllis Gross, Barry Lee Harrington, Linda Johnson, Michael Johnson, William Lee, Richard Payne, Willie Robinson, John Royal, Renise Shobe, Gary Simpson, William Smith, Bonita Springfield, Chere Thompson, Zach DeLongchamp, and Daniel Richardson; Joe Mathes, Penny Maxwell, and Oliver Smith; and Doris Adkins, Mark Adkisson, Ella Bell, Harvey Brown, Troy Brown, John Bundy, Spencer Cistrunk, Richard Cosgrove, Dwayne Evans, Darlene Frazier, Jamin Goodner, Jennifer Graham, Kindell Graham, Jamie Gramelspacher, George Harrison, Terry Heistand, Donnette Hellums, Jennifer Isenhower, John Johnson, Deborah Jones, Amos Kosia, James Lawson, Wallace Magee, Rozelle Manning, David Matherly, Tara McGee, Rodrick McMurray, Nicole McVea, Charlotte Mickle, Nicholas O'Neill, Christine Ovellette, Terence Sanders, James Sickle, Michelle Sutton, Richard Tyson, James Wilson and Terry Yoder. USSA's motion for summary judgment is also granted with respect to how the statute of limitations will be applied to the state law claims of the FLSA plaintiffs. In all other respects, USSA's motion for summary judgment is hereby denied. Finally, plaintiffs' motion for class certification (Docket No. 226) is also denied.

So ordered.

S.D.Ind.,2006.
Veerkamp v. U.S. Security Associates, Inc.
Not Reported in F.Supp.2d, 2006 WL 2850020 (S.D.Ind.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.