Case 9:09-cv-80535-JIC    Document 1    Entered on FLSD Docket 04/06/2009    Page 33 of 49

138.   Defendants not only manufactured, inspected, distributed, sold and/or installed a poorly designed and defective drywall, but also failed to give Plaintiff and the proposed class adequate warning regarding the risks associated with Defendants' product.

139.   Defendants' drywall was a substantial factor in the economic and physical losses that have been, and continue to be, incurred by the Plaintiff and proposed class.

140.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

141.   Economic losses include, but are not limited to, substantial reconstruction and repair of Plaintiff's and proposed Class Members' homes, damage to property other than the Plaintiff's and Class Members' homes, as well as any medical expenses incurred as a result of Defendants' drywall, which are in many instances considerable.

## COUNT IV

### BREACH OF EXPRESS WARRANTY
(Against all Defendants)

142.   Plaintiff incorporates and restates paragraphs 1-121 as if fully set forth herein.

143.   Defendants expressly warranted that the drywall they manufactured, distributed, and/or installed was safe, efficacious, well tested and of high quality.

144.   By manufacturing, distributing, selling and/or installing a defective, unsafe, and poorly manufactured drywall product, Defendants have breached their express warranty.

145.   Defendants knew or should have known that their warranties were specious.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

146. Plaintiff and the proposed Class and/or their representatives relied on these express warranties to their detriment.

147. As a direct result of this breach of expressed warranty, physical and economic damages have been, and continue to be, incurred by Plaintiff and the proposed Class.

## COUNT V

### BREACH OF IMPLIED WARRANTIES
(Against all Defendants)

148. Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

149. When Defendants manufactured, distributed, sold, and/or installed their drywall to Plaintiff and the proposed class, Defendants implicitly warranted that the product was safe, efficacious, well tested and of high quality. Plaintiff and members of the proposed class are beneficiaries of these warranties.

150. By manufacturing, distributing, selling, and/or installing a defective, unsafe, and poorly manufactured drywall product, Defendants have breached their implied warranties.

151. These implied warranties were relied on by Plaintiff and the proposed class and/or their representatives, because it is understood that Defendants have knowledge as to the quality, safety and efficacy of the drywall they manufacture, distribute, sell, and/or install.

152. As a direct result of this breach of implied warranty, physical and economic damages have been, and continue to be, incurred by Plaintiff and the proposed class.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, Fl 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

Case 9:09-cv-80535-JIC   Document 1   Entered on FLSD Docket 04/06/2009   Page 35 of 49

## COUNT VI

### FRAUDULENT CONCEALMENT
(Against all Defendants)

153.   Plaintiff incorporates and restates paragraphs 1-121 as if fully set forth herein.

154.   Defendants knew or should have known that Defendants' drywall was defective, unsafe and poorly manufactured.

155.   Defendants fraudulently concealed that Defendants' drywall was defective, unsafe and poorly manufactured.

156.   Defendants knew or should have known that their drywall would cause corrosion of, among other things, electrical wiring, air conditioner coils, plumbing and other personal property throughout the effected homes.

157.   Defendants fraudulently concealed that their drywall caused damage to, among other things, electrical wiring, air conditioner coils, plumbing and other personal property throughout the effected homes.

158.   Defendants fraudulently concealed that they had received and/or otherwise learned of complaints regarding their drywall product.

159.   Defendants' above-mentioned concealments of key facts regarding the Defendants' drywall resulted in physical and economic damages that have been, and continue to be, incurred by Plaintiff and the proposed class.

160.   As a result of the Defendants' fraudulent concealments regarding their drywall product, physical and economic damages have been, and continue to be, incurred by Plaintiffs and the proposed class.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

161.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects

## COUNT VII

### FRAUDULENT MISREPRESENTATION
(Against all Defendants)

162.   Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

163.   Defendants fraudulently alleged to the Plaintiff, the proposed class, and the public that the Defendants' drywall was safe, efficacious, well tested and of high quality.

164.   Defendants knew the above-mentioned representations made to Plaintiff, the proposed class, and the public were specious and fraudulent. These representations were made recklessly and with the intent of defrauding Plaintiff, the proposed Class and the public.

165.   Defendants' drywall was installed in Plaintiff's and proposed class members' homes in reliance of the veracity of the above-mentioned fraudulent representations.

166.   As a result of Defendants' fraudulent representations regarding their drywall product, physical and economic damages have been, and continue to be, incurred by Plaintiff and the proposed Class.

167.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550 Fax: 305-571-8558 • www.abbrclaw.com

Case 2:09-md-02047-EEF-MBN Document 4506-5 Filed 07/19/10 Page 5 of 50
Case 9:09-cv-80743-KMM Document 1-1 Entered on FLSD Docket 05/18/2009 Page 37 of 49

Case 9:09-cv-80535-JIC Document 1 Entered on FLSD Docket 04/06/2009 Page 37 of 49

experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

## COUNT VIII

### NEGLIGENT MISREPRESENTATION
(Against All Defendants)

168. Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

169. As discussed herein, Defendants fundamentally misrepresented material facts regarding the characteristics of the drywall and omitted other material facts that should have been disclosed to Plaintiff and the Class.

170. In disseminating information regarding the drywall Defendants negligently caused statements to be made, which they knew or should have known were inaccurate and untrue.

171. As a direct consequence of the Defendants' negligent misrepresentations and omissions of material facts regarding the defective drywall, Plaintiff and the class will be irreparably harmed and otherwise damaged in an amount which cannot presently be calculated.

172. As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550 Fax: 305-571-8558 • www.abbrclaw.com

## COUNT IX

### UNJUST ENRICHMENT
(Against all Defendants)

173.   Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

174.   Each Defendant individually and collectively profited from the sale of the defective drywall to Plaintiff and the Class, receiving payment themselves or through an agent.   Defendants received payment for the defective drywall and have retained those sums to the detriment of Plaintiff and the Class.

175.   Defendants' receipt and retention of the profits gained by sale of the defective drywall to Plaintiff and the proposed Class is unjust and inequitable.

176.   As a direct and proximate result of Defendants conduct complained of herein Plaintiff and the Class have sustained substantial damages, including, but not limited to: the removal and replacement of the defective drywall and/or the homes, replacement of any and mechanical and structural systems damaged in the homes, replacement of personal and other property damaged, costs of moving to alternative housing while repairs are made, costs of comparable alternative housing, loss of use and enjoyment of their homes and compensation for the reduced value of the homes as the result of perception of the homes as tainted by the defective drywall.

177.   Defendants knew or should have known of the damages their defective drywall would cause as described herein.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550 Fax: 305-571-8558 • www.abbrclaw.com

Case 2:09-md-02047-EEF-MBN   Document 4506-5   Filed 07/19/10   Page 7 of 50
Case 9:09-cv-80743-KMM   Document 1-1   Entered on FLSD Docket 05/18/2009   Page 39 of 49

Case 9:09-cv-80535-JIC    Document 1    Entered on FLSD Docket 04/06/2009    Page 39 of 49

## COUNT X

### BREACH OF CONTRACT
(Against Northstar Homes)

178.   Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

179.   Plaintiff and the Class offered and the Northstar Defendants accepted sums of money in exchange for an agreement to build homes.

180.   Upon information and belief each agreement entered into by Plaintiff and the Class for construction of their homes warranted that the homes would be free from defects.

181.   The presence of the defective drywall, which "off-gases" sulfur is a violation of Plaintiff's agreement, and upon information and belief, the contracts of each and every member of the Class.

182.   As a direct consequence of the breaches of contract described above, Plaintiff and the Class have sustained substantial damages, including, but not limited to: the removal and replacement of the defective drywall and/or the homes, replacement of any and mechanical and structural systems damaged in the homes, replacement of personal and other property damaged, costs of moving to alternative housing while repairs are made, costs of comparable alternative housing, loss of use and enjoyment of their homes and compensation for the reduced value of the homes as the result of perception of the homes as tainted by the defective drywall.

ALTERS | BOLDT | BROWN | RASH | CULMO
39

Miami Design District. 4141 Northeast 2nd Avenue · Suite 201 · Miami, Fl 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

Case 9:09-cv-80535-JIC Document 1 Entered on FLSD Docket 04/06/2009 Page 40 of 49

## COUNT XI

### PRIVATE NUISANCE
(Against all Defendants)

183. Plaintiff adopts and restates the preceding paragraphs 1-114 as if fully set forth herein.

184. The acts and/or omissions of Defendants have caused injury to Plaintiff and the Class by, among other things, depriving Plaintiff and the Class of the quiet enjoyment of their property.

185. Defendants' acts and/or omissions are wrongful and/or tortious, jeopardizing the health, wellbeing and safety of Plaintiff and the Class. Defendants knew their acts and/or omissions were wrongful or they should have known and the harm to Plaintiff and Class is ongoing.

186. As a direct consequence of Defendants' private nuisance Plaintiff and the Class have suffered, and continue to suffer, substantial damages to their property and to themselves as described herein.

187. As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

## COUNT XII

### EQUITABLE RELIEF, INJUNCTIVE RELIEF AND MEDICAL MONITORING
(Against All Defendants)

188. Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

Case 2:09-md-02047-EEF-MBN   Document 4506-5   Filed 07/19/10   Page 9 of 50
Case 9:09-cv-80743-KMM   Document 1-1   Entered on FLSD Docket 05/18/2009   Page 41 of 49

Case 9:09-cv-80535-JIC    Document 1    Entered on FLSD Docket 04/06/2009    Page 41 of 49

189.   Because no adequate remedy exists for the conduct of Defendants, equitable and injunctive relief is appropriate.

190.   Plaintiff and the Class will suffer irreparable injury if the Court does not order injunctive relief and medical monitoring.

191.   Plaintiff on behalf of herself and the Class demands that Defendants: (A) recall, repurchase and/or repair Plaintiff's and the Class Members' homes; (B) initiate and pay for a medical monitoring program under Florida law; (C) identify, at their own expense, each and every home with the defective drywall, if necessary, testing every home in which the defective drywall may potentially be found.

