# EXHIBIT B

Michael A. Mazer

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: | § | MDL NO. 2047 |
| CHINESE-MANUFACTURED | § | |
| DRYWALL PRODUCTS | § | SECTION: L |
| LIABILITY LITIGATION | § | |
| | § | JUDGE FALLON |
| This document applies | § | |
| to all cases | § | MAG. JUDGE WILKINSON |

— — —

FRIDAY, JANUARY 29, 2010

— — —

Videotaped deposition of MICHAEL A. MAZER, AS 30(B)(6) REPRESENTATIVE OF MAZER SUPER DISCOUNT STORE, held at the offices of Sirote & Permutt, PC, 2311 Highland Avenue South, Birmingham, Alabama, commencing at 9:03 a.m., on the above date, before Michael E. Miller, Certified Court Reporter, Registered Diplomate Reporter and Certified Realtime Reporter.

— — —

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Chinese Drywall Liability MDL                                    Michael A. Mazer
                                                                 January 29, 2010

Page 42

1  MAZER'S_0639 - MAZER'S_0647, was
2  marked for identification.)
3      BY MR. LAMBERT:
4  Q.  Exhibit No. 7 is Mazer
5  documents 0639 through 0647; and I'm asking
6  you, if you would, please, to refer to 0644.
7      And it says -- first of all,
8  it's Robert -- is it "Scarf"?
9  A.  Scharf.
10 Q.  Scharf. Who is Robert Scharf?
11 A.  He was an officer of Devon who
12 I bought the drywall from.
13 Q.  Okay. And I take it in April
14 of 2009, you and he were communicating with
15 one another, correct?
16 A.  Yes.
17 Q.  Okay. And he says here to you,
18 "Click here: Senator Seeking Drywall
19 Curbs/HeraldTribune.com/Sarasota,
20 Florida/Southwest Florida Information
21 Leader." And then, "This is not good. Linda
22 sold the drywall in New Orleans."
23     Do you see that?
24 A.  Yes.

Page 43

1  Q.  Who is Linda? That was my
2  question.
3  A.  Linda, I believe, is the owner
4  of a Chinese flooring factory, who somehow
5  was involved in drywall with Bob Scharf; but
6  I don't know how.
7  Q.  And where did you understand
8  that Linda was officed?
9  A.  China.
10 Q.  Did you ever go to China?
11 A.  No.
12 Q.  How is it that you know that
13 Linda was the owner of a Chinese flooring
14 factory?
15     MR. LOGSDON: Object to the
16 form.
17 A.  I met her at a flooring trade
18 show in Las Vegas, possibly.
19     BY MR. LAMBERT:
20 Q.  All right. Tell me about that
21 trade show in Las Vegas. When was that,
22 generally? And I know you don't remember the
23 date, but we're at the chocolate cake right
24 now.

Page 44

1  A.  I believe it's called Surfaces,
2  and it is in the beginning of every year,
3  February; and I believe this would have been
4  in '08, maybe '09.
5  Q.  Okay. And is it always in
6  Las Vegas?
7  A.  Well -- oh, Surfaces is always
8  in Las Vegas, yes.
9  Q.  Okay. And was the Devon
10 representative also in Las Vegas in February
11 of '08 or '09 at the Surfaces trade show?
12 A.  No.
13 Q.  Were there other Chinese
14 factory representatives there, if you recall,
15 other than Linda?
16 A.  Yes, there were other Chinese
17 factories.
18 Q.  Okay. Do you know whether or
19 not there were any drywall factory
20 manufacturers present in the -- at the trade
21 show?
22 A.  It was a flooring trade show.
23 I doubt it.
24 Q.  Have you ever been to a trade

Page 45

1  show for building materials?
2  A.  Yes.
3  Q.  Have you ever seen drywall
4  manufacturers display their goods at a
5  builders convention?
6  A.  I'm sure I have. I don't
7  remember the specifics.
8  Q.  In these communications, which
9  we'll go over in more detail in a little
10 while, there's reference to the Shandong
11 factory as the manufacturer of this
12 particular Chinese drywall.
13     Did you ever talk to anybody
14 from the Chinese drywall-manufacturing end of
15 things?
16 A.  No.
17 Q.  What contact, other than Devon
18 International, did you have with the Chinese
19 manufacturers of drywall?
20 A.  None.
21 Q.  Okay. At the Surfaces trade
22 show in Las Vegas, describe for me the
23 activities that you were aware of that Linda,
24 who owned the factory, flooring factory --

