# Exhibit "A"

```
<<
/ASCII85EncodePages false
/AllowTransparency false
/AutoPositionEPSFiles true
/AutoRotatePages /All
/Binding /Left
/CalGrayProfile (Dot Gain 20%)
/CalRGBProfile (sRGB IEC61966-2.1)
/CalCMYKProfile (U.S. Web Coated \050SWOP\051 v2)
/sRGBProfile (sRGB IEC61966-2.1)
/CannotEmbedFontPolicy /Warning
/CompatibilityLevel 1.4
/CompressObjects /Tags
/CompressPages true
/ConvertImagesToIndexed true
/PassThroughJPEGImages true
/CreateJDFFile false
/CreateJobTicket false
/DefaultRenderingIntent /Default
/DetectBlends true
/ColorConversionStrategy /LeaveColorUnchanged
/DoThumbnails false
/EmbedAllFonts true
/EmbedJobOptions true
/DSCReportingLevel 0
/SyntheticBoldness 1.00
/EmitDSCWarnings false
/EndPage -1
/ImageMemory 1048576
/LockDistillerParams false
/MaxSubsetPct 100
/Optimize true
/OPM 1
/ParseDSCComments true
/ParseDSCCommentsForDocInfo true
/PreserveCopyPage true
/PreserveEPSInfo true
/PreserveHalftoneInfo false
/PreserveOPIComments false
/PreserveOverprintSettings true
/StartPage 1
/SubsetFonts true
/TransferFunctionInfo /Apply
/UCRandBGInfo /Preserve
/UsePrologue false
/ColorSettingsFile ()
/AlwaysEmbed [ true
]
/NeverEmbed [ true
]
/AntiAliasColorImages false
/DownsampleColorImages true
/ColorImageDownsampleType /Bicubic
/ColorImageResolution 300
/ColorImageDepth -1
/ColorImageDownsampleThreshold 1.50000
```

```
/EncodeColorImages true
/ColorImageFilter /DCTEncode
/AutoFilterColorImages true
/ColorImageAutoFilterStrategy /JPEG
/ColorACSImageDict <<
 /QFactor 0.15
 /HSamples [1 1 1 1] /VSamples [1 1 1 1]
>>
/ColorImageDict <<
 /QFactor 0.15
 /HSamples [1 1 1 1] /VSamples [1 1 1 1]
>>
/JPEG2000ColorACSImageDict <<
 /TileWidth 256
 /TileHeight 256
 /Quality 30
>>
/JPEG2000ColorImageDict <<
 /TileWidth 256
 /TileHeight 256
 /Quality 30
>>
/AntiAliasGrayImages false
/DownsampleGrayImages true
/GrayImageDownsampleType /Bicubic
/GrayImageResolution 300
/GrayImageDepth -1
/GrayImageDownsampleThreshold 1.50000
/EncodeGrayImages true
/GrayImageFilter /DCTEncode
/AutoFilterGrayImages true
/GrayImageAutoFilterStrategy /JPEG
/GrayACSImageDict <<
 /QFactor 0.15
 /HSamples [1 1 1 1] /VSamples [1 1 1 1]
>>
/GrayImageDict <<
 /QFactor 0.15
 /HSamples [1 1 1 1] /VSamples [1 1 1 1]
>>
/JPEG2000GrayACSImageDict <<
 /TileWidth 256
 /TileHeight 256
 /Quality 30
>>
/JPEG2000GrayImageDict <<
 /TileWidth 256
 /TileHeight 256
 /Quality 30
>>
/AntiAliasMonoImages false
/DownsampleMonoImages true
/MonoImageDownsampleType /Bicubic
/MonoImageResolution 1200
/MonoImageDepth -1
/MonoImageDownsampleThreshold 1.50000
```

/EncodeMonoImages true
/MonoImageFilter /CCITTFaxEncode
/MonoImageDict <<
/K -1
>>
/AllowPSXObjects false
/PDFX1aCheck false
/PDFX3Check false
/PDFXCompliantPDFOnly false
/PDFXNoTrimBoxError true
/PDFXTrimBoxToMediaBoxOffset [
0.00000
0.00000
0.00000
0.00000
]
/PDFXSetBleedBoxToMediaBox true
/PDFXBleedBoxToTrimBoxOffset [
0.00000
0.00000
0.00000
0.00000
]
/PDFXOutputIntentProfile ()
/PDFXOutputCondition ()
/PDFXRegistryName (http://www.color.org)
/PDFXTrapped /Unknown

/Description <<
/FRA
<FEFF004f007000740069006f006e00730020007000650072006d0065007400740061006e00740020006
40065002000630072006500720020006400650073002000640006f00630075006d0065006e0074007
300200050004400460020006400f007400e90073002000640027007500060065002000720e90073006f
006c007500740069006f006e002000e9006c0065007600e90065002000700006f00750072002000750060e0
06500200071007500610060c0069007400e90020006400270069006d00700007200650073007300069006f0
06e00200061006d00e9006c0069006f007200e90065002e00200049006c00200065007300740020007000
6f007300730069006200600c0065002000640027006f007500760072006900720020006300650073002000
4006f00630075006d0065006e00740073002000500044004600200064006100e00730020004100630007
2006f006200610074002000650074002000520065006100640065007200002c002000760065007200073006
9006f006e002000200035002e003000020006f007500200075006c007400e9007200690065007500720065
002e>
/ENU (Use these settings to create PDF documents with higher image resolution for improved printing quality. The PDF documents can be opened with Acrobat and Reader 5.0 and later.)
/JPN
<FEFF3053306e8a2d5b9a306f30019ad889e350cf5ea6753b50cf3092542b3080002000500044004600020
658766f830924f5c62103059308b3068304d306b4f7f75283057307e305930025370523766423060e753b8c
ea30926700592796500306b4fdd306430533068304c3067304d307e305930023053306e8a2d5b9a30674f5
c62103057305f00200050004400460020658766f8306f002000410063007200600f006200610074000020304a3
08830730020005200650061006400650072002000035002e003000204ee5964d30678868793a3067304d3
07e30593002>
/DEU
<FEFF00560065007200770065006e00640065006e002000530069006500200064006900650073006500
2000450069006e007300740065006c006c0075006e00670065006e0020007a0075006d00200045007200
7300740065006c006c0065006e00200076006f006e0020005000440046002d0044006f006b0075006d006
5006e00740065006e0020006d0069007400200065006900600e00650072002000680060f6006800650072006
5006e002000420069006c00640061007500660006c00f600730075006e0067002c00200075006d00200065

0069006e006500200076006500720062006500730073006500720074006500200042006900c00640071
00750061006c0069007400e400740020007a007500200065007200720a00690065006c0065006e002e0020
0044006900650020005000440046002d0044006f006b0075006d0065006e007400650020006b00f6006e0
06e0065006e0020006d0069007400200041006300720006f006200610074002000060064006500720020000
6d006900740020006400650006d0020005200650061006400650072002000035002e003000200075006e00
640020006800f6006800650072002000670065006500f60066006e006500740020007700650072006400060
5006e002e>
/PTB
<FEFF005500740069006c0069007a006500200065007300740061007300200063006f006e0066006900060
7007500720061006e700f5006500730020007000610072006100200063007200690061007200200064006f
00630075006d0065006e0074006f007300200050004400460020063006f006d00200075006d006100200
07200650073006f006c007500e700e3006f00200064006500200069006d006100670065006d002000730
0750070006500720069006f0072002000700061007200610020006f0062007400650072002000075006d006
1002000710075006100640061006400650020006400650200069006d007000720065007300700
300e3006f0020006d0065006c0068006f0072002e0020004f007300200064006f00630075006d0065006e0
074006f0073002000500044004600200070006f00640065006d00200073006500720020006100620006500
720074006f007300200063006f006d0020006f002000410063007200006f00620061007400002c00200052006500
0061006400650072002000035002e0030002000650020007300750700065007200069006f0072002e>
/DAN
<FEFF00420072007500670020006400690073007300650020006900006e0064007300740069006c006c00
69006e0067006500720020007400069006c002000610074002000006f007000720065007400740065002000
500044046002d0064006f006b0075006d0065006e00740065007200200006d006500640020006800f8006
a006500720065002000620069006c006c00650064006f0070006c00f80073006e0069006e0067002000066
006f0072002000610074002000600e50020006200650064007200650020007500640073006b00720069
00660074007300006b00760061006c0069007400650074002e00200005000440046002d0064006f006b0075
006d0065006e007400650072020006b0061006e002000e50062006e00650073020006d006500640020
0041006300072006f006200610074002000006f006700200052006500610064006500720200035002e00300
020006f00670020006e007900650072065002e>
/NLD
<FEFF0047006500620072007500069006b002000640065007a006500200069006e007300740065006c00
6c0069006e00670065006e0020006f006d0020005000440046002d0064006f00630075006d0065006e007
40065006e00200074006500020006d0061006b0065006e0020006d0065007400200065006500e0020006
8006f006700650072006500200061006600062006500650006c00640069006e00670073007200650073006f
006c0075007400690065020076006f006f007200200065006500e00200062006500740065007200200650
0200061006600064007200075006b006b00770061006c006900740065006900740002e0020004400650020
05000440046002d0064006f00630075006d0065006e00740065006e0020006b0075006e006e0065006e0
0200077006f007200640065006e002000670065006f00700065006e00640020006d006500740020004100
630072006f006200610074002000065006e002000520065006100640065007200200035002e0030002000
65006e00200068006f006700650072002e>
/ESP
<FEFF0055007300650020006500730074006100730020006f007000630069006f006e006500730020007
00061007200610020006300720065006100720200064006f00630075006d0065006e0074006f00730020
00500044004600200063006f006e0020006d00610079006f0072002000720065073006f006c00750063
06900f3006e00200064006500200069006d006100670065006e002000700061007200610020006100750
06d0065006e007400610072020006c00610020063061006c00690064006100640020061006c00200
069006d007000720069006d00690072002e0020004c006f00730020064006f00630075006d0065006e00
74006f00730020005000440046002000730065002000700075006500640065006e00200061006200720
0690072002000063006f006e00200041006300072006f006200610074002000079002000520065006100640
0500720020035002e0030002000790020007600650072007300069006f006e00650073002000070006f0073
00740065007200069006f007200650073002e>
/SUO
<FEFF004e00e400690064006500e00200061007300650074007500730074006500e002000610076000
75006c006c0061002000076006f0069006400610061006e0020006c0075006f00640061002000500044004
6002d006100730069006100006b00690072006a006f006a0061002c0020006a006f0069006400650006e0020
00740075006c006f007300740075073006c0061006100740075020006f006e0020006b006f0072006b00
6500610020006a00610020006b00750076006100e00200074006100072006b006b0075007500730002000

```
730075007500720069002e0020005000440046002d0061007300690061006b00690072006a0061007400
200076006f00690064006100610006e00200061007600610074006100200041006300720006f0062006100
4002d0020006a0061002000410063007206f00620061007400200052006500610064006500720020003
5002e00300020002d006f0068006a0065006c006d0061006c006c0061002000740061006900200750075
00640065006d006d0061006c006c00610020007600650072007300690006f006c006c0061002e>
  /ITA
<FEFF00550073006100720065002000710075006500730074006500200069006d0070006f00730074006
1007a0069006f006e006900200070006500720020006300720065006100720065002000064006f00630075
006d0065006e00740069002000500044004600200063006f006e00200075006e006100200007200690073
006f006c0075007a0069006f006e00650020006d0061006700670069006f0072006500200070006500720
0200075006e006100200007100750061006c0069007400e0002000064006900200073007400610006d00700
0610020006d00690067006c0069006f00720065002e00200049002000064006f0063007500 6d0065006e00
740069002000500044004600200070006f00730073006f006e006f0020006500730073006500720065002
00061007000650072007400690020000063006f006e002000410063007206f006200610074002000650020
0052006500610064006500720200035002e00300020006500200007600650072007300690006f006e0069
0020007300750063006300650073007300690007600650 02e>
  /NOR
<FEFF004200720075006b00200006400690073007300650020000069006e006e007300740069006c006c00
69006e00670065006e006500200074006900 6c002000e50020006f00700070007200650074007400 6500
2000500044004600 2d0064006f006b0075006d0065006e0074006500720020006d00650064002000 6800f
8007900650072006500200062006900 6c00640065006f00700070006c00f80073006e0069006e00670020
0066006f007200200062006500640072006500200075007400730006b007200690066007400 73006b0076
0061006c006900740065007 4002e00200050004400 46002d0064006f006b0075006d0065006e00740065
006e00650020006b0061006e002000e50070006e006500730020006d006500640020004100630072006f
00620061007400200006f006700200052006500610064006500720200035002e003000 20006f006700200
0730065006e006500720065002e>
  /SVE
<FEFF0041006e007600e4006e0064002000640065002000 6800e40072002000 69006e0073007400e400
6c006c006e0069006e006700610072006e00610020006e00e4007200200064007500200076006 9006c00
6c0020007300 6b006100700061002000500044004600 2d0064006f006b0075006d0065006e0074002000
6d00650064002000 6800f6006700720065002000620069006c0064007500700070006c00f60073006e006
9006e0067002000 6f006300 6800200064 00e40072006d006500640020006600e50020006200e40074007
4007200650020007500740073006b0072006900660074007 3006b00760061006c00690074006500 74002
e00200050004400 46002d0064006f006b0075006d0065006e00740065006e0020006b0061006e002000f6
00700070006e006100730020006d0065006400200041006300 72006f00620061007400 20006f00630 0680
02000520065006100640065007200200035002e0030002000 65006c006c0065007200200073 0065006e0
06100720065002e>
 >>
>> setdistillerparams
<<
 /HWResolution [2400 2400]
 /PageSize [612.000 792.000]
>> setpagedevice
```

