# EXHIBIT 19

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| PATRICK JOSEPH TURNER, ET AL. | * | CIVIL ACTION |
| VERSUS | * | NO. 05-4206 |
| | | CONSOLIDATED CASE |
| MURPHY OIL USA, INC. | * | SECTION "L" (2) |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**THIS DOCUMENT RELATES TO ALL CASES**

### ORDER AND REASONS

Before the Court is the Plaintiffs' Motion for Class Certification. The Court received

evidence and argument regarding this motion in a two-day hearing that commenced on January

12, 2006. For the following reasons, Plaintiffs' Motion for Class Certification is hereby

GRANTED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

These twenty-seven consolidated class actions filed on behalf of several thousand people

claiming damages arise from an incident in St. Bernard Parish, Louisiana, that occurred during

the week following the landfall of Hurricane Katrina in 2005.[1] On September 3, 2005, Defendant

Murphy Oil USA, Inc. ("Murphy Oil" or "Murphy") notified the federal government that an oil

spill had been detected at their Meraux Refinery in St. Bernard Parish. According to Defendant,

approximately 25,110 barrels of crude oil escaped from a 250,000-barrel above-ground storage

tank ("Tank 250-2") on Murphy Oil's property.[2] Some of this oil traveled into the

---

[1] The Court furnishes this factual and procedural background to provide context only. The statements in this section should not be construed as findings of fact.

[2] Both Plaintiffs and Defendant have submitted evidence supporting their theories of how this spill occurred. However, causation is not an issue before the Court at this time; thus, the Court renders no opinion regarding the Defendant's negligence, fault, or lack thereof.

neighborhoods surrounding the refinery. Plaintiffs are homeowners and business owners in St. Bernard Parish who claim they have suffered damage as a result of the oil spill.

Since the spill, Defendant Murphy Oil has worked with the Environmental Protection Agency (EPA) and Louisiana Department of Environmental Quality (LDEQ) to assess the scope of the damage and to recover the oil that was spilled. Additionally, Murphy has developed a "settlement zone" and has undertaken a massive settlement program with residents of the area near the spill. Murphy has also begun cleanup and remediation efforts in public areas and for homeowners who have settled their claims with Murphy. In addition, the EPA has designated its own "oil-plume perimeter" which delineates the EPA's findings on oil contamination in the neighborhood. The EPA further classifies the oil contamination as either heavy, medium, or light within the perimeter. The EPA revised its initial oil spill boundary in early December 2005, and cautioned that the boundary was subject to change depending upon ongoing sampling and testing in the area.

The first suit of these consolidated class actions was filed on September 9, 2005. In separate Orders dated October 4 and October 5, 2005, this Court granted Plaintiffs' Motion to Consolidate Cases and provided that all future cases would be automatically consolidated. On October 12, 2005, the Court designated Plaintiffs' and Defendant's Liaison Counsel and established Plaintiffs' Executive and Steering Committees to manage the litigation. Plaintiffs subsequently petitioned the Court for supervision of Murphy Oil's settlement program, and their motion was granted in part on November 10, 2005. The Court restricted Murphy's communications with putative class members regarding their settlement program.

At the request of the Court, Plaintiffs and Defendant jointly compiled an Administrative

Master Complaint, which was filed on November 28, 2005. This complaint consolidates all claims raised by Plaintiffs in the various pending lawsuits. In December 2005, Defendant filed several motions to dismiss portions of the master complaint, and the Court granted those motions in part.

On November 22, 2005, Plaintiffs urged the Court to set a hearing date for their Motion for Class Certification. Plaintiffs seek certification of Counts I through V and Count VII of the Administrative Master Complaint (Rec. Doc. No. 49), as well as their Prayer for Relief and damage requests. These claims are as follows: Count I (negligence pursuant to Louisiana Civil Code article 2315), Count II (absolute liability pursuant to Louisiana Civil Code articles 667 and 2315), Count III (negligence, intentional conduct, and strict liability pursuant to common law), Count IV (strict liability pursuant to Louisiana Civil Code articles 2317 and 2322), Count V (nuisance and trespass pursuant to Louisiana Civil Code articles 3421 and 3425), and Count VII (groundwater contamination pursuant to Louisiana Revised Statutes Section 30:2015.1).[3] Plaintiffs seek the following types of damages under these counts: actual and punitive damages pursuant to common law (Count III), damages or payments for remediation of groundwater (Count VII), compensatory damages and attorneys' fees for injuries including contamination of property, cost of homogeneous restoration, loss of use of property, increased living expenses, extended displacement costs, diminution of property value, ecological damages, loss of income, lost profits, lost business opportunity, inconvenience, mental anguish, emotional distress, bodily harm, past and future medical expenses, and injunctive relief.

---

[3] Count VI of Plaintiffs' Administrative Master Complaint was a cause of action for fraud. In December 2005, the Court granted Defendant's motion to dismiss this claim from the master complaint. (Rec. Doc. No. 104).

Plaintiffs have further identified six potential class representatives. Phyllis N. Michon owns a home at 3313 Ventura Drive in Chalmette, Louisiana. Cherie Scott Perez is the owner of Gerald's Restaurant, a tenant at 2101 East Judge Perez Drive in Chalmette. (Although she lives in St. Bernard Parish, Ms. Perez does not allege that her home suffered damage from the Murphy Oil refinery.) Philip Hebert, Sr. had his primary residence at 2029 Judy Drive in Meraux, Louisiana. Fernand Marsolan, Jr. owns two residential rental properties in St. Bernard Parish, at 3212 and 2709 Dauterive Drive in Chalmette. Robin Clark owns a home at 3817 Despaux Drive in Chalmette. Finally, James Shoemaker owns residential rental property at 4028 Hamlet Drive and a home at 3525 Palmisano Drive, both in Chalmette. In addition, Mr. Shoemaker owned and operated a chiropractic clinic at 221 West Judge Perez Drive. The potential class representatives allege that all of these properties were contaminated by the Murphy Oil spill. Four class representatives (Michon, Perez, Hebert, and Clark) allege personal injuries from returning to their properties, and three (Perez, Marsolan, and Shoemaker) allege business and/or rental losses as a result of the spill.

The class certification hearing was set for January 12, 2006. The parties engaged in discovery, conducted testing, and took depositions for class certification purposes. A two-day hearing was held at which counsel presented their evidence for and against class certification. The Court now considers the Plaintiffs' Motion.

## II. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

### A.    Standard of Review

The proponents of the class bear the burden of demonstrating that the case is appropriate for class treatment. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 n.4 (5th Cir. 2001).

