# EXHIBIT A

STATE OF MICHIGAN        )

COUNTY OF EATON          )

### AFFIDAVIT OF SCOTT NORRIS

Before me, the undersigned authority, personally appeared SCOTT NORRIS, who after being by me first duly sworn, did depose and state as follows:

1.      My name is Scott Norris.  I am over the age of nineteen years and I am a resident of the State of Michigan.  I am employed by Auto-Owners Insurance Company as a senior attorney.  I have either personal knowledge of the truth of the matters stated herein or the truth of such matters is based upon records prepared, kept and maintained by Auto-Owners Insurance Company and its wholly-owned subsidiaries in the regular course of business.

2.      Owners Insurance Company, the company named as a defendant in the Amended Complaint filed by Robert C. Pate as Trustee for the Chinese Drywall Trust, Case No. 09-7791 in the Eastern District of Louisiana, is an insurance company formed under the laws of the State of Ohio with its principal place of business located in Lansing, Michigan.  Owners Insurance Company is a wholly-owned subsidiary of Auto-Owners Insurance Company.  Neither Owners Insurance Company nor any of the other subsidiaries of Auto-Owners Insurance Company, nor Auto-Owners Insurance Company itself, is formed under the laws of the State of Louisiana. Rather, each of the subsidiaries of Auto-Owners Insurance Company is formed under the laws of one of three states:  Michigan, Ohio, or Indiana.

3.      Owners Insurance Company is not licensed by the State of Louisiana to write policies of insurance in the state, nor does Owners Insurance Company write insurance coverage in the State of Louisiana.  Owners Insurance Company does not maintain any offices within the state of Louisiana, and does not have any employees in the state of Louisiana.  Owners Insurance

Company does not solicit business from Louisiana residents, and does not advertise for business on any local radio or television outlet or in any publications in the State of Louisiana. Owners Insurance Company does not collect premiums from Louisiana residents. Owners Insurance Company has not designated a registered agent for service of process within the State of Louisiana.

    4.    The First Amended Complaint filed by Robert C. Pate at ¶ 50 alleges that certain insurance policies were issued by Owners Insurance Company to Hinkle Drywall, LLC. The subject insurance policies, Policy Nos. 074612-20693161-07, -08, and -09, were issued by Owners Insurance Company to Hinkle Drywall, LLC in the State of Florida. The subject insurance policy was delivered to Hinkle Drywall, LLC at a Florida address and billing for the policy was sent to a Florida address. At all times that this policy was in force, Hinkle Drywall, LLC maintained with Owners Insurance Company a business address in the state of Florida.

    5.    Owners Insurance Company did not solicit Hinkle Drywall's business in the State of Louisiana. The aforementioned policies of insurance issued to Hinkle Drywall, LLC in the State of Florida had no connections with the State of Louisiana, whether in the application for coverage, the billing sent to Hinkle Drywall, LLC, or the collection of premiums from Hinkle Drywall, LLC. Rather, all of these activities in connection with the policy took place with Hinkle Drywall, LLC in the State of Florida.

    6.    By making this affidavit, neither I nor Owners Insurance Company nor its parent, Auto-Owners Insurance Company, waive or intend to waive application of the attorney-client privilege, and the right to assert such privilege by all such parties is specifically reserved.

Further Affiant sayeth not.

_Scott Norris_
**SCOTT NORRIS**

Sworn to and subscribed before me this 24th day of May _____, 2010.

_Robert C. Ellis_
NOTARY PUBLIC
My Commission Expires: _____

ROBERT C. ELLIS
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF SHIAWASSEE
My Commission Expires Oct. 29, 2014
Acting in the County of Eaton

3

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:   CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO.:  2047 |
| | JUDGE FALLON |
| This Document Relates to *Pate v. American International Specialty Lines Insurance Company, et al.* (09-7791) | MAGISTRATE JUDGE WILKINSON |

## PLAINTIFF'S AND PSC'S FIRST AMENDED NOTICE OF ORAL DEPOSITION PURSUANT TO FED. R. CIV. P. 30(b)(6)

To:   Owners Insurance Company
c/o Attorney Jerry L. Saporito, T.A.
Leake & Andersson, LLP
1100 Poydras Street, Suite 1700
New Orleans, LA  70163-1701

PLEASE TAKE NOTICE that the undersigned attorneys, pursuant to Federal Rule of

Civil Procedure 30(b)(6), intend to take the deposition of Your corporate representative,

Kathleen Lopilato, designated to testify about the areas identified in Schedule A attached hereto,

at 9:00 a.m. Central Time on September 16, 2010 at Leake & Andersson, LLP, 1100

Poydras Street, Suite 1700, New Orleans, LA  70163-1701 upon oral examination before a

court reporter, any other Notary Public or other officer authorized by law to take depositions.

The oral examination will continue from day to day until completed.  The deposition is being

taken for purposes of discovery, for use at trial, or such other purposes, as are permitted under

the applicable and governing rules.

Call-in capabilities will be provided as follows:

Dial In:  888-337-8218
Participant Code:  769758
Moderator Code:  7697584

NYDOCS1-953096.1

Dated:  September 15, 2010                      ANDERSON KILL & OLICK, P.C.


By:  /s/ Anna M. Piazza
      Robert M. Horkovich
      Anna M. Piazza
      1251 Avenue of the Americas
      New York, New York 10020
      P:  212-278-1000
      F:  212-278-1733
      rhorkovich@andersonkill.com
      apiazza@andersonkill.com

      *Plaintiff's Lead Counsel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing has been served on Attorney Jerry L. Saporito by e-mail on September 15, 2010.  The Notice will be served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by e-mail, and upon all parties by U.S. Mail and by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 6 on the 15th day of September, 2010.


      /s/  Anna M. Piazza
      Anna M. Piazza

## SCHEDULE A

### Definitions and Instructions

1.   "Communication" means every manner or type of disclosure, transfer, documentation, or exchange of information, whether written or oral, whether in person, by telephone, e-mail, mail, personal delivery or otherwise.

2.   "Document" means anything written down or recorded in any form, whether on paper or electronically, including, in particular, written communications in any form.

3.   "Insurance related products" refers to any contract which You have entered as an insurer, indemnitor, or surety.

4.   "Person" or "Person(s)" mean any individual, corporation, proprietorship, partnership, trust, association, or any other entity.

5.   "Pertaining to" means regarding, referring to, relating to, mentioning or addressing.

6.   "Related Entity" means your subsidiary and parent corporations, affiliates, or agents.

7.   "The State of Louisiana" refers to any governmental agency of the State of Louisiana, including, but not limited to, the Louisiana Department of Insurance.

8.   "You," "Your," or "Your Company" means any of the entities that you represent in this matter, including but not limited to: American Guarantee and Liability Insurance Company, Amerisure Insurance Company, Amerisure Mutual Insurance Company, Auto-Owners Insurance Company, Chartis Claims, Inc., Chartis Specialty Insurance Company, FCCI Commercial Insurance Company, FCCI Insurance Company, Hartford Accident & Indemnity Company, Hermitage Insurance Company, Illinois Union Insurance Company, Landmark American Insurance Company, Lexington Insurance Company, Mid-Continent Casualty Company, National Union Fire Insurance Company of Pittsburgh, P.A., NGM Insurance Company, Ohio Casualty Insurance Company, Owners Insurance Company, Scottsdale Insurance Company, Steadfast Insurance Company, and West American Insurance Company – and includes that entity(ies)'s respective agents, principals, employees, directors, officers, representatives, affiliates, departments, divisions, and parent and subsidiary corporations.

9.   Unless otherwise specified, the time frame for these requests is the period beginning five years ago and continuing to the present.

### Areas of Testimony[1]

1.      The date when You were first authorized and/or licensed to do business in Louisiana, the status of Your authorization and/or license to do business in Louisiana, and whether You are still doing business in Louisiana.

2.      Your efforts to solicit, market, or advertise insurance related products in Louisiana.

3.      When You first began to solicit, market, or advertise insurance related products in Louisiana and, if applicable, when you ceased doing so.

4.      When You first sold any insurance related products in Louisiana.

5.      When and whether You ceased selling any insurance related products in Louisiana.

6.      The types of insurance related products You have sold to insureds in Louisiana (including insureds who are resident in or who do business in Louisiana) and the types of coverage applicable to said insureds.

7.      The information You provided to the State of Louisiana pertaining to Your providing or selling insurance related products in the Louisiana.

8.      The Person(s) employed or working for You who are responsible for soliciting, marketing or advertising Your insurance related products in Louisiana, where those persons are located, and the manner in which they solicit, market, or advertise Your insurance related products in Louisiana.

9.      The Person(s) who have actually sold Your insurance related products in Louisiana, where those Person(s) are located, and the manner in which they sold Your insurance related products in Louisiana.

10.

11.     The Person(s) employed by or working for You who are responsible for administering claims related to insurance products You sold in Louisiana, where those Person(s) are located, and the manner in which they administered claims related to insurance products You sold in Louisiana.

12.     Any of Your marketing or strategic plans which mention or address Louisiana.

---

[1] This First Amended deposition notice utilizes the numbering of the original deposition notice to reflect the changes made in accordance with Judge Fallon's Minute Entry.

13.    Any of Your insurance policies (including endorsements thereto) which mention or reference Louisiana.

14.    The bases and facts supporting the statements made in any affidavit annexed to Your motion to dismiss in the above referenced action.

15.    Whether any of Your officers, directors, employees, representatives, or agents have traveled to Louisiana for the purposes of conducting business or engaging in any business activity related to insurance products in Louisiana.  If so, the names of the individuals, the dates of their visit(s) to Louisiana, and the purpose of their visit(s).

16.    Any offices You maintain, own, lease, and/or occupy in Louisiana.

17.    Any offices in Louisiana at or through which insurance policies are sold by You or on Your behalf.

18.    Any offices outside of Louisiana at or through which insurance policies are sold by You or on Your behalf to Person(s) that reside in or do business in Louisiana.

19.    Your sale of insurance related products in Louisiana, including to Person(s) that reside in or do business in Louisiana.

20.    Your relationship to any subsidiary or parent corporation that sells insurance to Person(s) that reside in or do business in Louisiana.

21.    Your filing of any tax returns in Louisiana.

22.    Your processing of insurance claims in Louisiana.

23.    Any assets You maintain, own, lease, or otherwise hold in Louisiana and the value of any such assets.

24.    Any ownership interest You possess(ed) in any entity that is located in or does business in Louisiana.

25.    Any of Your revenue that originates in Louisiana, including insurance premium payments by Person(s) that reside in or do business in Louisiana.

26.

27.

28.    Any companies located in Louisiana that serve as Your agents, affiliates, or representatives with regard to the sale of insurance policies.

29.    Your financing or contribution of capital to any corporation, subsidiary, affiliate, or agent located in Louisiana.

30.

31.     The insurance policies that You sold that are at issue in this proceeding, including their place of counter-signature and last act of contracting.

32.     Your managing general agent in Louisiana.

33.     Your brokers in Louisiana.

34.     Your retail agents in Louisiana.

35.

36.     Your corporate structure, including your relationship to Related Entities.

37.     Your board of directors, officers, and organizational structure.

38.     The board of directors, officers, and organizational structure of any Related Entity that does business in Louisiana.

39.     Any distribution or transfer of cash or assets between You and a Related Entity that does business in Louisiana.

40.     Any inter-company loans, advances of funds, or cost sharing between You and a Related Entity that does business in Louisiana.

41.     Any guarantees or similar assurances by You to financial institutions on behalf of any Related Entity that does business in Louisiana.

42.     The preparation and approval by You of annual and longer-term business plans, marketing plans, and budgets for any Related Entity that does business in Louisiana.

43.     The existence of any combined financial statements for You and any Related Entity that does business in Louisiana.

44.

45.     Your authorization of an agent to receive service of process or notice of proceedings in Louisiana.

46.

47.     Any losses that took place in Louisiana and related to which You sold insurance.

# EXHIBIT C

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED | * | MDL NO. 2047 |
| DRYWALL PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION: L |
| | * | |
| | * | JUDGE: FALLON |
| This Document Relates to: | * | |
| *Robert C. Pate, et al. versus* | * | MAG: WILKINSON |
| *American International Specialty Lines* | * | |
| *Insurance, et al.* | * | |
| *Case No. 2:09-cv-07791 (E.D.La.)* | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**OWNERS INSURANCE COMPANY'S RESPONSE TO PLAINTIFF ROBERT C.
PATE'S INTERROGATORIES AND REQUESTS FOR THE PRODUCTION OF
DOCUMENTS CONCERNING JURISDICTION AND VENUE**

**INTERROGATORIES**

**INTERROGATORY NO. 1:**

Do any of your subsidiary or parent corporations sell insurance – directly or indirectly –
to Louisiana residents or entities? If so, for each, identify: its headquarters; your percent
ownership in it or its percent ownership in you; any officers or directors common to you and the
subsidiary or parent; and whether you and the subsidiary or parent maintain separate accounting
systems.

**ANSWER TO INTERROGATORY NO. 1:**

Owners objects to Interrogatory No. 1 on the grounds that it is vague, ambiguous,
overly broad, unduly burdensome, not limited in time or scope and costly. Further answering,
and without waiving objections thereto, Owners does not sell insurance to Louisiana
residents or entities.

**INTERROGATORY NO. 2:**

Identify all offices that You maintain, own, lease, and/or occupy in Louisiana, and for each state the address and the entity maintaining, owning, leasing, and/or occupying the office.

**ANSWER TO INTERROGATORY NO. 2:**

Owners objects to Interrogatory No. 2 on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, not limited in time or scope and costly.  Further answering, and without waiving objections thereto, Owners does not maintain, own, lease and/or occupy any offices in Louisiana.

**INTERROGATORY NO. 3:**

Identify all offices in Louisiana at or through which insurance policies are sold by You or on Your behalf.

**ANSWER TO INTERROGATORY NO. 3:**

Owners objects to Interrogatory No. 3 on the grounds that it is vague, ambiguous, overly broad, unduly burdensome, not limited in time or scope and costly.  Further answering, and without waiving objections thereto, Owners does not have offices in Louisiana at or through which insurance policies are sold.

**INTERROGATORY NO. 4:**

Identify all periods of time during which You were qualified to do business in Louisiana and Identify all periods of time during which You were licensed to sell insurance in Louisiana.

**ANSWER TO INTERROGATORY NO. 4:**

Owners objects to Interrogatory No. 4 on the grounds that it is overly broad, not limited in time or scope, unduly burdensome and vague.  Further answering, and without waiving objections thereto, Owners is not qualified to do business in Louisiana or licensed to sell

insurance in Louisiana, and has never been qualified to do business in Louisiana or licensed to sell insurance in Louisiana.

**INTERROGATORY NO. 5:**

Identify any tax returns You have filed in Louisiana during the past ten years, including the filer of the tax return, its address, and the year it was filed.

**ANSWER TO INTERROGATORY NO. 5:**

Owners objects to Interrogatory No. 5 on the grounds that it is unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence and unlimited in scope.  Further answering, and without waiving objections thereto, Owners has never filed tax returns in Louisiana during the past ten years.

**INTERROGATORY NO. 6:**

During the past ten years, have You sold or marketed insurance policies to persons located in Louisiana, including but not limited to sales by Your subsidiaries, parents, affiliates, or agents? If so, identify the entity selling or marketing the insurance policies, the kind of insurance policies it sold, and the number of insurance policies of each kind it sold each year.

**ANSWER TO INTERROGATORY NO. 6:**

Owners objects to Interrogatory No. 6 on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, unlimited in scope, seeks information that is not discoverable under FED. R. CIV. P. 26, including but not limited to the protection of FED. R. CIV. P. 26(b) and seeks information for a time period not relevant to the matter identified in the Complaint.  Further answering, and without waiving objections thereto, Owners has not sold or marketed insurance policies to persons located in Louisiana.

**INTERROGATORY NO. 7:**

Identify the number of insurance claims You have processed in Louisiana in the past ten years, identifying in your answer the names of the entities processing the claims and their relation to You.

**ANSWER TO INTERROGATORY NO. 7:**

Owners objects to Interrogatory No. 7 on the grounds that it is overly broad, unduly burdensome, vague, ambiguous and unlimited in scope. Further answering, and without waiving objections thereto, Owners has never processed insurance claims in Louisiana.

**INTERROGATORY NO. 8:**

Identify all assets, including but not limited to real estate, bank accounts, financial instruments, or securities that You own or have owned in Louisiana in the past ten years, including the type of asset, the owner of the asset, and the dollar value of the asset.

**ANSWER TO INTERROGATORY NO. 8:**

Owners objects to Interrogatory No. 8 on the grounds that it is overly broad, unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence and unlimited in scope.

Further, Owners objects to Interrogatory No. 8 on the grounds that it seeks information that is not discoverable under FED. R. CIV. P. 26, including but not limited to the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Interrogatory No. 8 on the grounds that it seeks information that is privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation, any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to Interrogatory No. 8 on the grounds that it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Interrogatory No. 8 on the grounds that it seeks information for a time period not relevant to the matter identified in the Complaint and seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further answering, Owners does not own real estate, bank accounts or financial interests in Louisiana.   By agreement of counsel, Owners is not obligated to search for securities information.

## INTERROGATORY NO. 9:

For each of the past ten years, and for you and each of your subsidiary or parent corporations, Identify any revenue originating from Louisiana; the percent that revenue constitutes of your or your subsidiary or parent corporation's total annual revenue; and the percent of that annual revenue that originates from insurance premium payments by Louisiana residents or entities.

## ANSWER TO INTERROGATORY NO. 9:

Owners objects to Interrogatory No. 9 on the grounds that it is overly broad, unduly burdensome, vague in that "revenue" is undefined and unlimited in scope.

Further, Owners objects to Interrogatory No. 9 on the grounds that it seeks information that is not discoverable under FED. R. CIV. P. 26, including but not limited to the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Interrogatory No. 9 on the grounds that it seeks information that is privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation, any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to Interrogatory No. 9 on the grounds that it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Interrogatory No. 9 on the grounds that it seeks information for a time period not relevant to the matter identified in the Complaint and seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further answering, and without waiving objections thereto, Owners does not have any sales, product or service revenue originating from Louisiana.

**INTERROGATORY NO. 10:**

During the past ten years, have You been a party to any judicial or administrative proceeding in Louisiana? If so, state the name of the proceeding, the index or other identifying number of the proceeding, and describe of the nature of the proceeding.

**ANSWER TO INTERROGATORY NO. 10:**

Owners objects to Interrogatory No. 10 on the grounds that it is overly broad, unduly burdensome, vague and unlimited in scope.

Further, Owners objects to Interrogatory No. 10 on the grounds that it seeks information that is not discoverable under FED. R. CIV. P. 26, including but not limited to the protection of FED. R. CIV. P. 26(b).  Owner further objects on the grounds it seeks information that is not

material, not relevant, and it is not designed to lead to the discovery of admissible evidence.

Further, Owners objects to Interrogatory No. 10 on the grounds that it seeks information for a time period not relevant to the matter identified in the Complaint.

Further, Owners objects to Interrogatory No. 10 on the grounds that it is seeks the identities of information or materials that cannot be provided by Owners with substantially greater facility than would otherwise be provided by other sources or obtained independently by the Plaintiff, who has ample opportunity by discovery in this action to obtain the information or materials sought.

Further, Owners objects to Interrogatory No. 10 as the information sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive.

Further, Owners objects to Interrogatory No. 10 to the extent that the information sought is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.

Further answering, and without waiving objections thereto, Owners has conducted a search of readily accessible documents as they are kept in the ordinary course of business and is unable to identify any documents involving any Louisiana insured because Owners does not have any Louisiana insureds.  Further answering, and without waiving objections thereto, Owners has conducted a search of the readily accessible documents as they are kept in the ordinary course of business and is unable to identify any Owners' documents involving any judicial or administrative proceeding involving a Louisiana insured.

**INTERROGATORY NO. 11:**

Identify all the lawsuits or administrative proceedings in which You have been involved during the past 10 years in which the court applied Louisiana law.

**ANSWER TO INTERROGATORY NO. 11:**

Please see objections and responses to Interrogatory No. 10. Further, Owners objects to Interrogatory No. 11 on the grounds that it is overly broad, unduly burdensome, vague in that "involved" is undefined and unlimited in scope.

Further, Owners objects to Interrogatory No. 11 on the grounds that it seeks information that is not discoverable under FED. R. CIV. P. 26, including but not limited to the protection of FED. R. CIV. P. 26(b). Owner further objects on the grounds it seeks information that is not material, not relevant, and it is not designed to lead to the discovery of admissible evidence.

Further, Owners objects to Interrogatory No. 11 on the grounds that it seeks information for a time period not relevant to the matter identified in the Complaint.

Further, Owners objects to Interrogatory No. 11 on the grounds that it is seeks the identities of information or materials that cannot be provided by Owners with substantially greater facility than would otherwise be provided by other sources or obtained independently by the Plaintiff, who has ample opportunity by discovery in this action to obtain the information or materials sought.

Further, Owners objects to Interrogatory No. 11 as the information sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive.

Further, Owners objects to Interrogatory No. 11 to the extent that the information sought is unduly burdensome or expensive, taking into account the needs of the case, the amount in

controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.

**INTERROGATORY NO. 12:**

Identify all locations at which You maintain any documents in Louisiana and identify the categories of documents (ex. policies, underwriting files, or claims files).

**ANSWER TO INTERROGATORY NO. 12:**

Owners objects to Interrogatory No. 12 on the grounds that it is overly broad, unduly burdensome, not relevant, vague and unlimited in time and scope.   Further answering, and without waiving objections thereto, Owners does not have any locations at which Owners maintain any documents in Louisiana.

**INTERROGATORY NO. 13:**

Identify the number of claims that You have paid to Louisiana residents or entities in the past 10 years and the total amount of those claims.

**ANSWER TO INTERROGATORY NO. 13:**

Owners objects to Interrogatory No. 13 on the grounds that it is overly broad, unduly burdensome, or expensive, not relevant, not material, not reasonably calculated to lead to the discovery of admissible evidence, unlimited in scope, seeks information that is not discoverable under FED. R. CIV. P. 26, including but not limited to the protection of FED. R. CIV. P. 26(b) and seeks information for a time period not relevant to the matter identified in the Complaint.

**INTERROGATORY NO. 14:**

Identify all witnesses relevant to this case who reside or work in Louisiana.

**ANSWER TO INTERROGATORY NO. 14:**

Owners objects to Interrogatory No. 14 on the grounds that it is overly broad, unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in scope.

Owners objects to Interrogatory No. 14 on the grounds that it seeks information protected by the attorney-client privilege or work product prepared in anticipation of litigation or for trial and seeks information subject to the attorney-client privilege, the attorney work product privilege and materials or information prepared in the anticipation of litigation or trial privilege, including but not limited to the protections contained in FED. R. CIV. P. 26(b)(1)-(5).

Owners objects to Interrogatory No. 14 on the grounds that it seeks disclosure of the opinions, mental impressions, trial strategy, legal conclusions or legal theories of this Plaintiff, its counsel or other representatives.

Owners further objects to the disclosure of any information, materials or documents generated, certified, or acquired in response to the filing of the subject lawsuit by Plaintiff.

Further answering, and without waiving objections thereto, Owners contends that it is impossible to determine "all witnesses relevant to this case who reside or work in Louisiana."

**INTERROGATORY NO. 15:**

Identify each type of business that You have transacted in Louisiana, the entity transacting the business, and the time period during which You transacted the business.

**ANSWER TO INTERROGATORY NO. 15:**

Owners objects to Interrogatory No. 15 on the grounds that it is overly broad, unduly burdensome, vague and unlimited in time and scope.  Further answering, and without waiving objections thereto, Owners has not transacted business in Louisiana.

**INTERROGATORY NO. 16:**

Identify each type of service or thing that You have contracted to supply in Louisiana, the entity supplying the service or thing, and the time period during which You supplied the service or thing.

**ANSWER TO INTERROGATORY NO. 16:**

Owners objects to Interrogatory No. 16 on the grounds that it is overly broad, unduly burdensome, vague and unlimited in time and scope. Further answering, and without waiving objections thereto, Owners has not contracted to supply services or things in Louisiana.

**INTERROGATORY NO. 17:**

Identify all manners in which You solicit business or advertise to Louisiana residents or entities, including but not limited to catalogs, brochures, and internet advertisements, and when such soliciting or advertising took place.

**ANSWER TO INTERROGATORY NO. 17:**

Owners objects to Interrogatory No. 17 on the grounds that it is overly broad, unduly burdensome, vague and unlimited in time and scope. Further answering, and without waiving objections thereto, Owners has not solicited business or advertised to Louisiana residents or entities.

**INTERROGATORY NO. 18:**

Identify the number of employees who work for You in Louisiana or work for You elsewhere but reside in Louisiana.

**ANSWER TO INTERROGATORY NO. 18:**

Owners objects to Interrogatory No. 18 on the grounds that it is overly broad, unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible

evidence, vague, ambiguous and unlimited in time and scope. Further answering, and without waiving objections thereto, Owners does not have any employees who work for Owners in Louisiana. Further answering, and without waiving objections thereto, Owners contends that it is impossible to determine all employees relevant to this case who may reside in Louisiana, but work elsewhere

**INTERROGATORY NO. 19:**

During the past ten years, have You possessed an ownership interest in any corporation or business that is located in Louisiana? If so, identify the corporation, any subsidiaries, affiliates, or agents of that corporation, and describe the nature of the business in which the corporation, and any of its subsidiaries, affiliates, or agents, are or were engaged.

**ANSWER TO INTERROGATORY NO. 19:**

Owners objects to Interrogatory No. 19 on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, vague and unlimited in scope. Further answering, and without waiving objections thereto, Owners has not owned or operated any business in Louisiana.

**INTERROGATORY NO. 20:**

During the past ten years, has any company located in Louisiana served as an agent, affiliate, or representative for You with regard to sales of insurance policies? If so, identify the company, along with any parents, subsidiaries, affiliates, or agents of the company and describe the business in which the company and any of its parents, subsidiaries, affiliates, or agents are or were engaged.

**ANSWER TO INTERROGATORY NO. 20:**

Owners objects to Interrogatory No. 20 on the grounds that it is not reasonably calculated

to lead to the discovery of admissible evidence.  Further answering, and without waiving objections thereto, no company in Louisiana has served as an agent, affiliate or representative for Owners with regard to sales of insurance policies.

**INTERROGATORY NO. 21:**

During the past ten years, have any of your officers, directors, employees, representatives, or agents visited Louisiana for the purposes of conducting business or engaging in any business activity relating to the sale of insurance? If so, identify the relevant officers, directors, employees, representatives, or agents, the dates and lengths of their visit(s) to Louisiana, any persons or corporations they met during their visit(s) and describe briefly the purpose of their visit(s).

**ANSWER TO INTERROGATORY NO. 21:**

Owners objects to Interrogatory No. 21 on the grounds that it is overly broad, unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence.  Further answering, and without waiving objections thereto, no officers, directors, employees, representatives or agents have visited Louisiana for the purposes of conducting business or engaging in business activity relating to the sale of insurance.

**INTERROGATORY NO. 22:**

During the past ten years, have You ever financed or made contributions of capital to any corporation, subsidiary, affiliate or agent located in Louisiana? If so, identify all such transactions, including but not limited to any inter-company loans, advances of funds, costs sharing agreements, or extensions of credit.

**ANSWER TO INTERROGATORY NO. 22:**

Owners objects to Interrogatory No. 22 on the grounds that it is overly broad, unduly

burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence, vague, unlimited in scope and seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.  Further answering, and without waiving objections thereto, during the past ten years Owners has not financed or made contributions of capital to any corporation, subsidiary, affiliate or agent located in Louisiana.

**INTERROGATORY NO. 23:**

Identify all financial investors You have that reside in Louisiana.

**ANSWER TO INTERROGATORY NO. 23:**

Owners objects to Interrogatory No. 23 on the grounds that it is overly broad, ambiguous, unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence, vague and unlimited in scope and impossible to determine.

**INTERROGATORY NO. 24:**

Identify Your state of incorporation and principal place of business.

**ANSWER TO INTERROGATORY NO. 24:**

Owners is incorporated in the state of Ohio and its principal place of business is Michigan.

**INTERROGATORY NO. 25:**

For each of the insurance policies that You sold that are at issue in this proceeding, identify where the insurance policy was counter-signed and where the last act of contracting with regard to that insurance policy took place.

**ANSWER TO INTERROGATORY NO. 25:**

Owners objects to Interrogatory No. 25 on the grounds that it is unduly burdensome and

vague.   Further answering, and without waiving objections thereto, the relevant policy was issued in the State of Michigan and delivered in the State of Florida.   Further answering, and without waiving objections thereto, the home(s) and/or property(ies) that are related to the Hinkle Drywall, LLC and/or Hinkle Drywall, Inc. policy(ies) were located in the State of Florida.

**INTERROGATORY NO. 26:**

Identify Your managing general agent in Louisiana.

**ANSWER TO INTERROGATORY NO. 26:**

Owners objects to Interrogatory No. 26 on the grounds that it is overly broad, vague and unlimited in time.  Further answering, and without waiving objections thereto, Owners does not have a managing general agent in Louisiana.

**INTERROGATORY NO. 27:**

Identify Your brokers in Louisiana.

**ANSWER TO INTERROGATORY NO. 27:**

Owners objects to Interrogatory No. 27 on the grounds that it is overly broad, vague and unlimited in time.  Further answering, and without waiving objections thereto, Owners does not have insurance brokers in Louisiana.

**INTERROGATORY NO. 28:**

Identify all retail agents through which You have sold insurance in Louisiana in the past 10 years.

**ANSWER TO INTERROGATORY NO. 28:**

Owners objects to Interrogatory No. 28 on the grounds that it is overly broad, vague and unlimited in time.  Further answering, and without waiving objections thereto, Owners does not

have retail agents in Louisiana.

**INTERROGATORY NO. 29:**

Identify the total amount of premiums that You collected each year for the past ten years from Louisiana clients.

**ANSWER TO INTERROGATORY NO. 29:**

Owners objects to Interrogatory No. 29 on the grounds that it is overly broad, and unduly burdensome.   Further answering, and without waiving objections thereto, Owners has not collected premiums from Louisiana clients.

## DOCUMENT REQUESTS

**REQUEST FOR PRODUCTION NO. 1:**

Documents sufficient to show all travel to Louisiana by any of Your officers, directors, employees, representatives or agents for the purpose of conducting business or engaging in any business activity regarding the marketing, sale or promotion of insurance policies, including but not limited to expense records, airplane tickets, hotel bills, car rental bills and other travel records, as well as documents sufficient to show the dates and purposes of all such trips.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Owners objects to Request for Production No. 1 on the grounds that it is overly broad, unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence, and unlimited in scope.   Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because no such Owners' document exists.

**REQUEST FOR PRODUCTION NO. 2:**

Documents utilized to solicit, market, or advertise Your services or products in Louisiana, including but not limited to electronic media, brochures, advertisements, news releases, customer service reports, articles, and price lists produced by You for use by You or any Related Entity in Louisiana.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Owners objects to Request for Production No. 2 on the grounds that it is overly broad, unduly burdensome, vague and unlimited in time and scope.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because no such Owners' document exists.

**REQUEST FOR PRODUCTION NO. 3:**

Documents regarding actual or prospective purchasers of insurance policies in Louisiana, including reports regarding actual or projected sales of insurance policies by You or any Related Entity.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Owners objects to Request for Production No. 3 on the grounds that it is overly broad, unduly burdensome and vague in that "projected sales" is undefined, and unlimited in time and scope.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because no such Owners' document exists.

**REQUEST FOR PRODUCTION NO. 4:**

Documents related to any Louisiana state or federal legal proceedings involving You, including but not limited to: (a) claim, complaint, counterclaim or third party claim You filed in any court, administrative agency, or any other governmental entity within Louisiana; (b)

discovery responses and answers You filed in any litigation in which personal jurisdiction over You in Louisiana was or is an issue and any judicial orders, memoranda, or opinions issued thereon; and (c) copies of any judgment, levy, or assessment entered in Louisiana against or in Your favor.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Owners objects to Request for Production No. 4 as it is vague, ambiguous, argumentative, overly broad, unduly burdensome, not limited in time or scope or geographical location, irrelevant, immaterial, not reasonably calculated to lead to the production request of admissible evidence and/or has no conceivable bearing on the issues in the case. Further, Owners objects to Request for Production No. 4 to the extent it may seek the production request of information protected by the attorney-client privilege or work product prepared in anticipation of litigation or for trial.

