## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE WILKINSON** |
| **THIS DOCUMENT RELATES TO:** | |
| **Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al., Case No. 2:09-cv-6687 (E.D.La.)** | |

### PSC'S RESPONSE IN OPPOSITION TO TAISHAN'S MOTION PURSUANT TO RULES 12(B)(2), 55(C), 60(B) AND 62.1 TO VACATE THE DEFAULT JUDGMENT, DISMISS THIS ACTION AND TO SEEK REMAND FROM THE COURT OF APPEALS

## I.    INTRODUCTION

This litigation began eighteen months ago on May 1, 2009, when Plaintiffs filed a class action suit in the United States District Court for the Eastern District of Virginia on behalf of themselves and all other similarly situated owners and tenants alleging damages from Chinese-manufactured drywall installed in their homes. *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, --- F.Supp.2d ----, 2010 WL 1445684, *1 (E.D. La. Apr. 8, 2010). Plaintiffs sued Defendants Taishan Gypsum Co., Ltd, f/k/a Shandong Taihe Dongxin Co. Ltd.[1] ("Taishan"), Tobin Trading, Inc., Venture Supply, Inc. ("Venture Supply"), Harbor Walk Development, LLC and The Porter-Blaine Corp. *Id.* On May 26, 2009, Plaintiffs filed a First Amended Complaint against these Defendants. *Id.* Service of this Complaint was perfected on Taishan, the manufacturer of the problematic drywall, in China on August 3, 2009. *Id.* Thereafter, on October 13, 2009, the case was transferred to the Eastern District of Louisiana and consolidated with MDL 2047. *Id.*

---

[1] On September 10, 2007, Shandong Taihe Dongxin Co., Ltd., which was a subsidiary company controlled by Beijing New Building Material Co., Ltd. ("BNBM"), changed its name to Taishan Gypsum Co., Ltd. *See* Affidavit of Russ M. Herman ("Herman Aff."), attached hereto as Exhibit "A."

On October 30, 2009, Plaintiffs filed a motion to expand the class definition as it pertained to Taishan from a Virginia state class to a national class. Rec. Doc. No. 396. The Court granted this motion, Rec. Doc. 469, and Plaintiffs thereafter filed a Second Amended Complaint. Rec. Doc. No. 470. Because Taishan failed to timely respond to the First Amended Complaint or enter its appearance, on November 20, 2009, this Court entered a preliminary default judgment against the company. *Chinese-Manufactured Drywall*, 2010 WL 1445684 at *1.

The Court then scheduled an evidentiary hearing that was intended to serve as a bellwether trial to ascertain the scope and extent of appropriate remediation in Plaintiffs' homes. *Id.* at *1, *27-28. The Court permitted interested parties to intervene in the litigation. *Id.* at *1. Knauf Plasterboard Tianjin Co. Ltd. and The Mitchell Company, Inc. intervened in the case. In addition, fourteen individual plaintiffs (comprising seven married couples) intervened: Deborah and William Morgan, Jerry and Inez Baldwin, Joe and Cathy Leach, Robert and Lisa Orlando, Fred and Vanessa Michaux, Preston and Rachel McKellar, and Steven and Elizabeth Heischober. *Id.* The litigating parties engaged in vigorous and contested pretrial discovery: they exchanged documents, took depositions, designated experts, exchanged expert reports, and filed numerous *Daubert* and *in limine* motions. *Id.* at *2.

On the eve of trial, Intervenors Knauf and Mitchell withdrew from the case. *Id.* Following a non-jury evidentiary hearing on the Intervening-Plaintiffs' claims, the Court issued detailed Findings of Fact and Conclusions of Law. *Id.* Then, on May 11, 2010, the Court entered a default judgment against Taishan and in favor of the Intervening-Plaintiffs. Rec. Doc. No. 3013.

After remaining silent and sitting on the sidelines for over a year, on June 10, 2010, Taishan finally entered its appearance in this case, Rec. Doc. No. 3669. Immediately, Taishan

appealed the Court's default judgment to the Fifth Circuit Court of Appeals.[2]  Rec. Doc. No. 3670; 5th Cir. Dkt. No. 10-30568.  Since that time, Taishan has been an active litigant in this Court, determined to vacate the default judgment and dismiss this action against it.[3]

In addition to pursuing its appeal in the Fifth Circuit, Taishan filed an opposition to Intervening Plaintiffs' Counsel's Petition for Fees and Costs.  Rec. Doc. No. 4307.  Therein, Taishan argued that this Court lacked jurisdiction to award fees since Plaintiffs allegedly did not properly serve Taishan with the Second Amended Complaint and Intervening-Plaintiffs did not serve the company with their motion to intervene.[4]  *Id.*, Memo. in Opp. at 3-4.  The Court disagreed with Taishan, ruling that because "it is undisputed that the First Amended Complaint was properly served upon Taishan" and because the motion to intervene and the Second Amended Complaint "did not assert any new claims for relief against Taishan[,]" the Court has sufficient jurisdiction over Taishan to rule on fees.[5]  Rec. Doc. No. 4872 at 6-7.

Unsatisfied with the Court's ruling, on September 3, 2010, Taishan filed a motion to

---

[2]  Taishan's appellate brief was originally due on October 13, 2010, *see* 5th Cir. Dkt. No. 10-30568, Briefing Notice dated 9/3/2010 at Doc. No. 511224258.  However, that briefing was stayed and Taishan has since filed a Notification of Substantial Issue Pursuant to FRAP 12.1 and Unopposed Motion to Remand, attached hereto as Exhibit "B."

[3]  Taishan's counsel, Joe Cyr, apparently also seeks the dismissal of Taishan's subsidiaries and related entities from these MDL proceedings, even though he has not entered his appearance for these defendants.  *See* Transcript of Status Conference, 10/14/10, at pp. 22:1-23:2, attached hereto as Exhibit "Y."

[4]  Because of Taishan's belated appearance in this case and in order to respond to its contentions, the PSC is currently undergoing the time-consuming and expensive process of serving the Second Amended Complaint upon Taishan pursuant to the Hague Convention.  The Complaint has been translated and submitted to the central authority in China responsible for serving the defendant.  *See* Statement from APS International, Ltd., attached hereto as Exhibit "C."

[5]  The Court held that Taishan's Notice of Appeal did not divest it of jurisdiction to determine attorneys' fees and costs, *citing, Bank of La. v. Sungard Availability Svcs., L.P.*, 2010 WL 1189496, at *1 (5th Cir. Mar. 29, 2010); *Kira, Inc. v. All Star Maint., Inc.*, 294 Fed.Appx. 139, at **2 (5th Cir. 2008); *Proctor & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 524-25 (5th Cir. 2002).  Rec. Doc. No. 4872 at 3 n.2.

vacate the default judgment and dismiss this action for lack of personal jurisdiction. Rec. Doc. No. 5436. The Court effectively and summarily denied Taishan's motion on the grounds that it lacked jurisdiction over this matter in light of the pending appeal. Rec. Doc. No. 5504. Taishan has conceded that the Court was correct to deny its motion. *See* Transcript of Status Conference, 10/14/10, at pp. 19:22-20:1, attached hereto as Exhibit "Y."

Persistent in its course to escape this litigation, Taishan filed another similarly styled motion one week later on September 10, 2010, seeking (1) to have this Court state that it would grant Taishan's motion to vacate both the default judgment and the preliminary default judgment if the Court of Appeals remanded the case and (2) upon remand to dismiss the action for lack of personal jurisdiction and because Taishan allegedly was not properly served with the Second Amended Complaint or the motion to intervene. Rec. Doc. No. 5515.

