# EXHIBIT A

P3.0625. 1000

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al., Case No. 2:09-cv-6687 (E.D.La.) | |

### AFFIDAVIT OF RUSS M. HERMAN
### IN SUPPORT OF THE PLAINTIFFS' STEERING
### COMMITTEE'S EVIDENTIARY PRESENTATION
### REGARDING TAISHAN GYPSUM CO., LTD.

STATE OF LOUISIANA     :
                                          SS
PARISH OF ORLEANS     :

BEFORE ME, the undersigned Notary Public, in and for the Parish of Orleans,

State of Louisiana, personally came and appeared:

RUSS M. HERMAN

who, after being duly sworn, stated that:

1.      I am an attorney admitted to practice before the bar of the Supreme Court of the

United States, the United States Courts of Appeals for the Fifth Circuit, the United States District

Courts for the Eastern District of Louisiana and the Supreme Court of the State of Louisiana, among

others.  I received my L.L.B. from Tulane University Law School in 1966.

2.      I make this affidavit in my capacity as the Court-appointed Plaintiffs' Liaison

Counsel.  The purpose of this affidavit is to provide the Court with information obtained by the

Plaintiffs' Steering Committee ("PSC") regarding the defaulting defendant, Taishan Gypsum Co.,

Ltd. ("Taishan").  Because Taishan has failed to participate in these proceedings and defaulted, the

Plaintiffs have been deprived of their ability to conduct full and complete discovery against Taishan

under the Federal Rules of Civil Procedure. As a consequence, the PSC has had to resort to informal methods of discovery from public resources to obtain information regarding the corporate nature of Taishan, its products and the shipment of its drywall products to the United States. Of course, the PSC has been able to obtain formal discovery from other defendants that are participating in this litigation and it has obtained documents that inculpate Taishan that are described herein.

3.      The PSC has obtained documents from Venture Supply, Inc. in the course of discovery in these proceedings. These documents, some of which are identified and attached hereto, describe the shipment of drywall products from Taishan in China to Venture Supply, Inc. in the United States.

4.      As to other documents described herein, unless otherwise indicated, upon information and belief, these documents were excerpts of the P3-0629 trial exhibit and were created by the Republic of China Agencies or State Owned Entities (SOE's) as they appeared in English. Certain official news releases and certifications were obtained in Chinese and were translated by an interpreter admitted into the bar of China. The translator is a graduate of the Tulane University Law School with an LLM and has served as a legal translator in China from July 2004 through July 2008. A copy of the translators' curriculum vitae is attached hereto as Exhibit "A" for the Court's eyes only.

### Information Available From Documents Obtained from Venture Supply, Inc.

5.      On November 9, 2005, Venture Supply, Inc. provided an original letter of credit in the amount of $429,600.00 to the order of Shandong Taihe Dongxin Co. for 120,000 sheets of drywall to meet all USA ASTM ratings and fire rating standards. See Document V001812-17, Exhibit "B", attached hereto.

6.      On November 16, 2005, the manager of foreign trade for manufacturer Shandong Taihe Dongxin Co., Ltd., China, CLEM, Frank was directed by Sam Porter of Venture Supply to

place the following legend on end binding label tape:

    (1)    4'x12'x1/2" Gypsum Board Distributed by Venture Supply, Inc. ...

    (2)    On the back of the board . . .

        Venture Supply, Inc.

        MFG. Shandong Taihe Dongxin, Co., Ltd., China

All Chinese drywall imported by Venture Supply was marked as directed. See Document V002541, Exhibit "C", attached hereto.

7.    On November 14, 2005, Frank Clem, manager, advised that the manufacturer was not clear on U.S. ASTM ratings and Venture Supply was requested to remove US ASTM requirements from the letter of credit and rely on Chinese ratings. See Document V002592, Exhibit "C", attached hereto.

8.    On November 15, 2005, Venture Supply directed its bank to remove the U.S. ASTM requirement from the letter of credit. See Document Nos. V000393 and V001805, Exhibit "D", attached hereto.

9.    On December 16, 2005, a second contract was signed between Venture Supply and Shandong Taihe Dongxin Co. for 100,000 sheets on 2,000 pallets to be shipped to Norfolk, Virginia. See Document V000320, Exhibit "E", attached hereto.

10.    A Bill of Lading dated December 25, 2005, confirms the shipment of 2,000 pallets of Gypsum Board bearing the marking, Venture Supply, Inc. See Document V000322, Exhibit "F", attached hereto.

11.    This shipment of drywall was shipped aboard the M/V Glykofillousa from the Chinese Port of Loading, Lianyungang, and arrived in the USA in February, 2006. See Document V000656, Exhibit "G", attached hereto.

12.    However, the second shipment of drywall was reduced to 53,912 sheets on 586

pallets, which was shipped onboard the M/V Atlantic Fortune from the Chinese Port of Loading, Lianyungang. This shipment was off loaded in Camden, New Jersey. See Document No. V000656, *supra.*; see also Document V000660, Exhibit "H", attached hereto.

13.     The drywall product from China was never tested pursuant to the United States ASTM standard. Venture relied on a representation that Chinese testing was equivalent to the US testing standards. However, the Chinese tests were accomplished by a government agency of the Republic of China and not by an independent testing laboratory. See Document Nos. V028251-V028255; V028279; V028288-296; V028300; V001883, Exhibit "I", attached hereto.

