UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN RE: CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY
LITIGATION

                          CIVIL DOCKET NO. 09-MD-2047-EEF-JCW
                          SECTION "L"
                          NEW ORLEANS, LOUISIANA
                          WEDNESDAY, NOVEMBER 3, 2010, 1:30 P.M.

THIS DOCUMENT RELATES TO:

ROBERT C. PATE, AS TRUSTEE
FOR THE CHINESE DRYWALL
TRUST

V

AMERICAN INTERNATIONAL
SPECIALTY LINES INSURANCE
COMPANY, FCCI COMMERCIAL
INSURANCE COMPANY, FCCI
INSURANCE COMPANY, ET AL

2:09-CV-07791 (E.D. LA.)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

               TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFFS'
STEERING COMMITTEE:        HERMAN HERMAN KATZ & COTLAR
                           BY:  LEONARD A. DAVIS, ESQUIRE
                           820 O'KEEFE AVENUE
                           NEW ORLEANS, LA 70113

```
 1  APPEARANCES CONTINUED:

 2

 3                              LEVIN, FISHBEIN, SEDRAN & BERMAN
                                BY:  ARNOLD LEVIN, ESQUIRE
 4                                   FRED S. LONGER, ESQUIRE
                                510 WALNUT STREET, SUITE 500
 5                              PHILADELPHIA, PA 19106

 6

 7  FOR ROBERT C. PATE:        ANDERSON KILL & OLICK
                                BY:  ROBERT M. HORKOVICH, ESQUIRE
 8                                   ANNA M. PIAZZA, ESQUIRE
                                1251 AVENUE OF THE AMERICAS
 9                              NEW YORK, NY 10020

10

11  FOR THE INSURANCE
    STEERING COMMITTEE:        BARRASSO, USDIN, KUPPERMAN,
12                             FREEMAN & SARVER
                                BY:  H. MINOR PIPES, III, ESQUIRE
13                             LL&E TOWER
                                909 POYDRAS STREET
14                             SUITE 1800
                                NEW ORLEANS, LA 70112
15

16  FOR NGM INSURANCE
    COMPANY:                   HASSETT & DONNELLY
17                             BY:  DAVID F. HASSETT, ESQUIRE
                                446 MAIN STREET, 12TH FLOOR
18                             WORCESTER, MA 01608

19

20  FOR FCCI COMMERCIAL
    INSURANCE COMPANY:         GOODMAN MCGUFFEY LINDSEY & JOHNSON
21                             BY:  ROBERT M. DARROCH, ESQUIRE
                                3340 PEACHTREE ROAD, NE
22                             SUITE 2100
                                ATLANTA, GA 30326
23

24

25
```

```
1   APPEARANCES CONTINUED:

2


3   FOR AMERICAN INTERNATIONAL
    SPECIALTY LINES
4   INSURANCE COMPANY;
    NATIONAL UNION FIRE
5   INSURANCE COMPANY OF
    PITTSBURGH, PA; CHARTIS
6   SPECIALTY INSURANCE
    COMPANY:               HINKHOUSE WILLIAMS WALSH
7                          BY:  JOSEPH A. HINKHOUSE, ESQUIRE
                           180 NORTH STETSON STREET
8                          SUITE 3400
                           CHICAGO, IL 60601
9


10  FOR AUTO-OWNERS
    INSURANCE COMPANY,
11  OWNERS INSURANCE
    COMPANY:               MORROW, ROMINE & PEARSON
12                         BY:  ROGER S. MORROW, ESQUIRE
                           122 SOUTH HULL STREET
13                         P.O. BOX 4804
                           MONTGOMERY, AL 36104
14


15
    FOR AUTO-OWNERS INSURANCE
16  COMPANY, OWNERS INSURANCE
    COMPANY:               LEAKE & ANDERSSON
17                         BY:  JERRY L. SAPORITO, ESQUIRE
                               AMANDA W. VONDERHAAR, ESQUIRE
18                         ENERGY CENTRE
                           1100 POYDRAS STREET
19                         SUITE 1700
                           NEW ORLEANS, LA 70163-1701
20


21  FOR MID-CONTINENT
    CASUALTY COMPANY:       HINSHAW & CULBERTSON
22                          BY:  RONALD L. KAMMER, ESQUIRE
                            9155 S. DADELAND BOULEVARD
23                          SUITE 1600
                            MIAMI, FL 33156
24


25
```

```
1   APPEARANCES CONTINUED:

2

3   FOR CHARTIS SPECIALTY
    INSURANCE COMPANY,
4   LEXINGTON INSURANCE
    COMPANY, CHARTIS
5   CLAIMS, INC.:             MCGLINCHEY STAFFORD
                              BY:  ERIN FURY PARKINSON, ESQUIRE
6                             601 POYDRAS STREET
                              12TH FLOOR
7                             NEW ORLEANS, LA 70130

8

9   FOR LANDMARK AMERICAN
    INSURANCE COMPANY:        DEUTSCH, KERRIGAN & STILES
10                            BY:  MELISSA M. SWABACKER, ESQUIRE
                              755 MAGAZINE STREET
11                            NEW ORLEANS, LA 70130

12

13  FOR ILLINOIS UNION
    INSURANCE COMPANY:        COZEN & O'CONNOR
14                            BY:  ANDREA CORTLAND, ESQUIRE
                              ONE HOUSTON CENTER
15                            1221 MCKINNEY STREET
                              SUITE 2900
16                            HOUSTON, TX 77010

17

18  FOR AMERISURE INSURANCE
    COMPANY, AMERISURE MUTUAL
    INSURANCE COMPANY:        BOYER & HEBERT
19                            BY:  BRIAN K. ABELS, ESQUIRE
                              133 ASPEN SQUARE
20                            SUITE F
                              DENHAM SPRINGS, LA 70726

21

22  FOR CENTERLINE HOMES
    CONSTRUCTION, INC.:
23                            BROAD AND CASSSEL
                              BY:  VANESSA M. SERRANO, ESQUIRE
24                            ONE FINANCIAL PLAZA
                              SUITE 2700
25                            FORT LAUDERDALE, FL  33394
```

```
 1   APPEARANCES CONTINUED:

 2


 3   FOR THE STATE/FEDERAL
     COORDINATION COMMITTEE: BARRIOS, KINGSDORF & CASTEIX
 4                           BY:  DAWN M. BARRIOS, ESQUIRE
                             701 POYDRAS STREET, SUITE 3650
 5                           NEW ORLEANS LA 70139

 6


 7   OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                 500 POYDRAS STREET, ROOM B406
 8                               NEW ORLEANS LA 70130
                                 (504) 589-7779
 9

10   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                            **I N D E X**

2

3   SPEAKERS                                              PAGE

4

5   THE COURT............................................    7

6   MR. PIPES...........................................   10

7   MR. SAPORITO........................................   11

8   MR. HASSETT.........................................   19

9   MR. DARROCH.........................................   25

10   MR. KAMMER.........................................   35

11   MR. HORKOVICH......................................   43

12   MR. DARROCH........................................   58

13   MR. KAMMER.........................................   59

14   THE COURT..........................................   62

15   RECESS.............................................   64

16   THE COURT..........................................   64

17   MR. PIPES..........................................   64

18   MR. HINKHOUSE......................................   65

19   MR. HORKOVICH......................................   76

20   MR. HINKHOUSE......................................   84

21   THE COURT..........................................   86

22

23

24

25

1                    **P-R-O-C-E-E-D-I-N-G-S**

2                 WEDNESDAY, NOVEMBER 3, 2010

3            A F T E R N O O N   S E S S I O N

4                 (COURT CALLED TO ORDER)

5

6

7          THE DEPUTY CLERK:  Everyone rise.

8          THE COURT:  Be seated, please.

9               Good afternoon, ladies and gentlemen.

10              Call the case, please.

11         THE DEPUTY CLERK:  MDL 2047, *In re: Chinese Drywall*.

12         THE COURT:  Counsel, make your appearance for the

13   record, please.

14         MR. PIPES:  Minor Pipes on behalf of the Insurance

15   Steering Committee, Your Honor.

16         MR. DAVIS:  Good afternoon, Your Honor.  Leonard Davis

17   on behalf of the Plaintiffs' Steering Committee, and I'm going to

18   introduce Bob Horkovich, who has been before the Court.  He will

19   be arguing on behalf of the Plaintiffs' Steering Committee.

20         MR. HORKOVICH:  Thank you, Your Honor.

21         THE COURT:  This matter goes out of the MDL proceeding.

22   MDL 2047.  As we know, a number of cases have been filed in this

23   matter, and after a period of time in which the Court was able to

24   focus on organizational matters, it became timely to get to the

25   motions.

1           I established an order of proceeding on the

2   motions, and I have a number of motions before me today dealing

3   with the question of jurisdiction and joinder.  15 of the CGL

4   insurers stipulated to personal jurisdiction of the court, while

5   a number have not stipulated and have filed motions.

6           The cases involved the CGL insurers in the

7   following cases:  *Pate versus American International Specialty*

8   *Lines, Centerline Construction versus Mid-Continent,* and

9   *Northstar Holdings versus General Fidelity.*

10          I have a number of motions.  First, I would like to

11  take the motions to dismiss, and it might be best to take them in

12  the following way:  Let's do the *Pate* case first.  We have

13  Mid-Continent, FCCI, Owners Insurance Company and NGM Insurance

14  Company, and then Mid-Continent's motions in the Northstar and

15  Centerline Homes.  It seems that we can package them in that way.

16          Any suggestions contrary to that?

17      MR. PIPES:  Your Honor, we're in agreement.  I think we

18  had a slightly different order, but we wanted to take up the

19  jurisdictional motions first.

20          THE COURT:  Good, okay.

21      MR. PIPES:  The one question I think we had was, do you

22  want to take a motion, finish the motion, or do you want to do

23  them altogether?  And that was really the Court's preference.

24          THE COURT:  Well, it seems like the arguments, at least

25  many of them, are the same basic arguments, so it would seem that

1   the motions in the *Pate* case, it would be Mid-Continent, FCCI,

2   Owners Insurance and NGM Insurance, and then let the respondent

3   go to those.

4            MR. PIPES:  We were in agreement with that, Your Honor,

5   and that's perfect.

6            THE COURT:  Unless you all have a problem with that.

7            MR. PIPES:  No, I think that's fine, and I think the

8   first one up would be Owners.  Jerry Saporito will talk on behalf

9   of Owners.

10           MR. HORKOVICH:  Your Honor, if I could suggest a further

11  consolidation.

12           THE COURT:  Yes.

13           MR. HORKOVICH:  Vanessa Serrano is here for Centerline

14  and for Northstar, and she has had the misjudgment of permitting

15  me to argue on behalf of them, so I could argue Pate, Centerline

16  and Northstar all at the same time, Your Honor.  So if I could

17  basically let the insurance companies go, I'll have one

18  consolidated response on behalf of Pate, Centerline and

19  Northstar.

20           THE COURT:  Are you all okay with that?

21           MR. KAMMER:  Your Honor, Ronald Kammer.  It's nice to be

22  before you again.  I'm here on behalf of Mid-Continent

23  Casualty Company.  I agree with Mr. Horkovich whether

24  jurisdiction over my client applies in one case, it would apply

25  in the others.  I think it would save a lot of time.

 1          THE COURT:  Okay, let's do it that way, then.

 2          MR. PIPES:  Your Honor, before I turn it over to

 3   Mr. Saporito, I wanted to, in order to speed through this, I just

 4   want to give you the general outline of where we are, and I think

 5   Your Honor is familiar, but quickly, obviously, this -- in the

 6   *Pate* case and also in the *Centerline* and *Northstar* cases, these

 7   are Florida homebuilders.  In the *Pate* case, what's a little bit

 8   interesting is that homebuilder went bankrupt.  There's a

 9   bankruptcy court in Delaware and Pate is a trustee of a

10   Chinese Drywall Trust in Delaware.  And obviously, as Your Honor

11   pointed out, there's four insurers who have alleged for the three

12   or four subdivisions in Florida, that this Florida homebuilder

13   and with Florida insureds, that they don't have jurisdiction in

14   Louisiana.

15          I'm going to turn it over to Owners Mutual, who

16   will respond on their individual issues.

17          THE COURT:  Okay.  Before you leave, the cases that

18   we've mentioned are not cases that have been transferred under

19   1407.  They really are cases that have been filed in this

20   jurisdiction.  That also needs to be stated for the record.

21          MR. PIPES:  That's correct, Your Honor.  These were

22   filed directly in the Eastern District of Louisiana as original

23   cases in Louisiana.  They were not transferred by the JPMDL or by

24   another court, and some of them, and the individuals will deal

25   with it, have competing declaratory judgment actions in other

1    jurisdictions involving the same parties, but they'll deal with

2    this.

3            THE COURT:  Okay.

4            MR. PIPES:  Jerry.

5            THE COURT:  All right.

6            MR. SAPORITO:  Good afternoon, Your Honor.

7    Jerry Saporito here on behalf of Owners Insurance Company on our

8    Rule 12(d) motion to dismiss for lack of personal jurisdiction.

9            Owners Insurance Company was formed under the laws

10   of the State of Ohio.  The principal place of business is in the

11   State of Michigan.  In our motion to dismiss, our original motion

12   to dismiss, we attached an affidavit of Scott Norris, who is a

13   senior attorney with Auto-Owners, the parent company.  Mr. Norris

14   has also been deposed in this case, and the corporate deposition

15   of Auto-Owners and Owners has been taken through another senior

16   attorney by the name of Kathleen Lopilato.  So they have both

17   issued affidavits and both been deposed in the case.

18           The testimony is, from affidavits and from

19   depositions, is that, and I'm focusing now on Owners Insurance

20   because Owners is indeed a party in the litigation, but it would

21   be at this same formal Auto-Owners, which is the parent company

22   for Owners.

23           Owners is not licensed to write policies in the

24   State of Louisiana.  Owners does not write policies in the State

25   of Louisiana.  Owners does not maintain an office in the State of

1   Louisiana.  Owners does not have any employees in the State of

2   Louisiana.  Owners did not solicit any business from the State of

3   Louisiana.  Owners does not advertise, whether it's TV, radio or

4   billboards, in the State of Louisiana.  Owners does not have any

5   agents in the State of Louisiana.  Owners does not have a

6   registered agent for the service of process in Louisiana.  Owners

7   does not have any Louisiana insureds insuring any risk or any

8   business in Louisiana.  Owners does not own any property in the

9   State of Louisiana.

10        THE COURT:  Well, on the last one, on the other one,

11   though, the PSC says that you paid approximately 340 claims

12   directed to Louisiana addresses.  When you say you haven't done

13   any business, what --

14        MR. SAPORITO:  Well, I said they haven't insured any

15   risk in Louisiana or any business activity.  Of those 340 cases,

16   if you remember, Your Honor, that was the subject of a motion to

17   compel.  You ordered that we randomly select every tenth one.  We

18   allowed the plaintiffs to choose.  We gave them the list.  They

19   chose the ones.  We pulled them.  And of those 35 cases, 29 of

20   them were random automobile accidents of somebody who lived out

21   of state who came to Louisiana and had an automobile accident.

22   Of those 29, eight didn't even happen in Louisiana, but a person

23   had an automobile accident with somebody who lived in Louisiana,

24   had an accident with them in another state.  So of the 35, 29

25   were auto accidents, and eight of those happened in another

1   state, and those were just random automobile accidents.

2          Owners does not own property in the state, doesn't

3   have any bank accounts in the state.  And generally, there is no

4   activity at all in which Owners is availing itself of the state

5   in order to make any money or make any income from any activity

6   in the state.

7          There was testimony from the Owners representative

8   that if an insured from another state got sued in Louisiana for

9   some reason because of some activity and created a liability

10  coming out of Louisiana, then Owners would pay that liability for

11  its insured.  But it was crystal clear that the insured, the

12  operation, the risk contemplated by the operation was something

13  that was out of state from Louisiana.

14         There is no claim for specific jurisdiction in this

15  case.  All the activity, the insured -- the insured for Owners is

16  Hinkle Drywall.  They are a Florida business.  The work that they

17  did on homes were on Florida homes.  So there is no specific

18  jurisdiction claim here, it's all general jurisdictional claims.

19         THE COURT:  I think that may be true in all of the cases

20  that we're dealing with.

21         MR. SAPORITO:  It may be true under the WCI Trust cases

22  because I think all of those are Florida -- alleged to be Florida

23  homes.  I believe that's right, Your Honor.

24         But in the general jurisdiction argument, there

25  is -- has been no continuous, systematic, substantial contacts

1    that Owners has had with the State of Louisiana.

2            In the plaintiffs' 50 some odd page opposition

3    memorandum that they filed in response to all of the insurers who

4    are going to be here today to argue, four pages of that memo were

5    directed to alleged contacts in Louisiana for Owners Insurance

6    Company, and two more pages dealt with the fundamental fairness

7    issue, which is the second prong of the jurisdictional analysis.

8    But only four pages of that 50 some odd memo attempted to prove

9    some sort of minimal contact.

10           THE COURT:  I think the thrust of their arguments were

11   twofold, as I read them:  One is that you're a nationwide

12   company, and therefore, your exposure is to people nationwide,

13   which includes Louisiana and, second, that you have some

14   affiliation with some affiliates that do some business in

15   Louisiana.  How do you deal with this?

16           MR. SAPORITO:  Let me attack the second one first.

17   There is no affiliated company in the Auto-Owners group that does

18   business in Louisiana.  When I read that list of things to you

19   about lack of contacts with the State of Louisiana, that was true

20   for Owners as well as Auto-Owners, which is the parent company,

21   as well as the other insurance companies that are part of those

22   35 claims that were produced.

23           The 35 claims that were produced, only four of them

24   were Owners Insurance Company cases.  The others were Auto-Owners

25   cases or claimants against Auto-Owners or claimants against

 1  another company in the Auto-Owners group, but none of those

 2  companies differ at all from what I was telling Your Honor in the

 3  beginning, the lack of contacts.  So there is no affiliate -- and

 4  for Auto-Owners and Owners, there is no affiliated company that

 5  does any more business here that would in any way vary from the

 6  list of things that I was talking to Your Honor about a few

 7  minutes ago.

 8          THE COURT:  The affiliates didn't appoint the Secretary

 9  of State either?

10          MR. SAPORITO:  No, Your Honor.  And the affidavit deals

11  with that.  The affidavit says and the deposition testimony says

12  that while we're talking about Owners Insurance, in this

13  particular case, because they -- that's the company that's sued,

14  the answers would be the same for Auto-Owners and others in the

15  Auto-Owners group.  And in our brief, our memo, there is a whole

16  list of questions and the questions specifically state -- we ask

17  questions to our client representative specifically state would

18  the answers be any different if it was Owners, Auto-Owners or any

19  of the other companies in the group, and the answer to each one

20  of those questions -- there's a whole list of them -- is that,

21  no, it would not be any different.  And I can tell Your Honor,

22  it's on the bottom of Page 2 and all of Page 3 in our reply memo

23  that we filed in response to what the plaintiffs filed in

24  opposition.

25          The three things that plaintiffs do talk about

1   Owners, however, is the fact that the parent company,

2   Auto-Owners, at some point instituted some litigation in the

3   state.  The two cases that they cited to us and put in their

4   papers are over 40 years old, one from 1969, one from 1972 or 3.

5   And they were subrogation cases where Owners were trying to get

6   some money back from somebody where they had paid a claim, but

7   that's not availing yourself of the courts when you talk about

8   the two cases that were submitted to us that are 40 years old.

9           Owners, in response to Your Honor's order on the

10  motion to compel, provided the information for these 35 cases,

11  and they covered a five-year period, and they covered four

12  different companies within the Auto-Owners group, and four of

13  them were Owners cases.  I already mentioned the fact that 29 of

14  the 35 were random automobile accidents.  The other six were CGL

15  cases, three of which happened in another state, and the payment

16  just got sent here.

17          The distinction that I think our opposition doesn't

18  want to recognize is that just because a payment gets sent to a

19  claimant here in Louisiana doesn't mean that the company is doing

20  business in Louisiana, that the company is seeking to avail

21  itself of the State of Louisiana, it just simply means some

22  insured got into some situation with a claimant, and the

23  insurance company paid the claim.

24          We know from the 35 that were pulled out of the

25  warehouse and researched, 29 of them were automobile accidents.

1   Of the six CGL claims in this five-year period, three of them had

2   causes of action that occurred in a different state.

3          As far as the security interests, I'm surprised

4   this is even in plaintiffs' memo as it deals with us because that

5   was discussed in the deposition, and they know that Auto-Owners

6   does not own a security interest in any company in Louisiana,

7   doesn't own any stock in a company.  They, through an investment

8   broker, bought some debt of a Louisiana power company, and that's

9   the, quote, security interest that they would be talking about

10  if, indeed, they do talk about some security interest that Owners

11  has in the State of Louisiana.

12         I refer Your Honor briefly to some cases that we

13  put in our memo.  On Page 6 of our memo, we list the *Turan*

14  *Universal Healthcare Plan*, we list the *DNH, In-N-Out Burgers*

15  case.  Those cases talk particularly, on Page 6 of our memo,

16  about what is needed to have a continuous, systematic and

17  substantial contact with the State of Louisiana.

18         Owners Insurance Company, based upon the

19  representation that I made to you when we first got up here,

20  which is backed up by the deposition testimony and the

21  affidavits, does not have those type of contacts that would

22  suggest a continuous, systematic and substantial relationship

23  with the State of Louisiana.

24         A recent case that was decided about a month ago,

25  month and a half ago was the *American Bank versus Auto-Owners*

1    litigation.

2              THE COURT:  A Texas case.

3              MR. SAPORITO:  In the State of Texas.

4              THE COURT:  Right.

5              MR. SAPORITO:  And again, that's on Page 7 of our memo.

6    I'm not going to say a whole lot about it, except that there were

7    many more contacts with the State of Texas in that case than

8    there are with the State of Louisiana in our case because in

9    Texas, at one time, Auto-Owners had indeed been admitted.  They

10   previously had insurance policies issued there.  They collected

11   premiums from Texas insureds.  And those were not sufficient

12   contacts, in the Court's view, to convey jurisdiction.  We have a

13   lot less in this particular case.

14             Another case, though, that I point out to

15   Your Honor, and we did in our prior memo -- and it's on Page 8 of

16   this memo -- is the *Choice Healthcare versus Kaiser* case.  That's

17   a Fifth Circuit case, and that was from, I think, August of 2010.

18   And that case clearly held that making payments or mailing

19   payments to claimants in the state does not -- it's not

20   sufficient to establish a continuous, systematic and substantial

21   relationship with the State of Louisiana.

22             The last part of what I have to say, Your Honor, is

23   that I don't believe that we even get to the second prong of the

24   jurisdictional test.  I don't think there is sufficient minimum

25   contacts to hold Owners Insurance Company in the litigation.  But

1   the fundamental fairness part of that test, I think, is also on

2   the side of Owners Insurance Company because the insured is in

3   Florida, the houses that the insured allegedly worked on are in

4   Florida, there is a remedy in Florida, and Mr. Pate, the

5   plaintiff, the trustee for WCI Trust, is not a resident here in

6   Louisiana.  He's going to have to go somewhere, anywhere, to

7   bring his litigation.  So whether it would be here or whether it

8   would be in Florida should not make any difference to him.

9            Again, I don't think Your Honor should get to a

10  consideration of fundamental fairness, but we do think that as

11  well flows in the direction of Owners Insurance Company.

12           THE COURT:  Okay.

13           MR. SAPORITO:  Thank you, Your Honor.

14           THE COURT:  Thank you very much.

15           MR. PIPES:  Your Honor, the next argument is by NGM

16  Insurance Company, and it's going to be argued by Dave Hassett.

17           THE COURT:  Okay.

18           MR. HASSETT:  Good afternoon, Your Honor.  David Hassett

19  for NGM Insurance.

20           Judge, much what my brother, Mr. Saporito, said

21  equally applies to NGM Insurance.  The same standard in terms of

22  general jurisdiction applies.  This is not specific jurisdiction.

23  As Your Honor recalled, when we were here last in this court

24  before you, we were arguing about the scope of the discovery that

25  the plaintiffs would be permitted to conduct in order to come

1  forward with these motions to dismiss, and at that time, I

2  believe Your Honor said, when responding to some of the

3  objections to the scope of discovery, one or more occasions

4  Your Honor stated that you wanted to see what discovery would

5  demonstrate what the connection to Louisiana was with the

6  insurers, were they actually doing business in Louisiana.

7          And, Your Honor, now, after depositions have been

8  taken, interrogatories have been answered, documents have been

9  produced and affidavits have been submitted, it is clear on the

10 facts of this case, Your Honor, that NGM has no minimum contacts

11 with Louisiana as contemplated by the cases.

12         It's a Florida corporation, Your Honor.  Principal

13 place of business is in Jacksonville, does not conduct business

14 in Louisiana, is not licensed to conduct business in Louisiana.

15 It has not written coverage in Louisiana, does not collect

16 premiums in Louisiana, does not have any rates on file with the

17 Department of Insurance, is not registered with the Louisiana

18 Department of Insurance, has not authorized any insurance agent

19 to write any business, does not maintain an office in Louisiana,

20 has no bank accounts in Louisiana, does not have a registered

21 agent in Louisiana, does not directly advertise or market

22 insurance policies in the State of Louisiana.

23         So, Your Honor, in term of NGM Insurance doing

24 business in Louisiana, having a presence in Louisiana, the

25 discovery has clearly demonstrated that it does not.

1        THE COURT:  Let me ask, though, unlike Owners, the PSC

2    says that you are a hundred percent owner in Main Street, in

3    Old Dominion, in Great Lakes, you share the same offices, the

4    same directors, the same accounting firm, file consolidated tax

5    returns and things of that sort, and they claim that those

6    entities do, in fact, do business in Louisiana.

7        MR. HASSETT:  Yes, Your Honor.  I should have been more

8    specific.  They do not.  None of the affiliates -- there's a

9    Grain Dealers that's an affiliate, and none of the subsidiaries

10   do business.  So I was speaking for NGM and its subsidiaries.

11       THE COURT:  Okay.

12       MR. HASSETT:  Your Honor, what has been pointed to,

13   similar to Owners, is that they unearthed 54 claims that were

14   paid totalling under $2 million, and maintain that because claims

15   were paid to Louisiana or checks issued to Louisiana, that that,

16   in fact, would support a finding by this Court of minimum

17   contacts.  That just doesn't make the grade, Your Honor.

18           The claims in question involve primarily motor

19   vehicle policies, and similar to Owners, it is insured in a

20   different state than NGM and/or its subsidiaries write that is

21   traveling through Louisiana and gets in an accident, and as a

22   result, certainly NGM Insurance would follow through with that

23   and pay that claim, they would hire an independent adjuster to

24   confirm the facts of the case, they might even converse with an

25   attorney in Louisiana, but as to another insurance policy out of

1   state and a driver driving through Louisiana, yes, that claim

2   would be processed and would be paid, Your Honor.  That, again,

3   as my brother pointed out, is not NGM purposefully availing

4   itself of the benefits of Louisiana.

5            The case cited by Mr. Saporito, *Choice Medical*, I

6   believe, is on point with that, Your Honor.  I believe they

7   address the issue of making payments, and I think they

8   characterized it as fortuitous and/or random that their patients

9   would be treated in Louisiana, and therefore, they would have to

10  make a payment.  That just isn't substantial, it's not

11  continuous, it's not systematic such that you would turn and take

12  that fact and say there's minimum contacts.

13           THE COURT:  Choice Medical, Choice Healthcare, they paid

14  50 claims and they paid 54 claims in your case.

15           MR. HASSETT:  54 claims in my case in five years, Choice

16  was 50 claims in five years, Your Honor.

17           THE COURT:  Right.

18           MR. HASSETT:  Your Honor, they also point to -- I just

19  got the minimum contacts flow sheet.  And in looking at it, I

20  would take issue with what's been characterized.  There has been

21  a mischaracterization, Your Honor.  If you start from the top

22  with the minimum contacts, they then go down and say,

23  "Advertising including in Louisiana."  The 36 B -- the 30(b)(6)

24  deponent just simply said we do advertise nationally through

25  independent agencies.  They don't directly advertise or solicit

1   in Louisiana.

2            And they don't sell policies that cover property in

3   Louisiana, Judge.  They can't, they are not licensed to do that.

4   There was a scenario where at one point the deponent said that if

5   somebody were traveling and had an itemized schedule of jewelry

6   so that NGM insured it in Maine, hypothetically, and while

7   traveling through Louisiana, it was stolen or it was burglarized

8   in some fashion, yes, NGM would pay that.  But again, when we

9   compare that to the test, Your Honor, the test being systematic,

10  continuous, purposefully availing themselves of it, I think it's

11  very clear from the cases we cited, Your Honor, that that

12  wouldn't be adequate for this Court.

13           To go another step, Your Honor, it seems as though

14  if you accepted the plaintiffs' argument, it would really render

15  this whole standard meaningless because certainly an insurer can

16  operate at other parts or in other parts of the country, not be

17  licensed in Louisiana at all, and if you accept the plaintiffs'

18  argument, then there is going to be personal jurisdiction

19  everywhere because we understand that if you write an automobile

20  policy, that individual could drive across the country.  So that

21  simply doesn't make sense.  It goes against the case law,

22  Your Honor.

23           Going down here, Your Honor, there was an issue

24  involving one set of pleadings in another case in Louisiana.

25  I've put in an affidavit from the lawyer, Attorney Gardener.  He

1    erroneously admitted that Old Dominion, a subsidiary, did

2    business in Louisiana, and the affidavit sets forth the fact that

3    he was mistaken.  And it's clear from the documents we produced,

4    Your Honor, that NGM -- neither NGM nor any of its subsidiaries

5    conducted business in Louisiana.  So I suggest to you,

6    Your Honor, that's just a red herring.  It's in a separate case.

7    And actually, he would have amended the pleadings to correct it,

8    but the case has been dismissed.

9              Your Honor, turning to the payment of claims and

10   the retaining of counsel, the retaining of independent adjusters,

11   the payment of claims all involve those motor vehicles driving

12   through.

13             There was one situation where the deponent stated

14   that if there was a contractor in Tennessee and that he was doing

15   business in Louisiana and there was a claim, they said they might

16   pay that claim or payment could be made.  Again, isolated,

17   random, they are not writing, they are not purposefully availing

18   themselves, Your Honor, of the forum state.

19             In the cases, as my brother pointed out,

20   Your Honor, and as cited in our brief, there are cases where the

21   Court has declined to confer personal jurisdiction have

22   demonstrated many more contacts in much more depth than the

23   plaintiffs have demonstrated here with NGM.  And it's clear that

24   the courts have said that imposing general jurisdiction, personal

25   jurisdiction is an involved matter, and they want to make sure

1    that that standard is met.  And it's a substantial standard.   It

2    has to be systematic, it has to be continuous, and it has to be

3    substantial.

4              And, Your Honor, it just simply isn't the case in

5    connection with NGM Insurance, and I would ask you, based on the

6    case law and the facts we've presented here, to allow the motion

7    to dismiss of NGM.

