# EXHIBIT

## "A"

## THE ANTILLES

### PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into as of this 12 day of February , 2005, by and between ANTILLES VERO BEACH, LLC, a Florida limited liability company ("Seller"), and the buyer or buyers listed below who have signed this Agreement ("Buyer").

Buyer: _____ Edward M. Tighe _____

Address: _____ 608 NE 13th Ave. _____

City: _____ Ft. Lauderdale _____ State: _____ FL _____ Zip Code: _____ 33304 _____

E-Mail: _____ etighe913@aol.com     smiller100@aol.com _____

Home Tel: _____ 954 463 6601 Office: _____ Fax: 954 463 6625

Social Security Number(s): E. CEll (954 684 0311) Sandra 954 815 4246

Estimated Closing Date (See Section 10 herein): _____ 3/1/2006 _____

IN CONSIDERATION of the respective agreements hereinafter set forth, Buyer and Seller agree as follows:

1.     **PURCHASE AND SALE.** Buyer agrees to purchase from Seller, and Seller agrees to sell to Buyer, for the Total Purchase Price set forth below, and on the terms and conditions contained in this Agreement, Lot _176_ ("Lot") as shown on the proposed Site Plan of The Antilles Subdivision ("Site Plan"), together with the single-family home ("Home") to be constructed on the Lot, which shall be substantially similar to the floor plans ("Floor Plans") represented by the **Antigua:_____ Bermuda:_____ Cayman:_____ Martinique:_XXX_ Nevis:_____** Floor Plans (check one), and the elevation scheme ("Elevations"): _B_ (check A, B, or C), with a garage-to-street orientation ("Street Orientation") _Left_ (check Right or Left), and the related construction specifications ("Construction Specifications") for that Home. The Site Plan, Floor Plans and Elevations, and Construction Specifications are attached hereto as **Exhibit "A", Exhibit "B", and Exhibit "C"**, respectively, and made a part hereof. The Lot and Home are sometimes collectively referred to herein as the "**Property**"; however, the sale of the Lot and Home will be considered a single sale - the Home not being separate from the Lot. The Antilles development consists, generally, of 260 single-family homes, common areas and related improvements thereon ("**The Antilles**" and/or the "**Project**"). The Property address is: _____

2.     **PURCHASE PRICE**:

| | |
|---|---|
| Base Purchase Price: | $ 534,900.00 |
| Lot Premium, if any: | $ 30,000.00 |
| Upgrades, if any (see Upgrade Addendum): | $ n/a |
| Total Purchase Price: (exclusive of Closing Costs, prorations, and any Approved Upgrades and Approved Change Orders not included here): | $ 564,900.00 |

**TOTAL PURCHASE PRICE TO BE PAID AS FOLLOWS:**

| | |
|---|---|
| First Deposit: | $ 56,490.00 |
| Second Deposit (see Section 3 herein): | $ 56,490.00 |
| Upgrade Payment, if any (see Upgrade Addendum): | $ n/a |
| Balance of the Total Purchase Price (Due at Closing in local bank cashiers check or received wire transferred funds): | $ 451,920.00 |

1

Buyer Initials _____

THE ANTILLES

PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into as of this 12 day of February , 2005, by and between ANTILLES VERO BEACH, LLC, a Florida limited liability company ("Seller"), and the buyer or buyers listed below who have signed this Agreement ("Buyer").

Buyer: _____ Edward M. Tighe _____

Address: _____ 608 NE 13th Ave. _____

City: ___ Ft. Lauderdale ___   State: ___ FL ___   Zip Code: __33304__

E-Mail: _____ etighe913@aol.com   smiller100@aol.com _____

Home Tel: ___ 954 463 6601 Office: _____ Fax: 954 463 6625

E. CEll (954 684)0311) Sandra 954 815 4246
Social Security Number(s): _____

Estimated Closing Date (See Section 10 herein): 3/1/2006

IN CONSIDERATION of the respective agreements hereinafter set forth, Buyer and Seller agree as follows:

1.   **PURCHASE AND SALE.**   Buyer agrees to purchase from Seller, and Seller agrees to sell to Buyer, for the Total Purchase Price set forth below, and on the terms and conditions contained in this Agreement, Lot _176_ ("**Lot**"), as shown on the proposed Site Plan of The Antilles Subdivision ("**Site Plan**"), together with the single-family home ("**Home**") to be constructed on the Lot, which shall be substantially similar to the floor plans ("**Floor Plans**") represented by the **Antigua:**_____ **Bermuda:**_____ **Cayman:**_____ **Martinique:** _XXX_ **Nevis:** _____ Floor Plans (check one), and the elevation scheme ("**Elevations**"): __B__ (check A, B, or C), with a garage-to-street orientation ("**Street Orientation**") __Left__ (check Right or Left), and the related construction specifications ("**Construction Specifications**") for that Home. The Site Plan, Floor Plans and Elevations, and Construction Specifications are attached hereto as **Exhibit "A"**, **Exhibit "B"**, and **Exhibit "C"**, respectively, and made a part hereof. The Lot and Home are sometimes collectively referred to herein as the "**Property**"; however, the sale of the Lot and Home will be considered a single sale - the Home not being separate from the Lot. The Antilles development consists, generally, of 260 single-family homes, common areas and related improvements thereon ("**The Antilles**" and/or the "**Project**"). The Property address is: _____

2.   **PURCHASE PRICE:**

| | | |
|---|---|---|
| Base Purchase Price: | $ | 534,900.00 |
| Lot Premium, if any: | $ | 30,000.00 |
| Upgrades, if any (see Upgrade Addendum): | $ | n/a |
| Total Purchase Price: (exclusive of Closing Costs, prorations, and any Approved Upgrades and Approved Change Orders not included here): | $ | 564,900.00 |

**TOTAL PURCHASE PRICE TO BE PAID AS FOLLOWS:**

| | | |
|---|---|---|
| First Deposit: | $ | 56,490.00 |
| Second Deposit (see Section 3 herein): | $ | 56,490.00 |
| Upgrade Payment, if any (see Upgrade Addendum): | $ | n/a |
| Balance of the Total Purchase Price (Due at Closing in local bank cashiers check or received wire transferred funds): | $ | 451,920.00 |

1

Buyer Initials _____

3.     **DEPOSIT**.  The First Deposit is due upon Buyer's execution of this Agreement.  The Second Deposit is du within sixty (60) days of the Effective Date.  The First Deposit and Second Deposit are collectively referred to herein ; the "**Deposit.**"  The laws of the State of Florida provide: THE BUYER OF A ONE FAMILY OR TWO-FAMIL RESIDENTIAL DWELLING PROPERTY HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 1 PERCENT (10%) OF THE PURCHASE PRICE) DEPOSITED IN AN INTEREST-BEARING ESCRO\ ACCOUNT. THIS RIGHT MAY BE WAIVED IN WRITING BY THE BUYER.

**BUYER TO INITIAL ONE OF THE FOLLOWING PARAGRAPHS.**

A. _____      Buyer requires all Deposits, up to Ten Percent (10%) of the Total Purchase Price, to be held i escrow by Colonial Bank (the "Escrow Agent").  The Escrow Agent shall hold the Deposit subject to the terms of thi Agreement, and the Deposit Escrow Agreement between Seller and Escrow Agent, a copy of which is available at Seller' office.   The Deposit will be placed in an interest-bearing account, and all interest earned on Buyer's Deposit shall accru to the benefit of Seller, and shall not be credited against the Purchase Price of the Property.  Pursuant to Florida law, Selle may borrow money in an amount equal to the funds held in escrow for construction purposes only, and, at Closing, Buye will be liable to Seller for any interest Seller pays on any such loan for a period not to exceed twelve (12) months, but i such event Buyer will be credited for any interest earned on the escrow account.  In any event, Seller is not required t place any Deposits in excess of Ten Percent (10%) of the Total Purchase Price in escrow.

B. _____      Buyer waives the right to have up to Ten Percent (10%) of the Total Purchase Price held i escrow, whereupon the Deposit will be paid to Seller or Seller's construction lender, and Buyer will not be liable to Selle for any of the interest charges referred to in Section 3.A. above.

4.     **MORTGAGE FINANCING.**

**BUYER TO INITIAL ONE OF THE FOLLOWING PARAGRAPHS:**

**Option A – No Financing Contingency**.  Buyer understands and agrees that this Agreement and Buyer': obligations under this Agreement to purchase the Property are not contingent, in any way, upon Buyer obtaining a mortgage loan from any lender or any conditions imposed by any such lender. Buyer will be solely responsible for making his/her own financial arrangements for the purchase of the Property. If Buyer does arrange for a mortgage loan, Selle agrees to reasonably cooperate with any lender and to coordinate the Closing with such lender, provided such lende meets Seller's Closing schedule and pays Seller the proceeds of its mortgage loan at Closing.

Although Seller is not obligated to do so, if Seller agrees to delay Closing until Buyer's lender is ready to fund the proceeds of its mortgage loan, or to wait for funding from Buyer's lender until after Closing, Buyer agrees to pay a late funding charge equal to interest, at the then highest lawful interest rate on all funds due, which have not then been paid, from the date Seller originally scheduled the Closing to the date of actual payment to Seller of all Closing proceeds and final clearance of funds.

