# EXHIBIT "A"

# THE ANTILLES
## PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made and entered into as of this __6__ day of September, 2008, by and between ANTILLES VERO BEACH, LLC, a Florida limited liability company, whose address is 202 S.E. 5th Avenue, Delray Beach, Florida 33483 ("Seller"), and the buyer or buyers listed below who have signed this Agreement ("Buyer").

Buyer: _James A Hernandez as POA For Peter Blanchard_

Address: _8140 Seacrest Drive_

City: _Vero Beach_   State: _FL_   Zip Code: _32963_

E-Mail:

Home Tel: _561-254-6875_ Office:   Fax:

Social Security Number(s): _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_

IN CONSIDERATION of the respective agreements hereinafter set forth, Buyer and Seller agree as follows:

1. **PURCHASE AND SALE.** Buyer agrees to purchase from Seller, and Seller agrees to sell to Buyer, for the Total Purchase Price set forth below, and on the terms and conditions contained in this Agreement, Lot __187__ ("**Lot**"), as shown on the proposed Site Plan of The Antilles Subdivision ("**Site Plan**"), together with the single-family home ("**Residence**") constructed on the Lot, which shall be similar to the floor plans ("**Floor Plans**") represented by the Antigua: X Bermuda: __ Cayman: __ Dominica __ Martinique: __ Nevis: __ Floor Plans (check one), and the related construction specifications ("**Construction Specifications**") for that Residence. The Site Plan, Floor Plans and Construction Specifications are attached hereto as **Exhibit "A", Exhibit "B", and Exhibit "C"**, respectively; however, the sale of the Lot and Residence will be considered a single sale - the Residence not being separate from the Lot. The Antilles development consists, generally, of 260 single-family Lots and the Residences constructed thereon and other improvements related thereto, and the related Common Property, as defined in the Antilles Declaration of Covenants and Restrictions ("**The Antilles**" and/or the "**Project**").

The Property address is: 2866 St. Bart's Square Vero Beach, FL 32967

2. **PURCHASE PRICE:**

   Base Purchase Price: $ _335,000._⁰⁰

   Buyer's Premium: $ _33,500._⁰⁰

   Total Purchase Price: (exclusive of Closing Costs, prorations, not included here): $ _368,500._⁰⁰

   **TOTAL PURCHASE PRICE TO BE PAID AS FOLLOWS:**

   Deposit: $ 10,000.00

   Balance of the Total Purchase Price (Due at Closing in local bank cashiers check or received wire transferred funds): $ _358,500._⁰⁰

3. **DEPOSIT.** The Deposit set forth in Section 2 above ("**Deposit**") is due upon Buyer's execution of this Agreement. In accordance with the laws of the State of Florida, Section 501.1375, Florida Statutes, Seller is required to advise Buyer as follows:

THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO TEN PERCENT [10%] OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER.

Buyer Initials _____

_As P.O.A. For_

_Peter Blanchard_

1

Seller has two options in the event Buyer elects not to waive the escrow deposit and Seller desires to use the escrowed fund for building purposes, as follows:

a) Seller may use the escrowed funds for construction purposes only, after notifying Buyer and obtaining a surety bond payable to Buyer in the amount of the escrowed deposit, or Seller may obtain a master surety bond in an amount equal to or greater than the total amount of escrow deposits received by Seller, and Buyer shall be charged at Closing an amount equal to the premium for the applicable portion of the bond securing the deposit; or

b) If no surety bond is readily available in the open market, Seller may borrow money in an amount equal to the funds held in escrow, to be utilized for construction purposes only, in which case any interest which is paid by Seller on such a loan for a period not to exceed twelve (12) months shall be reimbursed to Seller by Buyer at the time of Closing, less any interest accrued on the escrowed amount.

Buyer is further advised that in the event Buyer waives the escrow provisions of the statute, Seller may and probably will use the Deposit in the actual construction and development of the Property. Since Seller will not, in said event, be placing any of the Buyer's Deposit in escrow, the entire deposit may be so used.

If the Buyer wishes to waive the escrow of Buyer's deposit (up to ten percent [10%] of the Purchase Price), Buyer may do so by signing the space provided in this Paragraph.

BUYER HEREBY WAIVES THE KEEPING OF DEPOSIT IN AN ESCROW ACCOUNT AND RELEASES THE FUNDS TO SELLER.

BUYER: _____                    BUYER: _____

If Buyer has not signed the above waiver, Buyer's deposit (up to ten percent [10%] of the Purchase Price) will be placed in an interest bearing escrow with such financial or banking organization or attorney's office as Seller shall designate (the "Escrow Agent") in accordance with this Agreement and applicable Florida law as of the date hereof. In the event that Escrow Agent resigns for any reason, Seller shall have the sole right to appoint a successor Escrow Agent who is qualified to serve under applicable Florida law and all deposits will be transferred to the successor Escrow Agent and held in escrow in accordance with this Agreement and applicable Florida law.

All accrued interest shall be credited to Seller at the time of Closing. The Deposit paid hereunder shall be credited to Buyer at the time of Closing.

4.   NO FINANCING CONTINGENCY: Buyer acknowledges that this Agreement and Buyer's obligations under this Agreement are not contingent or dependent on Buyer obtaining a loan or mortgage financing of any type or nature. The sale and purchase of the property pursuant to this Agreement is an all cash transaction.

5.   SELLER'S FINANCING. Buyer understands that Seller has obtained, or will obtain, acquisition, construction and other financing with respect to the Project. Buyer agrees that this Agreement, and all modifications and additions thereto, will be subordinate in all respects to the lien and priority of any mortgage (and related security interests) now or hereafter placed on the Property securing such Seller's financing, including all loan renewals, future advances, extensions and modifications. The parties intend that this subordination shall be effective automatically without any further notice to, or action by, Buyer. Buyer acknowledges that, as additional security for any of Seller's financing, Seller may assign all of its rights under this Agreement to its lender(s), including all rights Seller may have to Buyer's Deposit, subject to requirements of applicable laws.

6.   CONSTRUCTION SPECIFICATIONS.   Buyer and Seller both acknowledge and agree:   THE RESIDENCE MAY NOT BE CONSTRUCTED IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS SET FORTH IN THIS CONTRACT OR ON FILE WITH APPLICABLE GOVERNMENTAL AUTHORITIES. WITHOUT LIMITING THE GENERALITY OF SECTION 19 HEREIN, SELLER DISCLAIMS AND BUYER WAIVES ANY AND ALL EXPRESS OR IMPLIED WARRANTIES THAT CONSTRUCTION WILL BE ACCOMPLISHED IN COMPLIANCE WITH SUCH PLANS AND SPECIFICATIONS. SELLER HAS NOT GIVEN AND BUYER HAS NOT RELIED ON OR BARGAINED FOR ANY SUCH WARRANTIES.

The provisions of this section 6 will survive (continue to be effective after) Closing.

7.   Deleted.

FTL:2096895:10

2

Buyer Initials _____
AS POA FOR
PETER BENAVIDES

8. Deleted.

9. Deleted.

10. **CLOSING.** The term "Closing" refers to the time when Seller delivers the special warranty deed for the Property to Buyer and Buyer delivers to Seller the balance of the Total Purchase Price and any additional amounts owed by Buyer to Seller under this Agreement, as set forth herein, and ownership of Property is transferred from Seller to Buyer (the "**Closing**"). At Closing, the parties will execute and deliver all documents Seller's closing agent deems necessary or appropriate, and Buyer understands that until all sums have been received by Seller in cleared funds, Seller will be entitled to a vendor's lien on the Property. Buyer shall not move any personal property onto or take occupancy of the Property until a certificate of occupancy for the Property has been issued by the appropriate governmental agency, and Seller has received the Total Purchase Price in accordance with the terms of this Agreement. Legal and physical possession of the Property shall be delivered to Buyer at Closing.

Notwithstanding anything in this Agreement to the contrary, Seller agrees to complete construction of the Property within two (2) years after the date that Buyer executes this Agreement, plus additional periods of time equal to periods of Permissible Delay (as hereinafter defined). Permissible Delay is defined as delay caused by acts of God or other causes beyond the reasonable or practical control of Seller which are recognized as excusable delays under the laws of the State of Florida.

Buyer understands that Seller has the right to schedule the date, time and place for the Closing ("**Closing Date**"); provided, however, that before the Closing Date, Seller must obtain a certificate of occupancy for the Property. **The Closing Date is: October 6, 2008.** Buyer acknowledges that the common property and any improvements thereon need not be completed or have such certificates of occupancy prior to the Closing Date. Buyer will be given at least five (5) days' notice of the date, time and place of Closing. Seller is authorized to postpone the Closing for any reason and Buyer will close on the new date, time and place Seller specifies in its notice of postponement (as long as at least 2 days' notice of the new date, time and place are provided to Buyer). A change of time or place of Closing only (that is, one not involving a change of date) will not require any additional notice period. Any formal notice of Closing, and any postponement or rescheduling of the Closing may be given orally, by telephone, facsimile, electronic mail, regular mail or other reasonable means of communication at Seller's option. All such notices to Buyer shall be sent or directed to the address, facsimile, electronic mail address or telephone number (as appropriate), specified on Page 1 of this Agreement unless Seller has received written notice from Buyer of any address change prior to the date Seller's notice is sent, transmitted or given to Buyer. These notices (other than a change of address) will be effective on the date given, transmitted or mailed. An affidavit of one of Seller's employees or agents stating that this notice was given or mailed to Buyer will be conclusive in this regard.

