EXHIBIT C

F:\Agree\Oaks\K-Single Family Revised June, 2006

# THE OAKS AT BOCA RATON
### Agreement for Purchase and Sale

In this Agreement, the word BUYER refers to buyer or buyers who have signed the Agreement. The word SELLER means or refers to ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, whose address is 1000 Clint Moore Road, Suite 110, Boca Raton, Florida 33487.

If the first letter of the word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or in the Community Documents (as defined in Paragraph 14, of this Agreement).

Buyer(s): _____ JONATHAN RESNICK and DIANE RESNICK, His Wife _____
Address: _____ 17910 Monte Vista Drive _____
City: _____ Boca Raton _____ County: _____
State: _____ FL _____ Zip Code: _____ 33496 _____
Home Phone: ( 561 ) 477-8337 _____ Office Phone: ( 410 ) 484-9600 _____ Fax Phone: ( )
Social Security Number(s): _____
Estimated Completion Date of Home (See Paragraph 7): _____ Approximately 14 months from date of execution _____
On-Site Salesperson: _____
Cooperating Broker (See Paragraph 16-If not filled in, there is none): _____ None _____

1. <u>PURCHASE AND SALE</u>. Seller agrees to sell to, and Buyer agrees to purchase from Seller, the single family dwelling ("Home") and the "Lot" on which it is situated, as hereinafter described, for the price and on the terms and conditions now about to be set forth:

Lot: __ 41 __, Block _F1_, Model: _ MODIFIED BERMUDA _____ Garage Orientation: _As Per Plan_

    A.   DESCRIPTION OF HOME AND PARCEL

Buyer agrees to buy the Home constructed or to be constructed on Lot __41__, Block _F1_ ("Property") of The Oaks at Boca Raton, according to the Plat recorded in Plat Book _____, Page_____, Public Records of Palm Beach County, Florida, (the "Community"), together with the rights and subject to the obligations applicable thereto as set forth in the Community Documents (hereinafter defined).

The "Total Purchase Price" for the Property is:      $ ___ 2,333,500.00 _____

Base Price:      $ _____

Options & Extras:      $ _____

Total Purchase Price:      $ ___ 2,333,500.00 _____

BUYER HEREBY SELECTS PAYMENT OPTION 1_____ OR PAYMENT OPTION 2 _____ BELOW: (CHECK ONE)

<u>PAYMENT OPTION 1:</u>

| | | |
|---|---|---|
| A. Payment upon execution of Agreement | (10% of Total Purchase Price) | $ _____ |
| B. Submission of application for building permit | (10% of Total Purchase Price) | $ _____ |
| C. Completion of first floor slab | (10% of Total Purchase Price) | $ _____ |
| D. First floor tie beam poured | (10% of Total Purchase Price) | $ _____ |
| E. Roof trusses installed; interior framed | (15% of Total Purchase Price) | $ _____ |
| F. Rough electric, plumbing and A/C ducts installed; roof dried in | (15% of Total Purchase Price) | $ _____ |
| G. Roof Complete; stucco finish coat applied; windows installed | (10% of Total Purchase Price) | $ _____ |
| H. Cabinets and trim installed | (10% of Total Purchase Price) | $ _____ |
| I. Balance due at Closing | (10% of Total Purchase Price) | $ _____ |
| J. Total Purchase Price | | $ _____ |

PAYMENT OPTION 2:

A.   Payment upon execution of Agreement                                    $ _____ 10,000.00

B.   Payment to be made by Purchaser to Seller, no later than August 15th, 2007,    $ _____ 10,000.00
     time being of the essence.

C.   Payments to be made by Purchaser to Seller as follows:
     6 equal payments represented as 6 Post dated checks to be delivered to the Seller
     upon execution of this agreement hereof in the amount of $35,559.00 dated 9/15/07,
     10/15/07, 11/15/07, 12/15/07, 01/15/08, and 02/15/08, for a total amount of
     $213,350.00, time being of the essence with respect to each payment due    $ _____ 213,354.00

C.   Payment prior to February 15-2008 and prior to the issuance of Building Permit, time
     being of the essence                                                       $ _____ 50,000.00

D.   Payments to be made by Purchaser to Seller as follows:
     12 equal payments represented as 12 post dated checks to be delivered to the seller
     Upon the execution of this agreement hereof in the amount of $183,348.00 dated
     3/15/08, 4/15/08, 5/15/08, 6/15/08, 7/15/08, 8/15/08, 9/15/08, 10/15/08, 11/15/08,
     12/15/08, 01/15/09, 02/15/09, for a total of $183,348.00 and prior to closing, time
     being of the essence with respect to each payment due                      $ _____ 183,348.00

E.   Balance of Total Purchase Price due at closing, time being of the essence
     (80% of Total Purchase Price)                                              $ _____ 1,866,798.00

Buyer shall make each payment in full and in clear U.S. funds, within five (5) banking days from the date of Seller's request, time being of the essence for all such payments. If Buyer fails to tender the payment as required by this paragraph, then Buyer shall be deemed to be in default of this Agreement and Seller may pursue any and all remedies Seller may have under this Agreement. If Seller elects to accept any such payment at a later date, Buyer shall pay to Seller, together with the additional deposit, a sum equal to interest at the highest lawful rate on the amount of the additional deposit from the date such payment was due to Seller to the date such payment was made to Seller. Furthermore, if Seller elects to accept such payment at a later date Buyer expressly understands and agrees that Buyer shall pay to Seller along with such additional deposit all accrued interest as previously defined. Failure to do so will be deemed a material default hereunder. In addition, Buyer expressly acknowledges that Buyer has been advised by Seller that no construction will commence until such time as all deposits and other payments required to be made hereunder are received by Seller from Buyer as required herein.

All deposits and draw payments shall be made in cash or by check subject to collection. Seller reserves the right to increase the Purchase Price by 1% per month if construction of the improvements is not commenced within sixty (60) days after the effective date of this Agreement due to delay created or caused by Buyer.

Except where Buyer has selected Payment Option 1, Seller may borrow construction money from a lender to construct the improvements on the Property. Buyer agrees that any lender advancing construction funds will have a first mortgage on the Property until Closing. At that time, Seller may use all the closing proceeds to release the Property from the lien of the construction mortgage. This Agreement and the deposits will not give Buyer any lien or claim against the Property and the Buyer's rights hereunder will be subordinate to those of any lender holding a mortgage, whether or not such a mortgage secures the advancement of construction funds, even if such mortgage is placed on the Property after the date of this Agreement.

BUYER ALSO AGREES TO PAY ALL OTHER SUMS REQUIRED TO BE PAID BY BUYER IN THIS AGREEMENT.

The balance due at closing must be paid by cashier's check or wire transfer of funds cleared the United States Treasury, only. All payments must be made in U.S. Funds and all cashier's checks must be payable on a bank located in Palm Beach, Broward or Dade County, Florida, U.S.A.

2. TITLE EVIDENCE. Prior to Closing, Seller shall deliver to Buyer a title insurance commitment issued by a Florida licensed title insurer agreeing to issue to Buyer, upon recording of the deed, an owner's policy of title insurance (ALTA Form B) in the amount of the Total Purchase Price, insuring Buyer's title to the Property, subject only to the following permitted exceptions ("Permitted Exceptions").

A.   Liability for all taxes affecting the Property starting the year Buyer receives title and continuing thereafter.

B.   All laws and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded in the Public Records of Palm Beach County, or otherwise established with respect to the Property; for example, zoning restrictions, property use limitations and obligations, easements (right-of-way), plat restrictions, agreements relating to telephone lines, water and sewer lines and other utilities, provided however, none of the foregoing shall render title unmarketable or prohibit use of the Property for residential purposes.

C.   The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Community Documents, as described in Paragraph 14 (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded by Seller now or at any time after the date of this Agreement in the Public Records of Palm Beach County, Florida, and as amendments to any of such documents.

D.   Pending governmental liens for public improvements as of closing.

E.   Any state of facts which any accurate survey of the Property would show.

F.   Perpetual easement for encroachments now or hereinafter existing caused by the settlement or movement of improvements or caused by minor inaccuracies in building or rebuilding.

G.   Buyer's mortgage, if any.

H.   All standard printed exceptions contained in an ALTA Owner's title insurance policy customarily issued in Palm Beach County, Florida.  Provided however, upon delivery by Seller of customary affidavits and delivery of a survey at closing, exceptions relating to parties in possession, mechanic's liens, the "gap" and the survey will be deleted at closing. Notwithstanding the foregoing, Buyer acknowledges that certain minor encroachments are routinely disclosed on a survey (such as an encroachment of a driveway over a utility easement) and Buyer agrees to accept an exception for minor encroachments shown on a survey.

Buyer shall have five (5) days from the date of receiving the title insurance commitment to examine it.  If Buyer finds title unmarketable, Buyer shall, within five (5) days of receiving the title insurance commitment, notify Seller in writing specifying details.  If defects render title unmarketable, Seller shall have one hundred twenty (120) days from receipt of notice within which to remove defects, failing which, Buyer shall have the option of (i) either accepting the title as it then is or (ii) demanding a refund of the deposit(s) and monies paid for options and upgrades which shall immediately be returned to Buyer; whereupon Buyer and Seller shall be deemed to have released one another of all further obligations under this Agreement.  Seller will use reasonable efforts to remove title defects, but shall not be obligated to institute suit nor expend any sums in excess of three percent (3%) of the Total Purchase Price.  For purposes of this Agreement, title is defective only if matters are revealed which are not disclosed by or approved in this Agreement.

Unless Seller receives written notice from Buyer within five (5) days after the Effective Date of the Agreement or five (5) days  prior to closing, whichever occurs first, Seller will direct the title agent and insurer referred to above to issue the title insurance commitment referred to above and a title insurance policy after Closing.  In the event Buyer timely delivers such notice, (i) Seller shall have no obligation to deliver or cause to be delivered to Buyer a title insurance commitment and title insurance policy; (ii) Buyer shall be responsible for obtaining and delivering a title commitment to Seller a minimum of five  (5) days prior to Closing (if Buyer shall be deemed to waive Buyer's right to make title and title related objections and Buyer  shall be deemed to accept title subject to the Permitted Exceptions and all other matters affecting title); (iii) Buyer shall be responsible to directly pay all costs and fees arising from or related to the title commitment, title policy and the Closing of the transaction described herein; (iv) Seller shall have no obligation to provide Buyer with any prior owner's title insurance policy, base title, certificates of good standing, corporate resolution of Seller, estoppel letters, etc; and (v) Buyer shall be responsible for all costs and expenses (including a Delayed Closing Charge) if Closing is delayed as a result of the foregoing.

