# EXHIBIT F

F.\Agree\Oaks\K-lot 148, B-1 Rosen

# THE OAKS AT BOCA RATON
### Agreement for Purchase and Sale of Spec Home Under Construction

In this Agreement, the word BUYER refers to buyer or buyers who have signed the Agreement. The word SELLER means or refers to ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, whose address is 1200 S. Rogers Circle, Suite 11, Boca Raton, Florida 33487.

If the first letter of the word is capitalized in this Agreement, that word will have the meaning given to it in this Agreement or in the Community Documents (as defined in Paragraph 14, of this Agreement).

Buyer(s):   MICHAEL ROSEN AND ROBYN ROSEN, HIS WIFE

Address:   16340 Bristol Point Drive

City:   Delray Beach                County:   Palm Beach

State:   Florida                Zip Code:   33446

Cell Phone:  (561) 212-7000        Cell Phone:   (561) 756-6802        Fax: _____
E-Mail Address: _____
Social Security Number(s): _____

Estimated Completion Date of Home (See Paragraph 7): ~~June 30, 2006~~   *on or before Aug 30-06*

On-Site Salesperson:   Alan Hechtman

Cooperating Broker (See Paragraph 16-If not filled in, there is none):  Addison Mizner Realty

1.   **PURCHASE AND SALE**. Seller agrees to sell to, and Buyer agrees to purchase from Seller, the single family dwelling ("Home") and the "Lot" on which it is situated, as hereinafter described, for the price and on the terms and conditions now about to be set forth:

Lot #:   148    Block  B-1   Model:  Montecito Spec    Garage Orientation:   As Per Plan

A.   DESCRIPTION OF HOME AND PARCEL

Buyer agrees to buy the Home constructed or to be constructed on Lot 148, Block B-1 ("Property") of The Oaks at Boca Raton, Plat Three, according to the Plat recorded in Plat Book 87, Page 4, Public Records of Palm Beach County, Florida, (the "Community"), together with the rights and subject to the obligations applicable thereto as set forth in the Community Documents (hereinafter defined).

The "Total Purchase Price" for the Property is:        $   1,600,000.00

Base Price:                       $   N/A

Options & Extras:                 $   N/A

Total Purchase Price:             $   1,600,000.00

PAYMENT:

| | | |
|---|---|---|
| A. Payment upon execution of Agreement | (10% of Total Purchase Price) | $   160,000.00 |
| B. Balance of Total Purchase Price due at closing | (90% of Total Purchase Price) | $   1,440,000.00 |
| C. Total balance due at closing | | $   1,440,000.00 |

Buyer shall make each payment in full and in clear U.S. funds, within five (5) banking days from the date of Seller's request, time being of the essence for all such payments. If Buyer fails to tender the payment as required by this paragraph, then Buyer shall be deemed to be in default of this Agreement and Seller may pursue any and all remedies Seller may have under this Agreement. If Seller elects to accept any such payment at a later date, Buyer shall pay to Seller, together with the additional deposit, a sum equal to interest at the highest lawful rate on the amount of the additional deposit from the date such payment was due to Seller to the date such payment was made to Seller.  Furthermore, if Seller elects to accept such payment at a later date Buyer expressly understands and agrees that Buyer shall

pay to Seller along with such additional deposit all accrued interest as previously defined. Failure to do so will be deemed a material default hereunder. In addition, Buyer expressly acknowledges that Buyer has been advised by Seller that no construction will commence until such time as all deposits and other payments required to be made hereunder are received by Seller from Buyer as required herein.

This Agreement and the deposits will not give Buyer any lien or claim against the Property and the Buyer's rights hereunder will be subordinate to those of any lender holding a mortgage, whether or not such a mortgage secures the advancement of construction funds.

BUYER ALSO AGREES TO PAY ALL OTHER SUMS REQUIRED TO BE PAID BY BUYER IN THIS AGREEMENT.

The balance due at closing must be paid by cashier's check or wire transfer of funds cleared the United States Treasury, only.  All payments must be made in U.S. Funds and all cashier's checks must be payable on a bank located in Palm Beach, Broward or Dade County, Florida, U.S.A.

2.   **TITLE EVIDENCE.**   Prior to Closing, Seller shall deliver to Buyer a title insurance commitment issued by a Florida licensed title insurer agreeing to issue to Buyer, upon recording of the deed, an owner's policy of title insurance (ALTA Form B) in the amount of the Total Purchase Price, insuring Buyer's title to the Property, subject only to the following permitted exceptions ("Permitted Exceptions").

A.   Liability for all taxes affecting the Property starting the year Buyer receives title and continuing thereafter.

B.   All laws and all restrictions, covenants, conditions, limitations, agreements, reservations and easements recorded in the Public Records of Palm Beach County, or otherwise established with respect to the Property; for example, zoning restrictions, property use limitations and obligations, easements (right-of-way), plat restrictions, agreements relating to telephone lines, water and sewer lines and other utilities, provided however, none of the foregoing shall render title unmarketable or prohibit use of the Property for residential purposes.

C.   The restrictions, covenants, conditions, easements, terms and other provisions imposed by the documents contained or referred to in the Community Documents, as described in Paragraph 14 (and any other documents which Seller, in its sole discretion, believes to be necessary or appropriate) which are recorded by Seller now or at any time after the date of this Agreement in the Public Records of Palm Beach County, Florida, and as amendments to any of such documents.

D.   Pending governmental liens for public improvements as of closing.

E.   Any state of facts which any accurate survey of the Property would show.

F.   Perpetual easement for encroachments now or hereinafter existing caused by the settlement or movement of improvements or caused by minor inaccuracies in building or rebuilding.

G.   Buyer's mortgage, if any.

H.   All standard printed exceptions contained in an ALTA Owner's title insurance policy customarily issued in Palm Beach County, Florida.  Provided however, upon delivery by Seller of customary affidavits and delivery of a survey at closing, exceptions relating to parties in possession, mechanic's liens, the "gap" and the survey will be deleted at closing. Notwithstanding the foregoing, Buyer acknowledges that certain minor encroachments are routinely disclosed on a survey (such as an encroachment of a driveway over a utility easement) and Buyer agrees to accept an exception for minor encroachments shown on a survey.

Buyer shall have five (5) days from the date of receiving the title insurance commitment to examine it. If Buyer finds title unmarketable, Buyer shall, within five (5) days of receiving the title insurance commitment, notify Seller in writing specifying details.  If defects render title unmarketable, Seller shall have one hundred twenty (120) days from receipt of notice within which to remove defects, failing which, Buyer shall have the option of (i) either accepting the title as it then is or (ii) demanding a refund of the deposit(s) and monies paid for options and upgrades which shall immediately be returned to Buyer; whereupon Buyer and Seller shall be deemed to have released one another of all further obligations under this Agreement. Seller will use reasonable efforts to remove title defects, but shall not be obligated to institute suit nor expend any sums in excess of three percent (3%) of the Total Purchase Price. For purposes of this Agreement, title is defective only if matters are revealed which are not disclosed by or approved in this Agreement.

Unless Seller receives written notice from Buyer within five (5) days after the Effective Date of the Agreement or five (5) days prior to closing, whichever occurs first, Seller will direct the title agent and the title insurer referred to above to issue the title insurance commitment referred to above and a title insurance policy after Closing. In the event Buyer timely delivers such notice, (i) Seller shall have no obligation to deliver or cause to be delivered to Buyer a title insurance commitment and title insurance policy; (ii) Buyer shall be responsible for obtaining and delivering a title commitment to Seller a minimum of five (5) days prior to Closing (if Buyer shall be deemed to waive Buyer's right to make title and title related objections and Buyer shall be deemed to accept title subject to the Permitted Exceptions and all other matters affecting title); (iii) Buyer shall be responsible to directly pay all costs and fees arising from or related to the title commitment, title policy and the Closing of the transaction described herein; (iv) Seller shall have no obligation to provide Buyer with any prior owner's title insurance policy, base title, certificates of good standing, corporate resolution of Seller, estoppel letters, etc; and (v) Buyer shall be responsible for all costs and expenses (including a Delayed Closing Charge) if Closing is delayed as a result of the foregoing.

