**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | : MDL No. 2047<br>:<br>: SECTION:  L<br>: JUDGE FALLON<br>: MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: | :<br>: |
| Vickers, et al. v. Knauf GIPS KG, et al.,<br>Case No. 09-04117 (E.D.La.) | :<br>: |

## FIFTH AMENDED COMPLAINT--CLASS ACTION

Pursuant to Fed. R. Civ. P. 23, named Plaintiffs bring this class action on behalf of themselves and all other similarly situated owners and residents of residential homes in the United States containing drywall that is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that causes property damage and potential health hazards.  The drywall has been manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendants, Knauf Gips KG ("Knauf Gips"); Knauf Plasterboard (Tianjin) Co., LTD ("Knauf Tianjin"); Knauf Plasterboard (Wuhu) Co. LTD ("Knauf Wuhu"); Guangdong Knauf New Building Materials Products Co., Ltd. ("Guangdong Knauf") (all Knauf-related entities are collectively referred to herein as "Knauf"); Banner Supply Co. ("Banner Supply") Banner Supply Company Fort Myers, LLC, ("Banner Fort Myers"), Banner Supply Company Pompano, LLC ("Banner Pompano"), Banner Supply Company Port St. Lucie, LLC ("Banner Port St. Lucie"), Banner Supply Company Tampa, LLC ("Banner Tampa") (all Banner-related entities are collectively referred to herein as "Banner Entities"), installed by Defendant Atco Interior Corp. ("Atco") and present in homes built by Santa Barbara

1

Estates, Inc. ("Santa Barbara Estates"), other developers, and their subsidiaries, divisions and/or agents, and in support thereof, state as follows:

## <u>INTRODUCTION</u>

1.  Defendants' drywall used in the homes of named Plaintiffs and the Plaintiff Class and Subclass Members (collectively "Plaintiffs") is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors, and causes corrosion ("the Defect") of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

2.  This Defect is latent and existed in Defendants' drywall at the time of installation regardless of the way the product was installed, maintained, and/or painted.  There is no repair that will correct the Defect.

3.  As a result of Defendants' conduct as alleged herein, named Plaintiffs and thousands of Class Members have suffered economic losses by owning homes containing inherently defective drywall that has caused damage to their homes and Other Property.

4.  Plaintiffs and Class Members have incurred or will incur tens of thousands of dollars in damages including, but not limited to: repair/replacement of homes, Other Property, any materials contaminated or corroded by the drywall as a result of "off-gassing," incidental and consequential damages.

5.  Further, as a result of Defendants' conduct as alleged herein, Plaintiffs and thousands of Class Members have suffered harm and/or been exposed to an increased risk of harm and

thus have need for injunctive and/or equitable relief in the form of emergency notice, environmental monitoring, and medical monitoring.

6.  Plaintiffs bring this action on behalf of a Class of all similarly situated owners and residents of residential homes in the United States that contain defective, hazardous, or dangerous drywall manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendants.

7.  Plaintiffs bring additional subclasses against the builder/developers of the affected homes.

## JURISDICTION, PARTIES, AND VENUE

8.  This action is within the original jurisdiction of this Court by virtue of 28 U.S.C. §1332(d)(2) and the Class Action Fairness Act.  Plaintiffs and Defendants are citizens of different states and the amount in controversy of this Class action exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

9.  Should the Court not have original jurisdiction over any claim or claims under CAFA, this Court can exercise supplemental jurisdiction under 28 U.S.C. §1367 over the claims because they are derived from the same nucleus of operative facts such that plaintiffs would ordinarily expect to try them in one proceeding.

10. Venue in this district satisfies the requirements of 28 U.S.C. §1391(b)(1)-(2)  and (c) because a significant number of the absent class members reside in this jurisdiction and a substantial amount of the events and occurrences giving rise to the claims occurred in this District, or a substantial part of the property that is the subject of this action is situated in this district. Venue is otherwise appropriate in this district consistent with JPML's consolidation of MDL.

## PLAINTIFFS

11. For purposes of clarity, the Plaintiffs are asserting claims on behalf of all owners and residents of the subject properties, including but not limited to, minors and other residents of the properties who do not appear herein as named plaintiffs.

### The "South Kendall Construction" Plaintiffs

12. Plaintiff Karin Vickers is a citizen of Miami-Dade County, Florida, and owns a home located at is 2259 SE 19th Ave. in Homestead, Florida.

13. Plaintiff Karin Vickers home was built by South Kendall Construction using drywall manufactured and supplied by one or more of the Defendants.

14. Plaintiffs Felix Martinez and Jenny Martinez are citizens of Miami-Dade County, Florida and own a home located at 2250 SE 19th Ave. in Homestead, Florida.

15. Plaintiffs Felix Martinez and Jenny Martinez's home was built by South Kendall Construction using drywall manufactured and supplied by one or more of the Defendants.

16. Plaintiff Jason R. Santiago is a citizen of Miami-Dade County, Florida and owns a home located at 2140 SE 19th Ave. in Homestead, Florida.

17. Plaintiff Jason R. Santiago's home was built by South Kendall Construction using drywall manufactured and supplied by one or more of the Defendants.

18. The builder of the homes, South Kendall Construction has declared bankruptcy and has not been included as a party in this action.  Plaintiffs have included the South Kendall Construction name merely for identification.

### The "Santa Barbara Estates" Plaintiffs

19. Plaintiff Felix Diaz is a citizen of Miami-Dade County, Florida, and owns a home located at 20318 SW 87 Ct., Miami, FL 33189.

20. Plaintiff Felix Diaz's home was built by Santa Barbara Estates using drywall manufactured and supplied by one or more of the Defendants.

21. Plaintiffs Liem Quach and Ann Ngoc Thile are citizens of Miami-Dade County, Florida and own a home located at 21463 SW 86 Pl., Miami, FL 33189.

22. Plaintiff Felix Diaz's home was built by Santa Barbara Estates using drywall manufactured and supplied by one or more of the Defendants.

### The Engle/TOUSA Plaintiffs

23. Plaintiffs Luis Ochoa and Elizabeth Montoya are citizens of Miami-Dade County, Florida and own a home located at 11462 NW 84th Terrace, Miami, Florida.

24. Plaintiffs Gian Carlo Visciglia is a citizen of Miami-Dade County, Florida and owns a home located at 11402 NW 84th Terrace, Miami, Florida.

25. The builder of the homes, Engle/TOUSA has declared bankruptcy and has not been included as a party in this action.  Plaintiffs have included the Engle/TOUSA name merely for identification.

### DEFENDANTS

### Drywall Manufacturers - Knauf Entities

26. Defendant Knauf Gips is a German corporation doing business in the United States with its principal place of business located at Postfach 10, D-97343 Iphofen, Germany.

27. Knauf Gips is a leading manufacturer of drywall, building materials and systems with approximately 20,000 employees worldwide.

28. Knauf has more than 130 production plants in over 40 countries generating annual sales in excess of $4.8 billion Euros.

29. In 1995, Knauf began manufacturing drywall in China.  In 1997, 2000, and 2001 Knauf established three plasterboard plants located in Wuhu (Anhui province), Tianjin and Dongguan (Guangdong province), respectively.

30. Knauf Gips, together with its agents, subsidiaries, and/or affiliates (including Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf) provides building materials and systems to customers in over 50 countries, including the United States.

31. Knauf Gips provided defective drywall to one or more of the Plaintiffs' homes.

32. Knauf Gips improperly manufactured, marketed, and later distributed the subject defective drywall in the United States.  Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of Chinese drywall in the United States.

33. Upon information and belief, at all material times hereto, Knauf Gips supervised, operated, trained, and otherwise exercised control and/or had the right to control the operations of Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf, and their agents, apparent agents, and employees.

34. From 1997 through 2001, Knauf Gips established three plasterboard plants located in Wuhu, Tianjin, and Dongguan, China, respectively.

35. The quality of all Knauf Gips' Chinese drywall plants in China is supervised, overseen, and controlled according to the requirements of Knauf Gips' headquarters in Germany.

36. Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf and their employees are the actual and/or apparent agents of Knauf Gips.

37. Upon information and belief, Knauf Gips, together with its agents, subsidiaries and/or affiliates (including Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf) manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold and

placed within the stream of commerce drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within the United States.

38. Upon information and belief, Knauf Gips by itself and/or through its agents, subsidiaries, and/or affiliates (including Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf) has continuously and systematically distributed and sold drywall to numerous purchasers in the United States with the knowledge that its drywall would be and is installed in numerous homes in United States.

39. As discussed more fully below, Knauf Gips by itself and/or through its agents, subsidiaries and affiliates (including Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf) manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold, directly and indirectly, to certain suppliers in the United States, including the Banner Entities and Rothchilt, defective Chinese drywall that was installed in homes being built in United States, thereby causing substantial damage to Plaintiffs and Class Members in United States.

40. Knauf Gips, each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf) participated in the wrongful acts herein.

41. Knauf Gips, each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf) also acted in joint enterprise, joint venture and as each other's agent within the course and scope of said agency.

42. At all times relevant hereto, Defendant Knauf Gips, each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf) acted by and through their employees, agents, apparent agents and representatives, who were acting within the course and scope of their employment, agency, apparent agency and representation and in the furtherance of Defendants' interests.

43. Defendant Knauf Gips is the parent corporation of the Knauf Entities (Defendants Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf). Knauf Gips individually participated, ratified, approved and directed the improper or illegal acts and omissions described herein.

44. At all times relevant hereto, Knauf Gips gratuitously or for consideration, rendered the following services to Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf in the form of:

    a. marketing and sales of drywall;

    b. research and development of drywall;

    c. drywall design;

    d. drywall manufacturing;

    e. testing of drywall;

    f. technical supervision and/or assistance with drywall design and manufacture;

    g. investigation of the smelly defective drywall manufactured by the Knauf Entities that was exported into the United States;

    h. negotiating and settling claims against the Knauf Entities for smelly defective drywall manufactured by the Knauf Entities that was exported into the United States; and

    i. other services.

45. Knauf Gips failed to exercise reasonable care in the rendering of the aforementioned services set forth in subparagraphs (a-i) above, and increased the risk of harm to Plaintiffs and Class Members.

46. Knauf Gips assumption and rendering of the aforementioned services set forth in subparagraphs (a-i) above, were duties of care that were owed by Defendants Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf to Plaintiffs and Class Members.

47. Plaintiffs and Class Members suffered harm because Knauf Gips failed to undertake the aforementioned services set forth in subparagraphs (a-i) above with reasonable care.

**Knauf Gips' Chinese Drywall Distribution**

48. Upon information and belief, tens of millions of square feet of Defendant Knauf Gips defective drywall was used in the construction of United States homes between 2004 and the present.

49. Because of a shortage of construction materials from a booming housing market and massive damage in the United States in 2005 caused by Hurricanes Katrina and Wilma, domestic builders, suppliers, and importers began bringing significant stocks of foreign manufactured drywall into the United States.

