# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | : | **MDL NO. 2047** |
| **IN RE: CHINESE MANUFACTURED DRYWALL** | : |  |
| **PRODUCTS LIABILITY LITIGATION** | : | **SECTION:  L** |
|  | : |  |
|  | : | **JUDGE FALLON** |
|  | : | **MAG. WILKINSON** |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. :

**This Document Relates to Cases: 09-6072, 09-7393, 10-688, 10-792, 10-929, 10-930, 10-931, 10-1420, 10-1693, 10-1828.**

## ORDER & REASONS

Before the Court are the following motions filed by homeowners' insurance carriers

(collectively referred to as the "Insurers"):

> (1) Allstate Insurance Company's ("Allstate") Motion to Dismiss (R. 4472);
> (2) ASI Lloyds' Rule 12(c) Motion for Judgment on the Pleadings (R. 4462);
> (3) Auto Club Family Insurance Company's ("Auto Club") Rule 12(b)(6) Motion to Dismiss (R. 4651);
> (4) Federal Insurance Company's ("Federal") Rule 12(b)(6) Motion to Dismiss (R. 4459);
> (5) Property & Casualty Insurance Company of Hartford's ("Hartford") Motion for Judgment on the Pleadings (R. 4494);
> (6) Homesite Insurance Company's ("Homesite") Rule 12(b)(6) Motion to Dismiss (R. 4464);
> (7) The Standard Fire Insurance Company's ("Standard") Rule 12(b)(6) Motion to Dismiss (R. 4467);
> (8) State Farm Fire & Casualty Company and State Farm General Insurance Company's (collectively referred to as "State Farm") Rule 12(b)(6) Motion to Dismiss (R. 4503);
> (9) USAA Casualty Insurance Company's ("USAA") Motion to Dismiss (R. 4515);
> (10) USAA's Motion to Dismiss (R. 3251).

As to these motions, the Court has received extensive briefing and heard from the parties on oral

argument.  The Court has considered the arguments raised therein, as well as the applicable facts

and law, and is now prepared to rule on the motions.

**Exhibit B**

## I.    BACKGROUND

The present matter arises from the manufacture, distribution, sale, and installation of Chinese-manufactured drywall which is contained in homes owned or occupied by the Plaintiffs. Plaintiffs have filed suit against the manufacturers, distributors, sellers, and installers of the Chinese drywall, as well as others in the chain of commerce, and their insurers, alleging this drywall emits foul odors and damages metal and electronic elements and devices in their homes. These suits, among many others, comprise MDL 2047, *In re: Chinese-manufactured Drywall Products Liability Litigation*, and do so because of the commonality of facts involved.  As the MDL transferee Court, this Court has appointed steering committees, issued numerous pretrial orders, monitored discovery and depositions, held monthly status conferences, issued decisions on numerous motions, and, most notably, resolved ten bellwether cases from Virginia and Louisiana.

A number of these Plaintiffs have procured homeowners' insurance and sought coverage thereunder for the damages wrought on their homes by the Chinese drywall.  Accordingly, homeowners' insurers were brought into the litigation directly by the Plaintiffs or on their own in declaratory judgment actions.  Many of these homeowners' insurers have since filed dispositive motions seeking relief from the litigation.

The Court, determining it was an appropriate time in the MDL litigation, issued an Order establishing a briefing and hearing schedule for the dispositive motions filed by homeowners' insurers whose coverage is in dispute.  (R. 4300).  This Order scheduled a hearing on these motions, with oral argument, on September 2, 2010.  *Id.*  Ten motions were set for hearing and/or filed in response to this Order and are listed above; eight are Federal Rule of Civil

2

Procedure Rule 12(b)(6) motions to dismiss, and two are Rule 12(c) motions for judgment on the pleadings. The Court will address these motions collectively, first stating the standard of review for Rule 12(b)(6) and Rule 12(c) motions, then the law on interpretation of insurance policies, and thereafter, identify and discuss the common legal issues raised and the applicable policy language and facts alleged.

## II. STANDARD OF REVIEW

Both a Rule 12(b)(6) motion to dismiss and a Rule 12(c) motion for judgment on the pleadings are subject to the same standard of review. *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 313 (5th Cir. 2002). When reviewing these motions, courts must accept all well-pleaded facts as true and view them in the light most favorable to the non-moving party. *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "'To survive [these motions], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Gonzales v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009)(quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)). The moving party bears the burden of showing that "plaintiff can prove no set of facts consistent with the allegations in the complaint which would entitle it to relief." *Baton Rouge Bldg. & Constr. Trades Council AFL-CIO v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir. 1986). The reviewing court "must accept all well-pleaded factual allegations in the light most favorable to the non-moving party." *Am. Waste & Pollution Control Co. v. Browning Ferris Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991). Conclusory allegations or legal conclusions, however, will not suffice to defeat these motions. *See Fernandez-Montes v. Allied Pilots Ass'n*,

3

987 F.2d 278, 284 (5th Cir.1993).

As a general rule, in considering a Rule 12(b)(6) motion to dismiss and a Rule 12(c) motion for judgment on the pleadings, a district court must limit itself to the facts stated in the complaint. However, there are several exceptions to this rule. For example, a court may also consider documents that a defendant attaches to the motion which are referred to in the plaintiff's complaint and central to the claims therein. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). In the present matter, the homeowners' insurance policies are attached to the motions, *see* (R. 3251, 4459, 4462, 4464, 4467, 4472, 4494, 4503, 4515, 4651), and are central to the coverage claims in the complaints; thus, the Court may consider these policies in resolving the present motions. *See e.g. In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

Additionally, a court, in reviewing these motions, may consider matters of which judicial notice may be taken. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)(citing 5B Wright & Miller § 1357 (3d ed. 2004 & Supp. 2007)). In particular, a court may take judicial notice of items in the record of the case, related cases, and matters of public record, in reviewing a motion to dismiss and/or motion for judgment on the pleadings. *See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244 (3d Cir. 2006); *Kourtis v. Cameron*, 419 F.3d 989 (9th Cir. 2005); *Rodi v. S. New England Sch. of Law*, 389 F.3d 5 (1st Cir. 2004); *Ratcliff v. Rainwater*, 93 F. App'x 623 (5th Cir. 2004); *Gordon v. Impulse Mktg. Group, Inc.*, 375 F.Supp.2d 1040 (E.D. Wash. 2005); *Douris v. Dougherty*, 192 F.Supp.2d 358 (E.D. Pa. 2002); *French v. Chosin Few, Inc.*, 173 F.Supp.2d 451(W.D.N.C. 2001). For purposes of the present motions, the Court exercises its discretion to take judicial notice of the Omnibus

4

Complaints in which the Plaintiffs are named in addition to their individual complaints.

## III.   LAW ON INTERPRETATION OF CONTRACTS

All of the motions before the Court involve the interpretation of coverage-related

provisions in homeowners' insurance policies issued to Louisiana Plaintiffs and/or on Louisiana

homes which contain Chinese-manufactured drywall.  Since these contracts were issued to

Louisiana homeowners on Louisiana properties, the Court must look to the substantive law of

Louisiana to interpret these contracts.  *See Erie R.R. Co. v. Thompkins*, 304 U.S. 64, 78 (1939);

*see e.g. In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007); *Trinity Indus.,*

*Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 269 n. 4 (5th Cir. 1990).

The Louisiana Supreme Court has provided the following guidance to courts in

interpreting insurance policies,

> An insurance policy is a contract between the parties and should be construed by using
> the general rules of interpretation of contracts set forth in the Louisiana Civil Code.  The
> judiciary's role in interpreting insurance contracts is to ascertain the common intent of
> the parties to the contract.
>
> Words and phrases used in an insurance policy are to be construed using their plain,
> ordinary and generally prevailing meaning, unless the words have acquired a technical
> meaning.  An insurance contract, however, should not be interpreted in an unreasonable
> or strained manner under the guise of contractual interpretation to enlarge or to restrict its
> provisions beyond what is reasonably contemplated by unambiguous terms or achieve an
> absurd conclusion.  The rules of construction do not authorize a perversion of the words
> or the exercise of invention powers to create an ambiguity where none exists or the
> making of a new contract when the terms express with sufficient clearness the parties'
> intent.
>
> Ambiguous policy provisions are generally construed against the insurer and in favor of
> coverage.  Under this rule of strict construction, equivocal provisions seeking to narrow
> an insurer's obligation are strictly construed against the insurer.  That strict construction
> principle applies only if the ambiguous policy provision is susceptible to two or more
> *reasonable* interpretations; for the rule of strict construction to apply, the insurance
> policy must be not only susceptible to two or more interpretations, but each of the
> alternative interpretations must be reasonable.

If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written. Courts lack the authority to alter the terms of the insurances contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms. The determinations of whether a contract is clear or ambiguous is a question of law. *Cadwallader v. Allstate Ins. Co.*, 2002-1637, pp. 3-4 (La. 6/27/03); 848 So. 2d 577, 580 (internal citations omitted).

The homeowners' policies at issue in the present motions are "all risk" policies. *See* Lee R. Russ, 10A Couch on Ins. § 148:50 (3d ed. 2010). An "all risk" policy is an insurance policy where all risks are covered unless clearly and specifically excluded. *See Dawson Farms, LLC v. Millers Mut. Fire Ins. Co.*, 34,801, p. 3(La. App. 2 Cir. 8/1/01); 794 So. 2d 949, 951. With regard to insurance policy coverage and exclusions, the Louisiana Supreme Court provides, "[a]lthough the insured bears the burden of proving a policy of insurance affords coverage for an incident, the insurer bears the burden of proving the applicability of an exclusionary clause within a policy." *Jones v. Estate of Santiago*, 2003-1424, p. 12 (La. 4/14/04); 870 So. 2d 1002, 1010 (citing *Doerr v. Mobil Oil Corp.*, 2000-0947, p. 5 (La. 12/19/00); 774 So. 2d 119, 124, *modified on other grounds on reh'g*, 00-0947 (La. 3/16/01); 782 So. 2d 573)); *see also Blackburn v. Nat. Union Fire Ins. Co. of Pittsburgh*, 2000-2668, p. 6 (La. 4/3/01); 784 So. 2d 637, 641 ("The insurer bears the burden of proving the applicability of an exclusionary clause within a policy"); *La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So. 2d 1250, 1252 (La. 1993)("The insurer has the burden of proving that a loss comes within a policy exclusion"); Russ, 10A Couch on Ins. § 148:52 (3d ed. 2010). Furthermore, "[p]olicy exclusions must be clearly stated. Any ambiguity in an insurance policy's exclusions is construed to afford coverage." *La. Maint. Servs.*, 616 So. 2d at 1252; *see also Yount v. Maisano*, 627 So. 2d 148, 151 (La. 1993)("Any ambiguity in an exclusion should be narrowly construed in favor of coverage").

