**$2.4 Million Verdict in One Chinese Drywall Suit, Settlements Reported in Two Others**
*News Inferno*
6/21/10

A Florida jury has awarded plaintiffs in a Chinese drywall lawsuit more than $2 million for damage done to their home. Meanwhile, in New Orleans, two Chinese drywall lawsuits filed against Knauf Plasterboard Tianjin Co. were dismissed, after the manufacturer settled with plaintiffs.

The Florida verdict was handed down last Friday by a Miami-Dade Circuit Court jury, in what was the first U.S. jury trial to involve defective Chinese drywall. The jury found that Miami-based Banner Supply Co. was 55 percent responsible for damage done to the home of Armin and Lisa Seifart, and awarded them $2.4 million.

Knauf, which was not included in the suit, was deemed 35 percent responsible.

The two lawsuit settled by Knauf were part of a multidistrict litigation underway in federal court in New Orleans. More than 2,100 people in the U.S. have sued in federal court claiming damages from drywall made in China. The litigation involves about 1,000 defendants.

According to BusinessWeek, the two suits were brought by Paul Clement and Celeste Schexnaydre and by John Campbell, who own real estate near New Orleans and in Gulf Shores, Alabama, that they claimed had been tainted by contaminated drywall that can cause health problems. They were among 2,000 plaintiffs included in lass action suit filed in December 2009 against Knauf by New Orleans Saints Head Coach Sean Payton, and his wife. The Paytons have claimed that Knauf drywall ruined their Mandeville, Louisiana home.

The two lawsuits were to be among the first to go to trial in the multidistrict litigation, and were to be used as a benchmark for property damage in other cases.

Terms of the two agreements weren't immediately filed following a settlement conference Friday before U.S. District Judge Eldon Fallon, who is overseeing the massive litigation. According to BusinessWeek, Judge Fallon may discuss the effect of the settlements on pending cases at a regular monthly status conference for the multidistrict litigation on June 24.

Since late 2008, the Consumer Products Safety Commission (CPSC) has received more than 3,000 reports from residents in 37 states, the District of Columbia, and Puerto Rico regarding defective Chinese drywall. Gases emitted from Chinese drywall are being blamed for significant property damage, including damage to HVAC systems, smoke detectors, electrical wiring, metal plumbing components, and other household appliances. These gases also produce a sulfurous odor that permeates homes, and cause metals, including air conditioning coils and even jewelry, to corrode. People living with Chinese drywall have also suffered eye, respiratory and sinus problems that may be linked to the gases.

Chinese Drywall News: New Verdict; New Appeal; Insurance Coverage Updates
*Virginia Real Estate, Land Use & Construction Law Blog*
By Timothy R. Hughes
6/21/10

There is big news in the world of Chinese drywall litigation. First, various news sources including the Miami Herald reported a $2.5 million jury verdict on behalf of a homeowner couple against Banner Supply, the supplier of the drywall. The verdict is reported to include not just loss of use of the home and repair costs, but also stigma damages for loss of value to the property. The jury may have become inflamed by the supply company's actions after having been informed of complaints. According to CBS4 in Miami:

According to documents entered into evidence, when Banner Supply notified its Chinese supplier about the complaints, the supplier replaced the distributor's inventory of Chinese-made drywall with American-made drywall. In return, Banner Supply allegedly signed a confidentiality agreement not to say anything about it to the government or its customers.

This verdict is well in excess of the total of the $2.6 million verdict awarded to seven Virginia families by a New Orleans federal judge in April. In the New Orleans case, Virginia Lawyer's Weekly reported last week that the Chinese drywall manufacturer finally entered an appearance in the New Orleans case ... to file a notice of appeal of the $2.6 million verdict. We will await the legal arguments with interest, but absent a pretty significant service of process problem, it seems pretty hard to appeal a verdict after the case is over. That train has seemingly left the station, although there are plenty of other claims pending in the overall class action in New Orleans and elsewhere. Even an appearance by the Chinese entity may provide some hope of a ability to recover some measure of compensation as opposed to getting a judgment against a judgment-proof entity.

Finding defendants with deep pockets is critical to claimants as the coverage posture on these claims appears quite shaky. Per Virginia Lawyer's Weekly, a Norfolk federal judge recently ruled that there is no coverage under home owner' policies for such losses. As we previously discussed, another Norfolk federal judge previously ruled that a builder had failed to state a claim for coverage under its liability policies. That case is still pending with leave to amend having been granted, pending amended claims having been filed, and the parties still in the briefing stages of another round of motions to dismiss.

These cases continue to attract commentary and interest, and we have commented on them with some frequency. In the words of one longtime friend and insurance defense/coverage guru I know well, "These case dwarf anything we have seen before in the construction industry products liability arena. There are literally millions of implicated defendants and parties." Even with insurance coverage hurdles and questions of collection of judgments abounding, we can expect this topic to continue echoing for years rather than weeks or months.

### Florida family receives $2.46 million in first domestic Chinese drywall settlement
*Florida Independent*
By Brett Ader
6/23/10

A Florida family has been awarded a $2.46 million settlement by a Miami-Dade Circuit Court jury, a decision that is likely to establish how other trial juries will respond in cases relating to the thousands of complaints that have been pouring into the U.S. Consumer Products Safety Commission and Florida Department of Health regarding defective Chinese drywall.

