## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO.:  2047 |
| THIS DOCUMENT RELATES TO:<br>*Pate v. American International Specialty Lines Insurance Company, et al.* (09-7791) | JUDGE FALLON<br><br>MAGISTRATE JUDGE WILKINSON |

### PLAINTIFF ROBERT C. PATE AND THE PLAINTIFFS' STEERING COMMITTEE'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE POLLUTION EXCLUSION

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Robert C. Pate ("Pate") and the Plaintiffs' Steering Committee ("PSC") (collectively, "Plaintiffs") hereby move for partial summary judgment concerning the inapplicability of the pollution exclusion contained in the liability insurance policies that American International Specialty Lines Insurance Company (n/k/a Chartis Specialty Insurance Company) ("Chartis"), Illinois Union Insurance Company ("Illinois Union"), Lexington Insurance Company ("Lexington"), and Steadfast Insurance Company ("Steadfast") (collectively, "Defendants") sold to WCI Communities, Inc.

I.      **FACTS**

A.      **The Chinese Drywall Claims**

WCI Communities, Inc. builds homes and residential communities in states such as Florida, New York, New Jersey, Virginia, Maryland, and Connecticut.  Affidavit of Vivien Hastings ("Hastings Aff.") at ¶ 3.[1]  WCI began to receive complaints of property

---

[1] The Affidavit of Vivien Hastings is attached hereto as Ex. 1.

damage and/or bodily injury allegedly arising from Chinese Drywall[2] installed in homes that WCI sold.  *Id.* at ¶ 4; Notice Letters, attached to Affidavit of Sheila Leith ("Leith Aff.")[3] as Exs. Q, R.  The claimants allege damages that include increased rates of corrosion of soft metal materials throughout the houses (such as air conditioning coils, refrigerator tubing, electrical wires, and television connections); various health issues allegedly arising from the drywall; and tarnishing of silver and soft metal within the homes.  *See id.*

### B.    The Trust

Because of the overwhelming nature of the claims against WCI, and for other reasons, WCI Communities, Inc. and a number of its subsidiaries ultimately filed for bankruptcy (collectively, the "WCI Debtors").  Hastings Aff. at ¶ 2.  The plan of reorganization, approved by the United States Bankruptcy Court, created a Chinese Drywall Trust (the "Trust") upon which the WCI Debtors' liability or losses for claims asserted against the WCI Debtors by an owner or occupant of, or person otherwise exposed to, a home built by the WCI Debtors for damages related to Chinese Drywall was imposed.  Second Amended Plan of Reorganization, Article V, § 5.1(e), attached as Ex. J to Leith Aff.  The WCI Debtors transferred to the Trust their right, title, and interest in the "Insurance Coverage Actions"[4] and the "Chinese Drywall Actions"[5] and the

---

[2] As used herein, the term "Chinese Drywall" includes drywall manufactured in China as well as drywall manufactured domestically that contains recycled drywall from China.

[3] The Affidavit of Sheila Leith is attached hereto as Ex. 2.

[4] The Plan defines "Insurance Coverage Actions" as "any rights to indemnification, reimbursement, contribution or other payment under any of the [WCI] Debtors' existing insurance policies, including the [WCI] Debtors' director and officer liability insurance policies, as of the Effective Date that may provide coverage with respect to Allowed Chinese Drywall Claims."  Ex. J to Leith Aff., Ex. A # 71.

proceeds thereof, and any right, title or interest in pursuing and receiving any and all

"Insurance Recoveries."[6]  *Id.* at Article XI, § 11.2.  The Plan approved by the United

States Bankruptcy Court also established a Chinese Drywall Trustee ("Trustee") to

prosecute the Insurance Coverage Actions and Chinese Drywall Actions.  *Id.* at §

11.1(b).  The United States Bankruptcy Court for the District of Delaware confirmed the

Plan on August 26, 2009, including the creation of the Trust, and approved Judge

Robert C. Pate's appointment as Trustee.  Order Confirming Plan, attached to Leith Aff.

as Ex. K.  Over 700 homeowners allegedly have Chinese Drywall installed in their

homes by the WCI Debtors and may seek recovery through the Trust.

    **C.**    **The Pate Action**

    Judge Robert C. Pate, as Trustee, initiated this action against the Defendants as

well as seventeen other insurance entities.  *In re Chinese Manufactured Drywall*

*Products Liability Litigation*, MDL No. 2047, First Amended Complaint (E.D. La. Mar. 15,

2010) [Doc. No. 1732].  In his complaint, Pate seeks, inter alia, a declaratory judgment

that the defendant liability insurance companies are obligated to pay the liabilities faced

---

[5] The Plan defines "Chinese Drywall Actions" as "the Causes of Action that the [WCI] Debtors may have against any subcontractor or other Person who installed Chinese drywall in a home built or sold by a [WCI] Debtor, directly or indirectly, any insurer of any such subcontractor or other Person, any retailer, wholesaler, distributor, manufacturer or provider of Chinese drywall that was installed in a home built or sold by a [WCI] Debtor, directly or indirectly, and/or any insurer of any such retailer, wholesaler, distributor, manufacturer or provider."  Ex. J to Leith Aff., Ex. A # 22.

