## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE-MANUFACTURED DRYWALL        MDL DOCKET: 2047
    PRODUCTS LIABILITY LITIGATION

                                           SECTION:  L

                                           JUDGE FALLON
                                           MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO ALL CASES
_____/

### HOMEBUILDERS' STEERING COMMITTEE'S RESPONSE IN OPPOSITION
### TO THE PLAINTIFFS' STEERING COMMITTEE'S (I) MOTION FOR
### AN ORDER REQUIRING AN ACCOUNTING AND OTHER RELIEF, AND
### (II) EMERGENCY MOTION FOR AN ORDER PREVENTING THE PAYMENT
### OR TRANSFER OF CERTAIN MONEYS OR, IN THE ALTERNATIVE,
### FOR COURT ORDERED MEDIATION AND TEMPORARY STAY
### OF ALL OUTSIDE SETTLEMENT ACTIVITIES

The Homebuilders' Steering Committee ("HSC") hereby submits its response in opposition to the Plaintiffs' Steering Committee's ("PSC"): (i) Motion for an Order Requiring an Accounting and Other Relief ("Motion for Accounting"); and (ii) Emergency Motion for an Order Preventing the Payment or Transfer of Certain Moneys or, in the Alternative, for Court Ordered Mediation and Temporary Stay of all Outside Settlement Activities ("Motion to Prevent Settlement Payments") (collectively, the "Motions").

## I. INTRODUCTION

This Court has repeatedly made clear that the principal goal of these MDL proceedings is to, as quickly as possible, insure that all homes containing defective Chinese-manufactured drywall ("Chinese Drywall") are repaired.  Many homebuilders were leading the charge in this regard even before the MDL was confected, by making the decision early on to outlay millions of dollars repairing homes, without any hope or guarantee of ever recovering a dime from those ultimately responsible for manufacturing, supplying and installing the defective Chinese Drywall

in their homes.  To be sure, these homebuilders made the decision to take on the expense of making these repairs, despite being in the midst of one of the worst real estate markets in United States history.  It is because of these homebuilders' efforts that hundreds, if not thousands, of satisfied homeowners have already moved back in to their newly-rebuilt, fully-repaired homes, and many more are in the process of moving out of their homes so that they can have their homes repaired.

For their part, the members of the PSC have unfortunately lost sight of the fact that the MDL is about repairing homes.  For the third and fourth time in this litigation, the PSC again seeks to bring to a standstill the homebuilders' long-standing repair programs and efforts to settle claims by again making a reprehensible assertion to an entitlement to some "common benefit" fee from any and all settlements the homebuilders may reach, or may have already reached, with homeowners, insurers and other responsible supply chain parties (*e.g.,* manufacturers, suppliers, installers, *etc.*).  In these Motions, the PSC asks this Court to grant it the extraordinary remedy of halting all settlement activities that do not involve, or have the approval of, the PSC.  This is directly contrary to the strong public policy of encouraging, rather than discouraging, settlements.  *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994); *Robinson v. Shelby County Bd. of Educ.*, 566 F.3d 642, 648 (6th Cir. 2009) ("Public policy strongly favors settlement of disputes without litigation. . . . Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit." (citations and internal quotation marks omitted)).

Additionally, the PSC seeks, among other things, an order requiring all homebuilders to sequester "all payments made . . . by manufacturer-defendants and/or their insurers to settle or otherwise resolve Chinese drywall claims . . . pending a determination by this Court as to an

appropriate common benefit fee percentage." Motion for Accounting, pp 1-2. In support of these Motions, the PSC presents far-sweeping, yet unsupportable, arguments that the PSC has conferred such a substantial benefit to all issues relating to Chinese Drywall that it would be inequitable to allow any parties to settle their claims without some payment of fees to the PSC. The PSC gives itself much too much credit for settlements that have been achieved without benefit from the PSC's efforts, while asking this Court to prevent all future settlements pending this Court's creation of a common benefit fund for the PSC.

When one considers the PSC's prior motions in combination with the instant Motions, it seems abundantly clear that the PSC's goal here is to make their claim for fees of paramount importance in this litigation, while making the needs of homeowners desperate to have their homes repaired a distant second in importance. Moreover, the PSC clearly does not want homebuilders--the only ones who have stepped up to the plate and spent millions to actually repair homes--to have any avenue available to recover some portion of their substantial costs expended in doing so. Indeed, the primary concern of the PSC appears now to be how best to maximize the attorneys' fees they might receive, even for settlements that were consummated in the past and for which they had no involvement. Simply put, the PSC's Motions have no factual or legal support. Whether thinly-veiled under a claim of inadequate protocols, alleged misrepresentations, or some other concocted and unsupported basis to try to stop home repairs, the PSC, yet again, is before this Court arguing about how they can hold up the settlement process to collect a fee, to which they have made no legitimate effort and provided no evidentiary basis to establish an entitlement. Nor do the PSC's Motions appear to be in the best interests of homeowners, as granting the relief requested in any form will effectively prevent

these repairs and settlements from going forward.  Accordingly, and for the reasons discussed more fully below, this Court should deny the PSC's Motions as follows:

- The Court should refuse to require an accounting to the PSC of Chinese Drywall settlements;

- The Court should refuse to require an escrow or sequestration of funds from Chinese Drywall settlements;

- The Court should refuse to establish a common benefit fund because the PSC has failed to make a prime facie case that they are entitled to such common benefit fees at this time;

- If inclined to consider establishing a common benefit fund at this time, the Court should create a process for others who have provided substantial benefits to the MDL, such as homebuilders, to apply for such common benefit fees;

- The Court should only consider common benefit fees on a going forward and case-by-case basis, and refuse to surcharge settlements retroactively;

- The Court should refuse to surcharge homebuilders who have been committed to repairing homes since before this MDL was formed, because, for these homebuilders, the PSC's control over this litigation is serving no purpose, other than to delay repairs to the MDL plaintiffs' homes;

- The Court should refuse to enjoin any settlements or settlement payments; and

- The Court should refuse, yet again, the PSC's efforts to restrict communications between homebuilders and homeowners regarding settlement.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

While the facts relating to individual homebuilders vary broadly, typically, beginning in late 2008 or early 2009, many larger homebuilders notified their homeowners of the recent media reports concerning Chinese Drywall and offered to inspect their homes to determine if they contained any.  Certain of these homebuilders were responsible for being the first to identify an odor problem in their homes and to retain the consultants who assisted in identifying the source of the problem, the chemical basis for the problem, and a repair protocol to remedy the problem – all before the MDL had ever been formed or the PSC appointed.  In some instances,

homeowners contacted their homebuilders first. Some homeowners corresponded with their homebuilders through legal counsel. Most homeowners accepted the homebuilders' offer of an inspection.

