UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE -MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * * | MDL No. 2047 |
| THIS DOCUMENT RELATES TO: KENNETH and BARBARA WILTZ, et al vs. BEIJING NEW BUILDING MATERIALS PUBLIC Ltd, et al Case No. 2:10-cv-361-EEF-JCW | * * * * * * | JUDGE FALLON  MAG. WILKINSON |

## AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared

JAMES A. SCHIVINSKI

who, being duly sworn, upon his oath deposed and stated as follows:

1. He was the President of Portofino Homes, Inc. ("Portofino Homes"), and as such, has personal knowledge of the following based on his review of records that were maintained by Portofino Homes in the regular course of business.

2. Portofino Homes was a corporation organized and existing under the laws of the State of Florida and had its principal place of business in Lee County, Florida.

3. Portofino Homes was dissolved on January 14, 2010, as shown in the records of the Florida Secretary of State.

EXHIBIT "A"

4. Portofino Homes was a home builder that contracted with third party vendors for the construction of single-family homes and/or sold completed single-family homes.

5. Portofino Homes never built a residence in the State of Louisiana nor had any contracts or subcontracts with companies located in Louisiana.

6. Portofino Homes was never licensed or registered to do business in Louisiana or ever had any offices or employees in Louisiana.

7. Portofino Homes never had an agent for service of process in Louisiana.

8. Portofino Homes never had any bank accounts in Louisiana nor owned any property in Louisiana.

9. Portofino Homes did not solicit business in Louisiana or ever transacted business in Louisiana.

10. Portofino Homes never maintained a telephone line in Louisiana or kept a post office box or otherwise received mail in Louisiana.

11. Portofino Homes never maintained an office, store, headquarters, shop, warehouse, or any other facility in the State of Louisiana.

12. Portofino Homes never received any business from any contacts in Louisiana, whether individual customers, or business customers.

13. Consequently, Portofino Homes never anticipated it would be haled into court in Louisiana.

_____
James A. Schivinski

SWORN TO AND SUBSCRIBED
BEFORE ME THIS 3rd DAY OF September, 2010.

_____
NOTARY PUBLIC

"OFFICIAL SEAL"
Caroline D. McKinney
My Comm. Expires 7/16/2011
Commission # DD 685193

State of FL, County of LEE
Signed before me on this 3rd day
of Sept 2010 by James A. Schivinski
Notary Public _____

3



**PORTOFINO HOMES, INC.**

611 SE 11 Street Suite A • Cape Coral, Florida 33990
Phone 239-458-7570 • Fax 239-458-7938 • portofinohomes.com • CR-C058181

## CONSTRUCTION AGREEMENT

| Buyer #1: | Luis A. Mitjans | Buyer #2: | Arturo Loynaz | Home Phone: | (305) 986-6574 |
|---|---|---|---|---|---|
| Buyer #3: | Rigoberto Rivas | | | Work Phone: | |
| Address: | 12745 NW 10th Ln | | | Cell: | (305) 986-6574 |
| City: | Miami | State: FL | Zip: 33182 | Consultant: | Bill Parriman |

| Model: | Malibu | Address: | 3506 Tropicana Pkwy W. |
|---|---|---|---|
| Block: 4185 | Lot: 3-4 | Unit: 59 | Strap: 07-44-23-C2-04185.0030 |

| Purchase Price: | $209,900 | Draw Schedule | | Co-Broke | |
|---|---|---|---|---|---|
| Addendum: | $33,310 | X | Construction/Permanent | Agency: | First Trust Realty |
| Total Purchase Price: | $243,210 | Lender: | Riverside Bank Donna Carpenter | Agent: | Willie Perez |
| Initial Deposit Received: | $2,500 | Phone: | (239) 573-3730 | Phone: | (239) 649-3298 |

1. The BUILDER shall construct upon the building site listed above a building in accordance with the plans and specifications hereto attached. The BUILDER shall provide all materials and perform all work of the construction provided for in the plans and specifications in a good and workmanlike manner. The BUILDER warrants the construction of the building from defects of material or workmanship for a period of twelve (12) months from Certificate of Occupancy (CO), in accordance with terms outlined in this agreement.

2. OWNER herewith grants possession of the premises to the BUILDER. Said premises to be delivered to OWNER upon completion of the construction and payment by OWNER of all moneys due BUILDER and OWNER signing BUILDER'S acceptance form. OWNER agrees to remain off the job site, only while construction is in progress, during the working hours of 7:00 a.m. to 5:00 p.m.

