**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | ) MDL NO. 2047 |
| | ) |
| | ) SECTION: L |
| | ) |
| THIS DOCUMENT RELATES TO: | ) |
| | ) |
| ALL CASES | ) JUDGE FALLON |
| | ) MAG. JUDGE WILKINSON |
| | ) |

**THE PLAINTIFFS' STEERING COMMITTEE'S OMNIBUS REPLY MEMORANDUM IN SUPPORT OF (1) THE PSC'S MOTION FOR AN ORDER REQUIRING AN ACCOUNTING AND OTHER RELIEF; (2) THE PSC'S EMERGENCY MOTION FOR AN ORDER PREVENTING THE PAYMENT OR TRANSFER OF CERTAIN MONEYS OR, IN THE ALTERNATIVE, FOR COURT ORDERED MEDIATION AND TEMPORARY STAY OF ALL OUTSIDE SETTLEMENT ACTIVITIES; AND (3) THE PLAINTIFFS' STEERING COMMITTEE'S MOTION TO HALT ENTRY OF VOLUNTARY MOTIONS TO DISMISS WITHOUT PRIOR NOTICE TO THE <u>PLAINTIFFS' LIAISON COUNSEL AND DEFENSE LIAISON COUNSEL</u>**

## I.     <u>INTRODUCTION</u>

Before this Court are three simple and straightforward requests:

*First*, the PSC asks the Court to prevent parties who are before it from authorizing or paying settlement funds, and to order all parties to mediation while staying outside settlement activity.  The simple reason is that piecemeal resolution of these cases is not only a slow process in itself – making it no solution at all to wrapping this MDL litigation up – but it also threatens to undermine a global solution of the thousands of cases yet to be resolved.  Several defendants have agreed that global mediation is the only way to get a global solution, which is the only way to both efficiently resolve these cases while fully compensating each of the plaintiffs.  The defendants opposing the requested relief have been caught in an ugly contradiction: while

claiming to want speedy resolution and that their moral imperative guides them to take care of their customers (i.e., plaintiffs), they vehemently oppose any efforts by the PSC to do just that on a global scale.

*Second*, the PSC asks this court to sequester funds that would be used to pay attorneys' fees.  The PSC is not petitioning for common benefit fees at this time; the PSC is also not claiming that parties who have resolved their cases should not go ahead with remediation efforts.  None of that has anything to do with sequestration of moneys prior to a determination as to an appropriate division given the PSC efforts which have (i) located defendants across the globe and forced them to the table; (ii) vetted thousands of claims to facilitate analysis and ripening of the legal and factual issues; (iii) created an umbrella of legal precedent under which all cases benefit; (iv) laid the groundwork for future resolution through bellwether trials; and (v) systematically applied pressure on defendants such that they would prefer peaceful settlement to litigation; among other things.

The jurisdictional objections suffer an even worse fate.  The Rule 12 motion not only does not deprive this court of jurisdiction simply by not being filed (as some of have suggested), but this Court and the PSC have all agreed to preserve those motions pursuant to the conference of February 17, 2011 addressing these issues.  Moreover, the All Writs Act provides this Court with ample authority to issue the orders.  Defendants rely on the Anti-Injunction Acts strict limitation on such orders when they stay state court proceedings; but the PSC is not asking this Court to stay any state court proceeding.  And because Plaintiffs claims are equitable in nature, seeking rescission and restitution – under the Supreme Court's *Deckert* decision, this gives Plaintiffs an equitable interest in the res (either the specific moneys paid to defendants sought to

be refunded, attorneys fees, or the insurance policy covering the claims) such that this Court's equitable jurisdiction permits the stay on distribution of attorneys fees and/or insurance proceeds.

*Third*, the PSC seeks and administrative order to control the filing of motions for dismissals with prejudice to allow liaison counsel to evaluate the underlying circumstances of each motion (Rec. Doc. No. 7187). Oppositions to that motion were due to be filed no later than February 16, 2011, but none were (Rec. Doc. No. 7365).

Pursuant to the Court's scheduling order (Rec. Doc. No. 7185), more than a dozen briefs were submitted in response to the PSC's motion for an accounting (Rec. Doc. No. 6669) and the emergency motion for mediation (Rec. Doc. No. 6947). The PSC hereby files this Omnibus reply memorandum in support of its motions, as allowed by the Court (Rec. Doc. No. 7185).[1]

---

[1] This omnibus reply responds to the briefs filed on behalf of: Defendants The Travelers Indemnity Company of Connecticut, Travelers Property Casualty Company of America, St. Paul Fire & Marine Insurance Company, and The Standard Fire Insurance Company (collectively "Travelers") (Rec. Doc. No. 7384); Defendants Chartis Select Insurance Company, Chartis Specialty Insurance Company Illinois National Insurance Company, Lexington Insurance Company, and National Union Fire Insurance Company of Pittsburgh, PA (collectively "Chartis") (Rec. Doc. No. 7389); Installer Defendants (Rec. Doc. No. 7391 marked as "deficient document" on the docket); Defendant Meritage Homes of Florida, Inc. (Rec. Doc. No. 7390); the Homebuilders' Steering Committee (Rec. Doc. Nos. 7388-1 & 7427); Defendants Banner Supply Company, Banner Supply Company Pompano, LLC, Banner Supply Company Fort Myers, LLC, and Banner Supply Company Tampa, LLC (collectively "Banner") (Rec. Doc. Nos. 7371 & 7376); Defendants Venture Supply, Inc. and the Porter-Blaine Corporation (Rec. Doc. No. 7349); Plaintiffs Simon and Rebecca Finger, James and Joycelyn Butler, Carolyn Cathcart, and Jason and Renee Niemann ("Limited Opposition") (Rec. Doc. No. 7369); Defendants FCCI Commercial Insurance Company and FCCI Insurance Company (Rec. Doc. No. 7380); Defendants American Eastern, Inc., Wellington, LLC, Wyndwil, LLC, Atlantic Homes, LLC, HHJV, LLC, AHJV, LLC, Atlantic Homes Development Corp., Overlook Point, LLC, The Overlook, LLC, Ainslie Group, Inc., Plantation Group, LLC, Greensprings Plantation, Inc., Clark-Whitehill, Enterprises, Inc., and Peak Building Corporation ("Virginia Builders/Developer Defendants") (filed on *Wiltz* and *Amato* dockets); Defendants Knauf Plasterboard (Tianjin) Co., Ltd., Knauf Plasterboard (Wuhu) Co., Ltd., Guangdong Knauf New Building Materials Products Co., Ltd., Knauf Gips KG, Knauf International GmbH, Knauf Insulation GmbH, Knauf UK GmbH, and Gebr. Knauf Verwaltungsgesellschaft KG (collectively "Knauf Defendants") (Rec. Doc. Nos. 7386 & 7387); Certain Defendant Insurers (Rec. Doc. No. 7382); the Insurer Steering Committee (Rec. Doc. Nos. 7379 & 7387); Defendant Woodall, LLC (Rec. Doc. No. 7402); Attorney Victor Diaz (not found on the docket); Defendant R&H Masonry Contractor, Inc. (Rec. Doc. No. 7405); and Defendant Swedberg Enterprises, Inc. (Rec. Doc. No. 7406).

Previously on January 19, 2011, the PSC filed with the Court's permission a reply brief in response to Roberts & Durkee, PA's opposition to the PSC's motion for an accounting ("Roberts & Durkee reply") (Rec. Doc. No. 7046).[2]  That reply and its accompanying exhibits are incorporated by reference herein.

## II.  SUMMARY OF RESPONSES TO THE PSC'S MOTIONS

Some of the responses to the PSC's emergency motion do not oppose the proposal for a Court-ordered mediation, and even request the opportunity to participate in the structuring of any such mediation.  *See*, *e.g.*, Knauf Defendants' Resp. at 2 (Rec. Doc. No. 7387).  In the case of Banner, that defendant "wholeheartedly supports the PSC's motion to compel all the parties to mediation, at least those with claims against Banner."  Banner Entities' Resp. at 1 (Rec. Doc. No. 7371).  Of course, Banner's position favoring mediation will likely become moot as a consequence of a class action settlement that is expected to be announced by Banner shortly.  Other parties are also encouraging mediation as a means for resolving the claims at issue in this MDL.  Just last week, defendant Chartis and Banner filed a motion (in *Amato* and *Vickers*) to compel global mediation of all claims against Banner which motion has been scheduled for hearing on February 23, 2011 by Order dated February 16, 2011 (Rec. Doc. No. 7506) .  Again, that motion also will become moot as to Banner as a consequence of the expected class action

---

[2]  Mr. Durkee appears to be motivated to elicit as much benefit from the PSC's work-product in MDL No. 2047 while simultaneously avoiding any obligation to the PSC in his pursuit of private settlements for his clients.  Mr. Durkee cannot have it both ways.  Only recently has he submitted 78 clients for inclusion in the next Omni pleading being prepared by the PSC.  *See* Roberts & Durkee email of February 17, 2011 [Attached hereto as Exhibit "A"].  This submission is in addition to the hundreds of Roberts & Durkee clients already on the Omni Complaints.  *See* Extracted Signature Blocks from various Omni Complaints [Attached hereto as Exhibit "B"].  Similarly, Mr. Diaz and the other objecting plaintiffs' counsel have their own clients on Omni Complaints.  It is now almost patent that any settlement in this MDL can only take place if substantial funds are contributed by the manufacturer defendant.  The presence of these defendants in this litigation is solely the result of the PSC's efforts.

settlement with Banner.  Nevertheless, any Banner-specific mediations would be less unwieldy if they were stayed until after the class settlement fairness determination was concluded because at that point any claimants with claims left to be mediated would be limited to a very discrete group.

