## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO.:  2047 |
| THIS DOCUMENT RELATES TO:<br><br>*Pate v. American International Specialty Lines Insurance Company, et al.* (09-7791) | JUDGE FALLON<br>MAGISTRATE JUDGE WILKINSON |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF ROBERT C. PATE'S AND THE PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT CONCERNING INSURANCE COVERAGE TRIGGER THEORY**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff Robert C. Pate ("Pate") and the Plaintiffs' Steering Committee ("PSC") (collectively, "Plaintiffs") hereby move for partial summary judgment concerning the trigger theory applicable to the liability insurance policies that American International Specialty Lines Insurance Company (n/k/a Chartis Specialty Insurance Company) ("Chartis"), Illinois Union Insurance Company ("Illinois Union"), Lexington Insurance Company ("Lexington"), and Steadfast Insurance Company ("Steadfast") (collectively, "Defendants") sold to WCI Communities, Inc. ("WCI").[1]  Specifically, Plaintiffs seek a ruling that Defendants' insurance policies are triggered for each policy period during which a claimant homeowner sustained property damage as a result of Chinese Drywall or during which exposure to Chinese Drywall occurred.[2]

---

[1] As used herein, the term "WCI" includes WCI Communities, Inc. as well as its subsidiaries.

[2] This motion does not concern the coverage trigger for bodily injury.  Plaintiffs reserve the right to address that issue at a later date.

## I.    FACTS

### A.    The Chinese Drywall Claims

WCI Communities, Inc. builds homes and residential communities in states such as Florida, New York, New Jersey, Virginia, Maryland, and Connecticut.  Affidavit of Vivien Hastings ("Hastings Aff.") at ¶ 3.[3]  Between 2006 and 2009, WCI received complaints of property damage and/or bodily injury allegedly arising from Chinese Drywall[4] installed in homes that WCI developed.  *Id.* at ¶ 4; Notice Letters, attached to Affidavit of Sheila Leith ("Leith Aff.") as Exs. Q, R.[5]  The claimants allege property damage in the form of:

- increased rates of corrosion of soft metal materials in the houses, including corrosion of air conditioning coils, refrigerator tubing, electrical wires, and television connections;

- plumbing system oxidation and pitting;

- electrical system faults, including circuit breakers that frequently need resetting – and lights that flicker – without any apparent cause;

- appliance failures; and

- tarnishing of silver and soft metal, including de-silvered mirrors.

Exs. Q, R to Leith Aff.  The property damage that Chinese Drywall causes is progressive and continuous in nature.  *See in re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, Findings of Fact & Conclusions of Law (E.D. La. Apr. 8, 2010) [Doc. No. 2380] at pp. 12-14 (finding that Chinese Drywall releases

---

[3] The Hastings Aff. is attached hereto as Ex. 1.

[4] As used herein, the term "Chinese Drywall" includes drywall manufactured in China as well as drywall manufactured domestically that contains recycled drywall from China.

[5] The Leith Aff. is attached hereto as Ex. 2.

sulfur gases that react with metals, and sulfide deposits form on the metals' surfaces, which then cause electrical and mechanical devices to fail); [Doc. No. 2713] at pp. 10-11 (noting repeat deterioration of HVAC coil and refrigerator after repairs, and resulting damage to other areas of home).

###   B.   The Trust

Because of – among other reasons – the overwhelming nature of the claims against it, WCI and a number of its subsidiaries ultimately filed for bankruptcy (collectively, the "WCI Debtors").  Hastings Aff. at ¶ 2.  The plan of reorganization, approved by the United States Bankruptcy Court, created a Chinese Drywall Trust (the "Trust").  Second Amended Plan of Reorganization, Article V, § 5.1(e), attached as Ex. J to Leith Aff.; Order Confirming Plan, attached to Leith Aff. as Ex. K.  The plan imposed upon the Trust the WCI Debtors' liability or losses for claims asserted against the WCI Debtors by an owner or occupant of, or person otherwise exposed to, a home built by the WCI Debtors for Chinese Drywall related damages.  *Id.*  The WCI Debtors transferred to the Trust their right, title, and interest in the "Insurance Coverage Actions"[6] and the "Chinese Drywall Actions"[7] and the proceeds thereof, and any right,

---

[6] The plan defines "Insurance Coverage Actions" as "any rights to indemnification, reimbursement, contribution or other payment under any of the [WCI] Debtors' existing insurance policies, including the [WCI] Debtors' director and officer liability insurance policies, as of the Effective Date that may provide coverage with respect to Allowed Chinese Drywall Claims."  Ex. J to Leith Aff., Ex. A to Plan, # 71.

[7] The plan defines "Chinese Drywall Actions" as "the Causes of Action that the [WCI] Debtors may have against any subcontractor or other Person who installed Chinese drywall in a home built or sold by a [WCI] Debtor, directly or indirectly, any insurer of any such subcontractor or other Person, any retailer, wholesaler, distributor, manufacturer or provider of Chinese drywall that was installed in a home built or sold by a [WCI] Debtor, directly or indirectly, and/or any insurer of any such retailer, wholesaler, distributor, manufacturer or provider."  Ex. J to Leith Aff., Ex. A to Plan, # 22.

title or interest in pursuing and receiving any and all "Insurance Recoveries."[8]  *Id.* at Article XI, § 11.2.  The Plan also established a Chinese Drywall Trustee ("Trustee") – Judge Robert C. Pate – to prosecute the Insurance Coverage Actions and Chinese Drywall Actions.  *Id.* at § 11.1(b).  Over 700 homeowners allegedly have Chinese Drywall installed in their homes – which the WCI Debtors developed – and may seek recovery through the Trust.

### C.    The Pate Action

Judge Pate, as Trustee, initiated this action against the Defendants as well as seventeen other insurance entities.  *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, First Amended Complaint (E.D. La. Mar. 15, 2010) [Doc. No. 1732].  In his complaint, Pate seeks, inter alia, a declaratory judgment that the defendant liability insurance companies are obligated to pay the Trusts' liabilities for losses arising from claims against WCI for its development of homes allegedly containing Chinese Drywall.  *Id.* at ¶¶ 56-60.

