UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL | ) | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | ) | |
| | ) | SECTION: L |
| | ) | |
| | ) | JUDGE FALLON |
| | ) | MAG. JUDGE WILKINSON |
| _____ | ) | |

**THIS DOCUMENT RELATES TO:**
*Silva, et al. v. Interior Exterior Building Supply, LP et al.*,
Civ. Action No. 09-08030 (E.D.La.)

*Silva et al v. Arch Insurance Company, et al.*,
Civ. Action No. 09-08034 (E.D.La.)

**MEMORANDUM OF LAW IN SUPPORT OF TRIAL PLAINTIFFS' AND
THE PLAINTIFFS' STEERING COMMITTEE'S MOTION FOR PARTIAL
SUMMARY JUDGMENT CONCERNING PLAINTIFFS' REDHIBITION CLAIMS**

Pursuant to Federal Rule of Civil Procedure 56, the Plaintiffs' Steering Committee ("PSC") on behalf of the trial Plaintiffs Dean and Dawn Amato; Byron and Debra Byrne; Edward and Susan Beckendorf; and Donald and Marcelyn Puig (collectively, "Plaintiffs"), hereby moves for partial summary judgment concerning Plaintiffs' redhibition claims against Interior/Exterior Building Supply, LP ("INEX"). Specifically, Plaintiffs seek a ruling that Defendant INEX is liable to plaintiffs pursuant to Louisiana's redhibition laws.

I. **FACTUAL BACKGROUND**

A. **Information on Interior/Exterior Building Supply, LP ("INEX")**.

INEX is a Louisiana Limited Partnership, domiciled in the State of Louisiana, with its Principal Place of Business and Corporate Headquarters located in New Orleans, Louisiana

70119.[1]   Clay Geary and James Geary are each co-supervisors at INEX's Corporate Headquarters as well as a co-owners of INEX.[2]   INEX has or had branch offices in twelve (12) cities and four (4) states, and it sold and/or distributed drywall throughout multiple states, including but not necessarily limited to Alabama, Louisiana, Mississippi and Texas.[3]

>    **B.     Problems with tainted, contaminated and/or defective Chinese Products**.

Contamination and defect problems with Chinese products were commonly known in the U.S. prior to when INEX first began the process of importing Chinese drywall in late 2005 and 2006.   Moreover, these problems with Chinese products did not stop but rather continued and/or worsened throughout 2006 while INEX continued selling Chinese drywall.   Before and during the time period when INEX purchased, received and sold Chinese drywall, many different government recalls and warnings notified Americans that there were problems with various contaminated, tainted and/or defective Chinese products imported into the United States.   A partial listing of U.S. Consumer Product Safety Commission ("CPSC") recalls of Chinese Manufactured products during this time included:

**2005 CPSC Example Recalls of Chinese Manufactured Products**[4]

- Midwest Cannon Falls Recall of Chinese Manufactured Votive Candles (June 20, 2005);

---

[1] Ex. A - 9/9/09 INEX Distributor Profile Form at p. 1.

[2] Ex. A - 9/9/09 INEX Distributor Profile Form at p. 1; *See also* Ex. B - INT/EXT33427-33439;   Ex. C - 2/5/10 deposition of Clayton and James Geary at p. 298.

[3] Ex. D - Example INEX invoice outlining its various branch offices. (INT/EXT23834).

[4] *See* Ex. E; *see also* http://www.cpsc.gov/cgi-bin/prno.aspx entering search numbers: 05200, 05201, 05202, 05204, 05206, 05203, 05207, 05210, 05211, 05214, 05221, 05222, 05227, 05228, 05231, 05236, 05240, 05242, 05244, 05246, 05256, 05270, 05272, 05275, 05277, 05278, 06036 & 06042.

- Tahsin Industrial Corp. Recall of Chinese Manufactured Tree Stands (June 21, 2005);

- DeWALT Industrial Tool Company Recall of Chinese & Korean Manufactured Three-Gallon Hand-Carry Oil Free Air Compressors (June 21, 2005);

- Battery-Biz, Inc. Recall of Chinese Manufactured Notebook Computer Batteries (June 22, 2005);

- American Promotional Events, Inc. Recall of Chinese Manufactured Bat Out of Hell and Powder House Fireworks (June 22, 2005);

- Prestige Toy Corp. Recall of Chinese Manufactured Spinning Water Teethers (June 23, 2005);

- Target Stores Recall of Chinese Manufactured Birch and Bark Candles (June 24, 2005);

- CSK Auto Inc. Recall of Chinese Manufactured Aqua Water Scooters (June 29, 2005);

