# EXHIBIT C
# PART:III

Page 277

1  interior" --
2  A.  Pardon me. I'm sorry. I got
3  it.
4  Q.  I'm sorry.
5  A.  I got it now. Thank you.
6  Q.  I'm probably talking too fast
7  anyway.
8     -- "on the interior of the
9  houses noted above," I guess. "The greatest
10  impact is on the copper coils in the
11  air-handling units. We have narrowed the
12  cause down to sheetrock."
13     Is that consistent with the
14  complaints that Interior/Exterior has
15  received thus far?
16  A.  It is consistent that the coils
17  in houses or...
18  Q.  That there's been problems with
19  the coils that has been caused by the
20  sheetrock?
21  A.  We've heard that. I couldn't
22  tell you the consistency of it. I don't
23  know. But most definitely, we have heard
24  that --

Page 278

1  Q.  Okay. Outside of --
2  A.  -- on numerous occasions.
3  Q.  Outside of what your lawyers
4  may have done that may be privileged, has
5  Interior/Exterior conducted its own
6  investigation of any kind that has produced
7  evidence that's inconsistent with the fact
8  that sheetrock causes problems with
9  air-conditioning coils?
10  A.  We have not done any testing in
11  that regard.
12  Q.  Okay. And you see where
13  Mr. Allen says, "The potential impact of this
14  issue for all involved is catastrophic"?
15  A.  Yes, I do.
16  Q.  And what, if anything, did
17  Interior/Exterior do in response to this
18  information?
19  A.  Well, that was at the same time
20  we were contacting Knauf to get their
21  assistance in this.
22  Q.  And if you look at the first
23  page, which is 34599, you have
24  kurt.heider@us.knaufinsulation.com. That's

Page 279

1  the person you referred to before?
2  A.  Yes. He is the local sales
3  rep.
4  Q.  And Jeff Brisley is the same
5  Knauf USA guy that you referred to before?
6  A.  That is correct.
7     MR. HERMAN: Okay. I don't
8  have any other questions right now,
9  but my comrade in arms from the PSC,
10  Jim Reeves, has some. I don't know if
11  you want Jim or Clay.
12     MR. REEVES: Probably, it would
13  be more on the Knauf side of
14  questions. That would be Clay,
15  wouldn't it?
16     MR. DUPLANTIER: Let's take a
17  five-minute break.
18     THE VIDEOGRAPHER: We're off
19  the record at 2:13 p.m.
20     (Recess taken, 2:13 p.m. to
21  2:22 p.m.)
22     THE VIDEOGRAPHER: We're back
23  on record. The time is 2:22 p.m.
24     ///

Page 280

1     CLAYTON C. GEARY,
2  having been first duly sworn, testified as
3  follows:
4     EXAMINATION
5  BY MR. REEVES:
6  Q.  Good afternoon, Mr. Geary. My
7  name is Jim Reeves. I'm a member of the PSC.
8  Glad to meet you. I'm going to have some
9  follow-up questions. I'm going to try not to
10  repeat what Mr. Herman has already asked, but
11  I do have a couple follow-ups on some
12  exhibits that were identified.
13     First of all, looking at
14  Exhibit 35 and 38, 35 lists the different
15  offices that Interior/Exterior had in 2006;
16  is that correct?
17  A.  Yes, sir.
18  Q.  I saw some additional
19  addresses, I thought, on some of the
20  letterhead, including a Tuscaloosa branch.
21  Did you have a Tuscaloosa branch as well?
22  A.  Not at that time. The
23  Lafayette branch would have been next branch
24  after Foley, and it did not get any Chinese

Chinese Drywall MDL        Confidential – Subject to Further Confidentiality Review        Clayton & James Geary
February 5, 2010

Page 281

1   drywall.
2   Q.  The --
3   A.  Lafayette branch.
4   Q.  Lafayette did not?
5   A.  Did not.  And that was the next
6   branch that we opened after Foley.
7   Q.  Help me out here, because I
8   know you've said several times -- my
9   understanding is, the documents indicate when
10  drywall was delivered and where?
11  A.  Uh-huh.
12  Q.  But in some instances, you seem
13  to be sure that no Chinese drywall was
14  delivered to a particular location.  How do
15  you know that?
16  A.  From a transfer in our system.
17  Q.  All right.  Explain that to me.
18  A.  Well, those transfer numbers
19  that we went through on that exhibit earlier,
20  it shows a transfer number; and it shows that
21  it went from, say, the port to Baton Rouge, I
22  think is the one we were discussing.  So
23  we --
24      MR. DUPLANTIER: You're

Page 282

1   referring to Exhibit 36.
2       MR. REEVES: Yeah, I remember.
3   Thanks.
4   A.  And there were no transfers to
5   Lafayette.
6       BY MR. REEVES:
7   Q.  Okay.  So, as I understand it,
8   in some instances, you can verify that
9   Chinese drywall was not sent to a particular
10  location and in others, you know that 1/2"
11  12-foot board was delivered, but it may be
12  domestic or may be Chinese; is that fair?
13  A.  I'm sorry, repeat that.
14      MR. REEVES: Can you repeat
15  that?
16      (The following portion of the
17  record was read.)
18      "QUESTION: So, as I understand
19  it, in some instances, you can verify
20  that Chinese drywall was not sent to a
21  particular location and in others, you
22  know that 1/2" 12-foot board was
23  delivered, but it may be domestic or
24  may be Chinese; is that fair?

Page 283

1   A.  I think I need you to rephrase
2   that.
3       BY MR. REEVES:
4   Q.  Well, let me ask you this:  Can
5   you tell me everywhere that you sent Chinese
6   drywall?
7   A.  No.
8   Q.  Why not?
9   A.  Because it's one product code,
10  whether it was domestic or imported.
11  Q.  But in some locations, you can
12  tell me that you didn't send Chinese drywall;
13  is that correct?
14  A.  Tell you that I didn't send?
15  Q.  You just told me you didn't
16  send any to Lafayette.
17  A.  Oh, I can -- yes.  I'm sorry.
18  We can look in the system and see if we had a
19  transfer from the wharf to Lafayette, and we
20  did not.
21  Q.  Okay.  And if you did have that
22  transfer, that would tell you what?
23  A.  That we had shipped it to our
24  branch in Lafayette, not to a specific

Page 284

1   customer.
2   Q.  "It" being the Chinese drywall?
3   A.  Yes.
4   Q.  All right.  The Tuscaloosa
5   branch opened when?
6   A.  I don't know the exact date and
7   time.
8   Q.  Was the Chinese drywall shipped
9   to Tuscaloosa?
10  A.  Not to our branch, no.
11  Q.  Anywhere else in Tuscaloosa?
12  A.  I don't know.  I'd have to look
13  at the invoices.
14  Q.  Let me ask you a little bit
15  about the invoices.  Who prepares those, or
16  who prepared them in '06 through '08?
17  A.  Well, it's pretty much done by
18  the salesman.  The salesman will take an
19  order and put the information in, then it's
20  invoiced.  But the salesman does most of the,
21  you know, writing-up of the order.
22  Q.  So a typical transaction,
23  somebody would either come or call in, order
24  a certain amount of drywall, talk to a

Chinese Drywall MDL          Confidential – Subject to Further Confidentiality Review          Clayton & James Geary
February 5, 2010

Page 285

1  salesman, he would type up or put in the
2  invoice, correct?
3  A.  Correct.
4  Q.  The invoice would then tell the
5  next person in line where to send the drywall
6  and how much to charge; is that --
7  A.  Well, no, he would put the
8  price in.
9  Q.  Okay.
10  A.  So he would put the price.  He
11  would put the quantity.  He would put ship
12  to, where it's going to go.  He would put the
13  sales taxes.  And really, then, it goes out
14  into the warehouse, gets delivered, gets
15  back; and then it's invoiced, really, at that
16  point.
17  Q.  All right.  In terms of the
18  structure, I'm going to take, for instance,
19  the Gulfport office.  I'm based in Biloxi.
20  You've got a branch manager listed as Chip
21  Williams.  Is he still with the company?
22  A.  Yes, he is.
23  Q.  Is he still a branch manager?
24  A.  Yes, he is.

Page 287

1  A.  He is not.
2  Q.  Where is he now?
3  A.  He is with a steel stud
4  manufacturer in Houston.
5  Q.  If we wanted to get his
6  last-known address, where would you look to,
7  if I asked you to do that?
8  A.  We have his phone number.  We
9  could get it for you.
10  Q.  All right.  Beu Diano in
11  Mandeville, is he still with the company?
12  A.  Still there.
13  Q.  He is?
14  A.  Yes.
15  Q.  Bobby Freedman?
16  A.  No longer with the company.
17  Q.  When did he leave?
18  A.  A few months ago.
19  Q.  Where is he now?
20  A.  Don't know.  He's in
21  Birmingham, but I don't know who he's working
22  for.
23  Q.  In the Birmingham area?
24  A.  He's in the Birmingham area,

Page 286

1  Q.  Where at?
2  A.  In Gulfport.
3  Q.  Still in Gulfport?
4  A.  Uh-huh.
5  Q.  Would he have a sales team
6  working under him, or would he be the primary
7  person to generate these invoices?
8  A.  A typical branch has a branch
9  manager, any number of inside salespeople, a
10  couple of outside salespeople, then probably
11  a warehouse manager, warehousemen, and then
12  drivers and laborers.
13  Q.  Salespeople work on commission?
14  A.  Commission along with salary.
15  Q.  I want to ask you on some of
16  these other names if these people are still
17  with the company.
18  Charles Gray is listed as the
19  Foley branch manager.  Is he still with --
20  A.  That should be Charles Gay, and
21  yes, he's still there.
22  Q.  Still in the same capacity?
23  A.  Yes.
24  Q.  Gary Hymel in Houston?

Page 288

1  yes, sir.
2  Q.  Why did he leave?
3  A.  He was dismissed.
4  Q.  Why?
5  MR. DUPLANTIER: I'm going to
6  object to the form of the question.
7  That's actually a privilege
8  information.  It's also outside the
9  scope of the 30(b)(6) notice.  It has
10  nothing to do with this litigation,
11  but it's privileged for other reasons.
12  MR. REEVES: I guess that
13  depends on why he was fired.  So are
14  you instructing him not to answer?
15  MR. DUPLANTIER: Yeah, I am.
16  It's also outside the scope of the
17  notice, so...
18  MR. REEVES: Well, we don't
19  agree.  We'll take it up, if we deem
20  it necessary.
21  MR. DUPLANTIER: That's fine.
22  MR. REEVES: Okay.
23  BY MR. REEVES:
24  Q.  So Mr. Friedman is no longer

Chinese Drywall MDL          Confidential – Subject to Further Confidentiality Review          Clayton & James Geary
February 5, 2010

Page 289

1  with the company as of a few months ago?
2  A.  Yes.
3  Q.  Jim Green in Mobile, is he
4  still --
5  A.  Still with the company.
6  Q.  Still in the same capacity?
7  A.  Yes.
8  Q.  Bill Tarleton?
9  A.  No longer with the company.
10  Q.  When did he leave?
11  A.  I don't recall.
12  Q.  Where is he now?
13  A.  I don't know.
14  Q.  Why did he leave?
15  A.  He resigned.
16  Q.  Why?
17  A.  We had a personnel issue that
18  we confronted him on, and he -- he basically
19  said, "I'm not enjoying what I'm doing
20  anymore.  I think it would better for me to
21  go."
22  Q.  All right.  I'll ask you the
23  same question with regard to Robert McCay:
24  Is he still with the company?

Page 290

1  A.  Yes, he is.
2  Q.  In the same capacity?
3  A.  Yes.
4  Q.  And in terms of all these
5  individuals, your personnel records would
6  have their last-known address and phone
7  number?
8  A.  Yes.
9  Q.  Who is Mark Peterson?
10  A.  Mark Peterson is a warehouseman
11  in New Orleans.
12  Q.  Is he still with the company?
13  A.  Yes, he is.
14  Q.  Same capacity?
15  A.  Yes.
16  Q.  What's your current address,
17  Mr. Geary?
18  A.  My current address?
19  Q.  Yes.
20  A.  450 Fairway Drive.
21  Q.  Okay.  Let me ask you a little
22  bit about Bailey's Lumber.  They appear to be
23  a fairly large customer back in the '06
24  to '08 time period; is that fair?

