# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. 09 - 8074

GENERAL FIDELITY INSURANCE
COMPANY,

CIV-RYSKAMP   MAGISTRATE JUDGE
VITUNAG

Plaintiff,

v.

KATHERINE L. FOSTER, an individual;
NORTHSTAR HOLDINGS, INC., a Florida
corporation; NORTHSTAR HOMES, INC.,
a Florida corporation; and NORTHSTAR
HOLDINGS AT B & A, LLC, a Florida
corporation,


FILED by _____ D.C.
INTAKE

MAY 1 5 2009

STEVEN M. LARIMORE
CLERK U.S. DIST CT
S.D. OF FLA. MIAMI

Defendants.

_____/

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW Plaintiff, GENERAL FIDELITY INSURANCE COMPANY ("GENERAL FIDELITY"), and hereby files this Complaint for Declaratory Judgment and alleges as follows:

### Parties, Jurisdiction, Applicable Law and Venue

1.     This is an action for declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, to declare the rights surrounding questions of actual controversy that presently exist between Plaintiff and Defendants.

2.     Venue is proper in the West Palm Beach Division of the Southern District of Florida pursuant to 28 U.S.C. § 1391.

3.     GENERAL FIDELITY is a corporation organized and existing under the laws of California with its principal place of business in North Carolina, making GENERAL FIDELITY a citizen of the States of California and North Carolina.

4.     At all times material to this action, GENERAL FIDELITY was authorized to transact business in the state of Florida and submits itself to the jurisdiction and venue of this Court.

5.     Defendant Katherine Foster ("FOSTER") is an individual domiciled in Palm Beach County, Florida, and a citizen of Florida. Defendant is subject to the jurisdiction and venue of this Court.

6.     Defendant NORTHSTAR HOLDINGS, INC. is a Florida for-profit corporation with its principal place of business in Palm Beach County, Florida. Defendant is subject to the jurisdiction and venue of this Court.

7.     Defendant NORTHSTAR HOMES, INC. is a Florida for-profit corporation with its principal place of business in Palm Beach County, Florida. Defendant is subject to the jurisdiction and venue of this Court.

8.     Defendant NORTHSTAR HOLDINGS AT B & A, LLC is a Florida for-profit corporation with its principal place of business in Palm Beach County, Florida. Defendant is subject to the jurisdiction and venue of this Court.

9.     The Court has original jurisdiction over this action under the provisions of 28 U.S.C. § 1332(a) because it is a civil action in which the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

2

10.     The issues in controversy in this action should be determined under the laws of Florida because the parties to the insurance contracts, GENERAL FIDELITY, NORTHSTAR HOLDINGS, INC., and NORTHSTAR HOMES, INC., entered into the insurance contracts in Florida.

## Dispute at issue

11.     Defendant FOSTER has filed a putative class action in this Court, case number 9:09-cv-80535-JIC. Complaint attached as EXHIBIT A.

12.     Defendant FOSTER alleges her lawsuit is a putative class action because: (1) she believes that Class Members number in at least the thousands; (2) common questions of fact and law exist as to all members of the Class; (3) her claims are typical of the claims of the Class; and (4) she is an adequate representative of the Class because she is a member of the Class and her interests do not conflict with the interests of the members of the Class she seeks to represent. *See* EXHIBIT A at ¶¶ 106-109.

13.     The proposed claims of the putative class members allegedly exceed the sum or value of $5 million in the aggregate. *See* EXHIBIT A at ¶ 7.

14.     Defendant FOSTER alleges that the NORTHSTAR Defendants built her home in approximately 2006 located at 8777 Cobblestone Preserve Court in Boynton Beach, Florida and used defective drywall. *See* EXHIBIT A at ¶ 9.

15.     Defendant NORTHSTAR HOLDINGS at B & A, LLC. was the general contractor and entered into a subcontract agreement with Precision Drywall, Inc. for that subcontractor to furnish all labor, supervision, tools and equipment with respect to drywall

3

work at Cobblestone Creek. Cobblestone Creek Subcontract Agreement is attached as EXHIBIT B.

16.    Defendant FOSTER is suing Defendant NORTHSTAR HOMES, INC., NORTHSTAR HOLDINGS, INC. and other defendants for bodily injuries, property damage, and other damages she allegedly sustained as a result of defective drywall in her home. *See* EXHIBIT A.

17.    Defendant FOSTER alleges that the defective drywall emitted various sulfide gases and/or other chemicals through "off-gasing" that created noxious, "rotten egg-like" odors, causing bodily injury and property damage. *See* EXHIBIT A at ¶ 2.

18.    Defendant FOSTER alleges in her lawsuit that "[a]s a direct and proximate result of Defendants' actions and omissions, Plaintiff's and the Class Members' homes and bodies been exposed to Defendants' drywall and the corrosive and harmful effects of the sulfide gases and other chemicals being released from these proven hazardous substances." *See* EXHIBIT A at ¶ 98.

19.    Defendant FOSTER alleges, among other things, negligence against the NORTHSTAR Defendants, including that they were negligent and breached their duty to exercise reasonable care in the supply, inspection, selling, and installation, including a duty to adequately warn, of the defective drywall. See EXHIBIT A at ¶ 117.

20.    The following counts are in Defendant FOSTER's putative class action suit:

- Count I Negligence (Against All Defendants)
- Count II Negligence Per Se (Against All Defendants)
- Count III Strict Liability (Against All Defendants)
- Count IV Breach of Express Warranty (Against All Defendants)

4

- Count V Breach of Implied Warranties (Against All Defendants)
- Count VI Fraudulent Concealment (Against All Defendants)
- Count VII Fraudulent Misrepresentation (Against All Defendants)
- Count VIII Negligent Misrepresentation (Against all Defendants)
- Count IX Unjust Enrichment (Against All Defendants)
- Count X Breach of Contract (Against Northstar Homes)
- Count XI Private Nuisance (Against All Defendants)
- Count XII Equitable Relief, Injunctive Relief and Medical Monitoring
- Count XIII Violation of the Florida Deceptive and Unfair Trade Practices Act (All Defendants)
- Count XIV Breach of Implied Warranty of Merchantability (All Defendants)
- Count XV Breach of Implied Warranty of Fitness for a Particular Purpose (All Defendants)

*See* EXHIBIT A.

## The Policies

21.     Plaintiff GENERAL FIDELITY issued to Defendant NORTHSTAR HOLDINGS, INC. a commercial general liability policy, policy number BAG0002215-00 with effective dates of coverage from October 22, 2006 to October 22, 2007 ("First Policy"). A copy of the policy is attached as EXHIBIT C.

22.     The First Policy lists NORTHSTAR HOLDINGS AT B & A, LLC as a "supplemental – named insured." See EXHIBIT C.

23.     Plaintiff GENERAL FIDELITY issued to Defendant NORTHSTAR HOMES, INC. a commercial general liability policy, policy number BAG0004973-00 with effective

5

dates of coverage from October 22, 2007 to October 22, 2008 ("Second Policy"). A copy of the policy is attached as EXHIBIT D.

24.     The Second Policy lists NORTHSTAR HOLDINGS, INC. and NORTHSTAR HOLDINGS AT B & A, LLC as "supplemental – named insured." *See* EXHIBIT D.

25.     Plaintiff GENERAL FIDELITY issued to Defendant NORTHSTAR HOMES, INC. a commercial general liability policy, policy number BAG0006227-00, ("Third Policy") with effective dates of coverage from October 22, 2008  to October 22, 2009. A copy of the Policy is attached as EXHIBIT E.

26.     The Third Policy lists NORTHSTAR HOLDINGS, INC. and NORTHSTAR HOLDINGS AT B & A, LLC as  "supplemental – named insured." *See* EXHIBIT C.

27.     The First, Second and Third Policy ("the Policies" collectively) do not cover bodily injuries, property damage, or other damages caused by emissions of gases or fumes from the defective drywall.

28.     The Policies also do not cover any costs to repair or replace the defective drywall.

29.     The First Policy, effective from October 22, 2006 to October 22, 2007, and the Second Policy, effective from October 22, 2007 to October 22, 2008, use insuring form CG 00 01 12 04, while the Third Policy, effective from October 22, 2008 to October 22, 2009, uses insuring form CG 00 01 12 07. (Differences in language in the insuring forms are noted below).

30.     The Policies that GENERAL FIDELITY issued to NORTHSTAR HOLDINGS, INC. and NORTHSTAR HOMES, INC. provide coverage under Section - COVERAGES, COVERAGE A  BODILY INJURY AND PROPERTY DAMAGE LIABILITY, as follows:

6

**SECTION I – COVERAGES**

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.      **Insuring Agreement**

        a.      We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result....

* * *

        b.      This insurance applies to "bodily injury" and "property damage" only if:

                (1)     The "bodily injury" or "property damage" is caused by an occurrence that takes place in the "coverage territory";

                (2)     The "bodily injury" or "property damage" occurs during the policy period; and

                (3)     Prior to the policy period, no insured listed under Paragraph I. Of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part.  If such a listed insured or authorize "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any contribution, change or resumption of such "bodily injury" or

7

"property damage" during or after the
policy period will be deemed to have been
known prior to the policy period.

\* \* \*

31.   The Policies contain the following exclusions:

    2.   **Exclusions**

        This insurance does not apply to:

\* \* \*

    f.   **Pollution** [replaced by Florida Total Pollution Exclusion
         Endorsement, see below]

        (1)   "Bodily injury" or "property damage" arising out of the
              actual, alleged or threatened discharge, dispersal,
              seepage, migration, release or escape of "pollutants":

            (a)   At or from any premises, site or location which is
                  or was at any time owned or occupied by, or
                  rented or loaned to, any insured. However, this
                  subparagraph does not apply to:

                (i)    "Bodily injury" if sustained within a
                       building and caused by smoke, fumes,
                       vapor or soot produced by or originating
                       from equipment that is used to heat, cool
                       or dehumidify the building, or equipment
                       that is used to heat water for personal
                       use, by the building's occupants or their
                       guests;

                (ii)   "Bodily injury" or "property damage" for
                       which you may be held liable, if you are a
                       contractor and the owner or lessee of
                       such premises, site or location has been
                       added to your policy as an additional
                       insured with respect to your ongoing
                       operations performed for that additional
                       insured at that premises, site or location
                       and such premises, site or location is not
                       and never was owned or occupied by, or

8

rented or loaned to, any insured, other than that additional insured; or

(iii)   "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b)   At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c)   Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i)   Any insured; or

(ii)   Any person or organization for whom you may be legally responsible; or

(d)   At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.   However, this subparagraph does not apply to:

(i)   "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them.   This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, of if such fuels, lubricants or other operating fluids are brought on or

9

to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii)    "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii)   "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e)    At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

(2)    Any loss, cost or expense arising out of any:

(a)    Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b)    Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

\*\*\*

10

m.   **Damage to Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)   A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
(2)   A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n.   **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1)   "Your product";
(2)   "Your work"; or
(3)   "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

\* \* \*

**FLORIDA TOTAL POLLUTION EXCLUSION ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

I.   For purposes of this endorsement only, exclusion f. under paragraph 2., Exclusions of SECTION I - COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY is deleted and replaced by the following:

11

This insurance does not apply to:

f.      **Pollution**

(1)     "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

(2)     Any loss, cost or expense arising out of any:

    (a)     Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants"; or

    (b)     Claim or "suit" by or on behalf of a governmental authority or others for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of "pollutants."

II.     For purposes of this endorsement only, definition 15 of SECTION V - DEFINITIONS is deleted and replaced by the following:

15.     "Pollutants" mean any solid, liquid, gaseous, thermal, acoustic, electric, magnetic or electromagnetic irritant or contaminant. "Pollutants" include, but are not limited to, smoke, vapor, soot, dusts, fumes, fibers, radiation, acid(s), alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

All other terms and conditions of this policy remain unchanged.

32.     The Policies have the following relevant definitions:

**SECTION V - DEFINITIONS**

3.      "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\* \* \*

12

8.  "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

    a.  It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

    b.  You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

    a.  The repair, replacement, adjustment or removal of "your product" or "your work"; or

    b.  Your fulfilling the terms of the contract or agreement.
       **[insuring form CG 00 01 12 04]**

8.  "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

    a.  It incorporates "your product" or "your work" that is known or thought to be known to be defective, deficient, inadequate or dangerous; or

    b.  You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.
**[insuring form CG 00 01 12 07]**

\* \* \*

13.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

15.  "Pollutants" mean any solid, liquid, gaseous or thermal

13

irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed. [Replaced by Florida Total Pollution Exclusion Endorsement]

* * *

17.   "Property damage" means:

    a.   Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.   Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence' that caused it.

* * *

22.   "Your work":

    a.   Means:

        (1)   Work or operations performed by you or on your behalf; and

        (2)   Materials, parts or equipment furnished in connection with such work or operations.

    b.   Includes

        (1)   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

        (2)   The providing of or failure to provide warnings or instructions.

* * *

33.   The "Florida Total Pollution Exclusion Endorsement" endorsement excludes

14

any "bodily injury" or "property damage" caused in whole or in part by the "discharge, dispersal, seepage, migration, release or escape of 'pollutants.'"

34.    The "Florida Total Pollution Exclusion Endorsement" excludes any loss, cost or expense arising out of the removal and replacement of the allegedly defective drywall.

35.    Exclusion (n) excludes damages, including, but not limited to, the loss of use Defendant FOSTER's home as a result of the defective drywall.

36.    Exclusion (m) excludes any damages for any loss, cost or expense incurred for the loss of use of "your work" if it is withdrawn from the market or from use by any person so that the policy excludes damages for the removal and replacement of the defective drywall.

## DECLARATORY JUDGMENT

37.    GENERAL FIDELITY re-alleges paragraphs 1 through 36 above as if fully set forth herein.

38.    There exists a bona fide, actual, present and practical need for a legal determination by this Court of the duties, rights and obligations, if any, of GENERAL FIDELITY with regard to injuries and damages arising out of the defective drywall.

39.    GENERAL FIDELITY, FOSTER, NORTHSTAR HOMES, INC., NORTHSTAR HOLDINGS, INC., and NORTHSTAR HOLDINGS AT B & A, LLC have an actual, present, adverse and antagonistic interest in the subject matter described herein.

40.    The rights and obligations of GENERAL FIDELITY under the insurance contract are dependent upon the facts referenced herein and the law applicable to such facts.

41.    All conditions precedent to the maintenance of this action have been

15

complied with, have occurred, or otherwise have been waived.

    42.    All parties who do or may claim an interest in the subject matter hereof have been joined herein as parties.

    43.    The insurance contracts do not provide coverage for any bodily injuries, property damage or other damages arising out of the alleged release, emissions, or "off-gassing" from the defective drywall.

    44.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, GENERAL FIDELITY is entitled to a declaration that the Policies provide no coverage available for any claims with respect to the allegedly defective drywall.

    WHEREFORE, GENERAL FIDELITY requests entry of final judgment in its favor as against Defendants, declaring that the Policies provide no coverage for "bodily injury," "property damage," or other damages arising out of the alleged release, emission, or "off-gasing" from the defective drywall so that GENERAL FIDELITY has no duty to defend or indemnify for the losses complained.

Dated: May 13, 2009
       Tampa, Florida

16

Respectfully submitted,

LOUIS SCHULMAN, ESQ.
Florida Bar No.: 377244
lschulman@butlerpappas.com
BUTLER PAPPAS WEIHMULLER KATZ CRAIG LLP
777 S. Harbour Island Boulevard, Suite 500
Tampa, FL 33602
Tel. 813-281-1900
Fax. 813-281-0900
Attorneys for Plaintiff, GENERAL FIDELITY INSURANCE
COMPANY

17

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)     NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS

General Fidelity Insurance Company

**DEFENDANTS**

Katherine L. Foster; Northstar Holdings, Inc.; Northstar Homes, Inc.; Northstar Holdings at B and A, LLC

**(b)** County of Residence of First Listed Plaintiff  Mecklenburg, NC
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Palm Beach, FL
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.   MAY 1 5 2009

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Louis Schulman  Butler Pappas Weihmuller Katz Craig, LLP
777 S. Harbour Island Blvd., Suite 500, Tampa, FL 33602
813-281-1900

Attorneys (If Known)

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. - MIAMI

(d) Check County Where Action Arose:   □ MIAMI- DADE   □ MONROE   □ BROWARD   ☑ PALM BEACH   □ MARTIN   □ ST. LUCIE   □ INDIAN RIVER   □ OKEECHOBEE   HIGHLANDS

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

□ 1   U.S. Government
Plaintiff

□ 3   Federal Question
(U.S. Government Not a Party)

□ 2   U.S. Government
Defendant

√□ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | □ 1 | √□ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | √□ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

WPB09CV 80743 - Ryskamp/Vitunac

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | □ 610 Agriculture | □ 422 Appeal 28 USC 158 | □ 400 State Reapportionment |
| □ 120 Marine | □ 310 Airplane | □ 362 Personal Injury - | □ 620 Other Food & Drug | □ 423 Withdrawal | □ 410 Antitrust |
| □ 130 Miller Act | □ 315 Airplane Product | Med. Malpractice | □ 625 Drug Related Seizure | 28 USC 157 | □ 430 Banks and Banking |
| □ 140 Negotiable Instrument | Liability | □ 365 Personal Injury - | of Property 21 USC 881 | | □ 450 Commerce |
| □ 150 Recovery of Overpayment | □ 320 Assault, Libel & | Product Liability | □ 630 Liquor Laws | **PROPERTY RIGHTS** | □ 460 Deportation |
| & Enforcement of Judgment | Slander | □ 368 Asbestos Personal | □ 640 R.R. & Truck | □ 820 Copyrights | □ 470 Racketeer Influenced and |
| □ 151 Medicare Act | □ 330 Federal Employers' | Injury Product | □ 650 Airline Regs. | □ 830 Patent | Corrupt Organizations |
| □ 152 Recovery of Defaulted | Liability | Liability | □ 660 Occupational | □ 840 Trademark | □ 480 Consumer Credit |
| Student Loans | □ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | □ 490 Cable/Sat TV |
| (Excl. Veterans) | □ 345 Marine Product | □ 370 Other Fraud | □ 690 Other | | □ 810 Selective Service |
| □ 153 Recovery of Overpayment | Liability | □ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | □ 850 Securities/Commodities/ |
| of Veteran's Benefits | □ 350 Motor Vehicle | □ 380 Other Personal | □ 710 Fair Labor Standards | □ 861 HIA (1395ff) | Exchange |
| □ 160 Stockholders' Suits | □ 355 Motor Vehicle | Property Damage | Act | □ 862 Black Lung (923) | □ 875 Customer Challenge |
| □ 190 Other Contract | Product Liability | □ 385 Property Damage | □ 720 Labor/Mgmt. Relations | □ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| □ 195 Contract Product Liability | □ 360 Other Personal | Product Liability | □ 730 Labor/Mgmt.Reporting | □ 864 SSID Title XVI | □ 890 Other Statutory Actions |
| □ 196 Franchise | Injury | | & Disclosure Act | □ 865 RSI (405(g)) | □ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | □ 740 Railway Labor Act | **FEDERAL TAX SUITS** | □ 892 Economic Stabilization Act |
| □ 210 Land Condemnation | □ 441 Voting | □ 510 Motions to Vacate | □ 790 Other Labor Litigation | □ 870 Taxes (U.S. Plaintiff | □ 893 Environmental Matters |
| □ 220 Foreclosure | □ 442 Employment | Sentence | □ 791 Empl. Ret. Inc. Security | or Defendant) | □ 894 Energy Allocation Act |
| □ 230 Rent Lease & Ejectment | □ 443 Housing/ | **Habeas Corpus:** | Act | □ 871 IRS—Third Party | □ 895 Freedom of Information Act |
| □ 240 Torts to Land | Accommodations | □ 530 General | | 26 USC 7609 | |
| □ 245 Tort Product Liability | □ 444 Welfare | □ 535 Death Penalty | **IMMIGRATION** | | □ 900 Appeal of Fee Determination |
| □ 290 All Other Real Property | □ 445 Amer. w/Disabilities - | □ 540 Mandamus & Other | □ 462 Naturalization | | Under Equal Access to Justice |
| | Employment | □ 550 Civil Rights | Application | | |
| | □ 446 Amer. w/Disabilities - | □ 555 Prison Condition | □ 463 Habeas Corpus-Alien | | □ 950 Constitutionality of State |
| | Other | | Detainee | | Statutes |
| | □ 440 Other Civil Rights | | □ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

√□ 1 Original Proceeding   □ 2 Removed from State Court   □ 3 Re-filed (see VI below)   □ 4 Reinstated or Reopened   □ 5 Transferred from another district (specify)   □ 6 Multidistrict Litigation   □ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case □ YES □ NO     b) Related Cases ☑ YES □ NO

JUDGE  K. Michael Moore          DOCKET NUMBER 9:09CV80535

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 USC1322(a) Declaratory action involving diversity - Plaintiff is diverse from all Defendants.

