| Chinese Drywall MDL | Confidential – Subject to Further Confidentiality Review | Gina Milinovich |
| --- | --- | --- |
| | | April 1, 2010 |

**Page 237**

1  MR. BAUMANN: We're going to
2  make a --
3  MR. STECKLER: It's on there.
4  It's --
5  MR. BAUMANN: -- copy. Yeah.
6  THE WITNESS: It's what?
7  MR. BAUMANN: Yeah, I'll
8  just -- I'll keep it, if that's okay,
9  or if you want to make a copy of it --
10  MR. STECKLER: Well, he needs
11  to make -- I mean --
12  THE REPORTER: I need it.
13  MR. STECKLER: He needs it.
14  MR. BAUMANN: All right.
15  That's fine.
16  BY MR. BAUMANN:
17  Q. Now, one of the things that
18  you've talked about earlier when counsel was
19  asking you questions about the La Suprema
20  board versus the other Chinese drywall that
21  you received, and I wrote it down, and he
22  asked you about complaints about La Suprema
23  board specifically, and your answer was, and
24  I wrote it down, "I wouldn't know if it was

**Page 238**

1  related to La Suprema board or the other
2  Chinese drywall board."
3  Is that your recollection of
4  the testimony when you discussed that?
5  A. Yes.
6  MR. STECKLER: I'm going to
7  object to the form.
8  BY MR. BAUMANN:
9  Q. Okay. And I guess that's a
10  fair statement because you didn't receive any
11  complaints about Chinese drywall until early
12  2009, correct?
13  A. Correct.
14  Q. Okay. So it was nearly three
15  years after you first received Chinese
16  drywall before you had any notice of any
17  problems from any Chinese drywall board?
18  A. Correct.
19  Q. Okay. So -- and at that time,
20  you wouldn't know if those particular homes
21  that are being complained of were the result
22  of La Suprema board or board that you
23  obtained through IBSA; is that a fair
24  statement?

**Page 239**

1  A. Yes.
2  Q. Okay. And there's no way of
3  knowing at this point whether the board that
4  is at issue in any particular home is from
5  IBSA or through IBSA or from La Suprema
6  because, as you testified, there's no way
7  that Black Bear can reconcile through their
8  invoices who the particular distributor of
9  any particular drywall board was for any
10  given home, true?
11  MR. STECKLER: I have to object
12  to that, as well. I apologize.
13  Objection to the form of the question.
14  MR. BAUMANN: That's okay.
15  BY MR. BAUMANN:
16  Q. Is that a fair statement?
17  A. Yes.
18  Q. Okay.
19  MR. STECKLER: Hold on a
20  second. I don't want to ruin your
21  stride. I'll try to --
22  MR. BAUMANN: No stride. Go
23  ahead.
24  MR. STECKLER: You know,

**Page 240**

1  whatever.
2  MR. BAUMANN: There's no stride
3  here. It's fine.
4  BY MR. BAUMANN:
5  Q. So, for example, if I were to,
6  say, give you an address of a home in the
7  Tampa area, and I'll pick 4210 West
8  Kensington Avenue, Tampa, Florida, 33629, it
9  was a home built by River Street Homes, would
10  you know if that home at issue with Chinese
11  drywall would be Chinese drywall that was
12  provided by IBSA or by La Suprema?
13  A. I have no idea.
14  Q. Okay. And if I were to give
15  you the address of 2226 Soho Bay Court,
16  Tampa, Florida, 33606, would you know if that
17  Chinese drywall in that particular home came
18  through La Suprema or IBSA?
19  A. No.
20  Q. No, you couldn't tell me, one
21  way or the other?
22  A. No, I couldn't tell you, one
23  way or the other.
24  Q. And for the address


DEFENDANT'S EXHIBIT D

**Page 241**

1  21509 Draycott Way, Land O' Lakes, Florida,
2  34637, could you tell me, one way or the
3  other, if that home contains Chinese drywall
4  from either La Suprema or board obtained
5  through IBSA?
6  A. No.
7  Q. And I could continue, but I
8  guess the exercise is that there's no way for
9  Black Bear to tell, one way or the other; is
10 that true?
11 A. Correct.
12 Q. Okay. And that would be for
13 all homes at issue with Chinese drywall,
14 where Black Bear would have supplied the
15 Chinese drywall; is that a fair statement?
16 A. Yes.
17 Q. Now, with respect to the issue
18 of some of the board from IBSA where you said
19 that you wanted to return it because you had
20 nowhere to store it, do you remember that
21 issue we discussed near the end of your
22 testimony today?
23 A. I wanted -- I tried to refuse
24 the board.

**Page 242**

1  Q. Do you recall being told by Ray
2  Price that it was impossible to cancel the
3  order because it was purchased on an
4  irrevocable letter of credit?
5  A. Yes, that's how IBSA purchased
6  it.
7  Q. Meaning, "You asked us to
8  purchase this for you, we purchased this for
9  you with a document called irrevocable letter
10 of credit, meaning you can't revoke it, and
11 it's too late; you have to accept it."
12     And that was explained to you
13 by Ray Price at IBSA, correct?
14 A. Not until I tried to refuse it.
15 Q. Correct, because if you hadn't
16 refused it, it would have been accepted by
17 Black Bear -- or tried to refuse it, I should
18 say, right?
19     MR. HARDEMAN: Object to the
20 form of the question.
21     THE WITNESS: Wow. Can you
22 repeat that?
23     MR. BAUMANN: Yeah. It's been
24 a long couple of days for me here.

