# EXHIBIT "D-7"

8.  Partial and Final Waivers/Releases of liens will be provided to the Owner. These releases reflect time specific periods only and not specific dollar amounts.

9.  With time being of essence, all submittals must be approved as noted with five (5) days of submission for critical submittals and ten (10) days for non-critical submittals. Coastal will provide an anticipated submittal schedule for all parties use within sixty (30) days of executed Agreement. Any submittals rejected must be clearly marked as to the reason for rejection. After the above-indicated periods, Coastal may release the submittal for material as approved even if no action has been taken by the Architect / Engineers.

10. With time being of essence, all formal Requests for Information (RFIs) shall be responded to within three (3) days of issuance.

11. Weekly meetings will be conducted and attended by all parties, including the Design Team. Meetings will be held at the Coastal field office compound.

12. Schedule is based on ability to work Saturdays.

13. Various materials and finishes of materials exposed to the Florida environment will begin to deteriorate over time. Materials such as rooftop equipment, piping, conduits, etc., as well as finishes for stainless steel, wood, aluminum, etc. are all subject to deterioration. The Contractor is to provide the Owner, who in turn will provide to the Condominium Association a complete maintenance program for all products on the project. Maintenance will be required by Coastal during the completion stages of construction. Additionally, maintenance will be required by Owner immediately at turnover of the project to the developer (at base Building T.C.O.). The cost of maintenance personnel until maintenance of the building has been turned over to the Condo Association is by Owner.

14. Schedule is based upon availability of all permits (including but not limited to foundations, utility, shell, main building, interior, subsidiary permits, etc.) necessary to sustain continuous construction operations in all areas at all times. The Owner will be responsible for obtaining all necessary Building Department/Municipal approvals in order to facilitate construction operations, including issuance of the main building permit.

15. The Contract Documents will be modified to include all changes and/or cost savings items as indicated in the Qualifications & Assumptions, Exhibit A.

16. All necessary Certificates of Contractor's Liability Insurance and/or Policies shall be obtained, paid for and furnished by Contractor to Owner, naming Owner as an insured, except for Builder's Risk "All Risk" Insurance coverage, which will be obtained, furnished and paid for by the Owner naming Contractor as an additional insured. Owner is responsible for the deductible and/or any shortfall on this insurance policy. The Builder's Risk Insurance is to provide coverage to protect all of the Contractor's interests during the course of construction for the amount of the contract, per 11.4 of

27-Jun. 27, 2005   4:07PM   From Katz Barro  vultero & Faust, P.A.     305 285 0929          T-282  No. 4092  P.018/018  F-119

AIA Document A201-1997.  Coverage must also include, but not be limited to, fire, theft, vandalism, malicious mischief, collapse, earthquake, lightning, acts of war, terrorism, water damage, windstorm, flood (maximum obtainable amount up to the contract amount), formwork, shoring and reshoring, and all other broad perils.  Proof of insurance must be issued to the Contractor prior to commencement of work.

17.  Any and all changes required by the final building permit will be priced and become an adjustment to the Contract Amount via change order.

18.  All permit fees and associated costs, permit processing fees, utility hook-up fees, including meters, valves, deposits, connection and/or impact fees are to be the responsibility of and paid for by Owner.

19.  Substantial Completion is defined as the date a Temporary Certificate of Occupancy (TCO) is received from appropriate authorities, unless work, systems, or other items furnished and/or installed by the Owner/Buyer or Owner's/Buyer's separate contractors delay the obtaining of a TCO.  In that instance Substantial Completion will be the date that this Contractor has completed all of the Work necessary to obtain a TCO, except for Work interfered with or restrained by the Owner/Buyer or Owner's/Buyer's separate contractors.

20.  The Architect (or *Owner*) will provide the Contractor with a written final punchlist within ten (10) days of Substantial Completion. *per building* .   CC
     *Twenty (30)*

21.  All Architectural, Engineering, Surveying (including all required calculations for geometric closure of structure), Blueprinting, Inspections, Special Inspectors, Testing, and all other Testing Fees are to be paid by Owner.

22.  Jobsite Security Services, if required, shall be paid in full by Owner.

23.  If water and sewer connections are not available, a temporary and/or permanent Certificate of Occupancy may not be obtainable.  Contractor will not be held responsible for water and sewer connections and substantial completion will not be based on connections if they are not available as required by the Contractor's construction schedule.

24.  The costs of the following items are to be paid by the Owner subject to the Owner/Contractor Agreement.  These costs are not included in our proposal:

     a.  Unforeseen subsurface conditions and differing site conditions.
     b.  Removal of any obstructions.
     c.  Right of way costs.
     d.  Utility company charges for connections to services, temporary and permanent.
     e.  Utility impact fees and hook-up fees.

*6/27/2005*
*Page 3 of 4*

CC

25. **Florida Law contains important requirements you must follow before you may file a lawsuit for defective construction against a Contractor, subcontractor, supplier, or design professional for an alleged construction defect in your home. Sixty days before you file your law suit, you must deliver to the Contractor, subcontractor, supplier, or design professional a written notice of any construction conditions you allege are defective and provide your Contractor and any subcontractors, suppliers, or design professionals the opportunity to inspect the alleged construction defects and make an offer to repair or pay for the alleged construction defects. You are not obligated to accept any offer made by the Contractor or any subcontractors, suppliers, or design professionals. There are strict deadlines and procedures under Florida Law.**



# EXHIBIT C

# SUMMARY OF ALLOWANCES

*Villa Lago*
*Boynton Beach, Florida*

The following Lump Sum Allowances are included in this Proposal. Unless otherwise noted these Allowances include all Labor, Materials, Fabrication, Equipment, Delivery, Installation, Taxes, Freight, Accessories, and Subcontractor Fees & Bonds where applicable. Allowances for the E & W Buildings, Parking Garage, and Club House are grouped together in the list below:

The below listed Allowance for Appliances shall include labor, material, taxes, delivery, unloading, uncrating, distribution, installation, and off site disposal of all crating materials. Installation of washers, dryers, microwave ovens, and refrigerators is included in this Allowance. Installation of dishwashers, garbage disposals, cooktops and wall ovens shall be performed by the Plumbing and Electrical Contractors separate from this Allowance.

The below listed Allowance for Plumbing Fixtures shall include materials, taxes, delivery, and sub bonds. Unloading, handling, storage, uncrating, distribution, installation, protection, and disposal of crating shall be provided by the Plumbing Contractor separate from this Allowance.

| | SCOPES OF WORK | | VALUES |
|---|---|---|---:|
| 1. | Dewatering: | | $ 8,500 |
| 2. | Monument Sign Dimensional Letters: (2 Signs x 1 Side Each) | | $ 12,500 |
| 3. | Extra Grouting for 2 Hour Fire Rated Block Walls: | | $ 5,000 |
| 4. | Architectural Precast Concrete Columns, Trims, & Accessories: | | $ 17,392 |
| 5. | Elevator H Beams, Sill Angles, Pit Ladders, & Sump Pit Covers: | | $ 15,000 |
| 6. | Expansion Joint Covers: | | $ 12,500 |
| 7. | Metal Flashings at Parapets & Garage & Miscellaneous Flashings: | | $ 22,500 |
| 8. | Garage Anchor Bolt & Coil Rod Material & Installation: | | $ 7,925 |
| 9. | Timber Framing at Club House Gallery Roof: | | $ 5,000 |
| 10. | West Building Pool Restroom Counters: | | $ 1,000 |
| 11. | Club House & Pool Restroom Cabinets & Counters: | | $ 13,500 |
| 12. | Wood Base, Crown Molding, Interior Columns, Doors, Frames, Hardware, Access Panels, Vanity Mirrors, Wire Shelving, Toilet Partitions, Shower Enclosures, Toilet & Bath Accessories, Medicine Cabinets, Mail Boxes, & Installation – National Millwork: **Note:** This price includes the cost of the bond, since the subcontractor is unable to provide a bond at this time. Upon issuance of a bond, the costs thereof shall be removed. | | $ 1,100,743 |
| 13. | Ceramic Tile – Elevators: | | $ 2,500 |
| 14. | Ceramic Tile Sound Proofing: | | $ 130,500 |
| 15. | Acoustical Ceilings – Club House: | $2.50 / SF = | $ 15,000 |
| 16. | Acoustical Ceilings – West Building Pool Restrooms: | $2.50 / SF = | $ 1,000 |
| 17. | Signage – Building & Parking Garage: | | $ 34,000 |
| 18. | Signage – Club House: | | $ 1,500 |
| 19. | Basketball Backstop – Club House: | | $ 1,500 |

EXHIBIT C
SUMMARY OF ALLOWANCES

| | | | |
|---|---|---|---|
| 20. | Parking Garage Gates & Tele Entry System, Security & CCTV Systems, Security Access Control – Clubhouse | $ | 162,500 |
| 21. | Fire Rescue Air Systems & Related Construction:  $340,000 + Bond = | $ | 348,500 |
| 22. | Elevator Systems: | $ | 403,000 |
| 23. | Gas Piping For Pool Heaters – Condos: | $ | 10,000 |
| 24. | Gas Piping For Pool Heaters – Club House: | $ | 2,500 |
| 25. | Residential Appliances | $ | 1,020,970 |
| 26. | Scope contingency | $ | 500,000 |
| 27. | General & Liability Insurance | $ | 1,000,000 |

TOTAL ALLOWANCES...............................................................$4,855,030.00

Notes:

1. The Allowance values for the above scopes of Work are the amounts included in the Contract to cover all the cost of the Work as provided for in Article 7 of the Contract, except for the General Contractor's cost of General Conditions, general liability insurance, performance and payment bonds, and overhead/fee.  Any savings on Allowance shall be retained by the Owner, and all cost in excess of the Allowance value shall be paid by the Owner.

2. The General Liability allowance is based upon a rate of approximately 2.3% of the gross amount of the Contract.  Should Coastal sustain an increase on the policy renewal date of May 15, 2005, The Owner shall be responsible for the incremental cost adjustment on the unpaid balance of the Contract.

Jun. 24. 2005 12:20PM                              No. 4843   P. 2

<b>Exhibit "H"</b>

<b>CONTRACT AGREEMENT AND GENERAL CONDITIONS BETWEEN
GENERAL CONTRACTOR AND SUBCONTRACTOR
CONTRACT NO: 04-</b>

| | |
|---|---|
| **Contractor:** Coastal Construction of South Florida, Inc d/b/a/ Coastal Condominiums 790 N.W. 107th Avenue, Suite 308 Miami, FL 33172 | **Contract Date:** **Subcontractor:** |
| **GC License #:** CG-C046420 | **Contact:** **Phone No:** **Fax No:** **Cost Code:** |
| **Project No:** 04- | |
| **Project:** | **Bond Required:** ☐ Yes ☐ No |

**Contract Price: $ .00**   ( Hundred Thousand and 00/100 dollars.)
(Includes all applicable sales and use tax)

## ARTICLE 1 - SCOPE

1.1     Subject to the terms and conditions contained herein, Subcontractor agrees to furnish all material, equipment, labor and supervision as required to complete the following described work in connection with the construction of the above referenced project, including but not limited to all work as indicated per attached Exhibits:

        1.11 EXHIBIT "A" – Scope of Work
        1.12 EXHIBIT "B" – Enumeration Pages & Specification Enumeration
        1.13 EXHIBIT "C" – Project Schedule
        1.14 EXHIBIT "D" – General Jobsite Conditions
        1.15 EXHIBIT "E" – Qualifications & Clarifications
        1.16 EXHIBIT "F thru I " – not used

1.2     Notwithstanding the above mentioned scope of work, terms and conditions, this subcontract is lump sum and includes any and all LABOR AND MATERIAL FOR ALL WORK as required by the plans and specifications and all contract documents inclusive; work will be performed in a workmanlike manner in complete accordance with these plans and specifications and with all applicable codes and regulations, ordinances, rules and orders of any public authority bearing on the performance of the work (and manufacturers suggested installation standards, where applicable). Subcontractor hereby acknowledges that he has received, read and is thoroughly familiar with said plans and specifications and that the methods, sequences and procedures described therein for said work are agreed upon and correct.

