## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: | |
| *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* Case No. 2:09-cv-6687 (E.D.La.) | |
| Omni II (*Wiltz, et al v. Beijing New Building Materials Public Limited Co., et al* 10-361) | |
| Omni III (*Gross, et al v. Knauf Gips, KG, et al* 09-6690) | |
| Omni VII (*Abel, et al v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al* 11-080) | |
| *Hinkley, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* Case No. 2:09-cv-06686 (E.D.La.) | |

## DECLARATION OF LEE WARONKER, MAI, SRA

I, Lee Waronker, declare as follows:

1.       I graduated with a Bachelor of Science in Real Estate from Florida State University and hold a Master of Science in Management from Florida International University's School of Business and Organizational Science. I hold an MAI designation, (No. 6738) and am a

Florida certified General Appraiser, License Number RZ162.  My full background, education and work experience is set forth in Composite Exhibit A, attached hereto on the pages entitled "Appraiser Qualifications."

2.      I have appraised thousands of properties, a representative list which is contained in Composite Exhibit A.  I have also been retained as an expert witness in litigation matters concerning property evaluation in numerous cases. I have provided a listing of those matters, for the last 5 years, also contained in Composite Exhibit B.

3.      I was accepted by the Court, Judge Joseph Farina, in the case of Seifart v. Banner Supply Co., et al., in Miami-Dade County in June 2010 as an expert witness in my field of property appraisal, specifically regarding "stigma" damages and diminution in value of properties containing Chinese manufactured drywall.

4.      In the course of my work in the Seifart matter, other cases, and in my work and research, I have formed opinions regarding diminution in value of homes containing or that contained Chinese manufactured drywall.

5.      A complete statement of all opinions I will express the basis and reasons for them is set forth below.  I have rendered my opinions based on my experience, knowledge and training as a real estate appraiser, the relevant literature and other sources as set forth herein.  All of my opinions are based on a reasonable degree of probability as a real estate appraiser:

a.  The value of homes with defective Chinese manufactured drywall are less valuable than homes without defective Chinese manufactured drywall. Consumers who would purchase a home with defective Chinese manufactured

2

drywall will expect a deep discount on the home due to the need to repair and remediate the home.

b. The value of homes that had defective Chinese manufactured drywall that has been repaired/remediated is less than a similarly situated home that did not have defective Chinese manufactured drywall. Consumers who would purchase a home that had been repaired/remediated with defective Chinese manufactured drywall will expect a discount on the home.

c. The loss in value of homes that have defective Chinese manufactured drywall and that were repaired/remediated with Chinese manufactured drywall is known as "stigma" damages in the real estate and appraiser industry. The consumers fear, whether reasonable or not, is recognized in the real estate and appraisal industry and the stigma damages result in a diminution in value.

d. Consumer expectations in purchasing homes does not vary significantly from state to state. I believe that consumers in the affected states will expect a deep discount when purchasing homes that contain defective Chinese manufactured drywall. Moreover, the stigma damages are continuing in nature.

6. The data or other information considered by me in coming to the above referenced opinions is as follows:

a. Numerous conversations with real estate professionals regarding homes with Chinese drywall;

b. My work, appraisal, the research data, articles, literature and report in the matter of Seifart v. Banner Supply Co., attached hereto as Exhibit "A";

    c.  My experience, knowledge and training as set forth in my CV contained in Exhibit "A";

7.  The list of exhibits that I will use to summarize or support my opinions is contained in Exhibit "A";

8.  My qualifications are set forth in Exhibit A;

9.  I have attached a list of my prior testimony as Exhibit "B";

10.  A retainer for my services in the amount of $10,000.00 has been paid. Any required conferences, depositions or court appearances resulting from litigation will be billed at $275 per hour for principals, $150 per hour for staff appraisers and $50 per hour for researches, additional, and will be billed against the retainer. If the retainer is exhausted, I will continue to bill at the rates set forth above.

May 11, 2011
Date

_____
Lee H. Waronker, MAI, SRA

Sworn to and subscribed before me this 11th day of May, 2011

_____
NOTARY PUBLIC

My Commission Expires: 5-31-13

LINDA F. CLARK
MY COMMISSION # DD 857091
EXPIRES: May 31, 2013
Bonded Thru Budget Notary Services

4

Exhibit "A"

# Waronker & Rosen, Inc.

Real Estate Appraisers and Consultants
5730 S.W. 74th Street, Suite 200
South Miami, Florida 33143
Telephone (305) 665-8890

**Lee H. Waronker, MAI, SRA**  Fax (305) 665-5188  **Josh L. Rosen, MAI**

lee@waronkerandrosen.com   www.waronkerandrosen.com   josh@waronkerandrosen.com

May 27, 2010

Mr. Patrick S. Montoya, Esq.
Colson Hicks Eidson
255 Aragon Avenue, 2nd Floor

*Re:*  Diminution in Value Due to Chinese Drywall
Single Family Residence
4075 Bonita Avenue
Miami, FL 33133
CASE NO. 09-038887 *Seifart v. Knauf Gips KG*
WRI File No. 6424

Dear Mr. Montoya:

We have prepared a **Summary Appraisal Report** of the above referenced property for the purpose of estimating the diminution in the market value due to the existence of Chinese drywall, of the fee simple interest as of April 23, 2010. The terms market value and fee simple interest are defined in the pages of this report. This report has been prepared based on the scope of the work which is detailed on a following page. The reader of the appraisal is strongly advised to read the scope of work so as to understand the scope of this appraisal.

This report is intended for use only by the client and intended users as noted herein. Use of this report by others is not intended by the appraiser. No one else or any other entities should rely on this appraisal other than those noted herein.

The subject property is a two-story single family residence constructed in 2007, having 4 bedrooms, 3 bathrooms and 0 half bath(s). The building area is 4,342 adjusted square feet per the Miami-Dade Property Appraiser's Office. The improvements are situated on a 8,023 square foot site. The subject property is located at 4075 Bonita Avenue, Miami, FL. Zoning on this site is R-1, Single Family Residential, by the city of Miami, Florida allowing for single family residences. Additional discussion of the building improvements and the site can be found within this appraisal report.

Mr. Patrick S. Montoya, Esq.
Colson Hicks Eidson
May 27, 2010


The reader should be advised that our employment was not contingent on the appraisal providing As a result of our investigation, it is our opinion that the diminution in the market value due to the existence of Chinese drywall value, of the fee simple interest as of April 23, 2010, is in the amount of

**EIGHT HUNDRED AND FIFTYSIX THOUSAND DOLLARS**

**($856,000)**

This estimate includes the cost of remediation and holding costs.


Also requested was an estimate solely for the diminution of value after remediation, due to the uncertainty of the previous existence of Chinese drywall. This estimated diminution is estimated as of April 23, 2010 and is in the amount of

**TWO HUNDRED THOUSAND DOLLARS**

**($200,000)**


**This appraisal estimates the market value of the subject property with the hypothetical condition that the Chinese drywall does not exist and then estimates the loss in value due to the existence of the drywall.**

It should be noted that the valuation herein does not include any furniture; however it does include all built-ins and appliances.

On the following pages is the table of contents and scope of work followed by the certificate of value and general assumptions and limiting conditions. It is advised that these items be reviewed so the reader has an understanding of the limitations of this appraisal.


Very truly yours,

Lee H. Waronker, MAI, SRA
State-Certified General Appraiser
License No. RZ162

---

# Table of Contents

Title Page

Letter of Transmittal                                                            1

Table of Contents                                                               3

Scope of Work                                                                   5

Certificate of Value                                                            7

General Assumptions and Limiting Conditions                                     9

Limiting Conditions:                                                           10

**INTRODUCTION**                                                              11

Summary of Pertinent Data                                                      12

Miami-Dade County Map                                                          13

Plat Map                                                                       14

Aerial Photograph                                                              15

Subject Photographs                                                            16

Appraiser Qualifications                                                       26

**DESCRIPTION & ANALYSES**                                                    29

Purpose of the Appraisal Report                                                30

Client, Intended User and Use of the Appraisal Report                          32

Definition of Interest Being Appraised                                         32

Definition of Market Value                                                     33

Location and Address                                                           34

Legal Description                                                              34

Owner of Record                                                                34

History of the Subject Property                                                34

Site Data                                                                      35

Zoning                                                                         35

Flood Zone                                                                     35

Real Estate Assessment and Taxes                                               36

Description of the Building Improvements                                       37

Description of the Site Improvements                                           38

Neighborhood Overview                                                          39

Neighborhood Rating                                                            39

Reasonable Exposure Time                                                       40

Typical Purchaser of the Subject                                               40

Highest and Best Use                                                           41

Appraisal Process                                                              42

Cost Approach                                                                  43

Income Capitalization Approach                                                 44

Sales Comparison Approach                                                      17

Improved Sales Map                                                             19

Reconciliation of Value                                                              34

**ADDENDA**

Addendum A – County Area Description
Addendum B – Flood Zone Map
Addendum C – Articles
- "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values"
- Florida Realtors – White Paper: Chinese Drywall
- Chinese or Defective Drywall Addendum – Sarasota Association of Realtors
- National Association of Home Builders "Builders Rise to the Challenge of Corrosive Chinese Drywall
- Chinese Drywall, A Greenfield White paper
- Punta Gorda-Port Charlotte Realtors Weekly Update quoting Mr. Frank Desguin the Charlotte County Property Appraiser
- Interim Remediation Guidance for Homes with Corrosion from Problem Drywall
- The Florida Senate Issue Brief 2010-311 regarding imported drywall
- In the News, Chinese Drywall Liability: Who's on the Hook?
Addendum D – Remediation Cost Estimate provided by Lahoud & Hardan Enterprises, Inc,

# Scope of Work

The appraisal problem herein is to estimate the diminution in the market value of the subject property due to the existence of Chinese drywall. The following steps are taken within the appraisal to estimate the loss in value due to the existence of Chinese drywall.

1. *Estimate the market value of the residence.* Estimate the hypothetical value of the subject property as of April 23, 2010 without the existence of Chinese drywall and in a condition commensurate with a residence constructed in 2007 and in good to very good condition for its age.

2. *Deduct the cost to cure.* Deduct from the estimated market value as detailed above, the cost to cure the problem. This is the estimated cost to remove the Chinese drywall, rewire, replace air conditioners and restore the house to a condition commensurate with its age.

3. *Deduct additional associated costs.* Deduct costs that would be incurred by the owner associated with obtaining alternative housing during the time required for renovations.

4. *Deduction for associated risk.* Consider and deduct if applicable a risk factor a buyer might associate with the purchase of a house previously constructed with Chinese drywall.

5. *Conclude to an "As Is" value.* The net value indication is the "As Is" value of the subject property with consideration to the existence of Chinese drywall.

6. *Estimated diminution in value.* The difference between the hypothetical value estimate (Item 1) and the "As Is" value estimate (Item 5) is the diminution in value attributable to the existence of the Chinese drywall.

Also requested was an estimate solely for the diminution of value after remediation, due to the uncertainty of the previous existence of Chinese drywall. This value is a *hypothetical value* that considers the house as being remediated per the contract referenced herein and the loss in value.

The valuation approach used herein, the sales comparison approach, is considered sufficient to develop credible assignment results in solving the appraisal problem.

All appraisals begin by identifying the appraisal problem. Data on the subject property is derived from various sources including but not limited to the property owner, the county property appraiser's office, surveys and building plans. When possible, more than one source is utilized to confirm data. Within the appraisal the data source is acknowledged. Should plans or a building sketch be available, the measurements are confirmed for accuracy. Land size is based on surveys (when available), public records and recorded plats. Land measurements are not performed.

Description of the improvements is based on visual inspection and/or plans. The age of the building is based on public records. Appraisers are not structural engineers and therefore cannot attest to the soundness of a structure. Noticeable potential problems such as stress cracks and water damages are noted, if evident.

Comparable improved sales were inspected from the exterior. Sale prices are from public records and are typically confirmed with a party to the transaction, i.e. buyer, seller, real estate agent, or closing attorney. Public records are investigated for mortgage information and terms.

Research of comparables included, but was not limited to, using the following data sources:

    First American Real Estate Solutions Services (FARES)
    Board of Realtors' Multiple Listing Service (MLS)
    Miami-Dade County Property Appraiser (*http://gisims2.co.miami-dade.fl.us/myhome/propmap.asp*)

The MLS is reviewed to indicate up-to-date information of sales and listings. All information is analyzed in processing the appraisal reports and as support for the estimated value.

The scope of work for this assignment has been described above and is to be typical for an assignment of the nature of the subject appraisal problem.

# Certificate of Value

The undersigned does hereby certify that, to the best of my knowledge and belief:

1.   The statements of fact contained in this appraisal report are true and correct.

2.   The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and is my personal, impartial, and unbiased professional analyses, opinions and conclusions.

3.   I have no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

4.   I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.   My engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.   My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.   My analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the following requirements.

- The Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute
- Uniform Standards of Professional Appraisal Practice (USPAP)
- The State of Florida requirements for state-certified appraisers
- FIRREA of 1989 – Title XI and its updates
- Office of the Comptroller of the Currency of the United States of America
- Federal Deposit Insurance Corporation (FDIC)

8.   I have complied with the USPAP Competency Rule.

9.   This appraisal report sets forth all of the limiting conditions imposed by the terms of this assignment or by the undersigned affecting the analyses, opinions and conclusions contained in this report.

10.  No one provided significant real property appraisal professional assistance to the person signing this report, unless specifically noted herein.

11.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives. Additionally, it is subject to review by the state of Florida relating to review by the real estate appraisal subcommittee of the Florida Real Estate Commission.

12. As of the date of this report Lee H. Waronker, MAI, SRA has completed the continuing education program of the Appraisal Institute.

13. I, Lee H. Waronker, MAI, SRA have made a personal inspection of the property that is the subject of this report.

14. The estimated diminution in the market value due to the existence of Chinese drywall, of the fee simple interest as of April 23, 2010, is in the amount of $856,000. The above estimate includes the cost of remediation and holding costs.

15. Also requested was an estimate solely for the diminution of value after remediation, due to the uncertainty of the previous existence of Chinese drywall. This loss in value was estimated as of April 23, 2010 in the amount of $200,000.

16. It should be noted that the valuation herein does not include any furniture; however it does include all built-ins and appliances.

17. I have not performed any valuation services, or a previous appraisal of the subject within the three years prior to this assignment.

18. **This appraisal estimates the market value of the subject property with the hypothetical condition that the Chinese drywall does not exist and then estimates the loss in value due to the existence of the drywall.**

_____
Lee H. Waronker, MAI, SRA
State-Certified General Appraiser
License No. RZ162

*Date:* May 27, 2010

# General Assumptions and Limiting Conditions

This appraisal report has been made with the following general assumptions:

1.  No responsibility is assumed for the legal description or for matters pertaining to legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2.  The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.  Responsible ownership and competent property management are assumed.

4.  The information furnished by others is believed to be reliable but, no warranty is given for its accuracy.

5.  All engineering studies are assumed to be correct. Any plot plans or illustrative material in this report are included only to help the reader visualize the property.

6.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering that may be required to discover them. The values estimated herein are subject to typical inspections such as roof, structural, and termite, if applicable.

7.  It is assumed that the property is in full compliance with all applicable federal, state and local environmental regulations and laws unless the lack of compliance is stated, described and considered in the appraisal.

8.  It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a non-conformity has been identified, described and considered in the appraisal.

9.  It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in this report is based.

10. It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and considered in the appraisal.

11. Existence of hazardous materials, specifically Chinese drywall, was observed by the appraiser. The appraiser has no knowledge of the existence of additional hazardous materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presences of substances such as asbestos, urea formaldehyde foam insulation, or other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired.

12.   The physical condition of the improvements, if any, described herein was based on visual inspection. No liability is assumed for the soundness of structural members, since no engineering tests were made of same.

13.   Neither all nor any part of this appraisal report shall be disseminated to the general public using the appraiser's name or appraisal designation, without prior written consent of the appraisers signing this appraisal report.

14.   Authorization is not allowed for the out-of-context quoting from, or partial reprinting of, this appraisal report.

15.   By reason of the report, there is no requirement to testify with reference to the property herein appraised, unless arrangements have been previously made.

16.   To the best of our ability, the analysis, opinions, and conclusions were developed in this report was prepared in accordance with the standards and reporting requirements of FIRREA of 1989-XI and its updates, the office of the Comptroller of the Currency of the United States of America (OCC), the Federal Deposit Insurance Corporation (FDIC) and the Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation.

17.   The reader should be advised that our employment was not contingent on the appraisal providing a minimum valuation, a specific calculation or the approval of a loan. Additionally, we have complied with the USPAP Competency Rule.


*Limiting Conditions:*


1.   The allocation of total value between land and improvements applies only under the described utilization. The separate valuations for land and improvements must not be used in conjunction with any other appraisal and are invalid if so used.

2.   The Americans with Disability Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the requirements of the ADA. It is possible that a compliance survey of the property and detailed analyses of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the act. If so, this fact could have a negative impact upon the value of the property. Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

# INTRODUCTION



# Summary of Pertinent Data

| | |
|---|---|
| Location: | North side of Bonita Avenue, east of LeJeune Road (a/k/a S.W. 42nd Avenue), Miami, Florida |
| Address: | 4075 Bonita Avenue<br>Miami, FL, 33133 |
| Type of Use: | Two-story single family residence |
| Year Built: | 2007 |
| Building Area: | 4,342 square feet (adjusted area[1]) |
| Bedrooms/Bathrooms/Half Baths: | 4/3/0 |
| Land Area: | 8,023 square feet |
| Value by Cost Approach: | Not applicable |
| Value by Income Capitalization Approach: | Not applicable |
| Value by Sales Comparison Approach: | $1,520,000 |
| **Market Value Estimate of the Fee Simple Interest:** | **$1,520,000[2]** |
| **Diminution in Value (includes remediation):** | **$856,000** |
| **Diminution in Value:** | **$200,000[3]** |
| Date of Valuation: | April 23, 2010 |
| Date of Report: | May 27, 2010 |

---

[1]   The Miami-Dade County Property Appraiser's adjusted square footage. This size includes the gross building area at 100% and various percentages for overhangs, story height, and other areas that are not considered 100% areas.

[2]   Hypothetical value that assumes the subject property has not been affected by Chinese drywall and is in good to very good condition for its age.

[3]   Hypothetical estimate solely for the diminution of value after remediation, due to the uncertainty of the previous existence of Chinese drywall.

# Miami-Dade County Map



# Plat Map



*Introduction*                                            *Residence at 4075 Bonita Avenue, Miami, Florida*

# Aerial Photograph



# Subject Photographs



Front view of the subject property



Close-up view of the subject property



Rear view of the subject property



Close-up of rear of the subject property



Street view looking east along Bonita
Avenue.



Street view looking west along Bonita
Avenue.



Swimming pool

# Interior Views

 

 

## Interior Views *(continued)*







## *Interior Views* (continued)







## *Interior Views* (continued)







*Introduction*                                    *Residence at 4075 Bonita Avenue, Miami, Florida*

## *Interior Views* (continued)







## Interior Views *(continued)*







## *Interior Views* (continued)







## *Interior Views* (continued)







# Appraiser Qualifications

## LEE H. WARONKER, MAI, SRA

**Education**:     Master of Science in Management, School of Business and Organizational Science, Florida International University, 1981 (Major – Real Estate)

Bachelor of Science Degree, The Florida State University, Tallahassee, Florida 1976 (Major – Real Estate)

**Affiliations**:   MAI Designation (No. 6738) awarded by the Appraisal Institute in 1983.

State-Certified General Appraiser, State of Florida, License Number RZ162, May 1990.

**Experience**:    Appraised various types of properties, including:

| | | |
|---|---|---|
| Industrial Buildings | Restaurants | Warehouses |
| Office Buildings | Hotels and Motels | Hospitals |
| Service Stations | Retail Stores | Marinas |
| Churches & Synagogues | U.S. Post Offices | Historical Buildings |

President, **Waronker & Rosen, Inc.,** (formerly Waronker & Associates, Inc.) Miami, Florida, from 1987 to present. Vice President, **Property Consultants, Inc.** from 1979 to 1986. Appraiser, The Keyes Company, 1978 to 1979. Appraiser, Miami-Dade County Department of Right-of-Way, 1977 to 1978.

**Instructor:**   Appraisal Institute. Taught Courses 1A-1, 1A-2, 8-2, 1B-A, 1B-B, 110, 120, 210, 310, 320, 410, 420, 430, 510, 550, 600, 610 and 620, et al

**Other**:        Special Master for the Dade County Valuation Adjustment Board, 1989 to 1996. Assisted in the editing of *The Appraisal of Real Estate, 11th Edition and 13th Edition*

President of the Miami Chapter of the Appraisal Institute, 1990 to 1991.

**Author:**       Seminars entitled *"Dynamics of Office Building Valuation", "Why the Capitalization Rate is Always 10" and the "Appraisal of Real Estate 10th vs. 11th Edition".*

# Partial Client List

**LENDER**
BAC Bank
Banco Popular, N.A.
BankAtlantic
BankUnited
Bank of America
Bank of Coral Gables
Bank Leumi
BNY Mellon Bank
Branch Banking and Trust (BB&T)
Broward Bank of Commerce
CNL Bank
Cigna Investments, Inc.
Citibank and Citicorp
City National Bank of Florida
Coconut Grove Bank
Comerica Bank
Credit Suisse First Boston Mtg. Capital, LLC
Enterprise Bank of Florida
Espirito Santo Bank of Florida
Executive National Bank
Fifth Third Bank
First Bank Puerto Rico d/b/a First Bank
    Florida
First National Bank of South Miami
Florida Community Bank
Gibraltar Private Bank and Trust
Great Florida Bank
Gulf Coast National Bank
Holliday Fenoglio Fowler, LP
International Finance Bank
Israel Discount Bank of New York
JP Morgan Chase Bank
Lydian Bank
Lloyds International Bank (Lloyds of London)
Lutheran Brotherhood
Marine Bank
Mercantile CommerceBank, N.A.
Morgan Stanley Mortgage Capital
Northern Trust Bank
Ocean Bank
Orix Real Estate Capital Markets, LLC
Premier American Bank
Professional Bank
Regions Bank

R-G Crown Bank
Sabadell United Bank
Seacoast National Bank
SunTrust Bank
TD Bank
The Bank of Miami
TIB Bank
Totalbank
U.S. Century Bank
Union Credit Bank
Wells Fargo
Western Bank – Puerto Rico

**LIFE INSURANCE COMPANIES**
Allstate Insurance Company
American General Life Insurance Company
Fortis Capital Corp. and Life Insurance Co.
Franklin Life Insurance Company
General American Life Insurance Company
Independent Order of Foresters
John Alden Life Insurance Company
Kansas City Life Insurance Company
Lumberman's Life Insurance Company
Omaha Woodmen Life Insurance Society
Standard Life Insurance Company
Sun Life Insurance Company of America

**CORPORATIONS**
Church of Jesus Christ of the Latter-Day Saint
Florida Power and Light Corporation (FPL)
JC Penny Corporation
Wendy's International Corporation
Chevron U.S.A. Inc.
PBS and J
Johnson and Johnson Company

**DEVELOPERS AND INVESTORS**
Berkowitz Development Group
Bristol Group, Inc.
Constructa Development
Franklin Street Properties
Flagler Development Corporation
Goldman Properties
Hampshire Real Estate Companies
Hotels AB

Lennar Corporation
Napolitano Realty and Harnap Corporation
Noble House Resorts and Hotels
Ocean Properties, Ltd
Panther Real Estate
PLC Investments, LLC
R.K. Associates, Inc.
The Scott Robins Companies
Wometco Enterprises, Inc.

