UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE MANUFACTURED | * | MDL No. 2047 |
| DRYWALL PRODUCTS LIABILITY | * | |
| LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE |
| | * | JOSEPH C. WILKINSON, JR. |
| | * | |

* * * * * * * * * * * * * * ** * * * * * ** * * * * * * * *

**THIS DOCUMENT RELATES TO:** *All Cases*

**DEFENDANTS TAISHAN GYPSUM CO. LTD. AND
TAIAN TAISHAN PLASTERBOARD CO., LTD.'S
OPPOSITION TO THE PSC'S AND THE HSC'S MOTIONS TO COMPEL**

Defendants Taishan Gypsum Co. Ltd. ("TG") and Taian Taishan Plasterboard Co., Ltd.

("TTP") (together, "Defendants") submit this memorandum in opposition to the motions by the

Plaintiffs' Steering Committee (the "PSC") and the Homebuilder Steering Committee (the

"HSC") (collectively, "Movants")[1] to compel Defendants to produce additional or substitute

30(b)(6) witnesses, additional documents and for sanctions (the "PSC Motion" and the "HSC

Motion" and collectively, the "Motions to Compel").  (Rec. Doc. Nos. 8685 and 8695.)

**PRELIMINARY STATEMENT**

TG and TTP have complied with their jurisdictional discovery obligations.  In the months

leading up to their Rule 30(b)(6) depositions, Defendants produced over 30,000 pages of

documents.  Then, in April 2011, TG and TTP made three corporate representatives available for

a total of six days of depositions in Hong Kong.  Despite this extensive discovery directed solely

---

[1] This opposition is also submitted in response to any joinders in the Motions to Compel, to the extent they raise similar arguments.  To the extent those joinders raise additional arguments, Defendants will submit a separate memorandum.

towards personal jurisdiction, the PSC and the HSC have filed motions to compel additional depositions and documents, which will further delay resolution of the Rule 60(b) motion from which this issue initially arose.  But the facts establishing that Defendants lack the minimum contacts with any U.S. state necessary for personal jurisdiction are clear, and no amount of additional discovery will change them.

Movants' criticism of the adequacy of Defendants' witnesses is baseless.  While Movants argue that the witnesses were inadequately prepared, their citations show that they frequently questioned witnesses about the topics for which other witnesses had been designated. Movants also asked questions not relevant to personal jurisdiction, such as inquiries concerning drywall testing and quality.   Movants asked few factual questions concerning TG and TTP's jurisdictional contacts with U.S. states, if any.  They barely addressed key documents such as Defendants' Manufacturers' Profile Forms ("MPFs") and the drywall sales transactions listed on those documents.  When Movants actually asked the witnesses questions on their designated topics, the witnesses provided responsive and informative testimony.

Movants ignored continued warnings by Defendants' counsel to use their time wisely, and in fact elected to reduce the allotted time from six days to five for the expressed desire to return home for the weekend.  During five days of depositions, Movants had ample opportunity to ask questions relevant to personal jurisdiction.

Movants also seek to compel the production both of documents previously produced by Defendants and of new documents never before requested, even though they failed to ask questions of the witnesses about potentially relevant documents already produced.  The PSC also moves for the production of documents that are within the scope of the PSC's prior motions to

compel that the Court denied, and which the PSC still has not shown are relevant to personal jurisdiction.

There is no basis to award sanctions against TG or TTP, as they did not obstruct the depositions.  The examiners often asked complex, argumentative questions designed to establish legal positions rather than discover jurisdictional facts.  These questions elicited objections, were difficult to translate, and confused the witnesses.  The vast majority of TG and TTP's objections were succinctly stated, and the few longer objections made by counsel were in response to misleading questions or inquiries that went far beyond the scope of jurisdictional discovery.  Further, although Movants complain about Defendants' use of a check interpreter, the record shows that the PSC insisted on using an incapable interpreter for the entire week and that the PSC refused to provide her with the basic information about the case that she needed to prepare for the depositions.  The PSC's intentional refusal to prepare the interpreter and the interpreter's deficiencies were the subject of sometimes heated arguments between the *PSC and the interpreter* and necessitated extensive discussions between the interpreter, the witness, the check interpreter and counsel to correct translations and maintain an accurate record.

Movants have had an adequate opportunity to develop the evidence relating to the personal jurisdiction issue.  There is no reason to require Defendants to incur the burden, expense, and delay of any further discovery before the Court decides the question of personal jurisdiction.  The Court should deny the Motions and set a schedule for completing the briefing of TG's jurisdictional motions.  The Court should further award Defendants their attorneys' fees and costs for opposing Movants' unjustified motions.

## RELEVANT PROCEDURAL HISTORY

**A.      The PSC's First Motion to Compel and Defendants' Motion for a Protective Order**

The PSC insinuates that TG and TTP previously have refused to provide appropriate discovery (PSC Motion at 11), but the facts belie their claim.  The PSC filed a motion to compel on January 12, 2011 seeking, *inter alia*, further answers to the Interrogatories and Document Requests relating to the activities of TG's affiliates. (Rec. Doc. No. 6964.)  In response to the motion, Defendants showed that they had produced all available documents concerning their manufacture or sale of drywall made to dimensions used in the U.S.  On January 14, 2011, TG and TTP filed a Motion for a Protective Order requesting that the scope of document and deposition discovery be limited to their contacts with the U.S. in connection with their manufacture or sale of drywall.  (Rec. Doc. No. 7003.)  On January 20, 2011, the Court heard argument on both motions and entered an order permitting the PSC to question TG and TTP *at the depositions* concerning their relationships with "Other Entities." [2]  The Court, however, *did not require that TG and TTP produce any additional documents concerning their relationships with Other Entities prior to the depositions*.  (Rec. Doc. No. 7136 at 3.)  Subsequently the PSC filed a renewed motion to compel discovery of the additional documents that the Court had denied. (Rec. Doc. No. 7364.)  The Court denied the renewed motion on February 16, 2011. (Rec. Doc. No. 7511.)

