UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| ———————————— | § MDL NO. 2047 |
| IN RE: | § |
| CHINESE- | § SECTION: L |
| MANUFACTURED | § |
| DRYWALL PRODUCTS | § JUDGE FALLON |
| LIABILITY | § |
| LITIGATION | § MAGISTRATE |
| ———————————— | § JUDGE WILKINSON |

- - -

CROSS NOTICED IN VARIOUS OTHER ACTIONS

- - -

April 7, 2011

- - -

CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of WENLONG
PENG, held at 3 Pedder Street, Central,
Hong Kong, China, commencing at 8:59
a.m., on the above date, before Linda L.
Golkow, Certified Court Reporter,
Registered Diplomate Reporter, Certified
Realtime Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
ph 877.370.3377 | fax 917.591.5672
deps@golkow.com

---

Page 2

```
 1   APPEARANCES:
 2
 3   SEEGER WEISS LLP
     BY:  CHRISTOPHER A. SEEGER, ESQUIRE
 4   BY:  JEFFREY S. GRAND, ESQUIRE
     One William Street
 5   New York, New York 10004
     (212) 584-0700
 6   cseeger@seegerweiss.com
     jgrand@seegerweiss.com
 7   Representing the Plaintiffs' Steering
     Committee
 8
 9
10   COLSON HICKS EIDSON
     BY:  PATRICK S. MONTOYA, ESQUIRE
11   255 Alhambra Circle
     Penthouse
12   Coral Gables, Florida 33134
     (305) 476-7400
13   patrick@colson.com
     Representing Plaintiffs' Steering
14   Committee in the Federal and State
     Coordinated Actions
15
16
17   LAW OFFICES OF RICHARD SERPE, P.C.
     BY:  RICHARD J. SERPE, ESQUIRE
18   580 East  Main Street
     Suite 310
19   Norfolk, Virginia 23510
     (757) 233-0009
20   rserpe@serpefirm.com
     Representing the MDL Plaintiffs and
21   the Germano Plaintiffs
22
            - - -
23
24
```

---

Page 3

```
 1
     APPEARANCES (CONTINUED):
 2
 3
     HOGAN LOVELLS US LLP
 4   BY:  FRANK T. SPANO, ESQUIRE
     BY:  RENEE GARCIA, ESQUIRE
 5   875 Third Avenue
     New York, New York 10022
 6   (212) 918-3000
     Renee.garcia@hoganlovells.com
 7   frank.spano@hoganlovells.com
     Representing Taishan Gypsum Co.
 8   Ltd. and Tai'an Taishan
     Plasterboard Company Ltd. and the
 9   Witness, Wenlong Peng
10
11   HOGAN LOVELLS INTERNATIONAL LLP
     BY:  EUGENE CHEN, ESQUIRE
12   18th Floor, Park Place
     1601 Nanjing Road West
13   Shanghai, China 200040
     (86 21) 6122 3800
14   eugene.chen@hoganlovells.com
     Representing Taishan Gypsum Co.
15   Ltd. and Tai'an Taishan
     Plasterboard Company Ltd. and the
16   Witness, Wenlong Peng
17
18   HOGAN LOVELLS INTERNATIONAL LLP
     BY:  STACY YUAN, ESQUIRE
19   31st Floor - Tower 3
     China Central Place
20   Beijing, China 100025
     (86 10) 6582 9488
21   stacy.yuan@hoganlovells.com
     Representing Taishan Gypsum Co.
22   Ltd. and Tai'an Taishan
     Plasterboard Company Ltd. and the
23   Witness, Wenlong Peng
24
```

---

Page 4

```
 1
     APPEARANCES (CONTINUED):
 2
 3
 4   GREENBERG TRAURIG, LLP
     BY:  HILARIE BASS, ESQUIRE
 5   1221 Brickell Avenue
     Miami, Florida 33131
 6   (305) 579-0745
     bassh@gtlaw.com
 7   Representing the Home Builders
     Steering Committee
 8
 9
     GALLOWAY JOHNSON TOMPKINS BURR and
10   SMITH
     BY:  CARLINA C. EISELEN, ESQUIRE
11   One Shell Square
     701 Poydras Street, 40th Floor
12   New Orleans, Louisiana 70139
     (504) 525-6802
13   ceiselen@gjtbs.com
     Representing Interior/Exterior
14   Building Supply
15
16   PERKINS COIE LLP
     BY:  CRAIG M.J. ALLELY, ESQUIRE
17   1899 Wynkoop Street - Suite 700
     Denver, Colorado 80202
18   (303) 291-2300
     callely@perkinscoie.com
19   Representing the State of Louisiana
20
21
22
23
24
```

---

Page 5

```
 1   APPEARANCES (CONTINUED):
 2
 3   WEINBERG, WHEELER, HUDGINS, GUNN &
     DIAL, LLC
 4   BY:  NICHOLAS P. PANAYOTOPOULOS, ESQ.
     3344 Peachtree Road, NE
 5   Suite 2400
     Atlanta, Georgia 30326
 6   (404) 876-2700
     npanayo@wwhgd.com
 7   Representing Various Banner
     Defendants
 8
 9
10   BRENNER, EVANS & MILLMAN, P.C.
     BY:  THEODORE I. BRENNER, ESQUIRE
11   411 East Franklin Street
     Suite 200
12   Richmond, Virginia 23218
     (804) 644-1300
13   Representing Tobin Trading Company
14
     McKENRY, DANCIGERS, DAWSON &
15   LAKE, P.C.
     BY:  J. BRIAN SLAUGHTER, ESQUIRE
16   192 Ballard Court
     Suite 400
17   Virginia Beach, Virginia 23462
     (757) 461-2500
18   Jbslaughter@va-law.org
     Representing Atlantic Homes LLC and
19   Multiple Other Virginia-Based
     Defendants
20
21
22
23
24
```

**Page 6**

1  APPEARANCES (CONTINUED):
2
3  SHER GARNER CAHILL RICHTER KLEIN &
   HILBERT, L.L.C.
4  BY: MATTHEW C. CLARK, ESQUIRE
   909 Poydras Street
5  Suite 2800
   New Orleans, Louisiana 70112
6  (504) 299-2100
   mclark@shergarner.com
7  Representing the Southern Home
   Defendants
8
9
   SINNOTT, NUCKOLS & LOGAN, PC
10 BY: KENNETH F. HARDT, ESQUIRE
   13811 Village Mill Drive
11 Midlothian, Virginia 23114
   (804) 378-7600
12 khardt@snllaw.com
   Representing Venture Supply, Inc. and
13 Porter-Blaine Corp.
14
15
16
17
18
19
20
21
22
23
24

**Page 7**

1  APPEARANCES VIA TELEPHONE:
2
3  KUCHLER POLK SCHELL WEINER &
   RICHESON LLC
4  BY: FRANCIS X. deBLANC, III,
   1615 Poydras Street
5  Suite 1300
   New Orleans, Louisiana 70112
6  (504) 592-0691
   slauricella@kuchlerpolk.com
7  Representing Creola Ace Hardware and
   Thomas Gould Inc. in the MDL
8
9
10 HUNTON & WILLIAMS LLP
   BY: A. TODD BROWN, ESQUIRE
11 Bank of America Plaza
   101 South Tryon Street
   Suite 3500
12 Charlotte, North Carolina 28280
   (704) 378-4700
13 Representing Stock Building Supply,
   LLC
14
15
16 JONES, WALKER, WAECHTER, POITEVENT,
   CARRERE & DENEGRE LLP
   BY: MEGAN E. DONOHUE, ESQUIRE
17 600 Jefferson Street, Suite 1600
   Lafayette, Louisiana 70501
18 (337) 262-9062
   mdonohue@joneswalker.com
19 Representing Fireman's Fund Insurance
   Company
20
21
22
23
24

**Page 8**

1  APPEARANCES VIA TELEPHONE (CONTINUED):
2
3  DUPLASS ZWAIN BOURGEOIS PFISTER &
   WEINSTOCK
4  BY: PHILIP WATSON, ESQUIRE
   3838 N. Causeway Boulevard
5  Suite 2900
   Metairie, Louisiana 70002
6  (504) 832-3700
   pwatson@duplass.com
7  Representing R&H Masonry, Inc., and
   Swedberg Enterprises, Inc.
8
9
   RUMBERGER, KIRK & CALDWELL, P.A.
10 BY: ABIGAIL ROBERTS, ESQUIRE
   Brickell Bayview Centre
11 Suite 3000
   80 Southwest 8th Street
12 Miami, Florida 33130
   (305) 358-5577
13 aroberts@rumberger.com
   Representing Defendants' Liaison
14 Counsel for Installers
15
16 FULMER LEROY ALBEE BAUMANN
   BY: MICHAEL MCCAHILL, ESQUIRE
17 2866 East Oakland Park Boulevard
   Ft. Lauderdale, Florida 33306
18 (954) 707-4430
   mosscandace@fulmerleroy.com
19 Representing Independent Builders
   Supply Association (IBSA)
20
21
22
23
24

**Page 9**

1  APPEARANCES VIA TELEPHONE (CONTINUED):
2
3
   THOMPSON COE COUSINS & IRONS, L.L.P.
4  BY: SUZANNE M. PATRICK, ESQUIRE
   One Riverway, Suite 1600
5  Houston, Texas 77056
   (713) 403-8210
6  spatrick@thompsoncoe.com
   Representing The North River
7  Insurance Company
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 10

```
 1   APPEARANCES VIA STREAM:
 2
 3   BECNEL LAW FIRM, L.L.C.
     BY:  ROBERT BECNEL, ESQUIRE
 4   106 W. 7th Street
     Reserve, Louisiana 70084
 5   (985) 536-1186
     robbecnel@aol.com
 6   Representing the Plaintiffs'
     Steering Committee
 7
 8
 9   JONES, WALKER, WAECHTER, POITEVENT,
     CARRERE & DENEGRE LLP
10   BY:  MEGAN E. DONOHUE, ESQUIRE
     600 Jefferson Street, Suite 1600
11   Lafayette, Louisiana 70501
     (337) 262-9062
12   mdonohue@joneswalker.com
     Representing Fireman's Fund Insurance
     Company
13
14
15   HAYNSWORTH SINKLER BOYD, P.A.
     BY:  CHRISTOPHER B. MAJOR, ESQUIRE
16   75 Beattie Place - 11th Floor
     Greenville, South Carolina 29601
17   (864) 240-3200
     cmajor@hsblawfirm.com
     Representing USG Corporation and L&W
18   Supply Corporation
19
20   DEUTSCH, KERRIGAN & STILES
     BY:  MELISSA M. SWABACKER, ESQUIRE
21   755 Magazine St.
     New Orleans, Louisiana 70130
22   (504) 581-5141
     mswabacker@dkslaw.com
23   Representing Landmark American
     Insurance Company
24
```

## Page 11

```
 1   APPEARANCES VIA STREAM (CONTINUED):
 2
 3   KUCHLER POLK SCHELL WEINER &
     RICHESON LLC
 4   BY:  SOPHIA L. LAURICELLA, ESQUIRE
     1615 Poydras Street - Suite 1300
 5   New Orleans, Louisiana 70112
     (504) 592-0691
 6   slauricella@kuchlerpolk.com
     Representing Creola Ace Hardware and
 7   Thomas Gould Inc. in the MDL
 8
 9
10   ALSO PRESENT:
11
12   Stephanie Chin, Official Interpreter
     (Interpreter 1)
13
14   Una Wong, Check Interpreter
     (Interpreter 2)
15         - - -
16
17
18
19
20
21
22
23
24
```

## Page 12

```
 1         - - -
 2       I N D E X
 3         - - -
 4
 5   Testimony of: WENLONG PENG
 6   By Mr. Seeger          21
 7
 8         - - -
 9
10       E X H I B I T S
11
12         - - -
13
14   NO.     DESCRIPTION       PAGE
15   Peng-1   Handwritten note,    26
           English name of
           witness
16   Peng-2   Handwritten note,    93
           Company name
17
18   Peng-3   E-mail chain, top one  120
           dated 5/12/2006, Bates
           stamped TG 0000415
19
20   Peng-4   E-mail chain, top one  148
           dated 2/10/2007, Bates
           stamped TG 0000011
21
22   Peng-5   Document entitled    169
           "Advance Products
           International, LLC,"
           dated 10-31-06, Bates
           stamped TG 0019376
23
24   Peng-6   E-mail dated October  174
           9, 2007, Bates stamped
           TG 0022650
```

## Page 13

```
 1   Peng-7   Document entitled    185
           "Translation of TG
 2         0000463," June 8,
           2006, Bates stamped
 3         TTRSNL0026 and TG
           000463
 4
 5   Peng-8   E-mail dated 8/2/2006,  197
           Bates stamped TG
 6         0019381 and TG 0019382
 7   Peng-9   E-mail dated August   215
           15, 2009, Bates
 8         stamped TG 0025155
           through TG 0025158
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 38

1  BY MR. SEEGER:
2     Q.   Okay.
3          Mr. Peng, have you ever
4  traveled to the US?
5     A.   No.
6     Q.   Have you ever traveled to
7  England?
8     A.   No.
9     Q.   What other names have you
10 used in your business life other than Mr.
11 Peng and Frank Clem?
12    A.   I did not use any other
13 name.
14    Q.   Mr. Peng, who is Owen Li,
15 L-I?
16    A.   Can you tell me how do you
17 do the Pinyin and how to spell it, how to
18 write it.
19    Q.   Yeah.  I'm going to write it
20 on a piece of paper.
21         Mr. Peng, I'm going to hand
22 you a piece of paper on which I wrote
23 Owen, O-W-E-N, Li, L-I.
24         MR. SPANO:  Are we going to

Page 39

1  mark that as an exhibit?
2          MR. SEEGER:  Only if you
3  want to.
4          MR. SPANO:  Please do.
5          MR. SEEGER:  Sure.
6          INTERPRETER 1:  Is this N or
7  what?
8  BY MR. SEEGER:
9     Q.   Let me do this.
10         Mr. Peng, what I've put in
11 front of you is O-W-E-N, second name,
12 L-I.
13    A.   I cannot recall this English
14 name.
15         MR. SEEGER:  Mr. Spano, you
16 asked me to mark it.  I'm not
17 going to mark it at this point
18 because he doesn't know the name.
19 If you want to when you follow up,
20 you're free to mark it as an
21 exhibit.
22         If you can give it back to
23 me, please.
24         (Handing over document.)

Page 40

1          MR. SEEGER:  Thank you, Mr.
2  Peng.
3  BY MR. SEEGER:
4     Q.   So, Mr. Peng, other than the
5  name in front of you, I just want to be
6  really clear, and I may have asked you
7  this.  And if I did, I apologize.
8          Is that the only name other
9  than Peng Wenlong that you used in your
10 business life?
11         MR. SPANO:  Objection to
12 form, asked and answered.
13         THE WITNESS:  I did not
14 use -- I do not use any other
15 name.
16 BY MR. SEEGER:
17    Q.   Thank you.
18         Mr. Peng, how old are you?
19    A.   Are you talking about my
20 age?
21    Q.   Yes.
22    A.   This year.  This year, I am
23 30 years of age.
24    Q.   Did the fact that you could

Page 41

1  read some English make it easier for you
2  to communicate with your English-speaking
3  customers, Mr. Peng?
4     A.   I understand.
5          I did mention about this
6  earlier.  I know English, but I only know
7  very simple English.  My English level is
8  really bad, but I have no choice when I
9  have to deal with English-speaking
10 customers.  These customers, they don't
11 understand and they don't speak Chinese.
12 So, when we are communicating, it is
13 necessary.  To me, it's very, very
14 difficult for me, difficult for me that
15 my job require me to do this.  I can only
16 do a little by little with single words
17 with the assistance of a dictionary to
18 communicate.  I haven't finished yet.
19         In fact, many of our
20 customers, they bring their own
21 interpreters.  They have interpreters or
22 they have -- or they let the people from
23 the office of the agents to come to our
24 company to talk to me.  This is more

Page 54

