UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ———————————— | § MDL NO. 2047 |
| IN RE: | § |
| CHINESE- | § SECTION: L |
| MANUFACTURED | § |
| DRYWALL PRODUCTS | § JUDGE FALLON |
| LIABILITY | § |
| LITIGATION | § MAGISTRATE |
| ———————————— | § JUDGE WILKINSON |

-   -   -

CROSS NOTICED IN VARIOUS OTHER ACTIONS

-   -   -

April 4, 2011

-   -   -

CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

-   -   -

Videotaped deposition of TONGCHUN
JIA, held at 3 Pedder Street, Central,
Hong Kong, China, commencing at 9:05
a.m., on the above date, before Linda L.
Golkow, Certified Court Reporter,
Registered Diplomate Reporter, Certified
Realtime Reporter and Notary Public.

-   -   -

GOLKOW TECHNOLOGIES, INC.
ph 877.370.3377 | fax 917.591.5672
deps@golkow.com

Page 14

```
1   Jia-8    Printout from website,  184
             2 pages
2
    Jia-9    Taishan Ceiling and     219
3            Wall System, Bates
             stamped TG 0025132
4            through TG 0025151, TG
             0025155 through TG
5            0025158, TG 0025216
             through TG 0025218, TG
6            0025253 through TG
             0025255, TG 0025275,
7            TG 0025329 through TG
             0025332, TG 0025344
8            through TG 0025349,
             and TG 0025397 and TG
9            0025398
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 15

```
1                - - -
2        DEPOSITION SUPPORT INDEX
3                - - -
4
    Direction to Witness Not to Answer
5
             Page Line
6
7
8
9
    Request for Production of Documents
10
             Page Line
11
             98   18
12           110  19
13
14
15        Stipulations
16           Page Line
17
18
19   Questions/Objections Marked
20           Page Line
21           96   22
             99   7
22           99   16
             151  11
23           261  4
24
```

Page 16

```
1                - - -
2           MR. SPANO: This is Frank
3    Spano appearing on behalf of
4    Taishan Gypsum Company Limited and
5    Tai'an Taishan Plasterboard
6    company.
7           In advance of the deposition
8    or at the deposition right now, we
9    are producing a few pages of
10   additional responsive documents
11   that we located just yesterday.
12   It's only a few pages, and
13   generally speaking, it consists of
14   a trademark license agreement
15   between TG and TTP and a few pages
16   of sales contract documents
17   relating to sales of equipment
18   between TG and TTP.  The witness
19   will be prepared to address any
20   questions about these documents
21   and describe them in more detail
22   as you wish.
23          MR. SEEGER:  The only thing
24   I'll note for the record is that
```

Page 17

