Page 1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

3      _____    §  MDL NO. 2047
       IN RE:                      §
4      CHINESE-                    §  SECTION: L
       MANUFACTURED                §
5      DRYWALL PRODUCTS            §  JUDGE FALLON
       LIABILITY                   §
6      LITIGATION                  §  MAGISTRATE
       _____    §  JUDGE WILKINSON
7
                        -   -   -
8
        CROSS NOTICED IN VARIOUS OTHER ACTIONS
9
                        -   -   -
10
                   April 4, 2011
11
                        -   -   -
12
        CONFIDENTIAL - SUBJECT TO FURTHER
13              CONFIDENTIALITY REVIEW
14                      -   -   -
15         Videotaped deposition of TONGCHUN
       JIA, held at 3 Pedder Street, Central,
16     Hong Kong, China, commencing at 9:05
       a.m., on the above date, before Linda L.
17     Golkow, Certified Court Reporter,
       Registered Diplomate Reporter, Certified
18     Realtime Reporter and Notary Public.
19
20                      -   -   -
21
22          GOLKOW TECHNOLOGIES, INC.
        ph 877.370.3377 | fax 917.591.5672
23             deps@golkow.com
24

Confidential - Subject to Further Confidentiality Review

Page 2

```
 1   APPEARANCES:
 2
 3
     SEEGER WEISS LLP
 4     BY:  CHRISTOPHER A. SEEGER, ESQUIRE
       BY:  JEFFREY S. GRAND, ESQUIRE
 5     One William Street
       New York, New York 10004
 6     (212) 584-0700
       cseeger@seegerweiss.com
 7     jgrand@seegerweiss.com
       Representing the Plaintiffs' Steering
 8     Committee
 9
10   COLSON HICKS EIDSON
       BY:  PATRICK S. MONTOYA, ESQUIRE
11     255 Alhambra Circle
       Penthouse
12     Coral Gables, Florida 33134
       (305) 476-7400
13     patrick@colson.com
       Representing Plaintiffs' Steering
14     Committee in the Federal and State
       Coordinated Actions
15
16
17   LAW OFFICES OF RICHARD SERPE, P.C.
       BY:  RICHARD J. SERPE, ESQUIRE
18     580 East  Main Street
       Suite 310
19     Norfolk, Virginia 23510
       (757) 233-0009
20     rserpe@serpefirm.com
       Representing the MDL Plaintiffs and
21     the Germano Plaintiffs
22
23
           - - -
24
```

Page 3

```
 1   APPEARANCES (CONTINUED):
 2
 3   HOGAN LOVELLS US LLP
       BY:  JOE CYR, ESQUIRE
 4     BY:  FRANK T. SPANO, ESQUIRE
       BY:  ERIC D. STATMAN, ESQUIRE
 5     BY:  RENEE GARCIA, ESQUIRE
       875 Third Avenue
 6     New York, New York 10022
       (212) 918-3000
 7     joe.cyr@hoganlovells.com
       frank.spano@hoganlovells.com
 8     renee.garcia@hoganlovells.com
       eric.statman@hoganlovells.com
 9     Representing Taishan Gypsum Co.
       Ltd. and Tai'an Taishan
10     Plasterboard Company Ltd. and the
       Witness, Tongchun Jia
11
12
13   HOGAN LOVELLS INTERNATIONAL LLP
       BY:  EUGENE CHEN, ESQUIRE
14     18th Floor, Park Place
       1601 Nanjing Road West
15     Shanghai, China 200040
       (86 21) 6122 3800
16     eugene.chen@hoganlovells.com
       Representing Taishan Gypsum Co.
17     Ltd. and Tai'an Taishan
       Plasterboard Company Ltd. and the
18     Witness, Tongchun Jia
19
20   JIGTIAN & GONGCHENG
       BY:  CHUNGANG DONG, ESQUIRE
21     34/F, Tower 3, China Central Place
       77 Jianguo Road - Chaoyang District
22     Beijing, China  200040
       (86 10) 5809 1016
23     Representing Taishan Gypsum Company
       Limited and Tai'an Taishan
24     Plasterboard Company
```

Page 4

```
 1   APPEARANCES (CONTINUED):
 2
 3
     GREENBERG TRAURIG, LLP
 4     BY:  HILARIE BASS, ESQUIRE
       1221 Brickell Avenue
 5     Miami, Florida 33131
       (305) 579-0745
 6     bassh@gtlaw.com
       Representing the Home Builders
 7     Steering Committee
 8
 9   GALLOWAY JOHNSON TOMPKINS BURR and
     SMITH
10     BY:  CARLINA C. EISELEN, ESQUIRE
       One Shell Square
11     701 Poydras Street, 40th Floor
       New Orleans, Louisiana 70139
12     (504) 525-6802
       ceiselen@gjtbs.com
13     Representing Interior/Exterior
       Building Supply
14
15
16   PERKINS COIE LLP
       BY:  DAVID L. BLACK, ESQUIRE
17     1899 Wynkoop Street - Suite 700
       Denver, Colorado 80202
18     (303) 291-2300
       DBlack@perkinscoie.com
19     Representing the State of Louisiana
20
21
22
23
24
```

Page 5

```
 1   APPEARANCES (CONTINUED):
 2
 3   WEINBERG, WHEELER, HUDGINS, GUNN &
     DIAL, LLC
 4     BY:  NICHOLAS P. PANAYOTOPOULOS, ESQ.
       3344 Peachtree Road, NE
 5     Suite 2400
       Atlanta, Georgia 30326
 6     (404) 876-2700
       npanayo@wwhgd.com
 7     Representing Various Banner
       Defendants
 8
 9
10   BRENNER, EVANS & MILLMAN, P.C.
       BY:  THEODORE I. BRENNER, ESQUIRE
11     411 East Franklin Street
       Suite 200
12     Richmond, Virginia 23218
       (804) 644-1300
13     Representing Tobin Trading Company
14
15   McKENRY, DANCIGERS, DAWSON &
     LAKE, P.C.
16     BY:  J. BRIAN SLAUGHTER, ESQUIRE
       192 Ballard Court
17     Suite 400
       Virginia Beach, Virginia 23462
18     (757) 461-2500
       Jbslaughter@va-law.org
19     Representing Atlantic Homes LLC and
       Multiple Other Virginia-Based
20     Defendants
21
22
23
24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 6

```
1   APPEARANCES (CONTINUED):
2
3       SHER GARNER CAHILL RICHTER KLEIN &
        HILBERT, L.L.C.
4       BY:  MATTHEW C. CLARK, ESQUIRE
        909 Poydras Street
5       Suite 2800
        New Orleans, Louisiana 70112
6       (504) 299-2100
        mclark@shergarner.com
7       Representing the Southern Home
        Defendants
8
9       SINNOTT, NUCKOLS & LOGAN, PC
10      BY:  KENNETH F. HARDT, ESQUIRE
        13811 Village Mill Drive
11      Midlothian, Virginia 23114
        (804) 378-7600
12      khardt@snllaw.com
        Representing Venture Supply, Inc. and
13      Porter-Blaine Corp.
14
15
16
17
18
19
20
21
22
23
24
```

Page 8

```
1   APPEARANCES VIA TELEPHONE (CONTINUED):
2
3       DUPLASS ZWAIN BOURGEOIS PFISTER &
        WEINSTOCK
4       BY:  PHILIP WATSON, ESQUIRE
        3838 N. Causeway Boulevard
5       Suite 2900
        Metairie, Louisiana 70002
6       (504) 832-3700
        pwatson@duplass.com
7       Representing R&H Masonry, Inc., and
        Swedberg Enterprises, Inc.
8
9
        RUMBERGER, KIRK & CALDWELL, P.A.
10      BY:  ABIGAIL ROBERTS, ESQUIRE
        Brickell Bayview Centre, Suite 3000
11      80 Southwest 8th Street
        Miami, Florida 33130
12      (305) 358-5577
        aroberts@rumberger.com
13      Representing Defendants' Liaison
        Counsel for  Installers
14
15
        HAYNSWORTH SINKLER BOYD, P.A.
16      BY:  CHRISTOPHER B. MAJOR, ESQUIRE
        75 Beattie Place - 11th Floor
17      Greenville, South Carolina 29601
        (864) 240-3200
18      cmajor@hsblawfirm.com
        Representing USG Corporation and L&W
19      Supply Corporation
20
        PHELPS DUNBAR LLP
21      BY:  MITCHELL P. HASENKAMPF, ESQUIRE
        Canal Place
22      365 Canal Street, Suite 2000
        New Orleans, Louisiana 70130-6534
23      (504) 584-9249
        mitchell.hasenkampf@phelps.com
24      Representing State Farm
```

Page 7

```
1   APPEARANCES VIA TELEPHONE:
2
3       KUCHLER POLK SCHELL WEINER &
        RICHESON LLC
4       BY:  FRANCIS X. deBLANC, III,
        1615 Poydras Street
5       Suite 1300
        New Orleans, Louisiana 70112
6       (504) 592-0691
        slauricella@kuchlerpolk.com
7       Representing Creola Ace Hardware and
        Thomas Gould Inc. in the MDL
8
9       HUNTON & WILLIAMS LLP
10      BY:  A. TODD BROWN, ESQUIRE
        Bank of America Plaza
11      101 South Tryon Street
        Suite 3500
12      Charlotte, North Carolina  28280
        (704) 378-4700
13      Representing Stock Building Supply,
        LLC
14
15
        JONES, WALKER, WAECHTER, POITEVENT,
16      CARRERE & DENEGRE LLP
        BY:  MEGAN E. DONOHUE, ESQUIRE
17      600 Jefferson Street, Suite 1600
        Lafayette, Louisiana 70501
18      (337) 262-9062
        mdonohue@joneswalker.com
19      Representing Fireman's Fund Insurance
        Company
20
21
22
23
24
```

Page 9

