1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF LOUISIANA
2

3    _____   § MDL NO. 2047
     IN RE:                    §
4    CHINESE-                  § SECTION: L
     MANUFACTURED              §
5    DRYWALL PRODUCTS          § JUDGE FALLON
     LIABILITY                 §
6    LITIGATION                § MAGISTRATE
                               § JUDGE WILKINSON
7    _____   §

                    -   -   -
8

      CROSS NOTICED IN VARIOUS OTHER ACTIONS
9

                    -   -   -
10

                April 7, 2011
11

                    -   -   -
12

      CONFIDENTIAL - SUBJECT TO FURTHER
13           CONFIDENTIALITY REVIEW
14                  -   -   -
15        Videotaped deposition of WENLONG
     PENG, held at 3 Pedder Street, Central,
16   Hong Kong, China, commencing at 8:59
     a.m., on the above date, before Linda L.
17   Golkow, Certified Court Reporter,
     Registered Diplomate Reporter, Certified
18   Realtime Reporter and Notary Public.
19
20                  -   -   -
21
22        GOLKOW TECHNOLOGIES, INC.
        ph 877.370.3377 | fax 917.591.5672
23           deps@golkow.com
24

Confidential - Subject to Further Confidentiality Review

Page 18

1   representing the PSC and the
2   Germano plaintiffs.
3        MS. EISELEN:  Carlina
4   Eiselen representing
5   Interior/Exterior Building Supply
6   and Interior/Exterior.
7        MR. CLARK: Matthew Clark
8   representing Southern Homes.
9        MR. PANAYOTOPOULOS: Nick
10   Panayotopoulos here on behalf of
11   certain Banner entities.
12        MR. ALLELY: I'm Craig Allely
13   on behalf of the State of
14   Louisiana.
15        MR. SPANO:  Frank Spano,
16   Hogan Lovells, on behalf of
17   Taishan Gypsum Company Limited and
18   Tai'an Taishan Plasterboard
19   Company Limited.
20        Just for the record, I just
21   want to note that by agreement,
22   we're starting Mr. Peng's 30(b)(6)
23   deposition a day ahead of time,
24   and this deposition will conclude

Page 19

1   at 5:00 p.m. tomorrow.
2        MR. CHEN:  Eugene Chen,
3   Hogan Lovells, on behalf of
4   Taishan Gypsum Company Limited and
5   Tai'an Taishan Plasterboard
6   Company Limited.
7        INTERPRETER 2:  Una Wong,
8   check interpreter.
9        MS. YUAN: Stacy Yuan, Hogan
10   Lovells, on behalf of Taishan
11   Gypsum Co. Limited and Tai'an
12   Taishan Plasterboard Limited.
13        MS. GARCIA: Renee Garcia,
14   Hogan Lovells, on behalf of
15   Taishan Gypsum and Tai'an Taishan
16   Plasterboard.
17        MR. STATMAN: Eric Statman,
18   Hogan Lovells, on behalf of
19   Taishan Gypsum and Tai'an Taishan
20   Plasterboard.
21        MR. SEEGER:  Just to save
22   time, Mr. Dong has been here the
23   last couple of days.  Do you
24   expect him to come back?

Page 20

1        MR. SPANO:  No.
2        MR. SEEGER:  If people
3   enter --
4        INTERPRETER 1:  I --
5        MR. SEEGER:  Hold on,
6   Stephanie.  I'm talking.
7        If people enter, attorneys,
8   I'd like to just try to pick them
9   up so that we know that they are
10   here.
11        By the way, on what you
12   raise, Mr. Spano, we do appreciate
13   the accommodation of moving the
14   witness up a day and accommodating
15   everybody's schedule.  As to the
16   issue about ending at 5:00, we
17   would hope you'd reconsider that
18   if we're in the middle of
19   questioning.  People have flown 15
20   hours halfway across the world.
21   If we need a little time at the
22   end of the day tomorrow, we hope
23   you will accommodate that, and we
24   will deal with that tomorrow.

Page 21

1        MR. SPANO:  I understand
2   your point.
3        - - -
4        EXAMINATION
5        - - -
6   BY MR. SEEGER:
7   Q.    Good morning, Mr. Peng.
8   A.    Good morning.
9   Q.    Did I pronounce your name
10   correctly?  If I call you Mr. Peng, is
11   that a correct pronunciation of your
12   name?
13   A.    Peng.
14   Q.    Okay.  Mr. Peng.
15        Mr. Peng, what other names
16   have you used in your business career
17   other than Mr. Peng?
18   A.    I also use another name,
19   Frank Clem, F-R-A-N-K, one word, C-L-E-M,
20   another word.
21   Q.    Mr. Clem, I would just like
22   to note for the record that you've
23   written the name that's on the paper in
24   front of you in English.  Correct, sir?

Confidential - Subject to Further Confidentiality Review

Page 22

1      A.    Yes.
2      Q.    And you do speak a little
3  English, right, Mr. Peng?
4      A.    The level of my English is
5  not good. A lot of time I am relying on
6  handwriting. My verbal English level is
7  very, very bad, and I have to handwrite a
8  little by a little.
9      Q.    So, are you saying, Mr.
10  Peng, that you can write a little bit in
11  English but verbally you don't speak
12  English very well?
13     A.    I rarely speak -- my
14  speaking level is really bad.
15     Q.    How about, does he
16  understand English, like does he
17  understand --
18          I'm sorry.
19          Mr. Peng, do you understand
20  the questions I'm asking you in English?
21     A.    I don't understand.
22     Q.    When I ask a question in
23  English, do you understand it without
24  having the interpreter interpret it in

Page 23

1  Chinese for you?
2      A.    I won't understand, and
3  also, I don't know -- I cannot express
4  myself, and I am unable to understand.
5      Q.    I appreciate that. And Mr.
6  Peng, you have a right to an interpreter.
7  I just want to know how much English you
8  understand in terms of the questions I'm
9  asking you.
10          MR. SPANO: Objection to
11  form.
12          THE WITNESS: (Addressing
13  Mr. Spano.) What do you mean?
14          MR. SEEGER: He wants to
15  understand, I think, what you just
16  did.
17          MR. SPANO: I'm making an
18  objection to the form of the
19  question for the record. You may
20  answer the question.
21          THE WITNESS: I have
22  forgotten about the earlier
23  question. Would you mind
24  repeating that question?

Page 24

1  BY MR. SEEGER:
2      Q.    No problem.
3          MR. SEEGER: I've forgotten
4  my earlier question.
5          Linda, can you read it back,
6  and Stephanie, interpret it.
7          - - -
8          (Whereupon, the requested
9  portion of the transcript was read
10  by the court reporter.)
11          - - -
12          THE WITNESS: It is very
13  difficult to say. I might be able
14  to pick up single words, but for
15  the whole sentence, I would not be
16  able to understand in particular
17  in a very serious occasion like
18  this, very solemn occasion like
19  this.
20  BY MR. SEEGER:
21     Q.    I appreciate that, Mr. Peng.
22          Can you read English?
23     A.    Depends on the English, in
24  what area. If the English is very

Page 25

1  difficult, that would be difficult for
2  me. If it is simple or very simple
3  English, then I might understand it. For
4  the professional English or for the
5  English in some other area, it might
6  become very difficult to me or I don't
7  understand it at all.
8      Q.    Can you read an English
9  language newspaper, for example, Mr.
10  Peng?
11     A.    English newspapers?
12     Q.    An English language
13  newspaper.
14     A.    No, I don't understand.
15     Q.    You don't understand the
16  question or he doesn't understand -- you
17  can't read --
18          Mr. Peng, you don't
19  understand the question I just asked you,
20  or no, you can't read a newspaper in
21  English?
22     A.    This question I understand.
23  What I mean is that I cannot understand
24  the English newspaper.

7 (Pages 22 to 25)

Confidential - Subject to Further Confidentiality Review

Page 26

1    Q.    Okay.
2          Mr. Peng, the name that you
3    wrote on the paper that we're going to
4    mark as Exhibit 1 in front of you.
5          MR. SEEGER:  We'll call this
6    Peng Exhibit 1.
7              - - -
8          (Whereupon, Deposition
9          Exhibit Peng-1, Handwritten note,
10         English name of witness, was
11         marked for identification.)
12             - - -
13   BY MR. SEEGER:
14   Q.    Mr. Peng, the name that you
15   wrote on the paper in front of you that
16   we've marked as Exhibit 1, why do you use
17   that name?  Why did you choose the name
18   Frank Clem?
19   A.    This name was given to me by
20   my teacher when I went to school.
21   Q.    And where did you go to
22   school, Mr. Peng?
23   A.    When you say going to
24   school, what are you referring to?

Page 27

1    Elementary school, high school,
2    university or any other?
3    Q.    I was trying to be
4    consistent with --
5          Mr. Peng, I was following up
6    to your last answer.  The teacher who
7    gave you this name, what school was that
8    at?
9    A.    I understand now.
10         INTERPRETER 1:  Mr. Peng
11         gave out the name of his
12         university in Chinese.  The
13         interpreter is going to translate,
14         but before she translate, Counsel,
15         can I ask the witness to help me
16         if he knows the English name of
17         his school.
18         MR. SEEGER:  That's fine
19         with me.  I don't know if his
20         counsel -- are you okay with that?
21         She wants to pronounce in English
22         the name of his school.  So if he
23         knows the name of his school in
24         English, she's asking if it's okay

Page 28

1    that he correct her?
2          MR. SPANO:  Okay.
3          THE WITNESS:  I cannot
4    recall exactly the name in
5    English.
6          INTERPRETER 1:  The
7    interpreter is going to translate
8    best she can, not guarantee the
9    accuracy.
10         Shandong Construction
11         Material Industrial College.
12   BY MR. SEEGER:
13   Q.    Mr. Peng, do you have an
14   understanding as to why your teacher at
15   this school would give you an anglicized
16   name like Frank Clem?
17   A.    When we go to school, I
18   think it is for the convenience and also
19   to help the teacher to transmit the
20   knowledge to us.  I don't think it is for
21   any particular reason, because other
22   people also got an English name.  I think
23   this way people will feel closer to each
24   other.  Well, for the young people, I

Page 29

1    think it is a trend that is popular.  Do
2    you understand what I'm saying?
3    Q.    If I understand it or not,
4    it's not important, it's just what his
5    testimony is.
6    A.    I understand.
7    Q.    Were you given this name by
8    this teacher at the Shandong Construction
9    Material College with the idea that you
10   were supposed to use this in your
11   business life?
12         MR. SPANO:  Objection to
13         form.
14         THE WITNESS:  Do I still
15         need to answer this question?
16         What do you mean?
17   BY MR. SEEGER:
18   Q.    Let me ask you another
19   question, Mr. Peng.  It was your decision
20   to continue to use the name Frank Clem in
21   your business life, correct?
22         MR. SPANO:  Objection to
23         form.
24         THE WITNESS:  I didn't

Confidential - Subject to Further Confidentiality Review

Page 30

1    particularly try to use this name
2    for business purpose.  When I went
3    to school, my teacher gave me this
4    name.  So, it's like a marking, a
5    recognition for me, either it is
6    English or Chinese name.
7  BY MR. SEEGER:
8      Q.    Mr. Peng, does your family
9  call you Frank?
10     A.    No.  My family member, they
11 don't know English.
12     Q.    Do your closest friends in
13 China call you Frank?
14     A.    Yes, my friends, my
15 schoolmates.
16     Q.    What about friends that
17 aren't part of your construction life, do
18 they call you Frank?
19         MR. SPANO:  Objection to
20     form.
21         INTERPRETER 1:  Counsel,
22     "construction life," do you mean
23     when he works for the industry of
24     construction?

Page 31

1          MR. SEEGER:  Let me strike
2      it.  I'm going to ask it
3      differently, Stephanie.
4  BY MR. SEEGER:
5      Q.    What about friends that are
6  not part of your business life, do they
7  call you Frank?
8          MR. SPANO:  Note my
9      objection.
10         THE WITNESS:  I did mention
11     earlier, my friends, my
12     schoolmates, they have no
13     relationship with my business.
14     They call me Frank.
15 BY MR. SEEGER:
16     Q.    Wait.  Your schoolmates call
17 you Frank?  I'm just confused.  I want to
18 clarify, Mr. Peng.  You're saying your
19 schoolmates call you Frank?
20     A.    I have many schoolmates.  It
21 depends on how they like it.  Some, they
22 used to call me Peng Wenlong.  Some, they
23 used to call me Frank.  So, whatever way
24 they do it, they do it both ways.

Page 32

1      Q.    What does Mr. Jia call you?
2      A.    Mr. Jia call me Peng
3  Wenlong.
4      Q.    The school that you went to
5  in Shandong, the construction school, did
6  you speak English in the classes there?
7      A.    At school, when we have the
8  English lessons like during the senior
9  year, the fourth year, we might speak a
10 little English, but basically the main
11 language is Chinese.  My mother tongue is
12 also Chinese.
13     Q.    How about the school
14 materials that you studied, the
15 textbooks, articles and things that would
16 be handed to you by your teachers at the
17 school, were they in Chinese or were they
18 in English?
19         MR. SPANO:  Objection to
20     form.
21         THE WITNESS:  Which period
22     are you referring to?
23 BY MR. SEEGER:
24     Q.    Just throughout -- let's

Page 33

1  start generally throughout his school
2  years at Shandong Construction Material
3  College.
4      A.    Mainly it is in Chinese or
5  we call it Hanyu, the language of Han
6  Dynasty.  We have a little English or
7  sometimes English and Chinese
8  bilingually.
9      Q.    When you say English and
10 Chinese bilingually, was that, Mr. Peng,
11 in specific classes, or was that
12 generally?  I just want to be really
13 clear.
14     A.    For special classes, for
15 special teaching materials, the are in
16 English and Chinese.
17     Q.    Mr. Peng, what's the
18 teacher's name that gave you the name
19 Frank Clem?
20     A.    When I went to school, it
21 was in the year 1999.  It was many years
22 ago.  It was 12 years ago.  Up to today,
23 I don't recall.
24     Q.    I want to be clear.  Mr.

Confidential - Subject to Further Confidentiality Review

Page 34

1 Peng, you don't recall the teacher's
2 name, but you kept the name to use --
3 ever since you were given that name, you
4 kept that name to use from and after the
5 date it was given to you, correct?
6         MR. SPANO: Objection to
7    form.
8         THE WITNESS: I didn't
9    intentionally or subjectively
10   trying to use this name. I just
11   keep this name. I did mention
12   about this earlier. Well, it is a
13   marking. I remember this name. I
14   use this name. I did not
15   particularly try to use it or
16   subjectively take the initiative
17   try to use it. Well, I may
18   remember the name, so, I use the
19   name.
20 BY MR. SEEGER:
21   Q.   Did anybody force you to use
22 the name, Mr. Peng?
23   A.   No one forced me. This is
24 the freedom of everyone.

Page 35

1    Q.   So, you chose to continue to
2 use this name after it was given to you
3 by this teacher in school, correct?
4    A.   I did not take the
5 initiative subjectively trying to use
6 this. I did mention about this earlier.
7 I did not particularly try to make an
8 effort to use it. Well, it is very
9 normal, it is like a marking of me.
10 Well, if I want to use it, I use it. I
11 would not take the initiative and try
12 hard to push it to tell other people, and
13 I would not introduce this name to other
14 people or to recommend other people to
15 use this name.
16   Q.   Did the name Frank Clem help
17 you when you dealt with English-speaking
18 customers, Mr. Peng?
19        MR. SPANO: Objection to
20   form.
21        THE WITNESS: Well,
22   regarding whether it is helpful to
23   the customer or not, it would be
24   very difficult to say, and it is

Page 36

1 very difficult for me to
2 speculate. And sometimes when the
3 customers, they call me Peng
4 Wenlong, they find it not very
5 convenient and they are not used
6 to it, and they find it very
7 difficult to call a Chinese name.
8 So, they will choose a name which
9 is simple, easy. So, they would
10 call this name Frank Clem.
11 BY MR. SEEGER:
12   Q.   And you communicated the
13 name Frank Clem to your English-speaking
14 customers to make it easier for them,
15 correct, sir?
16        MR. SPANO: Objection to
17   form.
18        THE WITNESS: I find you put
19   it this way, it is inappropriate.
20 BY MR. SEEGER:
21   Q.   But can he answer the
22 question?
23   A.   I myself did not take the
24 initiative subjectively trying to use

Page 37

1 this name to communicate with the
2 customers.
3   Q.   Well, how did your
4 English-speaking customers, Mr. Peng,
5 know that you used the name Frank Clem?
6 Were they in school with you?
7        MR. SPANO: Objection to
8   form and...
9        THE WITNESS: Well, that is
10   impossible, for the customers to
11   go to school together with me.
12   That is not possible. That is
13   totally impossible. And when a
14   customer come to the company to
15   talk business to us, I will tell
16   them my full name, and then they
17   might find out that it is
18   difficult. How should I put it?
19   They would find it difficult to
20   call my full Chinese name. Then
21   they would request, is there a
22   name easy and simple, a simple and
23   easy name to call me? They
24   requested this.

Confidential - Subject to Further Confidentiality Review

Page 38

1  BY MR. SEEGER:
2      Q.    Okay.
3            Mr. Peng, have you ever
4  traveled to the US?
5      A.    No.
6      Q.    Have you ever traveled to
7  England?
8      A.    No.
9      Q.    What other names have you
10 used in your business life other than Mr.
11 Peng and Frank Clem?
12     A.    I did not use any other
13 name.
14     Q.    Mr. Peng, who is Owen Li,
15 L-I?
16     A.    Can you tell me how do you
17 do the Pinyin and how to spell it, how to
18 write it.
19     Q.    Yeah.  I'm going to write it
20 on a piece of paper.
21           Mr. Peng, I'm going to hand
22 you a piece of paper on which I wrote
23 Owen, O-W-E-N, Li, L-I.
24           MR. SPANO:  Are we going to

Page 39

1       mark that as an exhibit?
2            MR. SEEGER:  Only if you
3  want to.
4            MR. SPANO:  Please do.
5            MR. SEEGER:  Sure.
6            INTERPRETER 1:  Is this N or
7  what?
8  BY MR. SEEGER:
9      Q.    Let me do this.
10           Mr. Peng, what I've put in
11 front of you is O-W-E-N, second name,
12 L-I.
13     A.    I cannot recall this English
14 name.
15           MR. SEEGER:  Mr. Spano, you
16 asked me to mark it.  I'm not
17 going to mark it at this point
18 because he doesn't know the name.
19 If you want to when you follow up,
20 you're free to mark it as an
21 exhibit.
22           If you can give it back to
23 me, please.
24           (Handing over document.)

