# EXHIBIT A

Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |
|---|---|
| ———————————————— | § MDL NO. 2047 |
| IN RE: | § |
| CHINESE-MANUFACTURED | § SECTION: L |
| DRYWALL PRODUCTS LIABILITY | § |
| LITIGATION | § |
| ———————————————— | § JUDGE FALLON |
|  | § |
| THIS DOCUMENT RELATES TO | § |
| ALL ACTIONS | § MAG. JUDGE |
|  | §   WILKINSON |
| ———————————————— | § |

MONDAY, MAY 16, 2011
- CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

        Videotaped deposition of RONALD E.
WRIGHT, PE, held at the offices of HERMAN HERMAN
KATZ & COTLAR, 820 O'Keefe Avenue, New Orleans,
Louisiana, commencing at 9:03 a.m., on the above
date, before Lori Cobb, Certified Court Reporter
(LA), Registered Professional Reporter, Certified
LiveNote Reporter.

                    — — —

            GOLKOW TECHNOLOGIES, INC.
        ph 877.370.3377 | fax 917.591.5672
                deps@golkow.com

Confidential - Subject to Further Confidentiality Review

1     Q     So when you looked at the Germano homes,

2   you looked at drywall and you looked at plumbing

3   and electrical comments?

4     A     And HVAC, yes.

5     Q     And you were told when you were engaged

6   that there was suspected HVAC problems related to

7   the drywall; right?

8     A     At some point in time, I believe so.

9   I'm not sure if it was prior to or during the time

10  the inspections were going on.

11    Q     Why did you feel it necessary to go and

12  inspect the homes?

13    A     I guess I was asked to come take a look

14  at them, so I went and responded by going to do

15  that.

16    Q     Approximately how many homes were

17  involved?

18    A     I think there were seven or eight total.

19    Q     You went to each of them?

20    A     Yes.

21    Q     Approximately how long did you spend in

22  each of the homes?

23    A     I believe it ranged from 2, sometimes up

24  to 4 hours.

Confidential - Subject to Further Confidentiality Review

1      Q     Have you ever provided any reports or

2   other documentation for remediation and cost

3   estimating purposes where you did not, or someone

4   from your team did not, inspect the home?

5      A     Not that I can recall.

6      Q     And the reason that you or a member of

7   your team inspected the homes prior to providing

8   cost estimating reports was because you needed to

9   see what types of finishes and cabinets and

10   appliances and HVAC systems were actually in the

11   home; right?

12      A     That could be part of what the look was

13   for.  I don't recall that every time would have

14   involved doing that aspect, because sometimes

15   there were contractors involved that would do that

16   aspect.

17      Q     Whether it's your office or a

18   contractor, the simple fact is that you can't do a

19   cost estimate using takeoffs if you don't know the

20   physical structures and components of the home?

21      A     You would definitely need some

22   parameters.  I'm not sure how detailed they would

23   have to be if you had plans, or something else,

24   that could give you the same information.

Confidential - Subject to Further Confidentiality Review

Page 63

1      Q     What type of parameters?

2      A     Well, primarily as-built plans or

3   something that you know would give you that type

4   of information.  You could do the takeoffs without

5   having to see the house in that regard.

6      Q     As-built plans are typically filed at

7   the conclusion of the construction project?

8      A     Yes.

9      Q     If there were changes to the finish of a

10  home, they wouldn't be reflected in as-builts;

11  would they?

12     A     Well, that's the purpose of an as-built;

13  it actually would show you what was done there.

14     Q     I'm sorry, let me be a little bit more

15  precise.

16            If there were changes to the finish of a

17  wall after the as-builts were filed, such changes

18  would not be reflected in the as-builts?

19     A     If it was done after the as-built, that

20  would be correct.

21     Q     If there was a change in the HVAC system

22  after the as-builts were filed, they would not be

23  reflected on the as-builts?

24     A     That would be correct.

Confidential - Subject to Further Confidentiality Review

1      Q     If there was a change in the appliances

2   after the filing of the as-builts, they would not

3   be reflected on such documents; right?

