UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

```
-----------------------------------------------------------------x
IN RE:  CHINESE MANUFACTURED          :        MDL NO. 2047
DRYWALL PRODUCTS LIABILITY            :
LITIGATION                            :        SECTION:    L
-----------------------------------------------------------------x
THIS DOCUMENT RELATES TO:             :        JUDGE FALLON
                                      :
Payton v. Knauf Gips KG, et al., No. 09-7628    :        MAG. JUDGE WILKINSON
-----------------------------------------------------------------x
```

**KNAUF DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO
EXCLUDE THE REPORT AND PROPOSED TESTIMONY OF CLASS PLAINTIFFS'
EXPERT, LEE WARONKER, UNDER FEDERAL RULE OF EVIDENCE 702**

The Knauf Defendants[1] submit this memorandum in support of their motion to exclude

the report and proposed testimony of class plaintiffs' expert, Lee Waronker, under Federal Rule

of Evidence 702.

One of the issues in the Chinese Drywall cases is whether a plaintiff can recover stigma

damages in addition to the cost of remediation.  Assuming a plaintiff could overcome the legal

obstacles to such a double recovery,[2] the plaintiff would have to prove, as a matter of fact, that

the value of his or her home is less even after the home is fully remediated.

Mr. Waronker proposes to testify that even after a home has been remediated and

certified to be free of Chinese drywall contamination, each and every such home nevertheless

---

[1]     The Knauf Defendants are those named in the plaintiffs' class certification motion:
Knauf Plasterboard (Tianjin) Co., Ltd., Knauf Plasterboard (Wuhu) Co., Ltd., Guangdong
Knauf New Building Material Products Co., Ltd. and Knauf Gips KG.

[2]     *See*, *e.g.*, *Orkin Exterminating Co., Inc. v. DelGuidice*, 790 So. 2d 1158, 1159 (Fla. Dist.
Ct. App. 2001) ("Diminution in value damages, or stigma damages, not otherwise
provided for in a contract can be awarded in Florida on a breach of contract theory only
in limited circumstances," such as "when the remedy of repair or replacement is
impracticable").

carries a stigma that makes it less valuable.  But Mr. Waronker has done nothing that an appraiser ordinarily would do to test his hypothesis.  He concedes all of the following:

- There is empirical market data available that would show actual prices of homes sold after they were remediated of Chinese drywall.  *See* Tr. 61:4-11.[3]

- The "market data could show something contrary to what [he has] opined … and the only way to know is to look at it."  Tr. 201:21-202:5.

- Analyzing empirical market data "would be a more reliable method to find out if there was stigma damage" in every instance.  Tr. 313:19-315:2.

- Nevertheless, he did not obtain or analyze market data prior to arriving at his "firm" and "final" conclusions because nobody was "willing to pay me to do that."  Tr. 94:19-95:7; 116:23-117:9; 200:12-202:16; 313:19-315:2; 317:20-318:6.

Mr. Waronker's opinions plainly do not derive from "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  Mr. Waronker's report and proposed testimony should be excluded under Rule 702 because plaintiffs cannot show that "'the reasoning or methodology underlying the testimony is scientifically valid,' meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known." *Germano v. Taishan Gypsum Co., Ltd.*, No. 09-6687, slip op. at 4 (E.D. La. Feb. 17 2010) [Rec. Doc. 1090] (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993)).

---

[3]     References to "Tr. __" are to the transcript of the deposition of Lee Waronker, dated May 19, 2011.  Cited excerpts are attached as Exhibit 1.

## I.    MR. WARONKER'S OPINIONS AND METHODOLOGY

Mr. Waronker is a real estate appraiser who is licensed in Florida.  Tr. 29:20-23.  He

opines that every remediated home that is certified to be free of Chinese drywall is less valuable

than a comparable home that never contained Chinese drywall.  Letter from Lee H. Waronker to

Patrick S. Montoya, dated January 24, 2011 ("Report") at ¶ (i)(b) (attached as Exhibit 2); Tr.

275:23-24 ("Yes, I believe with or without that [certification] there's still stigma damage").

