# EXHIBIT 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

_____

'  MDL NO. 2047

IN RE:                         '

CHINESE-MANUFACTURED          '  SECTION: L

DRYWALL PRODUCTS LIABILITY    '

LITIGATION                     '

_____  '  JUDGE FALLON

'

THIS DOCUMENT RELATES TO      '

ALL ACTIONS                    '  MAG. JUDGE

'  WILKINSON

_____  '

THURSDAY, MAY 19, 2011

- CONFIDENTIAL -

SUBJECT TO CONFIDENTIALITY FURTHER REVIEW

Videotaped deposition of LEE WARONKER,

MAI, SRA, held at the offices of HERMAN HERMAN

KATZ & COTLAR, 820 O'Keefe Avenue, New Orleans,

Louisiana, commencing at 9:03 a.m., on the above

date, before Lori Cobb, Certified Court Reporter

(LA), Registered Professional Reporter, Certified

LiveNote Reporter.

GOLKOW TECHNOLOGIES, INC.

ph 877.370.3377 | fax 917.591.5672

deps@golkow.com

1    that?

2        A    I understand your answer.

3        Q    Yes?

4        A    Yes.  I understand it.

5        Q    Okay.

6            When did Mr. Montoya give you those two

7    CDs?

8        A    It was after I sent the CD to him with

9    all the request for information.

10        Q    When was that?

11        A    I have no idea.

12        Q    You have no idea when you sent him the

13    CD with all the information?

14        A    I have no idea of the specifics sitting

15    here right now, no.

16        Q    Was it more than a month ago?

17        A    No.  It was within the last week or so.

18        Q    Within the last week or so?

19        A    Yes.

20        Q    What licenses do you hold with respect

21    to being an appraiser?

22        A    I'm a state certified appraiser, State

23    of Florida.

24        Q    Do you hold any licenses in Louisiana?

1      A   I have a temporary license.

2      Q   When did you obtain that temporary

3    license?

4      A   It was returned to my office from

5    Louisiana about 2 to 3 weeks ago.

6      Q   And does it have an effective date on

7    it?

8      A   It issued April 19, 2011 by Leonard E.

9    Pauley, Jr., Chairman, from the Louisiana Real

10   Estate Appraisers Board; granted to myself

11   regarding appraisal assignment on the following

12   properties; residents having had Chinese drywall

13   as follows, and it lists some properties.

14     Q   May I see it?

15     A   Sure.

16     Q   (Reviewing document.)

17   MS. GARVEY:

18       We would like to mark this.  But, of

19   course, it's your original, I understand, so

20   we'll get a copy of it, and then we'll mark

21   it as Waronker #4, I guess, when we --

22   THE WITNESS:

23       I believe that was given to you in the

24   packet, so I don't need a copy.  I have it in

1       my file.

2              (Document marked as L. WARONKER #4 for

3       identification.)

4     BY MS. GARVEY:

5         Q   Are you sure?  It seems to have the

6     raised seal on it.

7         A   It doesn't mean anything special to me.

8         Q   I would feel better not taking your

9     original.

10        A   I appreciate it.

11        Q   I'm just going to keep this here for a

12    few minutes.

13        A   All right.

14        Q   I think you said it was effective

15    April 19th -- is that what you read to me?  Date

16    issued is April 19.  So you did not have a license

17    in Louisiana when you submitted your January 24th

18    letter/report to Mr. Montoya; correct?

19        A   That would be correct.

20        Q   Are there separate appraisal licenses

21    for commercial and residential properties?

22        A   Every state calls it license or

23    certification.  Yes, there's different ones.

24        Q   What does Florida call them?

1    Q    And for how long have you held that?

2    A    Probably be the early 1990s.

3    Q    Do you have any special certifications

4    or licenses with respect to stigma analysis?

5    A    No.

6    Q    Or environmental contamination analysis?

7    A    No.

8    Q    Have you ever written any articles on

9    environmental contamination analysis?

10   A    No.

11   Q    Have you ever given any lectures or

12   speeches regarding environmental contamination

13   analysis?

14   A    No.

15   Q    And same questions with respect to

16   stigma; have you written any articles on stigma

17   analysis?

18   A    No.

19   Q    Given any lectures or speeches regarding

20   stigma analysis?

21   A    No.

22   Q    Do you have any particular expertise in

23   that area?

24   MR. MONTOYA:

1       Form.

2       THE WITNESS:

3       A   General expertise?  Other than

4   experience, no.

5   BY MS. GARVEY:

6       Q   I don't know if I asked for this, but I

7   would like to get copies of the deposition

8   transcripts from the cases in which you testified

9   as a stigma expert also.

10      A   Let me ask you, how do I get those?

11      Q   They're not in your files?

12      A   No.

13      Q   Then we'll have to look into it; the

14  attorneys who represented you at the time should

15  have copies.

16          You are not an engineer; is that

17  correct?

18      A   Correct.

19      Q   Nor an industrial hygienist?

20      A   Correct.

21      Q   Not a doctor?

22      A   Correct.

23      Q   Or a chemist?

24      A   Correct.

1    class representatives' homes.  Are you aware of

2    that?

3       A   Same answer.

4       Q   Do you know whether these addresses here

5    on your temporary registration certification

6    represent the addresses of the Louisiana proposed

7    class representatives?

8       A   If I don't know who they are, I guess I

9    can't -- and how they're classified, I guess I

10    can't answer that question.

11       Q   So you've never heard that?

12       A   If I've heard it, it's nothing that's

13    privy to my situation.

14       Q   Okay.

15         Have you heard about the remediations

16    that are being done in connection with the pilot

17    settlement program in the MDL?

18       A   I don't think so.

19       Q   Have you heard that Moss, the

20    construction firm, is performing remediations of a

21    good number of homes that were involved in the

22    MDL?

23       A   No.

24       Q   So you're unaware of the costs to

1       A   Maybe not.

2       Q   Maybe not, but maybe yes?

3       A   Probably not more than yes.

4       Q   You think there is a lot of direct

5    market data these days?

6       A   I think from conversations with one or

7    two people whose houses I inspected, their homes

8    are being sold now that have been remediated; some

9    have not been remediated.  So I think your supply

10   of data is going to be more significant, or is

11   going to be there versus not having them there.

