

# CHINESE OR DEFECTIVE DRYWALL ADDENDUM

**Seller:** _____

**Buyer:** _____

**Property Address:** _____

The Residential Sale and Purchase Contract above-mentioned is hereby amended to add the following clauses:

1. <u>Chinese or Defective Drywall Disclosure</u>: If a residence or other improvement has been built or renovated on the Property during the approximate time frame of 2004 to present, the Buyer is hereby notified that such Property may contain defective drywall primarily manufactured in China. The presence of this Chinese or defective drywall seems to coincide with and may cause corrosion and damage to structural systems in such a residence or improvement and corrode and destroy system components. The damage has been extensive enough to require them to be replaced at substantial expense. Further, this Chinese or defective drywall apparently emits a strong sulfur-like odor or fume which may cause the residents of the home to experience health problems. The presence of this odor and/or the aforementioned damages may indicate the presence of Chinese or defective drywall, and the homeowner should investigate. The only known way to eliminate the fumes and the health problems and to stop the damage to the above-mentioned structural systems and system components is to remove and replace all of the defective drywall in the residence, which can be very costly. Finally, the presence of Chinese or defective drywall, the fumes, and the damaged systems, if not remedied, can impact the value or saleability of the property.

2. <u>Drywall Inspection</u>: In the event Buyer elects to conduct a risk assessment or inspection for any Chinese or defective drywall, which shall be done at Buyer's sole cost, Buyer must comply with the Inspection Period reflected in the Sales Contract, unless an addendum provides for an alternative inspection and notice to Seller. Buyer and Seller both agree that if Chinese or defective drywall is found, Buyer may, in Buyer's sole discretion, either cancel the Contract and be entitled to the return of the escrow funds, or notify Seller that Buyer elects to have the Chinese or defective drywall removed and the affected areas repaired and replaced with warranted items (along with any other damage caused by such Chinese or defective drywall to include, by way of example and not limitation, corroded wiring), provided said costs are within the Repair Limits of the Contract. Buyer's failure to exercise this right of inspection shall constitute a waiver if the Property is later determined to have Chinese or defective drywall.

3. <u>Seller Disclosure & Buyer Acknowledgment</u>: The Seller of the above-captioned Property hereby provides the Buyer with the following information on the existence of Chinese or defective drywall at the premises, and advises that a risk assessment or inspection for possible Chinese or defective drywall at the premises is recommenced prior to purchase.

**Seller's Disclosure (check one):**

☐ Chinese or defective drywall is present in the house, and Seller has provided Buyer with all available records and reports relating to Chinese or defective drywall in the Property as follows: _____
_____ ; or

☐ Chinese or defective drywall is present in the house, and Seller has no reports or records pertaining to Chinese or defective drywall in the Property; or

☐ Seller has no knowledge of the existence of Chinese or defective drywall in the Property.

**Buyer's Acknowledgement (check one):**
Buyer acknowledges said advice and recommendation and makes the election set forth below:

☐ Buyer acknowledges the right under the inspection clause in the Sales Contract to conduct a risk assessment or inspection for the presence of Chinese or defective drywall and has received all the information listed above, if any; or

☐ Buyer waives the opportunity to conduct such a risk assessment or inspection for the presence of Chinese or defective drywall and has received all the information listed above, if any.

4. <u>More Information</u>:  Further information on Chinese or defective drywall may be obtained from the Florida Department of Health, 850-245-4250 or the local county Health Department where the Property is located (Manatee County Health Department by contacting 941-748-0747, extension 1340; Sarasota County Health Department at 941-861-2900).

IN WITNESS WHEREOF, the undersigned have set their hands on the date set forth below:

BUYER:                                           SELLER:

_____         _____
                          Date                                              Date

_____         _____
                          Date                                              Date

5/7/2010                    NAHB: Builders Rise to the Challenge of ...

 **NAHB** National Association of Home Builders

Home > New sroom > Builders Rise to the Challenge of Corrosive Chinese Drywall

As published in...          **The Official Online Weekly Newspaper of NAHB**

**NATION'S BUILDING NEWS** www.nbnnews.com | *Read the latest issue now!*

## Builders Rise to the Challenge of Corrosive Chinese Drywall                                      Normal View



Home owners report corrosion or blackening of metal in or on
electrical fixtures, appliances, plumbing and air conditioner coils.
*Photo courtesy of CPSC*

**March 23, 2010** - Participants in a March 11 NAHB webinar discussed some of the ways that builders can
identify the presence of corrosive Chinese drywall in their homes and address the problem if they find it.

The speakers were from Marsh USA, Inc., a risk management company, and The NMAS Group, which were
hired by NAHB to provide their expertise in responding to the unfolding crisis.

Barbara Manis, MD, chief medical officer for The NMAS Group, said that to date more than 2,900 home
owners have reported drywall problems in 37 states, the District of Columbia and Puerto Rico. Florida
accounts for 60% of the reports and Louisiana 11%, with cases also concentrated in Alabama, Mississippi
and Virginia.

But occurrences have been "widespread across the country," she said.

An estimated total of 550 million pounds - or seven million sheets of drywall - were imported from China in
2000 and 2001, said Manis, and in the period of 2004 to 2007 when those imports increased rapidly in the

face of escalating demand from hurricane recovery needs in the Gulf Coast and the housing boom.

The imports from China provided enough drywall for 40,000 2,000-square-foot homes, she said, but a mix of Chinese and domestic gypsum board in many homes "could increase the number of homes affected markedly." However, not all drywall imported from China is corrosive; consequently, the number might be much smaller.

### Studying Indoor Air

A recent indoor air study by the Consumer Product Safety Commission (CPSC) of 41 homes whose owners had reported a drywall problem and 10 control homes - all built about the same time and located in the top five states for complaints - found that sulfur within the gypsum core of the problem drywall can produce hydrogen sulfide gas that corrodes exposed copper wiring and natural gas tubing, she said.

The corrosion is indicated by a distinctive black, sooty coating that can be found on un-insulated copper pipe leading to the air handling unit present in the garage or mechanical closet of the home, or on the ground wire of an electrical outlet.

The study also found corrosion present on copper air conditioning evaporative coils. Other metal was also corroded where there was moisture from condensation.

CPSC interviews with occupants in the study also identified health complaints such as irritation in the upper airways, and nose and throat air passages; burning or stinging eyes and a running nose. Non-specific complaints such as headache, fatigue, coughing and a general feeling of illness were also found in the study, she said, although these are "common complaints occurring in anyone in any circumstances and can have many causes."

"In homes with corrosion unaccompanied by any [sulfuric] odor, health complaints were much fewer or not existent," she added.

Interim protocols for proving that drywall in a home is corrosive were published by the CPSC in January. While this procedure is helpful in filing insurance claims or mitigation, "it is not an inexpensive guidance to follow."

Trained professionals are required at some point, and there are two laboratory tests. In the first, a piece of drywall from the home is placed in a small chamber to look for emissions of sulfide compounds. The second test places the drywall with copper in the chamber; the copper is allowed to corrode and then tested to see if sulfur is present.

Manis suggested that alternative visual testing methodologies that have been used by NASA for years might be more appropriate "if you build four to six homes a year and a home may potentially have drywall in it." Odors, corrosion on metal surfaces, finding a Chinese label on the drywall and ruling out other possible sources of corrosion are included in this screening method.

### Addressing the Problem

In fixing homes that have been damaged by corrosive drywall, "neither exotic nor extreme measures are called for," said Bruce Hallock, vice president of Marsh's Construction Consulting Practice. However, cleaning up the damage and restoring the home - one option for remediation and a process that typically involves relocating residents until the work is done - can average about 50% to 55% of the cost of building new, he said, depending on the level of finishes in the home and its location.

While some have recommended teardowns to repair damage from corrosive drywall, Hallock said that

complete demolition is unnecessary. "We all have the skills to remodel and deal with the removal of corrosive drywall," he said.

The remediation process involves good communication with the residents about the scope of the work that will be done, he said, and builders who decide to replace drywall will need to protect the interiors of the home and return the home as they found it.

For their personal protection and safety, workers remediating the home should follow the same procedures as those on any other home building site. Moon suits and full-face respirators "are not required and we discourage their use," he said.

Hallock also described procedures that builders can follow to document and save drywall samples and damaged items in the home in case they need to provide evidence for insurance or other purposes.

Although builders can reasonably expect the new drywall that is delivered not to be corrosive, they should take samples of each batch and preserve them so they can be tested later if it becomes necessary, he added.

### Government Reactions

Conceding that it is "a little bit late in the game now," Alan Schoem, senior vice president, Global Product Risk Practice for Marsh, said that the Consumer Product Safety Commission does have the power to recall drywall that it can prove is defective and presents a substantial risk of injury to the public.

The CPSC hasn't given any indication that it intends to pursue a recall, he said. It is more likely that the agency will decide to regulate the product so that it can be tracked by the name of the manufacturer, its product of origin and the date it was manufactured.

The commission has been working most closely with the Department of Housing and Urban Development to line up some financial relief for home owners, Schoem said. HUD has indicated that it would make Community Development Block Grant funds available for this purpose, although no money has been dispensed yet.

Also, at the end of last year, the Federal Housing Administration announced a program that would enable FHA borrowers to temporarily suspend or reduce payments on their mortgage in order to have the additional cash flow they might need to deal with drywall mitigation issues.

On the state level, Louisiana has approved a plan to reserve $5 million of its hurricane recovery program to provide property tax relief for home owners with corrosive drywall.

Home owners with corrosive drywall may also be able to qualify for special tax deductions for their losses, he said.