192.   Medical monitoring is a necessary component of the relief the Court should order because some of the sulfur compounds being emitted from the defective drywall are very hazardous.  For example, Hydrogen Sulfide ("H2S"), one of the compounds found in the drywall is a broad-spectrum poison – meaning it can attack more than one system of the body simultaneously.   H2S most commonly affects the central nervous system. Through a complex reaction the H2S prevents oxygen from reaching cells in the body, essentially preventing them from "breathing."

193.   As a direct consequence of the wrongful and/or tortious acts and/or omissions of Defendants' conduct, Plaintiff and the Class (among them, small children and senior citizens) have been exposed to H2S in quantities sufficient to harm them.

194.   Until it has been conclusively established that all defective drywall has been removed and that air quality is safe Defendants should bear the expense of air and environmental monitoring in each and every home with defective drywall.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305·571·8550 Fax: 305·571·8558 · www.abbrclaw.com

Case 9:09-cv-80535-JIC     Document 1     Entered on FLSD Docket 04/06/2009     Page 42 of 49

## COUNT XIII

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
(All Defendants)

195.  Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

196.  This is an action for relief under section 501.201, et. seq., Florida Statutes (The Florida Deceptive and Unfair Trade Practices Act).

197.  Section 501.203(7), Florida Statutes defines "Consumer" as "an individual; child, by and through its parent or legal guardian; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; or any other group or combination." Plaintiff and Class Members are "Consumers" within the meaning of §501.203(7), Florida Statutes.

198.  Section 501.203(8), Florida Statutes defines "Trade or Commerce" as:

[T]he advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or Commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

199.  The advertising, soliciting, providing, offering, or distributing of drywall by Defendants to Plaintiff and Class Members is "Trade or Commerce" within the meaning of section 501.203(8), Florida Statutes.

200.  Section 501.204(1) provides that: "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The Defendants acts and omissions as well as their failure to use reasonable care in this matter as alleged in this Complaint

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

Case 9:09-cv-80535-JIC   Document 1   Entered on FLSD Docket 04/06/2009   Page 43 of 49

equals unconscionable acts or practices, as well as deceptive and unfair acts or practices in the conduct of Defendants' trade or commerce pursuant to section 501.204, Florida Statutes.

201.   The unconscionable, illegal, unfair and deceptive acts and practices of Defendants violate the provisions of Florida's Deceptive and Unfair Trade Practices Act. Plaintiff and Class Members have suffered actual damage for which they are entitled to relief pursuant to section 501.211(2), Florida Statutes.

202.   Plaintiff and Class Members are entitled to recover their reasonable attorneys' fees pursuant to section 501.2105, Florida Statutes upon prevailing in this matter.

203.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

204.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

Case 2:09-md-02047-EEF-MBN Document 4506-5 Filed 07/19/10 Page 12 of 50
Case 9:09-cv-80743-KMM Document 1-1 Entered on FLSD Docket 05/18/2009 Page 44 of 49

Case 9:09-cv-80535-JIC Document 1 Entered on FLSD Docket 04/06/2009 Page 44 of 49

of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

## COUNT XIV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(All Defendants)

205. Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

206. Defendants were in privity with Plaintiff and Class Members.

207. At the times Defendants installed, utilized, supplied, inspected, and/or sold drywall for use in the Plaintiff's and Class Members' homes. Defendants knew, or it was reasonably foreseeable, that the drywall would be installed in the Plaintiff's and Class Members' homes for use as a building material, and impliedly warranted the product to be fit for that use.

208. Defendants' drywall product was placed into the stream of commerce by Defendants in a defective condition and the defective drywall was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which they were sold.

209. The drywall was defective because it was not fit for the uses intended or reasonably foreseeable by Defendants; to wit, the installation of the drywall in Plaintiff's and Class Members' homes for use as a building material, because it contained defects as set forth herein.

210. The Defendants breached the implied warranty of merchantability because the drywall was not fit to be installed in Plaintiff's and Class Members' homes as a building material due to the defects set forth herein.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

Case 2:09-md-02047-EEF-MBN   Document 4506-5   Filed 07/19/10   Page 13 of 50
Case 9:09-cv-80743-KMM   Document 1-1   Entered on FLSD Docket 05/18/2009   Page 45 of 49

Case 9:09-cv-80535-JIC     Document 1     Entered on FLSD Docket 04/06/2009     Page 45 of 49

211.   Defendants had reasonable and adequate notice of the Plaintiff's and the Class Members' claims for breach of implied warranty of merchantability and failed to cure.

212.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

213.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

214.   Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

ALTERS | BOLDT | BROWN | RASH | CULMO
45

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

## COUNT XV

### BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
(All Defendants)

215.   Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

216.   Defendants were in privity with Plaintiff and Class Members.

217.   Defendants' drywall product was placed into the stream of commerce by Defendants in a defective condition and was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it were sold.

218.   The drywall was defective because it was not fit for the specific purpose of installing in the Plaintiff's and Class Members' homes as a building material, for which Plaintiffs and Class Members bought the product in reliance on the judgment of Defendants.

219.   The Defendants breached the implied warranty of fitness for a particular purpose because the drywall was not fit to be installed in Plaintiff's and Class Members' homes as a building material due to the defects set forth herein.

220.   Defendants had reasonable and adequate notice of the Plaintiff's and the Class Members' claims for breach of implied warranty of merchantability and failed to cure.

221.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

Case 2:09-md-02047-EEF-MBN   Document 4506-5   Filed 07/19/10   Page 15 of 50
Case 9:09-cv-80743-KMM   Document 1-1   Entered on FLSD Docket 05/18/2009   Page 47 of 49

Case 9:09-cv-80535-JIC      Document 1     Entered on FLSD Docket 04/06/2009      Page 47 of 49

drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

222.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

223.    Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

## DEMAND FOR TRIAL BY JURY

Plaintiff, individually and on behalf of the Class Members, hereby demands a trial by jury as to all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and on behalf of a class of others similarly situated, requests that this Honorable Court grant the following relief:

a.   An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate class, finding that Plaintiff is a proper representative of the class and that her counsel is appropriate class counsel;

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

Case 9:09-cv-80535-JIC   Document 1   Entered on FLSD Docket 04/06/2009   Page 48 of 49

 

b.  An order requiring that Defendants pay compensation to Plaintiff and the class
members to the full extent permitted by the law;

c.  An order requiring medical monitoring;

d.  Costs and expenses in this litigation, including, but not limited to, expert fees,
filing fees, and reasonable attorneys' fees; and

e.  Such other relief as the Court may deem just and appropriate.

Dated: April 3, 2009                          Respectfully submitted,

_____
Jeremy W. Alters (Fla. Bar No. 111790)
Kimberly L. Boldt (Fla. Bar No. 957399)
Beth Tyler Vogelsang (Fla. Bar No. 509401)
Alters Boldt Brown Rash Culmo
4141 NE 2nd Avenue
Suite 201
Miami, FL 33137
(305) 571-8550 phone
(305) 571-8558 fax
jeremy@abbrclaw.com
kimberly@abbrclaw.com
beth@abbrclaw.com

Ian L. Kleinman (Fla. Bar No. 307490)
Law Offices of Wolf and Pravato
2101 W. Commercial Blvd.
Suite 1500
Fort Lauderdale, FL 33309
(954) 522-5800 phone
(954) 767-0960 fax
ian@wolfandpravato.com

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

Case 9:09-cv-80535-JIC      Document 1      Entered on FLSD Docket 04/06/2009      Page 49 of 49

**CIVIL COVER SHEET**

JS 44 (Rev. 2/08)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

**I. (a) PLAINTIFFS**

KATHERINE L. FOSTER, on behalf of herself individually and all others similarly situated

(b) County of Residence of First Listed Plaintiff   Palm Beach County
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) Attorney's (Firm Name, Address, and Telephone Number)

Ahers, Boldt, Brown, Rash & Culmo, P.A.
4141 NE 2nd Avenue, Suite 201
Miami, FL 33137        (305) 571-8550

09-80535 — Cohn / Seltzer

(d) Check County Where Action Arose: ☐ MIAMI-DADE ☐ MONROE ☐ BROWARD ☑ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

**DEFENDANTS**

NORTHSTAR HOLDINGS, INC., a Florida corporation;
NORTHSTAR HOMES, INC., a Florida corporation, et al.

County of Residence of First Listed Defendant   Palm Beach County
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Attorneys (If Known)

FILED by ATS D.C.

APR - 3 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. — MIAMI

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☑4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

[form checkbox categories: CONTRACT, TORTS, FORFEITURE/PENALTY, BANKRUPTCY, OTHER STATUTES — none marked as clearly selected]

**V. ORIGIN** (Place an "X" in One Box Only)

☑ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Re-filed (see VI below) ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).** (See instructions second page):
a) Re-filed Case ☐ YES ☑ NO     b) Related Cases ☐ YES ☑ NO
JUDGE                            DOCKET NUMBER

**VII. CAUSE OF ACTION** Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):
28 USC Section 1332. Products liability action seeking recovery on a class basis for defective drywall. One (1) Plaintiff is diverse from one Defendant.
LENGTH OF TRIAL via 10 days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:** ☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ 5,000,000.00   CHECK YES only if demanded in complaint: JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
SIGNATURE OF ATTORNEY OF RECORD
DATE April 3, 2009

FOR OFFICE USE ONLY
AMOUNT $ 350       RECEIPT # 998575
04/03/09



## COBBLESTONE
·C R E E K·

*BOYNTON BEACH, FL 33437*
**SUBCONTRACT AGREEMENT**

THIS CONTRACT, made this 2nd day of May, 2005 by and among NORTHSTAR HOLDINGS AT B & A, LLC (hereinafter "Owner"), whose address is 14406 Military Trail, Delray Beach, FL 33484, and Precision Drywall, Inc., (hereinafter "Subcontractor"), whose address is 3300 South Congress Avenue, Suite #18, Boynton Beach, Fl, 33426 and NORTHSTAR HOLDINGS AT B & A, LLC (hereinafter "Contractor"), whose address is 14406 Military Trail, Delray Beach, FL 33484.