Page 58

1  Q. This is April of '09, so that
2  is actually after you have sold out of the
3  material, correct?
4  A. Yes.
5  Q. Tell me what you recall about
6  your conversations with Mr. Scharf at Devon
7  about the issue of the Chinese drywall
8  problem. Let's just call it a problem.
9  A. Sometime in April, the national
10 news started publicizing the problems; and at
11 that point, I went to Devon to say, "What do
12 you know?"
13 Q. All right. And who did you
14 speak with there?
15 A. Bob Scharf.
16 Q. Okay. And what, as best you
17 can recall, did he tell you?
18 A. One, that he had personally
19 inspected the factories in China that he was
20 importing from, and that this was the best of
21 the bunch, and had no problems, as far as he
22 knew. And two, these articles are referring
23 to a manufacturer who was not ours and
24 symptoms that we never saw.

Page 59

1  Q. On how many occasions did you
2  speak with Bob about these problems?
3  A. A few. I don't know exactly
4  how many.
5  Q. Now, in December -- all right.
6  Let's back up a little bit.
7      (Whereupon, Deposition Exhibit
8  Mazer-Mazer-8, 12/1/08 Archer E-mail
9  to Mazer, Subject: Dry wall,
10 MAZER'S_0619, was marked for
11 identification.)
12     BY MR. LAMBERT:
13 Q. Okay. Exhibit No. 8, this is
14 in December of 2008. Who is Ted Archer?
15 A. He was a salesman for Mazer.
16 Q. Okay. And he would have
17 worked, on that corporate chart, under, I
18 take it, Mike O'Kain?
19 A. Not directly.
20 Q. Okay. Where is Mike O'Kain
21 now, if you know?
22 A. I believe he works for Dick's
23 Sporting Goods.
24 Q. And where is Dick's Sporting

Page 60

1  Goods?
2  A. There are many stores. I'm not
3  sure which store he is in.
4  Q. Is he in the Birmingham area?
5  A. I believe so.
6  Q. Okay. Have you spoken with him
7  about these issues, the issue of the Chinese
8  drywall?
9  A. Not recently.
10 Q. When's the last time you spoke
11 to him about it?
12 A. When he was an employee.
13 Q. Okay. And when was that?
14 A. He left in middle '09.
15 Q. Okay. So less than a year ago?
16 A. Probably.
17 Q. Okay. And, as best you know,
18 he lives in the Birmingham area, correct?
19 A. Yes.
20 Q. He works for Dick's Sporting
21 Goods, correct?
22 A. Yes.
23 Q. Can you provide your counsel
24 with his last telephone numbers and address,

Page 61

1  unless you know them off the top of your
2  head?
3  A. Yes and no.
4  Q. Okay. Do you know his -- where
5  did he live, the last time you know?
6  A. In the Birmingham area.
7  Q. Okay. But you don't know the
8  address?
9  A. No.
10 Q. Okay. What about his telephone
11 number, do you recall it?
12 A. No.
13 Q. Okay. Then I take it you can
14 provide counsel with that information from
15 your records?
16 A. Yes.
17 Q. Okay. Does Ted Archer still
18 work for you?
19 A. No.
20 Q. All right. And where is Ted
21 Archer, as best you know? In other words,
22 what's your last recollection or your
23 recollection of his last address or where he
24 lived? Obviously, Birmingham area?

Michael A. Mazer
January 29, 2010

Chinese Drywall Liability MDL

**Page 102**

1  MR. BOTTCHER: I believe we're
2  on No. 15.
3    BY MR. LAMBERT:
4  Q.  -- 15. Now, this is in April
5  of 2009, and if you'd read it into the
6  record, I'd appreciate it, please.
7  A.  "We continue to have many calls
8  from customers concerned about Chinese
9  drywall. If you receive any questions or
10 concerns, please refer the customer to the
11 website listed below that describes what to
12 look for.
13    "The sheetrock sold at Mazer is
14 not the toxic drywall that has been in the
15 news. The toxic drywall is easily
16 identifiable and is not sold at Mazer." The
17 website, NBC-2.com.
18 Q.  Okay. Is that the same website
19 we saw before?
20 A.  Yes.
21 Q.  Is that the same website that
22 you referred everybody to?
23 A.  Yes.
24 Q.  Okay. And what was the basis