# Exhibit "B"

**Lenny Davis**

**From:** Steven Glickstein [sglickstein@kayescholer.com]
**Sent:** Monday, July 05, 2010 10:34 AM
**To:** Lenny Davis
**Cc:** Jay Mayesh; Robert Grass; Douglas.Sanders@bakermckenzie.com; Karin Garvey; Grand, Jeff; flonger@lfsblaw.com; alevin@lfsblaw.com; Russ Herman; BASSH@gtlaw.com; RDuplantier@gjtbs.com; AnthonyIrpino; Gonzalez, Ervin; Miller, Kerry J.
**Subject:** Fw: MDL Discovery
**Attachments:** 32003256_V1.RTF

**Lenny:**

**Thanks for your comments. I have conferred with Jay and responded in red type to each of your comments below. Also attached is a revised draft discovery order (redlined) to reflect some of your comments.**

**I am travelling this afternoon and Tuesday, but can participate in a telphone conference on Wednesday at 9 am Central time, 10 am Eastern, if you would like to discuss this.**

**I hope you enjoyed your July 4th weekend.**

**Steve**

----- Forwarded by Robert Grass/NY/US/KSFHH on 07/02/2010 06:43 PM -----

"Lenny Davis" <LDAVIS@hhkc.com>
07/01/2010 11:12 AM

To "Steven Glickstein" <sglickstein@kayescholer.com>
cc "Jay Mayesh" <JMayesh@kayescholer.com>; "Robert Grass" <rgrass@kayescholer.com>; <Douglas.Sanders@bakermckenzie.com>; "Karin Garvey" <KGarvey@kayescholer.com>; "Grand, Jeff" <jgrand@seegerweiss.com>; <flonger@lfsblaw.com>; <alevin@lfsblaw.com>; "Russ Herman" <RHERMAN@hhkc.com>; <BASSH@gtlaw.com>; <RDuplantier@gjtbs.com>; "AnthonyIrpino" <airpino@irpinolaw.com>; "Gonzalez, Ervin" <Ervin@colson.com>; "Miller, Kerry J." <kmiller@frilot.com>
Subject RE: MDL Discovery

Hope you had a great vacation. We certainly missed you. I am sure you did not think about us at all while you were enjoying the fun. Anyway back to the grind!!

At the status conference we met and conferred with Jay and Doug. Below I will address the issues discussed in the same order of my email of Wednesday June 23. We covered the following:

#1) The protocol we established should apply to Knauf Gips. Knauf defendant entities agreed that it would key its document production by bates # with specific persons or the department with whom the documents are associated. We reviewed the email sent containing this info and we want to be sure that we have a complete set of all knauf entity productions cross referenced to specific persons data produced. Please check and let us know as we do not think that at this time we have 100% for all the productions made.

**I believe this was already taken care of. Paragraph 4 of the proposed discovery order obligates Knauf Gips, as well as KPT, Wuhu and Donnguan, to identify documents by custodian. You are correct that you do not yet have a complete custodial list with respect to the documents that have been produced by Knauf Gips. We are working on that and will provide you with one. We hope to have this finished by July 8.**

#2 & 5) Whereas search terms for China were agreed to, the same can not be said for GIPS. Those were done without any input or consultation with the PSC. Accordingly, the PSC shall review the search terms and advise Knauf of our findings. Jeff Grand will address this further with you. Further, the expanse of the prior search must be revisited. We only received 2 years of data and that is not what was previously agreed to. We asked for data from 2000 forward and in a prior meet and confer agreed to begin with full reservations of right and without prejudice to accept 2005 forward at this time. We have not received the 2005 forward data as promised and agreed to. In addition,Knaufs' search of laptops but not servers is not consistent with the agreed protocol. Knauf agreed to search the servers (without time frame). Also, the search must be expanded to persons more knowledgeable of the drywall problem Jay agreed to additional searches and to this end, we have already provided additional names in my email of june 25..

**You are correct that we agreed to search terms for the Chinese companies, but not with respect to the jurisdictional discovery directed to Knauf Gips. For that reason, paragraph 3 of the proposed order states that the ESI relating to jurisdictional discovery will proceed based on mutually agreeable search terms and from mutually agreeable custodians after a meet and confer. We understand that Jeff Grand will get back to us on that issue. In that connection, Doug Sanders sent a Word version of the search terms Jeff so that he could provide redline suggestions.**

**As for the time period, paragraph 1 of the proposed order reflects Jay's agreement to produce documents from 2005 through September 30, 2009 (the last full month prior to the PSC's and the HSC's requests). This is without waiver of your position regarding the earlier time period.**

**Please note that some of the people listed in the attachment to your e-mail of June 25 are not employed by Knauf Gips, KPT, Wuhu or Dongguan, and therefore they likely have no custodial**

**files to search. We look forward to Jeff Grant and Doug Sanders reaching agreement on the parameters of the search, including the custodian list and the German search terms.**

#3, 4 & 6) Although we reiterated our prior comment and again expressed our concern that we can not get jammed on document production, Knauf revealed that it was going to have to go back to rerun its searches (No time-frame for completing this search was provided.) and we are concerned about this. Jay assured us we would not get jammed. Knauf stated that foreign documents would not be produced until July 8, but when they are produced they will be accompanied by Knauf's translations. Jay agreed that we would get all English translations that exist. In addition, Knauf will prioritize its production by focusing on KPT first, then the other Knauf entities.

**On the time frame, let me break out the documents into two categories. As to the documents we originally agreed to produce, I am comfortable that everything will be produced at least a month before the first 30(b)(6) deposition. We are shooting for July 8 for Knauf Gips, KPT and Wuhu, and July 15 for Donnguan.**

**As to the time frame for producing documents based on expanded time period, search terms and custodians, what Jay recalls saying is that it was not in our interest to produce documents late, because that would potentially expose the 30(b)(6) witnesses to multiple depositions.**

**Having said that, and reflecting upon what will be required to expand the production -- there will be an expanded time frame, an expanded list of custodians and for Knauf Gips expanded search terms -- realistically it will not possible to complete the expanded production by the middle of August. In order to provide a realistic estimate for completion of the expanded production, we need to wait until Jeff Grand and Doug Sanders agree on the search terms and custodian list, after which it would take some time to assess the magnitude of the additional task.**

**We acknowledge that you have reserved the right to argue that you must renew depositions of 30(b)(6) witnesses if you are prejudiced by that. In the ideal world, it would be best to wait until the expanded production is completed before the 30(b)(6) depositions are taken. However, in anticipation that you may be unwilling to do that, in good faith we are not seeking to pull back the 30(b)(6) depositions, and are accepting the risk that the depositions may have to be continued if you can demonstrate prejudice as a result of later produced documents.**

**With respect to translations of foreign language documents, Jay's understanding was that he had agreed to produce all translations of foreign language documents that exist in the files in the usual course of business, which is reflected by paragraph 5 of the proposed order. There are indeed Chinese and German documents that were translated in the ordinary course of business, some of which have already been produced and the rest of which you will receive in the next wave of production.**

**Jay did not understand you to be talking about production of translations that did not exist in the ordinary course of business but which were instead recently commissioned by counsel solely for purpose of assisting counsel in the defense of this litigation. We have in fact arranged for translation of certain documents, but those litigation-created translations are clearly attorney work product, in that the selection of documents to be translated reflects counsel's strategy and mental impressions.**

7) Knauf discussed the nature of state secrets in China. Knauf expressed concern that documents on the server could be subject to state secrets. We disagreed but understood Knauf's position. Jay agreed to identify any documents Knauf contends are subject to the state secret and list them with full identification and reason in the privilege log so that if necessary we can address the issue with the court. In addition we requested an up to date privilege log that identifies attorneys and we were advised we would receive this very soon.