Class certification is soundly within the district court's discretion, and this decision is essentially

a factual inquiry. *Vizena v. Union Pac. R.R. Co.*, 360 F.3d 496, 502-03 (5th Cir. 2004).  The

class certification decision should not reach the merits of the plaintiffs' claims. *Castano v. Am.*

*Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).  However, in some cases it is necessary for a

district court to go beyond the pleadings to understand the claims, defenses, substantive law, and

relevant facts in order to make a meaningful certification decision. *Id.*  The district court must

make specific findings regarding how the case satisfies or fails to satisfy the requirements of

Rule 23 of the Federal Rules of Civil Procedure. *Vizena*, 360 F.3d at 503.

### B.     Class Certification

Plaintiffs seek certification of their claims as a class action under Rule 23(a) and 23(b)(3)

of the Federal Rules of Civil Procedure.  Rule 23 provides in relevant part:

> **(a) Prerequisites to a Class Action.**  One or more
> members of a class may sue or be sued as representative parties on
> behalf of all only if (1) the class is so numerous that joinder of all
> members is impracticable, (2) there are questions of law or fact
> common to the class, (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the
> class, and (4) the representative parties will fairly and adequately
> protect the interests of the class.
> **(b) Class Actions Maintainable.**  An action may be
> maintained as a class action if the prerequisites of subdivision (a)
> are satisfied, and in addition: ....
> (3) the court finds that the questions of law or fact common
> to the members of the class predominate over any questions
> affecting only individual members, and that a class action is
> superior to other available methods for the fair and efficient
> adjudication of the controversy.  The matters pertinent to these
> findings include: (A) the interest of the members of the class in
> individually controlling the prosecution or defense of separate
> actions; (B) the extent and nature of any litigation concerning the
> controversy already commenced by or against members of the
> class; (C) the desirability or undesirability of concentrating the

litigation of the claims in the particular forum; (D) the difficulties
likely to be encountered in the management of a class action.

Thus, read in combination, Rule 23(a) and 23(b)(3) provide six requirements for a group of

claims to be certified as a class action – numerosity, commonality, typicality, adequacy,

predominance, and superiority.  These requirements shall be addressed in turn.

### 1.   Numerosity - Rule 23(a)(1).

To demonstrate numerosity, Plaintiffs must establish that joinder is impracticable through

"some evidence or reasonable estimate of the number of purported class members." *Pederson v.*

*La. State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000).  "Although the number of members of any

proposed class is not determinative of whether joinder is impracticable," the Fifth Circuit has

generally set the threshold of 100 to 150 people as satisfying the numerosity requirement.

*Mullen v. Treasure Chest Casino LLC*, 186 F.3d 620, 624 (5th Cir. 1999).

The Agency for Toxic Substances and Disease Registry ("ATSDR"), a federal agency

providing health consultations on the Murphy Oil spill, estimated in December 2005 that

approximately 1,800 homes and an as-yet-undetermined number of other structures have been

affected by the oil spill.  (Plaintiffs' Exhibit P48).  Currently, there are 113 named plaintiffs in

this litigation.  However, Defendant argues that its Settlement Program has greatly reduced the

number of potential class members, and that joinder of the existing plaintiffs is not impracticable.

Contrary to Defendant's assertions, Rule 23(a)'s numerosity requirement is clearly met in

this litigation.  The number of impacted properties alone exceeds 1,800, and individual property

owners are too numerous to make joinder feasible in this case.  Also, the affected St. Bernard

Parish residents are still dispersed throughout the country after Hurricane Katrina:  it appears that

very few, if any, have returned to the parish to live. The geographical displacement of potential
plaintiffs further justifies the Court's finding that joinder would be impracticable in this case.

**2.      Commonality - Rule 23(a)(2).**

Rule 23(a)(2) requires that there be issues of law or fact common to the class. The
commonality requirement is satisfied if at least one issue's resolution will affect all or a
significant number of class members. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir.
2001); *Mullen*, 186 F.3d at 625. There is a low threshold for commonality, and the fact that
some plaintiffs have different claims or require individualized analysis does not defeat
commonality. *James*, 254 F.3d at 570.

Defendant argues that, particularly from the standpoint of damages, Plaintiffs' claims do
not meet the Rule 23 commonality requirement. According to Defendant, Plaintiffs' homes and
businesses received varying degrees of damage from the hurricane, and received different
amounts of oil contamination. In addition, Defendant argues that the proof required for
Plaintiffs' personal injury and mental anguish claims is such that their claims do not share
common issues of law or fact: each Plaintiff learned of the damage at different times, returned to
the area at different times, and suffered different levels of exposure to the crude oil. Murphy Oil
argues that these differences compel the Court to find that the commonality requirement has not
been met.

The Court disagrees with Defendant. Rule 23(a)(2) only requires that one issue's
resolution will affect all or most of the potential class members. That requirement is clearly met
in this case, which involves a single accident. These are just a few of the central issues that will
affect all or most of the class members:  whether Murphy Oil failed to properly maintain Tank

250-2, whether Murphy Oil had adequate hurricane safety plans and whether those plans were carried out during Hurricane Katrina, and whether the affected area will experience any long-term contamination.[4] While Plaintiffs' claims will involve some individualized determinations regarding the amount of damage suffered, if any, there are enough common issues regarding Defendant's liability that class treatment would be appropriate under Rule 23.

### 3.   Typicality - Rule 23(a)(3).

Rule 23(a)(3) requires that the claims of the class representatives are typical of the class's claims or defenses. Again, the threshold for typicality is low: class representatives must show similarity between their legal and remedial theories and the theories of the rest of the class. *Mullen*, 186 F.3d at 625. Typicality does not require that the claims of the class are identical, but rather that they share the same essential characteristics – a similar course of conduct, or the same legal theory. *James*, 254 F.3d at 571 (quoting 5 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 23.24[4] (3d ed. 2000)).

Plaintiffs have identified six class representatives. All six allege either business or residential property damage as a result of the discharge of oil from Murphy's refinery, and several allege personal injury. Upon reviewing the various complaints in these consolidated cases, it is clear that the class representatives' claims and alleged damages are fairly similar, if not identical, to the claims of other plaintiffs. The theories of liability among property owners in

---

[4] In this way, this case is unlike a state court case involving many of the same parties and counsel, *Ford v. Murphy Oil USA, Inc.*, 96-2913 (La. 9/9/97), 703 So.2d 542. In *Ford*, the plaintiffs alleged exposure to contaminants from four petrochemical plants over a four-year period. *Id.* at 543. The plaintiffs all resided in the area during different times, and none could identify the exact source of the contaminants. *Id.* at 548. The Louisiana Supreme Court refused to certify a class. *Id.* at 551.

the affected area are alike: they are suing for negligence, strict liability, and absolute liability under the Louisiana Civil Code, among other claims. In addition, the claims of the class representatives share essential characteristics in this case because they are based upon the same series of events – the natural disaster that befell St. Bernard Parish, the alleged negligence of the Defendant that led to the oil spill, and the remediation that has occurred since the spill. There may be differences in the types of damages, depending on the degree of contamination and depending upon whether the property was used as a residence or business. However, these differences do not relate to the Plaintiffs' legal theories regarding liability and causation. Again, the consolidated cases involve a single accident, and central issues of fact and law are shared among the group of Plaintiffs in the affected area. Because the class representatives share legal theories and the same course of conduct with other plaintiffs, the Court finds that the typicality requirement of Rule 23(a) is met.