Further, Owners objects to Request for Production No. 4 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 4 to the extent it may seek information that is privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to Request for Production No. 4 to the extent it may seek information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 4 to the extent it may seek information subject to the attorney-client privilege, the attorney work product privilege and materials or information prepared in the anticipation of litigation or trial privilege, including but not limited to, the protections contained in FED. R. CIV. P. 26(b)(1)-(5).  Owners further objects to Request for Production No. 4 as it seeks disclosure of the opinions, mental impressions, trial strategy, legal conclusions or legal theories of this Plaintiff, its counsel or other representatives. Owners further objects to the disclosure of any information, materials or documents generated, certified, or acquired in response to the filing of the subject lawsuit by Plaintiff.

Further, Owners objects to Request for Production No. 4 to the extent it seeks information for a time period not relevant to the matter identified in the Complaint.

Further, Owners objects to Request for Production No. 4 as it seeks the identities of information or materials that cannot be provided by Owners with substantially greater facility than would otherwise be provided by other sources or obtained independently by the Plaintiff, who has ample opportunity by discovery in this action to obtain the information or materials sought.  Owners further objects to Request for Production No. 4 as information sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive.  Owners further objects to Request for Production No. 4 as the information sought is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.

Further, Owners objects to Request for Production No. 4 as it seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Owners or third parties.

Further answering, and without waiving objections thereto, there is no Owners litigation in Louisiana involving a Louisiana insured.

**REQUEST FOR PRODUCTION NO. 5:**

All court orders issued in any action in Louisiana state or federal court wherein the court decided a motion You made to dismiss for lack of personal jurisdiction or improper venue and all briefs submitted by the parties in support of, or in opposition to, such a motion.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

Owners objects to Request for Production No. 5 as it is vague, ambiguous, argumentative, overly broad, unduly burdensome, not limited in time or scope or geographical location, irrelevant, immaterial, not reasonably calculated to lead to the production request of admissible evidence and/or has no conceivable bearing on the issues in the case.  Further, Owners objects to Request for Production No. 5 to the extent it may seek the production request of information protected by the attorney-client privilege or work product prepared in anticipation of litigation or for trial.

Further, Owners objects to Request for Production No. 5 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 5 that it may seek privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to Request for Production No. 5 as it seeks information subject to the attorney-client privilege, the attorney work product privilege and materials or information

prepared in the anticipation of litigation or trial privilege, including but not limited to, the protections contained in FED. R. CIV. P. 26(b)(1)-(5). Owners further objects to Request for Production No. 5 to the extent it may seek the disclosure of the opinions, mental impressions, trial strategy, legal conclusions or legal theories of this Plaintiff, its counsel or other representatives. Owners further objects to the disclosure of any information, materials or documents generated, certified, or acquired in response to the filing of the subject lawsuit by Plaintiff.

Further, Owners objects to Request for Production No. 5 to the extent it seeks information for a time period not relevant to the matter identified in the Complaint.

Further, Owners objects to Request for Production No. 5 as it seeks the identities of information or materials that cannot be provided by Owners with substantially greater facility than would otherwise be provided by other sources or obtained independently by the Plaintiff, who has ample opportunity by discovery in this action to obtain the information or materials sought. Owners further objects to Request for Production No. 5 as information sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive. Owners further objects to Request for Production No. 5 as the information sought is unduly burdensome or expensive, taking into account the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.

Further, Owners objects to Request for Production No. 5 to the extent it may seek information, documents or materials that are confidential, privileged, proprietary, business

sensitive or the trade secrets of Owners or third parties.

Further answering, and without waiving objections thereto, there is no Owners litigation in Louisiana involving a Louisiana insured.

**REQUEST FOR PRODUCTION NO. 6:**

Documents sufficient to identify all agents You authorized to receive service of process or notice of proceedings within Louisiana.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

Owners objects to Request for Production No. 6 on the grounds that it is overly broad and unduly burdensome.  Further answering, and without waiving objections thereto, Owners has never authorized any service of process.

**REQUEST FOR PRODUCTION NO. 7:**

Documents sufficient to identify the locations at which or from which Your services or products are sold in Louisiana and/or are sold to Louisiana residents and entities.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**

Owners objects to Request for Production No. 7 on the grounds that it is overly broad, unduly burdensome, vague and unlimited in time and scope.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because no such Owners' document exists.

**REQUEST FOR PRODUCTION NO. 8:**

All documents concerning any tax charged to You by the state of Louisiana.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**

Owners objects to Request for Production No. 8 on the grounds that it is unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible

evidence and unlimited in scope.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because no such Owners' document exists.

**REQUEST FOR PRODUCTION NO. 9:**

Documents sufficient to show for each of the past ten years, Your annual sales of insurance policies to purchasers in Louisiana (including but not limited to sales of insurance policies by any Related Entity) and the dollar value for all such sales.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

Owners objects to Interrogatory No. 9 on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence and unlimited in scope.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because no such Owners' document exists.

**REQUEST FOR PRODUCTION NO. 10:**

Documents sufficient to identify the offices You may maintain, own, lease, or occupy in Louisiana.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10:**

Owners objects to Request for Production No. 10 on the grounds that it is overly broad, unduly burdensome and unlimited in time.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because no such Owners' document exists.

**REQUEST FOR PRODUCTION NO. 11:**

Documents that You filed with the Louisiana Department of Insurance in the past ten years.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

Owners objects to Request for Production No. 11 on the grounds that it is overly broad, unduly burdensome and unlimited in time.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because no such Owners' document exists.

**REQUEST FOR PRODUCTION NO. 12:**

Documents that You filed with the Louisiana Secretary of State in the past ten years.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 12:**

Owners objects to Request for Production No. 12 on the grounds that it is overly broad, unduly burdensome and unlimited in time.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because no such Owners' document exists.

**REQUEST FOR PRODUCTION NO. 13:**

Documents sufficient to identify for each of the past ten years, your assets, including bank accounts, real estate interests, financial instruments or securities, located in Louisiana and the dollar value of each asset.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 13:**

Owners objects to Request for Production No. 13 on the grounds that it is overly broad, unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence, premature in that investigation and discovery have just begun and are ongoing and unlimited in scope.

Further, Owners objects to Request for Production No. 13 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 13 as it seeks information that is privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to Request for Production No. 13 as it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 13 to the extent that it seeks information for a time period not relevant to the matter identified in the Complaint.

Further, Owners objects to Request for Production No. 13 as it seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because no such Owners' document exists.   By agreement of counsel, Owners is not obligated to search for securities information.

**REQUEST FOR PRODUCTION NO. 14:**

Documents sufficient to show Your corporate structure, including any Related Entities.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 14:**

Owners objects to Request for Production No. 14 on the grounds that it is overly broad,

unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in time and scope.

Further, Owners objects to Request for Production No. 14 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 14 to the extent it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 14 to the extent it seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further answering, and without waiving objections thereto, Owners produces herewith a copy of the relevant documents. (Bates Nos. 00001-00002).

**REQUEST FOR PRODUCTION NO. 15:**

Documents sufficient to show Your percent ownership interest in any Related Entities.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 15:**

Owners objects to Request for Production No. 15 on the grounds that it is overly broad, unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in time and scope.

Further, Owners objects to Request for Production No. 15 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 15 to the extent it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 15 to the extent it seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further answering, and without waiving objections thereto, see Owners' Response to Request for Production No. 14.

**REQUEST FOR PRODUCTION NO. 16:**

Documents sufficient to any Related Entity's percent ownership interest in You.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 16:**

Owners objects to Request for Production No. 16 on the grounds that it is overly broad, unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in time and scope.

Further, Owners objects to Request for Production No. 16 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 16 to the extent it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 16 to the extent it seeks information, documents or materials that are confidential, privileged, proprietary, business

sensitive or the trade secrets of Defendant or third parties.

Further answering, and without waiving objections thereto, see Owners' Response to Request for Production No. 14.

**REQUEST FOR PRODUCTION NO. 17:**

Documents sufficient to identify Your board of directors, each corporate officer, and Your organizational structure.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 17:**

Owners objects to Request for Production No. 17 on the grounds that it is overly broad, unduly burdensome, not relevant, not material, not reasonably calculated to lead to the discovery of admissible evidence, vague in that "organizational structure" is undefined, ambiguous and unlimited in time and scope.

Further, Owners objects to Request for Production No. 17 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 17 to the extent it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 17 to the extent it seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further, Owners objects to objects to Request for Production No. 17 to the extent it seeks information that is privileged or made confidential or otherwise non-discoverable by applicable

law, whether state or federal, including without limitation any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to objects to Request for Production No. 17 to the extent it seeks information for a time period not relevant to the matter identified in the Complaint.

Further answering, and without waiving objections thereto, see Owners' Response to Request for Production No. 14.

**REQUEST FOR PRODUCTION NO. 18:**

Documents sufficient to identify the board of directors, each corporate officer, and the organizational structure of Related Entities.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 18:**

Owners objects to Request for Production No. 18 on the grounds that it is overly broad, unduly burdensome, not relevant, not material, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in time and scope.

Further, Owners objects to Request for Production No. 18 to the extent it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 18 to the extent it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 18 to the extent it seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further, Owners objects to objects to Request for Production No. 18 to the extent it seeks information that is privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to objects to Request for Production No. 18 to the extent it seeks information for a time period not relevant to the matter identified in the Complaint.

**REQUEST FOR PRODUCTION NO. 19:**

Documents sufficient to show each distribution or transfer of cash or assets between You and a Related Entity.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 19:**

Owners objects to Request for Production No. 19 on the grounds that it is overly broad, unduly burdensome, not relevant, not material, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in time and scope.

Further, Owners objects to Request for Production No. 19 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 19 as it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 19 as it seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further, Owners objects to objects to Request for Production No. 19 as it seeks information that is privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to objects to Request for Production No. 19 to the extent it seeks information for a time period not relevant to the matter identified in the Complaint.

**REQUEST FOR PRODUCTION NO. 20:**

Documents sufficient to show the existence of any inter-company loans, advances of funds, or cost sharing between You and a Related Entity.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 20:**

Owners objects to Request for Production No. 20 on the grounds that it is overly broad, unduly burdensome, not relevant, not material, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in time and scope.

Further, Owners objects to Request for Production No. 20 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 20 as it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 20 as it seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the

trade secrets of Defendant or third parties.

Further, Owners objects to objects to Request for Production No. 20 as it seeks information that is privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to objects to Request for Production No. 20 to the extent it seeks information for a time period not relevant to the matter identified in the Complaint.

**REQUEST FOR PRODUCTION NO. 21:**

Documents sufficient to show the existence of any guarantees or similar assurances by You to financial institutions on behalf of any Related Entity.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 21:**

Owners objects to Request for Production No. 21 on the grounds that it is overly broad, unduly burdensome, not relevant, not material, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in time and scope.

Further, Owners objects to Request for Production No. 21 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 21 as it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 21 as it seeks information,

documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further, Owners objects to objects to Request for Production No. 21 as it seeks information that is privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to objects to Request for Production No. 21 to the extent it seeks information for a time period not relevant to the matter identified in the Complaint.

**REQUEST FOR PRODUCTION NO. 22:**

Documents that relate to the preparation and approval by You of annual and longer-term business plans, marketing plans, and budgets for any Related Entity.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 22:**

Owners objects to Request for Production No. 22 on the grounds that it is overly broad, unduly burdensome, not relevant, not material, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in time and scope.

Further, Owners objects to Request for Production No. 22 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 22 as it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 22 as it seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further, Owners objects to objects to Request for Production No. 22 as it seeks information that is privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to objects to Request for Production No. 22 to the extent it seeks information for a time period not relevant to the matter identified in the Complaint.

**REQUEST FOR PRODUCTION NO. 23:**

Any combined financial statements for You and any Related Entity.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 23:**

Owners objects to Request for Production No. 23 on the grounds that it is overly broad, unduly burdensome, not relevant, not material, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in time and scope.

Further, Owners objects to Request for Production No. 23 as it seeks the production request of information that is not discoverable under FED. R. CIV. P. 26, including but not limited to, the protection of FED. R. CIV. P. 26(b).

Further, Owners objects to Request for Production No. 23 as it seeks information that is privileged, confidential, proprietary, protected as trade secrets, business sensitive, or otherwise non-discoverable.

Further, Owners objects to Request for Production No. 23 as it seeks information, documents or materials that are confidential, privileged, proprietary, business sensitive or the trade secrets of Defendant or third parties.

Further, Owners objects to objects to Request for Production No. 23 as it seeks information that is privileged or made confidential or otherwise non-discoverable by applicable law, whether state or federal, including without limitation any laws requiring the confidential treatment of non-public personal or financial information.

Further, Owners objects to objects to Request for Production No. 23 to the extent it seeks information for a time period not relevant to the matter identified in the Complaint.

Further answering, and without waiving objections thereto, Owners does not have any combined financial statements.

**REQUEST FOR PRODUCTION NO. 24:**

Documents sufficient to identify the percentage of Your revenue that originates from Louisiana residents or entities.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 24:**

Owners objects to Request for Production No. 24 on the grounds that it is overly broad, unduly burdensome, vague in that "revenue" is undefined and unlimited in scope. Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents because Owners does not have any sales, product or service revenue originating from Louisiana.

**REQUEST FOR PRODUCTION NO. 25:**

Documents sufficient to identify any of Your employees, independent contractors, or leased personnel whom You employ in Louisiana or who live in Louisiana.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

Owners objects to Request for Production No. 25 on the grounds that it is overly broad, unduly burdensome, not relevant, not reasonably calculated to lead to the discovery of admissible evidence, vague, ambiguous and unlimited in scope. Further answering, and without waiving objections thereto, neither Owners is not in possession of any responsive documents.

**REQUEST FOR PRODUCTION NO. 26:**

Documents concerning any lobbying performed by You on Your behalf in Louisiana.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

Owners objects to Request for Production No. 26 on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence and unlimited in scope. Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents.

**REQUEST FOR PRODUCTION NO. 27:**

Documents concerning Your storage or maintenance of any documents or things in Louisiana.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**

Owners objects to Request for Production No 27 on the grounds that it is overly broad, unduly burdensome, not relevant, vague and unlimited in time and scope. Further answering,

and without waiving objections thereto, Owners is not in possession of any responsive documents.

**REQUEST FOR PRODUCTION NO. 28:**

Documents sufficient to identify Your managing general agent in Louisiana.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 28:**

Owners objects to Request for Production No. 28 on the grounds that it is overly broad, vague and unlimited in time.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents.

**REQUEST FOR PRODUCTION NO. 29:**

Documents sufficient to identify Your brokers in Louisiana.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**

Owners objects to Request for Production No. 29 on the grounds that it is overly broad, vague and unlimited in time.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents.

**REQUEST FOR PRODUCTION NO. 30:**

Documents sufficient to identify the retail agents through which You have sold insurance in Louisiana in the past 10 years.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**

Owners objects to Request for Production No. 30 on the grounds that it is overly broad, vague and unlimited in time.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents.

**REQUEST FOR PRODUCTION NO. 31:**

Documents sufficient to identify each year for the last ten years the total amount of premiums You have collected from Louisiana clients.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**

Owners objects to Request for Production No. 31 on the grounds that it is overly broad and unduly burdensome.  Further answering, and without waiving objections thereto, Owners is not in possession of any responsive documents.

Respectfully submitted:

**LEAKE & ANDERSSON, LLP**

*/s/ Amanda W. Vonderhaar*
_____
JERRY L. SAPORITO, T.A.  (#11717)
E-mail:  jsaporito@leakeandersson.com
AMANDA W. VONDERHAAR (#31350)
E-mail:  avonderhaar@leakeandersson.com
1100 Poydras Street, Suite 1700
New Orleans, Louisiana 70163-1701
Tel:  (504) 585-7500
Fax: (504) 585-7775

-AND-

**MORROW, ROMINE & PEARSON P.C.**

*/s/ Roger S. Morrow*
_____
ROGER S. MORROW (AL Bar No. 4980-M60R)
E-mail:  rsmorrow@mrplaw.com
Post Office Box 4804
Montgomery, Alabama 36103-4804
Telephone: (334) 262-7707
Fax: (334) 262-7742

*Attorneys for Owners Insurance Company, Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding by:

( )   Hand Delivery     ( )   Prepaid U.S. Mail

( )   Facsimile        ( )   Federal Express

( )   Electronic mail    ( X )   Lexis Nexis File & Serve

New Orleans, Louisiana this 12th day of August, 2010.

*/s/ Amanda W. Vonderhaar*
_____
**AMANDA W. VONDERHAAR**

Cp:/39862/Response to Interrogatories & Requests for the Production of Documents concerning Jurisdiction and Venue.doc#2415



PROPERTY AND CASUALTY COMPANIES - ASSOCIATION EDITION

# ANNUAL STATEMENT

FOR THE YEAR ENDED DECEMBER 31, 2009
OF THE CONDITION AND AFFAIRS OF THE

## Owners Insurance Company

| | | | |
|---|---|---|---|
| NAIC Group Code | 0280 (Current)   0280 (Prior) | NAIC Company Code   32700   Employer's ID Number | 34-1172650 |

Organized under the Laws of _____ Ohio _____, State of Domicile or Port of Entry _____ Ohio _____
Country of Domicile _____ United States of America _____

Incorporated/Organized _____ 05/13/1975 _____    Commenced Business _____ 12/31/1975 _____

Statutory Home Office _____ 2325 North Cole Street _____    _____ Lima , OH 45801-2305 _____
(Street and Number)                                                    (City or Town, State and Zip Code)

Main Administrative Office _____ 6101 Anacapri Boulevard _____
(Street and Number)

_____ Lansing , MI 48917-3968 _____    _____ 517-323-1200 _____
(City or Town, State and Zip Code)                       (Area Code) (Telephone Number)

Mail Address _____ P.O. Box 30660 _____    _____ Lansing , MI 48909-8160 _____
(Street and Number or P.O. Box)                   (City or Town, State and Zip Code)

Primary Location of Books and Records _____ 6101 Anacapri Boulevard _____
(Street and Number)

_____ Lansing , MI 48917-3968 _____    _____ 517-323-1200 _____
(City or Town, State and Zip Code)                       (Area Code) (Telephone Number)

Internet Website Address _____ www.auto-owners.com _____

Statutory Statement Contact _____ Paul Roy Otto _____    _____ 517-323-1200 _____
(Name)                                                    (Area Code) (Telephone Number)

_____ aoacclg@aoins.net _____    _____ 517-323-8796 _____
(E-mail Address)                                          (FAX Number)

### OFFICERS

| | | |
|---|---|---|
| Chairman & CEO | Ronald Herman Simon # | Senior Vice President, Treasurer & CFO   Eileen Kay Fhaner |
| First Vice President, Secretary & General Counsel | Stuart Roy Birn | |

### OTHER

| | | |
|---|---|---|
| Jeffrey Francis Harrold   President | Rodney Jay Rupp   Executive Vice President | Robert Irwin Buchanan   Sr. Vice President |
| Katherine Maldow Noirot   Sr. Vice President | Jonathan Robert Rleise # Sr. Vice President | Kenneth Richard Schroeder   Sr. Vice President |
| Jeffrey Scott Tagsold   Sr. Vice President | Daniel Jerome Thelen   Sr. Vice President | Ian Robert Ward   Sr. Vice President |

### DIRECTORS OR TRUSTEES

| | | |
|---|---|---|
| Ronald Herman Simon (CHM) # | Stuart Roy Birn | John William Abbott |
| Jeffrey Francis Harrold | Thaddeus Joseph Buda Jr. | James Franklin Anderton IV |
| Rodney Jay Rupp | Gregg Lynn Cornell | Mark Edward Hooper |
| Roger Lee Looyenga | Jeffrey Scott Tagsold | Lori Ann McAllister |
| Herman Joseph Arends | | |

State of _____ Michigan _____ SS:
County of _____ Eaton _____

The officers of this reporting entity being duly sworn, each depose and say that they are the described officers of said reporting entity, and that on the reporting period stated above, all of the herein described assets were the absolute property of the said reporting entity, free and clear from any liens or claims thereon, except as herein stated, and that this statement, together with related exhibits, schedules and explanations therein contained, annexed or referred to, is a full and true statement of all the assets and liabilities and of the condition and affairs of the said reporting entity as of the reporting period stated above, and of its income and deductions therefrom for the period ended, and have been completed in accordance with the NAIC Annual Statement Instructions and Accounting Practices and Procedures manual except to the extent that: (1) state law may differ; or, (2) that state rules or regulations require differences in reporting not related to accounting practices and procedures, according to the best of their information, knowledge and belief, respectively.  Furthermore, the scope of this attestation by the described officers also includes the related corresponding electronic filing with the NAIC, when required, that is an exact copy (except for formatting differences due to electronic filing) of the enclosed statement. The electronic filing may be requested by various regulators in lieu of or in addition to the enclosed statement.

| | | |
|---|---|---|
| _Jeffrey Harrold_ | _Stuart Birn_ | _Eileen K. Fhaner_ |
| Jeffrey Francis Harrold President | Stuart Roy Birn First Vice President, Secretary & General Counsel | Eileen Kay Fhaner Senior Vice President, Treasurer & CFO |

Subscribed and sworn to before me this
27th   day of   January, 2010

_Meredith Kretschman_

Meredith F. Kretschman
Notary
10/21/2011

a. Is this an original filing? ...................   Yes [ X ] No [  ]
b. If no,
1. State the amendment number ..........
2. Date filed .................................
3. Number of pages attached ............

MEREDITH F. KRETSCHMAN
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires Oct. 21, 2011
Acting in the County of Eaton

10. Information Concerning Parent, Subsidiaries, Affiliates and Other Related Parties

    A.  Natures of Relationships
      The Company is 99.97% owned by Auto-Owners Insurance Company.  In 2009, Owners Insurance Company ceded 100% of all lines of business to Auto-Owners Insurance Company.  Auto-Owners retrocedes back 100% of all lines except Umbrella, Equipment Breakdown, Mine Sub/Sinkhole, Certified Terrorism, and Employment Practices Liability.
    B.  N/A
    C.  N/A
    REDACTED

    E.  N/A
    REDACTED

    G.  Generally, all outstanding shares of the Company (99.97%) are owned by the parent company, Auto-Owners Insurance Company, an insurance company domiciled in the State of Michigan.
    H.  N/A
    I.  N/A
    J.  N/A
    K.  N/A
    L.  N/A
REDACTED

OWNERS-000002

### LexisNexis File & Serve Transaction Receipt

| | |
|---|---|
| **Transaction ID:** | 32645785 |
| **Submitted by:** | Natalie Nunley, Leake & Andersson LLP |
| **Authorized by:** | Amanda W Vonderhaar, Leake & Andersson LLP |
| **Authorize and file on:** | Aug 12 2010 4:51PM CDT |

| | |
|---|---|
| **Court:** | LA US District Court Eastern District E-Service-Chinese Drywall |
| **Division/Courtroom:** | N/A |
| **Case Class:** | Civil-Products Liability-Chinese Drywall |
| **Case Type:** | Chinese Drywall |
| **Case Number:** | 2:09cv07791 |
| **Case Name:** | Pate et al vs American International Specialty Lines Insurance Co et al |

| | |
|---|---|
| **Transaction Option:** | Serve Only - Public |
| **Billing Reference:** | 3768/39862 |
| **Read Status for e-service:** | Not Purchased |

**Documents List**
**2 Document(s)**

**Attached Document, 39 Pages   Document ID: 32104118**                   PDF Format  |  Original Format

| **Document Type:** | **Access:** | **Statutory Fee:** | **Linked:** |
|---|---|---|---|
| Discovery Response | Public | $0.00 | |

**Document title:**
Owners Responses to Interrogatories and Requests for Production

**Attached Document, 2 Pages   Document ID: 32104202**                   PDF Format  |  Original Format
Related Document ID: 32104118

| **Document Type:** | **Access:** | **Statutory Fee:** | **Linked:** |
|---|---|---|---|
| Discovery Response | Public | $0.00 | |

**Document title:**
Owners Responsive Documents [OWNERS-000001 - OWNERS-000002]

Expand All

⊟ **Sending Parties (1)**

| Party | Party Type | Attorney | Firm | Attorney Type |
|---|---|---|---|---|
| Owners Insurance Company (pending) | Defendant | Vonderhaar, Amanda W | Leake & Andersson LLP | Attorney in Charge |

⊞ **Recipients (767)**

⊞ Service List (767)

⊟ Additional Recipients (0)

⊞ **Case Parties**

[ Close ]

 **LexisNexis®**   | About LexisNexis | Terms & Conditions | Privacy | Customer Support - 1-888-529-7587
Copyright © 2010 LexisNexis®, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED | * | MDL NO. 2047 |
| DRYWALL PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION: L |
| | * | |
| | * | JUDGE: FALLON |
| This Document Relates to: | * | |
| *Robert C. Pate, et al. versus* | * | MAG: WILKINSON |
| *American International Specialty Lines* | * | |
| *Insurance, et al.* | * | |
| *Case No. 2:09-cv-07791 (E.D.La.)* | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### OWNERS INSURANCE COMPANY'S SUPPLEMENTAL RESPONSE TO PLAINTIFF ROBERT C. PATE'S INTERROGATORIES AND REQUESTS FOR THE PRODUCTION OF DOCUMENTS CONCERNING JURISDICTION AND VENUE

Pursuant to the Court's September 2, 2010 Minute Entry (Rec. Doc. 5450), Owners Insurance Company ("Owners") hereby supplements its discovery responses dated August 12, 2010. In accordance with Paragraph 1(i) of the Court's Minute Entry, Owners confirms that all responses, save for the states of incorporation, are the exact same for all of Owners' Related Entities.[1] Further, in accordance with the Court's September 2, 2010 Minute Entry (p. 3), Owners limits its supplemental responses to information dating back five (5) years, instead of the ten (10) years requested by PSC and Pate.

### ANSWERS TO INTERROGATORY NOS. 1-12, 14-29:

Neither the Court's September 2, 2010 Minute Entry nor oral reasons stated during

---

[1] *See* Affidavit of Kathleen Lopilato attached to Owners' Unopposed Motion to Substitute Exhibit to Owners' Opposition to PSC and Pate's Motion to Compel, dated August 31, 2010, which states that all responses on behalf of Owners are the same for Owners' parent corporation, Auto-Owners Insurance Company. (Rec. Doc. 5420; ¶ 4).

the hearing requires Owners to provide supplemental responses to Interrogatory Nos. 1-12, 14-29 as Owners fully responded to same. Therefore, see Owners' Objections and Responses to Pate's discovery requests dated August 12, 2010.

**INTERROGATORY NO. 13:**

Identify the number of claims that You have paid to Louisiana residents or entities in the past 10 years and the total amount of those claims.

**ANSWER TO INTERROGATORY NO 13:**

Pursuant to Paragraph 1(d) of the Court's Minute Entry stating that "Plaintiff's request that certain non-stipulating insurers provide discovery responses concerning...processing of insurance claims in Louisiana...[is] granted as it pertains to Owners, but with the understanding Owners is permitted time to clarify its contested responses" and notwithstanding Owners' original objections in its August 12, 2010 discovery responses, Owners and its Related Entities provide the following responsive information, Owners and its Related Entities paid the following to Louisiana claimants:

2005:  70 claims totaling $593,343.73.

2006:  61 claims totaling $481,743.92.

2007:  62 claims totaling $502,399.70.

2008:  79 claims totaling $516,627.76.

2009:  74 claims totaling $431,381.04.

Respectfully submitted:

**LEAKE & ANDERSSON, LLP**

*/s/ Amanda W. Vonderhaar*

JERRY L. SAPORITO, T.A.  (#11717)
E-mail:  jsaporito@leakeandersson.com
AMANDA W. VONDERHAAR (#31350)
E-mail:  avonderhaar@leakeandersson.com
1100 Poydras Street, Suite 1700
New Orleans, Louisiana 70163-1701
Tel:  (504) 585-7500
Fax: (504) 585-7775

-AND-

**MORROW, ROMINE & PEARSON P.C.**

 */s/ Roger S. Morrow*

ROGER S. MORROW (AL Bar No. 4980-M60R)
E-mail:  rsmorrow@mrplaw.com
Post Office Box 4804
Montgomery, Alabama 36103-4804
Telephone: (334) 262-7707
Fax: (334) 262-7742

***Attorneys for Owners Insurance Company, Defendant***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has this date been served on all counsel of record in this proceeding by:

( )   Hand Delivery          ( )   Prepaid U.S. Mail

( )   Facsimile             ( )   Federal Express

( )   Electronic mail        ( X )   Lexis Nexis File & Serve

New Orleans, Louisiana this 14th day of September, 2010.

/s/ Amanda W. Vonderhaar

————————————————————
**AMANDA W. VONDERHAAR**

Cp:/39862/Response to Interrogatories & Requests for the Production of Documents concerning Jurisdiction and Venue.doc#4289

Your transaction has been successfully submitted to LexisNexis File & Serve. Your transaction information appears below. To print this information for your records, click anywhere on the transaction information, then click the browser Print button.
For a formatted copy of this information, obtain a transaction report.
To perform another transaction, click Begin a New Transaction.
To exit File & Serve, click Return to My File & Serve.

   *TIP:*  Receive notifications of new Filing & Service activity that match your search criteria. Click on the Alerts tab.