Clearly, Taishan wants to get out of this case. Despite the fact that it ignored the First Amended Class Action Complaint, sat back, did nothing and waited for over a year, during which time a preliminary and then a final default judgment were entered against it, Taishan now argues for the first time that because it is a Chinese company, it has no business defending claims in the United States resulting from the drywall it manufactured in China. Unfortunately for Taishan, it failed to raise any of these points earlier before this Court and chose instead to appeal the default judgment to the Court of Appeals, thereby divesting this Court of jurisdiction. Apparently, Taishan has changed its strategy and now wishes to have its appeal remanded so it can obtain a ruling here.[6]

However, with regard to service of the motion to intervene and the Second Amended Complaint, Taishan is rehashing the same arguments it made in its response to the Petition for Fees and Costs and upon which this Court already ruled more than two months ago. The Court

---

[6] *See* Court Order, attached hereto as Exhibit "G"; *see also* Exhibit "B."

4

previously held that "[t]he Motion to Intervene filed by the Intervening Plaintiffs did not raise any additional claims against Taishan and indicated only that Intervening Plaintiffs had an interest in the default judgment proceedings ... [and, thus,] service of this Motion on Taishan in accordance with Rule 4 was not required." Rec. Doc. No. 4872 at 6-7. The Court further held that, "whether or not the Second Amended Complaint was properly served upon Taishan, the Court has sufficient jurisdiction to award attorneys' fees as a result of the proper service of the First Amended Complaint since Intervening Plaintiffs' claims were properly within the First Amended Complaint."[7] *Id.* at 7.

Taishan has offered no new facts or legal basis to support its position. It simply argues that "[t]he Court is not bound to follow its previous decision." Taishan Mem. at 19 n.9. Thus, Taishan's "new" motion urging dismissal of this action against it on the grounds of improper service is nothing more than an untimely motion to reconsider, and for that reason it should be summarily denied.

With regard to the motion to dismiss for lack of personal jurisdiction, as shown in more detail below, Taishan knowingly and deliberately held itself out to the world as a supplier of drywall to the U.S. and other world markets. Taishan admits it manufactured its gypsum boards on a made-to-order basis and sold the subject drywall to Venture Supply, a company from Norfolk, Virginia, for installation in homes in Virginia. Further, public records and documentation produced by Venture Supply make clear that Taishan has additional ties to the United States through a complex chain of interrelated companies and their subsidiaries and

---

[7] In addition to being a defendant in *Germano*, Taishan has been named in other Omni complaints that bring close to 1000 litigants into these MDL proceedings. *See, e.g., Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et. al.*, Case No. 2:10-cv-00361 (E.D. La.) (Omnibus II, II(A), and II(B)); *Gross, et al. v. Knauf Gips KG, et. al.*, Case No. 2:09-cv-6690 (E.D. La.) (original complaint, Omnibus III, and Omnibus III(A)). These Complaints are in the process of being served upon Taishan under the Hague Convention. *See* Exhibit "C" hereto.

holding entities.  The Chinese manufacturer intentionally targeted this country for expanded sales of its products.

As of the date of this response to Taishan's motion, the PSC has not yet had an opportunity to conduct jurisdictional discovery of the manufacturer to fully flesh out the facts supporting our position.[8]  The PSC has served notices of deposition on Taishan and related parties, and those requests are outstanding.[9]  However, until the much-needed jurisdictional discovery is complete, a full airing of the issues germane to Taishan's motion will not be possible.  Accordingly, given the importance of this substantial issue, the PSC requests leave of Court to supplement this response upon full disclosure by Taishan of relevant facts pertaining to jurisdiction.  Even without that discovery, though, there is sufficient evidence to deny Taishan's latest motion to vacate the default judgment entered against it.

II.    **STATEMENT OF FACTS**

   A.    **Circumstances Leading to the Importation of Chinese Drywall into the United States and Problems Arising Therefrom.**

Following Hurricanes Katrina and Rita, the demand for gypsum drywall in the United States far exceeded the capacity of domestic manufacturers to produce the staple product.  This critical shortage of drywall led numerous businesses to look to foreign sources for their needs.  *See Chinese-Manufactured Drywall*, 2010 WL 1445684 at *1.  "As a result, drywall manufactured in China was brought into the United States and used in the construction and

---

[8]  Pursuant to the Joint Stipulation on Briefing Schedule for Taishan's Motion, Rec. Doc. No. 5615 (Sept. 28, 2010), our response to Taishan's motion is due within fourteen days of receipt of Taishan's Manufacturer Profile Form ("MPF").  Although the MPFs of Taishan and Tai'an Taishan Plasterboard ("TTP") were provided on October 14, 2010, these MPFs are deficient and incomplete.  *See* Letter email from L. Davis to R. Stanley dated Oct. 22, 2010, attached hereto as Exhibit "D."

[9]  *See* Notices of Oral and Videotaped Deposition directed to Taishan and TTP for December 1 & 2, 2010, collectively attached hereto as Exhibit "E."  *See also* Notices of Oral and Videotaped Deposition directed to Wendy Wong, Anna Qi and Phoenix Imports, collectively attached hereto as Exhibit "F"; Court's Order dated Oct. 25, 2010 Rec. Doc. No. 6101, attached hereto as Exhibit "G."

refurbishing of homes in coastal areas of the country, notably the Gulf Coast and East Coast," primarily in Louisiana, Florida and Virginia. *Id.*[10]

Once installed, Chinese drywall causes harm and damages to homes and their residents by emitting various reduced sulfur gases and creating noxious odors. *Id.* at \*5. The sulfur gas emissions from Chinese drywall are corrosive to metals, particularly copper and silver. *Id.* at \*6. This causes damage to the structural, mechanical and plumbing systems in the home, such as the framing, heating, air-conditioning and ventilation ("HVAC") units, refrigeration coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring, as well as personal and other property, such as microwaves, utensils, electronic appliances, jewelry, and other household and personal property items. *See id.* at \*5-\*7.

Given the widespread use of Chinese drywall in the United States between 2004 and 2007, the magnitude of problems associated with it spans much of the country.[11] The public outcry demanded that certain federal and state agencies weigh in on the subject. According to the Department of Housing and Urban Development ("HUD") and the U.S. Consumer Product Safety Commission ("CPSC"), the necessary repair of homes impacted by Chinese drywall requires that all problematic drywall and all electrical wiring be removed. *See, e.g.*, Interim Remediation Guidance Summary by CPSC and HUD dated April 2, 2010 ("This Interim Remediation Guidance for homes with problem drywall calls for the replacement of: 1. all possible problem drywall; 2. all fire safety alarm devices (including smoke alarms and carbon monoxide alarms); 3. all electrical components and wiring (including outlets, switches and circuit

---

[10]  Chinese drywall was installed in hundreds of homes in Virginia.  In fact, Venture Supply imported more than 170,000 sheets of Taishan's Chinese drywall for delivery to Norfolk. *See id.* at \*3-\*4; *see also* Statement from Venture Supply Company, available at http://www.wavy.com/dpp/news/local_venture_norfolk_venture_supply_co_statement_20090408.

[11]  "The Gypsum Association states that 300 million square feet of Chinese drywall was imported in 2006-07." *See* The Insurance Offices Bulletin, Chinese Drywall: The Next Big Issue? (Mar. 1, 2010).

breakers); and 4. all gas service piping and fire suppression sprinkler systems.") (attached hereto as Exhibit "H"). Thus, to properly repair the damaged portions of dwellings that are located behind the Chinese drywall, the Chinese drywall and any other drywall must be removed. *See also Chinese-Manufactured Drywall*, 2010 WL 1445684 at *26-*34.

### B. Taishan Manufactured and Directed the Sales of its Drywall for Use in Virginia and Elsewhere in the United States.