14.     Certificates of Quality were likewise issued by a government agency. But the Certificate of Quality Management System Certification issued predates the production of the drywall shipped to the United States by at least two (2) years. See Document Nos. V028247 and V028249, Exhibit "J", attached hereto.

### Information From Documents Obtained from Publicly Available Resources

15.     On September 10, 2007, Shandong Taihe Dongxin Co., Ltd., which was a subsidiary company controlled by BNBM, changed its name to Taishan Gypsum Co., Ltd. See key facts about Taishan Gypsum Co., Ltd. at Document Nos. 00150 and 00177, Exhibit "K", attached hereto.

16.     On March 19, 2005, BNBM became the largest shareholder of Taihe Dongxin by purchasing sixty-five percent (65%) of the equity of Taishan Dongxin. *Id.* This purchase occurred approximately one year prior to the delivery of drywall to Venture Supply.

17.     The state-owned Assets Supervision and Administration Commission of the State Counsel (SASAC), the People's Republic of China controls the "plasterboard" manufacturing, exportation and certification industry. The SASAC supervises and manages the State-owned assets of the enterprises engaged in drywall production. See BNBM Co. Ltd., 2008 Annual Report

4

Document No. 00113 and Document Nos. 00136-37, Exhibit "L", attached hereto. [1]

18.     SASAC oversees and controls 150 large central state-owned enterprises (SOEs), including China National Building Material Group Corporation (as CNBM Group).  SASAC owns 100% of the CNBM Group.  See *Id.* Document Nos. 00114-16, Exhibit "M", attached hereto.

19.     CNBM Group, intern, owns 56.4% of the China National Building Material Company, Limited (CNBM Co., Ltd.); 75% of BNBM; 100% of CNBM Import and Export Co. and 100% of CNBM Academy.  CNBM Co., Ltd. owns 52.40% of Beijing New Building Material Co., Ltd. (BNBM).  See *Id.* BNBM Co. Ltd. Annual Report 2008; CNBM Group website as 00117-20; CNBM website 00123-25, Exhibit "N", attached hereto.

20.     The degree of control SASAC (Government of China) exerts and influences is extensive and includes: performs the responsibility as the investor on behalf of the state; supervises and manages the state-owned assets and enterprises; supervises the value preservation and increment of the state-owned assets; guides and pushes forward the reform and restructuring of SOEs; appoints and removes top executives of SOEs; is responsible for organizing SOEs to turn gains over to the state; is responsible for urging SOEs to carry out laws and regulations for safety production; directs and supervises the management work of local state-owned assets; and undertakes other tasks assigned by the State Council.  See *Id.* 00115, Exhibit "M", attached hereto.

21.     SASAC also has a presence in the United States through CNBM USA Corporation, located at 17800 Castleton Street, Suite 558, City of Industry, California 91748.  CNBM USA was established in 2006 the same year that Taihe (Taishan) sold Chinese-manufactured drywall to Venture Supply Inc. CNBM (USA) Corporation has the announced mission to provide all kinds of building materials and services in the national market. See CNBM USA Corporation, Document No. 00122, Exhibit "O", attached hereto.

---

[1] Available at http://www.sasac.gov.cn/n2963340/n2963393/2965120.html

5

22. CNBM's Gypsum Board business production at December 31, 2008 from its wholly owned subsidiary, Taishan Gypsum Co., was 269.0 million M and $262.3 million yuan.

23. Taihe's (Taishan) revenue for 2006 was 773,000,000 yuan. A yuan is worth approximately 6.8 dollars.

24. Taishan manufactures more than 60 types of products including standard plasterboard. See Product Information, Document No. 00153, Exhibit "P", attached hereto.

25. In addition to the shipments in 2006 to Venture Supply, Taishan Plasterboard Co., Ltd. Shipped 76 shipments of plasterboard to the U.S. between March 2006 and August 2007 to four U.S. ports. See Plasterboard Export to U.S., Document No. 00175, Exhibit "Q", hereto attached.

26. BNBM in 1996 became "Beijing New Building Material (Group) Co., Ltd. a wholly state-owned corporation. Then in 1997 Beijing New Building Material Public Limited Company was founded and publicly listed but controlled by BNBM (Group) Co. Ltd. and other government entities. See BNBM Timeline: History, Document Nos. 00331-32, Exhibit "R", attached hereto.

27. On March 23, 2006 BNBM's holding subsidiary China National Building Material Co., Ltd. was listed on exchange.

FURTHER AFFIANT SAYETH NOT.

RUSS M. HERMAN
HERMAN, HERMAN, KATZ & COTLAR, L.L.P.

SWORN TO AND SUBSCRIBED
before me, this 19 day of
February , 2010.

NOTARY PUBLIC
PARISH OF ORLEANS
STATE OF LOUISIANA
Stephen J. Herman, La. Bar No. 23129

6

# EXHIBIT A

**FOR THE COURT'S EYES ONLY**

# EXHIBIT B

**RBC Centura**
International Department
200 Providence Road, 3rd Floor
Charlotte NC 28207

**Application and Agreement**
**For Commercial Documentary Credit**

**Date: November 09, 2005**

Please issue an irrevocable documentary credit in accordance with this application and forward same to your correspondent for delivery to the beneficiary as indicated below (by check "x"). In issuing the Credit you are expressly authorized to make such changes from the terms herein below set forth as you in your safe discretion may deem advisable provided that no such changes shall vary the principal terms hereof.