8              THE COURT:  Thank you.

9              MR. PIPES:  Your Honor, the third motion is FCCI.

10   Robert Darroch is going to speak.

11             THE COURT:  Okay.

12             MR. DARROCH:  Good afternoon, Your Honor.  I'm

13   Robert Darroch, and I represent FCCI Insurance Company and

14   FCCI Commercial Insurance Company in this case.

15             As the Court is probably noticing, there's

16   differences, some substantial, between the four movants, so I

17   want to start by pointing out one of the simple differences

18   between my clients and the others.  We're not an automobile

19   insurance carrier.  We don't write personal lines coverage at

20   all, we don't write homeowner's, we don't have people's private

21   passenger auto policies.  We're a GL carrier who focuses on

22   Workers' Compensation insurance.

23             From our standpoint, Your Honor, the issue, as

24   framed by Mr. Pate's counsel, is sort of twofold:  The first is

25   whether National Trust Insurance Company has sufficient contacts

1   with Louisiana to exercise general jurisdiction over it.  Because

2   they say if they can get general jurisdiction over National Trust

3   Insurance Company, then they can pull in my other clients,

4   FCCI Insurance Company and FCCI Commercial Insurance Company, to

5   this case under general jurisdiction.  So I want to address those

6   two issues separately for the Court.

7            On the first issue, whether National Trust has

8   contacts sufficient for general jurisdiction, the focus, Judge,

9   has to be on not what happened, as Owners pointed out, 40 years

10  ago.  If you look at the case law, which is cited in all of the

11  briefs, the relevant time frame is current.  Now, I'll

12  acknowledge, the Court has some discretion about what's a current

13  time frame for jurisdictional purposes.  And that becomes

14  particularly important in my client's situation.

15           If you look at this suit, which is pending in 2010,

16  and our clients got served back in March of this year, and filed

17  these motions to dismiss, the question is whether or not, from

18  their standpoint, they're saying National Trust Insurance Company

19  exercised continuous, systematic business activities in

20  Louisiana.

21           Now, look at whether National Trust did that or

22  not.  The evidence is that in 2007, National Trust wrote one kind

23  of coverage, Workers' Compensation insurance.  They were licensed

24  to write it.  They did write it.  In 2007, now three years ago,

25  National Trust made a conscious decision to withdraw from doing

1  business in the State of Louisiana, unrelated to anything for
2  this case.  They didn't write construction coverage.  They wrote
3  one thing, Workers' Compensation coverage.
4        All of the case law talks about not what did you do
5  in the past, it talks about do you have minimum contacts?  And
6  when you look at that, once National Trust made that decision in
7  2007, it exercised that decision consistently according to all of
8  the evidence that they've been able to dig up.  We're not talking
9  about we paid claims on car wrecks that drove through here.
10 We've never had an office here, we've never done any advertising
11 here, we have never had any kind of relationship where we had
12 assets here, bank accounts here, anything of that nature.
13       If you look at the last policy that we wrote in
14 2007, that policy at National Trust expired in June of 2008.  So
15 for more than two years, National Trust even has not issued a
16 single policy to a single Louisiana resident or to a single
17 Louisiana business, period.
18       THE COURT:  But isn't National Trust licensed to sell
19 policies or has a certificate of authority to do so since '97?
20       MR. DARROCH:  Yes.
21       THE COURT:  It's appointed the Secretary of State as
22 agent?
23       MR. DARROCH:  No.
24       THE COURT:  It doesn't?
25       MR. DARROCH:  We did not appoint the Secretary of State

1   as agent.

2        We did, Your Honor, we did have the other things

3   the Court talked about.  National Trust did write Workers'

4   Compensation insurance from 2000 to 2007.  No question about

5   that.

6        THE COURT:  Paid Louisiana taxes and pays Workmen's

7   Compensation assessments to the Louisiana Insurance Guaranty

8   Association?

9        MR. DARROCH:  Yes.  And here's the reason:  Once we

10  canceled the last of the policies and terminated our one

11  independent agent that worked out of here in 2007, if you have an

12  employee who got hurt in 2007, as the Court probably knows, if

13  you've got a Workers' Comp claim, we've still got to pay their

14  medical.  So during that period of time, after 2007, when we

15  terminated those arrangements, there was some, for lack of a

16  better word, runoff payments that had to take place.

17       Now, the interesting part of that is even the 2008

18  premium that we collected at the very beginning of the year on

19  those runoff policies, that was $11,000, Judge.  We're not

20  talking about ever having had a substantial presence in Louisiana

21  for National Trust Insurance Company.  And neither of my two

22  clients named in the case have ever done anything, anything in

23  Louisiana.

24       Now, one of the things that the plaintiffs'

25  attorneys like to rely on, and they tried it with my client's

1   deposition, they want to use, quote, public information that says

2   my client does business here.  You know what they did, they

3   pulled out a Sarasota newspaper article that said FCCI Insurance

4   Company did business.  A newspaper article.  They asked my

5   30(b)(6) representative, number one, have you seen the article?

6   No.  Number two, do you agree with it?  No.

7           You can't use public information of that sort to

8   try to develop some sort of jurisdiction.

9           For this Court to say that there is personal

10  jurisdiction over National Trust -- and we'll address the FCCI

11  issue next -- over National Trust, the Court's really got to say,

12  it's based on one thing and one thing only, that we have still a

13  certificate of insurance -- I mean, a certificate of authority to

14  deal with those runoff claims from 2007.

15      THE COURT:  So it's your position that you did do

16  business or National Trust did do business in Louisiana, but it

17  has long since stopped doing business with the exception of the

18  tails?

19      MR. DARROCH:  That is correct.  And that what we have

20  done is we have consistently shown that we have made the decision

21  not to purposefully avail ourselves of the benefits of the State

22  of Louisiana.  We made a decision to get out.  We got out.  We

23  have been out from that standpoint.

24          So let me turn to the second issue, and that is,

25  even if you say for a moment that National Trust Insurance

1    Company did enough for the Court to exercise general jurisdiction

2    over National Trust, now you've got to address issue two.  Is

3    what National Trust did sufficient to exercise jurisdiction over

4    FCCI Insurance Company and FCCI Commercial Insurance Company?

5    And there's -- depending on what case you look at, they focus on

6    a number of factors.  It's not a look at one thing and make a

7    decision from that standpoint.

8              The case that I think is probably the most

9    comprehensive is in our brief.  It's the *Cannon versus Cudahy*

10   case from the U.S. Supreme Court, 267 U.S. 333.  It looks at

11   about 18 different factors.  And one of the things that I think

12   is very important for the Court to focus on in this alter ego

13   theory that the plaintiffs don't want you to focus on is not that

14   FCCI somehow has a relationship to National Trust, we're talking

15   about having a parent-subsidiary type relationship.  Is the

16   parent trying to hide behind the coattails of the subsidiary?

17             Now, one of the very important things when you look

18   at these 18 factors from the standpoint of National Trust versus

19   my two clients, FCCI Insurance Company and FCCI Commercial

20   Insurance Company, is they are not parent and child.  They are

21   affiliated companies, yes, but they are not parent and child.  We

22   are not trying to get to a parent company.

23             If you look at -- and I apologize, I kind of did

24   this by hand, and I apologize for it not being fancy -- but if

25   you look at one of the factors that they say look at in all of

1    these cases, how are the companies operated?  The evidence is,

2    Your Honor, that there is a separate entity called,

3    "FCCI Services."  That FCCI Services, from an operational

4    standpoint, provides underwriting, it provides premium, it

5    provides various employee services to multiple companies.  The

6    three that matter here are FCCI Commercial Insurance Company,

7    FCCI Insurance Company, which are the two named defendants, and

8    National Trust Insurance Company.

9         Now, what's different about our case from all of

10   the cases that they rely on?  They are not trying to use what

11   National Trust did operationally to get at FCCI Services.  They

12   are not trying to get at somebody above them who owns them.  They

13   are trying to get at somebody who is a separate and distinct

14   insurance company who issues separate and distinct policies.  In

15   fact, separate types of business.  FCCI Commercial Insurance

16   Company, FCCI Insurance Company, they are writing general

17   liability business in Florida.  National Trust was writing

18   Workers' Comp in the past in Louisiana.

19        So the whole concept of alter ego isn't starting to

20   work from the very beginning.

21        THE COURT:  But don't they say you have the same

22   offices, you have the same location, you have the same tax

23   filings, you have the same accounting, and so it's just one in

24   the same, that they are really just one entity; isn't that their

25   approach?

1            MR. DARROCH:  They do say that.

2                 Now, let's look at the facts behind that.  What

3      they said is, do we use the same independent accountant?  Now,

4      Judge, I venture to say that if that's the standard, and you

5      start talking about large corporations, we may all use the same

6      accountant.  From an exterior accounting standpoint, yes, we

7      share an independent accountant.  From the standpoint of trying

8      to get back at the FCCI Services company, that might make some

9      argument that would make sense, but not when you're talking about

10     trying to get at an insurance company.

11                We don't share employees.  There is not a single

12     person that is employed by FCCI Commercial Insurance Company who

13     does any work for National Trust.  There is not a single person

14     employed by FCCI Commercial Insurance Company who does work for

15     National Trust.  That's what those cases focus on.

16                If the parent company's employees do work on the

17     subsidiary's business, that's the argument that they ought to be

18     making.  They can't make that argument because it doesn't happen.

19                They talk about as well, Your Honor, questions of

20     ownership, and let's talk about the ownership.  And again, I

21     apologize for the fanciness of my chart.  If you look at

22     ownership, and I've condensed it down from the chart, which is

23     actually attached to Ruth Willis' affidavit, the parent company

24     is FCCI Mutual Holding Company.  It a hundred percent owns FCCI

25     Group, Inc., which a hundred percent owns FCCI Insurance Company.

1   They will tell you that National Trust is owned by FCCI Insurance

2   Company.  That's not supported by any evidence.  The evidence

3   shows that FCCI Insurance Group, which is an incorporated entity,

4   owns a hundred percent of the stock of National Trust Insurance

5   Company and a hundred percent of the stock of FCCI Commercial

6   Insurance Company.

7           So, again, look at what they are trying to do.

8   They are trying to say what National Trust did can give you

9   jurisdiction over its sister company, FCCI Commercial Insurance

10  Company, and can give you jurisdiction over an entity,

11  FCCI Insurance Company, that doesn't own it.  So what they are

12  trying to do, Your Honor, is cloud all of these issues to show an

13  affiliation that simply doesn't exist.

14          One of the other factors, does the parent company

15  pay salaries of employees of the subsidiary?  There is no money

16  that goes from any of these other companies to an employee of

17  National Trust.

18          One of the questions that the Court looks at is

19  whether there is any undocumented transfer of funds.  There is

20  absolutely no evidence of that.  And as the Court knows, the

21  insurance industry is one of the most highly regulated industries

22  out there.  There is not going to be an undocumented transfer of

23  funds because of all of the regulation.

24          Do the corporations insure their corporate

25  formalities?  There is no evidence that they don't.

1          Was the subsidiary using corporate property of the

2    parent?  Now, this gets us back to this problem.  They keep

3    saying that National Trust uses the offices of somebody called

4    FCCI.  They use the offices, Your Honor, of FCCI Services, not

5    the offices of FCCI Commercial Insurance Company or

6    FCCI Insurance Company.  There is no evidence to support any

7    argument that National Trust itself uses a single office of

8    FCCI Commercial Insurance Company or FCCI Insurance Company.

9          One of the other factors that they look at, the

10   Court looks at is whether or not the only business that the

11   subsidiary has is given to it by the parent.  That doesn't

12   happen.  National Trust got its own business, and it's a

13   different kind of business than the other two.

14         Whether or not there's adequate capitalization, the

15   financial records show that National Trust is a hundred million

16   dollar corporation.  It's adequately capitalized.

17         What is the only factor to suggest that there may

18   be an alter ego issue here, and that's the one the Court pointed

19   out.  There is an overlap, to some extent, between officers and

20   directors.  The evidence, though, is those officers and directors

21   run those companies separately.  They have their separate

22   meetings.  They do not say, okay, we're going to do X, Y and Z

23   for all of these companies.  They had the deposition of an

24   officer of the company who is listed as an officer for each.

25   They could not solicit one piece of evidence to show where a

1  decision was ever made by one company that would affect the

2  other.  Not once.

3            And absent, Your Honor, that kind of evidence, this

4  Court should not choose to hold the FCCI Commercial Insurance

5  Company and FCCI Insurance Company are the alter ego of

6  National Trust Insurance Company.

7            THE COURT:  Thank you.

8            MR. DARROCH:  Thank you.

9            MR. PIPES:  Your Honor, the last jurisdictional argument

10  will be Mid-Con, and Ron Kammer will handle that.

11            MR. KAMMER:  Thank you.

12            Good afternoon, Your Honor.  Before I get into the

13  jurisdictional argument that's specific to my client, I think

14  that there is a procedural background that's important.  And

15  Minor began to highlight that at the beginning of his

16  presentation.

17            My client has competing actions in Florida

18  involving Centerline, Northstar and Pate.  Centerline is a

19  Florida corporation, Northstar is a Florida corporation, and

20  Pate, Judge Pate, is a citizen of the State of Texas.

21            When we filed the Centerline, Northstar and Pate

22  actions, there was a flurry of activity, as the Court may or may

23  not know, to get those cases before Your Honor.

24            The first thing I would like to show is the order

25  that was entered August 9th, 2010.  And that was the order

1   vacating the conditional transfer order in Centerline, Northstar

2   and Pate.  Thereafter, the same parties moved for

3   reconsideration, and once again, there was an order denying that

4   motion for reconsideration.

5           So in terms of what's happening with my client's

6   cases and Centerline and Northstar, those motions are done.

7   Those cases are at least not going to be transferred, we believe,

8   through the joint panel to Your Honor.

9           There also has been motion activity.  And in all

10  three cases, Your Honor, both Northstar, Centerline and Pate have

11  filed motions to dismiss.  One of those motions has been ruled on

12  by Judge Seitz, and that is in the *Northstar* case, and she denied

13  the motion to dismiss as pertains to Northstar based upon the

14  first to file rule.

15          And one of the reasons -- and this is important

16  when we get to the jurisdictional argument -- that she denied the

17  motions to dismiss is that unlike the actions before

18  Your Honor -- and this dovetails into fundamental fairness, which

19  I think is important when you talk about my client's motion -- is

20  that in the Centerline, Northstar and Pate actions, we have named

21  our named insured because in Pate and Northstar, those entities

22  are claiming additional insured status, in Centerline it's

23  hybrid, we insured Centerline and we also insured United Framers

24  and they are claiming AI status, and all of those companies that

25  we insured and all of our policies are Florida policies issued to

1    Florida insureds.

2              But in those actions as well, Your Honor, we also

3    named all of the underlying plaintiffs.  All Florida citizens

4    owning all Florida homes.  So right now pending and moving

5    forward are cases filed by Centerline, Northstar and Pate.

6              Clearly, Your Honor -- I agree with Your Honor that

7    this is a general and not a specific jurisdiction case that if we

8    were talking about specific jurisdiction, we would not have filed

9    our motion.  Clearly, my client -- and we have not attempted to

10   hide this at all -- is in a far different position than the three

11   have gone before you in terms of its contacts, but again, we

12   didn't try to hide it.

13             What did we do?  When we filed our motion back in

14   May, we filed the affidavit of Michael Coon.  Now, at the time we

15   filed Mr. Coon's affidavit, he was the executive vice-president.

16   He is now actually the president of my client.  And he was

17   deposed in this case.  And what's important, Your Honor, is that

18   we said -- and this was supplemented by our discovery

19   responses -- here is what we do.  And in the four years, and in

20   2010 it's even less, well, about four percent of our total

21   business nationwide was in Louisiana, about three percent, about

22   four-and-a-half percent and about seven percent.

23             And then when we looked at that, Your Honor, we

24   then said, okay, what has the Fifth Circuit said?  And you're

25   going to hear Mr. Horkovich, I've seen his chart, we don't

1   dispute anything that's in that chart.  Not a thing for the

2   purposes of this motion.  But when we look at the Fifth Circuit

3   cases, Your Honor, and they are cited beginning in our brief at

4   Page 8, running through and including Page 11, we cited to the

5   Court three cases.  And I believe these three cases, when you

6   compare the totality of contacts in *Bearry*, *Dalton*, and *Access*,

7   and you compare them to the contacts and general jurisdiction as

8   opposed to specific jurisdiction, that my client's case -- my

9   client's motion should also be granted.

10          In *Bearry*, Your Honor, there was evidence presented

11  for the five-year period before the motion, that Beech engaged in

12  a nationwide marketing campaign employing over 300 marketing

13  employees in its Kansas office, that during the five-year period,

14  nearly $250 million, far more business than we did, flowed to 17

15  independent Texas dealers.  I can see we have independent agents

16  in Louisiana, less than what was in *Bearry*.  That one of its

17  dealers in Louisiana was a wholly owned subsidiary of Beech

18  Holdings.  That's not like my case here.  That Beech traveled on

19  a fairly regular basis to its Texas dealers, far more that's in

20  the record than what we did, to assist with maintenance problems,

21  to demonstrate new aircraft and offer sales incentives to Texas

22  dealers.

23          What did the *Bearry* court say?  They relied on the

24  Florida -- excuse me, the United States Supreme Court case in

25  *Asahi*, and it said that both Kansas and Mississippi, because of

1  the facts of this case, and I think you can just take Kansas and

2  Mississippi and substitute Florida, had far stronger interests in

3  the case.  And that since Mississippi, or in this case Florida,

4  is the locus of the injury, that its interest in providing a

5  forum to the citizens was far greater than the forum chosen by

6  the plaintiffs in the *Bearry* case.

7       THE COURT:  The problem, to some extent, with

8  inconvenience is that when you look at those cases, they're

9  generally standalone cases, and when you try to pick from that

10  concept something that's germane to the MDL, it's problematic

11  because oftentimes, there is no contact with the MDL transferee

12  judge.  I didn't have one case in this case.  I mean, I didn't

13  have one drywall case when I got 50,000 of them all of a sudden.

14       MR. KAMMER:  Here is your opportunity to reduce the

15  inventory, Your Honor.

16       THE COURT:  So I understand the argument, but from the

17  inconvenience standpoint, it's a little harder.  The cases don't

18  fit too well in the MDL concept, is what I'm saying.

19            I understand the other arguments, and I think that

20  the cases where they stand alone or MDL cases, they are

21  significant because this, although it's an MDL case, the three

22  that we're talking about really are cases that are filed in this

23  jurisdiction.  It's not merely a transfer 1407 deal.  But the

24  inconvenience is a little problem.

25       MR. KAMMER:  Your Honor, I think the fact that the cases

 1   were filed here initially as opposed to being transferred

 2   buttresses as opposed to takes away of the argument on personal

 3   jurisdiction.  Because whether it's an MDL or whether it's not,

 4   I've seen -- I agree with Your Honor that none of the cases that

 5   I mentioned so far is an MDL case.  But when you talk about

 6   personal jurisdiction, I've not seen anything in the case law

 7   that says because it's an MDL, that what we've learned in the

 8   *Helicopteros* case or going even further back in time applies

 9   differently in the MDL context.

10        THE COURT:  No, I agree with that, what I'm saying,

11   though, is that that aspect where you look at convenience or

12   inconvenience, I mean, theoretically, in any event, doesn't

13   always work, but theoretically the MDL is just to discover things

14   and then send them back.  So the convenience part is generally

15   focused on trial.  And the MDL is theoretically not focused on

16   trial, it's focused on discovery.  So that is a little more

17   problematic when you try to use those cases for that purpose.

18   That's at least the way I see it, for the most part.

19        MR. KAMMER:  I understand that distinction as well in

20   terms of the MDL context, but still, in order to directly sue any

21   company, including insurance companies, you still have to have

22   personal jurisdiction and you still have to look in the general

23   jurisdiction context, was the business systematic, and then even

24   if it was, does that violate due process in terms of hailing a

25   defendant into the State of Louisiana.

1        Your Honor, without going through the *Dalton* case

2   in detail and some of the other cases we've cited from the

3   Fifth Circuit, the *Dalton* case, it was almost 13 percent, nearly

4   double of any of our years.  Again, far more contacts, but in the

5   *Access versus MCI Telecoms*, again, a great deal of more contact,

6   but I think there is two issues that I want to address in terms

7   of *Access*, in terms of hailing, and in terms of convenience.

8        First, Your Honor -- and this is what really sets,

9   I think, my client apart and what makes my situation different --

10  this is an endorsement, Your Honor, that is found in every single

11  one of our policies that are at issue here.  And once again,

12  without being repetitive -- of course, I am going to be

13  repetitive -- each of those policies were issued to Florida

14  companies issued and delivered in Florida.  And they said, "This

15  was a conscious business decision.  As you can see, we're not

16  just picking on Louisiana."  We said, "We do not insure all

17  construction operations in the following states," and it listed a

18  number of states, including Louisiana.

19        From my perspective, what could there be clearer

20  evidence?  And, again, the case law says we're allowed to

21  structure our business the way we're supposed to, then that

22  shouldn't be held against us, but what could be clearer evidence

23  that you, as Mid-Continent in this case, did not expect to be

24  hailed into Louisiana on a construction defect case?  The case is

25  involving, again, Florida witnesses, Florida homes and things of

1   that nature.

2           And what's, I think, significant about the *Access*

3   case, Your Honor, is when they talk about the contacts and they

4   talk about the fact that, again, in *Access*, and the *Smirch* case

5   as well, they are talking about due process.  And at the end of

6   that decision -- I know Your Honor has read the cases and you're

7   familiar with the cases -- they talk about why should a case such

8   as this be in Louisiana when none of the plaintiffs are in

9   Louisiana, none of the homes are in Louisiana, and when you look

10  at the five factors that talk about whether that does or does not

11  violate due process, they are overwhelmingly in favor of not

12  exercising personal jurisdiction because it would violate

13  fundamental due process.

14          And Your Honor, in closing, when you compare my

15  client's contacts with the contacts in the *Bearry* case, the

16  *Dalton* case, the *Access* case, all Fifth Circuit cases, it leads

17  me to the conclusion that when you're talking about general

18  jurisdiction, that it shouldn't be exercised over MCC.  There is

19  a forum that is up and running, ready, proceeding in Florida that

20  is the more complete jurisdiction, which -- because I have my

21  named insureds there, I have the plaintiffs there, so even if you

22  start dealing with the cases here, under Florida jurisprudence,

23  which I suggest applies to these policies, if you enter an order

24  in the case that only applies -- and when you're talking about

25  due process I can think of no better argument that only applies

1  to Centerline, Northstar and Pate, that order is going to be

2  subject to collateral attack by the named insureds in Florida,

3  subject to collateral attack by the underlying plaintiffs, and

4  whatever we do here, I may be or very well may be forced to do

5  again.  And for that reason alone, fundamental fairness and due

6  process indicates that Mid-Continent's motion should be granted

7  as well.  Thank you.

8          THE COURT:  Okay, thank you.

9            Anyone else?

10           Okay.  Let's hear the response.

11         MR. PIPES:  That's all, Your Honor.

12         THE COURT:  The MCC is a little different in their

13 arguments than the others, obviously.  The others take the

14 position that they are not pregnant, and MCC says they are just a

15 little bit pregnant.  It's a question of amount.

16         MR. KAMMER:  I'm in the first trimester only,

17 Your Honor.

18         THE COURT:  Right.  So you take them up in whichever way

19 you want to take them up.

20         MR. HORKOVICH:  Thank you, Your Honor.  For the Court's

21 convenience, we have prepared a chart which basically sets out in

22 chart form for each of the insurance companies the evidence

23 already set out in the brief.

24            May I approach, Your Honor?

25         THE COURT:  Sure.

1          MR. HORKOVICH:  But before we get there, Your Honor, our

2     overall position, Your Honor, is that the contacts for each of

3     the insurance companies are sufficient for this Court to exercise

4     general personal jurisdiction over the defendants.

5          We note the *M/T Iver Champion* case, which said that

6     in the due process analysis, the root question is whether the

7     defendant possesses a reasonable expectation that it would be

8     sued in the forum state.

9          THE COURT:  You see, I have looked at, as you know, all

10    of cases that you all have cited to me and are in your briefs.  I

11    think you have a real hard argument in Owners and NGM, I think

12    you have a questionable argument on FCCI, and you have a better

13    argument on MCC.  That's sort of the way I see the matter.

14         MR. HORKOVICH:  Thank you, Your Honor.  And I'll go into

15    those probably in reverse order.

16         THE COURT:  Okay.

17         MR. HORKOVICH:  In the *Hogue* case, the question really

18    is did they purposefully avail themselves of privilege of

19    conducting activities in the state?

20         THE COURT:  Are we talking Mid-Continent first?

21         MR. HORKOVICH:  Well, I was just talking generally,

22    Your Honor, with regard to all of them.  But I'll go into them

23    specifically.

24         THE COURT:  All right.

25         MR. HORKOVICH:  Mid-Continent first makes a big deal

1  about the cases that it has filed in a couple of instances as the

2  second -- as the second entity, the second filer in Florida.

3  Pate filed first here, Your Honor, in the MDL in December of last

4  year.  Months later, Mid-Continent filed a second action in the

5  Middle District of Florida.  Mr. Kammer was explaining that.  The

6  Mid-Continent case against Pate is before a Federal District

7  Court Judge Honeywell in the Middle District of Florida.  As soon

8  as we saw the Mid-Continent action, we -- Pate filed a motion to

9  dismiss for first file because we filed first here, a request to

10  transfer and a request to stay.

11        That motion is still pending, and, in fact,

12  Judge Honeywell has stayed the case, and that case presently is

13  still stayed by Judge Honeywell.  That's the status of that.

14        So the claim that -- any claim that Mid-Continent,

15  that it's getting whipsawed between two jurisdictions is its own

16  doing.  We didn't try to bring them into Florida.  They filed

17  that action and the second action or the multiplicity of

18  litigation is of their choosing.

19        Second, Mr. Kammer said -- he pointed on an

20  exclusion on the board a moment ago saying, we couldn't be

21  clearer that with regard to a specific risk that the -- that

22  the -- Louisiana was one of the jurisdictions excluded.  Well,

23  that exclusion doesn't go to jurisdiction, it goes to the merits.

24  We'll actually talk about that at a later time.  We'll go into

25  extensive evidence.  Mid-Continent extensively sells construction

1   performance bonds in Louisiana.  They sell construction bonds by

2   the dozens here.

3           With regard to their percentage of revenue

4   argument, that was a sole factor looked at.  Percentage of

5   revenue is not enough to destroy jurisdiction when combined with

6   other factors.  And we believe that there are many other factors

7   that we'll look at in a second which would suggest that --

8   militates towards this Court having jurisdiction over

9   Mid-Continent.

10          THE COURT:  Mid-Continent has appointed the Secretary of

11   State for service, they have submitted to the jurisdiction by

12   routinely submitting insurance policies and endorsement forms.

13   They've sold 1,280, as I count them, insurance policies in

14   Louisiana.  They've collected $4,479,718 in premium during that

15   period of time, and they annually pay premium taxes in Louisiana.

16          MR. HORKOVICH:  Yes, Your Honor.  Thank you.

17          And we have handed up a chart which would further

18   summarize this even more the contacts between Mid-Continent and

19   the State of Louisiana.  And that's not exclusive.  There is even

20   further evidence that sets out in our brief even beyond that of

21   Mid-Continent's contacts with Louisiana.

22          In terms of their convenience argument,

23   Mid-Continent is an Ohio company.  It's an Ohio domicile located

24   in Oklahoma.  It's not located in Florida.  And so in terms of

25   convenience for Mid-Continent, to the extent that those witnesses

1  have to get in an airplane to fly to Orlando, actually flying to

2  New Orleans is as convenient, if not more convenient.

3       THE COURT:  But their convenience argument is a little

4  bit more nuance than that.  As I see their convenience argument,

5  they take the position that they have the same issue in two

6  jurisdictions, and it would be inconvenient to have two

7  jurisdictions focused on the same issue and perhaps give two

8  different versions and require them to relitigate those issues

9  over and over.  That's at issue, an inconvenience that's a little

10  nuanced.

11       MR. HORKOVICH:  A little bit later, we'll be talking

12  about the indispensable party issue.  But otherwise, with regard

13  to Pate and Centerline, the policies we sold Pate and Centerline

14  and Northstar, that's of their choosing.  They -- we were here.

15  And they chose to go into a second jurisdiction.  And if they

16  chose to go into a third jurisdiction or a fourth jurisdiction or

17  a fifth jurisdiction, they'll have three or four or five times

18  the problem.  It's done of their choosing.

19            Mr. Kammer mentioned three cases -- *Bearry*, *Dalton*,

20  and *Access*.  *Bearry*, the defendant was not qualified, unlike

21  Mid-Continent, the defendant was not qualified to do business in

22  the forum state, did not pay taxes in the forum state, did not

23  insure any person in the forum state.

24            In *Dalton*, they were not -- the defendant was not

25  authorized to do business in the state.

1        In *Access*, the question was whether or not it did

2   business with the forum state, not a question of whether they did

3   the business in the forum, as is the issue here.

4        We believe that Mid-Continent's -- in terms of the

5   test, did they have a reasonable expectation that they could be

6   sued in this jurisdiction?  Absolutely.  Did they purposely avail

7   themselves of the privilege of conducting activities in this

8   state?  Absolutely.

9        Do they have a different argument that, gee, it's

10  inconvenient for us to litigate this here when we're litigating

11  elsewhere?  Yeah, they make that argument, but that is of their

12  choosing, not ours.

13        If I may move onto FCCI.

14        THE COURT:  The thrust of their argument there is that

15  National Trust is the focal point, and they don't have any

16  affiliation with National Trust.  It's a separate entity.

17        MR. HORKOVICH:  In there we have, as part of our chart,

18  Your Honor, we have an alter ego analysis that we set out.  And

19  that's the -- what's going on here with these companies.  It's

20  not quite that they don't have anything to do with them.  As we

21  go through the factors on alter ego, the first factor is the

22  amount of stock owned by the parent of the subsidiary.  Well,

23  FCCI Insurance Company owns a hundred percent of FCCI Insurance

24  Group which owns a hundred percent of National Trust.  FCCI

25  Insurance Company owns a hundred percent of FCCI Commercial

1    Insurance Company.  Do they have separate headquarters?  No, they

2    have the identical headquarters.  They have the identical

3    offices.  You're not going to find anywhere, Your Honor, an

4    office that says, "National Trust."  You're not going to find

5    anywhere an office that says, "FCCI Insurance Company."  You're

6    not going to find anywhere an office that says, "FCCI Commercial

7    Insurance Company."  It's a single office that says, "FCCI" up

8    front.  They have shared the identical offices.  The same offices

9    are used under a title of FCCI.

10           Mr. Darroch suggested that there might be some

11    overlap on directors and officers.  I appreciate understatement.