_____ **Option B - Financing Contingency**.  Buyer will apply, in good faith and at Buyer's expense, for a mortgage loan commitment within five (5) days after the Effective Date.  Buyer must use reasonable diligence to comply with all requirements, satisfy all conditions, and to pay any fees and expenses imposed by the mortgage lender.  Buyer will promptly execute all documents necessary in connection with the loan application and shall timely provide the mortgage lender with copies to Seller, all information and documents requested, which may include, without limitation, income tax returns, W-2 forms, pay stubs, divorce judgments, financial statements, and a list of creditors.  Buyer will notify Seller immediately, but in no event later than thirty (30) days after the Effective Date, upon receiving financing approval from the mortgage lender.  Buyer understands that if Seller does not receive written notice of Buyer's mortgage loan application being declined or delayed by the mortgage lender within thirty (30) days after the Effective Date ("**Loan Approval Period**"), Buyer acknowledges that Seller shall consider all mortgage financing contingencies stated herein fully satisfied, and Buyer's Deposit shall, at the end of the Loan Approval Period, be fully non-refundable, except as otherwise provided in this Agreement.  Buyer authorizes Seller to order or obtain a credit report from a credit-reporting agency or from any other source.  Buyer also authorizes Seller to contact Buyer's mortgage lender at any time regarding the status of the mortgage loan application, and further authorizes Buyer's mortgage lender to disclose to Seller all information regarding the status of Buyer's loan application.  If approval of Buyer's loan application is declined or delayed by the mortgage lender, and Seller receives notice of such decline or delay prior to the end of the Loan Approval Period, Seller, at its option, may terminate this Agreement or, alternatively, may require Buyer to submit an application to obtain mortgage financing through an alternate lender designated by Seller.  If Seller elects to terminate this Agreement, then Seller will return the Deposit to Buyer (less any expenses incurred by Seller) upon Buyer's executing a form of cancellation and release of this Agreement provided by Seller.  If Seller requires Buyer to submit a loan application to an alternate lender, Buyer will diligently seek to obtain financing from the alternate lender in the same manner as provided above for the initial loan application.  If the alternate lender rejects Buyer's loan application, then this Agreement shall automatically terminate, and Seller shall return the Deposit, or shall cause the return of the Deposit by Escrow Agent, as the case may be, to Buyer upon Buyer's execution of a form of cancellation and release of this Agreement provided by Seller.  The provisions of this Section 4 will survive (continue to be effective after) Closing.

Buyer Initials _____

5.    **SELLER'S FINANCING.** Buyer understands that Seller has obtained, or will obtain, acquisition, construction and other financing with respect to the Project. Buyer agrees that this Agreement, and all modifications and additions thereto, will be subordinate in all respects to the lien and priority of any mortgage (and related security interests) now or hereafter placed on the Property securing such Seller's financing, including all loan renewals, future advances, extensions and modifications. The parties intend that this subordination shall be effective automatically without any further notice to or action by, Buyer. Buyer acknowledges that, as additional security for any of Seller's financing, Seller may assign all of its rights under this Agreement to its lender(s), including all rights Seller may have to Buyer's Deposit, subject to requirements of applicable laws.

6.    **CONSTRUCTION SPECIFICATIONS.** The Home will be constructed in substantial accordance with the plans and specifications retained in Seller's sales office, as such plans and specifications are amended from time to time. Such construction plans and specifications, as they are so amended from time to time by Seller, are referred to in this Agreement as the **"Construction Specifications"**, and are attached as Exhibit "D" hereto and made a part hereof. Although Seller will complete construction of the Property substantially in accordance with the Floor Plans, Elevations, and Construction Specifications, Buyer acknowledges that during the course of construction certain modifications, substitutions, deviations or omissions in and to the Property, Project, Floor Plans, Elevations, and Construction Specifications (collectively referred to herein as **"Construction Modifications"**) may occur due to governmental required changes, construction and field conditions, design changes, labor or product availability, and subcontractor scheduling. These changes and adjustments are essential in order to permit all components of the Property to be integrated into a well-functioning and aesthetically pleasing product in an expeditious and cost efficient manner. Accordingly, Seller expressly reserves the right to make Construction Modifications during construction of the Property, and Buyer hereby authorizes Seller to make any such Construction Modifications deemed necessary in Seller's sole discretion; provided, however, that any Construction Modifications shall not adversely affect the value, quality or appearance of the Property.

Buyer further understands and agrees that: (i) the color, pattern or texture of paint, stain, tile, wood flooring, wood species, carpeting, cabinetry, granite, marble, doors, trim, hardware, appliances, fixtures, and other interior and exterior finishes installed by Seller pursuant to the Construction Specifications, or as may be shown in any sales model or sales office or any promotional materials are subject to change by Seller and/or the manufacturer of all such products, and are subject to shadings in color gradations, die lots, etc., and may vary from any samples or illustrations shown to Buyer without prior notice to Buyer; (ii) the illustrations in any project renderings, marketing brochures, advertising materials, floor plans, and building elevations, etc., are not actual construction plans or construction specifications and are not binding on Seller, and all representations of dimensions, materials, equipment, and finishes are approximations of size, materials, equipment, appearances, and finish, and are all subject to change by Seller in its reasonable discretion without prior notice to Buyer; (iii) changes in the dimensions of rooms, patios and balconies, and the location of utility (including, without limitation, electrical, television and telephone) lead-ins and outlets, doors, windows, air conditioning equipment, ducts and components, lighting fixtures, electric panel boxes and meters, fencing and gates, and the general layout of the Home and any exterior improvements on the Lot are subject to change by Seller in its reasonable discretion without prior notice to Buyer; (iv) many items, finishes, materials, fixtures, equipment, furnishings, window treatments, accessories, upgrades, changes, and other improvements which may be displayed in any sales model or sales office, or in any marketing or promotional materials, are for display, design and marketing purposes only, and to the extent such items are not included in the Construction Specifications, such items are not included in the Property; (v) if circumstances arise which warrant changes of suppliers, manufacturers, brand names or other items, Seller may substitute materials, finishes, equipment, fixtures, appliances, etc., which are of substantially equivalent quality in Seller's sole opinion, without prior notice to Buyer; (vi) Seller will have complete discretion in landscaping of the Property and the Project; (vii) Seller will have complete discretion with all improvements and amenities situated within the Common Property (as defined in the Homeowner Documents); (viii) the plans and specifications for the Home now or hereafter on file with the applicable governmental authorities may not be identical in detail to the final Floor Plans and the Construction Specifications, and (viii) because of the day-to-day nature of the changes described in this Section 6, the plans and specifications on file with applicable governmental authorities may not include some or any of these changes (there being no legal requirement to file every change with such authorities). As a result of the foregoing, Buyer and Seller both acknowledge and agree: **THE HOME MAY NOT BE CONSTRUCTED IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS NOW OR HEREAFTER ON FILE WITH APPLICABLE GOVERNMENTAL AUTHORITIES. WITHOUT LIMITING THE GENERALITY OF SECTION 19 HEREIN, SELLER DISCLAIMS AND BUYER WAIVES ANY AND ALL EXPRESS OR IMPLIED WARRANTIES THAT CONSTRUCTION WILL BE ACCOMPLISHED IN COMPLIANCE WITH SUCH PLANS AND SPECIFICATIONS. SELLER HAS NOT GIVEN AND BUYER HAS NOT RELIED ON OR BARGAINED FOR ANY SUCH WARRANTIES.**

The provisions of this section 6 will survive (continue to be effective after) closing.

7.    **UPGRADES; CHANGE ORDERS. BUYER RECOGNIZES THAT SELLER IS NOT OBLIGATED TO PROVIDE UPGRADES, EXTRAS, OPTIONS, OR CHANGE ORDERS OF ANY KIND.** Seller has no obligation to advise Buyer regarding Seller's construction schedule or the timing of product selection, purchasing or installation, and Seller has no obligation to show Buyer product samples of the interior and exterior finishes set forth in the Construction Specifications. Upon specific request of Buyer, and to the extent reasonably possible, Seller shall make available to Buyer

3

Buyer Initials _____  _____

such available product samples and illustrations of the standard interior and exterior finishes, fixtures, equipment, and appliances to be installed on the Property pursuant to the Construction Specifications.

Buyer shall have thirty (30) days from the Effective Date, which may be extended from time-to-time in writing by Seller in Seller's sole discretion, to make any required finish selections and any Upgrades, as defined herein, for the Home ("**Selection Period**"). Buyer understands that in the event Buyer fails to provide Seller with any required finish selections within the Selection Period, Seller may complete the Property using such finish selections that Seller shall determine in its sole discretion, without prior notice to Buyer, provided such finishes are consistent with the Construction Specifications.

During the Selection Period, if applicable, Buyer may request product upgrades from Seller's list of standard upgrades ("**Upgrade List**") offered to Buyer at the time of execution of this Agreement ("**Upgrades**"). Seller may from time-to-time modify the Upgrade List in terms of items offered and prices for same, and until such time as there is an Approved Upgrade, as defined below, all prices charged for Upgrades are subject to change without prior notice. No Upgrades shall be implemented unless an approved Upgrade Addendum ("**Upgrade Addendum**") for any such Upgrades is signed by Buyer and Seller and full payment for such Upgrades, as specified in the Upgrade Addendum, is received by Seller ("**Approved Upgrade**"). There shall be no administrative fee charged to Buyer for an Approved Upgrade if the Upgrade Addendum has been fully executed and the Upgrade Payment has been paid in full within the Selection Period. Buyer will be charged an administrative fee of $200.00 for any Approved Upgrade for which the Upgrade Addendum has not been fully executed or for which the Upgrade Payment has not been paid in full before the expiration of the Selection Period.

If Buyer requests changes to the Construction Specifications that are not offered as either Construction Specifications or on the then current Upgrade List ("**Change Orders**"), Seller may, in its sole and absolute discretion, either: (i) accommodate Buyer's change order request in the manner provided below, or (ii) deny any or all of Buyer's Change Order requests, and Buyer will accept Seller's decision on all change order requests as final. Buyer further understands that in the event Buyer's Change Order request is denied by Seller, the Home will be completed substantially in conformity to the Construction Specifications, and any Approved Upgrades or Approved Change Orders, as defined herein. No Change Orders shall be implemented unless an approved Change Order Addendum ("**Change Order Addendum**") for any such Change Orders is signed by Buyer and Seller and full payment for such Change Orders, as specified in the Change Order Addendum, is received by Seller ("**Approved Change Order**"), together with a separate administrative fee of $300.00 charged to Buyer for each Approved Change Order ("**Change Order Fee**").