If Buyer fails to receive any of these notices or the confirmation because Buyer failed to advise Seller of any change of address, telephone or facsimile number, or electronic mail address, or because Buyer has failed to pick up a letter when Buyer has been advised of an attempted delivery or because of any other reason, Buyer will not be relieved of Buyer's obligation to close on the scheduled date unless Seller agrees in writing to postpone the scheduled date. If Seller agrees in writing to reschedule the Closing at Buyer's request, or if Buyer is a corporation (or other business entity) and Buyer fails to produce the necessary documents establishing proof of the organization, good standing and authorization of representatives, as requested by Seller, and, as a result, Closing is delayed, or if Closing is delayed for any other reason (except for a delay desired, requested or caused by Seller), Buyer agrees to pay at Closing a late funding charge equal to interest, at the then highest applicable lawful rate, on that portion of the Total Purchase Price not then paid to Seller (and cleared), from the date Seller originally scheduled the Closing to the date of actual Closing. Additional late funding charges also may be imposed as stated in this Agreement. All prorations will be made as of the originally scheduled Closing Date. **BUYER UNDERSTANDS THAT SELLER IS NOT REQUIRED TO RESCHEDULE OR TO PERMIT A DELAY IN CLOSING AND THAT IF BUYER FAILS TO TIMELY CLOSE AS REQUIRED BY THIS SECTION 10, BUYER WILL BE IN DEFAULT UNDER SECTION 16 OF THIS AGREEMENT.**

11. **TITLE.** At Closing, Buyer will receive good and marketable title to the Property, subject to the permitted exceptions listed below ("**Permitted Exceptions**"). At Closing, Buyer will receive the following documents, which Buyer agrees to accept as proof that title is as represented above:

A. **Title Commitment.** A written title commitment from a title insurance company licensed in Florida agreeing to issue Buyer a title insurance policy for the Property (ALTA Owner's Policy with Florida modifications) ("**Title Policy**"). The title commitment will list the following Permitted Exceptions (exceptions subject to which Buyer agrees to take title to the Property):

1. Real property taxes and assessments affecting the Property for the year of Closing, and subsequent years, including any applicable special assessment, community redevelopment or improvement districts;

Buyer Initials _____

3

FTL\2096895:10

2.     All laws, and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded in the public records, or otherwise established with respect to the Project, for example, zoning restrictions, property use limitations and obligations, easements, rights-of-way, plat restrictions and dedications, and agreements relating to utilities and conservation areas;

3.     The restrictions, covenants, conditions, easements, liens, terms and other provisions imposed by the documents contained or referred to in the Homeowner Documents, as defined herein, and any amendments thereto (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which will be recorded by Seller now or at any time after the date of this Agreement in the Public Records of Indian River County, Florida, and all amendments to any of such documents;

4.     Easements in favor of the Association, as defined herein, and public utility providers for general access over and across the Property and the Project, and for the installation, service, repair, and maintenance of all water retention areas, conservation areas, wetland areas, and improvements and utilities serving the Property and the Project;

5.     Minor encroachments, if any, into easement areas serving public utilities by Property-related improvements such as air conditioner pads and equipment, which are hereby deemed permitted;

6.     The mortgage, and any other security instruments, in favor of Buyer's lender, if any;

7.     Pending governmental liens for public improvements as of Closing (Seller will be responsible, however, for certified governmental liens for public improvements as of Closing, as provided herein); and

8.     All other standard title exceptions contained in an ALTA owner's title policy customarily issued in Indian River County, Florida for similarly situated properties, and all other title exceptions for items common to the subdivision; provided that no limitation on Buyer's title may prohibit construction of the Home, nor the use of it as a Home, subject to the Homeowner Documents.

B.     Closing Documents.   At Closing, Buyer will receive: (i) a special warranty deed to the Property which will be subject to (that is, contain exceptions for) all of the matters described above, (ii) Seller's form of owners (no-lien) affidavit, FIRPTA ("non-foreign") affidavit, and gap affidavit, (iii) Bill of Sale for any personal property contained in the Residence, (iv) final as-built survey of the Property, (v) Soil treatment certificate, (vi) Insulation certificate, (vii) Certificate of Occupancy for the Property, and (viii) the Limited Warranty Registration, which shall require Buyer's execution at Closing. Buyer and Seller shall each execute and deliver to the other closing statements and such additional documents as reasonably required by the closing agent to close the transaction contemplated in this Agreement. The documents (the title commitment, as aforesaid, and the documents listed in this Section 11.B. are collectively referred to herein as the "**Closing Documents**").

12.   **CLOSING COSTS.**  Buyer understands that, in addition to the Total Purchase Price, Buyer shall pay at Closing the following fees and costs ("**Closing Costs**"):

A.     A transfer charge equal to one and one-half percent (1.5 %) of the Total Purchase Price of the Property;

B.     Deleted.

C.     Buyer's prorated share of the quarterly maintenance assessment charged by the Association for the quarterly assessment period in which the Closing occurs; provided, however, if the Closing shall occur in the last month of any quarter, Buyer will be charged for the next quarter's assessment at Closing in addition to the aforementioned proration for the current quarter;

D.     Initial contribution to the Association, as defined herein, equal to two (2) times the regular monthly assessment for the Property due the Association as determined at the time of Closing. This contribution will not be credited against regular assessments;

E.     Reimbursement to Seller for the cost of providing Buyer with: (i) a final as-built survey of the Property, the cost of which shall not exceed $300, and (ii) a F.E.M.A. elevation certificate, if required by Buyer's insurance company, the cost of which shall not exceed $200;

F.     Reimbursement to Seller for any utility deposits or hook-up fees for the Property which Seller may have advanced prior to Closing;

G.     Reimbursement to Seller of Buyer's share (based on the number of homes within the Project that are insured under the Association's insurance policies), of the total prepaid insurance policies obtained by Seller on behalf of the Association; and

Buyer Initials

*as P.O.A. for*
*Peter Buycuenas*

4

FTL:2096895:10

H.    Deleted.

I.    Deleted.

J.    All fees, costs, points, and charges imposed by Buyer's mortgage lender, if any, shall be paid by Buyer at Closing. Buyer acknowledges the Closing Costs referred to in Section 12.A. and 12.B. above do not include any mortgage loan closing costs of any kind, including, without limitation, the cost of title insurance required by Buyer's lender. In the event Buyer elects to use Seller's designated closing agent for the Closing, as aforesaid, Seller agrees to cause the closing agent to provide title insurance to Buyer's lender for the lowest amount permitted by law, and to coordinate the closing of Buyer's mortgage;

K.    Real property taxes will be prorated through the day before Closing on the current year's tax amount for the Property. If Closing occurs on a date when the current year's tax assessment is not available, taxes will be prorated on the prior year's tax, as allocated to the Property by Seller, and will be later adjusted by Buyer and Seller based on the exact amount of taxes, with allowance for the maximum applicable discount amount; provided, however, that any request for adjustment and/or re-proration of real estate taxes must be made in writing and delivered by the party requesting the adjustment to the other party within ninety (90) days of the date the notice of the current year's real estate tax assessment is published by the applicable taxing authority. If no written request for adjustment or re-proration is made and delivered within such ninety-day period, any entitlement to adjustment or re-proration of real estate taxes that may exist shall be deemed waived.

L.    Certified Special Assessments as of the scheduled Closing Date shall be paid by Seller. Pending Special Assessments assessed by governmental agencies as of the scheduled Closing Date shall be assumed by Buyer. If any such Certified Special Assessments are payable in installments, the installment due in the year of Closing shall be prorated and Buyer shall assume the balance of any such installments.

13.    **HOMEOWNERS' ASSOCIATION.**    Buyer acknowledges that (i) the Antilles Vero Beach Homeowners' Association, Inc., a Florida corporation not-for-profit ("**Association**") has been established for the purpose of maintaining certain aspects of the Property and the Project. Buyer understands that Seller, due to its present ownership of Lots and properties comprising the Project, currently controls the Association and has the right to appoint officers and directors thereof in accordance with the following documents governing the Property: (i) the Articles of Incorporation of the Association ("**Articles**"), (ii) the By-Laws of the Association ("**By-Laws**"), and (iii) the Declaration of Covenants and Restrictions ("**Declaration**"), all as amended from time to time (the Articles, By-Laws and Declaration are collectively referred to herein as the "**Homeowner Documents**"). Buyer further acknowledges that upon Closing, Buyer shall automatically become a member of the Association and shall be required to comply with all of the terms and provisions of the Homeowner Documents, and Buyer further acknowledges that Buyer shall be liable for the payment of any and all regular and special maintenance assessments levied against the Property pursuant to the Declaration, and that Buyer's failure to pay such assessments may result in penalties and the filing of a lien against the Property by the Association to secure payment of such assessments and other charges, as more particularly described in the Declaration.

After Closing, and in accordance with the Declaration, Buyer shall be responsible for the maintenance of the Property. In the event Buyer fails to properly maintain the Property in accordance with the Declaration, the Association shall have the right, but not the obligation, to perform such maintenance required of Buyer pursuant to the Declaration, in which event Buyer shall pay all cost incurred by the Association, including all collection costs. The Association shall have the right to assess the Property for all maintenance costs incurred by the Association, and any such assessments shall be secured by the assessment lien referred to in the Declaration.

Buyer acknowledges receipt of the proposed Homeowner Documents, which Buyer agrees to adhere to and be bound by the terms thereof, and all changes and amendments thereto. Buyer acknowledges and agrees that Seller has reserved the right to modify any of the Homeowner Documents prior to Closing and that: (i) neither prior notice to Buyer nor Buyer's consent shall be required for any such modifications, and (ii) any such modifications will not affect Buyer's obligations under this Agreement. The provisions of this Section 13 shall survive the Closing.

14.    **HOMEOWNER ASSOCIATION FEES.**    Buyer understands that any estimated operating budget provided to Buyer (the "**Budget**") provides only an estimate of what it will cost to run the Association during the period of time stated in the Budget. Buyer hereby acknowledges receipt of the Budget. The Budget is not guaranteed to be an accurate prediction of the expenditures required of the Association, and, as such, are subject to change at any time and from time to time to reflect actual and projected expenditures or changes in assumptions. These changes may occur before or after Closing, but will not affect any of Buyer's obligations under this Agreement or the Homeowner Documents, except as to resulting changes in closing prorations. Buyer recognizes and agrees that Buyer's assessments may include expenses attributable to Common Property which are not complete or usable by Buyer at any given time. The provisions of this Section 14 shall survive the Closing.

15.    **ADJUSTMENTS WITH THE ASSOCIATION.**    Buyer acknowledges that Seller may advance money to the Association, or on behalf of the Association, to pay for certain Association expenses, including, without limitation,

FTL:209689S:10

Buyer Initials

insurance premiums, Common Property maintenance and repairs, utility charges and deposits, permit and license fees, charges for service and maintenance contracts, salaries of Association employees, and other similar expenses. Seller is entitled to be reimbursed by the Association for all such sums advanced or paid by Seller on behalf of the Association. The Association will reimburse Seller out of initial contributions and regular assessments to be paid by Buyer and other Lot owners as those contributions and assessments are collected, or as otherwise requested by Seller.