3.    **DEPOSITS**.  SELLER HEREBY PROVIDES TO THE BUYER THE RIGHT TO HAVE DEPOSIT FUNDS (UP TO 10 PERCENT OF THE PURCHASE PRICE) IN AN INTEREST BEARING ESCROW ACCOUNT.  THIS RIGHT MAY BE WAIVED IN WRITING BY THE BUYER.

If Buyer elects to have the deposit funds in an escrow account, Buyer will be obligated to pay to the Seller at the time of closing an interest charge calculated pursuant to the formula set forth below:

Seller may borrow money in an amount equal to the funds held in escrow for construction purposes only, in which case any interest which the Seller pays on such a loan for a period not to exceed 12 months shall be paid by the Buyer at the time of closing, but the Buyer shall be credited for any interest accrued on the escrow account.

We have read the foregoing language and we agree that an escrow is: ( ___required); ( X waived) on 10% deposit of $233,350.00.

4.    **CONSTRUCTION SPECIFICATIONS**.  The Home will be constructed in substantial accordance with the plans and specifications kept in Seller's construction office ("Seller's Plans and Specifications").  Buyer acknowledges and agrees that it is a widely observed construction industry practice for plans and specifications for any home or building to be changed and adjusted from time to time in order to accommodate on-going "in the field" construction factors. Buyer further agrees that these changes and adjustments are essential in order to permit all components of the Home to be integrated into a well functioning and aesthetically pleasing product in an expeditious manner.  Because of the foregoing, Buyer acknowledges that such changes may occur and agrees that it is reasonable and for Buyer's benefit to allow Seller the flexibility to make such changes in the Home provided that such changes do not materially or adversely affect the size or dimensions of the Home.  The Home may be constructed on the lot as a reverse of that shown on the plans, on any sales and promotional material or as the model may have been constructed.

3

*Without limiting Seller's general right to make the changes referred to above, Buyer specifically agrees that changes in the location of utility (including, but not limited to electrical, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes may be made. Buyer further agrees that Seller may "site" the Home in a position that is different from that of the Model and the Seller's Plans and Specifications.*

Buyer agrees that all Change Orders for construction modifications must be submitted to Seller and approved by Seller. Buyer understands and agrees that Seller will not be obligated to accept any Change Orders after application for building permit is submitted. Non-structural Change Orders, if any, accepted by Seller subsequent to commencement of construction shall be at Seller's sole and absolute discretion and with such Change Order, the Closing Date may be extended. Payment for all costs set forth on all Change Orders shall be made by Buyer to Seller at the time each Change Order is accepted by Seller. Seller shall not be obligated to undertake any change pursuant to a Change Order until Buyer has made payment in full to Seller for all items on the Change Order.

Buyer acknowledges that in the course of construction of any building or other improvements, certain changes, deviations or omissions may be desirable or required by governmental authorities or job conditions. Any changes, deviations or omissions required by job conditions or governmental authorities are hereby authorized by Buyer.  Any costs or expenses resulting from any change, deviation, addition or omission required by governmental authorities, arising subsequent to the execution of this Agreement, shall be evidenced on a Change Order presented by the Seller to the Buyer, which shall be executed by the Buyer.

5.      MATERIALS AND COLOR SELECTIONS.  Buyer agrees and acknowledges that certain wall coverings, decorations and furnishing in any model displayed to Buyer are for display purposes only and are not included as part of this Agreement. Further, Buyer understands and agrees that certain other items (or where appropriate, upgraded versions of such items) which may be seen in the Model or in illustrations, are not included with the sale of the Buyer's Home.  Buyer further understands and agrees that items of this nature will not be included in Buyer's Home unless specifically provided for in Seller's published list of standard items (if any) or in a Rider or Schedule to this Agreement signed by both Buyer and Seller.

If circumstances arise which warrant changes of suppliers, manufacturers, brand names or other items, Seller may substitute equipment, material, appliances, etc. which are of equal or better quality to that designated on Seller's Plans and Specifications. Buyer further understands and agrees that certain of the finishing items, such as tile, marble, carpet, cabinets, stone, brickwork, roof tile, pool finishes, wood, paint, stain and mica are subject to size and color variations, grain and quality variations, and may vary in accordance with availability and changes by manufacturers from those shown in the model, if any, or illustrations or brochures or those included in the specifications or as shown in Seller's construction office.

Buyer may select certain standard colors and/or materials in the Home.  Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within ten (10) days of the date the list of selections is made available to Buyer.  If these selections are not delivered to Seller in writing within the time period stated above, then it is understood and agreed that the choices may be made by Seller in its discretion and be binding on Buyer. In that event, Seller's selections shall be binding upon Purchaser and shall not be a basis upon which Buyer may: (i) fail or refuse to close this transaction as scheduled; (ii) make any claim against Seller or (iii) fail or refuse to make any payment when due, in full.

6.      INSULATION.  Seller has advised Buyer by way of an Insulation Rider attached to this Agreement as required by the rules of the Federal Trade Commission, that it currently intends to install in the Home the insulation disclosed in that Rider.  The R-Value and other information shown in the Rider is based solely on the information given by the appropriate manufacturers (based on the thicknesses listed) and Buyer agrees that Seller is not responsible for the manufacturers' errors. All of the insulation information is subject to Seller's general right, under Paragraph 4 of this Agreement, to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability to Buyer.

7.      COMPLETION DATE.  Seller estimates that the Home will be substantially completed on or about the date indicated on the first page of this Agreement. Buyer acknowledges and agrees, however, that this estimate is given to Buyer for convenience only and is subject to change from time to time for any reason and without changing any liability of Seller.  Seller does, however, agree to substantially complete construction of the Home in the manner specified in this Agreement by a date no later than one (1) year and eleven (11) months from the date Buyer and Seller execute this Agreement, subject however, to delays caused by Buyer or acts of God, the unavailability of materials, strikes, other labor problems, governmental orders, or other events which would support a defense based upon impossibility of performance for reasons beyond Seller's control.

8.      SUBSTANTIAL COMPLETION.  Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete when the same is substantially complete in Seller's reasonable opinion. Notwithstanding the foregoing, however, the Home will not be considered complete or substantially complete by Seller for purposes of this Agreement unless Seller has obtained a Certificate of Occupancy (or its equivalent) from the proper governmental authority.

4

9.     INSPECTION PRIOR TO CLOSING.  Except as provided herein, for reasons of safety and/or requirements under policies of insurance held by Seller, neither Buyer nor any agent of Buyer shall be permitted to enter the Lot or the Home until after Buyer has closed this Agreement and has taken possession of the Home, whereupon Buyer's rights shall be as set forth in the Community Documents.  Buyer agrees to abide by such restriction and not to enter upon or interfere in any way with the construction of the Home or communicate with any of Seller's contractors, subcontractors, suppliers or workmen or interfere with any other improvements of the Community.

       Prior to Closing and upon notice from Seller, Buyer or Buyer's designated representative shall inspect the Home with Seller and together with Seller compile a Punch List specifying any outstanding work required to conform the Home to this Agreement.  Buyer's failure to perform Buyer's obligations hereunder shall not delay, postpone, or otherwise interfere with the Closing.  Seller shall have a reasonable period of time to complete all work required under the Punch List in a workmanlike manner.  The fact that Seller has to complete the work set forth under the Punch List shall not delay, or postpone the Closing, or Buyer's obligation to close and pay the balance of the Purchase Price, or be grounds for a reduction of or credit against the Purchase Price or be grounds for placing a portion of the Purchase Price in escrow pending completion of such items.  The provisions of this paragraph shall survive the Closing.

       The Property constitutes a part of the Community which may result in the construction of additional improvements by Seller. The Seller is not obligated, however, for the construction or completion of any additional improvements of any other portion of the Community as a pre-condition to the obligation of Buyer to close after substantial completion of the Home by Seller.

10.     CLOSING DATE.  Buyer will be given at least ten (10) days notice of the time and place of Closing, which shall be in Palm Beach County, Florida, at a location designated by Seller ("Closing Notice").  Seller is authorized to postpone the Closing for any reason and Buyer will close on the new date, time and place Seller specifies in a Notice of Postponement (as long as at least three (3) days' notice of the new date, time and place are given).  A change of time or place of Closing only (that is, one not involving a change of date) will not require any additional notice period.  Any Notice of Closing, Postponement or Rescheduling must be given in writing.  All of these notices to Buyer will be sent or directed to the address specified on the first page of this Agreement unless Seller has received written notice from Buyer of a change prior to the date the Closing Notice is given. These notices (other than a change of address) will be effective on the date mailed or placed in an express delivery system (i.e. Federal Express).  An Affidavit of one of Seller's employees or agents stating the Notice of Closing, Postponement or Rescheduling was mailed or placed with an express delivery system shall be presumed to establish that the Closing Notice was received.

       If Seller agrees to a delay of Closing at the request of Buyer (which Seller is not obligated to do), Buyer will pay to Seller, at the Closing (or in advance if so required by Seller) a late closing charge equal to eighteen percent (18%) per annum on the Total Purchase Price of the Property, computed from the originally scheduled Closing Date through the actual Closing Date.

       IF BUYER FAILS TO CLOSE AS REQUIRED BY THIS PARAGRAPH, BUYER WILL BE IN DEFAULT OF THIS AGREEMENT.

11.     CLOSING DOCUMENTS.  At Closing, Buyer will receive (i) a Special Warranty Deed to the Property, (ii) Seller's form of Owner's (No Lien) Affidavit, (iii) a copy of the Certificate of Occupancy or equivalent from the governmental agency having jurisdiction over the Home, and (iv) the FIRPTA Affidavit (collectively the "Closing Documents").  The Special Warranty Deed will be subject to (that is, contain exceptions for) all of the Permitted Exceptions described in Paragraph 2.  When Buyer receives the Special Warranty Deed at Closing, Buyer will sign all papers reasonably necessary or appropriate to effectuate the intent of this Agreement.

       At the same time Buyer receives the Closing Documents, Buyer agrees to pay the balance of the Total Purchase Price and any additional amounts Buyer owes under this Agreement.  Buyer will not be entitled to take possession of the Property until all funds have been received by Seller in accordance with this Agreement.  Seller will pay the costs of documentary stamps on the Deed and recording fees for the Deed.