3.    <u>DEPOSITS</u>. SELLER HEREBY PROVIDES TO THE BUYER THE RIGHT TO HAVE DEPOSIT FUNDS (UP TO 10 PERCENT OF THE PURCHASE PRICE) IN AN INTEREST BEARING ESCROW ACCOUNT.  THIS RIGHT MAY BE WAIVED IN WRITING BY THE BUYER.

If Buyer elects to have the deposit funds in an escrow account, Buyer will be obligated to pay to the Seller at the time of closing an interest charge calculated pursuant to the formula set forth below:

Seller may borrow money in an amount equal to the funds held in escrow for construction purposes only, in which case any interest which the Seller pays on such a loan for a period not to exceed 12 months shall be paid by the Buyer at the time of closing, but the Buyer shall be credited for any interest accrued on the escrow account.

We have read the foregoing language and we agree that an escrow is:(____ required); (_X_ waived) on 10% deposit of $160,000.00.

4.    <u>CONSTRUCTION SPECIFICATIONS</u>. The Home will be constructed in substantial accordance with the plans and specifications kept in Seller's construction office ("Seller's Plans and Specifications"). Buyer acknowledges and agrees that it is a widely observed construction industry practice for plans and specifications for any home or building to be changed and adjusted from time to time in order to accommodate on-going "in the field" construction factors.  Buyer further agrees that these changes and adjustments are essential in order to permit all components of the Home to be integrated into a well functioning and aesthetically pleasing product in an expeditious manner.  Because of the foregoing, Buyer acknowledges that such changes may occur and agrees that it is reasonable and for Buyer's benefit to allow Seller the flexibility to make such changes in the Home provided that such changes do not materially or adversely affect the size or dimensions of the Home.  The Home may be constructed on the lot as a reverse of that shown on the plans, on any sales and promotional material or as the model may have been constructed.

Without limiting Seller's general right to make the changes referred to above, Buyer specifically agrees that changes in the location of utility (including, but not limited to electrical, television and telephone) lead-ins and outlets, air-conditioning equipment, ducts and components, lighting fixtures and electric panel boxes may be made.  Buyer further agrees that Seller may "site" the Home in a position that is different from that of the Model and the Seller's Plans and Specifications.

Buyer agrees that all Change Orders for construction modifications must be submitted to Seller and approved by Seller.  Buyer understands and agrees that Seller will not be obligated to accept any Change Orders after application for building permit is submitted.  Non-structural Change Orders, if any, accepted by Seller subsequent to commencement of construction shall be at Seller's sole and absolute discretion and with such Change Order, the Closing Date may be extended.  Payment for all costs set forth on all Change Orders shall be made by Buyer to Seller at the time each Change Order is accepted by Seller.  Seller shall not be obligated to undertake any change pursuant to a Change Order until Buyer has made payment in full to Seller for all items on the Change Order.

Buyer acknowledges that in the course of construction of any building or other improvements, certain changes, deviations or omissions may be desirable or required by governmental authorities or job conditions.  Any changes, deviations or omissions required by job conditions or governmental authorities are hereby authorized by Buyer.  Any costs or expenses resulting from any change, deviation, addition or omission required by governmental authorities, arising subsequent to the execution of this Agreement, shall be evidenced on a Change Order presented by the Seller to the Buyer, which shall be executed by the Buyer.

5.    <u>MATERIALS AND COLOR SELECTIONS</u>. Buyer agrees and acknowledges that certain wall coverings, decorations and furnishing in any model displayed to Buyer are for display purposes only and are not included as part of this Agreement.  Further, Buyer understands and agrees that certain

other items (or where appropriate, upgraded versions of such items) which may be seen in the Model or in illustrations, are not included with the sale of the Buyer's Home. Buyer further understands and agrees that items of this nature will not be included in Buyer's Home unless specifically provided for in Seller's published list of standard items (if any) or in a Rider or Schedule to this Agreement signed by both Buyer and Seller.

If circumstances arise which warrant changes of suppliers, manufacturers, brand names or other items, Seller may substitute equipment, material, appliances, etc. which are of equal or better quality to that designated on Seller's Plans and Specifications. Buyer further understands and agrees that certain of the finishing items, such as tile, marble, carpet, cabinets, stone, brickwork, roof tile, pool finishes, wood, paint, stain and mica are subject to size and color variations, grain and quality variations, and may vary in accordance with availability and changes by manufacturers from those shown in the model, if any, or illustrations or brochures or those included in the specifications or as shown in Seller's construction office.

Buyer may select certain standard colors and/or materials in the Home. Buyer understands and agrees that Buyer must submit Buyer's selections to Seller in writing within ten (10) days of the date the list of selections is made available to Buyer. If these selections are not delivered to Seller in writing within the time period stated above, then it is understood and agreed that the choices may be made by Seller in its discretion and be binding on Buyer. In that event, Seller's selections shall be binding upon Purchaser and shall not be a basis upon which Buyer may: (i) fail or refuse to close this transaction as scheduled; (ii) make any claim against Seller or (iii) fail or refuse to make any payment when due, in full.

6.   **INSULATION**.   Seller has advised Buyer by way of an Insulation Rider attached to this Agreement as required by the rules of the Federal Trade Commission, that it currently intends to install in the Home the insulation disclosed in that Rider. The R-Value and other information shown in the Rider is based solely on the information given by the appropriate manufacturers (based on the thicknesses listed) and Buyer agrees that Seller is not responsible for the manufacturers' errors. All of the insulation information is subject to Seller's general right, under Paragraph 4 of this Agreement, to make changes in Seller's Plans and Specifications, and to applicable limitations of Seller's liability to Buyer.

7.   **COMPLETION DATE**.   Seller estimates that the Home will be substantially completed on or about the date indicated on the first page of this Agreement. Buyer acknowledges and agrees, however, that this estimate is given to Buyer for convenience only and is subject to change from time to time for any reason and without creating any liability of Seller. Seller does, however, agree to substantially complete construction of the Home in the manner specified in this Agreement by a date no later than one (1) year and eleven (11) months from the date Buyer and Seller execute this Agreement, subject however, to delays caused by Buyer or acts of God, the unavailability of materials, strikes, other labor problems, governmental orders, or other events which would support a defense based upon impossibility of performance for reasons beyond Seller's control.

8.   **SUBSTANTIAL COMPLETION**.   Whenever this Agreement requires Seller to complete or substantially complete an item of construction, that item will be understood to be complete when the same is substantially complete in Seller's reasonable opinion. Notwithstanding the foregoing, however, the Home will not be considered complete or substantially complete by Seller for purposes of this Agreement unless Seller has obtained a Certificate of Occupancy (or its equivalent) from the proper governmental authority.

9.   **INSPECTION PRIOR TO CLOSING**.   Except as provided herein, for reasons of safety and/or requirements under policies of insurance held by Seller, neither Buyer nor any agent of Buyer shall be permitted to enter the Lot or the Home until after Buyer has closed this Agreement and has taken possession of the Home, whereupon Buyer's rights shall be as set forth in the Community Documents. Buyer agrees to abide by such
restriction and not to enter upon or interfere in any way with the construction of the Home or communicate with any of Seller's contractors, subcontractors, suppliers or workmen or interfere with any other improvements of the Community.

Prior to Closing and upon notice from Seller, Buyer or Buyer's designated representative shall inspect the Home with Seller and together with Seller compile a Punch List specifying any outstanding work required to conform the Home to this Agreement. Buyer's failure to perform Buyer's obligations hereunder shall not delay, postpone, or otherwise interfere with the Closing. Seller shall have a reasonable period of time to complete all work required under the Punch List in a workmanlike manner. The fact that Seller has to complete the work set forth under the Punch List shall not delay, or postpone the Closing, or Buyer's obligation to close and pay the balance of the Purchase Price, or be grounds for a reduction of or credit against the Purchase Price or be grounds for placing a portion of the Purchase Price in escrow pending completion of such items. The provisions of this paragraph shall survive the Closing.