50. At least 550 million pounds of Chinese drywall came into the United States from approximately 2004 to 2006 -- enough to construct 60,000 average-size homes.

51. Nearly 60 percent of the Chinese drywall that came into the United States came in through Florida ports.

52. Miami's port received the largest number of shipments of Chinese drywall.  Public records show that more than 100 million pounds of Chinese drywall were off-loaded in Miami. Other ports with significant Chinese drywall off-loading include Port Everglades (80 million pounds), Tampa, (50 million pounds), as well as Port Manatee, Pensacola, Port Canaveral, and Jacksonville.

53. At least 37 million pounds of Knauf drywall was shipped directly from three sites in China to Florida through Tampa and Port Canaveral.  Knauf Tianjin sent an additional amount (characterized by company officials as "most" of its drywall) into Miami.

54. In March 2006, Guangdong Knauf shipped 11 million pounds of Chinese drywall aboard the cargo ship *Afra*. This shipment was unloaded in Port Canaveral.

55. In the spring of 2006, the cargo ship *Great Immensity* unloaded one shipment of more than 16 million pounds of Chinese drywall manufactured by Knauf Tianjin -- enough to make approximately 1,700 homes. The *Great Immensity* unloaded shipments at more than two dozen ports throughout the United States, including seven in Florida.

56. Shipping records show coordination between Knauf's Chinese subsidiaries, such as sharing the same vessel to transport their product to the U.S. In April 2006, the *Yong An Cheng* took three shipments from Knauf Wuhu and a fourth from Guangdong Knauf to the U.S. All were imported by United States Gypsum Corporation, one of the largest manufacturers of domestic drywall in the U.S. market.

57. Knauf Tianjin, one of three Knauf Gips Chinese subsidiaries, admits that it manufactured and imported at least 20% of the imported Chinese drywall that came into the United States.

58. Shipping information indicates that Knauf Tianjin sent at least 38.7 million pounds Chinese drywall to the United States in 2006 and Knauf Wuhu sent at least 28.6 million pounds of Chinese drywall. Based on U.S. Customs and Census information, these figures would indicate that 78 percent of Chinese drywall imports in 2006 came from these two Knauf plants.

59. Many builders in Florida have admitted using Knauf Chinese drywall in communities throughout Florida.

**Knauf Gips' Subsidiary—Knauf Tianjin**

60. Upon information and belief, Defendant, Knauf Tianjin, is an international corporation doing business in the United States.

61. Defendant Knauf Tianjin manufactured and distributed defective drywall that is in one or more of Plaintiffs' homes.

62. Knauf Tianjin improperly manufactured, marketed, and distributed the subject defective drywall in the United States.  Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

### Knauf Gips' Subsidiary—Knauf Wuhu

63. Upon information and belief, Defendant, Knauf Wuhu, is an international corporation doing business in the United States.

64. Defendant Knauf Wuhu manufactured and distributed defective drywall that is in one or more of Plaintiffs' homes.

65. Knauf Wuhu improperly manufactured, marketed, and later distributed the subject defective drywall in the United States.  Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

### Knauf Gips' Subsidiary— Guangdong Knauf

66. Upon information and belief, Defendant, Guangdong Knauf, is an international corporation doing business in the United States.

67. Defendant Guangdong Knauf manufactured and distributed defective drywall that is in one or more of Plaintiffs' homes.

68. Guangdong Knauf improperly manufactured, marketed, and later distributed the subject defective drywall in the United States.  Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

### Defendant Distributors/Suppliers

### Defendant Banner Supply

69. Defendant Banner Supply is a Florida corporation with its principal place of business located in the Southern District of Florida at 7195 N.W. 30th Street, Miami, Miami-Dade County, Florida 33122.

70. Defendant Banner Supply exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the state of Florida.  Directly or indirectly through agents, affiliates or co-conspirators, Defendant Banner Supply's acts or omissions related to defective Drywall have injured Plaintiffs and Class Members as alleged herein.

### Defendant Banner Fort Myers

71. Defendant Banner Fort Myers is a Florida corporation with its principal place of business located in the Southern District of Florida at 7195 N.W. 30th Street, Miami, Miami-Dade County, Florida 33122.

72. Defendant Banner Fort Myers exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the state of Florida.  Directly or indirectly through agents, affiliates or co-conspirators, Defendant Banner Fort Myers's acts or omissions related to defective Drywall have injured Plaintiffs and Class Members as alleged herein.

### Defendant Banner Pompano

73. Defendant Banner Pompano is a Florida corporation with its principal place of business located in the Southern District of Florida at 1660 SW 13th Court, Pompano Beach, FL 33069.

74. Defendant Banner Pompano exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the state of Florida.  Directly or indirectly through

agents, affiliates or co-conspirators, Defendant Banner Pompano's acts or omissions related to defective Drywall have injured Plaintiffs and Class Members as alleged herein.

### Defendant Banner Port St. Lucie

75. Defendant Banner Port St. Lucie is a Florida corporation with its principal place of business located in the Southern District of Florida at 7195 NW 30th St., Miami, Miami-Dade County, FL, 33122.

76. Defendant Banner Port St. Lucie exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the state of Florida.  Directly or indirectly through agents, affiliates or co-conspirators, Defendant Banner Port St. Lucie's acts or omissions related to defective Drywall have injured Plaintiffs and Class Members as alleged herein.

### Defendant Banner Tampa

77. Defendant Banner Tampa is a Florida corporation with its principal place of business located in the Southern District of Florida at 7195 NW 30th St., Miami, Miami-Dade County, FL, 33122.

78. Defendant Banner Tampa exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the state of Florida.  Directly or indirectly through agents, affiliates or co-conspirators, Defendant Banner Tampa's acts or omissions related to defective Drywall have injured Plaintiffs and Class Members as alleged herein.

### The Banner Entities' Concerted Actions

79. At all times relevant hereto the Banner Entities (Banner Supply, Banner Tampa, Banner Fort Myers, and Banner Port. St. Lucie) acted in concert with one another  through their respective cmployees, agents, apparent agents and representatives, who were acting within

the course and scope of their employment, agency, apparent agency and representation and in furtherance of the Banner Entities' interests.  Accordingly, Banner Supply, Banner Tampa, Banner Fort Myers, and Banner Port. St. Lucie are vicariously liable and responsible for the acts and omissions of each Banner entity.

**Installer Defendant**

**Atco Interior Corp.**

80. Defendant Atco is a Florida corporation with its principal place of business located in the Southern District of Florida at 13870 SW 151 Lane, Miami, Miami-Dade County, FL, 33186.

81. Defendant Atco was contracted by Defendants South Kendall Construction and Atco to install the drywall in Plaintiffs and Class Members' homes.  Atco installed defective drywall in Plaintiffs' and Class Members' homes.

82. Defendant Atco's acts or omissions directly or indirectly through its agents, employees, or affiliates, in the installation of defective drywall have injured Plaintiffs and Class Members as alleged herein.

**Developer/Builder Defendants**

**Santa Barbara Estates**

83. Defendant Santa Barbara Estates is a Florida corporation with its principal place of business located at 7975 NW 154 St., Suite 400, Miami Lakes, Florida.

84. Defendant Santa Barbara Estates installed defective drywall in one or more of Plaintiffs' homes located in the State of Florida.  Defendant Santa Barbara Estates' acts or omissions directly or indirectly through its agents, employees, or affiliates, in the installation of defective drywall have injured Plaintiffs and Class Members as alleged herein.

## GENERAL ALLEGATIONS

**A.      Drywall Background**

85. Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, sheetrock, gyproc, or simply board.

86. A drywall panel is made of a paper liner wrapped around an inner core made primarily from hardened gypsum plaster.

87. Drywall is typically available in 4 ft (1219 mm) wide sheets of various lengths. Newly formed sheets are cut from a belt, the result of a continuous manufacturing process.

88. The most commonly used drywall is one-half-inch thick but can range from one quarter (6.35 mm) to one inch (25.4 mm) thick.

89. The core material of drywall, gypsum, is available in two forms, pure gypsum, which is naturally occurring, and synthetic gypsum, which is manmade.

90. Pure gypsum is a white to transparent mineral, but sometimes impurities color it grey, brown, or pink.

91. Synthetic gypsum is generally manufactured with byproducts of coal-fired power plants.

92. Coal combustion byproducts ("CCBs" or "CCPs") are the inorganic residues that remain after pulverized coal is burned.

93. The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

94. In order to meet emission standards, many utilities have installed flue-gas-desulfurization (FGD) equipment.  Flue gas desulfurization is a chemical process to remove sulfur oxides from the flue gas at coal-burning power plants.

15

95. Various FGD methods have been developed that chemically combine the sulfur gases released in coal combustion by reacting them with a sorbent, such as limestone or lime.

96. As the flue gas comes in contact with the slurry of calcium salts, sulfur dioxide reacts with the calcium to form hydrous calcium sulfate, otherwise known as gypsum.

**B**.     **How Drywall Is Created**

97. In order to form drywall, gypsum must be "calcined," or partially dehydrated by heating.

98. When gypsum is heated, it loses about three quarters of its water and becomes hemihydrate gypsum which is soft and can be easily ground to a powder called hemihydrate gypsum plaster.

99. The gypsum powder is then mixed with water to form a paste or slurry.

100.    While the hemihydrate gypsum plaster is in slurry form, it is poured between two paper layers to make drywall.

101.    Drywall is formed by sandwiching a core of wet gypsum between two sheets of heavy paper or fiberglass mats. When the core sets and is dried in a large drying chamber, the "sandwich" becomes rigid and strong enough for use as a building material.

102.    The paste or slurry is typically mixed with fiber (usually paper and/or fiberglass), plasticizer, foaming agent, potash as an accelerator, starch or other chelate as a retarder, various additives that increase mildew and fire resistance (fiberglass or vermiculite), and water.

103.    Drywall may consist of two other materials with sulfur content: alkyl ethoxy sulfates as foaming agents and lignin or napthalene sulfonates as dispersing agents.

**C.     The Defective Drywall Emits Noxious and Corrosive Levels of Sulfur**

104.    Upon information and belief, Defendants' drywall contained naturally mined gypsum and synthetic gypsum manufactured from CCBs.

105.    When gypsum, mined or synthetic, is subjected to certain environmental conditions, the product breaks down into sulfate ions which in turn can be chemically transformed into hydrogen sulfide gas and other sulfide gases.

106.    The problem of sulfide emissions from drywall is well-understood in the drywall industry and has been studied for many years.

107.    The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.

108.    Sulfide emissions from drywall have been a particular problem in landfills and, as such, many landfills refuse to accept drywall or place strict limitations on the amounts and on the ways in which drywall can be disposed. An independent consulting firm, hired by a Miami-based builder, has concluded there is little doubt that the drywall manufactured by Defendants is the cause of the corrosion in many residents' homes.