6

## IV.     LAW & ANALYSIS OF COMMON ISSUES

As mentioned above, there are ten motions involving the Plaintiffs' homeowners'
insurance coverage before the Court.  The Court has identified the following common issues
raised by the motions: (1) coverage for losses to the Plaintiffs' homes, (2) coverage exclusion
provisions, (3) ensuing loss exception to coverage exclusions, (4) coverage for the Plaintiffs'
other losses, (5) bad faith, breach of the duty of good faith, and misrepresentation claims against
the Insurers, (6) value policy law claims against the Insurers, and (7) requests for injunctive
relief.  The Court will now address these issues in turn, therein summarizing the parties'
arguments on each legal issue, discussing the applicable law, and applying this law to the
policies and facts alleged in the present cases.

### A.     Coverage for Losses to the Plaintiffs' Homes

Although the language varies, all the homeowners' insurance policies at issue provide
coverage to the Plaintiffs for "physical loss" to their homes.  Homesite, Standard, and Auto Club
utilize ISO forms and thus, contain the same language in their homeowners' policies.  This
language requires the physical loss to be "direct."  Hartford and USAA's homeowners' policies
also require the physical loss to be "direct."  ASI Lloyds and Allstate's homeowners' policies
require the physical loss to be "sudden," "accidental," and "direct."  Finally, State Farm's
homeowners' policy requires that the physical loss be "accidental" and "direct."  Despite these
variations in policy language, the law and facts cited by the parties regarding coverage of
physical loss caused by the Chinese-manufactured drywall in the Plaintiffs' homes is relatively
consistent and is summarized as follows.

The Insurers contend that the Plaintiffs have failed to meet their burden of alleging a

covered claim for the property damage caused by the Chinese-manufactured drywall in their homes. The Insurers cite the Fifth Circuit's definition of "physical loss" in *Trinity Industries, Inc. v. Insurance Company of North American*, 916 F.2d 267 (5th Cir. 1990), to support their contention. In *Trinity*, the Fifth Circuit stated,

> The language 'physical loss or damage' strongly implies that there was an initial satisfactory state that was changed by some external event into an unsatisfactory state-for example, the car was undamaged before the collision that dented the bumper. It would not ordinarily be thought to encompass faulty initial construction. 916 F.2d at 270-71.

Based upon this definition, and subsequent cases which have relied upon this definition, the Insurers contend that since the Chinese-manufactured drywall in Plaintiffs' homes was installed in an "unsatisfactory" state and was not rendered unsatisfactory by an "external event," the Plaintiffs are not entitled to homeowners' insurance coverage for the damage caused by the Chinese drywall in their homes. The Insurers also contend that Plaintiffs who allege that the Chinese drywall in their homes is not damaged or defective with respect to its function as drywall have admitted that the damage caused by the Chinese-manufactured drywall does not constitute a physical loss for purpose of homeowners' insurance coverage. Finally, those Insurers with policies requiring the damage to be "sudden" and/or "accidental" contend that the Plaintiffs' complaints allege the damage caused by the Chinese-manufactured drywall has occurred over time and is not the result of an accident.

In response, the Plaintiffs contend that they have properly alleged a covered loss caused by the Chinese drywall in their homes. Plaintiffs note that their complaints contain allegations that Chinese-manufactured drywall has caused physical loss and damage to their homes, the covered properties, by emitting compounds that cause rapid corrosion, as well as odorous gases. Plaintiffs argue that because these allegations must be taken as true for the purpose of the present

8

motions, they have satisfied their burden of showing a covered loss, and now the burden is
shifted to the Insurers to prove an exclusion.  Plaintiffs also contend that they have a very light
burden of proving a covered loss under the all-risks policies at issue.

The homeowners' insurance policies do not define "physical loss," nor "direct,"
"accidental," or "sudden" as these terms apply to "physical loss."  Under Louisiana law,
"[w]ords and phrases used in an insurance policy are to be construed using their plain, ordinary
and generally prevailing meaning, unless the words have acquired a technical meaning."
*Cadwallader*, 2002-1637 at pp. 3-4; 848 So. 2d at 580.  The Louisiana Supreme Court has yet to
provide a definition for any of these terms in the context of a homeowners' insurance policy.
However, Couch on Insurance provides,

> The requirement that the loss be 'physical,' given the ordinary definition of that term is
> widely held to exclude alleged losses that are intangible or incorporeal, and, thereby, to
> preclude any claim against the property insurer when the insured merely suffers a
> detrimental economic impact unaccompanied by a distinct, demonstrable, physical
> alteration of the property.  Russ, 10A Couch on Ins. § 148:46 (3d ed. 2010).

Similarly, the Merriam-Webster Dictionary defines "physical" as "having material existence:
perceptible through the senses," and defines "loss" as "destruction, ruin" and "the amount of an
insured's financial detriment by death or damage that the insurer is liable for."  The Free
Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary (last visited Oct. 18,
2010).  In the present cases, the Chinese-manufactured drywall has caused a "distinct,
demonstrable, physical alteration" of the Plaintiffs' homes (the covered properties) by corroding
the silver and copper elements in the homes, often to the point of causing total or partial failure
in electrical wiring and devices installed in the homes, as well as by emitting odorous gases.
Thus, these definitions suggest that the Chinese drywall-related losses are covered.

Furthermore, while the mere presence of a potentially injurious material in a home may not qualify as a covered physical loss for purposes of homeowners' insurance policies, when these types of materials are activated, for example by releasing gases or fibers, courts have held there exists a covered physical loss. *See e.g. Port Auth. v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2002)(holding the mere presence of asbestos in an insured building does not constitute a physical loss); *Great N. Ins. Co. v. Benjamin Franklin Fed. Sav. & Loan Ass'n*, 793 F.Supp. 259 (D. Or. 1990), *aff'd per curiam*, 953 F.2d 1387 (9th Cir. 1992)(holding the mere presence of asbestos in an office building does not constitute a direct physical loss); *Pirie v. Fed. Ins. Co.*, 696 N.E.2d 553 (Mass. App. Ct. 1998)(holding lead paint in a home, absent peeling or chipping paint, or paint dust, does not constitute a physical loss*); cf. Sentinel Mgmt. Co. v. Aetna Cas. & Surety Co.*, 563 N.W.2d 296 (Minn. App. 1997)(holding the release of asbestos fibers in a building constituted physical loss*); Bd. of Educ. v. Int'l Ins. Co.*, 720 N.E.2d 622 (Ill. App. Ct. 1999)(holding asbestos contamination, i.e., release of asbestos fibers, in a building constituted a physical loss); *Farmers Ins. Co. v. Trutanich*, 858 P.2d 1332 (Or. Ct. App. 1993)(holding the saturation of an insured dwelling by methamphetamine fumes constituted a physical loss); *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 1332 (Colo. 1968)(holding the infiltration of a church by gas fumes constituted a physical loss). A number of these cases made their coverage determinations at least partially based upon whether the material rendered the property useless and/or uninhabitable. *See Port Authority*, 311 F.3d at 236; *Sentinel Mgmt.*, 563 N.W.2d at 300-01. Additionally, at least one of these cases, *Trutanich*, held that the odor caused by the material constitutes a physical loss. 123 Or.App. At 9-10; *accord Essex v. BloomSouth Flooring Corp.*, 562 F.3d 399, 406 (1st Cir. 2009)(applying Massachusetts law to find that unpleasant

10

odor constituted a physical injury to property). Here, the Chinese-manufactured drywall is not merely laying dormant in the Plaintiffs' homes, but rather is releasing elemental sulfur gases throughout the homes. Furthermore, the Chinese-manufactured drywall renders the Plaintiffs' homes useless and/or uninhabitable due to the damage to the electrical wiring, appliances, and devices, as well as the ever-present sulfur gases. Thus, the factual situation is more akin to the latter cases, weighing in favor of coverage.

Moreover, at least one court has already held that the presence of Chinese-manufactured drywall in a home constitutes a physical loss under a homeowners' insurance policy. In *Travco Insurance Co. v. Ward*, 2010 WL 2222255 (E.D. Va. June 3, 2010), the Eastern District of Virginia held that the plaintiffs' home suffered a "direct physical loss" due to the Chinese-manufactured drywall therein, and thus, the cost of removing and replacing the drywall was within coverage. The court reasoned, looking at cases both within and outside its jurisdiction, that for coverage, "physical damage to the property is not necessary, at least where the building in question has been rendered unusable by physical forces," and held based thereon that the damage caused by the Chinese-manufactured drywall in the plaintiffs' home constituted a direct physical loss because it rendered the home unusable and uninhabitable. *Id*.

In the present cases, the Court takes note that the insurance policies all define "property damage" to include loss of use of tangible property. *See* (R. 3251-2, p. 23 (USAA policy); 4472-2, p. 40 (Allstate policy); 4462-5, p.11 (ASI Lloyds policy); 4651-2, p. 31 (Auto Club policy); 4459-4, p. 6 (Federal policy); 4494-2, p. 32 (Hartford policy); 4464-2, p. 6 (Homesite policy); 4467-2, p. 23 (Standard policy); 4503-3, p. 8 (State Farm policy); 4515-3, p. 27 (USAA policy)). The Court is required to interpret each provision in a contract in light of other provisions, so that

11

each is given the meaning suggested by the contract as a whole.  La. Civ. Code art. 2050;

*Coleman v. School Bd. of Richland Parish*, 418 F.3d 511, 517 (5th Cir. 2005).  Accordingly, the

Court finds that the inclusion of "loss of use" as a type of property damage in the policies

suggests that the damage caused by the Chinese-manufactured drywall in Plaintiffs' homes

constitutes a covered physical loss since the drywall prevents the Plaintiffs from fully using and

enjoying their homes.

      As discussed above, the Insurers urge the Court to follow the Fifth Circuit's definition of

"physical loss" in *Trinity*.  However, *Trinity* is distinguishable from the present matter since it

involved a builders' risk policy issued for a vessel, and the issue raised therein was whether an

arbitration award involving a faulty workmanship claim constituted a physical loss under the

builders' risk policy.  None of these facts are present in the instant motions.  Moreover, a

builder's risk insurance policy is different in nature and purpose from a homeowners' policy.

*See generally* Russ, Couch on Ins. §§ 1:2, 1:53 (3d ed. 2010).  The same concerns are not at

issue when a vessel, versus a home, is the insured property; insurance on a vessel involves a

commercial interest while the interest in one's home is deeply personal.  Furthermore, in the 20

years since *Trinity* was decided, no court has applied its definition for physical loss under a

homeowners' insurance policy dispute governed by Louisiana law.[1]  The Court sees no reason to

do so here.

---

     [1]The only cases which have cited and relied upon the *Trinity* definition of physical loss
have done so in the context of: a commercial general liability policy, *see XL Specialty Ins. Co. v.
Bollinger Shipyards, Inc.*, 2002 WL 373293 (E.D. La. Mar. 7, 2002), a property insurance
dispute governed by Mississippi law involving the alleged theft of natural gas, *see Hartford Ins.
Co. v. Miss. Valley Gas Co.*, 181 F. App'x 465 (5th Cir. 2006), and an ocean marine insurance
policy coverage dispute involving coverage for a coffee inventory.  *See Fireman's Fund Ins. Co.
v. Cmty. Coffee Co., LLC*, 2007 WL 1076790 (E.D. La. Apr. 9, 2007).  None of these cases are
factually and/or legally similar to the present matter.