As reported earlier by The Florida Independent, the lawsuit, brought by Armin and Lisa Seifart of Coconut Grove, was the first to be filed against a domestic distributor. Documents revealed in the trial confirm that Banner Supply, a Miami-based company that supplies building materials to home builders, signed an agreement in 2007 with its distributor to suppress known issues with the tainted drywall that was imported to the United States between 2004 and 2007:

The plaintiffs claimed that Banner Supply made a secret deal to cover up drywall problems with Knauf Plasterboard Taijin, a German company that supplied them with Chinese drywall. Miami-Dade Circuit Judge Joseph Farina allowed the agreement to be unsealed before the trial. The agreement reveals that in 2007, Banner knew of several homes that had bad-smelling drywall and asked Knauf to investigate.

After its investigation, which determined that the sulfur levels in the home were safe, Knauf struck a deal with Banner to stay silent about the problems. In return, Knauf agreed to replace the Chinese drywall it has sold Banner with U.S.-made drywall, and paid Banner for holding it. Banner agreed to be quiet about the problem and not to help other plaintiffs seeking to sue Knauf.

Attorneys representing Banner maintained the company had operated under the assumption that the defective drywall was limited to small batches. Vice President Jack Landers testified his company was "in no way in cahoots with Knauf to hide this from anybody."

"It's a strong victory in favor of consumers," said family attorney Ervin Gonzalez of Colson Hicks Eidson in Coral Gables, Fla. "The American public won't tolerate companies that cheat."

"Profits over people; sales over safety," he repeated several times. "It's good for the business to keep it quiet."

"It could have been avoided. It should have been avoided. And it would have been avoided if Banner had done the right thing. But they didn't," Gonzalez said during closing arguments Thursday.

**First Chinese Drywall Jury Trial Concludes**
*Law Offices of Larry H. Parker*
6/23/10

The first Chinese drywall case to be tried by jury in U.S. courts has concluded. A Florida jury awarded an astonishing $2.4 million damages award to a Florida couple who had to abandon their $1.6 million home.

According to the Associated Press, "The six-person jury ruled that Armin and Lisa Seifart should receive more than just the costs of gutting and renovating their home: They were also awarded damages for loss of enjoyment of the $1.6 million house and for the drywall stigma that might reduce its resale value."

Thousands of lawsuits involving faulty Chinese drywall are pending in the courts. After Hurricane Katrina and the housing boom, faulty Chinese drywall was imported at a very high rate to the southeastern United States. Unfortunately, these batches of defective drywall began emitting a noxious odor, destroying wiring, ruining plumbing, and even causing damage to computers and jewelery.

The distributor of the toxic dry wall, Banner Supply Co., was accused of ignoring evidence that the drywall from China was defective, including recommendations from the Chinese manufacturers that the drywall not be used. The jury found Banner Supply Co. 55% responsible for the problems experienced by the Seifart family.

If your family suspects that tainted, faulty Chinese drywall was installed in your home, the Consumer Product Safety Commission has recommended removing the drywall as quickly as possible. Any adversely affected wiring or piping should also be removed. The Law Offices of Larry H. Parker handles many similar product liability cases. If you or a loved one has been the victim of any faulty product, contact us today using our email form or by phone at (800) 333-0000.

**Chinese Drywall Victim's Award Like "First to Land on Moon"**
*Lawyers and Settlements*
6/23/10

A bit of a landmark lawsuit snuck under that radar this week. A couple from Florida—whom you may have heard of if you are following the Chinese Drywall debacle—Lisa and Armin Seifart—were awarded about $2.5 million by a jury in Miami-Dade County, Florida, in damages and expenses in their defective drywall lawsuit. They had asked for $4 million.

The Seifarts brought their lawsuit against the Miami-based drywall supplier, Banner Supply, and drywall manufacturer, Knauf Plasterboard Tianjin. It turns out Banner had an agreement with Knauf Plasterboard to replace some 2.3 million square feet of defective Chinese drywall with domestically made product. But, smelling an opportunity to save a buck, Banner only replaced the defective drywall in homes where builders and/or installers actually complained about the smell. Yup, that stinks. Pun intended. Had these companies acted with conscience, thousands of people could have been spared the expense, health problems and general stress that has accompanied this mess. Not to mention the courts' time that will be used to help in the clean-up.

FYI—we are not talking small numbers here. There are some 36,000 homes, according to media reports, affected by the dodgy drywall in Florida alone, and possibly as many as 100,000 nationwide, including California, Alabama, Mississippi, Virginia, and Louisiana. (More problems for the people in the beleaguered Gulf states.)

But let's get back to the Seifarts for a moment. Two years and $700,000 later—that's the money they have so far shelled out on repairs to their five bedroom, five bathroom pad—the estimated market value of their house is currently about $200,000.

That's if they could sell it given the stigma that Chinese drywall carries. Be honest—would you buy a house that had contained sulphur-infected drywall in its original build?

So even though the Seifarts have gutted their house and are rebuilding, and have been awarded $2.5 million to help them recover—they may be stuck.

It also remains to be seen whether or not the Seirfarts actually collect their settlement. Just recently, seven Virginia homeowners were awarded $2.6 million by a federal judge, as settlement of their Chinese Drywall suit, but because the manufacturer—Taishan Gypsum Co did not take part in the proceedings, the verdict is in limbo, as are the homeowners.

Let's hope the Seifart's verdict will make a difference.