[6] The Plan defines "Insurance Recovery," in pertinent part, as "(a) the right to pursue and receive the benefits and proceeds of any insurance policy issued to, owned by, or otherwise providing coverage to any [WCI] Debtor, including any insurance policy owned by any third party on which any [WCI] Debtor is named as an additional insured, with respect to Chinese Drywall Claims; (b) the right to pursue and receive recovery from or as a result of any Insurance Coverage Action; ... [and] (e) the right to pursue and receive any other recovery from an insurance company, in its capacity as such, with respect to Chinese Drywall Claims."  Ex. J to Leith Aff., Ex. A # 71.

by the Trust for liabilities and losses arising from claims against WCI Communities, Inc.

and certain of its subsidiaries (collectively, "WCI") for the development and sale of

homes by WCI allegedly containing Chinese Drywall.  *Id.* at ¶¶ 56-60.

### D.    The Insurance Policies

This motion concerns the following liability insurance policies that the Defendant

liability insurance companies sold directly to WCI.  This motion does not involve liability

insurance policies sold to subcontractors under which WCI is an additional insured.

| Insurance Company | Policy Number | Policy Type | Policy Period |
| --- | --- | --- | --- |
| Chartis | 7412158 | Commercial umbrella liability | 5/1/06 – 5/1/07 |
| | 7412275 | Commercial umbrella liability | 5/1/07 – 5/1/08 |
| | BE 4943750 | Commercial umbrella liability | 5/1/08 – 12/1/08 |
| Illinois Union | XOO G22081706 | Commercial umbrella liability | 3/1/05 – 5/1/06 |
| Lexington | 0355453 | Excess liability | 5/1/06 – 5/1/07 |
| | 1011060 | Excess liability | 5/1/07 – 5/1/08 |
| | 1053988 | Excess liability | 5/1/08 – 12/1/08 |
| Steadfast | AEC 3836443 03 | Excess liability | 3/31/05 – 5/1/06 |
| | AEC 3836443 04 | Excess liability | 5/1/06 – 5/1/07 |

Each of these liability insurance policies contains language purporting to exclude

coverage for losses attributable to pollution.

### 1.    The Chartis Policies

The Chartis liability insurance policies contain a pollution exclusion, which states,

in pertinent part:

**Pollution**

This insurance does not apply to:

1.   Any **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** anywhere at any time;

2.   Any loss, cost or expense arising out of any request, demand, order or statutory or regulatory requirement that the **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **Pollutants**; or

3.   Any loss, cost or expense arising out of any claim or **Suit** by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to, or assessing the effects of **Pollutants**.

Chartis policy no. 7412158, Endorsement 7, attached to Leith Aff. as Ex. A;[7] Chartis policy no. 7412275, Endorsement 4, attached to Leith Aff. as Ex. B; Chartis policy no. BE 4943750, Endorsement 7, attached to Leith Aff. as Ex. C.  Policy nos. 7412275 and BE 4943750 define pollutants as "any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."  Ex. B to Leith Aff., Section VI(U); Ex. C to Leith Aff., Section VI(U).[8]

2.   The Illinois Union Policy

The Illinois Union liability insurance policy contains the following pollution exclusion:

---

[7] Notably, Endorsement 7 of Chartis policy no. 7412158 amends "Paragraph U. Pollution," but the policy does not contain a Paragraph U concerning pollution.

[8] Chartis policy no. 7412158 fails to define the term "pollutants."

This insurance does not apply to any injury, damage, expense, cost, loss, liability or legal obligation arising out of or in any way related to pollution, however caused.

Pollution includes the actual, alleged or potential presence in or introduction into the environment of any substance, if such substance has or is alleged to have the effect of making the environment impure, harmful, or dangerous.  Environment includes any air, land, structure or the air therein, watercourse or water, including underground water.

Illinois Union policy no. XOO G22081706, Endorsement 12, attached to Leith Aff. as Ex.

D.

> 3.    The Lexington Policies

The Lexington liability insurance policies include a pollution exclusion that states

as follows:

This policy does not apply:

1.    to any injury caused by, contributed to or arising out of the actual or threatened discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, pollutants or contaminants into or upon the land, the atmosphere or any course or body of water, whether above or below ground.  It is understood and agreed that the intent and effect of this exclusion is to delete from any and all coverages afforded by this policy any claim, action, judgment, liability, settlement, defense or expense (including any loss, cost, or expense arising out of any governmental direction or request that the Insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants) in any way arising out of such actual or threatened discharge, dispersal, release or escape, whether such results from the Insured's activities or the activities of others, and whether or not such is sudden or gradual, and whether or not such is accidental, intended, foreseeable, expected, fortuitous or inevitable, and wherever such occurs;

Lexington policy no. 0355453, Exclusions at p. 2, attached to Leith Aff. as Ex. E;

Lexington policy no. 1011060, Exclusions at p. 2, attached to Leith Aff. as Ex. F;

Lexington policy no. 1053988, Exclusions at p. 2, attached to Leith Aff. as Ex. G.  The

Lexington policies define neither "pollutants" nor "contaminants."

4.      The Steadfast Policies

Steadfast liability insurance policy no. AEC 3836443 03 contains the following

pollution exclusion:

**SECTION IV. – EXCLUSIONS, EXCLUSION B.** is deleted in its entirety
and replaced by the following:

B.      1.      Arising directly or indirectly out of the actual, alleged or threatened
                existence, discharge, seepage, migration, disposal, release or
                escape of "pollutants."

        2.      Arising out of any:

                a.      Request, demand, or order than any insured or others test
                        for, monitor, clean-up, remove, contain, treat, detoxify or
                        neutralize, or in any way respond to, or assess the effects of
                        "pollutants;" or

                b.      Claim or suit by or on behalf of a governmental authority for
                        damages because of testing for, monitoring, cleaning up,
                        removing, containing, treating, detoxifying or neutralizing, or
                        in any way responding to, or assessing the effects of
                        "pollutants."