During the course of the inspections, many homebuilders learned that certain of their subcontractors had installed defective Chinese Drywall in some of their homes. In those instances, many homebuilders offered to their homeowners to pay for temporary relocation expenses, to replace the defective Chinese Drywall with non-defective domestic drywall, to conduct extensive additional repairs, and in some instances, to warrant the work and to compensate the homeowners for incidental costs. In exchange, most homebuilders requested from homeowners an assignment of certain of their claims and a release for property damage claims only. These homebuilders made repairs without any monetary contribution from homeowners or any other responsible supply chain parties, despite the enormous costs involved.

Before this MDL was formed, the plaintiffs' lawyers in at least two putative drywall class actions pending in federal courts in Florida and Ohio filed motions seeking to restrict settlement communications between homebuilders and homeowners, which motions were virtually identical to the PSC's Motions here. *Kristin Culliton v. Taylor Morrison Services, inc., et al.,* U.S. Dist. Court, Middle Dist. of Florida, Case No. 09-cv-00589-JDW-TGW (MDL Case No. 09-4114); *Steven Minafri v. M/I Homes, Inc., et al.*, U.S. Dist. Court, Southern Dist. of Ohio, Case No. 2:09-cv-167 (MDL Case No. 09-4120). Both federal courts denied those motions based on *Gulf Oil Co. v. Bernard*, 452 U.S. 89 (1981), and its progeny.[1]

Soon after this MDL was formed, the PSC here made its first attempt to prevent homebuilders from entering into settlements with homeowners in a motion entitled *Emergency*

---

[1] The motions, hearing transcripts, and orders in *Culliton* and *Minafri* were previously filed in opposition to the PSC's original motion to prohibit settlement communications between homebuilders and homeowners. [D.E. 249.]

*Motion to Protect Class Members and Fairly Conduct the Action* [D.E. 208].  During the hearing

on September 24, 2009, this Court held:

> I look to the *Gulf Oil* case.  In *Gulf Oil v. Bernard*, the United States Supreme
> Court indicated that the order limiting communication should be based on a clear
> record and specific findings, weighing the need for restrictions against the
> interference with the parties' first amendment rights.
>
> I have a small record before me. I have all of the releases given to me by the
> plaintiffs and also some affidavits given to me by defendants of individuals who
> have signed the releases. The releases that I have looked at, all but perhaps three
> specifically say that personal injury claims are excluded.  The three don't
> specifically that, but they dwell on only property damage.
>
> A review of the material indicates that at the present time there's no clear record
> demonstrating misleading information or coercive or abusive communication.
> Also, I note that under 558, the builders have a right and perhaps even a duty to
> seek and to remedy the conditions caused by their installation of the defective
> Chinese drywall.
>
> At the present time, I have no record of showing that there's any abuses.  As I
> read the law, that's what's necessary. I'm going to deny the motion, but I do also
> advise the parties that I expect them to tell the clients that the parties who have
> signed the releases have a right to counsel before they sign the releases.
> Henceforth, I also want you to advise them of the MDL proceeding and give them
> the Court's website to that particular proceeding.  I also mention to the parties that
> this does not mean that they can't move on specific releases to set aside the
> releases, for various reasons, if they have good reason.

9/24/09 Hearing Transcript at pp. 15:3-16:7.  The Court denied the relief sought in the PSC's

first motion to restrict communications between homebuilders and homeowners by minute entry

dated September 24, 2009, but provided that property owners should be advised of the existence

of this MDL and of their right to consult with an attorney.  [D.E. 278.]  The Court further left

open the possibility of the PSC challenging any specific releases on a case-by-case basis.  *Id.*

Rather than addressing any specific issue the PSC had with a specific homeowner release,

the PSC made a second global attempt to prevent all homebuilders from settling with

homeowners by way of a motion filed on or about July 7, 2010, entitled *PSC's Motion*

*Restricting Communications With Putative Class Members*.  [D.E. 4338.]  In that motion, the PSC not only sought to restrict all homebuilder/homeowner settlements, but also sought to prevent settlements between homebuilders and manufacturers.  With the PSC failing yet again to provide any factual support for its motion, the Court also denied that relief.  [D.E. 5207.]   In announcing its ruling from the bench, the Court stated:

> I have read the record, and I have read the briefs in this matter.  The law is clear that before the Court issues such an order, it must have a clear record of specific findings under Rule 23, the order must be carefully drawn and be specific.  I instructed counsel before to inform the plaintiffs who signed a release that they have a right to counsel, that there is an existing MDL in litigation and that there is a website, and give them the website.  I am going to put all of this stuff on the website as it comes about, and I am going to highlight it and make it clear that that's the first thing that pops up.  So I am going to deny the motion.  I don't think a clear record has been shown, and I think enough information has been given with regard to the documents that are filed.   There should not be any misunderstanding.  I am not talking about the homebuilders' discussions with Knauf or what they are doing with Knauf, or whether they are doing anything or not.  That's between the homebuilders and Knauf, and not the plaintiffs.
>
> With regard to the plaintiff claimants, the homeowners, I want them to continue to highlight the website and to advise them of their right to counsel, and advise them that an MDL proceeding is in order.  That's the best we can do, folks.  If somebody is not interested in pursuing it, they are not interested in looking at the website, then that's their problem and not the Court's problem.  I can only tell them to look at the website, and tell them they have a right to counsel, and they have to then do something for themselves.

8/12/10 Hearing Transcript at pp. 27:17-28-18.

To this day, the PSC has never followed up with a motion directed to a specific issue with a specific settlement relating to a specific home or specific release.   Instead, in its Motions, the PSC continues to seek to restrict all communications and all settlements between homebuilders and homeowners.  Incredibly, the current Motions by the PSC are even more far reaching, as they purport to extend to settlement discussions and settlements to which the PSC and the homeowners are not even parties (such as, for example, settlements between homebuilders and

their insurers and between homebuilders and those parties in their chain of distribution of the

Chinese Drywall installed in their homes), as well as to attempt, retroactively, to impact

settlements the parties have fully performed long ago.

At the last steering committee meeting before the status conference on January 20, 2011,

the Court informed the PSC, **for a third time**, that it was not going to prevent settlements from

proceeding.  Regrettably, the PSC's Motions have not been withdrawn or modified.