3. **Construction is to be completed within 160 working days of the starting date, allowing five (5) working days per calendar week, unless delayed by legal holidays, strike, building material shortages, withholding of funds due the BUILDER under the Agreement, newly established requirements of governmental agencies, Act of God, or other causes beyond the BUILDER'S control. Start of construction is defined as the date on which footings are poured. Closing and settlement of this agreement will be within five (5) business days from the time the building is substantially ready for occupancy and certificate of occupancy has been issued by the Building Department.** Initial: _____

4. If the OWNER is to secure a mortgage loan, this construction agreement is contingent upon the OWNER obtaining a mortgage commitment with a payment schedule mutually agreeable to the Lending Institution and the BUILDER. If the OWNER is unsuccessful in obtaining a mortgage loan commitment, this construction agreement shall become null and void. The initial deposit is non-refundable. If the OWNER secures a mortgage loan, OWNER agrees and understands that there will be a loan closing with the financial institution or agency or its representatives when the mortgage is obtained. If the OWNER is not securing a mortgage, the OWNER must comply with the BUILDER'S request, prior to or at any time during construction, to set up an escrow account with a Commercial Bank or Savings and Loan whereby payments, or the balance of payments, according to an established draw schedule shall be guaranteed. All construction draws are due upon the request by

Initial: _____

Page 1 of 5

**EXHIBIT "B"**

the BUILDER. A 5% penalty on the amount of funds requested will be due if the BUILDER does not receive the draw within five (5) business days of the request for payment and an additional 5% penalty every five business days thereafter.

5. BUILDER will not apply for building permits or commence with construction prior to receiving signed OWNER APPROVED PLAN with any and all changes initialed. BUILDER will not be held responsible for delays in permit processing due to OWNER'S delay in returning OWNER APPROVED prints or engineering. Such delays will not affect or change the conditions as set forth in this Agreement. Changes in plans and specifications may be requested by the OWNER when practicable and must be stipulated in writing and signed by both parties. All changes must meet the approval of both the BUILDER and Lender, and must comply with all applicable governmental rules and regulations. Changes must be paid for when change order is signed and returned. Any structural and or mechanical changes made by the OWNER after BUILDER'S receipt of signed OWNER approved prints shall be paid for, along with cost for new drawings, new engineering, etc. before the start of construction. Upon purchase of building permit, BUILDER reserves the right not to commence construction until a signed color selection sheet has been provided to BUILDER by OWNER. Changes made by OWNER after BUILDER has purchased building permits must be received by BUILDER no later than fifteen (15) days prior to the phase of construction such change will affect. All changes made by OWNER after purchase of building permit are subject to BUILDER'S approval together with the costs thereof, and a two hundred fifty dollar ($250.00) change order fee for each change which shall be paid by OWNER at the time the changes are requested. For each change made by OWNER, the BUILDER shall be allowed a minimum of five additional working days to complete construction, notwithstanding any additional delays caused by the change order.

6. BUILDER may use and install materials other than and different from those specified in the plans, drawings and specifications, or incorporated in the Basic Model, provided such different materials are of substantially equal value and utility.

7. The BUILDER gives the OWNER a "Limited Warranty" for a period of one year, starting when the certificate of occupancy is granted. The BUILDER warrants all materials and their installation incorporated in the construction agreement, with the exception of those items stated as allowance or homesite improvements and any such items which required OWNER maintenance. Should the BUILDER determine that warranty work requested by the OWNER was the result of neglect or abuse, the OWNER agrees to reimburse the BUILDER for all expenses incurred in the repair. The BUILDER warrants the structure from defects of material or workmanship only. Due to unstable soil conditions if Florida, and fill requirements, the BUILDER'S warranty will not cover cracks caused by settling and/or stress.

8. The Contract Price and Lot Improvement Costs in this Agreement are based upon a readily accessible, clear, level lot up to 10,000 sq. ft. in total area, free of vegetation, brush and trees, of sufficiently high elevation to permit the foundation as specified in the plans. Fill, grading, and hauling costs are included under Lot Improvements, and applies to but is not limited to, charges from initial lot preparation, foundation fill, machine grading, compaction, culvert pipe & driveway grading, rough & final machine grading, and fill needed to establish proper grade. OWNER agrees to pay charges for any cleaning, special foundation requirements, testing by government agencies, additional fill requested on interior and exterior of foundation, temporary utilities, maintenance and repair of access roads, including, but not limited to any fill requirements necessitated to meet the provision of Federal Flood Insurance Laws, or any other applicable laws or regulations. It is the OWNER'S responsibility to notify the BUILDER of unusual soil conditions and provide any needed test borings. Expense for removal of excess dirt and vegetation to provide proper grade or any expenses caused by rock or other adverse sub soil conditions will be borne by OWNER, and paid to BUILDER at the time such expenses are incurred.