Despite certain defendants' protestations that mediation is premature and not in the public interest, the Court has made clear its support of mediation efforts sooner rather than later.  Last week, on February 11, 2011, the Court ordered all insurance companies handling Chinese drywall claims in the *Pate* and *Amato* cases to attend a global mediation in March, 2011 (Rec. Doc. No. 7414).  Additional Court-ordered mediations have taken or will take place among various plaintiffs and their builders, suppliers and installers.  *E.g.*, Order dated 2/3/2011 (Rec. Doc. No. 7326); Order dated 1/21/2011 (Rec. Doc. No. 7088).  Previously, mediation with the Knauf defendants and others successfully resulted in the exemplar Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall ("KPT Pilot Remediation Program").  Meanwhile, the Court has preserved any and all jurisdictional defenses that the insurer defendants may have.  The PSC has stipulated to this as well.  *See* Transcript of Proceedings, 1/20/2011, at pp. 14-15; Order dated 2/4/2011 (any defendant responding to the PSC's emergency motion for mediation and/or its motion for an accounting "does not waive any defenses, including venue or jurisdictional challenges, in this litigation as a result of filing such opposition, and any such defenses or venue or jurisdictional challenges are specifically reserved") (Rec. Doc. No. 7334).  Thus, the preservation of rights and defenses effectively moots the personal jurisdiction arguments of the insurers and the cross-motion to dismiss for lack of personal jurisdiction (filed by Travelers).

Some of the parties opposing the PSC's motions have boldly accused the Court-appointed committee, without any factual basis, of seeking to halt efforts to repair the plaintiffs' homes, discouraging and interfering with private settlements with homeowners, placing its fees above the interests of the plaintiffs in this litigation, and even trying to "double-dip." These parties make a further baseless claim that the PSC is asking the Court to act outside its jurisdiction. Nothing could be further from the truth. The PSC does not request – nor would it be proper – for the Court to act outside its jurisdiction. Since its appointment by the Court, the PSC has worked day and night to obtain redress on behalf of the plaintiffs who have suffered from the installation of Chinese drywall in their homes. The PSC's efforts to seek justice for the plaintiffs have included tracking down the foreign manufactures and traveling around the globe to take discovery from them. Not only is the PSC not trying to "double-dip" on attorneys' fees, at present the PSC has only sought an assessment for attorneys fees. It has not yet filed a fee petition obtain them. There appears to be a misconception that the PSC has submitted a common benefit fee request. This is not true. On July 26, 2010, the PSC filed a motion to establish a litigation expense fund to compensate and reimburse attorneys at an appropriate juncture for MDL administration and common benefit services (Rec. Doc. No. 4603). That motion has been stayed by the Court (Rec. Doc. No. 5207). As a result of certain parties' attempts to settle cases outside the MDL in order to avoid paying any common benefit fee percentage, the PSC has asked the Court in its motion for an accounting and other relief to preserve settlement funds through escrow in order to properly compensate the PSC for its common benefit services at an appropriate juncture. The Court may issue such an order within its jurisdiction as set forth in the moving papers.

The plaintiffs represented by Attorney Victor Diaz and Plaintiffs Simon and Rebecca Finger, James and Joycelyn Butler, Carolyn Cathcart, and Jason and Renee Niemann have argued that any settlements in state court should not be subject to a hold-back for common benefit fees for the PSC.  *See* Section H, *infra*.  They contend that they have not availed themselves of the PSC's work product and did not sue any foreign manufacturers of Chinese drywall.  Defendant Meritage claims that the PSC has not provided any common benefit to homeowners whose builder was Meritage.  And, the Homebuilders' Steering Committee goes as far to say that not only have the homebuilders provided benefits to the plaintiffs independent of the PSC, but the homebuilders are the ones who have helped the PSC design proper remediation protocols.

As set forth in the PSC's reply to Roberts & Durkee, the PSC has been solely responsible for bringing the foreign manufacturers, in addition to the domestic builders, suppliers and others in the chain of distribution, into the litigation through the various Omni complaints.[3]  Moreover, it has been the PSC that has pursued the foreign manufacturers through comprehensive, time-consuming and hard-fought substantive and jurisdictional discovery.  These efforts will inure to the benefit of the homeowner plaintiffs and the builder-, installer- and insurer-defendants seeking

---

[3]  *See, e.g.*, *Payton, et al. v. Knauf GIPS KG, et al.*, Case No. 2:09-cv-07628 (E.D. La.) (Omnibus I, I(A), I(B), and I(C)) (involving claims against the Knauf defendants); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Case No. 2:10-cv-00361 (E.D. La.) (Omnibus II, II(A), II(B), and II(C)) (involving claims against non-Knauf manufacturers such as Taishan and BNBM); *Gross, et al. v. Knauf GIPS KG, et al.*, Case No. 2:09-cv-6690 (E.D. La.) (original complaint, Omnibus III and III(A)) (asserting alternative liability theory against all known manufacturers for drywall that cannot be traced to a particular manufacturer); *Rogers, et al. v. Knauf GIPS KG, et al.*, Case No. 2:10-cv-00362 (E.D. La.) (Omnibus IV, IV(A), IV(B), and IV(C)) (involving claims against the Knauf defendants); *Amato, et al. v. Liberty Mutual Insurance Company*, Case No. 2:10-cv-00932 (E.D. La.) (Omnibus V); *Hernandez, et al. v. AAA Insurance, et al.*, Case No. 2:10-cv-3070 (E.D. La.) (Omnibus VI); *Kenneth Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080 (E.D.La.) (Omni VII); *Daniel Abreu, et al v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al*, Civ. Action No. 11-252 (E.D.La.)(Omni VIII).

reimbursement for costs of repair.  All of the parties participating in these MDL proceedings, even the Omni plaintiffs with separate state suits against their builders, have access to the PSC's work product.  It is specious to claim otherwise.[4]  In any event, in an effort to efficiently coordinate the prosecution of these claims, many of the state judiciary overseeing Chinese drywall litigation are working in coordination with this Honorable Court.[5]

 As shown in the opening papers supporting the motion for an accounting and other relief and in the Roberts & Durkee reply, there is persuasive evidence that settlements reached with builder- and supplier-defendants have been made possible and have come to fruition precisely because the PSC has expended hundreds of thousands of dollars to bring all interested and related parties – and specifically the foreign manufacturers – into the litigation by obtaining service of process through the Hague Convention.  A number of the builder-defendants have made clear their intention to recover from the Chinese drywall manufacturers all expenses associated with the remediation of plaintiffs' homes.  Without the presence of the manufacturers and their insurers in this litigation, subject to the jurisdiction of the Court, these builder settlements would not be possible.  The parties' desire to avoid having to pay an appropriate fee for the opportunities and common benefits provided by the PSC should be seen for what it is and rejected by the Court.

---

[4]  The PSC is well aware of the limits of this Court's jurisdictional authority viz. *In Re: Showa Denko K.K. L-Tryptophan Products Liability Litigation II*, 953 F.2d 162 (4th Cir. 1992), but nothing presented thus far by the objectors reveals any unwarranted application of this Court's jurisdiction.

[5]  *See* Letter from Todd Ehrenreich to Hon. Eldon E. Fallon, dated January 12, 2011, attached as Exhibit "B" to the Roberts & Durkee reply.

All of the defendants and even some of the plaintiffs (represented by Victor Diaz) oppose the injunction, arguing that the PSC has failed to show entitlement to the order it seeks.  As set forth below, the requirements for injunctive relief have been met.

Finally, with regard to the Knauf defendants, the PSC honors and supports the KPT Pilot Remediation Program, and nothing in the PSC's motions at issue here was intended to interfere with or contradict in any manner that settlement agreement.  To the extent that the PSC's motions are perceived to be redundant of or in conflict with the KPT Pilot Remediation Program, the PSC would like to clarify that the KPT settlement and the Pilot Remediation Program will proceed as originally intended and approved by the Court.