### D.    The Insurance Policies

This motion does not involve liability insurance policies sold to subcontractors and under which WCI is an additional insured.  This motion concerns the following liability insurance policies that the Defendant liability insurance companies sold to WCI:

---

[8] The plan defines "Insurance Recovery," in pertinent part, as "(a) the right to pursue and receive the benefits and proceeds of any insurance policy issued to, owned by, or otherwise providing coverage to any [WCI] Debtor, including any insurance policy owned by any third party on which any [WCI] Debtor is named as an additional insured, with respect to Chinese Drywall Claims; (b) the right to pursue and receive recovery from or as a result of any Insurance Coverage Action; ... [and] (e) the right to pursue and receive any other recovery from an insurance company, in its capacity as such, with respect to Chinese Drywall Claims."  Ex. J to Leith Aff., Ex. A to Plan, # 72.

| Insurance Company | Policy Number | Policy Type | Policy Period |
|---|---|---|---|
| Chartis | 7412158 | Commercial umbrella liability | 5/1/06 – 5/1/07 |
| | 7412275 | Commercial umbrella liability | 5/1/07 – 5/1/08 |
| | BE 4943750 | Commercial umbrella liability | 5/1/08 – 12/1/08 |
| Illinois Union | XOO G22081706 | Commercial umbrella liability | 3/1/05 – 5/1/06 |
| Lexington | 0355453 | Excess liability | 5/1/06 – 5/1/07 |
| | 1011060 | Excess liability | 5/1/07 – 5/1/08 |
| | 1053988 | Excess liability | 5/1/08 – 12/1/08 |
| Steadfast | AEC 3836443 03 | Excess liability | 3/31/05 – 5/1/06 |
| | AEC 3836443 04 | Excess liability | 5/1/06 – 5/1/07 |

*See* Exs. A-I of Leith Aff.

1.      The Chartis Policies

Chartis policy no. 7412158 contains an insuring agreement that states, in part:

> We will pay on behalf of the **Insured** those sums in excess of the **Self Insured Retention** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury**, **Property Damage**, or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract**, provided that:
>
> 1.      the **Bodily Injury** or **Property Damage** is caused by an **Occurrence** that takes place anywhere, and the **Bodily Injury** or **Property Damage** occurs during the **Policy Period**….

Chartis policy no. 7412158, Section I(A), attached to Leith Aff. as Ex. A.  The policy

defines "occurrence," in pertinent part, as:

as respects **Property Damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **Occurrence**….

*Id.* at Section VI(N)(2). Furthermore, the policy defines "property damage" as:

1.     physical Injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

2.     loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the **Occurrence** that caused it.

*Id.* at Section VI(T). The remaining Chartis liability insurance policies – nos. 7412275

and BE 4943750 – include an insuring agreement that states, in part:

A.     Coverage A:  Excess Liability Over Insured's Self-Insured Retention.

We will pay on behalf of the **Insured** those sums in excess of the **Self-Insured Retention** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury**, **Property Damage**, or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract**

Coverage A will be provided according to the terms, definitions, conditions and exclusions of this policy.

B.     Coverage B:  **Excess Liability Over Scheduled Underlying Insurance and any Other Insurance**

We will also pay on behalf of the **Insured** those sums in excess of the total applicable limits of **Scheduled Underlying Insurance** and any **Other Insurance** that the **Insured** becomes legally obligated to pay as damages provided the damages would be covered by **Scheduled Underlying Insurance** and any **Other Insurance**, except for exhaustion of the total applicable limits of **Scheduled Underlying Insurance** and any **Other Insurance** by the payment of **Loss**.

Coverage B will follow the terms, definitions, conditions and exclusions of **Scheduled Underlying Insurance**, subject to the **Policy Period**, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy.  If any provisions of **Scheduled Underlying Insurance** conflict with any provisions of this policy, the provisions of this policy will apply.

C.    This policy applies, only if:

1.a.    the **Bodily Injury** or **Property Damage** is caused by an **Occurrence** that takes place anywhere, and the **Bodily Injury** or **Property Damage** occurs during the **Policy Period**.

Chartis policy no. 7412275, Section I, attached to Leith Aff. as Ex. B; Chartis policy no.

BE 4943750, Section I, attached to Leith Aff. as Ex. C.  Policy nos. 7412275 and

BE4943750 define "occurrence" as:

1.    As respects **Bodily Injury** or **Property Damage**, an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results in **Bodily Injury** or **Property Damage** neither expected nor intended from the standpoint of any **Insured**.

In the event of continuing or progressively deteriorating damage over any length of time, such damage shall be one **Occurrence** and shall be deemed to occur only when such damage first commences….

Ex. B, Section VI(Q); Ex. C, Section VI(Q).  They define "property damage" as:

1.    physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use will be deemed to occur at the time of the physical injury that caused it; or

2.    loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the **Occurrence** that caused it….

Ex. B, Section VI(W); Ex. C, Section VI(W).

2.    <u>The Illinois Union Policy</u>

In policy no. XOOG22081706, Illinois Union agreed to

pay on behalf of the INSURED all sums that the INSURED shall become legally obligated to pay as damages because of BODILY INJURY, PERSONAL AND ADVERTISING INJURY or PROPERTY DAMAGE, to which this policy applies that takes place during the POLICY PERIOD.  The OCCURRENCE must take place in the COVERAGE TERRITORY.

Illinois Union policy no. XOO G22081706, Section I(A), attached to Leith Aff. as Ex. D.

It defines "occurrence" as:

> an accident including continuous or repeated exposure to substantially the same general harmful conditions.
>
> In the event of continuous, progressive, or deteriorating damage or injury which exists over any length of time, such damage or injury shall be deemed to be one Occurrence and shall be deemed to occur only when such damage or injury first commences.

*Id.* at Endorsement 8.  It defines "property damage" as:

> 1.   Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> 2.   Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the OCCURRENCE that caused it.

*Id.* at Section III(T).

### 3.   The Lexington Policies

The Lexington policies' insuring agreements state:

> A.   We will pay on behalf of the **Insured** that portion of the **loss** which the **Insured** will become legally obligated to pay as compensatory damages (excluding all fines, penalties, punitive or exemplary damages) by reason of exhaustion of all applicable underlying limits, whether collectible or not, as specified in Section II of the Declarations, subject to:
>
> 1.   the terms and conditions of the **underlying policy** listed in Section IIA of the Declarations, AND
>
> 2.   our Limit of Liability as stated in Section IC of the Declarations.

B.     Except as regards:  (1) the premium; (2) the obligation to investigate and defend, including costs and expenses thereto; (3) the limit of liability; (4) the renewal agreement, if any; (5) the notice of **occurrence**, **claim**, or suit provision; (6) any other provision therein inconsistent with this policy; the provisions of the **underlying policy** are hereby incorporated as part of this policy.

Lexington policy no. 0355453, Insuring Agreements, Section I, attached to Leith Aff. as

Ex. E; Lexington policy no. 1011060, Insuring Agreements, Section I, attached to Leith

Aff. as Ex. F; Lexington policy no. 1053988, Insuring Agreements, Section I, attached to

Leith Aff. as Ex. G.  The Lexington policies further state:

Following Form – It is agreed that this policy, except as herein stated, is subject to all conditions, agreements and limitations of and shall follow the **underlying policy/ies** in all respects, including changes by endorsement, and the **Insured** shall furnish the Company with copies of such changes.  It is further agreed, should any alteration be made in the premium for the policy/ies of the Primary Insurers during the period of this policy, then the premium hereon, other than the minimum premiums as stated in the Declarations, shall be adjusted accordingly.