- Pottery Barn Recall of Chinese Manufactured Cameron Toy Chests (June 29, 2005);

- Nautilis Inc. Recall of Chinese Manufactured Nautilus Exercise Benches (July 1, 2005);

- Graco Childrens' Products, Inc. Recall of Chinese Manufactured Duo Tandem Strollers and MetroLife Strollers (July 7, 2005);

- Pokemon USA, Inc. Recall of Chinese Manufactured Pokemon Plush Toys (July 8, 2005);

- Lamplight Farms, Inc. Recall of Chinese Manufactured Tiki Cone Metal Torches (July 19, 2005);

- Target Recall of Chinese Manufactured So Hot Way Cool Free Wheel Trucks (July 19, 2005);

- H & M Recall of Chinese Manufactured Baby Denim Knit Jackets (July 26, 2005);

- The Holmes Group Recall of Chinese Manufactured Rival Slow Cookers (July 29, 2005);

- The Holmes Group Recall of Chinese Manufactured Tower Heater Fans (August 11, 2005);

- The Gymboree Corp. Recall of Chinese Manufactured Baby Sandals (August 12, 2005);

- Almar Sales Co. Recall of Chinese Manufactured Childrens' Water Watches (August 17, 2005);

- West Bend Housewares, LLC Recall of Chinese Manufactured Coffee-makers (August 19, 2005);

- Worldwide Cycle Supply, Inc. Recall of Chinese Manufactured Bicycles (September 2, 2005);

- Bradshaw International, Inc. Recall of Chinese Manufactured "Bottle Sippers" Pull Up Bottle Caps (September 15, 2005);

- Pier 1 Imports Recall of Chinese Manufactured Glass Candle Holders (September 15, 2005);

- Pacific Market International, LLC Recall of Chinese & Korean Manufactured Stanley Thermos Bottles (September 21, 2005);

- Monogram International, Inc. Recall of Chinese Manufactured Disney Princess Bracelet Keyrings (September 22, 2005);

- Dollar General Corp. Recall of Chinese Manufactured Costume Jewelry (September 22, 2005);

- Delta Enterprise Corp. Recall of Chinese Manufactured Baby Cribs (November 22, 2005);

- Stravina Operating Co. Recall of Chinese Manufactured Children's Metal Necklaces and Zipper Pulls (November 30, 2005).

**2006 CPSC Example Recalls of Chinese Manufactured Products**[5]

- Provo Craft and Novelty, Inc. Recalls Art Accentz ChangIz Metal Charms (February 23, 2006);

- The Little Tikes Co. Recalls Chinese Manufactured Glowin' Dino and Glowin Doggy Animal Flashlights (March 1, 2006);

- Dollar Tree Stores, Inc. Recalls Chinese Manufactured Children Toy Necklaces and Rings (March 23, 2006);

- Reebok International, Ltd. Recalls Chinese Manufactured Heart-Shaped Charmed

---

[5] *See* Ex. E; *see also* http://www.cpsc.gov/cgi-bin/prno.aspx entering search numbers: 06093, 06100, 06118, 06119, 06123, 06150, 06156, 06160, 06236, 06251, 07029, 07035, 07033, 07042, 07054, 07051 & 07053.

Bracelets (March 23, 2006);

- American Girl Recalls Chinese Manufactured Children's Necklaces, Bracelets, Earrings and Hair Accessories (March 30, 2006);

- Selective Trading Corp. Recalls Chinese Manufactured Childrens' Necklaces (April 27, 2006);

- Twentieth Century Fox Recalls Chinese Manufactured Metal Charms sold with DVD's (May 5, 2006);

- Liz Claiborne, Inc. Recalls Chinese Manufactured Juicy Couture Children's Bracelets and Necklaces (May 10, 2006);

- Fun Express, Inc. Recalls Chinese Manufactured Bendable Dog and Cat Toys (August 17, 2006);

- Atico International USA, Inc. Recalls Chinese Manufactured Patio Umbrellas (September 7, 2006);

- Delta Enterprise Corp. Recalls Chinese Manufactured "Cars" Toy Storage Benches (November 9, 2006);

- Target Recalls Chinese Manufactured "Kool Toyz" Children's Products (November 15, 2006);

- Provo Craft Recalls Chinese Manufactured Decorative Snaps and Metal Clips (November 15, 2006);

- Really Useful Products, Inc. Recalls Chinese Manufactured Children's Mood Necklaces and Diva Necklaces (December 4, 2006);

- Rhode Island Novelty Recalls Chinese Manufactured Children's Powderpuff Girls Necklaces (December 13, 2006);

- U.S. Toy Company, Inc. Recalls Chinese Manufactured Children's Butterfly Necklaces (December 13, 2006);

- Celebrate Express, Inc. Recalls Chinese Manufactured Gigantic Gemstone Rings (December 19, 2006);

The PSC stresses that the above forty five (45) recalls represent only a partial listing of recalls (from 2005 & 2006) of Chinese manufactured products.  These recalls provide ample

5

bases and warnings for any reasonable distributor to have been highly suspect and/or hyper-vigilant with respect to a Chinese-manufactured product it considered importing.