Page 291

1  A.  Yes.
2  Q.  Do you have any primary
3  contacts over at Bailey's?
4  A.  My branch manager, Chip
5  Williams, deals primarily with them; but yes,
6  we have some contacts over there.
7  Q.  Mr. Kostal, Robert Kostal?
8  A.  Richard Kostal.
9  Q.  Richard Kostal.  I'm sorry.
10  Anyone else?
11  A.  Steve Braun, I think it is.
12  Q.  Right.
13  Would those be the two people,
14  primarily, that you would have dealt with or
15  your company would have dealt with during
16  this time?
17  A.  Well, they are more the
18  management.  Typically, what happened is a
19  salesman from Bailey would call my guy and
20  say, "Please make this delivery."
21  Q.  Okay.  Which brings me to sort
22  of my next question.  You did the same thing
23  with Bailey's, did you not, that you
24  described earlier with Lowe's and Home Depot,

Page 292

1  and that is a drop shipment method of
2  delivery?
3  A.  Yeah, where they would place
4  the order with us, we would bill them, and
5  they would bill the customer.
6  Q.  Just so it's clear as to how
7  that would work, a customer would come into
8  Bailey's, a builder or somebody who wanted
9  some drywall, they would place an order,
10  Bailey's --
11  A.  Well, actually, it would be,
12  you know, they would be building a house,
13  probably, and so they would have the
14  whole package --
15  MR. DUPLANTIER: Let him ask
16  his question.
17  THE WITNESS: I'm sorry.
18  MR. REEVES: That's okay.
19  BY MR. REEVES:
20  Q.  So they'd come in and they
21  would -- for instance, with the sheetrock, if
22  they wanted sheetrock, they would ask
23  Bailey's, I guess, for the rock.
24  Bailey's would, in

Page 293

1  circumstances where they dealt with y'all,
2  pick up the phone or otherwise contact you
3  and say, "You need to deliver x amount of a
4  certain kind of sheetrock to a work site."
5  Is that how it worked?
6  A.  Yes.  Yes, sir.
7  Q.  Okay.  And then would it be a
8  paper trail generated, or would that be a
9  telephone call from Bailey's?
10  A.  Usually a telephone call.
11  Q.  Okay.  Who would be the person
12  at Bailey's that would be making those calls
13  during the '06 to '08 time period?
14  A.  I think it would be various
15  salesmen.
16  Q.  Same thing; salesmen on that
17  end?
18  A.  Yeah.
19  Q.  Who would they contact on your
20  end during that time period?
21  A.  Various salespeople on our end.
22  Q.  All right.  And then you would
23  actually -- in many instances, then, your
24  company would deliver that rock to that site?

Page 294

1  A.  Yes.
2  Q.  Okay.  And then Bailey's would
3  presumably bill the customer?
4  A.  Correct.
5  Q.  You would bill Bailey's?
6  A.  Yes.
7  Q.  All right.  And that's the same
8  sort of -- I've used -- I've seen the term
9  "drop ship."  Is that what's used to describe
10  that?
11  A.  No.  A drop ship would normally
12  be more of a direct shipment of product,
13  where we just send a truck and it's unloaded
14  there.  This is more we have a boom truck and
15  labor and go stock the house, for instance.
16  Q.  Okay.  And that's the way you
17  would generally deal with Bailey's, Lowe's,
18  Home Depot?
19  A.  Most -- yes.
20  Q.  Would you deal with 84 Lumber
21  in the same manner?
22  A.  Yes.
23  Q.  In those instances, would
24  the -- the product, then, would never

Page 295

1  actually be in Bailey's possession; is that
2  correct?
3  A.  It would not usually go to
4  Bailey's facility.  It would go straight to
5  the house.
6  Q.  Looking at Exhibit 38,
7  Bates-stamp page 17768, this is the invoice
8  for Creola Ace Hardware that you discussed
9  earlier.  It's listed as "drop ship."  Do you
10  see that in the middle of the page?
11  A.  Yes.
12  Q.  Just so I'm clear, what is
13  that -- what procedure is that describing?
14  A.  It could mean a couple of
15  things.  It appears to be -- it appears to be
16  an 18-wheeler, because it's 612 pieces, which
17  is a full 18-wheeler.  So my guess would be
18  is that this came straight from a domestic
19  manufacturer and went straight to the
20  jobsite.
21  Q.  Let me ask you in terms of your
22  situation with Bailey's.  Isn't it true that
23  at some point, you actually warehoused some
24  of Bailey's sheetrock in one of your

Page 296

1  facilities?
2  A.  I don't recall that.
3  Q.  Just don't recall, one way or
4  another --
5  A.  No.
6  Q.  -- or you deny doing it?
7  A.  I don't recall it.
8  Q.  Okay.
9  A.  It may have happened.  I don't
10  recall it.
11  Q.  You have a warehouse in the
12  Gulfport area?
13  A.  Yes, we do.
14  Q.  All right.  A large warehouse?
15  A.  I'm trying to remember the
16  footage.  Maybe 20,000 feet or so.
17  Q.  All right.  And I've seen some
18  e-mails about other warehouse facilities that
19  you have.  Where else did you have warehouse
20  facilities in the '06 to '08 time period?
21  A.  In that time frame, we were in
22  New Orleans, Baton Rouge, Mobile, Birmingham,
23  Gulfport, Mandeville, Houston, Foley.  And,
24  as I said, we brought Lafayette on right at

Page 297

1  the tail end, but they did not get any
2  imported board.
3  Q.  Okay.  Did Bailey's, during
4  this time period, sell you any domestic or
5  imported drywall?
6  A.  I think they may have sold us
7  some domestic.  What was happening was
8  everybody was on allocation from their
9  manufacturers, and so I think Bailey's may
10  have sold us some domestic, but I can't swear
11  to it.
12  Q.  What would you need to look to
13  to verify that?
14  A.  I would have to -- I guess I
15  would go look in our purchase orders and pull
16  up "Bailey Lumber" and see if they sold us
17  any 4x12x1/2" regular sheetrock.
18  Q.  We haven't talked much about
19  your corporate structure.  How were you set
20  up, legally speaking, in '06 to '08 time
21  period?
22  A.  Limited partnership.
23  Q.  All right.  And describe for me
24  the members of the partnership.

Page 299

1  organization.  Jim and I pretty much -- I
2  guess you'd kind of consider us partners.
3  We're kind of interchangeable.  Below us, we
4  have functional managers and then branch
5  managers, and they report directly to us.
6  Q.  We went through the branch
7  managers, right?
8  A.  Uh-huh.
9  Q.  And the functional managers --
10  A.  We have accounting, human
11  resources, purchasing, credit.  Those type of
12  things.
13  Q.  Who is in charge of human
14  resources now?
15  A.  Now?
16  Q.  Yes.
17  A.  Jim McLaughlin.
18  Q.  What about in '06 to '08 time
19  period?
20  A.  Oh, we had a lady who was with
21  us in '05.  She's passed away; Tina Gorman, I
22  believe her name was.  And then Deana Eister
23  was with us for a period of time.  And I
24  can't remember when Jill came on.

Page 298

1  A.  Well, the general partner is
2  Interior/Exterior Enterprises, and the
3  limited partner is South Cortez, LLC.
4  Q.  And you and your brother are
5  members of both?
6  A.  We are both members of the
7  general partnership.
8  Q.  Anybody else a member of
9  either?
10  A.  My two siblings -- other two
11  siblings are members of the general
12  partnership.
13  Q.  And who are they?
14  A.  Jeff and Sid Geary.
15  Q.  All right.  And that's true
16  today, as well as in the '06 to '08 time
17  period?
18  A.  Yes.  Yes.
19  Q.  In terms of your structure, who
20  would report to you with regard to sales?  If
21  we were looking at a flowchart from you down
22  to who directed sales, who would be the next
23  person in line?
24  A.  It's a pretty flat

Page 300

1  Q.  Did you have anybody in charge
2  of customer or contractor complaints and/or
3  quality control?
4  A.  No.
5  Q.  Do you have anybody that
6  handles those jobs today?
7  A.  No.
8  Q.  Is there a procedure in place
9  for handling contractor or customer
10  complaints?
11  A.  Yeah.  Usually if we get a --
12  you know, a salesman or manager gets a call,
13  he'll call the manufacturer rep, and the rep
14  will come out to the job and try and resolve
15  the problem.
16  Q.  Okay.  So the typical way you
17  would receive a complaint, I guess, with
18  regard to any product, would be somebody
19  calling in and complaining about what they
20  received?
21  A.  From a customer, yeah.
22  Q.  Right.
23      And they would typically talk
24  to a salesperson?

Page 301

1 A. A salesperson, yes.
2 Q. And the salesperson would go
3 out with who?
4 A. He would call the
5 manufacturer's rep, and either the
6 manufacturer's rep would go out or he'd go
7 out with them.
8 Q. Would there be a written
9 document or file set up with regard to the
10 complaint?
11 A. I guess it would depend. The
12 manufacturer would do that, not us. But the
13 manufacturer would document any problems that
14 they have and replace the material or
15 whatever.
16 Q. Well, I was asking specifically
17 with regard to Interior/Exterior. Did you
18 have any procedure --
19 A. No formal procedure.
20 Q. Okay. And so it wouldn't
21 necessarily be a file with a complaint?
22 A. No.
23 Q. Wouldn't necessarily be
24 electronic -- electronically stored anywhere,

Page 302

1 any history of a complaint --
2 A. No.
3 Q. -- is that correct?
4 A. No.
5 Q. Still the same today?
6 A. Yes.
7 Q. It's my understanding that
8 during this time period, you -- I think you
9 went through the various types of drywall
10 that y'all were selling: several domestic,
11 then these Chinese that we're talking about.
12 And I've seen some different abbreviations in
13 the documents.
14    "USG" would be?
15 A. United States Gypsum, probably.
16 Q. United States Gypsum.
17    And if we're talking about gyp
18 board, that would be gypsum as well?
19 A. "Gyp board" would just be a
20 generic term, like "drywall."
21 Q. Okay. There seemed to be some
22 discussion in the documents about competition
23 for product during this time period, that
24 there wasn't enough to go around, at least

Page 303

1 for part of this time, right?
2 A. Yes.
3 Q. Who were some of your
4 competitors who were also trying to get rock?
5 A. I'm sure everybody was.
6    MR. DUPLANTIER: Just object to
7 the form of the question. But you can
8 answer it.
9 A. I'm sure everyone was.
10    BY MR. REEVES:
11 Q. You have primary competitors in
12 your field?
13 A. In different markets, there are
14 different competitors.
15 Q. Who would some of those be?
16 A. In the New Orleans market?
17 Q. Sure.
18 A. Seacoast Supply, metal studs;
19 Acoustical Ceiling Supply; and then to a
20 certain degree, we compete with the Lowe's
21 and Home Depots and so forth.
22 Q. What about on the Mississippi
23 Gulf Coast, who would you consider your
24 primary competitors during this time period?

Page 304

1 A. Let's see. I'm trying to
2 remember the name. They just closed the
3 door. We competed with Seacoast Supply, out
4 of Mobile. We competed with Renfro, out of
5 Jackson, Mississippi. The company that
6 closed down, and I can't recall their name.
7 Just Rite. Just Rite Supply, that's what it
8 was.
9 Q. When -- it was a little unclear
10 to me: When did you last sell Chinese
11 drywall?
12 A. Well, we don't know, exactly.
13 We feel like it was the end of 2006. We
14 produced documents through the first quarter
15 of 2007, you know, to be as safe as we could.
16 And there were an additional 23 invoices that
17 we identified that were after March 31st, and
18 I think they ended in May of '07.
19 Q. That were after March 31st
20 of '07?
21 A. Yes, and they were -- I thiuk
22 they went until May of '07.
23 Q. And that includes Knauf,
24 obviously?

Page 305

1 A.  Yes.
2 Q.  How were you able to estimate
3 when you last sold the Chinese drywall?
4 A.  Talking to our managers, and I
5 guess we could look and see -- well, really,
6 I guess it would just be -- we discussed it
7 with our managers, and our recollection,
8 mainly.
9 Q.  Who were the managers you
10 discussed it with?
11 A.  Probably Mandeville,
12 New Orleans, Gulfport.
13 Q.  You're talking about the branch
14 managers?
15 A.  The branch managers, yeah.
16 Yeah.
17 Q.  Okay.  So tell me how that
18 happened.  You basically -- you or your
19 brother, or both of y'all, called them or had
20 a conference and tried to figure out when it
21 was last sold?
22 A.  Yes.
23 Q.  Was it face-to-face or a
24 telephone call?

Page 306

1 A.  Telephone call.
2 Q.  Did everybody participate at
3 once, or did you just make the rounds
4 calling?
5 A.  No, I think we just made
6 various calls.
7 Q.  Create any notes with regard to
8 those conversations?
9 A.  No.
10 Q.  Just remembered it all?
11 A.  Yeah.
12 Q.  There's been a lot of
13 conversation about the Crescent City Gypsum
14 we talked about earlier.
15 When did you first hear that
16 name?
17 A.  I'd, frankly, forgotten about
18 it until I went and reviewed these documents
19 and I saw that document.  Sometime during the
20 whole process when we were trying to acquire
21 gyp board.
22 Q.  And your company has not issued
23 any type of notices or warning to customers
24 who bought the drywall, have they?