LENGTH OF TRIAL via  5  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

□ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   □ Yes   √ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  May 13, 2009

FOR OFFICE USE ONLY

AMOUNT $ 350.00   RECEIPT # 100104

05/18/09

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. _____

| | |
|---|---|
| KATHERINE L. FOSTER, on behalf of herself individually and all others similarly situated, : <br><br> Plaintiffs, : <br><br> v. : <br><br> NORTHSTAR HOLDINGS, INC., a Florida corporation; NORTHSTAR HOMES, INC., a Florida corporation; KNAUF GIPS KG, a German corporation; KNAUF PLASTERBOARD (TIANJIN) CO., LTD., a Chinese limited liability corporation; KNAUF PLASTERBOARD (WUHU) CO. LTD.; KNAUF PLASTERBOARD (DONGGUAN) CO. LTD.; USG CORPORATION, a foreign corporation; BANNER SUPPLY CO., a Florida corporation; ROTHCHILT INTERNATIONAL LTD., a foreign corporation; Developer/Builder Does 1-100; Supplier Does 1-100; Installer Does 1-100; and Distributer Does 1-100; : <br><br> ___Defendants.___ : | **09-80535** <br><br> **CIV-COHN** <br><br> CIVIL ACTION <br> **JURY TRIAL DEMANDED** <br> MAGISTRATE JUDGE <br> ∼ SELTZER ∽ <br><br> FILED by _ATS_ D.C. <br><br> APR - 3 2009 <br><br> STEVEN M. LARIMORE <br> CLERK U. S. DIST. CT. <br> S. D. of FLA. – MIAMI |

## CLASS ACTION COMPLAINT

Plaintiff, Katherine L. Foster, brings this action on behalf of herself and on behalf of a

Class of persons described below. Plaintiff brings this action against Northstar Holdings, Inc.

and Northstar Homes, Inc.; Knauf Gips KG, Knauf Plasterboard (Tianjin) Co., Ltd., and Knauf

Plasterboard (Dongguan) (collectively referred to herein as "Knauf"); USG Corporation, Banner

**EXHIBIT**

**A**

ALTER... ...ULMO

Miami Design District, 4141 Northeast 2nd Avenue · Su... ...: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

Supply Company, Rothchilt International Ltd.("Rothchilt"), Supplier Does 1-100 (collectively referred to herein as "Suppliers"); Installer Docs 1-100 (collectively referred to herein as "Installers"); and Distributer Does 1-100 (collectively referred to herein as "Distributers"). All facts contained in this complaint are alleged upon information and belief and based upon the investigation of counsel.

## INTRODUCTION

1.     Plaintiff brings this action individually and on behalf of all other similarly situated owners of homes in the United States built using the defective drywall described herein. Alternatively, Plaintiff brings this action individually and on behalf of all other similarly situated owners of homes in the State of Florida built using the defective drywall described herein.

2.     Defendants' drywall used in the homes of Plaintiff and the Plaintiff Class Members is inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors, and causes damage and corrosion ("the Defect") to home structure and mechanical systems such as air-conditioner and refrigerator coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring, as well as personal and other property such as microwaves, utensils, personal property, electronic appliances, jewelry, and other household items ("Other Property"). The compounds emitted by the drywall at issue are also capable of, among other things, harming the health of individuals subjected to prolonged exposure. These chemical compounds cause and have caused dangerous health consequences including, among other things, respiratory problems, sinus problems, eye irritation and nose bleeds.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue – Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

3.    This Defect is latent and existed in Defendants' drywall at the time of installation regardless of the way the product was installed, maintained, and/or painted. There is no repair that will correct the Defect.

4.    As a result of Defendants' conduct as alleged herein, Plaintiff and thousands of other Class Members have suffered economic losses by owning homes containing inherently defective drywall that has caused damage to their homes and Other Property.

5.    Plaintiff and Class Members have incurred or will incur tens of thousands of dollars in damages including, but not limited to: repair/replacement of homes, Other Property, any materials contaminated or corroded by the drywall as a result of "off-gassing," incidental and consequential damages.

6.    Further, as a result of Defendants' conduct as alleged herein, Plaintiff and thousands of others Class Members have suffered harm and/or been exposed to an increased risk of harm and thus have need for injunctive and/or equitable relief in the form of emergency notice, environmental monitoring, and medical monitoring.

## JURISDICTION AND VENUE

7.    The Court has subject matter jurisdiction over this nationwide class action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one plaintiff is diverse from at least one defendant.

8.    Venue is proper in this District under 28 U.S.C. § 1391(a), (b), and (c). Defendants are incorporated and headquartered within this Federal Judicial District, advertise in this District, build homes in this District, have made material omissions and misrepresentations

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue - Suite 201 · Miami, Fl 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

and breaches of warranties emanating from this District, or are otherwise subject to personal jurisdiction in this District.

## THE PARTIES

### PLAINTIFF

9.      Plaintiff, Katherine L. Foster, lives and resides in Palm Beach County, and owns and resides in a home located at 8777 Cobblestone Preserve Court, Boynton Beach, Florida 33472. Plaintiff's home was built by the Northstar Defendants using defective drywall in approximately 2006. Plaintiff has had substantial problems with the home, including but not limited to the corrosive effects of the sulfur and/or other compounds in the drywall, has suffered adverse medical effects and personal injury, and has suffered injury to personal and real property as a result of Defendants' conduct as further described herein.

### DEFENDANTS

**Developer/Builder Defendants: Northstar Holdings, Inc. and Northstar Homes, Inc.**

10.     Defendant Northstar Holdings, Inc. is a Florida for Profit Corporation with its principal place of business in Palm Beach County, Florida.

11.     Defendant Northstar Homes, Inc. is a Florida for Profit Corporation with its principal place of business in Palm Beach County, Florida.

12.     Defendants Northstar Holdings, Inc. and Northstar Homes, Inc. are affiliated companies located at the same address and having the same principal officers and directors. The Northstar Defendants operate under the trade name of "Northstar Homes" (collectively referred to as "the Northstar Defendants," "Northstar Homes," or "Builder"). Northstar Homes is a leading South Florida home builder and since its inception it has built thousands of homes in

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

numerous communities in the State of Florida.    Northstar Homes developed and built "Cobblestone Creek," the community where the Plaintiff's home is situated.

13.    Upon information and belief, the Northstar Defendants, and John Doe Builder/Developer Defendants, installed defective drywall in the Plaintiff's and Class Members' homes located in the State of Florida. Defendants' acts or omissions, directly or indirectly through its agents, employees, or affiliates, with respect to the defective drywall have injured Plaintiff and Class Members as alleged herein.

**Manufacturer Defendants: Knauf Entities**

14.    Defendant Knauf Gips is a German corporation doing business in the State of Florida with its principal place of business located at Postfach 10, D-97343 Iphofen, Germany. Knauf Gips is a leading manufacturer of building materials and systems. Knauf Gips, together with its affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan), provides building materials and systems to customers in over 50 countries, including the United States. Upon information and belief, at all material times hereto, Knauf Gips supervised, operated, trained and otherwise exercised control and/or had the right to control the operations of Knauf Tianjin, and its agents, apparent agents, and employees.

15.    Among other things, in 1995, Knauf Gips introduced its advanced production techniques and technology into China. From 1997 through 2001, Knauf Gips invested in China and established three plasterboard plants which are located in Wuhu, Tianjin and Dongguan. The product quality of all Knauf Gips' plants in China, including Knauf Tianjin, are strictly controlled according to the requirements of Knauf Gips' headquarters in Germany. Moreover, Knauf Gips' sales and technical support teams support Knauf Gips' businesses throughout the

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue - Suite 201 · Miami, FL 33137 - Telephone: 305-571-8550  Fax: 305-571-8558 - www.abbrclaw.com

world, including Knauf Tianjin in China. Knauf Tianjin and its employees are the actual and/or apparent agents in Knauf Gips.

16.    Upon information and belief, Knauf Gips, together with its affiliates and/or actual or apparent agents, including Knauf Tianjin, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within the United States, including Florida. Upon information and belief, Knauf Gips and/or Knauf Tianjin has continuously and systematically distributed and sold drywall to numerous purchasers in the State of Florida and throughout the United States, and their drywall is installed in numerous homes in the United States, including Florida. As discussed more fully below, Knauf Gips and/or Knauf Tianjin manufactured and sold, directly or indirectly, to certain suppliers in the United States and Florida, including Defendants USG Corporation, Banner Supply, Rothchill, and Does 1-100, defective gypsum drywall that was installed in homes being built by Northstar Homes and others, thereby causing substantial damage to Plaintiff and the Class. Moreover, Knauf Gips and/or Knauf Tianjin purposefully availed themselves of the jurisdiction of this Court by selling and shipping substantial quantities of drywall into the United States and the State of Florida and by hiring agents within the State of Florida to investigate the very allegations at issue in this lawsuit.

17.    Knauf Gips employs approximately 20,000 employees worldwide, with more than 130 production plants, and generates annual sales in excess of €4.8 billion.

18.    Knauf Gips provided defective drywall to one or more of the Plaintiffs' homes.

19.    Knauf Gips improperly manufactured, marketed, and later distributed the subject defective drywall in the United States, including Florida. Defendant also failed to provide

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone:305-571-8550 Fax:305-571-8558 • www.abbrclaw.com

adequate warnings regarding the hazardous and defective nature of Chinese drywall in the United States, including Florida.

20.     The quality of all Knauf Gips' Chinese drywall plants in China is supervised, overseen, and controlled according to the requirements of Knauf Gips' headquarters in Germany.

21.     Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan and their employees are the actual and/or apparent agents of Knauf Gips.

22.     Upon information and belief, Knauf Gips by itself and/or through its agents, subsidiaries, and/or affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) has continuously and systematically distributed and sold drywall to numerous purchasers in the United States, including Florida, with the knowledge that its drywall would be and is installed in numerous homes in the United States, including Florida.

23.     As discussed more fully below, Knauf Gips by itself and/or through its agents, subsidiaries and affiliates (including Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold, directly and indirectly, to certain suppliers in the United States and Florida, including Defendants USG Corporation, Banner Supply, Rothchilh, and Supplier/Installer/Distributer Does 1-100, defective Chinese drywall that was installed in homes being built in the United States, including Florida, thereby causing substantial damage to Plaintiff and Class Members in the United States, including Florida.

24.     Knauf Gips and each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) participated in the wrongful acts herein.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

25.    Knauf Gips and each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) also acted in joint enterprise, joint venture and as each other's agent within the course and scope of said agency.

26.    At all times relevant hereto, Defendant Knauf Gips and each Knauf Entity, (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan) acted by and through their employees, agents, apparent agents and representatives, who were acting within the course and scope of their employment, agency, apparent agency and representation and in the furtherance of Defendants' interests.

27.    Defendant Knauf Gips is the parent corporation of the Knauf Entities (Defendants Knauf Tianjin, Knauf Wuhu, and Knauf Dongguan). Knauf Gips individually participated, ratified, approved and directed the improper or illegal acts and omissions described herein.

**Knauf Gips' Chinese Drywall Distribution**

28.    Upon information and belief, tens of millions of square feet of Defendant Knauf Gips defective drywall was used in the construction of United States homes, including Florida homes, between 2004 and the present.

29.    Because of a shortage of construction materials from a booming housing market and massive damage in the United States in 2005 caused by Hurricanes Katrina and Wilma, domestic builders, suppliers, and importers began bringing significant stocks of foreign manufactured drywall into the United States.

30.    At least 550 million pounds of Chinese drywall came into the United States from approximately 2004 to 2006 -- enough to construct 60,000 average-size homes.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

31.    Nearly 60 percent of the Chinese drywall that came into the United States came in through Florida ports, as well as ports located in other U.S. States, including Louisiana, Texas, and ports along the east coast of the United States.

32.    Miami's port received the largest number of shipments of Chinese drywall. Public records show that more than 100 million pounds of Chinese drywall were off-loaded in Miami. Other ports with significant Chinese drywall off-loading include Port Everglades (80 million pounds), Tampa (50 million pounds), as well as Port Manatee, Pensacola, Port Canaveral, and Jacksonville.

33.    At least 37 million pounds of Knauf drywall was shipped directly from three sites in China to Florida through Tampa and Port Canaveral. Knauf Tianjin sent an additional amount (characterized by company officials as "most" of its drywall) into Miami.

34.    In March 2006, Knauf Dongguan shipped 11 million pounds of Chinese drywall aboard the cargo ship *Afra*. This shipment was unloaded in Port Canaveral.

35.    In the spring of 2006, the cargo ship *Great Immensity* unloaded one shipment of more than 16 million pounds of Chinese drywall manufactured by Knauf Tianjin -- enough to make approximately 1,700 homes. The *Great Immensity* unloaded shipments at more than two dozen ports throughout the United States, including seven in Florida.

36.    Shipping records show coordination between Knauf's Chinese subsidiaries, such as sharing the same vessel to transport their product to the U.S. In April 2006, the *Yong An Cheng* took three shipments from Knauf Wuhu and a fourth from Knauf Dongguan to the U.S. All were imported by United States Gypsum Corporation, one of the largest manufacturers of domestic drywall in the U.S. market.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

37.     Knauf Tianjin, one of three Knauf Gips Chinese subsidiaries, admits that it manufactured and imported at least 20 percent of the imported Chinese drywall that came into the United States.

38.     Shipping information indicates that Knauf Tianjin sent at least 38.7 million pounds Chinese drywall to the United States in 2006 and Knauf Wuhu sent at least 28.6 million pounds of Chinese drywall. Based on U.S. Customs and Census information, these figures would indicate that 78 percent of Chinese drywall imports in 2006 came from these two Knauf plants.

39.     Many builders in the United States and Florida have admitted using Knauf Chinese drywall in communities throughout the United States and Florida.

**Knauf Gips' Subsidiary-Knauf Tianjin**

40.     Upon information and belief, Defendant Knauf Tianjin, is an international corporation organized under the laws of China doing business in the State of Florida with its principal place of business located at North Yinhe Bridge, East Jingjin Road, RC-300400, Tianjin, China.

41.     Defendant Knauf Tianjin manufactured and distributed defective drywall that is in one or more of Plaintiffs' homes.

42.     Knauf Tianjin improperly manufactured, marketed, and distributed the subject defective drywall in the United States. Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, Fl 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

**Knauf Gips' Subsidiary-Knauf Wuhu**

43.    Upon information and belief, Defendant, Knauf Wuhu, is an international corporation organized under the laws of China doing business in the State of Florida with its principal place of business located at No. 2 Gang Wan Road, RC-241009, Wuhu Anhui, China.

44.    Defendant Knauf Wuhu manufactured and distributed defective drywall that is in one or more of Plaintiffs' homes.

45.    Knauf Wuhu improperly manufactured, marketed, and distributed the subject defective drywall in the United States. Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

**Knauf Gips' Subsidiary-Knauf Dongguan**

46.    Upon information and belief, Defendant Knauf Dongguan, is an international corporation organized under the laws of China doing business in the State of Florida with its principal place of business located at No.2 Xinsha Development Zone, RC-523147, Guangdong, China.

47.    Defendant Knauf Dongguan manufactured and distributed defective drywall that is in one or more of Plaintiffs' homes.

48.    Knauf Dongguan improperly manufactured, marketed, and distributed the subject defective drywall in the United States. Defendant also failed to provide adequate warnings regarding the hazardous and defective nature of its defective drywall in the United States.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

### Defendant Distributors/Suppliers

**Defendant USG Corporation**

49.     Defendant USG Corporation is a Delaware corporation authorized to do and doing business in the State of Florida. USG, together with its various affiliates, is the nation's largest distributor of drywall and related building products.

50.     Defendant USG Corporation exported, imported, manufactured, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the United States, including Florida. Directly or indirectly through agents, affiliates or co-conspirators, Defendant USG Corporation's acts or omissions related to defective Drywall have injured Plaintiff and Class Members as alleged herein.

**Defendant Banner Supply**

51.     Defendant Banner Supply is a Florida corporation with its principal place of business located in the Southern District of Florida at 7195 N.W. 30th Street, Miami, Miami-Dade County, Florida 33122.

52.     Defendant Banner Supply exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the State of Florida. Directly or indirectly through agents, affiliates or co-conspirators, Defendant Banner Supply's acts or omissions related to defective Drywall have injured Plaintiff and Class Members as alleged herein.

**Defendant Rothchilt International Ltd.**

53.     Defendant Rothchilt is a foreign corporation doing business in the State of Florida with its principal place of business located at N-510 Chia Hsin Bld., Annex 96 Chung Shan N. Rd. Sec. 2, Taipei, Taiwan R.O.C.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

54.    Defendant Rothchilt exported, imported, manufactured, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall in the United States, including Florida.    Directly or indirectly through agents, affiliates or co-conspirators, Defendant Rothchilt's acts or omissions related to defective Drywall have injured Plaintiff and Class Members as alleged herein.

55.    Defendant Distributor/Suppliers USG Corporation, Banner Supply and Rothchilt also failed to provide adequate warnings regarding the hazardous and defective nature of their defective drywall in the United States.

56.    The identities of Distributor Does 1-100, Supplier Does 1-100, and Installer Does 1-100 are unknown to Plaintiff at this time. These John Doe Defendants are builders, installers, and suppliers of defective drywall whom Plaintiff has not yet been able to identify. When the identities of these individuals and/or entities are discovered, undersigned counsel will amend the Complaint to specifically name the Defendants referred to as Distributor Does 1-100, Supplier Does 1-100, and Installer Does 1-100.

## GENERAL ALLEGATIONS

A.    **Drywall Background**

57.    Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, sheetrock, gyproc, or simply, board.

58.    A drywall panel is made of a paper liner wrapped around an inner core made primarily from hardened gypsum plaster.

59.    Drywall is typically available in 4 feet (1219 mm) wide sheets of various lengths. Newly formed sheets are cut from a belt, the result of a continuous manufacturing process.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

60.    The most commonly used drywall is ½ inch thick but can range from ¼ inch (6.35 mm) to one inch (25.4 mm) thick.

61.    The core material of drywall, gypsum, is available in two forms, pure gypsum, which is naturally occurring, and synthetic gypsum, which is manmade.

62.    Pure gypsum is a white to transparent mineral, but sometimes impurities color it grey, brown, or pink.

63.    Synthetic gypsum is generally manufactured with byproducts of coal-fired power plants.

64.    Coal combustion byproducts ("CCBs") or coal combustion products ("CCPs") are the inorganic residues that remain after pulverized coal is burned.

65.    The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

66.    In order to meet emission standards, many utilities have installed flue gas desulfurization ("FGD") equipment. Flue gas desulfurization is a chemical process to remove sulfur oxides from the flue gas at coal-burning power plants.

67.    Various FGD methods have been developed that chemically combine the sulfur gases released in coal combustion by reacting them with a sorbent, such as limestone or lime.

68.    As the flue gas comes in contact with the slurry of calcium salts, sulfur dioxide reacts with the calcium to form hydrous calcium sulfate, otherwise known as gypsum.

**B.    How Drywall Is Created**

69.    In order to form drywall, gypsum must be "calcined," or partially dehydrated by heating.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

70.    When gypsum is heated, it loses about three quarters of its water and becomes
hemihydrate gypsum which is soft and can be easily ground to a powder called hemihydrate
gypsum plaster.

71.    The gypsum powder is then mixed with water to form a paste or slurry.

72.    While the hemihydrate gypsum plaster is in slurry form, it is poured between two
paper layers to make drywall.

73.    Drywall is formed by sandwiching a core of wet gypsum between two sheets of
heavy paper or fiberglass mats. When the core sets and is dried in a large drying chamber, the
"sandwich" becomes rigid and strong enough for use as a building material.