**Page 243**

1  BY MR. BAUMANN:
2  Q. That issue developed because
3  you wanted to reject the board, correct?
4  A. Yeah, I no longer needed it.
5  Q. And you ended up placing that
6  board outside, correct?
7  A. Some was inside; some was
8  outside.
9  Q. And you were asked some
10 questions in your earlier deposition on
11 February 18th, 2009, about that issue. And
12 it was your testimony back then that you
13 would have disposed of in excess of 30,000
14 sheets of Chinese drywall at the Pasco County
15 dump, I believe is what you said previously,
16 but you also identified the -- what were the
17 other dumps you identified today?
18 A. The San Antonio one and the
19 Pinellas County one.
20 Q. Okay. Would that include the
21 Pasco County dump?
22 A. San Antonio is in Pasco.
23 Q. Okay. But then going back to
24 your testimony February 18th, 2009, you'd

**Page 244**

1  identified in excess of 30,000 boards that
2  would have been destroyed or disposed of at
3  the dump. Does that refresh your
4  recollection as to the quantity that would
5  have been discarded by Black Bear?
6  A. Yes.
7  Q. Does that sound about right?
8  A. At that time, yes.
9  Q. Okay. And was that all board
10 that would have been provided to Black Bear
11 through IBSA, since it was the board that you
12 had to store outside?
13 A. Yes.
14 Q. Okay. Now, on the issue of
15 inspection of the board, you agreed with
16 counsel when he made the point that IBSA
17 never had an opportunity to inspect the
18 board, since it was shipped directly from
19 Metro, directly to Black Bear, correct?
20 A. Yes.
21 Q. Okay. Meaning the board never
22 physically took a presence at IBSA prior to
23 being delivered to Black Bear, correct?
24 A. Correct.

Page 245

1 Q. And you were aware of this at
2 all times, correct?
3 A. Yes.
4 Q. So you wouldn't have expected
5 IBSA to conduct an inspection of this board
6 on Black Bear's behalf, since it was never
7 going to be physically in their possession
8 anytime before Black Bear took delivery of
9 this drywall, true?
10 A. I would have expected them to
11 investigate Metro before they signed a
12 contract.
13 Q. Well, let's talk about that for
14 a second. Metro was brought to Black Bear's
15 attention by a customer of yours through your
16 husband, Ron, I believe, correct? Was it
17 Jerome?
18 A. Yes.
19 Q. And what's Jerome's last name?
20 A. Harold.
21 Q. Which company is Jerome Harold
22 with?
23 A. Harold's Drywall.
24 Q. Okay. So Harold's Drywall,

Page 246

1 Jerome Harold, tells you about Metro
2 Resources and David Zhang, right?
3 A. Told Ron, yes.
4 Q. Okay. And at that point,
5 that's when David Zhang comes down -- and you
6 discussed this in your earlier deposition.
7 That's how I know this. That's when David
8 Zhang came down and met with you and with Ron
9 at your location here in Clearwater, correct?
10 A. Yes.
11 Q. And at that point, you decided
12 that you were going to purchase the board
13 after you met with David, and you contacted
14 IBSA and asked them to help with the
15 transaction, correct?
16 A. At first, the meeting that I
17 had with Ron and David, I -- we didn't
18 need -- I argued that we didn't need Chinese
19 board at that time. It was in a subsequent
20 meeting that Ron and David had that they
21 decided to purchase the board.
22 Q. Okay. But the point of my
23 questioning, I guess, is that IBSA did not
24 introduce Metro Resources to Black Bear, but

Page 247

1 instead, Black Bear contacted IBSA and asked
2 IBSA to contact Metro Resources on behalf of
3 Black Bear for the transaction that we've
4 been discussing?
5 A. Yes.
6 Q. Fair?
7 A. Yeah.
8 Q. Okay. Now, your husband also
9 has another drywall company called
10 O.H. Drywall, correct?
11 A. Not exactly.
12 Q. Well, "O.H." stands for owner's
13 husband, right?
14 A. Yes.
15 Q. You're the owner; he's the
16 husband. O.H. Drywall, correct?
17 A. Correct.
18 Q. Well, tell me why it's not
19 exactly, then.
20 A. It was never a formal entity.
21 I mean, it's not with the State of Florida.
22 It was just a way to -- when he did have
23 occasional jobs, for him to purchase material
24 through Black Bear.

Page 248

1 Q. So it was never a Florida
2 corporation, but O.H. Drywall was sort of on
3 the books with Black Bear as sort of a
4 fictitious company that your husband just set
5 up, "O.H." meaning owner's husband?
6 A. Yes.
7 Q. Okay. And do you know how much
8 drywall was purchased by O.H. Drywall?
9 MR. HARDEMAN: Let's go off the
10 record, please.
11 THE VIDEOGRAPHER: Going off
12 the record. The time is 3:02.
13 (Discussion off the record.)
14 THE VIDEOGRAPHER: Going back
15 on the record. The time is 3:03.
16 BY MR. BAUMANN:
17 Q. Well, how much drywall did
18 Black Bear distribute to O.H. Drywall?
19 A. I would have to go back and
20 look at the records, since it was sporadic.
21 Q. Now, do you still have that
22 computer, the one that crashed?
23 A. Yes.
24 Q. I'd ask you to hold on to it,