1.3     Subcontractor will furnish and pay for all labor, materials, permits, scaffolding, equipment, machinery, tools, apparatus, transportation, all required shop drawings and samples, as part of this contract.

1.4     Subcontractor shall comply with all Federal, State and Local tax laws, Social Security Acts, Unemployment Compensation Acts and Workers Compensation Acts to the extent that they apply to the performance of Subcontractor's work under this contract.

## ARTICLE 2 - COMPLIANCE

2.1     The Subcontractor maintains that it is an entity duly organized, validly existing and in good standing under the laws of both the state of its formation and the State of Florida.  Subcontractor further affirms that there are no actions, suits or proceedings pending or threatened against it which could, directly or indirectly, adversely affect Subcontractor's performance under the contract.

2.2     The Subcontractor has carefully examined the Contract Documents, including but not limited to all drawings and specifications, and agrees that the Contract Documents are adequate and sufficient for the performance of the work to be done under this contract.

2.3     Subcontractor acknowledges that he has visited the job site and has become familiar with all existing conditions or conditions affecting and governing the construction of the project and shall furnish all labor, materials, equipment or other items, facilities and services for the proper execution and completion of the Work under this contract.

2.4     Subcontractor can and will perform all work required herein, in a timely fashion, in accordance with the project construction schedule as provided by Coastal Condominiums, and so as not to delay the overall progress of the job or the work of any other subcontractor.

2.5     The Subcontractor has and will maintain adequate skilled employees, workforces, materials, machinery and tools necessary and adequate to accomplish the Work in accordance with Contractor's progress schedule.

## ARTICLE 3 - INSURANCE

3.1     Subcontractors shall secure and pay for insurance coverage as enumerated below.  All coverages shall be written on an occurrence based form.  An original certificate of insurance in a form acceptable to Contractor shall be delivered to Contractor within ten (10) days from the full execution hereof, or prior to commencement of any Subcontract Work hereunder by Subcontractor, whichever occurs first.  The certificate of insurance shall evidence insurance coverage at least in the minimum limits as follows, or as may be further increased in connection with the requirements of the Contract Documents:

    Workman's Compensation Insurance Certificate - Florida Statutory limits under all circumstances.
    Commercial Automobile Liability - $500,000 combined single limit.
    Commercial Liability - $1,000,000 per occurrence, $2,000,000 aggregate amount, $2,000,000 for products and completed operations.
    Umbrella Excess Liability $2,000,000 per occurrence, $2,000,000 aggregate.
Subcontractor's Commercial General Liability, Comprehensive Automobile Liability, and Umbrella/Excess Liability policies shall be endorsed to add Contractor and Owner as additional insured with respect to the performance of Subcontractor's operations under the Subcontract Agreement and the Contract Documents.  Such insurance afforded to Contractor and Owner as additional insured under Subcontractor's policies shall be written on a per project aggregate basis, primary insurance and not excess over, or contributing with, any insurance purchased or maintained by Contractor or Owner.  The completed operations coverage shall be maintained by Subcontractor for two (2) years after the Project completion date.  The certificate of insurance must contain the provision that:  "The coverages afforded shall not be cancelled or materially changed until after at least thirty (30) days written notice, by certified mail, return receipt requested, has been given to Contractor".

Page 1 of 5

   Initial:_____

## ARTICLE 4 - PAYMENTS

4.1      Payment requests for completed work must be submitted on Coastal Condominium's Subcontractor's Application for Payment, along with Subcontractor's Affidavit on or before 20th of the month to be paid by or around the 15th of the following month as further conditioned in other provisions of this contract.  (Sample of Coastal Condominium's Subcontractor's Application for Payment and Subcontractor's Affidavit are attached hereto).  The Contractor shall retain  TEN  percent (10%) retainage from every draw request from Subcontractor.  Retainage must be billed separately at the end of the project.

4.2      Subcontractor shall submit, prior to its first payment request, a detailed Schedule of Values, a detailed schedule of suppliers, material men and sub-subcontractors to be used in the performance of this contract.

4.3      Subcontractor agrees and warrants that it has paid for all material , equipment and labor used in, or in connection with, the performance of its work under this contract through the period covered by payments received from the Contractor and that it shall furnish satisfactory evidence to Contractor of such payments as further provided for herein.

4.4      Subcontractor shall provide releases of lien for materials and work performed under this contract in accordance with the requirements of Chapter 713, Florida Statutes.  Further, should any mechanic's lien be filed by any supplier, materialman or sub-subcontractor of Subcontractor, Subcontractor shall immediately cause such lien to be discharged or transferred to bond and Subcontractor shall protect, defend, indemnify and hold both Contractor and Owner harmless in respect of such lien.

4.5.     Subcontractor's right to final payment is subject to the following provisions:

a)  Subcontractor having given evidence satisfactory to Contractor that the project is free from lien and other claims arising by reason of the Work performed by Subcontractor.

b)  Subcontractor having satisfactorily completed any repairs to the Work required under this contract including but not limited to any and all contract related items regarding Contractor or Owner/Architect punchlists.

c)  Delivery to Contractor at the time of final payment, final releases of lien, affidavits and acknowledgements of payments for material, labor and equipment under this contract.

d)  Delivery to and acceptance by Contractor of all required close-out documents including but not limited to as-built drawings, guaranties, operation and maintenance manuals and the signed off completed punch list.

## ARTICLE 5 - GENERAL CONDITIONS

5.1      There will be no change orders to the contract unless the Owner or Contractor specifically adds to or changes the scope of work, as described herein.  All Subcontractor change orders must be in writing and approved and signed by Contractor.  Change orders that are not approved and signed by Contractor shall not be valid.

5.2      Jobsite is to be kept clean at all times.  At the end of each work day, subcontractor must pick up all trash and scrap material he has created at interior and exterior of jobsite, and dispose in dumpster provided by Coastal Condominiums.  Additionally, all interior floors must be broom swept.

5.3      All slab, ceiling, wall penetrations, etc., must be patched in accordance with all applicable codes, including fire codes, as work progresses, so as not to hold up completion of any work.

5.4      All work performed and materials supplied under this subcontract will be warranted by this Subcontractor for a period of one year (or longer as required by the Specifications and Contract Documents) from the Contractor's receipt of the latest of the following; 1) All Final Inspections, 2) Certificate of Occupancy or 3) Final Acceptance of Owner, Architect and Contractor.  Subcontractor warrants that all material used shall be new and that all work performed under this contract shall be of the highest quality, free from faults and defects and in conformance with the Contract Documents.  Subcontractor shall insure that all manufacturers warranties for equipment shall remain in effect for the length of time as warranted by Manufacturer, or as required by the Contract Documents, whichever is longer.

5.5      Subcontractor shall submit shop drawings, submittal data, brochures and samples to Contractor in as many duplicate copies as Contractor may require and no later than ten (10) days after notification therefore from Contractor.

5.6      Subcontractor agrees to immediately prepare for performance of the Work hereunder and to be prepared to begin such work as soon as instructed by Contractor and shall commence work upon receipt by Contractor of a notice to commence from Owner or other specifically written direction by Contractor.

5.7      If, in the opinion of the Contractor, the Subcontractor falls behind in the progress of the Work to be performed hereunder, the Contractor may direct the Subcontractor to take such steps as the Contractor deems necessary to improve the rate of progress, including requiring Subcontractor to increase the number of shifts, overtime operations, days of work, amount of workmen and/or amount of equipment and to submit for approval a schedule demonstrating the manner in which the required rate of progress may be regained, all without any additional costs whatsoever to Contractor.  Failure of Subcontractor to immediately comply with Contractor's scheduling requests provided herein shall be considered to be an event of material default hereunder and Contractor may assert any and all remedies as provided herein.  Should Subcontractor in any way cause delay to the Contractor, any other subcontractor on the project or to any portion of the work described in the prime contract, Subcontractor shall be liable to Contractor for any and all damages sustained by Contractor as a result thereof, including, but not limited to, all consequential damages and costs of continued supervision, job overhead, insurance, project facilities and other ongoing fixed costs.  In addition, in the event Owner shall assess any delay damages against Contractor, either pursuant to a valid liquidated damage provision in the prime contract or otherwise.  Contractor shall have the right and option to deduct any and all such assessments that are directly attributable to delays caused by Subcontractor from any amounts that may be owing to Subcontractor under this agreement.  Permitting Subcontractor to continue after the time to complete the work has expired shall not be construed as a waiver of damages from noncompliance with time requirements provided herein.

5.8      Contractor shall not be liable to the Subcontractor for delay to Subcontractor's work by act, neglect or default of the Owner or the Architect or the Engineer, or other Subcontractors or by reason of fire or other casualty, on account of riots, or strikes, or other combined action of the workmen or others, or on account of any acts of God, or any other cause, beyond Contractor's control, or on account of any circumstances caused or contributed to by the Subcontractor.  In any event, Contractor's liability for delays shall expressly exclude consequential or incidental damages sustained by Subcontractor for any other party.

5.9      Subcontractor shall maintain a competent and experienced superintendent or foreman on the project at all times, with authority to carry out directives of the Contractor relating to the Subcontractor's work and responsibility.  Subcontractor must at all times maintain, keep and supply adequate tools, appliances, equipment and material and employ a sufficient number of properly skilled workmen to efficiently and promptly execute all work required hereunder as requested by Contractor.

5.10     It is specifically agreed by Subcontractor that a material matter of inducement and consideration for the award of this subcontract by Contractor, is the Subcontractor's agreement that it will not look to the Contractor, or its surety, for payments hereunder unless and until the Contractor has received payment for Subcontractor's work from the Owner and, further, that said payment by the Owner is a specific condition precedent to Subcontractor's right to payment by the Contractor or its surety.

5.11     Subcontractor agrees not to post signs anywhere on the jobsite premises.

5.12     Subcontractor agrees that they shall not look to Contractor for additional financial compensation should subsurface or otherwise concealed or unknown physical conditions which differ materially from the contract documents or conditions of an unusual nature be uncovered or encountered.  Subcontractor agrees to proceed as directed by Contractor without delay to the project schedule to correct, remove, alter and remedy such concealed

**Page 2 of 5**

Initial _____

physical conditions or unknown physical conditions in a manner in which Subcontractor provides a complete scope of work acceptable to Owner, Architect and Contractor.