**GOVERNMENT AGENCIES**
Broward County School Board
City of Coral Gables
City of Miami Beach
City of Miami General Services Administration
Federal Deposit Insurance Corp. (FDIC)
Federal Home Loan Mortgage Corp. (FHLMC)
Florida Dept. of Environmental Protection
Florida Department of Transportation
Florida Keys Aqueduct Authority
Miami-Dade Water and Sewer Authority
Miami-Dade Co. – Aviation Authority
Miami-Dade Co. – County Attorney's Office
Miami-Dade Co. – General Services Administration
Miami-Dade Co. – Housing & Urban Development
Miami-Dade Co. – Public Works Department
Miami-Dade Co. – School Board
Nature Conservancy, Florida Chapter
South Florida Water Management District
United States Department of Justice
United Stated General Services Administration
United States Postal Services
Village of Pinecrest

**LAW FIRMS**
Akerman, Senterfitt & Eidson
Barranco, Kircher, P.A.
Berman, Wolfe Rennart Vogel & Mandler, P.A.
Greenberg Traurig, P.A.
Gunster Yoakley Valdes-Fauli & Stewart, P.A.
Holland & Knight
Kirkpatrick and Lockhart
Stearns, Weaver, Miller, Weissler, Alhadeff &
    Sitterson, P.A.
Steel Hector and Davis

# Notable Properties Appraised

## *Miami-Dade County*

| | | | |
|---|---|---|---|
| Miami Seaquarium | Virginia Key | Miami Free Zone – Global Trade Cntr | Miami |
| Miami International Airport | Miami | Metropolitan Hospital of Miami | Miami |
| City of Miami Correctional Facility | Miami | Spinnaker Marina | North Miami |
| Country Club of Miami Golf Course | Miami | Virginia Key & Rickenbacker Marinas | Key Biscayne |
| Mel Reese Golf Course | Miami | Waterways Yacht Basin | Miami |
| Burger King Headquarters – Waterford | Miami | Porto Vita Club and Spa | Aventura |
| Doctors Hospital | Coral Gables | Ocean Steps Entertainment Center | S. Miami Beach |
| Beacon Centre Development | Miami | Indian Creek Country Club | Indian Creek |
| FBI Headquarters | Miami | BIV Tower | Miami |
| Gables Waterway Executive Center | Coral Gables | Courthouse Tower | Miami |
| Joe's Stone Crab restaurant | Miami Beach | South Shore Hospital | Miami Beach |
| Doral Ocean Beach Resort (formerly) | Miami Beach | SouthCom Headquarters | Miami |
| Metro-Dade Bus Facility | Miami | | |

## *Fort Lauderdale/Broward County*

| | |
|---|---|
| Florida Medical Center (Hospital) | Ft. Lauderdale |
| Jackson Marine Center | Ft. Lauderdale |
| Las Olas Centre Office Building | Ft. Lauderdale |
| Martha's Restaurant | Hollywood |
| Various Luxury Single Family Homes | Fort Lauderdale |
| Seneca Industrial Park | Pembroke Park |

## *Monroe County/Florida Keys*

| | |
|---|---|
| Marriott Key Largo Bay Beach Resort | Key Largo |
| Islander Resort | Islamorada |
| Hawk's Cay Resort, Marina and DRI | Duck Key |
| Westin, formerly Hilton Resort and Sunset Key Island | Key West |
| Little Palm Island | Little Torch Key |
| Louis' Backyard Restaurant | Key West |
| Ocean Key Resort | Key West |
| Sloppy Joe's Bar | Key West |
| Truman Annex - Navy Base | Key West |

## *Other Florida Counties*

| | |
|---|---|
| Jupiter Beach Resort | Jupiter, Palm Beach County |
| La Playa Beach Resort | Naples, Collier County |
| Sheraton Four Points | Orlando, Orange County |
| Spring Hill Suites | Tampa, Hillsborough County |
| Hilton Carillon Park | St. Petersburg, Pinellas County |

## *Outside of the United States*

| | |
|---|---|
| Various Single Family Homes | Cat Cay, Bahamas |
| Single Family Home | Casa de Campo, Dominican Republic |
| Sapphire Beach Resort | St. Thomas,  U.S. Virgin Islands |
| Hotel Site | Grand  Turks and Caicos Islands |
| Montego Beach Resort | Montego Bay, Jamaica |
| Botany Bay Subdivision (400 acres) | St. Thomas, U.S. Virgin Islands |
| Ocean Club Resort | Grand Turks and Caicos Islands |
| Land lease under Ritz Carlton | San Juan, Puerto Rico |
| Various Land Holdings | St. Croix,  U.S. Virgin Islands |
| Vacant Land | West End, Grand Bahama Island |

# DESCRIPTION & ANALYSES



# Discussion of the Appraisal Problem

Due to shortages of drywall in the period of 2004 to 2007, a large percentage of drywall was imported from China to keep up with the demand levels caused by new construction and also reconstruction due to hurricanes.

The valuation herein is an estimate of the diminution in value due to the existence of Chinese drywall. The drywall within the subject property has been identified as defective Chinese drywall which is the type that has concentrated levels of sulfur and other substances that produce corrosive gases and odor. These gases have been diagnosed as being harmful to the residents and also have corroded electrical appliances, electrical wiring and copper piping.

Recently U.S. District Judge Eldon Fallon in New Orleans issued a ruling that "Plaintiffs purchased a new home and are entitled to have it restored to a new condition (i.e. without corrosion, tarnishing, residue or other damage to wiring and other components)". The ruling was required that the defendants pay for stripping the house to its studs and to replace electrical appliances. This ruling supports the claim and concern due to the existence of Chinese drywall.

Other evidence as to the concern for the existence of Chinese drywall includes;

1. *Florida Realtors – White Paper: Chinese Drywall* (refer to Addendum C herein). This paper addresses the concerns of the existence of Chinese drywall and also provides a summary of the history of this drywall. They estimate 36,000 homes to "contain Chinese-made drywall".

2. *Sarasota Association of Realtors – Chinese or Defective Drywall Addendum* (refer to Addendum C herein). Addendums have been created to address the seller's obligation to disclose the presence of defective Chinese drywall. This addendum details that this defective drywall "emits a strong sulfur-like odor or fume which may cause the residents of the home to experience health problems." Further it states "The only known way to eliminate the fumes and the health problems and to stop the damage to the above-mentioned structural systems and system components is to remove and replace all of the defective drywall in the residence, which can be very costly. Finally, the presence of Chinese or defective drywall, the fumes, and the damaged systems, if not remedied, can impact the value or salability of the property."

3. *National Association of Home Builders - Addendum* (refer to Addendum C herein). This association has gone on record as to the steps necessary to remediate the Chinese drywall problem. The article quotes the attorney for the NAHB that the methods suggested by NAHB are consistent with that of the Louisiana court.

Below is a chart created by Mr. Randall Bell, MAI illustrating the value of a property over time which has been subjected to a detrimental condition, such as Chinese drywall.  This chart has Point A as the unimpaired value prior to discovering the detrimental condition.  Point B is a loss in value due to the existence of the detrimental condition. After point B comes the assessment (Point C), repair (Point D), on-going (Point E) and market resistance/risk (Point F). This chart illustrates that the loss in value is comprised of;

1. Assessment –          Cost & Responsibility, Use & Uncertainty Factor (Risk)
2. Repair -               Cost & Responsibility, Use & Project Incentive (Risk)
3. On-going -            Cost & Responsibility Use
4. Market Resistance -   Risk



# Purpose of the Appraisal Report

The purpose of this appraisal is to estimate the diminution in the market value due to the existence of Chinese drywall, of the fee simple interest as of April 23, 2010. Also requested was an estimate solely for the diminution of value after remediation, due to the uncertainty of the previous existence of Chinese drywall.The term fee simple interest is defined below. The term market value is defined on the following page.

# Client, Intended User and Use of the Appraisal Report

The intended user of this appraisal is Patrick S. Montoya of Colson Hicks Eidson. The intended use of this appraisal is for litigation support in CASE NO. 09-038887 *Seifart v. Knauf Gips KG.*

# Definition of Interest Being Appraised

The interest appraised herein is that of the unencumbered fee simple interest, defined as follows:

> *Fee Simple Interest*:  an absolute fee without limitations to any particular class of heirs, but subject to the limitations of eminent domain, escheat, police power and taxation. An inheritable estate.

# Definition of Market Value

Market Value is a major focus of most real estate assignments. Both economic and legal definitions of market value have been developed and refined. A current economic definition agreed upon by federal financial institutions in the United States of America is:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.  buyer and seller are typically motivated;

2.  both parties are well informed or well advised and acting in what they consider their own best interest;

3.  a reasonable time is allowed for exposure to the open market;

4.  payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5.  the price represents a normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

The above definition is suggested by FIRREA of 1989- Title XI and its updates, the Uniform Standards of Professional Appraisal Practice (USPAP), the Appraisal Institute, the Federal Deposit Insurance Corporation and was the basis of the valuation in this appraisal.

*Source*:      Code of Federal Regulations: Title 12; - Bank and Banking
             Chapter I – Comptroller of the Currency, Department of the Treasury;
             Part 34 – Real Estate Lending and Appraisals – Subpart C – Appraisals, Section 34.42
             Definitions;
             *Revised as of January 1, 2000*

# Location and Address

The subject property is located at the north side of Bonita Avenue, east of LeJeune Road (a/k/a S.W. 42nd Avenue), Miami, Florida.

*Address*:          4075 Bonita Avenue
                    Miami, FL 33133

# Legal Description

The East 5 feet of Lot 17, and of Lot 18, and the West 16 feet of Lot 19, Block 2, AMENDED PLAT OF BONITA PARK, as recorded Plat Book 8 at Page 8 of the Public Records of Miami-Dade County, Florida.

*Source:  recording instrument (ORB 26231, Page 2047)*

# Owner of Record

Armin G. Seifart and Lisa Seifart, husband and wife
4075 Bonita Avenue
Miami, Florida 333133

*Source:  www.miamidade.gov/pa & recording instrument (ORB 26231, Page 2047)*

# History of the Subject Property

This property was last sold in February 2008 for $1,660,000. This sale was recorded in the Public Records in Miami-Dade County Official Records Book 26231, Page 2037. The subject property is not under contract nor listed for sale.

*Source:   www.miamidade.gov/pa & recording instrument (ORB 26231, Page 2047)*

# Site Data

The subject site is basically rectangular. There is frontage of approximately 71 feet along the north side of Bonita Avenue, a two lane asphalt paved road in average condition. Depth is approximately 113. The total area of the parcel is approximately 8,023 square feet as per the Miami-Dade County Property Appraiser's Office. The subject property is accessible from the north side of Bonita Avenue.

The site is level and at approximate street grade. Utilities available to the site are:

|  |  |
|---|---|
| Electric: | Florida Power and Light |
| Telephone: | AT&T |
| Water: | Miami-Dade Water and Sewer Authority |
| Sewer Disposal: | Miami-Dade Water and Sewer Authority |

# Zoning

The subject property is zoned R-1, Single Family Residential by the city of Miami, Florida. This zoning allows for the construction of single family residences. For a detailed listing of allowable uses and restrictions, refer to the the city of Miami zoning code.

***Source:***   *www.municode.com*

# Flood Zone

The subject property is located in Flood Zone X. This identification was located on Flood Insurance Rate Map, Community Panel No. 12086C0459L revised September 11, 2009. **For insurance purposes, a surveyor should be contacted to verify the exact zone by a flood elevation certificate, as well as its impact on insurance.** A copy of the flood zone map is located in the addenda to this report.

# Real Estate Assessment and Taxes

The subject property is identified by the Miami-Dade County Property Appraiser as tax folio number 01-4129-017-0140. Following is a breakdown of the assessment:

| Tax Assessment Analysis | Total Assessment | Sq.Ft. Size* | Assessment per Sq.Ft. |
|---|---|---|---|
| Assessed Land Value | $344,989 | 8,023 | $43.00 |
| Assessed Value of Improvements | $491,747 | 4,342 | $113.25 |
| Total Assessed Value | $836,736 | 4,342 | $192.71 |

*This is the size per the Miami-Dade County Property Appraiser's records.

The applicable millage rate is 22.9921. Therefore, the real estate taxes may be estimated as follows:

| Tax Calculation | Taxes |
|---|---|
| Millage Rate (Millage Rate ÷1,000) | .0229921 |
| Total Assessed Value | x $836,736 |
| Estimated Real Estate Taxes | $19,238 |

The above assessment represents the Miami-Dade County Property Appraiser's estimate of market value. Taxes are based on the assessed value. The subject property has Homestead Exemption which allows for a $25,000 reduction from the assessed value and restricts increases in the assessed value. The assessed value is $786,736.

Florida Statutes require assessments to be at 100% of market value less cost of sale. Cost of sale ranges from nothing to 15%, with the Miami-Dade Property Appraiser's office designating 15%. Based upon the existence of Chinese drywall the assessed value should be appealed as it is above what is appropriate due to this condition.

# Description of the Building Improvements

The improvements were inspected on April 23, 2010 and the public records were also examined. No plans were provided, therefore, this discussion was based upon a visual inspection. Following is a summary of the major components.

| | |
|---|---|
| Type of Building: | Two-story single family residence |
| Bedrooms/Baths/Half Baths: | 4/3/0 |
| Year Built: | 2007 |
| Size (Adjusted Area): | 4,342 square feet |
| Exterior Walls: | Concrete block with a painted stucco finish |
| Foundation: | Reinforced concrete footing |
| Roof Cover: | Barrel tile |
| Floors: | Concrete, covered by marble tile and wood |
| Interior Walls: | Painted drywall |
| Windows: | Aluminum hung, fixed pane, and French doors |
| Lighting: | Fixtures, chandeliers and recessed lighting on the interior, with sconces, dropped fixtures and spot lights on the exterior |
| Garage: | Two cars with electric door openers |
| Air Conditioning: | Multi-zone (2) central air and heating system |
| Appliances: | Side by side refrigerator (GE Monogram), oven, microwave, range, fan and hood |

Others:
- Balconies with wrought iron railing
- Laundry room with wood cabinets, washer and dryer, granite tops and sink
- Built-in wood closets
- Marble tile floors and walls in some bathrooms and tile in others
- Rear patio with paddle fans and light fixtures
- Wood shutters on some windows
- Staircase has marble floors
- Master bathroom has Jacuzzi tub
- Wood kitchen cabinets with granite tops
- Walk-in shower with multiple sprayers in the master bathroom. Tiles floor and walls with pane glass windows.

## Condition of the Improvements

The subject property's improvements were constructed with Chinese drywall and at the time of inspection holes were cut into the drywall and patches of drywall had been removed. The value herein is an estimation of the diminution in value due to the existence of Chinese drywall. **This appraisal estimates the market value of the subject property with the hypothetical condition that the Chinese drywall does not exist and then estimates the loss in value due to the existence of the drywall. Also estimated was a loss in value solely for the diminution of value after remediation, due to the uncertainty of the previous existence of Chinese drywall.**

## Description of the Site Improvements

Driveway                                  Brick paved driveway

Fencing/Wall:                             Wrought iron fence with concrete posts in front yard

Landscaping:                              Attractively landscaped including palm trees, round cover, hedges, shade trees and sod.

Miscellaneous:                            Swimming pool and patio (pavers)
                                          Sprinkler system
                                          Electronic entry gate

# Neighborhood Overview

**General Neighborhood Data**

| | |
|---|---|
| Location: | Suburban |
| Built Up: | 90% to 100% |
| Growth Rate: | Stable |
| Property Values: | Slight decrease |
| Demand/Supply: | Oversupply |
| Present Land Use: | Residential |
| Change in Present Land Use: | Not likely |
| Predominant Use: | Residential |

**Neighborhood Rating**

| | |
|---|---|
| Adequacy of Shopping: | Good |
| Employment Opportunity: | Good |
| Recreational Facilities: | Good |
| Adequacy of Utilities: | Good |
| Property Compatibility: | Good |
| Protection from Detrimental Condition: | Good |
| Police and Fire Protection: | Good |
| General Appearance of Properties: | Good |
| Appeal to Market: | Good |

**Adjacent Uses**

| | |
|---|---|
| East: | Single family residential |
| West: | Single family residential |
| South: | Single family residential |
| North: | Single family residential |

| **Linkage** | **Distance** | **Access** |
|---|---|---|
| Public Transportation: | Within a few blocks | Good |
| Employment Centers: | Two to three miles | Good |
| Expressway Access: | Three to five miles | Above average |
| Miami International Airport: | Five to seven miles | Above average |

# Reasonable Exposure Time

Reasonable exposure time is always presumed to precede the effective date of the appraisal. Reasonable exposure time is the estimated time the property would have been offered on the market prior to a hypothetical sale at market value on the effective date of the appraisal. The actual exposure time may differ from reasonable exposure time. Reasonable exposure time varies by type of real estate. A property may be exposed to the market for an extended period of time if it is overpriced. This analysis considers reasonable exposure time at a market related price such as the estimated market value(s) herein

In estimating a reasonable exposure time for the subject property the Multiple Listing Service was referenced for the days on market for the sales used herein and other sold residences in the area. The statistics for properties in subject zip code indicated an average of 140 days on the market for the active listings. The four sales used in the sales comparison approach ranged from four to 198 days on market with an average of 105 days. Based on these statistics the estimated reasonable exposure time is four to six months. This estimate of reasonable exposure time considers that the property would have been properly marketed and priced. It also considers the hypothetical assumption that there is no existence of Chinese drywall. If the property were not to have been priced correctly or marketed through proper channels, then it is not likely that the estimated market value and the estimated reasonable exposure time would have been achieved.

With consideration to the existence of Chinese drywall the marketing time would increase as there would be fewer buyers interested in purchasing a house with the existence of Chinese drywall. After remediation there would be more buyers that would consider a purchase, however the marketing time and price would be effected.

# Typical Purchaser of the Subject

The subject is a single family residence and the immediate area consists of similar single family residences. The typical purchaser of the subject would be an owner-user. The typical buyer of a home with the existence of Chinese drywall might be an investor or contractor that would purchase the house, make the needed restorations and then resell it after the renovations for a profit.

# Highest and Best Use

The site is valued for its highest and best use, which may be defined as follows:

That reasonable and probable use that will support value
as defined as of the effective date of the appraisal.

In analyzing the highest and best use, the following four questions are answered:

1.   **Legally Permissible.** What uses are legally permitted on the subject site with respect to zoning ordinances and deed restrictions?

2.   **Physically Possible.** What uses of those legally allowed are physically possible on the subject site?

3.   **Financially Feasible.** Of those uses determined to be physically possible and legally permissible, which ones will produce a positive return?

4.   **Maximally Productive.** Of those that are feasible, legally permissible, and physically possible, which will produce the highest rate of return or value?

*As Improved*

Single family residence

*As Vacant*

Single family residence

# Appraisal Process

An analysis of three separate approaches to value, sales comparison approach, cost approach, and income capitalization approach will be considered to estimate the value of the subject property. Although these three approaches to value are considered within every appraisal report, they may not be applicable to each and every property being appraised.

The cost approach is based on the principle of substitution which states that an informed purchaser would not pay more for a property than the cost of reproducing a property with the same utility. The cost approach can often yield reliable estimates of value for new construction. This approach entails estimating the cost of producing the improvements, deducting an estimate of depreciation, then adding the value of the site as if vacant. To this value an entrepreneurial incentive is added to arrive at the estimated value by the cost approach.

The income capitalization approach is based on the concept that value is created by the expectations of future benefits and higher earnings should result in higher values. Income producing real estate is purchased for the right to receive future income. The income capitalization approach consists of methods to analyze a property's capacity to generate income, and a reversion, and convert these monetary benefits into an estimate of value.

The sales comparison approach is based on the principle of substitution which suggests that, within competitive markets, similar products will realize similar prices. Inherent in this concept is the premise that a purchaser would not pay more for a property than the cost to acquire another property with the same amenities and utility.

The final steps in the appraisal process are review and reconciliation of the data and conclusions. In reaching a final conclusion of value, the entire process involving the approaches that were estimated must be reviewed for accuracy, completeness and consistency. After analysis, evaluation and reconciliation of the indications a value is estimated. The essence of this final reconciliation should be a defensible and rational conclusion of value.

The only approach used in this appraisal is the sales comparison approach. The cost approach and the income capitalization approach were considered not applicable in valuing the subject property as it is a single family residence and these approaches are not typically used by purchasers when acquiring a residence.

# Cost Approach

The basis of the cost approach is the principle of substitution. This principal suggests that a prudent buyer would not pay more for a property than the cost to acquire a similar site and construct comparable improvements.

Following are the procedures for preparing the cost approach.

1.  Estimate the value of the land as though vacant and available to be developed to its highest and best use.

2.  Determine which cost basis is most applicable to the assignment: reproduction cost or replacement cost.

3.  Estimate the direct (hard) and indirect (soft) costs of the improvements as of the effective appraisal date.

4.  Estimate an appropriate entrepreneurial profit or incentive from analysis of the market.

5.  Add estimated direct costs, indirect costs, and the entrepreneurial profit or incentive to arrive at the total cost of the improvements.

6.  Estimate the amount of depreciation in the structure and, if necessary, allocate it among the three major categories: physical deterioration, functional obsolescence, and external obsolescence.

7.  Deduct the estimated depreciation from the total cost of the improvements to derive an estimate of their depreciated cost.

8.  Estimate the contributory value of any site improvements that have not already been considered. (Site improvements are often appraised at their contributory value - i.e., directly on a depreciated-cost basis - but may be included in the overall cost calculated in Step 2 and depreciated, if necessary).

9.  Add the land value to the total depreciated cost of all the improvements to arrive at the indicated value of the property.

10. Adjust the value conclusion if for any personal property (e.g., furniture, fixtures, and equipment) or intangible assets are included in the appraisal assignment. If necessary this value, which reflects the value of the fee simple interest, may be adjusted for the property interest being appraised to arrive at the indicated value of the specified interest in the property. [1]

Purchasers of this type property do not typically rely on a cost approach.

---

[1] *The Appraisal of Real Estate, 13th Edition, 2008, Page 384 and 385*

# Income Capitalization Approach

Income producing real estate is typically purchased as an investment, and from an investor's point of view earning power is the critical element affecting property value. One basic investment premise holds that the higher the earnings, the higher value, provided the amount of the risk remains constant. An investor who purchases income-producing real estate is essentially trading present dollars for the expectation of receiving future dollars. The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value.[1]

In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value. The principle of anticipation is fundamental to the approach.[2]

The subject property is a single family residence to which the income capitalization approach is not applicable.

---

[1]   Appraisal of Real Estate, 13th Edition, 2008, Page 445
[2]   Ibid., 445

# Sales Comparison Approach

The *sales comparison approach* is based on the principle of substitution. *The principle of substitution holds that the value of a property tends to be set by the price that would be paid to acquire a substitute property of similar utility and desirability within a reasonable amount of time.*[1]

In the sales comparison approach, an opinion of market value is developed by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract (i.e., for which purchase offers and a deposit have been recently submitted). A major premise of the sales comparison approach is that an opinion of the market value of a property can be supported by studying the market's reaction to comparable and competitive properties.

Qualitative analysis is a relative comparison process without mathematics. Sales are ranked based upon their desirability as compared to the subject. Comparisons can be expressed as plus or minus as opposed to dollar or percentage adjustments.

Quantitative analysis is the process of applying mathematical techniques. Sales are adjusted to the subject property on a dollar or a percentage basis. One method of supporting adjustments is through *paired data analysis*. This method analyzes two sales and attributes the difference in their sales prices to the characteristic which is different. This analysis requires an abundance of sales data which is frequently not available.

Qualitative analysis is used herein to estimate a value by the *sales comparison approach*. Characteristics of the sales considered superior to the subject are given a minus (-) adjustment. Those characteristics of the sales considered inferior to the subject are given a plus (+) adjustment. Each sale is given an overall adjustment indicating how it compares to the subject.

On the following page is a grid of the sales used for comparison.

---

[1] The Appraisal of Real Estate 13th Addition, 2008, page 298-299

*Waronker & Rosen, Inc.* ❖ *Real Estate Appraisers & Consultants*

# Improved Sales Grid

Following is an improved sales grid of the comparable properties used for comparison to the subject property.

| Sale No. | Sale Date | Location | Sale Price | Bldg. SF (A) | Price per Sq.Ft. (B) | Land Size | Year Built |
|---|---|---|---|---|---|---|---|
| 1 | 4/10 | 6311 Leonardo Street | $1,900,000 | 4,756 | $399 | 13.500 | 2008 |
| 2 | 9/09 | 3851 Battersea Road | $1,520,000 | 4,163 | $365 | 8,300 | 2008 |
| 3 | 12/09 | 4160 La Playa Boulevard | $2,200,000 | 5,240 | $420 | 14,012 | 2000 |
| 4 | 4/10 | 4191 El Prado Boulevard | $1,200,000 | 4,326 | $278 | 9,861 | 2007 |
| 5 | Pending | 4051 Woodridge Road | $1,689,000 | 4,647 | $363 | 9,380 | 2008 |
| 6 | Asking | 4041 Ensenada avenue | $1,699,000 | 4,500 | $378 | 6,750 | 2009 |
| 7 | Asking | 4074 Bonita Avenue | $1,785,000 | 3,667 | $487 | 7,797 | 2008 |
| **Subject** | **2/08** | **4075 Bonita Avenue** | **$1,660,000** | **4,342** | **$382** | **8,023** | **2007** |

(A)   Miami-Dade County Property Appraiser's adjusted square footage
(B)   Includes land

On the following page is a map indicating the location of the sales and the subject.