**B.      The Depositions in Hong Kong**

Defendants designated Jia Tongchun, TG's chairman of the board and general manager, Mr. Zhang Jianchun, the secretary of the boards of directors of TG and TTP; and Peng Wenlong,

---

[2] "Other Entities" was a defined term in the PSC's document requests that encompassed TG's parent company, BNBM and numerous other downstream companies, inside and outside of China.

a former TTP employee and the current manager of TG's Foreign Trade Department to testify concerning the Rule 30(b)(6) deposition topics designated by the PSC.  (*See* Letter, dated February 16, 2011, attached hereto as **Exhibit A**.)  TG/TTP's counsel further explained that Messrs. Jia and Zhang would respond to questions related to the corporate structure of TG and TTP respectively, and Mr. Peng would address the companies' contacts with the U.S. and related sales of drywall.  (Ex. A.)  The PSC confirmed then their understanding of this.  (*See* E-mail, dated February 17, 2011, attached hereto as **Exhibit B**.)  Defendants also made clear that the depositions would be limited to issues related to personal jurisdiction.

Each 30(b)(6) witness was scheduled to be examined for two days: Mr. Jia, April 4-5; Mr. Zhang, April 6-7, and Mr. Peng, April 8-9.  Defendants also offered to make Mr. Peng available for an additional half-day, if Mr. Zhang's deposition finished early.  (*See* E-mail, dated March 23, 2011, attached hereto as **Exhibit C**.)

Mr. Jia was deposed for two full days on April 4 and 5.  On April 5, before hearing a word of testimony from Mr. Zhang, the examining parties decided to shorten Mr. Zhang's deposition to one day, to question Mr. Peng on April 7 and April 8, and to forgo depositions on April 9.[3]

---

[3] This agreement was memorialized on the record during Mr. Zhang's deposition as follows:

> MR. STATMAN: Before Mr. Montoya recommences with his questions, I just want to note that Mr. Zhang was scheduled to have his deposition taken over a period of two days.  I understand that yesterday you all agreed that his deposition would be taken only today and that you would take Mr. Peng's deposition over the next two days and you would not be taking any depositions on Saturday.  I see nods on the other side of the table, and I'm assuming that's all correct and no one disagrees with that.  (Transcript of the Deposition of Jianchun Zhang on April 6, 2011, relevant excerpts of which are attached hereto as **Exhibit D** ("Zhang Tr.") at 159:21-160:13.)

Counsel for Banner Supply and Tobin Trading were the only parties to demur, although counsel for Banner stated that "it's okay as long as I have an opportunity to ask a few questions today."  And he did get an opportunity to ask questions of Zhang.  (*See* Zhang Tr. at 174:20-194:20; 198:10-207:17.)

\\NY - 037476/000001 - 2321530 v1

## ARGUMENT

As is set forth below, the motions should be denied because Movants have not demonstrated that further jurisdictional discovery is reasonably necessary.[4]

## I.    THERE IS NO BASIS FOR FURTHER DEPOSITIONS OR OTHER JURISDICTIONAL DISCOVERY

### A.    Movants Had an Ample Opportunity For Jurisdictional Discovery

Counsel were allotted six days to conduct jurisdictional depositions, and although they decided to shorten the depositions to five days, this was still more than enough time to ask any relevant questions concerning jurisdictional issues.  Indeed, the PSC and HSC do not complain of insufficient time, and do not seek to re-open the depositions of the witnesses whose depositions they have taken.  To the extent other parties seek to re-open the depositions, their claims are misplaced, and are addressed in a separate memorandum.

### B.    Defendants Provided Adequate Rule 30(b)(6) Witnesses

Under Rule 30(b)(6) corporate representatives are only required to testify with respect to information known or reasonably available to the corporation on the topics for which they were designated to testify.  Moreover, contrary to Movants' assertions (PSC Br. 12-13; HSC Br. 5), under Rule 30(b)(6) a responding party is not required to produce the "best" or "most knowledgeable" witness, merely a witness with adequate knowledge of the topics designated in the deposition notice.  *See Rodriguez v. Pataki*, 293 F. Supp. 2d 305, 311 (S.D.N.Y. 2003) ("[I]t is settled law that a party need not produce the organizational representative with the greatest

---

[4] As is set forth in Defendants' Opposition to the PSC's and HSC's motions to expedite these hearings (Rec. 8741), Movants did not engage in a meaningful, good faith meet and confer prior to filing their motions as required by the Federal Rules of Civil Procedure and the Court's Order of April 26, 2011.  (FRCP 37(a)(1); Rec. Doc. No. 8649 at 3.)  *See Boland Marine & Mfg. Co., Inc. v. M/V Bright Field, Etc.*, No. 97-3097, 1999 WL 280451, at *3 (E.D. La. May 3, 1999).  The Court should deny the motions due to Movants' failure to participate in meaningful discussions with Defendants to resolve this dispute.  *See, e.g.*, *Velazquez-Perez v. Developers Diversified Realty Corp.*, No. 10-1002, 2011 WL 284954 (D.P.R. Jan. 28, 2011) (motion to compel denied where plaintiff did not meet requirement of FRCP 37(a)(1) and showed an "unwillingness to solve the dispute by threatening the defendant with filing a motion to compel if the documents requested were not produced").

knowledge about a subject; instead it need only produce a person with knowledge whose testimony will be binding on the party.").

As is shown below, while the HSC claims that the Rule 30(b)(6) witnesses for TG and TTP were inadequate, even the HSC's own cherry-picked citations show that the examiners did not ask the witnesses questions about the topics for which they had been designated.  Further, counsel asked few questions regarding the over 200 drywall sales listed on TTP's MPF.  In addition, notwithstanding that TG and TTP produced all of the underlying transaction documents, *e.g.*, contracts, invoices, etc., months before the depositions, counsel only asked about a few of them.  Movants cannot claim that the witnesses were inadequate to testify concerning jurisdictional issues.

### 1. Mr. Peng Was Prepared to Testify Concerning the MPFs and Related Jurisdictional Issues

Mr. Peng was designated to testify concerning Defendants' contacts with the United States, if any.  TTP's MPF itemizes over 200 relevant sales of drywall made to dimensions used in the U.S.  TG's MPF reflects its single sale of drywall to a U.S. customer, Venture Supply.[5]  The companies' MPFs are therefore highly relevant to assessing the nature and extent of the companies' contacts with the U.S.