```
 1   the word.
 2        MR. SEEGER:  Do you want
 3   them talking?
 4        THE WITNESS:  I have a
 5   question.  Can I bring it up?
 6        MR. SEEGER:  He asked her.
 7   I think he has a question he wants
 8   to ask.
 9        MR. SPANO:  Okay.
10        THE WITNESS:  Can I go to
11   the bathroom?
12        MR. SEEGER:  Of course.  I'm
13   sure you're not alone.
14        THE VIDEOTAPE TECHNICIAN:
15   The time now is approximately
16   10:03 a.m., and we are now off the
17   record.
18          - - -
19        (Whereupon, a recess was
20   taken from 10:03 a.m. until
21   10:16 a.m.)
22          - - -
23        THE VIDEOTAPE TECHNICIAN:
24   This begins tape 2 of today's
```

Page 55

```
 1   deposition.  The time now is
 2   approximately 10:16 a.m., and
 3   we're back on the record.
 4   BY MR. SEEGER:
 5        Q.   Mr. Peng, before we broke, I
 6   was asking you if you had any
 7   conversations with Mr. Jia and Mr. Zhang.
 8   Did you listen in by telephone to the
 9   depositions that we've had the last few
10   days?
11        A.   No.
12        Q.   Okay.  Let's go back to your
13   work experience at TG.  What is your
14   current title at TG?
15        A.   The manager of the, I can
16   translate into either foreign sales or
17   foreign trade department.
18        Q.   How long have you held that
19   position, Mr. Peng?
20        A.   Are you referring to how
21   long have I been in this position
22   recently or in total how long have I been
23   in that position?
24        Q.   Mr. Peng, how long have you
```

Page 56

```
 1   been the manager of foreign sales or
 2   trade at TG?
 3        MR. SPANO:  Objection to
 4   form.
 5        THE WITNESS:  I am the
 6   foreign trade, not a foreign trade
 7   company.
 8   BY MR. SEEGER:
 9        Q.   I don't understand.
10        INTERPRETER 2:  The check
11   interpreter believes that the
12   witness said, we have foreign
13   trade department, not a foreign
14   trade company.
15        MR. SEEGER:  Let me ask my
16   question again.
17   BY MR. SEEGER:
18        Q.   Mr. Peng, how long have you
19   held the title -- strike that.
20        Mr. Peng, you described your
21   current position with TG as the manager
22   of foreign sales or the manager of
23   foreign trade.  Do I have that correct?
24        INTERPRETER 1:  Foreign
```

Page 57

```
 1   sales or foreign trade is the
 2   translator's choice of word.  I
 3   don't know whether it should be
 4   translated into sales or trade.
 5        MR. SEEGER:  Let me ask a
 6   question based on that.
 7   BY MR. SEEGER:
 8        Q.   Mr. Peng, how long have you
 9   been the manager at TG of foreign sales?
10        MR. SPANO:  Objection to
11   form.
12        INTERPRETER 2:  Counsel, the
13   check interpreter believes that
14   when you are asking the question
15   the foreign trade department, then
16   the interpreter interpret into --
17   you were saying foreign sale, and
18   the interpreter interpret into
19   foreign trade, then the witness
20   will be answering according to the
21   word foreign trade instead of
22   foreign sale.  Because sale and
23   trade, after all, in Chinese would
24   be different.
```

Page 74

1  know what you're asking.
2      Q.   Did you have any meetings
3  with Peng Shiliang to prepare for your
4  testimony today where the attorneys were
5  present?  Just a yes or no answer to that
6  question.
7      A.   I still did not hear the
8  question clearly.  What type of
9  information are you asking?
10     Q.   I'm asking if he had any
11 meetings with Peng Shiliang and attorneys
12 to prepare for his testimony today?
13     A.   The attorney, Mr. --
14         MR. CHEN:  Hogan Lovells.
15         THE WITNESS:  Was in charge.
16         Under him being in charge of the
17         meeting, I met Mr. Peng, but I
18         cannot recall what was the content
19         of that meeting.
20 BY MR. SEEGER:
21     Q.   All right.
22         In 2006, what was your title
23 with TTP?
24     A.   No title.  I was only doing

Page 75

1  sales.
2      Q.   So, what was your title?
3  Did you have any official title or not?
4      A.   I did not have an office or
5  title.
6      Q.   Did you have an official
7  title with TTP in 2007?
8      A.   I want to make sure.  When
9  you refer to TTP, are you referring to
10 the company in the Chinese name called
11 Taishan Tai'an Zhi Mian Shi Gao Ban Xian
12 Gong Si.
13     Q.   Mr. Peng, you have no
14 understanding of what TTP means, what
15 company that relates to?
16         MR. SPANO:  Objection to
17         form.
18         MR. SEEGER:  Let him answer
19         before you object.
20         MR. CHEN:  I'll let him
21         answer, and then I'm going to make
22         a state -- say something.
23 BY MR. SEEGER:
24     Q.   You can answer the question.

Page 76

1      A.   I just want to make sure.
2         MR. CHEN:  If I could just
3  briefly note.  During the course
4  of this deposition, Mr. Peng has
5  been giving the full name of
6  Taishan Gypsum and TTP in his
7  responses.  The interpretation has
8  used TG and TTP, which we didn't
9  object to, because that was
10 something that we've established
11 over the course of the past
12 several days.  But his answers
13 have been giving the full name of
14 each company.
15         MR. SEEGER:  To move this
16 along, Gene, does he understand
17 TTP -- I'm going to ask him this,
18 but I want to know.  Is he going
19 to understand TTP to mean Tai'an
20 Taishan Plasterboard?
21         MR. CHEN:  Let me just --
22 for your assistance, on the
23 agreed-upon translation glossary,
24 the translator can just read

Page 77

1  directly the English and Chinese
2  names back and forth, and that
3  should help out.  Because right
4  now, I think she's also
5  translating by term.
6         MR. SEEGER:  Okay.
7         MR. CHEN:  So, there was --
8         INTERPRETER 1:  The
9  interpreter is looking at the
10 glossary.  Actually, the
11 translation into English is just
12 TTP.
13 BY MR. SEEGER:
14     Q.   Ask him if he understands --
15         What company does he think
16 the English letters TTP relates to?
17     A.   My understanding is that it
18 is only three alphabets.
19         MR. SEEGER:  Gene, let's
20 save some time here, all right?
21 You can ask him in Chinese if you
22 want.  It is on the video.  I want
23 to just cut through this.  I want
24 to use TTP for the company we've

Page 78

1 been talking about for the last
2 three days.
3 MR. CHEN: So, we just want
4 to establish that TTP refers to
5 that company?
6 MR. SEEGER: To that company
7 we've been talking about here for
8 three days.
9 (Discussion between the
10 witness and Mr. Chen in Chinese.)
11 BY MR. SEEGER:
12 Q. I'm going to use TTP for the
13 company that his attorney just talked to
14 him about. Just tell him that.
15 A. Now I understand.
16 Q. Okay. Thank you.
17 Did you have a job title in
18 2007 at TTP?
19 A. In the year 2007, I did not
20 have an office or title.
21 Q. During 2006 and 2007, were
22 you paid by a check? How were you paid
23 by the company? I want to know, was it a
24 check, a wire transfer, what method?

Page 79

1 MR. SPANO: Objection to
2 form.
3 INTERPRETER 2: The check
4 interpreter believes the
5 interpreter --
6 MR. CHEN: Let her finish.
7 INTERPRETER 2: Sorry.
8 INTERPRETER 1: I haven't
9 finished, and also I did translate
10 the objection before the question.
11 INTERPRETER 2: No, no, no.
12 It's just that --
13 MR. SEEGER: Stephanie, did
14 you finish asking the question of
15 the witness? And if you were
16 interrupted, then ask it again.
17 INTERPRETER 1: Yes, I
18 finished.
19 MR. SEEGER: Okay.
20 INTERPRETER 2: Because the
21 interpreter interpret during --
22 before 2006, not between 2006 and
23 2007.
24 INTERPRETER 1: Objection.

Page 80

1 Objection. She heard me wrong. I
2 did interpret it during 2006 and 7
3 because I was reading from the
4 screen.
5 MR. SEEGER: Okay. Can the
6 witness answer the question the
7 way you asked it? Go ahead. I
8 want his answer.
9 THE WITNESS: I am sorry. I
10 cannot recall the question. Would
11 you mind to repeat.
12 BY MR. SEEGER:
13 Q. During 2006 and 2007, what
14 method was he paid by? Did he receive a
15 check? Was he paid by check?
16 MR. SPANO: Objection to
17 form.
18 THE WITNESS: We don't have
19 a check. I did not receive a
20 check.
21 BY MR. SEEGER:
22 Q. Okay. How was he paid?
23 A. I have a bank account book.
24 TTP would just put this amount of money

Page 81

1 into my bank account book.
2 Q. Does he have receipts for
3 every time he got paid, his salary?
4 A. No receipt.
5 Q. Was it done by electronic
6 transfer of money?
7 A. I don't know what method
8 they used to transfer that money. The
9 only I concern of is that they did
10 transfer the money to my account and that
11 I did receive the money.
12 Q. When he received bank
13 statements on his own personal account,
14 would it show how much was transferred
15 and who it was transferred by?
16 A. I don't understand. What do
17 you mean by "personal account"?
18 Q. The bank account that he
19 uses to pay his rent or his mortgage or
20 buy groceries.
21 INTERPRETER 2: The check
22 interpreter believes the
23 interpreter use the term hu kou to
24 describe an account, but hu kou in

Page 82

1  China does not mean bank account.
2  It means an identity profile. So,
3  in China, bank account is zhang
4  hu, zhang hu.
5      INTERPRETER 1: It is the
6  same because account can be
7  translated in ten different ways.
8  I said bank account.
9      MR. CHEN: I will note that
10  there's a defined term bank
11  account on the glossary and agreed
12  by both sides. The interpreter
13  should use that term.
14      MR. SEEGER: Stephanie, ask
15  the question with that term,
16  please.
17      INTERPRETER 1: The witness
18  did answer the question earlier
19  when I used that term.
20      MR. SEEGER: Okay. But I
21  want to make sure we have a clean
22  record. So, ask the question one
23  more time with the agreed-upon
24  term.

Page 83

1      INTERPRETER 1: I need to
2  look at the glossary.
3      I apologize. The glossary
4  under word "account," it
5  translated as kuai ji cai mu. It
6  did not say the -- provide the
7  term that I heard earlier. So,
8  it's a third and a fourth
9  translation of the word account.
10      MR. SEEGER: Stephanie,
11  wait, wait, wait. Stop. Where's
12  the word? Where's the word?
13      MR. CHEN: It's under bank
14  account.
15      MR. SEEGER: Look under bank
16  account.
17      INTERPRETER 1: Oh, okay.
18  Let me go back to the
19  question.
20      MR. SEEGER: Just ask it
21  using that word.
22      MR. SPANO: Objection,
23  counsel.
24      Could you please reask the

Page 84

1  question in English so we can have
2  that question translated, because
3  it's several questions ago now.
4      MR. SEEGER: Linda, can you
5  read my question back, the one
6  that was pending.
7      - - -
8      (Whereupon, the requested
9  portion of the transcript was read
10  by the court reporter as follows:
11      "Q. When he received bank
12  statements on his own personal
13  account, would it show how much
14  was transferred and who it was
15  transferred by?
16      A. I don't understand.
17  What do you mean by "personal
18  account"?
19      Q. The bank account that
20  he uses to pay his rent or his
21  mortgage or buy groceries.")
22      - - -
23      MR. SEEGER: Strike it. I'm
24  going to ask another question.

Page 85

1  BY MR. SEEGER:
2      Q.  I want to know when he gets
3  a statement from the bank on his own
4  personal bank account if it shows how
5  much was transferred and who the money
6  was transferred by. That's the question.
7      A.  I did earlier mention, well,
8  regarding the procedures, well, I have
9  the bank card, I have the bank account
10  book. I cannot check the details. If I
11  have to check the details, I have to go
12  to the bank to have the printout in my
13  bank account book that would indicate
14  what time and what amount was being
15  transferred.
16      Q.  And would it say who
17  transferred the money?
18      A.  We cannot tell -- we cannot
19  see who transferred that money.
20      Q.  So, if I transferred $100 to
21  your account, Mr. Peng, you would just
22  see that I transferred you $100, but you
23  wouldn't know it came from me?
24      MR. SPANO: Objection to the

Page 190

BY MR. SEEGER:
Q.   Mr. Peng, Mr. Wei Chun Shan brought you customers from the United States; isn't that true?
A.   Mr. Wei brought this person indicated in the letter -- in the e-mail. Mr. Peng was pointing as the name Richard Hannam. He took him to our factory.
Q.   Mr. Peng, you've testified earlier you had several dealings with Mr. Wei, correct?
INTERPRETER 1:  Counsel, the word "dealings" can be interpreted in many ways. Can you help me?
MR. SEEGER:  Use -- say how about you had a business relationship or no?
Let me look at my question. Hold on.
INTERPRETER 1:  I'll go back to that question.
MR. SEEGER:  Hold on a second. I'm going to strike that and restate it.

Page 191

MR. CHEN:  Counsel, if it's helpful, the term that she used in translation can be used as contacts, several contacts, if that's what you want to go with.
MR. SEEGER:  Let's go with that. Go ahead, ask it that way, please.
(Interpreter repeats the question.)
THE WITNESS:  I did mention that I did contact -- I did have contact with Mr. Wei, but I did not say I had several contacts with Mr. Wei.
BY MR. SEEGER:
Q.   And in more than one instance, he introduced you to business customers from the United States? Isn't that true?
A.   I don't understand the question.
Q.   Mr. Wei introduced you on several occasions to US business people,

Page 192

correct, Mr. Peng?
A.   I can only recall this customer indicated in this e-mail.
Q.   And this is -- I'm sorry. This is a US customer, correct, sir?
A.   I recall that he took the customer to our factories, and then he mentioned about there is a possibility for the shipment. He was saying that the customer will buy it in China from -- to buy it from TTP and ship it to the United States. And the customer mentioned about the -- did mention about something like this. Whether they are a US company or not, we cannot confirm that.
Q.   Did you often take foreign customers to your factory to show them, you know, your operations? Was that something you did often?
A.   I don't understand when you mention about often. What kind of concept do you have?
MR. SEEGER: (Addressing the

Page 193

interpreter.)
What word did you use in Chinese? Did it translate the same way? The word used in Chinese, did it translate the same way, often.
INTERPRETER 1:  Yes, often, the same.
BY MR. SEEGER:
Q.   Mr. Peng, I don't understand what about question you don't understand.
A.   Okay. Some customer, after they come to TTP to talk about business, some of the customers, they requested to go to the factories, and we will take them there. And some customer, they did not have such a request, then we wouldn't take them to the factories. It all depends on the request of the customers.
Q.   Mr. Peng, do you recognize Richard Hannam as working for a company called Wood Nation?
A.   The person that you mentioned about the name, he is that

Page 194

1  person.  That person Wei Chun Shan took
2  him to our company.  While we were
3  talking about business, he told us about
4  his company name.
5      Q.   What do you recall from the
6  conversation you had with him?
7      A.   That conversation -- or let
8  me put it another way, conversation.  Are
9  you referring to the time -- to the
10  matter when they come to our company,
11  they do exchange of the business?  Is
12  that what you are talking about?
13     Q.   Yes.
14     A.   I was only talking to Mr.
15  Wei, and that foreigner that you just
16  mentioned, we only talk briefly.  He
17  mentioned about wanting to buy the
18  drywall.  We did not talk too much.  And
19  for the rest of the business, it was a
20  Mr. Apollo Yang to talk to them.
21     Q.   I didn't get the name, the
22  name of the person that you just
23  identified.  Is this person that you just
24  identified in Chinese, is that Apollo

Page 195

1  Yang, the same person?
2      A.   Yes, yes.
3      Q.   Mr. Peng, did you meet Jim
4  Scudder through somebody at BNBM?
5      A.   Do you mind to write down
6  the name of this person.
7      Q.   I wrote it down for you
8  earlier.  Do you still have it there?
9      A.   Which one?
10     Q.   She's got it right there.
11  It's on the screen.  Point to it on the
12  screen.  I'll write it if it makes it
13  easier.
14     A.   Yes, I can see it now.  I'm
15  sorry about this.  Would you mind to
16  repeat the question.
17        MR. SEEGER:  You have the
18  question, Stephanie, right?
19        INTERPRETER 1:  Yes.
20        (Interpreter repeats the
21  question.)
22        MR. SPANO:  Objection to
23  form.
24        THE WITNESS:  I don't recall

Page 196

1      the concrete details of this
2      customer.
3  BY MR. SEEGER:
4      Q.   Mr. Peng, when you dealt
5  with people in 2006 --
6          When you dealt with foreign
7  customers in 2006 and 2007, did you even
8  disclose to them at all that you worked
9  for a company called TTP?
10     A.   Many of the foreign
11  customers, they will bring the agents
12  from the agents in China or they will
13  bring their own interpreters to come to
14  TTP to do the business, and of course we
15  introduce to them about the condition of
16  the company and also the products of the
17  company.
18     Q.   Yes, but my question, Mr.
19  Peng, is, during this time frame of
20  2006/2007, did you even yourself mention
21  or disclose to any of the agents or
22  foreign customers that you worked for TTP
23  and not TG?
24     A.   I will if they ask.  And I

Page 197

**REDACTED**

50 (Pages 194 to 197)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

—————————————   § MDL NO. 2047
                                  §
IN RE:                            §
CHINESE-                          § SECTION: L
MANUFACTURED                      §
DRYWALL PRODUCTS                  § JUDGE FALLON
LIABILITY                         §
LITIGATION                        § MAGISTRATE
—————————————   § JUDGE WILKINSON

-   -   -

CROSS NOTICED IN VARIOUS OTHER ACTIONS

-   -   -

April 8, 2011

-   -   -

CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

-   -   -

Videotaped deposition of WENLONG
PENG, held at 3 Pedder Street, Central,
Hong Kong, China, commencing at 9:02
a.m., on the above date, before Linda L.
Golkow, Certified Court Reporter,
Registered Diplomate Reporter, Certified
Realtime Reporter and Notary Public.

-   -   -

GOLKOW TECHNOLOGIES, INC.
ph 877.370.3377 | fax 917.591.5672
deps@golkow.com

Page  224