```
1    I'm only getting these documents,
2    obviously, now, and it appears to
3    me to be, I don't know, 40
4    pages --
5           MR. SPANO:  No, no.  It is
6    four to five pages.  What you are
7    looking at here is 15 sets.
8           MR. SEEGER:  So, a handful
9    of pages.  Until we get them
10   translated, I obviously can't ask
11   questions about them.
12          MR. SPANO:  Would you care
13   to pass them around.
14          (Handing over documents.)
15          MR. CYR:  This is Joe Cyr
16   from Hogan Lovells representing
17   the witness today.
18          Is there anyone on the line
19   who is not a counsel for one of
20   the parties in the litigation?
21          (No response.)
22          MR. CYR:  Thank you.
23          THE VIDEOTAPE TECHNICIAN:
24   We are now going on the record.
```

Page 18

1  The date today is April 4, 2011.
2  The time now is approximately 9:07
3  a.m.
4      This is the 30(b)(6)
5  deposition of Tai'an Taishan
6  Plasterboard taken through its
7  representative Tongchun Jia taken
8  in reference to the Chinese
9  Manufactured Drywall Products
10  Liability Litigation.
11      The deposition today is
12  being held in Hong Kong.
13      My name is Melissa Bardwell,
14  videographer representing Golkow
15  Technologies, and the court
16  reporter today is Linda Golkow.
17      Would counsel and all
18  present please introduce
19  themselves and state their
20  affiliations for the record.
21      MR. CYR:  My name is Joe
22  Cyr.  I'm from Hogan Lovells, and
23  I represent -- we represent
24  Taishan Gypsum as well as, I will

Page 19

1  refer to the plasterboard company
2  as TTP.
3      And if it's okay with
4  counsel for the plaintiffs, I
5  would like to respectfully correct
6  the videographer in that Mr. Jia
7  is here in a 30(b)(6) deposition
8  on behalf of Taishan Gypsum for
9  several designated areas, and he's
10  here on behalf of TTP only with
11  respect to three designated areas.
12  I'll defer to plaintiffs' counsel
13  for the identification of those
14  areas if you would like to do that
15  in the interest of time.
16      Thank you.
17      MR. SEEGER:  Thanks.  We'll
18  get back to the introductions now.
19      Chris Seeger representing
20  the Plaintiffs' Steering Committee
21  in the Chinese Drywall Litigation
22  MDL.
23      MR. GRAND: Jeff Grand from
24  Seeger Weiss on behalf of the MDL.

Page 20

1      MR. MONTOYA:  Patrick
2  Montoya on behalf of the PSC in
3  the Federal and State coordinated
4  litigation.
5      MS. BASS: Hilarie Bass from
6  Greenberg Traurig on behalf of the
7  Home Builders Steering Committee.
8      MR. SLAUGHTER: Brian
9  Slaughter.  I represent multiple
10  Virginia builders, developers and
11  installers.  I'm here appearing
12  subject to our jurisdictional
13  defenses and motions that we have
14  previously filed, and we've also
15  filed a third-party claim against
16  Taishan in the Allen litigation in
17  Virginia.
18      MR. HARDT: My name is
19  Kenneth Hardt.  I represent
20  Venture Supply, Inc. and the
21  Porter-Blaine Corporation, making
22  a special appearance in the
23  Germano class action in which we
24  have cross-noticed these

Page 21

1  depositions as well.
2      MR. BRENNER: I'm Ted
3  Brenner.  I'm here for Tobin
4  Trading Company, making a special
5  appearance  in the Germano case as
6  well.
7      MR. CLARK:  Matthew Clarke
8  representing Southern Homes.
9      MS. EISELEN: Carlina Eiselen
10  for Interior/Exterior.
11      MR. BLACK: David Black for
12  the State of Louisiana.  We
13  reserve our rights as set forth in
14  the remand motion that's pending.
15      MR. PANAYOTOPOULOS: Nick
16  Panayotopoulos on behalf of
17  certain Banner entities, and we
18  obviously reserve our objections
19  as we have in the past.
20      MR. SERPE: Richard Serpe for
21  the Germano plaintiffs.
22      MR. CHEN: Eugene Chen of
23  Hogan Lovells on behalf of Taishan
24  Gypsum and TTP.

Page 34

1    my computer or not.
2  BY MR. SEEGER:
3      Q.   So, as part of your job as
4  chairman and general manager of TG,
5  you're saying you're not aware if you
6  have even computer access to documents
7  for BNBM?
8      A.   Yes.
9      Q.   Do you receive annual
10 reports from BNBM?
11     A.   I did not receive the annual
12 report from BNBM, but every year, there
13 is a meeting for the Board of Directors
14 that I would be able to see this report.
15 That is after the year 2008.
16     Q.   After the year 2008.  Okay.
17     Do you receive this
18 information before the board meets so you
19 can review it and think about it?
20     A.   I don't understand what you
21 mean.
22     Q.   The BN -- let's get a couple
23 of things clear.
24     The board meeting he's

Page 35

1  talking about is TG, correct?
2      A.   No.
3      Q.   What board of what companies
4  is he talking about?
5      A.   BNBM.
6      Q.   He's on the board of BNBM is
7  what you're saying?
8      A.   Yes.
9      Q.   And he's on the board, and
10 he has no idea on how to find -- he has
11 no access to documents regarding BNBM.
12 Is that his testimony?
13     A.   No.
14     Q.   Then what access does he
15 have to BNBM documents?  Let me ask it
16 that way.
17     A.   Every year there is a
18 meeting for the annual reports.  So, they
19 would put out all these documents on the
20 table.  I would just go through them and
21 leave it there.  If this -- to our
22 companies, if these documents don't have
23 too much relevance to us, we won't keep
24 it.

Page 36

1      INTERPRETER 2:  The check
2  interpreter objects to the
3  interpretation.  The witness said
4  company, not companies.
5      MR. SEEGER:  Do you agree
6  with that?
7      INTERPRETER 1:  Off the
8  record.  I need to clarify with
9  the witness because there's no
10 Chinese word company or companies.
11 It's the same word.  In Chinese,
12 it's the same word.
13     (Interpreter clarification
14 with the witness.)
15     INTERPRETER 1:  It's the
16 same word.
17     THE WITNESS:  I'm referring
18 to the annual report related to
19 BNBM and also to TG.  If they are
20 not -- if there's not much
21 relevance to me, I won't pay
22 attention -- his -- two companies.
23     INTERPRETER 2:  No.  The
24 check --

Page 37

1      INTERPRETER 1:  Two
2  companies.  Because TG is another
3  company.
4      INTERPRETER 2:  No.  The
5  check interpreter objects to the
6  interpretation.  The witness --
7  the rendition of the check
8  interpreter of the witness's
9  statement was that the document
10 from BNBM was not relevant to TG.
11     MR. SEEGER:  You're the
12 official translator.
13     INTERPRETER 1:  No.
14     MR. SEEGER:  So, I would
15 like to have what you say.  What's
16 the final word?  What do you say
17 it is?
18     INTERPRETER 1:  Can you
19 repeat what you said?  I want also
20 to have a screen in front of me.
21     MR. SEEGER:  Is your
22 interpretation companies?  Is your
23 interpretation of what he said
24 that he meant more than one

Page 42

1    MR. SEEGER: Yes.
2        INTERPRETER 1: If the
3    interpretation comes out to be
4    unclear, that's the way it is.
5        MR. SEEGER: Okay. Just let
6    us know if you follow up, if any
7    part of your question to the
8    witness -- because we don't speak
9    Chinese.
10       INTERPRETER 1: Right.
11       MR. SEEGER: If any part of
12   the question is you clarifying my
13   question or clarifying his answer,
14   we just need to know that;
15   otherwise, it needs to be
16   verbatim.
17       INTERPRETER 1: I think it
18   is not my job to do any
19   clarification.
20       MR. SEEGER: Thank you.
21       INTERPRETER 1: But the
22   reason I was clarifying at the
23   very beginning, I said, sometimes
24   I cannot hear him. Occasionally

Page 43

1    he has an accent. So I might need
2    to clarify with him. I did ask,
3    is it okay for me to go off the
4    record for me to clarify?
5        MR. SEEGER: Okay. No.
6    Let's do everything on the record.
7    But you understand, you're doing a
8    verbatim translation. That's
9    fine.
10       INTERPRETER 1: I am doing
11   verbatim, but at the same time,
12   sometimes if I don't hear it
13   clearly due to accent or whatever,
14   I might clarify with my ability to
15   understand or to listen to him,
16   you know, but not to try to make a
17   judgment.
18       MR. CYR: Mr. Seeger, may I?
19       MR. SEEGER: All right. Do
20   you have something you want to
21   add?
22       MR. CYR: Yeah. I just
23   wanted to say that with respect to
24   what I don't consider to be

Page 44

1    significant matters, I don't mind
2    a brief little exchange where she
3    asks him to clarify what she said,
4    just so we can get a very accurate
5    transcript. And it's just a
6    judgment call as we go forward,
7    but I have to admit that I thought
8    that it was appropriate for me to
9    provide that warning to her as we
10   go forward. That's all.
11       MR. SEEGER: All right.
12       INTERPRETER 1: Thank you.
13       MR. SEEGER: You are the
14   official translator today.
15       INTERPRETER 1: Right.
16       MR. SEEGER: You are going
17   to be the final word on this from
18   my perspective. There could be an
19   objection. We're going to deal
20   with that later, and that doesn't
21   affect you.
22       But both sides did agree to
23   this interpreter, right? There's
24   no dispute?

Page 45

1    MR. CYR: There's no dispute
2    about that.
3        And then the other thing I
4    just thought I'd mention is that
5    generally, of course everything
6    that's said is interpreted, so
7    that everybody in the room,
8    regardless of what language they
9    can speak, understands the
10   proceedings, including the
11   witness. But in the interest of
12   time, I'm, you might say, waiving
13   our rights to that with respect to
14   the dialogue that just happened,
15   because we'd be here for another
16   hour.
17       MR. SEEGER: My concern is
18   that we agreed to an official
19   translator, and you have every
20   right to bring a check translator.
21   It's not a problem. It becomes a
22   problem if the check translator
23   challenges every word and we're
24   going to be here all day with this

Page 54

1  she send e-mail for me.
2        - - -
3        (Whereupon, the following
4  portion of the transcript was read
5  by the court reporter:
6        "Q.  Does she read his
7  e-mails?
8        A.  She should read it.
9        Q.  Does she send e-mails
10  for him?")
11        - - -
12  BY MR. SEEGER:
13        Q.  Mr. Jia, does your secretary
14  send e-mails for you?
15        A.  Sometimes for sure, but it
16  is not the main way that we do
17  communication.
18        Q.  Mr. Jia, what is your
19  secretary's name?
20        A.  I don't have something
21  concrete as a secretary, but I have an
22  office.
23        INTERPRETER 2:  The check
24  interpreter object to the

Page 55

1  interpretation.  The check
2  interpreter's rendition is I don't
3  have a specific secretary, but I
4  have an office.
5        INTERPRETER 1:  Shi ti is
6  something concrete.
7        MR. SEEGER:  I have to be
8  honest.  I don't really see the
9  difference between what the check
10  interpreter said and what you
11  said.
12        INTERPRETER 1:  I think
13  she's too tedious in this whole
14  case.  She's check against gray
15  area instead of something
16  important.  And, you know, the
17  understanding, the background of
18  understanding a case would make a
19  difference in terms of the
20  interpretation.
21        MR. SEEGER:  Time out.
22        INTERPRETER 1:  So, we're
23  not doing that job.  And also --
24        MR. SEEGER:  Wait, no, no,

Page 56

1  no.  Time, time.
2        INTERPRETER 1:  Okay.
3        MR. SEEGER:  You're not
4  defending yourself here.  You have
5  to understand, all you have to do
6  is translate.  You don't have to
7  defend yourself against the check
8  interpreter or anybody here today.
9  So, just all you have to do is
10  accurately ask him my question in
11  Chinese and then translate to
12  English for me.  And that's it.
13  And you don't have to worry about
14  it.
15        INTERPRETER 1:  Can I ask
16  you to do me a favor?
17        MR. SEEGER:  Yeah.
18        INTERPRETER 1:  Can you
19  instruct the witness to break down
20  his answers, like don't go on for
21  too long, and pause once in a
22  while so I don't miss out
23  anything.
24        MR. SEEGER:  I don't think

Page 57

1  we're going to give him --
2        MR. CYR:  I'll leave that
3  one alone.
4        MR. SEEGER:  Yes, we're all
5  going to leave that one alone.
6        Let's just try to do the
7  best we can.
8        INTERPRETER 1:  Yeah, sure.
9        MR. SEEGER:  Okay.
10        INTERPRETER 1:  Thank you.
11  BY MR. SEEGER:
12        Q.  So, Mr. Jia, you had
13  identified earlier a person in your
14  office who reviewed your e-mails and from
15  time to time sent e-mails for you.  Who
16  is that person?
17        A.  I did mention earlier that
18  we have many persons in the office.
19  Whoever that is available that would send
20  the e-mail.
21        Q.  Mr. Jia, please identify for
22  us any person that either reviews your
23  e-mail account or sends e-mails for you.
24        A.  Zhang Jian Chun.

Page 58

1    INTERPRETER 1: The
2    interpreter does not translate
3    legal names because -- specific
4    names because there are many ways
5    of translating one name. So, I'm
6    asking the witness to write it
7    down in Chinese.
8        MR. SEEGER: Very good.
9    Thank you.
10       INTERPRETER 1: The witness
11   has written down three names:
12   Zhang Jian Chun, Chen Xin Hua,
13   Zhao Xiu Yun.
14   BY MR. SEEGER:
15   Q.   Would you also ask him to
16   write beside their name what their job
17   title is.
18       THE WITNESS: Can I take a
19   break?
20       MR. SEEGER: Yeah. Could we
21   just read this into the record?
22   I'm going to mark it as an
23   exhibit, and then we'll take a
24   break.

Page 59

1        INTERPRETER 1: The witness
2    has written down on the note next
3    to Zhang Jian Chun, he or she is
4    the secretary of the board of
5    directors of TG.
6        Chen Xin Hua is the general
7    staff.
8        Zhao Xiu Yun, an engineer.
9        MR. SEEGER: Then Linda,
10   could you mark this as Exhibit 1.
11       INTERPRETER 1: The
12   interpreter can write down in
13   English the titles.
14       MR. SEEGER: If you could do
15   that, we'll mark it as an exhibit.
16       Would you like to have your
17   person take a quick look, before
18   we mark it, on her translation?
19       MR. CYR: No.
20       MR. SEEGER: Thank you.
21   You're merciful.
22       - - -
23       (Whereupon, Deposition
24   Exhibit Jia-1, Handwritten note,

Page 60

1    Zhang Jiaiu Chun, Chen Xinghua,
2    and Zhao Siuyun, was marked for
3    identification.)
4        - - -
5        MR. SEEGER: So, you've just
6    marked that as Exhibit 1?
7        THE COURT REPORTER: Yes.
8        MR. SEEGER: Okay. We can
9    take a break.
10       THE VIDEOTAPE TECHNICIAN:
11   The time now is approximately 9:58
12   a.m., and we're now off the
13   record.
14       - - -
15       (Whereupon, a recess was
16   taken from 9:58 a.m. until
17   10:14 a.m.)
18       - - -
19       THE VIDEOTAPE TECHNICIAN:
20   This is the beginning of Tape 2 of
21   the videotape deposition of Mr.
22   Tongchun Jia. The time now is
23   approximately 10:15 a.m., and
24   we're back on the record.

Page 61

1        MR. SEEGER: It's really a
2    question I have of the
3    interpreter. I'm asking on the
4    record just so we know.
5        You were able to provide
6    interpretations of the job titles.
7    Can you put an English
8    interpretation of the name? Can
9    you do that on Exhibit 1?
10       INTERPRETER 1: Let me see.
11   I --
12       MR. SEEGER: If you need
13   time, we can do it during a break.
14   I just want to know if you're
15   capable of it.
16       INTERPRETER 1: I'll do it
17   during the break, because there's
18   so many ways of translating names,
19   we usually don't do it, but I'll
20   try my best. I will give it back
21   to you later. Sure.
22       MR. SEEGER: And if you want
23   to have the check interpreter take
24   a look and see if you can agree on

Page 62

1   it --
2        INTERPRETER 1: Probably
3   I'll ask the attorney. They will
4   know that better.
5        MR. SEEGER: All right. So
6   I want to go back to questioning.
7   BY MR. SEEGER:
8        Q.   Mr. Jia, I want to go back
9   to your presence at board meetings of
10  BNBM. Okay?
11       A.   The concept of the board of
12  directors, in China, we rarely use this
13  concept. With this concept, I did not
14  have contact with this contact before.
15       INTERPRETER 2: The check
16  interpreter objects to the
17  interpretation of the interpreter.
18  The witness stated that dong shi
19  ju, it's the Chinese word for
20  board of directors. However, it
21  is a dialect of Cantonese
22  pronunciation. In Mainland China,
23  typically it would say dong shi
24  hui. Then the check interpreter

Page 63

1   raised that because it is the same
2   meaning. However, the dialect is
3   different. So, perhaps the
4   witness would not understand dong
5   shi ju. Maybe the interpreter can
6   consider to rephrase it into dong
7   shi hui.
8        MR. SEEGER: Well, he's
9   hearing it. So, do you want to
10  ask it?
11       INTERPRETER 1: Are you
12  asking board of directors, of
13  board of director meetings? She
14  translated into board of director
15  meetings. That is dong shi hui.
16       MR. SEEGER: What was it the
17  other way?
18       INTERPRETER 1: I was doing
19  dong shi hui, board of directors.
20       MR. SEEGER: Strike the
21  question. I'm going to ask a new
22  question.
23       INTERPRETER 1: Okay.
24  BY MR. SEEGER:

Page 64

1        Q.   When he attends --
2        Mr. Jia, when you attend the
3   board of director meetings for BNBM, do
4   you report on the business of TG?
5        A.   I don't do it.
6        Q.   What do you do? What do you
7   do, Mr. Jia, at the BNBM meetings?
8        A.   I will listen to the report
9   by the GM.
10       Q.   What is the business
11  relationship between BNBM and TG?
12       MR. CYR: Object. I'm
13  sorry.
14       Objection on the grounds
15  that "business relationship" is
16  vague, but, Mr. Jia, please try to
17  answer.
18       I'm sorry, ma'am, but it
19  really would be great if you could
20  speak louder so that everybody in
21  the room could hear you.
22       INTERPRETER 1: Yeah, sure.
23  I'll try my best.
24       MR. SEEGER: How many people

Page 65

1   speak Chinese in the room? They
2   can all hear. You guys can hear.
3        MR. CHEN: We can't hear
4   very well.
5        MR. SEEGER: Go ahead. Did
6   you --
7        THE WITNESS: Can you repeat
8   your question?
9        - - -
10       (Whereupon, the following
11  portion of the transcript was read
12  by the court reporter:
13       "Q. What is the business
14  relationship between BNBM and
15  TG?")
16       - - -
17       THE WITNESS: The
18  relationship between TG and BNBM
19  is the investor, the one being
20  invested.
21  BY MR. SEEGER:
22       Q.   BNBM is an investor in TG.
23  Is that what you said, Mr. Jia?
24       A.   Yes.

17  (Pages 62 to 65)

Page 70

1  advance to be a real hindrance
2  here. And I mean that
3  respectfully to you.
4      MR. CYR: Let me just say,
5  and I hate to take up the time or
6  the record with this, but this is
7  one of the reasons why I sent the
8  e-mail yesterday to plaintiffs'
9  counsel, which I believe that you
10  were copied on the reply, where I
11  offered to have a telephone call
12  yesterday to address any
13  outstanding issues. And I think
14  that in the e-mail, I even
15  reflected relating to interpreters
16  or translators, is because it's
17  precisely this kind of issue that
18  takes up time in a deposition, and
19  frankly, I have no -- as a human
20  being, I have no reason to want to
21  delay this unnecessarily. That's
22  what I wanted to talk about during
23  the call, which you guys thought
24  was not necessary.

Page 71

1      MR. SEEGER: I think we were
2  on a plane.
3      MR. GRAND: In all fairness,
4  there weren't any outstanding
5  issues. From our perspective, we
6  agreed to, you interviewed an
7  official interpreter on the
8  telephone conference, which you
9  insisted on doing. We have an
10  agreed-to official interpreter.
11  What is now happening is you have
12  brought a second interpreter, who
13  is directly challenging her
14  interpretations, interacting with
15  her, and, frankly, interfering
16  with the deposition.
17      MR. SEEGER: It's like every
18  question.
19      MR. GRAND: She should be
20  discussing it with you, and if you
21  want to raise an objection or even
22  just state objection to have it on
23  the record, that's fine. But why
24  is she engaging with the

Page 72

1  interpreter?
2      MR. CYR: Let me just say,
3  there's two issues before us.
4      One is whether or not there
5  was an opportunity for you to
6  appreciate that we might bring a
7  check interpreter, and then the
8  second is the procedures.
9      With respect to the first, I
10  just have to say that I'm stunned
11  that you would think that in an
12  important deposition like this
13  that we would show up without a
14  check interpreter. The only issue
15  that I thought we needed to
16  address during the call was the
17  process that we're now struggling
18  with. And Frank shares with me
19  that in some fashion you actually
20  had notice that we were going to
21  bring a check interpreter.
22      And Frank, I welcome if you
23  --
24      MR. GRAND: We have a check

Page 73

1  interpreter agreement too. That's
2  not my issue.
3      MR. CYR: Okay.
4      MR. GRAND: I'm not
5  surprised you have one. What --
6      MR. CYR: Well, here we're
7  on just number one --
8      MR. GRAND: What I'm
9  surprised is that she's
10  interrupting and, frankly,
11  instructing the official
12  interpreter to clarify,
13  reinterpret, ask additional
14  questions of the witness. And to
15  me, that is not the role of your
16  check interpreter. If she wants
17  to raise an objection to you and
18  then you want to put an objection
19  on the record, please do so. But
20  this is our official interpreter,
21  and she has the last word on the
22  witness's -- on his questions,
23  your objections and the witness's
24  testimony.

Page 74

1    MR. CYR: So, Chris, it
2  seems to me that we have now
3  overcome this concern you had
4  about not being on notice for the
5  check interpreter to be here. We
6  seem to all be in agreement that
7  it was something that was actually
8  noticed and also reasonably
9  expected.
10      With respect to the process
11  and the procedure, we want to
12  cooperate with you.
13    MR. SEEGER: So let's do
14  this. First of all, this is a
15  first to me, having a check
16  interpreter objecting as she's
17  doing. And I've been through
18  these before. But just because
19  it's a first for me didn't mean I
20  would interfere with it. It just
21  seems now, an hour and several
22  minutes in, it's a challenge of
23  every question.
24    MR. CYR: Yes.

Page 75

1    MR. SEEGER: And we do have
2  one interpreter that we both have
3  agreed to. So we were -- you're
4  right. It wasn't that I didn't
5  know a check interpreter was going
6  to be here. I didn't understand
7  that she'd have the role that
8  she's playing today or that you
9  wanted her to play this role. And
10  I think I really have allowed this
11  to go for a while. I don't know
12  if other people in the room feel
13  differently about it, but for me,
14  it's become --
15    MR. CYR: I'm not saying
16  that your reaction to what's
17  occurred is an unreasonable one.
18  What I'm saying is that we are
19  going to ask our check interpreter
20  to continue listening to the
21  interpretation and to register an
22  objection to significant errors
23  that she believes the interpreter
24  has made and to do that briefly so

Page 76

1  that it's reflected on the record
2  and that you could proceed with
3  your questioning.
4    MR. SEEGER: Right. And it
5  won't be necessary, going forward,
6  for the check interpreter to say
7  the check interpreter objects to
8  the question. Just let her state
9  what the dispute is.
10    MR. CYR: I think that's
11  true. That's fine.
12    (Addressing the check
13  interpreter.)
14      You don't need to give an
15  introduction to your objection.
16  You can just look for your
17  opportunity to say and then just
18  say what you think the witness
19  said or that the lawyer said.
20  Okay?
21    INTERPRETER 2: Yes.
22    INTERPRETER 1:
23  (Indicating.)
24    MR. SEEGER: Is this really

Page 77

1  important? Because I want to get
2  back to the deposition. Go ahead.
3    INTERPRETER 1: Yes, it is.
4    To be fair, I'm not
5  attacking or defending anything.
6  I'm just saying, to be fair, when
7  you open up a dictionary, there's
8  so many choices for the
9  definition. That's what I call