```
1   APPEARANCES VIA TELEPHONE (CONTINUED):
2
3       FULMER LEROY ALBEE BAUMANN
        BY:  CANDACE MOSS, ESQUIRE
4       2866 East Oakland Park Boulevard
        Ft. Lauderdale, Florida 33306
5       (954) 707-4430
        mosscandace@fulmerleroy.com
6       Representing Independent Builders
        Supply Association (IBSA)
7
8
        THOMPSON COE COUSINS & IRONS, L.L.P.
9       BY:  SUZANNE M. PATRICK, ESQUIRE
        One Riverway, Suite 1600
10      Houston, Texas 77056
        (713) 403-8210
11      spatrick@thompsoncoe.com
        Representing The North River
12      Insurance Company
13
14      BERNARD, CASSISA, ELLIOTT & DAVIS,
        APLC
15      BY:  CAROLINE E. ELLIOTT, ESQUIRE
        1615 Metairie Road
16      Metairie, Louisiana 70005
        (504) 834-2612
17      elliottc@bernard-cassisa.com
        Representing  Phillips Abita Lumber
18      Company, Inc.
19
20
21
22
23
24
```

3 (Pages 6 to 9)

Confidential - Subject to Further Confidentiality Review

Page 10

1  APPEARANCES VIA STREAM:
2
3  BECNEL LAW FIRM, L.L.C.
   BY:  ROBERT BECNEL, ESQUIRE
4  106 W. 7th Street
   Reserve, Louisiana 70084
5  (985) 536-1186
   robbecnel@aol.com
6  Representing the Plaintiffs'
   Steering Committee
7
8
   QUINN EMANUEL URQUHART & SULLIVAN,
9  LLP
   BY: CLINTON DOCKERY
10 51 Madison Avenue, 22nd Floor
   New York, New York 10010
11 (212) 849-7000
   clintondockery@quinnemanuel.com
12 Representing Chartis Select Insurance
   Company and Related Chartis Insurers
13
14
   JONES, WALKER, WAECHTER, POITEVENT,
15 CARRERE & DENEGRE LLP
   BY:  MEGAN E. DONOHUE, ESQUIRE
16 600 Jefferson Street, Suite 1600
   Lafayette, Louisiana 70501
17 (337) 262-9062
   mdonohue@joneswalker.com
18 Representing Fireman's Fund Insurance
   Company
19
20
21
22
23
24

Page 11

1  APPEARANCES VIA STREAM (CONTINUED):
2
3  WOODLEY WILLIAMS LAW FIRM
   BY:  DONALD C. BROWN, ESQUIRE
4  1 Lakeshore Drive
   Suite 1750
5  Lake Charles, Louisiana 70629
   (337) 433-6328
6  dcbrown@woodleywilliams.com
   Representing Devon International,
7  Inc. Formerly, Devon International
   Trading, Inc.
8
9
   DEUTSCH, KERRIGAN & STILES
10 BY:  MELISSA M. SWABACKER, ESQUIRE
   755 Magazine St.
11 New Orleans, Louisiana  70130
   (504) 581-5141
12 mswabacker@dkslaw.com
   Representing Landmark American
13 Insurance Company
14
15 KUCHLER POLK SCHELL WEINER &
   RICHESON LLC
16 BY:  SOPHIA L. LAURICELLA, ESQUIRE
   1615 Poydras Street
17 Suite 1300
   New Orleans, Louisiana 70112
18 (504) 592-0691
   slauricella@kuchlerpolk.com
19 Representing Creola Ace Hardware and
   Thomas Gould Inc. in the MDL
20
21
22
23
24

Page 12

1  APPEARANCES VIA STREAM (CONTINUED):
2
3    TAYLOR WALKER, P.C.
     BY:  CHRISTOPHER J. WIEMKEN, ESQUIRE
4    555 E. Main Street
     Suite 1300
5    Norfolk, Virginia 23510
     (757) 625-7300
6    Cwiemken@taylorwalkerlaw.com
7
8  ALSO PRESENT:
9
10 Stephanie Chin, Official Interpreter
   (Interpreter 1)
11
12 Una Wong, Check Interpreter
   (Interpreter 2)
13              -  -  -
14
15
16
17
18
19
20
21
22
23
24

Page 13

1              -  -  -
2         I N D E X
3              -  -  -
4
5  Testimony of:  TONGCHUN JIA
6  By Mr. Seeger              23
7
8
9         E X H I B I T S
9              -  -  -
10
11 NO.        DESCRIPTION       PAGE
12 Jia-1   Handwritten note,     59
        Zhang Jiaiu Chun, Chen
13      Xinghua, and Zhao
        Siuyun
14
        Jia-2   Document entitled    81
15      "Shandong Taihe
        Dongxin Co., Ltd.," 12
16      pages
17 Jia-3   Handwritten note in    112
        Chinese
18
        Jia-4   Handwritten note, Pang  138
19      Shi Liang
20 Jia-5   Handwritten note, Zhou  148
        Wan and Wu Fade
21
22 Jia-6   Handwritten note, Ren   148
        Xu Lian and Xue Yu Li
23 Jia-7   Handwritten note, Keng  156
        Ming Guo, Ren Xu Lian
24      and Xue Yu Li

Confidential - Subject to Further Confidentiality Review

Page 182

1    you're interpreting it, and he
2    doesn't want you --
3         INTERPRETER 1:  I'm not
4    trying --
5         MR. SEEGER:  Great.
6         INTERPRETER 1:  No, no, no.
7    It is not my job.  I have never
8    done this in the 20 years of my
9    career.
10        MR. SEEGER:  Okay.  No, no,
11   no.  You're doing a great job.
12        INTERPRETER 1:  I just want
13   to clarify the concepts sort of --
14        MR. SEEGER:  He wants to
15   make sure his witness testifies,
16   that's all.
17        INTERPRETER 1:  Okay.  Good.
18   BY MR. SEEGER:
19        Q.   Okay.  Let me -- I'm going
20   to back up.  Okay?  When I refer to --
21        Tell the witness when I
22   refer in my questions to the Taihe Group,
23   I'm referring to a group of companies.
24   Is that his understanding?

Page 183

1         A.   Yes.
2         Q.   Okay.
3              Is he aware of TG marketing
4    itself as being a part of the Taihe
5    Group?
6         A.   Sometimes they did mention
7    it like this.
8         Q.   And why?  Why would TG
9    mention itself in this way, so we
10   understand?
11        A.   This I also don't
12   understand, because more than ten years
13   ago, before I come, they did not do it
14   before.  After I come, I gradually,
15   they -- they don't call it this way.
16        Q.   Is it called anything at the
17   present?
18        A.   Taishan Gypsum.
19        Q.   Were there other --
20             Other than TG, were there
21   other companies that he could identify
22   for us that were part of the Taihe Group
23   when it was known as the Taihe Group?
24        A.   I cannot say.

Page 184

1         Q.   You cannot say?
2              Are you aware that there is
3    currently still up a website that uses
4    the name Taihe Group, and it also, you
5    know, it shows it as -- I'm going to mark
6    it.  It's in English, though.  He's not
7    going to be able to read it.
8         MR. CYR:  I don't mind you
9    asking him that question if you
10   want to do it that way.
11            - - -
12        (Whereupon, Deposition
13   Exhibit Jia-8, Printout from
14   website, 2 pages, was marked for
15   identification.)
16            - - -
17        MR. SEEGER:  I'm sorry, were
18   you talking to the witness?
19        INTERPRETER 1:  I'm
20   translating the question.  I never
21   talk to him.
22        MR. SEEGER:  I think we got
23   off track, that's all.
24        MR. CYR:  Yes.  I just want

Page 185

1    to state for the record that as
2    you're asking him the question,
3    are you aware that there's a
4    website, and then you're handing
5    him a document that he can't read,
6    there is a suggestion to him that
7    the document that is being handed
8    to him somehow evidences the
9    website.  I'm hoping that you can
10   get through the questions without
11   doing that.
12        MR. SEEGER:  I'll tell you
13   what.  I don't really even have a
14   pending question on it.  I'm just
15   going to ask him.
16   BY MR. SEEGER:
17        Q.   So, ask Mr. Jia to please
18   take a look at what we've just marked as
19   Exhibit 8.
20        A.   (Witness complies.)
21        Q.   Now, Mr. Jia, you don't read
22   any English, right?
23        A.   I cannot read it.
24        Q.   Do you understand --

47 (Pages 182 to 185)

Confidential - Subject to Further Confidentiality Review

Page 186

1    Can you read the name
2  Taishan Gypsum in English if you saw it?
3  Would you understand that?
4    A.   It seems like to be it, but
5  I cannot be sure.
6    Q.   If you'd just point him to
7  the very first two words of the first
8  paragraph, would he understand that to
9  mean Taishan Gypsum?  Right, the very
10  first two words?
11    A.   I only recognize Taishan,
12  but I don't recognize the other words.
13    Q.   Could you go to the next
14  page, please, Mr. Jia.
15    A.   (Witness complies.)
16    Q.   And if you'd look at this
17  paragraph right here, the second
18  paragraph, Mr. Cyr, do you see your name
19  in that paragraph, Mr. Jia?
20    A.   Yes, I can see it.
21    Q.   Now, would you have any
22  understanding, sitting here today, as to
23  whether or not this is still up on the --
24  still available on the Internet, on the

Page 187

1  website?  I mean, if I represent to you
2  that I just got this off the website a
3  couple days ago --
4    MR. CYR:  I'm okay with
5  that.
6    MR. SEEGER:  Okay.
7  BY MR. SEEGER:
8    Q.   -- would you dispute that I
9  was able to find this?
10    A.   I don't know.
11    MR. SEEGER:  I'm sorry, what
12  was the problem?
13    MR. CHEN:  The actual
14  question didn't get translated.
15    MR. SEEGER:  Okay.  So did
16  you get my whole question?  Would
17  you repeat it to Mr. Jia?
18    INTERPRETER 1:  I did
19  translate your --
20    MR. SEEGER:  Oh, Linda
21  missed it?
22    THE COURT REPORTER:  I'm
23  sorry, it's right here.
24    - - -

Page 188

1    (Whereupon, the requested
2  portion of the transcript was read
3  by the court reporter as follows:
4    "Q.  If I represent to you
5  that I just got this off the
6  website a couple days ago, would
7  you dispute that I was able to
8  find this?")
9    - - -
10    MR. SEEGER:  That's the
11  question.
12    THE WITNESS:  I don't
13  understand English, and I have no
14  recollection of this.  I don't
15  know what is being written there.
16  BY MR. SEEGER:
17    Q.   But you do recognize -- I
18  know it's in English, but you recognize
19  your name on the second page, right, sir?
20    A.   Yes.
21    Q.   And it describes you on
22  this -- it's in English, but it describes
23  you as the general manager and chairman
24  of the board, so it accurately reflects

Page 189

1  your name and title, correct?
2    MR. CYR:  I'm going to
3  object.  The witness has already
4  said he doesn't understand
5  English.
6    MR. SEEGER:  Would you let
7  him answer that, though?
8    MR. CYR:  Sure.
9    MR. SEEGER:  If he can.
10  BY MR. SEEGER:
11    Q.   You can answer.
12    A.   Well, what do I have to
13  answer?  I'm not sure.
14    Q.   Okay.
15    Let me back up and ask you
16  questions I asked earlier, but I wasn't
17  sure if we really answered.
18    Does TTP market itself, as
19  far as you know, as part of the Taihe
20  Group?
21    A.   According to my
22  understanding, everything, the TTP, TG,
23  Tai'an, and all the other companies under
24  Tai'an, they are all in general being

Confidential - Subject to Further Confidentiality Review

Page 230

1    Q.   Now, in Exhibit 2, which is
2   a document that you acknowledge could be
3   dated, you know, could be back from the
4   time when the company had a different
5   name, which was Shandong Taihe Dongxin,
6   do you find the same language I just read
7   to you as Exhibit 9?
8        INTERPRETER 1:  Counsel, I
9   don't understand what you mean by
10  "find the same language."
11  BY MR. SEEGER:
12       Q.   Exhibit 2, do you see
13  exactly --
14       The identical language that
15  we read in Exhibit 9 with regard to
16  marketing and selling in the U.S., don't
17  you see the identical language in Exhibit
18  2?
19       MR. CYR:  I know you didn't
20  intend to.  I'm just going to
21  object in that I'm not sure that
22  the words here are consistent with
23  your phrase "marketing and selling
24  in the U.S."  There's no -- I have

Page 231

1   no need for the interpreter to
2   interpret what I just said except
3   for to say that, Mr. Jia, you can
4   try to answer the question.
5        MR. SEEGER:  Okay.
6        Would you also tell him that
7   he should feel free to put Exhibit
8   9 and Exhibit 2 in front of him,
9   and he can check the language in
10  both if he'd like.
11       MR. CYR:  I say this
12  respectfully in the interest of
13  advancing time, but the documents
14  do speak for themselves.  And
15  having him give his opinion about
16  whether or not it is the same
17  language, I'm just questioning
18  whether that's the best use of our
19  time.
20       MR. SEEGER:  Well, since
21  it's my time --
22       MR. CYR:  It's your time.
23       THE WITNESS:  I am finished
24  looking at it.

Page 232

1   BY MR. SEEGER:
2        Q.   It's pretty much the same
3   language in both documents, correct,
4   regarding exporting drywall to the U.S.?
5        A.   Yes.
6        Q.   Actually, there's one other
7   part of this, Mr. Jia, I want to ask you
8   about.  I'm sorry.
9        Again, I'm showing you
10  what's been marked as Exhibit 2.  Could
11  you please take a look at -- and I have
12  no problem if your team wants to help him
13  with this.  In English, the paragraph
14  starts with, "It is abundant in raw
15  gypsum resources."  The Chinese portion,
16  if you can point out to him.
17       MR. CYR:  So, right now
18  we're asking Mr. Jia to read --
19  excuse me, ma'am.
20       Right now we're asking Mr.
21  Jia to read this paragraph to
22  prepare for the next question.
23       (Mr. Chen translated to the
24  witness.)

Page 233

1        MR. CYR:  He doesn't seem to
2   understand.
3        MR. CHEN:  You asked him to
4   read, right, to prepare for the
5   next question?
6        MR. CYR:  Yes.
7        Why is she talking with him?
8        MR. CHEN:  I don't know.
9        MR. SEEGER:  They gave him
10  the instruction.  It's okay.
11       INTERPRETER 1:  He wants to
12  clarify.  Does that mean just look
13  at it or to read it out, say it
14  out loud?
15       MR. SEEGER:  You tell him to
16  read it.  He doesn't understand.
17       THE WITNESS:  I finished
18  reading it.
19  BY MR. SEEGER:
20       Q.   Mr. Jia, in that paragraph,
21  in the English version, it says, and, you
22  know, I'm just -- there's a small part at
23  the end, but I have to read it to put it
24  into a context.  "It is abundant in raw

59 (Pages 230 to 233)

Confidential - Subject to Further Confidentiality Review

Page 234

1  gypsum resources, the products 'Taishan'
2  series plasterboard can be used as
3  partition and ceiling material...have
4  advantages:  Fire-proof, sound
5  insulation, heat preservation,
6  quakeproof, and good for health."
7        And could you tell me where
8  your company -- what your company means
9  by the drywall being "good for health"
10  and why that was used here, if you can?
11        MR. CYR:  Before you get to
12  that, are you done?
13        INTERPRETER 1:  Yes.
14        MR. CYR:  I guess I have an
15  objection based on it seems like
16  it's outside the scope of the
17  designated areas for the
18  deposition.
19        MR. SEEGER:  It is a
20  statement made by the company.
21  That's my one question on this
22  document.
23        Did you have another issue?
24        MR. CYR:  Well, let's not

Page 235

1  skirt over my issue so quickly.
2        MR. SEEGER:  I don't think
3  you can stop him from answering
4  that, and rather than argue with
5  you, I figured I'd just --
6        MR. CYR:  What I was going
7  to suggest is that I just wanted
8  to make sure that it didn't become
9  a habit.  It's clearly outside the
10  scope of this deposition.  I have
11  no problems with his answering
12  this question.
13        MR. SEEGER:  Okay.
14        MR. CYR:  But generally, we
15  would like to stay on the
16  jurisdictional issues and the
17  other issues of the designated
18  areas that you've been covering
19  all day.
20        Go ahead.
21        MR. CHEN:  I'll also note
22  that the interpreter was
23  translating from your statement
24  rather than referring to the

Page 236

1  actual text here, referenced here.
2        MR. SEEGER:  So --
3        MR. CYR:  We didn't mean to
4  slow you down.  Go ahead.
5        MR. SEEGER:  No, that's
6  actually -- I just don't
7  understand.
8        When I was reading it, was
9  she reading it to him?
10        MR. CHEN:  No.  Just now
11  when you asked the question, she
12  did a verbatim translation rather
13  than referring to what is written
14  in the Chinese.
15        MR. SEEGER:  Okay.  Because
16  I was reading the English portion
17  into the record.  Okay.  So,
18  that's okay.  We'll fix it.  That
19  was my fault.
20        MR. GRAND:  Just to your
21  statement, your objection, the
22  witness has been designated to
23  testify about marketing plans for
24  Taishan Gypsum.  This is a

Page 237

1  statement in a marketing document.
2  It contains marketing statements
3  about its exports to the U.S.  So,
4  we don't believe it's -- I
5  appreciate that we're not -- I
6  appreciate your position about it
7  being outside the scope, but we
8  think it's fair balance within a
9  statement that he has given.
10        MR. CYR:  We disagree, but
11  I'm allowing the witness to answer
12  the question.
13  BY MR. SEEGER:
14     Q.   Okay.
15        So, here's where we are.  I
16  read into the record, Mr. Jia, the part
17  in English.  You've already looked at the
18  part in Chinese.  There's a statement in
19  there about plasterboard being good for
20  the health, and I'm asking you if you
21  have any understanding of why that
22  statement's in there and what the company
23  meant by it?
24        MR. CHEN:  I'm going to

Confidential - Subject to Further Confidentiality Review

Page 238

1   object again.  She's translating
2   "good for your health" as opposed
3   to referring to what's in the
4   actual text.  "Good for your
5   health."  So --
6         MR. SEEGER:  Well, let me
7   ask you a question.  Does the
8   Chinese say the same thing?
9         INTERPRETER 1:  Yes.
10  Because I was telling him --
11        MR. CYR:  I'm sorry, he
12  asked him a question.  Ma'am,
13  ma'am, he asked him a question.
14        MR. SEEGER:  She's just
15  trying to help.  Okay.
16        MR. CHEN:  She's not
17  giving -- she's not reading the
18  text in the document.  She's doing
19  a separate translation.
20        MR. SEEGER:  But he read it
21  already, and you objected when we
22  asked him to read it.  So, that's
23  why I didn't ask him to do it
24  again.

Page 239

1         MR. CHEN:  Right.  But what
2   I'm noting is, you're asking now
3   about what certain text means.
4         MR. SEEGER:  Right.
5         MR. CHEN:  And instead of
6   referring to the text, she is
7   translating separately the words
8   that you're using.
9         MR. SEEGER:  Okay.  Do me a
10  favor.  I'm going to ask him my
11  question, but just show him the
12  language in the document in
13  Chinese.
14  BY MR. SEEGER:
15        Q.   And my question is, what is
16  the company -- what is his understanding
17  of the basis for making the statement
18  that plasterboard is good for your
19  health?  But just show him the Chinese
20  language in the document and ask him that
21  question that way.
22        INTERPRETER 1:  I was doing
23  verbatim.
24        MR. SEEGER:  Okay.  I

Page 240

1   believe you.
2         INTERPRETER 1:  Because he
3   read it before.  He read it.
4         Okay.  Counsel, would you
5   mind help me, where does it begin?
6   Because I didn't have the document
7   in front of me when both of you
8   were reading.  I did not have the
9   document in front of me when both
10  of you were reading.  Do you want
11  to help me where?
12        MR. SEEGER:  It's this one.
13        THE WITNESS:  (Indicating.)
14        MR. SEEGER:  Yes.  He knows
15  where it is.
16  BY MR. SEEGER:
17        Q.   My question is, what was the
18  basis, what's the company's basis, based
19  on his understanding, for making the
20  statement that plasterboard is good for
21  the health?
22        MR. CHEN:  Objection again.
23  She's translating verbatim, and
24  she's not referring to the text in

Page 241

1   the document.
2         INTERPRETER 1:  That is what
3   a legal interpreter is supposed to
4   be doing.  She's supposed to do
5   verbatim, nothing more.  If
6   there's anything unclear, it's up
7   to the lawyers to follow up.  I
8   don't add or drop anything from
9   what I hear.
10        MR. CYR:  Can I help?
11        INTERPRETER 1:
12  Particularly, I don't have the
13  document in front of me.
14        MR. CYR:  Excuse me, ma'am.
15  Could you ask Mr. Jia if he's able
16  to answer the question?
17        THE WITNESS:  I can totally
18  be able to answer.
19        MR. CYR:  Please do before I
20  shoot myself.
21  BY MR. SEEGER:
22        Q.   Go ahead, answer.
23        INTERPRETER 1:  Because of
24  the accent personally, I need to

61 (Pages 238 to 241)

Confidential - Subject to Further Confidentiality Review

Page 242

1    clarify.  SIR, we have different
2    accent.
3         THE WITNESS:  Regarding the
4    material in China that I can't --
5    I will be able to be in context
6    regarding the introduction of the
7    material of the drywall regarding
8    the characteristic referring to
9    some chemical components.
10   Regarding the drywall, a main
11   component is CASO4.2H2O.
12   CASO4.2H2O is neutral.  It's
13   either acid or alkaline of the
14   drywall.  The wall made out of it,
15   when it is in contact with the
16   human skin, it doesn't affect the
17   skin like the cemented walls
18   affect the human beings because of
19   the acid and the alkaline nature.
20   And also with the drywall, it
21   contained, too, crystalized H2O.
22   Inside the drywall, there is 17
23   percent of the H2O, and when the
24   temperature is high, the water

Page 243

1    dissipated.  So, when the
2    temperature is low, it absorbed
3    humidities from the air.
4         So, because of this nature,
5    because of this phenomena,
6    therefore, it can adjust to
7    humidity and also the temperatures
8    inside this room regarding the
9    air.  Therefore, in general,
10   people believe that the houses
11   built with the drywall is more
12   suitable for human accommodation.
13   That is the reason why for more
14   than 100 years that the developed
15   country and the poor country, they
16   use the drywall.  Well, in my
17   opinion, the way we write down
18   this document, we did not
19   exaggerate.
20        MR. CYR:  Can we take a
21   break?
22        MR. SEEGER:  Yeah.
23        THE VIDEOTAPE TECHNICIAN:
24   The time now is --

Page 244

1         MR. CYR:  Let's have it be a
2    short one, because we're going to
3    finish up at 5:00, so we'll be
4    back in seven, eight minutes, just
5    to go to the bathroom.
6         THE VIDEOTAPE TECHNICIAN:
7    The time now is approximately
8    4:20 p.m., and we are now off the
9    record.
10            - - -
11        (Whereupon, a recess was
12    taken from 4:20 p.m. until
13    4:35 p.m.)
14            - - -
15        THE VIDEOTAPE TECHNICIAN:
16    This begins Tape 7 of today's
17    deposition.  The time now is
18    approximately 4:35 p.m., and we're
19    back on the record.
20   BY MR. SEEGER:
21        Q.    Mr. Jia, do you know who
22   Peng Wenlong is?
23        A.    I know.
24        Q.    Could you tell me who he is,

Page 245

1    what his role is at TG?
2         A.    He is now the manager of the
3    foreign trade company of TG.
4         INTERPRETER 2:  The check
5    interpreter believes the witness
6    said foreign trade department.
7         THE WITNESS:  To me, it is
8    the same thing.
9    BY MR. SEEGER:
10        Q.    As far as you know, has he
11   held any other positions in TG?
12        At any point in time, do you
13   know the other positions he may have
14   held?
15        A.    I cannot recall, but there
16   should be none.
17        Q.    Does Peng Wenlong hold any
18   positions with TTP?
19        A.    He was -- probably worked
20   for the sales of foreign trade.
21        Q.    For TTP, correct?
22        A.    Yes.
23        Q.    And are you aware of him
24   having a formal title at TTP?

62 (Pages 242 to 245)

Confidential - Subject to Further Confidentiality Review

1        UNITED  STATES  DISTRICT  COURT
             EASTERN  DISTRICT  OF  LOUISIANA

2

3   ————————————————————  §  MDL  NO.  2047
    IN  RE:               §
4   CHINESE-            §  SECTION:  L
    MANUFACTURED        §
5   DRYWALL  PRODUCTS   §  JUDGE  FALLON
    LIABILITY          §
6   LITIGATION        §  MAGISTRATE
    ————————————————————  §  JUDGE  WILKINSON

7
                  -   -   -
8
    CROSS  NOTICED  IN  VARIOUS  OTHER  ACTIONS
9
                  -   -   -
10
            April  5,  2011
11
                  -   -   -
12
    CONFIDENTIAL  -  SUBJECT  TO  FURTHER
13        CONFIDENTIALITY  REVIEW
14             -   -   -
15      Videotaped  deposition  of  TONGCHUN
    JIA,  held  at  3  Pedder  Street,  Central,
16   Hong  Kong,  China,  commencing  at  9:03
    a.m.,  on  the  above  date,  before  Linda  L.
17   Golkow,  Certified  Court  Reporter,
    Registered  Diplomate  Reporter,  Certified
18   Realtime  Reporter  and  Notary  Public.
19
                  -   -   -
20
21
22       GOLKOW  TECHNOLOGIES,  INC.
      ph  877.370.3377  |  fax  917.591.5672
23         deps@golkow.com
24

Confidential - Subject to Further Confidentiality Review

Page 271