Page 40

1            MR. SEEGER:  Thank you, Mr.
2  Peng.
3  BY MR. SEEGER:
4      Q.    So, Mr. Peng, other than the
5  name in front of you, I just want to be
6  really clear, and I may have asked you
7  this.  And if I did, I apologize.
8            Is that the only name other
9  than Peng Wenlong that you used in your
10 business life?
11           MR. SPANO:  Objection to
12 form, asked and answered.
13           THE WITNESS:  I did not
14 use -- I do not use any other
15 name.
16 BY MR. SEEGER:
17     Q.    Thank you.
18           Mr. Peng, how old are you?
19     A.    Are you talking about my
20 age?
21     Q.    Yes.
22     A.    This year.  This year, I am
23 30 years of age.
24     Q.    Did the fact that you could

Page 41

1  read some English make it easier for you
2  to communicate with your English-speaking
3  customers, Mr. Peng?
4      A.    I understand.
5            I did mention about this
6  earlier.  I know English, but I only know
7  very simple English.  My English level is
8  really bad, but I have no choice when I
9  have to deal with English-speaking
10 customers.  These customers, they don't
11 understand and they don't speak Chinese.
12 So, when we are communicating, it is
13 necessary.  To me, it's very, very
14 difficult for me, difficult for me that
15 my job require me to do this.  I can only
16 do a little by little with single words
17 with the assistance of a dictionary to
18 communicate.  I haven't finished yet.
19           In fact, many of our
20 customers, they bring their own
21 interpreters.  They have interpreters or
22 they have -- or they let the people from
23 the office of the agents to come to our
24 company to talk to me.  This is more

Confidential - Subject to Further Confidentiality Review

Page 42

```
1    comfortable to me.  This makes me happy.
2          INTERPRETER 2:  The check
3    interpreter believes the witness
4    said agents in China.
5          INTERPRETER 1:  He did not
6    say that.  The agent's office.
7          INTERPRETER 2:  In China.
8          INTERPRETER 1:  In China.  I
9    believe I don't have that in my
10   notes.  I believe that the
11   checking interpreter is trying to
12   help.
13         MR. SEEGER:  Trying to help
14   the witness?
15         INTERPRETER 1:  With the
16   definition of the office of the
17   agent.
18         MR. SEEGER:  Well, thank
19   you.
20         INTERPRETER 2:  The witness
21   did say agent office in China.
22         MR. CHEN:  I concur with
23   that as well.
24         MR. SEEGER:  Okay.  It is
```

Page 43

```
1    what it is, and we've got it on
2    video if anybody wants to listen
3    to it.
4          Thank you.
5    BY MR. SEEGER:
6          Q.   Mr. Peng, when you studied
7    at the Shandong Construction Material
8    College, what specific areas did you
9    study, if you can tell us?
10         A.   The subject I studied was
11   English for economic trade.
12         Q.   And did you have a sort of
13   --
14         Was that your major area of
15   study?  Did you have minor areas of study
16   as well?
17         MR. SPANO:  Objection.
18         THE WITNESS:  I do have a
19   minor.
20         MR. SPANO:  Please note my
21   objection to the form of the
22   question.
23   BY MR. SEEGER:
24         Q.   Mr. Peng, what was your
```

Page 44

```
1    minor?
2          A.   My minor was the classes in
3    public affairs, but I never taken any
4    position in this -- with this type of
5    position.  I only have certain
6    understanding of this type of knowledge.
7    I study sociology to have an
8    understanding of this knowledge.
9          Q.   Mr. Peng, did you receive a
10   degree from Shandong Construction
11   Material College?
12         A.   Degree, yes.
13         Q.   Could you tell us what it's
14   called?
15         A.   English literature.
16         Q.   Mr. Peng, what did you do to
17   prepare yourself for your deposition here
18   today?
19         A.   Under the guidance of my
20   attorney, I read some material, I checked
21   some materials.
22         Q.   And I'm not going to ask you
23   about any discussions you had with your
24   attorneys, Mr. Peng.  I'll give you that
```

Page 45

```
1    caution.  I'm sure your attorney has as
2    well.  But I want to follow up on that.
3          Mr. Peng, other than your
4    attorneys, who did you speak with at the
5    company to prepare yourself for your
6    testimony today?
7          A.   My company?  What company
8    are you talking to?
9          Q.   What company are you
10   employed by, Mr. Peng?
11         A.   The company hiring me now is
12   TG.
13         Q.   Who at TG did you speak
14   with, if anyone, to prepare for your
15   testimony today?
16         A.   Are you talking about -- the
17   question is, are you asking me about I
18   talked to my colleagues regarding
19   discussion about the issue or talking
20   about that I have to come to testify
21   today?
22         Q.   That's a fair correction,
23   Mr. Peng.
24         I want to know that in
```

12 (Pages 42 to 45)

Confidential - Subject to Further Confidentiality Review

Page 90

1    translating now the English name
2    that he wrote down?
3            INTERPRETER 1:  Yes.  I'm
4    translating in two ways because --
5    and I cannot guarantee accuracy.
6            MR. SEEGER:  Got it.
7            INTERPRETER 1:  It is called
8    Tai'an Shi, S-H-I.  Tai'an is one
9    word, S-H-I, Taishan, T-A-S-H-A-N
10   Plasterboard Company Limited.  And
11   another way I'm trying to
12   translate is TTP quote (Tai'an
13   City.)
14           MR. SEEGER:  Stephanie, put
15   the name of the company in front
16   of Mr. Peng because I want to ask
17   him a question about it.
18   BY MR. SEEGER:
19       Q.   Mr. Peng, the name of the
20   company that you were describing to the
21   interpreter, could you write it in
22   English, what you understand that to mean
23   in Chinese?
24           MR. SPANO:  Objection to the

Page 91

1    form of the question.  And I
2    object to you asking him to write
3    things in English for the reasons
4    he's stated, that he has very
5    limited capability with the
6    English language.
7            MR. SEEGER:  Okay.
8            THE WITNESS:  It is very
9    difficult.  It is very difficult
10   for me to write that.
11   BY MR. SEEGER:
12       Q.   Do you know how to write it
13   down in English or do you not know how to
14   write it down in English?
15       A.   Will you mind repeating the
16   question.
17       Q.   Mr. Peng, you have a degree
18   in English literature.  I'm just asking
19   you if you know how to write in English.
20   Don't worry about the spelling.  Can you
21   write in English the name of the company
22   that you have in front of you that's in
23   Chinese?
24           MR. SPANO:  I object to the

Page 92

1    form of the question, and I also
2    object to offhand comments or
3    remarks to the witness that are
4    not part of the question.
5            MR. SEEGER:  Okay.
6            MR. CHEN:  She should
7    translate the objection.
8            MR. SPANO:  Yes.
9            MR. SEEGER:  Okay, then mark
10   it for a ruling.
11           Go ahead, you have to
12   translate his objection.
13           MR. SPANO: Just for the
14   record --
15           MS. BASS:  Let her
16   translate.
17           MR. SPANO:  Just for the
18   record, I objected.  I did not
19   instruct him not to answer the
20   question.
21           MR. SEEGER:  I know that.  I
22   appreciate that.  We were all just
23   making a record.
24   BY MR. SEEGER:

Page 93

1        Q.   Do you need a read back of
2    the question that I asked, Mr. Peng?
3        A.   Please repeat that.  I
4    cannot recall the question.
5        Q.   Mr. Peng, can you write in
6    English, and don't worry about spelling,
7    the name of the company that's in front
8    of you that you wrote in Chinese?
9        A.   Yeah, okay, let me try to
10   write it down, but I'm still not very
11   self-confident.
12       Q.   Thank you.
13       A.   I'm sorry, the Chinese name,
14   I miss out one word.  I have written this
15   down.
16       Q.   Thank you.
17           MR. SEEGER:  Can we mark
18   that as Exhibit 2.
19             - - -
20           (Whereupon, Deposition
21   Exhibit Peng-2, Handwritten note,
22   Company name, was marked for
23   identification.)
24             - - -

Confidential - Subject to Further Confidentiality Review

Page 114

1  piece of paper?
2      A.   I did not hear clearly the
3  question.
4          MR. SEEGER:  Can you just
5  repeat it to him.
6          (Interpreter repeats the
7      question.)
8          THE WITNESS:  In this
9  e-mail, I will use this name.
10 BY MR. SEEGER:
11     Q.   I don't understand his
12 answer.
13         When he uses the name Frank
14 Clem in business dealings, does he use
15 the e-mail address that he just wrote on
16 this piece of paper?  That's my question.
17     A.   I don't understand the
18 question.
19     Q.   Mr. Peng, I'm going to put
20 in front of you an e-mail address.  I
21 would like you to identify what this is,
22 if you can.  For the record, it is
23 CLEMPW1123@163.com.  Could you please
24 tell us what that is?

Page 115

1      A.   It is an e-mail that I used.
2  I used it.
3      Q.   During what time period?
4      A.   I used this e-mail address
5  before the other e-mail I just wrote
6  down.
7      Q.   When did you start using the
8  e-mail address that I put in front of
9  you, which spells out Clem, and then it's
10 got some other characters there?
11     A.   Is it this one,
12 (indicating)?
13     Q.   Yes.
14     A.   I've been using this since I
15 went to school.
16     Q.   And do you currently use the
17 address, the one that's in front of you,
18 with the word Clem spelled out?  Do you
19 currently use that address?
20     A.   I don't use it now.
21     Q.   Did you use the address
22 that's in front of you, the one that has
23 Clem spelled out in it, for business
24 purposes?

Page 116

1      A.   I did.
2      Q.   Have you used it in
3  connection with business that you've done
4  as an employee of TG?
5      A.   When I worked for TG, I
6  did -- I had used this e-mail address
7  before.
8      Q.   And you used it while you
9  worked at TTP as well, in 2006 and 2007,
10 correct?
11     A.   This I don't recall.
12     Q.   Mr. Clem, while you were
13 with TTP, you were involved in shipping a
14 lot of drywall -- involved with either
15 the shipping or the sale of a lot of
16 drywall to the United States?  Wouldn't
17 that be a fair characterization?
18     A.   This question to me, it
19 doesn't seem to be very clear.
20     Q.   Well, your job while you
21 were with TG and TTP was to sell drywall
22 to foreign companies, correct?
23     A.   When I work for TTP, mainly
24 I did the sales including mainly for the

Page 117

1  Chinese companies or for the companies in
2  China.  Of course when foreign companies
3  come to buy, I also do it.  Finished.
4      Q.   Mr. Peng, you marketed, you
5  personally marketed the company you
6  worked for in 2006 and 2007 as having a
7  lot of experience selling drywall in the
8  United States.  Isn't that true?
9          MR. SPANO:  Objection to
10     form.
11         INTERPRETER 1:  Counsel, the
12     word "marketed" can be translated
13     like the last time into at least
14     more than three different ways.
15     So, I'm trying to use all three
16     different ways to --
17         MR. SEEGER:  I want to use
18     it in almost like the advertising
19     sense.
20         INTERPRETER 1:  Okay.
21         THE WITNESS:  I did not
22     do -- I did not market.
23 BY MR. SEEGER:
24     Q.   You promoted --

Confidential - Subject to Further Confidentiality Review

Page 118

1        You, yourself, promoted your
2  company as having a lot of experience
3  selling drywall in the United States.
4  Isn't that true, Mr. Peng?
5        A.    I don't recall I said that.
6        Q.    I'm not asking you if you
7  said that specifically.  I'm asking you
8  if you were engaged in the activity of
9  promoting, actively promoting your
10  company for sales of drywall in the
11  United States?
12        INTERPRETER 1:  Counsel, the
13        word "in" is difficult to
14        translate in the United States.  I
15        did it in two different ways.
16        THE WITNESS:  I did not do
17        that.
18  BY MR. SEEGER:
19        Q.    Mr. Peng, if you were
20  selling 600,000 sheets of drywall every
21  month in 2006 to companies in the U.S.,
22  would you think that that's selling a lot
23  of drywall?
24        A.    What time period are you

Page 119

1  referring to?
2        Q.    It's the same time period,
3  2006.
4        MR. SEEGER: (Addressing the
5        interpreter.)
6        Did you say that in my
7        question?  Because I said it in
8        the question.
9        INTERPRETER 1:  In 2006 to
10        the United States, to companies in
11        the United States.  You did say
12        that.
13        MR. SEEGER:  So, tell him
14        2006.
15        THE WITNESS:  That is not a
16        very big number.
17  BY MR. SEEGER:
18        Q.    600,000 sheets a month is
19  not a big number?  I just want to be
20  clear on his answer.
21        INTERPRETER 2:  The
22        interpreter did not include
23        600,000 sheets a month, monthly.
24        MR. SEEGER:  Please,

Page 120

1  Stephanie, repeat the question to
2  him the way I said it.
3        (Interpreter repeats the
4  question.)
5        THE WITNESS:  To sell this
6  much, that is not a small number.
7        INTERPRETER 2:  The witness
8  said, monthly sales of this number
9  is not a small number.
10        INTERPRETER 1:  It is the
11  same.
12        MR. SEEGER:  Would you
13  please mark this as Exhibit 3.
14              - - -
15        (Whereupon, Deposition
16  Exhibit Peng-3, E-mail chain, top
17  one dated 5/12/2006, Bates stamped
18  TG 0000415, was marked for
19  identification.)
20              - - -
21  BY MR. SEEGER:
22        Q.    Mr. Peng, I would like you
23  to take a quick look at an e-mail that
24  I've marked as Peng Exhibit 3.

Page 121

1        MS. BASS:  Bates.
2        MR. SEEGER:  It's Bates
3  number TG 0000415.
4        MS. BASS:  Thank you.
5  BY MR. SEEGER:
6        Q.    Now, Mr. Peng, I see you
7  looking this e-mail over.  You can read
8  that e-mail, right?
9        A.    Yes, I can.  But if I have
10  to look at it, I would have to make an
11  effort -- would require some time, and I
12  would have to look at it little by
13  little.
14        Q.    Mr. Peng, you wrote this
15  e-mail, didn't you?
16        A.    According to the information
17  in this e-mail, it reflected that it was
18  written by me.  But as a matter of fact,
19  inside my brain, I don't have such a
20  recollection.
21        Q.    Who is Darren Dai, D-A-I?
22        A.    This person, I have no
23  recollection.  But basing on this e-mail,
24  this person wrote to me they want to buy

Confidential - Subject to Further Confidentiality Review

Page 122

1  drywall and -- but now I don't have a
2  recollection.
3      Q.   So, you were --
4          Just to be clear for the
5  record, Mr. Peng, you were able to read
6  and understand what this e-mail in
7  English says in front of you, right?
8      A.   I can read something simple
9  or maybe I can read some words, but I
10  need dictionaries or I may need help from
11  other people.
12      MR. PANAYOTOPOULOS:
13      Objection, nonresponsive.
14  BY MR. SEEGER:
15      Q.   Mr. Peng, let me ask you
16  this.
17          Well, first let me ask you
18  this.  Just answer me yes or no if you
19  can.  If you need to explain, let me
20  know.  You can read this e-mail that you
21  wrote in English, can't you, sir?
22      A.   This question I cannot
23  respond to you as yes or no for the
24  concrete situation.  I need to explain.

Page 123

1      Q.   Let me ask you a different
2  question.  In what countries do you sell
3  drywall that's this size, 4 feet by 8
4  feet by half inch?
5      A.   Regarding drywall of this
6  measurement, we trade this in the
7  factories in China, I mean, the domestic
8  market.  I don't know exactly where can
9  this be shipped to, and I don't know
10  which country can this be shipped to.
11      Q.   Mr. Peng, in light of that
12  answer, I want to ask you if you can read
13  what you wrote to Mr. Darren Dai in this
14  e-mail for the record in English where it
15  starts right here.  Could you read from
16  here to here, (indicating)?  Would you be
17  able to do that?
18      A.   To read it right now?
19      Q.   Yes.  Would you be able to
20  read this for the record in English, the
21  e-mail that he wrote?
22      INTERPRETER 1:  Read it now?
23      MR. SEEGER:  Yes.
24      INTERPRETER 1:  Because the

Page 124

1  Chinese word "read" can be
2  translated as look at it --
3      MR. SEEGER:  No.
4      INTERPRETER 1:  -- or to
5  read it out loud.
6      MR. SEEGER:  I would like to
7  read it out loud.
8      MR. SPANO:  Objection.  I
9  think it's unwarranted to subject
10  the witness to that kind of
11  embarrassment and harassment, to
12  ask him to read out loud in
13  English.  And what he can read out
14  loud in English is utterly
15  irrelevant to anything that's
16  under discussion here.  I think
17  the inquiry into his level of
18  understanding, whether he
19  understands what he read, whether
20  he understands what he wrote, I
21  think is perfectly appropriate,
22  but I feel it's humiliating to ask
23  someone with his faulty English to
24  read something into the record.

Page 125

1  It's not pertinent at all.
2      I haven't made any speaking
3  objections yet today, but I have a
4  serious problem with that.
5      MR. SEEGER:  Mr. Spano, I
6  hear you.  The problem that we're
7  going to have with your objection
8  is the fact that your client wrote
9  this e-mail in English.  I don't
10  think it's unreasonable to ask a
11  man, anybody who writes an e-mail
12  in English, to read it.  Now, he
13  has a right to say, I'm not going
14  to read it.  I think we all know
15  he can read it.  But it's the
16  witness's call.
17      MR. SPANO:  Again, I didn't
18  instruct him --
19      MR. SEEGER:  I will say
20  this --
21      MR. SPANO:  I didn't
22  instruct him not to answer, but I
23  think it's highly inappropriate,
24  and I don't think it's pertinent

32 (Pages 122 to 125)

Confidential - Subject to Further Confidentiality Review

Page 126

1   to the issues that I acknowledge
2   you have the right to establish
3   through your question.
4           MR. SEEGER:  I think saying
5   it's highly inappropriate to ask
6   somebody to read an e-mail they
7   wrote is hyperbole.  But having
8   said that, there's no effort on my
9   part to harass this man or to
10  humiliate him in any way.  I'm
11  asking him to read an e-mail he
12  wrote for the record.  I can read
13  it, but I'm asking him to read it.
14          MR. SPANO:  Ms. Stephanie,
15  if you haven't interpreted all of
16  that, you don't have to, just as
17  long as my objection is on the
18  record.
19  BY MR. SEEGER:
20      Q.    Would you ask the witness
21  again if he would read the e-mail in
22  English out loud?
23      A.    Are you asking me to read
24  out now of this document, or are you

Page 127

1   asking am I able to read this?
2       Q.    I am asking Mr. Peng if he
3   would read this -- if he's capable of and
4   would he be willing to read this e-mail
5   that he wrote out loud so we all can hear
6   what the content is right now?
7       A.    Okay.  When I wrote this, I
8   rely on the dictionary.  I might be able
9   to read it, but, first of all, it was a
10  very long time ago.  Secondly, at that
11  time, I was relying on other tools,
12  therefore, reading it would be difficult.
13  But if I must try to push myself to read
14  it, maybe, but reading it, I still have
15  difficulty.
16      Q.    Just tell him I'm asking,
17  respectfully, if he would mind trying to
18  read it in English for the record.  If he
19  doesn't, I'm more than happy to read it.
20      A.    I still -- in order to save
21  time, I find that it is very difficult --
22  I still have difficulty reading it.  Why
23  don't you, Mr. Attorney, to read it.
24      Q.    Okay.  I will read it.

Page 128

1   Please follow along with me, Mr. Peng,
2   the e-mail that you wrote.
3           This e-mail is written on
4   May 12, 2006.  It says, "Dear...Darren.
5   Thank you very much for your enquiry on
6   gypsum board.  It is our hope to get" an
7   "agreement with you at the earliest
8   time."
9       A.    Can you read it slowly.
10      Q.    Oh, yes.
11          "As requested, I would like
12  to reply you as following:
13          "First," we're "exporting
14  our gypsum board to the USA with quantity
15  of 600000 sheets every month.  We have
16  much experience on exporting to the USA.
17          "Second, we can produce" 4
18  by 8 by half inch and 4 by 12 by half
19  inch and 4 by 8 by 5/8ths and 4 by 12 by
20  5/8ths "gypsum board.  But at this
21  moment, we normally produce half inch
22  gypsum board, and we have get the test
23  report according to ASTM standard.
24          "Third, we usually export

Page 129

1   gypsum board both by container of 40 HQ
2   and break bulk.  If your order less than
3   100000 sheets for each shipment, I
4   suggest you take container of 40 HQ.
5           "Thank you and best wishes!
6           "Yours faithfully, Frank."
7           Mr. Peng, were you able to
8   follow along with me?
9           MR. SPANO:  Objection to
10      form.  I'm objecting to the extent
11      that you misquoted the document.
12          MR. SEEGER:  Would you
13      please point out where I misquoted
14      the document?
15          MR. SPANO:  I don't want to
16      take time to do that.
17          MR. SEEGER:  No.  That's an
18      important one, because you're
19      suggesting I misread something.  I
20      don't think I did.  I'm more than
21      happy to take the correction and
22      fix the record right now.
23          MR. SPANO:  If you insist, I
24      will.