4      A     That would be correct.

5      Q     If there had been a change to the

6   cabinetry in the home, they would not be reflected

7   on the as-builts?

8      A     If it was changed after, that's correct.

9      Q     So in determining a cost takeoff, you

10  could not rely exclusively on the as-builts?

11     A     If the as-builts were correct, yes, you

12  could.  But if they had changes after, they're no

13  longer an as-built.

14     Q     And how would you go about confirming

15  the changes but for looking at the property?

16     A     Then yourself or a contractor, or

17  someone, would look at and see what the finishes

18  were or the different components.

19     Q     As a diligent professional, you would

20  want to make sure that the home as it existed at

21  the time of the remediation or cost estimating was

22  the same as it existed at the time of the filing

23  of the as-built plans; right?

24     A     I missed that.  I'm sorry.

Confidential - Subject to Further Confidentiality Review

Page 65

1       Q    That's fine.  I lost myself.

2            As a diligent responsible professional,

3   you would want to make sure that the as-builts

4   were reflective of the house that you are

5   currently doing cost estimating for?

6       A    For particulars of making sure it

7   matched what you were estimating, yes.

8       Q    And the best way to do that is to

9   physically inspect the property by either you, a

10  member of your staff or a contractor?

11      A    Or you could have owner involvement at

12  that point also.  If you had a set of plans, they

13  would tell you whether things were changed.

14      Q    You would rely on an owner to look at

15  as-built plans and differentiate for you the house

16  as it currently exists from the filed as-built

17  plans?

18      A    It's possible, yes.

19      Q    I understand it's possible.  But would

20  you do it as a reasonable professional?

21      A    It depends on what I think there may be

22  changes on.  If they said no changes, then I would

23  rely upon the plans.

24      Q    Has there ever been an occasion in your

Confidential - Subject to Further Confidentiality Review

1    32 years of practice where you've relied on the

2    owner to make such a call for you in doing cost

3    estimates?

4         A    Not that I can recall.

5         Q    Of the 25 homes for which your office

6    provided cost estimating services, can you tell me

7    the states in which they were located?  Just first

8    generally, and then we'll try and break it down

9    after that.

10        A    From what I recall, I believe there were

11   some in Virginia, North Carolina, Florida,

12   Louisiana and Alabama.

13        Q    Were you personally involved in the

14   Florida inspections?

15        A    In the majority of them, yes.

16        Q    Approximately how many were there in

17   Florida?

18        A    I believe six.

19        Q    Do you recall whether you were involved

20   in an inspection of a home located in Boynton

21   Beach, Florida owned by a Dr. Stevens, a

22   veterinarian?

23        A    Dr. Roberts?

24        Q    Roberts.  Sorry.  I always flip that.

Confidential - Subject to Further Confidentiality Review

Page 77

1         If you would, just give me a summary of
2    your opinions in the declaration as amended that
3    we've talked about.
4         A    That there is a way in which there could
5    be a methodology in place to determine that there
6    is the presence of Chinese drywall or corrosive
7    drywall within a residence, and the impacts it's
8    having within that residence.
9              And from that, then, another methodology
10   can be used to determine what the cost would be
11   for the remediation that's required for that; and
12   from that also what other costs would be involved
13   or needed to take care of that issue.
14        Q    And that's generally what I recall from
15   your declaration.
16             What methodology -- well, first off, are
17   these methodologies developed, or you think -- or
18   was it your belief that they're capable of being
19   developed?
20        A    I believe they're capable of being
21   developed, and that there are a number of things
22   that are already able to be done towards those
23   methodologies.
24        Q    With regard to the first methodology

Confidential – Subject to Further Confidentiality Review

1    that you identified, my shorthand for it was

2    product identification.  Do you understand what I

3    mean by that?

4        A    Yes.

5        Q    And was that roughly the first item you

6    had for a methodology that either existed or is

7    capable of existing?

8        A    Sorry.

9        Q    That's fine.

10            You believe that there is a methodology

11   that could be developed for product identification

12   across the class; right?

13       A    Yes.

14       Q    Tell me what methodology you've

15   currently developed, as well what methodology you

16   think could be developed.