According to Mr. Waronker, the "consumers' fear, whether reasonable or not, is recognized in

the real estate and appraisal industry and the stigma damages result in a diminution in value."

Report at ¶ (i)(c).  In addition, Mr. Waronker opines that "[c]onsumer expectations in purchasing

homes do[] not vary significantly from state to state" (Report at ¶ (i)(d)) even though Mr.

Waronker is not licensed in any state other than Florida.  Tr. 31:14-19; 334:17-20.[4]

Mr. Waronker testified that market data is now available that would show actual sales

prices of Chinese drywall homes after remediation.  Tr. 61:4-11.  But, in forming his opinions,

he made no effort to obtain and evaluate that information.  He does not know how many

remediated homes have been put on the market in Florida or Louisiana.  Tr. 61:12-20.  Nor does

he know how many sales of remediated homes have taken place.  Tr. 113:11-13; 115:10-24;

116:6-9.  He has no knowledge concerning the pilot program, which has resulted in the

remediation of homes.  Tr. 46:15-23.  Thus, in forming his opinions, Mr. Waronker did not look

---

[4]    After he submitted his Report, Mr. Waronker received a temporary license from Louisiana, permitting him to visit certain Louisiana properties.  Tr. 29:24-30:13.  Such visits took place only after Mr. Waronker submitted his Report.  Tr. 31:14-19.  Mr. Waronker testified that he did not want to visit homes because that was not "totally necessary" to his opinions.  Tr. 176:21-177:9.  He nevertheless did so at counsel's request.  *Id.*  The visits consisted of "just a lot of driving around to look at homes that had Chinese drywall" and talking with homeowners.  Tr. 177:4-21.

at market data to compare the actual sales prices for remediated homes and homes that never had Chinese drywall even though such information is now available:

> Q.    You could look to see what remediated homes are selling for versus neighboring homes that never had Chinese drywall in the first place; correct?
>
> A.    Yes, you could.
>
> Q.    But you did not do that in offering your opinion B; correct?
>
> A.    In January of '11, no I did not.
>
> Q.    And you haven't done it still to this day; is that correct?
>
> A.    I have not been asked to do it.
>
> Q.    Nor have you done it?
>
> A.    Nor have I done it.

Tr. 94:19-95:7; *see* Tr. 116:23-117:9.

According to Mr. Waronker, he did not review actual sales data because plaintiffs' counsel did not ask him to do so and did not offer to pay him to do so even though information concerning actual sales of remediated homes would be a more reliable method to test his hypothesis:

> Q.    And even though now there's available evidence where you could go out and measure and check on what actually the sales have been to see if your hypothesis is correct, you haven't done any of that; correct?
>
> [Objection]
>
> A.    If you're willing to pay me to do that, or somebody is willing to pay me to do that, I'll be more than glad to.  Nobody has offered to do such.  Until they do, I

don't know about you, but I don't go out and just do things just for fun if it's –

you know, unless it's non-business related.

Q.      The plaintiffs never asked you to do that?

A.      Correct.

Q.      The plaintiffs' attorneys never asked you to do that?

A.      Nobody has asked me to do that, as we speak here today.

Q.      But you understand that that's one way of verifying whether there is

stigma damage in every instance or not; right?

A.      I have testified to that all day today, yes.

Q.      And that would be a more reliable method to find out if there was stigma

damage, would you agree with that?

A.      I would agree with that.

Tr. 313:19-315:2.

Even though he has not looked at empirical sales data that might confirm or refute his

hypothesis, Mr. Waronker nevertheless testified that his sweeping conclusion that all remediated

homes are less valuable than comparable homes that never had Chinese drywall is "firm" and

"final."

Q.      Did you reach any conclusions regarding whether or not there even would

be stigma damages associated with those homes if they were to be remediated?

[Objection]

A.      My conclusion holds firm that if there are two homes side by side and you

have your choice, the one that had to be remediated is going to be less than the

other one.

Q.      And that is despite the fact that you did none of the investigation you said

you'd want to do, like looking at comparable sales in the same neighborhood.

A.      Correct.

* * *

Q.      Okay.  But, of course, the market data could show something contrary to

what you have opined; isn't that correct, and the only way to know is to look at it;

isn't that right?