12      Q   Are you aware of how many remediated

13   Chinese drywall homes have been put on the market

14   in Florida?

15      A   No.

16      Q   How about in Louisiana?

17      A   No.

18      Q   Wouldn't that have been relevant to your

19   analysis?

20      A   I don't think so.

21      Q   In terms of analyzing stigma, aren't you

22   trying to determine the effect, the diminution in

23   value, that would occur to the property due to the

24   fact that it had previously contained Chinese

1      me -- for valuing contaminated properties, they

2      are relevant to the analysis you did in Seifart;

3      correct?

4          A    Correct.

5          Q    As well as to the analysis that you did

6      in the January 24th short report that you gave to

7      Mr. Montoya; correct?

8          A    I didn't do an analysis on that short

9      report, I don't think.

10         Q    Well, you did come to some conclusions?

11         A    Right.

12         Q    And don't you have to do an analysis in

13     order to draw a conclusion?

14         A    They were from the Seifart case.

15         Q    Except for, as you noted in that letter

16     itself, you were referring to these matters,

17     Seifart was only one of the things you referred to

18     in that report; you referred to other sources and

19     pieces of information, as well; correct?  We can

20     look back at it, if it helps.

21         A    The answer to your question is -- the

22     answer to the January 2011 letter was just a

23     statement as to everything that's in Seifart

24     applies over here as far as loss in value.

1    commentary that was given in those articles that

2    you read when conducting your survey and analyzing

3    your results?

4        A    My survey was very, very simple.  There

5    were no guidelines necessary.  Okay?  It's a very

6    common sense approach.  You put two people -- or

7    you ask one person if you had two houses side by

8    side and you had a choice of buying a house that

9    never had Chinese drywall or one that was

10   remediated, and everything else is exactly the

11   same, which would you buy.  Okay?

12         That doesn't really take much survey

13   knowledge; that's how a typical buyer would look

14   at a house.  Okay?  If given proper information.

15         And the answer to the question was given

16   the choice, everything else being the same, I

17   would buy the one that has not ever had Chinese

18   drywall.

19       Q    And the Appraisal Institute in The

20   Journal articles that I've seen is concerned with

21   things, like, bias and methodology, and the

22   selection of the folks who answered a survey and

23   who conducts the questioning.

24       A    Fine.

1      Q   And did you concern yourself with any of

2   those comments that had been made in these various

3   articles from The Appraisal Journal in conducting

4   your own survey?

5      A   No.

6      Q   Okay.

7         In your Seifart report, I noted a moment

8   ago that you said you spoke to individuals.  Who

9   were those individuals?

10     A   Friends, family, people I just ran into

11   on vacation; just a myriad of people, just common

12   individuals.

13     Q   Okay.  Ran into on vacation where?

14     A   A specific place?  Where I went on

15   vacation?

16     Q   Yes.

17     A   Little Palm Island.

18     Q   Where is that?

19     A   Florida Keys.

20     Q   So a Florida vacation?

21     A   Correct.

22     Q   And how many people did you speak with?

23     A   At that time, at that location probably

24   half a dozen to eight.

1      Q   I'm sorry.  I meant in total, the

2   individuals you referred to having spoken to?

3      A   I have not kept count, but I've --

4   during the Seifart case, anybody that was near me,

5   I asked that question to.

6      Q   So hundreds?

7      A   I don't know about hundreds, but at

8   least two or three dozen.

9      Q   Okay.

10   MS. GARVEY:

11      We have 10 minutes left on the tape.

12      Why don't we keep going until then.  If

13      that's all right with you, and then we can

14      take a short break.

15   THE WITNESS:

16      Fine with me.

17   BY MS. GARVEY:

18      Q   You attached to your report submitted in

19   Seifart, as well as to what you submitted to

20   Mr. Montoya in January, an article by two

21   gentlemen, Simons and Throupe; correct?

22      A   If you say so.

23      Q   You don't recall that article?

24      A   Again, I'll repeat over and over again,

1    that could have informed your opinion further;

2    isn't that correct?

3        A    I think you're looking to specific

4    numbers, and B is a general statement that people

5    who would purchase a home that has been remediated

6    will expect a discount.  Now you're going to get

7    to the question of quantifying that discount.

8    That's a whole different analysis.

9        Q    Except the first sentence you're not

10    talking about consumer choice, you simply state

11    the value of homes.

12        A    Well, the value of a home would be based

13    upon consumers; those are the people who buy it,

14    and that's the basis of value.

15        Q    Right.  And the way you can see value is

16    by looking at market data; isn't that correct?

17        A    You could, yes.

18        Q    Okay.

19            You could look to see what remediated

20    homes are selling for versus neighboring homes

21    that never had Chinese drywall in the first place;

22    correct?

23        A    Yes, you could.

24        Q    But you did not do that in offering your

1    opinion B; correct?

2        A    In January of '11, no, I did not.

3        Q    And you haven't done it still to this

4    day; is that correct?

5        A    I have not been asked to do it.

6        Q    Nor have you done it?

7        A    Nor have I done it.

8        Q    In letter C, you say:  The loss in value

9    of homes that have defective Chinese-manufactured

10    drywall and that were repaired/remediated with

11    Chinese-manufactured drywall is known as stigma

12    damages.  The consumer's fear, whether reasonable

13    or not, is recognized in the real estate and

14    appraisal industry, and stigma damages will result

15    in diminution of value.

16        I think I read that correctly.

17        A    I digress.  Going back to part B; B is

18    that homes -- (Reading to self.)

19        Okay.  I'm sorry.  Go ahead.

20        Q    Looking at paragraph C.

21        A    Right.

22        Q    The first sentence just simply states an

23    appraisal concept that that's known as stigma

24    damages; correct?

1     A    That is correct.

2     Q    And then the next sentence is just that

3     that fear, whether reasonable or not, is

4     recognized.  That's just your appraisal -- your

5     knowledge as an appraiser of the way appraisal

6     analysis works; correct?

7     A    And articles that I've read, yes.

8     Q    Okay.

9          And letter D:  Consumer expectations in

10    purchasing homes does not vary significantly from

11    state to state.