### Looking at Insurance Provisions

What builders can expect from their insurance companies is fairly complex and a better understanding of how the courts view the issue will become clearer as pending cases on insurance coverage are decided in various jurisdictions, said John Denton, senior vice president of Marsh's Mass Tort and Complex Liability Practice.

Meanwhile, the first order of business for builders who have encountered this problem is to "identify all the potential applicable insurance policies and put carriers on notice and keep them apprised of what you are doing with the claims you are receiving," he said.

Builders should look not only at their own policy but should gather information on all potentially applicable policies issued by the general contractors and subs they have worked with under which they might be entitled to recover, Denton said.

A "major battleground" involves the pollution exclusion, he said, which most carriers are using as a basis for denying coverage for drywall claims. How courts have interpreted this exclusion varies by jurisdiction, but in Florida, where the majority of the drywall claims have occurred, the courts have consistently enforced it, finding that it applies to any type of internal vapors or odors.

Denton said that it is likely the courts in Florida will determine that the pollution exclusion bars coverage of losses from corrosive drywall, but the size of the problem in the state is so considerable that it could have some influence on the outcome.

Home owners may be able to cover some of their losses, he said. Even though their property insurance policies will have exclusions for defective work and products, they do have ensuing loss provisions that would cover the ensuing loss to the air conditioning system, for example, even if they don't provide coverage for the drywall.

**Protecting Your Brand**

Catherine Cahill, global managing director and leader of Marsh's Global Product Risk Practice, acknowledged that builders can suffer a serious blow to their business reputation if they don't take steps to protect their brand and its promise of quality and integrity in the homes they build.

The best protection, she suggested, is "open, honest and direct communication with your home owner." Even in a situation where it is possible that the owner will decide to go forward with litigation and become an adversary, or a small builder doesn't have the resources to correct the problem, "don't stop talking with them," she said. "This is an exercise in protecting the safety and security of people who trusted you in building them a safe home."

Most affected builders feel that they themselves have become a victim of the corrosive drywall problem. But "the true victim here is the home owner, the family that can no longer live in their home. When you start to deal with these deep emotional issues, that's probably the best way to protect your brand," she said.

For further information, e-mail David Jaffe at NAHB, or call him at 800-368-5242 x8317.

Subscribe to Nation's Building News

# ADDENDUM D
# REMEDIATION COST ESTIMATE

# ▩AIA® Document A101™ – 2007

### Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum

AGREEMENT made as of the Thirtieth  day of March  in the year Two Thousand Ten
*(In words, indicate day, month and year)*

BETWEEN the Owner:
*(Name, legal status, address and other information)*

Mr. Armin G. Seifart and Mrs. Lisa M. Gore Seifart
2515 Swenson Avenue
Miami, Florida 33133
Telephone Number: 786.218.6200

and the Contractor: .
*(Name, legal status, address and other information)*

Lahoud & Hardan Enterprises, Inc.
420 S. Dixie Hwy, #2M
Coral Gables, Florida 33146
Telephone Number: 305.666.6687
Fax Number: 305.666.6681

for the following Project:
*(Name, location and detailed description)*

Seifart Residence
4075 Bonita Avenue
Miami, Florida 33133

The Architect:
*(Name, legal status, address and other information)*

William Plasencia, R. A.
7700 N. Kendall Drive #506
Miami, Florida 33156
Telephone Number: 305.235.9211

The Owner and Contractor agree as follows.

ADDITIONS AND DELETIONS:
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document A201™–2007, General Conditions of the Contract for Construction, is adopted in this document by reference. Do not use with other general conditions unless this document is modified.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.8913241105_1 which expires on 03/28/2011, and is not for resale.
User Notes:                                                                          (793288320)

Init.



1

SEIFART  000676

**TABLE OF ARTICLES**

1   THE CONTRACT DOCUMENTS

2   THE WORK OF THIS CONTRACT

3   DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION

4   CONTRACT SUM

5   PAYMENTS

6   DISPUTE RESOLUTION

7   TERMINATION OR SUSPENSION

8   MISCELLANEOUS PROVISIONS

9   ENUMERATION OF CONTRACT DOCUMENTS

10  INSURANCE AND BONDS

**ARTICLE 1  THE CONTRACT DOCUMENTS**
The Contract Documents consist of this Agreement, Conditions of the Contract (General, Supplementary and other Conditions), Drawings, Specifications, Addenda issued prior to execution of this Agreement, other documents listed in this Agreement and Modifications issued after execution of this Agreement, all of which form the Contract, and are as fully a part of the Contract as if attached to this Agreement or repeated herein. The Contract represents the entire and integrated agreement between the parties hereto and supersedes prior negotiations, representations or agreements, either written or oral. An enumeration of the Contract Documents, other than a Modification, appears in Article 9.

**ARTICLE 2  THE WORK OF THIS CONTRACT**
The Contractor shall fully execute the Work described in the Contract Documents, except as specifically indicated in the Contract Documents to be the responsibility of others.

**ARTICLE 3  DATE OF COMMENCEMENT AND SUBSTANTIAL COMPLETION**
§ 3.1 *The date of commencement of the Work shall* occur upon the satisfaction of all of the following:
1)   The date this Agreement is fully executed by both parties;
2)   The date Contractor receives from Owner the initial deposit of $ 25,787.66.
3)   The date Contractor receives all permits and approvals from applicable governmental and quasi-governmental agencies necessary for the commencement and completion of the Work;
4)   The date Contractor receives a proper notice to proceed with construction of the Work from the Owner; and
5)   *The date Contractor receives evidence of a duly recorded Notice of Commencement.*

If, prior to the commencement of the Work, the Owner requires time to file mortgages and other security interests, the Owner's time requirement shall be as follows:

N.A.

§ 3.2 The Contract Time shall be measured from the date of commencement.

§ 3.3 The Contractor shall achieve Substantial Completion of the entire Work not later than
*(Paragraphs deleted)*

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.6913240106_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                                                   (1708280320)

Init.

2

SEIFART  000677

(210) days from the date of commencement ("Contract Time"), subject to adjustments of this Contract Time as provided in the Contract Documents, or as follows:

§ 3.4  The Project Schedule will set forth the target date for Substantial Completion.  For purposes of this Agreement and all other Contract Documents, Substantial Completion of the Work shall have the meaning ascribed thereto in Section 9.8.1 of the General Conditions, AIA Document A201-2007.

§ 3.5  Anything herein contained to the contrary notwithstanding, the Contractor will not guarantee that the Work will be performed within the Contract Time or in accordance with the Project Schedule due to factors beyond Contractor's control, and will not be liable to Owner if the Project Schedule dates are not met, other than in accordance with Section 5.2; provided however, that Contractor shall use its best reasonable efforts to meet the Project Schedule dates.

§ 3.6  The parties have specifically agreed that there will be no provision for liquidated damages for delay or bonuses for early completion of the Work.

### ARTICLE 4  CONTRACT SUM
§ 4.1 The Owner shall pay the Contractor the Contract Sum in current funds for the Contractor's performance of the Contract. The Contract Sum shall be Four Hundred Ninety-One Thousand Nine Hundred Seventy-Nine and 06/100 Dollars  ($491,979.06 ), subject to additions and deductions as provided in the Contract Documents.

§ 4.2 The Contract Sum is based upon the following alternates, if any, which are described in the Contract Documents and are hereby accepted by the Owner:
*(State the numbers or other identification of accepted alternates. If the bidding or proposal documents permit the Owner to accept other alternates subsequent to the execution of this Agreement, attach a schedule of such other alternates showing the amount for each and the date when that amount expires.)*

N.A.

§ 4.3 Unit prices, if any:
*(Identify and state the unit price; state quantity limitations, if any, to which the unit price will be applicable.)*

| Item | Units and Limitations | Price Per Unit ($ 0.00) |
|------|----------------------|------------------------|
| N.A. | | |

§ 4.4 Allowances included in the Contract Sum, if any:
*(Identify allowance and state exclusions, if any, from the allowance price.)*

| Item | Price |
|------|-------|
| See Exhibit "A " attached (4  pages) | |

§ 4.5  In the event Owner approves additional work which singly or collectively delays the Project Schedule, Owner shall pay Contractor general conditions and extend the Contract Time accordingly.

### ARTICLE 5  PAYMENTS
§ 5.1 PROGRESS PAYMENTS
§ 5.1.1 Based upon Applications for Payment submitted to the Architect by the Contractor and Certificates for Payment issued by the Architect, the Owner shall make progress payments on account of the Contract Sum to the Contractor as provided below and elsewhere in the Contract Documents.  Upon receipt of payment from Owner or as otherwise required herein, Contractor shall then make payment to Subcontractors and suppliers in accordance with Contractor's payment procedures.

The inspection(s) necessary for the issuance of the final Certificate of Payment pursuant to Paragraph 4.2.9 of AIA Document A201-2007 shall be conducted within ten (10) Calendar days after receipt of notice from the Contractor that the Work has reached Substantial Completion.  Within ten (10) Calendar days following the inspection(s),

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.0013240105_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                                                     (1902083394)

Init.

3

SEIFART  000678

Contractor shall be furnished with a detailed listing of each and every item of Work remaining to be completed or corrected. Owner or Architect shall immediately acknowledge completion of the Work and those items performed shall be removed from the list. At that time payment of that item shall be made within ten (10) Calendar days of item completion. If no itemized list is received by the Contractor within ten (10) Calendar days after notice from the Contractor as provided in this Section 5.1.1, then it shall be presumed that no items remain to be completed or corrected and the Owner's final payment to the Contractor shall be due and payable within ten (10) Calendar days.