### WITNESSETH:

WHEREAS, Owner (hereinafter "Owner" means the Owner or the Owner's authorized representative) is developing COBBLESTONE CREEK, BOYNTON BEACH, PALM BEACH COUNTY, FL. 33437 (hereinafter the "Project") according to the Contract Documents listed in Addendum "#1" attached hereto (hereinafter the "Contract Documents") which are available for Subcontractor's review at the office of the Contractor (hereafter defined); and

WHEREAS, Owner desires to contract certain work (hereinafter the "Work") specified in the Contract Documents, and Subcontractor desires to perform said Work at the prices and upon the terms and conditions hereinafter expressed. The term "Work" means the construction services required by the Contract Documents, whether completed or partially completed, and includes all labor, materials, equipment and services provided, or to be provided, by the Subcontractor to fulfill the Subcontractor's obligations. The Work may constitute the whole or a part of the Project.

WHEREAS, the Owner has engaged the Contractor, as the Contractor for the Project.

NOW THEREFORE, in consideration of the mutual agreements herein expressed, the parties do contract as follows:

### 1.  Subcontractor's Work

The Subcontractor shall execute the entire Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

### 2.  Complete Agreement

This Contract contains the entire agreement between the parties hereto with respect to the matters covered herein. No other agreements, representations, warranties or other matters, oral or written, shall be deemed to bind the parties hereto.

### 3.  Payment

a     Owner shall pay Subcontractor for performance of the Work, subject to additions and deductions by change order or other Contract provisions, in accordance with Addendum #1 and Vendor Base Plan Cost & Vendor Option Costs which is attached hereto and incorporated herein by reference as if set out in full when all of the following events have occurred: (i) Subcontractor is entitled to a payment at the time and under the terms specified herein and has furnished the Contractor with a written request for payment; and (ii) Subcontractor has furnished the Contractor with all affidavits or waivers required for Owner to make proper payments under Section 713.06, Florida Statutes. If the payment request from Subcontractor to Owner is incomplete or contains an error, the Contractor will be entitled to fourteen (14) days within which to return the request for payment to the Subcontractor for completion or correction. Owner agrees to make all payments to Subcontractor in accordance with Florida Law and as provided for herein. Applications for payment hereunder shall be submitted by the Subcontractor to the Contractor in such form and supported by such data to substantiate its accuracy as the Contractor may require. If the Owner is financing all or a portion of the Work with a loan from a financial institution, the Subcontractor shall comply with the reasonable requirements of such financial institution in connection with the making of advances of such construction loan

b.     Subcontractor shall insure that all subcontractors, employees and suppliers, at all times, are paid all amounts due in connection with the performance of this Contract. After the first payment hereunder, Owner shall have the right to withhold any

**EXHIBIT
B**

Initial Here

subsequent payments until Subcontractor submits evidence satisfactory to Owner that all amounts owed in connection with performance of this Contract have been paid. Further, Subcontractor agrees that Owner may pay all persons who have not been paid the monies due them in connection with this Contract whether or not a lien has been filed, and Subcontractor shall, to the extent that Owner has not covered said amounts while withholding payments to Subcontractor, pay said amounts to Owner upon demand. In the event Owner is required to pay or indemnify any person hereunder, Subcontractor shall reimburse Owner for the full cost thereof.

           c.     All material and work covered by partial payments shall become the property of Owner; however, this provision shall not relieve Subcontractor from the sole responsibility and liability for all work and materials upon which payments have been made until final acceptance thereof by Owner.

           d.     Owner may withhold amounts otherwise due under this Contract or any other contractual arrangement between the parties to cover Owner's reasonable estimate of any costs or liability Owner has incurred or may incur for which Subcontractor may be responsible hereunder. Appropriate adjustments to withholdings shall be made when the exact amounts owed hereunder are determined.

           e.     Final payment, subject to withholdings permitted hereunder, shall be made after Subcontractor's work has been completed and approved by Contractor and satisfactory proof of payment of all amounts owed by Subcontractor in connection with the Contract has been provided. Owner will not tender payment until such time as all releases have been provided by Subcontractor and the time allotted by statute for the filing of construction liens against the property has expired, unless, pursuant to applicable law, Owner is required to tender final payment prior to the dates specified herein.

    **4.**    **Subcontractor's Investigations and Representations**

           Subcontractor represents that it is fully qualified to perform this Contract, and acknowledges that, prior to the execution of this Contract, it has (a) by its own independent investigation ascertained (i) the Work required by this Contract, (ii) the conditions involved in performing the Work, and (iii) the obligations of this Contract and the Contract Documents; and (b) verified all information furnished by the Contractor or others satisfying itself as to the correctness and accuracy of that information. Any failure by Subcontractor to independently investigate and become fully informed will not relieve Subcontractor from its responsibilities hereunder. Subcontractor shall maintain all required state and local license required to perform the scope of work under this Contract and will supply the Contractor with copies of all valid licenses prior to beginning work.

    **5.**    **Performance and Payment Bonds**

           a.     Immediately upon receipt of this Contract, Subcontractor shall at the expense of _____ furnish to Owner performance and payment bonds in the form attached hereto as **Exhibit C** (if any) from a surety acceptable to Owner, in the full amount of this Contract.

 **No bond required.** Article 5.a. not applicable when box is checked and no bond indicated above.

           b.     If Subcontractor has not been required to furnish bonds or if Owner desires Subcontractor to provide additional bond coverage, Owner may, at any time upon written request, instruct Subcontractor to provide within ten (10) days, performance and payment bonds in a form and from a surety acceptable to Owner, in an amount up to the then current full value of this Contract. In this event, Owner will reimburse Subcontractor the amount of the additional bond cost.

           c.     The payment of any incremental increase in the cost of bonds arising as a result of changes in the Work shall be the responsibility of Subcontractor and may be included as a part of Subcontractor's price quotation for proposed changes pursuant to Article 9.

    **6.**    **Subcontractor's Liability**

           a.     Subcontractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent, and whether or not incorporated or to be incorporated in the Work. In addition, Subcontractor hereby assumes the entire responsibility and liability for all Work, supervision, labor and materials provided hereunder, whether or not erected in place and for all plant, scaffolding, tools, equipment, supplies and other items and/or materials provided by Subcontractor until final acceptance of the work by Owner. In the event of any loss, damage or destruction therefor resulting from willful misconduct or negligence of the Subcontractor or its agents, employees, subcontractors, or sub-subcontractors, the Subcontractor shall be liable therefor, and shall repair, rebuild and make good said loss, damage or destruction at Subcontractor's cost.

Initial Here 

b.    Subcontractor shall be liable to Owner for all costs Owner incurs as a result of Subcontractor's failure to perform this Contract in accordance with its terms. Subcontractor's failure to perform shall include the failure of its suppliers and/or subcontractors of any tier to perform. Subcontractor's liability shall include, but not be limited to (1) damages and other delay costs payable by Owner to others; (2) Owner's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor-caused delays or improper Subcontractor work; (3) warranty and rework costs; (4) liability to third parties; (5) excess costs; and (6) attorney's fees and related costs.

c.    If, as a result in whole or in part of negligence (or other act for which there is legal liability) of Subcontractor, its agents, employees, or sub-subcontractors, any person (including employees of Subcontractor) suffers injury or death or any property is damaged, lost or destroyed, Subcontractor assumes the liability therefor, shall (at Owner's option) defend any action, and shall pay all costs including attorney's fees through appellate proceedings and satisfy any judgments entered against Owner, and agrees to hold Owner, the Contractor, and their agents, employees and sureties harmless therefor. The Subcontractor's obligations under this Article 6.c. shall be in addition to any indemnity liability imposed by the Contract Documents.

d.    In the event that Subcontractor or Subcontractor's sub-subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items belonging to or under the control of Owner, or the Contractor, Subcontractor shall be liable to Owner and the Contractor for any loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be due solely to the gross negligence of the Owner's employees operating equipment owned or leased by the Owner or Contractor.

e.    Subcontractor's assumption of liability is independent from, and not limited in any manner by, the Subcontractor's insurance coverage obtained pursuant to Article 7, or otherwise. All amounts owed by Subcontractor to Owner or the Contractor as a result of the liability provisions of this Contract shall be paid upon demand.

f.    Subcontractor's liability for Owner's and Contractor's costs under this Article 6. and under Articles 3.d , 10 and 14 shall include a 10% administrative charge. This charge is not a penalty against Subcontractor, but is established as an agreed upon compensation for Owner's administrative and actual costs.

g.    Subcontractor acknowledges and agrees that the initial Five Hundred Dollars ($500.00) of the monies due from Owner hereunder, and other good and valuable consideration, represents the specific, stated consideration paid by Owner for all indemnifications from Subcontractor to Owner hereunder.

7.    **Preparation**

Immediately following execution and delivery of this Contract, Subcontractor shall prepare to perform the Work, including all of the following, which must be completed within ten (10) days following from the date hereof or prior to the commencement of the Work, whichever is sooner.

a.    Insurance. Subcontractor, at its cost, through the term of this Contract, shall obtain and maintain in force and effect the following insurance with respect to Subcontractor's operations under this Contract and the Certificate of Insurance MUST state "Thirty (30) days Notice of Cancellation must be sent to the Certificate Holder and any Additional Insured named".

(1)    Worker's Compensation: Worker's compensation insurance covering all employees of Subcontractor in the amount of Subcontractor's full statutory liability. NOTE: Northstar will no longer accept either a Workmen's Compensation Certificate with leased employees or a PEO.

(2)    Employer's Liability: Employer's liability insurance with a limitation of liability of at least $500,000 per accident or disease.

(3)    Public Liability Insurance: Comprehensive Public Liability Insurance with coverage limitations of not less than $1,000,000 combined single limit.