**Page 103**

1  of Mazer having told all of its employees to
2  assure their customers that there was no
3  problem with the Chinese drywall?
4    MR. LOGSDON: Object to the
5  form, mischaracterizes what the e-mail
6  says.
7    THE WITNESS: I don't
8  understand your question.
9    MR. LAMBERT: Let me withdraw
10 it.
11   BY MR. LAMBERT:
12 Q.  Is this an e-mail that was sent
13 to, as it says, all employees?
14 A.  Yes.
15 Q.  Okay. And it says that, "We
16 continue" -- this is April the 15th. "We
17 continue to have many calls from customers
18 concerned about Chinese drywall."
19   Now, did Mazer sell any drywall
20 at any store other than the drywall that
21 we've talked about that came from Devon
22 International?
23 A.  In what period?
24 Q.  This time frame.

**Page 104**

1  A.  No.
2  Q.  Okay. So all of the drywall
3  that Mazer would have sold, Mazer knew came
4  from China, correct?
5    MR. LOGSDON: Object. Object
6  to the form.
7  A.  In this time frame.
8    BY MR. LAMBERT:
9  Q.  In this time frame, correct?
10 A.  Yes.
11 Q.  Okay. And at this point in
12 time, I believe that you hadn't received any
13 reports from anyone that the drywall that was
14 being sold by Mazer was not defective,
15 correct?
16 A.  Would you repeat?
17 Q.  Sure.
18   You can't point me to any
19 document or communication that indicates that
20 Mazer received from anyone information that
21 this drywall wasn't toxic --
22   MR. BOTTCHER: Object to form.
23   MR. LOGSDON: Object to form.
24   BY MR. LAMBERT:

**Page 105**

1  Q.  -- from testing?
2  A.  Or was toxic.
3  Q.  Or was.
4  A.  Either, no.
5  Q.  That's correct? Okay.
6    And yet -- and so the basis
7  of -- well, first of all, based on this
8  communication which we've marked for
9  identification as No. 15, there was no
10 instruction to employees of Mazer to record
11 individuals who made complaints so that you
12 could contact them in the future, if you had
13 any results from Chinese drywall-testing?
14   MR. BOTTCHER: Object to the
15 form.
16   BY MR. LAMBERT:
17 Q.  Meaning any results from -- let
18 me redo the question again.
19   Was there any attempt on the
20 part of Mazer to catalog the continued
21 complaints that you were receiving in the
22 April time frame?
23 A.  No.
24 Q.  Okay. So there would --

### Page 126

1 A. I don't know.
2 Q. Okay. In a document that we've
3 already marked -- and I didn't mark down
4 which one it was. The one that talks about
5 the $50,000.
6     MR. LAMBERT: That's probably
7 it, right there.
8     MR. BOTTCHER: Oh.
9     MR. LAMBERT: No. 7.
10    MR. BOTTCHER: All right.
11    BY MR. LAMBERT:
12 Q. It says, "50,000 tomorrow,
13 which is payment in full for all 30 loads to
14 be picked up by Mazer through January 25th."
15    Were those the -- is that the
16 totality of the number of loads?
17 A. No, because later in the
18 e-mail, it says there's another PO for 100
19 loads.
20 Q. Okay. That's in the same
21 e-mail. That's right. I see that.
22    So that's 100 loads and 30
23 loads. Are those truckloads?
24 A. Yes.

### Page 127

1 Q. Okay. And so that's 130
2 truckloads. Do you know of any more?
3 A. No.
4 Q. That would be the totality of
5 it, as best you know?
6 A. We may not have received all of
7 the last 100, either.
8 Q. Okay. And about how many
9 sheets per load?
10 A. 476.
11    MR. LAMBERT: Okay.
12    MR. BOTTCHER: Hey,
13 Mr. Lambert, we're getting awfully
14 close to noon. When you get to a good
15 point to stop for lunch, we've been
16 going for about three hours.
17    MR. LAMBERT: Okay.
18    (Whereupon, Deposition Exhibit
19 Mazer-Mazer-18, Mazer Payment
20 Information, MAZER'S_0648 -
21 MAZER'S_0656, was marked for
22 identification.)
23    BY MR. LAMBERT:
24 Q. Let me mark for identification