**In paragraph 6 of the proposed order, we have agreed to provide both a privilege log and a state secrets log. We hope to have that completed by July 9 or shortly thereafter.**

8) Builder liaison should be copied. **We will of course copy Hillary Bass on our correspondence.**

9) I mentioned various testing of drywall done by the Germans and the absence of any production of testing results. In addition, source problems were also referenced and the the absence of any production was noted. Knauf agreed that this information was relevant and would be produced.

**We have agreed to produce such non-privileged documents, which is reflected in paragraph 2 of the revised proposed order.**

We also discussed and Jay agreed to develop some language to include either in a stipulation or in the proposed scheduling order to address the caption issue. By that, we agreed that the caption would only relate to those actions in which the Knauf entities were served, but not ALL ACTIONS. We understood that Knauf was concerned that the latter caption could be construed to reflect a waiver on its part to the jurisdiction of the court. Knauf, however, has no reservation that the depositions could be used in any case within the MDL to the fullest extent permitted by the FedR.Civ.P. we do not see that this has been addressed in your most recent draft of the scheduling order and are still waiting to see the proposed stipulation agreed to since you did not include the language in the proposed scheduling order.

**We have included such language in paragraph 12 of the revised proposed order.**

As to the dates you proposed for the 30(B)(6) depositions we can agree to Sept 20/21 provided we also schedule and agree to the other individual depositions we identify below. Please revise the scheduling order accordingly so that we can conclude the scheduling order and stipulation and get them to the court in final agreed form.

**As indicated above, further depositions should be scheduled after the document production and 30(b)(6) depositions have been completed.**

Jay agreed to accept service of notices of deposition on all Knauf employees without the need for formal service of subpoena. **We have included such language in paragraph 11 of the revised proposed order, but please note that the agreement extends to officers, directors or employees of those entities which have been served in the litigation.** The following is an initial list of folks we desire to depose and we would like to get these depositions set as soon as possible. We are prepared to begin the depositions now as soon as you advise as to availability:

1) Isabel Knauf

2) Hans Hummell

3) Mark Norris

4) Tony Robson

5) Martin Grundke

**We can accept service of a deposition notice on behalf of each of these individuals. Please note that while we are willing to bring 30(b)(6) witnesses to the United States, the depositions of other individuals will for their convenience be in the country of their employment, unless by mutual consent the parties agree otherwise.**

Finally, we discussed dates for future depositions and Jay advised he would discuss availability between now and September. **Jay's recollection on this is different than yours. He does not recall committing to a specific timetable for non-30(b)(6) depositions. As previously indicated, we are willing to start with the 30(b)(6) depositions before document production is complete, and to accept the possibility that the depositions will be continued. But, for other witnesses, the depositions will have to wait until production is finished. Otherwise, every witness will be subject to multiple depositions.**

Leonard A. Davis
Attorney at Law
Herman, Herman, Katz & Cotlar LLP
Herman Gerel LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
504-581-4892
504-561-6024(fax)

*This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) immediately at (504) 581-4892 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.*

CONFIDENTIAL ATTORNEY WORK PRODUCT

---

**From:** Steven Glickstein [mailto:sglickstein@kayescholer.com]
**Sent:** Wednesday, June 30, 2010 5:19 PM
**To:** Lenny Davis; BASSH@gtlaw.com; Fred Longer
**Cc:** Jay Mayesh; Robert Grass; Douglas.Sanders@bakermckenzie.com; Karin Garvey
**Subject:** MDL Discovery

Lenny, Hillary and Fred:

I'm sorry I missed you in New Orleans last week, although I must confess being on vacation was a lot more fun.

I understand that you and Jay and Doug worked out a number of issues. We've drafted a stipulated order covering those discussions, which I have attached. We welcome your comments regarding same.

Please note that I've left the date for the September depositions blank pending your letting me know which of the two proposed dates works best for you.

Regards,

Steve

* * * *

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

* * * *

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice cont

# Exhibit "C"

**Lenny Davis**

**From:** Lenny Davis
**Sent:** Wednesday, July 21, 2010 3:40 PM
**To:** 'Steven Glickstein'
**Cc:** AnthonyIrpino; alevin@lfsblaw.com; BASSH@gtlaw.com; Douglas.Sanders@bakermckenzie.com; Gonzalez, Ervin; flonger@lfsblaw.com; Grand, Jeff; Jay Mayesh; Karin Garvey; Miller, Kerry J.; RDuplantier@gjtbs.com; Robert Grass; Russ Herman; Jay Mayesh; Robert Grass; Karin Garvey; Douglas.Sanders@bakermckenzie.com
**Subject:** RE: Document Production

With respect to you comments we appreciate the response. I am addressing each one in the order you address them:

1) Unfortunately knauf undertook searches without getting the PSC's input initially. We hope that we will not be delayed in getting a prompt full production. In particular I expressed a lot of concern that we have not received a full production of the jurisdictional discovery responses. We need to know specifically what production by bates numbers is responsive to the jurisdictional discovery requests as opposed to the general merits discovery requests. Knauf needs to identify the particular documents from the vast data dump that has been provided so far. You advised that you would look into this and get back to me so that if we need to address this with Judge Fallon we could do so asap. Please let me know As to schanow files we agreed to defer arguing on that issue as more discovery is needed and we need a completed privilege log with all of his documents identified. This is done with full reservation of all rights to both sides. Also we discussed that the PSC may have additional search terms and custodian files we desire once we have an opportunity to review the production and the PSC is not considering the searches exclusive or complete at this time. We reserve the right to add additional search terms and custodians at a later date.
2) We disagree with you and we will be addressing this with the court. We believe that knauf is "one economic unit" as the recent EU court declared and we have been arguing for quite some time and as a result and anyway the documents are under the care, custody and control of named parties to the litigation. We believe these documents should be produced now and especially the jurisdiction responses.
3) Same as 2 above
4) While marion may no longer be associated with knauf she was and we believe that her emails and documents as well as Thies' relate to jurisdictional issues. As to the other folks we expect to receive emails by or from them in the productions you will be providing.
5) Ok
6) See 2 and 3 above. We need to know when we will receive these. Also will we receive separately the jurisdictional responses?

I will be sending you some additional requests in light of the EU ruling. Specifically we are requesting all submissions made that relate to the "economic unit" argument including the organizational chart. The one organizational chart that you sent last week was incomplete and apparently the one given to the court outlined all of the various knauf organizations. Also the shareholders agreement referenced in the order/judgement will be requested

Leonard A. Davis
Attorney at Law
Herman, Herman, Katz & Cotlar LLP
Herman Gerel LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
504-581-4892
504-561-6024(fax)

*This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) immediately at (504) 581-4892 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.*

CONFIDENTIAL ATTORNEY WORK PRODUCT

---

**From:** Steven Glickstein [mailto:sglickstein@kayescholer.com]
**Sent:** Wednesday, July 21, 2010 1:46 PM
**To:** Lenny Davis
**Cc:** AnthonyIrpino; alevin@lfsblaw.com; BASSH@gtlaw.com; Douglas.Sanders@bakermckenzie.com; Gonzalez, Ervin; flonger@lfsblaw.com; Grand, Jeff; Jay Mayesh; Karin Garvey; Miller, Kerry J.; RDuplantier@gjtbs.com; Robert Grass; Russ Herman; Jay Mayesh; Robert Grass; Karin Garvey; Douglas.Sanders@bakermckenzie.com
**Subject:** Document Production

Dear Lenny:

Following up on Monday's call, here is where we stand with respect to document custodians, and in particular to the custodians you requested that we search in your June 25 email. For ease of reference the attachment below lists the affiliations of the individuals listed in your June 25 email.

**1. Custodians of KPT, Wuhu, Dongguan and Knauf Gips, to date the only parties served in the MDL:**

We will be searching the files of all but one of your requested custodians as follows.

**a. Custodians whose files were previously searched, and whose production is being updated pursuant to agreement:** Stephan Christmann, Rainer Erk, Oliver Nuss, Walter Seidel, Martin Sturmer, Michael Tremmel, Hans-Ulrich Hummel, Martin Halbach, Bernd Knochel, Gerhard Wellert, Jorg Demmich, Wolfgang Kestel, Klaus Koch, Harald Schmitt, Liu Ying, Wang Fang, Wang Lan, Zhang Fudong, Yan Hui Qing, Shailesh Kiorala, Mark Norris, Ann Zhong, David Gregory, Qiu Shiming, Yvonne Ip; Niu Shishan, Qin Yusheng, Chen Yong, Liang Chang Jiang and Liao Yan Bo.

**b. Custodians whose files are being searched for the first time pursuant to plaintiffs' July 1 request:** Baldwin Knauf, Nikolaus Knauf, Manfred Grundke, Manfred Paul, Hans Peter Ingenillem, Yuan



Hong Wen, Chenjie, Cyrille Fournier, Patrick James, Richard Arrowsmith and John Davis

**c. Requested custodian whose file is not being searched:** [Joerg Schanow, Knauf Gips General Counsel. We are advised that, in addition to objections previously stated, German law may prohibit the search of Mr. Schanow's files. We are investigating that issue further and will advise you.]

**2. Custodians of Knauf Insulation, which has been served in state court actions but not the MDL:** Jeff Brisley, Bob Claxton, Tony Robson, Jon Pereira and Mark Andrews

a. Knauf Insulation is not a defendant in the MDL. The only document request served on Knauf Insulation has been by INEX in state court.

b. Pursuant to our agreement with INEX's counsel Rick Duplantier, we will be producing U.S. Knauf Insulation documents relating to Chinese Drywall by August 12, and foreign Knauf Insulation documents relating to Chinese Drywall by September 14. INEX and Knauf Insulation agreed to proceed with the September 27-28 30-b-6 deposition of Knauf Insulation pursuant to this protocol. Both sides reserve their rights concerning other documents requested by INEX, i.e., documents not specifically relating to Chinese Drywall.