4.      **Adequacy of Representation - Rule 23(a)(4).**

Rule 23(a)(4) demands that the named class representatives fairly and adequately represent the claims of the other class members. There can be differences between the position of class representatives and other class members so long as these differences do not "create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen*, 186 F.3d at 626. A district court should evaluate whether the class representatives have a sufficient stake in the outcome of the litigation, and whether the class representatives have interests antagonistic to the unnamed class members. *Id.* (citing *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1972)). In addition, the district court should inquire into the zeal and competence of the class representatives' counsel and into the class representatives' willingness to

-9-

take an active role in the litigation and to protect the interests of absentees. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001).

None of the six proposed class representatives appear to have interests that would be counter to those of other plaintiffs in this matter. Rather, the six class representatives' claims appear to be fairly representative of those raised by the plaintiffs in these cases, including personal property losses, business losses, personal injuries, and emotional distress. Moreover, all six class representatives have executed affidavits stating that they intend to vigorously prosecute their claims on behalf of the proposed class. (Plaintiffs' Exhibits P82a, P83a, P84a, P85a, P86a, and P87a). In addition, counsel for the six class representatives have filed affidavits stating the number of clients they represent in this litigation: these affidavits satisfy the Court that counsel are committed enough to these cases so that they will litigate them zealously. (Plaintiffs' Exhibit P88). The Court finds that the six class representatives can fairly and adequately represent a proposed class of plaintiffs in this matter under Rule 23(a)(4).

### 5.    Predominance - Rule 23(b)(3).

Rule 23(b)(3) requires that the class share common issues of law or fact that predominate over the questions affecting individual class members. In general, in order to predominate, common issues must form a significant part of individual cases. *Mullen*, 186 F.3d at 626. Specifically, a district court should consider how the cases would proceed to trial, that is, whether any cases would require individual trials on particular issues. *See Castano*, 84 F.3d at 744-45 (finding that certification was inappropriate where individual trials would be necessary to determine an element of the plaintiffs' fraud claims).

This element of the Rule 23 analysis requires the Court to examine each of Plaintiffs'

claims individually, as the Court must determine how these claims would be tried. It is important

that the same substantive law will apply to all Plaintiffs' claims in these cases: this is not a case

in which the varying laws of different states create the need for state subclasses or individual

trials. All of Plaintiffs' claims except one, Count III, arise under Louisiana law.

It is also important to note that, at least as far as the Plaintiffs' property damage claims

are concerned, Plaintiffs' claims share large areas of fact in common. For example, it is safe to

assume that few, if any, of the Plaintiffs were present at the time of the oil spill. All of the homes

at issue were damaged by the same natural event, Hurricane Katrina, prior to the spill. Moreover,

Plaintiffs' claims all have in common the circumstances surrounding the leak in Tank 250-2 –

how the leak physically occurred, what steps Murphy took or might have taken to contain the oil,

and what steps Murphy took or might have taken to prevent the leak.

Defendant argues that the oil did not spread uniformly throughout the affected area, and

that different homes in the area received differing degrees, if any, of oil contamination.

However, the central factual basis for all of Plaintiffs' claims is the leak itself – how it occurred,

and where the oil went. There is a large area of factual overlap in the Plaintiffs' causes of action.

Moreover, on January 19, 2006, Plaintiffs submitted a proposed trial plan to the Court.

The plan provides for a three-phase trial. Phase One would concern common issues of liability

for compensatory damages and the amount of damages for trial plaintiffs, Phase Two would

address common issues regarding punitive damages, and Phase Three would involve

compensatory damages for remaining members of the Plaintiff Class. As will be discussed, this

trial plan will need revision in light of the instant ruling. However, the Court believes that the

existence of a trial plan, and the potential for bifurcation of the issues of liability and damages,

-11-

will address the Defendant's concern that individualized inquiries will be needed to determine damage amounts in these cases. The Fifth Circuit has repeatedly upheld the decisions of district courts to bifurcate class action trials into liability and damages phases. *See Mullen*, 186 F.3d at 628 (affirming a bifurcated plan and citing other instances of bifurcated class action trials).

With these considerations in mind, the Court turns to the legal grounds for Plaintiffs' claims.

### a.    Predominance - Count I (Negligence).

In Count I of the Administrative Master Complaint, Plaintiffs allege that Murphy Oil was negligent pursuant to Louisiana Civil Code article 2315. Specifically, Plaintiffs allege that Murphy was negligent in the following respects: allowance of a hazardous condition in its refinery; negligent design, construction and maintenance of Tank 250-2; negligent failure to implement safety plans to reduce the likelihood of an oil spill; negligent failure to install equipment that would reduce the likelihood of a spill; negligent failure to follow established safety procedures; negligent failure to hire or train skilled employees and/or agents; negligent failure to mitigate damage from the spill after it occurred; negligent failure to advise Plaintiffs regarding threats to their health upon return to their properties; negligent failure to implement a plan of homogenous restoration of the entire affected area; and failure to follow state and federal law on oil refining and storage. Plaintiffs have alleged that *res ipsa loquitur* and negligence *per se* apply to this matter.

In Louisiana, courts employ a duty-risk analysis to determine the potential negligence of a defendant. *Long v. State Dept. of Trans. & Dev.*, 2004-0485 (La. 6/29/05), 916 So.2d 87, 101. Generally, this analysis involves five separate elements: 1) proof that the defendant had a duty to

-12-

conform its conduct to a specific standard (the duty element); 2) proof that the defendant's

conduct failed to conform to that standard (the breach element); 3) proof that the defendant's

conduct was cause-in-fact of plaintiff's injuries (the cause-in-fact element); 4) proof that the

defendant's conduct was legal cause of plaintiff's injuries (the scope of liability element); and 5)

proof of actual damages (the damages element). *Id.*

Under this framework, the Court must determine whether individual trials would be

required to prove any or all of the above elements. The majority of these elements focus solely

on Murphy Oil's alleged conduct – whether Murphy owed a duty to Plaintiffs, whether that duty

was breached, and whether Murphy's duty encompassed the risk of harm to the Plaintiffs

(elements 1, 2, and 4). There will be some individualized inquiry regarding whether there is oil

on a particular plaintiff's property, and whether that oil is crude oil from Murphy's refinery

(elements 3 and 5).[5] However, the predominant issues in the negligence inquiry will be centered

on the scope of Murphy's duty, if any, to the Plaintiffs. The remaining issues of whether there is

crude oil on a plaintiff's property, and how much oil, do not require the type of extensive

individualized proof that would preclude class treatment of the negligence claim.[6] Under the

---

[5] Although the Court believes that some individualized inquiry is warranted, it should be noted that Plaintiffs have presented evidence that certain elements of their alleged damages may be assessed on a class-wide basis. For example, Dr. John Kilpatrick, a real-estate expert, opined that the properties at issue would be properly subject to mass appraisal to determine their present value. (Plaintiffs' Exhibit P103b). Dr. Vincent Wilson offered an opinion that there is a possibility of cross-contamination among the properties in the affected area, and Dr. Paul Templet opined that a comprehensive cleanup of the area is needed. (Plaintiffs' Exhibits P100b (Wilson) and 99b (Templet)).