## LexisNexis File & Serve Transaction Receipt

| | |
|---|---|
| **Transaction ID:** | 33224745 |
| **Submitted by:** | Natalie Nunley, Leake & Andersson LLP |
| **Authorized by:** | Amanda W Vonderhaar, Leake & Andersson LLP |
| **Authorize and file on:** | Sep 14 2010 2:31PM CDT |

| | |
|---|---|
| **Court:** | LA US District Court Eastern District E-Service-Chinese Drywall |
| **Division/Courtroom:** | N/A |
| **Case Class:** | Civil-Products Liability-Chinese Drywall |
| **Case Type:** | Chinese Drywall |
| **Case Number:** | 2:09cv07791 |
| **Case Name:** | Pate et al vs American International Specialty Lines Insurance Co et al |

| | |
|---|---|
| **Transaction Option:** | Serve Only - Public |
| **Billing Reference:** | 3768/39862 (Pate) |
| **Read Status for e-service:** | Not Purchased |

**Documents List**
1 Document(s)
Attached Document, 4 Pages   Document ID: 32893337

| Document Type: | Access: | Statutory Fee: | Linked: |
|---|---|---|---|
| Discovery Response | Public | $0.00 | |

**Document title:**
Owners Insurance Company's Supplemental Response to Plaintiff Robert C. Pate's Interrogatories and Requests for the Production of Documents Concerning Jurisdiction & Venue

PDF Format  |  Original Format

Expand All
⊟ **Sending Parties (1)**

| Party | Party Type | Attorney | Firm | Attorney Type |
|---|---|---|---|---|
| Owners Insurance Co | Defendant | Vonderhaar, Amanda W | Leake & Andersson LLP | Attorney in Charge |

⊞ **Recipients (795)**

   ⊞ Service List (795)

   ⊟ Additional Recipients (0)

⊞ **Case Parties**

| Begin a New Transaction | Return to My File & Serve | Print | Transaction Report |
|---|---|---|---|

**LexisNexis**

About LexisNexis | Terms & Conditions | Privacy | Customer Support - 1-888-529-7587
Copyright © 2010 LexisNexis®, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT E

Confidential - Subject to Further Confidentiality Review

Page 1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF LOUISIANA
 2
     _____
                                     §   MDL NO. 2047
 3   IN RE:                          §
     CHINESE-MANUFACTURED            §   SECTION: L
 4   DRYWALL PRODUCTS LIABILITY      §
     LITIGATION                      §
 5                                   §   JUDGE FALLON
     _____  §
 6   THIS DOCUMENT RELATES TO        §
     PATE v. AMERICAN INTERNATIONAL  §   MAG. JUDGE
 7   SPECIALTY LINES INSURANCE       §    WILKINSON
     COMPANY, ET AL  (09-7791)       §
 8   _____  §
 9
10                 SEPTEMBER 16, 2010
11                  - CONFIDENTIAL -
12      SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
13                 DISCOVERY TESTIMONY
14                      - - -
                 30(b)(6) Deposition of Auto-Owners
15   Insurance Company, by and through its authorized
     representative, KATHLEEN LOPILATO, ESQUIRE held at
16   the offices of LEAKE & ANDERSSON, LLP, 1100 POYDRAS
     STREET, SUITE 1700, New Orleans, Louisiana,
17   commencing at 9:14 a.m., on the above date, before
     Dixie B. Vaughan, Certified Court Reporter (LA),
18   Registered Professional Reporter, Certified
     LiveNote Reporter.
19
20                      - - -
21
22            GOLKOW TECHNOLOGIES, INC.
23       ph 877.370.3377 | fax 917.591.5672
24               deps@golkow.com
```

Confidential - Subject to Further Confidentiality Review

Page 2

```
                    I N D E X
1
2                         PAGE
3   APPEARANCES                    3
4   EXAMINATION
5     BY MR. STECKLER         4
6     BY MR. SAPORITO        131
7   RE-EXAMINATION
8     BY MR. STECKLER        134
9   CERTIFICATION            149
10
11           INDEX OF EXHIBITS
12          (Exhibits are attached.)
13                       PAGE
14  EXHIBIT #1  NOTICE OF 30(b)(6)        6
                DEPOSITION
15
    EXHIBIT #2  2009 ANNUAL STATEMENT OF    10
16              AUTO-OWNERS INSURANCE
                COMPANY - CORPORATE
17              STRUCTURE
18  EXHIBIT #3  INTERROGATORY NO. 13      63
19
20
21
22
23
24
```

Page 3

```
1   A P P E A R A N C E S :
2
3   BRUCE W. STECKLER, ESQUIRE
      Email: bsteckler@baronbudd.com
4     Phone: (214)521-3605
    BARON & BUDD, P.C.
5   3102 Oak Lawn Avenue, Suite 1100
    Dallas, Texas 75219-4281
6   COUNSEL FOR MULTIPLE PLAINTIFFS
7
8   JERRY L. SAPORITO, ESQUIRE
      Email: jsaporito@leakeandersson.com
9     Phone: (504)585-7500
    LEAKE & ANDERSSON, LLP
10  1100 Poydras Street, Suite 1700
    New Orleans, Louisiana 70163-1701
11
12             - AND -
13
14  ROGER S. MORROW, ESQUIRE
      Email: rsmorrow@mrplaw.com
15    Phone: (334)262-7707
    MORROW, ROMINE & PEARSON, P.C.
16  122 South Hull
    Montgomery, Alabama 36103-4804
17  COUNSEL FOR AUTO-OWNERS INSURANCE COMPANY
18
19  SARAH B. CHRISTIE, ESQUIRE
      (VIA TELEPHONE)
20    Email: schristie@hassettanddonnelly.com
    Phone: (508)791-6287
21  HASSETT & DONNELLY, P.C.
    446 Main Street, 12th Floor
22  Worcester, Massachusetts 01608
    COUNSEL FOR MGM INSURANCE
23
24  ALSO PRESENT: SCOTT NORRIS
```

Page 4

```
1          KATHLEEN LOPILATO, ESQUIRE
2   having been first duly sworn, was examined and
3   testified as follows:
4               EXAMINATION
5   BY MR. STECKLER:
6     Q.   Good morning.
7     A.   Good morning.
8     Q.   Can you please state your name for the
9   record?
10    A.   Kathleen Lopilato.
11    Q.   Ms. Lopilato, you will excuse me if I
12  mispronounce your name during the course of the
13  depo but I could see myself doing that.
14         Where do you currently work?
15    A.   Auto-Owners Insurance Company, Lansing,
16  Michigan.
17  MR. SAPORITO:
18         Bruce, let me say something on the
19  record.  Technically, this is the deposition,
20  the corporate deposition of Auto-Owners
21  Insurance Company.
22  MR. STECKLER:
23         We'll get there.
24  MR. SAPORITO:
```

Page 5

```
1          Oh, I'm sorry.
2   MR. STECKLER:
3          I just want to find out who my witness
4   is.
5   MR. SAPORITO:
6          Got it.
7   BY MR. STECKLER:
8     Q.   Ms. Lopilato, you're with Auto-Owners
9   Insurance Company in Michigan, correct?
10    A.   That is correct.
11    Q.   What is your title job there?
12    A.   Senior attorney.
13    Q.   How long have you been a senior attorney
14  there?
15    A.   I've been a senior attorney for about
16  six years.
17    Q.   And during that six years, you've always
18  been entitled a senior attorney at Auto-Owners
19  Insurance?
20    A.   That's correct.
21    Q.   And how long in total have you been
22  working for Auto-Owners Insurance?
23    A.   Eleven years.
24    Q.   And you're a licensed attorney; is that
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 6

1  correct?
2      A.  I am.
3      Q.  In what states?
4      A.  Michigan.
5      Q.  Anywhere else?
6      A.  No.
7      Q.  And what year did you become licensed?
8      A.  1987.
9      Q.  And prior to becoming a staff attorney
10 at Auto-Owners Insurance, where did you work?
11     A.  I worked at a law firm entitled
12 Denfield, Timmer and Taylor.
13     Q.  And where were they located?
14     A.  Lansing, Michigan.
15     Q.  And is it your understanding that you're
16 here today as the corporate representative of
17 Auto-Owners Insurance; is that right?
18     A.  Correct.
19         (Document marked as EXHIBIT #1 for
20     identification.)
21     Q.  Okay.  And I'm going to hand you what's
22 already been marked as Exhibit Number #1.
23     A.  (Views document.)
24     Q.  Have you seen this document before?

Page 7

1      A.  I have.
2      Q.  And it references a 30(b)(6) deposition,
3  correct?
4      A.  Correct.
5      Q.  And you know what that is, don't you?
6      A.  I do.
7      Q.  And are you the designee for Auto-Owners
8  Insurance Company as the 30(b)(6) deponent today?
9      A.  Technically, Owners Insurance Company,
10 but, yes.
11     Q.  You're here for Owners Insurance, but
12 that does beg the question, you work for
13 Auto-Owners Insurance, correct?
14     A.  I am an employee of Auto-Owners
15 Insurance Company.
16     Q.  But on behalf of Auto-Owners Insurance,
17 you've been designated for their subsidiary as
18 their corporate rep deponent today, correct?
19     A.  That is correct.
20     Q.  And maybe to start off we should talk a
21 little about Auto-Owners Insurance Company.  Where
22 are they incorporated?
23     A.  Michigan.
24     Q.  And are they a holding company or a

Page 8

1  parent company of Owners Insurance Company?
2      A.  They are a parent company.
3      Q.  Parent company.
4         Does Auto-Owners Insurance have a
5  holding company or a parent above it?
6      A.  No.
7      Q.  Are they public or private?
8      A.  They are private.
9      Q.  And does Auto-Owners Insurance Company
10 solely do insurance business, or do they do other
11 things other than just sell insurance policies?
12     A.  Just insurance.
13     Q.  Just insurance.
14         And how many subsidiaries does
15 Auto-Owners Insurance Company have?
16     A.  I'm counting on my fingers.  Four.
17     Q.  Could you list those for me, please?
18     A.  Owners Insurance Company, Home-Owners
19 Insurance Company, Southern-Owners Insurance
20 Company, Property-Owners Insurance Company.  And
21 we do have a life company, so I guess that's five.
22     MR. SAPORITO:
23         A what?
24     THE WITNESS:

Page 9

1         A life company.
2  BY MR. STECKLER:
3      Q.  All of those subsidiaries are insurance
4  companies, correct?
5      A.  Correct.
6      Q.  I take it all of them are incorporated
7  in Michigan with the exception of Owners?
8      A.  No.  Home-Owners Insurance Company is
9  incorporated in Indiana.
10     Q.  That's right.  Okay.  In fact, let me go
11 ahead --
12     A.  And Owners Insurance Company.
13     Q.  Let me go ahead and show you the 2009
14 annual statement of Auto-Owners Insurance Company,
15 and I'm going to have you turn to the back here on
16 page 94.  It indicates a corporate structure.
17     A.  (Views document.) Okay.
18     Q.  Does that appear to be correct to you?
19     A.  Yes.
20     Q.  And if you'd let me take a look at that
21 real quick.
22         This indicates that there are five
23 subsidiaries as you outlined.  All of them are
24 Michigan domiciled companies with the exception of

3 (Pages 6 to 9)

Confidential - Subject to Further Confidentiality Review

Page 10

```
1   Property-Owners Insurance Company in Indiana and
2   Owners Insurance Company in Ohio, correct?
3       A.   Correct.
4       Q.   And why is Owners Insurance Company
5   domiciled in Ohio, ma'am?
6       A.   Because it is.
7       Q.   Is there any reason for that in
8   particular?
9       A.   Not that I'm aware of.
10      Q.   And what about Property-Owners Insurance
11  Company in Indiana?  Do you know why it's
12  domiciled in Indiana?
13      A.   I don't know why they chose to do that,
14  no.
15      Q.   And with your permission, I'd like to go
16  ahead and mark this as Exhibit Number #2 to your
17  deposition.
18      (Document marked as Exhibit Number #2
19  for identification.)
20  BY MR. STECKLER:
21      Q.   If you'll look at the top of each
22  company, can you tell me how much shares are owned
23  by Auto-Owners of each one of those subsidiaries?
24      A.   (Views document.)  They are not stock
```

Page 11

```
1   companies except for Owners.
2       Q.   Why don't you tell me about -- let's
3   just go through Owners first.
4       A.   All right.
5       Q.   What does that indicate to you with
6   respect to the stock owned by Auto-Owners
7   Insurance Company?
8       A.   99.97 percent.
9       Q.   So 99.97 percent of Owners Insurance
10  Company is owned by Auto-Owners Insurance Company,
11  correct?
12      A.   Correct.
13      Q.   And the next one on your list, left to
14  right?
15      A.   Auto-Owners Life Insurance Company.
16      Q.   And what's the corporate structure of
17  Auto-Owners Life Insurance Company?
18      A.   It is a mutual insurance company.
19      Q.   And does Auto-Owners Insurance Company
20  own the life insurance company?
21      A.   It does.
22      Q.   100 percent?
23      A.   100 percent.
24      Q.   And what is the next company?
```

Page 12

```
1       A.   Home-Owners Insurance Company.
2       Q.   Okay.  And how much of that company is
3   owned by Auto-Owners Insurance Company?
4       A.   100 percent.
5       Q.   What about -- is it Southern or Southern
6   Property?
7       A.   No.  Property-Owners Insurance Company
8   is the next one.
9       Q.   What -- well, there's a Southern one,
10  right?
11      A.   If we're going --
12      Q.   Okay.  Left to right, fine.  That's
13  fine.  You want to do Property-Owners?
14      A.   Okay.
15      Q.   All right.  Property-Owners?
16      A.   100 percent.
17      Q.   And then there's --
18      A.   Owners.
19      Q.   Owners Southern?
20      A.   And then the last one is Southern-Owners
21  Insurance Company.
22      Q.   And what are the percentages of those
23  two?
24      A.   100 percent.
```

Page 13

```
1       Q.   Are the offices for all of these
2   entities all located in the same place in Lansing,
3   Michigan?
4       A.   Yes.
5       Q.   How about the officers and directors of
6   each one of these subsidiaries?  Are they the same
7   as the parent?
8       A.   The -- for Auto-Owners Insurance Life
9   Insurance Company and Home-Owners Insurance
10  Company and Southern-Owners Insurance Company,
11  they are all in Michigan.  For Property-Owners --
12      Q.   That's not my question, ma'am.  I hate
13  to interrupt you, but my question had to do with
14  your officers and directors.
15      A.   That's what I'm telling you.
16      Q.   Okay.
17      A.   The same officers and directors for
18  Auto-Owners Insurance Life Insurance Company,
19  Home-Owners Insurance Company, and Southern-Owners
20  Insurance Company are in Michigan.
21      Q.   Okay.
22      A.   For Property-Owners Insurance Company,
23  there is one officer in Indiana, and then the rest
24  of them are in Michigan.  And for Owners Insurance
```

4 (Pages 10 to 13)

Page 14

1   Company, there -- there may be one outside
2   director for Owners.
3       Q.   With respect to Owners Insurance
4   Company, the one outside director, this one
5   outside director, are all the other officers and
6   directors the same ones for Auto-Owners Insurance?
7       A.   Correct.
8       Q.   And with respect to Property-Owners,
9   with the exception of that one officer or
10  director, are they all the same as Auto-Owners?
11      A.   Yes.
12      Q.   So is it fair to say with the two
13  exceptions you mentioned, all of these
14  subsidiaries have the same officers and directors
15  as Auto-Owners Insurance?
16      A.   Essentially.  With the exception of
17  those two, yes.
18      Q.   Thank you.
19          And are all of these businesses run out
20  of your campus in Lansing, Michigan?
21      A.   Yes.
22      Q.   Same offices, et cetera?
23      A.   Yes.
24      Q.   And do they pool the premiums with

Page 15

1   respect to Auto-Owners?  Do they pool all the
2   premiums that are received from these
3   subsidiaries?
4       A.   I'm not exactly sure what you mean by
5   pool.
6       Q.   The premiums that are received for
7   Owners Insurance Company, are they maintained
8   separately or are they transferred to Auto-Owners
9   Insurance Company and invested?
10      A.   There -- there are operating agreements
11  between the companies, and the premium is
12  separate.  And I'm sure that there are transfers
13  between the companies, reconciliations under the
14  operating agreements.
15      Q.   Do you know, or are you speculating?
16      A.   I know that there are operating
17  agreements.  I don't know -- I couldn't sit here
18  and tell you the exact details of what -- when the
19  reconciliations take place or what they involve,
20  but the premiums are not pooled in the sense that
21  I think you mean it.
22      Q.   Okay.  And do you know what I mean by
23  pooling of insurance premiums?  You're aware of
24  that sort of arrangement among insurance companies

Page 16

1   and their subsidiaries?
2       A.   I'm not sure what you mean by it; I know
3   what I understand it to be.
4       Q.   Why don't you tell me what you mean,
5   what that means to you?
6       A.   That the premiums are collected and
7   aggregated and basically held by the holding
8   company.
9       Q.   Right.  And that's not the case with
10  these subsidiaries in Auto-Owners Insurance, that
11  you're aware of?
12      A.   Correct.
13      Q.   Why does Auto-Owners have all these five
14  different subsidiaries?
15      A.   For various reasons.
16      Q.   What are some of those reasons?
17      A.   I believe that they are because of the
18  locations that we wanted to do business,
19  requirements of the various jurisdictions,
20  business reasons.
21      Q.   And I take it from your answers to
22  interrogatories, none of these subsidiaries that
23  we've discussed of Auto-Owners, Owners Insurance,
24  Home-Owners, Southern, Property Company or Life

Page 17

1   Company are licensed to do business in the State
2   of Louisiana?
3       A.   That is correct.
4       Q.   As well as Auto-Owners Insurance?
5       A.   That is correct.
6       Q.   At anytime in the past, are you aware of
7   Auto-Owners Insurance Company being licensed to do
8   business in the State of Louisiana?
9       A.   They were not.
10      Q.   Okay.  Anytime in the past, are you
11  aware of any of these subsidiary companies to
12  Auto-Owners being licensed to do business in
13  Louisiana?
14      A.   They were not.
15      Q.   Are you aware of any of these
16  subsidiaries -- well, are you aware of -- let me
17  strike that.
18          Are you aware of any of the policies
19  that are issued by any of these subsidiaries being
20  sold to individuals or residents in Louisiana?
21      A.   We have no Louisiana policies --
22      Q.   I'm not asking that.
23      A.   -- period.
24      Q.   I'm not asking that.  My question to you

Confidential - Subject to Further Confidentiality Review

Page 18

1   is, you do issue insurance policies, correct?
2       A.   We do.
3       Q.   And I'm wondering whether any of those
4   insurance policies are issued to individuals that
5   are residing in Louisiana?
6       A.   It is possible that a person residing in
7   Louisiana could purchase a policy in a state that
8   we operate.
9       Q.   And would that cover an incident that
10  occurred in Louisiana?
11      A.   No.
12      Q.   It would not?  It would exclude it
13  automatically?
14      A.   There are a number of things that could
15  take place, but we do not sell insurance policy
16  that covers any type of exposure or risk in
17  Louisiana.
18      Q.   And you never have?
19      A.   And we never have.
20      Q.   But you're aware that Louisiana could --
21  Louisiana residents could purchase policies that
22  are sold by either Auto-Owners or their
23  subsidiaries in other states?
24      A.   Correct.  They could -- there's no

Page 19

1   prohibition on a Louisiana resident having a
2   business in Alabama.
3       Q.   Right.  Now, do you all insure your
4   various subsidiaries as well as the parent company
5   of businesses that are nation-wide?  Like trucking
6   companies, transportation companies, distributors?
7       A.   You'd have to tell me what you mean by
8   nation-wide because there are businesses who have
9   multiple locations in varying states.  We would
10  not insure necessarily all locations.  We may
11  insure -- well, for instance, Piggly Wiggly.
12  Piggly Wiggly has locations in multiple states,
13  but we would insure the locations in a particular
14  state under that state's insurance policy but not
15  a national account that has a number of states
16  under the policy.
17      Q.   Is Piggly Wiggly a hypothetical, or is
18  it an actual situation?
19      A.   We have Piggly Wiggly.
20      Q.   Okay.  So if you don't mind --
21  MR. SAPORITO:
22          A grocery store.
23          (Discussion off the record.)
24

Page 20

1   BY MR. STECKLER:
2       Q.   So you insure Piggly Wiggly --
3       A.   Yes.
4       Q.   -- only in specific states; is that
5   right?
6       A.   Correct.
7       Q.   Okay.  So if Piggly Wiggly in Louisiana
8   does not have an Auto-Owners or one of its
9   subsidiaries' insurance policies, Piggly Wiggly
10  has to go buy a policy from somebody else?
11      A.   Correct.
12      Q.   Now, what about a distribution company?
13  Let's say there's a distributor and they
14  distribute products throughout the country.  Would
15  you insure them?
16      A.   It depends on the operations -- we're
17  not typically in the market for product
18  distribution.
19      Q.   What about transportation?
20      A.   We do have trucking companies.
21      Q.   So you're aware that trucking companies
22  are shipping products throughout the United
23  States, correct?
24      A.   Well, yes, generally.  Some can, yes.

Page 21

1       Q.   And do you insure trucking companies who
2   ship products or items throughout the United
3   States?
4       A.   We do insure trucking operations that
5   carry products throughout the states.
6       Q.   Okay.  And so you would agree that it
7   would be reasonable to expect that these trucks
8   who you are insuring or these transporters of
9   whatever would be within the state of Louisiana in
10  the course and scope of their business?  That's
11  not unreasonable, is it?
12      A.   That is possible that they could, but
13  from an underwriting perspective, we have certain
14  guidelines for our trucking operations and there
15  are certain questions that we ask.  And I think we
16  try to determine where their normal routes are.
17      Q.   But that doesn't necessarily mean that
18  it wouldn't be reasonable or foreseeable that a
19  transportation company would be traveling through
20  the state of Louisiana as part of its course of
21  business?  I appreciate your underwriting --
22      A.   I would -- I would tell you that if we
23  had a trucking operation who had regular routes in
24  Louisiana, we would probably take some

6 (Pages 18 to 21)

Confidential - Subject to Further Confidentiality Review

Page 22

1  underwriting action to avoid that risk.  For
2  instance -- but we cannot control what our
3  insureds do.
4      Q.   And so my point is that you would
5  understand that in transportation and trucking,
6  things like that, it's very likely that part of
7  their business may involve them transporting goods
8  through the State of Louisiana?
9      A.   It's possible, but what we would do from
10  an underwriting perspective is try to avoid
11  insuring risks that was -- that had a likelihood
12  of having operations in a state where we do not
13  write.
14      Q.   Okay.
15          How many trucking companies does your --
16  does Auto-Owners or its subsidiaries insure that
17  you're aware of?
18      A.   I do not know.
19      Q.   Over 100?
20      A.   I do not know.
21      Q.   You have no idea whatsoever?
22      A.   I cannot give you a number.
23      Q.   I'm not asking for a number.  I'm asking
24  if it's over 100 or less than 100.

Page 23

1      MR. SAPORITO:
2          The question has been asked and
3  answered, Bruce, so ask her one more time.
4      THE WITNESS:
5          I do not know the number.
6  BY MR. STECKLER:
7      Q.   That's not my question.  I'm not asking
8  for a specific number, ma'am.  I'm asking whether
9  you insure either over 100 trucking companies or
10  less than 100 trucking companies or do you have
11  absolutely no idea whatsoever even if you do
12  insure trucking companies?
13      A.   I know that we insure trucking
14  companies.  I do not know the number.
15      Q.   Okay.  And my question to you is, do you
16  think it would be more or less than 100?
17      A.   I'm not going to guess.  I do not know
18  the number.
19      Q.   I'm not asking you to guess the number.
20  I'm not asking for a specific number.  What about
21  more or less than 50?
22      A.   It's likely that it's more than 50.
23      Q.   But you do not know if it's less than
24  100; is that fair to say?

Page 24

1      A.   I do not know.  It is probably likely
2  that it's more than 100, but I do not know the
3  number.
4      Q.   And which entities would be insuring
5  these likely -- to use your words -- more than 100
6  trucking companies?  Would it be Auto-Owners or
7  would it be Owners or would it be one of these
8  other subsidiaries?
9      A.   Potentially, it could be any of those
10  subsidiaries other than the life company.
11      Q.   Okay.  And while you do underwriting on
12  these trucking companies, you would still cover
13  claims that would occur in the state of Louisiana
14  if they had to do business there; isn't that true?
15      A.   Potentially.
16      Q.   Isn't that correct?
17      A.   Yes.  Potentially.
18      Q.   Depending on whether they had coverage
19  or not?
20      A.   Correct.
21      Q.   But if they had had coverage, you would
22  cover them in Louisiana, right?
23      A.   Well, I would cover them under the
24  policy issued in the other state.

Page 25

1      Q.   Yes, the policy may be issued in another
2  state, but if they're somehow part of their course
3  and scope of doing business are in Louisiana, you
4  would cover them in Louisiana, right?
5      A.   Yes.
6      Q.   Okay.
7          And in fact, that's happened, hasn't it?
8      A.   Are we talking just about trucking
9  operations?
10      Q.   Well, sure, let's just talk about
11  trucking operations.  Has that happened that
12  you're aware of?
13      A.   Probably.
14      Q.   Okay.  So Auto-Owners or one of its
15  subsidiaries does in all likelihood cover a risk
16  in Louisiana based upon the course and scope of
17  their business?
18      A.   I wouldn't phrase it as covering a risk
19  in Louisiana.
20      Q.   How would you phrase it?
21      A.   We are covering an insured in whatever
22  state that policy is issued who has a liability in
23  Louisiana.
24      Q.   Okay.  So you issue policies to insureds

7 (Pages 22 to 25)

Confidential - Subject to Further Confidentiality Review

Page 26

1  who may or may not do business in Louisiana.  And
2  if they have a risk in Louisiana that's covered
3  under the policy, you would handle that coverage,
4  correct?
5      A.   If they have a liability.
6      Q.   Liability.  I apologize.
7      A.   Correct.
8      Q.   And you're aware of that having
9  happened, correct?
10     A.   I believe so.
11     Q.   And I guess that that's foreseeable and
12  likely that it's going to happen when you're
13  dealing with trucking companies, for example?
14     MR. MORROW:
15         Object.
16     MR. SAPORITO:
17         Let me object to the form of the
18     question to the extent it seeks a legal -- a
19     legal --
20     MR. STECKLER:
21         Okay.  I'm not asking for a legal
22     analysis.
23     MR. SAPORITO:
24         Foreseeable is legal.  That was the

Page 27

1      point of my objection.
2      MR. STECKLER:
3          I'm not asking her in a legal sense; I'm
4      asking her as the corporate witness.
5  BY MR. STECKLER:
6      Q.   You're insuring these trucking companies
7  and you're aware they're transporting goods, some
8  of them probably throughout the United States,
9  correct?  They may be domiciled in Indiana or
10  Michigan or Kentucky, but they're national
11  companies, correct?
12     A.   There are some companies that we
13  probably insure that have national operations.  A
14  trucking operation can be structured in a number
15  of ways.
16     Q.   I'm not -- I know that, and --
17     A.   We typically are not a market for
18  national.  We are typically a regional.  I'd have
19  to review the underwriting guidelines.  However,
20  as I said --
21     Q.   Do you have those with you?
22     A.   I do not.
23     Q.   Would you be able to get a copy of the
24  underwriting?

Page 28

1      A.   I was not finished with my previous
2  answer.
3      Q.   Oh, I'm sorry.  I didn't mean to cut you
4  off.  You had that pause, you know, and I wasn't
5  sure whether it was done or you were still going.
6  I'm sorry.  Go ahead.
7      THE WITNESS:
8          Can you read his original question,
9      please.
10         (Requested portion was read back.)
11     A.   Like I said before, we would try to
12  avoid a risk that we knew would go through states
13  we did not operate in on a regular basis.  Could
14  one of our trucking operations even if it was a
15  regional have a drive through Louisiana?  Yes,
16  that would not necessarily disqualify them from
17  coverage unless there was something specifically
18  written on the policy to exclude a certain
19  operation or a certain route.  That would be
20  possible for us to do as well.
21     Q.   And you do insure national trucking
22  companies, though, correct?
23     A.   It -- you mean like --
24     Q.   Trucking companies that do business

Page 29

1  throughout the continental United States.
2      A.   They may do business under a national
3  recognizable name.  As to whether they have local
4  and corporations --
5      Q.   I'm not asking about that.
6      A.   Right, and that's what I'm trying to
7  tell you is that I can't tell you what national
8  means.  We probably do have companies that we
9  issue policies to that have a national recognized
10  name but may be incorporated or be doing business
11  as that name but have actual people who are
12  incorporated in different states.
13         I don't know that there are what you're
14  referring to or what I believe you're referring to
15  as national trucking companies.  Something like a
16  Wal-Mart, that would not be in our book of
17  business.
18     Q.   Okay.  There were so many qualifiers
19  there.  Is it fair to say you don't know?
20     A.   I don't think it's fair to say that I
21  don't know.
22     Q.   So let's go back to the question.  Are
23  you aware of trucking companies that do business
24  on a national basis that you all insure?

8 (Pages 26 to 29)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 30

1     A.  I would think it would not be likely.
2  And I am not personally aware of something that
3  has just a national account or ownership.
4     Q.  Okay.
5        Have you ever given your deposition
6  before?
7     A.  Have I ever given one?
8     Q.  Yes.
9     A.  Yes, I have.
10    Q.  How many times?
11    A.  Probably somewhere between 8 and 15.
12    Q.  Any as a corporate representative?
13    A.  Yes.
14    Q.  How many times?
15    A.  Probably closer to eight or nine.
16    Q.  And in what types of cases were those?
17    A.  Typically, they would involve a claim
18  for coverage under a policy in South Carolina
19  mostly.  Although I believe I was deposed in Ohio
20  as well.
21    Q.  Okay.  And then the other six cases that
22  you were deposed, what did those depositions
23  involve?
24    A.  That wasn't an exact number.  I did

Page 31

1  not --
2     Q.  I understand.
3     A.  -- make a count.  I've been involved in
4  coverage claims in South Carolina for various
5  insurance policies and various claims from denials
6  based on arson to construction defect coverage
7  issues.
8     Q.  So basically in bad faith cases?
9     A.  Some were.  Some were just coverage.
10    Q.  Okay.  When did you graduate law school?
11    A.  1987.
12    Q.  And where?
13    A.  Detroit University -- well, Wayne State
14  University.
15    Q.  And where did you work right out of law
16  school?
17    A.  I'm sorry?
18    Q.  Where did you work right out of law
19  school?
20    A.  I worked for a law firm, Stegman and
21  Kellan.
22    Q.  What type of work did they do?
23    A.  They had an interesting combination of
24  plaintiff's and defense work.

Page 32

1     Q.  How long were you there?
2     A.  I was there after law school for about a
3  year and a half.
4     Q.  And then where did you go?
5     A.  To Lansing to Denfield, Timmer and
6  Taylor.
7     Q.  And what type of work did you do there?
8     A.  Interesting combination of plaintiff's
9  and defense.
10    Q.  In Michigan, did they not just pick one
11  way or the other?
12    A.  They do, but I just happened to land at
13  law firms that --
14    Q.  -- just couldn't help themselves?
15    A.  You know, it made us have a very
16  balanced perspective.
17    Q.  I gotcha.
18        And then why did you leave there?
19    A.  I left private practice to go to
20  Auto-Owners Insurance Company because I have a
21  special needs daughter and the private practice
22  was extremely stressful and I was traveling and I
23  was in trial and I needed to have some regular
24  location.

Page 33

1     Q.  And then they drag you down to
2  Louisiana?
3     A.  That's correct.
4     Q.  And South Carolina.
5     A.  And other exotic locales.
6     Q.  And other exotic locales.  There could
7  be much worse locales, I can assure you.  I think
8  I've been there.
9        In the legal department that you work
10  for, how many individuals are in the legal
11  department?
12    A.  Attorneys or --
13    Q.  Attorneys.  I apologize.
14    A.  I believe there's 22.
15    Q.  And who's the general counsel?
16    A.  Stuart Birn.
17    Q.  And then how is the structure set up for
18  the legal department, if you don't mind me asking?
19    A.  Under Stuart, there are three officers.
20    Q.  And then underneath the officers are?
21    A.  A number of senior attorneys.
22    Q.  And then there are staff attorneys; is
23  that the way it works?
24    A.  Just attorneys.  We don't call them

9 (Pages 30 to 33)

Confidential - Subject to Further Confidentiality Review

Page 34

1  staff, but, yes.
2      Q.   And how many senior attorneys are there?
3      A.   I've got to take a tally in my head.
4      Q.   Okay.  You can give me a rough guess.
5  MR. SAPORITO:
6          Since this is not real jurisdictional
7  here --
8  BY MR. STECKLER:
9      Q.   I don't want to overstep here, but
10 you're welcome to say about ten, or about eleven.
11 I'm cool with that.
12     A.   About ten.
13     Q.   Okay.  That's fine.
14 MR. SAPORITO:
15         It's not really a jurisdictional
16 question, and it's not on the notice; so
17 let's get back to what we need to get back
18 to, please.
19 MR. STECKLER:
20         I'm going to disagree with that.  And
21 let me just finish and I'm not --
22 MR. SAPORITO:
23         I'm just asking you please steer it back
24 to jurisdictional stuff.

Page 35

1  MR. STECKLER:
2          Just let me do the reckless driving I'm
3  doing, all right?
4  BY MR. STECKLER:
5      Q.   Are all of those attorneys in-house for
6  Auto-Owners?
7      A.   Yes.
8      Q.   And do they also handle issues with
9  respect to all the subsidiaries?
10     A.   Yes.
11     Q.   Did any of them work for any particular
12 subsidiary of Auto-Owners?
13     A.   No.
14     Q.   So all legal issues from any of the
15 subsidiaries are dealt with through Auto-Owners;
16 is that correct?
17     A.   Correct.
18     Q.   Each subsidiary doesn't have an
19 individual staff attorney involved?
20     A.   That's correct.
21     Q.   And does the legal department handle
22 coverage issues?  Is that one of the things that
23 you all will be asked to look at?
24     A.   Yes.

Page 36

1      Q.   Are you all handling and evaluating
2  coverage issues with respect to Chinese drywall
3  for Auto-Owners?
4      A.   No.  And I'm assuming you mean "you all"
5  not in the southern you all but all of you?
6      Q.   We now have "the southern you all."
7          The staff attorneys at Auto-Owners, are
8  they evaluating coverage issues with respect to
9  Chinese drywall?
10     A.   No.
11     Q.   Is there anybody that you're aware of
12 assigned as a staff attorney to look at Chinese
13 drywall issues, legal issues?
14     A.   You're looking at her.
15     Q.   Okay.  And are you dealing with any
16 Chinese drywall issues with respect to coverage or
17 any other issues other than the claims made by
18 WCI?
19     A.   Yes.
20     Q.   Okay.  And how many others are you
21 dealing with?
22     A.   I can't give you an exact number.
23     Q.   Okay.
24     A.   There are several.