Publicly available documents and correspondence obtained from defendant Venture Supply evidence a specific intent on the part of Taishan not only to manufacture drywall to made-to-order specifications for Venture Supply for use in Virginia, but also to sell and distribute its products generally to the U.S. and worldwide markets. Contrary to Taishan's claim that it sold only two shipments of drywall to Venture Supply in the United States, Taishan bragged in its promotional materials that its products, including drywall, were "exported to many countries such as the U.S.A." *See* Taishan's archived Web Page of Jan. 28, 2005, attached hereto as Exhibit "I." Taishan proclaimed:

> We have a self-supported import and export ability, our products not only sell well in our domestic market **also export to many countries e.g.** U.A.E., Indonesia, India, Russia, **U.S.A.** etc. The high quality plasterboard is in accordance with ISO9001, 2000 standard.

Exhibit "J," hereto (emphasis added). Taishan plainly held itself out as a provider of drywall to the U.S. market and actively sought to increase its share of that market through its dealings with Venture Supply.

Throughout their dealings, Taishan and Venture Supply were actively seeking to expand the sales and distribution of Taishan's drywall in the United States. The documents produced by Venture Supply are replete with examples of Taishan's efforts in this regard. Taishan's representative Frank Clemm wrote to Venture Supply representative Phillip W. Perry expressing Taishan's intent to sell its products in this country: "First, it is our hope to cooperate with you to

enlarge the market at your end." *See* Exhibit "K" (email dated 11/30/05 from Frank Clemm to

Phillip Perry).  Again, Taishan emphasized its goal to become "one of the biggest gypsum board

producing factor[ies]" for the U.S. market:

> It is our hope to cooperate with you especially in the field of
> gypsum board.  **We know that you are one of the powerful**
> **companies to deal with the gypsum products in your country**.
> And we would like to introduce ourself as one of the biggest
> gypsum board producing factory with the annual production of
> more than 200 million square meters.  We are confident that there
> is a bright future for our cooperation by joint efforts.

*See* Exhibit "L" (12/2/05 fax from Taishan representative Frank Clemm to Venture Supply owner

Sam Porter) (emphasis added).

Taishan's desire to expand its market in the United States quickly manifested into a plan

for Venture Supply to serve as Taishan's representative in this country so it could broker deals

with other suppliers across the U.S.  Venture Supply's representative reported back to Sam

Porter, owner of Venture Supply, after a trip to Taishan:

> They said that a lot of American companies have made enquiries,
> but I was the first to show enough interest to make the trip.  If we
> continue this size purchases or increase the volume, they will make
> us the USA representative.

*See* Exhibit "M" (11/7/05 email from Phillip Perry to Sam Porter and Venture Supply employee).

Taishan was certainly aware of Venture Supply's efforts on its behalf:

> In that Porter/Blaine is going to be a major purchaser of your
> products, they have asked me to approach you with the idea of
> becoming the exclusive distributor of the Shandong Taihe Dongxin
> Co., LTD. in the USA.  This is an important priority with them.
> Please give this serious consideration.

*See* Exhibit "N" (11/10/05 email from Phillip Perry to Frank Clemm).

Taishan's efforts to sell its drywall in the U.S. were successful from the start.  It is

undisputed that Taishan manufactured the Chinese drywall installed in the Intervening Plaintiffs'

homes in Virginia, which were the subject of the trial on the costs of remediation leading to the

default judgment entered against this Defendant.[12] *Chinese-Manufactured Drywall*, 2010 WL 1445684 at *3. As this Court already found, on November 9, 2005, Venture Supply provided a letter of credit to Taishan in the amount of $429,600.00. *Id.*, *citing*, Herman Aff. ¶ 5. This letter of credit was intended for the purchase of "120,000 sheets of drywall to meet all USA ASTM ratings and fire rating standards." *Id*. Because Taishan "was not clear on U.S. ASTM ratings[,]" it asked Venture Supply to "rely solely on Chinese ratings." *Id.*, Herman Aff. ¶ 7.

Taishan contracted with Venture Supply by way of agreements written in English to manufacture drywall that bore one identification label showing that the gypsum board was "Distributed by Venture Supply, Inc." and another that showed "Venture Supply, Inc. MFG. Shandong Taihe Dongxin, Co., Ltd., China." *Id*. at *4, Herman Aff. ¶ 6; *see also* Exhibit "O" (Taishan MPF at 2); Exhibit "P" (TTP MPF at 2).

Pursuant to their agreement, on December 25, 2005, Taishan shipped 2,000 pallets of this drywall to Venture Supply from the Chinese Port of Loading, Lianyungang. *Id*. at *3, Herman Aff. ¶¶ 10-11. The shipment arrived in the United States in February, 2006. *Id*. On December 16, 2005, a second contract was signed between Venture Supply and Taishan "for 100,000 sheets on 2,000 pallets to be shipped to Norfolk, Virginia." *Id*. at *4, Herman Aff. ¶ 9. However, "the second shipment of drywall was reduced to 53,912 sheets on 586 pallets, which was shipped onboard the M/V Atlantic Fortune from the Chinese Port of Loading, Lianyungang." *Id.*, Herman Aff. ¶ 12. The shipment was offloaded in Camden, New Jersey. *Id.*

Thereafter, Venture Supply shipped the Chinese drywall to each of the Intervening-Plaintiffs' homes, and another company related to Venture Supply, Porter-Blaine Corporation,

---

[12]  Taishan admits that "Taishan manufactured drywall to US dimensions on a made-to-order OEM basis on two isolated occasions for a U.S. purchaser, Venture Supply, Inc." Taishan MPF at 2, attached hereto as Exhibit "O"; *see also* TTP MPF at 2 (admitting that "TTP manufactured drywall to US dimensions on a made-to-order OEM basis"), attached hereto as Exhibit "P."

installed the drywall in the homes. *Id.*, *citing* 2/19/2010 Trial Transcript, Vol. I at p. 17(9-14), p. 13(16-20), p. 16(22)-17(2), p. 20(17-24) (Herman Opening).

Taishan's shipments of drywall for the United States were not limited to Virginia. By November, 2005, Taishan was already selling to other suppliers in addition to Venture Supply. As Phillip Perry reported:

> I ran into another American from Texas at the factory. He said he was from the HGC company. Claimed he was the big buyer, but Frank [Clemm] said he was only buying 1000 sheets and he wanted to use containers to ship.
>
> ...
>
> Frank was telling me about the many inquiries he has been getting, and I again suggested that these leads should be passed to us to investigate. We are buying and the others may want to buy, but do not know how, do not have the financing to make a large enough purchase, or may just be put off by the idea of importing. He said that he is thinking along those lines. I will hit him again with this.

Exhibit "Q" (11/28/05 email from Phillip Perry to Sam Porter). Mr. Perry also stated that:

> Taihe was visited by Duxx International Trading, LLC, a Jorge James, VP manager, came to the office to make an offer .... they have an office in Dallas, TX and in Mexico. The 2nd company is Holmanwood.com from Malaysia, the owner apparently showed up .... Both companies seemed to have offered to make the offered terms and agree to purchase 300,000 boards a month. **The accepted party would then get a sole distributorship for USA.** after 3 months of compliance with the terms. All referrals will be given to that company during the 3-month term.

Exhibit "R" (12/13/05 email from Phillip Perry to Sam Porter) (emphasis added).

In response to Taishan's sales to other companies for distribution in the United States and elsewhere, Venture Supply wrote to Taishan to inform the manufacture in specific terms how it expected to sell Taishan's drywall in the U.S.:

> We came to you all alone and at great expense to visit your factory and begin the process of buying boards for both our mutual benefits. We were the first persons to make that trip to you in four years, and we sought you out in part because our research shows

that you could produce the boards at an acceptable price for the competitive market here.

      ...

Now the demand is for us to take 300K each and every month on a T/T payment to get the **sole rights to the USA.**

      ...

We researched the market carefully and concluded that in our area it would need about 120K to be effective each and every month for a long period.