Transmit by:   X☐ Cable   ☐ Courier

| Advising Bank: | Applicant (name and address) |
|---|---|
| AGRICULTURAL BANK OF CHINA, TAIAN BRANCH<br>NO.96 YINGXUAN STREET TAIAN SHANDONG, P.R.CHINA 271000<br>SWIFT BIC: ABOCCNBJ150; ACCOUNT: 1408010016050<br>TEL: 0086-538-8228899, EXT 2056/2058 | Ventura Supply Inc.<br>1140 Azalea Garden Road<br>Norfolk, VA 23502-5612 |

| Beneficiary (name and address) | Amount |
|---|---|
| Shandong Taihe Dongxin Co., Ltd<br>South Suburb of Taian,<br>Shandong Province<br>People's Republic of China | In Words: four hundred twenty-nine thousand six hundred US dollars<br>In Figures: $429,600.00<br>X☐ Maximum   ☐ Approximately   ☐ Variance (+/- 10%) |

**Expiration Date: January 08, 2006**   In the country of the beneficiary unless otherwise indicated.

Available by drafts at sight drawn on you or at your option, any of your correspondents.
(indicate tenor – Sight, 30 days, 60 days, etc.)
(For time drafts only) Discount charges, if any, for the account of the ☐ applicant   ☐ beneficiary.

Drafts must be accompanied by the following documents in triplicate unless otherwise stipulated (as checked):
X☐ Signed Commercial Invoice
☐ Negotiable ☐ Marine ☐ Air Insurance Policy or Certificate, in duplicate, for 110% of CIF value (unless otherwise specified) covering All Risks and War Risks and other risks (please specify) _____.
X☐ Insurance to be effected by ourselves. We agree to keep insurance coverage in force until this transaction is completed.
X☐ Full set of clean on board ☐ port to port Ocean Bills of Lading X☐ multimodal transport document issued to the order of X☐RBC Centura ☐ The applicant ☐ Shipper, blank endorsed ☐ _____
☐ Clean Air Waybill consigned to ☐ The applicant ☐ _____
☐ Marked Freight X☐ Collect ☐ Prepaid and notify the applicant and ☐ Rogers & Brown Customs Brokers, 6160 Kempsville Circle, Suite 314A, Norfolk, VA 23502, TEL (757) 455-8522, FAX (757) 455-8531, attn Maryann
X☐ Packing List showing each pallet containing 3 hacks of 34 drywall boards each, plastic wrapped, steel banded
X☐ Other documents, if any: Inspection Certificate from Tobin Trading Inc. stating that they have inspected the goods (120,000 sheets of 3660 x 1220 x 12.7 mm Gypsum board (T/E)) in seller's factory and that they meet buyer's specifications, meet all applicable USA ASTM rating and Fire rating standards, and that pallets are constructed of drywall material or other material not subject to insect infestation (no wood), and that packing meets buyer's requirements, as per packing list.

Covering shipment of: 120,000 sheets of 3660 x 1220 x 12.7 mm Gypsum board (T/E) at USD3.58 / sheet

☐C.I.F.   ☐CFR   ☐C & I   X☐ F.O.B. Qingdao, China
(name of city, port, or airport)

Shipment from: Qingdao China
Shipment to: Norfolk, VA USA
Latest shipment date: December 09, 2005

Partial shipments: X☐ Permitted ☐Prohibited
Transshipments:   ☐ Permitted X☐Prohibited

X☐ Documents must be presented or negotiated no later than 21 days after date of shipment, but no later than the expiration date.
X☐ All banking charges outside the issuing bank for beneficiary's account.
☐ All banking charges for account of the ☐ applicant ☐ beneficiary.
☐ This Documentary Credit is transferable by the advising bank.
Special Instructions:

Unless otherwise expressly stated herein, this documentary credit is subject to the Uniform Customs and Practice for Documentary Credits, current revision in force as of date of this application.

**V001812**

## TERMS AND CONDITIONS OF APPLICATION AND AGREEMENT FOR COMMERCIAL DOCUMENTARY CREDIT

In consideration of your issuing, at our request, your Documentary Credit (herein called "the Credit") substantially in accordance with the Application appearing on page one hereof, the undersigned agree as follows:

1. We certify that each draft or acceptance under or purporting to be under the Credit will grow out of transactions pursuant to definite bona fide contracts for the shipment of goods within a specified reasonable time.

2. As to drafts or acceptances under or purporting to be under the Credit, which are payable in the United States Currency, we agree (a) in the case of each sight draft, to reimburse you at your issuing office, on demand, in United States legal tender, the amount paid on such draft, or, if so demanded by you, to pay to you at said office, in advance in such legal tender the amount required to pay such draft, and (b) in the case of each acceptance, to pay to you, at said office, in United States legal tender, the amount thereof, on demand but in any event not later than one business day prior to maturity. or, in case the acceptance is not payable at your office, then on demand, but in any event in time to reach the place of payment in the usual course of the mails not later than one business day prior to maturity

3. As to drafts or acceptances under or purporting to be under the Credit, which are payable in currency other than United States currency, we agree (a) in the case of each sight draft, to reimburse you, at your issuing office, on demand, the equivalent of the amount paid, in United States legal tender at the rate of exchange then current for cable transfers to the place of payment in the currency in which such draft is drawn; and (b) in the case of each acceptance, to furnish you, at said office, on demand, but in any event in time to reach the place of payment in the usual course of the mails not later than one business day prior to maturity, with first class bankers' demand bills of exchange to be approved by you for the amount of the acceptance, payable in the currency of the acceptance and bearing our endorsement, or, if you so request, to pay to you, at said office. on demand, the equivalent of the acceptance in United States legal tender at the rate of exchange then current for cable transfers to the place of payment in the currency in which the acceptance is payable.  A demand made on one of us shall fix the exchange rate as to all of us If for any reason whatsoever there shall be at the time of your demand for reimbursement or payment no rate of exchange current for effective cable transfers to the place of payment in the currency in which any such draft is drawn on any such acceptance is payable, we agree to pay you. on demand, in United States legal tender an amount which in your sole judgment shall be sufficient to meet our obligations hereunder, which amount may be applied by you at any time as a payment on account of such obligations, or at your option, held as security therefor: it being understood, however, that we shall remain liable for any deficiency which may result if such amount in United States-legal tender shall prove to be insufficient to effect full payment or reimbursement to you at the time when a rate of exchange for such cable transfers shall be again current.