12    They are identical.  They share a president.  They share an

13    executive vice-president.  They share the president, secretary,

14    treasurer and every single -- directors are identical and every

15    one of the trustees, with -- the only exception that

16    National Trust has an additional, an additional trustee.

17           They -- as I mentioned, they share the facility.  They

18    make no effort to distinguish between their offices.  They

19    have the same phone number.  They have the same mailing address.

20    They have the same web site.  They have the same statutory

21    statement contact.  They keep their books and records at the very

22    same location.

23           Now, the way they structured it is they all -- they

24    all participate in an organization called, "FCCI Services."  None

25    of them have employees.  There isn't a single employee of

 1    FCCI Insurance Company, a single employee of FCCI Commercial

 2    Insurance Company or a single employee of National Trust.  They

 3    don't have any employees.  They all use employees of an entity

 4    called, "FCCI Services."

 5              Do they have separate accounting systems?  No.

 6    They share the same accounting system.  They file a consolidated

 7    tax return.  They use the same accounting firm, the same actuary

 8    consulting firm, the same investment advisor.

 9              What is the authority over general policy?  Well,

10    when you go take a look at -- when you go take a look at their

11    ratings, you see that when you try to take a look of the ratings

12    of National Trust, you can see that the financial strength

13    ratings of FCCI and FCCI Insurance and Commercial Insurance are

14    factored.

15              National Trust correspondence has FCCI's name on

16    it.  Mr. Darroch is correct.  The public information, the

17    newspaper articles, the web sites and so on that talk about

18    FCCI -- talk about FCCI having operations in Louisiana.  I'm not

19    suggesting that the FCCI web site does that, but the common

20    discussion of the local press and the Florida press and the

21    Sarasota press discusses FCCI expanding their operations to do

22    business in Louisiana.  That is -- at the very least, that is the

23    media account, and not Mr. Darroch's -- Mr. Darroch is exactly

24    right, that's not FCCI's account.

25              Does the parent exercise control over the daily

1    activities?  Well, as they mentioned, they all commonly use

2    FCCI Services which provides staff, the claims adjusting

3    services, the underwriting services, the payroll services, the

4    clerical administrative assistants and the general manager

5    assistants, all commonly including National Trust.

6            They have a reinsurance of claims and losses where

7    FCCI Insurance Company reinsures a hundred percent of

8    National Trust claims and losses, and then National Trust cedes a

9    hundred percent of its premiums to FCCI Insurance Company.

10           In 2007 all of National Trust's policies were

11   transferred to FCCI Insurance Group, a hundred percent owner of

12   FCCI Commercial Insurance Company with the FCCI Insurance Group

13   to handle the claims under the policy.

14           Mr. Darroch said we're not -- National Trust

15   doesn't do that anymore.  But interrogatory responses that he

16   submitted, which were included, say that National Trust is still

17   collecting premiums in 2009.  Last year.  This is not ancient

18   history.  2009, National Trust is still collecting premiums, and

19   2008.

20           In terms of ancient history, one of the things to

21   consider here is these are liability policies, Your Honor.  And

22   unlike my -- unlike a policy that I currently think of, like

23   my -- unlike policies that we think of currently, liability

24   policies cover occurrences when the occurrences occurred that

25   gave rise to the liability.  And at the time that the

1    liability -- at the time this wall board was being installed and

2    the property damage was arising which gave rise to the liability

3    and for presentation of claims against those liability policies,

4    National Trust at that time was engaged in business in Louisiana.

5    National Trust had systematic contacts with the State of

6    Louisiana at the appropriate time.

7              I think Mr. Darroch misspoke.  He said that

8    National Trust does not have an agent for process of the

9    Secretary of State in the agent of process in -- in Louisiana,

10   and I think he may have misspoke or was mistaken, because this is

11   a printout on October 19th of the Louisiana Department of

12   Insurance.  It's Exhibit WW in our chart.  And it reflects that

13   National Trust Insurance Company does have, currently, as the

14   agent for service of process the Louisiana Secretary of State.

15             Talking about misspeaking, I misspoke.  By the way,

16   let me introduce Anna Piazza, Your Honor, who is my colleague and

17   has done a tremendous amount of the briefing here.  And I

18   misspoke.  I said that the web sites for FCCI do not reflect

19   presence in Louisiana.  They actually do.  This is Exhibit SS in

20   our papers, and this is the FCCI web site.  The FCCI web site

21   where we write business, and you'll notice the State of

22   Louisiana.

23             FCCI, through National Trust, wrote $62,000 in

24   premiums in 2008, $50,000 in Louisiana gross premiums in 2009.

25   In 2008, National Trust wrote $11,286 in direct premiums to

1   Louisiana residents.  National Trust was authorized to sell

2   insurance in Louisiana since 1997, and National Trust paid

3   Louisiana taxes, and in 2008 National Trust federal taxable

4   income in Louisiana was well over a million dollars.

5           National Trust has paid Workers' Compensation

6   assessments in 2008 to the Louisiana Insurance Guaranty

7   Association, and National Trust, this is -- we just saw, has

8   appointed the Louisiana Secretary of State as its agent to serve

9   as process as recently as two weeks ago that information was

10  correct.  And also, National Trust is a member of and pays

11  assessments to the Property Insurance Association of Louisiana.

12          There is no distinction between National Trust,

13  FCCI Insurance Company and FCCI Commercial Insurance Company.

14  National Trust has extensive business in Louisiana.

15          THE COURT:  What about other two?

16          MR. HORKOVICH:  The Owners Insurance Company,

17  Your Honor, Owners paid over 340 claims directed to Louisiana

18  addresses, totalling over a half million dollars in each and

19  every year over the last five years.

20          One of the things that Mr. Saporito said, he talked

21  about the motion to compel, which Your Honor heard in the

22  production of certain claims files, and there were, of the claims

23  files that we received, a large number of them were automobile

24  claims, but there were five that were liability insurance policy

25  claims, Your Honor.  And of those five, they directly reflect

1    that Owners insures entities that do business in Louisiana.  We

2    set this out in our supplemental memorandum of law.  Claim number

3    three, nine, 13 all set out that Owners sells liability insurance

4    policies to companies that do business in Louisiana.

5           Let me just, in short, Your Honor, it's set out in

6    our supplemental memorandum of law that claims files that they

7    produced for the liability insurance policies they sell reflect

8    that Owners sells liability insurance to entities that conduct

9    business in Louisiana.  Admittedly dated, in the cases that we

10   cited were dated cases, but Owners initiated litigation in

11   Louisiana.

12          Owners maintains a securities interest in

13   Louisiana.  We stand by that.  The testimony was that they bought

14   the debt of the -- Owners bought the debt of a Louisiana power

15   company.  Owners uses Louisiana independent adjusters, hires

16   local counsel to defend their Louisiana insureds.  And I'll say

17   that again, their Louisiana insureds.

18          In Exhibit 9, Exhibit N, which is the 30(b)(6)

19   deposition of Owners, Ms. Kathleen Lopilato, she testified, "We

20   would hire counsel to defend our insureds in Louisiana."  And

21   that's at Page 81, Your Honor, Lines 17 through 19.

22          And they sold insurance to individuals traveling

23   through or residing in Louisiana.

24          THE COURT:  How about NGM?

25          MR. HORKOVICH:  NGM, Your Honor, as Your Honor noted

1   early on that we believe that there is an identity between NGM

2   Insurance Company and the other NGM entities, including

3   Main Street America, but that we believe that NGM, in terms of

4   minimum contacts, Your Honor, they paid 66 Louisiana entities on

5   54 claims totalling nearly $2 million over the last five years.

6          And I'm mindful of the case that they've cited

7   saying paying merely 50 claims isn't sufficient in itself.  I'm

8   mindful of that, Your Honor, but that's not all that they did.

9   And understanding that in that case, that was the only activity

10  they focused on, saying that merely paying 50 claims in the State

11  of Louisiana does not give rise to jurisdiction.

12         That's not all that NGM did.  They paid 66

13  claims on 54 claims -- they paid 66 entities on 54 claims nearly

14  $2 million in the last five years.  They had pleadings that

15  reflected that they would subject themselves to personal

16  jurisdiction in the Eastern District of Louisiana.

17         They advertise nationwide.  Counsel is correct that

18  they didn't say, we advertise nationwide, including Louisiana,

19  but they advertise nationwide, and Louisiana is part of this

20  nation.

21         They sell insurance policies that cover property in

22  Louisiana.  They sell insurance policies to businesses that

23  operate in Louisiana.  They sell insurance policies to cover

24  policyholders who travel to Louisiana, they retain counsel in

25  Louisiana, they retain independent adjusters in Louisiana, they

1    pay claims arising in Louisiana, and they correspond with

2    individuals located in Louisiana regarding claims.

3         There was a suggestion in the testimony, and this

4    is in Exhibit S, and I want to -- Exhibit S to our motion, and

5    this was the testimony that was provided, the 30(b)(6) deposition

6    and the proposed changed:  "If a contractor had a person that

7    they did business for that was addressed in Louisiana and another

8    state, that person could have coverage," and now they want to

9    change it to that person could not have coverage.

10        They say in another answer, "An example, if we had

11   a contractor that's insured in Tennessee but went to Louisiana to

12   do a job and there was damage, that person -- there could be a

13   claim filed for negligence and there could be resolution, and

14   they want to insert the sentence there would be no coverage."

15        In *Greenway versus International Paper Company*,

16   Western District of Louisiana, 1992, 144 FRD 322 at 325 says

17   that, "Depositions have a function of a gather and preserve, and

18   no substantive changes are allowed to deposition transcripts.

19   Only transcription errors may be corrected through an errata

20   sheet."  They can't, after the fact, simply change the testimony

21   of their witness.

22        As Your Honor is aware, there are numerous cases

23   that say that if you have a license to do business in a forum

24   state and collect premiums in the forum state, that that suggests

25   that it's proper to exercise general personal jurisdiction.

1    That's the *Dooley* case.

2              The *Hicks* case that we cited, that where you have

3    an insurance agent that sells insurance and you advertise the

4    policies and you underwrite policies in a forum state, you

5    subject yourself to the jurisdiction.

6              We have an obligation, Your Honor, to make a

7    prima facie showing.  That's what the *McKay Equipment* case says

8    and the Fifth Circuit case in the *Luv N'* case.  They say we have

9    an obligation to make a prima facie showing.

10             The *Central Freight* case also says that all factual

11   conflicts have to be resolved in favor of finding jurisdiction.

12             Once we have made a prima facie case, then the

13   burden shifts to defendants to show that the court's exercise of

14   jurisdictions would be unreasonable, as so unreasonable as to

15   offend traditional notions of fair play and substantial justice.

16             We respectfully submit, Your Honor, that we have

17   made our prima facie showing and that they have that burden to

18   now show that this would be unreasonable and offend traditional

19   notions of fair play and substantial justice.

20             Mid-Continent has the financial burden argument

21   that we talked about before, but even there, the *Hogue* case that

22   we cited, Your Honor, that there is a very low burden for a

23   defendant to travel from one jurisdiction to another and that --

24   and that given the modern communications and modern

25   transportation operations, that it's a very low burden on the

1   defendant to travel to the plaintiffs' chosen jurisdiction.

2              Lastly, Your Honor, Your Honor noted this is the

3   MDL, and we believe that the plaintiffs' interest and the

4   interests -- the judicial system's interest share a common goal

5   of adjudicating all Chinese Drywall claims as efficiently as

6   possible.  The purpose -- the purpose of our participation in the

7   MDL was to prevent inconsistent, disorganized and wasteful

8   adjudication.  Dismissal of the actions may result in multiple

9   lawsuits in various jurisdictions which would present

10  inconsistent, disorganized and wasteful results.  The MDL -- it

11  was chosen to have the MDL here.  This Court will be adjudicating

12  underlying cases.  This Court has the familiarity with

13  Chinese Drywall and this is the jurisdiction where the cases

14  should stay.  Thank you, Your Honor.

15         THE COURT:  All right.  Anything from anybody?

16              I don't need anything from Owners and NGM.

17              Anything from MCC and FCCI?

18         MR. DARROCH:  I have one point, and that's this,

19  Your Honor, this chart that they put, and I've kind of scribbled

20  on mine, but the top statement that they make says --

21              That works, thank you.

22              And the Court has to look at the wording they use

23  very carefully.  Notice the second one, NTI, which is

24  National Trust, wrote $11,286 in direct premium to Louisiana

25  residents in 2008, which is true.  Zero in 2009 and zero in 2010

1    were the numbers for Louisiana residents.  Now, they go up above

2    that, and notice they change their language from direct premium

3    to Louisiana residents and businesses, which is what the Court

4    asked us to disclose, and they gather in gross premium, and if

5    you'll note, there's also rounded numbers.

6            The reason for that is, if an Alabama, for example,

7    corporation has an employee that comes into Louisiana for a

8    business meeting or for a convention who gets hurt here and he's

9    covered by Workers' Comp, he has the choice of Workers' Comp in

10   Louisiana or Workers' Comp in Alabama, even though we only wrote

11   him in Alabama.  So for tax purposes, we have to report those

12   rounded numbers, but that is not to be confused with the second

13   line which says what National Trust wrote as premium to Louisiana

14   residents and Louisiana businesses, which is the focus of general

15   jurisdiction.  We wrote zero in 2009 and 2010 for Louisiana

16   residents.

17           THE COURT:  Okay, thank you very much.

18           Mid-Continent.

19           MR. KAMMER:  Once again, thank you, Your Honor.  I just

20   want to make three points.  These being the Plaintiffs' Steering

21   Committee and others that they are arguing on behalf rely on the

22   *Pacific* case and the *Hogue* case.

23           The *Pacific* case, Your Honor, in that case,

24   72 percent of all the letters of guarantee, not less than

25   10 percent, but 72 percent that that particular defendant issued

1  in the United States, and the other item about the -- that case,

2  the Pacific employers who were regular visits, we discussed the

3  differences between the Pacific case and our situation on

4  Pages 11 and 12 of our reply.

5          With regard to the *Hogue* case, Your Honor, there

6  are several differences between *Hogue*.  That's discussed on

7  Page 13 of our reply, and I think one of the big differences is

8  in *Hogue*, the plaintiff was a Louisiana citizen, and the

9  State Farm policy at issue there provided coverage for *Hogue's*

10 Louisiana residents.  Big difference because there is no

11 connection here with any Louisiana citizen and any Louisiana

12 resident.

13         More importantly, in *Hogue*, they talked about the

14 fact that this was a national insurer and that the decision

15 reached in that case would have an impact on Louisiana citizens.

16 Once again, the reason why I put up that endorsement, we don't

17 insure construction in Louisiana.  That doesn't apply either.

18         With regard to the filing of -- in Florida, there

19 is a reason that I explained to this Court why we filed in

20 Florida that went unrebutted by Mr. Horkovich.  We filed in

21 Florida because that is the only jurisdiction, and the Court

22 picked up on that distinction, where you could have jurisdiction

23 over the underlying plaintiffs, the named insureds.  That is why

24 this case belongs in Florida.  That is why the due process

25 argument carries the day, in our opinion, for Mid-Continent.

1           I want to correct one thing that was said by

2   Mr. Horkovich.  I'm sure that it was a misstatement.  The stay in

3   the *Pate* case was only in effect until the JPML ruled.  We have

4   advised the Court that the JPML has ruled saying that the case

5   would not be transferred, and we have moved to lift the stay.

6           Last, I'm very confused about Mr. Horkovich's last

7   statement.  I understood what the Court said when they were

8   talking about this is an MDL.  And when the Court said in my

9   presentation, this is an MDL, that means we're going to handle

10  certain things here, and then it gets referred back for

11  substantive rulings.

12          Well, first of all, Your Honor --

13          THE COURT:  For trials.

14          MR. KAMMER:  For trials.

15          First of all, Your Honor -- well, again, in

16  coverage cases, more often than not, we're dealing with questions

17  of law, comparing and such and so forth, so I'll deal with that

18  in a second.  But when we were talking about the MDL, keep in

19  mind that the *Pate* case, the *Centerline* case and the *Northstar*

20  case were standalone cases when they were filed and then, because

21  of pretrial orders, transferred into the MDL.  It has always been

22  our position that those cases should have been filed where there

23  was jurisdiction, that being Florida, and then perhaps

24  transferred, if they could, of course, the JPML said they

25  shouldn't be transferred, so the MDL argument, in my view, does

1  not carry the day, going back to what I said in my initial

2  presentation.

3          But again, the distinction, which the Court just

4  brought up, referring back for trial, is we have already pending

5  in Florida cases where all the people can be brought.  And that's

6  where these cases should be, and that is why the motion to

7  dismiss should be respectfully granted.  Thank you.

8          THE COURT:  Thank you very much.

9          I've heard the arguments of the parties.  There are

10  several motions today.  One is the personal jurisdiction.

11          With regard to the law on personal jurisdiction,

12  the plaintiff bears the burden of establishing the

13  District Court's jurisdiction over a nonresident, but it may do

14  so only by showing a prima facie case.  Proof by a preponderance

15  of the evidence is not required in this aspect of the case.

16  However, it's true that uncontroverted allegations in the

17  complaints and conflicts between the parties have to also be

18  resolved in favor of the plaintiff.

19          Now, we all know that the Court may exercise

20  personal jurisdiction over a nonresident, either by way of

21  specific jurisdiction or general jurisdiction.  In this

22  particular matter, specific jurisdiction is not applicable to any

23  of the cases.  I look only to the general jurisdiction.

24          I have four insurance companies to analyze.  One is

25  Owners, the other is NGM, the third is FCCI, and the fourth is

1   Mid-Continent, MCC.

2              With regard to Owners, I see no one was appointed

3   for service of process.  There are really no contacts in the

4   particular jurisdiction.  There is no affiliate contacts.  I

5   don't feel this Court has personal jurisdiction over Owners.

6              Similarly with NGM.

7              However, with regard to Mid-Continent, I note that

8   Mid-Continent has held active licenses, authorizations to sell

9   insurance since 1996.  The Louisiana Secretary of State was

10  appointed agent for service of process.  They have submitted to

11  Louisiana jurisdiction by routinely submitting insurance policy

12  and endorsement forms and rate filings in the Louisiana

13  Department of Insurance for approval by the Louisiana

14  Departments.  They sold 1,288 insurance policies in Louisiana

15  from 2005 and 2010 through various agencies.  They've collected

16  over $4 million in premiums.  They have paid annual premium taxes

17  in Louisiana.  They also have an active surety bond practice in

18  Louisiana with agencies located in Louisiana.

19             I think the minimum contacts are there for MCC.

20             With FCCI, it's a little more problematic, but

21  there's enough allegations regarding an alter ego relationship

22  and the significance of the alter ego relationship to at least at

23  this stage satisfy the requirements of personal jurisdiction.  So

24  I feel that the Court has personal jurisdiction over that entity,

25  also.

1        I'll probably write something about this so that

2   you will have a little more information, and I will bring to bear

3   some of the citations that we're all familiar with to support

4   some of my views.

5        We'll take a ten-minute break at this time, and

6   I'll come back and hear argument on the other matters.  Thank you

7   very much.

8        (WHEREUPON, at this point in the proceedings, a brief

9   recess was taken.)

10        THE DEPUTY CLERK:  Everyone rise.

11        THE COURT:  Be seated, please.

12        I have another series of motions.  These motions

13   are under 12(b)(7).  They deal with a motion to dismiss for

14   failure to join indispensable parties.  The primary plaintiffs in

15   the case are the contractors.  The contractors required their

16   subs to get insurance and to list them, the primary contractors

17   or the contractors, as named insured or as additional insured.

18        The contractors sued the insurance companies.  They

19   did not sue the subcontractors or bring the subcontractors into

20   the litigation.  The issue is whether or not these are

21   indispensable parties and the cases should be dismissed.

22        I'll hear from the parties.

23        Same cases involved, except that most of them are

24   under the *Pate* case.

25        MR. PIPES:  That's correct, Your Honor, and there is a

1  number of motions, all of which are set today.  In order to speed

2  up the process, I know we have been a little slow today, but

3  Joe Hinkhouse is going to argue a consolidated argument that

4  applies to all of those motions before you in all of the cases.

5          THE COURT:  All right.

6          MR. HINKHOUSE:  Good afternoon, Your Honor.  My name is

7  Joe Hinkhouse, and I represent National Union Fire Insurance

8  Company of Pittsburgh, Pennsylvania, which is one of the Chartis

9  companies.  We issued policies, not to WCI or Centerline or

10 Northstar, but two of the subcontractors, Beta and Finest

11 Drywall.

12          Just to sort of fill out the procedural history

13 issues in the case, there is also a case in Florida that we filed

14 in against both Beta, Finest, the subcontractors, and also Pate.

15 And in response to our case, Pate has moved to dismiss.  That

16 motion was denied and Judge Lazarus' order set forth an Exhibit B

17 to our reply brief here, and more recently, Pate moved to dismiss

18 for lack of personal jurisdiction in Florida, and that motion was

19 denied summarily within a couple days.

20          So the coverage issues --

21         THE COURT:  Are these the state court in Florida or

22 federal court?

23         MR. HINKHOUSE:  No, they are in federal court.

24         THE COURT:  Okay.

25         MR. HINKHOUSE:  So as you mentioned, Your Honor, we

1    moved to dismiss the present action under Rule 12(b)(7) for

2    failure to join necessary and indispensable parties pursuant to

3    Rule 19.

4                    And as you mentioned, Pate seeks coverage, not only

5    for -- under its policies, the policies that it bought and paid

6    for, but also under policies that were bought and paid for by 11

7    different subcontractors.  And those 11 different subcontractors

8    negotiated the policies, they bought and paid for the policies,

9    and they are the named insured under the policies, and we believe

10   that they are indispensable to full and complete resolution of

11   this case.

12                   And I might add that all of those subcontractors

13   are located in Florida, and you've heard, at least for the *Pate*

14   case, all of the homes are located in Florida, and the claimants

15   cannot bring any action in this MDL because they must recover

16   under the bankruptcy proceeding that's been established.

17                   And, of course, as you mentioned, my argument also

18   applies to the *Centerline* and *Northstar* cases where those

19   plaintiffs are claiming coverage under only policies issued by

20   one subcontractor.  So Pate has 11 subcontractors that they are

21   claiming coverage under, and Northstar and Centerline just had

22   one.

23                   And we submit that under the standard of Rule 19,

24   that the absence of these subcontractors requires dismissal of

25   these cases.

1          THE COURT:  What's your theory on that, Joe?

2          MR. HINKHOUSE:  Well, I think if you look at Rule 19,

3    the question really is can complete relief be granted here in

4    this court in the absence of those parties or will adjudication

5    in this court prejudice either the nonparties, the

6    subcontractors, or the existing parties, namely, the insurance

7    companies?

8               And we think the answer is that complete relief,

9    complete justice, complete finality cannot be accomplished here

10   without the presence of the subcontractors.

11         THE COURT:  You're concerned if they are dismissed here,

12   the subcontractors may go some other place and file suit and it

13   be open again?

14         MR. HINKHOUSE:  No, the subcontractors cannot be a party

15   in Louisiana in the *Pate* case because there is no personal

16   jurisdiction over them.

17         THE COURT:  Right.

18         MR. HINKHOUSE:  So really what I'm concerned about is

19   that their interests, they have an interest in not only their

20   policies but also the interpretation of the contracts.

21              So I think --

22         THE COURT:  Isn't their interest the same as the others,

23   though?

24         MR. HINKHOUSE:  I don't think the interests are the same

25   as the others at all.  I think subcontractors -- well, the

1  starting point to determine whether there would be coverage for

2  Pate, for example, under the policies issued to the

3  subcontractors, the starting point would be the subcontracts

4  themselves, the business contracts between Pate and these 11

5  contractors.  And so the first thing the Court would have to do

6  to determine whether there is additional insured coverage would

7  be to adjudicate, to interpret the contracts between Pate on the

8  one hand and these absent parties on the other hand.  While Pate,

9  I think, has an interest in saying, well, these contracts confer

10 the obligation to provide insurance coverage, and therefore,

11 we're covered under your insurance, subcontractors' insurance, I

12 think the subcontractors would have a very different motivation.

13 I think they may have the motivation to argue that those

14 contracts don't require insurance, don't require the purchase of

15 insurance.  We don't know, we haven't seen them yet, but it would

16 be in the subcontractors' interest to preserve their insurance

17 asset for themselves because each one of them has their own

18 independent claims against them.  They all have a number of

19 substantial liabilities that they are facing, and I think they

20 would have an interest that's adverse certainly to Pate because

21 they would want to preserve their insurance asset, they would

22 want to litigate their insurance rights on their own.

23          THE COURT:  Wouldn't the fund be the same?  It creates a

24 fund, a pot.  Once the damages is paid, then nobody has a claim

25 against anyone.

1          MR. HINKHOUSE:  Well, first of all, I think they would

2     have an interest in litigating coverage, whether there is

3     coverage in the first place.  And then secondly, if we talk about

4     a pot, Pate has alleged and has inserted in the bankruptcy court

5     that they've got 220 odd million of liabilities.  They also say

6     they've got 160 million of insurance that they bought and paid

7     for, their direct insurance.  So that leaves $60 million that

8     they're going to try to sweep in and take that coverage from the

9     policies issued to the subs.  So that's a 60 million overage that

10    they are going to try to claim against the subcontractors'

11    policies.

12          Now, those same subcontractors, they have their own

13    claims.  They are not yet quantified, but we know they're

14    numerous and substantial.  Each one of the subcontractors is

15    faced, as you might imagine, with drywall claims in Florida,

16    primarily.  And so they would have, I think, every incentive to

17    maximize, to try to increase to the extent possible their

18    coverage to cover their own claims.

19          And I think -- this is really important -- I think

20    the Pate or the plaintiffs here made their intentions very clear

21    on Page 18 of their brief.  They say that they can sweep in, they

22    call it the first come, first serve rule.  They can basically, if

23    they get before Your Honor, they could come in and get an

24    adjudication of coverage, if Your Honor finds coverage, that is,

25    and that they can come in and take all the insurance, and that

1    they could leave the subcontractors without any insurance because

2    they think they are going to be first and they are going to sweep

3    in and take all of the insurance.

4           And then they say we're going to take all of this

5    insurance from the subcontractors, but the subcontractors have no

6    interest in that.  That's just logic I don't understand.  I think

7    subcontractors certainly have every interest in maximizing any

8    rights they have under their insurance policies, maximizing every

9    recovery that they could get.

10          But, of course, I think getting to the more

11   important point, this idea of first come, first serve isn't the

12   law that's going to be applied, or should be applied to these

13   matters.  The Florida Supreme Court's law, I think, would apply

14   that would address this issue.  There is no first come, first

15   serve rule.  The insurance companies have to take into account

16   all of the claims and all of their policyholders.  And we cited

17   the *Farinas* case and the *Contreras* case, very well known cases,

18   that the insurance companies have to take into account all of the

19   claims.

20          So even if the Court were to find coverage for

21   Pate, Centerline and Northstar and so forth, that would just

22   begin the litigation or begin the analysis because then there

23   would have to be adjudication in Florida.  There would have to be

24   some activity in Florida to say what interest do the

25   subcontractors have in these policies?  What are their rights and

1   obligations?  And then there would have to be some activity

2   taken, whether it be a mediation, whether it be judicial

3   activity, with all of the parties to come forward and say, we

4   have X dollars of insurance, if coverage is found, we've got Y

5   number of liabilities, and there would have to be a fair and

6   reasonable way to allocate the insurance resources against all of

7   the claims.

8          Now, you know, respectfully, and obviously, I

9   understand the MDL concept, but it doesn't seem that that can be

10  done here because we can't get all the parties here.  We can't

11  get the subcontractors here because they don't have jurisdiction

12  here.

13         We -- the claimants, particularly in the Pate

14  matter, will never be here because they can't assert a claim here

15  in this MDL.  They have to proceed through the bankruptcy trust.

16  So the *Pate* case is really unique in that regard.  And I think it

17  would make most sense for that case, in particular, to be

18  dismissed here, refiled or transferred to the State of Florida

19  where you can get everybody together and you can have an

20  adjudication of everyone's rights, first, as to whether is there

21  coverage; second, if there is coverage, how much coverage is

22  there, and then let's compare that to the liabilities and

23  determine a fair and equitable way to distribute the funds, which

24  I think may well turn out to be insufficient to cover the

25  liabilities of Pate and these various subcontractors, because a

1  lot of the subcontractors are small companies and they don't have

2  the tens and hundreds of millions of dollars of coverage that a

3  company like WCI had.  Some of them have a few million per year

4  of coverage.

5          So I think in order to, you know, to come to a fair

6  and just and equitable conclusion on this, and an efficient

7  result as well, I think we need to be somewhere where everyone

8  can participate.

9          And I might add that the Court's dismissal a few

10  minutes ago of the Owners Insurance and also NGM creates more

11  issues of indispensable parties.  Owners is a coinsurer with

12  Landmark.  They are both on the same level.  They've got

13  coinsurance on the same level of insurance, which I think is

14  primary.  I could be mistaken on that, but I think it's primary

15  insurance, the same year, same policy period, same everything

16  with a company called Hinkle Drywall.  So if we're going to be

17  adjudicating rights under policies sold and paid for by

18  Hinkle Drywall, you have one insurer here, which is Landmark, and

19  now Owners is gone.

20          And a similar situation occurs with NGM Insurance.

21  You've got -- it looks like they coinsure with Ohio Casualty and

22  West American providing coverage for HDS Drywall.  So now, you've

23  got one of the companies here, one of the insurers here and one

24  will be absent.

25          So really, I think what all of this is saying is an

1    adjudication here with the parties present will be a starting

2    point, but then they will spawn additional litigation most likely

3    in the State of Florida where all the parties have jurisdiction.

4    That's where all the claimants are.  That's where the policies

5    were sold and issued.  It seems to be a natural place for the

6    litigation.

7                And counsel for Pate said earlier, well, that's the

8    insurers' own making, that we filed cases in the State of

9    Florida.  Well, that's really not accurate.  I mean, Pate filed a

10   case here for their own strategic reasons.  He had no connection

11   here, the claimants weren't here, but they decided to file here,

12   and the fact of the matter is that choice, whether consciously or

13   not, left out these necessary parties.  It made it impossible to

14   get full relief in this court because they left out these 11

15   companies under whose insurance program they are trying to

16   recover the funds.

17               And I just don't think -- I don't think it would be

18   consistent with governing law to allow Pate to come in and sweep

19   in and take all the insurance money.  I don't think that would be

20   countenance by the case law.  But if that can't happen, then I

21   think by necessity, there has to be a secondary action, there has

22   to be some sort of combining, if the case were to proceed here

23   with activities in Florida with the activities here, and I'm not

24   sure how that could be presided over with parties that don't have

25   jurisdiction here; whereas, in Florida, everyone is subject to

1    jurisdiction.

2            As Mr. Kammer said, he made a good point about the

3    insurance companies' interests.  If there are separate rulings on

4    the contracts, the business contracts, separate rulings on the

5    policies between here and the State of Florida, any ruling here

6    would be subject to collateral attack in Florida.  So there may

7    be a finding of coverage here.