Buyer acknowledges and agrees that all payments made to Seller in connection with any Approved Upgrades and/or Approved Change Orders shall be not be considered as part of the Deposit, and any and all such payments are completely non-refundable in all respects; provided, however, if Seller shall fail to include any Approved Upgrade or Approved Change Order in the Property, Buyer's sole remedy and Seller's sole liability shall be to deduct the amount paid by Buyer for any such omitted Approved Upgrade or Approved Change Order from the Total Purchase Price, provided Buyer has paid Seller for same. Buyer further acknowledges and agrees that Seller's failure to include any Approved Upgrade or Approved Change Order, or any non-approved upgrade or non-approved change order request made by Buyer, on the Property or in the Home shall not be grounds for: (i) Buyer to delay or postpone the Closing, or Buyer's obligation to close and pay the balance of the Total Purchase Price to Seller, (ii) any reduction of or credit against the Total Purchase Price, or (iii) placing any portion of the Total Purchase Price in escrow.

8. **CONSTRUCTION OF THE PROPERTY.** Subject to other terms of this Agreement, Seller shall commence construction of the Property as soon as it is reasonably possible following the issuance of all required building permits, and shall proceed with reasonable diligence throughout the term of construction. Seller agrees that all construction shall utilize new materials (or equivalent quality) and that all such materials shall be in accordance with applicable governmental rules, regulations and building codes, and that all work shall be done in a good and workmanlike manner. Seller shall be responsible for all building permits, impact fees, water and sewer hook-up fees, excluding deposits for utility services which shall be reimbursed by Buyer at Closing.

9. **INSPECTION PRIOR TO CLOSING.** Prior to Closing, and upon notice to Buyer, Buyer shall be given a reasonable opportunity to inspect the Property with Seller's representative. At that time, Buyer shall present to Seller an inspection statement ("**Punch List**") signed by Buyer, setting forth any defects in workmanship or materials in the Property which are truly defects in workmanship and materials (the standards for which shall be the construction standards generally prevalent in Indian River County, Florida for similar property). Buyer understands and acknowledges that Buyer's setting forth any such perceived defects in workmanship or materials on an inspection statement does not obligate Seller to repair or warranty any such item(s). Those items on the inspection statement which are not equal to the then prevailing construction standards generally prevalent in Indian River County, Florida for similar property, and only those items that are not equal to such standards, as Seller shall determine in Seller's reasonable discretion, shall be considered by Seller as part of the Punch List for which Seller has an obligation for repair and warranty. Seller's failure to perform Seller's obligations hereunder shall not delay, postpone, or otherwise interfere with the Closing. Seller shall correct and/or complete all work required under the Punch List within sixty (60) days after Closing, at Seller's expense and in a workmanlike manner, subject to the availability of labor and materials, access to the Property after Closing, or

4

Buyer Initials _____ _____

events which constitute force majeure. Buyer hereby authorizes Seller to determine the means and methods for making any and all Punch List and warranty related repairs. Buyer further recognizes that although the Property, at Closing, will have received a final certificate of occupancy, Seller may still be in the process of completing certain improvements in the Home, on the Lot, and within the Project.

**NO ESCROWS OR HOLDBACKS OF CLOSING FUNDS WILL BE PERMITTED.** The fact that Seller has to complete work set forth in the Punch List after Closing shall not delay or postpone the Closing, or Buyer' obligation to close and pay the balance of the Total Purchase Price, or be grounds for a reduction of or credit against the Total Purchase Price, or be grounds for deferring or imposing any conditions on Closing, or be grounds for placing a portion of the Total Purchase Price in escrow pending completion of the Punch List items.

Buyer acknowledges that all matters pertaining to the initial construction of the Property and the Project will be handled by Seller and its representatives. Buyer agrees not to interfere with or interrupt any workers at the Property Buyer understands and agrees that for safety and insurance compliance reasons, and until after Closing and Buyer has taken possession of the Property, neither Buyer nor any invitee, agent, employee or contractor of Buyer shall be permitted to enter upon the Property or the Project without the prior approval of Seller or without being accompanied by Seller's representative, which must be pre-arranged with Seller prior to such entry. Accordingly, no personal inspections (other than Buyer's one pre-closing inspection) will be permitted unless arranged with Seller and made with a representative of Seller. Buyer agrees to indemnify, defend (with legal counsel of Seller's choice) and hold Seller harmless from any and all losses, liabilities, damages or costs (including attorneys fees and costs through all appellate levels) that may result from or arise in connection with any such inspection. Buyer may not order or allow any work to be performed on the Property until after Closing. The provisions of this Section 9 shall survive Closing.

10.   **CLOSING.** The term "Closing" refers to the time when Seller delivers the special warranty deed for the Property to Buyer and Buyer delivers to Seller the balance of the Total Purchase Price and any additional amounts owed by Buyer to Seller under this Agreement and for any Approved Upgrades and Approved Change Orders, as set forth herein, or therein, and ownership of Property is transferred from Seller to Buyer (the **"Closing"**). At Closing, the parties will execute and deliver all documents Seller's closing agent deems necessary or appropriate, and Buyer understands that until all sums have been received by Seller in cleared funds, Seller will be entitled to a vendor's lien on the Property. Buyer shall not move any personal property onto or take occupancy of the Property until a certificate of occupancy for the Property has been issued by the appropriate governmental agency, and Seller has received the Total Purchase Price in accordance with the terms of this Agreement. Legal and physical possession of the Property shall be delivered to Buyer at Closing.

Seller estimates that the Closing will occur on or about the date indicated on Page 1 of this Agreement (**"Estimated Closing Date"**). Buyer acknowledges and agrees, however, that this is an estimated date and is given to Buyer for convenience only and is subject to change from time to time for any reason, without prior notice to Buyer, and without creating any liability to Seller. Seller does, however, agree to substantially complete construction of the Property in the manner specified in this Agreement, by a date no later than twenty-four (24) months from the Effective Date, subject, however, to delays resulting from Seller's implementation of Approved Upgrades and Approved Change Orders, lack of timely decisions from Buyer regarding any required finish selections, acts of God, adverse weather conditions, unavailability of materials, strikes, other labor problems, governmental orders, local ordinances and restrictions, interference by Buyer or agents of Buyer with Seller, and any other similar events beyond Seller's reasonable control, which shall extend the Closing for a reasonable period.

Buyer understands that Seller has the right to schedule the date, time and place for the Closing (**"Closing Date"**); provided, however, that before the Closing Date, Seller must obtain a final certificate of occupancy for the Property. Buyer acknowledges that the common property and any improvements thereon need not be completed or have such certificates of occupancy prior to the Closing Date. Buyer will be given at least five (5) days' notice of the date, time and place of Closing. Seller is authorized to postpone the Closing for any reason and Buyer will close on the new date, time and place Seller specifies in its notice of postponement (as long as at least 2 days' notice of the new date, time and place are provided to Buyer). A change of time or place of Closing only (that is, one not involving a change of date) will not require any additional notice period. Any formal notice of Closing, and any postponement or rescheduling of the Closing may be given orally, by telephone, facsimile, electronic mail, regular mail or other reasonable means of communication at Seller's option. All such notices to Buyer shall be sent or directed to the address, facsimile, electronic mail address or telephone number (as appropriate), specified on Page 1 of this Agreement unless Seller has received written notice from Buyer of any address change prior to the date Seller's notice is sent, transmitted or given to Buyer. These notices (other than a change of address) will be effective on the date given, transmitted or mailed. An affidavit of one of Seller's employees or agents stating that this notice was given or mailed to Buyer will be conclusive in this regard.

If Buyer fails to receive any of these notices or the confirmation because Buyer failed to advise Seller of any change of address, telephone or facsimile number, or electronic mail address, or because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or because of any other reason, Buyer will not be relieved of Buyer's obligation to close on the scheduled date unless Seller agrees in writing to postpone the scheduled date. If Seller agrees in writing to reschedule the Closing at Buyer's request, or if Buyer is a corporation (or other business entity) and

5

Buyer Initials _____

Buyer fails to produce the necessary documents establishing proof of the organization, good standing and authorization c representatives, as requested by Seller, and, as a result, Closing is delayed, or if Closing is delayed for any other reaso (except for a delay desired, requested or caused by Seller), Buyer agrees to pay at Closing a late funding charge equal t interest, at the then highest applicable lawful rate, on that portion of the Total Purchase Price not then paid to Seller (an cleared), from the date Seller originally scheduled the Closing to the date of actual Closing. Additional late fundin charges also may be imposed as stated in this Agreement. All prorations will be made as of the originally scheduled date **BUYER UNDERSTANDS THAT SELLER IS NOT REQUIRED TO RESCHEDULE OR TO PERMIT A DELA IN CLOSING AND THAT IF BUYER FAILS TO TIMELY CLOSE AS REQUIRED BY THIS SECTION 10 BUYER WILL BE IN DEFAULT UNDER SECTION 16 OF THIS AGREEMENT.**

11.     **TITLE.**   At Closing, Buyer will receive good and marketable title to the Property, subject to the permitte exceptions listed below (**"Permitted Exceptions"**). At Closing, Buyer will receive the following documents, which Buyer agrees to accept as proof that title is as represented above:

A.   Title Commitment.   A written title commitment from a title insurance company licensed in Florida agreein to issue Buyer a title insurance policy for the Property (ALTA Owner's Policy with Florida modifications) (**"Title Policy"**). The title commitment will list the following Permitted Exceptions (exceptions subject to which Buyer agrees to take title to the Property):

1.      Real property taxes and assessments affecting the Property for the year of Closing, and subsequent years, including any applicable special assessment, community redevelopment or improvement districts;

2.      All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded in the public records, or otherwise established with respect to the Project, for example, zoning restrictions, property use limitations and obligations, easements, rights-of-way, plat restrictions and dedications, and agreements relating to utilities and conservation areas;

3.      The restrictions, covenants, conditions, easements, liens, terms and other provisions imposed by the documents contained or referred to in the Homeowner Documents, as defined herein, and any amendments thereto (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which will be recorded by Seller now or at any time after the date of this Agreement in the Public Records of Indian River County, Florida, and all amendments to any of such documents;

4.      Easements in favor of the Association, as defined herein, and public utility providers for general access over and across the Property and the Project, and for the installation, service, repair, and maintenance of all water retention areas, conservation areas, wetland areas, and improvements and utilities serving the Property and the Project;

5.      Minor encroachments, if any, into easement areas serving public utilities by Property-related improvements such as air conditioner pads and equipment, which are hereby deemed permitted;

6.      The mortgage, and any other security instruments, in favor of Buyer's lender, if any;

7.      Pending governmental liens for public improvements as of Closing (Seller will be responsible, however, for certified governmental liens for public improvements as of Closing, as provided herein); and

8.      All other standard title exceptions contained in an ALTA owner's title policy customarily issued in Indian River County, Florida for similarly situated properties, and all other title exceptions for items common to the subdivision; provided that no limitation on Buyer's title may prohibit construction of the Home, nor the use of it as a Home, subject to the Homeowner Documents.