16.   **DEFAULT**.  If Buyer fails, refuses or neglects to perform Buyer's obligations under this Agreement, including payment of the Deposit and any other payments required hereunder in a timely manner, Buyer shall be deemed in "default". If Buyer remains in default five (5) days after Seller sends notice of any such default, Seller shall be entitled to the remedies provided herein. If, however, Buyer's default is failing to close on the scheduled Closing Date, then Seller may cancel this Agreement without giving Buyer additional notification or opportunity to close at a later date. Upon Buyer's default (and after any applicable time period to cure the default has expired), all of Buyer's rights under this Agreement will terminate in all respects, and Seller can resell the Property to any third party as if this Agreement had never been made without any obligation to reimburse or account to Buyer for any part of the proceeds of such sale to any third party. Buyer understands and agrees that because Seller has taken the Property off the market for Buyer, has spent money on sales, advertising, promotion and construction, and has incurred other costs incident to this sale, Buyer's default will damage Seller. As compensation for this damage, in the event Seller cancels this Agreement due to Buyer's default, Buyer authorizes Seller to retain (or if not then paid by Buyer, Buyer will pay to Seller), Buyer's Deposit and any pre-closing advance payments required under this Agreement that Buyer has made (or which was required to be made hereunder had Buyer not defaulted) and all interest which was, or would have been, earned on them, all as liquidated damages as there is no precise method of determining Seller's damages. Any damage or loss that occurs to the Property while Buyer is in default will not affect Seller's right to liquidated damages. Except as otherwise specifically provided in this Agreement, the remedies afforded Seller in this Section 16, as a result of any default by Buyer, constitute Seller's sole and exclusive remedies for Buyer's default.

If Seller defaults in the performance of this Agreement, Buyer shall give Seller written notice of such default, and if Seller within ten (10) days from receipt of such written notice shall fail to begin and diligently continue to take action that would cure the default within a reasonable period of time, and if Buyer has performed all his/her obligations hereunder, Buyer shall have the option to cancel this Agreement by giving written notice thereof to Seller and upon such cancellation Seller shall refund to Buyer all monies paid by Buyer to Seller hereunder, in which event this Agreement shall be terminated and neither party shall have any claim against the other. Nothing contained herein shall be deemed to restrict Buyer's remedy of specific performance of this Agreement or action for actual, consequential or special damages; provided however in no event shall Seller be liable to Buyer for punitive, exemplary or speculative damages.

Acceptance of a special warranty deed at Closing shall be Buyer's acknowledgment of full performance by Seller of all of its agreements, duties and obligations under this Agreement and no agreement, duty or obligation of Seller shall survive the Closing except the "Limited Warranty," as defined in Section 19, below, and warranties contained set forth the special warranty deed, as provided in Section 11, above. The provisions of this Section 16 will survive Closing.

17.   **REAL ESTATE BROKER**.  If, and when, the Closing occurs and Seller receives the Total Purchase Price, Seller will pay a sales commission to the licensed cooperating broker ("**Broker**"), if any, named in a separate broker registration agreement executed by Broker and Seller's sales representative at the time of Buyer's introduction to the Project ("**Broker Registration**"). If there is no Broker Registration, Seller shall have no sales commission obligation to any Broker. By signing this Agreement, Buyer is representing and warranting to Seller that, except for the Broker named in the Broker Registration, if any, Buyer has not consulted or dealt with any other licensed real estate broker or salesperson with respect to this Property, and that Buyer will indemnify, defend (with legal counsel of Seller's choice) and hold harmless Seller from any person or entity claiming otherwise, including commissions, damages and other sums for which Seller may be held liable, and all attorneys' fees and court costs incurred by Seller, regardless of whether a lawsuit(s) is actually brought or whether Seller ultimately prevails. The provisions of this Section 17 shall survive Closing.

18.   **ONGOING ACTIVITIES**.  Buyer understands that as long as Seller owns property within the Project, it may retain offices and model homes within the Project (including on or within Common Property, and any improvements thereon). Seller's sales representatives may show homes, erect advertising signs and conduct any and all activities whatsoever as is necessary and appropriate for the sales, leasing or management of the Project. In addition to the foregoing, Seller, and its affiliates, assignees, contractors, subcontractors, licensees and designees may conduct such construction and other activities in or around the Project as are deemed necessary or appropriate in the sole discretion of Seller or the party conducting such activities on Seller's behalf. Without limiting the generality of the foregoing, and as a material inducement to Seller to enter into this Agreement, Buyer acknowledges and agrees that SELLER AND/OR OTHER PARTIES AFFILIATED WITH SELLER WILL BE CONDUCTING CONSTRUCTION, SALES, LEASING, AND OTHER ACTIVITIES WITHIN OR AROUND THE PROPERTY AND THE PROJECT, BOTH BEFORE AND AFTER The CLOSING. BUYER RECOGNIZES SELLER'S RIGHTS TO CONDUCT SUCH ACTIVITIES AND HEREBY AGREES NOT TO: (i) DEEM ANY OF THESE ACTIVITIES TO BE NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, (ii) ENTER, OR ALLOW ANY OTHERS UNDER BUYER'S CONTROL TO ENTER, ANY AREAS WHERE SUCH ACTIVITIES ARE BEING CONDUCTED (EVEN WHEN THEY HAVE

FTL2096895:10

Buyer Initials _____

6

TEMPORARILY CEASED, SUCH AS DURING NON-WORKING HOURS), OR (iii) INTERFERE WITH, RESTRICT OR IMPEDE THE WORK OF SELLER OR OTHERS AFFILIATED WITH SELLER WITHIN THE PROJECT, AND BUYER HEREBY GRANTS SELLER ACCESS TO THE LOT AND ALL PORTIONS THEREOF, SUBSEQUENT TO CLOSING IN ORDER TO COMPLETE ANY WORK WITHIN THE PROJECT.

Buyer agrees that all matters pertaining to construction will be discussed by Buyer only at the office of Seller. Buyer agrees that Buyer's agents and representatives shall not in any way interfere with workmen during the construction of the Residence. Buyer further agrees that Buyer and Buyer's agents and representatives shall not visit the construction site without Seller's prior written consent, which Seller may grant or deny in Seller's sole discretion, and if Seller grants such consent, Buyer and Buyer's agents and representatives must be accompanied to the construction site by a representative of Seller. Seller shall not be liable or responsible for any injury, loss or damage resulting from any violation of this paragraph or any visit to the construction site by Buyer or Buyer's agents or representatives. In addition, Buyer agrees to indemnify and hold Seller harmless from and against any and all injury, loss or damage (including, without limitation, reasonable attorneys' fees and court costs at trial and through all appellate levels and whether or not suit be brought) arising out of or in connection with any violation of this paragraph or any visit to the construction site by Buyer or Buyer's agents or representatives. Buyer also agrees that prior to Closing, Buyer and Buyer's contractors, subcontractors, agents and representatives shall not apply for any building permit with respect to the Residence for any modifications to the Residence, and that any such building permit application prior to Closing may result in a delay in the issuance by the appropriate governmental authority of a Certificate of Occupancy for the Residence and a delay in Closing. In the event of any such building permit application prior to Closing, in addition to any other remedies provided for in this Agreement, Seller may charge Buyer, and Buyer agrees to pay a late funding charge as liquidated damages in accordance with the provisions of Paragraph 10 of this Agreement. The provisions of this paragraph shall survive the Closing and any termination of this Agreement prior to Closing.

Buyer agrees not to interfere in any manner whatsoever in the sales process (including, without limitation, by picketing or distributing flyers or other literature) with other buyers or prospective buyers in, near or around or in the vicinity of the Project. In the event of interference, in addition to any remedies provided for in this Agreement, Seller may seek remedies available under applicable law. The provisions of this paragraph shall survive the Closing and any termination of this Agreement prior to Closing.

19. **SELLER'S LIMITED WARRANTY; DISCLAIMER OF IMPLIED WARRANTIES.** Seller agrees, at Seller's expense, subject to availability at Closing, to register the Property, at Closing, with Home Buyers Warranty Corporation's ("**HBW's**") 2-10 Home Buyers Warranty, and to further furnish Buyer, at Closing, with appropriate evidence of such registration in accordance with HBW's 2-10 Home Buyers Warranty program, as may be amended from time-to-time by HBW (hereinafter referred to as the "**Limited Warranty**" or "**2-10 Home Buyers Warranty**"). Seller is hereby providing Buyer with the most recent edition of the Home Buyers Warranty Booklet and Application for Enrollment, as of the date of the execution of this Agreement. That Booklet and Application for Enrollment make up the 2-10 Home Buyers Warranty, which have been made available to Buyer, are incorporated by reference and are made a part of this Agreement. The 2-10 Home Buyers Warranty is the sole warranty provided to Buyer. **BUYER CONSENTS TO THE TERMS AND CONDITIONS OF THE OF THE 2-10 HOME BUYERS WARRANTY, INCLUDING THE BINDING ARBITRATION PROVISION CONTAINED THEREIN.** Any other warranty or warranties, whether express or implied, are disclaimed by Seller and waived by Buyer, unless otherwise expressly prohibited by Florida law. If Seller is unable to register the Property with HBW's 2-10 Home Buyers Warranty or an alternative to HBW's 2-10 Home Buyers Warranty, at Closing, Buyer shall receive a credit at Closing equal to the amount charged by HBW for HBW's 2-10 Home Buyers Warranty for other Residences, or, if such rate information is unavailable at Closing, the amount of the credit shall be determined by the most recent formula published by HBW for calculating such amounts for residences comparable to the Residence. If Seller is unable to register the Property with HBW or an alternative to HBW, at Closing, Buyer's receipt of the foregoing credit at Closing shall be the Limited Warranty hereunder. Buyer acknowledges and agrees that Seller has not made, did not make, and specifically negates and disclaims any representations, warranties, promises, covenants, agreements, or guarantees of any kind whatsoever (except for the 2-year construction completion requirement as specifically set forth in this Agreement, and the Limited Warranty set forth in this Section 19 and the warranty of title as specifically set for in this Agreement) whether expressed or implied, oral or past, present or future, of, as to, concerning or with respect to (a) the physical condition of the Property; (b) the suitability of the Property; (d) the compliance of or by the Property with the laws, rules, ordinances or regulations of any applicable governmental authority or body; (c) the habitability, merchantability, or fitness for a particular purpose of the Property; (d) the nature or quality of the soils or geology of the Property; (f) the manner, quality, state of repair or lack of repair, of the Property, or any other matter with respect to the Property. **Buyer further acknowledges and agrees except for the Limited Warranty, to the maximum extent permitted by law, the sale and conveyance of the Property is being made on an "AS IS/WHERE IS," "WITH ALL FAULTS" condition and basis. BUYER UNDERSTANDS AND ACKWOLEDGES THAT THE 2-10 HOMEBUYERS WARRANTY IS AN EXPRESS LIMITED WARRANTY AND THAT NO PERSON OR ENTITY SHALL HAVE ANY LIABILITY WHATSOEVER, BY IMPLICATION OR OTHERWISE, FOR CLAIMS WHICH ARE NOT EXPRESSLY CONVERED BY THE 2-10 HOMEBUYERS WARRANTY. EXCEPT AS SPECIFICALLY PROVIDED IN THE LIMITED WARRANTY, AND TO THE MAXIMUM EXTENT PERMITTED BY LAW, BUYER WAIVES THE RIGHT TO SEEK DAMAGES OR OTHER LEGAL**