12.     CLOSING COSTS.  Buyer understands that, in addition to the Total Purchase Price for the Property, Buyer must pay certain other fees or costs when Buyer accepts title at Closing.  These include the following:

       A.     At the Closing, the Buyer, in addition to the payment of balance of the Purchase Price and any other sums due under this Agreement, shall pay a "development fee" equal to one and one-half percent (1 ½%) of the total Purchase Price (inclusive of all Change Orders) to cover costs, expenses and fees incurred by Seller in connection with the development of the Property.  Buyer understands and agrees that the "development fee" is not for payment of closing costs or settlement fees, but rather covers various costs and expenses of Seller as well as Seller's attorneys' fees in connection with the development;

       B.     The Property's prorata share of the assessments for The Oaks at Boca Raton Property Owners Association, Inc. (the "Association"), commencing as of the date of closing or from the date of issuance of the Certificate of Occupancy, whichever occurs first;

C.  A contribution to the Capital Improvement Fund of the Association, equal to three (3) months of the Association's annual assessment for the Property. This contribution shall be collected and maintained in a separate account for the use and benefit of the Association. The Capital Improvement Fund of the Association shall be disbursed by the Board of Directors for the Association in accordance with the Association documents;

D.  A prepayment of the Association's assessments for the Property for the quarter immediately following the quarter in which closing occurs;

E.  Loan fees, loan closing costs and all other related sums, including but not limited to, interest, points, attorneys fees, recording fees, documentary stamps, intangible tax, credit report, abstracting, inspection fees and title insurance charged by Buyer's lender, if any;

F.  Any utility or similar deposits attributable to the Property;

G.  Any late closing charges provided for elsewhere in this Agreement; and

H.  Real estate taxes shall be prorated as of the date of closing or from the date of issuance of the Certificate of Occupancy, whichever occurs first.

13.  **DEFAULT.** If Buyer defaults under this Agreement (beyond the expiration of any notice period, if applicable), all Buyer's rights under this Agreement will end and Buyer authorizes Seller to keep all deposits made or agreed to be made and other pre-closing advance payments (including, without limitation, those on options, extras, upgrades and the like) Buyer has then made and all interest which was earned on them, all as agreed and liquidated damages and not as a penalty. The parties acknowledge that the extent and amount of actual damages is uncertain and as such the amounts provided for above are agreed and liquidated damages. If Seller defaults under this Agreement, Buyer will give Seller notice of it and if Seller has not commenced appropriate action to cure the default within ten (10) days after such notice is given, Buyer will have the choice of either (i) receiving a refund of all deposits and prepayments for options, extras, upgrades and the like actually paid under this Agreement; (ii) specifically enforcing this Agreement; or (iii) any other remedy available to Buyer in law or in equity. When Buyer elects one of the remedies available to Buyer, Buyer will be deemed to have waived the other one(s); provided that notwithstanding anything to the contrary contained herein, Buyer shall have whatever remedies, including specific performance and damages, in the event Seller fails to fulfill its obligations to deliver the Property within one (1) year and eleven (11) months as provided in Paragraph 7 of this Agreement.

14.  **ASSOCIATION; RECEIPT OF COMMUNITY DOCUMENTS.** Upon taking title to the Property, Buyer shall automatically become a member of the Association described in the Community Documents (defined below). Buyer understands Buyer's membership will take effect at Closing.  At that time, Buyer agrees to accept all liabilities and obligations of such membership.

Buyer acknowledges receipt from Seller, prior to Buyer's signing this Agreement, of copies of the following documents (the "Community Documents"):

A.  Declaration of Covenants, Conditions and Restrictions for The Oaks at Boca Raton.
B.  Articles of Incorporation and By-laws of the Association.
C.  Rules and Regulations of the Association described in the Community Documents.
D.  Operating Budget for the Association (which may be in estimated form).

Buyer acknowledges and agrees that the Community Documents permit The Oaks at Boca Raton Venture, L.P., developer of The Oaks at Boca Raton ("Developer"), or Seller, as the case may be, to make amendments to them and that any changes it makes to them prior to Closing (i) will not necessarily be delivered to Buyer (however, such amendments will be a part of the Public Records of the County) and (ii) will not affect Buyer's obligation to perform any or all of the duties under this Agreement, unless such changes have a material and adverse effect on the market value of the Property.

Buyer understands that the budget for the Association is not guaranteed.  The budget is subject to change at any time and from time to time to reflect actual and projected expenditures.  These changes may occur before or after Closing but will not affect any of Buyer's obligations under this Agreement (except as to resulting changes in Closing prorations).  Buyer recognizes and agrees that Buyer's assessments may include expenses attributable to common areas which are not yet complete or usable by Buyer.

15.  **USE OF THE REMAINING PROPERTY.** As long as Seller, Developer or other builders own property in the Community, Seller, Developer or such other builders may keep a sales center, offices and model homes in the Community (including on the common areas).  Such persons' salespeople may show homes, erect advertising signs and do whatever else is necessary and helpful for sales, leasing or management. This use of such property must be reasonable, and cannot unreasonably interfere with Buyer's use and enjoyment of the Property and of the common areas.

In addition to the foregoing, Seller, Developer and other builders and their affiliates, contractors, subcontractors, licensees an designees may conduct such blasting, construction, excavation, repair and other activities in or around the Community as are deemed necessary or appropriate in the sole discretion of the party conducting such activities. Without limiting the generality of the foregoing, and as a material inducement to Seller to enter into this Agreement, Buyer acknowledges and agrees:

SELLER, DEVELOPER AND/OR THE OTHER PARTIES DESCRIBED ABOVE WILL BE CONDUCTING EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR AROUND THE COMMUNITY, BOTH BEFORE AND AFTER BUYER CLOSES UNDER THIS AGREEMENT. BUYER RECOGNIZES THEIR RIGHTS TO DO SO AND WILL NOT (i)DEEM ANY OF THESE ACTIVITIES TO BE NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, (ii) ENTER, OR ALLOW ANY OTHERS UNDER BUYER'S CONTROL TO ENTER ANY AREAS WHERE SUCH ACTIVITIES ARE BEING CONDUCTED (EVEN WHEN THEY HAVE TEMPORARILY CEASED, SUCH AS DURING NON-WORKING HOURS) AND (iii) HOLD SELLER OR DEVELOPER LIABLE OR SUE SELLER OR DEVELOPER FOR ANY DAMAGE OR INJURY ARISING FROM OR CONNECTED WITH ANY OF THE ACTIVITIES DESCRIBED ABOVE.

The provisions of this paragraph will not limit the generality or effect of any similar provisions in any of the Community Documents and, without limiting the generality of paragraph 27 of this Agreement, will continue to be effective after (survive) Closing.

The provisions of this Paragraph 15 will survive Closing.

16.   SALES COMMISSIONS.  Seller shall pay The Oaks at Boca Raton Realty, Inc., who shall pay the cooperating broker, if any, named on the first page of this Agreement.  By signing this Agreement, Buyer is representing and warranting to Seller that Buyer has not consulted or dealt with any other broker, salesperson, agent or finder and that Buyer will indemnify and hold Seller and The Oaks at Boca Raton Realty, Inc. harmless for and from any such person or company claiming otherwise, including commissions, attorneys' fees and court costs.

The provisions of this Paragraph 16 shall survive Closing.

17.   NOTICES.  Except for the provisions set forth in Paragraph 10, whenever Buyer or Seller is required to notify the other, the notice must be in writing addressed to the address set forth on page one of this Agreement and it must be sent by express mail, courier or certified mail, postage prepaid, with a return receipt requested. A change of address notice is effective when it is received.  All other written notices are effective on the day they are properly mailed or placed with an express courier, whether or not received.

18.   TRANSFER OR ASSIGNMENT.  Buyer has no right to assign, sell or transfer his interest in this Agreement without Seller's prior written consent, which Seller may withhold in its own discretion.  Buyer covenants and agrees that prior to Closing, Buyer shall not: (a) list or advertise the Property for sale with any broker, in any multiple listing service, in any classified or other advertisement, or otherwise (including, without limitation, "by owner"), and/or (b) enter into any agreement (verbal or written) for an assignment of the Agreement or the rights thereunder, or any agreement (verbal or written) for a transfer of title to the Property to any third party.

19.   OTHERS BOUND BY THIS AGREEMENT.  This Agreement will bind Buyer's heirs and personal representatives. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity.  If Buyer has received permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving Buyer's interest.

20.   PUBLIC RECORDS.  Buyer authorizes Seller to record the documents necessary to establish and operate the Community and the portion of it in which the Property is located, all other documents Seller deems necessary or appropriate, and all amendments and supplements to them in the Public Records of the County.

21.   LITIGATION.  In any suit or other proceeding brought by either Buyer or Seller, the prevailing party will be entitled to recover reasonable attorneys' fees, reasonable costs and expenses actually incurred by the prevailing party in such suit or proceeding or in any appeal and Buyer and Seller agree that venue for such litigation shall be in Palm Beach County, Florida.

22.   FLORIDA LAW.  This Agreement will be governed by the laws of the State of Florida.

23.   TIME OF THE ESSENCE.  The performance of all obligations on the precise times stated in this Agreement is of absolute importance and failure to perform any of them on time is a default, time being of the essence.

24.   RECORDING.  Neither this Agreement, nor any notice of memorandum hereof may be recorded among the Public Records and such recording shall constitute a default under this Agreement by the recording party.



25.    COMMUNITY. The developer of the Community is The Oaks at Boca Raton Venture, L.P. Buyer acknowledges and agrees that Seller has not made any representations, warranties or guarantees whatsoever in connection with this Agreement, as to the design, construction, completion, use, benefits or value of the Community of which the Property is a part. Buyer is purchasing the Property from Seller and regardless of any direct or indirect benefits which the Seller may receive from having Buyer purchase property in the Community, Buyer has not (and will not have) paid or given any consideration to Seller for any such representation, warranty or guaranty and Buyer has neither received nor relied on any such representation, warranty or guaranty from Seller as to the design, construction, completion, use, benefits or value of the Community.

26.    RETURN OF COMMUNITY DOCUMENTS. If this Agreement is cancelled for any reason, Buyer will return to Seller all of the Community Documents Seller has delivered to Buyer in the same condition Buyer received them, reasonable wear and tear excepted. If Buyer fails to return them, Buyer will pay Seller $50.00 (which may be withheld from Buyer's deposits if Buyer is then entitled to a refund) to defray Seller's cost of preparation, printing and delivery.

27.    SURVIVAL. The provisions and disclaimers in this Agreement which are intended to have effect after Closing (but only those provisions and disclaimers) will continue to be effective after (survive) Closing and delivery of the deed.