The Property constitutes a part of the Community which may result in the construction of additional improvements by Seller. The Seller is not obligated, however, for the construction or completion of any additional improvements of any other portion of the Community as a pre-condition to the obligation of Buyer to close after substantial completion of the Home by Seller.

10.   CLOSING DATE.   Buyer will be given at least ten (10) days notice of the time and place of Closing, which shall be in Palm Beach County, Florida, at a location designated by Seller ("Closing Notice").   Seller is authorized to postpone the Closing for any reason and Buyer will close on the new date, time and place Seller specifies in a Notice of Postponement (as long as at least three (3) days' notice of the new date, time and place are given).   A change of time or place of Closing only (that is, one not involving a change of date) will not require any additional notice period.   Any Notice of Closing, Postponement or Rescheduling must be given in writing.   All of these notices to Buyer will be sent or directed to the address specified on the first page of this Agreement unless Seller has received written notice from Buyer of a change prior to the date the Closing Notice is given.   These notices (other than a change of address) will be effective on the date mailed or placed in an express delivery system (i.e. Federal Express).   An Affidavit of one of Seller's employees or agents stating the Notice of Closing, Postponement or Rescheduling was mailed or placed with an express delivery system shall be presumed to establish that the Closing Notice was received.

If Seller agrees to a delay of Closing at the request of Buyer (which Seller is not obligated to do), Buyer will pay to Seller, at the Closing (or in advance if so required by Seller) a late closing charge equal to eighteen percent (18%) per annum on the Total Purchase Price of the Property, computed from the originally scheduled Closing Date through the actual Closing Date.

IF BUYER FAILS TO CLOSE AS REQUIRED BY THIS PARAGRAPH, BUYER WILL BE IN DEFAULT OF THIS AGREEMENT.

11.   CLOSING DOCUMENTS.   At Closing, Buyer will receive (i) a Special Warranty Deed to the Property, (ii) Seller's form of Owner's (No Lien) Affidavit, (iii) a copy of the Certificate of Occupancy or equivalent from the governmental agency having jurisdiction over the Home, and (iv) the FIRPTA Affidavit (collectively the "Closing Documents").   The Special Warranty Deed will be subject to (that is, contain exceptions for) all of the Permitted Exceptions described in Paragraph 2.   When Buyer receives the Special Warranty Deed at Closing, Buyer will sign all papers reasonably necessary or appropriate to effectuate the intent of this Agreement.

At the same time Buyer receives the Closing Documents, Buyer agrees to pay the balance of the Total Purchase Price and any additional amounts Buyer owes under this Agreement.   Buyer will not be entitled to take possession of the Property until all funds have been received by Seller in accordance with this Agreement.   Seller will pay the costs of documentary stamps on the Deed and recording fees for the Deed.

12.   CLOSING COSTS.   Buyer understands that, in addition to the Total Purchase Price for the Property, Buyer must pay certain other fees or costs when Buyer accepts title at Closing. These include the following:

  A.   At the Closing, the Buyer, in addition to the payment of balance of the Purchase Price and any other sums due under this Agreement, shall pay a "development fee" equal to one and one-half percent (1 ½%) of the total Purchase Price (inclusive of all Change Orders) to cover costs, expenses and fees incurred by Seller in connection with the development of the Property.   Buyer understands and agrees that the "development fee" is not for payment of closing costs or settlement fees, but rather covers various costs and expenses of Seller as well as Seller's attorneys' fees in connection with the development;

  B.   The Property's prorata share of the assessments for The Oaks at Boca Raton Property Owners Association, Inc. (the "Association"), commencing as of the date of closing or from the date of issuance of the Certificate of Occupancy, whichever occurs first;

  C.   A contribution to the Capital Improvement Fund of the Association, equal to three (3) months of the Association's annual assessment for the Property.   This contribution shall be collected and maintained in a separate account for the use and benefit of the Association.   The Capital Improvement Fund of the Association shall be disbursed by the Board of Directors for the Association in accordance with the Association documents;

D.    A prepayment of the Association's assessments for the Property for the quarter immediately following the quarter in which closing occurs;

E.    Loan fees, loan closing costs and all other related sums, including but not limited to, interest, points, attorneys fees, recording fees, documentary stamps, intangible tax, credit report, abstracting, inspection fees and title insurance charged by Buyer's lender, if any;

F.    Any utility or similar deposits attributable to the Property;

G    Any late closing charges provided for elsewhere in this Agreement; and

H.    Real estate taxes shall be prorated as of the date of closing or from the date of issuance of the Certificate of Occupancy, whichever occurs first.

13.    DEFAULT. If Buyer defaults under this Agreement (beyond the expiration of any notice period, if applicable), all Buyer's rights under this Agreement will end and Buyer authorizes Seller to keep all deposits made or agreed to be made and other pre-closing advance payments (including, without limitation, those on options, extras, upgrades and the like) Buyer has then made and all interest which was earned on them, all as agreed and liquidated damages and not as a penalty. The parties acknowledge that the extent and amount of actual damages is uncertain and as such the amounts provided for above are agreed and liquidated damages.

If Seller defaults under this Agreement, Buyer will give Seller notice of it and if Seller has not commenced appropriate action to cure the default within ten (10) days after such notice is given, Buyer will have the choice of either (i) receiving a refund of all deposits and prepayments for options, extras, upgrades and the like actually paid under this Agreement; (ii) specifically enforcing this Agreement; or (iii) any other remedy available to Buyer in law or in equity. When Buyer elects one of the remedies available to Buyer, Buyer will be deemed to have waived the other one(s); provided that notwithstanding anything to the contrary contained herein, Buyer shall have whatever remedies, including specific performance and damages, in the event Seller fails to fulfill its obligations to deliver the Property within one (1) year and eleven (11) months as provided in Paragraph 7 of this Agreement.

14.    ASSOCIATION; RECEIPT OF COMMUNITY DOCUMENTS.   Upon taking title to the Property, Buyer shall automatically become a member of the Association described in the Community Documents (defined below). Buyer understands Buyer's membership will take effect at Closing. At that time, Buyer agrees to accept all liabilities and obligations of such membership.

Buyer acknowledges receipt from Seller, prior to Buyer's signing this Agreement, of copies of the following documents (the "Community Documents"):

A.    Declaration of Covenants, Conditions and Restrictions for The Oaks at Boca Raton.
B.    Articles of Incorporation and By-laws of the Association.
C.    Rules and Regulations of the Association described in the Community Documents.
D.    Operating Budget for the Association (which may be in estimated form).

Buyer acknowledges and agrees that the Community Documents permit The Oaks at Boca Raton Venture, L.P., developer of The Oaks at Boca Raton ("Developer"), or Seller, as the case may be, to make amendments to them and that any changes it makes to them prior to Closing (i) will not necessarily be delivered to Buyer (however, such amendments will be a part of the Public Records of the County) and (ii) will not affect Buyer's obligation to perform any or all of the duties under this Agreement, unless such changes have a material and adverse effect on the market value of the Property.

Buyer understands that the budget for the Association is not guaranteed.  The budget is subject to change at any time and from time to time to reflect actual and projected expenditures.  These changes may occur before or after Closing but will not affect any of Buyer's obligations under this Agreement (except as to resulting changes in Closing prorations).  Buyer recognizes and agrees that Buyer's assessments may include expenses attributable to common areas which are not yet complete or usable by Buyer.

15.    USE OF THE REMAINING PROPERTY.  As long as Seller, Developer or other builders own property in the Community, Seller, Developer or such other builders may keep a sales center, offices and model homes in the Community (including on the common areas). Such persons' salespeople may show homes, erect advertising signs and do whatever else is necessary and helpful for sales, leasing or management.  This use of such property must be reasonable, and cannot unreasonably interfere with

Buyer's use and enjoyment of the Property and of the common areas.