109.    One of the managing principles of the independent testing firm stated that: "We have definitely identified that a combination of sulfide gases are the cause of the corrosion of the coils.  The substances we've found are well known to cause that kind of corrosion."

110.    The firm's December 2008 results found three sulfide gases: carbon disulfide, carbonyl sulfide and dimethyl sulfide.

111.    Hydrogen sulfide was found in previous testing that the company conducted on the Defendants' drywall: "Our previous studied indicate, however, that carbon disulfide, carbonyl sulfide, and hydrogen sulfide are gases that can be associated with emissions from Chinese drywall."

112.   According to a Knauf statement, the company "is doing its own investigation, and believes the problem drywall came from a specific [gypsum] mine, which also supplied other manufacturers." According to Knauf, the company stopped using the questionable mine in 2006.

113.   According to published reports, however, some independent environmental testing firms and building experts have said the source of the drywall problem is waste materials from the scrubbers of coal-fired power plants used to make the drywall in China.

114.   Knauf's 2009 statement also noted: "Until last year in Florida, no complaint had been raised and no product had been rejected because of odor or impacts to copper in the nine years of [Knauf Tianjin's] operation." (Emphasis added).

115.   Knauf received complaints from builders and contractors about "rotten egg" smells coming from its Chinese-manufactured drywall as far back as 2006.

116.   In November 2006, in response to reports of odors associated with its drywall, the company hired the Center for Toxicology and Environmental Health, L.L.C. (CTEH) to conduct an air quality investigation in five homes in Florida.

117.   Knauf's 2009 statement also declared: "The sulfur compounds detected in testing in homes have been found at no greater levels than air outside homes or in soil, marshes or the ocean."

118.   Knauf's 2006 testing revealed, however, that its product released detectable, above-background levels of various sulfur containing compounds. In particular, Knauf's testing revealed the presence of iron disulfide from its Chinese Drywall as the likely source of the sulfur smells. Knauf's testing agency declared: "These data indicate that certain naturally-

occurring sulfur-containing *compounds can be emitted from the Knauf Tianjin product at concentrations higher than present in background air.*" (emphasis added).

119.    One importer acknowledged in published reports that the defective Chinese Drywall was "well known in the industry" by 2007.

120.    No member of the Class could have discovered the existence of the defect in the Chinese-manufactured drywall until press reports about the defects were released in December 2008.

**D.    <u>The Need for Medical Monitoring for the Health Effects of Sulfur Emitting Drywall</u>**

121.    Hydrogen sulfide ("H2S"), one of the chemicals found to have been released from drywall, is considered a broad-spectrum poison, meaning that it can poison several different systems in the body, although the nervous system is most affected.

122.    The toxicity of H2S is comparable with that of hydrogen cyanide.  It forms a complex bond with iron in the mitochondrial cytochrome enzymes, thereby blocking oxygen from binding and stopping cellular respiration.

123.    Exposure to lower concentrations of sulfides can result in eye irritation, a sore throat and cough, nausea, shortness of breath, and fluid in the lungs.

124.    Long-term, low-level exposure to sulfides has been associated with fatigue, loss of appetite, headaches, irritability, poor memory, and dizziness.  Chronic exposures to low levels of sulfides has also been implicated in increased miscarriage and reproductive health issues.

125.    Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold defective drywall, which was unreasonably dangerous in its normal use in that the drywall caused corrosion and damage to Other Property in Plaintiffs and Class Members' homes and caused allergic reactions, coughing,

sinus and throat infection, eye irritation, breathing hazards, other health concerns, and/or significantly increased the risk of contracting a serious latent disease.

126.    As a direct and proximate result of Defendants' actions and omissions, Plaintiffs and the Plaintiff Class Members' homes and bodies have been exposed to Defendants' drywall and the corrosive and harmful effects of the sulfide gases and other chemicals being released from these proven hazardous substances.

127.    As a direct and proximate result of Defendants' defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, the Plaintiffs and the Class Members have suffered, and continue to suffer damages.  These damages include, but are not limited to, costs of inspection as well as the costs and expenses necessary to remedy, replace and remove the defective drywall and Other Property that has been affected.

128.    As a direct and proximate result of Defendants' defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, Plaintiffs and Class Members have been exposed to above-background levels of sulfides and other harmful chemicals, have been placed at an increased risk of disease, and have need for injunctive relief in the form of emergency notice, environmental testing and monitoring, and medical monitoring.

**E.  Defendants' Conduct in Importing, Distributing, and Selling the Drywall was Tortious and Designed to Shield Defendants from Liability to Injured Consumers**

129.    Defendants willingly facilitated the manufacture, exporting, importing, distribution, delivery, supply, inspection, marketing, and/or sale of the defective drywall in the United States since they knew or should have known that the testing performed abroad was inherently unreliable.

130.    By way of example, Defendants knew or should have known that the government sponsored inspections and/or certifications of the defective Chinese manufactured drywall were unreliable and never should have been relied upon for purposes of determining whether the drywall was in compliance with American regulatory standards.  Many of these government sponsored inspections and certifications were performed at the behest of entities that were either directly or indirectly owned by the Chinese government.  This conflict of interest by the entities and individuals performing the inspections/certifications was known to Defendants and, therefore, Defendants were reckless in relying upon such inspections and certifications.

131.    Defendants also knew or should have known that the testing performed abroad was inherently unreliable based on recent experiences involving the distribution and sale of defective products from China.  At or around the time the defective Chinese drywall at issue in this litigation was being imported to the United States, there were several recent controversies involving defective products imported from China.  Examples include: Chinese pet food containing melamine, toothpaste tainted with antifreeze, Chinese seafood laced with chemicals, counterfeit glycerin found in cough syrup, defective Heparin, salmonella found in spices used to season snack foods, children's toys and jewelry contaminated with lead paint, and tires that were manufactured without gum strip (*i.e.*, increasing the risk of tread separation and vehicle rollovers).  Since these controversies and others were being reported at or around the time the defective drywall at issue in this litigation was being imported to the United States, the Defendants knew or should have known that the testing of the Chinese manufactured drywall was inherently unreliable.  Thus,

Defendants were reckless and/or grossly negligent in relying upon such testing for purposes of determining compliance with American regulatory standards.

132.    Defendants engaged in a course of conduct, individually and/or collectively, that caused the Plaintiffs' and Class Members' exposure to the defective drywall at issue in this litigation by virtue of their interdependent conscious parallel conduct in the manufacture, exporting, importing, distribution, delivery, supply, inspection, marketing, and/or sale of the defective drywall at issue in this litigation.  Defendants' parallel conduct suggests their common behavior was not the result of idiosyncratic decision making.

133.    The United States has been invaded by defective Chinese-manufactured drywall that is being produced by over one hundred Chinese manufacturers, many of which are partially state-owned entities related to the Peoples Republic of China through byzantine corporate structures.  Although the Knauf entities are not wholly state-owned, they operate through such a byzantine corporate structure with interrelated corporate entities organized under the laws of Asia, Europe, and the United States.  This family of interrelated corporate entities have numerous subsidiaries or other related entities with whom they engaged in interdependent parallel conduct in the manufacture, exporting, importing, distribution, delivery, supply, inspection, marketing, and/or sale of the defective drywall at issue in this litigation.

134.    Knauf has attempted to use its byzantine corporate structure to shield itself from liability. As was noted above, Knauf has a complex corporate structure with interrelated corporate entities located in Europe, Asia, the United States, and elsewhere.  Knauf has attempted to use this complex corporate structure to profit through the distribution and sale of the

defective Chinese manufactured drywall while at the same time attempting to shield itself

from liability to Plaintiffs and Class Members.

135.    The distributors, suppliers, importers, exporters, and brokers have also aided, abetted,

and/or otherwise assisted the defendant manufacturers whose defective products were

imported into the United States.  These defendants engaged in a course of conduct,

individually and/or collectively, that caused the Plaintiffs' and Class Members' exposure to

the defective drywall at issue in this litigation by virtue of their interdependent parallel

conduct in the exporting, importing, distribution, delivery, supply, inspection, marketing,

and/or sale of the defective drywall at issue in this litigation.

136.    By information and belief, certain of the foreign defendants have positioned themselves

in a manner designed to avoid or evade liability for their role in causing the manufacture,

exporting, importing, distribution, delivery, supply, marketing, and/or sale of the defective

drywall at issue in this litigation by making it difficult for injured consumers (located in the

United States) to accomplish service on them.  Such foreign defendants are seemingly

attempting to avoid responsibility for their tortious conduct.

## Conditions Precedent

137.    All notice required by Chapter 558, Florida Statutes, and conditions precedent to bringing

this action have been met or will have been met or were waived by Defendants.

## CLASS ACTION ALLEGATIONS

138.    Plaintiffs bring this suit as a class action pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3)

and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and the

following Class and Subclasses (collectively referred to herein as "the Class") comprised of:

**Class Definition**

All owners and/or residents of real properties located in the United States containing defective Chinese drywall manufactured, sold, distributed, or supplied by Knauf.  All members of the class are seeking compensatory damages, injunctive and/or equitable relief for environmental and medical monitoring.  Defendant, its officers, directors, subsidiaries, or any person or other entity related to, affiliated with or employed by Defendant are excluded from the class definition.

**Subclass "A"**
**Distributor/Supplier Banner Entities Subclass:**
All owners and/or residents of real properties located in the State of Florida containing Knauf Chinese drywall that was sold, distributed, or supplied by Banner Supply Co., Banner Fort Myers, Banner Port St. Lucie, Banner Tampa and Banner Pompano.

**Subclass "B"**
**Installer Atco Interior Corp. Subclass:**
All owners and/or residents of real properties in the State of Florida that contain Knauf Chinese drywall installed by Atco Interior Corp.

**Subclass "C"**
**Developer/Builder Santa Barbara Estates Subclass:**
All owners and/or residents of real properties in the State of Florida that were built and/or made by Santa Barbara Estates and contain Knauf Chinese drywall.

139.    It is further averred upon information and belief that heretofore named and unnamed distributors were responsible for distributing the drywall to the named Plaintiffs, Class members, and Subclass members' homes.  However, this information is in the control and possession of the builder and manufacturing Defendants.  Following discovery, Plaintiffs contemplate that this information will be made available and the responsible distributors will either be specifically designated and/or joined in this action as Defendants.

## NUMEROSITY

140.    Upon information and belief, the Defendants' defective drywall was installed in

thousands of homes in the United States; therefore, the Class and Subclasses are sufficiently

numerous so that the joinder of all members of the Class and/or Subclasses in a single action

is impracticable.

141.    Upon information and belief, there are thousands of putative Class and Subclass members

involved in this case.