The Court finds, based upon the foregoing analysis, that the alleged damages to Plaintiffs' homes caused by Chinese drywall constitute a covered "physical loss" for purposes of their homeowners' policies. However, a number of the policies at issue also require for purposes of coverage, that the "physical loss" be "direct" "sudden," and/or "accidental." Again the policies do not define these terms; thus, the Court must construe them "using their plain, ordinary and generally prevailing meaning." *Cadwallader*, 2002-1637 at pp. 3-4; 848 So. 2d at 580.

First turning to "direct," the Court looks to *Milton v. Main Mutual Insurance Co.*, 261 So. 2d 723, 725 (La. App. 1972), for the holding that "direct" as used in insurance policies has essentially the same meaning as proximate cause in negligence cases. *See also* Russ, 11 Couch on Ins. § 153:13 (3d. ed. 2010). Since the Plaintiffs allege that the damage to their homes is solely caused by or the result of the Chinese drywall, the drywall constitutes the proximate cause of the losses. Accordingly, this damage is "direct" "physical loss," and covered by the homeowners' policies issued by Homesite, Standard, Auto Club, Hartford, and USAA, all of which require direct physical loss for coverage.

State Farm's homeowners' insurance policy requires that the direct physical loss also be "accidental" in order for coverage to apply. Under Louisiana jurisprudence, the term "accidental" as used in a homeowners' insurance policy has been characterized as follows,

> 'However, "accident," in the legal signification, is more difficult to define. It is not a technical legal term with a clear-defined meaning. It denotes, however, an event which proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore, unexpected, or an event happening by chance, without any human agency, or, if happening through human agency, an event which, under the circumstances, is unusual or unexpected to the person to whom it happens, and is thus distinguished from an act committed willfully or intentionally.' *Primm v. State Farm Fire & Cas. Co.*, 426 So. 2d 356, 359-60 (La. App. 2 Cir. 1983)(quoting *Velotta v. Western Fire Ins. Co.*, 121 So. 2d

13

857, 858 (La. App. 2 Cir. 1960)).

Applying this definition to the present case involving the State Farm policy, the Court finds that the "physical loss" caused by the Chinese drywall in the Plaintiffs' homes is "accidental" for purposes of coverage.  The allegations in the complaint indicate that the damage caused by the Chinese drywall was "unusual," "unexpected," and not the result of any willful or intentional act. Thus, State Farm's policy provides coverage for the accidental physical loss caused by the Chinese-manufactured drywall in its insureds' homes.

ASI Lloyds and Allstate's homeowners' insurance policies require that the direct physical loss be "sudden and accidental" for coverage to apply.  The Court has discussed the definition of "accidental" physical loss under a homeowners' insurance policy in the preceding paragraph.  The Court now must determine whether the loss caused by the Chinese drywall in the ASI Lloyds and Allstate's insureds' homes was also "sudden."  Louisiana jurisprudence defines "sudden" for purposes of a homeowners' insurance policy as follows,

> The Random House Dictionary of the English Language, Unabridged 1966 Edition, defines 'sudden' as 'happening, coming, made or done quickly, without warning, or unexpectedly:...occurring without transition from the previous form, state, etc.; abrupt.' Thus both unexpected and abrupt events can be said to be sudden events.  A sudden event may occur quickly even though it may have been expected, as in the case of a sudden change in the weather; or 'sudden' may connote an event of which there had been no anticipation but which nevertheless is not abrupt. *Primm,* 426 So. 2d at 359.

Additionally, Louisiana jurisprudence defines the meaning of both "sudden" and "accidental" for purposes of a homeowners' insurance policy as follows,  "it appears that the critical phrase 'sudden and accidental' means an event which is either abrupt (though expected), or unexpected. Also the event must occur from an unknown cause or be an unusual result of a known cause." *Id*. at 360.  Given these definitions, the Court finds that the damage caused by Chinese drywall in

14

the homes of Plaintiffs' insured under ASI Lloyds and Allstate's homeowners' policies

constitutes covered "accidental," "sudden," "physical," "loss."  These Plaintiffs' allegations

indicate that the damage caused by the Chinese drywall was "unexpected," "unknown," and

"unusual."  The Court must accept these allegations as true for the purposes of the present issue.

### B.    Coverage Exclusion Provisions

Now that the Court has determined that all of the homeowners' insurance policies at issue

provide coverage for the damage caused by the Chinese-manufactured drywall in the Plaintiffs'

homes, the next issue to address is the coverage exclusions in the policies.

As a threshold matter, Plaintiffs argue that the Court may not consider the Insurers'

arguments for application of the coverage exclusions because these arguments constitute

affirmative defenses which should not be considered at this stage of the litigation.  In response,

the Insurers contend that courts regularly grant insurers' motions to dismiss on the basis of

policy exclusions, and that the Court should consider these exclusions because the allegations in

the complaints invoke the exclusions.

A complaint may be subject to dismissal when its allegations indicate the existence of an

affirmative defense that will bar the award of any remedy, but only if the defense is clearly

indicated on the face of the complaint.  *See EPCO Carbon Dioxide Prods., Inc. v. JP Morgam

Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006)("Although dismissal under rule 12(b)(6)

may be appropriate based upon a successful affirmative defense, that defense must appear on the

face of the complaint"); Alan Wright & Arthur R. Miller, 5B Fed. Prac. & Proc. Civ. § 1357 (3d

ed. 2010).  After reviewing the Plaintiffs' complaints, the Court finds that the allegations therein

raise questions as to the applicability of the coverage exclusions.  Moreover, courts in this circuit

routinely consider policy exclusions in resolving motions to dismiss. *See e.g. In re Katrina Canal Breaches Litig.,* 495 F.3d 191 (5th Cir. 2007)(reviewing district court's order on motions to dismiss and motions for judgment on the pleadings based upon flood exclusions in homeowners' and commercial insurance policies); *Tuepker v. State Farm Fire & Cas. Co.,* 507 F.3d 346 (5th Cir. 2007)(considering on appeal whether water damage coverage exclusion applicable after denial of motion to dismiss); *Mendler v. Derouen,* 2008 WL 5423489 (E.D. La. Dec. 29, 2008)(considering faulty workmanship coverage exclusion raised on motion to dismiss). Accordingly, the Court finds it appropriate to address the Insurers' coverage exclusion arguments in the present motions, and begins its discussion thereof.

As noted above, under Louisiana law, once the insured bears its burden of proving coverage for a loss, the burden is shifted to the insurer to prove that this coverage is excluded by an applicable coverage exclusion provision in the policy. *Jones,* 2003-1424 at p. 12; 870 So. 2d at 1010. Additionally, any ambiguity in a coverage exclusion provision is construed to afford coverage. *La. Maint. Servs.,* 616 So. 2d at 1252. The coverage exclusion provisions at issue in the present motions are: (1) latent defect, (2) faulty materials, (3) corrosion, (4) pollution and/or contamination, and (5) dampness and/or temperature.

1.    *Coverage Exclusion-Latent Defect*

All of the homeowners' insurance policies at issue in the present motions exclude coverage for loss caused by latent defects. The Insurers contend that these provisions are applicable to the Plaintiffs' claims and thus, Plaintiffs are not entitled to coverage for the damage caused to their homes by Chinese-manufactured drywall. The Insurers rely upon *Nida v. State Farm Fire & Casualty Co.*, 454 So. 2d 328 (La. Ct. App. 1984), and *Travco*, 2010 WL 2222255,

16

to support this contention.  The Insurers cite the definition of latent defect in *Nida* which is "'a defect that is hidden or concealed from knowledge as well as from sight and which a reasonable customary inspection would not reveal.'" 454 So. 2d at 335.  The Insurers claim, based upon this definition, that since the Plaintiffs allege they did not realize that the problems in their homes were caused by Chinese drywall until they were notified by the media or otherwise, the Chinese drywall-related damage is excluded as a latent defect.  The Insurers further claim their position is consistent with the finding in *Travco*, 2010 WL 3333355, at *11, that the latent defect exclusion applies to losses caused by Chinese drywall.  The Insurers distinguish the finding by the Civil District Court for the Parish of Orleans in *Finger v. Audubon Insurance Co.,* 2009-08071 (La. Civ. D. Ct. 3/22/10); 2010 WL 1222273, that the latent defect exclusion does not apply to damages caused by Chinese drywall, on the basis that the exclusion in *Finger* is narrower than those presently at issue.

In response, the Plaintiffs contend that the latent defect exclusion does not bar their claims for damage to their homes caused by Chinese drywall.  Plaintiffs emphasize that the Insurers bear the burden of establishing the applicability of the latent defect exclusion, and that insurance policies should be construed to effect, and not deny coverage.  Plaintiffs rely upon Merriam-Webster's definition of latent defect, "present and capable of becoming though not now visible, obvious, active or symptomatic," as the appropriate definition of latent defect. Additionally, the Plaintiffs claim the insurance industry has defined latent defect as "a quality within an object which makes it tend to destroy itself," and contend that since the Chinese drywall is not destroying itself, there is no latent defect.  Finally, Plaintiffs urge the Court to consider the similar maritime definition of the latent defect exclusion, the self-destruction of an

17

item, such as rotting fruit, in reaching its decision.

None of the policies at issue in the present motions contain a definition of latent defect.

However, under Louisiana jurisprudence,

> The term 'latent defect' was defined in *Walker v. Travelers Indemnity Company*, 289 So. 2d 864 (La. App. 4 Cir. 1974) as follows:  'A latent defect is a hidden defect and generally involves the material out of which the thing is constructed.'...Our examination of the jurisprudence of other states and federal cases...reveals that our definition of latent defect...is incomplete.  A latent defect is defined by Black's Law Dictionary, 4th Ed., as a defect which a reasonably careful inspection would not reveal or a defect that could not have been discovered by any known or customary test.  A latent defect is a defect which is not apparent and which would not be discoverable upon reasonable inspection.  Latent defect means a defect not manifest, but hidden or concealed and not visible or apparent; a defect hidden from knowledge as well as from sight, and specifically a defect which reasonable inspection will not reveal.  The court in *Walker* went on to conclude that a proper definition of latent defect is 'a defect that is hidden or concealed from knowledge as well as from sight and which a reasonable customary inspection would not reveal.' *Nida v. State Farm Fire & Cas. Co.*, 454 So. 2d 328, 335 (La. App. 3 Cir. 1984)(internal citations omitted).