## 2.4 million Awarded in first Chinese drywall lawsuit
*Tennessee Injury Lawyer blog*
6/23/10

Many of us here in Tennessee and across the country may have read reports or seen the news about foul smelling Chinese drywall and the problems it can cause for many homeowners and people across the country and right here to the residents of Tennessee. However, this is the first trial about the drywall reports.

Armin and Lisa Seifart, a Florida couple left their dream home because of the foul smelling Chinese drywall and was awarded 2.4 million in damages in the nation's first trial over the defective drywall that will come up in many lawsuits in the future. The jury felt that the couple deserved more than just compensation for gutting and renovation and awarded damages for the loss of enjoyment of their 1.6 million home and damages for the loss of resale value caused by the drywall stigma. This case is only the beginning of what some people may be able to seek in Chinese drywall damages.

The Seifarts were not told of the drywall problem when they moved in, in March of 2008. They accuse the Banner Supply Company, of concealing knowledge it had as early as 2006 of the drywall problems including recommendations from the manufacturer Knauf Plasterboard Tianjian that they think the wallboards should not be used.

Banner's attorney Todd Ehrenreich only acknowledged some of the blame and only wanted to pay the couple direct expenses, arguing that the "hidden and undetectable" and that the problem may not become clear until years later. The jury held Banner fifty-five percent responsible and felt that and that Knauf and two related entities were responsible for the rest.

This case follows one in Louisiana where a federal judge awarded 2.6 million in damages to seven families in Virginia for bad Chinese drywall. The Consumer Product Safety Commission has recommended removing any bad drywall, affected wiring, fire alarm systems, and gas pipes.

If you or a loved one may have been affected by this bad drywall or have concerns about it, please contact one of our experienced and caring Tennessee defective product attorneys right away. We will hear your case and make sure that you get the compensation you deserve for the damages to your home and property. Contact us online or call us at 800.705.2121 to set up a FREE consultation to discuss your legal options.

**Bring on drywall lawsuits: Lawyer calls Miami case a 'bellwether' for victims.**
*By The Palm Beach Post*
6/25/10

A Miami jury just awarded $2.5 million to a couple whose house needs to be gutted and all the drywall, pipes and fixtures replaced. It was the first jury trial of a drywall case, and plaintiff's lawyer Ervin Gonzalez said in an interview last week that it had been selected for trial by the federal and state judges overseeing such cases in Louisiana and Florida. "This is a bellwether case," he said, for what to expect in terms of liability and damages.

The jury assigned portions of blame to drywall distributor Banner Supply Co. and Chinese manufacturer Knauf Plasterboard Tianjian, even though Knauf was not a named defendant. During discovery, Mr. Gonzalez said, plaintiffs found that contractors had complained to Banner about the product's smell since 2006. Then they uncovered a secret agreement under which Knauf would replace unused bad drywall it had sent to Banner, but no one would tell consumers or the media about the problems.

Mr. Gonzalez believes that they could have established liability and recovered damages without the documents. Clearly, though, the prior complaints and the coverup agreement helped enormously. "We went from good liability," he said, "to smoking guns to the bomb."

Banner and Knauf are defendants in thousands of other cases. Other manufacturers, distributors, contractors and subcontractors also are named in separate lawsuits. In another case - this one a class-action that could include owners of 152 homes - a construction company and Realtor in Miami-Dade Country agreed to a $6 million drywall settlement.

A looming problem, of course, is how to actually collect from manufacturers based in China. Some found liable in a previous federal case haven't responded. Mr. Gonzalez said recovering from the Chinese firms "is a little more complicated, but certainly not impossible." Such companies have assets that can be seized, and there are diplomatic efforts to make them take responsibility.

Meanwhile, the same day the Miami jury acted, the Chinese drywall maker Knauf agreed in federal court in New Orleans to gut and repair two homes that have tainted drywall. Knauf has mixed motives. The company hopes that removing the pipes and wiring will show that they did not need to be replaced. But for now, courts and juries correctly are sticking with the standard recommended by the Consumer Product Safety Commission, which calls for total removal of drywall, wiring and pipes.

The Chinese drywall nightmare isn't over, but the legal momentum is moving in the right direction.

**Jury Awards $2.5 Million Chinese Drywall Verdict**
*NBCMIAMI.com*
By Willard Shepard and Brian Hamacher
6/26/10

A jury has awarded a South Florida family $2.5 million in a benchmark defective Chinese drywall case.

Armin and Lisa Seifart won the judgment in a Miami-Dade civil court Friday against drywall distributor Banner Supply Company.

The jury, which had been deliberating since Thursday afternoon, returned the verdict around 5:15 p.m.

The Seifarts had been seeking at least $4.3 million in damages after they had to completely renovate their Coconut Grove home due to the noxious drywall.

"It was important to send a message to companies that they should do the right thing when the health of the public is at stake," said Armin Seifart after the verdict.

"I feel that justice was done," added Lisa Seifart.

The Seifarts and their two children moved out of the $1.6 million home, which the family purchased in 2008, after they learned it had been built with the defective drywall.

They said they've spent over $700,000 renovating the home and have have to rent a second residence while the renovations take place.

The Chinese drywall has been linked to possible health problems as well as ruining pipes, wiring and electronics and appliances like computers. Not to mention the bad smells.

During the two week trial, the Seifarts detailed the odd smell they noticed when they moved into the house, and claimed they weren't told about the bad drywall.