        As used in this endorsement, "pollutants" means any man-made or
        naturally occurring solid, liquid, gaseous or thermal irritant or contaminant,
        including but not limited to:  smoke; vapor; soot; fumes; acids; alkalis;
        chemicals; and waste.  Waste includes materials to be recycled,
        reconditioned or reclaimed.

        However, it is agreed that this exclusion does not apply to any liability,
        damage, loss, cost or expense described above for which coverage is
        afforded under **ACE's (Illinois Union Insurance Company** Policy No.
        **XOO G22081706** and then for no broader coverage than is afforded by
        such insurance (hereafter referred to as the "Underlying Pollution
        Coverage").  In the event that the "Underlying Pollution Coverage" is
        amended or deleted after the inception date of this policy, we must be so
        advised in writing within 14 days after the effective date of such
        amendment or deletion.  Any amendment which broadens coverage under
        the "Underlying Pollution Coverage" shall not be binding upon us unless
        our agreement is acknowledged in writing by an authorized representative
        of the Company.

Steadfast policy no. AEC 3836443 03, Endorsement 18, attached to Leith Aff. as Ex. H.

Steadfast liability insurance policy no. AEC 3836443 04 has the following pollution exclusion:

**SECTION IV.  EXCLUSIONS**

This policy does not apply to any liability, damage, loss, cost or expense:

**POLLUTION**

B.   1.   Arising directly or indirectly out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

   This exclusion does not apply to bodily injury or property damage arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

   a.   At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

   b.   At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

   2.   Arising out of any:

   a.   Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

   b.   Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants".

As used in this exclusion:

1.   A "hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

2.    "Pollutants" means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste.  Waste includes material to be recycled, reconditioned or reclaimed.

Steadfast policy no. AEC 3836443 04, Section IV at pp. 2-3, attached to Leith Aff. as Ex. I.

## II.    ARGUMENT

The outcome of this motion depends largely on a conflicts of law determination. Several states – Louisiana, New York, Massachusetts, and Florida – have contacts with the parties and the dispute.  For the reasons discussed below, Louisiana, New York, and Massachusetts law – all of which utilizes the same rules regarding the pollution exclusion – should apply.  Under that law, the pollution exclusion does not apply here, where the policyholder is not an active polluter and the alleged pollution was not environmental.

### A.    Standard Of Review

A court must grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Smith v. United Student Aid Funds, Inc.*, No. 96-1610, 1997 WL 159503, at *1 (E.D. La. Apr. 1, 1997); *Blair v. Sealift, Inc.*, 91 F.3d 755, 760 (5th Cir. 1996).  Once the moving party demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  *Alaro v. Offshore Serv. Vessels, LLC*, No. 09-5440, 2011 WL 63872, at *3 (E.D. La. Jan. 7, 2011).  However, "the showing of a genuine issue is not satisfied by creating some

metaphysical doubt as to the material facts, by conclusory allegations, unsubstantiated assertions, or by only a scintilla of evidence." *Millwrights & Mach. Erectors Local Union 729 v. Gulf Eng. Co., LLC*, No. 10989, 2011 WL 162071, at *2 (E.D. La. Jan. 18, 2011) (internal citations and quotations omitted).  Indeed, "the mere existence of some factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be genuine and material."  *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995) (stating that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will preclude summary judgment.").  Here, partial summary judgment should enter because there is no genuine issue as to any material fact concerning the inapplicability of each purported pollution exclusion, and Pate is entitled to a judgment as a matter of law.

   **B.     Louisiana Choice Of Law Rules Mandate The Application Of The Law Commonly Applied By Louisiana, New York, And Massachusetts**

   "A federal court, sitting in diversity, applies the choice of law rules from the forum state." *Travelers Cas. & Sur. Co. of Am. v. Wright Ins. Agency Inc.*, 404 F.3d 927, 928 (5th Cir. 2005).  For this reason, Louisiana choice of law rules apply.

   The pertinent Louisiana conflict of laws provisions are set forth in La. Civ. Code Articles 3515 and 3537 (2010).  *Champagne v. Ward*, 893 So. 2d 773, 780-81 (La. 2005).  Article 3515 provides the following general rule:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of:
>
> (1)     the relationship of each state to the parties and the dispute; and

> (2)    the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

Article 3537, which applies specifically to conventional obligations such as insurance policies, provides:

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of:
>
> (1)    the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties;
>
> (2)    the nature, type, and purpose of the contract; and
>
> (3)    the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

Articles 3515 and 3537 "are intended to be read together" with the objective of identifying the state whose policies would be more seriously impaired if its law were not applied to the issue. *Sentilles Optical Servs., Div. of Senasco, Inc. v. Phillips*, 651 So. 2d 395, 398 (La. Ct. App. 1995). "This objective is achieved through an issue-specific analysis of the policies of each of the … [implicated] states, the first step in which process is to identify the relevant policies of the laws in … [those] states." *Id.*

Louisiana courts will consider the aforementioned factors to determine the law applicable to the insurance policies at issue. *See, e.g., Liberty Mut. Ins. Co. v. Zurich Am. Ins. Co.*, No. 06-3206, 2007 WL 3487651, at *3 (E.D. La. Nov. 13, 2007) (stating that the "pertinent contacts" of each state favored applying Mississippi law where the

policyholder was incorporated and based in Mississippi, and the policy was negotiated, formed, and issued in Mississippi).