### III.  ARGUMENT

A.     **The PSC's Request for an Accounting or for Sequestration of Settlement
Funds Is Without Merit**.

1.  **This MDL is Atypical of Most MDL Proceedings.**

The Chinese Drywall litigation before this Court is not typical of most consolidated

multidistrict litigation proceedings.  Indeed, the cases before this Court do not merely involve a

group of similarly-situated plaintiffs pursuing claims against a single defendant for a mass tort,

such as an air disaster or the sale of unsafe pharmaceutical drugs.  In those typical MDL

proceedings, the steering committee on behalf of the injured plaintiffs is responsible for

coordinating litigation and settlement efforts against a single defendant that stands alone as the

responsible party.  Here, in contrast, there are a number of different types of parties, each of

which sits in uniquely different roles with uniquely different interests pursuing and defending

widely varying claims both upstream and downstream in the chain of distribution of the Chinese

Drywall.

For example, many of the homebuilders, whose interests are represented by the HSC, are

before this Court, as well as in various state courts, as both plaintiffs and defendants.  As

plaintiffs, these homebuilders are seeking recovery from the manufacturers, suppliers,

distributors, and installers of the Chinese Drywall, as well as from insurers, of the millions of

dollars they have expended to repair their customers' homes. Hundreds, if not thousands, of homeowners have communicated with their homebuilders and agreed to allow the homebuilders to remove the defective Chinese Drywall and perform other repairs in their homes. Indeed, in most situations, the homebuilders have the right to repair the homes with Chinese Drywall under their contracts with the homeowners.

The homebuilders that have proceeded with these repairs have done so at enormous expense and at significant risk that they will be unable to recover these repair and related costs from the manufacturers or others. In total, the homebuilders that are before this Court have repaired hundreds, if not thousands, of homes at a total cost of in excess of one hundred million dollars. These homebuilders are driven by a duty to do what they believe is the right thing; rather than wait for the conclusion of years of litigation to establish who the real culpable parties are, they are repairing these homes so that the homeowners may return to and live comfortably in their homes.

At the same time, however, some of the homebuilders have been sued as defendants in cases relating to Chinese Drywall. Indeed, the "Omni" Complaints that the PSC began to file in late 2009 name as defendants--alongside the manufacturers, suppliers, distributors, and installers--scores of homebuilders. While many of these homebuilders are prepared to and have offered to repair these homes (and, in fact, were offering to do so well before the MDL was even formed), some homeowners and members of the PSC are unsatisfied with that offer and seek more. At the same time, however, other homeowners, who are named plaintiffs in these Omni Complaints, have either already settled with their homebuilders or now wish to do so on terms that were made available to them before the MDL was even created. The extraordinary remedy sought by the PSC of preventing these homeowners from settling with their homebuilders on

terms they believe to be reasonable and from voluntarily dismissing their claims against these homebuilders, is simply inappropriate.

Thus, given the unique posture of the parties, this MDL should not be treated as a typical mass tort situation where the steering committee on behalf of the plaintiffs is awarded a common benefit fee from the settlement activities of all parties.  That approach simply does not work here.

### 2.   The Homebuilders and HSC have Conferred Substantial Benefits to their Homeowners, Independent of the Work Performed by the PSC.

It is plainly absurd -- and, frankly, offensive -- for the PSC to take the position that it should receive some common benefit fee from all settlements relating to Chinese Drywall that have already been consummated or would have been consummated were it not for the involvement of the PSC.  In fact, homebuilders were consummating the same or substantially similar settlements in 2009 as they are offering to their homeowners today, long before the PSC took any action that could be considered to have affected or benefitted these settlements.

Moreover, the efforts of the homebuilders have been as, if not more, instrumental than those of the PSC in developing the overall framework for understanding the cause of the problems in these homes and the effects from the Chinese Drywall, establishing the appropriate scope of repair work to address and eliminate the effects from Chinese Drywall, and negotiating and settling with the parties involved in the manufacture, supply, and installation of the Chinese Drywall.  As a result, the PSC should not be entitled to any common benefit fee award from settlements involving homebuilders that have not received any benefit from the PSC's efforts in this MDL proceeding, including, without limitation, any homebuilder settlements with their insurers.

If and when it becomes the right time for this Court to determine whether a common benefit fee should be awarded in these proceedings, this Court must also give the homebuilders

the opportunity to seek such a fee considering the substantial effort of the homebuilders and their counsel in identifying the problem, arriving at the appropriate scope of repairs, and resolving claims.  Just by way of example, by December 2008, Lennar Homes had already developed a protocol for the repair of homes it had identified as containing Chinese Drywall and had begun to repair homes.  Instrumental in the efforts of Lennar and other homebuilders were scientists at ENVIRON International Corp., who were retained and paid for by the homebuilders.  Shortly thereafter, on January 30, 2009, Lennar Homes filed one of the first complaints in any court, naming as defendants, among others, the Chinese manufacturers of the Chinese Drywall in *Lennar Homes, LLC v. Knauf Gips KG, et al.*, Case No. 09-07901, Complaint (11th Jud. Cir., Miami-Dade Cty., Fla., Jan. 30, 2009).  In fact, Lennar's Complaint served as a model for many of the lawsuits that were filed shortly thereafter by homeowners' plaintiffs' attorneys, who later were appointed to the PSC and further modeled their complaints in the MDL after Lennar's Complaint.  Other homebuilders, such as Taylor Morrison, have filed crossclaims in both the MDL and state court against some of the parties responsible for the Chinese Drywall in their homes.

In addition, the PSC, having recognized the value of the homebuilders' initial efforts in identifying the problems and coming up with solutions, repeatedly sought information developed through the efforts of the homebuilders and their consultants to utilize to pursue their claims. For example, the PSC requested the repair protocols from all homebuilders in its First Request for Production of Documents in the MDL, and utilized and substantially relied upon those repair protocols in prosecuting the *Germano* default judgment proceedings and *Hernandez* trial.  *See generally Hernandez v. Knauf Gips KG, et al.*, Case 2:09-md-02047-EEF-JCW, Findings of Fact and Conclusions of Law (E.D. La. Apr. 27, 2010) [D.E. 2713]; *Germano, et al. v. Taishan*

*Gypsum Co, Ltd., et al.*, Case No. 2:09-md-02047-EEF-JCW, Findings of Fact and Conclusions of Law (E.D. La. Apr. 8, 2010).