9. Pricing in the Agreement is based upon construction costs in effect at the time of the signing of the contract. OWNER and BUILDER recognize that construction costs are very fluid and subject to change. In the event that the BUILDER shall not be in the position to commence construction within forty-five (45) days of the date of this Agreement, as a result of a delay in obtaining permits or necessary governmental approvals, or delays in OWNER obtaining mortgage financing, the construction price shall be subject to change. The BUILDER shall notify the OWNER of any adjustments in price if said adjustment results in an increase of the contract total. OWNER has the right to cancel the contract and receive the return of the initial draw from loan closing, less any expenses incurred by the BUILDER, without further liability. Notice of this election must be given to BUILDER within (10) days of the receipt of adjustment notice by OWNER.

Initial: _____ _____ _____

10. The Builder does not provide soil testing of the Owner's Homesite. It is assumed that sub-surface soils will provide a minimum bearing of 2500psi. In the event soil testing is required, it will be the Owner's responsibility to provide the testing.

11. Items stated as Allowance(s) in this Agreement will be paid at face value to the OWNER or whom the OWNER directs the BUILDER to pay. All materials purchased and work performed for items listed as allowances are the OWNER'S responsibility and will not be covered by the BUILDER'S "Limited Warranty". The OWNER shall be directly responsible to the BUILDER for damages and delays which may result from allowance purchase. The expense for such damages will be deducted from the allowance prior to disbursement. The OWNER will be obligated to close with the BUILDER should delays occur due to allowance purchases, or be subject to penalties as set forth in paragraph six (6) of this Agreement. The OWNER clearly understands there in no obligation to purchase materials or services stated as an allowance from anyone the BUILDER or his staff may recommend.

12. OWNER agrees to maintain all items that require maintenance as of the time they are installed on the premises and through the balance of the construction period. Such items include sod, landscaping, sprinkler system, swimming pool, spa, etc. OWNER may request BUILDER to delay installation of these items, provided such a delay will not delay closing with OWNER and/or lender. Damages resulting from improper maintenance will not be covered by the BUILDER'S "Limited Warranty".

13. OWNER will not construct, cause to be built, or contact with other parties for any construction on the premises without the BUILDER'S written consent. Upon receiving the BUILDER'S consent, the OWNER will be directly responsible to the BUILDER for damages, delays and the costs thereof resulting from work the OWNER has performed by any other parties the OWNER has authorized. The OWNER, when contracting with other parties, agrees to use only licensed persons, and must supply the BUILDER with a valid Certificate of Liability and Workmanship Compensation Insurance, prior to commencement. The OWNER holds the BUILDER harmless for any and all delays, damages and injuries which may result.

14. Expenses for electrical service which may be required to be run across the building necessitated by power company pole location and regulations, or underground electric and or telephone services required will be borne by OWNER.

15. Connection allowances made for public water and sewer will be limited to a distance of forty-five (45) feet. Costs of lines required over the forty-five (45) feet will be borne by OWNER.

16. Permitting Fees will be paid by BUILDER. The term "Permitting Fees" as used in this Agreement will be limited to the purchase of home building permits and associated items including but not limited to Impact Fees, Septic Permits, etc. as stated on the attached specification sheet. Permitting Fees are based upon rates in effect at the time of the signing of the contract. Increases in Permitting Fees that become effective between the signing of the contract and the issuance of permits shall be borne by the OWNER. Expenses incurred for testing, engineering, or additional City, Local, or State Fees, including but not limited to Concurrency Fees, Health Department Fees, etc., and other special requirements made by the Building Department or the Lender shall also be borne by the OWNER, unless otherwise incorporated in this Agreement.

17. Insulation to be installed as follows:
    a. Above the ceiling in the living area will yield a value of R-30
    b. The exterior block walls will yield a value of R-4.2
    c. Frame walls adjacent to living areas will yield a value of R-11

18. Radon Gas is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

19. Concrete normally develops cracks and the BUILDER does not warranty concrete or masonry from cracking.

20. If required, the Septic System will be installed as permitted by the Department of Health, Florida Administrative Code, Chapter 64E-6.