## III.   ARGUMENT

### A.   Global Mediation Is Appropriate at this Juncture and Even Supported by Certain Defendants

The Knauf defendants do not oppose Court-ordered mediation and, in fact, have requested that they be given an opportunity to participate in the structuring of any such alternative dispute resolution program.  *See* Knauf Defendants' Resp. at 2 (Rec. Doc. No. 7387). Albeit recognizing that their position will become moot upon the expected class action settlement, the Banner Entities have made clear that they "wholeheartedly support[] the PSC's motion to compel all the parties to mediation, at least those with claims against Banner," Banner Entities' Resp. at 1 (Rec. Doc. No. 7371).[6]  Other parties are also encouraging mediation as a means for resolving Chinese-manufactured drywall claims at issue in this MDL.  Just last week, defendant Chartis and Banner filed a motion (in *Amato* and *Vickers*) to compel global mediation

---

[6]  A Term Sheet is in the process of being negotiated as of the time of this filing.

of all claims against Banner.  Again, that motion should become moot as a consequence of the expected class action settlement with Banner.  Nevertheless, any Banner-specific mediations would be less unwieldy if they were stayed until after the class settlement fairness determination was concluded because at that point any claimants with claims left to be mediated would be limited to a very discrete group.

Despite certain defendants' protestations that mediation is premature and not in the public interest, the Court has reiterated its desire to engage in mediation efforts sooner rather than later. Last week the Court ordered all insurance companies handling Chinese drywall claims in the *Pate* and *Amato* litigation to attend a global mediation in March, 2011 (Rec. Doc. No. 7414). Other mediations with builders, suppliers and/or installers have taken or will take place pursuant to Court order.  *E.g.*, Order dated 1/20/2011 (Rec. Doc. No. 7052); Order dated 1/21/2011 (Rec. Doc. No. 7088).  Previously, mediation with Knauf and others brought about the successful KPT Pilot Remediation Program designed to repair 300 homes.  Defendants cannot point to any real harm in at least trying to reach a global resolution of this litigation.

### B.   Defendants' Rights to Assert Jurisdictional Defenses Have Been Properly Preserved

In recognition of the various motions to dismiss for lack of personal jurisdiction that have been filed by the parties, the Court has preserved any and all jurisdictional defenses that the defendants may have.  *E.g.*, Order dated 2/4/2011 (Rec. Doc. No. 7334) (specifically reserving "any defenses, including venue or jurisdictional challenges, in this litigation"); Transcript of Proceedings, 1/20/2011, at pp. 14-15 .  The PSC has stipulated to a preservation of rights to raise jurisdictional defenses, *id*., and agreed to a proposed order prepared by defense counsel.  The

preservation of rights and defenses effectively moots for purposes of these motions the personal

jurisdiction arguments of the insurers and the cross-motion to dismiss for lack of personal

jurisdiction (filed by Travelers).  Nevertheless, the Court in a February 17, 2011 Conference

required plaintiffs and defendants to devise a discovery schedule to address these issues.

> ### C.  The Court Has Authority to Enter Orders to Ensure That these Proceedings Progress to Their "Natural Conclusion" and Result in Resolving the Claims of the Parties Before it

What is most remarkable about the defendants' submissions is not what they argued, but

what they have effectively conceded.  Specifically, not a single submission denies that the

litigation in this case is threatened by fragmented tracks, side deals, and piecemeal settlement

activity.  In short, there is a large and growing problem that requires a coordinated response lest

these proceedings go on with no end in sight in this Court, and perhaps in multiple bankruptcy

courts. Meanwhile, several defendants – most notably the Knauf and Banner defendants – not

only agree that there is such a growing dilemma, they also agree with Plaintiffs' proffered

solution.

Even if Plaintiffs' proposition is not the best one – and we are certainly open to others –

right now, it is the only one on the table.

On the other hand, several defendants point out that this is not the first time the PSC has

sought to reach a global resolution, critiquing the PSC's efforts as stall tactics designed to *delay*

resolution.  This is absurd.  The PSC is attempting to find a global solution because that makes it

more likely that *all plaintiffs* will receive *full compensation* as soon as possible.  These objectors'

assertion that it would be faster to settle and remediate homes one-by-one, rather than globally, is

delusional.  It also obfuscates – perhaps intentionally so – the reality that there are *thousands* of

victims waiting to be *fully* compensated.  These defendants' positions are impossible to reconcile: While championing the speedy and expeditious resolution of claims, they inexplicably yet vehemently *oppose* establishing a global resolution process – which is the only practical way to truly expedite resolution.

### 1.    Global Mediation Is Supported On Both Sides Of The Docket

Despite the throngs of objectors, there are sensible defendants that also favor mediation and requested it precisely for the reasons Plaintiffs set forth.  For example, the Knauf defendants do not oppose Court-ordered mediation and, in fact, have requested that they be given an opportunity to participate in the structuring of any such alternative dispute resolution program. *See* Knauf Defendants' Resp. at 2 (Rec. Doc. No. 7387).  The Banner Entities have made clear that they "wholeheartedly support[] the PSC's motion to compel all the parties to mediation, at least those with claims against Banner." *See* Banner Entities' Resp. at 1 (Rec. Doc. No. 7371). Other parties are also encouraging mediation as a means for resolving Chinese-manufactured drywall claims at issue in this MDL.  Just last week, defendant Chartis filed a motion (in *Amato* and *Vickers*) to compel global mediation of all claims against Banner.  Despite certain defendants' protestations that mediation is premature and not in the public interest, the Court has reiterated its desire to engage in mediation efforts sooner rather than later.  Last week the Court ordered all insurance companies handling Chinese drywall claims in this litigation to attend a global mediation in March, 2011. (Rec. Doc. No. 7414).  Other mediations with builders, suppliers and/or installers have taken or will take place pursuant to Court order.  *See, e.g.*, Order dated 1/20/2011 (Rec. Doc. No. 7052); Order dated 1/21/2011 (Rec. Doc. No. 7088).  Previously,

mediation with Knauf and others brought about the successful KPT Pilot Remediation Program designed to repair 300 homes.

The proof is in the proverbial pudding.  The defendants opposing Plaintiffs' motion do not point to any real harm in laying the groundwork for global resolution.

Therefore, an order for global mediation is entirely proper.

## 2.    The 12(b) Motion Arguments Are Circular And Moot

Several defendants raise a red-herring in the guise of their right to file 12(b) motions to challenge jurisdiction prior to anything else occurring.  This point is circular and moot.  The argument amounts to the contention that this court lacks jurisdiction before a defendant has had the chance to challenge jurisdiction.   And as shown below, the source of jurisdiction is firm under the All Writs Act which the Fifth Circuit has held gives the federal court power "to issue injunctive orders in a case even before the court's jurisdiction has been established.   "When potential jurisdiction exists, a federal court may issue status quo orders to ensure that once its jurisdiction is shown to exist, the court will be in a position to exercise it."  *ITT Community Development Corp. v. Barton*, 569 F.2d 1351, 1359 n.19 (5th Cir. 1978).  Thus, the mere postponement of the opportunity to file a 12(b) motion to challenge jurisdiction changes nothing.

In recognition of the various motions to dismiss for lack of jurisdiction that have been filed by some parties, the Court has preserved any and all jurisdictional defenses that the defendants may have. *See, e.g.*, Order dated 2/4/2011 (Rec. Doc. No. 7334) (specifically reserving "any defenses, including venue or jurisdictional challenges, in this litigation"); Transcript of Proceedings, 1/20/2011, at pp. 14-15.  Moreover, the PSC has stipulated to a preservation of rights to raise jurisdictional defenses and agreed to a proposed order prepared by

defense counsel.  The preservation of rights and defenses effectively moots the personal

jurisdiction arguments of the insurers and the cross-motion to dismiss for lack of personal

jurisdiction (e.g., filed by Travelers).

Thus, the right to file a Rule 12 motion is simply not an issue right now.

>    **3.    An Order Issued Under The All Writs Act's *Appropriate In Aid
>            Of Jurisdiction* Prong Is A Proper Exercise Of This Court's
>            Jurisdiction**

Plaintiffs, in their opening brief, argued that this Court's jurisdiction is, at least in part,

derived from its seat as an MDL court and that under the All Writs Act it may issue orders

"appropriate" to fulfilling its duties as such.  *See* Rec. Doc. No. 6947, at pp. 17.  Several

defendants claim that this Court lacks jurisdiction under the All Writs Act and Anti-Injunction

Act to issue such orders.  The oppositions hang their collective hats on the premise that this

Court, even as an MDL court, only has jurisdiction to enter extraordinary writs when necessary to

preserve its jurisdiction after it has a certified settlement class or final judgment, and to prevent

interference with execution of those orders.

For that proposition, they point to the All Writs Act's and Anti-Injunction Act's

"necessary in aid of jurisdiction" language, and case law interpreting it which (i) involved

injunctions that globally and forever stayed parallel state court proceedings, and (ii) held that

doing so was necessary to protect the court's jurisdiction over a certified settlement class or final

judgment.  Both the cited statutory language and the case law interpreting it are irrelevant here

because Plaintiffs (i) are invoking the All Writs Act's "appropriate" clause, not its "necessary"

clause, and (ii) are *not* seeking to stay state court proceedings.  That makes all the difference –

and thus, the oppositions miss the mark entirely.