Ex. E, Conditions, Section 1; Ex. F, Conditions, Section 1; Ex. G, Conditions, Section 1.

The policies also contain the following pertinent definitions:

Loss – The word **loss** means the sum paid in settlement of losses for which the **Insured** is liable after making deductions for all recoveries, salvages and other insurance (other than recoveries under the policy of the **underlying insurance**), whether recoverable or not, and shall include all expenses and costs.

…

Occurrence – The word **occurrence** means an event, including continuous or repeated exposures to conditions, neither expected or intended from the standpoint of the **Insured**.  All such exposure to substantially the same general conditions shall be deemed one **occurrence**.

…

>**Ultimate Net Loss** – The term **ultimate net loss** means the total sum which the **Insured** or any company as its insurer, or both, become legally obligated to pay by reason of **personal injury**, **property damage** or **advertising injury claims** covered by this policy, either through adjudication or compromise (with our written consent), and shall also include hospital, medical and funeral charges and all sums paid or payable as salaries, wages, compensation, fees, charges, interest, or expenses for doctors, nurses, and investigators and other persons, and for settlement, adjustment, investigation and defense of claims but excluding the **Insured's** salaries or the salaries of any of the underlying insurer's permanent employees.

Ex. E, Definitions 1, 3, 7; Ex. F, Definitions 1, 3, 7; Ex. G, Definitions 1, 3, 7.

>4.     The Steadfast Policies

The Steadfast liability insurance policies include the following insuring

agreements:

>A.     We will pay on behalf of the insured the sums in excess of the total Underlying Limits of Insurance shown in Item **6.B.** of the Declarations that the insured becomes legally obligated to pay as damages.

>B.     This insurance applies only to damages covered by the Controlling Underlying Policy as shown in Item **6.A.** of the Declarations.  Except as otherwise provided by this policy, the coverage follows the definitions, terms, conditions, limitations, and exclusions of the Controlling Underlying Policy in effect at the inception of this policy.

Steadfast policy no. AEC 3836443 03, Insuring Agreements, Section I, attached to Leith

Aff. as Ex. H; Steadfast policy no. AEC 3836443 04, Insuring Agreements, Section I,

attached to Leith Aff. as Ex. I.  Steadfast policy no. AEC3836443-03 contains the same

definitions of "occurrence" and "property damage" as the Illinois Union liability insurance

policy.  *See supra* at I(D)(2) (setting forth definitions); Ex. H, Insuring Agreements,

Section I(B).  Steadfast policy no. AEC 3836443 04 contains the same definitions of

"occurrence" and "property damage" as Chartis policy no. 7412158.  *See supra* at I(D)(1) (setting forth definitions); Ex. I, Insuring Agreements, Section I(B).

## II.    ARGUMENT

### A.    Standard Of Review

A court must grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Smith v. United Student Aid Funds, Inc.*, No. 96-1610, 1997 WL 159503, at *1 (E.D. La. Apr. 1, 1997); *Blair v. Sealift, Inc.*, 91 F.3d 755, 760 (5th Cir. 1996).  Once the moving party demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  *Alaro v. Offshore Serv. Vessels, LLC*, No. 09-5440, 2011 WL 63872, at *3 (E.D. La. Jan. 7, 2011).  However, "the showing of a genuine issue is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, unsubstantiated assertions, or by only a scintilla of evidence."  *Millwrights & Mach. Erectors Local Union 729 v. Gulf Eng. Co., LLC*, No. 10989, 2011 WL 162071, at *2 (E.D. La. Jan. 18, 2011) (internal citations and quotations omitted).  Indeed, "the mere existence of some factual dispute will not defeat a motion for summary judgment."  *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).  Rather, Rule 56 requires that the fact dispute be genuine and material – i.e., a dispute "over facts that might affect the outcome of the suit under the governing law."  *Id.*  Here, partial summary judgment should enter because no genuine issue as to any material fact exists concerning the applicable trigger theory, and Pate is entitled to a judgment as a matter of law.

## B.   Coverage Trigger Theories

This motion concerns the appropriate trigger theory to be applied to this case.  A coverage trigger consists of "the event or condition which determines whether a policy responds to a specific claim."  *Cole v. Celotex Corp.*, 599 So. 2d 1058, 1075 n.50 (La. 1992).  In general, four coverage trigger theories exist:  (1) exposure; (2) manifestation; (3) continuous trigger; and (4) injury-in-fact.  *Trs. of Tufts Univ. v. Commercial Union Ins. Co.*, 616 N.E.2d 68, 75 n.9 (Mass. 1993); 23 E.M. Holmes, Appleman on Insurance § 145.3[B][1] (2d ed. 2003).  Under the exposure theory, mere exposure to the harmful conditions during the policy period triggers coverage.  *Cole*, 599 So. 2d at 1076 n.51; *see also Trs. of Tufts Univ.*, 616 N.E.2d at 75 n.9 (pursuant to the exposure theory, the insurance policies in effect during the years that the claimant's property was exposed to hazardous material are triggered).  "Under the manifestation theory, coverage is triggered only when an injury manifests itself during the policy period."  *Cole*, 599 So. 2d at 1076 n.52; *Rubenstein v. Royal Ins. Co. of Am.*, 694 N.E.2d 381, 387 (Mass. App. Ct. 1998), *aff'd,* 429 Mass. 355 (1999).  The continuous trigger theory combines the exposure and manifestation theories, and provides that "all policies in effect during the entire injurious process will be triggered and are required to respond."  *Cole*, 599 So. 2d at 1076 n.53; *see also Trs. of Tufts Univ.*, 616 N.E.2d at 75 n.9 (under the continuous trigger theory, "property damage occurs during each year from the time of first hazardous exposure through manifestation").  Finally, under the injury-in-fact theory, an insurance policy is triggered when evidence of actual injury exists during the policy period.  23 E.M. Holmes, Appleman on Insurance § 145.3[B][2] at 15 (2d ed. 2003); *see also Trs. of Tufts Univ.*, 616 N.E.2d at 75 n.9 ("the injury-in-fact (or actual injury) trigger requires inquiry into when property damage actually occurred").

C.    A Choice Of Law Analysis Mandates Application Of Louisiana, New York, Or Massachusetts Law

To determine which trigger theory applies to this case, a choice of law analysis is appropriate.  "A federal court, sitting in diversity, applies the choice of law rules from the forum state."  *Travelers Cas. & Sur. Co. of Am. v. Wright Ins. Agency Inc.*, 404 F.3d 927, 928 (5th Cir. 2005).  For this reason, Louisiana choice of law rules apply here.