### C.   INEX's inspecting and testing of Chinese drywall (complete lack thereof).

INEX had the ability to inspect the Chinese drywall which it purchased while it was being produced.[6]   On November 29, 2005, Clay Geary sent an e-mail to Rajan Srinivasan (a freight facilitator agent for INEX) specifically requesting that Mr. Srinivasan inspect Chinese drywall (from a potential supplier for INEX) "while it is being produced."[7]   INEX never followed through with Mr. Srinivasan's inspection and never conducted an inspection of any Chinese drywall while it was being produced.[8]

INEX actually received some samples of drywall from a Chinese manufacturer which INEX was considering as a potential source for drywall.[9]   However, INEX did not choose to do any testing and in fact did nothing with the Chinese drywall samples which it had received.[10] INEX also had the ability to require composition and/or chemical testing to be made/done by the manufacturers from which INEX imported Chinese drywall, however, INEX never had any such testing done on the Chinese drywall which it purchased.[11]

---

[6]   Ex. F - 11/29/05 e-mail from Geary to Srinivasan.   (INT/EXT05980).   *See also* Ex. C - 2/5/10 deposition of Clayton and James Geary at pp. 80-83.

[7]   Ex. F.

[8]   Ex. C at pp. 80-83.

[9]   *Id.* at pp. 154-155.

[10]   *Id.*

[11]   *Id.* at pp. 29-30; *see also* Ex. - INT/EXT00084-89.

**D.      INEX's importation of Chinese drywall**

Prior to October 21, 2005, INEX had never purchased or imported drywall from China.[12]
From October 21, 2005 to December 21, 2005, INEX made four (4) purchases of 4' x 12' x ½"
sized Chinese drywall from Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), totaling 410,518
pieces of 4' x 12' x ½" Chinese drywall which INEX purchased from KPT.[13]   On May 9, 2006,
INEX purchased a load and/or shipment of 4' x 12' x ½" sized Chinese drywall from Taian Taishan
Plasterboard Co. ("Taishan"), totaling 33,000 pieces of 4' x 12' x ½" Chinese drywall which INEX
purchased from Taishan.[14]   On July 5, 2006, INEX purchased a load and/or shipment of 4' x 12' x
½" sized Chinese drywall from Knauf Plasterboard ("Wuhu") Co., Ltd. ("Wuhu"), totaling 68,000
pieces of 4' x 12' x ½" Chinese drywall which INEX purchased from Wuhu.[15]

**E.      Negative indications on INEX customer drywall invoices**

From January 2006 through March 2007, INEX issued approximately 162 drywall
invoices which specified "no Knauf" drywall was to be delivered to its customers on the
invoices.[16]   From January 2006 through March 2007, INEX issued approximately 84 drywall
invoices which specified that only "domestic" drywall was to be delivered to its customers on its
invoices.[17]   From January 2006 through March 2007, INEX issued approximately 48 invoices that

---

[12] Ex. A at pp. 2-4.

[13] *Id.*

[14] *Id.* at 4.

[15] *Id.* at 3.

[16] See Ex. K.

[17] See Ex. L.

specified "no import" drywall was to be delivered to its customers on the invoices.[18]   From January 2006 through March 2007, INEX issued approximately 422 drywall invoices which specified that Gold Bond brand drywall or USG brand drywall was to be delivered to its customers on the invoices.[19]

Examples of different INEX customer invoices with negative references, directly or indirectly, to Chinese drywall include:

- March 10, 2006 purchase order with corresponding INEX invoice indicating "AMERICAN MADE ROCK ONLY!!!!... JIMMY MONTRUELLE SAYS DO NOT SEND ANY "CHINC" ROCK"[20]

- March 27, 2006 purchase order with corresponding INEX invoice indicating "Do Not Send Knauf Rock out."[21]

- April 25, 2006 purchase order with corresponding INEX invoice indicating "goldbond preferred, usg accepted and temple last.   No knauf board."[22]

- May 19, 2006 purchase order with corresponding INEX invoice indicating "DOMESTIC BOARD ONLY."[23]

- December 12, 2006 purchase order with corresponding INEX invoice indicating "Swap out Knauf board for domestic."[24]

From January 31, 2006 through February 14, 2007, approximately fourteen (14) different INEX customers made purchase orders for drywall with INEX and each invoice made a negative

---

[18] *See* Ex. M

[19] See Ex. N.