Page 307

1 A.  No.
2 Q.  Just some names that popped out
3 in the documents and I'm not sure if we've
4 covered them all.  I want to see if you can
5 tell me who they are.
6 Rudy Remont, does that name
7 ring a bell?
8 A.  Rudy Remont worked for
9 J.W. Allen, which was the freight forwarder.
10 Q.  Is he still with them?
11 A.  I don't think so.
12 Q.  Do you know what happened to
13 him?
14 A.  I think he just retired, but
15 I'm not positive.
16 Q.  What did he do for J.W. Allen,
17 do you know?
18 A.  I don't know exactly.  For us,
19 he did a lot of -- he went over to China and
20 inspected the product as it was going onto
21 the ships and so forth.  I'm not sure what
22 his day-to-day duties were.
23 Q.  The inspections you talked
24 about earlier with my colleague, Mr. Herman?

Page 308

1 A.  Yes.  Yes.
2 Q.  Jerry Becnel, who is he?
3 A.  Jerry Becnel handled kiud of
4 the logistics of the trucks for J.W. Allen,
5 so he helped coordinate, you know, the trucks
6 as they went off the wharf to our branches.
7 Q.  So he was a J.W. Allen
8 employee?
9 A.  Yes, he was.
10 Q.  Is he still with them?
11 A.  I don't know.
12 Q.  David Zhang?
13 A.  I don't recall David Zhang.
14 Q.  Ring a bell?
15 A.  No.
16 Q.  Jeffrey Zeng?
17 A.  I don't recall him either.
18 Q.  Susan Li, L-I?
19 A.  Susan Li was with Weida
20 Freight.  And a lot of correspondence back
21 and forth.  She had -- we were trying to --
22 she was the one that had a little contention
23 with Knauf, I think, for a while, as far as
24 the logistics of getting the ships and so

Page 309

1  forth.
2  Q.   What did Weida Freight do for
3  you?
4  A.   Weida Freight was really
5  J.W. Allen's contact in China, and they made
6  a contact at BNBM for us.  They did some of
7  the inspectious, I think, of the products as
8  it was going onto the ships also.
9  Q.   Cecil -- Cecilia Wang?
10  A.   Cecilia Wang was -- Mark Norris
11  made the call.  You know, he was the -- I
12  guess the manager, because he would make the
13  decision, and then she was kind of logistics.
14  Q.   Manager of?
15  A.   Mark?
16  Q.   Yeah.
17  A.   I don't know.  I'm not sure --
18  Q.   What company was he with?
19  A.   Knauf --
20  Q.   Knauf?
21  A.   -- in China.
22  Q.   And then David Alexander?
23  A.   I don't remember that name.
24  Q.   Barry Topple?

Page 310

1  A.   Barry Topple was with Knauf.
2  When we tried to get more board from Knauf,
3  from Jeff Brisley, he, I guess, went up the
4  ladder to Barry Topple to see if Barry could
5  help him.
6  Q.   Carlos Cisneros?
7  A.   I can't remember who that is.
8  Q.   Has Interior/Exterior been
9  involved in any remediation of any properties
10  that have had the Chinese drywall problem?
11  A.   No.
12  Q.   And I was a little unclear:  In
13  terms of the inspections that were being
14  done, when people would call in with the
15  problem, they were referred to Knauf to be
16  handled; is that right?
17      MR. SANDERS: Object to the
18  form.
19  A.   Yes.
20      BY MR. REEVES:
21  Q.   And I was unclear: Did someone
22  from your company accompany the people with
23  Knauf out to these inspections of these
24  properties?

Page 311

1  A.   Did we accompany?
2  Q.   Yeah.
3  A.   To do the inspections?  No.  I
4  think one or two of my guys may have gone to
5  a couple of the houses with them, but not on
6  a regular basis, no.
7  Q.   But they've been to some.  Who
8  would have went?
9  A.   I believe Ben Diano went to
10  one.
11  Q.   Do you know what property?
12  A.   No, I don't.
13  Q.   And Ben is still with the
14  company?
15  A.   Yes, he is.
16  Q.   Who else went on these
17  inspections?
18  A.   I don't know if anybody else
19  did.
20  Q.   I want to talk a little bit
21  about insurance.  Y'all have identified a
22  number of policies in your profile form.
23      Have you been told by any of
24  your insurance companies that you may not

Page 312

1  have coverage for these claims?
2      MR. DUPLANTIER: I'm going to
3  object to the form of the question.
4  I'm going to instruct the witness not
5  to answer that question.
6      MR. REEVES: I just asking
7  about communication with his insurance
8  company.
9      MR. DUPLANTIER: I understand
10  that, but to the extent that those --
11  those communications occurred in
12  anticipation of litigation or as a
13  result of litigation or occurred with
14  lawyers, I'm instructing the witness
15  not to answer.  I think you're asking
16  for information that's both privileged
17  and irrelevant to this proceeding.
18      MR. REEVES: Well, we'll
19  disagree; and if we have to address
20  that later, we will.  Okay.
21      BY MR. REEVES:
22  Q.   What types of warranties, if
23  any, did Interior/Exterior provide to those
24  who purchased Chinese drywall from them?

Page 313

1 A. We did not --
2    MR. DUPLANTIER: Object to the
3 form of the question. You can answer.
4 Go ahead.
5 A. We did not provide any
6 warranties.
7    BY MR. REEVES:
8 Q. Okay. Let me make sure I just
9 kind of understand a few things from a
10 big-picture standpoint.
11    The first shipment that y'all
12 actually received of Chinese drywall was in
13 January of '06; is that right?
14 A. Yes.
15 Q. And based upon your best
16 estimation in talking to your branch
17 managers, you sold through the end of that
18 year, maybe early into '07; is that your
19 testimony?
20 A. Yes.
21 Q. And I think we've confirmed
22 that you didn't have in place during this
23 time any sort of official complaint procedure
24 or policy to document complaints; is that

Page 314

1 correct?
2 A. That's correct.
3 Q. You had no certain person that
4 was designated as the contact person for
5 anybody who may have had a complaint with a
6 product you sold them; is that right?
7 A. That's correct.
8 Q. And I understand your testimony
9 is the first inclination or knowledge that
10 Interior/Exterior knew where they knew that
11 Chinese drywall was a problem was in January
12 of '08, or was that...
13    MR. DUPLANTIER: I'm going to
14 object to the form of his question.
15 That's not his testimony.
16    MR. REEVES: Okay.
17    BY MR. REEVES:
18 Q. Tell me when it is.
19 A. The first notice that we had
20 was we got an e-mail that's -- I think it was
21 January 12th from someone saying -- a Wall
22 Street Journal article, I believe it was, was
23 January 12th of '09.
24 Q. Of '09?

Page 315

1 A. Yeah.
2 Q. Okay. You'd agree with me,
3 sir, as a seller of these products, that if
4 you become aware or if you have a lot of
5 complaints about a product that you're
6 selling, you ought to look into that, don't
7 you? You agree with that?
8 A. Yes.
9 Q. That's just common sense,
10 right?
11 A. Yes.
12 Q. So if you're getting systematic
13 complaints of people saying that a product is
14 inferior, that's something that a responsible
15 seller of the product ought to look into;
16 you'd agree?
17    MR. DUPLANTIER: Object to the
18 form of the question. You can answer
19 it.
20 A. Yes.
21    BY MR. REEVES:
22 Q. Okay. And you would certainly
23 agree with this, sir, that you shouldn't
24 continue to sell a product if you suspect

Page 316

1 it's unsafe or is an inferior product. You
2 would agree with that, wouldn't you?
3 A. Yes.
4 Q. And I think I heard you testify
5 earlier that, basically, in your estimation,
6 I'm paraphrasing here, that drywall was --
7 was sort of drywall and there was no
8 significant difference between any of it; is
9 that fair?
10 A. Correct.
11 Q. But, sir, isn't it true that as
12 early as February and March of '06, you began
13 to get specific requests from builders who
14 routinely did business with you that they
15 didn't want to use the Knauf wall; isn't that
16 true?
17 A. We have requests -- preference
18 requests all the time. I mean, some people
19 wanted USG. Some people want National. Some
20 people wanted --
21    MR. McKENNA: I'm sorry, I
22 can't hear the answer at all.
23 A. We always have preference
24 requests, one vendor versus another, one

Page 317

1 manufacturer versus another. So some people
2 preferred domestic; some people didn't.
3    BY MR. REEVES:
4 Q. Well, some people specifically
5 didn't specify anything, other than they
6 didn't want Knauf, didn't they?
7 A. There may have been someone who
8 did that. I don't recall that.
9 Q. There were several people that
10 did that, weren't there?
11 A. I don't recall that.
12 Q. Okay. Well, if it's in the
13 documents, you wouldn't dispute that, would
14 you? In the invoices?
15 A. Correct.
16 Q. Okay. In fact, they didn't
17 want the Knauf product because they reported
18 to your company that it was an inferior
19 product, didn't they?
20    MR. SANDERS: Object to form.
21 A. I don't recall anyone reporting
22 to us that it was an inferior product.
23    BY MR. REEVES:
24 Q. I'm going to mark --

Page 318

1    MR. REEVES: What are we up to,
2 Court Reporter?
3    (Whereupon, Deposition Exhibit
4 INEX-30b6-74, Interior/Exterior
5 Invoices, INT/EXT27357, INT/EXT28739,
6 INT/EXT28746, INT/EXT27312,
7 INT/EXT27316, was marked for
8 identification.)
9    BY MR. REEVES:
10 Q. All right. Sir, what's been
11 attached as Exhibit 74 to your deposition are
12 documents produced by Interior/Exterior,
13 27357, 28739, 28746, 27312, 27316; and those
14 are invoices, aren't they, sir?
15 A. Yes, they are.
16 Q. And the first one is dated
17 2/23/06, isn't it?
18 A. Invoice date, 2/28/06?
19 Q. Yes. I'm sorry. You're right.
20 2/28/06; is that correct?
21 A. Yes.
22 Q. So that's the date that the
23 invoice would have been generated?
24 A. Yes.

Page 319

1 Q. And this is roughly a month
2 after your first purchase of Chinese drywall;
3 is that correct?
4 A. Yes.
5 Q. And this is shipping to Rivers
6 Edge in Richmond, Texas, correct?
7 A. Yes, it is.
8 Q. Billing to Aurora Commercial
9 Construction, Inc. in Crosby, Texas; isn't
10 that correct?
11 A. Yes.
12 Q. And in the description, where
13 it says, "Product and Description," I'm going
14 to read this, and make sure I read it
15 correctly, sir. It says, "No Knauf, no
16 Knauf, no Knauf, no Knauf, no Knauf, no
17 Knauf," doesn't it?
18 A. Yes.
19 Q. So this is a person, within a
20 month after your receipt of Chinese drywall,
21 specifying that they don't want the Knauf
22 product, correct?
23 A. Correct.
24 Q. And isn't it true, sir, that

Page 320

1 they didn't want the Knauf product because
2 they told you it was an inferior product?
3 Isn't that true?
4    MR. SANDERS: Object to form.
5 A. I'm not aware of that.
6    BY MR. REEVES:
7 Q. Do you know the persons at
8 Aurora Commercial?
9 A. I don't know them personally.
10 Q. Are they -- they've done a
11 significant amount of business with you over
12 the years, haven't they?
13 A. I'm not sure what their sales
14 figures are.
15 Q. Would they have any reasou to
16 tell anything other than the truth here in
17 this case?
18 A. I don't know why not.
19 Q. Well, if they say that they
20 advised you they didn't want Knauf because it
21 wasn't a good product, you wouldn't dispute
22 that, then?
23 A. I can't dispute what they have
24 to say. I haven't heard what they had to

Page 321

1  say.
2  Q.  Okay.  What we know is, though,
3  that Interior/Exterior didn't have any method
4  to document whatever the complaints were or
5  the reason they didn't want Knauf, right?
6  A.  That's correct.
7  Q.  So if they had made complaints
8  and specified what the problems were, we
9  couldn't look to any document to find that
10  out because none were supposed to be kept,
11  necessarily; isn't that right?
12  A.  None were kept.
13      MR. DUPLANTIER: Object to the
14  form of the question.  You can answer.
15      BY MR. REEVES:
16  Q.  Okay.  Let's go to the next
17  page of the document.  That's an invoice
18  dated 3/14/06, correct?
19  A.  Yes.
20  Q.  And this is a -- would have
21  been the date the invoice was generated,
22  right?
23  A.  3/14/06.
24  Q.  And generated just the way we

Page 323

1  Knauf, no Knauf," correct?
2  A.  Correct.
3  Q.  Who generated these two
4  invoices?  Can you look at them and tell me?
5  A.  Yeah, that would probably be
6  Terri Collura.  "TYC," I think, is her
7  initials.
8  Q.  Is he still with the company,
9  or she?
10  A.  It's a she; and yes, she is.
11  Q.  Where does she work?
12  A.  Excuse me?
13  Q.  And she works here in
14  New Orleans?
15  A.  No.  Actually, she works in
16  Shreveport now.
17  Q.  And what is her job title?
18  A.  Inside sales.
19  Q.  Let's go to the next page of
20  this exhibit, Exhibit 74.  And it's dated
21  3/14/06 as well, correct?
22  A.  Yes.
23  Q.  And this is also from Titan for
24  delivery to another site, correct?