74.    The paste or slurry is typically mixed with fiber (usually paper and/or fiberglass),
plasticizer, foaming agent, potash as an accelerator, starch or other chelate as a retarder, various
additives that increase mildew and fire resistance (fiberglass or vermiculite), and water.

75.    Drywall may consist of two other materials with sulfur content: alkyl ethoxy
sulfates as foaming agents and lignin or napthalene sulfonates as dispersing agents.

C.    **The Defective Drywall Emits Noxious and Corrosive Levels of Sulfur**

76.    Upon information and belief, Defendants' drywall contained naturally mined
gypsum and synthetic gypsum manufactured from CCBs.

77.    When gypsum, mined or synthetic, is subjected to certain environmental
conditions, the product breaks down into sulfate ions which in turn can be chemically
transformed into hydrogen sulfide gas and other sulfide gases.

78.    The problem of sulfide emissions from drywall is well understood in the drywall
industry and has been studied for many years.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

79.     The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.

80.     Sulfide emissions from drywall have been a particular problem in landfills and, as such, many landfills refuse to accept drywall or place strict limitations on the amounts and on the ways in which drywall can be disposed. An independent consulting firm, hired by a Miami-based builder, has concluded there is little doubt that the drywall manufactured by Defendants is the cause of the corrosion in many residents' homes.

81.     One of the managing principles of the independent testing firm stated that: "We have definitely identified that a combination of sulfide gases are the cause of the corrosion of the coils. The substances we've found are well known to cause that kind of corrosion."

82.     The firm's December 2008 results found three sulfide gases: carbon disulfide, carbonyl sulfide and dimethyl sulfide.

83.     Hydrogen sulfide was found in previous testing that the company conducted on the Defendants' drywall: "Our previous studies indicate, however, that carbon disulfide, carbonyl sulfide, and hydrogen sulfide are gases that can be associated with emissions from Chinese drywall."

84.     According to a Knauf statement, the company "is doing its own investigation, and believes the problem drywall came from a specific [gypsum] mine, which also supplied other manufacturers." According to Knauf, the company stopped using the questionable mine in 2006.

85.     According to published reports, however, some independent environmental testing firms and building experts have said the source of the drywall problem is waste materials from the scrubbers of coal-fired power plants used to make the drywall in China.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550 Fax: 305-571-8558 • www.abbrclaw.com

86.    Knauf's 2009 statement also noted: "Until last year in Florida, no complaint had been raised and no product had been rejected because of odor or impacts to copper in the nine years of [Knauf Tianjin's] operation."

87.    Knauf received complaints from builders and contractors about "rotten egg" smells coming from its Chinese-manufactured drywall as far back as 2006.

88.    In November 2006, in response to reports of odors associated with its drywall, Knauf hired the Center for Toxicology and Environmental Health, L.L.C. (CTEH) to conduct an air quality investigation in five homes in Florida.

89.    Knauf's 2009 statement also declared: "The sulfur compounds detected in testing in homes have been found at no greater levels than air outside homes or in soil, marshes or the ocean."

90.    Knauf's 2006 testing revealed, however, that its product released detectable, above-background levels of various sulfur containing compounds. In particular, Knauf's testing revealed the presence of iron disulfide from its Chinese Drywall as the likely source of the sulfur smells. Knauf's testing agency declared: "These data indicate that certain naturally-occurring sulfur-containing compounds can be emitted from the Knauf Tianjin product at concentrations higher than present in background air."

91.    One importer acknowledged in published reports that the defective Chinese Drywall was "well known in the industry" by 2007.

92.    No member of the Class could have discovered the existence of the defect in the Chinese-manufactured drywall until press reports about the defects were released in December 2008.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, Fl 33137 • Telephone: 305-571-8550 Fax: 305-571-8558 • www.abbrclaw.com

D.    **The Need for Medical Monitoring for the Health Effects of Sulfur Emitting Drywall**

93.    Hydrogen sulfide ("H2S"), one of the chemicals found to have been released from drywall, is considered a broad-spectrum poison, meaning that it can poison several different systems in the body, although the nervous system is most affected.

94.    The toxicity of H2S is comparable with that of hydrogen cyanide. It forms a complex bond with iron in the mitochondrial cytochrome enzymes, thereby blocking oxygen from binding and stopping cellular respiration.

95.    Exposure to lower concentrations of sulfides can result in eye irritation, a sore throat and cough, nausea, shortness of breath, and fluid in the lungs.

96.    Long-term, low-level exposure to sulfides has been associated with fatigue, loss of appetite, headaches, irritability, poor memory, and dizziness. Chronic exposure to low levels of sulfides has also been implicated in increased miscarriage and reproductive health issues.

97.    Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold defective drywall, which was unreasonably dangerous in its normal use, in that the drywall caused corrosion and damage to the structure and mechanical systems of homes, as well as Other Property in Plaintiff's and Class Members' homes, and it caused medical ailments, including allergic reactions, coughing, sinus and throat infection, eye irritation, breathing disorders, other health problems, and/or significantly increased the risk of contracting a serious latent disease.

98.    As a direct and proximate result of Defendants' actions and omissions, Plaintiff's and the Class Members' homes and bodies have been exposed to Defendants' drywall and the corrosive and harmful effects of the sulfide gases and other chemicals being released from these proven hazardous substances.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

99.    As a direct and proximate result of Defendants' defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, the Plaintiff and the Class Members have suffered, and continue to suffer damages. These damages include, but are not limited to, costs of inspection as well as the costs and expenses necessary to remedy, replace and remove the defective drywall and Other Property that has been affected.

100.    As a direct and proximate result of Defendants' defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, the Plaintiff and the Class Members have suffered, and continue to suffer damages for injuries from medical ailments.

101.    As a direct and proximate result of Defendants' defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, Plaintiff and Class Members have been exposed to above-background levels of sulfides and other harmful chemicals, have been placed at an increased risk of disease, and have need for injunctive relief in the form of emergency notice, environmental testing and monitoring, and medical monitoring.

E.    The Sulfur Emitting Drywall Injures the Health of Affected Homeowners

102.    This defective drywall causes adverse health consequences such as respiratory problems, sinus problems, eye irritation and nosebleeds, in addition to the creation of noxious odors, which smell like "rotten eggs."

### Conditions Precedent

103.    All notice required by Chapter 558, Florida Statutes, and conditions precedent to bringing this action have been met or will have been met or were waived by Defendants.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 - Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

## CLASS ACTION ALLEGATIONS

104.   Plaintiff brings this case as a Class Action pursuant to Fed. R. Civ. P. 23

individually and on behalf of a class defined as:

> All owners and residents of homes in the United States, which contain drywall
> manufactured, sold or installed by Defendants that emits excessive amounts of
> sulfur as well as any individual or entity that paid for or performed repairs of
> damage caused by the drywall. Defendants, their officers, directors, subsidiaries,
> or any person or other entity related to, affiliated with or employed by Defendants
> are excluded from the Class Definition.

Expressly excluded from the Classes defined above are:

A.   Defendants and any entities in which Defendants have a controlling

interest;

B.   Any entities in which Defendants officers, directors, or employees are

employed and any of the legal representatives, heirs, successors or assigns of Defendants;

C.   The Judge and Magistrate to whom this case is assigned and any member

of the Judge's or Magistrate's immediate family; and

D.   All persons or entities that properly execute and timely file a request for

exclusion from the Class.

105.   In the alternative, Plaintiff brings this case as a Class Action pursuant to Fed. R.

Civ. P. 23 individually and on behalf of a class of all others similarly situated in the State of

Florida, defined as:

> All owners and residents of homes in the State of Florida, which contain drywall
> manufactured, sold or installed by Defendants that emits excessive amounts of
> sulfur as well as any individual or entity that paid for or performed repairs of
> damage caused by the drywall. Defendants, their officers, directors, subsidiaries,
> or any person or other entity related to, affiliated with or employed by Defendants
> are excluded from the Class Definition.

Expressly excluded from the Classes defined above are:

ALTERS | BOLDT | BRBWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone:305-571-8550  Fax:305-571-8558 • www.abbrclaw.com

A.    Defendants and any entities in which Defendants have a controlling

interest;

B.    Any entities in which Defendants officers, directors, or employees are

employed and any of the legal representatives, heirs, successors or assigns of Defendants;

C.    The Judge and Magistrate to whom this case is assigned and any member

of the Judge's or Magistrate's immediate family; and

D.    All persons or entities that properly execute and timely file a request for

exclusion from the Class.

**NUMEROSITY**

106.   The Class is so numerous that the individual joinder of all its members, in this or

any action, is impracticable. The exact number or identification of Class members is presently

unknown to Plaintiff, but it is believed that Class members number at least in the thousands. The

identity of Class members is ascertainable. Class members may be informed of the pendency of

this Class action by a combination of direct mail and public notice, or other means.

**COMMONALITY**

107.   Common questions of fact and law exist as to all members of the Class, which

predominate over questions affecting only individual members of the Class. These include, but

are not limited to, the following:

a.    Whether Defendants manufactured and sold defective drywall;

b.    Whether Defendants are liable for the repair and replacement of all
defective drywall;

c.    Whether Defendants are liable for the repair and replacement of all

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District. 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

damaged items in the affected homes;

d.    Whether Defendants are liable for the adverse medical consequences of the defective drywall;

e.    Whether Defendants deliberately concealed information about the defective drywall from the Class;

f.    Whether Defendants negligently, recklessly or intentionally concealed information about the defective drywall;

g.    Whether Defendants breached express warranties;

h.    Whether Defendants breached implied warranties;

i.    Whether Plaintiffs are entitled to compensatory, punitive, and other damages as a result of Defendants acts and/or omissions;

j.    Whether Defendants are guilty of fraudulent misrepresentation;

k.    Whether Defendants are guilty of fraudulent concealment;

l.    Whether Defendants are guilty of negligence;

## TYPICALITY

108.    Plaintiff's claims are typical of the claims of the Class and all such claims arise out of the wrongful course of conduct engaged in by Defendants.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8518 • www.abbrclaw.com

## ADEQUACY OF REPRESENTATION

109.   Plaintiff is an adequate representative of the Class because she is a member of the Class and her interests do not conflict with the interests of the members of the Class she seeks to represent. Plaintiff is represented by experienced and able counsel who have litigated numerous class actions, and Plaintiff's counsel intends to prosecute this action vigorously for the benefit of the entire Class. Plaintiff and her counsel can fairly and adequately protect the interests of the members of the Class.

## RULE 23(B) CERTIFICATION

110.   Class certification is also appropriate in this action because:

   a. Pursuant to Fed.R.Civ.P. 23(b)(1)(A), the prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudications could establish incompatible duties for Defendants under the law alleged herein.

   b. In seeking declaratory relief from Defendants' conduct alleged herein, pursuant to Fed.R.Civ.P. 23(b)(2), Defendants have acted or refused to act on grounds that apply generally to the Class, such that declaratory relief would be appropriate to the Class as a whole.

   c. Pursuant to Fed.R.Civ.P. 23(b)(3) the questions of law and fact common to all Class Members predominate over any questions that might arise as to an individual member, such that a Class Action is the superior, fair and efficient method of adjudicating this controversy where, as here, individual claims would be identical or nearly identical.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

### EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

111.   The running of any statute of limitations has been tolled due to Defendants' fraudulent concealment.  By failing to disclose a known defect to Plaintiff and the Class, and misrepresenting the nature of their product as safe for its intended use, actively concealed from Plaintiff and the Class the true risks associated with their drywall.

112.   Plaintiff and the Class could not have reasonably known or have learned of the manufacturing defect alleged herein and that those risks were a direct and proximate result of Defendants' acts and omissions.

113.   In addition, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the defective nature of their drywall. Defendants were under a duty to disclose the true information about their product and they failed in that duty to Plaintiff and the Class.

114.   Plaintiff and the Class had no knowledge that Defendants were engaged in the wrongdoing alleged herein due to the acts of fraudulent concealment alleged herein.

### COUNT I

### NEGLIGENCE
#### (Against All Defendants)

115.   Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

116.   Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) installation, j) marketing, and/or

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

k) selling drywall, including a duty to adequately warn of its failure to do the same.

Defendants' duties include, but are not limited to the following:

    a.    using reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

    b.    using reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

    c.    using reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

    d.    using reasonable care in the importing of the drywall to prevent it from containing Defects as set forth herein;

    e.    using reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

    f.    using reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

    g.    using reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

    h.    using reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

    i.    using reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

    j.    using reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

k.  using reasonable care in the installation of the drywall to prevent it from containing Defects as set forth herein;

l.  adequately warning and instructing the Plaintiff and Class Members of the Defects associated with drywall;

m.  properly manufacturing the drywall to prevent it from containing the Defects as set forth herein;

n.  properly selecting the gypsum that did not contain excessive levels of sulfur;

o.  recalling or otherwise notifying users at the earliest date that it became known that the drywall was dangerous and Defective;

p.  advertising and recommending the use of drywall with sufficient knowledge as to its manufacturing defect and dangerous propensities;

q.  not misrepresenting that the drywall was safe for its intended purpose when, in fact, it was not;

r.  not manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

s.  not exporting and/or importing drywall in a manner which was dangerous to its intended and foreseeable users;

t.  not distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

u.  not concealing information from Plaintiff and Class Members regarding reports of adverse effects associated with drywall;

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

  v. not improperly concealing and/or misrepresenting information from the Plaintiff and Plaintiff Class Members and/or the public, concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing Defect; and

  w. otherwise exercising reasonable care in the design, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall to prevent it from containing Defects as set forth herein.

  117. Defendants were negligent and breached their duty to exercise reasonable care in the design, manufacture, export, import, distribution, delivery, supply, inspection, installation, marketing, and/or sale of drywall, including a duty to adequately warn of its failure to do the same. Defendants' negligence included, but was not limited to the following:

  a. failing to use reasonable care in the design of the drywall to prevent it from containing Defects as set forth herein;

  b. failing to use reasonable care in the manufacturing of the drywall to prevent it from containing Defects as set forth herein;

  c. failing to use reasonable care in the exporting of the drywall to prevent it from containing Defects as set forth herein;

  d. failing to use reasonable care in the importing of the drywall to prevent it from containing Defects as set forth herein;

  e. failing to use reasonable care in the distributing of the drywall to prevent it from containing Defects as set forth herein;

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

f.    failing to use reasonable care in the delivering of the drywall to prevent it from containing Defects as set forth herein;

g.    failing to use reasonable care in the supplying of the drywall to prevent it from containing Defects as set forth herein;

h.    failing to use reasonable care in the inspecting of the drywall to prevent it from containing Defects as set forth herein;

i.    failing to use reasonable care in the marketing of the drywall to prevent it from containing Defects as set forth herein;

j.    failing to use reasonable care in the selling of the drywall to prevent it from containing Defects as set forth herein;

k.    failing to use reasonable care n the installation of the drywall to prevent it from containing Defects as set forth herein;

l.    failing to adequately warn and instruct the Plaintiff and Class Members of the Defects associated with drywall;

m.    failing to properly manufacture the drywall to prevent it from containing the Defects as set forth herein;

n.    failing to properly select the gypsum that did not contain excessive levels of sulfur;

o.    failing to recall or otherwise notify users at the earliest date that it became known that drywall was dangerous and Defective;

p.    advertising and recommending the use of drywall without sufficient knowledge as to its manufacturing Defect and dangerous propensities;

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

q.   misrepresenting that drywall was safe for its intended purpose when, in
     fact, it was not;

r.   manufacturing drywall in a manner which was dangerous to its intended
     and foreseeable users;

s.   exporting and/or importing drywall in a manner which was dangerous to
     its intended and foreseeable users;

t.   distributing, delivering, and/or supplying drywall in a manner which was
     dangerous to its intended and foreseeable users;

u.   concealing information from Plaintiff and Class Members regarding
     reports of adverse effects associated with drywall;

v.   improperly concealing and/or misrepresenting information from the
     Plaintiff and Class Members and/or the public, concerning the severity of
     risks and dangers of Defendants' drywall and/or the manufacturing
     Defect; and

w.   failing to otherwise exercise reasonable care in the design, manufacture,
     export, import, distribution, delivery, supply, inspection, market,
     installation and/or sale of drywall to prevent it from containing Defects
     as set forth herein.

118.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiff
and Class Members have incurred economic and other damages and are entitled to recover
monetary damages for: replacement/repair of their homes; the removal and replacement of
all of the drywall contained in their homes; the replacement of Other Property (air-
conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

119.  As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

120.  As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

121.  Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

### COUNT II

#### NEGLIGENCE PER SE
(Against all Defendants)

122.  Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

123.  Defendants breached their duties to Plaintiff and the proposed class by failing to exercise reasonable care in manufacturing, inspecting, distributing, selling and installing the drywall.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District. 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

124.   Defendants likewise breached their duties to Plaintiff and the proposed class by failing to warn Plaintiff and the proposed class about the defective nature of the drywall, which both malfunctioned and generated untoward side-effects. Defendants, through the exercise of reasonable care, knew or should have known the nature of the drywall and the adverse effects that it could have on the health of the homes it was used to build and the individuals within them.

125.   Given the defects of the Defendants' drywall, Defendants knew or should have known that their product could, and would, cause both economic and physical damage to the members of the class.

126.   Economic damages include, but are not limited to, substantial reconstruction and repair of Plaintiff's and proposed Class Members' homes, as well as any medical expenses incurred as a result of Defendants' drywall, which are in many instances considerable.

127.   Defendants' drywall was the proximate cause of both economic and physical damage brought upon the Plaintiff and members of the class.

128.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

129.   Due to Defendants' negligence, Plaintiff, members of the Class and the public at large will continue to suffer economic and physical damages.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District. 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

130.   Although Defendants knew or should have known about the defects of their drywall product, Defendants nevertheless continued to manufacture the product and sell it to Plaintiff, members of the class and the public at large.

### COUNT III

### STRICT LIABILITY
(Against all Defendants)

131.   Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

132.   Defendants were responsible for the manufacturing, inspecting, distributing, selling and installing of the drywall at issue.

133.   By the time Defendants' drywall left Defendants' hands, the risks associated with the product far outweighed its benefits.

134.   Further, by the time Defendants' drywall left Defendants' hands, they knew, or should have known, the product was unsafe, defective, and could cause serious physical and economic harm to Plaintiff and members of the proposed class.

135.   Defendants had a duty to provide Plaintiff, the proposed class and the general public with a safe and properly functioning product. This is a duty Defendants failed to uphold.

136.   Because Defendants' product created an unreasonable risk to Plaintiff's and proposed class members' homes and persons, Defendants are strictly liable for economic and physical injuries to Plaintiff and members of the proposed Class.

137.   No prudent buyer of Defendants' product could be expected to determine on his or her own that Defendants' product was dangerous and defective.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

138. Defendants not only manufactured, inspected, distributed, sold and/or installed a poorly designed and defective drywall, but also failed to give Plaintiff and the proposed class adequate warning regarding the risks associated with Defendants' product.

139. Defendants' drywall was a substantial factor in the economic and physical losses that have been, and continue to be, incurred by the Plaintiff and proposed class.

140. As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

141. Economic losses include, but are not limited to, substantial reconstruction and repair of Plaintiff's and proposed Class Members' homes, damage to property other than the Plaintiff's and Class Members' homes, as well as any medical expenses incurred as a result of Defendants' drywall, which are in many instances considerable.

## COUNT IV

### BREACH OF EXPRESS WARRANTY
(Against all Defendants)

142. Plaintiff incorporates and restates paragraphs 1-121 as if fully set forth herein.

143. Defendants expressly warranted that the drywall they manufactured, distributed, and/or installed was safe, efficacious, well tested and of high quality.

144. By manufacturing, distributing, selling and/or installing a defective, unsafe, and poorly manufactured drywall product, Defendants have breached their express warranty.

145. Defendants knew or should have known that their warranties were specious.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

146.   Plaintiff and the proposed Class and/or their representatives relied on these express warranties to their detriment.

147.   As a direct result of this breach of expressed warranty, physical and economic damages have been, and continue to be, incurred by Plaintiff and the proposed Class.