8.13      Subcontractor agrees to comply with all municipal, state and federal laws and ordinances, all federal OSHA and US or international trade or patent agreements and such other laws as may be applicable, and to comply with all other laws and ordinances and to reimburse and save Coastal Condominiums harmless from any annoyances and fines having reference to the work and to give proper authorities all requisite notices relating to the work and to procure and  pay for all  necessary official licenses, fees, royalties, or permits for carrying on the work described herein.  Subcontractor shall defend all suits or claims for infringement of any patent rights arising out of the work.  Subcontractor shall correct, at its own cost and expense, any violations thereof resulting from performance of the work.  Subcontractor shall furnish such proof as Coastal Condominiums may request showing compliance and correction of violations.

8.14      Subcontractor shall take all reasonable safety precautions with respect to its Work and to comply with all applicable laws, ordinance, rules, regulations, etc. relating to the safety of persons or property. Further, Subcontractor shall report any injury on the job site to the Contractor immediately upon the occurrence of said injury. In addition, the Subcontractor shall promptly property complete, duly execute and deliver to the Contractor a written report of the accident on a form furnished by or acceptable to Contractor.  Subcontractor shall simultaneously deliver to the Contractor a true, correct and complete copy of any and all reports and other documents prepared by or on behalf of Subcontractor in connection with the accident or occurrence at the time of delivery of such report or other document to any of Subcontractor's insurance companies or their agents or representatives. Failure to comply with Contractor's directives regarding safety shall be cause for the Contractor, at his discretion, to cause Sub-Contractor's forces to vacate the project site until compliance is accomplished.  In the event such action becomes necessary, any delays to the project as a result shall become the responsibility of the Sub-Contractor under the terms and conditions of this agreement.

8.15      General Contractor, at its sole discretion, may prepare a monthly punchlist of unacceptable work items and require all items to be corrected as a strict condition to the Subcontractor submitting and General Contractor processing Subcontractor's monthly Application for Payment.  General Contractor's monthly punchlist may include items of work that, in the General Contractor's opinion, have not been completed in a timely manner and/or are behind the construction schedule as determined by the General Contractor.  Subcontractor shall remain responsible for the correction of any defective or nonconforming work whether or not specifically noted on General Contractor's monthly punchlist.

8.16      In consideration of the specific sum of One Thousand ($1,000.00) Dollars and other specific consideration, all of which is included in the Contract Price and the receipt and sufficiency of which the Subcontractor, hereby acknowledges, Subcontractor shall, on behalf of itself, and its respective agents and employees, to the fullest extent permitted by law, protect, defend, indemnify and hold Contractor and Owner, and their respective agents, partners, officers, directors, attorneys, employees and representatives harmless from and against all liabilities, claims, damages, losses and expenses (including but not limited to, court costs and attorneys' fees incurred through all levels of proceedings and in bankruptcy) of every kind and nature, arising out of, in connection with or resulting from the failure of Subcontractor to perform, abide by or comply with any of the provisions of this Agreement, or arising out of, in connection with or resulting from the intentional wrongful act or negligent act or omission of Subcontractor, its sub-contractors, vendors or anyone directly or indirectly employed by any of them while performing the Subcontractor's work hereunder or delivering materials to the Project site.  The indemnification obligations of Subcontractor shall not be limited in any way by any limitations on the amount or type of damages, compensation or benefits payable by or for Subcontractor under worker's compensation acts, disability benefit acts or other employee benefit acts, except as otherwise provided by the laws of the State of Florida or any other laws having jurisdiction. The obligations expressed in this paragraph shall also be the obligations of the subcontractor's surety under and bond(s) provided herein. The provisions of this Section shall survive the expiration or sooner termination of this Agreement.

8.17      Subcontractor shall be fully responsible, financially and otherwise, for any loss incurred by Owner, Architect, Contractor, or any and all other parties. In the event of theft, accidental damage, vandalism or by any means whatsoever by any employee, representative, contracted labor delivery personnel or their agents, suppliers, or sub-subcontractor of Subcontractor. Further, Subcontractor shall provide compensation for any such loss within 72 hours of written notification from Contractor of loss, regardless of subcontractor's method of compensation to the damaged party available to Subcontractor, whether insurance or otherwise.  In the event Subcontractor fails to compensate the Owner, Architect, Contractor or other parties, Contractor, at its sole discretion, shall have the right to deduct the dollar amount of the loss from any monies or other compensations due or forthcoming to the Subcontractor under the terms of this Agreement.

8.18      Subcontractor is responsible for providing a secure storage area for his own materials.  Contractor will not be responsible for any theft, vandalism or damages of any kind to Subcontractors tools, equipment or materials.

8.19      Subcontractor shall be bound to Contractor by the terms of this Agreement and, to the extent that the provisions of the Contract Documents between the Owner and Contractor apply to the Work of the Subcontractor, the Subcontractor shall assume toward the Contractor all the obligations and responsibilities which the Owner and Contractor, by said Contract Documents, assumes towards the Owner and the Architect provided, however that where any provision of the Contract Documents between Owner and Contractor is inconsistent with any provision of this Agreement, this Agreement shall govern as between Contractor and Subcontractor.  At the Subcontractor's request, Contractor shall make available, copies of the Contract Documents to which Subcontractor shall be bound.

8.20      Subcontractor's Project Superintendent shall attend all weekly project meetings and any and all other project related meetings as required by Contractor. In addition, at Contractor's request, Subcontractor's principals (Owner(s), President, Vice President and all other persons) as required by Contractor shall attend all project related meetings as scheduled by Contractor.

8.21      Contractor and Sub-Contractor for themselves, their heirs, successors, executors, administrators and assigns, do hereby agree to full performance of the covenants of this agreement and agree that the provisions of this agreement and all rights and remedies provided herein shall be construed under and governed by the laws of the State of Florida.  In the event of suit by the Contractor or its surety against the Sub-Contractor or its surety for those with whom he deals on behalf of this agreement, or suit by the Sub-Contractor or its surety or those with whom he deals on behalf of this agreement against the Contractor or its surety, then the venue of such suit shall be in Dade County, Florida and the Sub-Contractor hereby waives for itself, its surety or those with whom he deals on behalf of this agreement whatever rights it may have in the selection of venue. Sub-Contractor and its surety do hereby further agree that provisions concerning venue as contained herein shall be specifically binding upon them, notwithstanding the existence of any contrary venue provision which may be contained in any surety bond delivered to the owner by Contractor and/or its surety.

## ARTICLE 6 - CHANGES

6.1       Coastal Condominiums may, without invalidating the agreement of any bond given hereunder, order extra and/or additional work, deletions, or other modifications to the work; such changes to be effective only upon written order of Coastal Condominiums. Any adjustment to the subcontract sum or to the time for completion of the work shall be made in accordance with the Contract Documents. In the event that the Subcontractor fails to submit a quotation within the time limit required Coastal Condominiums, subcontractor shall accept the decision of Coastal Condominiums for the value of the work. Notwithstanding any inability to agree upon any adjustment or the basis for a an adjustment. Subcontractor shall, if directed by Coastal Condominiums nevertheless proceed in accordance with the order and the subcontract sum shall be adjusted as reasonably determined by Coastal Condominiums with any dispute to be resolved after the completion of the work. If requested, by Coastal Condominiums, the Subcontractor shall perform extra work on a time and material basis. The Subcontractor shall not receive payment for additional work or work that deviates from the Contract Documents performed without a written authorization from Coastal Condominiums executed prior to commencement of any such work.

Initial

6.2     The value of the work to be changed, added or deleted shall be determined by the Contract Documents or by one or more of the following methods or combinations thereof as Coastal Condominiums may elect: (1) mutual acceptance of a lump sum with properly itemized costs; (2) unit prices stated in the Contract Documents or subsequently agreed upon (unit price shall be deemed to include an allowance for all of Subcontractor's direct and indirect costs, including without limitation, office or shop expense, overhead, profit and bond); or (3) actual field costs incurred in performance of the changed work, plus allowance for overhead, supervision and profit defined as follows:

6.2.1    Actual field cost shall mean costs necessarily incurred in the proper performance of the work and paid by Subcontractor at rates not higher than the standard paid in the locality of the work (except with prior consent of Coastal Condominiums) defined as follows:

6.2.2    Wages paid for labor in the direct employ of Subcontractor in performance of the work plus a payroll mark-up, acceptable to Coastal Condominiums, to cover all overhead items applicable to payroll, such as insurance, taxes, FICA, workers compensation, unemployment taxes and fringe benefits.

6.2.3    Net cost of all materials, supplies and equipment used in or incorporated in the work.

6.2.4    Third party rental charges of all necessary machinery and equipment, exclusive of hand tools, used in performing the changed work, including installation, minor repairs and replacements, dismantling, removal, transportation and delivery costs thereof at rental charges consistent with those prevailing in the locality of the project.

6.3     No additive change orders will be requested by Subcontractor unless the Owner or Architect request changes, in writing, which add to the scope of work defined herein. Subcontractor's combined overhead and profit for changes will be computed on the following basis for all revisions to the subcontract sum:

6.3.1    Architect/Owner initiated changes: The maximum allowance for combined overhead and profit added to itemized costs under a lump sum proposal or to actual field costs shall be the lesser of (1) 15% or (2) the maximum percentage allowance permitted in the Contract Documents for changed or extra work less an allowance to COASTAL CONDOMINIUMS for overhead and profit on such work, or (3) the maximum allowed by the Architect/Owner, less an allowance to COASTAL CONDOMINIUMS for overhead and profit on such work.

6.3.2    Subcontractor initiated change order/backcharge related to other subcontractors: Zero percent (0%) of the actual cost of the charge.

6.3.3    Contractor initiated changes: Zero percent (0%) of the cost of the changes.

6.4     Coastal Condominiums shall have the right to inspect, copy and audit the books and records of Subcontractor or any sub-subcontractor making claim for reimbursement for actual costs in order to verify the accuracy and allowability of all cost claimed.

6.5     All changes, additions or deletions to work ordered in writing by Coastal Condominiums shall be deemed part of the work hereunder and shall be performed in compliance with all provisions of the Contract Documents.

## ARTICLE 7 - ASSIGNMENT

7.1     Neither any payment herein provided to be paid to Subcontractor, nor any other right or interest of Subcontractor hereunder shall be assigned or transferred without Subcontractor first having received the expressed, written consent of Contractor. In the event Contractor shall agree to any such transfer or assignment, Contractor specifically reserves the right to renegotiate or to add any additional provisions as may be necessary under the circumstances and under no circumstances shall any such transfer or assignment relieve Subcontractor of any of its obligations under this agreement.