# Improved Sales Map





Sale 1



Sale 2



Sale 3



Sale 4



Sale 5

## Adjustment Grid

Below is a grid which illustrates qualitative adjustments used to compare the comparable sales to the subject property. Percentage adjustments were not utilized. In order to utilize percentage adjustments it would be necessary to pair (compare) sales to extract value differences. This is difficult as there is normally insufficient data to provide pairings for all value differences. Below is a grid which illustrates the adjustments made. A plus (+) sign indicates the unit of comparison of the sale must be adjusted upward as that characteristic is inferior to the subject. A minus (−) sign indicates the unit of comparison of the sale must be adjusted downward since the characteristic is superior to the subject. An equal (=) sign indicates the comparable sale characteristic is similar to the subject.

| Sale No. | Price/ Sq.Ft. | Market Conditions | Location | Age/ Condition | Bldg. Size | Land Size | Other | Overall Adjustment |
|---|---|---|---|---|---|---|---|---|
| 1 | $399 | = | = | = | + | -- | = | - |
| 2 | $365 | - | = | = | = | = | = | - |
| 3 | $420 | - | = | + | + | -- | = | - |
| 4 | $278 | = | + | = | = | - | + | + |
| 5 | $363 | - | = | = | + | - | = | - |

After considering the individual differences, either a plus (+), minus (−) or equal (=) sign has been placed in the "Overall" column. This indicates the overall adjustment that the sale would require as compared to the subject property.

## Analysis of Sales

Following is the discussion and comparison of various characteristics of the sales as compared to the subject property.

**Financing:**

The financing of the sales did not indicate any adjustments of their sale prices are warranted for favorable financing.

**Conditions of Sale:**

All of the sales were arm's length transactions. No evidence was found that would suggest that any of the sales were not a fair sale. An arm's length sale means that the buyer and seller are each acting prudently, knowledgeably, and under no necessity to buy or sell, i.e., a sale that is other than in a forced or liquidation sale. In addition, none of the sales were purchased by adjoining owners, whereby a premium was paid for assemblage. Therefore, no adjustments were made to any of the sales.

**Market Conditions (Time):**

The real estate market has been indicating a downward trend. The sales occurring in 2009 were adjusted downward to reflect selling during superior market conditions.  The sales in 2010 were not adjusted. Sale 5 is the asking price at the time it went pending.  The actual sales price will be less, therefore this sale was adjusted downward.

**Location:**

All of the sales are considered generally comparable in location with the exception of Sale 4 which has a side yard that fronts on a busy street (LeJeune Road). Sale 4 was adjusted upward for the inferior location.

**Age/Condition:**

Only Sale 3 built in 2000 required adjustment for age. The remaining sales were all similar in age and did not require adjustment.

**Building Size:**

These adjustments are based on the principles of economies of scale, whereby given all other characteristics being similar, larger properties tend to sell for less per square foot and smaller properties tend to sell for more per square foot. The sales that were larger than the subject were adjusted upward, the sales that are smaller were adjusted downward and those considered comparable in size were not adjusted.

**Land Size:**

Sales having larger lots were adjusted downward as they are superior and those with smaller lots were adjusted upward as they are inferior. Sales having comparable lot sizes were not adjusted.

**Other:**

Sale 4 does not have a swimming pool and was adjusted upward for the lack of this amenity.

## Conclusion of Value by the Sales Comparison Approach

The sales comparison approach compared similar properties to the subject property and adjustments were made for the pertinent characteristics. Based on these comparisons a value was estimated for the subject property.

Based upon the adjustment grid the subject should be valued above Sale 4 ($278/sq.ft.) and below Sales 1, 2, 3 and 5 ($363 to $420/sq.ft.). Sale 2 ($365/sq.ft.) was adjusted only for market conditions and is considered the best comparison overall.

Based upon analysis of these and other factors affecting value described above, it is concluded that the subject property has a value of $350 per square foot times 4,342 adjusted square feet, equal to $1,520,000, rounded.

**The above value estimate is considered a hypothetical value as it assumes the subject property to be in a condition consistent with its age (built in 2007). Since the subject is not in that condition this is a hypothetical situation as it is contrary to what exists. This valuation and assumptions are needed as a basis for estimating a diminution in value due to the existence of Chinese drywall.**

On the following page begins the analysis for the diminution in value.

# Diminution in Value

On the previous page a value was estimated for the subject property if not affected by Chinese drywall.  The existence of Chinese drywall within the subject property has been verified and there is evidence of negative effects.  The following steps are used to estimate the diminution in value due to Chinese drywall.

1. *Estimate the market value of the residence.* Estimate the hypothetical value of the subject property as of April 23, 2010 without the existence of Chinese drywall and in a condition commensurate with a residence constructed in 2007 and in good to very good condition for its age.

2. *Deduct the cost to cure.*  Deduct from the estimated market value as detailed above, the cost to cure the problem. This is the estimated cost to remove the Chinese drywall, rewire, replace air conditioners and restore the house to a condition commensurate with its age.

3. *Deduct additional associated costs.* Deduct costs that would be incurred by the owner associated with obtaining alternative housing during the time required for renovations.

4. *Deduction for associated risk.* Consider and deduct if applicable a risk factor a buyer might associate with the purchase of a house previously constructed with Chinese drywall.

5. *Conclude to an "*As Is*" value.* The net value indication is the "As Is" value of the subject property with consideration to the existence of Chinese drywall.

6. *Estimated diminution in value.* The difference between the hypothetical value estimate (Item 1) and the "As Is" value estimate (Item 5) is the diminution in value attributable to the existence of the Chinese drywall.

On the following page is a summary of the valuation;

| Item 1 – Market Value | $1,520,000 |
|---|---|
| Item 2 – *Less:* Cost to Cure | - 566,000 |
| Item 3 – *Less:* Associated Costs | -  50,000 |
| Item 4 – Less: Risk | -240,000 |
| Item 5 – Indicated "As Is" Value | $664,000 |

| Item 1 – Market Value | $1,520,000 | From above |
|---|---|---|
| *Less:* Item 5 – Indicated "As Is" Value | - 664,000 | From above |
| Item 6 – Diminution in value | $856,000 | |

### Discussions of Items

**Item 1** *Estimate the market value of the residence*

Estimated on a previous page, this is the hypothetical market value if Chinese drywall did not exist.

**Item 2** *Deduct the cost to cure*

Provided was a cost estimate prepared by Lahoud & Hardan Enterprises, Inc. and dated March 30, 2010 which is the cost to remediate the Chinese drywall. The estimated cost provided was $492,000 (rounded).  Based upon the subject's size of 4,342 square feet the indication is $113 per square foot ($492,000 ÷ 4,342 square feet).

By comparison there are newspaper articles indicating an average cost of $81.00 per square foot.  Additionally the NAHB (National Association of Home Builders) estimate the cost to be in the range of 50% to 55% of the total construction cost new.  Based on the original purchase price of $1,660,000 for land and building and a land value at that time in the range of $440,000, the implied cost new is $1,220,000, or $280 per square foot ($1,220,000 ÷ 4,342 sq.ft.).  This includes all costs inclusive of site improvements, appliances, etc.  Applying 50% of the $280 indicates $140 per square foot toward remediation. This is overstated as it includes site improvements; however it supports the cost by Lahoud & Hardan Enterprises, Inc. at $113 per square foot. Following is a summary of the land sales considered for this analysis.

| | | | | |
|---|---|---|---|---|
| 832 Alfonso Ave | 15,384 | $967,500 | $62.89 | Mar-2010 |
| 4060 Battersea Rd | 15,075 | $550,000 | $36.48 | May-2009 |
| 3812 Park Ave | 21,600 | $630,000 | $29.17 | Sep-2009 |
| 3802 Little Ave | 14,000 | $550,000 | $39.29 | Apr-2010 |
| 4095 Bonita Ave | 9,842 | $505,000 | $51.31 | Jul-2008 |

Within paragraph 3 of the contractor's contract it states "Should the State of Florida, the federal government, and/or any other governing agency or industry organization adopt and/or certify an official protocol for the repair of Chinese drywall at some time in the future, Owner acknowledges that Contractor may need to implement a revised repair protocol, the cost of which is not included in this Agreement. Moreover, if such governmental or industry approved protocol is adopted, a second repair may become necessary in order to comply with any protocol requirements which may differ from those adopted herein." This implies that there could be cost overruns should the acceptable protocol change. The contractors estimate includes a 15% add on for Overhead & Profit.

The purchaser of the house would be concerned with potential cost overruns and would also have to be active in hiring and supervising the contractor. To the estimated $492,000 is added an additional 15% for the overseeing of the contractor and for potential cost overruns, totaling $566,000.

An alternative way to consider this additional cost estimate is by considering the acquisition of the subject by an investor that intends to remediate the situation and then resell the property. The contractors cost does not include any entrepreneurial profit for the undertaking and for the supervision of remediating the Chinese drywall. An investor would require a profit for undertaking this type of investment.

## Item 3 *Deduct additional associated costs*

Associated costs would include alternative living expenses while awaiting the repair of the residence.  The contractor projects a time frame of thirty (30) weeks to repair, or 7.5 months. For analysis purposes this has been rounded to eight (8) months to account for any time overruns.  A rental rate for a residence comparable in size, age and location is estimated in the range of $6,500 ($1.50/SF) to $8,500 ($2.00/SF) per month. Using a rent of $7,500 per month ($1.75/SF), the additional associated costs would be $60,000 ($7,500 per month x 8 months). Below is a summary of the rentals considered.

| Address | Bed/ Bath | Adj. SF | Lot Size | Year Built | Rental | Price/S F | Date Rented |
|---|---|---|---|---|---|---|---|
| 4080 Barbarossa Ave | 4/3 | 3,908 | 6,540 | 2007 | $6,900 | $1.77 | Feb-2008 |
| 6311 Leonardo St | 6/7 | 4,756 | 13,500 | 2008 | $10,000 | $2.10 | Apr-2009 |
| 4054 Barbarossa Ave | 5/5 | 4,391 | 7,919 | 2007 | $8,500 | $1.94 | Dec-2007 |
| 4110 Woodridge Rd | 5/4 | 5,083 | 9,590 | 2007 | $8,000 | $1.57 | May-2008 |
| 3911 Battersea Rd | 5/4 | 3,706 | 7,000 | 2003 | $5,500 | $1.48 | Nov-2006 |
| 4040 Matheson Ave | 4/3 | 2,557 | 6,540 | 2007 | $5,150 | $2.01 | Aug-2007 |
| 4051 Woodridge Rd | 4/4 | 4,647 | 9,380 | 2008 | $9,500 | $2.04 | Asking |
| 6909 Veronese St | 3/2 | 2,807 | 10,570 | 1949 | $5,750 | $2.05 | Asking |

Alternatively, viewed from the investor's standpoint, the investor would have monies advanced in the range of $1,000,000 to $1,500,000. Based on the current prime rate of 3.25% and a holding period of eight (8) months, the interest would range from $22,000 to $33,000. Added to this would be the cost of insurance and real estate taxes during this period. If only the land was assessed during this period the taxes would be $8,000 per year, or $5,500 total. Insurance is estimated at $4,000 per year, or $3,000. Additional costs would be applicable for property maintenance and utilities estimated at $250 per month or $2,000. Total of these costs is $32,000 to $43,000, as compared to the $60,000 estimate based on market rent.

The estimate for this item is estimated at $50,000 with consideration to the indicated range of $43,000 to $60,000.

**Item 4** *Deduction for associated risk*

Difficult to estimate is the associated risk in acquiring the property. Once the house is remediated the seller would have to disclose that it previously had Chinese drywall. If there were two houses side-by-side one that never had Chinese drywall and one that had it and was remediated and all other aspects were the same, in question is would the buyer discount the price. In purchasing the property there would be concern that there might be a residual effect. As time goes on the associated risk will diminish if no effects are found. During this period the purchaser may have the house tested on an annual basis.

As support for this assumption is an article (see Addendum C) entitled "An Exploratory Review of the Effects of Toxic Mold on Real Estate Values". This article is regarding toxic mold and discusses post remediation stigma. In their survey of respondents when asked about purchasing a property with toxic mold 42% would not bid at all on the property. The remaining 58% stated losses of 20% to 37%. While this is a survey only, it does indicate the concern of a potential buyer of a house that previously had a detrimental condition.

An additional deduction of 20% for associated risk was applied. This risk was based on the total dollars to be invested in the range of $1,200,000. Based upon this $1,200,000 the associated risk is $240,000 ($1,200,000 x 20%).

**Item 5** *Conclude to an "As Is" value*

This value is the amount remaining after deducting all the associated costs and items from the hypothetical market value. The result is the estimated "As Is" value representing what a prudent and knowledgeable buyer would pay based on the current condition of the residence.

**Item 6** *Estimated diminution in value*

This is the difference between the market value (Item 1) and the "As Is" value (Item 5).  The difference is the loss in value associated with the existence of Chinese drywall.

## Summary of Conclusions

Valued herein is an estimate of the diminution in value due to the existence of Chinese drywall. This appraisal estimated the hypothetical market value of the subject property as of current date, assuming that there is no existence of Chinese drywall and the home is commensurate in condition of similar homes built during 2007. From this value were subtracted items to indicate an "As Is" value.  The difference between the hypothetical value and the "As Is' value indicates the diminution in value.

This valuation shows the difference in value for a residence without Chinese drywall versus with Chinese drywall that has been identified as emitting gases that have caused damage to the house. The value question answered herein is what would be the market value of a house without the Chinese drywall versus the market value with Chinese drywall.

It is more likely that a purchaser of the house would be an investor/contractor seeking to profit from the purchase and remediation of the house.  A typical homebuyer would not likely be interested in the house due to the time and expense required. In the current market with an oversupply of houses, most buyers are looking for houses that require little work or at bargain prices. Since the typical buyer would be an investor, an analysis was prepared based on that premise.

The concluded "As Is" value which considers the existence of Chinese drywall is $704,000. A purchaser at this price would then have to remediate the improvements ($566,000), and require 30 weeks to hold the property ($50,000).  This indicates a total investment of;

| | |
|---|---|
| $664,000 | "As Is" Value |
| +566,000 | *Plus*: Cost of remediation (includes overrun estimate) |
| 50,000 | *Plus:* Holding costs |
| $1,280,000 | Total Investment |

The implied profit is;

| | |
|---|---|
| $1,520,000 | Market Value |
| - 46,000 | *Less:* Sales Commission @ 3% (1/2 brokerage fee) |
| - 1,280,000 | *Less:* Total Investment (from above) |
| $194,000 | Implied Profit |

Alternatively if the investor was a contractor, the cost overruns and additional profit applied to the $492,000 estimate might not be considered. The analysis would change to:

| | |
|---|---|
| $664,000 | "As Is" Value |
| + 492,000 | *Plus*: Cost of remediation (excludes overrun estimate) |
| 50,000 | *Plus:* Holding costs |
| $1,206,000 | Total Investment |

The implied profit based on this scenario is;

| | |
|---|---|
| $1,520,000 | Market Value |
| - 46,000 | *Less:* Sales Commission @ 3% (1/2 brokerage fee) |
| - 1,206,000 | *Less:* Total Investment (from above) |
| $268,000 | Implied Profit |

Mr. Jay Meiselman, a local building contractor, was interviewed regarding the level of profit that an investor might require.  His estimate was 30% to 40%. If the "As Is" Value ($664,000) and the cost to remediate ($492,000) were the only consideration the investment would be $1,156,000. Applying 30% to 40% indicates profit of $350,000 to $460,000.  Adding the profit to the $1,156,000 investment yields a range of $1,500,000 to $1,600,000.  This indicates that he would not yield his required return of 30% to 40% as the net sales price in the above analysis is $1,474,000 ($1,520,000 less 3% sales cost). Based on a net sales price of $1,474,000 and a total investment of $1,206,000, the profit is 22% as compared to the desired 30% to 40% range.

For Mr. Meiselman to yield a 30% profit the residual "As Is" value would be $592,000.  At 40% the residual "As Is" value would be $511,000.

Also interviewed was Neal Bulbin, a residential home contractor.  Mr. Bulbin stated that the profit margin would have to be in excess of the normal 20%.  He discussed a conversation with another contractor that was considering undertaking the purchase of a home having Chinese drywall.  He stated that he and the other contractor were of the opinion that the value of the home would be "$.30 to $.35 on the dollar".  This estimate takes into consideration all of the associated risk to include the resale of the property. Based on $1,474,000 (estimated net sales price) the price would be $442,000 to $516,000 (.30 and .35 times $1,474,000).   Using a value of $500,000, the loss in value would be $974,000 ($1,474,000 less $500,000) as compared to the $856,000 estimated value herein.

# Additional Analysis

An additional analysis was requested that estimates the loss in value due to stigma. This analysis is based on the house being remediated and the loss in value due to stigma.  Considered are two houses that are the same in all respects with the exception that one previously had Chinese drywall which was remediated and one never had Chinese drywall.  In question is if there is a loss in value after remediation.

A loss in value occurs when buyers would not pay the same amount for one house as the other, due to the previous existence of Chinese drywall.  Several real estate agents were interviewed for their opinion as to a loss in value. These agents were of the opinion that buyers would discount the price even though the house was remediated.  One agent was of the opinion there would be a loss but did not quantify the loss percentage.  Another agent estimated a loss of 25% to 50%. One agent estimated no loss in value. Individuals were interviewed and asked if they had the choice between a house that never had Chinese drywall and one that was remediated which would they chose.  All those interviewed indicated they would choose the one that never had Chinese drywall.

In Addendum C is an article quoting Mr. John Kilpatrick, Ph.D. that "repairing a defective home usually leaves behind a loss in value called "stigma", a perceived inferiority that reduces the repaired home's market price compared to other homes on the market. Also reviewed was an article by Mr. Kilpatrick and Mr. Christopher A. Miner, MAI, entitled Chinese Drywall.  This paper discusses that the economic life of some of the components in the house may be shortened. Also noted is that metal studs present a concern.

From the September 2009 Issue Brief 2010-311 (see Addendum C) from the Florida Senate regarding Chinese drywall it states "Right now there are more questions than answers. One of the most pressing questions is: What are the health implications of the Chinese drywall? This question is a very immediate one for those people who are trying to remain in their homes to avoid financial ruin. Residents are concerned not only about potential safety hazards of the toxic drywall on their health but want to know whether the effect of the drywall on their wiring makes their homes fire hazards. A second question is: How does a homeowner effectively remediate their home so that they can either live in it safely or resell it without the stigma of Chinese drywall making the home valueless? These are questions that can only be answered with more research. Yet they are some of the most important questions to individuals suffering from Chinese drywall."

Mr. Frank Desquin, the Property Appraiser for Charlotte Count was quoted in an article (see Addendum C) stating he also "recognizes that there may be some stigma on the property for a few years after remediation which will cause marketability problems".

An article entitled How North American Appraisers Value Contaminated Property and Associated Stigma, by William N. Kinnard, Jr., MAI, SRA and Elaine M. Worzla, PhD surveys appraisers to identify the technique they use in estimating a loss in value.   The article states "Most respondents (51, or 63%) calculate and deduct from unimpaired value the present worth of the cost to remediate plus a percentage adjustment for stigma."

Another article entitled The Impact of Hazardous Waste on Property Value, written by Bill Mundy, MAI, PhD states "When the problem is understood, uncertainty is lessened and the value of a property should increase to a point at which the difference between its contaminated value and its market value is the sum of the cost to control the problem plus any residual stigma. When the contamination is controlled, the value of the property would be expected to increase to full market value if the public believes scientists and public health experts. Whether this actually occurs is debatable, however, because the public does not necessarily agree with the scientific community. This difference between cured value and full market value is the residual uncertainty caused by stigma, and should decrease with time as the public's perception of risk subsides – assuming there is no further contamination."

The above references are indications that stigma is a consideration in the valuation process. Only one real estate agent was of the opinion that there would be no effect on value.

The current market has experienced decreases in value due to oversupply of product and decreased demand levels. During the period of 2004 to the end of 2006 demand was strong and supply limited.  Buyers during this period were less discriminatory as to the condition of a house and more concerned of purchasing before prices increased. The current market provides an oversupply of listings and buyers are more discriminatory.  Many buyers are seeking short sales and foreclosures which offer substantial discounts from previous price levels. A house that has been remediated would be less desirable than one that never had Chinese drywall and a discount would be expected.

At this point in time the diminution in value is fueled by the uncertainty of the extent of the problems that are caused by the drywall and the long term effects, even after remediation.  For example, if the remediation methods were found to be insufficient or health problems were to occur after remediation.

Moisture Free is a company that is planning on providing a warranty for home owners that have had their house remediated. The warranty will require specific remediation requirements, not yet established, for the policy to be placed. This warranty is in front of the Colorado Insurance Board and is expected to be approved within the next two months. Cost of this warranty will be in the range of $2,200 to $5,000; however the actual price has not yet been established.

The fact that there is a company issuing a warranty suggests that they are of the opinion purchasers will be concerned with a reoccurrence should the remediation not be sufficient. This warranty does not reduce the stigma from potential health hazards only is a protection for additional remediation.

On page 55 herein was estimated an amount of $240,000 for the associated risk.  Based on the estimated value herein of $1,520,000 as remediated, the loss represents 16% ($240,000 ÷ $1,520,000) of the estimated market value.  This 16% estimate is toward the median of the range provided from interviewing real estate agents which was from 0% to 25%.

The ultimate question is at what discount a purchaser would consider buying the remediated house versus the house that was not remediated.  This scenario assumes "both parties are well informed or well advised and acting in what they consider their own best interest" as per the market value definition on page 33 herein.

A comparison of the two contractor estimates implies a difference of 10% profit.   The Meiselman approach looks at the required profit (30% to 40%) for undertaking the remediation while the Bulbin method provides a discount associated with the risk involved of 39% to 50%. Based on costs of $600,000 ("As Is"), plus $50,000 (holding costs) and plus $492,000 (remediation costs) the total costs would be $1,142,000.  Applying 10% to these costs for the added risk indicates $114,000, or 7.5% of the estimated $1,520,000 value.

Current market conditions have placed downward pressure on values and there are fewer buyers. The seller would need to find a buyer that is interested in this house and is also not concerned about the previous existence of Chinese drywall.  The references quoted are consistent in the perception of the public and their concern relating to these type issues. Expected would be a lower sale price and an extended marketing time.

Following is a summary of the analysis which compares the two contractor estimates;

| | Meiselman 30% Profit | Meiselman 40% Profit | Bulbin 70% Discount | Bulbin 65% Discount | Implied Profit | Implied Profit |
|---|---|---|---|---|---|---|
| Net Sale Price | $1,474,000 | $1,474,000 | $1,474,000 | $1,474,000 | $1,474,000 | $1,520,000 |
| Divided by Profit | 1.30 | 1.40 | | | 1.2 | 1.2 |
| Indicated Cost | $1,133,846 | $1,052,857 | | | $1,228,333 | $1,266,667 |
| Less: Remediation | $492,000 | $492,000 | $492,000 | $492,000 | $492,000 | $566,000 |
| Less: Holding Costs | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Indicated "As Is" Value | $591,846 | $510,857 | **$442,200** | $515,900 | $686,333 | $650,667 |
| **Rounded to** | **$592,000** | **$511,000** | **$442,000** | **$516,000** | **$686,000** | **$651,000** |
| **Dollar Profit** | **$340,154** | **$421,143** | **$490,000** | **$416,000** | **$245,667** | **$253,333** |
| **Percentage Profit** | **30%** | **40%** | **50%** | **39%** | **20%** | **20%** |
| **Average Dollar Profit** | **$380,648** | | **$453,000** | | | |
| **Average Difference** | **$72,352** | | | | | |

The last two columns are based on the conclusions in the appraisal.

The median of the surveyed range of real estate agents (0% to 25%) is 12.5% and indicates a $190,000 discount ($1,520,000 x 12.5%). This estimate is consistent with the previous estimate of $240,000 (page 55). An estimated diminution in after remediation, due to the uncertainty of the previous existence of Chinese drywall is correlated to $200,000.   This represents approximately 13% of the estimated market value.

# Reconciliation of Value

The reconciliation process considers the approaches which were utilized in this report. Each approach to value is analyzed as to its reliability and applicability. These approaches indicated the following values:

| | |
|---|---|
| **Cost Approach** | **Not applicable** |
| **Income Capitalization Approach** | **Not applicable** |
| **Sales Comparison Approach** | **$1,520,000** |
| **Diminution in Value (includes remediation costs)** | **$856,000** |
| **Diminution in Value** | **$200,000** |

The cost approach estimates the land value and adds the depreciated value of the improvements. In general, the cost approach is not a reliable indication of value for a single family residence. A cost approach was not considered applicable for the subject property. Further, purchasers of this type property do not base their acquisition on this method.

The income capitalization approach analyzes the actual and projected income and expenses of the subject property and capitalizes the net income into a value estimate by direct capitalization. The income capitalization approach is not an applicable approach to valuing a single family residence and was not used herein.

The sales comparison approach compared sales of similar properties to the subject property. These sales were analyzed for differences such as market conditions, location, size, age and condition, and land size. Based on these comparisons, a value was estimated for the subject property. The strength of this approach relies on the quality of the comparable sales. Sales which closely resemble and can be compared easily with the subject are most desirable. The more comparable the sales, the more reliable the sales comparison approach. There were five sales of comparable properties utilized in this approach for comparison. These sales were considered comparable and make the sales comparison approach a reliable indication of value.