The HSC alleges that Mr. Peng "lacked sufficient knowledge to testify about the details concerning the transactions set forth in the [MPFs]."  (HSC motion at 5.)  Nothing could be farther from the truth.  Mr. Peng testified he had reviewed the MPFs, was involved in their preparation, was familiar with them and that he and his colleagues in the foreign trade department had handled all of the transactions listed on the MPFs.  (Transcript of the Deposition

---

[5] Defendants also produced over 3,000 pages of contracts, invoices and correspondence concerning the sales listed on the MPFs.  Only a handful of these documents were brought up at the depositions.

of Wenlong Peng on April 7 & 8, 2011, relevant non-confidential excerpts of which are attached hereto as **Exhibit E** ("Peng Tr.") 341:24-355:7.)  ***The PSC, however, which interrogated Mr. Peng for over a day, never asked Mr. Peng a single question about the MPFs.***  Thus, the PSC's assertion that "none of the designated witnesses produced by Defendants were able to verify the sales history contained in the MPF produced by Defendants, nor were they able to explained how the information contained in the MPFs was collected" is patently **false**. (PSC Motion, p. 8.)

The HSC misrepresents that Mr. Peng claimed "[h]e lacked the authority to verify the accuracy of the TTP [MPF]."  (HSC Motion at 5.)  In fact, Mr. Peng refused to agree with the HSC counsel's incorrect assertion that the MPFs reflected that "1.7 million sheets of drywall manufactured by TTP end[ed] up in the U.S."  Moreover, Mr. Peng <u>did</u> testify that the MPFs were accurate.  (Peng Tr. at 341:24-355:7.)[6]

The HSC also complains that Mr. Peng testified he "could not recall" and "had no obligation to try to understand" where TG or TTP's customers shipped drywall they purchased in China.  (HSC Motion at 5.)  As Mr. Peng explained, because TG and TTP were not contractually responsible for shipping the drywall they sold in China, they did not pay much attention to where the buyers were planning to ship it.  Mr. Peng further testified that TG and TTP did not have knowledge of where the referenced drywall was "shipped to" or "ended up" because buyers made such arrangements themselves.[7]  (Peng Tr. at 318:2-323:18; 327:10-335:12; 343:21-347:2;

---

[6] Mr. Peng also testified that he reviewed TG's MPF and that he was responsible for the transaction with Venture Supply. (Peng Tr. at 352:15-355:7.)

[7] A Rule 30(b)(6) witness is not expected to answer every conceivable question related to a designated topic.  A Rule 30(b)(6) witness's lack of knowledge of a particular question, without more, does not necessarily indicate inadequate preparation. *See Chick-Fil-A v. ExxonMobil Corp.*, No. 08-64122, 2009 WL 3763032, at *12 (S.D. Fla. Nov. 10, 2009) (A 30(b)(6) witness's "absence of knowledge is, by itself, a fact that may be relevant to the issues in a given case.") (citation omitted). When Mr. Peng testified that he had no knowledge of whether certain purchasers planned to ship drywall to the United States, he provided relevant testimony about TTP.  (*See, e.g.*, Peng Tr. at 323:3-18.)

\\NY - 037476/000001 - 2321530 v1

358:15-364:5.)   Thus, Mr. Peng's testimony was an accurate statement of the companies' knowledge and does not reflect on his adequacy as a witness.

Other than a few misleading, argumentative questions concerning the MPFs, the HSC did not ask Mr. Peng <u>any</u> questions regarding the sales transactions listed on the MPFs or the underlying transaction documents (which Mr. Peng reviewed in preparation for the deposition). (Peng Tr. at 341:24-355:7.)

HSC also argues that Mr. Peng was not an adequate witness for the following reasons, none of which supports their contentions:

- *Mr. Peng did not "provide details concerning the [Defendants'] sales and marketing efforts."*  (HSC Motion, p. 5, citing Peng Tr. at 286:22-287:6; 290:5-293:3.)  This is incorrect.  In fact, Mr. Peng simply testified that he, and the company, had no recollection of mailing product catalogs to the U.S. (Peng Tr. at 285:14-287:6.)  Moreover, Mr. Peng testified at length about specific transactions when he was asked questions about them.  (S*ee, e.g.,* Peng Tr. at 342:13-343:19; 346:13-364:5; 370:10-375:21; 427:14-24; 430:24-433:2.)

- *Mr. Peng did not recall the content of the product information that TG posted on the Alibaba Chinese website.*  (HSC Motion, p.5, citing Peng Tr. at 290:5-293:3.)  Since the use of a Chinese website was not a contact with the U.S., this question is not geared to getting information that would subject TG to personal jurisdiction in the U.S.  *See Mink v. AAA Devs. LLC,* 190 F.3d 333, 337 (5th Cir. 1999) (foreign website accompanied by an online order form, a mailing address and an e-mail address insufficient to confer jurisdiction over a foreign company.)

- *Mr. Peng was unprepared to testify about "contacts with the U.S."*  (HSC Motion, p. 5, citing Peng Tr. at 191:17-192:3.)  This is incorrect.  The testimony cited shows that in response to a different question, Mr. Peng explained that Chinese businessmen sometimes introduced representatives of U.S. companies to TG or TTP <u>in</u> China, and some of these representatives asked to visit the companies' factories.  (Peng Tr. at 190:2-194:4.)  However, TG and TTP never sent any sales representatives to the U.S. (*Id.* 282:8-283:9.)

- *Mr. Peng could not provide details concerning "business in the United States or with U.S. companies."*  (HSC Motion, p. 5, citing Peng Tr. (the confidential sections of which are cited hereto as Ex. F) at 202:21-203:23.)  This is incorrect. The HSC cites testimony concerning a TTP customer's letter requesting a

warranty from TG, which Mr. Peng explained TG could not provide because it did not sell drywall to that customer. (Peng Tr. (Ex. F) at 200:18-205:9.)

In sum, Counsel had the opportunity to depose a witness who personally participated in TG and TTP's sales of drywall to U.S. dimensions, but chose to ask him few questions about those sales. This does not show that the *witness* was inadequately prepared for the deposition.[8]

### 2. Mr. Jia was an Adequate Witness

The HSC claims that Mr. Jia—the CEO of TG—was an inadequate witness (HSC Motion, p. 4), but provides zero support for this allegation. Indeed, the HSC fails to cite to a single instance where Mr. Jia failed to testify to facts within his designated areas. Each of Movants' arguments in support of its contention that Mr. Jia was an inadequate witness are addressed in turn:

- *Mr. Jia "could not recall the MPF or that he certified under the penalty of perjury that the information therein was true and accurate."* (HSC Motion, p. 4, citing Jia Tr. at 318:9-320:9.) This claim is incorrect. Mr. Jia testified that he signed the MPF (Transcript of Deposition of Tongchun Jia on April 4 & 5, 2011, relevant excerpts of which are attached hereto as **Exhibit G** ("Jia Tr.") at 324:3-7), that he knew he was signing under the penalty of perjury (*Id.* 324:8-15), that he stood by his signature on the document (*Id.* 324:16-18), and that the document was accurate. (*Id.* 326:5-22.)