```
1   APPEARANCES:
2
3   SEEGER WEISS LLP
    BY:  CHRISTOPHER A. SEEGER, ESQUIRE
4   BY:  JEFFREY S. GRAND, ESQUIRE
    One William Street
5   New York, New York 10004
    (212) 584-0700
6   cseeger@seegerweiss.com
    jgrand@seegerweiss.com
7   Representing the Plaintiffs' Steering
    Committee
8
9
10  COLSON HICKS EIDSON
    BY:  PATRICK S. MONTOYA, ESQUIRE
    255 Alhambra Circle
11  Penthouse
    Coral Gables, Florida 33134
12  (305) 476-7400
    patrick@colson.com
13  Representing Plaintiffs' Steering
    Committee in the Federal and State
14  Coordinated Actions
15
16
    LAW OFFICES OF RICHARD SERPE, P.C.
17  BY:  RICHARD J. SERPE, ESQUIRE
    580 East  Main Street
18  Suite 310
    Norfolk, Virginia 23510
19  (757) 233-0009
    rserpe@serpefirm.com
20  Representing the MDL Plaintiffs and
    the Germano Plaintiffs
21
22        - - -
23
24
```

Page  226

```
1   APPEARANCES (CONTINUED):
2
3   GALLOWAY JOHNSON TOMPKINS BURR and
    SMITH
4   BY:  CARLINA C. EISELEN, ESQUIRE
    One Shell Square
5   701 Poydras Street, 40th Floor
    New Orleans, Louisiana 70139
6   (504) 525-6802
    ceiselen@gjtbs.com
7   Representing Interior/Exterior
    Building Supply
8
9
10  PERKINS COIE LLP
    BY:  CRAIG M.J. ALLELY, ESQUIRE
    1899 Wynkoop Street - Suite 700
11  Denver, Colorado 80202
    (303) 291-2300
12  callely@perkinscoie.com
    Representing the State of Louisiana
13
14
    WEINBERG, WHEELER, HUDGINS, GUNN &
15  DIAL, LLC
    BY:  NICHOLAS P. PANAYOTOPOULOS, ESQ.
16  3344 Peachtree Road, NE - Suite 2400
    Atlanta, Georgia 30326
17  (404) 876-2700
    npanayo@wwhgd.com
18  Representing Various Banner
    Defendants
19
20
    BRENNER, EVANS & MILLMAN, P.C.
21  BY:  THEODORE I. BRENNER, ESQUIRE
    411 East Franklin Street -  Suite 200
22  Richmond, Virginia 23218
    (804) 644-1300
23  Representing Tobin Trading Company
24
```

Page  225

```
1   APPEARANCES (CONTINUED):
2
3   HOGAN LOVELLS US LLP
    BY:  FRANK T. SPANO, ESQUIRE
4   BY:  RENEE GARCIA, ESQUIRE
    875 Third Avenue
5   New York, New York 10022
    (212) 918-3000
6   frank.spano@hoganlovells.com
    Renee.garcia@hoganlovells.com
7   Representing Taishan Gypsum Co.
    Ltd. and Tai'an Taishan
8   Plasterboard Company Ltd. and the
    Witness, Wenlong Peng
9
10
    HOGAN LOVELLS INTERNATIONAL LLP
11  BY:  EUGENE CHEN, ESQUIRE
    18th Floor, Park Place
12  1601 Nanjing Road West
    Shanghai, China 200040
13  (86 21) 6122 3800
    eugene.chen@hoganlovells.com
14  Representing Taishan Gypsum Co.
    Ltd. and Tai'an Taishan
15  Plasterboard Company Ltd. and the
    Witness, Wenlong Peng
16
17
18  GREENBERG TRAURIG, LLP
    BY:  HILARIE BASS, ESQUIRE
19  1221 Brickell Avenue
    Miami, Florida 33131
20  (305) 579-0745
    bassh@gtlaw.com
21  Representing the Home Builders
    Steering Committee
22
23
24
```

Page  227

```
1   APPEARANCES (CONTINUED):
2
3   McKENRY, DANCIGERS, DAWSON &
    LAKE, P.C.
4   BY:  J. BRIAN SLAUGHTER, ESQUIRE
    192 Ballard Court
5   Suite 400
    Virginia Beach, Virginia 23462
6   (757) 461-2500
    Jbslaughter@va-law.org
7   Representing Atlantic Homes LLC and
    Multiple Other Virginia-Based
8   Defendants
9
10  SHER GARNER CAHILL RICHTER KLEIN &
    HILBERT, L.L.C.
11  BY:  MATTHEW C. CLARK, ESQUIRE
    909 Poydras Street
12  Suite 2800
    New Orleans, Louisiana 70112
13  (504) 299-2100
    mclark@shergarner.com
14  Representing the Southern Home
    Defendants
15
16
    SINNOTT, NUCKOLS & LOGAN, PC
17  BY:  KENNETH F. HARDT, ESQUIRE
    13811 Village Mill Drive
18  Midlothian, Virginia 23114
    (804) 378-7600
19  khardt@snllaw.com
    Representing Venture Supply, Inc. and
20  Porter-Blaine Corp.
21
22
23
24
```

2  (Pages  224  to  227)

Page 228

```
 1  APPEARANCES VIA TELEPHONE:
 2
 3  KUCHLER POLK SCHELL WEINER &
    RICHESON LLC
 4  BY:  FRANCIS X. deBLANC, III,
    1615 Poydras Street
 5  Suite 1300
    New Orleans, Louisiana 70112
 6  (504) 592-0691
    slauricella@kuchlerpolk.com
 7  Representing Creola Ace Hardware and
    Thomas Gould Inc. in the MDL
 8
 9  HUNTON & WILLIAMS LLP
10  BY:  A. TODD BROWN, ESQUIRE
    Bank of America Plaza
11  101 South Tryon Street
    Suite 3500
12  Charlotte, North Carolina  28280
    (704) 378-4700
13  Representing Stock Building Supply,
    LLC
14
15
    JONES, WALKER, WAECHTER, POITEVENT,
16  CARRERE & DENEGRE LLP
    BY:  MEGAN E. DONOHUE, ESQUIRE
17  600 Jefferson Street, Suite 1600
    Lafayette, Louisiana 70501
18  (337) 262-9062
    mdonohue@joneswalker.com
19  Representing Fireman's Fund Insurance
    Company
20
21
22
23
24
```

Page 230

```
 1  APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3
    THOMPSON COE COUSINS & IRONS, L.L.P.
 4  BY:  SUZANNE M. PATRICK, ESQUIRE
    One Riverway, Suite 1600
 5  Houston, Texas 77056
    (713) 403-8210
 6  spatrick@thompsoncoe.com
    Representing The North River
 7  Insurance Company
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 229

```
 1  APPEARANCES VIA TELEPHONE (CONTINUED):
 2
 3  DUPLASS ZWAIN BOURGEOIS PFISTER &
    WEINSTOCK
 4  BY:  PHILIP WATSON, ESQUIRE
    3838 N. Causeway Boulevard
 5  Suite 2900
    Metairie, Louisiana 70002
 6  (504) 832-3700
    pwatson@duplass.com
 7  Representing R&H Masonry, Inc., and
    Swedberg Enterprises, Inc.
 8
 9
    RUMBERGER, KIRK & CALDWELL, P.A.
10  BY:  ABIGAIL ROBERTS, ESQUIRE
    Brickell Bayview Centre
11  Suite 3000
    80 Southwest 8th Street
12  Miami, Florida 33130
    (305) 358-5577
13  aroberts@rumberger.com
    Representing Defendants' Liaison
14  Counsel for  Installers
15
16  FULMER LEROY ALBEE BAUMANN
    BY:  CANDACE ROSS, ESQUIRE
17  2866 East Oakland Park Boulevard
    Ft. Lauderdale, Florida 33306
18  (954) 707-4430
    mosscandace@fulmerleroy.com
19  Representing Independent Builders
    Supply Association (IBSA)
20
21
22
23
24
```

Page 231

```
 1  APPEARANCES VIA STREAM:
 2
 3  BECNEL LAW FIRM, L.L.C.
    BY:  ROBERT BECNEL, ESQUIRE
 4  106 W. 7th Street
    Reserve, Louisiana 70084
 5  (985) 536-1186
    robbecnel@aol.com
 6  Representing the Plaintiffs'
    Steering Committee
 7
 8
 9  JONES, WALKER, WAECHTER, POITEVENT,
    CARRERE & DENEGRE LLP
10  BY:  MEGAN E. DONOHUE, ESQUIRE
    600 Jefferson Street, Suite 1600
11  Lafayette, Louisiana 70501
    (337) 262-9062
12  mdonohue@joneswalker.com
    Representing Fireman's Fund Insurance
13  Company
14
15  HAYNSWORTH SINKLER BOYD, P.A.
    BY:  CHRISTOPHER B. MAJOR, ESQUIRE
16  75 Beattie Place - 11th Floor
    Greenville, South Carolina 29601
17  (864) 240-3200
    cmajor@hsblawfirm.com
18  Representing USG Corporation and L&W
    Supply Corporation
19
20
21
22
23
24
```

## Page 232

1   APPEARANCES VIA STREAM (CONTINUED):
2
3
    DEUTSCH, KERRIGAN & STILES
4   BY: MELISSA M. SWABACKER, ESQUIRE
    755 Magazine St.
5   New Orleans, Louisiana 70130
    (504) 581-5141
6   mswabacker@dkslaw.com
    Representing Landmark American
7   Insurance Company
8
9   KUCHLER POLK SCHELL WEINER &
    RICHESON LLC
10  BY: SOPHIA L. LAURICELLA, ESQUIRE
    1615 Poydras Street
11  Suite 1300
    New Orleans, Louisiana 70112
12  (504) 592-0691
    slauricella@kuchlerpolk.com
13  Representing Creola Ace Hardware and
    Thomas Gould Inc. in the MDL
14
15
16  ALSO PRESENT:
17
18  Stephanie Chin, Official Interpreter
    (Interpreter 1)
19
20  Una Wong, Check Interpreter
    (Interpreter 2)
21
22
23        - - -
24

## Page 233

1         - - -
2        I N D E X
3         - - -
4
5   Testimony of: WENLONG PENG
6   By Mr. Seeger          236
    By Mr. Montoya         277
7   By Ms. Bass            310
    By Mr. Hardt           364
8   By Mr. Brenner         383
    By Ms. Eiselen         408
9   By Mr. Clark           418
10
          - - -
11
         E X H I B I T S
12
          - - -
13
14  NO.      DESCRIPTION      PAGE
15  Peng-10  E-mail with       244
             translation, May 11,
16           2007, Translation of
             TG 0022728 and TG
17           0022728
18  Peng-11  E-mail dated September  294
             21, 2007, Bates
19           stamped TG 0021226
20  Peng-12  E-mail dated June 18,   376
             2009, with attachments
21
    Peng-13  Report in Chinese by    398
22           Pen Wenlong dated July
             27, 2009, Bates
23           stamped TG 0025222
             through TG 0025223
24

## Page 234

1   Peng-14  Translation of Exhibit  404
             13, "Taishan Gypsum
2            Co., Ltd. Export
             Report"
3
    Peng-15  E-mail dated 5/24/2006  412
4            with attachment, Bates
             stamped INT/EXT 01180
5            through INT/EXT 01182
6   Peng-16  Invoice, Taian Taishan  425
             Plasterboard Co.,
7            Ltd., dated July 3,
             2006, Bates stamped TG
8            001936
9   Peng-17  Document entitled       430
             "Counterfoil, Taian
10           Shandong Province
             Special Invoice for
11           Export," Bates stamped
             TG 0020107
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 235

1          - - -
2   DEPOSITION SUPPORT INDEX
3          - - -
4
    Direction to Witness Not to Answer
5
         Page Line
6
7
8
9
    Request for Production of Documents
10
         Page Line
11
12
13
14
    Stipulations
15
         Page Line
16
17
18
19
20  Question Marked
21       Page Line
22
23
24