10  the gray area. Many times I
11  choose one definition, she choose
12  another one. They're very close
13  enough and similar. And also like
14  a lot of upside down grammar, I
15  might be doing upside down, she
16  might be doing straightforward.
17  They are both correct. I think
18  those challenges are irrelevant,
19  and I hope that we can eliminate
20  those.
21    MR. SEEGER: Well, that's
22  what I'm hoping too. I'm hoping
23  we are going to limit --
24    INTERPRETER 1: Limit it to

20 (Pages 74 to 77)

Page 78

1  a major mistake.
2      MR. SEEGER: Right. I'm
3  hoping we can limit it to a major
4  mistake, because then we'll have
5  a --
6      INTERPRETER 1: Just like
7  the title GM or MD. In China,
8  they use both.
9      MR. SEEGER: Okay. Well,
10 look. At the end of the day,
11 you're the interpreter, both
12 parties have agreed to you, and
13 you're going to be doing it. So
14 let's get back to the deposition.
15     What was my last question,
16 Linda?
17         - - -
18     (Whereupon, the following
19 portion of the transcript was read
20 by the court reporter:
21     "Q.  And you are the
22 chairman of the board of TG,
23 correct?")
24         - - -

Page 79

1      MR. SEEGER: (Addressing the
2  interpreter.)
3      Would you please ask him
4  again that question.
5      (Interpreter repeats the
6  question.)
7      THE WITNESS: I'm the
8  director of the board of directors
9  of TG.
10 BY MR. SEEGER:
11     Q.  Mr. Jia, your answer is you
12 are the director of the board of
13 directors for TG? I want to make sure
14 we're clear on what the title is.
15     MR. CYR: I feel the need to
16 state for the record that I think
17 on two or three occasions now he
18 said that he's the chairman of the
19 board of the board of directors
20 for Taishan Gypsum.
21     MR. SEEGER: Did he answer
22 that?
23     THE WITNESS: TG does not
24 have dong shi ju, the board of

Page 80

1  directors. We only have dong shi
2  hui, the board of directors. It
3  is a different term -- it is the
4  same English term that could be
5  they call it dong shi ju or don
6  shi hui.
7      INTERPRETER 1: Because I
8  don't have the background
9  documents, so I don't know which
10 words to use, dong shi ju or dong
11 shi hui. So, the English is the
12 same. Dong shi hui and dong shi
13 ju is board of directors. It's
14 the same.
15     (Addressing the witness.)
16     I need to clarify.
17     MR. CYR: I'm sorry, ma'am.
18 Please don't talk to the witness.
19     MR. SEEGER: Hold on. We're
20 going to resolve this right now.
21     Can we mark what I'm handing
22 you as Exhibit 2.
23         - - -
24     (Whereupon, Deposition

Page 81

1  Exhibit Jia-2, Document entitled
2  "Shangdong Taihe Dongxin Co.,
3  Ltd.," 12 pages, was marked for
4  identification.)
5         - - -
6  BY MR. SEEGER:
7      Q.  Tell the witness to take a
8  look at the document. Mr. Jia -- I'm
9  going to say it, speak to him.
10     Mr. Jia, take a look at the
11 document we have just marked as Exhibit
12 2, and can you identify what this
13 document is for the record?
14     MS. BASS: Is there a Bates
15 Number?
16     MR. SEEGER: No,
17 unfortunately.
18     MR. SERPE: Chris, 25133.
19     MR. SEEGER: That's the
20 Bates number? Was that on there?
21 What is it?
22     MR. SERPE: When they
23 produced it to us.
24     MR. SEEGER: What is it?

Page 82

1      MR. SERPE: 25133.
2      (Witness reviewing
3   document.)
4   BY MR. SEEGER:
5      Q.   Mr. Jia, can you identify
6   this document?
7      A.   It is a document of TG,
8   Taishan -- of TG -- of TG, a shareholding
9   company introduced about the -- giving
10  introductions about the -- introducing
11  the company and also introducing the
12  products.
13     Q.   And can you give me an
14  approximate time frame of when this
15  document was created?
16      I'm sorry, let me restate
17  that.
18      Mr. Jia, can you give me a
19  time frame of when this document was
20  created?
21     A.   This document should be
22  before the year 2008.
23     Q.   Mr. Jia, how do you know
24  that it should be before the year 2008?

Page 83

1      A.   Because the title of this
2   document is the Shandong Taihe Dongxin
3   Company Limited. It was the title that
4   we used before the year 2008.
5      INTERPRETER 1: Off the
6   record.
7      The interpreter did not have
8   the list of the names of all the
9   companies, so, I did not look at this
10  document. When he was saying Taishan
11  Shigao Guifen, what I have here on my
12  notes is TG. But when I look at the
13  document, it should be Shandong Taihe
14  Dongxin Company Limited. The --
15      MR. SEEGER: Wait a second.
16  Time out. No, no, no. Time out.
17      What was his answer? I just
18  need his answer. What was his
19  answer?
20      INTERPRETER 1: I finish
21  the -- I finished the answer. I'm
22  raising the question as an
23  interpreter myself.
24      MR. SEEGER: Okay. But can

Page 84

1   you hold off on your question,
2   because I'm getting really
3   confused.
4      What was his answer? When I
5   asked him --
6      INTERPRETER 1: Okay.
7   Before I say "off the record"
8   was --
9      MR. SEEGER: No. Before
10  that, what was -- I want to know
11  how he described the document.
12      INTERPRETER 1: Yeah, right.
13      - - -
14      (Whereupon, the following
15  portion of the transcript was read
16  by the court reporter:
17      "Q. Mr. Jia, how do you
18  know that it should be before the
19  year 2008?
20      "A. Because the title of
21  this document is the Shandong
22  Taihe Dongxin Company Limited. It
23  was the title that we used before
24  the year 2008.")

Page 85

1      - - -
2      MR. SEEGER: Is that his
3   answer?
4      INTERPRETER 1: Right.
5      Off the record. Because
6   there --
7      MR. SEEGER: There is no off
8   the record.
9      INTERPRETER 1: Okay. Can
10  I -- okay. Because if I find a
11  problem and I need the attorney to
12  help me, because the interpreter
13  walk into this room with no list
14  of the names of all the companies
15  and all the parties. So, when I
16  heard he was saying the Taishan
17  Guifen (speaking in Chinese). So,
18  I got confused about a company
19  name, and I say TG. Now I read
20  the document, it says Shandong
21  Taihe, I want to clarify that.
22  And also, I want to have a --
23      MR. SEEGER: No. Did he say
24  TG or did he say this name on the

22  (Pages 82 to 85)

Page 86

1   document? I need his answer.
2       INTERPRETER 1: Because he
3   say it in Chinese, I don't know
4   which Chinese name is matching
5   with which English name. So it is
6   the problem of the interpreter,
7   not his problem. The problem with
8   me is that I walk in with no list
9   of all the company names and all
10  parties. I don't want to guess.
11  That's why I --
12      MR. GRAND: You're not
13  guessing. You're just stating his
14  testimony.
15      MR. SEEGER: See, and that's
16  why if you -- if what you're
17  saying -- if his answer was one
18  thing and you just repeated his
19  answer, we'd be fine. But if
20  you're saying that you heard him
21  say something and you interpreted
22  it wrong for some reason, yes, we
23  need to know that.
24      So, when I asked him whose

Page 87

1   document it was and he said it was
2   TG, was that the answer he gave or
3   did he say the other name?
4       INTERPRETER 1: He was
5   saying -- okay. Why don't I just
6   give the Chinese name instead of
7   reinterpreting the name, because
8   I'm not sure about the name now.
9       MR. SEEGER: We have to go
10  off the record for a second.
11      THE VIDEOTAPE TECHNICIAN:
12  The time now is approximately
13  10:40 a.m., and we're now off the
14  record.
15          - - -
16      (Whereupon, a recess was
17  taken from 10:40 a.m. until
18  10:44 a.m.)
19          - - -
20      THE VIDEOTAPE TECHNICIAN:
21  This begins Tape 3 of the
22  videotape deposition of Mr.
23  Tongchun Jia. The time now is
24  approximately 10:44 a.m., and

Page 88

1   we're back on the record.
2       MR. SEEGER: So look, I
3   think that Mr. Cyr and I are going
4   to agree on what I'm about to tell
5   you. Okay? So this is what we'd
6   like you to do to make your life
7   easy.
8       INTERPRETER 1: Thank you.
9       MR. SEEGER: When I ask him
10  a question, interpret it to the
11  best of your ability. When he
12  answers, whatever that answer is,
13  I don't care if you look at the
14  document and it looks like it's a
15  different name, please do the best
16  you can to just give me whatever
17  answers come out of his lips as
18  best as you can. If there's a
19  problem at that point, I think
20  then that the check interpreter
21  will bring it to Mr. Cyr's
22  attention, and we'll raise it that
23  way. But if nobody is
24  complaining, if nobody's -- if the

Page 89

1   check interpreters aren't saying
2   there's a problem with your
3   interpretation, let's just keep it
4   going. We don't want you to
5   interpret --
6       INTERPRETER 1: Thank you.
7       MR. SEEGER: We don't want
8   you to struggle for answers.
9       INTERPRETER 1: I don't want
10  to guess at anything. That's why
11  I bring this out.
12      MR. SEEGER: It's either
13  clear or it's not.
14      Don't guess at anything.
15  Just whatever he says, repeat it.
16      INTERPRETER 1: I don't
17  guess. I do verbatim.
18      MR. SEEGER: Yes.
19      INTERPRETER 1: The only
20  issue is that because before I
21  come into this room, I did not
22  have a list of the Chinese
23  names --
24      MR. SEEGER: But you've said

Page 90

1    that now ten times, and everybody
2    here understands that you have
3    not -- there's a reason you
4    haven't been given those
5    documents. You have to just trust
6    in that. So you have to do the
7    best you can.
8        INTERPRETER 1: No problem.
9        MR. SEEGER: What was the
10   last question and answer?
11       - - -
12       (Whereupon, the following
13   portion of the transcript was read
14   by the court reporter:
15       "Q. Mr. Jia, how do you
16   know that it should be before the
17   year 2008.
18       "A. Because the title of
19   this document is the Shandong
20   Taihe Dongxin Company Limited. It
21   was the title that we used before
22   the year 2008.")
23       - - -
24   BY MR. SEEGER:

Page 91

1    Q.   The title on this document,
2    Mr. Jia, Shandong Taihe Dongxin Company,
3    was the name of TG -- used to be the name
4    of TG, correct?
5    A.   Yes.
6    Q.   Mr. Jia, turn to Page 2 of
7    this document, please.
8    A.   (Witness complies.)
9    Q.   Mr. Jia, there's a
10   photograph in the upper left-hand corner
11   of this document. Who is that photograph
12   of?
13   A.   Me.
14   Q.   It's a good photo, by the
15   way.
16       And underneath this
17   photograph, what does it describe you as?
18   A.   Chairman of the board,
19   general manager.
20   Q.   Are you comfortable with
21   those titles, sir?
22       MR. CYR: He might not
23   understand what you mean by
24   "comfortable," but...

Page 92

1        THE WITNESS: I don't
2    understand what you're saying.
3    BY MR. SEEGER:
4    Q.   Strike the question.
5        Now, I want to go back to
6    the BNBM meetings, the board meetings,
7    whatever meeting. I don't want to
8    characterize them as anything. Whatever
9    meetings, Mr. Jia, you attend at BNBM, I
10   want to ask you a question about them.
11   Who gives reports in those meetings
12   regarding TG?
13   A.   At the meetings for BNBM, I
14   do not make report on behalf of TG.
15   Q.   Who does? Who makes the
16   report at --
17       INTERPRETER 2: The --
18       MR. CYR: (Addressing the
19   check interpreter.)
20       I'm sorry, state it briefly.
21       INTERPRETER 2: The witness
22   said TG did not give report at
23   BNBM meeting.
24       INTERPRETER 1: No. He

Page 93

1    said, I was not the one who do
2    report for -- on behalf of TG.
3        MR. SEEGER: All right.
4    We're going to go with the
5    interpreter on this one. Mr. Cyr
6    can object.
7        MR. CYR: To help out, is
8    that on most matters, we'll be
9    happy with the registering of the
10   objection and then continuing.
11       MR. SEEGER: Let's do that.
12       MR. CYR: Yes. Where it
13   would present a problem is if the
14   further questioning would go in
15   what we would consider the wrong
16   direction because of some kind of
17   a definitional thing. But most of
18   the things that have happened so
19   far, we make our objection, she
20   doesn't need to defend herself,
21   boom, you go back with your
22   question. That's our
23   recommendation.
24   BY MR. SEEGER:

Page 98

1   of directors.
2           MR. SEEGER:  I'm sorry.
3             - - -
4           (Whereupon, the following
5       portion of the transcript was read
6       by the court reporter:
7           "A.  The secretary of the
8       board of directors.")
9             - - -
10  BY MR. SEEGER:
11      Q.   Of which company?
12      A.   I don't understand your
13  question.
14      Q.   The secretary of the board
15  of directors of TG, is that who he's
16  referring to?
17      A.   Yes.
18          MR. SEEGER:  At this point,
19      I just want to call for the
20      production of any annual reports
21      and auditing statements by TG to
22      BNBM or any other company, because
23      they haven't been produced as far
24      as we know.

Page 99

1   BY MR. SEEGER:
2       Q.   Does BNBM make -- strike
3   that.
4           Does anyone on the board of
5   directors of BNBM make recommendations
6   regarding TG's business?
7           MR. CYR:  Objection on the
8       grounds that the question is
9       vague.  It doesn't indicate
10      recommendations to whom or in what
11      context.
12          MR. SEEGER:  I'm just going
13      to object again, because it's
14      sufficient to say objection.  If
15      you want to say vague, it's fine.
16          MR. CYR:  You're wasting
17      your time giving me speeches about
18      that.  You can just take it to the
19      judge.
20          MR. SEEGER: Well, I'll --
21          MR. CYR:
22          (Addressing the
23      interpreter.)
24          Please interpret what I

Page 100

1   said.  Let's take it one step at a
2   time.
3           Interpreter, please
4   interpret what I said.
5           Now, I suggest you mark the
6   record and then ask your next
7   question.
8           MR. SEEGER:  Don't tell me
9   what to do.  Just do your job,
10  I'll do mine, because now you're
11  pushing it with me.  All right?
12          MR. CYR:  This is what I'm
13  telling you.
14          MR. SEEGER:  Don't tell me
15  what to do.
16          MR. CYR:  Mark the record
17  and ask a question.
18          MR. SEEGER:  Mark that for
19  my objection.  I'll raise it with
20  Judge Fallon in the morning.
21          Okay.  So, where were we?
22  We had we left off?
23            - - -
24          (Whereupon, the following

Page 101

1   portion of the transcript was read
2   by the court reporter:
3       "Q.  Does anyone on the
4   board of directors of BNBM make
5   recommendations regarding TG's
6   business?")
7             - - -
8           THE WITNESS:  I don't
9   understand your question.  I don't
10  understand Cantonese, and please
11  say it in Mandarin.
12          MR. SEEGER:  Let me ask the
13  witness a question.
14  BY MR. SEEGER:
15      Q.   Does the witness
16  understand -- ask him --
17          Mr. Jia, do you understand
18  the questions or the interpretations
19  being presented to you by the
20  interpreter?
21      A.   I did not understand the
22  earlier question.
23      Q.   But is it an interpretation
24  problem?  Is there a dialect problem

Page 102

1 between the two of you? I need Mr. Jia
2 to tell me.
3     A.   My mother tongue is Chinese,
4 but I have a strong Shandong accent.
5     Q.   But Mr. Jia, do you
6 understand the interpreter? Are you
7 having any problem understanding the
8 interpreter?
9     A.   I can understand the
10 interpreter.
11     Q.   You're comfortable, Mr. Jia,
12 with us going forward with this
13 interpreter?
14     A.   How can I say it? I don't
15 know how to say it.
16     Q.   Is he satisfied -- never
17 mind. Strike that.
18     MR. SEEGER: What was my
19 last question, Linda?
20     - - -
21     (Whereupon, the following
22 portion of the transcript was read
23 by the court reporter:
24     "Q. Does anyone on the

Page 103

1 board of directors of BNBM make
2 recommendations regarding TG's
3 business.
4     A. I don't understand your
5 question. I don't understand
6 Cantonese, and please say it in
7 Mandarin.")
8     - - -
9 BY MR. SEEGER:
10     Q.   Mr. Jia, does the
11 interpreter speak Cantonese? Is that
12 what you're trying to say?
13     A.   Yeah. Has a Cantonese
14 accent, sometimes I cannot understand,
15 and I find it tiring.
16     Q.   Let me ask a question.
17     Mr. Jia, other than
18 yourself, are there any board members of
19 BNBM who are also on the board of TG?
20     A.   Yes.
21     Q.   Who?
22     A.   Me and another one, Wang
23 Bin. Wang Bin and another one. Wang Bin
24     Q.   I don't understand that

Page 104

1 answer.
2     A.   I and another one.
3     Q.   Okay. And one other person,
4 right, Mr. Jia?
5     And the name of that other
6 person is what?
7     INTERPRETER 1: Wang Bin.
8 BY MR. SEEGER:
9     Q.   How would you spell that?
10     A.   (Witness writes name on
11 paper.)
12     Q.   Wang Bin.
13     Could you also write next to
14 his name, Mr. Jia, his title?
15     A.   What period?
16     Q.   Let's start with the
17 present.
18     A.   (Witness writes down
19 answer.)
20     Q.   Hold on, keep that in front
21 of him.
22     Mr. Jia, what did you just
23 write on that piece of paper?
24     A.   Chairman of the board of

Page 105

1 BNBM, Wang Bin.
2     Q.   Then prior to that title,
3 what was Wang Bin's title before that?
4 And if you could write the dates.
5     A.   I cannot recall the exact
6 date, but he was originally the chairman
7 of the board of directors of BNBM.
8     MR. CYR: Objection.
9     INTERPRETER 2: General
10 manager, not the chairman of the
11 board of directors.
12 BY MR. SEEGER:
13     Q.   Mr. Jia, was --
14     MR. CYR: We're ready for
15 the next question.
16     MR. SEEGER: Well, I don't
17 know if we can resolve that one.
18     MR. CYR: You can spend time
19 trying to resolve that if you'd
20 like. I'm just saying that we're
21 comfortable now going with the
22 next question.
23 BY MR. SEEGER:
24     Q.   Prior to his --

Page 110

1  BY MR. SEEGER:
2      Q.   Are there any other
3  subsidiaries that you're involved with
4  other than the one you just wrote down?
5      A.   Henan Taishan Company
6  Limited.
7          INTERPRETER 1: The
8  interpreter is trying to translate
9  the names of the company. But
10  just looking at it, I cannot
11  guarantee its accuracy.
12         THE WITNESS: Hubei Taishan
13  Company Limited.
14         Shanxi Taishan Company
15  Limited.
16         And also Jiangsu Pizhou
17  Company Limited.
18         And there are many more.
19         MR. SEEGER: So, at this
20  point, Joe, can you provide us
21  with a list of all the
22  subsidiaries that Mr. Jia has any
23  kind of job responsibility with?
24  It will save a lot of time as

Page 111

1  opposed to doing it this way.
2          MR. CYR: Mr. Spano points
3  out to me that in our production,
4  there is a list of all the
5  subsidiaries, and I believe that
6  you have a translation of that.
7  But in addition to that, although
8  I'd like to confer with my
9  colleagues, I don't think there
10  would be any problem in providing
11  you a list of those entities in
12  which Mr. Jia holds some kind of
13  position.
14         MR. SEEGER: Okay.
15  Appreciate it.
16         MR. GRAND: We have a list
17  of the companies, but we don't
18  know his role in those companies.
19         MR. SEEGER: Right.
20         MR. CYR: Just -- I think so
21  far on the record, what you do
22  have from him is that he's a
23  director in some of the
24  subsidiaries, and he's not a

Page 112

1  director in others, but it's up to
2  you.
3          MR. SEEGER: He said that,
4  and maybe you can also give us --
5  would you indicate what his title
6  is in those? And then we could
7  save a lot of time.
8          MR. CYR: (Indicating.)
9          MR. SEEGER: He shook his
10  head yes. Did you put that down?
11         THE COURT REPORTER: Yes.
12         - - -
13         (Whereupon, Deposition
14  Exhibit Jia-3, Handwritten note in
15  Chinese, was marked for
16  identification.)
17         - - -
18  BY MR. SEEGER:
19      Q.   Mr. Jia, do you have any
20  responsibilities with TTP?
21      A.   I don't know what is the
22  concept of responsibility.
23      Q.   Do you have a job title for
24  TTP?

Page 113

1      A.   I don't have any positions
2  with TTP.
3      Q.   Do you provide any services?
4  Do you do anything for TTP at all,
5  provide consulting services, financial
6  services, anything like that?
7      A.   Which company is TTP? Can
8  you tell me first?
9      Q.   I believe it's pronounced
10  Tai'an Taishan Plasterboard.
11     A.   We don't have a company
12  called Tai'an Taishan. TTP Shareholding
13  Company Limited. We only have a Tai'an
14  Taishan TTP.
15         INTERPRETER 1: I need the
16  assistance from the lawyers to get
17  the names correct. I cannot make
18  out the names here at this point.
19  He's telling me two names.
20         MR. SEEGER: Okay. What two
21  names? Translate the two names he
22  gave you, if you don't mind.
23         INTERPRETER 1: As a legal
24  interpreter, we don't translate

29 (Pages 110 to 113)

Page 114

1  the names, first of all. And
2  also, there's ten ways to
3  interpret any name, and so I --
4  it's a very tedious difference
5  between the two names.
6      I need help.
7      (Discussion amongst Mr.
8  Chen, the interpreters and witness
9  in Chinese.)
10      MR. CHEN: If you could
11  just -- I guess you could put on
12  the record colloquy in Chinese.
13  I'm just trying to clarify for
14  you.
15      MR. CYR: We're trying to
16  help out here.
17      MR. CHEN: It's just Company
18  Limited. It's Limited Company.
19      INTERPRETER 1: So there is
20  a TTP Company, not a Shareholding
21  Limited Company, but it is a TTP
22  Limited Company.
23  BY MR. SEEGER:
24      Q.   I'm going to ask a question.

Page 115

1  It may not make sense because I'm not
2  really clear on what the confusion is
3  here, but, you know, does he recognize
4  the name Tai'an, and you may have to put
5  it in proper Chinese, Tai'an Taishan
6  Plasterboard?
7      Mr. Jia, do you recognize
8  that name as a company that you're
9  involved with, Tai'an Taishan
10  Plasterboard?
11      MR. CYR: I'm just -- I
12  don't think he said he was
13  involved in it, but --
14      MR. SEEGER: No. I'm asking
15  him if he recognizes it.
16      MR. CYR: I just want to
17  state for the record that I
18  believe that he's already
19  testified that he doesn't hold a
20  position at TTP. I just want to
21  make sure.
22      MR. SEEGER: I don't even
23  know what he's testified to
24  regarding, because he hasn't

Page 116

1  acknowledged he knows what that is
2  yet. So let's first see if we can
3  identify what the name of that
4  company is.
5      THE WITNESS: What do you
6  mean?
7  BY MR. SEEGER:
8      Q.   Mr. Jia, you have been asked
9  to give testimony today for two
10  companies. One is TG, and the other one
11  is Tai'an Taishan Plasterboard. Do you
12  understand that to be correct or not?
13      A.   I want to clarify what kind
14  of company is TTP so that I will be able
15  to answer your question.
16      Q.   Okay. We have a problem.
17      Do you understand that you
18  were asked to come and give testimony for
19  two companies today, Mr. Jia?
20      A.   Yes.
21      Q.   What two companies?
22      A.   Tai'an Taishan Gypsum
23  Company Limited.
24      INTERPRETER 1: The

Page 117

1  interpreter cannot guarantee the
2  accuracy of these formal names,
3  and I would ask you for help. Was
4  that correct?
5      MR. SEEGER: Are you going
6  to interpret what he said? Okay.
7      INTERPRETER 2: The witness
8  said yes, I understand. I come to
9  testify for TG Shareholding
10  Company Limited and TTP Company
11  Limited.
12  BY MR. SEEGER:
13      Q.   What do the letters TTP
14  stand for in the second company that
15  you're testifying for, Mr. Jia?
16      MR. CYR: Are you finished?
17      INTERPRETER 1: Yes.
18      MR. CYR: Objection on the
19  grounds that it assumes that
20  somehow when you translate it into
21  Chinese that it would necessarily
22  makes sense that it's TTP. That
23  might not be true. To try to
24  advance things, though, I do

Page 118

1    believe that Mr. Jia is familiar
2    with the reference TTP that we use
3    in English to refer to Tai'an, the
4    plasterboard company.
5        You can mark the transcript
6    if you'd like.
7        MR. SEEGER:  No, no.
8    Actually, that was helpful.  I'm
9    trying to move this along.
10       MR. CYR:  The others were
11   intended to be helpful to you.