```
1   APPEARANCES:
2
3   SEEGER WEISS LLP
    BY:  CHRISTOPHER A. SEEGER, ESQUIRE
4   BY:  JEFFREY S. GRAND, ESQUIRE
    One William Street
5   New York, New York 10004
    (212) 584-0700
6   cseeger@seegerweiss.com
    jgrand@seegerweiss.com
7   Representing the Plaintiffs' Steering
    Committee
8
9
    COLSON HICKS EIDSON
10  BY:  PATRICK S. MONTOYA, ESQUIRE
    255 Alhambra Circle
11  Penthouse
    Coral Gables, Florida 33134
12  (305) 476-7400
    patrick@colson.com
13  Representing Plaintiffs' Steering
    Committee in the Federal and State
14  Coordinated Actions
15
16  LAW OFFICES OF RICHARD SERPE, P.C.
    BY:  RICHARD J. SERPE, ESQUIRE
17  580 East  Main Street
    Suite 310
18  Norfolk, Virginia 23510
    (757) 233-0009
19  rserpe@serpefirm.com
    Representing the MDL Plaintiffs and
20  the Germano Plaintiffs
21
22
23        - - -
24
```

Page 272

```
1   APPEARANCES (CONTINUED):
2
3   HOGAN LOVELLS US LLP
    BY:  JOE CYR, ESQUIRE
4   BY:  FRANK T. SPANO, ESQUIRE
    BY:  ERIC D. STATMAN, ESQUIRE
5   BY:  RENEE GARCIA, ESQUIRE
    875 Third Avenue
6   New York, New York 10022
    (212) 918-3000
7   joe.cyr@hoganlovells.com
    frank.spano@hoganlovells.com
8   renee.garcia@hoganlovells.com
    eric.statman@hoganlovells.com
9   Representing Taishan Gypsum Co.
    Ltd. and Tai'an Taishan
10  Plasterboard Company Ltd. and the
    Witness, Tongchun Jia
11
12
    HOGAN LOVELLS INTERNATIONAL LLP
13  BY:  EUGENE CHEN, ESQUIRE
    18th Floor, Park Place
14  1601 Nanjing Road West
    Shanghai, China 200040
15  (86 21) 6122 3800
    eugene.chen@hoganlovells.com
16  Representing Taishan Gypsum Co.
    Ltd. and Tai'an Taishan
17  Plasterboard Company Ltd. and the
    Witness, Tongchun Jia
18
19
    JIGTIAN & GONGCHENG
20  BY:  CHUNGANG DONG, ESQUIRE
    34/F, Tower 3, China Central Place
21  77 Jianguo Road -  Chaoyang District
    Beijing, China  200040
22  (86 10) 5809 1016
    Representing Taishan Gypsum Company
23  Limited and Tai'an Taishan
    Plasterboard Company
24
```

Page 273

```
1   APPEARANCES (CONTINUED):
2
3   GREENBERG TRAURIG, LLP
    BY:  HILARIE BASS, ESQUIRE
4   1221 Brickell Avenue
    Miami, Florida 33131
5   (305) 579-0745
    bassh@gtlaw.com
6   Representing the Home Builders
    Steering Committee
7
8
    GALLOWAY JOHNSON TOMPKINS BURR and
9   SMITH
    BY:  CARLINA C. EISELEN, ESQUIRE
10  One Shell Square
    701 Poydras Street, 40th Floor
11  New Orleans, Louisiana 70139
    (504) 525-6802
12  ceiselen@gjtbs.com
    Representing Interior/Exterior
13  Building Supply
14
15  PERKINS COIE LLP
    BY:  DAVID L. BLACK, ESQUIRE
16  1899 Wynkoop Street - Suite 700
    Denver, Colorado 80202
17  (303) 291-2300
    DBlack@perkinscoie.com
18  Representing the State of Louisiana
19
20  WEINBERG, WHEELER, HUDGINS, GUNN &
    DIAL, LLC
21  BY:  NICHOLAS P. PANAYOTOPOULOS, ESQ.
    3344 Peachtree Road, NE
22  Suite 2400
    Atlanta, Georgia 30326
23  (404) 876-2700
    npanayo@wwhgd.com
24  Representing Various Banner
```

Page 274

```
1   APPEARANCES (CONTINUED):
2
3   BRENNER, EVANS & MANICA, P.C.
    BY:  THEODORE I. BRENNER, ESQUIRE
4   411 East Franklin Street
    Suite 200
5   Richmond, Virginia 23218
    (804) 644-1300
6   Representing Tobin Trading Company
7
8   McKENRY, DANCIGERS, DAWSON &
    LAKE, P.C.
9   BY:  J. BRIAN SLAUGHTER, ESQUIRE
    192 Ballard Court - Suite 400
10  Virginia Beach, Virginia 23462
    (757) 461-2500
11  Jbslaughter@va-law.org
    Representing Atlantic Homes LLC and
12  Multiple Other Virginia-Based
    Defendants
13
14
    SHER GARNER CAHILL RICHTER KLEIN &
15  HILBERT, L.L.C.
    BY:  MATTHEW C. CLARK, ESQUIRE
16  909 Poydras Street - Suite 2800
    New Orleans, Louisiana 70112
17  (504) 299-2100
    mclark@shergarner.com
18  Representing the Southern Home
    Defendants
19
20
    SINNOTT, NUCKOLS & LOGAN, PC
21  BY:  KENNETH F. HARDT, ESQUIRE
    13811 Village Mill Drive
22  Midlothian, Virginia 23114
    (804) 378-7600
23  khardt@snllaw.com
    Representing Venture Supply, Inc. and
24  Porter-Blaine Corp.
```

2 (Pages 271 to 274)

Confidential - Subject to Further Confidentiality Review

Page 275

1  APPEARANCES VIA TELEPHONE:
2
3    KUCHLER POLK SCHELL WEINER &
     RICHESON LLC
4    BY:  FRANCIS X. deBLANC, III,
     1615 Poydras Street
5    Suite 1300
     New Orleans, Louisiana 70112
6    (504) 592-0691
     slauricella@kuchlerpolk.com
7    Representing Creola Ace Hardware and
     Thomas Gould Inc. in the MDL
8
9    HUNTON & WILLIAMS LLP
10   BY:  A. TODD BROWN, ESQUIRE
     Bank of America Plaza
11   101 South Tryon Street
     Suite 3500
12   Charlotte, North Carolina  28280
     (704) 378-4700
13   Representing Stock Building Supply,
     LLC
14
15
     JONES, WALKER, WAECHTER, POITEVENT,
16   CARRERE & DENEGRE LLP
     BY:  MEGAN E. DONOHUE, ESQUIRE
17   600 Jefferson Street, Suite 1600
     Lafayette, Louisiana 70501
18   (337) 262-9062
     mdonohue@joneswalker.com
19   Representing Fireman's Fund Insurance
     Company
20
21
22
23
24

Page 276

1  APPEARANCES VIA TELEPHONE (CONTINUED):
2
3    DUPLASS ZWAIN BOURGEOIS PFISTER &
     WEINSTOCK
4    BY:  PHILIP WATSON, ESQUIRE
     3838 N. Causeway Boulevard
5    Suite 2900
     Metairie, Louisiana 70002
6    (504) 832-3700
     pwatson@duplass.com
7    Representing R&H Masonry, Inc., and
     Swedberg Enterprises, Inc.
8
9    RUMBERGER, KIRK & CALDWELL, P.A.
10   BY:  ABIGAIL ROBERTS, ESQUIRE
     Brickell Bayview Centre, Suite 3000
11   80 Southwest 8th Street
     Miami, Florida 33130
12   (305) 358-5577
     aroberts@rumberger.com
13   Representing Defendants' Liaison
     Counsel for  Installers
14
15
16   HAYNSWORTH SINKLER BOYD, P.A.
     BY:  CHRISTOPHER B. MAJOR, ESQUIRE
17   75 Beattie Place - 11th Floor
     Greenville, South Carolina 29601
18   (864) 240-3200
     cmajor@hsblawfirm.com
19   Representing USG Corporation and L&W
     Supply Corporation
20
21   PHELPS DUNBAR LLP
     BY:  MITCHELL P. HASENKAMPF, ESQUIRE
22   Canal Place
     365 Canal Street, Suite 2000
23   New Orleans, Louisiana 70130-6534
     (504) 584-9249
24   mitchell.hasenkampf@phelps.com

Page 277

1  APPEARANCES VIA TELEPHONE (CONTINUED):
2
3
     FULMER LEROY ALBEE BAUMANN
4    BY:  MICHAEL P. MCCAHILL, ESQUIRE
     2866 East Oakland Park Boulevard
5    Ft. Lauderdale, Florida 33306
     (954) 707-4430
6    mmccahill@fulmerleroy.com
     Representing Independent Builders
7    Supply Association (IBSA)
8
9    THOMPSON COE COUSINS & IRONS, L.L.P.
     BY:  SUZANNE M. PATRICK, ESQUIRE
10   One Riverway, Suite 1600
     Houston, Texas  77056
11   (713) 403-8210
     spatrick@thompsoncoe.com
12   Representing The North River
     Insurance Company
13
14
     BERNARD, CASSISA, ELLIOTT & DAVIS,
15   APLC
     BY:  CAROLINE E. ELLIOTT, ESQUIRE
16   1615 Metairie Road
     Metairie, Louisiana 70005
17   (504) 834-2612
     elliottc@bernard-cassisa.com
18   Representing  Phillips Abita Lumber
     Company, Inc.
19
20
21
22
23
24

Page 278

1  APPEARANCES VIA STREAM:
2
3    BECNEL LAW FIRM, L.L.C.
     BY:  ROBERT BECNEL, ESQUIRE
4    106 W. 7th Street
     Reserve, Louisiana 70084
5    (985) 536-1186
     robbecnel@aol.com
6    Representing the Plaintiffs'
     Steering Committee
7
8
9    QUINN EMANUEL URQUHART & SULLIVAN,
     LLP
10   BY: CLINTON DOCKERY
     51 Madison Avenue, 22nd Floor
11   New York, New York 10010
     (212) 849-7000
12   clintondockery@quinnemanuel.com
     Representing Chartis Select Insurance
13   Company and Related Chartis Insurers
14
15   JONES, WALKER, WAECHTER, POITEVENT,
     CARRERE & DENEGRE LLP
16   BY:  MEGAN E. DONOHUE, ESQUIRE
     600 Jefferson Street, Suite 1600
17   Lafayette, Louisiana 70501
     (337) 262-9062
18   mdonohue@joneswalker.com
     Representing Fireman's Fund Insurance
19   Company
20
21
22
23
24

3 (Pages 275 to 278)

Confidential - Subject to Further Confidentiality Review

Page 279

```
1   APPEARANCES VIA STREAM (CONTINUED):
2
3   WOODLEY WILLIAMS LAW FIRM
    BY:  DONALD C. BROWN, ESQUIRE
4   1 Lakeshore Drive
    Suite 1750
5   Lake Charles, Louisiana 70629
    (337) 433-6328
6   dcbrown@woodleywilliams.com
    Representing Devon International,
7   Inc. Formerly, Devon International
    Trading, Inc.
8
9
    DEUTSCH, KERRIGAN & STILES
10  BY:  MELISSA M. SWABACKER, ESQUIRE
    755 Magazine St.
11  New Orleans, Louisiana  70130
    (504) 581-5141
12  mswabacker@dkslaw.com
    Representing Landmark American
13  Insurance Company
14
15  KUCHLER POLK SCHELL WEINER &
    RICHESON LLC
16  BY:  SOPHIA L. LAURICELLA, ESQUIRE
    1615 Poydras Street
17  Suite 1300
    New Orleans, Louisiana 70112
18  (504) 592-0691
    slauricella@kuchlerpolk.com
19  Representing Creola Ace Hardware and
    Thomas Gould Inc. in the MDL
20
21
22
23
24
```

Page 280

```
1   APPEARANCES VIA STREAM (CONTINUED):
2
3   TAYLOR WALKER, P.C.
    BY:  CHRISTOPHER J. WIEMKEN, ESQUIRE
4   555 E. Main Street
    Suite 1300
5   Norfolk, Virginia 23510
    (757) 625-7300
6   Cwiemken@taylorwalkerlaw.com
7
8   ALSO PRESENT:
9
10  Stephanie Chin, Official Interpreter
    (Interpreter 1)
11
12  Una Wong, Check Interpreter
    (Interpreter 2)
13
14
15          - - -
16
17
18
19
20
21
22
23
24
```

Page 281

```
1           - - -
2        I N D E X
3         - - -
4
5   Testimony of:  TONGCHUN JIA
6   By Mr. Seeger          283
    By Mr. Montoya         407
7   By Ms. Bass            437
    By Mr. Hardt           456
8   By Mr. Brenner         482
9
10          - - -
11       E X H I B I T S
12
13  NO.      DESCRIPTION      PAGE
14  Jia-10   Translation of TG    284
             0020401, Bates Nos.
15           TTRNSL0071 through
             TTRNSL0073
16
    Jia-11   Taishan Gypsum Co.   322
17           Ltd. Manufacturer
             Profile Form, Bates
18           Nos. DPF-TAISHAN
             GYPSUM CO LTD-1-00001
19           through
             DPF-TAISHANGYPSUM CO
20           LTD-1-00014
21  Jia-12   Tai'an Taishan       408
             Plasterboard Co. Ltd.
22           Manufacturer Profile
             Form
23
24
```

Page 282