33 (Pages 126 to 129)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 130

1    MR. SEEGER: Mr. Spano, you
2    made an objection that I misquoted
3    the document. Now you want to go
4    back and read what I said and read
5    the document. You can't do that.
6    You have to have something in mind
7    when you made the objection. What
8    was it?
9        MR. SPANO: Yes. You
10   shortened "we are" to "we're."
11   You said the dimensions "by"
12   when --
13       MR. SEEGER: Instead of the
14   little star that was there?
15       MR. SPANO: Right. So, my
16   suggestion is that the document
17   will speak for itself. It's
18   marked as an exhibit. I didn't
19   want to waste time on these little
20   things, but I was just making an
21   objection.
22       MR. SEEGER: I just wanted
23   to make sure it wasn't something
24   material, but, again, the record

Page 131

1    is what it is.
2        I have a pending question, I
3    think.
4        What was the pending
5    question, Linda?
6            - - -
7        (Whereupon, the requested
8    portion of the transcript was read
9    by the court reporter as follows:
10       "Q. Mr. Peng, were you able
11   to follow along with me?")
12           - - -
13       THE WITNESS: I could not
14   follow up with the speed that you
15   read it.
16   BY MR. SEEGER:
17       Q. What about the statement
18   that you made in this document about your
19   "much experience on exporting to the"
20   United States? Those were your words at
21   that time, correct, sir?
22       A. This sentence, I got it from
23   the teaching material when I went to
24   school. I got it from that material and

Page 132

1    revised that.
2        Q. So, you couldn't remember
3    ever making this statement, but now you
4    remember exactly where you got it from.
5    Is that what you want us to believe, Mr.
6    Peng?
7        MR. SPANO: Objection to
8    form.
9        THE WITNESS: Looking at
10   this e-mail, I am sure at that
11   time my English level was not able
12   to write down this type sentence,
13   this level of English. Therefore,
14   I check it out from the teaching
15   materials when I went to school.
16   I got this content from the
17   teaching material. I use it to
18   express what I wanted to say.
19   BY MR. SEEGER:
20       Q. Mr. Peng, when you made the
21   statement that you have much experience
22   exporting drywall to the United States,
23   was that a true or a false statement?
24       A. Well, when this was written,

Page 133

1    it is the meaning like this. Under the
2    condition at that time, some of the
3    customers, they purchased the drywall
4    from our company, and then they reflected
5    to us, they told us sometimes they ship
6    it to the United States.
7        Q. At the time, you said, "We
8    have much experience." In May of 2006,
9    when you said, "We have much experience
10   on exporting to the" United States, was
11   that a true or a false statement at that
12   time, Mr. Peng?
13       A. In May of 2006, at that
14   point, I was only saying I realized the
15   drywall for the thickness of 12.7
16   millimeters, it was possible that it was
17   able to be used in the United States.
18   Regarding this type of drywall, if the
19   customers, they require this kind of
20   measurement, we relatively familiar with
21   in terms of the packaging and the
22   shipment. If the customers, they require
23   this kind of measurement of drywall, we
24   can do it for them.

34 (Pages 130 to 133)

Confidential - Subject to Further Confidentiality Review

Page 223

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF LOUISIANA
2

3     _____        § MDL NO. 2047
      IN RE:                     §
4     CHINESE-                   § SECTION: L
      MANUFACTURED               §
5     DRYWALL PRODUCTS           § JUDGE FALLON
      LIABILITY                  §
6     LITIGATION                 § MAGISTRATE
      _____        § JUDGE WILKINSON
7

8                      -  -  -

          CROSS NOTICED IN VARIOUS OTHER ACTIONS
9

10                     -  -  -

11                April 8, 2011

12                     -  -  -

         CONFIDENTIAL - SUBJECT TO FURTHER
13            CONFIDENTIALITY REVIEW
14                     -  -  -
15         Videotaped deposition of WENLONG
      PENG, held at 3 Pedder Street, Central,
16    Hong Kong, China, commencing at 9:02
      a.m., on the above date, before Linda L.
17    Golkow, Certified Court Reporter,
      Registered Diplomate Reporter, Certified
18    Realtime Reporter and Notary Public.
19
20                     -  -  -
21
            GOLKOW TECHNOLOGIES, INC.
22      ph 877.370.3377 | fax 917.591.5672
               deps@golkow.com
23
24

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 236

```
1                 - - -
2          THE VIDEOTAPE TECHNICIAN:
3   This begins Day 2, Tape Number 1
4   of the deposition of Mr. Peng
5   Wenlong.
6          The time now is
7   approximately 9:02 a.m., and we're
8   now back on the record.
9                 - - -
10         WENLONG PENG, after having
11  been previously sworn through the
12  interpreter, was examined and
13  testified as follows:
14                - - -
15         EXAMINATION
16                - - -
17  BY MR. SEEGER:
18     Q.   Good morning, Mr. Peng.  I
19  just want to remind you that you're still
20  under oath, the oath that the court
21  reporter administered to you yesterday.
22  Do you understand that?
23     A.   I understand.
24         MR. SPANO:  Before we
```

Page 237

```
1   proceed, I just want to reiterate
2   that we reserve reading and
3   signing of all of the transcripts
4   of our client's depositions.
5          MR. SEEGER:  Thank you.
6   BY MR. SEEGER:
7      Q.   Mr. Peng, I just have a
8   couple of questions from where we left
9   off yesterday.
10         Who besides you were at the
11  meetings with the CPSC and other
12  government officials at your factory?
13     A.   Yesterday I did mention
14  about this.  CPSC, after they went to our
15  factory, they did not have a meeting.
16  They pay a visit.  Of course, besides me,
17  from what I can recall, we have a Mr. Jia
18  Tongchun.
19     Q.   Anyone else from the
20  company?
21     A.   The other people, including
22  some of the security people, that I don't
23  recognize them.  I don't know them.
24         INTERPRETER 2:  Correction.
```

Page 238

```
1   The witness said safety assurance.
2          INTERPRETER 1:  Security and
3   safety is the same.
4   BY MR. SEEGER:
5      Q.   Do you know why the CPSC was
6   not permitted to visit the mines where TG
7   mined their gypsum?
8          MR. SPANO:  Objection to
9   form.
10         THE WITNESS:  Can you repeat
11  it?  I don't understand.
12         MR. SEEGER:  Can you try
13  repeating the question, Stephanie.
14         (Interpreter repeated the
15  question.)
16         INTERPRETER 2:  Correction.
17  The question should be like why
18  were they not permitted.
19         MR. CHEN:  If I can just
20  say, I believe the question was
21  interpreted to say, at the time TG
22  was mining their gypsum, why was
23  CPSC not permitted to visit.
24         MR. SEEGER:  Yes.
```

Page 239

```
1          MR. CHEN:  I don't think
2   that's the timeline you were
3   asking about, when they were
4   actually mining.
5          MR. SEEGER:  No.
6          MR. CHEN:  Maybe we can have
7   it reclarified.
8          INTERPRETER 1:  I do not see
9   the word "time."
10         MR. SEEGER:  Stephanie, I'm
11  just going to strike it.  I want
12  to make sure the question is clear
13  for everybody, so, I'm going to
14  ask it again.
15  BY MR. SEEGER:
16     Q.   When the CPSC was
17  investigating complaints about defective
18  drywall shipped by TG, they wanted to see
19  the mines or visit the mines where TG
20  mined the gypsum.  Do you know why they
21  weren't permitted?
22         That's a long question.
23         MR. SPANO:  Objection to
24  form.
```

Confidential - Subject to Further Confidentiality Review

Page 240

1    THE WITNESS:  First of all,
2  I want to say, the drywall of TG
3  has no problem.
4        Number 2, TG also does not
5  have a mine to mine for the
6  gypsum -- the natural gypsum for
7  themselves.
8        Number 3, regarding why the
9  mine for the gypsum were not being
10  allowed to visit, that is their
11  matter.  We don't know.
12  BY MR. SEEGER:
13    Q.   Who is the "their" in that
14  sentence?
15    A.   The mine of the gypsum.
16    Q.   Where does TG get its
17  natural gypsum?
18        MR. SPANO:  Objection to
19  form.
20        THE WITNESS:  What time
21  period?
22  BY MR. SEEGER:
23    Q.   In the time frame, let's
24  say, from 2005 to 2008.

Page 241

1        MR. SPANO:  Allow me to make
2  my objection, please, if you're
3  done translating.
4        INTERPRETER 1:  Yes.
5        MR. SPANO:  I'm objecting to
6  this question as now going beyond
7  the scope of the 30(b)(6)
8  designations.  We're giving a
9  deposition related to personal
10  jurisdiction.  We're not going to
11  be going into the mining and
12  manufacturing process for the
13  gypsum.  This is not a merits
14  deposition.
15        MR. SEEGER:  It's my last
16  question on it.
17        MR. GRAND:  He was
18  designated for that specific
19  topic.
20        MR. SEEGER:  All right.  But
21  I don't think I have that much
22  more.
23        MR. SPANO:  Actually, no, if
24  you read my letter, you'll see the

Page 242

1    reservation of qualifications, so,
2  you're wrong.
3        MR. SEEGER:  You're not
4  instructing him not to answer that
5  question?
6        MR. SPANO:  No.
7        INTERPRETER 1:  Do you want
8  me to translate the very long
9  objection?
10        MR. SPANO:  No.  You don't
11  have to translate the objection.
12  I just want it on the record.
13        MR. SEEGER:  So, he needs to
14  just answer the question.
15           - - -
16        (Whereupon, the requested
17  portion of the transcript was read
18  by the court reporter:
19  "Q.  Where does TG get its
20  natural gypsum in the time frame,
21  let's say, from 2005 to 2008?")
22           - - -
23        THE WITNESS:  Mainly from
24  the gypsum mine in the

Page 243

1    neighborhood of Shandong province.
2  BY MR. SEEGER:
3    Q.   Just a quick followup, does
4  he know the name of the mine?
5    A.   I don't recall this mine.
6    Q.   Is he familiar with the
7  Nueng mine?  Let me show it to you in
8  English.  See where I put a little blue
9  mark?
10    A.   I can't tell from reading
11  the English, but I can tell from the
12  Chinese.  From the Chinese, it is called
13  Luneng.  Is it a misspelling in the
14  English?
15    Q.   It's not important if it's a
16  misspelling.  He understands what mine
17  that's referring to, correct?
18    A.   What is the question?
19    Q.   The first question is, does
20  he understand what mine that that name
21  refers to?  Is he familiar with that
22  mine, Luneng?
23    A.   I heard of the name of this
24  mine, but I am not familiar with this

6 (Pages 240 to 243)

Confidential - Subject to Further Confidentiality Review

Page 244

1  mine.  I also have not been to this mine.
2      Q.    Would he know who owns the
3  mine?
4      A.    I don't know.  I just heard
5  of the name of this mine, and I don't
6  know who owns it.
7                  - - -
8          (Whereupon, Deposition
9  Exhibit Peng-10, E-mail with
10  translation, May 11, 2007,
11  Translation of TG 0022728 and TG
12  0022728, was marked for
13  identification.)
14                  - - -
15      MR. SEEGER:  For the record,
16  I'm marking as Exhibit 10,
17  Peng-10, which is -- the Bates
18  stamp is TG 0022728.
19      MR. GRAND:  The top sheet is
20  a translation that was provided by
21  defendants to plaintiffs.
22      MR. SEEGER:  I would like to
23  just point out one thing about
24  this, Mr. Spano.

Page 245

1          So, this translation that
2  we've just marked as Peng Exhibit
3  10 was a translation provided by
4  defense counsel to us.  I have no
5  idea who did the translation on
6  your side or how it was done, but
7  I do have to note for the record
8  that there is -- there's
9  something, what I think is very
10  important missing from the
11  translation, and that is, if you
12  look under -- and Eugene speaks
13  and reads Chinese, so he can look
14  at it and tell me if we're reading
15  it wrong.  But under Mr. Peng's
16  name on the Chinese version, it
17  says "Taihe Dongxin Company Ltd."
18  In the version that's translated
19  into English, that was omitted.
20  To me, it is a material omission,
21  and it is something I have to
22  raise.  If you guys want to
23  address it, you can.  Gene, if you
24  would like to take a look and see

Page 246

1  if we're misunderstanding, that's
2  fine.  But I guess for the record,
3  I would like to say, if you're
4  going to provide us with
5  translations, they have to be real
6  translations.  They have to be
7  something we can rely upon.
8          MR. SPANO:  We agreed to
9  exchange the translations we had.
10  We have made no representations as
11  to the completeness or accuracy of
12  the translations.  There were
13  errors in your translations, there
14  may be errors in ours.  The
15  translations are for the lawyers.
16  They're work product that was
17  exchanged on an agreement that
18  there would be no waiver of
19  privilege.  And as I said
20  yesterday, the questioning of the
21  witness is going to be questioned
22  on the discovery documents we
23  produced.  We're not going to
24  permit any questions to the

Page 247

1  witness regarding the translations
2  themselves.  So, your observation
3  about the translation is noted for
4  the record.  I don't disagree with
5  what you said, but it is what it
6  is.
7          MR. SEEGER:  Okay.
8  BY MR. SEEGER:
9      Q.    Mr. Peng, have you had an
10  opportunity to look at what I've just
11  marked as Exhibit 10?
12      A.    There are two pages.  Which
13  page are you referring to?
14      Q.    Well, there's an English
15  translation, and then there's a
16  Chinese -- English translation of the
17  Chinese e-mail.  I believe you're looking
18  at the Chinese e-mail, right, Mr. Peng?
19      A.    Yes.
20      Q.    And the English version
21  that's provided to you, that was provided
22  to us by your counsel, just for your
23  information.
24      A.    Understand.

Confidential - Subject to Further Confidentiality Review

Page 276

1    INTERPRETER 1:  Okay.
2    (Interpreter repeated the
3  question.)
4    THE WITNESS:  I did mention
5  about this point.  In the year
6  2006, the three of us joined TTP
7  to work.  I don't know about
8  any -- I don't know the business
9  of other people.
10    MR. SEEGER:  Mr. Spano, I'm
11  going to stop questioning the
12  witness at this point.  I'm not
13  really passing him in the formal
14  sense in that I'm giving up my
15  right to ever ask him questions
16  again in a deposition.  It's our
17  belief that he'll be deposed
18  again, but I'm going to
19  discontinue my questioning for now
20  and pass him to the next
21  questioner.
22    MR. SPANO:  I understand
23  your position.
24    MR. SEEGER:  Thank you, Mr.

Page 277

1  Peng.
2        - - -
3    EXAMINATION
4        - - -
5  BY MR. MONTOYA:
6    Q.   Good morning, sir.  My name
7  is Patrick Montoya.
8    A.   How are you?
9    Q.   I'm sorry I'm so far across
10  the table from you.  I apologize.
11    A.   But we have an interpreter.
12    Q.   Sir, you never told any
13  customer from the United States that
14  drywall was too heavy to ship to the
15  United States, did you?
16    A.    When I was communicating
17  with the customers and the customers
18  would ask us how heavy it is, and we will
19  tell them truthfully how heavy it is.
20        According to our opinion, we
21  would consider the cost for sea freight
22  to be too high.  First of all, the
23  drywall is very heavy; and secondly, the
24  shipment is very -- the cost for shipment

Page 278

1  is very high, and the cost for shipment
2  for the drywall would be very high.
3  Finished.
4    Q.    Sir, you never wrote to a
5  customer in the United States that the
6  drywall was too heavy to ship to the
7  United States, did you?
8    A.    So, when the customer come
9  to us to ask about in the factory, that
10  means when we talk about it face-to-face,
11  and when we were talking about business,
12  then they would ask us something related
13  to this issue.  Finished.
14    Q.    Sir, my question was, did
15  you ever write in an e-mail or in a
16  letter to a customer in the United States
17  that the drywall was too heavy to ship?
18    MR. SPANO:  Objection to
19    form.
20    THE WITNESS:  This I don't
21    recall.
22  BY MR. MONTOYA:
23    Q.    Sir, did you ever refuse to
24  sell drywall to a customer in the United

Page 279

1  States because the drywall was too heavy
2  to ship?
3    A.    Mainly we will base on the
4  requirement of the customers.  We will
5  tell them the truth, tell the customer
6  how heavy the drywall is.  And it is
7  according -- it is according to their
8  will, to see whether they're willing to
9  or whether they consider this to be
10  suitable to ship.  And this is their
11  option.
12    Q.    Sir, did you ever tell a
13  customer from the United States that you
14  would not ship drywall to them because it
15  was too heavy?
16    A.    I don't understand the
17  question.
18    Q.    Sir, selling drywall to the
19  United States was good for your business,
20  right?
21    MR. SPANO:  Objection to
22    form, lack of foundation.
23  BY MR. MONTOYA:
24    Q.    You can answer, sir.

15 (Pages 276 to 279)

Confidential - Subject to Further Confidentiality Review

Page 280

1    A.    I did mention about this
2  earlier.  We did not sell drywall in the
3  United States.  We did the transaction,
4  or another word, dealings, in China.  In
5  order to save time, I'm not going to
6  repeat my answer.
7    Q.    Sir, developing a market in
8  the United States for drywall was
9  important to your company; is that
10  correct?
11    MR. SPANO:  Objection to
12  form.
13    THE WITNESS:  We did not
14  have any objective to -- we don't
15  have any objective to develop the
16  market in the United States.  This
17  is not important to us.
18  BY MR. MONTOYA:
19    Q.    Sir, was it important to
20  your business from 2006 to 2008 to
21  develop a market for the sale of drywall
22  in the United States?
23    MR. SPANO:  Objection to
24  form, lack of foundation.

Page 281

1         - - -
2    (Whereupon, the following
3  portion of the transcript was read
4  by the court reporter:
5    "Q.    Sir, was it important
6  to your business from 2006 to 2008
7  to develop a market for the sale
8  of drywall in the United States?")
9         - - -
10    MR. CHEN:  Objection.  She's
11  still translating the mistaken
12  portion.
13    MR. MONTOYA:  I'll ask the
14  question again to make it easier.
15  BY MR. MONTOYA:
16    Q.    Sir, was it important to
17  your business from 2006 to 2008 to
18  develop a market for the sale of drywall
19  in the United States?
20    MR. SPANO:  Objection.
21  BY MR. MONTOYA:
22    Q.    You can answer.
23    A.    Can you make the question
24  shorter?  You confused me.

Page 282

1    Q.    Sir, one of the goals of the
2  Foreign Trade Office at your company from
3  2006 to 2008 was to develop a market in
4  the United States for the sale of
5  drywall, correct?
6    A.    The "company," what company
7  are you referring to?
8    Q.    The company you worked for
9  from 2006 to 2008.
10    A.    During the year 2006 and
11  2007, TTP did not establish a department
12  called department of foreign trade.
13    INTERPRETER 1:  Or during
14  the first three days of the
15  deposition, it was translated as
16  department of foreign sales.
17    INTERPRETER 2:  Correction.
18  The witness said, in 2006 and
19  2007, I worked for TTP, and TTP
20  did not have foreign trade -- was
21  not established a foreign trade
22  department.
23    INTERPRETER 1:  What?
24    MR. MONTOYA:  I'm going to

Page 283

1  move on to my next question.
2    THE WITNESS:  I haven't
3  finished yet.  I need to continue
4  with my answer.
5  BY MR. MONTOYA:
6    Q.    Please do so.
7    A.    We also did not go to the
8  United States to do marketing and to do
9  the sales.
10    Q.    Did your company have a
11  website that reached the United States
12  from 2006 to 2008?
13    MR. SPANO:  Objection to
14  form.
15    THE WITNESS:  TTP has never
16  had -- made such a website.
17  BY MR. MONTOYA:
18    Q.    Finished?
19    A.    According to my
20  understanding, TG did have a website.
21  Finished.
22    Q.    Did you develop any sales or
23  promotional materials on the Internet
24  when you worked from 2006 to 2008?

16 (Pages 280 to 283)

Confidential - Subject to Further Confidentiality Review

Page 292

1  was not put out by me.  I don't
2  recall exact content."
3      I asked him for what
4  company.  He did not answer the
5  question.  I will ask him the
6  question again.
7  BY MR. MONTOYA:
8      Q.   Sir, for what company did
9  you use the website Alibaba for?
10      INTERPRETER 1:  I'm sorry.
11  The transcript on the screen was
12  not clear.
13          - - -
14      (Whereupon, the requested
15  portion of the transcript was read
16  by the court reporter as follows:
17      "Q.  Sir, for what company
18  did you use the website Alibaba
19  for?")
20          - - -
21      THE WITNESS:  I myself
22  personally did not use it.  I am
23  not in particularly to use this
24  for any company.  TTP did not use

Page 293

1  this website.  TG, there is a
2  possibility that they have used
3  it, but I am not sure.
4  BY MR. MONTOYA:
5      Q.   Sir, in September of 2007,
6  you were working for TTP, correct?
7      A.   Yes.
8      Q.   Did you know if TG or TTP
9  sold a product called Illuminated, and
10  I'll spell it, I-L-L-U-M-I-N-A-T-E-D,
11  Columns, C-O-L-U-M-N-S?
12      MR. MONTOYA:  I don't think
13  it is a translated term.
14      INTERPRETER 1:  Can the
15  interpreter try, but I'm not sure.
16      The interpreter is trying to
17  help the witness to understand --
18      MR. MONTOYA:  That's okay.
19  I'll make it easier for you.
20      INTERPRETER 1:  -- the word
21  Illuminated Column, but he said --
22      MR. MONTOYA:  Stephanie,
23  that's okay.  I'll ask another
24  question.