17       A    I believe the methodology of identifying

18   the product would be to know that there had been

19   any kind of shipping records indicating shipping

20   to there; but on top of that, then also doing

21   actual visible ID of the product within the

22   residence.

23       Q    And since I'm counsel for Banner Supply,

24   I'll confine my questions to the Banner Supply

Confidential - Subject to Further Confidentiality Review

Page 80

1    conducted in bulk fashion, as I mentioned, the

2    shipping records would not be dispositive of what

3    street address has Chinese-manufactured drywall;

4    right?

5        A    If that were the case, that's correct.

6    But then they would be taken care of with the

7    physical evidence within the house.

8        Q    The second prong of the product

9    identification methodology you mentioned was a

10   visible identification; right?

11       A    Yes.

12       Q    Elaborate on that, please.

13       A    One would be to look for labels in areas

14   where you could see them from moving insulation,

15   such as, in the attic space, or also with doing

16   some type of burrowscope through the wall to

17   actually visibly identify the labeling on the back

18   side of the board.

19       Q    To identify the product through visible

20   identification, you would want a contractor or

21   other construction professional to conduct

22   identification; right?

23       A    Yes.

24       Q    Are you aware that a number of the homes

Confidential - Subject to Further Confidentiality Review

Page 90

1    contemplated litigation uses of your product

2    identification methodology?

3         MR. LEWIS:

4              Objection; calls for a legal conclusion.

5          Asked and answered.

6              Please answer.

7         THE WITNESS:

8         A    In my regard, I would say no, it's not

9    for litigation purposes to be able to accomplish

10   what I believe is trying to be accomplished.

11   BY MR. SEXTON:

12        Q    The second part of the methodology you

13   developed was for impacts, I think you described

14   it as.  Do you recall that?

15        A    Yes.

16        Q    What is that?

17        A    What impacts the corrosive environment

18   has.

19        Q    How would you go about determining those

20   from your methodology?

21        A    It would be based upon, again, the

22   knowledge that has been gained through the years

23   of testing, and also with what has been found from

24   the corrosive environment to have occurred to

Confidential - Subject to Further Confidentiality Review

1    other building materials of then knowing from the

2    initial testing that there is corrosive drywall

3    there; what the next step has to be.

4         Q    How would you go about determining the

5    impacts of a particular home?

6         A    I think, again, it goes back to if the

7    corrosive environment is there, you've already

8    determined that there is an impact to the house.

9    As to the level that it's impacted, that could be

10   done through looking at the different copper

11   items; such as, wiring or through the HVAC system,

12   other areas and components like that.

13        Q    And the analysis of impacts of your

14   methodology would be conducted by a professional,

15   like yourself, or a contractor?

16        A    For the documentation of some of that,

17   yes, it would be someone comparable to either what

18   I would do or a contractor.

19        Q    As I heard your opinions earlier, you

20   had essentially two methodologies; the first one

21   was what we just discussed, product identification

22   and impacts.  Was there anything else part of that

23   first methodology?

24        A    Not that I can think of, no.

Confidential - Subject to Further Confidentiality Review

1      Q     I'm just trying to understand your

2  second methodology.  The first bullet I have under

3  your second methodology is the scope of required

4  remediation, and I was hoping you would elaborate

5  on that -- or maybe that's as far as it's been

6  developed today; I don't know.

7      A     It would be, again, very similar to what

8  has been implemented on remediations to date, such

9  as what I testified in the Germano case about;

10  what the scope of repair would have to be for

11  addressing the corrosive drywall environment.

12           It would be also what other consultants

13  and experts have also implemented as to the way in

14  which the process would be done for accomplishing

15  a remediation.

16      Q     Would this component of your second

17  methodology be conducted on a house-by-house

18  basis?

19      A     It would be one where you would have the

20  parameters of what needs to be done, then you

21  would have to fill in the actual different

22  quantification of that particular residence.  So

23  you would need it to be based off of quantities

24  from the square foot takeoffs, things of that

Confidential - Subject to Further Confidentiality Review

Page 96

1  nature.