[Objection]

A.      Once you have that data available, the answer to that question would be

yes.

Q.      And you testified earlier today that you think it is now available?

A.      I think – I have a strong suspicion, a strong possibility that that

information would be available now.

Tr. 200:12-202:11; *see* Tr. 317:20-318:6.

Mr. Waronker's "firm" and "final" conclusion regarding remediated homes is based

solely on his analysis in connection with an appraisal report regarding a single property in

Florida that he submitted in another case in a Florida state court (*Seifart v. Banner Supply Co.*)

one year ago.  As Mr. Waronker explained, "I didn't do an analysis on that short [January 24]

report" independent of the analysis that he did in connection with his Seifart report.  Tr. 69:8-9.

Q.      What new [materials] did you rely on to prepare your January 24th

opinion report that you didn't rely on to prepare Seifart?

A.      Nothing.

Q.      How much time did you put into this new report?  I know you said that

Mr. Montoya's firm drafted it for you.

A.      No time.

Tr. 171:5-12.

Mr. Waronker's *Seifart* analysis was based on his review of articles outside the context of

Chinese drywall and what he calls an "informal survey."  Tr. 344:8-12.  Although one of the

articles produced from Mr. Waronker's files contained proposed standards for conducting

surveys "to ensure that appraisers are in conformance with" Rule 702 (Marcus T. Allen & Grant

W. Austin, *The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge*,

The Appraisal Journal 394, 396 (October 2001) (Waronker Ex. 9) (attached as Exhibit 3)), Mr.

Waronker testified that he did not concern himself with those standards:

Q.      And did you concern yourself with any of those comments that had been

made in these various articles from The Appraisal Journal in conducing your own

survey?

A.      No.

Tr. 82:1-5.  According to Mr. Waronker "[t]here were no guidelines necessary" because "[m]y

survey was very, very simple" and "a very common sense approach."  Tr. 81:4-6.

Mr. Waronker's survey consisted of a single hypothetical:  "if you had two houses side

by side and you had a choice of buying a house that never had Chinese drywall or one that was

remediated, and everything else is exactly the same, which would you buy."  Tr. 81:7-11.  He

posed that hypothetical to three real estate brokers in Florida who he found by searching the

Multiple Listing Services for brokers who had Chinese drywall listings.  Although he testified

that the response to his hypothetical was a "no-brainer" (Tr. 257:13-14), one of the brokers

contradicted his hypothesis: "If the problem has been fixed, then no discounts because it HAD the problem. Problem fixed = home that is just fine." Waronker Ex. 10 (attached as Exhibit 4). When Mr. Waronker followed up on that response, the broker further responded that a remediated home actually might be viewed by a prospective purchaser as more valuable than a home reported never to have had Chinese drywall because "[t]he thought in the back of their minds would be that it could have Chinese drywall." *Id.* Mr. Waronker discounted that further response because he concluded that the broker had misunderstood his hypothetical even though he made no attempt to clarify. Tr. 328:3-19.

Mr. Waronker also posed his hypothetical to "at least two or three dozen" people in Florida consisting of "[f]riends, family, people I just ran into on vacation …." Tr. 82:10-11; 83:7-8.[5] No one from Louisiana was surveyed. Tr. 96:9-17. As Mr. Waronker described his selection process: "It wasn't a question of picking them; it was around before the trial, so it just happened to be anybody that was at the restaurant near me that I might have known, or a friend of a friend, or at a party. It just became typical conversation for that few week period." Tr. 307:7-12. According to Mr. Waronker only one of them was actually a prospective home purchaser at the time of the interview. Tr. 155:2-12. According to Mr. Waronker, the people with whom he spoke said that they would choose the home that never had Chinese drywall over a remediated home. Tr. 81:15-18.

None of the people to whom Mr. Waronker spoke are identified except for the real estate broker who told him that no stigma would be associated with the sale of a remediated home. Tr. 308:5-21. The response of that broker, an email communication, is also the only one that is

---

[5]    Elsewhere Mr. Waronker testified that he spoke with "50 to 100 people." Tr. 342:19-23. The precise number of people with whom he spoke is immaterial.

documented.  Mr. Waronker has no notes of the responses of the other people with whom he spoke.  Tr. 130:21-131:4.