12         Have you interviewed consumers in

13    multiple states?

14    A    No.

15    Q    You've only interviewed homeowners and

16    consumers in Florida; correct?

17    A    Correct.

18    Q    In your Seifart deposition you testified

19    that the associated risk amount is not easily

20    quantifiable, and that's also the case with

21    stigma; correct?

22    A    Correct.

23    Q    And, in fact, at your deposition you

24    testified that the value due to associated risk --

1   and here I'm quoting:  Gets being towards the art

2   part, not the science part?

3       A   Correct.

4       Q   Do you recall testifying to that?

5       A   I do.

6       Q   And would you still agree with that

7   statement?

8       A   I think now we're in a bit more -- with

9   the new data that we'd be able to do it more

10   towards the science than the art.

11       Q   And the statement that you made at your

12   deposition was regarding associated risk.  At that

13   time it would have also been true for stigma

14   analysis; correct?

15       A   Correct.

16       Q   And now you're saying with the available

17   data that's currently out there, you could get

18   more towards the science part for associated risk.

19   Is that also true for stigma analysis?

20       A   Yes.

21       Q   You further testified in Seifart that

22   because there isn't the experience in the

23   marketplace, you would have to do it -- this is

24   now a quote:  You would have to do it on a

1       case-by-case basis, query individuals, interview

2       people to see what effect it would have.  End

3       quote.

4            Do you recall testifying to that?

5       A   Vaguely.

6       Q   Do you agree with that testimony?

7       A   Yes.

8       Q   And do you still agree with that

9       testimony?

10      A   Yes.

11      Q   It's important to look at each home on a

12      case-by-case basis and to discuss the issues with

13      individuals; correct?

14      A   That was for analysis of being able to

15      estimate the stigma damages.  So what we're

16      talking there is about individual case studies to

17      see if there's any consistency as to loss in value

18      in purchasing a home that had Chinese drywall that

19      was not fixed and/or had Chinese drywall that was

20      remediated and fixed up.

21      Q   Right.  Individual case studies of

22      different homes; correct?

23      MR. MONTOYA:

24           Form.

1       Q   Okay.

2            Are there any articles in the trade

3   press regarding stigma damage analysis for Chinese

4   drywall?

5       A   I'm sure there are.

6       Q   Did you review any?

7       A   I don't recall.

8       Q   You don't recall any?

9       A   I don't recall reviewing them.  Again,

10  over and over again, I've read hundreds of

11  articles.  To remember which ones said which, I

12  really don't -- you know, I don't recall.

13      Q   Okay.

14      A   I've not done a bibliography of what

15  I've read and what it said, what I read and what

16  it said.  I'm looking online at a lot of articles,

17  I'm looking at journals at a lot of articles, I'm

18  not keeping track of that.

19      Q   You know, though, that as an expert it

20  is important to keep track of the articles that

21  you read that might influence the testimony you

22  give in a case.  You're aware of that; aren't you?

23      A   I do have articles in the back of my

24  report, and you have articles that were provided

1    three brokers had Chinese drywall listings?

2        A   I searched the Multiple Listing for the

3    term Chinese drywall.

4        Q   And have you done that since then?

5        A   No.

6        Q   Didn't do it in preparation for today?

7        A   No.

8        Q   And didn't do it in preparation for

9    submitting your January 24th report?

10       A   Correct.

11       Q   Do you know how many sales there have

12   been involving Chinese drywall remediated homes?

13       A   No.

14       Q   Did you review the names and the

15   addresses of the class representatives and fact

16   witnesses that have been involved in this class

17   certification process in order to see whether or

18   not their homes have been remediated?

19       A   The only one I'm familiar with is one

20   home in particular.  I think it was the Ronkin

21   home that was remediated.  R-O-N-K-I-N, I believe

22   is the spelling.

23       Q   Any -- no others?

24       A   That were remediated?  Of the ones I

1    have been remediated.  That was Gus -- I don't

2    know his last name.

3        Q    Is it Pelias?

4        A    It's 12-something, right over by the

5    marina.

6        Q    And you're not sure whether or not

7    that's been remediated?

8        A    I'd have to look at my notes.  I'm not

9    sure.  I think it was remediated.

10       Q    Have you looked through the county

11   assessor files in Florida or the files of the

12   Louisiana Parishes to see what properties have

13   sold since you submitted your Seifart report, and

14   to see whether or not there was any information in

15   there on Chinese drywall?

16       A    No.

17       Q    And I think you've testified, and just

18   so I make sure I have it right, that you have not

19   looked at the Multiple Listing Services since

20   submitting the Seifart report; correct.

21       A    With regards to Chinese drywall.

22       Q    Right.  Sorry.  With regard Chinese

23   drywall?

24       A    Correct.

1      Q    And have you ever looked at the Multiple

2    Listing Services in Louisiana in order to look at

3    Chinese drywall, either remediated homes or

4    unremediated homes?

5      A    No.

6      Q    Are you familiar with the

7    post-remediation sale of a home in Vero Beach in

8    the Woodfield subdivision?

9      A    No.

10     Q    That was a home that was sold

11   post-remediation.  Don't you think that the

12   specifics of that transaction would have informed

13   your analysis?

14     MR. MONTOYA:

15       Object to the form.

16     THE WITNESS:

17     A    Lots of things could inform my opinion.

18   I would think if I'm asked to go forth and hired

19   to do an analysis of this, then I will seek out,

20   as I said earlier, any home that has been sold

21   that has been remediated.

22   BY MS. GARVEY:

23     Q    But you do, again, in your opinion, here

24   in paragraph B state:  The value of homes that had

1    Chinese-manufactured dry- -- defective

2    Chinese-manufactured drywall that has been

3    repaired/remediated is less than a similarly

4    situated home that did not have defective

5    Chinese-manufactured drywall.

6          So I'm asking if you've actually looked

7    at any of the sales of these homes in order to

8    inform that opinion?

9       A   Other sales?  No.

10      Q   Okay.

11          Given that you don't know about this

12   Vero Beach, Florida home at all, I suppose you

13   don't know whether or not it sold at a higher

14   price than it originally sold for in '06; is that

15   correct?