§ 5.1.2 The period covered by each Application for Payment shall be one (1) calendar month ending on the last day of the month, or as follows:

§ 5.1.3 Provided that an Application for Payment is received by the Architect not later than the Twenty-fifth (25ᵗʰ) day of a month, the Owner shall make payment of the certified amount to the Contractor not later than the 10ᵗʰ day of the following month. If an Application for Payment is received by the Architect after the application date fixed above, payment shall be made by the Owner not later than ten (10) calendar days after the Architect receives the Application for Payment.
*(Federal, state or local laws may require payment within a certain period of time.)*

§ 5.1.4 Each Application for Payment shall be based on the most recent schedule of values submitted by the Contractor in accordance with the Contract Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. This schedule shall be used as a basis for reviewing the Contractor's Applications for Payment. Owner acknowledges and agrees that amounts listed on the schedule of values may not correspond to amounts set forth in subcontracts

§ 5.1.5 Applications for Payment shall show the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

§ 5.1.6 Subject to other provisions of the Contract Documents, the amount of each progress payment shall be computed as follows:

  .1   Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of zero percent ( 0% ).

  .2   Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored on or off the site for subsequent incorporation in the completed construction less retainage of zero percent ( 0% );

  .3   Subtract the aggregate of previous payments made by the Owner to Contractor; and

  .4   Subtract amounts, if any, for which the Architect has withheld or nullified a Certificate for Payment as provided in Section 9.5 of AIA Document A201–2007.

§ 5.1.7 The progress payment amount determined in accordance with Section 5.1.6 shall be further modified under the following circumstances:

  .1   *Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum*

  .2   Add, if final completion of the Work is thereafter materially delayed through no fault of the Contractor, any additional amounts payable in accordance with Section 9.10.3 of AIA Document A201–2007.

§ 5.1.8 Reduction or limitation of retainage, if any, shall be as follows: Notwithstanding anything to the contrary set forth in the Contract Documents, once Subcontractor has completed One Hundred percent (100%) of the Work, Owner will pay to Contractor One Hundred percent (100%) of the retainage being withheld for that respective trade. (If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Sections 5.1.6.1 and 5.1.6.2 above, and this is not explained elsewhere in the Contract Documents, insert here provisions for such reduction or limitation.)

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:30:37 on 08/16/2010 under Order No.9913240106_1 which expires on 05/20/2011, and is not for resale.
User Notes:                                                                                                  (792260329)

Init.
/

4

SEIFART  000679

*(Paragraph deleted)*
§ 5.2 FINAL PAYMENT
§ 5.2.1 Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Contractor when
*(Paragraphs deleted)*
the Contractor achieves Substantial Completion of the Work as defined in Article 3.3 of this Agreement.

§ 5.2.2 Intentionally deleted.

ARTICLE 6   DISPUTE RESOLUTION
§ 6.1 INITIAL DECISION MAKER
The Architect will serve as Initial Decision Maker pursuant to Section 15.2 of AIA Document A201–2007, unless the parties appoint below another individual, not a party to this Agreement, to serve as Initial Decision Maker.
*(If the parties mutually agree, insert the name, address and other contact information of the Initial Decision Maker, if other than the Architect.)*

§ 6.2 BINDING DISPUTE RESOLUTION
For any Claim subject to, but not resolved by, mediation pursuant to Section 15.3 of AIA Document A201–2007, the method of binding dispute resolution shall be as follows:
*(Check the appropriate box. If the Owner and Contractor do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution method other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

    [ X ]    Arbitration pursuant to Section 15.4 of AIA Document A201–2007

    [   ]    Litigation in a court of competent jurisdiction

    [   ]    Other (Specify)

ARTICLE 7   TERMINATION OR SUSPENSION
§ 7.1 The Contract may be terminated by the Owner or the Contractor as provided in Article 14 of AIA Document A201–2007.

§ 7.2 The Work may be suspended by the Owner as provided in Article 14 of AIA Document A201–2007.

ARTICLE 8   MISCELLANEOUS PROVISIONS
§ 8.1 Where reference is made in this Agreement to a provision of AIA Document A201–2007 or another Contract Document, the reference refers to that provision as amended or supplemented by other provisions of the Contract Documents.

§ 8.2 Payments due and unpaid under the Contract shall bear interest from the date payment is due at the rate stated below, or in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located.
*(Insert rate of interest agreed upon, if any.)*

15% per annum

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 03/29/2011 under Order No 9913240108_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                                                          (789200261)

5

SEIFART 000680

§ 8.3 The Owner's representative:
*(Name, address and other information)*

Mr. Armin G. Seifart
2515 Swanson Avenue
Miami, Florida 33133
Telephone Number: 786.218.6200
Fax Number: 786.552.6022
Email Address: ArminSeifart@chevron.com

§ 8.4 The Contractor's representative:
*(Name, address and other information)*

Mr. Nazih B. Hardan
420 S. Dixie Hwy, Suite 2M
Coral Gables, Florida 33146
Telephone Number: 305.666.6687
Fax Number: 305.666.6681
Email Address: nazih@lahoudandhardan.com

§ 8.5 Neither the Owner's nor the Contractor's representative shall be changed without ten (10) days written notice to the other party.

§ 8.6 OTHER PROVISIONS

§ 8.6.1  Change Orders Without Adjustment in Contract Time.  The Contract Sum will be adjusted due to a Change Order in accordance with Article 7.2 of AIA Document A201-2007.  When no extension in the Contract Time is required under Article 7.2.3 of AIA Document A201-2007, the following percentages will be used to calculate the additional amount for supervision, overhead and profit that will be added to the Contract Sum due to the Change Order under Article 7 of AIA Document A201-2007:

- Supervision: 10%
- Overhead and Profit: 15%

§ 8.6.2  Change Order with Adjustment in Contract Time.  The Contract Sum will be adjusted due to a Change Order in accordance with Article 7.2 of AIA Document A201-2007.  When an extension of Contract Time is required under Article 7.2.3 of AIA Document A201-2007, the following percentages will be used to calculate the additional amount for supervision, general conditions, project management fees, project administration fees, and overhead and profit that will be added to the Contract Sum due to the Change Order under Article 7 of AIA Document A201-2007:

- Supervision: 10%
- General Conditions: 6%
- Project Management Fees: 0%
- Project Administration Fee: 0%
- Overhead and Profit: 15%

§ 8.6.3  Intentionally Deleted.

§ 8.6.4  Owner acknowledges and agrees that Contractor (i) is not responsible or liable for any errors, inconsistencies or omissions in the Contract Documents, and (ii) will not be required to perform any Work which is inconsistent with the requirements of any governmental or quasi-governmental agency(ies) having jurisdiction over the Project or the owner of the Project or the Property.  In the event changes in the Work are required due to the requirements of any governmental or quasi-governmental agency(ies) having jurisdiction over the Project, Owner will, at no cost to Contractor, cause the Contract Documents to be revised accordingly and deliver same to Contractor.  Upon receipt by Contractor of the revised Contract Documents, the Contractor will prepare a Change Order pursuant to Article 7 of AIA Document A201-2007.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:50:37 on 04/16/2010 under Order No 9913240108_1 which expires on 03/20/2011, and is not for resale.
User Notes:                                                                                          (769285782V)

Init.

6

§ 8.6.5  Owner Assuming Architect's Duties.  Notwithstanding anything herein or in the AIA Document A201-2007 to the contrary, Owner and Contractor hereby acknowledge and agree that the Owner will assume directly all duties and obligations of the Architect under the Contract Documents, including without limitation, administration of the Contract and processing and approval of Applications for Payment.

§ 8.6.6  Signage.  Contractor shall be permitted to display identifying signage and banners in prominent locations throughout the Project site, including tower cranes, display boards, and on the building, subject to Owner's prior approval (which approval shall not be unreasonably withheld, conditioned or delayed).

§ 8.6.7  Test and Inspections.  All tests and inspections required by the Contract Documents with respect to the Work will be scheduled and/or arranged by Contractor so as to cause no delay in the progress of the Work.  In the event any re-testing or re-inspection of the Work is necessary on account of any rejection of defective Work, Owner shall bear all costs and expenses of such re-testing or re-inspection; provided that same were not caused by the gross negligence of the Contractor and only to the extent that such costs are not recovered by the Contractor from the relevant Subcontractor.  Contractor agrees to give written notice to the Owner prior to the scheduling of any such tests and inspections.

§ 8.6.8  Building permits, etc.  Owner shall pay for all building permits, inspections, governmental fees, impact fees, licenses and related administrative items necessary for proper execution and completing of the Work, and such costs shall be specifically itemized in the Unit Prices referenced in Article 4.3 hereof.  The Owner shall cooperate with the Contractor in submitting such Contract Documents as are necessary in order to obtain governmental approvals for the Work.  All inspections performed by the Architect or any engineer of record shall be paid for by the Owner.

§8.6.9  Attorney's Fees.  In the event of any dispute between Owner and Contractor or their respective representatives arising out of the Project, the Contract, the General Conditions, the Contract Documents, or any other matter, the prevailing party in any such dispute shall be entitled to receive from the non-prevailing party its reasonable attorneys' fees, paralegal fees, expert fees, witness fees, costs and expenses, or any other expenses incurred in the proceeding and in resolving the dispute, whether at mediation, arbitration, trial, on appeal, or in any administrative proceeding, or otherwise.