(4)    Owner's premises and operations;

(5)    Independent Subcontractor's protection for Owner's legal liability in connection with any operations by any Subcontractor; and

(6)    Contractual: This coverage must protect Owner and the Contractor from claims of all persons for death, personal injury or property damage occurring on or about, or arising out of, those areas of the Project occupied by Subcontractor or

Initial Here (B)

under Subcontractor's control, or wherever arising if caused in whole or in part by any act or omission of, any condition created by, or any defect in workmanship or material furnished by Subcontractor, Subcontractor's subcontractors or suppliers, or by any agent or employee of Subcontractor or of any such subcontractor or supplier, or any combination of the aforementioned. The aforementioned coverage must apply regardless of whether the claim arises during the progress of the Work or at any time subsequent to completion of the Work, and shall include a completed "broad form property damage endorsement."

(7)    Automobile Liability: Automobile liability insurance for personal injury or death with coverage limits of not less than $1,000,000 combined single limit.

b.    Subcontractor will supply the Contractor with Certificate(s) of Insurance evidencing the required coverage at least ten (10) days prior to Subcontractor's commencing the Work. No certificate will be acceptable unless it provides that any change or termination within the policy periods will not be effective unless and until Owner has received thirty (30) days prior written notice. Any deductible under any Insurance policy shall be payable by Subcontractor or shall be deducted from Subcontractor's account. If Subcontractor's insurance certificate is not current, Owner will withhold payment until such insurance certificate is updated, submitted to and approved by the Contractor.

c.    If Subcontractor fails to obtain or maintain any required insurance, Owner shall have the option, but not the duty, to obtain or maintain such insurance for the account of Subcontractor, and all costs incurred by Owner shall be reimbursed by Subcontractor upon demand.

d.    All insurance must name Owner, the Contractor and Subcontractor as co-insureds as their respective interests may appear, must be written by companies authorized to do business in the State of Florida that are acceptable to Owner and must not contain any right of subrogation against Owner or Contractor. Thus, the following statement MUST be included on all insurance liability certificate(s): A waiver of Subrogation is provided in favor of the certificate holder.

e.    Site Requirements. Subcontractor shall furnish a detailed written statement specifying the particulars, if any, in which Project is not in proper condition to receive the Work. Failure to furnish such statement shall constitute a waiver of all claims by Subcontractor against Owner including, but not limited to, those claims arising out of the negligence of Owner or Contractor with respect to improper site conditions.

f.    Violations. Subcontractor has reviewed the plans and contract documents, including but not limited to, the scope of work and construction drawings, and has determined that all work can be performed and complied with under the existing building code. Subcontractor shall notify Contractor in writing of any violation of any legal requirement contained in the Contract Documents. Unless Subcontractor notifies Contractor in writing of any such violation before beginning the Work, Subcontractor will not be entitled to a price adjustment or extension for any such violation and Subcontractor in such event must complete the Work in compliance with all legal requirements at Subcontractor's cost, notwithstanding anything contrary in the Contract Documents, the certification of the Contract Documents by Owner or the Architect, or all of them, the fact that corrective work is required, or any combination of the foregoing.

g.    Information. Subcontractor shall deliver to Owner a detailed request for such additional information for the proper coordination, scheduling, and planning of Subcontractor's Work as Subcontractor may require. No extension of time will be allowed Subcontractor for lack of information unless such request has been made in writing to Owner and Owner has failed to furnish the information requested within a reasonable period of time.

h    Subcontractor acknowledges that the Work required by this Contract must be coordinated by the Contractor with work and materials to be performed and furnished by other Subcontractors and Subcontractor, and prior to commencing the Work the Subcontractor will familiarize itself with the method of construction and work sequence that the Contractor intends to use.

i.    Subcontractor shall, at all times, furnish Owner and Contractor with such information as either Owner or Contractor requires for the proper scheduling, coordination and performance of the Work and will follow Contractor's instructions in planning Subcontractor's Work and coordinating it with that to be performed by other Subcontractors.

j.    Subcontractor shall not delay or otherwise interfere with Owner, Contractor, or any other Subcontractors.

8.    **Time of Performance**

a.    Subcontractor will proceed with the Work in a prompt and diligent manner, in accordance with Contractor's schedule, as reasonably amended from time to time. **TIME IS OF THE ESSENCE.**

Initial Here 

b.     If requested by Owner or Contractor, Subcontractor shall submit a detailed schedule for performance of the Contract, in a form acceptable to Owner, which shall comply with all scheduling requirements of the Contract Documents and of paragraph a. above. Owner may, at its sole discretion, direct Subcontractor to make reasonable modifications and revisions in said schedule.

c.     Subcontractor will coordinate its work with the work of Owner, and Owner's other Subcontractor's, if any, so no delays or interference will occur in the completion of any part or the entire Project.

9.     **Changes**

a.     Owner may, at any time, unilaterally or by agreement with Subcontractor, without notice to the sureties, make changes in the Work. Any unilateral order or agreement under this Article 9(a) shall be in writing. Subcontractor shall perform the work as changed without delay.

b.     Subcontractor shall submit any claims for adjustments in the price, schedule or other provisions of the Contract claimed by Subcontractor for changes directed by Owner or as a result of deficiencies or discrepancies in the Contract Documents, to the Contractor. Said claims shall be submitted in writing by Subcontractor in time to allow Owner to comply with the applicable provisions of the Contract Documents. The Contractor shall process said claims in the manner provided by and according to the provisions of the Contract Documents. Owner shall process said claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interest of Subcontractor and others including Owner.

c.     If requested by Owner, Subcontractor shall, within seven (7) days, submit a reasonable price quotation for proposed changes.

10.     **Subcontractor's Failure to Perform**

a.     If, in the opinion of Owner, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workmen or materials of the proper quality (2) fail in any respect to perform the Work according to the current schedule, (3) cause, by any act or omission, the stoppage or delay of or interference with the work of Owner or of any other Subcontractor or sub-subcontractor. (4) fail to comply with all provisions of this Contract or the Contract Documents, (5) be adjudged as bankrupt, or make a general assignment for the benefit of its creditors, (6) have a receiver appointed, or (7) become insolvent or a debtor in reorganization proceedings, then, after serving three (3) days' written notice, unless the condition specified in such notice shall have been eliminated within such three (3) days, Owner, at its option (i) without voiding the other provisions of the Contract and without notice to the sureties, may take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to Owner for the cost thereof, (ii) terminate the Contract for default, or (iii) seek specific performance of Subcontractor's obligations hereunder, it being agreed by Subcontractor that specific performance may be necessary to avoid irreparable harm to Owner. In the event of termination for default, Owner may, at its option, (a) enter upon the premises and take possession, for the purpose of completing the Work, of all materials and equipment of Subcontractor, (b) require Subcontractor to assign to Owner any or all of Subcontractor's subcontracts or purchase orders involving the Project, or (c) either itself or through others complete the Work, by whatever method Owner may deem expedient. In case of termination for default, Subcontractor shall not be entitled to receive any further payment for Work in place or otherwise, until the Work shall be fully completed and accepted by Owner. At such time, if the unpaid balance of the price to be paid shall exceed the expense incurred by Owner, such excess shall be paid by Owner to Subcontractor. If such amount due Owner shall exceed such unpaid balance, then Subcontractor shall pay Owner the difference. Upon a default by Subcontractor, Owner may retain from any sum due to Subcontractor all sums as may be due and owing, or may become due from Subcontractor to Owner. Owner may retain a sufficient sum to protect itself from any claim or demand asserted against Owner by a third party as a result of work performed by Subcontractor hereunder until such claim or demand has been satisfied.

b.     If Owner is adjudged by a court of competent jurisdiction to have wrongfully exercised any option under 10.a.(i)(ii) or (iii), Owner shall be liable to Subcontractor for the reasonable value of work performed by Subcontractor, excluding all consequential damages, prior to Owner's wrongful action plus the direct costs incurred by Subcontractor as a result of Owner's wrongful action plus, in the case of a wrongful termination for default, less prior payments made. The Subcontractor's remedy under this Article 10.b. shall be exclusive. Nothing herein shall bar withholdings by Owner permitted by other provisions of this Contract.

11.     **Warranty**

a.     The Subcontractor warrants to the Owner and Contractor that materials and equipment furnished under the Contract will be of good quality and new, unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Contract Documents. Work not conforming to these requirements including substitutions not properly approved and authorized, may be considered defective. If required by the Contractor, the Subcontractor shall furnish satisfactory evidence as to the kind and quality of materials and

Initial Here ⟨B⟩

equipment The Warranty provided in this Section shall continue for a period of two (2) years next following the issuance of a Certificate of Occupancy for the building for which a Warranty claim may be made.

b. Subcontractor shall remove and repair or replace any of his workmanship, material and equipment that is defective or substandard and any equipment that fails to develop ratings, capacities or characteristics required by the Contract Documents at any time within two (2) years after acceptance of the work or within such longer period as is provided in the Contract Documents at its expense and Owner's convenience. Subcontractor shall also pay all expenses incurred in removing, replacing or repairing any work required as a result of removing, replacing or repairing any part of its defective work. If any statute or regulation provides for a warranty by the Owner in favor of any third party relative to the Project or any part thereof, the Subcontractor shall be liable for and responsible to Owner and/or the Contractor for any damages or loss for which the Owner is liable or responsible to any such third party based upon a breach of any such statutory warranty, if and to the extent that such breach of statutory warranty is the result of any defective or substandard workmanship, materials or equipment performed by or provided by the Subcontractor.

12. **Liens**

a. In the event that liens are filed by anyone (excluding Subcontractor) in relation to the labor and/or material being furnished by Subcontractor, Subcontractor agrees to have the same discharged, by posting a bond with the appropriate authorities, or otherwise, within five (5) days of notice. In the event such lien is not so discharged, in addition to all other rights which the Owner may have, Owner shall have the right to terminate this Contract for Default.

b. Prior to final payment, Subcontractor shall provide the Contractor a release of its liens and claims and all liens and claims of all persons furnishing labor and/or materials for the performance of this Contract, and satisfactory evidence that there are no other liens or claims whatsoever outstanding against the Work.

c. If required by the Contractor, Subcontractor shall furnish either releases of liens or waivers of lien with respect to all prior payments, as part of each request for partial payment other than the initial request.

d. Owner may issue joint checks to the Subcontractor and any sub-subcontractor for the initial payment and subsequent payments as well.