### Page 128

1 as No. 18 Mazer 648 through 656, Mazer
2 payment information, which has to do with
3 Devon International.
4    Can you flip through those and
5 tell me, in general, in simple terms, what
6 they are?
7 A. Page 1 is a copy of a check,
8 which was never mailed, because we wrote on
9 it "Wire Transfer"; and then the second page
10 is the wire transfer request.
11 Q. Okay.
12 A. Same with pages 3 and 4, 5 and
13 6, 7 and 8.
14 Q. And this has to do with Mazer's
15 purchase of drywall from Devon?
16 A. Yes.
17    (Whereupon, Deposition Exhibit
18 Mazer-Mazer-19, Devon International
19 Invoices and Payment Information,
20 MAZER'S_0658 - MAZER'S_0687, was
21 marked for identification.)
22    BY MR. LAMBERT:
23 Q. Okay. Can you tell me, in
24 general, what those documents represent,

### Page 129

1 which are labeled "Devon International
2 Invoices and Payment Information"?
3 A. These are invoices from Devon
4 for shipments.
5 Q. Okay. As best you know, are
6 those complete?
7 A. I would think not. I mean, let
8 me say it another way: If there's 130
9 truckloads on here, yes, but I don't know.
10 Q. Okay. So those are
11 representative of truckloads invoiced from
12 Devon, but you're just not certain whether
13 they're all-inclusive; is that fair?
14 A. Yes.
15    (Whereupon, Deposition Exhibit
16 Mazer-Mazer-20, Mazer Purchase Orders,
17 MAZER'S_0712- MAZER'S_0722, was marked
18 for identification.)
19    BY MR. LAMBERT:
20 Q. Okay. Could you identify for
21 me, please, Exhibit No. 20.
22 A. The top page is the purchase
23 order.
24 Q. Okay.

Michael A. Mazer
January 29, 2010

Chinese Drywall Liability MDL

Page 198

1  that's the nature of Chinese drywall.
2  Q. Right.
3  A. That's not a defect.
4  Q. Okay. And so the fact that
5  this particular drywall was refunded on that
6  date because it was heavy wouldn't
7  necessarily have been what made it defective
8  in your mind, and not resold; is that right?
9  A. No, it would be resold.
10 Q. It would have been resold?
11 A. Yes.
12 Q. And presumably was?
13 A. Yes.
14 Q. You would agree with me, sir,
15 that in your dealings with the public and
16 your customers, it's important to be honest?
17 A. Yes.
18 Q. And to be forthright if your
19 product has a defect, right?
20 A. Yes.
21 Q. And you understand that because
22 if you -- if you're not, if you have
23 information about a defective product that's
24 not related to the client, the client or

Page 199

1  customer could be injured or hurt, right?
2  A. Not necessarily.
3  Q. But could be, depending on the
4  product?
5  A. Okay.
6  Q. Right?
7     So it's important -- and you
8  understand that the clients, if they call
9  with a complaint or question about a product,
10 rely upon you to tell them the truth -- when
11 I say "you," I mean your company -- about the
12 products that you sold, don't they?
13    MR. BOTTCHER: Object.
14    MR. LOGSDON: Object to the
15 form of the question.
16 A. Yes.
17    BY MR. REEVES:
18 Q. Okay. And it's important, not
19 only for you but those that work for you, to
20 be forthright with customers as well, right?
21    MR. BOTTCHER: Objection.
22 A. Yes.
23    BY MR. REEVES:
24 Q. Okay. Now, we talked earlier

Page 200

1  about the fact that I think even today, up
2  until the point -- this point, other than
3  what you've done with your attorneys in
4  private, there's not been any testing
5  performed by Mazer on any of this product,
6  right?
7  A. Yes.
8  Q. And we talked about information
9  that you gathered from Devon at the time that
10 you initially bought this wall, but I want to
11 talk about information that you gathered from
12 them once you became aware of the complaints
13 about the product.
14    Now, I understand that you made
15 additional phone calls to Devon to ask them
16 about that, didn't you?
17 A. Yes.
18 Q. But you didn't require them to
19 provide you any testing data, did you?
20    MR. BOTTCHER: Object to the
21 form.
22    MR. LOGSDON: And let me
23 just --
24 A. Actually, we asked for it.