**3. Custodians whose files are not maintained by one of the served Knauf entities and whose files will not be searched:** Thies Knauf, Isabel Knauf and Barry Topple.

While Judge Fallon overruled Knauf Gips' motion to conduct discovery of it through the Hague Convention, he did not decide whether discovery of non-parties to the lawsuit can take place through means other than the Hague Convention. Our position is that discovery of foreign corporate entities who are not parties to the litigation must be conducted pursuant to the Hague Convention.

**4. Custodians who are not affiliated with any Knauf entity (or entities that are not Knauf entities):** Marion Knauf (former wife of Thies Knauf), Jawahar Rothchilt, William White, Donald "Mickey" Coblentz, Jack Landers, Artur Landers, Scott Giering, Gus Coffinas, Solomon Abadi, WCI, GL Homes, Distinctive Drywall, Beta Drywall, USG, La Suprema, Interior Exterior, Geary, Lennar, Doug Sanders, Jim Geary, Fraunhofer-Gesellschaft and Gordon Yeh

**5. Custodians we have not heard of:** Frank Clem, Heinz Ostereich, Adolph Wegmann, Sam Samarasingag, Scott Thomas, Hurrand and Michael Watkins

**6. Five "Priority Custodians" listed in your June 25 email:** The files of Hummel, Grundke, and Norris are being searched and given priority pursuant to the above email. Robson's file is being searched pursuant to the Knauf Insulation protocol described in #2 above. Isabel Knauf's custodial file is not being searched pursuant to #3 above. We note, however, that documents to or from Isabel Knauf appear in the files of the served Knauf entities, and those documents have been produced/are being produced.

* * * *

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice cont

# Exhibit "D"



Press and Information

Court of Justice of the European Union
**PRESS RELEASE No 68/10**
Luxembourg, 1 July 2010

Judgment in Case C-407/08 P
Knauf Gips KG v Commission

## The Court confirms the fine of €85.8 million imposed on Knauf Gips KG for its anti-competitive conduct on the plasterboard market

*The undertaking is solely liable for the infringements committed by the companies constituting the Knauf Group*

By Decision of 27 November 2002[1], the Commission imposed fines totalling €478 million on the undertakings Lafarge, Gyproc, BPB and Knauf Gips KG for their anti-competitive conduct on the plasterboard market. They had participated in a single, continuous infringement which was manifested, in particular, by exchanges of information on sales volumes, concerted action on price increases and meetings with a view to the sharing out or stabilisation of the plasterboard markets in Germany, the United Kingdom, France and the Benelux between 1992 and 1998.

The General Court, in its judgment of 8 July 2008[2] confirmed, as regards Knauf Gips KG, the Commission's decision and the fine of €85.8 million imposed on it. The undertaking then brought an appeal before the Court of Justice seeking to have that judgment set aside or the fine imposed reduced.

The Knauf Group is composed, in particular, of Knauf Gips KG and Gebrüder Knauf Verwaltungsgesellschaft KG ('GKV') which owns, directly or indirectly, ten or a dozen companies which operate on the plasterboard market.

Among the arguments deployed before the Court, Knauf Gips KG submits that GKV and its subsidiaries, on the one hand, and itself, on the other, do not constitute an economic unit in the competition law sense. Knauf Gips also challenges the fact that it was held liable for the actions of the Knauf Group.

First of all, the Court points out that the concept of an 'undertaking' covers any entity engaged in an economic activity, regardless of its legal status and the way in which it is financed. The concept of an undertaking must be understood as designating an economic unit even if in law that economic unit consists of several persons, natural or legal. The existence of an economic unit may thus be inferred from a body of consistent evidence, even if some of that evidence, taken in isolation, is insufficient to establish the existence of such a unit.

**The Court**, having analysed all that evidence, **concludes that the companies belonging to the Knauf family constitute an economic unit.**

As regards the role of Knauf Gips KG within the Knauf Group, the General Court found that it presented itself, during the administrative procedure as sole interlocutor with the Commission and did not challenge that capacity at any time during that procedure. In the General Court's view, the onus was on Knauf Gips KG to react during the administrative procedure, or be faced with the prospect of no longer being able to do so before the Courts of the Union, by demonstrating that, despite the factors relied on by the Commission, it could not be held liable for the infringement committed by the companies in the Knauf Group.

---

[1] Commission Decision 2005/471/EC of 27 November 2002 relating to proceedings under Article 81 of the EC Treaty (Case No COMP/E-1/37.152 – Plasterboard) (OJ 2005 L 166, p. 8).
[2] Case T-52/03 *Knauf Gips* v *Commission*. (see also Press Release 45/08)

On that point, the Court considers that there is no requirement under the law of the Union that the addressee of the statement of objections must react during the administrative procedure or be barred from doing so later at the stage of judicial proceedings. Although an undertaking's express or implicit acknowledgement of matters of fact or of law during the administrative procedure before the Commission may constitute additional evidence when determining whether an action is well founded, it cannot restrict the actual exercise of the right to bring proceedings before the General Court.

Consequently, the Court decides that **the General Court erred in law in holding that the onus was on Knauf Gips KG to react during the administrative procedure, or be faced with the prospect of no longer being able to do so before the Courts of the Union.**

Therefore, **the Court sets aside the General Court's judgment** insofar as it held that Knauf Gips KG was solely liable for the action of the Knauf Group in connection with the infringement.

Then, giving final judgment in the matter itself, the Court holds, on the basis of the body of evidence, that GKV does not determine its conduct on the market independently, but is dependent in that regard on Knauf Gips KG. The fact that there is no single legal person at the apex of the Knauf Group is no obstacle to Knauf Gips KG being held liable for the actions of that group.

Indeed, the legal structure particular to a group of companies, which is characterised by the absence of a single legal person at the apex of that group, is not decisive where that structure does not reflect the effective functioning and actual organisation of the group.

Consequently, the lack of subordinating legal links between Knauf Gips KG and GKV cannot cast any doubt on the conclusion that the former of those two companies must be held liable for the activities of the Knauf Group, since it is established that, in reality, GKV does not determine its conduct on the plasterboard market independently.

**The Court decides that the Commission made no error of assessment in holding that Knauf Gips KG should be considered to be responsible for all the activities of the Knauf Group.** 

---

*Unofficial document for media use, not binding on the Court of Justice.*

*The full text of the judgment is published on the CURIA website on the day of delivery.*

*Press contact: Christopher Fretwell ☎ (+352) 4303 3355*

# Exhibit "E"

**IMPORTANT LEGAL NOTICE** - The information on this site is subject to a disclaimer and a copyright notice.

JUDGMENT OF THE COURT (Second Chamber)

1 July 2010 (*)

(Appeal – Agreements, decisions and concerted practices – Plasterboard – Access to the file – Inculpatory and exculpatory evidence – Concept of 'undertaking' – Economic unit – Company responsible for the economic unit's actions – Argument raised for the first time during the judicial proceedings)

In Case C-407/08 P,

APPEAL under Article 56 of the Statute of the Court of Justice, brought on 19 September 2008,

**Knauf Gips KG,** formerly Gebrüder Knauf Westdeutsche Gipswerke KG, established in Iphofen (Germany), represented by M. Klusmann and S. Thomas, Rechtsanwälte,

appellant,

the other party to the proceedings being:

**European Commission,** represented by F. Castillo de la Torre and R. Sauer, acting as Agents, with an address for service in Luxembourg,

defendant at first instance,

THE COURT (Second Chamber),

composed of J.N. Cunha Rodrigues, President of the Chamber, P. Lindh, U. Lõhmus, A. Ó Caoimh and A. Arabadjiev (Rapporteur), Judges,

Advocate General: J. Mazák,

Registrar: K. Malacek, Administrator,

having regard to the written procedure and further to the hearing on 22 October 2009,

after hearing the Opinion of the Advocate General at the sitting on 11 February 2010,

gives the following

**Judgment**

1 By its appeal, Knauf Gips KG, formerly Gebrüder Knauf Westdeutsche Gipswerke KG ('Knauf' or 'the appellant'), seeks the setting-aside of the judgment of 8 July 2008 of the Court of First Instance of the European Communities (now 'the General Court') in Case T-52/03 *Knauf Gips* v *Commission* ('the judgment under appeal'), by which it dismissed Knauf's application for annulment of Commission Decision 2005/471/EC of 27 November 2002 relating to proceedings under Article 81 of the EC Treaty against BPB PLC, Gebrüder Knauf Westdeutsche Gipswerke KG, Société Lafarge SA and Gyproc Benelux NV (Case No COMP/E-1/37.152 – Plasterboard) (OJ 2005 L 166, p. 8; 'the contested decision').

**Legal context**

2    Article 15(2) of Council Regulation No 17 of 6 February 1962: First Regulation implementing Articles [81] and [82] of the Treaty (OJ, English Special Edition 1959-1962, p. 87) provided:

'The Commission may by decision impose on undertakings or associations of undertakings fines of from 1 000 to 1 000 000 units of account, or a sum in excess thereof but not exceeding 10% of the turnover in the preceding business year of each of the undertakings participating in the infringement where, either intentionally or negligently:

(a)    they infringe Article [81] (1) [EC] or Article [82 EC] ...

...'

**Facts**

3    In the judgment under appeal, the General Court summarised the facts which gave rise to the proceedings before it as follows:

'1    The applicant, Knauf ..., manufactures and markets plaster-based building materials.

2    The applicant is a limited partnership created under German law. All its capital is owned by 21 members of the Knauf family and a company which holds the shares of four other members. The personally liable managing partners are Mr B and Mr C.

3    On the basis of information received, on 25 November 1998 the Commission carried out unannounced inspections at the premises of eight undertakings operating in the plasterboard sector, including the applicant and other undertakings in the Knauf Group. On 1 July 1999, it pursued its investigations at the premises of two other undertakings.

4    The Commission then sent requests for information under Article 11 of ... Regulation No 17 ... to the various undertakings concerned. It requested information concerning certain documents obtained from those undertakings' premises during the inspections in November 1998 and July 1999. Knauf replied thereto on 14 September 1999.

5    On 18 April 2001, the Commission initiated the administrative procedure in this case and adopted a statement of objections ["the statement of objections"], which it addressed to the undertakings BPB PLC ["BPB"], Knauf, Société Lafarge SA ("Lafarge"), Etex SA and Gyproc Benelux NV ("Gyproc"). The undertakings concerned submitted their written observations and were given access to the Commission's investigation file in the form of a copy on CD-ROM which was sent to them on 17 May 2001.