[6] Defendant has argued that Plaintiffs' claims for personal injury and mental anguish do not meet the predominance requirement because certain factual elements of their claims will require individualized inquiry – when the plaintiff first learned of the oil spill, what preventative measures were taken to avoid personal injury, and what pre-existing health and mental conditions

negligence inquiry, all a plaintiff would have to prove to satisfy the elements is that either her

person or her property came into contact with Murphy crude oil in the affected area.  Moreover,

if *res ipsa loquitur* or negligence *per se* is applicable, a plaintiff would not need to show

individualized aspects of damage to establish Murphy's liability.

Thus, Murphy's liability would be appropriate for class treatment.  The presence or

degree of injury or damage is an issue of quantum that may be dealt with individually in a

bifurcated proceeding, if necessary.  *See Mullen*, 186 F.3d at 628 (approving a bifurcated trial

plan similar to this and describing other, similar bifurcated proceedings).  Accordingly, the Court

finds that the predominance requirement of Rule 23(b)(3) is met for Count I of the master

complaint.

### b.      Count II – Absolute Liability under La. Civ. Code arts. 667 & 2315

Louisiana Civil Code article 667 provides that a landowner is liable for any activity on his

property that would deprive his neighbor of enjoyment of his property or cause damage to him,

when the landowner knew or reasonably should have known of the potential for damage, when

that damage could have been avoided by the exercise of reasonable care, and when the landowner

failed to exercise reasonable care.  A violation of Louisiana Civil Code article 667 constitutes

fault within the meaning of Louisiana Civil Code article 2315.  *Cooper v. Louisiana Dept. of*

---

existed for each plaintiff.  While some individualized inquiry will be required, the Court does not
believe that this inquiry will be extensive.  *See Mullen,* 186 F.3d at 627.  The great factual
similarities between the Plaintiffs' claims merit a finding of predominance here.  All, or the great
majority, of Plaintiffs were out of the area when the spill occurred.  Those who returned to the
area have done so over a limited period of time under the cautions of Murphy and the local
authorities, and have all alleged exposure to the same contaminant, crude oil.  The Court also
believes that the personal injury and mental anguish damages will not form a significant portion
of the Plaintiffs' claims, which further supports a finding of predominance here.

*Public Works*, 2003-1074 (La. App. 4th Cir. 3/3/04), 870 So.2d 315, 322 (citing *Dean v. Hercules, Inc.*, 328 So.2d 69, 72 (La. 1976)).

Under the general standard of Louisiana Civil Code article 667, it appears that Plaintiffs would need to prove the following elements:  1) an activity of the Defendant 2) that caused damage to a plaintiff's property, and 3) that defendant knew or should have known the activity would cause damage, 4) the damage could have been prevented by the exercise of reasonable care, and 5) defendant failed to exercise reasonable care. La. Civ. Code art. 667.  The only element under article 667 that would need to be individually proved is the Plaintiffs' damages, as with Plaintiffs' negligence claims.  Also, under article 667, the trier of fact must determine how much of an inconvenience the plaintiff must tolerate without redress, in reference to factors like the character of the locality, the nature and degree of the intrusion, and the effect of the activity on the health and safety of neighbors. *Parish of East Feliciana v. East Feliciana Parish Police Jury*, 2004-1197 (La. App. 1st Cir. 8/10/05), -- So.2d --, 2005 WL 1883292 at *7.

In their Administrative Master Complaint, Plaintiffs cite to *Kent v. Gulf States Utilities Company*, 418 So.2d 493 (La. 1982), as stating the appropriate standard for determining absolute and strict liability in Louisiana.  In *Kent*, the Louisiana Supreme Court stated the standard of proof for absolute liability as follows:  "the enterpriser [in ultrahazardous activities], whether or not negligent in any respect, causes the damage, and the injured party recovers simply by proving the damage and causation." *Id.* at 498.  More recently, Louisiana Civil Code article 667 has reaffirmed this standard, but with the following caveat:  "[a]n ultrahazardous activity as used in this Article is strictly limited to pile driving or blasting with explosives."  Thus, although the Court cannot reach the merits of this dispute, it appears highly unlikely that Louisiana's absolute

-15-

liability standard would apply to these cases. However, were absolute liability to apply, Plaintiffs' claims would likely meet the predominance requirement for the same reasons that Plaintiffs' negligence claims do. The central elements of the claim surround Murphy's conduct, and the only individualized inquiry would relate to the amount of Plaintiffs' damages.

Regarding strict liability, the Louisiana Supreme Court in *Kent* stated that strict liability claims fall under Louisiana Civil Code article 2317. Because Count IV of Plaintiffs' master complaint addresses article 2317, the Court reserves discussion of strict liability.

### c.   Count III - Common Law Tort Claims

Count III of Plaintiffs' master complaint alleges claims of negligence, intentional conduct, and strict liability of Murphy Oil arising from the leak of Tank 250-2. Plaintiffs allege that these torts are available "under applicable common law." (Class Action Administrative Master Complaint ¶ 47, Rec. Doc. No. 49). In December, Defendant filed a motion to dismiss this claim, and in response, Plaintiffs argued that the law of Arkansas may potentially apply under this Count. The Court reserved ruling upon whether Arkansas law would be applicable to this dispute.