Page 37

1  MR. SAPORITO:
2          Let me -- wait, wait, please.  Let me
3  interject an objection.  This is not
4  jurisdictional questions.
5  MR. STECKLER:
6          It sure is, Jerry.
7  MR. SAPORITO:
8          Wait.  Let me finish my objection.
9  MR. STECKLER:
10         Okay.
11 MR. SAPORITO:
12         It's beyond the scope of the notice.
13 I've been flipping through the notice here.
14 There's nothing about claims handling and
15 evaluation of Chinese drywall claims; it's
16 just not.  It's a jurisdictional deposition,
17 Bruce.
18 MR. STECKLER:
19         I think it would be important for us to
20 know, okay, if your legal department is
21 dealing with Chinese drywall issues.  And
22 what I'm trying to get out is where those
23 claims are that are being made for
24 jurisdictional purposes.  Because if you are

Confidential - Subject to Further Confidentiality Review

Page 38

1  dealing with Chinese drywall issues and
2  coverage arising from claims in Louisiana,
3  that is jurisdictional.
4  MR. SAPORITO:
5      I agree.  We could ask that question.
6  MR. STECKLER:
7      That is exactly where I'm headed, but
8  you have decided to interject your objection
9  here.  Now, if you want to get to the
10  question, the heart of it:
11  BY MR. STECKLER:
12     Q.  Ma'am, on the Chinese drywall issues
13  that you are looking at in-house for Auto-Owners,
14  did any of them arise from claims regarding
15  Chinese drywall in the State of Louisiana?
16     A.  There are some claimants who are
17  participants in the MDL in Louisiana and they are
18  also in state court, so it's -- there's a
19  possibility that they are in the MDL.  But the
20  coverage issues we have, primarily, are out
21  there -- other than this claim -- are in other
22  states.
23     Q.  Okay.  And that's what I want to find
24  out.  You've got multiple -- I'm sure -- claims

Page 39

1  and issues with respect to Chinese drywall that
2  Auto-Owners is handling, correct?
3     A.  Correct.
4     Q.  What states are those claims arising
5  from?
6     A.  Primarily Florida.
7     Q.  Okay.
8     A.  Georgia, Alabama.
9     Q.  And now my question is more specific.
10  Are any of those claims being made by individuals
11  from The state of Louisiana against one of your
12  insureds?
13     A.  No.  The plaintiffs who are in the MDL
14  are not residents of Louisiana.
15     Q.  And that's what I'm asking you.  That's
16  a separate question.  I understand that the MDL is
17  here in Louisiana and people from a variety of
18  states have filed in the Omni complaints in
19  Louisiana.  But my question to you is, you're
20  handling Chinese drywall claims by individuals.
21  I'm wondering whether any of these individuals,
22  okay, are residents of the state of Louisiana.
23     A.  Not that I'm aware of.
24     Q.  Okay.  But you're aware that some of

Page 40

1  their claims are filed here, correct?
2     A.  Correct.
3     Q.  And then my second question to you is,
4  are any of your insureds who are being sued or
5  whose claim is at issue arising from either an
6  incident in Louisiana or drywall located in
7  Louisiana?
8     A.  No.
9     Q.  Okay.  None whatsoever?
10     A.  Not that I'm aware of.
11     Q.  Are any of those insureds what I would
12  consider multistate companies?  In other words,
13  they operate outside of just one or two states,
14  they're more national or regional?
15     A.  I believe that there are some insureds
16  who did their work in potentially more than one
17  state in a particular region.
18     Q.  Okay.  They're more regional companies?
19     A.  I'm not sure if they would be
20  characterized as regional, but they -- they would
21  have a state with their primary operations, but
22  they may cross state lines for a job at any
23  particular time.
24     Q.  Can you give me some examples of what we

Page 41

1  would be talking about here?
2     A.  I -- there -- I don't know of a specific
3  claim because we have general contractors and
4  installers.
5     Q.  Sure.
6     A.  And it's not unusual depending on where
7  their business is located sometimes for them to
8  cross state lines.  In the Chinese drywall, I'm
9  not aware of any of the generals that we have who
10  typically did that.  I believe there may be one or
11  two -- there may be -- there's one insured who may
12  have supplied drywall to homes in Florida and
13  Georgia.  But -- and I think those issues were
14  investigated, and I think it was actually
15  determined they did not supply Chinese drywall in
16  Georgia but did supply U.S. drywall in Georgia.
17  So they may cross state lines, but they typically
18  don't.
19     Q.  Who are the two suppliers, if you don't
20  mind, that you're thinking of in particular?
21     A.  Well, one's an installer/potential
22  supplier, Rightway Drywall, who is involved in the
23  MDL.
24     Q.  And is there another one?

11 (Pages 38 to 41)

Confidential - Subject to Further Confidentiality Review

Page 42

1      A.   Not that I can think of.
2      Q.   Okay.
3           Do you all solicit your insurance
4  products through insurance brokers?
5      A.   We use an independent agent system.
6      Q.   Okay.  And are there specific
7  independent agents that you all rely on to sell
8  your products?  In other words, is there -- I'm
9  trying to think what the words would be -- a
10 consortium of independent agents that you all use?
11     A.   You have -- you have to be appointed as
12 an independent agent.  You -- there -- it's not a
13 consortium.  They're basic -- they're independent
14 agencies that have business in the various states
15 and, you know, if they meet our criteria, we'll
16 appoint them and we'll have a contractual
17 relationship with them.
18     Q.   And do you all send them some sort of
19 criteria by which they can solicit your insurance
20 products?
21     A.   Yes, we have underwriting rules.
22     Q.   And is it your understanding that you
23 don't have any independent agents that you all
24 have approved in the state of Louisiana?

Page 43

1      A.   That is correct.
2      Q.   Okay.  What about in Mississippi?
3      A.   We do not have agents in Mississippi.
4      Q.   Arkansas?
5      A.   I believe we do in Arkansas.
6      Q.   And what about Texas?
7      A.   No.
8      Q.   Have y'all ever filed any tax returns in
9  the state of Louisiana?
10     A.   No.
11     Q.   You don't own any offices here in this
12 state?
13     A.   No.
14     Q.   Now, I noticed on your statement that
15 the Auto-Owners does quite a bit of investing.  It
16 appears they mostly invest in mutual funds; is
17 that right?
18     A.   The last part of your question was?
19     Q.   Your investments.
20     A.   Yes.
21     Q.   Yeah.  And I said in looking at your
22 annual statement, it indicates that the company
23 invests in a variety of mutual funds; are you
24 aware of that?

Page 44

1      A.   Yes.
2  MR. SAPORITO:
3           Let me interject an objection at this
4  point, Bruce.
5  MR. STECKLER:
6           Okay.
7  MR. SAPORITO:
8           The judge has already ruled that we're
9  not going into financial issues on these
10 jurisdictional depositions.  So we --
11 MR. STECKLER:
12          I thought that had to do with discovery,
13 not necessarily asking the questions in a
14 deposition.  It was your production of
15 documents to us, not whether as to based upon
16 what I had, whether I could inquire as to
17 that as it might relate to jurisdiction.
18 MR. SAPORITO:
19          The judge ruled on the list of topics
20 that were in the motion to compel and on the
21 chart -- wait.  On the chart y'all handed out
22 and the judge used, it had to do with
23 discovery questions and deposition topic
24 questions and they were both listed together

Page 45

1  in the chart.  And he made the general ruling
2  that we were not going to get into financial
3  issues to deal with jurisdictional issues.
4  MR. STECKLER:
5           All right.  I'm going to take a look at
6  the minute entry if you don't mind.  My
7  understanding is that it really had to do
8  with sort of pulling all your finances and
9  having y'all produce that to us versus me
10 being able to inquire.
11          You can shake your head if you want to.
12 MR. MORROW:
13          We're not going to go into it.  So let's
14 move on.
15 MR. STECKLER:
16          If you're going to instruct her not to
17 answer, that's fine.
18 MR. SAPORITO:
19          We're just saying it's beyond the
20 scope --
21 MR. STECKLER:
22          I'd just like to look at the Court's
23 ruling and we'll decide --
24 MR. SAPORITO:

12 (Pages 42 to 45)

Confidential - Subject to Further Confidentiality Review

Page 46

1    Yeah, go ahead.
2    MR. MORROW:
3    -- direct remark made, I'll respond
4    back.
5    MR. STECKLER:
6    You know what, I'm trying to do this in
7    a professional manner.
8    MR. MORROW:
9    I am, too.  And I expect -- I don't need
10   your sarcasm.
11   MR. STECKLER:
12   I don't need the head bob.
13   MR. MORROW:
14   And I don't need your sarcasm.
15   MR. STECKLER:
16   All right.  You know what, then you can
17   stop talking, and I'll just deal with Jerry,
18   who seems to be more of a gentleman.
19   MR. MORROW:
20   If you want to make it personal, that's
21   fine.  But you're not being a gentleman --
22   MR. SAPORITO:
23   We just want to limit it to --
24   MR. MORROW:

Page 47

1    -- and I'm not going to take it from
2    you.
3    MR. STECKLER:
4    Then leave the deposition and allow us
5    to be professional.
6    MR. MORROW:
7    Well, you be professional.
8    MR. SAPORITO:
9    We want to limit it to the scope.
10   MR. STECKLER:
11   Are you five years old?
12   MR. MORROW:
13   No, but you are.
14   THE WITNESS:
15   Would it be possible for us to take a
16   bathroom break?
17   MR. STECKLER:
18   My pleasure.  And anytime you need a
19   break, please ask.
20   MR. SAPORITO:
21   Just limit it to jurisdiction.  Before
22   we go off the record, just limit it to
23   jurisdiction.
24   MR. STECKLER:

Page 48

1    I want to look at the minute entry.  And
2    my understanding is -- and just so you
3    understand, I'm not going to sit there and go
4    through the finances.  What I'm trying to
5    understand is to look at the investments and
6    see whether any of the money that is being
7    collected or made by the company is being
8    invested here in Louisiana.  Whether that is
9    a fine line, I'm going to have to look and
10   see.  I'm not asking you to produce
11   confidential stuff.  I'm just looking at
12   what's public record, candidly.
13   MR. SAPORITO:
14   Let's look at it and take a break.
15   MR. STECKLER:
16   All right.
17   (Brief recess was taken.)
18   BY MR. STECKLER:
19   Q.  Ma'am, I apologize.  I think Jerry and I
20   figured out where we got off.
21   Your 2009 annual statement indicates
22   that Auto-Owners invests in mutual funds.  Do you
23   also have real estate holdings or other
24   investments outside of the state of Michigan?

Page 49

1    A.  Yes.
2    Q.  And are any of those real estate
3    holdings or investments in the State of Louisiana
4    that you're aware of?
5    A.  I know we have no real estate in
6    Louisiana.
7    Q.  Okay.
8    A.  I don't believe we have direct
9    investments in Louisiana.
10   Q.  Are you -- by your answer, are you not
11   sure or you don't believe so at all?
12   A.  There may be an -- it's -- if we own a
13   mutual fund, I don't know where they're invested
14   in.
15   Q.  I understand.  Mutual funds, Jerry and I
16   had talked about off the record.  That's a whole
17   different scenario.  I just noticed that the
18   Auto-Owners business had mutual funds, they have
19   some sub-prime stuff and some real estate
20   holdings.  And really what I was getting to is,
21   once again, contacts with the state of Louisiana?
22   A.  I understand that.  We do not have real
23   estate here.  We do not have bank accounts here.
24   We do not have direct investments in Louisiana,

13 (Pages 46 to 49)

Confidential - Subject to Further Confidentiality Review

Page 50

1  although we -- and I understand we're not talking
2  about securities, correct?
3       Q.   Well, we're not talking about --
4       A.   Or are you?
5       Q.   If you have -- I didn't see in here
6  where the firm -- I call it the firm.  I should
7  call it your corporation -- is investing in
8  individual companies.  And I guess the question
9  would be, if you are, are you investing in
10  individual companies in Louisiana, securities or
11  otherwise, directly versus a mutual fund?
12      A.   There is one security that I'm aware of
13  in Louisiana.  And other than that, nothing.
14      Q.   And that is an investment by Auto-Owners
15  Insurance Company that you're aware of, correct?
16      A.   It's part of our portfolio.  I don't
17  know that you'd call it -- it's part of the
18  investment department and -- but it involves a
19  security, so you're asking me -- I'm a little
20  outside of my comfort zone to know the difference
21  between a security and let's say having an
22  ownership interest in a company in Louisiana.
23      Q.   I understand.  You have no ownership
24  interest in companies in Louisiana?

Page 51

1       A.   We do not.
2       MR. STECKLER:
3            Let me take a quick break real quick, if
4       we'll go off the record.
5            (Discussion off the record.)
6  BY MR. STECKLER:
7       Q.   You indicated that Auto-Owners does own
8  a security in a Louisiana company.  Are you a
9  significant shareholder in that company?
10      A.   We're not a shareholder at all.
11      Q.   You just own stock in the company or an
12  interest -- or why don't you tell me your
13  understanding of it?
14      A.   We bought debt.
15      Q.   Okay.  And what company did you buy debt
16  in?
17      A.   It's a power company.
18      Q.   In which power company in Louisiana did
19  you buy debt?
20      A.   PC&G or E or something like that.
21  Sorry, I don't remember the exact name.
22      Q.   And do you recall whether it was a
23  significant amount of debt that you all had
24  bought?

Page 52

1       A.   Significant --
2       Q.   To you and I, it will probably be
3  significant.
4       MR. SAPORITO:
5            Let me just lodge my same objection
6       about going into investments and amount of
7       investments.  And now we've added the
8       vagueness of what the word significant means.
9       MR. STECKLER:
10           I'd love to ask the amount, but I think
11      y'all don't want me to ask that amount.
12      Let's just move on.  I've got it.  I think
13      I've got enough right there.
14  BY MR. STECKLER:
15      Q.   Are y'all involved in Chinese drywall
16  cases filed in Louisiana state courts?
17      A.   State courts, no.
18      Q.   In Louisiana?
19      A.   Correct.
20      Q.   Does Owners Insurance mostly insure
21  construction companies?  Is that a good part of
22  their business?
23      A.   It is a part of our business, but we do
24  write all -- we write personal and commercial.

Page 53

1  Auto, home, and commercial.
2       Q.   Okay.  And part of that commercial would
3  involve construction companies and general
4  contractors, correct?
5       A.   We have to track -- yes, we have a
6  number of contractors.
7       Q.   And we talked about contractors doing
8  work across state lines, correct?
9       A.   Yes.
10      Q.   You were aware of some that did that.
11  And I assume that if a contractor or a
12  construction company were to do work across state
13  lines that -- you know, assuming it fell within
14  that policy, you would cover that risk?
15      A.   If it falls under the terms of the
16  particular policy, there is a possibility, yes,
17  that we would cover that risk.
18      Q.   So in other words, if a construction
19  company built, let's say, a Hardee's or a Burger
20  King in Louisiana and it collapsed, y'all might
21  cover that risk for the construction company,
22  correct?
23      A.   If we had an Alabama or a Georgia or
24  that type of policy and there was not some

14 (Pages 50 to 53)

Confidential - Subject to Further Confidentiality Review

Page 54

1  restriction on the policy in terms of designated
2  operations or designated premises and the
3  contractor had an exposure that they built
4  something in Louisiana, there's a potential that
5  we would cover their liability.
6     Q.  And that's happened before, hasn't it?
7     A.  I'm not sure about that particular
8  scenario.  I know that we have had insureds that
9  have faced liability in Louisiana.  Mostly, in
10  would say, it's from the visiting person on the
11  personal lines, auto.
12     Q.  But you had it in the -- for example,
13  the construction context as well, correct?
14     A.  I'm not aware of construction.  Like,
15  for instance, something -- someone building a
16  Hardee's or something like that.
17     Q.  Yeah.
18     A.  Usually, it's from an operations.  In
19  other words, somebody sends a crew in -- and they
20  may have -- we write a lot of commercial auto as
21  well -- or something was brought into the state
22  that somebody had a hand in in a different state.
23  Most of our -- there may be -- I don't want to say
24  100 percent there never was, but we don't usually

Page 55

1  have contractors who have -- building, are doing
2  development here.
3     Q.  I understand that.  But my point is
4  there are construction companies that do business
5  in a variety of states that you insure, correct?
6     A.  Yes.
7     Q.  And assuming that something happened,
8  something that they constructed here in Louisiana,
9  that would be something that you may cover if
10  appropriate?
11     A.  It may.  You know, we do send bulletins
12  to our agents -- you know, particularly after the
13  hurricanes when people were coming from out of
14  state to chase work here and reconstruction
15  work -- that they needed to insure them for their
16  Louisiana risks.
17     Q.  And that's, I mean -- and that's a good
18  example.  After the hurricane, a lot of those
19  contractors from Florida and other states came
20  over here and worked, correct?
21     A.  Right.  And if they had significant
22  operations here, we wanted them to obtain their
23  Louisiana policy from a different carrier.
24     Q.  Right.  Or you might have covered them

Page 56

1  under the policy that they had --
2     A.  It would --
3     Q.  -- depending on the situation, correct?
4     A.  It would depend on the policy.
5     Q.  Do y'all have separate headquarters for
6  each of these subsidiaries, or are they all
7  based --
8     A.  The life company has separate building.
9     Q.  And where is that?
10     A.  Across the street.
11     Q.  It's still on your campus?
12     A.  Yes.
13     Q.  It's a campus, isn't it?
14     A.  Yes.
15     Q.  What about your accounting systems?  Are
16  they all separate for each entity, or are they
17  done together?  Your accounting system?
18     A.  When you say accounting systems, you're
19  talking about accounting department, our
20  personnel?
21     Q.  Right.  For each individual entity.
22     A.  There are not -- they are only
23  Auto-Owners employees.  All of the employees are
24  employed by Auto-Owners.

Page 57

1     Q.  So the accounting is done all through
2  Auto-Owners for all of the different subsidiaries,
3  correct?
4     A.  The associates for Auto-Owners will do
5  the accounting functions for the subsidiaries, and
6  I believe that's covered under the operating
7  agreements.
8     Q.  Right.  So basically there are operating
9  agreements but the parent company, Auto-Owners,
10  does all through the operating agreements, all the
11  accounting and all the legal issues, for example,
12  correct?
13     A.  We are authorized to do that for those
14  companies, yes.
15     Q.  And do you all file consolidated tax
16  returns?
17     A.  I don't believe so.  I would have to
18  check on that.  I believe they're separate tax
19  returns.
20     Q.  What about the selection of product
21  lines for each entity?  Are those decided at
22  Auto-Owners, or are they done at an individual
23  level for each entity?
24     A.  The selection of product lines for what

15 (Pages 54 to 57)

Confidential - Subject to Further Confidentiality Review

Page 58

1 we write and where we write?
2    Q.   Yes, ma'am.
3    A.   They're done basically by the same
4 individuals who may be wearing different hats but
5 that -- you know, for Owners, the executive
6 decisions are made on behalf of the board of
7 directors for Owners.
8    Q.   But it's basically the same group of
9 people for Auto-Owners and Owners that are making
10 decisions with respect to selling the product
11 lines and which entity will sell which products;
12 is that fair to say?
13    A.   It is the same individuals generally,
14 yes, that are making those decisions.
15    Q.   Do any of these separate subsidiaries
16 have distinct offices that are separate and apart
17 from your campus?
18    A.   Well, we have branch claims offices and
19 underwriting offices, but in terms of where the
20 corporate operations take place, no.
21    Q.   And I know I got into this, and I
22 thought there was a disconnect.  I want to go back
23 over it.
24       Is there a pooling of the assets and

Page 59

1 liabilities with all of the subsidiaries of
2 Auto-Owners?
3    A.   I --
4    Q.   In other words, when you're doing your
5 annual statements, are they done together?  When
6 you look at your assets here and you look at your
7 liabilities, are they broken out by company?  I'm
8 happy to show it to you if that would help.
9    A.   Well, each company files their own
10 statements as well.  And then the parent company,
11 Auto-Owners, has to file for its subsidiaries.
12    Q.   Like, for example, here is your 2009
13 statement.  It indicates the company's federal
14 income tax returns are consolidated with the
15 following entities and it lists them all out.
16    A.   I'd have no reason to disagree with
17 that.
18    Q.   Okay.  And then it talks about the
19 allocation between the companies is subject to a
20 written agreement but it's approved by the board
21 of directors.  And I assume that has to do with
22 basically Auto-Owners determining how to allocate
23 certain risks and assets, correct?
24    A.   The board of directors that's referring

Page 60

1 to is the Auto-Owners --
2    Q.   Yes, ma'am.
3    A.   -- board of directors, yes.
4    Q.   Okay.  Are there any separate employees
5 for these subsidiaries that you're aware of?
6    A.   No -- well, I'm sorry.  I'm not sure
7 about the life company.
8    Q.   Okay.
9    A.   I think -- I believe the life company --
10 I still believe they're Auto-Owners associates.
11 I'd have to check on that.
12    Q.   Now, in reviewing your supplemental
13 answers to -- I believe it was interrogatories?
14 Let me see if I can find it, and I'll get you a
15 copy.
16       Under Interrogatory No. 13, it indicates
17 that in 2005 Owners and its entities paid 70
18 claims totaling a little over half a million
19 dollars; is that correct?
20    A.   Correct.
21    Q.   And what did those claims involve?
22    A.   Specifically, I'm not aware.  Generally,
23 I believe a lot of them were auto-related.
24    Q.   All of that was auto-related?

Page 61

1    A.   I would say the vast majority of that is
2 auto-related.
3    Q.   And the ones that wouldn't have been
4 auto-related, what would they have involved?
5    A.   I'm not sure.
6    Q.   But it wouldn't -- it wouldn't be
7 100 percent auto-related, would it?
8    A.   I don't believe so.  Not -- not an
9 absolute 100 percent.  I just think that the vast
10 majority of them are -- that's typically -- for
11 the 11 years I've been at Auto-Owners, when
12 someone's talking about a claim in Louisiana,
13 that's typically what's happened.  I take that
14 back.  I am aware of like a bar fight that
15 happened here between a Michigan resident and...
16    Q.   But you get 70 different -- it looks
17 like -- well, let's just go through.  So then in
18 2006, this indicates that you all paid 61 claims
19 totaling, once again, this time, a little bit less
20 than a half a million dollars, correct?
21    A.   Correct.
22    Q.   And in 2007, you all handled 62 claims
23 to Louisiana claimants, once again totaling about
24 half a million dollars, correct?

16 (Pages 58 to 61)

Page 62

1    A.   Correct.
2    Q.   And in 2008, 79 claims regarding
3  Louisiana claimants totaling a half a million
4  dollars, a little bit more than half a million,
5  correct?
6    A.   Correct.
7    Q.   And then 2009, there were 74 claims
8  totaling a little bit less than half a million
9  dollars for Louisiana claimants, correct?
10   A.   Correct.  Can I clarify one thing?
11   Q.   Yeah.
12   A.   This is -- we did a search to come up
13  with these numbers to identify claims that were
14  paid to Louisiana residents.  And so, to that
15  extent, that's what we're understanding to be
16  Louisiana claimants.  I would say that probably
17  the vast majority of these were for Louisiana
18  incidents.
19   Q.   Sure.
20   A.   But it may be that we paid to a
21  Louisiana resident for something that happened
22  outside of Louisiana.  It just -- you know,
23  because there's a potential a Louisiana person
24  traveled to Michigan, let's say, for instance, and

Page 63

1  was in a Michigan auto accident with one of our
2  insureds.  I don't think -- without looking at
3  these individually, I can't tell you what that
4  was.  But what we could search was where the money
5  went and where the claimant was.
6    Q.   Let's go ahead and mark that as an
7  exhibit to your deposition.  I believe we're at
8  Exhibit Number #3.
9        (Document marked as Exhibit Number #3
10        for identification.)
11  BY MR. STECKLER:
12   Q.   And we're talking in about five years.
13  And just to use the terms that are put here in
14  Interrogatory No. 13, Owners and its related
15  entries have paid the following to Louisiana
16  claimants.  That's the words used there, correct?
17   A.   That's correct.
18   Q.   And it's -- when you say claimants,
19  you're telling me these could be either incidences
20  in Louisiana as well as Louisiana residents,
21  correct?  You don't distinguish between the two?
22   A.   I'm sorry.  Can you say it again?
23   Q.   You told me that it's not just Louisiana
24  residents.  When you said Louisiana claimants, it

Page 64

1  could be incidences that occurred in Louisiana as
2  well as Louisiana residents?
3    A.   Outside of Louisiana, yes.
4    Q.   Yes.  Okay.  So it's a mixed bag here?
5    A.   Yes.
6    Q.   But these all involved the State of
7  Louisiana, claims that arose from someone from the
8  state of Louisiana or in the state of Louisiana,
9  correct?
10   A.   I believe so, yes.
11   Q.   So there are about 340 claims during the
12  past five years that have either involved a
13  Louisiana resident or arose here in Louisiana,
14  correct?
15   A.   Yes.
16   Q.   And we've already discussed that they --
17  you think the majority of them may be auto
18  accidents, but not all of them, correct?
19   A.   Correct.
20   Q.   In fact, that would be very unlikely if
21  they were all auto accidents?
22   A.   Right.  Well -- right.  I know -- like I
23  said, we -- there are a lot of people who travel
24  to New Orleans, and the exposures could be

Page 65

1  anything from auto to a personal bar fight.
2    Q.   It could be auto, it could be a bar
3  fight, it could be construction, it could be -- it
4  might be a barge, it could be anything?
5    A.   Yeah.  I'm not aware of a barge.
6    Q.   I don't know.  I'm just saying.
7    A.   Okay.
8    Q.   They could come from a variety of
9  different avenues?
10   A.   They could, yes.  We would not know
11  without a manual review of each file.
12   Q.   So you don't know what claims these
13  were?
14   A.   Not specifically, no.
15   Q.   And you don't know why there were 340
16  over five years other than this is what you were
17  able to locate, correct?
18   A.   Right.
19   Q.   Did any of these involve Louisiana
20  companies that you're aware of?
21   A.   Without looking at each claim file, I
22  wouldn't be able to give you a valid answer.  When
23  you say -- I'm assuming as a claimant, correct?
24   Q.   Right.  Either as a claim against a

17 (Pages 62 to 65)

Confidential - Subject to Further Confidentiality Review

Page 66

1  Louisiana company or by a Louisiana company.
2      A.   Right.  As opposed to an individual, I
3  can't tell you.
4      Q.   So you don't know whether any of these
5  340 claims involved Louisiana companies, fair
6  enough?
7      A.   As claimants, I do not know, right.
8      Q.   Do you know whether any of them involve
9  Louisiana policyholders?
10     A.   Well, I can tell you that none of them
11  involved a policy issued in Louisiana.
12     Q.   That's not my question.
13     A.   All right.  That's what I want to make
14  clear --
15     Q.   Yes.
16     A.   -- because there may be -- when you
17  say a Louisiana policyholder...
18     Q.   Right.  A Louisiana resident that owns a
19  policy issued by Owners.
20     A.   If it was issued in another state, they
21  could.
22     Q.   And that's my point.
23     A.   They cannot buy a policy in Louisiana.
24     Q.   I understand the distinction, ma'am.

Page 67

1      A.   All right.
2      Q.   And so what I'm saying is, do you know
3  whether any of these claims involved Louisiana
4  policyholders of Owners Insurance?  In other
5  words, Louisiana companies might have gone out and
6  bought a policy in Alabama or Florida or another
7  state.
8      A.   If they did, I would review them as
9  being an Alabama policyholder, so that -- that's
10  the clarification I --
11     Q.   I understand what you're saying.
12     A.   Right.
13     Q.   But I'm asking whether any of these were
14  Louisiana residents.  I'm sure you would have
15  needed to have that information -- or Louisiana
16  companies who may have purchased policies from
17  your company.
18     A.   You are sure I would have needed to have
19  that information for...
20     Q.   When you -- for someone to purchase a
21  policy from Owners, I think you would want to know
22  where the company does business, where they're
23  incorporated or headquartered or where the
24  policyholder may live, correct?

Page 68

1      A.   When they purchase a policy from us,
2  they fill out an application indicating what they
3  want insured.
4      Q.   And they don't indicate where they're
5  from and where they're domiciled and all of that
6  information?
7      A.   We get a mailing address and then there
8  are -- depending on what type of insurance they're
9  applying for, there are location questions,
10  operations questions, what states they operate in.
11  It would not disqualify someone to have a mailing
12  address in Louisiana.  But if they listed it, for
13  instance, on the application that their location
14  was in Louisiana, we're not underwriting that.
15     Q.   Ma'am, you would agree with me that out
16  of 340, some of these must have been Louisiana
17  residents who owned policies from your company?
18     A.   Our insureds would have.
19     Q.   Right.
20     A.   I don't know if those were Louisiana
21  residents.  But these are claims that we paid out
22  on behalf of our policyholders.
23     Q.   Right.
24     A.   None of whom were Louisiana policies.

Page 69

1      Q.   Some of them who are Louisiana
2  residents, you meant?
3          MR. SAPORITO:
4              Wait, wait, wait.  Let her say her own
5          answer.
6          MR. STECKLER:
7              She's saying Louisiana policies.
8          THE WITNESS:
9              That's correct.  We paid these claims
10         out to our insureds.  None of whom could have
11         a Louisiana policy.  But they may have been
12         residents of Louisiana.
13  BY MR. STECKLER:
14     Q.   And that's my point.  Some of these
15  claimants may have been -- who hold Owners
16  Insurance policies or Auto-Owners Insurance
17  policies, may be Louisiana residents, correct?
18     A.   The claimants don't hold the policies.
19         MR. SAPORITO:
20             That was going to be my objection.
21  BY MR. STECKLER:
22     Q.   I understand the disconnect.  I
23  apologize.
24     A.   Okay.