**Other parts of the country would receive similar injections of materials in the 50K to 100K per month by us.**

      ...

Earlier on I mentioned that we spent about 18 Million on product last year, and **we want to expand and we shall!** ... In this area where we reside and work, the market share we dominate is roughly 53% of product. We know exactly how much can be sold here with out harm and how much to sell for a good profit. **The other parts of our country will handle goods on a similar guide line.** We want to expand but not burst the bubble.

Exhibit "S" (12/14/05 email from Sam Porter to Frank Clemm) (emphasis added). Taishan's

communications with Venture Supply, via instant messaging and email, demonstrate that Venture

Supply was actively assisting Taishan to distribute its product throughout the United States

without any geographic limitation:

Frank Peng says: I would like to inform you that the company, **Certified products international Inc. also want to import our boards to the U.S.A.** I refused to produce for them. Would you please or let other people from your company contact them? But please do not let them know it is me to let you contact them.

Phillip says: yes, and thank you for the information...

Frank Peng says: They said they want to send the boards to Norfolk...

Frank Peng says: U just have the contact number of their China office. **I think it is better for you to contact their head office in the USA.**

Phillip says: sounds like a very good idea.

Frank Peng says: I am writing to you by e-mail. Please wait.

*See* Exhibit "T" (12/15/05 instant messaging discussion between Frank Clemm and Phillip Porter) (emphasis added); *see also* Exhibit "U" (emails between various U.S. merchants and Venture Supply regarding the distribution of Taishan's products in Virginia, Texas, New York).

Taishan expected and intended for its expansion into the United States to continue. Taishan's representative expressed this desire to Venture Supply: "it is our hope to set up and keep a long term and steady relationship with your company." Exhibit "V" (12/15/05 email from Frank Clemm to Phillip Perry).

Discovery of other entities in this MDL, such as Banner Supply Company in Florida, has revealed additional sales of Taishan's drywall in the United States outside of Virginia. *See, e.g.,* Banner Distributor Profile Forms, collectively attached hereto as Exhibit "W." Moreover, there is outstanding discovery directed to Phoenix Imports, a company in Georgia that bought Taishan's drywall for use in the United States. *See* Exhibit "F."

### C.   **Taishan's Additional Ties Within the United States.**

There is further evidence of Taishan's connections within the United States. As this Court found during the trial on remediation, publicly available documents show that on March 19, 2005, Beijing New Building Material Co., Ltd. ("BNBM"), a wholly state-owned corporation, became the largest shareholder of Taihe Dongxin (*i.e.*, Taishan) by purchasing sixty-five percent (65%) of the company's equity. *Chinese-Manufactured Drywall*, 2010 WL

1445684 at *4, *citing*, Herman Aff. ¶¶ 16 & 26.[13]  BNBM is the parent of Taishan.  *See* Rec. Doc. No. 5075.  In China, the State-owned Assets Supervision and Administration Commission ("SASAC") of the State Counsel of the People's Republic of China controls the "plasterboard" manufacturing, exportation and certification industry and oversees and manages the state-owned assets of companies involved in drywall production, including Taishan.  *Chinese-Manufactured Drywall*, 2010 WL 1445684 at *4, Herman Aff. ¶¶ 18-20.  SASAC exercises strict and extensive control and influence over these companies.  *Id.*  For example, "SASAC assumes the responsibility as the investor on behalf of the state; it supervises and manages the state-owned assets and enterprises [SOEs]; controls the value preservation and increment of the state-owned assets; guides and pushes forward the reform and restructuring of SOEs; appoints and removes top executives of SOEs; is responsible for organizing SOEs to turn gains over to the state; is responsible for urging SOEs to carry out laws and regulations for safety production; directs and supervises the management work of local state-owned assets; and undertakes other tasks assigned by the State Council."  *Id.*  Furthermore, "SASAC oversees and controls 150 large central state-owned enterprises (SOEs), including China National Building Material Group Corporation (AS CNBM Group)."  *Id.*, Herman Aff. ¶ 18.

SASAC owns 100% of the CNBM Group,[14] giving it "a presence in the United States through CNBM USA Corporation, located at 17800 Castleton Street, City of Industry, California."  *Id.*, Herman Aff. ¶ 21.  The CNBM Group "owns 56.4% of the China National

---

[13]  The PSC recently filed an Omnibus motion for preliminary default judgment against BNBM and other related entities.  *See* Rec. Doc. No. 5621.  After failing to respond to plaintiffs' complaints, the lights suddenly went on for BNBM.  On October 13, 2010, we were notified that this defendant retained national counsel to enter an appearance in the litigation.  *See* Letter to A. Levin from J. Stengel, attached hereto as Exhibit "X."

[14]  The PSC's recently filed Omnibus motion for default judgment includes CNBM as well.  *See* Rec. Doc. No. 5621.

14

Building Material Company, Limited (CNBM Co., Ltd); 75% of BNBM [which is the parent and majority owner of Taishan]; 100% of CNBM Import and Export Co. and 100% of CNBM Academy." *Id.*, Herman Aff. ¶ 19.  CNBM Co., Ltd. owns 52.40% of BNBM. *Id.* CNBM Co., Ltd. is the parent of BNBM.  Rec. Doc. No. 5075.

The records show that CNBM USA was established in 2006, when Taishan sold its Chinese drywall to Venture Supply. *Chinese-Manufactured Drywall*, 2010 WL 1445684 at *4, Herman Aff. ¶ 19.  CNBM (USA) Corporation publicly announced that its "mission [is] to provide all kinds of building materials and services in the [U.S.] national market." *Id.*, Herman Aff. ¶ 21.  In accordance with this purpose, the evidence demonstrates that at December 31, 2008, the drywall business production of CNBM's wholly owned subsidiary, Taishan Gypsum Co., was 262.3 million yuan.[15]  *Id.* at *5, Herman Aff. ¶ 22.  Taishan's revenue for 2006 was 773 million yuan.  *Id.*, Herman Aff. ¶ 23.

Taishan's business is not limited to drywall.  It manufactures more than 60 types of building products including standard plasterboard.  *Id.*, Herman Aff. ¶ 24.  In addition to the shipments of Chinese drywall in 2005 and 2006 to Venture Supply, Taishan Plasterboard Co., Ltd. shipped 76 shipments of plasterboard to the United States between March, 2006 and August, 2007 to four different ports in this country.  *Id.*, Herman Aff. ¶ 25.

The sum of all of these contacts pertaining to Taishan's sales of its problematic drywall in Virginia specifically as well as in other parts of the United States permit the exercise of jurisdiction over Taishan in these proceedings.  Taishan would like to avoid this suit by suggesting that "Taishan's two sales [of drywall] to Venture Supply ... are the only sales of drywall Taishan has made to any customer based in the United States." *See* Affidavit of Jia Tongchun ("Tongchun Aff."), ¶ 38.  However, based on the evidence already available, the PSC

---

[15] A yuan is worth approximately 6.8 dollars. *Id.*

questions the veracity of that claim.  In any event, even if there were only two sales of drywall that led to Plaintiffs' damages, under the law Taishan can be held to answer for its actions here before this Court.

## III.   ARGUMENT

Taishan's motion to vacate the default judgment is based on five separate arguments:  (1) that personal jurisdiction is lacking because Taishan does not have the requisite minimum contacts with Virginia, where the original complaint was filed; (2) that the Intervening-Plaintiffs did not properly serve their motion to intervene on Taishan pursuant to Fed. R. Civ. P. 5(a)(2) and 24(c); (3) that Taishan was not served with the Second Amended Complaint, on which the default judgment was based; (4) that the default judgment cannot stand to the extent that Plaintiffs failed to state a claim under the Virginia Consumer Protection Act; and (5) that Taishan's failure to timely respond to the First Amended Complaint is excusable.  As set forth below, each of these arguments lacks merit, warranting denial of Taishan's motion.