4. We also agree to pay you, on demand, your commission and all charges and expenses (including all charges for legal services) paid or incurred by you in connection with the Credit, plus correspondents' charges, if any, and interest where chargeable.

5. That, if the foregoing application requests the inclusion in the Credit of any provision for Clean Advances to the beneficiary, you may place in the Credit such a provision in that respect as you may deem appropriate, under which any bank entitled to negotiate drafts under the Credit, acting in its discretion in each instance and upon the request and receipt in writing from the beneficiary, may make any one or more Clean Advances at any time on or prior to the date by which drafts are to be negotiated under the Credit  The aggregate of such advances shall in no event be more than the amount specified in the Application for Clean Advances, and in no event shall any such advance exceed the amount remaining available under the Credit at the time of the advance.  While it is expected by us that each such advance will be repaid to the bank that made the advance by the beneficiary from the proceeds of any drafts drawn under the Credit, should any such advances not be thus repaid, we will on demand pay you the amounts thereof as if such advances were evidenced by drafts drawn under the Credit, together with interest on each such amount for the period that the same shall have been outstanding as such rate as you may find at the time of demand to be payable.  It is understood that neither you nor any bank which may make such advances shall be obligated to inquire into the use that may be made thereof by the beneficiary and that you and each such bank shall be without liability for any wrongful use that may be made by the beneficiary of any funds so advanced.

6. We hereby recognize and admit your unqualified right to the possession and disposal of all property shipped or warehoused under or pursuant to or in connection with the Credit, in any way relative thereto or to the drafts drawn thereunder, whether or not released to any of us on trust or bailee receipt or otherwise, and also in and to all shipping documents, warehouse receipts, policies or certificates of insurance and other documents accompanying or relative to drafts drawn under the Credit, and in and to the proceeds of each and all of the foregoing, until such time as all the obligations and liabilities of us or any of us to you at any time existing under or with reference to the Credit or this agreement, or any other credit or any other obligation or liability to you, whether now existing or hereafter created or arising, have been fully paid and discharged, all as security for such obligations and liabilities; and that all or any of such property and documents, and the proceeds of any thereof, coming into the possession of you or any of your correspondents, may be held and disposed of by you as herein provided: and the receipt by you, or any of your correspondents, at any time of this security, of whatever nature, including cash, shall not be deemed a waiver of any of your rights or powers herein recognized.

7. Unless otherwise instructed by you. we agree from time to time to give you trust receipts in any form acceptable to you for any property or documents released by you to any of us and to sign and deliver to you such Statements of Trust Receipt Financing, such Security Agreements and/or such Financing Statements as you may from time to time request in any form acceptable to you.  We will pay any relative filing fees  In the event you receive some, but not all, of the documents against which availments may be made and, at our request. you deliver such documents to us, against trust receipt or otherwise, prior to the presentation of the relative draft, we agree to pay you on demand the amount of any claim made against you by reason thereof and authorize you to pay or accept (as the case may be) such draft when it is presented, regardless of whether or not such draft or any documents which may accompany it complies with the terms of the Credit.

8. Except so far as otherwise expressly stated in the Credit, we agree (a) that you and any of your correspondents may receive and accept, as a "Bill of Lading" relative to the Credit, any document issued or purporting to be issued by or on behalf of any carrier which acknowledges receipt of property for transportation, whatever the specific provisions of such documents, and any such bill of lading issued by or on behalf of an ocean carrier may be accepted by you as in "Ocean Bill of Lading" whether or not the entire transportation is by water, and the date of every bill of lading shall be deemed the date of shipment of the property mentioned therein, and (b) that you and any of your correspondents may receive and accept as sufficient and controlling the description of the property contained in the invoice and also receive and accept bills of lading, insurance, and other documents. however variant in description from that contained in the invoice: and (c) that you and any of your correspondents may

receive and accept bills of lading containing stamped, written, or typewritten provisions thereon, whether or not signed or initialled, and you and any of your correspondents may assume conclusively that the same were placed with proper authority on the bill of lading at the time of its signing and issuance by the carrier or any agent thereof; and (d) that if the Credit states that except so far as expressly stated it is subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce. Paris, France, which are in effect on the issue date (herein called the "Uniform Customs") the Credit shall be so subject in all respects, and (e) that, if the Credit does not state that except so far as otherwise expressly stated it is subject to the Uniform Customs, you and any of your correspondents may, without limiting the type of document acceptable according to any other provisions of this agreement, accept documents, of any character which comply with the Uniform Customs or which comply with the laws or regulations in force and customs and usages of the place of negotiation; and (f) that you and any of your correspondents may receive and accept as documents of insurance under the Credit either insurance policies or insurance certificates which need not be for an amount of insurance greater than the amount paid by you under or relative to the Credit; and (g) that you and any of your correspondents may receive. accept and pay as complying with the terms of the Credit, any drafts or other documents , otherwise in order, which may be signed by, or issued to, the administrator or executor of, or the trustee in bankruptcy of. or the receiver for any of the property of, the party in whose name the Credit provides that any drafts or other documents shall be drawn or issued.