8            THE COURT:  Or vice versa.

9            MR. HINKHOUSE:  Of course, it's a quagmire.

10           THE COURT:  But that's a problem when you don't have

11   them all in one court because that's the difficulty.  They are

12   strewn throughout the country at this point.  So it may be the

13   same policies, but you're going to get different views from

14   either different counties in Florida, different courts in

15   Florida, and also different courts in other states as well.  We

16   have about 26 states so far involved in this MDL.  I suspect that

17   they will have the same policies strewn throughout those 26

18   states, and the difficulty that's confronting this case and

19   perhaps the MDL court -- I don't mean the transferee court, I

20   mean the panel itself -- has now got the same policies being

21   interpreted by conceivably 26 different judges, which makes it a

22   little bit more difficult, I think.

23           MR. HINKHOUSE:  Doesn't Rule 19(b) really give us the

24   answer in that, I think, Pate has an adequate remedy, they could

25   file a comprehensive case in the State of Florida, and everyone

1   would be there?

2           THE COURT:  Well, maybe this case should have been in

3   the State of Florida MDL'd, but it's MDL'd in Louisiana, so

4   that's one of those things.  It seems like Florida has the most

5   drywall cases, but it is here.

6           MR. HINKHOUSE:  My observation is a lot can be done

7   here.  A lot has been done here already with the activities with

8   Knauf and so forth.  You know, there's a lot happening, a lot of

9   activity in place that I think is moving this thing forward.  I

10  think this Pate case is one, perhaps, exception to that where it

11  just doesn't fit here.

12          THE COURT:  Well, the reason I've held off on these

13  particular motions is because sometimes we can move the case to

14  the point that it's of more interest to the parties to get a

15  complete resolution of it than it is to get a ruling in one

16  court, then a ruling in another court and a ruling in a third

17  court that's all different, and so that they are, to some extent,

18  I don't know whether the Court does a favor when it says it's not

19  going to be decided by the MDL court, I don't have personal

20  jurisdiction over it.  That simply means that maybe another 15

21  courts will have jurisdiction over it.  And instead of having the

22  case resolved to your satisfaction, at least an end, you'll be

23  around a long, long time in 15 different courts.  But that's the

24  way it works in these complicated cases.

25              I understand your argument.  Let me hear from your

1    opponent.

2         MR. HINKHOUSE:   Thank you.

3         MR. HORKOVICH:   Thank you, Your Honor.   I think the

4    movants' papers have a couple of fundamental errors, fundamental

5    misconceptions that I would like to bring to the Court's

6    attention.

7         First of all, in this case, in the MDL and the *Pate*

8    case certainly, and also in the *Centerline* case and the *Northstar*

9    case, there are two different types of insurance that are issued.

10   And I'm not talking about homeowners versus CGL, I'm just talking

11   about on the CGL side, the liability side.   And there is

12   insurance that's sold directly to WCI that's been assigned to the

13   trust, the WCI trust, and insurance sold directly to Centerline

14   and insurance sold directly to Northstar.   The insurance company

15   is selling policies directly to them that have nothing to do with

16   subcontractors.   It has nothing to do with any subcontractors

17   under the policy -- under the policies.

18         And then there is another form of insurance in

19   which insurance was sold to subcontractors, and as Your Honor

20   noted, that the contractors insisted if they were going to -- if

21   the subcontractors were going to do work, that they be named as

22   additional insureds.   Those rights are not derivative of the

23   subcontractors' rights.   They are additional named insureds.

24   Pate's rights under the subcontractor policies don't go through

25   subcontractor.   As an additional named insured, it's WCI's rights

1   or now the trust's rights against the policy, Centerline's rights

2   against that policy, Northstar's rights against that policy.

3            And in terms of scope, more than half of the

4   insurance that's at issue here, as counsel noted, over

5   $164 million in coverage, is direct insurance that has nothing to

6   do with subcontractors.  More than half the insurance at issue in

7   this action doesn't fit into this present motion at all.  And in

8   fact -- but, in fact, still they are moving to dismiss the entire

9   action for lack of indispensable parties.

10           I also just note that ten of the insurance

11  companies who are defendants in this action have not joined in

12  it, and even as to the -- and as to the -- even as to those who

13  sold insurance to both -- to subcontractors in which WCI,

14  Centerline or Northstar were given separate independent rights as

15  additional named insurers, 11 insurance companies have chosen not

16  to join in this motion.

17           I could go through it, but WCI, the Illinois Union

18  Insurance Company, Steadfast Insurance Company, which is the

19  Zurich subsidiary, Chartis Claims, Chartis, the Lexington

20  Insurance Company, and an AIG company called American

21  International Speciality Lines Insurance Company all sold

22  insurance directly to WCI without any reference to any

23  subcontractor.  $164 million of insurance.  This Court should not

24  dismiss that action, dismiss that insurance.

25           With regard to Centerline, Mid-Continent,

1   Mr. Kammer's client, sold eight primary and excess policies

2   directly to Centerline without any involvement in the

3   subcontractors.  The insurance company, the State of

4   Pennsylvania, also sold direct insurance directly to Centerline.

5           With regard to the policies sold to Centerline as

6   to which Centerline has the nonderivative additional insured,

7   Mid-Continent sold coverage, Amerisure sold coverage, and

8   Interstate Fire sold coverage.  Interstate Fire did not join in

9   this motion to dismiss.

10          And even then, the motion to dismiss that Amerisure

11  or Mid-Continent filed only relates to a subcontractor by the

12  name of United Framers.  There was another subcontractor called

13  Ocean Coach Drywall, which is not part of the indispensable party

14  motion.

15          So similarly with Northstar, General Fidelity and

16  Quanta sold policies directly to Northstar.  They did not join in

17  this motion to dismiss.

18          Policies as to which Northstar has an independent

19  derivative right as a named insured include policies sold by

20  Mid-Continent and Excess Insurance Company, and Excess Insurance

21  Company did not join in this motion to dismiss.

22          So there is a tremendous amount of this case that

23  is not part of this motion, even though they want to dismiss the

24  entire action.  We cited a law.  I'm not going to recite it to

25  Your Honor.  Your Honor is obviously extremely well prepared and

1   has read the law, but we believe there is -- the nature of the

2   policies reflect that named insureds -- case law states the named

3   insureds do not as a matter of law substitute a necessary policy

4   to a litigation.  Why?  Because the rights are not derivative.

5            When a company -- when a subcontractor came to WCI

6   and said, we want to be able to install drywall, WCI said, okay,

7   as a condition of doing that job, we have to have coverage.  We

8   have our own, but we want -- if you do something that causes us

9   to have liability, we want to be covered.  And those -- and so

10  the subcontractors went out and got them named as additional

11  insureds.  Not derivative insureds, not supplemental insureds,

12  but additional insureds, and their rights are independent and

13  nonderivative.

14           So here in this action, each of the plaintiffs seek

15  a declaration that the defendants' obligations to WCI, the trust,

16  Centerline and Northstar under the defendants' insurance

17  policies.  We're not seeking an adjudication of the

18  subcontractors' rights under the policy.  We have nothing to do

19  with whether they gave notice, whether they didn't give notice.

20  We did.  So the Court can decide the issues before the Court.

21  The issue is can -- does the WCI Trust have rights under this

22  policy that National Union sold?  That can be decided here and is

23  going to be decided without the subcontractor because the sub --

24  it's not a derivative coverage.  It's our right under that

25  policy, and that can be -- that can be decided here.  All the

1   parties whose rights and liabilities are to be determined are

2   present in this court, and this Court can provide complete relief

3   to the parties present.

4          We don't believe that subcontractors are even

5   necessary or indispensable parties and that the Court should deny

6   the defendants' motion to dismiss.

7          We believe that the *Key Bank* case notes that it's a

8   highly practical and fact-based inquiry.  Can the Court provide

9   complete relief?  We believe they can.  Certainly as to the

10  policies that have nothing to do with the subcontractors, and

11  even as to the policies that we do believe relate to the

12  subcontractors, the Court can adjudicate the additional insureds

13  rights, which are nonderivative of the subcontractors.

14         The other test is whether or not a person claims an

15  interest in the policy.  It's worthy to note that not a single

16  one of the subcontractors, not a one, has come to this Court to

17  seek to intervene.

18         The *Key Bank* case said that, "Only if the presence

19  of some other person is required in this court does the inquiry

20  proceed to a 19(b) inquiry," the *SMI Steel* case says that, "Named

21  insureds are not necessary under" -- "in an adjudication."

22         Again, on burden, the movant bears the burden of

23  demonstrating that the person is indispensable and that the Court

24  should dismiss the action.  And that should be decided in the

25  context of the particular litigation, and that permits this Court

1   to take the MDL into consideration.

2          The Court -- the *Smith* case in the Fifth Circuit

3   says, "The Court should take into account pragmatic concerns,

4   especially the effect on the parties and the effect on the

5   litigation."  The pragmatic concern, Your Honor, is that we

6   should not be denied relief because --

7          THE COURT:  It says that if that happens, though, that

8   the subcontractors would be prejudiced.  How does that work?

9          MR. HORKOVICH:  The sharp -- let me drop back and

10  explain.  Of the 11 subcontractors, we have submitted Exhibit D

11  to our opposition, and it's a corporate records search.  Not --

12  understandably after this Chinese Drywall menace has come to

13  light, many, many, many of the subcontractors have dissolved,

14  or -- and we've put in Exhibit D that six out of the 11

15  subcontractors, Distinctive Finishes, Remedial Drywall,

16  First Choice Construction, Beta Drywall, Beta Construction,

17  Stephen Sweet Drywall, S & D Associates are dissolved.

18          What's going on, and this is interesting, is the

19  expressed concern we've heard, the alleged concern of, oh, the

20  subcontractors' interest might be affected.  One of the things

21  that would have been helpful to tell the Court is that they are

22  suing the subcontractors in Florida, the subcontractors are not

23  appearing, and they are moving for default judgments against the

24  subcontractors to extinguish their rights under the policy.  So

25  what we heard is this expressed concern of, oh, my, Your Honor,

1  you're going to be impairing the subcontractors' interests.

2  Well, if they are moving in Florida for default judgment to

3  extinguish any rights that the subcontractors have, and those

4  include Stephen Sweet Drywall, Distinctive Finishers, Swedberg,

5  Enterprises doing business as Florida Drywall, Beta Drywall,

6  Beta Construction, United Framers, and Precision Drywall are all

7  entities that they have sued, they failed to appear, and they are

8  moving for default judgment to get default judgment to extinguish

9  any rights that they may have, while they're coming to this Court

10  expressing concern that somehow their interests might be

11  affected.

12        They said that we could come here in this case and

13  ask for a determination of our rights, and in seeking our

14  determination of our rights, that that somehow might impinge on

15  the subcontractors' rights.  First of all, we have a right to

16  seek adjudication of our rights and we're not under the policy,

17  and it's not derivative and we're seeking adjudication of our

18  rights.  We do believe that we can get and should get,

19  respectfully submit we should get adjudication of our rights.

20        We've heard about what the impact is under Florida

21  law, and somehow I missed it, but there has been some sort of a

22  decision among the group here that there has been a choice of law

23  determination applying Florida law in the case.  Florida -- even

24  if Florida law is applied, it's a *lex loci contracti*

25  jurisdiction, not significant contacts, and that means where was

1   the last event that took place on the contract before the

2   contract was effective?

3           These guys are from New York, Ohio, Oklahoma, and

4   it can be a lot of different places other than Florida.  In fact,

5   in the -- in one case, the federal district court Judge Seitz in

6   the Southern District of Florida in one of their actions just

7   applied California law in one of their actions, not Florida law.

8           We do believe that we can get a declaration that we

9   are entitled to rights under the policies.  There is -- yet we

10  have -- yes, we do believe that we may have $224 million in

11  damages.  That will be determined after the trust as the -- apply

12  the trust distribution procedures to the claims and there is

13  adjudication -- there is a resolution of the claims, and we'll

14  find out what the amount is.  We speculate that at the present

15  time, that it's going to be over $200 million.

16          We've got over $300 million of insurance between

17  the direct insureds and the -- sold directly to WCI, Centerline

18  and Northstar and the insureds.  So there should be more

19  insurance than -- there is more insurance certainly than WCI will

20  have by a hundred million.

21          Your Honor raised a very good point, is that the

22  funds that go -- to the extent that there is a payment into the

23  trust, the trust will be satisfying damage requests.  And at

24  least for 700 claimants who have WCI constructed homes, they will

25  be compensated.  And that would, therefore, at the very least,

1   minimize or eliminate damages that could be held against the

2   subcontractors so that the subcontractors would get a benefit

3   from a payment from the trust.

4           The *SMI* case suggests that depriving a plaintiff of

5   a forum of its choice in which to try an action exceeds an

6   importance, any concern about the possibility of an inconsistent

7   result.  We haven't really seen any possibility of an

8   inconsistent result.  It's hypothetical.  Certainly hypothetical

9   if the subcontractors don't appear and their rights are

10  adjudicated to be extinguished, which is what's going on.

11          We ask the Court to recognize that in terms of

12  viewing ruling as to whether or not -- or the viewing of the

13  context of the case, that this is the court of the MDL, and that

14  this is the court -- this is the most comprehensive vehicle for

15  the resolution of the coverage disputes.  And instead of

16  encouraging piecemeal resolution in 26 different jurisdictions,

17  that may promote judicial waste, and we believe that the Court,

18  this Court can and should continue the case, and in that way the

19  goal of the multidistrict litigation will be preserved.

20          Thank you, Your Honor.

21      THE COURT:  Any rebuttal?

22      MR. HINKHOUSE:  One minute, Your Honor.

23          I have some comments from my coinsurer counsel.

24  One of the things he raised, Your Honor, and one of the things

25  just raised by Mr. Horkovich seems to be a notion that if the

1    *Pate* case doesn't get resolved, adjudicated in this MDL, that it

2    has to splinter off into 26 different cases.  I think it's

3    feasible and would be fairly simple to file one comprehensive

4    case in the State of Florida where everyone has jurisdiction.

5            So I don't think -- I don't think the option is

6    splintering off of a number -- to a number of different cases in

7    a number of different courthouses.  I think one judge could

8    preside over the entire controversy where everyone is subject to

9    personal jurisdiction.

10           There was another -- several fairly significant

11   misstatements of fact that were just made.  One is that the

12   insurance companies are, I think, Counsel said moving for default

13   and then trying to extinguish the coverage for the subcontractors

14   in the Florida cases.  I understand Mid-Continent, while they

15   moved for default, it's only an order, it's not a judgment.  And

16   they are continuing to this day to defend these subcontractors,

17   because, of course, not only do the subcontractors continue to

18   potentially have rights under the policies, but the injured

19   parties could exert some right over the coverage potentially, so

20   that the effort has been made to defend those companies, and it's

21   not a cut and run situation as has been portrayed.

22           There was some comment about certain insurance

23   companies who didn't join our motion.  I'm not sure I follow that

24   logic either.  The point is that the direct insurers of Pate, the

25   direct insurers of Centerline, the direct insurers of Northstar

1   don't really have standing to make this argument.  They are

2   director insurers.  It's all of the insurers of the

3   subcontractors that are saying, wait a minute, we are now put in

4   a major bind because we will be subject to inconsistent

5   adjudications, and we've got to deal with our subcontractors in

6   the State of Florida.

7           So I just wanted to clear up a couple of those

8   issues, and unless the Court has any questions...

9       THE COURT:  No, I don't.  Let me look at this a little

10  bit more closely, again, with your comments in mind, and I'll

11  issue an opinion on this one, too.

12      MR. HINKHOUSE:  Thank you very much.

13      THE COURT:  Thank you very much.

14          Is that it?

15          Thank you.  Court will stand in recess.

16      THE DEPUTY CLERK:  Everyone rise.

17      (WHEREUPON, at 4:05 p.m., the proceedings were

18  concluded.)

19                      *    *    *

20

21

22

23

24

25

1                     REPORTER'S CERTIFICATE

2

3        I, Cathy Pepper, Certified Realtime Reporter, Registered

4   Merit Reporter, Registered Professional Reporter, Certified Court

5   Reporter of the State of Louisiana, Official Court Reporter for

6   the United States District Court, Eastern District of Louisiana,

7   do hereby certify that the foregoing is a true and correct

8   transcript, to the best of my ability and understanding, from the

9   record of the proceedings in the above-entitled and numbered

10  matter.

11

12

13                          *s/Cathy Pepper*

14                          Cathy Pepper, CRR, RMR, CCR

15                          Official Court Reporter

16                          United States District Court

17

18

19

20

21

22

23

24

25

## $

**$11,000** [1] - 28:19
**$11,286** [2] - 52:25, 58:24
**$164** [2] - 77:5, 77:23
**$200** [1] - 83:15
**$224** [1] - 83:10
**$250** [1] - 38:14
**$300** [1] - 83:16
**$4,479,718** [1] - 46:14
**$50,000** [1] - 52:24
**$60** [1] - 69:7
**$62,000** [1] - 52:23

## '

**'97** [1] - 27:19

## 0

**01608** [1] - 2:18
**09-MD-2047-EEF-JCW** [1] - 1:6

## 1

**1,280** [1] - 46:13
**1,288** [1] - 63:14
**10** [2] - 6:6, 59:25
**10020** [1] - 2:9
**11** [11] - 6:7, 38:4, 60:4, 66:6, 66:7, 66:20, 68:4, 73:14, 77:15, 81:10, 81:14
**1100** [1] - 3:18
**12** [1] - 60:4
**12(b)(7** [1] - 66:1
**12(b)(7)** [1] - 64:13
**12(d** [1] - 11:8
**122** [1] - 3:12
**1221** [1] - 4:15
**1251** [1] - 2:8
**12TH** [2] - 2:17, 4:6
**13** [3] - 41:3, 54:3, 60:7
**133** [1] - 4:19
**1407** [2] - 10:19, 39:23
**144** [1] - 56:16
**15** [3] - 8:3, 75:20, 75:23
**160** [1] - 69:6
**1600** [1] - 3:23
**17** [2] - 38:14, 54:21
**1700** [1] - 3:19
**18** [3] - 30:11, 30:18, 69:21

**180** [1] - 3:7
**1800** [1] - 2:14
**19** [5] - 6:8, 54:21, 66:3, 66:23, 67:2
**19(b** [2] - 74:23, 80:20
**19106** [1] - 2:5
**1969** [1] - 16:4
**1972** [1] - 16:4
**1992** [1] - 56:16
**1996** [1] - 63:9
**1997** [1] - 53:2
**19th** [1] - 52:11
**1:30** [1] - 1:7

## 2

**2** [4] - 15:22, 21:14, 55:5, 55:14
**2000** [1] - 28:4
**2005** [1] - 63:15
**2007** [10] - 26:22, 26:24, 27:7, 27:14, 28:4, 28:11, 28:12, 28:14, 29:14, 51:10
**2008** [8] - 27:14, 28:17, 51:19, 52:24, 52:25, 53:3, 53:6, 58:25
**2009** [5] - 51:17, 51:18, 52:24, 58:25, 59:15
**2010** [9] - 1:7, 7:2, 18:17, 26:15, 35:25, 37:20, 58:25, 59:15, 63:15
**2047** [2] - 7:11, 7:22
**2100** [1] - 2:22
**220** [1] - 69:5
**25** [1] - 6:9
**26** [5] - 74:16, 74:17, 74:21, 84:16, 85:2
**267** [1] - 30:10
**2700** [1] - 4:24
**29** [5] - 12:19, 12:22, 12:24, 16:13, 16:25
**2900** [1] - 4:15
**2:09-CV-07791** [1] - 1:15

## 3

**3** [4] - 1:7, 7:2, 15:22, 16:4
**30(b)(6** [4] - 22:23, 29:5, 54:18, 56:5
**300** [1] - 38:12
**30326** [1] - 2:22
**322** [1] - 56:16

**325** [1] - 56:16
**33156** [1] - 3:23
**333** [1] - 30:10
**33394** [1] - 4:25
**3340** [1] - 2:21
**340** [3] - 12:11, 12:15, 53:17
**3400** [1] - 3:8
**35** [8] - 6:10, 12:19, 12:24, 14:22, 14:23, 16:10, 16:14, 16:24
**36** [1] - 22:23
**36104** [1] - 3:13
**3650** [1] - 5:4

## 4

**4** [1] - 63:16
**40** [3] - 16:4, 16:8, 26:9
**43** [1] - 6:11
**446** [1] - 2:17
**4804** [1] - 3:13
**4:05** [1] - 86:17

## 5

**50** [6] - 14:2, 14:8, 22:14, 22:16, 55:7, 55:10
**50,000** [1] - 39:13
**500** [2] - 2:4, 5:7
**504** [1] - 5:8
**510** [1] - 2:4
**54** [6] - 21:13, 22:14, 22:15, 55:5, 55:13
**58** [1] - 6:12
**589-7779** [1] - 5:8
**59** [1] - 6:13

## 6

**6** [2] - 17:13, 17:15
**60** [1] - 69:9
**601** [1] - 4:6
**60601** [1] - 3:8
**62** [1] - 6:14
**64** [3] - 6:15, 6:16, 6:17
**65** [1] - 6:18
**66** [3] - 55:4, 55:12, 55:13

## 7

**7** [2] - 6:5, 18:5
**700** [1] - 83:24

**701** [1] - 5:4
**70112** [1] - 2:14
**70113** [1] - 1:25
**70130** [3] - 4:7, 4:11, 5:8
**70139** [1] - 5:5
**70163-1701** [1] - 3:19
**70726** [1] - 4:20
**72** [2] - 59:24, 59:25
**755** [1] - 4:10
**76** [1] - 6:19
**77010** [1] - 4:16

## 8

**8** [2] - 18:15, 38:4
**81** [1] - 54:21
**820** [1] - 1:24
**84** [1] - 6:20
**86** [1] - 6:21

## 9

**9** [1] - 54:18
**909** [1] - 2:13
**9155** [1] - 3:22
**9th** [1] - 35:25

## A

**ABELS** [1] - 4:19
**ability** [1] - 87:8
**able** [3] - 7:23, 27:8, 79:6
**above-entitled** [1] - 87:9
**absence** [2] - 66:24, 67:4
**absent** [3] - 35:3, 68:8, 72:24
**absolutely** [3] - 33:20, 48:6, 48:8
**accept** [1] - 23:17
**accepted** [1] - 23:14
**Access** [8] - 38:6, 41:5, 41:7, 42:2, 42:4, 42:16, 47:20, 48:1
**accident** [4] - 12:21, 12:23, 12:24, 21:21
**accidents** [5] - 12:20, 12:25, 13:1, 16:14, 16:25
**accomplished** [1] - 67:9
**according** [1] - 27:7
**account** [5] - 50:23, 50:24, 70:15, 70:18,

81:3