B.   Closing Documents.   At Closing, Buyer will receive: (i) a special warranty deed to the Property which will be subject to (that is, contain exceptions for) all of the matters described above, (ii) Seller's form of owners (no-lien) affidavit, FIRPTA ("non-foreign") affidavit, and gap affidavit, (iii) Bill of Sale for any personal property contained in the Home, (iv) final as-built survey of the Property, (v) Soil treatment certificate, (vi) Insulation certificate, (vii) Certificate of Occupancy for the Property, and (viii) the Limited Warranty Registration (the title commitment, as aforesaid, and the documents listed in this Section 11.B. are collectively referred to herein as the **"Closing Documents"**).

If Buyer finds title not to be in the condition required by this Agreement, then within ten (10) days of receipt from Seller of the title commitment described above, Buyer shall notify Seller in writing of the specific nature of the claimed title defect and the specific actions needed to correct the alleged title defect, failing which any claimed title defect shown in the title commitment shall be deemed waived by Buyer. In the event Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (at least ninety

6

Buyer Initials _____ _____

(90) days after Buyer gives Seller written notice of an objection to title) to correct any defects in title, but Seller is not obligated to do so. If Seller cannot, or at any time elects not to, correct the claimed title defects, then within five (5) days of notice from Seller, Buyer shall elect to either (i) accept title in the condition Seller offers it (with any such defects) and pay the Total Purchase Price for the Property (without reduction or offset), and Buyer shall not make any claims against Seller because of the alleged defects which will also be excepted from the special warranty deed; or (ii) cancel this Agreement and receive a full refund of the Deposit, whereupon Seller will be relieved of all obligations under this Agreement upon delivery to Buyer of the Deposit. If Buyer does not give written notice of such election to Seller within said five (5) day period, Buyer will be deemed to have elected option (i) of the preceding sentence.

12.   **CLOSING COSTS**.  Buyer understands that, in addition to the Total Purchase Price (which shall include all Approved Upgrades and Change Orders), Buyer shall pay at Closing the following fees and costs (**"Closing Costs"**):

A.     A transfer charge equal to one and one-half percent (1.5 %) of the Total Purchase Price of the Property;

B.     The actual costs of: (i) officially recording the special warranty deed in the Public Records of Indian River County, Florida; (ii) the documentary stamp tax obligation (e.g., "transfer taxes") incurred in connection with the conveyance of the Property; (iii) title search fees, title examination fees, settlement fees, and closing administration fees; and (iv) the premium for the Title Policy.   Notwithstanding the forgoing, in the event Buyer elects to use Seller's designated closing agent for the Closing (which Buyer has no obligation to do), all of the foregoing costs listed in this Section 12.B. shall be paid by Seller at Closing.  In the event Buyer does not so designate, in writing, another closing agent at the time of execution of this Agreement, Buyer agrees that Seller shall designate its closing agent to complete the Closing.

C.     Buyer's prorated share of the quarterly maintenance assessment charged by the Association for the quarterly assessment period in which the Closing occurs; provided, however, if the Closing shall occur in the last month of any quarter, Buyer will be charged for the next quarter's assessment at Closing in addition to the aforementioned proration for the current quarter;

D.     Initial contribution to the Association, as defined herein, equal to two (2) times the regular monthly assessment for the Property due the Association as determined at the time of Closing. This contribution will not be credited against regular assessments;

E.     Reimbursement to Seller for the cost of providing Buyer with: (i) a final as-built survey of the Property, the cost of which shall not exceed $275, and (ii) a F.E.M.A. elevation certificate, if required, the cost of which shall not exceed $175;

F.     Reimbursement to Seller for any utility deposits or hook-up fees for the Property which Seller may have advanced prior to Closing;

G.     Reimbursement to Seller of Buyer's share (based on the number of homes within the Project that are insured under the Association's insurance policies), of the total prepaid insurance policies obtained by Seller on behalf of the Association; and

H.     Any unpaid charges for any Approved Upgrades and/or Approved Change Orders;

I.      Any late funding charges provided for elsewhere in this Agreement;

J.     All fees, costs, points, and charges imposed by Buyer's mortgage lender, if any, shall be paid by Buyer at Closing. Buyer acknowledges the Closing Costs referred to in Section 12.A. and 12.B. above do not include any mortgage loan closing costs of any kind, including, without limitation, the cost of title insurance required by Buyer's lender. In the event Buyer elects to use Seller's designated closing agent for the Closing, as aforesaid, Seller agrees to cause the closing agent to provide title insurance to Buyer's lender for the lowest amount permitted by law, and to coordinate the closing of Buyer's mortgage;

K.     Real property taxes will be prorated through the day before Closing on the current year's tax amount for the Property. If Closing occurs on a date when the current year's tax assessment is not available, taxes will be prorated on the prior year's tax, as allocated to the Property by Seller, and will be later adjusted by Buyer and Seller based on the exact amount of taxes, with allowance for the maximum applicable discount amount; and

L.     Certified Special Assessments as of the scheduled Closing Date shall be paid by Seller. Pending Special Assessments assessed by governmental agencies as of the scheduled Closing Date shall be assumed by Buyer. If any such Certified Special Assessments are payable in installments, the installment due in the year of Closing shall be prorated and Buyer shall assume the balance of any such installments.

Buyer Initials  _____

13.   **HOMEOWNERS' ASSOCIATION.**   Buyer acknowledges that (i) the Antilles Vero Beach Homeowners Association, Inc., a Florida corporation not-for-profit ("**Association**") has been established for the purpose of maintaining certain aspects of the Property and the Project.  Buyer understands that Seller, due to its present ownership of lots and properties comprising the Project, currently controls the Association and has the right to appoint officers and directors thereof in accordance with the following documents governing the Property: (i) the Articles of Incorporation of the Association ("**Articles**"), (ii) the By-Laws of the Association ("**By-Laws**"), and (iii) the Declaration of Covenants and Restrictions ("**Declaration**"), all as amended from time to time (the Articles, By-Laws and Declaration are collectively referred to herein as the "**Homeowner Documents**").  Buyer further acknowledges that upon Closing, Buyer shall automatically become a member of the Association and shall be required to comply with all of the terms and provisions of the Homeowner Documents, and Buyer further acknowledges that Buyer shall be liable for the payment of any and all regular and special maintenance assessments levied against the Property pursuant to the Declaration, and that Buyer's failure to pay any such assessments may result in acceleration and the filing of a lien against the Property by the Association to secure payment of such assessments and other charges, as more particularly described in the Declaration.

After Closing, and in accordance with the Declaration, Buyer shall be responsible for the maintenance of the Property. In the event Buyer fails to properly maintain the Property in accordance with the Declaration, the Association shall have the right, but not the obligation, to perform such maintenance required of Buyer pursuant to the Declaration, in which event Buyer shall pay all cost incurred by the Association, including all collection costs. The Association shall have the right to assess the Property for all maintenance costs incurred by the Association, and any such assessments shall be secured by the assessment lien referred to in the Declaration.

Buyer acknowledges receipt of the proposed Declaration, which Buyer agrees to adhere to and be bound by the terms thereof, and all changes and amendments thereto. Buyer acknowledges and agrees that Seller has reserved the right to modify any of the Homeowner Documents prior to Closing and that: (i) neither prior notice to Buyer nor Buyer's consent shall be required for any such modifications, and (ii) any such modifications will not affect Buyer's obligations under this Agreement; provided, however, any changes to the Homeowner Documents shall be reasonable and shall not materially and adversely alter the rights of Buyer.  The provisions of this Section 13 shall survive the Closing.

14.   **HOMEOWNER ASSOCIATION FEES.**   Buyer understands that any estimated operating budget provided to Buyer (the "**Budget**") provides only an estimate of what it will cost to run the Association during the period of time stated in the Budget. The Budget is not guaranteed to be an accurate prediction of the expenditures required of the Association, and, as such, are subject to change at any time and from time to time to reflect actual and projected expenditures or changes in assumptions. These changes may occur before or after Closing, but will not affect any of Buyer's obligations under this Agreement or the Homeowner Documents, except as to resulting changes in closing procedures.    Buyer recognizes and agrees that Buyer's assessments may include expenses attributable to common areas which are not complete or usable by Buyer at any given time.  The provisions of this Section 14 shall survive the Closing.