FTL:2096895:10

7

Buyer Initials _____

OR EQUITABLE REMEDIES FROM SELLER, ITS CONTRACTORS, SUBCONTRACTORS, AGENTS, VENDORS, SUPPLIERS, DESIGN PROFESSIONALS AND MATERIALMEN, UNDER ANY OTHER COMMON LAW OR STATUTORY THEORY OF LIABILITY, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE AND STRICT LIABILITY FOR ANY DEFECTS OR OTHER DAMAGE TO THE PROPERTY THAT MAY EXIST AT CLOSING OF THIS AGREEMENT AND BE SUBSEQUENTLY DISCOVERED BY THE BUYER OR ANYONE CLAIMING BY, THROUGH, UNDER OR AGAINST THE BUYER. TO THE MAXIMUM EXTENT PERMITTED BY LAW, BUYER WAIVES ANY DUTY ON THE PART OF SELLER TO DISCLOSE TO BUYER FACTS CONCERNING THE PROPERTY KNOWN TO SELLER AND NOT READILY OBSERVABLE TO BUYER MATERIALLY AFFECTING THE VALUE OF THE RESIDENCE OR THE PROPERTY. BUYER'S ONLY REMEDY IN THE EVENT OF A DEFECT IN OR TO THE PROPERTY IS AS PROVIDED TO BUYER UNDER THE EXPRESS LIMITED 2-10 HOME BUYERS WARRANTY. THE LIMITED WARRANTY SHALL NOT BE APPLICABLE TO ANY EXPRESS WRITTEN WARRANTY PROVIDED BY A MANUFACTURER OR VENDOR WHO HAS SUPPLIED ANY APPLIANCE OR COMPONENT FOR THE PROPERTY, NONE OF WHICH MANUFACTURERS' WARRANTIES ARE EXPRESSLY WARRANTED IN ANY WAY BY SELLER. BUYER UNDERSTANDS THAT THE ABOVE-DESCRIBED LIMITED WARRANTY TO BE DELIVERED TO BUYER AT CLOSING IS THE ONLY WARRANTY MADE BY SELLER WITH REGARD TO THE PROPERTY OR THE PROJECT. SELLER MAKES THIS LIMITED WARRANTY EXPRESSLY IN LIEU OF ALL OTHER EXPRESS OR IMPLIED WARRANTIES CONCERNING THE PROPERTY AND THE RESIDENCE SOLD OR TO BE CONSTRUCTED HEREUNDER, AND ANY OTHER REPRESENTATIONS, STATEMENTS OR PROMISES MADE BY ANY PERSON ARE UNAUTHORIZED AND ARE NOT BINDING UPON SELLER. THE AGREEMENT CONTAINED IN THIS SECTION SHALL BE ENFORCEABLE TO THE MAXIMUM EXTENT PERMITTED BY THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, AND SHALL BE APPLICABLE TO ANY CLAIM THEREAFTER MADE AGAINST SELLER OR ANY OTHER PERSON. ALL OTHER WARRANTIES WITH RESPECT TO THE PROPERTY HEREUNDER ARE HEREBY DISCLAIMED, TO THE MAXIMUM EXTENT PERMITTED BY LAW, WHETHER IMPLIED OR ARISING BY OPERATION OF LAW, COURSE OF DEALING, CUSTOM AND PRACTICE, OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF HABITABILITY, MERCHANTABILITY, AND FITNESS FOR PARTICULAR PURPOSE AND SELLER HAS NOT GIVEN AND BUYER HAS NOT RELIED ON OR BARGAINED FOR SUCH WARRANTIES. AS TO ANY IMPLIED WARRANTY THAT CANNOT BE DISCLAIMED ENTIRELY, ALL SECONDARY, INCIDENTAL AND CONSEQUENTIAL DAMAGES ARE SPECIFICALLY EXCLUDED, WAIVED AND DISCLAIMED (CLAIMS FOR SUCH SECONDARY, INCIDENTAL AND CONSEQUENTIAL DAMAGES BEING CLEARLY UNAVAILABLE IN THE CASE OF IMPLIED WARRANTIES WHICH ARE DISCLAIMED ENTIRELY ABOVE). BUYER REPRESENTS THAT BUYER HAS READ AND UNDERSTOOD THIS PROVISION, AND THAT BUYER UNDERSTANDS AND AGREES THAT BY ENTERING INTO THIS AGREEMENT AND ACCEPTING THE BENEFITS OF THE LIMITED WARRANTY DESCRIBED ABOVE, BUYER HAS KNOWINGLY RELINQUISHED ANY AND ALL OTHER WARRANTIES OF ANY KIND OR NATURE REGARDING THE PROPERTY. Without limiting the generality of the foregoing, if, but only if, Seller is prohibited from disclaiming entirely certain implied warranties by reason of the provisions of the "Magnuson-Moss Warranty Act" (15 U.S.C. §§2301-2312) (the "Warranty Act"), if applicable, Seller HEREBY LIMITS THOSE IMPLIED WARRANTIES, IF ANY, AS FOLLOWS: (i) IN SCOPE TO THOSE, IF ANY, GIVEN ON "CONSUMER PRODUCTS," IF ANY, AS DEFINED IN THE WARRANTY ACT, IF APPLICABLE) (ii) IN DURATION TO ONE YEAR, AND ALL THOSE IMPLIED WARRANTIES, IF ANY, ARE HEREBY DISCLAIMED ABSOLUTELY THEREAFTER. In no event shall Seller be liable to Buyer or the Association or any other person or entity for consequential or exemplary damages, or for personal injuries arising from any breach of the Limited Warranty. Buyer understands and agrees that Seller is authorized to utilize a 3rd party warranty management service in connection with the Buyer's enrollment in and the administration of the Limited Warranty, and that Buyer agrees to execute any registration and enrollment applications or agreements in connection with such Limited Warranty enrollment and administration. Seller will deliver to Buyer, at Closing, any and all manufacturers' warranties, which will be passed through to Buyer at Closing, none of which manufacturers' warranties are expressly warranted in any way by Seller. The provisions of this Section 19 will survive Closing. The provisions of this Section 19 will survive Closing and shall be binding and enforceable on Buyer's successors, assigns, heirs and personal representatives.

20. **NOTICES.** WHENEVER BUYER IS REQUIRED OR DESIRES TO GIVE NOTICE TO SELLER, THE NOTICE MUST BE IN WRITING AND IT MUST BE SENT CERTIFIED MAIL, POSTAGE PREPAID, WITH A RETURN RECEIPT REQUESTED TO SELLER AT THE ADDRESS SET FORTH ON PAGE 1 OF THIS AGREEMENT, OR SUCH OTHER ADDRESS AS SELLER MAY OTHERWISE DIRECT.

Unless this Agreement states other methods of giving notices, whenever Seller is required or desires to give notice to Buyer, the notice must be in writing and sent either: (i) by first class mail, postage prepaid (unless sent outside of the United States, in which event written notices to Buyer may be sent by regular air mail); (ii) by facsimile transmission or electronic mail if Buyer has indicated a facsimile number or electronic mail address on Page 1 of this Agreement; or (iii) by a national overnight courier service, to the address for Buyer set forth on Page 1 of the Agreement. A change of address notice is effective when it is received. All other written notices are effective on the day they are properly mailed,

8

FTL:2096895:10

Buyer Initials

transmitted, or delivered, as the case may be, whether or not received (and all permitted non-written notices to Buyer are effective on the date given by Seller) unless receipt is required as specifically set forth in portions of this Agreement.

21. **TRANSFER OR ASSIGNMENT.** Buyer may not assign, sell or transfer Buyer's interest in this Agreement or any of Buyer's rights under this Agreement.

Seller may assign or transfer freely all of its rights and obligations under this Agreement, including its rights in and to Buyer's Deposit and all other payments made by Buyer under this Agreement.

22. **OTHERS BOUND BY THIS AGREEMENT.** If Buyer dies or in any way loses legal control of Buyer's affairs, this Agreement will bind Buyer's heirs and personal representatives. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity. If more than one person signs this Agreement as Buyer, each will be jointly and severally liable for full performance of all Buyer's duties and obligations under this Agreement, and Seller can enforce this Agreement against each or either Buyer as individuals or together.

23. **FLORIDA LAW: SEVERABILITY.** This Agreement shall be governed by, and construed and enforced in accordance with the laws of the State of Florida, and any disputes in connection with this Agreement will be settled according to Florida law.

If any part of this Agreement violates a provision of Florida or federal law, such law will control. In such case, however, the remainder of the Agreement (not in violation) will remain in force and effect. Without limiting the generality of the foregoing, it is Buyer's and Seller's mutual desire and intention that all provisions of this Agreement be given full effect and be enforceable strictly in accordance with their terms. If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement, in its entirety, unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts (and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety), and then are to be enforced as so modified. If the unenforceable part or parts cannot be so modified, such part or parts will be stricken and considered null and void, and the remainder of this Agreement shall continue in full force and effect, in order that the mutual paramount goal (that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms) can be achieved.

Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights and powers, or waiving or limiting any of Buyers rights or powers or Seller's obligations (which otherwise would be applicable in the absence of such language), results in a final conclusion (after giving effect to the above judicial modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of Buyer's Deposit, such offending rights, powers, limitations and/or waivers shall be stricken, cancelled, rendered unenforceable, ineffective and null and void. Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement (other than language which is intended specifically to create such a cancellation right). **THE FOLLOWING SENTENCE WILL SUPERSEDE AND TAKE PRECEDENCE OVER ANYTHING IN THIS AGREEMENT THAT IS IN CONFLICT WITH IT: IF ANY PROVISIONS SERVE TO LIMIT OR QUALIFY SELLER'S SUBSTANTIAL COMPLETION OBLIGATION HEREIN, AND SUCH LIMITATIONS OR QUALIFICATIONS ARE NOT PERMITTED IF THE EXEMPTION OF THIS SALE FROM THE INTERSTATE LAND SALES FULL DISCLOSURE ACT PURSUANT TO 15 U.S.C. § 1702(a)(2) IS TO APPLY OR THIS AGREEMENT IS TO OTHERWISE BE FULLY ENFORCEABLE, THEN ALL THOSE PROVISIONS ARE HEREBY STRICKEN AND MADE NULL AND VOID AS IF NEVER A PART OF THIS AGREEMENT. FOR PURPOSES OF THIS PARAGRAPH ONLY, THE WORDS "THIS AGREEMENT" INCLUDE IN THEIR MEANING THE HOMEOWNER DOCUMENTS.**

24. **TIME OF THE ESSENCE.** The performance of all obligations on the precise times stated in this Agreement is of absolute importance, and failure to perform any such obligations on time is an event of default, time being of the essence with respect to each provision of this Agreement which requires performance by Buyer within a specified time period or upon a specified date.