28.    INDUCEMENT. Buyer acknowledges that the primary inducement for Buyer to purchase under this Agreement is the Property itself and not the Common Areas of the Community or any other part of it. Buyer also acknowledges that he was not induced to purchase the Property or sign this Agreement by any oral statement or oral representation made by Seller or Seller's agents.

29.    RADON GAS. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Buyer acknowledges that Seller has made no geological or environmental test or surveys of the Community. Seller makes no representations or warranty concerning geological or environmental matters including, but not limited to, radon gas. Seller specifically excludes such geological or environmental matters from any warranties given under this Agreement. If Buyer requires more information concerning this potential risk, additional information may be obtained from the U.S. Environmental Protection Agency and state and local authorities.

30.    RECEIPT OF DISCLOSURES. Seller hereby discloses to Buyer that The Oaks at Boca Raton Realty, Inc. and its salesperson are acting as the Real Estate Broker-Salesperson or Salesperson with respect to the purchase of the Property solely on behalf of Seller as an agent. Accordingly, it undertakes no duty of disclosure, representation or otherwise to Buyer in this transaction. Buyer acknowledges receipt of this disclosure, the disclosure summaries for the Community, the Agency Disclosure and Notice of the Closing Expenses prior to signing this Agreement.

31.    WATER LEVELS. Buyer acknowledges that all lakes and canals (singularly, referred to as "Lake Area" and collectively referred to as "Lake Areas") within the Community are designed as water management areas and are not designed as aesthetic features. Permits from various regulatory agencies govern the control of water levels. Due to varying climatic conditions, environmental conditions of water use requirements, including, without limitation, fluctuations in ground water elevations, priorities established by governmental authorities, and other causes out of the control of Developer, Seller and the Association, the water levels in the Lake Areas, depending on conditions, will rise and fall as often as daily and on occasion the water level may decline significantly and result in changes to the appearance of the Lake Areas. These water level fluctuations and changes in the appearance of the Lake Areas are considered normal occurrences. Buyer further understands and acknowledges that neither the Developer, Seller, nor the Association, have control over such water level fluctuation nor associated impacts to plant growth in the Lake Areas. Therefore, Buyer agrees to release and hold harmless Developer, Seller and the Association from and against any and all claims, demands, damages, costs and expenses of whatever nature or kind, including attorneys' fees and costs, arising from or relating in any manner to the Lake Areas, including, without limitation, water level fluctuations, permitting, construction and maintenance thereof. Buyer shall not alter, modify, expand, or fill any Lake Area without the prior written approval of the Developer, Seller, the U.S. Army Corps of Engineers, and such other local, state and federal authorities as may have relevant jurisdiction over such matters.

The provisions of this paragraph 31 shall survive closing and delivery of the deed to Buyer.

32.    SUBORDINATION. Buyer acknowledges and agrees that all his rights hereunder are subordinate to the lien of any mortgage which now or shall hereafter encumber the subject property prior to Closing and to all amendments, modifications, renewals, consolidations and extensions thereof, and all voluntary and involuntary future advances made thereunder. However, Seller agrees to cause any such mortgage to be discharged of record at the time of Closing.

33.    SEVERABILITY. Should any part, clause, provision or condition of this Agreement be held by a court of competent jurisdiction to be void, invalid or inoperative, including but not limited to compliance with 15 U.S.C. 1702(a)(2) of the Interstate Land Sales Full Disclosure Act ("Act"), the parties agree that such invalidity shall not effect any other part, clause, provision or condition hereof, and that the remainder of this Agreement shall be effective as though such void part, clause, provision or condition had not been contained herein. Additionally, if the interpretation of a provision of the Agreement or a condition within the Agreement could invalidate the

8



Agreement pursuant to the Act, then this Agreement shall be modified accordingly so that the offending part, clause, provision or condition of the Agreement will either be deleted or modified so that the intent of the parties can be fulfilled and yet the offending provision is removed.

34.   WAIVER OF JURY TRIAL. Each party hereby knowingly, voluntarily, and intentionally waives the right to a trial by jury with respect to any litigation between the parties, including, but not limited to any and all cause or causes of action, defenses, counterclaims, crossclaims, third party claims, and intervenor's claims, whether now existing or hereafter arising and whether sounding in contract, tort, equity or otherwise, regardless of the cause or causes of action, defenses or counterclaims alleged or the relief sought by any party, and regardless of whether such causes or action, defenses or counterclaims alleged or the relief sought by any party, and regardless of whether such causes of action, defenses or counterclaims are based on, or arise out of, under or in connection with this agreement or its subject matter, out of any alleged conduct or course of conduct, dealing or course of dealing, statements (whether verbal or written), or otherwise. Any party hereto may file a copy of this agreement with any court as conclusive evidence of the consent of the parties hereto to the waiver of any right they may have to trial by jury.

35.   DAMAGE BEFORE COMPLETION. If between the date of this Agreement and the Closing, the Property is damaged by fire or other casualty, the following shall apply:

A.   Risk of loss to the improvements by fire or other casualty until the Closing is assumed by Seller. Seller shall have no obligation to repair or replace the improvements; provided, however, if Seller elects to repair or replace such loss or damage to the improvements, this Agreement shall continue in full force and effect and Buyer shall not have the right to reject title or receive a credit against or abatement in the Purchase Price. In such event Seller shall be entitled to a reasonable period of time within which to complete repairs or replacement. Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss or damage shall belong entirely to Seller.

B.   If Seller notifies Buyer that it does not elect to repair or replace any such loss or damage, then this Agreement shall be deemed cancelled and of no further force or effect, and Seller shall refund to Buyer all deposits made hereunder, whereupon the parties shall be released and discharged of all claims and obligations hereunder, except that if Buyer is then otherwise in default under this Agreement, Seller shall retain all such deposits as liquidated damages.

36.   LITTORAL ZONES/AQUATIC LAKE PLANTINGS. In addition to the foregoing, the Buyer hereby stipulates and agrees that any and all conservation areas required by governmental authority to be located within the Community shall be dedicated as Common Areas and shall be the perpetual responsibility of the Association and may in no way be altered from the natural or permitted state. Activities prohibited within any and all conservation areas which may be required to be located within the Community, including, but are not limited to, construction or placing of buildings on or above the ground; dumping or placing of soil or other substances such as trash; removal or destruction of trees, shrubs or other vegetation (with the exception of "exotic" and/or "nuisance" vegetation removal); excavation; dredging or removal of soil material; diking or fencing and any other activities detrimental to drainage, flood control, water conservation, erosion control or fish and wildlife habitat conservation or preservation.

Furthermore, the Palm Beach County Department of Environmental Resource Management ("DERM") requires littoral zone lake plantings to be installed and maintained in certain areas in the Community. These plantings may not be disturbed, trimmed or removed by any other persons other than the Association who must first receive approval from DERM. The ongoing maintenance, cost and perpetual obligation of such plantings shall remain the responsibility of the Association after the Developer's representatives resign from the Board of Directors. Any Member(s) of the Association or Buyer who damages the referenced plantings shall be solely responsible for the cost or repairing same, as well as any fines, costs, or other charges imposed by DERM or any other agency or governmental entity arising from such damage. All Buyers shall be deemed to have acknowledged and agreed that views of, including but not limited to, any lakes or other bodies of water in or outside of the Community may be altered by the presence of such plantings.

All work pursuant to this Section and all expenses incurred or allocated to the Association pursuant to the Community Documents shall be paid for by the Association through assessments (either general or special) imposed in accordance herewith.

The provisions of Paragraph 36 shall survive closing.

37.   INTERLOCAL/SCHOOL AGREEMENT. By receipt of a copy of the Community Documents and acceptance of a special warranty deed conveying a lot or lots to the respective Buyer, Buyer does hereby agree to join in and consent to any application, petition or agreement involving an interlocal/school agreement supported by Seller and which will benefit the Community in Seller's sole and reasonable discretion. Buyer additionally acknowledges that school boundaries periodically change within Palm Beach County and Seller does not provide any warranty or guaranty to Buyer as to a child's attendance at a specific school for a specific period of time.

9

38.   WARRANTY; DISCLAIMER OF IMPLIED WARRANTIES. Seller grants to Buyer a limited warranty, the form of which is available at Seller's office. Buyer acknowledges that at the time of execution of this Agreement, Seller has no reason to know of any particular purpose Buyer might have in purchasing the Home and items of personal property sold pursuant to this Agreement other than normal residential use. Buyer further acknowledges that normal swelling, expansions and contractions of materials and construction, and any cracks appearing as a result thereof or as a result of settlement of, in, or on the Home shall not be deemed to be construction defects. Seller makes no other warranties with respect to the fitness, merchantability, habitability, intended use, workmanship, construction or physical condition of either the Home, any fixtures or items of personal property sold pursuant to this Agreement or any other real or personal property conveyed hereby.

This limited warranty is expressly in lieu of any other warranties, express or implied, except for the limited warranty. Seller disclaims any and all implied warranties or merchantability and fitness as to the home, and all fixtures or items of personal property whatsoever conveyed hereby, whether arising from custom, usage of trade, course of dealing, case law or otherwise. Seller shall not be liable for any defects in the work performed by third party contractors not hired by Seller, nor for any adverse impact to the Home, Property or Community caused thereby. Further, should Buyer elect to use a third party contractor that is a subcontractor of Seller, Buyer acknowledges that Seller makes no representations relative to the performance by such third party contractor. Seller will not be liable for damages or injury to any improvements Buyer makes to the Property, or the Buyer's personal property, or for any consequential damages including, but not limited to, inability to possess the Home, inconvenience, or loss of time, due to any defects.

The provisions of this Paragraph 38 will survive Closing.

39.   NOTICE REGARDING ENERGY EFFICIENCY. Pursuant to Section 553.996, Florida Statues, Buyer may, at Buyer's expense, have the energy efficiency rating determined for the Property.

40.   CONSTRUCTION INDUSTRIES RECOVERY FUND.   FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY (60) DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

41.   SWIMMING POOL SAFETY. If included in the Property, any swimming pool, spa and hot tub shall be equipped with at least one (1) pool safety feature as required by and defined in Florida Statutes Sections 515.27 and 515.29. Purchaser acknowledges receipt of a copy of Florida Statutes Sections 515.21 through 515.37 and the publication provided by the Florida Department of Health containing information on drowning prevention and the responsibilities of pool ownership.