In addition to the foregoing, Seller, Developer and other builders and their affiliates, contractors, subcontractors, licensees an designees may conduct such blasting, construction, excavation, repair and other activities in or around the Community as are deemed necessary or appropriate in the sole discretion of the party conducting such activities. Without limiting the generality of the foregoing, and as a material inducement to Seller to enter into this Agreement, Buyer acknowledges and agrees:

> SELLER, DEVELOPER AND/OR THE OTHER PARTIES DESCRIBED ABOVE WILL BE CONDUCTING EXCAVATION, CONSTRUCTION AND OTHER ACTIVITIES WITHIN OR AROUND THE COMMUNITY, BOTH BEFORE AND AFTER BUYER CLOSES UNDER THIS AGREEMENT. BUYER RECOGNIZES THEIR RIGHTS TO DO SO AND WILL NOT (i)DEEM ANY OF THESE ACTIVITIES TO BE NUISANCES OR NOXIOUS OR OFFENSIVE ACTIVITIES, (ii) ENTER, OR ALLOW ANY OTHERS UNDER BUYER'S CONTROL TO ENTER ANY AREAS WHERE SUCH ACTIVITIES ARE BEING CONDUCTED (EVEN WHEN THEY HAVE TEMPORARILY CEASED, SUCH AS DURING NON-WORKING HOURS) AND (iii) HOLD SELLER OR DEVELOPER LIABLE OR SUE SELLER OR DEVELOPER FOR ANY DAMAGE OR INJURY ARISING FROM OR CONNECTED WITH ANY OF THE ACTIVITIES DESCRIBED ABOVE.

> The provisions of this paragraph will not limit the generality or effect of any similar provisions in any of the Community Documents and, without limiting the generality of paragraph 27 of this Agreement, will continue to be effective after (survive) Closing.

The provisions of this Paragraph 15 will survive Closing.

16.  **SALES COMMISSIONS.** Seller shall pay the cooperating broker, if any, named on the first page of this Agreement. By signing this Agreement, Buyer is representing and warranting to Seller that Buyer has not consulted or dealt with any other broker, salesperson, agent or finder and that Buyer will indemnify and hold Seller harmless for and from any such person or company claiming otherwise, including commissions, attorneys' fees and court costs.

The provisions of this Paragraph 16 shall survive Closing.

17.  **NOTICES.** Except for the provisions set forth in Paragraph 10, whenever Buyer or Seller is required to notify the other, the notice must be in writing addressed to the address set forth on page one of this Agreement and it must be sent by express mail, courier or certified mail, postage prepaid, with a return receipt requested.
A change of address notice is effective when it is received. All other written notices are effective on the day they are properly mailed or placed with an express courier, whether or not received.

18.  **TRANSFER OR ASSIGNMENT.** Buyer has no right to assign, sell or transfer his interest in this Agreement without Seller's prior written consent, which Seller may withhold in its own discretion. Buyer covenants and agrees that prior to closing, Buyer shall not: (a) list or advertise the Property for sale with any broker, in any multiple listing service, in any classified or other advertisement, or otherwise (including, without limitation, "by owner") , and/or (b) enter into any agreement (verbal or written) for an assignment of Agreement or the rights thereunder, or any agreement (verbal or written) for a transfer of title to the Property to any third party.

19.  **OTHERS BOUND BY THIS AGREEMENT.** This Agreement will bind Buyer's heirs and personal representatives. If Buyer is a corporation or other business entity, this Agreement will bind any successor corporation or entity. If Buyer has received permission to assign or transfer Buyer's interest in this Agreement, this Agreement will bind anyone receiving Buyer's interest.

20.  **PUBLIC RECORDS.** Buyer authorizes Seller to record the documents necessary to establish and operate the Community and the portion of it in which the Property is located, all other documents Seller deems necessary or appropriate, and all amendments and supplements to them in the Public Records of the County.

21.  **LITIGATION.** In any suit or other proceeding brought by either Buyer or Seller, the prevailing party will be entitled to recover reasonable attorneys' fees, reasonable costs and expenses actually incurred by the prevailing party in such suit or proceeding or in any appeal and Buyer and Seller agree that venue for such litigation shall be in Palm Beach County, Florida.

22.  **FLORIDA LAW.** This Agreement will be governed by the laws of the State of Florida.

23.  **TIME OF THE ESSENCE.** The performance of all obligations on the precise times stated in this Agreement is of absolute importance and failure to perform any of them on time is a default, time being of the essence.

24. __RECORDING__. Neither this Agreement, nor any notice of memorandum hereof may be recorded among the Public Records and such recording shall constitute a default under this Agreement by the recording party.

25. __COMMUNITY__. The developer of the Community is The Oaks at Boca Raton Venture, L.P. Buyer acknowledges and agrees that Seller has not made any representations, warranties or guarantees whatsoever in connection with this Agreement, as to the design, construction, completion, use, benefits or value of the Community of which the Property is a part. Buyer is purchasing the Property from Seller and regardless of any direct or indirect benefits which the Seller may receive from having Buyer purchase property in the Community, Buyer has not (and will not have) paid or given any consideration to Seller for any such representation, warranty or guaranty and Buyer has neither received nor relied on any such representation, warranty or guaranty from Seller as to the design, construction, completion, use, benefits or value of the Community.

26. __RETURN OF COMMUNITY DOCUMENTS__. If this Agreement is cancelled for any reason, Buyer will return to Seller all of the Community Documents Seller has delivered to Buyer in the same condition Buyer received them, reasonable wear and tear excepted. If Buyer fails to return them, Buyer will pay Seller $50.00 (which may be withheld from Buyer's deposits if Buyer is then entitled to a refund) to defray Seller's cost of preparation, printing and delivery.

27. __SURVIVAL__. The provisions and disclaimers in this Agreement which are intended to have effect after Closing (but only those provisions and disclaimers) will continue to be effective after (survive) Closing and delivery of the deed.

28. __INDUCEMENT__. Buyer acknowledges that the primary inducement for Buyer to purchase under this Agreement is the Property itself and not the Common Areas of the Community or any other part of it. Buyer also acknowledges that he was not induced to purchase the Property or sign this Agreement by any oral statement or oral representation made by Seller or Seller's agents.

29. __RADON GAS__. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit. Buyer acknowledges that Seller has made no geological or environmental test or surveys of the Community. Seller makes no representations or warranty concerning geological or environmental matters including, but not limited to, radon gas. Seller specifically excludes such geological or environmental matters from any warranties given under this Agreement. If Buyer requires more information concerning this potential risk, additional information may be obtained from the U.S. Environmental Protection Agency and state and local authorities.

30. __RECEIPT OF DISCLOSURES__. Seller and the salesperson hereby disclose to Buyer that it is acting as the Real Estate Broker-Salesperson or Salesperson with respect to the purchase of the Property solely on behalf of Seller as an agent. Accordingly, it undertakes no duty of disclosure, representation or otherwise to Buyer in this transaction. This disclosure is given in accordance with Section 475.25(l)(q), Florida Statutes and Rule 21V-10.033, Florida Administrative Code. Buyer acknowledges receipt of this disclosure, the disclosure summaries for the Community, the Agency Disclosure and Notice of the Closing Expenses prior to signing this Agreement.