## COMMONALITY

142.    There are numerous common questions of law and fact that predominate over any

questions affecting only individual members of the Class and Subclasses.  Among these

common questions of law and fact are the following:

      a.      whether Defendants manufactured, exported, imported, distributed,

          delivered, supplied, inspected, marketed, and/or sold defective drywall

          products;

      b.      whether Defendants' drywall contains latent and/or manifest defects in the

          form of emitting sulfides and other chemicals;

      c.      whether Plaintiffs are entitled to recover compensatory, exemplary,

          incidental, consequential, and/or other damages as a result of Defendants'

          unlawful and tortious conduct;

      d.      whether Plaintiffs are entitled to recover injunctive and/or equitable relief

          as a result of Defendants' unlawful and tortious conduct;

e.      whether Defendants' conduct in manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling their drywall breached the duty of care owed by Defendants to Plaintiffs;

f.      whether Defendants are strictly liable for selling a defective product;

g.      whether Defendants failed to warn Plaintiffs of the dangers and hazards related to the defective drywall;

h.      whether Builder/Developer Defendants breached warranties;

i.      whether Builder/Developers Defendants breached implied warranties of merchantability;

j.      whether Distributor Defendants conduct constitutes negligence;

k.      whether the Installer Defendant's conduct constitutes negligence;

l.      whether Defendants breached implied warranties of fitness for a particular purpose;

m.      whether Defendants violated the various Consumer Protection Acts;

n.      whether Defendants created a private nuisance;

o.      whether Defendants should create and fund an emergency notice program, environmental monitoring, and/or a medical monitoring program;

p.      whether Defendants should give notice to Plaintiffs, Class Members, and Subclass Members under Fed. R. Civ. P. 23(b) 2 or (d) of the defects in drywall, of the need for necessary home inspection, and of the potential health risks associated with the drywall's defects; and

q.      whether Plaintiffs are entitled to attorney's fees, and if so, in what amount.

**TYPICALITY**

143.    The legal claims of the named Plaintiffs are typical of the legal claims of other members of the Class and Subclasses. Plaintiffs have the same legal interests as other members of the Class and Subclasses.

144.    The named Plaintiffs and each member of the Class and Subclasses have defective drywall in their homes.  Due to the drywall in named Plaintiffs, Class Members, and Subclass Members' homes, each have suffered damages in the form of economic damages, and the need for injunctive and equitable relief, as set forth herein.

145.    Named Plaintiffs, Class Members, and Subclass Members' homes and personal property have sustained the same type of economic damage and potential physical harm due to the defective drywall.  Thus, the legal remedies available to named Plaintiffs and the Class and Subclass Members are the same due to the wrongful conduct of Defendants.  The Plaintiffs' claims satisfy the typicality requirement.

## ADEQUACY OF REPRESENTATION

146.    Named Plaintiffs are adequate representatives of the Class and Subclasses and together with legal counsel will fairly and adequately protect the interests of the Class and Subclasses. Plaintiffs have no conflicts with the Class and Subclasses and are committed to the vigorous prosecution of this action and have retained competent counsel experienced in litigation of this nature to represent them.  Named Plaintiffs anticipate no difficulty in the management of this litigation as a class action.  Moreover, the class representatives' interests are aligned with the Class and Subclass Members and it is unlikely there will be a divergence of viewpoint.

147.    The undersigned counsel are competent counsel experienced in class action litigation, mass torts, and litigation involving defective and harmful products.  Counsel will fairly and adequately protect the interests of the Class and Subclasses.

## RULE 23(b)(1) REQUIREMENTS

148.  The various claims asserted in this action are certifiable under the provisions of Federal

Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against

individual Class and Subclass Members would create a risk of inconsistent or varying

adjudications with respect to individual Class and Subclass Members that would establish

incompatible standards of conduct for the party opposing the Class and Subclasses; or

adjudications with respect to individual Class and Subclass Members that, as a practical

matter, would be dispositive of the interests of the other Class and Subclass Members not

parties to the individual adjudications or would substantially impair or impede their ability to

protect their interests.

## RULE 23(b)(2) REQUIREMENTS

149.  The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2).

Defendants have acted or refused to act on grounds that apply generally to the Class and

Subclasses, so that final injunctive relief is appropriate respecting the Class and Subclasses as

a whole.

## RULE 23(b)(3) REQUIREMENTS

150.  The common questions set forth above predominate over Class and Subclass Members'

individual issues.

151.  A class action is superior to other methods of dispute resolution in this case.  The Class

and Subclass members have an interest in class adjudication rather than individual

adjudication because of the overlapping rights.  It is highly desirable to concentrate the

resolution of these claims in this single forum because it would be difficult and highly

unlikely that the affected Class and Subclass members would protect their rights on their own

without this class action case.  Management of the Class and Subclasses will be efficient and far superior to the management of individual lawsuits.

<u>**COUNT I**</u>
**NEGLIGENCE**
**(Against All Manufacturer Defendants Knauf Gips, Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf)**

152.    Plaintiffs and Class Members adopt and restate  paragraphs 1-68 and 85-151 as if fully set forth herein.

153.    Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) marketing, and/or j) selling drywall, including a duty to adequately warn of its failure to do the same.  Defendants' duty includes, but was not limited to the following:

    a.   using reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

    b.    using reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

    c.   using reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

    d.   using reasonable care in the importing of the drywall to prevent it from containing Defects as set forth herein;

    e.   using reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

    f.   using reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

g.  using reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

h.  using reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

i.  using reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

j.  using reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

k.  adequately warning and instructing the Plaintiffs and Class Members of the Defects associated with drywall;

l.  properly manufacturing the drywall to prevent it from containing the Defects as set forth herein;

m.  properly selecting the gypsum that did not contain excessive levels of sulfur;

n.  recalling or otherwise notifying users at the earliest date that it became known that the drywall was dangerous and Defective;

o.  advertising and recommending the use of drywall with sufficient knowledge as to its manufacturing defect and dangerous propensities;

p.  not misrepresenting that the drywall was safe for its intended purpose when, in fact, it was not;

q.  not manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

r.  not exporting and/or importing drywall in a manner which was dangerous to its intended and foreseeable users;

> s.   not distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;
>
> t.   not concealing information from Plaintiffs and Class Members regarding reports of adverse effects associated with drywall;
>
> u.   not improperly concealing and/or misrepresenting information from the Plaintiffs and Plaintiff Class Members and/or the public, concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and
>
> v.   otherwise exercising reasonable care in the design, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall to prevent it from containing Defects as set forth herein.

154.   Defendants were negligent and breached their duty to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall, including a duty to adequately warn of its failure to do the same.   Defendants' negligence included, but was not limited to the following:

> a.   failing to use reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;
>
> b.   failing to use reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein:
>
> c.   failing to use reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

d.  failing to use reasonable care in the importing of the drywall to prevent it from containing Defects as set forth herein;

e.  failing to use reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

f.  failing to use reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

g.  failing to use reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

h.  failing to use reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

i.  failing to use reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

j.  failing to use reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

k.  failing to adequately warn and instruct the Plaintiffs and Class Members of the Defects associated with drywall;

l.  failing to properly manufacture the drywall to prevent it from containing the Defects as set forth herein;

m.  failing to properly select the gypsum that did not contain excessive levels of sulfur;

n.  failing to recall or otherwise notify users at the earliest date that it became known that drywall was dangerous and Defective;

o.   advertising and recommending the use of drywall without sufficient knowledge as to its manufacturing Defect and dangerous propensities;

p.   misrepresenting that drywall was safe for its intended purpose when, in fact, it was not;

q.   manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

r.   exporting and/or importing drywall in a manner which was dangerous to its intended and foreseeable users;

s.   distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

t.   concealing information from Plaintiffs and Class Members regarding reports of adverse effects associated with drywall;

u.   improperly concealing and/or misrepresenting information from the Plaintiffs and Plaintiff Class Members and/or the public, concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and

v.   failing to otherwise exercising reasonable care in the design, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall to prevent it from containing Defects as set forth herein.

155.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator

coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

156.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; permanent diminution in value of the home;  and other related expenses.

157.    Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

      a.   an order certifying the case as a class action;

      b.   an order appointing Plaintiffs as the Class Representatives of the Class;

      c.   an order appointing undersigned counsel and their firms as counsel for the Class;

      d.   compensatory damages;

      e.   post-judgment interest;

      f.   an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

      g.   an award of taxable costs; and,

      h.   any and all such further relief as this Court deems just and proper.

## COUNT II
## STRICT LIABILITY
### (Against All Manufacturer Defendants Knauf Gips, Knauf Tianjin, Knauf Wuhu, Guangdong Knauf)

158.    Plaintiffs and Class Members adopt and restate paragraphs 1-68 and 85-151 as if fully

set forth herein.

159.    At all times relevant hereto, Defendants were in the business of designing,

manufacturing, exporting, importing, distributing, delivering, supplying, inspecting,

marketing, and/or selling drywall for sale to the general public.

160.    The drywall, including that installed in the homes of Plaintiffs and Class Members were

placed by Defendants in the stream of commerce.

161.    Defendants knew that the subject drywall would be used without inspection for defects

by consumers.

162.    Defendants intended that the drywall reach the ultimate consumer, such as Plaintiffs and

Class Members, and it indeed reached Plaintiffs and Class Members when it was installed in

their homes.

163.    When installed in the Plaintiffs and Class Members' homes, the drywall was in

substantially the same condition it was when Defendants manufactured, sold, and/or

delivered it.

164.    At all times relevant hereto the subject drywall was used in a manner consistent with the

uses intended by, or known to Defendants, and in accordance with the Defendants' directions

and instructions.

165.    The subject drywall was not misused or altered by any third parties, Plaintiffs or Class

Members.

166.    The drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, and sold.

167.    The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing and damage Plaintiffs' property that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property") and potential health hazards.

168.    The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors for drywall that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

169.    The drywall was also defective because it was improperly exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold in a defective condition, as described above.

170.    The defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to the Plaintiffs and Class Members.

171.    The drywall is also defective and unreasonably dangerous because Defendants failed to adequately warn and instruct the Plaintiffs and Class Members of the defective design, inspection, testing, manufacturing, marketing, and selling of the drywall.

172.    Plaintiffs and Class Members were unaware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Plaintiffs and Class Members, acting as a reasonably prudent people discover that Defendants' drywall was defective, as set forth herein, or perceive its danger.

173.    Defendants' defective drywall was much more dangerous and harmful than expected by the average consumer and by Plaintiffs and Class Members.

174.    Defendants' defective drywall benefit to Plaintiffs and Class Members, if any, was greatly outweighed by the risk of harm and danger to them.

175.    The defects in the drywall, as well as Defendants' failure to adequately warn the Plaintiffs and Class Members of the defects rendered the drywall unreasonably dangerous and was the direct and proximate cause of damages to Plaintiffs and Class Members.