The case from which this definition is cited, *Nida v. State Farm Fire & Casualty Co.*, 454 So. 2d 328, applied the definition to a claim under a homeowners' insurance policy for a cracked foundation and walls in a home caused by shrinkage and expansion of the clay soil on which the home was built.  The court held that because the foundation was not properly constructed to withstand the fluctuations of the clay soil in the area, the foundation contained a vice which falls under the definition of the latent defect exclusion.  *Nida*, 454 So. 2d at 335.  Thereafter, *Shields v. Pennsylvania General Insurance Co.*, 488 So. 2d 1252, 1255 (La. App. 4 Cir. 1986), distinguished *Nida*, holding that the dropping corner of a home, as well as the separation of bricks and window casement, caused by soil consolidation underneath the home, did not constitute a latent defect.  The court reasoned that the failure to include pilings in the foundation did not constitute a latent defect because, when the home was initially constructed, there was no

18

need for pilings in the foundation to withstand the soil consolidation; the need for the pilings came years later. *Id*.

While *Nida* and *Shields* involve foundation defects, *Finger*, 2010 WL 1222273, and *Travco*, 2010 WL 2222255, are factually on point with the present motions. However, the difficulty in relying upon these cases for guidance is that they employ different legal precepts and reach diametrically opposed conclusions. In *Finger*, the Civil District Court for the Parish of Orleans held that the latent defect exclusion did not apply to the damages caused by the Chinese drywall in a plaintiffs' home on the theory that the drywall was not damaging or destroying itself. 2010 WL 1222273, at *7. In reaching this conclusion, the court commingled its analysis of the inherent vice exclusion and latent defect exclusion. *Id*. While the Court cited a similar definition for latent defect as in *Nida*, it appears to have only applied the inherent vice definition in reaching its conclusion. *See id*. ("Here there is no evidence that the Chinese drywall is damaging or destroying itself, indicating the 'inherent vice' or 'latent defect' language from the GLS exclusion does not apply"). In the present cases, the inherent vice exclusion is not at issue and is an entirely separate exclusion, *see* Steven Plitt, Daniel Maldonado, & Joshua Rogers, Couch on Ins. § 153:77 (3d ed. 2010)("An exclusion for 'inherent vice' relates to a loss stemming entirely from some quality within the insured property that renders the damage inevitable....A 'latent defect' has been defined as 'an imperfection in the materials used which could not be discovered by any known and customary test'"), and thus, *Finger*'s analysis and conclusion regarding the latent defect exclusion are not applicable to the present motions. The Plaintiffs' characterization of latent defect similarly commingles the definitions of latent defect and inherent vice and is misplaced for purposes of the present motions.

Conversely, in *Travco*, 2010 WL 2222255, the Eastern District of Virginia held that the damage caused by Chinese drywall in a home constituted a latent defect under the Virginia definition for latent defect of "'integral to the damaged property by reason of its design or manufacture or construction.'" 2010 WL 2222255 at *11 (quoting *U.S. West v. Aetna Cas. & Sur. Co.*, 117 F.3d 1415 (4th Cir. 1997)). The court reasoned that there existed an "inherent contradiction in arguing," as the homeowner did, that his home had "suffered a 'direct physical loss' while simultaneously maintaining that the property is not damaged." *Id*. at 12. The court, however, also found that the damage the Chinese drywall caused to the homeowner's air conditioner or garage door did not constitute a latent defect under this definition. *Id*. While the Court finds the analysis in *Travco* to be thorough and sound, nonetheless, the Court is unable to give this analysis much weight for the present motions given the different definition of "latent defect" under Virginia versus Louisiana law.

Looking further outside the jurisdiction for guidance on the applicability of the latent defect exclusion, the Court finds instructive case law. For example in *Board of Education of Maine Township High School District No. 207 v. International Insurance Co.*, 292 Ill.App.3d 14, 22 (Ill.Appp. 1 Dist. 1997), *appeal denied*, 175 Ill.2d 523 (Ill. 1997), an Illinois state appellate court held that the damage caused by the presence of asbestos in a building constituted a latent defect under a property insurance policy on the basis that, (1) the asbestos was not detectable by the naked eye, and (2) the asbestos was not apparent except with the most searching analysis. Additionally, in *Wright v. Safeco Insurance Co.*, 124 Wash.App. 263, 278 (Wash.App. Div. 1, 2004), a Washington state appellate court held that a plumbing defect that caused a fountain and washing machine to leak was not a latent defect since the insureds knew the fountain leaked

20

from the time it was first used, and an inspection of the washing machine by an engineering firm would have revealed the plumbing defect.

Considering the definition of latent defect under Louisiana law as set out in *Nida* and the limited applicable case law on the exclusion, whether or not the latent defect exclusion applies to the present cases is close call. The definition of latent defect under Louisiana law requires that the defect be hidden and not discoverable upon a reasonable, customary inspection or test. *See Nida*, 454 So. 2d at 335. The Court acknowledges, as noted by the Insurers, that the Plaintiffs were not aware that their homes contained Chinese-manufactured drywall and the damages to their homes were caused by this drywall until they learned of the problem through the media or otherwise. However, the Plaintiffs were aware before the media reports that their homes contained a foul odor, their electrical wires and components were blackened, and their electrical devices and appliances were failing. Thus, the Court must determine whether the latent defect exclusion is avoided through knowledge or discoverability of the specific *cause of defects* in an insured property or simply by the knowledge of the *defects themselves*.

In the *Nida* definition of latent defect there is no indication as to whether the insured must know or be able to discover the cause of the damage or merely the presence of the damage. In *Nida*, the court based its finding of a latent defect upon evidence showing the foundation was improperly constructed for the type of soil in the area, not upon the cracks in the slab and walls caused by the defectively constructed foundation. Similarly, in *Shields* the court reached the opposite conclusion by focusing on the foundation defects, not the sinking home, and separated bricks and window frame that resulted therefrom. These cases imply that the test for a latent defect is focused on the caused of the underlying defect, and not the results of the defect, thus

21

lending support to the Insurers's position.

Board of Education, 292 Ill.App.3d 14, and Wright, 124 Wash.App. 263, provide further guidance, though less clarity, in determining whether the latent defect exclusion is applicable. For example, in Board of Education, the court reasoned that the presence of asbestos constituted a latent defect because it could not be detected by the naked eye, only through the most searching analysis. In factual contrast, Wright reasoned that plumbing defects were not latent defects because the insured knew its fountain leaked the first time it was used and an inspection of the washing machine would have revealed the defect. As compared to the present cases, the Chinese drywall boards are not visibly detectable without examining the trademarks, which are covered by paint or wallpaper on one side, but can be viewed easily from an attic or other unfinished areas of the home. Furthermore, the damage caused by the drywall-the odor, the blackened wires and metals-are easily detectable through smell and sight. Finally, a skilled worker such as an electrician, would immediately recognize the damage to electrical wiring, devices, and appliances. These findings lend support to Plaintiffs' position that the damage caused by the Chinese drywall does not constitute a latent defect.

Given that under Louisiana law "the insurer bears the burden of proving the applicability of an exclusionary clause within a policy," Jones, 2003-1424, at p. 12; 870 So. 2d at 1010, and the Court is unable to make a definitive determination as to whether the damage caused by the Chinese drywall in the Plaintiffs' homes constitutes a latent defect, the Court finds that the Insurers have failed to meet their burden and the latent defect exclusion does not apply to the present cases.

>2.     *Coverage Exclusion-Pollution and/or Contamination*

The homeowners' insurance policies each contain language excluding from coverage losses caused by pollution and/or contamination. The language in the Homesite, Standard Fire, Auto Club, ASI Lloyds, and Hartford policies is identical. These policies exclude coverage for loss caused by "[d]ischarge, dispersal, seepage, migration, or release or escape of pollutants," unless such is caused by a covered peril. The policies define pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste."

Allstate's policy excludes from coverage, loss "consisting of or caused by...[v]apors, fumes, acids, toxic chemicals, toxic gasses, toxic liquids, toxic solids, waste materials or other irritants, contaminants or pollutants." Allstate's policy also does "not cover loss consisting of or caused by...contamination, including but not limited to the presence of toxic, noxious or hazardous gasses, chemicals, liquids, solids or other substances at the residence premises or in the air, land or water serving the residence premises."

Federal's policy does "not cover any loss caused by contamination, pollution, smog, or industrial or agricultural smoke. Nor [does it cover] the cost to extract pollutants or contaminants from land or water, or the cost to remove, restore or replace polluted or contaminated land or water." Federal's policy defines "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Federal's policy defines "contaminant" as "an impurity resulting from the mixture or contact of a substance with a foreign substance."

State Farm's policy does not insure loss "which consists of, or is directly and immediately caused by [contamination]...regardless of whether the loss occurs suddenly or

gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these."

USAA's policy does "not insure loss...caused by or consisting of...discharge, dispersal, seepage, migration, release or escape of pollutants" unless such is caused by a covered peril. USAA's policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including, smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."

The Insurers argue that the damage caused by the Chinese drywall in the Plaintiffs' homes constitutes pollution and/or contamination which is excluded from coverage. The Insurers cite the Fifth Circuit's decisions in *United National Insurance Co. v. Hydro Tank, Inc*., 497 F.3d 445 (5th Cir. 2007), and *American Casualty Co. v. A.L. Myrick*, 304 F.2d 179 (5th Cir. 1962), the Middle District's decision in *Barry Concrete, Inc. v. Martin Marietta Materials, Inc*., 531 F.Supp.2d 766 (M.D. La. 2008), and *Travco*, 2010 WL 2222255, to support their position. The Insurers criticize the finding in *Finger*, 09-8071 (La.Civ.Dist.Ct. 3/22/10); 2010 WL 1222274, that the pollution/contamination exclusion did not apply on the basis that the case relied upon therein, *Doerr v. Mobil Oil Corp*., 2000-0947 (La. 12/19/00); 774 So. 2d 119, involved a commercial liability policy and not a homeowners' policy.

In response, the Plaintiffs contend that the pollution/contamination exclusions do not apply since the damage caused by the Chinese drywall in their homes does not satisfy the definition of pollution and/or contamination under the homeowners' policies or Louisiana law. The Plaintiffs' rely upon the Louisiana Supreme Court's decision in *Doerr v. Mobil Oil Corp*., 2000-0947 (La. 12/19/00); 774 So. 2d 119, as well as, *West v. Board of Commissioners*, 591 So. 2d 1359 (La. Ct. App. 4 Cir. 1991); and *Thompson v. Temple*, 580 So. 2d 1133 (La. Ct. App. 4

24

Cir. 1991)*; and* Finger, 09-8071 (La.Civ.Dist.Ct. 3/22/10); 2010 WL 1222274, all which denied

the applicability of pollution and/or contamination exclusions, to support their position.  These

cases interpret the pollution and/or contamination exclusions as applying to environmental

pollution, which Plaintiffs contend is distinguishable from the damage caused by Chinese

drywall.  They also cite an opinion from the Louisiana Commissioner of Insurance which

expresses concern about interpreting pollution and/or contamination exclusions broadly.