They claimed Banner Supply knew about the problem and had even made an agreement to send a shipment of 100,000 pounds of the drywall back to the Chinese manufacturer a year before they bought their home.

Banner Supply admitted the drywall was bad but said the money the Seifarts were seeking was unreasonable.

Banner attorney Todd Ehrenreich said an appeal would be considered.

"We're very disappointed in the verdict," he said.

The lawsuit is the first jury trial to decide the drywall issue and could open the doors for hundreds of other homeowners who have filed similar lawsuits throughout the country.

**First Chinese Drywall Jury Verdict: $2.4M**
*Top Legal News*
6/27/10

If you have been following the path of alleged damage and destruction caused by imported Chinese drywall on thousands of homes build across the Southeast and other areas of the country, you know that the Consumer Product Safety Commission has issued many advisories regarding the defective drywall. The CPSC has had its say, a judge in federal court in Louisiana, finding against the manufacturers of the drywall has had his say, now a jury in Florida has had its say.

According to the Associated Press, a jury has decided in favor of Florida homeowners Armin and Lisa Seifart who sued the drywall distributor Banner Supply Co. for hiding their knowledge of the defective drywall from them. The company fought in court to limit any damage award to the plaintiffs' actual costs incurred in completely rebuilding their home. However, the jury verdict awarded a total of $2.4 million in damages, an amount meant to also cover the loss of enjoyment of the Seifarts' $1.6 million house and for the stigma that might now reduce its resale value.

As has been discussed in previous posts on FindLaw's Common Law Blog, the drywall has been found to produce noxious fumes which are believed to contribute to the corrosion of metal and wiring in homes built with the defective drywall. Homeowners have complained of corrosion in everything from plumbing, to appliances, to wiring in alarm systems. Some homeowners have blamed health problems on the drywall as well.

According to the AP, the Seifarts had to leave their five-bedroom "dream home" in Miami's Coconut Grove last year so it could be gutted and renovated to address the drywall problems. Their attorney, Ervin Gonzalez, said the couple was not told of problems with the Chinese drywall in March 2008 when they moved into their home. Gonzalez argued at trial that the Banner Company concealed the knowledge it had as early as 2006 that Chinese drywall was defective, including recommendations from manufacturer Knauf Plasterboard Tianjian not to use the wallboards.

The Banner Company was disappointed in the verdict and is considering an appeal. During trial, Banner Company attorneys argued that as of 2006, the drywall problem was limited to a handful of homes in Florida out of some 2,700 built and that it took time for the extent of the damage to become clear. "That defect was hidden, latent and undetectable," said Ehrenreich in closing arguments. "It doesn't rear its ugly head until sometimes years later."

The jury verdict found Banner 55 percent liable for the Seifarts' problems and that Knauf and two other related companies bore the rest of the responsibility. Since Knauf and the other companies were not defendants in this suit, this may limit the payout the Seifarts actually receive. However, the Seifarts might take comfort in the guidance their case may provide for the many drywall cases still pending.

### 1st Chinese Drywall Trial Results in $2.4M Award
*Alabama Injury Attorney blog*
By Martinson & Beason
6/29/10

The first product liability jury trial in the Chinese Drywall litigation yields a giant victory for home owners. A Miami, Florida jury returned a $2.4 million dollar verdict for the plaintiffs whose home was ruined by the foul-smelling drywall. We first reported this problem in our previous post entitled: "Defective Chinese Drywall Leads to Corrosion and Health Concerns for Homeowners." This sulfur emitting drywall has been linked to health problems as well as problems with foul odors, corrosion of wiring, piping, computers and jewelry. The jury in this case not only returned a verdict for the cost of the repair, but also for loss of enjoyment of the house and for the likely reduction it in resale value. The outcome of this case, will surely impact the thousands of other Chinese drywall cases

<u>Harbinger or Outlier? Florida Jury Awards $2.47 in First Chinese Drywall Trial</u>
*Hunton Business Tort Liability Report*
By Hunton & Williams LLP
6/30/10

On June 18, 2010, a Florida family was awarded $2.47 million in the first Chinese drywall case to go to a jury. The jury found that Banner Supply, the drywall distributor was negligent in selling a defective product and violated the Florida Deceptive and Unfair Trade Practices Act. The verdict includes $492,000 in compensatory damages for remedying the problems in the plaintiffs' home and $1.7 million for loss of enjoyment of the home, as well as diminished value due to stigma. In reaching its decision, the jury assigned 55% of the blame to named defendant Banner Supply, while finding manufacturer Knauf Plasterboard Tianjin 35% responsible and the importer and exporter of the drywall 5% responsible each.

This suit was similar to the thousands of claims pending across the United States alleging Chinese drywall emits sulfur fumes, which corrode metal, produce a noxious odor and are harmful to human health. Interestingly, the verdict came the same day that Knauf Plasterboard settled two cases pending in a Louisiana federal multidistrict litigation. Knauf Plasterboard agreed to pay for the removal and replacement of all drywall, electrical components and other systems in the damaged homes. The scope of this settlement was in line with United States District Judge Eldon E. Fallon's findings regarding the remediation necessary for homes containing defective drywall. These developments follow a recent notice of appeal of a default judgment for seven Virginia homeowners in the amount of $2.6 million entered against Taishan Gypsum Company, a manufacturer owned by the Chinese government.