Application of Louisiana choice of law principles demonstrates that the laws of Louisiana, New York, and Massachusetts concerning the pollution exclusion – all of which are consistent – apply to this motion.[9]

> 1.   Louisiana is the state whose public policies would be most
>       seriously impaired if its law were not applied to this issue

Louisiana's public policies would be most seriously impaired if its law were not applied to the pollution exclusion issue.  Louisiana maintains a significant interest in the proper application of the pollution exclusion.  In fact, "the Louisiana Department of Insurance issued an advisory letter designed to guide insurers in their application of the [pollution] exclusions."  *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 133 (La. 2000).  In that letter, the Louisiana Commissioner of Insurance stated:

> [Pollution] exclusions are inappropriate for many types of coverage and/or
> for certain classes within particular coverage lines.  Many insureds do not
> present a pollution risk obviating the need for the broad exclusionary
> language found in standard pollution exclusions.
>
> Further, our review has disclosed a number of incidents where the
> standard pollution exclusions have been used to disavow coverage even
> though there was no underlying pollution incident which would justify use
> of the exclusion.  We are also concerned that the broad definition given to
> the term "pollutant" creates an opportunity for abuse.  This is a particular
> concern as regards commercial enterprises whose ongoing business
> activities do not present a risk to the environment.  For example, we have
> found instances where it has been argued that any thing and/or matter
> that harms a person, whether or not it has toxic or hazardous properties, is

---

[9] The Court need not choose among the laws of Louisiana, New York, and Massachusetts since they are consistent on the pollution exclusion.  *See Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 620 (5th Cir. 2005) (stating that "[i]f the laws of the states do not conflict, then no choice-of-law analysis is necessary, and we simply apply the law of the forum state") (internal quotation omitted).

de facto an irritant and therefore a pollutant, thereby triggering the
pollution exclusion.

The appropriate use of standard pollution exclusions in claims handling is
an issue of grave concern.  The Louisiana Department of Insurance will
take such action as is necessary to assure that the integrity of the
regulatory process is not undermined.  It is of critical importance that such
exclusions are used in a manner which is consistent with their stated
purpose.

*Id.* (citing James H. Brown, Louisiana Commissioner of Insurance, Advisory Letter 97-

01, pp.1-2s (June 4, 1997)) (emphasis added).  Given the concern that Louisiana – host

to the MDL and this action – has voiced regarding the application of the pollution

exclusion, Louisiana's public policies would be most seriously impaired if its law were

not applied to this issue.

New York's public policies would also be impaired if the Court were to apply law

contrary to New York's on the pollution exclusion.  As discussed below, New York law –

like Louisiana and Massachusetts law – requires *environmental* pollution.  One of the

Defendants, Chartis, maintains its principal place of business in New York.  The state of

New York has an interest in (1) regulating insurance companies that reside in, and enter

into contractual obligations from, New York, and (2) more specifically, preventing such

companies from utilizing the pollution exclusion to escape their obligations where there

was no environmental pollution.

Similarly, application of law inconsistent with that of Massachusetts would impair

Massachusetts' public policies.  The commonwealth of Massachusetts – like the state of

New York – has an interest in regulating resident insurance companies like Defendant

Lexington.  Massachusetts courts have interpreted the pollution exclusion narrowly,

protecting the policyholder.  Were the Court to apply pollution exclusion law contrary to

that of Massachusetts, Lexington – a Massachusetts resident – could avoid its coverage obligations in contravention of Massachusetts public policy.

Application of law other than Florida's will not impair Florida's public policies. The Florida Supreme Court has not limited the pollution exclusion to environmental or industrial pollution.[10]  Such a ruling protects insurance companies by upholding their decisions to deny coverage for any claims that are pollution related, whether they involve traditional environmental pollution or even indoor exposure.  Here, the insurance companies that would benefit from the application of Florida law are neither residents of – nor incorporated in – Florida.  To the extent that the Florida pollution exclusion rule aims to protect Florida insurance companies, Florida law should not apply here where it will not benefit a Florida insurance company.  Again, none of the insurance companies that sold insurance to WCI and that is a subject of this motion is incorporated or has a principal place of business in Florida.

> 2.    The states of Louisiana, New York, and Massachusetts have the
> most significant relationship with the parties and the dispute

Subsection 1 of Articles 3515 and 3537 requires the Court to consider:  the relationship of each state to the parties and the dispute and each state's pertinent contacts to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties.  Consideration of these factors collectively favors the application of Louisiana, New York, and Massachusetts law.

---

[10] *See Deni Associates of Florida, Inc. v. State Farm & Casualty Ins. Co.*, 711 So. 2d 1135, 1138 (Fl. 1998).  However, Plaintiffs do not concede that Florida law mandates application of the pollution exclusion in this case.

The state of New York has numerous contacts with the parties and the dispute. Each of the Defendants sells insurance in New York and collects premiums from New York residents. Annual Statements and Best's Insurance Reports, attached hereto as Ex. 3. Chartis, one of the Defendants, maintains its principal place of business in New York. Accordingly, New York is considered Chartis's home office for virtually all decisionmaking, including, but not limited to, principal underwriting operations and claims. Moreover, New York is from where Chartis makes virtually all of its significant final coverage determinations and payments under the insurance policies and other financial products and services Chartis sells. *See* Ex. P to Leith Aff. The Chartis insurance policies were negotiated, at least in part, in New York. WCI provided notice under the Chartis policies to the New York office. *See* Notice Letter, attached to Leith Aff. as Ex. Q.