In fact, Beazer Homes allowed one of its executives to assist the PSC in establishing the appropriate scope of repairs in both *Germano* and *Hernandez*. The repair protocols that have been proposed by the PSC, and which have been accepted as appropriate by this Court are "essentially the same in all material respects" as the scope of repairs utilized by homebuilders that are represented by the HSC. *See Hernandez v. Knauf Gips KG, et al.*, Case 2:09-md-02047-EEF-JCW, Findings of Fact and Conclusions of Law, at *34 (E.D. La. Apr. 27, 2010) [D.E. 2713] ("The remediation protocol formulated by the Court is consistent with protocols used by national homebuilders in their remediation efforts."); *Germano, et al. v. Taishan Gypsum Co, Ltd., et al.*, Case No. 2:09-md-02047-EEF-JCW, Findings of Fact and Conclusions of Law, at *54 (E.D. La. Apr. 8, 2010) [D.E. 2380] ("The necessary remediation proposed by the PSC is essentially the same in all material respects as the scope of remediation being utilized by national builders Beazer Homes and Lennar Homes.").

The purpose of a common benefit fund is to (a) prevent unjust enrichment of absent class members at the expense of class representatives and attorneys, and (b) compensate attorneys in proportion to the benefits obtained for the entire class. *See Brytus v. Spang & Co.*, 203 F. 3d 238, 242 (3d Cir. 2000); *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, 487 F. 2d 161, 165 (3d Cir. 1973). Because many homebuilders have been and continue to be settling directly with their homeowners on terms that either have been available to the homeowners since before the creation of this MDL, or were being developed by the homebuilders before any significant activities took place in the MDL, neither the homebuilders nor the homeowners received any benefit from the PSC in implementing their settlements with

homeowners.  Therefore, contrary to the urging of the PSC through its Motions, there is no basis for the Court to require these parties to account to the PSC for the value of any repair work performed or the amount of any settlement payments made by these parties.

In addition, a significant number of these homeowners are not, and have never desired to be, members (absent or otherwise) of the putative classes in the Omni Complaints before this Court.  Because the PSC has not conferred any benefit on these parties, neither the homebuilders nor their homeowners are being unjustly enriched.  From the initial discovery of the fact that their homes contained Chinese Drywall, the only remedy many homeowners have desired is the prompt repair of their home.  To the extent that those repairs have taken place outside of this litigation, they are the results of the efforts of the homebuilders and have not benefitted in any way from the efforts of the PSC.  Therefore, there is no basis for the PSC to seek any compensation from the settlements between these homeowners and their homebuilders.  *See Bowling v. Pfizer, Inc.*, 922 F. Supp. 1261, 1280 (S.D. Ohio 1996) ("[A]n attorney's work in a related, prior case may be compensable from the common fund created by the global settlement of a subsequent case if the lawyer's work in the previous case contributed to (i.e. 'set the table for') the subsequent settlement.").

Here, the PSC did nothing to "set the table" for the settlements and ongoing negotiations between homebuilders and homeowners, manufacturers, suppliers and insurers, and are not the result of any benefits conferred by the PSC.  Rather, these are more significantly the result of these homebuilders' extensive efforts to develop and implement an economical repair solution, and to pursue and engage in settlement discussions with these manufacturers and suppliers of the Chinese Drywall, as well as insurers.  The homebuilders' efforts were more instrumental than

any nominal and incidental benefit from the PSC in reaching these settlements and other likely settlements from ongoing negotiations.

>   **3.   To the Extent the Court Allows a Common Benefit Fund Assessment, if Any, it Should Only Apply Prospectively to Certain Future Settlements.**

In the event this Court ultimately establishes a common benefit fund, that fund should not apply to any portion of settlements recovered by homeowners or homebuilders in the MDL prior to this Court's establishment of such fund.    It would be patently unreasonable to require homeowner plaintiffs, some of whom received settlement payments months before the MDL was formed, and Omni Complaints were even filed, to have to return a portion of those settlements to the PSC, because the PSC did not confer any common benefits on those homeowner plaintiffs. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991) (noting that the common fund doctrine applies when litigation efforts *directly* benefit others); *In re Diet Drugs*, 582 F.3d 524, 546 (3d Cir. 2009) ("Under the common benefit doctrine, an award of attorney's fees is appropriate where the plaintiff's successful litigation confers a *substantial* benefit on the members of an ascertainable class . . . ." (emphasis added) (citation and internal quotation marks omitted)); *Brytus*, 203 F. 3d at 242; *Lindy Bros. Builders*, 487 F. 2d at 165.

The PSC's own argument for the surcharge -- *i.e.*, that its common benefit work has made "certain defendants and other entities . . . interested in exploring settlement of their liability exposure" -- plainly demonstrates that a retroactive surcharge is wholly inappropriate with respect to settlements that were reached or available to homeowners before the creation of this MDL.  Therefore, the surcharge should not be applied to settlements reached by or available to homeowner plaintiffs prior to the formation of the MDL.  *See e.g., In re Bextra and Celebrex Mktg. Sales Practices and Prod. Litig.*, 386 F.App'x 584, 585 (9th Cir. 2010) (holding that the district court did not abuse its discretion when it applied a pre-MDL cutoff to attorney fee

14

requests and declined compensation for time spent on matters prior to the commencement of the MDL).

In addition, the PSC should not be entitled to surcharge future settlements entered into by homeowners pursuant to settlements that were being offered to homeowners well before the PSC conferred any common benefit.  For example, as discussed above, certain of the homebuilders began repairing homes with defective Chinese Drywall many months before this MDL began, and continue to repair homes today under those very same repair programs.  As to any named homeowner who enters into a settlement agreement with a homebuilder under the same or substantially similar terms that were in place before the creation of the MDL, the PSC has neither made the homebuilder more "interested in exploring settlement," nor conferred a benefit on that homeowner plaintiff.  Therefore, the PSC should not be entitled to a surcharge on such a settlement.  *See Chambers*, 501 U.S. at 45; *In re Diet Drugs*, 582 F.3d at 546; *Brytus*, 203 F. 3d at 242; *Lindy Bros. Builders*, 487 F. 2d at 165.

With respect to homebuilder settlements with manufacturers and other parties in the chain of distribution, it appears from the PSC's Motions that it seeks the assessment of a common benefit fund and an accounting only of "builder-settlements of MDL plaintiffs' claims occurring outside the purview of this Court."  Motion for Accounting, at p.10.  To that end, it should be clarified that a homeowner that (i) is not a named plaintiff in the complaints before this Court and (ii) has authorized its homebuilder to repair its home in exchange for a release of liability for property damage, does not constitute an "MDL plaintiff."  These homeowners have preemptively opted out of any class that may eventually be certified in this MDL.  Therefore, the PSC should not be entitled to any common benefit fund assessment or accounting for settlements entered into between homebuilders and manufacturers or others in the chain of distribution for the repair of

homes of "non-MDL plaintiffs."  In addition, the HSC further maintains that the PSC should not be entitled to a common benefit fund assessment or accounting on homebuilder settlements with manufacturers or others in the chain of distribution for the repair of homes of a named "MDL plaintiff" who subsequently settles with its homebuilder on terms that were available to the homeowner prior to the creation of this MDL.  This is because, as explained above, the PSC did not confer any common benefits on those homeowner plaintiffs.  *See Chambers*, 501 U.S. at 45; *In re Diet Drugs*, 582 F.3d at 546; *Brytus*, 203 F. 3d at 242; *Lindy Bros. Builders*, 487 F. 2d at 165.