21. All times stated in this construction agreement or in the contract documents are of the essence to the contract.

Initial: _____

22. All claims and disputes relating to this contract shall be subject to arbitration at the option of either the OWNER or BUILDER in accordance with the arbitration rules of the American Arbitration Association for the construction industry in effect at the time of the arbitration. Written notice of demand for arbitration shall be filed with the other party to the contract and with the American Arbitration Association, within a reasonable time after the dispute has arisen. The prevailing party in any arbitration proceeding shall be entitled to recover attorney's fees from the other party.

23. The BUILDER may, on ten (10) days written notice to the OWNER, terminate this contract before the termination date when for a period of thirty (30) days after a progress payment is due, through no fault of the BUILDER, the OWNER, fails to make the payment. On such termination, the BUILDER may recover from the OWNER payment for all work completed and for any loss sustained by the BUILDER for labor, materials, equipment, tools, or machinery to the extent of the actual loss plus a reasonable profit, provided the BUILDER can prove such loss and damages.

24. It is understood and agreed that the OWNER will not assign this contract without the written consent of the BUILDER.

25. This Agreement shall be binding upon the heirs, executors, administrators, successors, and assigns of OWNER and BUILDER.

26. This Agreement constitutes the entire agreement between the parties and not representations, warranties, or agreements have been made unless incorporated herein.

27. Construction Industries Recovery Fund – Payment may be available from the Construction Industries Recovery Fund if you lose money on a project performed under contract, where the loss results from specified violations of Florida law by a state-licensed contractor. For information about the recovery fund and filing a claim, contact the Florida Construction Industry Licensing Board at 1940 North Monroe Street, Tallahassee, FL 32399-1039.

## 28. CONSTRUCTION LIEN DISCLOSURE.

**ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND ARE NOT PAID IN FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS OR NEGLECTS TO MAKE OTHER LEGALLY REQUIRED PAYMENTS, THE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY.**

Initial: _____

FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX AND IT IS RECOMMENDED THAT WHENEVER A SPECIFIC PROBLEM ARISES, YOU CONSULT AN ATTORNEY.

29. NOTICE AND RIGHT TO CURE.

FLORIDA LAW CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY FILE A LAWSUIT FOR DEFECTIVE CONSTRUCTION AGAINST A CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY DAYS BEFORE YOU FILE YOUR LAWSUIT, YOU MUST DELIVER TO THE CONTRACTOR, SUBCONTRACTOR, SUPPLIER, OR DESIGN PROFESSIONAL A WRITTEN NOTICE OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE YOUR CONTRACTOR AND ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND MAKE AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER MADE BY THE CONTRACTOR OR ANY SUBCONTRACTORS, SUPPLIERS, OR DESIGN PROFESSIONALS. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER FLORIDA LAW.

I (We) have read, understand, and agree to the conditions in this Construction Agreement.

| Owner's Signature | Date 4/9/05 | Witnessed by |
| Owner's Signature | Date 4/9/05 | Witnessed by |
| OWNER'S SIGNATURE Portofino Homes, Inc. | DATE 4-11-05 | Witnessed by |

Initial: _____

Page 5 of 5



**PORTOFINO HOMES, INC.**

611 SE 11 Street Suite A • Cape Coral, Florida 33990
Phone 239-458-7570 • Fax 239-458-7938 • E-mail dickivin@aol.com • CR-C058181

Addendum 1
Page 1 of 1

Date: 4/9/2005 7:49 PM
Owner: Mitjans, Loynaz, Rivas
Model: Malibu

| ITEM | AMOUNT |
|---|---|
| **POOLS/APPLIANCES/MISCELLANEOUS ITEMS** | |
| 1. Appliance Allowance of $2,500.00 | Included |
| 2. Add Standard Majestic Pools of SW Florida Level II Pool Package to Include All Features and Specifications as of 4/9/05. (Note: Price May Change After Consultation with Pool Representative) | $31,000.00 |
| **STRUCTURAL ITEMS** | |
| 3. Upgrade to 1050 Gallon Septic System in Lieu of Standard 900 Gallon Septic System. (Note: Required Under City Code for Homes with 3+ Bedrooms) | $1,900.00 |
| 4. Lot Preparation for Oversized Lot | $410.00 |

Addendum 1 Total        $33,310.00
Home Base Price         $209,900.00
**AMMENDED CONTRACT TOTAL**   $243,210.00

Owner _____  Date 4/9/05
Owner _____  Date 4/9/05
Portofino Homes, Inc. _____  Date 4-13-05

611 SE 11 Street Suite A • Cape Coral, Florida 33990
Phone 239-458-7570 • Fax 239-458-7938 • E-mail dickivin@aol.com • CR-C058181