14

*First*, the All Writs Act says that the district court "may issue all writs *necessary* or *appropriate* in aid of their respective jurisdictions and agreeable to the usages and principles of law[.]" 28 U.S.C. § 1651(a) (emphasis added).   While the All Writs Act's "necessary … in aid of [its] jurisdiction" language is often read conterminously with the Anti-Injunction Act's similarly-worded exception, the All Writs Act also allows for orders that are "*appropriate* … in aid of [a court's] jurisdiction and agreeable to the usages and principals of law."  Thus, the case law construing the "necessary" prong of the All Writs Act in conjunction with its cousin in the Anti-Injunction Act, does not apply where the Court is invoking the "appropriate" prong and is not seeking to stay state court proceedings.

To wit, the Supreme Court has recognized that the All Writs Act authorizes "extraordinary writs" while encouraging an expansive application of those writs: "This statute has served since its inclusion, in substance, in the original Judiciary Act as a 'legislatively approved source of procedural instruments designed to achieve 'the rational ends of law.''" *Harris v. Nelson*, 394 U. S. 286, 299 (1969) (quoting *Price v. Johnston*, 334 U.S. 266, 282 (1948).  Thus, "[u]nless appropriately confined by Congress, a federal court may avail itself of *all* auxiliary writs as aids in the performance of its duties, when the use of such historic aids *is calculated in its sound judgment to achieve the ends of justice entrusted to it.*" *Adams v. United States ex rel. McCann*, 317 U.S. 269, 273 (1942) (emphasis added). The Second Circuit illustrated this breadth by affirming injunctions when used in part to "promote judicial economy." *United States v. International Bhd. of Teamsters*, 907 F.2d 277, 280 (2d Cir. 1990).

Other opinions addressing the scope and propriety of orders appropriate to aid in jurisdiction have held likewise.  For instance, in *In re General Motors Corp. Pick-up Truck Fuel*

15

*Tank Products Liability Litigation*, 134 F.3d 133 (3rd Cir. 1998), the Third Circuit noted that while an injunction interfering with a state court proceeding could not overcome the Anti-Injunction Act's "necessary in aid of jurisdiction" threshold before a class was certified, such an order was proper to the extent it governed the actions of the parties before it since that was not directly interfering with the state proceedings. *Id*. at 141 n.2 ("… it is conceivable that we could direct the district court to enjoin those 200 plaintiffs [who were parties before the district court] from pursuing their state damage remedies in Louisiana [state court].").  The Tenth Circuit in *Hillman* also noted that it was entirely within a court's right to enjoin parties from engaging in proceedings – including initiating state court proceedings – that it called "conflicting litigation" and which would compete or undermine the federal court proceedings. *Hillman v. Webley*, 115 F.3d 1461, 1469 (10th Cir. 1997) (district court "undoubtedly had the authority under the All Writs Act to enjoin parties before it from pursuing conflicting litigation in the state court").  Long before that, in *New York Telephone*, the Supreme Court held that the All Writs Act affirmatively authorizes federal courts to enjoin or affirmatively compel the behavior of *nonparties* "who... are in a position to frustrate the implementation of a court order or the proper administration of justice. . . and encompasses even those who have not taken any affirmative action to hinder justice."  *United States v. New York Tel. Co*., 434 U.S. 159, 174 (1977) (citations omitted).  *In re Baldwin-United Corp.*, 770 F.2d 328, 335 (2d Cir. 1985), likewise held that the All Writs Act empowers a federal court to issue an order governing parties and non-parties "even before a federal judgment is reached" in the federal court.  The All Writs Act has also been used to issue orders to aid in conducting factual inquiries, *see e.g. American Lithographic Co. v.*

*Werckmeister*, 221 U.S. 603, 609-10 (1911), or to permit the use of interrogatories in habeas

corpus proceedings, *see e.g. Harris v. Nelson*, 394 U.S. 286, 298-300 (1969).

   *Second*, this expansive grant is limited by the Anti-Injunction Act, 28 U.S.C. § 2283,

which provides that "A court of the United States may not grant an injunction *to stay*

*proceedings in a state court* except as expressly authorized by Act of Congress, or where

necessary in aid of its jurisdiction, or to protect or effectuate its judgments." (emphasis added).

So, where a court order stays state court proceedings, it must contend with the Anti-Injunction

Act's limitation on doing so or find an exception.  But where a court order does not stay a state

court proceeding, the Anti-Injunction Act is irrelevant.

   The PSC does not seek to stay any known state court proceeding at this time.  It is largely

unconcerned about particular results in any one specific case – the PSC is concerned about

execution of final judgments and private, secret settlements that threaten to undermine, impede

or unnecessarily complicate the Chinese Drywall cases in these MDL proceedings from having

the "practical effect of diminishing the court's power to bring the litigation to its natural

conclusion." *ITT Community*, 569 F.2d at 1358.  That is a completely legitimate concern for both

the PSC and the Court. *See Guerra v. Texaco Exploration & Prod. (In re Lease Oil Antitrust*

*Litig. (No.II)*, 48 F. Supp. 2d 699, 704 (S.D. Tex. 1998) (All Writs Act authorized order – prior

to any settlement or class certification – preventing parties from engaging in out-of-court

litigation or settlements without notice to court and parties) *crit'd on other grounds*.  Thus, if

there are state court proceedings presently pending determining *liability*, the PSC is not

attempting to stay those at this time.  While the PSC admits that a state court proceeding to

enforce payment of a judgment from insurance proceeds would be implicated in the order it

seeks, the PSC currently knows of no such proceeding.

Thus, the Anti-Injunction Act is a non-issue, and because Plaintiffs ask this Court to

invoke the "appropriate… in aid of jurisdiction" prong, they are not under any burden to prove

that the orders are "necessary" to this court's jurisdiction – *i.e.*, Plaintiffs do *not* have to show

that without the order, this Court would be logistically or "physically unable" to exercise its

jurisdiction.

*Third,* the Court need not wait until there is a settlement, certified class or final resolution

before invoking the Act's "appropriate … in aid of jurisdiction" power.   The suggestion that an

MDL court has jurisdiction under the All Writs Act only when – and only because – there is

already a settlement in place, is unsupported by the statutory text or the case law.  In fact, the

cases addressing the issue have maintained that the jurisdictional grounds for issuing such an

order emanate from the MDL statute and the Court's investment in, and need to continue,

properly exercising its authority and supervision as an MDL court.  "[T]he jurisdiction of a

multidistrict court is 'analogous to that of a court in an *in rem* action or in a school desegregation

case, where it is intolerable to have conflicting proceedings and outcomes." *In re Baldwin-United

Corp.*, 770 F.2d 328, 337.  In *Baldwin-United* the class action proceeding was "so far advanced

that it was the virtual equivalent of a res over which the district judge required full control."

*Id.* In *Battle v. Liberty National Life Ins. Co.,* 877 F.2d 877, 882 (11th Cir. 1989) the Eleventh

Circuit observed that it "makes sense to consider this case, involving years of litigation and

mountains of paperwork, as similar to a *res* to be administered." *See also In re Corrugated.*, 659

F.2d at 1335 (sustaining injunction in "complicated multidistrict class action" noting that it "has

18

required a great deal of the district court's time and has necessitate it maintain a flexible approach in resolving the various claims of the many parties"); *Standard Microsystems Corp. v. Texas Instruments Inc.,* 916 F.2d 58, 60 (2d Cir. 1990) (upholding a stay when the "federal court's jurisdiction is *in rem* and the state court action may effectively deprive the federal court of the opportunity to adjudicate as to the *res*"); *In re Lease Oil Antitrust Litig. (No.II)*, 48 F. Supp. 2d 699, 704 (All Writs Act authorizes order to keep parties from attempting end-run around MDL court to resolve disputes piecemeal).

Indeed, these proceedings involve overlapping parties with other proceedings such that final executed judgments in those cases could have a serious effect on these proceedings; and the parties and the court have expended untold resources over "years of litigation" and generated "mountains of paperwork." And these proceedings have progressed far – involving several mediations and two bellwether trials. Accordingly, under every precedent, this Court has jurisdiction over the *res* of the Chinese Drywall litigation issues, and the requested order would be justified to allow this court to oversee this MDL to its "natural conclusion."

Therefore, the Court's has sound jurisdictional grounds for issuing the requested orders.

### 4. Plaintiffs Do Not Need To Prove Their "Entitlement" To The Orders Staying Settlement Discussion or Ordering Mediation

To the extent that this Court invokes its power under the All Writs Act, the Court's order would be issued in "aid of its jurisdiction." The court may plainly enter the order *sua sponte*. *In re General Motors Corp*, 134 F.3d at 141. The statute does not require Plaintiffs to even move for such an order, much less demonstrate harm: irreparable, imminent or otherwise. *See* 28

U.S.C. § 1651(a).  Thus, to the extent defendants attempt to attack the issuance of such an order by alleging a deficiency in Plaintiffs' submission, they are without a paddle.

Even the rudiments required for the order are uncontested.  Plaintiffs established that, to the extent that the Insurer Defendants' policies and Direct Defendants' insurance policies cover claims by named and absent plaintiffs, they will inevitably be competing for the same group of funds. *See* Opening Br., Rec. Doc. No. 6947 at pp. 4-5.  While the Insurer Defendants and Direct Defendants attempt to muddy the waters as to how interconnected they are with parallel litigations which will inevitably redound to and affect this one, they never contest the fundamental premise that because *they* are before the court, they can be bound by an order.  *In re General Motors Corp*, 134 F.3d at 141; *In re Lease Oil Antitrust Litig.*, 48 F. Supp. 2d at 714.