The pertinent Louisiana conflict of laws provisions are set forth in La. Civ. Code Articles 3515 and 3537 (2010).  *Champagne v. Ward*, 893 So. 2d 773, 780-81 (La. 2005).  Article 3515 provides the following general rule:

> Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of:
>
> (1)    the relationship of each state to the parties and the dispute; and
>
> (2)    the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

Article 3537, which applies specifically to conventional obligations such as insurance policies, provides:

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
>
> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of:
>
> (1)    the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and

> performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties;
>
> (2) the nature, type, and purpose of the contract; and
>
> (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

Articles 3515 and 3537 "are intended to be read together" with the objective of identifying the state whose policies would be more seriously impaired if its law were not applied to the issue. *Sentilles Optical Servs., Div. of Senasco, Inc. v. Phillips*, 651 So. 2d 395, 398 (La. Ct. App. 1995). "This objective is achieved through an issue-specific analysis of the policies of each of the … [implicated] states, the first step in which process is to identify the relevant policies of the laws in … [those] states." *Id.*

Louisiana courts will consider the aforementioned factors to determine the law applicable to the insurance policies at issue. *See, e.g., Liberty Mut. Ins. Co. v. Zurich Am. Ins. Co.*, No. 06-3206, 2007 WL 3487651, at *3 (E.D. La. Nov. 13, 2007) (stating that the "pertinent contacts" of each state favored applying Mississippi law where the policyholder was incorporated and based in Mississippi, and the policy was negotiated, formed, and issued in Mississippi).

Application of Louisiana choice of law principles demonstrates that the laws of Louisiana, New York, or Massachusetts concerning the trigger theory – all of which allow for a trigger of coverage during multiple policy periods – apply to this motion.[9]

---

[9] The Court need not choose among the laws of Louisiana, New York, and Massachusetts to the extent that it finds their trigger theories consistent. *See Mumblow v. Monroe Broad., Inc.*, 401 F.3d 616, 620 (5th Cir. 2005) (stating that "[i]f the laws of the states do not conflict, then no

*(footnote continued)*

      1.    Louisiana, New York, and Massachusetts' public policies would be most seriously impaired if those states' laws were not applied to the coverage trigger issue

Louisiana's public policies would be seriously impaired if its trigger theory were not applied.  The Louisiana Supreme Court has articulated three reasons underlying its adoption of an exposure trigger theory:  the exposure theory (1) "comports with a literal construction of the policy language"; (2) has the potential to maximize coverage; and (3) "honors the contracting parties' intent by providing for consistency between the insured's tort liability and the insurer's coverage" because "[t]he contracting parties would expect coverage to parallel the theory of liability."  *Cole*, 599 So. 2d at 1076-77.  Furthermore, as host to the MDL and to this case, Louisiana has an interest in its law's application.

New York's public policies would also be impaired if the Court were to apply law contrary to that of New York.  Under New York's application of the injury-in-fact theory, a policy is triggered during each policy period in which damage occurs.  *See infra* at Section II(E)(2).  One of the Defendants, Chartis, maintains its principal place of business in New York.  Annual Statements and Best's Insurance Reports, attached hereto as Ex. 3.  The state of New York has an interest in (1) regulating insurance companies – like Chartis – that reside in, and enter into contractual obligations from, New York, and (2) more specifically, preventing such companies from utilizing a trigger theory to escape or minimize their obligations.  *See U.S. Aviation Underwriters, Inc. v. U.S. Fire Ins. Co.*, 520 N.Y.S.2d 716, 719 (App. Div. 1987), *aff'd* 532 N.E.2d 98 (N.Y.

---

choice-of-law analysis is necessary, and we simply apply the law of the forum state") (internal quotation omitted).

1988) (stating that "New York has a well-established interest in regulating the activities of its resident insurers").

Similarly, application of law inconsistent with that of Massachusetts would impair Massachusetts' public policies.  Defendant Lexington maintains a principal place of business in Massachusetts.  Ex. 3.  The commonwealth of Massachusetts has an interest in regulating resident insurance companies like Lexington.  Massachusetts courts hold that where continuous, progressive property damage takes place over multiple policy periods, coverage is triggered under each policy in effect for those periods.  *See infra* at Section II(E)(3).  This trigger theory protects the policyholder's interests by allowing multiple policy periods to be triggered.  Were the Court to apply a trigger theory contrary to that of Massachusetts, Lexington – a Massachusetts resident – could avoid or minimize its coverage obligations in contravention of Massachusetts public policy.

Application of law other than Florida's will not impair Florida's public policies.  The District Court for the Southern District of Florida has applied the manifestation theory in a Chinese Drywall case.[10]  *Amerisure Mut. Ins. Co. v. Albanese Popkin The Oaks Dev. Grp., L.P.*, No. 09-81213-CIV, 2010 WL 4942972, at *5-7 (S.D. Fla. Nov. 30, 2010).  The manifestation trigger theory – which triggers coverage only when an injury manifests itself during the policy period – protects insurance companies by upholding their decisions to deny or minimize coverage.  *See supra* Section I(B).  Here, the insurance companies that would benefit from Florida law's application are neither

---

[10] Plaintiffs do not concede that Florida law mandates application of the manifestation theory here.

residents of – nor incorporated in – Florida.  To the extent that Florida's trigger theory aims to protect Florida insurance companies, Florida law should not apply here where it will not benefit a Florida insurance company.  Again, none of the Defendants is incorporated - or maintains a principal place of business - in Florida.

        2.      Louisiana, New York, and Massachusetts have the most significant <u>relationship with the parties and the dispute</u>

Subsection 1 of Articles 3515 and 3537 requires the Court to consider:  the relationship of each state to the parties and the dispute and each state's pertinent contacts to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties.  Consideration of these factors favors the application of Louisiana, New York, or Massachusetts law.

The state of New York has numerous contacts with the parties and the dispute. Each of the Defendants sells insurance in New York and collects premiums from New York residents.  Ex. 3.  Chartis, one of the Defendants, maintains its principal place of business in New York.  *Id.*  Accordingly, New York is considered Chartis's home office for virtually all decisionmaking, including, but not limited to, principal underwriting operations and claims.  Moreover, Chartis makes virtually all its significant coverage determinations and payments – under the insurance policies, other financial products, and services it sells – from New York.  *See* Ex. P to Leith Aff.  The Chartis insurance policies were negotiated, at least in part, in New York.  *See* Ex. P to Leith Aff.  WCI provided notice under the Chartis policies to Chartis' New York office.  *See* Notice Letter, attached to Leith Aff. as Ex. Q.