[20] Ex. O - INEX invoice indicating customer comment.

[21] Ex. P - INEX invoice indicating customer comment.

[22] Ex. Q - INEX invoice indicating customer comment.

[23] Ex. R - INEX invoice indicating customer comment.

[24] See Ex. S.

indication relating to Knauf drywall (e.g., "No Knauf" or "Swap out Knauf board for domestic" or "Do Not sent Knauf").[25]   From March 7, 2006 through October 26, 2006, approximately seventeen (17) different INEX customers made purchase orders for drywall with INEX and each invoice made a specific request for "GOLDBOND" and/or "USG"drywall (i.e., specific domestic brand name drywall).[26]   From March 9, 2006 through March 26, 2007, approximately sixty one (61) different INEX customers and/or end users made purchase orders for drywall with INEX and each invoice made a negative indication relating to imported drywall (e.g., "No Import" or "Domestic Only" or "MUST BE DOMESTIC BOARD!").[27]

**F.    Clay Geary's specific request for "USG BOARD ONLY"**

On May 15, 2006, Clay Geary,   co-supervisor at INEX's Corporate Headquarters as well as a co-owner of INEX, ordered drywall for his personal residence located at 450 Fairway Drive in New Orleans, LA and specified that he wanted "USG BOARD ONLY" delivered and/or supplied to his home.[28]   On June 9, 2006, Clay Geary ordered a 2nd shipment of drywall for his personal residence located at 450 Fairway Drive in New Orleans, LA and again specified that he wanted "USG BOARD ONLY" delivered and/or supplied to his home.[29]

---

[25] Ex. K - INEX invoices indicating customer comments.

[26] Ex. M - INEX invoices indicating customer comments.

[27] *See, e.g.,* Ex. K and L. - INEX invoices indicating customer comments.

[28] Ex. Y - INEX Geary Invoice #1. (INT/EXT21416); *see also* Ex. C - 2/5/10 deposition of Clayton and James Geary at pp. 329-332.

[29] Ex. Z - INEX Geary Invoice #2.   (INT/EXT21417); *see also* Ex. C - 2/5/10 deposition of Clayton and James Geary at pp. 329-332.

### G.      Industry notification and warnings of problems with Chinese drywall

The November 2006 issue of the Association of the Wall and Ceiling Industry's ("AWCI")

publication contained an article written by AWCI President, William Umbach, titled:

*Phosphogypsum Wallboard: A Potential Health Risk*.[30]   This November 2006 AWCI article

provided warnings to distributors and contractors about contaminated and/or tainted Chinese

drywall, including but not limited to the following:

> The recent increase of imported gypsum wallboard has raised concerns regarding the potential that foreign manufacturers may be using phosphogypsum in the manufacture of their product.  In the United States, the EPA bans the use of phosphogypsum in the manufacture of wallboard and it is believed that Europe and other developing countries have similar restrictions; however, that may not be the case everywhere.  Some countries do permit the use of phosphogypsum in other forms such as mixing it with soil or as a base for roadways, however, other countries such as Mexico and China, both large producers of phosphates, are not believed to have similar regulations and may be using it to manufacture wallboard. The United States manufactures most of the gypsum wallboard it consumes domestically.  Less than 5 percent of that consumption is imported, in which case it is predominantly from Canada and Mexico.  Historically, a very small portion [of drywall used in the U.S.] has been imported from Germany, Israel, Denmark and, to a limited extent, China.  However, in the first quarter of 2006, China suddenly became a major source of imported wallboard accounting for approximately 10 percent of total wallboard imports.  The EPA regulations do not impact the importation of gypsum wallboard, and it is possible that wallboards manufactured using phosphogypsum are being imported into the United States.   In a recent report, a leading industry consultant confirmed that some countries actually provide a subsidy to use phosphogypsum for the manufacture of wallboard, and China may be one of those countries.  The report also stated that the Department of Commerce confirmed that no information is collected as to the type of raw materials used to manufacture the imported wallboard.  Considering the high likelihood that Chinese gypsum wallboard is manufactured using phosphogypsum, it may be wise for distributors and contractors to avoid it until further information is available.[31]

INEX had a copy of the November 2006 AWCI article *Phosphogypsum Wallboard: A*

---

[30] Ex. AE - November 2006 AWCI "**TECH**UPDATE" article.