Page 322

1  talked about earlier, correct?
2  A.  Uh-huh.
3  Q.  And this says, "Ship To:  Glen
4  Abbey subdivision in Houston, Texas,"
5  correct?
6  A.  Yes.
7  Q.  And it says, "Bill To:  Titan
8  Drywall, Inc.," correct?
9  A.  "Bill To:  Titan," yes.
10  Q.  And this, again, is two months,
11  or maybe a month and a half, after you first
12  started selling Chinese drywall, correct?
13  A.  Yes.
14  Q.  And this is a different builder
15  than -- saying -- different builder than the
16  builder on the earlier page that said they
17  didn't want Knauf, right?
18  A.  Yes.
19  Q.  But these people don't want
20  Knauf either, correct?
21  A.  That's correct.
22  Q.  In fact, at the bottom, make
23  sure I read it correctly, it says, "Load only
24  American Board.  No Knauf, no Knauf, no

Page 324

1  A.  Yes.
2  Q.  And, again, they request no
3  Knauf, right?
4  A.  Correct.
5  Q.  Let's flip to the next page.
6  Invoice is dated 4/25/06, correct, sir?
7  A.  Yes.
8  Q.  Again, a delivery to bill to
9  Houston area, to be delivered in the Houston
10  area, right?
11  A.  Correct.
12  Q.  To David E. Smith.  Again, a
13  different builder than on the earlier two
14  pages that we looked at, correct?
15  A.  Correct.
16  Q.  So this is the third builder.
17  And at the bottom, I'm going to read it.
18  Make sure I read it correctly.  Specifically
19  says, "No Knauf, no Knauf, no Knauf,"
20  correct?
21  A.  Correct.
22  Q.  And 5/24 invoice date, is the
23  next one; and it's, again, the same builder
24  saying, "No Knauf," correct?

Page 325

1  A.  Yes, it is.
2  Q.  So in light of all these
3  people, or at least four builders saying, "We
4  don't want Knauf," you can't point to us
5  any -- to any document or any investigation
6  that you did to determine why they didn't
7  want Knauf, can you?
8  A.  No, I can't.
9  Q.  And you have no document or
10  files that we can look at to see why they
11  didn't want Knauf, correct?
12  A.  No, I don't.
13  Q.  That's not documented in any
14  way?
15  A.  No.
16  Q.  If an invoice ever said, "No
17  Knauf," did you deliver Knauf anyway, in some
18  cases?
19  A.  They shouldn't, if it was a
20  customer preference to not.  They should not
21  have.
22      (Whereupon, Deposition Exhibit
23  INEX-30b6-75, Interior/Exterior
24  Invoice, INT/EXT19773, was marked for

Page 326

1  identification.)
2      BY MR. REEVES:
3  Q.  Let me ask you about another
4  series -- another invoice that I saw.  This
5  will be 75.  Take a look at that, sir, and
6  tell me, once you've had a chance to do so.
7  A.  Okay.
8      MR. DUPLANTIER: What are you
9  numbering this?  Did you just number
10  the last set 75?
11      THE REPORTER: Yes.
12      MR. REEVES: This should be 75.
13  You got it?  This should be 75.
14      BY MR. REEVES:
15  Q.  Who generated this invoice,
16  sir?
17  A.  My guess would be Rebecca
18  Galleon.
19  Q.  Is she still with your company?
20  A.  Yes, she is.
21  Q.  And where is she employed, and
22  in what capacity?
23  A.  Mandeville branch, inside
24  sales.

Page 327

1  Q.  I want to ask you about the
2  first line under "Product and Description."
3  This is a sale to 84 Lumber, correct?
4  A.  Yes, it is.
5  Q.  And it's got a bunch of dollar
6  signs, right?
7  A.  Uh-huh.
8  Q.  And then, "China rock," and
9  then a bunch of dollar signs again, correct?
10  A.  Uh-huh.
11  Q.  And this is dated 3/28/07,
12  correct?
13  A.  Yes.
14  Q.  What does she mean by the
15  dollar signs?
16  A.  They usually just do that to
17  make a note.  They'll sometimes use a pound
18  sign or something to just -- to make sure
19  that you can see the note.
20  Q.  Is it your testimony they do
21  that frequently?
22  A.  They'll put notes on tickets
23  quite often.
24  Q.  Will they mark it with dollar

Page 328

1  signs frequently?
2  A.  I don't know that it's
3  frequently or not.
4  Q.  This is the only one we found,
5  is why I ask you --
6  A.  Okay.  Okay.
7  Q.  -- in the 30,000 or so
8  documents that have been produced, so I'll
9  ask you:  Is this something that's frequently
10  done, the dollar signs?
11      MR. DUPLANTIER: He answered
12  the question.  Ask him another
13  question.  He answered the question.
14      MR. REEVES: Well, maybe he
15  did.  Okay.
16      BY MR. REEVES:
17  Q.  Mr. Geary, isn't it true that
18  you, yourself, knew in '06 that the Knauf
19  product was an inferior product that you were
20  selling, didn't you?
21  A.  No, that's not true.
22  Q.  You were, in fact, in '06,
23  doing some work on your house, weren't you?
24  A.  Yes, I was.

Page 329

1  Q.  Or were you building your
2  house?
3  A.  Excuse me?
4  Q.  Were you building your house or
5  doing work on it?
6  A.  No, my house got flooded.
7  Q.  Okay.  So you got flooded in
8  the storm; and you bought product for your
9  home from your company, didn't you?
10  A.  Yes.
11  Q.  You bought drywall, didn't you?
12  A.  Yes, I did.
13  Q.  And the truth is, in the
14  invoice that you submitted for your home, for
15  your family, right, you specifically
16  requested domestic board, didn't you?
17  A.  I requested USG board.
18  Q.  Right.  That's domestic board,
19  isn't it?
20  A.  Yes, it is.
21  Q.  Okay.  You didn't request
22  Knauf?
23  A.  No, I did not.
24  Q.  You didn't say, "I don't care,

Page 330

1  just send me half-inch."  You requested USG,
2  didn't you?
3  A.  Yes, I did.
4  Q.  And you did that because you
5  knew that was a better product, didn't you?
6  A.  It was a personal preference.
7  Q.  Right.
8  In your opinion, it was a
9  superior product.  The Knauf product was
10  inferior; isn't that the truth?
11  MR. SANDERS:  Object to form.
12  MR. DUPLANTIER:  I'm going to
13  object to the form too.  He's answered
14  the question.  He's answered the
15  question.  You can ask him another
16  question.
17  MR. REEVES:  I don't think he
18  has.
19  MR. DUPLANTIER:  He just did.
20  He just said it was a personal
21  preference.
22  MR. REEVES:  Read the question
23  back, please.
24  (The following portion of the

Page 331

1  record was read.)
2  "QUESTION: In your opinion, it
3  was a superior product.  The Knauf
4  product was inferior; isn't that the
5  truth?"
6  THE WITNESS:  Did you read back
7  my answer?
8  THE REPORTER:  There was not an
9  answer after that.
10  THE WITNESS:  Okay.
11  A.  Knauf product was -- no, I'm
12  sorry.  It was not an inferior product, no.
13  BY MR. REEVES:
14  Q.  Well, you didn't request an
15  inferior product to go into your own home,
16  did you?
17  A.  I had a personal preference for
18  USG product.
19  Q.  You preferred a better product,
20  right, like most people?
21  A.  I preferred it over National
22  Gypsum, over Temple, over all of the domestic
23  manufacturers as well.
24  Q.  And the Chinese as well,

Page 332

1  correct?
2  A.  Yes.
3  Q.  And you preferred it over
4  Knauf?
5  A.  Yes.
6  MR. REEVES:  Let's mark that
7  invoice as the next exhibit.
8  (Whereupon, Deposition Exhibit
9  INEX-30b6-76, Interior/Exterior
10  Invoices, INT/EXT21416 - INT/EXT21417,
11  was marked for identification.)
12  MR. REEVES:  Do you need an
13  extra copy?
14  MR. DUPLANTIER:  Yeah, I'm
15  trying to keep two sets of copies.
16  MR. SANDERS:  Do you have
17  another copy, Jim?
18  MR. REEVES:  I'm sorry?
19  MR. SANDERS:  Do you have an
20  extra?
21  MR. REEVES:  I don't know.  Let
22  me see.
23  Yeah, here's an extra one.
24  MR. SANDERS:  Thanks.

Page 333

1     BY MR. REEVES:
2  Q.  I want to go back, sir, to
3  Exhibit -- I think we marked it 74 or 75, the
4  one with the dollar signs on it.  75?
5  A.  Okay.
6  Q.  Let me ask you:  This invoice
7  is dated 3/28/07, correct?
8  A.  Yes.
9  Q.  And it references specifically
10  China rock?  China rock.  It specifically
11  references to use China rock, doesn't by, it
12  the dollar signs?
13  A.  Yes, it does.  Yes.
14  Q.  So we know your company was
15  selling Chinese rock at least through
16  3/28/07, don't we?
17  A.  Yes.
18  Q.  Okay.  So at least until then,
19  based upon this invoice we just looked at,
20  correct?
21  A.  Yes.
22     MR. REEVES: Let's take a quick
23  break.  I may can pull my stuff
24  together.

Page 334

1     MR. DUPLANTIER: Why don't you
2  try and finish up so that, when we
3  take a break, someone else can kind of
4  take into your spot?
5     MR. REEVES: It'd be more
6  efficient if you'd let me kind of go
7  through my things where I can check
8  them off.  We'll just take five.
9     THE VIDEOGRAPHER: Off the
10  record at 3:07 p.m.
11     (Recess taken, 3:07 p.m. to
12  3:14 p.m.)
13     THE VIDEOGRAPHER: Stand by.
14  We're back on the record.  The time is
15  3:14 p.m.
16     BY MR. REEVES:
17  Q.  Mr. Geary, just a few more
18  questions.
19     Describe for me the
20  procedure -- I think we went through it all,
21  but you basically had a telephone conference
22  with your branch managers, looked over
23  documentation and tried to determine when you
24  last sold the Chinese drywall.  Is that

Page 335

1  basically what you did?
2  A.  I had a telephone conversation
3  with them and, you know, I guess we all
4  wracked our brains to try and recall when,
5  you know, the last shipments were seut out.
6  Q.  Was it multiple phone
7  conversations, a single one?
8  A.  I don't recall.
9  Q.  All right.  Was your brother in
10  on those as well?
11  A.  Yes.
12  Q.  Okay.  And this would have been
13  after litigation had ensued?
14  A.  Yes.
15  Q.  Y'all understood this was an
16  important matter, to know when you last sold
17  it, correct?
18  A.  Yes, sir.
19  Q.  And it was important for a lot
20  of reasons, so that you'd know who ended up
21  with the Chinese drywall, right?
22  A.  Correct.
23  Q.  And could report that back and
24  figure out if they had a problem, right?

Page 336

1  A.  Correct.
2     (Whereupon, Deposition Exhibit
3  INEX-30b6-77, Interior/Exterior
4  Invoice, INT/EXT32838, was marked for
5  identification.)
6     BY MR. REEVES:
7  Q.  Let me show you what I'll mark
8  as the next exhibit.  And this, sir, what
9  we've marked as Exhibit 77, is Bates-stamped
10  32838; and it's an invoice dated 5/18/07,
11  correct?
12  A.  Yes, sir.
13  Q.  Who created this invoice?
14  A.  I'm not sure.
15  Q.  What were you looking to
16  earlier to determine who created a particular
17  invoice?
18  A.  I was looking at the initials,
19  "KLM," and it escapes me who that is.
20  Q.  Okay.  So the initials would be
21  there for the person that created a
22  particular invoice?
23  A.  Yes.
24  Q.  All right.  And that just

Chinese Drywall MDL          Confidential – Subject to Further Confidentiality Review          Clayton & James Geary
February 5, 2010

Page 337

1  doesn't ring a bell to you?
2  A.  Right.
3  Q.  Now, specifically here, they're
4  referencing the sale of Knauf, aren't they?
5  If you look in the middle of the page there,
6  it says, "Knauf, Knauf, Knauf," does it not?
7  A.  Yes, they are.
8  Q.  Okay.  And this is in May
9  of '07?
10  A.  Yes.
11  Q.  Actually, May 18th, correct?
12  A.  Uh-huh.
13  Q.  So that indicates that you were
14  selling Chinese drywall at least until that
15  date, correct?
16  A.  We identified -- I think it was
17  23 invoices past March 31st that were
18  imported board.
19  Q.  And this is one of those?
20  A.  I believe so.
21  Q.  I want to make sure we're
22  covering this insurance issue, because your
23  counsel and I have a disagreement over that
24  and I want to make sure it's clear for the

Page 338

1  judge.
2      I'm not asking you for any
3  conversations you've had with your attorneys
4  with regard to your insurance coverage that
5  you've had with them in private.
6      What I am asking you is:  Have
7  any of your insurers themselves or their
8  agents advised you as to whether you may or
9  may not have coverage for the Chinese drywall
10  litigation?
11      MR. DUPLANTIER: You can answer
12  that question.
13  A.  We've received a reservation of
14  rights letter from all of our carriers.
15      BY MR. REEVES:
16  Q.  From all of them?
17  A.  Well, I say that.  I know from
18  the underlying carriers.  I don't know about
19  the excess carriers.
20  Q.  All right.  And you have copies
21  of those letters?
22  A.  Yes.
23  Q.  All right.  And what's the
24  stated reason for the reservation, if any?