## COUNT V

### BREACH OF IMPLIED WARRANTIES
(Against all Defendants)

148.   Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

149.   When Defendants manufactured, distributed, sold, and/or installed their drywall to Plaintiff and the proposed class, Defendants implicitly warranted that the product was safe, efficacious, well tested and of high quality. Plaintiff and members of the proposed class are beneficiaries of these warranties.

150.   By manufacturing, distributing, selling, and/or installing a defective, unsafe, and poorly manufactured drywall product, Defendants have breached their implied warranties.

151.   These implied warranties were relied on by Plaintiff and the proposed class and/or their representatives, because it is understood that Defendants have knowledge as to the quality, safety and efficacy of the drywall they manufacture, distribute, sell, and/or install.

152.   As a direct result of this breach of implied warranty, physical and economic damages have been, and continue to be, incurred by Plaintiff and the proposed class.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

## COUNT VI

### FRAUDULENT CONCEALMENT
(Against all Defendants)

153.   Plaintiff incorporates and restates paragraphs 1-121 as if fully set forth herein.

154.   Defendants knew or should have known that Defendants' drywall was defective, unsafe and poorly manufactured.

155.   Defendants fraudulently concealed that Defendants' drywall was defective, unsafe and poorly manufactured.

156.   Defendants knew or should have known that their drywall would cause corrosion of, among other things, electrical wiring, air conditioner coils, plumbing and other personal property throughout the effected homes.

157.   Defendants fraudulently concealed that their drywall caused damage to, among other things, electrical wiring, air conditioner coils, plumbing and other personal property throughout the effected homes.

158.   Defendants fraudulently concealed that they had received and/or otherwise learned of complaints regarding their drywall product.

159.   Defendants' above-mentioned concealments of key facts regarding the Defendants' drywall resulted in physical and economic damages that have been, and continue to be, incurred by Plaintiff and the proposed class.

160.   As a result of the Defendants' fraudulent concealments regarding their drywall product, physical and economic damages have been, and continue to be, incurred by Plaintiffs and the proposed class.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

161.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects

## COUNT VII

### FRAUDULENT MISREPRESENTATION
(Against all Defendants)

162.   Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

163.   Defendants fraudulently alleged to the Plaintiff, the proposed class, and the public that the Defendants' drywall was safe, efficacious, well tested and of high quality.

164.   Defendants knew the above-mentioned representations made to Plaintiff, the proposed class, and the public were specious and fraudulent. These representations were made recklessly and with the intent of defrauding Plaintiff, the proposed Class and the public.

165.   Defendants' drywall was installed in Plaintiff's and proposed class members' homes in reliance of the veracity of the above-mentioned fraudulent representations.

166.   As a result of Defendants' fraudulent representations regarding their drywall product, physical and economic damages have been, and continue to be, incurred by Plaintiff and the proposed Class.

167.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

## COUNT VIII

### NEGLIGENT MISREPRESENTATION
(Against All Defendants)

168. Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

169. As discussed herein, Defendants fundamentally misrepresented material facts regarding the characteristics of the drywall and omitted other material facts that should have been disclosed to Plaintiff and the Class.

170. In disseminating information regarding the drywall Defendants negligently caused statements to be made, which they knew or should have known were inaccurate and untrue.

171. As a direct consequence of the Defendants' negligent misrepresentations and omissions of material facts regarding the defective drywall, Plaintiff and the class will be irreparably harmed and otherwise damaged in an amount which cannot presently be calculated.

172. As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 · Fax: 305-571-8558 · www.abbrclaw.com

## COUNT IX

### UNJUST ENRICHMENT
(Against all Defendants)

173.   Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

174.   Each Defendant individually and collectively profited from the sale of the defective drywall to Plaintiff and the Class, receiving payment themselves or through an agent. Defendants received payment for the defective drywall and have retained those sums to the detriment of Plaintiff and the Class.

175.   Defendants' receipt and retention of the profits gained by sale of the defective drywall to Plaintiff and the proposed Class is unjust and inequitable.

176.   As a direct and proximate result of Defendants conduct complained of herein Plaintiff and the Class have sustained substantial damages, including, but not limited to: the removal and replacement of the defective drywall and/or the homes, replacement of any and mechanical and structural systems damaged in the homes, replacement of personal and other property damaged, costs of moving to alternative housing while repairs are made, costs of comparable alternative housing, loss of use and enjoyment of their homes and compensation for the reduced value of the homes as the result of perception of the homes as tainted by the defective drywall.

177.   Defendants knew or should have known of the damages their defective drywall would cause as described herein.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue - Suite 201 - Miami, FL 33137 - Telephone: 305-571-8550  Fax: 305-571-8558 - www.abbrclaw.com

## COUNT X

### BREACH OF CONTRACT
(Against Northstar Homes)

178.    Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

179.    Plaintiff and the Class offered and the Northstar Defendants accepted sums of money in exchange for an agreement to build homes.

180.    Upon information and belief each agreement entered into by Plaintiff and the Class for construction of their homes warranted that the homes would be free from defects.

181.    The presence of the defective drywall, which "off-gases" sulfur is a violation of Plaintiff's agreement, and upon information and belief, the contracts of each and every member of the Class.

182.    As a direct consequence of the breaches of contract described above, Plaintiff and the Class have sustained substantial damages, including, but not limited to: the removal and replacement of the defective drywall and/or the homes, replacement of any and mechanical and structural systems damaged in the homes, replacement of personal and other property damaged, costs of moving to alternative housing while repairs are made, costs of comparable alternative housing, loss of use and enjoyment of their homes and compensation for the reduced value of the homes as the result of perception of the homes as tainted by the defective drywall.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, Fl 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

## COUNT XI

### PRIVATE NUISANCE
(Against all Defendants)

183.  Plaintiff adopts and restates the preceding paragraphs 1-114 as if fully set forth herein.

184.  The acts and/or omissions of Defendants have caused injury to Plaintiff and the Class by, among other things, depriving Plaintiff and the Class of the quiet enjoyment of their property.

185.  Defendants' acts and/or omissions are wrongful and/or tortious, jeopardizing the health, wellbeing and safety of Plaintiff and the Class.  Defendants knew their acts and/or omissions were wrongful or they should have known and the harm to Plaintiff and Class is ongoing.

186.  As a direct consequence of Defendants' private nuisance Plaintiff and the Class have suffered, and continue to suffer, substantial damages to their property and to themselves as described herein.

187.  As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred personal injuries and are experiencing or at risk of experiencing serious and dangerous health hazards including economic and non-economic damages resulting from the adverse health effects.

## COUNT XII

### EQUITABLE RELIEF, INJUNCTIVE RELIEF AND MEDICAL MONITORING
(Against All Defendants)

188.  Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  fax: 305-571-8558 · www.abbrclaw.com

189. Because no adequate remedy exists for the conduct of Defendants, equitable and injunctive relief is appropriate.

190. Plaintiff and the Class will suffer irreparable injury if the Court does not order injunctive relief and medical monitoring.

191. Plaintiff on behalf of herself and the Class demands that Defendants: (A) recall, repurchase and/or repair Plaintiff's and the Class Members' homes; (B) initiate and pay for a medical monitoring program under Florida law; (C) identify, at their own expense, each and every home with the defective drywall, if necessary, testing every home in which the defective drywall may potentially be found.

192. Medical monitoring is a necessary component of the relief the Court should order because some of the sulfur compounds being emitted from the defective drywall are very hazardous. For example, Hydrogen Sulfide ("H2S"), one of the compounds found in the drywall is a broad-spectrum poison – meaning it can attack more than one system of the body simultaneously. H2S most commonly affects the central nervous system. Through a complex reaction the H2S prevents oxygen from reaching cells in the body, essentially preventing them from "breathing."

193. As a direct consequence of the wrongful and/or tortious acts and/or omissions of Defendants' conduct, Plaintiff and the Class (among them, small children and senior citizens) have been exposed to H2S in quantities sufficient to harm them.

194. Until it has been conclusively established that all defective drywall has been removed and that air quality is safe Defendants should bear the expense of air and environmental monitoring in each and every home with defective drywall.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

## COUNT XIII

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
(All Defendants)

195.   Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

196.   This is an action for relief under section 501.201, et. seq., Florida Statutes (The Florida Deceptive and Unfair Trade Practices Act).

197.   Section 501.203(7), Florida Statutes defines "Consumer" as "an individual; child, by and through its parent or legal guardian; firm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; or any other group or combination." Plaintiff and Class Members are "Consumers" within the meaning of §501.203(7), Florida Statutes.

198.   Section 501.203(8), Florida Statutes defines "Trade or Commerce" as:

[T]he advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated. "Trade or Commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

199.   The advertising, soliciting, providing, offering, or distributing of drywall by Defendants to Plaintiff and Class Members is "Trade or Commerce" within the meaning of section 501.203(8), Florida Statutes.

200.   Section 501.204(1) provides that: "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The Defendants acts and omissions as well as their failure to use reasonable care in this matter as alleged in this Complaint

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

equals unconscionable acts or practices, as well as deceptive and unfair acts or practices in the conduct of Defendants' trade or commerce pursuant to section 501.204, Florida Statutes.

201.   The unconscionable, illegal, unfair and deceptive acts and practices of Defendants violate the provisions of Florida's Deceptive and Unfair Trade Practices Act. Plaintiff and Class Members have suffered actual damage for which they are entitled to relief pursuant to section 501.211(2), Florida Statutes.

202.   Plaintiff and Class Members are entitled to recover their reasonable attorneys' fees pursuant to section 501.2105, Florida Statutes upon prevailing in this matter.

203.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

204.   As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

## COUNT XIV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(All Defendants)

205. Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

206. Defendants were in privity with Plaintiff and Class Members.

207. At the times Defendants installed, utilized, supplied, inspected, and/or sold drywall for use in the Plaintiff's and Class Members' homes. Defendants knew, or it was reasonably foreseeable, that the drywall would be installed in the Plaintiff's and Class Members' homes for use as a building material, and impliedly warranted the product to be fit for that use.

208. Defendants' drywall product was placed into the stream of commerce by Defendants in a defective condition and the defective drywall was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which they were sold.

209. The drywall was defective because it was not fit for the uses intended or reasonably foreseeable by Defendants; to wit, the installation of the drywall in Plaintiff's and Class Members' homes for use as a building material, because it contained defects as set forth herein.

210. The Defendants breached the implied warranty of merchantability because the drywall was not fit to be installed in Plaintiff's and Class Members' homes as a building material due to the defects set forth herein.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550 Fax: 305-571-8558 · www.abbrclaw.com

211.    Defendants had reasonable and adequate notice of the Plaintiff's and the Class Members' claims for breach of implied warranty of merchantability and failed to cure.

212.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

213.    As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

214.    Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

## COUNT XV

## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE
### (All Defendants)

215.  Plaintiff incorporates and restates paragraphs 1-114 as if fully set forth herein.

216.  Defendants were in privity with Plaintiff and Class Members.

217.  Defendants' drywall product was placed into the stream of commerce by Defendants in a defective condition and was expected to, and did, reach users, handlers, and persons coming into contact with said product without substantial change in the condition in which it were sold.

218.  The drywall was defective because it was not fit for the specific purpose of installing in the Plaintiff's and Class Members' homes as a building material, for which Plaintiffs and Class Members bought the product in reliance on the judgment of Defendants.

219.  The Defendants breached the implied warranty of fitness for a particular purpose because the drywall was not fit to be installed in Plaintiff's and Class Members' homes as a building material due to the defects set forth herein.

220.  Defendants had reasonable and adequate notice of the Plaintiff's and the Class Members' claims for breach of implied warranty of merchantability and failed to cure.

221.  As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue · Suite 201 · Miami, FL 33137 · Telephone: 305-571-8550  Fax: 305-571-8558 · www.abbrclaw.com

drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

222. As a direct and proximate cause of Defendants' acts and omissions, Plaintiff and Class Members have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

223. Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

## DEMAND FOR TRIAL BY JURY

Plaintiff, individually and on behalf of the Class Members, hereby demands a trial by jury as to all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and on behalf of a class of others similarly situated, requests that this Honorable Court grant the following relief:

a. An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate class, finding that Plaintiff is a proper representative of the class and that her counsel is appropriate class counsel;

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550 Fax: 305-571-8558 • www.abbrclaw.com

b.  An order requiring that Defendants pay compensation to Plaintiff and the class members to the full extent permitted by the law;

c.  An order requiring medical monitoring;

d.  Costs and expenses in this litigation, including, but not limited to, expert fees, filing fees, and reasonable attorneys' fees; and

e.  Such other relief as the Court may deem just and appropriate.

Dated: April 3, 2009

Respectfully submitted,

Jeremy W. Alters (Fla. Bar No. 111790)
Kimberly L. Boldt (Fla. Bar No. 957399)
Beth Tyler Vogelsang (Fla. Bar No. 509401)
Alters Boldt Brown Rash Culmo
4141 NE 2nd Avenue
Suite 201
Miami, FL 33137
(305) 571-8550 phone
(305) 571-8558 fax
jeremy@abbrclaw.com
kimberly@abbrclaw.com
beth@abbrclaw.com

Jan L. Kleinman (Fla. Bar No. 307490)
Law Offices of Wolf and Pravato
2101 W. Commercial Blvd.
Suite 1500
Fort Lauderdale, FL 33309
(954) 522-5800 phone
(954) 767-0960 fax
jan@wolfandpravato.com

ALTERS | BOLDT | BROWN | RASH | CULMO

Miami Design District, 4141 Northeast 2nd Avenue • Suite 201 • Miami, FL 33137 • Telephone: 305-571-8550  Fax: 305-571-8558 • www.abbrclaw.com

Case 9:09-cv-80535-JIC    Document 1    Entered on FLSD Docket 04/06/2009    Page 49 of 49

JS 44 (Rev. 2/08)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

### I. (a) PLAINTIFFS

KATHERINE L. FOSTER, on behalf of herself individually and all others similarly situated

**(b)** County of Residence of First Listed Plaintiff  Palm Beach County
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Alters, Boldt, Brown, Rash & Culmo, P.A.
4141 NE 2nd Avenue, Suite 201
Miami, FL 33137        (305) 571-8550

09-CV-80535- Cohn / Seltzer

(d) Check County Where Action Arose:   ☐ MIAMI-DADE   ☐ MONROE   ☐ BROWARD   ☑ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE   ☐ HIGHLANDS

### DEFENDANTS

NORTHSTAR HOLDINGS, INC., a Florida corporation;
NORTHSTAR HOMES, INC., a Florida corporation, et al.

County of Residence of First Listed Defendant  Palm Beach County
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED

Attorneys (If Known)

FILED by ATS D.C.

APR - 3 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA.- MIAMI

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 864 SSID Title XVI | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☒ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt. Reporting | | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | ☐ 871 IRS—Third Party | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization | | |
| | Employment | ☐ 550 Civil Rights | Application | | ☐ 950 Constitutionality of State |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - | | Statutes |
| | Other | | Alien Detainee | | |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

### V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO        b) Related Case ☐ YES ☑ NO

JUDGE _____    DOCKET NUMBER _____

### VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 USC Section 1332. Products liability action seeking recovery on a class basis for defective drywall. One (1) Plaintiff is diverse from one Defendant

LENGTH OF TRIAL via  10  days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 5,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE  April 3, 2009

FOR OFFICE USE ONLY
AMOUNT $ 350 ___  RECEIPT # 9985 25

04/03/09



# COBBLESTONE
## ·CREEK·

### BOYNTON BEACH, FL 33437
### SUBCONTRACT AGREEMENT

THIS CONTRACT, made this 2nd day of May, 2005 by and among NORTHSTAR HOLDINGS AT B & A, LLC (hereinafter "Owner"), whose address is 14406 Military Trail, Delray Beach, FL 33484, and Precision Drywall, Inc., (hereinafter "Subcontractor", whose address is 3300 South Congress Avenue, Suite #18, Boynton Beach, Fl, 33426 and NORTHSTAR HOLDINGS AT B & A, LLC (hereinafter "Contractor"), whose address is 14406 Military Trail, Delray Beach, FL 33484.

### WITNESSETH:

WHEREAS, Owner (hereinafter "Owner" means the Owner or the Owner's authorized representative) is developing COBBLESTONE CREEK, BOYNTON BEACH, PALM BEACH COUNTY, FL. 33437 (hereinafter the "Project") according to the Contract Documents listed in Addendum "#1" attached hereto (hereinafter the "Contract Documents") which are available for Subcontractor's review at the office of the Contractor (hereafter defined); and

WHEREAS, Owner desires to contract certain work (hereinafter the "Work") specified in the Contract Documents, and Subcontractor desires to perform said Work at the prices and upon the terms and conditions hereinafter expressed. The term "Work" means the construction services required by the Contract Documents, whether completed or partially completed, and includes all labor, materials, equipment and services provided, or to be provided, by the Subcontractor to fulfill the Subcontractor's obligations. The Work may constitute the whole or a part of the Project.

WHEREAS, the Owner has engaged the Contractor, as the Contractor for the Project.

NOW THEREFORE, in consideration of the mutual agreements herein expressed, the parties do contract as follows:

**1.      Subcontractor's Work**

The Subcontractor shall execute the entire Work described in the Contract Documents, except to the extent specifically indicated in the Contract Documents to be the responsibility of others.

**2.      Complete Agreement**

This Contract contains the entire agreement between the parties hereto with respect to the matters covered herein. No other agreements, representations, warranties or other matters, oral or written, shall be deemed to bind the parties hereto.

**3.      Payment**

a      Owner shall pay Subcontractor for performance of the Work, subject to additions and deductions by change order or other Contract provisions, in accordance with Addendum #1 and Vendor Base Plan Cost & Vendor Option Costs which is attached hereto and incorporated herein by reference as if set out in full when all of the following events have occurred: (i) Subcontractor is entitled to a payment at the time and under the terms specified herein and has furnished the Contractor with a written request for payment; and (ii) Subcontractor has furnished the Contractor with all affidavits or waivers required for Owner to make proper payments under Section 713.06, Florida Statutes. If the payment request from Subcontractor to Owner is incomplete or contains an error, the Contractor will be entitled to fourteen (14) days within which to return the request for payment to the Subcontractor for completion or correction. Owner agrees to make all payments to Subcontractor in accordance with Florida Law and as provided for herein. Applications for payment hereunder shall be submitted by the Subcontractor to the Contractor in such form and supported by such data to substantiate its accuracy as the Contractor may require. If the Owner is financing all or a portion of the Work with a loan from a financial institution, the Subcontractor shall comply with the reasonable requirements of such financial institution in connection with the making of advances of such construction loan

b.      Subcontractor shall insure that all subcontractors, employees and suppliers, at all times, are paid all amounts due in connection with the performance of this Contract. After the first payment hereunder, Owner shall have the right to withhold any

U:\Shop\Gina\Cobblestone\Precision Drywall\Contract for cobblestone\subcontract agreement finalrev41301[1].doc

Page 1 of 13         _____ itial Here ___

subsequent payments until Subcontractor submits evidence satisfactory to Owner that all amounts owed in connection with performance of this Contract have been paid. Further, Subcontractor agrees that Owner may pay all persons who have not been paid the monies due them in connection with this Contract whether or not a lien has been filed, and Subcontractor shall, to the extent that Owner has not covered said amounts while withholding payments to Subcontractor, pay said amounts to Owner upon demand. In the event Owner is required to pay or indemnify any person hereunder, Subcontractor shall reimburse Owner for the full cost thereof.

        c.      All material and work covered by partial payments shall become the property of Owner; however, this provision shall not relieve Subcontractor from the sole responsibility and liability for all work and materials upon which payments have been made until final acceptance thereof by Owner.

        d.      Owner may withhold amounts otherwise due under this Contract or any other contractual arrangement between the parties to cover Owner's reasonable estimate of any costs or liability Owner has incurred or may incur for which Subcontractor may be responsible hereunder. Appropriate adjustments to withholdings shall be made when the exact amounts owed hereunder are determined.

        e.      Final payment, subject to withholdings permitted hereunder, shall be made after Subcontractor's work has been completed and approved by Contractor and satisfactory proof of payment of all amounts owed by Subcontractor in connection with the Contract has been provided. Owner will not tender payment until such time as all releases have been provided by Subcontractor and the time allotted by statute for the filing of construction liens against the property has expired, unless, pursuant to applicable law, Owner is required to tender final payment prior to the dates specified herein.