## ARTICLE 8 - FAILURE TO PERFORM

8.1     Should the Subcontractor fail to do or perform work required hereunder or in any other manner breach or fail to perform any of its obligations and undertakings herein, thereby in the opinion of the Contractor causing or threatening to cause delay in general progress of the building, structure or project, Contractor shall have the right to any or all of the following remedies or courses of action:

        a.  Investigate the cause of such breach or failure and expedite same in any way or manner whatsoever, or
        b.  Take charge of and complete the performance of this agreement and the work provided for herein, or
        c.  Declare this contract to be breached by Subcontractor by twenty-four (24) hours notice to him as provided herein and renegotiate and re-execute contract or contracts for the completion of the work required to be done under this agreement with such persons, firms or corporation as shall be necessary in the opinion of Contractor. All losses, damages, and expenses, including interest, attorneys fees, court costs, appellate attorneys fees and appellate court costs in the prosecution of defense of any action or suit incurred by or resulting to Contractor in the above account, or by reason of any other breach of failure by Subcontractor hereunder, shall be borne by and charged against Subcontractor and its surety, including a ten (10%) percent overhead and a ten (10%) percent profit, and shall be the damages for breach of this agreement, and Contractor may recover on the bond(s) previously described, if any, and both Subcontractor and its surety, if any, agree to pay Contractor such losses, damages, expenses, interest, attorney fees, court costs, appellate attorneys fees, and appellate court costs, and including a ten (10%) percent overhead and a ten (10%) percent profit. Subcontractor further agrees that a breach of any other agreement between Contractor and Subcontractor pertaining to this or any other construction project shall be and constitute a material breach under this agreement, thereby enabling Contractor to assert all its rights and remedies hereunder.

8.2     For any and all work performed by Subcontractor, Subcontractor shall supply Contractor with submittals, shop drawings, etc. and receive written approval from Contractor prior to the purchasing of materials, fabrication or production and the performance of any work whatsoever. Should the Subcontractor commence with the purchasing of materials, fabrication or production or performance of any type of work, incurring any costs prior to Contractor written approval of required submittals, shop drawings, etc., then it shall be considered that Subcontractor has done so at its own risk and shall not look to the Contractor or its surety for any compensation, financial or other wise.

8.3     Should it become necessary for Contractor or anyone on Contractor's behalf, to incur any costs and/or expenses, whether directly or indirectly, including, but not limited to attorney's fees, collection fees, court costs, mediation or arbitration expenses, or appellate attorney's fees, in connection with any claim or demand asserted by Subcontractor, or as a result of Subcontractor's action or omission, Subcontractor and its surety, if any, agrees to pay all such costs and expenses.

## ARTICLE 9 - TERMINATION

9.1     The Contractor reserves the right to terminate this agreement and all rights and obligations hereunder, with or without cause and at Contractor's sole discretion, at any time up to seven (7) days prior to the scheduled actual commencement of the work by Subcontractor. The Contractor further reserves the right, at any time after actual commencement of the Work by Subcontractor, to terminate this Agreement upon three (3) days' written notice to the Subcontractor. Upon the giving of any such notice to terminate to Subcontractor, Contractor shall have the right to take possession of any materials, equipment or other items related to the Work on the job site. In the event Contractor terminates this agreement without cause prior to commencement of work as further conditioned in other provisions of this agreement, then Contractor shall reimburse Subcontractor for any reasonable out of pocket costs incurred by Subcontractor for the actual preparation of performance of work under this agreement. In the event Contractor shall terminate this agreement after commencement of the work and whether with or without justifiable cause, damages recoverable by Subcontractor, if any, shall be strictly limited to compensation for Subcontractor for services performed through the date of such termination, subject to off set for damages, delays and costs to Contractor and other monetary loss to Contractor caused by said termination.

## ARTICLE 10 - APPROVAL OF WORK

10.1    All work is to be performed subject to the final approval of the Owner, Architect/Engineer (other design professionals if applicable) and Contractor at their sole discretion as to the performance of the work in accordance with the plans and specifications and the true construction and

meaning of the plans and specifications shall be final. Subcontractor shall conform to and abide by any additional specifications, drawings or explanations furnished by Architect or Engineer to illustrate the work to be performed.

10.2    All work and/or materials which are determined by the Owner, Architect/Engineer (other design professionals if applicable) or Contractor to be defective or deficient in any manner shall be repaired, remedied, removed and/or replaced by the Subcontractor in the manner specified by the Owner, Architect/Engineer (other design professionals if applicable) or Contractor, at the sole cost and expense of the Subcontractor. If Subcontractor fails to so repair defective work within a time specified by the Contractor, then Contractor may cause the defective work or materials to be repaired at the expense of the Subcontractor.

## ARTICLE 11 - PRIOR COMMENCEMENT

11.1    In the event any work described herein shall be commenced or in any part undertaken by Subcontractor without its having first executed this agreement, and said Subcontractor shall have received a copy of this Subcontract Agreement, then Subcontractor and Contractor until the full execution hereof, shall be deemed to have entered into an oral agreement, fully binding upon said parties and containing the identical provisions as are contained herein.

## ARTICLE 12 - THE AGREEMENT

12.1    Subcontractor hereby acknowledges and agrees that Subcontractor will enter into any agreements which may be required by any construction lender for the project including, without limitation, (a) the Subcontractor's agreement to continue the Work, (b) the subordination of Subcontractor's lien rights to the lien of the construction mortgage, (c) the escrowing of releases of lien, (d) the issuance of joint checks and (e) such other requirements as are generally required by construction lenders.
12.2    This subcontract is contingent upon Contractor's receipt of a fully executed Agreement between Owner and Contractor and all conditions and provisions of said Agreement having been met.
12.3    This contract, including the terms and conditions contained herein, embodies the entire agreement between the parties and no other agreement, instructions or papers, oral or otherwise except those set forth in this agreement shall be deemed to exist or bind any of the parties hereto relating to the subject matter hereof.
12.4    It is understood by Subcontractor that time is of the essence in the performance of the Work under this contract.

## ARTICLE 13 - LICENSING

13.1    It is specifically agreed by the Subcontractor that upon execution of this Contract Agreement, he must submit a copy of his appropriate County Occupational License along with a State of Florida Specialty Contractors License or Certificate of Competency (as may be applicable), to Coastal Condominiums. Subcontractor further agrees to keep all licenses current throughout the duration of the project. Failure to do so releases Coastal Condominiums and the Owner from all liability or responsibility for any payment whatsoever that may be due or become due hereunder.

## ARTICLE 14 - SPECIAL PROVISIONS

14.1    Subcontractor shall provide Coastal a Payment and Performance bond(s) payable to Coastal, in an amount equal to the contract amount as specified above or as subsequently changed, on a form and executed by a surety satisfactory to Coastal undertaking to insure to Coastal the full and faithful performance of all obligations and undertakings contained herein, and the payment of all labor and materials supplied by or through Subcontractor hereunder. The original bond(s) shall be delivered to Coastal within ten (10) days from the full execution hereof, but in any event, prior to commencement of any work hereunder by Subcontractor. All terms, conditions and obligations herein defined are specifically incorporated by reference into the said bond(s) as though fully set forth therein. Should the surety, at any future date become insolvent or otherwise in the opinion of Coastal to be unable to financially support the bond, Subcontractor will within ten (10) days from the receipt of request of Coastal, deliver a replacement bond to Coastal in full conformance with this agreement. The cost of the bond is included in the subcontract amount.
14.2    Subcontractor agrees that it will not, under any circumstances, allow any person to perform any work on the project, either on or off site, on behalf of subcontractor who is not covered by subcontractor's worker's compensation insurance, in compliance with Sections 440.10 and 440.38, Florida Statutes, which are expressly incorporated herein by reference. Failure to comply with this requirement shall constitute a material breach of the Subcontract Agreement by subcontractor.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the day and year first above written.

SUBCONTRACTOR:                                          COASTAL  CONSTRUCTION OF SOUTH FLORIDA, INC
                                                        d/b/a COASTAL CONDOMINIUMS

By: _____                             By: _____

Print Name: _____                     Print Name: _____

Title: _____                          Title: _____

Date: _____                           Date: _____

FJun. 24. 2005⌐11:55AM          No. 4841   P. 2P.02

Exhibit "I"

# THE AMERICAN INSTITUTE OF ARCHITECTS



AIA Document A311

Bond No.

# Performance Bond

KNOW ALL MEN BY THESE PRESENTS: that

*Coastal Construction of South Florida, Inc. d/b/a Coastal Condominiums, 790 NW 107 Ave. #308, Miami, FL  33172*

as Principal, hereinafter called Contractor, and **DRAFT** (Here insert full name and address or legal title of Surety)

*Arch Insurance Company, 5601 Mariner St. #220, Tampa, FL  33609*

as Surety, hereinafter called Surety, are held and firmly bound unto    (Here insert full name and address or legal title of Owner)

*RCR I Holdings, LLC, 980 N. Federal Highway, Suite 200, Boca Raton, FL  33432*

***\*\*\*Please see attached Dual Obligee Rider\*\*\****
as Obligee, hereinafter called Owner, in the amount of –
*Twenty Eight Million Two Hundred Fifty Thousand and No/100\*\*\*\*\*\*\*\**       Dollars (**$28,250,000.00** ),

for the payment whereof Contractor and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS,

Contractor has by written agreement dated *July 27, 2004* , entered into a contract with Owner for
(Here insert full name, address and description of project)

*SAN RAFAEL AT RENAISSANCE COMMONS*

in accordance with Drawings and Specifications prepared by    (Here insert full name and address or legal title of Architect)
*Mouriz, Salazar & Associates, Inc., 7695 S.W. 104⁰ Street, Miami, FL  33156*

which contract is by reference made a part hereof, and is hereinafter referred to as the Contract.

AIA DOCUMENT A311 • PERFORMANCE BOND AND LABOR AND MATERIAL PAYMENT BOND • AIA ®
FEBRUARY 1970 ED • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 N.Y. AVE., N.W., WASHINGTON, D.C. 20006

1

C:\DOCUME~1\laura\LOCALS~1\Temp\6838685.doc
JUN-24-2005  13:02                    96%         P.02

Jun. 24. 2005 11:56AM                                          No. 4841   P. 3. 03

# PERFORMANCE BOND

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Contractor shall promptly and faithfully perform said Contract, then this obligation shall be null and void; otherwise it shall remain in full force and effect.

The Surety hereby waives notice of any alteration or extension of time made by the Owner.

Whenever Contractor shall be, and declared by Owner to be in default under the Contract, the Owner having performed Owner's obligation thereunder, the Surety may promptly remedy the default, or shall promptly

1) Complete the Contract in accordance with its terms and conditions, or

2) Obtain a bid or bids for completing the Contract in accordance with its term and conditions, and upon determination by Surety of the lowest responsible bidder, or if the Owner elects, upon determination by the Owner and the Surety jointly of the lowest responsible bidder, arrange for a contract between such bidder and Owner, and make available as work progresses (even though there should be a default or a succession of defaults

under the contract or contracts of completion arranged under this paragraph) sufficient funds to pay the cost of completion less the balance of the contract price; but not exceeding, including other costs and damages for which the Surety may be liable hereunder, the amount set forth in the first paragraph hereof. The term "balance of the contract price," as used in this paragraph, shall mean the total mount payable by Owner to Contractor under the Contract and any amendments thereto, less the amount properly paid by Owner to Contractor.

Any suit under this bond must be instituted before the expiration of two (2) years from the date on which final payment under the Contract falls due.

No right of action shall accrue on this bond to or for the use of any person or corporation other than the Owner named herein or the heirs, executors, administrators or successors of the Owner.