The only applicable valuation method is the sales comparison approach. The income capitalization approach and the cost approach were considered not applicable. Based on the data and analysis within this appraisal, the subject property has an indicated market value of the fee simple interest as of April 23, 2010 in the amount of $1,520,000. In addition the diminution in value was estimated at $856,000. Also requested was an estimate solely for the diminution of value after remediation, due to the uncertainty of the previous existence of Chinese drywall. This was estimated at $200,000 as of April 23, 2010.

**This appraisal estimates values of the subject property with the hypothetical condition that the Chinese drywall does not exist, estimates the loss in value due to the existence of the drywall and the hypothetical that the drywall has been remediated.**

# ADDENDA



# ADDENDUM A
# COUNTY AREA DESCRIPTION

# Miami-Dade County and Area Description

## General Overview

Miami-Dade County is at the southeastern tip of Florida and is the south-easternmost state in the continental United States. With land area of approximately 1,946 square miles, it is the most populous county in the state and is often referred to as Greater Miami, in combination with its most populous city, Miami. It is bordered on the north by Broward County, on the west and south by Collier and Monroe Counties, respectively, with the east side bordered by the Atlantic Ocean.

Within the county's borders are two national parks (Everglades and Biscayne National), 15 state water conservation and wildlife management areas, four state parks, 135 area-wide parks and 571 local parks, totaling 727 park and recreations areas.

## Demographics

The early 1960's marked the beginning of the arrival of large numbers of Cuban Refugees into Miami-Dade County and South Florida which has transformed Miami into having a Latin flavor. In the years following, have come significant numbers of immigrants from Haiti, Cuba and other Latin American countries.

Estimated population in 2009 was 2,467,618, a .45% decrease from 2,478,745 in 2008. The 2014 projected population is 2,549,776 or 3.3% over 2009. This is similar to trends throughout Florida.

| Miami-Dade County Population | | | |
|---|---|---|---|
| Projected 2010 | % Change from 2009 to 2010 | Projected 2015 | % Change from 2010 to 2015 |
| 2,476,289 | .2% | 2,558,134 | 3.3% |

*Source: March 2010 - http://EDR.state.fl.us*

The primary industries that support Miami-Dade County's economy through employment are trade, transportation and utilities, followed by education/health services and government. The most known is tourism, a major industry for Miami-Dade County.

## Ports of Entry

The Port of Miami is the world's leading port for cruise line passenger traffic, while also showing impressive strength in international freight. The port's biggest ocean freight trading partner is China, and vice versa. Eight major cruise lines dock at the port, also home to 26 steamship lines. The port is Florida's No. 1 container port with three terminals. It also contributes over $17 billion annually to the local South Florida economy, providing direct and indirect employment of over 176,000 jobs. As part of the growing environmental concerns, the Port has implemented procedures that integrate pollution prevention and waste reduction. It

conserves natural resources by reusing and recycling materials, purchasing recycled materials and products that do not adversely affect the environment, and that can be reused, recycled and disposed of in a safe manner. Scheduled to coincide with the 2014 Panama Canal expansion, the port will be bringing online $1 billion in new infrastructure assets that includes dredging the main channel harbor to accommodate the world's largest container vessels, and increasing intermodal and distribution network with strategic partners.

**Economic Base**

Miami-Dade County is the top vegetable supplier production in the country. It is in the top ten in state agriculture and the top 20 nationally. Farmers grow an abundance of tomatoes, bush beans, avocados and yucca, as well as nursery plants. Miami-Dade County supplies 25% of all ornamental plants sold in the United States. The production of tropical produce is No. 1 in the nation. The climate is considered Subtropical Marine with an annual average temperature of approximately 77 degrees, a 70% probability of sunshine and an approximate average annual precipitation of 79 inches. Average elevation is 12 feet. Its semi-tropical location and very suitable climate allow for year round outdoor activity.

In 2008 and 2009, like most other parts of the country, Miami-Dade County has seen a significant decline in the housing market. This has continued in 2010, but the latest statements for 2010 are not available. The chart below reflects these issues which are considered to continue into the near future.

| Existing Single-Family Home Sales | | Housing | |
|---|---|---|---|
| **Percent Change in Homes Sold** | | **Units Permitted** | |
| 2002-2003 | 1.9% | 2002 | 13,398 |
| 2003-2004 | .4% | % change from 2001 to 2002 | -1.0% |
| 2004-2005 | -12.7% | 2003 | 15,055 |
| 2005-2006 | -21.1% | % change from 2002 to 2003 | 12.4% |
| 2006-2007 | -39.2% | 2004 | 21,820 |
| 2007-2008 | -17.2% | % change from 2003 to 2004 | 44.9% |
| 2008-2009 | 52.7% | 2005 | 29,545 |
| | | % change from 2004 to 2005 | 35.4% |
| **Percent Change in Median Sale Price** | | 2006 | 22,300 |
| 2002-2003 | 20.8% | % change from 2005 to 2006 | -24.5% |
| 2003-2004 | 22.8% | 2007 | 8,891 |
| 2004-2005 | 28.2% | % change from 2006 to 2007 | -50.1% |
| 2005-2006 | 7.0% | 2008 | 3,609 |
| 2006-2007 | 1.1% | % change from 2007 to 2008 | -57.7% |
| 2007-2008 | -27.2% | 2009 | 1,178 |
| 2008-2009 | -29.4% | % change from 2008 to 2009 | -52.1% |

*Source: www.edr.state.fl.us*

**Sports**

Professional, college and even local neighborhood sports draw spectators, participants and investors to a high degree and create a positive atmosphere. Professional football (Miami

Dolphins), basketball (Miami Heat), baseball (Florida Marlins) and ice hockey (Florida Panthers) are continual draws. There are two horse tracks and a dog track. Several of these tracks have been approved for slot gambling or table gambling, depending upon location in a municipality or Indian reservation. Also offered are golf, tennis, as well as the numerous water sports, given the significant bodies of water.

The Orange Bowl Stadium was the home of the University of Miami Hurricanes. The stadium has recently been demolished and under construction is a new stadium for the Florida Marlins baseball team.

## Linkages

Transportation systems include Metrorail, an elevated rail rapid transit system with 22 stations that connect portions of Miami-Dade County from the Kendall area to above the Hialeah area. The Metromover automated people mover system is located in downtown Miami and is an off-shoot of the Metrorail system. There are also Metrobus buses, most of which are in service daily throughout the county. The Metromover system includes the Brickell Avenue financial district and also runs north to the Omni area. Other transportation services in Miami-Dade County include Tri-Rail, railroads and taxicabs. Railroad service by Amtrak is accessible in northwest Miami-Dade. Tri-Rail is South Florida's commuter train system which services Miami-Dade, Broward and Palm Beach Counties.

In the construction stage and nearing completion is the Miami Intermodal Center (MIC), which will link the airport, East/West Rail (companion project), Amtrack, Tri-Rail, Airport/Seaport Connector and Metrorail mainline rail. Located near the State Road No. 836/State Road 112 Connector, just east of the airport will be parking, retail, commercial, residential and tourist-designed development.

Within Miami-Dade County, major roads include the Palmetto Expressway (State Road No. 826), a major north/south expressway, the Dolphin Expressway (State Road No. 836), a major east/west expressway, Interstate No. 95 and the Florida Turnpike. All of these represent Miami's expressway network and make almost any destination in Miami-Dade County within 30 to 45 minutes driving time. Miami International Airport is the driving force behind the area along with the linkages. The Port of Miami is approximately nine miles to the southeast.

## Government

Within Miami-Dade County there are 36 individual municipal jurisdictions with the largest jurisdiction being the unincorporated area. Miami-Dade County has a strong mayor form of government, with nine elected individuals (one mayor and eight commissioners) making up the Miami-Dade County Board of Commissioners. The mayor appoints a professional administrator to manage the daily activities of the county government and a county attorney to handle its legal matters. Its largest municipality, Miami, is comprised of a nonvoting executive mayor elected citywide and five commissioners from five districts.

Some governmental activities, services and functions previously handled by individual municipalities are now handled by the county. Among these are real property assessment and valuation, health and welfare, most water and sewers, traffic engineering, public libraries, public

transportation, public housing, urban renewal, seaport, airport, regional parks and air and water pollution control. In addition to these, Miami-Dade County provides services to the unincorporated areas of the county such as: police and fire protection, building and zoning regulation, trash and garbage collection and disposal, parks and recreation, consumer protection and corrections and rehabilitation of adults and youth offenders.

## Education

Miami-Dade's education system is governed by an elected 7-member board who in turn appoints a superintendent whose responsibility is to manage the daily activities of the school system. Based upon student population, the Miami-Dade County School system is the fourth largest school system in the nation. Several colleges and universities are located in the county, including Barry University, Florida International University, Miami-Dade Community College, St. Thomas University, Florida Memorial College and Johnson & Wales University. Many private institutions at each academic level exist as alternative choices for the public.

## Medical

Miami-Dade County has the largest concentration of medical facilities in Florida. The largest institution is Jackson Memorial Medical Center, the second largest public hospital in the nation which shares many teaching, treatment and research capacities with the University of Miami.

## Arts and Culture

Known for the wealth of ethnic diversity and heritage, Miami-Dade County has a cultural mix of festivals, concerts, theater and dance performances. A state-of-the art performing arts complex opened in late 2006. Five companies occupy the two buildings: The Concert Association of Florida, Florida Grand Opera, Florida Philharmonic Orchestra, Miami City Ballet and the New World Symphony. The complex contains an opera house, symphony hall, flexible space studio theater, outdoor performance space, tower and restaurant, banquet hall, education center and commissioned artwork. Adjacent parking is available.

## Summary

During its history, Miami-Dade County and the Greater Miami area have experienced significant changes and growth. Trends indicate that the growth will continue, albeit at a much lower pace into the future.

The diverse economic base and the bilingual population should continue to attract new residents and businesses into the Greater Miami/Miami-Dade County area.

*Sources*    various websites including, but not limited to,
www. greatermiami.com/gmcc/about (Greater Miami Chamber of Commerce)
www.beaconcouncil.com (Beacon Council)
Rev. 4/10

# ADDENDUM B
# FLOOD ZONE MAP

# Flood Zone Map



# ADDENDUM C
# ARTICLES



features

### abstract

This article reports outcomes of ten litigated toxic mold cases; a contingent valuation (CV) analysis of toxic mold in South Carolina; and mold case studies of an apartment complex near Seattle and a group of homes in Cleveland, Ohio. The litigated cases had very large payouts, some larger than the property value. Postcure reductions of 20%–37% in property value were revealed in the CV surveys. The apartment property contaminated with toxic mold had losses in excess of 60% and potentially as high as 100%. A mildly affected group of homes in Cleveland, Ohio, incurred unit remediation costs of 5%–15%.

# An Exploratory Review of the Effects of Toxic Mold on Real Estate Values

*by Robert A. Simons, PhD, and Ron Throupe, PhD*

**D**espite widespread recent interest in toxic mold, real estate literature has provided limited guidance on valuation issues for properties affected by it. To advance knowledge of this topic, this article first summarizes the scant quantitative data available on the effect of toxic mold on property values. A report on the nonempirical literature available on toxic mold is provided along with a summary of the settlements and verdicts in ten legal cases. Some new research conducted using contingent valuation analysis (CV) is described and more evidence of the effects of toxic mold on real estate values is revealed through study of a contaminated apartment building and a synopsis of the results of a city-led mold remediation program. The summary of the findings from these studies reveals a considerable range of potential outcomes, which suggests an urgent need for more research on the effects of toxic mold on property values.

## Background

Mold is a very common occurrence in homes. The generic term *mold* includes mildew and other organisms that are typically not dangerous and can be readily dealt with by property owners or renters themselves without risk of personal injury. However, it is toxic molds that are the focus of this research.

Toxic mold includes such black-colored organisms as stachybotrys, penicillium, aspergillus, and fusarium.[1] The most feared of toxic molds is stachybotrys, also known as black mold, which is associated with respiratory infections and other negative health effects in children. Some colonies of mold do well in relatively dry conditions, while others require more moisture to thrive. Mold lives and grows well on many types of organic building materials. It is particularly insidious when there is moisture behind a wall or in an area hidden from view where the mold grows undetected and unabated while thriving on drywall, wood, or insulation material. It then can spread via spores and be readily transmitted

---

1. See http://www.mold help.org.

in the air or through an HVAC system. The spores are associated with mycotoxins that can cause moderate and severe health problems in humans.

The term *toxic mold* includes fungi and mold. (All molds are fungi, but not all fungi are molds.) Toxic mold is a type of mold, not a level or measurement of mold. Guidelines for measuring toxic mold levels are vague, and there is not at present a set of standards for mold-level measurement. Local health organizations identify levels they consider dangerous on a case-by-case basis.

Real estate market guidelines for disclosure and inspection of mold are evolving. Some states have included mold disclosure as part of the real estate sales disclosure form; others have relied on general wording that would include mold. There are forms being developed by local multiple listing services for disclosure to limit liability for real estate agents. Property inspection firms with mold-related qualifications are also emerging. Appraisers are being advised to limit liability by adding language in the scope of work section of their appraisal reports to define and clarify the extent of the inspection and the limits of appraiser's expertise.[2]

## Literature on Toxic Mold

Since toxic mold is a relatively new issue, there are no peer-reviewed studies that empirically address toxic mold and its effects on property values.[3] The most recent and comprehensive look at mold was by Aalberts and Hoyt, whose peer-reviewed article reflects on the role of the appraiser when evaluating toxic mold property risk.[4] Their findings suggest various issues for the appraiser to consider in conforming to the Uniform Standards of Professional Appraisal Practice (USPAP) when toxic mold is present in a property. Toxic mold has been examined in the context of commercial and residential water damage without any empirical results, while other studies have laid out the scope and nature of indoor mold in the context of suggested measures for portfolio and property managers.[5]

Finally, Bell's study of detrimental conditions contains several diagrams that may pertain to the toxic mold problem.[6] Bell lays out a set of possible scenarios of detrimental conditions and illustrates the outcomes in diagram form. These outcomes include curable and incurable conditions and a time component identifying when and if a property may recover from detrimental effects to value. The mold problem, if curable, could be the type of problem that reduces cash flow and property value for a time, after which the property largely recovers to near its original property value after remediation. On the other hand, another possible outcome is that the detrimental condition causes a total loss that creates a personal liability, such as an outstanding mortgage that is greater than the value of the land.

## Legal Outcomes in Toxic Mold Cases

Large settlement awards in toxic mold lawsuits have raised expectations in mold-related litigation. An estimated 10,000 mold-related cases are pending in United States courts with a likelihood that many plaintiffs will receive large settlements.[7] Although most current cases deal with residential properties, commercial properties are increasingly involved in mold litigation. Table 1 shows the outcomes of ten toxic mold cases.

While the cases shown in Table 1 do not constitute a random sample, they include all cases written about in Mealey's litigation service publications[8] and all those listed in its verdicts and settlements database since 2000. Of these ten mold cases, nine resulted in payouts to the plaintiffs. Some awards or settlements were many times the property value and included punitive damages. Individual case outcomes for residential homes ranged from a low of $200,000 to several million dollars. One class action settlement averaged $11,700 per plaintiff. It should be noted that court verdicts and pretrial settlements do not necessarily reflect market value losses. This is especially true when punitive damages are part of a settlement and "mold hysteria" may have affected jury judgments.

2.  Robert Wiley, "Mold: The Hidden Menace," *Valuation Insights & Perspectives* 7, no. 2 (Second Quarter 2002): 34.

3.  A Texas appraiser used historical analysis and estimated the preremediation property value discount for properties affected with mold to be 17% to 25%. The postremediation stigma was reported to be up to 3% with full disclosure. However, this conclusion is based on only a few case studies, and the results were reported in a non peer-reviewed publication and cannot be further verified. See Jack Schoppa, "Mold, Moisture, Stigma and Value," *Appraiser E-Gram* (October 2002), http://www.naifa.com/gram/2002oct/schoppa-oct02.html.

4.  Robert J. Aalberts and Richard W. Hoyt, "Appraisers and Toxic Mold: Legal and Valuation Issues," *Journal of Real Estate Practice & Education* 6, no. 2 (2003): 203–216.

5.  Del Williams, "Commercial and Residential Water Damage: The Mold Connection," *The Appraisal Journal* (October 2002): 447–449; Leonard Zumpano, Suzanne Hartley, and Ken Johnson, "The Problem with Indoor Mold for Portfolio and Property Managers," *Journal of Portfolio Management* 9, no. 2 (2003): 187–192.

6.  Randall Bell, *Real Estate Damages: an Analysis of Detrimental Conditions* (Chicago: Appraisal Institute, 1999); published earlier in Randall Bell, "The Impact of Detrimental Conditions on Property Values," *The Appraisal Journal* (October 1988): 380–391.

7.  Linda A. Stiefsky, "Reduce Mold Related Risk," *Commercial Investment Real Estate* (March/April 2003): 30–32.

8.  See http://www.mealeys.com.

**Table 1   Summary of Outcomes of Toxic Mold Legal Cases**

| Case Name | Location | Nature of Case | Number of Plaintiffs | Verdict Amount | Case on Appeal | Settlement Amount | Comments |
|---|---|---|---|---|---|---|---|
| Aglaz et al. v. Fullmer Construction et al., No. 00CC00647, Calif. Super., Orange Co. | Santa Ana, CA | Mold contamination case | 1 | $200,000 | - | - | |
| Harley et al. v. Century-National Insurance Co. et al., No. CV 2000006713, Ariz. Super., Maricopa Co. | Maricopa Co., AZ | Insurance carrier allegedly delayed remediating mold contamination. | 1 | $4 million | | - | Jury awarded Harleys $244,000 in compensatory damages and $4 million in punitive damages. |
| Davis et al. v. Henry Phipps Plaza South et al., No. 11631/98, N.Y. Sup., N.Y. Co. | New York County, NY | Residents maintained mold and fungal contamination caused personal injury and property damage. | 495 New York apartment residents (Class action) | | | Confidential | Plaintiffs sought approximately $9 billion in damages from two New York apartment building owners |
| Ballard et al. v. Fire Insurance Exchange, No. 99-05252, Texas Dist., Travis Co. | Austin, TX | Plaintiff claimed carrier acted in an unfair, deceptive, and fraudulent way when evaluating a mold property damage claim. | 1 | $32 million | $4 million or more | Confidential | Trial verdict, appealed down, then a settlement. |
| Smith et al. v. Behr Process Corp., No. 25670-3-II, Wash. App., Div. II | Tacoma, WA | Paint company appealed damages verdict in case in which residents alleged exterior paint caused mold and other property damage. | Class action | | Yes | - | Jury awarded damages ranging from $14,454 to $87,818. Trial court awarded $2.18 million in attorney fees and costs, part of which was attributed to discovery violations. |
| Sandcastle Condominium Homeowners Assoc. v. Croziour et al., No. 724894, Calif. Super., San Diego Co. | San Diego, CA | Builder agreed to pay $125,000 to correct various defects that led to water intrusion and mold. | | | | $125,000 | |
| Flaxburn v. Fireman's Fund Insurance Co., Insurance Appraisal Proceedings, Insurance Code [ 2071; CCP [ 1282 et seq.] | Encino, CA | Appraisal panel awarded funds to home owner for property damages and additional living expenses incurred after the house's underground heating, ventilation, and air-conditioning ducts became contaminated with mold. | 1 | $699,560 | No | | Appraisal panel |
| Allison et al. v. West Del Amo Pacific Condominium Association et al., No. YC040331, Calif. Super., Los Angeles Co. | Los Angeles, CA | Condominium association found not liable for claims that a unit contaminated with mold eventually led to personal injuries. A judge in a tentative ruling denied plaintiffs request for declaratory relief on common unit repairs. | | No award | No | - | |
| Anderson v. Allstate Insurance Co., No. 01-15330, 9th Cir. | San Francisco, CA | Home owner insurance carrier appealed and home owner cross-appealed a federal judge's decision to reduce a verdict from $18 million to approximately $3 million in a mold property damage case. | 1 | $18 million | $3.3 million | | Appealed and award reduced |
| Colon v. Trinity Homes LLC, Ind. Sup. Ct., No. 29BO2-0404-PL-374 | Indianapolis, IN | Home builder arrived at a settlement with property owners to begin inspecting and repairing mold damage over the next several years at no cost to home owners. | 2,044 | | | $24 million | Average award $11,700 per property |

Source: Authors and Measley's verdicts and settlements database

The wide range of potential outcomes in toxic mold litigation can be partly attributed to an equally large range of physical defects. These may range from common scenarios of water leakage around sinks and bathrooms, which can be remediated quickly, to cases where mold festers undetected for long periods of time until health concerns are suspected. Consumers' lack of understanding of the issues and fear of a latent defect can contribute to a reluctance to purchase properties with past or present occurrence of toxic mold.

## Contingent Valuation Analysis of Toxic Mold

Another mode of investigating the effects of toxic mold on property values when sufficient market data is not available is a form of market survey known as contingent valuation (CV) analysis. This type of analysis has sometimes been used to determine prospective buyer attitudes toward other types of contamination and defects. CV surveys of prospective buyers, addressing property defects and attributes,[9] have been used as a supportive analytical technique when a sufficient number of market sales are available for analysis. CV surveys are also appropriate when no other pertinent market data is available, as in the case of toxic mold.

The CV method was originally developed to price public goods and has been recently adapted to the estimation of discounts for private real estate properties. Chalmers and Roehr recognize the use of CV surveys for analyzing contaminated real estate in "as is" condition, especially when traditional approaches to value do not work.[10] They advocate the use of formal procedures to interview market participants, including buyers, for real estate cases that involve contamination. Most recently, McLean and Mundy; Allen and Austin; Simons; Simons and Winson-Geideman; Flynn et al., and others have set forth methodological guidance on this topic.[11]

## Study Limitations

A CV analysis has certain limitations. One general concern is that if survey participants have a stake in the outcome of a case, they may give biased results to secure funds. To avoid this threat to validity, the survey presented here excludes individuals directly involved in any mold litigation. Another concern is that respondents may be inclined to provide answers that they think will please the surveyors. Consequently, the trained surveyors in the study were instructed to stay within a prearranged script and were not informed in advance about the details of the case so that this threat to research validity could also be avoided.

A third concern is that some respondents may provide answers that would not reflect their actual actions because there are no real-life consequences to providing responses to hypothetical questions (hypothetical bias). This situation has been associated with a discrepancy between stated (surveys) and revealed (actual sales) preferences.[12] To address this potential for hypothetical bias, unreasonably low bids were removed from the pricing calculations, and instead focus was placed on the marginal buyer at the top half or top quarter of the market.

Despite the potential limitations, it is appropriate to apply the CV methodology to the toxic mold question, in part because of the complete lack of other available data on the potential effects of toxic mold on property values. Moreover, empirical evidence suggests that CV outcomes do not always overstate the magnitude of losses. For example, Carson et al. compare over 600 CV results (stated preferences) with revealed preference outcomes[13] and find correlation coefficients between 0.60 and 0.98. Interestingly, the CV results were found to be smaller in magnitude (closer to zero) than the revealed outcomes.

## Survey Methods

A survey research firm from Columbia, South Carolina, was engaged to contact a stratified random

9. These surveys feature full information to replicate the "well-informed buyer" assumption under the federal definition of market value. See Appraisal Institute, *The Appraisal of Real Estate*, 12th ed. (Chicago: Appraisal Institute, 2001), 23.

10. James A. Chalmers and Scott A. Roehr, "Issues in the Valuation of Contaminated Property," *The Appraisal Journal* (January 1993): 28–41.

11. David McLean and Bill Mundy, "The Addition of Contingent Valuation and Conjoint Analysis to the Required Body of Knowledge for the Estimation of Environmental Damages to Real Property," *Journal of Real Estate Practice and Education* 1, no. 1 (1998): 1–19; Bill Mundy and David McLean, "Using the Contingent Value Approach for Natural Resource and Environmental Damage Applications," *The Appraisal Journal* (July 1998): 290–297; Marcus T. Allen and Grant Austin, "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge," *The Appraisal Journal* (October 2001): 394–403; Robert A. Simons, "Estimating Proximate Property Damage from PCB Contamination in a Rural Market: A Multiple Techniques Approach," *The Appraisal Journal* (October 2002): 388–400; Robert A. Simons and Kimberly Winson-Geideman, "Determining Market Perceptions on Contamination of Residential Property Buyers Using Contingent Valuation Surveys," *Journal of Real Estate Research* (forthcoming); James Flynn et al., "A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation," *The Appraisal Journal* (Winter 2004): 35–44.