- *Mr. Jia was "unsure how TG obtained the information contained in the TG MPF."* (HSC Motion, p. 4, citing Jia. Tr. 329:19-331:17.) This claim is incorrect. Mr. Jia testified that he obtained the information contained in the TG MPF from the manager of TG's foreign trade department. (Jia Tr. 330:14-332:15.)

---

[8] The PSC argues that Defendants obstructed the depositions by requiring an interpreter for Mr. Peng despite his degree in English. (PSC Motion, p. 13.) Such an outrageous and offensive statement barely deserves attention. Mr. Peng testified numerous times that he was not fluent in spoken or written English, and, in fact, required the use of a dictionary when drafting e-mails. (Peng Tr. at 22:2-25:24; 40:24-42:1.) Mr. Peng was entitled to testify in his native language. *See Phan v. Trinity Regional Hosp.*, 3 F. Supp. 2d 1014, 1023 (N.D. Iowa 1998) (allowing witness to use interpreter at trial where witness was concerned her testimony might be misunderstood); *see also Juhl v. U.S.*, 383 F.2d 1009, 1015 (Ct. Cl. 1967), *rev'd on other grounds Augenblick v. Juhl*, 393 U.S. 348 (1969) ("There is no more dangerous witness than a foreign national whose English is only just good enough for him or her to be denied the help of an interpreter.").

\\\NY - 037476/000001 - 2321530 v1

- *Mr. Jia could not provide details about the sales by TG of drywall to U.S. entities or the Venture Supply transaction.* (HSC Motion, p. 4, citing Jia Tr. 329:19-331:17.) *The PSC further complains that Mr. Jia testified that the "best person to testify regarding sales of drywall to the United States were personnel in his foreign sales department."* (PSC Motion, 9-10, citing Jia Tr. 440:15:23.) These claims are misleading. Mr. Jia was not designated to testify about sales transactions or sales to the U.S. (Ex. A.) He explained the detailed information on the MPF was produced by the foreign sales department headed by Mr. Peng. *See Id.* Mr. Peng, not Mr. Jia, was designated to testify concerning the MPF. (Jia Tr. 329:19-332:15; Peng Tr. at 55:12-17.)

- *Mr. Jia had no knowledge of the information or transactions contained in TTP's Profile Form and was unprepared to answer questions on the subject.* (HSC Motion, p. 4.). Mr. Jia does not hold a position with TTP (Jia Tr. at 112:23-124:2), and was not designated to testify with respect to TTP's sales of drywall (Ex. A).

- *Mr. Jia would not speculate as to whether "[it is] **possible** that [TG] sold drywall to distributors who brought the drywall to the United States that are not reflected in [the MPF]."* (HSC Motion, p. 4, citing Jia Tr. at 338:19-339:23) (emphasis added). Mr. Jia's refusal to speculate on counsel's hypothetical does not suggest a lack of factual knowledge.

- *Mr. Jia did not know about BNBM's U.S. operations.* (HSC Motion, p. 5., citing Jia Tr. 394:8-11; 397:22-398:1-4.) This allegation is misplaced. Mr. Jia could not respond to questions that had no foundation. (Jia Tr. 393:22-394:11.) Further, Mr. Jia was not a 30(b)(6) witness for BNBM. Rather, he testified on behalf of TG, and his testimony was that TG had no knowledge of whether BNBM had any contacts with the U.S. (Jia Tr. 397:1-398:11.)

- *"Mr. Jia stated that he was not the best person to testify as to TTP's relationship with the PRC and with Morgan Stanley and J.P. Morgan."* (HSC Motion, p. 5, citing Jia Tr. at 127:8-128:14.) This is incorrect. Mr. Jia in fact testified that he "might be the best person to testify" as to those subjects, and Counsel never asked any follow up questions of Mr. Jia on these topics. (Jia Tr. at 127:8-128:14.)

Neither the HSC nor the PSC has identified a single instance where Mr. Jia failed to testify on a topic for which he was designated to do so.

### 3.    Mr. Zhang was an Adequate Witness

Mr. Zhang was designated as a corporate representative of TTP regarding several topics concerning its corporate structure, operations and relationship with TG.  He testified that, as secretary of the Boards of Directors of TG and TTP, he was familiar with TTP's operations, organization and structure.  (Zhang Tr. at 18:23-24:23.)  Mr. Zhang was prepared to answer questions for two days on his designated topics.  Counsel decided *in advance of Mr. Zhang's deposition* to question him for only one day.[9]  During that day Mr. Zhang testified thoroughly concerning TTP's business plans, including the purpose of its formation and operations and the reasons for its cessation of operations in 2008.  (Zhang Tr. at 140:5-143:2; 151:16-154:20.)

As with its other claims, the HSC's arguments that Mr. Zhang was not an adequate witness are set forth below, and are belied by their own citations to his deposition transcript:

- *Mr. Zhang did not "review" TTP's annual reports before testifying.*  (HSC Motion, p. 6, citing Zhang Tr., 65:1-23.)  This is misleading.  Mr. Zhang was not required to "review" the reports so long as he was capable of answering factual questions concerning the reports, which he was.  Counsel, however, did not ask follow-up questions; they never asked Mr. Zhang whether he was *familiar with the information in those reports* and never asked him any substantive questions about them.  (Zhang Tr., 65:14-66:2.)