Page 256

```
 1   BY MR. SEEGER:
 2       Q.   It's your deposition.  Yes.
 3       A.   It is the number when I
 4   first work for TG, and here this number
 5   0086 is a country code.  And 0538 is the
 6   area code.  And 8812017 is the telephone
 7   number.  In the year 2006, after I joined
 8   TTP, because in the new office of TTP,
 9   they did not have a new telephone number,
10   they did not have a line.  At that time,
11   we tried to apply for local telephone
12   services from a supplier that I cannot
13   recall.  It could be Zhong Guo Wang Tong
14   China Internet something or Zhong Guo
15   Dian Xin.
16           INTERPRETER 2:  China
17   Telecom.
18           THE WITNESS:  China Telecom
19       that I cannot recall.  At that
20       point, they help to adjust the
21       telephone to my office or
22       transfer.
23           INTERPRETER 2:  Correction.
24       The office of TTP.
```

Page 257

```
 1           INTERPRETER 1:  I did not
 2       have that TTP word in my notes.
 3   BY MR. SEEGER:
 4       Q.   Okay.  So --
 5           THE WITNESS:  I haven't
 6       finished yet.  Therefore, when I
 7       worked for TTP, the telephone
 8       number was still (00 86) 5388
 9       812017.  Finished.
10   BY MR. SEEGER:
11       Q.   Mr. Peng, in the e-mail that
12   you wrote in Chinese, you tell the
13   customer in this case that Shandong Taihe
14   Dongxin exports gypsum board to the
15   United States in about 18 million square
16   meters.  Isn't that what you say?
17           MR. SPANO:  Objection to
18       form.
19           THE WITNESS:  Are you
20       referring to this statement here?
21       (Indicating.)
22           INTERPRETER 1:  The witness
23       is pointing to this sentence
24       saying "the export of gypsum
```

Page 258

```
 1       boards to the United States last
 2       year was 18 million square
 3       meters."
 4   BY MR. SEEGER:
 5       Q.   Correct.
 6       A.   In this case, let me
 7   explain.  Number one --
 8       Q.   Well, actually -- go ahead.
 9       A.   Exporting to the United
10   States referred to as the company in
11   China talking to customer in China
12   regarding they talk about it, negotiation
13   or talk and also signing the contracts
14   and also producing for the customers.  We
15   talk about this in China.  We also
16   collect the money in China.  We also make
17   the dealings in China of the products.
18           INTERPRETER 2:  Correction.
19       The transaction was regarded in
20       China.
21           INTERPRETER 1:  Transaction
22       and dealings are the same.  We
23       have many words that we can choose
24       from.  Interpreter, I hope you
```

Page 259

```
 1       don't play games with similar
 2       words anymore.  It's a waste of
 3       time and unprofessional.
 4           MR. SEEGER:  Stephanie,
 5       you're the official interpreter.
 6       Let's not have a back and forth.
 7       Let her say what she says and
 8       then --
 9           MR. CHEN:  If I may
10       interject, because that was quite
11       a serious accusation.  And let me
12       refer the interpreter again to the
13       agreed-upon list where the term
14       that was used is translated as
15       transaction.  That was used by
16       both sides and agreed upon.  And
17       so before she makes accusations
18       about manipulation of terms, she
19       should use what was actually
20       provided to her in terms of
21       agreed-upon terms.
22           MR. SEEGER:  It's fair
23       enough.  No more back and forth.
24       Just let her make her objection.
```

10 (Pages 256 to 259)

Page 260

```
 1    You don't have to respond to her
 2    objection or defend your
 3    interpretation.
 4         INTERPRETER 1:  Thank you.
 5         MR. SEEGER:  No, but use the
 6    terms that were provided, if you
 7    can.  So let's just go forward.
 8         MR. PANAYOTOPOULOS:  Let me
 9    make an objection, please, as
10    nonresponsive.
11 BY MR. SEEGER:
12    Q.  Did he finish his answer?
13    A.  I haven't finished yet.
14    Q.  He can finish.  I'm going to
15 let him finish.  I just want him to know,
16 he's not answering my question.  Does he
17 want to answer the question I asked or
18 does he want to finish the speech?
19 Whatever he wants.
20         MR. SPANO:  I object to that
21    question and that characterization
22    of his answer.  There is a
23    foundation in this deposition that
24    this witness has limited English
```

Page 261

```
 1    language reading and writing
 2    ability.  And when you're
 3    confronting him with his writing,
 4    he's entitled to explain what he
 5    meant.  So, ask questions if you
 6    want, but don't insult him and
 7    don't characterize his testimony.
 8    Next question.
 9         MR. SEEGER:  You'd better
10    lower your voice.
11         MS. BASS:  Let me just
12    object to the speaking objection.
13         MR. SEEGER:  You'd better
14    lower your voice or I'll put the
15    camera on you the rest of the
16    deposition.  I'm not going to have
17    you scream at me from across the
18    table.
19         MR. SPANO:  I apologize.
20         MR. SEEGER:  It's accepted.
21         MR. SPANO:  I apologize, but
22    that was an unwarranted attack on
23    the witness, who is trying to
24    explain what he wrote.  And you
```

Page 262

```
 1    questioned him for an hour
 2    yesterday about his English
 3    ability, and he's laid a strong
 4    foundation that he has problems
 5    with English, that he sits for
 6    hours with dictionaries before he
 7    writes words, and you're sticking
 8    documents --
 9         MR. SEEGER:  It's his
10    document, Frank.  He wrote it.
11         MR. SPANO:  You're sticking
12    documents in front of his eyes and
13    saying gotcha because he used
14    certain words.
15         MR. SEEGER:  No.
16         MR. SPANO:  So, under those
17    circumstances, it's reasonable and
18    appropriate for him to explain
19    what he meant.
20         MR. SEEGER:  Frank, the
21    answer was so obviously coached,
22    it's like off the charts that you
23    really want to have this
24    discussion.  Let's let the record
```

Page 263

```
 1    speak for itself.  You've made
 2    your objection.  I accept your
 3    apology for yelling at me.  I will
 4    not be yelling at you.  Let's move
 5    on.
 6 BY MR. SEEGER:
 7    Q.  All right.  I would like to
 8 ask him and try to get an answer to the
 9 question I'm asking, which is simple, and
10 counsel can object to it if he likes.
11 And he can instruct him not to answer, do
12 whatever he wants.
13         But in the e-mail that you
14 wrote, Mr. Peng, to Mr. Zhang, you said,
15 "The export of gypsum boards to the
16 United States last year" referring to
17 2006, "was 18 million square meters."
18 Did you write that or did you not write
19 that?
20    A.  The e-mail wrote down 18
21 million square meters, but I need to
22 explain the situation.  We have new
23 customers, they want to buy drywalls.
24 And the customers, they want to
```

Page 264

1  understand the company, therefore, we can
2  come to an agreement, the same
3  agreement -- the same opinion, the same
4  opinion. The 18 million square meter,
5  that's not implied, the actual production
6  of 18 million square meters, or we did
7  have the transaction of 18 million square
8  meters at that --
9       INTERPRETER 1:  I asked the
10      witness to pause, and let me
11      finish the part that I can finish,
12      and I will ask him to help me, to
13      repeat to me what I missed.
14      THE WITNESS:  At that time,
15      the customers, they made
16      inquiries, and they want to place
17      the order, and they want to get
18      the quotation for that order. The
19      customer made an expression of how
20      much they wanted to buy. During
21      the process when we were talking
22      about business with our customers,
23      they expressed that they have a
24      very big ability to buy. It is

Page 265

1       how much they can buy and also it
2       is how much they hope to buy from
3       our company. Of course this 18
4       million was the preliminary
5       statistics. It is not very
6       concrete. Finished.
7  BY MR. SEEGER:
8       Q.   When you write e-mails to
9  your customers, do you make an effort to
10 be truthful, Mr. Peng?
11      A.   Yeah, I would try my best to
12 be truthful.
13      Q.   Mr. Peng, you also in this
14 e-mail referenced to this customer that
15 you -- that the 127 millimeter gypsum
16 board has passed US professional ASTM
17 inspection, correct?  You wrote that?
18      INTERPRETER 1:  Counsel, is
19      it 12.7 millimeter?
20      MR. SEEGER:  127 millimeter.
21      127.
22      I'm sorry. I'm looking at
23      the Chinese version. It is 12.7
24      millimeter.

Page 266

1       THE WITNESS:  I did write
2       down in my e-mail that the 12.7
3       millimeter gypsum board has passed
4       US professional ASTM inspection.
5  BY MR. SEEGER:
6       Q.   Mr. Peng, in the board that
7  you shipped to the US, you would for
8  customers do private labeling, correct?
9  You would allow customers to put a
10 different name on the board or change the
11 color of the tape and do things like
12 that, correct?
13      MR. SPANO:  Objection to
14      form.
15      THE WITNESS:  Mr. Attorney,
16      I want to know when you refer to
17      the word "tape," is it what we
18      call the tape to seal the edges?
19 BY MR. SEEGER:
20      Q.   Yes.
21      MR. SPANO:  Are you done
22      with this exhibit?
23      MR. SEEGER:  Yes.
24      THE WITNESS:  When we

Page 267

1       produce it or when we were talking
2       about business, I mean, when we
3       were dealing with the orders for
4       the 12.7 millimeter boards, we
5       would do it according to the
6       requirements of the customers for
7       the tapes. Then we would design
8       the tape and design -- and to make
9       different designs according to the
10      requirements of the customers.
11 BY MR. SEEGER:
12      Q.   And you would actually --
13 I'm sorry.
14      A.   I haven't finished yet.
15      Of course the requirement
16 coming from the customer has to be --
17 must be legal, not to infringe, no
18 infringement, and do not violate the law,
19 and also, according to the capacity of
20 our production. And also, these are the
21 requirements that we are able to do, then
22 we would do it according to the
23 requirements of the customers. Finished.
24      Q.   Thank you.

Page 280

1      A.   I did mention about this
2  earlier.  We did not sell drywall in the
3  United States.  We did the transaction,
4  or another word, dealings, in China.  In
5  order to save time, I'm not going to
6  repeat my answer.
7      Q.   Sir, developing a market in
8  the United States for drywall was
9  important to your company; is that
10 correct?
11         MR. SPANO:  Objection to
12     form.
13         THE WITNESS:  We did not
14     have any objective to -- we don't
15     have any objective to develop the
16     market in the United States.  This
17     is not important to us.
18 BY MR. MONTOYA:
19     Q.   Sir, was it important to
20 your business from 2006 to 2008 to
21 develop a market for the sale of drywall
22 in the United States?
23         MR. SPANO:  Objection to
24     form, lack of foundation.

Page 281

1            - - -
2         (Whereupon, the following
3      portion of the transcript was read
4      by the court reporter:
5      "Q.  Sir, was it important
6      to your business from 2006 to 2008
7      to develop a market for the sale
8      of drywall in the United States?")
9            - - -
10         MR. CHEN:  Objection.  She's
11     still translating the mistaken
12     portion.
13         MR. MONTOYA:  I'll ask the
14     question again to make it easier.
15 BY MR. MONTOYA:
16     Q.   Sir, was it important to
17 your business from 2006 to 2008 to
18 develop a market for the sale of drywall
19 in the United States?
20         MR. SPANO:  Objection.
21 BY MR. MONTOYA:
22     Q.   You can answer.
23     A.   Can you make the question
24 shorter?  You confused me.

Page 282

1      Q.   Sir, one of the goals of the
2  Foreign Trade Office at your company from
3  2006 to 2008 was to develop a market in
4  the United States for the sale of
5  drywall, correct?
6      A.   The "company," what company
7  are you referring to?
8      Q.   The company you worked for
9  from 2006 to 2008.
10     A.   During the year 2006 and
11 2007, TTP did not establish a department
12 called department of foreign trade.
13         INTERPRETER 1:  Or during
14     the first three days of the
15     deposition, it was translated as
16     department of foreign sales.
17         INTERPRETER 2:  Correction.
18     The witness said, in 2006 and
19     2007, I worked for TTP, and TTP
20     did not have foreign trade -- was
21     not established a foreign trade
22     department.
23         INTERPRETER 1:  What?
24         MR. MONTOYA:  I'm going to

Page 283

1      move on to my next question.
2          THE WITNESS:  I haven't
3      finished yet.  I need to continue
4      with my answer.
5  BY MR. MONTOYA:
6      Q.   Please do so.
7      A.   We also did not go to the
8  United States to do marketing and to do
9  the sales.
10     Q.   Did your company have a
11 website that reached the United States
12 from 2006 to 2008?
13         MR. SPANO:  Objection to
14     form.
15         THE WITNESS:  TTP has never
16     had -- made such a website.
17 BY MR. MONTOYA:
18     Q.   Finished?
19     A.   According to my
20 understanding, TG did have a website.
21 Finished.
22     Q.   Did you develop any sales or
23 promotional materials on the Internet
24 when you worked from 2006 to 2008?

16  (Pages  280  to  283)

Page 284

1    A.   I don't understand.  Are you
2  referring to me as an individual or are
3  you referring to the company?
4    Q.   Let's start with you as an
5  individual.
6    A.   No.
7    Q.   How about the company?
8      MR. SPANO:  Objection to
9    form.
10      THE WITNESS:  I'm sorry.  I
11    don't recall the question.  Can
12    you repeat it?
13  BY MR. MONTOYA:
14    Q.   Yes.
15      Did your company develop any
16  sales or promotional materials on the
17  Internet when you worked from 2006 to
18  2008?
19      MR. SPANO:  Objection to
20    form.
21  BY MR. MONTOYA:
22    Q.   You can answer.
23    A.   First of all, just like what
24  I mentioned earlier, TTP did not have a

Page 285

1  website.  Number two, TG has a website.
2  According to my understanding, they give
3  a very brief introduction of the
4  situation or condition.
5    Q.   When your TTP customers
6  asked you for a website to look at
7  regarding your product from 2006 to 2008,
8  you had them look at the TG website,
9  correct?
10      MR. SPANO:  Objection.
11      THE WITNESS:  It was the
12    case of between 2006 and 2007.
13  BY MR. MONTOYA:
14    Q.   Did you ever send product
15  catalogs to customers in the United
16  States by e-mail from 2006 to 2008?
17      INTERPRETER 1:  Counsel, the
18    word "product catalogs" has many
19    different wordings for it, and I'm
20    trying my best.
21      MR. MONTOYA:  I'll point out
22    "catalog" is a defined term on the
23    glossary that we've agreed to, if
24    you could use that, please.

Page 286

1      INTERPRETER 1:  No problem.
2      MR. CHEN:  As is product
3    catalog.  That specific term is
4    defined.
5      MR. MONTOYA:  Use product
6    catalog, please.
7      INTERPRETER 1:  Okay.
8      THE WITNESS:  Do you mean
9    have I ever introduced our
10    products to our customers through
11    the product catalog?  Is that what
12    you mean?
13      INTERPRETER 2:  By e-mail,
14    via e-mail.
15      THE WITNESS:  By e-mail?
16  BY MR. MONTOYA:
17    Q.   Yes.  And did you ever send
18  that catalog by e-mail to the United
19  States?
20    A.   According to my knowledge,
21  no.
22    Q.   Do you know if Mr. Che ever
23  sent the product catalog to a customer in
24  the United States by e-mail?