12       MR. MONTOYA:  Can she
13   translate that?
14       MR. SEEGER:  Can we get her
15   to translate that?
16       MR. CYR:  Sure.  He knows
17   what TTP is.
18       MR. SEEGER:  Okay.
19   BY MR. SEEGER:
20       Q.  Mr. Jia, what do you
21   understand TTP to be?
22       A.  Tai'an Taishan
23   Plasterboard -- let me see.
24       Q.  Let's ask him this.

Page 119

1        (Discussion in Chinese.)
2        MR. CHEN:  She's asking me
3    to clarify.
4        MR. CYR:  May I make --
5        INTERPRETER 1:  Company
6    Limited.
7        MR. SEEGER:  Let me tell you
8    what my problem is.  If I don't
9    get from his lips, you know, the
10   companies he's here for, you know,
11   we can all speculate.  I just need
12   him to say that he understands TTP
13   is Tai'an Taishan Plasterboard.
14   If you guys want to coach him on
15   that particular point so we can
16   move on and --
17       INTERPRETER 1:  Okay.  Let
18   me try again.
19       INTERPRETER 2:  The witness
20   did say that.
21       MR. CYR:  Excuse me, ma'am,
22   could you just wait for us.
23       Yes.
24       MR. SEEGER:  We'll just

Page 120

1    stipulate that TTP is Tai'an
2    Taishan Plasterboard?  Are you
3    okay with that?
4        MR. CHEN:  He already
5    answered that.  It was just a
6    matter of translation.
7        MR. CYR:  I understand that.
8    Okay.
9        INTERPRETER 1:  I will try
10   again.
11       MR. SEEGER:  No.  We got it.
12   We resolved it.  You don't have to
13   worry about it.  We took care of
14   it.
15   BY MR. SEEGER:
16       Q.  Just ask Mr. Jia if he's
17   comfortable if I use the letters TTP for
18   the second company he's testifying for?
19       A.  I understand.
20       Q.  Thank you.
21       Do you hold a title or
22   position with TTP, Mr. Jia?
23       A.  I don't understand.  What
24   does it mean by the title?

Page 121

1        Q.  Do you have any involvement
2    with the company TTP?
3        A.  Involvement?  I am not sure
4    about this concept.
5        Q.  Do you work for TTP?
6        A.  I am leading all the work of
7    TTP.  TTP has its own people for
8    management and also for the organization.
9        MR. CYR:  We have an
10   objection.
11       INTERPRETER 2:  The witness
12   stated, I'm leading TG.  TTP has
13   its own management.
14       INTERPRETER 1:  Management
15   people and also for the
16   organization.
17   BY MR. SEEGER:
18       Q.  Mr. Jia, why are you a
19   corporate representative today for TTP if
20   you hold no position or title with TTP?
21       A.  I have no position at TTP.
22       Q.  So, are you the best person
23   to give testimony regarding the business
24   of -- I'm sorry, strike that.

Page 122

1    Are you the best person to
2  give testimony regarding the business of
3  TTP?
4    A.   Once again, there would be
5  people testifying on behalf of TTP
6  regarding its operation and situation.
7    Q.   So, I just want to be clear.
8  Are you the best person for us to talk to
9  about TTP and its business practices?
10    A.   Some things regarding TTP
11  that I know, I'm willing to satisfy your
12  need here now.
13    Q.   Tell us what those things
14  are about TTP that you're the best person
15  to talk to.
16    A.   For example, the objective
17  for the establishment of this company,
18  that would be more appropriate.
19    Q.   For Mr. Jia?
20    A.   Yes.
21    Q.   Any other topics about TTP
22  that would be more appropriate for you?
23    A.   I cannot be sure what would
24  be better.

Page 123

1    Q.   So, with regard to the
2  information of TTP regarding its
3  objective of the company, why is it that
4  you're the best person to talk to on that
5  topic? How do you know that?
6    A.   Because I, myself, have
7  personally organized people from the
8  company to talk about this topic.
9    Q.   I'm sorry?
10    A.   I personally organize people
11  in the company to talk about this topic,
12  organize.
13    Q.   Do you have personal
14  knowledge on that topic regarding TTP,
15  about the objective for establishing the
16  company?
17    A.   Yes.
18    Q.   And why is that?
19    A.   TG is a company that
20  utilized the industrial waste by-products
21  to produce plasterboard so it can enjoy
22  the value-added tax, VAT.
23    Q.   Oh, VAT, value-added tax.
24    What is the relationship

Page 124

1  between TG and TTP specifically?
2    A.   Investor and being the
3  invested.
4    Q.   Who is the investor and who
5  is the invested?
6    A.   TG is the investor, and TTP
7  is the one being invested.
8    Q.   And do you personally hold
9  any position at TTP?
10    A.   I did answer. I have no
11  position.
12    Q.   So, who would be the best
13  person to talk about --
14    Regarding TTP, who would be
15  the best person to talk to regarding
16  dealings between TTP and, let's say, you
17  know, Morgan Stanley or J.P. Morgan?
18    MR. CYR:  Objection on the
19  grounds that the question
20  improperly assumes that there were
21  dealings with Morgan Stanley and
22  J.P. Morgan.
23    Please answer the question,
24  Mr. Jia.

Page 125

1    THE WITNESS:  I did not
2  understand your question.
3  BY MR. SEEGER:
4    Q.   We were told, Mr. Jia, that
5  you were here to speak on three topics
6  involving TTP.
7    MR. SEEGER:  (Addressing the
8  interpreter.)
9    Could you just tell him
10  that, and then I'll tell him what
11  the three topics are.
12  BY MR. SEEGER:
13    Q.   Okay. The three topics were
14  the purpose and function of related
15  entities or other entities with employees
16  in the United States.
17    MR. SEEGER:  (Addressing the
18  interpreter.)
19    Could you do your best to
20  repeat that.
21    INTERPRETER 1:  Why don't
22  you do one at a time.
23    COURT REPORTER:  It's right
24  here on the screen. Just read it

Page 126

1  from the screen.
2      - - -
3      (Whereupon, the follow
4  portion of the transcript was read
5  by the court reporter:
6      "Q:   The three topics were
7  the purpose and function of
8  related entities or other entities
9  with employees in the United
10  States.")
11      - - -
12      THE WITNESS: Can you repeat
13  the question?
14  BY MR. SEEGER:
15      Q.  Let me try to do this
16  quickly so we can get us out of here for
17  lunch.
18      There were three topics that
19  Mr. Jia was supposed to testify about
20  regarding TTP.
21      MR. SEEGER: (Addressing the
22  interpreter.)
23      Give him that so far.
24  BY MR. SEEGER:

Page 127

1      Q.  The first topic was TTP and
2  any companies related to TTP with
3  employees in the United States. That's
4  topic 1. My question is, are you the
5  best person to talk about, to testify
6  with regard to that topic?
7      A.  Yes.
8      Q.  Okay. And then with regard
9  to the second topic is whatever
10  proprietary interests, government
11  ownership or any commercial relationship
12  between TTP and its related companies and
13  the People's Republic of China. Are you
14  the best person to testify on that topic?
15      A.  I can answer a part of it,
16  but regarding whether I'm the best person
17  or not, I cannot be sure.
18      MR. CHEN: He said, I might
19  be the best person.
20      INTERPRETER 1: I might be
21  the best person. I am not sure,
22  but I might be.
23  BY MR. SEEGER:
24      Q.  The third and last topic

Page 128

1  you're here to testify about on TTP is
2  dealings, whether they exist or not, with
3  Morgan Stanley and J.P. Morgan. Are you
4  the best person to testify on that topic?
5      A.  It should be the case.
6      Q.  I want to be clear. So, ask
7  him this.
8      Mr. Jia, it should be the
9  case that you are the best person to
10  testify on that topic?
11      A.  Regarding this topic, I
12  should -- I should know about it. But
13  whether I am the best or not, that I am
14  not sure.
15      Q.  Just one more question and
16  we can take a lunch break.
17      How is it that --
18      On the three topics we just
19  talked about, is it that you are
20  competent to testify on those subjects or
21  capable of testifying on those subjects?
22      A.  Okay. I am the chairman of
23  TG, of the board of TG, and TTP is the
24  subsidiary of TG and is 100 percent owned

Page 129

1  by TG. So, a lot of the important
2  matters and a lot of things that I know.
3      Q.  Just a last question.
4      Mr. Jia, do you speak any
5  English at all?
6      A.  No. I never learn.
7      MR. SEEGER: We can take a
8  lunch break.
9      THE VIDEOTAPE TECHNICIAN:
10  The time now is approximately --
11      MR. CYR: What time do we
12  come back?
13      MR. SEEGER: Hold on. Let's
14  just stay on for a second.
15      What do you want to do? Do
16  you want to do an hour?
17      MR. CYR: Is an hour
18  sufficient?
19      MR. SEEGER: Look,
20  whatever -- I apologize for going
21  over 11:30. I didn't understand
22  all the issues.
23      MR. CYR: Two issues. One
24  is to do whatever is appropriate

Page 190

1  called Taihe.  And originally there is a
2  Taihe Dongxin -- originally they have --
3  there is a Taihe Dongxin, but later on
4  they deleted the word "Dongxin."
5      Q.   Do you know, Mr. Jia, if
6  BNBM marketed itself at any point as part
7  of the Taihe Group?
8      A.   It has never been the case.
9      Q.   Do BNBM and TG share any
10  production lines or facilities?
11      A.   Please repeat it.
12      MR. SEEGER:  (Addressing the
13  interpreter.)
14      Well, you can go ahead.  I
15  think that related more to you.
16  I'm off the hook on that one.
17      (Interpreter repeats
18  question.)
19      THE WITNESS:  No.
20  BY MR. SEEGER:
21      Q.   At any time, to your
22  knowledge, did BNBM and TG ever share any
23  employees?
24      A.   No.

Page 191

1      Q.   To your knowledge, have
2  there been any loans or other financial
3  arrangements between BNBM and TG?
4      A.   No loan.
5      MR. SEEGER:  Excuse me?
6      INTERPRETER 1:  No loan.
7  BY MR. SEEGER:
8      Q.   I'm not sure I understand
9  the answer.
10      Are there any other
11  financial arrangements other than loans
12  between BNBM and TG?
13      A.   Financial arrangement, if
14  you translated it directly, I don't
15  understand.
16      Q.   Do BNBM -- I'm sorry, strike
17  it.
18      Does BNBM guarantee loan
19  obligations to banks on behalf of TG?
20      A.   Yes.
21      Q.   Has BNBM loaned money to TG?
22      A.   No.
23      MR. SEEGER:  I'm sorry, what
24  was the answer?

Page 192

1      INTERPRETER 1:  No.
2      MR. SEEGER:  Excuse me.
3  BY MR. SEEGER:
4      Q.   Does TG guarantee loan
5  obligations to any banks for TTP?
6      A.   No.
7      Q.   Does TG loan money to TTP?
8      A.   I did answer before, no.
9      Q.   Does TG continue to invest
10  money in TTP?
11      A.   No.
12      Q.   Does BNBM invest money --
13  continue to -- let me strike that.
14      Does BNBM invest money in
15  TG?
16      A.   I don't understand the
17  question.
18      Q.   Okay.
19      For any point in time, has
20  BNBM invested money in TG?
21      A.   It did buy shares from TG.
22      Q.   Was that the extent of its
23  investment?
24      INTERPRETER 2:  The check

Page 193

1  interpreter believes the
2  interpretation should be zhe shi
3  fou ni men de, tou zi, tg sou you
4  de tou zi.
5      INTERPRETER 1:  What the
6  check interpreter was interpreting
7  was that all of the investment to
8  TG.  I thought it was not the
9  question.  I disagree with the
10  check interpreter.
11      MR. SEEGER:  The question
12  that I asked -- you understood --
13  I don't even remember what the --
14      - - -
15      (Whereupon, the requested
16  portion of the transcript was read
17  by the court reporter as follows:
18      "Q.  For any point in time,
19  has BNBM invested money in TG?
20      A.  It did buy shares from
21  TG.
22      Q.  Was that the extent of
23  its investment?")
24      - - -

49 (Pages 190 to 193)

Page 194

1    MR. CHEN: My issue was the
2  translation of that last question.
3    MR. SEEGER: Okay. Okay.
4  So ask that question again.
5  Let me just see what the -- you
6  guys listen in. Okay? Ask the
7  same question.
8    - - -
9    (Wheretupon, the requested
10  portion of the transcript was read
11  by the court reporter as follows:
12    Q.  Was that the extent of
13    its investment?")
14    - - -
15    THE WITNESS: I don't
16  understand what you want me to
17  answer.
18  BY MR. SEEGER:
19    Q.  Other than purchasing the
20  shares, did BNBM invest any other money
21  in TG? Did it provide it with money in
22  any other way?
23    A.  No.
24    Q.  And I'm going to reask the

Page 195

1  question, because I think when I did ask
2  it, I didn't do a good job.
3    MR. CYR: As you can see, I
4    don't have problems with you
5    asking the same question more than
6    once, because we do have some
7    uncertainties with respect to the
8    language.
9    MR. SEEGER: And I'm
10    definitely signaling, I think I
11    asked it, but I'm not sure I asked
12    it the right way.
13  BY MR. SEEGER:
14    Q.  At any point in time, has TG
15  loaned money to TTP? At any point in
16  time?
17    A.  No.
18    Q.  I'm going to ask another
19  series of questions.
20    Are there any employees,
21  including shareholders, officers or
22  directors of TG, that are paid or
23  compensated by BNBM?
24    A.  No.

Page 196

1    Q.  Are there any employees,
2  shareholders, officers or directors of
3  TTP that are paid or compensated in any
4  way by TG?
5    A.  Please repeat it.
6    (The interpreter repeats the
7  question.)
8    No.
9    Q.  All right.
10    Do BNBM and TG share any
11  plants, factories or production lines?
12    A.  No.
13    Q.  Do BNBM and TG share any
14  operations together at all?
15    A.  Can you give me the
16  definition of the word "operation"?
17    Q.  Factory operations for the
18  production of plasterboard, let's say.
19    A.  No.
20    Q.  Do they share --
21    Does BNBM and TG share any
22  mining operations or mines from which
23  gypsum is mined?
24    A.  What mine?

Page 197

1    Q.  You tell me. That's my
2  question. I'm asking if BNBM and TG
3  share the same mines for mining gypsum.
4    A.  No.
5    Q.  Do BNBM and TG share any of
6  the same product lines? Do they make the
7  same products?
8    A.  No.
9    MR. CHEN: Let me just
10    clarify. The question translated
11    referred to production lines, not
12    product lines.
13    MR. SEEGER: Production
14    lines, not what?
15    MR. CHEN: Not product
16    lines.
17    MR. SEEGER: Oh, I was
18    asking about products, specific
19    products.
20  BY MR. SEEGER:
21    Q.  Do they sell --
22    Do they make and sell
23  similar products?
24    A.  I don't understand.

1  MR. CHEN: One moment. Just
2  the term "fangshi" I think means
3  more of a way or a pattern. Fang
4  shi is more a formula, as in a
5  mathematical formula.
6      MR. SEEGER:  Which one are
7  you using?
8      MR. CHEN:  You were using
9  way or pattern.
10     INTERPRETER 1:  No, no. I
11 did use formula. I did write it
12 down here even, sir. Formula, I
13 did translate formula as formula
14 in Chinese.
15     But when he responded, he
16 said fangshi. That's the method
17 or the way, fangshi.
18     MR. CHEN:  So, his response
19 was referring to the method or
20 pattern, not necessarily a
21 mathematical formula.
22     MR. SEEGER:  Okay.
23     INTERPRETER 1:  But I did
24 ask him the word "formula."

1  best to describe that cooperation or
2  joint venture between the two?
3      A.   Okay.  After BNBM procured
4  the shares from TG, according to my
5  understanding, that forms a relationship
6  of a joint venture.  And I was a
7  shareholder of TG before.  And even
8  earlier, I was a shareholder of BM.
9  According to my understanding, it become
10 a joint venture.
11     MR. CYR:  Is that accurate?
12     INTERPRETER 2:  The check
13 interpreter believes that after
14 BNBM purchased TG's shares, my
15 understanding is that it is a
16 cooperation relationship.  And I
17 was TG shareholder.  And before
18 that, I was BNBM shareholder.  So,
19 to me, it's like a joint venture.
20     INTERPRETER 1:  But he used
21 the joint venture in both times,
22 he zi instead of he zuo.  He zi is
23 cooperation.  I have he zuo both
24 times, so I disagree with the

1  BY MR. SEEGER:
2      Q.   Mr. Jia, in answering a
3  couple of these questions, you referred
4  to the relationship between TG and BNBM
5  once as cooperative and another time as a
6  joint venture. Can you explain what you
7  mean by that?
8      A.   Okay. Let me say, to me,
9  cooperation and joint venture is the same
10 concept.
11     Q.   Okay.
12         And I'm asking you if you
13 could elaborate on what you mean by a
14 joint venture between TG and BNBM.
15     A.   Okay. After the procurement
16 of the shares of TG by BNBM, that
17 relationship, I call it a joint venture
18 or cooperation.
19     Q.   Can you explain --
20         When you use the words
21 "cooperation" or "joint venture,"
22 whatever you're more comfortable with,
23 could you give me examples of the
24 relationship between BNBM and TG as a way

1  check interpreter.
2      MR. CYR:  When it's
3  convenient for you, I think it's
4  time for a break.
5      MR. SEEGER:  Can I go five
6  more minutes?
7      MR. CYR:  Yes.
8  BY MR. SEEGER:
9      Q.   Mr. Jia, do you own any
10 shares or stock in TG?
11     A.   I have shares.
12     Q.   Can you tell me what
13 percentage of the outstanding shares he
14 owns?
15     MR. PANAYOTOPOULOS:
16 Objection to the form.
17     MR. SEEGER:  You're right.
18 Let me rephrase it. Okay? Let me
19 ask the question again.
20 BY MR. SEEGER:
21     Q.   Mr. Jia, what percentage of
22 the outstanding shares of TG do you own?
23     A.   5 percent.
24     Q.   What percentage of the

1    Q.   Now, in Exhibit 2, which is
2  a document that you acknowledge could be
3  dated, you know, could be back from the
4  time when the company had a different
5  name, which was Shandong Taihe Dongxin,
6  do you find the same language I just read
7  to you as Exhibit 9?
8        INTERPRETER 1:  Counsel, I
9       don't understand what you mean by
10      "find the same language."
11 BY MR. SEEGER:
12   Q.   Exhibit 2, do you see
13 exactly --
14       The identical language that
15 we read in Exhibit 9 with regard to
16 marketing and selling in the U.S., don't
17 you see the identical language in Exhibit
18 2?
19       MR. CYR:  I know you didn't
20      intend to.  I'm just going to
21      object in that I'm not sure that
22      the words here are consistent with
23      your phrase "marketing and selling
24      in the U.S."  There's no -- I have

1   no need for the interpreter to
2   interpret what I just said except
3   for to say that, Mr. Jia, you can
4   try to answer the question.
5        MR. SEEGER:  Okay.
6        Would you also tell him that
7   he should feel free to put Exhibit
8   9 and Exhibit 2 in front of him,
9   and he can check the language in
10  both if he'd like.
11       MR. CYR:  I say this
12  respectfully in the interest of
13  advancing time, but the documents
14  do speak for themselves.  And
15  having him give his opinion about
16  whether or not it is the same
17  language, I'm just questioning
18  whether that's the best use of our
19  time.
20       MR. SEEGER:  Well, since
21  it's my time --
22       MR. CYR:  It's your time.
23       THE WITNESS:  I am finished
24  looking at it.

1  BY MR. SEEGER:
2     Q.   It's pretty much the same
3  language in both documents, correct,
4  regarding exporting drywall to the U.S.?
5     A.   Yes.
6     Q.   Actually, there's one other
7  part of this, Mr. Jia, I want to ask you
8  about.  I'm sorry.
9        Again, I'm showing you
10 what's been marked as Exhibit 2.  Could
11 you please take a look at -- and I have
12 no problem if your team wants to help him
13 with this.  In English, the paragraph
14 starts with, "It is abundant in raw
15 gypsum resources."  The Chinese portion,
16 if you can point out to him.
17       MR. CYR:  So, right now
18      we're asking Mr. Jia to read --
19      excuse me, ma'am.
20       Right now we're asking Mr.
21      Jia to read this paragraph to
22      prepare for the next question.
23       (Mr. Chen translated to the
24      witness.)

1        MR. CYR:  He doesn't seem to
2  understand.
3        MR. CHEN:  You asked him to
4  read, right, to prepare for the
5  next question?
6        MR. CYR:  Yes.
7        Why is she talking with him?
8        MR. CHEN:  I don't know.
9        MR. SEEGER:  They gave him
10 the instruction.  It's okay.
11       INTERPRETER 1:  He wants to
12 clarify.  Does that mean just look
13 at it or to read it out, say it
14 out loud?
15       MR. SEEGER:  You tell him to
16 read it.  He doesn't understand.
17       THE WITNESS:  I finished
18 reading it.
19 BY MR. SEEGER:
20    Q.   Mr. Jia, in that paragraph,
21 in the English version, it says, and, you
22 know, I'm just -- there's a small part at
23 the end, but I have to read it to put it
24 into a context.  "It is abundant in raw

Page 234

1  gypsum resources, the products 'Taishan'
2  series plasterboard can be used as
3  partition and ceiling material...have
4  advantages: Fire-proof, sound
5  insulation, heat preservation,
6  quakeproof, and good for health."
7        And could you tell me where
8  your company -- what your company means
9  by the drywall being "good for health"
10 and why that was used here, if you can?
11       MR. CYR:  Before you get to
12 that, are you done?
13       INTERPRETER 1:  Yes.
14       MR. CYR:  I guess I have an
15 objection based on it seems like
16 it's outside the scope of the
17 designated areas for the
18 deposition.
19       MR. SEEGER:  It is a
20 statement made by the company.
21 That's my one question on this
22 document.
23       Did you have another issue?
24       MR. CYR:  Well, let's not

Page 235

1  skirt over my issue so quickly.
2        MR. SEEGER:  I don't think
3  you can stop him from answering
4  that, and rather than argue with
5  you, I figured I'd just --
6        MR. CYR:  What I was going
7  to suggest is that I just wanted
8  to make sure that it didn't become
9  a habit.  It's clearly outside the
10 scope of this deposition.  I have
11 no problems with his answering
12 this question.
13       MR. SEEGER:  Okay.
14       MR. CYR:  But generally, we
15 would like to stay on the
16 jurisdictional issues and the
17 other issues of the designated
18 areas that you've been covering
19 all day.
20       Go ahead.
21       MR. CHEN:  I'll also note
22 that the interpreter was
23 translating from your statement
24 rather than referring to the

Page 236

1  actual text here, referenced here.
2        MR. SEEGER:  So --
3        MR. CYR:  We didn't mean to
4  slow you down.  Go ahead.
5        MR. SEEGER:  No, that's
6  actually -- I just don't
7  understand.
8        When I was reading it, was
9  she reading it to him?
10       MR. CHEN:  No.  Just now
11 when you asked the question, she
12 did a verbatim translation rather
13 than referring to what is written
14 in the Chinese.
15       MR. SEEGER:  Okay.  Because
16 I was reading the English portion
17 into the record.  Okay.  So,
18 that's okay.  We'll fix it.  That
19 was my fault.
20       MR. GRAND:  Just to your
21 statement, your objection, the
22 witness has been designated to
23 testify about marketing plans for
24 Taishan Gypsum.  This is a

Page 237

1  statement in a marketing document.
2  It contains marketing statements
3  about its exports to the U.S.  So,
4  we don't believe it's -- I
5  appreciate that we're not -- I
6  appreciate your position about it
7  being outside the scope, but we
8  think it's fair balance within a
9  statement that he has given.
10       MR. CYR:  We disagree, but
11 I'm allowing the witness to answer
12 the question.
13 BY MR. SEEGER:
14       Q.  Okay.
15       So, here's where we are.  I
16 read into the record, Mr. Jia, the part
17 in English.  You've already looked at the
18 part in Chinese.  There's a statement in
19 there about plasterboard being good for
20 the health, and I'm asking you if you
21 have any understanding of why that
22 statement's in there and what the company
23 meant by it?
24       MR. CHEN:  I'm going to

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                          § MDL NO. 2047
CHINESE-                        §
MANUFACTURED                    § SECTION: L
DRYWALL PRODUCTS                §
LIABILITY                       § JUDGE FALLON
LITIGATION                      §
                                § MAGISTRATE
                                § JUDGE WILKINSON

- - -

CROSS NOTICED IN VARIOUS OTHER ACTIONS

- - -

April 5, 2011

- - -

CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

- - -

Videotaped deposition of TONGCHUN
JIA, held at 3 Pedder Street, Central,
Hong Kong, China, commencing at 9:03
a.m., on the above date, before Linda L.
Golkow, Certified Court Reporter,
Registered Diplomate Reporter, Certified
Realtime Reporter and Notary Public.

- - -

GOLKOW TECHNOLOGIES, INC.
ph 877.370.3377 | fax 917.591.5672
deps@golkow.com

## Page 271