```
1           - - -
2   DEPOSITION SUPPORT INDEX
3           - - -
4
    Direction to Witness Not to Answer
5
          Page Line
6
           350 7
7          356 18
8
9
    Request for Production of Documents
10
          Page Line
11
12
13
    Stipulations
14
          Page Line
15
16
17
18
19  Questions/Objections Marked
20        Page Line
21         318 16
           319 17
22         336 12
           452 7
23
24
```

4 (Pages 279 to 282)

Confidential - Subject to Further Confidentiality Review

Page 283

1              - - -
2          THE VIDEOTAPE TECHNICIAN:
3    This begins Tape 1 of Day 2 of the
4    deposition of Mr. Tongchun Jia.
5    The time now is 9:03 a.m., and we
6    are back on the record.
7          Mr. Jia, I want to remind
8    you that you are still under oath
9    from yesterday.
10             - - -
11         TONGCHUN JIA, after having
12    been previously sworn through the
13    interpreter, was examined and
14    testified as follows:
15             - - -
16         EXAMINATION
17             - - -
18   BY MR. SEEGER:
19     Q.    Good morning, Mr. Jia.  I'm
20   going to continue the questioning for you
21   this morning.
22         MR. SEEGER:  Linda, I would
23   like to mark this as Exhibit 10.
24             - - -

Page 284

1          (Whereupon, Deposition
2    Exhibit Jia-10, Translation of TG
3    0020401, Bates Nos. TTRNSL0071
4    through TTRNSL0073, was marked for
5    identification.)
6              - - -
7    BY MR. SEEGER:
8      Q.    Mr. Jia, would you take a
9    look at what we've just marked as Exhibit
10   10.
11     A.    (Witness reviewing
12   document.)
13     Q.    And would you just take a
14   moment to look through it and tell me if
15   there's any inaccuracies or if that
16   accurately reflects the positions you
17   hold with entities related to Taishan, to
18   TG.
19     A.    I don't understand English.
20   Would you mind to translate it for me.
21         MR. CYR:  May I just state
22   for the record, Mr. Seeger, that I
23   believe that this Exhibit Number
24   10, that is a document that we've

Page 285

1    provided you this morning in
2    response to your request yesterday
3    for the positions that Mr. Jia
4    holds with subsidiaries of Taishan
5    Gypsum.  And it's in English.
6          MR. SEEGER:  You are
7    completely right.  When you're
8    going without sleep and you're
9    jetlagged, I forgot he doesn't
10   speak English or read it.
11         Okay, well, thank you.  Mr.
12   Cyr was kind enough to provide
13   this list that we've marked as
14   Exhibit 10 of Mr. Jia's positions
15   with TG-related entities.
16         Is that a fair
17   characterization of this?
18         MR. CYR:  Yes.
19         MR. SEEGER:  You can put it
20   aside.
21         MR. CYR:  The only thing I
22   feel compelled to say is that you
23   all have defined the phrase
24   "related entities" in a certain

Page 286

1    way, I believe, that arguably
2    would include BNBM.  Yesterday he
3    testified that at some point in
4    time that he's a director of BNBM.
5    Exhibit 10 does not purport to
6    reflect that.
7          MR. SEEGER:  That's fine.
8    Okay.  Subject to that.
9    BY MR. SEEGER:
10     Q.    Let me just add, I
11   understand that Mr. Jia does not --
12         Mr. Jia, I understand you do
13   not speak or read English, but were you
14   involved, as best as you know, with the
15   creation of the document that's marked as
16   Exhibit 10?
17     A.    I did not participate.
18     Q.    And has --
19         Without getting into any
20   discussions you've had with anybody, has
21   anybody described Exhibit 10 to you prior
22   to you seeing it now?
23     A.    I'm not -- I cannot be sure,
24   but my feeling tells me that a lot of the

5 (Pages 283 to 286)

Confidential - Subject to Further Confidentiality Review

Page 287

1  content is related to my subsidiaries.
2      Q.    That's fine.  You can put it
3  aside.
4          MR. CYR:  And just to offer,
5  we're happy to state that this
6  information was obtained from the
7  books and records of the companies
8  and that we can confer with Mr.
9  Jia during a break to see if he
10  has any information that it's
11  inaccurate in any respect.
12         MR. SEEGER:  Okay.  So, I'm
13  just asking, Counsel, you have not
14  yet had an opportunity to do that
15  before we marked it?
16         MR. CYR:  No.
17         MR. SEEGER:  Okay.  Why
18  don't we do that.  We can always
19  mark it up.
20         MR. CYR:  Whatever you want
21  to do.
22         MR. SEEGER:  That's fine.
23  We'll move on.
24  BY MR. SEEGER:

Page 288

1      Q.    Mr. Jia, do you review or
2  consult in the creation of marketing
3  materials for the company?
4      A.    I did see this material, but
5  I did not pay too much attention.  I did
6  not pay too much attention.
7      Q.    Mr. Jia, without regard to
8  any specific materials, do you generally
9  review or consult in the creation of
10  marketing materials for the company, for
11  TG?
12     A.    I don't understand the
13  concept of "consult."
14     Q.    Okay.  Do you review
15  marketing materials created by anyone --
16  let me strike that.
17         Do you review marketing
18  materials that are created for the use of
19  TG in the marketing of drywall anywhere?
20  Strike that too.  That's awful.
21         Do you generally review --
22  why do I keep asking the same question?
23         What is your role at TG with
24  regard to the reviewing of marketing

Page 289

1  materials?
2      A.    Some of the marketing
3  materials, for example, those materials
4  that we saw yesterday, usually we would
5  have discussions among the department of
6  the sales, the production and also some
7  people from the office, they discuss it.
8  And then they would look for a print
9  shop.  Then they do the layout.  After
10  that, they come to me.  And I didn't
11  really pay much attention to this type of
12  things, and I would just say, okay, okay,
13  go ahead and print it.  So usually this
14  is the way how things are done.  Unless
15  these are very significant, major issues,
16  then I will really pay attention to take
17  care of it.
18     Q.    And then, Mr. Jia, with
19  regard to marketing, what would you
20  consider a significant or major issue
21  that would require your attention?
22     A.    I would like to tell you
23  some of the basic way, fundamental way,
24  of how a Chinese company operate.

Page 290

1      Q.    Please do.
2      A.    Therefore, it will be
3  beneficial for you to understand some of
4  the information of our company.
5      Q.    Go ahead.  Please tell us.
6      A.    Okay.  After China entered
7  the WTO, the Chinese government requires
8  the economy to go forward globally, and
9  it also requires opening of the policy
10  and reform of the policies.
11         Therefore, people always say
12  that our company is an open company.  We
13  are embracing the whole world.  We are
14  using the language that is being used by
15  the WTO and to apply to our marketing
16  material.  If we don't make this type of
17  statements, other people might
18  consider -- when they look at it, they
19  might consider our company, is it too
20  small, is it too backward.
21         So the information that you
22  saw yesterday, it had a statement called
23  based in China but move forward towards
24  the world.  This is how we come up with

6 (Pages 287 to 290)

Page 327

1  how do you know those figures are true,
2  Mr. Jia?
3       A.   I'm referring to this
4  company.
5       INTERPRETER 1:  The witness
6    is pointing to the name of this
7    company, Venture Supply.
8       THE WITNESS:  I don't know
9    how to call this company.  And
10   what I am saying is true, is that
11   TG sold the plasterboard to this
12   company is true.
13 BY MR. SEEGER:
14      Q.   So, you do -- he's not
15 finished.
16      A.   We exported a lot of
17 plasterboards, of all the plasterboard.
18 They turn around and be sold in China,
19 that I don't know.  Therefore, these two
20 facts I just stated, they are not
21 contrary.
22      Q.   Mr. Jia, the statement in
23 the document in English says that there
24 were shipments of drywall to Venture

Page 328

1  Supply to the United States.  Does it say
2  a similar thing in the document in
3  Chinese?
4       MR. CYR:  I'm sorry,
5    Counsel, where are you reading
6    that?
7       MR. SEEGER:  I'm in that
8    same section, Roman III, 2.  It's
9    the section that says "Amount of
10   drywall exported."  And then next
11   to it, I'm taking the words there
12   where it says "Shipments of
13   drywall by Venture Supply to the
14   United States."
15      MR. CYR:  What's the
16   question?
17      MR. SEEGER:  The question
18   is, does it say exactly the same
19   thing in the document in Chinese
20   in front of you?
21      MR. CYR:  Thank you.
22      THE WITNESS:  I don't know
23 English, therefore, to check the
24 Chinese against the correctness of

Page 329

1  the English, whether the English
2    has made a mistake or Chinese made
3    a mistake, I cannot do it.
4  BY MR. SEEGER:
5       Q.   That's not my question, Mr.
6  Jia, respectfully.
7       My question is, in the
8  Chinese version of this document, in
9  section III(2) where it says "Amount of
10 drywall exported," does it say
11 essentially the same thing in the Chinese
12 document, that there were shipments of
13 drywall by Venture Supply to the United
14 States of TG drywall?  Does it basically
15 say that in the Chinese version or not?
16      A.   In this document in Chinese,
17 it says this plasterboard was shipped to
18 the United States.
19      Q.   Okay.  So, you do know in
20 TG, you can tell us exactly how much
21 plasterboard was shipped to the U.S.,
22 correct?  You can find that information,
23 can't you?
24      MR. CYR:  Objection.  The

Page 330

1  question is vague.
2       You can try to answer.
3       THE WITNESS:  Incorrect.
4  BY MR. SEEGER:
5       Q.   Explain why.  Why am I
6  incorrect?
7       A.   Because TG also including
8  all the subsidiaries, the sales for every
9  year is very large.  So, the amount is
10 too large.  It is impossible for me to
11 know of every single contract.  That is
12 impossible.  Even as a GM, I cannot do
13 it.
14      Q.   So, you were able to find
15 information regarding drywall exported to
16 Venture Supply in the United States, but
17 you're saying you can't do that for
18 everyone you've exported to?  Is that
19 your answer?
20      MR. CYR:  Objection on two
21   grounds.  One is it might be
22   unclear whether or not you're
23   referring to Mr. Jia personally or
24   the company Taishan Gypsum just

Confidential - Subject to Further Confidentiality Review

Page 331

1  because of the language
2  difference.  And then secondly,
3  your use of the phrase "shipped to
4  Venture Supply in the United
5  States."
6       No need to interpret that
7  unless Mr. Seeger would like to.
8       MR. SEEGER:  No.  He can
9  answer my question.
10      MS. BASS:  Once again, let
11  me just note an objection to the
12  speaking objection.
13      MR. SEEGER:  So he's not
14  asking you to read the objection
15  to the witness.  He's just asking
16  you to read my question.
17      THE WITNESS:  Yes.
18  BY MR. SEEGER:
19      Q.   Where in the company did you
20  go or did whoever works for you go to
21  find the information that's reflected on
22  this exhibit in front of you regarding
23  Venture Supply?  Where in the company
24  would you go to find that?

Page 332

1       A.   Of course they have it in
2  the foreign sales department.
3       Q.   Does the foreign sales
4  department keep their records on a
5  computer?
6       A.   We require this to be done.
7  I can recall that originally I requested
8  my staff to do this.
9       Q.   Who specifically on your
10  staff was asked to do this for you, Mr.
11  Jia?
12      A.   The manager of the foreign
13  sales department, Peng Wenlong.  I think
14  he should know of this type of
15  information.
16      Q.   Do your financial auditors
17  for TG review your sales records?
18      INTERPRETER 2:  The check
19  interpreter believe that the
20  interpreter did not put TG into
21  her interpretation.
22      MR. SEEGER:  Please ask it
23  with TG.
24      INTERPRETER 1:  It says

Page 333

1  "your sales record."
2       MR. SEEGER:  Is it my
3  mistake?
4       INTERPRETER 1:  Yeah.
5       MR. SEEGER:  Was it my
6  mistake?
7       INTERPRETER 1:  I mean my
8  mistake.
9       MR. SEEGER:  Okay.  So, will
10  you ask it the way I asked it.
11      Go ahead.  You want him to
12  ask the question the way I asked
13  it.
14      (Interpreter repeats the
15  question.)
16      THE WITNESS:  I, myself,
17  personally, don't have a sales
18  record.
19  BY MR. SEEGER:
20      Q.   Do the financial auditors
21  for the company, for TG, review sales
22  records?
23      A.   We have a finance
24  department.  The finance department will

Page 334

1  make the record.  They will have the
2  information regarding the sales.
3       Q.   Does your financial
4  department have information regarding
5  shipping records?
6       A.   No.
7       Q.   Who has the information
8  regarding shipping records, which
9  department?
10      A.   The shipment record should
11  be with the foreign sales department.
12      Q.   So, the foreign sales
13  department would have the shipping
14  records, correct?
15      A.   Yes.
16      Q.   Is that also kept on
17  computer?
18      A.   I'm not sure.  Not
19  necessarily.  In the computer maybe you
20  can also find it somewhere else.
21      Q.   Let me just ask, for
22  example, when you signed off on this
23  particular document that's been marked as
24  an exhibit, the manufacturers profile

17 (Pages 331 to 334)

Confidential - Subject to Further Confidentiality Review

Page 335

1   sheet, did you look to see where the
2   information came from regarding sales and
3   shipping in this instance?
4       A.   I did not delete this
5   document, and it would be impossible for
6   me to delete this document.  I also don't
7   know about this document.
8           MR. CHEN:  (Addressing the
9   interpreter.)
10          Objection.
11          It's the reference to delete
12  this information, not delete this
13  document, for the interpreter's
14  suggestion or consideration.
15          INTERPRETER 1:  He did
16  answer and also flip flop between
17  the word zhi liao and wenjian.
18          MR. SEEGER:  So what's your
19  interpretation of his answer?  Let
20  me just have it one more time.
21              - - -
22          (Whereupon, the following
23  portion of the transcript was read
24  by the court reporter:

Page 336

1           "A.  I did not delete this
2   document, and it would be
3   impossible for me to delete this
4   document.  I also don't know about
5   this document.")
6               - - -
7   BY MR. SEEGER:
8       Q.   Is it possible, Mr. Jia,
9   that there were other TG sales of gypsum
10  board to the U.S. that are not accounted
11  for in this document?  Is that possible?
12          MR. CYR:  Objection on the
13  grounds that the question is vague
14  and assumes a fact not in the
15  record.
16          Please interpret that.
17          MR. SEEGER:  Mark that.
18          INTERPRETER 2:  The check
19  interpreter believes the
20  interpreter did not complete the
21  interpretation.
22          INTERPRETER 1:  I am
23  interpreting the objection.
24          MR. CYR:  It's okay.  The

Page 337

1   English version, I'm sure, is
2   captured on the record.
3           You may proceed.  Thank you.
4           MR. SEEGER:  I think we're
5   just waiting on an answer.
6           You can tell him the
7   question again if you want, but he
8   needs to answer the question that
9   we asked.
10          (Interpreter repeats the
11  question.)
12          THE WITNESS:  I don't
13  understand the way you ask the
14  question.
15          MR. SEEGER:  I've forgotten
16  the question.
17          MS. BASS:  Is it possible
18  there were other sales in the U.S.
19  that were not included in this
20  document?
21          MR. SEEGER:  There you go.
22  BY MR. SEEGER:
23      Q.   I just want to know in this
24  document that he's looking at -- I'm

Page 338

1   sorry.
2           Mr. Jia, the document that
3   you're looking at, this exhibit in front
4   of you, reflects your knowledge of all
5   shipments and exports of drywall to the
6   United States.  Is it possible that you
7   have shipments of drywall or exports of
8   drywall to the United States that are not
9   reflected in this document?
10          MR. CYR:  Same objection.
11          Mr. Jia, please try to
12  answer the question if you can.
13          THE WITNESS:  I still don't
14  understand -- I still don't
15  understand what you are asking
16  about.
17  BY MR. SEEGER:
18      Q.   Mr. Jia, is it possible that
19  you sold drywall to distributors who
20  brought the drywall to the United States
21  that are not reflected in this document?
22      A.   Are you talking about TG or
23  TTP?
24      Q.   Let's start with TG.

18 (Pages 335 to 338)

Confidential - Subject to Further Confidentiality Review

Page 339

1    A.   TG is a company.  It has
2  signed an agreement and also a contract
3  for implementation.  This has already
4  been implemented.
5    Q.   What contract is he
6  referring to?
7    A.   Venture Supply.  Is it
8  called Venture Supply?
9    Q.   Yes, yes.
10    MR. SEEGER:  So, what's his
11  answer?
12    INTERPRETER 1:  That's the
13  answer.
14    THE WITNESS:  So, the
15    agreement that we signed with
16    them, we have implemented that.
17  BY MR. SEEGER:
18    Q.   So, you're saying --
19    Is it possible that you
20  could have sold drywall to any other
21  distributor that was brought into the
22  United States?  Is that possible?
23    A.   I cannot speculate.
24    Q.   Other than Venture Supply,

Page 340

1  are you aware of TG selling gypsum board