Page 294

1      MR. CHEN:  She should at
2  least translate what he said.
3      MR. MONTOYA:  That's fine.
4      THE WITNESS:  Would you mind
5  to tell me exactly what it is?
6      MR. MONTOYA:  Yes, sir, I
7  will.
8      Translate that.
9      THE WITNESS:  Please.
10      MR. MONTOYA:  Linda, what's
11  the next exhibit?
12      THE COURT REPORTER:  11.
13          - - -
14      (Whereupon, Deposition
15  Exhibit Peng-11, E-mail dated
16  September 21, 2007, Bates stamped
17  TG 0021226, was marked for
18  identification.)
19          - - -
20  BY MR. MONTOYA:
21      Q.   Sir, I'm going to hand you
22  Exhibit 11 to your deposition, and a copy
23  to your counsel as well.  The Bates
24  Number is TG --

Page 295

1      MR. MONTOYA:  You need to
2  swap that.
3  BY MR. MONTOYA:
4      Q.   TG 21226 is the Bates label
5  number.
6      A.   Are you referring to this
7  product, (indicating)?
8      INTERPRETER 1:  The witness
9  is pointing to "Illuminated
10  Columns."
11  BY MR. MONTOYA:
12      Q.   Yes, sir.  If you could
13  please turn the document to the camera
14  and point to what you're reading.  Are
15  you reading "illuminated roman towers"?
16      MR. MONTOYA:  If you can
17  translate that, please.
18  BY MR. MONTOYA:
19      Q.   If you can just hold it up
20  and point to it so we understand where
21  you're reading.
22      A.   Is it okay like this?
23      Q.   Sure, that's fine.
24      MR. CHEN:  The translation

Confidential - Subject to Further Confidentiality Review

Page 296

1    was to just sit up and face the
2    camera, not turn around and show
3    us where you are pointing.
4         MR. MONTOYA:  That's okay.
5    Thank you.  Don't worry about it.
6         INTERPRETER 1:  No.  I would
7    not translate what was written not
8    being said.  It is not my job.
9    BY MR. MONTOYA:
10        Q.    That's okay.
11           What's an illuminated roman
12   tower?  That's my question.
13        A.    I don't know.
14        Q.    Is that your e-mail address
15   at the top of Exhibit 11,
16   8812017538@163.com?
17        A.    Yes, it is my e-mail
18   address.
19        Q.    And the e-mail starts, it
20   says "Dear Owen Li."  Do you see that?
21        A.    I see that.
22        Q.    Who is Owen Li?
23        A.    According to my
24   understanding, he is a staff of TG.

Page 297

1         Q.    This is an inquiry from a
2    customer in the United States, correct?
3         MR. SPANO:  Objection to
4    form.
5         THE WITNESS:  This is an
6    e-mail from Alibaba to my e-mail.
7    It is the website of Alibaba, an
8    advertisement.  They do it for
9    themselves.  They send me this
10   e-mail.  I don't understand this
11   e-mail, and I don't know why they
12   send me this e-mail.  A lot of
13   this advertisement company or
14   companies, they want to do
15   promotion, including company such
16   as Alibaba.  They would dispatch
17   e-mails as a group, group dispatch
18   to do promotion for themselves.  I
19   usually call this junk mail.
20   BY MR. MONTOYA:
21        Q.    You know that this e-mail
22   was sent by someone in the United States,
23   correct?
24        MR. SPANO:  Objection to

Page 298

1    form, lack of foundation,
2    mischaracterizes the document.
3    Other than that, it's fine.
4    BY MR. MONTOYA:
5         Q.    You can answer, sir.
6         A.    I said I saw this e-mail,
7    but this kind of e-mail is meaningless to
8    us.  Is that what you mean?  Today I see
9    this e-mail.  Is that what you mean?
10        Q.    No.  What I meant was that
11   the e-mail was sent by someone in the
12   United States?
13        INTERPRETER 2:  Correction.
14   The witness asked is that -- do
15   you want to know how I feel when I
16   see this e-mail today?
17        INTERPRETER 1:  Objection.
18   BY MR. MONTOYA:
19        Q.    You can answer my question,
20   sir.
21        MR. MONTOYA:  It's okay.
22        INTERPRETER 1:  Ratification
23   of the question by the check
24   interpreter.

Page 299

1    BY MR. MONTOYA:
2         Q.    Please answer my question.
3    My question was, was the e-mail sent by
4    somebody in the United States?
5         A.    This e-mail was sent to my
6    e-mail by Alibaba.
7         Q.    Did anybody follow up on the
8    inquiry from Alibaba?
9         MR. SPANO:  Objection to
10   form.
11        THE WITNESS:  I said this is
12   the junk mail.  We don't
13   understand it, and we are unable
14   to reply to it.
15        MR. CHEN:  Objection.  What
16   he said was, we don't understand
17   what this product is, and we're
18   unable to respond to it.
19        INTERPRETER 1:  Objection.
20   He did not say that.
21        MR. CHEN:  Well, it's on the
22   video, so, that's fine.
23        MR. MONTOYA:  Let's move on.
24   BY MR. MONTOYA:

20 (Pages 296 to 299)

Confidential - Subject to Further Confidentiality Review

Page 308

1    THE WITNESS:  I don't know.
2    What is your question?
3  BY MR. MONTOYA:
4    Q.    What did you do to increase
5  the sales of Taishan brand drywall?
6    A.    I would not intentionally
7  or, in other words, deliberately trying
8  to pursue the objective to increase the
9  sales of Taishan drywall.
10    MR. CHEN:  I believe the
11    reference was Taishan Gypsum
12    drywall.  I believe he said that
13    in Chinese, if you want to clarify
14    it.  I don't know.
15    MR. MONTOYA:  That's fine.
16  I'm going to leave that.
17    At this time, I would pass
18    the witness to the next
19    questioner.
20    And sir, I appreciate your
21  time and courtesy today.
22    If you would translate that,
23  please.
24    THE WITNESS:  Thank you.

Page 309

1    MR. SPANO:  Can we go off
2  the record.
3    THE VIDEOTAPE TECHNICIAN:
4  The time now is approximately
5  11:30 a.m., and we are now off the
6  record.
7    - - -
8    (Whereupon, a recess was
9  taken from 11:30 a.m. until
10  11:31 a.m.)
11    - - -
12    THE VIDEOTAPE TECHNICIAN:
13  The time now is approximately
14  11:31 a.m., and we are back on the
15  record.
16    MR. SPANO:  We conferred
17  with the witness off the record,
18  and he would like to break at noon
19  if that's okay.
20    MS. BASS:  That's fine.  No
21  problem at all.
22    - - -
23    EXAMINATION
24    - - -

Page 310

1  BY MS. BASS:
2    Q.    Good morning.  My name is
3  Hilarie Bass.
4    A.    How are you?
5    Q.    Very well, thank you.
6    I represent home builders in
7  the United States whose homes were built
8  with Taishan Gypsum drywall.  So, we are
9  here today to try and understand how it
10  is that defective drywall manufactured by
11  your company ended up in their homes.
12    MR. SPANO:  Counsel, could
13    you please limit your introductory
14    remarks and ask questions.
15    MS. BASS:  I'm done with my
16    introductory remarks.
17    MR. SPANO:  Thank you.
18  BY MS. BASS:
19    Q.    Mr. Peng, I understand your
20  testimony is that you majored in English
21  literature; is that correct?
22    A.    I mentioned about this
23  yesterday.  My degree is in English
24  literature.

Page 311

1    Q.    And in your Chinese
2  university, did you read the English
3  literature required for your degree in
4  English?
5    MR. SPANO:  Objection to
6    form, lack of foundation.
7    THE WITNESS:  I did mention
8  about this yesterday.  At
9  universities in China, when we
10  learn English, there are two ways.
11  Number one, it would be at the
12  teacher's college or we call it
13  the Normal school, college, Normal
14  University.  Another type of
15  English is that any type of
16  English you learn, it will be
17  called English literature.
18  Yesterday I did mention about when
19  I went to university, my
20  professional learning was economic
21  trade English or it could also be
22  translated as English in economic
23  and trading.  According to the
24  educational system in China,

23 (Pages 308 to 311)

Confidential - Subject to Further Confidentiality Review

Page 312

1  ultimately the degree that I
2  received as to what I mentioned
3  earlier, the degree for English
4  besides the degrees -- that that
5  type of degrees in English that I
6  mentioned earlier before, there is
7  no third type of degree in
8  English.
9      INTERPRETER 2:  Correction.
10  The witness says, in China, apart
11  from the teaching English degree
12  or the English literature degree,
13  which is any kind of English
14  learning, there is no third
15  kind -- there is no third kind of
16  English degree in China.
17      INTERPRETER 1:  Objection.
18  The checking interpreter is trying
19  to fix the answer by adding the
20  words besides teaching English and
21  the other type of English.  That
22  was what he gave during the
23  earlier part of the answer.  As an
24  interpreter, we only do verbatim.

Page 313

1  We don't add anything extra that
2  he did not say on to the script.
3  We don't fix the witness
4  testimony.
5      MS. BASS:  Thank you.
6      THE WITNESS:  When I went to
7  school, when I was learning the
8  curriculum of the English, we were
9  learning about elementary level of
10  the curriculum.  I went to college
11  in the year 1995.  The
12  universities that I entered, the
13  name was Shandong Construction
14  Material Industrial College.  But
15  during the time when I graduated,
16  the school's name has already
17  changed.  It is -- it was called
18  Jinan University.  And the school
19  has already changed the name.  It
20  was in the year 2003.
21  BY MS. BASS:
22      Q.   I would ask that you direct
23  the witness to limit his responses to the
24  question that I have asked.

Page 314

1      Mr. Peng, for
2  representatives of the United States jury
3  who might be watching this videotape, my
4  question to you is, are you suggesting
5  that you can get a degree from a Chinese
6  university in English trade -- in English
7  for economics and trade and not be able
8  to read or speak any English?
9      MR. SPANO:  Objection to
10  form.
11      THE WITNESS:  I did mention
12  about this earlier.  I can speak
13  simple English, and I can also
14  write simple English.  I did not
15  say I don't know any English.
16  BY MS. BASS:
17      Q.   Did you review any documents
18  in preparation for your deposition today?
19      A.   Under the guidance of my
20  attorney, I did read some documents.
21      Q.   Did you review any of the
22  e-mails that you wrote that were produced
23  to counsel in this litigation?
24      A.   I did browse about this.

Page 315

1      Q.   Do you have an estimate of
2  how many e-mails have been produced to
3  counsel in this case that you wrote, Mr.
4  Peng, in English?
5      A.   Are you talking about how
6  many e-mails that I produced to my
7  counsel?
8      Q.   I am asking if you are aware
9  of how many e-mails were produced to your
10  counsel that reflect that they were
11  written by you in the English language?
12      MR. SPANO:  Objection.
13  Objection.  In answering this
14  question, do not reveal any
15  communications with counsel or any
16  information regarding documents
17  exchanged with counsel.
18      INTERPRETER 1:  Let me do it
19  again, because sometimes I need to
20  do it upside down.
21      THE WITNESS:  When I
22  produced the e-mail to my counsel,
23  I did not produce it in one batch.
24  Any time he ask for it, then I

24 (Pages 312 to 315)

Confidential - Subject to Further Confidentiality Review

Page 316

1    will produce, and I don't recall
2    how many e-mails I produced to
3    him.
4  BY MS. BASS:
5        Q.    Isn't it correct, Mr. Peng,
6    that you wrote scores of e-mails to
7    American customers in the English
8    language?
9              INTERPRETER 1:  Counsel,
10   "wrote scores," you mean many?
11             MS. BASS:  Many.  Many,
12   many.
13             INTERPRETER 1:  Counsel, I'm
14   trying to avoid the wording --
15             MS. BASS:  I appreciate
16   that.
17  BY MS. BASS:
18        Q.    Isn't it correct that you
19   wrote many, many, many e-mails to
20   American customers in English?
21             MR. SPANO:  Objection to
22   form, and also it's a harassing
23   question.
24             THE WITNESS:  I don't

Page 317

1    understand.  What do you mean by
2    "many, many, many"?
3  BY MS. BASS:
4        Q.    In excess of 50.
5        A.    I do not recall.  I do not
6    recall exactly whether this is in excess
7    of 50 or not.  But it should be more than
8    10.
9        Q.    Okay.  Fine.
10             Isn't it true that you wrote
11   in excess of 10 e-mails to American
12   customers regarding the sales of gypsum
13   drywall by TTP and TG in English?
14             MR. SPANO:  Objection to
15   form.
16             THE WITNESS:  These e-mails
17   are mainly communications with the
18   customers regarding the
19   followings:  The design, the
20   packaging, the timetable for
21   production, the timetable for
22   delivery, and the concrete time.
23   This is what these e-mails are
24   about.

Page 318

1  BY MS. BASS:
2        Q.    Isn't it true that you wrote
3    e-mails to American customers in English
4    confirming shipments of Chinese drywall
5    to cities in the United States?
6             MR. SPANO:  Objection to
7    form.
8             THE WITNESS:  We did not
9    ship Chinese drywall to cities in
10   the United States.  We made a
11   transaction or, in other words,
12   dealings in China.  Sometimes when
13   the customer wanted us to do
14   this -- when the customers do the
15   shipment and they asked us to pay
16   for the fee of the shipment on
17   their behalf, that is only under
18   very special conditions.  And I
19   did explain about this yesterday.
20  BY MS. BASS:
21        Q.    Under certain circumstances,
22   Mr. Peng, isn't it correct that you
23   assisted in shipping your drywall from
24   China to the Port of Tampa in Florida?

Page 319

1             MR. SPANO:  Objection to
2    form.
3             THE WITNESS:  I'm not sure,
4    and also, I have no obligation to
5    try to understand or to know where
6    the customers ship -- which port
7    these customers ship it to.
8    Sometimes customers, they may ask
9    us for information, asking us for
10   the shipment information.  Then we
11   will provide -- when they request,
12   we will provide the contact
13   information for shipment.
14  BY MS. BASS:
15        Q.    Isn't it true, Mr. Peng,
16   that you've assisted in arranging for
17   shipment of drywall to Tampa, Florida?
18             MR. SPANO:  Excuse me.  We
19   have a correction.
20             MS. BASS:  Don't interrupt,
21   please.
22             MR. SPANO:  He wasn't
23   finished with his answer.  It's
24   not complete because it was

25 (Pages 316 to 319)

Confidential - Subject to Further Confidentiality Review

Page 320

1    mistranslated, so we're completing
2    the answer.
3         MS. BASS:  Don't interrupt
4    the translator.  When the
5    translator is finished, you can
6    make whatever objection you feel
7    is appropriate.  Thank you.
8         THE WITNESS:  I finished.
9         MR. CHEN:  I'll just note,
10   it's actually an issue with
11   transcription.  I believe in line
12   64, 9, it is, we will provide the
13   contact information, not the
14   content information.
15                  - - -
16        (Whereupon, the following
17   portion of the transcript was read
18   by the court reporter:
19   "Q.  Isn't it true, Mr.
20   Peng, that you've assisted in
21   arranging for shipment of drywall
22   to Tampa, Florida?")
23                  - - -
24   BY MS. BASS:

Page 321

1         Q.   I would ask the witness to
2    give a yes or no answer, and then he can
3    provide whatever explanation he believes
4    is necessary.
5         MR. SPANO:  Objection to the
6    form and asked and answered.
7         THE WITNESS:  This question
8    I cannot answer by simply saying
9    yes or no.
10        According to my
11   understanding, minority of the
12   customers, where it occurred two
13   times.  The customers require us
14   to help.  They said they are not
15   familiar with the sea freight, and
16   they hope that we can help them
17   with the shipment to certain
18   ports.  The customer required us
19   to pay the sea freight fee on
20   their behalf, and the customer
21   requested that we contact the sea
22   freight company, but I don't
23   recall what port it was for.
24        INTERPRETER 2:  The

Page 322

1    interpreter just says container.
2         INTERPRETER 1:  It's about
3    two to three containers.
4    BY MS. BASS:
5         Q.   It's your testimony under
6    oath, Mr. Peng, that you have no
7    knowledge of having assisted in the
8    shipment of Chinese drywall to the Port
9    of Tampa?  Is that your testimony under
10   oath today?
11        MR. SPANO:  Objection to
12   form and mischaracterizes his
13   testimony.
14        THE WITNESS:  I did explain
15   to you the actual situation at
16   that time.
17   BY MS. BASS:
18        Q.   Are you aware that Chinese
19   drywall that you sold in China was going
20   to be utilized in the state of Florida?
21        MR. SPANO:  Objection to
22   form.
23        THE WITNESS:  I don't know
24   where they would utilize it in the

Page 323

1    United States or used.
2    BY MS. BASS:
3         Q.   Are you aware that Chinese
4    drywall that you sold in China was going
5    to be transported to the Tampa Port in
6    Florida?
7         MR. SPANO:  Objection to
8    form.
9         THE WITNESS:  Sometimes it
10   will go through the agent of the
11   shipment company appointed by the
12   customer.  Or in minority of the
13   time, very few times the customer
14   would tell us where it is possible
15   or where they want it to ship to.
16   But it is not our concern.  We
17   also don't pay attention to where
18   they are going to ship this to.
19   BY MS. BASS:
20        Q.   For the purpose of Chinese
21   tax records, does your company have to
22   maintain records of where product is
23   being shipped to?
24        A.   Our company would not have a

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 324

1 record regarding where it will be shipped
2 to, but according to the tax law in
3 China, by law, they require by the tax
4 bureau -- the tax bureau would have a
5 format for invoicing -- for the invoice.
6 And there is a column, there is one
7 column the tax bureau require us to fill
8 in to fill out where it is going to ship
9 to. Of course this requirement is not
10 very prudent or very accurate, very tight
11 to -- the requirement is not very tight
12 or very serious or --
13     INTERPRETER 1:  Many words
14 for the Chinese word that he was
15 trying to express.
16     THE WITNESS:  It is not very
17 accurate. Just like what I
18 mentioned earlier, that we will
19 make a phone call to the agent
20 appointed by the customer to ask
21 them where it is going to be
22 shipped to. I will put down what
23 they told us. Or sometimes we
24 just put down a country.

Page 325

1 BY MS. BASS:
2     Q.   Does your company maintain
3 copies of these invoices which reflects
4 this information that the tax bureau
5 requires you to maintain?
6     MR. SPANO:  Objection to
7 form, lack of foundation.
8     Also, are you almost done
9 with this line of questioning,
10 because it is after noon?
11     MS. BASS:  Let him finish
12 this question, please.
13     (Interpreter repeated the
14 question.)
15     THE WITNESS:  Usually we
16 keep it, but exactly how they keep
17 it, I don't know. It is possible
18 that we keep it between one or two
19 year, but exactly, I'm not sure.
20 And I have already produced these
21 invoices to my attorney under the
22 guidance of my attorney.
23 BY MS. BASS:
24     Q.   One last question before we

Page 326

1 break.
2     What is the name of the
3 individual who would have responsibility
4 for maintaining those records at your
5 company?
6     A.   The finance staff in the
7 company, they handle this.
8     MS. BASS:  We can break here
9 if you'd like.
10     MR. CHEN:  The
11 transcription, I believe, it's the
12 finance staff, not the filing
13 staff.
14     INTERPRETER 1:  The finance
15 staff, he said the people of the
16 finance.
17     MS. BASS:  Thank you.
18     THE VIDEOTAPE TECHNICIAN:
19 The time now is approximately
20 12:09 p.m., and we are now off the
21 record.
22         - - -
23     (Whereupon, a luncheon
24 recess was taken from 12:09 p.m.

Page 327

1 until 1:19 p.m.)
2         - - -
3     THE VIDEOTAPE TECHNICIAN:
4 This begins tape four of today's
5 portion of our deposition. The
6 time now is approximately 1:19
7 p.m., and we're back on the
8 record.
9 BY MS. BASS:
10     Q.   Mr. Peng, before we broke
11 for lunch, you indicated that on
12 occasion, customers would tell you where
13 they wanted the drywall to be shipped to.
14 Do you recall a customer ever telling you
15 that they wanted to ship to Florida?
16     A.   That I don't recall. When
17 the customers tell us, first of all, only
18 some of the customer would tell us.
19 Secondly, we don't care about it,
20 therefore, we don't recall.
21     Q.   So, your testimony under
22 oath is you have no recollection of ever
23 discussing with the customer their
24 intentions to utilize the gypsum they

Page 328

1  were purchasing from you in Florida?
2       MR. SPANO: Objection to
3    form and mischaracterizes the
4    testimony.
5       THE WITNESS: I said some of
6    the customer, they would tell us
7    where they wish these products to
8    be shipped to where. We don't try
9    to make efforts to remember what
10   he said or what the customer said
11   exactly which port they want to
12   ship it to. Where they are going
13   to use this drywall, we wouldn't
14   know it.
15  BY MS. BASS:
16   Q. So, the answer to my
17  question is no, you have no recollection
18  of ever discussing with the customer the
19  fact that they were going to ship the
20  drywall they purchased from you to
21  Florida? And I believe it's a yes or no
22  answer.
23       MR. SPANO: Objection to
24    form.