2      Q      The square foot takeoffs, that was going

3  off of what we talked about earlier for carpet.

4  For example, you could do the takeoffs based on

5  the square footage of the room that needed new

6  carpet; right?

7      A      Yes.

8      Q      But the remediation protocol that you

9  suggested in Germano is much more than just

10  carpet; right?

11      A      That's correct.

12      Q      It involves replacing all the drywall in

13  the house; right?

14      A      Yes.

15      Q      The cabinetry?

16      A      Yes.

17      Q      The plumbing fixtures?

18      A      Yes.

19      Q      And takeoffs would need to be done for

20  each of those components; right?

21      A      I believe -- and this is where the

22  methodology is not fully developed, but you could

23  go into having subsets of conditions.  So if

24  there's one that has a carpeted floor, then you

Confidential - Subject to Further Confidentiality Review

Page 121

```
 1        Q     You say I can determine the comparable
 2   alternative living costs in Florida by surveying
 3   local moving and rental prices.  Is that an
 4   attempt or a statement by your -- that you can
 5   determine the alternative living costs for anyone
 6   and everyone in Florida?
 7        A     By looking at what the local costs would
 8   be for specific areas, yes.
 9        Q     You wouldn't look at Florida as a
10   monolithic entity for purposes of alternative
11   living costs; right?
12        A     No.  I would not intend it to be that
13   way.
14        Q     Would you break it down by county?
15        A     I would break it down probably by
16   whatever a region that a mover may be able to do,
17   because you could get a unit price through him for
18   a specific geographic area; that may be county or
19   it may be multiple counties.
20        Q     Within Florida, within Miami, would you
21   equate the alternative living costs as being the
22   same or substantially similar for Coral Gables and
23   Hialeah?
24        A     I haven't looked at that yet.  That's
```

Confidential - Subject to Further Confidentiality Review

Page 122

1  something that would be part of the methodology to

2  incorporate to get to that level.

3      Q    You understand that the alternative

4  living costs can vary from neighborhood to

5  neighborhood from block to block?

6      A    For the particular living cost itself,

7  that's a possibility; the moving would be

8  something I believe you would be able to get a

9  broader region than that.

10      Q    If you did a broader region that didn't

11  reflect the economic realities of particular

12  neighborhoods or blocks, you would be

13  overcompensating in some instances and

14  undercompensating in others?

15      MR. LEWIS:

16          Objection; calls for a legal conclusion.

17          Please answer to the best of your

18      ability.

19      THE WITNESS:

20      A    That's a possibility.  But in the

21  methodology, I believe you can get down to a level

22  where you would definitely keep that to a minimum,

23  if not eliminate it.

24

Confidential - Subject to Further Confidentiality Review

Page 123

1    BY MR. SEXTON:

2        Q    As you're sitting here today, have you

3    made any attempt to discern the submarkets within

4    the State of Florida for purposes of alternative

5    living costs?

6        A    No, I have not.

7        Q    You then talk about categories of

8    damages for personal property -- excuse me --

9    personal property damage and loss of enjoyment and

10   use of homes.  Do you see that towards the end of

11   paragraph 6?

12       A    Yes.

13       Q    If you look at Mr. Nunez and Dr. Roberts

14   and determine from there that quote:  My firm,

15   with the assistance of expert statisticians, can

16   design and administer the survey questionnaire in

17   order to determine these damages on a classwide

18   basis.  Unquote.

19            I'm not sure what you meant by that.

20   Can you elaborate?

21       A    That would be able to put it in

22   parameters of, again, you would have a selection

23   of what may be the types of equipment or types of

24   electronics that would be involved, so then you

Confidential - Subject to Further Confidentiality Review

Page 124

1   could be able to get how much an average that

2   would be for a person; but then you would have a

3   survey that the individual would have that would

4   help develop what that would be to their specific

5   house, but you would use the statistics to be able

6   to get to what would be the ranges of dollars for

7   different aspects.

8            That's the methodology I envision would

9   be coming through doing that statistical analysis

10  and getting the information in that way.

11      Q    If these components of damages

12  ultimately need to be confirmed on an

13  individualized basis, what use is the statistician

14  in this?