Although, Mr. Waronker also purports to rely for his opinions, in part, on his "experience, knowledge and training" (Report at ¶ (ii)(c)), he has very little experience, knowledge and training in assessing the effect on real estate value of stigma allegedly associated with homes after an environmental contaminant has been removed and any damage caused by the contaminant has been repaired.  He has no special certifications or licenses with respect to assessing the effect of alleged stigma on real estate values, has never written articles on the subject, and has never lectured or otherwise taught on the subject.  Tr. 38:3-39:4; 163:18-24.

In addition, Mr. Waronker has no particular experience, knowledge and training with respect to sales of remediated Chinese drywall homes or lingering effects, if any, of Chinese drywall subsequent to removal and remediation.  He has never talked to prospective purchasers of remediated Chinese drywall homes, experts in Chinese drywall remediation, environmental or industrial engineers about the effects of Chinese drywall contamination and subsequent remediation, or governmental officials from the CPSC, Florida Department of Health or other regulatory agencies regarding Chinese drywall.  Tr. 172:6-173:1.  Nor does Mr. Waronker recall reviewing articles in the trade press regarding stigma allegedly associated with homes constructed with Chinese drywall, although he is "sure there are" such articles.  Tr. 101:2-7.

Based on his *Seifart* analysis, Mr. Waronker concluded that the home at issue in Seifart, which had been remediated shortly after it was constructed, lost value due to stigma.  Based solely on that same analysis – and conducting no further work – he now extrapolates that every home in Florida and Louisiana that had Chinese drywall and has been remediated and certified to be free of Chinese drywall carries a stigma that diminishes its value.  Mr. Waronker did not

attempt to quantify the diminution in value allegedly due to stigma for any or all homes that had been constructed with Chinese drywall.  He testified that quantifying stigma damages would require a "case-by-case" analysis.  Tr. 97:21-98:20.

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Rule 702, this Court must "serve as the gatekeeper for expert testimony and should not admit such testimony without first determining that the testimony is both 'reliable' and 'relevant.'"  *Germano*, slip op. at 4 (quoting *Daubert*, 509 U.S. at 589); *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) ("*Daubert* 'assigned the trial court a gatekeeper role to ensure [expert] testimony is both reliable and relevant'") (citation omitted), *cert. denied*, 130 S. Ct. 1892 (2010).

"Scientific testimony is reliable only if 'the reasoning or methodology underlying  the testimony is scientifically valid,' meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known."  *Germano*, slip op. at 4 (quoting *Daubert*, 509 U.S. at 592-93).  In *Daubert*, the Supreme Court set forth a non-exclusive list of factors for assessing reliability of expert methodology:  "(1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been

maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community." *Id.* (citing *Daubert*, 509 U.S. at 593-95).

In assessing proposed expert testimony, this Court "has a special obligation to ensure that any and all expert testimony meets these standards." *Id.* at 5. The Court "need not take the expert's word for it." *Id.* (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997)). "Instead, when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it." *Id.* at 5-6 (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998)). These principles apply to all expert testimony, including opinions concerning real property values such as those offered by Mr. Waronker. *See Kumho Tire*, 526 U.S. at 147 ("this basic gatekeeping obligation … applies to all expert testimony"); *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (affirming exclusion of proposed expert testimony regarding real property valuation); *Hebbler v. Turner*, 2004 WL 414821, at *4 (E.D. La. Mar. 3, 2004) (excluding proposed testimony concerning commercial real estate valuation where expert "failed to illustrate a reliable adherence to real estate valuation methodology").[6]

---

[6]    In *Turner v. Murphy Oil USA, Inc.*, 2006 WL 91364, at *3 (E.D. La. Jan. 12, 2006), this Court held that "a limited *Daubert* review is appropriate" at the class certification stage. The Court relied on the Second Circuit's holding in *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001). Subsequent to *Visa Check* and to this Court's decision in *Murphy Oil*, the Second Circuit has "disavow[ed] the suggestion in *Visa Check* that an expert's testimony may establish a component of a Rule 23 requirement simply by being not fatally flawed." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006); *accord*, *Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 816 (7th Cir. 2010) ("the district court must perform a full *Daubert* analysis before certifying the class if the situation warrants"). In any event, Mr. Waronker's opinions do not withstand scrutiny under even a limited *Daubert* analysis. *See Murphy Oil*, 2006 WL 91364, at *4 ("the Court shall review the expert's opinion to ensure that it contains no flaws that would render it inadmissible as a matter of law: the methodology must show
(continued...)