16      A   Then I would have to know what it sold

17   for in '06.  Was it sold with Chinese drywall in

18   it --

19      Q   Right.  No, it was not.

20      A   -- and was it remediated.

21          You're asking questions that there --

22   and this is not an easy process.  You're talking

23   about there's -- you have to be extremely

24   detailed; and just because a home sold that was

1    where surveys were admitted and not admitted,

2    methodological guidelines by Morgan and Dolan, and

3    the authors' experiences.

4         Do you see that?

5    A   No.  But I heard it.

6    Q   If you want to have a look, it's at page

7    401.

8    A   Okay.

9    Q   Did you go through the various points in

10   this article in coming up with the survey that you

11   conducted of the real estate brokers and the

12   various individuals you talked to, and your family

13   and your friends and on vacation?

14   A   And acquaintances.

15       No.  All my -- my survey was pretty --

16   my conversation was pretty simple, and it's what

17   we do every day as appraisers.

18   Q   Okay.  The answer to my question,

19   though, was no?

20   A   The answer to your question is no.

21   Q   Did you take notes on your conversations

22   with these real estate brokers or with your

23   family, friends or vacation acquaintances?

24   A   If they're in not my file, then, I guess

Waronker, Lee  5/19/2011  12:00:00 AM

1    no.

2        Q    They weren't in your file.  That means

3    no?

4        A    Correct.

5        Q    Okay.

6            You just retained it in your head, what

7    everybody said to you?

8        A    I could have written in the report and

9    then cleared my file.

10       Q    If you look at the very last page of

11   that document, under design, administration and

12   reporting of the research, the second sentence

13   says most appraisers will not have the specialized

14   knowledge to prepare a formal market survey.

15           Had you noted that prior to deciding to

16   conduct your own survey?

17       A    You keep on referring to what I do as a

18   formal market survey.  It's just a very simple

19   interview process of people who were potential

20   buyers of property.

21           So to start quantifying it as a formal

22   survey, that's just not what it is; so there's no

23   reason to -- for one question, would you or would

24   you not, to me, doesn't constitute having to write

1    a 40 page survey and go through it.  That's not

2    necessary.

3        Q    Would you call what you did an informal

4    survey?

5        A    An interview process, informal survey,

6    whatever terminology you want to use.

7        Q    Where in any of the appraisal literature

8    in the Institute's guidelines, et cetera, will I

9    find the guidelines applicable to an informal

10    survey?

11        A    Confirmation of sales.  Confirmation.

12    Talking to people.  Discussing with market

13    participants, interviewing market participants.

14        Q    But where will I find the guidelines for

15    doing that?

16        A    You don't find guidelines for doing

17    everything.  Guidelines don't say pick up the pen,

18    do this.  There's USPAP, and it'll say that you

19    should interview market participants.

20        Q    A few minutes ago I asked about your

21    notes.  You said that they could have been in the

22    draft and then you cleared the file?

23        A    Not in the draft.  They would have been

24    in my file.  Okay.  Sometimes I take notes on

1    to you.  I'm putting down what the response was.

2        Q    Okay.  The family, friends, and

3    individuals you met on vacation in Florida, whom

4    you discussed this same issue with, which home

5    would they prefer --

6        A    Right.

7        Q    -- were any of them actual prospective

8    purchasers of a remediated Chinese drywall home,

9    were they in the market for new homes?

10       A    One gentleman, I think, was in the

11   market for a new home.  But other than that, no, I

12   don't think so.

13       Q    And you said you spoke to something

14   south of 100 people, but a good number of people;

15   correct?

16       A    I spoke to a lot of people and asked

17   them the same question, yeah.

18       Q    I noticed that -- I've read a couple of

19   reports you've written.  I've read the Beachside

20   Associates versus Okemo Limited Liability report

21   that you did.  Do you recall that one?

22       A    Yes.

23       Q    It's in the Virgin Islands, I think?

24       A    Yes.

1    A   I teach real estate appraisals classes;

2    I've taught in 30 different states, I've taught in

3    Seoul, Korea, Puerto Rico and Canada.  I've taught

4    for the University of Miami, I taught for

5    Miami-Dade Community College.

6    Q   And in terms of that 30 different state

7    classes, in Seoul, Korea and Puerto Rico and

8    Canada, are you hired by a particular organization

9    to teach those classes?

10   A   The Appraisal Institute.

11   Q   Are they, sort of, continuing -- we have

12   CLE, as lawyers, continuing legal education.  Are

13   they that type of class for the Appraisal

14   Institute?

15   A   Predominantly the classes I taught were

16   courses, not seminars.  I did teach some seminars.

17   The classes are for qualification.

18   Q   And none of them, I think we discussed

19   earlier, were on the subject of stigma analysis;

20   correct?

21   A   No.

22   Q   Nor environmental contamination

23   analysis?

24   A   That is correct.

1      A   Correct.

2      Q   And that's material we talked about

3   earlier that I asked you to produce; correct?

4      A   Correct.

5      Q   What new did you rely on to prepare your

6   January 24th opinion report that you didn't rely

7   on to prepare Seifart?

8      A   Nothing.

9      Q   How much time did you put into this new

10   report?  I know you said that Mr. Montoya's firm

11   drafted it for you.

12      A   No time.

13      Q   I believe Mr. Montoya, in sending me

14   your files -- I'm sort of looking at Mr. Montoya

15   with this question -- also sent me copies of

16   deposition transcripts from depositions that were

17   taken of both the class representatives and the

18   fact witnesses?

19      MR. MONTOYA:

20          Correct.

21      MS. GARVEY:

22          Thank you.

23   BY MS. GARVEY:

24      Q   Have you reviewed those?

Waronker, Lee  5/19/2011  12:00:00 AM

1      A   I've read through some of the

2   depositions briefly from the people whose homes I

3   looked at in Florida.

4      Q   And I will come to them in just a couple

5   of minutes.

6          Have you ever spoken specifically to

7   prospective purchasers of remediated Chinese

8   drywall homes?