§ 8.6.10  Complete Agreement; Amendment.  This Agreement, together with all other Contract Documents incorporated herein by reference, constitutes the entire agreement between the parties and supercedes all agreements, representations, warranties, statements, promises and understandings, whether oral or written, with respect to the subject matter hereof, and neither party hereto shall be bound by nor charged with any oral or written agreements, representations, warranties, statements, promises or understandings not specifically set forth in this Agreement.  This Agreement may not be amended, altered or modified except by a writing signed by both parties.

§ 8.6.11  Severability.  If any provision of this Agreement or application to any party or circumstances shall be determined by any arbitrator or court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstance other than those as to which it is so determined invalid or unenforceable shall not be affected thereby, and each provision hereof shall be valid and shall be enforced to the fullest extent permitted by law.

§ 8.6.12  Terminology.  All personal pronouns used in this Agreement whether used in the masculine, feminine or neuter gender, shall include all other genders and the singular shall include the plural and vice versa.  Titles of any provisions of this Agreement are for convenience only and neither limit nor amplify the provisions of the Agreement itself.  The use herein of the work "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation", or "but not limited to", or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that could reasonably fall within the broadest possible scope of such general statement, term or matter.

§ 8.6.13  Governing law/venue.  This Agreement shall be governed, interpreted and determined in accordance with the laws of the state in which the Project is located.  The venue of any suits or other proceedings with respect to this Agreement shall be the county in which the Project is located.

§ 8.6.14  Waiver.  No consent or waiver, express or implied, by either party to or any breach or default by the other party in the performance of any obligations hereunder shall be deemed or construed to be a consent or waiver to of any other breach or default by such party.  Failure on the part of a party to complain of any act or failure to act of the other party or to declare the other party in default, irrespective of how long such failure continues, shall not

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 19:30:37 on 04/16/2010 under Order No. 9913241105_1 which expires on 09/29/2011 and is not for resale.
User Notes:                                                                                                      (1962883291)

Init.

§
/

SEIFART  000682

constitute a waiver of its rights of such party. The giving of consent by one party in any one instance shall not limit or waive the necessity to obtain the consent of such party in any future instance.

§ 8.6.16  Owner acknowledges that, as of the date of this Agreement, no governmental or other authoritative entity has issued or certified an approved repair or remediation protocol with respect to reactive drywall (also commonly referred to as "Chinese drywall"). As such, there is no scientific evidence that the protocol set forth in Contractor's scope of work under this Agreement (or any other protocol proposed at this time) will effectively remedy the problems caused by and/or are associated with Chinese drywall that may be currently located within the Property. Owner acknowledges and agrees that, although the scope of Contractor's Work includes the removal of existing drywall from the Property, Contractor cannot and does not guarantee or warranty that its Work will fully eradicate all of the potential problems caused by and/or associated with any existing Chinese drywall. AS SUCH, CONTRACTOR SPECIFICALLY EXCLUDES FROM ANY AND ALL WARRANTIES SET FORTH IN THIS AGREEMENT (IF ANY), ANY WARRANTY, EXPRESS OR IMPLIED (INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE), THAT CONTRACTOR'S WORK WILL ERADICATE THE POTENTIAL PROBLEMS OR EFFECTS CAUSED (NOW OR IN THE FUTURE) BY AND/OR ASSOCIATED WITH ANY CHINESE DRYWALL THAT MAY BE LOCATED WITHIN THE PROPERTY.

Owner acknowledges that Contractor is not a licensed environmental engineer or consultant. Owner further acknowledges that Contractor has advised Owner to seek the advice of a licensed environmental engineer or consultant in order to determine an appropriate method for remediating the Property of the effects of Chinese drywall and to review and approve the scope of Work given to Contractor by Owner under this Agreement. As such, in addition to any other indemnity obligations set forth in this Agreement, Owner releases, indemnifies and holds Contractor harmless from any and all damages, liabilities, claims or other actions with respect to or arising out of the existence of Chinese drywall at the Property and/or the protocols set forth in the scope of Work with respect to the removal of Chinese drywall and other materials and equipment from the Property. Notwithstanding the above, and for the sake of clarity, Contractor's limitation of liability with respect to the eradication of the Chinese drywall and the potential problems caused there from, does not release the Contractor from any negligence by Contractor in the removal of the Chinese Drywall as to matters within Contractor's general knowledge or control, or with respect to the scope of Work generally on matters unrelated to the removal of Chinese Drywall. The current Scope of Work "Exhibit A" and Construction Schedule "Exhibit B", contemplates adequate time and cost allocated to "Air the House" as defined in "Exhibit A , Main Trades # 3" of the Property and general cleaning of the Property, as well as, all supervision by Contractor.

Should the State of Florida, the federal government, and/or any other governing agency or industry organization adopt and/or certify an official protocol for the repair of Chinese drywall at some time in the future, Owner acknowledges that Contractor may need to implement a revised repair protocol, the cost of which is not included in this Agreement. Moreover, if such governmental or industry approved protocol is adopted, a second repair may become necessary in order to comply with any protocol requirements which may differ from those adopted herein. At such time as or if an official governmental or court- sanctioned protocol is issued during the Contract Time, Contractor and Owner shall work in good faith to revise the scope of Work accordingly, and depending on the rate of completion at the time of such official or court sanctioned protocol being issued, to minimize delays and wherever possible the cost of Change Orders that are required to comply with such newly issued official or court-sanctioned protocols.

Owner additionally acknowledges that, to the extent that it may seek to pursue claims against the party or parties responsible for originally installing the Chinese drywall in the Property (which Owner acknowledges was not Contractor), Owner will need to preserve, at its own expense, physical evidence of the existing Chinese drywall in accordance with certain orders issued by the governing courts. To the extent that Owner should request Contractor's assistance in gathering such evidence so that Owner may preserve same, the cost and time involved in such an endeavor is not included in this Agreement.

Init.

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.5013240106_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                          (788286529)

8

SEIFART  000683

Contractor and Owner acknowledge that the removal of the Chinese Drywall is included in the scope of Work, as defined in Section 12 (b) and (g) of the Agreement, as applicable, and furthermore, Contractor shall be responsible for the removal and disposal of the Chinese Drywall in accordance with applicable local, state and federal waste management or environmental laws known at the time of execution of this Contract and shall indemnify and hold Owner harmless from any and all damages, liabilities, claims or other actions with respect to or arising from the disposal of the Chinese Drywall removed from the Property.

Owner acknowledges that portion of the Chinese Drywall and other affected elements of the property have already been removed and or will be removed by owner's own Consultants and or Parties other than Contractor.

§ 8.6.16  Preparation, testimony and any other and all mitigation support will be billed at $ 200.00 per hour plus costs.

§ 8.6.17  General Contractor nor Subcontractors are liable in case of any damage during the removal and reinstallation of existing items and/or materials in the house.

ARTICLE 9   ENUMERATION OF CONTRACT DOCUMENTS
§ 9.1 The Contract Documents, except for Modifications issued after execution of this Agreement, are enumerated in the sections below.

§ 9.1.1 The Agreement is this executed AIA Document A101-2007, Standard Form of Agreement Between Owner and Contractor, as amended and modified.

§ 9.1.2 The General Conditions are AIA Document A201-2007, General Conditions of the Contract for Construction, as amended and modified.. Owner and Contractor acknowledge and agree that the AIA Document A201-2007 referenced and incorporated herein and applicable to this Project, has been substantially amended and modified as reflected by (1) computer generated inserts and deletions, and (2) other written changes, if any, initialed by the parties.  Owner and Contractor further acknowledge and agree that each of them has reviewed, understands and agrees to be bound by such General Conditions, as amended and modified.

§ 9.1.3 The Supplementary and other Conditions of the Contract:

| Document | Title | Date | Pages |
|---|---|---|---|
| N.A. | | | |

§ 9.1.4 The Specifications:
*(Either list the Specifications here or refer to on exhibit attached to this Agreement.)*
Title of Specifications Exhibit:  N.A.

| Section | Title | Date | Pages |
|---|---|---|---|
| N.A. | | | |

§ 9.1.5 The Drawings:
*(Either list the Drawings here or refer to on exhibit attached to this Agreement.)*
Title of Drawings Exhibit: N.A.

| Number | Title | Date |
|---|---|---|
| N.A. | | |

§ 9.1.6 The Addenda, if any:

| Number | Date | Pages |
|---|---|---|
| N.A. | | |

Portions of Addenda relating to bidding requirements are not part of the Contract Documents unless the bidding requirements are also enumerated in this Article 9.

- Init.   AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No 9913240108_1 which expires on 03/29/2011, and is not for resale.
User Notes:   (766283329)

9

SEIFART  000684

**§ 9.1.7** Additional documents, if any, forming part of the Contract Documents:

.1   AIA Document E201™–2007, Digital Data Protocol Exhibit, if completed by the parties, or the following:

N.A.