13. **Inspection and Acceptance**

a. Subcontractor shall provide appropriate facilities at all reasonable times for inspection by Owner or the Contractor of the Work and materials provided under this Contract, whether at the Project site or at any place where such work or materials may be in preparation, manufacture, storage, or installation. Subcontractor shall promptly replace or correct any Work or materials which Owner or the Contractor shall reject as failing to conform to the requirements of this Contract. If Subcontractor does not do so within a reasonable time, Owner shall have the right to do so and Subcontractor shall be liable to Owner for the cost thereof. If, in the opinion of Owner or Contractor, it is not expedient to correct or replace all or any part of rejected Work or materials, then Owner, at its option, may deduct payments due, or to become due, to Subcontractor, such amount as, in Owner's reasonable judgment, will represent (i) the difference between the fair value of the rejected Work and materials and the value thereof if it complied with this Contract, or (ii) the cost of correction, whichever is higher.

b. The Work shall be accepted according to the terms of the Contract Documents. However, unless otherwise agreed in writing, entrance and use by Owner or the Contractor, shall not constitute acceptance of the Work.

14. **Inconsistencies and Omissions**

Should inconsistencies or omissions appear in the Contract Documents, it shall be the duty of Subcontractor to so notify the Contractor, in writing, prior to commencing Work. Upon receipt of said notice, the Contractor shall instruct Subcontractor as to the measures to be taken, and Subcontractor shall comply with the Contractor's instructions. Nothing herein shall bar Subcontractor's right to seek adjustment under Article 9.b. if allowable under the Contract Documents.

15. **Termination for Convenience**

Owner shall have the right to terminate this Contract for convenience, by providing Subcontractor with a written notice of termination, to be effective upon receipt by Subcontractor. If the Subcontractor is terminated for convenience, the Subcontractor shall be paid the amount representing costs only to the extent of any work in place at the time of termination, which costs are due for its Work, as provided in the Contract Documents.

Initial Here 

16. **Approvals**

a.      Subcontractor shall deliver to Owner copies of shop drawings, cuts, samples and material lists required by Owner, the Contractor, or the Contract Documents and in accordance with the Contract Documents within sufficient time so as not to delay performance of the Project or within sufficient time for the Owner to submit the same within the time stated in the Contract Documents, whichever is earlier. Any deviation from the Contract Documents shall be clearly identified on shop drawings and shall be accompanied by a letter describing such deviation in detail and the effect, if any, on the Subcontractor's work and time of performance. Notwithstanding any general approval granted by Owner or the Contractor, all work shall be in accordance with the Contract Documents.

b.      The Contractor's review of shop drawings, cuts, samples and material lists is only for the convenience of the Owner in following the work and shall not relieve the Subcontractor from responsibility for any deviations from the requirements of the Contract Documents. The Contractor's review shall not be construed as a completed check nor shall it relieve the Subcontractor from responsibility for errors of any sort in shop drawings, cuts, samples and material lists, or from the necessity of furnishing any work required by the Contract Documents which may have been omitted from the shop drawings, cuts, samples or material lists.

17. **General Obligations**

a.      As and when directed by Owner or Contractor, Subcontractor shall promptly commence the Work and pursue it diligently to completion. All work must

(1)     be completed to the Contractor's satisfaction,
(2)     conform strictly with all legal requirements; and
(3)     conform strictly to the Contract Documents.

b.      Subcontractor shall schedule all inspections required by all governmental agencies having jurisdiction so as not to interfere with the progress of the Work to be performed by Subcontractor and other Subcontractors.

c.      All workmanship (labor and materials) supplied by Subcontractor shall be acceptable to Owner and the Contractor

d.      Subcontractor shall daily and upon completion of the Work clean the Job Site to the Contractor's satisfaction, including removal of all debris and other materials left by Subcontractor to a place designated by the Contractor for such purpose. If Subcontractor fails to do so, Owner may impose the cleanup back charge for each day the Subcontractor fails to do so.

e.      All action required by the Contract Documents shall be at Subcontractor's expense unless the Contract Documents expressly provide otherwise.

f.      By initiation of his phase of Work, Subcontractor agrees that any work previously done by others is acceptable. Subcontractor shall immediately notify the Contractor's superintendent of any workmanship or materials supplied by others that is not, in Subcontractor's opinion, acceptable. Subcontractor must receive a written waiver of responsibility with respect to work performed or materials furnished by others from the Contractor's superintendent before proceeding with work which would cover or tie into any unacceptable work. It shall be Subcontractor's responsibility to forward a copy of the written waiver directly to the Corporate Office of the Contractor in accordance with Article 25 hereof.

g.      An authorized representative of Subcontractor shall visit the Project office each day to receive all notices and correspondence pertaining to its Work.

h.      Subcontractor shall resolve all back charges with the Owner within thirty (30) days after receipt of a back charge and if the same are not resolved within thirty (30) days, Owner shall have the right to terminate this Contract.

i.      In the event that Owner elects to terminate the Work, Subcontractor shall terminate its Work upon being so notified. Upon such termination, Owner's sole liability shall be to pay Subcontractor for Work completed prior to such termination, and Owner shall have no further liability, nor shall Subcontractor have any claims against Owner, for any matters of any type except as to Work completed; provided, however, in the event Owner elects within sixty (60) days after termination to recommence the Work.

18. **Assignment and Subcontracting**

Subcontractor shall not assign or transfer this Contract, or funds due hereunder, without the prior written consent of the Subcontractor's surety and the Owner. The Owner shall not unreasonably withhold its consent to the assignment of funds due hereunder.

U:\Shelly-xxx\C:\obb-t-one\P\colmn Drywall\consit-not for cobblestone\subbcontract agreement-finalrev4130511).doc

Initial Here 

All subcontracts and purchase orders awarded by Subcontractor are subject to the provisions of this Contract, and Subcontractor shall insert therein all provisions necessary to enable each Subcontractor to comply with the terms hereof, including, but not limited to, a waiver of all rights to proceed against Owner and/or the Contractor, in the event Owner terminates this Contract, for monies owed to them by Subcontractor.

### 19. Patents and Royalties

Except as otherwise provided by the Contract Documents, Subcontractor shall pay all royalties and license fees which may be due on the inclusion of any patented materials in the Work. Subcontractor shall defend all suits or claims for infringement of any patent rights that may be brought against Owner or the Contractor arising out of the Work, and shall be liable to Owner and the Contractor for all loss, including all costs and expenses, on account thereof.

### 20. Taxes and permits

Except as otherwise provided by the Contract Documents, Subcontractor agrees to pay and comply with and hold Owner and the Contractor harmless against the payment of all contributions, taxes or premiums which may be payable by it under Federal, state or local laws arising out of the performance of this Contract, and all sales use or other taxes of whatever nature levied or assessed against Owner, Contractor, or Subcontractor arising out of this Contract, including any interest or penalties. Subcontractor waives any and all claims for additional compensation because of any increase in the aforementioned taxes unless payment for said increase is specifically provided for in the Contract Documents. Subcontractor shall obtain and pay for all permits, licenses, fees and certificates of inspection necessary for the prosecution and completion of its work, and shall arrange for all necessary inspection and approvals by public officials.

### 21. Laws, Regulations and Ordinances

Subcontractor agrees to be bound by, and at its own cost, comply with all federal, state, and local laws, codes, ordinances and regulations applicable to this Contract and the performance of the Work whether by reason of general law or by reason of provisions in the Contract Documents. Subcontractor shall be duly licensed to operate under the law of the applicable jurisdictions.

### 22. Health and Safety

Subcontractor and all employees and agents thereof shall comply with the applicable requirements issued pursuant to the Occupational Safety and Health Act of 1970, as amended, and all other applicable health and safety laws and regulations. Subcontractor shall be liable to Owner and Contractor for all loss, cost and expense attributable to any acts of commission or omission by Subcontractor, its employees and agents resulting from failure to comply therewith including, but not limited to, any fines, penalties or corrective measures.

### 23. Information Required by Owner

In addition to the information to be provided by Subcontractor pursuant to other provisions of the Contract, Subcontractor hereby agrees to provide, at no additional cost to Owner, and in a prompt and timely fashion, any and all additional information relating to this Contract which is required either by the Contract Documents or by law.

### 24. Severability and Waiver.

A partial or complete invalidity of any one or more provisions of this Contract shall not affect the validity of the remaining provisions of this Contract, and the invalid provision shall be replaced by a mutually acceptable valid, legal and enforceable provision which comes closest to the intent of the Parties.

### 25. Notices

All notices shall be addressed to the parties at the addresses set out herein, and shall be considered as delivered when postmarked, if dispatched by registered mail, or when received in all other cases, or continuing force and effect of any other provision. The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Contract, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

Initial Here 

26.    **Interpretation of Contract Documents**

b.    It is the intention of the parties that all terms of this Contract are to be considered as complimentary. However, in the event that such an interpretation is not possible, the order of precedence of the documents forming this Contract shall be (1) modifications of any documents forming part of the Contract; (2) this Contract, unless the Contract Documents impose a higher standard or greater requirement on Subcontractor, in which case the Contract Documents; (3) the Contract Documents, unless the provisions of (2) apply.

c.    In the event of a conflict between or among modifications, the later in date shall prevail; in the event of a conflict between or among the terms of this Contract, the higher standard or greater requirement for Subcontractor shall prevail, and in the event of a conflict between or among the terms of the Contract Documents, the higher standard or greater requirement for Subcontractor shall prevail.

d.    Subcontractor acknowledges receiving, reviewing and understanding the provisions of the Contract Documents.

27.    **Advertising**

Neither Subcontractor, its subcontractors, suppliers, agents nor employees shall take photographs of the work on site, or publish or display advertising matter of any description relating to the Project without first obtaining the written consent of Owner and the Contractor.

28.    **Contract Time**

Unless the terms hereof are modified in writing within thirteen (13) months of the date of this Contract, the terms of this Contract shall be automatically renewed as provided herein and shall not expire until Subcontractor satisfactorily performs all Work on the Project.