Page 201

1     MR. LOGSDON: This has all been
2  covered.
3     MR. BOTTCHER: And it's
4  contrary to the documents that have
5  already been testified about.
6     MR. REEVES: Your objection has
7  been noted, and we can go on.
8     BY MR. REEVES:
9  Q. So the question is: You didn't
10 require them to provide any testing data, did
11 you?
12    MR. BOTTCHER: Same objection.
13 A. We did request it.
14    BY MR. REEVES:
15 Q. I understand you requested it,
16 but you said you never received it, right?
17 A. Correct.
18 Q. Okay. You didn't -- where
19 was -- where was the defective wall -- what
20 area in China was it coming from, to your
21 understanding?
22 A. I don't know.
23 Q. What area in China was the wall
24 that you sold -- where was it manufactured?

Chinese Drywall Liability MDL

Michael A. Mazer
January 29, 2010

Page 202

1  Where did it come from?
2  A. I don't know.
3  Q. Okay. So you basically had the
4  conversation with him. There's nothing in
5  your shipping records, Mazer's shipping
6  records, that led you to believe that this
7  problem with Chinese drywall didn't apply to
8  your product, was there?
9       MR. LOGSDON: Object to the
10 form of the question.
11 A. Apply? Rephrase, please.
12      BY MR. REEVES:
13 Q. My point is -- my point is, is:
14 Basically, the conversations you had with
15 Devon is what you had -- the entity that sold
16 it to you, is what you relied upon in
17 representing to customers that there was not
18 a problem with the drywall that you sold
19 them; isn't that true?
20      MR. LOGSDON: Object -- hang
21 on. Object to the form of the
22 question to the extent it
23 mischaracterizes --
24 A. No, that's not solely.

Page 203

1       MR. LOGSDON: Hang on just a
2  second.
3       THE WITNESS: I'm sorry.
4       MR. LOGSDON: We don't get to
5  talk much.
6       THE WITNESS: Help yourself.
7  Knock yourself out.
8       MR. LOGSDON: Object to the
9  form of the question to the extent it
10 mischaracterizes what he's talked
11 about previously as to the things he's
12 done to check on the drywall.
13      MR. REEVES: You may answer.
14      THE WITNESS: Now you've got to
15 say it all again.
16      BY MR. REEVES:
17 Q. Here's the point, and look,
18 we're trying to wrap it up here, so my
19 question is simply this: My understanding of
20 what you had said is that you made calls to
21 Devon, or representatives of Devon, once it
22 became widely known in the media of the
23 potential problem with Chinese drywall,
24 right?

Page 204

1  A. Yes.
2  Q. You called them?
3  A. Yes.
4  Q. And they gave you assurances,
5  oral assurances, that the drywall that they
6  sold you was not problem drywall; is that
7  correct?
8  A. Yes. But it was not the
9  drywall mentioned in the articles that were
10 coming out at the time. More importantly, in
11 the three years that we sold that drywall, we
12 never had complaints of smell or corrosion.
13 Q. I understand that part.
14 A. So that -- my point to you is:
15 Devon's assurances weren't the only thing
16 that gave us confidence that our drywall was
17 of good quality.
18 Q. Well, you understand, sir, if
19 somebody's got a house, and, for instance,
20 the air-conditioning coils go out once every
21 year in a new house, that an average person
22 wouldn't typically relate that, necessarily,
23 to his drywall. You agree with that, don't
24 you?

Page 205

1  A. Yes.
2  Q. Okay. And so unless
3  somebody -- or somehow, a connection is made,
4  the average person in the house isn't going
5  to go, when their coil goes out, and say,
6  "It's got to be the drywall." That's asking
7  a little much, don't you think?
8       MR. BOTTCHER: Object to the
9  form.
10      BY MR. REEVES:
11 Q. Don't you agree?
12 A. Yes. But it is much more
13 likely, given my meager knowledge of HVAC
14 systems, that it was a bad coil itself.
15 Q. Well, we can debate that later,
16 but you understand that basic fact.
17      Just because somebody had
18 electrical problems or problems with
19 appliances going out or problems with an
20 air-conditioning coil, you wouldn't expect
21 that person to immediately connect that to
22 Chinese drywall, would you? That's
23 unreasonable.
24      MR. BOTTCHER: Object to form.