6    The applicant replied to the statement of objections by letter of 6 July 2001.

7    Hearings took place on 17 July 2001. BPB and Gyproc presented part of their case *in camera*.

8    By letter of 10 August 2001, the Hearing Officer sent non-confidential versions of BPB's and Gyproc's documents to the applicant.

9    By letter of 20 August 2001, the applicant requested access to all the documents which had been added to the file since the dispatch of the CD-ROM and, in particular, to the replies of the other undertakings concerned by the administrative procedure to the statement of objections.

10    On 7 September 2001, the Hearing Officer sent to the applicant three additional documents which Lafarge had sent to the Commission following the hearing of 17 July 2001.

11    By letter of 11 September 2001, the Commission rejected the applicant's request of 20 August

2001 for access to the other documents in the file.

12 On 19 November 2002, the Hearing Officer adopted his report.

13 On 27 November 2002, the Commission adopted the [contested] decision.

14 The operative part of the [contested] decision states:

"*Article 1*

BPB ..., the Knauf Group, ... Lafarge ... and Gyproc ... have infringed Article 81(1) [EC] by participating in a set of agreements and concerted practices in the plasterboard business.

The duration of the infringement was as follows:

(a) BPB ...: from 31 March 1992, at the latest, to 25 November 1998;

(b) [the] Knauf [Group]: from 31 March 1992, at the latest, to 25 November 1998;

(c) ... Lafarge ...: from 31 August 1992, at the latest, to 25 November 1998;

(d) Gyproc ...: from 6 June 1996, at the latest, to 25 November 1998;

...

*Article 3*

In respect of the infringement referred to in Article 1, the following fines are imposed on the following undertakings:

(a) BPB ...: EUR 138.6 million;

(b) ... Knauf ...: EUR 85.8 million;

(c) ... Lafarge ...: EUR 249.6 million;

(d) Gyproc ...: EUR 4.32 million;

..."

15 The Commission found in the [contested] decision that the undertakings concerned participated in a single and continuous agreement which was manifested in the following conduct constituting agreements or concerted practices:

- the representatives of BPB and Knauf met in London (United Kingdom) in 1992 ["the London meeting"] and expressed the common desire to stabilise the plasterboard markets in Germany, the United Kingdom, France and the Benelux;

- the representatives of BPB and Knauf established, as from 1992, information exchange arrangements, to which Lafarge and subsequently Gyproc acceded, relating to their sales volumes on the German, French, United Kingdom and Benelux plasterboard markets;

- the representatives of BPB, Knauf and Lafarge exchanged information, on various occasions, prior to price increases on the United Kingdom market;

- in view of particular developments on the German market, the representatives of BPB, Knauf, Lafarge and Gyproc met at Versailles (France) in 1996, Brussels (Belgium) in 1997 and The Hague (Netherlands) in 1998 with a view to sharing out or at least stabilising the German market;

- the representatives of BPB, Knauf, Lafarge and Gyproc exchanged information on various occasions and concerted their action on the application of price increases on the German market between 1996 and 1998.

16 For the purpose of calculating the amount of the fine, the Commission applied the methods set out in its guidelines on the method of setting fines imposed pursuant to Article 15(2) of Regulation No 17 and Article 65(5) of the ECSC Treaty (OJ 1998 C 9, p. 3; ...).

17 In fixing the starting amount of the fines, determined according to the gravity of the infringement, the Commission initially considered that the undertakings concerned had committed an infringement which was very serious by its very nature in so far as the aim of the practices at issue was to put an end to the price war and to stabilise the market through exchanges of confidential information. The Commission also considered that the practices at issue had had an impact on the market, since the undertakings concerned represented almost all plasterboard supply and the various manifestations of the cartel had been put into practice in a highly concentrated and oligopolistic market. As regards the geographic extent of the relevant market, the Commission considered that the cartel had covered the four main European Community markets, namely Germany, the United Kingdom, France and the Benelux.

18 Considering, next, that there was a considerable disparity between the undertakings concerned, the Commission took a differentiated approach, relying for that purpose on the sales turnover for the product concerned on the relevant markets during the last complete year of the infringement. On that basis, the starting amount of the fines was set at EUR 80 million for BPB, EUR 52 million for Knauf and Lafarge and EUR 8 million for Gyproc.

19 In order to ensure that the fine had a sufficiently deterrent effect having regard to the size and global resources of the undertakings, the starting amount of the fine imposed on Lafarge was increased by 100%, becoming EUR 104 million.

20 In order to take account of the duration of the infringement, the starting amount was then increased by 65% for BPB and Knauf, by 60% for Lafarge and by 20% for Gyproc, the infringement being classified by the Commission as of long duration in the case of Knauf, Lafarge and BPB and of medium duration in the case of Gyproc.

21 In respect of aggravating circumstances, the basic amount of the fines imposed on BPB and Lafarge was increased by 50% on account of repeated infringement.

22 Next, the Commission reduced by 25% the fine imposed on Gyproc on account of attenuating circumstances, in that it had acted as a destabilising element helping to limit the impact of the cartel on the German market and it was absent from the United Kingdom market.

23 Finally, the Commission reduced the amount of the fines by 30% for BPB and by 40% for Gyproc, pursuant to Section D.2 of the Commission notice on the non-imposition or reduction of fines in cartel cases (OJ 1996 C 207, p. 4; ...). Accordingly, the final amount of the fines imposed was EUR 138.6 million for BPB, EUR 85.8 million for Knauf, EUR 249.6 million for Lafarge and EUR 4.32 million for Gyproc.'

**The judgment under appeal**

4 Knauf brought an action for annulment of the contested decision by application lodged at the Registry of the General Court on 13 February 2003. In the alternative, it requested the General Court to reduce the amount of the fine imposed on it.

5 By the judgment under appeal, the General Court dismissed that action in its entirety.

**Forms of order sought by the parties**

6 By its appeal, Knauf claims that the Court of Justice should:

- set aside the judgment under appeal;

- in the alternative, refer the case back to the General Court for a fresh decision;

- in the further alternative, reduce the fine imposed on the appellant by Article 3 of the contested decision in an appropriate manner and, in any event, by at least EUR 54.51 million;

- order the Commission to pay the costs.

7 The Commission contends that the appeal should be dismissed and Knauf ordered to pay the costs.

**The appeal**

8 In support of its appeal, Knauf relies on three grounds of appeal, alleging breach, first, of the rights of the defence, second, of Article 81 EC and, third, of Article 15 of Regulation No 17.

*The first ground of appeal, alleging breach of the rights of the defence*

9 This ground of appeal divides into two distinct limbs which it is appropriate to examine in turn.

The first limb of the first ground of appeal, relating to the refusal of access to inculpatory evidence

- Arguments of the parties

10 Knauf challenges, in essence, paragraphs 49 and 50 of the judgment under appeal in that the General Court unlawfully failed in its obligation to examine the consequences of the Commission's refusal to give it access to certain items of inculpatory evidence. It submits that since it had identified the inculpatory documents which were not disclosed to it and the passages of the contested decision based exclusively on that evidence, no additional information is necessary to conclude that, had that evidence been excluded, the corresponding parts of that decision would have been different. Given that those parts concern the material element of the infringement as a whole, the result to which the contested decision led would have been different.

11 The Commission contends that the first limb of the first ground of appeal is inoperative, because it criticises a superfluous argument, as is apparent from paragraph 63 of the judgment under appeal. In addition, the Commission claims that Knauf has not shown that the result at which the contested decision arrived would have been different if the appellant had had access to the undisclosed inculpatory documents.

- Findings of the Court

12 The General Court held, in paragraph 49 of the judgment under appeal, that, with the exception of some more detailed examples, the appellant merely listed the recitals in the preamble to the contested decision in which the documents to which access was refused are mentioned and concluded that such listing was insufficient to satisfy the obligation under the case-law that an applicant must show that the result at which the Commission arrived in its decision would have been different if the documents in question had been disallowed as evidence against it. Consequently, as is stated in paragraph 50 of the judgment under appeal, the General Court examined the alleged breach of the right of access to the documents as containing inculpatory evidence only in the light of the complaints expressly raised by the appellant.

13 In that regard, it is settled case-law that the failure to communicate a document constitutes a breach of the rights of the defence only if the undertaking concerned shows, first, that the Commission relied on that document to support its objection concerning the existence of an infringement and, second, that the objection could be proved only by reference to that document. If there were other documentary evidence of which the parties were aware during the administrative procedure that specifically supported the Commission's findings, the fact that an incriminating document not communicated to the

person concerned was inadmissible as evidence would not affect the validity of the objections upheld in the contested decision. It is thus for the undertaking concerned to show that the result at which the Commission arrived in its decision would have been different if a document which was not communicated to that undertaking and on which the Commission relied to make a finding of infringement against it had to be disallowed as evidence (Joined Cases C-204/00 P, C-205/00 P, C-211/00 P, C-213/00 P, C-217/00 P and C-219/00 P *Aalborg Portland and Others* v *Commission* [2004] ECR I-123, paragraphs 71 to 73).

14 The mere listing of the recitals in the preamble to the contested decision in which the documents to which access was refused are mentioned is not capable of showing, by itself, that the result at which the Commission arrived in that decision would have been different if those documents had been disallowed as evidence.

15 Accordingly, the first limb of the first ground of appeal must be rejected as unfounded.

The second limb of the first ground of appeal, relating to the refusal of access to exculpatory evidence

– Arguments of the parties

16 First, Knauf complains that the General Court erroneously summarised, in paragraphs 64 and 65 of the judgment under appeal, its argument concerning the Commission's refusal to give it access to certain items of exculpatory evidence.

17 Secondly, Knauf submits that, in paragraphs 70 to 78 of the judgment under appeal, the General Court incorrectly applied the Court of Justice's case-law relating to exculpatory evidence. Thus, an applicant is required to show not that if it had had access to the replies provided by the other undertakings concerned to the statement of objections the contested decision would have been different in content, but only that it could have used those documents for its defence. Yet, it alleges, the General Court considered whether the exculpatory evidence cited by the appellant could have had repercussions on the result of that decision.

18 Thirdly, Knauf challenges the General Court's finding that BPB's reply to the statement of objections contained no exculpatory evidence. It claims that, according to the general principles concerning evidence, statements made by the other undertakings concerned constitute evidence. Moreover, the fact that the appellant deployed the same arguments in the course of the administrative procedure does not change the nature of such statements.