While Plaintiffs allege that Count III refers to the law of Arkansas, Count III is not so limited; rather, it states that these torts may be available under any "applicable common law." Given that language, it is impossible for the Court to determine how this Count may be tried, or whether common issues predominate over individual ones. Both this Court and the Fifth Circuit have refused to certify class actions in the past where the laws of multiple states are potentially applicable to the plaintiffs' claims, on the grounds that the claims are unmanageable and present too many issues requiring individual resolution. *Castano*, 84 F.3d at 741-43; *In re Propulsid*

-16-

*Prods. Liab. Litigation*, 208 F.R.D. 133, 146-47 (E.D. La. 2002) (Fallon, J.).  During the

Defendant's motions to dismiss, Plaintiffs presented a scenario by which the law of Arkansas

would uniformly apply to all of Plaintiffs' claims because the applicability of Arkansas law

would depend upon the extent of Defendant's tortious conduct in Arkansas.  However, the Court

found that argument tenuous at best.  Also, it is not clear at this point that this is the only scenario

under which another state's law would apply:· the Administrative Master Complaint is not as

narrow as the Plaintiffs claim.  Accordingly, the predominance requirement of Rule 23(b)(3) has

not been met for Count III of Plaintiffs' master complaint, and this claim will not be certified for

class treatment.

### d.    Count IV - Strict Liability Under La. Civ. Code arts. 2317 & 2322

Louisiana Civil Code article 2317 provides that a person is liable for damages caused by a

thing within the person's custody or *garde*.  The Louisiana Supreme Court has interpreted this

article to provide a form of strict liability.  *Loescher v. Parr*, 324 So.2d 441, 446 (La. 1975).

Louisiana Civil Code article 2317.1 limits article 2317, and provides that the owner or custodian

of a thing is answerable for damage only under the following conditions: 1) that the defendant

knew, or should have known, of the ruin, vice or defect in the thing, 2) that the damage could

have been prevented by exercise of reasonable care, and 3) that he failed to exercise reasonable

care.

Louisiana Civil Code article 2322 covers damage caused by ruin of buildings.  For

damage caused by ruin of a building, either through failure to repair, or from a vice in

construction or design, a plaintiff must show 1) that the building either suffered from a failure to

repair, or from a construction or design defect, 2) that the defendant knew or should have known

of the vice or defect through the exercise of reasonable care, 3) that the damage could have been prevented through the exercise of reasonable care, and 4) that the defendant failed to exercise reasonable care.

In this case, the elements of strict liability under Louisiana Civil Code articles 2317, 2317.1, and 2322 focus entirely on the Defendant's conduct, and require no individualized inquiry other than the amount of damages, if any, owed to each plaintiff. As stated earlier, the individualized quantum determination does not preclude the Court from finding the predominance requirement is met.

   **e.**  **Count V - Nuisance and Trespass Under La. Civ. Code arts. 3421 & 3425**

Louisiana Civil Code articles 3421 and 3425 provide a property owner a right to quiet corporeal possession of his or her property. Disturbance of this right may give the property owner an action in nuisance and/or trespass under Louisiana Civil Code article 2315. The tort of nuisance is typically grounded in Louisiana Civil Code articles 667 through 669. *Inabnet v. Exxon Corp.*, 93-0681 (La. 9/6/94), 642 So.2d 1243, 1251. Nuisance has already been discussed in connection with Louisiana Civil Code article 667, *supra* at 14; this claim meets the predominance requirement. Trespass is the unlawful physical invasion of the property of another. *Boudreaux v. Jefferson Island Storage Hub, LLC*, 255 F.3d 271, 274 (5th Cir. 2001) (citing *Gliptis v. Fifteen Oil Co.*, 204 La. 896, 16 So.2d 471 (1943)). The primary elements of proof for trespass are whether there was a physical invasion of the plaintiff's property by a defendant, and whether that invasion was unlawful. These elements will not require the Court to inquire extensively into individual cases for proof of liability. As such, Count V of Plaintiffs'

master complaint meets the predominance requirement.

  **f.**  **Count VII - Groundwater Contamination Under La. R.S. 30:2015.1**

  Louisiana Revised Statutes section 30:2015.1(B) provides that a party who is responsible

for any contamination or pollution that impacts or threatens usable groundwater may be liable in

a civil suit for damages.  Additionally, a court hearing a claim under this section shall adopt or

structure a plan to evaluate and remediate the contamination and to protect the usable

groundwater in the area in question.  La. R.S. 30:2015.1(D).  Plaintiffs' Count VII alleges a cause

of action under La. R.S. 30:2015.1, arguing that the oil spill may have threatened or impacted

usable groundwater.

  Plaintiffs' Count VII clearly meets the predominance requirement, as proof of this claim

will require evidence that the public ground water in the affected area was contaminated as a

whole.  Common issues clearly predominate over individual ones for this claim.

  **6.**  **Superiority - Rule 23(b)(3).**

  Under Rule 23(b)(3), a district court must evaluate four factors to determine whether the

class action format is superior to other methods of adjudication: the class members' interest in

individually controlling their separate actions, the extent and nature of existing litigation by class

members concerning the same claims, the desirability of concentrating the litigation in the

particular forum, and the likely difficulties in class management.[7]

_____

  [7] The Fifth Circuit in *Castano* advised that a district court's superiority analysis should
include consideration of the negative impact upon a defendant of certification of a mass tort.  84
F.3d at 746.  The court noted that class certification magnifies unmeritorious claims, increases
plaintiffs' damage awards, and creates "insurmountable pressure" upon defendants to settle - all
of which could be tantamount to "judicial blackmail." *Id.*  Also, the Fifth Circuit warned that
"historically, class certification of mass torts has been disfavored." *Id.*
  However, the U.S. Supreme Court has more recently held that mass tort cases can be

Defendant argues that this element of the Rule 23 analysis is not met because Murphy's private settlement program is a superior method of resolving this dispute. However, the merits of Murphy's settlement program aside, Murphy's argument confuses the superiority standard under Rule 23. The analysis is whether the class action format is superior to other methods of *adjudication*, not whether a class action is superior to an out-of-court, private settlement program. When evaluated under those terms, the Court finds that the class action format would be superior to consolidation of individual cases in this matter. Both Murphy and Plaintiffs have expressed a desire for quick resolution of these cases, and the class action format could streamline this litigation. In addition, there appears to be little existing litigation of these claims outside of the lawsuits filed in this Court, so class certification would act to centralize these proceedings. Also, given the strains on the state judicial system after Hurricane Katrina, the federal forum appears to be preferable to state court at this time. Although the concerns raised by the Fifth Circuit in *Castano* with regard to the economic pressure placed on a litigant to settle are present here as they are in any mass tort litigation, the Court believes the pressures on the Defendant created by class certification would not be extreme in this case. Murphy Oil is already conducting an extensive settlement program with residents of St. Bernard Parish: class certification will not greatly exacerbate the pressure upon Murphy to settle these claims. The benefits of the class action format in case management and speed of resolution support class certification in this case. Accordingly, the Court finds that the superiority requirement of Rule

---

certified under Rule 23. *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997) ("Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement .... [however, courts should exercise] caution when individual stakes are high and disparities among class members great.")

-20-

23(b)(3) has been met.