18 (Pages 66 to 69)

Confidential - Subject to Further Confidentiality Review

Page 70

1  MR. SAPORITO:
2      Did you get her answer?
3  BY MR. STECKLER:
4      Q.  And you don't know whether any of these
5  claims involved Louisiana companies that own
6  Owners or Auto-Owners Insurance policies, correct?
7      A.  I do not know whether any of the
8  claimants -- is that your question?  The
9  claimants?  Or the insureds?
10     Q.  Well, let's do the insureds.
11     A.  Okay.
12     Q.  Are any of the insureds Louisiana
13  companies?
14     A.  I do not know that answer.
15     Q.  Okay.  Were any of the insureds
16  Louisiana residents?
17     A.  It's possible.  I don't know
18  specifically.
19     Q.  Were any of these 340 claims Louisiana
20  risks?
21     A.  No.
22     Q.  How do you know?
23     A.  As I understand -- what I understand the
24  risk to mean, we do not insure risks or exposures

Page 71

1  in Louisiana on our policies.  We may have
2  insureds who have liabilities in Louisiana that
3  are insured under the states we write business and
4  policies.
5      Q.  Okay.  But once again, just so we're
6  clear, you've not manually looked at each of these
7  340 claims, correct?
8      A.  I have not.
9      Q.  But that's just based upon your custom
10  and practice?
11     A.  It's based on my 11 years of knowledge
12  of how we do business, yes.
13     Q.  Fair enough.  Okay.
14         How did Owners adjust these 340 claims?
15     A.  I'm not sure I understand your question.
16     Q.  Well, how did they investigate and
17  evaluate these claims for these Louisiana
18  claimants that either incidents that occurred
19  there or involved Louisiana residents?
20     A.  In a variety of ways.
21     Q.  Okay.  Well, would they have sent
22  adjustors to Louisiana?
23     A.  No.
24     Q.  Would you have hired adjustors in

Page 72

1  Louisiana to look at these claims?
2      A.  There's a likelihood that if something
3  needed to be inspected we would have entered into
4  a contract with an independent adjusting company.
5      Q.  So based upon your experience, for any
6  of these -- I'm going to call them -- can we call
7  these 340 Louisiana claims, since they involved,
8  you said, either a mix of incidences in Louisiana
9  or involving Louisiana residents, we'll just call
10  them the Louisiana claims; is that fair?
11     A.  If understanding that that's what you're
12  referring to as the answer to 13, that's fine.
13     Q.  Okay.  Because we don't know whether
14  they either were incidences that occurred in
15  Louisiana or they involved just Louisiana
16  residents.  You're calling them Louisiana
17  claimants, but then you call them claims here.  So
18  I'm trying to come up with a global --
19     A.  You can call them Louisiana claims.  I
20  know that's what you're referring to as that,
21  claims identified in the answer to Interrogatory
22  13, yes.
23     Q.  Fair enough.
24         So in these like 340 Louisiana claims in

Page 73

1  the past five years, you all would have hired an
2  independent contractor to assist in investigating
3  and evaluating these claims?
4      A.  If it was necessary, yes.
5      Q.  Okay.  And you would have, in all
6  likelihood, if it involved an incident in
7  Louisiana, you would have hired an adjustor in
8  Louisiana, correct?
9      A.  If it involved an incident -- that would
10  be if there needed to be an investigation,
11  photographs, that type of thing, we would have
12  retained an independent adjustor to conduct the
13  investigation in Louisiana.
14     Q.  On the ground in Louisiana, correct?
15     A.  Correct.
16     Q.  And do y'all have some sort of procedure
17  or policy in place on how you handle that?
18     A.  Not specifically for Louisiana, but we
19  do have claims-handling guidelines.
20     Q.  All right.  And that Louisiana person
21  would have to follow your claims-handling
22  guidelines; is that right?
23     A.  No.  The claims processing and the
24  claims handling takes place in our branches in our

19 (Pages 70 to 73)

Confidential - Subject to Further Confidentiality Review

Page 74

1  states.
2      Q.   What about the investigation and
3  evaluation of the claim?  Would that have had to
4  have been in accordance with some sort of written
5  policy to the individual you hired?
6      A.   The investigation is done, and it's
7  specifically for Louisiana according to the --
8  their processes and procedures.  If we needed
9  something more on investigation, our independent
10  adjustors -- if we retained an independent
11  adjustor, they are to do the investigation.  All
12  of the evaluation is done by Auto-Owners.
13      Q.   So you all would have evaluated these
14  340 Louisiana claims if it happened here, correct?
15      A.   Auto-Owners associates would.
16      Q.   And would y'all have sent people here on
17  the ground to look at these -- the incidences, the
18  site, and deal with things?
19      A.   Not Auto-Owners associates.  The
20  investigation would be done by the retained
21  third -- independent adjustor to do the
22  photographs, interviewing of witnesses to obtain
23  facts for us.  They translate the facts to us.
24      Q.   So y'all would rely upon the local

Page 75

1  Louisiana guy y'all hire to handle that, correct?
2      A.   Or girl.
3      Q.   Or girl.  And I didn't mean that in a
4  sexist form.
5      A.   I know you didn't.  I had just had to
6  give you a little...
7      Q.   I appreciate that.  As the father of
8  many daughters, I'm constantly reminded.
9          And is this sort of procedure set out in
10  writing at Owners or Auto-Owners on how this is
11  handled when you have a claim arising from another
12  state or an out-of-state resident how y'all handle
13  that?
14      A.   No.  I don't think, specifically what
15  you're asking about.
16      Q.   Is there -- is there any way that we can
17  get information on these 340 claims and what they
18  involve?
19      A.   It would require us to pull the paper
20  claims files for all those claims and review them.
21      Q.   Is there not a computer system that
22  could provide basic information on these 340 or so
23  claims?
24      A.   What -- there is a computer system where

Page 76

1  you could take the claim number and get a screen
2  snapshot that would tell you some very basic
3  information, but it's not going to tell you any
4  detailed information.
5      Q.   What type of information would we get on
6  this particular snapshot?
7      A.   The name of the insured, the date of the
8  loss, policy term, the reserves, the name of the
9  claimants, and a brief loss description.
10      Q.   Okay.  And have you gathered all of that
11  information and provided that to your outside
12  counsel?
13      A.   In responding to these interrogatories,
14  I ran a search to determine the specific answer to
15  13.  I have not pulled the -- I have not captured
16  a screen with the information that I just
17  described on each of these claims.
18      MR. STECKLER:
19          Jerry, would that be something y'all
20      would agree to provide to us?  A printout of
21      these 340 claims and just sort of the general
22      description?  I don't know what sort of
23      confidentiality may be involved in that, and
24      I would, of course, want to abide by whatever

Page 77

1  concerns you all had, but I'd like to request
2  that basic information with some redaction if
3  possible.
4      MR. SAPORITO:
5          Well, we'll talk about it afterwards,
6      Bruce.  I don't think that this search can be
7      done that she's talking about without
8      identifying a claim number first.
9      THE WITNESS:
10          Right.
11      MR. SAPORITO:
12          And if that's the issue, then you're
13      talking about a manual search; you have to
14      grab each one of these, get a claim number
15      and then do this computer screen she's
16      talking about.
17      BY MR. STECKLER:
18      Q.   Haven't you already identified that by
19  virtue of coming up with the number of claims?
20      MR. SAPORITO:
21          Are you asking the witness that?
22      BY MR. STECKLER:
23      Q.   Yes, ma'am.
24      A.   No.  I don't have the -- by a specific

20 (Pages 74 to 77)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 78

1  claim number. I had asked them to provide me with
2  the amount. We ran a search, we determined the
3  amount and the number.
4     Q. Can you not take that search and then go
5  back and figure out the claim numbers and then
6  print that off in a relatively easy fashion on
7  your computer system?
8     A. Relatively easy is a term that you're
9  using. No, it's not relatively easy.
10     Q. What would be involved?
11     A. Every search that's required requires me
12  to tie up people in our claims automation group
13  who are already doing other projects and they have
14  to program the search.
15     Q. And so what -- how much time would be
16  involved in obtaining this information for this
17  case?
18     A. To just program the search and run the
19  search, we're talking probably two associates tied
20  up for two or three days, which maybe to you is
21  insignificant but to us is disruptive.
22     Q. No. I appreciate that. But, you know,
23  the issue does involve in this litigation, a
24  policy of somebody's or a variety of a number of

Page 79

1  peoples' homes that was totally destroyed by
2  something that they thought might have been
3  covered. So it's very significant to them as
4  well. While I appreciate your concerns, my
5  clients have similar concerns and that's something
6  I want to ascertain, and if there's an easier way
7  to do that, I'm all for it but I think this is
8  important information we may want. And Jerry and
9  I can talk about this after the depo.
10     MR. SAPORITO:
11        We'll try to figure it out, but the
12     understanding that we have at this point is
13     that they had to construct something to run
14     this search and to come up with numbers. And
15     to do anything further would require grabbing
16     these files, getting claim numbers and then
17     opening files. And we do object to doing
18     that.
19     MR. STECKLER:
20        We can talk about this after the depo,
21     and if there's a reasonable way we can do it,
22     let's try to do that. If not, we'll see what
23     we need, okay?
24     MR. SAPORITO:

Page 80

1        We can certainly agree to talk about it,
2     yes.
3     MR. STECKLER:
4        I'm not committing you to anything on
5     the record, okay?
6  BY MR. STECKLER:
7     Q. And did Owners Insurance and its
8  subsidiaries -- when you said "Owners" here, we're
9  talking Auto-Owners in your answer to
10  Interrogatory No. 3, or are you talking Owners
11  Insurance Company?
12     A. These were directed to Owners Insurance
13  Company, but the answers would be the same. And
14  there is no way for us to tell you which of these
15  claims and which -- involved which company.
16     Q. So I'm just referring to it as Owners
17  and its related entities as you have.
18     A. That's fine.
19     Q. Since there's no way to segregate each
20  individual company from the search that you were
21  able to do, correct?
22     A. Right.
23     Q. So it's all sort of in one database?
24     A. There's one way to do it, and it would

Page 81

1  be a manual review of the claim file.
2     Q. But the way you were able to do it, it's
3  one database for all the Auto-Owners, Owners and
4  its related entities, correct?
5     A. The way that we conducted the search was
6  just for claims paid.
7     Q. I understand. And I'm saying that it's
8  all done on one computer system, correct?
9     A. Correct.
10     Q. And one database, correct?
11     A. Correct.
12     Q. For all the companies, correct?
13     A. Correct.
14     Q. On these claims, did you all hire
15  Louisiana counsel in some instances to defend
16  these claims?
17     A. In -- for some of these claims in
18  litigation, correct, we would hire Louisiana
19  counsel to defend our insureds in Louisiana.
20     Q. So Owners would have retained insurance
21  defense counsel for its insureds, correct?
22     A. That's quite likely.
23     Q. Would they have done that through
24  written agreements with Louisiana law firms or

21 (Pages 78 to 81)

Confidential - Subject to Further Confidentiality Review

Page 82

1    specific attorneys?
2        A.   No, I don't believe there are written
3    agreements.
4        Q.   You don't have any sort of captured
5    counsel here in Louisiana?
6        A.   No.
7        Q.   But y'all would retain counsel to handle
8    some of these 340 claims in Louisiana, correct?
9        A.   Correct.
10       Q.   And do you know whether these are suits
11   that you all filed in Louisiana if any of these
12   involved suits?
13       A.   I can tell you that the search that I
14   conducted for any suits filed by one of the
15   Auto-Owners companies as a plaintiff only showed
16   one suit that was actually transferred to the MDL
17   and no others as any company -- Auto-Owners
18   Company.  We do not track subrogation suits in our
19   system.  So I cannot tell you whether one of the
20   companies has filed a subrogation action ever in
21   Louisiana without reviewing all of the --
22       MR. SAPORITO:
23           The one case is the Mitchell case,
24       Bruce.

Page 83

1        MR. STECKLER:
2            Okay.
3        MR. SAPORITO:
4            Filed in Florida, transferred to this
5        court.
6        MR. STECKLER:
7            I understand.
8    BY MR. STECKLER:
9        Q.   Did you all have a manual on hiring
10   counsel, outside counsel, and what's required?
11       A.   We have litigation guidelines.
12       Q.   Okay.  And do you subject your counsel
13   to litigation guidelines?
14       A.   That has an ominous tone to it, but we
15   expect our attorneys to follow our general
16   litigation guidelines, yes.
17       Q.   Billing guidelines?
18       A.   There are -- in the litigation
19   guidelines, there are references to some items of
20   billing.
21       Q.   Do you subscribe to that -- what is it,
22   LAS system?
23       A.   Hell no.
24       Q.   But you do have certain guidelines with

Page 84

1    respect to the billing that you want your outside
2    counsel to follow, correct?
3        A.   Correct.
4        Q.   And do you provide them with a manual or
5    information on status reports and information that
6    they need to provide you regarding your insureds?
7        A.   In our litigation guidelines, we set out
8    our expectations.  It's a -- it is a very broad
9    and general statement of expectations.  And it --
10   there is certain general recommendations, but
11   we're not a company that sets out hard-and-fast
12   dictates to our outside attorneys.
13       MR. SAPORITO:
14           Let me just object.  You might be ready
15       to move on, but I just want to object.  These
16       questions about counsel and billing programs
17       and stuff are just not jurisdictional in
18       nature.
19   BY MR. STECKLER:
20       Q.   Let me see if I have this right just so
21   we're clear and why I think it is jurisdictional.
22   And that is, we know that Owners hires Louisiana
23   counsel to defend claims in Louisiana, correct?
24       A.   That is correct.

Page 85

1        Q.   You don't have written agreements with
2    those counsel, or do you?
3        A.   We don't have written contracts with
4    them for the representation.
5        Q.   But you do have expectation that the
6    counsel that you retain for your insureds follow
7    your guidelines in your manual, correct?
8        A.   We have litigation guidelines for our
9    outside counsel, correct.
10       Q.   Okay.  And do you set out any
11   expectations in the guidelines specific as to
12   Louisiana?
13       A.   No.
14       Q.   Okay.  Or to any state, for that matter?
15       A.   No, it's not state-based.
16       Q.   And you don't have any pre-existing
17   agreements with Louisiana counsel to handle
18   Louisiana claims?
19       A.   I'm sorry?  What do you mean
20   pre-existing?
21       Q.   In other words, you've retained a
22   counsel that you know that every time you get a
23   claim in Louisiana --
24       A.   Oh.

22 (Pages 82 to 85)

Confidential - Subject to Further Confidentiality Review

Page 86

1    Q.   -- you're going to hire Andersson and
2  Leake?
3    A.   I would love to have Jerry on every
4  defense --
5    Q.   Jerry would love to be on every defense,
6  I'm sure.
7    MR. SAPORITO:
8      That's Leake and Andersson.
9    MR. STECKLER:
10     I apologize.  I had a Leake.
11   THE WITNESS:
12     Do you need a break?
13     Right, we don't have a --
14  BY MR. STECKLER:
15   Q.   Any counsel agreements?
16   A.   No.
17   Q.   But in each of these incidences, in
18  these 340 claims that went beyond the adjusting
19  process, you would have retained Louisiana
20  counsel, correct?
21   A.   If it was in litigation, correct.
22   Q.   Do you have any agreements with any
23  adjustors in Louisiana that you utilize for these
24  types of claims?

Page 87

1    A.   I don't believe so.  I am not
2  100 percent positive that there is not a -- a
3  written agreement with a particular vendor in
4  Louisiana.  Typically, we don't.
5    Q.   Can you check and see for me and let me
6  know whether there are any written agreements
7  between Owners and its related entities?
8    A.   And any Louisiana independent adjusting
9  firm?
10   Q.   Yes.
11   MR. SAPORITO:
12     Yeah, we'll do that.
13  BY MR. STECKLER:
14   Q.   And how do you pay these adjustors that
15  you retain for these types of claims?
16   A.   Typically, the independent firms will
17  invoice us.
18   MR. STECKLER:
19     Do you want to take a quick break?
20   MR. SAPORITO:
21     Oh, sure.
22     (Brief recess was taken.)
23  BY MR. STECKLER:
24   Q.   Ma'am, in these 340 claims we've been

Page 88

1  talking about in Interrogatory No. 13, are you
2  aware of any complaints regarding how Owners
3  handled these 340 claims?
4    A.   I am not.
5    Q.   Do you know whether any complaints were
6  lodged with the Department of Insurance in
7  Louisiana on how these claims were handled?
8    A.   I do not.
9    Q.   You talked about the incidences of, for
10  example, contractors and builders crossing state
11  lines earlier in your deposition, correct?
12   A.   Correct.
13   Q.   And you talked about that that was
14  frequently done but you were generally
15  underwriting the risks for their general location,
16  correct?  In other words, where they were
17  operating?
18   A.   Right.
19   Q.   But after Hurricane Katrina, you're
20  aware that a number of contractors came to
21  Louisiana from Florida and other states to do
22  work, correct?
23   A.   Yes.  We became aware that there were
24  contractors who were traveling to do cleanup work.

Page 89

1    Q.   You would have dropped those insureds,
2  or would you have increased their premiums if they
3  were doing work outside of their general area?
4    A.   Neither.  What we would try to do is to
5  have their agents make sure that they had the
6  proper insurance in place to cover the Louisiana
7  risks.
8    Q.   And some of your policies may very well
9  cover those risks, correct?
10   A.   I'm not going to say that we didn't.  We
11  would not -- we would try to eliminate that risk,
12  but yes, there were probably policies that we --
13   Q.   So you -- I'm sorry.  You keep stopping,
14  and I'm --
15   A.   There were probably policies that
16  provided coverage for their operations that
17  occurred in Louisiana.
18   Q.   And just so we're clear, you're aware
19  that there were individuals leaving other states
20  and doing work in Louisiana after Hurricane
21  Katrina, correct?
22   A.   We became aware, correct.
23   Q.   And you're aware that some of those
24  policies that you had issued to those contractors

23 (Pages 86 to 89)

Confidential - Subject to Further Confidentiality Review

Page 90

1  or individuals were covered in Louisiana, correct?
2      A.   That they were providing coverage for
3  those insureds for liabilities that they faced in
4  Louisiana, yes.
5      Q.   And we don't know based upon the list
6  that we have here on Interrogatory No. 3 --
7      MR. SAPORITO:
8          Thirteen.
9  BY MR. STECKLER:
10     Q.   I mean 13.  I apologize.
11         -- whether any of these 340 claims
12 involved those types of cases, do we, that we just
13 discussed with respect to Katrina and
14 construction, right?
15     A.   Without a manual review, I couldn't say
16 with 100 percent certainty that they did not
17 involve the liability of an out-of-state insured
18 that they were based in Louisiana.
19     Q.   Okay.  And how long has Auto-Owners been
20 in business?
21     A.   Oh, my God, I'm going to get fired.  We
22 had our 100-year anniversary -- 90-year
23 anniversary.  Okay.  Somewhere between 90 and 100
24 years.  I think it was --

Page 91

1      MR. SAPORITO:
2          That's good enough, right?
3          (Discussion off the record.)
4  BY MR. STECKLER:
5      Q.   I need to know the exact year on the
6  record, for the general counsel, of Auto-Owners
7  Insurance that your company began business?
8      A.   I think it was 1908.
9      Q.   Would you like a lifeline?
10     A.   Yes.  Is this Cash Cab?
11         I believe it was 1908 because I think we
12 just --
13     Q.   Auto-Owners has been in business for --
14     A.   -- a long time.
15     Q.   -- a long time, hasn't it?
16     A.   Yes.
17     Q.   I think we've reached some mutual
18 agreements here.  And during that time, it's been
19 writing policies, correct?
20     A.   Yes.  I know that it started out in
21 Mount Pleasant, Michigan with a premium of like
22 $15.
23     Q.   And I just pulled up some cases in
24 Louisiana that Auto-Owners Insurance Company was

Page 92

1  involved in, and the first one I have is a 1969
2  case.
3      A.   (Views document.)
4      Q.   It's a case in which Auto-Owners insured
5  a boat and they filed a suit on a subrogation
6  matter.  Is that the same Auto-Owners that we're
7  talking about here today?
8      A.   I believe so.
9      Q.   Okay.  And the style of that case is
10 Auto-Owners Insurance company et, al., the -- and
11 I'll let Jerry pronounce this -- is it Plaisance?
12     MR. SAPORITO:
13         Plaisance.
14 BY MR. STECKLER:
15     Q.   Plaisance.
16     A.   Okay.
17     Q.   Correct?
18         And would this have been -- can I see
19 the case, please.
20     A.   (Tenders document.)
21         (Interruption in proceedings.)
22 BY MR. STECKLER:
23     Q.   This would have been -- take a look at
24 it if you had a chance.  Have you seen this case

Page 93

1  before?
2      A.   No.
3      Q.   This is a situation in which Auto-Owners
4  brought the action against a corporation and its
5  officer who purchased a boat, correct?  We don't
6  need to go through the whole details of it, but
7  it's the sum and substance of the case?
8      MR. SAPORITO:
9          Well, let me just object to that unless
10 she knows about this case, to try to get into
11 a case that was in 1969, I don't --
12     MR. STECKLER:
13         No, no.  You know what?  Let's just take
14 judicial notice of the fact in July of 1969
15 Auto-Owners filed a lawsuit in Louisiana.  We
16 can agree with that, can't we?
17     THE WITNESS:
18         Filed a subrogation action, it appears,
19 in Louisiana in 1969.
20 BY MR. STECKLER:
21     Q.   And it involves -- we can read it -- an
22 action by an insurer against a corporation and its
23 officer who purchased a boat which was stolen from
24 an insured --

24 (Pages 90 to 93)

Confidential - Subject to Further Confidentiality Review

Page 94

1      MR. SAPORITO:
2          From the alleged theft of a boat from
3   the insured, right.
4      MR. STECKLER:
5          Right. Correct.
6   BY MR. STECKLER:
7      Q.   And insurance company retained Louisiana
8   counsel to handle that matter, right?
9      A.   That's what it appears, yes.
10     Q.   Insurance carrier, I should say.
11         And then let me go ahead and show you a
12  case from 1971. This is a case filed in the
13  United States District Court for the Eastern
14  District of Louisiana in 1971 involving a Level &
15  Company versus a variety of people including
16  International Erectors, Inc, Home-Owners Insurance
17  Company, U.S. Fidelity and a number of other
18  carriers. Is Home-Owners Insurance Company one of
19  the Auto-Owners group's insurance companies?
20     A.   Home-Owners is, correct.
21     Q.   This is called Homeowner Insurance
22  Company.
23     A.   Yeah.
24     Q.   Would this have been y'all's Home-Owners

Page 95

1   Insurance Company?
2      A.   I don't know. I was nine years old when
3   this case was issued.
4      MR. SAPORITO:
5          The problem we're having here, and then,
6   therefore the objection is, is that,
7   number one --
8      MR. STECKLER:
9          I didn't know there was an objection.
10  I'm just asking if she knew whether this was
11  the Home-Owners subsidiary of Auto-Owners and
12  whether she could figure that out. If she
13  can't, she can't.
14     THE WITNESS:
15         I'm not -- yeah, you've had more time to
16  read it. And just scanning it, there's isn't
17  a lot of information about what insurance
18  company is involved in this.
19     MR. SAPORITO:
20         Anyway, the objection is, is that,
21  number one, the Court limited going back and
22  producing documents to five years, which
23  we've done.
24     MR. STECKLER:

Page 96

1      Right.
2      MR. SAPORITO:
3          To present this witness with a case from
4   LexisNexis pulled off of a website that goes
5   back to 1971 and ask her to comment on the
6   parties in the case, I think, is improper
7   and --
8      MR. STECKLER:
9          Okay. Well --
10     MR. SAPORITO:
11         And objectionable and beyond the scope
12  of the jurisdiction deposition.
13     MR. STECKLER:
14         You're welcomed to instruct her not to
15  answer or object --
16     MR. SAPORITO:
17         I'm not doing that. I'm asking you that
18  if she can't answer the question because she
19  doesn't recognize the case, to just make note
20  of that and move on.
21     MR. STECKLER:
22         I'm fine with that. My question was
23  whether this was the Home-Owners Insurance
24  Company based upon what she can see here that

Page 97

1   is related to the Auto-Owners Insurance
2   entity that's at issue here.
3      MR. SAPORITO:
4          She answered.
5      MR. STECKLER:
6          And just to comment on what you said,
7   the reason the Court limited things was
8   because, at least with respect to pleadings
9   and judicial matters, is because I was told
10  it was easily accessible to us. Well, I've
11  accessed the information and now I'm asking
12  questions about it.
13     THE WITNESS:
14         Okay. You want me to answer the
15  original question?
16  BY MR. STECKLER:
17     Q.   Yes, ma'am.
18     A.   I'm not certain that this is our
19  company.
20     Q.   Okay.
21     A.   We typically put a dash, but it's not
22  unusual for reporting -- you know, for people to
23  leave the dash out. And I'm not 100 percent --
24  there's nothing from the case that I can tell, oh,

25 (Pages 94 to 97)

Confidential - Subject to Further Confidentiality Review

Page 98

1    yeah, that sounds like us or somebody else.  I
2    would have to do some more digging.
3        Q.   Okay.  And this case involving
4    Home-Owners Insurance Company involves insurance
5    provided to International Erectors regarding
6    the -- I think it's the construction of a
7    Rivergate project by the dock-board here in New
8    Orleans.  Is that your understanding from your
9    review of the case in front of you?
10       MR. SAPORITO:
11           Again, I object to asking her to give
12       you her understanding and review of the case
13       that she's had in front of her for about a
14       minute.
15       MR. STECKLER:
16           Okay.
17   BY MR. SAPORITO:
18       Q.   Well, let me give you some time and you
19   can look at it and confirm whether I'm correct or
20   not on that question.
21       THE WITNESS:
22           Sure.  Let me --
23       MR. SAPORITO:
24           And the question is whether or not this

Page 99

1    company insured --
2        MR. STECKLER:
3            Jerry, no.  The question is the one that
4        I just asked.
5        MR. SAPORITO:
6            Which is?
7        MR. STECKLER:
8            Which you were so busy talking about --
9        she can repeat it.  It had to do with the
10       nature of the case.
11           (The requested portion was read back.)
12       MR. SAPORITO:
13           Do you see an area where he talks about
14       who the insured is and just direct us to
15       that?
16       MR. STECKLER:
17           I didn't highlight that stuff.  I
18       thought it was pretty evident when I read it.
19       Really, the question...
20       MR. SAPORITO:
21           Can we go off the record?
22           (Discussion off the record.)
23       MR. STECKLER:
24           Would you like me to rephrase the

Page 100

1    question, Jerry?
2        MR. SAPORITO:
3            I just -- I don't know how she can talk
4        about this case.  That's all I'm saying.
5        MR. STECKLER:
6            Okay.  I gotcha, Jerry.  I don't want us
7        to quibble about stupidity, okay?
8    BY MR. STECKLER:
9        Q.   Real quick, ma'am.  Here's a lawsuit in
10   which Home-Owners Insurance Company is a party in
11   the Eastern District of Louisiana, correct?
12       A.   That's what it appears to be, yes.
13       Q.   One of the subsidiaries of Auto-Owners
14   Insurance Company is Home-Owners Insurance
15   Company, correct?
16       A.   Correct.
17       Q.   This particular Home-Owners Insurance
18   Company does not have a hyphen between "home" and
19   "owners" like your company does, correct?
20       A.   Correct.
21       Q.   However, you said you've seen it before
22   in cases where they don't always put the hyphen
23   there, correct?
24       A.   It's possible, yes.

Page 101

1        Q.   And this case involves a construction
2    project, correct?
3        A.   Yes.  As much I can get from the case.
4        Q.   And it's a construction project, I
5    believe, involving something to do with the Port
6    of New Orleans, correct?
7        A.   That's what it appears to be.
8        Q.   And you don't know as you sit here today
9    whether this is your Home-Owners Insurance Company
10   or not, correct?
11       A.   Correct.
12       Q.   You probably could go back on your files
13   or something and maybe figure that out, but as you
14   sit here today, you don't know; is that fair to
15   say?
16       A.   That's fair to say.
17       Q.   But it does appear to be a Home-Owners
18   Insurance Company involved in a case in Louisiana
19   in 1971, correct?
20       A.   In some fashion, yes.
21       Q.   And was Home-Owners Insurance Company in
22   existence in 1971, or do you know?
23       A.   I would have to look at the records to
24   be absolutely certain.

26 (Pages 98 to 101)

Confidential - Subject to Further Confidentiality Review

Page 102

1    Q.   And let me show you a case in which
2   Auto-Owners Insurance Company is a plaintiff in a
3   Court of Appeals of Louisiana, First Circuit.  And
4   that's a case style Auto-Owners versus Freret, and
5   that is a 1973 case, correct?
6    MR. SAPORITO:
7        It would be Freret.
8    THE WITNESS:
9        F-R-E-R-E-T.
10       (Discussion off the record.)
11   MR. SAPORITO:
12       1973 case that you handed --
13   MR. STECKLER:
14       Yes.
15   BY MR. STECKLER:
16    Q.   And this is the owner of an automobile
17   who is going after an insurer for damages
18   sustained by a dump truck in an accident?
19    A.   Yeah.  This is -- it's styled as if
20   Auto-Owners was the plaintiff --
21    Q.   It's an appellate court case?
22    A.   -- but the suit was brought by the owner
23   of the auto against Auto-Owners and the insured.
24    Q.   Right.

Page 103

1    A.   Okay.
2    Q.   And this is a 1973 case, correct?
3    A.   Yes.
4    Q.   And Auto-Owners is a litigant in that
5   case, correct?
6    A.   It appears that they were sued by
7   this --
8    Q.   Right.
9    A.   -- claimant who had a dump truck.
10    Q.   And let me go ahead and show you another
11   case.  I'm going to let your counsel tell you the
12   plaintiff's name as a matter of courtesy to both
13   of us.  But it's a lawsuit involving a contractor
14   and its surety to recover damages for breach of
15   contracts for construction of a fast-food
16   restaurant.
17    MR. SAPORITO:
18       1982 case.  It's Brulet (phonetic).
19   BY MR. STECKLER:
20    Q.   And if you look to the second page,
21   ma'am, it says that defendants, Consolidated
22   Construction Company of Florida, Inc. and
23   Auto-Owners Insurance Company, appealed from a
24   judgment holding them liable for damage incurred

Page 104

1   as a result of breaches of three construction
2   contracts.  Do you see that?
3    A.   I do.
4    Q.   Okay.  And it appears that Consolidated
5   Construction Company of Florida was insured by
6   Auto-Owners based upon that statement, correct?
7    A.   They -- no.  They were not insured by
8   Auto-Owners.  They had a bond with us.
9    Q.   They were bonded by you all.  I
10   apologize.
11    A.   Yes.
12    Q.   And this involved the construction of a
13   Sherwood Forest restaurant for a Hardee's in Baton
14   Rouge.  Do you see that?  It's down sort of at the
15   bottom.  Do you see that, ma'am?  Can I show you?
16    A.   Sure.
17    Q.   Just right there (indicating).
18    A.   Okay.
19    Q.   What is a surety bond?
20    A.   In the construction, there are -- well,
21   the big picture is that there are a number of
22   types of bonds that are required contractually,
23   and Auto Owners does do -- we write bonds.  There
24   are things like license and permit bonds.  There

Page 105

1   are conservatorship bonds for probate court.  And
2   in the construction field, there are performance
3   bonds.
4    Q.   And that's one of the products that you
5   all sell?
6    A.   We do sell them.
7    Q.   And this would involve that type of bond
8   on a construction project in Louisiana?
9    A.   I would assume --
10    Q.   Does that appear to be the case?
11    A.   Yeah.  And it appears to be a
12   performance bond for a Florida principal.
13    Q.   Right.  But you would have --
14    A.   Because it says that there's -- it's for
15   damages resulting from nonperformance of a
16   contract; so I'm assuming it was a performance
17   bond.
18    Q.   This is an example of a Florida company
19   but it's getting bonding from Auto-Owners for a
20   project that it is undertaking in another state,
21   Louisiana in this instance?
22    A.   I'd have to look at the bond to see its
23   terms to see if it was for that project or if we
24   issued a bond -- because we can issue a

27 (Pages 102 to 105)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 106

1 performance bond to a principal for its projects
2 for a certain time frame. And then there are some
3 that you bond for specific projects.
4    Q.   But as part of the underwriting, you'd
5 want to know what projects and what type of work
6 they were doing, wouldn't you?
7    A.   I think it depends on the type of bond
8 that they're getting.
9    Q.   What about this type of bond at issue in
10 this case?
11    A.   I'd have to look.
12    Q.   It's all set out here on, I believe it's
13 page 2.
14    A.   It's really not all set out. It says
15 it's a performance bond. Bond -- bonds are not
16 like a pre-printed form. There may be parts, but
17 you'd have to look at the specific bond to see
18 what its terms were. The underwriting is going to
19 vary for bonds in terms of what they're seeking to
20 be bonded.
21    Q.   So you guys could be issuing bonds to
22 companies in other states that do business in
23 Louisiana and you have no idea?
24    MR. SAPORITO:

Page 107

1       Object to the form of the question.
2    THE WITNESS:
3       You're asking me is it possible for
4       someone to obtain a bond from us without
5       telling us that it's in a state, like
6       Louisiana?
7 BY MR. STECKLER:
8    Q.   Yeah.
9    A.   That's possible.
10    Q.   Right. And you're going to stick by
11 that bond, though, aren't you?
12    A.   Potentially, yes. We would reevaluate
13 the circumstances in the bond itself to see if we
14 had -- if that bond covered that liability.
15    Q.   So you have bonds that are some sort of
16 general bonds for periods of time that could
17 involve projects in a variety of states that are
18 not state-specific, correct?
19    A.   We have bonds issued in other states
20 that cover the performance or whatever's bonded
21 under that and to indemnify the principal.
22    Q.   Right and those -- and you don't know or
23 they may very well be doing projects in other
24 states such as Louisiana, as in this case?