### A.   This Court Already Ruled that Jurisdiction Over Taishan Was Accomplished by Proper Service of the First Amended Complaint.

Even Taishan admits that it was properly served with the First Amended Complaint on behalf of a class of "owners and residents of residential homes in the Commonwealth of Virginia containing defective drywall that was designed, manufactured ... by Defendant Taishan ..." (although it claims it did not understand the significance of the litigation).  Taishan Mem. at 4-5. This Court has held that the default judgment "was based upon the Virginia state law claims raised within the First Amended Complaint."  Rec. Doc. No. 4872 at 7.  In adjudicating Intervening Plaintiffs' Counsel's Petition for Fees and Costs after Taishan defaulted, the Court held that "with regard to parties in default, such as Taishan, Federal Rule of Civil Procedure 5(a)(2) generally does not require service of pleadings and other papers, such as a motion to

16

intervene or an amended complaint which does not assert additional claims...." *Id.* at 5-6.[16] Because the Intervening Plaintiffs are all owners of homes in Virginia that contained defective drywall manufactured by Taishan, the Court found that the Intervening Plaintiffs fell within the class defined by the First Amended Complaint and, therefore, the motion to intervene "did not raise any additional claims against Taishan and indicated only that Intervening Plaintiffs had an interest in the default judgment proceedings." *Id.* at 6. Consequently, service of the motion to intervene on Taishan was not required. *Id.* at 6-7.

Similarly, the Second Amended Complaint merely expanded the class of plaintiffs from a Virginia state class to a national class of homeowners and residents alleging damages to their homes from defective drywall manufactured by Taishan. No new claims were asserted. *Id.* at 7. Significantly, the claims of the Intervening Plaintiffs, all Virginia homeowners, were *exactly* the same. *Id.* Thus, the Court found, "whether or not the Second Amended Complaint was properly served upon Taishan, the Court has sufficient jurisdiction to award attorneys' fees as a result of the proper service of the First Amended Complaint since Intervening Plaintiffs' claims were properly within the First Amended Complaint." *Id.*, citing, *Annunciation v. W. Capital Fin. Svcs. Corp.*, 1996 WL 534049, at *3 (9th Cir. Sept. 19, 1996).

Taishan's repeated efforts to have this case dismissed for lack of proper service of the motion to intervene and the Second Amended Complaint are without merit. The Court already ruled on these points and rejected Taishan's contentions. Taishan failed to file a timely motion to reconsider and has offered no new facts or legal basis for the Court to change its course. The

---

[16] Moreover, the Fifth Circuit observes Rule 24(c) leniently and allows intervenors simply to adopt the existing pleadings of the parties. *See S.E.C. v. Funding Resource Group*, 233 F.3d 575 (5th Cir. 2000) ("Although the filing of a complaint in intervention is clearly required by the language of the rule, this court has traditionally 'been lenient in hearing the appeals of parties who have failed to fulfill the provisions of Rule 24(c).'"), *citing, Int'l Marine Towing, Inc. v. Southern Leasing Partners, Ltd.*, 722 F.2d 126, 129 (5th Cir. 1983); 7C Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* §1914 at 517 (2007).

motion to vacate the default judgment and to dismiss should therefore be denied.

**B.**   **This Court May Exercise Jurisdiction over Taishan Because it Intentionally Sold its Drywall to Venture Supply for Use in Virginia and Other Parts of the United States.**

A federal court sitting in diversity may exercise personal jurisdiction over a foreign defendant if: "(1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Ruston Gas Turbines, Inc. v. Donaldson Company, Inc.*, 9 F.3d 415, 418 (5th Cir. 1993); *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006). In cases where there are disputes as to alleged jurisdictional facts, courts "must resolve all conflicts in favor of the party seeking to invoke the court's jurisdiction." *Id.*; *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990) ("[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a prima facie case for personal jurisdiction exists."), *quoting*, *D.J. Investments, Inc. v. Metzler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir. 1985).

In this case, the long-arm statute of Virginia extends jurisdiction to the extent permitted by due process. *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002), *cert. denied*, 8 U.S. 1035 (2003). The same is true for Louisiana. *Bean Dredging Corp. v. Dredge Technology Corp.*, 744 F.2d 1081, 1083 (5th Cir. 1984) ("The Louisiana Long-Arm Statute is to be interpreted liberally in favor of finding jurisdiction ... and is to extend to the full limits of due process under the fourteenth amendment."). To decide whether personal jurisdiction is consistent with the Due Process Clause, a three-prong test is applied:

> (1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the

18

> forum state or purposely availed itself of the privileges of
> conducting activities there; (2) whether the plaintiff's cause of
> action arises out of or results from the defendant's forum-related
> contacts; and (3) whether the exercise of personal jurisdiction is
> fair and reasonable.

*Nuovo Pignone SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 378 (5th Cir. 2002), *citing, Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985); *International Shoe Co. v. Washington*, 326 U.S. 310, 316-19 (1945).

### 1.   *Minimum Contacts*

The "minimum contacts" test is satisfied when the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King*, 471 U.S. at 475; *Int'l Shoe*, 326 U.S. at 319.  Under this scenario, the defendant "'should reasonably anticipate being haled into court' in the forum state." *Ruston Gas Turbines*, 9 F.3d at 419, *quoting, World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  The state may exercise either specific jurisdiction or general jurisdiction over a non-resident defendant.  "Specific jurisdiction" comes into play "when the lawsuit arises from or relates to the defendant's contact with the forum state." *Ruston Gas Turbines*, 9 F.3d at 418-19; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984); *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987).[17]

The Supreme Court has stated that "a defendant's placing of its product into the stream of commerce with the knowledge that the product will be used in the forum state is enough to constitute minimum contacts." *Ruston Gas Turbines*, 9 F.3d at 419, *citing, World-Wide Volkswagen*, 444 U.S. at 298.  The Fifth Circuit has interpreted *World-Wide Volkswagen* to hold

---

[17] "In contrast, when the act or transaction being sued upon is unrelated to the defendant's contacts with the forum state, personal jurisdiction does not exist unless the defendant has sufficient 'continuous and systematic contacts' with the forum state to support an exercise of 'general jurisdiction.'" *Id.* at 419, *quoting, Ham v. La Cienega Music Co.*, 4 F.3d 413, 416 n.10 (5th Cir. 1993).

that "**mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce**." *Id.*, quoting, *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 111 (1987)[18] (emphasis in original), *citing, Bean Dredging*, 744 F.2d 1081 (5th Cir. 1984).[19]

Even just "[a] single act by the defendant directed at the forum state ... can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas Turbines*, 9 F.3d at 419; *Bearry*, 818 F.2d at 374 ("In specific jurisdiction cases, the defendant may have, at a minimum, one contact with the forum state-the product or conduct that caused injury there."); *Nuovo Pignone*, 310 F.3d at 379; *Ham*, 4 F.3d 413, 415-16 (5th Cir. 1993); *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1361 (5th Cir. 1990).

In today's modern age, due process does not require that the defendant physically enter

---

[18] Even though four justices in the Supreme Court's plurality opinion in *Asahi* advocated for a narrower interpretation of the stream-of-commerce doctrine, "the Fifth Circuit has continued to follow the original 'stream-of-commerce' theory established in the majority opinion of *World-Wide Volkswagen*." *Id.* at 420. *See, e.g., Irving v. Owens-Corning Fiberglas Corp.*, 864 F.2d 383, 385 (5th Cir.), *cert. denied*, 493 U.S. 823 (1989) ("Because the [Supreme] Court's splintered view of minimum contacts in *Asahi* provides no clear guidance on this issue, we continue to gauge [the nonresident defendant]'s contacts with [the state] by the stream of commerce standard as described in *World-Wide Volkswagen* and embraced in this circuit."); *Bearry*, 818 F.2d at 375; *Nuovo Pignone*, 310 F.3d at 380 ("Where a nonresident's contact with the forum state 'stems from a product, sold or manufactured by the foreign defendant, which has caused harm in the forum state, the court has [specific] jurisdiction if it finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased or used by consumers in the forum state.'") (citation omitted); *Luv n' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006) ("district court erred in holding that placing a product into the stream of commerce, at least where the defendant knows the product will ultimately reach the forum state, does not rise to the level of 'purposeful availment.'"). *See also Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1548 & n.17 (11th Cir.) (noting that the Fifth Circuit in *Irving*, as well as federal district courts in Utah, Guam, Indiana, Kansas and West Virginia, have declined to follow the *Asahi* plurality), *cert. denied*, 508 U.S. 907 (1993).