9.   Except as otherwise expressly stated in the Credit, we agree (a) that part shipment may be made under the Credit and that you may honor the relative drafts without inquiry regardless of any apparent disproportion between the quantity shipped and the amount of the relative draft and the total amount of the Credit and the total quantity to be shipped under the Credit; and (b) that if the Credit specified shipments in installments within stated periods and the shipper fails to ship in any designated period. shipments of subsequent installments may nevertheless be made in their respective designated periods and you may honor the relative drafts.

10.   We agree that in the event of any extension of the maturity or time for presentation of drafts, acceptances or documents, or any other modifications of the terms of the Credit, at the request of any of us, with or without notification to the others, or in the event of any increase in the amount of the Credit at our request. this agreement shall be binding upon us with regard to the Credit so increased or otherwise modified to drafts, documents and property covered thereby, and to any action taken by you or any of your correspondents in accordance with such extension, increase, or other modification.

11.   We hereby expressly authorize you and any of your correspondents to accept and pay at your option any drafts drawn under or purporting to be drawn under the Credit notwithstanding any discrepancies or irregularities between the drafts and documents presented and those required by the terms of the Credit; provided that as to discrepancies and irregularities not otherwise covered by the provisions of this agreement, you or your correspondent so accepting or paying must be furnished with an indemnity satisfactory to you which, running in our favor as well as yours covers the discrepancies or irregularities but is limited to the actual damage directly attributable to such discrepancies or irregularities.

12.   We assume all risks of the acts or omissions of the users of the Credit. We agree that should the beneficiary under the Credit, upon receipt of advice by cable, or otherwise, of the issuance of the Credit, but prior to its actual receipt. negotiate drafts by virtue of such advice. such negotiation shall be considered a proper one and shall be included under the terms and subject to all conditions hereof, and we assume all the risks of the misuse of the Credit whatsoever. Neither you nor your correspondents shall be responsible: for the existence, character, description. quality, quantity, weight, condition. packing, value, or delivery of the property purporting to be represented by documents; for any difference in character, description, quality, quantity, weight, condition, packing, or value of the property from that expressed in documents: for the form. validity, sufficiency, genuineness or legal effect of documents, even if such documents should in fact prove to be in any or all respects invalid, insufficient, fraudulent, or forged; for the time, place, manner, or order in which shipment is made: for partial or incomplete shipment, or failure or omission to ship any or all of the property referred to in the Credit; for the character, adequacy, validity. or genuineness of any insurance. for the solvency or responsibility of any insurer, or for any other risk connected with insurance; for any deviation from instructions, delay, default or fraud by the shipper or anyone else in connection with the property or the shipping thereof; for the solvency, responsibility or relationship to the property of any party issuing any documents in connection with the property; for delay in arrival or failure to arrive of either the property of any of the documents relating thereto; for delay in giving or failure to give notice of arrival or any other notice; for any breach of contract between the shippers or vendors and ourselves or any of us. for the validity or sufficiency of any instrument assigning or purporting to assign the Credit or the rights or benefits thereunder or proceeds thereof in whole or in part, which may prove to be invalid or ineffective for any reason. or failure of any draft to bear any reference or adequate reference to the Credit, or failure of documents to accompany any draft at negotiation. or failure of documents to accompany any draft at payment if sent by duplicate mail, or failure of any person to note the amount of any draft on the reverse of the Credit or to surrender or take up the Credit or to send forward documents apart from drafts as required by the terms of the Credit. each of which provisions, if contained in the Credit itself. it is agreed may be waived by you, or for errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail. cable, telegraph. wireless or otherwise, whether or not they be in cipher, nor shall you be responsible for any error, neglect, or default of any of your correspondents for errors in translation or for errors in interpretation of technical terms or for any consequences arising from causes beyond your control; and none of the above shall affect, impair, or present the vesting of any of your rights or powers hereunder. You shall have the right to transmit the terms of the Credit without translating them. We shall protect you and any other drawee in paying any draft dated on or before the expiration of any time limit expressed in the Credit regardless of when drawn and when or whether negotiated. If the Credit provides that payment is to be made by your correspondent. neither you nor such correspondent shall be responsible for the failure of any of the documents specified in the Credit to come into your hands or for any delay in connection therewith. and our obligation to reimburse you for payments made or obligations incurred shall not be affected by such failure or delay in the receipt by you of any such documents. In furtherance and extension and not in limitation of the specific provisions hereinbefore set forth. we agree that any action taken by you or any correspondent of yours. under or in connection with the Credit or the relative drafts. documents. or property. if taken in good faith, shall be binding on us, and shall not put you or your correspondent under any resulting liability to us: and we make like agreement as to any inaction or omission unless in breach of good faith.

You shall not in any way be liable for any failure by you or anyone else to pay or accept any draft or acceptance under the Credit resulting from any censorship. law. control, or restriction rightfully or wrongfully exercised by any de facto or de jure domestic or foreign government or agency or from any other cause beyond your control or the control of your correspondents. agents. or sub-agents of for any loss or damage to us or anyone else resulting from any such failure to pay or accept, all such risks being expressly assumed by us. and we agree to indemnify and hold you harmless from any claim. loss. liability, or expense arising by reason of any such failure to pay or accept. We are responsible to you for all obligations imposed upon you with respect to the Credit or the relative drafts, documents. or property.