**accountant** [3] - 32:3, 32:6, 32:7
**accounting** [6] - 21:4, 31:23, 32:6, 50:5, 50:6, 50:7
**accounts** [2] - 13:3, 20:20, 27:12
**accurate** [1] - 73:9
**acknowledge** [1] - 26:12
**action** [16] - 17:2, 45:4, 45:8, 45:17, 66:1, 66:15, 73:21, 77:7, 77:9, 77:11, 77:24, 78:24, 79:14, 80:24, 84:5
**actions** [6] - 10:25, 35:17, 35:22, 36:17, 36:20, 37:2, 58:8, 83:6, 83:7
**active** [2] - 63:8, 63:17
**activities** [7] - 26:19, 44:19, 48:7, 51:1, 73:23, 75:7
**activity** [12] - 12:15, 13:4, 13:5, 13:9, 13:15, 35:22, 36:9, 55:9, 70:24, 71:1, 71:3, 75:9
**actuary** [1] - 50:7
**add** [2] - 66:12, 72:9
**additional** [14] - 36:22, 49:16, 64:17, 68:6, 73:2, 76:22, 76:23, 76:25, 77:15, 78:6, 79:10, 79:12, 80:12
**address** [7] - 22:7, 26:5, 29:10, 30:2, 41:6, 49:19, 70:14
**addressed** [1] - 56:7
**addresses** [2] - 12:12, 53:18
**adequate** [3] - 23:12, 34:14, 74:24
**adequately** [1] - 34:16
**adjudicate** [2] - 68:7, 80:12
**adjudicated** [2] - 84:10, 85:1
**adjudicating** [3] - 58:5, 58:11, 72:17
**adjudication** [12] - 58:8, 67:4, 69:24, 70:23, 71:20, 73:1, 79:17, 80:21, 82:16, 82:17, 82:19, 83:13
**adjudications** [1] - 86:5

**adjuster** [1] - 21:23
**adjusters** [3] - 24:10, 54:15, 55:25
**adjusting** [1] - 51:2
**administrative** [1] - 51:4
**admitted** [2] - 18:9, 24:1
**admittedly** [1] - 54:9
**adverse** [1] - 68:20
**advertise** [8] - 12:3, 20:21, 22:24, 22:25, 55:17, 55:18, 55:19, 57:3
**advertising** [1] - 27:10
**Advertising** [1] - 22:23
**advised** [1] - 61:4
**advisor** [1] - 50:8
**affect** [1] - 35:1
**affected** [2] - 81:20, 82:11
**affidavit** [8] - 11:12, 15:10, 15:11, 23:25, 24:2, 32:23, 37:14, 37:15
**affidavits** [4] - 11:17, 11:18, 17:21, 20:9
**affiliate** [3] - 15:3, 21:9, 63:4
**affiliated** [3] - 14:17, 15:4, 30:21
**affiliates** [3] - 14:14, 15:8, 21:8
**affiliation** [3] - 14:14, 33:13, 48:16
**afternoon** [7] - 7:9, 7:16, 11:6, 19:18, 25:12, 35:12, 65:6
**agencies** [3] - 22:25, 63:15, 63:18
**agent** [12] - 12:6, 20:18, 20:21, 27:22, 28:1, 28:11, 52:8, 52:9, 52:14, 53:8, 57:3, 63:10
**agents** [2] - 12:5, 38:15
**ago** [8] - 15:7, 17:24, 17:25, 26:10, 26:24, 45:20, 53:9, 72:10
**agree** [5] - 9:23, 29:6, 37:6, 40:4, 40:10
**agreement** [2] - 8:17, 9:4
**AI** [1] - 36:24
**AIG** [1] - 77:20
**aircraft** [1] - 38:21
**airplane** [1] - 47:1
**AL** [2] - 1:14, 3:13

**Alabama** [3] - 59:6, 59:10, 59:11
**allegations** [2] - 62:16, 63:21
**alleged** [5] - 10:11, 13:22, 14:5, 69:4, 81:19
**allegedly** [1] - 19:3
**allocate** [1] - 71:6
**allow** [2] - 25:6, 73:18
**allowed** [3] - 12:18, 41:20, 56:18
**almost** [1] - 41:3
**alone** [2] - 39:20, 43:5
**alter** [8] - 30:12, 31:19, 34:18, 35:5, 48:18, 48:21, 63:21, 63:22
**altogether** [1] - 8:23
**AMANDA** [1] - 3:17
**amended** [1] - 24:7
**America** [1] - 55:3
**American** [4] - 8:7, 17:25, 72:22, 77:20
**AMERICAN** [3] - 1:12, 3:3, 4:9
**AMERICAS** [1] - 2:8
**Amerisure** [2] - 78:7, 78:10
**AMERISURE** [2] - 4:17, 4:18
**amount** [5] - 43:15, 48:22, 52:17, 78:22, 83:14
**analysis** [4] - 14:7, 44:6, 48:18, 70:22
**analyze** [1] - 62:24
**ancient** [2] - 51:17, 51:20
**AND** [1] - 4:23
**ANDERSON** [1] - 2:7
**ANDERSSON** [1] - 3:16
**ANDREA** [1] - 4:14
**Anna** [1] - 52:16
**ANNA** [1] - 2:8
**annual** [1] - 63:16
**annually** [1] - 46:15
**answer** [4] - 15:19, 56:10, 67:8, 74:24
**answered** [1] - 20:8
**answers** [2] - 15:14, 15:18
**apart** [1] - 41:9
**apologize** [3] - 30:23, 30:24, 32:21
**appear** [2] - 82:7, 84:9
**appearance** [1] - 7:12
**APPEARANCES** [5] - 1:21, 2:1, 3:1, 4:1, 5:1

**appearing** [1] - 81:23
**applicable** [1] - 62:22
**applied** [4] - 70:12, 82:24, 83:7
**applies** [9] - 9:24, 19:21, 19:22, 40:8, 42:23, 42:24, 42:25, 65:4, 66:18
**apply** [4] - 9:24, 60:17, 70:13, 83:11
**applying** [1] - 82:23
**appoint** [2] - 15:8, 27:25
**appointed** [5] - 27:21, 46:10, 53:8, 63:2, 63:10
**appreciate** [1] - 49:11
**approach** [2] - 31:25, 43:24
**appropriate** [1] - 52:6
**approval** [1] - 63:13
**argue** [5] - 9:15, 14:4, 65:3, 68:13
**argued** [1] - 19:16
**arguing** [7] - 7:19, 19:24, 59:21
**argument** [32] - 13:24, 19:15, 23:14, 23:18, 32:9, 32:17, 32:18, 34:7, 35:9, 35:13, 36:16, 39:16, 40:2, 42:25, 44:11, 44:12, 44:13, 46:4, 46:22, 47:3, 47:4, 48:9, 48:11, 48:14, 57:20, 60:25, 61:25, 64:6, 65:3, 66:17, 75:25, 86:1
**ARGUMENT** [1] - 1:18
**arguments** [6] - 8:24, 8:25, 14:10, 39:19, 43:13, 62:9
**arising** [2] - 52:2, 56:1
**ARNOLD** [1] - 2:3
**arrangements** [1] - 28:15
**article** [3] - 29:3, 29:4, 29:5
**articles** [1] - 50:17
**AS** [1] - 1:9
**Asahi** [1] - 38:25
**aspect** [2] - 40:11, 62:15
**ASPEN** [1] - 4:19
**assert** [1] - 71:14
**assessments** [3] - 28:7, 53:6, 53:11
**asset** [2] - 68:17, 68:21

**assets** [1] - 27:12
**assigned** [1] - 76:12
**assist** [1] - 38:20
**assistants** [2] - 51:4, 51:5
**Associates** [1] - 81:17
**Association** [3] - 28:8, 53:7, 53:11
**ATLANTA** [1] - 2:22
**attached** [2] - 11:12, 32:23
**attack** [4] - 14:16, 43:2, 43:3, 74:6
**attempted** [2] - 14:8, 37:9
**attention** [1] - 76:6
**Attorney** [1] - 23:25
**attorney** [3] - 11:13, 11:16, 21:25
**attorneys** [1] - 28:25
**August** [2] - 18:17, 35:25
**authority** [3] - 27:19, 29:13, 50:9
**authorizations** [1] - 63:8
**authorized** [2] - 20:18, 47:25, 53:1
**Auto** [17] - 11:13, 11:15, 11:21, 14:17, 14:20, 14:24, 14:25, 15:1, 15:4, 15:14, 15:15, 15:18, 16:2, 16:12, 17:5, 17:25, 18:9
**auto** [2] - 12:25, 25:21
**AUTO** [2] - 3:10, 3:15
**Auto-Owners** [17] - 11:13, 11:15, 11:21, 14:17, 14:20, 14:24, 14:25, 15:1, 15:4, 15:14, 15:15, 15:18, 16:2, 16:12, 17:5, 17:25, 18:9
**AUTO-OWNERS** [2] - 3:10, 3:15
**automobile** [9] - 12:20, 12:21, 12:23, 13:1, 16:14, 16:25, 23:19, 25:18, 53:23
**avail** [4] - 16:20, 29:21, 44:18, 48:6
**availing** [5] - 13:4, 16:7, 22:3, 23:10, 24:17
**AVENUE** [2] - 1:24, 2:8
**aware** [1] - 56:22

**B**

**B406** [1] - 5:7
**backed** [1] - 17:20
**background** [1] - 35:14
**Bank** [3] - 17:25, 80:7, 80:18
**bank** [3] - 13:3, 20:20, 27:12
**bankrupt** [1] - 10:8
**bankruptcy** [4] - 10:9, 66:16, 69:4, 71:15
**BARRASSO** [1] - 2:11
**BARRIOS** [2] - 5:3, 5:4
**based** [5] - 17:18, 25:5, 29:12, 36:13, 80:8
**basic** [1] - 8:25
**basis** [1] - 38:19
**bear** [1] - 64:2
**Bearry** [8] - 38:6, 38:10, 38:16, 38:23, 39:6, 42:15, 47:19, 47:20
**bears** [2] - 62:12, 80:22
**became** [1] - 7:24
**becomes** [1] - 26:13
**Beech** [3] - 38:11, 38:17, 38:18
**BEFORE** [1] - 1:18
**began** [1] - 35:15
**begin** [2] - 70:22
**beginning** [5] - 15:3, 28:18, 31:20, 35:15, 38:3
**behalf** [9] - 7:14, 7:17, 7:19, 9:8, 9:15, 9:18, 9:22, 11:7, 59:21
**behind** [2] - 30:16, 32:2
**belongs** [1] - 60:24
**benefit** [1] - 84:2
**benefits** [2] - 22:4, 29:21
**BERMAN** [1] - 2:3
**best** [2] - 8:11, 87:8
**Beta** [6] - 65:10, 65:14, 81:16, 82:5, 82:6
**better** [3] - 28:16, 42:25, 44:12
**between** [15] - 25:16, 25:18, 34:19, 45:15, 46:18, 49:18, 53:12, 55:1, 60:3, 60:6, 62:17, 68:4, 68:7,

74:5, 83:16
**beyond** [1] - 46:20
**big** [3] - 44:25, 60:7, 60:10
**billboards** [1] - 12:4
**bind** [1] - 86:4
**bit** [6] - 10:7, 43:15, 47:4, 47:11, 74:22, 86:10
**board** [2] - 45:20, 52:1
**Bob** [1] - 7:18
**bond** [1] - 63:17
**bonds** [2] - 46:1
**books** [1] - 49:21
**bottom** [1] - 15:22
**bought** [7] - 17:8, 54:13, 54:14, 66:5, 66:6, 66:8, 69:6
**BOULEVARD** [1] - 3:22
**BOX** [1] - 3:13
**BOYER** [1] - 4:18
**break** [1] - 64:5
**BRIAN** [1] - 4:19
**brief** [9] - 15:15, 24:20, 30:9, 38:3, 43:23, 46:20, 64:8, 65:17, 69:21
**briefing** [1] - 52:17
**briefly** [1] - 17:12
**briefs** [2] - 26:11, 44:10
**bring** [6] - 19:7, 45:16, 64:2, 64:19, 66:15, 76:5
**BROAD** [1] - 4:23
**broker** [1] - 17:8
**brother** [3] - 19:20, 22:3, 24:19
**brought** [2] - 62:4, 62:5
**burden** [8] - 57:13, 57:17, 57:20, 57:22, 57:25, 62:12, 80:22
**Burgers** [1] - 17:14
**burglarized** [1] - 23:7
**business** [57] - 11:10, 12:2, 12:8, 12:13, 12:15, 13:16, 14:14, 14:18, 15:5, 16:20, 20:6, 20:13, 20:14, 20:19, 20:24, 21:6, 21:10, 24:2, 24:5, 24:15, 26:19, 27:1, 27:17, 29:2, 29:4, 29:16, 29:17, 31:15, 31:17, 32:17, 34:10, 34:12, 34:13, 37:21, 38:14, 40:23, 41:15, 41:21, 47:21, 47:25,

48:2, 48:3, 50:22, 52:4, 52:21, 53:14, 54:1, 54:4, 54:9, 56:7, 56:23, 59:8, 68:4, 74:4, 82:5
**businesses** [3] - 55:22, 59:3, 59:14
**buttresses** [1] - 40:2
**BY** [18] - 1:24, 2:3, 2:7, 2:12, 2:17, 2:21, 3:7, 3:12, 3:17, 3:22, 4:5, 4:10, 4:14, 4:19, 4:23, 5:4, 5:9, 5:10

**C**

**California** [1] - 83:7
**CALLED** [1] - 7:4
**campaign** [1] - 38:12
**canceled** [1] - 28:10
**Cannon** [1] - 30:9
**cannot** [3] - 66:15, 67:9, 67:14
**capitalization** [1] - 34:14
**capitalized** [1] - 34:16
**car** [1] - 27:9
**carefully** [1] - 58:23
**carrier** [2] - 25:19, 25:21
**carries** [1] - 60:25
**carry** [1] - 62:1
**case** [141] - 7:10, 8:12, 9:1, 9:24, 10:6, 10:7, 11:14, 11:17, 13:15, 15:13, 17:15, 17:24, 18:2, 18:7, 18:8, 18:13, 18:14, 18:16, 18:17, 18:18, 20:10, 21:24, 22:5, 22:14, 22:15, 23:21, 23:24, 24:6, 24:8, 25:4, 25:6, 25:14, 26:5, 26:10, 27:2, 27:4, 28:22, 30:5, 30:8, 30:10, 31:9, 36:12, 37:7, 37:17, 38:8, 38:18, 38:24, 39:1, 39:3, 39:6, 39:12, 39:13, 39:21, 40:5, 40:6, 40:8, 41:1, 41:3, 41:20, 41:23, 41:24, 42:3, 42:4, 42:7, 42:15, 42:16, 42:24, 44:5, 44:17, 45:6, 45:12, 55:6, 55:9, 57:1, 57:2, 57:7, 57:8, 57:10, 57:12, 57:21, 59:22,

59:23, 60:1, 60:3, 60:5, 60:15, 60:24, 61:3, 61:4, 61:19, 61:20, 62:14, 62:15, 64:15, 64:24, 65:13, 65:15, 66:11, 66:14, 67:15, 70:17, 71:16, 71:17, 73:10, 73:20, 73:22, 74:18, 74:25, 75:2, 75:10, 75:13, 75:22, 76:7, 76:8, 76:9, 78:22, 79:2, 80:7, 80:18, 80:20, 81:2, 82:12, 82:23, 83:5, 84:4, 84:13, 84:18, 85:1, 85:4
**cases** [77] - 7:22, 8:6, 8:7, 10:6, 10:17, 10:18, 10:19, 10:23, 12:15, 12:19, 13:19, 13:21, 14:24, 14:25, 16:3, 16:5, 16:8, 16:10, 16:13, 16:15, 17:12, 17:15, 20:11, 23:11, 24:19, 24:20, 31:1, 31:10, 32:15, 35:23, 36:6, 36:7, 36:10, 37:5, 38:3, 38:5, 39:8, 39:9, 39:17, 39:20, 39:22, 39:25, 40:4, 40:17, 41:2, 42:6, 42:7, 42:16, 42:22, 44:10, 45:1, 47:19, 54:9, 54:10, 56:22, 58:12, 58:13, 61:16, 61:20, 61:22, 62:5, 62:6, 62:23, 64:21, 64:23, 65:4, 66:18, 66:25, 70:17, 73:8, 75:5, 75:24, 85:2, 85:6, 85:14
**CASSSEL** [1] - 4:23
**CASTEIX** [1] - 5:3
**CASUALTY** [1] - 3:21
**Casualty** [2] - 9:23, 72:21
**Cathy** [2] - 87:3, 87:14
**CATHY** [1] - 5:7
**causes** [2] - 17:2, 79:8
**CCR** [2] - 5:7, 87:14
**cedes** [1] - 51:8
**CENTER** [1] - 4:14
**Centerline** [35] - 8:8, 8:15, 9:13, 9:15, 9:18, 10:6, 35:18, 35:21, 36:1, 36:6, 36:10, 36:20, 36:22, 36:23, 37:5, 43:1, 47:13, 61:19, 65:9,

66:18, 66:21, 70:21, 76:8, 76:13, 77:14, 77:25, 78:2, 78:4, 78:5, 78:6, 79:16, 83:17, 85:25
**CENTERLINE** [1] - 4:22
**Centerline's** [1] - 77:1
**Central** [1] - 57:10
**CENTRE** [1] - 3:18
**certain** [3] - 53:22, 61:10, 85:22
**certainly** [8] - 21:22, 23:15, 68:20, 70:7, 76:8, 80:9, 83:19, 84:8
**CERTIFICATE** [1] - 87:1
**certificate** [3] - 27:19, 29:13
**Certified** [2] - 87:3, 87:4
**certify** [1] - 87:7
**CGL** [6] - 8:3, 8:6, 16:14, 17:1, 76:10, 76:11
**Champion** [1] - 44:5
**change** [3] - 56:9, 56:20, 59:2
**changed** [1] - 56:6
**changes** [1] - 56:18
**characterized** [2] - 22:8, 22:20
**chart** [10] - 32:21, 32:22, 37:25, 38:1, 43:21, 43:22, 46:17, 48:17, 52:12, 58:19
**CHARTIS** [3] - 3:5, 4:3, 4:4
**Chartis** [3] - 65:8, 77:19
**checks** [1] - 21:15
**CHICAGO** [1] - 3:8
**child** [2] - 30:20, 30:21
**CHINESE** [2] - 1:4, 1:10
**Chinese** [5] - 7:11, 10:10, 58:5, 58:13, 81:12
**CHINESE-MANUFACTURED** [1] - 1:4
**choice** [4] - 59:9, 73:12, 82:22, 84:5
**Choice** [6] - 18:16, 22:5, 22:13, 22:15, 81:16
**choose** [2] - 12:18, 35:4
**choosing** [4] - 45:18,

47:14, 47:18, 48:12
**chose** [3] - 12:19, 47:15, 47:16
**chosen** [4] - 39:5, 58:1, 58:11, 77:15
**Circuit** [7] - 18:17, 37:24, 38:2, 41:3, 42:16, 57:8, 81:2
**citations** [1] - 64:3
**cited** [15] - 16:3, 22:5, 23:11, 24:20, 26:10, 38:3, 38:4, 41:2, 44:10, 54:10, 55:6, 57:2, 57:22, 70:16, 78:24
**citizen** [3] - 35:20, 60:8, 60:11
**citizens** [3] - 37:3, 39:5, 60:15
**CIVIL** [1] - 1:6
**claim** [17] - 13:14, 13:18, 16:6, 16:23, 21:5, 21:23, 22:1, 24:15, 24:16, 28:13, 45:14, 54:2, 56:13, 68:24, 69:10, 71:14
**claimant** [2] - 16:19, 16:22
**claimants** [8] - 14:25, 18:19, 66:14, 71:13, 73:4, 73:11, 83:24
**claiming** [4] - 36:22, 36:24, 66:19, 66:21
**CLAIMS** [1] - 4:5
**Claims** [1] - 77:19
**claims** [46] - 12:11, 13:18, 14:22, 14:23, 17:1, 21:13, 21:14, 21:18, 22:14, 22:15, 22:16, 24:9, 24:11, 27:9, 29:14, 51:2, 51:6, 51:8, 51:13, 52:3, 53:17, 53:22, 53:24, 53:25, 54:6, 55:5, 55:7, 55:10, 55:13, 56:1, 56:2, 58:5, 68:18, 69:13, 69:15, 69:18, 70:16, 70:19, 71:7, 80:14, 83:12, 83:13
**clear** [7] - 13:11, 20:9, 23:11, 24:3, 24:23, 69:20, 86:7
**clearer** [3] - 41:19, 41:22, 45:21
**clearly** [4] - 18:18, 20:25, 37:6, 37:9
**clerical** [1] - 51:4
**CLERK** [4] - 7:7, 7:11, 64:10, 86:16

**client** [9] - 9:24, 15:17, 29:2, 35:13, 35:17, 37:9, 37:16, 41:9, 78:1
**client's** [7] - 26:14, 28:25, 36:5, 36:19, 38:8, 38:9, 42:15
**clients** [5] - 25:18, 26:3, 26:16, 28:22, 30:19
**closely** [1] - 86:10
**closing** [1] - 42:14
**cloud** [1] - 33:12
**Coach** [1] - 78:13
**coattails** [1] - 30:16
**coinsurance** [1] - 72:13
**coinsure** [1] - 72:21
**coinsurer** [2] - 72:11, 84:23
**collateral** [3] - 43:2, 43:3, 74:6
**colleague** [1] - 52:16
**collect** [2] - 20:15, 56:24
**collected** [4] - 18:10, 28:18, 46:14, 63:15
**collecting** [2] - 51:17, 51:18
**combined** [1] - 46:5
**combining** [1] - 73:22
**coming** [2] - 13:10, 82:9
**comment** [1] - 85:22
**comments** [2] - 84:23, 86:10
**COMMERCIAL** [2] - 1:13, 2:20
**Commercial** [19] - 25:14, 26:4, 30:4, 30:19, 31:6, 31:15, 32:12, 32:14, 33:5, 33:9, 34:5, 34:8, 35:4, 48:25, 49:6, 50:1, 50:13, 51:12, 53:13
**COMMITTEE** [3] - 1:23, 2:11, 5:3
**Committee** [4] - 7:15, 7:17, 7:19, 59:21
**common** [2] - 50:19, 58:4
**commonly** [2] - 51:1, 51:5
**communications** [1] - 57:24
**Comp** [5] - 28:13, 31:18, 59:9, 59:10
**companies** [32] - 9:17, 14:21, 15:2, 15:19,

16:12, 30:21, 31:1, 31:5, 33:16, 34:21, 34:23, 36:24, 40:21, 41:14, 43:22, 44:3, 48:19, 54:4, 62:24, 64:18, 65:9, 67:7, 70:15, 70:18, 72:1, 72:23, 73:15, 77:11, 77:15, 85:12, 85:20, 85:23
**companies'** [1] - 74:3
**company** [33] - 11:13, 11:21, 14:12, 14:17, 14:20, 15:1, 15:4, 15:13, 16:1, 16:19, 16:20, 16:23, 17:6, 17:7, 17:8, 30:22, 31:14, 32:8, 32:10, 32:23, 33:9, 33:14, 34:24, 35:1, 40:21, 46:23, 54:15, 72:3, 72:16, 76:14, 77:20, 78:3, 79:5
**COMPANY** [19] - 1:13, 1:14, 1:14, 2:16, 2:20, 3:4, 3:5, 3:6, 3:10, 3:11, 3:16, 3:16, 3:21, 4:3, 4:4, 4:9, 4:13, 4:18, 4:18
**Company** [70] - 8:13, 8:14, 9:23, 11:7, 11:9, 14:6, 14:24, 17:18, 18:25, 19:2, 19:11, 19:16, 25:13, 25:14, 25:25, 26:3, 26:4, 26:18, 28:21, 29:4, 30:1, 30:4, 30:19, 30:20, 31:6, 31:7, 31:8, 31:16, 32:12, 32:14, 32:24, 32:25, 33:2, 33:5, 33:6, 33:10, 33:11, 34:5, 34:6, 34:8, 35:5, 35:6, 48:23, 48:25, 49:1, 49:5, 49:7, 50:1, 50:2, 51:7, 51:9, 51:12, 52:13, 53:13, 53:16, 55:2, 56:15, 65:8, 77:18, 77:20, 77:21, 78:20, 78:21
**company's** [1] - 32:16
**compare** [5] - 23:9, 38:6, 38:7, 42:14, 71:22
**comparing** [1] - 61:17
**compel** [3] - 12:17, 16:10, 53:21
**compensated** [1] - 83:25

**Compensation** [6] - 25:22, 26:23, 27:3, 28:4, 28:7, 53:5
**competing** [2] - 10:25, 35:17
**complaints** [1] - 62:17
**complete** [9] - 42:20, 66:10, 67:3, 67:8, 67:9, 75:15, 80:2, 80:9
**complicated** [1] - 75:24
**comprehensive** [4] - 30:9, 74:25, 84:14, 85:3
**COMPUTER** [1] - 5:10
**Con** [1] - 35:10
**conceivably** [1] - 74:21
**concept** [4] - 31:19, 39:10, 39:18, 71:9
**concern** [6] - 81:5, 81:19, 81:25, 82:10, 84:6
**concerned** [2] - 67:11, 67:18
**concerns** [1] - 81:3
**concluded** [1] - 86:18
**conclusion** [2] - 42:17, 72:6
**condensed** [1] - 32:22
**condition** [1] - 79:7
**conditional** [1] - 36:1
**conduct** [4] - 19:25, 20:13, 20:14, 54:8
**conducted** [1] - 24:5
**conducting** [2] - 44:19, 48:7
**confer** [2] - 24:21, 68:9
**confirm** [1] - 21:24
**conflicts** [2] - 57:11, 62:17
**confronting** [1] - 74:18
**confused** [2] - 59:12, 61:6
**connection** [4] - 20:5, 25:5, 60:11, 73:10
**conscious** [2] - 26:25, 41:15
**consciously** [1] - 73:12
**consider** [1] - 51:21
**consideration** [2] - 19:10, 81:11
**consistent** [1] - 73:18
**consistently** [2] - 27:7, 29:20
**consolidated** [4] -

9:18, 21:4, 50:6, 65:3
**consolidation** [1] - 9:11
**constructed** [1] - 83:24
**CONSTRUCTION** [1] - 4:22
**Construction** [4] - 8:8, 81:16, 82:6
**construction** [6] - 27:2, 41:17, 41:24, 45:25, 46:1, 60:17
**consulting** [1] - 50:8
**contact** [5] - 14:9, 17:17, 39:11, 41:5, 49:21
**contacts** [33] - 13:25, 14:5, 14:19, 15:3, 17:21, 18:7, 18:12, 18:25, 20:10, 21:17, 22:12, 22:19, 22:22, 24:22, 25:25, 26:8, 27:5, 37:11, 38:6, 38:7, 41:4, 42:3, 42:15, 44:2, 46:18, 46:21, 52:5, 55:4, 63:3, 63:4, 63:19, 82:25
**contemplated** [2] - 13:12, 20:11
**context** [5] - 40:9, 40:20, 40:23, 80:25, 84:13
**Continent** [29] - 8:8, 8:13, 9:1, 9:22, 41:23, 44:20, 44:25, 45:4, 45:6, 45:8, 45:14, 45:25, 46:9, 46:10, 46:18, 46:23, 46:25, 47:21, 57:20, 59:18, 60:25, 63:1, 63:7, 63:8, 77:25, 78:7, 78:11, 78:20, 85:14
**CONTINENT** [1] - 3:21
**Continent's** [4] - 8:14, 43:6, 46:21, 48:4
**continue** [2] - 84:18, 85:17
**CONTINUED** [4] - 2:1, 3:1, 4:1, 5:1
**continuing** [1] - 85:16
**continuous** [8] - 13:25, 17:16, 17:22, 18:20, 22:11, 23:10, 25:2, 26:19
**contract** [2] - 83:1, 83:2
**contracti** [1] - 82:24

**contractor** [3] - 24:14, 56:6, 56:11
**contractors** [7] - 64:15, 64:16, 64:17, 64:18, 68:5, 76:20
**contracts** [7] - 67:20, 68:4, 68:7, 68:9, 68:14, 74:4
**contrary** [1] - 8:16
**Contreras** [1] - 70:17
**control** [1] - 50:25
**controversy** [1] - 85:8
**convenience** [8] - 40:11, 40:14, 41:7, 43:21, 46:22, 46:25, 47:3, 47:4
**convenient** [1] - 47:2
**convention** [1] - 59:8
**converse** [1] - 21:24
**convey** [1] - 18:12
**Coon** [1] - 37:14
**Coon's** [1] - 37:15
**COORDINATION** [1] - 5:3
**corporate** [4] - 11:14, 33:24, 34:1, 81:11
**corporation** [5] - 20:12, 34:16, 35:19, 59:7
**corporations** [2] - 32:5, 33:24
**correct** [9] - 10:21, 24:7, 29:19, 50:16, 53:10, 55:17, 61:1, 64:25, 87:7
**corrected** [1] - 56:19
**correspond** [1] - 56:1
**correspondence** [1] - 50:15
**CORTLAND** [1] - 4:14
**COTLAR** [1] - 1:23
**counsel** [10] - 7:12, 24:10, 25:24, 54:16, 54:20, 55:17, 55:24, 73:7, 77:4, 84:23
**Counsel** [1] - 85:12
**count** [1] - 46:13
**countenance** [1] - 73:20
**counties** [1] - 74:14
**country** [3] - 23:16, 23:20, 74:12
**couple** [4] - 45:1, 65:19, 76:4, 86:7
**course** [6] - 41:12, 61:24, 66:17, 70:10, 74:9, 85:17
**COURT** [74] - 1:1, 5:7, 7:4, 7:8, 7:12, 7:21, 8:20, 8:24, 9:6, 9:12,

9:20, 10:1, 10:17, 11:3, 11:5, 12:10, 13:19, 14:10, 15:8, 18:2, 18:4, 19:12, 19:14, 19:17, 21:1, 21:11, 22:13, 22:17, 25:8, 25:11, 27:18, 27:21, 27:24, 28:6, 29:15, 31:21, 35:7, 39:7, 39:16, 40:10, 43:8, 43:12, 43:18, 43:25, 44:9, 44:16, 44:20, 44:24, 46:10, 47:3, 48:14, 53:15, 54:24, 58:15, 59:17, 61:13, 62:8, 64:11, 65:5, 65:21, 65:24, 67:1, 67:11, 67:17, 67:22, 68:23, 74:8, 74:10, 75:2, 75:12, 81:7, 84:21, 86:9, 86:13

**Court** [65] - 7:18, 7:23, 21:16, 23:12, 24:21, 25:15, 26:6, 26:12, 28:3, 28:12, 29:9, 30:1, 30:10, 30:12, 33:18, 33:20, 34:10, 34:18, 35:4, 35:22, 38:5, 38:24, 44:3, 45:7, 46:8, 58:11, 58:12, 58:22, 59:3, 60:19, 60:21, 61:4, 61:7, 61:8, 62:3, 62:19, 63:5, 63:24, 68:5, 70:20, 75:18, 77:23, 79:20, 80:2, 80:5, 80:8, 80:12, 80:16, 80:23, 80:25, 81:2, 81:3, 81:21, 82:9, 84:11, 84:17, 84:18, 86:8, 86:15, 87:4, 87:5, 87:6, 87:15, 87:16

**court** [24] - 8:4, 10:9, 10:24, 19:23, 38:23, 65:21, 65:22, 65:23, 67:4, 67:5, 69:4, 73:14, 74:11, 74:19, 75:16, 75:17, 75:19, 80:2, 80:19, 83:5, 84:13, 84:14

**court's** [1] - 57:13

**Court's** [8] - 8:23, 18:12, 29:11, 43:20, 62:13, 70:13, 72:9, 76:5

**COURT.....................
....................... [4] -
6:5, 6:14, 6:16, 6:21

**courthouses** [1] -
85:7

**courts** [6] - 16:7,
24:24, 74:14, 74:15,
75:21, 75:23

**cover** [6] - 23:2, 51:24,
55:21, 55:23, 69:18,
71:24

**coverage** [41] - 20:15,
25:19, 26:23, 27:2,
27:3, 56:8, 56:9,
56:14, 60:9, 61:16,
65:20, 66:4, 66:19,
66:21, 68:1, 68:6,
68:10, 69:2, 69:3,
69:8, 69:18, 69:24,
70:20, 71:4, 71:21,
72:2, 72:4, 72:22,
74:7, 77:5, 78:7,
78:8, 79:7, 79:24,
84:15, 85:13, 85:19

**covered** [5] - 16:11,
59:9, 68:11, 79:9

**COZEN** [1] - 4:13

**created** [1] - 13:9

**creates** [2] - 68:23,
72:10

**CRR** [2] - 5:7, 87:14

**crystal** [1] - 13:11

**Cudahy** [1] - 30:9

**CULBERTSON** [1] -
3:21

**current** [2] - 26:11,
26:12

**cut** [1] - 85:21

## D

**DADELAND** [1] - 3:22

**daily** [1] - 50:25

**Dalton** [6] - 38:6, 41:1,
41:3, 42:16, 47:19,
47:24

**damage** [3] - 52:2,
56:12, 83:23

**damages** [3] - 68:24,
83:11, 84:1

**Darroch** [7] - 25:10,
25:13, 49:10, 50:16,
50:23, 51:14, 52:7

**DARROCH** [10] - 2:21,
25:12, 27:20, 27:23,
27:25, 28:9, 29:19,
32:1, 35:8, 58:18

**Darroch's** [1] - 50:23