15.   **ADJUSTMENTS WITH THE ASSOCIATION.**   Buyer acknowledges that Seller may advance money to the Association, or on behalf of the Association, to pay for certain Association expenses, including, without limitation, insurance premiums, common area maintenance and repairs, utility charges and deposits, permit and license fees, charges for service and maintenance contracts, salaries of Association employees, and other similar expenses.  Seller is entitled to be reimbursed by the Association for all such sums advanced or paid by Seller on behalf of the Association. The Association will reimburse Seller out of initial contributions and regular assessments to be paid by Buyer and other Lot owners as those contributions and assessments are collected, or as otherwise requested by Seller.

16.   **DEFAULT.**   If Buyer fails, refuses or neglects to perform Buyer's obligations under this Agreement, including payment of the Deposit and any other payments required hereunder in a timely manner, Buyer shall be deemed in "default". If Buyer remains in default five (5) days after Seller sends notice of any such default, Seller shall be entitled to the remedies provided herein. If, however, Buyer's default is failing to close on the scheduled Closing Date, then Seller may cancel this Agreement without giving Buyer additional notification or opportunity to close at a later date. Upon Buyer's default (and after any applicable time period to cure the default has expired), all of Buyer's rights under this Agreement will terminate in all respects, and Seller can resell the Property to any third party as if this Agreement had never been made without any obligation to reimburse or account to Buyer for any part of the proceeds of such sale to any third party. Buyer understands and agrees that because Seller has taken the Property off the market for Buyer, has spent money on sales, advertising, promotion and construction, and has incurred other costs incident to this sale, Buyer's default will damage Seller. As compensation for this damage, in the event Seller cancels this Agreement due to Buyer's default, Buyer authorizes Seller to retain (or if not then paid by Buyer, Buyer will pay to Seller), Buyer's Deposit and any pre-closing advance payments required under this Agreement, including, without limitation, payments for any Approved Upgrades or Approve Change Orders that Buyer has made (or which was required to be made hereunder had Buyer not defaulted) and all interest which was, or would have been, earned on them, all as liquidated damages as there is no precise method of determining Seller's damages.  Any damage or loss that occurs to the Property while Buyer is in default will not affect Seller's right to liquidated damages. Except as otherwise specifically provided in this Agreement, the remedies afforded Seller in this Section 16, as a result of any default by Buyer, constitute Seller's sole and exclusive remedies for Buyer's default.

8

Buyer Initials  _____

If Seller defaults under this Agreement, Buyer shall give Seller written notice specifying any such default. I Seller has not cured the default within ten (10) days following Seller's receipt of Buyer's default notice, or where th nature of the specified default cannot reasonably be cured within such ten-day period, and Seller commenced a course o action and thereafter diligently pursued such course of action as reasonably required to promptly cure such default withii a time period not to exceed ninety (90) days, Buyer shall have such rights as may be available in equity or unde applicable law. The provisions of this Section 16 will survive Closing.

17.   **REAL ESTATE BROKER**.  If, and when, the Closing occurs and Seller receives the Total Purchase Price Seller will pay a sales commission to the licensed cooperating broker (**"Broker"**), if any, named in a separate broke registration agreement executed by Seller and Seller's sales representative at the time of Buyer's introduction to thι Project (**"Broker Registration"**).  If there is no Broker Registration, Seller shall have no sales commission obligation tι any Broker.  By signing this Agreement, Buyer is representing and warranting to Seller that, except for the Broker named ·in the Broker Registration, if any, Buyer has not consulted or dealt with any other licensed real estate broker oι salesperson with respect to this Property, and that Buyer will indemnify, defend (with legal counsel of Seller's choice) anι hold harmless Seller from any person or entity claiming otherwise, including commissions, damages and other sums foι which Seller may be held liable, and all attorneys' fees and court costs incurred by Seller, regardless of whether ɛ lawsuit(s) is actually brought or whether Seller ultimately prevails.  The provisions of this Section 17 shall survivε Closing.

18.   **ONGOING ACTIVITIES**.   Buyer understands that as long as Seller owns property within the Project, it may retain offices and model homes within the Project (including on or within common areas, and any improvements thereon). Seller's sales representatives may show homes, erect advertising signs and conduct any and all activities whatsoever as iː necessary and appropriate for the sales, leasing or management of the Project. In addition to the foregoing, Seller, and its affiliates, assignees, contractors, subcontractors, licensees and designees may conduct such construction and otheι activities in or around the Project as are deemed necessary or appropriate in the sole discretion of Seller or the party conducting such activities on Seller's behalf. Without limiting the generality of the foregoing, and as a material inducement to Seller to enter into this Agreement, Buyer acknowledges and agrees that SELLER AND/OR OTHER PARTIES AFFILIATED WITH SELLER WILL BE CONDUCTING CONSTRUCTION, SALES, LEASING, AND OTHER ACTIVITIES WITHIN OR AROUND THE PROPERTY AND THE PROJECT, BOTH BEFORE AND AFTER The CLOSING. BUYER RECOGNIZES SELLER'S RIGHTS TO CONDUCT SUCH ACTIVITIES AND HEREBY AGREES NOT TO: (i) DEEM ANY OF THESE ACTIVITIES TO BE NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, (ii) ENTER, OR ALLOW ANY OTHERS UNDER BUYER'S CONTROL TO ENTER, ANY AREAS WHERE SUCH ACTIVITIES ARE BEING CONDUCTED (EVEN WHEN THEY HAVE TEMPORARILY CEASED, SUCH AS DURING NON-WORKING HOURS), OR (iii) INTERFERE WITH, RESTRICT OR IMPEDE THE WORK OF SELLER OR OTHERS AFFILIATED WITH SELLER WITHIN THE PROJECT, AND BUYER HEREBY GRANTS SELLER ACCESS TO THE LOT AND ALL PORTIONS THEREOF, SUBSEQUENT TO CLOSING IN ORDER TO COMPLETE ANY WORK WITHIN THE PROJECT.

19.   **SELLER'S LIMITED WARRANTY; DISCLAIMER OF IMPLIED WARRANTIES**.  Seller agrees, at Seller's expense, to register the Property, at Closing, with Home Buyers Warranty Corporation (2-10 HBW) (**"HBW"**), and to further furnish Buyer, at Closing, with appropriate evidence of such registration in accordance with HBW's 2-10 HBW registered warranty program (**"Limited Warranty"**).  Specimen copies of the Limited Warranty may be reviewed in Seller's sales office.  BUYER UNDERSTANDS THAT THE ABOVE-DESCRIBED LIMITED WARRANTY TO BE DELIVERED TO BUYER AT CLOSING IS THE ONLY WARRANTY MADE BY SELLER WITH REGARD TO THE PROPERTY OR THE PROJECT, AND, TO THE MAXIMUM LAWFUL EXTENT AND UNLESS CLEARLY AND ABSOLUTELY PROHIBITED BY LAW, ALL IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY AND HABITABILITY, ANY WARRANTIES IMPOSED BY STATUTE, AND ALL OTHER EXPRESS AND/OR IMPLIED WARRANTIES OF ANY KIND OR CHARACTER ARE SPECIFICALLY DISCLAIMED, AND SELLER HAS NOT GIVEN AND BUYER HAS NOT RELIED ON OR BARGAINED FOR ANY SUCH WARRANTIES.  AS TO ANY IMPLIED WARRANTY THAT CANNOT BE DISCLAIMED ENTIRELY, ALL SECONDARY, INCIDENTAL AND CONSEQUENTIAL DAMAGES ARE SPECIFICALLY EXCLUDED, WAIVED AND DISCLAIMED (CLAIMS FOR SUCH SECONDARY, INCIDENTAL AND CONSEQUENTIAL DAMAGES BEING CLEARLY UNAVAILABLE IN THE CASE OF IMPLIED WARRANTIES WHICH ARE DISCLAIMED ENTIRELY ABOVE).  BUYER UNDERSTANDS AND HEREBY AGREES TO THE TERMS AND CONDITIONS OF THE LIMITED WARRANTY.  Without limiting the generality of the foregoing, if, but only if, Seller is prohibited from disclaiming entirely certain implied warranties by reason of the provisions of the "Magnuson-Moss Warranty Act" (15 U.S.C. §§2301-2312) (the **"Warranty Act"**), if applicable, Seller HEREBY LIMITS THOSE IMPLIED WARRANTIES, IF ANY, AS FOLLOWS: (i) IN SCOPE TO THOSE, IF ANY, GIVEN ON "CONSUMER PRODUCTS," IF ANY, AS DEFINED IN THE WARRANTY ACT, IF APPLICABLE) WHICH ARE ACTUALLY COVERED BY THE LIMITED WARRANTY, AND (ii) IN DURATION TO THE ONE YEAR PERIOD OF SELLER'S LIMITED WARRANTY, AND ALL THOSE IMPLIED WARRANTIES, IF ANY, ARE HEREBY DISCLAIMED ABSOLUTELY THEREAFTER.  Seller will deliver to Buyer, at Closing, any and all manufacturers' warranties, which will be passed through to Buyer at Closing, none of which manufacturers' warranties are expressly warranted in any way by Seller. The provisions of this Section 19 will survive Closing.

9

Buyer Initials _____

21.   **NOTICES.**   WHENEVER BUYER IS REQUIRED OR DESIRES TO GIVE NOTICE TO SELLER, TH
NOTICE MUST BE IN WRITING AND IT MUST BE SENT CERTIFIED MAIL, POSTAGE PREPAID, WITH A
RETURN RECEIPT REQUESTED TO SELLER AT THE ADDRESS SET FORTH ON PAGE 1 OF THI
AGREEMENT, OR SUCH OTHER ADDRESS AS SELLER MAY OTHERWISE DIRECT.