25. **ENTIRE AGREEMENT.** This Agreement constitutes the entire understanding between the parties, and no future agreement, understanding, amendment or modification of this Agreement shall be valid, binding or enforceable against either party unless reduced to writing signed by Seller and Buyer. Any current or prior agreements, understandings, verbal and visual representations and statements, including, without limitation, artist's rendering, sales and advertising materials, or oral statements and representations of Seller's sales representatives, agents, employees servants or any other persons if not expressed in this Agreement or in the Homeowner Documents, are hereby merged into the terms of this Agreement and are void and have no effect, and Buyer acknowledges that Buyer has not relied on any such information or materials. Seller is not liable or bound in any manner by any verbal or written statement, representations or information pertaining to the Property furnished by any attorney, real estate broker, agent, employee, servant or other person.

FTL/2096895:10

9

Buyer Initials _____

26.    A.   **LITIGATION OF DISPUTES WHICH ARISE BEFORE CLOSING.**   In the event of any dispute arising out of this Agreement prior to Closing, the prevailing party shall be entitled to recover all costs incurred, including, without limitation, reasonable attorneys' fees and costs through all appellate levels and all bankruptcy and administrative proceedings. The venue of any litigation or other dispute resolution arising out of this Agreement shall be Indian River or Palm Beach County, Florida. This provision shall survive the Closing or earlier termination hereof.

B.   **ARBITRATION OF DISPUTES WHICH ARISE AFTER CLOSING.**   It is hereby agreed that all claims, disputes, and controversies between Buyer and Seller arising from or related to the Property after Closing, or to any defect in or to the Property, or the sale of the Property by seller, including but not limited to, any claim for breach of contract, negligent, or intentional misrepresentation, shall be submitted to binding arbitration by and pursuant to the arbitration provision contained in the most recent edition of the HBW Limited Warranty Booklet, as of the date of the execution of this Agreement. That Booklet has been made available to Buyer, and is incorporated herein by reference, and made a part of this Agreement. This provision shall survive the Closing or earlier termination hereof.

27.   **RECORDING.**   Neither this Agreement, nor any notice of memorandum hereof may be recorded among the Public Records, and any such recording shall constitute Buyer's default under this Agreement. Buyer hereby waives any lien rights, legal or equitable, which might be available to Buyer by virtue of this Agreement. Buyer acknowledges and agrees that Buyer's violation of the terms of this Section 27 will materially impair Seller's title to the Property and will cause substantial damage to Seller. In such event, Seller shall be entitled, at Buyer's expense (including all attorneys fees and costs incurred by Seller), and without waiving Buyer's default under this Agreement, to obtain the immediate discharge of any recorded notice, memorandum or lis pendens which Buyer may record in the Public Records; or, alternatively, at Seller's option, and without waiving Buyer's default under this Agreement, Seller may require that Buyer immediately post a bond in the full amount of the Purchase Price, plus all closing costs and attorneys' fees for which Buyer may be liable under this Agreement. Buyer waives any requirement imposed by law that Seller demonstrates any economic damage in order to support the posting of the bond required above.

28.   **SURVIVAL.**   The provisions and disclaimers in this Agreement which are expressly set forth herein to have effect after Closing (but only those provisions and disclaimers) will continue to be effective after Closing and delivery of the deed. All other provisions of the Agreement shall be deemed performed or waived at Closing, and shall be merged into the deed.

29.   **INCORPORATION BY REFERENCE.**   Every exhibit, schedule, modification, rider, and other addendum and appendix attached to this Agreement or referred to herein is hereby incorporated in this Agreement.

30.   **INSULATION DISCLOSURE.**   Seller has disclosed to Buyer, as required by the applicable rules of the Federal Trade Commission that the type, thickness, R-value and location of the insulation Seller intends to install in the Home, are as follows:

| Type | Thickness | R-Value | Location |
|------|-----------|---------|----------|
| Blown | 12" | R-30 | Roof |
| Batt | 3 ½" | R-11 | Living-Garage Ceiling (2-story models only) |
| Batt | 3 ½" | R-11 | Living-Garage Wall |
| Batt | 3 ½" | R-11 | Interior Sound Walls (if any) |
| Foil | N/A | R-4.2 | Exterior Masonry Walls |

Buyer understands that the above information is based solely on the information provided by the manufacturers of such insulation products, and Buyer agrees that Seller is not responsible for any manufacturers' errors or discrepancies. All of the foregoing information is subject to Seller's rights, under this Agreement to make changes in the Construction Specifications, and to any applicable limitations of Seller's liability to Buyer. Pursuant to F.S., Chapter 553.996, Buyer acknowledges receipt of the Energy-Efficiency Standards published by the Florida Dept. of Community Affairs, which among other things, notifies Buyer of the option of obtaining, at Buyer's expense, an energy-efficiency rating on the Residence, a copy of which is attached hereto as Exhibit "E". Buyer is further notified that pursuant to Section 553.9085, Florida Statutes, the energy performance level resulting from compliance with such section shall be disclosed if requested by Buyer. Any request to have the energy efficiency rating or energy performance level provided to Buyer must be delivered to Seller in writing and shall be at Buyer's cost and expense. This paragraph and any information provided pursuant hereto is only for purposes of complying with the requirements of Chapter 553, Florida Statutes, and this Agreement is not contingent upon Buyer approving same. Attached hereto as Exhibit "F" is a sample copy of the energy performance level display card.

31.   **RADON GAS DISCLOSURE.**   Seller does not conduct radon testing with respect to the Property, and specifically disclaims any and all representations or warranties as to the absence of radon gas or radon producing conditions in connection with the Property.   THE FOLLOWING PARAGRAPH IS PROVIDED FOR INFORMATIONAL PURPOSES PURSUANT TO FLORIDA STATUTES 404.056(5):   **RADON GAS: RADON GAS IS A NATURALLY OCCURRING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE**

Buyer Initials _____

As for Foz

PETER BLANCHARD

10

EXPOSED TO IT OVER TIME. LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA. ADDITIONAL INFORMATION REGARDING RADON AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY PUBLIC HEALTH DEPARTMENT.

32.    **RIGHTS AND REMEDIES CUMULATIVE.**    The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies, unless expressly limited by the terms of this Agreement. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise, unless expressly limited by the terms of this Agreement.

33.    **CONSTRUCTION.**    Every covenant, term, provision of this Agreement shall be construed simply according to its fair meaning, and shall not be more strictly construed against any one of the parties hereto. Further, notwithstanding the fact that the form of this Agreement has been drafted, initially, by Seller, all parties to this Agreement have participated fully in the negotiation and preparation hereof, and as this Agreement has been fully negotiated between the parties hereto, the principle of contract interpretation which would result in an ambiguity being construed against the draftsman shall not, and is not intended, to apply. In construing this Agreement, the singular shall be held to include the plural, the plural shall be held to include the singular, and the use of any gender shall be held to include every other gender. The titles and captions contained herein are for convenience only and shall not be deemed a part of the context of this Agreement.

34.    **NEGOTIATIONS.**    Buyer acknowledges that the negotiation of this Agreement and all discussions with Seller and its agents regarding the sale of the Property were conducted in the English language. Buyer also acknowledges that (a) Buyer has had ample opportunity to inspect the documents provided to Buyer pursuant to this Agreement, and pursuant to any request of Buyer, and (b) that although Seller's sales agents are not authorized to change the form of this Agreement, they have strict instructions from Seller to communicate any of Buyer's requests for changes to this Agreement to Seller's management, which has given Buyer the opportunity to discuss and negotiate any such changes to the Agreement. In light of the foregoing, Buyer's decision to sign this Agreement now is totally free and voluntary and Buyer acknowledges and accepts all of the provisions of the Agreement and the Homeowner Documents as fair, reasonable, negotiated, discussed and explained to Buyer's complete satisfaction.

35.    **COUNTERPARTS.**    This Agreement may be executed in counterparts, each of which shall be deemed an original, and shall be binding upon the party or parties who executed same, but all of such counterparts shall constitute one and the same Agreement.

36.    **EFFECTIVE DATE.**    The effective date ("**Effective Date**") of this Agreement shall be the date stated on Page 1 of this Agreement, and shall be the date from which all time periods under this Agreement are computed. Notwithstanding the foregoing, should the Effective Date be subsequent to the date Buyer executes this Agreement, the Effective Date shall not extend the time period within which Seller must complete construction of the Property.

37.    **JURY TRIAL WAIVER.**    **SELLER AND BUYER KNOWINGLY, INTENTIONALLY AND VOLUNTARILY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, THE ACTIONS OF THE PARTIES IN THE NEGOTIATION, PERFORMANCE AND ENFORCEMENT OF THIS AGREEMENT, THEIR CONDUCT OR COURSE OF DEALINGS.**

38.    Deleted.

39.    Florida Homeowners' Construction Recovery Fund.  Pursuant to Section 489.1425, Florida Statutes, Seller is required to provide the following notice to Buyers:

**FLORIDA HOMEOWNERS' CONSTRUCTION RECOVERY FUND**

PAYMENT MAY BE AVAILABLE FROM THE FLORIDA HOMEOWNERS' CONSTRUCTION RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS: 1940 NORTH MONROE STREET, TALLAHASSEE, FL 32399-0783, PHONE: 850-487-1395.

40.    **Property Tax Disclosure.**    Pursuant to Section 689.261, Florida Statutes, Seller is required to provide the following notice to Buyers:

PROPERTY TAX DISCLOSURE SUMMARY

Buyer Initials _____
as P.O.A. for
PETER BLANCHARD

11

BUYER SHOULD NOT RELY ON THE SELLER'S CURRENT PROPERTY TAXES AS THE AMOUNT OF PROPERTY TAXES THAT THE BUYER MAY BE OBLIGATED TO PAY IN THE YEAR SUBSEQUENT TO PURCHASE. A CHANGE OF OWNERSHIP OR PROPERTY IMPROVEMENTS TRIGGERS REASSESSMENTS OF THE PROPERTY THAT COULD RESULT IN HIGHER PROPERTY TAXES. IF YOU HAVE ANY QUESTIONS CONCERNING VALUATION, CONTACT THE COUNTY PROPERTY APPRAISER'S OFFICE FOR INFORMATION.