42.   MOLD. Mold, mildew and algae are types of fungi occurring naturally in the environment. Residential home construction is not, and cannot be, designed to exclude mold spores. Whether or not Buyer as a homeowner experiences mold growth depends largely on how Buyer manages and maintains the home. Seller shall not be responsible for damages caused by mold or other fungi.

43.   CASH TRANSACTION. The transaction covered by this Agreement shall be on an all cash basis and shall not be subject to Buyer procuring financing.

44.   ENTIRE AGREEMENT. This Agreement, together with the Addenda attached hereto, constitute the entire Agreement for Purchase and Sale of the Property and once the Agreement is signed, the Agreement can only be amended in writing. ANY CURRENT OR PRIOR AGREEMENT, REPRESENTATIONS, UNDERSTANDINGS AND ORAL STATEMENTS, INCLUDING BUT NOT LIMITED TO RENDERINGS OR REPRESENTATIONS CONTAINED IN SALES BROCHURES, ADVERTISING OR SALES MATERIALS AND ORAL STATEMENTS OF SALES REPRESENTATIVES, IF NOT EXPRESSED IN THIS AGREEMENT OR IN THE COMMUNITY DOCUMENTS, ARE VOID AND HAVE NO EFFECT. BUYER ACKNOWLEDGES AND AGREES THAT BUYER HAS NOT RELIED ON ANY SUCH ITEMS.

45.   SPECIAL CLAUSES. The following attached Addenda are incorporated into and made a part of this Agreement:

- Common Facility Disclosure
- Notice of Closing Costs
- Homeowner Association Disclosure Addendum
- Insulation Rider
- Energy Efficiency Rating Brochure and Energy Performance Level Display Card
- Specifications Rider
- Swimming Pool Disclosure



Zoning Conditions Disclosure
Other: Platting Addendum (if applicable)

BY SIGNING BELOW, BUYER AND SELLER AGREE TO BE BOUND BY ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT, INCLUDING THOSE PARAGRAPHS AS PRINTED ON THE REVERSE SIDES OF THE PAGES. BUYER IS ADVISED TO CAREFULLY REVIEW SUCH TERMS AND PROVISIONS AS WELL AS THE VARIOUS DISCLAIMERS APPEARING IN THIS AGREEMENT.

NOTE:  BEFORE BUYER SIGNS THIS AGREEMENT, BUYER SHOULD READ IT AND THE COMMUNITY DOCUMENTS CAREFULLY AND IS FREE TO CONSULT AN ATTORNEY OF BUYER'S CHOICE.

Witnesses:

SELLER:

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, by ALBANESE-POPKIN DEVELOPMENT GROUP, LLC., a Florida limited liability Company, General Partner

By: _____
Leonard A. Albanese, Manager
_Gavin Guinen_
Date: _____7-2-07_____

BUYER:

_____
Jonathan Resnick

_____
Diane Resnick

Date: _____7-2-07_____

11

## COMMON FACILITIES DISCLOSURE

As required by Florida Law, the purchaser(s) of property in The Oaks of Boca Raton (the "Development") are advised that the following recreational or other facilities are available for use by the property owners in the Development.

A Community Building of approximately _____20,000_____ gross square feet with swimming pool and tennis courts.

There will be charges for the use of the facilities listed above. The Declarant, the Association or other entity which owns and/or operates the facilities have the right to levy assessments which are used, in part, for the operation and upkeep of the facilities. Further, there may be other property (e.g., private roads, parks) in the Community and/or Development which is owned or operated by the Association.

By signing below, the purchaser(s) acknowledges receipt of this disclosure prior to the execution of a contract to purchase property in the Community and Development.

Purchaser: _____
                Jonathan Resnick

Purchaser: _____
                Diane Resnick

Date: _____7-2-07_____

c:\wpdocs\facilities\OaksatBocaRaton.wpd

## THE OAKS OF BOCA RATON
## NOTICE OF CLOSING EXPENSES

Pursuant to the rules promulgated by the Department of Legal Affairs, Buyer is hereby warned that upon Closing, additional costs may be required to be paid by the Buyer in the form of closing costs, which may include the following:

1.  The balance of the Purchase Price, plus any unpaid extras (i.e., Change Orders).

2.  Prorated portion of the current real property taxes and assessments from the date of closing or from the date of issuance of the Certificate of Occupancy, whichever occurs first.

3.  A "development fee" equal to one and one-half percent (1 ½ %) of the Purchase Price.

4.  A prorated portion of the Associations assessments from the date of closing or from the date of issuance of the Certificate of Occupancy, whichever occurs first and a working capital contribution equal to three (3) months assessments for The Oaks at Boca Raton Property Owners Association, Inc.

5.  Buyer's own hazard and liability insurance.

6.  Attorney's fees for Buyer's attorney, if any.

7.  Default interest, delayed closing charges or penalties.

In addition, if the Buyer obtains a mortgage, additional costs may be demanded from the Buyer by the lender.

c: wpdocs closingexp.OaksatBocaRaton.wpd

THE OAKS AT BOCA RATON
PURCHASE AND SALE AGREEMENT
HOMEOWNER ASSOCIATION DISCLOSURE ADDENDUM

THIS ADDENDUM to The Oaks at Boca Raton Purchase and Sale Agreement (the "Agreement") made between Albanese-Popkin The Oaks Development Group, L.P., a Florida limited partnership, ("Seller"), and JONATHAN RESNICK and DIANNE RESNICK, his wife ("Buyer"), for the purchase of the property located at (Lot 41-F1), is hereby entered into and made a part of said Agreement as if fully set forth therein.

WITNESSETH:

1.  In the event of any conflict between the terms and provisions of this Addendum and any terms and provisions of the Agreement, the terms and provisions of this Addendum shall control. Capitalized terms which are employed in this Addendum without definition but which are defined in the Agreement shall have the same meaning in this Addendum as in the Agreement.

2.  Association Memberships:

A.      As a purchaser of property in this Community, you X will _____ will not be obligated to be a member of a Homeowners' Association ("Association").

B.      There have been or will be recorded restrictive covenants (the "Covenants") governing the use and occupancy of properties in this Community.

C.      You X will _____ will not be obligated to pay assessments to the Association. You X will _____ will not be obligated to pay Assessments to the respective municipality, county or special district. All Assessments are subject to periodic change.

D.      Your failure to pay Special Assessments or Assessments levied by a Mandatory Homeowners' Association could result in a lien on your property.

E.      You will be obligated to pay assessments to the Association. Assessments may be subject to periodic change. The 2006 obligation is $653.08* per month. There is an additional obligation of $133.00 per month at the Enclave and the Enclave East, and an additional obligation of $20.00 per month at the Grand Estates and Grand Lake Estates. You will also be obligated to pay any special assessments imposed by the Association. Currently, at this time there are no special assessments.

F.      The developer may have the right to amend the restrictive covenants without the approval of the Association's membership or, approval of the parcel owners.

G.      The statements contained in this disclosure form are only summary in nature, and, as a Prospective Purchaser, you should refer to the Covenants and the Association Governing Documents before purchasing property.

H.      These Documents are matters of Public Record and can be obtained from the Record Office in the County where the Property is located.

3.  Buyer acknowledges that this Homeowner Association Disclosure Addendum was provided to Buyer prior to Buyer's execution of the Agreement.

BUYER:

_signature_
Jonathan Resnick

_signature_
Diane Resnick

SELLER:

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, by ALBANESE-POPKIN DEVELOPMENT GROUP, LLC., a Florida limited liability Company, General Partner

By: _signature_
    Leonard A. Albanese, Manager
    Gavin Guinan V.P

DATE EXECUTED BY BUYER:
_7-2_____, 200 7

DATE EXECUTED BY SELLER:
_July   2_, 200 7

14

## INSULATION DISCLOSURE

Seller presently intends to install insulation in the Property as follows:

1. Material:  Fiberglass batts, foil-backed paper

2. R-Value:  R-30  /  R-11  /  R-4.1

3. Thickness:  9"  /  4"  / N/A
   Living  / O/S  / O/S

4. Location:  area ceilings/ frame walls / block walls (unless otherwise specified, insulation
   will not be installed in outside garage walls, garage ceilings or interior walls).

Pursuant to rules of the Federal Trade Commission, Seller reserves the right to change such
insulation by delivering written notice of the changes to Purchaser.

_____          _Jonut J Resnick_____

                                         Jonathan Resnick

_____          _Diane Resnick_____

                                         Diane Resnick

                                         Date of Execution: 7-2-07

15

THE OAKS AT BOCA RATON
DISCLOSURE
Residential Swimming Pool Safety Act

Chapter 515, Florida Statutes, effective October 1, 2000, sets forth certain pool safety feature and disclosure requirements regarding drowning prevention and pool ownership.

All new residential swimming pools, spas, and hot tubs must be equipped with at least one pool safety feature as specified in the chapter, designed to deny, delay or detect unsupervised entry to a swimming pool, spa, or hot tub, in order to reduce drowning and near-drowning incidents.

The State of Florida Department of Health shall be responsible for producing its own or adopting a nationally recognized publication that provides the public with information on drowning prevention and the responsibilities of pool ownership and also for developing its own or adopting a nationally recognized drowning prevention education program for the public and for persons violating the pool safety requirements of the chapter. As of the date hereof, no publication has been prepared or adopted.

**DEFINITIONS.**

The term:

"Approved safety pool cover" means a manually or power-operated safety pool cover that meets all of the performance standards of the American Society for Testing and Materials (ASTM) in compliance with standard F1346-91.

"Barrier" means a fence, dwelling wall, or non-dwelling wall, or any combination thereof, which completely surrounds the swimming pool and obstructs access to the swimming pool, especially access from the residence or from the yard outside the barrier.

"Exit alarm" means a device that makes audible, continuous alarm sounds when any door or window which permits access from the residence to any pool area that is without an intervening enclosure is opened or left ajar.

**RESIDENTIAL SWIMMING POOL SAFETY FEATURE OPTIONS AND PENALTIES.**

In order to pass final inspection and receive a certificate of completion, a residential swimming pool must meet at least one of the following requirements relating to pool safety features:

(1)    The pool must be isolated from access to a home by an enclosure that meets the pool barrier requirements of s. 515.29;

(2)    The pool must be equipped with an approved safety pool cover;

(3)    All doors and windows providing direct access from the home to the pool must be equipped with an exit alarm that has a minimum sound pressure rating of 85 dB A at 10 feet; or

(4)    All doors providing direct access from the home to the pool must be equipped with a self-closing, self-latching device with a release mechanism placed no lower than 54 inches above the floor.