31. __WATER LEVELS__. Buyer acknowledges that all lakes and canals (singularly, referred to as "Lake Area" and collectively referred to as "Lake Areas") within the Community are designed as water management areas and are not designed as aesthetic features. Permits from various regulatory agencies govern the control of water levels. Due to varying climatic conditions, environmental conditions of water use requirements, including, without limitation, fluctuations in ground water elevations, priorities established by governmental authorities, and other causes out of the control of Developer, Seller and the Association, the water levels in the Lake Areas, depending on conditions, will rise and fall as often as daily and on occasion the water level may decline significantly and result in changes to the appearance of the Lake Areas. These water level fluctuations and changes in the appearance of the Lake Areas are considered normal occurrences. Buyer further understands and acknowledges that neither the Developer, Seller, nor the Association, have control over such water level fluctuation nor associated impacts to plant growth in the Lake Areas. Therefore, Buyer agrees to release and hold harmless Developer, Seller and the Association from and against any and all claims, demands, damages, costs and expenses of whatever nature or kind, including attorneys' fees and costs, arising from or relating in any manner to the Lake Areas, including, without limitation, water level fluctuations, permitting, construction and maintenance thereof. Buyer shall not alter, modify, expand, or fill any Lake Area without the prior written approval of the Developer, Seller, the U.S. Army Corps of Engineers, and such other local, state and federal authorities as may have relevant jurisdiction over such matters.

The provisions of this paragraph 31 shall survive closing and delivery of the deed to Buyer.

8

32.   SUBORDINATION.  Buyer acknowledges and agrees that all his rights hereunder are subordinate to the lien of any mortgage which now or shall hereafter encumber the subject property prior to Closing and to all amendments, modifications, renewals, consolidations and extensions thereof, and all voluntary and involuntary future advances made thereunder. However, Seller agrees to cause any such mortgage to be discharged of record at the time of Closing.

33.   SEVERABILITY.  Should any part, clause, provision or condition of this Agreement be held by a court of competent jurisdiction to be void, invalid or inoperative, including but not limited to compliance with 15 U.S.C. 1702(a)(2) of the Interstate Land Sales Full Disclosure Act ("Act"), the parties agree that such invalidity shall not effect any other part, clause, provision or condition hereof, and that the remainder of this Agreement shall be effective as though such void part, clause, provision or condition had not been contained herein. Additionally, if the interpretation of a provision of the Agreement or a condition within the Agreement could invalidate the Agreement pursuant to the Act, then this Agreement shall be modified accordingly so that the offending part, clause, provision or condition of the Agreement will either be deleted or modified so that the intent of the parties can be fulfilled and yet the offending provision is removed.

34.   WAIVER OF JURY TRIAL. Each party hereby knowingly, voluntarily, and intentionally waives the right to a trial by jury with respect to any litigation between the parties, including, but not limited to any and all cause or causes of action, defenses, counterclaims, crossclaims, third party claims, and intervenor's claims, whether now existing or hereafter arising and whether sounding in contract, tort, equity or otherwise, regardless of the cause or causes of action, defenses or counterclaims alleged or the relief sought by any party, and regardless of whether such causes or action, defenses or counterclaims alleged or the relief sought by any party, and regardless of whether such causes of action, defenses or counterclaims are based on, or arise out of, under or in connection with this agreement or its subject matter, out of any alleged conduct or course of conduct, dealing or course of dealing, statements (whether verbal or written), or otherwise.  Any party hereto may file a copy of this agreement with any court as conclusive evidence of the consent of the parties hereto to the waiver of any right they may have to trial by jury.

35.  DAMAGE BEFORE COMPLETION.  If between the date of this Agreement and the Closing, the Property is damaged by fire or other casualty, the following shall apply:

A.  Risk of loss to the improvements by fire or other casualty until the Closing is assumed by Seller. Seller shall have no obligation to repair or replace the improvements; provided, however, if Seller elects to repair or replace such loss or damage to the improvements, this Agreement shall continue in full force and effect and Buyer shall not have the right to reject title or receive a credit against or abatement in the Purchase Price.  In such event Seller shall be entitled to a reasonable period of time within which to complete repairs or replacement.  Any proceeds received from insurance or in satisfaction of any claim or action in connection with such loss or damage shall belong entirely to Seller.

B.  If Seller notifies Buyer that it does not elect to repair or replace any such loss or damage, then this Agreement shall be deemed cancelled and of no further force or effect, and Seller shall refund to Buyer all deposits made hereunder, whereupon the parties shall be released and discharged of all claims and obligations hereunder, except that if Buyer is then otherwise in default under this Agreement, Seller shall retain all such deposits as liquidated damages.

36.   LITTORAL ZONES/AQUATIC LAKE PLANTINGS.  In addition to the foregoing, the Buyer hereby stipulates and agrees that any and all conservation areas required by governmental authority to be located within the Community shall be dedicated as Common Areas and shall be the perpetual responsibility of the Association and may in no way be altered from the natural or permitted state. Activities prohibited within any and all conservation areas which may be required to be located within the Community, including, but are not limited to, construction or placing of buildings on or above the ground; dumping or placing of soil or other substances such as trash; removal or destruction of trees, shrubs or other vegetation (with the exception of "exotic" and/or "nuisance" vegetation removal); excavation; dredging or removal of soil material; diking or fencing and any other activities detrimental to drainage, flood control, water conservation, erosion control or fish and wildlife habitat conservation or preservation.

Furthermore, the Palm Beach County Department of Environmental Resource Management ("DERM") requires littoral zone lake plantings to be installed and maintained in certain areas in the Community. These plantings may not be disturbed, trimmed or removed by any other persons other than the Association who must first receive approval from DERM. The ongoing maintenance, cost and perpetual obligation of such plantings shall remain the responsibility of the Association after the Developer's representatives resign from the Board of Directors. Any Member(s) of the Association or Buyer who damages the referenced plantings shall be solely responsible for the cost or repairing same, as well as any fines, costs, or other charges imposed by DERM or any other agency or governmental entity arising from such damage.  All Buyers shall be deemed to have acknowledged and agreed that views of, including but not limited to, any lakes or other bodies of water in or outside of the Community may be

9

altered by the presence of such plantings.

All work pursuant to this Section and all expenses incurred or allocated to the Association pursuant to the Community Documents shall be paid for by the Association through assessments (either general or special) imposed in accordance herewith.

The provisions of Paragraph 36 shall survive closing.

37.   INTERLOCAL/SCHOOL AGREEMENT.  By receipt of a copy of the Community Documents and acceptance of a special warranty deed conveying a lot or lots to the respective Buyer, Buyer does hereby agree to join in and consent to any application, petition or agreement involving an interlocal/school agreement supported by Seller and which will benefit the Community in Seller's sole and reasonable discretion. Buyer additionally acknowledges that school boundaries periodically change within Palm Beach County and Seller does not provide any warranty or guaranty to Buyer as to a child's attendance at a specific school for a specific period of time.

38.   ADDITIONAL LAND.  Currently, the Developer of The Oaks at Boca Raton has submitted plans to the County to add the approximate 118 +/- acres property to the east of The Oaks [Additional Land] to the Community. If the Developer finalizes the approvals for this Additional Land, then the following, among other changes not yet determined, may at the Developer's option, occur: (i) the Additional Land will be added as part of the Community; (ii) the Community Documents will govern the Additional Land and the homes, common areas, and other improvements constructed thereon as part of the Community, (iii) the Rec facility and common areas serving the Community may be enlarged and/or modified with the homes in the Additional Land having the same use rights as the homes in the existing Community; and (iv) the current planned entrance on Clint Moore Road may be relocated further to the east.

39.   WARRANTY; DISCLAIMER OF IMPLIED WARRANTIES. Seller grants to Buyer a limited warranty, the form of which is available at Seller's office. Buyer acknowledges that at the time of execution of this Agreement, Seller has no reason to know of any particular purpose Buyer might have in purchasing the Home and items of personal property sold pursuant to this Agreement other than normal residential use. Buyer further acknowledges that normal swelling, expansions and contractions of materials and construction, and any cracks appearing as a result thereof or as a result of settlement of, in, or on the Home shall not be deemed to be construction defects. Seller makes no other warranties with respect to the fitness, merchantability, habitability, intended use, workmanship, construction or physical condition of either the Home, any fixtures or items of personal property sold pursuant to this Agreement or any other real or personal property conveyed  hereby.