176.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

177.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment

of real property; the loss in value of the home due to the stigma attached to having defective

drywall in the home; permanent diminution in value of the home; and other related expenses.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

      a.   an order certifying the case as a class action;

      b.   an order appointing Plaintiffs as the Class Representatives of the Class;

      c.   an order appointing undersigned counsel and their firms as counsel for the Class;

      d.   compensatory damages;

      e.   post-judgment interest;

      f.   an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

      g.   an award of taxable costs; and,

      h.   any and all such further relief as this Court deems just and proper.

## COUNT III
### VIOLATION OF CONSUMER PROTECTION ACTS
(Against All Manufacturer Defendants Knauf Gips, Knauf Tianjin, Knauf Wuhu, and Guangdong Knauf)

178.   Plaintiffs and the Class Members adopt and restate paragraphs 1-68 and 85-151 as if fully

set forth herein.

179.   This is an action for relief under the various Consumer Protection Acts of the

jurisdictions in which affected properties are present, including but not limited to, Louisiana,

Alabama, North Carolina, Florida, Virginia, Texas, and Mississippi.  *See* L.SA-R.S. 51:1401,

*et seq.* (Louisiana Unfair Trade Practices and Consumer Protection Law); Ala. Code 1975 §

8-19-1, *et seq.*, (Alabama Deceptive Trade Practices Act); G.S. § 75-1.1, *et seq* (North

Carolina Consumer Protection Act); F.S. § 501.201, *et seq*. (Florida Deceptive and Unfair

38

Trade Practices Act); Va. Code. Ann. § 59.1-196, *et seq.* (Virginia Consumer Protection

Act); Tex. Bus. Com. Code Ann. § 17.41, *et seq* (Texas Deceptive Trade Practices-Consumer

Protection Act); Miss. Code Ann. §75-24-1, *et seq.* (Mississippi Consumer Protection Act).

180.    The Defendants' acts and omissions as well as their failure to use reasonable care in this

matter as alleged in this Complaint, including, but not limited to, the knowing

misrepresentation or failure to disclose the source, affiliation, origin, characteristics,

ingredients, standards and quality of the defective drywall constitute violation of the

aforementioned provisions of the Consumer Protection Acts of the relevant states.

181.    The unconscionable, illegal, unfair and deceptive acts and practices of Defendants violate

the provisions of the various Consumer Protection Acts of the jurisdictions in which affected

properties are located.  Plaintiffs and Class Members have suffered actual damage for which

they are entitled to relief pursuant to Consumer Protection Statutes.

182.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class

Members have incurred economic damages and are entitled to recover monetary damages

for: replacement/repair of their homes; the removal and replacement of all of the drywall

contained in their homes; the replacement of Other Property (air-conditioner and refrigerator

coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring,

personal property, electronic appliances, and other metal surfaces and household items); and

the repair and/or replacement of any materials contaminated or corroded by the drywall.

183.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class

Members have incurred or will incur incidental and consequential damages for the costs of

moving while homes are being repaired; renting of comparable housing during the duration

of the repairs; the loss of use and enjoyment of real property; the loss in value of the home

due to the stigma attached to having defective drywall in the home; permanent diminution in value of the home;  and other related expenses.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

     a.  an order certifying the case as a class action;

     b.  an order appointing Plaintiffs as the Class Representatives of the Class;

     c.  an order appointing undersigned counsel and their firms as counsel for the Class;

     d.  compensatory damages;

     e.  post-judgment interest;

     f.  an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

     g.  an award of taxable costs; and,

     h.  any and all such further relief as this Court deems just and proper.

## COUNT IV
## STRICT LIABILITY
### (Against the Banner Entities)

184.    Plaintiffs and the Class Members adopt and restate paragraphs 1-25, 69-79 and 85-151 as if fully set forth herein.

185.    At all times relevant hereto, the Banner Entities Defendants were in the business of exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

186.    The drywall, including that installed in the homes of Plaintiffs and Class Members were placed by the Banner Entities in the stream of commerce.

187.    The Banner Entities knew that the subject drywall would be used without inspection for defects by consumers.

188.    The Banner Entities intended that the drywall reach the ultimate consumer, such as Plaintiffs and Class Members, and it indeed reached Plaintiffs and Class Members when it was installed in their homes.

189.    When installed in the Plaintiffs and Class Members' homes, the drywall was in substantially the same condition it was when the Banner Entities distributed, supplied, sold, and/or delivered it.

190.    At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to the Banner Entities, and in accordance with the The Banner Entities' directions and instructions.

191.    The subject drywall was not misused or altered by any third parties, Plaintiffs or Class Members.

192.    The drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, delivered, and/or sold.

193.    The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing and damage Plaintiffs' property that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property") and potential health hazards.

194.    The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gases and/or other chemicals through "off-gassing" that creates

noxious, "rotten egg-like" odors for drywall that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

195.    The drywall was also defective because it was improperly exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold in a defective condition, as described above.

196.    The defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to the Plaintiffs and Class Members.

197.    The drywall is also defective and unreasonably dangerous because the Banner Entities failed to adequately warn and instruct the Plaintiffs and Class Members of the defective design, inspection, testing, manufacturing, marketing, and selling of the drywall.

198.    Plaintiffs and Class Members were unaware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Plaintiffs and Class Members, acting as a reasonably prudent people discover that The Banner Entities' drywall was defective, as set forth herein, or perceive its danger.

199.    The Banner Entities' defective drywall was much more dangerous and harmful than expected by the average consumer and by Plaintiffs and Class Members.

200.    The Banner Entities' defective drywall benefit to Plaintiffs and Class Members, if any, was greatly outweighed by the risk of harm and danger to them.

201.   The defects in the drywall, as well The Banner Entities' failure to adequately warn the Plaintiffs and Class Members of the defects rendered the drywall unreasonably dangerous and was the direct and proximate cause of damages to Plaintiffs and Class Members.

202.   As a direct and proximate cause of The Banner Entities' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

203.   As a direct and proximate cause of The Banner Entities' acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; permanent diminution in value of the home;  and other related expenses.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

      a)   an order certifying the case as a class action;

      b)   an order appointing Plaintiffs as the Class Representatives of the Class;

      c)   an order appointing undersigned counsel and their firms as counsel for the Class;

      d)   compensatory damages;

e)   post-judgment interest;

f)   an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

g)   an award of taxable costs; and,

h)   any and all such further relief as this Court deems just and proper.

### COUNT V
### VIOLATION OF THE FLORIDA DECEPTIVE
### AND UNFAIR TRADE PRACTICES ACT
### (Against Distributor Defendant Banner Entities)

204.   Plaintiffs and the Class Members adopt and restate paragraphs 1-25, 69-79 and 85-151 as if fully set forth herein.

205.   This is an action for relief under section 501.201, *et.seq.,* Florida Statutes (The Florida Deceptive and Unfair Trade Practices Act).

206.   Section 501.203(7), Florida Statutes defines "Consumer" as "an individual; child, by and through its parent or legal guardian; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; or any other group or combination." Plaintiffs and Class Members are "Consumers" within the meaning of §501.203(7), Florida Statutes.

207.   Section 501.203(8), Florida Statutes defines "Trade or Commerce" as:

> [T]he advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or Commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

The advertising, soliciting, providing, offering, or distributing of drywall by the Banner Entities to Plaintiffs and Class Members is "Trade or Commerce" within the meaning of section 501.203(8), Florida Statutes.

208.    Section 501.204(1) provides that: "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  The Banner Entities' acts and omissions as well as their failure to use reasonable care in this matter as alleged in this Complaint equals unconscionable acts or practices, as well as deceptive and unfair acts or practices in the conduct of the Banner Entities' trade or commerce pursuant to section 501.204, Florida Statutes.

209.    The unconscionable, illegal, unfair and deceptive acts and practices of the Banner Entities violates the provisions of Florida's Deceptive and Unfair Trade Practices Act.  Plaintiffs and Class Members have suffered actual damage for which they are entitled to relief pursuant to section 501.211(2), Florida Statutes.

210.    Plaintiffs and Class Members are entitled to recover their reasonable attorneys' fees pursuant to section 501.2105, Florida Statutes upon prevailing in this matter.

211.    As a direct and proximate cause of the Banner Entities' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for the replacement value of the defective drywall in their home.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

      a.   an order certifying the case as a class action;

      b.   an order appointing Plaintiffs as the Class Representatives of the Class;

      c.   an order appointing undersigned counsel and their firms as counsel for the Class;

d.   compensatory damages;

e.   post-judgment interest;

f.   an award of attorneys' fees to class counsel based upon a common fund theory

as allowed by Federal law, for the benefits conferred upon the Class and/or as

allowed by contract or statute;

g.   an award of taxable costs; and,

h.   any and all such further relief as this Court deems just and proper.

**COUNT VI**
**NEGLIGENCE**
**(Against Defendant Banner Entities)**

212.   Plaintiffs and the Class Members adopt and restate paragraphs 1-25, 69-79 and 85-151 if

fully set forth herein.

213.   The Banner Entities owed a duty to Plaintiffs to exercise reasonable care in the a)

inspecting, and b) testing, of the drywall it supplied for installation in Plaintiffs and Class

Members' homes, including a duty to adequately warn of its failure to do the same.  The

Banner Entities duty includes, but was not limited to the following:

a)   using reasonable care in the inspecting of the drywall they supplied

to the Plaintiffs and Class Members' homes to discover that it

contained Defects as set forth herein;

b)   using reasonable care in the testing of the drywall it supplied to the

Plaintiffs and Class Members' homes to discover that it contained

Defects as set forth herein;

c)   adequately warning and instructing the Plaintiffs and Class Members

of the Defects associated with drywall; and

46

d)      otherwise exercising reasonable care in the inspecting and testing of the drywall provided to and installed in the Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein.

214.    The Banner Entities were negligent and breached their duty to exercise reasonable care in the a) inspecting, and b) testing of the drywall it supplied for installation in the Plaintiffs and Class Members' homes, including a duty to adequately warn of its failure to do the same. The Banner Entities negligence included, but was not limited to the following:

a.   failing to use reasonable care in the inspecting of the drywall it supplied to Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein;

b.   failing to use reasonable care in the testing of the drywall it supplied to Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein;

c.   failing to adequately warn and instruct the Plaintiffs and Class Members's of the Defects associated with drywall; and

d.   failing to otherwise exercise reasonable care in the inspecting and testing of the drywall provided to and installed in Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein.

215.    As a direct and proximate cause of The Banner Entities' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and

refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

216.    As a direct and proximate cause of The Banner Entities' acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; permanent diminution in value of the home;  and other related expenses.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

     a)  an order certifying the case as a class action;

     b)  an order appointing Plaintiffs as the Class Representatives of the Class;

     c)  an order appointing undersigned counsel and their firms as counsel for the Class;

     d)  compensatory damages;

     e)  post-judgment interest;

     f)  an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

     g)  an award of taxable costs; and,

     h)  any and all such further relief as this Court deems just and proper.