The policies, for the most part, do provide definitions of the pollution and/or

contamination exclusions.  Problematically, these definitions are expansive, if not all-

encompassing.  *See* Russ, 9 Couch on Ins. § 127:6.  Fortunately, the Louisiana Supreme Court in

*Doerr v. Mobil Oil Corp.*, 2000-0947; 774 So. 2d 119, addressed the meaning and applicability

of pollution and/or contamination exclusions[2], and thus, this is where the Court begins its

analysis.

In *Doerr*, 2000-0947; 774 So. 2d 119, the Louisiana Supreme Court was presented with

the issue of whether a total pollution exclusion in a commercial liability insurance policy was

triggered by claims alleging water contamination caused by discharge from an oil refinery.  The

exclusion at issue was similar to those in the present cases, excluding from coverage "any injury

that 'would not have occurred in whole or part but for the actual, alleged or threatened discharge,

dispersal, seepage, migration, release or escape' of any 'solid, liquid, gaseous, or thermal irritant

or contaminant' at any time."  *Id.* at 124.  The Court found this provision would lead to absurd

consequences if enforced as written since it could be read to exclude any injury from a pollutant

---

[2]The Louisiana Supreme Court uses the term "total pollution exclusion" in its opinion,
but the exclusion at issue uses the term "contaminant" rather than pollutant.  Thus, the Court
interprets the *Doerr* decision as applying broadly to both pollution and contamination
exclusions.

and/or contaminant-from a release of toxic gases by a conglomerate chemical plant to a slip-and-fall on spilled gasoline at a corner service station. *Id.* Accordingly, the Court set out to determine the proper meaning and interpretation of the exclusion. *Id.* at 125. In doing so, the Court noted its previous decision in *Ducote v. Koch Pipeline, Co.*, 98-0942 (La. 1/20/99); 730 So. 2d 432, in which the Court rejected the argument that a pollution exclusion in a commercial liability insurance policy was applicable only to active industrial polluters or businesses which emit pollutants. *Id.* Thereafter, the Court conducted a searching review of the origin of the total pollution exclusion, the history of pollution exclusions in Louisiana courts, and the position of the Louisiana Commissioner of Insurance on pollution/contamination exclusions. *See id.* at 126-34. Based thereon, the Court found,

> [T]hat the total pollution exclusion was neither designed nor intended to be read strictly to exclude coverage for all interactions with irritants or contaminants of any kind. Instead, we find that 'it is appropriate to construe a pollution exclusion clause in light of its general purpose, which is to exclude coverage for environmental pollution, and under such interpretation, the clause will not be applied to all contact with substances that may be classified as pollutants.'" *Id.* at 135 (internal citation omitted).

The Court went on to create a set of considerations for determining "[t]he applicability of a total pollution exclusion in any given case." *Id.* These considerations are as follows:

> (1) Whether the insured is a 'polluter' within the meaning of the exclusion;
> (2) Whether the injury-causing substance is a 'pollutant' within the meaning of the exclusion; and
> (3) Whether there was a 'discharge, dispersal, seepage, migration, release, or escape' of a pollutant by the insured within the meaning of the policy. *Id.*

On the basis of the Court's holding, *Ducote* was overruled.

Although *Doerr* involved a commercial liability policy rather than a homeowners' policy, in reaching its holding it relied upon *Thompson v. Temple*, 580 So. 2d 1133 (La. Ct. App. 4 Cir.

1991), in which a Louisiana appellate court held that a pollution exclusion in a homeowners'
policy did not apply to exclude injuries caused by a leaking gas heater in a home. In reaching
this conclusion, the *Thompson* court reasoned,

> It seems that the intent of the insurance industry in adding pollution exclusion clauses to
> their policies was to exclude coverage for entities which knowingly pollute the
> environment over a substantial period of time. That situation is totally different from a
> leaking gas heater within a home. It is unlikely that the insurance industry intended such
> an exclusion clause to apply to this situation. *Id.* at 1135.

Given the Louisiana Supreme Court's unarguably thorough analysis in *Doerr*, if the Court was
skeptical of the application of its holding to homeowners' insurance policies, it likely would
have said so. Furthermore, in announcing its holding, the Court stated "[t]he applicability of a
total pollution exclusion *in any given case* must necessarily turn on several considerations," *id.*
at 135(emphasis added), indicating that the Court intended for its holding to apply to any case
involving a pollution and/or contamination exclusion. Additionally, the Civil District Court for
the Parish of Orleans in *Finger*, 09-8071 (La.Civ.Dist.Ct. 3/22/10); 2010 WL 1222274, applied
*Doerr* in holding that the pollution exclusion did not apply to damages caused by Chinese
drywall in an insureds' home. Accordingly, the Court follows *Doerr* in its own determination as
to whether the pollution exclusion applies in the present cases.[3]

    Applying the *Doerr* considerations, the Court finds that the pollution and/or
contamination exclusions do not apply to the present cases. Under the first consideration, the

---

[3]The Court declines to follow the Fifth Circuit cases cited by the Insurers on the basis
that these cases apply Texas substantive law. *See United Nat. Ins. Co. v. Hydro Tank, Inc.*, 497
F.3d 445 (5th Cir. 2007); *Am. Cas. Co. v. A.L. Myrick*, 304 F.2d 179 (5th Cir. 1962). Nor does
the Court follow the Eastern District of Virginia's holding in *Travco*, 2010 WL 2222255, at 16,
that a pollution exclusion applies to damage caused by Chinese drywall on the basis that the
Virginia law on pollution exclusions is on the other side of split authority from Louisiana law.
*See also* Russ, 9 Couch on Ins. § 127:6 (discussing split of authority).

Louisiana Supreme Court states,

> [T]he determination of whether an insured is a 'polluter' is a fact-based conclusion that should encompass consideration of a wide variety of factors. In making this determination, the trier of fact should consider the nature of the insured's business, whether that type of business presents a risk of pollution, whether the insured has a separate policy covering the disputed claim, whether the insured should have known from a read of the exclusion that a separate policy covering pollution damages would be necessary for the insured's business, who the insurer typically insures, any other claims made under the policy, and any other factor the trier of fact deems relevant to this conclusion. *Doerr*, 2000-0947, at pp. 25-26; 774 So. 2d at 135.

Applying these considerations to the Plaintiffs, the Court finds that the Plaintiffs, who are home owners and occupants, do not constitute polluters under any sense of the word.

As to the second consideration, the Louisiana Supreme Court provides,

> [T]he determination of whether the injury-causing substance is a 'pollutant' is also a fact-based conclusion that should encompass a wide variety of factors. As pointed out above, there are a variety of substances that could fall within the broad definition of irritants and contaminants as provided in this policy. For example, under pollution exclusions similar to the one at issue here, courts have found 'pollutant' to include everything from asbestos, carbon monoxide, gasoline, lead paint, and some pesticides; on the other hand, some courts have found that 'pollutants' do not include muriatic acid, styrene resins, and other forms of pesticide. Consequently, when making this determination, the trier of fact should consider the nature of the injury-causing substance, its typical usage, the quantity of the discharge, whether the substance was being used for its intended purpose when the injury took place, whether the substance is one that would be viewed as a pollutant as the term is generally understood, and any other factor the trier of fact deems relevant to that conclusion. *Doerr*, 2000-0947, at p. 26; 774 So. 2d at 135.

Applying these considerations to the present cases, the Court finds that whether the Chinese drywall is a pollutant is at best factually determinative and not a clear legal question. Often parallels are drawn between Chinese drywall and two of the "pollutants" listed above, asbestos and lead paint, on the basis that all three materials function for the purpose for which they are made, but contain some property which causes damage. However, Chinese drywall can also be distinguished from these materials on the basis that asbestos and lead paint cause well-

28

established, severe personal injuries or death, while Chinese drywall predominantly causes property damage since the personal injuries related thereto are less established and have not, at least at this time, been proven to cause severe personal injuries or death.  Also, considering the nature of Chinese drywall and whether it is viewed as a pollutant, the Court finds that Chinese drywall is not a typical pollutant, but that the elemental sulfur contained therein and released by the Chinese drywall may be considered a pollutant.  The remaining factors- typical usage, quantity of discharge, and whether the Chinese drywall is used for its intended purpose-are inapplicable to the present facts and pertain to materials emitted by a polluter.

As to the third consideration, the Louisiana Supreme Court provides,

> [T]he determination of whether there was 'discharge, dispersal, seepage, migration, release or escape' is likewise a fact-based conclusion that must result after a consideration of all relevant circumstances.  Specifically, the trier of fact should consider whether the pollutant was intentionally or negligently discharged, the amount of the injury-causing substance discharged, whether the actions of the alleged polluter were active or passive, and any other factor the trier of fact deems relevant.  *Doerr*, 2000-0947, at p. 27; 774 So. 2d at 135-36.

Applying these considerations to the present cases, the Court finds based upon the language of the policies, the sulfur gases are discharged or released by the Chinese drywall.  However, the other considerations listed by the Louisiana Supreme Court are inapplicable to the present facts and pertain to the actions of an alleged polluter in releasing a substance.

Based upon all three considerations, the Court finds that pollution and/or contamination exclusions in the homeowners' insurance policies do not apply to the present cases.  The presence of Chinese drywall in the Plaintiffs' homes is outside the ambit of the Louisiana Supreme Court's concern with and focus upon environmental pollution for purposes of the exclusion.  The Plaintiffs are not polluters, nor does Chinese drywall cause environmental

pollution by its presence in the Plaintiffs' homes.

3.    *Coverage Exclusion-Dampness or Temperature*

Only the Federal homeowners' insurance policy excludes coverage for damage caused by dampness or temperature. This exclusion provides, "[w]e do not cover any loss caused by air dampness, water vapor or temperature extremes." Federal claims that to the extent humidity causes the emission of gases from the Chinese drywall and resultant property damage, such losses are excluded under the above provision. Federal cites to this Court's decision in *Transcontinental*, 2008 WL 4286538, to support its position.

In response, Plaintiffs contend that they have not alleged that humidity, dampness, or temperature have caused or contributed in any way to the damages caused by the Chinese drywall in their homes.

Upon review of the Petition in the case involving Federal, Case No. 10-1693, (R. 1), the Court finds no allegations involving dampness, water vapor, or temperature extremes. Accordingly, the Court concludes that Federal has failed to meet its burden of proving the dampness or temperature exclusion bars the Plaintiffs' claims for coverage. Also, whether climate caused, exacerbated, or played any part is factually specific and not an appropriate inquiry at this stage.

4.    *Coverage Exclusion-Faulty Materials*

The homeowners' insurance policies at issue each contain a provision excluding from coverage any loss to property caused by, what the Court will refer to as, faulty materials. The Homesite, Standard, Auto Club, ASI Lloyds, Hartford, and Allstate policies all contain identical language for their faulty materials exclusion. This language provides that loss to property

caused by "[f]aulty, inadequate, or defective....[m]aterials used in repair, construction, renovation or remodeling," is excluded from coverage. Similarly, USAA's policy contains this same language with the addition of "negligent" to the adjectives describing "materials." Federal's policy contains slightly different wording, excluding from coverage, "any loss caused by the faulty acts, errors, or omissions...in planning, construction, or maintenance.... 'Construction' includes materials...used for construction or repair." Finally, State Farm's policy excludes from coverage, loss, "regardless of whether one or more of the following; (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss...b. defect, weakness, inadequacy, fault or unsoundness in:...(2) design, specifications, workmanship, construction, grading, compaction; (3) materials used in construction or repair."