Although the Florida verdict may be an outlier based on bad facts -- there was evidence that Banner Supply had entered into a confidentiality agreement with Knauf to keep secret concerns about the drywall's odors -- there is still cause for concern. This verdict demonstrates that American distributors, wholesalers and retailers of Chinese drywall are at risk of significant jury verdicts. In particular, suppliers may be exposed to "loss of enjoyment" damages that are disproportional to actual damages. Loss of enjoyment and diminished value damages may be likely in jurisdictions that require that homeowners disclose the past or current presence of Chinese drywall to any prospective buyers. Accordingly, American suppliers of Chinese drywall need to be prepared to face damages beyond home repair if the case is put before a jury.

Furthermore, the joint and several liability available in many jurisdictions against sellers of defective products makes American suppliers easy targets compared to Chinese manufacturers that could potentially evade execution of judgments.

**Lawyer Wins Landmark Drywall Case in Florida**
*Lawyers and Settlements*
By Brenda Craig
6/30/10

Miami, FL: "This is an importance case for consumers," says attorney Ervin Gonzalez. "And this is what I do: sue bad companies who do bad things." Gonzalez has recently landed a $2.4 million verdict for a Florida family whose dream home was ruined by toxic Chinese drywall. The trial, says Gonzalez, sent a powerful message. It's the first jury trial in the avalanche of litigation hurled at distributors, manufacturers and contractors involved the toxic drywall catastrophe.

"It's a bellwether case," says Gonzalez from his office in Miami. "It serves to show parties what the percentages of responsibility are and the amount of the award is indicative of what jurors can do with this case.".

Gonzalez's vigorous pursuit of the drywall distributor in this case revealed a tell-tale e-mail that showed the company made a disastrous choice—a choice that Gonzalez calls "the saddest part of all".

Drywall Distributor Failed to Warn, Disclose or Recall

"The distributor knew about the problems in 2006," says Gonzalez. "The company (Banner Supply Co.) protected its own skin and returned the defective drywall to the manufacturer. But it kept everything secret. It did not tell consumers, it did not tell the media, and it did not tell its customers."

Gonzalez's clients, the Seifart family, are currently renting while their home in Coconut Grove is remediated. Toxic drywall literally ate their house alive – destroying wiring, appliances, plumbing and wiring. "The Seifarts purchased a nice home they thought they could be safe in, but what they got was a home with cancerous walls."

The money recouped will go along way to helping the Seifarts repair their $1.6 million home. The remainder of the settlement is relief for loss of enjoyment of their property and damage to the home's resale value.

Seifart v Banner Supply Co. yielded the plaintiffs $111 per square foot in compensation. That's number that Gonzalez says is a "good indication that jurors are willing to put toxic drywall homeowners back to 100 percent of where they should be."

Gonzalez expects that Banner will appeal the decision.

There are some 2000 other cases pending against Banner Supply Co. and hundreds of other toxic drywall cases in litigation mostly across the southern US.

**First Chinese Wall Jury Verdict Comes From Florida**
*Law Offices of Kim Cullen, P.A.*
6/23/2010

A Dade County jury recently awarded a Coconut Grove family $2.4 million in the first jury verdict in the United States involving defective Chinese drywall. Courts around the country had previously issued legal rulings in insurance cases involving Chinese drywall, but this was the first jury verdict against one of the companies that imported the poisonous building material.

The verdict came against Banner Supply Co., one of several companies that imported drywall from China during the building boom in the middle of the last decade. Although Banner insisted that it had no idea that the Chinese drywall was dangerous, evidence was introduced at trial that the Chinese company that made the wall board had warned Banner of the potential danger. The jury ultimately placed 55% of the blame on Banner, and the remainder of the fault on the Chinese company and one other.

The plaintiffs moved into their Coconut Grove in 2008, and have soon found themselves experience health problems. They moved out of their home and asked Banner to compensate them for renovating their home, for their inconvenience, and for the diminished resale value of their now-stigmatized home. Banner refused to pay for anythign more than renovation costs. The jury awarded substantially more.

This case highlights the importance of the court system in making sure that injured or damaged people are able to be made whole by recovering the full measure of their damages. Many corporations talk about justice and responsibility, but few are wiling to accept FULL responsibility for their actions. Without an open courthouse door, people like this Coconut Grove family would have no way to make a large corporation pay.

# EXHIBIT 8

Case 2:09-md-02047-EEF-MBN   Document 7386-13   Filed 02/09/11   Page 15 of 20
Case 2:09-md-02047-EEF-JCW   Document 4824-8   Filed 08/04/10   Page 2 of 7
Case 2:09-md-02047-EEF-JCW   Document 3822-1   Filed 06/18/10   Page 2 of 7



# FACSIMILE   TRANSMITTAL

## NEW ORLEANS PASSPORT AGENCY
1 CANAL PLACE, 365 CANAL STREET SUITE 1300
NEW ORLEANS, LOUISIANA 70130-6508

TO: Leonard Davis and Jeremy Epstein
FROM: Tatum Hernandez

Fee Agreement

Case 2:09-md-02047-EEF-MBN   Document 7386-13   Filed 02/09/11   Page 16 of 20
Case 2:09-md-02047-EEF-JCW   Document 4824-8   Filed 08/04/10   Page 3 of 7
Case 2:09-md-02047-EEF-JCW   Document 3822-1   Filed 06/18/10   Page 3 of 7