Additionally, Defendants signed and countersigned many of the insurance binders and policies in New York. Specifically, Steadfast countersigned policy nos. AEC 3836443 03 and AEC 3836443 04, and their corresponding binders, in New York. *See* Ex. L to Leith Aff. (insurance binder signed by Rob Kenyon, team leader for underwriting of Zurich North America Specialties Excess Casualty NYC); Ex. H to Leith Aff. and Ex. 6 attached hereto (policy countersigned by Doreen Miller of Zurich North America's New York office); Ex. M to Leith Aff. (binder signed by Rob Kenyon, regional vice president of Zurich North America Specialties Excess Casualty NYC); Ex. I to Leith Aff. (policy countersigned by Robert Kenyon of Zurich Excess Casualty New York). Chartis created and signed the binder for policy no. 7412158, and countersigned policy no. 7412275, in New York. *See* Ex. O to Leith Aff. (binder signed by Jonathan Luca of

Chartis in New York); Ex. B to Leith Aff. and Ex. 7 attached hereto (policy countersigned by Timothy J. McAuliffe, an executive of Chartis in New York). Moreover, Chartis created and signed the binder for policy no. BE4943750 in New York, and sent the binder to WCI's broker, Lockton, Inc. ("Lockton") in New York. *See* Ex. P to Leith Aff. (e-mail correspondence transmitting binder from Elizabeth K. Johnson of AIG Excess Casualty[11] to Timothy J. Harper of Lockton Companies, LLC in New York). It also countersigned policy no. BE4943750 in New York. *See* Ex. C to Leith Aff. and Ex. 7 attached hereto (policy countersigned by Timothy J. McAuliffe, an executive of Chartis in New York). Lastly, Lexington delivered the binder for policy no. 1053988 to Lockton in New York. *See* Exs. N, P to Leith Aff. (binder addressed to Tim Harper of Lockton in New York).

Louisiana also maintains contacts with the parties and the dispute. The Pate Action – and the MDL – are venued in Louisiana. In addition, the Defendants have been named defendants in other member cases of the MDL. *See, e.g.*, *Amato v. Liberty Mut. Ins. Co.*, C.A. No. 10-932 (naming American International Specialty Lines, Lexington, and Steadfast as defendants); *Hernandez v. AAA Insurance*, C.A. No. 10-3070 (naming Lexington as a defendant). Furthermore, each of the Defendants sells insurance in Louisiana and collect premiums from Louisiana residents. *See* Ex. 3.

Like the states of New York and Louisiana, the commonwealth of Massachusetts is related to the parties and the dispute. WCI provided notice under the policies to Lexington's Massachusetts office. *See* Notice Letter, attached to Leith Aff. as Ex. R. Lexington countersigned each of the Lexington policies in Massachusetts, and

---

[11] AIG was renamed Chartis.

Lexington maintains its principal place of business in Massachusetts.  *See* Ex. E to Leith Aff. and Ex. 7 attached hereto (policy countersigned by Shaun E. Kelly, Chief Operating Officer of Lexington, which is located in Boston, Massachusetts); Ex. F to Leith Aff. and Ex. 7 attached hereto (same); Ex. G to Leith Aff. and Ex. 7 attached hereto (same).  The Defendants all sell insurance in Massachusetts and collect premiums from Massachusetts residents.  *See* Ex. 3.[12]

In contrast, the contacts between the state of Florida and the parties and the dispute, though existent, do not warrant application of Florida law.  While the properties at issue are located mostly in Florida, the place of injury is not dispositive of the choice of law analysis for contracts.  *See, e.g., Liberty Mutual Ins. Co.*, 2007 WL 3487651, at *4 (stating that "[e]ven though Louisiana is the place where … [the policyholder] allegedly caused the injury, that does not override the pertinent contacts of Mississippi with the insurance contract and this action").  Additionally, neither Pate nor any of the Defendants is a Florida resident or incorporated in Florida.[13]  Finally, the Pate Action is

---

[12] The place of domicile, habitual residence, or business of the parties is as follows:

| PARTY | DOMICILE, RESIDENCE, OR BUSINESS |
|---|---|
| Pate | Resides in Corpus Christi, Texas |
| Chartis | Alaskan corporation with its principal place of business in New York |
| Illinois Union | Illinois corporation with its principal place of business in Pennsylvania |
| Lexington | Delaware corporation its principal place of business in Massachusetts |
| Steadfast | Delaware corporation with its principal place of business in Illinois |

[13] Although WCI is located in Florida, WCI is not a party to this action, and Pate has initiated this lawsuit on behalf of the Trust, not WCI.

a coverage action involving insurance of risk in multiple states; it is not a tort action based on an injury that occurred solely in Florida.

      3.     The public policies and needs of the interstate and international systems, including the parties' justified expectations and minimization of possible adverse consequences from application of the law of multiple states favors the application of Louisiana, New York, and Massachusetts law

Application of Louisiana, Massachusetts, and New York law – all of which is consistent on the pollution exclusion – upholds the parties' justified expectations.  The Defendants, having been hailed into court in Louisiana – as parties to more than one case in the MDL – and having sold insurance and collected premiums in Louisiana, New York, and Massachusetts, must have anticipated that Louisiana, New York, and Massachusetts law could apply in an insurance coverage case brought against them. Furthermore, Chartis and Lexington, who maintain principal places of business in New York and Massachusetts, respectively, could have anticipated that they would be subject to the laws of the jurisdictions in which they reside.  Pate, having filed this action in Louisiana and suing under some insurance policies procured through Lockton of New York, is justified in his expectation that Louisiana and New York law could apply to this dispute.  No adverse consequences will follow from subjecting the Defendants to the law of multiple states – here, Louisiana, Massachusetts, and New York – because this law is consistent on the pollution exclusion.  If anything, application of this uniform body of law will simplify matters.