4.  **The PSC's Motions Would Likely have the Effect of Halting the Repair of Homes.**

If this Court were to grant the PSC's Motions in any form, it would potentially result in the halting of not only settlement payments and voluntary dismissals, but also the homebuilders' ability to continue to repair the homes of their homeowners.  For more than two years, many homebuilders have expended substantial amounts of money, in the hundreds of millions of dollars, repairing homes.  The homebuilders have done so at their own risk--without any commitment from manufacturers, suppliers, or others in the chain of distribution, to reimburse the homebuilders for these costs--because the homebuilders have had the ability to pursue immediately those supply chain parties through litigation and other settlement means for recovery of these costs.

If the homebuilders' ability to recover their substantial repair costs is delayed or diminished, it is likely certain that many homebuilders which, to date, have stepped up and committed to repair their homes will no longer be in a position to do so.  Specifically, if these homebuilders are precluded from receiving any settlement proceeds until the PSC provides its "stamp of approval," which might be a matter of months or even years before a common benefit

fund is organized and effectively administered, these homebuilders may encounter financial difficulties due to the large amounts of unreimbursed repair work they will have incurred.

In addition, some members of the PSC have made it clear through these proceedings that, in addition to the assessment of a common benefit fund to any homebuilder recoveries, they intend to settle their homeowner plaintiffs' claims only if the homebuilders pay an attorneys' fee based on the value of the costs to repair these homes.  Many homebuilders are not interested in settling on those terms insofar as their offers to repair homes were made long before the plaintiffs' counsel became involved or participated in any settlement discussions.   Where homeowners are receiving no further benefit beyond what the homebuilders were willing to offer them prior to any significant involvement or work by the PSC, why should the PSC be able to tax such a settlement with an attorneys' fee award where no additional value was created?  If these Motions were granted, and homebuilders were facing a situation where they would be precluded for some period of time from recovering any of their repair costs, it would not be surprising if many homebuilders were forced to stop repairing homes.

Therefore, the Court should reject the PSC's request for an accounting and sequestration of funds from any and all homebuilder settlements.

**B.      This Court Should Refrain from Enjoining Settlements and Once Again Reject the PSC's Request to Restrict Settlement Communications.**

**1.  There is No Factual or Legal Basis for a Nationwide Injunction to Prohibit Settlements.**

The Plaintiffs' Steering Committee, in its Motion to Prevent Settlement Payments, requests the following injunctive relief:

> Accordingly, Plaintiffs respectfully request that this Court enter an order preventing Defendants - Insurer Defendants and Direct Defendants alike - from settling and/or paying, transferring, or otherwise do anything with funds or moneys available to them to resolve one or more claims in this litigation, which

> would last until resolution of the litigation involving the enjoined party.   In
> addition, or in the alternative, Plaintiffs respectfully request that the Court order
> all parties before it to mediation within thirty (30) days before the parties'
> selected mediator, John Perry, and in the interim stay all settlements, payments of
> settlement, and/or disbursement of funds in resolution of claims pending the
> mediation.

*Id.* at p.2.   Apparently not satisfied with its initial request to stop all settlement payments by all

parties in this MDL case, the PSC even goes so far as to argue later in its brief that an order

should be entered essentially preventing any settlements or payments **by anyone in America**,

whether they are parties to the MDL proceeding or not: "The fact that the order may reach

defendants over whom Plaintiffs have yet to perfect service, or who are third parties to the MDL

is irrelevant at this juncture."  *Id.* at p.6.

As support for its overbroad and overwhelming request, the PSC asserts that the Court

has equitable jurisdiction to provisionally restrain "dissipation" of certain assets.   However, the

PSC fails to take into account that the assets being "transferred", at least by the homebuilders,

are in connection with repairs of the homes for homeowners, whether they are part of the MDL

process or not.   Any payments for relocation, storage, or personal property are made directly to

the homeowners, and are not being "dissipated."   The vast majority of these homeowners never

have been nor will be plaintiffs in this proceeding **or any other lawsuit**.   The PSC nonetheless

asserts that *Deckert v. Independence Shares Corp.,* 311 U.S. 282 (1940), supports their request

for an injunction apparently pertaining to everyone in America related to defective drywall.

However, the *Deckert* case dealt with a situation where the Court enjoined a specific defendant

from dissipating specific funds under SEC jurisdiction.  *See id.* at 284-85.   The Court held as

follows: "We are of [the] opinion that the bill states a cause for equitable relief.   There are

allegations that Independence is insolvent, that its business is practically halted, that it is

threatened with many lawsuits, that its assets are endangered, and that preferences to creditors are probable." *Id.* at 288.

In contrast, in the present proceeding, there are any number of different defendants involved in this case. Many of the defendants have substantial assets and, once again, the PSC is overlooking the fact that the settlement funds paid from homebuilders are going directly to the homeowners. There is no evidentiary basis provided by the PSC to support the theory that any single defendant, let alone **all** of the defendants, are close to insolvency or that there is a specific fund of money that will be dissipated. To the extent that the homebuilders are seeking to recover funds from third parties, it is reimbursement to them for the substantial expenditures that they have already incurred to repair homes that were built with defective Chinese Drywall.

*Animale Group Inc. v. Sunny's Perfume, Inc.,* 256 F.App'x 707  (5th Cir. 2007), cited by the PSC, is equally inapposite. In that case, the district court entered a preliminary injunction enjoining a perfume store from transferring cash and real property after the owners of the store violated the Federal Trademark Act by selling counterfeit perfume. *Id.* at 707-08. Once again the Fifth Circuit's ruling hinged on the economic viability of the specific defendant and the specific fund created by the violation of a federal statute. *See id.* at 708-09.