And those not before the court but who might be *affected* by the order – i.e., they may have to wait to execute their final judgments or cash in their settlements – lack grounds to complain. "Courts do not need personal jurisdiction over every party that might be affected—even indirectly—by an injunction." *Iantosca*, 604 F.3d 24, 32; *accord Hendricks v. Bank of America, N.A.*, 408 F.3d 1127, 1135-36 (9th Cir. 2005).

### 5. This Court's Equitable Jurisdiction Under *Deckert* Supplies Independent Grounds For This Court's Actions

The Supreme Court, in *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940), affirmed the district court's preliminary injunction freezing specific liquidated assets of the defendant pending trial to satisfy a potential judgment.  *Id.* at 289-91.  The district court concluded that because plaintiffs were in substance seeking restitution and disgorgement, both equitable remedies, they had an equitable interest in those specific moneys. *Id*. at 289.  Because

there was no other adequate remedy were the funds were to become dissipated, such an event

when constitute irreparable harm, thus it was proper to sequester those funds necessary to satisfy

the potential judgment. *Id.* at 290.  The court did not wait until the funds were at risk of

dissipation – since from the outset, the equitable remedy was directly tied to those funds.  *Id.*

Plaintiffs likewise seek the provisional remedy authorized by the U.S. Supreme Court in this

highly instructive case.

This Court should not be led astray by those submissions raising the Supreme Court's

decision in *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308

(1999).  They misconstrue *Grupo Mexicano* as prohibiting *all* injunctions of the kind sought

here.  In fact, it held that, only for *actions at law* (i.e., not equity) district courts lack the equitable

powers to enjoin the use or disposition of assets to support a potential judgment.  It expressly

preserved *Deckert*'s authorization of injunctions in aid of equitable recoveries. *See id.* at 324-25

and 336 n.3.

Here, as discussed in the opening brief, Plaintiffs in this action seek equitable as well as

legal remedies – a "mixed case" as it were.  Mixed cases have always followed *Deckert*, not

*Grupo Mexicano* – and they further reinforce the propriety of granting the equitable relief sought

herein. *See Animale Group Inc. v. Sunny's Perfume Inc.,* 256 Fed. App'x 707, 708-09 (5th Cir.

2007) (holding that *Grupo Mexicano* is limited to cases where no equitable relief is sought);

*accord Iantosca v. Step Plan Servs.*, 604 F.3d 24, 34 (1st Cir. 2010) ("a court may, consistent

with *Grupo Mexicano*, 'issue[] asset freezing injunctions in 'mixed' cases . . . where both

equitable and legal remedies are sought.'") (citations omitted); *SEC v. ETS Payphones, Inc.,* 408

F.3d 727, 734 (11th Cir. 2005) ("*Grupo Mexicano* does not control the outcome of this case

because the SEC seeks equitable relief (disgorgement), not just money damages"); *In re Focus Media Inc.,* 387 F.3d 1077, 1085 (9th Cir. 2004) ("when equitable claims are at issue, as opposed to solely legal damages claims, the rule barring issuance of a preliminary injunction freezing assets is inapplicable[.] . . .*Grupo Mexicano* thus exempts from its proscription against preliminary injunctions freezing assets  ... cases in which equitable relief is sought."); *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir. 2002) (affirming asset freeze injunction where plaintiff "had the option of seeking either statutory damages, actual damages, or an accounting and profits remedy."  "This last remedy, sought by Cablevision in the alternative in its initial complaint, is equitable in nature and imposes a constructive trust on the defendant."); *United States ex rel Rahman v. Oncology Assocs., P.C.,* 198 F.3d 489, 496-97 (4th Cir. 1999) (upholding injunction where in addition to legal claims, plaintiffs sought unjust enrichment and construct trust).

Therefore, defendants' reliance on *Grupo Mexicano* is severely misplaced.

### 6.      Plaintiffs Have Established Their Entitlement To Relief Under *Deckert* And Its Progeny

Several defendants claim that the injunction should not issue because Plaintiffs have failed to prove "irreparable harm."  This argument is legally incorrect on two counts:

*First*, under *Deckert*, where, as here, there is an equitable claim establishing an equitable interest in unliquidated property or the liquidated value of that property, courts have found that irreparable harm would attach through dissipation of the asset, and even where – as it had been in *Deckert* – the asset was liquidated courts have had no trouble attaching the liquidated funds in lieu of the specific res.  *See, e.g., Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940)

(freezing amount of cash obtained through sale of stock where stock purchase agreement sought to be rescinded on equitable rescission grounds); *Animale Group Inc. v. Sunny's Perfume Inc.,* 256 Fed. App'x 707, 709 (2007) (sequestering assets sufficient to pay royalty denied plaintiff through trademark violation); *Iantosca v. Step Plan Servs.,* 604 F.3d 24 (1st Cir. 2010) (freezing insurance proceeds while entitlement to them established where parallel claims threatened to dissipate assets); *See Johnson v. Couturier*, 572 F.3d 1067, 1082 (9th Cir. 2009) (affirming preliminary injunction preventing insurer from advancing directors defense fees and costs, despite arbitration awarding directors same, in order to preserve funds for potential judgment); *SEC v. ETS Payphones, Inc.,* 408 F.3d 727, 734 (11th Cir. 2005) ("the asset freeze is justified as a means of preserving funds for the equitable remedy of disgorgement"); *CSC Holdings, Inc. v. Redisi,* 309 F.3d 988, 996 (7th Cir. 2002) ("Since the assets in question here were profits the Redisis made by unlawfully stealing Cablevision's services, the freeze was appropriate and may remain in place pending final disposition of the case."); *United States ex rel Rahman v. Oncology Assocs., P.C.,* 198 F.3d 489, 496-97 (4th Cir. 1999) ("a court may in the interim invoke equity to preserve the *status quo* pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested"); *Gerardi v. Pelullo*, 16 F.3d 1363, 1373-74 (3d Cir. 1994) ("the injunction is reasonably necessary to preserve the status quo, and thus to ensure the satisfaction of a potential future judgment ordering the transfer of money from defendants to plaintiffs."); *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94 (6th Cir. 1982) (affirming injunction freezing defendant's assets in order to protect rights of plaintiff shareholders' seeking damages for directors' breaches of fiduciary duties); *Seide v. Crest Color, Inc.*, 835 F.Supp. 732 (S.D.N.Y. 1993) (enjoining fund's use or

removal of assets which would satisfy potential judgment to plaintiffs); *Cattle Fin. Co. v. Boedery, Inc.*, 795 F.Supp. 362 (D.Kan. 1992) (preliminary injunction issued to prevent disposition of sale proceeds pending litigation outcome to ensure plaintiffs' potential judgment would be satisfied); *TLX Acquisition Corp. v. Telex Corp.*, 679 F. Supp. 1022 (E.D. Okl. 1987) (ordering injunction to prevent dissipation of $1.5 million in cash available to satisfy plaintiffs' claims).

In none of these cases was a rigid "irreparable harm" standard imposed, of the sort defendants seek to impose here.

Contrary to defendants' naked assertions that have not, Plaintiffs have demonstrated that they are entitled to specific funds to satisfy their equitable claims for rescission and restitution – i.e., those funds paid by a plaintiff to a defendant, and which now require the insurance policies to refund, and those funds that otherwise are needed meet the liabilities.  Rec. Doc. No. 6947, at pp. 10-11; 17-19.  The "nexus" inheres in the claim, as it did in Deckert.

The "nexus" between the equitable claims and the funds is thus established – as it was in the laundry list of cases cited above.  The *DeBeers* case, *DeBeers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212 (1945) on which several defendants rely is inapposite because, there, the United States had no equitable claims, and the relief they sought sequested *all* assets.  They were not seeking rescission or restitution of specific property or money, whereas the plaintiffs in *Deckert* and its progeny cited above were, and as the Plaintiffs do here.  Meanwhile, no defendant has contested Plaintiffs proof that their claims are equitable in nature and in substance, which under *Deckert* gives Plaintiffs an equitable interest in the funds discussed herein.

*Second*, defendants misconstrue the law of injunctions by citing generic recitations of the elements. While irreparable harm is an element, it lies on a sliding scale with the demonstrated likelihood of success: the more chance of success, the less one need show imminent irreparable harm. *See* Wright & Miller § 2948.3, p.187-197. Here, plaintiffs have shown a high likelihood of success given their strict liability claims and the outcomes of the bellwether trials. Rec. Doc. No. 6947, at pp. 12-13. This is never really contested in any submission. Ultimately, nothing in the injunction unreasonably prohibits any Defendant from otherwise investing, utilizing, or benefiting from those funds *unless* a Defendant approaches insolvency or files for bankruptcy, in which case the necessity for such an injunction would become alarmingly critical.