Additionally, Defendants signed and countersigned many of the insurance binders and policies in New York.  Specifically, Steadfast countersigned policy nos. AEC 3836443 03 and AEC 3836443 04, and their corresponding binders, in New York. *See* Ex. L to Leith Aff. (insurance binder signed by Rob Kenyon, team leader for underwriting of Zurich North America Specialties Excess Casualty NYC); Ex. H to Leith Aff. and Ex. 4 attached hereto (policy countersigned by Doreen Miller of Zurich North America's New York office); Ex. M to Leith Aff. (binder signed by Rob Kenyon, regional vice president of Zurich North America Specialties Excess Casualty NYC); Exs. I, M to Leith Aff. (policy countersigned by Robert Kenyon of Zurich Excess Casualty New York).  Chartis created and signed the binder for policy no. 7412158, and countersigned policy no. 7412275, in New York.  *See* Ex. O to Leith Aff. (binder signed by Jonathan Luca of Chartis in New York) and Ex. 6 attached hereto; Ex. B to Leith Aff. and Ex. 5 attached hereto (policy countersigned by Timothy J. McAuliffe, an executive of Chartis in New York).  Moreover, Chartis created and signed the binder for policy no. BE4943750 in New York, and sent the binder to WCI's broker, Lockton, Inc. ("Lockton") in New York.  *See* Ex. P to Leith Aff. (e-mail correspondence transmitting binder from Elizabeth K. Johnson of AIG Excess Casualty[11] to Timothy J. Harper of Lockton Companies, LLC in New York).  Chartis also countersigned policy no. BE4943750 in New York.  *See* Ex. C to Leith Aff. and Ex. 5 attached hereto (policy countersigned by Timothy J. McAuliffe, an executive of Chartis in New York).  Lastly, Lexington delivered the binder for policy no. 1053988 to Lockton in New York.  *See* Exs. N, P to Leith Aff. (binder addressed to Tim Harper of Lockton in New York).

---

[11] AIG was renamed Chartis.

Louisiana also maintains contacts with the parties and the dispute.  The Pate Action – and the MDL – are venued in Louisiana.  In addition, the Defendants have been named defendants in other MDL cases.  *See, e.g.*, *Amato v. Liberty Mut. Ins. Co.*, C.A. No. 10-932 (naming American International Specialty Lines, Lexington, and Steadfast as defendants); *Hernandez v. AAA Insurance*, C.A. No. 10-3070 (naming Lexington as a defendant).  Furthermore, each of the Defendants sells insurance in Louisiana and collects premiums from Louisiana residents.  *See* Ex. 3.

Like the states of New York and Louisiana, the commonwealth of Massachusetts is related to the parties and the dispute.  WCI provided notice under the Lexington policies to Lexington's Massachusetts office.  *See* Notice Letter, attached to Leith Aff. as Ex. R.  Lexington countersigned each of the Lexington policies in Massachusetts, Lexington maintains its principal place of business in Massachusetts, and provides that service of process may be made upon its legal counsel in Massachusetts.  *See* Ex. E to Leith Aff. and Ex. 5 attached hereto (policy countersigned by Shaun E. Kelly, Chief Operating Officer of Lexington, which is located in Boston, Massachusetts); Ex. F to Leith Aff. and Ex. 5 attached hereto (same); Ex. G to Leith Aff. and Ex. 5 attached hereto (same).  The Defendants all sell insurance in Massachusetts and collect premiums from Massachusetts residents.  *See* Ex. 3.[12]

---

[12] The parties' place of domicile, habitual residence, or business is as follows:

| PARTY | DOMICILE, RESIDENCE, OR BUSINESS |
|---|---|
| Pate | Resides in Corpus Christi, Texas |
| Chartis | Illinois corporation with its principal place of business in New York |

*(footnote continued)*

In contrast, the contacts between the state of Florida and the parties and the dispute, though existent, do not warrant application of Florida law.  While the properties at issue here are located mostly in Florida, the place of injury is not dispositive of the choice of law analysis for contracts.  *See, e.g., Liberty Mutual Ins. Co.*, 2007 WL 3487651, at *4 (stating that "[e]ven though Louisiana is the place where … [the policyholder] allegedly caused the injury, that does not override the pertinent contacts of Mississippi with the insurance contract and this action").  Additionally, neither Pate nor any of the Defendants is a Florida resident or incorporated in Florida.[13]  Finally, the Pate Action is a coverage action involving insurance of risk in multiple states; it is not a tort action based on an injury that occurred exclusively in Florida.

> 3.   The public policies and needs of the interstate and international systems, including the parties' justified expectations and minimization of possible adverse consequences from application of the law of multiple states favors the application of Louisiana, New York, or Massachusetts law

Application of Louisiana, New York, or Massachusetts law – all of which allow policies in multiple policy periods to be triggered – upholds the parties' justified expectations.  The Defendants, having been hailed into court in Louisiana as parties to more than one case in the MDL – and having sold insurance and collected premiums in

| | |
|---|---|
| Illinois Union | Illinois corporation with its principal place of business in Pennsylvania |
| Lexington | Delaware corporation with its principal place of business in Massachusetts |
| Steadfast | Delaware corporation with its principal place of business in Illinois |

Ex. 3.

[13] Although WCI is located in Florida, WCI is not a party to this action, and Pate has initiated this lawsuit on behalf of the Trust, not WCI.

Louisiana, New York, and Massachusetts - must have anticipated that Louisiana, New York, or Massachusetts law could apply in an insurance coverage case brought against them.  Furthermore, Chartis and Lexington, who maintain principal places of business in New York and Massachusetts, respectively, could have anticipated that they would be subject to the laws of the jurisdictions in which they reside.  Pate, having filed this action in Louisiana and suing under some insurance policies procured through Lockton of New York, is justified in his expectation that Louisiana or New York law could apply to this dispute.  No adverse consequences will follow from subjecting the Defendants to the law of multiple states – here, Louisiana, Massachusetts, or New York – because this law is consistent in allowing policies to be triggered in multiple policy periods. Application of this consistent body of law will simplify matters in this litigation.

4.    The nature, type, and purpose of the contract favors the application of Louisiana, New York, or Massachusetts law

The contracts at issue are liability insurance policies – specifically, commercial umbrella liability and excess liability insurance policies – that are intended to supplement the limits of WCI's underlying insurance policies and protect WCI from exclusions and gaps that exist in its primary liability insurance.  Accordingly, a body of law that favors greater coverage - like that of Louisiana, New York, and Massachusetts – comports with the insurance policies' purpose.

5.    The policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other support the application of Louisiana, New York, or Massachusetts law

The application of Louisiana law facilitates the orderly planning of transactions because Louisiana law is the law of the forum and presumably most familiar to the

decisionmaker.  *See Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 232 (N.D.N.Y. 2009)

(noting that the law of the forum "can be administered more conveniently" because the

lawyers and judges are more familiar with it).  Furthermore, the application of Louisiana,

New York, or Massachusetts law protects one party from undue imposition by the other

and promotes multistate commercial intercourse because it will apply the majority

position on the trigger theory[14] – a position that, because of its predominance, was likely

foreseeable to the parties.  In light of the aforementioned analysis, the Court should

apply Louisiana, New York, or Massachusetts law.