[31] *Id.*

*Potential Health Risk* in its files/records.[32]

### H.   INEX's customer service and tracking/documentation of Chinese drywall sales

At all pertinent times herein, INEX represented on its company website ("interiorexterior.net") that "Interior/Exterior Building Supply Sales Offices are dedicated to customer service."[33]   However, INEX did not have and still does not have any person at its company who was/is dedicated to handling customer complaints.[34]   INEX did not have and still does not have any formal policy or procedure for documenting customer complaints.[35]

INEX did not track if any of its customers actually received Chinese drywall, domestic drywall, or both.[36]   INEX did not implement any policies or procedures to identify which brands of drywall were being sent to its customers.   To this day, INEX cannot, through its own records, confirm if its clients received Chinese drywall, domestic drywall, or both.[37]

### I.   INEX's quality control and quality assurance

At all pertinent times when INEX was purchasing, receiving, selling and/or distributing Chinese drywall, INEX did not have any person at its company who was designated to handle quality control or quality assurance.[38]   INEX has never had any person at all who was dedicated to

---

[32] *Id.*

[33] *See* www.interiorexterior.net

[34] Ex. C - 2/5/10 deposition of Clayton and James Geary at p. 300.

[35] *Id.*

[36] *Id.* at pp. 199-202.

[37] *Id.*

[38] *Id.* at p. 97.

the issues of quality control or quality assurance.[39]   INEX's stated purpose for not having a person dedicated to either quality control or quality assurance was that as long as the products would comply with ASTM standards, then that is all INEX would need because that is all INEX received from its domestic manufacturers.[40]

## J.   Trial plaintiffs' purchases of Chinese drywall

Plaintiffs do not believe that there exists any dispute that their drywall was sold and distributed by INEX.   However, out of an abundance of caution, plaintiffs provide relative INEX drywall invoice information herein.   Drywall for the Puig residence was purchased from INEX on January 30, 2006 and was delivered by INEX on January 30, 3006.[41]   Drywall for the Beckendorf residence was purchased from INEX on March 8, 2006 and was delivered by INEX on March 16, 2006.[42]   Drywall for the Amato residence was purchased from INEX on May 2, 2006 and was delivered by INEX on May 8, 3006.[43]   Drywall for the Byrne residence was purchased from INEX on November 28, 2006 and was delivered by INEX on November 30, 2006.[44]

## II.   STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and

---

[39] *Id.*

[40] *Id.*

[41] Ex. AA - Invoice for Puig.

[42] Ex. AB - INEX invoice for Beckendorf.

[43] Ex. AC - INEX invoice for Amato.

[44] Ex. AD - INEX invoice for Byrne.

that the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(c).   The moving party bears the initial burden of informing the Court of the basis for its motion by identifying evidence which highlights the absence of genuine issues of material fact.   *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007).

A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.   *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 248 (1986).   A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Id.*   "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.   Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial.   *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).   Once the moving party demonstrates the absence of a genuine issue of material fact, "the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."   *Alaro v. Offshore Serv. Vessels, LLC*, No. 09-5440, 2011 WL 63872, at *3 (E.D. La. Jan. 7, 2011).   The non-moving party must show more than "some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor.   *Anderson*, 477 U.S. at 255.

A court must grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

13

of law." *Smith v. United Student Aid Funds, Inc.*, No. 96-1610, 1997 WL 159503, at *1 (E.D. La. Apr. 1, 1997); *Blair v. Sealift, Inc.*, 91 F.3d 755, 760 (5th Cir. 1996). Indeed, "the mere existence of some factual dispute will not defeat a motion for summary judgment." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). Rather, Rule 56 requires that the fact dispute be genuine and material – i.e., a dispute "over facts that might affect the outcome of the suit under the governing law." *Id.* Here, partial summary judgment should enter because no genuine issue as to any material fact exists concerning plaintiffs' redhibition claims, and Plaintiffs are entitled to a judgment as a matter of law.

## III.   INEX IS LIABLE TO PLAINTIFFS AS A BAD FAITH SELLER UNDER LOUISIANA'S REDHIBITION LAW.

"The seller warrants the buyer against redhibitory defects, or vices, in the thing sold." La. Civ. Code art. 2520. A defect is redhibitory "...when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect." *Id.* It has been extensively proven and well established in this litigation that Chinese drywall contains a vice or defect which renders it useless.[45]

Louisiana Civil Code article 2545 addresses the liability of a bad faith seller (i.e., one who knew or should have known of the defect in the product it sold), and provides in pertinent part:

> A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and

---

[45] *See in re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, Findings of Fact & Conclusions of Law (E.D. La. Apr. 8, 2010) [Doc. No. 2380] at pp. 12-14 (finding that Chinese Drywall releases sulfur gases that react with metals, and sulfide deposits form on the metals' surfaces, which then cause electrical and mechanical devices to fail); [Doc. No. 2713] at pp. 10-11 (noting repeat deterioration of HVAC coil and refrigerator after repairs, and resulting damage to other areas of home).

those incurred for the preservation of the thing, and also for damages and reasonable attorney fees.