Page 339

1  A.  You have to talk to the
2  attorney about that.  We have a coverage
3  attorney who's looking at that for us.
4  Q.  All right.  And who is that?
5  A.  Phil Nizialek.
6      MR. REEVES: Subject to the
7  reservations that -- we'd like to get
8  copies of those letters, if that's
9  okay.  Can we do a formal --
10      MR. DUPLANTIER: We've objected
11  to that.
12      MR. REEVES: To providing the
13  letter?
14      MR. DUPLANTIER: Yeah.
15      MR. REEVES: Okay.  We can take
16  that up with the Court.
17      Subject to taking up with the
18  Court the areas that we reserved the
19  right to do that on the record, we
20  will tender the witness.
21      MR. DUPLANTIER: This
22  deposition was cross-noticed in a
23  number of state court proceedings by
24  Kanner & Whiteley, and we're going to

Page 340

1  give them an opportunity to ask
2  questions next.
3      MR. LAMBERT: Just on behalf of
4  Allan, who's not here right now, he'll
5  pass this witness until Knauf is
6  finished, and hopefully he will be
7  there by then.  We've contacted him.
8  You can't set up an order of a
9  deposition.
10      MR. DUPLANTIER: Actually, I
11  can.
12      MR. LAMBERT: Well, I don't
13  think so.
14      MR. DUPLANTIER: Mr. Kanner
15  cross-noticed the deposition for
16  today.
17      MR. LAMBERT: I --
18      MR. DUPLANTIER: If he's not
19  here to ask questions, we're going to
20  pass his questions.
21      MR. LAMBERT: You can go --
22      MR. DUPLANTIER: So he's been
23  given an opportunity to ask questions
24  in accordance with the notice that he

Page 341

1  issued for today.  He issued his
2  notice before anybody else, other than
3  the PSC.
4      MR. LAMBERT: I understand.
5  And we'll just attach, for the record,
6  a copy of a letter dated the 26th of
7  2010 as the next number exhibit.  What
8  is that?
9      THE REPORTER: 78.
10     MR. DUPLANTIER: We object to
11  that being attached to the deposition,
12  actually.
13     MR. LAMBERT: You can do that.
14  You can object.
15     77?  78?  And 79 is the 1442
16  notice.
17     (Whereupon, Deposition Exhibit
18  INEX-30b6-78, Notice of 1442
19  Deposition (Dennis v.
20  Interior/Exterior, et al.), was marked
21  for identification.)
22     (Whereupon, Deposition Exhibit
23  INEX-30b6-79, 1/26/10 Kanner Letter to
24  Herman & Levin, was marked for

Page 342

1  identification.)
2      MR. DUPLANTIER: Can I have a
3  copy of the notice?
4      77 [sic] is the cross-notice of
5  this deposition, which mimicked in its
6  entirety the notice issued by the PSC.
7  And this is issued in the Dennis case
8  by Kanner & Whiteley.
9      Counsel for the Dennis
10  plaintiffs is Allan Kanner, along with
11  Ms. Fuselier, who is present here and
12  is being given the opportunity to ask
13  questions.  And it's not my fault that
14  they're not prepared to ask their
15  questions.
16     MR. LAMBERT: I don't want to
17  argue with you.  I just --
18     MR. DUPLANTIER: I understand.
19  I understand, Mr. Lambert, that you
20  didn't issue these notices, nor do you
21  represent these parties, from what I
22  understand.
23     MR. LAMBERT: That's correct.
24     MR. DUPLANTIER: I'm not sure

Page 343

1  why you're handling this for the
2  counsel that's present.  But we're
3  going to -- if they are not willing to
4  ask their questions at the present
5  time, let's go to the next witness.
6      MR. HERMAN: Okay.  This is
7  Steve Herman, and I'd just like to put
8  something on the record.  You can take
9  this up with Judge Bagneris or
10  Judge Fallon or whoever you want to
11  take it up with.
12     I just want to say, for the
13  record, that somebody from Allan's
14  office called me yesterday to see if
15  they thought that we would be going
16  all day and have to continue the
17  deposition onto another day, and I
18  thought that we would.
19     If that has created confusion,
20  I apologize to everyone involved.  But
21  they may have been relying on my
22  belief, which was a good-faith belief
23  that we would go at least all day and
24  have to continue it.

Page 344

1      MR. DUPLANTIER: And let me
2  state for the record -- hold on.  I
3  got that information, that Mr. Herman
4  had made those representations to
5  Kanner & Whiteley.
6      I corrected those
7  representations, that we were going to
8  be here to complete this deposition
9  today, and that we were not going to
10  agree to continue this deposition
11  beyond today.  So they should have
12  been on notice within an hour of the
13  conversation with Mr. Herman that we
14  intended to be prepared to answer
15  their questions.
16     MR. LAMBERT: Rick, with all
17  due respect, you've got your position
18  on the record.  Cantor has his
19  position on the record, and with the
20  attachments.  There's no rush.  These
21  can be set at a later point in time.
22  There's no intention to go all night
23  or tomorrow.
24     MR. DUPLANTIER: It's not all

Page 345

1  night. It's only 3:19 in the
2  afternoon.
3      MR. LAMBERT: No, no, I
4  understand. But I'm simply saying
5  that the convenience of the witnesses,
6  your convenience, can all be met.
7  There's no intention --
8      MR. DUPLANTIER: You're making
9  representations that you can't --
10  let's go off the record. You're
11  making representations that you can't.
12  We don't have all the time. There are
13  exceptions pending in state court that
14  you are unaware of, with deadlines.
15      MR. LAMBERT: Look, Rick --
16  excuse me. Rick, I don't want to
17  argue with you right now.
18      MR. DUPLANTIER: Yes, you do.
19      MR. LAMBERT: Put your position
20  on the record.
21      MR. DUPLANTIER: You're arguing
22  with me. You're making
23  representations that are, in fact,
24  untrue. And there are deadlines that

Page 346

1  are applicable to the state court
2  proceeding. Judge Bagneris has
3  ordered my client to be present for a
4  deposition. They're here to answer
5  questions in accordance with this
6  deposition notice.
7      MR. LAMBERT: Okay. I
8  understand your position.
9      MR. DUPLANTIER: Next?
10  Who's -- is anyone from Kanner &
11  Whiteley, on behalf of the Dennises,
12  going to ask questions?
13      MS. FUSELIER: No, we're not
14  going to ask any questions.
15      MR. DUPLANTIER: Okay.
16      MR. LAMBERT: Not right now.
17      MR. DUPLANTIER: Who's next?
18      MR. SANDERS: Plaintiffs go
19  before me.
20      THE VIDEOGRAPHER: Off the
21  record, 3:22 p.m.
22      (Recess taken, 3:22 p.m. to
23  3:25 p.m.)
24      THE VIDEOGRAPHER: Stand by.

Page 347

1  We're back on the record. The time is
2  3:25 p.m.
3      MS. FUSELIER: This is Melissa
4  Fuselier with Kanner & Whiteley. I
5  just wanted to put on the record that
6  the exceptions in front of
7  Judge Bagneris are pending in April.
8  They're not pending next month or the
9  month after, so it's the end of April,
10  that they're pending. That's all I
11  wanted to say.
12      CLAYTON C. GEARY,
13  having been first duly sworn, testified as
14  follows:
15      EXAMINATION
16      BY MR. NICHOLAS:
17  Q. Is it Geary or Geary? I want
18  to get it straight.
19  A. "GEER-ree."
20  Q. Geary.
21      Mr. Geary, my name is Steve
22  Nicholas. I represent The Mitchell Company,
23  who's been mentioned once or twice as a
24  plaintiff in the MDL. I've got some

Page 348

1  questions to ask you. I'm going to try not
2  to repeat, so, by nature, it's going to kind
3  of bounce around a little bit, but I'll try
4  to tell you where I'm headed?
5      And I've also, frankly, lost
6  track of, between you and your brother, maybe
7  who said what. So if I ask you something and
8  you think your brother is better able to
9  answer the question, if you tell me that, I
10  would appreciate it --
11  A. Okay.
12  Q. -- is that fair?
13      If you don't understand me or
14  if I'm not clear in a question, please ask me
15  to rephrase it, okay?
16  A. Okay.
17      (Whereupon, Deposition Exhibit
18  INEX-30b6-80, Exhibit A, Knauf
19  Commercial Invoice, IE-000003,
20  IE-000005, IE-000007, IE-000009, was
21  marked for identification.)
22      BY MR. NICHOLAS:
23  Q. First, I'd like to just kind of
24  establish the timeline a little better. Let

Page 349

1  me show you what I've marked as Exhibit 80,
2  and one of these may already be marked
3  somewhere else.  But do you recognize those
4  as invoices that would have come from Knauf
5  to Interior/Exterior Building Supply?
6  A.  Yes.
7  Q.  All right.  And from looking at
8  the invoices, at least for these, and I think
9  these are all the Knauf Tianjin shipments,
10  but it would tell you the vessel and the bill
11  of lading number.  Do you see that?
12  A.  Yes, I do.
13      (Whereupon, Deposition Exhibit
14  INEX-30b6-81, Customs Information on
15  Knauf Plasterboard Shipments, was
16  marked for identification.)
17      BY MR. NICHOLAS:
18  Q.  All right.  And let me show you
19  what I've marked as Exhibit 81 to your
20  deposition, which I'm going to just see if we
21  can use to maybe help identify some dates.
22  And I'll represent to you that this is a
23  printout of the customs information regarding
24  those shipments.

Page 350

1      And so if you look at the
2  second page first, the one at the top there,
3  you see the vessel, the MYSTRAS?
4  A.  Okay.
5  Q.  You see that?
6  A.  Yes, I do.
7  Q.  Now, you also see it says,
8  "Cosignee to the order of Whitney Bank."
9      On each of these shipments,
10  Whitney Bank issued a letter of credit,
11  correct?
12  A.  Yes.
13  Q.  And then it says, "Notify
14  Interior/Exterior Building Supply"?
15  A.  Yes.
16  Q.  And the actual arrival date,
17  you see towards the upper right-hand corner
18  of that block, says "1/14/2006"?
19  A.  Okay.  Yes.
20  Q.  Does that refresh your
21  recollection about the time you would have
22  received the first shipment of Knauf Tianjin
23  drywall?
24  A.  It was -- yeah, it was in that

Page 351

1  neighborhood.
2  Q.  All right.
3  A.  And then if you look back at
4  the first page again, the one just before
5  that one, you see it says the vessel is the
6  UPC TORONTO?  It would be the bottom of the
7  one with the sticker on it that you have in
8  your right hand.
9      MR. DUPLANTIER: I don't see
10  that.
11  A.  I don't see "UPC TORONTO"
12  either.
13      BY MR. NICHOLAS:
14  Q.  Right here.
15  A.  Okay.
16  Q.  And if you looked at the
17  invoice, you'll see, if you want to refer
18  back to it, that one of the vessels was the
19  UPC TORONTO?
20  A.  Yes.
21  Q.  Do you remember that?
22  A.  I do remember that.
23  Q.  All right.  And it's -- the
24  actual arrival date there is 2/1/06?

Page 352

1  A.  Correct.
2  Q.  Does that sound about right of
3  when the second shipment would have come in?
4  A.  Yes, sir.
5  Q.  And then if you look again on
6  the second page, again -- I'm sorry for
7  having to bounce around -- you see the second
8  one there, the second entry, talks about the
9  vessel DUAL CONFIDENCE, the bottom of the
10  second page --
11  A.  Yes.
12  Q.  -- or the second entry on the
13  second page?
14  A.  Yes.
15  Q.  And there are actually two
16  invoices with the DUAL CONFIDENCE.  That one
17  is on the third page as well.  And it came in
18  in May -- I mean, I'm sorry, April of 2006?
19  Does that sound right to you?
20  A.  That sounds right.  I thought
21  it was later than that, but...
22  Q.  Well, and then the final one
23  would be the first one on Exhibit 81, which
24  is the one that's notifying J.W. Allen

Page 353

1   instead of notifying you. But they were your
2   freight forwarder, correct?
3   A.  Yes, they were.
4   Q.  And that's the ALEXANDERGRACHT
5   or something like that?
6   A.  Yes.
7   Q.  Do you recall that vessel?
8   A.  Yes.
9   Q.  And that was September of
10  2006 --
11  A.  Yes.
12  Q.  -- correct?
13      And then I believe you
14  testified earlier that the next shipment
15  would have been the Wuhu shipment, right --
16  or that was the Wuhu shipment. I'm sorry.
17  A.  I think that was the Wuhu
18  shipment.
19  Q.  And then after that is when
20  y'all got some product from Metro, but that
21  was non-Knauf product, right?
22  A.  Correct.
23  Q.  All right. Switching gears.
24  A.  Okay.