    **4.**    **Subcontractor's Investigations and Representations**

        Subcontractor represents that it is fully qualified to perform this Contract, and acknowledges that, prior to the execution of this Contract, it has (a) by its own independent investigation ascertained (i) the Work required by this Contract, (ii) the conditions involved in performing the Work, and (iii) the obligations of this Contract and the Contract Documents; and (b) verified all information furnished by the Contractor or others satisfying itself as to the correctness and accuracy of that information. Any failure by Subcontractor to independently investigate and become fully informed will not relieve Subcontractor from its responsibilities hereunder. Subcontractor shall maintain all required state and local license required to perform the scope of work under this Contract and will supply the Contractor with copies of all valid licenses prior to beginning work.

    **5.**    **Performance and Payment Bonds**

        a.      Immediately upon receipt of this Contract, Subcontractor shall at the expense of _____ furnish to Owner performance and payment bonds in the form attached hereto as Exhibit C (if any) from a surety acceptable to Owner, in the full amount of this Contract.

 No bond required. Article 5.a. not applicable when box is checked and no bond indicated above.

        b.      If Subcontractor has not been required to furnish bonds or if Owner desires Subcontractor to provide additional bond coverage, Owner may, at any time upon written request, instruct Subcontractor to provide within ten (10) days, performance and payment bonds in a form and from a surety acceptable to Owner, in an amount up to the then current full value of this Contract. In this event, Owner will reimburse Subcontractor the amount of the additional bond cost.

        c.      The payment of any incremental increase in the cost of bonds arising as a result of changes in the Work shall be the responsibility of Subcontractor and may be included as a part of Subcontractor's price quotation for proposed changes pursuant to Article 9.

    **6.**    **Subcontractor's Liability**

        a.      Subcontractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent, and whether or not incorporated or to be incorporated in the Work. In addition, Subcontractor hereby assumes the entire responsibility and liability for all Work, supervision, labor and materials provided hereunder, whether or not erected in place and for all plant, scaffolding, tools, equipment, supplies and other items and/or materials provided by Subcontractor until final acceptance of the work by Owner. In the event of any loss, damage or destruction therefor resulting from willful misconduct or negligence of the Subcontractor or its agents, employees, subcontractors, or sub-subcontractors, the Subcontractor shall be liable therefor, and shall repair, rebuild and make good said loss, damage or destruction at Subcontractor's cost.

Initial Here ___

      b.    Subcontractor shall be liable to Owner for all costs Owner incurs as a result of Subcontractor's failure to perform this Contract in accordance with its terms. Subcontractor's failure to perform shall include the failure of its suppliers and/or subcontractors of any tier to perform. Subcontractor's liability shall include, but not be limited to (1) damages and other delay costs payable by Owner to others; (2) Owner's increased costs of performance, such as extended overhead and increased performance costs resulting from Subcontractor-caused delays or improper Subcontractor work; (3) warranty and rework costs; (4) liability to third parties; (5) excess costs; and (6) attorney's fees and related costs.

      c.    If, as a result in whole or in part of negligence (or other act for which there is legal liability) of Subcontractor, its agents, employees, or sub-subcontractors, any person (including employees of Subcontractor) suffers injury or death or any property is damaged, lost or destroyed, Subcontractor assumes the liability therefor, shall (at Owner's option) defend any action, and shall pay all costs including attorney's fees through appellate proceedings and satisfy any judgments entered against Owner, and agrees to hold Owner, the Contractor, and their agents, employees and sureties harmless therefor. The Subcontractor's obligations under this Article 6.c. shall be in addition to any indemnity liability imposed by the Contract Documents.

      d.    In the event that Subcontractor or Subcontractor's sub-subcontractors utilize any machinery, equipment, tools, scaffolding, hoists, lifts or similar items belonging to or under the control of Owner, or the Contractor, Subcontractor shall be liable to Owner and the Contractor for any loss or damage (including personal injury or death) which may arise from such use, except where such loss or damage shall be due solely to the gross negligence of the Owner's employees operating equipment owned or leased by the Owner or Contractor.

      e.    Subcontractor's assumption of liability is independent from, and not limited in any manner by, the Subcontractor's insurance coverage obtained pursuant to Article 7, or otherwise. All amounts owed by Subcontractor to Owner or the Contractor as a result of the liability provisions of this Contract shall be paid upon demand.

      f.    Subcontractor's liability for Owner's and Contractor's costs under this Article 6. and under Articles 3.d , 10 and 14 shall include a 10% administrative charge. This charge is not a penalty against Subcontractor, but is established as an agreed upon compensation for Owner's administrative and actual costs.

      g.    Subcontractor acknowledges and agrees that the initial Five Hundred Dollars ($500.00) of the monies due from Owner hereunder, and other good and valuable consideration, represents the specific, stated consideration paid by Owner for all indemnifications from Subcontractor to Owner hereunder.

    7.    **Preparation**

    Immediately following execution and delivery of this Contract, Subcontractor shall prepare to perform the Work, including all of the following, which must be completed within ten (10) days following from the date hereof or prior to the commencement of the Work, whichever is sooner.

      a.    Insurance. Subcontractor, at its cost, through the term of this Contract, shall obtain and maintain in force and effect the following insurance with respect to Subcontractor's operations under this Contract and the Certificate of Insurance MUST state "Thirty (30) days Notice of Cancellation must be sent to the Certificate Holder and any Additional Insured named".

      (1)    Worker's Compensation: Worker's compensation insurance covering all employees of Subcontractor in the amount of Subcontractor's full statutory liability. NOTE: Northstar will no longer accept either a Workmen's Compensation Certificate with leased employees or a PEO.

      (2)    Employer's Liability: Employer's liability insurance with a limitation of liability of at least $500,000 per accident or disease.

      (3)    Public Liability Insurance: Comprehensive Public Liability Insurance with coverage limitations of not less than $1,000,000 combined single limit.

      (4)    Owner's premises and operations;

      (5)    Independent Subcontractor's protection for Owner's legal liability in connection with any operations by any Subcontractor; and

      (6)    Contractual: This coverage must protect Owner and the Contractor from claims of all persons for death, personal injury or property damage occurring on or about, or arising out of, those areas of the Project occupied by Subcontractor or

U:\Study\Excel\Forms\Contracts\Vendor\Dywidag\Contract for cable systems\Subcontract agreement-final-rev1150(1).doc

Initial Here _____

under Subcontractor's control, or wherever arising if caused in whole or in part by any act or omission of, any condition created by, or any defect in workmanship or material furnished by Subcontractor, Subcontractor's subcontractors or suppliers, or by any agent or employee of Subcontractor or of any such subcontractor or supplier, or any combination of the aforementioned. The aforementioned coverage must apply regardless of whether the claim arises during the progress of the Work or at any time subsequent to completion of the Work, and shall include a completed "broad form property damage endorsement."

(7)    Automobile Liability:  Automobile liability insurance for personal injury or death with coverage limits of not less than $1,000,000 combined single limit.

b.    Subcontractor will supply the Contractor with Certificate(s) of Insurance evidencing the required coverage at least ten (10) days prior to Subcontractor's commencing the Work.  No certificate will be acceptable unless it provides that any change or termination within the policy periods will not be effective unless and until Owner has received thirty (30) days prior written notice.  Any deductible under any Insurance policy shall be payable by Subcontractor or shall be deducted from Subcontractor's account.  If Subcontractor's insurance certificate is not current, Owner will withhold payment until such insurance certificate is updated, submitted to and approved by the Contractor.

c.    If Subcontractor fails to obtain or maintain any required insurance, Owner shall have the option, but not the duty, to obtain or maintain such insurance for the account of Subcontractor, and all costs incurred by Owner shall be reimbursed by Subcontractor upon demand.

d.    All insurance must name Owner, the Contractor and Subcontractor as co-insureds as their respective interests may appear, must be written by companies authorized to do business in the State of Florida that are acceptable to Owner and must not contain any right of subrogation against Owner or Contractor.  Thus, the following statement MUST be included on all insurance liability certificate(s):  A waiver of Subrogation is provided in favor of the certificate holder.

e.    Site Requirements.  Subcontractor shall furnish a detailed written statement specifying the particulars, if any, in which Project is not in proper condition to receive the Work.  Failure to furnish such statement shall constitute a waiver of all claims by Subcontractor against Owner including, but not limited to, those claims arising out of the negligence of Owner or Contractor with respect to improper site conditions.

f.    Violations.  Subcontractor has reviewed the plans and contract documents, including but not limited to, the scope of work and construction drawings, and has determined that all work can be performed and complied with under the existing building code.  Subcontractor shall notify Contractor in writing of any violation of any legal requirement contained in the Contract Documents.  Unless Subcontractor notifies Contractor in writing of any such violation before beginning the Work, Subcontractor will not be entitled to a price adjustment or extension for any such violation and Subcontractor in such event must complete the Work in compliance with all legal requirements at Subcontractor's cost, notwithstanding anything contrary in the Contract Documents, the certification of the Contract Documents by Owner or the Architect, or all of them, the fact that corrective work is required, or any combination of the foregoing.

g.    Information.  Subcontractor shall deliver to Owner a detailed request for such additional information for the proper coordination, scheduling, and planning of Subcontractor's Work as Subcontractor may require.  No extension of time will be allowed Subcontractor for lack of information unless such request has been made in writing to Owner and Owner has failed to furnish the information requested within a reasonable period of time.

h    Subcontractor acknowledges that the Work required by this Contract must be coordinated by the Contractor with work and materials to be performed and furnished by other Subcontractors and Subcontractor, and prior to commencing the Work the Subcontractor will familiarize itself with the method of construction and work sequence that the Contractor intends to use.

i.    Subcontractor shall, at all times, furnish Owner and Contractor with such information as either Owner or Contractor requires for the proper scheduling, coordination and performance of the Work and will follow Contractor's instructions in planning Subcontractor's Work and coordinating it with that to be performed by other Subcontractors.

j.    Subcontractor shall not delay or otherwise interfere with Owner, Contractor, or any other Subcontractors.

8.    **Time of Performance**

a.    Subcontractor will proceed with the Work in a prompt and diligent manner, in accordance with Contractor's schedule, as reasonably amended from time to time.  TIME IS OF THE ESSENCE.



b.   If requested by Owner or Contractor, Subcontractor shall submit a detailed schedule for performance of the Contract, in a form acceptable to Owner, which shall comply with all scheduling requirements of the Contract Documents and of paragraph a. above. Owner may, at its sole discretion, direct Subcontractor to make reasonable modifications and revisions in said schedule.

c.   Subcontractor will coordinate its work with the work of Owner, and Owner's other Subcontractor's, if any, so no delays or interference will occur in the completion of any part or the entire Project.

9.   **Changes**

a.   Owner may, at any time, unilaterally or by agreement with Subcontractor, without notice to the sureties, make changes in the Work. Any unilateral order or agreement under this Article 9(a) shall be in writing. Subcontractor shall perform the work as changed without delay.

b.   Subcontractor shall submit any claims for adjustments in the price, schedule or other provisions of the Contract claimed by Subcontractor for changes directed by Owner or as a result of deficiencies or discrepancies in the Contract Documents, to the Contractor. Said claims shall be submitted in writing by Subcontractor in time to allow Owner to comply with the applicable provisions of the Contract Documents. The Contractor shall process said claims in the manner provided by and according to the provisions of the Contract Documents. Owner shall process said claims in the manner provided by and according to the provisions of the Contract Documents so as to protect the interest of Subcontractor and others including Owner.

c.   If requested by Owner, Subcontractor shall, within seven (7) days, submit a reasonable price quotation for proposed changes.

10.   **Subcontractor's Failure to Perform**

a.   If, in the opinion of Owner, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workmen or materials of the proper quality (2) fail in any respect to perform the Work according to the current schedule, (3) cause, by any act or omission, the stoppage or delay of or interference with the work of Owner or of any other Subcontractor or sub-subcontractor, (4) fail to comply with all provisions of this Contract or the Contract Documents, (5) be adjudged as bankrupt, or make a general assignment for the benefit of its creditors, (6) have a receiver appointed, or (7) become insolvent or a debtor in reorganization proceedings, then, after serving three (3) days' written notice, unless the condition specified in such notice shall have been eliminated within such three (3) days, Owner, at its option (i) without voiding the other provisions of the Contract and without notice to the sureties, may take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to Owner for the cost thereof, (ii) terminate the Contract for default, or (iii) seek specific performance of Subcontractor's obligations hereunder, it being agreed by Subcontractor that specific performance may be necessary to avoid irreparable harm to Owner. In the event of termination for default, Owner may, at its option, (a) enter upon the premises and take possession, for the purpose of completing the Work, of all materials and equipment of Subcontractor, (b) require Subcontractor to assign to Owner any or all of Subcontractor's subcontracts or purchase orders involving the Project, or (c) either itself or through others complete the Work, by whatever method Owner may deem expedient. In case of termination for default, Subcontractor shall not be entitled to receive any further payment for Work in place or otherwise, until the Work shall be fully completed and accepted by Owner. At such time, if the unpaid balance of the price to be paid shall exceed the expense incurred by Owner, such excess shall be paid by Owner to Subcontractor. If such amount due Owner shall exceed such unpaid balance, then Subcontractor shall pay Owner the difference. Upon a default by Subcontractor, Owner may retain from any sum due to Subcontractor all sums as may be due and owing, or may become due from Subcontractor to Owner. Owner may retain a sufficient sum to protect itself from any claim or demand asserted against Owner by a third party as a result of work performed by Subcontractor hereunder until such claim or demand has been satisfied.

b.   If Owner is adjudged by a court of competent jurisdiction to have wrongfully exercised any option under 10.a.(i)(ii) or (iii), Owner shall be liable to Subcontractor for the reasonable value of work performed by Subcontractor, excluding all consequential damages, prior to Owner's wrongful action plus the direct costs incurred by Subcontractor as a result of Owner's wrongful action plus, in the case of a wrongful termination for default, less prior payments made. The Subcontractor's remedy under this Article 10.b. shall be exclusive. Nothing herein shall bar withholdings by Owner permitted by other provisions of this Contract.

11.   **Warranty**

a.   The Subcontractor warrants to the Owner and Contractor that materials and equipment furnished under the Contract will be of good quality and new, unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform with the requirements of the Contract Documents. Work not conforming to these requirements including substitutions not properly approved and authorized, may be considered defective. If required by the Contractor, the Subcontractor shall furnish satisfactory evidence as to the kind and quality of materials and

equipment  The Warranty provided in this Section shall continue for a period of two (2) years next following the issuance of a Certificate of Occupancy for the building for which a Warranty claim may be made.

       b.     Subcontractor shall remove and repair or replace any of his workmanship, material and equipment that is defective or substandard and any equipment that fails to develop ratings, capacities or characteristics required by the Contract Documents at any time within two (2) years after acceptance of the work or within such longer period as is provided in the Contract Documents at its expense and Owner's convenience. Subcontractor shall also pay all expenses incurred in removing, replacing or repairing any work required as a result of removing, replacing or repairing any part of its defective work. If any statute or regulation provides for a warranty by the Owner in favor of any third party relative to the Project or any part thereof, the Subcontractor shall be liable for and responsible to Owner and/or the Contractor for any damages or loss for which the Owner is liable or responsible to any such third party based upon a breach of any such statutory warranty, if and to the extent that such breach of statutory warranty is the result of any defective or substandard workmanship, materials or equipment performed by or provided by the Subcontractor.

### 12.    Liens

       a.     In the event that liens are filed by anyone (excluding Subcontractor) in relation to the labor and/or material being furnished by Subcontractor, Subcontractor agrees to have the same discharged, by posting a bond with the appropriate authorities, or otherwise, within five (5) days of notice. In the event such lien is not so discharged, in addition to all other rights which the Owner may have, Owner shall have the right to terminate this Contract for Default.

       b.     Prior to final payment, Subcontractor shall provide the Contractor a release of its liens and claims and all liens and claims of all persons furnishing labor and/or materials for the performance of this Contract, and satisfactory evidence that there are no other liens or claims whatsoever outstanding against the Work.

       c.     If required by the Contractor, Subcontractor shall furnish either releases of liens or waivers of lien with respect to all prior payments, as part of each request for partial payment other than the initial request.

       d.     Owner may issue joint checks to the Subcontractor and any sub-subcontractor for the initial payment and subsequent payments as well.

### 13.    Inspection and Acceptance

       a.     Subcontractor shall provide appropriate facilities at all reasonable times for inspection by Owner or the Contractor of the Work and materials provided under this Contract, whether at the Project site or at any place where such work or materials may be in preparation, manufacture, storage, or installation.  Subcontractor shall promptly replace or correct any Work or materials which Owner or the Contractor shall reject as failing to conform to the requirements of this Contract. If Subcontractor does not do so within a reasonable time, Owner shall have the right to do so and Subcontractor shall be liable to Owner for the cost thereof. If, in the opinion of Owner or Contractor, it is not expedient to correct or replace all or any part of rejected Work or materials, then Owner, at its option, may deduct payments due, or to become due, to Subcontractor, such amount as, in Owner's reasonable judgment, will represent (i) the difference between the fair value of the rejected Work and materials and the value thereof if it complied with this Contract, or (ii) the cost of correction, whichever is higher.

       b.     The Work shall be accepted according to the terms of the Contract Documents. However, unless otherwise agreed in writing, entrance and use by Owner or the Contractor, shall not constitute acceptance of the Work.

### 14.    Inconsistencies and Omissions

       Should inconsistencies or omissions appear in the Contract Documents, it shall be the duty of Subcontractor to so notify the Contractor, in writing, prior to commencing Work.  Upon receipt of said notice, the Contractor shall instruct Subcontractor as to the measures to be taken, and Subcontractor shall comply with the Contractor's instructions. Nothing herein shall bar Subcontractor's right to seek adjustment under Article 9.b. if allowable under the Contract Documents.

### 15.    Termination for Convenience

       Owner shall have the right to terminate this Contract for convenience, by providing Subcontractor with a written notice of termination, to be effective upon receipt by Subcontractor. If the Subcontractor is terminated for convenience, the Subcontractor shall be paid the amount representing costs only to the extent of any work in place at the time of termination, which costs are due for its Work, as provided in the Contract Documents.

Initial Here 

16.   **Approvals**

a.      Subcontractor shall deliver to Owner copies of shop drawings, cuts, samples and material lists required by Owner, the Contractor, or the Contract Documents and in accordance with the Contract Documents within sufficient time so as not to delay performance of the Project or within sufficient time for the Owner to submit the same within the time stated in the Contract Documents, whichever is earlier.  Any deviation from the Contract Documents shall be clearly identified on shop drawings and shall be accompanied by a letter describing such deviation in detail and the effect, if any, on the Subcontractor's work and time of performance.  Notwithstanding any general approval granted by Owner or the Contractor, all work shall be in accordance with the Contract Documents.

b.      The Contractor's review of shop drawings, cuts, samples and material lists is only for the convenience of the Owner in following the work and shall not relieve the Subcontractor from responsibility for any deviations from the requirements of the Contract Documents.  The Contractor's review shall not be construed as a completed check nor shall it relieve the Subcontractor from responsibility for errors of any sort in shop drawings, cuts, samples and material lists, or from the necessity of furnishing any work required by the Contract Documents which may have been omitted from the shop drawings, cuts, samples or material lists.