*The Warranty Obligations of the Surety under this Bond is limited to one (1) year after issuance of the Certificate of Occupancy.*

**DRAFT**

Signed and sealed this          day of                                    2004

Coastal Construction of South Florida, Inc.
d/b/a Coastal Condominiums
(Principal)

_____
(Witness)

_____(Title)
                                                          (Seal)

Arch Insurance Company
(Surety)

_____
(Witness)

_____(Title)
(Title) Charles J. Nielson, Attorney-In-Fact & Resident
Agent          (Seal)

AIA DOCUMENT A311 • PERFORMANCE BOND AND LABOR AND MATERIAL PAYMENT BOND • AIA ®
FEBRUARY 1970 ED • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 N.Y. AVE., N.W., WASHINGTON, D.C. 20006      2

At Jun. 24. 2005 11:56AM                                    No. 4841   P. 4P.04

## RIDER ADDING
## ADDITIONAL OBLIGEE

Rider to be attached to and form a part of Bond Number _____, dated the _____ day of
_____, 19 _____, executed by **Arch Insurance Company** (the "Surety") on

behalf of  **Coastal Construction of South Florida, Inc.**                       (the "Principal")
**d/b/a Coastal Condominiums**

in favor of  **RCR I Holdings, LLC**

                                                                      (the "Obligee")

WHEREAS, the Principal has by written agreement dated **July 27**  ,  19 **2004**  entered into
a contract (the "Contract") with the Obligee for

**San Rafael at Renaissance Commons**                                    ; and

WHEREAS, upon the request of the Principal and Obligee the attached bond is hereby amended to add

**Wachovia Bank, N.A.**                                        as additional Obligee.

PROVIDED, HOWEVER, there shall be no liability under this bond to the Obligees, or either of them
unless the said Obligees, or either of them, shall make payments to the Principal or to the Surety, should it arrange
for or undertake the completion of the Contract upon default of the Principal, strictly in accordance with the terms
of the Contract; and otherwise satisfy all terms and conditions and perform all of the other obligations to be
performed under the Contract at the time and in the manner therein set forth; all of the acts of one Obligee being
binding on the other.

In no event shall the aggregate liability of the Surety to either, or to both Obligees exceed the penal sum of
the attached bond, nor shall the Surety be liable except for a single payment for each single breach or default. At
the Surety's election, any payment due to either Obligee may be made by its check issued jointly to both.

This change is effective this _____ day of _____, 19 _____

The attached bond shall be subject to all of its terms, conditions and limitations except as herein modified.

Signed, sealed and dated this _____ day of _____, 19

WITNESS or ATTEST:                              **Coastal Construction of South Florida,**
                                                 **d/b/a Coastal Condominiums**        **Inc.**
                                                          (Principal)

_____           By _____ (Seal)
                                              Name:
                                              Title:

                                           **Arch Insurance Company**

Accepted:                                  By _____ (Seal)
**Wachovia Bank, N.A.**                         Attorney-In-Fact  & Resident Agent

Name: _____ (Obligee)          **Charles J. Nielson**
Title:

Name: _____ (Obligee)
Title:
Date:

JUN-24-2005  13:02                              96%                    P.04

Jun. 24. 2005 11:57AM No. 4841 P. 10.10

# POWER OF ATTORNEY

Know All Men By These Presents:

That the Arch Insurance Company, a corporation organized and existing under the laws of the State of Missouri, having its principal office in Kansas City, Missouri (hereinafter referred to as the "Company") does hereby appoint

Mary C. Aceves, Warren M. Alter, Charles D. Nielson, Charles J. Nielson and Laura Clymer of Miami Lakes, FL (EACH)

its true and lawful Attorney(s)-in-Fact, to make, execute, seal, and deliver from the date of issuance of this power for and on its behalf as surety, and as its act and deed:

Any and all bonds and undertakings

EXCEPTION: NO AUTHORITY is granted to make, execute, seal and deliver bonds or undertakings that guarantee the payment or collection of any promissory note, check, draft or letter of credit.

This authority does not permit the same obligation to be split into two or more bonds in order to bring each such bond within the dollar limit of authority as set forth herein.

The Company may revoke this appointment at any time.

The execution of such bonds and undertakings in pursuance of these presents shall be as binding upon the said Company as fully and amply to all intents and purposes, as if the same had been duly executed and acknowledged by its regularly elected officers at its principal office in Kansas City, Missouri.

This Power of Attorney is executed by authority of resolutions adopted by unanimous consent of the Board of Directors of the Company on March 3, 2003, true and accurate copies of which are hereinafter set forth and are hereby certified to by the undersigned Secretary as being in full force and effect:

"VOTED, That the Chairman of the Board, the President, or any Vice President, or their appointees designated in writing and filed with the Secretary, or the Secretary shall have the power and authority to appoint agents and attorneys-in-fact, and to authorize them to execute on behalf of the Company, and attach the seal of the Company thereto, bonds and undertakings, recognizances, contracts of indemnity and other writings, obligatory in the nature thereof, and any such officers of the Company may appoint agents for acceptance of process."

This Power of Attorney is signed, sealed and certified by facsimile under and by authority of the following resolution adopted by the unanimous consent of the Board of Directors of the Company on March 3, 2003:

VOTED, That the signature of the Chairman of the Board, the President, or any Vice President, or their appointees designated in writing and filed with the Secretary, and the signature of the Secretary, the seal of the Company, and certifications by the Secretary, may be affixed by facsimile on any power of attorney or bond executed pursuant to the resolution adopted by the Board of Directors on March 3, 2003, and any such power so executed, sealed and certified with respect to any bond or undertaking to which it is attached, shall continue to be valid and binding upon the Company.

00ML0013 00 03 03

Page 1 of 2

Printed in U.S.A.

Jun. 24. 2005˜11:57AM                                     No. 4841   P. 11·11

In Testimony Whereof, the Company has caused this instrument to be signed and its corporate seal to be affixed by their authorized officers, this 24th___ day of November_____, 20 03___.

Arch Insurance Company

Attested and Certified

Joseph S. Labell, Corporate Secretary                    Thomas P. Luckstone, Vice President

STATE OF CONNECTICUT   SS

COUNTY OF FAIRFIELD       SS

I Melissa B. Gilligan, a Notary Public, do hereby certify that Thomas P. Luckstone and Joseph S. Labell personally known to me to be the same persons whose names are respectively as Vice President and Corporate Secretary of the Arch Insurance Company, a Corporation organized and existing under the laws of the State of Missouri, subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that they being thereunto duly authorized signed, sealed with the corporate seal and delivered the said instrument as the free and voluntary act of said corporation and as their own free and voluntary acts for the uses and purposes therein set forth.

OFFICIAL SEAL
MELISSA B. GILLIGAN, Notary Public
State of Connecticut
My Commission Expires February 28, 2005

**DRAFT**

Melissa B. Gilligan, Notary Public
My commission expires 2-28-05

CERTIFICATION

I, Joseph S. Labell, Corporate Secretary of the Arch Insurance Company, do hereby certify that the attached Power of Attorney dated November 24, 2003_____ on behalf of the person(s) as listed above is a true and correct copy and that the same has been in full force and effect since the date thereof and is in full force and effect on the date of this certificate; and I do further certify that the said Thomas P. Luckstone, who executed the Power of Attorney as Vice President, was on the date of execution of the attached Power of Attorney the duly elected Vice President of the Arch Insurance Company.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the Arch Insurance Company on this _____ day of _____ 20___.

Joseph S. Labell, Corporate Secretary

This Power of Attorney limits the acts of those named therein to the bonds and undertakings specifically named therein and they have no authority to bind the Company except in the manner and to the extent herein stated.

Home Office: Kansas City, MO

00ML0013 00 03 03                        Page 2 of 2                        Printed in U.S.A.

Jun. 24. 2005 11:56AM        No. 4841   P. P.07



# THE AMERICAN INSTITUTE OF ARCHITECTS

AIA Document A311 <u>Bond No.</u>

# Labor and Material Payment Bond

THIS BOND IS ISSUED SIMULTANEOUSLY WITH PERFORMANCE BOND IN FAVOR OF THE
OWNER CONDITIONED ON THE FULL AND FAITHFUL PERFORMANCE OF THE CONTRACT

KNOW ALL MEN BY THESE PRESENTS: that **DRAFT** (Here insert full name and address or legal title of contractor)

*Coastal Construction of South Florida, Inc. d/b/a* ~~DRAFT~~ *Condominiums, 790 NW 107 Ave. #308, Miami, FL 33172*

as Principal, hereinafter called Contractor, and, (Here insert full name and address or legal title of Surety)

*Arch Insurance Company, 5601 Mariner Street, Suite 220, Tampa, FL 33609*

as Surety, hereinafter called Surety, are held and firmly bound unto (Here insert full name and address or legal title of Owner)

*RCR I Holdings, LLC, 980 N. Federal Highway, Suite 200, Boca Raton, FL 33432*

*\*\*\*Please see attached Dual Obligee Rider\*\*\**
As Obligee, hereinafter called Owner, in the amount of
*Twenty Eight Million, Two Hundred Fifty Thousand and No/100\*\*\*\*\*\*\**    Dollars   (**$28,250,000.00** ),

for the payment whereof Contractor and Surety bind themselves, their heirs, executors, administrators,
successors and assigns, jointly and severally, firmly by these presents.

WHEREAS,

Contractor has by written agreement dated   *July 27, 2004*  , entered into a contract with Owner for
(Here insert full name, address and description of project)
*SAN RAFAEL AT RENAISSANCE COMMONS*

in accordance with Drawings and Specifications prepared by   (Here insert full name and address or legal title of Architect)
*Mouriz, Salazar, & Associates, Inc., 7695 S.W. 104ᵗʰ Street, Miami, FL 33156*

which contract is by reference made a part hereof, and is hereinafter referred to as the Contract.

AIA DOCUMENT A311 • PERFORMANCE BOND AND LABOR AND MATERIAL PAYMENT BOND • AIA ®
FEBRUARY 1970 ED • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 N.Y. AVE., N.W., WASHINGTON, D.C. 20006

3

C:\DOCUME~1\laura\LOCALS~1\Temp\6838685.doc
JUN-24-2005 13:02        96%     P.07

AJun. 24. 2005 11:57AM                                        No. 4841   P. 8P. 28

# LABOR AND MATERIAL PAYMENT BOND

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that, if Principal shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the Contract, then this obligation shall be void; otherwise it shall remain in full force and effect, subject, however, to the following conditions:

1. Claimant is defined as one having a direct contract with the Principal or with a Subcontractor of the Principal for labor, material, or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract.

2. The above named Principal and Surety hereby jointly and severally agree with the Owner that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The Owner shall not be liable for the payment of any costs or expenses of any such suit.