12. Thomas O. Jackson, "The Contributions of William N. Kinnard, Jr. to the Field of Contaminated Property Valuation," in *Essays in Honor of William N. Kinnard, Jr.*, ed. C.F. Sirmans and E.M. Worzala, 81–89 (Norwell, MA: Kluwer Academic Publishers, 2003); Robert D. Row, Ralph C. d'Arge, and David S. Brookshire, "An Experiment on the Economic Value of Visibility," *Journal of Environmental Economics and Management* 7, no. 1 (March 1980): 1–19.

13. Richard Carson et al., "Contingent Valuation and Revealed Preference Methodologies: Comparing the Estimates for Quasi-Public Goods," *Land Economics* 72, no.1 (Feb. 1996): 80–99.

sample of 200 homeowners in South Carolina. The telephone calls to homeowners were made in November and December 2002. The methodology has been peer-reviewed, and the mold questions were included as additional scenarios as part of a litigation matter unrelated to toxic mold. Of the 200 surveys, 195 were useable for this analysis, meaning that the respondents bid (offered) a baseline housing value and answered key questions in a way that showed that they understood the environmental component of the survey. The survey methodology followed standard research protocols.[14]

The first part of the survey sets the stage and allows the respondent to become familiar with the bidding scale. It also determines the baseline price of a residential property the respondent is seeking in the context of a job move. The average baseline price bid for a home in the CV sample is $121,500, which is reasonably close to the average price of $111,300 for houses in South Carolina in 2002. When asked which of the different scenarios (property near a business park, property near a railroad track, properties with leaking underground storage tank, or property with toxic mold contamination) they were most likely to bid on, only 8% said the toxic mold scenario, the lowest percentage for any of the four scenarios presented.

With respect to the nonmold scenarios, the first potential scenario asks for any discount related to a business park located a block away. About 90% of respondents bid on the business park scenario. Another scenario asks for any discount related to a railroad track located behind the home. About 64% of the respondents bid on the railroad track scenario. Still another scenario asks for any discount related to a property that is contaminated from gasoline releases from a leaking underground storage tank. About 55% of the respondents bid on this scenario.

Two factors are of primary importance in evaluating the survey results. The first is the percentage of respondents who would bid on a scenario. The ratio of no bid to total bids reflects the loss of market demand for the property. The second factor is the potential value loss on sale. Of those that bid, the ratio of maximum bid to baseline price reflects the percentage they would pay. One minus this percentage reflects the discount, for example, if the person's baseline price was $100,000 and the maximum they would bid was $70,000, the discount would be 30%.

**The Toxic Mold Scenario**
The survey presented a description of a home with a toxic mold problem that had been remediated. The text description reads as follows:

> The property has a nice home on it, but in the recent past the home was subjected to water damage and a black mold was found in a bathroom area and in the basement. More investigation showed that the mold had also grown into the walls of the house. Environmental testing showed the mold to be toxic. The home was cleaned by a professional crew, which had to open the inside walls and remove the mold, and rebuild the affected parts. The local health authority has said that the mold is gone. Except for this one issue, the neighborhood is like yours, and the home is very similar to your home.

The bidding issue was determined by the following question:

> Using the scale below, where –3 means you definitely would not bid and +3 means you would, how likely is it that you would make any offer on this home?

A total of 113 respondents (58%) bid on the toxic mold scenario; 42% of the respondents did not bid. This ratio of no bid to total bids indicates a substantial reduction in the market demand for this type of property, assuming that information about this problem is available to potential home buyers. Empirical evidence also indicates that neighborhood characteristics do not independently affect the likelihood of bidding on contaminated residential property.[15]

---

14. The initial instrument was pretested for time length, clarity, and for other items that might cause problems; subsequent instruments used the same or very similar questions. A recent pretest of a very similar instrument among a random sample of the group to be surveyed showed no problems in comprehension, language clarity, or other issues. The population for this study was residential homeowners in all 46 counties in South Carolina, and the results can be generalized to this population. Interviewers were given instructions to call names at random and to continue making calls until the required number of interviews were completed. For this type of survey, generally about 30% of the calls result in no answer, another 30% are answered by answering machines, and 10% of the numbers are no longer active. Of the remaining 30%, about 20% participate, and nearly all of these finish the interview. The remaining 10% refuse to participate or are not the homeowner. If a telephone number does not result in a completed survey, the interviewer randomly selects another telephone number. If needed, numbers are called up to three times before they are removed from the pool. The overall response rate (i.e., useable, completed survey by qualified respondents) once the interviewer speaks to the homeowner has been over 60%. Thus, because the factors leading to nonparticipation (mostly no answer, answering machine, and some out of date numbers) were unrelated to demographics or other key respondent characteristics, the survey technique is sufficiently random to allow its use for statistical analysis. In addition, a split-sample technique was employed to test if the position of questions within the instrument affected the results.

15. See Simons and Winson Geideman, Table 6b. That study also uses CV analysis to determine the effects of leaking underground storage tank contamination on residential property in eight states, including South Carolina. The research used a Probit model to include the factors associated with bidding on contaminated property, including character of neighborhood (primarily residential, commercial/mixed, etc.). These variables were not statistically significant.

Of those that bid, the following question was asked:

What is the most you would be willing to pay for the home?

The prices bid by these 113 respondents were discounted by between 0% (the smallest discount, full value) and 99% of full value (a throw-away bid). The average discount for the property affected by the toxic mold releases was 59%.

However, not all these bids would necessarily be in the market. Due to search costs and the small number of bidders, the chances are reduced that any of the potential bidders would find a suitable home and place a bid that would be accepted by a seller. On the other hand, hugely discounted "bottom-fishing" (very low) bids would have little value in the market because it is the bids with the smallest discounts–those at the top of the market–that would get the attention of likely sellers and culminate in a sale.

The decision on which price-reduction figure to apply would be a function of supply and demand. On the demand side (represented by the CV potential buyers), there is evidence of a large, but not complete, reduction in the number of potential buyers (only 58% bid).[16] Because the survey did not specify the number of houses that are afflicted with mold, a firm percentage reduction cannot be determined. However, if there were relatively few affected units, then the losses would approximate the lower discounts associated with the top quarter of the market. This would indicate that sellers would entertain bids averaging 80% of market range (equivalent to a 20% reduction in value). If more affected units were in the market, for example all or part of an entire subdivision, market-clearing bids in the top half of the market (average loss of 37%) would probably be considered.[17] In other words, the average discount of the top quarter of potential bidders is 20% when information about the toxic mold problem is known and the problem is believed to be cured. The discount for toxic mold can be loosely interpreted as pure stigma damages.

A separate analysis based on house prices was also conducted. For a house priced at $100,000 or less, 66% of respondents bid, compared with the 53% that bid on houses priced above $100,000. The top-half bids and top-quarter bids for the lower-priced group of houses had average discounts of 37% and 21%, compared with discounts of 49% and 34% respectively for the higher-priced house group. The main difference can be attributed to three no-discount bids in the lower-priced group and none in the higher-priced group. It is reasonable to conclude that the magnitude of any loss would be greater in higher-priced houses.

## Conclusions from the Toxic Mold Survey

The results of this survey demonstrate the relative undesirability of residences afflicted with toxic mold. Only 58% of prospective home buyers with full information would bid to buy a home with mold contamination, and they would discount their bids so much that many sellers would probably refuse to honor them. Full information generally means that the seller would have to disclose the condition upon listing the house for sale and that the buyer would be provided with enough information to be considered well informed. Therefore, it appears that the loss on this type of property, calculated using the CV survey approach, would be between 20% (when there is one or only relatively few affected units) and 37% (when more units are affected by toxic mold). The appropriate figure for a given situation would depend on supply and demand and would reflect postcure stigma.

This reduction in bid value is a way to measure the reduction in housing utility, or the flow of enjoyment from owner-occupied housing. It also assumes more complete information than is probably the case among actual buyers and sellers of homes in typical transactions where only sellers may know of selected defects but choose not to disclose them unless required by law.

## Distinctions among Buyers

Within the marginal-bidder framework, an important issue is how to reconcile what portion of market bids should be considered. For example, there are buyers in every market that self-select, use asymmetric information, or have different levels of risk

---

16. The percentage of buyers willing to bid is also a function of risk aversion, confidence in the information presented, and consideration of latent defect.

17. A split sample was conducted in which about half of the respondents received a slightly different version of an unrelated scenario. The toxic mold scenario did not vary and appeared in the second and fourth sequential positions out of four scenarios. The results presented in the article are the average of all who responded on the toxic mold scenario. There was a small amount of fluctuation within the split sample. For example, the percentage of bidders for each half of the split sample ranged from 56%-62%, while the average bid was 59% 61% for each half sample. The average of the top half bids for the split sample ranged from 36%-40%. A difference of proportions analysis reveals that none of the three sets of bid figures from the split sample are statistically distinct from each other at a 95% level of confidence. Therefore, the ordering of the questions does not appear to have materially affected the results.

aversion. But that does not mean that the average or typical market participant who purchases a home in that same market thinks and acts like the buyer who has an unusually high or low level of perceived or real risk. For example, a structural engineer with special expertise buying slide-zone property that others consider worthless would have a dominant bid for a property in a slide zone. This situation is more relevant for a single or very small set of properties; however, even in this situation, market depth is an important issue. After the first house sells at or near full, unimpaired value, is there another engineer ready to buy the next house? More generally, there are information and search costs, and some high bidders also look at other properties. Thus, each high bid would not get assigned to each house on the market, and bidders below the top bid would be able to acquire properties with their bids. This supports averaging the top of the market in those markets with few defective properties for sale. This is an example of a market with low supply and limited demand.

In markets with a larger supply of defective properties (such as an area with a class action lawsuit for groundwater pollution) and more potential buyers, averaging the top of the market is essential because the top buyer's bid satisfies only a small portion of the market. Although it is true that in some cases groups of buyers may have less than full information about local market conditions (e.g., large numbers of foreign buyers in a market with a speculative bubble), this is an exception and not in long-run equilibrium.

In sum, because the CV survey results include a few full (undiscounted) bids on a property with toxic mold does not mean that every house affected with mold will trade at full value without a discount. How to determine which portion of the top of the market to apply in a given situation is an important matter for future research.

## Toxic Mold Case Study

Rigorous case studies can also provide guidance in determining potential real property value losses. Although generalizations may not be made from them, case studies such as that of a mold-infested apartment complex in Seattle, Washington, provide a useful look at the way events unfold and how the effects of mold (and in this case the lack of insurance) may affect a property's value.

## Property Description

The case study property is an apartment complex originally constructed in 1965. Purchasing this complex was the property owner's first venture in low-equity real estate investment. When he purchased the property in 1983, the 42-unit complex had only eleven tenants and only seven of these were paying rent. The complex had poor-quality construction and lacked ventilation systems in the bathrooms and kitchens. This resulted in continuous upkeep of the buildings and higher maintenance costs than the owner expected.

Under the new owner, the rents were adjusted for the condition of the property, and economic occupancy was brought up to between 70% and 95% depending on the year. This occupancy level had been maintained for the past decade with a rental rate attractive to a low- to middle-income renter pool. The owner believed the property had a market value of $1.1 million to $1.2 million, including a land value of $300,000.[18] However, based on a review of the last three years of the property's net operating income capitalized at a local market rate and on all tenants' having month-to-month leases, the value of the complex was probably closer to $700,000. For the purpose of estimating losses in this case study, it is assumed that the asset would appraise for $750,000. The owner had a mortgage loan with recourse of $500,000 on the property, so the owner's equity position prior to discovery of the mold problem was $250,000. Although fairly typical, the recourse factor substantially complicates the analysis of this case.

## Discovery of Mold and Cancellation of Insurance

In 2002, the owner of the apartment complex evicted a tenant for nonpayment of rent, and the tenant notified the health authority that he was not paying rent because of claims of a toxic mold concern. The health authority required the owner to open up the walls in the unit for inspection once the occupant had permanently vacated. This action revealed a visible amount of mold inside the walls, alarming the owner and motivating him to investigate toxic mold issues on the Internet. He discovered pictures of toxic mold that resembled the conditions of the interior of the walls in the vacated unit. His further investigation revealed the growing number of litigation cases and claims of health effects from toxic mold.

---

18. The data for this case study was provided by a property owner from Washington who wishes to remain anonymous due to concerns about potential tenant litigation. He provided ten years of cash-flow data for the apartment complex.

The property owner assessed his options prior to having the entire complex investigated. If an investigation revealed a toxic mold problem throughout the complex, he would be obligated to notify each of the tenants. This notification might also lead to each tenant's pursuing legal remedies. He notified his insurance company of the findings by the health authority. Insurance company representatives came to the site and tested for toxic mold. During the visit, the insurance representative notified the owner that the policy on the apartment complex would be cancelled in forty-five days. The property owner was informed that a mold claim was not covered because it is considered fungi and thus excluded in the insurance policy

As indicated, the insurance company cancelled its policy on the apartment complex forty-five days later along with the policies of the owner's five other apartment complexes insured by the property-casualty firm, some of which were of better quality. The owner of the apartment complex in this case study initially had difficulty finding insurance for properties that he owned that were not affected by toxic mold, resulting in a change in insurance premiums from a previous payment of $8,000 per year to $25,000 per year for the non-mold-related properties (a factor that is not considered in the loss estimated below). Cancellation of the insurance policy on the mold-affected property severely limited the owner's options.

**Assessment of Alternative Courses of Action**
The owner's options included abandoning the complex, razing the structures and pursuing a new development project on the site, or remediating the complex and re-leasing it. The potential for tenant lawsuits based on health claims, the loss of revenue during the remediation, and the re-leasing of units to new tenants (because the current tenants were likely to find other permanent housing in the interim) were important issues. Also of concern was that public knowledge of the mold problems would result in higher vacancy or lower rents. The cost to bring the building up to current building codes was unknown, and it was unlikely that the complex would be able to get insurance after remediation. The property owner also had an outstanding mortgage loan, with recourse for $500,000. Any decision would prove costly.

The owner decided that the way to minimize losses was to demolish the buildings. He notified the tenants by letter that he would be asking them to leave but was allowing them to stay rent-free for two months while they searched for replacement housing.

> Of concern was that public knowledge of the mold problems would result in higher vacancy or lower rents.

After the property was vacated, the insurance company sent the owner the results of its testing, which showed mold levels inside the buildings to be from 1,000 to 5,000 times the outside measurements. As of February 2004, the buildings had been demolished and the land was being prepared for redevelopment. The property owner refinanced another apartment complex, using the "cash-out" proceeds to pay off the outstanding mortgage balance on the contaminated property, thereby maintaining his credit throughout this financial catastrophe.

**Analysis of Case Outcomes**
The losses in this case can be looked at several ways. The loss of the owner's prediscovery equity of $250,000 was in excess of 100% of the equity amount due to the recourse provisions of his mortgage and demolition expenses. Before the mold problem, his balance sheet showed asset value of $750,000, liability of $500,000, and net equity of $250,000. After the mold problem, the balance sheet showed asset value of $300,000 (remaining value of the land) and liability of $500,000 from the recourse loan plus $50,000 for demolition, resulting in a net equity of -$250,000 ($300,000 – $500,000 – $50,000).

If the property owner had owned the building without financing and demolished it, the loss would have been $750,000 plus the $50,000 for demolition less the $300,000 land value, resulting in a net loss of $500,000, or 66%, based on the real estate asset. However, this scenario of 100% equity ownership is not as likely for a private investor who has borrowing capacity. It is more likely for debt-averse investors such as pension funds that do not have the tax advantages of debt. However, this would have been the best outcome for the owner and reflects loss to the property rather than to the owner.

Hypothetically, if the owner had a nonrecourse loan and had walked away from the property prior to demolition, the loss to the owner would have been 100% of equity. (The owner's net equity would be

negative in this case: net asset value of $200,000 after demolition and a mortgage liability of $500,000.) The lender would then own an asset worth about $250,000 after demolition. Since the mortgage was $500,000, the lender would suffer a loss of 50%, assuming it decided to demolish the property immediately. This scenario demonstrates the lender's risk, which will inevitably be priced into future loans in terms of rate, fees, or guarantees.

Thus, the decision to demolish the building appears to have been the best alternative under the circumstances. The best outcome under the different ownership scenarios considered here would be a loss of over 60%, which indicates that demolition was the right approach because it results in a smaller loss than incurred by riding out the remediation and re-leasing of the property.[19]

## A Study of Toxic Mold in Cleveland, Ohio

Cleveland is the central city in Cuyahoga County, Ohio, with a 2000 population of about 1.6 million and over 500,000 housing units. Toxic mold is not a particularly well-known problem in Cleveland, but it is nevertheless a concern. Over the past several years, the Cuyahoga County Board of Health received 545 calls about mold and conducted 402 home visits. A total of 147 homes qualified for and were enrolled in a program designed to determine the health effects of mold on children with asthma. By program definition, all of those homes had expected remediation costs under $10,000. Of the 70 homes remediated to date, 46 (about 65%) were owner occupied and 24 were rentals. The average remediation costs were $6,900 and the average elapsed time between reporting the problem to the authorities and the final signoff that the property was cleared of the mold problem was 8.4 months.

In addition to these 70 homes, there were 12 homes remediated separately at an average cost of about $15,000. Thus, the weighted-average remediation cost of the Cleveland experience is about $8,200, or about 5%-15% of property value for an average home in this county.[20] Only two of the 70 properties were marketed and sold after a bout with mold, but their sale prices did not differ excessively from expectations; information on marketing time was not available. The sales data is too sparse at this point,

however, to draw any conclusions concerning stigma or other discounts on sale.

## Conclusion and Comparison of Outcomes

Little empirical information is available to determine the effects of toxic mold on property values. While some appraisers may have data in their personal files, no peer-reviewed evidence is available on the extent of property damage caused by toxic mold. To partially remedy this situation, this article presents a report of nonempirical literature available on toxic mold. Also presented is research in different parts of the United States that provides some measure of empirical results: legal case outcomes, contingent valuation surveys of postremediated residential homes in South Carolina, a case study of an apartment complex affected by toxic mold in Washington state, and a public health study of mildly affected residential property in Ohio. These studies address different aspects of the mold issue and do not provide a clear answer, but they are the best data available at this time. Table 2 summarizes the findings.

The ten legal case outcomes documented since 2000 show very substantial losses due to toxic mold contamination, with the settlements often being many times the value of the property. Both individual plaintiff lawsuits and class action lawsuits have been tried and settled, and there is a very large backlog of cases. A survey of potential home buyers in South Carolina shows that potential buyers would expect a stigma discount of between 20% and 37% on postremediated residential properties that had been affected by toxic mold. A case study of an apartment complex infected with toxic mold illustrates the issues and decisions of a property owner who demolished a property rather than risk an undeterminable set of costs for a loss in excess of 100% of his equity. Finally, mildly affected properties in Cleveland had remediation costs of 5%-15% of property value.

These results present a very wide range of outcomes, which can be expected to narrow somewhat as data on mold cases becomes available, mold prevention strategies are developed, and public awareness increases. This research suggests that when the lower ranges of clean-up costs are combined with postremediation stigma, there is a generic minimum

---

19. Putting this property's experience back into the context of Bell's detrimental conditions diagrams, this case could be a total loss, with the added insult of personal liability because the outstanding mortgage debt was greater than the value of the land.

20. John Sobolowski (supervisor, Healthy Homes Program, Cuyahoga County Board of Health) in a telephone interview with Robert Simons.

**Table 2   Summary of Toxic Mold Study Outcomes**

| Type of Study | Property Type | Type of Loss | Amount of Loss | Sample Size |
|---|---|---|---|---|
| Legal cases | Varied, mostly residential | Property, punitive damages, health issues | $11,700 to several million dollars per property | 10 verdicts and settlements since 2000 |
| Contingent valuation survey | Residential houses in South Carolina | Postremediation stigma | Stated losses of 20%–37%; 42% of respondents would not bid at all | Random sample of 195 prospective house buyers |
| Case study | Garden-style apartment complex near Seattle | Demolition of complex and pay-off of loans | 50%–70% losses to property, over 100% loss to equity (recourse financing) | 1 |
| Health monitoring | Residential houses with children at risk for asthma in Cleveland | Remediation costs for mildly affected properties | 5%–15% remediation costs | 82 houses remediated after being affected by mold |

**Robert A. Simons, PhD,** is a professor and the Director of the Master of Urban Planning, Design and Development Program at the Levin College of Urban Affairs at Cleveland State University (CSU) in Cleveland, Ohio. He teaches courses in real estate development, market analysis and finance, PhD research methods, public economics, and environmental finance. He is also the faculty advisor for the Certificate Program in Real Estate Development and Finance, which is offered in conjunction with the Nance College of Business at CSU. Simons received his PhD from the University of North Carolina (UNC) at Chapel Hill in City and Regional Planning, with an emphasis in real estate. He holds a master's degree in regional planning and in economics, both from the UNC. His undergraduate degree in anthropology was earned at Colorado State University. Simons has published over 40 articles and book chapters on real estate, urban redevelopment, environmental damages, housing policy and brownfields redevelopment. He authored a book entitled *Turning Brownfields into Greenbacks*, published by Urban Land Institute. Simons has an active consulting practice, and has served as an expert witness in matters related to real estate and environmental damages. He has been a member of the American Institute of Certified Planners (AICP) since 1983. **Contact:** T 216-687-5258; E-mail: roby@urban.csuohio.edu

**Ron Throupe, PhD,** is director of operations at Mundy Associates in Seattle, Washington. He is the former Associate Director/Acting Director of the Runstad Center for Real Estate at the University of Washington (UW). Prior to joining UW, Throupe was an assistant professor and the Acting Director of the Real Estate Program at Washington State University, where he also participated in the Washington Center for Real Estate. He has a PhD in business (real estate) from the University of Georgia, an MBA in finance from the University of Georgia, and a BS in civil engineering from the University of Connecticut. Throupe is an elected member of the National Council of Real Estate Investment Fiduciaries (NCREIF). His industry affiliations include having served as a board member of the Downtown Seattle Association Research Committee, the local CCIM chapter, the Commercial Brokers Association (CBA), and the Central Puget Sound Real Estate Research Report. He is also a member of the Appraisal Institute, the American Real Estate Society, and the American Real Estate and Urban Economics Association. **Contact:** T 206-623-2935; E-mail: Ron@mundyassoc.com

reduction in value of 25% for residential properties that are currently affected by toxic mold but that can be remediated. This reduction could increase to 50% when many affected properties are in the same market.

All that can be inferred at this early stage in toxic-mold research is that property values of units previously contaminated with toxic mold would suffer from a discounted sale price and a smaller number of interested buyers compared to similar homes without mold related histories. This suggests that more research on the clean-up costs and long-term property value effects of toxic mold is urgently needed. Proper study of this problem will provide more guidance to appraisers and other real estate market participants on liability and valuation issues related to toxic mold. Research could provide information on several related topics, including determination of the following:

- How to remediate and maintain a toxic-mold-free property
- Who is qualified to inspect mold-suspected property and how they should be trained
- The responsibilities and liabilities of real estate participants
- The insurance implications for property before and after a toxic mold event
- How investors can protect themselves against surprises from toxic mold

It may also be beneficial to address the level of market participants' knowledge about toxic mold and the phenomenon of other newly discovered market-influencing factors. This research could take the form of open-ended questions or focus groups. Research is also needed on how to reconcile supply and demand issues to determine discounts for contaminated properties when using survey data and other techniques in markets of various sizes.



The tools you need, the advice you count on. We're your partner in Florida real estate.

# White Paper: Chinese Drywall

**Overview.** Due to a shortage of U.S. manufactured drywall between 2004 and 2007, many builders were forced to buy drywall imported from China. The "Chinese drywall" has been linked to seeping sulfide gases that can corrode electrical wiring and components of air-conditioning and other household appliances. Some residents have been forced to move from their homes, and a few builders in Florida have begun gutting homes and replacing the drywall.

The potential scope of the problem is huge. In Florida alone, an estimated 36,000 homes are believed to contain Chinese-made drywall. It is estimated that between 60,000 and 100,000 homes nationwide may contain this tainted drywall.

The Florida Department of Health (DOH) has received numerous complaints about drywall that has polluted homes with a "rotten-egg" smell. The agency is currently identifying and assessing potential human health hazards related to the phenomenon of rapid and recurring corrosion of metals inside homes. Florida Gov. Charlie Crist has also sent requests to the U.S. Environmental Protection Agency (EPA) and Centers for Disease Control and Prevention (CDC) asking for help with problems attributed to tainted Chinese drywall. Governor Crist is specifically asking that the federal agencies help Florida develop chemical testing strategies for homes that are experiencing severe copper corrosion.

**Legislative initiatives.** U.S. Sens. Bill Nelson (D-FL) and Mary Landrieu (D-LA) have filed two bills relating to this issue. S. RES. 91 is an effort to press the Consumer Product Safety Commission (CPSC) for a recall of Chinese-made drywall, based in part on findings by a Florida homebuilder and state officials who have confirmed the presence of sulfide gases in homes built with the drywall. S. 739, the Drywall Safety Act, would require the CPSC to work with federal testing labs and the EPA to determine the level of hazard posed by certain chemicals and as yet unidentified organic compounds in the drywall. In addition, the legislation calls on the commission to issue an interim ban on imports until it can create federal drywall safety standards so consumers are protected in the future.