- *Mr. Zhang could not speak to TTP's sales activities and did not review TTP's sales records or MPF, and did not speak with Mr. Song with respect to sales to the U.S.*  (HSC Motion, p. 6, citing Zhang Tr., 69:6-70:4; 72:8-73:19).  This argument is incorrect.  Mr. Zhang was not designated to testify about TTP's MPF or its sales.  (Ex. A.)[10]

- *Mr. Zhang could not identify every single TTP employee.*  (HSC Motion, p. 6, citing 72:8-73:19; 121:14-122:12.)  Mr. Zhang was not designated to provide such

---

[9] Even with just the one day of examination, a number of attorneys, *including the HSC*, did not question him at all, choosing instead to make self-serving statements on the record regarding his alleged inadequacy.  (Zhang Tr. at 170:12-173:9; 194:21-198:9.)

[10] Mr. Zhang's testimony shows that he answered a question about his "knowledge" that drywall manufactured by TTP was present in the United States.  He stated that he had no personal knowledge, but TTP received litigation alleging that fact.  (Zhang Tr. at 71:4-72:16.)

irrelevant testimony.   In point of fact, however, Mr. Zhang did identify the officers, directors, and management of TTP.  (Zhang Tr. at 77:17-79:7; 102:20-103:20.)

- *Mr. Zhang could not provide details concerning TTP's marketing efforts.*  (HSC Motion, p. 6, citing Zhang Tr. at 121:14-122:12.)  This is incorrect.  This claim mischaracterizes Mr. Zhang's testimony, which was that TTP had no marketing plans.  (Zhang Tr. 119:13-19.)  He also testified that he had no knowledge of the marketing plans of *TG's* other subsidiaries, not including TTP, a topic for which he was not designated.  (Zhang Tr. 119:16-121:20.)

- *Mr. Zhang could not provide information about TTP's finances.*  (HSC Motion, p. 6.)  This claim is misleading.  Mr. Zhang was not designated to testify about this subject and in any event Movants do not identify any relevant questions he could not answer.

In sum, the Movants have not identified a single instance where Mr. Zhang or any other witness failed to testify to a deposition topic for which he was designated.

## II.   MOVANTS HAVE NOT SHOWN FURTHER DOCUMENT DISCOVERY IS WARRANTED

The majority of the documents the PSC seeks to have produced in its motion to compel have already been produced.  As Movants did not ask questions about them at the depositions, and apparently did not know they had been produced, this raises a question about the adequacy of Movants' document review and deposition preparation.[11]  Further, asking for them now, after depositions have occurred, instead of asking for them after the document production was made, raises questions about the PSC's motives—if they thought relevant documents had to exist but had not been produced, they should have inquired prior to the depositions.  Further still, as the Movants have not asked to re-open the depositions of the witnesses with knowledge of these documents, Messrs. Jia and Zhang, there is no reason to produce these documents. The PSC also

---

[11] Indeed, at the meet and confer the PSC demanded that Defendants identify by Bates number the documents previously produced that they are now requesting.  This is not a burden the Rules place on the producing party, but it does indicate that Movants' document review was substandard.

renews its previously unsuccessful effort to compel production of documents concerning other entities, such as BNBM, without any justification.  To the extent the PSC requests these or other new documents, it has not shown that they are relevant to the personal jurisdiction issue before the Court.

A.     **Four Pages Produced at the Start of Five Days of Deposition Does Not Justify Further Discovery**

Defendants produced four one-page documents at the start of the first day of depositions. The documents consisted of a trademark license, a lease agreement, and two contracts for the sale of equipment from TG to TTP in 2006 and from TTP back to TG in 2008.  Counsel located the documents the day prior to the deposition and did not have time to translate them prior to the deposition.  (Jia Tr. at 16:2–11.)  Before the start of the deposition Defendants' counsel explained the nature of the documents.  (Jia Tr. at 16:12–18.)  In addition, a Chinese-speaking attorney from Defendants' counsel's office verbally translated each of these four pages that morning during a break.[12]  (Declaration of Frank T. Spano in Opposition to the PSC's and the HSC's Motions to Compel, dated May 18, 2011 ("Spano Decl.") at ¶ 2.).  Moreover, the PSC also had a Chinese-speaking translator and/or interpreter available to them who presumably could have provided a further translation if the PSC wanted.  (Jia Tr. at 72:24-73:2.)

The Examiners clearly understood what was contained in those documents because they questioned both Mr. Jia and Mr. Zhang about them. (Jia Tr. at 445:24-448:15; Zhang Tr. 146:20-151:12.)  The documents demonstrate that, as the testimony also showed, TG and TTP engaged in arms-length transactions.    Movants have not shown any prejudice from Defendants'

---

[12] The PSC questions Defendants' counsel's representations to the Court that "it faced difficulties in discovery due to a language barrier" because counsel employs bilingual attorneys.  (PSC Motion, p. 3.)  The difficulty the examiners had in taking the depositions of Chinese speaking witnesses should be enough to show that the language barrier does cause difficulties.  Further, counsel must overcome the barriers of explaining the requirements of the American judicial system, including its discovery obligations, to a client in a country that not only has no "discovery" in their legal system, but also criminalizes depositions within its borders.

production of four additional pages on top of the 30,000 produced prior to the depositions. These four pages are merely a red herring Movants are attempting to employ to justify further discovery. Defendants are not entitled to the production of additional documents.

### B. The PSC Requests Documents Already Produced

#### 1. Underlying Documents for MPF's (PSC Motion at 8)

The PSC incorrectly asserts that the only sales information TTP has produced is on the chart attached to its MPF as Exhibit A. (PSC Motion, pp. 8, 9-10.) In fact, five months before the depositions, TG and TTP produced over 3,000 pages of documents concerning the transactions listed on their MPFs, including invoices, contracts, and related correspondence. (*See, e.g.*, Ex. H, TG 0000059-61;[13] TG 0001567-68; TG 0020011.) If the PSC did not know that these basic, undoubtedly relevant documents had been produced, the time to inquire, and to complain, was before the depositions, not after. Defendants also produced documents concerning attempted sales of drywall to the U.S., including documents from the files of Yang Jiapo and Che Gong, who worked under Mr. Peng in TTP's Foreign Trade Department. (*See e.g.,* Ex. H, TG 0000050; TG 0001095-96; TG 0001268-69.) Thus, while the PSC also vaguely requests the "custodial" files of Messrs. Che and Yang (PSC Motion, pp. 10-11), the PSC has not shown there are any additional responsive documents concerning Mr. Che or Mr. Yang, and Defendants are not aware of any. In addition, Mr. Peng was available to testify about all these sales-related documents, although Movants barely questioned him.