Page 287

1    A.   That I don't recall.
2    Q.   How about Mr. Yang, do you
3  know if he ever sent product catalogs to
4  customers in the United States by e-mail?
5    A.   I also am not sure.  I can't
6  recall.
7    Q.   When you and Mr. Che and Mr.
8  Yang worked together, did you have sales
9  meetings?
10    A.   We communicate -- sorry.
11  I'll do it again.
12      We communicate any time,
13  therefore, it would be convenient for our
14  exchange.
15    Q.   But did you ever have
16  periodic meetings, say, once a month,
17  once a week, regarding sales?
18    A.   We don't have a fixed
19  timetable.  I just mentioned it earlier.
20  When this is necessary, we would
21  communicate at any time.
22    Q.   Did you ever take notes when
23  you spoke with Mr. Che or Mr. Yang
24  regarding sales to the United States?

17  (Pages 284 to 287)

Page 288

1        MR. SPANO:  Objection to
2    form.
3  BY MR. MONTOYA:
4        Q.   You can answer.
5        A.   We would talk about exact
6  business, the concrete business, but the
7  business talks, we don't have any
8  records, for example, the requirement of
9  the customers or whether we are capable
10  of fulfilling the requirement of the
11  customers.
12        Q.   How old is Mr. --
13        How old is Bill Che or Bill
14  Che.  I keep mispronouncing his name.
15        A.   How old is Bill Che?
16        Q.   Yes.
17        A.   I think he is about three or
18  four years older than me.
19        Q.   And Mr. Yang, how old is he?
20        A.   His age is similar to Mr.
21  Che.
22        Q.   Did you go to school with
23  either of them?
24        A.   Go to school together?

Page 289

1        Q.   Yes.
2        A.   No.
3        Q.   Do you know if Bill Che or
4  Mr. Yang studied English like you did?
5        A.   They did not study English.
6  What I mean is that they did not learn --
7  they did not study professional English.
8  They might know something like A,B,C.
9        Q.   Did you ever use any
10  services to get customers in the United
11  States, referral services?
12        Let me start my question
13  again.
14        Did you ever use any
15  referral services to get customers in the
16  United States?
17        INTERPRETER 1:  Counsel,
18  "referral service," you mean the
19  middlemen?
20        MR. MONTOYA:  Yes.
21        MR. SPANO:  Objection to
22  form.
23  BY MR. MONTOYA:
24        Q.   You can answer, sir.

Page 290

1        A.   I don't understand the
2  question.  Can you explain it to me?
3        Q.   Sure.  I'll ask you another
4  question to make it easier.
5        Are you familiar with a
6  website called Alibaba.com?
7        A.   I know this website.
8        Q.   Tell me about the website.
9        MR. SPANO:  Objection.
10        THE WITNESS:  I know that it
11  is a Chinese website -- it's a
12  website in China.  People can
13  release information through this
14  website.
15  BY MR. MONTOYA:
16        Q.   What did you use the website
17  for?
18        A.   What do -- I don't quite
19  remember well --
20        INTERPRETER 1:  The witness
21  paused.
22        THE WITNESS:  In the year
23  '06 and '07, I use the website to
24  release some information, product

Page 291

1  information.
2  BY MR. MONTOYA:
3        Q.   For what company?
4        A.   This information was not put
5  out by me.  I don't recall exact content.
6        Q.   For what product?
7        A.   It should be the drywall.
8        Q.   And I didn't get an answer
9  to my other question.  I asked you for
10  what company?
11        MR. SPANO:  Objection to
12  form.  He did answer the question.
13  He said he didn't know the
14  content.
15        MR. MONTOYA:  Please don't
16  argue with me, Counsel.
17        MR. SPANO:  You made a
18  comment on the record that wasn't
19  part of the question.  So, if you
20  can do it, I can do it.
21        MR. MONTOYA:  I will read
22  the question.
23        It says, "For what company?"
24  "Answer.  This information

Page 292

1  was not put out by me. I don't
2  recall exact content."
3      I asked him for what
4  company. He did not answer the
5  question. I will ask him the
6  question again.
7  BY MR. MONTOYA:
8      Q.  Sir, for what company did
9  you use the website Alibaba for?
10      INTERPRETER 1: I'm sorry.
11  The transcript on the screen was
12  not clear.
13          - - -
14      (Whereupon, the requested
15  portion of the transcript was read
16  by the court reporter as follows:
17      "Q.  Sir, for what company
18  did you use the website Alibaba
19  for?")
20          - - -
21      THE WITNESS: I myself
22  personally did not use it. I am
23  not in particularly to use this
24  for any company. TTP did not use

Page 293

1  this website. TG, there is a
2  possibility that they have used
3  it, but I am not sure.
4  BY MR. MONTOYA:
5      Q.  Sir, in September of 2007,
6  you were working for TTP, correct?
7      A.  Yes.
8      Q.  Did you know if TG or TTP
9  sold a product called Illuminated, and
10  I'll spell it, I-L-L-U-M-I-N-A-T-E-D,
11  Columns, C-O-L-U-M-N-S?
12      MR. MONTOYA: I don't think
13  it is a translated term.
14      INTERPRETER 1: Can the
15  interpreter try, but I'm not sure.
16      The interpreter is trying to
17  help the witness to understand --
18      MR. MONTOYA: That's okay.
19  I'll make it easier for you.
20      INTERPRETER 1: -- the word
21  Illuminated Column, but he said --
22      MR. MONTOYA: Stephanie,
23  that's okay. I'll ask another
24  question.

Page 294

1      MR. CHEN: She should at
2  least translate what he said.
3      MR. MONTOYA: That's fine.
4      THE WITNESS: Would you mind
5  to tell me exactly what it is?
6      MR. MONTOYA: Yes, sir, I
7  will.
8      Translate that.
9      THE WITNESS: Please.
10      MR. MONTOYA: Linda, what's
11  the next exhibit?
12      THE COURT REPORTER: 11.
13          - - -
14      (Whereupon, Deposition
15  Exhibit Peng-11, E-mail dated
16  September 21, 2007, Bates stamped
17  TG 0021226, was marked for
18  identification.)
19          - - -
20  BY MR. MONTOYA:
21      Q.  Sir, I'm going to hand you
22  Exhibit 11 to your deposition, and a copy
23  to your counsel as well. The Bates
24  Number is TG --

Page 295

1      MR. MONTOYA: You need to
2  swap that.
3  BY MR. MONTOYA:
4      Q.  TG 21226 is the Bates label
5  number.
6      A.  Are you referring to this
7  product, (indicating)?
8      INTERPRETER 1: The witness
9  is pointing to "Illuminated
10  Columns."
11  BY MR. MONTOYA:
12      Q.  Yes, sir. If you could
13  please turn the document to the camera
14  and point to what you're reading. Are
15  you reading "illuminated roman towers"?
16      MR. MONTOYA: If you can
17  translate that, please.
18  BY MR. MONTOYA:
19      Q.  If you can just hold it up
20  and point to it so we understand where
21  you're reading.
22      A.  Is it okay like this?
23      Q.  Sure, that's fine.
24      MR. CHEN: The translation

Page 308

1      THE WITNESS: I don't know.
2   What is your question?
3   BY MR. MONTOYA:
4      Q.    What did you do to increase
5   the sales of Taishan brand drywall?
6      A.   I would not intentionally
7   or, in other words, deliberately trying
8   to pursue the objective to increase the
9   sales of Taishan drywall.
10      MR. CHEN: I believe the
11   reference was Taishan Gypsum
12   drywall. I believe he said that
13   in Chinese, if you want to clarify
14   it. I don't know.
15      MR. MONTOYA: That's fine.
16   I'm going to leave that.
17      At this time, I would pass
18   the witness to the next
19   questioner.
20      And sir, I appreciate your
21   time and courtesy today.
22      If you would translate that,
23   please.
24      THE WITNESS: Thank you.

Page 309

1      MR. SPANO: Can we go off
2   the record.
3      THE VIDEOTAPE TECHNICIAN:
4   The time now is approximately
5   11:30 a.m., and we are now off the
6   record.
7         - - -
8      (Whereupon, a recess was
9   taken from 11:30 a.m. until
10   11:31 a.m.)
11         - - -
12      THE VIDEOTAPE TECHNICIAN:
13   The time now is approximately
14   11:31 a.m., and we are back on the
15   record.
16      MR. SPANO: We conferred
17   with the witness off the record,
18   and he would like to break at noon
19   if that's okay.
20      MS. BASS: That's fine. No
21   problem at all.
22         - - -
23      EXAMINATION
24         - - -

Page 310

1   BY MS. BASS:
2      Q.   Good morning. My name is
3   Hilarie Bass.
4      A.   How are you?
5      Q.   Very well, thank you.
6      I represent home builders in
7   the United States whose homes were built
8   with Taishan Gypsum drywall. So, we are
9   here today to try and understand how it
10   is that defective drywall manufactured by
11   your company ended up in their homes.
12      MR. SPANO: Counsel, could
13   you please limit your introductory
14   remarks and ask questions.
15      MS. BASS: I'm done with my
16   introductory remarks.
17      MR. SPANO: Thank you.
18   BY MS. BASS:
19      Q.   Mr. Peng, I understand your
20   testimony is that you majored in English
21   literature; is that correct?
22      A.   I mentioned about this
23   yesterday. My degree is in English
24   literature.

Page 311

1      Q.   And in your Chinese
2   university, did you read the English
3   literature required for your degree in
4   English?
5      MR. SPANO: Objection to
6   form, lack of foundation.
7      THE WITNESS: I did mention
8   about this yesterday. At
9   universities in China, when we
10   learn English, there are two ways.
11   Number one, it would be at the
12   teacher's college or we call it
13   the Normal school, college, Normal
14   University. Another type of
15   English is that any type of
16   English you learn, it will be
17   called English literature.
18   Yesterday I did mention about when
19   I went to university, my
20   professional learning was economic
21   trade English or it could also be
22   translated as English in economic
23   and trading. According to the
24   educational system in China,

Page 316

```
 1      will produce, and I don't recall
 2      how many e-mails I produced to
 3      him.
 4  BY MS. BASS:
 5      Q.   Isn't it correct, Mr. Peng,
 6  that you wrote scores of e-mails to
 7  American customers in the English
 8  language?
 9           INTERPRETER 1:  Counsel,
10      "wrote scores," you mean many?
11           MS. BASS:  Many.  Many,
12      many.
13           INTERPRETER 1:  Counsel, I'm
14      trying to avoid the wording --
15           MS. BASS:  I appreciate
16      that.
17  BY MS. BASS:
18      Q.   Isn't it correct that you
19  wrote many, many, many e-mails to
20  American customers in English?
21           MR. SPANO:  Objection to
22      form, and also it's a harassing
23      question.
24           THE WITNESS:  I don't
```

Page 317

```
 1      understand.  What do you mean by
 2      "many, many, many"?
 3  BY MS. BASS:
 4      Q.   In excess of 50.
 5      A.   I do not recall.  I do not
 6  recall exactly whether this is in excess
 7  of 50 or not.  But it should be more than
 8  10.
 9      Q.   Okay.  Fine.
10           Isn't it true that you wrote
11  in excess of 10 e-mails to American
12  customers regarding the sales of gypsum
13  drywall by TTP and TG in English?
14           MR. SPANO:  Objection to
15      form.
16           THE WITNESS:  These e-mails
17      are mainly communications with the
18      customers regarding the
19      followings:  The design, the
20      packaging, the timetable for
21      production, the timetable for
22      delivery, and the concrete time.
23      This is what these e-mails are
24      about.
```

Page 318

```
 1  BY MS. BASS:
 2      Q.   Isn't it true that you wrote
 3  e-mails to American customers in English
 4  confirming shipments of Chinese drywall
 5  to cities in the United States?
 6           MR. SPANO:  Objection to
 7      form.
 8           THE WITNESS:  We did not
 9      ship Chinese drywall to cities in
10      the United States.  We made a
11      transaction or, in other words,
12      dealings in China.  Sometimes when
13      the customer wanted us to do
14      this -- when the customers do the
15      shipment and they asked us to pay
16      for the fee of the shipment on
17      their behalf, that is only under
18      very special conditions.  And I
19      did explain about this yesterday.
20  BY MS. BASS:
21      Q.   Under certain circumstances,
22  Mr. Peng, isn't it correct that you
23  assisted in shipping your drywall from
24  China to the Port of Tampa in Florida?
```

Page 319

```
 1           MR. SPANO:  Objection to
 2      form.
 3           THE WITNESS:  I'm not sure,
 4      and also, I have no obligation to
 5      try to understand or to know where
 6      the customers ship -- which port
 7      these customers ship it to.
 8      Sometimes customers, they may ask
 9      us for information, asking us for
10      the shipment information.  Then we
11      will provide -- when they request,
12      we will provide the contact
13      information for shipment.
14  BY MS. BASS:
15      Q.   Isn't it true, Mr. Peng,
16  that you've assisted in arranging for
17  shipment of drywall to Tampa, Florida?
18           MR. SPANO:  Excuse me.  We
19      have a correction.
20           MS. BASS:  Don't interrupt,
21      please.
22           MR. SPANO:  He wasn't
23      finished with his answer.  It's
24      not complete because it was
```

Page 320

1    mistranslated, so we're completing
2    the answer.
3        MS. BASS:  Don't interrupt
4    the translator.  When the
5    translator is finished, you can
6    make whatever objection you feel
7    is appropriate.  Thank you.
8        THE WITNESS:  I finished.
9        MR. CHEN:  I'll just note,
10   it's actually an issue with
11   transcription.  I believe in line
12   64, 9, it is, we will provide the
13   contact information, not the
14   content information.
15       - - -
16       (Whereupon, the following
17   portion of the transcript was read
18   by the court reporter:
19       "Q.  Isn't it true, Mr.
20   Peng, that you've assisted in
21   arranging for shipment of drywall
22   to Tampa, Florida?")
23       - - -
24   BY MS. BASS:

Page 321

1        Q.   I would ask the witness to
2    give a yes or no answer, and then he can
3    provide whatever explanation he believes
4    is necessary.
5        MR. SPANO:  Objection to the
6    form and asked and answered.
7        THE WITNESS:  This question
8    I cannot answer by simply saying
9    yes or no.
10       According to my
11   understanding, minority of the
12   customers, where it occurred two
13   times.  The customers require us
14   to help.  They said they are not
15   familiar with the sea freight, and
16   they hope that we can help them
17   with the shipment to certain
18   ports.  The customer required us
19   to pay the sea freight fee on
20   their behalf, and the customer
21   requested that we contact the sea
22   freight company, but I don't
23   recall what port it was for.
24       INTERPRETER 2:  The

Page 322

1    interpreter just says container.
2        INTERPRETER 1:  It's about
3    two to three containers.
4    BY MS. BASS:
5        Q.   It's your testimony under
6    oath, Mr. Peng, that you have no
7    knowledge of having assisted in the
8    shipment of Chinese drywall to the Port
9    of Tampa?  Is that your testimony under
10   oath today?
11       MR. SPANO:  Objection to
12   form and mischaracterizes his
13   testimony.
14       THE WITNESS:  I did explain
15   to you the actual situation at
16   that time.
17   BY MS. BASS:
18       Q.   Are you aware that Chinese
19   drywall that you sold in China was going
20   to be utilized in the state of Florida?
21       MR. SPANO:  Objection to
22   form.
23       THE WITNESS:  I don't know
24   where they would utilize it in the

Page 323

1    United States or used.
2    BY MS. BASS:
3        Q.   Are you aware that Chinese
4    drywall that you sold in China was going
5    to be transported to the Tampa Port in
6    Florida?
7        MR. SPANO:  Objection to
8    form.
9        THE WITNESS:  Sometimes it
10   will go through the agent of the
11   shipment company appointed by the
12   customer.  Or in minority of the
13   time, very few times the customer
14   would tell us where it is possible
15   or where they want it to ship to.
16   But it is not our concern.  We
17   also don't pay attention to where
18   they are going to ship this to.
19   BY MS. BASS:
20       Q.   For the purpose of Chinese
21   tax records, does your company have to
22   maintain records of where product is
23   being shipped to?
24       A.   Our company would not have a

Page 324

1  record regarding where it will be shipped
2  to, but according to the tax law in
3  China, by law, they require by the tax
4  bureau -- the tax bureau would have a
5  format for invoicing -- for the invoice.
6  And there is a column, there is one
7  column the tax bureau require us to fill
8  in to fill out where it is going to ship
9  to. Of course this requirement is not
10 very prudent or very accurate, very tight
11 to -- the requirement is not very tight
12 or very serious or --
13       INTERPRETER 1:  Many words
14    for the Chinese word that he was
15    trying to express.
16       THE WITNESS:  It is not very
17    accurate. Just like what I
18    mentioned earlier, that we will
19    make a phone call to the agent
20    appointed by the customer to ask
21    them where it is going to be
22    shipped to. I will put down what
23    they told us. Or sometimes we
24    just put down a country.