```
1   APPEARANCES:
2
3   SEEGER WEISS LLP
    BY: CHRISTOPHER A. SEEGER, ESQUIRE
4   BY: JEFFREY S. GRAND, ESQUIRE
    One William Street
5   New York, New York 10004
    (212) 584-0700
6   cseeger@seegerweiss.com
    jgrand@seegerweiss.com
7   Representing the Plaintiffs' Steering
    Committee
8
9
    COLSON HICKS EIDSON
10  BY: PATRICK S. MONTOYA, ESQUIRE
    255 Alhambra Circle
11  Penthouse
    Coral Gables, Florida 33134
12  (305) 476-7400
    patrick@colson.com
13  Representing Plaintiffs' Steering
    Committee in the Federal and State
14  Coordinated Actions
15
16  LAW OFFICES OF RICHARD SERPE, P.C.
    BY: RICHARD J. SERPE, ESQUIRE
17  580 East Main Street
    Suite 310
18  Norfolk, Virginia 23510
    (757) 233-0009
19  rserpe@serpefirm.com
    Representing the MDL Plaintiffs and
20  the Germano Plaintiffs
21
22
23       - - -
24
```

## Page 273

```
1   APPEARANCES (CONTINUED):
2
3   GREENBERG TRAURIG, LLP
    BY: HILARIE BASS, ESQUIRE
4   1221 Brickell Avenue
    Miami, Florida 33131
5   (305) 579-0745
    bassh@gtlaw.com
6   Representing the Home Builders
    Steering Committee
7
8
    GALLOWAY JOHNSON TOMPKINS BURR and
9   SMITH
    BY: CARLINA C. EISELEN, ESQUIRE
10  One Shell Square
    701 Poydras Street, 40th Floor
11  New Orleans, Louisiana 70139
    (504) 525-6802
12  ceiselen@gjtbs.com
    Representing Interior/Exterior
13  Building Supply
14
15  PERKINS COIE LLP
    BY: DAVID L. BLACK, ESQUIRE
16  1899 Wynkoop Street - Suite 700
    Denver, Colorado 80202
17  (303) 291-2300
    DBlack@perkinscoie.com
18  Representing the State of Louisiana
19
20  WEINBERG, WHEELER, HUDGINS, GUNN &
    DIAL, LLC
21  BY: NICHOLAS P. PANAYOTOPOULOS, ESQ.
    3344 Peachtree Road, NE
22  Suite 2400
    Atlanta, Georgia 30326
23  (404) 876-2700
    npanayo@wwhgd.com
24  Representing Various Banner
```

## Page 272