2  to any customers in the United States?
3    A.   No.
4    Q.   Mr. Jia, since the
5  litigation in the U.S. regarding
6  defective Chinese Drywall, have your
7  sales been affected, the shipments of
8  drywall, regarding selling drywall?
9    MR. CYR:  I'm going to
10    object in that the question
11    appears to me at first glance to
12    be outside the designated areas.
13    It's your time.  I'm not
14    instructing the witness not to
15    answer.
16    MR. SEEGER:  Since you're
17    not instructing him, I'm not going
18    to get -- I have a basis for
19    asking.  We think it's within the
20    scope.  But that's fine.  You can
21    answer.
22    INTERPRETER 2:  May the
23    check interpreter give the
24    rendition of the Chinese

Page 341

1  interpretation to the witness?
2    MR. SEEGER:  No, not to the
3  witness.  If you want to make an
4  objection, if your lawyers want to
5  make an objection for the record,
6  that's fine.
7    MR. CHEN:  State the
8  objection.
9    INTERPRETER 2:  I just don't
10  think the interpreter's
11  interpretation is understandable
12  to the witness.  That's all.
13  BY MR. SEEGER:
14    Q.   Mr. Jia, did you understand
15  the question that was -- did we even ask
16  him the question yet?
17    Mr. Jia, do you understand
18  the question that was just asked of you
19  by the interpreter?
20    A.   I have forgotten what you
21  asked.
22    Q.   That's understandable.
23    MR. SEEGER:  Could you ask
24  him the question again.

Page 342

1    - - -
2    (Whereupon, the following
3    portion of the transcript was read
4    by the court reporter:
5    "Q.  Mr. Jia, since the
6    litigation in the U.S. regarding
7    defective Chinese Drywall, have
8    your sales been affected, the
9    shipments of drywall, regarding
10    selling drywall?")
11    - - -
12    THE WITNESS:  I don't
13    understand your concept and what
14    is the meaning of the shipment of
15    the drywall and being affected.  I
16    don't understand.
17  BY MR. SEEGER:
18    Q.   Mr. Jia, do you understand
19  that there's litigation going on in the
20  United States that drywall shipped by
21  your company is defective, correct?
22    A.   Incorrect.
23    Q.   But you understand that
24  there is litigation stating, alleging

Confidential - Subject to Further Confidentiality Review

Page 343

1    that your drywall is defective, correct?
2         A.    Yes.
3         Q.    Now, when you answered
4    before and you said incorrect, did you
5    mean to say it's incorrect that the
6    drywall is defective?  Was that what your
7    answer was?
8         A.    Yes.
9         Q.    Have you reviewed any
10   studies or reports issued by the U.S.
11   government regarding drywall shipped by
12   your company?
13             MR. CYR:  I guess we're
14        going to have to have a discussion
15        about what designated area you
16        believe this falls under.
17             MR. SEEGER:  Marketing.
18        Ultimately I'm asking him
19        questions regarding the marketing
20        and sales of the drywall from the
21        time frame of 2005 to present.
22        And this all occurred during that
23        time frame.
24             MR. CYR:  Excuse me.  I

Page 344

1        don't understand.  But maybe just
2        help me out.  I don't understand
3        --
4             THE WITNESS:  Can I take a
5        break.
6             MR. CYR:  -- how questions
7        about whether or not he reviewed
8        certain reports relate to --
9             MR. SEEGER:  Because I want
10       to ask him questions about sales.
11       That's where I'm going.
12            MR. CYR:  You want to ask
13       him questions about --
14            MR. SEEGER:  Yes, sales,
15       business.
16            MR. CYR:  I'm sorry, but
17       sales is different than marketing.
18            MR. SEEGER:  Let me just
19       answer, because one of the
20       categories that we asked for him
21       to be here for were business
22       plans, marketing plans, budgets
23       for TG and other companies.
24            MR. CYR:  Right.

Page 345

1             MR. SEEGER:  This would go
2        to marketing plans, business plans
3        and budgets.
4             MR. CYR:  I strongly
5        disagree.  If you want to take
6        time out to call the judge about
7        this, which would be very
8        unfortunate --
9             MR. SEEGER:  Not at this
10       hour.
11            MR. CYR:  There's two issues
12       really.  Is that in my view, this
13       is clearly outside the scope of
14       the designated area.  The second,
15       I should just state for the
16       record, is that I would welcome
17       the opportunity on a personal
18       level for the witness to be able
19       to address these kinds of issues,
20       but that's not why we're here.
21       And the other thing is, there's a
22       bunch of other lawyers who are
23       anxious to ask questions, and I'm
24       just going to share with you now,

Page 346

1        is that, in my view, we spent a
2        lot of time yesterday working
3        things out between plaintiffs'
4        counsel and the interpreter and
5        then also addressing questions
6        with respect to BNBM, which you
7        are allowed to ask, but I think
8        that it's a colossal waste of time
9        with respect to the jurisdictional
10       issues.  So, we're going to wrap
11       things up today at 5:00, and you
12       need to manage your time together.
13            MR. SEEGER:  Thank you for
14       that.
15            MS. BASS:  Excuse me.  Let
16       me just note for the record that
17       we had a specific discussion
18       yesterday about the fact that
19       holding to 5:00 end time today was
20       unrealistic and would likely
21       inevitably result in this witness
22       having to be called back.  So, I
23       suggest we not waste any more time
24       arguing about a single question of

Confidential - Subject to Further Confidentiality Review

Page 347

1   the questioner.  Let's move
2   forward, but I'm going to
3   strenuously object if you suggest
4   that you are going to pull the
5   witness at 5:00.
6        MR. CYR:  Your suggestion is
7   rejected.  And I would like to
8   just emphasize again that we're
9   stopping at 5:00 today.  So, you
10  guys need to manage your time.
11       MR. SEEGER:  I appreciate
12  the thing about managing your
13  time.  I do support Hilarie in
14  this.  If we need the witness for
15  a little extra time, you ought to
16  make him available.
17       MR. CYR:  I indicated
18  yesterday that we would be
19  reasonable in that regard.  Now
20  we're talking minutes, not hours,
21  with respect to 5:00.  So if
22  there's a lawyer here that
23  traveled all the way to Hong Kong
24  and only gets his or her turn at

Page 348

1   quarter to 5:00, we're not going
2   to ring the bell at 5:00.  We're
3   going to proceed reasonably.  But
4   you're spending time questioning
5   the witness now --
6        MR. SEEGER:  I've only asked
7   one question so far, in fairness
8   to me.
9        MR. CYR:  Why don't you go a
10  little bit further.  I'm not
11  waiving any rights with respect to
12  the designated areas here.
13       MR. SEEGER:  Can he answer
14  the question that I asked
15  previously?
16       INTERPRETER 1:  The witness
17  has asked to take a break.
18       MR. SEEGER:  I really would
19  like to get an answer since we
20  have a pending question and not
21  take a break.
22       (Interpreter repeats the
23  question.)
24       THE WITNESS:  I did not

Page 349

1   receive any report issued by the
2   U.S. government.  I did not
3   receive it nor did I see any.  I
4   only saw a little something from
5   the media, from the media.
6   BY MR. SEEGER:
7        Q.    Did the report that you saw
8   in the media discuss in any way reports
9   issued by the U.S. government regarding
10  defective drywall sold by your company?
11  Strike that.
12       Are you aware, sitting here
13  today, that there is a U.S. government
14  report, there's several reports,
15  regarding defective Chinese drywall sold
16  by your company?
17       A.    The medias in the United
18  States reported that the drywall sold by
19  TG company has some problems, but I don't
20  believe it is true.
21       Q.    And you have not personally
22  reviewed the reports issued by the U.S.
23  government regarding defective Chinese
24  drywall sold by your company; is that

Page 350

1   correct?
2        A.    Correct.
3        Q.    Are you interested in seeing
4   those reports issued by the U.S.
5   government regarding your -- defective
6   drywall sold by your company?
7        MR. CYR:  I'm going to
8   object.  Unless you can persuade
9   me how this falls in a designated
10  area, I'm so reluctant to do it,
11  but I'm going to have to instruct
12  the witness not to answer.
13       I regret the judge is not
14  available now either, because I'm
15  confident that he would agree with
16  me.
17       MR. SEEGER:  So, on that
18  question, you're instructing the
19  witness not to answer?
20       MR. CYR:  I'd welcome some
21  --
22       MR. SEEGER:  I don't know if
23  I can say a lot more to convince
24  you about why I think this comes

Confidential - Subject to Further Confidentiality Review

Page 351

1    within marketing, sales, business
2    plans. I've made the pitch. I
3    think it is a mistake to instruct
4    him not to answer, because you
5    jeopardize him having to be
6    deposed again, but that's your
7    call. And I assume you've
8    considered that?
9         MR. CYR: I do. I just
10   don't see any connection at all.
11   I'm sorry.
12   BY MR. SEEGER:
13        Q.   Mr. Jia, your attorney has
14   instructed you not to answer the question
15   I just asked. Are you willing to answer
16   it despite that instruction or not?
17        A.   I am not willing to answer
18   this question.
19        Q.   Let me ask you another
20   question, one or two more, and we can
21   take a break.
22        A.   I need to take a break right
23   now immediately.
24        MR. SEEGER: I can't stop

Page 352

1    you.
2         THE VIDEOTAPE TECHNICIAN:
3    The time now is approximately
4    11:05 a.m., and we are now off the
5    record.
6              - - -
7         (Whereupon, a recess was
8    taken from 11:05 a.m. until
9    11:23 a.m.)
10             - - -
11        MR. PANAYOTOPOULOS: Can we
12   get a clarification about what
13   time we're going to break? I
14   would like to keep going as long
15   as possible since we just took a
16   break.
17        MR. CYR: Let's ask Mr. Jia
18   if he can go until noon rather
19   than 11:30. It makes sense, since
20   it's close to 11:30 already.
21        Break at noon.
22        MR. SEEGER: Noon until
23   1:00.
24        THE VIDEOTAPE TECHNICIAN:

Page 353

1    This begins Tape 3 of today's
2    portion of our deposition. The
3    time now is approximately 11:25
4    a.m., and we're back on the
5    record.
6    BY MR. SEEGER:
7         Q.   Mr. Jia, yesterday you had
8    given us some testimony about the health
9    benefits of the drywall that you sell.
10   What have you done to test the drywall in
11   light of the allegations regarding the
12   fact that it could be unhealthy and
13   statements in the media?
14        MR. CYR: I guess, once
15   again, we're going to have to have
16   a discussion about why this is in
17   one of the designated areas.
18   Which designated area does this
19   question fall under?
20        MR. SEEGER: It goes into
21   sales and marketing. We're still
22   under sales and marketing. There
23   are allegations that the drywall
24   is defective, potentially

Page 354

1    unhealthy. He says he saw them in
2    the media. What's he done?
3         MR. CYR: How is that
4    relevant to jurisdiction at all?
5         MR. SEEGER: Because I'm
6    going to connect it. If you give
7    me a few questions and you let him
8    answer a few questions, I'll
9    connect it up for you.
10        MR. CYR: I'm sorry to have
11   to spend some time on this on the
12   record, but I see no connection
13   whatsoever between whatever
14   Taishan Gypsum has done subsequent
15   to the litigation, subsequent to
16   the filing of the Complaint with
17   respect to checking tests and how
18   that conceivably could be related
19   to the jurisdictional questions in
20   this case. And unless there's
21   some showing of a connection
22   that's persuasive, I, regretfully,
23   I have to instruct the witness not
24   to answer.

22 (Pages 351 to 354)

Confidential - Subject to Further Confidentiality Review

Page 355

1    MR. SEEGER:  I'm going to
2  let Jeff address it because he's
3  been more involved with the
4  discovery, but I don't really
5  think it's proper for you to ask
6  me for a showing.  I don't think I
7  have to make a showing on it, but
8  go ahead.
9    MR. GRAND:  I'm going to say
10  that this witness has been
11  designated by Taishan Gypsum to
12  speak to business plans, marketing
13  plans and budgets for Taishan
14  Gypsum and related or other
15  entities.  In connection with
16  that, we reviewed yesterday
17  promotional materials created by
18  Taishan that contained promotional
19  statements about that the gypsum
20  board was good for health.  We are
21  entitled to ask him whether he's
22  taken any steps to ensure that
23  those statements are still true
24  and whether the marketing

Page 356

1  materials are still true.  Those
2  marketing materials are still out
3  there.
4    MR. CYR:  And how does that
5  relate to the jurisdictional
6  issues in this case?
7    MR. GRAND:  While you may
8  disagree, it is our contention
9  that your client markets this
10  globally, marketed into the United
11  States.
12    MR. CYR:  What time period
13  do you think is relevant for the
14  jurisdictional issues in this
15  case?
16    MR. GRAND:  I think right up
17  to the present.
18    MR. CYR:  Based on that
19  dialogue, I'm very comfortable in
20  instructing the witness not to
21  answer.
22    We're ready for your next
23  question.
24  BY MR. SEEGER:

Page 357

1    Q.    Mr. Jia, your counsel has
2  instructed you not to answer the question
3  that I've asked.  Are you going to follow
4  counsel's instructions or would you like
5  to answer the question?
6    MR. PANAYOTOPOULOS:  I'm
7  sorry.
8  BY MR. SEEGER:
9    Q.    Mr. Jia can answer.
10    A.    I don't want to answer this
11  question.
12    MR. PANAYOTOPOULOS:  Let me
13  just state for the record that
14  Banner joins in the question.  And
15  the position is, from what I
16  understand yesterday, this witness
17  testified at length about the
18  basis that he and the company had
19  to make statements in their
20  marketing materials that the
21  drywall that they produced has
22  certain benefits for the
23  customers.  This was included in
24  marketing material that I believe

Page 358

1  is out today.  I think that for
2  cross-examination purposes, we
3  certainly have a basis to test
4  whether those are true statements.
5  And the witness volunteered
6  yesterday with counsel present and
7  went on and on about the basis
8  that the company had to make those
9  statements.  We'd like to verify
10  and check on the extent of that
11  basis, and now the witness is
12  being instructed not to answer.
13  So, we join in, and we again would
14  like an answer to that question.
15    MS. EISELEN:  For the
16  record, Interior/Exterior also
17  joins in that objection.
18    MR. CYR:  Before I respond,
19  I want to give everybody an
20  opportunity to join in.
21    MR. BLACK:  We also join on
22  behalf of the State of Louisiana.
23    We also note that topic
24  number 19, footnote 3, which

Confidential - Subject to Further Confidentiality Review

Page 359

1  indicates you're not producing
2  anybody with respect to the
3  category that's indicated in
4  footnote 3, someone to testify
5  about the design, development,
6  testing, inspection, performance
7  of drywall manufactured by TG or
8  TTP, you're not producing anyone,
9  that the involvement of TG or TTP
10  in determining performance and/or
11  inspection of the drywall that
12  they manufactured during the
13  period of time in question goes to
14  jurisdiction.
15      MR. CYR:  Anyone else?
16      MR. PANAYOTOPOULOS:  I also
17  have not seen any objections to
18  the Notice of Deposition
19  especially within the time frame
20  provided under the Federal Rules.
21      MR. CYR:  Anyone else?
22      MS. CLARK:  Southern Homes
23  joins in the objections of
24  Interior/Exterior, State of

Page 360

1  Louisiana and Banner.
2      MR. HARDT:  So does Venture
3  Supply and Porter-Blaine in the
4  Germano action.
5      MR. SLAUGHTER:  Likewise,
6  Atlantic Homes.
7      MS. BASS:  Likewise, the
8  Home Builders Steering Committee.
9      MR. BRENNER:  Same for
10  Tobin.
11      MR. MONTOYA:  On behalf of
12  plaintiffs' liaison counsel from
13  Florida as well.
14      MR. CYR:  Just very briefly,
15  I do think that when The Court
16  looks at the transcript of
17  yesterday, when the question was
18  asked with respect to the brochure
19  and the reference to health, that
20  I registered my concerns.  I
21  indicated that although I was
22  going to allow the witness to
23  answer that question, that I was
24  preserving the right to object to

Page 361

1  any further questions relating to
2  that issue or other issues
3  relating to the drywall itself and
4  the liability issues, and that's
5  precisely what I've done today.
6      Of course, as we all know,
7  Mr. Jia was not designated for
8  topic number 19, and so that is an
9  issue for Mr. Peng's deposition.
10      And then finally, I just
11  want to emphasize that we have
12  studied very carefully the
13  designated areas, and we
14  appreciate your ability to ask
15  questions about business plans and
16  marketing plans and budgets, but