Page 329

1       THE WITNESS: I cannot
2    answer this question simply by
3    putting it as yes or no. I
4    mention about this earlier, and I
5    stated the fact that what we did,
6    and I don't want to repeat my
7    answer in order to save time.
8  BY MS. BASS:
9   Q. Do you have a recollection
10  of ever discussing with the customer the
11  fact that they were going to be utilizing
12  the drywall they purchased from you in
13  Florida? I've heard your prior
14  testimony. I believe I'm entitled to an
15  answer to this question.
16       MR. SPANO: Objection to
17    form. Objection, asked and
18    answered. And don't make speeches
19    to the witness. Don't make
20    comments. Ask the question, you
21    get an answer. If you don't like
22    the answer, move on.
23       MS. BASS: I will continue
24    to ask the question until I get an

Page 330

1    answer. The witness has been
2    nonresponsive. The question is
3    does he have a recollection. I
4    believe it can be answered with a
5    yes or a no.
6       MR. SPANO: Well, that's
7    your belief.
8       MS. BASS: I'm entitled to
9    it, Mr. Spano, and he can then
10   respond to it.
11      MR. SPANO: You've stated
12   your belief.
13      MS. BASS: Excuse me.
14   Please don't talk at the same time
15   I'm talking.
16      MR. SPANO: Stop speaking
17   while I'm speaking.
18      MS. BASS: I thought you
19   finished your objection. I'm
20   entitled to a yes or no answer.
21   He can then explain. Shall I ask
22   the witness yet again the
23   question? It asks very simply if
24   he has a recollection. I believe

Page 331

1    I'm entitled to a yes or no
2    answer.
3       MR. SPANO: You asked --
4       MS. BASS: Please repeat the
5    question for the witness.
6       MR. SPANO: You asked the
7    question, I made an objection to
8    your ad hominum remarks as part of
9    the question. What you believe is
10   not part of the question.
11      MS. BASS: Can the witness
12   answer the question now?
13      MR. SPANO: Of course.
14      MS. BASS: Thank you.
15      INTERPRETER 1: Let me go
16   back to the question. I haven't
17   translated the question yet.
18      MS. BASS: There's no need
19   to translate the colloquy between
20   counsel.
21      MR. SPANO: I agree.
22      INTERPRETER 1: Let me go
23   back to that question.
24      (Interpreter repeats the

Confidential - Subject to Further Confidentiality Review

Page 332

1    question.)
2         THE WITNESS: I don't
3    recall.
4  BY MS. BASS:
5         Q.   Do you have a recollection
6  of ever having been told by a customer
7  that the gypsum they were purchasing from
8  you would be used in Virginia?
9         A.   I remembered it was a
10  gentleman, he said he is from Virginia.
11  His name is Phillips, Perry.  Maybe that
12  is the way to spell it, Phillips,
13  P-E-R-Y, Perry.  It is possible how it is
14  being spelled.
15        Q.   Did Mr. Perry tell you that
16  the gypsum he was purchasing from you
17  would be used in Virginia?
18        A.   He did not say he might use
19  it in Virginia.  He did say probably.  He
20  is shipping the drywall to Virginia.
21        Q.   Did any customer ever tell
22  you that they were --
23        INTERPRETER 2:  Correction.
24        MS. BASS:  I'm sorry.

Page 333

1         INTERPRETER 2:  The witness
2    says he only said that he would
3    set -- ship the gypsum to the port
4    of Virginia.
5  BY MS. BASS:
6         Q.   Did any --
7         INTERPRETER 1:  No.  He did
8    not state the port of Virginia.
9  BY MS. BASS:
10        Q.   Did any customer ever tell
11  you that they were going to be shipping
12  the drywall they purchased from you to
13  the port of New Orleans?
14        MR. CHEN:  She was
15    translating, I think, some earlier
16    part of the transcript.  If we
17    could just go over that.
18        INTERPRETER 1:  No.  Off the
19    record.  I haven't translated this
20    question regarding New Orleans,
21    the port of New Orleans.
22        MS. BASS:  Please translate
23    that now.
24        INTERPRETER 1:  Let me

Page 334

1    translate that.  The word "port"
2    is in this question and I haven't
3    translated.
4         THE WITNESS:  Some of the
5    customers, it would be possible
6    that they did mention about
7    probably they wanted to ship it to
8    the city of New Orleans, but
9    exactly who says that, I cannot
10    recall.
11  BY MS. BASS:
12        Q.   Did any of your customers
13  ever tell you that they were going to be
14  shipping the drywall they purchased from
15  you to the port of Miami?
16        A.   Miami, I don't recall.
17        Q.   Did any of your customers
18  ever tell you that they were going to be
19  shipping the drywall they purchased from
20  you to the port of Tampa?
21        A.   I don't recall.
22        Q.   Do you have a recollection
23  of any of your customers ever telling you
24  they were going to be shipping to any

Page 335

1  other port in the United States other
2  than those that you've already testified
3  about?
4         MR. SPANO:  Objection to
5    form.
6         THE WITNESS:  As I mentioned
7    earlier, we don't pay attention,
8    we don't care about where they
9    ship it to, therefore, I have no
10    recollection of where did the
11    customer want to ship the products
12    to.
13  BY MS. BASS:
14        Q.   Was your company the first
15  to use containers to export drywall board
16  to the United States?
17        MR. SPANO:  Objection to
18    form.
19        THE WITNESS:  I don't
20    understand.  What do you mean by
21    "the first"?
22  BY MS. BASS:
23        Q.   Did your company use
24  containers to export gypsum board to the

Confidential - Subject to Further Confidentiality Review

Page 336

1  United States?
2        INTERPRETER 2:  Correction.
3  Container, can you use the
4  Mainland Chinese container term
5  instead of the Cantonese.
6        INTERPRETER 2:  Yes.  The
7  one I am using it is also
8  Mainland.  If you have another
9  term, the same for container,
10 would you mind to tell me.
11       INTERPRETER 2:  Ji zhuang
12 xiang.
13       INTERPRETER 1:  Paper boxes
14 for containing things.
15       INTERPRETER 2:  No, no, no.
16       INTERPRETER 1:  Can you say
17 it.
18       INTERPRETER 2:  Ji zhuang
19 xiang.  It's container for
20 Mainland Chinese.
21       INTERPRETER 1:  I don't
22 think that is a Mainland Chinese
23 term that you're providing, but I
24 will use your term.

Page 337

1        THE WITNESS:  TTP, according
2  to the requirement of the
3  customers, they did use the
4  containers to ship to the United
5  States, the big containers of 40
6  square feet, the big container
7  with the length of 40 feet.
8  BY MS. BASS:
9        Q.    Isn't it also true that the
10 company, TG, used containers to ship
11 gypsum board from China to the U.S.?
12       A.    I did mention about this
13 before.  Both TG and TTP, they did not
14 ship gypsum board to the United States.
15 Maybe it was arranged by the customers.
16       Q.    Isn't it true, Mr. Peng,
17 that you represented to US customers that
18 TG was capable of using containers to
19 export gypsum board to the United States?
20       MR. SPANO:  Objection to
21 form.
22       THE WITNESS:  The way you
23 say it is incorrect.  I represent
24 the company who said we can do it

Page 338

1        according to the requirement of
2        the customers to do packaging for
3        the containers.
4  BY MS. BASS:
5        Q.    For shipment to the United
6  States; isn't that correct?
7        MR. SPANO:  Objection.
8        THE WITNESS:  Can you repeat
9        the question.
10 BY MS. BASS:
11       Q.    Isn't it correct that you
12 represented to customers of TG that TG
13 could use containers to export gypsum
14 board to the United States from China?
15       MR. SPANO:  Objection.
16       THE WITNESS:  You cannot say
17       that.  I did explain this.
18 BY MS. BASS:
19       Q.    So, if you made such a
20 statement, it would have been a
21 misrepresentation?
22       MR. SPANO:  Objection to
23       form.
24       INTERPRETER 1:  Counsel,

Page 339

1        would you mind to help me with the
2        word misrepresentation?
3        MS. BASS:  A lie.
4        MR. CHEN:  Hold on.  Hold
5        on.
6        He asked for an explanation,
7        and I think the explanation should
8        come from counsel, not from the
9        interpreter.
10       INTERPRETER 1:  I did not.
11       MS. BASS:  I said --
12       INTERPRETER 1:  I'm not
13 giving an explanation.  I was
14 translating the question.
15       MR. CHEN:  He made a comment
16 in Chinese asking what, and I
17 think that should be from counsel,
18 and then you can handle that, how
19 you feel appropriate, as opposed
20 to having the interpreter explain
21 further the question.
22       INTERPRETER 1:  Excuse me.
23 I was doing verbatim translating
24 the question.  I was not doing the

30 (Pages 336 to 339)

Confidential - Subject to Further Confidentiality Review

Page 340

1    explanation.  I was looking at the
2    screen translating the question
3    from the screen in verbatim.  I
4    did not do any explanation.  That
5    was not my job.
6          MS. BASS:  Can you please
7    ask the witness to answer the
8    question.
9          THE WITNESS:  I was
10   interrupted.  Would you mind to
11   say it again.
12   BY MS. BASS:
13        Q.   Mr. Peng, if you made a
14   representation to a US customer
15   indicating, quote, we are the first to
16   use container to export gypsum board to
17   USA in China, would that have been a lie?
18         INTERPRETER 2:  Correction.
19   The term "representation," meaning
20   to tell, but the interpreter may
21   have interpreted it into
22   representing.
23         MS. BASS:  That's fine.
24         MR. SPANO:  Objection to

Page 341

1    form.
2          THE WITNESS:  I don't
3    understand.  What is the question
4    you are asking?
5    BY MS. BASS:
6          Q.   Did he make such a
7    representation to American customers?
8          INTERPRETER 1:  Counsel, the
9    word "representation," would you
10   mind to help me, because there are
11   more than one way of translating
12   it.
13   BY MS. BASS:
14        Q.   Did he make a statement to
15   American customers stating that his
16   company was the first to use containers
17   to export gypsum board to the United
18   States in China?
19         MR. SPANO:  Objection to
20   form.
21         THE WITNESS:  I don't
22   recall.
23   BY MS. BASS:
24        Q.   Mr. Peng, did you review the

Page 342

1    profile form filed on behalf of TTP in
2    this litigation?
3          INTERPRETER 1:  Manufacturer
4    profile form?
5          MS. BASS:  Yes.
6          MR. CHEN:  Objection.  The
7    translation referred to when he
8    was representing TTP.
9          INTERPRETER 1:  Counsel,
10   would you mind to help me with the
11   word "on behalf of"?
12   BY MS. BASS:
13        Q.   Did you review the profile
14   form filed by TTP in this litigation?
15        A.   Under the guidance of my --
16   of our attorney, I saw it.
17        Q.   Did you assist in the
18   preparation of the exhibit attached to
19   the profile form listing the exports of
20   Chinese drywall into the United States?
21         MR. SPANO:  Objection to
22   form and mischaracterizes the
23   document.
24         INTERPRETER 1:  Let me

Page 343

1    translate once more because I need
2    to translate upside down to make
3    it clear to him.
4          THE WITNESS:  According to
5    the requirements and guidance of
6    our attorney, I did make
7    preparation, and I did make
8    inquiries to my company about
9    technical information of the 12.7
10   millimeter drywall.  I did not
11   make preparation to the attorney
12   of the information, what you
13   mentioned just earlier, that the
14   drywall information -- the
15   information of the drywall from
16   China shipped to the United
17   States, I mentioned about this
18   earlier.  There is no exports for
19   us to the United States.
20   BY MS. BASS:
21        Q.   Are you aware, Mr. Peng,
22   that 1.7 million sheets of drywall
23   produced by TTP were shipped into the
24   United States?

31 (Pages 340 to 343)

Page 344

1    MR. SPANO:  Objection to
2  form.
3        THE WITNESS:  Can you repeat
4  the question?  I don't understand
5  it.
6        MS. BASS:  Please ask the
7  witness the same question that I
8  previously posed.
9        (Interpreter repeats the
10  question.)
11       THE WITNESS:  I did provide
12  to our attorney, to my attorney
13  for the drywall of 12.7 mm
14  thickness that were produced by
15  TTP company.  I'm not sure whether
16  this drywall was shipped to the
17  United States or not.  We also
18  cannot say this.
19 BY MS. BASS:
20    Q.    Are you suggesting, Mr.
21  Peng, that the document filed by your
22  attorneys in the MDL proceeding
23  reflecting 1.7 million sheets of drywall
24  manufactured by TTP ending up in the

Page 345

1  United States is not accurate?
2        MR. CHEN:  For the
3  interpreter, MDL is actually a
4  defined term that you could use as
5  well.
6        INTERPRETER 1:  Let me see
7  what is MDL.  I just state MDL to
8  the witness.  I don't find MDL in
9  the glossary.
10       MR. CHEN:  Multi-District
11  Litigation.  You have circled MDL.
12       INTERPRETER 1:  Let me see.
13       MR. CHEN:  It is under
14  multi.
15       INTERPRETER 1:  It is under
16  multi not MLD.
17       Thank you.
18       THE WITNESS:  Would you mind
19  to repeat the question.  I don't
20  recall it.
21       MR. SPANO:  Objection to
22  form, lacks foundation and
23  mischaracterizes the document.
24       (Interpreter repeats the

Page 346

1  question.)
2        THE WITNESS:  We collect
3  this type of information, this
4  type of the table with information
5  in it.  I did it according to the
6  requirement and the guidance of my
7  attorney.  And now the problems
8  that you're referring to, I am
9  unable to make judgment, and also
10  I don't have any authority to make
11  this judgment.
12 BY MS. BASS:
13    Q.    Do you believe the list
14  attached as Exhibit A to the TTP profile
15  form is accurate?
16    A.    I don't know what document
17  you're referring to.  Would you mind to
18  let me take a look?
19    Q.    Mr. Peng, didn't you just
20  tell me you had reviewed the TTP profile
21  form?
22    A.    Yes, I did browse it.
23    Q.    Okay.  And now my question
24  to you is, is it accurate?

Page 347

1    A.    The table is -- no, the list
2  is accurate.
3    Q.    And all of the sales of
4  drywall that are reflected on Exhibit A
5  would have been transactions undertaken
6  by you and your colleagues at TTP,
7  correct?
8    A.    The question, I raised it
9  earlier, was, would you mind to let me
10  take a look at the attachments that you
11  mentioned?
12    Q.    I'd be happy to.  Since it's
13  in English, I'm sure you'll be able to
14  follow along.  Here is the document
15  that's Exhibit A to the TTP profile form.
16  Please review it.
17       MR. SPANO:  No.  If you're
18  questioning him about an English language
19  document that he did not prepare, you
20  have to use the Chinese translation.
21       MS. BASS:  Mr. Spano, please
22  don't throw documents at me.
23       MR. SPANO:  I'm not throwing
24  them.  I passed it back to you.

32 (Pages 344 to 347)

Confidential - Subject to Further Confidentiality Review

Page 360

1   very much. Thank you. Good.
2       (Interpreter repeats the
3   question.)
4       THE WITNESS: Regarding this
5   question, I don't understand what
6   you're referring to as the
7   document 30 bracketed something.
8   I also don't understand what do
9   you mean by "the shipping invoices
10  issued by."
11  BY MS. BASS:
12      Q.   As the witness designated by
13  TTP and TG to testify regarding indirect
14  sales by those companies of gypsum board
15  to the United States, did you review the
16  invoices for sales to US customers in
17  preparation for this deposition?
18      INTERPRETER 2: Correction.
19  The interpreter, indirect sales,
20  can I help with that term for the
21  interpreter?
22      INTERPRETER 1: Yes.
23      INTERPRETER 2: Jian jie.
24      INTERPRETER 1: She's using

Page 361

1   the word "indirect." Yeah, we are
2   using different words, different
3   wordings for indirect.
4   BY MS. BASS:
5       Q.   The question to the witness
6   remains the same.
7       Did he review sales invoices
8   of TG and TTP in preparation for this
9   deposition?
10      A.   Invoices, yes. Under the
11  guidance of my attorney, yes, I did see
12  the invoices.
13      Q.   In your review of the
14  invoices, did you make note of the
15  locations within the United States to
16  which the Taishan Gypsum board
17  plasterboard was to be shipped?
18      MR. SPANO: Objection to the
19  form of the question, and the
20  answer to this question should not
21  reveal communications with counsel
22  or any information prepared by
23  counsel or at the request of
24  counsel.

Page 362

1       THE WITNESS: This invoices
2   has to do with our company. After
3   they sell the drywall to the
4   customers in China, they have to
5   issue the invoices because of the
6   requests by the tax bureau. We
7   don't care which country or which
8   port they were being shipped to.
9   BY MS. BASS:
10      Q.   My question to you, Mr.
11  Peng, was not what you choose to care
12  about. My question was whether or not
13  you are aware of what the invoices
14  reflected were the eventual destination
15  of the TG and TTP drywall being shipped
16  to the US?
17      MR. SPANO: Objection to
18  form.
19      THE WITNESS: I did mention
20  about this earlier. Some of the
21  customers, it is possible for them
22  to tell us for where they shipped
23  this drywall to or the agent of
24  the shipping company appointed by

Page 363

1   the customers, and they would have
2   invoices indicating the
3   destination. We don't know where
4   these drywalls were being shipped
5   to, and we don't know whether this
6   drywalls were shipped to the
7   United States or not.
8   BY MS. BASS:
9       Q.   Even when the invoices
10  reflected that they were being shipped to
11  the United States, is that your
12  testimony?
13      MR. SPANO: I object to the
14  form of the question.
15      THE WITNESS: What I meant
16  is that this information that you
17  refer to, what I mean is that when
18  we get it from the agents of the
19  shipping company appointed by the
20  customers or when the tax bureau
21  requested us to fill out the
22  invoices, we would ask the agent
23  of the shipping company appointed
24  by the customers regarding where

36 (Pages 360 to 363)

Confidential - Subject to Further Confidentiality Review

Page 364

1   they will ship this to.  Regarding
2   where it is shipping to, regarding
3   whether this is true or not, we
4   don't care.  We also don't pay
5   attention to it.
6        MS. BASS:  I'm going to pass
7   the witness at this point.
8            - - -
9        EXAMINATION
10           - - -
11  BY MR. HARDT:
12       Q.   Mr. Peng, good afternoon.
13  I represent Venture Supply and the
14  Porter-Blaine Corporation, and I'm making
15  an appearance at these depositions in the
16  Germano class action.
17       Mr. Peng, I have a couple of
18  follow-up questions.
19       In 2005, when you were the
20  director of foreign sales at TG, who did
21  you report to?
22       INTERPRETER 1:  Counsel,
23  would you mind to help me?  Is it
24  director or manager?

Page 365

1        MR. HARDT:  I think he
2   testified he was director of
3   foreign sales, director of the
4   foreign sales department.
5        MR. CHEN:  Counsel, I think
6   there's confusion over the use of
7   the word "director," and that's
8   what the interpreter was asking
9   about.
10       MR. HARDT:  Everybody's been
11  using that.
12       MR. CHEN:  She's translating
13  director as board of directors.
14       MR. HARDT:  Manager is fine.
15       INTERPRETER 1:  Thank you
16  for the clarification.
17  BY MR. HARDT:
18       Q.   Mr. Peng, in 2005, when you
19  were the manager of foreign sales at TG,
20  who did you report to?
21       A.   When I worked for TG, I
22  reported to the manager of the sales
23  department.
24       Q.   And who was that?