15      A    You would be able to have the range of

16  cost without having to go in and confirm on each

17  and every location; you would be able to do it

18  through questionnaires, then.

19      Q    Under your methodology or at least what

20  you're saying in this declaration, a homeowner

21  would self-report the personal property damage and

22  you would verify it through the use of statistics?

23      A    It would be the statistics to get you

24  the cost for what that would equate to; they would

Confidential - Subject to Further Confidentiality Review

Page 125

1    tell you as to if they had two TVs, then you would

2    have through the statistical analysis a way that,

3    okay, that equates out to this amount of dollars.

4        Q    Are you looking at the fair market value

5    or the replacement value?

6        A    What was the first one?

7        Q    Fair market value?

8        A    "Fair". I thought you said "fear". I

9    thought fear?

10            It would be replacement, because in the

11   case of a TV you wouldn't be able to get a used TV

12   that matches that.

13       Q    So in the case of personal property, you

14   would always be looking to the replacement value

15   as opposed to the fair market value?

16       A    I believe you would need to, yes.

17       Q    When you were talking about statistics,

18   are you talking about a mere price list of items,

19   like, a 42-inch television equals $650?

20       A    My statistical analysis would envision

21   something along those lines, but have not gotten

22   to the point of having that fully developed in how

23   you would do the different breakdown of

24   components.

Confidential - Subject to Further Confidentiality Review

Page 126

1      Q     How large of a sample would you use

2   within each product type?

3      A     That's where a statistician would have

4   to be utilized to know how far and what it would

5   have to be, so that you're within the confines of

6   his norm on his graph.

7      Q     Would you attempt to compensate for

8   differences in brand?

9      A     Again, I would have to get with a

10  statistician on the variances that would have to

11  be developed through that to understand where and

12  what you would need to do that.

13     Q     So as your methodology sits today, a

14  Radio Shack speaker may be the same as a Bose

15  speaker, but you'll just have to wait and see at a

16  later date; right?

17     A     I don't know that I would agree with

18  that assessment.  It's, again, one that you would

19  have to go through the statistical analysis to get

20  to the break points of what you're doing.

21     Q     Have you consulted with any

22  statisticians to confirm they do what you ask?

23     A     At this point in time, not for this

24  specifically, no.

Confidential - Subject to Further Confidentiality Review

Page 156

1    and do a product identification as you would in an

2    attic; right?

3        A    That's correct.

4        Q    In connection with the remediation of

5    the Germano homes, was there a scope of work or

6    protocol that was either developed by or provided

7    to the contractors actually doing the work?

8        MR. LEWIS:

9            Objection; foundation.

10           Please answer.

11       THE WITNESS:

12       A    That was one that in conjunction, again,

13   with the team of people that were involved in the

14   variety of tasks on that came up with what the

15   scope of repair would be, and it was one in which

16   I conveyed that to the different contractors for

17   their pricing.

18   BY MR. SEXTON:

19       Q    Do you know how long as-builts are kept

20   on county by the -- excuse me.  Let me try it

21   again.

22           Do you know how long as-built plans are

23   kept on file by the various permitting agencies?

24       A    I'm not sure that they actually would

Page 157

1    keep as-builts for residential construction in a

2    local government jurisdiction.  That's usually

3    only with something in a commercial or industrial

4    type setting.

5        Q    You're not a statistician; are you?

6        A    No, I am not.

7        Q    And since you're not a statistician and

8    have not consulted with one in connection with

9    this project, you're not proposing any specific

10   statistical measures or calculations; are you?

11       A    No, I'm not.

12       Q    In your consulting work, you've been

13   retained by insurance companies in the past;

14   right?

15       A    We have had some times where the client

16   was an insurance carrier, yes.

17       Q    Are you familiar generally with the

18   adjusting process of insurance carriers?

19       A    The ones we've been involved in were not

20   really ones that dealt with that aspect, so I'm

21   not sure I would say I'm very familiar with that

22   process.

23       Q    Are you aware of whether it's

24   commonplace for an adjustor to actually visit a