Plaintiffs bear the burden to demonstrate that Mr. Waronker's proposed testimony satisfies the standards for admissibility. *Germano*, slip op. at 5. As demonstrated below, they cannot satisfy their burden.

## III. MR. WARONKER'S PROPOSED TESTIMONY SHOULD BE EXCLUDED

Plaintiffs cannot show that Mr. Waronker's proposed testimony is "is based on recognized methodology and supported by appropriate validation based on what is known." *Id.* at 4. As demonstrated below, Mr. Waronker's failure to consider available empirical data showing actual sales prices for remediated homes violates a fundamental principle in the real estate valuation community and renders his opinions unreliable. Even if, contrary to Mr. Waronker's concession, such empirical sales data were unavailable, his "informal survey" conducted one year ago for an appraisal report involving a single Florida home in another case would be an inadequate basis for his proposed testimony that all homes in Florida and Louisiana that had Chinese drywall and have been remediated are diminished in value due to alleged stigma.

### A.   Mr. Waronker Did Not Obtain Or Analyze Available Empirical Data Bearing Directly On His Opinions

The requirements of Rule 702 "make certain that an expert, whether basing testimony upon professional studies or personal experience employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Mr. Waronker plainly has not done so.

Mr. Waronker concedes that analysis of available empirical sales data " "would be a more reliable method to find out if there was stigma damage." Tr. 313:19-315:2. He further

---

some hallmarks of reliability, whether through peer review or use of generally-accepted standards or methods").

concedes that he made no effort to obtain available empirical data reflecting sales prices for remediated homes even though "the market data could show something contrary to what [he has] opined … and the only way to know is to look at it." Tr. 94:19-95:7; Tr. 200:12-202:16; 313:19-315:2; 317:20-318:6. Mr. Waronker's explanation – that he has not been asked or paid to perform that analysis (Tr. 313:19-314:17) – does not excuse his failure to test his hypothesis against available information as required by the standards of the valuation community. He should not need counsel or anyone else to inform him what he is required to do to support his sweeping conclusions.

Having ignored available empirical sales data critical to test his hypothesis, Mr. Waronker's opinions amount to unsupported speculation, which is not a sufficient basis for admissibility under Rule 702 and *Daubert*. *See Hebbler*, 2004 WL 414821, at *4 (excluding proposed testimony concerning commercial real estate valuation where expert "failed to illustrate a reliable adherence to real estate valuation methodology"). His opinions should be excluded on that basis alone.

**B.    Mr. Waronker's "Informal Survey" Does Not Provide A Reliable Basis For His Opinions**

Mr. Waronker's "informal survey" conducted one year ago regarding a single Florida property does not provide a reliable basis for his opinions concerning stigma allegedly associated with every remediated home in Florida and Louisiana. That "informal survey" does not satisfy any of the factors set forth in *Daubert* to assess the reliability of an expert's methodology:

- Mr. Waronker's theory has not been tested. As explained above, Mr. Waronker concedes that he did not even seek to obtain available empirical market data that would have permitted him to do so.

- Mr. Waronker does not rely on any peer-reviewed literature that suggests that an "informal survey" is a reliable method for testing his sweeping hypothesis.  In fact, the literature directly refutes that proposition.

    o As Mr. Waronker concedes, the literature produced from his files provides that surveys may be useful in assessing the value of real property "in cases where there is no empirical data."  Tr. 348:20-349:1; *see* Waronker Ex. 9 at 395 (quoted at Tr. 345:15-22); *id.* at 401 (before using surveys, "[a]n appraiser should first consider other sources of data that may be more relevant in terms of customary use by other appraisers or in terms of actual use in the transactional marketplace").

    o That same article provides methodological guidelines for completing surveys, which Mr. Waronker ignored.  Tr. 82:1-5.