9      A   No.

10     Q   Have you ever spoken to experts in

11  Chinese drywall remediation?

12     A   No.

13     Q   Have you ever spoken to environmental

14  engineers or industrial hygienists about the

15  effects of Chinese drywall contamination and then

16  subsequent remediation?

17     A   No.

18     Q   Have you spoken to medical experts,

19  doctors, about Chinese drywall effects on people?

20     A   No.

21     Q   And have you spoken to any government

22  officials, like, those from the CPSC or the

23  Florida Department of Health regarding Chinese

24  drywall?

Waronker, Lee  5/19/2011  12:00:00 AM

1      A   No.

2      MS. GARVEY:

3          If we can mark this one, please.  We'll

4      mark this as Exhibit #13.

5          (Document marked as L. WARONKER #13 for

6      identification.)

7      BY MS. GARVEY:

8      Q   This came from a file of documents that

9      Mr. Montoya produced to me, and it says job

10     number 6621.  Is that an internal reference code

11     for your office?

12     A   Yes, it is.

13     Q   And it's a log-in date, Thursday

14     January 27, 2011.  Does that mean that this file

15     was created that day?

16     A   That's generally what she does.  When

17     she logs in she would make up a folder.

18     Q   Who is the "she"?

19     A   My secretary, Jean.

20     Q   Okay.

21     COURT REPORTER:

22         Gina?

23     THE WITNESS:

24         J-E-A-N.  I apologize.

1      A    Today.

2      Q    And he lists there -- one, two, three,

3    four, five, six -- seven homes; correct.

4      A    That is correct.

5      Q    Do you know how he arrived at this list

6    of seven homes?

7      A    I have no idea.

8      Q    And how many and which of these homes

9    did you, in fact, inspect?

10      A    I inspected all except for the Dean

11    property, because I was informed they were away on

12    vacation.

13      Q    When did you conduct those inspections?

14      A    Various dates.  Mother's Day was for

15    sure for Dr. Roberts.  And then Saturday of --

16    Saturday of this past week was Karen Vickers and

17    Felix Martinez; the day before was Mr. Santiago,

18    which would be Friday.  The day before that was

19    the Ronkin residence, which would be Thursday; and

20    Mr. Diaz, I want to say it was that Wednesday.

21      Q    Okay.  And why did you want to visit the

22    homes?

23      A    I didn't want to.

24      Q    You didn't want to?

1     A   No.

2     Q   Okay.  Why did you visit the homes?

3     A   Mr. Montoya asked me to visit them.

4     Q   Why didn't you want to?

5     A   For what we're doing here today, I

6   didn't think it was totally necessary, so it was

7   just a lot of driving around to look at homes that

8   had Chinese drywall.  So it really wasn't specific

9   to what I was doing at that point in time.

10     Q   And what were you doing at that point in

11   time?

12     A   Not much.  My thought would be if,

13   indeed, that it had to do with valuation of these

14   homes, then it would take more than just looking

15   at them.  But I did take the opportunity to talk

16   to each one of the homeowners who met me there and

17   see what their experiences would have been, and

18   when they noticed the drywall, how they came about

19   noticing the drywall problem; and then they

20   sometimes were talkative and sometimes, you know,

21   not so much.

22     Q   Okay.

23         Did you take notes regarding these

24   conversations or regarding what you saw when you

1      A   No.

2      Q   Just two more.  The Nguyen home --

3   N-G-U-Y-E-N -- also on the west coast of Florida?

4      A   No.

5      Q   The Bidigare home also on the west

6   coast?

7      A   No.

8      Q   For those homes that you did visit, I

9   know you didn't reach a conclusion in terms of any

10  quantification regarding stigma damages?

11     A   Correct.

12     Q   Did you reach any conclusions regarding

13  whether or not there even would be stigma damages

14  associated with those homes if they were to be

15  remediated?

16     MR. MONTOYA:

17         Form.

18  BY THE WITNESS:

19     Q   My conclusion holds firm that if there

20  are two homes side by side and you have your

21  choice, the one that had to be remediated is going

22  to be less than the other one.

23  BY MS. GARVEY:

24     Q   And that is despite the fact that you

1   did none of the investigation you said you'd want

2   to do, like, looking at comparable sales in the

3   same neighborhood?

4       A   Correct.

5       MR. MONTOYA:

6           Form.

7   BY MS. GARVEY:

8       Q   The reason you would look at comparable

9   sales is that would assist you in formulating an

10  opinion; correct?

11      A   It would assist you in quantifying it.

12      Q   Not in formulating it; that you just do

13  from the top of your head?

14      MR. MONTOYA:

15          Form.

16      THE WITNESS:

17      A   No.  That was from talking to people;

18  brokers, potential -- I won't say potential, but

19  the individuals and good old-fashioned common

20  sense.

21      Q   Okay.  But, of course, the market data

22  could show something contrary to what you have

23  opined; isn't that correct, and the only way to

24  know is to look at it; isn't that right?

1    MR. MONTOYA:

2       Form.

3    THE WITNESS:

4       A   Once you have that data available, the

5    answer to that question would be yes.

6    BY MS. GARVEY:

7       Q   And you testified earlier today that you

8    think it is now available?

9       A   I think -- I have a strong suspicion, a

10   strong possibility that that information would be

11   available now.

12      Q   But you have not looked at it?

13      A   You're going to ask that question a lot;

14   aren't you?

15      Q   Yeah.

16      A   No.

17      Q   I named some homes that you did not go

18   to.  Have you ever expressed an opinion on a

19   home's value without visiting it?

20      A   I don't think so, but there always could

21   be a possibility.

22      Q   None that come to mind, though?

23      A   None that come to mind.

24      Q   Okay.

1    that says it's of a certain value; it is less

2    than X.

3        Q    Uh-huh.

4        A    All right?

5            I mean, I don't know that there's too

6    many people out there that if you didn't offer

7    them the choices -- somebody will say if I had the

8    choice, why would you pick something that would

9    have been remediated if you can pick one right

10   next-door that's the same exact thing that's never

11   had Chinese drywall; why would you want that?

12           I don't understand -- everybody looks at

13   me like I'm from another planet.  It's, like, it's

14   a no-brainer decision on their part.

15       Q    Except for that one woman you e-mailed

16   with?