.2   Other documents, if any, listed below:
*(List here any additional documents that are intended to form part of the Contract Documents. AIA Document A201–2007 provides that bidding requirements such as advertisement or invitation to bid, Instructions to Bidders, sample forms and the Contractor's bid are not part of the Contract Documents unless enumerated in this Agreement. They should be listed here only if intended to be part of the Contract Documents.)*

Exhibit "A " Cost Breakdown (4 pages)
Exhibit "B " Preliminary Construction Schedule (1 page)
Exhibit "C " Application and Certificate For Payment (3 pages)

## ARTICLE 10   INSURANCE AND BONDS
The Contractor shall purchase and maintain insurance and provide bonds as set forth in Article 11 of AIA Document A201–2007.
*(State bonding requirements, if any, and limits of liability for insurance required in Article 11 of AIA Document A201–2007.)*

| Type of insurance or bond | Limit of liability or bond amount (\$ 0.00) |
|---|---|
| N.A. | |

## ARTICLE 11   CONTRACT TIME
The Contractor shall be entitled to a Change Order extending the Schedule and Contract Time, and providing for associated general conditions in the event of an "Excusable Delay," described as follows:

(a)   any delay caused by Owner, including those described below, which actually and directly causes such delay;

(b)   any delay actually and directly caused by design errors and/or omissions by the designers;

(c)   any delay actually and directly caused by permitting agencies, building department, building inspectors, or any governmental agencies;

(d)   any delay caused by changes and/or additions to the scope of Work made by the Owner and/or Architect;

(e)   any delay caused by weather in excess of ten (10) rain days per year, impacting activities that require no rain;

(f)   any delay caused by force majeure events;

(g)   any delay caused by Architect and/or its consultants;

(h)   any delay caused by failure of the Owner to make timely payment to Contractor in accordance with this Agreement;

(i)   any delay caused by Owner's (or any of its representative's, employees or agent's) failure to make timely decisions within the time periods provided for in the Contract Documents, or failure to timely issue certifications, failure to timely respond to requests for information;

(j)   any delay caused by any one or more of the relevant building department, fire department and/or any governmental agency having jurisdiction over the Project in granting or denying Contractor's requests for final government approval; or

(k)   any other delay caused by reasons or events not within the control of Contractor; provided that Contractor has not caused nor materially contributed to such delay.

## ARTICLE 12   GENERAL EXCLUSIONS FROM CONTRACTOR'S SCOPE OF WORK
The following are excluded from Contractor's scope of Work on this Project:

AIA Document A141™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1937, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.6913240108_1 which expires on 03/29/2011, and is not for resale.
User Notes:                                                                                      (2952883791)

10

Init.

SEIFART  000685

(a) Unforeseen hidden conditions;
(b) Deleterious material, including asbestos, surveys and abatement and toxic materials;
(c) Allowance for code interpretations different than anticipated;
(d) Testing of materials;
(e) Cost of repairing or protecting adjacent properties if necessary;
(f) Governmental requirements effective after the date of execution of this Agreement that change the scope of Work;
(g) Removal of hazardous waste;
(h) Builder's Risk Insurance and any deductibles; and
(i) Permit and Impact Fees not expressly provided for herein.

## ARTICLE 13 STATUTORY DISCLOSURES

CHAPTER 558, FLORIDA STATUTES, CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT. SIXTY DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS CONTRACT A WRITTEN NOTICE, REFERRING TO CHAPTER 558, OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

CONSTRUCTION INDUSTRIES RECOVERY FUND -- PAYMENT MAY BE AVAILABLE FROM THE CONSTRUCTION INDUSTRIES RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER CONTRACT, WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A STATE-LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS:

CONSTRUCTION INDUSTRY LICENSING BOARD
1940 North Monroe Street
Tallahassee, Florida 32399
Telephone (850) 487-1395

ACCORDING TO FLORIDA'S CONSTRUCTION LIEN LAW (SECTIONS 713.001-713.37, FLORIDA STATUTES), THOSE WHO WORK ON YOUR PROPERTY OR PROVIDE MATERIALS AND SERVICES AND ARE NOT PAID IN FULL HAVE A RIGHT TO ENFORCE THEIR CLAIM FOR PAYMENT AGAINST YOUR PROPERTY. THIS CLAIM IS KNOWN AS A CONSTRUCTION LIEN. IF YOUR CONTRACTOR OR A SUBCONTRACTOR FAILS TO PAY SUBCONTRACTORS, SUB-SUBCONTRACTORS, OR MATERIAL SUPPLIERS, THOSE PEOPLE WHO ARE OWED MONEY MAY LOOK TO YOUR PROPERTY FOR PAYMENT, EVEN IF YOU HAVE ALREADY PAID YOUR CONTRACTOR IN FULL. IF YOU FAIL TO PAY YOUR CONTRACTOR, YOUR CONTRACTOR MAY ALSO HAVE A LIEN ON YOUR PROPERTY. THIS MEANS IF A LIEN IS FILED YOUR PROPERTY COULD BE SOLD AGAINST YOUR WILL TO PAY FOR LABOR, MATERIALS, OR OTHER SERVICES THAT YOUR CONTRACTOR OR A SUBCONTRACTOR MAY HAVE FAILED TO PAY. TO PROTECT YOURSELF, YOU SHOULD STIPULATE IN THIS CONTRACT THAT BEFORE ANY PAYMENT IS MADE, YOUR CONTRACTOR IS REQUIRED TO PROVIDE YOU WITH A WRITTEN RELEASE OF LIEN FROM ANY PERSON OR COMPANY THAT HAS PROVIDED TO YOU A "NOTICE TO OWNER." FLORIDA'S CONSTRUCTION LIEN LAW IS COMPLEX, AND IT IS RECOMMENDED THAT YOU CONSULT AN ATTORNEY.

Init. AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 16:30:37 on 04/16/2010 under Order No.9913240105_1 which expires on 03/25/2011, and is not for resale.
User Notes:   (7902800791)

11

SEIFART 000686

This Agreement entered into as of the day and year first written above.

_____          _____
OWNER (Signature)                                CONTRACTOR (Signature)
Mr. Armin G. Seifart , Owner                     Mr. Jad N. Lehoud, President/CEO
*(Printed name and title)*                       *(Printed name and title)*

_____          _____
OWNER (Signature)
Mrs. Lisa M. Gore Seifart , Owner                _____
*(Printed name and title)*

AIA Document A101™ – 2007. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991, 1997 and 2007 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 15:30:37 on 04/16/2010 under Order No.0013242106_1 which expires on 02/02/2011, and is not for resale.
User Notes:                                                                        (1972083291)

Init.

12

SEIFART  000687

Exhibit "A"                                            4/16/2010  12:28 PM  1



General Contractors

| | **Seifart Residence** |
| | 4075 Bonita Avenue |
| | Miami, Florida 33133 |

| S.N | **DESCRIPTIONS:** | **AMOUNT** |
|---|---|---|
| | **"A"  General Conditions:** | |
| 1 | Permit Fees: | $4,000.00  Allowance |
| 2 | Notice of Commencement: | $45.00 |
| 3 | Temporary Utilities: | $1,950.00 |
| | - Electric: 6 months x $ 100.00/month = $ 600.00 | |
| | - Portable Toilet: 8 months x $ 120.00/month = $ 960.00 | |
| | Permit: $ 150.00 | |
| | - Water: 6 months x $ 40.00/month = $ 240.00 | |
| 4 | Trash Hauling: | $10,400.00 |
| 5 | Survey: (Required for Final Inspection) | $850.00 |
| 6 | Protection/Covering: (Material Only) | $7,380.00 |
| | - Protect existing floor coverings, bathroom wall tiles and vanities (masonite, | |
| | paper, tape, vacuum filters, cloth rags etc...) and driveway with sand and plywood. | |
| 7 | Builder's Risk Insurance: | $3,500.00  Allowance |
| 8 | Construction Cleaning: | $1,800.00 |
| 9 | Temporary A/C for Wood Floor: | $1,100.00 |
| 10 | General Labor: | $12,500.00 |
| 11 | Warehouse for vanities and doors: | $1,160.00 |
| 12 | Equipment Rental: | $1,450.00 |
| 13 | Supervision: | $42,000.00 |
| | **SUBTOTAL "A":** | **$89,125.00** |
| | **"B" Main Trades:** | |
| 1 | Covering of Floors / Tile floors, Driveway.  Removal of interior doors and handrail, | $1,920.00 |
| | wrapping and delivery to warehouse. | |
| 2 | Dismantle vanities, wood shutters, wrap and transport to warehouse | $1,890.00 |
| 3 | Demolition & Hauling: | $35,300.00 |
| | - Remove and haul away drywall and framing, moldings, baseboard, insulation, electrical, | |
| | plumbing, HVAC ducts, copper pipes and wiring, window sills, kitchen counter | |
| | tops, Laundry Counter Tops, Kitchen Backsplash, appliances, plumbing fixtures, | |
| | electric fixtures, all bathroom tile (walls only). | |
| | a) Remove from the interior of the house, including garage, and haul to a Class 1 Landfill, | |
| | all drywall, framing material, electrical (wires, conduits, switches, | |
| | breakers, light fixtures), plumbing (all copper lines, and any metal pipes and fittings, | |
| | fixtures, except tubs which are to remain), HVAC (equipment, pipes, registers and | |
| | ductwork), appliances, wall tiles in bathroom and kitchen, countertops and insulation. | |
| | b) During the demolition period, have all windows and door open. | |
| | c) Once the entire house, from the interior, is demolished as per item (a), vacuum the entire | |
| | house, masonry walls, ceiling and floor thoroughly using a normal vacuum with either | |
| | HEPA filter or filters made  of HEPA material.  Using an air hose and starting from top | |
| | to bottom, hose down with pressure all exterior masonry walls and the trusses. | |

Continued.......