IN WITNESS WHEREOF, the parties, by their duly authorized representatives, have executed this Contract on the date first above written.

SUBCONTRACTOR: PRECISION DRYWALL, INC.

By: _Lear A. Beaver_

Title: _VICE PRESIDENT_

Subcontractor Tax Identification No.: _65-001 5503_

OWNER AND CONTRACTOR:
NORTHSTAR HOLDINGS AT B & A, LLC

By: _____

Title: _____

# NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

| | | | |
|---|---|---|---|
| **COMMUNITY** | COBBLESTONE CREEK | | |
| **ADDENDUM NUMBER** | ONE | **DATED** | **May 23, 2005** |
| **SUBCONTRACTOR** | Precision Drywall, Inc. | **CONTACT NAME** | Jesus Barajas |
| **ADDRESS** | 3300 So. Congress Ave, Suite #18, Boynton Beach, FL 33426 | | |
| **TELEPHONE** | 561-733-4077 | **FAX** | 561-733-3390 |
| **MOBILE** | | **PAGER** | |
| **E-MAIL** | | | |

**CONTRACT TYPE   DRYWALL LABOR AND MATERIALS**

## 1   SCOPE

It is mutually agreed that the Subcontractor shall furnish all labor, supervision, material, tools and equipment as required to perform all the work and services necessary to complete this contract with Northstar Holdings, at B & A, Inc. at Cobblestone Creek, Palm Beach County, Florida (Owner). All work performed by this Subcontractor shall meet all local codes and requirements of governmental agencies having jurisdiction. The Subcontractor will be responsible for supplying his own temporary power.

## 2   PLANS AND SPECIFICATIONS

The Subcontractor's work, services, and materials shall be in accordance with the plans as listed below or signed cabinet drawings or existing models. This contract is all inclusive and in compliance with the plans listed below. Any and all written proposals and/or verbal discussions are superceded by this contract.

### MODEL

A= ANDOVER
C1=CHELSEA
C2=CAMBRIDGE
D= DEVON
E= ESSEX
F= FAIRFAX

## 3   WORK TO BE PERFORMED BY OWNER

Not Applicable.

Page 1 of 6

## NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

### 4   WORK TO BE PERFORMED BY SUBCONTRACTOR

A. All wood framing members by others to which gypsum wallboard will be fastened shall be straight and spaced as shown on drawings. Upon starting, Subcontractor accepts work done previously.

B. Gypsum wallboard shall be applied first to ceiling, then walls, using horizontal application method, with paperboard edge at right angles to the framing members.

C. Wallboard joints at openings shall so be located so that no end joints align with edges of openings. End joints shall be staggered and joints in opposite sides of a partition shall not occur on the same stud.

D. All materials to be dry, preferably by being stored inside the building under roof. Where it is necessary to store gypsum wallboard outside, it shall be stacked off the ground properly supported on a level platform and fully protected from the weather.

E. Upon completion of all work and spraying, unit is to be scraped and swept out. Use existing openings to receive materials, protecting windows and door frames.

F. Replace insulation fallen or unattached prior to drywall.

G. Gypsum wallboard shall be cut by scoring, breaking or by sawing, away from the face side. All cut edges and ends of the gypsum wallboard shall be smoothed where in order to obtain neat joints. Where drywall meets projections, it shall be scribed to fit and neatly cut.

H. Install wallboard with the long dimension horizontal and in such a manner that tapered butt joints will be centered on a stud or furring.

I. Fill all screw heads and dimples in the body of the panels with joint compound and smooth out so that after painting no visible sign remains. Joints shall be taped and smoothed out with joint cement. Interior corners shall have at least one coat of joint or topping compound applied with the edges feathered out. Outside corners shall have all zinc or plastic corner beads with flanges concealed by not less than two coats of compound, feathered as recommended by the manufacturer. All taping and finishing of sheetrock. Drywall to be lightly sanded prior to painting.

J. Float drywall to within tolerance of ¼" to 8'. Install all drywall with screws (at proper length), not nails.

K. Subcontractor shall install window bucks, including all materials and labor.

## NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

L. Provide and install window bucks at all windows, exterior swing doors and sliding glass door openings. All required wood nailers, wood backing windows and sliding glass doors to be caulked.

M. All bucks to be fastened from product approval specifications.

N. Ceilings are to be knockdown: Wall are to be orange peel.

O. In the event roof tiles not loaded, first coat with joint compound. Superintendent will authorize approval to continue.

P. Apply drywall fireproofing at roof trusses.

Q. Provide 1x4 wood backing necessary for kitchen and bathroom cabinets or any other furniture or equipment attached to the walls, including support for tub skit and air conditioned units. Provide 1x8 backing at floor mounted shower pan liners. Backing shall be installed at all wet areas at metal studs where liner attaches to studs. Drywall fasteners shall not penetrate the liner at any area.

## 5    MATERIALS TO BE SUPPLIED BY OWNER

Not Applicable

## 6. MATERIALS TO BE SUPPLIED BY SUBCONTRACTOR

A. All gypsum wallboard shall have edges tapered in the following types: REG 4x12x½", FC 4x12x5/8, MR 4x12x½".

B. All wall surfaces to be textured finished with light coat of Orange Peel texture, Gold Bond "Texture". Ceilings are to be knockdown.

C. All shower and wet areas to receive MR board.

D. Furnish and install 1 x 2 pressure treated furring strips 24 o.c. with additional strips at corners, intersections and any other locations where required for a complete installation of the wallboard; including pressure treated 1 x 2's nailed horizontally on all masonry or concrete walls at the floor line; extend pressure treated 1 x 4 bucks 12" beyond all windows and sliding glass doors. Backing for cabinets in kitchen and bathrooms shall be pressure treated 1" x 4" wood.

## NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

E.  Provide and install all 25 gauge metal stud per plans. Interior framing shall be 3 5/8"
metal studs on 24" centers at interior walls, and a double row of 1 5/8" metal studs at
24" centers at chase walls.

F.  2 x 4 wood rough bucks at entry door, and interior passage doors. All wood bucks
applied to masonry or concrete shall be pressure treated and set in a bed of vinyl
caulk or equal.

G.  Use of ½" or 5/8" at 1-hour walls should be determined by plans and put in
appropriate location.

H.  All party walls and interior end wall to be 2" x 2" PT bucks.

I.  Ceiling to receive 1 layer of 5/8" type "X" applied to underside of trusses.

J.  Tub and shower recess shall include one layer of ½" MR on metal studs framed
16" o.c.

K.  A Subcontractor representative to be on site to walk with city inspector for drywall
screw inspections.

L.  Add drywall fire proofing at roof trusses.

**7  OPTIONS**

Vendor Option Costs

**8  TRASH**

A.  To remove from the building and surrounding area, all debris and scrap caused by and
during the performance of his work. Upon completion of each job, Subcontractor must
collect and discard, in a place designated by the Owner's representative, all trash related
to his trade, within 48 hours or Owner will back charge Subcontractor $250.00 minimum.

**9  GUARANTEE**

A.  Subcontractor will furnish labor at no charge to Owner for the removal and replacement of
defective materials damaged during the course of construction. This labor will be confined
only to work performed under this contract

## NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

**10   SAFETY**

A.     To comply with OSHA Safety and Regulations in tolerance to the execution of his work and will be responsible for any and all penalties or fines caused by his failure to conform to OSHA Regulations.

**11   INSPECTION BY SUBCONTRACTOR PRIOR TO COMMENCEMENT OF WORK**

A.     That in the event the construction completed prior to the work to be performed by the Subcontractor here under is not satisfactory to this contract, he shall immediately notify Owner, in writing, of such conditions. By commencing and proceeding with the work under this contract, the Subcontractor shall be deemed to have accepted the conditions of such prior completed construction; and the lack of quality of workmanship of such prior completed construction shall not then be an excuse for the failure of the work under this contract to meet the quality of workmanship required here under.

**12   SUBCONTRACTOR INFORMATION**

A.     Subcontractor's emergency telephone number for 24 hour service  _561- 436- 8758_

B.     Person in charge is                                        _JEFF_

**13   COMPENSATION**

A.     The total prices, the stages of work and the amounts for which the subcontractor shall be entitled to payment for the work as previously described shall be in accordance with Vendor Base Plan Costs & Vendor Option Costs Addendum attached hereto.

**14   SERVICE WORK**

A.     All service tickets to be completed within 10 days of issue or monies will be held until completed. If the work is not completed within 20 days, Owner will hire whatever personnel necessary to do the work and backcharge this Subcontractor

**15   LICENSES AND INSURANCE**

A.     This Subcontractor shall be responsible for maintaining and supplying Owner with current licenses as required by state local regulations. Before starting work, copies of all licenses and insurance is not brought current on due date, monies will be held until such updated documents are provided

Page 5 of 6

# NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

### 16   WORK ORDERS

A.   All work orders must be written prior to the commencement of work, and they must specify who is responsible for the costs incurred.

B.   All work orders must be turned into the Main Office within 30 days after completion to help prevent loss of the work order and to expedite its payment. Any work order not sent in this time frame will not be paid.