19 Lastly, the appellant complains that the General Court failed to take account of certain passages, which it had invoked as undisclosed exculpatory evidence, in BPB's reply to the statement of objections.

20 The Commission contends that the General Court correctly applied the Court of Justice's case-law and did not distort the appellant's argument.

21 The Commission contends also that Knauf has confined itself to reproducing the arguments which it had already deployed before the General Court, seeking thus to obtain a further examination of its claims by the Court of Justice, which makes the second limb of the first ground of appeal inadmissible. Moreover, the appellant has not demonstrated how the undisclosed evidence in question would have been helpful for its defence.

– Findings of the Court

22 A corollary of the principle of respect for the rights of the defence, the right of access to the file means that the Commission must give the undertaking concerned the opportunity to examine all the documents in the investigation file which may be relevant for its defence. Those documents include both incriminating and exculpatory evidence, save where the business secrets of other undertakings, the internal documents of the Commission or other confidential information are involved (*Aalborg Portland and Others* v *Commission*, paragraph 68 and the case-law cited).

23    As regards failure to disclose an exculpatory document, it is settled case-law that the undertaking concerned need establish only that the non-disclosure was able to influence, to its detriment, the course of the procedure and the content of the Commission's decision. It is thus sufficient for the undertaking to show that it would have been able to use the exculpatory documents for its defence, in the sense that, had it been able to rely on them during the administrative procedure, it would have been able to invoke evidence which was not consistent with the inferences made at that stage by the Commission and therefore could have had an influence, in any way at all, on the assessments made by the Commission in any decision, at least as regards the gravity and duration of the conduct in which the undertaking was found to have engaged and, accordingly, the level of the fine (*Aalborg Portland and Others* v *Commission*, paragraphs 74 and 75 and the case-law cited).

24    It follows that it is for the appellant to establish not only that it did not have access to certain exculpatory evidence, but also that it could have used that evidence for its defence.

25    The General Court held in that regard, in paragraphs 72 to 77 of the judgment under appeal, that the appellant had not shown that it could have used the undisclosed documents in question for its defence, given that, during the administrative procedure, it had raised the same arguments as those contained in those documents and that those arguments had been rejected by the Commission in the contested decision. It was on that basis that the General Court could conclude, in paragraph 78 of that judgment, that, even if the appellant had been able to avail itself of those documents during the administrative procedure, the Commission's findings could not have been influenced by them.

26    The appellant has not put in issue the General Court's findings that it had not shown that it could have used for its defence the documents which were not disclosed to it during the administrative procedure.

27    Accordingly, even if the documents in question do, as the appellant claims, constitute exculpatory evidence, that cannot entail the setting-aside of the judgment under appeal.

28    Likewise, if, as the appellant argues, the General Court erroneously applied, in paragraph 74 of the judgment under appeal, the case-law referred to in paragraph 23 of the present judgment in holding that the information contained in an undisclosed exculpatory document, namely paragraph 4.2.1 of BPB's reply to the statement of objections, could not have changed the 'final result' of the contested decision, that error could not entail the setting-aside of the judgment under appeal since the appellant did not try to show that it could have used that information for its defence in the light, particularly, of the General Court's finding that the Commission had already taken account of such arguments in that decision.

29    That complaint must, therefore, be rejected as inoperative.

30    The complaint alleging distortion of the arguments presented by Knauf at first instance, which it alleges were summarised erroneously in paragraph 65 of the judgment under appeal, cannot succeed either.

31    An appellant alleging distortion of its own arguments must, under Article 256 TFEU, the first paragraph of Article 58 of the Statute of the Court of Justice of the European Union and indent (c) of the first subparagraph of Article 112(1) of its Rules of Procedure, indicate precisely the arguments alleged to have been distorted by the General Court (see, by analogy, *Aalborg Portland and Others* v *Commission*, paragraph 50). However, the appellant has not indicated precisely those of its arguments which it alleges were distorted in the judgment under appeal.

32    Moreover, since the appellant does not complain that the General Court failed to respond to its pleas in law and claims at first instance, the question whether the General Court erroneously summarised the appellant's arguments is irrelevant to the result of these proceedings.

33    Nor can this Court uphold the complaint alleging failure, by the General Court, to take account of certain passages in BPB's reply to the statement of objections and, particularly, of paragraphs 4.1.16 and 4.2.3 thereof.

34    As regards paragraph 4.1.16 of that reply, its main import lies in the statement that 'competition remained intense across the various European markets' despite the 'alleged undertaking' reached at the

London meeting. However, the issue of continued competition was addressed by the General Court in paragraphs 72 and 75 of the judgment under appeal.

35      As regards paragraph 4.2.3 of BPB's reply to the statement of objections, BPB stated that the figures exchanged between it and its competitors did not form part of its planning process. However, the General Court responded implicitly to the appellant's argument when it examined, in paragraphs 73 and 74 of the judgment under appeal, the statements concerning the purpose of that exchange of information and the alleged fact that the information thus exchanged was known only to Mr D, a director of Gyproc and Chief Executive Officer of BPB.

36      Consequently, the second limb of the first ground of appeal must be rejected.

37      Hence, Knauf's first ground of appeal must be rejected.

*The second ground of appeal, alleging breach of Article 81(1) EC*

Arguments of the parties

38      Knauf claims that the General Court concluded that Article 81(1) EC had been infringed relying, in paragraphs 140 to 298 of the judgment under appeal, on findings based on undisclosed inculpatory evidence. Thus, the General Court did not comply with its own statement, in paragraph 63 of that judgment, that it would not take that inculpatory evidence into account when it examined the substance of the case.

39      In addition, the appellant submits that, even taking the undisclosed inculpatory evidence into account, none of the five elements of the infringement found against it, namely the London meeting in 1992, the exchange of information concerning sales volumes in Germany, France, the Benelux and the United Kingdom from 1992 to 1998, the exchange of information on price increases in the United Kingdom during the same period, the agreements on market shares in Germany (meetings at Versailles, Brussels and The Hague) from June 1996 and the agreements on price increases in Germany from 1996, fulfils the criteria for finding an infringement under Article 81(1) EC.

40      The Commission submits that the second ground of appeal is inadmissible in its entirety as it concerns only findings of fact by the General Court.

41      Furthermore, the Commission notes that Knauf does not deny the existence of a single, continuous infringement on which the contested decision is based. The existence of an anti-competitive practice or agreement is to be inferred, it submits, from a number of coincidences and indicia which, taken together, may, in the absence of another plausible explanation, constitute evidence of an infringement of the competition rules.

Findings of the Court

42      As regards, first, the complaint that the General Court relied, to conclude that Article 81(1) EC had been infringed, on findings based on undisclosed inculpatory evidence, the appellant refers, only in summary fashion, to paragraphs 140 to 298 of the judgment under appeal, without indicating precisely the undisclosed inculpatory evidence on which it alleges that the General Court based its reasoning.

43      It follows from Article 256 TFEU, the first paragraph of Article 58 of the Statute of the Court of Justice and indent (c) of the first subparagraph of Article 112(1) of its Rules of Procedure that an appeal must indicate precisely the contested elements of the judgment which the appellant seeks to have set aside and also the legal arguments specifically advanced in support of the appeal (see, in particular, Case C-352/98 P *Bergaderm and Goupil* v *Commission* [2000] ECR I-5291, paragraph 34; Case C-248/99 P *France* v *Monsanto and Commission* [2002] ECR I-1, paragraph 68; and Case C-487/06 P *British Aggregates* v *Commission* [2008] ECR I-10515, paragraph 121).

44      That complaint is, therefore, inadmissible.

45 As regards, secondly, the argument that none of the five elements of conduct found against the appellant was an infringement, the General Court found, in paragraph 306 of the judgment under appeal, that it is clear from the contested decision that 'the set of agreements and concerted practices in the present case form part of a series of actions by the undertakings in question pursuing a single economic aim, namely the restriction of competition, and constitute the various manifestations of a complex, continuous agreement the object and effect of which was to restrict competition. In view of the fact that the abovementioned agreements and concerted practices gave, without interruption from 1992 until 1998, substantive shape to the parties' common wish to stabilise, and hence restrict competition on, at least the German, French, United Kingdom and Benelux plasterboard markets, the Commission characterises the infringement as single, complex and continuous'. In paragraph 321 of that judgment, the General Court rejected the appellant's arguments against the characterisation of the cartel as a single, continuous infringement.

46 Knauf does not challenge the General Court's finding of a single, continuous infringement, but confines itself to asserting that none of the elements constituting the infringement imputed to it substantiates an infringement of Article 81(1) EC.

47 In that regard, it should be recalled that, in order to establish that there has been an infringement of Article 81(1) EC, the Commission must produce firm, precise and consistent evidence (see, to that effect, Joined Cases C-89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85 *Ahlström Osakeyhtiö and Others* v *Commission* [1993] ECR I-1307, paragraph 127). However, it is not necessary for every item of evidence produced by the Commission to satisfy those criteria in relation to every aspect of the infringement. It is sufficient if the body of evidence relied on by that institution, viewed as a whole, meets that requirement.

48 Therefore, even if, as the appellant asserts, none of the different elements of the infringement in question constitutes, considered separately, an agreement or concerted practice prohibited by Article 81 (1) EC, such a conclusion does not prevent those elements, considered together, from constituting such an agreement or practice.

49 As the Court has already held, since the prohibition on participating in anti-competitive practices and agreements and the penalties which infringers may incur are well known, it is normal that the activities which those practices and agreements involve take place in a clandestine fashion, for meetings to be held in secret, frequently in a non-member country, and for the associated documentation to be reduced to a minimum. Even if the Commission discovers evidence explicitly showing unlawful contact between traders, such as the minutes of a meeting, it will normally be only fragmentary and sparse, so that it is often necessary to reconstitute certain details by deduction. In most cases, the existence of an anti-competitive practice or agreement must be inferred from a number of coincidences and indicia which, taken together, may, in the absence of another plausible explanation, constitute evidence of an infringement of the competition rules (see, to that effect, *Aalborg Portland and Others* v *Commission*, paragraphs 55 to 57).

50 That complaint is, therefore, without foundation.

51 Accordingly, Knauf's second ground of appeal must be rejected as being, in part, inadmissible and, in part, unfounded.