In summary, the Court finds that the requirements of Rule 23(a) and Rule 23(b)(3) have been met in these cases. As such, the pending consolidated cases shall be certified as a class action. The Court now must address the issues of class counsel, and, most importantly, the boundaries of the affected area.

### C.   Appointment of Class Counsel

Under Rule 23(g) of the Federal Rules of Civil Procedure, a district court must appoint class counsel at the time the class is certified, unless otherwise provided by statute. The class counsel must fairly and adequately represent the interests of the class, and the court must review the counsel's work in investigating claims, experience in handling class action litigation, knowledge of the applicable law, and the resources counsel will commit to representing the class. Rule 23(g)(B-C).

The Court sees no reason to upset its prior rulings regarding interim class counsel, and hereby appoints interim class counsel as class counsel. Thus far, these attorneys have applied their considerable experience and resources to litigate their clients' claims in this matter and will serve well as class counsel. Sidney D. Torres shall serve as Plaintiffs' Liaison Counsel. The Plaintiffs' Executive Committee shall be comprised of Sidney Torres, Richard Arsenault, Daniel Becnel, Val Exnicios, and Michael Stag. The Plaintiffs' Steering Committee shall be comprised of those attorneys already appointed to the interim Plaintiffs' Committee, including Sidney Torres, Richard Arsenault, Daniel Becnel, Val Exnicios, Michael Stag, Mickey Landry, Scott Bickford, Hugh Lambert, Joseph Bruno, Madro Bandaries, William Bradley, Ronnie Penton, Robert Becnel, Walter Leger, Donni Young, Darleen Jacobs, E. Carroll Rogers, Salvador

-21-

Gutierrez, Michael Hingle, Walter Dumas, Anthony Irpino, and Gerald Meunier.

### D.   Definition of Class to be Certified - the Affected Area

One of the unwritten requirements of Rule 23 is that the class to be certified must be

"adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th

Cir. 1970). A precise definition is essential to identify those entitled to notice and those bound

by a judgment. *In re Monumental Life Ins. Co.*, 365 F.3d 408, 413 (5th Cir. 2004).

In this case, in the fall of 2005, Murphy Oil designated an area to the west of the Meraux

refinery that it has used for settlement purposes. This area is smaller than, but overlaps

significantly with, the oil-plume perimeter established by the EPA. Plaintiffs have asked the

Court to certify a much-larger expanse that covers areas farther to the west and east of the

refinery. (The map attached to this Order as Exhibit A, a copy of Exhibit 4 to Defendant's

Opposition to Class Certification, is useful for comparison. A color copy is available in the

record of these proceedings.)

Defendant has argued that the Court's only options are to certify Plaintiffs' proposed

boundary or not to certify a class at all. However, the Fifth Circuit has stated recently that

district courts enjoy discretion to "limit or modify class definitions to provide the necessary

precision." *Monumental Life*, 365 F.3d at 414. That court recognized that class definition is a

process of "ongoing refinement and give-and-take[,]" and, as such, a district court's role is to

define a precise class. *Id.*

The Court undertakes class definition in this matter by referring to the evidence produced

at the class certification hearing, including the expert opinions offered by Plaintiffs and

Defendant in support of their positions. A brief summary of the relevant expert testimony is

helpful to explain the Court's ruling on the class definition.

###### 1.    Marco Kaltofen - Plaintiffs' Fingerprinting Expert

Plaintiffs offered the expert testimony of Marco Kaltofen, P.E., as the primary support for their proposed class boundary. As discussed in the Court's ruling on the Defendant's motion in limine to exclude Mr. Kaltofen's testimony, Mr. Kaltofen is well-qualified in the area of testing of environmental contamination. In this case, Mr. Kaltofen began by conducting visual inspections of the area around the refinery, and then conducted a series of GC/FID chromatograms and GC/MS spectra to determine whether oil was present at individual locations. Mr. Kaltofen took over 75 soil/sediment samples and eleven air samples to arrive at his estimated boundary of crude oil contamination. *See* Plaintiffs' Exhibit 107C (Kaltofen's map and test results). Mr. Kaltofen's boundary is included within the area proposed by Plaintiffs for class certification.

Defendant challenged Mr. Kaltofen's findings on a number of grounds. First, Murphy argued that Mr. Kaltofen's sampling of the affected area was far too small, and was inherently unreliable because of the low sampling rate. Defendant also pointed out that numerous positive samples were taken by an individual hired by one of Plaintiffs' counsel who was not under the supervision or control of Mr. Kaltofen; thus, Mr. Kaltofen could not vouch for the reliability of those positive results. Second, Murphy argued that Mr. Kaltofen's method of sampling is not the method adopted by the EPA in this case, and is therefore unreliable. Mr. Kaltofen testified that he took single samples of soil, rather than the composite samples used by Murphy and the EPA in the area. Murphy and EPA testers derive a composite sample from a mixture of three sample points at an individual location; soil from these sample points are combined and tested together.

-23-

Mr. Kaltofen tested each sample point. Both of these methods employ "bias sampling," meaning that the tester is looking for oil rather than sampling randomly. The Court has received no credible evidence regarding the validity or superiority of either of these sampling methods, and therefore cannot comment on their preferability.

Third, Murphy challenged Mr. Kaltofen's findings that each of his positive results indicated the presence of crude oil. Mr. Kaltofen used three sample results taken from Murphy Oil's property as results that were positive for crude oil; these were his baselines for comparison with neighborhood samples. (Plaintiffs' Exhibits P110 - P112). These three sample results were somewhat different from each other, but Mr. Kaltofen opined that all were positive for Murphy crude oil. Defendant's expert, Dr. Scott Stout, argued that the majority of Mr. Kaltofen's positive results were not in fact Murphy crude oil. Dr. Stout demonstrated that biological plant material and lubricating oil (oil found in cars, lawnmowers, etc.) both have similar "fingerprints" to crude oil, that is, they produce similar results on a GC/FID chromatogram. Dr. Stout argued that, while some of Mr. Kaltofen's results showed crude oil, others only indicated the presence of plant material thrown into the neighborhood from the nearby wetlands by the storm and spilled oil from cars and gas stations that had flooded after the hurricane.[8]

### 2.   Glenn Millner - Defendant's Supervisor of Sampling

Defendant also presented expert testimony and evidence regarding sampling and testing in the neighborhoods surrounding the refinery. Murphy hired a consulting agency, the Center for

---

[8] It should be noted that Defendant's expert, Dr. Keith Baugher, testified that Tank 250-2 contained five different types of crude oil at the time of the spill – Bonnie Light, Basara, Ural, Arab Light, and Arab Medium. It is unclear to the Court whether this mixture would create one fingerprint or multiple fingerprints; Dr. Stout and Mr. Kaltofen obviously disagree on this point.