Page 108

1    MR. SAPORITO:
2       Object to the form.
3 BY MR. STECKLER:
4    Q.   Or do you know or do they usually try to
5 find out where the work is being done?
6    MR. SAPORITO:
7       Object to the form of the question.
8    THE WITNESS:
9       There's special underwriting for bonds
10       and I think it depends on the type of bond,
11       what you're bonding.
12 BY MR. STECKLER:
13    Q.   So in this instance you're bonding a
14 project that is occurring in Louisiana or a
15 company that is doing business in Louisiana,
16 correct?
17    MR. SAPORITO:
18       Again -- wait. Let me object again. To
19       ask this wit --
20    MR. STECKLER:
21       You can object to the form of the
22       question. She has the opportunity to read
23       the thing. If she can't answer it, she can't
24       answer it. I really don't want the speaking

Page 109

1 objections anymore, Jerry.
2    MR. SAPORITO:
3       I'm objecting to showing the witness a
4       lawsuit and asking her to tell you what this
5       bond was for.
6    MR. STECKLER:
7       I'm not asking her that question.
8    MR. SAPORITO:
9       That's what I understood it to be.
10       That's why I objected.
11 BY MR. STECKLER:
12    Q.   I'm asking you what this case involves.
13 A surety bond, correct?
14    A.   Don't yell at me, okay?
15    Q.   I'm not yelling. I don't mean to be
16 yelling.
17    A.   It involves what appears to be a
18 performance bond.
19    Q.   A performance bond. A performance bond
20 on a construction project, correct?
21    A.   Well, that's, I think, where we're
22 disconnecting. It is a performance bond which may
23 have been written for a specific project or it
24 could be written -- it really is going to set out

28 (Pages 106 to 109)

Confidential - Subject to Further Confidentiality Review

Page 110

1  who the principal is -- please listen to me and
2  don't get frustrated.
3      Q.   I'm listening to you, ma'am.
4      A.   This could be a bond for the performance
5  of the company no matter what they're performing
6  for a specific time frame.  I can't tell you the
7  terms of the bond without looking at the bond.
8      Q.   It does say that plaintiff sued
9  Consolidated Construction and its surety,
10  Auto-Owners Insurance Company, for damages
11  resulting from non-performance of the contracts?
12      A.   That's what it says, yes.
13      Q.   It says that, right?  The surety bond at
14  issue was provided to Consolidated Construction;
15  is that your understanding based upon the case in
16  front of you?
17      A.   Where are you reading that from the
18  case?
19      Q.   I'm reading on page 2.
20      A.   All right.  Where are you reading?
21      Q.   In the second paragraph on the right,
22  here on page 2, Plaintiffs sued.
23      A.   Right.  That's the sentence you first
24  said, and then you --

Page 111

1      Q.   Yes, ma'am.  And then after that it says
2  that Auto-Owners Insurance Company filed a third
3  party demand against Consolidated Construction for
4  any sums that may be liable under its performance
5  bonds.
6      A.   That's correct.
7      Q.   So we're dealing with performance bonds,
8  correct?
9      A.   That's what it appears to be, yes.
10      Q.   Consolidated Construction, okay?  It's
11  Consolidated Construction Company of Florida,
12  Inc.,  correct?
13      A.   All right.  Yes.
14      Q.   The construction project at issue based
15  upon the lawsuit in front of you involves the
16  construction of a restaurant; isn't that right?
17      A.   Yes.
18      Q.   And it's on Airline Highway, right?
19      A.   That's what this says.
20      Q.   Okay.  And it is in, I believe -- and I
21  can find the sentence if you want -- in Baton
22  Rouge.  Or you can take my word for it.
23      A.   It's on Sherwood Forest Boulevard.
24      Q.   Let's not even play the hunt-and-peck.

Page 112

1  Assume with me the construction project is for a
2  restaurant in the Baton Rouge area.
3      A.   All right.
4      Q.   This would be an example of Auto-Owners
5  Insurance Company providing a bond to a
6  construction company that is doing business in the
7  Baton Rouge area, if that's correct?
8      A.   That's what it appears to be.
9      Q.   Okay.
10          And in fact, there was a judgment
11  rendered in this case.  And part of that judgment
12  limited Auto-Owners Insurance liability to
13  $16,624.  Right here, ma'am (indicating).
14      A.   All right.
15      Q.   Okay.
16          This is a case in 1986 in -- this was a
17  Court of Appeal of Louisiana, Third Circuit.  It
18  involves our favorite company again, Consolidated
19  Construction Company and Auto-Owners
20  Insurance Company as a defendant-appellee.  And
21  this involves workers' compensation benefits.
22  Does that appear to be the case, ma'am?
23      A.   You've given me a LexisNexis document
24  for a Court of Appeals of Louisiana, Third Circuit

Page 113

1  decision in Rochon, R-O-C-H-O-N, versus
2  Consolidated Construction Company and Auto-Owners
3  Insurance Company, yes.
4      MR. SAPORITO:
5          Is that the same construction company
6  that's on that other one?
7      MR. STECKLER:
8          Yeah.  Yeah.
9  BY MR. STECKLER:
10      Q.   And it says at the very first line,
11  plaintiff filed a petition for workers'
12  compensation benefits; do you see that?
13      A.   I do.
14      Q.   And it talks about a suit for
15  compensation benefits resulting from injuries
16  sustained in the course and scope of employment by
17  the plaintiff?
18      A.   Yes.
19      Q.   And this is our Auto-Owners Insurance
20  Company as a litigant in this case in 1987; is
21  that right?
22      A.   As a defendant, yes.
23      Q.   It's your company, yeah.
24          And then let me show you a case in 2000,

29 (Pages 110 to 113)

Confidential - Subject to Further Confidentiality Review

Page 114

1  although it was probably filed in 1999.  In that
2  one, it says Auto-Owners is the third party
3  defendant and appellee?
4      A.   Yes.
5      Q.   And who is the counsel in that case for
6  Auto-Owners Insurance Company?
7      A.   It says Gerald Nielson from the Nielson
8  law firm from Metairie.
9      Q.   Metairie, Louisiana?
10     A.   Yes.  Can I just look at this, please?
11     Q.   Yeah, that involves a flood case.
12     A.   No.  Well, a house fell into Lake
13  Michigan.
14     Q.   It can't just jump in.
15     A.   That's why I wanted to look at it.  I'm
16  like, really, it did?
17  MR. SAPORITO:
18      In Lake Michigan?
19  THE WITNESS:
20      Yeah, Richard Neuser's house fell into
21  Lake Michigan after the bluff on which it sat
22  eroded away.
23      In the year -- I'm not sure when that
24  took place.  It's the national flood program,

Page 115

1  okay.
2  MR. SAPORITO:
3      You don't have a question open right
4  now, do you?  She's just reading?
5  MR. STECKLER:
6      Just out of curiosity, I want to give
7  her the time to look at it if she's
8  interested.  I know it's a fascinating case.
9  THE WITNESS:
10      I'm wondering if they made a mistake,
11  because I don't -- they have this firm listed
12  for appellee, but I don't know why.
13  BY MR. STECKLER:
14     Q.   Okay.  And I guess -- I mean, you've
15  answered the question at hand, really.
16     A.   It doesn't look like they have a
17  connection.
18     Q.   I thought maybe you might be an expert
19  in, you know, flood issues.  I don't know.
20     A.   Well, it may be -- we -- because the
21  flood insurance program is 100 percent reinsured,
22  it's written on carrier's papers but it's the
23  federal government that handles those and directs
24  those.  Because we -- we write -- we don't

Page 116

1  underwrite, write flood.  That's all I'm saying is
2  that that's not probably someone we work with.
3  MR. STECKLER:
4      Well --
5  MR. SAPORITO:
6      This case is not a Louisiana case this;
7  is a Michigan case.
8  BY MR. STECKLER:
9      Q.   That's the interesting thing about it is
10  we have a case here that's in the United States
11  Court of Appeals for the Sixth Circuit and counsel
12  for Auto-Owners Insurance Company, third party
13  defendant/appellee is an attorney out of Metairie
14  Louisiana.
15     A.   Yeah.  So we don't handle those claims.
16     Q.   So you retain this firm out of Louisiana
17  to handle them or?
18     A.   The government does.
19     Q.   The government does on your behalf?
20     A.   Actually, it's a strange program.  All
21  carriers are in this program with the U.S.
22  Government.  Well, I shouldn't say all, but our
23  flood program is the government's flood program.
24  So -- because the government does not issue

Page 117

1  insurance policies.  They write it on our paper,
2  but all -- it's all their underwriting and all
3  their claims handling.  And so they would assign
4  counsel.  I don't know who that person is.  Okay?
5      Q.   And my point simply is, counsel for
6  Auto-Owners Insurance Company in this instance
7  just happens to be --
8      A.   Yeah, in name --
9      Q.   -- a Louisiana resident and law firm?
10     A.   But you asked me if they were retained
11  by Auto-Owners?
12     Q.   I didn't ask you that.
13     A.   No.  You did.
14     Q.   Did I?  I didn't know whether --
15     A.   Well, you said -- you assumed --
16     Q.   They're representing you.  I don't know
17  whether -- I don't know the circumstances behind
18  their retention.
19     A.   Okay.
20     Q.   Whether it was the government or whether
21  you went out and hired them.  I just know that
22  your counsel in this case --
23     A.   Right.
24     Q.   -- is a Louisiana law firm.  Isn't that

30 (Pages 114 to 117)

Confidential - Subject to Further Confidentiality Review

Page 118

1  correct?
2      A.   That's what that Michigan case --
3      Q.   Right?
4      A.   -- states.
5      Q.   Right.  You can sit here and try to
6  explain why or how, but my understanding is that
7  you don't have personal knowledge of how this came
8  about?
9      A.   I have personal knowledge as to how our
10  company operates with the flood program but not
11  that case.
12      Q.   Right.  Well, you know, I -- the reason
13  I say that is we've been through a few cases and
14  you've not wanted to speculate on a lot of it.  I
15  wasn't going to ask you to do that with this one
16  (indicating) unless you feel like you need to
17  explain it and that's fine.  I --
18      A.   I don't have a need to explain it, other
19  than what I've already testified.
20      Q.   Fair enough.  And I don't want to deny
21  you the opportunity to explain it if you want.
22  I -- my point's simply that we've got a Louisiana
23  law firm here representing an Auto-Owners
24  Insurance Company in this published opinion, fair

Page 119

1  enough?
2      A.   That's what that states, yes.
3      Q.   So we've -- just from a historical
4  perspective, we've seen Auto-Owners Insurance
5  Company involved in litigation in Louisiana from
6  1969, potentially 1970s with that Home-Owners
7  Insurance case in the '80s and we know that in
8  2000, there were 340 claims involving Louisiana
9  for Owners Insurance; isn't that right?
10      A.   No.
11      Q.   I'm sorry.  Let's go through real
12  quick --
13      A.   The last part of your question --
14      Q.   Yeah, I was referring to the
15  Interrogatory No. 13, in which there are about 340
16  claims in the past five years --
17      A.   Right.
18      Q.   -- involving either incidents in
19  Louisiana or Louisiana claims that either arise
20  from Louisiana or residents of Louisiana.
21      A.   Your prior question, I think you
22  misstated.  You said there were --
23      Q.   Let me rephrase it.  Can I stop and I'll
24  rephrase it because you and I are disconnecting.

Page 120

1      We've just reviewed a series of cases in
2  which Auto-Owners or one of its entities, we
3  think, was involved in litigation in Louisiana,
4  correct?
5      A.   Yes.
6      Q.   And we went through a case from '69, one
7  that we think was involved, Home-Owners Insurance,
8  which is a subsidiary in Louisiana -- a subsidiary
9  of Auto-Owners, correct?
10      A.   Yes.
11      Q.   Okay.  And then we looked at a case --
12  two cases, I believe, in the 1980s, correct?
13      A.   Yes.  One in 1981 and 2000.  Or are you
14  talking about --
15      Q.   I was talking about the two Consolidated
16  cases, actually.
17      A.   Okay.  All right.
18      Q.   And then we also know from your
19  Interrogatories No. 13 that Auto-Owners and its
20  related entities was involved in about 340 claims
21  involving what we termed, you and I, the Louisiana
22  claimants, right?
23      A.   Between 2005 and 2009, yes.
24      Q.   Right.  And what I'm wondering is

Page 121

1  whether you know that historical perspective that
2  we see from 2005 to 2009 was consistent prior to
3  2005?  In other words, it appears from that that
4  about $500,000 in claims are being paid on average
5  during that period of time.
6      A.   And your question to me is do I know if
7  that is what we did prior to that?
8      Q.   Yes, ma'am.
9      A.   I do not.
10      Q.   Because it seems, with all due respect,
11  I mean, relatively consistent over five years,
12  wouldn't you agree?
13      A.   You know, the numbers are the numbers.
14      Q.   Yes.
15      A.   And I was not asked to provide
16  historical numbers since 1969.  So I cannot tell
17  you.
18      Q.   And I'm not asking for historical
19  numbers from 1969.  I'm just wondering whether you
20  had an opportunity to look prior to that or have
21  an understanding from your experience having been
22  with the company for so long as to whether or not
23  this would be historically consistent based upon
24  the time you've been there?

Confidential - Subject to Further Confidentiality Review

Page 122

1    A.  I have not formulated any opinion about
2  historical consistency of the claims paid over any
3  time period prior to 2005.
4    Q.  All right.
5    A.  I looked to provide the answers that I
6  was asked.
7    Q.  Okay.
8  MR. STECKLER:
9    Let's take a quick break, then.
10  MR. SAPORITO:
11    Do you need a break to get out of the
12  room, or you just need a minute or two?
13  Because we won't go anywhere if we're just
14  going to sit right here.
15    (Discussion off the record.)
16    (Brief recess was taken.)
17  BY MR. STECKLER:
18    Q.  Ma'am, in coming to your answer to
19  Interrogatory No. 13, is there a way to figure
20  out, looking at those 340 or so claims, which
21  incidences arose in Louisiana?
22    A.  There is a way that involves a manual
23  review of the claims file.
24    Q.  It's purely manual, but you now know the

Page 123

1  universe of claims, correct, the 340, right?
2    A.  I know the number.
3    Q.  Right.
4    A.  Right.
5    Q.  So can you then take that universe of
6  340 and review those to see which incidences arose
7  in Louisiana during that time period?
8    A.  As I testified before, with some
9  programming, I would have to re-conduct the
10  search. I'd have to identify the claim numbers,
11  and then we would have to have someone pull those
12  claim files from the warehouse and they would have
13  to be physically looked at.
14    Q.  How did you come up with this number?
15    A.  I had them run a search against claim --
16  the payment address for Louisiana; so the payment
17  was sent to Louisiana. And then the number of
18  claims that they -- what the total amount was per
19  year, what the total amount was -- I think I
20  actually added that up myself -- but per year for
21  those years and that would have had a mailing
22  address for Louisiana.
23    Q.  Okay. So we know -- so this list was
24  based upon Louisiana mailing addresses of checks

Page 124

1  by owners --
2    A.  In claims, right.
3    Q.  -- and related entities and claims?
4    A.  Yeah.
5    Q.  And as part of that search, did that
6  provide you with the claim numbers of all of these
7  payments?
8    A.  I don't believe so.
9    Q.  So in identifying where these claims
10  were paid, you are not able to ascertain the claim
11  number?
12    A.  We are able to do that with -- they have
13  to rerun the search. And I'm not an IT person,
14  but the IT people would do the search with
15  additional criteria.
16    Q.  Okay. All right. So it's something
17  that could be done --
18    A.  And then --
19    Q.  If I wanted to determine the incidences
20  that occurred in Louisiana, I could -- I could
21  determine from these 340 the claim numbers and
22  then you're telling me manually they would have to
23  figure out which ones arose in Louisiana by
24  looking at that screen that provides a

Page 125

1  description?
2    A.  I'm not sure that -- not by looking at
3  the screen. But the screen would tell us the
4  insured name and the claimant name and a brief
5  loss description. But if you wanted the specific
6  details of the incident and where it arose -- I
7  would have a date of loss on the screen, but the
8  specific facts would be only in the claim file.
9  I'd have to look at the claim file.
10    Q.  Okay. And is there any way to figure
11  out, using a search, of whether the claim is
12  arising from a loss in Louisiana?
13    A.  I'm sorry? Is there a --
14    Q.  Is there any way to search whether a
15  claim is arising from a loss in Louisiana versus
16  what you did, which was paying claims in
17  Louisiana?
18    A.  It -- not accurately. You'd have to
19  look at the claim file to be 100 percent sure. I
20  could run a search against the loss description to
21  see if the words in there said "accident in
22  Louisiana." But they're not required to do that;
23  they may just say "auto accident." And so it
24  wouldn't be -- I wouldn't consider it to be

32 (Pages 122 to 125)

Confidential - Subject to Further Confidentiality Review

Page 126

1 reliable. I would have to look at the claim files
2 themselves to see what happened where.
3     Q.   And because I'm going to -- and I'm just
4 going to -- because I'm going to make a request
5 upon the company, I'm trying to figure out whether
6 there's a way in which we can easily identify
7 claims not just paid in Louisiana, since we've
8 already done that, but claims arising in
9 Louisiana, through a search in the past five
10 years, since we've done previously --
11     A.   I'd have to take the claims, get the
12 claim number and look at the files.
13     Q.   And we've already -- okay. And there's
14 no way to query whether it arose there, other than
15 maybe a -- sub-sort of search term?
16     A.   Correct.
17     Q.   And we could still manually go through
18 the 340 that we discussed, but that doesn't
19 necessarily mean they would have arisen in
20 Louisiana; those were just claims paid to people
21 in Louisiana?
22     A.   Right. I would have to look at them
23 individually and sort out what actually happened
24 in Louisiana as opposed to a Louisiana person

Page 127

1 being somewhere else.
2     Q.   And to save you work, we might just
3 being able to look at the brief description of the
4 incident, but it would not be as accurate, as you
5 said, as looking at the whole claim file; is that
6 fair?
7     A.   It's not likely to be reliable. It's
8 likely to just have auto accident, slip-and-fall.
9 It's not going to say that that happened in
10 Louisiana.
11     Q.   I understand.
12     A.   Yeah.
13     Q.   And really the only way to get sort of a
14 reliable level of information on that would be to
15 manually get those numbers and then look at those
16 340 as a starting point?
17     A.   To -- computer-obtained claim numbers
18 and then manually look at the paper files.
19     Q.   Other than maybe printing off just the
20 screens and seeing what's there. But that, as you
21 said, would not be as reliable but it could
22 provide some information?
23     A.   Some brief information.
24     Q.   Okay. All right.

Page 128

1         And just so we're clear for the record,
2 it is possible to have claims arising in Louisiana
3 but paid to folks outside of the state of
4 Louisiana?
5     A.   Is it possible to have claims arising in
6 Louisiana --
7     Q.   But are paid --
8     A.   -- paid to the folks outside of
9 Louisiana.
10     Q.   Right. And I'm happy to provide a
11 hypothetical. The consolidated Construction
12 Company of Florida has an employee, they've come
13 to Louisiana, they do work, the employee is a
14 resident of another state, brings a claim against
15 the company on one of your policies.
16     A.   Yeah. How about a different
17 hypothetical, because I'm not sure that's actually
18 what happened there, but --
19     Q.   No, I'm just picking up the -- you're
20 welcome to do it. But what I'm suggesting is that
21 you don't have -- you can have Louisiana
22 incidences occur in which you are paying on those
23 claims but they would be to -- they would be
24 payments outside of the state of Louisiana?

Page 129

1     MR. SAPORITO:
2         Object to the speculative form of the
3 question.
4     THE WITNESS:
5         So if I had -- so let me just see if I
6 understand your question correctly. I might
7 have a Kansas insured in Louisiana who gets
8 into a bar fight with a Florida insured on
9 Bourbon Street and --
10 BY MR. STECKLER:
11     Q.   -- you pay that claim out to the
12 Kansas --
13     A.   Florida. To the Florida insured --
14     Q.   Florida.
15     A.   -- from the -- yeah.
16     Q.   Sure.
17     A.   That's a possibility. Lots of things
18 can happen on Bourbon Street.
19     Q.   No, I know there are.
20     A.   Yes, there are -- something could happen
21 in Louisiana that involved somebody not related to
22 Louisiana at all.
23     Q.   Yeah. And that's why --
24     A.   Other than they were here at one point

33 (Pages 126 to 129)

Page 130

1 in time.
2    Q.   And I just bring that point up as I
3 queried this to try to figure out the level of
4 accuracy of the information, if I request it,
5 what's some of the issues that might be involved.
6 And that would be one of them.
7    A.   All right.
8    Q.   Is that correct?
9    A.   That's potential, yeah.
10    Q.   All right.
11    A.   You know what, though?  That's not going
12 to show up on this.
13    Q.   That's my point.
14    A.   Right.
15    Q.   That's exactly my point.
16    A.   Yeah.
17    Q.   So the --
18    A.   Because the payment's going to go to
19 Kansas.
20    Q.   Right.
21    A.   Right.  In that hypothetical.
22    Q.   And that's my point.  Of the 340 cases
23 in which you've got claims being paid within
24 Louisiana, there could be also incidences that

Page 131

1 arose in Louisiana but claims were not necessarily
2 paid in Louisiana?
3    A.   To Louisiana residents, right, yeah.
4    Q.   Okay.  All right.
5 MR. STECKLER:
6       Thank you.  I think I'm done, yeah.
7 Have a nice trip home.
8 MR. SAPORITO:
9       I have a couple of questions.
10              EXAMINATION
11 BY MR. SAPORITO:
12    Q.   Is Auto-Owners or Owners Insurance or
13 any of those other companies that we've been
14 discussing licensed to do business in the state of
15 Louisiana?
16    A.   They are not.
17    Q.   Auto-Owners or Owners Insurance or those
18 other companies, do they write insurance in
19 Louisiana?
20    A.   They do not.
21    Q.   Does Auto-Owners or Owners Insurance or
22 the other companies that we've been talking about
23 maintain any offices within the state of
24 Louisiana?

Page 132

1    A.   They do not.
2    Q.   Do Auto-Owners or Owners or any other
3 insurance companies that we've been speaking about
4 maintain any employees in the state of Louisiana?
5    A.   They do not.
6    Q.   Does Auto-Owners or Owners or these
7 other companies have any agents in the state of
8 Louisiana?
9    A.   They do not.
10    Q.   Does Auto-Owners or Owners or these
11 other companies that we've been talking about have
12 any Louisiana insureds?
13    A.   They do not.
14    Q.   Does Auto-Owners or Owners or the other
15 companies we've been talking about solicit any
16 business in Louisiana?
17    A.   They do not.
18    Q.   Does Owners -- Auto-Owners or Owners or
19 the other companies we've been talking about
20 advertise for any business in Louisiana, whether
21 it be radio, TV, billboards, et cetera?
22    A.   They do not.
23    Q.   Does Auto-Owners or Owners or any of the
24 companies that we've been talking about have any

Page 133

1 registered agents for the service of process --
2    A.   They do not.
3    Q.   -- in Louisiana?
4    A.   They do not.
5    Q.   The 340 claims that we have been talking
6 about in the production from years 2005 to 2009,
7 are those all claims that are in litigation?  Are
8 those all lawsuits?
9    A.   They are not.
10    Q.   Do you have any idea whether most of
11 them are or most of them aren't in litigation?
12    A.   Most of them would not be.  Just that --
13 and that I base that on our general claims
14 experiences, something less than 20 percent
15 actually end up in litigation generally.
16    Q.   And then the actual lawsuits that
17 counsel showed you previously, I believe there
18 were four lawsuits, one from -- well, running from
19 1969 to 1980.  Have you seen any of those lawsuits
20 before today, or do you have any reason to review
21 any of those lawsuits before today?
22    A.   No.
23    Q.   Am I correct that my memory was, there
24 were approximately four lawsuits spanning these

34 (Pages 130 to 133)

Confidential - Subject to Further Confidentiality Review

Page 134

1  years that -- '69 through the '80s that he showed
2  you today?
3      A.  Yes.
4      Q.  And this computer search that you had
5  conducted in order to come up with the responses
6  to Interrogatory No. 13 from claims paid into
7  Louisiana from '05 to '09, to do anything further
8  on that search to specifically identify claimants'
9  location of an incident, et cetera, would you need
10  the claims number in order to do that?
11      A.  I would.
12      Q.  And does the computer search that you've
13  ran provide you claim numbers, or do you have to
14  do something further?
15      A.  I believe we have to go back and look at
16  that data and do some additional programming and
17  go searching.
18      Q.  Okay.
19  MR. SAPORITO:
20          That's all the questions I have.
21            RE-EXAMINATION
22  BY MR. STECKLER:
23      Q.  Auto-Owners Insurance and its related
24  entities insure companies that do business in

Page 135

1  Louisiana, don't they?
2      A.  Not in Louisiana -- we do not issue
3  insurance policies.
4      Q.  That's not my question.  My question is
5  you insure companies that are doing business in
6  Louisiana; isn't that true?
7      A.  We issue policies in states other than
8  Louisiana that insure people who conduct business
9  in Louisiana.
10      Q.  And that you may not be issuing policies
11  to Louisiana businesses, but you're issuing
12  policies to businesses outside of Louisiana but
13  who are doing business in this state, correct?
14      A.  Some type of business, yes.
15      Q.  Right.  And that's my point.
16      A.  Okay.
17      Q.  There are companies who are insureds of
18  Auto-Owners and its related entities that are
19  doing business in Louisiana, right?
20  MR. SAPORITO:
21          Let me object to the speculative form of
22  the question.
23  MR. STECKLER:
24          Is it speculative that Consolidated of

Page 136

1  Florida was doing business in Louisiana,
2  Jerry?
3  MR. SAPORITO:
4          That's not the question, Bruce.  You
5  said are doing business in Louisiana, and
6  that case is a 1980 case or a 1979 case.
7  BY MR. STECKLER:
8      Q.  Go ahead.
9      A.  We issue policies to businesses and
10  individuals in states where we operate, and those
11  businesses or individuals are free to conduct
12  business wherever they want to.  Whether we insure
13  those liabilities is a question for the policy
14  itself and the facts of the loss.
15      Q.  Right.  And you're aware based upon
16  underwriting that some of those businesses do
17  business in the state of Louisiana; isn't that
18  true?
19      A.  Right.  We are aware that at times our
20  insureds in the states that we were at business
21  have conducted operations in Louisiana.
22      Q.  And that was -- that's what I was
23  getting at, with all due respect, is that some of
24  these policies you're writing for businesses

Page 137

1  outside of Louisiana are doing business in this
2  state?
3      A.  Some of the people that we write
4  policies for have business in this state.
5      Q.  Right.  And some of that business
6  involves covered losses or risks that you've
7  undertaken as an insurance company?
8      A.  Liabilities for our insurers that are
9  covered under our policy.  We do not intentionally
10  write risks or exposures in Louisiana.  But we
11  will cover an insurer who faces a liability in
12  Louisiana.
13          I may issue a life policy to a Michigan
14  person who retires to Louisiana.  It's a Michigan
15  policy, and it's covering their life in Louisiana.
16  There's no prohibition on doing that.  They don't
17  have to get rid of their policy because they
18  moved.  So -- if it's -- that's --
19      Q.  And my point is, your company is
20  knowingly underwriting and issuing policies to
21  businesses that you're aware of that do business
22  in the state of Louisiana; isn't that true?
23  MR. SAPORITO:
24          Object to the speculative form of the

35 (Pages 134 to 137)

Confidential - Subject to Further Confidentiality Review

Page 138

1  question.
2  THE WITNESS:
3      Can you --
4  MR. SAPORITO:
5      And I'll just say same objection without
6  restating it.
7      (The requested portion was read back.)
8  THE WITNESS:
9      Our company knowingly writes insurance
10  policies in states that we operate covering
11  their exposures and risks in the states that
12  we operate. And we do have knowledge that
13  sometimes they have operations or other
14  business in Louisiana.
15  BY MR. STECKLER:
16      Q.  And on multiple occasions you all have
17  been paying on claims that are arising in
18  Louisiana over the past five years?
19      A.  We gave you information about 346 claims
20  that were paid to Louisiana mailing addresses,
21  presumably Louisiana residents who had claims
22  against our insureds.
23      Q.  And you're paying those claims based
24  upon your insurance business, correct?

Page 139

1      A.  Our insurance policies, yes.
2      Q.  Which is the nature of your business,
3  correct?
4      A.  Correct.
5      Q.  So on multiple occasions, you all have
6  been paying out claims in Louisiana as part of
7  your business practice; isn't that true?
8      A.  Yes.
9      Q.  So isn't it true that you've been doing
10  business at least continuously over the past five
11  years in Louisiana by virtue of paying those
12  claims?
13      A.  That's not true.
14      Q.  That's not true?
15      A.  No.  Think about that.  The insurance,
16  Auto-Owners or any other company writing an auto
17  insurance policy, your auto insurance.  If you
18  drove here, do you think you needed to get a
19  Louisiana insurance policy?  No.  You assume that
20  the policy you bought in Texas or wherever would
21  cover your liabilities under your contract of
22  insurance.
23      Q.  And that's exactly my point.  Part of
24  your business is broadly covering liabilities, not

Page 140

1  just automobile liabilities but other liabilities
2  such as construction companies, and they're
3  covering claims and have been covering claims that
4  are occurring in Louisiana for the past five
5  years; isn't that correct?
6      A.  But in my scenario, you're not a
7  Louisiana insured, you're a Texas insured.  And so
8  your insurance company is doing business in Texas,
9  not Louisiana.  You, yourself, are doing business
10  in Louisiana.
11      Q.  You are --
12      A.  So your original question to me was,
13  doesn't that mean that you've over the last five
14  years been doing business in Louisiana?  No, it
15  does not mean that.  It means I've been doing
16  business in the states where I'm licensed and
17  admitted to do business and issuing policies.
18      Q.  And part of your issuing policies, in
19  doing business in those states, involves
20  underwriting, correct?
21      A.  Yes.
22      Q.  And part of that underwriting is
23  determining what other states that your insureds
24  are doing business in so you're aware of what your

Page 141

1  policies are going to be covering for a certain --
2      A.  For certain lines.
3      Q.  Isn't that true?
4      A.  For certain lines, yes.
5      Q.  And so you're aware, usually, through
6  your underwriting, that some of the businesses
7  you're insuring are doing work in Louisiana,
8  correct?
9      A.  We are aware that some of the insureds
10  who we have issued policies for in other states
11  have business or conduct business or have
12  operations or drive through Louisiana.  We have
13  that acknowledged, yes, that they do at times.
14      Q.  So you're aware that part of their
15  business and the premiums that are being paid to
16  you are being derived from work that they're doing
17  in Louisiana, correct?
18  MR. SAPORITO:
19      Object to the speculative --
20  THE WITNESS:
21      That's not what I said.
22  MR. SAPORITO:
23      Wait, wait.  Object to the speculative
24  form of the question.

36 (Pages 138 to 141)

Confidential - Subject to Further Confidentiality Review

Page 142

1  BY MR. STECKLER:
2  Q.  But it's true if you're aware that
3  companies are doing business in Louisiana, you
4  would -- it would be reasonable to assume,
5  wouldn't it, that part of the premiums that you're
6  obtaining from these companies are based upon
7  their businesses in Louisiana?
8  MR. SAPORITO:
9  Same objection.
10  THE WITNESS:
11  No.
12  BY MR. STECKLER:
13  Q.  No, it's not at all?  There's no way
14  that a company that's doing business in Louisiana,
15  although they may be domiciled in Alabama, is
16  deriving money from that Louisiana business that's
17  going to your premiums?
18  MR. SAPORITO:
19  Same objection plus argumentative.
20  THE WITNESS:
21  I would not make the same conclusion
22  that you're attempting to draw.
23  BY MR. STECKLER:
24  Q.  Okay.  Fair enough.  And I don't want to

Page 143

1  quibble with you.  We can agree to disagree there.
2  So in essence, we -- just so we're
3  clear, you're issuing policies to companies that
4  knowingly do business in Louisiana, although
5  they're not domiciled in Louisiana.  That, we
6  agree on?
7  A.  Who is the knowing, now?  The insured?
8  Q.  Yeah, the insurance.  You.
9  A.  The insurance company issues insurance
10  policies to insureds who may have business in
11  Louisiana.
12  Q.  Right.  And you have been systemically
13  and continuously over the past five years paying
14  claims based at least in part on some of those
15  businesses and the work that they're doing in
16  Louisiana?
17  MR. SAPORITO:
18  Object to the speculative form of the
19  question.
20  THE WITNESS:
21  If we owe insurance policy coverage to
22  our insureds for claims for liabilities that
23  they face in Louisiana, we will honor those
24  claims on behalf of the insured.  The policy

Page 144

1  provides that we will indemnify our insured.
2  I don't know what you mean by systematically
3  and continuously.  There's no systematic
4  intent here.  It's a matter of contract.
5  BY MR. STECKLER:
6  Q.  Right.  And based upon the various
7  contracts you all have over -- it appears that
8  you've been paying claims on average at about
9  $500,000 a year for the past five years arising
10  from situations that occurred in Louisiana,
11  correct?
12  A.  Right.
13  Q.  And that's based upon your insurance
14  contracts that you all have, correct?
15  A.  That are issued in other states.
16  MR. SAPORITO:
17  Wait.  Object to the --
18  BY MR. STECKLER:
19  Q.  I understand they're issued in other
20  states.  That's not an issue.
21  MR. SAPORITO:
22  I want object to the form of the
23  question and the misstatement of her
24  testimony.