[19] The Supreme Court recently granted certiorari in two cases, to be argued in tandem, involving the exercise of *in personam* jurisdiction over a foreign corporation: *Nicastro v. J. Mcintyre Machinery America, Ltd.*, 201 N.J. 48, 987 A.2d 575 (2010), *cert. granted*, 2010 WL 1789343 (U.S. Sup. Ct. Sept. 28, 2010) and *Brown v. Meter*, 681 S.E.2d 382 (N.C. 2009), *appeal dism'd*, 364 N.C. 128, 695 S.E.2d 756 (N.C. 2010), *cert. granted sub nom. Goodyear Luxembourg Tires, S.A. v. Brown*, 2010 WL 2771430 (U.S. Sup. Ct. Sept. 28, 2010).

the forum or know the identity of the ultimate user of the product.  The Supreme Court has recognized that:

> [a]lthough territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.  So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Burger King*, 471 U.S. at 476; *see also Asahi*, 480 U.S. at 117 ("A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State and indirectly benefits from the State's laws that regulate and facilitate commercial activity.") (Brennan, J., concurring in part and concurring in the judgment); *Irving*, 864 F.2d at 386 ("Personal jurisdiction does not require certain knowledge of the user's identity.... even a nonresident defendant's out-of-state activities can establish the necessary minimum contacts if those activities have 'reasonably foreseeable consequences' within the forum state."); *Nuovo Pignone*, 310 F.3d at 380 ("As a voluntary member of the economic chain that brought the [product] to Louisiana, [the defendant] purposely has availed itself of the privilege of conducting business in that state.").

A long line of 5th Circuit Court of Appeals precedents supports exercising personal jurisdiction over Taishan in this case.[20]  In *Bean Dredging*, for example, the Fifth Circuit held

---

[20]  Taishan relies only on Fourth Circuit law, however, "the rule in multidistrict litigation is that the transferee court, in interpreting federal law, should apply the law of its own circuit rather than the law of the transferor court's circuit." *In re Nat'l Century Financial Enterprises, Inc. Inv. Litig.*, 323 F. Supp. 2d 861, 876 (S.D. Ohio 2004); *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1176 (D.C. Cir. 1987), *aff'd*, 490 U.S. 122 (1989) (holding that "the law of a transferor forum on a federal question ... does not have stare decisis effect in a transferee forum situated in another circuit"); *In re TMJ Implants Prods. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996) ("When analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located."); *Newton v. Thomason*, 22 F.3d 1455,

that where a component manufacturer based in Washington state put its steel castings into the stream of commerce and two of those castings were incorporated into cylinders that became the subject of a defective dredge in Louisiana, sufficient contacts with Louisiana existed to justify the exercise of jurisdiction over the Washington defendant. *Bean Dredging*, 744 F.2d at 1085. In that case, the component manufacturer:  (1) never knew where the two castings were used; (2) "had no knowledge of the end-product into which the castings would be incorporated"; (3) "never sold directly to a company in Louisiana"; (4) "did not know whether any castings went to Louisiana"; (5) "never sold its products directly to any Louisiana company nor did Louisiana personnel travel to Washington to negotiate with [the company]"; (6) "did not solicit business in Louisiana"; and (7) "did not own property in the state." *Id.* at 1082.  The president of the component manufacturer in *Bean Dredging* acknowledged, however, that "once [the castings] entered the stream of commerce, [they] might go virtually anywhere" in the United States.  *Id.*

The Fifth Circuit upheld jurisdiction over a foreign manufacturer of lighters in *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 199-200 (5th Cir. 1980), under similar circumstances where the company delivered millions of lighters to a distributer in the United States and "[t]here [wa]s nothing in th[e] record to indicate that [the manufacturer] attempted in any way to limit the states in which the lighters could be sold.  To the contrary, the record show[ed] that [the manufacturer] had every reason to believe its product would be sold to a nation-wide market." *See also Coulter v. Sears, Roebuck & Co.*, 426 F.2d 1315, 1318 (5th Cir. 1970) ("When a manufacturer voluntarily chooses to sell his product in a way in which it will be resold from dealer to dealer, transferred from hand to hand and transported from state to state, he cannot reasonably claim that he is surprised at being held to answer in any state for the damage the product causes.  Nor can he deny the substantial interest of the injured person's state in providing a convenient forum for its

---

1460 (9th Cir. 1994); *Menowitz v. Brown*, 991 F.2d 36, 40-41 (2nd Cir. 1993).

citizens.") (quotations omitted).

In *Irving*, the Fifth Circuit reversed a lower court's dismissal on jurisdictional grounds of an action brought against a Yugoslavian seller/distributor of asbestos by workers exposed to the asbestos at a Texas plant. *Irving*, 864 F.2d at 388. In that case, the foreign seller/distributor obtained the raw asbestos from a mine in Yugoslavia and then hired an American broker that distributed the product and sold it to the Texas plant. There was no evidence in that case to "indicate[] that [the Yugoslavian seller], which was not qualified to do business in Texas and solicited no asbestos sales directly in Texas, knew [the Texas plant] was the ultimate purchaser. [The seller] kept no offices, employees or property in Texas." *Id.* at 384. Likewise, the seller did not know the injured Texan workers. Yet, the Fifth Circuit found that its contacts with Texas were sufficient to confer jurisdiction over the company because: (1) it "conveyed the asbestos to a freight forwarder for shipment to Houston"; (2) it "shared the cost of quality-control testing by a Houston lab"; (3) it "received [the broker's] debits for ... bag-cleaning charges of another Houston company"; and most importantly, (4) the seller "accepted payments for the asbestos and stored it." *Id.* at 386.

In *Ruston Gas Turbines*, the Fifth Circuit reversed a lower court decision dismissing for lack of personal jurisdiction a Minnesota third-party subcontractor component manufacturer for an air-infiltration system, who was brought into litigation in Texas on an indemnity/contribution claim. In that case, in an effort to avoid the Texas suit the component manufacturer alleged that it: (1) "does not conduct business or maintain a place of business in Texas"; (2) "does not employ or maintain a sales representative or manufacturer representative in Texas"; (3) "has not recruited any employees in Texas"; (4) "has not designated a registered agent for service of process in Texas"; (5) "has not contracted by mail with any Texas resident whereby the contract was to be performed in whole or part in Texas"; and (6) "has not committed a tort in Texas." *Id.*,

9 F.3d at 417.  In addition, the company claimed that:  "all of its actions related to its contract

with [the principal manufacturing defendant] occurred in Minnesota"; its product was "shipped

FOB Waseca, Minnesota"; and "it had no direct contract with [the ultimate buyer] and no verbal,

written, or any other communication with [the buyer] regarding the sale of the equipment at

issue."  *Id.*  Further, the component manufacturer contended that "its only communications were

with [the principal manufacturing defendant in Minnesota and] none of its employees

communicated with or performed any work with persons in Texas in fabricating, manufacturing

or delivering the equipment."  *Id.*  Nevertheless, the Fifth Circuit held that due process was

satisfied in Texas where the Minnesota component company had knowledge that its parts would

be shipped to Texas and that a Texas company would purchase the systems into which they were

placed.  *Id.*  In addition, there was evidence that the component manufacturer had shipped its

parts on other occasions to additional customers in Texas.  *Id.* at 417-18.