V001814

13. We agree to procure promptly any necessary import and export or other licenses for the import or export or shipping of the property and to comply with all foreign and domestic governmental regulations in regard to the shipment of the property or the financing thereof, and to furnish such certificates in that respect as you may at any time require, and to keep the property adequately covered by insurance satisfactory to you. In companies satisfactory to you. and to assign the policies or certificates of insurance to you, or to make the loss or adjustment, if an. payable to you. at your option: and to furnish you if demanded with evidence of acceptance by insurers of such assignment.

14. Each of us agrees, at any time and from time to time, on demand, to deliver to you. as a security for any and all of the liabilities of us and any of us hereunder and all other liabilities of us and any of us to you. direct or contingent, joint, several, or independent, now or hereafter existing. due or to become due, whether created directly or acquired by assignment or otherwise, additional property satisfactory to you or to make such payment as you may require. Each of us agrees that the balance of every account of us or any of us with you and each claim of us or any of us against you existing from time to time, shall be subject to a lien and subject to be set off against any and all such liabilities of us or any of us: and you may at any time or from time to time at your option and without notice appropriate and apply toward the payment of any of such liabilities of us or any of us the balance of each such account of us or any of us with you and each such claim of us or any of us against, and we and each of us will continue to be liable for any deficiency. Each of us agrees that all property of every description now or hereafter in your possession or custody or in transit to you for any purpose including safekeeping, collection, or pledge, for the account of us or any of us, or as to which we or any of us may have any interest, right, or power, whether or not such property is in whole or in part released to us or any of us on trust or bailee receipt, are hereby made security and subject to a lien and security interest in your favor for any and all such liabilities of us or any of us. You may at any time and from time to time, without notice, transfer into your own name or that of your nominee any property so held as collateral. Each of us agrees that upon the failure of us or any of us at all umes to keep a margin of security with you satisfactory to you, or upon the non-payment or non-fulfillment of any such liabilities of us or any of us when they shall become due or be made due, or upon the death or insolvency of us or any of us, or upon the suspension of business of us or any of us, or upon the issuance of any warrant of attachment against the credits or any of the property of us or any of us. or upon the making by us or any of us of any assignment for the benefit of creditors, or upon the application for the appointment or the appointment of a trustee or receiver for us or any of us or for any of the property of any of us for the purpose of conserving the assets of any of us, or upon any proceedings being commenced by or against us or any of us under or purporting to be under any bankruptcy, reorganization, arrangement, readjustment of debt, receivership, liquidation, dissolution, winding up, adjustment. compensation or liquidation law or statute of any jurisdiction, then and in any such event. (a) any and all such liabilities of us or any of us shall, at your option. become and be immediately due and payable, without notice, presentation, demand of payment or protest, all such being hereby expressly waived, and notwithstanding any credit or time allowed to any of us, or any instrument evidencing such liabilities or otherwise, and (b) you shall have the right from time to time to sell, re-sell, assign, and deliver all or any part of the property securing any liabilities of us or any of us, arrived or to arrive, at any Brokers' Board of Exchange, or a public or private sale, at your option, without having the property at the place of sale, in such parcel or parcels and at such time or times and at such place or places, and upon such terms and conditions as you may deem proper, and in connection therewith may grant options all without demand, advertisement or notice to us or any of us, all of which are hereby expressly waived, and to apply the net proceeds of such sale or sales to the payment of any and all such liabilities and we and each of us will continue liable to you for any deficiency, with interest. Upon each such sale, you may purchase the whole or any part of the property of us or any of us being sold, free from any right of redemption, which we and each of us hereby expressly waive and release. Demands or calls for collateral on or any notices to us or any of us respectively (a) may be made or given by you by leaving same at the last known address of us or any of us respectively or by mailing, telegraphing, cabling, radioing, telephoning, or otherwise sending same to such address, with the same effect as if delivered to all of us in person, (b) shall be considered made as of the time of such leaving or mailing, telegraphing, cabling, radioing, telephoning, or other sending by public agencies of communication Each of us agrees that with or without notification to any of us, you may exchange, release, surrender, realize upon, release on trust receipt to any of us, or otherwise deal with any property by whomsoever pledged, mortgaged, or subjected to a security interest to secure directly or indirectly any of the obligations hereunder or for which any of the undersigned may be liable.

We will bear and pay all expenses of every kind (including all charges for legal services) of the enforcement of any of your rights herein mentioned, of any claim or demand by you against us or any of us, and of any actual or attempted sale, exchange, enforcement, collection, maintenance, retention, insurance, compromise, settlement, release, delivery on trust receipt or delivery of any such security, and of the receipt of proceeds thereof, and will repay to you any such expenses incurred by you.

15. None of your options, powers, or rights (including those hereunder) shall be waived unless you or your authorized agent shall have signed such waiver in writing. No such waiver. unless expressly as stated therein, shall be effective as to any transaction which occurs subsequent to the date of such waiver. nor as to any continuance of a breach after such waiver. No segregation or specific allocation by you of specified collateral against any liability shall waive or affect any lien of any sort against other securities or property or any of your options, powers. or rights (including those hereunder).