**DARROCH...............
...............................[2]
- 6:9, 6:12

**dated** [2] - 54:9, 54:10

**Dave** [1] - 19:16

**DAVID** [1] - 2:17

**David** [1] - 19:18

**Davis** [1] - 7:16

**DAVIS** [2] - 1:24, 7:16

**DAWN** [1] - 5:4

**days** [1] - 65:19

**deal** [10] - 10:24, 11:1,
14:15, 29:14, 39:23,
41:5, 44:25, 61:17,
64:13, 86:5

**dealers** [4] - 38:15,
38:17, 38:19, 38:22

**Dealers** [1] - 21:9

**dealing** [4] - 8:2,
13:20, 42:22, 61:16

**deals** [2] - 15:10, 17:4

**dealt** [1] - 14:6

**debt** [3] - 17:8, 54:14

**December** [1] - 45:3

**decide** [1] - 79:20

**decided** [7] - 17:24,
73:11, 75:19, 79:22,
79:23, 79:25, 80:24

**decision** [11] - 26:25,
27:6, 27:7, 29:20,
29:22, 30:7, 35:1,
41:15, 42:6, 60:14,
82:22

**declaration** [2] -
79:15, 83:8

**declaratory** [1] - 10:25

**declined** [1] - 24:21

**default** [6] - 81:23,
82:2, 82:8, 85:12,
85:15

**defect** [1] - 41:24

**defend** [4] - 54:16,
54:20, 85:16, 85:20

**defendant** [8] - 40:25,
44:7, 47:20, 47:21,
47:24, 57:23, 58:1,
59:25

**defendants** [4] - 31:7,
44:4, 57:13, 77:11

**defendants'** [3] -
79:15, 79:16, 80:6

**Delaware** [2] - 10:9,
10:10

**delivered** [1] - 41:14

**demonstrate** [2] -
20:5, 38:21

**demonstrated** [3] -
20:25, 24:22, 24:23

**demonstrating** [1] -
80:23

**DENHAM** [1] - 4:20

**denied** [5] - 36:12,
36:16, 65:16, 65:19,
81:6

**deny** [1] - 80:5

**denying** [1] - 36:3

**Department** [4] -
20:17, 20:18, 52:11,
63:13

**Departments** [1] -
63:14

**deponent** [3] - 22:24,
23:4, 24:13

**deposed** [3] - 11:14,
11:17, 37:17

**deposition** [9] - 11:14,
15:11, 17:5, 17:20,
29:1, 34:23, 54:19,
56:5, 56:18

**depositions** [2] -
11:19, 20:7

**Depositions** [1] -
56:17

**depriving** [1] - 84:4

**depth** [1] - 24:22

**DEPUTY** [4] - 7:7,
7:11, 64:10, 86:16

**derivative** [6] - 76:22,
78:19, 79:4, 79:11,
79:24, 82:17

**destroy** [1] - 46:5

**detail** [1] - 41:2

**determination** [3] -
82:13, 82:14, 82:23

**determine** [3] - 68:1,
68:6, 71:23

**determined** [2] - 80:1,
83:11

**DEUTSCH** [1] - 4:9

**develop** [1] - 29:8

**differ** [1] - 15:2

**difference** [2] - 19:8,
60:10

**differences** [5] -
25:16, 25:17, 60:3,
60:6, 60:7

**different** [30] - 8:18,
15:18, 15:21, 16:12,
17:2, 21:20, 30:11,
31:9, 34:13, 37:10,
41:9, 43:12, 47:8,
48:9, 66:7, 68:12,
74:13, 74:14, 74:15,
74:21, 75:17, 75:23,
76:9, 83:4, 84:16,
85:2, 85:6, 85:7

**differently** [1] - 40:9

**difficult** [1] - 74:22

**difficulty** [2] - 74:11,
74:18

**dig** [1] - 27:8

**direct** [10] - 52:25,
58:24, 59:2, 69:7,
77:5, 78:4, 83:17,

85:24, 85:25

**directed** [3] - 12:12,
14:5, 53:17

**direction** [1] - 19:11

**directly** [14] - 10:22,
20:21, 22:25, 40:20,
53:25, 76:12, 76:13,
76:14, 76:15, 77:22,
78:2, 78:4, 78:16,
83:17

**director** [1] - 86:2

**directors** [5] - 21:4,
34:20, 49:11, 49:14

**disclose** [1] - 59:4

**discover** [1] - 40:13

**discovery** [6] - 19:24,
20:3, 20:4, 20:25,
37:18, 40:16

**discretion** [1] - 26:12

**discussed** [3] - 17:5,
60:2, 60:6

**discusses** [1] - 50:21

**discussion** [1] - 50:20

**dismiss** [26] - 8:11,
11:8, 11:11, 11:12,
20:1, 25:7, 26:17,
36:11, 36:13, 36:17,
45:9, 62:7, 64:13,
65:15, 65:17, 66:1,
77:8, 77:24, 78:9,
78:10, 78:17, 78:21,
78:23, 80:6, 80:24

**dismissal** [3] - 58:8,
66:24, 72:9

**dismissed** [4] - 24:8,
64:21, 67:11, 71:18

**disorganized** [2] -
58:7, 58:10

**dispute** [1] - 38:1

**disputes** [1] - 84:15

**dissolved** [2] - 81:13,
81:17

**distinct** [2] - 31:13,
31:14

**distinction** [5] - 16:17,
40:19, 53:12, 60:22,
62:3

**Distinctive** [2] - 81:15,
82:4

**distinguish** [1] - 49:18

**distribute** [1] - 71:23

**distribution** [1] -
83:12

**District** [11] - 10:22,
45:5, 45:6, 45:7,
55:16, 56:16, 62:13,
83:6, 87:6, 87:16

**DISTRICT** [3] - 1:1,
1:1, 1:19

**district** [1] - 83:5

**DNH** [1] - 17:14
**DOCKET** [1] - 1:6
**DOCUMENT** [1] - 1:8
**documents** [2] - 20:8, 24:3
**dollar** [1] - 34:16
**dollars** [4] - 53:4, 53:18, 71:4, 72:2
**domicile** [1] - 46:23
**Dominion** [2] - 21:3, 24:1
**done** [10] - 12:12, 27:10, 28:22, 29:20, 36:6, 47:18, 52:17, 71:10, 75:6, 75:7
**DONNELLY** [2] - 2:16
**Dooley** [1] - 57:1
**double** [1] - 41:4
**dovetails** [1] - 36:18
**down** [3] - 22:22, 23:23, 32:22
**dozens** [1] - 46:2
**drive** [1] - 23:20
**driver** [1] - 22:1
**driving** [2] - 22:1, 24:11
**drop** [1] - 81:9
**drove** [1] - 27:9
**drywall** [4] - 39:13, 69:15, 75:5, 79:6
**DRYWALL** [2] - 1:4, 1:10
**Drywall** [18] - 7:11, 10:10, 13:16, 58:5, 58:13, 65:11, 72:16, 72:18, 72:22, 78:13, 81:12, 81:15, 81:16, 81:17, 82:4, 82:5, 82:6
**due** [8] - 40:24, 42:5, 42:11, 42:13, 42:25, 43:5, 44:6, 60:24
**during** [3] - 28:14, 38:13, 46:14

**E**

**E.D** [1] - 1:15
**early** [1] - 55:1
**EASTERN** [1] - 1:1
**Eastern** [3] - 10:22, 55:16, 87:6
**effect** [3] - 61:3, 81:4
**effective** [1] - 83:2
**efficient** [1] - 72:6
**efficiently** [1] - 58:5
**effort** [2] - 49:18, 85:20
**ego** [8] - 30:12, 31:19,

66:16
**establishing** [1] - 62:12
**eight** [3] - 12:22, 12:25, 78:1
**either** [6] - 15:9, 60:17, 62:20, 67:5, 74:14, 85:24
**ELDON** [1] - 1:18
**eliminate** [1] - 84:1
**elsewhere** [1] - 48:11
**employed** [2] - 32:12, 32:14
**employee** [7] - 28:12, 31:5, 33:16, 49:25, 50:1, 50:2, 59:7
**employees** [8] - 12:1, 32:11, 32:16, 33:15, 38:13, 49:25, 50:3
**employers** [1] - 60:2
**employing** [1] - 38:12
**encouraging** [1] - 84:16
**end** [2] - 42:5, 75:22
**endorsement** [4] - 41:10, 46:12, 60:16, 63:12
**ENERGY** [1] - 3:18
**engaged** [2] - 38:11, 52:4
**enter** [1] - 42:23
**entered** [1] - 35:25
**Enterprises** [1] - 82:5
**entire** [3] - 77:8, 78:24, 85:8
**entities** [8] - 21:6, 36:21, 54:1, 54:8, 55:2, 55:4, 55:13, 82:7
**entitled** [2] - 83:9, 87:9
**entity** [8] - 31:2, 31:24, 33:3, 33:10, 45:2, 48:16, 50:3, 63:24
**equally** [1] - 19:21
**Equipment** [1] - 57:7
**equitable** [2] - 71:23, 72:6
**ERIN** [1] - 4:5
**errata** [1] - 56:19
**erroneously** [1] - 24:1
**errors** [2] - 56:19, 76:4
**especially** [1] - 81:4
**ESQUIRE** [19] - 1:24, 2:3, 2:4, 2:7, 2:8, 2:12, 2:17, 2:21, 3:7, 3:12, 3:17, 3:17, 3:22, 4:5, 4:10, 4:14, 4:19, 4:23, 5:4
**establish** [1] - 18:20
**established** [2] - 8:1,

34:18, 35:5, 48:18, 48:21, 63:21, 63:22

66:16

39:7, 46:25, 69:17, 75:17, 83:22
**exterior** [1] - 32:6
**extinguish** [4] - 81:24, 82:3, 82:8, 85:13
**extinguished** [1] - 84:10
**extremely** [1] - 78:25

**F**

**faced** [1] - 69:15
**facie** [5] - 57:7, 57:9, 57:12, 57:17, 62:14
**facility** [1] - 49:17
**facing** [1] - 68:19
**fact** [18] - 16:1, 16:13, 21:6, 21:16, 22:12, 24:2, 31:15, 39:25, 42:4, 45:11, 56:20, 60:14, 73:12, 77:8, 80:8, 83:4, 85:11
**fact-based** [1] - 80:8
**factor** [3] - 34:17, 46:4, 48:21
**factored** [1] - 50:14
**factors** [10] - 30:6, 30:11, 30:18, 30:25, 33:14, 34:9, 42:10, 46:6, 48:21
**facts** [5] - 20:10, 21:24, 25:6, 32:2, 39:1
**factual** [1] - 57:10
**failed** [1] - 82:7
**failure** [2] - 64:14, 66:2
**fair** [5] - 57:15, 57:19, 71:5, 71:23, 72:5
**fairly** [3] - 38:19, 85:3, 85:10
**fairness** [5] - 14:6, 19:1, 19:10, 36:18, 43:5
**FALLON** [1] - 1:18
**familiar** [3] - 10:5, 42:7, 64:3
**familiarity** [1] - 58:12
**fanciness** [1] - 32:21
**fancy** [1] - 30:24
**far** [9] - 17:3, 37:10, 38:14, 38:19, 39:2, 39:5, 40:5, 41:4, 74:16
**Farinas** [1] - 70:17
**Farm** [1] - 60:9
**fashion** [1] - 23:8
**favor** [4] - 42:11, 57:11, 62:18, 75:18

**FCCI** [78] - 1:13, 1:14, 2:20, 8:13, 9:1, 25:9, 25:13, 25:14, 26:4, 29:3, 29:10, 30:4, 30:14, 30:19, 31:3, 31:6, 31:7, 31:11, 31:15, 31:16, 32:8, 32:12, 32:14, 32:24, 32:25, 33:1, 33:3, 33:5, 33:9, 33:11, 34:4, 34:5, 34:6, 34:8, 35:4, 35:5, 44:12, 48:13, 48:23, 48:24, 48:25, 49:5, 49:6, 49:7, 49:9, 49:24, 50:1, 50:4, 50:13, 50:18, 50:19, 50:21, 51:2, 51:7, 51:9, 51:11, 51:12, 52:18, 52:20, 52:23, 53:13, 58:17, 62:25, 63:20
**FCCI's** [2] - 50:15, 50:24
**feasible** [1] - 85:3
**federal** [4] - 53:3, 65:22, 65:23, 83:5
**Federal** [1] - 45:6
**few** [3] - 15:6, 72:3, 72:9
**Fidelity** [2] - 8:9, 78:15
**fifth** [1] - 47:17
**Fifth** [7] - 18:17, 37:24, 38:2, 41:3, 42:16, 57:8, 81:2
**file** [9] - 20:16, 21:4, 36:14, 45:9, 50:6, 67:12, 73:11, 74:25, 85:3
**filed** [32] - 7:22, 8:5, 10:19, 10:22, 14:3, 15:23, 26:16, 35:21, 36:11, 37:5, 37:8, 37:13, 37:14, 37:15, 39:22, 40:1, 45:1, 45:3, 45:4, 45:8, 45:9, 45:16, 56:13, 60:19, 60:20, 61:20, 61:22, 65:13, 73:8, 73:9, 78:11
**filer** [1] - 45:2
**files** [3] - 53:22, 53:23, 54:6
**filing** [1] - 60:18
**filings** [2] - 31:23, 63:12
**fill** [1] - 65:12
**finality** [1] - 67:9
**financial** [3] - 34:15,

50:12, 57:20
**FINANCIAL** [1] - 4:24
**fine** [1] - 9:7
**Finest** [2] - 65:10, 65:14
**finish** [1] - 8:22
**Finishers** [1] - 82:4
**Finishes** [1] - 81:15
**FIRE** [1] - 3:4
**Fire** [3] - 65:7, 78:8
**firm** [3] - 21:4, 50:7, 50:8
**first** [33] - 8:10, 8:12, 8:19, 9:8, 14:16, 17:19, 25:24, 26:7, 35:24, 36:14, 41:8, 43:16, 44:20, 44:25, 45:3, 45:9, 48:21, 61:12, 61:15, 68:5, 69:1, 69:3, 69:22, 70:2, 70:11, 70:14, 71:20, 76:7, 82:15
**First** [1] - 81:16
**FISHBEIN** [1] - 2:3
**fit** [3] - 39:18, 75:11, 77:7
**five** [13] - 16:11, 17:1, 22:15, 22:16, 38:11, 38:13, 42:10, 47:17, 53:19, 53:24, 53:25, 55:5, 55:14
**five-year** [4] - 16:11, 17:1, 38:11, 38:13
**FL** [2] - 3:23, 4:25
**FLOOR** [2] - 2:17, 4:6
**Florida** [77] - 10:7, 10:12, 10:13, 13:16, 13:17, 13:22, 19:3, 19:4, 19:8, 20:12, 31:17, 35:17, 35:19, 36:25, 37:1, 37:3, 37:4, 38:24, 39:2, 39:3, 41:13, 41:14, 41:25, 42:19, 42:22, 43:2, 45:2, 45:5, 45:7, 45:16, 46:24, 50:20, 60:18, 60:20, 60:21, 60:24, 61:23, 62:5, 65:13, 65:18, 65:21, 66:13, 66:14, 69:15, 70:13, 70:23, 70:24, 71:18, 73:3, 73:9, 73:23, 73:25, 74:5, 74:6, 74:14, 74:15, 74:25, 75:3, 75:4, 81:22, 82:2, 82:5, 82:20, 82:23, 82:24, 83:4, 83:6, 83:7, 85:4, 85:14, 86:6

**flow** [1] - 22:19
**flowed** [1] - 38:14
**flows** [1] - 19:11
**flurry** [1] - 35:22
**fly** [1] - 47:1
**flying** [1] - 47:1
**focal** [1] - 48:15
**focus** [7] - 7:24, 26:8, 30:5, 30:12, 30:13, 32:15, 59:14
**focused** [5] - 40:15, 40:16, 47:7, 55:10
**focuses** [1] - 25:21
**focusing** [1] - 11:19
**follow** [2] - 21:22, 85:23
**following** [3] - 8:7, 8:12, 41:17
**FOR** [16] - 1:10, 1:23, 2:7, 2:11, 2:16, 2:20, 3:3, 3:10, 3:15, 3:21, 4:3, 4:9, 4:13, 4:17, 4:22, 5:3
**forced** [1] - 43:4
**foregoing** [1] - 87:7
**form** [2] - 43:22, 76:18
**formal** [1] - 11:21
**formalities** [1] - 33:25
**formed** [1] - 11:9
**forms** [2] - 46:12, 63:12
**FORT** [1] - 4:25
**forth** [5] - 24:2, 61:17, 65:16, 70:21, 75:8
**fortuitous** [1] - 22:8
**forum** [14] - 24:18, 39:5, 42:19, 44:8, 47:22, 47:23, 48:2, 48:3, 56:23, 56:24, 57:4, 84:5
**forward** [4] - 20:1, 37:5, 71:3, 75:9
**four** [13] - 10:11, 10:12, 14:4, 14:8, 14:23, 16:11, 16:12, 25:16, 37:19, 37:20, 37:22, 47:17, 62:24
**four-and-a-half** [1] - 37:22
**fourth** [2] - 47:16, 62:25
**frame** [2] - 26:11, 26:13
**framed** [1] - 25:24
**Framers** [3] - 36:23, 78:12, 82:6
**FRD** [1] - 56:16
**FRED** [1] - 2:4
**FREEMAN** [1] - 2:12
**Freight** [1] - 57:10

**front** [1] - 49:8
**full** [2] - 66:10, 73:14
**function** [1] - 56:17
**fund** [2] - 68:23, 68:24
**fundamental** [8] - 14:6, 19:1, 19:10, 36:18, 42:13, 43:5, 76:4
**funds** [5] - 33:19, 33:23, 71:23, 73:16, 83:22
**FURY** [1] - 4:5

**G**

**GA** [1] - 2:22
**Gardener** [1] - 23:25
**gather** [2] - 56:17, 59:4
**gee** [1] - 48:9
**General** [2] - 8:9, 78:15
**general** [22] - 10:4, 13:18, 13:24, 19:22, 24:24, 26:1, 26:2, 26:5, 26:8, 30:1, 31:16, 37:7, 38:7, 40:22, 42:17, 44:4, 50:9, 51:4, 56:25, 59:14, 62:21, 62:23
**generally** [4] - 13:3, 39:9, 40:14, 44:21
**gentlemen** [1] - 7:9
**germane** [1] - 39:10
**given** [3] - 34:11, 57:24, 77:14
**GL** [1] - 25:21
**goal** [2] - 58:4, 84:19
**GOODMAN** [1] - 2:20
**governing** [1] - 73:18
**grade** [1] - 21:17
**Grain** [1] - 21:9
**granted** [4] - 38:9, 43:6, 62:7, 67:3
**Great** [1] - 21:3
**great** [1] - 41:5
**greater** [1] - 39:5
**Greenway** [1] - 56:15
**gross** [2] - 52:24, 59:4
**group** [6] - 14:17, 15:1, 15:15, 15:19, 16:12, 82:22
**Group** [5] - 32:25, 33:3, 48:24, 51:11, 51:12
**guarantee** [1] - 59:24
**Guaranty** [2] - 28:7, 53:6
**guys** [1] - 83:3

**H**

**hailed** [1] - 41:24
**hailing** [2] - 40:24, 41:7
**half** [5] - 17:25, 37:22, 53:18, 77:3, 77:6
**hand** [3] - 30:24, 68:8
**handed** [1] - 46:17
**handle** [3] - 35:10, 51:13, 61:9
**hard** [1] - 44:11
**harder** [1] - 39:17
**HASSETT** [7] - 2:16, 2:17, 19:18, 21:7, 21:12, 22:15, 22:18
**Hassett** [2] - 19:16, 19:18
**HASSETT...................
.........................** [1] - 6:8
**HDS** [1] - 72:22
**headquarters** [2] - 49:1, 49:2
**Healthcare** [3] - 17:14, 18:16, 22:13
**hear** [5] - 37:25, 43:10, 64:6, 64:22, 75:25
**heard** [6] - 53:21, 62:9, 66:13, 81:19, 81:25, 82:20
**HEARD** [1] - 1:18
**HEBERT** [1] - 4:18
**held** [5] - 18:18, 41:22, 63:8, 75:12, 84:1
**Helicopteros** [1] - 40:8
**helpful** [1] - 81:21
**hereby** [1] - 87:7
**HERMAN** [1] - 1:23
**herring** [1] - 24:6
**Hicks** [1] - 57:2
**hide** [3] - 30:16, 37:10, 37:12
**highlight** [1] - 35:15
**highly** [2] - 33:21, 80:8
**HINKHOUSE** [16] - 3:6, 3:7, 65:6, 65:23, 65:25, 67:2, 67:14, 67:18, 67:24, 69:1, 74:9, 74:23, 75:6, 76:2, 84:22, 86:12
**Hinkhouse** [2] - 65:3, 65:7
**HINKHOUSE.............
..........................** [2] - 6:18, 6:20

**Hinkle** [3] - 13:16, 72:16, 72:18
**HINSHAW** [1] - 3:21
**hire** [2] - 21:23, 54:20
**hires** [1] - 54:15
**history** [3] - 51:18, 51:20, 65:12
**Hogue** [7] - 44:17, 57:21, 59:22, 60:5, 60:6, 60:8, 60:13
**Hogue's** [1] - 60:9
**hold** [2] - 18:25, 35:4
**Holding** [1] - 32:24
**Holdings** [2] - 8:9, 38:18
**homebuilder** [2] - 10:8, 10:12
**homebuilders** [1] - 10:7
**homeowner's** [1] - 25:20
**homeowners** [1] - 76:10
**HOMES** [1] - 4:22
**homes** [8] - 13:17, 13:23, 37:4, 41:25, 42:9, 66:14, 83:24
**Homes** [1] - 8:15
**Honeywell** [3] - 45:7, 45:12, 45:13
**Honor** [134] - 7:15, 7:16, 7:20, 8:17, 9:4, 9:10, 9:16, 9:21, 10:2, 10:5, 10:10, 10:21, 11:6, 12:16, 13:23, 15:2, 15:6, 15:10, 15:21, 17:12, 18:15, 18:22, 19:9, 19:13, 19:15, 19:18, 19:23, 20:2, 20:4, 20:7, 20:10, 20:12, 20:23, 21:7, 21:12, 21:17, 22:2, 22:6, 22:16, 22:18, 22:21, 23:9, 23:11, 23:13, 23:22, 23:23, 24:4, 24:6, 24:9, 24:18, 24:20, 25:4, 25:9, 25:12, 25:23, 28:2, 31:2, 32:19, 33:12, 34:4, 35:3, 35:9, 35:12, 35:23, 36:8, 36:10, 36:18, 37:2, 37:6, 37:17, 37:23, 38:3, 38:10, 39:15, 39:25, 40:4, 41:1, 41:8, 41:10, 42:3, 42:6, 42:14, 43:11, 43:17, 43:20, 43:24, 44:1, 44:2, 44:14,

44:22, 45:3, 46:16, 48:18, 49:3, 51:21, 52:16, 53:17, 53:21, 53:25, 54:5, 54:21, 54:25, 55:4, 55:8, 56:22, 57:6, 57:16, 57:22, 58:2, 58:14, 58:19, 59:19, 59:23, 60:5, 61:12, 61:15, 64:25, 65:6, 65:25, 69:23, 69:24, 76:3, 76:19, 78:25, 81:5, 81:25, 83:21, 84:20, 84:22, 84:24
**Honor's** [1] - 16:9
**HONORABLE** [1] - 1:18
**HORKOVICH** [17] - 2:7, 7:20, 9:10, 9:13, 43:20, 44:1, 44:14, 44:17, 44:21, 44:25, 46:16, 47:11, 48:17, 53:16, 54:25, 76:3, 81:9
**Horkovich** [6] - 7:18, 9:23, 37:25, 60:20, 61:2, 84:25
**Horkovich's** [1] - 61:6
**HORKOVICH.............** .............................. [2] - 6:11, 6:19
**houses** [1] - 19:3
**HOUSTON** [2] - 4:14, 4:16
**HULL** [1] - 3:12
**hundred** [13] - 21:2, 32:24, 32:25, 33:4, 33:5, 34:15, 48:23, 48:24, 48:25, 51:7, 51:9, 51:11, 83:20
**hundreds** [1] - 72:2
**hurt** [2] - 28:12, 59:8
**hybrid** [1] - 36:23
**hypothetical** [2] - 84:8
**hypothetically** [1] - 23:6

**I**

**idea** [1] - 70:11
**identical** [5] - 49:2, 49:8, 49:12, 49:14
**identity** [1] - 55:1
**III** [1] - 2:12
**IL** [1] - 3:8
**Illinois** [1] - 77:17
**ILLINOIS** [1] - 4:13
**imagine** [1] - 69:15
**impact** [2] - 60:15,

82:20
**impairing** [1] - 82:1
**impinge** [1] - 82:14
**importance** [1] - 84:6
**important** [9] - 26:14, 30:12, 30:17, 35:14, 36:15, 36:19, 37:17, 69:19, 70:11
**importantly** [1] - 60:13
**imposing** [1] - 24:24
**impossible** [1] - 73:13
**IN** [1] - 1:4
**In-N-Out** [1] - 17:14
**Inc** [1] - 32:25
**INC** [2] - 4:5, 4:22
**incentive** [1] - 69:16
**incentives** [1] - 38:21
**include** [2] - 78:19, 82:4
**included** [1] - 51:16
**includes** [1] - 14:13
**including** [7] - 22:23, 38:4, 40:21, 41:18, 51:5, 55:2, 55:18
**income** [2] - 13:5, 53:4
**inconsistent** [5] - 58:7, 58:10, 84:6, 84:8, 86:4
**inconvenience** [5] - 39:8, 39:17, 39:24, 40:12, 47:9
**inconvenient** [2] - 47:6, 48:10
**incorporated** [1] - 33:3
**increase** [1] - 69:17
**indeed** [3] - 11:20, 17:10, 18:9
**independent** [14] - 21:23, 22:25, 24:10, 28:11, 32:3, 32:7, 38:15, 54:15, 55:25, 68:18, 77:14, 78:18, 79:12
**indicates** [1] - 43:6
**indispensable** [10] - 47:12, 64:14, 64:21, 66:2, 66:10, 72:11, 77:9, 78:13, 80:5, 80:23
**individual** [2] - 10:16, 23:20
**individuals** [3] - 10:24, 54:22, 56:2
**industries** [1] - 33:21
**industry** [1] - 33:21
**information** [6] - 16:10, 29:1, 29:7, 50:16, 53:9, 64:2

**initial** [1] - 62:1
**initiated** [1] - 54:10
**injured** [1] - 85:18
**injury** [1] - 39:4
**inquiry** [3] - 80:8, 80:19, 80:20
**insert** [1] - 56:14
**inserted** [1] - 69:4
**insisted** [1] - 76:20
**install** [1] - 79:6
**installed** [1] - 52:1
**instances** [1] - 45:1
**instead** [2] - 75:21, 84:15
**instituted** [1] - 16:2
**insufficient** [1] - 71:24
**INSURANCE** [19] - 1:13, 1:14, 1:14, 2:11, 2:16, 2:20, 3:4, 3:5, 3:6, 3:10, 3:11, 3:15, 3:16, 4:3, 4:4, 4:9, 4:13, 4:17, 4:18
**Insurance** [92] - 7:14, 8:13, 9:2, 11:7, 11:9, 11:19, 14:5, 14:24, 15:12, 17:18, 18:25, 19:2, 19:11, 19:16, 19:19, 19:21, 20:17, 20:18, 20:23, 21:22, 25:5, 25:13, 25:14, 25:25, 26:3, 26:4, 26:18, 28:7, 28:21, 29:3, 29:25, 30:4, 30:19, 30:20, 31:6, 31:7, 31:8, 31:15, 31:16, 32:12, 32:14, 32:25, 33:1, 33:3, 33:4, 33:6, 33:9, 33:11, 34:5, 34:6, 34:8, 35:4, 35:5, 35:6, 48:23, 48:25, 49:1, 49:5, 49:7, 50:1, 50:2, 50:13, 51:7, 51:9, 51:11, 51:12, 52:12, 52:13, 53:6, 53:11, 53:13, 53:16, 55:2, 63:13, 65:7, 72:10, 72:20, 77:18, 77:20, 77:21, 78:20
**insurance** [86] - 9:17, 14:21, 16:23, 18:10, 20:18, 20:22, 21:25, 25:19, 25:22, 26:23, 28:4, 29:13, 31:14, 32:10, 33:21, 40:21, 43:22, 44:3, 46:12, 46:13, 53:2, 53:24, 54:3, 54:7, 54:8, 54:22, 55:21, 55:22,

55:23, 57:3, 62:24, 63:9, 63:11, 63:14, 64:16, 64:18, 67:6, 68:10, 68:11, 68:14, 68:15, 68:16, 68:21, 68:22, 69:6, 69:7, 69:25, 70:1, 70:3, 70:5, 70:8, 70:15, 70:18, 71:4, 71:6, 72:13, 72:15, 73:15, 73:19, 74:3, 76:9, 76:12, 76:13, 76:14, 76:18, 76:19, 77:4, 77:5, 77:6, 77:10, 77:13, 77:15, 77:22, 77:23, 77:24, 78:3, 78:4, 79:16, 83:16, 83:19, 85:12, 85:22
**insure** [4] - 33:24, 41:16, 47:23, 60:17
**insured** [24] - 12:14, 13:8, 13:11, 13:15, 16:22, 19:2, 19:3, 21:19, 23:6, 36:21, 36:22, 36:23, 36:25, 56:11, 64:17, 66:9, 68:6, 76:25, 78:6, 78:19
**insureds** [22] - 10:13, 12:7, 18:11, 37:1, 42:21, 43:2, 54:16, 54:17, 54:20, 60:23, 76:22, 76:23, 79:2, 79:3, 79:11, 79:12, 80:12, 80:21, 83:17, 83:18
**insurer** [3] - 23:15, 60:14, 72:18
**insurers** [12] - 8:4, 8:6, 10:11, 14:3, 20:6, 72:23, 77:15, 85:24, 85:25, 86:2
**insurers'** [1] - 73:8
**insures** [1] - 54:1
**insuring** [1] - 12:7
**intentions** [1] - 69:20
**interest** [19] - 17:6, 17:9, 17:10, 39:4, 54:12, 58:3, 58:4, 67:19, 67:22, 68:9, 68:16, 68:20, 69:2, 70:6, 70:7, 70:24, 75:14, 80:15, 81:20
**interesting** [3] - 10:8, 28:17, 81:18
**interests** [8] - 17:3, 39:2, 58:4, 67:19, 67:24, 74:3, 82:1, 82:10
**INTERNATIONAL** [2] -

1:12, 3:3
**International** [3] - 8:7, 56:15, 77:21
**interpret** [1] - 68:7
**interpretation** [1] - 67:20
**interpreted** [1] - 74:21
**interrogatories** [1] - 20:8
**interrogatory** [1] - 51:15
**Interstate** [2] - 78:8
**intervene** [1] - 80:17
**introduce** [2] - 7:18, 52:16
**inventory** [1] - 39:15
**investment** [2] - 17:7, 50:8
**involve** [2] - 21:18, 24:11
**involved** [4] - 8:6, 24:25, 64:23, 74:16
**involvement** [1] - 78:2
**involving** [4] - 11:1, 23:24, 35:18, 41:25
**isolated** [1] - 24:16
**issue** [23] - 14:7, 22:7, 22:20, 23:23, 25:23, 26:7, 29:11, 29:24, 30:2, 34:18, 41:11, 47:5, 47:7, 47:9, 47:12, 48:3, 60:9, 64:20, 70:14, 77:4, 77:6, 79:21, 86:11
**issued** [14] - 11:17, 18:10, 21:15, 27:15, 36:25, 41:13, 41:14, 59:25, 65:9, 66:19, 68:2, 69:9, 73:5, 76:9
**issues** [11] - 10:16, 26:6, 31:14, 33:12, 41:6, 47:8, 65:13, 65:20, 72:11, 79:20, 86:8
**item** [1] - 60:1
**itemized** [1] - 23:5
**itself** [6] - 13:4, 16:21, 22:4, 34:7, 55:7, 74:20
**Iver** [1] - 44:5

**J**

**Jacksonville** [1] - 20:13
**JERRY** [1] - 3:17
**Jerry** [3] - 9:8, 11:4, 11:7

**jewelry** [1] - 23:5
**job** [2] - 56:12, 79:7
**Joe** [3] - 65:3, 65:7, 67:1
**JOHNSON** [1] - 2:20
**join** [7] - 64:14, 66:2, 77:16, 78:8, 78:16, 78:21, 85:23
**joinder** [1] - 8:3
**joined** [1] - 77:11
**joint** [1] - 36:8
**JOSEPH** [1] - 3:7
**JPMDL** [1] - 10:23
**JPML** [3] - 61:3, 61:4, 61:24
**judge** [3] - 19:20, 39:12, 85:7
**Judge** [11] - 23:3, 26:8, 28:19, 32:4, 35:20, 36:12, 45:7, 45:12, 45:13, 65:16, 83:5
**JUDGE** [1] - 1:19
**judges** [1] - 74:21
**judgment** [5] - 10:25, 82:2, 82:8, 85:15
**judgments** [1] - 81:23
**judicial** [3] - 58:4, 71:2, 84:17
**June** [1] - 27:14
**jurisdiction** [84] - 8:3, 8:4, 9:24, 10:13, 10:20, 11:8, 13:14, 13:18, 13:24, 18:12, 19:22, 23:18, 24:21, 24:24, 24:25, 26:1, 26:2, 26:5, 26:8, 29:8, 29:10, 30:1, 30:3, 33:9, 33:10, 37:7, 37:8, 38:7, 38:8, 39:23, 40:3, 40:6, 40:22, 40:23, 42:12, 42:18, 42:20, 44:4, 45:23, 46:5, 46:8, 46:11, 47:15, 47:16, 47:17, 48:6, 55:11, 55:16, 56:25, 57:5, 57:11, 57:23, 58:1, 58:13, 59:15, 60:21, 60:22, 61:23, 62:10, 62:11, 62:13, 62:20, 62:21, 62:22, 62:23, 63:4, 63:5, 63:11, 63:23, 63:24, 65:18, 67:16, 71:11, 73:3, 73:25, 74:1, 75:20, 75:21, 82:25, 85:4, 85:9
**jurisdictional** [8] - 8:19, 13:18, 14:7,

**18:24, 26:13, 35:9, 35:13, 36:16**
**jurisdictions** [8] - 11:1, 45:15, 45:22, 47:6, 47:7, 57:14, 58:9, 84:16
**jurisprudence** [1] - 42:22
**justice** [3] - 57:15, 57:19, 67:9

### K