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notic
to Buyer, the notice must be in writing and sent either: (i) by first class mail, postage prepaid (unless sent outside of th
United States, in which event written notices to Buyer may be sent by regular air mail); (ii) by facsimile transmission o
electronic mail if Buyer has indicated a facsimile number or electronic mail address on Page 1 of this Agreement; or (iii
by a national overnight courier service, to the address for Buyer set forth on Page 1 of the Agreement.  A change o
address notice is effective when it is received. All other written notices are effective on the day they are properly mailed
transmitted, or delivered, as the case may be, whether or not received (and all permitted non-written notices to Buyer ar
effective on the date given by Seller) unless receipt is required as specifically set forth in portions of this Agreement.

22.   **TRANSFER OR ASSIGNMENT.**   Buyer may not assign, sell or transfer Buyer's interest in this Agreement o:
any of Buyer's rights under this Agreement.

Seller may assign or transfer freely all of its rights and obligations under this Agreement, including its rights ir
and to Buyer's Deposit and all other payments made by Buyer under this Agreement.

23.   **OTHERS BOUND BY THIS AGREEMENT.**   If Buyer dies or in any way loses legal control of Buyer's
affairs, this Agreement will bind Buyer's heirs and personal representatives.  If Buyer is a corporation or other business
entity, this Agreement will bind any successor corporation or entity. If more than one person signs this Agreement as
Buyer, each will be jointly and severally liable for full performance of all Buyer's duties and obligations under this
Agreement, and Seller can enforce this Agreement against each or either Buyer as individuals or together. If two (2) or
more persons and/or entities are named herein as Buyer or if any person named herein as Buyer is married, any selections,
Upgrades, Change Orders, or other actions hereunder taken by, and any notice to, any one person or entity named as
Buyer, or any spouse of a Buyer whether or not named as a Buyer, will be binding on Buyer.

24.   **FLORIDA LAW; SEVERABILITY.**   This Agreement shall be governed by, and construed and enforced in
accordance with the laws of the State of Florida, and any disputes in connection with this Agreement will be settled
according to Florida law.

If any part of this Agreement violates a provision of Florida or federal law, such law will control. In such case,
however, the remainder of the Agreement (not in violation) will remain in force and effect. Without limiting the generality
of the foregoing, it is Buyer's and Seller's mutual desire and intention that all provisions of this Agreement be given full
effect and be enforceable strictly in accordance with their terms. If, however, any part of this Agreement is not
enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement, in its entirety,
unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible
to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or
this Agreement in its entirety), and then are to be enforced as so modified. If the unenforceable part or parts cannot be so
modified, such part or parts will be stricken and considered null and void, and the remainder of this Agreement shall
continue in full force and effect, in order that the mutual paramount goal (that this Agreement is to be enforced to the
maximum extent possible strictly in accordance with its terms) can be achieved.

Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to
Seller certain rights and powers, or waiving or limiting any of Buyers rights or powers or Seller's obligations (which
otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the
above judicial modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of Buyer's
Deposit, such offending rights, powers, limitations and/or waivers shall be stricken, cancelled, rendered unenforceable,
ineffective and null and void. Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement
solely by reason of the inclusion of certain language in this Agreement (other than language which is intended specifically
to create such a cancellation right). **THE FOLLOWING SENTENCE WILL SUPERSEDE AND TAKE
PRECEDENCE OVER ANYTHING IN THIS AGREEMENT THAT IS IN CONFLICT WITH IT:  IF ANY
PROVISIONS SERVE TO LIMIT OR QUALIFY SELLER'S SUBSTANTIAL COMPLETION OBLIGATION
HEREIN, AND SUCH LIMITATIONS OR QUALIFICATIONS ARE NOT PERMITTED IF THE EXEMPTION
OF THIS SALE FROM THE INTERSTATE LAND SALES FULL DISCLOSURE ACT PURSUANT TO 15
U.S.C. § 1702(a)(2) IS TO APPLY OR THIS AGREEMENT IS TO OTHERWISE BE FULLY ENFORCEABLE,
THEN ALL THOSE PROVISIONS ARE HEREBY STRICKEN AND MADE NULL AND VOID AS IF NEVER
A PART OF THIS AGREEMENT. FOR PURPOSES OF THIS PARAGRAPH ONLY, THE WORDS "THIS
AGREEMENT" INCLUDE IN THEIR MEANING THE HOMEOWNER DOCUMENTS.**

25.   **TIME OF THE ESSENCE.**   The performance of all obligations on the precise times stated in this Agreement is
of absolute importance, and failure to perform any such obligations on time is an event of default, time being of the

Buyer Initials _____  _____

essence with respect to each provision of this Agreement which requires performance by Buyer within a specified tim period or upon a specified date.

26.   **ENTIRE AGREEMENT**.  This Agreement constitutes the entire understanding between the parties, and ma not be amended except by written agreement executed by all parties hereto.  Any current or prior agreement understandings, verbal and visual representations and statements, including, without limitation, artist's rendering, sale and advertising materials, or oral statements and representations of Seller's sales representatives, if not expressed in thi Agreement or in the Homeowner Documents, are hereby merged into the terms of this Agreement and are void and hav no effect, and Buyer acknowledges that Buyer has not relied on any such information or materials.

27.   **LITIGATION**.  In the event of any dispute arising out of this Agreement, the prevailing party shall be entitle to recover all costs incurred, including, without limitation, reasonable attorney's fees and costs through all appellate level and all bankruptcy and administrative proceedings. The venue of any litigation or other dispute resolution arising out c this Agreement shall be Palm Beach County, Florida. This provision shall survive the Closing or earlier terminatio: hereof.

28.   **RECORDING**.  Neither this Agreement, nor any notice of memorandum hereof (nor any Lis Pendens) may be recorded among the Public Records, and any such recording shall constitute Buyer's default under this Agreement. Buye hereby waives any lien rights, legal or equitable, which might be available to Buyer by virtue of this Agreement. Buye acknowledges and agrees that Buyer's violation of the terms of this Section 28 will materially impair Seller's title to the Property and will cause substantial damage to Seller.  In such event, Seller shall be entitled, at Buyer's expense (including all attorneys fees and costs incurred by Seller), and without waiving Buyer's default under this Agreement, to obtain the immediate discharge of any recorded notice, memorandum or lis pendens which Buyer may record in the Public Records or, alternatively, at Seller's option, and without waiving Buyer's default under this Agreement, Seller may require that Buyer immediately post a bond in the full amount of the Purchase Price, plus all closing costs and attorneys' fees for which Buyer may be liable under this Agreement.  Buyer waives any requirement imposed by law that Seller demonstrates any economic damage in order to support the posting of the bond required above.

29.   **SURVIVAL**.  The provisions and disclaimers in this Agreement which are expressly set forth herein to have effect after Closing (but only those provisions and disclaimers) will continue to be effective after Closing and delivery of the deed. All other provisions of the Agreement shall be deemed performed or waived at Closing, and shall be merged into the deed.

30.   **INCORPORATION BY REFERENCE**.  Every exhibit, schedule, modification, rider, and other addendum and appendix attached to this Agreement or referred to herein is hereby incorporated in this Agreement.

31.   **INSULATION DISCLOSURE**.  Seller has disclosed to Buyer, as required by the applicable rules of the Federal Trade Commission that the type, thickness, R-value and location of the insulation Seller intends to install in the Home, are as follows:

| Type | Thickness | R-Value | Location |
|------|-----------|---------|----------|
| Blown | 12" | R-30 | Roof |
| Batt | 3 ½" | R-11 | Living-Garage Ceiling (2-story models only) |
| Batt | 3 ½" | R-11 | Living-Garage Wall |
| Batt | 3 ½" | R-11 | Interior Sound Walls (if any) |
| Foil | N/A | R-4.2 | Exterior Masonry Walls |

Buyer understands that the above information is based solely on the information provided by the manufacturers of such insulation products, and Buyer agrees that Seller is not responsible for any manufacturers' errors or discrepancies. All of the foregoing information is subject to Seller's rights, under this Agreement to make changes in the Construction Specifications, and to any applicable limitations of Seller's liability to Buyer. Pursuant to F.S., Chapter 553.996, Buyer acknowledges receipt of the Energy-Efficiency Standards published by the Florida Dept. of Community Affairs, which among other things, notifies Buyer of the option of obtaining, at Buyer's expense, an energy-efficiency rating on the Home.

32.   **RADON GAS DISCLOSURE**.   Seller does not conduct radon testing with respect to the Property, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Property.  THE FOLLOWING PARAGRAPH IS PROVIDED FOR INFORMATIONAL PURPOSES PURSUANT TO FLORIDA STATUTES 404.056(8):  **RADON GAS IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME. LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA. ADDITIONAL INFORMATION REGARDING RADON AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY PUBLIC HEALTH UNIT.**

11

Buyer Initials  _____

33.   **RIGHTS AND REMEDIES CUMULATIVE.**  The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

34.   **CONSTRUCTION.**  Every covenant, term, provision of this Agreement shall be construed simply according to its fair meaning, and shall not be more strictly construed against any one of the parties hereto. Further, notwithstanding the fact that the form of this Agreement have been drafted, initially, by Seller, all parties to this Agreement have participated fully in the negotiation and preparation hereof, and as this Agreement has been fully negotiated between the parties hereto, the principle of contract interpretation which would result in any ambiguity being construed against the draftsman shall not, and is not intended, to apply. In construing this Agreement, the singular shall be held to include the plural, the plural shall be held to include the singular, and the use of any gender shall be held to include every other gender. The titles and captions contained herein are for convenience only and shall not be deemed a part of the context of this Agreement.

35.   **NEGOTIATIONS.**  Buyer acknowledges that the negotiation of this Agreement and all discussions with Seller and its agents regarding the sale of the Property were conducted in the English language. Buyer also acknowledges that (a) Buyer has had ample opportunity to inspect the documents provided to Buyer pursuant to this Agreement, and pursuant to any request of Buyer, and (b) that although Seller's sales agents are not authorized to change the form of this Agreement, they have strict instructions from Seller to communicate any of Buyer's requests for changes to this Agreement to Seller's management, which has given Buyer the opportunity to discuss and negotiate any such changes to the Agreement. In light of the foregoing, Buyer's decision to sign this Agreement now is totally free and voluntary and Buyer acknowledges and accepts all of the provisions of the Agreement and the Homeowner Documents as fair, reasonable, negotiated, discussed and explained to Buyer's complete satisfaction.