41.    **Disclosure Summary.**    Pursuant to Section 720.401, Florida Statutes, Seller is required to provide each prospective buyer in the Project with a Disclosure Summary regarding the Project before such prospective buyer executes a contract to purchase a Residence in the Project. The Disclosure Summary for the Project is incorporated into this Agreement by this reference and is attached to this Agreement as Exhibit "D". **BUYER SHOULD NOT EXECUTE THIS AGREEMENT UNTIL BUYER HAS RECEIVED AND READ THE DISCLOSURE SUMMARY.** In that regard,

**IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 720.401, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT OR REPRESENTATIVE WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.**

Buyer acknowledges that Buyer has received and read the Disclosure Summary for the Project before executing this Agreement.

BUYER: _____                      BUYER: _____

AS  P.O.A.  FOR  PETER  BLANCHARD

42.    **ADDITIONAL DISCLOSURES AND DISCLAIMERS.**    Seller hereby discloses the following information to Buyer which Buyer should carefully evaluate in its decision to purchase the Property:

(a)    Buyer acknowledges that certain aspects of the Common Property may, in some cases, be unfinished as of the date of Closing, and that Buyer will accept such improvements and facilities in their "AS IS" condition as of the Closing Date.

(b)    Although the glass and windows in the Residence are impact-resistant, according to the manufacturer, Seller makes no representations as to the resistance qualities or capabilities of the glass windows or doors in the case of a major weather event.

(c)    Deleted.

(d)    Buyer acknowledges that given the climate and humid conditions in Florida, molds, mildew, toxins, fungus and other microorganisms may exist and/or develop within the Residence or within the Common Property. Buyer is hereby advised that certain mold, mildew, fungi and other microorganisms may be, or if allowed to remain for a sufficient period, may become, toxic and potentially pose a health risk. By executing this Agreement and Closing, Buyer shall be deemed to have assumed the risks associated with molds, mildew, toxins and/or fungi and to have released Seller and Seller's contractors from any and all liability whatsoever resulting from same. Seller shall not be liable or responsible for any loss or damage that is caused by or made worse by any of the following causes, whether acting alone, or in sequence or concurrence with any other cause or causes whatsoever, including without limitation: microorganisms, fungus, decay, wet rot, dry rot, soft rot, rotting of any kind, mold, mildew, vermin, termites, insects, rodents, birds, wild or domestic animals, plants, corrosion, rust, radon, radiation, formaldehyde, asbestos, any solid, liquid or gaseous pollutant, contaminant, toxin, irritant, or carcinogenic substance, whether organic or inorganic, and electromagnetic field or emission, including any claim of health risk or uninhabitability based on any of the foregoing.

(e)    Buyer acknowledges that any proposed Association budget provided to Buyer reflects estimated expenses, and, as an estimate, such expenses are subject to change between the time of Buyer's receipt of any proposed Association budget and the time such expenses are to be paid by the Association.

(f)    Buyer acknowledges that any sidewalks shown on any Exhibits to this Agreement may not be installed on the Lot that is subject to this Agreement, and Seller is not bound by any such Exhibits, as Buyer understands that sidewalks within the Project are located on only one side on the streets within the Project, and may not be located on the Lot.

Buyer Initials _____

AS  P.O.A.  FOR
PETER  BLANCHARD

12

FTL:2096895:10









(g) Deleted.

(h) It is the intention of the parties that this sale qualify for the exemption provided by 15 U.S.C. Section 1702(a)(2), and nothing herein contained shall be construed or operate, as to any obligations of Seller or rights of Buyer, in a manner which would render said exemption inapplicable.

(i) **PROHIBITING TRANSACTIONS WITH PERSONS WHO COMMIT, THREATEN TO COMMIT, OR SUPPORT TERRORISM**: Buyer, which for this purpose includes its partners, members, principal stockholders and any other constituent entities, if any, hereby represents that he/she/it (i) has not been designated as a "specifically designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at is official website http://www.treas.gov/ofac/t11sdn.pds or at any replacement website or other replacement official publication of such list; (ii) is currently in compliance with and will at all times during the term of this Contract (including any extension thereof) remain in compliance with the regulations of the Office of Foreign Asset Control of the Department of the Treasury and any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action relating thereto; and (iii) has not used and will not use funds from illegal activities for any portion of the Purchase Price, including the Deposit.

The provisions of this Section 42 will survive Closing.

**BY SIGNING BELOW, BUYER AND SELLER AGREE TO BE BOUND BY ALL TERMS AND PROVISIONS OF THIS AGREEMENT. ACCORDINGLY, BUYER IS HEREBY ADVISED TO CAREFULLY REVIEW THIS AGREEMENT AND THE HOMEOWNER DOCUMENTS, AND TO CONSULT WITH AN ATTORNEY OF BUYER'S CHOICE.** If, after the execution of this Agreement, Buyer or any attorney on Buyer's behalf, informs Seller that Buyer desires or intends to terminate this Agreement, or that Buyer is or may be unable or unwilling to comply with any of the terms of this Agreement, then, at the option of Seller, same will constitute a default by Buyer.

IN WITNESS WHEREOF, the parties hereto have sworn to and executed this Agreement as of the date first above written.

**SELLER:**

ANTILLES VERO BEACH, LLC,
a Florida limited liability company

By: Ironwood Development, Inc.,
a Florida corporation, its Managing Member

By: ______________________
Cary Glickstein, as President

Date: 9/6/08

**BUYER:**

______________________ AS P.O.A. FOR PETER BLANCHARD

Print Name: JAMES A. HERNANDEZ

Date: ______________________

______________________

Print Name: ______________________

Date: ______________________

FTL:2096895:10

Buyer Initials ______

AS POA FOR PETER BLANCHARD

PRELIMINARY ROOF PLAN
SCALE: 3/16" = 1'-0"

STREET ORIENTATION - LEFT

The 'ANTILLES' Developement
for IRONWOOD PROPERTIES, INC.

SECTION II, TOWNSHIP 32S, RANGE 39E
INDIAN RIVER COUNTY, FLORIDA

DRAWING
PRELIMINARY ROOF PLAN

MODEL - 1 SCHEME - B

MODEL NO. 1 ( ANTIGUA ) - SCHEME - B

A.3

AS POR FOX

PETER PLAN CHECKER



FRONT ELEVATION

RIGHT-SIDE ELEVATION



LEFT-SIDE ELEVATION



REAR ELEVATION

PRELIMINARY ELEVATIONS
SCALE:  3/16" = 1'-0"

The "ANTILLES" Developement
for IRONWOOD PROPERTIES, INC.

STREET ORIENTATION - LEFT

MODEL NO. 1 ( ANTIGUA ) - SCHEME - B

A.4

As Per For
Peter Blanchard

## EXHIBIT "C"

## THE ANTILLES
## CONSTRUCTION SPECIFICATIONS

**MODEL TYPE: ANTIGUA**
(February 9, 2006)

### General Area Tabulations:

| | |
|---|---|
| Living A/C Area: | 3083 Sq. Ft. |
| Covered Entries: | 77 Sq. Ft. |
| Covered Porches: | 189 Sq. Ft. |
| 2-Car Garage: | 493 Sq. Ft. |
| Total Area Under Roof: | 3,842 Sq. Ft. |

### Foundation and Exterior Walls:

- Steel-reinforced concrete foundation, over visqueen vapor barrier and compacted, termite-treated soil.
- Steel-reinforced masonry exterior walls with steel-reinforced concrete vertical columns, and horizontal beams.

### Roof Materials:

- Elevation Type A: Hanson (or equal) 13" Chalet Shake, color thru concrete roof tile and ridge caps over 30# ASTM mineral surface roll roofing on 15# roofing membrane tin-tagged to 5/8" exterior grade plywood sheathing nailed to pre-engineered and manufactured wood roof trusses, anchored and spaced @ 24" on center with white aluminum flashings and drip edge.

- Elevation Type B: 5-V-Crimp metal roof with mill finish over 15# felt roofing membrane anchored to 5/8" exterior grade plywood sheathing nailed to pre-engineered and manufactured wood roof trusses, anchored and spaced @ 24" on center with galvanized metal flashing and drip edge.

- Elevation Type C: Hanson (or equal) 13" wide, Nordic Slate Ice White, color-thru concrete roof tile with mitered edges over 30# ASTM mineral surface roll roofing on 15# roofing membrane tin-tagged to 5/8" exterior grade plywood sheathing nailed to pre-engineered and manufactured wood roof trusses, anchored and spaced @ 24" on center with bronze aluminum flashings and drip edge.

### Exterior Finishes:

- Smooth stucco finish on exterior walls, covered entry and porch ceilings, and soffits with continuous soffit vents.
- Smooth stucco lap siding finish on front and partial side exterior wall elevations (Elevation Type B only).
- Decorative, painted soffit rafter tails in selected locations.
- Decorative, pre-finished aluminum (non-operative) shutters at front and partial side locations.
- Concrete paver driveways and entry walkways.
- Porter (or equal) exterior flat latex paint on all stucco.
- Porter (or equal) exterior semi-gloss enamel paint non-pre-finished doors and wood trim.

1

Buyer Initials: _____   As For Fox
Peter Blanchard

## Interior Finishes:

- Interior partitions to be 4" - 6" 25 gauge metal studs spaced @ 24" on center.
- ½" and 5/8" gypsum wall board on all interior walls and ceilings, respectively, with smooth texture.
- Denshield moisture resistant wallboard on all bathroom shower/tub walls and master tub deck and skirt.
- 10' flat ceilings, except for 11' tray ceilings at den/living and master bedroom.
- Porter (or equal) interior flat latex paint on interior walls (cream/off-white) and ceilings (white).
- Porter (or equal) interior semi-gloss enamel paint on all interior doors and wood trim (white).
- Prestige 8' x 1 3/8" thick, solid-core LDF interior doors with raised panels.
- 5¼" painted crown molding at foyer, den/living room, dining room, and master bedroom.
- 5¼" painted base trim.
- 3¼" painted casing trim around all interior and exterior doors.
- 1" x 4" painted wood window sills and aprons.
- Ashley-Norton (or equal) bronze door hardware on interior and exterior doors, with deadbolts on all exterior doors.
- Chrome and clear glass shower enclosures.
- ¼" x 48" high clear plate mirrors in master bathroom and guest bathrooms.
- Bathroom accessories: polished chrome towel bars and paper holders in all bathrooms. Recessed medicine cabinets with mirror doors in all full bathrooms.
- Central vacuum piping with wall outlets and pre-wiring for garage wall-mounted vacuum unit (vacuum unit not included).
- Pull-down attic stairs in garage.
- Closet and (walk-in-pantry, if applicable) shelving allowance of $1,000.