**RESIDENTIAL SWIMMING POOL BARRIER REQUIREMENTS.**

A residential swimming pool barrier must have all of the following characteristics:

1)  The barrier must be at least 4 feet high on the outside.

2)  The barrier may not have any gaps, openings, indentations, protrusions, or structural components that could allow a young child to crawl under, squeeze through, or climb over the barrier.

16

3) The barrier must be placed around the perimeter of the pool and must be separate from any fence, wall, or developing is own publication, may adopt a nationally recognized drowning prevention and responsibilities of pool ownership publication, other enclosure surrounding the yard unless the fence, wall, or other enclosure or portion thereof is situated on the perimeter of the pool, is being used as part of the barrier, and meets the barrier requirements of this section.

4) The barrier must be placed sufficiently away from the water's edge to prevent a young child or medically frail elderly person who may have managed to penetrate the barrier from immediately falling into the water.

Gates that provide access to swimming pools must open outward away from the pool and be self-closing and equipped with a self-latching locking device, the release mechanism of which must be located on the pool side of the gate and so placed that it cannot be reached by a young child over the top or through any opening or gap. A wall of a dwelling may serve as part of the barrier if it does not contain any door or window that opens to provide access to the swimming pool.

A barrier may not be located in a way that allows any permanent structure, equipment, or similar object to be used for climbing the barrier.

## DROWNING PREVENTION EDUCATION PROGRAM; PUBLIC INFORMATION PUBLICATION.

The Department of Health shall develop a drowning prevention education program, which shall be made available to the public at the state and local levels and which shall be required as set forth in s. 515.27(2) for persons in violation of the pool safety requirements of this chapter. The Department may charge a fee, not to exceed $100, for attendance at such a program. The drowning prevention education program shall be funded using fee proceeds, state funds appropriated for such purpose, and grants. The Department, in lieu of developing its own program, may adopt a nationally recognized drowning prevention education program to be approved for use in local safety education programs.

The Department shall also produce, for distribution to the public at no charge, a publication that provides information on drowning prevention and the responsibilities of pool ownership. The Department, in lieu of developing its own publication, may adopt a nationally recognized drowning prevention and responsibilities of pool ownership publication.

THE UNDERSIGNED PURCHASER HEREBY ACKNOWLEDGES THAT THIS DISCLOSURE WAS PROVIDED TO PURCHASER IN ACCORDANCE WITH THE ACT.

_____          _____
Jonathan Resnick                                       Diane Resnick

Date: __7-2-07__                                        Date: __7-2-07__

c: w.pdocs poolsafety.Oaksat BocaRaton.wpd

THE OAKS AT BOCA RATON
ZONING CONDITION DISCLOSURES

PORTIONS OF THE PROPERTY ARE IMMEDIATELY ADJACENT TO THE CLINT MOORE ANIMAL HOSPITAL, WHICH IS A VETERINARY CLINIC AND COMMERCIAL DOG KENNEL, AND WHICH HAS OUTDOOR DOG RUNS AND EXERCISE AREAS, WHICH AMONG OTHER THINGS COULD GENERATE NOISE. EACH OWNER ACKNOWLEDGES AND AGREES THAT THE USES OF THE CLINT MOORE ANIMAL HOSPITAL PREDATE THE DEVELOPMENT OF THE PROJECT AND THAT IN ACQUIRING THE RESPECTIVE LOT, BUYER HAS HAD AN OPPORTUNITY TO INSPECT THE CONDITIONS PRESENTED BY THE USES OF THE CLINT MOORE ANIMAL HOSPITAL AND KNOWINGLY AND VOLUNTARILY ACKNOWLEDGES AND ACCEPTS SUCH CONDITIONS, AND WAIVES, RELEASES, INDEMNIFIES AND HOLDS HARMLESS THE DEVELOPER, SELLER AND THE ASSOCIATION FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, COSTS AND EXPENSES, INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS' FEES AND COSTS ARISING FROM OR RELATED TO SUCH CONDITIONS.

PORTIONS OF THE PROJECT ARE IMMEDIATELY ADJACENT AND NEAR CERTAIN AGRICULTURAL FACILITIES AND A PACKING PLANT, THE ACTIVITIES OF THESE FACILITIES, AMONG OTHER THINGS MAY GENERATE NOISE, ODORS AND TRUCK TRAFFIC.   OWNER ACKNOWLEDGES AND AGREES THAT THESE USES PREDATE THE PROJECT AND THAT, IN ACQUIRING ITS LOT, BUYER HAS HAD AN OPPORTUNITY TO INSPECT THE CONDITIONS PRESENTED THEREBY AND KNOWINGLY AND VOLUNTARILY ACKNOWLEDGES AND ACCEPTS SUCH CONDITIONS, AND WAIVES, RELEASES, INDEMNIFIES AND HOLDS HARMLESS THE DEVELOPER, SELLER, AND THE ASSOCIATION FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, COSTS AND EXPENSES, INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS' FEES AND COSTS ARISING FROM OR RELATED TO SUCH CONDITIONS.

BUYER:

_____
Jonathan Resnick

_____
Diane Resnick

Date: _____7-2-07_____

c:\wpdocs\ zoningdis\Oaksat BocaRaton.wpd

18

May 11, 2007

2YF.1

**CONSTRUCTION SPECIFICATIONS**
For Lot# 4KF Resnick Residence
**MODIFIED BERMUDA**
**@ THE OAKS**



**THE OAKS**
*at Boca Raton*

**Two Story Residence:** 5 Bedrooms, 5 Full Bath Rooms, Powder Room, Cabana Bath, Foyer, Living Room, Dining Room, Family Room, Loft, Game Room, Library, Kitchen, Breakfast Room, 2 Laundry Rooms and 3 Car Garage

Total A/C Living Area          6538 S.F.

## FOUNDATION:

- Reinforced steel monolithic concrete slab with plastic moisture barrier
- Interior bearing wall footings using 2500 PSI concrete
- Certified termite treatment under slab

## EXTERIOR STRUCTURE:

- Structure meets hurricane requirements of Palm Beach County
- 2 story masonry block construction
- Reinforced masonry/concrete bond beams and columns utilizing 3000 PSI concrete
- Engineered Southern Pine floor and roof trusses @ 24" on center
- Cement Tile Roof (Choice of standard color). 90# mineral surfaced, hot mopped membrane applied over 30# fiberglass felt, tin tagged to 5/8" CDX plywood sheathing
- Galvanized metal at all flashings
- Galvanized drip edge over 1" x 2" PT drip over 2" x 8" rough sawn Cedar
- Light textured stucco on exterior walls w/ stucco soffits over wire lath
- Raised stucco bands with smooth finish as per approved plans
- Stucco primed and painted with exterior grade latex paint with accent color on bands
- One coat sealer and one coat exterior latex paint on exterior wood surfaces
- Precast details & columns with tops per drawings

## INTERIOR WALLS:

- Load bearing walls 2" x 6" wood studs @ 16" o.c., secured in accordance with code requirements to prevent uplift
- Non-load bearing walls of 2" x 4" metal studs @ 24" o.c. over 2" x 4" PT wood plate
- 1" x 2" PT vertical furring strips @ 16" o.c. on concrete block walls
- 1" x 4" PT window and door wraps on concrete block walls
- 2" x 4" wood door bucks on all 8'0" swing type doors in metal stud wall openings
- 1/2" sheetrock on walls and 5/8" sheetrock on ceilings
- 1/2" moisture resistant wall board in all bath wet areas
- One step coffer ceiling standard in Dining room, Master bedroom, Bedroom 5, Master bath, Vestibule @ bar, and Bedroom #2. Box beam ceiling in Family Room.

## INTERIOR WALLS (continued):

- Knockdown or Slick finish on all walls and knockdown on ceilings
- One (1) prime coat and one (1) finish coat of interior grade flat latex paint on walls and ceilings and semi-gloss on woodwork.  Choice of Two (2) colors
- Wall niche with side niches standard in Master Bedroom
- Wall niche Standard in Dining room

## WINDOWS, DOORS and HARDWARE:

**\*Note:** Windows and Sliding Glass Doors will have Impact rated glass to meet minimum hurricane requirements for Palm Beach County

- PGT fixed windows.  Bronze aluminum frames with bronze tinted glass
- PGT horizontal sliding windows. Bronze aluminum frames, bronze tinted glass
- PGT glass doors. Bronze aluminum frames, bronze tinted tempered glass
- Smooth Fiberglass Entrance Doors with decorative moldings & heavy duty hinges
- Baldwin Front Entry hardware
- 8' solid core, paint grade garage to house door.  1 ¾" flush door w/ applied moldings
- 8' solid core flush Masonite interior doors.  1 ¾" w/ applied moldings
- Travertine marble window sills throughout
- Galvanized steel raised panel or flush insulated garage doors with applied molding
- Dade County approved for insurance reductions
- Two (2) garage door openers and two (2) operators
- Choice of interior/exterior door hardware, see builders selection

## AIR CONDITIONING and INSULATION:

- Multi-Zone high efficiency Central Air Conditioning and electric heat strips
- Equipment sized to meet loading and efficiency per code
- Programmable thermostats

- *Zoning efficiency and sizing of A/C system shall be per the mechanical engineer's calculations*

- All walk-in closets air-conditioned
- Exhaust venting in each bathroom
- R-30 batt fiberglass ceiling insulation
- R-11 fiberglass batt insulation in exterior wood framed walls
- R-4.1 insulation on all exterior concrete block walls

STANDARD SPECIFICATIONS – Bermuda                                              07/02/07
Page 3 of 10

## ELECTRICAL:

- Four (4) corner flood light outlets.  Lights as per builders standard
- 300-400 Amp electrical service with circuit breaker panel, sized as needed
- Copper wiring throughout
- Decora series switches and receptacles (quantities and locations as required by code)
- Ten (10) paddle fan outlets.  Fans by owner
- 87 Hi-Hat cans, includes standard bulb and white recessed trim with white or black baffle, $175 per each additional hi-hat
- Reinforced (J-Box) outlets for pendent lights in numerous locations per plans
- Seven (7) exterior WP GFI receptacles
- Two (2) stub outs for future landscape lighting.  (See options for landscape lighting)
- Kitchen under cabinet fluorescent lighting per plans
- Bedroom closets, Laundry Room and Garage have fluorescent lighting fixtures
- Exterior wall lighting
- Interior decorative fixtures/fans supplied by Owner and installed by Builder
- Eight (8) zone security system on all operable doors and windows includes three (3) control panels, motion detector, automatic dialer and door chime
- Smoke detectors as required by County & State codes
- Central vacuum system including standard five (5) piece cleaning kit.  Sized as necessary
- Coach lights are per plans & Builder's selection
- Structured Wiring per plan
- Four pair of Niles in wall/ceiling with volume control
- Install 4 110v outlets in bath cabinets to be installed post CO
- Install under counter lighting @ Master Morning bar w/ switch fixture
- Install 2 above cabinet stub outs with 2 separate switches for future cabinet lighting
- Install 4 mini cans (light) Kitchen w/ switch