This limited warranty is expressly in lieu of any other warranties, express or implied, except for the limited warranty. Seller disclaims any and all implied warranties or merchantability and fitness as to the home, and all fixtures or items of personal property whatsoever conveyed hereby, whether arising from custom, usage of trade, course of dealing, case law or otherwise.  Seller shall not be liable for any defects in the work performed by third party contractors not hired by Seller, nor for any adverse impact to the Home, Property or Community caused thereby.  Further, should Buyer elect to use a third party contractor that is a subcontractor of Seller, Buyer acknowledges that Seller makes no representations relative to the performance by such third party contractor. Seller will not be liable for damages or injury to any improvements Buyer makes to the Property, or the Buyer's personal property, or for any consequential damages including, but not limited to, inability to possess the Home, inconvenience, or loss of time, due to any defects.

The provisions of this Paragraph 39 will survive Closing.

40.  CASH TRANSACTION.  The transaction covered by this Agreement shall be on an all cash basis and shall not be subject to Buyer procuring financing.

41.  ENTIRE AGREEMENT.  This Agreement, together with the Addenda attached hereto, constitute the entire Agreement for Purchase and Sale of the Property and once the Agreement is signed, the Agreement can only be amended in writing.   ANY CURRENT OR PRIOR AGREEMENT, REPRESENTATIONS, UNDERSTANDINGS AND ORAL STATEMENTS, INCLUDING BUT NOT LIMITED TO RENDERINGS OR REPRESENTATIONS CONTAINED IN SALES BROCHURES, ADVERTISING OR SALES MATERIALS AND ORAL STATEMENTS OF SALES REPRESENTATIVES, IF NOT EXPRESSED IN THIS AGREEMENT OR IN THE COMMUNITY DOCUMENTS, ARE VOID AND HAVE NO EFFECT.  BUYER ACKNOWLEDGES AND AGREES THAT BUYER HAS NOT RELIED ON ANY SUCH ITEMS.

42. <u>SPECIAL CLAUSES</u>. The following attached Addenda are incorporated into and made a part of this Agreement:

        Common Facilities Disclosure
        Notice of Closing Costs
        Homeowner Association Disclosure Addendum
        Insulation Rider
        Specifications Rider
        Swimming Pool Disclosure
        Zoning Conditions Disclosure
        Other: Platting Addendum

BY SIGNING BELOW, BUYER AND SELLER AGREE TO BE BOUND BY ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT, INCLUDING THOSE PARAGRAPHS AS PRINTED ON THE REVERSE SIDES OF THE PAGES. BUYER IS ADVISED TO CAREFULLY REVIEW SUCH TERMS AND PROVISIONS AS WELL AS THE VARIOUS DISCLAIMERS APPEARING IN THIS AGREEMENT.

NOTE: BEFORE BUYER SIGNS THIS AGREEMENT, BUYER SHOULD READ IT AND THE COMMUNITY DOCUMENTS CAREFULLY AND IS FREE TO CONSULT AN ATTORNEY OF BUYER'S CHOICE.

Witnesses:                                SELLER:

                                          ALBANESE-POPKIN THE OAKS DEVELOPMENT
                                          GROUP, L.P., a Florida limited partnership, by
                                          ALBANESE-POPKIN DEVELOPMENT GROUP, LLC.,
                                          a Florida limited liability Company, General Partner

                                          By: _____
                                              Leonard A. Albanese, Manager

                                          Date: _May 9, 2006_____

                                          BUYER:

                                          _____
                                          Michael Rosen

                                          _____
                                          Robyn Rosen

                                          Date: _05/09/06_____

## COMMON FACILITIES DISCLOSURE

As required by Florida Law, the purchaser(s) of property in The Oaks of Boca Raton (the "Development") are advised that the following recreational or other facilities are available for use by the property owners in the Development.

A Community Building of approximately _____ 20,000 _____ square feet with swimming pool and tennis courts.

There will be charges for the use of the facilities listed above. The Declarant, the Association or other entity which owns and/or operates the facilities have the right to levy assessments which are used, in part, for the operation and upkeep of the facilities. Further, there may be other property (e.g., private roads, parks) in the Community and/or Development which is owned or operated by the Association.

By signing below, the purchaser(s) acknowledges receipt of this disclosure prior to the execution of a contract to purchase property in the Community and Development.

Purchaser: _____
Michael Rosen

Purchaser: _____
Robyn Rosen

Date: _____

wpdocs\facilitiesOaksaBocaRaton.wpd

THE OAKS OF BOCA RATON
<u>NOTICE OF CLOSING EXPENSES</u>

Pursuant to the rules promulgated by the Department of Legal Affairs, Buyer is hereby warned that upon Closing, additional costs may be required to be paid by the Buyer in the form of closing costs, which may include the following:

1.   The balance of the Purchase Price, plus any unpaid extras (i.e., Change Orders).

2.   Prorated portion of the current real property taxes and assessments from the date of closing or from the date of issuance of the Certificate of Occupancy, whichever occurs first.

3.   A "development fee" equal to one and one-half percent (1 ½ %) of the Purchase Price.

4.   A prorated portion of the Associations assessments from the date of closing or from the date of issuance of the Certificate of Occupancy, whichever occurs first and a working capital contribution equal to three (3) months assessments for The Oaks at Boca Raton Property Owners Association, Inc.

5.   Buyer's own hazard and liability insurance.

6.   Attorney's fees for Buyer's attorney, if any.

7.   Default interest, delayed closing charges or penalties.

In addition, if the Buyer obtains a mortgage, additional costs may be demanded from the Buyer by the lender.

c:\wpdocs\closingexp.OaksatBocaRaton.wpd

THE OAKS AT BOCA RATON
PURCHASE AND SALE AGREEMENT
HOMEOWNER ASSOCIATION DISCLOSURE ADDENDUM

THIS ADDENDUM to The Oaks at Boca Raton Purchase and Sale Agreement (the "Agreement") made between Albanese-Popkin The Oaks Development Group, L.P., a Florida limited partnership, ("Seller"), and MICHAEL ROSEN AND ROBYN ROSEN, ("Buyer"), for the purchase of the property located at _____ (Lot 148, B-1), is hereby entered into and made a part of said Agreement as if fully set forth therein.

W I T N E S S E T H:

1.  In the event of any conflict between the terms and provisions of this Addendum and any terms and provisions of the Agreement, the terms and provisions of this Addendum shall control. Capitalized terms which are employed in this Addendum without definition but which are defined in the Agreement shall have the same meaning in this Addendum as in the Agreement.

2.  Association Memberships:

(A)  As a purchaser of property in this Community, you  X  will  ____  will not be obligated to be a member of a Homeowners' Association ("Association").

(B)  There have been or will be recorded restrictive covenants (the "Covenants") governing the use and occupancy of properties in this Community.

(C)  You X will  ____  will not be obligated to pay assessments to the Association. You  X  will  ____  will not be obligated to pay Assessments to the respective municipality, county or special district. All Assessments are subject to periodic change.

(D)  Your failure to pay Special Assessments or Assessments levied by a Mandatory Homeowners' Association could result in a lien on your property.

(E)  There ____ is  X  is not an obligation to pay rent or land use fees for recreational or other commonly used facilities as an obligation of membership in the Homeowners' Association. (If such obligation exists, then the amount of the current obligation is $1,793.48 per quarter.)

(F)  The Covenants ____ can  X  cannot be amended without the approval of the Association Membership or, if no mandatory Association exists, parcel owners.

(G)  The Statements contained in this disclosure form are only summary in nature, and, as a Prospective Purchaser, you should refer to the Covenants and the Association Governing Documents before purchasing property.

(H)  These Documents are matters of Public Record and can be obtained from the Record Office in the County where the Property is located.

3.  Buyer acknowledges that this Homeowner Association Disclosure Addendum was provided to Buyer prior to Buyer's execution of the Agreement.