## COUNT VII
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (All Defendant Builder/Developer Defendants Santa Barbara Estates)

217.   Plaintiffs and the Class Members adopt and restate paragraphs 1-25 and 83-151 as if fully set forth herein.

218.   Defendants were in privity with Plaintiffs and Class Members.

219.   At the times Defendants installed, utilized, supplied, inspected, and/or sold drywall for use in the Plaintiffs and Class Members' homes.  Defendants knew, or it was reasonably foreseeable, that the drywall would be installed in the Plaintiffs and Class Members' homes for use as a building material, and impliedly warranted the product to be fit for that use.

220.   Defendants' drywall product was placed into the stream of commerce by Defendants in a defective condition and were expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which they were sold.

221.   The drywall was defective because it was not fit for the uses intended or reasonably foreseeable by Defendants; to wit, the installation of the drywall in Plaintiffs and Class Members' homes for use as a building material, because it contained defects as set forth herein.

222.   The Defendants breached the implied warranty of merchantability because the drywall was not fit to be installed in Plaintiffs and Class Members' homes as a building material due to the defects set forth herein.

223.   Defendants had reasonable and adequate notice of the Plaintiffs' and the Class Members' claims for breach of implied warranty of merchantability and failed to cure.

224.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class

Members have incurred economic damages and are entitled to recover monetary damages

for: replacement/repair of their homes; the removal and replacement of all of the drywall

contained in their homes; the replacement of Other Property (air-conditioner and refrigerator

coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring,

personal property, electronic appliances, and other metal surfaces and household items); and

the repair and/or replacement of any materials contaminated or corroded by the drywall.

225.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class

Members have incurred or will incur incidental and consequential damages for the costs of

moving while homes are being repaired; renting of comparable housing during the duration

of the repairs; the loss of use and enjoyment of real property; the loss in value of the home

due to the stigma attached to having defective drywall in the home; diminution in value of

the home; and other related expenses.

226.    Defendants knew or should have known that their wrongful acts and omissions would

result in economic, incidental, and consequential damages in the manner set forth herein.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

a.   an order certifying the case as a class action;

b.   an order appointing Plaintiffs as the Class Representatives of the Class;

c.   an order appointing undersigned counsel and their firms as counsel for the Class;

d.   compensatory damages;

e.   post-judgment interest;

    f.   an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

    g.   an award of taxable costs; and,

    h.   any and all such further relief as this Court deems just and proper.

<u>COUNT VIII</u>
**BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**
**(All Defendant Builder/Developer Defendants Santa Barbara Estates)**

227.   Plaintiffs and the Class Members adopt and restate paragraphs 1-25 and 83-151 as if fully set forth herein.

228.   Defendants were in privity with Plaintiffs and Class Members.

229.   Defendants' drywall product was placed into the stream of commerce by Defendants in a defective condition and was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it were sold.

230.   The drywall was defective because it was not fit for the specific purpose of installing in the Plaintiffs and Class Members' homes as a building material, for which Plaintiffs and Class Members bought the product in reliance on the judgment of Defendants.

231.   The Defendants breached the implied warranty of fitness for a particular purpose because the drywall was not fit to be installed in Plaintiffs and Class Members homes as a building material due to the defects set forth herein.

232.   Defendants had reasonable and adequate notice of the Plaintiffs and the Class Members' claims for breach of implied warranty of merchantability and failed to cure.

233.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

234.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; permanent diminution in value of the home; and other related expenses.

235.   Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

     a.   an order certifying the case as a class action;

     b.   an order appointing Plaintiffs as the Class Representatives of the Class;

     c.   an order appointing undersigned counsel and their firms as counsel for the Class;

     d.   compensatory damages;

     e.   post-judgment interest;

f.  an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

g.  an award of taxable costs; and,

h.  any and all such further relief as this Court deems just and proper.

**COUNT IX**
**VIOLATION OF THE FLORIDA DECEPTIVE**
**AND UNFAIR TRADE PRACTICES ACT**
**(All Defendant Builder/Developer Defendants Santa Barbara Estates)**

236.  Plaintiffs and the Class Members adopt and restate paragraphs 1-25 and 83-151 as if fully set forth herein.

237.  This is an action for relief under section 501.201, *et.seq.,* Florida Statutes (The Florida Deceptive and Unfair Trade Practices Act).

238.  Section 501.203(7), Florida Statutes defines "Consumer" as "an individual; child, by and through its parent or legal guardian; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; or any other group or combination." Plaintiffs and Class Members are "Consumers" within the meaning of §501.203(7), Florida Statutes.

239.  Section 501.203(8), Florida Statutes defines "Trade or Commerce" as:

> [T]he advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or Commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

The advertising, soliciting, providing, offering, or distributing of drywall by Defendants to Plaintiffs and Class Members is "Trade or Commerce" within the meaning of section 501.203(8), Florida Statutes.

240.    Section 501.204(1) provides that: "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  The Defendants' acts and omissions as well as their failure to use reasonable care in this matter as alleged in this Complaint equals unconscionable acts or practices, as well as deceptive and unfair acts or practices in the conduct of Defendants' trade or commerce pursuant to section 501.204, Florida Statutes.

241.    The unconscionable, illegal, unfair and deceptive acts and practices of Defendants violate the provisions of Florida's Deceptive and Unfair Trade Practices Act.  Plaintiffs and Class Members have suffered actual damage for which they are entitled to relief pursuant to section 501.211(2), Florida Statutes.

242.    Plaintiffs and Class Members are entitled to recover their reasonable attorneys' fees pursuant to section 501.2105, Florida Statutes upon prevailing in this matter.

As a direct and proximate cause of the Defendants' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for the replacement value of the defective drywall in their home. WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

> a.    an order certifying the case as a class action;
>
> b.    an order appointing Plaintiffs as the Class Representatives of the Class;
>
> c.    an order appointing undersigned counsel and their firms as counsel for the Class;
>
> d.    compensatory damages;

    e.   post-judgment interest;

    f.   an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

    g.   an award of taxable costs; and,

    h.   any and all such further relief as this Court deems just and proper.

<u>**COUNT X**</u>
**BREACH OF CONTRACT AGAINST DEFENDANT SANTA BARBARA ESTATES ON BEHALF OF THE SANTA BARBARA ESTATES PLAINTIFFS**

243.   Plaintiffs and the Class Members adopt and restate paragraphs 1-25 and 83-151 as if fully set forth herein.

244.   Santa Barbara Estates made an offer to build homes for Plaintiffs Felix Diaz, Liem Quach, Ann Ngoc Thile and the Santa Barbara Estates Subclass.

245.   Plaintiffs Felix Diaz, Liem Quach, Ann Ngoc Thile and the Santa Barbara Estates' Subclass accepted Santa Barbara Estates' offer to build a home for them.

246.   As consideration, Plaintiffs Felix Diaz, Liem Quach, Ann Ngoc Thile and the Santa Barbara Estates' Subclass agreed to compensate Santa Barbara Estates for building their homes.

247.   As part of the agreement to purchase the homes, Santa Barbara Estates promised Felix Diaz, Liem Quach, Ann Ngoc Thile and the Santa Barbara Estates' Subclass that their homes would be free of defects, such as drywall that is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that causes property damage and potential health hazards.

248.   Santa Barbara Estates breached the contract by providing Felix Diaz, Liem Quach, Ann Ngoc Thile and the Santa Barbara Estates' Subclass homes that were not free of defects, to wit, the homes contained drywall that is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that causes property damage and potential health hazards.

249.   Plaintiffs' contracts for the purchase of their homes are attached hereto as Composite Exhibit "B."

250.   As a direct and proximate cause of Santa Barbara Estates' breach of contract, Plaintiffs Felix Diaz, Liem Quach, Ann Ngoc Thile and the Santa Barbara Estates' Subclass have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

251.   As a direct and proximate cause of Santa Barbara Estates' breach of contract, Plaintiffs , Plaintiffs Felix Diaz, Liem Quach, Ann Ngoc Thile and the Santa Barbara Estates' Subclass have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; permanent diminution in value of the home; and other related expenses.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

a.   an order certifying the case as a class action;

b.   an order appointing Plaintiffs as the Class Representatives of the Class;

c.   an order appointing undersigned counsel and their firms as counsel for the Class;

d.   compensatory damages;

e.   post-judgment interest;

f.   an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

g.   an award of taxable costs; and,

h.   any and all such further relief as this Court deems just and proper.

## COUNT XI
## PRIVATE NUISANCE
### (Against All Defendants)

252.   Plaintiffs and the Class Members adopt and restate paragraphs 1-151 as if fully set forth herein.

253.   The Defendants' tortious or wrongful acts or omissions have caused sulfide gas and/or other chemical leaching into Plaintiffs and Class Members' homes which has unreasonably interfered, and continues to interfere, with the Plaintiffs and Class Members' use and enjoyment of their properties and caused them potential health problems.

254.   Defendants' interference has impaired the rights of Plaintiffs and Class Members health, comfort, safety, free use of their property, and/or peaceful enjoyment of their property.

255.   Defendants' invasions were intentional and unreasonable, and/or unintentional but otherwise negligent or reckless.

256.    The interference with Plaintiffs and Class Members' use of their property caused by Defendants is substantial and is ongoing.

257.    Defendants' private nuisance was the direct, proximate, and foreseeable cause of Plaintiffs and Plaintiff Class Members' damages, injuries, harm, economic loss, and increased risk of harm, which they suffered and will continue to suffer.

258.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

259.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; permanent diminution in value of the home; and other related expenses.

260.    Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

        a.   an order certifying the case as a class action;

        b.   an order appointing Plaintiffs as the Class Representatives of the Class;

  c. an order appointing undersigned counsel and their firms as counsel for the Class;

  d. compensatory damages;

  e. post-judgment interest;

  f. an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

  g. an award of taxable costs; and,

  h. any and all such further relief as this Court deems just and proper.

**COUNT XII**
**EQUITABLE AND INJUNCTIVE RELIEF AND MEDICAL MONITORING**
**(All Defendants)**

261. Plaintiffs and the Class Members adopt and restate paragraphs 1-151 as if fully set forth herein. Plaintiffs and the Class are without adequate remedy at law, rendering injunctive and other equitable relief appropriate.

262. Plaintiffs and the Class will suffer irreparable harm if the Court does not render the injunctive relief and medical monitoring relief set forth herein, and if defendants are not ordered to recall, buy back, remediate and/or repair the plaintiffs and members of the class' homes.

263. Plaintiffs on behalf of themselves and all others similarly situated, demand injunctive and equitable relief and further, that defendants be ordered to: (1) remedy, repair, remediate and/or replace the drywall in the homes, (2) cease and desist from misrepresenting to the Class and the general public that there is no defect in, or danger associated with, the drywall, and (3) institute, at their own cost, a public awareness campaign to alert the Class and general

public of the defect, dangers associated with the drywall (4) create, fund, and support a medical monitoring program.