The Insurers contend that their homeowners' insurance policies exclude from coverage the losses caused by the Chinese drywall in the Plaintiffs' homes on the basis that the Chinese drywall triggers the faulty material exclusion. The Insurers rely upon a number of cases to support their position, including, *Alton Ochsner Medical Foundation v. Allendale Mutual Insurance Co.*, 219 F.3d 501 (5th Cir. 2000); *Mendler v. Derouen*, 2009 WL 411244 (E.D. La. Feb. 18, 2009); *Holland v. Breaux*, 2005 WL 3542899 (E.D. La. Nov. 22, 2005); and *Travco*, 2010 WL 2222255. According to the Insurers, these cases demonstrate that, when a defective material such as Chinese drywall is used in the construction of a home or installed in a home, any losses therefrom are excluded under the faulty materials exclusion. The Insurers further contend that these cases permit the application of the faulty materials exclusion even when the property in question, here the Chinese drywall, may be serving its intended purpose. They also

distinguish the finding in *Finger* that the faulty materials exclusion was inapplicable to losses caused by Chinese drywall, on the basis that the court did not cite any authority to support its finding and the clear weight of authority is inapposite.

In response, the Plaintiffs contend that the faulty materials exclusion does not apply to the Chinese drywall in their homes since this drywall is functioning properly as drywall and their complaints allege insomuch. The Plaintiffs cite as support the Civil District Court of Orleans Parish's conclusion in *Finger*, 09-8071 (La.Civ.Dist.Ct. 3/22/10); 2010 WL 1222274, which is consistent with their argument.

Again, the Court is presented with terms for which the homeowners' insurance policies provide no definition. Additionally, Louisiana law provides no definition for "faulty materials" in the context of a homeowners' insurance policy. Given that the Court is required to construe words in the policies "using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning," *Cadwallader,* 2002-1637 at pp. 3-4; 848 So. 2d at 580, the Court looks to the dictionary definitions of these words for guidance in interpreting the exclusion language. Merriam-Webster defines "faulty" as "marked by fault or defect," and in turn defines "fault" as "a physical...imperfection or impairment," and "defect" as "an imperfection that impairs worth or utility." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary (last visited Oct. 22, 2010). Black's Law Dictionary (9th ed. 2009), defines "material" as "[o]f or relating to matter; physical." Considering these definitions together, the Court finds that a "faulty material" constitutes a physical thing tainted by imperfection or impairment.

Most of the case law cited by the Insurers in support of the application of the faulty

materials exclusion actually involves the related but separate faulty workmanship/construction exclusion. *See e.g. Alton*, 219 F.3d 501; *Mendler*, 2009 WL 411244; *Holland*, 2005 WL 3542899. The faulty workmanship/construction exclusion has been applied where the installation, design, construction, or repair is the cause of the imperfection or impairment in a thing. *See Alton*, 219 F.3d 501 (involving 15 story building constructed with pre-cast concrete piles covered by caps which cracked as a result of design error and faulty construction); *Mendler*, 2009 WL 411244 (involving a builders' improper installation, repair, and painting of various elements in a home); *Holland*, 2005 WL 3542899 (involving poor drainage and improper ventilation which caused walls to crack, floor to sag, and doors to settle); *Nuerge v. Coldewy Corp.*, 08-1258 (La. App. 5 Cir. 4/28/09); 14 So. 3d 39 (affirming that the improper installation of shingles which caused water leaks constituted faulty workmanship defects); *see also* Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary (last visited Oct. 22, 2010)(defining "workmanship" as "something effected, made, or produced," "the quality imparted to a thing in the process of making"). The exclusions in this case target faulty materials and not faulty workmanship. Faulty workmanship focuses on the installation of the product. This is distinguishable from "faulty materials" where the focus is upon the quality or character of the material, rather than action of installing, designing, constructing, or repairing. Thus, the Court finds the case law cited by the Insurers provides minimal guidance for purpose of the present motions.

In *Finger,* the Civil District Court for the Parish of Orleans held that the Chinese-drywall installed in the plaintiff's home did not fall under a faulty materials exclusion in a homeowners' insurance policy with language similar to the exclusions at issue in the present motions. The

*Finger* court, despite recognizing the Chinese drywall's off-gassing, reasoned that because the drywall was acting as an aesthetic or finishing material for a home and had not been installed incorrectly, it did not constitute a faulty material under the policy. Because *Finger* failed to provide an explanation as to how it came to define faulty materials, only citing conclusions reached in the plaintiff's own memorandum and testimony, and the testimony of the insurer's corporate representative, the Court is not able to follow this approach. *See generally Boothe v. Am. Assurance Co.*, 327 So. 2d 477, 480 (La. Ct. App. 1 Cir. 1976)("The [insurance policy] itself is the best evidence of its contents and meaning. It is the province of the court and not that of the litigants to interpret that meaning when the issue arises").

The Eastern District of Virginia in *Travco*, 2010 WL 2222244, declined to follow *Finger* on a similar basis, *see id.* at 12-13, and reached the opposite conclusion-the faulty materials exclusion did apply to the Chinese drywall damage in plaintiff's home. The court, looking to the dictionary definition of the terms and applicable case law, reasoned that a material may be faulty even when it is serving its intended purpose. *Id*. at 13.

Similarly, the Eastern District of Missouri in *Falcon Products, Inc. v. Insurance Co. of the State of Penn.*, 615 F.Supp. 37, 38-39 (E.D. Missouri 1985), held that table bases made of radioactive scrap metal constituted faulty materials under an insurance policy exclusion. The court reasoned that there was no indication that the bases could not serve as such, only that they were "unusable" because of the contaminated materials used in constructing them. *Id*. Additionally, courts have recognized that the presence of materials containing asbestos and lead in buildings triggers the faulty materials exclusion. *See Yale Univ. v. Cigna Ins. Co.* 224 F.Supp.2d 402, 415 (D. Conn. 2002)(citing *Leafland Group-II v. Ins. Co. of N. Am.*, 118 N.M.

34

281 (1994)). In these cases there also was no indication that the buildings, walls, or insulation containing asbestos or lead were not able to function as such, only that they contained these damaging substances. *See id.*

Based upon the foregoing, the Court finds that the Chinese-manufactured drywall contained in the Plaintiffs' homes constitutes "faulty materials" as that term is used in their homeowners' insurance policies, and thus, the loss therefrom is excluded from coverage. Although the drywall serves its intended purpose as a room divider, wall anchor, and insulator, the allegations in the complaints provide that the drywall emits foul-smelling odors and releases gases which damage silver and copper components in the home, including electrical devices, appliances, and wiring. Accordingly, the drywall is like the radioactive table bases and building components containing asbestos or lead which function for all practical purposes as table bases and building components, but are faulty because the materials of which they are composed. In fact, this Court has previously recognized the factual similarities between Chinese drywall and asbestos on these same bases for purposes of a different legal controversy. *See In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 680 F.Supp.2d 780 (E.D. La. 2010)("The Chinese drywall has been installed in numerous homes and in each instance is functioning as drywall. This is similar to the asbestos fire-proofing which was installed in numerous buildings and functions as fire-proofing. Additionally, the Chinese drywall is releasing contaminants, causing damage to the building and those occupying the buildings, just as the asbestos"). The broad definition of faulty materials under common usage of a defect or imperfection in a physical thing lends further support to the finding that the Chinese drywall constitutes a faulty material. Furthermore, as the *Travco* court recognized, it is inconsistent to argue that Plaintiffs have

suffered a loss due to the Chinese drywall, but that the drywall is not in any way faulty.  The whole basis of the Plaintiffs' claims is that the Chinese drywall in question was faulty and rendered homes unlivable.

 5.     *Coverage Exclusion-Corrosion*

The homeowners' insurance policies at issue in the present motions each contain coverage exclusions for loss relating to corrosion.  The policies issued by Homesite, Standard Fire, Auto Club, ASI Lloyds, and Hartford exclude from coverage, "loss...[c]aused by...corrosion." Allstate and USAA's corrosion exclusions are slightly broader, excluding loss "consisting of" or "caused by" corrosion.  Federal's policy is unique, excluding from coverage the "presence of...corrosion," as well as "any loss caused by...corrosion."  Finally, State Farm's policy excludes from coverage "any loss...which consists of, or is directly and immediately caused by [corrosion]..., regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these."

The Insurers argue that Plaintiffs' claims for coverage relating to corrosion are excluded under the corrosion exclusion of their homeowners' insurance policies.  The Insurers rely upon *Travco*, *Transcontinental Insurance Company v. Guico Machine Works, Inc.*, 2008 WL 4286538 (E.D. La. Sept. 17, 2008), *Orthopedic Practice, LLC v. Hartford Casualty Insurance Co.*, 2008 WL 687184 (E.D. La. Mar. 10, 2008), and *Central Louisiana Electric Co. v. Westinghouse Electric Corp*, 579 So. 2d 981 (La. 1991), to support their position.  They claim that these cases all conclude that the mere presence of corrosion in a covered property triggers the corrosion exclusion.  Accordingly, the Insurers claim that Plaintiffs' allegations regarding the corrosion in

36

their homes caused by the Chinese drywall invoke the corrosion exclusion.

In response, the Plaintiffs contend that their loss is not caused by corrosion, but rather is caused by the sulfur gases emitted by the Chinese drywall, and thus, the corrosion exclusion is not triggered. Plaintiffs' position is drawn from the Civil District Court's reasoning in *Finger*, 09-8071 (La.Civ.Dist.Ct. 3/22/10); 2010 WL 1222274. They also cite *Trus Joist Macmillan v. Neeb Kearney & Co.*, 2000 WL 306654 (E.D. La. Mar. 23, 2000), to demonstrate that the corrosion exclusion only applies to naturally occurring corrosion, and not to the rapidly occurring, unnatural corrosion at issue in the present cases.

Once again, the policies do not provide a definition for the corrosion exclusion, nor has the corrosion exclusion in a homeowners' insurance policy been defined in Louisiana case law. However, under a "plain, ordinary and generally prevailing meaning," corrosion is defined as "the action, process, or effect of corroding" and "a product of corroding." Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary (last visited Oct. 18, 2010).

Additionally, the Louisiana Supreme Court has addressed the applicability of a corrosion exclusion in a boiler and machinery policy which provides some guidance in the present motions. In *Central Louisiana Electric Co., Inc. v. Westinghouse Electric Corp.*, 579 So. 2d 981 (La. 1991), the Louisiana Supreme Court was presented with the issue of whether a boiler and machinery insurance policy, which provided coverage for damage to property caused by an accident but excluded corrosion, covered the cost of replacing an entire turbine blade unit cracked by pressure exerted on corrosive pitting. The Court held that all of the damage was excluded from coverage since the corrosion pitting, as a form of corrosion was excluded, and the cracking was a proximate or direct cause of the corrosion pitting. *Id*. at 987.