# Fee Agreement and Authority to Represent
## (Contingency Fee)

This is an agreement between TATUM HERNANDEZ and CHARLENE HERNANDEZ, the undersigned clients (hereinafter referred to as "we," "us," or the "Clients") and the law firm of Herman, Herman, Katz & Cotlar, L.L.P. (hereinafter referred to as "Attorneys") wherein we do hereby retain and employ Herman, Herman, Katz & Cotlar, L.L.P. as our Attorneys to represent us solely and exclusively to investigate or pursue a claim against the manufacturer and distributor of Dry Wall, and the builder who installed said Dry Wall, in clients' property located at 68034 MARION STREET, MANDEVILLE, LOUISIANA 70471

Unless a different Agreement is made in writing, this Agreement alone shall govern Attorney's and Clients' respective rights and responsibilities. It is specifically understood that Attorney's representation is limited to specific person and/or companies named as Clients and that Attorneys are not representing or expected to represent any other person or entity not named herein as Clients.

Attorney agrees to investigate, prepare, file and pursue litigation (including settlement procedures and negotiations. Attorney will provide legal services, with respect to the claim(s) described above.

We specifically authorize Attorney to undertake negotiations and/or file suit or institute legal proceedings necessary on our behalf.

We further authorize Attorney to retain and employ, at our expense, the services of any experts, as well as the services of other outside contractors, as Attorney deems necessary or expedient in representing our interests.

1) ATTORNEYS FEES. We acknowledge that we have been advised by Attorney that any contingency fee is negotiable. Bearing such in mind, as compensation for legal services, We agree to pay our Attorney a contingency fee out of any award, settlement and/or judgment, before the deduction of cost and expenses as set forth in Section 3 herein, as follows:

33 1/3 % if settled without suit or placing claim on a tolling agreement
40 % in the event suit is filed or the claim is placed on a tolling agreement
40 % in the event a trial actually starts.

Clients authorize Herman, Herman, Katz & Cotlar, L.L.P. to employ one or more other law firms as Associate Counsel in this matter to assist with handling of the matter. In the event another law firm is engaged as Associate Counsel, Clients shall be notified and agrees to execute all documents necessary to engage the Associate Counsel provided such engagement does not increase the amount of fee due for handling the matter.

It is understood and agreed that this employment is upon a contingency fee basis and, if no recovery is made, we will not be indebted to my Attorney for any sum whatsoever as Attorney's Fees. If Attorney associates outside counsel to assist in the handling of this matter, we understand all Attorneys are only entitled to one fee that is divided between them, pursuant to their agreement. In the event of recovery, costs shall be paid out of my share of the recovery. The contingency fee shall apply whether recovery is by way of settlement, judgment, or otherwise.

2) POWER OF ATTORNEY. Attorney shall not, without first obtaining the informed consent of Clients, enter into any binding agreement to settle or compromise Clients' claims. Additionally, clients agree to make no settlement or offer of settlement without first settling with Attorney. Subject to that limitation, Clients hereby grant to Attorney a Power of Attorney to sue, to receive any and all payments, to endorse

Page 1 of 5

Case 2:09-md-02047-EEF-MBN   Document 7386-13   Filed 02/09/11   Page 17 of 20
Case 2:09-md-02047-EEF-JCW   Document 4824-8   Filed 08/04/10   Page 4 of 7
Case 2:09-md-02047-EEF-JCW   Document 3822-1   Filed 06/18/10   Page 4 of 7

any and all checks, to sign any and all documents, of whatever nature, to obtain medical records and other personal information, and to do everything generally which may be necessary in the prosecution of Client's legal matters as if Clients were present. Clients agree that this power of attorney is continuous until expressly revoked by Client in writing.

3) ADVANCES AND EXPENSES (hereinafter referred to as "costs"). Attorney is authorized to incur reasonable costs, advances and expenses in performing legal services under this Agreement. Out of our recovery, in addition to paying Attorney's Fees, we agree to pay all costs Attorney incurs during the handling of this matter out of any settlement and/or judgment. Costs shall be billed to my account as they are incurred. A copy of my account shall be provided to me upon request. We hereby agree to reimburse Attorney out of the first settlement and any other settlements, if necessary. Costs may include (but are not limited to) the following: an open file fee of $125, long distance telephone charges (billed at actual cost), photocopying (.25 cents per page), postage, facsimile costs ($2.50 per page), Overnight Courier (e.g. Federal Express) or other delivery charges, medical records/bills, charts, models, photographs, blow-ups, and other demonstrative aids and evidence, deposition costs and fees, expert fees, subpoena costs, court costs, sheriff's and service fees, travel expenses (including, but not limited to, air fare, lodging, mileage (based on the rate set by the Internal Revenue Service), automobile rental charges, and meals), investigation fees; and payments made, owed, for treatment rendered to plaintiff(s), and/or guaranteed. In addition, clerical staff overtime will be charged at 1.5 times the base hourly rate paid to the staff who work that overtime. The base hourly rates for clerical staff range from $9.00 per hour to $25.00 per hour (These costs only pertain to overtime which might be required in the handing of client's specific claims.)

In addition to the above listed individual case cost, Attorneys may also charge certain common benefit costs to Clients. Common benefit cost are cost expended for the common benefit for a group of clients to pursue similar type cases. Such common benefit costs may include deposition expenses, expert expenses, investigation, computer research, jury research and other case expenses that may provide a common benefit to all as a result of client sharing in such costs. I understand that common benefit expenses will result in no one client having to solely bare the entire cost which actually benefit the group as a whole and that many of these costs that could be incurred in litigation or handling the matter may be able to be shared by claimants who are similarly situated pursuing similar type claims.