      4.     The nature, type, and purpose of the contract favors the application of Louisiana, New York, and Massachusetts law

The contracts at issue are liability insurance policies – specifically, commercial umbrella liability and excess liability insurance policies – that are intended to

supplement the limits of WCI's underlying insurance policies and protect WCI from exclusions and gaps that exist in its primary liability insurance.  Accordingly, a body of law that favors coverage, like that of Louisiana, New York, and Massachusetts – supports the purpose of this type of insurance policy.

> 5.   The policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other support the application of Louisiana, New York, and Massachusetts law

The application of the law of Louisiana facilitates the orderly planning of transactions because Louisiana law is the law of the forum and presumably most familiar to the decisionmaker.  *See Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 232 (N.D.N.Y. 2009) (noting that the law of the forum "can be administered more conveniently" because the lawyers and judges are more familiar with it).  Furthermore, the application of Louisiana, New York, and Massachusetts law protects one party from undue imposition by the other and promotes multistate commercial intercourse because it will apply the majority position on the pollution exclusion[14] – a position that, because of its predominance, was likely foreseeable to the parties.  In light of the aforementioned analysis, the Court should apply the law shared by Louisiana, New York, and Massachusetts.

---

[14] *See MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 642, 735 P.3d 1205, 1209 n.2 (2003) (stating that "the narrower interpretation of the pollution exclusion appears to be in the majority"); J. Wylie Donald; Craig W. Davis, "Carbon Dioxide:  Harmless, Ubiquitous, and Certainty not a "Pollutant" under a Liability Policy's Absolute Pollution Exclusion," Seton Hall L. Rev., at 119 (2009) (stating that "[t]he majority of courts that have addressed the scope of a pollution exclusion have limited its reach to 'traditional environmental pollution' and have declined to extend its effect to any instance of negligence that merely involved a toxic or hazardous substance.").

### C.     As A Matter Of Law, The Pollution Exclusion Does Not Apply To The Policies At Issue

1.     Settled principles of contract interpretation require that the insurance policies be construed in Pate's favor

"An insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003). "Ambiguous policy provisions are generally construed against the insurer and in favor of coverage." *Id.* "Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer." *Id.; see also Louisiana Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So. 2d 1250, 1252 (La. 1993) (stating that "[p]olicy exclusions must be clearly stated. Any ambiguity in an insurance policy's exclusions is construed to afford coverage").

Applying these contract interpretation principles to the insurance policies' plain language, the Court should construe at least Chartis policy no. 7412158 and the Lexington policies against the Defendants and in favor of coverage because they are ambiguous. Chartis policy no. 7412158 and the Lexington policies fail to define the term "pollutants," even though this term appears in the pollution exclusions. Furthermore, Endorsement 7 of Chartis policy no. 7412158 amends "Paragraph U" concerning pollution, but the policy does not contain any paragraph designated "U" that concerns pollution.

2.     Louisiana, New York, and Massachusetts law holds that the pollution exclusions at issue apply only to environmental pollution caused by active polluters over an extended period of time

"[T]he total pollution exclusion was neither designed nor intended to be read strictly to exclude coverage for all interactions with irritants or contaminants of any kind."

*Doerr*, 774 So. 2d at 135.  Rather, "it is appropriate to construe [a] pollution exclusion clause in light of its general purpose, which is to exclude coverage for <u>environmental pollution</u>, and under such interpretation, [the] clause will not be applied to all contact with substances that may be classified as pollutants."  *Id.* (emphasis added).

In determining whether the pollution exclusion applies in a particular case, a court should consider three factors:

> (1) [w]hether the insured is a "polluter" within the meaning of the exclusion;
>
> (2) [w]hether the injury-causing substance is a "pollutant" within the meaning of the exclusion; and
>
> (3) [w]hether there was a "discharge, dispersal, seepage, migration, release or escape" of a pollutant by the insured within the meaning of the policy.

*Id.*  To determine whether the insured is a "polluter," the court should examine:

> [1] the nature of the insured's business, [2] whether that type of business presents a risk of pollution, [3] whether the insured has a separate policy covering the disputed claim, [4] whether the insured should have known from a read of the exclusion that a separate policy covering pollution damages would be necessary for the insured's business, [5] who the insurer typically insures, [6] any other claims made under the policy, and [7] any other factor the trier of fact deems relevant to this conclusion.

*Id.*  Moreover, to assess whether the injury-causing substance constitutes a "pollutant," the court should evaluate:

> [1] the nature of the injury-causing substance, [2] its typical usage, [3] the quantity of the discharge, [4] whether the substance was being used for its intended purpose when the injury took place, [5] whether the substance is one that would be viewed as a pollutant as the term is generally understood, and [6] any other factor the trier of fact deems relevant to that conclusion."

*Id.*  Finally, in connection with the third factor for application of the pollution exclusion, the court should consider:

NYDOCS1-960467.7

"[1] whether the pollutant was intentionally or negligently discharged, [2] the amount of the injury-causing substance discharged, [3] whether the actions of the alleged polluter were active or passive, and [4] any other factor the trier of fact deems relevant.