A third primary case cited by the PSC in support of the proposition that an overbroad injunction should be entered is *Iantosca v. Step Plan Services, Inc.,* 604 F.3d 24 (1st Cir. 2010). There, the court concluded that judgment creditors who brought an action against judgment debtors had a right to freeze specific assets held by an insurance company in resolution of the claim. *Id.* at 28-31. In that case, the court held as follows: "Further, the preliminary injunction runs only against the insurers, and they have not contested personal jurisdiction." *Id.* at 31. The court further stated:

> But the creditors themselves have a colorable claim that appellants' own supposed interest under the settlement rests upon a fraudulent conveyance that a court will not recognize, and that the settlement funds properly belong to one or more of the named defendants who are liable to the creditors under the *Cahaly* judgment. So the creditors do have a claimed lien interest to support the preliminary injunction.

*Id.* at 33.

In the case at bar, the PSC is not requesting an injunction against a single defendant or a specific fund. There is no allegation that a specific defendant is about to go out of business or that a fraudulent transfer occurred. Instead, this is simply an attempt for the PSC to obtain a portion of every settlement inside and outside of the MDL proceedings. Any settlement proceeds are being paid either to the homeowners themselves (who suffered the damages), or in the case of a potential settlement in favor of a homebuilder, to reimburse that homebuilder for repairs already made.

In short, there is no evidentiary support for a nationwide injunction either by an affidavit, a deposition, or otherwise. Even worse, there is not even a factual allegation of any basis to enjoin any defendant or any specific fund. Such an overbroad request should be denied on its face.[2]

Other Plaintiffs have filed a memorandum opposing the PSC's Motion (the "Opposing Plaintiffs"). [D.E. 7016.] In their Memorandum in Opposition, the Opposing Plaintiffs cite *De*

---

[2] The practical difficulties arising from granting the relief requested by the PSC, which also seeks to enjoin all payments by insurers under policies that cover any claim related to Chinese drywall, clearly demonstrate that any benefit of such a nationwide injunction cannot outweigh the severe prejudice resulting to the defendants. The PSC's request is so overbroad as to arguably enjoin insurer payments for claims totally unrelated to Chinese drywall. The breadth of the PSC's request would handcuff insurance assets a homebuilder might rely upon to both settle and defend non-Chinese drywall claims if the insurance policy also covers Chinese drywall claims. Essentially, the PSC asks this Court to issue an Order that would freeze the assets of parties in pending actions across the country, with no relationship whatsoever to the MDL, and which are outside this Court's jurisdiction. Such an Order would force any homebuilder falling within its purview to face the prospect of trials, arbitrations and judgments in other forums without the benefit of its insurance, and interfere with the ability of litigants adverse to those homebuilders to collect fair settlements. Further, such relief would effectively penalize any homebuilder which made early efforts to remediate its customers' homes, at its own risk, by cutting off its statutory, contractual and common law rights of contribution, indemnity and insurance to make itself whole, merely to ensure that the PSC receives its common benefit fee.

*Beers Consolidated Mines, Ltd. v. United States,* 325 U.S. 212 (1945).  In *DeBeers*, the United

States sought equitable relief from foreign defendants, consisting of causes of action for violation

of the Sherman Act and Wilson Tariff Act.  *Id.* at 215.  In that case, the U.S. obtained an

injunction restraining the defendants from withdrawing property that they owned, which was

located in the United States, based on the U.S.'s connection that this property would be needed

to satisfy any judgment obtained against the defendants.  *Id.* at 215-16.  The Court vacated the

injunction, stating:

> A preliminary injunction is always appropriate to grant intermediate relief of the
> same character as that which may be granted finally.   The injunction in question
> is not of this character.   It is not an injunction in the cause, and it deals with a
> matter lying wholly outside the issues in the suit.  It deals with property which in
> no circumstances can be dealt with in any final injunction that may be entered.

*Id.* at 220-23.

The Court went on to hold that an injunction cannot be entered for every damage claim

that contains a count in equity, purely on the grounds that funds may not be available to pay a

judgment.  *Id.* at 222-23.  The Court stated:

> Every suitor who resorts to chancery for any sort of relief by injunction may, on a
> mere statement of belief that the defendant can easily make away with or
> transport his money or goods, impose an injunction on him, indefinite in duration,
> disabling him to use so much of his funds or property as the court deems
> necessary for security or compliance with its possible decree.   And, if so, **it is
> difficult to see why a plaintiff in any action for a personal judgment in tort or
> contract may not, also, apply to the chancellor for a so-called injunction
> sequestrating his opponent's assets pending recovery and satisfaction of a
> judgment in such a law action.  No relief of this character has been thought
> justified in the long history of equity jurisprudence**.

*Id.* (emphasis added).

The Opposing Plaintiffs' also cite *Travelers Casualty & Surety Company of America v.

Beck,* 95 F.Supp.2d 549 (E.D.Va. 2000).  In *Travelers*, the court held that the plaintiff therein

had not met the "nexus" test, and therefore, was not entitled to an injunction freezing the

defendants' funds. *Id*. at 552-555.  The plaintiff sought an injunction freezing the proceeds of a life insurance policy, which the plaintiff contended was necessary to satisfy a judgment which could be obtained based on the breach of the indemnity agreement.  *Id.* at 551-52.  The plaintiff stated equitable causes of action for an accounting and specific performance.  *Id.* at 551.  The court found that the plaintiff had failed to show that she had an equitable interest in the proceeds of the life insurance policy, based on the plaintiff's failure to show that the defendant had come to possess the disputed property through fraud or misconduct, or that she had any direct interest in the disputed property, which was unrelated to the losses she suffered as a result of the breach of indemnity agreement.  *Id.* at 554-55.  Similarly, in this case, there is no nexus alleged between every single potential settlement involving a defendant and the claims of the PSC.

Finally, the PSC fails to point out that Rule 65(c) of the Federal Rules of Civil Procedure requires that a bond be posted to pay the costs and damages sustained by the party that could be potentially wrongfully enjoined.   In this case, the PSC seeks a nationwide injunction prohibiting settlements that would provide payments to homebuilders, homeowners, and any other party. One can only wonder what the fair amount of a bond for such an injunction would be.   By way of example, in *Sanofi-Synthelabo v. Apotex, Inc.,* 470 F.3d 1368, 1384 (Fed. Cir. 2006), the court held that the party obtaining a preliminary injunction in a patent case was required to post a bond for $400 million.  The $400 million bond was sustained on an appeal.  *Id.*  Given the potentially thousands of homes identified by the PSC in the MDL case, and the thousands of homes already repaired by the homebuilders with expenditures which run into the millions of dollars, the PSC has artfully failed to address the fact that any such injunction should require a bond in the tens of millions of dollars.

The PSC's request for a nationwide injunction against settlements should be denied.