Plaintiffs have shown irreparable harm in their opening brief as well. *Id.* Plaintiffs gave the example of defendants Porter-Blaine and Hanover, against whom Dragas (a non-party here) has a judgment. Plaintiffs have asked the court to enjoin these two parties, for the time being, from dissipating any insurance proceeds since many plaintiffs in this case also have claims against Porter-Blaine and therefore also will seek payment from Hanover. Rec. Doc. No. 6947, at pp. 4. No defendant disagrees with this fundamental analysis. As the cases above demonstrate, dissipation of the assets to satisfy a judgment would be irreparable. Specifically, in *Iantosca*, the trial and appellate courts both recognized that where there are competing claims to a single set of moneys, sequestering those funds while both claims are liquidated was justified under the courts' equitable jurisdiction.

To require any more proof than that would be perverse: this motion is animated in large part precisely because while Plaintiffs are fully aware that there are multiple claims against the same limited sources of funds, just as in the Porter-Blaine/Hanover scenario. This is also very

true for smaller Direct Defendants (of which there are several) or in capped insurance policies, all of whom are before this Court.  But Plaintiffs do not and cannot be expected to have all the facts and are not able to police the circumstances under which the fund pools or insurance policies, for example, could become dissipated.  Plaintiffs should not have to wait until it is too late at which time there is universal agreement the harm to plaintiffs would be irreparable, such as if a defendant approaches insolvency or files for bankruptcy, in which case the necessity for such an injunction would become alarmingly critical – but it would be too late.  *See cf. In re Delorean Motor Co.*, 755 F.2d 1223 (orders to protect limited funds after declaration of insolvency require bankruptcy court intervention and use of bankruptcy rules).

Those considerations, combined with the overwhelming weight of the likelihood of success at trial merit the injunction, firmly establish that this Court would be well within its jurisdiction to issue the either or both of the requested orders.

> **D.     The PSC Has Provided Inherent Benefits to All Plaintiffs Asserting Chinese-Manufactured Drywall Claims in this MDL, Regardless of Whether They Have Also Brought Claims In State Court**

The arguments of Messrs. Durkee and Diaz in opposition to the PSC's motion for an accounting and sequestration of settlement funds are based on an artificial portrayal of their lawsuits.  They suggest that because they have pending claims against their homebuilders and others in state court, the PSC's work product in this MDL related to the foreign manufacturing defendants is irrelevant and not of any benefit to them in their state actions.  This argument ignores the presence of their clients in the Omni Complaints and incorrectly assumes that the information produced in the MDL does not reach the same parties litigating Chinese drywall

claims in state court.[7]  It also ignores the important connection between the builders' willingness to settle plaintiffs' Chinese drywall claims and their desire to seek reimbursement of amounts spent to remediate the plaintiffs' homes from the manufacturing defendants that the PSC have brought and will bring to the negotiating table.

The PSC was appointed and ordered by the Court to perform numerous, specific pretrial tasks on behalf of the plaintiffs in this MDL, as detailed below and set forth in Pretrial Order No. 8.  As such, the PSC owes a fiduciary duty to all MDL plaintiffs.  It is specious to suggest that the state court litigants, who are also present before this Court, do not benefit from the PSC's document depository or its international discovery of and service-of-process on the foreign manufacturers.  The law recognizes that  the PSC's work product benefits all Chinese drywall plaintiffs regardless of whether they affirmatively use it.

Generally, MDL consolidation and coordination provide inherent benefits for all plaintiffs in the litigation.  Indeed, this Court has "pointed to the many economies of scale that benefit[] attorneys across the board" in an MDL case, including the avoidance of "pursuing individual discovery, filing individual motions, engaging in individual settlement negotiations, or preparing individual trial plans."  *See In re Vioxx Prods. Liab. Litig.*, 650 F. Supp. 2d 549, 555 (E.D. La. 2009) (citation omitted).  The *Genetically Modified Rice* MDL provides a good example of this benefit.  There, the court readily recognized that:

> [T]he leadership group's work in discovery, motion practice, and
> the bellwether trials has provided a foundation for all of the cases
> involved in the litigation.  Evidence about what [the defendant] did
> in developing and distributing the genetically modified rice is

---

[7]  Indeed, the *Harrell* settlement incorporates terms directly from the KPT Pilot Remediation Program that was negotiated by the PSC with KPT.

> central to the proof on all the claims in this litigation.  This
> evidence was exclusively within [the defendant]'s control, and the
> only realistic way for the evidence to be developed was through the
> type of centralized discovery that the leadership group conducted.
> It would not have been possible for thousands of plaintiffs to
> separately obtain discovery from [the defendant], and that, of
> course, is part of the reason the cases were combined in this MDL.
> In addition to coordinating and conducting all the discovery against
> [the defendant], the leadership lawyers have conducted two
> bellwether trials.  Those trials essentially provided a preview for all
> other plaintiffs of the trial testimony they might expect from the
> [defendant] witnesses and the types of cross-examination that their
> witnesses and clients might expect at trial from [the defendant]'s
> counsel.  The trial preview, when combined with the discovery, is a
> great benefit for all plaintiffs....

*In re Genetically Modified Rice Litig.*, MDL 1811, 2010 WL 716190, *5 (E.D. Mo. Feb. 24,

2010); *see also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL

3896006, *6 (D. Minn. Aug. 21, 2008) ("Claimants' attorneys generally benefit from economies

of scale related to coordinated discovery, motion practice, and global settlement negotiations

because they are not required to do certain work that they would otherwise do in an individual

case.").

Courts have held uniformly that "Plaintiffs are substantially benefitted by 'the mere

availability' of relevant discovery, even if an objecting plaintiff chooses not [to] use it."

*Genetically Modified Rice*, 2010 WL 716190 at *5-*6 ("[s]ubstantial benefit should be

determined with respect to the plaintiffs as a whole, not with respect to individual plaintiffs.");

*see also In re Clearsky Shipping Corp.*, 2003 WL 1563820, at *1-*4 (E.D. La. Feb. 26, 2003); *In

re Diet Drugs*, 582 F.3d 524, 548 (3rd Cir. 2009); *In re Diet Drugs Prods. Liab. Litig.*, Pretrial

Order No. 1492 at 5 (E.D. Pa. Nov. 8, 2000) ("even if Plaintiffs' attorneys did not choose to use

common benefit work product in the prosecution of Plaintiffs' case and its ultimate settlement,

Plaintiffs clearly benefitted from the efforts of the [steering committee]") (attached as Exhibit "C" to the Roberts & Durkee reply).

The Third Circuit's decision in the *Diet Drugs* litigation is instructive.  In that MDL, there were "hundreds of thousands of class members spread all across the United States." *Diet Drugs*, 582 F.3d at 547, *citing In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1012 (5th Cir. 1977).   During the fee adjudication process, some of the fee objectors argued that their initial opt-out and PPH "clients [who did not participate in the global settlement] did not enjoy a substantial benefit from the PMC's services."  *Id*. at 547.  These objectors reasoned that "because those clients were not parties to the Settlement Agreement, they did not receive any of the benefits – such as medical testing or claims preservation – for which the PMC bargained." *Id*.  In overruling the objections, the Third Circuit held that:  the "PMC bestowed numerous benefits on initial opt-out and PPH claimants, even if their attorneys did not use the discovery that the PMC marshaled and retained.  The mere availability of the discovery ... substantially influenced [the defendant's] evaluation of *every* plaintiff[']s case."[8]  *Id*.  In addition, the Court ruled that "the PMC had, to the benefit of every claimant, helped to administer the MDL by tracking individual cases, distributing court orders, and serving as a repository of information concerning the litigation and settlement."  *Id*. at 548.  Moreover, the PMC "obtained a number of favorable discovery and evidentiary rulings that applied on a litigation-wide basis, and it

---

[8]    *See* William B. Rubenstein, Alba Conte, Herbert B. Newberg, 4 Newberg On Class Actions, §14:9 (4th ed. Jun. 2010) ("even if the settling lawyers used none of the PMC's work product, the defendant itself might have assessed the value of the settling parties' case based on what had happened during the PMC's discovery process.").

enforced a uniform procedure for the production of documents, deposition testimony, and expert disclosures that governed every MDL case." *Id*.

If MDL participants can avoid the payment of common benefit fees simply by arguing that they did not benefit from the use of the management committee's work product, this "would provide an incentive for lawyers who represent individual clients in an MDL to ignore the work product generated by Class Counsel in favor of generating duplicative discovery, and [this] would thereby undermine the efficiency gains that the judicial system realizes from MDLs." *Id*. at 548 n.45.

For these reasons, plaintiffs' contention that state plaintiffs (who also have cases in this MDL) should not be subject to any order requiring an accounting and sequestration of settlement monies has no merit.