>   D.   **The Insurance Policies' Plain Language Demonstrates That
>        The Insurance Policies Were Triggered In Each Policy Period
>        During Which A Claimant Homeowner Sustained Property
>        Damage**

An insurance policy is a contract between the policyholder and the insurance

company, and should be construed using general contract interpretation rules.  *Mossy*

*Motors, Inc. v. Cameras America*, 898 So. 2d 602 (La. Ct. App. 2005).  Interpretation of

an insurance policy presents a question of law.  *Mears v. Stanley*, 23 So. 3d 318, 322

(La. Ct. App. 2008); *Boston Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 304

(Mass. 2009).  The parties' intent, as reflected by the insurance policy's words,

determines the extent of coverage.  *Washington v. McCauley*, No. 45,916-CA, 2011 WL

524177, at *3 (La. Ct. App. 2011).  When an insurance policy's words are clear and lead

to no absurd consequences, the court must enforce the policy as written and may not

further interpret the policy in search of the parties' intent.  *Id.* The policy must be

---

[14] *See Developments in the Law-Toxic Waste Litigation*, 99 Harv. L. Rev. 1458, 1581 (1986)
("The standard rule for property damage caused by hazardous waste has been that the
occurrence is continuous, extending from disposal to manifestation of the damage.").

construed as a whole, words are to be given their generally prevailing meaning, and "each provision in the policy must be interpreted in light of the other provisions" so that each is given meaning. *Id.* at *4; *Mossy Motors, Inc.,* 898 So. 2d at 605; *Boston Gas Co.*, 910 N.E.2d at 304. Ambiguous policy provisions – those that are susceptible to more than one rational interpretation – are generally construed against the insurance company and in favor of coverage. *Boston Gas Co.*, 910 N.E.2d at 305 n.32; *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003). Ambiguous provisions that seek to narrow an insurance company's obligations are strictly construed against the insurance company. *Crutchfield v. Landry*, 757 So. 2d 858, 860-61 (La. Ct. App. 2000); *Louisiana Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So. 2d 1250, 1252 (La. 1993).

A plain reading of the insurance policies at issue mandates the application of a trigger theory that triggers coverage during each policy period in which property damage occurred. The insurance policies' insuring agreements generally permit coverage where "the Bodily Injury or Property Damage *occurs* during the Policy Period." Ex. A, Section I(A); Ex. B, Section I; Ex. C, Section I; Ex. D, Section I(A). Furthermore, the definition of "occurrence" – "an accident, including continuous or repeated *exposure* to substantially the same general harmful conditions" – refers to exposure, over time, to a substance like Chinese Drywall. Ex. A, Section VI(N)(2); Ex. B, Section VI(Q); Ex. C, Section VI(Q); Ex. D, Endorsement 8; Ex. E, Definition 3; Ex. F, Definition 3; Ex. G, Definition 3.

While Defendants may argue that a manifestation trigger theory applies, a plain reading of the insurance policies does not permit such a construction. Notably, the

insurance policies do not employ the term "manifestation" in any of the operative clauses or definitions.  Defendants, as the drafters of the liability insurance policies in question, had the opportunity and duty to explicitly state that an "occurrence" means the *manifestation* of property damage or that coverage requires manifestation of the property damage during the policy period.  Defendants failed to do so.  Instead, the insurance policies' clear language allows coverage if the property damage occurred during the policy period.  If the Court disagrees with this interpretation, and finds that the insurance policies yield two plausible interpretations, then the law deems the insurance policies ambiguous and requires an interpretation that effects, not denies, coverage. *See Boston Gas Co.*, 910 N.E.2d at 305 n.32; *Cadwallader*, 848 So. 2d at 580.

### E.     Application Of Louisiana, New York, And Massachusetts Law Demonstrates That Defendants' Liability Insurance Policies Were Triggered In Each Policy Period During Which Exposure To Chinese Drywall Or Property Damage Occurred

In analogous cases involving property damage caused by exposure to contaminants over time, Louisiana, New York, and Massachusetts courts have applied the exposure and injury-in-fact trigger theories to reach the same result:  the triggering of all policies in effect whenever exposure to – or damage from – the harmful conditions occurred.

#### 1.     Under Louisiana law, coverage is triggered in each policy period during which an exposure to harmful conditions occurred

The Louisiana Supreme Court has not ruled on the trigger theory to be applied in cases of ongoing property damage.  *Liberty Mut. Ins. Co. v. Jotun Paints, Inc.*, 555 F. Supp. 2d 686, 697 n.41 (E.D. La. 2008).  However, as a general rule regarding continuing, successive injuries, the Louisiana Supreme Court has held that "the

exposure theory is a sound one" and has "adopt[ed] that theory as a precept of this court." *Cole*, 599 So. 2d at 1076.

In *Cole*, the Louisiana Supreme Court considered the trigger theory that should apply to "injuries to workers caused by long-term exposure to asbestos at their workplace." *Id.* at 1060.  The court held that exposure to harmful conditions in a policy period triggered coverage under the policy covering that period.  *Id.* at 1076.  The court reasoned that the exposure theory comported with the literal construction of the policy language, maximized coverage, and honored the parties' intent.  *Id.* at 1076-77.

An examination of environmental contamination cases – which also involve prolonged exposure to harmful conditions – supports the exposure theory's application in a property damage case.  *See, e.g., Grefer v. Travelers Ins. Co.*, 919 So. 2d 758, 765-66 (La. Ct. App. 2005).  In *Grefer v. Travelers Insurance Co.*, for instance, plaintiff landowners sued various entities for environmental property damage to a 33-acre tract. *Id.* at 761-62.  A defendant insurance company argued that the manifestation trigger theory applied.  *Id.* at 765.  The Court of Appeals, however, affirmed the exposure trigger theory's application, and expressly rejected application of the manifestation trigger theory, based on the policies' "occurrence" and "property damage" definitions. *Id.*[15]  The court held that, "[c]learly given this plain and clear language, the trial court's finding that the exposures were the proper coverage trigger … was correct, without

---

[15] Defendant Gray Insurance Company's insurance policies defined occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" and defined "property damage" as "physical injury to tangible property."  *Id.*  Defendant TIG Group's insurance policy defined "occurrence," in pertinent part, as "a continued or repeated exposure to conditions occurring during the Policy Period and which result in … damage to property during the Policy Period provided such injury or damage is accidentally caused."  *Id.* at 766.

having to resort to reliance on the reasoning in *Cole*." *Id.* Likewise, the court affirmed that the "[t]he radioactive scale falling to the ground and/or its mixture with soil and use as fill on the [plaintiffs'] tract" triggered coverage under the TIG Group Insurance Company policies. *Id.* at 766.