Even absent actual knowledge of a defect, a seller will still be liable under La.C.C. art. 2545 as long as a reasonable seller in the same position would have known of the defect.   "A seller may not simply turn a blind eye to defects for the purpose of avoiding liability under redhibition."[46] "[A buyer] need not prove willful misrepresentation, he need only show actual or constructive knowledge by the seller."[47]   If the seller "knew or should have know of a defect" he will be liable as a bad faith seller pursuant to La.C.C. art. 2545.

The facts of this case prove that INEX should have known that the Chinese drywall it sold to plaintiffs contained a defect.   These facts include: a) widely publicized and known contamination problems with imported Chinese products, b) continuous negative statements from INEX customers about the Chinese drywall, c) Clay Geary's insistence on using only domestic drywall for use in his personal residence, and d) industry recognition of and warnings about problems with contaminated Chinese drywall.   These facts prove INEX's constructive knowledge of a contamination defect with the Chinese drywall which it imported and sold.   Moreover, considered in the light of INEX's refusal and/or failure to: 1) conduct proper inspecting/testing, 2) have policies, procedures or workers dedicated to customer complaints, or 3) have policies, procedures or workers dedicated to quality control or assurance, there exists no genuine issue of material fact regarding INEX's constructive knowledge of a defect in the Chinese drywall which it sold.

---

[46]   *Meche v. Harvey, Inc.*, 664 So.2d 855, 859 (La.App. 3rd Cir. 1995).

[47]   *Harper v. Coleman Chrysler-Plymouth-Dodge, Inc.*, 510 So.2d 1366, 1370 (La.App. 3rd Cir. 1987).

**A.     Widely publicized and known contamination problems and other defects with imported Chinese products.**

For nearly a decade now, it has been well publicized in the U.S. media and known by the American public that products manufactured in China have tainting, contamination and defect rates significantly higher than those of domestic products.   Contamination and defect problems with Chinese products were commonly known in the U.S. prior to and during the time when INEX first began the process of importing Chinese drywall in late 2005 and 2006.   Moreover, this problem did not stop but rather continued and/or worsened throughout 2006 and 2007 while INEX was selling Chinese drywall.   Accordingly, INEX knew or should have known of the widespread problems with Chinese products before and during its process of importing Chinese drywall.

**B.     Continuous negative statements on INEX invoices about Chinese drywall.**

Almost immediately after its first sale of Chinese drywall, INEX began receiving continuous negative statements from INEX customers about Chinese drywall.   These negative statements were made by INEX customers when specifying which type of drywall they wanted INEX to deliver.   Customers repeatedly requested and/or warned INEX: 1) not to deliver Knauf drywall, 2) not to deliver imported drywall or to only deliver domestic drywall, and 3) to only deliver specific domestic drywall.   While these negative statements from INEX customers varied somewhat in language, their overall message was consistent: SOMETHING IS WRONG WITH YOUR IMPORTED DRYWALL.

**1.     Negative statements about Knauf drywall.**

From January 2006 through March 2007, INEX issued approximately 162 drywall invoices which specified "no Knauf" drywall was to be delivered to its customers on the

invoices.[48]   These INEX drywall invoices which make negative statements regarding Knauf drywall relate to fourteen (14) different INEX customers.[49]   The statements included directions such as "No Knauf"  and "Do Not send Knauf").[50]   One such customer even specifically requested that INEX "Swap out Knauf board for domestic" when Knauf drywall was received.[51]

### 2.    Negative statements about imported drywall.

From January 2006 through March 2007, INEX issued approximately 84 drywall invoices which specified that only "domestic" drywall was to be delivered to its customers on its invoices.[52] From January 2006 through March 2007, INEX issued 48 invoices that specified "no import" drywall was to be delivered to its customers on the invoices.[53]   These INEX drywall invoices specifying "domestic only" and/or "no import" relate to more than (60) different INEX customers. The statements included directions such as "No Import," "Domestic Only," or "MUST BE DOMESTIC BOARD!"[54]   In fact, a March 10, 2006 INEX invoice specified as follows: "AMERICAN MADE ROCK ONLY!!!!   JIMMY MONTRUELLE SAYS NO "CHINC" ROCK."[55]

---

[48] Ex. K.