Page 354

1   Q.  You were shown Exhibit 3, and
2   you can dig it out, if you need to, but I
3   don't think you'll have to. But if you feel
4   like you want to look at the documeut, let me
5   know. And you were asked some questions
6   about a warranty that was provided by one of
7   the Knauf entities, that the product was free
8   from defects. Do you recall that, generally?
9   A.  Yes, I do.
10  Q.  Now, your company has always
11  been in the business of reselling the
12  building materials that it purchases from
13  people like Knauf, correct?
14  A.  Correct.
15  Q.  And when you talked to the
16  people at Knauf, they understood you were in
17  the business of reselling this plasterboard
18  that you were buying from them, correct?
19      MR. SANDERS: Object to the
20  form.
21  A.  Yes.
22      BY MR. NICHOLAS:
23  Q.  Well, let me deal with
24  Mr. Sanders' objection.

Page 355

1       Did you ever have a
2   conversation with anyone at Knauf, Tianjin
3   specifically, where they -- where you
4   expressed to them that you were buying this
5   for resale?
6   A.  I can't tell you specifically,
7   but I would assume we would have.
8   Q.  And certainly when you had the
9   conversation with Mr. Brisley -- is that his
10  name?
11  A.  Brisley.
12  Q.  Brisley. He understand that's
13  what you were doing?
14  A.  Yes, he did.
15  Q.  And you would agree with me, if
16  it turned out there was something wrong,
17  anything wrong that made that product
18  defective, that it would be your customers
19  who would feel that defect, correct?
20  A.  Yes.
21  Q.  And you understood that when
22  you were selling the product?
23  A.  Yes.
24  Q.  And by its very nature, Knauf

Page 356

1   would have understood that, correct?
2       MR. SANDERS: Object to the
3   form.
4   A.  Yes.
5       BY MR. NICHOLAS:
6   Q.  That it's your customers
7   involved, right?
8   A.  Yes. Yes.
9       MR. NICHOLAS: Excuse me. Give
10  me just a second. I need to find the
11  next topic.
12      BY MR. NICHOLAS:
13  Q.  Let's talk about Mr. -- I'm
14  going to mispronounce it again, Brisley?
15  A.  Brisley.
16  Q.  Brisley. Brisley.
17      As I understand your testimony
18  earlier today, Mr. Brisley was employed by,
19  or you had a relationship with him from
20  selling your company insulation products?
21  A.  Correct.
22  Q.  What kind of products did y'all
23  buy through your connection with Mr. Brisley?
24  A.  We buy fiberglass insulation

Page 357

1  from Knauf.
2  Q.  And do you have an
3  understanding as to where that insulation
4  comes from?
5  A.  Yes.
6  Q.  Where it's manufactured?
7  A.  Yes.
8  Q.  What's that understanding?
9  A.  They have a couple of plants
10  that we deal with.  One is in, I think,
11  Shelbyville, Indiana, and Lynette, Alabama.
12  Q.  Okay.  And you also, I believe,
13  said that there's a local representative for
14  that entity?
15  A.  Yes.
16  Q.  And what's that gentleman's
17  name?
18  A.  Kurt Heider.
19  Q.  Did you ever have a
20  conversation with Mr. Heider about obtaining
21  drywall?
22  A.  About obtaining drywall from?
23  Q.  From anybody.
24  A.  I don't think we called him.  I

Page 358

1  don't remember having a conversation with him
2  about it prior to talking to -- when Jim
3  talked to Jeff Brisley.
4  Q.  And so it was your brother that
5  talked to Mr. Brisley?
6  A.  Yes.
7  Q.  I was hoping to avoid it, but
8  I'm not going to be able to.  I'm going to
9  have to get him in here at some point.  I'll
10  defer all these things.
11      Well, did you ever talk to
12  Mr. Brisley about drywall, anything about
13  drywall?
14  A.  I think Jim had all the
15  conversations with him.
16  Q.  All right.  Okay.  I'll just
17  defer that, then.
18      There were a number of
19  exhibits, specifically Exhibit 9, 10, 11,
20  that were e-mails from a Mr. John Davis?
21  A.  Uh-huh.
22  Q.  Do you recall those e-mails?
23  A.  Yes.
24  Q.  And I think I may have picked

Page 359

1  them up.  Maybe I'd ask you to look for them,
2  Mr. Geary.
3      MR. DUPLANTIER:  Yeah.
4      MR. NICHOLAS:  Let me just pull
5  them real quick.
6      BY MR. NICHOLAS:
7  Q.  You see the e-mails from
8  Mr. Davis, he has a title under his name?
9  A.  Yes, "Business Development
10  Manager."
11  Q.  For what company or what
12  entity?
13  A.  It says, "Knauf Plasterboard
14  and Insulation China."
15  Q.  All right.  Did you ever have a
16  conversation with Mr. Davis about who that
17  was, who Knauf Plasterboard and Insulation
18  China was?
19  A.  No.
20  Q.  Did you ever gain any
21  understanding from any other source as to who
22  that company or who that entity was?
23  A.  No.
24  Q.  Sitting here today, do you know

Page 360

1  if there is any such entity called Knauf
2  Plasterboard and Insulation China?
3  A.  I don't know.
4  Q.  Did you ever get a bill from a
5  company that had that name on it?
6  A.  Well, the letter of credit
7  had -- I can't remember the exact wording,
8  but it had "Tianjin" on it, I believe.
9  Q.  Okay.  But I'm talking about
10  specifically those -- that phrase or that
11  designation of a company, did you ever see
12  that in any of the paperwork?
13  A.  Not that I recall.
14  Q.  Looking at Exhibit 11, if you
15  have it there, where Mr. Davis is saying
16  that, "We have priced their product," and
17  some things like that.  Do you see that?
18  A.  Yes, I see that.
19  Q.  Do you have an understanding --
20  well, let me back up.
21      Did you ever ask Mr. Davis who
22  "we" was?
23  A.  I did not.
24  Q.  Did you have an understanding,

Page 361

1  from either talking with Mr. Davis or talking
2  with anybody else, who "we" was?
3  A.  I don't know.
4  Q.  Now, correct me again:
5  Exhibit 12, which, I believe, are notes
6  regarding a conversation with Mr. Norris, was
7  that you or your brother?  Mark Norris?
8  A.  With Mark Norris, it would have
9  been me.
10  Q.  All right.  And who did you
11  understand Mr. Norris to be associated with
12  or employed by?
13  A.  Knauf in China.
14  Q.  Okay.  Did you have any more
15  specific understanding of Knauf in China, who
16  that was?
17  A.  No.  I guess I would have just
18  assumed it was some type of division of
19  Knauf.
20  Q.  Did Mr. Norris ever explain to
21  you the relationship between any of the
22  Chinese Knauf entities?
23  A.  No.
24  Q.  Did he ever explain to you the

Page 362

1  relationship between any of the Chinese Knauf
2  entities and any other Knauf entity?
3  A.  No.
4  Q.  And when he said something to
5  the effect -- I believe your testimony was
6  that somebody owed -- owned, I'm sorry, 12%
7  of USG?  Is --
8  A.  Yes, 12-1/2%.
9  Q.  12-1/2%.
10  As best you can recall, what
11  did he say as far as who owned 12-1/2% of
12  USG?
13  A.  Knauf.
14  Q.  Did he explain anything more
15  specific than "Knauf"?
16  A.  Not that I recall.
17  Q.  But that it was your
18  understanding, based on your conversation
19  with him, the ownership of 12-1/2% of USG
20  somehow affected your ability to do business
21  with Knauf Plasterboard Tianjin --
22  MR. SANDERS: Object to the
23  form.
24  BY MR. NICHOLAS:

Page 363

1  Q.  -- right?
2  A.  The ability for them to ship
3  into the United States.
4  Q.  Well, the person who was
5  shipping into the United States was Knauf
6  Plasterboard Tianjin, right?
7  A.  Yes.
8  Q.  Or Knauf Plasterboard Wuhu?
9  A.  Correct.
10  Q.  And that somehow, the Knauf
11  ownership of 12-1/2% of USG impacted that
12  ability?
13  A.  Yes.
14  MR. SANDERS: Object to form.
15  BY MR. NICHOLAS:
16  Q.  But he didn't explain to you
17  any further about how all that
18  interconnected?
19  A.  He did not.  He did not.
20  Q.  Did he say, "We own 12-1/2% of
21  USG," or anything like that?
22  A.  I don't recall.
23  Q.  Okay.  All right.  Switching
24  subjects.

Page 364

1  You were asked a series of
2  questions about how the product -- and I'm
3  talking about the Chinese plasterboard, how
4  it arrived and how it moved, and that's the
5  general topic I want to ask you about.
6  As I understand your testimony,
7  on -- as I understand it, on every occasion,
8  it would be off-loaded off the ship, and then
9  disbursed to your various locations; is that
10  correct, or am I incorrect?
11  A.  With the Knauf?
12  Q.  Yes, sir.
13  A.  Yes.
14  Q.  Yeah, I'm only talking about
15  Knauf right now.
16  A.  Okay.
17  Q.  Would there be occasions,
18  though, when, let's say, Mobile or -- it's
19  actually Foley, right?
20  A.  Well, we have a place in Mobile
21  and in Foley.
22  Q.  Okay.  Where -- that's right.
23  Where either one of those locations would run
24  out of drywall, would they get some more

Page 365

1  from, say, New Orleans?
2  A.  Typically, what would happen
3  is, we would send another truck from the
4  wharf to Foley, if they needed it.
5  Q.  Well, I'm confused.
6      Was all the product off-loaded
7  from the ship and then sent somewhere?
8  A.  What happened was, they took
9  the product off the ship and they put it in
10  the wharf, you know, on the river, and we
11  sent them transfer tickets, and they shipped
12  the product to our various warehouses.
13  Q.  All right.  So I am confused.
14      So for a period of time, the
15  product, the Knauf plasterboard, would have
16  stayed at the wharf?
17  A.  Yes.
18  Q.  And so until it was then
19  disbursed out, there would be some there?
20  A.  Correct.
21  Q.  And we identified kind of the
22  dates of the shipments when I first started
23  this, but were there times when you ran out
24  at the wharf?

Page 366

1  A.  I'm sure we did.
2  Q.  Well, if you ran out at the
3  wharf and I'm in -- I'm in Mobile and Mobile
4  ran out, would you move it from another
5  location to Mobile, or would you just deliver
6  it to somebody in Mobile?
7  A.  No, not typically.  What we
8  would do is probably order it from a domestic
9  manufacturer.  We didn't -- you didn't want
10  to transfer it any more than you needed to
11  because of the cost of the product -- the
12  cost of the freight is very high.
13  Q.  All right.  So it would be
14  unusual, and you don't think it happened,
15  that New Orleans would move it from its
16  warehouse to Mobile or --
17  A.  Not typically.
18  Q.  -- Birmingham to Mobile or
19  anything like that?
20  A.  Not typically.
21  Q.  All right.  Thank you.
22      Can you tell me whether it was
23  typical or atypical of how decentralized the
24  sales process was.  I mean, and where I'm

Page 367

1  going is let's say I'm a homebuilder in
2  Mobile.  Would I typically just deal with the
3  Mobile office?
4  A.  Our branches typically sell
5  product within about an hour-and-a-half
6  radius of our branches.  As I mentioned, it's
7  a very freight-intensive product, and you
8  don't go too far, usually, because it just
9  costs too much money.
10  Q.  All right.  So if I'm in
11  Mobile, I would probably, from what you're
12  telling me, never interact with the people in
13  New Orleans?
14  A.  Right.  Right.
15  Q.  And if the guy in Mobile
16  doesn't have the product, then I've got to go
17  find it somewhere else?
18  A.  On occasion, you know, if
19  there's something that New Orleans has, a
20  specific product -- not necessarily drywall,
21  but a specific product, they may transfer
22  that product over.
23  Q.  Okay.  All right.  Switching
24  gears on you again.