17.   **General Obligations**

a.      As and when directed by Owner or Contractor, Subcontractor shall promptly commence the Work and pursue it diligently to completion.  All work must

(1)      be completed to the Contractor's satisfaction,
(2)      conform strictly with all legal requirements; and
(3)      conform strictly to the Contract Documents.

b.      Subcontractor shall schedule all inspections required by all governmental agencies having jurisdiction so as not to interfere with the progress of the Work to be performed by Subcontractor and other Subcontractors.

c.      All workmanship (labor and materials) supplied by Subcontractor shall be acceptable to Owner and the Contractor

d.      Subcontractor shall daily and upon completion of the Work clean the Job Site to the Contractor's satisfaction, including removal of all debris and other materials left by Subcontractor to a place designated by the Contractor for such purpose.  If Subcontractor fails to do so, Owner may impose the cleanup back charge for each day the Subcontractor fails to do so.

e.      All action required by the Contract Documents shall be at Subcontractor's expense unless the Contract Documents expressly provide otherwise.

f.      By initiation of his phase of Work, Subcontractor agrees that any work previously done by others is acceptable. Subcontractor shall immediately notify the Contractor's superintendent of any workmanship or materials supplied by others that is not, in Subcontractor's opinion, acceptable.  Subcontractor must receive a written waiver of responsibility with respect to work performed or materials furnished by others from the Contractor's superintendent before proceeding with work which would cover or tie into any unacceptable work.  It shall be Subcontractor's responsibility to forward a copy of the written waiver directly to the Corporate Office of the Contractor in accordance with Article 25 hereof.

g.      An authorized representative of Subcontractor shall visit the Project office each day to receive all notices and correspondence pertaining to its Work.

h.      Subcontractor shall resolve all back charges with the Owner within thirty (30) days after receipt of a back charge and if the same are not resolved within thirty (30) days, Owner shall have the right to terminate this Contract.

i.      In the event that Owner elects to terminate the Work, Subcontractor shall terminate its Work upon being so notified.  Upon such termination, Owner's sole liability shall be to pay Subcontractor for Work completed prior to such termination, and Owner shall have no further liability, nor shall Subcontractor have any claims against Owner, for any matters of any type except as to Work completed; provided, however, in the event Owner elects within sixty (60) days after termination to recommence the Work.

18.   **Assignment and Subcontracting**

Subcontractor shall not assign or transfer this Contract, or funds due hereunder, without the prior written consent of the Subcontractor's surety and the Owner.  The Owner shall not unreasonably withhold its consent to the assignment of funds due hereunder.

U:\Safety\SuzeC\Werken\Proview Departments\text for wld\contract\subcontract agreement-faubret1503[1].doc

Page 7 of 13                                    Initial Here

All subcontracts and purchase orders awarded by Subcontractor are subject to the provisions of this Contract, and Subcontractor shall insert therein all provisions necessary to enable each Subcontractor to comply with the terms hereof, including, but not limited to, a waiver of all rights to proceed against Owner and/or the Contractor, in the event Owner terminates this Contract, for monies owed to them by Subcontractor.

## 19.    Patents and Royalties

Except as otherwise provided by the Contract Documents, Subcontractor shall pay all royalties and license fees which may be due on the inclusion of any patented materials in the Work. Subcontractor shall defend all suits or claims for infringement of any patent rights that may be brought against Owner or the Contractor arising out of the Work, and shall be liable to Owner and the Contractor for all loss, including all costs and expenses, on account thereof.

## 20.    Taxes and permits

Except as otherwise provided by the Contract Documents, Subcontractor agrees to pay and comply with and hold Owner and the Contractor harmless against the payment of all contributions, taxes or premiums which may be payable by it under Federal, state or local laws arising out of the performance of this Contract, and all sales use or other taxes of whatever nature levied or assessed against Owner, Contractor, or Subcontractor arising out of this Contract, including any interest or penalties. Subcontractor waives any and all claims for additional compensation because of any increase in the aforementioned taxes unless payment for said increase is specifically provided for in the Contract Documents. Subcontractor shall obtain and pay for all permits, licenses, fees and certificates of inspection necessary for the prosecution and completion of its work, and shall arrange for all necessary inspection and approvals by public officials.

## 21.    Laws, Regulations and Ordinances

Subcontractor agrees to be bound by, and at its own cost, comply with all federal, state, and local laws, codes, ordinances and regulations applicable to this Contract and the performance of the Work whether by reason of general law or by reason of provisions in the Contract Documents. Subcontractor shall be duly licensed to operate under the law of the applicable jurisdictions.

## 22.    Health and Safety

Subcontractor and all employees and agents thereof shall comply with the applicable requirements issued pursuant to the Occupational Safety and Health Act of 1970, as amended, and all other applicable health and safety laws and regulations. Subcontractor shall be liable to Owner and Contractor for all loss, cost and expense attributable to any acts of commission or omission by Subcontractor, its employees and agents resulting from failure to comply therewith including, but not limited to, any fines, penalties or corrective measures.

## 23.    Information Required by Owner

In addition to the information to be provided by Subcontractor pursuant to other provisions of the Contract, Subcontractor hereby agrees to provide, at no additional cost to Owner, and in a prompt and timely fashion, any and all additional information relating to this Contract which is required either by the Contract Documents or by law.

## 24.    Severability and Waiver.

A partial or complete invalidity of any one or more provisions of this Contract shall not affect the validity of the remaining provisions of this Contract, and the invalid provision shall be replaced by a mutually acceptable valid, legal and enforceable provision which comes closest to the intent of the Parties.

## 25.    Notices

All notices shall be addressed to the parties at the addresses set out herein, and shall be considered as delivered when postmarked, if dispatched by registered mail, or when received in all other cases, or continuing force and effect of any other provision. The failure of either party to insist, in any one or more instances, upon the performance of any of the terms, covenants, or conditions of this Contract, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such term, covenant, condition or right as respects further performance.

Initial Here 

26.   **Interpretation of Contract Documents**

b.      It is the intention of the parties that all terms of this Contract are to be considered as complimentary. However, in the event that such an interpretation is not possible, the order of precedence of the documents forming this Contract shall be (1) modifications of any documents forming part of the Contract; (2) this Contract, unless the Contract Documents impose a higher standard or greater requirement on Subcontractor, in which case the Contract Documents; (3) the Contract Documents, unless the provisions of (2) apply.

c.      In the event of a conflict between or among modifications, the later in date shall prevail; in the event of a conflict between or among the terms of this Contract, the higher standard or greater requirement for Subcontractor shall prevail, and in the event of a conflict between or among the terms of the Contract Documents, the higher standard or greater requirement for Subcontractor shall prevail.

d.      Subcontractor acknowledges receiving, reviewing and understanding the provisions of the Contract Documents.

27.   **Advertising**

Neither Subcontractor, its subcontractors, suppliers, agents nor employees shall take photographs of the work on site, or publish or display advertising matter of any description relating to the Project without first obtaining the written consent of Owner and the Contractor.

28.   **Contract Time**

Unless the terms hereof are modified in writing within thirteen (13) months of the date of this Contract, the terms of this Contract shall be automatically renewed as provided herein and shall not expire until Subcontractor satisfactorily performs all Work on the Project.

IN WITNESS WHEREOF, the parties, by their duly authorized representatives, have executed this Contract on the date first above written.

SUBCONTRACTOR: PRECISION DRYWALL, INC.

By: _____

Title: _V I C E   P R E S I D E N T_

Subcontractor Tax Identification No.: _65-001 5503_

OWNER AND CONTRACTOR:
NORTHSTAR HOLDINGS AT B & A, LLC

By: _____

Title: _____

Initial Here_____

# NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

**COMMUNITY**      COBBLESTONE CREEK

| | | | |
|---|---|---|---|
| **ADDENDUM NUMBER** | ONE | **DATED** | May 23, 2005 |
| **SUBCONTRACTOR** | Precision Drywall, Inc. | **CONTACT NAME** | Jesus Barajas |
| **ADDRESS** | 3300 So. Congress Ave, Suite #18, Boynton Beach, FL 33426 | | |
| **TELEPHONE** | 561-733-4077 | **FAX** | 561-733-3390 |
| **MOBILE** | | **PAGER** | |
| **E-MAIL** | | | |

**CONTRACT TYPE**      DRYWALL LABOR AND MATERIALS

### 1   SCOPE

It is mutually agreed that the Subcontractor shall furnish all labor, supervision, material, tools and equipment as required to perform all the work and services necessary to complete this contract with Northstar Holdings, at B & A, Inc. at Cobblestone Creek, Palm Beach County, Florida (Owner). All work performed by this Subcontractor shall meet all local codes and requirements of governmental agencies having jurisdiction. The Subcontractor will be responsible for supplying his own temporary power.

### 2   PLANS AND SPECIFICATIONS

The Subcontractor's work, services, and materials shall be in accordance with the plans as listed below or signed cabinet drawings or existing models. This contract is all inclusive and in compliance with the plans listed below. Any and all written proposals and/or verbal discussions are superceded by this contract.

<u>MODEL</u>

A= ANDOVER<br>
C1=CHELSEA<br>
C2=CAMBRIDGE<br>
D= DEVON<br>
E= ESSEX<br>
F= FAIRFAX

### 3   WORK TO BE PERFORMED BY OWNER

Not Applicable.

Page 1 of 6

## NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

4   **WORK TO BE PERFORMED BY SUBCONTRACTOR**

A. All wood framing members by others to which gypsum wallboard will be fastened shall be straight and spaced as shown on drawings. Upon starting, Subcontractor accepts work done previously.

B. Gypsum wallboard shall be applied first to ceiling, then walls, using horizontal application method, with paperboard edge at right angles to the framing members.

C. Wallboard joints at openings shall so be located so that no end joints align with edges of openings. End joints shall be staggered and joints in opposite sides of a partition shall not occur on the same stud.

D. All materials to be dry, preferably by being stored inside the building under roof. Where it is necessary to store gypsum wallboard outside, it shall be stacked off the ground properly supported on a level platform and fully protected from the weather.

E. Upon completion of all work and spraying, unit is to be scraped and swept out. Use existing openings to receive materials, protecting windows and door frames.

F. Replace insulation fallen or unattached prior to drywall.

G. Gypsum wallboard shall be cut by scoring, breaking or by sawing, away from the face side. All cut edges and ends of the gypsum wallboard shall be smoothed where in order to obtain neat joints. Where drywall meets projections, it shall be scribed to fit and neatly cut.

H. Install wallboard with the long dimension horizontal and in such a manner that tapered butt joints will be centered on a stud or furring.

I. Fill all screw heads and dimples in the body of the panels with joint compound and smooth out so that after painting no visible sign remains. Joints shall be taped and smoothed out with joint cement. Interior corners shall have at least one coat of joint or topping compound applied with the edges feathered out. Outside corners shall have all zinc or plastic corner beads with flanges concealed by not less than two coats of compound, feathered as recommended by the manufacturer. All taping and finishing of sheetrock. Drywall to be lightly sanded prior to painting.

J. Float drywall to within tolerance of ¼" to 8'. Install all drywall with screws (at proper length), not nails.

K. Subcontractor shall install window bucks, including all materials and labor.

## NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

L.  Provide and install window bucks at all windows, exterior swing doors and sliding glass door openings. All required wood nailers, wood backing windows and sliding glass doors to be caulked.

M.  All bucks to be fastened from product approval specifications.

N.  Ceilings are to be knockdown: Wall are to be orange peel.

O.  In the event roof tiles not loaded, first coat with joint compound. Superintendent will authorize approval to continue.

P.  Apply drywall fireproofing at roof trusses.

Q.  Provide 1x4 wood backing necessary for kitchen and bathroom cabinets or any other furniture or equipment attached to the walls, including support for tub skit and air conditioned units. Provide 1x8 backing at floor mounted shower pan liners. Backing shall be installed at all wet areas at metal studs where liner attaches to studs. Drywall fasteners shall not penetrate the liner at any area.

## 5    MATERIALS TO BE SUPPLIED BY OWNER

Not Applicable

## 6. MATERIALS TO BE SUPPLIED BY SUBCONTRACTOR

A.  All gypsum wallboard shall have edges tapered in the following types: REG  4x12x½", FC 4x12x5/8,  MR 4x12x½".

B.  All wall surfaces to be textured finished with light coat of Orange Peel texture, Gold Bond "Texture". Ceilings are to be knockdown.

C.  All shower and wet areas to receive MR board.

D.  Furnish and install 1 x 2 pressure treated furring strips 24 o.c. with additional strips at corners, intersections and any other locations where required for a complete installation of the wallboard; including pressure treated 1 x 2's nailed horizontally on all masonry or concrete walls at the floor line; extend pressure treated 1 x 4 bucks 12" beyond all windows and sliding glass doors. Backing for cabinets in kitchen and bathrooms shall be pressure treated 1" x 4" wood.

Page 3 of 6

## NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

E. Provide and install all 25 gauge metal stud per plans. Interior framing shall be 3 5/8" metal studs on 24" centers at interior walls, and a double row of 1 5/8" metal studs at 24" centers at chase walls.

    F. 2 x 4 wood rough bucks at entry door, and interior passage doors. All wood bucks applied to masonry or concrete shall be pressure treated and set in a bed of vinyl caulk or equal.

    G. Use of ½" or 5/8" at 1-hour walls should be determined by plans and put in appropriate location.

    H. All party walls and interior end wall to be 2" x 2" PT bucks.

    I. Ceiling to receive 1 layer of 5/8" type "X" applied to underside of trusses.

    J. Tub and shower recess shall include one layer of ½" MR on metal studs framed 16" o.c.

    K. A Subcontractor representative to be on site to walk with city inspector for drywall screw inspections.

    L. Add drywall fire proofing at roof trusses.

## 7   OPTIONS

Vendor Option Costs

## 8   TRASH

A. To remove from the building and surrounding area, all debris and scrap caused by and during the performance of his work. Upon completion of each job, Subcontractor must collect and discard, in a place designated by the Owner's representative, all trash related to his trade, within 48 hours or Owner will back charge Subcontractor $250.00 minimum.

## 9   GUARANTEE

A. Subcontractor will furnish labor at no charge to Owner for the removal and replacement of defective materials damaged during the course of construction. This labor will be confined only to work performed under this contract

## NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

### 10   SAFETY

A.   To comply with OSHA Safety and Regulations in tolerance to the execution of his work and will be responsible for any and all penalties or fines caused by his failure to conform to OSHA Regulations.

### 11   INSPECTION BY SUBCONTRACTOR PRIOR TO COMMENCEMENT OF WORK

A.   That in the event the construction completed prior to the work to be performed by the Subcontractor here under is not satisfactory to this contract, he shall immediately notify Owner, in writing, of such conditions.  By commencing and proceeding with the work under this contract, the Subcontractor shall be deemed to have accepted the conditions of such prior completed construction; and the lack of quality of workmanship of such prior completed construction shall not then be an excuse for the failure of the work under this contract to meet the quality of workmanship required here under.

### 12   SUBCONTRACTOR INFORMATION

A.   Subcontractor's emergency telephone number for 24 hour service  _561- 436- 8758_

B.   Person in charge is                                     _JEFF_

### 13   COMPENSATION

A.   The total prices, the stages of work and the amounts for which the subcontractor shall be entitled to payment for the work as previously described shall be in accordance with Vendor Base Plan Costs & Vendor Option Costs Addendum attached hereto.

### 14   SERVICE WORK

A.   All service tickets to be completed within 10 days of issue or monies will be held until completed. If the work is not completed within 20 days, Owner will hire whatever personnel necessary to do the work and backcharge this Subcontractor

### 15   LICENSES AND INSURANCE

A.   This Subcontractor shall be responsible for maintaining and supplying Owner with current licenses as required by state local regulations. Before starting work, copies of all licenses and insurance is not brought current on due date, monies will be held until such updated documents are provided

Page 5 of 6

NORTHSTAR HOLDINGS, AT B & A, INC.
## SUBCONTRACT AGREEMENT - ADDENDUM # 1

### 16  WORK ORDERS

A.    All work orders must be written prior to the commencement of work, and they must specify who is responsible for the costs incurred.

B.    All work orders must be turned into the Main Office within 30 days after completion to help prevent loss of the work order and to expedite its payment. Any work order not sent in this time frame will not be paid.

C.    All work orders over $500.00 require a written estimate. Work orders over $500.00 must be written and approved by the Contracts Department.

| SUBCONTRACTOR | PRECISION DRYWALL, INC. | OWNER | NORTHSTAR HOLDINGS, AT B & A, LLC |
|---|---|---|---|
| BY | | BY | |
| DATE | 6 - 30 - 05 | DATE | |

Page 6 of 6

Client#: 37443        PREDR

## ACORD™ CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY) 03/15/2006

| PRODUCER | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | |
|---|---|---|
| Advanced Insurance Underwriters 3250 North 29th Avenue Hollywood, FL 33020-1313 954 963-6666 | | |
| | **INSURERS AFFORDING COVERAGE** | **NAIC #** |
| INSURED | INSURER A: Old Dominion Insurance Co | |
| Precision Drywall, Inc. 601 N Congress Ave, #501 Delray Beach, FL 33445 | INSURER B: Essex Insurance Company | |
| | INSURER C: American International Companies (U | |
| | INSURER D: Progressive Company | |
| | INSURER E: | |

### COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY** | MSG24989 | 09/09/05 | 09/09/06 | EACH OCCURRENCE | $1,000,000 |
| | X | COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | 150,000 |
| | | CLAIMS MADE [X] OCCUR | | | | MED EXP (Any one person) | 15,000 |
| | X | BI/PD Ded:500 | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | | [ ] POLICY [X] PRO-JECT [ ] LOC | | | | | |
| D | | **AUTOMOBILE LIABILITY** | 015399893 | 03/10/06 | 03/10/07 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | ANY AUTO | | | | | |
| | | ALL OWNED AUTOS | | POSTED | | BODILY INJURY (Per person) | $ |
| | X | SCHEDULED AUTOS | | OCT 17 2006 | | | |
| | X | HIRED AUTOS | | | | BODILY INJURY (Per accident) | $ |
| | X | NON OWNED AUTOS | | | | | |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | ANY AUTO | | | | OTHER THAN EA ACC AUTO ONLY: AGG | $ $ |
| B | | **EXCESS/UMBRELLA LIABILITY** | XMR03371 | 09/14/05 | 09/09/06 | EACH OCCURRENCE | $2,000,000 |
| | X | OCCUR [ ] CLAIMS MADE | | | | AGGREGATE | $2,000,000 |
| | | | | | | | $ |
| | | DEDUCTIBLE | | | | | $ |
| | | RETENTION $ | | | | | $ |
| C | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | WC6702314 | 05/31/05 | 05/31/06 | [X] WC STATU-TORY LIMITS [ ] OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? If yes, describe under SPECIAL PROVISIONS below | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| | | **OTHER** | | | | | |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS
Certificate Holders NorthStar Homes and NorthStar @ Gramercy Square, LLC are hereby named as Additional Insureds. A Waiver of Subrogation is provided in favor of the Certificate Holder. Workers Compensation insurance covering all employees of Contractor in the amount of the Contractors full statutory liability.
(See Attached Descriptions)

MAR 21 2006

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| NorthStar Homes 14406 Military Trail Delray Beach, FL 33484 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL 30* DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| | AUTHORIZED REPRESENTATIVE *Charlotte Floyd* CHL |

ACORD 25 (2001/08) 1 of 3    #S374653/M372568               © ACORD CORPORATION 1988

# ACORD. CERTIFICATE OF LIABILITY INSURANCE

DATE (MM/DD/YYYY)
02/15/07isa

| | |
|---|---|
| **PRODUCER**<br>Advanced Insurance Underwriters<br>3250 North 29th Ave.<br>Hollywood, FL 33020-1313<br>954 963-6666 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |

| | INSURERS AFFORDING COVERAGE | NAIC # |
|---|---|---|
| **INSURED**<br>Precision Drywall, Inc.<br>601 N Congress Ave, #501<br>Delray Beach, FL 33445 | INSURER A: Mid-Continent Casualty Co | |
| | INSURER B: Essex Insurance Company | |
| | INSURER C: American International Co | |
| | INSURER D: Progressive Company | |
| | INSURER E: | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADD'L INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY**<br>X COMMERCIAL GENERAL LIABILITY<br>CLAIMS MADE  X  OCCUR<br>X BI/PD Ded:1,000<br><br>GEN'L AGGREGATE LIMIT APPLIES PER:<br>POLICY  X  PRO-JECT  LOC | O4GL000657042 | 09/09/06 | 09/09/07 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $100,000 |
| | | | | | | MED EXP (Any one person) | $-0- |
| | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| D | | **AUTOMOBILE LIABILITY**<br>ANY AUTO<br>ALL OWNED AUTOS<br>X SCHEDULED AUTOS<br>X HIRED AUTOS<br>X NON-OWNED AUTOS | 015399894 | 03/10/06 | 03/10/07 | COMBINED SINGLE LIMIT (Ea accident) | $1,000,000 |
| | | | | | | BODILY INJURY (Per person) | $ |
| | | | | | | BODILY INJURY (Per accident) | $ |
| | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY**<br>ANY AUTO | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | | | | | OTHER THAN  EA ACC<br>AUTO ONLY:  AGG | $<br>$ |
| B | | **EXCESS/UMBRELLA LIABILITY**<br>X OCCUR  CLAIMS MADE<br><br>DEDUCTIBLE<br>X RETENTION  $ 10000 | 04XS147476 | 09/09/06 | 09/09/07 | EACH OCCURRENCE | $2,000,000 |
| | | | | | | AGGREGATE | $2,000,000 |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| C | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY**<br>ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?<br>If yes, describe under SPECIAL PROVISIONS below | WC6702314 | 05/31/06 | 05/31/07 | X  WC STATU-TORY LIMITS  OTH-ER | |
| | | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | | | | | | E.L. DISEASE - EA EMPLOYEE | $1,000,000 |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $1,000,000 |
| | | **OTHER** | | | | | |

**DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES / EXCLUSIONS ADDED BY ENDORSEMENT / SPECIAL PROVISIONS**
*10 days for non-payment
Blanket Additional Insured/Blanket Waiver of Subrogation/Primary and Non-Contributory on General Liability
Blanket Waiver of Subrogation on Workers Compensation
(See Attached Descriptions)

POSTED FEB 19 2007

DECR... FEB 16 2007

| | |
|---|---|
| **CERTIFICATE HOLDER**<br>Northstar Homes<br>14406 Military Trail<br>Delray Beach, FL 33484<br><br>Fax: 561-498-4354 | **CANCELLATION**<br>SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL _30_ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES.<br>**AUTHORIZED REPRESENTATIVE**<br>Charlotte Floyd   LSA |

ACORD 25 (2001/08) 1 of 3   #S439340/M413392   © ACORD CORPORATION 1988

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# POLICY CHANGES

Policy Change
Number 1 ___

| POLICY NUMBER | POLICY CHANGES EFFECTIVE | COMPANY |
|---|---|---|
| BAG0002215-00 | 10/22/2006 | General Fidelity Insurance Company |

| NAMED INSURED | AUTHORIZED REPRESENTATIVE |
|---|---|
| Northstar Holdings Inc<br>As Per Named Insured Endorsement<br>14406 Military Trail<br>Delray Beach, FL 33484 | HBW Insurance Services, LLC<br>4501 Circle 75 Pkwy, Suite F 6200<br>Atlanta, GA 30339-<br>Producer Code:10015-00 |

**COVERAGE PARTS AFFECTED**

Commercial General Liability (CGL)

**CHANGES**

In consideration of the premium specified on this endorsement and subject to all of the terms and conditions of the policy, it is hereby understood and agreed the following change is made to the policy:

**Audit Adjustment**

Based on information from your records during our recent audit the policy premium is adjusted as follows:

**Policy Level**

| Coverage | Audit Exposure | Final Premium | Policy Premium | Difference |
|---|---|---|---|---|
| Terrorism - Certified Acts | | $▮▮▮ | $▮▮▮ | $▮▮▮ |
| | | | Total Policy Level | $▮▮▮ |

**Location Level**

Loc 001  Bldg 001

| Classification | Rate | Audit Exposure | Final Premium | Policy Premium | Difference |
|---|---|---|---|---|---|
| 91583 Contractors-Subcontracted Work-in Connection with Building Construction, Reconstruction, Repair or Erection - one or two family dwellings | | | | | |
| Prem/Ops | $▮▮▮ | ▮▮▮ | $▮▮▮ | $▮▮▮ | $▮▮▮ |
| Products | $▮▮▮ | ▮▮▮ | $▮▮▮ | $▮▮▮ | $▮▮▮ |
| 91580 Contractors-Executive Supervisors or Executive Superintendents | | | | | |
| Prem/Ops | $▮▮▮ | ▮▮▮ | $▮▮▮ | $▮▮▮ | $▮▮▮ |
| 47051 Real Estate Development Property | | | | | |
| Prem/Ops | $▮▮▮ | If Any | $▮▮▮ | $▮▮▮ | $▮▮▮ |
| 49451 Vacant Land Other than Not-For-Profit | | | | | |
| Prem/Ops | $▮▮▮ | If Any | $▮▮▮ | $▮▮▮ | $▮▮▮ |
| 46362 Model Homes | | | | | |
| Prem/Ops | $▮▮▮ | | ▮.00 | $▮▮▮ | $▮▮▮ |

EXHIBIT

C

IL 12 01A (11-85)

Page 1 of 2

```
Loc 001   Bldg 001

                                   Audit         Final          Policy
Classification         Rate        Exposure      Premium        Premium       Difference
91340 Carpentry - Construction of Residential Property Not Exceeding three stories in
height
  Prem/Ops           $▓▓▓▓      ▓▓▓▓▓      $▓▓▓▓     $▓▓▓▓      $▓▓▓▓
  Products           $▓▓▓▓      ▓▓▓▓▓      $▓▓▓▓     $▓▓▓▓      $▓▓▓▓
91629 Debris Removal-Construction Site
  Prem/Ops           $▓▓▓▓      If Any        $▓▓▓      $▓▓▓       $▓▓▓
  Products           $▓▓▓▓      If Any        $▓▓▓      $▓▓▓       $▓▓▓
                                                   Total Location    $▓▓▓▓

                                                Total Return Premium  $▓▓▓▓
```

General Fidelity Insurance Company          DECLARATIONS
A Bank of America Company          (866) 763-7790
201 North Tryon Street          NC1-022-19-02
Charlotte, NC 28255

| | |
|---|---|
| **Policy No.:**  BAG0002215-00 | **Producer** |
| Renewal of: | HBW Insurance Services, LLC |
| | 4501 Circle 75 Pkwy, Suite F 6200 |
| **Business Description:**  Residential General | Atlanta, GA 30339- |
|           Contractor | Producer Code:10013-00 |
| **Type of Business:** Corporation | **Audit Period - Annual** |

**Named Insured & Address:**   Northstar Holdings Inc
                                             As Per Named Insured Endorsement
                                             14406 Military Trail
                                             Delray Beach, FL 33484

**Policy Period: from**   <u>10/22/2006</u>   to   <u>10/22/2007</u>   at 12:01 A.M. standard time at your mailing address above.
                              (inception date)          (expiration date)

**Coverage Forms that form a part of this policy:**

This policy consists of the following coverage parts for which a premium is indicated.  This premium may be subject to adjustment.  The policy writing minimum premium for this policy is ___5___ .

| **Coverage Parts** | **Premium:** |
|---|---|
| COMMERCIAL GENERAL LIABILITY COVERAGE PART | $ ▒▒▒▒▒▒▒ |
| TERRORISM - CERTIFIED ACTS (GENERAL LIABILITY) | $ ▒▒▒▒▒ |
| **TOTAL POLICY PREMIUM:** | $ ▒▒▒▒▒▒ |

In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.

**Forms Applicable To All Coverage Forms:**          See  IIT 1009  for a complete listing of forms.

THESE DECLARATIONS TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE PART DECLARATIONS, COVERAGE FORM(S)AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

Countersigned _____          by _____
                              Date                                                   Authorized Representative

Issuing Office: HBW Insurance Services 4501 Circle 75 Pkwy., Suite F-6200 Atl, GA. 30339  Issued Date: <u>10/24/2006</u>

IIT 1000  4-96                                      Original                                      Page   1  of  2

General Fidelity Insurance Company

## SUPPLEMENTAL - NAMED INSURED

Policy No.:   BAG0002215-00

Northstar Holdings Inc
Avalon Estates, LLC
Northstar @ B & A, LLC
Northstar @ Tuscany Village, LLC
Northstar Funding #1, Inc
Northstar Funding #2, Inc
Northstar at Gramercy Square LLC
Gramercy Square LLC aka Home Devco/Gramercy Square LLC
Cobblestone Creek Models LLC

It is further understood and agreed that the following condition will be
supplemented: The first Named Insured as shown on the Declarations is
deemed the representative for all Named Insureds as shown above as regards
all notice and claim obligations.

General Fidelity Insurance Company
A Bank of America Company          (866) 763-7790
201 North Tryon Street          NC1-022-19-02
Charlotte, NC 28255

# LISTING OF FORMS AND ENDORSEMENTS FORMING
# A PART OF THIS POLICY

POLICY NUMBER: BAG0002215-00

| NUMBER | TITLE |
|---|---|
| | **COMMON** |
| IIT 1000 (04-96) | Common Policy Declarations |
| IIT 1009 (04-96) | Listing Of Forms And Endorsements Forming A Part Of This Policy |
| IIT 1010 (04-96) | Common Policy Location Schedule |
| GFIC-POL-001 (05-06) | Policy Signature Page |
| IL 00 17 (11-98) | Common Policy Conditions |
| IL 00 21 (07-02) | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |
| IL 09 85 (01-06) | Disclosure Pursuant To Terrorism Risk Insurance Act |
| | **GENERAL LIABILITY** |
| IIT 1200 (07-99) | Commercial General Liability Coverage Part Declarations |
| CG 00 01 (12-04) | Commercial General Liability Coverage Form |
| CG 00 67 (03-05) | Exclusion-Violation Of Statutes That Govern E-Mails, Fax, Phone Calls Or Other Methods Of Sending Material Or Information |
| CG 02 20 (12-04) | Florida Changes - Cancellation And Nonrenewal |
| CG 20 11 (01-96) | Additional Insured - Managers Or Lessors Of Premises |
| CG 20 12 (07-98) | Additional Insured - State Or Political Subdivisions - Permits |
| CG 20 18 (11-85) | Additional Insured - Mortgagee, Assignee Or Receiver |
| CG 20 34 (03-97) | Additional Insured - Lessor Of Leased Equipment - Automatic Status When Required In Lease Agreement With You |
| CG 21 34 (01-87) | Exclusion - Designated Work |
| CG 21 47 (07-98) | Employment Related Practices Exclusion |
| CG 21 70 (11-02) | Cap on Losses From Certified Acts of Terrorism |
| CG 21 87 (05-04) | Conditional Exclusion of Terrorism (Relating to Disposition of Federal Terrorism Risk Insurance Act of 2002) |
| CG 21 96 (03-05) | Silica or Silica-Related Dust Exclusion |
| CG 22 79 (07-98) | Exclusion - Contractors - Professional Liability |
| BOA-ASB-001 (07-01) | Absolute Asbestos Exclusion |
| BOA-COE-001-FL (07-05) | Completed Operations Exclusion |
| BOA-CPTT-001 (08-03) | Amendment of Copyright, Patent, Trademark Or Trade Secret Exclusion |
| BOA-CSE-001 (05-05) | Cross Suits Exclusion |
| BOA-DWE-001 (05-05) | Exclusion-Designated Operations Covered By A Consolidated (Wrapup) Program or Specific Project Insurance |
| BOA-FMM-EXC (05-01) | Fungus, Mildew and Mold Exclusion |
| BOA-LSE-001 (07-00) | Limited Subsidence Exclusion |
| BOA-SIR-OCC (04-04) | Self Insured Retention - Per Occurrence |
| BOA-SRE-001-FL (07-06) | Subcontractor Requirements Endorsement |
| BOA-TPE-001-FL (09-01) | Florida Total Pollution Exclusion Endorsement |

General Fidelity Insurance Company
A Bank of America Company        (866) 763-7790
201 North Tryon Street        NC1-022-19-02
Charlotte, NC 28255

Policy No.: BAG0002215-00                     Effective Date: 10/22/2006

Named Insured: Northstar Holdings Inc              Renewal Of:

Location of all Premises you own, rent or occupy:

| Premises Number | | Location | Construction | Occupancy |
|---|---|---|---|---|
| | | | | Homebuilder |
| Location: | 001 | 14406 Military Trail | | |
| Building: | 001 | Delray Beach, FL 33484 | | |

IIT 1010 4-96                      Original                      Page  1  of  1

General Fidelity Insurance Company
A Bank of America Company  (866) 763-7790
201 North Tryon Street  NC1-022-19-02
Charlotte, NC 28255

## COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

☒ OCCURRENCE   ☐ CLAIMS MADE

| | |
|---|---|
| Policy No.: BAG0002215-00 | Effective Date: 10/22/2006 |
| Named Insured: Northstar Holdings Inc | Renewal Of: |

**Form of Business:**
Each paid claim for the following coverages reduces the amount of insurance we provide during the applicable coverage period.

Audit Period - Annual

| Coverage | Limits of Insurance |
|---|---|
| Each Occurrence Limit | $1,000,000 |
| Personal & Advertising Injury Limit (Any One Person or Organization) | $1,000,000 |
| General Aggregate (other than Products/Completed Operations) | $2,000,000 |
| Products/Completed Operations Aggregate | $2,000,000 |
| Damage To Premises Rented To You (Any One Premises) | $100,000 |
| Medical Expense Limit (Any One Person) | $5,000 |
| Self Insured Retention | $25,000 |

| Classification | Class Code | Prem/Ops Prod/CO Rate | Estimated Exposure | Prem/Ops | Prod/CO |
|---|---|---|---|---|---|
| **Location Number:** 001<br>**Building Number:** 001<br>Territory: 002<br>PALM BEACH COUNTY | | | | | |
| Contractors-Subcontracted Work-in Connection with Building Construction, Reconstruction, Repair or Erection - one or two family dwellings | 91583 | $1000 Total Cost | $ | $ | $ |
| Contractors-Executive Supervisors or Executive Superintendents Products-completed operations are subject to the General Aggregate Limit | 91580 | $ Payroll    Incl. | $ | $ | Incl. |

Forms Applicable To This Coverage Part:  See  IIT 1009  for a complete listing of forms.

THESE DECLARATIONS, WHEN COMBINED WITH THE COMMON POLICY DECLARATIONS, THE COMMON POLICY CONDITIONS, COVERAGE FORM(S) AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE CONTRACT OF INSURANCE.

IIT 1200  7-99                     Original                     Page 1 of 2

COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

| | | | | | | |
|---|---|---|---|---|---|---|
| Policy No.: BAG0002215-00 | | | | Effective Date: 10/22/2006 | | |
| Named Insured: Northstar Holdings Inc | | | | Renewal Of: | | |
| Classification | Class Code | Prem/Ops Prod/CO Rate | | Estimated Exposure | Prem/Ops | Prod/CO |
| Location Number: 001 Building Number: 001 Territory: 002 PALM BEACH COUNTY | | | | | | |
| Real Estate Development Property Products-completed operations are subject to the General Aggregate Limit | 47051 | ▨▨▨ Each | Incl. | If Any | | Incl. |
| Vacant Land Other than Not-For-Profit Products-completed operations are subject to the General Aggregate Limit | 49451 | ▨▨▨ Each | Incl. | If Any | | Incl. |
| Model Homes Products-completed operations are subject to the General Aggregate Limit | 46362 | ▨▨▨ Each | Incl. | If Any | | Incl. |
| Carpentry - Construction of Residential Property Not Exceeding three stories in height | 91340 | ▨▨▨ $▨▨ Payroll | ▨▨▨ | $▨▨▨ | $▨▨▨ | $▨▨▨ |
| Debris Removal-Construction Site | 91629 | ▨▨▨ $▨▨ Payroll | ▨▨▨ | If Any | | |
| | | | | Subtotal Premium: | $▨▨▨ | $▨▨▨ |
| | | | | Total General Liability Premium: | | $▨▨▨ |

—

In Witness Thereof, the issuing Company has caused this policy to be signed officially below.

Jerome D.  Breslin
Sr. Vice President

James W. Mann
Sr. Vice President

**General Fidelity Insurance Company**

GFIC-POL-001 (05/06)

Case 2:09-md-02047-EEF-MBN   Document 8381-3   Filed 03/24/11   Page 95 of 132

# COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 21 07 02

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PROFESSIONAL LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

   (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

   (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

   (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

   (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

© ISO Properties, Inc., 2001

2. As used in this endorsement:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "Special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

© ISO Properties, Inc., 2001

IL 00 21 07 02   □

POLICY NUMBER: BAG0002215-00                                    IL 09 85 01 06

THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN
RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK
INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR
CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

## SCHEDULE

Terrorism Premium (Certified Acts) $~~~~~~~~~
This premium is the total Certified Acts premium attributable to the following Coverage Part(s), Coverage Form(s) and/or Policy(s):

Certified Acts - General Liability                    $~~~~~~~~~

Additional information, if any, concerning the terrorism premium:

Federal share of terrorism losses          90 % Year: 20 06
(Refer to Paragraph B. in this endorsement.)

Federal share of terrorism losses          85 % Year: 20 07
(Refer to Paragraph B. in this endorsement.)

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. For losses occurring in 2006, the federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. For losses occurring in 2007, the federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention. If the federal program is extended beyond 2007, the applicable percentage is shown in the Schedule of this endorsement or in the policy Declarations.

IL 09 85 01 06                    ©ISO Properties, Inc., 2005                    Page 1 of 1 □

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II - Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V - Definitions.

## SECTION I - COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

      (2) The "bodily injury" or "property damage" occurs during the policy period; and

      (3) Prior to the policy period, no insured listed under Paragraph 1. of Section II - Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

   c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

   d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II - Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

      (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

      (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

      (3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

© ISO Properties, Inc., 2003

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

This insurance does not apply to:

a. **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

 © ISO Properties, Inc., 2003 CG 00 01 12 04

f. **Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

 © ISO Properties, Inc., 2003

(2) Any loss, cost or expense arising out of any:

    (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

    (b) Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

    (a) Less than 26 feet long; and

    (b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of:

    (a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

    (b) the operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

© ISO Properties, Inc., 2003

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III - Limits Of Insurance.

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

k. **Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

l. **Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

m. **Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

n. **Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o. **Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

p. **Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III - Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement**

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

(1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

**(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

**2. Exclusions**

This insurance does not apply to:

**a. Knowing Violation Of Rights Of Another**

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**b. Material Published With Knowledge Of Falsity**

"Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

**c. Material Published Prior To Policy Period**

"Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

**d. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

**e. Contractual Liability**

"Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

**f. Breach Of Contract**

"Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

**g. Quality Or Performance Of Goods - Failure To Conform To Statements**

"Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

**h. Wrong Description Of Prices**

"Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

**i. Infringement Of Copyright, Patent, Trademark Or Trade Secret**

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**j. Insureds In Media And Internet Type Businesses**

"Personal and advertising injury" committed by an insured whose business is:

**(1)** Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of websites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs 14.a., b. and c. of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

© ISO Properties, Inc., 2003

m. **Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

n. **Pollution-Related**

Any loss, cost or expense arising out of any:

(1) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

o. **War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

## COVERAGE C MEDICAL PAYMENTS

1. **Insuring Agreement**

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

2. **Exclusions**

We will not pay expenses for "bodily injury":

a. **Any Insured**

To any insured, except "volunteer workers".

b. **Hired Person**

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. **Injury On Normally Occupied Premises**

To a person injured on that part of premises you own or rent that the person normally occupies.

d. **Workers Compensation And Similar Laws**

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. **Athletics Activities**

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

f. **Products-Completed Operations Hazard**

Included within the "products-completed operations hazard".

g. **Coverage A Exclusions**

Excluded under Coverage A.

## SUPPLEMENTARY PAYMENTS - COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

(2) Provides us with written authorization to:

(a) Obtain records and other information related to the "suit"; and

(b) Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I - Coverage A - Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when:

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in Paragraph f. above, are no longer met.

## SECTION II - WHO IS AN INSURED

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

© ISO Properties, Inc., 2003
CG 00 01 12 04

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

(1) "Bodily injury" or "personal and advertising injury":

(a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

(b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1)(a) above;

(c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

(d) Arising out of his or her providing or failing to provide professional health care services.

(2) "Property damage" to property:

(a) Owned, occupied or used by,

(b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or member) or any member (if you are a limited liability company).

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

SECTION III - LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

   a. Medical expenses under Coverage C;

   b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

   c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

   a. Damages under Coverage A; and

   b. Medical expenses under Coverage C

   because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

## SECTION IV - COMMERCIAL GENERAL LIABILITY CONDITIONS

1. Bankruptcy

   Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

   a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

      (1) How, when and where the "occurrence" or offense took place;

      (2) The names and addresses of any injured persons and witnesses; and

      (3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

   b. If a claim is made or "suit" is brought against any insured, you must:

      (1) Immediately record the specifics of the claim or "suit" and the date received; and

      (2) Notify us as soon as practicable.