3. No suit or action shall be commenced hereunder by any claimant:

a) Unless claimant, other than one having a contract with the Principal, shall have given written notice to any two of the following: the Principal, the Owner, or the Surety above named, within ninety (90) days after such claimant did or performed the last of the work or labor, or furnished the last of the materials for which said claim is made, stating with substantial

accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same by registered mail or certified mail, postage prepaid, in an envelope addressed to the Principal, Owner or Surety, at any place where an office is regularly maintained for the transaction of business, or served in any manner in which legal process may be served in the state in which the aforesaid project is located, save that such service need not be made by a public officer.

b) After the expiration of one (1) year following the date on which Principal ceased work on said Contract, it being understood, however, that if any limitation embodied in this bond is prohibited by any law controlling the construction hereof such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

c) Other than in a state court of competent jurisdiction in and for the county or other political subdivision of the state in which the project, or any part thereof, is situated, and not elsewhere.

4. The amount of this bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder, inclusive of the payment by Surety of mechanic's liens which may be filed of record against said improvement, whether or not claim for the amount of such lien be presented under and against this bond.

***THIS BOND HEREBY IS AMENDED SO THAT THE PROVISIONS AND LIMITATIONS OF SECTION 255.05 OR SECTION 713.23, FLORIDA STATUTES, WHICHEVER IS APPLICABLE, ARE INCORPORATED HEREIN BY REFERENCE.***

Signed and sealed this _____ day of _____ _____ 2004.

*Coastal Construction of South Florida, Inc.*
*d/b/a Coastal Condominiums*
(Principal)

_____   (Witness)

_____   (Seal)
(Title)

*Arch Insurance Company*                              (Surety)

_____   (Witness)

_____   (Seal)
(Title) *Charles J. Nielson, Attorney-in-Fact & Resident Agent*

AIA DOCUMENT A311 • PERFORMANCE BOND AND LABOR AND MATERIAL PAYMENT BOND • AIA •
FEBRUARY 1970 ED • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 N.Y. AVE., N.W., WASHINGTON, D.C. 20006         4

JUN. 24. 2005 11:57AM    NO. 4841   P. 9/P. 09



# ARCH Insurance Company

**ARCH Surety**

### NOTICE – DISCLOSURE OF TERRORISM PREMIUM

In accordance with the Terrorism Risk Insurance Act of 2002, we are providing this disclosure notice for bonds on which Arch Insurance Company is the surety.

### DISCLOSURE OF PREMIUM

The portion of the premium attributable to coverage for terrorist acts certified under the Act is Zero Dollars ($0.00).

### DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The United States will pay ninety percent (90%) of covered terrorism losses exceeding the applicable insurer deductible.

**DRAFT**

CIC

HU Jun. 24. 2005 11:56AM                                     No. 4841   P. 5~~

# POWER OF ATTORNEY

Know All Men By These Presents:

That the Arch Insurance Company, a corporation organized and existing under the laws of the State of Missouri, having its principal office in Kansas City, Missouri (hereinafter referred to as the "Company") does hereby appoint

Mary C. Aceves, Warren M. Alter, Charles D. Nielson, Charles J. Nielson and Laura Clymer of Miami Lakes, FL (EACH)

Its true and lawful Attorney(s)-in-Fact, to make, execute, seal, and deliver from the date of issuance of this power for and on its behalf as surety, and as its act and deed:

Any and all bonds and undertakings

EXCEPTION: NO AUTHORITY is granted to make, execute, seal and deliver bonds or undertakings that guarantee the payment or collection of any promissory note, check, draft or letter of credit.

This authority does not permit the same obligation to be split into two or more bonds in order to bring each such bond within the dollar limit of authority as set forth herein.

The Company may revoke this appointment at any time.

The execution of such bonds and undertakings in pursuance of these presents shall be as binding upon the said Company as fully and amply to all intents and purposes, as if the same had been duly executed and acknowledged by its regularly elected officers at its principal office in Kansas City, Missouri.

This Power of Attorney is executed by authority of resolutions adopted by unanimous consent of the Board of Directors of the Company on March 3, 2003, true and accurate copies of which are hereinafter set forth and are hereby certified to by the undersigned Secretary as being in full force and effect.

"VOTED, That the Chairman of the Board, the President, or any Vice President, or their appointees designated in writing and filed with the Secretary, or the Secretary shall have the power and authority to appoint agents and attorneys-in-fact, and to authorize them to execute on behalf of the Company, and attach the seal of the Company thereto, bonds and undertakings, recognizances, contracts of indemnity and other writings, obligatory in the nature thereof; and any such officers of the Company may appoint agents for acceptance of process."

This Power of Attorney is signed, sealed and certified by facsimile under and by authority of the following resolution adopted by the unanimous consent of the Board of Directors of the Company on March 3, 2003:

VOTED, That the signature of the Chairman of the Board, the President, or any Vice President, or their appointees designated in writing and filed with the Secretary, and the signature of the Secretary, the seal of the Company, and certifications by the Secretary, may be affixed by facsimile on any power of attorney or bond executed pursuant to the resolution adopted by the Board of Directors on March 3, 2003, and any such power so executed, sealed and certified with respect to any bond or undertaking to which it is attached, shall continue to be valid and binding upon the Company.

C/C

00ML0013 00 03 03

Printed in U.S.A.

JUN-24-2005   13:02                                        96%                           P.05

Jun. 24. 2005 11:56AM                                    No. 4841   P. 6 P. 06

In Testimony Whereof, the Company has caused this instrument to be signed and its corporate seal to be affixed by their authorized officers, this 24th day of November _____, 20 03

Arch Insurance Company

)Attested and Certified

_Joseph S. Labell, Corporate Secretary_

_Thomas P. Luckstone, Vice President_

STATE OF CONNECTICUT   SS

COUNTY OF FAIRFIELD      SS

I Melissa B. Gilligan, a Notary Public, do hereby certify that Thomas P. Luckstone and Joseph S. Labell personally known to me to be the same persons whose names are respectively as Vice President and Corporate Secretary of the Arch Insurance Company, a Corporation organized and existing under the laws of the State of Missouri, subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that they being thereunto duly authorized signed, sealed with the corporate seal and delivered the said instrument as the free and voluntary act of said corporation and as their own free and voluntary acts for the uses and purposes therein set forth.

OFFICIAL SEAL
MELISSA B. GILLIGAN, Notary Public
State of Connecticut
My Commission Expires February 28, 2005

**DRAFT**

_Melissa B. Gilligan, Notary Public_
My commission expires 2-28-05

CERTIFICATION

I, Joseph S. Labell, Corporate Secretary of the Arch Insurance Company, do hereby certify that the attached Power of Attorney dated November 24, 2003 on behalf of the person(s) as listed above is a true and correct copy and that the same has been in full force and effect since the date thereof and is in full force and effect on the date of this certificate; and I do further certify that the said Thomas P. Luckstone, who executed the Power of Attorney as Vice President, was on the date of execution of the attached Power of Attorney the duly elected Vice President of the Arch Insurance Company.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the Arch Insurance Company on this _____ day of _____, 20_____.

_Joseph S. Labell, Corporate Secretary_

This Power of Attorney limits the acts of those named therein to the bonds and undertakings specifically named therein and they have no authority to bind the Company except in the manner and to the extent herein stated.

Home Office: Kansas City, MO

00ML0013 00 03 03                        Page 2 of 2                        Printed in U.S.A.

JUN-24-2005   13:02                                     96%                 P. 06

## AGREEMENT OF GENERAL CONTRACTOR

### EXHIBIT "J"

AGREEMENT OF GENERAL CONTRACTOR (the "**Agreement**"), dated June  23, 2005, by **Coastal Construction of South Florida, Inc., d/b/a Coastal Condominiums**, having an office at 790 NW 107ᵀʰ. Avenue, Suite 308, Miami, Florida 33172 ("**Contractor**"), in favor of **WACHOVIA BANK, NATIONAL ASSOCIATION**, as Agent for the "Lenders" which now are or hereafter become parties to the "Loan Agreement" described herein, having an office at 200 East Broward Boulevard, Suite 200, Fort Lauderdale, Florida 33301 (singularly and collectively, "**Lender**").

### BACKGROUND

A.      Lender, pursuant to the terms and conditions of a Construction Loan Agreement (the "**Loan Agreement**") between RCR HOLDINGS II, LLC, a Florida limited liability company ("**Owner**") and Lender, will be providing financing for the construction of a *328 unit residential condominium project* to be known as the "Villa Lago" (the "**Project**"), on certain premises located in the City of Boynton Beach, Palm Beach County, Florida (the "**Property**"), as more particularly described in the Loan Agreement; and

B.      Contractor and Owner have entered into a Contract dated _June 22, 2005 (the "**Contract**") providing for the construction of the Project on the Property; and

C.      It is a condition to Lender's making the Loan described in the Loan Agreement (collectively, the "**Loan**") that Contractor enter into this Agreement, on which Agreement Lender will be relying in advancing the Loan pursuant to the Loan Agreement.  As the Loan will inure to the benefit of Contractor, Contractor hereby agrees and acknowledges the Bank's Obligation to advance the proceeds of the loan, of which such Contractor's portion of any advance shall be paid directly to the Contractor from the Lender, is subject to satisfaction of the disbursement terms of the Loan Agreement to be executed by Borrower at the closing of the Loan as contained in Section 5 of the Loan Agreement attached hereto as Exhibit "A" and made a part hereof ("Loan Agreement") and Contractor hereby acknowledges payment in full for all services rendered through Requisition Number _____ dated _____2005, except for retainages in accordance with the contract and Contractor hereby subordinates its lien on the Property to the lien of the Lender's mortgage encumbering the Property and all other security instruments executed by Borrower in favor of Lender.

> **Formatted:** Font: Not Bold, Font color: Auto

### AGREEMENT

**NOW, THEREFORE,** in consideration of the premises contained herein and intending to be legally bound hereby, the parties hereto agree as follows:

1.      **CONTRACT.**

Contractor represents and warrants that: (i) no work was commenced nor materials delivered to the Property prior to _ June 22 _, 2005____; (ii) all fees and other sums required to be paid as of the date hereof under the terms of the Contract have been paid; (iii) the Contract is in full force and effect, is valid and enforceable, and has not been altered, modified or amended( except as set forth in **Exhibit B Miscellaneous Provisions and Exhibit A-1 Assumptions and Clarifications, attached hereto and incorporated herein by reference**);; (iv) neither Contractor nor, to the best of Contractor's knowledge, Owner are in default under any of the terms, covenants or conditions of the Contract; (v) Contractor is not prohibited under any law, agreement, judgment or permit from performing any of its obligations under the Contract; (vi) no action has been brought or, to the best of Contractor's knowledge, is threatened which in any manner is likely to interfere with the performance of any of Contractor's obligations under the Contract; and (vii) Contractor has full power and authority to execute and deliver this Agreement.

2.   **AGREEMENT TO PERFORM.**

Contractor consents to the assignment of the Contract by Owner to Lender pursuant to the Loan Agreement. Contractor agrees, at the request of Lender and without regard to any prior default of Owner under the Contract, to continue to perform under the terms of the Contract if Lender should notify Contractor in writing that Lender has elected to undertake to complete or cause the completion of the Project, provided that Bank agrees in writing to pay contractor directly, all sums due for it's work through the date of the authorization notice and agrees to continue to pay Contractor for the balance of the work in accordance with the Contract for any work, labor and material rendered. Contractor further specifically agrees that, in the event Lender forecloses or takes over the Project and the Property, Contractor agrees to complete all work provided that that Bank agrees in writing to pay contractor all sums due for it's work through the date of the authorization notice and agrees to continue to pay Contractor for the balance of the work in accordance with the Contract for any work, labor and material rendered.