Nelson and Landrieu say they're pressing the CPSC for a recall in the hope of jump-starting a process for helping affected homeowners with the costs of repairs or replacement. Under their legislation, manufacturers would be responsible for these costs.

U.S. Rep. Robert Wexler (D-FL) sent a letter to Governor Crist requesting the Governor declare a state of emergency over the problem. A spokesperson for Governor Crist has stated that he is not clear what practical effect a state of emergency declaration would have at this time.

**Legal considerations.** Several federal class action lawsuits have been filed, including claims against U.S. homebuilder Lennar, Banner Supply Company, Chinese drywall manufacturer Knauf Plasterboard Tianjin and the foreign company that distributed that company's drywall within the United States, Rothchilt International Ltd. Attorneys who filed one of the lawsuits say they estimate homes in 13 states are believed to have defective Chinese drywall. They anticipate that when the Consumer Products Safety Commission completes its investigation, this could be potentially one of the largest product liability cases related to home construction in U.S. history.

Like any condition that could materially affect the value of a property, the presence of defective Chinese drywall triggers the need for an affirmative disclosure of its presence. No one expects real estate professionals to conduct home inspections or recognize signs that a home may contain this material. However, if a homeowner is aware of the presence of this material, they as well as the real estate professional must disclose it. It is important to understand that not all Chinese drywall is defective and not all defective drywall is from China. The extent of the problem is still being researched.

In order to assist FAR members, the FAR Law and Policy Department has developed a "Chinese Drywall Addendum for Purchase" contract addendum. FAR is also in the process of adding language to FAR's Seller's Real Property Disclosure to address a seller's obligation to disclose the presence of defective Chinese drywall. Both forms are in production and will be available shortly. These forms are designed to alert potential buyers of the possible presence of this material and provide awareness on the availability of inspections or other options to evaluate any concerns. Real estate professionals working with buyers may choose to provide a copy of the addendum to buyers during their property search to educate them on this issue. **PLEASE NOTE –There is no requirement under Florida law to use this addendum. It is provided to assist the real estate professional when working with buyers and sellers.**

## Resources

Florida Department of Health: http://www.doh.state.fl.us/environment/community/indoor-air/drywall.html
Florida Gov. Charlie Crist's letter to U.S. Environmental Protection Agency:
http://www.flgov.com/release/10642
U.S. Sen. Bill Nelson: http://billnelson.senate.gov/news/details.cfm?id=310757&

*This publication is provided as a service to members of the Florida Association of REALTORS® and is intended for educational use only. Opinions or suggestions in this publication do not necessarily represent the official policies or positions of the Florida Association of REALTORS®. The Florida Association of REALTORS® does not accept responsibility for any misinterpretation or misapplication by the reader of the information contained in this article. The publishing of this material does not constitute the practice of law nor does it attempt to provide legal advice concerning any specific factual situation. FOR ADVICE ON SPECIFIC LEGAL PROBLEMS CONSULT LEGAL COUNSEL.*



Sarasota Association of REALTORS®

## CHINESE OR DEFECTIVE DRYWALL ADDENDUM

**Seller:** _____

**Buyer:** _____

**Property Address:** _____

The Residential Sale and Purchase Contract above-mentioned is hereby amended to add the following clauses:

1. Chinese or Defective Drywall Disclosure: If a residence or other improvement has been built or renovated on the Property during the approximate time frame of 2004 to present, the Buyer is hereby notified that such Property may contain defective drywall primarily manufactured in China. The presence of this Chinese or defective drywall seems to coincide with and may cause corrosion and damage to structural systems in such a residence or improvement and corrode and destroy system components. The damage has been extensive enough to require them to be replaced at substantial expense. Further, this Chinese or defective drywall apparently emits a strong sulfur-like odor or fume which may cause the residents of the home to experience health problems. The presence of this odor and/or the aforementioned damages may indicate the presence of Chinese or defective drywall, and the homeowner should investigate. The only known way to eliminate the fumes and the health problems and to stop the damage to the above-mentioned structural systems and system components is to remove and replace all of the defective drywall in the residence, which can be very costly. Finally, the presence of Chinese or defective drywall, the fumes, and the damaged systems, if not remedied, can impact the value or saleability of the property.

2. Drywall Inspection: In the event Buyer elects to conduct a risk assessment or inspection for any Chinese or defective drywall, which shall be done at Buyer's sole cost, Buyer must comply with the Inspection Period reflected in the Sales Contract, unless an addendum provides for an alternative inspection and notice to Seller. Buyer and Seller both agree that if Chinese or defective drywall is found, Buyer may, in Buyer's sole discretion, either cancel the Contract and be entitled to the return of the escrow funds, or notify Seller that Buyer elects to have the Chinese or defective drywall removed and the affected areas repaired and replaced with warranted items (along with any other damage caused by such Chinese or defective drywall to include, by way of example and not limitiation, corroded wiring), provided said costs are within the Repair Limits of the Contract. Buyer's failure to exercise this right of inspection shall constitute a waiver if the Property is later determined to have Chinese or defective drywall.

3. Seller Disclosure & Buyer Acknowledgment: The Seller of the above-captioned Property hereby provides the Buyer with the following information on the existence of Chinese or defective drywall at the premises, and advises that a risk assessment or inspection for possible Chinese or defective drywall at the premises is recommenced prior to purchase.

**Seller's Disclosure (check one):**

☐ Chinese or defective drywall is present in the house, and Seller has provided Buyer with all available records and reports relating to Chinese or defective drywall in the Property as follows: _____
_____ ; or

☐ Chinese or defective drywall is present in the house, and Seller has no reports or records pertaining to Chinese or defective drywall in the Property; or

☐ Seller has no knowledge of the existence of Chinese or defective drywall in the Property.

**Buyer's Acknowledgement (check one):**
Buyer acknowledges said advice and recommendation and makes the election set forth below:

☐ Buyer acknowledges the right under the inspection clause in the Sales Contract to conduct a risk assessment or inspection for the presence of Chinese or defective drywall and has received all the information listed above, if any; or

☐ Buyer waives the opportunity to conduct such a risk assessment or inspection for the presence of Chinese or defective drywall and has received all the information listed above, if any.

4. <u>More Information</u>:  Further information on Chinese or defective drywall may be obtained from the Florida Department of Health, 850-245-4250 or the local county Health Department where the Property is located (Manatee County Health Department by contacting 941-748-0747, extension 1340; Sarasota County Health Department at 941-861-2900).

IN WITNESS WHEREOF, the undersigned have set their hands on the date set forth below:

BUYER:                                    SELLER:

_____              _____
                    Date                                      Date


_____              _____
                    Date                                      Date



**NAHB**    **National Association of Home Builders**

Home > New sroom > Builders Rise to the Challenge of Corrosive Chinese Dryw all

As published in...

**NATION'S BUILDING NEWS**   **The Official Online Weekly Newspaper of NAHB**
www.nbnnews.com | *Read the latest issue now!*

## Builders Rise to the Challenge of Corrosive Chinese Drywall

Normal View



Home owners report corrosion or blackening of metal in or on electrical fixtures, appliances, plumbing and air conditioner coils.
*Photo courtesy of CPSC*

**March 23, 2010 -** Participants in a March 11 NAHB webinar discussed some of the ways that builders can identify the presence of corrosive Chinese drywall in their homes and address the problem if they find it.

The speakers were from Marsh USA, Inc., a risk management company, and The NMAS Group, which were hired by NAHB to provide their expertise in responding to the unfolding crisis.

Barbara Manis, MD, chief medical officer for The NMAS Group, said that to date more than 2,900 home owners have reported drywall problems in 37 states, the District of Columbia and Puerto Rico. Florida accounts for 60% of the reports and Louisiana 11%, with cases also concentrated in Alabama, Mississippi and Virginia.

But occurrences have been "widespread across the country," she said.

An estimated total of 550 million pounds - or seven million sheets of drywall - were imported from China in 2000 and 2001, said Manis, and in the period of 2004 to 2007 when those imports increased rapidly in the

face of escalating demand from hurricane recovery needs in the Gulf Coast and the housing boom.

The imports from China provided enough drywall for 40,000 2,000-square-foot homes, she said, but a mix of Chinese and domestic gypsum board in many homes "could increase the number of homes affected markedly." However, not all drywall imported from China is corrosive; consequently, the number might be much smaller.

## Studying Indoor Air

A recent indoor air study by the Consumer Product Safety Commission (CPSC) of 41 homes whose owners had reported a drywall problem and 10 control homes - all built about the same time and located in the top five states for complaints - found that sulfur within the gypsum core of the problem drywall can produce hydrogen sulfide gas that corrodes exposed copper wiring and natural gas tubing, she said.

The corrosion is indicated by a distinctive black, sooty coating that can be found on un-insulated copper pipe leading to the air handling unit present in the garage or mechanical closet of the home, or on the ground wire of an electrical outlet.

The study also found corrosion present on copper air conditioning evaporative coils. Other metal was also corroded where there was moisture from condensation.

CPSC interviews with occupants in the study also identified health complaints such as irritation in the upper airways, and nose and throat air passages; burning or stinging eyes and a running nose. Non-specific complaints such as headache, fatigue, coughing and a general feeling of illness were also found in the study, she said, although these are "common complaints occurring in anyone in any circumstances and can have many causes."

"In homes with corrosion unaccompanied by any [sulfuric] odor, health complaints were much fewer or not existent," she added.

Interim protocols for proving that drywall in a home is corrosive were published by the CPSC in January. While this procedure is helpful in filing insurance claims or mitigation, "it is not an inexpensive guidance to follow."

Trained professionals are required at some point, and there are two laboratory tests. In the first, a piece of drywall from the home is placed in a small chamber to look for emissions of sulfide compounds. The second test places the drywall with copper in the chamber; the copper is allowed to corrode and then tested to see if sulfur is present.

Manis suggested that alternative visual testing methodologies that have been used by NASA for years might be more appropriate "if you build four to six homes a year and a home may potentially have drywall in it." Odors, corrosion on metal surfaces, finding a Chinese label on the drywall and ruling out other possible sources of corrosion are included in this screening method.

## Addressing the Problem

In fixing homes that have been damaged by corrosive drywall, "neither exotic nor extreme measures are called for," said Bruce Hallock, vice president of Marsh's Construction Consulting Practice. However, cleaning up the damage and restoring the home - one option for remediation and a process that typically involves relocating residents until the work is done - can average about 50% to 55% of the cost of building new, he said, depending on the level of finishes in the home and its location.

While some have recommended teardowns to repair damage from corrosive drywall, Hallock said that

complete demolition is unnecessary. "We all have the skills to remodel and deal with the removal of corrosive drywall," he said.

The remediation process involves good communication with the residents about the scope of the work that will be done, he said, and builders who decide to replace drywall will need to protect the interiors of the home and return the home as they found it.

For their personal protection and safety, workers remediating the home should follow the same procedures as those on any other home building site. Moon suits and full-face respirators "are not required and we discourage their use," he said.

Hallock also described procedures that builders can follow to document and save drywall samples and damaged items in the home in case they need to provide evidence for insurance or other purposes.

Although builders can reasonably expect the new drywall that is delivered not to be corrosive, they should take samples of each batch and preserve them so they can be tested later if it becomes necessary, he added.

**Government Reactions**

Conceding that it is "a little bit late in the game now," Alan Schoem, senior vice president, Global Product Risk Practice for Marsh, said that the Consumer Product Safety Commission does have the power to recall drywall that it can prove is defective and presents a substantial risk of injury to the public.

The CPSC hasn't given any indication that it intends to pursue a recall, he said. It is more likely that the agency will decide to regulate the product so that it can be tracked by the name of the manufacturer, its product of origin and the date it was manufactured.

The commission has been working most closely with the Department of Housing and Urban Development to line up some financial relief for home owners, Schoem said. HUD has indicated that it would make Community Development Block Grant funds available for this purpose, although no money has been dispensed yet.

Also, at the end of last year, the Federal Housing Administration announced a program that would enable FHA borrowers to temporarily suspend or reduce payments on their mortgage in order to have the additional cash flow they might need to deal with drywall mitigation issues.

On the state level, Louisiana has approved a plan to reserve $5 million of its hurricane recovery program to provide property tax relief for home owners with corrosive drywall.

Home owners with corrosive drywall may also be able to qualify for special tax deductions for their losses, he said.

**Looking at Insurance Provisions**

What builders can expect from their insurance companies is fairly complex and a better understanding of how the courts view the issue will become clearer as pending cases on insurance coverage are decided in various jurisdictions, said John Denton, senior vice president of Marsh's Mass Tort and Complex Liability Practice.

Meanwhile, the first order of business for builders who have encountered this problem is to "identify all the potential applicable insurance policies and put carriers on notice and keep them apprised of what you are doing with the claims you are receiving," he said.

Builders should look not only at their own policy but should gather information on all potentially applicable policies issued by the general contractors and subs they have worked with under which they might be entitled to recover, Denton said.

A "major battleground" involves the pollution exclusion, he said, which most carriers are using as a basis for denying coverage for drywall claims. How courts have interpreted this exclusion varies by jurisdiction, but in Florida, where the majority of the drywall claims have occurred, the courts have consistently enforced it, finding that it applies to any type of internal vapors or odors.

Denton said that it is likely the courts in Florida will determine that the pollution exclusion bars coverage of losses from corrosive drywall, but the size of the problem in the state is so considerable that it could have some influence on the outcome.

Home owners may be able to cover some of their losses, he said. Even though their property insurance policies will have exclusions for defective work and products, they do have ensuing loss provisions that would cover the ensuing loss to the air conditioning system, for example, even if they don't provide coverage for the drywall.

**Protecting Your Brand**

Catherine Cahill, global managing director and leader of Marsh's Global Product Risk Practice, acknowledged that builders can suffer a serious blow to their business reputation if they don't take steps to protect their brand and its promise of quality and integrity in the homes they build.

The best protection, she suggested, is "open, honest and direct communication with your home owner." Even in a situation where it is possible that the owner will decide to go forward with litigation and become an adversary, or a small builder doesn't have the resources to correct the problem, "don't stop talking with them," she said. "This is an exercise in protecting the safety and security of people who trusted you in building them a safe home."

Most affected builders feel that they themselves have become a victim of the corrosive drywall problem. But "the true victim here is the home owner, the family that can no longer live in their home. When you start to deal with these deep emotional issues, that's probably the best way to protect your brand," she said.

For further information, e-mail David Jaffe at NAHB, or call him at 800-368-5242 x8317.

Subscribe to Nation's Building News

# ADDENDUM D
# REMEDIATION COST ESTIMATE

# ﷯AIA® Document A101™ – 2007

## Standard Form of Agreement Between Owner and Contractor *where the basis of payment is a Stipulated Sum*

**AGREEMENT** made as of the Thirtieth  day of March  in the year Two Thousand Ten
*(In words, indicate day, month and year)*

**BETWEEN** the Owner:
*(Name, legal status, address and other information)*

Mr. Armin G. Seifart and Mrs. Lisa M. Giore Seifart
2515 Swanson Avenue
Miami, Florida 33133
Telephone Number: 786.218.6200

and the Contractor:
*(Name, legal status, address and other information)*

Lahoud & Hardan Enterprises, Inc.
420 S. Dixie Hwy, #2M
Coral Gables, Florida 33146
Telephone Number: 305.666.6687
Fax Number: 305.666.6681

for the following Project:
*(Name, location and detailed description)*

Seifart Residence
4075 Bonita Avenue
Miami, Florida 33133

The Architect:
*(Name, legal status, address and other information)*

William Plasencia, R. A.
7700 N. Kendall Drive #506
Miami, Florida 33156
Telephone Number: 305.235.9211

The Owner and Contractor agree as follows.

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

**Init.**
**/**

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/18/2010 under Order No.9913240108_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                              (793288320)

1

TABLE OF ARTICLES

1       THE CONTRACT DOCUMENTS

2       THE WORK OF THIS CONTRACT

3       DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4       CONTRACT SUM

5       PAYMENTS

6       DISPUTE RESOLUTION

7       TERMINATION OR SUSPENSION

8       MISCELLANEOUS PROVISIONS

9       ENUMERATION OF CONTRACT DOCUMENTS

10      INSURANCE AND BONDS

### ARTICLE 1  THE CONTRACT DOCUMENTS

The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement, all of which form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than a Modification, appears in Article 9.

### ARTICLE 2  THE WORK OF THIS CONTRACT

The Contractor shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

### ARTICLE 3  DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

§ 3.1 *The date of commencement of the Work shall occur upon the satisfaction of all of the following:*

1) The date this Agreement is fully executed by both parties;
2) The date Contractor receives from Owner the initial deposit of $ 25,787.66;
3) The date Contractor receives all permits and approvals from applicable governmental and quasi-governmental agencies necessary for the commencement and completion of the Work;
4) The date Contractor receives a proper notice to proceed with construction of the Work from the Owner; and
5) *The date Contractor receives evidence of a duly recorded Notice of Commencement.*


If, prior to the commencement of the Work, the Owner requires time to file mortgages and other security interests, the Owner's time requirement shall be as follows:

N.A.

§ 3.2 The Contract Time shall be measured from the date of commencement.

§ 3.3 The Contractor shall achieve Substantial Completion of the entire Work not later than
*(Paragraphs deleted)*

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.9913240106_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                         (706288320)

Init.
/

2

SEIFART  000677

(210) days from the date of commencement ("Contract Time"), subject to adjustments of this Contract Time as provided in the Contract Documents, or as follows:

§ 3.4  The Project Schedule will set forth the target date for Substantial Completion.  For purposes of this Agreement and all other Contract Documents, Substantial Completion of the Work shall have the meaning ascribed thereto in Section 9.8.1 of the General Conditions, AIA Document A201-2007.

§ 3.5  Anything herein contained to the contrary notwithstanding, the Contractor will not guarantee that the Work will be performed within the Contract Time or in accordance with the Project Schedule due to factors beyond Contractor's control, and will not be liable to Owner if the Project Schedule dates are not met, other than in accordance with Section 5.2; provided however, that Contractor shall use its best reasonable efforts to meet the Project Schedule dates.

§ 3.6  The parties have specifically agreed that there will be no provision for liquidated damages for delay or bonuses for early completion of the Work.

## ARTICLE 4  CONTRACT SUM
§ 4.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be Four Hundred Ninety-One Thousand Nine Hundred Seventy-Nine and 06/100 Dollars  ($ 491,979.06  ), subject to additions and deductions as provided in the Contract Documents.

§ 4.2 The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If the bidding or proposal documents permit the Owner to accept other alternates subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires.)*

N.A.

§ 4.3 Unit prices, if any:
*(Identify and state the unit price; state quantity limitations, if any, to which the unit price will be applicable.)*

| Item | Units and Limitations | Price Per Unit ($ 0.00) |
|------|----------------------|--------------------------|
| N.A. | | |

§ 4.4 Allowances included in the Contract Sum, if any:
*(Identify allowance and state exclusions, if any, from the allowance price.)*

| Item | Price |
|------|-------|
| See Exhibit "A " attached (4  pages) | |

§ 4.5  In the event Owner approves additional work which singly or collectively delays the Project Schedule, Owner shall pay Contractor general conditions and extend the Contract Time accordingly.

## ARTICLE 5  PAYMENTS
### § 5.1 PROGRESS PAYMENTS
§ 5.1.1 Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.  Upon receipt of payment from Owner or as otherwise required herein, Contractor shall then make payment to Subcontractors and suppliers in accordance with Contractor's payment procedures.

The inspection(s) necessary for the issuance of the final Certificate of Payment pursuant to Paragraph 4.2.9 of AIA Document A201-2007 shall be conducted within ten (10) Calendar days after receipt of notice from the Contractor that the Work has reached Substantial Completion.  Within ten (10) Calendar days following the inspection(s),

Init.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.9013240106_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                                          (790960329)

3

Contractor shall be furnished with a detailed listing of each and every item of Work remaining to be completed or corrected. Owner or Architect shall immediately acknowledge completion of the Work and those items performed shall be removed from the list. At that time payment of that item shall be made within ten (10) Calendar days of item completion. If no itemized list is received by the Contractor within ten (10) Calendar days after notice from the Contractor as provided in this Section 5.1.1, then it shall be presumed that no items remain to be completed or corrected and the Owner's final payment to the Contractor shall be due and payable within ten (10) Calendar days.

§ 5.1.2 The period covered by each Application for Payment shall be one (1) calendar month ending on the last day of the month, or as follows:

§ 5.1.3 Provided that an Application for Payment is received by the Architect not later than the Twenty-fifth (25th) day of a month, the Owner shall make payment of the certified amount to the Contractor not later than the 10th day of the following month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than ten (10) calendar days after the Architect receives the Application for Payment.
*(Federal, state or local laws may require payment within a certain period of time.)*

§ 5.1.4 Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. This schedule shall be used as a basis for reviewing the Contractor's Applications for Payment. Owner acknowledges and agrees that amounts listed on the schedule of values may not correspond to amounts set forth in subcontracts

§ 5.1.5 Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

§ 5.1.6 Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

.1   Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of zero percent  ( 0% ).

.2   Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored on or off the site for subsequent incorporation in the completed construction less retainage of zero percent  ( 0% );

.3   Subtract the aggregate of previous payments made by the Owner to Contractor; and

.4   Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of AIA Document A201–2007.

§ 5.1.7 The progress payment amount determined in accordance with Section 5.1.6 shall be further modified under the following circumstances:

.1   *Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum*

.2   Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Section 9.10.3 of AIA Document A201–2007.

§ 5.1.8 Reduction or limitation of retainage, if any, shall be as follows:  Notwithstanding anything to the contrary set forth in the Contract Documents, once Subcontractor has completed One Hundred percent (100%) of the Work, Owner will pay to Contractor One Hundred percent (100%) of the retainage being withheld for that respective trade. (If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Sections 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.9913249106_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                                      (790268029)

Init.

/

4

SEIFART  000679

*(Paragraph deleted)*
**§ 5.2 FINAL PAYMENT**
**§ 5.2.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when
*(Paragraphs deleted)*
the Contractor achieves Substantial Completion of the Work as defined in Article 3.3 of this Agreement.

**§ 5.2.2** Intentionally deleted.

## ARTICLE 6  DISPUTE RESOLUTION
**§ 6.1 INITIAL DECISION MAKER**
The Architect will serve as Initial Decision Maker pursuant to Section 15.2 of AIA Document A201–2007, unless the parties appoint below another individual, not a party to this Agreement, to serve as Initial Decision Maker.
*(If the parties mutually agree, insert the name, address and other contact information of the Initial Decision Maker, if other than the Architect.)*

**§ 6.2 BINDING DISPUTE RESOLUTION**
For any Claim subject to, but not resolved by, mediation pursuant to Section 15.3 of AIA Document A201–2007, the method of binding dispute resolution shall be as follows:
*(Check the appropriate box. If the Owner and Contractor do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

[ X ]   Arbitration pursuant to Section 15.4 of AIA Document A201–2007

[   ]   Litigation in a court of competent jurisdiction

[   ]   Other *(Specify)*

## ARTICLE 7  TERMINATION OR SUSPENSION
**§ 7.1** The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201–2007.

**§ 7.2** The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201–2007.

## ARTICLE 8  MISCELLANEOUS PROVISIONS
**§ 8.1** Where reference is made in this Agreement to a provision of AIA Document A201–2007 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

**§ 8.2** Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

15%  per annum

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:39:37 on 04/16/2010 under Order No 9913240106_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                              (796Z863291)

5

SEIFART  000680

§ 8.3 The Owner's representative:
*(Name, address and other information)*

Mr. Armin G. Seifart
2515 Swanson Avenue
Miami, Florida 33133
Telephone Number: 786.218.6200
Fax Number: 786.552.6022
Email Address: ArminSeifart@chevron.com

§ 8.4 The Contractor's representative:
*(Name, address and other information)*

Mr. Nazih B. Hardan
420 S. Dixie Hwy, Suite 2M
Coral Gables, Florida 33146
Telephone Number: 305.666.6687
Fax Number: 305.666.6681
Email Address: nazih@lahoudandhardan.com

§ 8.5 Neither the Owner's nor the Contractor's representative shall be changed without ten (10) days written notice
to the other party.