#### 2. Mr. Jia's E-mails

The PSC seeks Mr. Jia's e-mails "pertaining to the subject matters identified in the Rule 30(b)(6) deposition notice" as well as the e-mail files of three other TG employees. (PSC Motion,

---

[13] The relevant pages from Defendants' document production that have been marked confidential have been attached hereto as **Exhibit H**. The relevant pages from Defendants' document production that have not been marked confidential have been attached hereto as **Exhibit I**.

p. 5.)  Mr. Jia testified that he does not use e-mail, and that those three employees review his e-mail account and send e-mails for him.  (Jia Tr. at 57:12-58:13.)  Mr. Jia's e-mail account was searched, and, to the extent there were relevant e-mails, they were produced.  (*See, e.g.*, Ex. H, TG 0025351-352).  Further, the individuals who reviewed Mr. Jia's e-mail do not have relevant e-mails *in their own personal e-mail files*.  Accordingly, there are no additional e-mails to be produced.

### C.        Document Requests Relating to TG's Parent and Subsidiaries

The PSC moves to compel documents relating to TG's relationship with its parent, BNBM, and with subsidiaries other than TTP.  The Court previously ruled that Defendants were not required to produce these documents prior to the depositions, although the Court allowed the PSC to ask questions at the depositions to possibly lay a foundation for additional discovery.  Even after deposing TG and TTP for five days, however, the PSC has not demonstrated that production of these or other additional documents is reasonably necessary for the Court to decide the pending jurisdictional issues.

Mr. Jia's testimony demonstrated nothing more than that BNBM owned shares in TG.  He testified that BNBM had no role in TG's manufacturing or sale of drywall to U.S. dimensions, does not share facilities or production lines with TG, does not share employees with TG, did not provide any loans to TG, and does not get its gypsum at the same mines as TG.  (Jia Tr. at 190:9-191:22; 196:10-197:4.)[14]  While Mr. Jia sits on the Board of BNBM and in that capacity attends its annual meetings, he otherwise has no regular contact with BNBM, and he testified that he did

---

[14] The PSC alleges that Mr. Jia "admitted" that TG and BNBM have a "joint venture" together.  But they mischaracterize his testimony.  "Joint venture" is a legal term.  Mr. Jia, a layperson, testified that, to him, once BNBM became a shareholder of TG, the two companies formed a "cooperation," a term he used interchangeably with "joint venture."  (Jia Tr. at 203:2-204:19.)

16

not receive or maintain annual reports from BNBM because "these documents don't have too much relevance to [their company]."  (Jia Tr. at 34:9-35:24.)

The PSC had ample opportunity to question Mr. Jia on this subject, as TG has already produced voluminous responsive documents from its files, including documents related to the guarantee provided by BNBM on behalf of TG (PSC Motion at 5, request 1) (*see, e.g.*, Ex. I, TG 0020677-681); documents related to BNBM's acquisition of shares in TG including shareholder resolutions, audit reports, corporate filings reflecting the acquisition, minutes and other reports provided to BNBM in its capacity as a shareholder (requests 2 and 5); and TG's government filings (request 7).  (*See, e.g.*, Ex. I, TG 0020644-5, TG 0020666.)  The eight additional categories of documents sought by the PSC (PSC Motion at 5) should not be produced when the PSC failed to inquire about documents they had relating to the same subject matter.  Further, to the extent the PSC seeks documents from BNBM (*Id.*, Requests 3, 6, and 8), TG does not have them to produce.[15]

As noted above, the Court has previously denied the PSC's motions to compel further document production concerning Other Entities.[16]  *But the PSC did not ask any questions at all about the other TG subsidiaries.*  Therefore, this request should be denied, again.

The PSC also seeks new documents concerning the relationship between TG and TTP, in order to support their claim that the presumptive separateness of the corporations should be disregarded.  But the record is replete with evidence that TTP functioned as an independent

---

[15] The law does not require TG to reach into the files of its parent company where TG does not otherwise have control over such files.  *See Goh v. Baldor Elec. Co.*, No. 98-064, 1999 WL 20943, at *2-3 (N.D. Tex. Jan. 13, 1999) (denying motion to compel production of documents in possession of corporate affiliate where entities controlled own resources, maintained separate profit pools and management).  *See also Gerling Int'l. Ins. Co. v. Comm'r Internal Rev.*, 839 F.2d 131, 140 (3d Cir. 1988) (a corporation does not have control of documents in possession of a separate corporation solely by virtue of an overlap in ownership or officers).

[16] Nevertheless, the parties have produced hundreds of pages of documents concerning the operations of certain corporate subsidiaries of TG.  (*See, e.g.,* TG 0020808 – TG 0021193.)

17

corporate entity, as the Chinese government required before approving its incorporation.  (*See, e.g.*, Zhang 110:12-115:17; 136:13-142:24; Ex. I, TG 0020817, TG 0020841.) The PSC has not pointed to a shred of evidence to suggest the contrary. The PSC now seeks, however, for the first time, the production of documents related to the cessation of TTP's sales of drywall.  The pretext for this request is that, because, as Mr. Zhang testified to the undisputed fact that, in 2008 TG and TTP jointly decided to close TTP, (Zhang Tr. at 151:16-154:20.), this decision is relevant to show whether TG "controlled" TTP. (PSC Motion at 9.) As the PSC acknowledges, however, "it is not surprising" that a parent could decide to shut down a subsidiary (*Id.*)  Any suggestion that a subsidiary could operate against a parent's wishes is absurd.  Thus, the PSC's expressed rationale for production of the documents, that they relate to the "control" necessary to pierce the corporate veil so that TG could be liable for TTP's actions, is utterly baseless.  *See Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983) (allegations of 100% ownership and control over subsidiaries' overall policy insufficient to impute subsidiaries jurisdictional contacts to parent).

        In the same vein, the PSC seeks "any and all licensing, marketing, rental, leasing, shipping, loan or expense sharing agreements" between TG and TTP, as well as "any related correspondence or board minutes" (PSC Motion, p. 4.), and "documentation of any payments or exchange of monies between the two companies" (PSC Motion, pp. 4, 7).  This is another unnecessary fishing expedition.   TG and TTP have already produced numerous written agreements between the companies. (*See, e.g.*, Ex. I, TG 0025412-14.) TG and TTP have already produced documents concerning the transfers of assets and other transactions between the two companies.  (*See, e.g.*, Ex. I, TG 0025412-414.)  They have further produced an audited financial report describing TG's investment in TTP.  (Ex. I, TG 0020833, TG 0020846.)   Under the

circumstances, the minutiae of money transfers between parent and subsidiary cannot be relevant to personal jurisdiction.