Page 325

1  BY MS. BASS:
2       Q.  Does your company maintain
3  copies of these invoices which reflects
4  this information that the tax bureau
5  requires you to maintain?
6       MR. SPANO:  Objection to
7  form, lack of foundation.
8       Also, are you almost done
9    with this line of questioning,
10   because it is after noon?
11      MS. BASS:  Let him finish
12   this question, please.
13      (Interpreter repeated the
14   question.)
15      THE WITNESS:  Usually we
16   keep it, but exactly how they keep
17   it, I don't know.  It is possible
18   that we keep it between one or two
19   year, but exactly, I'm not sure.
20   And I have already produced these
21   invoices to my attorney under the
22   guidance of my attorney.
23 BY MS. BASS:
24      Q.  One last question before we

Page 326

1  break.
2       What is the name of the
3  individual who would have responsibility
4  for maintaining those records at your
5  company?
6       A.  The finance staff in the
7  company, they handle this.
8       MS. BASS:  We can break here
9    if you'd like.
10      MR. CHEN:  The
11   transcription, I believe, it's the
12   finance staff, not the filing
13   staff.
14      INTERPRETER 1:  The finance
15   staff, he said the people of the
16   finance.
17      MS. BASS:  Thank you.
18      THE VIDEOTAPE TECHNICIAN:
19   The time now is approximately
20   12:09 p.m., and we are now off the
21   record.
22              - - -
23      (Whereupon, a luncheon
24   recess was taken from 12:09 p.m.

Page 327

1    until 1:19 p.m.)
2              - - -
3       THE VIDEOTAPE TECHNICIAN:
4    This begins tape four of today's
5    portion of our deposition.  The
6    time now is approximately 1:19
7    p.m., and we're back on the
8    record.
9  BY MS. BASS:
10      Q.  Mr. Peng, before we broke
11 for lunch, you indicated that on
12 occasion, customers would tell you where
13 they wanted the drywall to be shipped to.
14 Do you recall a customer ever telling you
15 that they wanted to ship to Florida?
16      A.  That I don't recall.  When
17 the customers tell us, first of all, only
18 some of the customer would tell us.
19 Secondly, we don't care about it,
20 therefore, we don't recall.
21      Q.  So, your testimony under
22 oath is you have no recollection of ever
23 discussing with the customer their
24 intentions to utilize the gypsum they

Page 328

1  were purchasing from you in Florida?
2        MR. SPANO:  Objection to
3  form and mischaracterizes the
4  testimony.
5        THE WITNESS:  I said some of
6  the customer, they would tell us
7  where they wish these products to
8  be shipped to where.  We don't try
9  to make efforts to remember what
10  he said or what the customer said
11  exactly which port they want to
12  ship it to.  Where they are going
13  to use this drywall, we wouldn't
14  know it.
15  BY MS. BASS:
16      Q.   So, the answer to my
17  question is no, you have no recollection
18  of ever discussing with the customer the
19  fact that they were going to ship the
20  drywall they purchased from you to
21  Florida?  And I believe it's a yes or no
22  answer.
23        MR. SPANO:  Objection to
24  form.

Page 329

1        THE WITNESS:  I cannot
2  answer this question simply by
3  putting it as yes or no.  I
4  mention about this earlier, and I
5  stated the fact that what we did,
6  and I don't want to repeat my
7  answer in order to save time.
8  BY MS. BASS:
9      Q.   Do you have a recollection
10  of ever discussing with the customer the
11  fact that they were going to be utilizing
12  the drywall they purchased from you in
13  Florida?  I've heard your prior
14  testimony.  I believe I'm entitled to an
15  answer to this question.
16        MR. SPANO:  Objection to
17  form.  Objection, asked and
18  answered.  And don't make speeches
19  to the witness.  Don't make
20  comments.  Ask the question, you
21  get an answer.  If you don't like
22  the answer, move on.
23        MS. BASS:  I will continue
24  to ask the question until I get an

Page 330

1  answer.  The witness has been
2  nonresponsive.  The question is
3  does he have a recollection.  I
4  believe it can be answered with a
5  yes or a no.
6        MR. SPANO:  Well, that's
7  your belief.
8        MS. BASS:  I'm entitled to
9  it, Mr. Spano, and he can then
10  respond to it.
11        MR. SPANO:  You've stated
12  your belief.
13        MS. BASS:  Excuse me.
14  Please don't talk at the same time
15  I'm talking.
16        MR. SPANO:  Stop speaking
17  while I'm speaking.
18        MS. BASS:  I thought you
19  finished your objection.  I'm
20  entitled to a yes or no answer.
21  He can then explain.  Shall I ask
22  the witness yet again the
23  question?  It asks very simply if
24  he has a recollection.  I believe

Page 331

1  I'm entitled to a yes or no
2  answer.
3        MR. SPANO: You asked --
4        MS. BASS: Please repeat the
5  question for the witness.
6        MR. SPANO:  You asked the
7  question, I made an objection to
8  your ad hominum remarks as part of
9  the question.  What you believe is
10  not part of the question.
11        MS. BASS:  Can the witness
12  answer the question now?
13        MR. SPANO:  Of course.
14        MS. BASS:  Thank you.
15        INTERPRETER 1:  Let me go
16  back to the question.  I haven't
17  translated the question yet.
18        MS. BASS:  There's no need
19  to translate the colloquy between
20  counsel.
21        MR. SPANO:  I agree.
22        INTERPRETER 1: Let me go
23  back to that question.
24        (Interpreter repeats the

Page 332

1    question.)
2         THE WITNESS: I don't
3    recall.
4    BY MS. BASS:
5         Q.  Do you have a recollection
6    of ever having been told by a customer
7    that the gypsum they were purchasing from
8    you would be used in Virginia?
9         A.   I remembered it was a
10   gentleman, he said he is from Virginia.
11   His name is Phillips, Perry.  Maybe that
12   is the way to spell it, Phillips,
13   P-E-R-Y, Perry.  It is possible how it is
14   being spelled.
15        Q.   Did Mr. Perry tell you that
16   the gypsum he was purchasing from you
17   would be used in Virginia?
18        A.   He did not say he might use
19   it in Virginia.  He did say probably.  He
20   is shipping the drywall to Virginia.
21        Q.   Did any customer ever tell
22   you that they were --
23        INTERPRETER 2: Correction.
24        MS. BASS: I'm sorry.

Page 333

1         INTERPRETER 2: The witness
2    says he only said that he would
3    set -- ship the gypsum to the port
4    of Virginia.
5    BY MS. BASS:
6         Q.   Did any --
7         INTERPRETER 1: No.  He did
8    not state the port of Virginia.
9    BY MS. BASS:
10        Q.   Did any customer ever tell
11   you that they were going to be shipping
12   the drywall they purchased from you to
13   the port of New Orleans?
14        MR. CHEN:  She was
15   translating, I think, some earlier
16   part of the transcript.  If we
17   could just go over that.
18        INTERPRETER 1: No.  Off the
19   record.  I haven't translated this
20   question regarding New Orleans,
21   the port of New Orleans.
22        MS. BASS:  Please translate
23   that now.
24        INTERPRETER 1: Let me

Page 334

1    translate that.  The word "port"
2    is in this question and I haven't
3    translated.
4         THE WITNESS:  Some of the
5    customers, it would be possible
6    that they did mention about
7    probably they wanted to ship it to
8    the city of New Orleans, but
9    exactly who says that, I cannot
10   recall.
11   BY MS. BASS:
12        Q.   Did any of your customers
13   ever tell you that they were going to be
14   shipping the drywall they purchased from
15   you to the port of Miami?
16        A.   Miami, I don't recall.
17        Q.   Did any of your customers
18   ever tell you that they were going to be
19   shipping the drywall they purchased from
20   you to the port of Tampa?
21        A.   I don't recall.
22        Q.   Do you have a recollection
23   of any of your customers ever telling you
24   they were going to be shipping to any

Page 335

1    other port in the United States other
2    than those that you've already testified
3    about?
4         MR. SPANO:  Objection to
5    form.
6         THE WITNESS:  As I mentioned
7    earlier, we don't pay attention,
8    we don't care about where they
9    ship it to, therefore, I have no
10   recollection of where did the
11   customer want to ship the products
12   to.
13   BY MS. BASS:
14        Q.   Was your company the first
15   to use containers to export drywall board
16   to the United States?
17        MR. SPANO:  Objection to
18   form.
19        THE WITNESS:  I don't
20   understand.  What do you mean by
21   "the first"?
22   BY MS. BASS:
23        Q.   Did your company use
24   containers to export gypsum board to the

Page 340

```
 1    explanation.  I was looking at the
 2    screen translating the question
 3    from the screen in verbatim.  I
 4    did not do any explanation.  That
 5    was not my job.
 6         MS. BASS:  Can you please
 7    ask the witness to answer the
 8    question.
 9         THE WITNESS:  I was
10    interrupted.  Would you mind to
11    say it again.
12 BY MS. BASS:
13    Q.   Mr. Peng, if you made a
14 representation to a US customer
15 indicating, quote, we are the first to
16 use container to export gypsum board to
17 USA in China, would that have been a lie?
18         INTERPRETER 2:  Correction.
19    The term "representation," meaning
20    to tell, but the interpreter may
21    have interpreted it into
22    representing.
23         MS. BASS:  That's fine.
24         MR. SPANO:  Objection to
```

Page 341

```
 1    form.
 2         THE WITNESS:  I don't
 3    understand.  What is the question
 4    you are asking?
 5 BY MS. BASS:
 6    Q.   Did he make such a
 7 representation to American customers?
 8         INTERPRETER 1:  Counsel, the
 9    word "representation," would you
10    mind to help me, because there are
11    more than one way of translating
12    it.
13 BY MS. BASS:
14    Q.   Did he make a statement to
15 American customers stating that his
16 company was the first to use containers
17 to export gypsum board to the United
18 States in China?
19         MR. SPANO:  Objection to
20    form.
21         THE WITNESS:  I don't
22    recall.
23 BY MS. BASS:
24    Q.   Mr. Peng, did you review the
```

Page 342

```
 1 profile form filed on behalf of TTP in
 2 this litigation?
 3         INTERPRETER 1:  Manufacturer
 4    profile form?
 5         MS. BASS:  Yes.
 6         MR. CHEN:  Objection.  The
 7    translation referred to when he
 8    was representing TTP.
 9         INTERPRETER 1:  Counsel,
10    would you mind to help me with the
11    word "on behalf of"?
12 BY MS. BASS:
13    Q.   Did you review the profile
14 form filed by TTP in this litigation?
15    A.   Under the guidance of my --
16 of our attorney, I saw it.
17    Q.   Did you assist in the
18 preparation of the exhibit attached to
19 the profile form listing the exports of
20 Chinese drywall into the United States?
21         MR. SPANO:  Objection to
22    form and mischaracterizes the
23    document.
24         INTERPRETER 1:  Let me
```

Page 343

```
 1    translate once more because I need
 2    to translate upside down to make
 3    it clear to him.
 4         THE WITNESS:  According to
 5    the requirements and guidance of
 6    our attorney, I did make
 7    preparation, and I did make
 8    inquiries to my company about
 9    technical information of the 12.7
10    millimeter drywall.  I did not
11    make preparation to the attorney
12    of the information, what you
13    mentioned just earlier, that the
14    drywall information -- the
15    information of the drywall from
16    China shipped to the United
17    States, I mentioned about this
18    earlier.  There is no exports for
19    us to the United States.
20 BY MS. BASS:
21    Q.   Are you aware, Mr. Peng,
22 that 1.7 million sheets of drywall
23 produced by TTP were shipped into the
24 United States?
```

1      MR. SPANO:  Objection to
2   form.
3      THE WITNESS:  Can you repeat
4   the question?  I don't understand
5   it.
6      MS. BASS:  Please ask the
7   witness the same question that I
8   previously posed.
9      (Interpreter repeats the
10  question.)
11     THE WITNESS:  I did provide
12  to our attorney, to my attorney
13  for the drywall of 12.7 mm
14  thickness that were produced by
15  TTP company.  I'm not sure whether
16  this drywall was shipped to the
17  United States or not.  We also
18  cannot say this.
19  BY MS. BASS:
20     Q.   Are you suggesting, Mr.
21  Peng, that the document filed by your
22  attorneys in the MDL proceeding
23  reflecting 1.7 million sheets of drywall
24  manufactured by TTP ending up in the

1   United States is not accurate?
2      MR. CHEN:  For the
3   interpreter, MDL is actually a
4   defined term that you could use as
5   well.
6      INTERPRETER 1:  Let me see
7   what is MDL.  I just state MDL to
8   the witness.  I don't find MDL in
9   the glossary.
10     MR. CHEN:  Multi-District
11  Litigation.  You have circled MDL.
12     INTERPRETER 1:  Let me see.
13     MR. CHEN:  It is under
14  multi.
15     INTERPRETER 1:  It is under
16  multi not MLD.
17     Thank you.
18     THE WITNESS:  Would you mind
19  to repeat the question.  I don't
20  recall it.
21     MR. SPANO:  Objection to
22  form, lacks foundation and
23  mischaracterizes the document.
24     (Interpreter repeats the

1   question.)
2      THE WITNESS:  We collect
3   this type of information, this
4   type of the table with information
5   in it.  I did it according to the
6   requirement and the guidance of my
7   attorney.  And now the problems
8   that you're referring to, I am
9   unable to make judgment, and also
10  I don't have any authority to make
11  this judgment.
12  BY MS. BASS:
13     Q.   Do you believe the list
14  attached as Exhibit A to the TTP profile
15  form is accurate?
16     A.   I don't know what document
17  you're referring to.  Would you mind to
18  let me take a look?
19     Q.   Mr. Peng, didn't you just
20  tell me you had reviewed the TTP profile
21  form?
22     A.   Yes, I did browse it.
23     Q.   Okay.  And now my question
24  to you is, is it accurate?

1      A.   The table is -- no, the list
2   is accurate.
3      Q.   And all of the sales of
4   drywall that are reflected on Exhibit A
5   would have been transactions undertaken
6   by you and your colleagues at TTP,
7   correct?
8      A.   The question, I raised it
9   earlier, was, would you mind to let me
10  take a look at the attachments that you
11  mentioned?
12     Q.   I'd be happy to.  Since it's
13  in English, I'm sure you'll be able to
14  follow along.  Here is the document
15  that's Exhibit A to the TTP profile form.
16  Please review it.
17     MR. SPANO:  No.  If you're
18  questioning him about an English language
19  document that he did not prepare, you
20  have to use the Chinese translation.
21     MS. BASS:  Mr. Spano, please
22  don't throw documents at me.
23     MR. SPANO:  I'm not throwing
24  them.  I passed it back to you.