```
1   APPEARANCES (CONTINUED):
2
3   HOGAN LOVELLS US LLP
    BY: JOE CYR, ESQUIRE
4   BY: FRANK T. SPANO, ESQUIRE
    BY: ERIC D. STATMAN, ESQUIRE
5   BY: RENEE GARCIA, ESQUIRE
    875 Third Avenue
6   New York, New York 10022
    (212) 918-3000
7   joe.cyr@hoganlovells.com
    frank.spano@hoganlovells.com
8   renee.garcia@hoganlovells.com
    eric.statman@hoganlovells.com
    Representing Taishan Gypsum Co.
9   Ltd. and Tai'an Taishan
10  Plasterboard Company Ltd. and the
    Witness, Tongchun Jia
11
12
    HOGAN LOVELLS INTERNATIONAL LLP
13  BY: EUGENE CHEN, ESQUIRE
    18th Floor, Park Place
14  1601 Nanjing Road West
    Shanghai, China 200040
15  (86 21) 6122 3800
    eugene.chen@hoganlovells.com
16  Representing Taishan Gypsum Co.
    Ltd. and Tai'an Taishan
17  Plasterboard Company Ltd. and the
    Witness, Tongchun Jia
18
19
    JIGTIAN & GONGCHENG
20  BY: CHUNGANG DONG, ESQUIRE
    34/F, Tower 3, China Central Place
21  77 Jianguo Road - Chaoyang District
    Beijing, China 200040
22  (86 10) 5809 1016
    Representing Taishan Gypsum Company
23  Limited and Tai'an Taishan
    Plasterboard Company
24
```

## Page 274