17  not for a moment do I believe that
18  The Court intended for you to ask
19  questions about Mr. Jia's actions
20  during 2011 with respect to
21  reviewing the liability issues and
22  the defectiveness issues in this
23  case.  I'm very confident that the
24  judge will agree with me when he

Page 362

1  reads the transcript.
2      I suggest that after all of
3  this that we continue with the
4  deposition in the designated
5  areas.
6      MR. HARDT:  On behalf of
7  Venture Supply and Porter-Blaine
8  in the Germano action, if I can
9  say one more thing.  There's
10  considerable case law out there
11  that suggests that instructing the
12  witness not to answer the
13  question, if it's not a privilege
14  objection, is not the proper
15  procedure to handle the matter.
16  It's outside the scope of the
17  rules, instructing the witness not
18  to answer the question not on the
19  basis of privilege.
20      So, I think proceeding this
21  way, you know, you just run the
22  risk that we're going to have to
23  revisit this with this witness
24  after the ruling.

Confidential - Subject to Further Confidentiality Review

Page 363

1    MR. CYR:  Thank you very
2    much, Counselor, and that's why I
3    allowed the questions yesterday,
4    because, frankly, I think this is
5    the first time I've ever
6    instructed a witness not to answer
7    questions during the deposition.
8    But this line of questioning runs
9    so far afoul of not only the terms
10   of the designated areas, but also
11   I'm extremely confident that if
12   the judge was here, that he would
13   emphasize that you should be
14   asking questions relating to the
15   jurisdictional issues.  That's why
16   he allowed this all to unfold.
17      So, thanks for the warning.
18   I wish we could get the judge on
19   the phone now, but that's
20   unrealistic.
21      MR. SEEGER:  I'm going to
22   ask a question.
23   BY MR. SEEGER:
24   Q.    Mr. Jia, since the news

Page 364

1    reports in the media regarding defective
2    drywall, what have you done to reassure
3    your customers that the drywall is not
4    defective?
5       MR. SEEGER:  That's sales.
6    That's sales.  I've changed it.
7    It's sales.  I'm not asking him --
8    I'm asking him what he's done to
9    reassure his customers.
10      MR. CYR:  Where is sales,
11   Chris?
12      MR. SEEGER:  Sales,
13   marketing.  I mean, there are news
14   reports that are out there.
15      MR. PANAYOTOPOULOS:  Topic
16   14.
17      MR. SEEGER:  There are news
18   reports that are out there, and
19   asking him what he's doing from a
20   marketing perspective to reassure
21   his customer base I think is
22   clearly, clearly a fair question.
23      MR. CYR:  And how does that
24   relate to jurisdictional issues in

Page 365

1    this case?
2       MS. BASS:  How about the
3    obvious?
4       MR. GRAND:  Do we have to go
5    back and forth on this?  This is
6    wasting time.
7       MS. BASS:  We're wasting
8    valuable time, but, obviously, who
9    he considers his customers, who he
10   perceives the need to communicate
11   with about a problem with his
12   drywall, assuming it is defective,
13   goes directly to the
14   jurisdictional issues.  Your
15   choice of narrowly viewing each of
16   these questions is not something
17   that you have the right to do in a
18   deposition.  He has the right to
19   explore broadly based on the
20   categories that he has been
21   designated to testify about.
22   That's what he's doing.
23      MR. CYR:  Do you have any
24   case law at all with respect to

Page 366

1    any of the jurisdictions that
2    reflects that a defendant's
3    actions after the complaint has
4    been filed are relevant to
5    jurisdictional issues?
6       MS. BASS:  Let me ask you
7    this.  If he perceives his
8    customers are in the United States
9    and he perceives the need to
10   communicate with them about a
11   defect in some product that his
12   company has sold in the United
13   States, you are going to suggest
14   that's not relevant to
15   jurisdiction?
16      MR. SEEGER:  That's exactly
17   where I'm going with this line of
18   questioning.
19      MR. CYR:  Maybe you guys are
20   missing the point here, is that
21   it's my understanding that with
22   respect to jurisdictional issues,
23   that the time period that's
24   relevant, and courts differ, it's

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 367

1    at the time of the filing of the
2    complaint, or some reasonable
3    period thereto.  Some courts
4    disagree.  They have different
5    views about what that time period
6    should be.  But one thing that's
7    very clear, almost in every case
8    that I've seen in every state, and
9    that is that actions by defendants
10   after the filing of the Complaint.
11         MR. SEEGER:  It's not after.
12   That's not my question, Joe.  You
13   misunderstood the question.
14         MR. CYR:  Oh, I'm sorry.
15         MR. GRAND:  It is not after.
16         MR. CYR:  I'm sorry.
17         MR. SEEGER:  I said since
18   the news in the media.  There was
19   news in the media before we filed
20   the complaint.  So, he said --
21   your witness has testified he's
22   only seen what's in the media.  He
23   hasn't seen U.S. government
24   reports.  So, it is since the news

Page 368

1    in the media.
2         MR. CYR:  I can help out
3    here to save time, because I
4    really want to do the right thing
5    here.
6         Just for the record, it
7    seems to me that there's some
8    chance that the question could
9    relate to Taishan Gypsum's
10   activities before certain of the
11   complaints in this litigation have
12   been served or filed such as the
13   Gross or Wilkes case, and so I'm
14   going to allow the witness to
15   answer the most recent question.
16         MR. SEEGER:  Thank you.
17   Could you read the question
18   that I asked.
19         (Interpreter repeats the
20   question.)
21         THE WITNESS:  Okay.  First
22   of all, TG went over the complaint
23   records regarding the production
24   of drywall for many years.  We did

Page 369

1    not discover the problems as
2    discussed -- reported in the
3    media, reflected in the media or
4    reflected by some of the
5    customers.  Our government also
6    take this matter seriously.  It
7    draw a large amount of samples
8    from our company.  Our government
9    did not say the products that we
10   produce has the problems similar
11   to those reflected by the U.S.
12   consumers.  We strongly believe
13   that the quality of our drywall is
14   good.
15   BY MR. SEEGER:
16         Q.   Mr. Jia, did you do any
17   testing to confirm that? Did the company
18   do any testing independent to confirm
19   that?
20         MR. CYR:  I just want to
21   state for the record that I'm
22   going to allow the witness to
23   answer for the reason that I
24   mentioned before, but I'm not

Page 370

1    waiving my rights to insist that
2    we stay with the designated areas.
3    And, sincerely, I do think that
4    this is a decision y'all are
5    making with respect to managing
6    the time that you have.
7         No need to interpret that.
8         Please answer the question,
9    Mr. Jia.
10        THE WITNESS:  Our company
11   also built a building.  It is all
12   of our products.  There is no
13   phenomena like what is being
14   claimed by the U.S. media.  We
15   also made a survey along the
16   coastal line to do an
17   investigation with our customers.
18   We did not find similar problems.
19   BY MR. SEEGER:
20        Q.   So, Mr. Jia, the testing you
21   did, to be clear, is you built a building
22   for which you put your products in it,
23   and you did a survey of your customers.
24   Did I understand the answer correctly?

26 (Pages 367 to 370)

Confidential - Subject to Further Confidentiality Review

Page 371

1       INTERPRETER 2:  The check
2   interpreter did not think the
3   interpreter accurately interpret
4   the question asked by the counsel.
5   Because the interpreter did not
6   ask the witness the test, whether
7   the test is build the building and
8   also survey the coastal -- the
9   customer along the coastal line.
10  The interpreter did not interpret
11  the test.
12      INTERPRETER 1:  Objection.
13  The check interpreter is not doing
14  verbatim.  She digested and
15  rephrased it.  I was doing
16  verbatim to every word --
17      MR. SEEGER:  Did you ask the
18  question the way I asked it?
19      INTERPRETER 1:  Yes.
20      MR. SEEGER:  Okay.  That's
21  all.
22      INTERPRETER 2:  I was doing
23  verbatim.  I don't try to rephrase
24  it.  She is trying to rephrase

Page 372

1   herself.
2       MR. SEEGER:  You don't have
3   to defend yourself.  Can the
4   witness answer the question?  Ask
5   him my question.  I want to make
6   sure he answers my question.
7       INTERPRETER 1:  Okay.  Let
8   me go back to that question.
9       THE WITNESS:  There's some
10  discrepancies regarding your
11  understanding.  I can add on to
12  it.
13  BY MR. SEEGER:
14      Q.    Whatever tests --
15      Mr. Jia, whatever testing
16  you've done regarding -- since the media
17  reports of the problem with the drywall,
18  we would like to know about it.  So,
19  please give me a complete answer.
20      A.    I did answer.
21      Q.    Okay.  If he's answered,
22  that's fine.
23      Did he want to add anything
24  to his answer?

Page 373

1       A.    I just stated it.  If you
2   don't understand it, then I can restate
3   it.
4       Q.    No, it's not necessary.
5   Thank you.
6       Mr. Jia, where can we find
7   these complaints that you relied upon to
8   form your belief that, you know -- strike
9   that.
10      The complaints that you
11  referenced in your answer regarding your
12  product, where would those complaints be?
13      A.    Our company has a file for
14  complaints.
15      Q.    And if you needed to, you
16  would know where to find that, Mr. Jia?
17      A.    Yes.  We have a service
18  department for after sales.
19      Q.    And the survey that you did
20  of your customers, is that also someplace
21  where if you needed to find it, you could
22  find it?
23      A.    Yes.
24      Q.    Okay.

Page 374

1       And where would that be
2   within the company?
3       A.    The department for after
4   sales, they have the file.
5       Q.    Okay.
6       And did you mention this
7   testing that you've done in any of your
8   marketing materials to assure your
9   customers that the product is safe and
10  performing properly?
11      A.    Yes.
12      Q.    Okay.
13      And where could we find
14  those marketing materials?
15      A.    I don't know what type of
16  marketing material you are referring to.
17      Q.    Well, the question that I
18  had asked earlier is, did you mention the
19  testing that you've done in any of your
20  marketing materials to assure your
21  customers that the product was safe and
22  performing properly?  And he answered
23  yes.  So, my question now is, where are
24  those marketing materials?

27 (Pages 371 to 374)

Confidential - Subject to Further Confidentiality Review

Page 379

1    A.   I did not obtain the report.
2  But the government definitely would have
3  obtained the report.
4    Q.   Mr. Jia, sitting here today,
5  do you have a specific understanding
6  about what the specific allegation is
7  that's wrong with the Chinese drywall
8  that's been shipped and used in many
9  homes in the United States?
10       MR. CYR:  Which designated
11    area does that question fall
12    under?
13       MR. SEEGER:  Well, I mean, I
14    just want to make sure that he has
15    a basic understanding of at least
16    what the allegation is that the
17    defect is before I can ask him
18    what have you done to assure your
19    customers, what marketing efforts
20    have you done to, you know, tell
21    your customers anything about the
22    product?  So, you know, I mean,
23    this is just sort of foundational
24    stuff.  That's all.  I just want

Page 380

1  to know what his understanding is.
2  Does he understand the defect?
3  There can't be anything wrong with
4  answering that one, Joe.
5       MR. CYR:  I'm going to let
6    the witness answer this question
7    even though it doesn't fall in one
8    of the designated areas.
9       MR. SEEGER:  You can answer.
10       THE WITNESS:  Can you
11    interpret it in a continuous way
12    so, therefore, I can have a better
13    concept?
14  BY MR. SEEGER:
15    Q.   Okay.
16       You know there's been a lot
17  of testing of your drywall in the U.S.
18  regarding high sulfur levels.  Do you
19  have an understanding that high sulfur
20  levels is part of the problem with the
21  drywall that's been shipped to the United
22  States?  Yes or no, one way or another?
23       MR. CYR:  I'm going to
24    object to that question and

Page 381

1  instruct the witness not to answer
2  that one.  What I have said is
3  that I'm allowing the witness to
4  answer the question you previously
5  asked with respect to his
6  awareness of the allegations in
7  the complaints.
8       MR. SEEGER:  That's not how
9    I asked it.  But he asked for
10    clarification.  I just narrowed
11    the question down to make it
12    easier for the witness.  So, I
13    don't see the difference.  The two
14    questions really go together.
15       MR. CYR:  I'm allowing the
16    witness to answer your question
17    with respect to his awareness of
18    the allegations in the complaints.
19       MR. SEEGER:  Okay.
20  BY MR. SEEGER:
21    Q.   So, Mr. Jia, do you have a
22  specific understanding of what the
23  alleged defect is with your product
24  that's been used in the United States?

Page 382

1    A.   Regarding the defective
2  drywall, I only find this out from the
3  media or from the allegation documents.
4    Q.   Okay.  With regard to -- oh,
5  I'm sorry.  Did you want to complete?
6       MR. SEEGER:  I think he
7    wanted to answer more.
8       THE WITNESS:  At the
9    earliest time, the media in the
10    United States -- not the media.
11    Strike United States.
12       At the earliest time, the
13    media mention about the drywall in
14    the -- drywall made in China has a
15    high content of sulfur.
16  BY MR. SEEGER:
17    Q.   Mr. Jia, have you done
18  anything to test that?
19    A.   Therefore, it is that the
20  Chinese Drywall has a problem.  Now I
21  also see a lot of reports from the media.
22  It is not related to a field fatal event.
23  I also see some reports by some medias
24  that all the reports of the CPSC, it

29 (Pages 379 to 382)

Confidential - Subject to Further Confidentiality Review

Page 383

1  claims that it would not be unsafe to the
2  human body. I don't understand why do
3  they sue me -- sue us, why do they sue
4  us?
5         MR. CYR: Can we break? Go
6      ahead if you have a couple more,
7      but I mean, it is after --
8         MR. SEEGER: Okay. If you
9      give me just a little bit of
10     leeway here.
11        MR. CYR: Sure.
12 BY MR. SEEGER:
13     Q.   Mr. Jia, what have you
14 done -- strike that.
15         In response to the CPSC
16 study that you referenced, what have you
17 done internally in the company to test
18 the product? Have you done anything, has
19 the company done anything to test its own
20 product?
21     A.   Along the coastal line,
22 there are a lot of customers they use our
23 drywalls. No laboratories would be
24 better than the laboratory we put it such

Page 384

1  as the customer that they are using our
2  products along the coastal line. We got
3  into that laboratory. Any laboratory
4  testing would not be as accurate as the
5  site testing, on-site testing. The
6  Chinese customers have never had that
7  problem. Isn't that the best testing?
8      Q.   Mr. Jia --
9         INTERPRETER 2: In the
10     world. The check interpreter
11     believed the witness said, isn't
12     that the best testing in the
13     world?
14        MR. SEEGER: Thank you.
15 BY MR. SEEGER:
16     Q.   Mr. Jia, if you could just
17 tell me before we break for lunch the
18 specifics of the testing you've done in
19 the homes of the Chinese people who live
20 along the coastal region, what specific
21 testing?
22     A.   No odor. No decay.
23     Q.   Other than testing for odor
24 and decay, did you do any scientific

Page 385

1  testing in any of those homes for sulfur
2  levels?
3      A.   I find that testing in that
4  location is the most scientific testing.
5      Q.   How many homes did you test
6  in?
7      A.   All of our customers, they
8  answer like that.
9      Q.   How many? How many?
10     A.   I can't tell.
11     Q.   More than 100?
12     A.   We have too many, too many
13 customers.
14     Q.   Would it be more than 10,000
15 customers?
16     A.   Well, our survey would never
17 have that large figure, but no customer
18 have that problem, and also we don't have
19 the complaint.
20     Q.   Okay.
21         Can you give me just a rough
22 number of how many?
23         INTERPRETER 1: He wants to
24     go for lunch.

Page 386

1         THE WITNESS: I have already
2      given you the figure. I don't
3      have more.
4         MR. CYR: Before we break
5      for lunch, I just want to register
6      a standing objection to the whole
7      line of questioning. I don't
8      think it has anything to do with
9      the designated areas or the
10     jurisdictional issues. I think
11     that it's been abusive of Mr.
12     Jia's time and all of our time. I
13     hope you don't do it this
14     afternoon.
15        MR. SEEGER: I have to
16     respond, because I've never been
17     accused of abusing the witness,
18     so, I know you don't mean to use
19     that word.
20        MR. CYR: Just abusing his
21     time.
22        MR. SEEGER: You made a
23     mistake on that one. I'm not
24     abusing his time. It's my time.

30 (Pages 383 to 386)