Page 366

1        A.   His name is Mr. Fu, that's
2   the last name, Ting Huan, the first name.
3        Q.   Who did he report to?
4        A.   I don't know who he reported
5   to.  He was my leader.
6        Q.   You don't know if he
7   reported directly to Mr. Jia?
8        A.   I don't know whether he has
9   made the -- he has made a report or not.
10       Q.   You talked before about the
11  sale with Venture Supply, and you dealt
12  with Mr. Phillip Perry; is that correct?
13       A.   Mr. Phillip came to our
14  company to meet us.
15       Q.   And he met with you, right?
16       A.   Yes, in the office.  Yes, I
17  met with him.
18       Q.   And Mr. Perry didn't speak
19  Chinese, did he?
20       A.   He did not speak Chinese.
21       Q.   So, when you dealt with Mr.
22  Perry, you dealt with him in English?
23       A.   At the beginning, we did
24  very simple exchanges.  Sometimes we have

Page 367

1   to write it down on a piece of paper.
2   Later on, I don't know where he hire this
3   interpreter that he brings.  I did not
4   know where he hire this interpreter.
5        Q.   So, it's your testimony that
6   Mr. Perry brought an interpreter with him
7   at some point in time to talk with you?
8        A.   Yes, he brought an
9   interpreter to come to our company.
10       Q.   How many times did you meet
11  directly with Mr. Perry?
12       A.   How many times, it is very
13  difficult to say.  Sometimes he stays
14  for -- sometimes he stayed for three days
15  and he came over every single day.  Well,
16  maybe I should say more than two times.
17       Q.   How many times did he meet
18  with you with an interpreter?
19       A.   From my recollection, well,
20  maybe one time or two times.  I cannot
21  recall.
22       Q.   And then all the other
23  times, he met with you without an
24  interpreter; is that correct?

Confidential - Subject to Further Confidentiality Review

Page 368

1    A.    Yes.
2    Q.    And you talked in English
3  with Mr. Perry; is that correct?
4    A.    I did mention about this
5  earlier.  Yes, we did some simple
6  exchanges verbally.  With things that are
7  more complicated that I'm not able to say
8  it, I would rely on a piece of paper that
9  I handwrite on it.
10    Q.    And you handwrite, what, in
11  English?  I don't understand.
12    A.    Yes.  Whatever that I am
13  unable to express verbally, I would write
14  it down.  I would write single words or
15  short sentences.
16    Q.    In English?
17    A.    Yes, English.
18    Q.    You even spoke on the
19  telephone with Mr. Perry a number of
20  times, didn't you?
21          MR. CHEN:  Hold on one
22      second.  She added into the
23      translation "in English, right?"
24      I don't believe that was in your

Page 369

1  original question.
2          MR. HARDT:  No, it wasn't.
3      That was in the second question.
4  BY MR. HARDT:
5    Q.    You spoke on the telephone a
6  number of times with Mr. Perry, didn't
7  you?
8          MR. HARDT:  That's my
9      question.
10          THE WITNESS:  Mr. Perry,
11      yes, we did communicate over the
12      phone.
13  BY MR. HARDT:
14    Q.    And that was in English; is
15  that correct?
16    A.    It was in English, but to
17  tell you the truth, I did not totally
18  understand what he was saying, and also,
19  when I talk to him, I was unable to
20  express completely what I wanted to say.
21    Q.    In fact, you spoke to my
22  client's president, Sam Porter, by
23  telephone, didn't you?
24    A.    I cannot recall exactly, but

Page 370

1  I remember under the guidance of Mr.
2  Phillip, I talked to his colleagues or
3  leaders in the United States a few times
4  over the phone very few times.
5    Q.    And again, that was in
6  English, correct?
7    A.    Yes, English.  Simple and
8  limited exchanges.
9    Q.    Okay.
10          Now, you recall that there
11  were two contracts with my client,
12  Venture Supply.  Do you recall that?
13    A.    Yeah.  We signed with
14  Venture Supply company for two contracts.
15  They were both signed in China inside our
16  factory.
17    Q.    And there were two separate
18  shipments of drywall to the United
19  States, weren't there?
20          MR. SPANO:  Objection to
21      form.
22          THE WITNESS:  Well, we
23      deliver goods to Venture Supply
24      two times, but regarding where it

Page 371

1  was being sent to, we did not
2  follow up.  We also did not know.
3  We signed the contract in China.
4  We also collect the money for the
5  goods in China, and we also
6  completed the transaction in
7  China.
8  BY MR. HARDT:
9    Q.    You were aware the first
10  shipment went to Virginia, aren't you?
11          MR. SPANO:  Objection to
12      form.
13          THE WITNESS:  When I
14      communicate with Mr. Phillip, he
15      said he came from Virginia, and he
16      told us that he planned to ship
17      the drywalls to Virginia.  But
18      ultimately, where these drywalls
19      were shipped to, we have no
20      knowledge.  These were arranged by
21      Mr. Phillip and the shipping
22      company, they confirm it, and they
23      make the arrangement, and we did
24      not know what happened.

38 (Pages 368 to 371)

Confidential - Subject to Further Confidentiality Review

Page 372

BY MR. HARDT:
1  BY MR. HARDT:
2      Q.   Do you remember with the
3  second shipment, Mr. Perry was having
4  trouble finding a ship that went directly
5  to Norfolk, Virginia?
6      A.   At that point, I know he has
7  difficulty finding shipment facilities.
8  They were unable to find a shipping
9  company for appropriate ships.
10  Therefore, the products that we produce
11  for them were stored in our storage for a
12  long time.
13      Q.   And you assisted him during
14  the second -- I mean --
15          After the first shipment, in
16  between the first shipment and the second
17  shipment, you assisted him with trying to
18  find a shipper, didn't you?
19      A.   I did mention about earlier
20  that Mr. Phillip, they were unable to
21  find a ship appropriate, so until very
22  late, they were unable to ship it, and
23  they told me that they were unable to
24  find a ship to ship it and, therefore, we

Page 373

1  tried to push them and tell them to ship
2  it as soon as possible because they have
3  been storing the products in our storage.
4  At this point, Mr. Phillip told us and
5  they asked us to help them to find an
6  agent doing shipment in China to help
7  them to ship it.
8      Q.   And you provided that
9  assistance, right?  You provided that
10  help, right?
11      A.   I did provide the
12  information, how to make contact with the
13  agent of the shipping company.  For the
14  rest of the matter, he handle it himself.
15      Q.   Did you, yourself, first
16  contact the shipping agent and tell them
17  that you had a customer that needed
18  assistance?
19      A.   I would find some agents of
20  the shipping companies.  All these agents
21  are in China, the agents in China, the
22  agents of the shipping companies in
23  China.
24      Q.   And you would contact these

Page 374

1  agents of the shipping companies in China
2  and tell them that you had a customer
3  that needed assistance; is that correct?
4          MR. SPANO:  Objection to
5      form.
6          THE WITNESS:  Yes.  I would
7      tell the agents of the shipping
8      company something like this.
9  BY MR. HARDT:
10      Q.   Do you recall discussions
11  with Mr. Perry about the possibility of
12  Venture Supply becoming the exclusive
13  agent for distribution of your company's
14  products in the United States?
15      A.   I recall Mr. Phillip did
16  mention about this.  But to ask me
17  consider this impossible, this cannot be
18  realized.  Mr. Phillip just do this
19  because he wanted to have a better price.
20  We did not agree to this requirement, and
21  we also did not sign any agreement with
22  him.
23      Q.   I understand you didn't sign
24  an agreement with him, but were there

Page 375

1  discussions with him about the
2  possibility of Venture being the
3  exclusive agent?
4          MR. SPANO:  Objection, asked
5      and answered.
6          THE WITNESS:  I did answer
7      this question already.
8          MR. HARDT:  I'll let the
9      record reflect that.
10          MR. PANAYOTOPOULOS:  I'll
11      object.  The question was asked.
12      The witness did not answer.
13          MR. HARDT:  I agree.  The
14      witness didn't answer.
15  BY MR. HARDT:
16      Q.   Can you answer my question?
17      A.   Yes.  Mr. Phillip did bring
18  up to us with such a request, but we
19  consider this request to be unrealistic
20  and also we don't think this can be
21  actualized.
22          MR. HARDT:  Let me show you
23      a document we'll have marked.
24          - - -

39 (Pages 372 to 375)

Confidential - Subject to Further Confidentiality Review

Page 376

1          (Whereupon, Deposition
2     Exhibit Peng-12, E-mail dated June
3     18, 2009, with attachments, was
4     marked for identification.)
5            - - -
6          MS. BASS:  Bates Number.
7          MR. HARDT:  There isn't a
8     Bates Number.  This was a document
9     that was provided with Venture and
10    Porter-Blaine's profile forms in
11    the MDL.
12         MR. SPANO:  It is these four
13    pages, five?
14         MR. HARDT:  Six.
15   BY MR. HARDT:
16      Q.    The first thing, Mr. Peng, I
17   would like you to do is look at the first
18   page of Exhibit 12, and the e-mail
19   addresses the "Tos."  Do you recognize
20   any of those e-mail addresses?
21      A.    I see this e-mail.
22      Q.    Do you recognize any of the
23   addresses?
24      A.    I'm not sure.  It seems like

Page 377

1    the first one seems to be one of the
2    mailboxes of TG.  I'm not sure, because I
3    never used it, and I don't recall.
4       Q.    How about the second one, is
5    that Mr. Bill Che's?
6       A.    I know Mr. Che has a mailbox
7    with 1623, but I don't know whether Mr.
8    Che, he has actually used this e-mail or
9    not.
10      Q.    So, you don't know one way
11   or the other whether this is his e-mail
12   address?
13      A.    I don't know.
14      Q.    How about the last three?
15      A.    "The last three," what do
16   you mean?
17      Q.    The last three on the "To"
18   line.
19      A.    According to my
20   understanding, we used the e-mail address
21   with the number 1623 or 126.  I'm not
22   sure about the e-mail of hotmail because
23   our colleagues, they used the e-mail of
24   163 or 126.

Page 378

1       Q.    So, is the answer you don't
2    recognize those last three e-mail
3    addresses on the "To" line?
4       A.    I am unable to be sure.  I
5    cannot be sure who's e-mail addresses
6    these are.
7       Q.    Okay.  Have you ever seen
8    either the e-mail or the attachments
9    before today?
10         MR. SPANO:  Objection to go
11    form.
12         THE WITNESS:  What are you
13    talking about?  Are you talking
14    about this e-mail?
15   BY MR. HARDT:
16      Q.    And its attachment, the
17   letter and the contracts.
18      A.    Are you sure these two
19   pages, the two pages that are with this,
20   is holding in his hand, are the two pages
21   are holding in his hand.  But regarding
22   the other documents, I need some time to
23   look at it.  Do you want me to look at it
24   now or when?

Page 379

1       Q.    I'm not going to ask you any
2    questions about what's in it.  But I will
3    tell you, I sent this e-mail and these
4    attachments.  I'm just trying to find out
5    if in this form you saw these before, not
6    what's in it, just if you saw it in this
7    form?
8          MR. SPANO:  Objection.
9          INTERPRETER 1:  Counsel,
10    what form can mean the table or
11    the format?
12         MR. HARDT:  Format.
13         THE WITNESS:  I have never
14    seen this format before,
15    therefore, I would like to take
16    some time to take a look before I
17    can decide whether I have seen
18    this before or not.
19   BY MR. HARDT:
20      Q.    Okay.  Take a minute.
21      A.    Can I take a break?
22      Q.    If you would take a look at
23   that document on the break, I don't see a
24   problem with taking a break.

Confidential - Subject to Further Confidentiality Review

Page 380

1 MR. SPANO: Off the record.
2 THE VIDEOTAPE TECHNICIAN:
3 The time now is approximately 3:19
4 p.m., and we are now off the
5 record.
6 - - -
7 (Whereupon, a recess was
8 taken from 3:19 p.m. until 3:31
9 p.m.)
10 - - -
11 THE VIDEOTAPE TECHNICIAN:
12 This begins Tape 6 of our
13 deposition. The time now is
14 approximately 3:31 p.m., and we're
15 back on the record.
16 BY MR. HARDT:
17 Q. Mr. Peng, Exhibit 12, my
18 question to you is, have you ever seen
19 this document before?
20 A. I have never seen this
21 document before.
22 Q. Mr. Peng, were you aware at
23 the time that Venture Supply made its
24 purchase of drywall from TG that there

Page 381

1 was a shortage of drywall in the United
2 States?
3 A. I didn't know.
4 Q. You never had a discussion
5 with any of your US customers that they
6 were having trouble finding drywall made
7 in the United States?
8 A. I did not understand the
9 question.
10 INTERPRETER 2: The check
11 interpreter correction. The
12 interpreter said to find drywall
13 in the U.S., did not say having to
14 find drywall made in the U.S.
15 MR. HARDT: Made in the U.S.
16 (Addressing the
17 interpreter.)
18 Can you ask the question
19 that I asked.
20 - - -
21 (Whereupon, the following
22 portion of the transcript was read
23 by the court reporter:
24 "Q. You never had a

Page 382

1 discussion with any of your US
2 customers that they were having
3 trouble finding drywall made in
4 the United States?")
5 - - -
6 THE WITNESS: I don't have
7 such a recollection.
8 BY MR. HARDT:
9 Q. Did you make any inquiry
10 into why US importers were coming to your
11 company to try to buy drywall?
12 A. Yes. Some of the Chinese
13 companies, when they come to our company
14 to buy drywalls, they will mention about
15 different types of situations. They
16 would mention -- these companies,
17 they would mention about in the U.S. that
18 there has been strong winds or
19 hurricanes, this type of situation, but I
20 don't have too much recollection.
21 Q. The interpreter said Chinese
22 companies. Did you mean US companies, it
23 was the U.S. companies that were
24 mentioning problems like high winds and

Page 383

1 those kinds of things?
2 A. What I meant was, most of
3 the customers that come to our company,
4 TTP company, to buy drywalls are Chinese
5 customers. Only very small part -- only
6 very small number of the companies are
7 foreign companies. Whether these
8 companies, they have mention about this
9 kind of situation or not, I have no
10 recollection.
11 Q. All right.
12 MR. HARDT: Well, based upon
13 the time limits that I did not
14 agree to but that I understand are
15 in place, I'm going to let others
16 ask questions of you, but I
17 reserve my right to ask you
18 questions at another time.
19 - - -
20 EXAMINATION
21 - - -
22 BY MR. BRENNER:
23 Q. Good afternoon, Mr. Peng.
24 A. How are you?

41 (Pages 380 to 383)

Confidential - Subject to Further Confidentiality Review

Page 384

1    Q.   Well.
2         My name is Theodore Brenner.
3    I represent Tobin Trading in the Germano
4    case.
5              Were you an employee of TG
6    during the entire year 2005?
7        A.   I was the employee of TG.
8        Q.   And were you the employee of
9    TG at the beginning of 2006 until
10   February of 2006?
11       A.   Yes.  During this period of
12   time, I was the employee of TG.
13       Q.   And in February 2006, did
14   you cease your employment with TG and
15   begin your employment with TTP?
16       A.   In February 2006, I joined
17   TTP company to work for them.  So, in
18   February 2006, I worked for TTP, but
19   there was some work with TG I haven't
20   finished yet, I mean, the work left over
21   when I was working for TG.  Therefore, if
22   time allowed, I will spend a little time
23   trying to finish those work.  I mean, it
24   was I did not work for -- I did not spend

Page 385

1    all the time only for TTP.  Of course,
2    this has to do with my respect to TG and
3    also this is I, myself, a way that I feel
4    that I can protect my reputation.
5        Q.   When you joined TTP in
6    February 2006, what work for TG remained
7    for you to do?
8        A.   I remember at that time some
9    of the work regarding the orders from
10   Venture Supplies, I mean about the later
11   stage work of Venture Supply that I did
12   not finish handling.
13       Q.   And how long did it take for
14   you to complete the work that you had to
15   do for TG after you joined TTP?
16       A.   I spend very little time on
17   this.  What I can say is that I will try
18   my best depending on the requirement of
19   the work.  And I try to complete this
20   type of work as soon as possible, and I
21   also try to be able to completely devote
22   myself to the work of TTP, because I
23   understand that if I spend too much time
24   on this, the managers of TTP would not be

Page 386

1    happy with me, and it would also impact
2    my work at TTP.
3        Q.   Had you completed the
4    remaining TG work by August 2006?
5        A.   Completed already.
6        Q.   By what month did you
7    complete the remaining TG work?
8        A.   It is difficult to say.  I
9    don't recall.
10       Q.   Except it was certainly
11   completed by August of 2006; is that
12   correct?
13       A.   You can say that.
14       Q.   My question is, is that your
15   testimony?
16       A.   Yes.
17       Q.   Is it true that -- strike
18   that question.
19              When did you stop being an
20   employee of TTP?
21       A.   December 2007.
22       Q.   Between August 26, 2006 and
23   December 2007, is all of the sales work
24   that you performed performed as an

Page 387

1    employee of TTP?
2        A.   Well, I need to give an
3    explanation to this situation because
4    when I work for TG, the customer -- some
5    of the customers, they have already
6    gotten my contact.  Therefore, when I
7    joined TTP, this customer continue to
8    contact me, therefore, if it is
9    necessary, if this has no violation to my
10   work, I will try my best to provide
11   assistance.  All of these things that I
12   do would not affect my work at TTP.
13   Finished.
14       Q.   The assistance that you just
15   described, is that assistance that would
16   benefit TG?
17             MR. SPANO:  Objection, form.
18             THE WITNESS:  I don't know
19       whether this benefit TG or not,
20       but this has to do with my
21       personal respect to the customer.
22       I mentioned earlier, so, these are
23       a very small amount and the
24       necessary help that assist my

Page 388

1    customer for the respect of them.
2    BY MR. BRENNER:
3        Q.   Mr. Peng, did you know that
4    Venture Supply offices were located in
5    Virginia in the United States of America?
6            MR. SPANO:  Objection to
7        form.
8            THE WITNESS:  Mr. Phillip,
9        he did tell me that Venture Supply
10       was located in Virginia.
11   BY MR. BRENNER:
12       Q.   Isn't it also true, Mr.
13   Peng, that you received letters from
14   Venture Supply with their address printed
15   on them showing their location in
16   Virginia?
17       A.   I remember I received faxes
18   from Venture Supply, but I don't recall
19   what addresses was on it.  I also don't
20   recall the content of the fax.  I roughly
21   remember that I did receive the faxes.
22       Q.   Did anyone else in the TG
23   sales office have dealings with Venture
24   Supply other than yourself?