- Use of an undocumented "informal survey" as the sole basis for determining that alleged stigma reduces the value of all remediated homes plainly is not generally accepted in the relevant community.

- There is no known potential rate of error for Mr. Waronker's method of determining that every single home that was constructed with Chinese drywall and has been remediated carries a stigma that diminishes its value.  Mr. Waronker has not conducted any statistical analysis to determine the rate of error.  Indeed, there is no way to determine the rate at which Mr. Waronker's methodology leads to erroneous results because Mr. Waronker has not tested his own hypothesis, let alone identified anyone else who has extrapolated from an informal survey to make sweeping conclusions regarding the effect of stigma on the value of all previously contaminated homes.

- There are no existing standards and controls that have been maintained with respect to the conduct of Mr. Waronker's "informal survey." Indeed, when asked where one would find guidelines for conducting an informal survey, Mr. Waronker responded that "[y]ou don't find guidelines for doing everything." Tr. 132:7-19. With one exception – the real estate broker who expressed an opinion contrary to his own – there is absolutely no documentation of whom Mr. Waronker spoke to, what he communicated to them, or what they communicated to him.

Mr. Waronker's "informal survey" is no substitute for the empirical sales data that he chose to ignore. His sole reliance on that survey as a basis for his opinions concerning all remediated homes in Florida and Louisiana plainly fails to satisfy the standard for admissibility under Rule 702 and should be rejected on that basis alone.

But even if, contrary to Mr. Waronker's concession, empirical sales data was not available, Mr. Waronker's opinions should be excluded because he did not follow any recognized methodology in conducting his informal survey. As the *Reference Manual on Scientific Evidence*, published by the Federal Judicial Center states, "[a] survey is presented by a survey expert who testifies about the responses of a substantial number of individuals who have been selected according to an explicit sampling plan and asked the same set of questions by interviewers who were not told who sponsored the survey or what answers were predicted or preferred." Shari Seidman Diamond, *Reference Guide on Survey Research* in *Reference Manual on Scientific Evidence* 229, 236 (2d ed. 2000) ("*Reference Manual*"). That does not even remotely describe what Mr. Waronker purports to have done.

Indeed, literature from Mr. Waronker's files makes clear that surveys may be useful in the absence of actual market data only "if rigorous and objective survey methods are employed."

Waronker Ex. 9 at 395.  The same article offered steps that appraisers should follow when relying on surveys "to ensure that appraisers are in conformance" with Federal Rule of Evidence 702.  *Id.* at 396, 400-03.  Among other things, the article included a checklist for the use of survey techniques in appraisals developed from "generally accepted survey standards, the proposed USPAP [Uniform Standards of Professional Appraisal Practice] Statement on appraisal standards for statistical and market survey techniques, recent litigation valuation cases where surveys were admitted and not admitted, methodological guidelines … and the authors' experiences."  *Id.* at 401.  But Mr. Waronker did not follow those "methodological guidelines" even though they were prescribed in the very article produced from his files.  Tr. 82:1-5  As a result, Mr. Waronker's survey (regardless of his characterization of it as "simple" or "informal") is woefully inadequate to provide a reliable basis for his current opinions.

　　For example, results of a survey should be documented in a survey report that includes, among other things: (1) "a description of the sample design, including the method of selecting respondents, the method of interview, the number of callbacks, respondent eligibility or screening criteria, and other pertinent information;" (2) "a description of the results of sample implementation, including (a) the number of potential respondents contacted, (b) the number not reached, (c) the number of refusals, (d) the number of incomplete interviews or terminations, (e) the number of noneligibles, and (f) the number of completed interviews;" and (3) "the exact wording of the questions used, including a copy of each version of the actual questionnaire, interviewer instructions, and visual exhibits."  *Reference Manual* at 270.  Mr. Waronker did not do anything to document the results of his survey.  The only information that is documented is an email exchange with a real estate broker who contradicted Mr. Waronker's hypothesis.  This methodological flaw, alone, is sufficient to render his "informal survey" unreliable.