17       A    Who misunderstood the question by -- if

18   you read it, yes.

19       Q    Well, she specifically said no, and you

20   even put that in your report.  So I presume you

21   didn't think she misunderstood that part of the

22   question or you wouldn't have included it in your

23   report; correct?

24           MR. MONTOYA:

1      or did the whole work, yes, of course it would.

2      BY MS. GARVEY:

3          Q    Okay.

4              And if a home post-remediation received

5      a certification from an environmental engineer or

6      an industrial hygienist versus not receiving such

7      a certification, that also could have been a

8      effect on the home's stigma damages; isn't that

9      right?

10         MR. MONTOYA:

11             Objection to form.

12         THE WITNESS:

13         A    You're talking about the amount, not if?

14     BY MS. GARVEY:

15         Q    If a home had a certification or did

16     not?

17         A    Okay.  We keep on getting -- this is the

18     frustrating, because we keep on giving things a

19     value.  Okay?  And the answer to the question is

20     the stigma there, is it is there.  Now you're

21     trying to quantify it, and nothing so far that

22     I've done goes to quantification.

23             Yes.  I believe with or without that

24     there's still stigma damage.

1    drywall in the first place.

2        A    Please read that.

3        Q    Sure.

4            (Discussion off the record.)

5    BY MS. GARVEY:

6        Q    Question:  But you're definitely going

7    to have freshly painted walls throughout the

8    home -- throughout the house?

9            Answer:  Correct.

10            Question:  You're going to have new

11    appliances to the extent that they're replaced?

12            Answer:  Correct.

13            Question:  You're going to have a new

14    HVAC system or systems?

15            Answer:  Correct.

16            Question:  Those are positive.  I mean,

17    they make it newer than it would have been had

18    this not happened in the first place.

19            Answer:  You pick up probably 2 years,

20    maybe.

21            Question:  Okay.  But, I mean, that has

22    a value, certainly?

23            Answer:  You could say it has a value.

24    I don't know when a buyer buys a house, and you're

1    looking at a million-5, million-6 purchase, how

2    you could differentiate between the sale of the

3    house at a million-5 because it's got -- the

4    appliances are a year or two newer.  That's a hard

5    adjustment to make.  With that said, in the

6    overall package maybe somebody says, well, this is

7    great; I have all brand-new stuff and I'm moving

8    in.

9        A    Okay.

10       Q    Do you still agree with that testimony

11   you gave in Seifart?

12       A    Yes.

13       Q    When we were talking about items, like,

14   whether a home has a certification for the work

15   it's undergone or not, the scope of the

16   remediation that was done, whether the market is

17   good or bad, how long ago the remediation was

18   done, all of those factors influence the amount of

19   stigma that a home might feel; correct?

20       A    You rattled off a lot of things there.

21   Let's take them one by one.

22       Q    Sure.

23       MR. MONTOYA:

24           Object to the form.

1    about earlier; just had general discussion with

2    appraisers.

3        Q    Sure.

4            And those people were just randomly

5    picked, you just -- you just picked certain people

6    and just asked them questions?

7        A    It wasn't a question of picking them; it

8    was around before the trial, so it just happened

9    to be anybody that was at the restaurant near me

10   that I might have known, or a friend of a friend,

11   or at a party.  It just became typical

12   conversation for that few week period.

13       Q    And those opinions varied from person to

14   person?  One person said there's no stigma damage,

15   in fact, she believed there was a benefit; others

16   said there was significant stigma damage, and

17   others said there's minimal; is that right?

18       A    Those were the three brokers.  The

19   individuals that I interviewed regarding my

20   side-by-side comparison, all of them said they

21   would -- some said they wouldn't even buy a house

22   that was remediated, some of them said -- but they

23   all would recognize that there would be -- they

24   would prefer the house to the left than the right.

1     Q   The results you got varied, though, from

2   the real estate professionals; correct?

3     A   From the real estate professionals,

4   correct.

5     Q   And the only name that we have from your

6   file that we can check on, if we want to talk to

7   these people, is the one that said that there's no

8   stigma damage and there's a benefit; correct?

9     A   But as we spoke about earlier, it was

10   not a -- her assumption is different than the

11   question posed.

12     Q   Sure.

13         The only person we know about is that

14   lady, or that e-mail that said she doesn't believe

15   there's stigma damage; correct?

16     A   Correct.

17     Q   We can't -- the rest of us, and the

18   court and the jury, could not figure out -- could

19   not talk to those same people you talked to

20   because we don't know who they are; right?

21     A   Correct.

22     Q   Are you still of the opinion that stigma

23   damage is very subjective?

24     A   No.  I think you can quantify stigma

1    I've talked to, nobody would really -- if they had

2    the choice of getting appliances 2 years newer,

3    okay, and painted drywall that's nice and clean,

4    versus never having to go through this instance,

5    I'm pretty darn certain whoever I talked to, their

6    choice would be I will take -- you know, I'll take

7    old appliances over the Chinese drywall.

8        Q   But you've done no analysis to check on

9    what the answer is by the evidence, by looking?

10       A   The evidence is talking to people who

11   say I would never buy a home that had Chinese

12   drywall; I would never buy a home, even if it was

13   remediated, with Chinese drywall because I've been

14   through this whole situation and my son had a

15   bloody nose and my husband has headaches, he's got

16   to go through a respirator.  These are -- so I'm

17   not quantifying anything, correct.

18       Q   Okay.

19           And even though now there's available

20   evidence where you could go out and measure and

21   check on what actually the sales have been to see

22   if your hypothesis is correct, you haven't done

23   any of that; correct?

24       MR. MONTOYA:

1        Form.

2        THE WITNESS:

3        A   If you're willing to pay me to do that,

4    or somebody is willing to pay me to do that, I'll

5    be more than glad to.  Nobody has offered to do

6    such.  Until they do, I don't know about you, but

7    I don't go out and just do things just for fun if

8    it's -- you know, unless it's non-business

9    related.

10   BY MR. PANAYOTOPOULOS:

11       Q   The plaintiffs never asked you to do

12   that?

13       A   Correct.

14       Q   The plaintiffs' attorneys never asked

15   you to do that?