F:\L 14 Data\Model\Seifart Residence.xls

**SEIFART  000688**

Exhibit "A"                                                        4/16/2010 12:29 PM 2



d) Once the above items are done, wipe the trusses, one time, using a damp sponge.
e) For a period of four weeks, weekdays, from Monday to Friday and from 8:00 am to
    3:30 pm, open all windows and let the house air out before the rebuilding is started.      $28,400.00

4  Electric:
    - Use Romex
    - Permit.                                             $4,691.68  Allowance

5  Electric Fixtures:
    - Replace Existing.                            $8,490.00

6  Low Voltage: (Replace Existing)
    - Alarm System , CCTV, Speakers, Central Vacuum.      $26,587.00

7  HVAC:                                         $27,200.00

8  Plumbing:
    - New copper pipes for hot and cold lines.
    - New water heaters
    - Remove and dispose of all plumbing fixtures except whirlpool and bathtubs.
    - New motor for Jacuzzi in Master Bath: (ALLOWANCE)    $450.00
                                      $18,464.00  Allowance

9  Plumbing Fixtures:
    - Replace existing with same except whirlpool and tubs (not to be touched).    $37,060.00

10  Drywall:
    - All New Framing and drywall:
    - Furnish, install and finish 5/8" drywall                   $5,555.00

11  Insulation:
    a) Exterior Walls:  3/4" R-5 Rigid Boards
    b) Interior: R-11-Knee wall between garage and A/C area.
    c) Ceiling: R-30 Batts                               $31,300.00

12  Cabinets:
    - Remove existing cabinets carefully and store in an air conditioned warehouse for (7) months.
    - Replace trim (all new) with pieces to match existing (crown, flat pieces in front, connectors,
      under cabinet light covers, etc.)
    - Replace side pieces of refrigerator.
    - Replace damaged hardware.
    - Reinstall cabinets and touch up paint to match existing.
    - <u>Note:</u> G.C. nor its Subcontractors are liable in case of any damage during the removal
      and reinstallation.                                 $16,729.00

13  Interior Millwork:
    a) Reinstall existing doors: - 16hrs x $ 30.00/hr = $ 480.00      $480.00
    - <u>Note:</u> G.C. nor its Subcontractors are liable in case of any damage during the removal
      and reinstallation.
    b) Casing Material: 850' x $ 1.30/ft = $ 1,105.00      $1,105.00
    c) Crown Material: 1,040' x $ 4.50/ft = $ 4,680.00    $4,680.00
    d) Base Material: 880' x $ 5.30/ft = $ 4,664.00     $4,664.00
    e) Installation of casing, crown and base:          $4,800.00
                                            $19,300.00

14  Painting:  Interior ONLY using Low VOC Paint        $2,950.00

15  Closets:
    - Remove, store, and reinstall existing closets.
    - <u>Note:</u> G.C. nor its Subcontractors are liable in case of any damage during the removal
      and reinstallation.

E:\\...H Data\\Seifert\\Seifart Residence.xls

SEIFART 000689

Exhibit "A"                                                     4/16/2010 12:20 PM  3



| 18 | Tile/Stone/Tops: | $41,844.25 |
|----|-----------------|-----------|

a) Counter Tops:
- Kitchen, Laundry, Onyx in Foyer, Onyx in Master Bath,
  Guest Bath, Bath #1, Window Sills and Kitchen Backsplash.
- For Kitchen top fabrication and installation with same          $4,937.50
  material and edge detail as existing.  Labor & Material Included.
- Kitchen Backsplash with mini brick travertine as per existing,  $1,125.00
  Labor & Material Included.
- New Laundry Granite top with same material and edge detail       $2,000.00
  as existing.  Labor & Material Included.
- Honey Onyx top for Entry Foyer.  Labor & Material Included.     $1,000.00
- Honey Onyx vanity top for Master Bath.  Fabrication &           $3,750.00
  Installation for (2) sets.
- Vanity top fabrication & Installation for Guest Bath #1, Labor & Material.   $812.50
- Vanity top fabrication & Installation for Guest Bath #2, Labor & Material    $812.50
- Window Sill replacement on first and second floor.  Labor &     $1,500.00
  Material Included.
- Cleaning & Polishing all marble floor areas including terraces.  $3,125.00
b) Tile & Stone:
- Master Bathroom; New Installation on shower walls as existing    $2,950.00
  with Crema Marfil 36" x 36" and Honey Onyx mosaic installation
  on shower head areas including bullnose edge detail (Labor Only)
- For new Jacuzzi fabrication and installation including Honey     $2,350.00
  Onyx mosaic installation on Jacuzzi backsplash.
- Material for Master Bath:
  - Crema Marfil including waste;                                 $2,700.00
  - Honey Onyx Mosaic, Mini brick style for shower walls and      $1,444.00
    and Jacuzzi backsplash.
  - Honey Onyx bullnose edge for shower walls and Jacuzzi backsplash.   $1,425.00
  - Honey Onyx slab material for new Jacuzzi top and front area.  $3,675.00
- Guest Bath #1 on 2nd Floor - Labor:
  - New slate Installation on shower walls, diagonal installation as existing.   $800.00
- Guest Bath #1 on 2nd Floor - Material:
  - 12" x 12" slate multicolor material as existing.             $593.75
- Guest Bath #2 on 2nd Floor - Labor:
  - For new travertine installation on shower walls including    $1,000.00
    tumbled stone border around shower walls.
- Guest Bath #2 on 2nd Floor - Material:
  - Yellow Travertine 18" x 18"                                   $516.00
  - Tumbled Stone border.                                         $144.00
  - Travertine full bullnose edge.                                $120.00
- Guest Bath #1 First Floor - Labor:
  - Yellow Travertine mini bricks/split face installation on     $1,400.00
    shower walls as existing.
- Guest Bath #1 First Floor - Material:                           $2,160.00
  - New Yellow Travertine mini bricks/split face stone material:
- Guest Bath #2 on First Floor - Labor
  - New stone installation on shower walls, diagonal installation as existing.   $720.00
- Guest Bath #2 on First Floor - Material
  - Crema Valencia 18" x 18" including waste:                     $784.00



F:\...H:Dual\Seifart\Seifart Residence.xls

SEIFART  000690

Exhibit "A"                                    4/16/2010  12:20 PM  4



| | | | | |
|---|---|---|---|---|
| 17 | Appliances | | | $22,200.00 |
| | a) Appliances: (ALLOWANCE) | | $21,400.00 | |
| | b) Installation: | | $800.00 | |

18  Shower Enclosures:                                    $3,612.05
- Remove and relocate customer's glass shower doors and fix panels with new hardware.
- Powder Room (1) 33" x 76" Three clips (Shower).
- Bath #1: (1) 32-1/2" x 68" Two clips, one towel bar (Tub)
- Master Bath: (2) 33" x 78-1/2" Doors (2 hinges) One 6" pull, (1) 42-1/2" x 51" fixed glass Four clips.
- Upstairs Bath #2: (1) 32-1/2" x 68" Fixed Two Clips, one towel bar (Tub)
- Upstairs Bath #3: (1) 29" x 77" Fixed Three Clips, one towel Bar (Shower)
- Note: G.C. nor its Subcontractors are liable in case of any damage during the removal and reinstallation.

19  Exterior Keyed Locks:                                    $2,100.00
- Replace all existing Medeco deat bolts (key on outside and turn bolt on inside)
- All locks keyed the same - Quantity - 9.

20  Inspection at the end of the demolition and cleaning process by a special consultant:    $2,500.00  Allowance

21  Pool:                                    $1,300.00
- Replace pool pump and start up.
- Clean, pressure wash and acid wash pool.
- Note: For new Diamond Brite ADD: $ 2,818.00

22  Landscaping & Irrigation:                                    $1,200.00  Allowance
- Repair items damaged during construction and due to neglect while the home was unoccupied.

|  | | |
|---|---|---|
| **SUBTOTAL "B":** | **$339,682.88** |
| **SUBTOTAL "A + B":** | **$427,807.88** |

23  Overhead & Profit @ 15%:                                    $64,171.18

GRAND TOTAL :    $491,979.06

Owner's Approval: _____

Date: 3/30/2010

Contractor's Signature: _____

Date: _____

SEIFART  000691

Exhibit "G"

**Lahoud & Hardan - Construction Schedule**
**Seifart Residence - 4075 Bonita Avenue, Miami, Florida**

Project Duration: 30 weeks (210 Calendar Days) [Weeks]

- PERMIT
- PREPARATION/DEMO/REMOVE & PACK
- Cabinets/Vanities/Laundry/Closets & Door...
- DEMOLITION
- VENTILATION
- FRAMING
- HVAC/DUCT
- PLUMBING/PIPING
- ELECTRICAL WIRING
- ALARM/TEL/SPEAKERS/VACUUM
- MEP/INSPECTIONS
- INSULATION/INSPECTION
- DRYWALL/HANG/FINISH
- PAINT/PRIMER/DRYWALL PUNCHLIST/ONE COAT OF PAINT
- INTERIOR DOORS/BASEBOARDS/CROWN
- CABINETS/VANITIES
- COUNTER TOPS/BACKSPLASH
- ELECTRIC TRIM
- LOW VOLTAGE TRIM
- HVAC TRIM & EQUIPMENT
- PLUMBING TRIM
- APPLIANCES
- CLOSETS
- PAINT/FINAL COAT
- CLEANING/INSPECTIONS/PUNCHLIST

Legend: = Scheduled   = Desired   = Completed   = Rescheduled   = Owner Selection

SEIFART 000692

Exhibit "C"

# APPLICATION AND CERTIFICATE FOR PAYMENT

| | | | Distribution to: |
|---|---|---|---|
| TO OWNER: | PROJECT: | APPLICATION NO: 1 | OWNER |
| Mr. Armin G. Seifert | Seifert Residence | APPLICATION DATE: 3/30/2010 | ARCHITECT |
| | | PERIOD TO: 3/30/2010 | CONTRACTOR |
| 4075 Bonita Ave | 4075 Bonita Ave | ARCHITECTS PROJECT NO: Seifert | |
| Miami, Florida 33133 | Miami, Florida 33133 | | |
| FROM CONTRACTOR: | | | |
| L'Anvol 3 J Venture Enterprises, Inc. | | | |
| 426 S. Dixie Hwy, Suite 3M | VIA ARCHITECT: | | |
| Coral Gables, Florida 33146 | | | |
| CONTRACT FOR: | | | |