C.   All work orders over $500.00 require a written estimate. Work orders over $500.00 must be written and approved by the Contracts Department.

| SUBCONTRACTOR | PRECISION DRYWALL, INC. | OWNER | NORTHSTAR HOLDINGS, AT B & A, LLC |
|---|---|---|---|

BY _____   BY _____

DATE  6 - 30 - 05 _____   DATE _____

Page 6 of 6

Client#: 37443    PREDR

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
03/15/2006

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|
| Advanced Insurance Underwriters<br>3250 North 29th Avenue<br>Hollywood, FL 33020-1313<br>954 963-6666 | |
| | INSURERS AFFORDING COVERAGE | NAIC # |
| INSURED | INSURER A: Old Dominion Insurance Co | |
| Precision Drywall, Inc.<br>601 N Congress Ave, #501<br>Delray Beach, FL 33445 | INSURER B: Essex Insurance Company | |
| | INSURER C: American International Companies (U | |
| | INSURER D: Progressive Company | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | GENERAL LIABILITY<br>[X] COMMERCIAL GENERAL LIABILITY<br>[ ] CLAIMS MADE [X] OCCUR<br>[X] BI/PD Ded:500 | MSG24989 | 09/09/05 | 09/09/06 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $50,000 |
| | | | | | | MED EXP (Any one person) | $5,000 |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER:<br>[ ] POLICY [X] PRO-JECT [ ] LOC | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| D | | AUTOMOBILE LIABILITY<br>[ ] ANY AUTO<br>[ ] ALL OWNED AUTOS<br>[X] SCHEDULED AUTOS<br>[X] HIRED AUTOS<br>[X] NON OWNED AUTOS | 015399893 | 03/10/06 | 03/10/07 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY<br>[ ] ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN   EA ACC<br>AUTO ONLY:   AGG | $<br>$ |
| B | | EXCESS/UMBRELLA LIABILITY<br>[X] OCCUR [ ] CLAIMS MADE<br>[ ] DEDUCTIBLE<br>[ ] RETENTION   $ | XMR03371 | 09/14/05 | 09/09/06 | EACH OCCURRENCE | $2,000,000 |
| | | | | | | AGGREGATE | $2,000,000 |
| | | | | | | | $<br>$<br>$ |
| C | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below<br>OTHER | WC6702314 | 05/31/05 | 05/31/06 | [X] WC STATU-TORY LIMITS [ ] OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |

POSTED
OCT 17 2006

MAR 2 1 2006

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
Certificate Holders NorthStar Homes and NorthStar @ Gramercy Square, LLC are hereby named
as Additional Insureds. A waiver of subrogation is provided in favor of the Certificate
Holder. Workers Compensation insurance covering all employees of Contractor in the amount
of the Contractors full statutory liability.
(See Attached Descriptions)

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| NorthStar Homes<br>14406 Military Trail<br>Delray Beach, FL 33484 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL ___30___ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br><br>AUTHORIZED REPRESENTATIVE<br>*Charlotte Floyd*   CHL |

ACORD 25 (2001/08) 1  of 3    #S374653/M372568    © ACORD CORPORATION 1988

Client: 37443                                          Ph..R

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

| | DATE (MM/DD/YYYY) 02/15/07 |
| --- | --- |

**PRODUCER**
Advanced Insurance Underwriters
3250 North 29th Ave.
Hollywood, FL 33020-1313
954 963-6666

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

**INSURED**
Precision Drywall, Inc.
601 N Congress Ave, #501
Delray Beach, FL 33445

| INSURERS AFFORDING COVERAGE | NAIC # |
| --- | --- |
| INSURER A: Mid-Continent Casualty Co | |
| INSURER B: Essex Insurance Company | |
| INSURER C: American International Co | |
| INSURER D: Progressive Company | |
| INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| A | | GENERAL LIABILITY | O4GL000657042 | 09/09/06 | 09/09/07 | EACH OCCURRENCE | $1,000,000 |
| | X | COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $100,000 |
| | | CLAIMS MADE  X  OCCUR | | | | MED EXP (Any one person) | $-0- |
| | X | BI/PD Ded:1,000 | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | POLICY  X  PRO-JECT  LOC | | | | | |
| D | | AUTOMOBILE LIABILITY | 015399894 | 03/10/06 | 03/10/07 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | ANY AUTO | | | | | |
| | | ALL OWNED AUTOS | | | | BODILY INJURY (Per person) | $ |
| | X | SCHEDULED AUTOS | | | | | |
| | X | HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | X | NON-OWNED AUTOS | | | | | |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | GARAGE LIABILITY | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | ANY AUTO | | | | OTHER THAN   EA ACC | $ |
| | | | | | | AUTO ONLY:   AGG | $ |
| B | | EXCESS/UMBRELLA LIABILITY | 04XS147476 | 09/09/06 | 09/09/07 | EACH OCCURRENCE | $2,000,000 |
| | X | OCCUR   CLAIMS MADE | | | | AGGREGATE | $2,000,000 |
| | | | | | | | $ |
| | | DEDUCTIBLE | | | | | $ |
| | X | RETENTION   $ 10000 | | | | | $ |
| C | | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY | WC6702314 | 05/31/06 | 05/31/07 | X  WC STATU-TORY LIMITS  OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | If yes, describe under SPECIAL PROVISIONS below | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | OTHER | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |

POSTED
FEB 19 2007

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
*10 days for non-payment
Blanket Additional Insured/Blanket Waiver of Subrogation/Primary and Non-Contributory on General Liability
Blanket Waiver of Subrogation on Workers Compensation
(See Attached Descriptions)

DECLINED
FEB 1 6 2007

| CERTIFICATE HOLDER | CANCELLATION |
| --- | --- |
| Northstar Homes 14406 Military Trail Delray Beach, FL 33484  Fax: 561-498-4354 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL   30*   DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.  AUTHORIZED REPRESENTATIVE  Charlotte Floyd    LSA |

ACORD 25 (2001/08) 1  of 3        #S439340/M413392                      © ACORD CORPORATION 1988

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number 1 __

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| BAG0002215-00 | 10/22/2006 | General Fidelity Insurance Company |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| Northstar Holdings Inc<br>As Per Named Insured Endorsement<br>14406 Military Trail<br>Delray Beach, FL 33484 | HBW Insurance Services, LLC<br>4501 Circle 75 Pkwy, Suite F 6200<br>Atlanta, GA 30339-<br>Producer Code:10013-00 |

**COVERAGE PARTS AFFECTED**

Commercial General Liability (CGL)

**CHANGES**

In consideration of the premium specified on this endorsement and subject to all of the terms and conditions of the policy, it is hereby understood and agreed the following change is made to the policy:

**Audit Adjustment**

Based on information from your records during our recent audit the policy premium is adjusted as follows:

**Policy Level**

| Coverage | | Audit Exposure | Final Premium | Policy Premium | Difference |
|---|---|---|---|---|---|
| Terrorism - Certified Acts | | | $▮▮▮▮ | $▮▮▮▮ | $▮▮▮ |
| | | | | Total Policy Level | $▮▮▮ |

**Location Level**

Loc 001  Bldg 001

| Classification | Rate | Audit Exposure | Final Premium | Policy Premium | Difference |
|---|---|---|---|---|---|
| 91583 Contractors-Subcontracted Work-in Connection with Building Construction, Reconstruction, Repair or Erection - one or two family dwellings | | | | | |
| Prem/Ops | $▮▮▮ | $▮▮▮▮ | $▮▮▮ | $▮▮▮ | $▮▮▮ |
| Products | $▮▮▮ | | $▮▮▮ | $▮▮▮ | $▮▮▮ |
| 91580 Contractors-Executive Supervisors or Executive Superintendents | | | | | |
| Prem/Ops | $▮ | | $▮▮▮▮ | $▮▮▮ | |
| 47051 Real Estate Development Property | | | | | |
| Prem/Ops | $▮▮▮ | If Any | $▮▮▮ | $▮▮ | $▮▮▮ |
| 49451 Vacant Land Other than Not-For-Profit | | | | | |
| Prem/Ops | $▮▮▮ | If Any | $▮▮▮ | $▮▮ | $▮▮ |
| 46362 Model Homes | | | | | |
| Prem/Ops | $▮▮▮ | | 0.00 | $▮▮ | $▮▮▮ |

EXHIBIT
C

IL 12 01A (11-85)                                                  Page 1 of 2

Loc 001   Bldg 001

| Classification | Rate | Audit Exposure | Final Premium | Policy Premium | Difference |
|---|---|---|---|---|---|
| 91340 Carpentry - Construction of Residential Property Not Exceeding three stories in height | | | | | |
| Prem/Ops | $▇▇▇ | ▇▇▇▇ | $▇▇▇▇ | $▇▇▇▇ | $▇▇▇ |
| Products | $▇▇▇ | ▇▇▇▇ | $▇▇▇▇ | $▇▇▇▇ | $▇▇▇ |
| 91629 Debris Removal-Construction Site | | | | | |
| Prem/Ops | $▇▇▇ | If Any | $▇▇▇ | $▇▇▇ | $▇▇▇ |
| Products | $▇▇▇ | If Any | | | |

Total Location   $▇▇▇▇▇

Total Return Premium   $▇▇▇▇▇▇▇

**COMMON POLICY DECLARATIONS**

**General Fidelity Insurance Company**
**A Bank of America Company**      **(866) 763-7790**
**201 North Tryon Street**      **NC1-022-19-02**
**Charlotte, NC 28255**

| | |
|---|---|
| **Policy No.:**   BAG0002215-00 | **Producer** |
| Renewal of: | HBW Insurance Services, LLC |
| | 4501 Circle 75 Pkwy, Suite F 6200 |
| **Business Description:**  Residential General | Atlanta, GA 30339- |
| Contractor | Producer Code:10013-00 |

**Type of Business:** Corporation            **Audit Period - Annual**

**Named Insured & Address:**   Northstar Holdings Inc
As Per Named Insured Endorsement
14406 Military Trail
Delray Beach, FL 33484

**Policy Period: from**   10/22/2006   to   10/22/2007   at 12:01 A.M. standard time at your mailing address above.
                       (Inception date)        (expiration date)

**Coverage Forms that form a part of this policy:**

This policy consists of the following coverage parts for which a premium is indicated.  This premium may be subject to adjustment.  The policy writing minimum premium for this policy is   $▬▬▬▬▬▬▬▬ .

| **Coverage Parts** | **Premium:** |
|---|---|
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $▬▬▬▬ |
| TERRORISM - CERTIFIED ACTS (GENERAL LIABILITY) | $▬▬▬ |
| **TOTAL POLICY PREMIUM:** | $▬▬▬▬ |

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

**Forms Applicable To All Coverage Forms:**      See  IIT 1009  for a complete listing of forms.

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE FORM(S)AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Countersigned _____   by _____
              Date                        Authorized Representative

Issuing Office: HBW Insurance Services 4501 Circle 75 Pkwy., Suite F-6200 Atl, GA. 30339  Issued Date: 10/24/2006

**IIT 1000  4-96**                        Original                        Page  1  of  2

## General Fidelity Insurance Company

### SUPPLEMENTAL - NAMED INSURED

**Policy No.:** BAG0002215-00

Northstar Holdings Inc
Avalon Estates, LLC
Northstar @ B & A, LLC
Northstar @ Tuscany Village, LLC
Northstar Funding #1, Inc
Northstar Funding #2, Inc
Northstar at Gramercy Square LLC
Gramercy Square LLC aka Home Devco/Gramercy Square LLC
Cobblestone Creek Models LLC

It is further understood and agreed that the following condition will be
supplemented: The first Named Insured as shown on the Declarations is
deemed the representative for all Named Insureds as shown above as regards
all notice and claim obligations.