*The third ground of appeal, alleging breach of Article 15 of Regulation No 17 and Article 81 EC*

Arguments of the parties

52 Knauf claims, at the outset, that it is apparent from the wording of paragraph 348 of the judgment under appeal that the General Court failed to act with objectivity and impartiality but, on the contrary, was prejudiced in considering that a fine should be imposed for the acts committed by Gebrüder Knauf Verwaltungsgesellschaft KG ('GKV') and its subsidiaries, although the finding that the subsidiaries had benefited from the infringement in question is not supported by any reasoning.

53 The appellant submits that the General Court also infringed Article 15 of Regulation No 17 by concluding that it formed an economic unit with the other companies owned by the Knauf family ('the

Knauf Group'), and by imputing to it liability for the activities of those companies.

54 Knauf criticises the evidence on which the General Court based its conclusion that it formed an economic unit with GKV and its subsidiaries. In particular, it asserts that the judgment in Case C-286/98 P *Stora Kopparbergs Bergslags* v *Commission* [2000] ECR I-9925 is not applicable in this case since the appellant is not controlled by and does not control another company. In addition, the judgment in Case T-66/99 *Minoan Lines* v *Commission* [2003] ECR II-5515, to which the General Court referred in paragraphs 350, 351 and 355 of the judgment under appeal, is not applicable either, since that judgment concerns commercial agency arrangements. The same applies to the judgment in Case T-9/99 *HFB and Others* v *Commission* [2002] ECR II-1487, since the existence of an economic unit was based, in that judgment, on the fact that all the shares in the different companies were held by the same person, whereas, here, the appellant and GKV are owned by 22 persons, each with a minority shareholding.

55 Nor, it is submitted, may a finding of an economic unit be based on the joint control of the appellant and the other companies in the Knauf Group by the numerous shareholders belonging to the Knauf family, since joint control is excluded where shifting or varying majorities are possible among the shareholders. The family contract of 9 December 1994 ('the family contract'), mentioned by the General Court in paragraph 349 of the judgment under appeal, did not place the companies in question under joint control. Knauf submits, in that regard, that the judgment under appeal is inconsistent with the Court's case-law and, in particular, with the judgment in Case C-196/99 P *Aristrain* v *Commission* [2003] ECR I-11005, in which, according to Knauf, it was held that the simple fact that the share capital of two separate commercial companies belongs to the same person or the same family is insufficient, in itself, to establish that those two companies constitute an economic unit.

56 In addition, the fact that the same two shareholders managed all the companies in the Knauf Group and that they represented them during the period when the infringement was observed is alleged to be irrelevant. The same is claimed to apply to the exchanges of information between the companies in that group, the communication of turnovers in connection with the administrative procedure, the fact that most of the documents found during the inspections were on Knauf's letterhead with its address and details, and its capacity as interlocutor during the administrative procedure.

57 As regards the imputation to the appellant of liability for the activities of the companies in the Knauf Group, it criticises paragraph 356 of the judgment under appeal, claiming that the fact that it is the only company not managed by GKV does not explain the reason for which the fine was imposed not on GKV but on Knauf alone.

58 Knauf argues that there is a contradiction between, on the one hand, the statement, contained in paragraph 357 of the judgment under appeal, that it coordinates the operational activities of the Knauf Group on the relevant market and, on the other hand, that contained in paragraph 337 of that judgment, to the effect that 'there is ... not one legal entity which, at [the] head [of the Knauf Group], could, as the body charged with coordinating the group's activities, be held responsible for the infringements committed by the various companies in the group'.

59 Finally, the appellant criticises paragraphs 359 and 360 of the judgment under appeal, according to which it should have challenged, during the administrative procedure, the conclusion that it constituted an economic unit with the other companies in the Knauf Group, or be faced with the prospect of no longer being able to do so before the General Court. It submits that such conclusion infringes the *in dubio pro reo* principle.

60 The Commission contests all the arguments put forward by the appellant in support of the third ground of appeal contending that the General Court's findings concerning the existence of an economic unit contain no error of law.

Findings of the Court

61 As regards, first, the allegation of the General Court's lack of objectivity and impartiality, based on the finding, in paragraph 348 of the judgment under appeal, that GKV's subsidiaries benefited from the

infringement in question, it is important to note that the Court of Justice has no jurisdiction, on appeal, to establish the facts or, in principle, to examine the evidence which the General Court accepted in support of those facts. The appraisal of those facts and the evidence produced to the General Court does not therefore, save where the clear sense of the evidence has been distorted, constitute a point of law which is subject, as such, to review by the Court of Justice (see Joined Cases C-322/07 P, C-327/07 P and C-338/07 P *Papierfabrik August Koehler and Others* v *Commission* [2009] ECR I-0000, paragraph 52 and the case-law cited).

62 Since the appellant has not alleged distortion of the clear sense of the evidence on which the General Court relied for its conclusion, in paragraph 348 of the judgment under appeal, that GKV's subsidiaries benefited from the infringement in question, its allegation seeks, in reality, to obtain a further appraisal of that evidence, which is not within the jurisdiction of the Court of Justice to undertake. Consequently, that complaint must be rejected as inadmissible.

63 As regards, secondly, the allegation of breach of Article 15 of Regulation No 17, Knauf challenges both the General Court's conclusion that GKV and its subsidiaries, on the one hand, and the appellant, on the other, constitute an economic unit in the competition law sense and its conclusion that the appellant is the company responsible for the activities of the Knauf Group.

64 As regards the question of the existence of an economic unit, it is settled case-law that the competition law of the European Union covers the activities of undertakings and that the concept of an undertaking covers any entity engaged in an economic activity, regardless of its legal status and the way in which it is financed. The concept of an undertaking, in the same context, must be understood as designating an economic unit even if in law that economic unit consists of several persons, natural or legal (Case C-97/08 P *Akzo Nobel and Others* v *Commission* [2009] ECR I-0000, paragraphs 54 and 55 and the case-law cited).

65 The existence of an economic unit may thus be inferred from a body of consistent evidence, even if some of that evidence, taken in isolation, is insufficient to establish the existence of such a unit.

66 In this case, the General Court concluded that there was an economic unit on the basis of a body of evidence. Thus, in paragraph 344 of the judgment under appeal, it held, first, that the shareholders in the appellant and the other companies owned by the Knauf family, particularly those owned by GKV, are the same, namely 21 natural persons who are members of that family and a company formed by four other members of that family.

67 Secondly, the General Court pointed out, in paragraph 345 of the judgment under appeal, that the two managing shareholders in Knauf, Mr B and Mr C, are also managing shareholders in all the companies in the Knauf Group.

68 Thirdly, whilst holding, in paragraph 347 of the judgment under appeal, that GKV has shareholdings in several companies which operate on the plasterboard market and are controlled by the Knauf family, the General Court stated, in paragraph 348 of the judgment under appeal, that GKV is merely a holding company, without staff, managing the portfolio companies which it holds for the 22 shareholders who own it and that it depends for managers and premises on the appellant.

69 Fourthly, the General Court took account, in paragraph 349 of the judgment under appeal, of the family contract, Article 1(2) of which provides that its purpose is to ensure the single management and direction of the companies in the Knauf Group. According to paragraphs 3 and 4 of that article, the contract's object is also to guarantee, first, the single and concentrated exercise of the rights of the companies in the whole group and, second, the adoption of decisions concerning the direction, management, organisation and legal form of the company so that they are not hindered by a single shareholder or a small number of shareholders. Among those companies are, particularly, under Article 2 of the family contract, Knauf and GKV.

70 Fifthly, the General Court held, in paragraph 346 of the judgment under appeal, that all the appellant's sales figures exchanged in connection with the infringement in question referred to all the companies in the Knauf Group which operate on the plasterboard market and that there was no evidence that Mr B and Mr C did not represent that group in connection with the various manifestations of the infringement.

71    Finally, it is clear from paragraph 347 of the judgment under appeal that the appellant itself, without being presented with any requests to that end by the Commission, sent to the Commission all the turnovers of the Knauf Group in its reply of 19 September 2002 to the request for information made under Article 11 of Regulation No 17.

72    It was on the basis of that body of evidence that the General Court could conclude, correctly, in paragraph 350 of the judgment under appeal, that the companies belonging to the Knauf family constitute a single economic unit.

73    As regards the fact, expressly relied upon by Knauf, that both GKV and itself are owned by 22 shareholders, none of whom has a majority of shares or votes, which makes possible the formation of varying majorities within the different companies in the Knauf Group, the General Court took account of the fact that all those companies are held by the same 22 shareholders, who are, in addition, members of the Knauf family, only in so far as it is only one of the elements capable of establishing the existence of an economic unit. Moreover, the possibility of varying majorities forming within a group of companies does not, by itself, exclude the possibility of the existence of a single economic unit.

74    Contrary to Knauf's argument, the General Court did not misapply the judgment in *Aristrain* v *Commission*. Indeed, the Court of Justice found, in paragraph 99 of that judgment, that the simple fact that the share capital of two separate commercial companies is held by the same person or the same family is insufficient, in itself, to establish that those two companies are an economic unit. As is clear from what is stated in the preceding paragraph, the General Court did not rely solely on the fact the companies in the Knauf Group are owned by the same family to conclude that there was an economic unit.

75    Knauf also challenges the relevance of the family contract to which the General Court referred in paragraph 349 of the judgment under appeal. In its submission, that contract is intended only to enable, in future, the shareholdings constituting the capital of the companies in the Knauf Group to remain in the possession of members of the Knauf family. Its purpose is, in addition, to prevent those companies being controlled by certain shareholders or groups of shareholders.

76    Even if the family contract's objectives are actually those mentioned in the preceding paragraph, the appellant does not deny that the contract's purpose, as expressly stated in its Article 1(2), is 'to ensure the single management and direction of the Knauf undertakings'.

77    The appellant submits, in addition, that the fact that Mr B and Mr C are the managers of all the companies in the Knauf Group is irrelevant as regards the existence of an economic unit, since that fact does not exclude the possibility that the different companies in that group are independent under competition law. However, the fact that those companies are managed by the two same shareholders actually permits the single management and direction thereof for the purposes of Article 1(2) of the family contract.

78    As regards the exchanges of sales figures of all the companies in the Knauf Group which operated on the plasterboard market in connection with the infringement in question, it is appropriate to point out that, contrary to the appellant's submission, that fact is an additional item of evidence tending to indicate that those companies acted, at least during the infringement, as an economic unit with a common interest.