Toxicology and Environmental Health ("CTEH"), to perform soil and air sampling in the area.[9]

Mr. Glenn Millner, a supervisor for CTEH, testified that CTEH has been testing in the area daily

since September 2005.  Typically, there are twelve to twenty CTEH employees, split up into

three to seven teams, performing sampling on any given day.  An EPA representative

accompanies each team to supervise the sampling.  Over 2,500 homes have been sampled.  To

comply with the state environmental standards,[10] CTEH takes four samples at each home – the

sediment inside the house, sediment outside the house, a "wipe" sample of the "bathtub ring" on

the house,[11] and an air sample.  Once a sample is taken, CTEH sends it to a lab, and Dr. Stout

analyzes the results.  CTEH shares all of its findings with the EPA and "splits" approximately

every tenth sample with the EPA for the EPA's own testing.

　　　Mr. Millner stated that CTEH developed the boundaries for Murphy's settlement area.

He also testified that CTEH had found sites which tested positive for Murphy crude oil outside of

the settlement area;  according to Mr. Millner, the settlement area indicates the area with the

highest percentage of positive results.  (In fact, it appears that Murphy has settled with

homeowners who live outside of its settlement zone.  (Plaintiffs' Exhibit P105).)

### 3.　　Scott Stout - Defendant's Fingerprinting Expert

　　　Dr. Scott Stout, Defendant's expert in charge of analyzing samples, confirmed Mr.

---

[9] Murphy also hired another consulting company, the O'Briens Group, to perform oil recovery and develop incident action plans after the spill as required by law.  It appears the CTEH may have developed its map based in part upon preliminary maps used by the O'Briens Group.  *See* Defendant's Exhibits D105 - D107 (O'Briens Group maps).

[10] These are the LDEQ's Risk Evaluation/Corrective Action Program (RECAP) standards.

[11] For this sample, the testers take a portion of the dark line of residue, or "bathtub ring," left on the outside of a building after flood waters receded.

Millner's opinion and offered a report of his opinion upon the distribution of crude oil in the area. (Defendant's Exhibit D60). Dr. Stout has developed a three-tier plan for analyzing the samples at issue. The first tier involves GC/FID chromatogram testing: all of the CTEH samples have gone through this round. The second tier involves GC/MS spectra testing: Dr. Stout has run a group of samples through this tier, which he opines produces a more specific result. The third tier involves a statistical correlation between what Dr. Stout believes is Murphy crude oil and the other positive oil results in the area, to determine whether the unknown oil is Murphy crude. Only 14 samples have gone through Tier 3 analysis at this point.

In Dr. Stout's opinion, the CTEH/Murphy settlement area most clearly defines the *concentration* of oil contamination in the neighborhoods. At the class certification hearing, Dr. Stout presented maps showing the number of "equivocal" test results found by Murphy in the area, and stated that approximately 59% of the samples produced equivocal results. Dr. Stout opined that these equivocal results were likely to be lubricating oil or not oil at all, and that the Tier 2 and 3 testing could eliminate the equivocals, once that testing is completed. However, Dr. Stout also found equivocal results to the east and west of the CTEH boundaries, even west of Paris Road.

### 4.   Philip Bedient - Plaintiffs' Hydrology Expert

Dr. Philip Bedient, a professor in civil and environmental engineering, offered an expert report for Plaintiffs on the distribution of crude oil following the Murphy Oil release. (Plaintiffs' Exhibit P102b). Dr. Bedient examined the flood data and EPA findings on the crude oil spill, and concluded that flooded canals and streets acted as preferential pathways for the oil in the days after the spill. In addition, Dr. Bedient opines that, because of post-hurricane conditions,

variable winds and storm surge conditions also were a factor in the transport of oil in the area.[12]

### 5.    Paul Kuhlmeir - Defendant's Hydrology Expert

Dr. Paul Kuhlmeir, a Ph.D. in civil engineering, testified for Murphy regarding the fate and transport of the crude oil in the affected area. *See* Defendant's Exhibit D63 (Dr. Kuhlmeir's expert report). Dr. Kuhlmeir testified that the natural topography of the area is such that the ground slopes down away from the Mississippi River toward the 40 Arpent Canal to the north; this creates a natural northern "gravity gradient" which pulls water and other liquids northward and eastward. (Other experts also testified to this fact.)

However, given that the area was flooded due to the hurricane, Dr. Kuhlmeir testified that other gravity gradients came into play, specifically, pumping stations that were in operation to the west of the refinery. One of the closer pumps is Pumping Station Number 6, which is located approximately where Lafitte Parkway meets the 40-Arpent Canal. *See* Plaintiffs' Exhibit 107. According to pumping station records, Pump 6 was in operation on September 1, 2005, several days after the storm, and continued operation at least through September 3, 2005. (Defendant's Exhibits D111 and D113). The closest pump to the refinery is Pumping Station Number 7, which lies immediately to the northeast of the refinery. *See* Plaintiffs' Exhibit 107. This pump was not in operation until September 4, 2005. (Defendant's Exhibits D111 and D113). Also, Dr. Kuhlmeir testified that, in an effort to drain the area, the Army Corps of Engineers cut a breach in the levee adjacent to the 40 Arpent Canal; this breach was near Pump 6 and west of the refinery. Dr. Kuhlmeir testified that during the time period of the oil spill, which Murphy alleges was

---

[12] Dr. Bedient also stated that he could not offer an opinion upon the reach of the oil spill at this time, and that the exact boundary was still ill-defined.

September 3, 2005, the gravity gradients acting in the area were such that the crude oil initially

drifted south along an access road (and Judge Perez Drive), and then was pulled north by

northwest toward Pump 6 and the breach cut in the levee by the Army Corps of Engineers.  Dr.

Kuhlmeir further testified that, after Pump 7 went into operation on September 4, 2005, the

strongest gravity gradient acting upon the crude oil was Pump 7, which pulled the oil northeast.

While Dr. Kuhlmeir agreed in theory with Dr. Bedient's opinion that oil traveled along

the preferential pathways of canals and streets, Dr. Kuhlmeir believed that the oil distribution

was localized to an area near the refinery because obstructions in the roadway made travel

difficult for the oil.  *See* Defendant's Exhibit D110.  Dr. Kuhlmeir did not believe that wind

played a role in the oil's transport because the normal wind elevation is higher than that of the

flood waters at the time of the spill.

### 6.    The Affected Area

After reviewing the evidence and expert opinions offered by the parties, the Court elects

to designate a class boundary somewhat smaller than that suggested by the Plaintiffs, and

somewhat larger than Defendant's settlement zone.  The Court agrees that Mr. Kaltofen's low

sampling rate, together with the questions raised about the sampling technique and analysis,

cannot support a finding at this juncture that Murphy crude oil likely could have traveled as far as

Plaintiffs have alleged.  However, this is not the end of the inquiry, as the Court expresses no

opinion upon where crude oil has traveled in the parish.  While Murphy has performed extensive

testing, a majority of this testing, some 59% of the samples, is "equivocal" at this point.  Also,

Murphy has not performed extensive testing outside of its own settlement zone.