Page 145

1  MR. STECKLER:
2  You can object to the form and let's
3  leave it at that.  Let's not speak if --
4  MR. SAPORITO:
5  I'm not going to speak further other
6  than the misstatement of her testimony.
7  That's all.
8  MR. STECKLER:
9  Okay.  Let's end on a bad note.  Thank
10  you, Jerry.  And thank you, ma'am, for your
11  time today.
12  (END OF TESTIMONY AT 12:14 P.M.)
13
14
15
16
17
18
19
20
21
22
23
24

37 (Pages 142 to 145)

Confidential - Subject to Further Confidentiality Review

Page 146

1     ACKNOWLEDGMENT OF DEPONENT
2
3         I,_____, do hereby
4  certify that I have read the foregoing pages and
5  that the same is a correct transcription of the
6  answers given by me to the questions therein
7  propounded, except for the corrections or changes
8  in form or substance, if any, noted in the attached
9  Errata Sheet.
10  _____
11     KATHLEEN LOPILATO, ESQUIRE      DATE
12
13  Subscribed and sworn to before me this
14  _____ day of _____, 20 _____.
15  My commission expires: _____
16
17  Notary Public
18
19
20
21
22
23
24

Page 147

1             - - - - - -
2              ERRATA
3             - - - - - -
4  PAGE LINE  CHANGE & REASON
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____

Page 148

1             - - - - - -
2            LAWYER'S NOTES
3             - - - - - -
4  PAGE LINE
5  ____ ____ _____
6  ____ ____ _____
7  ____ ____ _____
8  ____ ____ _____
9  ____ ____ _____
10  ____ ____ _____
11  ____ ____ _____
12  ____ ____ _____
13  ____ ____ _____
14  ____ ____ _____
15  ____ ____ _____
16  ____ ____ _____
17  ____ ____ _____
18  ____ ____ _____
19  ____ ____ _____
20  ____ ____ _____
21  ____ ____ _____
22  ____ ____ _____
23  ____ ____ _____
24  ____ ____ _____

Page 149

1             CERTIFICATE
2        I, DIXIE B. VAUGHAN, Certified Court
3  Reporter (LA), NCRA Registered Professional
4  Reporter and Certified LiveNote™ Reporter, do
5  hereby certify that prior to the commencement of
6  the examination, KATHLEEN LOPILATO was duly
7  sworn by me to testify to the truth, the
8  whole truth and nothing but the truth.
9        I DO FURTHER CERTIFY that the foregoing
10  is a verbatim transcript of the testimony as taken
11  stenographically by and before me at the time,
12  place and on the date hereinbefore set forth, to
13  the best of my ability.
14        I DO FURTHER CERTIFY that I am neither a
15  relative nor employee nor attorney nor counsel of
16  any of the parties to this action, and that I am
17  neither a relative nor employee of such attorney or
18  counsel, and that I am not financially interested
19  in the action.
20
21        _____
22        DIXIE B. VAUGHAN
       Certified Court Reporter (LA)
       Registered Professional Reporter
23     Certified LiveNote™ Reporter
24

38 (Pages 146 to 149)

# EXHIBIT F

Confidential - Subject to Further Confidentiality Review

Page 1

```
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
 2
     _____
                                       §   MDL NO. 2047
 3   IN RE:                            §
     CHINESE-MANUFACTURED              §   SECTION: L
 4   DRYWALL PRODUCTS LIABILITY        §
     LITIGATION                        §
 5   _____  §   JUDGE FALLON
                                       §
 6   THIS DOCUMENT RELATES TO          §
     PATE v. AMERICAN INTERNATIONAL    §   MAG. JUDGE
 7   SPECIALTY LINES INSURANCE         §    WILKINSON
     COMPANY, ET AL  (09-7791)         §
 8   _____  §
 9
10              SEPTEMBER 16, 2010
11                - CONFIDENTIAL -
12     SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
13                DISCOVERY TESTIMONY
                     -  -  -
14
               Deposition of SCOTT NORRIS, ESQUIRE held
15   at the offices of LEAKE & ANDERSSON, LLP, 1100
     POYDRAS STREET, SUITE 1700, New Orleans, Louisiana,
16   commencing at 12:27 p.m., on the above date, before
     Dixie B. Vaughan, Certified Court Reporter (LA),
17   Registered Professional Reporter, Certified
     LiveNote Reporter.
18
19                   -  -  -
20
21            GOLKOW TECHNOLOGIES, INC.
22       ph 877.370.3377 | fax 917.591.5672
23              deps@golkow.com
24
```

Confidential - Subject to Further Confidentiality Review

Page 2

1                    I N D E X
2                         PAGE
3    APPEARANCES                      3
4    EXAMINATION
5        BY MR. STECKLER            4
6        BY MR. SAPORITO           61
7    RE-EXAMINATION
8        BY MR. STECKLER           64
9    CERTIFICATE                    69
10
11              INDEX OF EXHIBITS
12            (Exhibits are attached.)
13                              PAGE
14   EXHIBIT #1  Notice of Deposition      65
15
16
17
18
19
20
21
22
23
24

Page 3

1    A P P E A R A N C E S:
2
3    BRUCE W. STECKLER, ESQUIRE
        Email: bsteckler@baronbudd.com
4        Phone: (214)521-3605
     BARON & BUDD, P.C.
        3102 Oak Lawn Avenue, Suite 1100
        Dallas, Texas 75219-4281
6        COUNSEL FOR MULTIPLE PLAINTIFFS
7
8    JERRY L. SAPORITO, ESQUIRE
        Email: jsaporito@leakeandersson.com
9        Phone: (504)585-7500
     LEAKE & ANDERSSON, LLP
10       1100 Poydras Street, Suite 1700
        New Orleans, Louisiana 70163-1701
11
12                    - AND -
13
14   ROGER S. MORROW, ESQUIRE
        Email: rsmorrow@mrplaw.com
15       Phone: (334)262-7707
     MORROW, ROMINE & PEARSON, P.C.
16       122 South Hull
        Montgomery, Alabama 36103-4804
17       COUNSEL FOR AUTO-OWNERS INSURANCE COMPANY
18
19   SARAH B. CHRISTIE, ESQUIRE
        (VIA TELEPHONE)
20       Email: schristie@hassettanddonnelly.com
        Phone: (508)791-6287
21   HASSETT & DONNELLY, P.C.
        446 Main Street, 12th Floor
22       Worcester, Massachusetts 01608
        COUNSEL FOR MGM INSURANCE
23
24   ALSO PRESENT: KATHLEEN LOPILATO

Page 4

1    SCOTT NORRIS, ESQUIRE
2    having been first duly sworn, was examined and
3    testified as follows:
4                      EXAMINATION
5    BY MR. STECKLER:
6        Q.   Can you please state your name for the
7    record?
8        A.   Scott Norris.
9        Q.   Mr. Norris, what's your job title?
10       A.   I'm a senior attorney.
11       Q.   And where do you work?
12       A.   Auto-Owners Insurance Company.
13       Q.   And where are they located?
14       A.   They are located in Lansing, Michigan.
15   MR. SAPORITO:
16           Bruce, stop for a minute.
17           (Discussion off the record.)
18   BY MR. STECKLER:
19       Q.   How long have you been a senior attorney
20   at Auto-Owners Insurance Company?
21       A.   Since 1997.
22       Q.   And where did you work prior to joining
23   Auto-Owners Insurance?
24       A.   I worked at a law firm in Lansing,

Page 5

1    Michigan.  The name of the firm was Anderson
2    Stull, S-T-U-L-L, and Kraft, K-R-A-F-T.
3        Q.   And what type of work did they do?
4        A.   Primarily agricultural law, financial
5    restructuring for farmers with debt problems,
6    Chapter 12.  Problems primarily for farmers and
7    agricultural issues.
8        Q.   And prior to joining Anderson Stull,
9    where did you work?
10       A.   That was my first job as an attorney.
11       Q.   And where did you attend law school?
12       A.   Thomas M. Cooley Law School in Lansing,
13   Michigan.
14       Q.   And what year did you graduate?
15       A.   I believe it was in 1986.
16       Q.   And when you joined Auto-Owners
17   Insurance in 1997, did you go in as a senior
18   attorney?
19       A.   No.  I joined Auto-Owners in 1990 and
20   became a senior attorney in 1997.
21       Q.   Okay.  And what were your job duties and
22   responsibilities as a senior attorney for
23   Auto-Owners Insurance?
24       A.   I oversee claims that are submitted by

Confidential - Subject to Further Confidentiality Review

Page 6

1  branch offices, claims representatives who submit
2  claims to me to oversee and review, primarily are
3  my responsibilities.
4      Q.   And that's different from coverage
5  issues?
6      A.   It may entitle coverage issues, but
7  that's just a part of overseeing the claim.
8      Q.   And would that work also involve Owners
9  Insurance and the other subsidiaries of
10  Auto-Owners Insurance?
11      A.   Yes.
12      Q.   Okay.  Do you all have one particular
13  attorney assigned to Chinese drywall claims?
14      A.   In the way that the question is phrased,
15  I would say no.
16      Q.   Okay.  And why do you say -- why do you
17  have that caveat?
18      A.   There are distinctions between whether
19  or not there are coverage issues involving the
20  Chinese drywall claims or whether or not we are
21  defending claims involving Chinese drywall --
22      Q.   Subject to reservation of rights?  Is
23  that what you're saying?
24      A.   Whether there's a coverage issue

Page 7

1  regardless of whether there's a reservation of
2  rights or not.  I mean, a coverage issue may exist
3  without a reservation letter.  But there may be a
4  coverage issue, and it may involve different
5  people involved in that than people handling
6  liability issues.
7      Q.   Fair enough.
8          Is there one particular staff attorney
9  within your company that's handling the majority
10  of the Chinese drywall claims?
11      A.   No.
12      Q.   Okay.  Regardless of what the issue is?
13      A.   To answer your question as accurately as
14  I can, I would say no, there is not a single
15  attorney responsible -- predominantly responsible
16  for Chinese drywall.
17      Q.   Is there a single adjustor or
18  investigator that's handling these claims for
19  Auto-Owners or any of its subsidiaries with
20  respect to Chinese drywall?
21      A.   No.
22      Q.   And are you aware of Chinese drywall
23  claims being made on insurance policies that your
24  entities insure from states other than, I believe

Page 8

1  we discussed, Georgia, Florida, and Alabama?
2      A.   I have no personal knowledge of Chinese
3  drywall claims in states other than those.
4      Q.   Okay.  Because as you were here and you
5  sat through the testimony of the 30(b)(6) witness
6  for Auto-Owners Insurance, I'm just wondering
7  whether you have any different information with
8  respect to Chinese drywall claims?
9      A.   I would not -- I would say I do not have
10  different or new -- other information.
11      Q.   Are you involved in any way in
12  underwriting?
13      A.   I would not consider my role in the
14  company as being involved in underwriting, but
15  that might be my understanding of the question and
16  maybe not how you intend the question.
17      Q.   Please explain.
18      A.   I don't work for the underwriting
19  department and I'm not proactive in underwriting
20  risks for the company, so I don't perceive myself
21  to be involved in the underwriting as I would
22  understand the question.
23      Q.   Fair enough.
24          And from time to time, are you asked for

Page 9

1  legal opinions with respect to underwriting?
2      A.   On an occasion, it may happen.
3      Q.   The way you phrased your answer, I take
4  it that's not something that you do in the
5  ordinary course of your business?
6      A.   That's correct.
7      Q.   Okay.  What type of work do you do in
8  the ordinary course of your business in working
9  for Auto-Owners Insurance?
10      A.   The majority of my time is overseeing
11  claims that have been submitted by the branch,
12  which include bodily injury claims, liability
13  claims, claims in litigation that meet certain
14  requirements of the company to report claims to
15  the home office legal department.
16      Q.   And do you handle claims arising from
17  all of the various entities of Auto-Owners
18  Insurance Company?
19      A.   I don't believe I have any of the claims
20  involving the life -- life department, but I
21  believe I would have claims involving the rest of
22  the subsidiaries of Auto-Owners.
23      Q.   And life is a little bit unique compared
24  to the other lines of insurance being sold by the

3 (Pages 6 to 9)

Confidential - Subject to Further Confidentiality Review

Page 10

1  other entities, correct?
2      A.  Correct.
3      Q.  In your handling claims from branch
4  offices, has that been the majority of your work
5  over the time you've been with the company for the
6  past -- 20 years?
7      A.  Yes and yes.
8      MR. STECKLER:
9          Off the record.
10         (Discussion off the record.)
11  BY MR. STECKLER:
12     Q.  Mr. Norris, have you been involved in
13  claims from incidents arising in Louisiana in your
14  20 years of working with the company?
15     A.  I have been involved in claims involving
16  litigation in Louisiana.  Whether or not that
17  meets "arising out of," I don't want to split
18  hairs in my answer.
19     Q.  Let's break it down, if you don't mind.
20  So you've been involved in litigation in Louisiana
21  on behalf of Auto-Owners?
22     A.  I would say yes.  As I understand the
23  question, yes.
24     Q.  What type of cases were those?

Page 11

1      A.  I don't recall specific cases, but the
2  typical case will be a policyholder is sued in
3  Louisiana, and we will hire a Louisiana counsel to
4  provide the defense for the insured.
5      Q.  And are there specific firms that you've
6  utilized in retaining a defense counsel in
7  Louisiana during the course of your career?
8      A.  There are a few attorneys or firms that
9  we have used that we would know to call.
10     Q.  Which are those go-to firms, if you
11  don't mind me asking, in Louisiana?
12     A.  We have used Chris D'amour in Louisiana
13  to defend our insureds, and he's worked for a
14  couple of different law firms over the years.
15         I see the instance so infrequently,
16  trying to recall the names of specific firms and
17  attorneys off the top of my head is -- that's the
18  only name that I could think of that immediately
19  comes to mind.
20     Q.  What firm is Chris D'amour with right
21  now?
22     A.  Chris is with the -- I'm trying to
23  visualize the name of his law firm.
24     Q.  Where are they located?

Page 12

1      A.  They've got many offices, I believe, in
2  Louisiana.  But I think Chris is in the -- in the
3  New Orleans area.
4      Q.  And every time -- on occasion when
5  you've had something in Louisiana, generally he
6  would be your go-to lawyer; is that fair to say?
7      A.  Oftentimes we would hire Chris.
8      Q.  What about when Auto-Owners has been
9  named as a defendant or sued in direct action in
10  Louisiana?  Have you been involved in those types
11  of cases?
12     A.  I don't recall any types of cases beyond
13  the case involved in this particular litigation.
14     Q.  And you were sitting here for the
15  deposition of Ms. -- and I apologize if I say it
16  wrong -- is it "Lopileto" or "Lopilato"?
17     MR. SAPORITO:
18         L-O, Lopilato.
19  BY MR. STECKLER:
20     Q.  Lopilato.
21         And you saw there were -- I think we
22  went through five or six cases in which
23  Auto-Owners was actually a litigant.  Are you
24  familiar with any of those cases?

Page 13

1      A.  I was not familiar with any of those
2  cases.
3      Q.  Okay.  And are you familiar with the
4  Louisiana direct action statute, as someone who
5  handles claims for Auto-Owners?
6      A.  I am familiar of it, but I wouldn't
7  profess to be familiar with it.
8      Q.  It's unique to Louisiana, and I -- I'm
9  sure that most people in your business are
10  aware --
11     A.  I understand the general concept of the
12  direct action.
13     Q.  But you've not been involved in a
14  direct-action type case in Louisiana during the
15  time you've been with Auto-Owners?
16     A.  Not to my recollection.
17     Q.  Most of your work has been handling
18  claims against or by insureds?
19     A.  Yes.
20     Q.  Or maybe incidences that arose in
21  Louisiana?
22     A.  Yes.
23     Q.  Fair enough.  Okay.
24         And have you had direct contact with

4 (Pages 10 to 13)

Confidential - Subject to Further Confidentiality Review

Page 14

1  adjustors or investigators that you've retained in
2  Louisiana to handle these claims?
3       A.   I don't recall that I myself has had any
4  direct contact with adjustors or investigators in
5  Louisiana.
6       Q.   Would that not have been done before you
7  with the legal department became involved, do you
8  have -- do your branch offices hire local
9  investigators or individuals to look at cases and
10  states that you don't usually handle?
11      A.   The branch offices are the front lines
12  of who's actually handling the claim, and I would
13  oversee portions of the claim.  So if a suit was
14  filed, I might have the name of the defense
15  attorney to send the file to, but they would also
16  be responsible for the contact with the
17  investigators involved rather than my doing that
18  directly.
19      Q.   I see.
20           What about evaluating claims and doing
21  sort of preliminary adjustment of claims?  Would
22  you be involved in hiring people on the ground to
23  do adjustments or evaluations of claims prior to
24  litigation?

Page 15

1       A.   My expectations are, the claim
2  representatives of the company are those
3  individuals that provide the reports to me.
4       Q.   And is that done on a state-by-state
5  basis, or is it all done from Lansing?
6       A.   The claim representative that prepared
7  the reports would be on a state-by-state basis.
8  And for those claims submitted to the home office
9  legal department, the reports would be sent to
10  Michigan where the department is.
11      Q.   I understand.
12           And in a state like Louisiana where you
13  do not have a branch office, who would retain
14  someone to adjust that claim or evaluate that
15  claim on a local level?
16      A.   That would be typically done either at
17  the branch level, or if we had counsel involved,
18  we would work through counsel.
19      Q.   And are there policies and procedures in
20  place on how you handle situations like that,
21  hiring people, local people to handle claims in
22  Louisiana?
23      A.   I don't recall that we have a specific
24  policy and procedure addressing that issue.

Page 16

1       Q.   Okay.  And I don't know whether you're
2  more familiar or less familiar than Ms. Lopilato
3  on defense counsel policies and procedures.  But
4  are there set policies and procedures and
5  agreements that you have with defense counsel?
6       A.   We have what we've described, and what
7  Ms. Lopilato's described, as attorney guidelines
8  so that the firms that we use on a regular basis
9  or as we introduce ourselves to firms, these are
10  expectations and guidelines that we have.
11  Although, again, they are guidelines rather than
12  demands.  But we, you know -- if -- I think that's
13  the question that you're asking.
14      Q.   Are they reporting guidelines?
15      A.   Yes.
16      Q.   Okay.  Are they anything beyond the
17  reporting guidelines such as billing and --
18  expectations?
19      A.   There are some general provisions in
20  there that do address billings.
21      Q.   Have you been involved directly in the
22  Chinese drywall claims that have been made in
23  Florida?
24      A.   I oversee claims made against our

Page 17

1  policyholders for some of the claims that are
2  Chinese drywall claims in Florida.
3       Q.   And are those cases in suit in the
4  Eastern District of Louisiana against your
5  insureds?
6       MR. SAPORITO:
7           Object to the form of the question.
8           Speculative.  And to the extent he knows,
9           correct?
10  BY MR. STECKLER:
11      Q.   Yeah.  If you don't know, you don't
12  know.
13      A.   The claims that I'm aware of, unless
14  there is a claim against our insured that happens
15  to be in one of the multi-district litigations, I
16  don't recall being aware of any.
17      Q.   Of any what?  I'm sorry.
18      A.   Of any of our Florida insureds that are
19  a party in the Louisiana action.
20      Q.   And that is my question.  Are any of
21  your insureds, whether Florida or otherwise, a
22  party to a Louisiana action regarding Chinese
23  drywall?
24      MR. MORROW:

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 18

1    That he's overseeing?
2  MR. STECKLER:
3    That he's aware of.  I mean, more
4  globally than that.
5  THE WITNESS:
6    I don't recall any, no.
7  BY MR. STECKLER:
8  Q.  Okay.  Can you briefly tell me the
9  different lines of insurance that are sold by the
10  various entities?  For example, Auto-Owners
11  Insurance, what type of policies do they issue?
12  A.  I'm not sure I could tell you from each
13  company and each subsidiary exactly which
14  underwriting lines they each sell.
15  Q.  Okay.  Let me -- and I don't mean this
16  to be comprehensive, and this is not a memory
17  test.  And if you don't mind, just generally
18  speaking if you could sort of tell me how you
19  break it down among the related entities, that
20  would be appreciated.  The life insurance company,
21  I think I get that one.  But if you could explain
22  the related entities and sort of the lines that
23  you're aware of that are involved.
24  A.  I can tell you that we sell personal

Page 19

1  auto policies and we sell commercial auto
2  policies.  We sell executive umbrella policies,
3  which are also known as a personal umbrella
4  policy.  We sell commercial umbrella policies.  We
5  insure dwelling fire policies, farm policies, and
6  what we would call a TPP, or a tailored protection
7  policy, that might provide coverage for property,
8  scheduled property, like a home, and then
9  liability coverage that would be part of that same
10  package.
11  Q.  Would that --
12  A.  For someone that might have a
13  slip-and-fall on property or something to that
14  extent.
15  Q.  Would that be like a CGL policy?
16  A.  Yes.
17  Q.  And those different various forms of
18  insurance, are they sold by generally Auto-Owners
19  Insurance or are they also sold by the various
20  subsidiaries?
21  A.  I'm not sure I could -- generally, I
22  suspect that most of those companies sell most of
23  those policies, but I don't know which companies
24  may not offer a commercial umbrella policy on a

Page 20

1  line-by-line basis.
2  Q.  I see.
3    And what is an executive umbrella
4  policy?  I don't quite understand that one.
5  A.  An executive umbrella policy is excess
6  insurance where if you had a homeowners policy
7  with $500,000 in liability and someone came up to
8  your front door and slipped on your porch, your
9  executive umbrella policy would be a second layer
10  of providing liability coverage in an instance
11  that would be over your homeowners liability
12  coverage.
13  Q.  And as a -- as a senior attorney, you
14  handle issues arising -- legal issues arising from
15  all of these various policies, with the exception
16  of life, from all of these various entities; is
17  that correct?
18  A.  Yes.
19  Q.  Okay.  The legal department is not
20  distinguished at Auto-Owners Insurance by entity,
21  is it?
22  A.  No.
23  Q.  It's a common legal department for all
24  of the related entities, correct?

Page 21

1  A.  That's correct.
2  Q.  Similarly, accounting is the same
3  general accounting group of folks that are
4  handling the accounting for all of the related
5  entities?
6  A.  All the individuals are Auto-Owners
7  Insurance Company employees.
8  Q.  Right.  And that's really where I'm
9  getting as well, is every -- actually, almost all
10  employees are Auto-Owners employees, correct?
11  A.  Correct.
12  Q.  Even if they work for the various
13  related entities?
14  A.  Correct.
15  Q.  And then I believe we talked a little
16  bit about there are certain sort of contractual
17  agreements for services that are occurring?
18  A.  Yes.
19  Q.  But at the end of the day, accounting
20  employees, legal staff, officers and directors for
21  all of the entities of Auto-Owners are pretty much
22  the same?
23  A.  I would say it's my understanding they
24  are all employees of Auto-Owners Insurance

6 (Pages 18 to 21)

Confidential - Subject to Further Confidentiality Review

Page 22

1  Company, yes.
2      Q.   And the officers and directors, with the
3  exception of maybe two that we heard about earlier
4  today, are all the same for the related entities,
5  correct?
6      A.   That's my understanding.
7      Q.   And so, similarly, accounting is all the
8  same for the companies, legal staff is all the
9  same for the companies, correct?
10     A.   I suspect that would be correct.
11     Q.   Okay.  Well, you're -- and you're all
12 located at the exact same campus address in
13 Lansing, Michigan, correct?
14     A.   Yes.
15     Q.   With that little lake and the shooting
16 fountain, right?
17     A.   Yes.
18     Q.   Yeah.  It looks delightful.  There was
19 no snow in the picture that I saw, which surprised
20 me.
21     A.   Thank you.
22     Q.   Why does Auto-Owners register to do
23 business in only certain states?
24     A.   It would be my understanding that

Page 23

1  Auto-Owners considers the legal climate, the types
2  of claims, the types of resources that we want to
3  utilize and pursue to move into new states as the
4  company grows.  And I don't have personal
5  knowledge of the factors that are discussed, but
6  decisions are made which states that we want to
7  grow into, you know, as a --
8      Q.   So risk benefit analysis, basically?
9      A.   I suspect so.
10     Q.   And do you register to do business to
11 sell policies as part of your business, or do you
12 do it as to whether you're adjusting or paying
13 claims?  How does that work?
14     A.   I don't know.  I suspect -- and I could
15 offer what I suspect to be true, but I can't say
16 that I know exactly why we would register in
17 particular states.
18     Q.   What do you suspect to be true, if you
19 don't mind me asking you?
20     A.   I suspect that we register if we intend
21 to do business, sell policies, have a presence or
22 do business in a particular state.
23     Q.   Okay.  And so the concept of registering
24 to do business in a state for an insurance company

Page 24

1  would be the ability to write policies in that
2  state --
3      A.   Yes.
4      Q.   -- is that right?
5          And that's a prerequisite, I take it, to
6  doing business in a state and writing policies in
7  that state, is to register to do business there?
8      A.   That's my understanding.
9      Q.   And you also have to register with
10 respect to the state insurance board, for example,
11 to sell certain policies?
12     A.   Yes.
13     Q.   That does not preclude, though,
14 Auto-Owners Insurance from selling policies that
15 would cover claims in other states, as we've
16 previously discussed, correct?
17     A.   Correct.
18     Q.   And, in fact, one of the things that
19 Auto-Owners does as part of its due diligence in
20 underwriting is evaluate each particular business
21 before it issues a policy, correct?
22     A.   That would be our intention, yes.
23     Q.   Right.
24          And so part of that underwriting would

Page 25

1  be an undertaking of determining what type of
2  risks are being underwritten for, in other words
3  what kind of businesses were they doing, correct?
4      A.   Correct.
5      Q.   And one of the due diligence things that
6  you would expect an insurance company to do would
7  be to determine where the sum and substance of the
8  business they are doing is being conducted,
9  correct?
10     A.   That would be correct.
11     Q.   And that's the type of due diligence
12 that insurance companies do before they write
13 policies, correct?
14     A.   Yes.
15     Q.   And so insurance companies could very
16 well, based upon the underwriting process, be
17 aware that the companies that they're writing
18 insurance for are doing business in states other
19 than ones in which they were licensed to sell
20 insurance?
21     MR. SAPORITO:
22          Object to the speculative form of the
23 question.
24

7 (Pages 22 to 25)

Confidential - Subject to Further Confidentiality Review

Page 26

1  BY MR. STECKLER:
2      Q.   Correct?
3      A.   Could you repeat the question for me?
4      Q.   No.
5      MR. STECKLER:
6          Can you read it back, please?
7          (The requested portion was read back.)
8  BY MR. STECKLER:
9      Q.   Would you like me to rephrase it?
10     A.   If you could rephrase the question, that
11 might be helpful.
12     Q.   When an insurance company issues a
13 policy, generally they've done a pretty thorough
14 analysis of the business before they issue a
15 policy, correct?
16     A.   We would hope so.
17     Q.   Right.  And that's part of underwriting,
18 correct?
19     A.   Correct.
20     Q.   And part of that process would be
21 determining where that company is doing some of
22 its business, correct?
23     A.   Correct.
24     Q.   And the type of business that they're

Page 27

1  doing, correct?
2      A.   Correct.
3      Q.   And you can sell policies that cover
4  businesses that are working in states in which you
5  are not licensed to do business, correct?
6      A.   As I'm thinking of the question, I'm not
7  even sure if that's a question that requires a
8  legal conclusion --
9      Q.   It's really not --
10     A.   -- but I -- I think that it is possible
11 that a policy would cover a claim that arises from
12 some insured's business in another state.
13     Q.   And let's face it, insurance companies
14 are not in the business of dictating to their
15 insureds how to operate their business, correct?
16     A.   Correct.
17     Q.   The insurance company job is to insure
18 risks of its insured, correct?
19     A.   Correct.
20     Q.   And they do a thorough, hopefully,
21 evaluation of what's happening and where claims
22 could potentially rise, correct?
23     A.   Correct.
24     Q.   And you sell these policies in the

Page 28

1  states that you're licensed in, correct?
2      A.   Correct.
3      Q.   But that doesn't mean that those
4  businesses are confined to those particular
5  states; isn't that true?
6      A.   That is true.
7      Q.   And so part of one of the things that
8  your company, Auto-Owners Insurance, and its
9  related entities know from hopefully good
10 underwriting, is basically where their exposure's
11 going to lie with any particular insurer; is that
12 correct?
13     A.   That's correct.
14     Q.   And so when you are dealing with, let's
15 say, construction companies that have -- that do
16 business in multiple states, you're aware of that
17 it's reasonable foreseeable that that's one of the
18 risks that you may undertake --
19     MR. SAPORITO:
20         Object to the form --
21 BY MR. STECKLER:
22     Q.   -- is that you could get sued in one of
23 those other states?
24     MR. SAPORITO:

Page 29

1          Object to the form of the question.
2  BY MR. STECKLER:
3      Q.   Isn't that true?
4      A.   That we could get sued, or the insured
5  could get sued?
6      Q.   The insured could get sued.
7      A.   I think that's possible, yes.
8      Q.   Right.  And, I mean, it happens all the
9  time, you all have been sued or had claims made in
10 states where you don't usually sell policies?
11     MR. SAPORITO:
12         Object to the form of the question.
13 BY MR. STECKLER:
14     Q.   Isn't that true?
15     A.   I believe that is true.
16     Q.   And, in fact, we've seen on
17 Interrogatory No. 13 in this litigation about 340
18 claims paid to folks in Louisiana, right?
19     A.   Well, I'm not personally familiar with
20 Interrogatory 13.  But as I understand it, they
21 are paid to the mailing addresses or claims that
22 have some connection with Louisiana, whether it
23 happened outside of Louisiana or -- but...
24     Q.   And we don't know because we haven't

Confidential - Subject to Further Confidentiality Review

Page 30

1  gone through this search process that we talked
2  about in the prior deposition, correct?
3       A.   Yes, correct.
4       Q.   But if you look at No. 13 -- and I'm
5  sorry.  Have you not seen No. 13?
6       A.   I have seen the question, but I haven't
7  been involved in the discovery of it.
8       Q.   I understand.
9            And it indicates that about half a
10  million dollars over the past five years, on
11  average, was paid out to folks in Louisiana,
12  correct?
13       A.   That's what it says.
14       Q.   And I think it's quite clear, you've
15  said to us you don't sell policies to people in
16  Louisiana, but clearly there are insureds that
17  you're dealing with that have connections, whether
18  by automobile or businesses or some other fashion,
19  that either takes them to Louisiana or their
20  business to Louisiana; is that your understanding?
21       A.   That would be the conclusion that I
22  would reach from that.
23       Q.   And given just looking back over five
24  years in the history we see there, it's

Page 31

1  foreseeable that claims are going to continue to
2  be paid to Louisiana residents just based on the
3  nature of your business?
4       MR. SAPORITO:
5            Object to the form of the question.
6            Speculative.
7       THE WITNESS:
8            I don't know that it would be to
9       Louisiana residents, but it seems that these
10       are claims that may be involved in litigation
11       in Louisiana and may be paid.  Louisiana
12       resident might be a term of art.  But again,
13       as far as with a relationship to Louisiana,
14       it may be possible there are other claims
15       that are made or suits filed against insureds
16       in Louisiana.
17  BY MR. STECKLER:
18       Q.   And really the missing piece to this
19  data that we see over the past five years is the
20  fact that we don't know whether the incident arose
21  in Louisiana or whether the payment's being made
22  to Louisiana residents for some other connection
23  to one of your insureds?  I mean, that's not just
24  not in that data?