     *See also Paz*, 445 F.3d at 813 (finding jurisdiction in Mississippi over non-resident

defendant even though all relevant transactions "took place entirely in California and [defendant]

conduct[ed] no activity whatsoever in Mississippi," since defendant was aware that its product

would be used in the forum state); *Luv n' care*, 438 F.3d at 470-71 (finding jurisdiction in

Louisiana over Colorado company that manufactured bottles sold to retailer, even though retailer

purchased and picked up bottles in Colorado for delivery to distribution centers and their

agreement never mentioned any distribution to forum state; fact that employees had no actual

knowledge that product was destined for Louisiana did not shield manufacturer from jurisdiction

when electronic purchase orders mentioned the forum state); *Nuovo Pignone*, 310 F.3d at 379,

381 (agreement to provide product that was ultimately destined for forum state of Louisiana

sufficient to confer jurisdiction even though defendant's obligations under contract were

performed in Italy and defendant never contracted with any entity from Louisiana but with only

third-party intermediaries).

It is not genuine for Taishan to assert that it "had no knowledge or information concerning whether any of the drywall it supplied in China pursuant to those contracts [with Venture Supply] would be distributed or used in Virginia." Tongchun Aff., ¶ 33.  Taishan entered into contracts, written in English, with Venture Supply, a Norfolk, Virginia company. These agreements were for the manufacture and delivery of ~174,000 sheets of drywall with labels affixed to each sheet explicitly stating that the gypsum board was "Distributed by Venture Supply, Inc."  Herman Aff. ¶ 6.  Clearly, this drywall was headed for the U.S. market.  Taishan's disclaimer that it "never had a role in the distribution or installation of drywall in Virginia," Taishan Mem. at 5, is disingenuous and insufficient to deny jurisdiction over the company, and in the context of this litigation is silly.[21]  *See, e.g.*, *Luv n' care*, 438 F.3d at 470-71, *supra*.

Moreover, through the complex and prolix chain of holding companies, China-owned companies and subsidiary companies related to or owning and controlling Taishan, specifically, CNBM Group having a presence in the United States through CNBM USA and having a majority interest in Taishan through BNBM, it was announced that their "mission [was] to provide all kinds of building materials and services in the [U.S.] national market."  Herman Aff. ¶ 21.  And indeed, this was accomplished.  The drywall business production of CNBM's wholly owned subsidiary, Taishan Gypsum Co., at December 31, 2008, was 262.3 million yuan.[22]  Herman Aff. ¶ 22.  Taishan's revenue for 2006 was 773 million yuan.  Herman Aff. ¶ 23.  Plainly, Taishan

---

[21]  Taishan has made similar outlandish claims in other cases.  In Alabama, Taishan has tried to avoid jurisdiction there by arguing that it "did not expect, intend, or anticipate" that its drywall would end up in Alabama, even though the company targeted sales of its drywall in the United States through its relationship with Venture Supply and other companies.  Taishan made this same argument in another case in this MDL with regard to drywall it manufactured that "somehow" surfaced in Florida.  *See* Exhibit "Z" & Exhibit "W."

[22]  A yuan is worth approximately 6.8 dollars.  *Id.*

placed its drywall into the United States stream of commerce and sold its drywall to a company in Norfolk, Virginia for distribution there.

### 2.    *Fair Play and Substantial Justice*

To determine fundamental fairness, courts examine: "(1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies." *Ruston Gas Turbines*, 9 F.3d at 421; *Asahi*, 480 U.S. at 112; *World-Wide Volkswagen*, 444 U.S. at 292; *Irving*, 864 F.2d at 387.

Here, the Intervening Plaintiffs have a strong interest in obtaining efficient relief before this Court for the damages caused to their homes by the defective drywall manufactured by Taishan. The case was initiated in their home state of Virginia as a class action, and through transfer of the litigation by the Judicial Panel on Multidistrict Litigation to the MDL, the consolidation of the Plaintiffs' case and the trial of their claims occurred here.

This Court has a strong interest in adjudicating the causes of action against Taishan. An additional 700+ cases have been lodged against the defendant-manufacturer in this MDL. *See Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et. al.*, Case No. 2:10-cv-00361 (E.D. La.) (Omnibus II, II(A), and II(B)); *Gross, et al. v. Knauf Gips KG, et. al.*, Case No. 2:09-cv-6690 (E.D. La.) (original complaint, Omnibus III, and Omnibus III(A)). One of the principal purposes of MDL transfer pursuant to 28 U.S.C. § 1407 in situations involving cases pending in different districts involving common questions of fact is "to further judicial economy and to eliminate the potential for conflicting pretrial rulings." *Good v. Prudential Ins. Co. of Am.*, 5 F. Supp. 2d 804, 809 (N.D. Cal. 1998); *Londo v. Medtronic, Inc.*, 2008 WL 94768, *1 (W.D. La. Jan. 4, 2008) (purpose of § 1407 is "the promotion of the just and efficient administration of the litigation"); *In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig.*, 424

26

F. Supp. 504, 507 (J.P.M.L. 1976) ("Indeed, one of the purposes of coordinated or consolidated pretrial proceedings is to streamline the efforts of the parties and witnesses, their counsel and the judiciary in order to effectuate an overall savings of cost and a minimum of inconvenience to all concerned.).

Even though Taishan is a Chinese company, the Supreme Court has stated that "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum will justify even the serious burdens placed on the alien defendant." *Asahi*, 480 U.S. at 114-15; *see also Irving*, 864 F.2d at 387; *Hedrick v. Daiko Shoji Co., Ltd., Osaka*, 715 F.2d 1355, 1358 (9th Cir. 1983), *opinion withdrawn in part on other grounds sub nom.*, *Hedrick v. Pine Oak Shipping, S.A.*, 733 F.2d 1335 (9th Cir. 1984) (defendant manufacturer subject to jurisdiction in Oregon "when it produced a splice that it knew was destined for ocean-going vessels serving United States ports, including those of Oregon."); *Stabilisierungsfonds Fur Wein v. Kaiser, Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 203 (D.C. Cir. 1981) (personal jurisdiction existed in Washington D.C. over Australian defendants who "arranged for introduction of their wine into the United States stream of commerce with the expectation ... that their products w[ould] be shelved and sold at numerous local outlets in diverse parts of the country."); 2 Moore's Federal Practice 4.41-1[4.1] (1987).

When weighing the interests of the Intervening Plaintiffs and this Court's efficient management of the MDL against Taishan's burden of defending claims related to damages caused by the product it placed in the stream of commerce, due process is not offended by this Court's exercise of personal jurisdiction over Taishan.

 **C. Taishan Is Not Entitled to Dismissal of this Action on the Grounds That Plaintiffs Allegedly Failed to State a Claim under the Virginia Consumer Protection Act.**

This Court held previously that the Intervening Plaintiffs were not entitled to attorneys'

fees from Taishan under the Virginia Consumer Protection Act ("VCPA") because Taishan's

sales of drywall to suppliers and homebuilders "constituted a commercial transaction, which is

outside the ambit of 'consumer transaction[s]' covered by the VCPA." Rec. Doc. No. 4872 at

12-13. This adverse ruling was limited to attorneys' fees only. In fact, the Court referred the

Intervening Plaintiffs' request for taxation of costs against Taishan to the Clerk of Court for

determination. *Id.* at 13.