16. The word "property" as used in this agreement includes goods, merchandise, securities, funds. closes in action, and any and all other forms of property, whether real, personal. or mixed and any right or interest therein. Property in your possession shall include property in possession of anyone for you in any manner whatsoever. Your options. powers, and rights specified in this agreement are in addition to those otherwise created. You are hereby expressly given the right and power in furtherance of any right, power, or privilege which you may have hereunder or in connection with the Credit to execute endorsements. assignments, or other instruments of conveyance to transfer in our name. place. and stead covering any property standing in our name or belonging to us of every kind and description which you may hold or which may come into your possession under the Credit or by reason of this agreement.

17 If the undersigned is a banking institution, the undersigned hereby appoints you as its agent to the extend of issuing the Credit in accordance with. and subject to the terms and provisions of the foregoing Application and Agreement for Documentary Letter of Credit.

18. This agreement shall be binding upon us, our heirs, executors, administrators, successors and assigns and shall inure to the benefit of, and to be enforceable by you, your successors. transferees, and assigns. If this agreement should be terminated or revoked by operation of law as to us. or any of us. we will indemnify and save you harmless from any loss which may be suffered or incurred by you in acting hereunder prior to the receipt by you, or your transferees or assigns. of notice in writing of such termination or revocation. If this agreement is signed by two or more parties. it shall be the joint and several agreement of such parties and whenever used herein, the singular number shall include the plural. and the plural the singular. This agreement shall be governed by and construed in accordance with the law of the State of North Carolina.

V001815

19. We hereby certify that transactions in the merchandise covered by this application are not prohibited under the Foreign Assets Control or Cuban Assets Control Regulations of the United States Treasury Department, and that any importation covered by this application conforms in every respect with all existing United States Government regulations and executive orders.

20. We agree that if we obtain possession of merchandise covered under this documentary credit prior to Centura Bank's receipt and review of the required documents, all discrepancies on said documents will be automatically waived.

21. We warrant that no shipment in connection with this transaction is or will be in violation of U.S. Treasury Department Foreign Assets Control Regulations.

22. This Documentary Credit is secured by:

_Venture Supply Inc._
(Corporation or Firm)

By: _____ _President_
(Authorized Signature and Title)

_____ (SEAL)
(Individual)

Venture Supply, Inc.
1140 Azalea Garden Road
Norfolk, VA 23502
Phone: 757-855-5433
Fax: 757-857-0283

VENTURE SUPPLY INC.

# FAX

To: _Vernon_                              From: Jessica A. Richardelli

Fax : _892-2045_                          Date: _11/9/05_

Phone:                                    Pages: _6_

Re: _Letter of Credit_                    CC:

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply

V001817

# EXHIBIT C

**Leslie Waddell**

| | |
|---|---|
| **From:** | phillip perry [phillipwperry@hotmail.com] |
| **Sent:** | Wednesday, November 16, 2005 10:52 PM |
| **To:** | clempw1123@163.com |
| **Cc:** | Leslie Waddell |
| **Subject:** | Labeling Tape and Back of Board |

Frank:

1) The following information to be printed on one line for the Edge Binding Label tape:

# 4' x 12' x 1/2"   GYPSUM BOARD DISTRIBUTED BY VENTURE SUPPLY INC. 757-855-5433   VENTURESUPPLY.COM

2) On the back of the board the following is to be printed on two lines:

# VENTURE SUPPLY INC.

MFG.  SHANDONG TAIHE DONGXIN CO., LTD, CHINA

*Phillip W. Perry*

11/17/2005

**EXHIBIT**

PSC-VPB 81

V002541

Nov 14 05 07:57a

p.1
Page 1

①  As Soon As
   I Get Documents
   In English ~~yes~~
②  NO
③  yes      ④  yes

Subj.       China Drywall
Date:       11/14/2005 7:34:52 AM Eastern Standard Time
From:       phillipwperry@hotmail.com
To:         porterblaine1@aol.com
CC:         dwoods3@cox.net

Sam:

The translation of the documents is being done by Frank Clem. Clear original will be provided with translation

ASTM Rating - They are not clear on the requirements of the fire rating. Frank has asked if you can remove
requirement from the LC or give him a pass by using the Chinese fire rating he has provided? Do you need
fire rating for 1/2" drywall? He also asked if you could get the ASTM fire rating tests done in the USA?
②  No     ③  yes

Production Date - projected for 5-6 days after receipt of the down payment. It will take 12 days to make the
board, so I should be out of here in around 18-20 days. We will be delayed by 2 days, because Susan has
an order for 20,000 boards, 1/2" x 4' x 12'. That board is going to the USA. Our down payment is cost
us. Frank asked me to check the board for the right dimensions. He said that it was a test run, before mak
ours.

Edge Bonding Tape - They are getting a paper tape with a light blue background and dark blue letters that
the information you provided. Do you want "VENTURESPUPPLY.COM" or something else printed on the b
the board also?     ④ yes     ⑤

Production Capability - They have a capacity for at least 20,000 boards a day here. If you enter into a mon
purchase agreement with them, they will make a contract with an ocean shipping line to provide scheduled
deliveries to Venture Supply. The requirement for a 30% down payment will also be reviewed for better pay
terms.

Plaster Board - They use the same board as I sent you for their drywall and plaster board. If you were to se
sample of plaster board and/or specifications, they will see what their paper factory can come up with.

Moisture Board - Samples will be put in shipment of drywall.

Fiberglass Insulation - There is a fiberglass factory nearby and Frank will introduce me to the manager. I v
a sample of what they make for you.