**Kaiser** [1] - 18:16
**Kammer** [6] - 9:21, 35:10, 45:5, 45:19, 47:19, 74:2
**KAMMER** [9] - 3:22, 9:21, 35:11, 39:14, 39:25, 40:19, 43:16, 59:19, 61:14
**Kammer's** [1] - 78:1
**KAMMER...................
...................** [2] - 6:10, 6:13
**Kansas** [3] - 38:13, 38:25, 39:1
**Kathleen** [2] - 11:16, 54:19
**KATZ** [1] - 1:23
**keep** [3] - 34:2, 49:21, 61:18
**KERRIGAN** [1] - 4:9
**Key** [2] - 80:7, 80:18
**KILL** [1] - 2:7
**kind** [6] - 26:22, 27:11, 30:23, 34:13, 35:3, 58:19
**KINGSDORF** [1] - 5:3
**Knauf** [1] - 75:8
**known** [1] - 70:17
**knows** [2] - 28:12, 33:20
**KUPPERMAN** [1] - 2:11

### L

**LA** [9] - 1:15, 1:25, 2:14, 3:19, 4:7, 4:11, 4:20, 5:5, 5:8
**lack** [6] - 11:8, 14:19, 15:3, 28:15, 65:18, 77:9
**ladies** [1] - 7:9
**Lakes** [1] - 21:3
**LANDMARK** [1] - 4:9
**Landmark** [2] - 72:12, 72:18

**language** [1] - 59:2
**large** [2] - 32:5, 53:23
**last** [14] - 12:10, 18:22, 19:23, 27:13, 28:10, 35:9, 45:3, 51:17, 53:19, 55:5, 55:14, 61:6, 83:1
**lastly** [1] - 58:2
**LAUDERDALE** [1] - 4:25
**law** [24] - 23:21, 25:6, 26:10, 27:4, 40:6, 41:20, 54:2, 54:6, 61:17, 62:11, 70:12, 70:13, 73:18, 73:20, 78:24, 79:1, 79:2, 79:3, 82:21, 82:22, 82:23, 82:24, 83:7
**laws** [1] - 11:9
**lawsuits** [1] - 58:9
**lawyer** [1] - 23:25
**Lazarus'** [1] - 65:16
**leads** [1] - 42:16
**LEAKE** [1] - 3:16
**learned** [1] - 40:7
**least** [9] - 8:24, 36:7, 40:18, 50:22, 63:22, 66:13, 75:22, 83:24, 83:25
**leave** [2] - 10:17, 70:1
**leaves** [1] - 69:7
**left** [2] - 73:13, 73:14
**LEONARD** [1] - 1:24
**Leonard** [1] - 7:16
**less** [4] - 18:13, 37:20, 38:16, 59:24
**letters** [1] - 59:24
**level** [2] - 72:12, 72:13
**LEVIN** [2] - 2:3, 2:3
**lex** [1] - 82:24
**LEXINGTON** [1] - 4:4
**Lexington** [1] - 77:19
**liabilities** [6] - 68:19, 69:5, 71:5, 71:22, 71:25, 80:1
**liability** [15] - 13:9, 13:10, 31:17, 51:21, 51:23, 51:25, 52:1, 52:2, 52:3, 53:24, 54:3, 54:7, 54:8, 76:11, 79:9
**LIABILITY** [1] - 1:4
**license** [1] - 56:23
**licensed** [6] - 11:23, 20:14, 23:3, 23:17, 26:23, 27:18
**licenses** [1] - 63:8
**lift** [1] - 61:5
**light** [1] - 81:13
**likely** [1] - 73:2

**LINDSEY** [1] - 2:20
**line** [1] - 59:13
**lines** [1] - 25:19
**LINES** [2] - 1:13, 3:3
**Lines** [3] - 8:8, 54:21, 77:21
**list** [8] - 12:18, 14:18, 15:6, 15:16, 15:20, 17:13, 17:14, 64:16
**listed** [2] - 34:24, 41:17
**litigate** [2] - 48:10, 68:22
**litigating** [2] - 48:10, 69:2
**litigation** [15] - 11:20, 16:2, 18:1, 18:25, 19:7, 45:18, 54:10, 64:20, 70:22, 73:2, 73:6, 79:4, 80:25, 81:5, 84:19
**LITIGATION** [1] - 1:5
**lived** [2] - 12:20, 12:23
**LL&E** [1] - 2:13
**local** [2] - 50:20, 54:16
**located** [6] - 46:23, 46:24, 56:2, 63:18, 66:13, 66:14
**location** [2] - 31:22, 49:22
**loci** [1] - 82:24
**locus** [1] - 39:4
**logic** [2] - 70:6, 85:24
**LONGER** [1] - 2:4
**look** [28] - 26:10, 26:15, 26:21, 27:6, 27:13, 30:5, 30:6, 30:17, 30:23, 30:25, 32:2, 32:21, 33:7, 34:9, 38:2, 39:8, 40:11, 40:22, 42:9, 46:7, 50:10, 50:11, 58:22, 62:23, 67:2, 86:9
**looked** [3] - 37:23, 44:9, 46:4
**looking** [1] - 22:19
**looks** [4] - 30:10, 33:18, 34:10, 72:21
**Lopilato** [2] - 11:16, 54:19
**losses** [2] - 51:6, 51:8
**LOUISIANA** [2] - 1:1, 1:7
**Louisiana** [169] - 10:14, 10:22, 10:23, 11:24, 11:25, 12:1, 12:2, 12:3, 12:4, 12:5, 12:6, 12:7, 12:8, 12:9, 12:12,

12:15, 12:21, 12:22, 12:23, 13:8, 13:10, 13:13, 14:1, 14:5, 14:13, 14:15, 14:18, 14:19, 16:19, 16:20, 16:21, 17:6, 17:8, 17:11, 17:17, 17:23, 18:8, 18:21, 19:6, 20:5, 20:6, 20:11, 20:14, 20:15, 20:16, 20:17, 20:19, 20:20, 20:21, 20:22, 20:24, 21:6, 21:15, 21:21, 21:25, 22:1, 22:4, 22:9, 22:23, 23:1, 23:3, 23:7, 23:17, 23:24, 24:2, 24:5, 24:15, 26:1, 26:20, 27:1, 27:16, 27:17, 28:6, 28:7, 28:20, 28:23, 29:16, 29:22, 31:18, 37:21, 38:16, 38:17, 40:25, 41:16, 41:18, 41:24, 42:8, 42:9, 45:22, 46:1, 46:14, 46:15, 46:19, 46:21, 50:18, 50:22, 52:4, 52:6, 52:9, 52:11, 52:14, 52:19, 52:22, 52:24, 53:1, 53:2, 53:3, 53:3, 53:4, 53:6, 53:8, 53:11, 53:14, 53:17, 54:1, 54:4, 54:9, 54:11, 54:13, 54:14, 54:15, 54:16, 54:17, 54:20, 54:23, 55:4, 55:11, 55:16, 55:18, 55:19, 55:22, 55:23, 55:24, 55:25, 56:1, 56:2, 56:7, 56:11, 56:16, 58:24, 59:1, 59:3, 59:7, 59:10, 59:13, 59:14, 59:15, 60:8, 60:10, 60:11, 60:15, 60:17, 63:9, 63:11, 63:12, 63:13, 63:14, 63:17, 63:18, 67:15, 75:3, 87:5, 87:6
**low** [2] - 57:22, 57:25
**Luv** [1] - 57:8

### M

**M/T** [1] - 44:5
**MA** [1] - 2:18
**MAGAZINE** [1] - 4:10
**mailing** [2] - 18:18, 49:19
**Main** [2] - 21:2, 55:3

**MAIN** [1] - 2:17
**Maine** [1] - 23:6
**maintain** [3] - 11:25, 20:19, 21:14
**maintains** [1] - 54:12
**maintenance** [1] - 38:20
**major** [1] - 86:4
**manager** [1] - 51:4
**MANUFACTURED** [1] - 1:4
**March** [1] - 26:16
**market** [1] - 20:21
**marketing** [2] - 38:12
**matter** [10] - 7:21, 7:23, 24:25, 31:6, 44:13, 62:22, 71:14, 73:12, 79:3, 87:10
**matters** [3] - 7:24, 64:6, 70:13
**maximize** [1] - 69:17
**maximizing** [2] - 70:7, 70:8
**MCC** [7] - 42:18, 43:12, 43:14, 44:13, 58:17, 63:1, 63:19
**MCGLINCHEY** [1] - 4:5
**MCGUFFEY** [1] - 2:20
**MCI** [1] - 41:5
**McKay** [1] - 57:7
**MCKINNEY** [1] - 4:15
**MDL** [35] - 7:11, 7:21, 7:22, 39:10, 39:11, 39:18, 39:20, 39:21, 40:3, 40:5, 40:7, 40:9, 40:13, 40:15, 40:20, 45:3, 58:3, 58:7, 58:10, 58:11, 61:8, 61:9, 61:18, 61:21, 61:25, 66:15, 71:9, 71:15, 74:16, 74:19, 75:19, 76:7, 81:1, 84:13, 85:1
**MDL'd** [2] - 75:3
**mean** [7] - 16:19, 29:13, 39:12, 40:12, 73:9, 74:19, 74:20
**meaningless** [1] - 23:15
**means** [4] - 16:21, 61:9, 75:20, 82:25
**MECHANICAL** [1] - 5:9
**media** [1] - 50:23
**mediation** [1] - 71:2
**Medical** [2] - 22:5, 22:13
**medical** [1] - 28:14
**meeting** [1] - 59:8

**meetings** [1] - 34:22
**MELISSA** [1] - 4:10
**member** [1] - 53:10
**memo** [11] - 14:4, 14:8, 15:15, 15:22, 17:4, 17:13, 17:15, 18:5, 18:15, 18:16
**memorandum** [3] - 14:3, 54:2, 54:6
**menace** [1] - 81:12
**mentioned** [9] - 10:18, 16:13, 40:5, 47:19, 49:17, 51:1, 65:25, 66:4, 66:17
**merely** [3] - 39:23, 55:7, 55:10
**Merit** [1] - 87:4
**merits** [1] - 45:23
**met** [1] - 25:1
**MIAMI** [1] - 3:23
**Michael** [1] - 37:14
**Michigan** [1] - 11:11
**MID** [1] - 3:21
**Mid** [32] - 8:8, 8:13, 8:14, 9:1, 9:22, 35:10, 41:23, 43:6, 44:20, 44:25, 45:4, 45:6, 45:8, 45:14, 45:25, 46:9, 46:18, 46:21, 46:23, 46:25, 47:21, 48:4, 57:20, 60:25, 63:1, 63:7, 63:8, 77:25, 78:7, 78:11, 78:20, 85:14
**mid** [2] - 46:10, 59:18
**Mid-Con** [1] - 35:10
**MID-CONTINENT** [1] - 3:21
**Mid-Continent** [27] - 8:8, 8:13, 9:1, 9:22, 41:23, 44:20, 44:25, 45:4, 45:6, 45:8, 45:14, 45:25, 46:9, 46:18, 46:23, 46:25, 47:21, 57:20, 60:25, 63:1, 63:7, 63:8, 77:25, 78:7, 78:11, 78:20, 85:14
**mid-Continent** [2] - 46:10, 59:18
**Mid-Continent's** [4] - 8:14, 43:6, 46:21, 48:4
**Middle** [2] - 45:5, 45:7
**might** [11] - 8:11, 21:24, 24:15, 32:8, 49:10, 66:12, 69:15, 72:9, 81:20, 82:10, 82:14
**militates** [1] - 46:8

**million** [19] - 21:14, 34:15, 38:14, 53:4, 53:18, 55:5, 55:14, 63:16, 69:5, 69:6, 69:7, 69:9, 72:3, 77:5, 77:23, 83:10, 83:15, 83:16, 83:20
**millions** [1] - 72:2
**mind** [2] - 61:19, 86:10
**mindful** [2] - 55:6, 55:8
**mine** [1] - 58:20
**minimal** [1] - 14:9
**minimize** [1] - 84:1
**minimum** [9] - 18:24, 20:10, 21:16, 22:12, 22:19, 22:22, 27:5, 55:4, 63:19
**MINOR** [1] - 2:12
**Minor** [1] - 35:15
**minor** [1] - 7:14
**minute** [3] - 64:5, 84:22, 86:3
**minutes** [2] - 15:7, 72:10
**mischaracterization** [1] - 22:21
**misconceptions** [1] - 76:5
**misjudgment** [1] - 9:14
**missed** [1] - 82:21
**Mississippi** [3] - 38:25, 39:2, 39:3
**misspeaking** [1] - 52:15
**misspoke** [4] - 52:7, 52:10, 52:15, 52:18
**misstatement** [1] - 61:2
**misstatements** [1] - 85:11
**mistaken** [3] - 24:3, 52:10, 72:14
**modern** [2] - 57:24
**moment** [2] - 29:25, 45:20
**money** [4] - 13:5, 16:6, 33:15, 73:19
**MONTGOMERY** [1] - 3:13
**month** [2] - 17:24, 17:25
**months** [1] - 45:4
**MORROW** [2] - 3:11, 3:12
**most** [8] - 30:8, 33:21, 40:18, 64:23, 71:17, 73:2, 75:4, 84:14

**motion** [37] - 8:22, 11:8, 11:11, 12:16, 16:10, 25:6, 25:9, 36:4, 36:9, 36:13, 36:19, 37:9, 37:13, 38:2, 38:9, 38:11, 43:6, 45:8, 45:11, 53:21, 56:4, 62:6, 64:13, 65:16, 65:18, 77:7, 77:16, 78:9, 78:10, 78:14, 78:17, 78:21, 78:23, 80:6, 85:23
**motions** [21] - 7:25, 8:2, 8:5, 8:10, 8:11, 8:14, 8:19, 9:1, 20:1, 26:17, 36:6, 36:11, 36:17, 62:10, 64:12, 65:1, 65:4, 75:13
**motivation** [2] - 68:12, 68:13
**motor** [2] - 21:18, 24:11
**movant** [1] - 80:22
**movants** [1] - 25:16
**movants'** [1] - 76:4
**move** [2] - 48:13, 75:13
**moved** [6] - 36:2, 61:5, 65:15, 65:17, 66:1, 85:15
**moving** [7] - 37:4, 75:9, 77:8, 81:23, 82:2, 82:8, 85:12
**MR** [86] - 6:6, 6:7, 6:8, 6:9, 6:10, 6:11, 6:12, 6:13, 6:17, 6:18, 6:19, 6:20, 7:14, 7:16, 7:20, 8:17, 8:21, 9:4, 9:7, 9:10, 9:13, 9:21, 10:2, 10:21, 11:4, 11:6, 12:14, 13:21, 14:16, 15:10, 18:3, 18:5, 19:13, 19:15, 19:18, 21:7, 21:12, 22:15, 22:18, 25:9, 25:12, 27:20, 27:23, 27:25, 28:9, 29:19, 32:1, 35:8, 35:9, 35:11, 39:14, 39:25, 40:19, 43:11, 43:16, 43:20, 44:1, 44:14, 44:17, 44:21, 44:25, 46:16, 47:11, 48:17, 53:16, 54:25, 58:18, 59:19, 61:14, 64:25, 65:6, 65:23, 65:25, 67:2, 67:14, 67:18, 67:24, 69:1, 74:9, 74:23,

75:6, 76:2, 76:3, 81:9, 84:22, 86:12
**multidistrict** [1] - 84:19
**multiple** [2] - 31:5, 58:8
**multiplicity** [1] - 45:17
**must** [1] - 66:15
**MUTUAL** [1] - 4:18
**Mutual** [2] - 10:15, 32:24

## N

**N'** [1] - 57:8
**name** [4] - 11:16, 50:15, 65:6, 78:12
**named** [18] - 28:22, 31:7, 36:20, 36:21, 37:3, 42:21, 43:2, 60:23, 64:17, 66:9, 76:21, 76:23, 76:25, 77:15, 78:19, 79:2, 79:10
**Named** [1] - 80:20
**namely** [1] - 67:6
**nation** [1] - 55:20
**national** [1] - 60:14
**National** [68] - 25:25, 26:2, 26:7, 26:18, 26:21, 26:22, 26:25, 27:6, 27:14, 27:15, 27:18, 28:3, 28:21, 29:10, 29:11, 29:16, 29:25, 30:2, 30:3, 30:14, 30:18, 31:8, 31:11, 31:17, 32:13, 32:15, 33:1, 33:4, 33:8, 33:17, 34:3, 34:7, 34:12, 34:15, 35:6, 48:15, 48:16, 48:24, 49:4, 49:16, 50:2, 50:12, 50:15, 51:5, 51:8, 51:10, 51:14, 51:16, 51:18, 52:4, 52:5, 52:8, 52:13, 52:23, 52:25, 53:1, 53:2, 53:3, 53:5, 53:7, 53:10, 53:12, 53:14, 58:24, 59:13, 65:7, 79:22
**NATIONAL** [1] - 3:4
**nationally** [1] - 22:24
**nationwide** [7] - 14:11, 14:12, 37:21, 38:12, 55:17, 55:18, 55:19
**natural** [1] - 73:5
**nature** [3] - 27:12,

42:1, 79:1
**NE** [1] - 2:21
**nearly** [4] - 38:14, 41:3, 55:5, 55:13
**necessary** [5] - 66:2, 73:13, 79:3, 80:5, 80:21
**necessity** [1] - 73:21
**need** [2] - 58:16, 72:7
**needed** [1] - 17:16
**needs** [1] - 10:20
**negligence** [1] - 56:13
**negotiated** [1] - 66:8
**never** - 27:10, 27:11, 71:14
**NEW** [9] - 1:7, 1:25, 2:9, 2:14, 3:19, 4:7, 4:11, 5:5, 5:8
**new** [1] - 38:21
**New** [2] - 47:2, 83:3
**newspaper** [3] - 29:3, 29:4, 50:17
**next** [2] - 19:15, 29:11
**NGM** [31] - 2:16, 8:13, 9:2, 19:15, 19:19, 19:21, 20:10, 20:23, 21:10, 21:20, 21:22, 22:3, 23:6, 23:8, 24:4, 24:23, 25:5, 25:7, 44:11, 54:24, 54:25, 55:1, 55:2, 55:3, 55:12, 58:16, 62:25, 63:6, 72:10, 72:20
**nice** [1] - 9:21
**nine** [1] - 54:3
**NO** [1] - 1:6
**nobody** [1] - 68:24
**nonderivative** [3] - 78:6, 79:13, 80:13
**none** [7] - 15:1, 21:8, 21:9, 40:4, 42:8, 42:9, 49:24
**nonparties** [1] - 67:5
**nonresident** [2] - 62:13, 62:20
**Norris** [2] - 11:12, 11:13
**NORTH** [1] - 3:7
**Northstar** [33] - 8:9, 8:14, 9:14, 9:16, 9:19, 10:6, 35:18, 35:19, 35:21, 36:1, 36:6, 36:10, 36:12, 36:13, 36:20, 36:21, 37:5, 43:1, 47:14, 61:19, 65:10, 66:18, 66:21, 70:21, 76:8, 76:14, 77:14, 78:15, 78:16, 78:18, 79:16,

83:18, 85:25
**Northstar's** [1] - 77:2
**note** [5] - 44:5, 59:5, 63:7, 77:10, 80:15
**noted** [4] - 54:25, 58:2, 76:20, 77:4
**notes** [1] - 80:7
**nothing** [5] - 76:15, 76:16, 77:5, 79:18, 80:10
**notice** [5] - 52:21, 58:23, 59:2, 79:19
**noticing** [1] - 25:15
**notion** [1] - 84:25
**notions** [2] - 57:15, 57:19
**NOVEMBER** [2] - 1:7, 7:2
**NTI** [1] - 58:23
**nuance** [1] - 47:4
**nuanced** [1] - 47:10
**Number** [1] - 29:6
**number** [16] - 7:22, 8:2, 8:5, 8:10, 29:5, 30:6, 41:18, 49:19, 52:3, 54:2, 65:1, 68:18, 71:5, 85:6, 85:7
**numbered** [1] - 87:9
**numbers** [3] - 59:1, 59:5, 59:12
**numerous** [2] - 56:22, 69:14
**NY** [1] - 2:9

## O

**O'CONNOR** [1] - 4:13
**O'KEEFE** [1] - 1:24
**objections** [1] - 20:3
**obligation** [3] - 57:6, 57:9, 68:10
**obligations** [2] - 71:1, 79:15
**observation** [1] - 75:6
**obviously** [5] - 10:5, 10:10, 43:13, 71:8, 78:25
**occasions** [1] - 20:3
**occurred** [2] - 17:2, 51:24
**occurrences** [2] - 51:24
**occurs** [1] - 72:20
**Ocean** [1] - 78:13
**October** [1] - 52:11
**odd** [3] - 14:2, 14:8, 69:5
**OF** [4] - 1:1, 1:18, 2:8,

3:5
**offend** [2] - 57:15, 57:18
**offer** [1] - 38:21
**office** [9] - 11:25, 20:19, 27:10, 34:7, 38:13, 49:4, 49:5, 49:6, 49:7
**officer** [2] - 34:24
**officers** [3] - 34:19, 34:20, 49:11
**offices** [9] - 21:3, 31:22, 34:3, 34:4, 34:5, 49:3, 49:8, 49:18
**OFFICIAL** [1] - 5:7
**Official** [2] - 87:5, 87:15
**often** [1] - 61:16
**oftentimes** [1] - 39:11
**Ohio** [5] - 11:10, 46:23, 72:21, 83:3
**Oklahoma** [2] - 46:24, 83:3
**old** [2] - 16:4, 16:8
**Old** [2] - 21:3, 24:1
**OLICK** [1] - 2:7
**once** [9] - 27:6, 28:9, 35:2, 36:3, 41:11, 57:12, 59:19, 60:16, 68:24
**one** [83] - 8:21, 9:8, 9:17, 9:24, 12:10, 12:17, 14:11, 14:16, 15:19, 16:4, 18:9, 20:3, 23:4, 23:24, 24:13, 25:17, 26:22, 27:3, 28:10, 28:24, 29:5, 29:12, 30:6, 30:11, 30:17, 30:25, 31:23, 31:24, 33:14, 33:18, 33:21, 34:9, 34:18, 34:25, 35:1, 36:11, 36:15, 38:16, 39:12, 39:13, 41:11, 45:22, 49:15, 51:20, 53:20, 57:23, 58:18, 58:23, 60:7, 61:1, 62:10, 62:24, 63:2, 65:8, 66:20, 66:22, 68:8, 68:17, 69:14, 72:18, 72:23, 74:11, 75:4, 75:10, 75:15, 80:16, 81:20, 83:5, 83:6, 83:7, 84:22, 84:24, 85:3, 85:7, 85:11, 86:11
**ONE** [2] - 4:14, 4:24
**ones** [1] - 12:19
**open** [1] - 67:13

**operate** [2] - 23:16, 55:23
**operated** [1] - 31:1
**operation** [2] - 13:12
**operational** [1] - 31:3
**operationally** [1] - 31:11
**operations** [4] - 41:17, 50:18, 50:21, 57:25
**opinion** [2] - 60:25, 86:11
**opponent** [1] - 76:1
**opportunity** [1] - 39:14
**opposed** [3] - 38:8, 40:1, 40:2
**opposition** [4] - 14:2, 15:24, 16:17, 81:11
**option** [1] - 85:5
**ORAL** [1] - 1:18
**order** [18] - 8:1, 8:18, 10:3, 13:5, 16:9, 19:25, 35:24, 35:25, 36:1, 36:3, 40:20, 42:23, 43:1, 44:15, 65:1, 65:16, 72:5, 85:15
**ORDER** [1] - 7:4
**ordered** [1] - 12:17
**orders** [1] - 61:21
**organization** [1] - 49:24
**organizational** [1] - 7:24
**original** [2] - 10:22, 11:11
**Orlando** [1] - 47:1
**ORLEANS** [8] - 1:7, 1:25, 2:14, 3:19, 4:7, 4:11, 5:5, 5:8
**Orleans** [1] - 47:2
**otherwise** [1] - 47:12
**ought** [1] - 32:17
**ourselves** [1] - 29:21
**outline** [1] - 10:4
**overage** [1] - 69:9
**overall** [1] - 44:2
**overlap** [2] - 34:19, 49:11
**overwhelmingly** [1] - 42:11
**own** [14] - 12:8, 13:2, 17:6, 17:7, 33:11, 34:12, 45:15, 68:17, 68:22, 69:12, 69:18, 73:8, 73:10, 79:8
**owned** [3] - 33:1, 38:17, 48:22
**owner** [2] - 21:2, 51:11

**OWNERS** [4] - 3:10, 3:11, 3:15, 3:16
**Owners** [81] - 8:13, 9:2, 9:8, 9:9, 10:15, 11:7, 11:9, 11:13, 11:15, 11:19, 11:20, 11:21, 11:22, 11:23, 11:24, 11:25, 12:1, 12:2, 12:3, 12:4, 12:5, 12:6, 12:8, 13:2, 13:4, 13:7, 13:10, 13:15, 14:1, 14:5, 14:17, 14:20, 14:24, 14:25, 15:1, 15:4, 15:12, 15:14, 15:15, 15:18, 16:1, 16:2, 16:5, 16:9, 16:12, 16:13, 17:5, 17:10, 17:18, 17:25, 18:9, 18:25, 19:2, 19:11, 21:1, 21:13, 21:19, 26:9, 44:11, 53:16, 53:17, 54:1, 54:3, 54:8, 54:10, 54:12, 54:14, 54:15, 54:19, 58:16, 62:25, 63:2, 63:5, 72:10, 72:11, 72:19
**ownership** [3] - 32:20, 32:22
**owning** [1] - 37:4
**owns** [7] - 31:12, 32:24, 32:25, 33:4, 48:23, 48:24, 48:25

## P

**p.m** [1] - 86:17
**P.M** [1] - 1:7
**P.O** [1] - 3:13
**PA** [2] - 2:5, 3:5
**Pacific** [4] - 59:22, 59:23, 60:2, 60:3
**package** [1] - 8:15
**Page** [11] - 15:22, 17:13, 17:15, 18:5, 18:15, 38:4, 54:21, 60:7, 69:21
**PAGE** [1] - 6:3
**page** [1] - 14:2
**Pages** [1] - 60:4
**pages** [3] - 14:4, 14:6, 14:8
**paid** [23] - 12:11, 16:6, 16:23, 21:14, 21:15, 22:2, 22:13, 22:14, 27:9, 28:6, 53:2, 53:5, 53:17, 55:4, 55:12, 55:13, 63:16,

66:5, 66:6, 66:8, 68:24, 69:6, 72:17
**panel** [2] - 36:8, 74:20
**Paper** [1] - 56:15
**papers** [3] - 16:4, 52:20, 76:4
**parent** [16] - 11:13, 11:21, 14:20, 16:1, 30:15, 30:16, 30:20, 30:21, 30:22, 32:16, 32:23, 33:14, 34:2, 34:11, 48:22, 50:25
**parent-subsidiary** [1] - 30:15
**PARKINSON** [1] - 4:5
**part** [10] - 14:21, 18:22, 19:1, 28:17, 40:14, 40:18, 48:17, 55:19, 78:13, 78:23
**participate** [2] - 49:24, 72:8
**participation** [1] - 58:6
**particular** [8] - 15:13, 18:13, 59:25, 62:22, 63:4, 71:17, 75:13, 80:25
**particularly** [3] - 17:15, 26:14, 71:13
**parties** [25] - 11:1, 36:2, 62:9, 62:17, 64:14, 64:21, 64:22, 66:2, 67:4, 67:6, 68:8, 71:3, 71:10, 72:11, 73:1, 73:3, 73:13, 73:24, 75:14, 77:9, 80:1, 80:3, 80:5, 81:4, 85:19
**parts** [2] - 23:16
**party** [4] - 11:20, 47:12, 67:14, 78:13
**passenger** [1] - 25:21
**past** [2] - 27:5, 31:18
**Pate** [53] - 8:7, 8:12, 9:1, 9:15, 9:18, 10:6, 10:7, 10:9, 19:4, 35:18, 35:20, 35:21, 36:2, 36:10, 36:20, 36:21, 37:5, 43:1, 45:3, 45:6, 45:8, 47:13, 61:3, 61:19, 64:24, 65:14, 65:15, 65:17, 66:4, 66:13, 66:20, 67:15, 68:2, 68:4, 68:7, 68:8, 68:20, 69:4, 69:20, 70:21, 71:13, 71:16, 71:25, 73:7, 73:9, 73:18, 74:24, 75:10, 76:7, 85:1, 85:24

**PATE** [2] - 1:9, 2:7
**Pate's** [2] - 25:24, 76:24
**patients** [1] - 22:8
**pay** [9] - 13:10, 21:23, 23:8, 24:16, 28:13, 33:15, 46:15, 47:22, 56:1
**paying** [2] - 55:7, 55:10
**payment** [8] - 16:15, 16:18, 22:10, 24:9, 24:11, 24:16, 83:22, 84:3
**payments** [4] - 18:18, 18:19, 22:7, 28:16
**payroll** [1] - 51:3
**pays** [2] - 28:6, 53:10
**PEACHTREE** [1] - 2:21
**PEARSON** [1] - 3:11
**pending** [4] - 26:15, 37:4, 45:11, 62:4
**Pennsylvania** [2] - 65:8, 78:4
**people** [2] - 14:12, 62:5
**people's** [1] - 25:20
**Pepper** [3] - 87:3, 87:13, 87:14
**PEPPER** [1] - 5:7
**per** [1] - 72:3
**percent** [19] - 21:2, 32:24, 32:25, 33:4, 33:5, 37:20, 37:21, 37:22, 41:3, 48:23, 48:24, 48:25, 51:7, 51:9, 51:11, 59:24, 59:25
**percentage** [2] - 46:3, 46:4
**perfect** [1] - 9:5
**performance** [1] - 46:1
**perhaps** [4] - 47:7, 61:23, 74:19, 75:10
**period** [9] - 7:23, 16:11, 17:1, 27:17, 28:14, 38:11, 38:13, 46:15, 72:15
**permits** [1] - 80:25
**permitted** [1] - 19:25
**permitting** [1] - 9:14
**person** [11] - 12:22, 32:12, 32:13, 47:23, 56:6, 56:8, 56:9, 56:12, 80:14, 80:19, 80:23
**personal** [24] - 8:4, 11:8, 23:18, 24:21,

24:24, 25:19, 29:9, 40:2, 40:6, 40:22, 42:12, 44:4, 55:15, 56:25, 62:10, 62:11, 62:20, 63:5, 63:23, 63:24, 65:18, 67:15, 75:19, 85:9
**perspective** [1] - 41:19
**pertains** [1] - 36:13
**PHILADELPHIA** [1] - 2:5
**phone** [1] - 49:19
**Piazza** [1] - 52:16
**PIAZZA** [1] - 2:8
**pick** [1] - 39:9
**picked** [1] - 60:22
**picking** [1] - 41:16
**piece** [1] - 34:25
**piecemeal** [1] - 84:16
**PIPES** [14] - 2:12, 7:14, 8:17, 8:21, 9:4, 9:7, 10:2, 10:21, 11:4, 19:15, 25:9, 35:9, 43:11, 64:25
**Pipes** [1] - 7:14
**PIPES.....................**
**.....................** [2] -
6:6, 6:17
**Pittsburgh** [1] - 65:8
**PITTSBURGH** [1] - 3:5
**place** [8] - 11:10, 20:13, 28:16, 67:12, 69:3, 73:5, 75:9, 83:1
**places** [1] - 83:4
**plaintiff** [5] - 19:5, 60:8, 62:12, 62:18, 84:4
**plaintiffs** [16] - 12:18, 15:23, 15:25, 19:25, 24:23, 30:13, 37:3, 39:6, 42:8, 42:21, 43:3, 60:23, 64:14, 66:19, 69:20, 79:14
**plaintiffs'** [7] - 14:2, 17:4, 23:14, 23:17, 28:24, 58:1, 58:3
**PLAINTIFFS'** [1] - 1:23
**Plaintiffs'** [3] - 7:17, 7:19, 59:20
**Plan** [1] - 17:14
**play** [2] - 57:15, 57:19
**PLAZA** [1] - 4:24
**pleadings** [3] - 23:24, 24:7, 55:14
**point** [17] - 16:2, 18:14, 22:6, 22:18, 23:4, 48:15, 58:18,

64:8, 68:1, 68:3, 70:11, 73:2, 74:2, 74:12, 75:14, 83:21, 85:24
**pointed** [7] - 10:11, 21:12, 22:3, 24:19, 26:9, 34:18, 45:19
**pointing** [1] - 25:17
**points** [1] - 59:20
**policies** [66] - 11:23, 11:24, 18:10, 20:22, 21:19, 23:2, 25:21, 27:19, 28:10, 28:19, 31:14, 36:25, 41:11, 41:13, 42:23, 46:12, 46:13, 47:13, 51:10, 51:21, 51:23, 51:24, 52:3, 54:4, 54:7, 55:21, 55:22, 55:23, 57:4, 63:14, 65:9, 66:5, 66:6, 66:8, 66:9, 66:19, 67:20, 68:2, 69:9, 69:11, 70:8, 70:25, 72:17, 73:4, 74:5, 74:13, 74:17, 74:20, 76:15, 76:17, 76:24, 78:1, 78:5, 78:16, 78:18, 78:19, 79:2, 79:17, 80:10, 80:11, 83:9, 85:18
**policy** [23] - 21:25, 23:20, 27:13, 27:14, 27:16, 50:9, 51:13, 51:22, 53:24, 60:9, 63:11, 72:15, 76:17, 77:1, 77:2, 79:3, 79:18, 79:22, 79:25, 80:15, 81:24, 82:16
**policyholders** [2] - 55:24, 70:16
**portrayed** [1] - 85:21
**position** [6] - 29:15, 37:10, 43:14, 44:2, 47:5, 61:22
**possesses** [1] - 44:7
**possibility** [2] - 84:6, 84:7
**possible** [2] - 58:6, 69:17
**pot** [2] - 68:24, 69:4
**potentially** [2] - 85:18, 85:19
**power** [2] - 17:8, 54:14
**POYDRAS** [5] - 2:13, 3:18, 4:6, 5:4, 5:7
**practical** [1] - 80:8
**practice** [1] - 63:17
**pragmatic** [1] - 81:3,

81:5
**Precision** [1] - 82:6
**preference** [1] - 8:23
**pregnant** [2] - 43:14, 43:15
**prejudice** [1] - 67:5
**prejudiced** [1] - 81:8
**premium** [9] - 28:18, 31:4, 46:14, 46:15, 58:24, 59:2, 59:4, 59:13, 63:16
**premiums** [10] - 18:11, 20:16, 51:9, 51:17, 51:18, 52:24, 52:25, 56:24, 63:16
**prepared** [2] - 43:21, 78:25
**preponderance** [1] - 62:14
**presence** [5] - 20:24, 28:20, 52:19, 67:10, 80:18
**present** [7] - 58:9, 66:1, 73:1, 77:7, 80:2, 80:3, 83:14
**presentation** [4] - 35:16, 52:3, 61:9, 62:2
**presented** [2] - 25:6, 38:10
**presently** [1] - 45:12
**preserve** [3] - 56:17, 68:16, 68:21
**preserved** [1] - 84:19
**preside** [1] - 85:8
**presided** [1] - 73:24
**president** [5] - 37:15, 37:16, 49:12, 49:13
**press** [3] - 50:20, 50:21
**pretrial** [1] - 61:21
**prevent** [1] - 58:7
**previously** [1] - 18:10
**prima** [5] - 57:7, 57:9, 57:12, 57:17, 62:14
**primarily** [2] - 21:18, 69:16
**primary** [5] - 64:14, 64:16, 72:14, 78:1
**principal** [2] - 11:10, 20:12
**printout** [1] - 52:11
**private** [1] - 25:20
**privilege** [2] - 44:18, 48:7
**problem** [6] - 9:6, 34:2, 39:7, 39:24, 47:18, 74:10
**problematic** [3] - 39:10, 40:17, 63:20

**problems** [1] - 38:20
**procedural** [2] - 35:14, 65:12
**procedures** [1] - 83:12
**proceed** [3] - 71:15, 73:22, 80:20
**proceeding** [4] - 7:21, 8:1, 42:19, 66:16
**PROCEEDINGS** [3] - 1:18, 5:9, 7:1
**proceedings** [3] - 64:8, 86:17, 87:9
**process** [16] - 12:6, 40:24, 42:5, 42:11, 42:13, 42:25, 43:6, 44:6, 52:8, 52:9, 52:14, 53:9, 60:24, 63:3, 63:10, 65:2
**processed** [1] - 22:2
**PRODUCED** [1] - 5:10
**produced** [5] - 14:22, 14:23, 20:9, 24:3, 54:7
**production** [1] - 53:22
**PRODUCTS** [1] - 1:4
**Professional** [1] - 87:4
**program** [1] - 73:15
**promote** [1] - 84:17
**prong** [2] - 14:7, 18:23
**proof** [1] - 62:14
**proper** [1] - 56:25
**property** [6] - 12:8, 13:2, 23:2, 34:1, 52:2, 55:21
**Property** [1] - 53:11
**proposed** [1] - 56:6
**prove** [1] - 14:8
**provide** [3] - 68:10, 80:2, 80:8
**provided** [3] - 16:10, 56:5, 60:9
**provides** [2] - 31:4, 31:5, 51:2
**providing** [2] - 39:4, 72:22
**PSC** [2] - 12:11, 21:1
**public** [3] - 29:1, 29:7, 50:16
**pull** [1] - 26:3
**pulled** [3] - 12:19, 16:24, 29:3
**purchase** [1] - 68:14
**purpose** [3] - 40:17, 58:6
**purposefully** [1] - 22:3, 23:10, 24:17, 29:21, 44:18
**purposely** [1] - 48:6
**purposes** [3] - 26:13,

38:2, 59:11
**pursuant** [1] - 66:2
**put** [7] - 16:3, 17:13, 23:25, 58:19, 60:16, 81:14, 86:3

## Q

**quagmire** [1] - 74:9
**qualified** [2] - 47:20, 47:21
**Quanta** [1] - 78:16
**quantified** [1] - 69:13
**questionable** [1] - 44:12
**questions** [7] - 15:16, 15:17, 15:20, 32:19, 33:18, 61:16
**questions..** [1] - 86:8
**quickly** [1] - 10:5
**quite** [1] - 48:20
**quote** [2] - 17:9, 29:1

## R

**radio** [1] - 12:3
**raised** [3] - 83:21, 84:24, 84:25
**random** [5] - 12:20, 13:1, 16:14, 22:8, 24:17
**randomly** [1] - 12:17
**rate** [1] - 63:12
**rates** [1] - 20:16
**ratings** [3] - 50:11, 50:13
**re** [1] - 7:11
**RE** [1] - 1:4
**reached** [1] - 60:15
**read** [4] - 14:11, 14:18, 42:6, 79:1
**ready** [1] - 42:19
**real** [1] - 44:11
**really** [18] - 8:23, 10:19, 23:14, 29:11, 31:24, 39:22, 41:8, 44:17, 63:3, 67:3, 67:18, 69:19, 71:16, 72:25, 73:9, 74:23, 84:7, 86:1
**Realtime** [1] - 87:3
**reason** [7] - 13:9, 28:9, 43:5, 59:6, 60:16, 60:19, 75:12
**reasonable** [3] - 44:7, 48:5, 71:6
**reasons** [2] - 36:15, 73:10