36.   **COUNTERPARTS.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, and shall be binding upon the party or parties who executed same, but all of such counterparts shall constitute one and the same Agreement.

37.   **EFFECTIVE DATE.**   The effective date ("Effective Date") of this Agreement shall be the date stated on Page 1 of this Agreement, and shall be the date from which all time periods under this Agreement are computed.

38.   **JURY TRIAL WAIVER.**   SELLER AND BUYER KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING IN CONNECTION WITH THIS AGREEMENT OR THE COURSE OF DEALINGS OR CONDUCT OF THE PARTIES TO THIS AGREEMENT.

39.   **OTHER STATUTORY DISCLOSURES.**

CHAPTER 558, FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS CONTRACT A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

NOTICE OF CONSUMER RIGHTS UNDER THE CONSTRUCTION INDUSTRIES RECOVERY FUND – PURSUANT TO SECTION 489.1425, FLORIDA STATUTES. PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE LICENSED CONTRACTOR.  FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE TELEPHONE NUMBER AND ADDRESS: 7690 ARLINGTON EXPRESSWAY, SUITE 300, JACKSONVILLE, FLORIDA 32211, TELEPHONE (904) 359-6310.

BUYERS SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEARS SUBSEQUENT TO PURCHASE.  A CHANGE IN OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU

Buyer Initials  _____   _____

HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERT APPRAISER'S OFFICE FOR INFORMATION.

ATTACHED HERETO AS EXHIBIT "D" IS A HOMEOWNER ASSOCIATION DISCLOSURE SUMMAR REQUIRED BY SECTION 720.401, FLORIDA STATUTES WHICH IS HEREBY INCORPORATED IN AN MADE A PART OF THIS AGREEMENT.  IF THE DISCLOSURE SUMMARY REQUIRED BY SECTIO 720.401, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASE BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER B DELIVERING TO SELLER OR SELLER'S AGENT OR REPRESENTATIVE WRITTEN NOTICE OF TH BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMAR OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THI VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHAL TERMINATE AT CLOSING

40.  **ADDITIONAL DISCLOSURES AND DISCLAIMERS.**  Seller hereby discloses the following information t Buyer which Buyer should carefully evaluate in its decision to purchase the Property:

(a)   Buyer acknowledges that certain aspects of the Common Property may, in some cases, be unfinished as o the date of Closing, and that Buyer will accept such improvements and facilities in their "AS IS condition as of the Closing Date.

(b)   To the extent the glass and windows in the Home are impact resistant or are protected by hurrican shutters. Seller makes no representation as to the resistance capabilities or qualities of the glass, window and/or shutters in the case of a major weather event.

(c)   Buyer acknowledges Seller may obtain FNMA or FHLMC project approval; however, Seller is no required to obtain the approval.

(d)   Buyer acknowledges that given the climate and humid conditions in Florida, molds, mildew, toxins and fungus may exist and/or develop within the Home or within the Common Property.  Buyer is hereby advised that certain molds may be, or if allowed to remain for a sufficient period, may become, toxic and potentially pose a health risk.  By executing this Agreement and Closing, Buyer shall be deemed to have assumed the risks associated with molds, mildew, toxins and/or fungi and to have released Seller from any and all liability whatsoever resulting from same.

(e)   Buyer acknowledges that any proposed Association budget provided to Buyer reflects estimated expenses, and, as an estimate, such expenses are subject to change between the time of Buyer's receipt of any proposed Association budget and the time such expenses are to be paid by the Association.

The provisions of this Section 40 will survive Closing.

BY SIGNING BELOW, BUYER AND SELLER AGREE TO BE BOUND BY ALL TERMS AND PROVISIONS OF THIS AGREEMENT. ACCORDINGLY, BUYER IS HEREBY ADVISED TO CAREFULLY REVIEW THIS AGREEMENT AND THE HOMEOWNER DOCUMENTS, AND TO CONSULT WITH AN ATTORNEY OF BUYER'S CHOICE.  If, after the execution of this Agreement, Buyer or any attorney on Buyer's behalf, informs Seller that Buyer desires or intends to terminate this Agreement, or that Buyer is or may be unable or unwilling to comply with any of the terms of this Agreement, then, at the option of Seller, same will constitute a default by Buyer.

THIS SPACE INTENTIONALLY LEFT BLANK

13

Buyer Initials

IN WITNESS WHEREOF, the parties the parties hereto have sworn to and executed this Agreement as of the date firs above written.

**SELLER:**

By: ANTILLES VERO BEACH, LLC,
    a Florida limited liability company

By:  Ironwood Properties, Inc.,
    a Florida corporation, its Manager

By: _____
    Cary Glickstein, as President

**BUYER:**

_____

Print Name: _____ EDWARD M. TIGHS

_____

Print Name: _____

14

Buyer Initials _____

EXHIBIT "B"



MODEL NO. 4 ( MARTINIQUE ) - SCHEME - B

STREET ORIENTATION - LEFT

The 'ANTILLES' Development
for IRONWOOD PROPERTIES, INC.

SECTION 1L TOWNSHIP 32S, RANGE 39E
INDIAN RIVER COUNTY, FLORIDA

A.1



MODEL NO. 4 ( MARTINIQUE ) - SCHEME - B                    STREET ORIENTATION - LEFT

The 'ANTILLES' Development
for IRONWOOD PROPERTIES, INC.

SECTION 11, TOWNSHIP 32S, RANGE 39E
INDIAN RIVER COUNTY, FLORIDA

A.2



**MODEL NO. 4 ( MARTINIQUE ) - SCHEME - B**

**STREET ORIENTATION - LEFT**

The 'ANTILLES' Developement
for IRONWOOD PROPERTIES, INC.

SECTION 11, TOWNSHIP 32S, RANGE 39E
INDIAN RIVER COUNTY, FLORIDA



RIGHT-SIDE ELEVATION

FRONT ELEVATION

LEFT-SIDE ELEVATION

REAR ELEVATION

PRELIMINARY ELEVATIONS

SCALE 3/16" = 1'-0"

MODEL NO. 4 ( CAYMAN ) – SCHEME – B

SITE ORIENTATION – LEFT

The 'ANTILLES' Developement
for IRONWOOD PROPERTIES, INC.

SECTION 11, TOWNSHIP 32S, RANGE 39E
INDIAN RIVER COUNTY, FLORIDA

A.4

EXHIBIT "A" 



MATCHLINE SEE SHEE

**<u>EXHIBIT "C"</u>**

**THE ANTILLES
CONSTRUCTION SPECIFICATIONS**

**MODEL TYPE: BERMUDA
(February 16, 2005)**

**General Area Tabulations:**

| | |
|---|---|
| Living A/C Area: | 2747 Sq. Ft. |
| Covered Entries: | 47 Sq. Ft. |
| Covered Porches: | 344 Sq. Ft. |
| 2- Car Garage: | 462 Sq. Ft. |
| Total Area Under Roof: | 3,600 Sq. Ft. |

**Foundation and Exterior Walls:**

- Steel-reinforced concrete foundation, over visqueen vapor barrier and compacted, termite-treated soil.
- Steel-reinforced masonry exterior walls with steel-reinforced concrete vertical columns, and horizontal beams.

**<u>Roof Materials:</u>**

- Elevation Type A:  Hanson (or equal) 13" rustic shake, color thru concrete roof tile and ridge caps over 30# ASTM mineral surface roll roofing on 15# roofing membrane tin-tagged to 5/8" exterior grade plywood sheathing nailed to pre-engineered and manufactured wood roof trusses, anchored and spaced @ 24" on center with white aluminum flashings and drip edge.

- Elevation Type B:  5-V-Crimp metal roof with mill finish over 15# felt roofing membrane anchored to 5/8" exterior grade plywood sheathing nailed to pre-engineered and manufactured wood roof trusses, anchored and spaced @ 24" on center with galvanized metal flashing and drip edge.

- Elevation Type C: Entegra (or equal) 13" wide, white, color-thru concrete roof tile with mitered edges over 30# ASTM mineral surface roll roofing on 15# roofing membrane tin-tagged to 5/8" exterior grade plywood sheathing nailed to pre-engineered and manufactured wood roof trusses, anchored and spaced @ 24" on center with bronze aluminum flashings and drip edge.

**Exterior Finishes:**

- Smooth stucco finish on exterior walls, covered entry and porch ceilings, and soffits with continuous soffit vents.
- Smooth stucco lap siding finish on front and partial side exterior wall elevations (Elevation Type B only).
- Decorative, painted soffit rafter tails.
- Decorative, pre-finished aluminum (non-operative) shutters at front and partial side locations, as per Elevations.
- Painted, wood posts/beams at front entry (Elevation Scheme B only).
- Flemish gable and decorative louver vent at front entry (Elevation Scheme C only).
- Decorative roof cupola (Elevation Scheme A only)
- Brick paver driveways and entry walkways.
- Porter (or equal) exterior flat latex paint on all stucco.
- Porter (or equal) exterior semi-gloss enamel paint non-pre-finished doors and wood trim.