## Windows, Exterior Doors, and Garage Doors

- PGT pre-finished white aluminum, single-hung windows with impact-resistant, tinted glass, and screens.
- PGT 8' pre-finished white aluminum french doors with impact-resistant, tinted glass at all porch areas.
- PGT 8' pre-finished white aluminum french door with impact-resistant, tinted glass at front entry or Therma-Tru (or equal) 8' insulated, painted fiberglass, raised panel door.
- Garage Door(s): Raynor, painted, raised panel, metal garage doors (and remote garage door operators for each garage door).

**Insulation:**   See Seller's Disclosure Exhibit

## Air Conditioning and Heating:

- High-efficiency Carrier (or equal) 12 SEER single-zone central air conditioning and heating system, as per HVAC plans.
- Venting for clothes dryer.
- Exhaust fans in all bathrooms.

2

Buyer Initials: _____

AS P.O. A. FOR
PETER BENYAMINE

## Plumbing and Fixtures:

- All copper water lines.
- Kohler Memoirs Stately two-piece elongated water closet in all bathrooms (white).
- Kohler Memoirs Stately pedestal lav at powder room (white).
- Kohler Memoirs widespread lever faucet at powder room (polished chrome).
- Kohler Devonshire widespread lever faucets and shower/tub controls in master bathroom (polished chrome).
- Kohler Fairfax widespread lever faucets and shower/tub controls in secondary bathrooms (polished chrome).
- Kohler K-1146-S oval acrylic whirlpool bath at master bathroom (white).
- Kohler K-3351 18-gauge stainless steel, undermount, double basin kitchen sink.
- Kohler Coralais kitchen faucet and hose spray (polished chrome).
- Insinkerator 1/2 hp sink disposal unit.
- A.O. Smith 80 gallon, electric quick-recovery water heater.
- Mustee fiberglass drop-in laundry sink (white).
- Kohler Trend laundry sink faucet (polished chrome).
- Recessed washing machine box with water supply valves.
- Recessed dryer vent box.
- Outside hose bibs (sides and rear).

## Electrical and Fixtures:

- 200-250 amp service, as per electrical plan for the Home.
- Copper wiring throughout Home.
- Decora rocker light switches and receptacles (white).
- Pre-wired CATV outlets homerun to central panel.
- Pre-wired Category-5 telephone wiring homerun to central panel.
- Pre-wired ceiling fan receptacles (fans supplied by Buyer).
- Pre-wired dining area and foyer, and nook. Note, all wall-mounted light fixtures (except for bathrooms noted herein), all ceiling-mounted light fixtures (except for recessed lights noted herein), and all ceiling fans are to be supplied by Buyer.
- Under cabinet, fluorescent light fixtures in kitchen.
- Ceiling-mounted fluorescent light fixtures at walk-in closets, laundry room, and garage.
- Recessed light fixtures as per electrical plan for the Home.
- Recessed vapor proof light fixtures above showers and bathtubs.
- Wall-mounted sconce light fixtures at master bathroom and powder room.
- Wall-mounted exterior light fixtures at exterior entry doors and garage doors (bronze).
- Security alarm system with contacts on all 1st floor exterior doors and operable windows, 2 control keypads, 2 motion sensors, and smoke detectors as required by applicable building code.
- Exterior entry door intercom-to-telephone system.
- Entry gate call box connection.

## Appliances: (All Kitchen-Aide with white, biscuit or black finish)

- 36" 25.3 cu. ft. refrigerator with door water and ice dispenser.
- 30" self-cleaning, undercounter convection oven
- 30" smooth glass cooktop
- 30" microwave oven/hood
- 24" dishwasher
- Extra-large capacity washer and dryer (white)

Buyer Initials: _____

3

## Cabinetry and Countertops:

Kitchen:

- Wood, raised panel, full overlay doors and drawers, as per cabinet plan for Home (standard complimentary colors).
- Granite countertop with 1½" edge profile and 4" backsplash.
- 34 1/2" high x 24" deep base cabinets.
- 42" high x 12" deep upper cabinets with upper cabinets over refrigerator and microwave oven, and pantry cabinets, if applicable.
- Adjustable shelving in all cabinets.
- Brushed stainless door and drawer pulls.

Master Bathroom:

- Wood, raised panel, full overlay doors and drawers, and adjustable shelves, as per cabinet plan for Home (standard complimentary colors).
- Solid, one piece, cultured marble (white or biscuit) vanity top with 1½" edge, 4" backsplash, and two (2) integral, recessed oval sinks.
- Brushed chrome door and drawer pulls.

Guest Bathrooms:

- Thermafoil, full overlay doors and drawers with square raised panels (matte white or biscuit), and adjustable shelves, as per cabinet plan for Home.
- Solid, one piece, cultured marble (white or biscuit) vanity tops with 1½" bullnose edge, 4" backsplash, and one (1) integral, recessed oval sink.
- Brushed chrome door and drawer pulls.

Laundry Room:

- Thermafoil, full overlay, raised panel doors and drawers (matte white), and adjustable shelves, as per cabinet plan for Home.
- Postform color-thru laminate (white or biscuit) countertop with 1½" bullnose edge and integral 4" backsplash.
- Chrome door and drawer pulls.

## Flooring:

- Decorative 18" ceramic tile at all living area floors, except for bedrooms bathrooms and bedroom-related closets (tile allowance of $5 psf).
- Decorative ceramic tile at all bathrooms (tile allowance of $5 psf).
- Carpet allowance of $20 psy for all bedrooms and closets.

## Landscaping, Paving and Decking:

- Landscaping pursuant to Urban Design Studio landscape plans.
- Zoned automatic sprinkler system utilizing Common Area retention water.
- Concrete pavers at driveway, entry walkway, and front entry.
- Concrete pavers at all covered porches.
- Postmaster General approved mailbox and address plate.

Buyer Initials: _____

A3 P.O.A. FOR
PETER BLANCHARD

4

**Security and Recreation Amenities:**

- Perimeter fencing and decorative walls around Subdivision.
- Entry Gates at US-1 entrance with gatehouse pavilion (un-manned) and call box to each Home.
- Entry gates and call box at 63rd Street entrance.
- 11,000 SF Clubhouse Facilities with detached Community Building, and Exercise Pavilion.
- Heated community swimming pool and heated spa and pool deck
- Gated tot-lot playground area.
- Three (3) regulation size lighted tennis courts.

## SPECIFICATION DISCLOSURES
### BUYER UNDERSTANDS AND AGREES THAT:

All dimensions and floor plan layouts are approximate, and all materials, features, finishes, equipment, and product selections are subject to change by Seller without prior notice pursuant to the Purchase and Sale Agreement.

Certain materials, features, finishes, equipment and products may appear in/on the Floor Plans or Elevations for one model type but not others.

Exterior paint color combinations will be determined by Seller, it its discretion based on appropriateness to the Elevations and location of the Home in relation to adjacent Homes.

Exterior features such as landscaping and fencing shown on any promotional materials may not be accurate representations of the landscaping or fencing to be installed by Seller, and Seller is not bound by any such representations. Except in connection with any pool fencing required by building codes, or as otherwise noted herein, there is no fencing between the lots and homes.

Certain design features shown on the Floor Plans and/or Elevations are based on architectural software, such that certain design features, including, without limitation, exterior doors, windows, entry gates, railings, decorative shutters, garage doors, and light fixtures may not be accurate representations of the items or materials to be installed by Seller pursuant to these Specifications, and Seller is not bound by any such representations in the Floor Plans or Elevations.

Certain features that may be shown on the Floor Plans or the Elevations may not be included in the Home, including, without limitations, swimming pools, pool decks, outside grills, fireplace, desks, built-ins, interior fireplace, exterior chimneys. Only those items stated in these Specifications will be included in the Home, subject to the provisions of the Purchase and Sale Agreement. Any representations of pools and pool decks of any promotional materials may not be accurate representations of the pool and pool deck locations, sizes or configurations.

Any lot dimensions shown on any promotional materials or in the Floor Plan exhibits to the Purchase and Sale Agreement are used to show typical lot dimensions, and may not be accurate representations of the Lot that is subject to this Purchase and Sale Agreement, and Seller is not bound by such information. For accurate Lot dimensions, refer to Exhibit "A" to the Purchase and Sale Agreement.

The glass in the windows and doors are impact-resistant, according to the manufacturer. Seller makes no representation as to the resistance qualities or capabilities of the glass windows or doors in the case of a major weather event.

Buyer Initials: _____

AS POA FOR

PETER GIANCHINO

5

**EXHIBIT "D"**

DISCLOSURE SUMMARY FOR THE ANTILLES VERO BEACH HOMEOWNERS ASSOCIATION

1.  AS A BUYER OF PROPERTY IN THIS COMMUNITY, YOU WILL BE OBLIGATED TO BE A MEMBER OF A HOMEOWNERS' ASSOCIATION ("ASSOCIATION").

2.  THERE HAVE BEEN OR WILL BE RECORDED RESTRICTIVE COVENANTS ("COVENANTS") GOVERNING THE USE AND OCCUPANCY OF PROPERTIES IN THIS COMMUNITY.

3.  YOU WILL BE OBLIGATED TO PAY ASSESSMENTS TO THE ASSOCIATION. ASSESSMENTS MAY BE SUBJECT TO PERIODIC CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $400.00 PER MONTH. YOU WILL ALSO BE OBLIGATED TO PAY ANY SPECIAL ASSESSMENTS IMPOSED BY THE ASSOCIATION. SUCH SPECIAL ASSESSMENTS MAY BE SUBJECT TO CHANGE. IF APPLICABLE, THE CURRENT AMOUNT IS $ 0.00.

4.  YOU MAY BE OBLIGATED TO PAY SPECIAL ASSESSMENTS TO THE RESPECTIVE MUNICIPALITY, COUNTY, OR SPECIAL DISTRICT. ALL ASSESSMENTS ARE SUBJECT TO PERIODIC CHANGE.

5.  YOUR FAILURE TO PAY SPECIAL ASSESSMENTS OR ASSESSMENTS LEVIED BY A MANDATORY HOMEOWNERS' ASSOCIATION COULD RESULT IN A LIEN ON YOUR PROPERTY.

6.  THERE MAY BE AN OBLIGATION TO PAY RENT OR LAND USE FEES FOR RECREATIONAL OR OTHER COMMONLY USED FACILITIES AS AN OBLIGATION OF MEMBERSHIP IN THE HOMEOWNERS' ASSOCIATION. IF APPLICABLE, THE CURRENT AMOUNT IS $ 0.00.

7.  THE DEVELOPER MAY HAVE THE RIGHT TO AMEND THE RESTRICTIVE COVENANTS WITHOUT THE APPROVAL OF THE ASSOCIATION MEMBERSHIP OR THE APPROVAL OF THE PARCEL OWNERS.