## PLUMBING (all fixture quantities and layout per plan):

## MASTER BATHROOM: White or Biscuit

- Kohler #3466 San Raphael One Piece Water Closet with seat
- Polished brass water closet trip lever and supply kit
- Kohler #4854 San Tropez Bidet
- Kohler Revival #K316-4MP PB Bidet Fitting and polished brass bidet supply kit
- Kohler #2210 under mount Caxton Lavs
- Kohler Revival #K310-4MPB polished brass Lav Faucets
- Kohler Revival #KT313-4MP polished brass Shower Fitting
- Biscuit shower drain cover and polished brass tub drain
- Kohler Revival #KT314-4MP polished brass deck mount Tub Faucet
- Jacuzzi Riva 6' Whirlpool tub with matching jets

**BATHROOMS #2, #3, #4, #5 and CABANA: White or Biscuit**

- Kohler #3422 Wellworth Two Piece Water Closet with seat
- Kohler #K-2210 under mount Lav
- Kohler Fairfax #K12265-4 Chrome Lav Faucet
- Kohler #K12114-4 polished chrome pressure balance shower or Tub/Shower Fitting
- Polished chrome tub or shower drain cover
- Villager #K715/6 Tub (where applicable)

**POWDER ROOM:  White or Biscuit**

- Kohler #3366 San Raphael One Piece Water Closet with seat
- Polished brass trip lever and supply kit
- Kohler #2210 Caxton undermount Lav
- Kohler #K310-4 polished brass Lav Faucet

**KITCHEN:**

- (1) Kohler #3355 Stainless Steel undermount Kitchen Sink
- (1) Kohler K15160 Pull Out Satin Nickel Faucet
- (1) Badger V Disposal
- Connection to Ice Maker at refrigerator
- Rohl Pot Filler @ cook top (like model)

**GAME/LIBRARY WET BAR:**

- Standard Stainless Steel Sink
- Standard Stainless Steel Faucet

**MISCELLANEOUS:**

- One (1) "Energy Saver" 100 gallon gas water heater  with recirculating system and pump
- Mustee #10 Drop-in Laundry tray with Briggs #115-L Faucet in both Laundry rooms
- Washing machine outlet
- Four (4) outside hose bibs
- 1 ½" water service with 1 ½" backflow preventer
- All waste lines to be PVC, all water lines to be copper
- All hot lines under slab to be insulated with ½" armaflex
- Second floor laundry hook-up
- Connection to Icemaker for UC Refrigerator at all locations indicated in these specs.

## CABINETS and INTERIOR TRIM:

- Interior millwork to be paint grade throughout
- Casings: Victorian (3 ½")
- Base: Victorian (7 ¼")
- Door Moldings: M62A (3/4" x 1 ¾")
- All interior woodwork painted with one prime coat and one finish coat of oil based enamel
- Choice of one (1) color
- Crown molding in Living Room
- Cabinetry package provided to include the following:  Location as per the Bermuda Model
- Kitchen cabinets level #7 Includes 42" uppers European Style Wood
- Powder Room Level #5 cabinets
- Secondary Bath level #5 cabinets
- Utility Room level #5 cabinets
- Granite Kitchen countertops with 1 ½" standard edges (Level 1) and full 4"x 4" tumbled marble backsplashes
- Granite Powder Room top with 1 ½"standard edges (Level 1) and 4" tile backsplash
- Saturnia Marble Master Bath vanity tops with 1 ½" standard edge (see Builder's selection) with 4" tumbled Marble Backsplash
- Secondary Bath tops to be standard color granite tops with standard edge (Level 1)
- Travertine marble window sills throughout
- Utility Room granite countertops with 1 ½" standard edge and a 4" backsplash (Level 1)
- $4,500 Allowance for Master Bedroom Built-In Closet.
- Wood ventilated shelving in all secondary closets (2 shelves)
- Melamine shelving (5 shelves) in kitchen pantry
- Towel and toilet paper holders in all baths supplied by owners & installed by Builder
- Wet Bar with Level 5 Cabinets and Level 1 Granite Tops with1 ½" Standard edges and 4" Backsplash

## APPLIANCES:

- Thermador # PC364GDBS 36" Rangetop 4 Star Burners & Griddle
- Best Hood  # PK2238 W/ internal 1000 CFM Blower
- Thermador # SEC302BP Double Oven W/ Convection Top
- Bosch # SHV46C13UC Dishwasher 4 cycle Integra series (Trim Kit Req.)
- GE # JEM31SF 800 Watt Microwave SS
- SubZero # 642  42" Refrigerator no Disp (Trim Kit Req.)
- Bosch # WFMC3200UC Washer
- Bosch # WFMC3200UC Washer
- Bosch # WTMC3500UC Gas Dryer
- Bosch # WTMC3500UC Gas Dryer
- U-Line # 2075RB Undercounter Ref
- U-Line # 2075 Wine Chiller at Wet Bar

## FLOORING:

- Master bath saturnia marble (18" x 18") laid straight includes: bath floors, shower walls and tub deck

  - **Note: tile base to match floors**

- Secondary bathrooms Saturnia marble (18" x 18") laid straight includes: bath floors, shower walls to 8' above finish floor, 8"x 8" or equal laid straight on floor.  See Builder's selection
- Main floors Saturnia marble (24" x 24") laid straight included
- Carpeting allowance is $25.00/square yard, includes labor and material
- 18" x 18" Saturnia on accessible balconies
- All marble is mud set installation

## ADDITIONAL ITEMS:

- Stairs shall be stain grade tread and riser, paint grade skirt board, oak cap and rail, iron balusters and oak newel.  See Builder's selection
- 1/4" clear plate glass mirror to the soffit/ceiling and full length of vanities in all baths. Master Bath shall go wall to corner, corner to vanity
- Frameless shower enclosures with clear glass in all shower stalls including Master Bath
- Straight in driveway and service walk using standard interlocking brick pavers set in sand per plans
- Standard interlocking brick pavers at covered entry, patio(s) and at exterior doors
- Fully sodded lot with automatic sprinkler system on city water
- Landscape Allowance of $20,000.00 including sod and street tree, Builder must install Landscape
- Custom Oaks Mailbox
- Aluminum gutters as required by plan
- 15' x 32' or 94 linear foot pool. One (1) light, 3' to 5' at deepest point, bullnose brick coping, pump and filter. One row of 6" water line tile per Builder's selection
- Raised 6' x 6' 18" Spa With 400,000 BTU Heater
- Interlocking brick pavers set in sand on pool patio surface (1250 SF Allowance)
- Outdoor BBQ with Granite Top, Cabinetry, BBQ and Sink (Add U-Line 1175)
- Bronze aluminum rail fence in rear yards with two (2) gates as per plan
- Epoxy Coat garage floor (Battleship Grey) –No color options
- In-Wall Pest Control
- Add footings for future screen enclosure at rear covered patio
- Miele Built-In Coffee Maker w/ Plumbing
- Install 18 full extension pull-out shelves
- Install 6 full extension pull-out drawers
- Install 2 pair of clear or standard selection glass cabinet Doors
- Install 2 pair of clear or standard selection glass cabinet Doors "small" 18"x18" max size
- Substitute standard tub in bath 3 to Maestro 838 white

## ADDITIONAL ITEMS (continued):

- Install 2nd Shower Head per standard spec @ Master Shower Kohler Revival KT-313-4-MP
- Install 2 pullout spice towers in base cabinet
- Install 2 counter top height windows in kitchen
- Additional Cabinet allowance above Level 7 for the Kitchen, Powder and Master Bath: $3,500.00 Allowance
- 2060 Impact Glass Window (Fixed Window) $765.00 Allowance
- Add double door to cabana (includes credit for cabinet, counter top, etc.)
- Omit Living Room Arched Top Window
- All bath/showers shall have a 12"x18" tiled niche. Bath 4 and Bath 5 shall include seat. Bath 2 shall be Shower with Seat.
- Wall niche in Bath 4 & Bath 5 adjacent the toilet similar to the model

## ALLOWANCES:

- **All allowances include labor and material (including sales tax) unless otherwise noted!**
- Front Gate Allowance.......................... $ 1,550.00
- Landscaping/Sod……….....................…….... $20,000.00

**Shall at a minimum cover all Palm Beach County's requirements.**

## ** The following options are included in contract:

- Add 331 Square Feet to Library/Game Room including windows
- Add 36"x 42" 450# capacity Elevator with Wood Cab, Tile Floor, Light & Emergency Telephone. Two Stops and 2 Openings and Controls & Call Boxes. 30' per minute Travel ($27,000.00Allowance)
- Add In-Wall Pest Control System. (Buyer to enter into a 1 Year Service Agreement with Century 21 Pest Control)
- Upgraded Trim Package to include all "cased" openings per model; casing, base, and crown in same profile and locations as model; all windows cased as per model; built-in in Living Room per model; including matching picture frame, ceiling moldings Living Room per model; Casing on Dining Room arch niche per model; casing at Balcony openings Living Room per model; additional "cased" opening in Game Room; Cove moldings only at Family Room ceiling detail per model; applied moldings for artwork upstairs and downstairs hall and wine room picture frame per model; all moldings per model in Master Bedroom.
- Upgrade Front Entry Doors to 3 lite Mahogany with Beveled Impact Glass. ($15,000.00 Allowance)
- Add Aluminum Applied Mullions on windows per model
- Enlarge 9 windows in Family Breakfast Room to floor length
- Add Pre-Cast Stone Balastrade at front courtyard in lieu of Aluminum Railings and Pre-     Cast Balastrade  at rear upper balconies (2)