BUYER:

_____
Michael Rosen

_____
Robyn Rosen

SELLER:

ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., a Florida limited partnership, by ALBANESE-POPKIN DEVELOPMENT GROUP, LLC., a Florida limited liability Company, General Partner

By: _____
Leonard A. Albanese, Manager

DATE EXECUTED BY BUYER:

_____, 200___

DATE EXECUTED BY SELLER:

_____ May 9 _____, 2006

14

INSULATION DISCLOSURE

Seller presently intends to install insulation in the Property as follows:

1. Material:  Fiberglass batts, foil-backed paper

2. R-Value:  R-30  /  R-11   / R-4.1

3. Thickness:  9"  /  4"   / N/A
   Living  / O/S   / O/S

4. Location:  area ceilings/ frame walls / block walls (unless otherwise specified, insulation will not be installed in outside garage walls, garage ceilings or interior walls).

Pursuant to rules of the Federal Trade Commission, Seller reserves the right to change such insulation by delivering written notice of the changes to Purchaser.

Michael Rosen

Robyn Rosen

Date of Execution: 05/09/06

15

THE OAKS AT BOCA RATON
DISCLOSURE
<u>Residential Swimming Pool Safety Act</u>

Chapter 515, Florida Statutes, effective October 1, 2000, sets forth certain pool safety feature and disclosure requirements regarding drowning prevention and pool ownership.

All new residential swimming pools, spas, and hot tubs must be equipped with at least one pool safety feature as specified in the chapter, designed to deny, delay or detect unsupervised entry to a swimming pool, spa, or hot tub, in order to reduce drowning and near-drowning incidents.

The State of Florida Department of Health shall be responsible for producing its own or adopting a nationally recognized publication that provides the public with information on drowning prevention and the responsibilities of pool ownership and also for developing its own or adopting a nationally recognized drowning prevention education program for the public and for persons violating the pool safety requirements of the chapter. As of the date hereof, no publication has been prepared or adopted.

DEFINITIONS.

The term:

"Approved safety pool cover" means a manually or power-operated safety pool cover that meets all of the performance standards of the American Society for Testing and Materials (ASTM) in compliance with standard F1346-91.

"Barrier" means a fence, dwelling wall, or nondwelling wall, or any combination thereof, which completely surrounds the swimming pool and obstructs access to the swimming pool, especially access from the residence or from the yard outside the barrier.

"Exit alarm" means a device that makes audible, continuous alarm sounds when any door or window which permits access from the residence to any pool area that is without an intervening enclosure is opened or left ajar.

RESIDENTIAL SWIMMING POOL SAFETY FEATURE OPTIONS AND PENALTIES.

In order to pass final inspection and receive a certificate of completion, a residential swimming pool must meet at least one of the following requirements relating to pool safety features:

(1)    The pool must be isolated from access to a home by an enclosure that meets the pool barrier requirements of s. 515.29;

(2)    The pool must be equipped with an approved safety pool cover;

(3)    All doors and windows providing direct access from the home to the pool must be equipped with an exit alarm that has a minimum sound pressure rating of 85 dB A at 10 feet; or

(4)    All doors providing direct access from the home to the pool must be equipped with a self-closing, self-latching device with a release mechanism placed no lower than 54 inches above the floor.

RESIDENTIAL SWIMMING POOL BARRIER REQUIREMENTS.

A residential swimming pool barrier must have all of the following characteristics:

(1)    The barrier must be at least 4 feet high on the outside.

(2)    The barrier may not have any gaps, openings, indentations, protrusions, or structural components that could allow a young child to crawl under, squeeze through, or climb over the barrier.

16

(3)   The barrier must be placed around the perimeter of the pool and must be separate from any fence, wall, or other enclosure surrounding the yard unless the fence, wall, or other enclosure or portion thereof is situated on the perimeter of the pool, is being used as part of the barrier, and meets the barrier requirements of this section.

(4)   The barrier must be placed sufficiently away from the water's edge to prevent a young child or medically frail elderly person who may have managed to penetrate the barrier from immediately falling into the water.

Gates that provide access to swimming pools must open outward away from the pool and be self-closing and equipped with a self-latching locking device, the release mechanism of which must be located on the pool side of the gate and so placed that it cannot be reached by a young child over the top or through any opening or gap. A wall of a dwelling may serve as part of the barrier if it does not contain any door or window that opens to provide access to the swimming pool.

A barrier may not be located in a way that allows any permanent structure, equipment, or similar object to be used for climbing the barrier.

DROWNING PREVENTION EDUCATION PROGRAM; PUBLIC INFORMATION PUBLICATION.

The Department of Health shall develop a drowning prevention education program, which shall be made available to the public at the state and local levels and which shall be required as set forth in s. 515.27(2) for persons in violation of the pool safety requirements of this chapter. The Department may charge a fee, not to exceed $100, for attendance at such a program. The drowning prevention education program shall be funded using fee proceeds, state funds appropriated for such purpose, and grants. The Department, in lieu of developing its own program, may adopt a nationally recognized drowning prevention education program to be approved for use in local safety education programs.

The Department shall also produce, for distribution to the public at no charge, a publication that provides information on drowning prevention and the responsibilities of pool ownership. The Department, in lieu of developing is own publication, may adopt a nationally recognized drowning prevention and responsibilities of pool ownership publication.

c:\wpdocs\poolsafety.Oaksat BocaRaton.wpd

17

## THE OAKS AT BOCA RATON
## ZONING CONDITION DISCLOSURES

PORTIONS OF THE PROPERTY ARE IMMEDIATELY ADJACENT TO THE CLINT MOORE ANIMAL HOSPITAL, WHICH IS A VETERINARY CLINIC AND COMMERCIAL DOG KENNEL, AND WHICH HAS OUTDOOR DOG RUNS AND EXERCISE AREAS, WHICH AMONG OTHER THINGS COULD GENERATE NOISE. EACH OWNER ACKNOWLEDGES AND AGREES THAT THE USES OF THE CLINT MOORE ANIMAL HOSPITAL PREDATE THE DEVELOPMENT OF THE PROJECT AND THAT IN ACQUIRING THE RESPECTIVE LOT, BUYER HAS HAD AN OPPORTUNITY TO INSPECT THE CONDITIONS PRESENTED BY THE USES OF THE CLINT MOORE ANIMAL HOSPITAL AND KNOWINGLY AND VOLUNTARILY ACKNOWLEDGES AND ACCEPTS SUCH CONDITIONS, AND WAIVES, RELEASES, INDEMNIFIES AND HOLDS HARMLESS THE DEVELOPER, SELLER AND THE ASSOCIATION FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, COSTS AND EXPENSES, INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS' FEES AND COSTS ARISING FROM OR RELATED TO SUCH CONDITIONS.

PORTIONS OF THE PROJECT ARE IMMEDIATELY ADJACENT AND NEAR CERTAIN AGRICULTURAL FACILITIES AND A PACKING PLANT, THE ACTIVITIES OF THESE FACILITIES, AMONG OTHER THINGS MAY GENERATE NOISE, ODORS AND TRUCK TRAFFIC. OWNER ACKNOWLEDGES AND AGREES THAT THESE USES PREDATE THE PROJECT AND THAT, IN ACQUIRING ITS LOT, BUYER HAS HAD AN OPPORTUNITY TO INSPECT THE CONDITIONS PRESENTED THEREBY AND KNOWINGLY AND VOLUNTARILY ACKNOWLEDGES AND ACCEPTS SUCH CONDITIONS, AND WAIVES, RELEASES, INDEMNIFIES AND HOLDS HARMLESS THE DEVELOPER, SELLER, AND THE ASSOCIATION FROM ANY AND ALL CLAIMS, DEMANDS, LIABILITIES, COSTS AND EXPENSES, INCLUDING BUT NOT LIMITED TO REASONABLE ATTORNEYS' FEES AND COSTS ARISING FROM OR RELATED TO SUCH CONDITIONS.