264.    Until Defendants' defective drywall has been removed, Defendants should provide continued environmental and air monitoring in Plaintiffs and Class Members' homes.

265.    Plaintiffs and Class Members have been exposed to greater than normal background levels of sulfides and other hazardous chemicals as a result of exposures to Defendants' defective drywall.

266.    The sulfides gases and the other chemicals which have been released from Defendants drywall and to which Plaintiffs and Class Members have been exposed are proven hazardous, dangerous, or toxic substances.

267.    Plaintiffs' and Class Members' exposures were caused by the Defendant's negligence or otherwise tortious conduct.

268.    Plaintiffs and Class Members exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

269.    The method and means for diagnosing the Plaintiffs and Class Members potential medical problems are well accepted in the medical and scientific community and will be of great benefit to the Plaintiffs and Class Members by preventing or minimizing health problems that they may encounter as a result of the defective drywall.

270.    As a proximate result of their exposure to sulfide gases and other toxic chemicals from Defendants' defective drywall, Plaintiffs and Class Members have developed a significantly increased risk of contracting a serious latent disease.

271.    Monitoring procedures exist that makes the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

272.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

WHEREFORE, Plaintiffs, on behalf of all others similarly situated demand injunctive and/or equitable relief against the Defendant as follows:

    a.   an Order certifying the Class and appointing Plaintiffs as Class Representatives;

    a.   an order appointing Class Counsel to the represent the Class;

    b.   an order and judgment requiring the necessary repairs, remediation, relocation costs, personal property replacement, establishment of environmental and medical monitoring programs;

    c.   pre-judgment and post-judgment interest at the maximum rate allowable at law;

    d.   all statutory damages;

    e.   an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

    f.   the costs and disbursements incurred by Plaintiffs and Class Members in connection with this action, including reasonable attorneys' fees based on the benefits conferred upon the Class, a common fund, statutory, and/or contractual basis;

    g.   equitable, injunctive, and declaratory relief;

h.   pursuant to Rule 23(b)(2) and/or Rule 23(d), Plaintiffs seek notice to Class Members of the defective drywall in their home, need to have the home inspected, and potential health risks associated with the drywall;

i.   environmental and air monitoring;

j.   medical monitoring; and

k.   such other and further relief under all applicable state and federa1 law and any other relief the Court deems just and appropriate.

## COUNT XIII
## STRICT LIABILITY
### (Against Installer Defendant Atco)

273.   Plaintiffs and the Class Members adopt and restate paragraphs 1-25, 80-82, and 85-151 as if fully set forth herein.

274.   At all times relevant hereto, Defendant was in the business of exporting, importing, distributing, delivering, supplying, inspecting, marketing, installing, and/or selling drywall for sale to the general public.

275.   The drywall, including that installed in the homes of Plaintiffs and Class Members was placed by Defendant in the stream of commerce.

276.   Defendant knew that the subject drywall would be used without inspection for defects by consumers.

277.   Defendant intended that the drywall reach the ultimate consumer, such as Plaintiffs and Class Members, and it indeed reached Plaintiffs and Class Members when it was installed in their homes.

278.   When installed in the Plaintiffs and Class Members' homes, the drywall was in substantially the same condition it was when Defendant distributed, supplied, sold, installed, and/or delivered it.

279.   At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendant, and in accordance with the Defendant's directions and instructions.

280.   The subject drywall was not misused or altered by any third parties, Plaintiffs or Class Members.

281.   The drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, delivered, and/or sold.

282.   The design defect was in designing drywall that allowed high levels of sulfur and/or other chemicals to emit through off-gassing and damage Plaintiffs and Class Members' property that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property") and potential health hazards.

283.   The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors for drywall that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

284.    The drywall was also defective because it was improperly exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold in a defective condition, as described above.

285.    The defective manufacturing, designing, inspecting, testing, marketing, distributing, installation, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to the Plaintiffs and Class Members.

286.    The drywall is also defective and unreasonably dangerous because Defendant failed to adequately warn and instruct the Plaintiffs and Class Members of the defective design, inspection, testing, manufacturing, marketing, and selling of the drywall.

287.    Plaintiffs and Class Members were unaware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Plaintiffs and Class Members, acting as a reasonably prudent people discover that Defendant's drywall was defective, as set forth herein, or perceive its danger.

288.    Defendant's defective drywall was much more dangerous and harmful than expected by the average consumer and by Plaintiffs and Class Members.

289.    Defendant's defective drywall benefit to Plaintiffs and Class Members, if any, was greatly outweighed by the risk of harm and danger to them.

290.    The defects in the drywall, as well as Defendant's failure to adequately warn the Plaintiffs and Class Members of the defects rendered the drywall unreasonably dangerous and was the direct and proximate cause of damages to Plaintiffs and Class Members.

291.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall

contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

292.    As a direct and proximate cause of Defendant's acts and omissions, Plaintiffs and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; permanent diminution in value of the home;  and other related expenses.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

    a)  an order certifying the case as a class action;

    b)  an order appointing Plaintiffs as the Class Representatives of the Class;

    c)  an order appointing undersigned counsel and their firms as counsel for the Class;

    d)  compensatory damages;

    e)  post-judgment interest;

    f)  an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

    g)  an award of taxable costs; and,

    h)  any and all such further relief as this Court deems just and proper.

**COUNT XIV**
**VIOLATION OF THE FLORIDA DECEPTIVE**
**AND UNFAIR TRADE PRACTICES ACT**
**(Against Installer Defendant Atco)**

293.    Plaintiffs and the Class Members adopt and restate paragraphs 1-25, 80-82, and 85-151 as

if fully set forth herein.

294.    This is an action for relief under section 501.201, *et.seq.,* Florida Statutes (The Florida

Deceptive and Unfair Trade Practices Act).

295.    Section 501.203(7), Florida Statutes defines "Consumer" as "an individual; child, by and

through its parent or legal guardian; firm; association; joint venture; partnership; estate; trust;

business trust; syndicate; fiduciary; corporation; or any other group or combination."

Plaintiffs and Class Members are "Consumers" within the meaning of §501.203(7), Florida

Statutes.

296.    Section 501.203(8), Florida Statutes defines "Trade or Commerce" as:

> [T]he advertising, soliciting, providing, offering, or distributing,
> whether by sale, rental, or otherwise, of any good or service, or any
> property, whether tangible or intangible, or any other article,
> commodity, or thing of value, wherever situated. "Trade or
> Commerce" shall include the conduct of any trade or commerce,
> however denominated, including any nonprofit or not-for-profit
> person or activity.

The advertising, soliciting, providing, offering, or distributing of drywall by the Banner Entities

to Plaintiffs and Class Members is "Trade or Commerce" within the meaning of section

501.203(8), Florida Statutes.

297.    Section 501.204(1) provides that: "[u]nfair methods of competition, unconscionable acts

or practices, and unfair or deceptive acts or practices in the conduct of any trade or

commerce are hereby declared unlawful."  Defendant's acts and omissions as well as their

failure to use reasonable care in this matter as alleged in this Complaint equals

unconscionable acts or practices, as well as deceptive and unfair acts or practices in the conduct of the Banner Entities' trade or commerce pursuant to section 501.204, Florida Statutes.

298.    The unconscionable, illegal, unfair and deceptive acts and practices of the Defendant violates the provisions of Florida's Deceptive and Unfair Trade Practices Act.  Plaintiffs and Class Members have suffered actual damage for which they are entitled to relief pursuant to section 501.211(2), Florida Statutes.

299.    Plaintiffs and Class Members are entitled to recover their reasonable attorneys' fees pursuant to section 501.2105, Florida Statutes upon prevailing in this matter.

300.    As a direct and proximate cause of the Defendant's acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for the replacement value of the defective drywall in their home.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

a.   an order certifying the case as a class action;

b.   an order appointing Plaintiffs as the Class Representatives of the Class;

c.   an order appointing undersigned counsel and their firms as counsel for the Class;

d.   compensatory damages;

e.   post-judgment interest;

f.   an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

g.   an award of taxable costs; and,

h.   any and all such further relief as this Court deems just and proper.

**COUNT XV**
**NEGLIGENCE**
**(Against Installer Defendant Atco)**

301.    Plaintiffs and the Class Members adopt and restate paragraphs 1-25, 80-82, and 85-151 as if fully set forth herein.

302.    Defendant owed a duty to Plaintiffs to exercise reasonable care in the a) inspecting, and b) testing, of the drywall it was installing in Plaintiffs and Class Members' homes, including a duty to adequately warn of its failure to do the same.  Defendant's duty included, but was not limited to the following:

   a.    using reasonable care in inspecting the drywall it installed in Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein and not to install the defective drywall in Plaintiffs' and Class Members' homes;

   a.    using reasonable care in the testing of the drywall it supplied to the Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein and not to install the defective drywall in Plaintiffs' and Class Members' homes;

   b.    adequately warning and instructing the Plaintiffs and Class Members of the Defects associated with drywall; and

   c.    otherwise exercising reasonable care in the inspecting and testing of the drywall provided to and installed in the Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein.

303.    Defendant was negligent and breached its duty to exercise reasonable care in the a) inspecting, and b) testing of the drywall it supplied for installation in the Plaintiffs and Class

Members' homes, including a duty to adequately warn of its failure to do the same. The Defendant's negligence included, but was not limited to the following:

    a.   failing to use reasonable care in inspecting the drywall it installed in Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein and not to install the defective drywall in Plaintiffs' and Class Members' homes;

    b.   failing to use reasonable care in the testing of the drywall it supplied to the Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein and not to install the defective drywall in Plaintiffs' and Class Members' homes;

    c.   failing to adequately warn and instructi the Plaintiffs and Class Members of the Defects associated with drywall; and

    d.   failing to otherwise exercise reasonable care in the inspecting and testing of the drywall provided to and installed in the Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein.

304.    As a direct and proximate cause of the Defendant's acts and omissions, Plaintiffs and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

305.   As a direct and proximate cause of the Defendant's acts and omissions, Plaintiffs and

Class Members have incurred or will incur incidental and consequential damages for the

costs of moving while homes are being repaired; renting of comparable housing during the

duration of the repairs; the cost of repair or replacement of the homes; the loss of use and

enjoyment of real property; the loss in value of the home due to the stigma attached to having

defective drywall in the home; permanent diminution in value of the home; and other related

expenses.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

a)   an order certifying the case as a class action;

b)   an order appointing Plaintiffs as the Class Representatives of the Class;

c)   an order appointing undersigned counsel and their firms as counsel for the Class;

d)   compensatory damages;

e)   post-judgment interest;

f)   an award of attorneys' fees to class counsel based upon a common fund theory

as allowed by Federal law, for the benefits conferred upon the Class and/or as

allowed by contract or statute;

g)   an award of taxable costs; and,

h)   any and all such further relief as this Court deems just and proper.