37

Conversely, this Court in *Trus Joist Macmillian v. Neeb Kearney & Co.*, 2000 WL 306654 (E.D. La. Mar. 23, 2000), held that a corrosion exclusion did not apply where bedplates were damaged by exposure to standing water on the basis that the corrosion and/or rust on the bedplates was not the *cause* of the damage, but rather constituted the damage *itself*.  The Civil District Court for the Parish of Orleans relied upon *Trus Joist* when it held in *Finger*, 09-8071 (La.Civ.Dist.Ct. 3/22/10); 2010 WL 1222274, that the corrosion exclusion did not apply to the corrosive damage caused by Chinese drywall in the plaintiff's home.

*Central Louisiana* and *Trus Joint,* represent contradictory interpretations of corrosion exclusions in insurance policies.[4]  However, because the cases at issue are before the Court on diversity, the Court sits "as an *Erie* court and must apply Louisiana law in an attempt to rule as a Louisiana court would if presented with the same issues.  To determine a state law question, [the court] first look[s] to decisions of the Louisiana Supreme Court."  *Musser Davis Land Co. v. Union Pac. Res.*, 201 F.3d 561, 563 (5th Cir. 2000).  Although *Central Louisiana* is not factually on point with the present cases, it does provide the Court with guidance in determining what the Louisiana Supreme Court would do if faced with the corrosion exclusions at issue.  Thus, respectfully, the Court applies the underlying reasoning of *Central Louisiana* rather than that of *Trus Joint,* to the present cases.

Each of the complaints involved in the present motions allege that the Chinese drywall in the Plaintiffs' homes emits gases which cause corrosion to metallic and electrical components in the home.  These allegations indicate that the present cases are not ones in which corrosion is *de minimis* and no loss is caused thereby.   Rather, the Court finds that these allegations trigger the

---

[4]Additionally, neither of these cases involve a homeowners' insurance policy such as the ones at issue in the present motions.

corrosion exclusion since the corrosion is responsible for the majority of losses suffered by the Plaintiffs. Thus, the homeowners' policies, whether they exclude from coverage loss caused by, consisting of, or the presence of corrosion, exclude from coverage the corrosion and corrosion-related damages. The Louisiana Supreme Court in *Central Louisiana* made clear that corrosion-related loss triggers the corrosion exclusion in an insurance policy. This is consistent with the ordinary meaning of corrosion which is expansive, encompassing the action, process, effect and product of corroding. Additionally, a number of courts outside the jurisdiction have reached similar, if not identical, conclusions.

For example in *Travco*, 2010 WL 2222255, at *14-15, the Eastern District of Virginia rejected an insured's argument that the corrosion caused by the Chinese drywall in his home was not excluded by the corrosion exclusion because the corrosion was not the cause of the loss, but rather the actual loss. The court held that based upon the applicable law and ordinary meaning of corrosion, the corrosion exclusion was triggered by the presence of the Chinese drywall-related corrosion in the insured's home, whether or not it was the loss itself or the cause of the loss. *Id*.

Similarly, in *Bettigole v. American Employers Ins. Co.*, 30 Mass.App.Ct. 272, 567 N.E.2d 1259 (1991), a Massachusetts appellate court held that damage to a parking deck caused by chloride ions which penetrated the concrete of the deck and corroded the steel reinforcing rods therein was excluded under a corrosion exclusion. The court rejected an argument, similar to that raised by the Plaintiffs, that the corrosion exclusion did not apply because the ions were the primary cause of the loss, while the corrosion was only a secondary cause of the loss. *Id*. The court observed that if the insureds' view were adopted, the corrosion exclusion would tend to

39

disappear altogether because with corrosion, there is always a catalyst material that causes the corrosion. *Id.* at 1262. The Court finds this observation sound, and declines to create a distinction between corrosion as a loss and corrosion as a cause of the loss for purposes of the corrosion exclusion.

Nor does the Court find reason to draw a distinction between the chemically-created corrosion in the present cases and corrosion that occurs in nature. The policy language and the dictionary definition of corrosion do not contain this distinction. Additionally, this distinction has been rejected in case law. For example, in *Adams-Arapahoe Joint School District v. Continental Insurance Co.*, 891 F.2d 772 (10th Cir. 1989), the Tenth Circuit rejected an argument by the insured that the corrosion exclusion in an all-risk policy only applied to normal or natural corrosion, and held that the corrosion exclusion applied to all corrosion, however brought about, including that on steel caused by gypsum-based concrete. Furthermore, the Louisiana Supreme Court in *Central Louisiana* did not interpret corrosion narrowly for purposes of the corrosion exclusion, and instead held that the corrosion pitting, "simply one of many forms of corrosion," triggered the corrosion exclusion in the insurance policy. 579 So. 2d at 987. Accordingly, the Court finds that loss due to corrosion is excluded by the corrosion exclusion provisions in these homeowners' insurance policies.

C.    **Ensuing Loss Exception to Coverage Exclusions**

In the above analysis, the Court has concluded that the Plaintiffs' claims for losses related to Chinese drywall are excluded by the faulty materials exclusion and the corrosion exclusion. However, this does not end the discussion. It is now necessary to consider the effect

of the ensuing loss provisions of the policies.  All of the insurers, except Allstate[5], provide

coverage for ensuing losses from faulty materials and corrosion.  These ensuing loss provisions,

though the language varies slightly, generally provide coverage for ensuing or resulting losses

which (1) constitute covered losses, (2) not excepted from coverage by any coverage exclusion.

Plaintiffs argue that they are entitled to coverage from the Insurers, including the

excluded losses, based upon the ensuing loss provisions in their homeowners' insurance policies.

Plaintiffs claim that although a loss may be excluded from the policies, the ensuing loss

provisions are "Lazarus-like," resurrecting coverage for the excluded losses.  Plaintiffs draw a

distinction between the faulty Chinese drywall itself, an excluded loss, and the covered ensuing

losses which are the losses caused by or resulting from the drywall.  Plaintiffs note that the

industry FC&S Bulletin states that any ensuing loss "as a result of the faulty drywall would be

covered, for example if the drywall caused corrosion damage to wires or pipes," and that there

"is coverage for ensuing losses from faulty workmanship."  Plaintiffs cite *Holden v. Connex-*

*Metalna*, 2000 WL 1876338, at *8-9 (E.D. La. Dec. 12, 2000), in which this Court applied the

faulty workmanship exclusion to losses caused by defective components of a crane, but found

coverage for the damage caused by the crane when it fell, including the loss of the crane itself,

pursuant to the ensuing loss provision of a property insurance policy.

In response, the Insurers contend that the Plaintiffs fail to allege ensuing losses since the

damages caused by the Chinese drywall to the Plaintiffs' homes are all derived from a single

source-the alleged off-gassing of the drywall-rather than from an event separate in time, causing

---

[5]Because Allstate's homeowners' policy does not contain ensuing loss provisions for
either the faulty materials exclusion or the corrosion exclusion, Allstate's Motion to Dismiss (R.
4472) is granted at this point of the Court's analysis insofar as the Plaintiffs' claims for coverage
under the policy for damages to their homes caused by Chinese drywall.

separate damage.  The Insurers rely upon the Eastern District of Virginia's finding in *Travco*,

2010 WL 2222255, at *19, that the damages caused by the Chinese drywall do not constitute

ensuing losses.  The Insurers also note the holdings in *Holland*, 2005 WL 3542899, and *Alton*,

219 F.3d 501, and claim that these decisions demonstrate that the Plaintiffs' damages are not

covered as ensuing losses.

The homeowners' insurance policies at issue do not provide a definition of ensuing or

resulting loss.  Nor has the Louisiana Supreme Court addressed the meaning of an ensuing loss

provision in an insurance policy.  However, Louisiana appellate courts have.  For example, in

*Dawson Farms, LLC v. Millers Mutual Fire Insurance Co.*, 34,801 (La. App. 2 Cir. 8/1/01); 794

So. 2d 949, the court held the cost to repair a refrigerated warehouse was excluded from

coverage under the faulty design and workmanship exclusions, but that the loss of sweet potatoes

stored in the faulty warehouse was covered as a resulting loss.  The court reasoned that the loss

of sweet potatoes constituted a "second accident, i.e., the losses associated with the damage to

the contents of the building resulting from the accumulation of condensation that fell on the

stored potatoes."  *Id.* at 952-53.

Thereafter, *Morgan v. Auto Club Family Insurance Co.*, 04-1562 (La. App. 3 Cir.

4/6/05); 899 So. 2d 135, distinguished *Dawson* and held that mold damage in an attic caused by

excluded faulty workmanship of a roof did not constitute a covered ensuing loss since, even if

the mold was a separate, subsequent accident, loss of property caused by mold was specifically

excluded from coverage under the policy.

There is also instructive case law on ensuing loss from the Fifth Circuit.  The Circuit's

most recent decision involving an ensuing loss provision is *Alton Ochsner Medical Foundation*

*v. Allendale Mutual Insurance Co.*, 219 F.3d 501 (5th Cir. 2000). In *Alton*, the Court held that under an all-risk property insurance policy, losses due to cracks in a foundation of a building were excluded under the faulty workmanship and cracking exclusions, and did not invoke the ensuing loss provision. The insured did not dispute that the cracking in the foundation caused by faulty workmanship was an excluded loss, but argued that the more severe cracking that occurred over the years constituted a covered ensuing loss. *Id.* at 505. The Fifth Circuit rejected this argument, reasoning that the ensuing loss provision was triggered only when a different kind of damage or damage from an event extraneous to the original damage, not excluded by the policy, results. *Id.* at 506-07.

Looking to *Alton* and other Fifth Circuit precedent, this Court in *Holden v. Connex-Metalna*, 2000 WL 1876338 (E.D. La. Dec. 21, 2000), summarized a number of precepts for interpreting ensuing loss provisions. The Court stated,

> First, the damage that falls under the exclusion and the ensuing damage must be separable events in that the damage and the ensuing loss must be different in kind, not just degree. Second the mere fact that an excluded act or event is the 'but for' cause of the ensuing loss does not necessarily preclude coverage for the ensuing loss. Third, catastrophic damages to a machine caused by its own mechanical breakdown may be considered 'ensuing loss.' Finally, courts distinguish between damages arising from faulty workmanship during the construction process itself, and damages primarily caused by events extraneous to the construction process. *Id.* at *6 (internal citations omitted).