If we decide to terminate Attorney's employment, we agree to pay all costs, as set forth in this Section, out of any settlement and/or judgment ultimately obtained. If we terminate Attorney's employment and decide not to pursue this matter, I agree to pay all costs, as set forth in this section, regardless of whether there is any recovery in this matter.

If an advance deposit is being held by Attorney we agree to promptly reimburse Attorney for any amount in excess of what is being held in advance.

Advance required       ___Yes       _X_No

We agree to advance $ __N/A__ for costs, which amount shall be deposited in Attorney's trust account and shall be applied to costs and expenses as they accrue. Should this advance be exhausted, we agree to replenish the advance promptly upon Attorney's request. If we fail to replenish the advance within ten (10) days of Attorney's request, Attorney shall have, in addition to other rights, the right to withdraw as our Attorney.

4) LINE OF CREDIT. In the event our attorneys find it necessary to obtain a line of credit specifically to fund the costs of our case, the interest paid by them on said line of credit and principal shall be an expense to be reimbursed with all other costs and advances out of our share of the proceeds of any judgment or settlement.

5) INTERESTS; ATTORNEY'S FEE FOR ENFORCEMENT. If any Attorney's fees or costs and expenses are not paid within ten (10) days of Attorney's mailing of statement to me, we further agree to pay interest thereafter on any balance due at the rate of twelve percent (12%) per annum. We further agree to

Page 2 of 5

Case 2:09-md-02047-EEF-MBN   Document 7386-13   Filed 02/09/11   Page 18 of 20
Case 2:09-md-02047-EEF-JCW   Document 4824-8   Filed 08/04/10   Page 5 of 7
Case 2:09-md-02047-EEF-JCW   Document 3822-1   Filed 06/18/10   Page 5 of 7

pay the reasonable attorney's fee of any attorney employed by Attorney to seek enforcement of this agreement.

6) NO GUARANTEE. We acknowledge that my Attorney has made no promise or guarantee regarding the outcome of our legal matter. In fact, Attorney has advised me that litigation in general is risky, can take a long time, can be very costly and can be very frustrating.

7) CANCELLATION OF AGREEMENT. We further acknowledge that my Attorney shall have the right to cancel this agreement and withdraw from this matter if, in Attorney's professional opinion, the matter does not have merit, we do not have a reasonably good possibility of recovery, the cost of litigation exceeds the potential amount of recovery in attorney's opinion, we refuse to follow the recommendations of Attorney, we fail to abide by the terms of this agreement, and/or if Attorney's continued representation would result in a violation of the Rules of Professional Conduct, or at any other time as or if permitted under the Rules of Professional Conduct.

8) COOPERATION. Clients agree to cooperate with Attorney and to be available for conferences, depositions or other negotiations, including court appearances. Clients agree to review all materials sent to Clients by Attorney promptly upon receipt. In the event of inquiries, complaints, or misunderstandings which Clients may have, Clients agree to promptly bring those matters to the attention of Attorney. Clients shall keep attorney informed of Clients' current residence and business addresses, as well as residence and business telephone numbers and email address.

9) SETTLEMENT/COMPROMISE/RELEASE/DISCONTINUANCE. It is further agreed that neither Attorney, or those associated with Attorney, nor Clients may, without the consent of the other, settle, compromise, release, discontinue or otherwise dispose of the suit or claim mentioned above. Either party to this contract may, at anytime, file it with the Clerk of the District Court in which the suit is pending, or is to be brought, and have a copy made and served on the opposite party and due return made as in case of petitions and ordinary suits. After such service, any settlement, compromise, discontinuance, or other disposition made of the suit or claim by either Attorney or Clients without the written consent of each other shall be null and void, and the suit or claim shall be proceeded with as if no such settlement or discontinuance had been made.

10) STATUTORY ATTORNEY'S FEES. In the event of recovery under the provisions of the Longshore and Harbor Workers' Compensation Act, or under Louisiana Workman's Compensation laws, or under any other laws which specify attorney's fees to be paid, then the Attorney's fees shall be paid in accordance with the maximum allowed by law.

11) ATTORNEY'S LIEN/PRIVILEGE. We agree and understand that this contract is intended to and does hereby assign, transfer, set over and deliver unto Attorney as his fee for representation of us in this matter an interest in the claim(s), the proceeds or any recovery therefrom under the terms and conditions aforesaid, in accordance with the provisions of Louisiana Revised Statute §37:213, and that Attorney shall have the privilege afforded by Louisiana Revised Statute §9:5001.

12) ARBITRATION OF FEE DISPUTES. In the event of any dispute or disagreement concerning this agreement, Attorney and Clients agree to submit said dispute to binding arbitration by the Louisiana State Bar Association Lawyer Fee Dispute Resolution Program.

13) ARBITRATION OF NON-FEE RELATED DISPUTES. If a dispute arises between Clients and Attorney regarding legal services performed by Attorney in connection with the claim(s) covered by this Agreement such dispute shall be submitted to binding arbitration.

Such arbitration shall be conducted in accordance with the rules of Judicial Arbitration and Mediation Services. The arbitrator shall have discretion to order the losing party in the arbitration proceedings to reimburse the prevailing party for all costs and fees incurred in connection with the arbitration, including, without limitation, attorney fees and arbitrator fees.