*Id.* at 135-36.[15]

Louisiana courts have refused to apply the pollution exclusion in cases where the pollution did not amount to "environmental pollution," and/or the policyholder was not an active industrial polluter who caused pollution over an extended period of time. *See, e.g., In re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, Order & Reasons at p. 29 (E.D. La. Dec. 16, 2010) [Doc. No. 6670] (holding that the pollution exclusion did not apply to losses caused by Chinese Drywall in the plaintiffs' homes because, inter alia:  (1) "[t]he presence of Chinese drywall in the Plaintiffs' homes is outside the ambit of the Louisiana Supreme Court's concern with and focus upon environmental pollution for purposes of the exclusion"; and (2) "Chinese drywall [does not] cause environmental pollution by the presence in the Plaintiffs' homes"); *Thompson v. Temple*, 580 So. 2d 1133, 1134-35 (La. Ct. App. 1991) (holding that "pollution exclusion clauses are intended to exclude coverage for active industrial polluters, when businesses knowingly emitted pollutants over extended periods of time"); *West v. Board of Com'rs*, 591 So. 2d 1358, 1360 (La. Ct. App. 1991) (holding

---

[15] The defendant insurance companies in the MDL have made clear that the *Doerr* analysis is particularly appropriate in the context of a liability policy, as opposed to the homeowner context:

The whole Doerr test which was devised for a liability policy doesn't fit here … – one of the questions is[,] is the insured an active polluter:  Well, the insured is a homeowner.  If you say it can only apply to environmental cleanup, this covers the home, the property in the home; and so the exclusion is rendered meaningless, the homeowner exclusion, the property part.  A liability policy is different.

Transcript of Motion Proceedings Before Judge Fallon, 9/2/10, pp. 24-25, attached hereto as Ex. 5.

that absolute pollution exclusion, worded similarly to the Lexington insurance policy pollution exclusion at issue here,[16] applies only to "polluters – those who indifferently pollute our environment – and not those who only incidentally possess the pollutant in the course of their other business"); *Avery v. Commercial Union Ins. Co.*, 621 So. 2d 184, 190 (La. Ct. App. 1993) (noting that pollution exclusions apply only to "active industrial polluters" who "knowingly emitted pollutants over extended periods of time"); *Finger v. Audobon Ins. Co.*, No. 09-8071, 2010 WL 1222273 (La. Civil Dist. Ct. Mar. 22, 2010) (striking pollution exclusion as an affirmative defense because it "does not, and was never intended, to apply to residential homeowners['] claims for damages caused by substandard building materials" and "[t]he fact that Chinese drywall releases various gases into the home is not sufficient to qualify as a 'pollutant' under the pollution exclusion").

New York and Massachusetts courts have held similarly that the pollution exclusion does not apply to indoor exposures and non-industrial pollution. *See, e.g., Belt Painting v. TIG Ins. Co.*, 100 N.Y.2d 377, 795 N.E.2d 15 (2003) (holding under New York law that the total pollution exclusion was ambiguous and did not apply to injuries arising from indoor exposure to paint fumes that drifted a short distance from its intended use to cause inhalation injuries); *Herald Sq. Loft Corp. v. Merrimack Mut. Fire Ins. Co.*, 344 F. Supp. 2d 915, 922 (S.D.N.Y. 2004) (refusing to apply pollution exclusion to bar coverage for damages allegedly due to lead paint dust because

---

[16] The exclusion at issue in *West* closely mirrors that of the Lexington insurance policies. *Id.* at 1360. It precludes coverage for: "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants, into or upon the land, the atmosphere or any water course or body of water." *Id.*

exclusion was overly broad, ambiguous, and did not comport with the insured's reasonable expectations concerning what the policy covered); *Tower Ins. Co. of N.Y. v. Breyter*, 37 A.D.3d 309, 309, 830 N.Y.S.2d 122, 122 (1st Dep't 2007) (holding that pollution exclusion did not apply to bar coverage for damages allegedly due to fumes from nail salon); *Atlantic Mut. Ins. Co. v. McFadden*, 413 Mass. 90, 91, 595 N.E.2d 762, 764 (1992) (holding under Massachusetts law that pollution exclusion did not bar coverage for lead poisoning because insured would reasonably expect the pollution exclusion to apply to injuries caused by "certain forms of industrial pollution ... [not] injuries allegedly caused by the presence of leaded materials in a private residence."); *Western Alliance Ins. Co. v. Gill*, 426 Mass. 115, 120, 686 N.E.2d 997, 1000 (1997) (holding that pollution exclusion did not apply to alleged exposure to carbon monoxide fumes while dining at a restaurant because policyholder "did not contemplate that their ordinary cooking operations would poison patrons"); *Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.*, No. 030353, 2006 WL 1537382, at *8 (Mass. Super. Ct. Feb. 6, 2006) (stating that "[g]iven that the dust containing lead was restricted to the interior of the building in which it was generated, this is not a case of environmental pollution" where the pollution exclusion could exclude coverage); *Eastern Reproduction Corp. v. Seaco Ins. Co.*, No. 00182, 2004 WL 1932640, at *3-4 (Mass. Super. Ct. July 19, 2004) (coverage for personal injury resulting from ferric chloride mixed with water spilled within plaintiff's facility is not barred under the pollution exclusion); *Essex Ins. Co. v. Berkshire Envtl. Consultants, Inc.*, No. 99-30280, 2002 WL 226172, at *3 (D. Mass. Feb. 7, 2002) (holding that pollution exclusion did not apply where the underlying complaints alleged injury and death resulting from exposure to gas that was not widely dispersed, but

rather was limited to or confined within the original area of its intended use, i.e. the workplace).