**2.   The Homebuilders are Legally Permitted to Communicate with Putative Class Members to Negotiate Settlements Prior to Certification of a Class so long as Their Communications are not Misleading or Coercive.**

As it has consistently ruled when the PSC has raised this issue on at least two prior occasions, this Court should once again refuse to restrict communications between homebuilders and homeowners.   While this Court certainly has broad discretionary powers to supervise communications by defense counsel with class members, it is uncontradicted that the homebuilders' customers are not "class members" because no class has been certified in this MDL or in any case transferred to it.  The PSC also ignores the First Amendment limitations that circumscribe this Court's broad discretionary powers in this context.   Contrary to the PSC's argument, federal courts generally hold that parties cannot be prohibited from communicating with putative class members, prior to class certification, unless there is a clear finding that the communications are misleading or coercive, and that this outweighs the infringement of the parties' right to communicate with non-parties.

The starting point for this analysis is the Supreme Court's decision in *Gulf Oil Co. v. Bernard,* 452 U.S. 89 (1981).   In *Gulf Oil*, the Court struck down a district court order prohibiting communications between the plaintiffs' counsel in an uncertified class action and putative class members.  *Id.* at 91-96, 100-04.  The Court found that "the order was an abuse of discretion," explaining:

> [A] district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties.  But this discretion is not unlimited . . . . The record reveals no grounds on which the District Court could have determined that it was necessary or appropriate to impose this order. . . . [T]he order involved serious restraints on expression.  This fact, at minimum, counsels caution on a part of a district court in drafting such an order, and attention to whether the restraint is justified by a likelihood of serious abuses.

*Id.* at 100-04.  Although the Court recognized that parties' communications with putative class members might result in abuses in some circumstances, it held that "the mere possibility of abuses does not justify routine adoption of a communications ban[.]"  *Id.* at 104.  A court may enter "a carefully drawn order that limits speech as little as possible," but it can do so only on the basis of a "clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties."  *Id.* at 101-02.

After *Gulf Oil*, the federal courts have generally agreed that parties cannot be prohibited from communicating with putative class members, prior to class certification, unless there is a clear finding that the communications are misleading or coercive and that this outweighs the infringement of the parties' right to communicate with non-parties.[3]  *See, e.g., Payne v. Goodyear Tire & Rubber Co.,* 207 F.R.D. 16, 18-21 (D. Mass. 2002).  Even cases predating *Gulf Oil* generally allowed communications to "putative" class members.  *See, e.g., Weight Watchers of Phila., Inc., v. Weight Watchers Int'l Inc.,* 455 F.2d 770, 773 (2d Cir. 1972).  This Court previously refused to restrict such communications in *Patrick Turner v. Murphy Oil*, Civil Action No. 05-4206 (E.D.La), when it denied the plaintiffs' motion to preclude *ex parte* communications between Murphy Oil and putative class members, and required that such issues be raised on a case-by-case basis.  *See October 4, 2005, Minute Entry.*

In order to meet its heavy burden here, the PSC must make an evidentiary showing of two kinds of proof.  First, it must show that a particular form of communication has occurred or is threatened to occur.  *See Cox Nuclear Medicine v. Gold Cup Coffee Svcs., Inc.,* 214 F.R.D.

---

[3] As is clear from this Court's previous orders, as well as other applicable law, parties are permitted and, in fact, encouraged, to communicate and discuss settlement without their attorneys.  The Florida Rules of Professional Conduct expressly authorizes such communications.  Specifically, the commentary to Rule 4-4.2 of the Florida Rules of Professional Conduct provides that "[p]arties to a matter may communicate directly with each other."  *See also Ellis Rubin, P.A. v. Alarcon*, 892 So. 2d 501, 503 (Fla. 3d DCA 2004) (noting that parties are allowed to communicate directly with each other and that parties may settle an action without their attorneys).

696, 697 (S.D. Ala. 2003).   Second, the PSC must show that the particular form of communication at issue is abusive and that it threatens the proper functioning of the litigation. *See id.* at 697-98.  The PSC has provided **no** actual evidence of a single misleading or abusive communication.  Evidence that one or more homebuilders have offered to repair their customers' homes can hardly be deemed *per se* abusive.  "Claims that the defendant merely communicated a settlement offer to a putative plaintiff will not provide the basis for a limitation.  Absent any specific evidence that the communication is abusive, a limitation is inappropriate." *The Kay Co. v. Equitable Prod. Co.,* 246 F.R.D. 260, 263 (S.D.W.Va. 2007) (finding defendant contact with putative class members regarding settlement was not abusive).  Because the PSC has failed to provide any evidence of a communication that is abusive or that otherwise threatens the proper functioning of the litigation, the Court should deny the PSC's Motions.

### 3.  The PSC's Request To Prohibit Settlement Communications Is Not Supported By Law.

Most of the cases the PSC cites address the very different question of whether defense counsel can be prohibited from communicating with parties, *i.e.,* members of a class that has been certified and who, therefore, are represented by counsel.  *See, e.g., Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1197-1207 (11th Cir. 1985), where the court found that it was improper for defendant to conduct a massive telephone campaign to convince members of a certified class "to withdraw from the class," so that the defendant could reduce its potential liability.  The telephone calls violated two previous district court orders, but the Eleventh Circuit's ruling was based upon the "ethical duty" that "a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter[.]"  *Id.* at 1207 n.28 (citation omitted).  That rule does not apply here because no class has been certified and the PSC does not represent putative class members, much

less the homebuilders or any other party in the supply chain.  *See Resnick v. American Dental Association*, 95 F.R.D. 372, 376-77 (N.D. Ill. 1984) ("unnamed class members, once the class has been certified, are 'represented by' the class counsel[,]" and therefore, "the reasons for the prohibition of a lawyer's direct dealing with an adverse party represented by counsel . . . apply here"); *In re Federal Skywalk Cases*, 97 F.R.D. 370, 376 (W.D. Mo. 1983) (finding that communications between defense counsel and class members were improper because "this Court expressly created an attorney-client relationship between the counsel appointed to represent the class and those class members" when it certified the class).[4]

In addition, most of the cases the PSC cites, including those that address pre-certification communications with putative class members, were decided *before* the Supreme Court changed the rule in *Gulf Oil, supra*, and held that prohibitions on pre-certification communications between parties and putative class members should be ordered with "caution" and must be based upon a clear record showing that the communications are misleading, coercive, or otherwise threaten the fairness of the proceedings, and that this outweighs the resulting infringement of the parties' rights to communicate with non parties.  *See* 452 U.S. at 101-04.  Many of these courts expressly relied upon a previous provision in the Manual for Complex Litigation that had allowed similar prohibitions before the *Gulf Oil* ruling.    At that time, the Manual recommended "that the court at pretrial enter an order forbidding unapproved direct or indirect written and oral communications by formal parties or their counsel with potential and actual class members[.]"  *See Erhardt,* 629 F.2d at 845 (citation and internal quotation marks omitted).