**E.     The PSC Has Provided and Continues to Provide Significant Common Benefit Services to All Plaintiffs in this Litigation**

This Court summarized in a detailed 28-page Minute Entry the status of many issues that have been resolved to date or are pending in this massive litigation as a result of the successful common benefit efforts of the PMC.  Minute Entry dated 12/2/2010 (Rec. Doc. No. 6525).  For example, since the initiation of this MDL the Court has entered 24 pretrial orders, some with multiple subparts, governing these proceedings, including the appointment of the Plaintiffs' Steering Committee, Plaintiffs' Liaison Counsel, Russ Herman, and Lead Counsel, Arnold Levin.  PTO 8 (Rec. Doc. No. 144-1).  The Court has tasked the PSC with specific fiduciary duties on behalf of all MDL plaintiffs, as follows:

(a)     initiating, coordinating and conducting in a consolidated manner all pretrial discovery for all plaintiffs and creating the schedules for said discovery;

     (b)      issuing all necessary document requests and subpoenas for witnesses in order to adequately prepare for the adjudication of pretrial issues;

     (c)      initiating and preparing briefs pertinent to pretrial proceedings;

     (d)      calling meetings of plaintiffs' counsel;

     (e)      examining witnesses and introducing evidence at hearings on behalf of plaintiffs;

     (f)      acting as spokespersons for all plaintiffs at pretrial conferences;

     (g)      submitting and arguing motions on behalf of plaintiffs and opposing motions that are involve matters withing the sphere of responsibility of the PSC;

     (h)      negotiating and entering into stipulations with defendants;

     (i)      exploring, developing and pursuing settlement opportunities "pertaining to any claim or portion thereof of any case filed in litigation"; and

     (j)      establishing and maintaining a document and exhibit depository and making those records available to all plaintiffs' attorneys.

PTO 8 at 3-4.

In addition, the Court ordered the PSC to collect, maintain and present to the Court and the inspection company photographic samples of Chinese drywall from the plaintiffs' homes. PTO 10 (Rec. Doc. No. 171). The PSC thereafter observed, videotaped and otherwise monitored the inspection program.

Various members of the PSC were also ordered to participate on a State/Federal Coordination Committee to "work together jointly to assist the Court, the litigants and the judicial system to facilitate coordination between this MDL and the various state court cases." PTO 19 at 3 (Rec. Doc. No. 1871). PSC member Dawn Barrios is the chair of that committee and has provided reports to the Court as to the status of state matters, including trials, discovery motions, dispositive motions and federal/state coordination issues. 12/2/2010 Minute Entry at 6.

Further, in compliance with Court order, the PSC prepared plaintiff profile forms and negotiated the content of all defendant manufacturer, supplier, importer, builder and insurance profile forms. The PSC has analyzed all profile forms submitted. *See id.* at 4-5.

As set forth in the opening motion for an accounting, the PSC has been the architect of

the various Omni complaints designed to bring all interested parties into the litigation, *id*. at 19-

22.  The protesting plaintiffs have signed on to those Omni complaints.  The PSC has also been

responsible for negotiating a stipulation with Knauf to accept service of process of the various

Omni complaints, including the most recent Omni VIII complaint.[9]

--------

[9]  The Knauf entities have agreed to accept service of process which has allowed the PSC to avoid
expending hundreds of thousands of dollars necessary to satisfy the onerous service requirements
imposed by the Hague Convention.  In contrast to Knauf, Taishan and TTP have forced the PSC to
satisfy these requirements and Taishan and TTP continue to openly challenge this Court's authority.
Despite the fact that Taishan and its related entities have been doing business in the United States,
including commercial settlements involving sales contracts with Guardian Building Products
Distribution, Inc., a Georgia business (TG0020118- 147) and sales to Venture Supply Inc. in Virginia,
Taishan's counsel, Mr. Joseph Cyr represented in open Court:

> But again, just for the record, is that Taishan Gypsum
> manufactured some drywall in 2006 and 2007 and all of that
> drywall was sold in China to distributors that were covered by
> arbitration agreements. And they have no expectation whatsoever
> that they were going to purposely avail themselves of the state
> markets of any particular state in the United States. And I, also, I
> know this is a very positive day for a lot of people that are involved
> with all of the Knauf negotiations for the past year, but since I have
> these brief moments, I have to say, your Honor, is that based on our
> investigation and our discussions with the client, they absolutely do
> not understand why their high quality drywall allegedly emitted
> excessive amounts of hydrogen sulfide. They don't understand the
> causation issues. We are not right behind Knauf in any kind of
> settlement negotiations, even if the court finds that it has personal
> jurisdiction. I wanted to be upfront with you about that.

> THE COURT: Sure, okay. I understand.

> MR. CYR: I have just a couple of other things to say, your
> Honor. One is that, as I mentioned to you in the phone call in June,
> and I am not trying to be critical because I know how these things
> happen, but in the gross [sic.] class action the PSC named I think
> approximately 20 subsidiaries who have been served, subsidiaries
> of Taishan. Now, our investigation, as I told you, revealed that

In addition, the PSC has created and maintains a master database with an index of pending motions to assist the Court and the parties with the coordination of this litigation.  *Id*. at 7-8.  The PSC in conjunction with other parties organizes, groups and schedules the motions in the database in a sensible manner for adjudication by the Court.  *Id*. at 7-8.  The PSC in engaged in motion practice on a variety of issues including class certification motions for Florida and

> these subsidiaries are spread throughout this very huge country of China and that they have nothing to do at all with the drywall that was manufactured in China that apparently was distributed to some extent in the United States and found its way into some homes. And we see no good faith basis for including those subsidiaries in the gross complaint.  I suspect that they were added because somebody went on Google, did a web site, saw a whole bunch of subsidiaries and threw them in the complaint. Again, I am not trying to be preaching, your Honor, but we are not the only country that thinks you should have a good faith basis for suing somebody before you sue them.  And then the second point of that is: It's very unfair then to then require those subsidiaries to subject themselves to discovery, offer declarations, declaring their innocence unless the first step is taken and that is that the PSC demonstrates the answer to this question: What was the good faith basis for suing those companies? We've tried to have this discussion with them because we join your Honor in wanting to narrow the issues. We know what the companies are that manufacturer drywall that eventually was distributed into the United States by others, we want to address the personal jurisdiction issue, and if the court finds that Taishan is subject to personal jurisdiction and Taishan is in the lawsuit, that's the first step and then we go to the next step.

*In re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, Transcript of Status Conference at 21 - 22 (E.D.La. Oct. 14, 2010).  Mr. Cyr has not appeared in court since these assertions were made or since documents have been produced evidencing the substantial contacts between his clients and the United States have been discovered.  We take him at his word, but expect that in depositions anticipated to take place in April, that the Taishan entities will confirm that they have engaged in substantial commerce sufficient to establish jurisdiction over them.  Once established, we are hopeful and expect that Taishan will acknowledge the harm that it has caused our clients and begin to finally participate in this litigation towards a meaningful resolution of these claims.  As to the defendants that Mr. Cyr contends should not be in the complaint and for whom he pleaded for dismissals, he failed to enter his appearance on their behalf and allowed defaults to be taken as to some and has not responded to an additional motion for default as to others.

33

Louisiana Homeowners classes for damages and declaratory relief, a motion for class certification in *Germano*, several motions to intervene, motions for default judgment, and a motion to establish a plaintiffs' litigation expense fund. *Id*. at 23-25.

The PSC has propounded several sets of discovery requests and requests for admission on the various defendants and has participated in numerous negotiation sessions with regard to discovery issues in dispute. *Id*. at 9-11. In addition, the PSC has conducted dozens of depositions of defendants and their key employees. As an example, the PSC has deposed La Suprema entities, Venture Supply and Porter Blaine entities, Mazer Super Discount Store, Interior/Exterior Building Supply, LP, Black Bear Gypsum Supply, and the Lennar entities and these efforts are continuing.

The PSC also has deposed Knauf Gips relating to jurisdiction, alter ego and agency issues, Knauf Insulation GmbH, and various Knauf witnesses in New York, Hong Kong, London and Germany, including, Michael Anthony Robson, Isabel Knauf, Mark Patrick Norris, Jeffrey R. Brisley, Oliver Froehlich, Martin Stuermer, and Hans Hummel. This discovery has firmly established Knauf's liability as the Knauf Group readily admitted to product defect and efforts to conceal knowledge of the defect from consumers of Knauf's defective drywall. The PSC has also discovered facts regarding the corporate interrelatedness it believes is necessary to attach jurisdiction to all of the Knauf Group, which has led to additional complaints against such entities as Gebrueder Knauf Verwaltungsgesellschaft, KG. To conclude this area of inquiry, the PSC is also scheduled to again travel to New York, Germany and Hong Kong to take the depositions of Hans-Peter Ingenillem, Manfred Paul, Baldwin Knauf and other Knauf witnesses. The PSC has also served jurisdictional interrogatory requests on various Knauf entities. In

August, 2010, the PSC filed a motion for sanctions and to compel discovery of Knauf, which was granted in part. *Id*. at 10.

The PSC is also engaged in extensive jurisdictional discovery of Taian Taishan Plasterboard Co., Ltd. ("TTP") and Taishan Gypsum Co., Ltd.  ("Taishan").  *Id*. at 9-11.  The PSC has undertaken the review of thousands of Taishan and TTP documents.  Depositions of Taishan and TTP witnesses, Peng Wenglong, Jia Tongchun, and Zhang Jianchun, are scheduled to occur in Hong Kong beginning April 4, 2011.  The PSC is also investigating entities related to Taishan and TTP, including its parent companies in China and J.P. Morgan and other entities.