Here, the Court should apply the exposure theory as set forth in *Cole* and *Grefer*. *Cole* and *Grefer* – like this case – concern exposure to harmful conditions over an extended period of time. The cause of property damage in this case (exposure to sulfur compounds that Chinese Drywall emits) is similar to the cause of injury in *Cole* (exposure to asbestos fibers). Moreover, application of the exposure theory supports the public policies set forth in *Cole*. First, the exposure theory comports with a literal construction of the insurance policies at issue. The insurance policies define "property damage," in pertinent part, as "physical injury to tangible property" and "occurrence" as "an accident, including continuous or repeated *exposure* to substantially the same general harmful conditions." Ex. A, Sections VI(N)(2), VI(T); Ex. B, Sections VI(Q), VI(W); Ex. C, Sections VI(Q), VI(W); Ex. D, Endorsement 8 and Section III(T) (emphasis added). [16] The policies speak in terms of exposure. For this reason, the trigger theory applied here should – consistent with insurance policies' language – trigger coverage in each policy period during which exposure to harmful conditions occurred. Second, under the instant facts, application of the exposure theory maximizes coverage because the exposure to Chinese Drywall that occurred over multiple policy periods triggers

---

[16] The Lexington policies define "occurrence" using different words than the remaining insurance policies use but giving the term similar meaning: "an event, including continuous or repeated exposures to conditions, neither expected or intended from the standpoint of the Insured." Ex. E, Definition 3; Ex. F, Definition 3; Ex. G, Definition 3.

multiple towers of insurance.  Third, the exposure theory honors WCI's and the

Defendants' intent by providing for consistency between WCI's alleged tort liability and

the Defendants' coverage obligations because WCI and Defendants would expect

coverage to parallel the theory of liability.  *See Cole*, 599 So. 2d at 1076-77.  Like *Cole*,

*Grefer* is relevant here because, among other reasons, the court interpreted

"occurrence" and "property damage" definitions that mirror those of the insurance

policies at issue.  *See infra* n.13.[17]

---

[17] The cases of *Korossy v. Sunrise Homes, Inc.*, 653 So. 2d 1215 (La. App. Ct. 1195), *James Pest Control, Inc. v. Scottsdale Ins. Co.*, 765 So.2d 485 (La. App. Ct. 2000), and *New Orleans Assets, LLC v. Travelers Prop. Cas. Co.*, Nos. Civ. A. 01-2171, 02-974, 2002 WL 32121257 (E.D. La. September 12, 2002), in which the court applied a manifestation trigger theory, are distinguishable from the instant case because each involved a difficult factual determination as to when property damage actually occurred and/or what actually qualified as property damage to an objective observer.  *See Korossy*, 653 So. 2d at 1225-26 (court applied manifestation theory when it faced difficult factual questions of what constituted damage from foundation settlement and when such damage occurred); *James Pest Control, Inc.*, 765 So. 2d at 491 (court applied manifestation theory when it faced difficult factual issue of when termite damage occurred); *New Orleans Assets, LLC*, 2002 WL 32121257, at *2 (court applied manifestation theory when it faced difficult factual question of when mold damage happened).  The *Grefer* court noted these difficult factual questions, stating:

> [t]he *Korossy* and *James Pest Control* cases dealt with factual scenarios (differential settlement of homes; termite damage) that, when applied to occurrence language in the respective policies, rendered that language ambiguous.  Both courts then used the manifestation trigger to determine coverage under their policies' language.

*Grefer*, 919 So.2d at 766.  This case does not involve a difficult factual issue of when hidden property damage occurred, and the factual scenario does not render the policies ambiguous.  Here, the dates of exposure to Chinese Drywall can be determined.

Other cases in which Louisiana courts applied the manifestation theory are also irrelevant because they involve property damage that occurred simultaneous with manifestation.  *See Alberti v. Welco Mfg. of Texas*, 560 So. 2d 964, 965 (La. Ct. App. 1990) (applying manifestation theory where chemical reaction in drywall caused drywall to stain and the property damage occurred simultaneous with its manifestation); *Silva v. St. Charles Steel Works, Inc.*, No. 04-3324, 2007 WL 496866, at *2-5 (E.D. La. February 13, 2007) (applying manifestation theory where a negligently designed boat capsized and the damage occurred simultaneous with its manifestation).

2.      Under New York law, an insurance policy is triggered in each period in which damage occurs

Under New York law, coverage under occurrence-based insurance policies is triggered when an "'injury-in-fact' – that is, an actual injury – takes place during the policy period." *Emp'rs Ins. of Wausau v. The Duplan Corp.*, No. 94 Civ. 3143(CSH), 1999 WL 777976, at *25 (S.D.N.Y. Oct. 20, 1999). This rule holds true regardless of when the cause of the injury happened, or when the injury was discovered. *Id.* In the property damage context, "[t]he approach to determine when a policy is triggered … is a "'damage-in-fact' trigger, meaning that coverage will be invoked if it is shown that the damage to the property actually occurred during the period for which the insurer was on the risk." *Island Lathing & Plastering, Inc. v. Travelers Indem. Co.*, 161 F. Supp. 2d 278, 283-84 (S.D.N.Y. 2001).

Successive injuries or property damage over multiple policy periods trigger the insurance policies in effect in any period in which the damage can be identified. *Md. Cas. Co. v. W.R. Grace and Co.*, 23 F.3d 617, 627 (2d Cir. 1993), *cert. denied*, 513 U.S. 1052 (1994) (distinguishing one-time trigger of asbestos installation from other "types of property damage – such as the gradual contamination of earth and groundwater by leaking landfills - [which] may be analogous to the slow progression of diseases such as asbestosis and cancer."); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1195 (2d Cir. 1995) (holding that the "injury-in-fact" approach permits triggering all policies in force during each period in which successive injuries occur); *Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 321-22 (2d Cir. 2000) (finding that ongoing, progressive environmental property damage triggered each of defendant insurance company's policies sold from 1956 through 1970); *In re Liquidation of Midland Ins. Co.*,

709 N.Y.S.2d 24, 32 (App. Div. 2000) (finding that both initial and repeated exposure to asbestos triggered coverage, as long as the exposure resulted in an injury).  New York courts have expressly rejected the application of a manifestation trigger theory in the context of a property damage case.  *See, e.g.*, *Md. Cas. Co.*, 23 F.3d at 625-26 (holding that for a policy to be triggered, injury must result during the policy period, but it need not be discovered during that time).

Here, application of analogous New York law concerning progressive and continuous injury provides that Defendants' insurance policies are triggered in each policy period during which damage occurred.  *See W.R. Grace*, 23 F.3d at 628 ("If property damage is ongoing, then it is possible to trigger several successive insurance policies because the damage-in-fact occurs over a time continuum.")