[49] Exs. L – P at INT/EXT26560, 27357-27470, 28739, 28834-28835, 28750-29755, 28744-28746, 22118, 32104-32105, 31020, 31073-31074, 31088, 27729-27736, 28739, 27741-27755, 23916, 31127, 31971-31972, 30057-30059, 25368 & 24045.

[50] *Id.*

[51] Ex. S.

[52] See Ex L.

[53] *See* Ex. N.

[54] *See, e.g.,* Ex. L at INT/EXT: 17532, 17776, and 17814.

[55] Ex. O.

### 3.    Requests for specific domestic drywall.

From January 2006 through March 2007, INEX issued 422 drywall invoices which specified that Gold Bond brand drywall or USG brand drywall was to be delivered to its customers on the invoices.[56]   These INEX drywall invoices specifying particular brands of domestic drywall relate to  approximately seventeen (17) different INEX customers.[57]   These invoices included instructions such as "use USG rock only," "Goldbond only," and "USG or Goldbond."[58]   An April 24, 2006 invoice spells out the issue nicely in stating: "goldbond preferred, usg accepted, temple last.   No Knauf board."[59]

The negative statements on INEX's invoices did not occur just once or twice or in an isolated manner.   There were literally hundreds of such invoices, and they were continuous and repeated.    In all, there were nearly one hundred different customers which had INEX invoices that made negative statements relating to Chinese drywall. Using the "three strikes and you are out rule" relative to realizing negative product response, the INEX team got no-hit (without putting the bat on the ball) for dozens of games during the 2006-2007 drywall distribution season.

---

[56]See M.

[57] *Id.*

[58] *Id.*

[59] Ex. Q.

**C.   Clay Geary's insistence on using only domestic drywall for use in his personal residence.**

Clay Geary is one of the co-owners of INEX.  On May 15, 2006, Clay Geary ordered drywall for his personal residence located at 450 Fairway Drive in New Orleans, LA and specified that he wanted "USG BOARD ONLY" delivered and/or supplied to his home.[60]   On June 9, 2006, Clay Geary ordered a 2nd shipment of drywall for his personal residence and again specified that he wanted "USG BOARD ONLY" delivered and/or supplied to his home.[61]

At the very least, Mr. Geary's specification proves INEX's actual knowledge of the differences in quality between the various brands of drywall product.  This fact alone certainly makes it difficult to accept that INEX did not consider Chinese drywall to be of different quality from domestic drywall.   However, viewed in the context of known contamination and/or defects with many different Chinese products and hundreds of INEX invoices indicating problems with Chinese drywall, Mr. Geary's invoices provide even further proof of "constructive knowledge" relative to a defect in the Chinese drywall being imported and sold by INEX.

**D.   Industry recognition of and warnings about problems with contaminated Chinese drywall.**

The November 2006 issue of the Association of the Wall and Ceiling Industry's ("AWCI") publication contained an article written by AWCI President, William Umbach, titled: *Phosphogypsum Wallboard: A Potential Health Risk.*[62]   This article provided warnings to

---

[60] Ex. C - 2/5/10 deposition of Clayton and James Geary at pp. 329-332 & Ex. Y - INT/EXT21416.

[61] Ex. Z & Ex. C at pp. 329-332.

[62] Ex. AE - November 2006 AWCI "TECHUPDATE" article.

distributors and contractors about contaminated and/or tainted Chinese drywall.[63]   After citing

that "...no information is collected as to the type of raw materials used to manufacture the imported

wallboard[,]" the article concludes by stating that "...it may be wise for distributors and contractors

to avoid it until further information is available."[64]

INEX had a copy of the November 2006 AWCI article *Phosphogypsum Wallboard: A

Potential Health Risk* in its files/records.[65]   Thus, with respect to Chinese drywall, INEX knew or

should have known that: a) no information is collected as to the type of raw materials used to

manufacture it, b) there were contamination problems with it, and c) they should avoid it until

further information became available.

> **E.    INEX's refusals and/or failures regarding inspecting/testing, customer complaints and quality control.**

The history of problems with Chinese products, the negative statements regarding Chinese

drywall on hundreds of INEX invoices, Clay Geary's insistence on "USG BOARD ONLY" for his

personal residence, and industry warnings regarding Chinese drywall prove INEX's constructive

knowledge of the defect in the Chinese drywall it imported and sold.   However, INEX's

constructive knowledge gains further "education" in the context of its refusals and/or failures to: 1)

conduct proper inspecting/testing, 2) have policies, procedures or workers dedicated to customer

complaints, and/or 3) have policies, procedures or workers dedicated to quality control or

assurance.