Page 368

1      You were asked about the first
2  complaint or knowledge of any kind of issue
3  that you had from a customer about Chinese
4  drywall, correct?
5  A.  Uh-huh.  Actually, Jim was.
6  Q.  Okay.  What I want to ask you
7  is:  Did anyone internally at
8  Interior/Exterior ever report up the line
9  that they thought there was anything unusual
10  about the Chinese drywall?
11  A.  No.
12  Q.  Nobody handling it ever said,
13  you know, "This stuff smells funny"?
14  A.  No.
15  Q.  Did anyone ever report -- well,
16  let me back up.
17      As I understand the testimony,
18  the first report you got was about
19  air-conditioning coil corrosion in the Wall
20  Street Journal article; is that right?
21  A.  I don't remember the article
22  specifically.  I remember it was
23  January 12th, there was a Wall Street Journal
24  article.  I don't remember the -- I know the

Page 369

1   general -- general make-up of the article,
2   but I can't tell you the specifics.
3   Q.  All right.  And prior to that
4   time, no one, either internally or
5   externally, had talked about odor?
6   A.  No.
7   Q.  And tell me, is this you or
8   your brother, but as I understand, at some
9   point in time, there was communication with
10  someone at Knauf, once you were put on --
11  once your company was put on notice there
12  might be a problem?
13  A.  That was Jim.
14  Q.  Did you ever have a
15  conversation with anyone who you understood
16  to be in any way connected with Knauf, prior
17  to litigation, about problems with its
18  product or alleged problems with its product?
19  A.  Jim and I had a conference call
20  with Doug Sanders.  I don't know if that was
21  pre- or post-litigation.  I think it was
22  pre- -- about getting -- you know, what are
23  they going to do, and they were going to go
24  do these inspections with Strategy.

Page 370

1   Q.  All right.  So prior to you
2   having a conference call with Mr. Sanders,
3   you personally had not talked to anyone?
4   A.  No.
5   Q.  Do y'all still do business with
6   Knauf USA?
7   A.  Yes, we do.
8   Q.  Up until this day, have you
9   ever had a conversation with anyone at
10  Knauf USA about Chinese drywall?
11  A.  Up until -- through today?
12  Q.  Yes, this minute.
13  A.  Yes.
14  Q.  Who have you talked to?
15  A.  I talked to Kurt Heider and
16  Jeff Brisley.
17  Q.  What did y'all talk about?
18  A.  We asked them, basically,
19  "What's going on," and didn't get any answer
20  at all.
21  Q.  Well, can you give me a little
22  more idea of what their response was?
23  A.  You know, basically, "We've
24  been told not to say anything, and can't say

Page 371

1   a word."
2   Q.  All right.  I assume your
3   answer is going to be the same.  I just want
4   to make sure:  Did you talk to them in any
5   way about any relationship between Knauf USA
6   and Knauf Plasterboard Tianjin, Knauf
7   Plasterboard Wuhu or any of these other
8   companies?
9   A.  No.
10  Q.  Has your company, to your
11  knowledge, ever purchased any product --
12  well, let me ask it this way.  Strike that.
13      Has your company ever bought
14  anything related to Knauf, other than
15  insulation and drywall?
16  A.  No.
17  Q.  So there's never been another
18  occasion, for instance, where Knauf USA has
19  sold you something that may have come from
20  another Knauf company?
21  A.  No.
22  Q.  I probably should have asked
23  you this a minute ago, but I forgot about it.
24      You and I talked about the

Page 372

1   shipments and how they come into the wharf
2   and go out.  How do domestic drywall
3   shipments differ from that, in terms of how
4   y'all handle it?
5   A.  They deliver them directly to
6   our warehouses.
7   Q.  So, again, if I'm talking about
8   Mobile and Mobile runs out of drywall and has
9   a domestic source, it would be shipped
10  however it gets there, into that Mobile
11  warehouse?
12  A.  Call USG and deliver it on
13  Thursday to your warehouse.
14  Q.  Would there be a centralized
15  record of that delivery?
16  A.  We have a purchase-order system
17  in our computer system.
18  Q.  And that computer system is in
19  New Orleans?
20  A.  Yes.
21  Q.  So somebody in Mobile would
22  input that data, but you would have it?
23  A.  Yeah.
24  Q.  All right.  A couple of times

Page 373

1 today -- well, let me strike that. Let me
2 just show you this.
3     (Whereupon, Deposition Exhibit
4 INEX-30b6-82, Sales Documentation
5 Between Creola Ace Hardware,
6 Interior/Exterior and Mitchell Co.,
7 700109, 70010, 700115, 700118, 700112,
8 700124, 700127, was marked for
9 identification.)
10    BY MR. NICHOLAS:
11 Q.  Let me show you what I've
12 marked as Exhibit 82, which I'm going to
13 represent to you are some of the documents
14 regarding your sales to Creola Ace Hardware,
15 and then in turn to The Mitchell Company,
16 okay?
17    Do you recognize the one on
18 top?
19 A.  Yes.
20 Q.  And the way I read this, you
21 see it's to be delivered to the Bessemer
22 Family Rentals, Prichard, Alabama, right
23 above the signatures?
24 A.  Correct.

Page 374

1 Q.  And I'll represent to you that
2 that project was built by The Mitchell
3 Company; and I think if you look at the other
4 things, you'd bear that out.
5    Who is the name on the left
6 side, that signature there?
7 A.  Jim Green.  He's our manager in
8 Mobile, branch manager.
9 Q.  All right.  Did you or anyone
10 in your New Orleans office have anything to
11 do with this transaction at the time of the
12 transaction?
13 A.  I remember it being rather
14 strange, in that they wanted to deposit -- I
15 think they gave us this money ahead of time.
16 Q.  Yeah, that's the second page.
17 A.  Okay.
18 Q.  It sort of memorializes that;
19 is that right?
20 A.  Yes.
21 Q.  So you were aware the
22 transaction was occurring in August of --
23 when it occurred in August of '05, is that
24 right, because of that --

Page 375

1 A.  Yeah.  Yes.
2 Q.  -- unusual event?
3 A.  Uh-huh.
4 Q.  Look at the third page there.
5 Yeah, that's it.  That looks like a different
6 kind of invoice.  Can you identify that
7 document for me?  Is that your company's
8 document?
9 A.  It looks like our company's
10 document without the overlay from the
11 software.
12 Q.  Okay.  So would that document
13 have been generated out of Mobile?
14 A.  Well, they input the orders in
15 Mobile, and then they'll push a button to
16 invoice it.  The invoice is actually spit out
17 in New Orleans.
18 Q.  Okay.
19 A.  And then we mail them from
20 New Orleans.
21    Now, they have the ability to
22 print an invoice in Mobile, but they can't --
23 they can't generate an invoice.  In other
24 words, they can print an invoice that's

Page 376

1 already been invoiced, but we run the
2 invoices in New Orleans and mail them out of
3 New Orleans.
4 Q.  Do you recall any information
5 coming to you from your company that Creola
6 Ace Hardware did not want Chinese drywall?
7 A.  Do I recall any correspondence?
8 Q.  Discussions, anything that
9 you've heard of that indicated they didn't
10 want imported drywall?
11 A.  I don't recall that.
12 Q.  You referred to it a couple of
13 times in your testimony today as a customer
14 preference.
15 A.  Uh-huh.
16 Q.  But if a customer said, "I
17 don't want imported drywall," is it your
18 testimony your company would not provide it?
19 A.  They would mark down on the
20 ticket that it shouldn't, and the
21 warehouseman should not deliver it.
22 Q.  And if they did deliver it, it
23 would be a mistake?
24 A.  Yes.

Page 377

1  Q.  It would not be what the
2  customer ordered?
3  A.  Correct.
4  Q.  Well, do you know whether
5  through, Creola Ace Hardware -- I'm having
6  trouble saying that today -- that Knauf
7  product was delivered to the Bessemer Family
8  housing project?
9  A.  I do not know.
10  Q.  Well, look at the third page
11  there, just below the dotted line across.
12  You see it says, "No import rock"?
13  A.  Yes.
14  Q.  So you would agree that, based
15  on this invoice, they should not have
16  delivered Knauf product, right?
17  A.  Yes.
18  Q.  And if you turn the page, the
19  next one says the same thing, right, just
20  below the dotted line?
21  A.  Yes.
22  Q.  And then turn the next page.
23  The next one says the same thing, correct?
24  A.  I will say that there were --

Page 378

1  and I don't know the particulars, but there
2  was a difference -- two different parts of
3  this project, and one had requested -- I
4  think there was a -- requested USG board, and
5  one did not specify the type of board.  And I
6  don't know --
7  Q.  Well, how did you gain that
8  understanding?
9  A.  From my manager over there.
10  Q.  Mr. Green?
11  A.  Yeah.
12  Q.  What did he tell you?
13  A.  That there were -- there was
14  one project, I think, that we had -- had a
15  job commitment from another vendor, a
16  domestic vendor; and that project, I think,
17  was going to go domestic, and the other one
18  was not.
19  Q.  I'm sorry, I just didn't
20  understand what you said, and it's my fault.
21  But another job --
22  A.  I thought there was -- I'm
23  fuzzy on the details, but there was a
24  Bessemer Sales and a Bessemer Rentals, I

Page 379

1  believe, and one part of the project had been
2  requested domestic, and one had not.
3  Q.  Do you have any understanding
4  as to why someone would have requested
5  domestic?
6  A.  I think it had to do with our
7  commitment from a domestic manufacturer on
8  price.  At this time, it was very
9  difficult -- we had a contract price, I
10  think -- a cost that we would buy the product
11  for, guaranteed from a domestic manufacturer.
12  Q.  So help me:  Was it cheaper to
13  have domestic?
14  A.  Well, at this point, the
15  problem was not just price, but availability,
16  the fact that they guaranteed the
17  availability -- well, they guaranteed the
18  price on this project.
19  Q.  Well, I still don't understand.
20  These invoices are May of '06, right?
21  A.  Uh-huh.
22  Q.  Upper right-hand corner.
23  So in May of '06 --
24  MR. DUPLANTIER:  You have to

Page 380

1  say "yes."
2  BY MR. NICHOLAS:
3  Q.  -- somebody, in connection with
4  either Ace Hardware or Mitchell or Bessemer
5  housing project or somebody, said, "I don't
6  want import rock," right?
7  A.  On this ticket, they said, "No
8  import rock," yes, sir.
9  Q.  All right.  And my question to
10  you is:  Can you help me figure out why?
11  A.  No.  I don't know.
12  Q.  And what you were trying to
13  tell me about shipments and domestic drywall
14  and all that, how does that help me figure
15  out why?
16  A.  I don't know.  I don't know why
17  they said, "No import rock."  I shouldn't
18  have spoken because I don't know the
19  particulars, but there was something to do
20  with Bessemer Sales versus Bessemer Rentals,
21  and I don't know the particulars.
22  Q.  All right.  Other than just
23  looking on the back of the board, is there
24  anything, to your knowledge, that would have

Page 381

1   indicated to anyone that handled the board
2   that it was not domestic board?
3   A.   The product has end tape on it.
4   Q.   Bad question.
5       I guess I'm saying:  Did you
6   ever have a conversation with anyone in this
7   transaction specifically or anywhere else
8   that says, "Hey, we're sending you imported
9   rock or imported drywall --
10  A.   No, I did not.
11  Q.   -- "is that okay," or anything
12  like that?
13  A.   I did not.
14      MR. NICHOLAS: I think that's
15  all.  I need to ask the other
16  Mr. Geary a couple things.
17      THE VIDEOGRAPHER: Off the
18  record at 3:56 p.m.
19      (Recess taken, 3:56 p.m. to
20  3:59 p.m.)
21      THE VIDEOGRAPHER: Stand by.
22  We're back on the record.  The time is
23  3:59 p.m.  This is the start of
24  Tape 4.