   You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

   c. You and any other involved insured must:

      (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2) Authorize us to obtain records and other information;

      (3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

      (4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

   d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. Legal Action Against Us

   No person or organization has a right under this Coverage Part:

   a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

© ISO Properties, Inc., 2003

CG 00 01 12 04

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

4. **Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. **Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

b. **Excess Insurance**

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I - Coverage A - Bodily Injury And Property Damage Liability.

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c. **Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. **Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations**

By accepting this policy, you agree:

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations.

7. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

9. **When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION V - DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means:

a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in a. above;

(2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

 © ISO Properties, Inc., 2003 CG 00 01 12 04

b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

 © ISO Properties, Inc., 2003

(1) Equipment designed primarily for:

  (a) Snow removal;

  (b) Road maintenance, but not construction or resurfacing; or

  (c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

  a. False arrest, detention or imprisonment;

  b. Malicious prosecution;

  c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

  d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

  e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

  f. The use of another's advertising idea in your "advertisement"; or

  g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

  a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    (1) Products that are still in your physical possession; or

    (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      (a) When all of the work called for in your contract has been completed.

      (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

    Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

  b. Does not include "bodily injury" or "property damage" arising out of:

    (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

    (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

    (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

  a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

© ISO Properties, Inc., 2003
CG 00 01 12 04

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

COMMERCIAL GENERAL LIABILITY
CG 00 67 03 05

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - VIOLATION OF STATUTES THAT GOVERN E-MAILS, FAX, PHONE CALLS OR OTHER METHODS OF SENDING MATERIAL OR INFORMATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

b. The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

c. Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**B.** The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**DISTRIBUTION OF MATERIAL IN VIOLATION OF STATUTES**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

a. The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

b. The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

c. Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

COMMERCIAL GENERAL LIABILITY
CG 02 20 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# FLORIDA CHANGES - CANCELLATION AND NONRENEWAL

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
ELECTRONIC DATA LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
PRODUCT WITHDRAWAL COVERAGE PART

A. Paragraph 2. of the Cancellation Common Policy Condition is replaced by the following:

2. **Cancellation Of Policies In Effect**

a. **For 90 Days Or Less**

If this policy has been in effect for 90 days or less, we may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

(1) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

(2) 20 days before the effective date of cancellation if we cancel for any other reason, except we may cancel immediately if there has been:

(a) A material misstatement or misrepresentation; or

(b) A failure to comply with the underwriting requirements established by the insurer.

b. **For More Than 90 Days**

If this policy has been in effect for more than 90 days, we may cancel this policy only for one or more of the following reasons:

(1) Nonpayment of premium;

(2) The policy was obtained by a material misstatement;

(3) Failure to comply with underwriting requirements established by the insurer within 90 days of the effective date of coverage;

(4) A substantial change in the risk covered by the policy; or

(5) The cancellation is for all insureds under such policies for a given class of insureds.

If we cancel this policy for any of these reasons, we will mail or deliver to the first Named Insured written notice of cancellation, accompanied by the reasons for cancellation, at least:

(a) 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

(b) 45 days before the effective date of cancellation if we cancel for any of the other reasons stated in Paragraph 2.b.

B. The following is added and supersedes any other provision to the contrary:

**NONRENEWAL**

1. If we decide not to renew this policy we will mail or deliver to the first Named Insured written notice of nonrenewal, accompanied by the reason for nonrenewal, at least 45 days prior to the expiration of this policy.

2. Any notice of nonrenewal will be mailed or delivered to the first Named Insured's last mailing address known to us. If notice is mailed, proof of mailing will be sufficient proof of notice.

CG 02 20 12 04 © ISO Properties, Inc., 2003 Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 20 11 01 96

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

SCHEDULE

1. Designation of Premises (Part Leased to You):

**All premises leased to you.**

2. Name of Person or Organization (Additional Insured):

**Any person or organization where required by written contract.**

3. Additional Premium:  Included

(If no entry appears above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1. Any "occurrence" which takes place after you cease to be a tenant in that premises.
2. Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule.

CG 20 11 01 96              Copyright, Insurance Services Office, Inc., 1994              Page 1 of 1      □

COMMERCIAL GENERAL LIABILITY
CG 20 12 07 98

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED -
# STATE OR POLITICAL SUBDIVISIONS - PERMITS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

State Or Political Subdivision:

Any State Or Political Subdivision where required by written contract.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

Section II - Who Is An Insured  is amended to include as an insured any state or political subdivision shown in the Schedule, subject to the following provisions:

1. This insurance applies only with respect to operations performed by you or on your behalf for which the state or political subdivision has issued a permit.

2. This insurance does not apply to:

   a. "Bodily injury," "property damage" or "personal and advertising injury" arising out of operations performed for the state or municipality; or

   b. "Bodily injury" or "property damage" included within the "products-completed operations hazard".

Copyright, Insurance Services Office, Inc., 1997

COMMERCIAL GENERAL LIABILITY

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED -
# MORTGAGEE, ASSIGNEE, OR RECEIVER

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

**Name of Person or Organization:**

Any person or organization where required by written contract.

**Designation of Premises:**

All premises owned, maintained or used by you.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

1.  WHO IS AN INSURED (Section II) is amended to include as an insured the person(s) or organization(s) shown in the Schedule but only with respect to their liability as mortgagee, assignee, or receiver and arising out of the ownership, maintenance, or use of the premises by you and shown in the Schedule.
2.  This insurance does not apply to structural alterations, new construction and demolition operations performed by or for that person or organization.

COMMERCIAL GENERAL LIABILITY
CG 20 34 03 97

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - LESSOR OF LEASED EQUIPMENT - AUTOMATIC STATUS WHEN REQUIRED IN LEASE AGREEMENT WITH YOU

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. **Who Is An Insured (Section II)** is amended to include as an insured any person or organization from whom you lease equipment when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an insured only with respect to their liability arising out of the maintenance, operation or use by you of equipment leased to you by such person or organization. A person's or organization's status as an insured under this endorsement ends when their contract or agreement with you for such leased equipment ends.

B. With respect to the insurance afforded these additional insureds, the following additional exclusions apply:

This insurance does not apply:

1. To any occurrence which takes place after the equipment lease expires;

2. To bodily injury or property damage arising out of the sole negligence of such person or organization.

COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - DESIGNATED WORK

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

SCHEDULE

Description of your work:

1.  Arising out of the design manufacture, fabrication, preparation, installation, application, maintenance or repair, including remodeling, service correction or replacement of an "**exterior insulation and finish system**" (commonly referred to as synthetic stucco) or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulkings or sealants in connection with such a system.  For the purpose of this endorsement, an "**exterior insulation and finish system**" means an exterior cladding or finish system used on any part of any structure and consisting of:

     a.  a rigid or semi-rigid insulation board made of expanded polystyrene or other materials;
     b.  the adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;
     c.  a reinforced base coat; or
     d.  a finish coat providing texture and color.

2.  Arising out of any work or operations with respect to any exterior component, fixture or feature of any structure if an "**exterior insulation and finish system**" is used on any part of that structure.

3.  Arising out of the design, manufacture, construction, fabrication, maintenance, repair, remodeling, service, correction, or replacement of any part of a "**condominium project**" and/or "**community apartment project/co-operative project**" and/or "**commercial construction**" and/or "**common area(s)**".

     a.  For the purpose of this endorsement, "**condominium project**" means:  a development consisting of condominiums.  A condominium consists of an undivided interest in common in a portion of real property coupled with a separate interest in space called a unit.  A condominium shall not mean single family detached condominiums, if and only if, each condominium owner owns, as its separate interest, fee title to the residence and surrounding yard area.

     b.  For the purpose of this endorsement "**community apartment project/co-operative**" means:  a development in which an undivided interest in land is coupled with the right of exclusive occupancy of any apartment located thereon.

     c.  For the purpose of this endorsement, "**commercial construction**" means:  any structure whose intended or actual purpose or use, in whole or in part, is other than habitational in nature, including but not limited to the following:
         i.    Any commercial structure greater then 20,000 square feet or greater than two (2) stories,
         ii.   Retail stores and/or operations except retail space shells without tenant improvements or operational construction,
         iii.  Clinics or hospitals,
         iv.   Schools or universities,
         v.    Sports and recreation facilities including playgrounds, stadiums, arenas, golf courses, and rinks,
         vi.   Gas, oil and propane stations, distributors and/or dealers,
         vii.  Automotive distribution centers, service facilities and garages,
         viii. Manufacturing facilities,

CG 21 34 01 87          Copyright, Insurance Services Office, Inc., 1986          Page 1 of 2          □

ix.   Health and exercise facilities,
x.    Hotels, motels and casinos,
xi.   Laboratories, research or testing facilities,
xii.  Food and grocery stores,
xiii. Airports, bridges, dams and tunnels,
xiv.  Any structure which could be classified as a Highly Protected Risk,
xv.   Piers, wharves, docks and any waterborne exposure,
xvi.  Demolition operations
xvii. Any completed non-residential construction owned or operated by the named insured.

However, "commercial construction" shall not mean:  non-revenue generating structures, buildings and common areas, constructed specifically within a residential community or development, used solely by the residents of that community (and their invited guests), and where the completed construction (or occupancy) has not been transferred to a homeowner s association which is responsible for the maintenance and upkeep of the structure or area.  Examples of generally acceptable exposures include guard houses, club houses (including incidental exercise facilities of less than 500 sq. ft.), pump houses, gazebos and the like.  In addition, "commercial construction" shall not mean structures designed and built for use by the named insured as an office.

d.  For the purpose of this endorsement "common area(s)" means:  the entire development, except those areas of the development separately held by any member of a homeowner s association.

4.  Arising out of the design, manufacture, construction, fabrication, maintenance, repair, remodeling, service, correction, or replacement of any structure, not otherwise excluded by this endorsement, which exceeds (3) stories or (12) units per building.

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

This insurance does not apply to "bodily injury" or "property damage" included in the "products-completed operations hazard" and arising out of "your work" shown in the Schedule.

          Copyright, Insurance Services Office, Inc., 1986          CG 21 34 01 87      □

COMMERCIAL GENERAL LIABILITY
CG 21 47 07 98

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability:

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

B. The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation or discrimination directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs (a), (b), or (c) above is directed.

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

 Copyright, Insurance Services Office, Inc., 1997 □

COMMERCIAL GENERAL LIABILITY
CG 21 70 11 02

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

With respect to any one or more "certified acts of terrorism", we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

1. The act resulted in aggregate losses in excess of $5 million; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

© ISO Properties, Inc., 2002

COMMERCIAL GENERAL LIABILITY
CG 21 87 05 04

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CONDITIONAL EXCLUSION OF TERRORISM (RELATING TO DISPOSITION OF FEDERAL TERRORISM RISK INSURANCE ACT OF 2002)

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

A. Applicability Of The Provisions Of This Endorsement

1. The provisions of this endorsement will become applicable commencing on the date when any one or more of the following first occurs:

   a. The federal Terrorism Risk Insurance Program ("Program"), established by the Terrorism Risk Insurance Act of 2002, has terminated with respect to the type of insurance provided under this Coverage Part or Policy; or

   b. A renewal, extension or continuation of the Program has become effective without a requirement to make terrorism coverage available to you and with revisions that:

      (1) Increase our statutory percentage deductible under the Program for terrorism losses. (That deductible determines the amount of all certified terrorism losses we must pay in a calendar year, before the federal government shares in subsequent payment of certified terrorism losses.); or

      (2) Decrease the federal government's statutory percentage share in potential terrorism losses above such deductible; or

      (3) Redefine terrorism or make insurance coverage for terrorism subject to provisions or requirements that differ from those that apply to other types of events or occurrences under this policy.

The Program is scheduled to terminate at the end of December 31, 2005 unless renewed, extended or otherwise continued by the federal government.

2. If the provisions of this endorsement become applicable, such provisions:

   a. Supersede any terrorism endorsement already endorsed to this policy that addresses "certified acts of terrorism" and/or "other acts of terrorism", but only with respect to an incident(s) of terrorism (however defined) which results in injury or damage that occurs on or after the date when the provisions of this endorsement become applicable (for claims made policies, such an endorsement is superseded only with respect to an incident of terrorism (however defined) that results in a claim for injury or damage first being made on or after the date when the provisions of this endorsement become applicable); and

   b. Remain applicable unless we notify you of changes in these provisions, in response to federal law.

3. If the provisions of this endorsement do NOT become applicable, any terrorism endorsement already endorsed to this policy, that addresses "certified acts of terrorism" and/or "other acts of terrorism", will continue in effect unless we notify you of changes to that endorsement in response to federal law.

B. The following definitions are added and apply under this endorsement wherever the term terrorism, or the phrase any injury or damage, are enclosed in quotation marks:

1. "Terrorism" means activities against persons, organizations or property of any nature:

   a. That involve the following or preparation for the following:

      (1) Use or threat of force or violence; or

      (2) Commission or threat of a dangerous act; or

      (3) Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

   b. When one or both of the following applies:

      (1) The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

      (2) It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

2. "Any injury or damage" means any injury or damage covered under any Coverage Part or Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part or Policy.

C. The following exclusion is added:

   EXCLUSION OF TERRORISM

   We will not pay for "any injury or damage" caused directly or indirectly by "terrorism", including action in hindering or defending against an actual or expected incident of "terrorism". "Any injury or damage" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to such injury or damage. But this exclusion applies only when one or more of the following are attributed to an incident of "terrorism":

   1. The "terrorism" is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the "terrorism" was to release such material; or

3. The "terrorism" is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

4. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the "terrorism" was to release such materials; or

5. The total of insured damage to all types of property exceeds $25,000,000. In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the "terrorism" and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

6. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ.

Multiple incidents of "terrorism" which occur within a 72-hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one incident, for the purpose of determining whether the thresholds in Paragraphs C.5. or C.6. are exceeded.

With respect to this Exclusion, Paragraphs C.5. and C.6. describe the threshold used to measure the magnitude of an incident of "terrorism" and the circumstances in which the threshold will apply, for the purpose of determining whether this Exclusion will apply to that incident. When the Exclusion applies to an incident of "terrorism", there is no coverage under this Coverage Part or Policy.

In the event of any incident of "terrorism" that is not subject to this Exclusion, coverage does not apply to "any injury or damage" that is otherwise excluded under this Coverage Part or Policy.

 © ISO Properties, Inc., 2004   CG 21 87 05 04   □

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2., **Exclusions** of Section I - Coverage A - Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

Silica Or Silica-Related Dust

a. "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

b. "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

c. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph 2., **Exclusions** of Section I - Coverage B - Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

Silica Or Silica-Related Dust

a. "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

b. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

1. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

2. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

© ISO Properties, Inc., 2004

COMMERCIAL GENERAL LIABILITY
CG 22 79 07 98

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION - CONTRACTORS - PROFESSIONAL LIABILITY

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2., Exclusions of Section I - Coverage A - Bodily Injury And Property Damage Liability and Paragraph 2., Exclusions of Section I - Coverage B - Personal And Advertising Injury Liability:

1. This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the rendering of or failure to render any professional services by you or on your behalf, but only with respect to either or both of the following operations:

   a. Providing engineering, architectural or survey-ing services to others in your capacity as an engineer, architect or surveyor; and

   b. Providing, or hiring independent professionals to provide, engineering, architectural or survey-ing services in connection with construction work you perform.

2. Subject to Paragraph 3. below, professional ser-vices include:

   a. Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, re-ports, surveys, field orders, change orders, or drawings and specifications; and

   b. Supervisory or inspection activities performed as part of any related architectural or engineer-ing activities.

3. Professional services do not include services within construction means, methods, techniques, sequences and procedures employed by you in connection with your operations in your capacity as a construction contractor.

CG 22 79 07 98                    Copyright, Insurance Services Office, Inc.,  1997                    Page 1 of 1        □

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ABSOLUTE ASBESTOS EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE FORM
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY
RAILROAD PROTECTIVE LIABILITY COVERAGE FORM
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE FORM
BUSINESSOWNERS LIABILITY COVERAGE FORM

This insurance does not apply to any liability arising out of:

1. Inhaling, ingesting or prolonged physical exposure to asbestos or goods or products containing asbestos; or

2. The use of asbestos in constructing or manufacturing any good, product or structure; or

3. The removal of asbestos from any good, product or structure; or

4. The manufacture, sale, transportation, storage or disposal of asbestos or goods or products containing asbestos.

The coverage afforded by this policy does not apply to payment for the investigation or defense of any loss, injury or damage, or any cost, fine or penalty or for any expense or claim or "suit" related to any of the above.

All other terms and conditions of this policy remain unchanged.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## COMPLETED OPERATIONS EXCLUSION - FLORIDA

This endorsement modifies insurance provided under the following:

### Commercial General Liability Coverage Form

Item I. Damage to Your Work of Paragraph 2. Exclusions of SECTION I - COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY is deleted and replaced with the following:

I.  Damage To Your Work

"Property damage" to "your work", arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was:

(1) performed on your behalf by a subcontractor, and

(2) as respects temporary or permanent dwelling units only, if you were:
    i. the seller of a temporary or permanent dwelling unit or
    ii. acting as the general contractor for the construction of a temporary or permanent dwelling unit for an owner/developer,
    the sale of that unit was covered by a fully insured (by a third party) new home warranty that provided all the following coverages and provisions:

    - One (1) year of "Workmanship" coverage and Two (2) years of "Systems" coverage all from moment of closing;
    - Ten (10) years of "Structural" coverage for "actual physical damage" with coverage beginning at moment of closing;
    - Exclusive remedy provision where permitted by state law.

For purposes of this endorsement, "Workmanship", "Systems" and "Structural" mean:

- "Workmanship" - Defects in materials and workmanship as defined in the written construction quality standards provided by the third party warranty insurer.

- "Systems" - Defects in the electrical, plumbing and mechanical systems to the extent stated in the written construction quality standards provided by the third party warranty insurer.

- "Structural" - "Actual physical damage" for the designated load-bearing elements of the property caused by failure of such load-bearing elements which affects their load-bearing functions to the extent that the property becomes unsafe, unsanitary, or otherwise unlivable. For the purposes of this endorsement, the "actual physical damage" will have the same meaning as that contained in regulations of the Department of Housing and Urban Development in effect at the time of the issuance of the new home warranty.

All other terms and conditions of this Policy remain unchanged.

BOA-COE-001-FL  (07/05)                                                                 Page 1 of 1

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## Amendment of
## Copyright, Patent, Trademark Or Trade Secret Exclusion

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**SECTION 1. -COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY 2. Exclusions, i. Infringement Of Copyright, Patent, Trademark Or Trade Secret is deleted in its entirely and replaced by the following:**

This insurance does not apply to:

"Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights, including infringement of copyright, trade dress or slogan in your "advertisement".

**SECTION V. -DEFINITIONS 14.** "Personal and Advertising Injury" **14. g.** is deleted in its entirety.

All other terms and conditions of this policy remain unchanged.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### CROSS SUITS EXCLUSION

This insurance does not apply to, and we will not have the duty to investigate or defend, any claim or suit for injury or damage brought by one insured against any other insured.

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

## EXCLUSION-DESIGNATED OPERATIONS COVERED BY A CONSOLIDATED (WRAPUP) PROGRAM OR SPECIFIC PROJECT INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE FORM

The following exclusion is added to paragraph 2., **Exclusions of COVERAGE A-BODILY INJURY AND PROPERTY DAMAGE LIABILITY (Section I-Coverages):**

This insurance does not apply to "bodily injury" or "property damage" arising out of either your ongoing operations or operations included within the "products-completed operations hazard" at any location where you are involved or performing operations and:

    a.  a consolidated (wrap-up) insurance program has been provided by the prime contractor/project manager or owner of the construction project in which you are involved; or,

    b.  a specific project insurance policy has been provided for the project in which you are involved.

This exclusion applies whether or not the consolidated (wrap-up) insurance program or specific project insurance policy:

    (1)  Provides coverage identical to that provided by this Coverage Part;
    (2)  Has limits adequate to cover all claims; or
    (3)  Remains in effect