3.   **MODIFICATION AND AMENDMENTS.**

No amendment shall be made to the "Plans and Specifications" (as hereinafter defined) or to the Contract, nor shall any change orders be made thereunder without the prior written consent of Lender; provided, however, that Lender's consent shall not be required for (but Lender shall promptly receive copies of) any change orders which do not involve a change in the scope of the Project or a reduction in the value thereof so long as such change order does not (a) affect the electrical, plumbing, mechanical, HVAC or structural portions of the Project, (b) materially change gross square footage, number of Units or floors, basic layout, parking or quality of materials; (c) extend the Completion Date, or (d) exceed $ 25,000.00 or more. Once the aggregate of all change orders exceeds $ 50,000.00, Lender's consent shall be required for all change orders regardless of amount.

4.   **CONTRACTOR'S COVENANTS.**

Contractor agrees: (i) to give Lender prompt written notice at Lender's address as set forth above of any defaults by Owner under the Contract and to give Lender, at the sole option of Lender, the right (but not the obligation) to cure any defaults by Owner under the Contract for a period of thirty (30) days after receipt by Lender of notice of such default; (ii) not to assign its rights and obligations under the Contract without the prior written consent of Lender; (iii) to pay and discharge all liens or claims for labor and materials furnished in connection with the construction of the Project pursuant to the Contract; (iv) to fully complete the Project in a good and workmanlike manner on or before the completion date specified in the Contract, subject to any permitted delays as set forth in the Contract; (v) that in the event any of the Loan proceeds are disbursed under the Loan Agreement directly to Contractor, Contractor will receive such advances as a trust fund for the work to be performed under the Contract and Contractor will apply such sums first to such payment before using any part of such advances for any other purpose; (vi) that Lender shall have no liability to Contractor either under the Contract, this Agreement, or otherwise, for any act or omission occurring prior to such time as Lender elects in writing to assume the future obligations of Owner under the Contract; and (vii) to furnish to Lender, upon request, complete, current and correct lists of all subcontractors and material suppliers of the Project.

Contractor further covenants and agrees that the Project will be completed in accordance with the plans and specifications for the Project approved by Lender ("Plans and Specifications"), the list of which is attached to the Contract, and that in addition to all affidavits, partial releases and other documents and papers required to be furnished by Contractor under the Contract and the Florida Mechanics' Lien Law, Contractor, at the time of final payment, will furnish a full and complete release of lien of Contractor and of every person who performed work, labor or services or supplied materials covered by the Contract to the Property. Requisitions for draws will be submitted on an AIA form as designated by the Contract, accompanied by such certifications and other evidence of payment of obligations as Lender may require. Contractor will not stop work under the Contract for any reason without giving Lender at least seven (7) days prior written notice.

Contractor agrees that each subcontract executed between Contractor and a subcontractor performing work on the Project shall include a provision whereby the subcontractor agrees that (i) if Contractor defaults under the subcontract, the subcontractor will, before exercising any remedy, give Borrower and Lender written notice specifying the default and the steps necessary to cure same, and Borrower and/or Lender shall have the right (but not the obligation) within thirty (30) days after receipt of such notice to cure such default or cause it to be cured; and (ii) following a default by Contractor under the subcontract, at the request of Borrower and/or Lender, the subcontractor will continue performance under the subcontract in accordance with its terms, or will enter into a new subcontract with a contractor to be approved by Borrower and Lender upon substantially the same terms and conditions as the original subcontract, so long as subcontractor shall be paid in accordance with the subcontract or such new subcontract for all work, labor and materials furnished in connection therewith. Contractor further agrees to furnish Lender simultaneously with draw requests a copy of each fully executed subcontract that has been signed within the preceding thirty (30) day period.

Contractor acknowledges that Lender may have no means of determining in due course when Contractor may claim a default under the Contract with Borrower. Therefore, Contractor agrees that it shall not claim a breach entitling it to rescind or terminate its performance under the Contract nor will it claim any right to additional consideration, time or performance, unless Contractor shall have given written notice to Lender of such breach at the same time and in the same manner as notice is given to Owner, with the same opportunity to cure, and provided further that Contractor is compensated in accordance with the Contract for all services performed for during such cure period. No claim by Contractor of rescission or of default or of any right or remedy under the Contract shall be binding upon Lender in the absence of receipt of such notice by Lender, and, upon the curing of any such default or breach (whether cured by Borrower or Lender), Contractor shall continue to perform its obligations under the Contract, which shall be performed to or for the benefit of Lender, if Lender is then acting pursuant to its rights under this document.

5.  **INSPECTION OF PROJECT.**

Contractor will permit Lender or its agents at any time (i) to enter upon and inspect the work or construction at the Project and (ii) in the event that any mechanics' or materialmen's liens are filed against the Project, or other questions are raised concerning Contractor's performance relating to the Project, to examine such portions of Contractor's books and records as relate to the Project or the Contract, as Lender or its agents may require.

6.  **SUBORDINATION.**

Contractor further agrees that any present or future lien rights Contractor may have shall be subject and subordinate at all times to the lien of Lender's mortgage on the Property, as the same may be hereafter modified, spread, supplemented, extended or otherwise altered.

7.  **MISCELLANEOUS.**

7.1.  **Binding Effect.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

7.2.  **Modifications.**  This Agreement may not be supplemented, amended or modified unless set forth in writing and signed by the parties hereto.

7.3.  **Notices.**  All notices and communications under this Agreement shall be in writing and shall be given by either (a) hand delivery, (b) certified mail, return receipt requested, or (c) reliable overnight commercial courier (charges prepaid) to the addresses listed in this Agreement. Notice shall be deemed to have been given and received: (i) if by hand delivery, upon delivery; (ii) if by mail, three (3) calendar days after the date first deposited in the United States mail; and (iii) if by overnight courier, on the date scheduled for delivery. A party may change its address by giving written notice to the other party as specified herein.

7.4.   **Governing Law**.  This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Florida without reference to conflict of laws principles.

**IN WITNESS WHEREOF**, Contractor has signed and sealed this agreement as of the day and year first above written.

**CONTRACTOR**

By: _____

Name: DANIELE WHITEMAN

Title: PRESIDENT

(CORPORATE SEAL)

**DESCRIPTION AND ADDRESS OF PROJECT:**

Construction of a 328 unit residential condominium project to be known as the "Villa Lago", with related amenities (the "Project"), located in the City of Boynton Beach, Palm Beach County, Florida.

**EXHIBIT "A"**

5.    **CONDITIONS TO ADVANCE**

5.1.    **General Conditions.** Lenders will have no obligation to make any Advance (a) unless Agent is satisfied, in its Reasonable discretion, that the conditions precedent to the making of such Advance have been satisfied; or (b) if an Event of Default or an event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, has occurred and is continuing.

> Deleted: sole

5.2.    **Conditions to Initial Advance.** Lenders' obligations hereunder to make the initial Advance on a building-by-building basis is conditioned upon Agent's receipt of the following, each in form and substance satisfactory to Agent:

5.2.1.    each of the Loan Documents duly executed as necessary to be enforceable against the parties thereto;

5.2.2.    each of the other documents, certificates, opinion letters and instruments required under this Agreement and/or the Commitment Letter;

5.2.3    a paid title insurance commitment or policy (the **"Title Policy"**) issued by the Title Insurer acceptable to Agent, insuring the Mortgage as a valid first lien on Borrower's fee estate in the Property for the full amount of the Loan, free and clear of all defects and encumbrances except as Agent shall approve;

5.2.4.    A Notice of Commencement signed by Borrower and acceptable to Agent shall have been delivered to the Title Insurer to be recorded on a date subsequent to the date of the recording of the Mortgage. An executed copy of the payment Bond (as hereinafter defined) shall be attached to and recorded with the Notice of Commencement. Borrower shall have agreed to post a certified copy of the recorded Notice of Commencement on the Property in accordance with the Legal Requirements;

5.2.5.    Copies of Qualified Contracts with sales prices that in the aggregate of at least $68,655,914 and otherwise acceptable to Agent;

> Formatted: Font: Bold

5.2.6.    Agent and its counsel must review and approve the condominium documents and any and all relevant filings with the Division of Florida Land Sales, Condominiums and Mobile Homes (the **"Division"**), and the United States Department of Housing and Urban Development (the **"HUD"**), including, but not limited to, evidence that the Project is registered with HUD as required by the Interstate Land Sales Act so that all contracts of sale are enforceable beyond twenty-four (24) months from contract execution. Additionally, Borrower shall covenant and provide reasonable certifications, opinions and documentation, acceptable to Agent and its legal counsel that (i) no contract of sale is at risk of being voided or rescinded due to its required closing date being prior to the anticipated date of Project completion date, and (ii) all contracts of sale contain provisions to extend the required closing date for the period of any uncontrollable delays in construction including force majeure;

5.2.7.    An independent appraisal showing (i) the as-is value of the Property to be not less than $_____, and (ii) the discounted sellout value of the Project to be not less than $_____. The appraisal shall also indicate the as-if completed value of the Project and the individual retail values for each Unit. The appraiser and the form and substance of the appraisal shall be acceptable to Agent; and

5.3.    **Conditions to Subsequent Advances.** Lenders' obligations hereunder to make any subsequent Advances on a building-by-building basis are conditioned upon Agent's receipt of the following, each in form and substance satisfactory to Agent:

5.3.1.    a timely Advance Request, together with all required supporting documentation;

5.3.2.  evidence that Borrower has invested the required portion of the Equity Requirement in the Project;

5.3.3.  an endorsement to the Title Policy continuing the effective date of the Title Policy through the date of the Advance and insuring that there has been no change in the status of the title to the Property.  In the event the Title Policy contains a "pending disbursement" clause, the endorsement shall also increase the amount of the Title Policy by the amount of the Advance being made in connection therewith;

5.3.4.  an inspection report from the Agent's inspector satisfactory to Agent;  and

5.3.5.  such other documents, instruments, information, agreements and certificates as Agent or the Title Insurer may reasonably require.

5.4.  **Conditions to Final Advance.**  Lenders' obligations hereunder to make the final Advance is conditioned upon Agent's receipt of the following, each in form and substance satisfactory to Agent:

5.4.1.  each of the items set forth in subsection 5.3 hereof, except as otherwise provided herein;

5.4.2.  a final endorsement to the Title Policy continuing the effective date of the Title Policy so as to insure the Loan as fully disbursed and removing any "pending disbursement" clause, any survey exceptions and any other exceptions to title arising out of the construction of the Project;

5.4.3.  the final "as-built" survey in compliance with the requirements of Section 7.6;

5.4.4.  evidence that Borrower's builder's risk insurance has been converted to an "all-risk" fire and extended coverage hazard insurance policy (non-reporting Commercial Property Policy with Special Cause of Loss form) in accordance with the requirements of the Mortgage; and

5.4.5.  each of the items set forth in the Completion Conditions set forth in subsection 7.2. below.