§ 8.6 OTHER PROVISIONS

§ 8.6.1  Change Orders Without Adjustment in Contract Time.  The Contract Sum will be adjusted due to a
Change Order in accordance with Article 7.2 of AIA Document A201–2007.  When no extension in the Contract
Time is required under Article 7.2.3 of AIA Document A201–2007, the following percentages will be used to
calculate the additional amount for supervision, overhead and profit that will be added to the Contract Sum due to
the Change Order under Article 7 of AIA Document A201–2007:
- Supervision: 10%
- Overhead and Profit: 15%

§ 8.6.2  Change Order with Adjustment in Contract Time.  The Contract Sum will be adjusted due to a Change
Order in accordance with Article 7.2 of AIA Document A201–2007.  When an extension of Contract Time is
required under Article 7.2.3 of AIA Document A201–2007, the following percentages will be used to calculate the
additional amount for supervision, general conditions, project management fees, project administration fees, and
overhead and profit that will be added to the Contract Sum due to the Change Order under Article 7 of AIA
Document A201–2007:
- Supervision: 10%
- General Conditions: 6%
- Project Management Fees: 0%
- Project Administration Fee: 0%
- Overhead and Profit: 15%

§ 8.6.3  Intentionally Deleted.

§ 8.6.4  Owner acknowledges and agrees that Contractor (i) is not responsible or liable for any errors, inconsistencies
or omissions in the Contract Documents, and (ii) will not be required to perform any Work which is inconsistent
with the requirements of any governmental or quasi-governmental agency(ies) having jurisdiction over the Project
or the owner of the Project or the Property.  In the event changes in the Work are required due to the requirements of
any governmental or quasi-governmental agency(ies) having jurisdiction over the Project, Owner will, at no cost to
Contractor, cause the Contract Documents to be revised accordingly and deliver same to Contractor.  Upon receipt
by Contractor of the revised Contract Documents, the Contractor will prepare a Change Order pursuant to Article 7
of AIA Document A201–2007.

Init.

/

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1983, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American
Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized
reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the
maximum extent possible under the law. This document was produced by AIA software at 15.30.37 on 04/18/2010 under Order No 9913240105_1 which
expires on 03/26/2011, and is not for resale.
User Notes:                                                                                      (795288/329)

6

SEIFART  000681

**§ 8.6.5 Owner Assuming Architect's Duties.** Notwithstanding anything herein or in the AIA Document A201-2007 to the contrary, Owner and Contractor hereby acknowledge and agree that the Owner will assume directly all duties and obligations of the Architect under the Contract Documents, including, without limitation, administration of the Contract and processing and approval of Applications for Payment.

**§ 8.6.6 Signage.** Contractor shall be permitted to display identifying signage and banners in prominent locations throughout the Project site, including tower cranes, display boards, and on the building, subject to Owner's prior approval (which approval shall not be unreasonably withheld, conditioned or delayed).

**§ 8.6.7 Test and Inspections.** All tests and inspections required by the Contract Documents with respect to the Work will be scheduled and/or arranged by Contractor so as to cause no delay in the progress of the Work. In the event any re-testing or re-inspection of the Work is necessary on account of any rejection of defective Work, Owner shall bear all costs and expenses of such re-testing or re-inspection; provided that same were not caused by the gross negligence of the Contractor and only to the extent that such costs are not recovered by the Contractor from the relevant Subcontractor. Contractor agrees to give written notice to the Owner prior to the scheduling of any such tests and inspections.

**§ 8.6.8 Building permits, etc.** Owner shall pay for all building permits, inspections, governmental fees, impact fees, licenses and related administrative items necessary for proper execution and completing of the Work, and such costs shall be specifically itemized in the Unit Prices referenced in Article 4.3 hereof. The Owner shall cooperate with the Contractor in submitting such Contract Documents as are necessary in order to obtain governmental approvals for the Work. All inspections performed by the Architect or any engineer of record shall be paid for by the Owner.

**§8.6.9   Attorney's Fees.** In the event of any dispute between Owner and Contractor or their respective representatives arising out of the Project, the Contract, the General Conditions, the Contract Documents, or any other matter, the prevailing party in any such dispute shall be entitled to receive from the non-prevailing party its reasonable attorneys' fees, paralegal fees, expert fees, witness fees, costs and expenses, or any other expenses incurred in the proceeding and in resolving the dispute, whether at mediation, arbitration, trial, on appeal, or in any administrative proceeding, or otherwise.

**§ 8.6.10   Complete Agreement; Amendment.** This Agreement, together with all other Contract Documents incorporated herein by reference, constitutes the entire agreement between the parties and supercedes all agreements, representations, warranties, statements, promises and understandings, whether oral or written, with respect to the subject matter hereof, and neither party hereto shall be bound by nor charged with any oral or written agreements, representations, warranties, statements, promises or understandings not specifically set forth in this Agreement. This Agreement may not be amended, altered or modified except by a writing signed by both parties.

**§ 8.6.11 Severability.** If any provision of this Agreement or application to any party or circumstances shall be determined by any arbitrator or court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstance other than those as to which it is so determined invalid or unenforceable shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

**§ 8.6.12 Terminology.** All personal pronouns used in this Agreement whether used in the masculine, feminine or neuter gender, shall include all other genders and the singular shall include the plural and vice versa. Titles of any provisions of this Agreement are for convenience only and neither limit nor amplify the provisions of the Agreement itself. The use herein of the word "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation", or "but not limited to", or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term or matter.

**§ 8.6.13 Governing law/venue.** This Agreement shall be governed, interpreted and determined in accordance with the laws of the state in which the Project is located. The venue of any suits or other proceedings with respect to this Agreement shall be the county in which the Project is located.

**§ 8.6.14 Waiver.** No consent or waiver, express or implied, by either party to or any breach or default by the other party in the performance of any obligations hereunder shall be deemed or construed to be a consent or waiver to of any other breach or default by such party. Failure on the part of a party to complain of any act or failure to act of the other party or to declare the other party in default, irrespective of how long such failure continues, shall not

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No. 9913240106_1 which expires on 09/29/2011, and is not for resale.
User Notes:                                                                                                            (768288329)

Init.

7

constitute a waiver of its rights of such party. The giving of consent by one party in any one instance shall not limit or waive the necessity to obtain the consent of such party in any future instance.

§ 8.6.15 Owner acknowledges that, as of the date of this Agreement, no governmental or other authoritative entity has issued or certified an approved repair or remediation protocol with respect to reactive drywall (also commonly referred to as "Chinese drywall"). As such, there is no scientific evidence that the protocol set forth in Contractor's scope of work under this Agreement (or any other protocol proposed at this time) will effectively remedy the problems caused by and/or are associated with Chinese drywall that may be currently located within the Property. Owner acknowledges and agrees that, although the scope of Contractor's Work includes the removal of existing drywall from the Property, Contractor cannot and does not guarantee or warranty that its Work will fully eradicate all of the potential problems caused by and/or associated with any existing Chinese drywall. AS SUCH, CONTRACTOR SPECIFICALLY EXCLUDES FROM ANY AND ALL WARRANTIES SET FORTH IN THIS AGREEMENT (IF ANY), ANY WARRANTY, EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE), THAT CONTRACTOR'S WORK WILL ERADICATE THE POTENTIAL PROBLEMS OR EFFECTS CAUSED (NOW OR IN THE FUTURE) BY AND/OR ASSOCIATED WITH ANY CHINESE DRYWALL THAT MAY BE LOCATED WITHIN THE PROPERTY.

Owner acknowledges that Contractor is not a licensed environmental engineer or consultant. Owner further acknowledges that Contractor has advised Owner to seek the advice of a licensed environmental engineer or consultant in order to determine an appropriate method for remediating the Property of the effects of Chinese drywall and to review and approve the scope of Work given to Contractor by Owner under this Agreement. As such, in addition to any other indemnity obligations set forth in this Agreement, Owner releases, indemnifies and holds Contractor harmless from any and all damages, liabilities, claims or other actions with respect to or arising out of the existence of Chinese drywall at the Property and/or the protocols set forth in the scope of Work with respect to the removal of Chinese drywall and other materials and equipment from the Property. Notwithstanding the above, and for the sake of clarity, Contractor's limitation of liability with respect to the eradication of the Chinese Drywall and the potential problems caused there from, does not release the Contractor from any negligence by Contractor in the removal of the Chinese Drywall as to matters within Contractor's general knowledge or control, or with respect to the scope of Work generally on matters unrelated to the removal of Chinese Drywall. The current Scope of Work "Exhibit A" and Construction Schedule "Exhibit B", contemplates adequate time and cost allocated to "Air the House" as defined in "Exhibit A , Main Trades # 3" of the Property and general cleaning of the Property, as well as, all supervision by Contractor.

Should the State of Florida, the federal government, and/or any other governing agency or industry organization adopt and/or certify an official protocol for the repair of Chinese drywall at some time in the future, Owner acknowledges that Contractor may need to implement a revised repair protocol, the cost of which is not included in this Agreement. Moreover, if such governmental or industry approved protocol is adopted, a second repair may become necessary in order to comply with any protocol requirements which may differ from those adopted herein. At such time as or if an official governmental or court- sanctioned protocol is issued during the Contract Time, Contractor and Owner shall work in good faith to revise the scope of Work accordingly, and depending on the rate of completion at the time of such official or court sanctioned protocol being issued, to minimize delays and wherever possible the cost of Change Orders that are required to comply with such newly issued official or court-sanctioned protocols.

Owner additionally acknowledges that, to the extent that it may seek to pursue claims against the party or parties responsible for originally installing the Chinese drywall in the Property (which Owner acknowledges was not Contractor), Owner will need to preserve, at its own expense, physical evidence of the existing Chinese drywall in accordance with certain orders issued by the governing courts. To the extent that Owner should request Contractor's assistance in gathering such evidence so that Owner may preserve same, the cost and time involved in such an endeavor is not included in this Agreement.

Init.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.6013240106_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                          (786286529)

8

SEIFART  000683

Contractor and Owner acknowledge that the removal of the Chinese Drywall is included in the scope of Work, as defined in Section 12 (b) and (g) of the Agreement, as applicable, and furthermore, Contractor shall be responsible for the removal and disposal of the Chinese Drywall in accordance with applicable local, state and federal waste management or environmental laws known at the time of execution of this Contract and shall indemnify and hold Owner harmless from any and all damages, liabilities, claims or other actions with respect to or arising from the disposal of the Chinese Drywall removed from the Property.

Owner acknowledges that portion of the Chinese Drywall and other affected elements of the property have already been removed and or will be removed by owner's own Consultants and or Parties other than Contractor.

§ 8.6.16  Preparation, testimony and any other and all mitigation support will be billed at $ 200.00 per hour plus costs.

§ 8.6.17  General Contractor nor Subcontractors are liable in case of any damage during the removal and reinstallation of existing items and/or materials in the house.

## ARTICLE 9   ENUMERATION OF CONTRACT DOCUMENTS

§ 9.1 The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated in the sections below.

§ 9.1.1 The Agreement is this executed AIA Document A101--2007, Standard Form of Agreement Between Owner and Contractor, as amended and modified.

§ 9.1.2 The General Conditions are AIA Document A201-2007, General Conditions of the Contract for Construction, as amended and modified.  Owner and Contractor acknowledge and agree that the AIA Document A201-2007 referenced and incorporated herein and applicable to this Project, has been substantially amended and modified as reflected by (1) computer generated inserts and deletions, and (2) other written changes, if any, initialed by the parties.  Owner and Contractor further acknowledge and agree that each of them has reviewed, understands and agrees to be bound by such General Conditions, as amended and modified.

§ 9.1.3 The Supplementary and other Conditions of the Contract:

| Document | Title | Date | Pages |
|---|---|---|---|
| N.A. | | | |

§ 9.1.4 The Specifications:
*(Either list the Specifications here or refer to an exhibit attached to this Agreement.)*
Title of Specifications Exhibit:  N.A.

| Section | Title | Date | Pages |
|---|---|---|---|
| N.A. | | | |

§ 9.1.5 The Drawings:
*(Either list the Drawings here or refer to an exhibit attached to this Agreement.)*
Title of Drawings Exhibit: N.A.

| Number | Title | Date |
|---|---|---|
| N.A. | | |

§ 9.1.6 The Addenda, if any:

| Number | Date | Pages |
|---|---|---|
| N.A. | | |

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 9.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:36:37 on 04/18/2010 under Order No 9913240106_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                              (796268328)

9

SEIFART  000684

§ 9.1.7 Additional documents, if any, forming part of the Contract Documents:

    .1    AIA Document E201™–2007, Digital Data Protocol Exhibit, if completed by the parties, or the following:

         N.A.

    .2    Other documents, if any, listed below:
         *(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201–2007 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

         Exhibit "A " Cost Breakdown (4 pages)
         Exhibit "B " Preliminary Construction Schedule (1 page)
         Exhibit "C " Application and Certificate For Payment (3 pages)

## ARTICLE 10   INSURANCE AND BONDS
The Contractor shall purchase and maintain insurance and provide bonds as set forth in Article 11 of AIA Document A201-2007.
*(State bonding requirements, if any, and limits of liability for insurance required in Article 11 of AIA Document A201–2007.)*

| Type of insurance or bond | Limit of liability or bond amount ($ 0.00) |
| --- | --- |
| N.A. | |

## ARTICLE 11   CONTRACT TIME
The Contractor shall be entitled to a Change Order extending the Schedule and Contract Time, and providing for associated general conditions in the event of an "Excusable Delay," described as follows:

    (a)    any delay caused by Owner, including those described below, which actually and directly causes such delay;

    (b)    any delay actually and directly caused by design errors and/or omissions by the designers;

    (c)    any delay actually and directly caused by permitting agencies, building department, building inspectors, or any governmental agencies;

    (d)    any delay caused by changes and/or additions to the scope of Work made by the Owner and/or Architect;

    (e)    any delay caused by weather in excess of ten (10) rain days per year, impacting activities that require no rain;

    (f)    any delay caused by force majeure events;

    (g)    any delay caused by Architect and/or its consultants;

    (h)    any delay caused by failure of the Owner to make timely payment to Contractor in accordance with this Agreement;

    (i)    any delay caused by Owner's (or any of its representative's, employees or agent's) failure to make timely decisions within the time periods provided for in the Contract Documents, or failure to timely issue certifications, failure to timely respond to requests for information;

    (j)    any delay caused by any one or more of the relevant building department, fire department and/or other governmental agency having jurisdiction over the Project in granting or denying Contractor's requests for final government approval; or

    (k)    any other delay caused by reasons or events not within the control of Contractor; provided that Contractor has not caused nor materially contributed to such delay.

## ARTICLE 12   GENERAL EXCLUSIONS FROM CONTRACTOR'S SCOPE OF WORK
The following are excluded from Contractor's scope of Work on this Project:

Init.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/18/2010 under Order No.9913240108_1 which expires on 09/26/2011, and is not for resale.
User Notes:         (7962883291)

10

SEIFART 000685

(a) Unforeseen hidden conditions;
(b) Deleterious material, including asbestos, surveys and abatement and toxic materials;
(c) Allowance for code interpretations different than anticipated;
(d) Testing of materials;
(e) Cost of repairing or protecting adjacent properties if necessary;
(f) Governmental requirements effective after the date of execution of this Agreement that change the scope of Work;
(g) Removal of hazardous waste;
(h) Builder's Risk Insurance and any deductibles; and
(i) Permit and Impact Fees not expressly provided for herein.

## ARTICLE 13  STATUTORY DISCLOSURES

CHAPTER 558, FLORIDA STATUTES, CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS CONTRACT A WRITTEN NOTICE, REFERRING TO CHAPTER 558, OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

CONSTRUCTION INDUSTRIES RECOVERY FUND -- PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE-LICENSED CONTRACTOR.  FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS:

CONSTRUCTION INDUSTRY LICENSING BOARD
1940 North Monroe Street
Tallahassee, Florida 32399
Telephone (850) 487-1395

ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND SERVICES AND ARE NOT PAID IN FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS, THOSE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE ALREADY PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY. TO PROTECT YOURSELF, YOU SHOULD STIPULATE IN THIS CONTRACT THAT BEFORE ANY PAYMENT IS MADE, YOUR CONTRACTOR IS REQUIRED TO PROVIDE YOU WITH A WRITTEN RELEASE OF LIEN FROM ANY PERSON OR COMPANY THAT HAS PROVIDED TO YOU A "NOTICE TO OWNER." FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX, AND IT IS RECOMMENDED THAT YOU CONSULT AN ATTORNEY.

Init.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.9913240106_1 which expires on 03/29/2011 and is not for resale.
User Notes: (790298029)

SEIFART  000686

This Agreement entered into as of the day and year first written above.

_____          _____
OWNER (Signature)                         CONTRACTOR (Signature)
Mr. Armin G. Seifart , Owner              Mr. Jad N. Lahoud, President/CEO
*(Printed name and title)*                *(Printed name and title)*

_____          _____
OWNER (Signature)                         _____
Mrs. Lisa M. Gore Seifart , Owner         _____
*(Printed name and title)*                _____

Init.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No 9913240106_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                    (796268329)

12

SEIFART  000687

Exhibit "A"                                          4/16/2010  12:29 PM  1



General Contractors

| S.N | DESCRIPTIONS: | AMOUNT | |
|---|---|---|---|

### Seifart Residence
#### 4075 Bonita Avenue
#### Miami, Florida 33133

| S.N | DESCRIPTIONS: | AMOUNT | |
|---|---|---|---|
| | **"A" General Conditions:** | | |
| 1 | Permit Fees: | $4,000.00 | Allowance |
| 2 | Notice of Commencement: | $45.00 | |
| 3 | Temporary Utilities: | $1,950.00 | |
| | - Electric: 6 months x $ 100.00/month = $ 600.00 | | |
| | - Portable Toilet: 8 months x $ 120.00/month = $ 960.00 | | |
| |    Permit: $ 150.00 | | |
| | - Water: 6 months x $ 40.00/month = $ 240.00 | | |
| 4 | Trash Hauling: | $10,400.00 | |
| 5 | Survey: (Required for Final Inspection) | $850.00 | |
| 6 | Protection/Covering: (Material Only) | $7,380.00 | |
| | - Protect existing floor coverings, bathroom wall tiles and vanities (masonite, | | |
| | paper, tape, vacuum filters, cloth rags etc...) and driveway with sand and plywood. | | |
| 7 | Builder's Risk Insurance: | $3,500.00 | Allowance |
| 8 | Construction Cleaning: | $1,600.00 | |
| 9 | Temporary A/C for Wood Floor: | $1,100.00 | |
| 10 | General Labor: | $12,500.00 | |
| 11 | Warehouse for vanities and doors: | $1,160.00 | |
| 12 | Equipment Rental: | $1,450.00 | |
| 13 | Supervision: | $42,000.00 | |
| | **SUBTOTAL "A":** | **$88,125.00** | |
| | **"B" Main Trades:** | | |
| 1 | Covering of Floors / Tile floors, Driveway. Removal of interior doors and handrail, wrapping and delivery to warehouse. | $1,920.00 | |
| 2 | Dismantle vanities, wood shutters, wrap and transport to warehouse | $1,890.00 | |
| 3 | Demolition & Hauling: | $35,300.00 | |

- Remove and haul away drywall and framing, moldings, baseboard, insulation, electrical, plumbing, HVAC ducts, copper pipes and wiring. window sills, Kitchen counter tops, Laundry Counter Tops, Kitchen Backsplash, appliances, plumbing fixtures, electric fixtures, all bathroom tile (walls only).
a) Remove from the interior of the garage, and haul to a Class 1 Landfill, all drywall, framing material, electrical (wires, conduits, switches, breakers, light fixtures) plumbing (all copper lines. and any metal pipes and fittings, fixtures, except tubs which are to remain), HVAC (equipment, pipes, registers and ductwork), appliances, wall tiles in bathroom and kitchen, countertops and insulation.
b) During the demolition period, have all windows and door open.
c) Once the entire house, from the interior, is demolished as per item (a), vacuum the entire house, masonry walls, ceiling and floor thoroughly using a normal vacuum with either HEPA filter or filters made  of HEPA material.  Using an air hose and starting from top to bottom, hose down with pressure all exterior masonry walls and the trusses.

Continued.......

SEIFART  000688



Exhibit "A"                                      4/16/2010 12:29 PM  2

d) Once the above items are done, wipe the trusses, one time, using a damp sponge.
e) For a period of four weeks, weekdays, from Monday to Friday and from 8:00 am to
   3:30 pm, open all windows and let the house air out before the rebuilding is started.

4   Electric:                                                       $28,400.00
    - Use Romex
    - Permit.

5   Electric Fixtures:                              $4,891.58  Allowance
    - Replace Existing.

6   Low Voltage: (Replace Existing)           $8,490.00
    - Alarm System , CCTV, Speakers, Central Vacuum.

7   HVAC:                               $26,587.00

8   Plumbing:                         $27,200.00
    - New copper pipes for hot and cold lines.
    - New water heaters
    - Remove and dispose of all plumbing fixtures except whirlpool and bathtubs.
    - New motor for Jacuzzi in Master Bath: (ALLOWANCE)    $450.00

9   Plumbing Fixtures:                 $18,464.00  Allowance
    - Replace existing with same except whirlpool and tubs (not to be touched).

10  Drywall:                         $37,950.00
    - All New Framing and drywall:
    - Furnish, install and finish 5/8" drywall

11  Insulation:                     $5,555.00
    a) Exterior Walls:  3/4" R-5 Rigid Boards
    b) Interior: R-11-Knee wall between garage and A/C area.
    c) Ceiling: R-30 Batts

12  Cabinets:                       $31,300.00
    - Remove existing cabinets carefully and store in an air conditioned warehouse for (7) months.
    - Replace trim (all new) with pieces to match existing (crown, flat pieces in front, connectors,
      under cabinet light covers, etc.)
    - Replace side pieces of refrigerator.
    - Replace damaged hardware.
    - Reinstall cabinets and touch up paint to match existing.
    - **Note:**  **G.C. nor its Subcontractors are liable in case of any damage during the removal**
      **and reinstallation.**

13  Interior Millwork:                  $15,729.00
    a) Reinstall existing doors: - 16hrs x $ 30.00/hr = $ 480.00    $480.00
    - **Note:**  **G.C. nor its Subcontractors are liable in case of any damage during the removal**
      **and reinstallation.**
    b) Casing Material: 850' x $ 1.30/ft = $ 1,105.00    $1,105.00
    c) Crown Material: 1,040' x $ 4.50/ft = $ 4,680.00    $4,680.00
    d) Base Material: 880' x $ 5.30/ft = $ 4,664.00    $4,664.00
    e) Installation of casing, crown and base:    $4,800.00

14  Painting:  Interior ONLY using Low VOC Paint    $19,300.00

15  Closets:                         $2,950.00
    - Remove, store, and reinstall existing closets.
    - **Note:**  **G.C. nor its Subcontractors are liable in case of any damage during the removal**
      **and reinstallation.**



F:\L H Data\Seifart\Seifart Residence.xls



| 16 | Tile/Stone/Tops: | | $41,844.25 |
|---|---|---|---|

a) Counter Tops:
- Kitchen, Laundry, Onyx in Foyer, Onyx in Master Bath,
  Guest Bath, Bath #1, Window Sills and Kitchen Backsplash.
- For Kitchen top fabrication and installation with same                $4,937.50
  material and edge detail as existing.  Labor & Material Included.
- Kitchen Backsplash with mini brick travertine as per existing,        $1,125.00
  Labor & Material included.
- New Laundry Granite top with same material and edge detail            $2,000.00
  as existing.  Labor & Material included.
- Honey Onyx top for Entry Foyer.  Labor & Material Included.           $1,000.00
- Honey Onyx vanity top for Master Bath.  Fabrication &                 $3,750.00
  Installation for (2) sets.
- Vanity top fabrication & installation for Guest Bath #1, Labor & Material.  $812.50
- Vanity top fabrication & installation for Guest Bath #2, Labor & Material   $812.50
- Window Sill replacement on first and second floor.  Labor &          $1,500.00
  Material included.
- Cleaning & Polishing all marble floor areas including terraces.       $3,125.00

b) Tile & Stone:
- Master Bathroom: New installation on shower walls as existing         $2,950.00
  with Crema Marfil 36" x 36" and Honey Onyx mosaic installation
  on shower head areas including bullnose edge detail (Labor Only)
- For new Jacuzzi fabrication and installation including Honey          $2,350.00
  Onyx mosaic installation on Jacuzzi backsplash.
- Material for Master Bath:
  - Crema Marfil including waste:                                       $2,700.00
  - Honey Onyx Mosaic, Mini brick style for shower walls and           $1,444.00
    and Jacuzzi backsplash.
  - Honey Onyx bullnose edge for shower walls and jacuzzi backsplash.  $1,425.00
  - Honey Onyx slab material for new Jacuzzi top and front area.       $3,675.00
- Guest Bath #1 on 2nd Floor - Labor:
  - New slate installation on shower walls, diagonal installation as existing.  $800.00
- Guest Bath #1 on 2nd Floor - Material:
  - 12" x 12" slate multicolor material as existing.                     $593.75
- Guest Bath #2 on 2nd Floor - Labor:
  - For new travertine installation on shower walls including          $1,000.00
    tumbled stone border around shower walls.
- Guest Bath #2 on 2nd Floor - Material:
  - Yellow Travertine 18" x 18"                                          $516.00
  - Tumbled Stone border:                                                $144.00
  - Travertine full bullnose edge.                                       $120.00
- Guest Bath #1 First Floor - Labor:
  - Yellow Travertine mini bricks/split face installation on           $1,400.00
    shower walls as existing.
- Guest Bath #1 First Floor - Material:
  - New Yellow Travertine mini bricks/split face stone material:       $2,160.00
- Guest Bath #2 on First Floor - Labor
  - New stone installation on shower walls, diagonal installation as existing.  $720.00
- Guest Bath #2 on First Floor - Material
  - Crema Valencia 18" x 18" including waste:                            $784.00