### D.    The PSC's New Document Requests

#### 1.    Additional Corporate Reports

The PSC now seeks production of monthly reports from TTP, annual reports of TG and TTP, communications between Mr. Jia and the TTP Board, all board minutes, TTP's "audited" financial statements, and TTP's "business plans" (PSC Motion, pp. 6-8.); none of these documents had been previously requested.  During the depositions the examiners failed to ask any questions concerning the contents of the reports.  Since there is no indication the reports contain information about the sale of drywall to customers from the United States they should not have to be produced.[17]

### E.    Documents Not Relevant to Personal Jurisdiction

#### a.    <u>Documents Related to Government Tests for Alleged Defects</u>

The PSC seeks to compel production of documents concerning the testing of drywall by TG or a Chinese government agency or other steps to investigate drywall defect allegations. These documents are not relevant to personal jurisdiction.[18]  Furthermore, Mr. Jia testified that he did not have and had not ever seen the testing reports from the Chinese government.  (Jia Tr. at 377:17-378:12.)

---

[17] Further, because the depositions clearly established the corporate separateness of TG and TTP, the possibility of veil piercing should not serve as the reason for the production of these documents.  The deponents testified that the two companies were independent, that the local tax bureaus required the companies to be separate, and specifically that TG and TTP had separate facilities, separate accounting systems, separate officers, separate employees, and that TTP followed the appropriate corporate formalities. (Zhang Tr. at 54:19-55:14; 78:20-81:10; 109:10-115:17; 126:21-127:7; 138:2-139:7; 140:1-142:21; 155:1-155:9.)  Thus, Movants' unfounded speculation that the corporate veil should be pierced does not warrant further burdensome and unnecessary discovery that is not relevant to personal jurisdiction.

[18] TG counsel permitted Movants to ask Mr. Jia a few questions on these issues, but objected to them as beyond the scope of the Rule 30(b)(6) deposition.

The PSC also requests the "custodial file" of Mr. Zhang, without explaining how additional documents beyond these already produced would be relevant to jurisdictional discovery.  (PSC Motion, p. 7.)  Mr. Zhang's duties included preparing documents for *TG's* board (not TTP's, as the PSC alleges) (Zhang Tr. at 21:6-16), but there is no reason to assume that a document is relevant just because he prepared it.  Defendants have already produced the corporate files of TG and TTP, and obviously not every other shred of paper concerning the companies' operations is relevant.

## III.   THERE IS NO BASIS FOR SANCTIONS AGAINST DEFENDANTS

The alleged "obstreperous" behavior by TG and TTP is simply not supported by the record.  Further, the HSC's allegation that the Defendants stopped the depositions "prematurely" (*see* HSC Motion, p. 9), is especially preposterous because counsel for HSC had an opportunity to question each witness, although it chose not to even question Mr. Zhang; indeed, the fact that the Movants do not seek to re-open the depositions of Messrs. Jia, Zhang and Peng shows that any time wasting claim is meritless.  Lastly, the claims that Defendants impeded the depositions through use of a check interpreter and by objecting to Movants' questions are also meritless.

### A.   The PSC's Poor Choice of Interpreter

The transcript shows that the PSC failed to engage a capable interpreter and intentionally withheld necessary background information from the interpreter prior to the deposition.  (Jia Tr. at 83:7-90:8.)  It was clear on the morning of the first day that the interpreter was frequently translating inaccurately, but the PSC rejected TG and TTP's suggestions to replace her.[19]

---

[19] Prior to the deposition TG and TTP's Chinese-speaking counsel conducted a brief telephone interview of the interpreter in the presence of the PSC.  Based on that short conversation, during which the PSC extolled the interpreter's capabilities, there was no compelling reason to object to the selection.  In practice, however, the interpreter's performance was seriously deficient.  This became apparent early; and beginning on the first day of the deposition, TG and TTP encouraged the PSC to replace the interpreter with the check interpreter, who was present at the deposition.  But the PSC chose to proceed with the manifestly deficient interpreter.  (Spano Decl. ¶ 3.)

The PSC's interpreter, a native Cantonese speaker, often had problems translating lawyers' questions into Mandarin, the official language of mainland China, and had problems interpreting the witnesses' answers from Mandarin into English.  (*See, e.g.*, Jia Tr. at 62:15-63:7; 101:8-103:15; 307:6-308:16.)  She refused to use the glossary of terms the parties had agreed upon prior to the depositions.  (Peng Tr. at 75:13-77:18; 81:12-84:3; 257:11-263:5; Peng Tr. (Ex. F) at 201:15-202:8.)  The record is replete with her translation errors and exercise of poor judgment; for instance, when the witness was asked whether he "read anything in the papers about problems with TTP drywall in America," she translated "papers" as "sheets of paper" rather than as "newspapers", and went on to defend her translation, by stating that "Interpreters do not speculate on the meaning of words, it is up to the lawyers to clarify."  (Zhang Tr. at 185:1-14; *see also* Zhang Tr. at 75:12-76:1 (translating "officers" as "office staff").)  The deficiency of the interpreter's technical performance was exacerbated by her demeanor; she frequently argued with the check interpreter and the attorneys – including counsel for the PSC. (*See* Jia Tr. at 54:23-57:7; 76:24-78:14; 308:21-310:8.)

While the PSC now objects to Defendants' check interpreter, the PSC was aware prior to the depositions that a check interpreter would attend (Jia Tr. at 75:4-6) and even acknowledged that Defendants "have every right to bring a check interpreter" (Jia Tr. at 45:19-20).  Moreover, courts regularly condone the use of check interpreters.  *See, e.g.*, *Trading Technologies Intern., Inc. v. eSpeed, Inc.,* 750 F. Supp. 2d 962, 983 (N.D. Ill. 2010) (awarding costs for check interpreter where the other party retained the official interpreter).[20]  In short, the depositions suffered from interpretation problems.  Discussions between the interpreter, the witness, the

---

[20] Movants also complain that Defendants' Chinese-speaking counsel objected to the translation of the questions. But the PSC stated on the record that they were not opposed to counsel making objections (Jia Tr. at 306:19-307:2) "we've asked your team if we can have one person, whoever it is going to be, I don't care if it's Gene or the check interpreter, maybe have one person make the objection") and even asked counsel for help at times (Jia Tr. at 232:6-16; Peng Tr. at 76:15-20; 77:19-78:2).

check interpreter and at times with the attorneys were necessary to obtain an accurate record, and facilitate the depositions.