Page 348

1    MS. BASS:  That was hardly a
2  passing, but the record will speak
3  for itself.
4    MR. SPANO:  Yes, it will.
5    MS. BASS:  This is the
6  document the witness asked me to
7  provide to him.
8    MR. SPANO:  No, it's not.
9    MS. BASS:  Let's not argue.
10  I'm handing you the document that
11  is the Exhibit A to the profile
12  form --
13    MR. SPANO:  That's not the
14  complete Exhibit A.
15    MS. BASS:  Can I please
16  finish, Mr. Spano.  Please don't
17  interrupt me.  It's common
18  courtesy.  If you would like to
19  provide your witness some other
20  document, you are welcome to do
21  so.  This is the document he's
22  asked me to provide him.
23    MR. SPANO:  Wrong.  It's not
24  the Exhibit A that was filed with

Page 349

1  the translation, and he's not
2  going to answer questions about
3  this document without the
4  translation.
5    MS. BASS:  Do you have the
6  copy of the translation you'd like
7  to provide him, Mr. Spano?
8    MR. SPANO:  This is your
9  deposition.  If you're going to
10  ask him questions about a
11  document, use the proper document.
12    MS. BASS:  I'm not asking
13  him questions about a document.  I
14  asked him about his recollection
15  as to whether or not that document
16  was accurate, because he testified
17  under oath he'd reviewed it.
18    MR. SPANO:  That's a
19  question.  You asked him -- you're
20  improperly asking him to follow
21  along on an English language
22  document that you know full well
23  there's a Chinese translation of.
24  So, please don't play games, okay?

Page 350

1    MS. BASS:  I won't even
2  respond to that suggestion, Mr.
3  Spano.
4    Here's a copy of the same
5  document in Chinese.  You are
6  welcome to provide it to the
7  witness.
8    (Handing over document.)
9    MR. SPANO:  Would you like
10  to mark it as an exhibit.
11    MS. BASS:  There's no need
12  to mark it as an exhibit.  You're
13  welcome to have him take a look at
14  it.  It's a document filed of
15  record in the case.  There's no
16  need to have it marked as a
17  separate Deposition Exhibit.
18    MR. SPANO:  There's no
19  pending question at this point.
20    MS. BASS:  He asked me to
21  look at this document.  Would you
22  like him to look at it?
23    MR. SEEGER:  I think she
24  just gave it to you to give him.

Page 351

1    MS. BASS:  I'm giving you
2  the courtesy of giving it to you
3  first to provide to your witness.
4    MR. SPANO:  What is this
5  document?  Since you are not
6  marking it as an exhibit, what is
7  this document?
8    MS. BASS:  It is the
9  document he requested, which is
10  Exhibit A to a filing in the MDL
11  proceeding --
12    MR. SPANO:  Is this a
13  complete copy of Exhibit A to
14  TTP's manufacturer profile form?
15    MS. BASS:  Yes.
16    MR. SPANO:  Okay.  I want
17  the record to reflect the document
18  you're putting in front of the
19  witness.
20    (Witness reviewing
21  document.)
22    THE WITNESS:  I did see it.
23  May I know what question do you
24  have.

33  (Pages 348 to 351)

Page 352

```
 1              - - -
 2        (Whereupon, the following
 3    portion of the transcript was read
 4    by the court reporter:
 5        "Q.   And all of the sales
 6    of drywall that are reflected on
 7    Exhibit A would have been
 8    transactions undertaken by you and
 9    your colleagues at TTP, correct?")
10              - - -
11        THE WITNESS:  These
12    transactions were handled by me
13    and my colleagues.
14 BY MS. BASS:
15        Q.   Thank you.
16        Are you also familiar with
17 the profile form filed on behalf of TG in
18 the MDL proceeding?
19        A.   Under the guidance of my
20 counsel, I did see the manufacturer
21 profile form of TG.
22        Q.   Isn't it also correct, Mr.
23 Peng, that you and your colleagues were
24 responsible for completing the
```

Page 353

```
 1 transactions that are referenced in the
 2 TG manufacturer's profile form?
 3        MR. SPANO:  Objection to
 4    form.
 5        THE WITNESS:  Under the
 6    guidance of TG, the transaction
 7    referred to in this manufacturer
 8    profile form was done by me.  This
 9    transaction carry out in China.
10 BY MS. BASS:
11        Q.   So, you were responsible for
12 the sales of Taishan Gypsum board to
13 Venture Supply that are reflected in the
14 manufacturer's profile form of TG,
15 correct?
16        A.   When you refer to Taishan,
17 what do you mean?
18        Q.   My question was whether or
19 not you were responsible for the sales of
20 Taishan Gypsum board to Venture Supply
21 that are reflected on the manufacturer's
22 profile form of TG?
23        MR. CHEN:  Counsel, for your
24    information, I think the confusion
```

Page 354

```
 1 is you're referring to Taishan
 2    Gypsum board.  Perhaps if you said
 3    Taishan gypsum plasterboard or
 4    gypsum board, then the translation
 5    would be more accurate, because
 6    it's translating right now in
 7    Chinese as just Taishan
 8    plasterboard.
 9        INTERPRETER 1:  I'm supposed
10    to be doing verbatim.
11        MS. BASS:  You can ask the
12    question again with that
13    clarification, Taishan Gypsum
14    plasterboard.
15        INTERPRETER 1:  No problem.
16    Thank you.
17        (Interpreter repeats the
18    question.)
19        THE WITNESS:  TG Company
20    with the manufacturer profile form
21    being written and that recorded
22    that transaction was the
23    transaction when the
24    representative of Venture Supply
```

Page 355

```
 1 came to TG Company.  It was me to
 2    be responsible to communicate with
 3    Mr. Phillip Perry that I referred
 4    to earlier.  I was responsible to
 5    communicate with him and also to
 6    assist him to complete this
 7    transaction.
 8 BY MS. BASS:
 9        Q.   Did you also assist Mr.
10 Perry in creating a legend to be stamped
11 on the board, on the plasterboard?
12        INTERPRETER 1:  Counsel,
13    would you mind me to help -- help
14    me with the word "a legend to be
15    stamped on the board."
16        MS. BASS:  You can use the
17    word brand.
18        INTERPRETER 1:  Brand, okay.
19        MR. SPANO:  Objection to
20    form.
21        THE WITNESS:  We did it
22    according to the requirement of --
23    according to the request of
24    Venture Supplies to put labeling
```

Page 356

1    and packaging for the
2    plasterboards.
3        Can I take a break?
4        MS. BASS:  That's fine.
5        THE VIDEOTAPE TECHNICIAN:
6    The time now is approximately 2:14
7    p.m., and we are now off the
8    record.
9            - - -
10       (Whereupon, a recess was
11   taken from 2:14 p.m. until
12   2:22 p.m.)
13           - - -
14       THE VIDEOTAPE TECHNICIAN:
15   This begins tape 5 of today's
16   deposition.  The time now is
17   approximately 2:23 p.m., and we're
18   back on the record.
19   BY MS. BASS:
20       Q.   Mr. Peng, before we broke,
21   we were discussing transactions to
22   Venture Supply.  My question to you is,
23   were you aware that the gypsum board
24   being purchased by Venture Supply was

Page 357

1    going to be shipped to the port in
2    Norfolk, Virginia?
3        MR. SPANO:  Objection to
4    form.
5        THE WITNESS:  Mr. Phillip
6    Perry told me that it is possible
7    that they would ship it to the
8    state of Virginia, but I did not
9    know whether it is for fact that
10   they did ship it there or not.
11   BY MS. BASS:
12       Q.   Isn't it correct, Mr. Peng,
13   that you assisted Mr. Perry in arranging
14   the shipment of the gypsum board
15   purchased by Venture Supply for shipment
16   to the United States?
17       MR. SPANO:  Objection to
18   form.
19       THE WITNESS:  Regarding the
20   order placed by Venture Supply
21   from my company regarding the
22   shipment, I and Mr. Phillip
23   together, I did provide some
24   information regarding to make

Page 358

1    contact to the agent of the
2    shipping company.  Mr. Phillip
3    told me he wanted to find some
4    shipping company, wanted to find
5    some methods where the shipping
6    costs would be lower, and he
7    wanted me to help him.
8    BY MS. BASS:
9        Q.   Did you provide that
10   assistance to Mr. Phillip?
11       A.   I did mention earlier, I did
12   help him with some of the information
13   regarding making contact with shipping
14   company under his request.
15       Q.   Mr. Peng, as the 30(b)(6)
16   representative for TG and TTP regarding
17   indirect shipments of building materials
18   to the United States, did you review
19   shipping invoices issued by those two
20   companies during the period of 2006 to
21   2008 to prepare yourself for this
22   deposition?
23       MR. SPANO:  Objection to
24   form.

Page 359

1        THE WITNESS:  I did not hear
2    the question clearly.
3        INTERPRETER 1:  Let me
4    translate it again.
5        (Interpreter repeats the
6    question.)
7        INTERPRETER 2:  Correction.
8    The shipment invoice.  The
9    interpreter should interpret
10   shipment invoice in her
11   interpretation.
12       INTERPRETER 1:  I don't see
13   it on the transcript.  I see it as
14   shipments of building materials to
15   the United States, did you review
16   shipping, I know, issued by those
17   during the period.  I don't see
18   the word "invoice" in there.
19   There is some confusion with the
20   transcript.
21       MS. BASS:  Wait one moment.
22   Let her repair the transcript and
23   then you can --
24       INTERPRETER 1:  Thank you

35 (Pages 356 to 359)

Page 360

1   very much. Thank you. Good.
2       (Interpreter repeats the
3   question.)
4       THE WITNESS: Regarding this
5   question, I don't understand what
6   you're referring to as the
7   document 30 bracketed something.
8   I also don't understand what do
9   you mean by "the shipping invoices
10  issued by."
11  BY MS. BASS:
12      Q.   As the witness designated by
13  TTP and TG to testify regarding indirect
14  sales by those companies of gypsum board
15  to the United States, did you review the
16  invoices for sales to US customers in
17  preparation for this deposition?
18      INTERPRETER 2: Correction.
19  The interpreter, indirect sales,
20  can I help with that term for the
21  interpreter?
22      INTERPRETER 1: Yes.
23      INTERPRETER 2: Jian jie.
24      INTERPRETER 1: She's using

Page 361

1   the word "indirect." Yeah, we are
2   using different words, different
3   wordings for indirect.
4   BY MS. BASS:
5       Q.   The question to the witness
6   remains the same.
7       Did he review sales invoices
8   of TG and TTP in preparation for this
9   deposition?
10      A.   Invoices, yes. Under the
11  guidance of my attorney, yes, I did see
12  the invoices.
13      Q.   In your review of the
14  invoices, did you make note of the
15  locations within the United States to
16  which the Taishan Gypsum board
17  plasterboard was to be shipped?
18      MR. SPANO: Objection to the
19  form of the question, and the
20  answer to this question should not
21  reveal communications with counsel
22  or any information prepared by
23  counsel or at the request of
24  counsel.

Page 362

1       THE WITNESS: This invoices
2   has to do with our company. After
3   they sell the drywall to the
4   customers in China, they have to
5   issue the invoices because of the
6   requests by the tax bureau. We
7   don't care which country or which
8   port they were being shipped to.
9   BY MS. BASS:
10      Q.   My question to you, Mr.
11  Peng, was not what you choose to care
12  about. My question was whether or not
13  you are aware of what the invoices
14  reflected were the eventual destination
15  of the TG and TTP drywall being shipped
16  to the US?
17      MR. SPANO: Objection to
18  form.
19      THE WITNESS: I did mention
20  about this earlier. Some of the
21  customers, it is possible for them
22  to tell us for where they shipped
23  this drywall to or the agent of
24  the shipping company appointed by

Page 363

1   the customers, and they would have
2   invoices indicating the
3   destination. We don't know where
4   these drywalls were being shipped
5   to, and we don't know whether this
6   drywalls were shipped to the
7   United States or not.
8   BY MS. BASS:
9       Q.   Even when the invoices
10  reflected that they were being shipped to
11  the United States, is that your
12  testimony?
13      MR. SPANO: I object to the
14  form of the question.
15      THE WITNESS: What I meant
16  is that this information that you
17  refer to, what I mean is that when
18  we get it from the agents of the
19  shipping company appointed by the
20  customers or when the tax bureau
21  requested us to fill out the
22  invoices, we would ask the agent
23  of the shipping company appointed
24  by the customers regarding where

Page 364

```
 1    they will ship this to.  Regarding
 2    where it is shipping to, regarding
 3    whether this is true or not, we
 4    don't care.  We also don't pay
 5    attention to it.
 6         MS. BASS:  I'm going to pass
 7    the witness at this point.
 8              - - -
 9         EXAMINATION
10              - - -
11    BY MR. HARDT:
12         Q.   Mr. Peng, good afternoon.
13    I represent Venture Supply and the
14    Porter-Blaine Corporation, and I'm making
15    an appearance at these depositions in the
16    Germano class action.
17         Mr. Peng, I have a couple of
18    follow-up questions.
19         In 2005, when you were the
20    director of foreign sales at TG, who did
21    you report to?
22         INTERPRETER 1:  Counsel,
23    would you mind to help me?  Is it
24    director or manager?
```

Page 365

```
 1         MR. HARDT:  I think he
 2    testified he was director of
 3    foreign sales, director of the
 4    foreign sales department.
 5         MR. CHEN:  Counsel, I think
 6    there's confusion over the use of
 7    the word "director," and that's
 8    what the interpreter was asking
 9    about.
10         MR. HARDT:  Everybody's been
11    using that.
12         MR. CHEN:  She's translating
13    director as board of directors.
14         MR. HARDT:  Manager is fine.
15         INTERPRETER 1:  Thank you
16    for the clarification.
17    BY MR. HARDT:
18         Q.   Mr. Peng, in 2005, when you
19    were the manager of foreign sales at TG,
20    who did you report to?
21         A.   When I worked for TG, I
22    reported to the manager of the sales
23    department.
24         Q.   And who was that?
```

Page 366

```
 1         A.   His name is Mr. Fu, that's
 2    the last name, Ting Huan, the first name.
 3         Q.   Who did he report to?
 4         A.   I don't know who he reported
 5    to.  He was my leader.
 6         Q.   You don't know if he
 7    reported directly to Mr. Jia?
 8         A.   I don't know whether he has
 9    made the -- he has made a report or not.
10         Q.   You talked before about the
11    sale with Venture Supply, and you dealt
12    with Mr. Phillip Perry; is that correct?
13         A.   Mr. Phillip came to our
14    company to meet us.
15         Q.   And he met with you, right?
16         A.   Yes, in the office.  Yes, I
17    met with him.
18         Q.   And Mr. Perry didn't speak
19    Chinese, did he?
20         A.   He did not speak Chinese.
21         Q.   So, when you dealt with Mr.
22    Perry, you dealt with him in English?
23         A.   At the beginning, we did
24    very simple exchanges.  Sometimes we have
```