```
1   APPEARANCES (CONTINUED):
2
3   BRENNER, EVANS & MILLMAN, P.C.
    BY: THEODORE I. BRENNER, ESQUIRE
4   411 East Franklin Street
    Suite 200
5   Richmond, Virginia 23218
    (804) 644-1300
6   Representing Tobin Trading Company
7
8   McKENRY, DANCIGERS, DAWSON &
    LAKE, P.C.
9   BY: J. BRIAN SLAUGHTER, ESQUIRE
    192 Ballard Court - Suite 400
10  Virginia Beach, Virginia 23462
    (757) 461-2500
11  Jbslaughter@va-law.org
    Representing Atlantic Homes LLC and
12  Multiple Other Virginia-Based
    Defendants
13
14
    SHER GARNER CAHILL RICHTER KLEIN &
15  HILBERT, L.L.C.
    BY: MATTHEW C. CLARK, ESQUIRE
16  909 Poydras Street - Suite 2800
    New Orleans, Louisiana 70112
17  (504) 299-2100
    mclark@shergarner.com
18  Representing the Southern Home
    Defendants
19
20
    SINNOTT, NUCKOLS & LOGAN, PC
21  BY: KENNETH F. HARDT, ESQUIRE
    13811 Village Mill Drive
22  Midlothian, Virginia 23114
    (804) 378-7600
23  khardt@snllaw.com
    Representing Venture Supply, Inc. and
24  Porter-Blaine Corp.
```

2  (Pages 271 to 274)

Page 275

1  APPEARANCES VIA TELEPHONE:
2
3  KUCHLER POLK SCHELL WEINER &
   RICHESON LLC
4  BY: FRANCIS X. deBLANC, III,
   1615 Poydras Street
5  Suite 1300
   New Orleans, Louisiana 70112
6  (504) 592-0691
   slauricella@kuchlerpolk.com
7  Representing Creola Ace Hardware and
   Thomas Gould Inc. in the MDL
8
9  HUNTON & WILLIAMS LLP
10 BY: A. TODD BROWN, ESQUIRE
   Bank of America Plaza
11 101 South Tryon Street
   Suite 3500
12 Charlotte, North Carolina 28280
   (704) 378-4700
13 Representing Stock Building Supply,
   LLC
14
15 JONES, WALKER, WAECHTER, POITEVENT,
   CARRERE & DENEGRE LLP
16 BY: MEGAN E. DONOHUE, ESQUIRE
   600 Jefferson Street, Suite 1600
17 Lafayette, Louisiana 70501
   (337) 262-9062
18 mdonohue@joneswalker.com
19 Representing Fireman's Fund Insurance
   Company
20
21
22
23
24

Page 276

1  APPEARANCES VIA TELEPHONE (CONTINUED):
2
3  DUPLASS ZWAIN BOURGEOIS PFISTER &
   WEINSTOCK
4  BY: PHILIP WATSON, ESQUIRE
   3838 N. Causeway Boulevard
5  Suite 2900
   Metairie, Louisiana 70002
6  (504) 832-3700
   pwatson@duplass.com
7  Representing R&H Masonry, Inc., and
   Swedberg Enterprises, Inc.
8
9  RUMBERGER, KIRK & CALDWELL, P.A.
10 BY: ABIGAIL ROBERTS, ESQUIRE
   Brickell Bayview Centre, Suite 3000
11 80 Southwest 8th Street
   Miami, Florida 33130
12 (305) 358-5577
   aroberts@rumberger.com
13 Representing Defendants' Liaison
   Counsel for Installers
14
15
16 HAYNSWORTH SINKLER BOYD, P.A.
   BY: CHRISTOPHER B. MAJOR, ESQUIRE
   75 Beattie Place - 11th Floor
17 Greenville, South Carolina 29601
   (864) 240-3200
18 cmajor@hsblawfirm.com
   Representing USG Corporation and L&W
19 Supply Corporation
20
21 PHELPS DUNBAR LLP
   BY: MITCHELL P. HASENKAMPF, ESQUIRE
22 Canal Place
   365 Canal Street, Suite 2000
23 New Orleans, Louisiana 70130-6534
   (504) 584-9249
24 mitchell.hasenkampf@phelps.com

Page 277

1  APPEARANCES VIA TELEPHONE (CONTINUED):
2
3  FULMER LEROY ALBEE BAUMANN
   BY: MICHAEL P. MCCAHILL, ESQUIRE
4  2866 East Oakland Park Boulevard
   Ft. Lauderdale, Florida 33306
5  (954) 707-4430
6  mmccahill@fulmerleroy.com
   Representing Independent Builders
7  Supply Association (IBSA)
8
9  THOMPSON COE COUSINS & IRONS, L.L.P.
   BY: SUZANNE M. PATRICK, ESQUIRE
10 One Riverway, Suite 1600
   Houston, Texas 77056
11 (713) 403-8210
   spatrick@thompsoncoe.com
12 Representing The North River
   Insurance Company
13
14
15 BERNARD, CASSISA, ELLIOTT & DAVIS,
   APLC
16 BY: CAROLINE E. ELLIOTT, ESQUIRE
   1615 Metairie Road
17 Metairie, Louisiana 70005
   (504) 834-2612
18 elliottc@bernard-cassisa.com
   Representing Phillips Abita Lumber
19 Company, Inc.
20
21
22
23
24

Page 278

1  APPEARANCES VIA STREAM:
2
3  BECNEL LAW FIRM, L.L.C.
   BY: ROBERT BECNEL, ESQUIRE
4  106 W. 7th Street
   Reserve, Louisiana 70084
5  (985) 536-1186
   robbecnel@aol.com
6  Representing the Plaintiffs'
   Steering Committee
7
8
9  QUINN EMANUEL URQUHART & SULLIVAN,
   LLP
10 BY: CLINTON DOCKERY
   51 Madison Avenue, 22nd Floor
11 New York, New York 10010
   (212) 849-7000
12 clintondockery@quinnemanuel.com
   Representing Chartis Select Insurance
13 Company and Related Chartis Insurers
14
15 JONES, WALKER, WAECHTER, POITEVENT,
   CARRERE & DENEGRE LLP
16 BY: MEGAN E. DONOHUE, ESQUIRE
   600 Jefferson Street, Suite 1600
17 Lafayette, Louisiana 70501
   (337) 262-9062
18 mdonohue@joneswalker.com
   Representing Fireman's Fund Insurance
19 Company
20
21
22
23
24

Page 303

1    INTERPRETER 1: I did at the
2  very beginning. I do it upside
3  down.
4    MR. CHEN: At the very
5  beginning, you said at any time,
6  and that's not what Mr. Seeger's
7  comment was.
8    INTERPRETER 1: No. He was
9  saying at any time --
10   MR. SEEGER: At the time it
11  was printed.
12   INTERPRETER 1: So I put it
13  at the beginning, so it's the
14  same.
15   MR. CHEN: You said --
16   MR. SEEGER: I can't really
17  have the interpreter fighting with
18  people. If she says she said
19  it --
20   INTERPRETER 1: I said it.
21   MR. SEEGER: Please ask the
22  witness to answer.
23   INTERPRETER 1: At the time
24  it was written.

Page 304

1    THE WITNESS: Can you repeat
2  the question.
3    MR. SEEGER: That's the
4  problem with all the
5  interruptions. And for the
6  record, it's not any fault of
7  yours, I'm not accusing you, but
8  it's a difficulty in getting this
9  done. But we've got a lot of
10  people here jumping in. So please
11  do it one more time. Repeat the
12  question with that thing that I
13  said about it's true at the time.
14    (Interpreter repeats
15  question.)
16    THE WITNESS: Well, this is
17  the way I'll put it. I consider
18  this statement reflects the true
19  sentiment of Taihe. I made a
20  mistake. I myself made a mistake
21  with the name.
22    INTERPRETER 1: He's saying
23  that.
24  BY MR. SEEGER:

Page 305

1    Q.   You made a mistake. Tell
2  him to clarify.
3    A.   I made a mistake with the
4  name.
5    Q.   Mr. Jia, clarify what you
6  mean. I don't know what you mean by you
7  made a mistake with the name.
8    A.   When I say "Taihe," I made a
9  mistake with this Taihe. I made a
10  mistake with the name.
11    Q.   What did he mean to say?
12    A.   Let me repeat it again. Let
13  me do it again.
14      With drywall, if for sure it
15  is exported, then it is moving forward
16  towards the world. It is how we consider
17  this. Our experience tells us that some
18  of our products has already been outside
19  of China. Therefore, we consider that we
20  have already moved forward to the world.
21    Q.   Okay. And if you could, Mr.
22  Jia, if you would take a look at the
23  exhibit -- do you need a break?
24    A.   Yes. I want to take a

Page 306

1  break.
2    THE VIDEOTAPE TECHNICIAN:
3  The time now is approximately 9:42
4  a.m., and we are now off the
5  record.
6      - - -
7    (Whereupon, a recess was
8  taken from 9:42 a.m. until
9  9:57 a.m.)
10      - - -
11    THE VIDEOTAPE TECHNICIAN:
12  This begins Tape 2 of today's
13  portion of our deposition. The
14  time now is approximately 9:57
15  a.m., and we're back on the
16  record.
17    MR. SEEGER: Let me just
18  state for the record, Mr. Cyr,
19  we've asked your team if we can
20  have one person, whoever it is
21  going to be, I don't care if it's
22  Gene or the check interpreter,
23  maybe have one person make the
24  objection if there's any issues on

Page 307

1  the interpretation, if that's okay
2  with you.
3      MR. CYR: That sounds very
4  reasonable. Why don't you just
5  decide.
6      INTERPRETER 2: Counsel, do
7  you mind if the check interpreter
8  to raise a few words in here in
9  the record so that everyone would
10 know that what we are objecting
11 about. The term marketing, sales,
12 these are the main words that we
13 have issues with because the check
14 -- the interpreter interpret
15 market into tui xiao, but in
16 Mainland China, the most commonly
17 used term in market will be ying
18 xiao, which is -- so that
19 sometimes if people use tui xiao
20 in front of a Chinese Mainlander,
21 they may not know what you mean by
22 if you are using tui xiao.
23 Essentially the check interpreter
24 agree that they are the same

Page 308

1  meaning, but one is a Cantonese
2  meaning, one is a Mainland,
3  Beijing, the most part of China's
4  meaning. If you're using one term
5  instead of the other, the
6  Mainlander may not understand what
7  you are talking about.
8      And another is -- and
9  another is sales it is not just
10 mai. Sales is xiao shou. So, I
11 mean, they probably mean the same
12 thing, but if you are telling the
13 Mainlander one way, but not the
14 way that they are used to, they
15 may not understand it. That is
16 what we are very concerned with.
17     MR. SEEGER: Okay.
18     MR. CYR: Thank you for
19 letting us register that. We're
20 prepared now to continue.
21     INTERPRETER 1: I want to
22 respond.
23     MR. SEEGER: Wait a second.
24 You have to stop. There's a

Page 309

1  reason for it. It has nothing to
2  do with you. You don't have to
3  respond. You do not have to
4  defend yourself.
5      INTERPRETER 1: I am not
6  defending myself. Mr. Jia used a
7  third term.
8      MR. SEEGER: No, no, no,
9  that's fine. They're just noting
10 it for the record. Don't worry
11 about it.
12     One other thing I have to
13 raise, and I'm not going to call
14 anybody out by name. Somebody on
15 the team, I believe, has attempted
16 to ask the interpreter off the
17 record if she could standardize
18 certain terms. I'm not alleging
19 any wrongdoing. I'm just saying,
20 if you could just inform your
21 team, you know, lawyers or
22 non-lawyers, that they shouldn't
23 do that with the interpreter off
24 the record. Just raise it with

Page 310

1  us, and we'll deal with it here.
2      MR. CYR: That's a very
3  reasonable request, and we'll
4  honor it.
5      MR. SEEGER: Thank you. Now
6  we are going to get back to work,
7  right? Okay. We're all set.
8  Everyone is doing great.
9  BY MR. SEEGER:
10 Q.  Mr. Jia, in the document --
11     MR. SEEGER: Where's the
12 document, the readable version?
13 We have to substitute it. Where's
14 your version?
15     MR. CHEN: I'm sorry, Chris.
16     MR. SEEGER: Did you take it
17 back?
18     MR. CHEN: Chris, if I may
19 say just one more thing. There
20 were a set of agreed-upon terms,
21 and so the term that Ms. Wong just
22 mentioned that was a proper PRC
23 term was the agreed-upon term
24 between both sides and provided to

Page 315

1  sells well in the United States.
2      Q.  Do you keep track in your
3  company, in TG, of sales volume in Asia
4  and outside of Asia?
5      A.  The sales volume to be
6  exported outside of China is very small,
7  and the market is small, very few amount
8  the volume of products of TG.
9      Q.  Mr. Jia, respectfully,
10 that's not my question.  Do you know how
11 much you sell outside of China?  Do you
12 know how much drywall you ship to the
13 United States, for example, in any given
14 year?  Do you know what that would be?
15      MR. CYR:  Mr. Seeger, I'm
16     going to object.  I know you
17     didn't intend to, but I think you
18     asked two or three questions at
19     the same time.  And you also asked
20     him how much was shipped to the
21     United States, which is contrary
22     to the record.
23      There's no need to interpret
24     this unless Mr. Seeger wants to

Page 316

1      have it interpreted, because I
2      have no intent here to suggest
3      anything to the witness, but I
4      think the question was improper.
5      MR. SEEGER:  Would you mind
6     if I allow him to go ahead and
7     answer that, and let's see what
8     his answer is.  And I'll decide if
9     I have to follow up.
10      MR. CYR:  I'm not
11     instructing the witness not to
12     answer, but any answer you get I
13     think would be meaningless.
14      THE WITNESS:  Can you repeat
15     the question.
16 BY MR. SEEGER:
17      Q.  Yes.  Would you know, can
18 you go back to some place in the company
19 and tell us, for example, how much
20 drywall you ship to the United States in
21 a given year, in any year?
22      MR. CYR:  Same objection.
23      Mr. Jia, you can try to
24     answer the question.

Page 317

1      THE WITNESS:  The
2     plasterboard that our company
3     shipped to the United States, it
4     would be very difficult for me to
5     give you the figure.  I am unable
6     to provide you with the figure
7     because some of our customers from
8     the United States, they applied
9     the products to be shipped out,
10    but how, what is the result or
11    where they are being shipped to,
12    that I don't know.
13 BY MR. SEEGER:
14      Q.  Would you be able to tell us
15 what your sales figures are for drywall
16 sold outside of China?
17      A.  What time period?
18      Q.  From 2005 to present.
19      A.  We have the data, but
20 regarding the figure of our company, I
21 cannot be sure about this data, because
22 some of the product, whether they have
23 actually been shipped outside of China or
24 not, I cannot be sure.  And some of the

Page 318

1  customer, it is possible that they buy
2  the products and then they sell in China,
3  or they may not actually export it to
4  somewhere outside of China, and the
5  product comes back to China.  With this
6  kind of situation, I cannot do a
7  statistics, therefore, I cannot decide
8  the amount for the total sales.
9      Q.  Mr. Jia, do you realize that
10 in connection with the litigation that's
11 going on in the United States, you have
12 signed off on statements regarding the
13 amount of drywall that's been exported to
14 certain distributors?  Are you aware of
15 that?
16      MR. CYR:  Mr. Seeger, I have
17     to object because I'm not aware of
18     what the statements are that
19     you're referring to.  Would it be
20     best to just show them?  And I
21     just want to point out for the
22     record to save time that Mr. Jia
23     may have signed the manufacturing
24     profile form for Taishan Gypsum,

13  (Pages 315 to 318)

Page 319

```
 1    but I think that you'll find, if
 2    you ask him, that he did not sign
 3    the manufacturing profile form for
 4    TTP.
 5        MS. BASS:  Let me just
 6    object on the record to the
 7    speaking objection.  Let the
 8    witness answer the question.
 9        MR. SEEGER:  Do I have an
10    answer to the last question I
11    asked?
12        MR. CYR:  No.
13        MS. BASS:  No, you don't.
14        MR. SEEGER:  I would like to
15    have an answer to the question
16    then.
17        MR. CYR:  I object that the
18    question misleads the witness and
19    that the witness should be shown
20    whatever documents you're
21    referring to.
22        Please interpret that.
23        MS. BASS:  For the record,
24    my objection to his second
```

Page 320

```
 1    objection to the same question.
 2        MR. SEEGER:  Do me a favor.
 3    Mark the record for a ruling on
 4    that.  I'm not necessarily at this
 5    point looking at anything.  I
 6    would just like the witness to
 7    answer that question, if he could.
 8        THE WITNESS:  I can't
 9    recall.
10    BY MR. SEEGER:
11        Q.  Do you recall signing off on
12    any documents that are being used in the
13    litigation that's going on in the United
14    States regarding defective drywall
15    shipped from China?
16        A.  I don't recall.
17        Q.  Do you recall signing off on
18    manufacturers profile sheets?  I don't
19    know how you would translate that in
20    Chinese.
21        INTERPRETER 2:  Maybe the
22    check interpreter help.
23        THE WITNESS:  Can I look at
24    the document?
```

Page 321

```
 1    BY MR. SEEGER:
 2        Q.  Well, I'm just asking if you
 3    have --
 4        Before I show you, and I
 5    will talk to you about the document, do
 6    you have any independent recollection,
 7    Mr. Jia, of signing off on a
 8    manufacturers' profile sheet to be used
 9    in litigation in the United States
10    regarding defective Chinese drywall?
11        A.  I don't recall.
12        Q.  Sir, is it generally your
13    practice before you sign a document to
14    try to read it and understand it?
15    Obviously it has to be in Chinese, but is
16    it your practice before you sign a
17    document to read it and then understand
18    it?
19        A.  Every day I sign off a lot
20    of documents.  So this is a document many
21    years ago.  I cannot recall whether I
22    have signed it or not.
23        MR. SEEGER:  Let me mark
24    this.
```

Page 322