Page 387

1      MR. CYR:  Well, I believe it
2  is his time as well.
3      MR. SEEGER:  He's here for
4  two days whether he wants to be.
5      THE VIDEOTAPE TECHNICIAN:
6  The time now is approximately
7  12:12 p.m., and we are now off the
8  record.
9          - - -
10     (Whereupon, a luncheon
11  recess was taken from 12:12 p.m.
12  until 1:22 p.m.)
13         - - -
14     THE VIDEOTAPE TECHNICIAN:
15  This begins Tape 4 of today's
16  portion of our deposition.  The
17  time now is approximately
18  1:22 p.m., and we're back on the
19  record.
20  BY MR. SEEGER:
21     Q.   Mr. Jia, why are you no
22  longer selling drywall to U.S.
23  distributors?
24     MR. CYR:  Objection as to

Page 388

1  form.
2      THE WITNESS:  Now there's no
3  U.S. customer that comes to our
4  company to buy the plasterboard,
5  the drywall.
6  BY MR. SEEGER:
7     Q.   Mr. Jia, is this a --
8      Would you agree that this is
9  a true statement, that TG is one of the
10  key enterprises of China National
11  Building Material Group Corporation?
12     A.   CNBM Group is a shareholder
13  of the CNBM Company Limited by share.
14     INTERPRETER 1:  Or
15  shareholding company, whichever
16  way.  I am not sure how to
17  translate that.
18     THE WITNESS:  CNBM Company
19  Limited by sharing, or translated
20  as shareholding company, is a
21  listed company.  One of the
22  shareholder of BNBM is CNBM.  One
23  of the major shareholder of --
24  BNBM is one of the major

Page 389

1  shareholders of TG.
2  BY MR. SEEGER:
3     Q.   So, just if you can answer
4  yes or no.  If you can't, that's fine.
5      Would you agree that TG is a
6  key enterprise of CNBM?
7     A.   I disagree with this
8  statement.
9     Q.   Could you tell me why you
10  disagree with it?
11     A.   CNBM is a very large
12  company.  Regarding its production, the
13  drywall is only a small part of it.
14  Regarding the plaster, the manufacturing
15  of the plasterboard, for sure, we are the
16  largest company in China.
17     Q.   Is he referring to TG when
18  he says "we are the largest company in
19  China"?
20     INTERPRETER 2:  TG.
21     MR. SEEGER:  No, TG.
22     THE WITNESS:  TG including
23  all the subsidiaries under.
24  BY MR. SEEGER:

Page 390

1     Q.   So, TG including --
2      If I were to ask the
3  question this way, TG including its
4  subsidiaries are a key enterprise of
5  CNBM, would you agree with that?
6     A.   I don't understand your
7  question.
8     Q.   Just to be clear, Shandong
9  Taihe Dongxin Company Ltd. is the same
10  thing as TG, correct?
11     A.   Yes.
12     Q.   Okay.
13      And you would disagree with
14  the statement if I were to say TG is a
15  key enterprise of CNBM, you disagree with
16  that statement?  I just want to be clear.
17     A.   The main concept that I
18  understand is different from the concept
19  that you understand.
20     Q.   Okay.
21      But can he answer the
22  question, does he agree or disagree that
23  TG is a key enterprise of CNBM?
24     MR. CHEN:  I'm sorry, you

31 (Pages 387 to 390)

Confidential - Subject to Further Confidentiality Review

Page 451

1    A.   TG has no responsibility to
2  make remedy to the defects for the
3  products of TTP.
4    Q.   My question was, will TG
5  remedy defects in the products that TG
6  manufacturers?
7       MR. CHEN:  Hold one moment.
8       THE WITNESS:  TG concerning
9    its own product?
10 BY MS. BASS:
11   Q.   Yes.  That's the question.
12      INTERPRETER 2:  Perhaps the
13   check interpreter believes the
14   word "remedy," the interpreter may
15   have interpreted it as like a
16   repair.  But perhaps it should be
17   like some measures to help.
18      INTERPRETER 1:  It's the
19   same.  Fix it.
20      MS. BASS:  Just ask the
21   witness to please answer the
22   question.
23      THE WITNESS:  Yes.
24 BY MS. BASS:

Page 452

1    Q.   Would that be the case
2  wherever that product was utilized?
3       INTERPRETER 1:  The word
4    "utilized" cannot be interpreted
5    very clearly.
6  BY MS. BASS:
7    Q.   Used.  Wherever the product
8  was used, would they stand behind a
9  defective product that they manufactured?
10      MR. CYR:  What designated
11   area does this relate to?
12      MS. BASS:  Jurisdiction.
13   You can answer the question.
14      MR. CYR:  No, not yet.
15      MS. BASS:  If you have an
16   objection, note it for the record.
17   I would like the witness to answer
18   the question.
19      MR. CYR:  I understand that.
20   You don't want to engage in any
21   dialogue about what designated
22   area this is?
23      MS. BASS:  It goes directly
24 to the issue of jurisdiction.

Page 453

1       MR. CYR:  How is that?
2       MS. BASS:  I don't have to
3  go through an explanation for you.
4       MR. CYR:  Yeah, okay.
5       MS. BASS:  If you want to
6  instruct the witness not to answer
7  whether or not he will remedy,
8  he's prepared to stand behind
9  products that are defective,
10 wherever they are, you give that
11 instruction, and we'll bring it to
12 Judge Fallon, and we'll be back
13 here with him answering that
14 question sometime in the future.
15 It's your choice.
16      MR. CYR:  Are you finished?
17      MS. BASS:  I am.
18      MR. CYR:  I instruct the
19 witness not to answer.
20      Next question, please.
21      MS. BASS:  Fine.  Please
22 note it for the record.
23      MR. CYR:  No answer.
24 BY MS. BASS:

Page 454

1    Q.   If there were specific
2  requests by customers for particular
3  labeling on TG products, would you be
4  aware of those?
5    A.   I am aware of this
6  situation.
7    Q.   Okay.
8       So, each time a customer,
9  for example, requested a specific brand
10 or a specific type of tape, you would
11 have personal knowledge of those?
12   A.   Some customers, they may
13 require a special label.  In general, our
14 company would have no objection to this
15 practice.  But it doesn't mean every
16 customer, when they have any requirement,
17 we would follow.  And it also doesn't
18 mean that every demand of every customer
19 I would know.
20   Q.   So, there could be certain
21 requests made by your customers for a
22 particular brand marking on drywall that
23 you would not be aware of?
24   A.   I just mentioned that we

47 (Pages 451 to 454)

Confidential - Subject to Further Confidentiality Review

Page 455

1  allow this condition to exist.  But
2  regarding which customer putting on which
3  label, that I don't know.
4      Q.    Who within your company
5  would have knowledge of those type of
6  specialized requests?
7      A.    My customer, we need to
8  check our file in order to find out.
9      Q.    Was there a particular
10  person within your company that such
11  requests would have to be made to?
12      A.    A Mr. Peng Wenlong, he is --
13  during a certain period of time, he was
14  working for the foreign sales department.
15  He would know.  He should be able to
16  check out the exported products.  We also
17  have a lot of this type of customers in
18  China.  Mr. Peng Wenlong may not be able
19  to find out.
20      MS. BASS:  I'm going to pass
21  the witness to make sure everybody
22  else has an opportunity.
23      MR. CYR:  Can we take ten
24  minutes and then try to give

Page 456

1  everybody a chance?
2      THE VIDEOTAPE TECHNICIAN:
3  The time now is approximately
4  4:17 p.m., and we are now off the
5  record.
6          - - -
7      (Whereupon, a recess was
8  taken from 4:17 p.m.  until
9  4:33 p.m.)
10
11      THE VIDEOTAPE TECHNICIAN:
12  This begins Tape 7 of today's
13  portion of our deposition.  The
14  time now is approximately
15  4:35 p.m., and we're back on the
16  record.
17          - - -
18      EXAMINATION
19          - - -
20  BY MR. HARDT:
21      Q.    Mr. Jia, good afternoon.  My
22  name is Ken Hardt.  I represent Venture
23  Supply, the company that actually
24  purchased drywall from Shandong Taihe

Page 457

1  Dongxin Limited -- Company Limited.
2      Can you translate that for
3  me, please.
4      During my questioning, I may
5  refer to Shandong Taihe Dongxin Company
6  Limited as just Shandong.  Is that okay
7  with you?
8      A.    When you say "Shandong," I
9  don't understand.
10      Q.    It's just a shortcut.
11  Rather than pronounce the whole word, the
12  whole name, Shandong Taihe Dongxin
13  Company Limited, I'm just going to refer
14  to them as Shandong.  So, if I say
15  Shandong, I'm referring to Shandong Taihe
16  Dongxin Company Limited.  Is that okay?
17      A.    When you refer to Shandong,
18  in this place called Shandong, there are
19  so many, many factories that manufacture
20  drywalls, and some, they might also
21  produce it for the United -- produce it
22  for the United States.
23      Q.    Okay.  I'll try to use the
24  full name then.

Page 458

1      INTERPRETER 2:  Mr. Jia did
2  say that how about use TG.
3      INTERPRETER 1:  Did he say
4  that?  I did not hear that.
5      MR. CHEN:  He did mention it
6  briefly.
7      INTERPRETER 1:  I did not
8  hear that.
9      MR. CHEN:  Counsel, I'll
10  just briefly state.  Shandong is a
11  large province.  It would be like
12  calling something just U.S.
13  instead of U.S. something or
14  other.  Maybe if you could --
15      MR. HARDT:  I'll just use TG
16  then.
17      INTERPRETER 1:  I disagree
18  because I did not hear the witness
19  say that.
20      MR. HARDT:  I was just
21  trying to differentiate between
22  the name change, but okay.
23      INTERPRETER 1:  I did not
24  hear the witness say TG.

48 (Pages 455 to 458)

Confidential - Subject to Further Confidentiality Review

Page 459

BY MR. HARDT:
1
2     Q.    Okay.  I will use TG.
3     A.    I hope to use TG.
4     Q.    The contracts that were
5  signed between my client and TG were in
6  late 2005.  Were you aware of that?
7     A.    Now I know.
8     Q.    Well, the first contract was
9  for the purchase of 100,000 sheets of
10 drywall.  Were you aware of that?
11    A.    Now I know.
12    Q.    Did you know at the time?
13    A.    At that time, I did not
14 know.
15    Q.    I've seen affidavits.  I've
16 seen -- I've heard your testimony earlier
17 on.  The sales to Venture Supply, my
18 client, were the only U.S. sales that TG
19 made; is that correct?
20          MR. CYR:  I'm not asking the
21    interpreter to interpret, but I
22    think you just accidentally
23    referred to U.S. sales, and that's
24    inconsistent with the record.

Page 460

1          MR. HARDT:  He can answer.
2          INTERPRETER 2:  The check
3  interpreter doesn't think the
4  interpreter's interpretation
5  reflects the question.
6          MR. HARDT:  Can I get an
7  answer?
8          INTERPRETER 1:  I disagree.
9          MR. HARDT:  He disagrees?
10         INTERPRETER 1:  I disagree
11 with the check interpreter.
12         MR. HARDT:  Please just ask
13 him to answer the question.
14         THE WITNESS:  Please repeat
15 the question.
16         (Interpreter repeats the
17 question.)
18         THE WITNESS:  What I saw
19 earlier was written down as such.
20 BY MR. HARDT:
21    Q.    Okay.  And so this was the
22 first sale to a U.S. importer by TG of
23 drywall; is that correct?
24    A.    Around 2005 or 2006, I do

Page 461

1  not exactly recall the exact time, and a
2  representative from the foreign trade
3  department of TG come to tell me one of
4  the customers from the United States,
5  they say that they want to buy the
6  drywall from TG.  After they purchase it,
7  they are going to ship it to the United
8  States.
9     Q.    So, you were aware of this
10 back in 2005, late -- early 2006?
11    A.    That is not my concept.
12 That is not the concept I am talking
13 about.
14    Q.    What concept are you talking
15 about?
16    A.    The manager of the foreign
17 sales department told me.  But after
18 that, I did not believe that our product
19 would be able to sell outside of the
20 country, would be able to sell to the
21 United States.
22    Q.    That's not what I asked you.
23 I asked you, you were aware of this
24 particular sale to my client back around

Page 462

1  the time it was made; is that correct?
2     A.    When it was made, that I was
3  not sure.  Now I am sure.
4     Q.    But you heard something back
5  in late 2005/2006 that a U.S. importer
6  wanted to buy your drywall, TG's drywall,
7  and import it back into the United
8  States; is that correct?
9     A.    Yes.
10    Q.    And when you were made aware
11 of this purchase by a US importer, did
12 you consider that significant for your
13 country -- I mean, for your company?
14    A.    I did not consider this to
15 be significant.
16    Q.    At the time, this was your
17 first sale of drywall to a U.S. importer;
18 is that correct?
19    A.    I don't know whether this
20 was the first time or not.
21    Q.    Well, had you made any sales
22 prior to this time to a US importer?
23    A.    This is not my concept.
24    Q.    What is your concept?

49 (Pages 459 to 462)

Confidential - Subject to Further Confidentiality Review

Page 463

1    A.    I'm referring to the sales
2  of the drywall by TTG when they sell
3  it -- TTP when they sell it to -- when
4  they sell it outside of the country.  I
5  am not sure whether this was earlier than
6  the sales of TG that sold it to TG or
7  not, and I was not sure about who sold it
8  first, who had the first time.
9    Q.    Okay.  We'll get there in a
10 second.  I asked about TG.  This was the
11 first sale to a US importer by TG itself?
12   A.    Yes.
13       MR. CHEN:  Objection to the
14   translation.  She did not
15   translate this was the first sale
16   to a US importer.  She translated,
17   this was the first sale to the US.
18       MR. HARDT:  I'm happy with
19   the answer.
20       MR. CYR:  We're happy with
21   the objection.
22       MR. HARDT:  Go ahead and
23   stand by your objection.
24 BY MR. HARDT:

Page 464

1    Q.    At the time that you were
2  made aware of this first sale by your
3  company, TG, to a US importer, were you
4  also made aware that other US importers
5  were making inquiries about buying
6  drywall from TG?
7    A.    Can you repeat this
8  question?  It is not clear.
9       MR. HARDT:  You'll just have
10   to read it back to him.
11       (Interpreter repeats
12   question.)
13       THE WITNESS:  At that time,
14   I did not know that the drywall
15   was sold to the United States.  I
16   also did not know how many
17   customers came to our company to
18   make inquiries.  I also did not
19   know where it was being sold.
20 BY MR. HARDT:
21   Q.    So, TG is making its first
22 sale to a US importer, and there are --
23 the documents will show there are
24 inquiries being made by other US

Page 465

1  importers of TG to purchase drywall for
2  importation into the United States.  Do
3  you think as general manager of TG, you
4  should have been made aware of that?
5    A.    Because if the contract is
6  really big, they would tell me.  If the
7  contract is very small, they won't tell
8  me.
9       Regarding the contract,
10 well, there's someone.  Probably it was
11 Mr. Peng Wenlong.  He told me that there
12 was one customer coming to our company
13 who buy the drywall.  Whether they did it
14 or not, whether they sold it or not, at
15 that point I did not know it.  I know it
16 about -- I know about it now.
17   Q.    Is that somebody different
18 than Venture that you're talking about,
19 this customer?
20       INTERPRETER 1:  Counsel, by
21   "Venture," do you mean by Venture
22   Supply?
23       MR. HARDT:  Yes, Venture
24   Supply.

Page 466

1       THE WITNESS:  I don't know
2    about the company now you
3    represent.  I have no recollection
4    of it.  I don't know English;
5    therefore, I have no recollection,
6    and I cannot recall clearly of the
7    companies in English -- in the
8    English name.
9  BY MR. HARDT:
10   Q.    Were you aware that other
11 companies around the 2005/2006 time frame
12 were approaching TG, and by "other
13 companies," I mean other US importers,
14 were approaching TG to purchase TG
15 drywall to import to the United States?
16   A.    I don't know.  What I am
17 sure is that the drywalls are very heavy,
18 therefore, the cost is very high.  It is
19 impossible to sell it to the United
20 States.
21   Q.    That's not the question I
22 asked you.
23       I asked you, were you aware
24 back in 2005/2006 of other companies

50 (Pages 463 to 466)

Confidential - Subject to Further Confidentiality Review

Page 467

1  approaching TG, other US importers
2  approaching TG, to purchase your drywall
3  to import into the United States?  That's
4  the question I want an answer to, please.
5       A.   I do not know whether
6  there's any customer that come to TG and
7  who purchased the products for the United
8  States.
9       Q.   If that had occurred, if
10 customers, US importers were coming to
11 your company in 2005/2006 to talk about
12 purchasing TG product to import into the
13 United States, would you have expected
14 your director of foreign sales, Mr. Peng,
15 to inform you of that, Peng Wenlong?
16      A.   I don't understand.  What do
17 you mean by "expect"?  What?
18      Q.   Who did Mr. Peng Wenlong
19 report to?
20           INTERPRETER 2:  The check
21      interpreter doesn't believe that
22      the interpreter's interpretation
23      was correct.  The question was who
24      did Peng Wenlong report to?  The

Page 468

1       interpreter interpreted did Peng
2       Wenlong tell you that?
3  BY MR. HARDT:
4       Q.   No.  I was asking basically,
5  who was the direct supervisor of Peng
6  Wenlong?
7           INTERPRETER 1:  Off the
8       record.
9           MR. HARDT:  Ask that
10      question.  Ask him that question,
11      please.  Ma'am, please, I'm asking
12      a different question.
13          INTERPRETER 1:  Okay.
14 BY MR. HARDT:
15      Q.   Who was the direct
16 supervisor of Mr. Peng Wenlong back in
17 the 2005/2006 time frame?
18          INTERPRETER 1:  Interpreter