Page 389

1        A.   I don't understand.  What do
2    you mean by "dealings"?
3        Q.   Conversations or
4    communication of any sort.
5        A.   From my recollection, no,
6    none.
7        Q.   After the contracts with
8    Venture Supply were signed, were all
9    follow up requests or discussions with
10   Venture Supply done by you as a
11   representative of TG?
12           MR. SPANO:  Objection.
13           THE WITNESS:  In reality,
14       regarding the follow-up, it's like
15       this.  When Mr. Phillip was in
16       China, we immediately do the
17       communication, and we immediately
18       resolve the issue.  After we
19       deliver the goods in China, we did
20       not follow up on the goods.
21   BY MR. BRENNER:
22       Q.   After you delivered the
23   goods in China, did you ever follow up
24   with Venture Supply to ask for feedback

Page 390

1    on how the product was received by
2    customers?
3        A.   At that point --
4            INTERPRETER 1: Well, at
5        certain occasions, the witness
6        paused.
7            THE WITNESS: Because I met
8        with Mr. Phillip, I was familiar
9        with him sometimes in order to
10       complete the responsibility for
11       our future sales that Mr. Phillip
12       will ask for the drywalls, and
13       during that time for sure, we
14       would ask this type of
15       information.  But I cannot recall
16       exactly what that is.  Finished.
17   BY MR. BRENNER:
18       Q.   By using the phrase
19   "responsibility for our future sales,"
20   are you talking about discussions of
21   additional drywall to be shipped?
22           MR. SPANO: Objection to
23       form.
24           THE WITNESS:  Well, at that

Page 391

1    time, the situation was like this.
2    I was asking Mr. Phillip to come
3    to our company again, to come to
4    our company to buy more drywall.
5            INTERPRETER 2:  And
6        correction.  The witness says I
7        know Mr. Philip relatively better.
8        He did not say I know him -- I'm
9        familiar with him well.
10           INTERPRETER 1:  What does it
11       mean by relatively better?  What
12       is difference between familiar and
13       know him better?  It is the same
14       word.
15           MR. CHEN:  The objection is
16       on the record by the check
17       interpreter.
18           INTERPRETER 1:  Written in
19       Chinese notes, I have the word
20       familiar in Chinese.
21   BY MR. BRENNER:
22       Q.   Did you ask Mr. Perry to
23   come to your company again to buy more
24   drywall in a conversation by telephone,

Page 392

1  in a communication by facsimile or by
2  some other type of communication?
3      A.  I don't recall because it
4  was too long ago.
5      Q.  Did you initiate the
6  conversation to ask Mr. Perry to come
7  back to your factory to discuss future
8  sales of drywall?
9      A.  Can you repeat that?
10      Q.  Let me ask a different
11  question.
12          Was the invitation that you
13  made to Mr. Perry to come back to your
14  company to discuss future drywall sales
15  made after October 2006?
16      A.  I don't recall the exact
17  time because Mr. Phillip, Mr. Perry, he
18  came, we met.  I am familiar with him.
19          INTERPRETER 1:  Or we can
20      also translate it as I know him
21      well after a few dealings or
22      translated as interaction.
23          THE WITNESS:  We become
24      friends.  We communicate many

Page 393

1      times as friends.  Well, I said I
2      recall during the first few years,
3      every year on his birthday, I wish
4      him happy birthday.
5          MR. CHEN:  By the way, just
6      for the record, in this last
7      answer, I think the comments "we
8      can also translate it as" or
9      "translated as," I think that was
10      the translator making
11      clarification.  It's not part of
12      the answer itself.  I think she's
13      making different terms that could
14      be used in English.
15          INTERPRETER 1:  I'm not
16      making clarification, I'm
17      indicating that it is a term that
18      could be translated.  There are
19      many ways to translate it.  So, I
20      could put it this way or that way
21      for the same Chinese term.
22          MR. CHEN:  Right.  But I'm
23      just noting that it was the
24      interpreter's --

Page 394

1          INTERPRETER 1:  It is not
2      clarification.  I am putting two
3      similar words.
4          MR. SERPE:  Noted.
5          MR. CHEN:  Thank you.
6          INTERPRETER 1:  Thank you.
7  BY MR. BRENNER:
8      Q.  Is it true that after
9  October 2006, you frequently requested
10  Venture Supply to place follow up orders
11  for drywall?
12      A.  I don't understand the
13  question.
14      Q.  Is it true that after
15  October 2006, you requested that Venture
16  Supply place another order for drywall?
17      A.  The situation was like this.
18  After we completed the two orders placed
19  by Venture Supply, after that, we had
20  more contacts, but by that time, we did
21  exchanges as an individual, as friends.
22  You cannot say I asked Venture Supply to
23  place more orders.  I mean the word
24  "request," you cannot use the word

Page 395

1  "request."  The word "request" is
2  inappropriate.  When I exchange with Mr.
3  Phillip, I did ask him, maybe it is
4  possible that I asked him is he going to
5  buy more drywalls from our company.
6          INTERPRETER 2:  Correction.
7          INTERPRETER 1:  I haven't
8      finished yet.
9          THE WITNESS:  I can only say
10      from my recollection, we did have
11      some exchanges, but I cannot make
12      it exactly -- I cannot exactly
13      recall how we say it and what was
14      being exchanged.
15  BY MR. BRENNER:
16      Q.  Did you make reports of your
17  sales efforts to anyone at TG or TTP?
18          MR. SPANO:  Objection to
19      form.
20          THE WITNESS:  I did not
21      understand the question.
22  BY MR. BRENNER:
23      Q.  Did you report to anyone at
24  TG or TTP about discussions that you had

Page 396

1   with Venture Supply or its representative
2   about possible future drywall sales?
3       A.   I am not sure about this
4   question. I want to clarify. Are you
5   referring to me talking to the
6   representative of my company or the
7   representative of Venture Supply?
8       Q.   To the representative of
9   your company.
10      A.   I did not. Regarding the
11  dealings with Venture Supply, I did not
12  make reports to the representative of the
13  company. I did not make a complete or a
14  thorough report to the representative of
15  the company or specifically report this
16  matter. But I, myself, as an individual,
17  I cannot exclude the possibility of other
18  people, during the conversation, they
19  might briefly bring up the matter related
20  to the orders from Venture Supply.
21      Q.   Did Mr. Perry tell you that
22  the plasterboard purchased from your
23  company had arrived at the destination in
24  Norfolk, Virginia?

Page 397

1       A.   Mr. Phillip did say about
2   this when he was doing business in our
3   factory, he did mention about he wanted
4   to ship this to certain ports in
5   Virginia.
6       Q.   That is not my question, Mr.
7   Peng. My question is, did Mr. Perry tell
8   you that the plasterboard purchased from
9   your company had arrived at the
10  destination, Norfolk, Virginia?
11      A.   Regarding this, I don't
12  recall whether he has said this or not.
13      Q.   Mr. Peng, I'm going to hand
14  you a document that is Bates numbered TG
15  0025222 through TG 0025223.
16      MR. SPANO:  Do you have the
17      translation?
18      MR. BRENNER:  (Handing over
19      document.)
20      I've got my translation.
21      THE WITNESS:  I see that.
22      MR. BRENNER:  Let me place
23  on the front page Exhibit Number
24  13.

Page 398

1           - - -
2       (Whereupon, Deposition
3   Exhibit Peng-13, Report in Chinese
4   by Peng Wenlong dated July 27,
5   2009, Bates stamped TG 0025222
6   through TG 0025223, was marked for
7   identification.)
8           - - -
9   BY MR. BRENNER:
10      Q.   This is an exhibit produced
11  by your counsel in the litigation.
12      MR. BRENNER:  Translate
13      that.
14      THE WITNESS:  What do you
15      mean?
16  BY MR. BRENNER:
17      Q.   Your lawyers produced this
18  document in the current litigation.
19      A.   This is a document we
20  produced to our attorney under the
21  guidance of our attorney.
22      Q.   Did you prepare this
23  document, Mr. Peng?
24      A.   Yes, I prepare this.

Page 399

1       Q.   Turn to the second page of
2   the document, sir.
3       A.   After this question, is it
4   possible for me to go to the bathroom, or
5   let me go now, or after I finish
6   answering this question, either way.
7       MR. BRENNER:  I'd like a
8   discussion with Mr. Spano. I'm
9   happy to let him take a bathroom
10  break provided there's no
11  discussion between the witness and
12  counsel during the bathroom break.
13      MR. SPANO:  Fine.
14      MR. BRENNER:  Is that
15  agreed?
16      MR. SPANO:  Sure.
17      THE VIDEOTAPE TECHNICIAN:
18  The time now is approximately 4:22
19  p.m., and we are now off the
20  record.
21      THE WITNESS:  I understand.
22  I understand.
23          - - -
24      (Whereupon, a recess was

Page 400

1    taken from 4:22 p.m. until
2    4:28 p.m.)
3         - - -
4         THE VIDEOTAPE TECHNICIAN:
5    This begins Tape 7 of today's
6    deposition. The now is
7    approximately 4:28 p.m., and we're
8    back on the record.
9    BY MR. BRENNER:
10       Q.   Mr. Peng, you have Exhibit
11   13 before you?
12       A.   I see that.
13       Q.   You prepared this report
14   July 27, 2009?
15       A.   Yes.
16       Q.   At the time, you were an
17   employee of TG?
18       A.   I was an employee of TG
19   Company.
20       Q.   And is it true, sir, that
21   the title of this report is "Taishan
22   Gypsum Company Limited Export Report"?
23       A.   This report, the meaning for
24   this report is, this is a report that we

Page 401

1    send to the city of Tai'an for the Bureau
2    of Inspection and Quarantine. This
3    report mainly is to introduce about TG
4    Company on the following matters, the
5    production --
6         MR. BRENNER: I'm going to
7    object. Excuse me.
8         THE WITNESS: -- the
9    production, the delivery of the
10   goods of the 12.7 mm drywall of
11   the situation.
12        MR. BRENNER: And I'm going
13   to object to the witness further
14   answering.
15   BY MR. BRENNER:
16       Q.   My question, sir, is, was
17   the title of this report "Taishan Gypsum
18   Company Limited Export Report"? That's
19   my only question to you.
20       A.   Then I will briefly answer
21   your question. So, this is a report for
22   the Bureau of Inspection and Quarantine
23   in the city of Tai'an. This report is
24   about our company regarding the

Page 402

1    production, the sales of the 12.7 mm
2    drywalls. This is the content.
3         Q.   Mr. Peng, answer my
4    question. Is the title of this report
5    Taishan Gypsum Company Limited Export
6    Report? That question asks for a yes or
7    a no answer.
8         A.   The title of this report is
9    like this, but the content of this report
10   is like what I mentioned earlier.
11        Q.   Mr. Peng, in preparing this
12   report for the Bureau of Inspection and
13   Quarantine in the city of Tai'an, did you
14   realize that it was important for you to
15   prepare an accurate report?
16        A.   For sure. I make
17   preparations seriously.
18        Q.   If you would turn to the
19   second page of the report, starting at
20   the fourth line.
21        A.   I see that.
22        Q.   You reported that after
23   October 2006, you repeatedly requested
24   Venture Supply to place follow-on order.

Page 403

1    Is that correct?
2         A.   In this report, yes, this is
3    the way I wrote it in Chinese.
4         Q.   And is it also true that in
5    this report, you stated that "Mr. Phillip
6    Perry replied that our plasterboard after
7    arriving at the destination" of
8    "(Norfolk, Virginia) was well received by
9    the market"?
10        A.   Well, just like what I
11   mentioned earlier, I also hope the
12   Venture Supply company can buy more goods
13   from my company. Mr. Phillip said after
14   our goods arrived to the port that is
15   Norfolk, Virginia, I put a bracket
16   inside, we got this information from the
17   agent of the shipping company. After we
18   got this information, I put this
19   inside -- this information inside the
20   letter with a bracket. This statement
21   I'm making, I'm just trying to say that
22   there's no -- we don't have any bad
23   response from our customers. Sorry. We
24   don't have any response from our

Page 404

1 customers that are no good.
2      MR. BRENNER: I'm going to
3 offer the translation of Exhibit
4 13 into evidence as Exhibit 14.
5      - - -
6      (Whereupon, Deposition
7 Exhibit Peng-14, Translation of
8 Exhibit 13, "Taishan Gypsum Co.,
9 Ltd. Export Report," was marked
10 for identification.)
11      - - -
12 BY MR. BRENNER:
13   Q.  Mr. Peng, is it true that
14 you informed Mr. Perry that if Venture
15 Supply would purchase 300,000 sheets of
16 drywall a month that it would be
17 considered as an exclusive dealership for
18 TG in the United States?
19      MR. SPANO: Objection. I
20 would like to reserve our
21 objections to the admission of
22 Exhibit 14.
23      INTERPRETER 2: Correction.
24 The interpreter interpret

Page 405

1 "dealership" into "agent."
2      INTERPRETER 1: "Sole agent"
3 and "exclusive dealership," it's
4 the same word in Chinese.
5      MR. CHEN: We just wanted to
6 make sure that was what you were
7 asking.
8      MR. SERPE: That's close
9 enough.
10      INTERPRETER 1: Exactly the
11 same word in Chinese. So, when I
12 --
13      MS. BASS: Okay.
14      MR. SERPE: That's fine.
15      MR. BRENNER: Has the
16 witness answered the question?
17      THE COURT REPORTER: No.
18      - - -
19      (Whereupon, the following
20 portion of the transcript was read
21 by the court reporter:
22     "Q. Mr. Peng, is it true
23 that you informed Mr. Perry that
24 if Venture Supply would purchase

Page 406

1     300,000 sheets of drywall a month
2     that it would be considered as an
3     exclusive dealership for TG in the
4     United States?")
5      - - -
6      (Interpreter repeats the
7     question.)
8      THE WITNESS: Mr. Phillip
9     Perry, when he was in my company
10     talking about business, he did
11     mention he wanted --
12      INTERPRETER 1: The witness
13     pause.
14      THE WITNESS: -- could
15     Venture Supply become the agent of
16     TG? At that point, we consider,
17     first of all, that is because the
18     customer wants to have a lower
19     price that is for the purpose to
20     complete the deal. At that time,
21     we consider it would be impossible
22     for us to set up, to have an agent
23     in the United States. We also did
24     not want to do this. But because

Page 407

1     (pause) but also we cannot say
2     (pause) we are not an agency
3     company (pause) if we did not give
4     that to Mr. Phillip, probably that
5     order of Mr. Phillip (pause) he
6     would not purchase that order from
7     us.
8 BY MR. BRENNER:
9   Q.  My last question to you, Mr.
10 Peng.
11     Is it true that the samples
12 that were shipped by TG to Venture
13 Supply, the shipping of the samples was
14 paid by TG?
15      MR. SPANO: Objection to
16     form, lack of foundation.
17      THE WITNESS: I remember,
18     Mr. Phillip bring up the request
19     for the sample, but at that time,
20     Mr. Phillip was unable to go back
21     to the United States immediately,
22     therefore, he requested that we
23     ship it. At that time, the
24     request from us was that the

Confidential - Subject to Further Confidentiality Review

Page 408

1    shipment fee would be paid by
2    Venture Supply.  But eventually
3    who pay for that shipment cost, I
4    don't recall.
5        MR. BRENNER:  Mr. Peng, I
6    have many other questions for you,
7    but as Mr. Hardt said, in the
8    interest of allowing others to ask
9    questions, I will pass the witness
10   for now and reserve my rights to
11   continue.
12            - - -
13        EXAMINATION
14            - - -
15   BY MS. EISELEN:
16       Q.   Good afternoon.  Mr. Peng.
17   My name is Carlina Eiselen.  I represent
18   a company called Interior/Exterior.
19       A.   Good afternoon.
20       Q.   Good afternoon.
21            Yesterday you told us that
22   customers in Canada, Panama and Africa
23   requested drywall in the measurements of
24   feet and inches.

Page 409

1        MR. SPANO:  Objection to
2    form, mischaracterizes the
3    testimony.
4        THE WITNESS:  I insist on my
5    answer yesterday.
6    BY MS. EISELEN:
7        Q.   That's fine.
8            Can you tell me which
9    customers in Canada requested
10   measurements in feet and inches of
11   drywall?
12       MR. SPANO:  And note my
13   objection to the form of the
14   question.
15       THE WITNESS:  Regarding
16   this, I cannot recall exactly
17   which company in Canada.  I was
18   saying that it is possible for
19   customers in Canada, in Panama and
20   Africa to use the measurement of
21   feet for the drywall.  It is the
22   information I obtained through the
23   communications with the companies
24   in China and with the import and

Page 410

1    export companies.  After
2    communicating with these
3    companies -- I mean, after the
4    communications, after the
5    exchange, therefore, we concluded
6    that these companies are possible
7    to use the measurement by the feet
8    for the drywalls.  Finish.
9    BY MS. EISELEN:
10       Q.   Sir, do you know a company
11   called Metro Resources Corporation?
12       A.   I don't know.
13       Q.   Do you know a gentleman by
14   the name David Zhang or Zhang, Z-H-A-N-G?
15       INTERPRETER 1:  Z-H-A-N-G,
16   right?
17       MS. EISELEN: Z-H-A-N-G, yes.
18       INTERPRETER 1:  Zhang can be
19   translated in many ways, but one
20   of the ways -- do you mind I
21   tell -- I'm not speculating.  I'm
22   just stating there are many.
23       THE WITNESS:  This name is
24   very common.  I don't know who

Page 411

1    you're referring to exactly.
2    BY MS. EISELEN:
3        Q.   Fair enough.
4            Do you know if TTP ever gave
5    a David Zhang of Metro Resources quality
6    reports on ASTM standards?
7        A.   Okay.  During the period
8    between 2006 to 2007, during that time
9    when we were producing and selling 12.7
10   mm drywalls, at that time, we would
11   provide the inspection report of ASTM
12   1396 to the customer according to the
13   request of the customer.  I mean, these
14   reports are provided by TTP.  When the
15   customers, they make such a request for
16   this inspection report, we would provide.
17   But for sure, I am unable to recall to
18   which company, to which person we provide
19   this inspection report.
20       MS. EISELEN:  Is he
21   finished?
22       THE WITNESS:  Finished.
23            - - -
24       (Whereupon, Deposition

Confidential - Subject to Further Confidentiality Review

Page 412

1   Exhibit Peng-15, E-mail dated
2   5/24/2006 with attachment, Bates
3   stamped INT/EXT 01180 through
4   INT/EXT 01182, was marked for
5   identification.)
6           - - -
7   BY MS. EISELEN:
8       Q.   Sir, I'm going to hand you
9   what I'm going to label as Exhibit 15.
10          MR. EISELEN: This is, for
11  the record, Interior/Exterior
12  01180 through 01182.
13          Counsel, for your record.
14          (Handing over document.)
15  BY MS. EISELEN:
16      Q.   Sir, the first page is an
17  original e-mail from David Zhang to my
18  client, Jim Geary of Interior/Exterior.
19  And it says on the subject line, "quality
20  report." And for your understanding, the
21  message of the e-mail says, "Jim:
22  Attached testing report is for your
23  reference.  If Chinese plant couldn't
24  pass this test, they couldn't stamp 'MADE

Page 413

1   IN CHINA, MEET OR EXCEED ASTM C1396 04
2   STANDARD.'  This testing report expiring
3   date is on February 15, 2007.  Regards,
4   David."
5       A.   Let me look at it.
6           MR. SERPE:  I would like the
7   record to reflect that the witness
8   has requested the opportunity to
9   read the Exhibit 15, which has
10  been placed in front of him,
11  which, as the document will speak
12  for itself, is plainly written in
13  English.
14          (Witness reviewing
15  document.)
16          MR. CHEN: I also note that
17  the interpreter has not translated
18  the contents that Ms. Eiselen read
19  on to the record.
20          MS. EISELEN:  Stephanie,
21  would you please translate.
22          THE WITNESS:  I finished
23  reading these statements.
24          INTERPRETER 1:  He finished

Page 414

1   reading.  Do I still need to
2   translate?
3           MS. EISELEN: No, it's okay.
4   BY MS. EISELEN:
5       Q.   Mr. Peng, attached to this
6   e-mail was two inspection certificates.
7   If you'll turn to Page 2, the second
8   page.  This is the test report from
9   Tai'an Taishan Plasterboard, and it has a
10  delivery date of February 12, 2006?
11      A.   I see this.  Is there any
12  question?
13      Q.   Do you know how David Zhang
14  of Metro Resources received this, these
15  two certificates?
16          MR. CHEN:  By the way, these
17  two -- I just wanted to note that
18  your earlier comment beforehand
19  was not translated either.  But
20  now go ahead, please.
21          INTERPRETER 1:  The witness
22  testified before the interpreter
23  had a chance to interpret it.
24  Therefore, I did not have a chance

Page 415

1   because the answer was provided
2   already.
3           - - -
4           (Whereupon, the following
5   portion of the transcript was read
6   by the court reporter:
7           "Q.  Do you know how David
8   Zhang of Metro Resources received
9   this, these two certificates?")
10          - - -
11          MR. SPANO:  Object to the
12  form of the question and the lack
13  of foundation.
14          THE WITNESS:  I don't know.
15  BY MS. EISELEN:
16      Q.   Mr. Peng, you earlier
17  testified that TTP was established in
18  February 2006; is that correct?
19      A.   On the business license, the
20  date was February 2006.
21      Q.   Did TTP begin actual
22  production of drywall on February 1st of
23  2006?
24      A.   I did not hear the question

49 (Pages 412 to 415)

Confidential - Subject to Further Confidentiality Review

Page 416

1 clearly.
2          MS. EISELEN:  Stephanie,
3 would you mind repeating the
4 question.
5          INTERPRETER 1:  Sure.
6          (Interpreter repeats
7 question.)
8          THE WITNESS:  When TTP was
9 established (pause) on the
10 business license, license was the
11 date February 1st.  After that
12 date, we go to the Bureau of
13 Industry and Commerce to apply to
14 use this name.  And the Bureau of
15 Industry and Commerce approved us
16 to use this name.  During this
17 period of time, the production
18 lines of TTP were under
19 adjustment.  So, during this
20 adjustment period for production
21 line, we did produce different
22 measurements of the product.  For
23 example, 9.0, 9.5 or 12 or 12.7
24 mm, of course these are parts of

Page 417

1 products.  I cannot tell all these
2 products, different length and
3 different width.
4          MS. EISELEN:  Is he
5 finished?
6          THE WITNESS:  Finished.
7          MR. SPANO:  Counsel, it is
8 after 5:00.  How much more do you
9 have?
10          MR. EISELEN:  Just a few.
11 And I understand that my other
12 colleagues have been waiting quite
13 a while, and so I will wrap my
14 questioning up very quickly.
15          MR. SPANO:  We have limited
16 time, so...
17 BY MS. EISELEN:
18     Q.    Mr. Peng, it's my
19 understanding that TG sold its production
20 line on February 20th, 2006 to TTP or
21 there was a transfer of the production
22 line on February 20, 2006 to TTP.  Is
23 that your understanding?
24     A.    Regarding all these matters

Page 418

1 between TTP and TG, I did not have any
2 information.  I did not participate.  I
3 did not know, and I'm not sure.
4          MS. EISELEN:  Mr. Peng, I'm
5 going to pass, and I thank you for
6 your time.  I'm going to pass the
7 witness to my colleagues.  I do
8 object to the termination of this
9 and reserve all of my rights and
10 Interior/Exterior's rights for
11 later on.  Thank you, Mr. Peng.
12          - - -
13          EXAMINATION
14          - - -
15 BY MR. CLARK:
16     Q.    Hello, Mr. Peng.  My name is
17 Matthew Clark.  I represent Southern
18 Homes, a Louisiana home builder.
19     A.    How are you?
20     Q.    Very well, thank you.
21          Are you aware of a hurricane
22 named Katrina that struck the United
23 States and particularly Louisiana?
24          MR. SPANO:  Objection to

Page 419

1 form.
2          THE WITNESS:  I don't know
3 about the situation that you're
4 talking about, but I did hear
5 about at that time that there had
6 to be a hurricane or the high
7 winds, but I did not have much
8 understanding, I did not know the
9 name, and I did not know the
10 impact.
11 BY MR. CLARK:
12     Q.    Did anyone tell you about a
13 need for drywall or other TTP products
14 that came from Hurricane Katrina?
15          MR. SPANO:  Objection to
16 form.
17          THE WITNESS:  I am not clear
18 about the question.  I did not
19 hear clearly.
20          (Interpreter repeats the
21 question.)
22          THE WITNESS:  How do you say
23 this, a need for drywall or other
24 TTP products?