In addition, the steps that Mr. Waronker ignored state: "The survey administrator must be qualified by education and experience as an expert in survey research. Most appraisers will not have the specialized knowledge to prepare a formal market survey.…" Waronker Ex. 9 at 403. "Experts prepared to design, conduct, and analyze a survey generally should have graduate training in psychology (especially social, cognitive, or consumer psychology), sociology, marketing, communication sciences, statistics, or a related discipline; that training should include courses in survey research methods, sampling measurement, interviewing and statistics." *Reference Manual* at 238. Mr. Waronker does not have any relevant education or experience that qualified him to design, conduct or analyze a survey. *See* Report, Ex. A at 26-28.

Moreover, appraisers relying on surveys are advised to "[i]nclude in the survey population all relevant respondents" and further advised that the "[s]ample size must be justifiable – ideally with face validity and statistical arguments." Waronker Ex. 9 at 401; *see Reference Manual* at 242 ("Identification of a survey population must be followed by selection of a sample that accurately represents that population. The use of probability sampling techniques maximizes both the representativeness of the survey results and the ability to assess the accuracy of estimates obtained from the survey"). Mr. Waronker does not even claim that his survey involved a statistically significant, representative sample of the relevant population.

As an initial matter, he did not survey anyone from Louisiana. Tr. 96:9-17. Thus, the survey cannot form a reliable basis for Mr. Waronker's opinions regarding a proposed class of Louisiana homeowners. Nor, particularly in light of the fact that he was licensed only in Florida at the time he submitted his Report, has Mr. Waronker provided any basis for his opinion that "[c]onsumer expectations in purchasing homes do[] not vary significantly from state to state." Report at ¶ (i)(d). This Court "need not take [Mr. Waronker's] word for it." *Germano*, slip op.

at 5; *see Joiner*, 522 U.S. at 146 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

More importantly, Mr. Waronker's survey amounts to nothing more than the views of three real estate brokers (one of whom rejected his hypothesis) and family, friends and acquaintances of Mr. Waronker who he happened to encounter during a short period of time prior to the submission of his *Seifart* report. Tr. 83:1-8; 307:4-12. According to Mr. Waronker only one of the respondents was even a prospective home purchaser. Tr. 155:2-12. Mr. Waronker offers nothing to suggest that this haphazard sampling produced a statistically significant sample of the views of prospective home purchasers in Florida, much less Louisiana. *See DeRosa v. Massachusetts Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 99 (D. Mass. 2010) (excluding survey that was "based on statistically insignificant response rate" because "it does not 'rest[] on a sufficiently trustworthy foundation'") (citation omitted).

Appraisers also are advised that "[t]he survey instrument and the method of its administration must not introduce bias." Waronker Ex. 9 at 396; *see id.* at 402 (" Do not bias your sampling toward any viewpoint or opinion group"); *Reference Manual* at 248. But Mr. Waronker's survey was plainly designed to support a pre-formed conclusion. Indeed, according to Mr. Waronker, his hypothetical presented a "no-brainer decision on the[] part" of respondents. Tr. 257:13-14. As Mr. Waronker explained, "why would you pick something that would have been remediated if you can pick one right next door that's the same exact thing that's never had Chinese drywall, why would you want that?" Tr. 257:8-11. Mr. Waronker's use of a survey that inevitably would support his hypothesis is the antithesis of the scientific method. *See*, *e.g.*, *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion

first and then doing research to support it is the antithesis of [the scientific] method"); *Perry v. United States*, 755 F.2d 888, 892 (11th Cir. 1985) ("A scientist who has a formed opinion as to the answer he is going to find before he even begins his research may be less objective than he needs to be in order to produce reliable scientific results").