16       A   Nobody has asked me to do that, as we

17   speak here today.

18       Q   But you understand that that's one way

19   of verifying whether there is stigma damage in

20   every instance or not; right?

21       A   I have testified to that all day today,

22   yes.

23       Q   And that would be a more reliable method

24   to find out if there was stigma damage; would you

1    agree with that?

2        A   I would agree with that.

3        MR. MONTOYA:

4            Form.

5    BY MR. PANAYOTOPOULOS:

6        Q   Rather than randomly asking various

7    individuals; right?

8        A   At the time I asked random individuals,

9    as I testified to earlier, there were no sales or

10   resales of Chinese drywall at that point in time.

11   The other situation is somebody is going to have

12   to pick a date and value.

13       Q   Sure.

14       A   So you have all sorts of things you're

15   asking questions about, and there's no answer.

16           The question has to be when was it

17   remediated, how was it remediated, what is your

18   date of value, when did the value actually -- when

19   did you lose value; so there's lots of questions,

20   so you're asking a lot of things that until

21   somebody sets out the protocol, it could be a

22   waste of time going through this analysis.

23       Q   But that's what would ultimately give us

24   an answer whether your hypothesis is correct;

1    that question.

2    BY MR. PANAYOTOPOULOS:

3         Q    Since January they've told you that they

4    know about homes that have been sold; correct?

5         A    That have been sold?

6         Q    Yes.

7         A    I don't know that they have.

8         Q    Okay.

9              And your opinions are final; is that

10    correct, you don't believe that they're subject to

11    change; correct?

12        A    My opinions as --

13        MR. MONTOYA:

14            Object to form.

15        THE WITNESS:

16        A    -- the report are that a home with

17    Chinese drywall has a deep discount, a home that's

18    been remediated has a discount.

19    BY MR. PANAYOTOPOULOS:

20        Q    Sure.  And those opinions are final;

21    correct?

22        A    Correct.

23        Q    Even though you've not checked on any

24    empirical evidence about whether that's manifested

1    in sales; correct?

2        A    If you want me to look at the sales, I'm

3    more than willing to do that.

4        Q    But you've already come to your

5    conclusion; right?

6        A    That there's a loss in value, yes.

7        Q    Do you think it would matter as to

8    whether there's stigma damage as to how much

9    Chinese drywall there is in a home?

10    MR. MONTOYA:

11        Form.

12    THE WITNESS:

13        A    Asked and answered.

14    BY MR. PANAYOTOPOULOS:

15        Q    Would you please answer it again?

16    THE WITNESS:

17        All right.  Let's take a break.

18    MR. PANAYOTOPOULOS:

19        Sure.

20    VIDEOGRAPHER:

21        Time now is approximately 3:54 p.m. and

22    we are now off the record.

23        (Recess taken at 3:54 p.m.  Back on

24    record at 4:06 p.m.)

1        A    Which people are you talking about?

2        Q    The people that you asked; the survey

3    that you conducted.

4        A    Correct.

5        Q    What information -- what was it that you

6    asked them or what information did you provide

7    them?

8        A    I provided all of them the same

9    information; I said, if you had two homes side by

10   side, okay, one never had Chinese drywall, one had

11   remediated Chinese drywall, which would you pay

12   more for, which one would you prefer.

13       Q    Did you tell them anything about having

14   changed plumbing in the home that formerly had

15   Chinese drywall?

16       A    No.

17       Q    Did you tell them anything about new

18   carpet in the home?

19       A    No.

20       Q    Did you tell them any other changes that

21   typically are made when remediating a Chinese

22   drywall home?

23       A    No.

24       Q    Would you agree with me that the people

1  that you asked had incomplete information about

2  the comparison that you were making?

3      A   No.

4      Q   Even though you didn't tell them what

5  the differences were between the two houses?

6      A   That wasn't the question I was asking

7  them.  I was asking them two houses side by side,

8  everything being identical, would you pay less for

9  the one that had the remediation.

10      Q   That's not --

11      A   That's the answer -- that was the answer

12  to the question.

13      Q   I got it.

14          So what you're looking at is somewhat

15  different than what we're looking at in comparing

16  the homes in this case?

17      A   It may or may not be.

18          In the particular case that I was

19  involved with, the home was recently finished; so

20  the differential between new carpeting, as we

21  talked about before, was only a year or two.  I

22  don't know anybody that can differentiate between

23  appliances that are 6 months old or 1 year old.

24      Q   You've made that point.  I understand.

Waronker, Lee  5/19/2011  12:00:00 AM

1      A    Well, you keep asking the same

2    questions.  I've got to make the point over and

3    over again.

4      Q    Well, my question is a little different.

5         What I'm asking to find out is did you

6    tell these people that this is actually the

7    condition, what you're comparing?

8      A    It wasn't part of my question.  I just

9    answered that.

10     Q    Right.  But you were asking something

11   different than what we're comparing here about

12   actually remediated homes and compared to the

13   homes that didn't undergo any remediation, because

14   the homes in this case may have new carpet, may

15   have all this other stuff.  So would you agree

16   that the question you were asking was somewhat

17   different than what we're looking into here?

18     A    Nobody's defined the scope of work as

19   to, quote, what we're looking into here.  My

20   questions were asked for the Seifart case,

21   specifically for that.

22     Q    And those people assumed that the homes

23   were identical in every respect?

24     A    That was the premise that I gave them,

Knauf                            None                          Page  323

1    correct.

2         Q    And they didn't know about the newer

3    appliances, the newer carpet; correct?

4         MR. MONTOYA:

5              Form.

6         THE WITNESS:

7         A    The question had to do with stigma.  So

8    if you would say to me, if they paid the same

9    amount for a house with or without, then the

10   answer is still they'd have stigma because they

11   should be paying a premium for the carpet and

12   everything else, and the difference would be

13   stigma.  So any way you look at it, there's

14   something there.  So unless you know everything,

15   yes, you're right.

16        BY MR. PANAYOTOPOULOS:

17        Q    That's your conclusion, but the people

18   that you asked, that you based that conclusion on,

19   didn't have the information that you have;

20   correct?