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet is attached.

| | | | |
|---|---|---|---|
| 1. ORIGINAL CONTRACT SUM | $ | 431,975.06 |
| 2. Net change by Change Orders | $ | |
| 3. CONTRACT SUM TO DATE (Line 1 +2) | $ | 431,975.06 |
| 4. TOTAL COMPLETE & STORED TO DATE | $ | 25,787.66 |
| 5. RETAINAGE: | | |
| a. _____ % of Completed Work $ | | |
| (Column D & E on Continuation) | | |
| b. _____ % of Stored Material $ | | |
| (Column F on Continuation) | | |
| Total Retainage | $ | |
| 6. TOTAL EARNED LESS RETAINAGE | $ | 25,787.66 |
| (Line 4 less Line 5 Total) | | |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT | $ | |
| (Line 6 from prior Certificate) | | |
| 8. CURRENT PAYMENT DUE | $ | 25,787.66 |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE | $ | 466,191.40 |
| (Line 3 less Line 6) | | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | $0.00 | $0 |
| Total approved this month | $0.00 | $0 |
| TOTALS | $0.00 | $0 |
| NET CHANGES by Change Order | $0.00 | $0 |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____  Date: _____

State of: _____  Florida
County of: _____  Miami-Dade

Subscribed and sworn to before me this _____ day of _____

Notary Public: _____

My Commission expires: _____

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED ... $ _____
(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this application and on the Continuation Sheet that are changed to conform to the amount certified.)

ARCHITECT:

By: _____  Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

SEIFART 000693

## CONTINUATION SHEET

APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
in tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

Exhibit C

SEIFART 000694

| APPLICATION NO: | 1 |
| --- | --- |
| APPLICATION DATE: | 3/30/2010 |
| PERIOD TO: | 3/30/2010 |
| | Seifart |
| ARCHITECT'S PROJECT NO: | |

| A | B | C | D WORK COMPLETED | E | F | G | | H | I |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED & STORED TO DATE (D + E + F) | % (G/C) | BALANCE TO FINISH (C - G) | RETAINAGE (IF VARIABLE RATE) |
| 1 | Permit Fees | $ 4,000.00 | $ - | $ - | | $ - | 0% | $ 4,000.00 | $ - |
| 2 | Notice of Commencement | $ 45.00 | $ - | $ - | | $ - | 0% | $ 45.00 | $ - |
| 3 | Temporary Utilities | $ 1,950.00 | $ - | $ 390.00 | | $ 390.00 | 20% | $ 1,560.00 | $ - |
| 4 | Trash Hauling | $ 10,400.00 | $ - | $ - | | $ - | 0% | $ 10,400.00 | $ - |
| 5 | Survey | $ 850.00 | $ - | $ - | | $ - | 0% | $ 850.00 | $ - |
| 6 | Protection/Covering (Material) | $ 7,380.00 | $ - | $ 1,476.00 | | $ 1,476.00 | 20% | $ 5,904.00 | $ - |
| 7 | Builder's Risk Insurance | $ 3,500.00 | $ - | $ - | | $ - | 0% | $ 3,500.00 | $ - |
| 8 | Construction Cleaning | $ 1,800.00 | $ - | $ - | | $ - | 0% | $ 1,800.00 | $ - |
| 9 | Temporary A/C for Wood Floor | $ 1,100.00 | $ - | $ 220.00 | | $ 220.00 | 20% | $ 880.00 | $ - |
| 10 | General Labor | $ 12,500.00 | $ - | $ - | | $ - | 0% | $ 12,500.00 | $ - |
| 11 | Warehouse for Vanities and Doors | $ 1,150.00 | $ - | $ 575.00 | | $ 575.00 | 50% | $ 575.00 | $ - |
| 12 | Equipment Rental | $ 1,450.00 | $ - | $ - | | $ - | 0% | $ 1,450.00 | $ - |
| 13 | Supervision | $ 42,000.00 | $ - | $ - | | $ - | 0% | $ 42,000.00 | $ - |
| 14 | Covering of floors, tile walls, driveway, removal of interior doors & delivery to warehouse. Remove of handrail. | $ 1,920.00 | $ - | $ 960.00 | | $ 960.00 | 50% | $ 960.00 | $ - |
| 15 | Dismantle Vanities, wood shutters, wrap & transport to Whse | $ 1,890.00 | $ - | $ 445.00 | | $ 445.00 | 24% | $ 1,445.00 | $ - |
| 16 | Demolition & Hauling | $ 35,300.00 | $ - | $ 7,650.00 | | $ 7,650.00 | 22% | $ 27,650.00 | $ - |
| 17 | Electric | $ 28,450.00 | $ - | $ 3,660.00 | | $ 3,660.00 | 13% | $ 24,740.00 | $ - |
| 18 | Electric Fixtures | $ 4,891.58 | $ - | $ - | | $ - | 0% | $ 4,891.58 | $ - |
| 19 | Low Voltage | $ 8,490.00 | $ - | $ - | | $ - | 0% | $ 8,490.00 | $ - |
| 20 | HVAC | $ 25,597.00 | $ - | $ 3,288.05 | | $ 3,288.05 | 13% | $ 22,318.95 | $ - |
| 21 | Plumbing | $ 27,200.00 | $ - | $ 3,780.00 | | $ 3,780.00 | 14% | $ 23,420.00 | $ - |
| 22 | Plumbing Fixtures | $ 16,464.00 | $ - | $ - | | $ - | 0% | $ 16,464.00 | $ - |
| 23 | Framing & Drywall | $ 37,950.00 | $ - | $ - | | $ - | 0% | $ 37,950.00 | $ - |
| 24 | Insulation | $ 5,555.00 | $ - | $ - | | $ - | 0% | $ 5,555.00 | $ - |
| 25 | Cabinets | $ 31,300.00 | $ - | $ - | | $ - | 0% | $ 31,300.00 | $ - |

# CONTINUATION SHEET

APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

Exhibit C

APPLICATION NO.: 1
APPLICATION DATE: 3/30/2010
PERIOD TO: 3/30/2010
ARCHITECT'S PROJECT NO.: Seifart

| A ITEM NO. | B DESCRIPTION OF WORK | C SCHEDULED VALUE | D WORK COMPLETED FROM PREVIOUS APPLICATION (D+E) | E THIS PERIOD | F MATERIALS PRESENTLY STORED (NOT IN D OR E) | G TOTAL COMPLETED & STORED TO DATE (D+E+F) | % (G/C) | BALANCE TO FINISH (C-G) | I RETAINAGE (IF VARIABLE RATE) |
|---|---|---|---|---|---|---|---|---|---|
| 26 | Interior Millwork | $ 15,729.00 | $ - | $ - | $ | $ - | 0% | $ 15,729.00 | $ - |
| 27 | Painting | $ 19,300.00 | $ - | $ - | $ | $ - | 0% | $ 19,300.00 | $ - |
| 28 | Closets | $ 2,950.00 | $ - | $ - | $ | $ - | 0% | $ 2,950.00 | $ - |
| 29 | Tile/Stone/Tops | $ 41,844.25 | $ - | $ - | $ | $ - | 0% | $ 41,844.25 | $ - |
| 30 | Appliances | $ 22,200.00 | $ - | $ - | $ | $ - | 0% | $ 22,200.00 | $ - |
| 31 | Shower Enclosures | $ 3,612.05 | $ - | $ - | $ | $ - | 0% | $ 3,612.05 | $ - |
| 32 | Exterior Keyed Locks | $ 2,100.00 | $ - | $ - | $ | $ - | 0% | $ 2,100.00 | $ - |
| 33 | Inspection by Special Consultant at end of | $ 2,900.00 | $ - | $ - | $ | $ - | 0% | $ 2,500.00 | $ - |
| 34 | Demo/Cleaning Process | $ 1,300.00 | $ - | $ - | $ | $ - | 0% | $ 1,300.00 | $ - |
| 35 | Pool | $ 1,200.00 | $ - | $ - | $ | $ - | 0% | $ - | $ - |
| 35 | Landscaping & Irrigation | | $ - | $ - | $ | $ - | | | $ - |
| 36 | Overhead & Profit @ 15%: | $ 64,171.18 | $ - | $ 3,363.51 | $ | $ 3,363.51 | 5% | $ 60,807.57 | $ - |
| 37 | | | $ - | $ - | $ | $ - | | | $ - |
| 38 | | | $ - | $ - | $ | $ - | | | $ - |
| 39 | | | $ - | $ - | $ | $ - | | | $ - |
| 40 | | | $ - | $ - | $ | $ - | | | $ - |
| | Grand Totals: | $ 491,979.05 | $ - | $ 25,787.66 | $ | $ 25,787.66 | 5% | $ 464,991.40 | $ - |

SEIFART 000695

Exhibit "B"