**General Fidelity Insurance Company**
**A Bank of America Company**        **(866) 763-7790**
**201 North Tryon Street**        **NC1-022-19-02**
**Charlotte, NC 28255**

# LISTING OF FORMS AND ENDORSEMENTS FORMING
# A PART OF THIS POLICY

POLICY NUMBER: BAG0002215-00

| NUMBER | TITLE |
|---|---|
| | **COMMON** |
| IIT 1000 (04-96) | Common Policy Declarations |
| IIT 1009 (04-96) | Listing Of Forms And Endorsements Forming A Part Of This Policy |
| IIT 1010 (04-96) | Common Policy Location Schedule |
| GFIC-POL-001 (05-06) | Policy Signature Page |
| IL 00 17 (11-98) | Common Policy Conditions |
| IL 00 21 (07-02) | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| IL 09 85 (01-06) | Disclosure Pursuant To Terrorism Risk Insurance Act |
| | **GENERAL LIABILITY** |
| IIT 1200 (07-99) | Commercial General Liability Coverage Part Declarations |
| CG 00 01 (12-04) | Commercial General Liability Coverage Form |
| CG 00 67 (03-05) | Exclusion-Violation Of Statutes That Govern E-Mails, Fax, Phone Calls Or Other Methods Of Sending Material Or Information |
| CG 02 20 (12-04) | Florida Changes - Cancellation And Nonrenewal |
| CG 20 11 (01-96) | Additional Insured - Managers Or Lessors Of Premises |
| CG 20 12 (07-98) | Additional Insured - State Or Political Subdivisions - Permits |
| CG 20 18 (11-85) | Additional Insured - Mortgagee, Assignee Or Receiver |
| CG 20 34 (03-97) | Additional Insured - Lessor Of Leased Equipment - Automatic Status When Required In Lease Agreement With You |
| CG 21 34 (01-87) | Exclusion - Designated Work |
| CG 21 47 (07-98) | Employment Related Practices Exclusion |
| CG 21 70 (11-02) | Cap on Losses From Certified Acts of Terrorism |
| CG 21 87 (05-04) | Conditional Exclusion of Terrorism (Relating to Disposition of Federal Terrorism Risk Insurance Act of 2002) |
| CG 21 96 (03-05) | Silica or Silica-Related Dust Exclusion |
| CG 22 79 (07-98) | Exclusion - Contractors - Professional Liability |
| BOA-ASB-001 (07-01) | Absolute Asbestos Exclusion |
| BOA-COE-001-FL (07-05) | Completed Operations Exclusion |
| BOA-CPTT-001 (08-03) | Amendment of Copyright, Patent, Trademark Or Trade Secret Exclusion |
| BOA-CSE-001 (05-05) | Cross Suits Exclusion |
| BOA-DWE-001 (05-05) | Exclusion-Designated Operations Covered By A Consolidated (Wrapup) Program or Specific Project Insurance |
| BOA-FMM-EXC (05-01) | Fungus, Mildew and Mold Exclusion |
| BOA-LSE-001 (07-00) | Limited Subsidence Exclusion |
| BOA-SIR-OCC (04-04) | Self Insured Retention - Per Occurrence |
| BOA-SRE-001-FL (07-06) | Subcontractor Requirements Endorsement |
| BOA-TPE-001-FL (09-01) | Florida Total Pollution Exclusion Endorsement |

**General Fidelity Insurance Company**
**A Bank of America Company**     **(866) 763-7790**
**201 North Tryon Street**     **NC1-022-19-02**
**Charlotte, NC 28255**

**COMMON POLICY**
**LOCATION SCHEDULE**

Policy No.: BAG0002215-00

Effective Date: 10/22/2006

Named Insured: Northstar Holdings Inc

Renewal Of:

Location of all Premises you own, rent or occupy:

| Premises Number | | Location | Construction | Occupancy |
|---|---|---|---|---|
| | | | | Homebuilder |
| Location: | 001 | 14406 Military Trail | | |
| Building: | 001 | Delray Beach, FL 33484 | | |

IIT 1010  4-96                                    Original                              Page   1   of   1

**General Fidelity Insurance Company**
**A Bank of America Company**          **(866) 763-7790**
**201 North Tryon Street**          **NC1-022-19-02**
**Charlotte, NC 28255**

## COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

☒ OCCURRENCE          ☐ CLAIMS MADE

| | |
|---|---|
| Policy No.: BAG0002215-00 | Effective Date: 10/22/2006 |
| Named Insured: Northstar Holdings Inc | Renewal Of: |

**Form of Business:**          **Audit Period - Annual**
Each paid claim for the following coverages reduces the amount of insurance we provide during the
applicable coverage period.

| Coverage | Limits of Insurance |
|---|---|
| Each Occurrence Limit | $1,000,000 |
| Personal & Advertising Injury Limit (Any One Person or Organization) | $1,000,000 |
| General Aggregate (other than Products/Completed Operations) | $2,000,000 |
| Products/Completed Operations Aggregate | $2,000,000 |
| Damage To Premises Rented To You (Any One Premises) | $100,000 |
| Medical Expense Limit (Any One Person) | $5,000 |
| Self Insured Retention | $25,000 |

| Classification | Class Code | Prem/Ops Prod/CO Rate | Estimated Exposure | Prem/Ops | Prod/CO |
|---|---|---|---|---|---|
| Location Number:  001 Building Number:  001 Territory: 002 PALM BEACH COUNTY | | | | | |
| Contractors-Subcontracted Work-in Connection with Building Construction, Reconstruction, Repair or Erection - one or two family dwellings | 91583 | ▆▆  ▆▆ $1000 Total Cost | $▆▆▆ | $▆▆ | $▆▆ |
| Contractors-Executive Supervisors or Executive Superintendents Products-completed operations are subject to the General Aggregate Limit | 91580 | ▆▆  Incl. $▆▆ Payroll | $▆▆▆ | $▆▆ | Incl. |

Forms Applicable To This Coverage Part:  See   IIT 1009  for a complete listing of forms.

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON
POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART
THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

## COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

**Policy No.:** BAG0002215-00

**Effective Date:** 10/22/2006

**Named Insured:** Northstar Holdings Inc

**Renewal Of:**

| Classification | Class Code | Prem/Ops Prod/CO Rate | | Estimated Exposure | Prem/Ops | Prod/CO |
|---|---|---|---|---|---|---|
| **Location Number:** 001 **Building Number:** 001 Territory: 002 PALM BEACH COUNTY | | | | | | |
| Real Estate Development Property Products-completed operations are subject to the General Aggregate Limit | 47051 | ▆▆▆ Each | Incl. | If Any | | Incl. |
| Vacant Land Other than Not-For-Profit Products-completed operations are subject to the General Aggregate Limit | 49451 | ▆▆▆ Each | Incl. | If Any | | Incl. |
| Model Homes Products-completed operations are subject to the General Aggregate Limit | 46362 | ▆▆▆ Each | Incl. | If Any | | Incl. |
| Carpentry - Construction of Residential Property Not Exceeding three stories in height | 91340 | $▆▆ Payroll | | $▆▆▆ | $▆▆▆ | $▆▆ |
| Debris Removal-Construction Site | 91629 | $▆▆▆Payroll | | If Any | | |
| | | | | **Subtotal Premium:** | $▆▆▆ | $▆▆▆ |
| | | | | **Total General Liability Premium:** | | $▆▆▆ |

**In Witness Thereof,** the issuing Company has caused this policy to be signed officially below.

Jerome D.  Breslin
Sr. Vice President

James W. Mann
Sr. Vice President

**General Fidelity Insurance Company**

GFIC-POL-001 (05/06)

IL 00 17 11 98

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

  Copyright, Insurance Services Office, Inc., 1998   □

IL 00 21 07 02

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

   © ISO Properties, Inc., 2001     □

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2001
IL 00 21 07 02       □

POLICY NUMBER: BAG0002215-00

IL 09 85 01 06

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

## SCHEDULE

Terrorism Premium (Certified Acts) $███████

This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):

Certified Acts - General Liability                    $███████

Additional information, if any, concerning the terrorism premium:

Federal share of terrorism losses        90 % Year: 20 06
(Refer to Paragraph **B.** in this endorsement.)

Federal share of terrorism losses        85 % Year: 20 07
(Refer to Paragraph **B.** in this endorsement.)

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. For losses occurring in 2006, the federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. For losses occurring in 2007, the federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. If the federal program is extended beyond 2007, the applicable percentage is shown in the Schedule of this endorsement or in the policy Declarations.

IL 09 85 01 06                    © ISO Properties, Inc., 2005                    Page 1 of 1    □

COMMERCIAL GENERAL LIABILITY
CG 00 01 12 04

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERAGES

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph **1.** of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph **1.** of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

© ISO Properties, Inc., 2003

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

## 2. Exclusions

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

### c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

### d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

### e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

© ISO Properties, Inc., 2003

**f. Pollution**

**(1)** "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**(a)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

**(i)** "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

**(ii)** "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

**(b)** At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

**(c)** Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

**(i)** Any insured; or

**(ii)** Any person or organization for whom you may be legally responsible; or

**(d)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

**(i)** "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

**(ii)** "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

**(iii)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

**(e)** At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

 © ISO Properties, Inc., 2003