79    The allegation that the General Court infringed the *in dubio pro reo* principle in holding, in paragraph 346 of the judgment under appeal, that there was no evidence that Mr B and Mr C did not represent the Knauf Group in connection with the infringement cannot be accepted. In fact, in paragraph 346, the General Court simply held that the evidence submitted to it indicated that Mr B and Mr C played a representational role for that group in connection with the infringement and that no evidence had been produced before it to establish that such was not the case.

80    In that regard, according to the Court's case-law, it is for the party or the authority alleging an infringement of the competition rules to prove the existence thereof and it is for the undertaking or association of undertakings invoking the benefit of a defence against a finding of an infringement to demonstrate that the conditions for applying such defence are satisfied, so that the authority will then have to resort to other evidence. Thus, although according to those principles the legal burden of proof

is borne either by the Commission or by the undertaking or association concerned, the factual evidence on which a party relies may be of such a kind as to require the other party to provide an explanation or justification, failing which it is permissible to conclude that the burden of proof has been discharged (see *Aalborg Portland and Others* v *Commission*, paragraphs 78 and 79).

81      Knauf also claims that certain judgments on which the General Court relied to arrive at the judgment under appeal are irrelevant.

82      As regards the judgment in *Stora Kopparbergs Bergslags* v *Commission*, it should be noted that the General Court did not refer to that judgment for the conclusion that there was an economic unit. Besides, the fact that, in the present proceedings, the subsidiary is not wholly owned by a parent company, contrary to the facts of the case which gave rise to that judgment, does not exclude the possible existence of an economic unit, in the competition law sense.

83      As regards the judgment in *Minoan Lines* v *Commission*, the General Court cited it only as a point of reference in support of considerations of general application in competition matters, without drawing any analogy between the specific facts of the case which gave rise to that judgment and those of the present case.

84      Indeed, the General Court observed, in paragraphs 350, 351 and 355 of the judgment under appeal, referring to settled case-law, that the concept of an 'undertaking' in competition law must be understood as designating an economic unit for the purpose of the subject-matter of the agreement in question even if in law that economic unit consists of several persons, natural or legal, and that such an economic entity consists of a unitary organisation of personal, tangible and intangible elements, which pursue a specific economic aim on a long-term basis and can contribute to the commission of an infringement of the kind in Article 81(1) EC. The General Court also decided that, where a group of companies constitutes one and the same undertaking, the Commission may impute liability for an infringement committed by the undertaking and impose a fine on the company responsible for the actions of the group in the context of the infringement.

85      The same applies to the judgment in *HFB and Others* v *Commission*, since it is clear from paragraph 343 of the judgment under appeal that the General Court referred to that judgment only as an example in order to illustrate the relevance, to the determination as to the existence of an economic unit, of certain factual matters, such as, in particular, the fact that the same person had key functions within the management bodies of the companies in the group and the fact that that person represented, at directors' meetings, the various companies and that those companies were allocated a single quota for the purposes of the cartel.

86      It follows from the foregoing that the General Court did not err in law in finding that the companies belonging to the Knauf family constitute an economic unit.

87      As regards the appellant's role within the Knauf Group, the General Court held, in paragraph 358 of the judgment under appeal, that it presented itself, during the administrative procedure, as sole interlocutor with the Commission and did not deny that capacity at any time during that procedure. In paragraph 359 of that judgment, the General Court pointed out that, while it appeared that the Commission considered, in the statement of objections, that the infringement concerned the entire Knauf Group and that, on the basis of the information contained in that statement, the appellant could not have been unaware that it was liable to be the addressee of a final decision of the Commission, it none the less replied to the Commission without putting in issue its role as the company responsible for the actions of that group in connection with the infringement.

88      The General Court concluded, in paragraph 360 of the judgment under appeal, that, in such a situation, the onus was on the appellant to react during the administrative procedure, or be faced with the prospect of no longer being able to do so, by demonstrating that, despite the factors relied on by the Commission, the appellant could not be held liable for the infringement committed by the companies in the Knauf Group.

89      In that regard, as the appellant correctly argues as regards the application of Articles 81 EC and 82 EC, there is no requirement under the law of the European Union that the addressee of the statement of objections must challenge its various matters of fact or law during the administrative procedure, if it is

not to be barred from doing so later at the stage of judicial proceedings.

90    Although an undertaking's express or implicit acknowledgement of matters of fact or of law during the administrative procedure before the Commission may constitute additional evidence when determining whether an action is well founded, it cannot restrict the actual exercise of a natural or legal person's right to bring proceedings before the General Court under the fourth paragraph of Article 263 TFEU.

91    In the absence of a specific legal basis, such a restriction is contrary to the fundamental principles of the rule of law and of respect for the rights of the defence. Moreover, the rights to an effective remedy and of access to an impartial tribunal are guaranteed by Article 47 of the Charter of Fundamental Rights of the European Union which, under the first subparagraph of Article 6(1) TEU, has the same legal value as the Treaties. Under Article 52(1) of that charter, any limitation on the exercise of the rights and freedoms recognised by the charter must be provided for by law.

92    Consequently, in holding that the onus was on Knauf to react during the administrative procedure, or be faced with the prospect of no longer being able to do so before the Courts of the Union, the General Court erred in law.

93    Accordingly, first, the judgment under appeal must be set aside in so far as the General Court found, in paragraph 362 thereof, that the appellant was the company responsible for the actions of the Knauf Group in connection with the infringement, and, second, the rest of the appeal must be dismissed.

**The plea in law before the General Court, alleging breach of Article 15(2) of Regulation No 17**

94    In accordance with the first paragraph of Article 61 of the Statute of the Court of Justice, if the appeal is well founded, that court must quash the General Court's decision. It may then itself give final judgment in the matter, where the state of the proceedings so permits. That is the case here.

95    As regards the appellant's role within the Knauf Group, it must be examined whether the Commission made an error of assessment in considering it solely responsible for the actions of the companies in that group, which together constitute an economic unit, as has been established in paragraph 86 of the present judgment.

96    It is apparent from the group structure chart provided by the appellant in reply to a written question from the General Court that, in 2001, at the apex of that group were three companies, namely the appellant, GKV and Knauf Fiber Glass GmbH. The last company, the centre of activities of which is in the United States, did not, however, operate on the plasterboard market.

97    That same chart reveals that GKV owns, directly or indirectly, dozens of companies, many of which do operate on that market.

98    It should, therefore, be examined whether the Commission was entitled to impute liability for the infringement in question to Knauf and not to GKV.

99    That would be the case if GKV did not determine its conduct on the market in question independently.

100    In order to decide whether a company determines its conduct on the market independently, account must be taken of all the relevant factors relating to the economic, organisational and legal links which exist between it and the company in the same group which is considered to be responsible for the actions of that group, and which may vary from case to case and cannot therefore be set out in an exhaustive list (see, by analogy, *Akzo Nobel and Others* v *Commission*, paragraph 74).

101    In the present case, first, it has been established that GKV is only a holding company, with no staff, managing portfolio companies which it holds for the 22 shareholders who own it, and that finding has not been criticised by Knauf.

102   Secondly, it is clear from paragraph 497 of the contested decision that GKV depends on Knauf both for its premises and for its staff, at least in part; that finding has moreover not been challenged by the appellant.

103   Thirdly, it is established that Knauf is the only company in the Knauf Group which operates on the market in question and which is not managed by GKV.

104   Fourthly, most of the Knauf Group's documents seised by the Commission during the inspections were printed on the appellant's letterhead which gives its details. Even if that company was correct in arguing, as it did on the appeal, that those documents were photocopied by chance or selected intentionally by the Commission's officials responsible for the inspection, the fact remains that it has not adduced any evidence capable of supporting that argument.

105   Fifthly, according to the group structure chart mentioned in paragraph 96 of the present judgment, among the companies in the Knauf Group which operate on the plasterboard market, the appellant is the company with by far the largest relevant turnover. That fact indicates its predominance within that group, at least as regards that market.

106   It follows from the preceding findings that, in reality, GKV does not determine its conduct on that market independently, but is dependent in that regard on Knauf.

107   Contrary to the latter's argument, the fact that there is no single legal person at the apex of the Knauf Group is no obstacle to the appellant being held liable for the actions of that group.

108   Indeed, the legal structure particular to a group of companies, which is characterised by the absence of a single legal person at the apex of that group, is not decisive where that structure does not reflect the effective functioning and actual organisation of the group.

109   Consequently, the lack of subordinating legal links between the appellant and GKV cannot cast any doubt on the conclusion that the former of those two companies must be held liable for the activities of the Knauf Group, since it is established that, in reality, GKV does not determine its conduct on the plasterboard market independently.

110   It follows that the Commission made no error of assessment in holding that the appellant should be considered to be responsible for all the activities of the Knauf Group.

111   Accordingly, the fourth plea in law in the action brought by the appellant before the General Court, alleging breach of Article 15(2) of Regulation No 17, must be rejected.


**Costs**

112   Under the first paragraph of Article 122 of the Rules of Procedure, where the appeal is well founded and the Court itself gives final judgment in the case, it is to make a decision as to costs.

113   Under Article 69(2) of those rules which, under Article 118 thereof, applies to appeals, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. However, under the first subparagraph of Article 69(3) of those rules, the Court may, where each party succeeds on some and fails on other heads of claim, order that each party shall bear its own costs.

114   In this case, since both Knauf and the Commission have been unsuccessful in part in their claims on the appeal, it is appropriate to decide that each of them shall bear its own costs relating to the appeal.

115   By contrast, since the action for annulment brought by Knauf has been dismissed, paragraph 2 of the operative part of the judgment under appeal must be confirmed as regards the costs relating to the proceedings at first instance.

On those grounds, the Court (Second Chamber) hereby:

1. **Sets aside the judgment of 8 July 2008 of the Court of First Instance of the European Communities in Case T-52/03 *Knauf Gips* v *Commission* in so far as it imputes to Knauf Gips KG liability for the infringements committed by the companies constituting the Knauf Group;**

2. **Dismisses the rest of the appeal;**

3. **Dismisses the action brought by Knauf Gips KG for annulment of Commission Decision 2005/471/EC of 27 November 2002 relating to proceedings under Article 81 of the EC Treaty against BPB PLC, Gebrüder Knauf Westdeutsche Gipswerke KG, Société Lafarge SA and Gyproc Benelux NV (Case No COMP/E-1/37.152 – Plasterboard);**

4. **Orders each party to bear its own costs relating to the appeal and Knauf Gips KG to pay all the costs at first instance.**

[Signatures]

---

* Language of the case: German.