The Court believes, based upon the high number of equivocal results found west of the

-28-

CTEH area, that the western boundary of the class should extend to Paris Road. Based upon the opinions of Doctors Bedient and Kuhlmeir, and the test results presented by both sides, the Court believes that the crude oil moved north by northwest toward Pump 6 during the time in question. Also based upon the hydrologists' opinions, the Court finds that the roads and canals acted as preferential pathways and natural boundaries for the oil.

For these same reasons, the Court establishes the northern boundary of the class at the 40 Arpent Canal. This is a natural boundary and a preferential pathway for the oil. Also, several witnesses (Dr. Kuhlmeir and Ben Badon) testified to the natural barrier at the intersection of Paris Road and the 40 Arpent Canal that was blocked with debris during this time period.

The Court sets the southern boundary of the class at St. Bernard Highway, until St. Bernard Highway intersects with Jacob Drive. The boundary then runs north on Jacob Drive to Judge Perez Drive, which forms the southern boundary farther east. Both the EPA and Murphy have shown significant positive results for crude oil in the area between Judge Perez Drive and St. Bernard Highway, and further testing needs to be completed in the area. The boundary of St. Bernard Highway is consistent with the testimony of eyewitnesses and of the expert opinions of Plaintiffs' and Defendant's hydrologists regarding the movement of oil in the area.

Regarding the eastern boundary, the parties are in dispute over whether any crude oil traveled into the neighborhoods east of the refinery. Murphy argues that very little oil escaped the refinery. Based upon their test results and the testimony of Dr. Kuhlmeir, Murphy argues that the oil that escaped the refinery only traveled west. By the time that Pump 7 went into operation on September 4, causing a strong eastward movement of the water, Murphy argues that the oil was contained by sandbagging at the refinery.

Given that the Court cannot reach the merits of the dispute, the Court expresses no opinion upon when the oil leak into the surrounding neighborhoods stopped. However, the Court notes that even Murphy's experts have found a number of equivocal results in the area directly east of the refinery in a small trailer park. Also, this area is partially included in the EPA's oil-plume perimeter. As such, the Court finds that the eastern boundary of the class shall include the trailer park immediately adjacent to the Murphy refinery, on Mary Ann Drive, and extending in a northerly direction to the 40 Arpent Canal.[13] Exhibit B to this Order and Reasons is a map of the Court's designated affected area.

It is important to note that the above-stated class definition does not end the Court's involvement in this issue. The fact that a particular plaintiff resides outside the class area does not preclude that plaintiff from bringing an individual suit. Conversely, the fact that a plaintiff resides in the class area does not automatically entitle him or her to recovery. Also, the Court reserves the right to expand or reduce the class area, depending upon the results of further testing and discovery. The Court has endeavored to certify this area based upon the strongest evidence presented by the parties, given the ongoing testing and investigation in St. Bernard Parish.

## III.  CONCLUSION - CERTIFICATION ORDER

Having considered the evidence, memoranda, and arguments of counsel at the January 12, 2006 class certification hearing, and, for the reasons stated above,

IT IS ORDERED, ADJUDGED, and DECREED that the prerequisites to a class action

---

[13] This class boundary does not include the properties of proposed class representatives at 2029 Judy Drive (Philip Hebert), 4028 Hamlet Drive (James Shoemaker), and 221 West Judge Perez Drive (James Shoemaker). Because Mr. Hebert owns no property in the class area, he shall be excluded as a class representative. Mr. Shoemaker may remain a class representative because one of his properties lies within the class boundary, at 3525 Palmisano Drive.

set forth in Rule 23(a) are satisfied, inasmuch as the class is so numerous that joinder of all

plaintiffs is impracticable, there are questions of law and fact common to the class, the claims

and defenses of the class representatives are typical of the claims of the class as a whole, and the

class representatives for plaintiffs will fairly and adequately protect the interests of the proposed

class.

IT IS ORDERED that the class representatives shall be Phyllis N. Michon, Cherie Scott

Perez, James Shoemaker, Fernand Marsolan, and Robin Diaz Clark.

IT IS FURTHER ORDERED that the following counsel are appointed as class counsel:

Sidney Torres, Richard Arsenault, Daniel Becnel, Val Exnicios, Michael Stag, Mickey Landry,

Scott Bickford, Hugh Lambert, Joseph Bruno, Madro Bandaries, William Bradley, Ronnie

Penton, Robert Becnel, Walter Leger, Donni Young, Darleen Jacobs, E. Carroll Rogers, Salvador

Gutierrez, Michael Hingle, Walter Dumas, Anthony Irpino, and Gerald Meunier.  Sidney Torres

shall serve as Plaintiffs' Liaison Counsel, and an Executive Committee shall be comprised of

Sidney Torres, Richard Arsenault, Daniel Becnel, Val Exnicios, and Michael Stag.

IT IS FURTHER ORDERED that this action may be maintained as a class action

pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, inasmuch as the questions of

law and/or fact common to the members of the class predominate over questions affecting only

individual members, and a class action is superior to other available methods of adjudication of

this dispute.

IT IS FURTHER ORDERED that, pursuant to Rule 23(b)(3) of the Federal Rules of Civil

Procedure, a Class consisting the following persons shall be certified, which Class the Court

finds is adequately defined and clearly ascertainable:

-31-

All persons and/or entities who/which have sustained injuries, loss, and/or damages as a result of the September 2005 spill of crude oil and any other related substances from a storage tank located on Defendant Murphy Oil USA, Inc.'s property in Meraux, Louisiana, and who/which on August 29, 2005, were residents of, or owned properties or businesses in, the following area:  Beginning north, from the 40 Arpent Canal with its intersection in the west at Paris Road in Chalmette, Louisiana, and traveling along Paris Road in a southerly direction to its intersection with St. Bernard Highway, then heading east from this intersection along St. Bernard Highway to Jacob Drive, then heading north along Jacob Drive to the intersection with East Judge Perez Drive, then heading east along East Judge Perez Drive to its intersection with Mary Ann Drive, then heading north along Mary Ann Drive to the 40 Arpent Canal.

*See* Exhibit B attached to this Order for a map of this area.

IT IS FURTHER ORDERED that only Counts I, II, IV, V, and VII of the Plaintiffs'

Administrative Master Complaint shall be certified for class treatment.

New Orleans, Louisiana, this __30th__ day of January ,2006.

UNITED STATES DISTRICT JUDGE

-32-



Potential Impact Boundary
Summary

EXHIBIT A

# Exhibit B - The Court's Designated Class Boundary