Page 32

1       A.   Correct.
2       Q.   But it does appear to be that over the
3  past five years there have been continuous
4  payments to Louisiana residents regarding
5  insurance policies sold by Owners and its related
6  entities, correct?
7       A.   Well, again, with the same type of
8  response as to the search that was run that
9  targeted Louisiana for the number of these claims,
10  then my answer would be the same as my last
11  answer, yeah.
12       Q.   And candidly, between you and I, I mean,
13  we're limited in knowing the circumstances behind
14  each of these claims and whether they're incidents
15  that are occurring within the state or whether
16  they're incidents that are outside of the state,
17  right?
18       A.   Correct.
19       Q.   But clearly, this isn't just one or two
20  people stepping foot in Louisiana, is it --
21       MR. SAPORITO:
22            Object to the form of the question.
23  BY MR. STECKLER:
24       Q.   -- in your opinion?  I mean, do y'all

Page 33

1  pay claims for just regular things that happen?
2       A.   That's a lot of claims for a few people.
3       Q.   And that's -- and that's -- is this
4  surprising to see this many Louisiana people being
5  paid on claims when your business is not designed,
6  according to the testimony I've heard, to be
7  selling policies in Louisiana?
8       MR. SAPORITO:
9            Object to the form of the question.
10       THE WITNESS:
11            I wouldn't say I'm surprised, because I
12       would expect a lot of policyholders may want
13       to vacation or travel in Louisiana.  And if
14       most of these were auto accidents, I don't
15       know that I would be surprised.
16  BY MR. STECKLER:
17       Q.   You think all 340 of these or a lot of
18  them are auto accidents?
19       A.   I would think quite a few are, because
20  we don't write business or target business in
21  Louisiana.  And my expectation would be a lot of
22  these probably are auto accidents or visitors to
23  Louisiana involved in the bar fight incident that
24  was --

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 34

1    Q.   It's your contention or speculation --
2  it's speculation that these are auto accidents and
3  tourism cases; that's your speculation, correct?
4    A.   Yes.
5    Q.   You have no personal knowledge as to
6  what these incidents are, do you?
7    A.   I do not.
8    Q.   And as you've sat here today during
9  Mrs. Lopilato's deposition, she didn't give you
10 any information substantively as to what these
11 incidents are whatsoever, did she?
12   A.   That's correct.
13   Q.   Because we don't have that information
14 and that has not been secured, correct?
15   A.   Correct.
16   Q.   I would assume that these also could be
17 businesses that you insure that are doing business
18 in Louisiana?
19       MR. SAPORITO:
20           Object to the form.
21 BY MR. STECKLER:
22   Q.   Is that an unreasonable assumption?
23       MR. SAPORITO:
24           Object to the form of the question.

Page 35

1        THE WITNESS:
2            It is a possibility.
3  BY MR. STECKLER:
4    Q.   It is as much a possibility as the
5  automobiles and the bar fights and the tourism
6  deals, correct?
7    A.   I don't know I would reach the
8  conclusion that it's as much of a possibility,
9  because we hope that the insureds are telling us
10 where they do business.  And since we don't write
11 in Louisiana, the hope is the insureds are not
12 failing to tell us they do business in Louisiana.
13   Q.   So it's important for us if we're going
14 to -- because everything now that we're talking
15 about is pure speculation.  I think the root of
16 the matter is that we really would need to look at
17 each one of these claims to make a determination
18 of what we're talking about here?
19   A.   Yes.
20   Q.   Other than that, it's pure speculation
21 other than the mere fact that 340 claims over five
22 years are being paid out to Louisiana residents,
23 fair enough?
24   A.   You know, I have my expectations, but it

Page 36

1  would still be speculations.
2    Q.   And that's really what I'm getting at.
3        And there are businesses -- and I don't
4  want to rehash it.  There are businesses that you
5  all are insuring that are doing business in
6  Louisiana?
7        MR. SAPORITO:
8            Object to the form of the question.
9        THE WITNESS:
10           I suspect we have businesses that are
11 doing business in states that we're not aware
12 of.
13 BY MR. STECKLER:
14   Q.   That's my point.  Or states that you are
15 aware of including Louisiana?
16       MR. SAPORITO:
17           Object to the form of the question.
18 BY MR. STECKLER:
19   Q.   Because you were diligent in your
20 underwriting, correct?
21       MR. SAPORITO:
22           Object to the form of the question.
23       THE WITNESS:
24           Well, we do work with humans; so I don't

Page 37

1  know that I would be able to say that with
2  any certainly either.
3  BY MR. STECKLER:
4    Q.   I understand what you're saying.  But,
5  you know, my point is that part of the
6  underwriting was due diligence, as determining the
7  operations of an insured, correct?
8    A.   Correct.
9    Q.   And you don't know personally whether
10 these insureds have revealed that they're working
11 in Louisiana or not?
12   A.   Correct.
13   Q.   We can only assume that they've been
14 honest and truthful?
15   A.   Yes.
16   Q.   And that's what we want.  Regardless of
17 what side of the aisle we are.
18       And we went through some cases.  We went
19 through, I believe, a number of cases that were --
20 in which Auto-Owners was a litigant in Louisiana.
21 And I think one of them involved Consolidated
22 Construction Company, for example, correct?
23   A.   I do recall hearing that, yes.
24   Q.   And that's an example of an insured who,

10 (Pages 34 to 37)

Confidential - Subject to Further Confidentiality Review

Page 38

1  based upon what you heard, was doing business in
2  Louisiana; is that your understanding?
3      MR. SAPORITO:
4          Object to the form of the question.  And
5      that court document or that two-page blurb
6      from the internet is not --
7      MR. STECKLER:
8          Hold on.  Westlaw and LexisNexis, I
9      believe, are tools utilized by lawyers.  I
10     don't believe it's Google.
11     MR. SAPORITO:
12         I didn't say Google.  I said the
13     internet.
14     MR. STECKLER:
15         We put the books away to save money, we
16     now do our research for cases on-line, and
17     that's how I got these.  So I don't --
18     MR. SAPORITO:
19         My objection's not to the case.  My
20     objection is to the comment that it's a
21     business that he knew was doing business in
22     Louisiana.
23  BY MR. STECKLER:
24     Q.  I'm not asking for your personal

Page 39

1  knowledge about it.  I'm just saying that we -- we
2  talked about, in the deposition earlier, cases in
3  which Auto-Owners were involved.  One of them, I
4  know, was a construction company.  Do you recall
5  that testimony?
6      A.  I do recall hearing the testimony.
7      Q.  Right.  That was doing business,
8  apparently, based upon what was read out loud and
9  discussed, in Louisiana, correct?
10     MR. SAPORITO:
11         That's the part -- that's the part I
12     objected to.
13  BY MR. STECKLER:
14     Q.  Okay.  All right.  Fair enough.  And if
15  we need to look at the case, I'm happy to show
16  them to you.  Here, take a look.
17     A.  (Views document.)
18     Q.  Here's another one.
19     MR. SAPORITO:
20         I think there were four, Bruce.
21  BY MR. STECKLER:
22     Q.  We have the stolen-boat case with
23  Auto-Owners in '69.  We have the Home-Owners
24  Insurance Company in '71.  We have the '73

Page 40

1  Auto-Owners sues for the dump truck accident.  And
2  then we have an '82 case with Consolidated
3  Construction.  Do you see that, sir?
4      A.  I do see the case.
5      Q.  And then there's an '86 Consolidated
6  Construction case.  And then there's a -- it was a
7  '73 Auto-Owners versus Freret case involving -- I
8  might have repeated the dump truck.  But I'm
9  showing you the Consolidated ones there?
10     A.  Yes.
11     Q.  And I'm just saying that's a
12  construction company that appears to have been
13  doing business in Louisiana.
14     A.  Well, I listened to the testimony of
15  your reading the case and Ms. Lopilato's
16  understanding of what you've indicated and what
17  she's read.  I don't have any separate or
18  independent knowledge, having not read those cases
19  before this moment either.
20     Q.  And I'm not suggesting you were working
21  as a lawyer at Auto-Owners in the '80s.  I'm not
22  suggesting that at all, okay?
23         My question to you is:  That would be --
24  hypothetically, without you even having read it --

Page 41

1  an example of one of your insureds who was doing
2  business in Louisiana?
3      MR. SAPORITO:
4          That's the nature of my objection, the
5      "doing business in Louisiana" part.
6      MR. STECKLER:
7          Hold on --
8      MR. SAPORITO:
9          They're sued in a lawsuit.  That's all
10     that tells anybody.
11     MR. STECKLER:
12         You know what, you're right, they're
13     sued in a lawsuit in Louisiana.  It involves
14     an incident, if we read the cases, involving
15     a construction company doing construction in
16     Louisiana.  That may not be doing business to
17     you.
18  BY MR. STECKLER:
19     Q.  Is it doing business to you, or do you
20  not -- can you answer that?
21     A.  Prior to reading the cases, I'm not sure
22  I could reach a conclusion on that question,
23  really.
24     Q.  I'm just trying to use it as more of a

11 (Pages 38 to 41)

Confidential - Subject to Further Confidentiality Review

Page 42

1  hypothetical, if you had an insured that was a
2  construction company conducting a construction
3  project in Louisiana, that would be an example of
4  where you're not selling policies but one of your
5  insureds is doing work there, correct?
6      A.  I understand your hypothetical, sure.
7      Q.  Right.  And that would be an example
8  where you're covering a claim that's arising from
9  a construction situation in Louisiana, right?
10     A.  I'm not familiar with the case, so I'm
11  not sure I could say we're covering the claim.
12  MR. SAPORITO:
13      Object to the form of the question.
14  THE WITNESS:
15      Don't know the case.
16  BY MR. STECKLER:
17     Q.  You're an active litigant in a case in
18  Louisiana, aren't you?
19     A.  Well, sometimes we get sued.  And you
20  have to be active if you're defending yourself.
21     Q.  I get it.  I get it.
22      As an attorney, have you been a litigant
23  in Louisiana on behalf of Auto-Owners Insurance
24  Company?

Page 43

1      A.  Not to my recollection.
2      Q.  Only a defendant or an insurance --
3  retain the insurance defense counsel?
4      A.  Notwithstanding the case at hand, I
5  don't remember Auto-Owners being a defendant other
6  than the cases that have been presented today
7  before my time, without my knowledge.
8      Q.  I understand.  I understand.
9      Do you know whether Auto-Owners collects
10  premiums from Louisiana residents?
11     A.  I do not believe that we collect premium
12  from Louisiana residents, but I'm not sure that we
13  know or have reported to us who is and who is not
14  a Louisiana resident.
15     Q.  Do you know whether there are
16  independent agents that are soliciting business
17  for Louisiana residents and insureds?
18     A.  We do not have any doing that, no.
19     Q.  But Louisiana residents can buy a policy
20  from you in other states?
21     A.  I don't know of a prohibition from them
22  wanting a policy from us for a risk outside of
23  Louisiana.
24     Q.  But we also know from you that it may

Page 44

1  cover a risk in Louisiana?  You all write policies
2  that cover risks in Louisiana, don't you?
3  MR. SAPORITO:
4      Object to the form of the question.
5  It's not the testimony.
6  THE WITNESS:
7      I don't know that we cover risks in
8  Louisiana.  We cover claims made against our
9  insureds in Louisiana, which is different
10  than a risk, as I would view that.
11  BY MR. STECKLER:
12     Q.  And that's semantics, and I'm not an
13  insurance guy, so I really don't have a clue.
14     A.  I don't really want to make it perceived
15  as a semantic, because I don't view it as a
16  semantic.
17     Q.  I understand that.  And my point is, is
18  you're selling policies.  That makes insurance
19  company money, right?
20     A.  Yes.
21     Q.  The more policies you sell, the more
22  money you make.  And some of those policies that
23  you sell are to companies that may do business in
24  Louisiana, correct?

Page 45

1      A.  It is possible.
2      Q.  Right.  And you do underwriting on those
3  policies, right?
4      A.  That would be my understanding, yes.
5      Q.  And you all at times have decided, I
6  assume -- if you know -- to write policies that
7  may involve risks that can arise in Louisiana?
8  MR. SAPORITO:
9      Object to the form.
10  BY MR. STECKLER:
11     Q.  Or liabilities that could arise in
12  Louisiana?
13  MR. SAPORITO:
14      Object to the form of the question.
15  THE WITNESS:
16      I don't know if we've made a decision to
17  accept risks in Louisiana, but we accept the
18  fact that people might have an accident in
19  Louisiana, which I find to be a fundamental
20  different analysis and decision.  And that's
21  why -- I don't want to have a semantics
22  dispute, but I see it differently as to how
23  we actually look at the risk.
24

12 (Pages 42 to 45)

Confidential - Subject to Further Confidentiality Review

Page 46

BY MR. STECKLER:
1
2    Q.   I understand.  I understand.
3        But that's something that's foreseeable
4    to the company, that it could very well have a
5    loss in Louisiana?
6    A.   Oh, it's foreseeable that we would have
7    a loss in Louisiana.
8    Q.   Right.  And that's part of underwriting
9    is you guys look at all those various factors
10   before you issue a policy.  And I'm not just
11   talking about automobile but construction or CGL
12   or whatever it may be, you do that?
13   A.   As I understand your question, yes.
14   Q.   And in fact, I take it, based upon the
15   number of claims paid to Louisiana residents, that
16   the company's aware that it can't just avoid the
17   state of Louisiana completely, can it?
18   A.   Um --
19   MR. SAPORITO:
20       Wait.  Let me object to the form of the
21   question.  If you're restating Interrogatory
22   13 --
23   MR. STECKLER:
24       I'm not restating Interrogatory 13.

Page 47

1    MR. SAPORITO:
2        Well, you're saying Louisiana residents.
3    And that's the issue, and that's what the
4    objection is.
5    MR. STECKLER:
6        Well, they're Louisiana -- well, you
7    know -- and you know what -- you know, Jerry,
8    I'll tell you what.  Every time we have this
9    argument, it further supports the reason why
10   the information that you've provided to us is
11   so poor and misleading.  Because we really
12   don't know what these 340 claims involve.
13   I'm told it's claims paid in Louisiana.  That
14   is -- really doesn't say whether they're
15   incidences involving companies that you've
16   insured that are doing business here, they're
17   residents.  We've heard speculation it could
18   be a bar fight.  We've heard it's an auto
19   accident, but we really don't know.  But I've
20   got to tell you, it's a lot of claims.  And
21   it makes me wonder why I'm not getting that
22   detail.  And I think that that's relevant and
23   important for us in figuring out
24   jurisdiction.

Page 48

1    MR. SAPORITO:
2        This is not the argument on any motion
3    right now --
4    MR. STECKLER:
5        No, no.  I'm just telling you --
6    MR. STECKLER:
7        -- this is the -- a search that was done
8    in response to Judge Fallon telling us to go
9    back five years.  That's what we did.
10   MR. STECKLER:
11       I understand that.  But the way you've
12   broken it out does not really articulate for
13   us whether we have incidents occurring in
14   Louisiana or residents simply being paid and
15   under what types of policies.  And that's
16   why -- and I apologize for the question, and
17   I don't mean to be misleading, and I don't
18   mean to mess with the words.  I'm having
19   trouble articulating that because it's a
20   sword and a shield for you, okay?  All I know
21   is Louisiana people are being paid to the
22   tune of about a half a million dollars a year
23   for five years.  I don't know the
24   circumstances.

Page 49

1    BY MR. STECKLER:
2    Q.   I'm trying to ascertain that from you,
3    sir, and I apologize if it's confusing.
4    MR. STECKLER:
5        And I'm sorry for the objections.  I'm
6    not trying to --
7    MR. SAPORITO:
8        That's okay.  I made the objection, and
9    it is what it is.
10   MR. STECKLER:
11       Exactly.  And I'm going to have to seek
12   this info.  And I'm sorry, I don't want to
13   have to create more problems, but I think
14   it's relevant.
15   BY MR. STECKLER:
16   Q.   And so I don't know whether this is
17   based upon adjusting -- I mean underwriting.  I
18   don't know whether these numbers are based upon
19   underwriting risks or decisions that are being
20   made or whether they're happenstance.  Do you have
21   an understanding of that?
22   A.   I understand the question you're asking
23   me.  And as I've stated before, I don't know that
24   this is responsive to claims paid to Louisiana

13 (Pages 46 to 49)

Confidential - Subject to Further Confidentiality Review

Page 50

1  residents, because that's a very specific defined
2  area, as opposed to claims that are paid that may
3  be in litigation in Louisiana that may not involve
4  a Louisiana resident. And I can't tell you the
5  answer based on the answer to interrogatory, to
6  that question.
7      Q.  Right. And you can't tell also from
8  this information whether these were involving
9  incidents that occurred in Louisiana either?
10     A.  Correct.
11     Q.  Okay. And -- all right. We're now on
12  the same page. We have no information, we just
13  know there are 340 claims, and that's what it
14  involves, is the total dollars per year,
15  correct --
16     A.  That are related to a search of
17  Louisiana --
18     Q.  Right.
19     A.  -- related claims, yes.
20     Q.  Based upon your 20 years of experience
21  at Auto-Owners Insurance, is there a way I can go
22  back and figure out the circumstances of the
23  incident in question or --
24     A.  As I understand, with my 20 years of

Page 51

1  experience with the company, we would have to have
2  the IT individuals create some sort of computer
3  program that would go and look at the 340 claims
4  and see if that data will show as claim numbers.
5  And by those claim numbers, you would have to pull
6  the claim files to see whether or not it was a
7  suit in Louisiana or a claimant that was a
8  resident of Louisiana and the circumstances
9  relevant to each particular claim file.
10     Q.  Okay.
11     A.  And those would have to be searched
12  manually.
13     Q.  Okay. All right. Based upon this,
14  though, these would indicate to you -- or I don't
15  know whether you know -- that these are claims
16  paid to Louisiana claimants. Does that mean
17  something more significant to you, that money from
18  Auto-Owners Insurance and their related entities
19  is going to Louisiana? Or does that not -- is
20  that not what it's about? Do you know? I don't
21  know.
22     A.  I'm not -- I didn't answer the
23  interrogatory, so I'm not sure if the beginning of
24  it, "Louisiana claimant," has a defined meaning

Page 52

1  for the interrogatories. I don't know.
2      Q.  All right. Thank you. That helps me as
3  well.
4          Are there any sort of intercompany
5  cost-sharing agreements with respect to litigation
6  or underwriting?
7      A.  We have -- we have an agreement or
8  contract where we will allocate, you know -- the
9  employees from Auto-Owners Insurance Company that
10  are doing work on behalf of any of the subsidiary
11  companies will be reimbursed under that contract
12  or agreement. But that's the only cost-sharing
13  agreement that I'm aware of that I think you're
14  referring to.
15     Q.  When you did your affidavit in this
16  case, did you look at the underwriting to
17  determine whether Hinkle Drywall was doing drywall
18  contracting in other states?
19     A.  I don't recall looking at an
20  underwriting file of theirs. I do remember
21  looking at some of the dec sheets and being aware
22  it was a Florida business and a Florida-issued
23  policy, but I don't remember looking at any
24  further underwriting materials regarding the

Page 53

1  Hinkle operation.
2      Q.  What sort of background research did you
3  do to figure out whether or not Hinkle Drywall was
4  doing work beyond the state of Florida?
5      A.  We looked at the claims that had been
6  presented. And our awareness of any -- I guess
7  any claims that had been submitted, we weren't
8  aware of any further operations or anything by
9  Hinkle.
10     Q.  And that's what I was wondering, is
11  whether you took the step to look at the
12  underwriting to see whether, in fact, that while
13  they may be a Florida business, whether, in fact,
14  they were doing work in Georgia, let's say, or
15  Mississippi or someplace else?
16     A.  Yeah, I don't remember looking at the
17  underwriting file materials on that.
18     Q.  All right. Do you all have any
19  employees that you're aware of in Louisiana that
20  assist you with claims here?
21     A.  It's my understanding we do not have any
22  employees in Louisiana.
23     Q.  You clearly could keep some busy,
24  though.

14 (Pages 50 to 53)

Confidential - Subject to Further Confidentiality Review

Page 54

1      A.  Excuse me?
2    MR. SAPORITO:
3        Don't answer that.  That's just a
4    comment.
5    BY MR. STECKLER:
6      Q.  I'm just saying, you've got the volume
7    and the work.  Just, if you ever considered it, it
8    might be nice.
9        What is your retention policy with
10   respect to documentation on claims, do you know?
11     A.  I have seen the retention policy, but it
12   has been such a long period of time, I don't
13   recall what the retention policy is.
14     Q.  Do you know anything about those 340
15   claims?  Do you have any specific information
16   about any of them?  Did you look -- did you do the
17   search?  Was this solely done by Ms. Lopilato?
18     A.  I was not involved in the search itself
19   at all, no.
20     Q.  When you get claims that are out of
21   state, like in Louisiana, do you have a certain
22   policy or procedure that you follow?
23     A.  I wouldn't say that we have a certain
24   policy or procedure, no.

Page 55

1      Q.  There's no written policy on how you're
2    going to handle claims in states that you don't
3    generally write policies?
4      A.  Unless there's something in our
5    claims-handling guide that refers to this, I don't
6    believe that we have a specific policy for
7    out-of-state claims.
8      Q.  No procedure manual that dictates how
9    those are going to be handled?
10     A.  Not that I recall.
11     Q.  All right.  And who assigns the cases --
12   for example, if you get a claim in from Louisiana,
13   whether it's a Louisiana incident or a claim, who
14   assigns that claim to the firm to handle and to do
15   the adjustment and all of that on the claim?
16     A.  Most of the time, the claim branch will
17   report the claim to home office legal and that
18   home office legal individual will either contact
19   someone directly or contact the branch with the
20   name of the person to contact.
21     Q.  So if the policy is purchased in
22   Florida, they would go back to the Florida branch,
23   say, Hey, I've got a suit in Louisiana, I need
24   counsel, whatever, and then the Florida branch

Page 56

1    would go ahead and take steps to secure legal
2    counsel and maybe do any of the adjusting or
3    evaluation of the claim?
4      A.  Yes.
5      Q.  It doesn't necessarily go right to you?
6    You might be supervising it, but it wouldn't go
7    directly to you or to any other senior attorney?
8      A.  It wouldn't necessarily go to any other
9    attorney.  But considering it's a state outside of
10   the familiarity of the underlying state, they will
11   very likely consult with the attorney at the home
12   office because they may be unfamiliar with hiring
13   an attorney in Louisiana.
14     Q.  And do you have, internally in your
15   office, attorneys that have expertise and
16   experience in retaining counsel in Louisiana or
17   Texas or states where you don't usually write
18   business?
19     A.  I would say no.
20     Q.  Okay.  I mean, you've talked about your
21   experience dealing with counsel in Louisiana.  I'm
22   wondering whether you're the go-to guy when these
23   situations arise?
24     A.  I would say that my circumstances would

Page 57

1    be similar to someone else that had a claim from a
2    different branch that would come to them.  They
3    would be in a similar situation of mine, if it was
4    a different branch office where the claim
5    originated.
6      Q.  Gotcha.  What steps did you undertake to
7    determine whether or not premiums were collected
8    from Louisiana residents?
9      A.  We -- I reviewed the -- we have a chart
10   that shows us which states that we're registered
11   and licensed to do business in.  And as we were
12   not registered or licensed to do business in
13   Louisiana and had no agents in the state of
14   Louisiana and issued no policies in the state of
15   Indiana -- Louisiana, rather, my conclusion was
16   that we were not accepting money from people in
17   Louisiana.
18     Q.  Okay.  And how unusual is it, in your
19   opinion, for example, for a company in Louisiana
20   that does business, let's say, in the Midwest
21   where, you know, you all clearly have a stronger
22   presence, to buy a policy from you for that type
23   of work?
24     A.  I would think it would be rather

15 (Pages 54 to 57)

Confidential - Subject to Further Confidentiality Review

Page 58

1 unusual. Since the business from Louisiana
2 wouldn't be seeing any advertising from our
3 company, wouldn't be seeing our presence in the
4 state of Louisiana, and it would be, to my
5 conclusion, rather unlikely they would be looking
6 to us to find coverage.
7     Q.  It wouldn't have anything to do with
8 pricing?  For example, I know just for my own
9 experience on auto insurance, I really don't care
10 where the company's located or where they've
11 advertised.  I don't like the little gecko
12 commercials, or GEICO, or whatever it's called.
13 I'm looking at pricing and whether, in fact, I
14 think it's a good policy for me.
15     Why would the advertising really be an
16 issue and not just a pricing and finding a company
17 that's going to provide me a policy that's
18 reasonable and provide coverage?
19     MR. SAPORITO:
20         Object to speculative form of the
21     question.
22     THE WITNESS:
23         Yeah.  I don't know about the pricing in
24     Louisiana, so I really couldn't draw any

Page 59

1     conclusions about how a policyholder in
2     Louisiana would look to us for pricing on
3     their policies.
4 BY MR. STECKLER:
5     Q.  And the reason I ask is you basically
6 said here in your affidavit that Owners Insurance
7 Company does not collect premiums from Louisiana
8 residents.  And my understanding is the steps that
9 were taken to figure that was, we're not licensed
10 in Louisiana, therefore it's not likely that we're
11 doing that.  And I'm just trying to figure out how
12 you came to that conclusion.  Because in this day
13 and age, if you don't mind me saying, it's my
14 opinion that a lot of businesses are more national
15 in nature than sort of provincial.  Does that make
16 sense?
17     MR. SAPORITO:
18         Object to the speculative form of the
19     question.
20 BY MR. STECKLER:
21     Q.  Does that make sense to you, what I'm
22 saying by national versus provincial?
23     A.  I can generally understand your concept,
24 yeah.

Page 60

1     Q.  And so I'm wondering if there's some
2 other form and fashion that you could have made
3 this conclusion in your affidavit.  Could you have
4 searched premiums or something on your database to
5 figure this information out?
6     A.  I'm not aware of a database that we
7 would have searched to come to that conclusion.
8     Q.  And that's what I'm getting at, is when
9 it talks about collecting premiums, I'm wondering
10 whether you can sort of search on your system
11 premiums collected, location of where the premiums
12 are coming from?
13     A.  I'm not aware of a search for that.
14     Q.  Because -- and no offense, and I don't
15 mean to challenge what you did here -- it seems
16 like you just sort of said, well, we're not
17 licensed, no way we had premiums here.  That isn't
18 necessarily true, but it was a conclusion that you
19 reached based upon your experience; fair enough?
20     A.  Those were the conclusions that I
21 reached.
22     Q.  And I'm not trying to impugn that.  I'm
23 just trying to figure out whether -- like we've
24 talked about, these cases -- whether there's a

Page 61

1 searchable means to determine whether premiums are
2 being collected from Louisiana residents, and
3 there isn't?
4     A.  Not to my knowledge.
5     Q.  Okay.  And there's no way to determine
6 whether or not companies that are being insured by
7 you all are obtaining substantial income from
8 Louisiana and using that to secure a policy from
9 you?
10     MR. SAPORITO:
11         Object to the form of the question.
12     THE WITNESS:
13         Without going to that particular
14     business or risk, I don't know how we would
15     find that out, no.
16 BY MR. STECKLER:
17     Q.  Exactly.  That's what I'm just trying to
18 figure out.
19     MR. STECKLER:
20         This has been interesting.  Thank you
21     for coming down to Louisiana for your
22     deposition.
23         EXAMINATION
24 BY MR. SAPORITO:

16 (Pages 58 to 61)

Confidential - Subject to Further Confidentiality Review

Page 62

1    Q.   I have a couple of questions.
2         Mr. Norris, does Auto-Owners Insurance,
3    Owners Insurance, or the other related companies,
4    have they ever or are they now licensed to do
5    business in the state of Louisiana?
6    A.   They are not.
7    Q.   And do any of those companies,
8    Auto-Owners Insurance or Owners Insurance Company
9    or the related companies, do they write any
10   insurance coverage in Louisiana?
11   A.   They do not.
12   Q.   Do any of those related companies that
13   I've been discussing maintain any offices in
14   Louisiana?
15   A.   No.
16   Q.   Do any of those related companies have
17   any employees in Louisiana?
18   A.   No.
19   Q.   Does Auto-Owners or Owners or any of
20   those related companies do anything to solicit
21   business in Louisiana, advertise, TV, radio,
22   billboards, et cetera?
23   A.   No.
24   Q.   Does Auto-Owners or Owners Insurance or

Page 63

1    any of the related companies have any registered
2    agents for the service of process in Louisiana?
3    A.   No.
4    MR. SAPORITO:
5         That's all the questions I have.
6    MR. MORROW:
7         One minute.
8         (Brief recess was taken.)
9    BY MR. SAPORITO:
10   Q.   Mr. Norris, earlier you heard the
11   testimony of Ms. Lopilato's when she was asked
12   about who for Owners or Auto-Owners was involved
13   in looking at coverage issues involved in this
14   litigation.  Do you remember that testimony?
15   A.   Yes.
16   Q.   Who is it, to your knowledge, in the
17   company that's involved in these different Chinese
18   drywall litigation cases that is looking at
19   coverage issues?
20   A.   Ms. Lopilato is the individual that's
21   responsible for the coverage issues in the Chinese
22   drywall claims.
23   Q.   In your testimony earlier, you were
24   asked a question about who was involved or who was

Page 64

1    handling Chinese drywall claims.  And I want you
2    to explain the difference between who's handling
3    coverage issues and who's handling liability
4    issues.
5    A.   Yes.  We have Chinese drywall claims
6    that will come from different branch offices that
7    are reported to the home office legal department.
8    And the attorney or senior attorney working with
9    that branch office may be involved with the
10   liability claims involving Chinese drywall, but
11   that's entirely separate from a coverage issue
12   involving the Chinese drywall that Ms. Lopilato's
13   would handle.
14   MR. SAPORITO:
15        Okay.  That's all I wanted to clear up.
16   I have no further in questions.
17        RE-EXAMINATION
18   BY MR. STECKLER:
19   Q.   And you do intend to find coverage for
20   all these claims, don't you?
21   MR. SAPORITO:
22        Object to the form of the question.
23   BY MR. STECKLER:
24   Q.   Because it would be wrong not to,

Page 65

1    wouldn't it?
2    MR. SAPORITO:
3         Object to the form of the question.
4    MR. STECKLER:
5         Thank you for your time today.
6         (Document marked as EXHIBIT Number #1
7    for identification.)
8         (END OF TESTIMONY AT 1:44 P.M.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

17 (Pages 62 to 65)

Confidential - Subject to Further Confidentiality Review

Page 66

ACKNOWLEDGMENT OF DEPONENT

1
2
3          I,_____, do hereby
4    certify that I have read the foregoing pages and
5    that the same is a correct transcription of the
6    answers given by me to the questions therein
7    propounded, except for the corrections or changes
8    in form or substance, if any, noted in the attached
9    Errata Sheet.
10   _____
11       SCOTT NORRIS, ESQUIRE          DATE
12
13   Subscribed and sworn to before me this
14   _____ day of _____, 20 _____.
15   My commission expires: _____
16
17   Notary Public
18
19
20
21
22
23
24

Page 68

1         - - - - - -
2         LAWYER'S NOTES
3         - - - - - -
4    PAGE LINE
5    _____ _____ _____
6    _____ _____ _____
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____

Page 67

1         - - - - - -
2         ERRATA
3         - - - - - -
4    PAGE LINE  CHANGE & REASON
5    _____ _____ _____
6    _____ _____ _____
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____ _____
22   _____ _____ _____
23   _____ _____ _____
24   _____ _____ _____

Page 69

CERTIFICATE

1          I, DIXIE B. VAUGHAN, Certified Court
2    Reporter (LA), NCRA Registered Professional
3    Reporter and Certified LiveNote™ Reporter, do
4    hereby certify that prior to the commencement of
5    the examination, SCOTT NORRIS was duly
6    sworn by me to testify to the truth, the
7    whole truth and nothing but the truth.
8          I DO FURTHER CERTIFY that the foregoing
9    is a verbatim transcript of the testimony as taken
10   stenographically by and before me at the time,
11   place and on the date hereinbefore set forth, to
12   the best of my ability.
13          I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of
15   any of the parties to this action, and that I am
16   neither a relative nor employee of such attorney or
17   counsel, and that I am not financially interested
18   in the action.
19
20
21   _____
22   DIXIE B. VAUGHAN
     Certified Court Reporter (LA)
     Registered Professional Reporter
23   Certified LiveNote™ Reporter
24

18 (Pages 66 to 69)