In denying attorneys' fees, the Court did not rule that Plaintiffs failed to state any claim

against Taishan. On the contrary, Plaintiffs alleged a variety of causes of action including

negligence, negligence per se, breach of express and implied warranties, as well as violation of

various consumer protection acts. Based on the evidence admitted at the evidentiary hearing, in

its Findings of Fact the Court determined that "Plaintiff-intervenors' interests in their real

properties have been injured by defendant Taishan's negligence in producing a defective product,

and that they are entitled to recover the damages proximately caused by same." *Chinese-

Manufactured Drywall*, 2010 WL 1445684 at *31. The Court ruled further that "the proper

measure of damages is the cost of repair, plus the amount the property was depreciated, if any,

because it was damaged." *Id.* at *32. In the case of the Intervening Plaintiffs, these damages

totaled more than $2.7 million in the aggregate. The default judgment against Taishan was based

on Plaintiffs' success in proving these damages under the law. Taishan is not entitled to a

dismissal of this action.

### D.   **Taishan Has Not Shown Excusable Neglect**

Taishan seeks to vacate the default judgment entered against it on the grounds of

excusable neglect pursuant to Fed. R. Civ. P. 60(b)(1). "When determining whether there has

been excusable neglect, [the court] review[s] 'all relevant circumstances surrounding the party's

omission.'" *Johnson v. Potter*, 364 Fed. Appx. 159, 164, 2010 WL 454718, **5  (5th Cir. 2010),

*quoting, Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).

The Fifth Circuit has held that these "circumstances" might include: "(1) the danger of prejudice

to the [non-movant]; (2) the length of the delay and its potential impact on judicial proceedings";

and (3) "the reason for the delay, including whether it was within the reasonable control of the

movant, and whether the movant acted in good faith." *Id.* The district court has discretion to

"refuse to set aside a default judgment if the defendant fails to present a meritorious defense

sufficient to support a finding on the merits for the defaulting party." *United States v.*

*$670,706.55*, 367 Fed. Appx. 532 (5th Cir. 2010), *citing, Jenkens & Gilchrist v. Groia & Co.*, 542

F.3d 114, 120 (5th Cir. 2008). And, "[n]either ignorance nor carelessness on the part of a litigant

or his attorney provide grounds for relief under Rule 60(b)(1)." *Ben Sager Chemicals Intern.,*

*Inc. v. E. Targosz & Co.*, 560 F.2d 805, 809 (7th Cir. 1977); *DiVito v. Fidelity and Deposit*

*Company of Maryland*, 361 F.2d 936, 938 (7th Cir. 1966) ("Rule 60(b) provides for extraordinary

relief and may be invoked only upon a showing of exceptional circumstances.").

Taishan's only excuse for failing to timely respond to the First Amended Complaint is

that "Taishan did not understand the significance of the First Amended Complaint, and could not

imagine how its sales of drywall in China could have legitimately resulted in U.S. litigation it

was required to participate in." Taishan Mem. at 22. Taishan asserts further that "[n]o employee

at Taishan has sufficient mastery of the English language to read and understand legal documents

written in English." Tongchun Aff., ¶ 43. And, yet, Taishan's contracts with Venture Supply to

manufacture hundreds of thousands of sheets of drywall for the Virginia company were written in

English. *See id.* at Exhibits A & C. Each sheet of Taishan's drywall contained a label written in

English stating that the gypsum board was "Distributed by Venture Supply, Inc." Herman Aff. ¶

6. The inspection certificates that Taishan relies upon were also written in English. *See*

Tongchun Aff. at Exhibits B & D. Moreover, Plaintiffs went to great lengths and expense to

retain APS International to translate the First Amended Complaint into Mandarin and accomplish proper service abroad consistent with the Hague Convention and Rule 4 of the Federal Rules of Civil Procedure.  Taishan's decision not to investigate or examine the significance of this legal document is not a valid reason to vacate the default judgment entered against it.

As for Taishan's "meritorious defense," the company asserts in its brief only that "there is a question whether the drywall at issue was defective when it left Taishan's hands in China or if it was damaged or contaminated by a third-party during transit or after it arrived in the U.S." Taishan Mem. at 23.  This hardly constitutes any defense, much less a meritorious one. Outstanding discovery of Taishan may shed light on the defense it will be asserting in the litigation.  But for now, Taishan has failed to show excusable neglect warranting vacation of the default judgment.

## IV.    CONCLUSION

Taishan deliberately chose not to participate in these proceedings for over a year until a default judgment was entered against it.  Now, even prior to any discovery from Taishan (except for a deficient and incomplete MPF), Taishan wants the default judgment vacated and it wants to be dismissed from the case for lack of personal jurisdiction.  It has asked for a response to its Rule 62.1 motion prior to the taking of its deposition or the production of any documents in its possession.  As of the filing of this response, plaintiffs have not had the opportunity to discover the extent and breadth of Taishan's contacts in this country in general and in Virginia in particular.  It is plain from our investigation from other sources, though, that Taishan's sales in the U.S. were not limited only to two sales of drywall to Venture Supply.  Taishan set out on a course to expand the sales of its drywall in the United States and has admitted that it manufactured made-to-order gypsum boards that were used in the construction of the Intervening-Plaintiffs' homes at issue in this case.  Taishan should not be given an advantage for

having avoided this litigation entirely when it failed to respond initially to the properly served

Complaint and now seeking dismissal without proper jurisdictional discovery. Taishan has used

this same strategy in at least two other cases we are aware of in an effort to avoid jurisdiction in

Alabama and Florida. *See* Exhibit "Z" hereto (Taishan's motions to dismiss for lack of personal

jurisdiction filed in state court in Alabama in *Alexander v. Taishan Gypsum, Co., Ltd.*, CV-2009-

900356.00 (Cir. Ct. of Elmore County, AL) and in this MDL in *The Mitchell Co., Inc. v. Knauf*

*Gips KG, et al.*, Case No. 09-4115). There has been no jurisdictional ruling in either of these

cases.

For all of the reasons outlined above, Taishan's Motion Pursuant to Rules 12(b)(2), 55(c),

60(b) and 62.1 to Vacate the Default Judgment, Dismiss this Action and to Seek Remand from

the Court of Appeals should be denied. In the alternative, given the outstanding pending

discovery directed to Taishan and related entities, the PSC asks for leave to supplement the

foregoing response in opposition to Taishan's motion.


Dated: October 28, 2010                          Respectfully submitted,



                                                 /s/ Russ M. Herman
                                                 Russ M. Herman, Esquire (Bar No. 6819)
                                                 Leonard A. Davis, Esquire (Bar No. 14190)
                                                 Stephen J. Herman, Esquire (Bar No. 23129)
                                                 HERMAN, HERMAN, KATZ & COTLAR, LLP
                                                 820 O'Keefe Avenue
                                                 New Orleans, Louisiana 70113
                                                 Phone: (504) 581-4892
                                                 Fax: (504) 561-6024
                                                 Ldavis@hhkc.com
                                                 *Plaintiffs' Liaison Counsel*
                                                 *MDL 2047*


31

Arnold Levin (On the Brief)
Fred S. Longer (On the Brief)
Matthew C. Gaughan
Sandra L. Duggan (On the Brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Victor Manuel Diaz
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
vdiaz@podhurst.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
  Matthews, Martinez, Gonzales,
  Kalbac & Kane
255 Alhambra Circle, Penthouse
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
  Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Bruce William Steckler
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeldllp.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Jeremy W. Alters
Alters, Boldt, Brown, Rash & Culmo, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@abbrclaw.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing PSC's Response in Opposition to Taishan's Motion Pursuant to Rules 12(b)(2), 55(c), 60(b) and 62.1 to Vacate the Default Judgment, Dismiss this Action and to Seek Remand from the Court of Appeals has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 28th day of October, 2010.

/s/ Leonard A. Davis
Leonard A. Davis, Esquire
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
Plaintiffs' Liaison Counsel
MDL 2047

*Co-counsel for Plaintiffs*

34