Drywall Screws - Franks company makes drywall screws. I gave samples of fine and coarse thread screws
their factory representative. I am waiting on a price. In what quantity would you be interested in buying?
⑥

Well, that is all I got done today. Please reply and let me know your thoughts on these maters. Some of th
on a short fuse.

Phillip W. Perry

⑤  Put Chinese Info on Board

⑥  Not Sure at this time

Monday, November 14, 2005 America Online: PORTERBLAINE1

EXHIBIT
PSC-VPB
46

V002592

# EXHIBIT D

DEC-05-2005 MON 01:09 PM R B C CENTURA LENDING     FAX NO. 7578922045            P. 02/02

Page 1 of 2

Mary (RBC Centura)

m:       Leslie Waddell [lwaddell@Porterblaine.com]
Sent:    Tuesday, November 15, 2005 8:49 AM
To:      Edney, Mary (RBC Centura)
Subject: FW: Amended Letter of Credit and Wiring Instructions

From: Leslie Waddell
Sent: Tuesday, November 15, 2005 8:30 AM
To: 'vernon.towler@rbc.com'; 'kenneth.bender@rbc.com'
Subject: Amended Letter of Credit and Wiring Instructions

Per Sam, please amend the Letter of Credit to delete the ASTM requirement. We already have the test results here. The 30% deposit is to be wired out of Venture Supply operating account #2040015169.

Wiring instructions are as follows:

FOR THE CASH WIRE TRANSFER:

AGRICULTURAL BANK OF CHINA, TAIAN BRANCH
25 YINGXUAN ROAD, TAIAN, CHINA
ACCOUNT NO. 1408010018050

FOR THE DELIVERY OF THE L/C:

AGRICULTURAL BANK OF CHINA, TAIAN BRANCH
95 YINGXUAN STREET, TAIAN SHANDONG P.R. CHINA 271000

SWIFT BIC: ABOCCNBJ150

TELEPHONE: 0086-538-8228699 EXT 2056/2058
FAX: 0085-538-8336916

I will call you shortly to make certain you have received this information and that all will progress smoothly.

Thank you, Leslie

*Leslie Waddell*
Executive Assistant
Legacy Properties Group, LLC
1140 Azalea Garden Road
Norfolk, VA  23502
757-889-9184
757-857-0285 Fax

11/15/2005



EXHIBIT
PSC-VPB
49

V000393

NOV-18-2005 FRI 01:10 PM RBC CENTURA          FAX NO. 704 686 1498          P. 02

!!! LIVE  !!!!  LIVE  !!!!  LIVE  !!!!!! LIVE  !!!  LIVE  !!!!  LIVE

Req by: TOR AUTOUSC    In: AUT PRT    11/18/05   12:59    Page    1
ICN: CA 051118-155456-001 Que: CA TOR USC ADMR           Pri 150 DupN
Msg Type: ENTERED        Poss Dup: N Pri: N
Time Created: 11/18/05 12:58
Completion: MESSAGE ACTIVE            Exception:
Correspondent: 0329995               II
Amount:
Name: AGRICULTURAL BK OF CHINA.,JINAN
Address: 182 JINGSI WEIER ROAD
Address:
City: JINAN                Cntry: CHINA           PC: 25001
CE2 SWIFT msg type: 707    Curr Code: 0
Output Dest: YES          Parent ICN:            Ansb:
Pri Service: SWF  Addr: ABOCCNBJ150707
Alt Service:      Addr:                          Ansb:
Cable Charges     Method:  W    Amount:
Cost Center:              Account ID:

TO: Jessica
FROM: CC. Vernon
RBC CENTURA
INTERNATIONAL SERVICES
Owner Office: TOR/USC

Sent Date/Time: 11/18/05   12:58      Completion: SENT, SVC ACCEPTED
Service SWF   Ref: F051118CNTAUS33AXXX   Sequence: 038113   Poss Dup: N
Delivery:  ICN: CA 051118-161662-000  Date/Time: 11/18/05     12:59
Answerback Received:

CNTAUS33AXXX
707 02
ABOCCNBJ150

:20:IMP-4535
:21:UNKNOWN
:31C:051109
:30:051118
:26E:02
:59:SHANDONG TAIHE DONGXIN CO.,LTD.
SOUTH SUBURB OF TAIAN
SHANDONG PROVINCE
PEROPLE'S REPUBLIC OF CHINA
:79:1-FIELD 46A ITEM 4 NOW TO READ AS FOLLOWS:
INSPECTION CERTIFICATE FROM TOBIN TRADING INC.
STATING THAT THEY HAVE INSPECTED THE GOODS
(120,000 SHEETS OF 3660 X 1220 X 12.7 MM GYPSUM
BOARD (T/E)) IN SELLER'S FACTORY AND THAT THEY
MEET BUYER'S SPECIFICATIONS, MEET ALL APPLICABLE
USA FIRE FATING STANDARDS AND THAT PALLETS
ARE CONSTRUCTED OF DRYWALL MATERIAL OR OTHER
MATERIAL NOT SUBJECT TO INSECT INFESTATION (NO
WOOD), AND THAT PACKING MEETS BUYER'S
REQUIREMENTS, AS PER PACKING LIST.

Remove

---------  END OF MESSAGE  ----------

!!! LIVE  !!!!  LIVE  !!!! LIVE  !!!!!! LIVE  !!!  LIVE  !!!!  LIVE
{1:F21CNTAUS33AXXX3705038113}{4:{177:0511181259}{451:0}} ORIGINAL ICN: CAO

EXHIBIT
PSC-VPB
50

V001805