**rebuttal** [1] - 84:21
**recalled** [1] - 19:23
**received** [1] - 53:23
**recent** [1] - 17:24
**recently** [2] - 53:9, 65:17
**recess** [2] - 64:9, 86:15
**RECESS**.................
..........................[1]
- 6:15
**recite** [1] - 78:24
**recognize** [2] - 16:18, 84:11
**reconsideration** [2] - 36:3, 36:4
**record** [4] - 7:13, 10:20, 38:20, 87:9
**RECORDED** [1] - 5:9
**records** [3] - 34:15, 49:21, 81:11
**recover** [2] - 66:15, 73:16
**recovery** [1] - 70:9
**red** [1] - 24:6
**reduce** [1] - 39:14
**refer** [1] - 17:12
**reference** [1] - 77:22
**referred** [1] - 61:10
**referring** [1] - 62:4
**refiled** [1] - 71:18
**reflect** [4] - 52:18, 53:25, 54:7, 79:2
**reflected** [1] - 55:15
**reflects** [1] - 52:12
**regard** [12] - 44:22, 45:21, 46:3, 47:12, 60:5, 60:18, 62:11, 63:2, 63:7, 71:16, 77:25, 78:5
**regarding** [2] - 56:2, 63:21
**registered** [3] - 12:6, 20:17, 20:20
**Registered** [2] - 87:3, 87:4
**regular** [2] - 38:19, 60:2
**regulated** [1] - 33:21
**regulation** [1] - 33:23
**reinsurance** [1] - 51:6
**reinsures** [1] - 51:7
**relate** [1] - 80:11
**RELATES** [1] - 1:8
**relates** [1] - 78:11
**relationship** [7] - 17:22, 18:21, 27:11, 30:14, 30:15, 63:21, 63:22
**relevant** [1] - 26:11

**relied** [1] - 38:23
**relief** [6] - 67:3, 67:8, 73:14, 80:2, 80:9, 81:6
**relitigate** [1] - 47:8
**rely** [3] - 28:25, 31:10, 59:21
**Remedial** [1] - 81:15
**remedy** [2] - 19:4, 74:24
**remember** [1] - 12:16
**render** [1] - 23:14
**repetitive** [2] - 41:12, 41:13
**reply** [4] - 15:22, 60:4, 60:7, 65:17
**report** [1] - 59:11
**Reporter** [6] - 87:3, 87:4, 87:5, 87:15
**REPORTER** [1] - 5:7
**REPORTER'S** [1] - 87:1
**represent** [2] - 25:13, 65:7
**representation** [1] - 17:19
**representative** [3] - 13:7, 15:17, 29:5
**request** [2] - 45:9, 45:10
**requests** [1] - 83:23
**require** [3] - 47:8, 68:14
**required** [3] - 62:15, 64:15, 80:19
**requirements** [1] - 63:23
**requires** [1] - 66:24
**researched** [1] - 16:25
**resident** [3] - 19:5, 27:16, 60:12
**residents** [7] - 53:1, 58:25, 59:1, 59:3, 59:14, 59:16, 60:10
**residing** [1] - 54:23
**resolution** [6] - 56:13, 66:10, 75:15, 83:13, 84:15, 84:16
**resolved** [4] - 57:11, 62:18, 75:22, 85:1
**resources** [1] - 71:6
**respectfully** [4] - 57:16, 62:7, 71:8, 82:19
**respond** [1] - 10:16
**respondent** [1] - 9:2
**responding** [1] - 20:2
**response** [6] - 9:18, 14:3, 15:23, 16:9, 43:10, 65:15

**responses** [2] - 37:19, 51:15
**result** [5] - 21:22, 58:8, 72:7, 84:7, 84:8
**results** [1] - 58:10
**retain** [2] - 55:24, 55:25
**retaining** [2] - 24:10
**return** [1] - 50:7
**returns** [1] - 21:5
**revenue** [2] - 46:3, 46:5
**reverse** [1] - 44:15
**rights** [31] - 68:22, 70:8, 70:25, 71:20, 72:17, 76:22, 76:23, 76:24, 76:25, 77:1, 77:2, 77:14, 79:4, 79:12, 79:18, 79:21, 80:1, 80:13, 81:24, 82:3, 82:9, 82:13, 82:14, 82:15, 82:16, 82:18, 82:19, 83:9, 84:9, 85:18
**rise** [6] - 7:7, 51:25, 52:2, 55:11, 64:10, 86:16
**risk** [4] - 12:7, 12:15, 13:12, 45:21
**RMR** [2] - 5:7, 87:14
**ROAD** [1] - 2:21
**Robert** [2] - 25:10, 25:13
**ROBERT** [4] - 1:9, 2:7, 2:7, 2:21
**ROGER** [1] - 3:12
**ROMINE** [1] - 3:11
**Ron** [1] - 35:10
**Ronald** [1] - 9:21
**RONALD** [1] - 3:22
**ROOM** [1] - 5:7
**root** [1] - 44:6
**rounded** [2] - 59:5, 59:12
**routinely** [2] - 46:12, 63:11
**Rule** [6] - 11:8, 66:1, 66:3, 66:23, 67:2, 74:23
**rule** [3] - 36:14, 69:22, 70:15
**ruled** [3] - 36:11, 61:3, 61:4
**ruling** [5] - 74:5, 75:15, 75:16, 84:12
**rulings** [3] - 61:11, 74:3, 74:4
**run** [2] - 34:21, 85:21
**running** [2] - 38:4,

42:19
**runoff** [3] - 28:16, 28:19, 29:14
**Ruth** [1] - 32:23

## S

**s/Cathy** [1] - 87:13
**salaries** [1] - 33:15
**sales** [1] - 38:21
**Saporito** [6] - 9:8, 10:3, 11:7, 19:20, 22:5, 53:20
**SAPORITO** [9] - 3:17, 11:6, 12:14, 13:21, 14:16, 15:10, 18:3, 18:5, 19:13
**SAPORITO................
.......................** [1] - 6:7
**Sarasota** [2] - 29:3, 50:21
**SARVER** [1] - 2:12
**satisfaction** [1] - 75:22
**satisfy** [1] - 63:23
**satisfying** [4] - 83:23
**save** [1] - 9:25
**saw** [2] - 45:8, 53:7
**scenario** [1] - 23:4
**schedule** [1] - 23:5
**scope** [3] - 19:24, 20:3, 77:3
**Scott** [1] - 11:12
**scribbled** [1] - 58:19
**search** [1] - 81:11
**seated** [2] - 7:8, 64:11
**second** [17] - 14:7, 14:13, 14:16, 18:23, 29:24, 45:2, 45:4, 45:17, 45:19, 46:7, 47:15, 58:23, 59:12, 61:18, 71:21
**secondary** [1] - 73:21
**secondly** [1] - 69:3
**secretary** [1] - 49:13
**Secretary** [8] - 15:8, 27:21, 27:25, 46:10, 52:9, 52:14, 53:8, 63:9
**SECTION** [1] - 1:6
**securities** [1] - 54:12
**security** [4] - 17:3, 17:6, 17:9, 17:10
**SEDRAN** [1] - 2:3
**see** [10] - 20:4, 38:15, 40:18, 41:15, 44:9, 44:13, 47:4, 50:11, 50:12, 63:2

**seek** [3] - 79:14, 80:17, 82:16
**seeking** [4] - 16:20, 79:17, 82:13, 82:17
**seeks** [1] - 66:4
**seem** [2] - 8:25, 71:9
**Seitz** [2] - 36:12, 83:5
**select** [1] - 12:17
**sell** [9] - 23:2, 27:18, 46:1, 53:1, 54:7, 55:21, 55:22, 55:23, 63:8
**selling** [1] - 76:15
**sells** [4] - 45:25, 54:3, 54:8, 57:3
**send** [1] - 40:14
**senior** [2] - 11:13, 11:15
**sense** [3] - 23:21, 32:9, 71:17
**sent** [2] - 16:16, 16:18
**sentence** [1] - 56:14
**separate** [12] - 24:6, 31:2, 31:13, 31:14, 31:15, 34:21, 48:16, 49:1, 50:5, 74:3, 74:4, 77:14
**separately** [2] - 26:6, 34:21
**series** [1] - 64:12
**SERRANO** [1] - 4:23
**Serrano** [1] - 9:13
**serve** [4] - 53:8, 69:22, 70:11, 70:15
**served** [1] - 26:16
**service** [5] - 12:6, 46:11, 52:14, 63:3, 63:10
**services** [4] - 31:5, 51:3
**Services** [8] - 31:3, 31:11, 32:8, 34:4, 49:24, 50:4, 51:2
**set** [8] - 23:24, 43:23, 48:18, 54:2, 54:3, 54:5, 65:1, 65:16
**sets** [4] - 24:2, 41:8, 43:21, 46:20
**seven** [1] - 37:22
**several** [3] - 60:6, 62:10, 85:10
**share** [6] - 21:3, 32:7, 32:11, 49:12, 49:13, 49:17, 50:6, 58:4
**shared** [1] - 49:8
**sharp** [1] - 81:9
**sheet** [2] - 22:19, 56:20
**shifts** [1] - 57:13
**short** [1] - 54:5

**show** [6] - 33:12, 34:15, 34:25, 35:24, 57:13, 57:18
**showing** [4] - 57:7, 57:9, 57:17, 62:14
**shown** [1] - 29:20
**shows** [1] - 33:3
**side** [3] - 19:2, 76:11
**significance** [1] - 63:22
**significant** [4] - 39:21, 42:2, 82:25, 85:10
**similar** [3] - 21:13, 21:19, 72:20
**similarly** [2] - 63:6, 78:15
**simple** [2] - 25:17, 85:3
**simply** [7] - 16:21, 22:24, 23:21, 25:4, 33:13, 56:20, 75:20
**single** [13] - 27:16, 32:11, 32:13, 34:7, 41:10, 49:7, 49:14, 49:25, 50:1, 50:2, 80:15
**sister** [1] - 33:9
**site** [4] - 49:20, 50:19, 52:20
**sites** [2] - 50:17, 52:18
**situation** [7] - 16:22, 24:13, 26:14, 41:9, 60:3, 72:20, 85:21
**six** [3] - 16:14, 17:1, 81:14
**slightly** [1] - 8:18
**slow** [1] - 65:2
**small** [1] - 72:1
**SMI** [2] - 80:20, 84:4
**Smirch** [1] - 42:4
**Smith** [1] - 81:2
**sold** [22] - 46:13, 47:13, 54:22, 63:14, 72:17, 73:5, 76:12, 76:13, 76:14, 76:19, 77:13, 77:21, 78:1, 78:4, 78:5, 78:7, 78:8, 78:16, 78:19, 79:22, 83:17
**sole** [1] - 46:4
**solicit** [3] - 12:2, 22:25, 34:25
**sometimes** [1] - 75:13
**somewhere** [2] - 19:6, 72:7
**soon** [1] - 45:7
**sort** [9] - 14:9, 21:5, 25:24, 29:7, 29:8, 44:13, 65:12, 73:22, 82:21

**SOUTH** [1] - 3:12
**Southern** [1] - 83:6
**spawn** [1] - 73:2
**SPEAKERS** [1] - 6:3
**speaking** [1] - 21:10
**Speciality** [1] - 77:21
**Specialty** [1] - 8:7
**SPECIALTY** [4] - 1:13, 3:3, 3:6, 4:3
**specific** [11] - 13:14, 13:17, 19:22, 21:8, 35:13, 37:7, 37:8, 38:8, 45:21, 62:21, 62:22
**specifically** [3] - 15:16, 15:17, 44:23
**speculate** [1] - 83:14
**speed** [2] - 10:3, 65:1
**splinter** [1] - 85:2
**splintering** [1] - 85:6
**SPRINGS** [1] - 4:20
**SQUARE** [1] - 4:19
**SS** [1] - 52:19
**staff** [1] - 51:2
**STAFFORD** [1] - 4:5
**stage** [1] - 63:23
**stand** [3] - 39:20, 54:13, 86:15
**standalone** [2] - 39:9, 61:20
**standard** [6] - 19:21, 23:15, 25:1, 32:4, 66:23
**standing** [1] - 86:1
**standpoint** [9] - 25:23, 26:18, 29:23, 30:7, 30:18, 31:4, 32:6, 32:7, 39:17
**start** [4] - 22:21, 25:17, 32:5, 42:22
**starting** [4] - 31:19, 68:1, 68:3, 73:1
**state** [31] - 12:21, 12:24, 13:1, 13:2, 13:3, 13:4, 13:6, 13:8, 13:13, 15:16, 15:17, 16:3, 16:15, 17:2, 18:19, 21:20, 22:1, 24:18, 44:8, 44:19, 47:22, 47:23, 47:25, 48:2, 48:8, 56:8, 56:24, 57:4, 65:21
**State** [48] - 11:10, 11:11, 11:24, 11:25, 12:1, 12:2, 12:4, 12:5, 12:9, 14:1, 14:19, 15:9, 16:21, 17:11, 17:17, 17:23, 18:3, 18:7, 18:8,

18:21, 20:22, 27:1, 27:21, 27:25, 29:21, 35:20, 40:25, 46:11, 46:19, 52:5, 52:9, 52:14, 52:21, 53:8, 55:10, 60:9, 63:9, 71:18, 73:3, 73:8, 74:5, 74:25, 75:3, 78:3, 85:4, 86:6, 87:5
**STATE/FEDERAL** [1] - 5:3
**statement** [2] - 49:21, 58:20, 61:7
**STATES** [2] - 1:1, 1:19
**States** [4] - 38:24, 60:1, 87:6, 87:16
**states** [6] - 41:17, 41:18, 74:15, 74:16, 74:18, 79:2
**status** [3] - 36:22, 36:24, 45:13
**statutory** [1] - 49:20
**stay** [4] - 45:10, 58:14, 61:2, 61:5
**stayed** [2] - 45:12, 45:13
**Steadfast** [1] - 77:18
**Steel** [1] - 80:20
**Steering** [4] - 7:15, 7:17, 7:19, 59:20
**STEERING** [2] - 1:23, 2:11
**STENOGRAPHY** [1] - 5:9
**step** [1] - 23:13
**Stephen** [2] - 81:17, 82:4
**STETSON** [1] - 3:7
**STILES** [1] - 4:9
**still** [10] - 28:13, 29:12, 40:20, 40:21, 40:22, 45:11, 45:13, 51:16, 51:18, 77:8
**stipulated** [2] - 8:4, 8:5
**stock** [4] - 17:7, 33:4, 33:5, 48:22
**stolen** [1] - 23:7
**stopped** [1] - 29:17
**strategic** [1] - 73:10
**STREET** [11] - 2:4, 2:13, 2:17, 3:7, 3:12, 3:18, 4:6, 4:10, 4:15, 5:4, 5:7
**Street** [2] - 21:2, 55:3
**strength** [1] - 50:12
**strewn** [2] - 74:12, 74:17
**stronger** [1] - 39:2

structure [1] - 41:21
structured [1] - 49:23
sub [1] - 79:23
subcontractor [8] -
66:20, 76:24, 76:25,
77:23, 78:11, 78:12,
79:5, 79:23
subcontractors [55] -
64:19, 65:10, 65:14,
66:7, 66:12, 66:20,
66:24, 67:6, 67:10,
67:12, 67:14, 67:25,
68:3, 68:12, 69:12,
69:14, 70:1, 70:5,
70:7, 70:25, 71:11,
71:25, 72:1, 76:16,
76:19, 76:21, 77:6,
77:13, 78:3, 79:10,
80:4, 80:10, 80:12,
80:13, 80:16, 81:8,
81:10, 81:13, 81:15,
81:22, 81:24, 82:3,
84:2, 84:9, 85:13,
85:16, 85:17, 86:3,
86:5
subcontractors' [8] -
68:11, 68:16, 69:10,
76:23, 79:18, 81:20,
82:1, 82:15
subcontracts [1] -
68:3
subdivisions [1] -
10:12
subject [9] - 12:16,
43:2, 43:3, 55:15,
57:5, 73:25, 74:6,
85:8, 86:4
submit [1] - 57:16,
66:23, 82:19
submitted [6] - 16:8,
20:9, 46:11, 51:16,
63:10, 81:10
submitting [2] - 46:12,
63:11
subrogation [1] - 16:5
subs [2] - 64:16, 69:9
subsidiaries [4] -
21:9, 21:10, 21:20,
24:4
subsidiary [9] - 24:1,
30:15, 30:16, 33:15,
34:1, 34:11, 38:17,
48:22, 77:19
subsidiary's [1] -
32:17
substantial [13] -
13:25, 17:17, 17:22,
18:20, 22:10, 25:1,
25:3, 25:16, 28:20,
57:15, 57:19, 68:19,
69:14

substantive [2] -
56:18, 61:11
substitute [2] - 39:2,
79:3
sudden [1] - 39:13
sue [2] - 40:20, 64:19
sued [6] - 13:8, 15:13,
44:8, 48:6, 64:18,
82:7
sufficient [8] - 18:11,
18:20, 18:24, 25:25,
26:8, 30:3, 44:3,
55:7
suggest [6] - 9:10,
17:22, 24:5, 34:17,
42:23, 46:7
suggested [1] - 49:10
suggesting [1] - 50:19
suggestion [1] - 56:3
suggestions [1] - 8:16
suggests [2] - 56:24,
84:4
suing [1] - 81:22
suit [2] - 26:15, 67:12
SUITE [10] - 2:4, 2:14,
2:22, 3:8, 3:19, 3:23,
4:15, 4:20, 4:24, 5:4
summarily [1] - 65:19
summarize [1] - 46:18
supplemental [3] -
54:2, 54:6, 79:11
supplemented [1] -
37:18
support [3] - 21:16,
34:6, 64:3
supported [1] - 33:2
supposed [1] - 41:21
Supreme [2] - 30:10,
38:24, 70:13
surety [1] - 63:17
surprised [1] - 17:3
suspect [1] - 74:16
SWABACKER [1] -
4:10
Swedberg [1] - 82:4
sweep [4] - 69:8,
69:21, 70:2, 73:18
Sweet [2] - 81:17, 82:4
system [1] - 50:6
system's [1] - 58:4
systematic [10] -
13:25, 17:16, 17:22,
18:20, 22:11, 23:9,
25:2, 26:19, 40:23,
52:5
systems [1] - 50:5

## T

tails [1] - 29:18
talks [2] - 27:4, 27:5
tax [4] - 21:4, 31:22,
50:7, 59:11
taxable [1] - 53:3
taxes [5] - 28:6, 46:15,
47:22, 53:3, 63:16
Telecoms [1] - 41:5
ten [2] - 64:5, 77:10
ten-minute [1] - 64:5
Tennessee [2] - 24:14,
56:11
tens [1] - 72:2
tenth [1] - 12:17
term [1] - 20:23
terminated [2] - 28:10,
28:15
terms [15] - 19:21,
36:5, 37:11, 40:20,
40:24, 41:6, 41:7,
46:22, 46:24, 48:4,
51:20, 55:3, 77:3,
84:11
test [6] - 18:24, 19:1,
23:9, 48:5, 80:14
testified [1] - 54:19
testimony [8] - 11:18,
13:7, 15:11, 17:20,
54:13, 56:3, 56:5,
56:20
Texas [9] - 18:2, 18:3,
18:7, 18:9, 18:11,
35:20, 38:15, 38:19,
38:21
THE [85] - 1:10, 1:18,
1:23, 2:8, 2:11, 5:3,
6:5, 6:14, 6:16, 6:21,
7:7, 7:8, 7:11, 7:12,
7:21, 8:20, 8:24, 9:6,
9:12, 9:20, 10:1,
10:17, 11:3, 11:5,
12:10, 13:19, 14:10,
15:8, 18:2, 18:4,
19:12, 19:14, 19:17,
21:1, 21:11, 22:13,
22:17, 25:8, 25:11,
27:18, 27:21, 27:24,
28:6, 29:15, 31:21,
35:7, 39:7, 39:16,
40:10, 43:8, 43:12,
43:18, 43:25, 44:9,
44:16, 44:20, 44:24,
46:10, 47:3, 48:14,
53:15, 54:24, 58:15,
61:13, 62:8, 62:17,
64:10, 64:11, 65:5,
65:21, 65:24, 67:1,

67:11, 67:17, 67:22,
68:23, 74:8, 74:10,
75:2, 75:12, 81:7,
84:21, 86:9, 86:13,
86:16
themselves [7] -
23:10, 24:18, 44:18,
48:7, 55:15, 68:4,
68:17
theoretically [3] -
40:12, 40:13, 40:15
theory [2] - 30:13,
67:1
thereafter [1] - 36:2
therefore [4] - 14:12,
22:9, 68:10, 83:25
they've [8] - 27:8,
46:13, 46:14, 55:6,
63:15, 69:5, 69:6,
72:12
third [4] - 25:9, 47:16,
62:25, 75:16
THIS [1] - 1:8
three [16] - 10:11,
15:25, 16:15, 17:1,
26:24, 31:6, 36:10,
37:10, 37:21, 38:5,
39:21, 47:17, 47:19,
54:3, 59:20
throughout [2] -
74:12, 74:17
thrust [2] - 14:10,
48:14
timely [1] - 7:24
title [1] - 49:9
TO [2] - 1:8, 7:4
today [5] - 8:2, 14:4,
62:10, 65:1, 65:2
together [1] - 71:19
took [1] - 83:1
top [2] - 22:21, 58:20
total [1] - 37:20
totality [1] - 38:6
totalling [3] - 21:14,
53:18, 55:5
towards [1] - 46:8
TOWER [1] - 2:13
traditional [2] - 57:15,
57:18
transcript [1] - 87:8
TRANSCRIPT [2] -
1:18, 5:9
transcription [1] -
56:19
transcripts [1] - 56:18
transfer [5] - 33:19,
33:22, 36:1, 39:23,
45:10
transferee [2] - 39:11,
74:19

transferred [10] -
10:18, 10:23, 36:7,
40:1, 51:11, 61:5,
61:21, 61:24, 61:25,
71:18
transportation [1] -
57:25
travel [3] - 55:24,
57:23, 58:1
traveled [1] - 38:18
traveling [4] - 21:21,
23:5, 23:7, 54:22
treasurer [1] - 49:14
treated [1] - 22:9
tremendous [2] -
52:17, 78:22
trial [3] - 40:15, 40:16,
62:4
trials [2] - 61:13,
61:14
tried [1] - 28:25
trimester [1] - 43:16
true [6] - 13:19, 13:21,
14:19, 58:25, 62:16,
87:7
trust [9] - 71:15,
76:13, 79:15, 83:11,
83:12, 83:23, 84:3
TRUST [1] - 1:10
Trust [69] - 10:10,
13:21, 19:5, 25:25,
26:2, 26:7, 26:18,
26:21, 26:22, 26:25,
27:6, 27:14, 27:15,
27:18, 28:3, 28:21,
29:10, 29:11, 29:16,
29:25, 30:2, 30:3,
30:14, 30:18, 31:8,
31:11, 31:17, 32:13,
32:15, 33:1, 33:4,
33:8, 33:17, 34:3,
34:7, 34:12, 34:15,
35:6, 48:15, 48:16,
48:24, 49:4, 49:16,
50:2, 50:12, 50:15,
51:5, 51:8, 51:14,
51:16, 51:18, 52:4,
52:5, 52:8, 52:13,
52:23, 52:25, 53:1,
53:2, 53:3, 53:5,
53:7, 53:10, 53:12,
53:14, 58:24, 59:13,
79:21
trust's [1] - 77:1
Trust's [1] - 51:10
trustee [3] - 10:9,
19:5, 49:16
TRUSTEE [1] - 1:9
trustees [1] - 49:15
try [10] - 29:8, 37:12,

39:9, 40:17, 45:16, 50:11, 69:8, 69:10, 69:17, 84:5
**trying** [13] - 16:5, 30:16, 30:22, 31:10, 31:12, 31:13, 32:7, 32:10, 33:7, 33:8, 33:12, 73:15, 85:13
**Turan** [1] - 17:13
**turn** [5] - 10:2, 10:15, 22:11, 29:24, 71:24
**turning** [1] - 24:9
**TV** [1] - 12:3
**two** [20] - 14:6, 16:3, 16:8, 26:6, 27:15, 28:21, 29:6, 30:2, 30:19, 31:7, 34:13, 41:6, 45:15, 47:5, 47:6, 47:7, 53:9, 53:15, 65:10, 76:9
**twofold** [2] - 14:11, 25:24
**TX** [1] - 4:16
**type** [2] - 17:21, 30:15
**types** [2] - 31:15, 76:9

# U

**U.S** [2] - 30:10
**uncontroverted** [1] - 62:16
**under** [36] - 10:18, 11:9, 13:21, 21:14, 26:5, 42:22, 49:9, 51:13, 64:13, 64:24, 66:1, 66:5, 66:6, 66:9, 66:16, 66:19, 66:21, 66:23, 68:2, 68:11, 70:8, 72:17, 73:15, 76:17, 76:24, 79:16, 79:18, 79:21, 79:24, 80:21, 81:24, 82:16, 82:20, 83:9, 85:18
**underlying** [4] - 37:3, 43:3, 58:12, 60:23
**understandably** [1] - 81:12
**understatement** [1] - 49:11
**understood** [1] - 61:7
**underwrite** [1] - 57:4
**underwriting** [2] - 31:4, 51:3
**undocumented** [2] - 33:19, 33:22
**unearthed** [1] - 21:13
**UNION** [2] - 3:4, 4:13
**Union** [3] - 65:7,

77:17, 79:22
**unique** [1] - 71:16
**United** [7] - 36:23, 38:24, 60:1, 78:12, 82:6, 87:6, 87:16
**UNITED** [2] - 1:1, 1:19
**Universal** [1] - 17:14
**unless** [2] - 9:6, 86:8
**unlike** [6] - 21:1, 36:17, 47:20, 51:22, 51:23
**unreasonable** [3] - 57:14, 57:18
**unrebutted** [1] - 60:20
**unrelated** [1] - 27:1
**up** [16] - 8:18, 9:8, 17:19, 17:20, 27:8, 42:19, 43:18, 43:19, 46:17, 49:7, 59:1, 60:16, 60:22, 62:4, 65:2, 86:7
**USDIN** [1] - 2:11
**uses** [3] - 34:3, 34:7, 54:15

# V

**vacating** [1] - 36:1
**Vanessa** [1] - 9:13
**VANESSA** [1] - 4:23
**various** [4] - 31:5, 58:9, 63:15, 71:25
**vary** [1] - 15:5
**vehicle** [2] - 21:19, 84:14
**vehicles** [1] - 24:11
**venture** [1] - 32:4
**versa** [1] - 74:8
**versions** [1] - 47:8
**versus** [10] - 8:7, 8:8, 8:9, 17:25, 18:16, 30:9, 30:18, 41:5, 56:15, 76:10
**vice** [3] - 37:15, 49:13, 74:8
**vice-president** [2] - 37:15, 49:13
**view** [2] - 18:12, 61:25
**viewing** [1] - 84:12
**views** [2] - 64:4, 74:13
**violate** [3] - 40:24, 42:11, 42:12
**visits** [1] - 60:2
**VONDERHAAR** [1] - 3:17

# W

**wait** [1] - 86:3
**wall** [1] - 52:1
**WALNUT** [1] - 2:4
**WALSH** [1] - 3:6
**warehouse** [1] - 16:25
**waste** [1] - 84:17
**wasteful** [2] - 58:7, 58:10
**WCI** [16] - 13:21, 19:5, 65:9, 72:3, 76:12, 76:13, 77:13, 77:17, 77:22, 79:5, 79:6, 79:15, 79:21, 83:17, 83:19, 83:24
**WCI's** [1] - 76:25
**web** [6] - 49:20, 50:17, 50:19, 52:18, 52:20
**WEDNESDAY** [2] - 1:7, 7:2
**weeks** [1] - 53:9
**West** [1] - 72:22
**Western** [1] - 56:16
**whereas** [1] - 73:25
**WHEREUPON** [2] - 64:8, 86:17
**whichever** [1] - 43:18
**whipsawed** [1] - 45:15
**whole** [5] - 15:15, 15:20, 18:6, 23:15, 31:19
**wholly** [1] - 38:17
**WILLIAMS** [1] - 3:6
**Willis'** [1] - 32:23
**withdraw** [1] - 26:25
**witness** [1] - 56:21
**witnesses** [2] - 41:25, 46:25
**WORCESTER** [1] - 2:18
**word** [1] - 28:16
**wording** [1] - 58:22
**Workers'** [10] - 25:22, 26:23, 27:3, 28:3, 28:13, 31:18, 53:5, 59:9, 59:10
**Workmen's** [1] - 28:6
**works** [2] - 58:21, 75:24
**worthy** [1] - 80:15
**wrecks** [1] - 27:9
**write** [13] - 11:23, 11:24, 20:19, 21:20, 23:19, 25:19, 25:20, 26:24, 27:2, 28:3, 52:21, 64:1
**writing** [2] - 24:17, 31:16, 31:17

**written** [1] - 20:15
**wrote** [9] - 26:22, 27:2, 27:13, 52:23, 52:25, 58:24, 59:10, 59:13, 59:15
**WW** [1] - 52:12

# Y

**year** [11] - 16:11, 17:1, 26:16, 28:18, 38:11, 38:13, 45:4, 51:17, 53:19, 72:3, 72:15
**years** [12] - 16:4, 16:8, 22:15, 22:16, 26:9, 26:24, 27:15, 37:19, 41:4, 53:19, 55:5, 55:14
**YORK** [1] - 2:9
**York** [1] - 83:3
**yourself** [2] - 16:7, 57:5

# Z

**zero** [3] - 58:25, 59:15
**Zurich** [1] - 77:19