**Interior Finishes**:

- Interior partitions to be 4" - 6" 25 gauge metal studs spaced @ 24" on center.
- ½" and 5/8" gypsum wall board on all interior walls and ceilings, respectively, with smooth texture.
- Denshield moisture resistant wallboard on all bathroom shower/tub walls and master tub deck and skirt.
- 10' flat ceilings; 11' tray ceilings at master bedroom and other selected locations, as per Floor Plans .
- Porter (or equal) interior flat latex paint on interior walls (cream/off-white) and ceilings (white).
- Porter (or equal) interior semi-gloss enamel paint on all interior doors and wood trim (white).
- Prestige 8' x 1 3/8" thick, solid-core LDF interior doors with raised panels:
- 5 1/4" painted wood base trim.
- 3 1/4" painted wood casing trim around all interior and exterior doors.
- 1" x 4" painted fir wood window sills and aprons.
- Ashley-Norton (or equal) bronze door hardware on interior and exterior doors, with deadbolts on all exterior doors.
- Chrome and clear glass shower enclosures.
- 1/4" x 48" high clear plate mirrors in master bathroom and guest bathrooms.
- Bathroom accessories: polished chrome towel bars and paper holders in all bathrooms.  Recessed medicine cabinets with mirror doors in all full bathrooms.
- Central vacuum piping with wall outlets and pre-wiring for garage wall-mounted vacuum unit (vacuum unit not included).
- Pull-down attic stairs in garage.
- Closet and (walk-in-pantry, if applicable) shelving allowance of $1,000.

**Windows, Exterior Doors, and Garage Doors**

- PGT pre-finished white aluminum, single-hung windows with impact-resistant tinted glass, and screens.
- PGT 8' pre-finished white aluminum french doors with impact-resistant tinted glass at all porch areas.
- PGT 8' pre-finished white aluminum french door with impact-resistant tinted glass at front entry or Therma-Tru (or equal) 8' insulated, painted fiberglass, raised panel door.
- Garage Door(s): One (1) Raynor 16'x8', painted, raised panel, metal garage door (Elevation Scheme A and B only); Two (2) Raynor 8'x8', painted, raised panel, metal garage doors (Elevation Scheme C only), and remote garage door operators for each garage door.

**Insulation:**  See Seller's Disclosure Exhibit

**Air Conditioning and Heating:**

- High-efficiency Carrier (or equal) 12 SEER single-zone central air conditioning and heating system.
- Venting for clothes dryer.
- Exhaust fans in all bathrooms.

83

**Plumbing and Fixtures:**

- All copper water lines.
- Kohler Memoirs Stately two-piece elongated water closet in all bathrooms (white).
- Kohler Memoirs Stately 27" pedestal lav at powder room (white).
- Kohler Fairfax 8" spread lever faucets in master and guest bathrooms (polished chrome w/ porcelain handle inserts).
- Newport Brass 930/26 (or equal) widespread gooseneck faucet (polished chrome)
- Kohler Fairfax shower and tub controls (polished chrome w/ porcelain handle inserts).
- Kohler K-1146-S oval acrylic whirlpool bath at master bathroom (white).
- Kohler K-3351 18-gauge stainless steel, undermount, double basin kitchen sink.
- Kohler Coralais polished chrome kitchen faucet and hose spray.
- Insinkerator 1/2 hp sink disposal unit.
- A.O. Smith 80 gallon, electric quick-recovery water heater.
- Mustee fiberglass drop-in laundry sink (white).
- Kohler Trend K-11936 laundry sink faucet (polished chrome).
- Recessed washing machine box with water supply valves.
- Recessed dryer vent box.
- Outside hose bibs (sides and rear).

**Electrical and Fixtures:**

- 200-250 amp service, as per electrical plan for the Home.
- Copper wiring throughout Home.
- Decora rocker light switches and receptacles (white).
- Pre-wired CATV outlets homerun to central panel.
- Pre-wired Category-5 telephone wiring homerun to central panel.
- Pre-wired ceiling fan receptacles (fans supplied by Buyer).
- Pre-wired dining area and foyer, and nook. Note, all wall-mounted light fixtures (except for bathrooms noted herein), all ceiling-mounted light fixtures (except for recessed lights noted herein), and all ceiling fans are to be supplied by Buyer.
- Under cabinet, slim-line fluorescent light fixtures in kitchen.
- Ceiling-mounted fluorescent light fixtures at walk-in closets, laundry room, and garage.
- Recessed light fixtures as per electrical plan for the Home.
- Recessed vapor proof light fixtures above showers and bathtubs.
- Wall-mounted sconce light fixtures at master bathroom and powder room.
- Wall-mounted exterior light fixtures at entry door, balconies, and over garage doors (bronze).
- Security alarm system with contacts on all 1st floor exterior doors and operable windows, 2 control keypads, 2 motion sensors, and smoke detectors as required by applicable building code.
- Exterior entry door intercom-to-telephone system.
- Entry gate call box connection.

**Appliances:** (All Kitchen-Aide with white, biscuit or black finish)

- 36" 25.3 cu. ft. refrigerator with door water and ice dispenser.
- 30" self-cleaning, undercounter convection oven
- 30" smooth glass cooktop
- 30" microwave oven/hood
- 24" dishwasher
- Extra-large capacity washer and dryer (white)



**Cabinetry and Countertops:**

Kitchen:

- Canac (or equal) Signature I Series (standard complementary colors), raised panel, wood full overlay doors and drawers, as per cabinet plan for Home.
- Granite countertop with 1½" edge profile and 4" backsplash.
- 34 1/2" high x 24" deep base cabinets.
- 42" high x 12" deep upper cabinets with upper cabinets over refrigerator and microwave oven, and pantry cabinets, if applicable.
- Adjustable shelving in all cabinets.
- Brushed stainless door and drawer pulls.

Master Bathroom:

- Canac (or equal) 36" high, Signature I Series (standard complementary colors), raised panel, wood full overlay doors and drawers, and adjustable shelves, as per cabinet plan for Home.
- Solid, one piece, cultured marble (white or biscuit) vanity top with 1½" edge, 4" backsplash, and two (2) integral, recessed oval sinks.
- Brushed chrome door and drawer pulls.

Guest Bathrooms:

- Canac (or equal) 36" high, Phoenix Ultra 3 Series thermafoil full overlay doors and drawers with square raised panels (low gloss white), and adjustable shelves, as per cabinet plan for Home.
  Solid, one piece, cultured marble (white or biscuit) vanity tops with 1½" bullnose edge, 4" backsplash, and one (1) integral, recessed oval sink.
- Brushed chrome door and drawer pulls.

Laundry Room:

- Canac (or equal) New Haven Ultra 1 Series thermafoil full overlay doors and drawers with bead-board doors (low gloss white), and adjustable shelves, as per cabinet plan for Home.
  Postform color-thru laminate (white or biscuit) countertop with 1½" bullnose edge and integral 4" backsplash.
  Chrome door and drawer pulls.

**Flooring:**

- Decorative 18" ceramic tile at all living area floors, except for bedrooms bathrooms and bedroom-related closets (tile allowance of $5 psf).
- Decorative ceramic tile at all bathrooms (tile allowance of $5 psf)
- Carpet allowance of $20 psy for all bedrooms and closets.

**Landscaping, Paving and Decking:**

- Landscaping pursuant to Urban Design Studio landscape plans.
- Zoned automatic sprinkler system utilizing Common Area retention water.
- Concrete pavers at driveways, walkways, and entry.
- Concrete pavers or pre-cast cement at all covered porches.
- Postmaster General approved mailbox and address plate.



**Security and Recreation Amenities:**

- Combination fencing and decorative walls around entire Property Entry Gates at US-1 entrance with gatehouse pavilion (un-manned) and call box to each Home
- Entry gates and call box at 63rd Street entrance.
- 11,000 SF Clubhouse Facilities with detached Community Building, Exercise Pavilion, ladies and gentlemen's poolside locker rooms and private poolside bathrooms.
- 65' x 45' heated community swimming pool and heated spa and pool deck
- Two (2) outdoor cooking stations
- Gated tot-lot playground area
- Three (3) regulation size lighted tennis courts
- Conservation Areas

## SPECIFICATION DISCLOSURES
### BUYER UNDERSTANDS AND AGREES THAT:

- **All dimensions and floor plan layouts are approximate, and all materials, features, finishes, equipment, and product selections are subject to change by Seller without prior notice pursuant to the Purchase and Sale Agreement.**
- **Certain materials, features, finishes, equipment and products may appear in/on the Floor Plans or Elevations for one model type but not others.**
- **Exterior paint color combinations will be determined by Seller, it its discretion based on appropriateness to the Elevations and location of the Home in relation to adjacent Homes.**
- **Exterior features such as landscaping and fencing shown on any promotional materials may not be accurate representations of the landscaping or fencing to be installed by Seller, and Seller is not bound by any such representations.  Except in connection with any pool fencing required by building codes, or as otherwise noted herein, there is no fencing between the lots and homes.**
- **Certain design features shown on the Floor Plans and/or Elevations are based on architectural software, such that certain design features, including, without limitation, exterior doors, windows, entry gates, railings, decorative shutters, garage doors, and light fixtures may not be accurate representations of the items or materials to be installed by Seller pursuant to these Specifications, and Seller is not bound by any such representations in the Floor Plans or Elevations.**
- **Certain features that may be shown on the Floor Plans or the Elevations may not be included in the Home, including, without limitations, swimming pools, pool decks, outside grills, fireplace, desks, built-ins, interior fireplace, exterior chimneys.  Only those items stated in these Specifications will be included in the Home, subject to the provisions of the Purchase and Sale Agreement.  Any representations of pools and pool decks of any promotional materials may not be accurate representations of the pool and pool deck locations, sizes or configurations.**
- **Any lot dimensions shown on any promotional materials or in the Floor Plan exhibits to the Purchase and Sale Agreement are used to show typical lot dimensions, and may not be accurate representations of the Lot that is subject to this Purchase and Sale Agreement, and Seller is not bound by such information.  For accurate Lot dimensions, refer to Exhibit "A" to the Purchase and Sale Agreement.**
- **The glass in the windows and doors are impact-resistant, according to the manufacturer.  Seller makes no representation as to the resistance qualities or capabilities of the glass windows or doors in the case of a major weather event.**