8.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE FORM ARE ONLY SUMMARY IN NATURE, AND, AS A PROSPECTIVE PURCHASER, YOU SHOULD REFER TO THE COVENANTS AND THE ASSOCIATION GOVERNING DOCUMENTS BEFORE PURCHASING PROPERTY.

9.  THESE DOCUMENTS ARE EITHER MATTERS OF PUBLIC RECORD AND CAN BE OBTAINED FROM THE RECORD OFFICE IN THE COUNTY WHERE THE PROPERTY IS LOCATED. OR ARE NOT RECORDED AND CAN BE OBTAINED FROM THE DEVELOPER.

_____
BUYER   *AS POA FOR*
*PETER BLANCHARD*

_____
BUYER

_____
DATE   *1/6/02*

_____
DATE

Buyer Initials _____

*AS POA FOR*
*PETER BLANCHARD*

Page 1 of 4

EXHIBIT "E"

Buyer Initials ____

AS POA FOR
PETER ZAMORRD



# Thinking About Buying a Home?

## Get An EnergyGauge™ Rating!

### Consider the Benefits:

- More Home for Less Money
- Improved Mortgage Options
- Enhanced Indoor Comfort
- Superior Energy Efficiency
- More Environmental Sustainability
- Tested Quality Construction
- Greater Resale Value

Congratulations on your decision to purchase a home.

As you know, there are a lot of factors to consider before signing on the dotted line. By now you've probably checked out the location of the home you like the best. You know how much the seller wants, how many bedrooms there are, whether your dining room table will fit, where you'll park your car and lots of other important things.

**But wait, there's still one more important thing you really ought to do.**

You wouldn't buy a car without asking how many miles-per-gallon it gets, would you? So why would you even think of buying a house without knowing how much the power bills will be? That's why now is the perfect time to get an EnergyGauge rating on the house.

Since 1994, there has been a voluntary statewide energy-efficiency rating system for homes in Florida, and prospective home-owners just like you all around the state are getting their homes rated before they make their purchase. There are several very important reasons why:

♦ **Energy ratings give homebuyers a market-place yardstick that measures the benefits of energy-efficiency improvements.** You get detailed estimates of how much your energy use will cost.

♦ **Energy ratings give you clear and specific information that lets you compare similar homes on their energy use.**

Page 1 of 4

You're already familiar with the miles-per-gallon stickers on new automobiles, and the yellow EnergyGuide labels on home appliances. Shoppers use this information to figure out how much that car or appliance is really going to cost them. This information gives the buyer a good estimate of what it will cost to operate that car or use that appliance, over and above the purchase price. A car or product that is cheaper to buy can often be more expensive to operate, so this information can be very important to assure that you make the best purchase decision.

**Here's how the Florida Energy Gauge program works.**

After the rating, you'll get an easy-to-read form like the one on the next page. The Rating Guide has a scale that allows you to compare the specific home you're looking at with the most efficient and the least-efficient homes of the same size with the same number of bedrooms available in your part of the state today. And in addition to this overall estimate of energy use and comparisons, you get a detailed breakdown on the energy costs of the home's air-conditioning, space heating, water heating, refrigerator, clothes dryer, cooking costs, lighting, pool pumping and other miscellaneous equipment.

One of the keys to the success of this program is the uniformity of ratings, made possible by the use of the EnergyGauge software developed by the Florida Solar Energy Center. It has been specially designed to let Raters input the key data on the home and obtain accurate information for comparison purposes. A unique optimization feature even lets Raters determine what energy-efficiency

features can be added to the home to maximize cost-savings and comfort-improvement.

**So how can a home energy rating help you reduce your energy use and save money?**

That's easy. While the design and construction of your home and the efficiency of its appliances and equipment control the most significant portion of its energy use, occupant life-style will still have a big effect on exactly how much energy gets used. Your comfort preferences and personal traits - the level at which you set the thermostat, whether or not you turn off lights and fans when leaving a room, how much natural ventilation you use, and other factors - all will affect your home's actual monthly energy use.

**The Ratings program in Florida closely parallels national activities.**

The U.S. Department of Energy has been working to set national standards for Home Energy Rating Systems, and Florida's system meets these standards. The Florida Building Energy Rating Guide provides a HERS score for the home. This national score enables homes to qualify for national mortgage financing options requiring a HERS score. This score is computed in accordance with proposed national guidelines, considering the heating, cooling, and hot water energy uses. HERS awards stars to the rating.

**Tell your Realtor or builder that you want to get the home rated before you buy it.**

They can give you the names of Raters in your area. Additional information on the program is available from the Energy Gauge Program Office at 407-638-1492.

Buyer Initials

Page 2 of 4

FTL:209689S:10



Page 3 of 4

Buyer Initials

A3 POA FOR
PETER BLANCHARD

Two homes might look pretty much alike, but one may be efficient and comfortable and the other an energy-guzzler with a very uncomfortable interior.

◆ Maybe most important of all, the **national Home Energy Rating System (HERS) score on the energy rating can qualify you for a number of special mortgage programs that offer lower interest rates, lower closing costs, and other benefits.** More and more lenders are coming into Florida with money-saving packages for buyers of energy-efficient homes.

**Before buying your next home, hire a Certified Energy Rater to do a rating.**

Your builder or Realtor can help you find a Certified Rater in your area. After the rating, you'll get an easy-to-understand Energy Guide that estimates how much it will cost to pay for energy used in that home, and will allow you to look at a number of separate areas of energy use throughout the house.

For many years, buyers have had home inspectors look over a home before making their purchase. This is a great way to find out about potential house problems before you make your purchase. Smart homebuyers around the country are now also asking for a home energy rating to look specifically at the energy-users in a home and determine their efficiency. Because energy costs can often equal house payments, the relatively small cost of a home energy rating can easily be offset by many years of lower energy payments.

## Who does Energy Ratings?

It is important to note that only State Certified Raters are allowed to perform ratings. These Raters have undergone rigorous training programs and have passed the required challenge exams. They are also required to undergo continuing education classes and further exams to keep their certifications current. An on-going quality control program also watches over their Ratings and their work. All their Ratings are submitted to a central Registry that checks them for accuracy and compiles generic building data.

## Energy Ratings in Florida

The Florida Building Energy-Efficiency Rating Act (Florida Statute 553.9900 was passed by the State Legislature in 1993 and amended in 1994. It established a voluntary statewide energy-efficiency rating system for homes. The Rating System has been adopted by DCA Rule 9B-60.



The Florida Energy Gauge

5-14C-85

**The Florida Energy Gauge Program**
*Florida's Building Energy Rating System*
1679 Clearlake Road
Cocoa, Florida 32922-5703
407-638-1492
Fax: 407-638-1010
E-Mail: EnGauge@fsec.ucf.edu
Website: www.fsec.ucf.edu

Page 4 of 4

Buyer Initials _____

AJ POA FOX
PETER BURROWES

EXHIBIT "F"

# ENERGY PERFORMANCE LEVEL (EPL)
## DISPLAY CARD

ESTIMATED ENERGY PERFORMANCE SCORE* = _____
The higher the score, the more efficient the home.

1. New home or addition _____
2. Single family or multifamily _____
3. Number of units, if multifamily _____
4. Number of bedrooms _____
5. Is this a worst case? (yes or no) _____
6. Conditioned floor area _____ sq.ft.
7. Glass type & area
   a. Single pane, clear _____ sq.ft.
   b. Single pane, tinted _____ sq.ft.
   c. Double pane, clear _____ sq.ft.
   d. Double pane, tinted _____ sq.ft.
8. Floor types, Insulation level
   a. Slab-on-grade, edge insulation  R=_____
   b. Wood, raised  R=_____
   c. Concrete, raised  R=_____
9. Wall types, Insulation level
   Exterior
   a. Wood frame  R=_____
   b. Metal frame  R=_____
   c. Concrete block  R=_____
   d. Log  R=_____
   e. Other: _____  R=_____
   Adjacent
   a. Wood frame  R=_____
   b. Metal frame  R=_____
   c. Concrete block  R=_____
   d. Log  R=_____
   e. Other: _____  R=_____
10. Ceiling types, Insulation level
    a. Under attic  R=_____
    b. Single assembly  R=_____
    c. Knee walls/skylight walls  R=_____
    d. Radiant barrier installed  R=_____

11. Ducts, Location & Insulation Level
    a. Supply ducts: _____  R=_____
    b. Return ducts: _____  R=_____
12. Cooling systems  Capacity: _____
    a. Split system  SEER: _____
    b. Single package  SEER: _____
       COP: _____
    c. Ground/water source  EER: _____
    d. Room unit  EER: _____
    e. PTAC  COP: _____
    f. Gas-driven
13. Heating systems  Capacity: _____
    a. Split system heat pump  HSPF: _____
    b. Single package heat pump  HSPF: _____
    c. Electric resistance  COP: _____
    d. Gas furnace, natural gas  AFUE: _____
    e. Gas furnace, LPG  AFUE: _____
    f. Gas-driven heat pump  COP: _____
    g. Combination water/space gas systems  Recov.Eff.: _____
14. Water heating systems
    a. Electric resistance  EF: _____
    b. Gas-fired, natural gas  EF: _____
    c. Gas-fired, LPG  EF: _____
    d. Solar system with tank  EF: _____
    e. Dedicated heat pump with tank  EF: _____
    f. Heat recovery unit  HeatRecEff.: _____
    g. Other: _____
15. HVAC credits claimed
    a. Ceiling fans _____
    b. Cross ventilation _____
    c. Whole house fan _____
    d. Multizone cooling credit _____
    e. Multizone heating credit _____
    f. Programmable thermostat _____

I certify that this home has complied with the Florida Energy Efficiency Code For Building Construction through the above energy saving features which will be installed (or exceeded) in this home before final inspection. Otherwise, a new EPL Display Card will be completed based on Code compliant features.

Builder Signature: _____  Date: _____

Address of New Home: _____  City/FL. Zip: _____

*NOTE: The home's estimated energy performance score is only available through the FLA/RES computer program. This is not a Building Energy Rating. If your score is 80 or greater (or 86 for a US EPA/DOE EnergyStar™ designation), your home may qualify for energy efficiency mortgage (EEM) incentives if you obtain a Florida Energy Gauge Rating. Contact the Energy Gauge Hotline at 407/638-1492 or see the Energy Gauge web site at www.fsec.ucf.edu for information and a list of certified Raters. For information about Florida's Energy Efficiency Code For Building Construction, contact the Department of Community Affairs at 850/487-1824.

Buyer Initials _____

AS POA FOR
PETER ZANCHULSKI