**\*\* The following options are included in contract (continued):**

- Upgrade to Wood Flooring per model (5" x ¾" Santos Mahogany in Library, Game Room,   Loft, and Hall)
- Upgrade Stairs per model (includes $3100 carpet runner allowance, 5" Santos Mahogany Treads, Painted Closed Stringer, Painted Risers, Stained Mahogany Stringer Cap, Stained Mahogany Newel Posts,  upgraded Painted Colonial Balusters and Stained Mahogany Balcony Nosing)
- Add Morning bar in Master Bedroom including Cabinets, Counter Top, SS Undermount       Sink & Chrome Briggs Faucet  Include Under Counter Refrigerator  U-Line 1175 UC       ($10,500.00 Allowance) and under counter light
- Upgrade Wet Bar at Game Room TBD ($14,360.00 Allowance)
- Reverse door swing on closet under stairs
- Add Niche with shelves at Master Bedroom substantially similar to model (Excluding       Zebra Wood)
- Add 1695 square feet of additional Standard Pavers at Pool Deck
- Add Insinkerator Insta Hot/Cold  #HC100 Polished Chrome in Kitchen
- Add Outdoor Shower w/ Kohler # K16111CP Valve (Hot & Cold Water, No Drain)
- Add Plumbing Stub Out for Future Water Feature at Front Courtyard.
- Upgrade all Countertops to Level 3 Granite or Marble (Similar to Model) including edge details
- Add Tile Listello or Trim at Shower & Tub Walls ($12,500.00 Allowance)
- Upgrade Flooring to 24x24 Pallatium Cream in a Diagonal Pattern at 1st Floor Common areas including Foyer, Hall, Dining Room, Laundry Room & Hall, Kitchen, Family Room and Cabana Bath & Hall. (see Powder Bath Floor below)
- Secondary Bath, Floors and Shower/Tub Surrounds to Ceiling in Saturnia 18x18
- Upgrade to Durarock at Shower walls & Tub Surrounds, all baths
- Upgrade Finish for Master Shower Enclosure (to match plumb. fixtures)
- Powder Room Upgrades (vanity, sink, faucet, toilet per model; broken pattern on floor) $4,000.00 Allowance
- Add mirror molding in Guest Bath ($1,240.00 Allowance)
- Add Mirror to 3 niches in Master Hall
- Add Mirror in Living Room per Model
- Kitchen Island will be similar in size as Bermuda Model.
- Add Plywood Backing for TV's at Master Bedroom, Bedroom #3,4,5, Game Room, Study, Master Bath and Loft. And for Mirror in Living Room.
- Molding, doors and painted wood work shall be one color not included in the total paint selection. The Box Area between the Applied Beams in the Living Room shall be painted the same as the Applied Molding. Buyer shall have the choice of 3 (three) additional paint colors in a max of 3 (three) rooms.

**\*\* The following options are included in contract:**

- Add Wood Range Hood Cover (Hearth) in Kitchen ($7,500.00 Allowance)
- Rear covered patio to have square columns 16"x16"
- Upgrade Refrigerator to 48" ($1,440.00 Allowance)
- Upgrade Range to 48" ($2,640.00 Allowance)
- Add 2 – Refrigerator Drawers ($4,600.00 Allowance)
- Add Warming Drawer ($1,850.00 Allowance)
- Add 2nd Dishwasher ($1,00.00 Allowance)
- Increase Carpet Allowance to $45.00 per Square Yard in Standard Areas (Excludes areas upgraded to other materials)
- Delete Standard Bidet in Master Bath
- Delete Standard Allowance for Master Closet Built-ins
- Omit 2 (two) columns an entry and increase 2 (two) entry courtyard columns to 6'
- Exterior elevation shall be substantially similar in appearance to Chateau plans.
- Buyer to determine final size of Dining Room niche (excluding Built-ins).
- Exterior coach lights shall be substantially similar to the Chateau model.
- If a condition in the interior trim at door casing Crown Molding transition is less than 2",     the Seller shall install an appropriate filler.
- Closet under stairs to have bi-fold doors
- Omit J.Box at Kitchen Island
- Omit arched window in Living Room
- Add floor drains to laundry rooms
- Slick finish on ceilings in lieu of knockdown; entire house excluding: Bedroom and Baths #2, 3, 4, 5 and both laundry rooms

## Electrical Upgrades

- Add 25 KW Quite Source Liquid Cooled #05324 Automatic Stand-by Generator with Automatic Transfer Switch, Gas Line hook up, Concrete Slab and 1 Year Service Agreement (will provide enough power for One (1) A/C Unit and 5 to 7 Circuts
- Add 25 Lutron Maestro Dimmer Switches.
- Additional Hi Hats per model (87 standard Hi Hats, plus 39 additional Hi Hats). 2 (two)additional minis in Master Bedroom Niche.
- Add 2 - floor outlets w/ Brass Cover Plates and 3- structured outlets at Library/Game Room
- Add 2 sconces and switch in Cabana
- Add J-box at center of Kitchen over bar
- Add 4 Sconce Outlets with Switch at upstairs hall
- Add 2 sconces w/ Switch at Guest Bath
- Add 4 Sconce Outlets w/ Switch at upstairs hall

## Electrical Upgrades (continued):

- Add 2 Sconce Outlets w/ Switch at Guest Bath
- Add 2 – High Hats w/ Switch and 2 – Sconce Outlets w/ Switch at Master
- Add 6 – Sconce Outlets w/ switch at Master Bedroom Hall
- Add 2 - High Hats in Master Bedroom Niche
- Add 2 – High Hats w/ Switch and 2 – Sconce Outlets w/ Switch at Master Bath
- Add Electric Rough in for Future Ironing Center in Laundries, Builder to Install Buyer's product.
- Add 200# Fixture Supports in Entry, Living Room, Dining Room & Game Room
- Add Plasma TV Jump at 55" A.F.F. at Master Bedroom, Bedroom #3, 4, 5, Master Bath and Loft.
- Add Electric Rough in for Future Water Feature in Front Courtyard.
- Add Exterior Light Fixture on Existing Switch in Courtyard
- Add Electric for 2 – Refrigerator Drawers in Kitchen Island
- Add 220V Outlet for Warming Drawer at Kitchen.
- Add 110V Outlet for 2nd Dishwasher
- Add Electric for Insta Hot in Kitchen

F:\Agree\Oaks\Add K Lot

ADDENDUM "1"
TO THE AGREEMENT FOR SALE AND PURCHASE BY AND BETWEEN
ABANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., (SELLER) AND
JONATHAN RESNICK AND DIANE RESNICK, HIS WIFE, (BUYER)
FOR THE SALE AND PURCHASE OF LOT 41-F1 THE OAKS AT BOCA RATON

IT IS HEREBY MUTUALLY AGREED UPON AS FOLLOWS:

1.   Paragraph 1(A) of the above referenced Agreement, ("Total Purchase Price") is hereby amended to increase the purchase price to reflect an additional sum of $300,000.00 for the additional work described on Exhibit "1" attached hereto, thereby resulting in a total revised contract price in the amount of $2,633,350.  The additional sum referred to herein in the amount of $300,000.00 shall be paid by the Buyer directly to the Seller as follows:

2.   The sum of $60,000 as and for a 20% deposit to be paid directly to Seller as follows:

   a.   $5,000.00 upon execution of this agreement. $5,000.00 each month for 11 (eleven) months commencing September 15th, 2007 and then October 15th, 2007, November 15th, 2007, December 15th 2007, January 15th 2008, February15th 2008, March 15th 2008, April 15th 2008, May 15th 2008, June 15th 2008 and July 15 2008.

   b.   The balance in the amount of $240,000.00 shall be paid by the Buyer to the Seller at or before the date of closing by means of a cashier's check drawn on a bank doing business in the State of Florida and made payable to the Seller, time being of the essence; and

   c.   Failure on the part of the Buyer to make any payment required to be made hereunder as set forth in the above referenced Contract, time being of the essence, with respect to each such payment shall be deemed to be a material breach and default of the above referenced Contract and this Addendum and Seller may in such event exercise any and all default remedies available to it pursuant to the above referenced Contract.

2.  In the event there exists a conflict between the terms and provisions of this Addendum "1" and the terms and provisions of the Agreement for Purchase and Sale, then the terms and provisions of this Addendum "1" shall control and prevail.  Except as modified herein, all terms and provisions of the above referenced Agreement for Purchase and Sale shall remain in full force and effect.

SELLER:
ALBANESE-POPKIN THE OAKS
DEVELOPMENT GROUP, L.P.
A Florida limited partnership

By:  Albanese-Popkin Development Group, LLC
a Florida limited liability Company, General Partner

Date: 7-2-07                    By: _____
                                Leonard A. Albanese - Manager
                                GAVIN GUINAN  V.P.

                                BUYER:

Date: 7-2-07                    _____
                                Jonathan Resnick
                                _____
                                Diane Renick

F:\Agree\Oaks\Add 2 L... 41 F Resnick

ADDENDUM "2"
TO THE AGREEMENT FOR SALE AND PURCHASE BY AND BETWEEN
ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., (SELLER) AND
JONATHAN RESNICK AND DIANE RESNICK, HIS WIFE, (BUYER)
<u>FOR THE SALE AND PURCHASE OF LOT 41, F, THE OAKS AT BOCA RATON</u>

IT IS HEREBY MUTUALLY AGREED UPON AS FOLLOWS:

1.    Paragraph 1 of the above referenced Agreement for Purchase and Sale is hereby amended to reflect Lot 41, F previously selected by the Buyer shall be switched to Lot 24 F.

2.    The total purchase price for the above referenced Sale and Purchase Contract shall be increased from $2,633,350.00 to $3,053,350.00.

3. The increase in the purchase price in the total amount of $420,000.00 shall be paid by the Buyer to the Seller as follows:  10%, ($42,000.00) upon execution of this Addendum.   An additional 10%, ($42,000.00) shall be paid by the Buyer to the Seller on or before March 28, 2008, time being of the essence.  The balance of the increase of the purchase price in the amount of $336,000.00 shall be paid by Buyer to Seller at closing.

3.  In the event there exists a conflict between the terms and provisions of this Addendum "2" or the terms and provisions of Addendum "1" or the terms and provisions of the Contract for Purchase and Sale, then the terms and provisions of this Addendum "2" shall control and prevail. Except as modified herein, all terms and provisions of the above referenced Contract for Sale and Purchase shall remain in full force and effect.

SELLER:
ALBANESE-POPKIN THE OAKS
DEVELOPMENT GROUP, L.P.
A Florida limited partnership

By: Albanese-Popkin Development Group, LLC
a Florida limited liability Company, General Partner

By: _____
Leonard A. Albanese        *Gavin Guinan*
Manager                    *V. P.*

Date: 3-3-08

BUYER:

_____
Jonathan Resnick

_____
Diane Resnick

Date: _____