BUYER: _____
Michael Rosen

_____
Robyn Rosen

Date: 08/09/04

c:\wpdocs\ zoningdis\Oaksat BocaRaton.wpd

F:\Agree\Oaks\Add Lot 148, B-1 Rosen

ADDENDUM "1"
TO THE AGREEMENT FOR SALE AND PURCHASE BY AND BETWEEN
ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., (SELLER) AND
MICHAEL ROSEN AND ROBYN ROSEN, HIS WIFE, (BUYER)
FOR THE SALE AND PURCHASE OF LOT 148, B-1, THE OAKS AT BOCA RATON

IT IS HEREBY MUTUALLY AGREED UPON AS FOLLOWS:

1.    In addition to the purchase price set forth in paragraph 1 of the above referenced Contract in the

amount of $1,600,000.00 the Buyer shall pay to the Seller the additional sum of $225,000.00 for extras

and options (included in the specs attached to the Contract), thereby resulting in an adjusted total

contract price of $1,825,000.00.

2.  The additional sum of $225,000.00 shall be payable as follows:

        $22,500.00   10%

    (a)     $45,000.00 - (20%) payable upon execution hereof, time being of the essence.

        $202,500.00   90%

    (b)     $180,000.00 - (80%) representing the balance due, payable by means of a cashier's

check drawn on a local bank or wire transfer of funds, payable immediately upon issuance of the

Certificate of Occupancy for the subject residence, however, in no event later than five (5) days prior

to closing, whichever occurs first, time being of the essence.

3.    As part of the additional consideration, the Seller agrees to do the work listed as Schedule A. See

attached.

4.    In the event there exists a conflict between the terms and provisions of this Addendum "1"and the

terms and provisions of the Agreement for Purchase and Sale, then the terms and provisions of this

Addendum "1" shall control and prevail.  Except as modified herein, all terms and provisions of the

above referenced Agreement for Purchase and Sale shall remain in full force and effect.

                     SELLER:
                     ALBANESE-POPKIN THE OAKS
                     DEVELOPMENT GROUP, L.P.
                     A Florida limited partnership

                     By:  Albanese-Popkin Development Group, LLC
                     a Florida limited liability Company, General Partner

                     By: _____
                           Leonard A. Albanese
                           Manager

Date: _____May 9, 2006_____

Date: ___05/09/06___

                     BUYER:
                     _____
                     Michael Rosen
                     _____
                     Robyn Rosen

Schedule A

- Buyer shall have the option to reselect Standard Rear Pavers

- No Carpet shall be installed

- Gas Stub for future generator

- Install ¾" Oak Flooring in Loft and Upstairs Hallway (Buyer shall select Stain Color)

- Install Faux 1x6 Pecky Cypress in Upstairs Master Covered Patio and Downstairs Covered Patio

- Install Full ceramic Tile Back Splash on Barbeque Wall ($3.00 per SF Material Allowance)

- Install one 36" Subzero Refrigerator (601R-0) and one 36" Subzero Freezer (601F-0)

- Install Bosch Dishwasher with cabinet panel (SHV46C13UC)

- Install Black Kitchenaid Double Oven (KEBC207KBL)

- Install Black Thermador Cook Top (SGS365CB 5 Burner Gas Cook Top in Black Sealed Burners)

- Install a Dry Bar with Cabinets and Granite Counter Top in the Living Room

- Refinish Master Bathroom and Morning Bar

- Install Dark Emperadour Slab Counter Top on Master Morning Bar

- $300.00 (Three Hundred Dollars) additional allowance for Plumbing Fixtures in each Secondary Bath and $1,5000.00 (One Thousand Five Hundred Dollars) Additional Master Bath Allowance for Plumbing Fixtures

handle

2

F:\Agree\Oaks\Add 2 K Lot 148, B-1 Rosen

ADDENDUM "2"

TO THE AGREEMENT FOR SALE AND PURCHASE BY AND BETWEEN
ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., (SELLER) AND
MICHAEL ROSEN AND ROBYN ROSEN, HIS WIFE, (BUYER)
FOR THE SALE AND PURCHASE OF LOT 148, B-1 THE OAKS AT BOCA RATON

1.  The above referenced Contract is subject to Buyer obtaining a written loan commitment in a

form satisfactory to Seller and Seller's construction lender, in their sole and absolute discretion,

setting forth that Buyer has obtained a firm written commitment for a ninety (90%) percent

mortgage loan in the amount of $1,440,000.00, which loan is to be funded at closing with Seller.

Buyer must provide the aforesaid written loan commitment to Seller no later than the end of

business on Wednesday, May 31, 2006.  In the event Buyer does not provide the aforesaid loan

commitment Seller may at Seller's option, elect to cancel this Agreement in which event Seller

shall return Buyer's initial deposit and the Contract shall thereafter be deemed null and void and of

no further force and effect.

2.   In the event there exists a conflict between the terms and provisions of this Addendum "2" and

the  terms and provisions of Addendum "1" or the terms and provisions of the Agreement for

Purchase and Sale, then the terms and provisions of this Addendum "2" shall control and prevail.

Except as modified herein, all terms and provisions of the above referenced Agreement for

Purchase and Sale shall remain in full force and effect.

SELLER:
ALBANESE-POPKIN THE OAKS
DEVELOPMENT GROUP, L.P.
A Florida limited partnership

By: Albanese-Popkin Development Group, LLC
a Florida limited liability Company, General Partner

By: _____
        Leonard A. Albanese
        Manager

Date: _May 9, 2006_____

BUYER: _____
Michael Rosen

_____
Robyn Rosen

Date: _____

F:\Agree\Oaks\Add Lot 148, B Rosen

ADDENDUM "3"
TO THE AGREEMENT FOR SALE AND PURCHASE BY AND BETWEEN
ALBANESE-POPKIN THE OAKS DEVELOPMENT GROUP, L.P., (SELLER) AND
MICHAEL ROSEN AND ROBYN ROSEN, HIS WIFE, (BUYER)
FOR THE SALE AND PURCHASE OF LOT 148, B, THE OAKS AT BOCA RATON
IT IS HEREBY MUTUALLY AGREED UPON AS FOLLOWS:

1. **ATTORNEYS' REVIEW:** The above referenced Contract is hereby made contingent upon and subject to Buyer's attorney's review and approval of the aforesaid Contract no later than Friday, May 12, 2006 at 4:00 P.M. In the event Buyer's attorney does not approve the Contract prior to Friday, May 12, 2006 at 4:00 P.M. Buyer may elect to cancel this agreement and receive a complete refund of any and all deposits paid provided that Buyer delivers to Seller, c/o Edward D. Popkin, at 5355 Town Center Road, Suite 801, Boca Raton, FL 33486, written notice of Buyer's election to cancel this agreement. In the event Buyer elects to cancel as heretofore set forth then, in such event, this Contract shall be deemed null and void and of no further force and effect.

In the alternative, if Buyer does not provide written notice of their election to cancel this Agreement on or before Friday, May 12, 2006 at 4:00 P.M. then, in such event, Buyer's right to terminate and the contingency provision contained herein shall be deemed waived and the above referenced Contract shall remain in full force and effect. Time shall be of the essence with respect to this provision.

2. In the event there exists a conflict between the terms and provisions of this Addendum "1" and the terms and provisions of the Agreement for Purchase and Sale, then the terms and provisions of this Addendum "3" shall control and prevail. Except as modified herein, all terms and provisions of the above referenced Contract for Sale and Purchase shall remain in full force and effect.

SELLER:
ALBANESE-POPKIN THE OAKS
DEVELOPMENT GROUP, L.P.
A Florida limited partnership

By: Albanese-Popkin Development Group, LLC
a Florida limited liability Company, General Partner

By: _____
Leonard A. Albanese
Manager

BUYER:

Date: May 9, 2006

_____
Michael Rosen

Date: 05/09/06

_____
Robyn Rosen