## COUNT XVI
## PERSONAL INJURY NEGLIGENCE
### (Against All Defendants)

306.   Plaintiffs and the Class Members adopt and restate paragraphs 1-151 as if fully set forth

herein.

307.    Defendants owed a duty to Plaintiffs to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) marketing, j) testing, k) installing and/or l) selling drywall, including a duty to adequately warn of its failure to do the same.  Defendant's duty included, but was not limited to the following:

   a.   using reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

   b.   using reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

   c.   using reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

   d.   using reasonable care in the importing of the drywall to prevent it from containing Defects as set forth herein;

   e.   using reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

   f.   using reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

   g.   using reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

   h.   using reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

   i.   using reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

j.  using reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

k.  adequately warning and instructing the Plaintiffs and Class Members of the Defects associated with drywall;

l.  properly manufacturing the drywall to prevent it from containing the Defects as set forth herein;

m.  properly selecting the gypsum that did not contain excessive levels of sulfur;

n.  recalling or otherwise notifying users at the earliest date that it became known that the drywall was dangerous and Defective;

o.  advertising and recommending the use of drywall with sufficient knowledge as to its manufacturing defect and dangerous propensities;

p.  not misrepresenting that the drywall was safe for its intended purpose when, in fact, it was not;

q.  not manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

r.  not exporting and/or importing drywall in a manner which was dangerous to its intended and foreseeable users;

s.  not distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

t.  not concealing information from Plaintiffs and Class Members regarding reports of adverse effects associated with drywall;

u.  not improperly concealing and/or misrepresenting information from the Plaintiffs and Class Members and/or the public, concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and

v.  using reasonable care in the inspecting of the drywall they supplied to the Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein;

w.  using reasonable care in the testing of the drywall it supplied to the Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein;

x.  adequately warning and instructing the Plaintiffs and Class Members of the Defects associated with drywall; and

y.  otherwise exercising reasonable care in the design, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, installing and/or selling drywall to prevent it from containing Defects as set forth herein.

308.   Defendant was negligent and breached its duty to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) marketing, j) testing, k) installing and/or l) selling drywall, including a duty to adequately warn of its failure to do the same. The Defendants' negligence included, but was not limited to the following:

a.  failing to use reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

b.  failing to use reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

c.  failing to use reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

d.  failing to use reasonable care in the importing of the drywall to prevent it from containing Defects as set forth herein;

e.  failing to use reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

f.  failing to use reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

g.  failing to use reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

h.  failing to use reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

i.  failing to use reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

j.  failing to use reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

k.  failing to adequately warn and instruct the Plaintiffs and Class Members of the Defects associated with drywall;

l.  failing to properly manufacture the drywall to prevent it from containing the Defects as set forth herein;

m.  failing to properly select the gypsum that did not contain excessive levels of sulfur;

74

n.  failing to recall or otherwise notify users at the earliest date that it became known that the drywall was dangerous and Defective;

o.  failing to advertise and recommend the use of drywall with sufficient knowledge as to its manufacturing defect and dangerous propensities;

p.  failing to use misrepresent that the drywall was safe for its intended purpose when, in fact, it was not;

q.  manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

r.  failing to export and/or import drywall in a manner which was dangerous to its intended and foreseeable users;

s.  distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

t.  concealing information from Plaintiffs and Class Members regarding reports of adverse effects associated with drywall;

u.  improperly concealing and/or misrepresenting information from the Plaintiffs and Class Members and/or the public, concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and

v.  failing to use reasonable care in the inspecting of the drywall they supplied to the Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein;

w.  failing to use use reasonable care in the testing of the drywall it supplied to the Plaintiffs and Class Members' homes to discover that it contained Defects as set forth herein;

x.  failing to adequately warn and instruct the Plaintiffs and Class Members of the Defects associated with drywall; and

y.  failing to use otherwise exercise reasonable care in the design, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, installing and/or selling drywall to prevent it from containing Defects as set forth herein.

309.   Defendants knew or should have known that their acts and omissions, as stated herein, were likely to cause injury to Plaintiffs and Class Members.

310.   As a direct and proximate result of the Defendants' negligence, Plaintiffs and Class Members suffered bodily injury, exacerbation of a pre-existing condition, allergies, rashes, nosebleeds, respiratory problems, shortness of breath, pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical care and rehabilitation.  These losses are permanent and continuing in nature and Plaintiffs and Class Members will continue to suffer these losses in the future.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

a)  an order certifying the case as a class action;

b)  an order appointing Plaintiffs as the Class Representatives of the Class;

c)  an order appointing undersigned counsel and their firms as counsel for the Class;

d)  compensatory damages;

e)  post-judgment interest;

f)  an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

g) an award of taxable costs; and,

h) any and all such further relief as this Court deems just and proper.

## COUNT XVII
## PERSONAL INJURY BASED ON STRICT LIABILITY
### (Against All Defendants Except Santa Barbara Estates)

311.    Plaintiffs and Class Members adopt and restate  paragraphs 1-82 and 85-151 as if fully set forth herein.

312.    At all times relevant hereto, Defendants were in the business of designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

313.    The drywall, including that installed in the homes of Plaintiffs and Class Members were placed by Defendants in the stream of commerce.

314.    Defendants knew that the subject drywall would be used without inspection for defects by consumers.

315.    Defendants intended that the drywall reach the ultimate consumer, such as Plaintiffs and Class Members, and it indeed reached Plaintiffs and Class Members when it was installed in their homes.

316.    When installed in the Plaintiffs and Class Members' homes, the drywall was in substantially the same condition it was when Defendants manufactured, sold, and/or delivered it.

317.    At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendants, and in accordance with the Defendants' directions and instructions.

318.    The subject drywall was not misused or altered by any third parties, Plaintiffs or Class

Members.

319.    The drywall was defectively manufactured, designed, inspected, tested, marketed,

distributed, and sold.

320.    The design defect was in designing drywall that allowed high levels of sulfur and/or other

chemicals to emit through off-gassing that caused Plaintiffs and Class Members' bodily

injury.

321.    The manufacturing defect was in improperly selecting, testing, inspecting, mining,

making, assembling, and using, gypsum for drywall with levels of sulfur that were too high

and emitted various sulfide gases and/or other chemicals through "off-gassing" that creates

noxious, "rotten egg-like" odors for drywall that caused Plaintiffs and Class Members'

bodily injury.

322.    The drywall was also defective because it was improperly exported, imported,

distributed, delivered, supplied, inspected, marketed, and/or sold in a defective condition, as

described above.

323.    The defective manufacturing, designing, inspecting, testing, marketing, distributing, and

selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and

to the Plaintiffs and Class Members.

324.    The drywall is also defective and unreasonably dangerous because Defendants failed to

adequately warn and instruct the Plaintiffs and Class Members of the defective design,

inspection, testing, manufacturing, marketing, and selling of the drywall.

325.    Plaintiffs and Class Members were unaware of the unreasonably dangerous propensities

and defective condition of the drywall, nor could Plaintiffs and Class Members, acting as a

reasonably prudent people discover that Defendants' drywall was defective, as set forth herein, or perceive its danger.

326.    Defendants' defective drywall was much more dangerous and harmful than expected by the average consumer and by Plaintiffs and Class Members.

327.    Defendants' defective drywall benefit to Plaintiffs and Class Members, if any, was greatly outweighed by the risk of harm and danger to them.

328.    As a direct and proximate result of the Defendants' acts and omissions, Plaintiffs and Class Members suffered bodily injury, exacerbation of a pre-existing condition, allergies, rashes, nosebleeds, respiratory problems, shortness of breath, pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical care and rehabilitation.  These losses are permanent and continuing in nature and Plaintiffs and Class Members will continue to suffer these losses in the future.

WHEREFORE Plaintiffs, on behalf of all others similarly situated and the Class, demand:

  a.   an order certifying the case as a class action;

  b.   an order appointing Plaintiffs as the Class Representatives of the Class;

  c.   an order appointing undersigned counsel and their firms as counsel for the Class;

  d.   compensatory damages;

  e.   post-judgment interest;

  f.   an award of attorneys' fees to class counsel based upon a common fund theory as allowed by Federal law, for the benefits conferred upon the Class and/or as allowed by contract or statute;

  g.   an award of taxable costs; and,

  h.   any and all such further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs individually and on behalf of the Class Members, hereby demand a trial by jury as to all issues so triable as a matter of right.

Respectfully submitted,

Dated:  January 25, 2011

/s/ Arnold Levin
Arnold Levin, Esquire
Fred S. Longer, Esquire
Matthew C. Gaughan, Esquire
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
*Counsel for Individual Representative Plaintiffs and the Class*

Ervin A. Gonzalez
Patrick S. Montoya
COLSON HICKS EIDSON COLSON MATTHEWS
MARTINEZ GONZALEZ KALBAC & KANE
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-476-7400
Fax: (305) 476-7444
*Counsel for Individual Representative Plaintiffs and the Class*

Richard Serpe, Esquire
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com
*Counsel for Individual Representative Plaintiffs and the Class*

Michael D. Hausfeld, Esquire
Richard S. Lewis, Esquire

James J. Pizzirusso, Esquire
Faris Ghareeb, Esquire
HAUSFELD LLP
1700 K Street, N.W., Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
*Counsel for Individual Representative Plaintiffs and the Class*

## OF COUNSEL TO PLAINTIFFS (PLAINTIFFS' STEERING COMMITTEE)

Russ M. Herman
*Liaison Counsel MDL 2047*
Leonard A. Davis
Stephen J. Herman
HERMAN, HERMAN KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com

Arnold Levin
*Plaintiffs' Lead Counsel MDL 2047*
Fred S. Longer
Matthew C. Gaughan
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

Daniel E. Becnel, Jr.
BECNEL LAW FIRM LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Ben W. Gordon, Jr.
LEVIN, PAPANTONIO, THOMAS, MITHCELL,
ECHSNER & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Richard Serpe, Esquire
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

Hugh P. Lambert
LAMBERT & NELSON
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Bruce William Steckler
BARON & BUDD, P.C.
3102 Oak Lawn Ave., Suite 1100

James Robert Reeves
LUMPKIN & REEVES
160 Main Street

Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Gerald E. Meunier
GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmenunier@gainsben.com

Jerrold Seth Parker
PARKER, WAICHMAN, ALONSO LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
jerry@yourlawyer.com

Dawn M. Barrios
BARRIOS, KINGSDORF & CATEIX, LLP
701 Poydras Street, Suie 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (305) 524-3313
barrios@bkc-law.com

Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
SEEGER WEISS, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@aseegerweiss.com

Scott Wm. Weinstein
MORGAN & MORGAN
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkp@lewis-roberts.com

Robert Josefsberg
PODHURST ORSECK, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Jeremy W. Alters
Alters Law Firm, P.A.
4141 NE 2nd Ave., Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@abbrclaw.com

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W., Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeldllp.com