The Court went on to hold that, although the damage to a trolley and boom of a crane was excluded under the faulty workmanship exclusion, the loss of the crane when it plunged into the river was not excluded since the toppling of the crane was the result of an event extraneous, though not entirely unrelated, to the defective trolley and boom. *Id.* at *8. The Court distinguished *Alton* on the basis that in *Alton* the damage was to the quality of the product itself, i.e. the cracking foundation, and not to loss of the entire property, i.e. the entire crane. *Id.*

43

Thereafter, in *Holland*, 2005 WL 3542899 (E.D. La. Nov. 22, 2005), this Court held that a sagging floor, walls, and doorframes in a home, which were the result of a rotting foundation, did not constitute ensuing losses under the insured's homeowners' insurance policy.  The Court rejected the insured's argument that the sagging elements constituted damage distinct from the rotting foundation, and instead concluded that the rotting of the foundation and the sagging of the components in the home were not different in kind and not caused by an extraneous, separate event.  *Id*.

For purpose of the present motions, the Court's analysis is almost entirely confined to the allegations in the Plaintiffs' petitions.  *See supra* pp. 4-5.  These petitions each similarly, if not identically, allege that the gases emitted by the Chinese drywall in their homes cause, (1) odors, and (2) corrosion of metal components and electrical wiring and devices.  It is these losses which Plaintiffs contend constitute ensuing losses.

As to the losses caused by the odors emitted by the Chinese drywall, the Court finds that these losses are not ensuing because they are neither sufficiently different in kind from the losses caused by the Chinese drywall, nor the result of an extraneous event.  The odors are inseparable from the drywall and are a continuous result of the drywall, much like the cracking foundation in *Alton* and the sagging, rotting home components in *Holland*.  The emanation of odors from the Chinese drywall also is distinguishable from the "second accidents" which occurred when sweet potatoes were ruined by condensation caused by a faulty refrigerator in *Dawson,* and when an entire crane, with a few faulty components, was entirely ruined when it fell into a river in *Holden*.

The Court also finds that the corrosion-related losses caused by Chinese drywall do not

constitute ensuing losses.  However, even assuming that the corrosion or corrosion-caused losses

due to the Chinese drywall in Plaintiffs' homes were ensuing or resulting losses, they remain

excluded losses because, as discussed above, corrosion and corrosion-related losses are

specifically excluded from coverage.  *See supra* pp. 36-40.  Whether the Chinese drywall in

Plaintiffs' homes causes corrosion pitting or residue on a metal pipe, wire, or surface, or causes

more extreme loss, such as the failure of a system, device, or appliance in which these metal

components are located, because these losses are the result of corrosion, they are excluded from

coverage.  This is consistent with the holding in *Morgan*, where the court concluded that even if

mold caused by a defectively constructed roof was an ensuing loss, it was excluded from

coverage because the applicable insurance policy specifically excluded losses constituting mold.

However, both time and circumstance are relevant to whether ensuing losses are caused

by Chinese drywall.  For example, even the Insurers concede that if the corrosion caused by

Chinese drywall resulted in a second accident, separable and different in kind, such as a fire, the

losses therefrom would be covered under the ensuing loss provisions.  *See* Hr'g Tr. 88:12-17

(Sept. 2, 2010).  There are no fires or similar occurrences which may qualify as ensuing losses

alleged by the Plaintiffs, but with the passage of time and/or intervening circumstances, it is

possible that ensuing losses may occur.  In fact, the Eastern District of Virginia recognized in

*Travco* that while the ensuing loss provision in a homeowners' policy did not apply to the losses

alleged by the homeowner, the occurrence of an ensuing loss in the future was possible.  2010

WL 2222255, at *20 ("The damage to Defendant's property is extensive, and the secondary

consequences may not be fully realized at this point.  The Court cannot speculate as to whether

some of these secondary losses might qualify for coverage under the ensuing loss provision.

Rather, the Court must confine its inquiry into the question of whether Plaintiff is entitled to the declaratory relief it seeks"). Accordingly, in concluding for purposes of the present motions no ensuing losses have been alleged, the Court does not seek to foreclose any future Chinese drywall-related ensuing loss claims under homeowners' insurance policies.

Because the Court finds there are no ensuing losses alleged by the Plaintiffs, the Insurers' motions are granted insofar as they pertain to the Plaintiffs' claims for coverage for the damage caused to their homes by the Chinese drywall therein.

**D.      Coverage for Other Losses Alleged by Plaintiffs**

Certain of the Plaintiffs allege they have suffered a number of covered losses other than those to their homes. These losses include: (1) personal property losses, (2) loss of use, (3) additional living expenses (ALE), and (4) diminished value. The Insurers contend that these losses are not covered under the homeowners' insurance policies. The Court will now address each of these alleged losses.

1.      *Personal Property Loss*

The Insurers contend that the homeowners' insurance policies do not provide coverage for damage to personal property in the Plaintiffs' homes caused by Chinese drywall on the basis that the policies only cover a specific list of perils for personal property, which does not include Chinese drywall. Plaintiffs agree that the damage to their personal property caused by Chinese drywall is not a covered peril under the policies. Thus, the Court grants the Insurers' motions as they pertain to personal property coverage.

2.      *Loss of Use*

Auto Club, State Farm, and USAA contend that their homeowners' insurance policies do

46

not provide coverage for loss of use of the Plaintiffs' homes caused by Chinese drywall on the basis that coverage for loss of use is conditioned upon coverage of underlying losses for which there is none. Plaintiffs agree that coverage for loss of use is conditioned upon proving an underlying covered loss. Accordingly, because the Court has concluded that the Plaintiffs' underlying losses are not covered by their homeowners' insurance polices, Auto Club, State Farm, and USAA's motions are granted insofar as they pertain to Plaintiffs' claims for loss of use.

3. *Personal Injuries*

Auto Club, State Farm, and USAA contend that their homeowners' insurance policies expressly exclude coverage for first-party personal injury claims. Plaintiffs agree. Thus, the Court grants Auto Club, State Farm, and USAA's motions insofar as they pertain to Plaintiffs' personal injury claims.

4. *Additional Living Expenses (ALE)*

USAA argues that since the Plaintiffs have not established a covered loss under their homeowners' insurance policies, they are not entitled to damages for ALE. Plaintiffs agree that coverage for ALE is contingent upon coverage for their underlying losses. Because the Court has concluded that Plaintiffs are not entitled to coverage from USAA for their underlying losses, USAA's motions are granted insofar as they pertain to Plaintiffs' claims for ALE coverage.

5. *Diminished Value*

State Farm contends that its policy does not provide coverage for Plaintiffs' allegations of "lost value or devaluation" of their homes. Plaintiffs agree that diminished value is not covered by their policy since this is an economic loss. Accordingly, the Court grants State

Farm's motion insofar as it pertains to Plaintiffs' diminished value claims.

### E.      Bad Faith, Breach of the Duty of Good Faith, Misrepresentation

Allstate, Standard, Hartford, State Farm, and USAA contend that they have not acted in bad faith, breached their duty of good faith, or misrepresented the terms of the homeowner policies in denying the Plaintiffs' requests for coverage for the losses sustained as a result of Chinese drywall.  These Insurers claim that, under Louisiana law, when they have a reasonable defense to coverage or reasonable doubts to coverage, they have the right to litigate these questionable claims without being subjected to damages and penalties.

In response, Plaintiffs argue that they have stated claims for bad faith since they have alleged a claims for coverage under their homeowners policies, yet their insurers denied their claims.

Under Louisiana law, an insurer owes its policyholder a duty of good faith in settling claims.  La. Rev. Stat. § 22:1220.  Failure to pay a claim within a certain period of time after being presented with satisfactory proof of loss, is a breach of the duty if it is "arbitrary, capricious, or without probable cause."  La. Rev. Stat. § 22:658(B)(1).  Such a breach may expose the insurer to liability for damages, penalties, and/or attorneys' fees.  *See* La. Rev. Stat. §§ 22:1220; 22:658.  The insured has the burden of proving the insurer acted in bad faith.  *Reed v. State Farm Mut. Auto. Ins. Co.*, 2003-0170 (La. 10/21/03); 857 So. 2d 1012, 1021.  Under applicable statutes, "arbitrary and capricious" means "vexatiously," as in a "vexatious refusal to pay" or a refusal to pay without reason or justification.  *Id.*  An insurer does not act arbitrarily or capriciously when its refusal to pay a claim is based on a genuine dispute over coverage or the amount of the loss.  *Id.*

48

In the present matter, the Insurers' denial of coverage does not constitute bad faith given that the Court has concluded the Plaintiffs are not entitled to coverage under their homeowners' insurance policies for the damage to their homes caused by Chinese drywall. Furthermore, Plaintiffs have not alleged actions on the part of the Insurers which would arise to "arbitrary and capricious."

### F.    Valued Policy Law ("VPL") Claims

Standard argues that Plaintiffs' VPL claims fail since they have not demonstrated coverage for their underlying claims pursuant to their homeowners' insurance policies. Plaintiffs have not responded to this claim. However, because the Court has determined that Plaintiffs are not entitled to coverage under their homeowners' insurance policies, there is no basis for their VPL claims. Thus, Standard's motion is granted accordingly.

### G.    Injunctive Relief

A number of Plaintiffs seek injunctive relief preventing the Insurers from cancelling their policies, increasing the rates of their policies, and other similar actions. Allstate and State Farm claim that because the Plaintiffs have not shown that they have a substantial likelihood of success of prevailing on the merits, their claims for injunctive relief should be denied. Additionally, the Insurers claim that Plaintiffs have not put forth any evidence that they will deny further coverage, cancel policies, or increase premiums.

In response, Plaintiffs contend that they have demonstrated a substantial likelihood of success of prevailing on the merits, as evidenced by the arguments raised in their briefs, and thus, injunctive relief is warranted.

Under applicable law, a preliminary injunction,

[I]s an extraordinary remedy that should only issue if the movant shows: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest." *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008).

Given the extraordinary nature of the remedy, an "injunction...should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Ferrellgas, LP v. McConathy*, 2010 WL 1010831, at *2 (W.D. La. Mar. 15, 2010).

In the present motions, the Plaintiffs have not put forth sufficient evidence that the Insurers plan to or have carried out the alleged actions. Additionally, the Court has concluded that the Plaintiffs will not prevail on the merits of their coverage claims. Accordingly, the Court grants Allstate and State Farm's motions insofar as the injunctive relief claims.

## IV. CONCLUSION

For the foregoing reasons, the following motions are GRANTED:

(1) Allstate's Motion to Dismiss (R. 4472);
(2) ASI Lloyds' Rule 12(c) Motion for Judgment on the Pleadings (R. 4462);
(3) Auto Club's Rule 12(b)(6) Motion to Dismiss (R. 4651);
(4) Federal's Rule 12(b)(6) Motion to Dismiss (R. 4459);
(5) Hartford's Motion for Judgment on the Pleadings (R. 4494);
(6) Homesite's Rule 12(b)(6) Motion to Dismiss (R. 4464);
(7) Standard's Rule 12(b)(6) Motion to Dismiss (R. 4467);
(8) State Farm's Rule 12(b)(6) Motion to Dismiss (R. 4503);
(9) USAA's Motion to Dismiss (R. 4515);
(10) USAA's Motion to Dismiss (R. 3251).

New Orleans, Louisiana, this 16th day of December, 2010.

U.S. DISTRICT JUDGE

50