Page 3 of 5

Case 2:09-md-02047-EEF-MBN   Document 7386-13   Filed 02/09/11   Page 19 of 20
Case 2:09-md-02047-EEF-JCW   Document 4824-8   Filed 08/04/10   Page 6 of 7
Case 2:09-md-02047-EEF-JCW   Document 3822-1   Filed 06/18/10   Page 6 of 7

YOUR INITIALS BELOW SIGNIFY YOUR ACKNOWLEDGMENT OF THE FOLLOWING EXPLANATION:

You acknowledge that Attorney has explained to you that such binding arbitration may deprive you of various rights that you otherwise might have in a legal action, including, without limitation, the right to a jury trial, the right to appeal, and full discovery rights.

_____ (Clients' initials) _____ (Clients' initials)

14) ADDITIONAL TERMS - INTENTIONALLY OMITTED.

15) LOUISIANA LAW. This contract shall be governed by Louisiana law.

16) TERMINATION OF REPRESENTATION. We understand that we have the right to terminate the representation at any time upon written notice to that effect. We understand that we will be responsible for any fees and costs incurred prior to the discharge or termination. It is also understood that Attorney has a right to terminate representation upon written notice to that effect. We understand that should Attorney terminate said representation, we will be responsible for any fees and costs incurred prior to the discharge or termination.

17) CONFIDENTIALITY AND CONFLICT. The undersigned acknowledge that the firm may be representing multiple clients in connection with the subject matter of this fee agreement. Any communications and information may be fully disclosed by the Firm to the undersigneds, unless one of the undersigneds inform the Firm of his or her desire that a particular communication or item of information be considered confidential and be withheld from the other. You are informed that Louisiana state law requires that no attorney not disclose confidential communications or secrets of a client. Each of the undersigned hereby expressly consents to such disclosure to the other, except for communications or items of information about which he or she informs the Firm that confidentiality from the other must be maintained. Nothing in this provision is intended to authorize, under any circumstances, the Firm's disclosure of confidential communications or secrets of the undersigned to any individual or entity other than the other. If the Firm is advised that confidentiality from the other must be maintained with respect to a particular communication or item of information, the Firm will advise the other that such a request has been made, without divulging its subject matter, and will withdraw from its representation, provided the withdrawal is permitted under the Rules of Professional Conduct of the State Bar of Louisiana.

You are informed that the Rules of Professional Conduct of the State Bar of Louisiana require, before an attorney may concurrently represent two or more clients interested in the same subject matter, that the attorney inform the clients in writing of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the clients. You are further informed that the Rules require that when the clients' interests potentially conflict, the attorney may not represent them without their informed written consent. At present there does not appear to be a potential conflict of interest or circumstances that are reasonably foreseeable that could result in adverse consequences to clients as a result of multiple representation in this case. Should circumstances arise where it appears to the Firm that there is a possibility that one or more of your interests may potentially conflict or that continued representation of multiple clients could result in reasonably foreseeable adverse consequences, the Firm will so advise you in writing and at that time disclose the nature of the potential conflict or circumstances and seek each of your consent to the Firm's continued representation despite the possibility of conflict. The Firm may withdraw from such representation if there is an actual conflict between the interests of the undersigneds, provided the withdrawal is permitted under the Rules of Professional Conduct of the State Bar of Louisiana.

You are advised that at any time you may seek your own attorney who will represent solely your own interests.

18) BANKRUPTCY PROVISIONS. Clients represent to attorneys that they are not presently, nor do they

Page 4 of 5

Case 2:09-md-02047-EEF-MBN   Document 7386-13   Filed 02/09/11   Page 20 of 20
Case 2:09-md-02047-EEF-JCW   Document 4824-8   Filed 08/04/10   Page 7 of 7
Case 2:09-md-02047-EEF-JCW   Document 3822-1   Filed 06/18/10   Page 7 of 7

contemplate filing for Bankruptcy protection; that they will inform attorney should such a course of action be contemplated in the future. Clients acknowledge that any fees garnered as result from this claim are subject to such proceedings wherein they are to be scheduled as an asset by Clients. Clients further acknowledges that any expense which the Attorney may require to protect Attorney's fees from said result shall be subtracted from fees which normally would flow to Clients as their share of recovery.

19) HERMAN GEREL, LLP. We understand that Herman, Herman, Katz & Cotlar, L.L.P. and its partners are also partners in Herman Gerel, LLP, a Georgia limited liability partnership.

20) We are not tax attorneys. Our firm makes no representations regarding the tax implications of any settlement or judgment herein. Tax implications, if any, of any settlement or judgment should be made in conjunction with your accountant and/or tax attorney.

21) ENTIRE AGREEMENT. We have read this agreement in its entirety and we agree to and understand the terms and conditions set forth herein. We acknowledge that there are no other terms or oral agreements existing between Attorney and Client. This agreement may not be amended or modified in any way without the prior written consent of Attorney and Clients.

This agreement is executed by us, the undersigned Clients, on this 25 day of June, 2009.

CLIENT(S):

_____
Print Name: TATUM HERNANDEZ

_____
Print Name: CHARLENE HERNANDEZ

The foregoing agreement is hereby accepted on this _____ day of _____, 20____.

HERMAN, HERMAN, KATZ & COTLAR, L.L.P.

BY: _____
ATTORNEY
Print Name: _____