The Fire, Casualty, & Surety Bulletins ("FC&S"), a property and casualty information service started by the founder of The National Underwriter Company, even concedes that the pollution exclusion is inapplicable in the context of Chinese Drywall. One FC&S bulletin states that while:

> [u]nder the ISO commercial general liability policy CG 00 01 12 07, pollution is a major exclusion … an exception exists for injury or damage sustained within a building and caused by the release of vapors, fumes, or gases from materials brought into that building in connection with the operations being performed.  Construction of the dwelling is certainly an operation being performed.  So even if the vapors are considered to be a pollutant, there is coverage because of this exception.

*See* FC&S Bulletin, attached hereto as Ex. 4.

In this case, for several reasons, the pollution exclusion does not apply as a matter of Louisiana, New York, and Massachusetts law.  First, Chinese Drywall does not cause *environmental* pollution, which is required for application of the exclusion. *See Doerr*, 774 So. 2d at 135.  Any pollution that Chinese Drywall causes occurs indoors.  Second, WCI does not constitute an "active polluter."  WCI did not actively install the drywall itself, but hired subcontractors who allegedly installed the Chinese Drywall.  WCI certainly did not knowingly hire subcontractors with the intent of them installing defective drywall.  Furthermore, WCI is a developer of homes, a business which generally does not present a "pollution risk."  *See id.* at 133.  Rather, it is a "commercial enterprise[] whose ongoing business activities do not present a risk to the environment."  *Id.*  WCI does not possess pollutants as a matter of course, and has not knowingly emitted pollutants over an extended period of time.

Third, Chinese Drywall does not constitute a pollutant within the meaning of the pollution exclusions.  Drywall, as the term is commonly understood, typically does not cause pollution.  Further, "[t]he fact that Chinese drywall releases various gases into the home is not sufficient to qualify as a 'pollutant' under the pollution exclusion."  *Finger v. Audobon Ins. Co.*, No. 09-8071, 2010 WL 1222273 (La. Civil Dist. Ct. Mar. 22, 2010). For these reasons, the pollution exclusions in the insurance policies do not apply to bar coverage.

## III.   CONCLUSION

For the aforementioned reasons, Plaintiffs respectfully request that the Court grant their motion for partial summary judgment as to the inapplicability of the pollution exclusions in the identified liability insurance policies sold by the Defendants.

February 3, 2011                              Respectfully submitted,

/s/ Russ M. Herman
Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
P:  504-581-4892
F:  504-561-6024
LDavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin
Fred S. Longer (On the Brief)
Matthew C. Gaughan (On the Brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
P:  215-592-1500
F:  215-592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
P:  504-524-3300
F:  504-524-3313
Barrios@bkc-law.com

Robert C. Josefsberg
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
  Matthews, Martinez, Gonzales,
  Kalbac & Kane
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
P:  305-476-7400
F:  305-476-7444
Ervin@colson.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
P:  504-581-1750
F:  504-529-2931
hlambert@lambertandnelson.com

Jerrold Seth Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
P:  239-390-1000
F:  239-390-0055
Jerry@yourlawyer.com

Daniel E. Becnel, Jr.
Becnel Law Firm, LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
P:  985-536-1186
F:  985-536-6445
dbecnel@becnellaw.com

Bruce William Steckler (On the Brief)
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
P:  214-521-3605
F:  214-520-1181
bsteckler@baronbudd.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
  Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
P:  850-435-7000
F:  850-435-7020
bgordon@levinlaw.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
  & Warshauer, LLC
2800 Energy Centre
1100 Poydras St.
New Orleans, LA 70163-2800
P:  504-522-2304
F:  504-528-9973
gmeunier@gainsben.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
P:  239-433-6880
F:  239-433-6836
sweinstein@forthepeople.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
P:  228-374-5151
F:  228-374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
P:  212-584-0700
F:  212-584-0799
cseeger@seegerweiss.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
P:  757-233-0009
F:  757-233-0455
rserpe@serpefirm.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
P:  919-981-0191
F:  919-981-0431
dkb@lewis-roberts.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Jeremy W. Alters
Alters Law Firm, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, FL 33137
P:  305-571-8550
F:  305-571-8559
jeremy@alterslaw.com

Richard S. Lewis
Hausfeld LLP
1700 K Street, N.W, Suite 650
Washington, DC 20006
P:  202-540-7200
F:  202-540-7201
rlewis@hausfeldllp.com

## INDIVIDUAL COUNSEL FOR PLAINTIFF ROBERT C. PATE, TRUSTEE FOR THE CHINESE DRYWALL TRUST

Robert M. Horkovich (On the Brief)
Anna M. Piazza (On the Brief)
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, New York 10020
P:  212-278-1000
F:  212-278-1733
rhorkovich@andersonkill.com
apiazza@andersonkill.com

Burton LeBlanc
Baron & Budd, P.C.
9015 Bluebonnet Blvd.
Baton Rouge, LA 70810
P:  225-927-5441
F:  225-927-5449
bleblanc@baronbudd.com

NYDOCS1-960467.7

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing has been served on Plaintiffs'

Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S.

Mail and e-mail and upon all counsel of record by electronically uploading the same to

Lexis Nexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing

was electronically filed with the Clerk of Court of the United States District Court for the

Eastern District of Louisiana by using the CM/ECF System, which will send a notice of

electronic filing in accordance with the procedures established in MDL 2047, on this 3rd

day of February, 2011.

/s/ Russ M. Herman
Russ M. Herman

NYDOCS1-960467.7