---

[4] Other cases the PSC cites or cited previously that involve post-certification communication with parties include *Bower v. Bunker Hill Co.*, 689 F.Supp. 1032 (E.D. Wash. 1985); *Tedesco v. Mishkin*, 629 F. Supp. 1474 (S.D.N.Y. 1986); *In re School Asbestos Litigation*, 842 F.2d 671 (3d Cir. 1988); *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590 (2d Cir. 1986); *Haffer v. Temple University*, 115 F.R.D. 506 (E.D. Pa. 1987); *Erhardt v. Prudential Group, Inc.* 629 F.2d 843 (2d Cir. 1980); *Georgine v. Amchem Products*, 160 F.R.D. 478 (E.D. Pa. 1995); *In re Community Bank of Northern Virginia.*, 418 F.3d 277 (3d Cir. 2005); and *Impervious Paint Industries, Inc. v. Ashland Oil Co.*, 508 F. Supp. 720 (W.D. Ky. 1981).

This is precisely the type of blanket prohibition that the Supreme Court struck down in *Gulf Oil*, and the Manual was radically changed after *Gulf Oil*.  The Manual now provides that "[d]efendants and their counsel generally may communicate with potential class members in the ordinary course of business, including discussing settlement before certification, but may not give false, misleading, or intimidating information, conceal material information, or attempt to influence the decision about whether to request exclusion from a class certified under Rule 23(b)(3)." *Manual for Complex Litigation (4th Ed.), § 21.12 - Precertification Communications with the Proposed Class*.[5]  The Manual observes that "[m]ost judges are reluctant to restrict communications between the parties or their counsel and potential class members, except when necessary to prevent serious misconduct." *Id.*

Significantly, many of the cases the PSC cites involved communications that occurred after formal class *notice* was approved.  Courts are particularly concerned about misleading attempts to influence class members during the "opt-out" period when they must decide whether to exclude themselves from a class.  The fact that the communications occurred after class notice was also significant to the courts in *Kleiner,* 751 F.2d at 1201-02; *Georgine,* 160 F.R.D. at 490; *Impervious Paint,* 508 F. Supp. at 723; and *Erhardt,* 629 F.2d at 845-46.

More to the point, however, many courts have expressly recognized that a defendant may properly engage in communications with putative class members, including settlement discussions, before a class is certified.[6]  For example, in *Cada v. Costa Line, Inc.,* 93 F.R.D. 95, 98 (N.D.Ill. 1981), the court held that

---

[5]      The Manual for Complex Litigation is available at http://www.fjc.gov/public/pdf.nsf/lookup/MCL40002.pdf/$file/MCL40002.pdf.

[6] This Court has already recognized that the homebuilders in Florida have a statutory right, pursuant to Chapter 558, Florida Statutes, to communicate with their homeowners about offers to repair alleged construction defects that would result in resolution of potential claims.

[i]ndividual class members who choose to settle (or to litigate or indeed just to forget about) their claims are simply opting out of the class, an opportunity available to them until there has been a class determination under Rule 23(c) and the date specified in the class notice in accordance with Rule 23 (c)(2)(A) . . . has passed.  Rule 23(e) is aimed at a different target.  It requires court approval of settlement of the class action itself, not of individual claims.

There is simply no basis for the Court to reverse its prior stance on this issue.  The PSC's request to restrict communications between homebuilders and homeowners should, yet again, be denied.

## IV.  <u>CONCLUSION</u>

This Court should deny the PSC's Motions because the relief sought in these Motions is inappropriate in the context of this unique MDL proceeding.  In addition, the PSC has failed to demonstrate that its efforts have conferred any common benefit to those settlements resulting from homeowners that settle with their homebuilders prior to this MDL being formed, or on terms that were available to the homeowners prior to any significant involvement by the PSC.  The requested relief will likely result in a chilling effect for homebuilders who are otherwise prepared to repair the homes of their homeowners.  Finally, this Court has previously ruled on and rejected many of the arguments the PSC advances in the Motions, and should not continue to revisit the PSC's repetitive requests to restrict communications and settlements between homebuilders, homeowners and other responsible parties, especially where, as here, there is no evidence, let alone a clear record, of misleading or coercive communications.  This Court should also reject the PSC's request to enjoin settlements as there is no basis for such extraordinary relief.   For all the foregoing reasons, the Motions should be denied.

Respectfully submitted,

**STONE PIGMAN WALTHER WITTMANN**
*Local Lead Counsel of the HSC*
546 Carondelet Street
New Orleans, LA  70130
Telephone: (504) 593-0804
Facsimile: (504) 593-0804
E-mail: pwittmann@stonepigman.com

By:      /s/ Phillip A. Wittmann
         PHILLIP A. WITTMANN
         Louisiana Bar No. 13625

**GREENBERG TRAURIG, P.A.**
*Lead Counsel for the HSC*
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email: bassh@gtlaw.com
Email: salkym@gtlaw.com

By:      /s/ Hilarie Bass
         HILARIE BASS
         Florida Bar No. 334323
         MARK A. SALKY
         Florida Bar No. 058221

**SIVYER BARLOW & WATSON**
*Member of the HSC*
100 S Ashley Drive, Suite 2150
Tampa, FL 33602
Telephone: (813) 221-4242
Facsimile: (813) 227-8598
Email: nsivyer@sbwlegal.com

By:      /s/ Neal Allen Sivyer
         NEAL A. SIVYER
         Florida Bar No. 373745

**KING & SPALDING LLP**
*Member of the HSC*
1180 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Email: kbuster@kslaw.com

By:      /s/ J Kevin Buster
         J. KEVIN BUSTER
         Georgia Bar No. 099267

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February9th, 2011, this document has been served on Plaintiffs' Liaison Counsel, Russ Herman, Esq., and Defendants' Liaison Counsel, Kerry Miller, Esq., and Homebuilders' Steering Committee Dorothy Wimberly and Insurer Defendants' Liaison Counsel, Judy Y. Barrasso, Esq. by U.S. mail and/or email or by hand delivery and I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and upon all parties by electronically uploading the same to Lexis/Nexis File & Serve in accordance with Pretrial Order No. 6.

/s/ Hilarie Bass

Hilarie Bass