Further, the PSC has issued a number of Freedom of Information Act requests and is analyzing all information produced.  *Id*. at 13.  Overall, the PSC has analyzed tens of thousands of documents produced by defendants and third parties including the Center for Toxicology and Environmental Health, LLC.  *Id*. at 12.  On the other side of the equation, the PSC has responded to discovery propounded by Knauf.  *Id*. at 12.  The PSC has also responded to Knauf's identification of plaintiffs who allegedly have not provided indicia of Knauf drywall in their homes.  *Id*.

Aside from discovery, the PSC prepared and tried ten Bellwether cases as to property damage only in Virginia and Louisiana.  *See id*. at 13-16 (referencing *Germano, et al. v. Taishan Gypsum Co., Ltd., et al.*, Case No. 09-6687 (E.D. Va.) (7 cases), Default Judgment (May 11, 2010) (Rec. Doc. No. 3013); *Hernandez v. Knauf Gips KG, et al.*, CA 09-6050 (E.D. La.) (1 case), Judgment (May 11, 2010) (Rec. Doc. No. 3); *Campbell v. KPT, et al.*, Case No. 2:09-cv-7628 (E.D. La.) and *Clement v. KPT, et al.*, Case No. 2:09-cv-7628 (E.D. La.), Settlement on the

eve of trial on June 18, 2010).  The Bellwether trials produced findings of fact and conclusions of law that serve to assist the Court and the parties resolve additional Chinese drywall cases.

The PSC has been engaged in mediation sessions with the Knauf defendants, Interior/Exterior Building Supply, QBE Insurance, State Farm, and the Louisiana Homebuilders Association General Liability Trust.  *Id.* at 25.  On October 14, 2010, the parties announced a 300 home pilot remediation settlement program with Knauf.  That remediation program is currently underway, and the parties are hopeful that it will be expanded.  *Id.* at 28.  Other mediations with builders, suppliers and/or installers have taken or will take place pursuant to Court order.  *E.g.*, Order dated 1/20/2011 (Rec. Doc. No. 7052); Order dated 1/21/2011 (Rec. Doc. No. 7088).  A global mediation with the insurer defendants is scheduled to take place in March, 2011 (Rec. Doc. No. 7414).

Thus, as is evident from the Court's December 2, 2010 Minute Entry and the Court's docket sheets, the PSC has provided and continues to provide in conformance with its duties numerous common benefit services to all plaintiffs in this litigation.

## F.  The PSC Is Not Asking the Court to Act Outside Its Jurisdiction

For purposes of clarification, the PSC is not asking the Court to act outside of its jurisdiction.  *See In re Showa Denko, supra.*  The PSC is seeking an appropriate Order from the Court governing only the actions and the parties subject to the MDL Court's jurisdiction.  The protesting attorneys, Mssrs. Durkee, Diaz and Kanner voluntarily subjected themselves to this Court's jurisdiction, having filed lawsuits as named representatives in the Omni class action complaints against the manufacturer defendants, the source of most of the funds in settlements of

the state litigations, including *Harrell*.  Their complaint that they should not be subject to any

sequestration order here because they have claims pending in the state court system lacks merit.

### G.   The PSC Is Not Seeking A Common Benefit Fee At This Time, Nor Is It Trying to "Double-Dip"

Contrary to certain parties' contentions, the PSC's motions do not seek an immediate

award of common benefit fees.  Nor is the PSC trying to "double-dip" in any manner.  Because

the builders are attempting to settle cases outside the purview of this Court and because certain

plaintiffs are trying to avoid having to pay any common benefit fee, the PSC is asking that

attorneys' fees be escrowed "pending a determination by the Court at an appropriate juncture as

to a fair and reasonable common benefit fee percentage."  Proposed Order at 2-3.  Currently, the

PSC's motion to establish a plaintiffs' litigation expense fund has been stayed by the Court.

12/2/2010 Minute Entry at 24.  It would be appropriate, therefore, to preserve the resources

available to compensate the PSC at an appropriate juncture for the common benefit services it

has provided to all plaintiffs in this litigation.

Under Paragraph X of the KPT Pilot Remediation Program, the PSC is entitled to

attorneys fees in an amount to be determined (this entitlement is distinct from any cash payments

made by entities contributing to settlements outside of the relief and payments of the KPT Pilot

Remediation Program for which the PSC seeks a separate assessment).  Pursuant to that

agreement, the PSC's fees will be presented to the Court for its approval.[10]   The PSC intends to

---

[10]  At an appropriate time, the Court will be asked to approve conduct an analysis of attorneys' fees pursuant to *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974) and its progeny, including *In re Propulsid Prod. Liab. Litig.*, MDL No. 1355 (E.D. La.); *Turner v. Murphy Oil USA, Inc.*, 2008 WL 4661806 (E.D. La. Oct. 6, 2008); and *In re Vioxx Prod. Liab. Litig.*, 2010 WL 5576193 (E.D.La. Oct. 19, 2010).

at all times strive for transparency under *In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008).

### H.   Victor Diaz's Claims Lack Merit

Attorney Victor Diaz does not mention in his opposition to the PSC's motions that he has an axe to grind with the PSC.  Mr. Diaz is no longer a member of the firm of Podhurst Orseck, P.A. or the PSC.  Several of the PSC members contributed substantially to the successful resolution of the class action in Florida, *Harrell v. South Kendall Construction Corp.*, No. 09-08401 CA (Miami Dade County, Florida), of which he is class counsel.  In addition to providing Mr. Diaz with valuable work product, the PSC fronted Mr. Diaz substantial costs for experts in the prosecution of the claims in that case, which were utilized by class counsel in *Harrell.*  The PSC has taken the position with Mr. Diaz that as to the homes being remediated as part of the *Harrell* settlement, counsel fees and costs should be awarded in accordance with Paragraph X of the KPT Pilot Remediation Program.  This provision covers both common benefit fees as well as the costs of the individual handling attorneys' fees to be paid by Knauf - subject to negotiation and ultimately, if not successful, by this Honorable MDL Court, together with the Honorable Joseph P. Farina of the Miami-Dade County Court in Florida.  For all of the reasons stated herein, Mr. Diaz's opposition lacks merit.

### I.   The Motion to Halt Entry of Voluntary Motions to Dismiss Without Prior Notice to the Plaintiffs' Liaison Counsel and Defense Liaison Counsel Was Unopposed

The PSC's motion to halt entry of voluntary motion to dismiss without prior notice should be granted since it was unopposed.  The absence of any controversy over this motion is

not surprising given the Court's inherent authority to control its docket and ability to command

such a prerequisite to filing.  Accordingly, this motion should be granted.

## IV.    <u>CONCLUSION</u>

For the reasons set forth in the opening motions, in this Omnibus reply, and in the

Roberts & Durkee reply, the PSC requests that (1) the PSC's Motion for an Order Requiring an

Accounting and Other Relief; (2) the PSC's Emergency Motion for an Order Preventing the

Payment or Transfer of Certain Moneys Or, in the Alternative, for Court Ordered Mediation and

Temporary Stay of All Outside Settlement Activities; and (3) the PSC's Motion to Halt Entry of

Voluntary Motions to Dismiss Without Prior Notice to the Plaintiffs' Liaison Counsel and

Defense Liaison Counsel be granted and the proposed Orders entered by the Court.

Respectfully submitted,


Dated: February 18, 2011                   /s/ Russ M. Herman
                                           Russ M. Herman, Esquire (Bar No. 6819)
                                           Leonard A. Davis, Esquire (Bar No. 14190)
                                           Stephen J. Herman, Esquire (Bar No. 23129)
                                           HERMAN, HERMAN, KATZ & COTLAR, LLP
                                           820 O'Keefe Avenue
                                           New Orleans, Louisiana 70113
                                           Phone: (504) 581-4892
                                           Fax: (504) 561-6024
                                           LDavis@hhkc.com
                                           *Plaintiffs' Liaison Counsel*
                                           *MDL 2047*

Arnold Levin (On the Brief)
Fred S. Longer (On the Brief)
Sandra L. Duggan (On the Brief)
Matthew C. Gaughan (On the Brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Robert C. Josefsberg
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Bruce William Steckler
Mazin A. Sbaiti (on the brief)
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
  Matthews, Martinez, Gonzales,
  Kalbac & Kane
255 Alhambra Circle, Penthouse
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

40

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W
Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Jeremy W. Alters
Alters Law Firm
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@alterslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing The Plaintiffs' Steering Committee's Omnibus Reply Memorandum in Support of (1) the PSC's Motion for an Order Requiring an Accounting and Other Relief and (2) the PSC's Emergency Motion for an Order Preventing the Payment or Transfer of Certain Moneys Or, in the Alternative, for Court Ordered Mediation and Temporary Stay of All Outside Settlement Activities has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 18th day of February, 2011.

/s/ Leonard A. Davis
Leonard A. Davis, Esquire
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhkc.com
Plaintiffs' Liaison Counsel
MDL 2047