3.     Under Massachusetts law, each policy in effect when property damage occurs is triggered

Massachusetts courts consistently have held that where continuous, progressive property damage takes place over multiple policy periods, coverage is triggered under every policy in effect for those periods.  *Boston Gas Co.*, 910 N.E.2d at 301 (coverage was triggered under insurance policies in place during decades of continued contamination); *Trs. of Tufts Univ.*, 616 N.E.2d at 75 (holding that insurance policies in effect from 1968 to 1975 were triggered to cover damages from progressive environmental contamination even though cause of pollution ceased in the early 1960s and damage did not manifest until after 1975); *Rubenstein*, 694 N.E.2d at 387 (finding that although most of the oil was released into the ground before 1969, and clean-up did not begin until 1988, the continued property damage triggered coverage each year of the 1969-1972 policy period).

In *Trustees of Tufts University*, a landowner sued Tufts, the former landowner, seeking indemnification for clean-up costs due to pollution caused by wood treatment operations.  616 N.E.2d at 70.  Tufts, in turn, sought defense coverage from two insurance companies, which had sold Tufts liability insurance for the policy periods of 1968 to 1972 and 1972 to 1975, respectively.  *Id.* at 70.  The insurance companies denied their defense obligations because, *inter alia*, the damage did not manifest until after the last policy period.  *Id.* at 74.  The court rejected application of the manifestation trigger theory, instead stating that the property damage, as defined by the policies' terms, was "the continued contamination of soil and groundwater on the site during the policy periods caused by the release of the hazardous material."  *Id.* at 71-72.  Indeed, since the pollution at issue in Tufts ceased in the early 1960s, it was the progressive contamination and migration of pollutants – which were no longer being released – that triggered the policies at issue.  *Id.*[18]

Here, application of Massachusetts law provides that the policies covering each period in which property damage occurred are triggered.  In this case, the property damage consists of the Chinese Drywall's continued contamination of the homes.  Just as the cases described above, the damage here – caused by Chinese Drywall in the claimants' homes – did not result in a one-time instance of property damage, but rather, property damage started immediately and worsened from that point on.  *See in re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, Findings of Fact & Conclusions of Law (E.D. La. Apr. 8, 2010) [Doc. No. 2380] at pp. 12-14 and

---

[18] In addition to *Trustees of Tufts University*, other Massachusetts cases expressly have rejected application of the manifestation theory in a similar context.  *See, e.g., Rubenstein*, 694 N.E.2d at 387 (rejecting manifestation theory in the context of an oil release).

[Doc. No. 2713] at pp. 10-11 (describing Chinese Drywall's release of sulfur compounds and the resulting progressive damage); *see also Keyspan New England, LLC v. Hanover Ins. Co.*, Nos. 93-01458, 04-01855, 2008 WL 4308310, at *6 (Mass. Super. Ct. Aug. 14, 2008) (noting that "exposure to toxic materials typically inflicts property damage not only immediately ... but also over a period of many years, due to the leaching and migration of toxic materials over time.").  Accordingly, under either Louisiana's exposure trigger, New York's "injury-in-fact" trigger, or Massachusetts law, coverage is triggered under the Defendants' liability insurance policies for each policy period during which damage or exposure to Chinese Drywall occurred.

## III.   CONCLUSION

For the aforementioned reasons, Plaintiffs respectfully request that the Court grant their motion for partial summary judgment, holding that Defendants' insurance policies were triggered for every policy period in which exposure to – or damage from – Chinese Drywall occurred.

February 24, 2011                              Respectfully submitted,

                                              /s/ Russ M. Herman
                                              Russ M. Herman (Bar No. 6819)
                                              Leonard A. Davis (Bar No. 14190)
                                              Stephen J. Herman (Bar No. 23129)
                                              Herman, Herman, Katz & Cotlar, LLP
                                              820 O'Keefe Avenue
                                              New Orleans, Louisiana 70113
                                              P:  504-581-4892
                                              F:  504-561-6024
                                              LDavis@hhkc.com
                                              *Plaintiffs' Liaison Counsel*
                                              *MDL 2047*

Arnold Levin
Fred S. Longer (On the Brief)
Matthew C. Gaughan (On the Brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
P: 215-592-1500
F: 215-592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel
MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
P: 504-524-3300
F: 504-524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm, LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
P: 985-536-1186
F: 985-536-6445
dbecnel@becnellaw.com

Robert C. Josefsberg
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Bruce William Steckler (On the Brief)
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
P: 214-521-3605
F: 214-520-1181
bsteckler@baronbudd.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
  Matthews, Martinez, Gonzales,
  Kalbac & Kane
255 Aragon Avenue, 2nd Floor
Cora Gables, FL 33134
P: 305-476-7400
F: 305-476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
  Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
P: 850-435-7000
F: 850-435-7020
bgordon@levinlaw.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
P: 504-581-1750
F: 504-529-2931

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
  & Warshauer, LLC
2800 Energy Centre
1100 Poydras St.
New Orleans, LA 70163-2800

hlambert@lambertandnelson.com

Jerrold Seth Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
P:  239-390-1000
F:  239-390-0055
Jerry@yourlawyer.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
P:  228-374-5151
F:  228-374-6630
jrr@lumpkinreeves.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
P:  757-233-0009
F:  757-233-0455
rserpe@serpefirm.com

P:  504-522-2304
F:  504-528-9973
gmeunier@gainsben.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
P:  239-433-6880
F:  239-433-6836
sweinstein@forthepeople.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
P:  212-584-0700
F:  212-584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
P:  919-981-0191
F:  919-981-0431
dkb@lewis-roberts.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Jeremy W. Alters
Alters Law Firm, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, FL 33137
P:  305-571-8550
F:  305-571-8559
jeremy@alterslaw.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
P:  985-783-6789
F:  985-783-1333

Richard S. Lewis
Hausfeld LLP
1700 K Street, N.W, Suite 650
Washington, DC 20006
P:  202-540-7200
F:  202-540-7201
rlewis@hausfeldllp.com

andrew@lemmonlawfirm.com

**INDIVIDUAL COUNSEL FOR PLAINTIFF ROBERT C. PATE,
TRUSTEE FOR THE CHINESE DRYWALL TRUST**

Robert M. Horkovich (On the Brief)
Anna M. Piazza (On the Brief)
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, New York 10020
P:  212-278-1000
F:  212-278-1733
rhorkovich@andersonkill.com
apiazza@andersonkill.com

Burton LeBlanc
Baron & Budd, P.C.
9015 Bluebonnet Blvd.
Baton Rouge, LA 70810
P:  225-927-5441
F:  225-927-5449
bleblanc@baronbudd.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Plaintiffs'

Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S.

Mail and e-mail and upon all counsel of record by electronically uploading the same to

Lexis Nexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing

was electronically filed with the Clerk of Court of the United States District Court for the

Eastern District of Louisiana by using the CM/ECF System, which will send a notice of

electronic filing in accordance with the procedures established in MDL 2047, on this

24th day of February, 2011.

/s/ Russ M. Herman
Russ M. Herman