---

[63] *Id.* at p. 2.

[64] *Id.*

[65] *Id.*

**1.      Refusals and/or failures regarding inspecting and testing.**

INEX had multiple opportunities to inspect and/or test the Chinese drywall which it imported and sold, but failed to follow through with any of those opportunities.  INEX had the opportunities to: a) inspect Chinese drywall while it was being produced[66] (i.e., observe and inspect the production process), b) inspect and/or test samples of Chinese drywall which it actually received,[67] and c)  require composition and/or chemical testing on the Chinese drywall.[68] However, INEX never utilized any of these inspection or testing opportunities and consequently never confirmed the safety or quality of the Chinese drywall which it purchased and distributed.[69]

**2.      Refusals and/or failures regarding customer complaints.**

Although INEX represented on its company website ("interiorexterior.net") that "Interior/Exterior Building Supply Sales Offices are dedicated to customer service,"[70] it has never had any person at its company dedicated to handling customer complaints.[71]  In fact, INEX has never had any formal policy or procedure for documenting customer complaints.[72]  These problems are compounded by the facts that INEX did not track or document if any of its customers actually received Chinese drywall, domestic drywall, or both.[73]

---

[66] Ex. G.

[67] *Id.*

[68] Ex. C at pp. 29-30; *see also* Ex. - INT/EXT00084-89.

[69] Ex. C at pp. 29-30 & 80-83.

[70] *See* www.interiorexterior.net

[71] Ex. C at p. 300.

[72] *Id.*

[73] *Id.* at pp. 199-202.

INEX' complete disregard for having dedicated customer complaint personnel and procedures, as well as its failure to track or document which product went to which customers, is uncontested evidence that INEX should have known of the problems with its Chinese drywall.   If INEX had any semblance of a customer complaint and tracking department or policy: a) the hundreds of INEX invoices stating "NO KNAUF," "DOMESTIC ONLY," and "NO IMPORT" would not have gone ignored, b) the co-owner of the company only allowing USG drywall in his home would not have been ignored, and c) the nearly one hundred INEX customers to whom/which Chinese drywall was not allowed to be supplied would not have been ignored.

### 3.      Refusals and/or failures regarding quality control.

Although INEX held itself out as one of the largest drywall suppliers in the Gulf South, it has never had any person at all who was dedicated to the issues of quality control.[74]   INEX has produced no policies or procedures relating to quality control.   In sum, quality control at INEX was non-existent.

If INEX had any semblance of a quality control department or policy: a) the history of problems with contaminated and/or defective Chinese products would not have been ignored, b) the Chinese drywall at issue would have been inspected (during its production) and tested prior to its importation, c) the hundreds of INEX invoices showing a consistent pattern of issues with Chinese drywall would not have been ignored, and d) the industry recognitions of and warnings about Chinese drywall would not have been ignored.

The facts herein prove that INEX chose to turn a blind eye to obvious warnings and problems with respect to the Chinese drywall it imported and sold in the United States.   This is

---

[74] *Id.*

particularly relevant when considering that "[a] seller may not simply turn a blind eye to defects for the purpose of avoiding liability under redhibition."[75]   Because INEX "knew or should have know of a defect" in the Chinese drywall which it distributed, it is liable as a bad faith seller pursuant to La.C.C. art. 2545.

## IV.   CONCLUSION

For the aforementioned reasons,[76] Plaintiffs respectfully request that the Court grant their motion for partial summary judgment, holding that INEX is liable as a knowing seller pursuant to Louisiana Civil Code article 2545.

Respectfully submitted,

Dated: March 22, 2011

/s/ Leonard A. Davis
Russ M. Herman, Esquire
Leonard A. Davis, Esquire
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

---

[75]   *Meche v. Harvey, Inc.*, 664 So.2d 855, 859 (La.App. 3rd Cir. 1995).

[76]   Further evidence in support of the instant motion was established at the March 18, 2011 deposition of Mark Peterson and at the March 21, 2011 deposition of Rebecca Galleon.   Plaintiffs will provide a supplement to this memorandum once the final/certified versions of the aforementioned depositions have been received by the PSC.

Arnold Levin, Esq.
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail or hand delivery and e-mail upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this the ___22nd___ day of March, 2011.

Respectfully submitted,

*/s/Leonard A. Davis*
Leonard A. Davis
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, LA 70113
504.581.4892 Telephone
504.561.6024 Facsimile
ldavis@hhkc.com

24