Page 382

1       JAMES F. GEARY, SR.,
2   having been first duly sworn, testified as
3   follows:
4   EXAMINATION
5   BY MR. NICHOLAS:
6   Q.  Mr. Geary, good afternoon.  You
7   understand you're still under oath?
8   A.  Yes, I do.
9   Q.  Let me pick up on the item I
10  started asking your brother about.  The
11  conversation with Mr. Brisley is what I want
12  to focus on.
13  A.  Yes.
14  Q.  Tell me, again:  Was it unusual
15  for you to be talking to Mr. Brisley?
16  A.  I didn't speak with him very
17  often.  Most of our contact and communication
18  was through Kurt Heider, the sales rep.
19  But -- so we had very little reason to talk
20  to Mr. Brisley, but we did communicate with
21  him from time to time.
22  Q.  And --
23  A.  And we knew each other.
24  Q.  I mean, he was basically your

Page 383

1   local sales rep's boss; is that the way you
2   understood it?
3   A.  I can't tell you the exact
4   structure.  My appreciation, it could be
5   wrong, would be he would be something like an
6   overall general sales manager.
7   Q.  And how did the topic of Knauf
8   or any Knauf entity supplying you with
9   drywall come up?
10  A.  Again, we -- I had a
11  conversation with him shortly after Katrina,
12  when we had been relocated to our Mandeville
13  office.  And as some of our other suppliers
14  and vendors had done, he called just to check
15  in on us to see how we were doing, how we
16  fared through the storm.
17      And in the course of that
18  conversation was when we had discussion about
19  buying drywall from Knauf.
20  Q.  And as best you can recall, can
21  you tell me how Mr. Brisley described who
22  would be selling you the product?
23  A.  I don't recall.
24  Q.  Well, did he explain to you

Page 384

1   that it was some other company that he could
2   arrange for or help arrange for the sale of
3   the product?
4   A.  Not that I remember.  The
5   understanding was, it was going to be Knauf
6   drywall.
7   Q.  And any explanation further
8   than "Knauf drywall"?
9   A.  Not that I recall.
10      MR. SANDERS: Object to the
11  form.
12      BY MR. NICHOLAS:
13  Q.  Did -- and you may have been
14  asked this, and there may be a document and I
15  just didn't see it.  But did Mr. Brisley send
16  you a price list?
17  A.  Brisley sent a price list to
18  Kurt Heider, who -- via an e-mail.  And
19  because at the time our computer system -- or
20  our e-mail system was down, Kurt Heider
21  handed me a hard copy of that communication.
22  Q.  After the -- after this initial
23  conversation and you getting the rate sheet,
24  did you have further conversations with

Page 385

1   Mr. Brisley about drywall?
2   A.   We did, but I really couldn't
3   tell you the specifics of that.  I think we
4   had a couple of occasions to talk about it,
5   but just in general terms is what I remember.
6   Q.   Well, in any conversation with
7   Mr. Brisley, did he ever try to explain to
8   you any kind of relationship between his
9   company and the company that was actually
10  shipping you the product?
11  A.   Not that I recall.
12  Q.   Did you talk to Mr. Brisley
13  when the problems with Chinese drywall, or
14  specifically the Knauf drywall, first
15  surfaced?
16  A.   No.  We started with Kurt
17  Heider, the sales rep, and asked him to see
18  what he could do for us.
19  Q.   And anything -- did you ever
20  have a conversation with Kurt in addition to
21  what your brother talked to me about or
22  already testified to about?
23  A.   I'm sorry, could you --
24  Q.   Bad question.

Page 386

1       Did you ever have a
2   conversation with Kurt about any problems
3   with Knauf drywall?
4   A.   Are you talking about after
5   that, things --
6   Q.   Yes, sir.
7   A.   Yeah, I mean, we -- when all
8   these things started surfacing, yeah, that
9   was the first person we contacted, was Kurt
10  Heider.  And, you know, if I remember
11  correctly, he indicated to us -- I mean, this
12  was beyond him.  He needed to go to his
13  higher-ups and go through the chain of
14  command.
15  Q.   Well, when the problem first
16  came up, am I correct that Kurt's the person
17  you called, not someone in China?
18  A.   That's correct.
19  Q.   And did he ever go through his
20  chain of command and get back to you?
21  A.   Did Kurt ever go through his
22  chain of command?
23  Q.   Yes, sir.
24  A.   My belief is, yes, he did.

Page 387

1   Q.   And what did he do?  What did
2   he tell you?
3   A.   Well, at the end of the day,
4   they got us in touch with their attorney.
5   Q.   And your brother talked to me a
6   little bit -- or just said a little bit about
7   having a conference call with Mr. Sanders?
8   A.   Yes.
9   Q.   Well, who set that up?  Who let
10  you know about that?
11  A.   I'm sorry, who let us know
12  about the...
13  Q.   About that you needed to talk
14  to Mr. Sanders.
15  A.   I believe it was from Kurt
16  Heider, but I'm not positive about that.
17  Yeah, I guess it had to have been Kurt
18  Heider.
19  Q.   Wasn't somebody from China?
20  A.   No, I'm fairly certain it was
21  not.
22  Q.   I talked to your brother about
23  Mr. Davis and Mr. Norris, I believe, and
24  having any better understanding about who

Page 388

1   they worked for.  You heard me ask your
2   brother that, right?
3   A.   Yes, I did.
4   Q.   Do you have anything to add to
5   anything he said about that situation?
6   A.   No, I do not, because I -- at
7   that point, then, Clay handled all the
8   communications directly with those gentlemen.
9   Q.   I'm not asking you to vouch for
10  every word that your brother testified to,
11  but in sitting there, hearing him testify, is
12  there anything he said you thought was
13  incorrect?
14  A.   No.
15  Q.   Let me ask you one more thing.
16  The wharf that he told me about when the
17  product was initially off-loaded from the
18  ships, is it open-air, or is it contained?
19  A.   Well, it's certainly got --
20  it's open in the sense that there are bay
21  doors or warehouse doors; but other than
22  that, it's enclosed.
23  Q.   And how big is it?
24  A.   Huge.  I could only guess how

Chinese Drywall MDL     Confidential – Subject to Further Confidentiality Review     Clayton & James Geary
February 5, 2010

Page 389

1  big it is.
2  Q.  Is your -- does your company
3  have the exclusive -- is everything in there
4  yours?  And, again, I'm talking the '06/08
5  time frame.
6  A.  Yeah.  No, I don't think so.  I
7  think I'm if -- if I remember correctly,
8  there were some other products in those
9  warehouses.  You know, steel and other
10  products and such.
11  Q.  And when -- again, I'm trying
12  to get some idea of size.  But when a
13  shipload, one of these deliveries, was first
14  off-loaded and put in that warehouse, what
15  percentage of the warehouse would be taken up
16  by that product?
17  A.  Only a guess, something like
18  25%, something -- that's a guess.
19  Q.  And nobody ever made a comment
20  about odor when all that product was put in
21  that warehouse, correct?
22  A.  No, sir.
23      MR. NICHOLAS: Give me just a
24  second.

Page 390

1      That's all I have.  Thank you,
2  sir.
3      MR. DUPLANTIER: Does anybody
4  else who cross-noticed the deposition
5  have questions?
6      (Pause.)
7      MR. DUPLANTIER: Other than
8  Knauf?
9      (Pause.)
10      MR. DUPLANTIER: We are --
11      THE VIDEOGRAPHER: The
12  gentleman who left said he had some
13  questions.
14      MR. NICHOLAS: Shilling said he
15  had like 15 minutes' worth.
16      MR. DUPLANTIER: Well, let's
17  take a break while he comes back.
18      THE VIDEOGRAPHER: Off the
19  record, 4:08 p.m.
20      (Recess taken, 4:08 p.m. to
21  4:17 p.m.)
22      (The following proceedings were
23  conducted off the videotaped record.)
24      MR. COHEN: My name is Max

Page 391

1  Cohen.  I represent Rockhill Insurance
2  Company in the Butler and Finger
3  litigation pending in civil district
4  court.  I'm not aware that anybody in
5  my cases has cross-noticed this
6  deposition.
7      I only became aware of the
8  deposition during a telephone status
9  conference the other day, so I decided
10  to attend, but I'm not going to ask
11  any questions today.
12      I want to reserve my rights to
13  ask questions at the appropriate time
14  when the deposition of
15  Interior/Exterior is noticed in those
16  two cases.  Thank you.
17      MR. SCHILLING: Steven
18  Shilling, I represent Mayeaux
19  Construction, Inc. in the Chad Jerrell
20  vs. Knauf Gyps, et al. litigation.  I
21  also did not cross-notice this
22  deposition.
23      I became aware of it in a
24  status conference hearing about a

Page 392

1  month ago.  I reserve my right to
2  depose Interior/Exterior when the
3  Jerrell litigation and any other
4  litigation involving Mayeaux
5  Construction, Inc. comes up before the
6  Court.
7      MR. DUPLANTIER: As I
8  understand it, counsel for Knauf
9  has -- Doug, and you can correct me --
10  three to four hours of additional
11  questions.  We have agreed to discuss
12  the continuation of this deposition at
13  a later date beyond the time limits
14  allowed under the Federal Rules of
15  Civil Procedure.
16      I am reserving my rights to
17  object to continuing beyond that time
18  limit, subject to those continued
19  negotiations with counsel for Knauf.
20      MR. SANDERS: Doug Sanders on
21  behalf of Knauf Plasterboard Tianjin.
22  I think that was stated correctly.
23  We're at about seven hours now, or
24  close to it.  And rather than start

Chinese Drywall MDL          Confidential – Subject to Further Confidentiality Review          Clayton & James Geary
February 5, 2010

---

Page 393

1  and have to stop, I'm going to try to
2  take it all up in one session.  If we
3  have to talk to the judge, we will;
4  but hopefully, we can agree.
5      (Proceedings concluded at
6      4:19 p.m.)
7  - - - - - - -
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 395

1          ACKNOWLEDGMENT OF DEPONENT
2              CLAYTON C. GEARY
3
4
5          I, CLAYTON C. GEARY, do hereby
6  certify that I have read the foregoing pages
   and that the same is a correct transcription
   of the answers given by me to the questions
7  therein propounded, except for the
   corrections or changes in form or substance,
8  if any, noted in the attached
   Errata Sheet.
9
10
11
12
13
   _____
   CLAYTON C. GEARY            DATE
14
15
16  Subscribed and sworn to before me this
17  _____ day of _____, 20 _____.
18  My commission expires: _____
19
20  Notary Public
21
22
23
24

---

Page 394

1              CERTIFICATE
2
3          I, MICHAEL E. MILLER, Registered
   Diplomate Reporter, Certified Realtime
4  Reporter and Notary Public, do hereby certify
   that prior to the commencement of the
5  examination CLAYTON C. GEARY and JAMES F.
   GEARY, SR. were duly sworn by me to testify
6  to the truth, the whole truth and nothing but
   the truth.
7
           I DO FURTHER CERTIFY that the
8  foregoing is a verbatim transcript of the
   testimony as taken stenographically by and
9  before me at the time, place and on the date
   hereinbefore set forth, to the best of my
10 ability.
11         I DO FURTHER CERTIFY that I am
   neither a relative nor employee nor attorney
12 nor counsel of any of the parties to this
   action, and that I am neither a relative nor
13 employee of such attorney or counsel, and
   that I am not financially interested in the
14 action.
15
16
17
       _____
18     MICHAEL E. MILLER,
       NCRA Registered Diplomate Reporter
19     NCRA Certified Realtime Reporter
       Certified LiveNote Reporter
       LA Certified Court Reporter #27009
20
21     Dated: February 9, 2010
22
23
24

---

Page 396

1  - - - - - - -
2      ERRATA - CLAYTON C. GEARY
   - - - - - - -
3  PAGE  LINE      CHANGE
4  ____  ____  _____
5  REASON: _____
6  ____  ____  _____
7  REASON: _____
8  ____  ____  _____
9  REASON: _____
10 ____  ____  _____
11 REASON: _____
12 ____  ____  _____
13 REASON: _____
14 ____  ____  _____
15 REASON: _____
16 ____  ____  _____
17 REASON: _____
18 ____  ____  _____
19 REASON: _____
20 ____  ____  _____
21 REASON: _____
22 ____  ____  _____
23 REASON: _____
24

---

Chinese Drywall MDL          Confidential – Subject to Further Confidentiality Review          Clayton & James Geary
February 5, 2010

---

Page 397

```
 1            ACKNOWLEDGMENT OF DEPONENT
 2               JAMES F. GEARY, SR.
 3
 4
 5          I, JAMES F. GEARY, SR., do hereby
    certify that I have read the foregoing pages
 6  and that the same is a correct transcription
    of the answers given by me to the questions
 7  therein propounded, except for the
    corrections or changes in form or substance,
 8  if any, noted in the attached
    Errata Sheet.
 9
10
11
12
13  _____
    JAMES F. GEARY, SR.              DATE
14
15
16  Subscribed and sworn to before me this
17  _____ day of _____, 20 _____.
18  My commission expires: _____
19
20  Notary Public
21
22
23
24
```

---

Page 399

```
 1          - - - - - - - -
            LAWYER'S NOTES
 2          - - - - - - - -
 3  PAGE   LINE
 4  ____   ____   _____
 5  ____   ____   _____
 6  ____   ____   _____
 7  ____   ____   _____
 8  ____   ____   _____
 9  ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21  ____   ____   _____
22  ____   ____   _____
23  ____   ____   _____
24  ____   ____   _____
```

---

Page 398

```
 1          - - - - - - - -
         ERRATA - JAMES F. GEARY, SR.
 2          - - - - - - - -
 3  PAGE   LINE     CHANGE
 4  ____   ____    _____
 5  REASON: _____
 6  ____   ____    _____
 7  REASON: _____
 8  ____   ____    _____
 9  REASON: _____
10  ____   ____    _____
11  REASON: _____
12  ____   ____    _____
13  REASON: _____
14  ____   ____    _____
15  REASON: _____
16  ____   ____    _____
17  REASON: _____
18  ____   ____    _____
19  REASON: _____
20  ____   ____    _____
21  REASON: _____
22  ____   ____    _____
23  REASON: _____
24
```