6

| Act ID | Description | Orig Dur | Rem Dur | Early Start | Early Finish | Actual Start | Actual Finish |
|---|---|---|---|---|---|---|---|
| | **RESIDENTIAL EAST** | | | | | | |
| 10000 | Notice to proceed | 1d | 1d | 18JUL05 | 18JUL05 | | |
| 10020 | Shop drawing review footing steel | 1d | 1d | 19JUL05 | 19JUL05 | | |
| 10040 | Review and shop approvals | 1d | 1d | 13JUL05 | 18JUL05 | | |
| 10060 | Review and shop approvals | 1d | 1d | 19JUL05 | 19JUL05 | | |
| 10080 | Layout building footings | 3d | 3d | 19JUL05 | 21JUL05 | | |
| 10100 | Dig Footings | 10d | 10d | 25JUL05 | 03AUG05 | | |
| 10120 | Install form Boards | 7d | 7d | 25JUL05 | 03AUG05 | | |
| 10140 | Install Rebar | 10d | 10d | 27JUL05 | 09AUG05 | | |
| 10160 | Footing Inspections | 2d | 2d | 10AUG05 | 11AUG05 | | |
| 10180 | Pour footings | 8d | 8d | 12AUG05 | 23AUG05 | | |
| 10200 | Layout exterior walls | 5d | 5d | 22AUG05 | 26AUG05 | | |
| 10220 | Install sidewall blocks/ backfill | 10d | 10d | 22AUG05 | 05SEP05 | | |
| 10240 | Install underground utilities in Bldg | 15d | 15d | 01SEP05 | 21SEP05 | | |
| 10260 | Inspect utilities | 5d | 5d | 22SEP05 | 28SEP05 | | |
| 10280 | Backfill utilities | 5d | 5d | 27SEP05 | 03OCT05 | | |
| 10300 | Prep ground floor slab | 2d | 2d | 28SEP05 | 29SEP05 | | |
| 10320 | Slab Inspection | 2d | 2d | 29SEP05 | 30SEP05 | | |
| 10340 | Pour ground floor slab/elevator pits | 1d | 1d | 10OCT05 | 10OCT05 | | |
| 10360 | Form Board Survey | 2d | 2d | 11OCT05 | 12OCT05 | | |
| 10380 | First floor block 8" walls/include any tie | 200 | 200 | 12OCT05 | 08NOV05 | | |
| 10400 | Second floor 51/2" concrete slab | 25d | 25d | 26OCT05 | 29NOV05 | | |
| 10420 | Second floor 8" load bearing masonry | 20d | 20d | 09NOV05 | 06DEC05 | | |
| 10440 | Form/pour first floor stairs | 50d | 50d | 09NOV05 | 18NOV05 | | |
| 10460 | Third floor 51/2" concrete slab | 30d | 30d | 11NOV05 | 22DEC05 | | |
| 10480 | Form / Pour second floor stairs | 12d | 12d | 11NOV05 | 28NOV05 | | |
| 10490 | Third Floor 8" Load bearing masonry walls | 20d | 20d | 23NOV05 | 20DEC05 | | |
| 10500 | Fourth Floor 51/2" concrete slab | 30d | 30d | 28NOV05 | 05JAN06 | | |
| 10520 | Form/Pour third floor stairs | 12d | 12d | 25NOV05 | 12DEC05 | | |
| 10540 | Form/Pour fourth floor stairs | 25d | 25d | 25NOV05 | 02JAN06 | | |
| 10560 | Fourth Floor 8" load bearing masonry | 12d | 12d | 01DEC05 | 11JAN06 | | |
| 10580 | Fifth deck 51/2" slab | 12d | 12d | 01DEC05 | 18DEC05 | | |
| 10600 | Form/pour fourth floor stairs | 25d | 25d | 18DEC05 | 21JAN06 | | |
| 10620 | Sixth Floor Block | 30d | 30d | 02JAN06 | 15FEB06 | | |
| 10640 | Sixth Floor slab Plans | 16d | 16d | 26JAN06 | 15SEB06 | | |
| 10660 | Sixth Floor block | 16d | 16d | 26FAN06 | 15SEB06 | | |
| 10680 | Roof block | 30d | 30d | 16FEB06 | 29MAR06 | | |
| 10700 | Set mansard roof trusses | 21d | 21d | 20MAR06 | 074PR06 | | |
| 10720 | Install the roof | 21d | 21d | 10APR06 | 08MAY06 | | |
| 10740 | Caulk/our roof deck slabs | 10d | 10d | 10APR06 | 21APR06 | | |
| 10760 | Caulk all exterior windows and door frames. | 10d | 10d | 24APR06 | 05MAY06 | | |
| 10780 | Install all exterior trim | 15d | 15d | 08MAY06 | 26MAY06 | | |
| 10800 | Brown Coat stucco | 15d | 15d | 18JUN06 | 18JUL06 | | |
| 10820 | Final stucco | 15d | 15d | 18JUN06 | 18JUL06 | | |
| 10840 | Prime / Paint exterior of building | 10d | 10d | 11JUL06 | 24JUL06 | | |
| 10860 | Tie in exterior site utilities | 5d | 5d | 11JUL06 | 17JUL06 | | |

Start date 18JUL05
Finish date 02MAY07
Data date 18JUL05
Run date 24JUN05
Page number 1A

Coastal Condominiums
VILLA LAGO CONTRACT EXHIBIT " K "

Legend:
- Early bar
- Progress bar
- Critical bar
- Summary bar
- Start milestone point
- Finish milestone point

© Primavera Systems, Inc.

Jun. 24. 2005  4:13PM                    No. 4850   P. 1

| Act ID | Description | Orig Dur | Rem Dur | Early Start | Early Finish | Actual Start | Actual Finish |
|---|---|---|---|---|---|---|---|
| 10900 | Rough in fire sprinklers | 15d | 15d | 13JUL05 | 13JUL05 | | |
| 10910 | Install all interior concrete slabs | 5d | 5d | 01AUG06 | 07AUG05 | | |
| 10920 | Install window bucks, first floor | 5d | 5d | 17MAY08 | 17MAY08 | | |
| 10940 | Caulk first floor buck both sides | 5d | 5d | 15MAY08 | 15MAY08 | | |
| 10950 | Install windows on first floor | 5d | 5d | 15MAY08 | 25MAY08 | | |
| 10960 | Install interior wall framing on first floor | 10d | 10d | 15MAY08 | 26MAY08 | | |
| 11000 | Rough wall and ceiling electric,first floor | 10d | 10d | 17MAY08 | 30MAY08 | | |
| 11020 | Rough in HVAC, first floor | 10d | 10d | 17MAY08 | 30MAY08 | | |
| 11040 | Rough wall plumbing first floor | 15d | 15d | 17MAY08 | 05JUN08 | | |
| 11060 | Wall close in inspections, first floor | 5d | 5d | 25MAY08 | 31MAY08 | | |
| 11080 | Hang all drywall, first floor | 10d | 10d | 01JUN08 | 14JUN08 | | |
| 11100 | Tape block, finish, sand first floor | 10d | 10d | 05JUN08 | 18JUN08 | | |
| 11120 | Install all doors/frames/trim/first floor | 10d | 10d | 01JUN08 | 27JUN08 | | |
| 11140 | Prime paint first floor | 10d | 10d | 12JUN08 | 25JUN08 | | |
| 11160 | Point-up first floor | 5d | 5d | 14JUN08 | 27JUN08 | | |
| 11180 | Final Paint first floor | 10d | 10d | 16JUN08 | 25JUN08 | | |
| 11200 | Install Ceramic flooring/ bathrooms/first floor | 10d | 10d | 22JUN08 | 05JUL08 | | |
| 11220 | Install Kitchen cabinets/vanities/first floor | 15d | 15d | 28JUN08 | 18JUN08 | | |
| 11240 | Install Kitchen counter tops/bath vanities | 15d | 15d | 05JUN08 | 23JUN08 | | |
| 11260 | First trim on Plumbing first floor | 10d | 10d | 05JUN08 | 18JUN08 | | |
| 11280 | Final first floor electrical trim/first floor | 10d | 10d | 07JUL08 | 20JUN08 | | |
| 11300 | Final First floor plumbing/ sprinkler trim | 10d | 10d | 07JUL08 | 20JUN08 | | |
| 11320 | Appliances Installation/first floor | 5d | 5d | 07JUL08 | 24JUN08 | | |
| 11340 | Install all door hardware | 10d | 10d | 19JUL08 | 01AUG08 | | |
| 11360 | Final touch up/clean up/first floor | 10d | 10d | 24JUL08 | 04AUG08 | | |
| 11380 | Final inspections/first floor | 5d | 5d | 07AUG08 | 19AUG08 | | |
| 11400 | Carpet first touch-up | 10d | 10d | 23MAY08 | 19AUG08 | | |
| 11420 | Install window bucks, 2nd floor | 5d | 5d | 23MAY08 | 02JUN08 | | |
| 11440 | Caulk 2nd floor buck both sides | 5d | 5d | 26MAY08 | 05JUN08 | | |
| 11460 | Install windows on 2nd floor | 10d | 10d | 23MAY08 | 06JUN08 | | |
| 11480 | Install interior wall framing on 2nd floor | 10d | 10d | 23MAY08 | 03JUN08 | | |
| 11500 | Rough wall and ceiling electric,2nd floor | 10d | 15d | 15JUN08 | 20JUN08 | | |
| 11520 | Rough in HVAC, 2nd floor | 10d | 10d | 15JUN08 | 20JUN08 | | |
| 11540 | Rough wall plumbing 2nd floor | 10d | 15d | 31MAY08 | 27JUN08 | | |
| 11560 | Wall close in inspections, 2nd floor | 5d | 5d | 28JUN08 | 12JUL08 | | |
| 11580 | Hang all drywall, 2nd floor | 10d | 10d | 28JUN08 | 13JUL08 | | |
| 11600 | Tape block, finish, sand 2nd floor | 10d | 10d | 13JUL08 | 28JUL08 | | |
| 11620 | Install all doors/frames/trim/ 2nd floor | 10d | 10d | 14JUL08 | 27JUL08 | | |
| 11640 | Prime paint 2nd floor | 10d | 10d | 14JUL08 | 31JUL08 | | |
| 11660 | Point-up 2nd floor | 5d | 5d | 18JUL08 | 01AUG08 | | |
| 11680 | Final Paint 2nd floor | 10d | 10d | 18JUL08 | 02AUG08 | | |
| 11700 | Install Ceramic flooring/ bathrooms/2nd floor | 10d | 10d | 24JUL08 | 07AUG08 | | |
| 11720 | Install Kitchen cabinets/vanities/2nd floor | 15d | 15d | 24JUL08 | 11AUG08 | | |
| 11740 | Install Kitchen counter tops/vanities, 2nd | 15d | 15d | 25JUL08 | 14AUG08 | | |

Coastal Condominiums
VILLA LAGO CONTRACT EXHIBIT "K"

| Start date | 18JUL05 |
|---|---|
| Finish date | 02MAY07 |
| Data date | 13JUL05 |
| Run date | 24JUN05 |
| Page number | 2A |

© Primavera Systems, Inc.

Legend:
■ Early bar
■ Progress bar
■ Critical bar
▬ Summary bar
◆ Start milestone point
◆ Finish milestone point