SEIFART  000690



Exhibit "A"                                                                    4/16/2010 12:29 PM  4

| | | |
|---|---|---|
| 17 | Appliances | $22,200.00 |
| | a) Appliances: (ALLOWANCE) | $21,400.00 |
| | b) Installation: | $800.00 |
| 18 | Shower Enclosures: | $3,612.05 |
| | - Remove and relocate customer's glass shower doors and fix | |
| |   panels with new hardware. | |
| | - Powder Room (1) 33" x 76" Three clips (Shower). | |
| | - Bath #1: (1) 32-1/2" x 68" Two clips, one towel bar (Tub) | |
| | - Master Bath: (2) 33" x 76-1/2" Doors (2 hinges) One 6" pull, | |
| |   (1) 42-1/2" x 51" fixed glass Four clips. | |
| | - Upstairs Bath #2: (1) 32-1/2" x 68" Fixed Two Clips, one towel bar (Tub) | |
| | - Upstairs Bath #3: (1) 29" x 77" Fixed Three Clips, one towel Bar (Shower) | |
| | - <u>Note:</u>  G.C. nor its Subcontractors are liable in case of any damage during the removal | |
| |   and reinstallation. | |
| 19 | Exterior Keyed Locks: | $2,100.00 |
| | - Replace all existing Medeco deal bolts (key on outside and turn bolt on inside) | |
| | - All locks keyed the same - Quantity - 9. | |
| 20 | Inspection at the end of the demolition and cleaning process by a special consultant: | $2,500.00  Allowance |
| 21 | Pool: | $1,300.00 |
| | - Replace pool pump and start up. | |
| | - Clean, pressure wash and acid wash pool. | |
| | - <u>Note:</u>  For new Diamond Brite ADD: $ 2,818.00 | |
| 22 | Landscaping & Irrigation: | $1,200.00  Allowance |
| | - Repair items damaged during construction and due to neglect while the home | |
| |   was unoccupied. | |

| | |
|---|---|
| **SUBTOTAL "B":** | **$339,682.88** |
| **SUBTOTAL "A + B":** | **$427,807.88** |

| | | |
|---|---|---|
| 23 | Overhead & Profit @ 15%: | $64,171.18 |

| | |
|---|---|
| **GRAND TOTAL :** | **$491,979.06** |

Owner's Approval: _____

Date: 3/30/2010

Contractor's Signature: _____

Date: _____

SEIFART  000691

## Lahoud & Hardan – Construction Schedule
### Seifart Residence – 4075 Bonita Avenue, Miami, Florida

Exhibit "B"

4/15/2010

Project Duration: 30 weeks (210 Calendar Days)

Weeks: 1–30

Tasks (top to bottom):

- PERMIT
- PREPARATION/COVERINGS/REMOVE & PACK (Cabinets/Vanities/Laundry/Closets & Doors)
- DEMOLITION
- VENTILATION
- FRAMING
- HVAC / DUCT
- PLUMBING / PIPING
- ELECTRIC WIRING
- ALARM / TEL / SPEAKERS / VACUUM
- MEP / INSPECTIONS
- INSULATION / INSPECTION
- DRYWALL / HANG / FINISH
- PAINT / PRIMER / DRYWALL PUNCHLIST / CLEAN
- COAT OF PAINT
- INTERIOR DOORS / BASEBOARDS / CROWN
- CABINETS / VANITIES
- COUNTER TOPS / BACKSPLASH
- ELECTRIC: TRIM
- LOW VOLTAGE TRIM
- HVAC TRIM & EQUIPMENT
- PLUMBING: TRIM
- APPLIANCES
- CLOSETS
- PAINT: FINAL COAT
- CLEANING / INSPECTIONS / PUNCHLIST

Legend:
- ▓ = Scheduled
- ▦ = Delayed
- ▒ = Completed
- ■ = Rescheduled
- ▓ = Owner Selection

SEIFART  000692

# APPLICATION AND CERTIFICATE FOR PAYMENT

Exhibit "C"

| TO OWNER: | PROJECT: | APPLICATION NO.: | 1 | Distribution to: |
|---|---|---|---|---|
| Mr. Armin G. Seifart | Seifart Residence | APPLICATION DATE: | 3/30/2010 | OWNER ☐ |
| | | PERIOD TO: | 3/30/2010 | ARCHITECT ☐ |
| FROM CONTRACTOR: | 4075 Bonita Ave | ARCHITECT'S PROJECT NO.: | Seifart | CONTRACTOR ☐ |
| Lahoud & Hayden Enterprises, Inc. | Miami, Florida 33133 | | | |

Mr. Armin G. Seifart

4075 Bonita Ave
Miami, Florida 33133

FROM CONTRACTOR:
Lahoud & Hayden Enterprises, Inc.
420 S. Dixie Hwy, Suite 2M
Coral Gables, Florida 33146

CONTRACT FOR:

VIA ARCHITECT:

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation sheet is attached.

| | | |
|---|---|---|
| 1. ORIGINAL CONTRACT SUM .................................................. | $ | 451,979.06 |
| 2. Net change by Change Orders ............................................ | $ | - |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) ............................... | $ | 451,979.06 |
| 4. TOTAL COMPLETE & STORED TO DATE .............................. | $ | 25,787.66 |
| (Column G on Continuation) | | |
| 5. RETAINAGE: | | |
| a. _____ % of Completed Work $ | | |
| (Columns D & E on Continuation) | | |
| b. _____ % of Stored Material $ | - | |
| (Column F on Continuation) | | |
| Total Retainage | | $ |
| (Line 5a + 5b or Total in Column I of Continuation) | | |
| 6. TOTAL EARNED LESS RETAINAGE ..................................... | $ | 25,787.66 |
| (Line 4 less Line 5 Total) | | |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT | $ | - |
| (Line 6 from prior Certificate) | | |
| 8. CURRENT PAYMENT DUE ................................................. | $ | 25,787.66 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE | | |
| (Line 3 less Line 6) | $ | 466,191.40 |

| CHANGE ORDER SUMMARY : | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $0.00 | $0 |
| Total approved this month | $0.00 | $0 |
| TOTALS | $0.00 | $0 |
| NET CHANGES by Change Order | $0.00 | $0 |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief, the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due, and, the current payment shown (or portions thereof) shown herein represent amounts due to Contractor for percentages of Work completed and such amounts do not necessarily represent the monies to be paid to subcontractors, material suppliers or others as some monies may instead be retained by Contractor.

CONTRACTOR:

By: _____ Date: _____

State of: _____ Florida
County of: _____ Miami-Dade
Subscribed and sworn to before me this _____ day of _____

Notary Public: _____
My Commission expires: _____

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ............................................... $ _____
Attach explanation if amount certified differs from the amount applied for. Initial all figures on this application and on the Continuation Sheet that are changed to conform to the amount certified.

ARCHITECT:

By: _____ Date: _____

This certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

SEIFART 000693

SEIFART 000694

Exhibit C

# CONTINUATION SHEET

APPLICATION AND CERTIFICATE FOR PAYMENT.
containing Contractor's signed Certification, is attached.
in tabulations below, amounts are stated to the nearest dollar.
Use Column i on Contracts where variable retainage for line items may apply.

APPLICATION NO: 1
APPLICATION DATE: 3/30/2010
PERIOD TO: 3/30/2010
ARCHITECT'S PROJECT NO: Seifart

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D+E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED & STORED TO DATE (D+E+F) | % (G/C) | H BALANCE TO FINISH (C-G) | I RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Permit Fees | $ 4,000.00 | $ - | $ - | | $ - | 0% | $ 4,000.00 | $ - |
| 2 | Notice of Commencement | $ 45.00 | $ - | $ - | | $ - | 0% | $ 45.00 | $ - |
| 3 | Temporary Utilities | $ 1,950.00 | $ - | $ 390.00 | | $ 390.00 | 20% | $ 1,560.00 | $ - |
| 4 | Trash Hauling | $ 10,400.00 | $ - | $ - | | $ - | 0% | $ 10,400.00 | $ - |
| 5 | Survey | $ 850.00 | $ - | $ - | | $ - | 0% | $ 850.00 | $ - |
| 6 | Protection/Covering (Material) | $ 7,380.00 | $ - | $ 1,476.00 | | $ 1,476.00 | 20% | $ 5,904.00 | $ - |
| 7 | Builder's Risk Insurance | $ 3,500.00 | $ - | $ - | | $ - | 0% | $ 3,500.00 | $ - |
| 8 | Construction Cleaning | $ 1,800.00 | $ - | $ - | | $ - | 0% | $ 1,800.00 | $ - |
| 9 | Temporary A/C for Wood Floor | $ 1,100.00 | $ - | $ 220.00 | | $ 220.00 | 20% | $ 880.00 | $ - |
| 10 | General Labor | $ 12,500.00 | $ - | $ - | | $ - | 0% | $ 12,500.00 | $ - |
| 11 | Warehouse for Vanities and Doors | $ 1,150.00 | $ - | $ 575.00 | | $ 575.00 | 50% | $ 575.00 | $ - |
| 12 | Equipment Rental | $ 1,450.00 | $ - | $ - | | $ - | 0% | $ 1,450.00 | $ - |
| 13 | Supervision | $ 42,000.00 | $ - | $ - | | $ - | 0% | $ 42,000.00 | $ - |
| 14 | Covering of floors, tile walls, driveway, removal of interior doors & delivery to warehouse. Remove of handrail. | $ 1,920.00 | $ - | $ 960.00 | | $ 960.00 | 50% | $ 960.00 | $ - |
| 15 | Dismantle Vanities, wood shutters, wrap & transport to Whse | $ 1,890.00 | $ - | $ 445.00 | | $ 445.00 | 24% | $ 1,445.00 | $ - |
| 16 | Demolition & Hauling | $ 35,300.00 | $ - | $ 7,650.00 | | $ 7,650.00 | 22% | $ 27,650.00 | $ - |
| 17 | Electric | $ 28,400.00 | $ - | $ 3,660.00 | | $ 3,660.00 | 13% | $ 24,740.00 | $ - |
| 18 | Electric Fixtures | $ 4,891.58 | $ - | $ - | | $ - | 0% | $ 4,891.58 | $ - |
| 19 | Low Voltage | $ 8,490.00 | $ - | $ - | | $ - | 0% | $ 8,490.00 | $ - |
| 20 | HVAC | $ 25,587.00 | $ - | $ 3,268.05 | | $ 3,268.05 | 13% | $ 22,318.95 | $ - |
| 21 | Plumbing | $ 27,200.00 | $ - | $ 3,780.00 | | $ 3,780.00 | 14% | $ 23,420.00 | $ - |
| 22 | Plumbing Fixtures | $ 18,464.00 | $ - | $ - | | $ - | 0% | $ 16,464.00 | $ - |
| 23 | Framing & Drywall | $ 37,950.00 | $ - | $ - | | $ - | 0% | $ 37,950.00 | $ - |
| 24 | Insulation | $ 5,555.00 | $ - | $ - | | $ - | 0% | $ 5,555.00 | $ - |
| 25 | Cabinets | $ 31,300.00 | $ - | $ - | | $ - | 0% | $ 31,300.00 | $ - |

Exhibit C

# CONTINUATION SHEET

APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO: 1
APPLICATION DATE: 3/30/2010
PERIOD TO: 3/30/2010
ARCHITECT'S PROJECT NO: Seifart

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | WORK COMPLETED | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED & STORED TO DATE (D + E + F) | % (G / C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE RATE) |
| | | | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | | | | |
| 26 | Interior Millwork | $ 15,729.00 | $ - | $ - | $ - | $ - | 0% | $ 15,729.00 | $ - |
| 27 | Painting | $ 19,300.00 | $ - | $ - | $ - | $ - | 0% | $ 19,300.00 | $ - |
| 28 | Closets | $ 2,950.00 | $ - | $ - | $ - | $ - | 0% | $ 2,950.00 | $ - |
| 29 | Tile/Stone/Tops | $ 41,844.25 | $ - | $ - | $ - | $ - | 0% | $ 41,844.25 | $ - |
| 30 | Appliances | $ 22,200.00 | $ - | $ - | $ - | $ - | 0% | $ 22,200.00 | $ - |
| 31 | Shower Enclosures | $ 3,612.05 | $ - | $ - | $ - | $ - | 0% | $ 3,612.05 | $ - |
| 32 | Exterior Keyed Locks | $ 2,100.00 | $ - | $ - | $ - | $ - | 0% | $ 2,100.00 | $ - |
| 33 | Inspection by Special Consultant at end of | $ 2,500.00 | $ - | $ - | $ - | $ - | 0% | $ 2,500.00 | $ - |
| 34 | Demo/Clearing Process Pool | $ 1,300.00 | $ - | $ - | $ - | $ - | 0% | $ 1,300.00 | $ - |
| 35 | Landscaping & Irrigation: | $ 1,200.00 | $ - | $ - | $ - | $ - | 0% | | $ - |
| 36 | Overhead & Profit @ 15%: | $ 64,171.18 | $ - | $ 3,363.61 | $ - | $ 3,363.61 | 5% | $ 60,807.57 | $ - |
| 37 | | | | $ - | $ - | $ - | 0% | $ - | $ - |
| 38 | | | | $ - | $ - | $ - | 0% | $ - | $ - |
| 39 | | | | $ - | $ - | $ - | 0% | $ - | $ - |
| 40 | | | | $ - | $ - | $ - | 0% | $ - | $ - |
| | Grand Totals: | $ 491,879.08 | $ - | $ 25,787.66 | $ - | $ 25,787.66 | 5% | $ 464,991.40 | $ - |

SEIFART 000695

3

Exhibit "B"

## Cases Grouped by Year

| File | Date | Property | Property Location | Case | Attorney | Atty Firm |
|---|---|---|---|---|---|---|
| **2010 (4 records)** | | | | | | |
| 6356 | Feb 16 2010 | Residential Condominium | Villa Regina, 1581 Brickell Avenue | Feldman v. Villa Regina | Scott Shehati | Shehati & Torres |
| 6117 | Feb 01 2010 | Wilder v. Wilder | Various Locations | Wilder v. Wilder | A.J. Barrancano | Barranco & Kircher, PA |
| 6319 | Jan 21 2010 | Apartment Bldg | 2000 Park Avenue, Miami Beach, FL | Western United Life Assurance v G-2 Development | Anthony Conti | Foley & Lardner LLP |
| 5782 | Jan 20 2010 | Residential Condominium | Villa Regina, 1581 Brickell Avenue | Jerome Feldman v Villa Regina Assoc | John Lakin | Lakin Smith |
| | Jan 04 1900 | | | | | |
| **2009 (8 records)** | | | | | | |
| 6310 | Dec 03 2009 | Sapphire Beach Resort | St Thomas | Beachside Associates vs Okemo & Mueller | Neil Goldman | Young Goldman & Van Beek |
| 6217 | Sep 28 2009 | Sapphire Beach Resort | St. Thomas, USVI | Beachside Assoc vs. Okemo | Neil Goldman | Young Goldman & Van Beek |
| 6141 | May 27 2009 | 1965 Alton Road | 1965 Alton Road, Miami Beach, FL | 750 Jefferson v Ram Realty | Mark Dikeman | Stearns Weaver |
| 6121 | Apr 30 2009 | Fountainbleau Golf Course | NW 87th Avenue & NW 8th St, Miami, FL | Miami Dade County v Carolyn Sakolsky | Mitchell Widom | Bilzin Sumberg |
| 6098 | Mar 16 2009 | Miami Arena | 721 NW 1st Avenue, Miami, FL | Miami Dade County v Arena Ventures | Larry Zink | Zink, Zink & Zink |
| 6056 | Feb 11 2009 | 4400 West 16th Ave | 4400 W 16th Ave, Hialeah, FL | Ocean Bank v 4400 LLC | Phil Allon | Gartell Stephany Allen & Roza, PA |
| 6068 | Jan 15 2009 | Miami Arena | 721 NW 1st Avenue, Miami, FL | Miami Dade County v Arena Ventures | Larry Zink | Zink, Zink & Zink |
| 6062 | Jan 08 2009 | Single Family Residence | 253 Romano Avenue, Coral Gables, FL | Impac v American Bancshare | Ms. Leslie Vandale | Wohle & Wyman, LLP |
| | Jan 08 1900 | | | | | |
| **2008 (4 records)** | | | | | | |
| 5991/5992 | Jul 02 2008 | Lot & Island | Bamboo Key & McCole | Beyer & McCole v City of Marathon | Adam Schachter | City of Marathon |
| 5205/5861 | May 29 2008 | East Everglades Parcels | East Everglades, Miami, FL | USA v 2.20 Acres of Land | Ms. Veronica James | USDOJ |
| 5859 | Feb 25 2008 | Apartment Building | 158 NE 41 St, Miami, FL | Cynthia Palmer v Michael Palmer | Raymond J. Rafool | Barranco Kircher |
| 5786/5800 | Jan 16 2008 | Warehouse | 7267 NW 32nd Street, Miami, FL | Firehouse & Beers v Airport Trade Center | Frank Zemel/Jason Gordon | Arnstein & Lahr |
| | Jan 04 1900 | | | | | |
| **2007 (3 records)** | | | | | | |
| 5778 | Sep 26 2007 | Retail | 2935 East Las Olas Blvd, Ft Lauderdale | S & S Investments v Payless Flea Market | Frank Zemel | Arnstein & Lahr |
| 5767 | Aug 23 2007 | Harbour House Apts | 10295 Collins Avenue | Mejia, Lezos & Cohen | Morgan Swing | Stearns Weaver |
| 5782/5632 | Jul 11 2007 | Residential Condominium | Villa Regina, Miami, FL | Jerome Feldman v Villa Regina Assoc | John Lakin | Lakin Smith |
| | Jan 03 1900 | | | | | |
| **2006 (2 records)** | | | | | | |
| 5438 et al | Oct 31 2006 | 9489 Collins et al | Miami Beach, FL | Fernandez v Fernandez | Maurice Jay Kutner | Kutner & Associates |
| 5482 | Jul 12 2006 | Office Building | 1177 Kane Concourse, Bay Harbor, FL | Carolyn Miller v Eckert Seamans | Curtis Carlson | Carlson & Lewittes |
| | Jan 02 1900 | | | | | |
| **2005 (9 records)** | | | | | | |
| 5395 | Dec 10 2005 | East Everglades Parcels - Group 34 | East Everglades | USA v Acres of Land | Mr. Norman Hemming | USDOJ |
| 5334 | Nov 22 2005 | East Everglades Parcels - Group 35 | East Everglades | USA v Acres of Land | Mr. Norman Hemming | USDOJ |
| 5351 | Oct 06 2005 | East Everglades Parcels - Group 33 | East Everglades | USA v 2.5 Acres | Mr. Norman Hemming | USDOJ |
| 5322 | Sep 07 2005 | East Everglades Parcels - Group 31 | East Everglades | USA v Acres of Land | Mr. Norman Hemming | USDOJ |
| 5316 | Aug 01 2005 | East Everglades Parcels | East Everglades | USA | Mr. Douglas R. Wright | USDOJ |
| 5283 | Jul 19 2005 | East Everglades Parcels - Group 29 | East Everglades | USA v Acres of Land | Mr. Norman Hemming | USDOJ |
| 5276 | Jun 28 2005 | Vincent Land | Ft Lauderdale | Goodrick v Ponsoldt | Mr. Wayne M. Alder | Sexton Alder & Matthewman |
| 5276 | Jun 28 2005 | East Everglades Parcels - Group 28 | East Everglades | USA v Acres of Land | Mr. Norman Hemming | USDOJ |
| 4939 | Feb 14 2005 | Single Family Residence | 221 Casuarina Concourse, Coral Gables, FL | | Mr. Andrew Gold | |
| | Jan 09 1900 | | | | | |
| **2004 (1 record)** | | | | | | |
| 5254 | Oct 25 2004 | East Everglades Parcels - Group 20 | East Everglades | USA v Acres of Land | Mr. Norman Hemming | USDOJ |
| | Jan 01 1900 | | | | | |
| **2003 (1 record)** | | | | | | |
| 4884 | Apr 01 2003 | 99 Year Ground Lease | Ritz Carlton, San Juan, PR | | Joel Tabas | Tabas Freedman Soloff Miller |
| | Jan 01 1900 | | | | | |
| **2001 (1 record)** | | | | | | |
| 4563 | Aug 09 2001 | Hotel Property | Sunset Key Island, Key West, FL | Monroe County | | |
| | Jan 01 1900 | | | | | |
| **2000 (1 record)** | | | | | | |
| 4431 | Nov 01 2000 | Single Family Residence | 1770 Lake Road | Miami, FL | Betsy Warwick | |
| | Jan 01 1900 | | | | | |
| | Feb 03 1900 | | | | | |

Cases Grouped by Year

| Atty City State | Opposing Counsel | Opp atty firm | Opp atty city state | Testimony | Jurisdiction | Issue |
|---|---|---|---|---|---|---|
| Miami, FL | Andrew Bray | Bray & Assoc. | Ft Lauderdale, FL | Court | Miami-Dade | Dimunition in value |
| Miami, FL | | | | Court | Clearwater | Appraisal fees - Divorce |
| Orlando, FL | Michel Weiss | | Miami, FL | Deposition | Miami-Dade County | Lender liability |
| Bradenton, FL | Andrew Bray | | Ft Lauderdale, FL | Deposition | Miami-Dade | Water intrusion/loss in value |
| | | | | | | |
| Alexandria, VA | John Benham | Law Office of John Benham | St Thomas, USVI | Court | US Virgin Islands | Dimunition in value due to claims on title |
| | | | | | | |
| Alexandria, VA | John Benham | Law Office of John Benham | St Thomas, USVI | Deposition | US Virgin Islands | Dimunition in value due |
| Miami, FL | Joel Aresty | | Miami, FL | Court | Bankruptcy Court | Deficiency/foreclosure |
| Miami, FL | Thomas Logue | Miami-Dade County | Miami, FL | Deposition | Miami-Dade | Real estate tax appeal |
| Canton, OH | Thomas Logue | Miami Dade County | Miami, FL | Court | Miami-Dade | Real estate tax appeal |
| Miami, FL | Omar Ortega | | Miami, FL | Court | Miami-Dade | Foreclosure & request to appoint receiver |
| Canton, OH | Thomas Logue | Miami Dade County | Miami, FL | Deposition | Miami-Dade | Real estate tax appeal |
| Irvine, CA | Michael Cosculluela | Cosculluela & Marzano, PA | Miami Lakes, FL | Arbitration | California | Litigation regarding an improper appraisal |
| | | | | | | |
| Miami, FL | Andy Tobin | | Key Largo, Fl | Deposition | Monroe | Buildable rights of wetlands |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Miami, FL | Natalie Lemos | Leinoff & Lemos | Miami, FL | Deposition | Miami-Dade | Divorce, historical value |
| Ft Lauderdale | Steven Mishan | | Miami, FL | Deposition | Miami-Dade | Contract dispute |
| | | | | | | |
| Ft Lauderdale, FL | Stephen Rakusin | | Ft Lauderdale, FL | Court | Broward | Lease dispute |
| Miami, FL | Richard M. Dunn | Ozan O'Connor | Miami, FL | Deposition | Miami-Dade | Mold/loss in value |
| Bradenton, FL | Andrew Bray | | Ft Lauderdale, FL | Deposition | Miami-Dade | Water intrusion/loss in value |
| | | | | | | |
| Miami, FL | Gerald Krongold | | Miami, FL | Court | Miami-Dade | Divorce |
| Miami, FL | Sheryl Martens Dunaj | Sheryl Martens Dunaj | Stephens Lynn Klein | Deposition | Miami-Dade | Attorney malpractice |
| | | | | | | |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Washington, DC | Robert Byrne | Brigham Moore Byrne | Miami, FL | Deposition | Federal | Appraisal review |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Miami, FL | | | | Deposition | Miami-Dade | Review of improper appraisal |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Miami, FL | | | | Arbitration | Miami-Dade | Construction delay |
| | | | | | | |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| | | | | | | |
| Miami, FL | | | | Court | Broward | Fraud dealing with 99 year land lease |
| | | | | | | |
| Miami, FL | John Dent | | Sarasota, FL | Court | Monroe | Real estate tax appeal |
| | | | | | | |
| Miami, FL | | | | Court | Miami-Dade | Divorce |