### B.     The Examiner's Questions

Counsel asked numerous complex and argumentative questions that prompted the witnesses to request simpler questions.  (*See, e.g.*, Peng Tr. at 281:24-25 ("Can you make the question shorter?  You confused me.").) [21]   Counsel's questions also routinely contained assumptions that the interpreter found difficult to translate and the witnesses found difficult to understand.  Then, counsel sought to cajole the witnesses when they would not agree with counsel's assertions.  (*See* Peng Tr. at 317:10-325:22; 328:16-329:7; Jia Tr. at 440:24-443:3; Zhang Tr. at 189:19-194:20; 211:21-213:15.)  Counsel further asked argumentative questions designed more to characterize facts than to conduct jurisdictional discovery.  For example, counsel for the HSC asked Mr. Peng whether he wrote "scores" of e-mails in English or "many many many" or in "excess of 50", when the number of e-mails that TG produced is a documentary fact, albeit irrelevant to the question of personal jurisdiction.  (Peng Tr. 316:5-317:8.)  Similarly, the PSC's counsel asked Mr. Jia, who testified that he does not read English, to compare the English wording of two TG marketing brochures.  (Jia Tr. at 230:1-236:19.) Counsel were free to frame their questions as they wished, but they cannot blame Defendants for wasting time.

Movants' complaints about improper "speaking objections" are equally unavailing.  (PSC Motion, p. 13; HSC Motion, p. 3.)  Tellingly, the PSC cites no examples of speaking objections. The HSC's citations mainly are not to "speaking objections" at all.  For example, while the HSC

---

[21] *See also* Jia Tr. at 337:12-14 ("I don't understand the way you ask the question."); Jia Tr. at 338:13-16 ("I still don't understand what you are asking about."); Jia Tr. at 450:19-20 ("I don't understand.  What do you mean by 'stand behind'?"); Zhang Tr. at 122:4-7 (Mr. Attorney, would you mind to put it in some other way so that it might help me to understand the question better?").

points to Peng Tr. at 78:21-80:11, the only objection was to "form," there was colloquy between the interpreters as to meaning, and the PSC's main interpreter objected.  The objection at Zhang Tr. 147:15-148:16 was to "form" and to the interpreter rephrasing a question asked by the PSC.  The vast majority of TG's and TTP's counsel's objections were "succinctly and economically stated" and therefore not improper.  *See Breaux v. Halliburton Energy Services*, No. 04-1636, 2006 WL 2460748, at *2 (E.D. La. Aug. 22, 2006) (approving of "object to Form Compound.  Calls for information beyond her personal recollection.").  Counsel clearly misunderstand just what a speaking objection is.  (*See, e.g.* Zhang tr. at 59:18-60:6).  Defendants' speaking objections were few and far between, and usually in response to misleading questions or inquiries that went far beyond the reasonable scope of jurisdictional discovery.  TG and TTP's counsel did not obstruct the depositions, or otherwise "frustrate[ ] the fair examination of the deponent" within the meaning of Rule 30(d)(2).  Thus, there is no basis to award sanctions.

## IV.    THE COURT HAS ALL THE DISCOVERY IT NEEDS TO DECIDE THE PENDING MOTIONS TO DISMISS

While Movants seek more discovery, in reality all the discovery the Court needs to make a decision on personal jurisdiction has already been provided.  Plaintiffs have argued that they need to test the accuracy of Defendants' declarations submitted in support of their motions to dismiss for lack of personal jurisdiction.  After 30,000 pages of production and five days of depositions, there is a clear record that Defendants lack minimum contacts with any U.S. state.  The Court has enough information to determine the issue of personal jurisdiction and should set a briefing schedule for Defendants' pending motions to dismiss.

## V.    COSTS AND FEES SHOULD BE AWARD TO DEFENDANTS

Pursuant to Rule 37(a)(5)(B), the Court should award TG and TTP their reasonable expenses incurred in opposing the motion, including attorneys' fees. *See, e.g., CoStar Realty Inf.,*

*Inc. v. Field*, 737 F. Supp. 2d 496, 514–16 (D. Md. 2010) (awarding attorneys' fees where party prevailed in its opposition to motion to dismiss).

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully submit that the Court deny the Motions to Compel and Movants' requests for further depositions or jurisdictional discovery.

Respectfully submitted,

| | |
|---|---|
| Joe Cyr | /s/  Thomas P. Owen Jr. |
| Frank T. Spano | Richard C. Stanley (La. Bar No. 8487) |
| Eric Statman | Thomas P. Owen, Jr. (La. Bar No. 28181) |
| HOGAN LOVELLS US LLP | STANLEY, REUTER, ROSS, THORNTON & |
| 875 Third Avenue | ALFORD, LLC |
| New York, New York 10022 | 909 Poydras Street, Suite 2500 |
| E-mail: Joe.cyr@hoganlovells.com | New Orleans, Louisiana 70112 |
| Frank.spano@hoganlovells.com | Telephone: 504-523-1580 |
| Eric.statman@hoganlovells.com | Facsimile: 504-524-0069 |
| Telephone: 212-918-3000 | E-mail: rcs@stanleyreuter.com |
| Facsimile: 212-918-3100 | tpo@stanleyreuter.em |
| *Attorneys for Taishan Gypsum Co., Ltd. and* | *Attorneys for Taishan Gypsum Co., Ltd. and* |
| *Taian Taishan Plasterboard Co., Ltd.* | *Taian Taishan Plasterboard Co., Ltd.* |

### CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Defendants Taishan Gypsum Co. Ltd. and Taian Taishan Plasterboard Co., Ltd.'s Opposition to the PSC's and the HSC's Motions to Compel has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Pretrial Order No. 6, and that the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 18th day of May, 2011.

/s/  Thomas P. Owen Jr.

\\\\NY - 037476/000001 - 2321530 v1