Page 367

```
 1    to write it down on a piece of paper.
 2    Later on, I don't know where he hire this
 3    interpreter that he brings.  I did not
 4    know where he hire this interpreter.
 5         Q.   So, it's your testimony that
 6    Mr. Perry brought an interpreter with him
 7    at some point in time to talk with you?
 8         A.   Yes, he brought an
 9    interpreter to come to our company.
10         Q.   How many times did you meet
11    directly with Mr. Perry?
12         A.   How many times, it is very
13    difficult to say.  Sometimes he stays
14    for -- sometimes he stayed for three days
15    and he came over every single day.  Well,
16    maybe I should say more than two times.
17         Q.   How many times did he meet
18    with you with an interpreter?
19         A.   From my recollection, well,
20    maybe one time or two times.  I cannot
21    recall.
22         Q.   And then all the other
23    times, he met with you without an
24    interpreter; is that correct?
```

37 (Pages 364 to 367)

Page 368

1   A.   Yes.
2   Q.   And you talked in English
3  with Mr. Perry; is that correct?
4   A.   I did mention about this
5  earlier.  Yes, we did some simple
6  exchanges verbally.  With things that are
7  more complicated that I'm not able to say
8  it, I would rely on a piece of paper that
9  I handwrite on it.
10   Q.   And you handwrite, what, in
11  English?  I don't understand.
12   A.   Yes.  Whatever that I am
13  unable to express verbally, I would write
14  it down.  I would write single words or
15  short sentences.
16   Q.   In English?
17   A.   Yes, English.
18   Q.   You even spoke on the
19  telephone with Mr. Perry a number of
20  times, didn't you?
21   MR. CHEN:  Hold on one
22  second.  She added into the
23  translation "in English, right?"
24  I don't believe that was in your

Page 369

1  original question.
2   MR. HARDT:  No, it wasn't.
3  That was in the second question.
4  BY MR. HARDT:
5   Q.   You spoke on the telephone a
6  number of times with Mr. Perry, didn't
7  you?
8   MR. HARDT:  That's my
9  question.
10   THE WITNESS:  Mr. Perry,
11  yes, we did communicate over the
12  phone.
13  BY MR. HARDT:
14   Q.   And that was in English; is
15  that correct?
16   A.   It was in English, but to
17  tell you the truth, I did not totally
18  understand what he was saying, and also,
19  when I talk to him, I was unable to
20  express completely what I wanted to say.
21   Q.   In fact, you spoke to my
22  client's president, Sam Porter, by
23  telephone, didn't you?
24   A.   I cannot recall exactly, but

Page 370

1  I remember under the guidance of Mr.
2  Phillip, I talked to his colleagues or
3  leaders in the United States a few times
4  over the phone very few times.
5   Q.   And again, that was in
6  English, correct?
7   A.   Yes, English.  Simple and
8  limited exchanges.
9   Q.   Okay.
10   Now, you recall that there
11  were two contracts with my client,
12  Venture Supply.  Do you recall that?
13   A.   Yeah.  We signed with
14  Venture Supply company for two contracts.
15  They were both signed in China inside our
16  factory.
17   Q.   And there were two separate
18  shipments of drywall to the United
19  States, weren't there?
20   MR. SPANO:  Objection to
21  form.
22   THE WITNESS:  Well, we
23  deliver goods to Venture Supply
24  two times, but regarding where it

Page 371

1  was being sent to, we did not
2  follow up.  We also did not know.
3  We signed the contract in China.
4  We also collect the money for the
5  goods in China, and we also
6  completed the transaction in
7  China.
8  BY MR. HARDT:
9   Q.   You were aware the first
10  shipment went to Virginia, aren't you?
11   MR. SPANO:  Objection to
12  form.
13   THE WITNESS:  When I
14  communicate with Mr. Phillip, he
15  said he came from Virginia, and he
16  told us that he planned to ship
17  the drywalls to Virginia.  But
18  ultimately, where these drywalls
19  were shipped to, we have no
20  knowledge.  These were arranged by
21  Mr. Phillip and the shipping
22  company, they confirm it, and they
23  make the arrangement, and we did
24  not know what happened.

Page 372

BY MR. HARDT:

Q. Do you remember with the second shipment, Mr. Perry was having trouble finding a ship that went directly to Norfolk, Virginia?

A. At that point, I know he has difficulty finding shipment facilities. They were unable to find a shipping company for appropriate ships. Therefore, the products that we produce for them were stored in our storage for a long time.

Q. And you assisted him during the second -- I mean --

After the first shipment, in between the first shipment and the second shipment, you assisted him with trying to find a shipper, didn't you?

A. I did mention about earlier that Mr. Phillip, they were unable to find a ship appropriate, so until very late, they were unable to ship it, and they told me that they were unable to find a ship to ship it and, therefore, we

Page 373

tried to push them and tell them to ship it as soon as possible because they have been storing the products in our storage. At this point, Mr. Phillip told us and they asked us to help them to find an agent doing shipment in China to help them to ship it.

Q. And you provided that assistance, right? You provided that help, right?

A. I did provide the information, how to make contact with the agent of the shipping company. For the rest of the matter, he handle it himself.

Q. Did you, yourself, first contact the shipping agent and tell them that you had a customer that needed assistance?

A. I would find some agents of the shipping companies. All these agents are in China, the agents in China, the agents of the shipping companies in China.

Q. And you would contact these

Page 374

agents of the shipping companies in China and tell them that you had a customer that needed assistance; is that correct?

MR. SPANO: Objection to form.

THE WITNESS: Yes. I would tell the agents of the shipping company something like this.

BY MR. HARDT:

Q. Do you recall discussions with Mr. Perry about the possibility of Venture Supply becoming the exclusive agent for distribution of your company's products in the United States?

A. I recall Mr. Phillip did mention about this. But to ask me consider this impossible, this cannot be realized. Mr. Phillip just do this because he wanted to have a better price. We did not agree to this requirement, and we also did not sign any agreement with him.

Q. I understand you didn't sign an agreement with him, but were there

Page 375

discussions with him about the possibility of Venture being the exclusive agent?

MR. SPANO: Objection, asked and answered.

THE WITNESS: I did answer this question already.

MR. HARDT: I'll let the record reflect that.

MR. PANAYOTOPOULOS: I'll object. The question was asked. The witness did not answer.

MR. HARDT: I agree. The witness didn't answer.

BY MR. HARDT:

Q. Can you answer my question?

A. Yes. Mr. Phillip did bring up to us with such a request, but we consider this request to be unrealistic and also we don't think this can be actualized.

MR. HARDT: Let me show you a document we'll have marked.

- - -

Page 424

1    INTERPRETER 1: I'm sorry.
2    I have 5.
3    BY MR. CLARK:
4    Q.   Who contacted you?
5        MR. SPANO: Objection to
6    form.
7        THE WITNESS: I don't
8    understand "contact." I don't
9    understand. Can you tell me more
10   concretely.
11   BY MR. CLARK:
12   Q.   You testified earlier that
13   someone mentioned to you Hurricane
14   Katrina or the high winds that we've been
15   discussing. Who did that?
16       MR. SPANO: Objection to
17   form. It mischaracterizes the
18   testimony also.
19       THE WITNESS: I know that
20   there has been the blowing of the
21   wind, but I don't know which
22   name -- which one or what name.
23   BY MR. CLARK:
24   Q.   Earlier you testified that

Page 425

1    shipping invoices would have been written
2    by TTP for purposes of tax reporting in
3    China. I'm going to show you an invoice
4    and ask that you tell me whether this is
5    such an invoice?
6        MR. CLARK: I'll mark it as
7    16.
8        - - -
9        (Whereupon, Deposition
10   Exhibit Peng-16, Invoice, Tai'an
11   Taishan Plasterboard Co., Ltd.,
12   dated July 3, 2006, Bates stamped
13   TG 001936, was marked for
14   identification.)
15       - - -
16       MS. BASS: Is there a Bates
17   Number?
18       THE WITNESS: There was some
19   background noise. I cannot hear
20   clearly.
21       INTERPRETER 1: The
22   interpreter says she will repeat
23   it to him.
24       (Interpreter repeats

Page 426

1    question.)
2        MR. SPANO: Object to the
3    form of the question, and it
4    mischaracterizes the testimony.
5        MR. CLARK: For the record,
6    this is document number TG 001936.
7        THE WITNESS: I see this
8    document.
9        MR. CLARK: Is he finished?
10       THE WITNESS: Not finished
11   yet.
12       (Witness reviewing
13   document.)
14       THE WITNESS: I finish
15   reading this.
16   BY MR. CLARK:
17   Q.   Is it a TTP document?
18   A.   According to the content of
19   the document, it should be made by TTP.
20   Q.   Is this the type of document
21   that TTP would write for tax reporting
22   purposes?
23   A.   No. This is mainly for the
24   customers. It is for the customers to

Page 427

1    look -- this is according to the request
2    of the customers. This is for the
3    purpose of them to receive the goods.
4        INTERPRETER 2: Correction.
5    For the purpose of the customer
6    when they pick up the product.
7        INTERPRETER 1: No. Purpose
8    of them.
9        MR. CLARK: It's okay. I
10   have another question.
11       INTERPRETER 1: The same
12   thing.
13   BY MR. CLARK:
14   Q.   So, that document reflects a
15   TTP sale, correct?
16   A.   This is an invoice issued
17   according to the requirement of the
18   customers. Of course, on this invoice,
19   we would have the details of the
20   description of the goods and the quantity
21   and the price. Any other information, we
22   would write or make it clear according to
23   the requirement of the customers,
24   according to different customers.

Page 428

1  Finished.
2      Q.   Does that document represent
3  a completed sale?
4      A.   You cannot say that.  Do you
5  need me to explain?
6      Q.   Another question.
7          Did TTP issue that document
8  for the purpose of being paid?
9      A.   You cannot say that.  This
10 is not accurate.
11     Q.   Did TTP issue that document
12 after drywall was shipped?
13         MR. SPANO:  Objection to
14 form.
15         It's 5:30, we need to
16 conclude this.  How much more do
17 you have?
18         MR. CLARK:  I have one other
19 type of form that I would like him
20 to explain to me because I don't
21 know what it is.
22         MR. SPANO:  Then that will
23 be it.
24         THE WITNESS:  This type of

Page 429

1  invoice, sometimes we would issue
2  it before the transaction was
3  completed.  This is to show to the
4  customer the price, the
5  description of the product, and
6  certain information for
7  references.  Sometimes during the
8  transaction, we would issue this
9  according to the requirement of
10 the government, the customs or
11 different departments.  And
12 sometimes after the transaction is
13 finished for the convenience of
14 the customers to pick up the
15 goods, we would also issue these
16 type of documents.
17 BY MR. CLARK:
18     Q.   Finished?
19     A.   Finished.
20         MR. CLARK: One other
21 document to show you.  For the
22 record, it's Bates labeled TG
23 0020107.  It's called a
24 counterfoil.  I've marked it

Page 430

1  Exhibit 17.
2          - - -
3          (Whereupon, Deposition
4  Exhibit Peng-17, Document
5  entitled, "Counterfoil, Tai'an
6  Shandong Province Special Invoice
7  for Export," Bates stamped TG
8  0020107, was marked for
9  identification.)
10         - - -
11         MR. SPANO:  The record
12 should reflect that this piece of
13 paper is partially obscured.
14         MR. CLARK:  That's how it
15 was produced.
16 BY MR. CLARK:
17     Q.   Would you ask him to please
18 take a look at the document and describe
19 to me the purpose of it.
20     A.   (Witness reviewing
21 document.)
22         I see this document.  Mr.
23 Attorney, what is your question?
24     Q.   What is the purpose of that

Page 431

1  document, and is it a TTP document?
2          MR. SPANO:  Objection to
3  form.
4          THE WITNESS:  Yes, this is a
5  TTP document.  However, I cannot
6  see everything here, and I think
7  it should be the case, but I
8  cannot make -- I cannot be sure.
9  BY MR. CLARK:
10     Q.   Is this a common type of
11 document that TTP would write?
12         MR. SPANO:  Objection to
13 form.  Objection.
14         THE WITNESS:  This type of
15 document, this is according to the
16 requirement of our local tax
17 bureau that we issue this type of
18 invoice.  This type of invoice has
19 a fixed format.  This format comes
20 from the tax bureau, and we cannot
21 change it.  We filled in the
22 content according to the format of
23 this invoice.
24 BY MR. CLARK:

Page 432

1    Q.   Is he finished?
2    A.   Finished.
3    Q.   Do you recognize the
4  purchaser listed on that form?
5        MR. SPANO:  Objection to
6  form.
7        THE WITNESS:  I don't
8    recognize the purchaser.  But
9    under the guidance of my attorney,
10   I did have an understanding of
11   this type of knowledge.  This
12   customer was being led by an
13   agent, a middleman in Hangzhou
14   city of China.  This middleman
15   bring this customer to our
16   company, TTP, to talk business.
17   Finished.
18 BY MR. CLARK:
19   Q.   Which of your colleagues at
20 TTP handled transactions with that
21 customer?
22       MR. SPANO:  Objection to
23   form.
24       THE WITNESS:  I don't recall

Page 433

1  whether it is manager, Mr. Che, or
2  manager, Mr. Yang.
3        MR. SPANO:  That's it.
4  We're done.
5        THE VIDEOTAPE TECHNICIAN:
6  The time now is approximately 5 --
7        MR. CLARK:  Thank you for
8  your time.  I have several more
9  questions for you, but it looks
10 like those will be reserved for
11 another day.
12       MR. SPANO:  Off the record.
13       MR. PANAYOTOPOULOS:  Are you
14 terminating the deposition?
15       MR. SPANO:  This deposition
16 is concluded as agreed.
17       MR. PANAYOTOPOULOS:  Agreed
18 by whom?
19       MR. SPANO:  As agreed by us
20 and the PSC.
21       MR. PANAYOTOPOULOS:  I'm not
22 on the PSC, and I've not had an
23 opportunity to ask any questions
24 on behalf of my client.  I

Page 434

1  understand you guys unilaterally
2  are terminating this deposition.
3  I thought I was going to get a
4  chance to at least ask some
5  questions so we get somewhere and
6  get started.  I knew I wouldn't be
7  able to finish it tonight, but I'd
8  just note for the record my
9  client, on behalf of my client, I
10 have not had a chance to ask a
11 single question.
12       MR. ALLELY:  I'm Greg Allely
13 on behalf of the State of
14 Louisiana.  I have a few questions
15 to ask.  I hoped that I'd be able
16 to have a chance to ask them
17 today.  We did come many thousands
18 of miles here, and not to be able
19 to ask any questions at all when
20 the deposition was noticed to
21 continue until completed the
22 entire week even into Saturday is
23 unreasonable and unfair.  I would
24 ask that you reconsider and allow

Page 435

1  us to ask ten minutes of questions
2  on my behalf.
3        MR. SERPE:  Anyone else?
4        MR. HARDT:  Lastly, I'm Ken
5  Hardt on behalf of Venture and
6  Porter-Blaine.  I'm here in the
7  Germano action.  I noticed these
8  depositions separately in the
9  Germano action.  I wasn't a part
10 of the agreement between the PSC
11 and Taishan on these depositions.
12 My notice of deposition said
13 beginning, I believe, April 4th,
14 which was the first day of
15 depositions, until completed.  A
16 lot of folks have come a lot of
17 way, and we had no control over
18 the PSC and the amount of time
19 they took in questioning the
20 witnesses.  So, the fact that this
21 is being unilaterally terminated
22 by Taishan, at least as far as
23 we're concerned, gives us grounds
24 to move to reopen these