```
 1        - - -
 2        (Whereupon, Deposition
 3    Exhibit Jia-11, Taishan Gypsum Co.
 4    Ltd. Manufacturer Profile Form,
 5    Bates Nos. DPF-TAISHAN GYPSUM CO
 6    LTD-1-00001 through
 7    DPF-TAISHANGYPSUM CO LTD-1-00014,
 8    was marked for identification.)
 9        - - -
10        MR. SEEGER:  Joe, do you
11    mind looking on with the witness
12    for this one, because I only have
13    one copy, and I'm going to work
14    from that.
15        MS. BASS:  Is that a
16    composite of both?
17        MR. SEEGER:  Yes.  There's
18    the Chinese version and then
19    there's the English version.
20    BY MR. SEEGER:
21        Q.  Mr. Jia, would you take a
22    look at what we just marked as Exhibit
23    11.  Are you looking at the Chinese
24    version?
```

Page 323

1    MR. CHEN: I'm telling him
2  to look at the document.
3    MR. CYR: We don't need to
4  share with him what we're saying
5  to our client.
6    MR. SEEGER: I want to make
7  sure he's not telling the
8  witness what to do.
9    MR. CYR: I'll take care of
10  that.
11    MR. SEEGER: You want me to
12  just trust you?
13    MR. CYR: We will talk to
14  our client whenever we want to.
15    MR. SEEGER: Not during a
16  question. Now I need to ask a
17  question. Is that okay?
18    MR. CYR: We're just giving
19  him a chance to look at the
20  document for the record.
21    MR. SEEGER: It may be
22  actually easier if I tell him what
23  I'm looking for, and then he can
24  look at it.

Page 324

1    MR. CYR: Great.
2  BY MR. SEEGER:
3    Q.  Mr. Jia, did you sign this
4  document?
5    A.  Yes, I did sign on this
6  document. These are -- these words are
7  written by me.
8    Q.  Okay. And is there --
9      On the document that you
10  signed, did you notice that there was a
11  declaration or something called a
12  certification before your signature
13  requiring you to answer or sign under the
14  penalty of perjury?
15    A.  Yes.
16    Q.  And you stand by your
17  signature on that document, correct, sir?
18    A.  Yes.
19    Q.  In section -- and I hope
20  this works for the Chinese, but in
21  section 2 of this document, there's a
22  representation about how much drywall was
23  shipped to a company called Venture
24  Supply. Could you tell me if you can

Page 325

1  find that part of the document? I
2  believe it's on Page 2 or 3. Section 2.
3  It's in section 2.
4    MR. CYR: I believe the
5  question is referring to section
6  3, subsection 2 on Page 3, Mr.
7  Jia.
8    MR. SEEGER: You're right.
9  You're right.
10    MR. CYR: Please interpret
11  what I said.
12    MR. SEEGER: He's right.
13  It's section Roman III, and I
14  don't know how it's reflected on
15  the Chinese version, Paragraph 2.
16    THE WITNESS: What do you
17  want me to answer? I'm not sure.
18  BY MR. SEEGER:
19    Q.  How did you go about finding
20  the information that allowed you to
21  answer the question about how much
22  drywall was shipped to Venture Supply?
23    MR. CYR: I have to object.
24  I don't see any reference to

Page 326

1  shipments to Venture Supply.
2    MR. SEEGER: I'm sorry. Let
3  me make the correction.
4  BY MR. SEEGER:
5    Q.  Sold to Venture Supply.
6      Actually, I want to strike
7  that. I want to strike that, because I'm
8  reading the language, and I don't know if
9  the Chinese version says the same thing.
10      But the English version of
11  this document says that the February 24,
12  2006 and July 20, 2006 shipments of
13  drywall by Venture Supply to the United
14  States contained 153,912 sheets of
15  drywall respectively. And it is also in
16  the section that says "Amount of drywall
17  exported." Could you please tell me
18  where you found the information to answer
19  that question.
20    A.  This information is true.
21  The data and the amount contained in this
22  document is also true.
23    Q.  Well, if you don't know how
24  much you shipped outside of Asia, then

15 (Pages 323 to 326)

Page 327

1   how do you know those figures are true,
2   Mr. Jia?
3       A.   I'm referring to this
4   company.
5           INTERPRETER 1:  The witness
6       is pointing to the name of this
7       company, Venture Supply.
8           THE WITNESS:  I don't know
9       how to call this company.  And
10      what I am saying is true, is that
11      TG sold the plasterboard to this
12      company is true.
13  BY MR. SEEGER:
14      Q.   So, you do -- he's not
15  finished.
16      A.   We exported a lot of
17  plasterboards, of all the plasterboard.
18  They turn around and be sold in China,
19  that I don't know.  Therefore, these two
20  facts I just stated, they are not
21  contrary.
22      Q.   Mr. Jia, the statement in
23  the document in English says that there
24  were shipments of drywall to Venture

Page 328

1   Supply to the United States.  Does it say
2   a similar thing in the document in
3   Chinese?
4           MR. CYR:  I'm sorry,
5       Counsel, where are you reading
6       that?
7           MR. SEEGER:  I'm in that
8       same section, Roman III, 2.  It's
9       the section that says "Amount of
10      drywall exported."  And then next
11      to it, I'm taking the words there
12      where it says "Shipments of
13      drywall by Venture Supply to the
14      United States."
15          MR. CYR:  What's the
16      question?
17          MR. SEEGER:  The question
18      is, does it say exactly the same
19      thing in the document in Chinese
20      in front of you?
21          MR. CYR:  Thank you.
22          THE WITNESS:  I don't know
23      English, therefore, to check the
24      Chinese against the correctness of

Page 329

1       the English, whether the English
2       has made a mistake or Chinese made
3       a mistake, I cannot do it.
4   BY MR. SEEGER:
5       Q.   That's not my question, Mr.
6   Jia, respectfully.
7           My question is, in the
8   Chinese version of the document, in
9   section III(2) where it says "Amount of
10  drywall exported," does it say
11  essentially the same thing in the Chinese
12  document, that there were shipments of
13  drywall by Venture Supply to the United
14  States of TG drywall?  Does it basically
15  say that in the Chinese version or not?
16      A.   In this document in Chinese,
17  it says this plasterboard was shipped to
18  the United States.
19      Q.   Okay.  So, you do know in
20  TG, you can tell us exactly how much
21  plasterboard was shipped to the U.S.,
22  correct?  You can find that information,
23  can't you?
24          MR. CYR:  Objection.  The

Page 330

1       question is vague.
2           You can try to answer.
3           THE WITNESS:  Incorrect.
4   BY MR. SEEGER:
5       Q.   Explain why.  Why am I
6   incorrect?
7       A.   Because TG also including
8   all the subsidiaries, the sales for every
9   year is very large.  So, the amount is
10  too large.  It is impossible for me to
11  know of every single contract.  That is
12  impossible.  Even as a GM, I cannot do
13  it.
14      Q.   So, you were able to find
15  information regarding drywall exported to
16  Venture Supply in the United States, but
17  you're saying you can't do that for
18  everyone you've exported to?  Is that
19  your answer?
20          MR. CYR:  Objection on two
21      grounds.  One is it might be
22      unclear whether or not you're
23      referring to Mr. Jia personally or
24      the company Taishan Gypsum just

16  (Pages 327 to 330)

Page 331

1    because of the language
2    difference. And then secondly,
3    your use of the phrase "shipped to
4    Venture Supply in the United
5    States."
6        No need to interpret that
7    unless Mr. Seeger would like to.
8        MR. SEEGER: No. He can
9    answer my question.
10       MS. BASS: Once again, let
11   me just note an objection to the
12   speaking objection.
13       MR. SEEGER: So he's not
14   asking you to read the objection
15   to the witness. He's just asking
16   you to read my question.
17       THE WITNESS: Yes.
18   BY MR. SEEGER:
19   Q.   Where in the company did you
20   go or did whoever works for you go to
21   find the information that's reflected on
22   this exhibit in front of you regarding
23   Venture Supply? Where in the company
24   would you go to find that?

Page 332

1    A.   Of course they have it in
2    the foreign sales department.
3    Q.   Does the foreign sales
4    department keep their records on a
5    computer?
6    A.   We require this to be done.
7    I can recall that originally I requested
8    my staff to do this.
9    Q.   Who specifically on your
10   staff was asked to do this for you, Mr.
11   Jia?
12   A.   The manager of the foreign
13   sales department, Peng Wenlong. I think
14   he should know of this type of
15   information.
16   Q.   Do your financial auditors
17   for TG review your sales records?
18       INTERPRETER 2: The check
19   interpreter believe that the
20   interpreter did not put TG into
21   her interpretation.
22       MR. SEEGER: Please ask it
23   with TG.
24       INTERPRETER 1: It says

Page 333

1    "your sales record."
2        MR. SEEGER: Is it my
3    mistake?
4        INTERPRETER 1: Yeah.
5        MR. SEEGER: Was it my
6    mistake?
7        INTERPRETER 1: I mean my
8    mistake.
9        MR. SEEGER: Okay. So, will
10   you ask it the way I asked it.
11       Go ahead. You want him to
12   ask the question the way I asked
13   it.
14       (Interpreter repeats the
15   question.)
16       THE WITNESS: I, myself,
17   personally, don't have a sales
18   record.
19   BY MR. SEEGER:
20   Q.   Do the financial auditors
21   for the company, for TG, review sales
22   records?
23   A.   We have a finance
24   department. The finance department will

Page 334

1    make the record. They will have the
2    information regarding the sales.
3    Q.   Does your financial
4    department have information regarding
5    shipping records?
6    A.   No.
7    Q.   Who has the information
8    regarding shipping records, which
9    department?
10   A.   The shipment record should
11   be with the foreign sales department.
12   Q.   So, the foreign sales
13   department would have the shipping
14   records, correct?
15   A.   Yes.
16   Q.   Is that also kept on
17   computer?
18   A.   I'm not sure. Not
19   necessarily. In the computer maybe you
20   can also find it somewhere else.
21   Q.   Let me just ask, for
22   example, when you signed off on this
23   particular document that's been marked as
24   an exhibit, the manufacturers profile

17 (Pages 331 to 334)

Page 335

1 sheet, did you look to see where the
2 information came from regarding sales and
3 shipping in this instance?
4    A.   I did not delete this
5 document, and it would be impossible for
6 me to delete this document. I also don't
7 know about this document.
8        MR. CHEN: (Addressing the
9 interpreter.)
10       Objection.
11       It's the reference to delete
12 this information, not delete this
13 document, for the interpreter's
14 suggestion or consideration.
15       INTERPRETER 1: He did
16 answer and also flip flop between
17 the word zhi liao and wenjian.
18       MR. SEEGER: So what's your
19 interpretation of his answer? Let
20 me just have it one more time.
21       - - -
22       (Whereupon, the following
23 portion of the transcript was read
24 by the court reporter:

Page 336

1       "A. I did not delete this
2 document, and it would be
3 impossible for me to delete this
4 document. I also don't know about
5 this document.")
6       - - -
7 BY MR. SEEGER:
8    Q.   Is it possible, Mr. Jia,
9 that there were other TG sales of gypsum
10 board to the U.S. that are not accounted
11 for in this document? Is that possible?
12       MR. CYR: Objection on the
13 grounds that the question is vague
14 and assumes a fact not in the
15 record.
16       Please interpret that.
17       MR. SEEGER: Mark that.
18       INTERPRETER 2: The check
19 interpreter believes the
20 interpreter did not complete the
21 interpretation.
22       INTERPRETER 1: I am
23 interpreting the objection.
24       MR. CYR: It's okay. The

Page 337

1 English version, I'm sure, is
2 captured on the record.
3       You may proceed. Thank you.
4       MR. SEEGER: I think we're
5 just waiting on an answer.
6       You can tell him the
7 question again if you want, but he
8 needs to answer the question that
9 we asked.
10       (Interpreter repeats the
11 question.)
12       THE WITNESS: I don't
13 understand the way you ask the
14 question.
15       MR. SEEGER: I've forgotten
16 the question.
17       MS. BASS: Is it possible
18 there were other sales in the U.S.
19 that were not included in this
20 document?
21       MR. SEEGER: There you go.
22 BY MR. SEEGER:
23    Q.   I just want to know in this
24 document that he's looking at -- I'm

Page 338

1 sorry.
2       Mr. Jia, the document that
3 you're looking at, this exhibit in front
4 of you, reflects your knowledge of all
5 shipments and exports of drywall to the
6 United States. Is it possible that you
7 have shipments of drywall or exports of
8 drywall to the United States that are not
9 reflected in this document?
10       MR. CYR: Same objection.
11       Mr. Jia, please try to
12 answer the question if you can.
13       THE WITNESS: I still don't
14 understand -- I still don't
15 understand what you are asking
16 about.
17 BY MR. SEEGER:
18    Q.   Mr. Jia, is it possible that
19 you sold drywall to distributors who
20 brought the drywall to the United States
21 that are not reflected in this document?
22    A.   Are you talking about TG or
23 TTP?
24    Q.   Let's start with TG.

18 (Pages 335 to 338)

Page 339

1     A.   TG is a company.  It has
2   signed an agreement and also a contract
3   for implementation.  This has already
4   been implemented.
5     Q.   What contract is he
6   referring to?
7     A.   Venture Supply.  Is it
8   called Venture Supply?
9     Q.   Yes, yes.
10        MR. SEEGER:  So, what's his
11   answer?
12        INTERPRETER 1:  That's the
13   answer.
14        THE WITNESS:  So, the
15   agreement that we signed with
16   them, we have implemented that.
17   BY MR. SEEGER:
18     Q.   So, you're saying --
19        Is it possible that you
20   could have sold drywall to any other
21   distributor that was brought into the
22   United States?  Is that possible?
23     A.   I cannot speculate.
24     Q.   Other than Venture Supply,

Page 340

1   are you aware of TG selling gypsum board
2   to any customers in the United States?
3     A.   No.
4     Q.   Mr. Jia, since the
5   litigation in the U.S. regarding
6   defective Chinese Drywall, have your
7   sales been affected, the shipments of
8   drywall, regarding selling drywall?
9        MR. CYR:  I'm going to
10   object in that the question
11   appears to me at first glance to
12   be outside the designated areas.
13   It's your time.  I'm not
14   instructing the witness not to
15   answer.
16        MR. SEEGER:  Since you're
17   not instructing him, I'm not going
18   to get -- I have a basis for
19   asking.  We think it's within the
20   scope.  But that's fine.  You can
21   answer.
22        INTERPRETER 2:  May the
23   check interpreter give the
24   rendition of the Chinese

Page 341

1   interpretation to the witness?
2        MR. SEEGER:  No, not to the
3   witness.  If you want to make an
4   objection, if your lawyers want to
5   make an objection for the record,
6   that's fine.
7        MR. CHEN:  State the
8   objection.
9        INTERPRETER 2:  I just don't
10   think the interpreter's
11   interpretation is understandable
12   to the witness.  That's all.
13   BY MR. SEEGER:
14     Q.   Mr. Jia, did you understand
15   the question that was -- did we even ask
16   him the question yet?
17        Mr. Jia, do you understand
18   the question that was just asked of you
19   by the interpreter?
20     A.   I have forgotten what you
21   asked.
22     Q.   That's understandable.
23        MR. SEEGER:  Could you ask
24   him the question again.

Page 342

1        - - -
2        (Whereupon, the following
3   portion of the transcript was read
4   by the court reporter:
5        "Q.  Mr. Jia, since the
6   litigation in the U.S. regarding
7   defective Chinese Drywall, have
8   your sales been affected, the
9   shipments of drywall, regarding
10   selling drywall?")
11        - - -
12        THE WITNESS:  I don't
13   understand your concept and what
14   is the meaning of the shipment of
15   the drywall and being affected.  I
16   don't understand.
17   BY MR. SEEGER:
18     Q.   Mr. Jia, do you understand
19   that there's litigation going on in the
20   United States that drywall shipped by
21   your company is defective, correct?
22     A.   Incorrect.
23     Q.   But you understand that
24   there is litigation stating, alleging

Page 367

1    at the time of the filing of the
2    complaint, or some reasonable
3    period thereto.  Some courts
4    disagree.  They have different
5    views about what that time period
6    should be.  But one thing that's
7    very clear, almost in every case
8    that I've seen in every state, and
9    that is that actions by defendants
10   after the filing of the Complaint.
11        MR. SEEGER:  It's not after.
12   That's not my question, Joe.  You
13   misunderstood the question.
14        MR. CYR:  Oh, I'm sorry.
15        MR. GRAND:  It is not after.
16        MR. CYR:  I'm sorry.
17        MR. SEEGER:  I said since
18   the news in the media.  There was
19   news in the media before we filed
20   the complaint.  So, he said --
21   your witness has testified he's
22   only seen what's in the media.  He
23   hasn't seen U.S. government
24   reports.  So, it is since the news

Page 368

1    in the media.
2         MR. CYR:  I can help out
3    here to save time, because I
4    really want to do the right thing
5    here.
6         Just for the record, it
7    seems to me that there's some
8    chance that the question could
9    relate to Taishan Gypsum's
10   activities before certain of the
11   complaints in this litigation have
12   been served or filed such as the
13   Gross or Wilkes case, and so I'm
14   going to allow the witness to
15   answer the most recent question.
16        MR. SEEGER:  Thank you.
17        Could you read the question
18   that I asked.
19        (Interpreter repeats the
20   question.)
21        THE WITNESS:  Okay.  First
22   of all, TG went over the complaint
23   records regarding the production
24   of drywall for many years.  We did

Page 369

1    not discover the problems as
2    discussed -- reported in the
3    media, reflected in the media or
4    reflected by some of the
5    customers.  Our government also
6    take this matter seriously.  It
7    draw a large amount of samples
8    from our company.  Our government
9    did not say the products that we
10   produce has the problems similar
11   to those reflected by the U.S.
12   consumers.  We strongly believe
13   that the quality of our drywall is
14   good.
15   BY MR. SEEGER:
16        Q.   Mr. Jia, did you do any
17   testing to confirm that?  Did the company
18   do any testing independent to confirm
19   that?
20        MR. CYR:  I just want to
21   state for the record that I'm
22   going to allow the witness to
23   answer for the reason that I
24   mentioned before, but I'm not

Page 370

1    waiving my rights to insist that
2    we stay with the designated areas.
3    And, sincerely, I do think that
4    this is a decision y'all are
5    making with respect to managing
6    the time that you have.
7         No need to interpret that.
8         Please answer the question,
9    Mr. Jia.
10        THE WITNESS:  Our company
11   also built a building.  It is all
12   of our products.  There is no
13   phenomena like what is being
14   claimed by the U.S. media.  We
15   also made a survey along the
16   coastal line to do an
17   investigation with our customers.
18   We did not find similar problems.
19   BY MR. SEEGER:
20        Q.   So, Mr. Jia, the testing you
21   did, to be clear, is you built a building
22   for which you put your products in it,
23   and you did a survey of your customers.
24   Did I understand the answer correctly?

Page 375

1      A.   Well, the understanding that
2  you had earlier, I feel that there were
3  misunderstanding.  The testing
4  information, we did not put it inside our
5  marketing material.
6      Q.   Now, the testing information
7  that the Chinese government did, does the
8  company have that?  Does TG have that
9  information?
10      A.   According to the government
11  standard, TG, and also according to
12  relevant standard, TG will follow these
13  standards to check every product.  And it
14  also has the testing report.
15      Q.   Where is that testing
16  report?  Who at TG has the testing report
17  from the Chinese government?
18      A.   So, all of our subsidiaries
19  would have this report, testing report,
20  and every batch of our products would
21  have this report, testing report.
22      Q.   I want to make sure that
23  we're communicating to each other.
24          Are you talking about ASTM

Page 376

1  certifications or are you talking about
2  testing done specifically by the Chinese
3  government to determine whether there was
4  a defect in the drywall?
5      A.   We don't have any defected
6  products released from the factory.
7      Q.   Okay.
8          I want to go back to the
9  testing that you testified earlier, Mr.
10  Jia, that the Chinese government did
11  testing of your product.  Where is the
12  results of that testing?  Where would
13  that be right now?
14      A.   This information is now with
15  the government in a bureau.
16          INTERPRETER 1:  The
17      interpreter do not have the
18      English translation for this
19      bureau.  Do you think Eugene or
20      the check interpreter can help?
21      Guojia ji jian.
22          MR. SEEGER:  Just give me
23      his answer, and then I'll deal
24      with what the --

Page 377

1          INTERPRETER 1:  Okay.
2          MR. SEEGER:  Okay.
3          THE WITNESS:  It is in a
4      government bureau, in the hands
5      of -- of the Chinese government.
6          INTERPRETER 1:  And the
7      interpreter does not have the
8      English name for it.
9          MR. SEEGER:  You have to
10      take yourself out of it.  What is
11      his answer?  Give me his exact
12      answer.
13          INTERPRETER 1:  That's the
14      answer.  That's the answer.
15  BY MR. SEEGER:
16      Q.   Okay.
17          Have you seen the results of
18  the test yourself, Mr. Jia?
19      A.   No.
20      Q.   Do you know what tests they
21  performed specifically?
22      A.   They draw samples of our
23  drywall and take it to the laboratories
24  for testing.  Concretely, what methods

Page 378

1  that they use for testing is up to the
2  scientist, not me.
3      Q.   Well, do you care, Mr. Jia,
4  what the results of those tests are?
5      A.   I care very much.
6      Q.   And have you sought to get
7  the results of those tests from the
8  Chinese government?
9      A.   I did request it from the
10  government, and relevant department
11  informed us that you can continue to
12  produce, there is no problem.
13      Q.   Have you asked for a
14  specific -- strike that.
15          MR. CYR:  There's no
16      question.
17  BY MR. SEEGER:
18      Q.   Okay.
19          So, then, other than
20  assuring you verbally, I take it, Mr.
21  Jia, that there's no problem, you have
22  not been provided with any reports from
23  the Chinese government showing specific
24  tests and the results of those tests?

Page 391

1    should actually translate the
2    response, not give an explanation
3    of it.
4         MR. SEEGER: Okay. Just
5    tell me his response. Just tell
6    me his response.
7         THE WITNESS: I don't
8    understand. What do you mean by
9    the key concept?
10   BY MR. SEEGER:
11        Q.   Not key concept, key
12   enterprise.
13        INTERPRETER 1: Key
14   enterprises. I put it in Chinese
15   as major concepts, or I can put it
16   as an important enterprise.
17        MR. SEEGER: Put it as an
18   important enterprise. I'll ask
19   the question that way so we have a
20   clean record.
21   BY MR. SEEGER:
22        Q.   Would he agree that TG is an
23   important enterprise of CNBM?
24        A.   I agree with this statement

Page 392

1    that TG is a subsidiary company under
2    CNBM mainly producing plasterboards.
3         INTERPRETER 2: The check
4    interpreter believes that the
5    witness said, I agree with that
6    statement, that is, TG is a key
7    subsidiary under CNBM.
8         MR. SEEGER: Are you okay
9    with that answer?
10        MR. CYR: Yeah. I'm ready
11   to continue. It sounded close.
12        INTERPRETER 1: It's the
13   same. The same.
14   BY MR. SEEGER:
15        Q.   Mr. Jia, are you aware that
16   BNBM issued a press release in May of
17   2010 discussing the allegations made
18   against Taishan Gypsum? I just want to
19   know if you are aware of that.
20        A.   I don't understand your
21   question.
22        Q.   Okay. I'll start over.
23        Are you aware that BNBM
24   issued a press release in May of 2010

Page 393

1    discussing the allegations regarding --
2    made in the U.S. regarding Taishan
3    Gypsum, TG?
4         A.   I know.
5         Q.   Were you involved or did you
6    participate in any way in the creation of
7    that press release?
8         A.   BNBM is a listed company.
9    They should make announcement for major
10   incidents. We go through some channels
11   to reflect this to BNBM. BNBM, based on
12   the condition to make such an
13   announcement, the content of the
14   announcement, I am not very sure.
15        Q.   So, just to be very clear,
16   I'm not sure if the answer is in what you
17   just gave us, so I want to be clear.
18        Did you in any way
19   participate in drafting the statement,
20   approving the statement made by BNBM?
21        A.   I did not participate.
22        Q.   What do you know about
23   BNBM's U.S. operations, Mr. Jia?
24        A.   Please repeat the question.

Page 394

1         MR. SEEGER: (Addressing the
2    interpreter.)
3         Could you do that?
4         (Interpreter repeats the
5    question.)
6         THE WITNESS: I don't know.
7    BY MR. SEEGER:
8         Q.   Your testimony is you don't
9    know anything about BNBM's U.S.
10   operations?
11        A.   Yes.
12        Q.   Do you know who Cao Jiang
13   Lin is? I don't know if I'm saying it
14   right.
15        A.   I don't know this person.
16        Q.   Does he know who the
17   chairman of BNBM is?
18        INTERPRETER 1: Chairman
19   could be interpreted in two ways
20   in Chinese, dong shi ju or dong
21   shi hui.
22        THE WITNESS: What time
23   period?
24   BY MR. SEEGER:

32  (Pages 391 to 394)

Page 395

1     Q.   Let's start with the
2  present.
3     A.   Wang, the last name is Wang.
4  Wang Bin is the chairman of BNBM.
5     Q.   How about back in 2007?
6     A.   I cannot be sure who that
7  is, but I know during the earlier period.
8     Q.   What name from the earlier
9  period does he know?
10    A.   Cao Jiang Lin.
11    Q.   That's the name I was trying
12 to write.  I knew I wasn't pronouncing it
13 correctly, but I figured we'd get there
14 somehow.
15        INTERPRETER 1:  That's close
16 enough.
17 BY MR. SEEGER:
18    Q.   Do you know who Cao Jiang
19 Lin is?
20    A.   I know.
21    Q.   Do you know what his current
22 position is with BNBM?
23    A.   I don't know.
24    Q.   Do you know if he's

Page 396

1  currently still with BNBM?
2     A.   I don't know.
3     Q.   Do you know if he has a
4  position with CNBM?
5     A.   According to my knowledge,
6  he has no positions with CNBM.
7     Q.   In all the time that you
8  have been on the board of BNBM, you don't
9  recall any presentations regarding BNBM
10 business in the U.S.?
11    A.   I don't know.
12        MR. CHEN:  Objection.  The
13        way it was translated was did you
14        know of any business in the U.S.,
15        not do you recall any
16        presentations regarding business
17        in the U.S.
18        MR. SEEGER:  So, he answered
19        the one do you know of any
20        business?  That's the one he
21        answered?
22        MR. CHEN:  I believe so.
23        MR. SEEGER:  Okay.
24 BY MR. SEEGER:

Page 397

1     Q.   Let me ask the question
2  again so we have a question and answer.
3        In all your time on the
4  board at BNBM, do you recall
5  presentations or information provided to
6  board members regarding BNBM business in
7  the United States?
8        INTERPRETER 1:  Counsel, the
9        word "presentation" is very
10       difficult to translate accurately.
11       Do you mind to help me?
12       MR. SEEGER:  Discussions.
13       Use discussions instead of
14       presentations.
15       INTERPRETER 1:  Discussions,
16       okay.  Good.
17       THE WITNESS:  I don't
18       understand.  I don't know what you
19       are talking about the business in
20       the United States of the BNBM.
21 BY MR. SEEGER:
22    Q.   Well, do you have an
23 understanding that BNBM does business in
24 the U.S. at all one way or another?

Page 398

1     A.   I don't know.
2     Q.   Are you aware if BNBM has
3  any U.S. subsidiaries?
4     A.   No.
5     Q.   Have you ever heard of BNBM
6  of America Inc.?
7     A.   I have never heard of it.
8     Q.   Do you have any
9  understanding if Cao Jiang Lin held any
10 positions at CNBM as well as BNBM?
11    A.   I don't know.
12    Q.   Do you know who Peng Shou
13 is?
14        INTERPRETER 1:  P?
15        MR. SEEGER:  It's P-E-N-G,
16        and in English spelled S-H-O-U.
17        THE WITNESS:  I met this
18        person.
19 BY MR. SEEGER:
20    Q.   And how did you meet him?
21    A.   I cannot recall how I met
22 him, but he gave me a name card.
23    Q.   Do you know if Peng Shou has
24 any position with BNBM?

Page 415

1    A.   Fine.
2    Q.   I understand that you, Mr.
3  Jia, helped start the process of learning
4  how to produce synthetic gypsum yourself;
5  is that correct?
6        MR. CYR:  Objection as to
7     form.
8        THE WITNESS:  I want to help
9     to give you a more thorough
10    picture of the production of
11    synthetic gypsum in China.
12 BY MR. MONTOYA:
13    Q.   I understand that, but I
14  need to ask you my questions.
15    A.   Yes.  I'm going to answer.
16  Please complete your question.
17    Q.   You or your company helped
18  start the production of synthetic gypsum
19  in China; is that correct?
20    A.   Yes.
21        MR. CYR:  I'm sorry.  I need
22    to object.  You don't need to
23    interpret this, but I do think
24    that the transcript will be

Page 416

1     confusing.  I believe that counsel
2     intended to ask a question with
3     respect to drywall using synthetic
4     gypsum, and that's not the way
5     that the transcript currently
6     reads.
7        We're ready for your next
8     question.
9  BY MR. MONTOYA:
10    Q.   Sir, when we're talking
11  about synthetic gypsum, I'm talking about
12  for the production of drywall.  Do you
13  understand that?
14    A.   Yes.
15    Q.   From 2005 until 2008, did
16  TTP and TG use synthetic gypsum for
17  making drywall?
18    A.   We did.
19    Q.   And TTP and TG believed
20  synthetic gypsum was a safe product and
21  marketed it that way; is that correct?
22    A.   Yes.
23    Q.   The synthetic gypsum product
24  that was manufactured by TG and TTP

Page 417

1  between 2005 and 2008 was the drywall
2  product that eventually ended up in the
3  United States, correct?
4    A.   I don't understand your
5  question.
6    Q.   Do you know whether the
7  drywall that was produced by TG or TTP
8  that ended up in the United States was
9  made with synthetic gypsum?
10    A.   Now I know some of our
11  drywalls has ended up in the United
12  States.  Before May 2009, I did not know
13  how many drywall ended up in the United
14  States.  Our company based our
15  requirement of the customers to use the
16  materials.
17    Q.   Did the customers from the
18  United States request synthetic gypsum?
19    A.   I cannot tell for sure what
20  gypsums the U.S. customer requires.
21    Q.   TTP stopped doing business
22  in 2008, correct?
23    A.   Yes.
24    Q.   Between 2008 to today, has

Page 418

1  TTP done any business?
2    A.   No.
3    Q.   Are they currently doing
4  business?  Is TTP currently doing
5  business?
6    A.   No.
7    Q.   Between 2005 and 2008, who
8  at TTP reported to you?
9    A.   Peng Shi Liang.
10        INTERPRETER 1:  Peng is the
11    last name.
12 BY MR. MONTOYA:
13    Q.   Where is Peng Shi Liang now?
14    A.   Peng Shi Liang is now
15  working in a subsidiary under TG.
16    Q.   Is it common for -- strike
17  that.
18        Did the employees that used
19  to work at TTP, when they stopped doing
20  business, get transferred to other TG
21  entities?
22    A.   Not to transfer, but to
23  rehire.
24    Q.   Is it common for the

Page 439

1    Q.   Isn't that correct?
2    A.   When a customer come to us
3  from commercial products, if they have
4  specific requirements, we need to fulfill
5  it.
6    Q.   Were you aware that certain
7  of your customers requested that you
8  comply with the ASTM standards?
9    A.   These customers were handled
10  by our foreign sales department.  I did
11  not directly in touch with these
12  customer, therefore, I cannot answer this
13  question.
14    Q.   Okay.
15      So, you don't have any
16  personal knowledge as to whether or not
17  certain of your customers requested that
18  your drywall meet specifications required
19  for the United States?
20    A.   I don't know anything about
21  this regarding what are requirement,
22  regarding what customer.  I have never
23  participated in even one incidence of the
24  negotiation.

Page 440

1    Q.   So, as far as you know,
2  there could have been hundreds of
3  American customers purchasing from your
4  company and demanding that the drywall be
5  built and be manufactured in compliance
6  with American standards because you don't
7  know?
8    A.   I don't know how many
9  customers come to China, but come to us
10  to do the purchase or they did make the
11  inquiries.  I did not participate in any
12  process of the negotiation.  I did not
13  know about a requirement of the
14  customers.
15    Q.   So, the best person to tell
16  us what amount of drywall of your company
17  was purchased for use in the United
18  States would be representatives of your
19  foreign sales department, not you; isn't
20  that correct?
21    A.   Yes.  People from the
22  foreign sales department, they understand
23  the export situations the best.
24    Q.   You previously testified

Page 441

1  that you could not speculate whether
2  there were additional sales to the United
3  States by TG; isn't that correct?
4    A.   I don't understand.  What do
5  you mean?
6    Q.   You previously testified
7  that you could not speculate about
8  whether there were additional sales to
9  the United States of TG plasterboard
10  other than those identified in your
11  profile form; isn't that correct?
12      MR. CYR:  Objection as to
13    form.
14      Mr. Jia, you can try to
15    answer the question.
16      THE WITNESS:  I still don't
17    understand the concept.
18  BY MS. BASS:
19    Q.   Isn't it correct that you
20  don't have personal knowledge as to how
21  many other American customers purchased
22  drywall from your company?
23    A.   Yes.
24    Q.   Isn't it also correct that

Page 442

1  you don't know -- that you don't have
2  personal knowledge about how many other
3  customers spoke to people in your foreign
4  sales department and expressly described
5  to them that they were purchasing drywall
6  for use in the United States?
7    A.   I don't understand.
8    Q.   Do you have personal
9  knowledge of conversations that your
10  customers had with representatives of the
11  foreign sales department wherein they
12  described that they were purchasing
13  drywall from your company for specific
14  use in the United States?
15    A.   I don't know.
16    Q.   Isn't it true that you have
17  no personal knowledge of sales to
18  customers in the United States that were
19  made by BNBM?
20    A.   I am not sure.
21    Q.   You don't know what sales --
22      INTERPRETER 1:  I haven't
23    finished yet.
24      MS. BASS:  I'm so sorry.

Page 443

1        THE WITNESS:  I am not clear
2    of the products BNBM sells to the
3    United States.
4    BY MS. BASS:
5        Q.   In the monthly reports of
6    TTP that you previously testified you
7    reviewed, was it disclosed, the amount of
8    product TTP was selling to customers in
9    the United States?
10        MR. CYR:  Objection on the
11    use of the phrase "customers in
12    the United States."
13        THE WITNESS:  I don't know.
14    I don't know which drywall is for
15    the U.S. customers or for other
16    customers.
17    BY MS. BASS:
18        Q.   So, you don't know what
19    amount of drywall TTP was selling to
20    customers in the United States; isn't
21    that true?
22        A.   So, every month we have a
23    monthly report.  It will tell us the
24    specifics of the production and also the

Page 444

1    volume of the sales.  But regarding which
2    customer it was sold to, because TG has
3    too many, many customers, more than
4    10,000 customers, so, this type of
5    information would not come to me.
6        Q.   Have you reviewed the
7    manufacturers profile form filed in this
8    litigation by TTP?
9        A.   Are you referring to the
10    form signed by Mr. Song that we talk
11    about earlier?
12        Q.   Yes.
13        A.   I just saw it.
14        Q.   You just saw it for the
15    first time?
16        A.   Yes.
17        Q.   Are you familiar with the
18    exhibit to that profile form that lists
19    sales to customers in the United States?
20        MR. CYR:  There's no need to
21    interpret this, but I do object
22    again to this phrase.  You're
23    insisting on using the phrase
24    "customers in the United States."

Page 445

1    It is just totally inconsistent
2    with the record.
3        Mr. Jia, you can answer the
4    question.
5        THE WITNESS:  I am not
6    familiar.
7    BY MS. BASS:
8        Q.   Are you familiar with
9    whether or not TTP was authorized to use
10    TG's name on their product?
11        A.   Yes.
12        Q.   Are you familiar with
13    whether or not TG's name was used on any
14    of the sales of products that are
15    described on Exhibit A to the TTP
16    manufacturers profile form?
17        A.   I don't understand.  What do
18    you mean?
19        Q.   Do you know whether or not
20    TTP used TG's brand on any of the sales
21    that are described on Exhibit A to the
22    TTP manufacturers profile form?
23        A.   I don't know.
24        Q.   Did TG ever license the name

Page 446

1    brand Taishan to be used by TTP?
2        INTERPRETER 2:  The check
3    interpreter believes that -- can
4    the check interpreter supply the
5    Chinese interpretation?
6        INTERPRETER 1:  But he did
7    not say he did not understand.
8        INTERPRETER 2:  The question
9    is that TG license the Taishan
10    name to TTP?
11        MS. BASS:  Correct.
12        INTERPRETER 2:  So, I would
13    like to interpret it like that in
14    Chinese.  Is that okay?
15        MS. BASS:  That's fine.
16        INTERPRETER 1:  The brand
17    name.  She said the brand.  It's
18    the same.
19        MR. CYR:  I'm sorry.  Let's
20    wait for the lawyer to ask what's
21    next.
22        MS. BASS:  The question
23    that's been posed.  I'm waiting
24    for an answer.

45  (Pages 443 to 446)

Page 447

1  THE WITNESS: I don't
2  understand. What do you mean by
3  "our name"?
4  BY MS. BASS:
5  Q.  Was there a license
6  agreement between TTP and TG by which TG
7  agreed that TTP could use its brand name
8  on its products?
9  MR. CHEN: Objection. For
10  the interpreter's consideration, I
11  think license, you are using zhi
12  jao as in a driver's license, and
13  I think hsuke bwould be more
14  appropriate for your
15  consideration.
16  INTERPRETER 1: Okay. No
17  objection. It is good.
18  THE WITNESS: TG has a lot
19  of brands. This brand is not
20  using its name. TG did authorize
21  TTP and other companies to use its
22  brand.
23  BY MS. BASS:
24  Q.  Is that brand known as the

Page 448

1  Taishan brand?
2  A.  Besides Taishan, there are
3  also other brands.
4  Q.  Were those other brands also
5  licensed for use by TTP?
6  A.  Yes.
7  Q.  What was the time frame for
8  the license of use of the brand by TTP?
9  A.  I cannot recall exactly the
10  time period.
11  Q.  Can you tell me
12  approximately?
13  A.  I don't recall
14  approximately, but it should be around
15  the year 2006.
16  Q.  During the time frame of
17  that license, was TG and TTP both using
18  the same brands?
19  A.  Sometimes it is the same
20  brand.
21  Q.  During the time frame of
22  that license, does that mean that drywall
23  manufactured by TTP could conceivably
24  have the same brand name on it as

Page 449

1  plasterboard manufactured by TG?
2  A.  Yes.
3  Q.  Other than what you've
4  previously testified to regarding sales
5  to U.S. customers by TG, did TG sell any
6  other products which it believes were
7  eventually utilized by customers in the
8  United States?
9  A.  I don't know.
10  Q.  So, you don't know whether
11  or not, for example, TG manufactured
12  metal studs that might have been
13  eventually utilized in the United States?
14  INTERPRETER 1: Counsel,
15  would you mind explaining what is
16  metal studs? I have translation
17  difficulty with metal studs.
18  MS. BASS: Well, I sure
19  can't help her.
20  MR. MONTOYA: I didn't know
21  if you heard her.
22  MR. CYR: I have no comment
23  on that matter.
24  INTERPRETER 1: She's

Page 450

1  looking in the dictionary.
2  MS. BASS: That's fine.
3  (Discussion in Chinese
4  between interpreters.)
5  THE WITNESS: Regarding the
6  metal studs, we have very few
7  production, and also the sales is
8  very small, therefore, I don't pay
9  attention of the quantity. I also
10  don't know whether we have any
11  U.S. customers or not.
12  BY MS. BASS:
13  Q.  Once again, would we need to
14  ask someone in the foreign sales
15  department to obtain that information?
16  A.  It should be the case.
17  Q.  Does TG stand behind its
18  products if there is a problem with them?
19  A.  I don't understand. What do
20  you mean by "stand behind"?
21  Q.  Assuming there was a defect
22  in a product manufactured by TG, would TG
23  be prepared to remedy that defect in
24  their product?