19      oppose the check interpreter to
20      interpreting a question.  The
21      interpreter did not have a chance
22      to interpret first.
23          MR. HARDT:  Ma'am, I do not
24      need that.  I've asked him --

Page 469

1           Interpreter, please.  I've
2       asked a new question.
3           INTERPRETER 1:  Okay.
4  BY MR. HARDT:
5       Q.   The new question is, who was
6  the direct supervisor of Peng Wenlong in
7  the 2005/2006 time frame?
8           MR. HARDT:  Can you ask him
9       that question, please.
10          THE WITNESS:  I don't
11      recall.
12 BY MR. HARDT:
13      Q.   As the director of foreign
14 sales, would he report directly to you,
15 the general manager?
16      A.   Usually Peng Wenlong would
17 report to the other leaderships that they
18 have the division of the task of
19 management.  Sometimes when we -- when I
20 bump into him when we say hello, he will
21 tell me related matters.  But this does
22 not happen often.
23          MR. CYR:  Counsel, I just
24      want to state for the record, I

Page 470

1       think we've reached the 5:00 time
2       period, but as we've discussed,
3       we're flexible about that, and we
4       appreciate you've come a long way,
5       and you're answering questions.
6       And I think there's at least one
7       other lawyer who would like to ask
8       questions.  We would just
9       appreciate your consideration.
10      Thank you.
11          MR. HARDT:  I understand.  I
12      have significantly cut back my
13      questions, but if I could get a
14      straight answer, we might go a
15      long way.
16 BY MR. HARDT:
17      Q.   Mr. Jia, back in the
18 2005/2006 time frame, were you also or
19 were you made aware that US importers
20 were coming to your company and asking to
21 be your company's exclusive distributor
22 in the United States for your product?
23          INTERPRETER 1:  The word
24      "exclusive" I use it as specific

51 (Pages 467 to 470)

Confidential - Subject to Further Confidentiality Review

Page 471

1    distributor in Chinese --
2        MR. HARDT:  Sole.  Only.
3        THE WITNESS:  TG, they would
4    not allow any sole distributor
5    either inside China or outside of
6    China.
7    BY MR. HARDT:
8        Q.    But were you made aware that
9    people were trying to be your United
10   States sole distributor back in the
11   2005/2006 time frame?
12       A.    I don't know.
13       Q.    As general manager of TG,
14   would you have expected to be made aware
15   of that information if it was occurring?
16       A.    I don't understand what you
17   mean.
18       Q.    As general manager of TG,
19   would you have liked to have known that
20   information, that people wanted to be
21   your sole distributor in the United
22   States?
23       A.    Whether the people wanted to
24   do it or not, I don't know.  But I don't

Page 472

1    have such a wish.  I would not take the
2    initiative to have such a wish to make
3    the United States to become our market.
4    It is impossible.  That is something that
5    TG cannot do.
6        Q.    Well, I will tell you, there
7    are documents that show that around that
8    2005/2006 time frame that there were US
9    importers anxious, making inquiries to
10   buy your product and import it into the
11   United States, and there were also US
12   importers making inquiry to be your sole
13   distributor in the United States.  And
14   your testimony as you sit here today is
15   you were not made aware of that?
16       MR. CYR:  Objection on the
17   grounds the question is compound
18   and confusing.
19       Mr. Jia, you may try to
20   answer the question.
21       THE WITNESS:  I don't know
22   how they think.
23       MR. HARDT:  I don't know
24   what?

Page 473

1        INTERPRETER 1:  I don't know
2    how they think.
3    BY MR. HARDT:
4        Q.    All right.
5        Now, according to an
6    affidavit that you have submitted and
7    actually your testimony today, this was
8    the only sale -- well, these two sales to
9    my client, Venture Supply, were the only
10   sales of drywall by TG; is that correct?
11       MR. CYR:  Objection as to
12   form.  Objection as to form.
13       Please try to answer, Mr.
14   Jia.
15       THE WITNESS:  I don't
16   understand.  What do you mean?
17   BY MR. HARDT:
18       Q.    Well, it's your testimony
19   that the only sale to a US importer of TG
20   drywall was made to Venture Supply and
21   that's it; is that correct?
22       A.    I'm unable to answer your
23   questions, but I insist that my affidavit
24   is correct.  I insist that it is correct.

Page 474

1        Q.    And the affidavit says that
2    the only sale to a US importer by TG was
3    to Venture Supply, correct?
4        A.    Yes.
5        Q.    And I will tell you for the
6    purposes of my next question that the
7    contracts for those sales were in late
8    2005.  All right?
9        MR. HARDT:  Please translate
10   that.
11       THE WITNESS:  Yes.
12   BY MR. HARDT:
13       Q.    And my understanding is that
14   TTP was formed in February of 2006 as a
15   subsidiary of TG; is that correct?
16       A.    Yes.
17       Q.    And it was in February of
18   2006, I think it's February 20, 2006 that
19   the license was entered into between TG
20   and TTP to allow TTP to use TG's brand
21   name; is that correct?
22       A.    Yes.
23       Q.    And also on February 20th of
24   2006, there was an equipment sale by TG

52 (Pages 471 to 474)

Confidential - Subject to Further Confidentiality Review

Page 475

1  to TTP; is that correct?
2      A.   Yes.
3      Q.   And was that production
4  equipment?
5      A.   Yes.
6      Q.   And then after February of
7  2006 -- well, take that back.
8           TG never made a sale to
9  another US importer of TG drywall; is
10 that correct?
11         MR. PANAYOTOPOULOS:
12 Objection to form.
13         MR. HARDT:  (Addressing the
14 interpreter.)
15     You can ask the question.
16         MR. CYR:  I object as to
17 form, and also I think it's the
18 fourth or fifth time you've asked
19 the same question, and it is 15
20 after 5:00.  And so I guess --
21         MR. HARDT:  I was going
22 somewhere with this.
23         MR. CYR:  Please don't
24 interrupt me.

Page 476

1       I guess I would like to say,
2  respectfully, that we have another
3  ten minutes, and then we're going
4  to call it an evening.
5       Thank you.
6           MR. HARDT:  I don't
7  appreciate the artificial
8  timeline, but I'm trying to get
9  answers from this gentleman.
10         MS. BASS:  Are you
11 suggesting he has ten minutes
12 or --
13         MR. CYR:  No, no.  We're
14 going to be all done in ten
15 minutes.
16         MR. BRENNER:  So, you're
17 suggesting that those of us that
18 have come from wherever to ask the
19 few questions that we have will be
20 unable to ask questions after ten
21 minutes?
22         MR. CYR:  What I am
23 suggesting is that you are now 15
24 minutes beyond the time limit that

Page 477

1  was allocated for the depositions,
2  that I've repeatedly warned the
3  entire group of plaintiffs'
4  counsel who are here that you need
5  to manage your time so that
6  everybody has an opportunity to
7  ask the questions.  In my view,
8  we've spent a lot of time asking
9  questions that weren't even in the
10 designated areas and don't even
11 relate to jurisdiction.  You've
12 made these choices.  We're now 15
13 minutes beyond 5:00.  He's just
14 asked the same question for the
15 fourth or fifth time.
16         We're going to wrap it up in
17 ten minutes, and you can complain
18 to the Judge.
19         MS. BASS:  Let me just note
20 for the record that I have never
21 before been in a deposition where
22 out of every hour, 15 minutes is
23 taken as a break by the witness,
24 oftentimes in excess of 15

Page 478

1  minutes.  So the timeline of the
2  deposition will speak for itself.
3  But I do suggest that you
4  reconsider the number of people
5  who are here having flown 20,000
6  miles to ask their questions.
7           MR. HARDT:  Can I continue
8  to ask questions, please.
9           MR. CYR:  I do appreciate
10 that.
11         MR. HARDT:  If you're going
12 to cut it off in ten minutes,
13 let's get through what we can get
14 through.
15         MR. CYR:  And I appreciate
16 that we just spent a few minutes
17 talking about it, and so the ten
18 minutes -- we have to have -- I
19 don't mean to be Draconian, but we
20 have to have some expectation of
21 when it's going to stop.  So, why
22 don't we say -- first of all, the
23 sensitivity with respect to that
24 issue was displayed yesterday.

53 (Pages 475 to 478)

Confidential - Subject to Further Confidentiality Review

Page 479

1 That was the right time for it,
2 but not now. Let's go until 5:30.
3     Thank you.
4     MR. PANAYOTOPOULOS: I just
5 want to note for the record that
6 on behalf of my client, I have not
7 had an opportunity to ask any
8 questions, and we will attempt to
9 ask that this deposition gets
10 continued if it gets cut off by
11 counsel I guess at 5:30.
12     MS. EISELEN: Likewise for
13 Interior/Exterior.
14     MR. CYR: What is your
15 suggestion with respect to how
16 we're supposed to conduct these
17 depositions? I don't understand.
18 Do you just think we're just going
19 to go to midnight?
20     MR. PANAYOTOPOULOS: The
21 same way that every other
22 deposition gets conducted. If we
23 don't have an opportunity, we'll
24 need to come back at another time.

Page 480

1 If we can do it later today, I'm
2 willing to stay as late as we need
3 to.
4     MR. CYR: No. We're going
5 to wrap it up at 5:30. I'm sorry.
6 Go ahead, sir.
7     MR. BRENNER: I'll note the
8 same objection. I have maybe ten
9 minutes worth of questions.
10     MR. BLACK: I want to make
11 the objection for the State of
12 Louisiana. Same objection.
13     MR. PANAYOTOPOULOS:
14 Reservation of rights.
15     MS. EISELEN: Same.
16     MR. HARDT: Can I ask a
17 question?
18 BY MR. HARDT:
19     Q.   Let me ask you this.
20     Was TTP formed as a
21 subsidiary of TG to sell drywall to US
22 importers?
23     A.   No.
24     Q.   Can you explain for me why

Page 481

1 after the formation of TTP in February of
2 2006 that only TTP made sales to US
3 importers and TG did not?
4     A.   In the year 2006, the
5 department -- the tax department, they
6 inform us that we cannot issue invoice
7 for VAT. That's value-added tax. But
8 there were a lot of the customers of TG,
9 they were -- they are asking for the
10 issuing of invoice for VAT. So, under
11 the suggestions of the tax bureau,
12 therefore, all the customers, they wanted
13 to use VAT invoices. They would go to
14 TTP. We will use TTP to do the
15 production. That is for the convenience
16 of the management of that tax, because
17 most of the customers that sold for --
18 that buy the products to be sold to
19 somewhere outside of China for the
20 drywall, most of them, they require the
21 invoice of the VAT. Therefore, the
22 products produced by TTP, they would have
23 a lot of the products sold outside of
24 China. TG has very few of them.

Page 482

1     MR. HARDT: I wish I had
2 time to delve into that answer,
3 but I'm going to pass the witness.
4     MR. CYR:  (Addressing Mr.
5 Chen.)
6     Mr. Jia has complained about
7 the time. Could you ask him if we
8 can go until 5:30.
9     Okay.
10     - - -
11     EXAMINATION
12     - - -
13 BY MR. BRENNER:
14     Q.   Mr. Jia, I represent Tobin
15 Trading, Incorporated.
16     Did you ever meet with any
17 representative of Tobin Trading,
18 Incorporated?
19     A.   I have never seen any.
20     Q.   The product that TG sold to
21 Venture Supply, where was the factory
22 located that produced the product?
23     A.   In the city called Tai'an in
24 the province of Shandong.

54 (Pages 479 to 482)

Confidential - Subject to Further Confidentiality Review

Page 483

1    Q.   Was the product that was
2  sold by TG to Venture Supply produced in
3  one factory or more than one factory?
4    A.   I don't understand.
5      That I'm not sure.
6    Q.   The place where the product
7  was produced that was sold to Venture
8  Supply, is there a paper factory nearby?
9    A.   Whose factory?
10   Q.   Was there a paper factory
11 nearby that supplied the paper for use in
12 the drywall that was produced for Venture
13 Supply?
14   A.   I don't understand what
15 factories you're referring to.  In
16 Tai'an, there are a lot of paper
17 factories.
18   Q.   Was there more than one
19 paper factory that produced the paper
20 that was used to make the drywall that
21 was sold to Venture Supply?
22   A.   There is no paper factories
23 would be specifically to produce papers
24 for specific enterprise.

Page 484

1    Q.   Where was the paper that was
2  used to produce the drywall recycled or
3  manufactured?  That's a bad question.
4  Strike that question.
5      Did TG own any of the
6  factories or paper factories used to
7  either produce or recycle the paper used
8  for drywall production by TG?
9    A.   TG has one paper factory,
10 but the scale of this factory is very
11 small.  The paper it produced is for the
12 use of drywall for TG.  TG also purchase
13 a large amount of paper from other
14 companies.
15   Q.   Where is the paper factory
16 that you've referred to located?
17   A.   Are you talking about the TG
18 factory?
19   Q.   Yes.
20   A.   In Tai'an, Shandong.
21      MR. CYR:  I've got 5:30.
22      MR.  BRENNER:  I've got
23    three, maybe four questions.  It's
24    not long.  Just two more areas to

Page 485

1      cover.
2  BY MR. BRENNER:
3    Q.   How far is the distance
4  between the paper factory and the nearest
5  drywall manufacturing plant?
6    A.   It's approximately about
7  1,000 meters.
8    Q.   Are all of the --
9      Were all of the employees in
10 2005 and 2006 of the paper plant
11 employees of TG?
12   A.   The employees for the paper
13 factories are the employees of TG.
14   Q.   Were there any workers --
15 and then I've got two more quickies
16 because I know --
17      Were there any workers in
18 the TG paper factory -- strike that.
19      Did the workers in the TG
20 paper factory wear uniforms?
21      INTERPRETER 1:  Wear
22    uniforms?
23      MR.  BRENNER:  Yes.
24      THE WITNESS:  Our country

Page 486

1  take the matter of the safeties of
2  the laborers very seriously.
3  Without a uniform, they cannot
4  enter the factory.
5      MR. CYR:  One more question,
6    please, sir.
7  BY MR. BRENNER:
8    Q.   Do you know a company called
9  THBM?
10   A.   I know.
11      MR. CYR:  Thank you very
12    much.
13      MR.  BRENNER:  You're not
14    going to let him answer questions
15    about the business of THBM?
16      MR. CYR:  No, I'm not.
17    Thank you very much.
18      MR.  BRENNER:  All right.
19    I'll object for the record for
20    having my questions cut off
21    arbitrarily, and we reserve the
22    right to ask the judge to order
23    Mr. Jia to come back for a few
24    questions, and we will ask The

55 (Pages 483 to 486)

Confidential - Subject to Further Confidentiality Review

Page 487

1  Court to impose costs.
2      MR. PANAYOTOPOULOS:  On
3  behalf of Banner, we're not
4  agreeing that the deposition is
5  terminated.  As far as we're
6  concerned, it's continued because
7  counsel for the defendant chose to
8  terminate it, to stop it at this
9  point.  So, we're just reserving
10  all of our rights and objecting to
11  the unilateral termination.
12      MS. EISELEN:
13  Interior/Exterior also reserves
14  its rights.
15      MR. BLACK:  The State of
16  Louisiana joins.
17      MR. CLARK:  Southern Homes
18  also joins.  It objects to the
19  termination of this deposition
20  without having asked questions of
21  this witness and reserves its
22  right to so ask questions of this
23  witness.
24      MR. CYR:  And on behalf of

Page 488

1  Taishan Gypsum and TTP, I would
2  just like to say that everything
3  that I said during the very first
4  part of the first day and then
5  repeatedly throughout the
6  deposition holds true for now.
7      Thank you very much.
8      MR. HARDT:  I would like to
9  say on behalf of Venture and
10  Porter-Blaine that I arbitrarily
11  cut off my questioning of this
12  witness due to defense counsel
13  saying that he was going to cut
14  the deposition short to give
15  somebody else a chance to ask
16  questions, but I reserve my right
17  also to ask The Court to reopen
18  this deposition at the cost of
19  Taishan and in the United States.
20      MR. SLAUGHTER:  Atlantic
21  Homes joins in the objections of
22  the other defendants.
23      THE VIDEOTAPE TECHNICIAN:
24  The time now is approximately 5:35

Page 489

1  p.m.  Today's portion of our
2  deposition consisting of seven
3  tapes is now concluded.
4          - - -
5      (Whereupon, the deposition
6  adjourned at 5:35 p.m.)
7          - - -

Page 490

1  C E R T I F I C A T E.
2
3
4      I, LINDA L. GOLKOW, a
   Registered Diplomate Reporter, Certified
   Court Reporter and Notary Public, do
5  hereby certify that, pursuant to notice,
   the deposition of TONGCHUN JIA was duly
6  taken on April 5, 2011 at 9:03 a.m.
   before me.
7
8      The said TONGCHUN JIA was
   duly sworn by me through the interpreter
9  according to law to tell the truth, the
   whole truth and nothing but the truth and
10  thereupon did testify as set forth in the
   above transcript of testimony.  The
11  testimony was taken down stenographically
   by me.
12
13      I do further certify that
   the above deposition is full, complete
14  and a true record of all the testimony
   given by the said witness.
15
16
17      Linda L. Golkow
   Registered Diplomate Reporter
18  Certified Realtime Reporter
19
20      (The foregoing certification
   of this transcript does not apply to any
21  reproduction of the same by any means,
   unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

56 (Pages 487 to 490)