50 (Pages 416 to 419)

Confidential - Subject to Further Confidentiality Review

Page 420

1   BY MR. CLARK:
2        Q.   Hurricane Katrina caused
3   property damage in Louisiana, homes were
4   destroyed.  In order to rebuild homes,
5   drywall was needed.  Are you aware of
6   that need?
7            MR. SPANO:  I object to the
8        form of the question.  It's also
9        beyond the scope of his --
10           THE WITNESS:  I am not sure.
11           MR. SPANO:  -- deposition
12       designations.  It's almost a
13       quarter after 5.  We need to
14       conclude the deposition by around
15       5:30.  So, let's stick to
16       questions that are relevant to the
17       issues of personal jurisdiction.
18           MR. HARDT:  That's relevant
19       to sales clearly, what he's
20       designated to testify to.
21   BY MR. CLARK:
22       Q.   Did you contact anyone in
23   Louisiana about selling drywall after
24   2005?

Page 421

1            MR. CHEN:  Objection to the
2        translation.  Stephanie, the way
3        it's asked is, "did you contact
4        anyone?"  And the way that she's
5        translated is, "did you have
6        contact with anyone?"  One is
7        suggesting him affirmatively
8        contacting, the other suggesting
9        any kind of contact, just for note
10       of clarification.
11           MR. CLARK:  I'm not sure how
12       to correct it in Chinese, but if
13       you --
14           INTERPRETER 1:  Objection.
15       The Chinese doesn't have that type
16       of grammar that you're referring
17       to.
18           MR. CHEN:  I think you're
19       wrong, but in any case --
20           MR. CLARK:  Can you give her
21       a helpful suggestion she can
22       consider.
23           MR. CHEN:  What are you
24       trying to ask is the question?

Page 422

1            MR. CLARK:  I'm trying to
2        ask him if he contacted any
3        American company.
4            MR. CHEN:  Then for the
5        interpreter's consideration, I
6        would suggest ni you mei you lian
7        luo guo and so on.
8            MR. CLARK:  Would you please
9        try it again with his suggestion.
10           INTERPRETER 1:  No problem.
11       It is the same word.  I am more
12       than happy to use that.
13           (Interpreter repeats the
14       question.)
15           MR. CHEN:  Objection.  She
16       used the same term she used
17       originally.
18           INTERPRETER 1:  Thank you.
19       Yeah, I used the word provided by
20       Mr. Chen.
21           MR. CLARK:  Can you just ask
22       him to answer the question, if he
23       can, please.
24           MR. SPANO:  Object to the

Page 423

1        form of the question.
2            THE WITNESS:  I did not take
3        the initiative to contact those
4        people of that state, that
5        Louisiana.  I did not contact the
6        people there.  After the year
7        2009, it was certain that some
8        people from foreign countries come
9        to our company.  They were from
10       the United States, but I cannot
11       recall where from the United
12       States.
13           INTERPRETER 2:  Correction.
14       The witness said after 2005.
15           INTERPRETER 1:  What?
16           INTERPRETER 2:  The witness
17       said after 2005.
18           INTERPRETER 1:  I did say
19       that.
20           MR. CLARK:  You said 2009.
21           INTERPRETER 1:  2005.  I
22       have it on my notes.
23           THE COURT REPORTER:  You
24       said 9.

51 (Pages 420 to 423)

Confidential - Subject to Further Confidentiality Review

Page 424

1    INTERPRETER 1: I'm sorry.
2    I have 5.
3    BY MR. CLARK:
4        Q.   Who contacted you?
5        MR. SPANO:  Objection to
6    form.
7        THE WITNESS: I don't
8    understand "contact." I don't
9    understand.  Can you tell me more
10   concretely.
11   BY MR. CLARK:
12       Q.   You testified earlier that
13   someone mentioned to you Hurricane
14   Katrina or the high winds that we've been
15   discussing.  Who did that?
16       MR. SPANO:  Objection to
17   form.  It mischaracterizes the
18   testimony also.
19       THE WITNESS:  I know that
20   there has been the blowing of the
21   wind, but I don't know which
22   name -- which one or what name.
23   BY MR. CLARK:
24       Q.   Earlier you testified that

Page 425

1    shipping invoices would have been written
2    by TTP for purposes of tax reporting in
3    China.  I'm going to show you an invoice
4    and ask that you tell me whether this is
5    such an invoice?
6        MR. CLARK:  I'll mark it as
7    16.
8        - - -
9        (Whereupon, Deposition
10   Exhibit Peng-16, Invoice, Tai'an
11   Taishan Plasterboard Co., Ltd.,
12   dated July 3, 2006, Bates stamped
13   TG 001936, was marked for
14   identification.)
15       - - -
16       MS. BASS:  Is there a Bates
17   Number?
18       THE WITNESS:  There was some
19   background noise.  I cannot hear
20   clearly.
21       INTERPRETER 1:  The
22   interpreter says she will repeat
23   it to him.
24       (Interpreter repeats

Page 426

1    question.)
2        MR. SPANO:  Object to the
3    form of the question, and it
4    mischaracterizes the testimony.
5        MR. CLARK:  For the record,
6    this is document number TG 001936.
7        THE WITNESS:  I see this
8    document.
9        MR. CLARK:  Is he finished?
10       THE WITNESS:  Not finished
11   yet.
12       (Witness reviewing
13   document.)
14       THE WITNESS:  I finish
15   reading this.
16   BY MR. CLARK:
17       Q.   Is it a TTP document?
18       A.   According to the content of
19   the document, it should be made by TTP.
20       Q.   Is this the type of document
21   that TTP would write for tax reporting
22   purposes?
23       A.   No.  This is mainly for the
24   customers.  It is for the customers to

Page 427

1    look -- this is according to the request
2    of the customers.  This is for the
3    purpose of them to receive the goods.
4        INTERPRETER 2:  Correction.
5    For the purpose of the customer
6    when they pick up the product.
7        INTERPRETER 1:  No.  Purpose
8    of them.
9        MR. CLARK:  It's okay.  I
10   have another question.
11       INTERPRETER 1:  The same
12   thing.
13   BY MR. CLARK:
14       Q.   So, that document reflects a
15   TTP sale, correct?
16       A.   This is an invoice issued
17   according to the requirement of the
18   customers.  Of course, on this invoice,
19   we would have the details of the
20   description of the goods and the quantity
21   and the price.  Any other information, we
22   would write or make it clear according to
23   the requirement of the customers,
24   according to different customers.

52 (Pages 424 to 427)

Confidential - Subject to Further Confidentiality Review

Page 428

1 Finished.
2      Q.    Does that document represent
3 a completed sale?
4      A.    You cannot say that.  Do you
5 need me to explain?
6      Q.    Another question.
7          Did TTP issue that document
8 for the purpose of being paid?
9      A.    You cannot say that.  This
10 is not accurate.
11      Q.    Did TTP issue that document
12 after drywall was shipped?
13          MR. SPANO:  Objection to
14 form.
15          It's 5:30, we need to
16 conclude this.  How much more do
17 you have?
18          MR. CLARK:  I have one other
19 type of form that I would like him
20 to explain to me because I don't
21 know what it is.
22          MR. SPANO:  Then that will
23 be it.
24          THE WITNESS:  This type of

Page 429

1 invoice, sometimes we would issue
2 it before the transaction was
3 completed.  This is to show to the
4 customer the price, the
5 description of the product, and
6 certain information for
7 references.  Sometimes during the
8 transaction, we would issue this
9 according to the requirement of
10 the government, the customs or
11 different departments.  And
12 sometimes after the transaction is
13 finished for the convenience of
14 the customers to pick up the
15 goods, we would also issue these
16 type of documents.
17 BY MR. CLARK:
18      Q.    Finished?
19      A.    Finished.
20          MR. CLARK: One other
21 document to show you.  For the
22 record, it's Bates labeled TG
23 0020107.  It's called a
24 counterfoil.  I've marked it

Page 430

1 Exhibit 17.
2          - - -
3          (Whereupon, Deposition
4 Exhibit Peng-17, Document
5 entitled, "Counterfoil, Tai'an
6 Shandong Province Special Invoice
7 for Export," Bates stamped TG
8 0020107, was marked for
9 identification.)
10          - - -
11          MR. SPANO:  The record
12 should reflect that this piece of
13 paper is partially obscured.
14          MR. CLARK:  That's how it
15 was produced.
16 BY MR. CLARK:
17      Q.    Would you ask him to please
18 take a look at the document and describe
19 to me the purpose of it.
20      A.    (Witness reviewing
21 document.)
22          I see this document.  Mr.
23 Attorney, what is your question?
24      Q.    What is the purpose of that

Page 431

1 document, and is it a TTP document?
2          MR. SPANO:  Objection to
3 form.
4          THE WITNESS:  Yes, this is a
5 TTP document.  However, I cannot
6 see everything here, and I think
7 it should be the case, but I
8 cannot make -- I cannot be sure.
9 BY MR. CLARK:
10      Q.    Is this a common type of
11 document that TTP would write?
12          MR. SPANO:  Objection to
13 form.  Objection.
14          THE WITNESS:  This type of
15 document, this is according to the
16 requirement of our local tax
17 bureau that we issue this type of
18 invoice.  This type of invoice has
19 a fixed format.  This format comes
20 from the tax bureau, and we cannot
21 change it.  We filled in the
22 content according to the format of
23 this invoice.
24 BY MR. CLARK:

53 (Pages 428 to 431)

Confidential - Subject to Further Confidentiality Review

Page 432

```
 1     Q.    Is he finished?
 2     A.    Finished.
 3     Q.    Do you recognize the
 4  purchaser listed on that form?
 5            MR. SPANO:  Objection to
 6  form.
 7            THE WITNESS:  I don't
 8  recognize the purchaser.  But
 9  under the guidance of my attorney,
10  I did have an understanding of
11  this type of knowledge.  This
12  customer was being led by an
13  agent, a middleman in Hangzhou
14  city of China.  This middleman
15  bring this customer to our
16  company, TTP, to talk business.
17  Finished.
18  BY MR. CLARK:
19     Q.    Which of your colleagues at
20  TTP handled transactions with that
21  customer?
22            MR. SPANO:  Objection to
23  form.
24            THE WITNESS:  I don't recall
```

Page 433

```
 1  whether it is manager, Mr. Che, or
 2  manager, Mr. Yang.
 3            MR. SPANO:  That's it.
 4  We're done.
 5            THE VIDEOTAPE TECHNICIAN:
 6  The time now is approximately 5 --
 7            MR. CLARK:  Thank you for
 8  your time.  I have several more
 9  questions for you, but it looks
10  like those will be reserved for
11  another day.
12            MR. SPANO:  Off the record.
13            MR. PANAYOTOPOULOS:  Are you
14  terminating the deposition?
15            MR. SPANO:  This deposition
16  is concluded as agreed.
17            MR. PANAYOTOPOULOS:  Agreed
18  by whom?
19            MR. SPANO:  As agreed by us
20  and the PSC.
21            MR. PANAYOTOPOULOS:  I'm not
22  on the PSC, and I've not had an
23  opportunity to ask any questions
24  on behalf of my client.  I
```

Page 434

```
 1  understand you guys unilaterally
 2  are terminating this deposition.
 3  I thought I was going to get a
 4  chance to at least ask some
 5  questions so we get somewhere and
 6  get started.  I knew I wouldn't be
 7  able to finish it tonight, but I'd
 8  just note for the record my
 9  client, on behalf of my client, I
10  have not had a chance to ask a
11  single question.
12            MR. ALLELY:  I'm Greg Allely
13  on behalf of the State of
14  Louisiana.  I have a few questions
15  to ask.  I hoped that I'd be able
16  to have a chance to ask them
17  today.  We did come many thousands
18  of miles here, and not to be able
19  to ask any questions at all when
20  the deposition was noticed to
21  continue until completed the
22  entire week even into Saturday is
23  unreasonable and unfair.  I would
24  ask that you reconsider and allow
```

Page 435

```
 1  us to ask ten minutes of questions
 2  on my behalf.
 3            MR. SERPE:  Anyone else?
 4            MR. HARDT:  Lastly, I'm Ken
 5  Hardt on behalf of Venture and
 6  Porter-Blaine.  I'm here in the
 7  Germano action.  I noticed these
 8  depositions separately in the
 9  Germano action.  I wasn't a part
10  of the agreement between the PSC
11  and Taishan on these depositions.
12  My notice of deposition said
13  beginning, I believe, April 4th,
14  which was the first day of
15  depositions, until completed.  A
16  lot of folks have come a lot of
17  way, and we had no control over
18  the PSC and the amount of time
19  they took in questioning the
20  witnesses.  So, the fact that this
21  is being unilaterally terminated
22  by Taishan, at least as far as
23  we're concerned, gives us grounds
24  to move to reopen these
```

54 (Pages 432 to 435)

Confidential - Subject to Further Confidentiality Review

Page 436

1   depositions at the cost of Taishan
2   in the United States.
3        MS. EISELEN:  This is
4   Carlina Eiselen.  I represent
5   Interior/Exterior.  I also
6   cross-noticed this deposition in
7   the MDL.  I am not part of the
8   Plaintiffs' Steering Committee.  I
9   don't have an agreement with
10  Taishan, and I note that I object
11  to the conclusion of this
12  deposition and expect to be able
13  to come back and question Taishan
14  at a later time.
15       MR. SERPE:  On behalf of the
16  PSC, I don't want our silence to
17  be an assent to the concept that
18  we agree that the deposition is
19  concluded.  We feel that there
20  have been inadequacies with
21  document productions and other
22  problems with the deposition.  We
23  reserve our rights to reopen the
24  deposition as well.

Page 437

1        MS. BASS:  Similarly, on
2   behalf of the Home Builders
3   steering committee, in light of
4   the fact that there were documents
5   that were just produced and never
6   translated just prior to the
7   deposition, contrary to the
8   outstanding Request for
9   Production, we also object and
10  reserve our rights to come back or
11  to have the witness brought to the
12  United States so we have the
13  opportunity to complete our
14  deposition.
15       MR. BRENNER:  On behalf of
16  Tobin, as stated on the record,
17  there are many more questions that
18  went directly to the issue of
19  jurisdiction that we were not able
20  to ask out of the understanding
21  that others would need to ask some
22  questions before Taishan
23  terminated this deposition.
24       MR. SLAUGHTER:  This is

Page 438

1   Brian Slaughter for Atlantic
2   Homes, and without belaboring it,
3   we join in the objections raised
4   via the parties.  We, likewise,
5   are not a part of the PSC and have
6   no control over that, and we
7   object to these being terminated
8   at this time, and we will reserve
9   all our rights.
10       MR. SPANO:  On behalf of the
11  defendants Taishan Gypsum Company
12  Limited and Tai'an Taishan
13  Plasterboard, we have a lot to say
14  in response to these statements,
15  and we'll do so at the appropriate
16  time.  But at this point, we'll
17  just state that we've made our
18  clients available for six days of
19  depositions, and there was ample
20  opportunity for all questions
21  relevant to personal jurisdiction.
22  This deposition is now concluded,
23  and I thank everyone and wish them
24  all a safe flight home.

Page 439

1        MR. PANAYOTOPOULOS:  I just
2   want to make sure.  You are not
3   disagreeing with any of the
4   statements that I made on the
5   record about us having no
6   agreement that you could
7   unilaterally terminate the
8   deposition without me asking
9   questions?  You are not -- you
10  agree that we have not -- we do
11  not have the agreement that you
12  can unilaterally terminate the
13  deposition or that I agree to any
14  particular term, right?
15       MR. SPANO:  I don't agree.
16       MR. PANAYOTOPOULOS:  You're
17  saying that we have had some
18  agreement?
19       MR. SPANO:  I'm not
20  discussing it further.
21       MR. PANAYOTOPOULOS:  Well, I
22  just want to make sure that the
23  record is clear.  I've never
24  agreed to anything, and you never

55 (Pages 436 to 439)

Confidential - Subject to Further Confidentiality Review

Page 440

1   even discussed that issue with me.
2   We've separately noticed it.  I
3   don't want any arguments later.
4   You believe that we've got some
5   agreement?
6        MR. SPANO:  What I do
7   believe is that the Court
8   contemplated that there would be
9   one jurisdictional deposition by
10  our client in these matters.
11  That's --
12       MR. PANAYOTOPOULOS:  That's
13  fine.  I just want to make sure
14  that you didn't dispute what I was
15  saying about us not having --
16       MR. SPANO:  That's where I
17  part company with you.
18       MR. PANAYOTOPOULOS:  We
19  disagree, but I understand.  That
20  makes sense.
21       THE VIDEOTAPE TECHNICIAN:
22  The time now is approximately 5:43
23  p.m.  Today's portion of our
24  deposition consisting of 7 tapes

Page 441

1   is now concluded.
2        - - -
3        (Whereupon, the deposition
4   concluded at 5:43 p.m.)
5        - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 442

1                C E R T I F I C A T E
2
3
4        I, LINDA L. GOLKOW, a
     Registered Diplomate Reporter, Certified
5    Court Reporter and Notary Public, do
     hereby certify that, pursuant to notice,
6    the deposition of WENLONG PENG was duly
     taken on April 8, 2011 at 9:02 a.m.
     before me.
7
8        The said WENLONG PENG was
     duly sworn by me through the interpreter
9    according to law to tell the truth, the
     whole truth and nothing but the truth and
10   thereupon did testify as set forth in the
     above transcript of testimony.  The
11   testimony was taken down stenographically
     by me.
12
13       I do further certify that
     the above deposition is full, complete
14   and a true record of all the testimony
     given by the said witness.
15
16
17       Linda L. Golkow
          Registered Diplomate Reporter
18        Certified Realtime Reporter
19
20       (The foregoing certification
     of this transcript does not apply to any
21   reproduction of the same by any means,
     unless under the direct control and/or
22   supervision of the certifying reporter.)
23
24

Page 443

1        INSTRUCTIONS TO WITNESS
2
3
4        Please read your deposition
5   over carefully and make any necessary
6   corrections.  You should state the reason
7   in the appropriate space on the errata
8   sheet for any corrections that are made.
9
10       After doing so, please sign
11  the errata sheet and date it.  It will be
12  attached to your deposition.
13
14       It is imperative that you
15  return the original errata sheet to the
16  deposing attorney within thirty (30) days
17  of receipt of the deposition transcript
18  by you.  If you fail to do so, the
19  deposition transcript may be deemed to be
20  accurate and may be used in court.
21
22
23
24

56 (Pages 440 to 443)