The bias inherent in Mr. Waronker's hypothetical is further revealed by his reaction to the real estate broker who informed him that a prospective purchaser might prefer a remediated home out of concern that a comparable home represented not to have Chinese drywall might later be found to contain Chinese drywall. *See* Waronker Ex. 10. Mr. Waronker dismissed that response on the ground that the broker must have misunderstood his hypothetical, which asked respondents to assume that the comparable home never had Chinese drywall. But according to Mr. Waronker, market value is affected by prospective purchasers' fears regarding Chinese drywall "whether reasonable or not." Report at ¶ (i)(c). Mr. Waronker's hypothetical does not permit consideration of the possibility that a prospective purchaser, whether reasonable or not, might fear that a home represented to never have had Chinese drywall might later be found to contain Chinese drywall. As the broker with whom Mr. Waronker communicated suggested, such a prospective purchaser might prefer the verifiable certainty that a remediated home no longer contains Chinese drywall to the uncertainty afforded by an unverifiable representation concerning the presence of Chinese drywall. *See* Waronker Ex. 10.

In addition, as posed, Mr. Waronker's hypothetical required respondents to make a choice. In doing so, it failed to provide a means for a prospective purchaser to express no preference. *See*, *e.g.*, *Reference Manual* at 249-50 (survey questions that do not provide a "no opinion" option "will reflect only what the respondent can glean from the question, or they may reflect pure guessing"). To the extent the removal of Chinese drywall from a remediated home

would have no material impact on a prospective purchaser's decision between otherwise comparable homes, there is no lost value due to alleged stigma.

Moreover, Mr. Waronker's hypothetical did not provide all the information that might be relevant to a prospective purchaser. Waronker Ex. 9 at 402 ("Be objective in the presentation of facts to survey participants – make sure that the information is complete, does not leave out significant information, and is unbiased (an equal tendency to fall on either side of what it represents)"). The hypothetical assumes that a remediated home and a comparable home that never had Chinese drywall are otherwise "identical in every respect." Tr. 323:22-324:1. The hypothetical does not provide any information that might be perceived as beneficial to prospective purchasers of remediated homes, including the installation of new plumbing, new carpeting, new appliances or other changes generally associated with remediated homes. Tr. 321:13-23; *see* Tr. 282:6-283:12.

Mr. Waronker explained that the hypothetical was designed "for the Seifart case, specifically," in which the home was remediated shortly after it was constructed and "I don't know anybody that can differentiate between appliances that are 6 months old or 1 year old." Tr. 322:18-23; 323:19-21. But, in forming his opinions in this case, Mr. Waronker did not consider that some class members might own homes that were remediated up to 4 or 5 years after their construction. There is no reliable basis for Mr. Waronker to extrapolate from responses to a hypothetical that does not cover the range of circumstances that affect class members.

## CONCLUSION

For the reasons set forth above, this Court should exclude Mr. Waronker's report and proposed testimony under Federal Rule of Evidence 702.

Dated:  June 10, 2011                    Respectfully submitted,

                                         By:  Kyle A. Spaulding
                                         MILES P. CLEMENTS (#4184)
                                         PETER E. SPERLING (#17812)
                                         KERRY J. MILLER (#24562)
                                         KYLE A. SPAULDING (#29000)
                                         PAUL C. THIBODEAUX (#29446)
                                         FRILOT L.L.C.
                                         1100 Poydras Street
                                         Suite 3700
                                         New Orleans, LA 70163
                                         Telephone:  (504) 599-8249
                                         Facsimile:  (504) 599-8137
                                         Email:  kspaulding@frilot.com

                                                  - AND -

                                         STEVEN GLICKSTEIN (NY Bar No. 1038157)
                                         JAY P. MAYESH (NY Bar No. 1081603)
                                         KAYE SCHOLER LLP
                                         425 Park Avenue
                                         New York, NY 10022
                                         Telephone:  (212) 836-8485
                                         Facsimile:  (212) 836-6485
                                         Email:  sglickstein@kayescholer.com

                                         Counsel for the Knauf Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing Knauf Defendants' Memorandum in Support of Their Motion to Exclude the Report and Proposed Testimony of Class Plaintiffs' Expert, Lee Waronker, Under Federal Rule of Evidence 702 has been served upon Plaintiffs' Liaison Counsel and counsel for the Builders by email and by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 10th day of June, 2011.

<u>/s/ Kyle Spaulding</u>

60098272.docx