21        MR. MONTOYA:

22             Form.

23        THE WITNESS:

24        A    There was no need for that information.

Waronker, Lee  5/19/2011  12:00:00 AM

1       A   How do I know?

2       Q   Okay.  Thank you.

3           You testified earlier that the real

4    estate broker that sent that e-mail, that you had

5    that e-mail exchange with, misunderstood your

6    second question; is that right?

7       A   Correct.

8       Q   Did you write back to her and say you've

9    misunderstood, let me explain to you what I really

10   meant?

11      A   No.

12      Q   You didn't follow up at that time to say

13   you've -- there's a problem here; that's not what

14   I'm asking?

15      A   Correct.

16      Q   You just left it alone?

17      A   Correct.

18      Q   You accepted her answer?

19      A   Correct.

20      Q   And that's why you used it in your

21   report; correct?

22      A   Correct.

23      Q   It's only now in the deposition -- is it

24   only now in the deposition that you came to that

1      Q    What's your current occupation?

2      A    I'm a real estate appraiser.

3      Q    How long have you been a real estate

4   appraiser for?

5      A    Since 1977.

6      Q    What do you do as a real estate

7   appraiser?

8      A    Value property.

9      Q    And when you value properties, do you

10   produce an appraisal report?

11      A    Most often.

12      Q    What types of properties do you

13   evaluate?

14      A    All types; single family residence,

15   industrial, apartments, office buildings,

16   warehouses, stadium, amusement park.

17      Q    Do you hold any licenses for appraising?

18      A    I'm a state certified appraiser.

19      Q    In what state?

20      A    Florida.

21      Q    Do you have any other licenses or

22   certification as relating to appraisals?

23      A    MAI and SRA designations.

24      Q    What's an MAI designation?

1   real estate business, is that something you

2   typically do when doing an appraisal?

3        A   Yes.

4        Q   Why?

5        A   You try and verify the sale, see the

6   motivations of the buyer and seller, if that

7   information is available.

8        Q   Is calling others in the real estate

9   industry an acceptable standard of property

10  appraisal in your industry?

11       A   Yeah.  We do that every day.  Every day

12  is probably an exaggeration, but somebody in the

13  office is doing something like that every day.

14       Q   I'm going to ask you a similar series of

15  questions about the other folks you talked about

16  were not real estate professionals.  I think what

17  you've referred to as "the man on the street"?

18       A   Correct.

19       Q   What did you ask -- how many people did

20  you talk to that were not real estate

21  professionals?

22       A   I think it was 50 to 100.  It was a lot

23  of people.

24       Q   What did you ask those people?

1    on the street, the person tell you about the

2    Chinese drywall homes, the stigma?

3        A    Some said they would never touch a home

4    that ever had Chinese drywall, remediated or not.

5    And then others said that they would -- their

6    preference would be to the one that's never

7    been -- had any Chinese drywall.

8        Q    And the appraisal industry, the phone

9    calls that you made to the real estate

10   professionals and the public, is that referred to

11   as an informal survey?

12       A    It's an informal survey, yes.

13       Q    Is that an acceptable practice that

14   property appraisers follow?

15       A    Yeah.  We're always calling people,

16   whether it be for something like this, or a broker

17   or a buyer or seller just to find out what

18   motivated them to buy the property, what motivated

19   them to sell the property, how they find out it

20   was listed for sale, was it listed for sale;

21   things of this nature.

22       Q    I'm going to read from Exhibit #9 that

23   was attached to your deposition.  It's an article

24   by Marcus T. Allen, Ph.D. and Grant W. Austin, who

1   has an MAI designation.

2        At the bottom of page 394, it says -- I

3   just want to ask you if you agree with this

4   statement:  Informal surveys are part of an

5   appraiser's daily practice as they collect a wide

6   assortment of information ranging from specific

7   property, rental rates, the general attitudes and

8   anticipations of market participants.

9       A   Yes.  I just testified to that.  That's

10  what we do.

11      Q   And I'm going to read another passage

12  from the same article, Exhibit #9.  I want to know

13  if you agree or disagree with this statement.

14      A   Okay.

15      Q   Even the most conservative value

16  theorist is likely to acknowledge that when direct

17  observations of market participants' behaviors are

18  not available, asking participants how they would

19  behave if faced with a certain situation is an

20  acceptable method of forecasting the market's

21  collective behavior.

22      A   Which is what I did.  I would agree.

23      Q   You've used the informal survey method

24  before in your property appraisals?

1    MR. MONTOYA:

2         Why don't you use those.  I've got my

3    notes on there.

4    MR. PANAYOTOPOULOS:

5         I'm sorry.

6    MR. MONTOYA:

7         It's all right.

8    MR. PANAYOTOPOULOS:

9         What number is it?

10    MR. MONTOYA:

11         #9.

12    BY MR. PANAYOTOPOULOS:

13    Q   You talked about Exhibit Number #9 with

14    Mr. Montoya?

15    A   Did I talk to him about it?

16    Q   Yes.  That's what you were just

17    testifying about; right?

18    A   He just read that to me, yes.

19    Q   Right.

20         He was asking you if it was okay to

21    conduct informal surveys; correct?

22    A   Correct.

23    Q   And that was in cases where there is no

24    empirical data; correct?

Waronker, Lee  5/19/2011  12:00:00 AM

1     A   Correct.

2     Q   Okay.  In this case in January of 2011,

3   you didn't look -- you didn't ask the plaintiffs

4   to find out if there was any available empirical

5   data; correct?

6     A   At that point in time it had nothing to

7   do with value.  If we were going to go on to

8   value, then I would have looked for empirical

9   data.

10     Q   You don't think empirical data has

11   anything to do with the opinion that every single

12   home has diminished in value after it's renovated

13   because of Chinese drywall?

14     A   Correct.  I think there's a loss in

15   value; your loss -- you know, the loss in value

16   and your likelihood of increased marketing time is

17   an indirect loss in value.

18     Q   Empirical data would do nothing to

19   change that opinion; correct?

20     A   If --

21     MR. MONTOYA:

22        Form.

23     THE WITNESS:

24     A    -- every house or a multitude -- or

Knauf                           None                      Page  349