Cases Grouped by Year

| File | Date | Property | Property Location | Case | Attorney | Atty Firm |
|---|---|---|---|---|---|---|
| 0550 | Feb 16 2010 | Residential Condominium | Villa Regina, 1581 Brickell Avenue | Firshein v. Villa Regina | Scott Shelton | Shertold & Torres |
| 0117 | Feb 01 2010 | Vacant Wicker | Vizcaya Boulevard | Widov v. Wicker | A.J. Barranco | Barranco & Kircher, PA |
| 0316 | Jan 21 2010 | Apartment Bldg | 2900 Park Avenue, Miami Beach, FL | Windsom United J/Js Abscharca v G-2 Development | Anthony Curto | Foley & Lardner LLP |
| 0762 | Jan 20 2010 | Residential Condominium | Villa Regina, 1581 Brickell Avenue | Jerome Feldman v Villa Regina Assoc | John Leon | Leon Smith |
| 0310 | Dec 02 2009 | Suspense Beach Resort | St Thomas | Beachside Associates Vs Oceano & Mueller | Neil Goldman | Young Goldman & Van Beek |
| 0217 | Sep 30 2009 | Oceano Beach Resort | St Thomas, USVI | Beachside Assoc VS Oceano | Neil Goldman | Young Goldman & Van Beek |
| 0121 | May 21 2009 | Villa Allon Pool | 1560 Allon Road, Miami Beach, FL | Hou v Allon Pool | Mark Vaxman | Stearns Weaver |
| 0121 | Apr 30 2009 | Fountainbleau Golf Course | NW 87th Avenue & NW 8th St, Miami, FL | Miami Dade Country v Carolyn Sakolsky | Mitchell Widom | Bilzin Sumberg |
| 0296 | Mar 19 2009 | Miami Arena | 721 NW 1st Avenue, Miami, FL | Miami Dade Country v Arena Ventures | Larry Zink | Zink, Zink & Zink |
| 0696 | Feb 11 2009 | 4600 West 16th Ave | 4600 W 16th Ave, Hialeah, FL | Ocean Towy v 4600 LLC | Phil Allon | Gerbart Shepherd Allon & Tracy, PA |
| 0696 | Feb 10 2009 | Miami Arena | 721 NW 1st Avenue, Miami, FL | Miami Dade Country v Arena Ventures | Larry Zink | Zink, Zink & Zink |
| 0862 | Jan 06 2009 | Single Family Residence | 255 Romano Avenue, Coral Gables, FL | Hipsky v American Sanctuary | Ms. Lissa Vanatta | Wicks & Wyman, LLP |
| 0965 | | | | | | |
| 3810 | Aug 10 2008 | Land | Everglades Key & McClaine | Bayer v Miccolis v City of Marathon | Adam Schuster | Cory of Marathon |
| 0205/0601 | May 28 2008 | Glen Eagles House Acre | East Everglades, Miami, FL | USA v 2.20 Acres of Land | Ms. Veronica Junro | USDOJ |
| 3800 | Feb 25 2008 | Hammoon Building | 158 NW 41 St, Miami, FL | Orthus Partner v Layout Home | Harmony G Molina | Barranco Kircher |
| 0740 | Jul 14 2008 | Apartment Building | 721 NW 2nd Street, Miami, FL | Miami Arena Ventures Cotton | Betty Wayne | Amazon & Lehr |
| 5776 | Sep 30 2007 | Hotel | 2355 East Las Olas Blvd, Ft Lauderdale | S.E. Investments v Previous Flex Market | Fruna Zermal | Amazon & Lehr |
| 0570 | Aug 02 2007 | House Acre | Miami Collins Avenue | Miami, Lewis & Cotton | Margie | Stearns Weaver |
| 5760/6022 | Jul 11 2007 | Residential Condominium | Villa Regina, Miami, FL | Jerome Feldman v Villa Regina Assoc | John Leon | Leon Smith |
| 5428 | | | 1177 Kane Concourse, Bay Harbor, FL | Carolyn Miller v Robert Seamans | Curtis Cottson | Dichiari & Levittos |
| 5428 | Jul 17 2008 | Office Building | 1177 Kane Concourse, Bay Harbor, FL | Carolyn Miller v Robert Seamans | Curtis Cottson | Dichiari & Levittos |
| 5203 | Dec 12 2006 | East Everglades Parcels - Group 34 | East Everglades | USA v Acres of Land | Mr. Norman Hemming | USDOJ |
| 5204 | Nov 27 2006 | East Everglades Parcels - Group 35 | East Everglades | USA v Acres of Land | Mr. Norman Hemming | USDOJ |
| 5091 | Oct 26 2006 | East Everglades Parcels - Group 33 | East Everglades | USA v 2.5 Acres | Mr. Norman Hemming | USDOJ |
| 5091 | Sep 14 2006 | East Everglades Parcels - Group 31 | East Everglades | USA v Acres | Mr. Norman Hemming | USDOJ |
| 5016 | Aug 01 2006 | East Everglades Parcels | East Everglades | USA | Mr. Douglas M. Wright | USDOJ |
| 5060 | Jul 24 2006 | East Everglades Parcels | East Everglades | USA v Acres of Land | Mr. Kris Hemming | USDOJ |
| 5405 | Jun 30 2006 | Vacant Land | Ft Lauderdale | Goodrich v Permalard | Mr. Wayne M. Alder | Seldon Adler & Matthowman |
| 5076 | Jun 29 2006 | East Everglades Parcels - Group 30 | East Everglades | USA v Acres of Land | Mr. Norman Hemming | USDOJ |
| 1432 | May 02 2006 | Single Family Residence | 221 Catalonia Corporation, Coral Gables, FL | Catalonia Corporation v | Mr. Andrew Gold | USDOJ |
| 4504 | Apr 01 2003 | Year Ground Lease | Rita Denton, San Juan, PR | | Jose Tobias | Tobias Freidman Scott Miller |
| 4503 | Aug 09 2001 | Hotel Property | Sunset, Key Island, Key West, FL | Monroe County | | |
| 4439 | Jul 01 2000 | Single Family Residence | 721 Cass Road | | | |

## Cases Grouped by Year

| Atty City State | Opposing Counsel | Opp atty firm | Opp atty venue | Testimony | Jurisdiction | Issues |
|---|---|---|---|---|---|---|
| Miami, FL | Matthew Bray | Bray & Assoc. | FL Lauderdale, FL | Court | Miami-Dade | Restricted value |
| Miami, FL | | | | Court | Construction | Demolition in value |
| Orlando, FL | Michell Weiss | | Miami, FL | Court | Miami-Dade County | Appraisal fees – Divorce |
| | | | | Deposition | | Lender liability |
| Bradenton, FL | Andrew Bray | | FL Lauderdale, FL | Deposition | Miami-Dade | Water intrapolation in value |
| Alexandria, VA | John Benham | Law Office of John Benham | St. Thomas, USVI | Deposition | US Virgin Islands | |
| Alexandria, VA | John Benham | Law Office of John Benham | St. Thomas, USVI | Court | US Virgin Islands | Demolition in value |
| Miami, FL | Jose Amdy | | Miami, FL | Court | Bankruptcy Court | Dissipation/foreclosure |
| Miami, FL | Thomas Logue | Miami-Dade County | Miami, FL | Deposition | Miami-Dade | Real estate tax appeal |
| Canton, OH | Thomas Logue | Miami-Dade County | Miami, FL | Court | Miami-Dade | Real estate tax appeal |
| Canton, OH | Omar Ortega | | Miami, FL | Court | Miami-Dade | Foreclosure |
| Canton, OH | Thomas Logue | Miami-Dade County | Miami, FL | Deposition | Miami-Dade | Foreclosure & request to appoint receiver |
| Irvine, CA | Michael Cabranes | Consultants & Martano, PA | Miami Lakes, FL | Arbitration | California | Real estate tax appeal |
| | | | | | | Litigation regarding an improper appraisal |
| Miami, FL | Andy Tobin | Property Owners | Key West, FL | Deposition | Monroe | Appraisal rights of easement |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| FL Lauderdale | Lewell & Lemos | Lewell & Lemos | Miami, FL | Deposition | Miami-Dade | Contract dispute |
| Miami, FL | Steven Mahan | | Miami, FL | Court | Miami-Dade | Divorce, historical value |
| | | | | Deposition | Federal | Lease dispute |
| FL Lauderdale, FL | Stephen Benham | | FL Lauderdale, FL | Court | Broward | Attorney malpractice |
| Miami, FL | Richard M. Dunn | | FL Lauderdale, FL | Deposition | Miami-Dade | Nuisances in value |
| Bradenton, FL | Andrew Bray | | FL Lauderdale, FL | Deposition | Miami-Dade | Water intrapolation in value |
| Miami, FL | Goren O'Connor | | | Court | Miami-Dade | |
| Miami, FL | Property Owners | | Miami, FL | Court | Miami-Dade | Divorce |
| Miami, FL | Gontell Kirkland | | | Court | Federal | Attorney malpractice |
| Miami, FL | Shaylis Lynn Yana | Shaylis Lynn Yana | | Deposition | Federal | |
| Miami, FL | Sherry Moises Dunst | Sherry Moises Dunst | | Court | Miami-Dade | |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |
| Miami, FL | Property Owners | Brigham Moore Byrne | | Deposition | Federal | Eminent domain |
| Miami, DC | | | Miami, FL | Court | Federal | Appraisal review |
| Miami, FL | | | | Deposition | Federal | Eminent domain |
| Miami, FL | Property Owners | | | Court | Miami-Dade | Review of improper appraisal |
| Miami, FL | | | | Court | Federal | Eminent domain |
| Miami, FL | | | | Arbitration | Miami-Dade | Continuation delay |
| Miami, FL | John Dyer | | Sarasota, FL | Court | Monroe | Real estate tax appeal |
| Miami, FL | Property Owners | | | Court | Federal | Eminent domain |

Exported from TrackVia Tue Apr 20, 2010 4:15 PM EDT